# Antitrust lawsuit, if successful, could unravel the UFC



Photo: John Medina/WireImage



BY **MICHAEL MCCANN**                         Posted: **Tue Dec. 16, 2014**

It was only two weeks ago when the Ultimate Fighting Championship trumpeted the signing of CM Punk, the wrestling star who exited World Wrestling Entertainment frustrated by working conditions. The tables have now turned on the UFC. Tuesday afternoon, a group of prominent current and former UFC fighters filed an antitrust lawsuit in the U.S. District Court for the Northern District of California against UFC's parent company, Zuffa, leveling harsh criticisms of UFC working conditions. The group includes UFC star Cung Le as well as former stars Jon Fitch and Nate Quarry. They seek certification to represent other fighters in what might become a massive class action.

Cung and his co-plaintiffs insist the UFC is an illegal monopoly under federal antitrust law. The UFC, in their view, unlawfully stifles competition from other MMA leagues. By denying UFC fighters opportunities to bargain with rival MMA leagues, the UFC can pay its fighters low wages and impose strict employment restrictions. According to this theory, the UFC leaves its fighters with no

bargaining leverage and then takes full and brutal advantage of this absence of competition.

The fighters' claims are reminiscent of those raised by Curt Flood in his historic lawsuit against Major League Baseball for free agency and by Ed O'Bannon in his recent case against the NCAA for name, image and likeness rights. If successful, Cung and co-plaintiffs demand monetary damages, which would be automatically tripled (trebled) under antitrust law, plus a court injunction that would force changes to the UFC. *Le v. Zuffa* threatens to unravel the UFC, which has stunningly grown in value from $2 million in 2002 to as much as $3.5 billion today.

**The fighters' core grievances**

The fighters contend they've been forced to sign oppressive contracts that make them indentured servants to UFC. As the fighters see it, they've been unlawfully denied free agency and name, image and likeness rights. This denial has led to seemingly low salaries compared to massive UFC revenues. According to Cung's complaint, while tthe starting fight purse for a UFC fighter is just $6,000, the UFC generated $483 million in revenue from October 2012 to September 2013 and "has profit margins higher than all or nearly all other major professional sports." While there is considerable debate about average and median earnings for UFC fighters, estimates generally indicate the average UFC fighter takes home less than $100,000 year. While salary figures for UFC fighters are nearly impossible to get, it's general accepted that a huge percentage of the company's payouts go to a few fighters, with the rest getting crumbs, relatively speaking.

• **Three MMA fighters file antirust suit against the UFC**

Cung contends onerous contractual provisions cause these low salaries. For instance, UFC fighters contractually assent to a "champion's clause," which triggers an extension of a fighter's contract if he becomes a champion. This means that a fighter can't negotiate a new contract at the optimal time: when he's at the top. The champion's clause bears a resemblance to the "reserve clause" used by baseball teams until the 1970s to automatically renew expired contracts and prevent free agency. Other contractual clauses similarly provide the UFC with restraints on fighters' earning power. Consider the "exclusivity clause," which allows the UFC to match offers received by fighters from other mixed martial arts leagues even after the fighter's UFC contract has expired. This seemingly impairs rival MMA leagues, such as Bellator MMA and World Series of Fighting, in recruiting UFC talent and prevents UFC fighters from leveraging leagues against one another in negotiations.

Also, arguably like NCAA athletes, UFC fighters are obligated to convey their name, image and likeness rights to the UFC in perpetuity. This is through the "ancillary rights clause," which grants the UFC exclusive name, image and likeness rights for merchandise, video games and broadcasts. UFC fighters contend the ancillary rights clause has greatly diminished their sponsorship opportunities and deprived them of lucrative contracts signed by the UFC.

### The fighters' antitrust argument

Pointing out arguably unfair contractual provisions and seemingly low wages is not enough to prove the UFC has broken the law. Employees in the United States do not enjoy an inherent right to "fair" wages. Recognizing this, Le and his co-plaintiffs charge the UFC has violated Section 2 of the Sherman Antitrust Act. In general, Section 2 bars illegal monopolies. A company being dominant in an industry does not automatically prove the company is an illegal monopoly. The company must have engaged in anticompetitive practices over a particular industry and in a particular market.

According to Le, the UFC has used a combination of oppressive contracts and deceitful tactics to remove rivals and would-be rivals in the market for "live elite professional MMA fighter services." The absence of serious competition for UFC has allegedly given it "monopsony power."  A monopsony is similar to a monopoly, except that it involves a buyer rather than a seller. The basic idea of a monopsonyis that those selling a service, such as elite professional MMA fighting, are stuck selling those services to one main buyer, in this case the UFC. The buyer can set low prices and impose other restrictions on the sellers, who know that other buyers aren't significant enough to offer better prices.



