WILLIAM A. ISAACSON (Admitted *Pro Hac Vice*)
(wisaacson@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW, Washington, DC 20015
Telephone: (202) 237-2727; Fax: (202) 237-6131

JOHN F. COVE, JR. #212213
(jcove@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000; Fax: (510) 874-1460

RICHARD J. POCKER #114441
(rpocker@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382 7300; Fax: (702) 382 2755

DONALD J. CAMPBELL (Admitted *Pro Hac Vice*)
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS (Admitted *Pro Hac Vice*)
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, Nevada 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br>     v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>          Defendant. | Case No.  5:14-cv-05484 EJD<br><br>**DEFENDANT ZUFFA, LLC'S CONSOLIDATED NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINTS PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Date:     July 23, 2015<br>Time:    9:00 a.m.<br>Place:    Courtroom 4<br>Judge:   Hon. Edward J. Davila |

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

| | |
|---|---|
| 1 | Luis Javier Vazquez and Dennis Lloyd Hallman, on behalf of themselves and all others similarly situated, | Case No.  5:14-cv-05591 EJD |
| 2 | | |
| 3 | Plaintiffs, | |
| 4 | | |
| | v. | |
| 5 | | |
| 6 | Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| 7 | | |
| | Defendant. | |
| 8 | | |

| | |
|---|---|
| 9 | Brandon Vera and Pablo Garza, on behalf of themselves and all others similarly situated, | Case No.  5:14-cv-05621 EJD |
| 10 | | |
| | Plaintiffs, | |
| 11 | | |
| 12 | v. | |
| 13 | Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| 14 | | |
| | Defendant. | |
| 15 | | |

| | |
|---|---|
| 16 | Gabe Ruediger and Mac Danzig, on behalf of themselves and all others similarly situated, | Case No.  5:15-cv-00521 EJD |
| 17 | | |
| | Plaintiffs, | |
| 18 | v. | |
| 19 | Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| 20 | | |
| 21 | Defendant. | |

22

23

24

25

26

27

28

TO THE COURT, ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on July 23, 2015 at 9:00 a.m., or as soon thereafter as this matter may be heard, Defendant Zuffa, LLC will and hereby does move this Court for an order dismissing the Complaints of Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez, Dennis Hallman, Brandon Vera, Pablo Garza, Gabe Ruediger, and Mac Danzig on the ground that the Complaints fail to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The hearing will be conducted before the Hon. Edward J. Davila, United States District Court Judge for the Northern District of California, in Courtroom 4 of the San Jose Courthouse, 280 South 1st Street, San Jose, CA 95113.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the attached appendix, Zuffa's Request for Judicial Notice,  the Declaration of Suzanne E. Jaffe, and any other evidence or materials that the Court may allow before or at the time the matter is set to be heard.

Zuffa's Not. Mot. & Mot to Dismiss        Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                              5:14-cv-05621 EJD; 5:15-cv-00521 EJD

1

2

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    SUMMARY OF ALLEGATIONS ...................................................................... 2

    A.    The Sport and Business of Mixed Martial Arts........................................ 2

    B.    The Alleged "Scheme" to Monopolize and Monopsonize. .................... 3

         1.    The Alleged Relevant Markets. ................................................... 3

         2.    Putative Classes. ........................................................................ 4

         3.    Alleged Anticompetitive Conduct. ............................................. 4

             a.    Alleged Exclusive Deals Between Zuffa and Fighters. ............... 4

             b.    Alleged Exclusive Deals Between Zuffa and Event Venues, Sponsors and Television Distribution Channels. ......................... 6

             c.    Alleged Expropriation of Identity Rights.................................... 6

             d.    Allegations Related to Zuffa's Acquisitions. .............................. 6

         4.    Professional MMA Competitors.................................................. 6

III.    LEGAL STANDARD.......................................................................................... 8

IV.   ARGUMENT ...................................................................................................... 9

    A.    Plaintiffs Have Not and Cannot Plead Specific Facts Plausibly Showing that the Exclusivity Provisions in Zuffa's Contracts Are Anticompetitive............ 9

         1.    Exclusive Dealing Arrangements Are Common, Procompetitive, and an Integral Feature of the Sports and Entertainment Businesses............ 10

         2.    Plaintiffs Failed to Allege Specific Facts Plausibly Showing That Zuffa's Exclusive Dealing Arrangements Foreclose Competition in Either Relevant Market............................................................... 11

             a.    No substantial foreclosure of athletes. ..................................... 12

                 i    No foreclosure in competition for exclusive contracts.................. 13

                 ii    No showing of the duration of exclusivity. ................................... 13

                 iii    No showing of the percentage of market foreclosure.................... 14

              b.    No substantial foreclosure of event venues................................. 15

              c.    No substantial foreclosure of sponsors. ...................................... 15

              d.    No substantial foreclosure of television distribution outlets................. 16

          3.    The UFC Has No Duty to Deal With Competitors........................ 16

    B.    Plaintiffs Fail to Allege Properly Defined Relevant Product Markets. ................ 17

    C.    Plaintiffs Have Not and Cannot Plead Specific Facts Plausibly Showing That the Ancillary Rights Provisions Are Anticompetitive or Reduce Competition in the Relevant Markets............................................. 19

         1.    Name and Likeness Licenses Are Common and Procompetitive.................. 20

          2.    Contractual Restrictions on the Use of the UFC Name and Marks Are the Legitimate Exercise of Zuffa's Intellectual Property Rights and Are Not Anticompetitive. ................................................... 21

ii

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

3.   Plaintiffs' Identity Rights Claims Do Not State an Antitrust
Violation. ...................................................................................... 22

D.   Plaintiffs Have Not Pled Specific Facts Plausibly Demonstrating That
Zuffa's Acquisitions Have Had Anticompetitive Effects....................................... 23

E.   Plaintiffs' Complaints About Strong Competition Do Not State an
Antitrust Violation.................................................................................. 25

V.   CONCLUSION..................................................................................... 25

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

iii

Zuffa's Not. Mot. & Mot to Dismiss          Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
5:14-cv-05621 EJD; 5:15-cv-00521 EJD

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
    No. C 08-01035 JSW, 2008 WL 4830740  (N.D. Cal. Nov. 6, 2008) ................................. 10, 24

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998)......................................................................................... 15, 16

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*,
    592 F.3d 991 (9th Cir. 2010)......................................................................................... 10, 11

*Am. Football League v. Nat'l Football League*,
    323 F.2d 124 (4th Cir. 1963)............................................................................................... 15

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002)............................................................................................... 17

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................................. 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................... 8, 12

*Barry Wright Corp. v. ITT Grinnell Corp.*,
    724 F.2d 227 (1st Cir. 1983).............................................................................................. 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................ 1, 8, 9, 12

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979).............................................................................................................. 16

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990) .......................................................................................................... 24

*Carefusion Corp. v. Medtronic, Inc.*,
    No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ................................ 23

*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*,
    No. C-09-2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010),
    *aff'd* 444 F. App'x 937 (9th Cir. 2011)............................................................................. 12

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013) ............................................................................. 19

*Donald B. Rice Tire Co. v. Michelin Tire Corp.*,
    483 F. Supp. 750 (D. Md. Jan. 30, 1980),
    *aff'd* 638 F.2d 15 (4th Cir. 1981)..................................................................................... 19

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

iv

*F.T.C. v. Lab. Corp. of Am.*,
  No. SACV 10-1873 AG MLGX, 2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ..................... 23

*Feitelson v. Google, Inc.*,
  Case No. 14-cv-02007-BLF (N.D. Cal. Feb. 23, 2015) .......................................................... 9

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
  658 F. 2d 139 (3d Cir. 1981) ................................................................ 14, 15, 20, 21

*Haelan Labs, Inc. v. Topps Chewing Gum, Inc.*,
  202 F.2d 866 (2d Cir. 1953) ......................................................................................... 20

*Hazel Bishop, Inc. v. Perfemme, Inc.*,
  314 F.2d 399 (2d Cir. 1963) ......................................................................................... 20

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014) ......................................................................................... 22

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988) ............................................................................ 18

*Ind. Entm't Grp. v. Nat'l Basketball Ass'n*,
  853 F. Supp. 333 (C.D. Cal. 1994) .............................................................................. 11

*Int'l Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*,
  518 F.2d 913 (9th Cir. 1975) ........................................................................................ 24

*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999) ...................................................................................... 9

*J&J Sports Prods., Inc., v. Medinarios*,
  No. C 08-0998 JF (RS),
  2008 WL 4412240 (N.D. Cal. Sept. 25, 2008) ............................................................... 5

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*,
  698 F.2d 1011 (9th Cir. 1983) ................................................................................... 9, 10

*John Doe 1 v. Abbott Labs.*,
  571 F.3d 930 (9th Cir. 2009) ........................................................................................ 19

*Kan. Penn Gaming v. Collins*,
  656 F.3d 1210 (10th Cir. 2011) ...................................................................................... 9

*Kendall v. Visa, U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ........................................................................................ 9

*Kingvision Pay-Per-View, Ltd. v. Guzman*,
  No. CV–07–0963–PHX–PGR, 2008 WL 1924988 (D. Ariz. Apr. 30, 2008) ........................... 5

B O I E S ,  S C H I L L E R  &  F L E X N E R   L L P
O A K L A N D ,  C A L I F O R N I A

v

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004)................................................................................. 13

*MiniFrame Ltd. v. Microsoft Corp.*,
    No. 11 CIV. 7419 RJS, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013)
    *aff'd*, 551 F. App'x 1 (2d Cir. 2013) ................................................................... 21

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984) ............................................................................................... 16

