EXHIBIT "2"

EXHIBIT "2"

Joseph R. Saveri (State Bar No. 130064)
Joshua P. Davis (State Bar No. 193254)
Matthew S. Weiler (State Bar No. 236052)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone: (415) 500-6800
Facsimile:   (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **Cung Le, Nathan Quarry, Jon Fitch, on behalf of themselves and all others similarly situated,** | Case No.  5:14-cv-05484-EJD |
| | 5:14-cv-05591- EJD |
| | 5:14-cv-05621- EJD |
| **Plaintiffs,** | |
| | **DECLARATION OF JOSEPH R. SAVERI IN SUPPORT OF MOTION TO APPOINT INTERIM CO-LEAD CLASS COUNSEL** |
| v. | |
| **Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,** | |
| **Defendant.** | |
| **Luis Javier Vazquez and Dennis Lloyd Hallman, on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs,** | |
| v. | |
| **Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,** | |
| **Defendant.** | |
| **Brandon Vera and Pablo Garza, on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs,** | |
| v. | |
| **Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,** | |
| **Defendant.** | |

I, Joseph R. Saveri, declare:

1.     I am the Founding Partner of the Joseph Saveri Law Firm, Inc. ("JSLF"). I am an attorney of record in these related matters for Plaintiffs Le, Quarry, Fitch, Vazquez, Hallman, Vera, Garza, Ruediger, and Danzig, and a member in good standing with the State Bar of California. I submit this Declaration in support of Plaintiffs' Motion to Appoint Interim Co-Lead Class Counsel. I am a member of the California Bar in good standing and am admitted to practice before this Court. I have personal knowledge of the matters stated herein, and if called to testified I could and would do so competently.

2.     Pursuant to Fed. R. Civ. P. 23(g), Plaintiffs seek approval of a class leadership that includes appointment of JSLF as Interim Co-Lead Class Counsel. JSLF, in conjunction with Berger & Montague, P.C. and by Cohen Milstein Sellers & Toll PLLC (with JSLF, "Proposed Interim Co-Lead Class Counsel") worked with Plaintiffs and their other attorneys, to conduct an extensive factual and legal analysis of the market for elite mixed martial art ("MMA") athletes, including control of the elite MMA market and oppressive tactics adopted by Defendant, Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC ("UFC"). Proposed Interim Co-Lead Class Counsel and their staff spent hundreds of hours researching the bases for, and drafting, the three Complaints in the matters of *Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC*, No. 5:14-cv-05484-EJD; *Vasquez, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC*, No. 5:14-cv-05591-EJD; and *Vera*, e*t al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC*, No. 5:14-cv-05621-EJD (collectively, the "Complaints").

3.     In developing the *Le*, *Vasquez*, and *Vera* Complaints, Proposed Interim Co-Lead Class Counsel worked closely with Robert Maysey of Warner Angle Hallam Jackson & Formanek, PLC ("Warner Angle"). As explained in further detail in **Exhibit 1**, which is a true and correct copy of Mr. Maysey's Warner Angle profile, Mr. Maysey has represented figures and otherwise been involved in the elite MMA industry for over ten years.

4.     The Complaints have generated media interests. Attached as **Exhibit 2** is a true and correct copy of an article from ESPN's website concerning the Le complaint, which was downloaded at my direction from the following address: http://espn.go.com/mma/story/_/id/12037883/antitrust-lawsuit-filed-ufc-parent-company-claims-monopoly. Attached as **Exhibit 3** is a true and correct copy of an article from Sports Illustrated's website concerning this litigation, which was downloaded at my direction

from the following address: http://www.si.com/mma/2014/12/16/ufc-antitrust-lawsuit-cung-le.

5.     JSLF attorneys coordinated with attorneys for Gabe Ruediger and Mac Danzig, including Jay Cohen of Spector Roseman Kodroff & Willis, P.C. to file *Ruediger, et al. v. Zuffa, LLC*, Case No. 5:15-cv-00521-NC (N.D. Cal.), on February 4, 2015. Proposed Interim Co-Lead Class Counsel have committed to coordinating with Mr. Ruediger and Mr. Danzig's attorneys moving forward.

6.     Attached hereto as **Exhibits 4 and 5** are true and correct copies of articles concerning other litigation involving the UFC that were downloaded at my direction from the following websites: https://torrentfreak.com/ufc-pirate-apologizes-settles-following-32m-lawsuit-140913/, https://www.techdirt.com/articles/20120320/10225718173/ufc-makes-awful-decision-to-sue-some-its-biggest-fans.shtml.

7.     As part of their work on the *Le*, *Vasquez*, *Vera*, and *Ruediger* matters, Proposed Interim Co-Lead Class Counsel served the Complaints, summons and related materials on UFC. Subsequently, Proposed Interim Co-Lead Class Counsel negotiated a stipulation providing for an orderly briefing schedule for responsive pleadings or motions to be filed by the UFC. *See* Dkt. 28.

8.     Proposed Interim Co-Lead Class Counsel have served third-party subpoenas on Twitter, Inc. and Google, Inc., in order to preserve all potentially relevant evidence. These measures are part of Plaintiffs' investigation of whether there has been deletion of social media by persons affiliated with UFC.

9.     Proposed Interim Co-Lead Class Counsel, in conjunction with Plaintiffs' other attorneys, have taken measures to protect Plaintiffs' interests in connection with the UFC's disclosure of Plaintiffs Le, Quarry, Fitch, Vasquez, Hallman, Vera, and Garza's social security numbers, which the UFC made public for five days because of its failure to redact exhibits to a declaration from one of their in-house attorneys that was submitted with the UFC's motion to transfer. Proposed Interim Co-Lead Class Counsel informed the UFC of the disclosure as soon as they learned of it, so that the exhibits would be promptly removed. The next morning, February 4, the UFC moved to have the exhibits removed from the Court's public docket, and the Court ordered their removal that same day. *See* Dkt. 45.  On February 5, Proposed Interim Co-Lead Class Counsel demanded that, *inter alia*, the UFC (1) explain how the information was disclosed, so that Plaintiffs can be sure it will not happen again; (2) search the public domain for copies of the exhibits and ensure their removal; (3) investigate whether the information has

been used; (4) pay for seven years of credit monitoring for each of Messrs. Le, Fitch, Quarry, Garza, Vera, Hallman, and Vazquez, and agree to reimburse these individuals for all consequential damages, if any, flowing from the improper disclosure of this information. On February 6, the UFC responded by letter, providing an explanation for the transmission, and updated Proposed Interim Co-Lead Class Counsel on its investigation of the consequences of the transmission. UFC sent Proposed Interim Co-Lead Class Counsel another letter on February 12, providing an additional update.  Proposed Interim Co-Lead Class Counsel are evaluating the UFC's responses, and are considering what legal remedies, if any, should be pursued on Plaintiffs' behalf.

10.     Proposed Interim Co-Lead Class Counsel drafted a proposed Stipulated Protective Order along the lines of the model promulgated by the Northern District of California. Plaintiffs provided their draft to the UFC for comment on February 5, 2012. On February 12, the UFC responded with a draft making a number of changes. Plaintiffs are evaluating the UFC's version of the Stipulated Protective Order.

