```
─────────────TRANSCRIBED FROM DIGITAL RECORDING─────────────
```

1            UNITED STATES DISTRICT COURT

2                DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5                Plaintiffs,    ) Case No. 2:15-cv-01045-RFB-PAL
                                       )
6        vs.                    ) Las Vegas, Nevada
                                ) July 28, 2015
7  ZUFFA, LLC, d/b/a Ultimate   )
   Fighting Championship and    )
8  UFC,                         ) MOTIONS HEARING
                                )
9                Defendants.    )
   ─────────────────────────────────

10

11

12

13                TRANSCRIPT OF PROCEEDINGS

14            THE HONORABLE PEGGY A. LEEN,
              UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19  APPEARANCES:           See Next Page

20  DIGITALLY RECORDED:    Liberty Court Recorder (LCR)
                           10:02 a.m.

21

22  TRANSCRIBED BY:        PATRICIA L. GANCI
                           (702) 385-0670

23

24  Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.

25

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1   APPEARANCES:

2   For the Plaintiffs:

3           **DON SPRINGMEYER, ESQ.**
            WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4           3556 E. Russell Road, 2nd Floor
            Las Vegas, Nevada 89120
5           (702)341-5200

6           **ERIC L. CRAMER, ESQ.**
            BERGER & MONTAGUE, P.C.
7           1622 Locust Street
            Philadelphia, Pennsylvania 19103
8           (215)875-3000

9           **BENJAMIN DOYLE BROWN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
10          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
11          (202)408-4600

12  For the Defendants:

13          **J. COLBY WILLIAMS, ESQ.**
            CAMPBELL & WILLIAMS
14          700 South 7th Street
            Las Vegas, Nevada 89101
15          (702)382-5222

16          **WILLIAM A. ISAACSON, ESQ.**
            BOIES, SCHILLER & FLEXNER, LLP
17          5301 Wisconsin Ave., NW
            Washington, DC 20015
18          (202)237-2727

19          **JOHN F. COVE, JR., ESQ.**
            BOIES, SCHILLER & FLEXNER, LLP
20          1999 Harrison Street, Suite 900
            Oakland, California 94612
21          (510)874-1000

22

23

24

25

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1        LAS VEGAS, NEVADA; TUESDAY, JULY 28, 2015; 10:02 A.M.

2                            --oOo--

3                    P R O C E E D I N G S

4        COURTROOM ADMINISTRATOR:  Your Honor, we are now

5   calling the motion hearing in the matter of Cung Le, et al.

6   versus Zuffa, LLC.  The Case No. is 2:15-cv-1045-RFB-PAL.

7   Beginning with plaintiff's counsel, counsel, please state your

8   names for the record.

9        MR. SPRINGMEYER:  Good morning, Your Honor.  Don

10  Springmeyer from Wolf Rifkin for the plaintiffs.  With me is

11  Eric Cramer from Berger & Montague and Ben Brown from Cohen

12  Milstein.

13        MR. CRAMER:  Good morning.

14        COURTROOM ADMINISTRATOR:  And defense counsel, please.

15        MR. ISAACSON:  Bill Isaacson, Boies, Schiller &

16  Flexner, for the defendant.

17        MR. COVE:  Good morning, Your Honor.  John Cove, Boies,

18  Schiller & Flexner, for the defendant.

19        MR. WILLIAMS:  Good morning, Your Honor.  Colby

20  Williams, Campbell & Williams, for the defendant.

21        THE COURT:  This is on calendar on two separate

22  motions.  I'll take the first one.  There has been no

23  opposition, and it was filed as an unopposed motion for

24  appointment of interim counsel.  Are there any parties in the

25  courtroom that wish to be heard in opposition to this motion?

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          There being no response and good cause shown, the

2  unopposed motion to appoint interim co-lead class counsel and

3  interim liaison counsel is granted.  I hope you weren't blushing

4  too much when you extolled your virtues, counsel.

5          All right.  With respect to the -- and was there a

6  proposed order attached to the papers?  I frankly don't recall.

7  I haven't --

8          MR. SPRINGMEYER:  I think so, but I'm not positive.

9          THE COURT:  All right.  I'll double check, and if not,

10  I'll require you to submit a proposed order that is pretty and

11  official.  Okay?

12          MR. SPRINGMEYER:  Yes.  Yes, Your Honor.

13          THE COURT:  On the second motion on calendar, this is a

14  contested motion to stay discovery filed on behalf of the

15  defendants.  I have read the moving and responsive papers, but,

16  movant, this is your opportunity to be heard.  Who will be

17  arguing on behalf of the defendants?

18          MR. ISAACSON:  I will, Your Honor, Bill Isaacson.

19          THE COURT:  Yes, sir.

20          MR. ISAACSON:  We've tried to consolidate our basic

21  points, Your Honor.  I can hand that up.

22          THE COURT:  I get a Gilbert outline for your arguments?

23          MR. ISAACSON:  It is more pictures than words.  So I

24  think it's -- it's different from Gilbert's, I hope.

