EXHIBIT "3"

EXHIBIT "3"

# Matthew Weiler

| | |
|---|---|
| **From:** | Perry Grossman <pgrossman@BSFLLP.com> |
| **Sent:** | Thursday, August 20, 2015 5:30 PM |
| **To:** | Joseph Saveri; Matthew Weiler; mdellangelo@bm.net |
| **Cc:** | John Cove; Marcy Norwood Lynch; Suzanne Jaffe |
| **Subject:** | [UFC] Restrictions on Access to Highly Confidential Materials |
| **Attachments:** | ESPN--Fighters claim UFC restricts earnings.pdf; Jesse Zwick_ No Holds Barred _ The New Republic.pdf; Maysey Further Explains Benefits of MMAFA _ MMAPayout.pdf; Brown Bag Software v Symantec Corp.rtf; Frank Brunckhorst Co LLC v Ihm.rtf; Mikohn Gaming Corp v Acres Gaming Inc.rtf; Saint Alphonsus Med CTR v St Luke's Health System.rtf |

Counsel,

With respect to this morning's discussion regarding restrictions on access to highly confidential information for Mr. Maysey and other counsel who may participate in commercial activities competitive with or adverse to Zuffa, please find below the relevant authorities regarding protective orders addressing this issue and articles related to the MMAFA and Mr. Maysey's position as head of the MMAFA.  As we discussed, we will send you a draft compromise proposal on this issue no later than the end of the week.

The attached cases include:
1. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992);
2. *Saint Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, No. 1:12-CV-00560-BLW-RE, 2013 WL 139324 (D. Idaho Jan. 10, 2013);
3. *Frank Brunckhorst Co., LLC v. Ihm*, No. CIV. 11-1883 CAB NLS, 2012 WL 684760 (S.D. Cal. Mar. 2, 2012).
4. *Mikohn Gaming Corp. v. Acres Gaming Inc.*, No. CV-S-97-1383-HDM(LRL, 1998 WL 1059557 (D. Nev. Apr. 15, 1998)

The attached articles include:
1. John Barr, "Fighters claim UFC restricts earnings," ESPN.com (Dec. 16, 2014), http://espn.go.com/mma/story/_/id/12037883/antitrust-lawsuit-filed-ufc-parent-company-claims-monopoly
2. Jesse Zwick, "No Holds Barred," The New Republic (May 18, 2012), http://www.newrepublic.com/article/politics/magazine/103397/ufc-mma-labor-unions-carrano-white-gsp-bill-culinary (Last accessed Aug. 20, 2015).
3. Robert Joyner, "Maysey Further Explains Benefits of MMAFA," MMAPayout.com (July 8, 2009), http://mmapayout.com/2009/07/maysey-further-explains-benefits-of-mmafa/ (Last accessed Aug. 20, 2015).


Regards,

Perry Grossman



Perry Grossman
Associate
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612

(direct) 510-874-1206
(fax) 510-874-1460
pgrossman@bsfllp.com

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

 **ESPN.com:** Mixed Martial Arts     [Print without images] 

Tuesday, December 16, 2014
# Fighters claim UFC restricts earnings

By John Barr
ESPN.com

SAN JOSE, Calif. -- A group of current and former mixed martial arts fighters is suing the company that owns the Ultimate Fighting Championship in what could evolve into a class-action antitrust lawsuit involving hundreds of fighters, according to one of the attorneys involved.

The lawsuit, the culmination of months of rumors about pending legal action, was filed against Zuffa LLC, the parent company of the UFC, in U.S. District Court for the Northern District of California. It has three named plaintiffs: current UFC middleweight [Cung Le](#) and former UFC fighters [Jon Fitch](#) and [Nathan Quarry](#).

It accuses the UFC of being a monopoly that forces out rival promotions and limits fighter earnings.

Rob Maysey, a Phoenix-based attorney and longtime critic of what he describes as the "restrictive" labor practices of the UFC, says he has tried for years to warn the world's largest promoter of MMA competitions about the prospect of an antitrust case.

"I called [the UFC] in 2006 and said, 'You have a choice.' I said, 'You guys are going to recognize a fighters' association or you're going to face an antitrust case,'" Maysey told "Outside the Lines" on Tuesday.