Exploring Adrian Peterson's legal options following failed appeal
by Michael McCann

In addition to the "one sided" contract provisions discussed above, the UFC also allegedly obliterates competition. According to Le, the UFC has engineered "a serious of acquisitions designed to remove competing rivals and would-be rivals and thereby championship titles from the marketplace." Those acquisitions include acquiring the contracts of Elite Professional MMA Fighters. Moreover, according to Le, the UFC ensures it is the only MMA league in town by requiring "major physical venues for MMA bouts to supply their services to the UFC exclusively."

### Legal significance of no 'UFC union' and Zuffa completely owning the UFC

A key difference between UFC fighters and players in the NFL, NBA, NHL and baseball is that UFC fighters are not unionized. There is no "UFCPA" like there is an NFLPA or NHLPA. As a consequence, restrictions on UFC fighters' salary and other types of compensation are not collectively bargained and thus not contained in a collective bargaining agreement. The restrictions are instead negotiated individually between fighters and the UFC, and Le and his co-plaintiffs contend the UFC won't budge on certain provisions.

If not for the fact that the UFC is owned entirely by Zuffa, the UFC would face a legal vulnerability not shared by the other major leagues. Under what's known as the "non-statutory labor exemption," employment restrictions created through collective bargaining are exempt from the area of antitrust law most threatening to leagues: Section 1 of the Sherman Act. Section 1 prohibits competitions -- such as rival, separately-owned teams in a league -- from conspiring to impose unreasonable restrictions on players' earning power. The basic logic of the labor exemption is that it encourages owners to negotiate rules with labor rather than to unilaterally impose those rules. The exemption enables pro leagues like the NFL and NBA to enforce salary caps, maximum player salaries, eligibility rules, personal conduct policies, drug testing procedures and other restrictions on employment that might otherwise run afoul of antitrust law. Even if they those restrictions would be found lawful under antitrust law, leagues like the NFL and NBA don't want to spend millions of dollars taking their chances in court.

• **Will Cung Le fight or act?**

The UFC, however, is structured as a "single entity" sports league. Single entities are wholly owned companies. A single entity may have subsidiaries, but it wholly owns those subsidiaries. For example, Frito-Lay is a wholly owned subsidiary of Pepsi Co., which at any time can take the shoes of Frito-Lay. This relationship is unlike leagues such as the NFL or NBA where competing teams are individually owned. Crucially, a single entity is not subject to Section 1 since Section 1 only regulates competitors. The UFC thus does not need to collectively bargain employment rules with fighters to avoid Section 1 scrutiny. This dynamic likely discouraged Le from raising a Section 1 claim and highlights the impressive foresight and wisdom of the UFC in organizing as a single entity.

**Likely UFC defenses**

The UFC will offer a number of defenses to debunk Le's legal theory.

First, the UFC will stress that fighters voluntarily sign contracts to fight in the UFC. No fighter is "forced" to pursue a career in the UFC nor accept employment terms offered by the UFC. There are other MMA leagues and other professions that fighters could instead pursue. Along those lines, the UFC will emphasize that UFC contracts reflect a bargained-for exchange that benefits both sides. While the UFC seems to receive a great deal from fighters' labor, fighters are compensated, in some cases quite well, and they also receive media exposure and endorsement opportunities they might not otherwise obtain.

Second, the UFC will portray its rules and business practices as reflecting superior business acumen, keen foresight and honed skills—the very virtues promoted by capitalism. It is not illegal to thrive in the business world. To the extent the UFC enjoys monopsony power, the UFC will claim it reflects natural progression of making good decisions and taking risks. The more the UFC can frame its success as reflecting merit, the harder it will be for Le to prevail on an antitrust claim.

Third, expect the UFC to reference how the Federal Trade Commission investigated it for antitrust violations from 2011 to 2012 but declined to pursue the matter. The FTC studied the UFC's acquisition of Strikeforce, World Fighting Alliance and other MMA leagues, but found no unlawful conduct.

Lastly, watch for the UFC to contend that a judge forcing changes to its business model would harm the very industry at the heart of Le's lawsuit: elite professional MMA fighting. The UFC will likely submit data and expert testimony that links the extraordinary growth in popularity of MMA in the U.S. to the success of the UFC. Under this theory, preventing the UFC from effectively competing would endanger that popularity, and potentially lead to lower salaries for UFC fighters.

### Going forward and risk to the UFC of pretrial discovery

Antitrust litigation often takes years to play out, so do not expect a swift resolution.Le also does not necessarily need to win a trial in order to be considered a "winner." If Le's complaint can advance past Zuffa's motion to dismiss, a judge would likely order pretrial discovery. This could force Zuffa to reveal sensitive information about fighters' salaries and UFC contracts and potentially help fighters negotiate better pay.

The risk of pretrial discovery might also motivate the UFC to offer Le an attractive settlement that, if accepted, would increase fighters' pay.

**Michael McCann** *is a Massachusetts attorney and the founding director of the Sports and Entertainment Law Institute at the University of New Hampshire School of Law. He is also the distinguished visiting Hall of Fame Professor of Law at Mississippi College School of Law.*

*Jeff Wagenheim and Jon Wertheim contributed to this article*