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ................................................................................. 9

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) .................................................................... 20

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997)....................................................................... 10, 12

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009) ............................................................................................... 8

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Cir. 1996)........................................................................... 11, 13

*PNY Techn's, Inc. v. SanDisk Corp.*,
    No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014)........... 11, 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................................ 17

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    No. 12-cv-05847, 2013 WL 5694452  (N.D. Cal. Oct. 18, 2013) ........................ 17

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    No. 12-CV-05847-JST, 2013 WL 3242245 (N.D. Cal. Jun. 25, 2013) ............ 11, 12

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ................................................................................. 9

*Rooney v. Columbia Pictures Indus., Inc.*,
    538 F. Supp. 211 (S.D.N.Y. 1982)...................................................................... 20

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ................................................................. 8

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005)............................................................................... 25

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

vi

Zuffa's Not. Mot. & Mot to Dismiss    Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
5:14-cv-05621 EJD; 5:15-cv-00521 EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

*Schachar v. Am. Academy of Ophthalmology, Inc.,*
  870 F.2d 397 (7th Cir. 1989)..................................................................... 25

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.,*
  88 F.3d 780 (9th Cir. 1996).......................................................................... 8

*Spiteri v. Russo,*
  No. 12-CV-2780 MKB RLM, 2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013)........................... 16

*Sprewell v. Golden State Warriors,*
  266 F.3d 979 (9th Cir. 2001).......................................................................... 8

*Tanaka v. Univ. of S. Cal.,*
  252 F.3d 1059 (9th Cir. 2001)......................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)..................................................................................... 5

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.,*
  709 F. Supp. 2d 802 (C.D. Cal. 2010) ............................................................... 25

*United States v. E. I. du Pont de Nemours & Co.,*
  351 U.S. 377 (1956).................................................................................... 17

*United States v. Oracle Corp.,*
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ......................................................... 17, 18

*United States v. Syufy Enters.,*
  903 F.2d 659 (9th Cir. 1990)................................................................. 23, 24, 25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)............................................................................. 8, 17, 21

*Washington v. Nat'l Football League,*
  880 F. Supp. 2d 1004 (D. Minn. 2012)......................................................... 22, 23

**STATUTES**

Federal Rule of Civil Procedure
  Rule 8(a)(2) .............................................................................................. 8
  Rule 12(b)(6)............................................................................................. 1

United States Code
  Title 15, Section 2 ...................................................................... 1, 8, 17, 23

vii

1

**OTHER AUTHORITIES**

2

4 Phillip E. Areeda et al.,
   Antitrust Law ¶ 901a (2009) ................................................................................... 23

3

4

Pamela R. Lester,
   Marketing the Athlete; Endorsement Contracts, SC47 ALI-ABA 405 (January 22, 1998) ...... 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

Zuffa's Not. Mot. & Mot to Dismiss          Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                            5:14-cv-05621 EJD; 5:15-cv-00521 EJD

## I.   INTRODUCTION

Defendant Zuffa, LLC ("Zuffa") moves to dismiss the Complaints in the above-entitled actions for failure to state a claim on which relief may be granted.  Fed. R. Civ. P. 12(b)(6).

Plaintiffs, professional mixed martial arts ("MMA") fighters, allege that Zuffa, d/b/a the Ultimate Fighting Championship® and the UFC®, uses exclusive dealing arrangements to foreclose rival MMA promoters from the inputs necessary to compete in the alleged markets for what Plaintiffs call "Elite Professional MMA Fighter services" and the "promotion of Elite Professional MMA bouts" in violation of Section 2 of the Sherman Act.  Plaintiffs allege that this scheme enabled the UFC to obtain monopoly power and depress fighters' compensation for bouts and for the rights to their names and likenesses.  The Complaints' vague and conclusory allegations fall far short of the Supreme Court's requirements in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) for pleading specific facts showing a plausible antitrust claim.

First, Plaintiffs fail to allege facts that plausibly show that Zuffa's alleged exclusive dealing arrangements are anticompetitive.  Exclusive deals are common and procompetitive, including in sports, because they encourage interbrand competition, encourage promoters to invest in marketing both the athlete and the sport, and prevent competitors from free-riding on those investments.  Plaintiffs' conclusory accusation that Zuffa's contracts "indefinitely" lock up "all or virtually all" of the Professional MMA fighters necessary to compete in the promotion of MMA bouts is unsupported by specific factual allegations and implausible on its face.  Plaintiffs' conclusory allegation that Zuffa has locked up all the venues, television outlets and sponsors necessary to compete is similarly implausible and without factual foundation.  Plaintiffs' Complaints do not show that Zuffa has foreclosed any competition in the alleged markets, much less foreclosed a substantial share of the alleged markets.  Absent plausible allegations that the UFC's exclusive deals have foreclosed competitors from obtaining the necessary inputs to compete, Plaintiffs cannot show that Zuffa's contracts are anticompetitive or justify the enormous expense of a large antitrust case.

Second, Plaintiffs have failed to allege plausible, properly defined relevant product markets.  Plaintiffs have *invented* the term "Elite Professional MMA Fighter" and then defined it

1

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1  only by their vague and subjective perceptions of fighters' degrees of quality.  But antitrust

2  plaintiffs are required to define relevant markets clearly and based on principles of reasonable

3  substitutability, not their own outcome-driven preferences.  Plaintiffs' incomprehensible and

4  artificially narrow markets for "Elite" fighters and bouts fail to meet that basic requirement.

5        Third, Plaintiffs' allegations that the UFC refused to co-promote events with rivals does

6  not state a cognizable antitrust claim nor do their allegations regarding contractual restrictions on

7  the use of the UFC name and brand.  Firms, even alleged monopolists, have no duty to deal with

8  competitors or to allow their intellectual property to be used by competitors.

9        Fourth, Plaintiffs have not plausibly alleged that the contractual provisions relating to their

10  name and likeness rights are anticompetitive.  Grants of exclusive name and likeness rights,

11  including rights in perpetuity, are common in the sports and entertainment industries and have

12  been consistently upheld by the courts.  Plaintiffs have failed to allege any facts showing the

13  granting of such rights has impacted competition in either of the alleged markets.  Although

14  Plaintiffs might have preferred to license fewer rights to the UFC or to receive more money for

15  their rights, those desires do not give rise to an antitrust claim.

16        Finally, Plaintiffs have not pled specific facts showing that the UFC's acquisition of other

17  MMA promoters has resulted in any anticompetitive effect.  The Complaints make clear that even

18  after these acquisitions, the UFC continues to face robust competition from multiple, well-funded

19  competitors able to stage bouts with prominent fighters and television distribution.

20  **II.     SUMMARY OF ALLEGATIONS**

21       **A.     The Sport and Business of Mixed Martial Arts.**

22        MMA, an interdisciplinary sport that combines attributes of boxing, wrestling, karate,

23  muay thai, Brazilian jiu jitsu, judo and other sports, first emerged as a sport in the early 1990s.[1]

24  Le Compl. ¶¶ 59, 105.[2]  The UFC was one of the earliest promotions, founded in 1993, and

25

26  [1] For purposes of this motion only, Zuffa assumes the truth of the Complaints' factual allegations.

27  [2] Because all four complaints are essentially identical and for ease of reading, this motion cites
   only the *Le* Complaint where identical allegations are contained in the other complaints.  A list of
   cross-references to identical allegations in the other complaints is attached as Appendix A.

28

Zuffa's Not. Mot. & Mot to Dismiss        Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                     5:14-cv-05621 EJD; 5:15-cv-00521 EJD

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

purchased by Zuffa in 2001. *Id.* ¶ 105. Zuffa "built the UFC into an international brand that, in many instances, has been synonymous with the rapidly growing sport of MMA." *Id.* ¶ 75. As the sport has grown, so have opportunities for athletes. Plaintiffs allege that in 2015, the UFC plans to hold 45 events — nearly one every week. *Id.* ¶ 155. With events typically containing 11 bouts, according to Plaintiffs' math, there will be a total of 495 bouts or 990 opportunities for fighters in the UFC in 2015. *Id.* Plaintiffs acknowledge that today, professional MMA in general is now "one of the most popular and fastest growing spectator sports in the U.S. and North America." *Id.* ¶ 95.

### B.   The Alleged "Scheme" to Monopolize and Monopsonize.

The gravamen of the Plaintiffs' claim is that Zuffa has engaged in a "scheme" to monopolize and monopsonize by alleged exclusive dealing arrangements with fighters, venues, sponsors, TV networks and other third parties that have allegedly reduced competition by denying rivals access to inputs that are "necessary" to promote live "Elite Professional MMA bouts." Le Compl. ¶¶ 9-10. Plaintiffs also claim that acquisitions of certain rival promoters reduced competition in the alleged markets. *Id.* ¶¶ 11-12, 129. Plaintiffs allege that the result of this "scheme" is that they received less compensation for participation in bouts and related grants of ancillary rights than they otherwise would have. *Id.* ¶¶ 153, 160.

### 1.   The Alleged Relevant Markets.

Plaintiffs allege two relevant product markets: (1) the input market — the market for "Elite" Professional MMA Fighter services, and (2) the output market — a market for the promotion of live "Elite" Professional MMA bouts. Le Compl. ¶¶ 55, 76. Plaintiffs define an "Elite Professional MMA Fighter" as "any Professional MMA fighter who has demonstrated success through competition in local and/or regional MMA promotions, or who has developed significant public notoriety amongst MMA Industry media and the consuming audience through demonstrated success in athletic competition." *Id.* ¶ 30(d).