11.     To integrate the *Le*, *Vasquez*, *Vera*, and *Ruediger* matters, and streamline this litigation, Proposed Interim Co-Lead Class Counsel promptly sought to relate the *Vasquez* and *Vera* matters to the *Le* Complaint, resulting in the three cases currently assigned to the Court. *See* Dkt. 18-19.  Proposed Interim Co-Lead Class Counsel have also sought to relate the *Ruediger* matter. *See* Dkt. 49. Proposed Interim Co-Lead Class Counsel filed a motion to consolidate these four matters on February 10, 2015. *See* Dkt. 52. Proposed Interim Co-Lead Class Counsel discussed case management issues with the UFC's counsel in some detail, and obtained counsel for the UFC's agreement on nearly all terms of the [Proposed] Case Management Order submitted with the Motion to Consolidate, except that the UFC wanted consolidation to be for all purposes, while Plaintiffs had requested that consolidation be limited to pre-trial proceedings for the time being. *See* Dkt. 48-1 at ¶5. Proposed Interim Co-Lead Class Counsel have divided the work among Plaintiffs' attorneys to ensure efficient and non-duplicative practices, and have continuously communicated with Plaintiffs' other attorneys.

12.     On February 3, 2015, Proposed Interim Co-Lead Counsel submitted a motion to appoint interim co-lead class counsel by the Court's administrative motion procedure. Proposed Interim Co-Lead Counsel did so in the interests of efficiency, and because Proposed Interim Co-Lead Class Counsel had no

Case No. 5:14-cv-05484-EJD
Case No. 5:14-cv-05591-EJD
Case No. 5:14-cv-05621-EJD

1   reason to believe that a motion to appoint counsel would be opposed.

2        13.    As is explained in further detail in **Exhibit 6**, which is a true and correct copy of a firm

3   resume maintained by JSLF describing the firm's experience and expertise, JSLF is qualified to prosecute

4   Plaintiffs' antitrust claims. Additional information regarding the firm, its experience, and its credentials

5   can be found on the JSLF website, www.saverilawfirm.com. JSLF has the personnel and the financial

6   resources to commit to this litigation.

7       I declare under penalty of perjury under the laws of the United States and the State of California

8   that the foregoing is true and correct to the best of my knowledge and that this declaration was executed

9   in San Francisco, California on February 13, 2015.

 

 

                                                                         *&#47;s&#47; Joseph R. Saveri*
                                                                       Joseph R. Saveri

EXHIBIT "1"

EXHIBIT "1"

2/12/2015

Case 2:15-cv-01045-RFB-BNW Document 197-3 Filed 07/09/15 Page 8 of 37
Case 2:15-cv-01045-RFB-PAL Document 36-3 Filed 02/25/15 Page 8 of 37



  

FIRM OVERVIEW    ATTORNEY PROFILES    PRACTICE AREAS    CONTACT US    HOME

# WARNER ANGLE HALLAM JACKSON & FORMANEK PLC

Helping Businesses and Individuals Since 1959

(602) 264-7101

Corporate and Business Law | Construction Law | Divorce and Family Law | Estate Planning, Tax and Probate | Real Estate | Commercial and Civil Litigation | Appeals | Personal Injury

## REAL ESTATE LAW

VITAL RECORDS

### Robert C. Maysey

Rob Maysey is an experienced real estate, transactional and litigation attorney. Rob practices in all areas of commercial real estate, including the representation of private investors and developers in the acquisition, sale, development, leasing and financing of office buildings, industrial parks and other projects.

Rob has considerable experience in representing borrowers in the negotiation of a wide variety of commercial real estate lending transactions. His practice also includes representation of both buyers and sellers in the negotiation of purchase and sale contracts, as well as both landlords and tenants in the negotiation of ground, office, retail, industrial and other commercial leases and subleases.

In addition to real estate transactions, Rob represents clients in various corporate transactions including the creation of corporate entities, asset and stock purchase transactions, negotiating and drafting employment and non-compete agreements, and in the development of franchise systems.

Rob also regularly represents clients in civil litigation matters including business disputes, real estate disputes, appeals, condemnation actions, valuation actions and business torts.

Rob is licensed to practice in Arizona, California and Minnesota (voluntarily inactive). He graduated with a Bachelor of Arts degree in Politics (with honors) from Whitman College and a J.D. from Cornell Law School. Rob was a Washington State Finalist for the Rhodes Scholarship and a member of the Whitman College Varsity Baseball team.

### SPORTS AND LAW

For more than 10 years, Rob has been actively involved in all facets of the Mixed Martial Arts (MMA) industry, assisting athletes and agents in litigation matters and in negotiating agreements. Rob has written extensively on a variety of topics affecting MMA athletes, including the need to apply the Muhammad Ali Boxing Reform Act of 2000 (the "Muhammad Ali Act") as amended, to the sport of MMA. Rob testified before the California State Assembly in support of a bill to extend similar legal protections enjoyed by boxers to mixed martial artists. Rob also testified before the California State Athletic Commission in support of enhanced regulation for the protection of amateur mixed martial artists.

Rob was a panelist on the ESPN "Outside the Lines" television program regarding pay for MMA athletes and was the featured speaker at a legal symposium on sports and law at the West Virginia College of Law. His work was cited in the WEST VIRGINIA LAW REVIEW. Rob has been featured in the New York Times, the Los Angeles Times, SI.Com, ESPN.com, The New Republic, Crain's New York Business and numerous other media outlets.

**Areas of Practice**
Real Estate Law
Real Estate Purchases and Sales
Commercial Real Estate Finance
Foreclosure, Loan Workouts and Restructuring
Commercial Landlord-Tenant
Real Estate Development
Corporate and Business Law
Corporations, Partnerships and LLCs
Homeowner and Community Associations
Mobile Home and RV Communities
Home and Building Inspections
Commercial Litigation
Appeals
Franchise Law

**Professional Associations and Memberships**
American Bar Association
State Bar of Arizona

**Education**
J.D. Cornell University, 1999
B.A., Whitman College: Rhodes Scholarship Finalist

**Court Admissions**
California, 1999
Arizona, 2006
Minnesota, 2007 (voluntarily inactive)

© 2013-2015. Warner Angle Hallam Jackson & Formanek PLC.  •  2555 E. Camelback Rd., Suite 800, Phoenix, AZ 85016  •  602-264-7101

The information you obtain at this site is not, nor is it intended to be, legal advice. You should consult an attorney for advice regarding your individual situation. We invite you to contact us and welcome your calls, letters and electronic mail. Contacting us does not create an attorney-client relationship. Please do not send any confidential information to us until such time as an attorney-client relationship has been established. The lawyers listed in this website practice law only in the jurisdictions where they are admitted. This website is regulated by the Arizona Rules of Professional Conduct.



The Best Lawyers in America® 2015. Copyright 2014 by Woodward/White, Inc., Aiken, SC

Martindale-Hubbell® Peer Review Ratings™ is a trademark of Reed Elsevier Properties Inc., used under license.
AV®, BV®, AV Preeminent® and BV Distinguished® are registered certification marks of Reed Elsevier Properties Inc.