25          Your Honor has said and other Courts have said that in

—TRANSCRIBED FROM DIGITAL RECORDING—

1   this situation the guiding principle is really Rule 1.  And

2   you're balancing two different things, the desire to move a case

3   forward and then the cost of discovery that's faced when you do

4   move the case forward.  Obviously, we've filed a motion to

5   dismiss, and defense goal is to avoid unnecessary cost.  The

6   Courts have recognized and the parties recognize the

7   practicalities of an antitrust case is that if discovery goes

8   forward in whole or in part we're talking about what the Ninth

9   Circuit has called prohibitive costs of an antitrust case,

10  millions of dollars.

11         And so you're basically, in reviewing the papers,

12  juggling those two different things.  So I would initially point

13  to, as we've pointed in our papers, the discovery that the

14  plaintiffs seek to immediately go forward with.  And we've

15  given --

16         THE COURT:  The plaintiffs in their papers say that you

17  rejected any offer to try to negotiate a narrow scope of the

18  discovery in favor of filing this motion to stay.  Is that

19  accurate?

20         MR. ISAACSON:  We have had -- I wouldn't put it that

21  way, and so we have not -- we have been unable to reach

22  agreement.  Any time both sides have been unable to reach

23  agreement, either side can say that.

24         I think there are things that can be done that don't

25  cost millions of dollars and that pave the way for eventual

––––––––––TRANSCRIBED FROM DIGITAL RECORDING––––––––––

1  discovery, such as a protective order.  We've sent over a draft

2  protective order.  We can move forward with ESI protocol.  We

3  can deal with written objections.

4         What we are essentially concerned with are two things.

5  One is taking on millions of dollars in costs, and the second

6  thing is giving the plaintiffs discovery to remedy a defective

7  complaint that -- to sort of come up with an actual complaint by

8  going through discovery.

9         THE COURT:  It seems to be inconsistent with your

10  arguments.  You're going to get a decision soon.

11         MR. ISAACSON:  Well, we are hoping to get a decision

12  soon, and if we do get a decision soon --

13         THE COURT:  Then that problem won't exist.

14         MR. ISAACSON:  I agree.  I agree.  I have -- we are

15  here today in the hopes that that happens.  And we are not

16  intending to inhibit said, you know, decline to meet and confer

17  about all of those different things I just -- that I just

18  listed.

19         If at some point we have to get to the point of

20  producing all of these years of financial records, itemized, as

21  plaintiffs keep asking for, and doing electronic discovery with

22  custodians, then we're talking about incurring lots of costs.

23  Hopefully we get notice of the hearing next week and we find out

24  one way or the other what's going to happen.  And then this all

25  becomes a moot point, but we're here today without that

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  knowledge.

 2        So -- and -- so we are faced with requests that have

 3  not been withdrawn or delayed.  You know, there's been no offer

 4  to say, We will forestall this until we hear from -- get a

 5  ruling on the motion to dismiss.  So we have the requests for

 6  all of our financial information going back more than a decade,

 7  and that includes -- we've highlighted some of it on the fourth

 8  slide, Requests For Production No. 11, Total gate receipts

 9  broken down by event, total merchandising receipts broken down

10  by event, total revenues for pay-per-view broadcasts, itemized.

11  And we list all of these things because this is going to be

12  quite a substantial effort if we have to move forward.

13        And our goal, which would be the goal of any business,

14  is having made a motion to dismiss that challenges the

15  sufficiency of what has been alleged is that we should not have

16  to take on those burdens.

17        So the standard before the Court, and the Court's

18  familiar with this, is would the motion potentially dispose of

19  the entire case or an issue in which discovery is sought, and

20  that bifurcated notion there of will it dispose of the case or

21  narrow the case is important because we are talking about very

22  broad discovery and narrowing the discovery would have an

23  important effect --

24        THE COURT:  If the motion is granted in part and denied

25  in part, you agree that the district judge is likely to give

—————————TRANSCRIBED FROM DIGITAL RECORDING —————————

1  them leave to amend?

2       MR. ISAACSON:  There's liberal leave to amend, and --

3  but I don't -- and so I guess you say there's always likely to

4  be --

5       THE COURT:  Do you really think the district judge is

6  going to grant your motion and dismiss this case with prejudice

7  finding that they can't state any claim on which relief may be

8  granted?

9       MR. ISAACSON:  Dismiss without any leave?  No, I say

10  judges ordinarily grant leave to amend.  However, okay, there

11  isn't -- there hasn't been any -- any argument from the

12  plaintiffs, If given leave to amend, here is what we are going

13  to do.  Here is how we are going to make the pleadings better.

14  Here is how we are going to allege, for example -- you know, for

15  example, the issue of our tele -- our exclusive television

16  contract.  There's many, many different television stations.

17  There are competitors who have deals with television stations.

18  It's -- the plaintiffs don't have any suggestion as to how they

19  are going to say our contract forecloses the opportunities for

20  competitors to get their own television deal.

21       There hasn't been any suggestion from the plaintiffs,

22  likewise, when we do a deal with Reebok, which they say

23  forecloses the market, there's not -- there's no explanation as

24  to why -- what they're going to be able to allege that says,

25  Well, we've been foreclosed -- our competitors have been

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1  foreclosed from doing a deal with Nike or other apparel

2  manufacturers.  Same thing with doing a beer -- a beer deal.

3  When you have an exclusive contract with one beer dealer,

4  there's nothing about that that forecloses with another beer

5  dealer.