"They [the UFC] have become the only game in town and locked down the entire sport. ... At its heart, this lawsuit is about fundamental fairness. The world-class athletes that comprise the UFC are making enormous sacrifices and taking huge risks. It is a basic right that these athletes enjoy the fruits of their labors."

The lawsuit alleges that the UFC prevents fighters from working with other MMA promoters, profiting from individual marketing deals and signing with outside sponsors, all monopolistic practices that suppress fighters' incomes, according to the lawsuit.

"The antitrust laws of the United States were designed to prevent any company from dominating a market, artificially stifling competition and hoarding supercompetitive profits. That is exactly what happened here," Maysey said.

"They [the UFC] control our likeness," said Le, the only fighter currently under contract with the UFC to be listed as a plaintiff in the lawsuit. "They control our career, and that's a choice we as fighters should have. And we don't have that choice.

"I'm going to represent all the fighters that are scared to take a step up."

The Federal Trade Commission's Bureau of Competition opened an anti-trust investigation on Zuffa after the purchase of Strikeforce in 2011. The FTC closed that investigation in January 2012 but maintained the right to reopen at any time.

Le has clashed with UFC management in recent months over a disputed drug test after his August fight in Macau. He was initially suspended for a year after testing positive for elevated levels of human growth hormone, but in October that suspension was overturned when the UFC determined that the initial test results were not reliable.

After nearly drowning in $44 million of debt as recently as 2005, according to CEO Lorenzo Fertitta, the UFC today is widely believed by industry insiders to be worth north of $1 billion.

The lawsuit refers to the Las Vegas-based company as a $2 billion outfit.

**OTL on UFC pay**

In June 2012, ESPN's "Outside the Lines" took an in-depth look at the issue of fighter pay. Look back at the coverage from then. **Story**

"The UFC is aware of the action filed today but has not been served, nor has it had the opportunity to review the document," a UFC spokesperson said in a statement. "The UFC will vigorously defend itself and its business practices."

Maysey is a member of one of five law firms that have joined forces in what could eventually be certified by the court as a class-action lawsuit.

"All UFC fighters are paid a mere fraction of what they would make in a competitive market," said Benjamin Brown, another of the plaintiffs' attorneys.

"Rather than earning paydays comparable to boxers -- a sport with many natural parallels -- MMA fighters go substantially undercompensated despite the punishing nature of their profession," Brown added.

Litigation will be long and costly. Maysey pointed out that antitrust cases of this magnitude typically last three to five years and can cost $3-5 million.

"We're prepared for a very long and tumultuous fight," said Quarry, who retired in 2010 with a 12-4 record, including an appearance on "The Ultimate Fighter" reality series in 2005.

"We have confidence we're in the right."

# NEW REPUBLIC

MAY 18, 2012

# No Holds Barred

By Jesse Zwick



Last May, a group of some of the most fearsome fighters in the world gathered in a hotel room at the Red Rock Casino Resort & Spa in Las Vegas. Initially, only three or four showed up for the meeting; but eventually 19 brawny bodies packed into the room. The fighters were attending a two-day summit hosted by Ultimate Fighting Championship (UFC), a promotion outfit that, in recent years, has become nearly synonymous with mixed-martial-arts fighting—an often bloody spectacle in which competitors combine elements of Brazilian jiu-jitsu, boxing, and wrestling.

This particular meeting, however, wasn't on the summit's official agenda. It had been

convened by Robert Maysey—a Scottsdale, Arizona, lawyer and mixed-martial-arts enthusiast, who was trying to enlist support for a fighters' association. He projected PowerPoint slides onto a screen, estimating UFC's revenue and laying out the advantages to collective bargaining. The fighters, he recalls, were intrigued. "They all would have signed right then and there," he told me when we spoke recently.

But then, one of the star fighters stood up. "Rob, I'd love to, but they've got me by the balls," he said, referring to UFC. "They've got half my pay in bonuses." Others worried that UFC would blackball them if they were to organize. One by one, the fighters filtered out. Maysey tried to follow up later on, but they all eventually stopped returning his calls.