Plaintiffs allege that the relevant geographic market for both the input and output markets is "the United States, and, in the alternative, North America." *Id.* ¶ 63.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

2.    **Putative Classes.**

All Plaintiffs but one seek to represent the same two putative classes: the "Bout Class" and the "Identity Class." The "Bout Class" consists of "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States" since December 16, 2010. Le Compl. ¶¶ 30(c), 39. The "Identity Class" consists of "Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials . . . in the United States" for the same period. *Id*. ¶¶ 30(c), 47.

3.    **Alleged Anticompetitive Conduct.**

Plaintiffs claim that successful promotion of a live Elite Professional MMA event requires "Elite Professional MMA fighters" and "a suitable venue, access to PPV or television distribution outlets, sponsors and endorsements," *id*. ¶ 58, and the UFC has locked up: "(i) all or virtually all Elite Professional MMA Fighters with substantial national or regional notoriety; (ii) the vast majority of major sponsors; and (iii) key physical and television venues." *Id*. ¶ 10. They also allege the UFC "shuts out rival promotion opportunities for promoters and fighters by refusing to co-promote events with would-be rival MMA Promoters and prohibiting its athletes from competing against non-UFC MMA Fighters in live Elite Professional MMA bouts." *Id*. ¶ 17.

a.    **Alleged Exclusive Deals Between Zuffa and Fighters.**

Plaintiffs allege that the UFC deprives rivals of access to "Elite Professional MMA Fighters" through "exclusive dealing agreements with UFC Fighters that lock in Elite Professional MMA Fighter services ***perpetually and exclusively*** for the UFC." Le Compl. ¶ 110 (emphasis added). Plaintiffs cite certain contract provisions in support of this conclusion, including (1) the "Exclusivity Clause," which prohibits fighters from working with rival promoters while under contract with the UFC without the UFC's approval, *id*. ¶ 113(a); (2) the "Champion's Clause," which applies only to the few weight class champions at any given time and purportedly "allows the UFC to extend a UFC Fighter's contract for as long as the athlete is a 'champion' in his or her weight class," *id*. ¶ 113(b); and (3) unspecified "Tolling provisions," which allegedly "extend the term of the UFC Fighter's contract during periods when he or she is

4

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

injured, retired, or otherwise declines to compete," *id*. ¶ 113(g).  Plaintiffs claim these provisions

allow the UFC to extend the period of exclusivity "indefinitely."  *Id*. ¶ 113(a), (b).  Plaintiffs do

not allege the actual duration of any fighter's contract with the UFC, including their own.

       Thus, the Complaints conclude that "all or virtually all" Elite Professional MMA Fighters

are locked up by the UFC "indefinitely."  *Id*. ¶¶ 10, 113(a), (b).  Many allegations in the

Complaints and many facts properly subject to judicial notice contradict this conclusion.[3]  For

example, Plaintiffs acknowledge that UFC fighters whose contracts have ended have fought for

Bellator, a rival MMA promoter.  Le Compl. ¶ 146.  Further, judicially noticeable state records

show that some of Plaintiffs themselves actually fought for competitors after fighting for the

UFC.  Plaintiffs Fitch and Hallman both fought for World Series of Fighting,[4] Hallman also

fought for Titan Fighting Championship,[5] and Plaintiff Ruediger fought for promoter BAMMA.[6]

The Complaints also refer to several prominent fighters who either never fought for the UFC or

fought for other promoters since fighting for the UFC — Fedor Emelianenko (*id*. ¶ 126), Ben

---

[3] "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Public records of athletic contests maintained by state athletic commissions are judicially noticeable.  *E.g.*, *J&J Sports Prods., Inc., v. Medinarios*, No. C 08-0998 JF (RS), 2008 WL 4412240, at *1 n.4 (N.D. Cal. Sept. 25, 2008) (taking judicial notice of Nevada Athletic Commission records of bout); *Kingvision Pay-Per-View, Ltd. v. Guzman*, No. CV–07–0963–PHX–PGR, 2008 WL 1924988, at *2 (D. Ariz. Apr. 30, 2008) (judicial notice of the Nevada Athletic Commission records of bout).

[4] Declaration of Suzanne E. Jaffe in support of Zuffa, LLC's Request for Judicial Notice ("RJN"), ¶ 3, Ex. A (Fla. State Boxing Comm'n, Match Results, July 5, 2014 event for "WSoF" at Convention Ctr. — Daytona (bout between Fitch and Hallman on line 7)); ¶ 4, Ex. B (Nev. State Ath. Comm'n, MMA Show Results, June 14, 2013 event for WSOF, LLC at Hard Rock Hotel & Casino, Las Vegas (bout involving Fitch)); ¶ 5, Ex. C (Fla. State Boxing Comm'n, Match Results, Oct. 26, 2013 event for World Series of Fighting at Bank United Ctr. — Coral Gables, FL (bout involving Fitch on line 7)); ¶ 6, Ex. D (Cal. State Ath. Comm'n, MMA Bout Results, Dec. 13, 2014 event for promoter "WSOF" at McClellan Civic Ctr., Sacramento, CA (Fitch in Bout 11)).

[5] RJN ¶ 7, Ex. E (Mo. Office of Athletics, MMA Bout Results, Aug. 30, 2013 event for "Titan Fighting Champ" at Union Station in Kansas City, MO (Hallman in Bout 6)).

[6] RJN ¶ 8, Ex. F (Cal. State Ath. Comm'n, MMA Bout Results, May 31, 2013 event for promoter BAMMA at Commerce Casino, Commerce, CA (Ruediger in Bout 7)).

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

B O I E S   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1  Askren (*id.* ¶ 137), Jake Shields (*id.* ¶ 28),[7] and Quinton "Rampage" Jackson (*id.* ¶ 123).[8]

2                **b.**       **Alleged Exclusive Deals Between Zuffa and Event Venues,**

3                             **Sponsors and Television Distribution Channels.**

4       Plaintiffs allege that the UFC has locked up: "the vast majority of major sponsors; and

5  (iii) key physical and television venues."  Le Compl. ¶ 10.  Plaintiffs do not allege how many

6  sponsors or potential sponsors exist or what percentage of those sponsors the UFC has under

7  contract.  In regards to venues, Plaintiffs do not describe the universe of "key" venues or explain

8  why other venues would be not reasonable substitutes.  As for television distribution, Plaintiffs do

9  not allege which or how many networks are restricted, nor why any other of the hundreds of

10  television networks that do not carry UFC bouts are not adequate alternatives for competitors.

11                **c.**       **Alleged Expropriation of Identity Rights.**

12       Plaintiffs also allege that the UFC's contracts with fighters have resulted in fighters'

13  names and likenesses being "exploited or expropriated" (1) without adequate compensation to the

14  fighters based on the scope and duration of the contracts; and (2) in a way that denies fighters the

15  opportunity to exploit their connection with the UFC brand to profit outside of their dealings with

16  the UFC.  Le Compl. ¶¶ 3, 6, 92, 113(d).

17                **d.**       **Allegations Related to Zuffa's Acquisitions.**

18       The Complaints allege that Zuffa acquired certain other MMA promoters between 2006

19  and 2011.  Le Compl. ¶¶ 12, 129, 133.  Of these acquisitions, only one — the Strikeforce

20  acquisition in March 2011 — is alleged to have occurred since December 16, 2010.  *Id.* ¶ 133.

21                **4.**       **Professional MMA Competitors.**

22       The Complaints acknowledge that many new MMA promoters have emerged since 2006,

23  including five named in the Complaints, and compete with the UFC for both fighter services and

24  the promotion of live events.  Le Compl. ¶¶ 141-144, 146, 150.  Many of these competitors are

25 

26  [7] RJN ¶ 9, Ex. G (Nev. State Ath. Comm'n, MMA Show Results, January 17, 2015 event for WSOF at Planet Hollywood Resort, Las Vegas (bout involving Shields)).

27  [8] RJN ¶¶ 10-11, Ex. H (N.J. State Ath. Control Bd., Scoring Detail, Nov. 15, 2013 event for Bellator Sports Worldwide LLC at Revel — Atlantic City (bout involving Jackson)).

28 

Zuffa's Not. Mot. & Mot to Dismiss      Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                               5:14-cv-05621 EJD; 5:15-cv-00521 EJD

backed by well-funded individuals or corporations, have established television distribution, and/or have attracted fighters whom the Complaints expressly acknowledge are prominent fighters.

- Resurrection Fighting Alliance is operated by Ed Soares, the "prominent manager of many Elite Professional MMA Fighters," *id.* ¶ 141, and is broadcast on AXS TV, which is backed "by billionaire owner of the Dallas Mavericks and HDNet founder, Mark Cuban." *Id.* ¶¶ 130(b), 141 (AXS TV is "formally HDNet").

- Titan Fighting Championship has been "broadcast on the CBS Sports cable network" and is promoted by "multi-millionaire Jeff Aronson." *Id.* ¶ 142. Titan FC has been able to secure the services of Plaintiff Hallman. Note 5, *supra.*

- Legacy Fighting Championship, which has been promoting MMA bouts since 2009, also has television distribution through AXS TV. Le Compl. ¶ 143.

- Invicta Fighting Championship, which focuses on the promotion of women's MMA bouts, is owned by "a veteran of the MMA Industry" and has secured distribution "on the UFC's Internet broadcast subscription service 'Fight Pass.'" *Id.* ¶ 144.