EXHIBIT "2"

EXHIBIT "2"

 **ESPN.com:** Mixed Martial Arts [Print without images] 

Tuesday, December 16, 2014

# Fighters claim UFC restricts earnings

By John Barr
ESPN.com

SAN JOSE, Calif. -- A group of current and former mixed martial arts fighters is suing the company that owns the Ultimate Fighting Championship in what could evolve into a class-action antitrust lawsuit involving hundreds of fighters, according to one of the attorneys involved.

The lawsuit, the culmination of months of rumors about pending legal action, was filed against Zuffa LLC, the parent company of the UFC, in U.S. District Court for the Northern District of California. It has three named plaintiffs: current UFC middleweight Cung Le and former UFC fighters Jon Fitch and Nathan Quarry.

It accuses the UFC of being a monopoly that forces out rival promotions and limits fighter earnings.

Rob Maysey, a Phoenix-based attorney and longtime critic of what he describes as the "restrictive" labor practices of the UFC, says he has tried for years to warn the world's largest promoter of MMA competitions about the prospect of an antitrust case.

"I called [the UFC] in 2006 and said, 'You have a choice.' I said, 'You guys are going to recognize a fighters' association or you're going to face an antitrust case," Maysey told "Outside the Lines" on Tuesday.

"They [the UFC] have become the only game in town and locked down the entire sport. ... At its heart, this lawsuit is about fundamental fairness. The world-class athletes that comprise the UFC are making enormous sacrifices and taking huge risks. It is a basic right that these athletes enjoy the fruits of their labors."

The lawsuit alleges that the UFC prevents fighters from working with other MMA promoters, profiting from individual marketing deals and signing with outside sponsors, all monopolistic practices that suppress fighters' incomes, according to the lawsuit.

"The antitrust laws of the United States were designed to prevent any company from dominating a market, artificially stifling competition and hoarding supercompetitive profits. That is exactly what happened here," Maysey said.

"They [the UFC] control our likeness," said Le, the only fighter currently under contract with the UFC to be listed as a plaintiff in the lawsuit. "They control our career, and that's a choice we as fighters should have. And we don't have that choice.

"I'm going to represent all the fighters that are scared to take a step up."

The Federal Trade Commission's Bureau of Competition opened an anti-trust investigation on Zuffa after the purchase of Strikeforce in 2011. The FTC closed that investigation in January 2012 but maintained the right to reopen at any time.

2/12/2015
Case 2:15-cv-01045-RFB-BNW   Document 123-2   Filed 07/09/15   Page 11 of 37
Case 2:15-cv-01045-RFB-PAL   Document 86-2   Filed 02/13/15   Page 2 of 2

Le has clashed with UFC management in recent months over a disputed drug test after his August fight in Macau. He was initially suspended for a year after testing positive for elevated levels of human growth hormone, but in October that suspension was overturned when the UFC determined that the initial test results were not reliable.

After nearly drowning in $44 million of debt as recently as 2005, according to CEO Lorenzo Fertitta, the UFC today is widely believed by industry insiders to be worth north of $1 billion.

The lawsuit refers to the Las Vegas-based company as a $2 billion outfit.

**OTL on UFC pay**

In June 2012, ESPN's "Outside the Lines" took an in-depth look at the issue of fighter pay. Look back at the coverage from then. **Story**

"The UFC is aware of the action filed today but has not been served, nor has it had the opportunity to review the document," a UFC spokesperson said in a statement. "The UFC will vigorously defend itself and its business practices."

Maysey is a member of one of five law firms that have joined forces in what could eventually be certified by the court as a class-action lawsuit.

"All UFC fighters are paid a mere fraction of what they would make in a competitive market," said Benjamin Brown, another of the plaintiffs' attorneys.

"Rather than earning paydays comparable to boxers -- a sport with many natural parallels -- MMA fighters go substantially undercompensated despite the punishing nature of their profession," Brown added.

Litigation will be long and costly. Maysey pointed out that antitrust cases of this magnitude typically last three to five years and can cost $3-5 million.

"We're prepared for a very long and tumultuous fight," said Quarry, who retired in 2010 with a 12-4 record, including an appearance on "The Ultimate Fighter" reality series in 2005.

"We have confidence we're in the right."

EXHIBIT "3"

EXHIBIT "3"

2/12/2015
Case 2:15-cv-01045-RFB-BNW Document 127-3 Filed 07/09/15 Page 13 of 37
Case 2:15-cv-01045-RFB-PAL Document 56-5 Filed 02/23/15 Page 3 of 5

# Antitrust lawsuit, if successful, could unravel the UFC



Photo: John Medina/WireImage

 BY **MICHAEL MCCANN**

Posted: **Tue Dec. 16, 2014**

It was only two weeks ago when the Ultimate Fighting Championship trumpeted the signing of CM Punk, the wrestling star who exited World Wrestling Entertainment frustrated by working conditions. The tables have now turned on the UFC. Tuesday afternoon, a group of prominent current and former UFC fighters filed an antitrust lawsuit in the U.S. District Court for the Northern District of California against UFC's parent company, Zuffa, leveling harsh criticisms of UFC working conditions. The group includes UFC star Cung Le as well as former stars Jon Fitch and Nate Quarry. They seek certification to represent other fighters in what might become a massive class action.

Cung and his co-plaintiffs insist the UFC is an illegal monopoly under federal antitrust law. The UFC, in their view, unlawfully stifles competition from other MMA leagues. By denying UFC fighters opportunities to bargain with rival MMA leagues, the UFC can pay its fighters low wages and impose strict employment restrictions. According to this theory, the UFC leaves its fighters with no

bargaining leverage and then takes full and brutal advantage of this absence of competition.

The fighters' claims are reminiscent of those raised by Curt Flood in his historic lawsuit against Major League Baseball for free agency and by Ed O'Bannon in his recent case against the NCAA for name, image and likeness rights. If successful,Cung and co-plaintiffs demand monetary damages, which would be automatically tripled (trebled) under antitrust law, plus a court injunction that would force changes to the UFC. *Le v. Zuffa* threatens to unravel the UFC, which has stunningly grown in value from $2 million in 2002 to as much as $3.5 billion today.

## The fighters' core grievances

The fighters contend they've been forced to sign oppressive contracts that make them indentured servants to UFC. As the fighters see it, they've been unlawfully denied free agency and name, image and likeness rights. This denial has led to seemingly low salaries compared to massive UFC revenues. According to Cung'scomplaint, while tthe starting fight purse for a UFC fighter is just $6,000, the UFC generated $483 million in revenue from October 2012 to September 2013 and "has profit margins higher than all or nearly all other major professional sports." While there is considerable debate about average and median earnings for UFC fighters, estimates generally indicate the average UFC fighter takes home less than $100,000 year. While salary figures for UFC fighters are nearly impossible to get, it's general accepted that a huge percentage of the company's payouts go to a few fighters, with the rest getting crumbs, relatively speaking.