6         So there's no explanation as to, Okay, you know, maybe

7  we didn't get it the first time, but we're going to amend and

8  here is what we are going to say.  And all of those areas I just

9  described are substantial areas of discovery, and we don't think

10  that the defendant should have to go forward with those areas

11  until we've been heard by the Court.  And each one of those is

12  expensive, and each one of those gets into our, you know, what

13  is legitimately private financial information and allows the

14  plaintiffs to go rooting around trying to come up with some

15  cause of action.

16         The same is true with the fighter contracts.  We know

17  that the plaintiff -- the plaintiffs allege there's been

18  foreclosure because these contracts are in perpetuity, but, on

19  the other hand, we also know the plaintiffs have fought -- many

20  of the plaintiffs have fought for competitors.  So we know that

21  that is not true, and we know that based on things that have

22  been even said in the complaint as well as what anybody can

23  observe these folks have done.

24         So the actual obligation on foreclosure is to plead the

25  size of the market and to plead the percentage or an estimate of

—TRANSCRIBED FROM DIGITAL RECORDING—

1  foreclosure.  And there's been no suggestion from the plaintiffs

2  that they're going to be able to do that with television, with

3  apparel, with sponsors, with venues in Las Vegas or elsewhere,

4  or even with respect to the fighters.

5       And with respect to the fighters, the other issue is

6  the market definition, for example.  The Courts have been quite

7  clear, and antitrust cases are quite clear, that single brands

8  are not markets.  The Courts are very, very skeptical of that.

9       And this complaint uses a term "elite" setting.  And

10  how does it define elite?  It defines elite as fighters who are

11  in the UFCW.  It creates a circle.  It comes back to the UFC

12  being a market by itself, even though we know some of these

13  fighters have fought for competitors.

14       That sort of market definition can't fly.  Otherwise,

15  you can just -- you can throw out other adjectives.  Fighters

16  who are really good.  Fighters who are excellent.  Fighters who

17  are top rate and say, Okay, that's the market.

18       Now, this argument we've -- we've made this motion.

19  And the plaintiffs haven't come forward and said, Well, if we

20  replead, all right, here's an actual economic market that we

21  would all offer in the alternative.

22       So, you know, ultimately to answer the question, will

23  the Court grant leave to replead, generally Courts liberally do

24  that.  What will happen with repleading here, though, we don't

25  know because there hasn't been any explanation as to how that

————TRANSCRIBED FROM DIGITAL RECORDING————

1  will cure any of that.  And so --

2        THE COURT:  Well, it would depend on what the district

3  judge finds deficient, if he finds deficient.

4        MR. ISAACSON:  That's always the case.  That's right.

5  And we're here without that guidance, but each area of

6  deficiency is significant in terms of the amount of discovery

7  that is attached to it.  And the plaintiffs want to say, Okay,

8  even if one area is deficient, you have to consider the whole

9  thing together, which is what the Courts call in a monopoly case

10  the monopoly broth.  You just slop it all in together and say,

11  Well, you have to look at it as a whole, and even if each piece

12  is deficient, you look at this broth together.  And that doesn't

13  work, particularly when you're talking about the background

14  standard of plausibility out of Twombly and Iqbal, etc.

15        The whole -- you know, for example, the television

16  allegation that we have foreclosed the television market when

17  anyone turning on a television set can see all of these

18  different stations and can see competitors on different

19  stations.  That -- that allegation is so implausible, the idea

20  that when you combine it with someone -- with something else

21  that it, therefore, becomes plausible and we get discovery on

22  the whole television sponsorship and contracts and markets and

23  revenues, that doesn't make any sense.  And that's the whole --

24  that's the whole line of cases about the monopoly law.

25        THE COURT:  All right.  If I understand what your

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1   arguments are, a series of lawful business practices that makes

2   you good at what you do doesn't equate to antitrust violation.

3           MR. ISAACSON:  That is -- what you have just said is at

4   the heart of antitrust law, Your Honor.  And what they're

5   lacking is -- are allegations that are not -- other than

6   conclusory allegations, that are able to take on that principle

7   and justify the cost of discovery because they are not showing

8   that we are foreclosing competitors and not defining how we're

9   doing that in any meaningful way.  There's no definition, for

10  example, of how much of television sponsors have been

11  foreclosed.  There's no definition of how many apparel sponsors

12  have been foreclosed.

13          Even with respect to fighters, there is no definition

14  of the number of fighters that fall into this elite category and

15  whether our contracts, which come up for rebidding, how many

16  fighters are or are not available.  Nothing like that is found

17  in the complaint.

18          Now, remember, these plaintiffs, and there's several of

19  them, have access to their own contracts without any discovery.

20  They can look at their own contract clauses.  This isn't a

21  complaint that attached any of these contracts.  All right.  It

22  is a complaint that made general conclusions about the contracts

23  and certainly makes strong allegations about them, but doesn't

24  go through the contracts of the plaintiffs or explain the

25  plaintiffs' lives and how they've been foreclosed from working

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   for competitors, that their contracts never came up and they

2   were unable to work for a competitor.  You don't see that and

3   that level of analysis in the complaint.  And if they wanted to

4   replead, they don't need discovery for that.  They have access

5   to all of that right now.