For a long time, mixed martial arts—or MMA, as it's known—resided on the fringes of American culture. And the sport remains illegal in Connecticut and New York. (A bid to overturn the New York ban failed in the state assembly earlier this month.) In the rest of the country, however, MMA is no longer a marginal enterprise. UFC—having in recent years bought up most of its competitor organizations and established control over 80 to 90 percent of the mixed-martial-arts market—is now worth more than a billion dollars. Last year, the company signed a seven-year TV deal with Fox worth a reported $100 million annually. The rules governing MMA have changed, too: Where once only eye-gouging and biting were officially off limits, UFC now bans groin attacks, heel kicks to the kidney, and throat strikes. Mixed martial arts, in other words, appears on its way to becoming a semi-legitimate sport. But one thing is still largely missing: labor protections for fighters.

ROBERT MAYSEY is 37 and has the sturdy build of a former college athlete. Growing up playing baseball and football, he initially dismissed MMA as a "blood sport that exploits underprivileged people," but his opinion changed after he watched a UFC competition in 1996. Witnessing the event inspired him to join a small jiu-jitsu club at Cornell when he enrolled in the law school that fall, and he quickly became hooked, keeping up with his training even after he graduated and moved to Los Angeles.

At his gym in Hollywood, Maysey became friends with a number of MMA fighters. Over time, they began to tell him about their legal troubles, and he began to help. He assisted a woman who was thrown out of her hotel room for refusing to fight an opponent who was significantly bigger and more experienced than advertised. He sued a promoter in Japan on behalf of a man who had signed an exclusive 18-month, three-fight deal, but was only given a single fight. "That was my introduction," Maysey says. "I realized the fighters had zero leverage."

As UFC began to monopolize the rapidly expanding industry, fighter leverage worsened. Pay and benefits increased marginally, but contractual terms deteriorated. Contracts regularly featured a "champion's clause," which automatically extended the contract of a fighter at a lucrative moment in his or her career, as well as provisions that made it exceedingly difficult for fighters to negotiate higher pay. Fighters were also compelled to relinquish control over their images, voices, and likenesses—often "in perpetuity." When video-game-makers began to produce games like UFC Undisputed, fighters saw their likenesses being put to commercial use. (UFC did not comment for this article, but Lawrence Epstein, the company's general counsel, has said that UFC's merchandizing agreements have "literally created millions and millions of dollars for our fighters.")

Some of the fighters were aware of this mistreatment. Four-time middleweight UFC champion Frank "The Legend" Shamrock had the Screen Actors Guild look at his contracts after he was invited by Chuck Norris to appear on "Walker, Texas Ranger." "They said, 'These people are raping you!'" Shamrock recalls. Christian Wellisch—a former MMA fighter who now practices law and has also taught a philosophy course on moral issues at San Jose State University—recalls a time when some of his fellow fighters at the American Kickboxing Academy took issue with a contract that granted UFC exclusive lifetime video-game rights to their names and likenesses. "The message was clear: If one of you doesn't sign one of these contracts, then all of you would be fired," he told me. "It worked. Everybody signed the contract."

In 2005, Maysey founded a group called the Mixed Martial Arts Fighters Association and started reaching out to MMA gyms across the country. He hoped the organization would become something analogous to the players' associations that have advocated

for labor rights in other sports. At the outset, he was mostly rebuffed, though he did manage to gain some stature after he successfully represented a group of MMA fighters under contract with a collapsing promotion entity called Elite Xtreme Combat in 2008. Maysey sent the company a letter threatening legal action if it didn't reassign its fighters to another promotion or release them from their contracts—and the company caved.

But, as it turned out, the cause of MMA labor rights would get its biggest boost from an unexpected corner: Nevada's largest union, the Culinary Workers Local 226. The union had been engaged in an ugly, years-long battle with Station Casinos and started investigating the other holdings of the casino chain's owners—which happened to include UFC. The fighters, the culinary workers concluded, were being bullied, just like the busboys and cocktail waitresses.

When UFC purchased its last remaining major rival, in March 2011, the culinary workers sent a letter to the Federal Trade Commission, requesting an investigation into a possible antitrust violation. More recently, the culinary workers have played an role in backing a California state assembly measure—introduced this year by Assemblyman Luis Alejo, an avid MMA fan—that would establish protections for MMA fighters akin to those enjoyed by professional boxers, such as a prohibition against contracts that assign exclusive merchandising rights for an unreasonable period of time or contracts that automatically renew or extend without good-faith negotiations. Maysey was enlisted to help draft portions of the bill, and the culinary union has rallied groups like the Teamsters to send letters of support. (The union was also instrumental in blocking legalization of the sport in New York—a move that will presumably be less well-received by MMA fighters.)