- Bellator has access to national television distribution, including Pay-Per-View (Le Compl. ¶ 150 (PPV), Vazquez Compl. ¶ 149 (national television distribution)), and has secured prominent fighters such as Quinton Jackson, whom Plaintiffs identify as a fighter capable of attracting major sponsors and licensing deals. RJN ¶¶ 11-12, Ex. H; Le Compl. ¶ 123. Bellator is a subsidiary of publicly-traded Viacom, Inc., and is broadcast on Viacom's Spike TV Network.[9]

In addition to those competitors listed in the Complaints, state athletic commission records show other currently-active MMA promoters, including two others (World Series of Fighting and BAMMA) that three named Plaintiffs fought for after their time with the UFC. Notes 4 and 6, *supra.*

---

[9] RJN ¶ 12 Ex. I at 8. Viacom also owns many other TV networks such as MTV, VH1, BET, Nickelodeon, Comedy Central and had worldwide revenues last year over $13.7 billion. *Id.* at 1, 33.

Zuffa's Not. Mot. & Mot to Dismiss          Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                            5:14-cv-05621 EJD; 5:15-cv-00521 EJD

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a court "may dismiss a complaint as a matter of law for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). *Twombly* directs a "two-pronged approach" in determining whether an antitrust complaint should be dismissed: identify and disregard naked assertions and conclusory allegations, and then determine whether the factual context presented by the remaining specific factual allegations plausibly suggest the defendant is liable under the relevant law. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Determining whether a claim is plausible is "context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663-64. On a motion to dismiss, the court generally accepts Plaintiffs' allegations as true, but "need not, however, accept as true allegations that contradict matters properly subject to judicial notice or . . . allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To state a claim for unlawful monopolization or monopsonization under Section 2 of the Sherman Act, a plaintiff must allege: "(1) Possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare*, 88 F.3d at 783. Section 2 "targets the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). "The mere possession of monopoly power . . . is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). That is why to "safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* "Anticompetitive conduct is that which is without a legitimate business purpose that makes sense only because it eliminates competition." *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1081 (S.D. Cal. 2012).

In reviewing a Section 2 claim based on multiple theories of conduct, "Each legal theory

8

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

must be examined for its sufficiency and applicability, on the entirety of the relevant facts." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1367 (Fed. Cir. 1999).  If allegations "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."  *Kan. Penn Gaming v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).

Given the "substantial expenditures" of discovery and "the opportunity to extort large settlements even where [plaintiff] does not have much of a case," *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), "something beyond the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 557-58).  As "our Supreme Court has noted precisely in the context of private antitrust litigation, 'it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.'" *Feitelson v. Google, Inc.*, Case No. 14-cv-02007-BLF, Slip Op. at 6 (N.D. Cal. Feb. 23, 2015) (quoting *Twombly*, 550 U.S. at 558-59).  Thus, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 6-7.

## IV.   ARGUMENT

### A.   Plaintiffs Have Not and Cannot Plead Specific Facts Plausibly Showing that the Exclusivity Provisions in Zuffa's Contracts Are Anticompetitive.

Exclusive dealing is a common and procompetitive form of agreement that encourages participants to invest in mutually beneficial promotional activities and prevents competitors from free-riding on those investments. *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1015 (9th Cir. 1983); *see Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 395 (7th Cir. 1984) (Posner, J.) (exclusive dealing enables a firm to prevent others "from taking a free ride on his efforts (for example, efforts in the form of national advertising) to promote his brand").  For example, exclusive multi-year contracts are common with executives and performers in entertainment and sports and with television networks that televise shows exclusive to their

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    network.  Because of these procompetitive benefits and because all contracts restrict the parties'

2    freedom to some extent, plaintiffs pleading antitrust claims based on exclusive dealing must

3    allege specific, plausible facts showing that the arrangement is anticompetitive, *i.e.,* that its

4    "effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"

5    *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP,* 592 F.3d 991, 996 (9th Cir.

6    2010) (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).

7           The Complaints fail this standard.  First, even where they allege that fighters, sponsors

8    and other third parties agreed to exclusive contracts, Plaintiffs have not alleged that competitors

9    were foreclosed from competing for those contracts in the first place.  Second, even assuming

10   incorrectly that competition for those fighters and third parties is foreclosed, the Complaints do

11   not allege facts plausibly showing these contracts have blocked competitors' access to so many

12   athletes, venues, sponsors and media outlets that it has foreclosed competition in the promotion of

13   MMA bouts and in MMA fighter services.  Nor do Plaintiffs allege the purported extent or

14   duration of foreclosure from exclusive contracts with fighters, venues, television networks or

15   third parties.  *See Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035

16   JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (dismissing complaint for failure to

17   plead facts showing foreclosure where exclusive dealing foreclosed only certain outlets).  Third,

18   Plaintiffs' allegations rely on the faulty assumption that the antitrust laws require the UFC to deal

19   with its competitors and co-promote events, which they do not.

20           **1.      Exclusive Dealing Arrangements Are Common, Procompetitive, and**
                       **an Integral Feature of the Sports and Entertainment Businesses.**
21

22          The Ninth Circuit has acknowledged the "'well-recognized economic benefits to exclusive

23   dealing arrangements, including the enhancement of interbrand competition.'"  *Allied Orthopedic*,

24   592 F.3d at 996 (quoting *Omega*, 127 F.3d at 1162).  Exclusive dealing stimulates interbrand

25   competition and increases output by incentivizing contracting parties to make mutually beneficial

26   investments in product quality, marketing, and promotion without having "to worry about" other

27   firms "taking a 'free ride' on their efforts."  *JBL Enters.*, 698 F.2d at 1015.

28          Exclusive dealing arrangements are a longstanding, critical, and procompetitive part of

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

10

many businesses, including sports and entertainment businesses, yielding benefits for athletes, promoters, fans, and other partners. First, exclusivity is valuable in sports because, as in other fields, athletes benefit financially from promoters engaging in "competition-for-the-contract" for their services. *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (Easterbrook, J.) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common"). Second, the promoter who wins the exclusive rights to a particular athlete's services can promote events that are "both more attractive to [fans] and more distinctive from its rivals." *Id.* at 43. Finally, by reducing the ability of rivals to free-ride on a promoter's investments, exclusive contracts encourage a promoter to invest in recruiting, developing, and marketing athletes; building and maintaining an infrastructure for the sport; and building the league's brand. *Ind. Entm't Grp. v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994). For example, in *Independent Entertainment Group*, the court rejected antitrust claims that exclusive contracts between the NBA and players that prevented a rival promoter from contracting with NBA players for an offseason pay-per-view basketball event violated the Sherman Act, finding plaintiff's antitrust suit an "attempt to free-ride on the NBA's investment in its star players and in rebuilding the League during the 1980's." *Id.*

### 2. Plaintiffs Failed to Allege Specific Facts Plausibly Showing That Zuffa's Exclusive Dealing Arrangements Foreclose Competition in Either Relevant Market.

In light of the important procompetitive benefits that exclusive dealing arrangements yield, "antitrust plaintiffs must allege, and ultimately prove, that the arrangement's effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-JST, 2013 WL 3242245, at *10 (N.D. Cal. Jun. 25, 2013) (quoting *Allied Orthopedic,* 592 F.3d at 996); *see PNY Techn's, Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *10 (N.D. Cal. July 2, 2014) (exclusive dealing must "bar a substantial number of rivals or severely restrict the market's ambit"). It is insufficient to allege merely that a defendant's exclusive dealing contracts have denied rivals access to inputs without pleading facts showing the extent of foreclosure because "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of

11

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

the market, namely the portion consisting of what was bought." *Omega*, 127 F.3d at 1162

(quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983)

(Breyer, J.)). "If competitors can reach the ultimate consumers of the product by employing

existing or potential alternative channels of distribution, it is unclear whether such restrictions

foreclose from competition *any* part of the relevant market." *Omega*, 127 F.3d at 1163.

Based on these principles, courts routinely dismiss complaints that fail to plead specific

facts "from which it reasonably could be inferred that the percentage of the product market

foreclosed is sufficiently substantial" to state an antitrust claim based on exclusive dealing.

*Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, No. C-09-2192 MMC, 2010 WL 2108123,

at *6 (N.D. Cal. May 25, 2010), *aff'd* 444 F. App'x 937 (9th Cir. 2011); *see also PNY Tech's*,

2014 WL 1677521, at *7 (dismissing antitrust complaint because bare allegations of foreclosure

are "exactly what *Twombly* and *Iqbal* warned against"); *Rheumatology*, 2013 WL 3242245,

at *11 (dismissing exclusive dealing based claims where allegations did not permit court to

"evaluate whether the . . . agreement foreclosed competition in a substantial share of the line of

commerce affected"). Plaintiffs have not alleged specific facts as to the extent of any alleged

foreclosure and instead rely on vague, implausible, and economically nonsensical allegations that

"the UFC locked up:  (i) all or virtually all Elite Professional MMA Fighters with substantial

national or regional notoriety; (ii) the vast majority of major sponsors; and (iii) key physical and

television venues." Le Compl. ¶ 10 (emphasis added).  These conclusory allegations are

insufficient to justify the expense and burden of an antitrust claim based on what is recognized as

pro-competitive conduct.

### a.    No substantial foreclosure of athletes.

Plaintiffs' allegations are insufficient to show (1) that competitors were foreclosed from

initially competing for the contract for any athlete who signed a UFC contract; (2) that the

duration of contracts for so many UFC fighters was so long that competitors are foreclosed from

competing for those fighters when their contracts run out or are otherwise terminated; or (3) even

if one were to assume (incorrectly) that the UFC somehow obtained without competition

complete and perpetual exclusivity with the 500 fighters it allegedly has under contract, that the

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

12

inability to access these UFC fighters forecloses competitors from competing for a substantial share of the relevant alleged markets with other Professional MMA fighters.