• **Three MMA fighters file antirust suit against the UFC**

Cung contends onerous contractual provisions cause these low salaries. For instance, UFC fighters contractually assent to a "champion's clause," which triggers an extension of a fighter's contract if he becomes a champion. This means that a fighter can't negotiate a new contract at the optimal time: when he's at the top. The champion's clause bears a resemblance to the "reserve clause" used by baseball teams until the 1970s to automatically renew expired contracts and prevent free agency. Other contractual clauses similarly provide the UFC with restraints on fighters' earning power. Consider the "exclusivity clause," which allows the UFC to match offers received by fighters from other mixed martial arts leagues even after the fighter's UFC contract has expired. This seemingly impairs rival MMA leagues, such as Bellator MMA and World Series of Fighting, in recruiting UFC talent and prevents UFC fighters from leveraging leagues against one another in negotiations.

Also, arguably like NCAA athletes, UFC fighters are obligated to convey their name, image and likeness rights to the UFC in perpetuity. This is through the "ancillary rights clause," which grants the UFC exclusive name, image and likeness rights for merchandise, video games and broadcasts. UFC fighters contend the ancillary rights clause has greatly diminished their sponsorship opportunities and deprived them of lucrative contracts signed by the UFC.

## The fighters' antitrust argument

Pointing out arguably unfair contractual provisions and seemingly low wages is not enough to prove the UFC has broken the law. Employees in the United States do not enjoy an inherent right to "fair" wages. Recognizing this, Le and his co-plaintiffs charge the UFC has violated Section 2 of the Sherman Antitrust Act. In general, Section 2 bars illegal monopolies. A company being dominant in an industry does not automatically prove the company is an illegal monopoly. The company must have engaged in anticompetitive practices over a particular industry and in a particular market.

According to Le, the UFC has used a combination of oppressive contracts and deceitful tactics to remove rivals and would-be rivals in the market for "live elite professional MMA fighter services." The absence of serious competition for UFC has allegedly given it "monopsony power."  A monopsony is similar to a monopoly, except that it involves a buyer rather than a seller. The basic idea of a monopsony is that those selling a service, such as elite professional MMA fighting, are stuck selling those services to one main buyer, in this case the UFC. The buyer can set low prices and impose other restrictions on the sellers, who know that other buyers aren't significant enough to offer better prices.



**NFL**

Exploring Adrian Peterson's legal options following failed appeal

*by Michael McCann*

In addition to the "one sided" contract provisions discussed above, the UFC also allegedly obliterates competition. According to Le, the UFC has engineered "a serious of acquisitions designed to remove competing rivals and would-be rivals and thereby championship titles from the marketplace." Those acquisitions include acquiring the contracts of Elite Professional MMA Fighters. Moreover, according to Le, the UFC ensures it is the only MMA league in town by requiring "major physical venues for MMA bouts to supply their services to the UFC exclusively."

## Legal significance of no 'UFC union' and Zuffa completely owning the UFC

A key difference between UFC fighters and players in the NFL, NBA, NHL and baseball is that UFC fighters are not unionized. There is no "UFCPA" like there is an NFLPA or NHLPA. As a consequence, restrictions on UFC fighters' salary and other types of compensation are not collectively bargained and thus not contained in a collective bargaining agreement. The restrictions are instead negotiated individually between fighters and the UFC, and Le and his co-plaintiffs contend the UFC won't budge on certain provisions.

If not for the fact that the UFC is owned entirely by Zuffa, the UFC would face a legal vulnerability not shared by the other major leagues. Under what's known as the "non-statutory labor exemption," employment restrictions created through collective bargaining are exempt from the area of antitrust law most threatening to leagues: Section 1 of the Sherman Act. Section 1 prohibits competitions -- such as rival, separately-owned teams in a league -- from conspiring to impose unreasonable restrictions on players' earning power. The basic logic of the labor exemption is that it encourages owners to negotiate rules with labor rather than to unilaterally impose those rules. The exemption enables pro leagues like the NFL and NBA to enforce salary caps, maximum player salaries, eligibility rules, personal conduct policies, drug testing procedures and other restrictions on employment that might otherwise run afoul of antitrust law. Even if they those restrictions would be found lawful under antitrust law, leagues like the NFL and NBA don't want to spend millions of dollars taking their chances in court.

• **Will Cung Le fight or act?**

The UFC, however, is structured as a "single entity" sports league. Single entities are wholly owned companies. A single entity may have subsidiaries, but it wholly owns those subsidiaries. For example, Frito-Lay is a wholly owned subsidiary of Pepsi Co., which at any time can take the shoes of Frito-Lay. This relationship is unlike leagues such as the NFL or NBA where competing teams are individually owned. Crucially, a single entity is not subject to Section 1 since Section 1 only regulates competitors. The UFC thus does not need to collectively bargain employment rules with fighters to avoid Section 1 scrutiny. This dynamic likely discouraged Le from raising a Section 1 claim and highlights the impressive foresight and wisdom of the UFC in organizing as a single entity.

**Likely UFC defenses**

The UFC will offer a number of defenses to debunk Le's legal theory.

First, the UFC will stress that fighters voluntarily sign contracts to fight in the UFC. No fighter is "forced" to pursue a career in the UFC nor accept employment terms offered by the UFC. There are other MMA leagues and other professions that fighters could instead pursue. Along those lines, the UFC will emphasize that UFC contracts reflect a bargained-for exchange that benefits both sides. While the UFC seems to receive a great deal from fighters' labor, fighters are compensated, in some cases quite well, and they also receive media exposure and endorsement opportunities they might not otherwise obtain.

Second, the UFC will portray its rules and business practices as reflecting superior business acumen, keen foresight and honed skills—the very virtues promoted by capitalism. It is not illegal to thrive in the business world. To the extent the UFC enjoys monopsony power, the UFC will claim it reflects natural progression of making good decisions and taking risks. The more the UFC can frame its success as reflecting merit, the harder it will be for Le to prevail on an antitrust claim.

2/12/2015

Case 2:15-cv-01045-RFB-BNW Document 127-3 Filed 07/09/15 Page 17 of 37
Case 2:15-cv-01045-RFB-PAL Document 1-1 Filed 02/23/15 Page 5 of 5

Third, expect the UFC to reference how the Federal Trade Commission investigated it for antitrust violations from 2011 to 2012 but declined to pursue the matter. The FTC studied the UFC's acquisition of Strikeforce, World Fighting Alliance and other MMA leagues, but found no unlawful conduct.

Lastly, watch for the UFC to contend that a judge forcing changes to its business model would harm the very industry at the heart of Le's lawsuit: elite professional MMA fighting. The UFC will likely submit data and expert testimony that links the extraordinary growth in popularity of MMA in the U.S. to the success of the UFC. Under this theory, preventing the UFC from effectively competing would endanger that popularity, and potentially lead to lower salaries for UFC fighters.

**Going forward and risk to the UFC of pretrial discovery**

Antitrust litigation often takes years to play out, so do not expect a swift resolution.Le also does not necessarily need to win a trial in order to be considered a "winner." If Le's complaint can advance past Zuffa's motion to dismiss, a judge would likely order pretrial discovery. This could force Zuffa to reveal sensitive information about fighters' salaries and UFC contracts and potentially help fighters negotiate better pay.

The risk of pretrial discovery might also motivate the UFC to offer Le an attractive settlement that, if accepted, would increase fighters' pay.