6           So I don't want to go on and on, Your Honor.  I think

7   our thesis is pretty simple that we will cooperate and meet and

8   confer about a lot of things that can be done.  We don't want to

9   incur substantial discovery costs until the motion has been

10  decided.  We think under the relevant law, which specifically,

11  you know, as you apply these days to antitrust cases where there

12  is a strong motion pending and you get to take a peak at that

13  motion, as the cases say, without prejudging it or suggesting

14  how it will ultimately come out.

15          But the one thing that should just be clear is that

16  there's going to be for purposes of Rule 1 substantial expense

17  if we move forward on -- in these various major areas.  We can

18  make some progress without incurring that expense in the

19  meantime and hope that, and I assume it's correct, that we will

20  soon have a hearing on the motion to dismiss and we will get the

21  guidance that you're asking about.

22          THE COURT:  Thank you.

23          And who will be arguing on behalf of the plaintiffs?

24          MR. SPRINGMEYER:  Your Honor, with your permission, I'd

25  like to offer the Court some thoughts on the local district law

----- TRANSCRIBED FROM DIGITAL RECORDING -----

1  and practice, and then Mr. Cramer will present regarding the

2  merits of the complaint, the motion to dismiss, and the

3  discovery because I'm more recently come into the case than he

4  and ask your permission to do that even though his pro hac vice

5  application is still pending.

6          THE COURT:  Granted.

7          MR. SPRINGMEYER:  Thank you.

8          Both based on what I perceive to be Your Honor's and

9  this district's practice and from what I've just heard from the

10  defense, I would suggest that the outcome that would serve the

11  dueling interests of Rule 1 and the defense concerns of expense

12  would be for you to deny the motion to stay, order the parties

13  to meet and confer, set up a schedule, begin the negotiation and

14  resolution of issues over a protective order, which we have

15  already begun, and electronic-stored information protocol, and

16  begin various aspects of discovery which don't turn into this

17  millions of dollars coming down on us next month bug-a-boo that

18  you just heard.

19          I think that would be an appropriate resolution under

20  the law of the district because -- as you well know, because you

21  wrote one of the leading three decisions on which we rely which

22  says that the magistrate judge must be convinced that the motion

23  to dismiss will be granted without leave to amend.  Otherwise,

24  the motion to stay should be denied.

25          And I personally don't see how that's possible with

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   this complaint.  And it is a little bit ridiculous to suggest

2   that we're supposed to predict what the district judge is going

3   to say might be deficient and then pose what are solutions to

4   those deficiencies would be I guess in our reply to the motion

5   to -- in the opposition to the motion to stay or in the

6   opposition to the motion to dismiss.

7          So based on your decision in Tradebay and the

8   subsequent decisions in Rosenstein and Grand Canyon Skywalk, the

9   solution I've just suggested is my best idea for the Court on

10  how to deal with this in a way that handles all of the competing

11  interests appropriately.  It might even be useful and necessary

12  to schedule a monthly or bimonthly status conference by

13  telephone because I predict we're going to have a lot of

14  controversy and a lot of strife in this case.  It's being hard

15  fought and with strong views on both sides.

16         THE COURT:  Have you discussed limiting the scope of

17  discovery while both sides appreciate how the district judge

18  views your pleadings?

19         MR. SPRINGMEYER:  That has not been discussed in the

20  context of a meet and confer about what could we do about the

21  pending discovery requests.  So that is exactly the kind of

22  thing I'm suggesting could happen under this order I've proposed

23  to the Court.

24         THE COURT:  Mr. Cramer?

25         MR. CRAMER:  Thank you, Your Honor.  And if it pleases

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1  the Court.

2       To address Your Honor's last question, in the hallway

3  before we came in here we had a brief discussion about what

4  kinds of things could be done before the motion to dismiss was

5  decided.  And one of the defense counsel had a conversation with

6  one of the plaintiffs' counsel, but -- and that was within the

7  last week.  So there have been some very preliminary discussions

8  along those lines just to bring Your Honor up to date and to

9  complete the record on that.

10      Let me address Mr. Isaacson's attack on the complaint.

11 I think -- I think the key -- let me step back and explain what

12 the case is about because I think it gets lost a little bit in

13 Mr. Isaacson's argument.

14      What we have alleged -- we represent 11 UFC fighters

15 and two proposed classes of UFC fighters.  And what we have

16 alleged is that the UFC has used an anticompetitive scheme

17 involving several different elements to deprive key inputs to

18 rival promoters so that those rival promoters have no ability to

19 compete with the UFC.  And by the UFC's own admission, as

20 alleged in the complaint, the UFC is now the only game in town

21 for an elite professional in MMA fighting.  They claim they are

22 the NFL.  Everybody else is the minor leagues.

23      And what we allege is as a result of depriving the

24 ability of rivals to get access to key fighters, to get access

25 to sponsors, to get access to venues, the UFC has been able to

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  abuse -- to gain monopoly and monopsony power and abuse that

2  power by under-compensating and mistreating the fighters.

3  That's what the case is about.

4           So let's talk about the three --

5           THE COURT:  Well, you're arguing they only get a

6  fraction of what, for example, professional fighters get because

7  of the UFC's lock on the market.