This unlikely alliance of convenience between the service union and some MMA fighters has proved irksome to UFC management. "All kinds of crazy shit they're trying to throw in this bill for MMA," UFC President Dana White told The Orange County Register last month. "You know who's doing it? The culinary union from Las Vegas." The bill is now awaiting the approval of the state appropriations committee.

Maysey is heartened by all of these developments. Still, even if the bill passes, he argues that MMA fighters will not be able to bargain for things like health insurance,

pensions, and a greater percentage of merchandizing revenue until they are organized into a fighters' association—a development that he contends would help not just the fighters, but the sport as a whole. "I've said all along, I think an association would benefit the UFC's growth in the long term," he told me. "It would make the UFC the NFL."

*Jesse Zwick is a special correspondent for* The New Republic. *This article appeared in the June 7, 2012 issue of the magazine.*

SHARE YOUR THOUGHTS

Show all 2 comments

You must be a subscriber to post comments. Subscribe today. [/signup]



- Home
- About
  - Privacy Policy
- Staff
- Archive
- Blue Book
  - Pay-per-view
  - Live Gate & Attendance
  - Television
  - Sponsors

Subscribe

Browse > Home / 1 / Maysey Further Explains Benefits of MMAFA

# Maysey Further Explains Benefits of MMAFA

July 8, 2009

MMAPayout.com recently sat down with Mixed Martial Arts Fighters Association head Rob Maysey to clear up a common misconception of MMAFA and elaborate further on the benefits of the organization.

**One thing that often gets misinterpreted with MMAFA is the thought that it is a union, or that it will necessarily lead to o a union. Such is not the case, according to Maysey:**

No, organization is not the obvious precursor to a union, though organization is the precursor to virtually any successful venture. I am a member of the American Bar Association (ABA), and have been for years. The ABA is not, has never been, nor does it intend to be a union of any kind. That said, membership in the ABA provides benefits to members that individually, they could not obtain on their own. By approaching providers on behalf of the entire membership of the ABA, the ABA is able to obtain group discounts on a variety of benefit plans and from service providers and vendors. Individually, these discounts would be unobtainable. By leveraging its collective membership, the ABA is able to provide its members with a number of benefits including discounts on insurance plans, hotels and rental cars, and from various vendors and service providers. Membership in the ABA also provides members with a network and platform in which to hone their skills and to gain notoriety in any chosen field by writing articles for ABA publications, by chairing committees, and by networking with members. The ABA also leverages its collective membership by effectively lobbying congress, submitting draft proposals of laws for consideration, and participates in litigation by filing amicus briefs. Again, without the backing of its membership, none of these things is possible. By bringing attorneys together in one association, the ABA has created a very powerful and influential vehicle that not only provides benefits to its members, but also plays an active role in shaping the law.

Another example directly related to the mixed martial arts industry is the Association of Boxing Commissions (ABC). The ABC isn't a union of any sort, nor do they intend to be. The ABC, however, plays a central role in shaping the sport by adopting uniform rules which are voted upon and approved by each of its constituent members. Additionally, by coming together under one association, the ABC was able to create a "badge of distinction" that they then auctioned off to private enterprise. This distinction came in the form of the "Official Certified Database for Mixed Martial Arts," and this "official" recognition was sold to Mixed Martial Arts, LLC. This is value created solely by virtue of the individual commissions coming together under one umbrella to recognize one official database. No individual commission would have been able to auction off such recognition, but together as a group, they created value to private enterprise that didn't exist before.

The World Alliance of Mixed Martial Arts (WAMMA) provides another example in the Mixed Martial Arts industry. While not truly an "association," WAMMA fashions itself an "alliance" between its promotional and advertising partners. WAMMA, by assembling this alliance, aims to profit by creating brand value in yet another "badge of distinction," in this case, recognition as a WAMMA champion. By assembling the alliance and promoting its brand, WAMMA aims to profit by selling advertising to sponsors and by gaining corporate sponsorship for its rankings and belts. If WAMMA is unsuccessful in assembling a wide enough "alliance," no value will be created.