### i        No foreclosure in competition for exclusive contracts.

As noted, courts have long recognized that competition to persuade people to sign exclusive contracts, often called "competition for the contract," provides important procompetitive benefits.  *E.g.*, *Paddock Publ'ns,* 103 F.3d at 45.  Plaintiffs allege no facts showing that Zuffa has foreclosed competitors from competing for exclusive contracts with any fighter.

### ii        No showing of the duration of exclusivity.

Plaintiffs allege no facts showing the contract duration or any other indicia of the time period that they, or any other fighters, are limited to UFC bouts; instead, they proffer vague, unsupported conclusions, such as that UFC fighters' contracts are "<u>long-term</u>" (Le Compl. ¶ 5), or last "<u>all but indefinitely.</u>"  (*Id*. ¶ 9).  The Complaints refer to the "Champion's Clause" and tolling provisions that may apply when a fighter is injured or otherwise not participating in bouts, but these provisions apply only to the few individual champions at any given time and the subset of injured or otherwise non-participating fighters.  *Id*. ¶ 113(b), (g).  Plaintiffs provide no other facts plausibly supporting their "all but indefinitely" claim.  Nor do they show why competitors cannot compete for fighters on a staggered basis as fighters' UFC contracts end, even as some UFC fighters remain under contract.  *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("staggered expiration dates make entry easier" because competitors can sign individual contracts as they expire, as opposed to having to enroll the whole industry at once).  In sum, there is no plausible support for the conclusion that rivals are precluded from access to "<u>all or virtually all</u>" "Elite Professional MMA fighters."  *Id*. ¶¶ 10, 115.

The Complaints are not saved by their curious disclaimer that Plaintiffs do not contend their own individual contracts violate the antitrust laws.  *Id*. ¶ 115.  To the contrary, this allegation shows that contracts at issue are not plausible violations of the antitrust laws.  This disclaimer emphasizes the need for Plaintiffs to plead plausible facts showing contracts foreclosing competition.

Zuffa's Not. Mot. & Mot to Dismiss        Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                                    5:14-cv-05621 EJD; 5:15-cv-00521 EJD

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

BOIES, SCHILLER & FLEXNER LLP   OAKLAND, CALIFORNIA

### iii.       No showing of the percentage of market foreclosure.

Plaintiffs also fail to allege the percentage of the markets allegedly foreclosed.  The Plaintiffs claim approximately 500 athletes are under contract with the UFC and thus, under their theory, completely blocked from competitors. Le Compl.¶ 155.  But they provide no information about the total number of so-called "Elite" Professional MMA fighters available to fight in the U.S. or how many such fighters a promoter would need to stage competitive bouts.  Nor do they attempt to quantify the number of actual or potential non-"Elite" Professional MMA Fighters.  Thus, even incorrectly assuming that rivals could not compete for UFC fighters before or after their UFC contracts, there is still no basis to conclude that Zuffa has foreclosed a substantial share of the markets for either set of Professional MMA Fighter services or bouts.  To the contrary, the Complaints make clear that accomplished Professional MMA Fighters are available to rivals.  *See* § II.B.4, *supra*.  Further, Plaintiffs do not allege that Professional MMA Fighters are not reasonable substitutes for Elite Professional MMA fighters, *id*. ¶¶ 59-62; *see* §IV.B, *infra*.

The allegation that the leading firm has contracts with current top athletes does not mean that rivals cannot compete for other talented athletes. *See Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F. 2d 139, 150-51 (3d Cir. 1981).  In *Fleer*, the Third Circuit rejected Fleer's attempts to draw a similar distinction between two types of professional baseball players — major league and minor league baseball players — in claiming that Topps' exclusive deals had monopolized the market for trading cards of major league baseball players. *Id.*  The Plaintiff argued, and the district court accepted, that competition for agreements with minor leaguers did not suffice because it "would take several years of contracts with the minor league players before enough reached the majors and created an alternative series of baseball trading cards," *Id.* at 146.  The Third Circuit reversed, holding that "Fleer's claim that Topps' dominance precludes rapid entry into the market misses the mark.  A rival competitor may not be able to obtain major league players already under contract to Topps, but it can still compete for player licenses in the same forum in which Topps secured its present licensing agreements: the minor leagues." *Id.* at 150.

Similarly, Plaintiffs' conclusory allegations that Zuffa has foreclosed the market for "Elite" fighters asks this Court to ignore the wide open supply of "Professional MMA Fighters,"

and hold that the antitrust laws guarantee competitors not merely the right to compete, but a right of "rapid entry" into the market. And unlike *Fleer*, which could only wait and see if the minor leaguers developed into major leaguers, promoters such as Bellator or Titan FC —who already contract with, and promote bouts featuring, Elite Professional MMA Fighters — can do the job themselves by signing Professional MMA Fighters and promoting their fighters and bouts themselves. Le Compl. ¶¶ 142, 150; and notes 5 and 8, *supra*.

### b. No substantial foreclosure of event venues.

As with their allegations regarding fighters, Plaintiffs' allegations that rival promoters cannot access a suitable location to stage an MMA bout because of Zuffa's alleged contractual restrictions with the venues it rents are both conclusory and wildly implausible. Le Compl. ¶¶ 9-10, 73, 108, 122. Plaintiffs allege only that Zuffa's exclusive deals prevent rivals from holding events "with top event venues along the Las Vegas Strip" and force rivals "to use second-rate venues." *Id.* ¶ 122. The Complaints do not identify which event locations constitute these "top venues" or "second-rate venues" or even attempt to approximate the number or percentage of event venues allegedly foreclosed to rivals on the "Las Vegas Strip." This allegation is insufficient to allege foreclosure in one city, much less to allege foreclosure in the geographic market that Plaintiffs allege — the United States (*id.* ¶ 63). *See Am. Football League v. Nat'l Football League*, 323 F.2d 124, 130 (4th Cir. 1963) (rejecting monopolization claim based on allegations that the NFL had locked up the most desirable local markets in the United States because those local markets are not the relevant market).

### c. No substantial foreclosure of sponsors.

Plaintiffs' allegations of foreclosure in the market for sponsors do not "make economic sense." *Adaptive Power Solutions, LLC v. Hughes Missile Sys*. Co., 141 F.3d 947, 952 (9th Cir. 1998) (to survive a motion to dismiss, "antitrust claims must make economic sense"). Plaintiffs claim Zuffa has "locked up" "key" or "major" sponsors, but do not identify the universe of sponsors or the extent to which rivals are foreclosed from access to them. Le Compl. ¶¶ 10, 116. For example, if Zuffa has an exclusive deal with Reebok, Reebok may well be a "major" or "key" sponsor, but this allegation says nothing about whether competitors can compete for other major

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

apparel providers, such as Nike, Under Armour, Adidas, Puma, Everlast, Champion, and countless others.  The same principle applies to the other categories subject to the alleged exclusion, e.g., beer and soft drink companies, gyms, video games, publications, various manufacturers, etc. — an exclusive deal with one beer company, no matter how "major" or "key," leaves all the other beer companies free to deal with competitors.  These allegations do not plausibly demonstrate foreclosure or exclusion at all, much less substantial foreclosure.

### d.     No substantial foreclosure of television distribution outlets.

Plaintiffs' allegations that Zuffa's exclusive dealing arrangements have foreclosed rivals access to "key" or "major" television venues (Le Comp. ¶¶ 10, 73) are similarly conclusory, wildly implausible, and do not make economic sense.  *Adaptive Power Solutions*, 141 F.3d at 952.  If Zuffa enters an exclusive deal with one television distribution outlet, then all of the other hundreds of television channels can enter deals with the UFC's rivals.  Plaintiffs do not plead any facts regarding the universe of television outlets or how Zuffa's conduct restricts rivals' access to this universe.  In fact, *four of the five* rival promoters named in the Complaints already have either cable TV or PPV distribution, and Bellator is owned by TV network giant Viacom, Inc.  *See* § II.B.4 *supra.* The Court is "neither obligated to reconcile nor accept [these] contradictory allegations in the pleadings as true in deciding a motion to dismiss."  *Spiteri v. Russo*, No. 12-CV-2780 MKB RLM, 2013 WL 4806960, at *8 (E.D.N.Y. Sept. 7, 2013) (citing cases).

In contrast to Plaintiffs' assertion of foreclosure, their Complaints allege the very indicia of a competitive market — that MMA is "one of the most popular and fastest growing spectator sports in the U.S. and North America."  Le Compl. ¶ 95.  Increasing output is a sign of competition, not foreclosure.  *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103 (1984) (increasing output indicates practice is "procompetitive") (citing *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 18-23 (1979)).

### 3.     The UFC Has No Duty to Deal With Competitors.

Plaintiffs allege that the UFC's refusal to co-promote events with rivals constitutes part of

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

16

its allegedly anticompetitive "scheme."[10]  These allegations do not support an antitrust claim because it is black letter law that Zuffa has no duty to deal with or aid competitors.  *E.g., Trinko*, 540 U.S. at 411.