**Michael McCann** *is a Massachusetts attorney and the founding director of the Sports and Entertainment Law Institute at the University of New Hampshire School of Law. He is also the distinguished visiting Hall of Fame Professor of Law at Mississippi College School of Law.*

*Jeff Wagenheim and Jon Wertheim contributed to this article*

EXHIBIT "4"

EXHIBIT "4"

2/12/2015
Case 2:15-cv-01045-RFB-PAL Document 33-3 Filed 07/29/15 Page 19 of 37
Case 2:15-cv-01045-RFB-PAL Document 33-3 Filed 02/13/15 Page 19 of 37

# UFC PIRATE APOLOGIZES & SETTLES FOLLOWING $32M LAWSUIT

BY **ANDY** ON **SEPTEMBER 13, 2014**                    C: **25**

*A man hit with a $32 million lawsuit after releasing an estimated 200 hours of UFC PPV events on torrent sites has settled his case with UFC owner, Zuffa. On top of a permanent injunction Steven Messina, known online as Secludedly, publicly apologized to the UFC and will hand over all of this equipment and website data.*

According to fans around the world, MMA is the fastest growing sport, bar none. The planet's premier MMA production company is the Ultimate Fighting Championship, more often known as simply UFC.



In addition to events broadcast on regular TV, each month the UFC puts on special PPV cards. These cards attract a lot of attention and are a major money spinner for the martial arts organization. However, there are thousands of fans out there who prefer not to pay to view. For them, torrent sites are the answer.

Until the first few months of this year one of the most prolific releasers of UFC content was an individual known online as Secludedly. However, during April his activities came to an abrupt halt after he was targeted in a $32 million lawsuit filed by UFC parent company, Zuffa.

Secludedly was soon revealed to be Steven A. Messina, a 27-year-old from Staten Island, New York.

"I'll be honest, I don't understand the laws and all that around this type of thing, so I'm a little lost here and overwhelmed," Messina told TorrentFreak at the time. "I don't even know what is going on. I think people on the Internet know more than me."

With a default judgment looming TorrentFreak further interviewed Messina who told us that he'd decided to launch a funding campaign to defend himself against Zuffa. He raised a few hundred dollars, nowhere near enough to take on the multi-billion valued company.

Then the inevitable happened. On June 4, 2014, a default judgment was entered against Messina and his fight with the UFC was over. The question now was how badly they'd choose to beat him up financially after the final bell.

All went quiet until early September when Zuffa filed for a permanent injunction to stop

Messina pirating UFC content in the future. Behind the scenes the UFC and their arch-enemy had settled their case, with the only public record being the injunction jointly signed by the martial arts organization and Messina.

As can be seen from the excerpt from the injunction below, the UFC are keen to learn from Messina's operation, and that means collecting all data they can from the New Yorker.

"This Court hereby enters an injunction requiring Defendant, Steven A Messina, to turn over to the plaintiff, Zuffa..[..].. any readily available information, processes, records accounts, bills received for the purchase of any UFC event, user profile names and identifications, domains utilized by Defendant and any user information for any website or computer used by, owned or controlled by Defendant that was used or assisted in the unauthorized access, streaming, copyright, uploading, downloading, distributing or public performance of any UFC event, including, but not limited to, the events that are the subject of the instant litigation," the injunction reads.

Also of interest to Zuffa is the equipment used by Messina to pirate their content. The injunction cites a 2013 TorrentFreak article in which Messina explained how he captured super-smooth video. All equipment related to that must be surrendered to Zuffa including various pieces of software, scripts and storage devices.

In addition to restraining Messina from future piracy acts, the UFC are also allowed to check up on him to ensure compliance.

"Plaintiff shall be entitled to conduct all discovery permitted under the Federal Rules of Civil Procedure for the period of six (6) months from the date of the filing of this stipulation for the purpose of monitoring Defendant's compliance with the terms of this permanent injunction," the injunction reads.

There is no mention of a cash settlement and even if there was one it wouldn't amount to much, certainly not $32 million. However, to act as a deterrent, the UFC has had Messina come out in public to both apologize and warn others away from the perils of piracy.

"I apologize to the UFC for any damages incurred as a result of my actions in illegally distributing copyrighted UFC broadcasts. As a result of my confession for piracy of UFC's protected content, I fully accept the terms of the settlement with the UFC," Messina said.

"I now realize the harm caused by my actions. It is my hope that I can use this difficult period as a learning experience as I move on with my life. I would also like to tell anyone pirating UFC broadcasts, either through illegal downloading or non-authorized streaming, that it is illegal and not worth the risk."

Kirk Hendrick, UFC's Chief Legal Officer, said the MMA organization was satisfied with the result.

"The UFC organization is pleased with the outcome of this case and Messina's willingness to assist the UFC's efforts in protecting our intellectual property and broadcasts. With Messina's apology and understanding, the UFC organization will learn more to help us continue uncovering illegal distribution of our content."

But while Messina may have been brought under control, the lawsuit against him has done nothing to stop content appearing online. Following last weekend's Jacare vs Mousasi card, no less than five separate release groups uploaded the event online.

EXHIBIT "5"

EXHIBIT "5"

Case 2:15-cv-01045-RFB-PAL (LW) Document 53-7 Official Use Pending Filed 02/13/15 Page 23 of 37

# UFC Makes The Awful Decision To Sue Some Of Its Biggest Fans

from the *short-sighted* dept

Having recently lost its attempt to blame Justin.tv for the fact that some of its users stream Ultimate Fighting Championship matches, UFC's parent company Zuffa is moving ahead with its strategy of going after its fans directly. This isn't entirely new. A few years ago, the company announced plans to sue fans, even though it admitted at the time that the costs of such lawsuits would outweigh any benefits. Of course, that alone should make you wonder what Zuffa management is thinking, but it seems that their entire thought process is "piracy bad, must stop," and that's about it.

The latest move is that Zuffa was able to get user information from Greenfeedz.com, one of the websites that let people watch unauthorized feeds of UFC's pay-per-view (PPV) events. This plan is very reminiscent of when DirecTV ran one of the first of these extortion-like shakedown campaigns by getting the list of customers from a seller of smart cards (which had other legitimate purposes) and then demanding $3,500 from each of them. That action did not go well for DirecTV, leading to multiple lawsuits, including from former employees, and the company eventually dropped the program altogether. Stunningly, Zuffa's lawyer compares his situation to the DirecTV situation... but seems to ignore the massive backlash it created, the legal pushback and the eventual dropping of the program.

Of course, as we also noted in that post a couple years ago about Zuffa's plan to sue fans, huge numbers of people are perfectly willing to pay large sums for the PPV fights, and the numbers seem to keep growing. It seems to depend more on who's fighting rather than whether or not unauthorized streams are available. That said, in explaining why they're going to sue their fans, Zuffa's legal boss, Lawrence Epstein, said that he believes the company has an obligation to sue the fans.