8           MR. CRAMER:  That is one of the arguments that we make,

9  yes.  If there were competition between promotions, then the

10  fighters would get paid more.  Yes, that is what happens.

11  Competition --

12          THE COURT:  How many lawyers do you think are

13  competitive with you, sir?  If you're good at what you do, that

14  doesn't necessarily equate to engaging monopolistic practices or

15  antitrust behavior.

16          MR. CRAMER:  Of course.  That is exactly right.  Sadly,

17  I do not have monopoly power.  I'm just little old me and there

18  are thousands of other lawyers who are competing with me, but

19  the UFC does have monopoly power and monopsony power, which

20  means they are the only purchaser of services for our clients.

21  They, by their own admission, are the major leagues.  Everybody

22  else is the minor leagues.

23          So they first argue that we --

24          THE COURT:  Give that as true, why is that antitrust

25  violation?

──────── TRANSCRIBED FROM DIGITAL RECORDING ────────

1        MR. CRAMER:  Well, it is not antitrust violation simply

2   to be a monopoly, to be good at what you do.  That is certainly

3   true.  What is an antitrust violation is to use the power that

4   you have to enter into exclusive agreements to prevent rivals

5   from getting access to key inputs.  So, for example, if you're a

6   pharmaceutical company and you own the key -- and you have --

7   and you put trucks in front of your rival's ability to get their

8   product to market, it's illegal -- it's legal to park your

9   trucks on a public street, but you're blocking your rival's

10  ability to get to market.

11        Similarly here what the UFC has done is it has entered

12  into contracts with every single professional fighter in the

13  major leagues and put provisions in those contracts that makes

14  them essentially forever, in perpetuity.  There are provisions

15  like a tolling provision where the UFC decides when they can

16  fight, and -- and if they are a champion, that they can't take

17  that championship belt elsewhere.  The UFC decides when they can

18  fight, how they can fight, and everything about that.

19        And so they determine the length of that contract.  And

20  for many of the fighters that contract is in perpetuity, until

21  the fighters are no longer useful to the UFC, and then they let

22  them go, and they can fight for the minor leagues.  So the UFC

23  locks up all of the fighters.  That's a traditional exclusive

24  dealing claim.  And exclusive dealing under Tampa Electric is

25  illegal.  You cannot lock up all of the inputs through long-term

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1  exclusive deals and to deprive rivals of the ability to compete.

2       And they threaten sponsors.  So they threaten sponsors,

3  If you sponsor a rival promotion, if you sponsor a fighter that

4  fights for a rival promotion, you're dead to us.  You can no

5  longer sponsor anyone in the UFC.

6       They enter into exclusive deals with venues at key

7  important venues.  If you're a rival promotion and you want to

8  be in the major leagues and you want to compete with the UFC,

9  you need key elite fighters.  You need key sponsors.  You need

10  key venues.  And the UFC has deprived rivals of all of those

11  things.  That's what we allege.

12       And as a result of what we allege, no matter how the

13  market is defined, I mean, this -- they argue we've improperly

14  defined the relevant market.  We define the market as only elite

15  fighters.  It is a red herring.  No matter how you define the

16  MMA market, the UFC dominates it.  They have, we allege, 90

17  percent of all revenues in the professional MMA business in the

18  United States.  They, by their own admission, are the major

19  leagues as a result of their conduct.

20       Mr. White, the president of the UFC, we allege has

21  admitted that through their conduct they have put their rivals

22  out of business.  And we allege as a result of depriving their

23  rivals of oxygen to survive, of key fighters, of key venues, of

24  key sponsors, they impaired them so much they bought the rest of

25  them out.  They bought out Strikeforce, their rival.  They

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  bought out Pride.  And as a result of all of this, the UFC now

2  is the only major professional MMA promotion in the United

3  States.  And it is not illegal simply to be a monopoly or a

4  monopsony, but it is illegal to enter into exclusive deals --

5  long-term exclusive deals and to threaten rivals -- threaten

6  sponsors and others from working with rivals to keep rivals from

7  coming to the market.  And that's what they have done.

8          Now, Mr. Isaacson says that we have -- plaintiffs have

9  not alleged foreclosure in the TV market.  There are other TV

10  stations.  Foreclosure in the venue market.  We're not talking

11  about the TV market or the venue market.  We're talking about

12  the market --

13          THE COURT:  But you want every contract they've ever

14  entered into and any discussion with anybody they've ever

15  entered into for TV broadcasting rights.

16          MR. CRAMER:  Well, what we want to see is that the

17  UFC -- well, what we want to see is that the UFC has used its

18  power, its monopoly power in the business, to threaten TV

19  stations, sponsors, venues that if you work with a rival, you

20  will never work with us.  And if you are a powerful company like

21  the UFC who is 90 percent of the MMA business, who admits that

22  it is the major leagues and everyone else is the minor leagues,

23  and you are out there threatening all television stations,

24  venues, fighters that if you fight for a rival, you'll never

25  work in this business again, which is effectively what we allege

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  that the UFC is doing and has done, then there can never be

2  competition in the MMA business.  And that's what we are

3  alleging.

4       Do we want the instruments of how the UFC has got the

5  lock on the MMA business?  Of course we do.