In terms of the MMAFA, organization is the precursor to group licensing, branding, and effective lobbying. Large revenue streams are being claimed by private enterprise in the form of corporate sponsorships, advertising, memberships, and branded products. Talent isn't even in the market for the vast majority of these revenue streams at all, because they don't have a group to present to the corporate sponsors and gear providers, and they don't have a group vehicle on the web to present to advertisers. Talent also has virtually no role in shaping the sport in which they compete, and in terms of influence, rank even below media. By coming together under one association, fighters will have a central voice in matters that impact the sport.

The model being utilized by the MMAFA has proven remarkably successful, over and over, and will provide its members with the same kinds

of benefits, publicity, and protections as enjoyed by athletes in all of the other major professional sports. The MMAFA aims to maximize the influence and earning capacity of its members in the amazing sport of mixed martial arts. Unlike all other industry groups, the MMAFA is truly an association formed for the benefit of its members. The trademarks, logos, website, domains, and all other property of the MMAFA will be held in trust for the collective benefit of MMAFA members. Modeled closely after the Major League Baseball Players' Association and the Screen Actors Guild, the MMAFA will be led and directed by its members and their elected member representatives.

The MMAFA provides its members with a brand that can be monetized through the sale of merchandise, and through licensing to third parties. The MMAFA also provides the following to all of its members:

· Media platform and publicity vehicle to promote and publicize the activities of our members;

· Revenue maximization through merchandising and licensing of collective brand; and

· Lobbying, and if necessary, litigation vehicle.

The future direction of the MMAFA is determined solely by the members. I am not a member, nor am I an owner. Thus, it is necessarily presumptuous of me or anyone else to speak as to the direction the members will choose at some future date.

**Some overstate the role of litigation in the overall structure of MMAFA, Maysey defined the role of litigation within MMAFA…**

Litigation is not a goal of the MMAFA, but as you saw with the EliteXC complaint prepared by the MMAFA, an association provides an effective litigation vehicle for its members. The career of a professional mixed martial artist is relatively short in duration. Thus, professional mixed martial artists must maximize their earnings potential during their peak athletic years. Litigation is an expensive, time-consuming process, and for the vast majority of professional mixed martial artists, not a viable option. The MMAFA will provide its members with a litigation vehicle, should litigation be necessary or desirable to improve the condition and status of its members in the mixed martial arts industry.

**Maysey also gave a detailed look at how MMAFA would add untapped revenue streams for fighters as well as provide other benefits:**

I believe the MMAFA can provide all members with revenue streams they don't currently enjoy at all, and by capturing this revenue, the MMAFA seeks to provide all of its full members with health and other benefits. As the MMAFA matures, members decide how to allocate excess revenue, including the possibility of distributions to the members. Currently, in the mixed martial arts industry, private parties in the form of gear and apparel providers, community websites, media sites, and others profit from the personalities of the athletes who make this sport great. Very little of this ancillary revenue is returned to the talent at all. The MMAFA provides a vehicle to capture a large portion of this ancillary revenue for the talent—the one element consistently sought out by the general public.

Consider two potential tradeshow possibilities. This example is just a hypothetical used to show how various aspects of the industry currently operate, and to show why fighters on the whole receive a small fraction of the revenue they generate.

The first tradeshow is run and organized by a private enterprise, which pays a handful of fighters a small sum to appear at the tradeshow, and seeks to entice other fighters to attend by offering free admission. This private company then advertises the presence of the fighters to attract corporate sponsorships, advertising, and paying attendees from the general public.

The second tradeshow is presented by the MMAFA. All profits derived from this tradeshow go the members, less only the expenses of organizing the show. In the first example, fighters will collect approximately 5% at most of the profits derived. In the second example, the fighters become the owners of the event, and retain all profits.

The MMAFA has already prepared the stage, provided the infrastructure, and the tools necessary for fighters to do all of these kinds of things for themselves—and thus, keep the majority of the revenue derived.

Written by robnashville · Filed Under 1
Tagged:

**Got something to say?**

Name (required)

Email Address (required)

Website

Speak your mind