### B.   Plaintiffs Fail to Allege Properly Defined Relevant Product Markets.

To state a claim for monopolization or attempted monopolization, a plaintiff must allege facts showing that the defendant possesses monopoly power in a properly defined relevant market.  *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847, 2013 WL 5694452, at *14 (N.D. Cal. Oct. 18, 2013) ("To state a claim, the plaintiffs must allege 'monopoly power *in the relevant market*,' and not just any market").  Failure to allege facts showing a plausible market is fatal to a claim under Section 2 of the Sherman Act.  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

Both of Plaintiffs' market definitions are based on what the Complaints describe as "Elite Professional MMA fighters," a term not used in the industry and apparently created solely for the purpose of this litigation.  Plaintiffs do not define the contours of these markets, particularly in what distinguishes an "Elite" fighter from other Professional MMA fighters, in any understandable, much less a legally cognizable, way.  "The test of market definition turns on reasonable substitutability."  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) (citing *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)).  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted."  *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d

---

[10] *E.g.*, Le Compl. ¶ 17 ("the UFC shuts out rival promotion opportunities for promoters and fighters by refusing to co-promote events with would-be rival MMA Promoters"); ¶ 130(b) (referring to the UFC's "persistent refusal to co-promote" as part of "its aggressive anticompetitive campaign"); ¶ 147 (alleging that Bellator has been unsuccessful "in part because the UFC refuses to co-promote with any of Bellator's fighters regardless of talent or merit").

Zuffa's Not. Mot. & Mot to Dismiss      Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                      5:14-cv-05621 EJD; 5:15-cv-00521 EJD

Cir. 1997)).  Plaintiffs do not define their proposed markets in accord with these principles.

Plaintiffs claim that an "Elite" fighter is a Professional MMA Fighter who has "demonstrated success" or developed "significant public notoriety," but also contend that any fighter who participated in a single UFC bout is an Elite Professional MMA fighter, even if he fought only once and lost.  Le Compl. ¶ 30(d), (s).  While Plaintiffs name other prominent non-UFC fighters who are presumably "Elite," *id.* ¶¶ 126, 137, they also allege that "all or virtually all" Elite Professional MMA fighters are under contract with the UFC.  *Id.* ¶ 115.  Plaintiffs do not allege why a Professional MMA Fighter is not a reasonable substitute for an Elite Professional MMA fighter, nor even how one tells the difference.

This attempt to define a market for "Elite" Professional MMA Fighters fails for at least two reasons.  First, courts have repeatedly rejected attempts to define narrow antitrust markets by subjective, vague terms purporting to reflect alleged qualitative differences because such distinctions are "economically meaningless where the differences are actually a *spectrum* of price and quality differences."  *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (listing cases) (finding that "gradations among various qualities of ice cream are not sufficient to establish separate relevant markets").

As in *Super Premium Ice Cream*, Plaintiffs here attempt to use standardless notions of "demonstrated success" and "significant public notoriety" to draw a distinction between Professional MMA Fighters and so-called "Elite" Professional MMA Fighters.  Le Compl. ¶ 30(d).  "But the court cannot delineate product boundaries in [antitrust] suits based upon the mere notion that there is 'something different' about the [products identified by the complaint] and all others, especially when that 'something different' cannot be expressed in terms to make a judgment of the court have meaning.  More is required."  *Oracle*, 331 F. Supp. at 1159 (rejecting proposed product market definition of "high function" software sold to largest enterprise customers because it improperly excluded so-called "mid-market" vendors who sold similar software to smaller companies).  That "more" is sorely lacking here.

Second, Plaintiffs' allegation that "all or virtually all . . . Elite Professional MMA fighters" are under contract to the UFC (Le Compl. ¶ 115) is just a tautology to create a single-

18

B O I E S ,   S C H I L L E R   &   F L E X N E R     L L P
O A K L A N D ,   C A L I F O R N I A

1  brand market comprised solely of UFC fighters under a different name.  Courts' acceptance of

2  such circular, single-brand markets "are, at a minimum, extremely rare."  *Apple, Inc. v. Psystar*

3  *Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *accord Dang v. San Francisco Forty*

4  *Niners*, 964 F. Supp. 2d 1097, 1105 (N.D. Cal. 2013).  The fact that the association with UFC

5  brings stature to a fighter does not mean that other fighters are not reasonable substitutes.  *Donald*

6  *B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F. Supp. 750, 755 (D. Md. Jan. 30, 1980), *aff'd* 638

7  F.2d 15 (4th Cir. 1981) (Although "Michelin is a premium tire with a reputation for durability and

8  safety these attributes are insufficient . . . to justify such a narrow product market definition.").

9      **C.**    **Plaintiffs Have Not and Cannot Plead Specific Facts Plausibly Showing That**

10              **the Ancillary Rights Provisions Are Anticompetitive or Reduce Competition in the Relevant Markets.**

11        Plaintiffs allege that the UFC has "expropriate[d]" Plaintiffs' names and likenesses and

12  "paid [fighters] a fraction of what they would earn in a competitive marketplace," Le Compl. ¶ 1.

13  They seek to certify a class of "Each and every UFC Fighter whose Identity was expropriated or

14  exploited by the UFC." *Id.* ¶ 47.  But loaded, conclusory words like "exploited" and

15  "expropriated" are not a substitute for a coherent antitrust theory or for facts to show either that:

16  (1) the contractual provisions relating to Plaintiffs' names and likenesses are anything other than

17  the ordinary license of an individual's rights to publicity; or (2) the contractual grants of

18  intellectual or identity property rights reduced competition in either of the alleged relevant

19  markets.

20        While their theory is not clear, to the extent Plaintiffs argue that they wanted greater

21  freedom to license their identities in other contexts, they do not explain how this would have

22  increased competition in either MMA bouts or MMA fighter services.  Clearly, the Plaintiffs who

23  fought for other promoters after leaving the UFC were able to use their names and likenesses in

24  promoting competitive bouts.  *See* § II.3.a, 4, *supra*.  Stripped of epithets, Plaintiffs' claim boils

25  down to no more than a complaint that they believe they contracted away too many rights for too

26  little compensation because Zuffa allegedly possesses a monopoly.  But complaints about the

27  prices and other contract terms of an alleged monopolist do not amount to antitrust violations.

28  *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934 (9th Cir. 2009) (the "basic rule" is "that mere

Zuffa's Not. Mot. & Mot to Dismiss      Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                        5:14-cv-05621 EJD; 5:15-cv-00521 EJD

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

possession of monopoly power and the practice of charging monopoly prices does not run afoul of §2").

### 1.      Name and Likeness Licenses Are Common and Procompetitive.

There is nothing uncommon or anticompetitive about an athlete or performer granting to a promoter or producer his publicity rights in the performance in exchange for his compensation for the performance. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 968 (N.D. Cal. 2014) ("Professional athletes often sell group licenses to use their names, images, and likenesses in live game telecast, videogames, game re-broadcasts, advertisements, and other archival footage").  Allowing athletes and promoters to contract for intellectual property rights associated with their services, including exclusive rights, is necessary to allow athletes to obtain value for their performance of services. *Haelan Labs, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953).  "This right of publicity would usually yield [rights' holders] no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their picture." *Id.*  Licenses that extend past the term of the contract provide a number of practical economic benefits, including certainty and reducing transaction costs.  For example, it is hard to imagine how a DVD of a bout or video game could be produced if it would need to be taken off the shelves every time an athlete appearing in the DVD or video game had his or her contract expire.

Courts have consistently upheld exclusive grants of such name and likeness rights, *e.g.*, *Fleer*, 658 F.2d at 149-50 (upholding exclusive license of baseball players' names and likenesses on trading cards to one company), including where the grant is in perpetuity. *Rooney v. Columbia Pictures Indus., Inc.*, 538 F. Supp. 211, 227-28 (S.D.N.Y. 1982) (upholding contract terms granting movie studios the perpetual right to actor's likeness and voice in connection with movies filmed for the studios); *Hazel Bishop, Inc. v. Perfemme, Inc.*, 314 F.2d 399, 400-01, 404 (2d Cir. 1963) (upholding the perpetual license of a person's name and likeness to be used in the promotion of cosmetic products even after she left the company).  Further, courts recognize that group licenses, where a promoter becomes the licensor for all its athletes, are necessary to prevent the prohibitive transaction costs that would be incurred if "every potential retailer had to contract

20

BOIES · SCHILLER & FLEXNER  LLP
OAKLAND, CALIFORNIA

1   with each player individually." *Fleer Corp.*, 658 F.2d at 151 ("Far from being a restraint of trade,

2   the commercial authorization agreement is pro-competitive. . . . If every potential retailer had to

3   contract with each player individually for a group license, few licenses would exist.").

> **2.     Contractual Restrictions on the Use of the UFC Name and Marks Are
> the Legitimate Exercise of Zuffa's Intellectual Property Rights and
> Are Not Anticompetitive.**

6   Plaintiffs' complaints about restrictions on the use of Plaintiffs' identity rights in

7   connection with the UFC brand and trademarks ignore Zuffa's right to control its name and

8   intellectual property.[11]  *See MiniFrame Ltd. v. Microsoft Corp.*, No. 11 CIV. 7419 RJS, 2013 WL

9   1385704, at *4 (S.D.N.Y. Mar. 28, 2013) *aff'd*, 551 F. App'x 1 (2d Cir. 2013) (holders of

10  intellectual property rights have "no duty to deal with their competitors or permit them access to

11  their" intellectual property).  For example, Plaintiffs allege that the UFC charges a fee to sponsors

12  "for the right to associate their brands with specific UFC Fighters" in order to sponsor a "UFC

13  Fighter *during UFC events*."  Le Compl. ¶ 124 (emphasis added).  But nothing in the antitrust

14  laws requires Zuffa to permit sponsors to gain free exposure on UFC programming and benefit

15  from the UFC's investment in its brand and its events without paying for it or to allow its name to

16  be used by competitors.  Tellingly, Plaintiffs do not allege that Zuffa charges a fee when the UFC

17  brand is not involved.  And alleging that the fee or so-called "tax" is used to "dominate" MMA

18  industry segments (*id.*) cannot transform a protected exercise of intellectual property rights into

19  an antitrust violation.  *Trinko*, 540 U.S. at 411.[12]  The same principle applies to Plaintiffs' claim

[11] The Complaints show that the name and likeness grants are narrowly tailored to UFC licensed merchandise, promotional materials and intellectual property, and do not encompass a blanket name and likeness right in all capacities and for all purposes.  Le Compl. ¶ 30(s) (UFC fighter is a person "whose Identities were acquired for use and/or used in UFC Licensed Merchandise and/or UFC Promotional Materials").  "UFC Licensed Merchandise" is apparel and other promotional items that "contains the trademarks, trade names, logos and other *intellectual property owned or licensed by Zuffa.*" *Id.* ¶ 30(t) (emphasis added). UFC Promotional Materials includes "all forms of television . . . merchandising and program rights *in connection or based upon the UFC brand, UFC bouts, UFC Pre-Bout Events or UFC Post-Bout Events.*"  *Id.* ¶ 30(u) (emphasis added).