But, even more ridiculous is the response when someone asks about suing fans. Epstein claims that UFC loves its fans, but anyone who infringes is simply not a fan at all. However, that's *ridiculous*. An article by Ben Fowlkes at MMAFighting.com provides a wonderful explanation for why this is a ridiculous claim:

> For starters, the UFC seems to believe that there are two types of MMA fans: the type who buys the pay-per-views, and the type who watches them illegally. In reality, the line between those two groups is probably a lot blurrier than Zuffa realizes. Chances are very good that some of the people who have streamed events in the past have also bought them, and probably will buy them again at some point in the future. Maybe they only pony up the $55 for the pay-per-view when the card is good enough, or when they can get friends to split the cost with them. Maybe they stream it when they only care about one or two fights, or when they're simply too strapped for cash to afford it.
>
> My point is, not all piracy is created equal, at least on the receiving end, and attacking viewers as if they are distributors could do much more harm than good.
>
> For instance, picture a 19-year-old college student just about anywhere in America. He wants to see a UFC event, but maybe he can't even afford basic cable, let alone a pay-per-view. He can't go to a bar to watch the fights (unless he has a convincing fake ID), so he stays home and finds an illegal stream on his laptop, because he can't stand to miss the big fight. Then, months later, he gets sued by the UFC.
>
> What's going to happen when that kid graduates, goes to work, and finds a job that will allow him to enjoy luxury expenses like pay-per-views? You think he's going to become a loyal customer of the company that sued him back when he was struggling to buy books? You think he's going to buy a ticket to see a UFC event when it comes to his city? You think he's going to buy merchandise or watch

*free events or patronize the UFC in any way after that experience? Maybe. Or maybe he'll hold a little bit of a grudge. You know, for the rest of his natural life.*

That's the amazing thing about so many anti-piracy attempts. They simply don't take into account the *actual* situation, and what the real costs and benefits of their actions are. They just think "piracy bad, must stop." They refuse to accept that those who are infringing may have reasons for doing so beyond "I'll never give any money to these people ever." Not actually understanding that seems like a huge strategic blunder. For all the talk of having an "obligation" to sue fans, I would think that the company's officers actually have an obligation to the company's shareholders, which means not making braindead moves that actually hurt the bottom line. And yet that seems to be the ultimate plan here.

EXHIBIT "6"

EXHIBIT "6"

# JOSEPH SAVERI LAW FIRM, INC.

505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone (415) 500-6800
Facsimile (415) 395-9940
www.saverilawfirm.com

The Joseph Saveri Law Firm, Inc. specializes in antitrust law and complex civil and class action litigation in federal and state courts throughout the United States and in cases across the globe. The firm was founded in 2012 by Joseph R. Saveri. Since that time, the firm has quickly developed a track record of success in prosecuting cases on behalf of its clients and performing the highest quality legal work. Recently, the firm has been ranked as a 2014 Best Lawyers and US News Best Law Firm in the area of antitrust litigation.

With more than 25 years' civil litigation experience, Joseph R. Saveri has handled cases involving numerous industries including banking and financial services, insurance, energy, pharmaceuticals, agricultural products, computer hardware, computer software, manufacturing inputs, travel and transportation, paper products, cosmetics, and consumer electronics. Mr. Saveri has established himself as one of the country's top litigators in the antitrust field.

Over the past 25 years, Mr. Saveri has investigated, prosecuted and successfully resolved numerous antitrust class actions and other complex cases. He has served both as a court-appointed leader of such efforts, and as a valued member of the teams operating under the leadership of others. As lead or co-lead counsel in many of these cases, he has taken a personal leadership role in organizing litigation, setting strategy, establishing and directing teams of lawyers, and assigning specific tasks to teams of attorneys in a way that ensures the efficient use of resources and maximizes the talents of the litigation team. Throughout these cases, Mr. Saveri has displayed the energy, vision and commitment that leadership requires, combined with the ability to listen, share and work cooperatively so that the litigation team operates equitably, efficiently, and without friction. Mr. Saveri serves or has served as lead counsel in many class actions and other complex cases, including most recently the *Titanium Dioxide*, *High Tech Employee*, and *TFT (Flat Panel)* litigation.

A list of cases in which Mr. Saveri has served includes:

1. *In re Titanium Dioxide Antitrust Litigation*, 10-cv-00318-RDB (D. Md.). Mr. Saveri served as Co-Lead Counsel to a class of direct purchasers of titanium dioxide. This case produced a settlement of $165 million on the day before the trial was to commence.

2. *In re High-Tech Employees Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.). Mr. Saveri serves as Co-Lead Class Counsel for a class of over 60,000 employees of leading technology companies against their employers for their alleged agreements to restrict recruiting in an effort to suppress wages. The court has approved a partial settlement of $20 million. The case against the remaining defendants is set to go to trial on April 9, 2015.

3. *Maxon Auto Enterprises, Inc. v. Carfax,* No. 13-cv-2680 (AJN) (S.D.N.Y.). The Joseph Saveri Law Firm serves as Counsel for over 400 auto dealerships in an antitrust case against Carfax for their alleged use of unlawful exclusive dealing contracts. Plaintiffs allege that Carfax has entered exclusive dealing arrangements with various auto manufacturers and leading websites that provide classified listings for used car sales, which has restricted competition in the market for vehicle history reports and led to higher prices and a lower quality product.

4. *In re Cipro Cases I and II,* JCCP Nos. 4154, 4220 (San Diego County Sup. Ct.). Mr. Saveri serves as Co-Lead Counsel for consumers who purchased Cipro, a blockbuster antibiotic drug. Plaintiffs allege that Bayer Corporation, Barr Laboratories, two other generic drug companies, and other defendants entered into an unlawful agreement to keep a generic version of the drug off the market that allowed Bayer to sell Cipro at inflated prices. In November 2013, the California Superior Court for the County of San Diego approved a $74 million class action settlement between Bayer and the Class. The case continues against the Generic drug companies and is currently on appeal to the California Supreme Court.

5. *Fond du Lac Bumper Exchange Inc. v. Jui Li Enterprise Company Ltd. et al*, No. 2:09-cv-00852-LA (E.D. Wisc.). The Joseph Saveri Law Firm serves as counsel for a class of auto parts distributors who allege that

Taiwanese manufacturers of aftermarket sheet metal auto parts colluded to artificially raise prices and eliminate competition.

6.  *Cung Le et al. v. Zuffa, LLC*, No. 5:14-cv-05484-EJD (N.D. Cal.). The Joseph Saveri law represents Elite Professional Mixed Martial Arts Fighters in a class action against Ultimate Fighting Championship or UFC. Plaintiffs allege that UFC illegally acquired and maintained monopoly power which it used to prevent other promoters from competing for the Fighters' services, which artificially suppressed wages for the Fighters. Plaintiffs also allege that UFC used its monopoly power to expropriate some fighters' likenesses, further suppressing their wages.

7.  *In re Lidoderm Antitrust Litigation*, No. 14-md-02521 (N.D. Cal.). The Joseph Saveri Law Firm serves as End-Payors' Interim Liaison Counsel in a proposed class action lawsuit brought by indirect purchasers of Lidoderm against Endo Pharmaceuticals Inc., Teikoku Seiyaku Co., Inc. and Actavis Inc. (as well as their respective subsidiaries). Plaintiffs claim that Defendants entered into an illegal pay-for-delay or reverse payment agreement whereby Endo provided nearly $100 million worth of branded Lidoderm to Actavis to keep generic lidocaine patches off the market. Endo further promised not to launch an authorized generic version of Lidoderm to compete with Actavis' generic version for seven and a half months. Plaintiffs allege that this anticompetitive scheme employed by Endo and Actavis amounted to an unlawful reverse payment that caused plaintiffs to pay higher prices for Lidoderm.