6       Now, as to the arguments about the breadth of

7  discovery, Your Honor, we can deal with those issues in the

8  normal course of discovery.  There will be meet and confers.

9  Your Honor will adjudicate disputes about the breadth of that

10 discovery, I'm sure, and that can be limited in various

11 different ways.  We can do it in phases.  There are all kinds of

12 ways that discovery can be limited.

13      But there is very little doubt that the motion to

14 dismiss will be denied at least in part.  We only have one claim

15 and the UFC has argued, Well, certain aspects of the complaint

16 may disappear.  We have one claim, a monopsony claim, a claim

17 that the UFC has gotten a monopsony in the market per UFC by UFC

18 fighter services, professional fighter services, elite

19 professional fighter services, and is under-compensating our

20 clients and class members for bouts and for identity rights.

21      That's one claim.  And there's no motion to strike

22 anything.  The claim either survives or it doesn't.  And I

23 submit to Your Honor that it will survive given that it doesn't

24 matter what the relevant market is.  We have alleged monopoly

25 and monopsony power.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1          Elite is a recognized category.  What we're trying to

2   do is to distinguish elite professional fighters from minor

3   leagues.  It's like in baseball.  There are major leagues and

4   there are minor leagues.  And those products are not reasonably

5   interchangeable.  They're different products.  Therefore, they

6   belong in different markets.  That's why it makes sense to

7   distinguish between highly-trained fighters that have notoriety

8   and can gain sponsors and fighters that are fighting in the

9   minor leagues where somebody might pay $50 to fight in a gym

10  somewhere.

11         We're talking about the top of the sport.  And that's

12  why it makes sense to use the term "elite," but it's a red

13  herring because we have alleged and the UFC has admitted that

14  they are the major leagues and they have no competition.  Your

15  Honor will see that in the complaint.

16         As to the aspect of whether each of the aspects of the

17  scheme that we've alleged has sufficiently foreclosed rivals,

18  the UFC is wrong in how they analyze that.  First of all, the

19  law is in the Ninth Circuit and the Supreme Court that the

20  scheme needs to be taken as a whole, that the Court needs to

21  look at the entire anticompetitive scheme, all of the conduct

22  together, to see whether that forecloses rivals, makes it more

23  difficult for rivals to compete.

24         THE COURT:  Is it your argument that a series of lawful

25  business practices that are effective can constitute

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1   cumulatively antitrust behavior?

2          MR. CRAMER:  Yes, and that's been held by Courts for a

3   long time.  That's -- I mean, it has long been held that conduct

4   that is legal when taken by an entity that is not a monopolist

5   can be illegal and violate the antitrust laws when it's taken by

6   an entity that is a monopolist.  What the antitrust laws and

7   Section 2 of the Sherman Act in particular is concerned about is

8   the abuse of dominance, is that dominant entities once they

9   become dominant, then they can stay dominant forever if they're

10  able to lock up the market.

11         If the UFC is now able to prevent every elite fighter

12  from fighting for a rival, to prevent every key sponsor that

13  wants to sponsor a professional MMA or many key sponsors from

14  sponsoring a rival or a fighter that deigns to fight for a minor

15  league rival, if they can lock up all of the key venues, there

16  will never been competition in the MMA business, ever.  And

17  that's what the antitrust laws are concerned about.  They are

18  concerned about dominant entities maintaining dominance by doing

19  things that would be legal if they were being done by someone

20  who is not a monopolist.

21         If there were 50 promotions and some promotion locked

22  up one venue for a year, that would not be antitrust violation

23  because that -- that one out of 50 promoters doesn't have

24  monopoly power, but when that's done by a monopolist who locks

25  up all of the key venues, who locks up all of the key fighters,

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   that can be antitrust violation and has long been deemed an

2   antitrust violation.

3           And as to foreclosure, just to make this final point on

4   foreclosure, the UFC and Mr. Isaacson make it appear as if what

5   plaintiffs need to show is that the scheme we have alleged

6   eliminated all competition.  We don't need to show that.  What

7   the law is is that an antitrust scheme needs to foreclose a

8   substantial line of commerce effectively, not all commerce, just

9   a substantial line of commerce.

10          So if the UFC has engaged in a scheme to prevent rivals

11  from getting access to key parts of the market, that can be and

12  has been held to be an antitrust violation.  And we have alleged

13  that the scheme that the UFC engaged in did substantially

14  foreclose rivals from competing with the UFC no matter how that

15  market is defined, whether it's elite fighters or all

16  professional MMA fighters.  By their own admission, they are the

17  major leagues.  There is nobody else.

18          We have alleged they have 90 percent of all of the

19  revenues in the United States from professional MMA fighting.

20  They are a monopsonist.  We have alleged that the reason why

21  they are a monopolist and monopsonist is the cost of the scheme

22  they have engaged in by locking up the fighters, locking up the

23  venues, threatening the sponsors, and buying out those rivals

24  that have been weakened.

25          So the complaint, Your Honor, through this preliminary

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  peak which has now been a little bit longer than preliminary we

2  believe will survive; that it will survive in whole because we

3  only have one claim.  And the case has been pending, Your Honor,

4  since December of last year.  It's gone through -- we filed it

5  in the San Jose.  We had a motion to transfer that was briefed

6  and argued and now it's been sent here, but the case has been

7  going on for months and months and it's time we believe for

8  discovery to begin.