[12] That a sports organization insists on permission before allowing its name to be used in a commercial sponsorship is commonplace.  When an NFL player appears in a commercial in his NFL uniform, his team and/or the NFL has granted permission.  When an NFL player appears in a commercial in something other than his NFL uniform and without the name of his team or the

21

B O I E S   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

that fighters are limited in their ability to use the UFC brand to promote themselves when they fight for a competitor.  Le Compl. ¶¶ 30(s), 113(d).  This is no more than another complaint that the UFC refuses to cooperate with its competitors.  Moreover, the argument the UFC should have been more liberal in allowing Plaintiffs to associate their sponsors with UFC events is a clear acknowledgement that the UFC brand adds value and is subject to free-riding.

Further, Plaintiffs do not show that, in the absence of contractual restrictions on the Plaintiffs' use of the UFC brand, there would be additional competition in UFC Licensed Merchandise or Promotional Material because no one can use the UFC brand without Zuffa's permission.  To the extent that Plaintiffs contend that the contracts restrict rights unrelated to the UFC's trademarks, name or brand, they have not shown (1) as discussed above, that the contracts go beyond Zuffa's legally protected rights to control its own intellectual property or (2) that the contracts have restricted competition that would otherwise exist for those rights.  *See Washington v. Nat'l Football League,* 880 F. Supp. 2d 1004, 1007 (D. Minn. 2012) ("Plaintiffs do not explain what market might exist in game footage that features only that footage to which any player can claim to be individually entitled:  a single player's image without any NFL logos or marks").  Finally, even if they could, Plaintiffs have not shown that any possible effect in the "markets" for sponsor licensing rights reduces competition in the markets alleged in the Complaints — the markets for bouts and fighter services.

**3.      Plaintiffs' Identity Rights Claims Do Not State an Antitrust Violation.**

In essence, the claim that Plaintiffs' identities have been "exploited and expropriated" amounts to no more than a challenge to the terms and compensation received under their contracts.  Where a plaintiff simply attaches "antitrust 'labels and conclusions' to what is, at most, an ordinary contract dispute," the complaint does not state a plausible claim for relief under the Sherman Act.  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135-36 (2d Cir. 2014).

---

NFL, permission is not required.  *See* Pamela R. Lester, Marketing the Athlete; Endorsement Contracts, SC47 ALI-ABA 405, 410 (January 22, 1998) ("For example, a professional football player cannot appear in his team uniform in an advertisement unless the manufacturer or the player has entered into a separate licensing agreement with NFL Properties for the use of the team name and logo").  The Complaints do not show that Zuffa's contracts operate differently.

Zuffa's Not. Mot. & Mot to Dismiss        Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                                5:14-cv-05621 EJD; 5:15-cv-00521 EJD

1    Plaintiffs' attempt to shoehorn their allegations into an antitrust claim should be rejected.

2    *Washington*, 880 F. Supp. 2d at 1005, 1008 (dismissing claim that the NFL monopolized the

3    market for former players' licenses by denying access to game films and images because, "What

4    they have are claims for royalties, not claims for antitrust").

5

6    **D.    Plaintiffs Have Not Pled Specific Facts Plausibly Demonstrating That Zuffa's Acquisitions Have Had Anticompetitive Effects.**

7    The "mere fact that a merger eliminates competition between the firms concerned has

8    never been a sufficient basis for illegality."  4 Phillip E. Areeda *et al.*, Antitrust Law ¶ 901a

9    (2009).  Acquisitions "may enhance competition by combining complementary assets,

10   eliminating duplicative assets, or achieving scale economies," which result in efficiencies that

11   "directly benefit consumers by, for example, improving quality, increasing innovation, and

12   lowering prices."  *F.T.C. v. Lab. Corp. of Am.,* No. SACV 10-1873 AG MLGX, 2011 WL

13   3100372, at *20 (C.D. Cal. Feb. 22, 2011) (citing cases).  "[I]n a competitive market, buying out

14   competitors is not merely permissible, it contributes to market stability and promotes the efficient

15   allocation of resources."  *United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990).

16   Because of these procompetitive benefits, a plaintiff can sustain a Section 2 claim only

17   where he pleads plausible, specific facts showing that the acquisition has "the effect of

18   'lessen[ing] competition' or tend[ing] to create a monopoly."  *Carefusion Corp. v. Medtronic,*

19   *Inc.*, No. 10-CV-01111-LHK, 2010 WL 4509821, at *7 (N.D. Cal. Nov. 1, 2010) (dismissing

20   Section 2 claim based on a variety of alleged conduct including acquisitions of alleged rivals).

21   In *Syufy*, the Ninth Circuit affirmed a judgment that a movie theater operator, Syufy, had

22   not monopolized the Las Vegas theater market through acquisitions of three other theaters even

23   though the acquisitions resulted in Syufy controlling, at least temporarily, "100% of the first-run

24   film market in Las Vegas."  *Id.* at 665.  Just as Plaintiffs have alleged here, Syufy's acquisitions

25   "temporarily diminished the number of competitors . . . . But this does not necessarily indicate

26   foul play; many legitimate market arrangements diminish the number of competitors.  It would be

27   odd if they did not, as the nature of competition is to make winners and losers."  *Id.* at 664.

28   The allegations here are weaker than in *Syufy*.  First, all but one of the acquisitions that

B O I E S , S C H I L L E R & F L E X N E R L L P
O A K L A N D , C A L I F O R N I A

23

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs discuss occurred outside the applicable four-year statute of limitations. *Abbyy*, 2008 WL 4830740, at *6 (citing 15 U.S.C. § 15b). They cannot, therefore, serve as a basis for imposing liability now. *Int'l Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 929 (9th Cir. 1975), *overruled on other grounds*, *California v. Am. Stores Co.*, 495 U.S. 271 (1990) ("The abuses which would occur if plaintiffs were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old, seem apparent").[13]

Second, Plaintiffs have not pled facts showing plausible high barriers to entry in the promotion of MMA bouts. Leaving aside the facially implausible allegations, such as that Zuffa has locked up all the suitable venues in the United States or all the possible TV distribution networks, nothing in the Complaints suggests that there is any structural barrier to entry such as necessary intellectual property rights, high fixed-cost facilities, or research and development expenses. Instead, the Complaints show that new competitors are able to and do freely access necessary inputs to stage MMA bouts. *See* Section II.B.4, *supra*.

Third, as in *Syufy*, Plaintiffs have not pled any specific, plausible allegations from which the court could conclude that the Strikeforce acquisition had any anticompetitive effect. For example, Plaintiffs do not and cannot allege that fighter compensation was reduced after the acquisition. Plaintiffs' allegations actually contradict their claims that Zuffa's acquisitions have reduced competition or output in either relevant market. Notwithstanding assertions that the acquisitions left only "fringe" and "minor league" rivals to the UFC, the Complaints and state athletic commission records demonstrate that Zuffa continues to face well-funded competitors that can attract prominent fighters and television distribution. *See* § II.B.4, *supra* (describing allegations relating to current MMA competitors, their backers, their TV arrangements, and named Plaintiffs' participation in their bouts).

Finally, Plaintiffs fail to plead specific facts showing that the acquisitions have reduced output. The Complaints reveal the exact opposite of a monopolized market: "a rough-and-tumble

_____

[13] The Strikeforce acquisition in 2011 was the subject of an FTC investigation that was closed without further action in January 2012. RJN ¶ 13, Ex. J (Letter from Donald S. Clark, Secretary, Federal Trade Commission to Stephen Axinn, Esq. (Jan. 25, 2012)).

Zuffa's Not. Mot. & Mot to Dismiss     Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
5:14-cv-05621 EJD; 5:15-cv-00521 EJD

industry, marked by easy market access, fluid relationships with distributors, an ample and continuous supply of product, and a healthy and growing demand." *Syufy*, 903 F.2d at 667. Since 2006, when Plaintiffs claim the UFC's alleged scheme began, several new promoters have emerged, capable of securing prominent fighters (including Plaintiffs), TV distribution, and event venues. The result is that MMA has "become one of the most popular and fastest growing spectator sports in the U.S. and North America," if not the entire world. Le Compl. ¶ 95.