8.  *In re Aluminum Warehousing Antitrust Litigation,* No. 13-md-02481-KBF (S.D.N.Y.). The Joseph Saveri Law Firm represents a class of direct purchasers of aluminum which was stored in warehouses owned and operated by Defendants JPMorgan Chase, Goldman Sachs, Glencore Xstrata and their respective subsidiaries. Plaintiffs allege that Defendants conspired to manipulate the amount of time aluminum was stored in LME-approved warehouses, which cost consumers billions of dollars in added premiums.

9.  *In Re Capacitors Antitrust Litigation*, No. 14-cv-03264-JD (N.D. Cal.). The Joseph Saveri Law Firm has been appointed sole lead counsel representing a class of direct purchasers of capacitors used in

electronic devices. Plaintiffs allege that Defendants formed a cartel and conspired to fix, raise and stabilize prices in the multi-billion dollar market for aluminum, tantalum, and film capacitors.

10. *Insulate SB, Inc. v. Advanced Finishing Systems*, No. 14-2561 (8th Cir.). The Joseph Saveri Law Firm, Inc. serves as counsel for a proposed class of fast-set spray foam equipment purchasers who have alleged various federal and state antitrust violations against Graco Inc. and several of its distributors. The case is currently pending on appeal to the Eighth Circuit Court of Appeals.

11. *Meijer v. Abbot Laboratories*, Nos. 4:07-cv-5470; 4:07-cv-5702; 4:07-cv-5985 (N.D. Cal.). Joseph Saveri served as Liaison Counsel on behalf of the class of direct purchaser plaintiffs in the Norvir Antitrust Litigation. The case involved claims under Section One and Section Two of the Sherman Act in connection with the sale, marketing and pricing of the bundled drugs Norvir and Kaletra by Abbott Laboratories. Mr. Saveri participated in all phases of the litigation, including trial. Among other things, Mr. Saveri's work during jury selection of the case resulted in the landmark decision by the Ninth Circuit in in *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471 (9th Cir. 2014) confirming that equal protection prohibits discrimination based on sexual orientation in jury selection and that the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), applies in civil cases. Following jury selection, the direct purchasers settled their claims in full for $52 million.

12. *Microsoft Private Antitrust Litigation*. Representing businesses and consumers, Mr. Saveri prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee. Plaintiffs alleged that Microsoft engaged in anticompetitive conduct and/or violated state deceptive and unfair business practices statutes to harm competition and monopolize the markets for Intel-compatible, personal computer operating system software, as well as word processing and spreadsheet software. In August 2006, the New York Supreme Court granted final approval to a settlement that makes available up to $350 million in benefits for New York businesses and consumers. In August 2004, the court in the North Carolina action granted final approval to a settlement valued at over

$89 million. In June 2004, the court in the Tennessee action granted final approval to a $64 million settlement. In November 2003, in the Florida Microsoft litigation, the court granted final approval to a $202 million settlement, one of the largest antitrust settlements in Florida history. Mr. Saveri served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

13.   *In re Lupron Marketing and Sales Practices Litigation,* MDL No. 1430 (D. Mass.). In May 2005, the court granted final approval to a settlement of a class action brought by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty. The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities that paid for Lupron from January 1, 1985 through March 31, 2005. Plaintiffs charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid. Mr. Saveri served as Co-Lead Plaintiffs' Counsel.

14.   *In re Buspirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.). In November 2003, Mr. Saveri obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payors that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety. Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market. Mr. Saveri served as Plaintiffs' Co-Lead Counsel.

15.   *California Vitamin Cases,* J.C.C.P. No. 4076 (San Francisco Superior Ct.). Mr. Saveri served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution. In January 2002, the court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action

alleging that these and other manufacturers engaged in price fixing of particular vitamins. In December 2006, the court granted final approval to over $8.8 million in additional settlements.

16. *Pharmaceutical Cases I, II, and III,* J.C.C.P. Nos. 2969, 2971, and 2972 (San Francisco County Sup. Ct.). Mr. Saveri served as Co-Lead and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations of the Cartwright Act and the Unfair Competition Act. The class alleged that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses. In April 1999, the court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that serve California's poor and uninsured. In October 2001, the court approved a settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

17. *In re Electrical Carbon Products Antitrust Litigation,* MDL No. 1514 (D.N.J.). Mr. Saveri represented the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

18. *In re Travel Agency Commission Antitrust Litigation*, MDL No. 1058 (D. Minn.). Mr. Saveri served as Co-Lead Counsel for a certified class of U.S. travel agents on claims against the major U.S. air carriers, who allegedly violated the federal antitrust laws by fixing the commissions paid to travel agents. In 1997, the court approved an $82 million settlement.

19. *In re Brand Name Prescription Drugs*, MDL No. 997 (N.D. Ill.). Mr. Saveri served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws. Class Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by

denying those discounts provided to hospitals, health maintenance organizations, and nursing homes. In 1996 and 1998, the court approved settlements with certain manufacturers totaling $723 million.

## BIOGRAPHIES

Attorneys

Joseph R. Saveri

Joseph Saveri began his career doing general litigation work at the San Francisco law firm of McCutchen, Doyle, Brown & Enersen. In 1992, Mr. Saveri joined the plaintiffs' firm Lieff, Cabraser, Heimann & Bernstein, where he founded and developed the firm's Antitrust and Intellectual Property practice, which he established and chaired. He also served as the firm's Managing Partner and Chair of the firm's Antitrust and Intellectual Property practice group. In 2012, the Antitrust and Intellectual Property practice group was recognized as one of the top five practice groups in California. Mr. Saveri left Lieff Cabraser in May of 2012 to start his own firm, the Joseph Saveri Law Firm, Inc.

Between 2010 and 2013, Mr. Saveri was chosen to serve as a Lawyer's Representative for the United States District Court for the Northern District of California and the Ninth Circuit Court of Appeals. He has served and serves on a number of court committees charged with developing rules and programs regarding complex litigation, ediscovery and a variety of other matters. Mr. Saveri was chosen to serve as a member of the Northern District's Civil Rules Advisory Committee from 2009-2012, the committee to establish rules and procedures for expedited trials, which the court adopted as General Rule 64, Expedited Trial Procedures, and the committee which crafted the new ediscovery rules and procedures recently adopted by the court. Mr. Saveri is also a frequent author of articles on antitrust and complex litigation issues, and a frequent lecturer on a variety of matters, including antitrust, complex litigation, class action practice and discovery. He is a member of the Advisory Board of the American Antitrust Institute.