9        If you have any questions for me, I'd be glad to answer

10  them.

11        THE COURT:  No.  Thank you.

12        This is your motion, counsel, you get the last word,

13  but make it brief, please.  I've got a courtroom full of people

14  waiting for the next hearing.

15        MR. ISAACSON:  Appreciate that, Your Honor.  I think

16  we've made clear that whether or not there's a motion to stay or

17  any order from the Court, we will move forward with the

18  plaintiffs on the protective order, ESI, written discovery

19  objections.  And if the Court wants to have a regular conference

20  call, then that's fine by us as well to see if -- in case the

21  plaintiffs are unhappy with the progress that we're making on

22  that.  We have no objection to that.  I don't -- whether that's

23  in a Court order or not in a Court order, we're willing to do

24  that.

25        The motion to stay is about what is said in the motion

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

1  to stay, whether we actually begin to cat -- produce large

2  categories of documents.  Other than the hallway, there were

3  meet and confers between Mr. Cove and their colleague,

4  Mr. Saveri.  Plaintiffs have not said, Well, produce this

5  category of documents, but not that category of documents.  We

6  just face the entire range of all of the categories of

7  documents.  And I have some sympathy for them that it's hard to

8  figure out the inexpensive set of documents in this case.  There

9  isn't a clear category of documents in television, fighters, or

10  etc. that would be inexpensive and that would make sense to move

11  forward.

12      Mr. Cramer's presentation, I'll just say briefly, makes

13  clear why this complaint is in jeopardy because it is high-level

14  slogans and anticompetitive schemes directed towards inputs,

15  lines of commerce have been precluded, inputs have been

16  precluded, but nothing in his presentation says how many of the

17  television inputs have been precluded, how many of the sponsors

18  have been precluded, how many of the venues have been precluded,

19  how many of the fighters have been precluded.

20      On the fighters he said various things.  The champions

21  can get extended.  Well, that's a champion.  Then he said many

22  are locked up in perpetuity, and then he said we lock up all the

23  fighters.  Right.  Three different things.  You don't have --

24  and focus on that strongest sentence, lock up all the fighters.

25  Right.  What -- which fighters and how are we defining those?

1          He says it doesn't matter because we have 90 percent of

2    all of the revenues, but of course it matters.  He is arguing a

3    monopsony case about the employment market, and we don't have a

4    coherent definition of who the employees are and one that meets

5    the standards for defining an antitrust market.  And what we

6    know about those fighters is several of them from the plaintiffs

7    have worked for -- have worked for competitors.

8          One of the other things he says is that the UFC

9    threatens television stations.  Now, threats is sort of an

10   unusual word, but let's take that as true.  But then how do we

11   define the threat?  Well, if you work with a competitor, we're

12   not going to go on your television station.  You know, Bellator,

13   who -- the former owner -- the former executive from Strikeforce

14   which is owned by Viacom is on Spike TV.  You don't have -- the

15   UFC says to MSNBC or Spike or anybody, Boy, if you don't work --

16   if you work with them, you can't work with us.  That's not a

17   threat and it is not a plausible way of controlling a market

18   because television stations get to say, Fine, we'll work with

19   these other folks.  That's nice of you to tell us that.  It's

20   not a plausible explanation.

21          Ultimately, what they want to rely on is high-level

22   rhetoric to say, Look, a UFC executive used strong terms to say,

23   These other guys, they're small time.  They're minor leagues.

24   Well, that's the way that competitors talk about one another and

25   probably a little bit more so when you're in the world of MMA

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   because this case will have word -- will have words about war

2   and fighting and conquering and crushing, and that doesn't

3   establish an antitrust claim.

4        The -- one of the plaintiffs after they failed to

5   prevail on the motion to transfer Tweeted out afterwards,

6   innocently, So we go to hell to fight the devil in his home

7   town, off to war.  That's normal talk in this industry.  It

8   doesn't make any claim of wrongdoing, and if we said that, it

9   wouldn't make an antitrust claim.

10       So --

11       THE COURT:  No, I understand trash talk doesn't equate

12  to a pleading.

13       MR. ISAACSON:  Right.  Right.  And that would be --

14  that would be -- you know.  So we think that this case is ripe

15  for some commonsense steps to move forward.  When Judge Boulware

16  decides the case, then we'll know where the case stands.  It's

17  not -- he says it's ridiculous to predict what Judge Boulware

18  will do.  It's not ridiculous to say, We've made a motion.  And

19  you can respond to a motion to dismiss and say, We think our

20  complaint is sufficient, but, Judge, if it isn't, we would

21  replead and add these facts.  That's not what's happened here.

22       And it's also incorrect to say that, Yes, we have one

23  claim.  That's the title.  It's incorrect that the district

24  court can't narrow the allegations that are going to be allowed

25  to support that claim.  The claim itself, while being a monopoly

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

 1   claim, one claim can continue to exist, but on much narrower

 2   grounds which would have a major effect on discovery.  It isn't

 3   the case that -- that the district -- or that Judge Boulware

 4   won't be able to narrow this case and narrow the discovery.