### E.   Plaintiffs' Complaints About Strong Competition Do Not State an Antitrust Violation.

Plaintiffs devote considerable space to brash, colorful, and sometimes intemperate remarks about rival MMA promoters, fighters, and the UFC's own place in the industry by UFC President Dana White, whose job it is to promote the UFC. Le Compl. ¶¶ 8, 12-15, 18, 70, 113(e), 117-19, 145, 148. Courts have long recognized such remarks are indicative of vigorous competition. "Warfare among suppliers and their different products is competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) (quoting *Schachar v. Am. Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989)); *see also TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 810 (C.D. Cal. 2010) ("Promotion and persuasion are not actionable as antitrust violations, even where the speaker holds extraordinary prestige and influence"). "An efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating." *Syufy*, 903 F.2d at 669. Similarly, Plaintiffs' complaints that Zuffa allegedly "counter programmed" against rivals, i.e., scheduled bouts for the same night as competitors, amount to nothing more than complaints about fierce competition. Le Compl. ¶¶ 132, 150.

## V.   CONCLUSION

For the foregoing reasons, Zuffa respectfully requests an order dismissing Plaintiffs' Complaints for failure to state a claim upon which relief can be granted.

Zuffa's Not. Mot. & Mot to Dismiss          Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                                            5:14-cv-05621 EJD; 5:15-cv-00521 EJD

1

Dated: February 27, 2015          Respectfully Submitted,

2

BOIES, SCHILLER & FLEXNER LLP

3

By: */s/ William A. Isaacson*

4

William A. Isaacson

*Attorneys for Defendant* Zuffa, LLC, d/b/a

5

Ultimate Fighting Championship and UFC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Zuffa's Not. Mot. & Mot to Dismiss          Case Nos. 5:14-cv-05484 EJD; 5:14-cv-05591 EJD;
                                            5:14-cv-05621 EJD; 5:15-cv-00521 EJD

**Appendix A**

Cross references from the *Le* Complaint to identical or substantially similar paragraphs
in the *Vazquez, Vera* and *Ruediger* Complaints

| *Le* et al. | *Vazquez* et al. | *Vera* et al. | *Ruediger* et al. |
|---|---|---|---|
| 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 3 | 3 | 3 |
| 4 | 4 | 4 | 4 |
| 5 | 5 | 5 | 5 |
| 6 | 6 | 6 | 6 |
| 7 | 7 | 7 | 7 |
| 8 | 8 | 8 | 8 |
| 9 | 9 | 9 | 9 |
| 10 | 10 | 10 | 10 |
| 11 | 11 | 11 | 11 |
| 12 | 12 | 12 | 12 |
| 13 | 13 | 13 | 13 |
| 14 | 14 | 14 | 14 |
| 15 | 15 | 15 | 15 |
| 16 | 16 | 16 | 16 |
| 17 | 17 | 17 | 17 |
| 18 | 18 | 18 | 18 |
| 19 | 19 | 19 | 19 |
| 20 | 20 | 20 | 20 |
| 21 | 21 | 21 | 21 |
| 22 | 22 | 22 | 22 |
| 23 | 23 | 23 | 23 |
| 24 | 24 | 24 | 24 |
| 25 | 25 | 25 | 25 |
| 26 | 26 | 26 | 26 |
| 27 | 27 | 27 | 27 |
| 28 | 28 | 28 | 28 |
| 29 | 29 | 29 | 29 |
| 30 | 30 | 30 | 30 |
| 31 | 31 | 33 | 33 |
| 32 | 32 | 34 | 34 |
| 33 | 33 | 35 | 35 |
| 34 | 34 | 36 | 36 |
| 35 | 35 | 37 | 37 |
| 36 | -- | -- | -- |
| 37 | -- | -- | -- |
| 38 | -- | -- | -- |
| 39 | 38 | 38 | 38 |
| 40 | 39 | 39 | 39 |
| 41 | 40 | 40 | 40 |
| 42 | 41 | 41 | 41 |
| 43 | 42 | 42 | 42 |
| 44 | 43 | 43 | 43 |
| 45 | 44 | 44 | 44 |

| *Le* et al. | *Vazquez* et al. | *Vera* et al. | *Ruediger* et al. |
|---|---|---|---|
| 46 | 45 | 45 | 45 |
| 47 | 46 | 46 | 46 |
| 48 | 47 | 47 | 47 |
| 49 | 48 | 48 | 48 |
| 50 | 49 | 49 | 49 |
| 51 | 50 | 50 | 50 |
| 52 | 51 | 51 | 51 |
| 53 | 52 | 52 | 52 |
| 54 | 53 | 53 | 53 |
| 55 | 54 | 54 | 54 |
| 56 | 55 | 55 | 55 |
| 57 | 56 | 56 | 56 |
| 58 | 57 | 57 | 57 |
| 59 | 58 | 58 | 58 |
| 60 | 59 | 59 | 59 |
| 61 | 60 | 60 | 60 |
| 62 | 61 | 61 | 61 |
| 63 | 62 | 62 | 62 |
| 64 | 63 | 63 | 63 |
| 65 | 64 | 64 | 64 |
| 66 | 65 | 65 | 65 |
| 67 | 66 | 66 | 66 |
| 68 | 67 | 67 | 67 |
| 69 | 68 | 68 | 68 |
| 70 | 69 | 69 | 69 |
| 71 | 70 | 70 | 70 |
| 72 | 71 | 71 | 71 |
| 73 | 72 | 72 | 72 |
| 74 | 73 | 73 | 73 |
| 75 | 74 | 74 | 74 |
| 76 | 75 | 75 | 75 |
| 77 | 76 | 76 | 76 |
| 78 | 77 | 77 | 77 |
| 79 | 78 | 78 | 78 |
| 80 | 79 | 79 | 79 |
| 81 | 80 | 80 | 80 |
| 82 | 81 | 81 | 81 |
| 83 | 82 | 82 | 82 |
| 84 | 83 | 83 | 83 |
| 85 | 84 | 84 | 84 |
| 86 | 85 | 85 | 85 |
| 87 | 86 | 86 | 86 |
| 88 | 87 | 87 | 87 |
| 89 | 88 | 88 | 88 |
| 90 | 89 | 89 | 89 |
| 91 | 90 | 90 | 90 |
| 92 | 91 | 91 | 91 |
| 93 | 92 | 92 | 92 |

| *Le* et al. | *Vazquez* et al. | *Vera* et al. | *Ruediger* et al. |
|---|---|---|---|
| 94 | 93 | 93 | 93 |
| 95 | 94 | 94 | 94 |
| 96 | 95 | 95 | 95 |
| 97 | 96 | 96 | 96 |
| 98 | 97 | 97 | 97 |
| 99 | 98 | 98 | 98 |
| 100 | 99 | 99 | 99 |
| 101 | 100 | 100 | 100 |
| 102 | 101 | 101 | 101 |
| 103 | 102 | 102 | 102 |
| 104 | 103 | 103 | 103 |
| 105 | 104 | 104 | 104 |
| 106 | 105 | 105 | 105 |
| 107 | 106 | 106 | 106 |
| 108 | 107 | 107 | 107 |
| 109 | 108 | 108 | 108 |
| 110 | 109 | 109 | 109 |
| 111 | 110 | 110 | 110 |
| 112 | 111 | 111 | 111 |
| 113 | 112 | 112 | 112 |
| 114 | 113 | 113 | 113 |
| 115 | 114 | 114 | 114 |
| 116 | 115 | 115 | 115 |
| 117 | 116 | 116 | 116 |
| 118 | 117 | 117 | 117 |
| 119 | 118 | 118 | 118 |
| 120 | 119 | 119 | 119 |
| 121 | 120 | 120 | 120 |
| 122 | 121 | 121 | 121 |
| 123 | 122 | 122 | 122 |
| 124 | 123 | 123 | 123 |
| 125 | 124 | 124 | 124 |
| 126 | 125 | 125 | 125 |
| 127 | 126 | 126 | 126 |
| 128 | 127 | 127 | 127 |
| 129 | 128 | 128 | 128 |
| 130 | 129 | 129 | 129 |
| 131 | 130 | 130 | 130 |
| 132 | 131 | 131 | 131 |
| 133 | 132 | 132 | 132 |
| 134 | 133 | 133 | 133 |
| 135 | 134 | 134 | 134 |
| 136 | 135 | 135 | 135 |
| 137 | 136 | 136 | 136 |
| 138 | 137 | 137 | 137 |
| 139 | 138 | 138 | 138 |
| 140 | 139 | 139 | 139 |
| 141 | 140 | 140 | 140 |

| *Le* et al. | *Vazquez* et al. | *Vera* et al. | *Ruediger* et al. |
|---|---|---|---|
| 142 | 141 | 141 | 141 |
| 143 | 142 | 142 | 142 |
| 144 | 143 | 143 | 143 |
| 145 | 144 | 144 | 144 |
| 146 | 145 | 145 | 145 |
| 147 | 146 | 146 | 146 |
| 148 | 147 | 147 | 147 |
| 149 | 148 | 148 | 148 |
| 150 | 149 | 149 | 149 |
| 151 | 150 | 150 | 150 |
| 152 | 151 | 151 | 151 |
| 153 | 152 | 152 | 152 |
| 154 | 153 | 153 | 153 |
| 155 | 154 | 154 | 154 |
| 156 | 155 | 155 | 155 |
| 157 | 156 | 156 | 156 |
| 158 | 157 | 157 | 157 |
| 159 | 158 | 158 | 158 |
| 160 | 159 | 159 | 159 |
| 161 | 160 | 160 | 160 |
| 162 | 161 | 161 | 161 |
| 163 | 162 | 162 | 162 |
| 164 | 163 | 163 | 163 |
| 165 | 164 | 164 | 164 |
| 166 | 165 | 165 | 165 |
| 167 | 166 | 166 | 166 |
| 168 | 167 | 167 | 167 |
| 169 | 168 | 168 | 168 |
| 170 | 169 | 169 | 169 |
| 171 | 170 | 170 | 170 |
| 172 | 171 | 171 | 171 |