An AV-Peer Review Rated Attorney by Martindale-Hubbell, Mr. Saveri has been selected by peer and blue-ribbon panel review to the Best Lawyers in America for antitrust litigation, 2012–2015. He has been named a Northern California Super Lawyer by Thomson Reuters' Super Lawyers publication from 2006-2014, and was named one of the "Top Attorneys in Antitrust Law" by the Super Lawyers Corporate Counsel Edition in 2010 and 2012-2014. In 2014, he was selected for inclusion in Who's Who Legal: Competition, and was named a Leading Labor & Employment Lawyer in California by the Daily Journal Corporation's editorial staff. He was recently named a Band 1 (top-ranked) plaintiffs' antitrust attorney for California and nationwide by Chambers

USA, and was recently named "One to Watch" by Acquisition International magazine. On October 30, 2014, Law360 named Mr. Saveri a "Titan Of The Plaintiffs' Bar," citing his leadership and vision in extending the reach of antitrust cases into new areas such as pharmaceutical reverse payments and "no-poach" agreements by high-tech employers.  He also serves as an author of California State Antitrust and Unfair Competition Law, the legal treatise published by the State Bar of California's Antitrust and Unfair Competition Section.

Mr. Saveri has performed virtually every aspect of complex and class action litigation, including, among other things, factual and economic analysis of market conditions and pricing practices, drafting of pleadings, law and motion matters, organizing electronic discovery, creating a discovery plan, administering and directing on-line review of documents which requires coordination of dozens of lawyers fluent in English and foreign languages, propounding written discovery, taking and defending percipient and expert witness depositions, organizing the factual record, briefing and arguing summary judgment, trial and appellate work.

Mr. Saveri received his J.D. from the University of Virginia Law School in 1987. He received his B.A., with honors, in 1984 from the University of California, Berkeley.

Andrew M. Purdy

Andrew M. Purdy has litigated a wide array of federal and state cases from inception to conclusion, either at trial or by the court's disposition, over the last 12 years.  Prior to joining Joseph Saveri Law Firm in May 2014, Andrew practiced with international law firms in both New York City and San Francisco, where he represented individuals, public and private companies, professional services firms and financial institutions in numerous consumer and securities class actions, regulatory enforcement actions, white collar criminal investigations and matters, and complex commercial and intellectual property cases.  He previously served as a sworn prosecutor in San Francisco District Attorneys' Office, conducting criminal jury trials on the City and County's behalf.  In addition to his litigation experience, Andrew has performed complex factual investigations as part of several corporate internal investigations either arising from whistleblower reports or independently initiated by board committees.

Andrew has extensive experience performing every aspect of complex litigation. Specifically, he has conducted and overseen voluminous document productions and reviews, and has personally synthesized the yield of such reviews to prepare

for affirmative and defensive discovery. He has written and responded to discovery, as well as taken and defended countless fact and expert witness depositions. Andrew also has researched, written and argued a variety of dispositive and non-dispositive motions.

Andrew received his J.D., cum laude, from American University, Washington College of Law in 2002, where he was a Note and Comment Editor of the *American University Law Review*. He received his B.A., cum laude, in Political Science from Vanderbilt University in 1999.

Matthew S. Weiler

Matthew S. Weiler has over ten years of experience litigating complex matters in California state and federal courts. Matthew focuses his practice on complex commercial litigations, including class actions, antitrust, securities, corporate ownership and control, sports law, and Foreign Sovereign Immunity Act litigation. Before joining the Joseph Saveri Law Firm, Matthew was an associate at two international law firms in Los Angeles and San Francisco, where he represented athletes, a professional sports franchise, companies of various sizes, and a foreign government.

At the Joseph Saveri Law Firm, Matthew advocates on behalf of the firm's clients in several different industries, including technology and professional sports. He focuses his practice on prosecuting antitrust conspiracies, and representing individuals, companies, and investors who have been harmed by fraud and unfair business practices.

In 2013 and 2014, Matthew was named a Northern California "Rising Star" by Thomson Reuters' Super Lawyers publication.

Matthew received his J.D., cum laude, from the University of Michigan Law School in 2004. He received his B.A., with honors and highest distinction, in Economics from the University of Michigan in 2001, where he was a member of Phi Beta Kappa and a James B. Angell Scholar. From 2000 to 2001, he studied English Literature at St. Edmund Hall, Oxford.

Matthew is admitted to practice in California and before the U.S. Court of Appeals for the Ninth Circuit and the U.S. District Courts for the Northern, Eastern, Southern, and Central Districts of California.

Kevin Rayhill

Kevin Rayhill specializes in complex class actions involving antitrust claims. He represents plaintiffs harmed by the anticompetitive practices of powerful corporations in markets such as automobiles, steel, commodities warehousing, long-haul trucking, paint manufacture, plastics and commercial food products. Kevin is a graduate of Oberlin College (B.A.), the Berklee College of Music (Professional Diploma), and the University of California, Hastings College of the Law ( J.D.). While in law school, he held internships at the California Attorney General's Office (Environment, Land Use, and Natural Resources Division) and the San Francisco City Attorney's Office (Energy and Telecommunications Team), and an externship with Justice Stuart R. Pollak of the California Court of Appeal (First District). Upon graduation he worked as a Legal Research Attorney at the Superior Court of San Francisco (Criminal Division).

James Dallal

Since joining the Joseph Saveri Law Firm, James Dallal has focused on complex class actions involving antitrust claims. He has practiced in all phases of antitrust litigation from pleadings through discovery, class certification, dispositive motions, and appellate briefing. Prior to joining the firm he worked for a boutique plaintiffs' firm in Los Angeles that assisted borrowers in their suits against the financial industry. He attended Rice University (B.A., History), Hastings College of the Law ( J.D. cum laude), and Université Panthéon-Assas in Paris (LL.M. in European Law, first in class and mention bien). Prior to attending law school he worked as a paralegal for a major international firm in its patent litigation group. He has certified proficiency in French and Portuguese.

Ryan J. McEwan

Ryan J. McEwan focuses his practice on complex civil and class action litigation in state and federal court. Since joining the Joseph Saveri Law Firm, Ryan has participated in all phases of antitrust litigation including pre-filing investigation, law and motion practice, discovery, pre-trial, jury selection, trial, and appellate briefing. Prior to joining the Joseph Saveri Law Firm Ryan served as a fellowship attorney in the Antitrust Section of the California Department of Justice. Ryan received his B.A. in Political Science from the University of Oregon.  He earned his J.D., magna cum laude, Order of the Coif, from the University of California Hastings College of the Law in 2012.  During law

school, Ryan served as a judicial extern to the Honorable John E. Munter of the San Francisco Superior Court, Complex Litigation Department.

<u>Counsel</u>

Joshua P. Davis

Joshua P. Davis has been involved in class actions in general and in antitrust class actions for over fifteen years. He graduated from NYU School of Law, serving as the Senior Articles Editor of the Law Review and receiving the Frank Sommer Award for the top general scholarship and achievement in his class. He clerked for the Honorable Patrick Higginbotham, the United States Court of Appeals for the Fifth Circuit. He was a partner at Lieff, Cabraser, Heimann & Bernstein LLP until he joined the law faculty of the University of San Francisco School of Law, where he now serves as Associate Dean for Academic Affairs. He has written dozens of law review articles, many of them on class actions and private antitrust enforcement. He has also participated as part of the team prosecuting numerous active antitrust and other class actions.