 5          THE COURT:  Thank you, counsel.

 6          I have carefully reviewed your moving and responsive

 7   papers and both sides did an admirable job of stating your

 8   respective positions, but having gone through the exercise, I am

 9   not convinced that the plaintiffs can state no claim on which

10   relief may be granted.  In this case I am going to deny the

11   motion for stay.  I am going to require, however, that the

12   parties meet and confer and submit a proposed form of

13   confidentiality and protective order within 30 days as well as

14   an ESI protocol.  I would strongly urge you to discuss in detail

15   issues pertaining to ESI.  That can be one of the most difficult

16   issues to address, especially if it's not done at the initial

17   stages of the case.

18          I'd also urge you to consider nontraditional methods of

19   searching for ESI instead of key words or custodian searches

20   which are expensive and the data shows not particularly

21   accurate.  I am going to impose restrictions on discovery, and

22   I'll consider phasing or limiting the scope while the district

23   judge addresses your motion to dismiss.  And I'll hold periodic

24   status and dispute resolution conferences to keep this case

25   moving in a cost-effective manner.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1      And I'm going to set this for hearing in 60 days.  By

2  then, hopefully, you will have a decision on the dispositive

3  motion if the case survives.  In the meantime I expect you to

4  make some preliminary progress.  And I expect plaintiffs to take

5  a very hard look at those very broad requests that you have

6  submitted to the defendants in this case to see if you can reach

7  an agreement with respect to a category of information that

8  makes sense or phasing of the rolling production in discovery in

9  a way that is cost effective.

10      And at the end of the day the plaintiffs have an

11  incentive not to incur more costs than the case warrants either.

12      MR. SPRINGMEYER:  Thank you, Your Honor.

13      MR. ISAACSON:  Thank you, Your Honor.

14      MR. CRAMER:  Thank you, Your Honor.

15      COURTROOM ADMINISTRATOR:  Your Honor, we'll set this

16  matter for continued hearing on Tuesday, September the 29th,

17  2015, at 9:30 a.m. in this courtroom.

18      THE COURT:  And I'll require you to provide me with a

19  joint status report the Friday before letting me know what --

20  the issues you've discussed, whether you've reached agreement

21  on, whether you have disagreements on, and any discovery

22  disputes that require the Court's immediate resolution to move

23  the case forward with sufficient specificity to avoid the

24  necessity of formal briefing and the motion back and forth.  I'm

25  not going to preclude you from filing, of course, appropriate

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1   discovery motions, but to the extent we can, I expect that the

2   routine decisions that are discretionary calls by the Court

3   should be done by a joint status report that accomplishes two

4   objectives, one, it gets you to talk to each other and, two, to

5   articulate your respective positions in writing in a format that

6   avoids the 35- or 36-day turnaround for briefings.

7           MR. ISAACSON:  Yes, Your Honor.

8           MR. CRAMER:  Your Honor, one request.

9           THE COURT:  Yes, sir.

10          MR. CRAMER:  Is the time of the hearing.  I'm actually

11  going to be in trial in this courthouse in the Oracle Remedy

12  matter that you're familiar with.

13          THE COURT:  Lucky you.

14          MR. CRAMER:  Yes, and -- which runs until about 1:30 I

15  think every day.  So if the hearing were later in the afternoon,

16  I would be able to participate.

17          THE COURT:  Sure.  Mr. Miller -- anybody else have any

18  scheduling issues or glitches that you want to address?

19          MR. ISAACSON:  I'd have to look at my calendar, Your

20  Honor, but ...

21          THE COURT:  Okay.  And what do we have -- do we have a

22  settlement -- I have settlement conferences in the afternoons

23  many times, so ...

24          COURTROOM ADMINISTRATOR:  Yes, Your Honor.  We do have

25  an ENE scheduled for 1:30 p.m. that afternoon.  But, Your Honor,

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1   the whole of Monday, September the 28th, is available on our

2   calendar.

3           THE COURT:  The only problem with that is that's my

4   first day back after being out of the district.  And no offense,

5   folks, but I suspect you're going to be a fair amount of work.

6   What do we have later on in the week?

7           COURTROOM ADMINISTRATOR:  Your Honor, we have another

8   settlement conference on Wednesday, September 30th.  That is a

9   morning setting.  And, Your Honor, it appears that Thursday,

10  October 1st, and Friday, October 2nd, are blocked out on the

11  Court's calendar.

12          THE COURT:  Could we do it Wednesday afternoon, say, at

13  2 o'clock?  Would that work for you folks?

14          MR. ISAACSON:  Certainly, Your Honor.

15          THE COURT:  And if you do have a problem, just contact

16  my courtroom deputy jointly and propose some alternatives in the

17  ballpark, and we'll work with you.  Okay?

18          MR. CRAMER:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          (Whereupon proceedings concluded at 10:46:51 a.m.)

21

22

23

24

25

─TRANSCRIBED FROM DIGITAL RECORDING─

1

2                         --oOo--

3       I, Patricia L. Ganci, court-approved transcriber, certify

4  that the foregoing is a correct transcript transcribed from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8       /s/ PATRICIA L. GANCI          AUGUST 25, 2015
            Patricia L. Ganci                Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25