UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION

CUNG LE, ET AL.,                  ) CASE NO:  2:15-CV-1045-RFB-PAL
                                  )
            Plaintiffs,           )           CIVIL
                                  )
    vs.                           )      Las Vegas, Nevada
                                  )
ZUFFA, LLC.,                      )  Wednesday, September 30, 2015
                                  )     (2:02 p.m. to 2:48 p.m.)
_____Defendant._____ )

STATUS CONFERENCE

BEFORE THE HONORABLE PEGGY A. LEEN,
UNITED STATES MAGISTRATE JUDGE

Appearances:              See Next Page

Court Reporter:           Recorded; Liberty

Courtroom Administrator: Jeff Miller

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                      DON SPRINGMEYER, ESQ.
                                 Wolf Rifkin Shapiro Schulman &
                                  Rabkin, LLP
                                 3556 E. Russell Road, 2nd Floor
                                 Las Vegas, NV 89120-2234

                                 MICHAEL C. DELL'ANGELO, ESQ.
                                 1622 Locust Street
                                 Philadelphia, PA 19103

                                 BENJAMIN D. BROWN, ESQ.
                                 Cohen Milstein Sellers & Toll, PLLC
                                 1100 New York Avenue, NW,
                                 Suite 500 West
                                 Washington, DC 20005

                                 MATTHEW S. WEILER, ESQ.
                                 The Joseph Saveri Law Firm, Inc.
                                 555 Montgomery Street, Suite 1210
                                 San Francisco, CA 94111

                                 ROBERT MAYSEY, ESQ.
                                 Warner Angle Hallam Jackson
                                  Formanek, PLC
                                 2555 E. Camelback Road
                                 Suite 800
                                 Phoenix, AZ 85016

Defendant:                       JOHN F. COVE, JR., ESQ.
                                 Boies Schiller & Flexner, LLP
                                 1999 Harrison Street, Suite 900
                                 Oakland, CA 94612

                                 MARCY N. LYNCH, ESQ.
                                 Boies Schiller & Flexner, LLP
                                 121 S. Orange Avenue, Suite 840
                                 Orlando, FL 32801

                                 PHILIP R. ERWIN, ESQ.
                                 Campbell & Williams
                                 700 S. Seventh Street
                                 Las Vegas, NV 89101

1        **Las Vegas, Nevada; Wednesday, September 30, 2015; 2:02 p.m.**

2                              **(Call to Order)**

3                **THE CLERK:** All rise.

4                **THE COURT:** Good afternoon.  Please be seated.

5                **COUNSEL:** Good afternoon, your Honor.

6                **THE CLERK:** Your Honor, we are now calling the status

7  conference in the matter of *Le versus Zuffa, LLC*.  The case

8  number is 2:15-cv-1045-RFB-PAL.

9                Beginning with plaintiffs' counsel, Counsel, please

10  state your names for the record.

11                **MR. SPRINGMEYER:** Good afternoon, your Honor.  Don

12  Springmeyer, Wolf Rifkin, for plaintiffs.

13                **MR. BROWN:** Benjamin Brown, Cohen Milstein, for

14  plaintiffs.

15                **MR. DELL'ANGELO:** Michael Dell'Angelo of Berger and

16  Montague on behalf of plaintiffs.

17                **MR. COVE:** Good afternoon, your Honor.  John Cove,

18  Boies, Schiller and Flexner, for Zuffa, LLC.

19                **MS. LYNCH:** Good afternoon.  Marcy Lynch, Boies,

20  Schiller and Flexner, for Zuffa, LLC.

21                **MR. ERWIN:** Phil Erwin, Campbell and Williams, on

22  behalf of Zuffa, LLC.

23                **MR. HENDRICK:** Good afternoon, your Honor.  Kirk

24  Hendrick, Chief Legal Officer for UFC.

25                **THE COURT:** We're here for a status conference, and

1    you folks have now had an opportunity to mull over Judge

2    Boulware's decisions with respect to the dispositive motion

3    that has been filed.  I have read your joint status report and

4    the parties' proposed competing forms of protective order in

5    this case, so let me ask -- just initially I'm going to take

6    oral argument on the issue with respect to the only disputed

7    provision of the proposed form of protective orders, which is

8    the highly confidential, attorneys' eyes only issue, and then

9    I'll take up the more specific issues with respect to document

10   production and ESI and so forth.  I understand Judge Boulware

11   approved your ESI protocol.  He deferred the decision about the

12   motion for protective order to me, and he's indicated just

13   generally, for whatever value it's worth to you, that his

14   intention is to defer most case management and discovery-

15   related matters to me.  He intends to take up those matters

16   that he knows he's going to get one way or the other.  So, for

17   whatever value that provides you moving forward.

18           Let me hear first from the parties concerning the

19   proposed form of order and arguments concerning the propriety

20   or lack thereof of a attorneys' eyes only provision starting

21   with the moving parties' request for that provision.  Mr. Cove?

22           **MR. COVE:**  Yes.  Thank you, your Honor.

23           Two-tiered protective orders that protect the

24   parties' most sensitive and highly confidential information,

25   anti-trust litigation, are routine in anti-trust litigation.

1    Courts don't want discovery to be used for the purposes -- for

2    purposes outside the litigation and are very concerned about

3    inadvertent disclosure.  As the *Deutsche Bank* case said:

4              "It is very difficult for the human mind to

5              compartmentalize and selectively suppress information

6              once learned no matter how well-intentioned the

7              effort to do so may be."

8              Now, here there were two issues when we began, and

9    one was the issue of attorneys who represented fighters in the

10   normal course of business and negotiations with Zuffa, and the

11   other is Mr. Maysey, who is the promoter, creator, founder of

12   the Mixed Martial Arts Fighter Association.

13             The first issue has essentially been resolved.  The

14   attorney who acted as a representative in negotiating contracts

15   has agreed to be firewalled from this litigation, and the

16   parties don't really have a dispute about that.  So, the issue,

17   then, is Mr. Maysey.

18             **THE COURT:**  And with respect to that issue, the

19   parties have an agreement in principle that attorneys who

20   represent fighters who -- in various stages, and whether

21   they're contract or sponsorship or merchandising agreements and

22   so forth, that an attorney who has actually represented should

23   not have access to information about whether the fighters --

24             **MR. COVE:**  And I think it might be a little broad to

25   describe it as an agreement in principle.  There was a specific

1   individual who performs that role, who is a partner of

2   Mr. Springmeyer's.

3           **THE COURT:**  Correct.  And I understand that.

4           **MR. COVE:**  Yeah.

5           **THE COURT:**  And, then, there are exchanges back and

6   forth about what he did or did not do, and now I want to probe

7   with you whether or not you have an agreement with respect to a

8   principle or just that individual.

9           **MR. COVE:**  I believe it is just that individual, and

10  that's what we -- that's why we require that two-tier

11  protective order that we've -- that we've established.

12          **THE COURT:**  Very well.  So --

13          **MR. COVE:**  We -- we don't have any other individuals

14  in mind who are in that -- who are similarly situated, and I

15  don't think Mr. Tabachnick, who is Mr. Springmeyer's partner,

16  presents any -- any controversy right now.

17          So, the issue, then, is Mr. Maysey.  Mr. Maysey, as I

18  said, he is the -- the creator, the promoter, and the driving

19  force behind the Mixed Martial Arts Fighters Association.  His

20  stated ambition for this entity, among others, is to have it

21  serve as a group licenser for MMA fighters in direct -- which

22  would be in direct competition with Zuffa for those licensing

23  rights.  Irrespective of --

24          **THE COURT:**  You don't license rights for fighters, do

25  you?  You license rights in your own accord?

1    **MR. COVE:**  We -- Zuffa licenses, in order to put on

2    the bouts and promote the bouts, obtains contractually the

3    licenses -- the rights to use fighters' name, likeness, and so

4    forth in connection with that.  And, then, there are third

5    parties, such as sponsors or merchandisers Zuffa works with to

6    license its brand and the fighters -- with the fighters to --

7         **THE COURT:**  Their identities.

8         **MR. COVE:**  Their identities.  Right.  So, if a

9    sponsor, say, Reebok, pays a certain amount of money for people

10   to wear their Reebok uniform in the competition, the fighters

11   will get a certain amount of that revenue.

12        **THE COURT:**  Correct.  That's one of the things the

13   plaintiffs are complaining about --

14        **MR. COVE:**  Right.

15        **THE COURT:**  -- is that you have this arrangement, and

16   they also say you engaged in a series of other conduct that

17   prohibits the fighter from independently going out and --

18   although he has to wear the team uniform, as it were --

19   prohibiting the fighter from obtaining outside sponsorships not

20   related to the bout for which a contract is -- contractual

21   right is provided to you.

22        **MR. COVE:**  That is their contention.  We disagree

23   with it as a fact.  But -- but -- and I'm glad to explain that

24   if you'd like, if you want me to go --

25        **THE COURT:**  No; I know you disagree with that.  I'm

1    just trying to --

2              **MR. COVE:**  Yes.

3              **THE COURT:**  -- hone out what you're talking about.

4    You agree that you have contractual rights to the fighters'

5    identities for purposes of commercializing your opportunities.

6              **MR. COVE:**  In connection with the UFC activities.

7    The fighters can go out on their own when they're not involved

8    in UFC activities without the UFC name and brand and license

9    their identities --

10             **THE COURT:**  So, what is the risk of harm to you if

11   you have a binding and valid contractual obligation with the

12   fighters with respect to individual bouts for disclosure of

13   information that pertains to activities that you acknowledge

14   they could engage in lawfully and permissibly if they want to?

15             **MR. COVE:**  Well, they're -- they are a competitor

16   in -- in doing that.

17             **THE COURT:**  How so?

18             **MR. COVE:**  Because --

19             **THE COURT:**  You only compete in -- in the events,

20   correct?  Not in the --

21             **MR. COVE:**  Well, no, the sponsors -- we're competing

22   for the -- for the sponsors.  The sponsors can sponsor --

23   choose to have a deal with Zuffa or it can choose to make other

24   independent deals.

25             **THE COURT:**  Why would any sponsor want to deal with

1    Zuffa and a fighter independently when Zuffa has an agreement

2    with a fighter to -- that obligates the fighter?

3              **MR. COVE:**  Because it's -- they can have -- have the

4    fighter engage in much broader activities in support of their

5    brand.  So, if -- if, you know -- Reebok, for example, they

6    have the uniform that -- they provide the uniform that the

7    fighters compete in in the Octagon.  If they want to have one

8    of these people go out and promote their brand some other way,

9    they can reach a separate agreement to do that with them.

10             **THE COURT:**  Correct, but how is that --

11             **MR. COVE:**  They can and do.

12             **THE COURT:**  But how does that compete with you?

13             **MR. COVE:**  Well, that activity, per se, is not --

14   when an individual fighter who -- who has a deal with us makes

15   another deal with a --

16             **THE COURT:**  With your same sponsor.

17             **MR. COVE:**  -- with a sponsor, it --

18             **THE COURT:**  For something that you're not engaged in.

19             **MR. COVE:**  Right.  It's -- it could still compete

20   because the sponsor has a limited amount of money and has to

21   decide where it's going to spend that money and what's most

22   effective.  And if -- what Mr. Maysey's ambition to do, as he's

23   articulated in the materials that we cite, is to get a group of

24   people together and license those rights, you know, as -- as a

25   group to -- to whomever.  And, so, that would be a competitive

1    activity.  The sponsor would have to decide whether they wanted

2    to -- wanted to contract with UFC or with --

3         **THE COURT:**  Well, there's only so much of the piece

4    of the pie.  But what you have a contractual agreement with

5    your fighter was, is that you're going to use his identity for

6    a certain bout, and all you're telling me is that if Reebok

7    only wants to spend a million and they spend a half a million

8    with you, and you -- you don't want the fighter to engage in

9    other alternatives to Reebok that cut into your piece?

10        **MR. COVE:**  No.  It's -- it's not them wanting to;

11   it's just they are -- they are a competitor, and -- and, you

12   know, this -- this is -- this is --

13        **THE COURT:**  Well, competitor in a sense they're a

14   competitor of the total piece of the pie that Reebok might

15   decide to devote to advertising.  They're not a competitor to

16   you with respect to the exclusive rights you already have with

17   the fighter, right?

18        **MR. COVE:**  Well, once -- once they're contracted for,

19   the fighter can't sell them twice, but those contracts come

20   up --

21        **THE COURT:**  Correct.

22        **MR. COVE:**  -- and they will have to compete again.

23   Let -- let me step back for a second, because there is a

24   broad --

25        **THE COURT:**  I'm really trying to understand your

1  competition argument.

2  **MR. COVE:**  All right.  There is a broader aspect of

3  this, which is that Zuffa, UFC, is competing for fighters with

4  other promoters, such as Bellator and so forth.  And the Reebok

5  deal is part of what they offer to fighters, and it restricts

6  the fighters from other things they could do in the Octagon

7  with sponsors with regard to other competitors.  So, Bellator,

8  for example, is using the Reebok deal to say, you know, "Come

9  to us, because you'll be able to make more money with sponsors

10  in addition to what we're paying you."  So, it's a --

11  **THE COURT:**  Because they'll pay a bigger piece of the

12  pie of the Reebok deal to the fighter?  Or --

13  **MR. COVE:**  Because the -- because the individuals

14  have more of an opportunity to do their own sponsorship deals

15  where those -- that sponsored clothing into their -- into the

16  Bellator ring, into the competitive space, and have the

17  sponsors be on TV, whereas Zuffa has only Reebok uniforms in

18  the -- in the Octagon these days.  So --

19  **THE COURT:**  Okay.  So --

20  **MR. COVE:**  Some -- some --

21  **THE COURT:**  So, Zuffa only allows, as an example, a

22  Reebok logo on a uniform, but Bellator would permit the fighter

23  to put a Reebok and a Nike --

24  **MR. COVE:**  Yeah.  It wouldn't be Reebok.  But it

25  would -- it would be any -- anybody else if they -- if they

1    could sell Nike or if they could sell, you know, batteries or

2    cell phones or Monster drinks, whatever; whatever the fighter

3    can convince a sponsor to pay for and get that exposure on TV

4    by wearing it in the ring.  Zuffa has -- has reached --

5              **THE COURT:**  It -- they could be a walking billboard,

6    yes.

7              **MR. COVE:**  Right.  So --

8              **THE COURT:**  And you don't allow that.

9              **MR. COVE:**  Yeah.  So, we -- so, there has been a

10   change in the business model over the last few years, and this

11   is the business model that Zuffa's chosen to go through one

12   sponsor; the fighters are paid according to the number of

13   fights that they've had, paid from the Reebok money -- the

14   Reebok money that comes in.  They're paid according to the

15   number of fights they've had, a certain amount.  And some of

16   them say it's a better deal for some, it's a worse deal for

17   others, compared to what they could make, they say, based on

18   freely offering their sponsorship rights to others.  And that's

19   an aspect which the president of Bellator has publicly stated

20   many times; I am encouraging people to come to me; you can make

21   more money with licensing, because of the Reebok deal.   So,

22   that's -- it goes to show that there's a lot of competition on

23   a lot of metrics in this industry and it's --

24             **THE COURT:**  So --

25             **MR. COVE:**  -- not correct to -- to isolate, you know,

1    one licensing right or another licensing right.

2              **THE COURT:**  How would a fighter who's contracted with

3    you gain a competitive advantage by knowing about what your

4    deal with Reebok is in dealing with Bellafor (sic) or anybody

5    else that wants to give him a -- exposure to other

6    opportunities?

7              **MR. COVE:**  Well, it's not just the deal itself, but

8    it's all of the confidential information that could be --

9              **THE COURT:**  So, tell me what that is.

10             **MR. COVE:**  Well, there are costs; there are revenue

11   streams; there are strategies as to how they will approach new

12   sponsorship opportunities, new merchandise oppor- --

13             **THE COURT:**  "They" being who?

14             **MR. COVE:**  Zuffa.  Zuffa is continually looking for

15   new sponsorship opportunity and new merchandise opportunities,

16   new ways to market its product, to popularize its product.  All

17   these things are competitive strategies that it would harm

18   Zuffa if they were disclosed.  And, you know, in a price-fixing

19   litigation, say you have a -- buyers are suing a group of

20   sellers for -- for price fixing.  The sellers can't have

21   access -- typically, under a two-tier protective order --

22   cannot get access to the competitively -- business counsel for

23   the buyers I should -- or the sellers I should say; they can't

24   get competitively sensitive information about their competing

25   sellers, but they also are barred from getting the

competitively sensitive information from the buyers, with whom

they have a -- a vertical relationship and aren't really

competing.

          **THE COURT:**  So, who are the buyers and sellers as

between you and the fighters for purposes of your assertions?

          **MR. COVE:**  Well, we're -- we're a little different

here in that they are the sellers of the services.

          **THE COURT:**  That's why I'm having a hard time --

          **MR. COVE:**  Yeah.

          **THE COURT:**  -- following your --

          **MR. COVE:**  Well, I think the principle is the same.

You could have a monopoly case where the sellers are colluding

or you could have a monopsony case where the -- excuse me --

yeah, a monopsony case where the sellers -- monopoly case where

the sellers are colluding or a monopsony case where the buyers

are colluding, agreeing not to compete for certain products,

for example, or agreeing not to pay more than a certain price.

That would be price fixing on the -- on the monopsonization

side.  But the principle is the same, that if the seller --

there is no reason the -- the seller could be harmed if the

buyer learns about all of its highly competitive, sensitive

information, and the seller could be harmed if the buyer learns

about it.  I don't think there is a major distinction here, and

that's -- that's the problem we have here, that both, you know,

the MMAFA, as a horizontal competitor for licensing, and

15

1    Mr. Maysey's activities in -- in representing and advising

2    fighters with regard to their negotiations with -- with -- with

3    Zuffa.

4              You know, the plaintiffs used the example of a union

5    in their papers that -- and I think it's actually an apt

6    example.  If U.S. Steel were sued for some anti-trust

7    violation, the chief labor negotiator for U.S. Steel unions

8    wouldn't be entitled to every -- to use every piece of

9    information that they -- that was subject to discovery in the

10   anti-trust litigation.  Now, here there is no collective

11   bargaining, and there is no indication that Mr. Maysey

12   represents, you know -- is going to do that, but that's clearly

13   his ambition, and both as a collective bargainer and his

14   current practice now with regard to fighters.  So, therefore,

15   we feel that that risk, that knowledge -- and it's not our --

16   you know, as the Court said in MyConn (phonetic):

17              "Even if they act in best of faith in accordance with

18              the highest ethical standards, the question remains

19              whether the confidential information would create an

20              unacceptable opportunity for inadvertent disclosure."

21              And here we think that it would.

22              I think it's important to remember here that there is

23   a challenge procedure.  The plaintiffs feel strongly about

24   this.  If anything is overdesignated and is impeding their

25   ability to -- to prosecute this case, they can come to us first

1   and under -- under our proposed limited protective order, and

2   if they don't get satisfaction, they can come back here.  And

3   that's a major incentive for us to be as judicious and as

4   careful as possible in only designating the things that are

5   truly highly confidential and that could cause competitive

6   harm.  And if --

7          **THE COURT:**  How do you propose that the Court enforce

8   the description of agents or one of the agents for -- your

9   language is more articulate than that, but that's what it says.

10          **MR. COVE:**  Well, there is a limited universe of

11  people who are going to be exposed to confidential information

12  of any sort under the protective order, and I think it's the

13  plaintiffs' obligation, if they have people who fall within

14  that category, to make a determination whether they're in that

15  category, and if there is any question about it, we can -- I

16  mean, we don't know who they're going to have reviewing

17  documents and so forth, and we're not going to regulate that,

18  but if there is a question they can bring it -- bring it to us

19  or bring it to the Court's attention.  I mean, there's a lot of

20  ways to work out these things in a -- in a litigation.  You

21  know, I have -- I've been in cases where the in-house counsel

22  really wanted to see the expert report that contained highly

23  sensitive information and otherwise wouldn't be able to, and

24  counsel were able to work out arrangements; okay, you know,

25  "We'll redact this part of the sensitive information and we'll

1  give you -- we'll make sure that your client can do his job --

2  his or her job."  And, you know, that's -- that's the kind of

3  thing that could -- could happen here as well.  But to just

4  leave the floodgates open and the most highly confidential, the

5  most highly sensitive information here --

6          THE COURT:  Well, the -- the floodgates aren't open.

7  It still can be designated as confidential.  It's the

8  restriction on who gets access and for what purpose that you're

9  concerned about.

10          MR. COVE:  That's -- that's correct.  I overstated my

11  points with the "floodgates" comment, but I think -- I think

12  that, you know, there are ways to work these things out, and,

13  obviously, when we come to the point of summary judgment in

14  trial we know that you and other courts are very concerned

15  about the sealing of material that shouldn't be in the public,

16  and --

17          THE COURT:  Well, compliance with the *Kamakana*

18  decision and the presumption of public access.

19          MR. COVE:  Sure.  Of course.  And, you know, we've

20  tried a variety -- in previous cases we've met and conferred

21  and worked out a variety of mechanisms to address those issues.

22  So, I don't think this has to be a major issue here.  We just

23  need the ability to protect the most highly sensitive,

24  confidential information from disclosure.

25              And, you know, the last point I'll make is that there

1    is really no showing here that there can be -- is or will be

2    any harm to the plaintiffs' ability to prosecute this case.

3    They have -- they moved for appointment of --

4              **THE COURT:**  Yes, of course, but that turns the burden

5    on its head.  The burden is on you to establish the

6    justification for the protection.

7              **MR. COVE:**  Understood.  But I think we -- we've done

8    that, and at that point it becomes a balancing, a balancing

9    test.  And Mr. Hendrick's declaration that we've submitted, you

10   know, provides an evidentiary basis for this.  It's hard to,

11   sitting here today, detail every specific piece of information

12   that could cause competitive harm, but there is -- there is a

13   lot of it.  I mean, this is a very dynamic industry.  They are

14   thinking creatively about how to do new things, and as are

15   their competitors, and having that information not as tightly

16   controlled as possible just because an anti-trust lawsuit has

17   been filed I don't think is -- is -- serves justice.

18              And I don't think that they will be prejudiced in

19   prosecuting this case in any way.  They have -- they moved for

20   the appointment of four law firms as interim counsel.  All

21   those law firms are very qualified, as reflected by their

22   papers.  There's 17 lawyers, I think.  So, there is really no

23   indication that this will not allow them to prosecute the case

24   fully and vigorously, and if they have a problem with it, there

25   is a procedure that they can take that will be effective that

1    serves as a check on us right now, because I don't want to be

2    here, you know, in two or three months trying to justify

3    something -- you know, a designation that is not justifiable.

4    So, I -- I think this is the most reasonable solution.  It's

5    not -- it's kind of an unusual -- Mr. Maysey's position is a

6    little bit unusual.  It's not like a typical in-house counsel

7    position where this decision is relatively routine, but I think

8    the same principle should apply here and that we should get

9    this protection.

10            **THE COURT:**  Thank you, Mr. Cove.

11            Who will be arguing from the plaintiffs' point of

12   view?

13            **MR. DELL'ANGELO:**  Michael Dell'Angelo, your Honor.

14        **(Pause)**

15            **MR. DELL'ANGELO:**  Good afternoon, your Honor.

16   Michael Dell'Angelo.

17            So, there -- there are a few kind of 10,000-foot-view

18   items that I'd like to address, but I'll get to those in a

19   moment, and I'd like to kind of jump right in with -- on

20   something that Mr. Cove said.  And toward the end of this

21   presentation what he said is that it is difficult to detail

22   every piece of evidence of potential competition that may

23   necessitate the entry of a highly confidential designation

24   here.  And that's -- it's a telling statement, because when you

25   look at the filings that Zuffa has made, the declaration of

1    Mr. Hendrick in support, and the materials that they provided,

2    we submit, your Honor, that there is actually not a single

3    piece of evidence that Zuffa has presented that meets the

4    burden that they're required to make.

5         The burden for a highly confidential designation,

6    your Honor, requires an actual showing of harm.  And there has

7    to be competition for that to happen.  And the showing of

8    competition and actual harm requires specific facts.  And what

9    we haven't seen here is a single specific fact.  All right.

10   So, the founding of the MMAFA goes back almost 10 years.  And

11   looking through the record, UFC or Zuffa cannot present a

12   single instance of potential competition or actual competition

13   between the two.

14        And, so, what we heard are --

15        **THE COURT:**  Well, are you saying that your fighters

16   are potential competitors and the pool of money that's

17   available for sponsors (indiscernible)?

18        **MR. DELL'ANGELO:**  So, your Honor, the -- the

19   designation that Zuffa is seeking really falls into -- there

20   are three separate designations.  So, the first is just the

21   plaintiffs themselves.  So, what Zuffa is saying is that the

22   plaintiffs should not be entitled to see any highly

23   confidential information.  But in their papers what they

24   haven't done, and in Mr. Hendrick declaration what they haven't

25   done, is presented a single instance or piece of evidence that

1    supports competition between the two.  I think what you heard

2    from Mr. Cove is some things we haven't heard before today,

3    which suggests that that competition is possible, but none of

4    it meets the showing that there is actual competition that

5    would result in a direct harm to the UFC.  There is simply

6    none.

7            I mean, and the same is true with respect to the

8    second tier that the UFC has proposed, which is excluding the

9    availability of highly confidential information from agents as

10   well.  Again, looking through their papers and their entire

11   submission, they don't even really say directly that there is

12   reason to believe that anyone who is -- and if you look at the

13   language, which they've done, it's incredibly over broad.  It's

14   anyone who anticipates being an agent for any athlete in any

15   sport should be precluded from seeing this material.  But,

16   again, what they don't do is provide a single instance of --

17   you know, or a specific fact to suggest that there is any

18   actual harm that would result from the disclosure of what

19   they'd like to characterize as highly confidential information.

20           So, and, you know, that kind of addresses sort of a

21   larger issue with respect to a highly confidential designation

22   that they're proposing here.  It's incredibly broad, and it

23   lacks the specificity that such designation should have.  And

24   if you go through the language, it -- I think it suggests that

25   there is a high degree of likelihood that there will be over

1   designation.  And, you know, the cases that look at this --

2        **THE COURT:**  Well, Counsel has just assured me that

3   they have no intention of doing that, because they know you

4   have a mechanism to bring it to me, and nobody wants to be

5   called on the carpet for over designating materials.

6        **MR. DELL'ANGELO:**  Well, I understand that

7   representation, but, your Honor, the cases that have looked at

8   this -- and *Dysthe*, the basic research out of the Central

9   District of California, one of the cases that we cite, talks

10  about this -- is that there should be extremely well-defined

11  reasons and the scope of the highly confidential designation

12  should be narrowly tailored so that everybody knows what

13  they're talking about.  And what's interesting is, if you look

14  at that *Dysthe* decision, on pages four to five, the language in

15  that opinion cites the proposed highly confidential language

16  that was rejected by the Court in that case, and it's verbatim,

17  almost identical, to the language that we're seeing here.  So,

18  while I recognize the representation of counsel, and I

19  appreciate they would try to do that, I think the risk is high.

20  That said, Section 7.1 of the proposed protective order, which

21  both parties have agreed to, provides that no recipient of the

22  material designated as confidential or otherwise is permitted

23  to use it for any purpose other than this litigation.  So, the

24  fact that one can challenge and that they might not over

25  designate, in a way, puts the cart before the horse.  I mean,

1    really, the question is, should it be designated as highly

2    confidential at all.  And I submit that it shouldn't unless

3    Zuffa has made the appropriate showing, which it hasn't.

4              So, particularly with respect to the MMAFA and Mr. --

5    Mr. Maysey, what the -- what Zuffa hasn't done is demonstrate

6    why the MMAFA is actually a competitor of the UFC.  And there

7    are sort of myriad reasons why that assertion doesn't hold.  I

8    mean, it's a -- it's a bald assotion -- assertion, rather,

9    which is -- and I think Mr. -- Mr. Cove used the word that it's

10   their "ambition" to compete and that there is no collective

11   bargaining.  But even if one assumes that it's the ambition of

12   the MMAFA to compete in this market, the question is, are they

13   even competing over the same things.  And it's impossible to

14   know, because, again, in 10 years of the existence of the

15   MMAFA, we haven't seen a single instance of actual competition.

16   I mean, they can't point to a single one.

17             Which gets us to the next issue; Mr. Maysey, more

18   specifically.  What Zuffa concedes and the cases are clear

19   about is that he would have to be a competitive decision-maker

20   in order to be excluded.  And he's not.  Again, it doesn't meet

21   the test.  That would mean that he'd have to direct decisions.

22   He'd have to make decisions about competitive conduct that the

23   MMAFA is engaging in.  But, you know, you have this problem

24   where the MMAFA is not engaging in any competitive conduct.

25   But even if it were, Mr. Maysey absolutely is the founder, but

1    there's -- he hasn't engaged any competitive conduct, and

2    there's -- there is none to point to.

3              But even if you accept everything that Zuffa has said

4    with respect to competition, you're right, your Honor, to seize

5    on the shifting of the burden here, because there -- there is a

6    balancing that has to happen.  And I think balancing weighs

7    strongly in favor of striking down or not affording the

8    defendants the highly confidential designation that they seek.

9    And the reason for that is that Mr. Maysey is an industry

10   expert.  He's the choice of counsel -- excuse me -- the choice

11   of the plaintiffs in this case.  He's an important piece of the

12   counsel picture here.  And what -- what Zuffa has said in their

13   papers, and I think what you heard, is that there are plenty of

14   lawyers who can look at the documents.  But anybody who has

15   litigated a case knows that looking at documents is just a

16   small subset of what happens in the case.  The highly

17   confidential designation here would have the effect of

18   excluding Mr. Maysey entirely from the case.  He couldn't

19   participate in communications with clients where

20   confidential -- highly confidential documents are discussed.

21   He couldn't prepare for a deposition; couldn't take a

22   deposition; couldn't participate in the preparation of class

23   certification brief or motion for summary judgment if it was

24   going to use those materials.  I mean, if we were looking at

25   those materials today in connection with another hearing, he

1    wouldn't even be permitted in the courtroom.  And, then, in

2    theory -- I mean, I understand that there are workarounds for

3    this, but as it's drafted, he wouldn't even be permitted to

4    participate in the trial of this case.

5              So, in effect, what you do is, by entering the highly

6    confidential designation, is you -- you exclude him entirely

7    from the case.  And, so, you deprive the plaintiffs of their

8    choice of counsel; you've deprived them of the opportunity to

9    see documents about what -- what the case is about, when you

10   haven't established that they're competitors in the first

11   place; and then you run into -- to another issue.  Not only do

12   you -- do you undermine the choice of counsel that the

13   plaintiffs have made, but this is not just your standard party-

14   on-party case.  It's class action.  And under Rule 23, the

15   representative plaintiffs have certain obligations that are

16   heightened because they, in effect, are acting on behalf of all

17   the absent class members.  So, they have to be making decisions

18   about the case on behalf of -- of others.  And if their primary

19   counsel liaison can't look at documents, and they can't look at

20   documents, you know, how can they reliably discharge their

21   duties as class members on behalf of the class?

22             So, I think -- think what you have here is a highly

23   confidential designation that is exceedingly broad and doesn't

24   meet any of the tests with respect to the factual showing

25   that's necessary and has a -- a real chilling effect on the

26

1    case, and, on balance, there really isn't an adequate

2    workaround for the involvement of somebody like Mr. Maysey, who

3    is not a competitive decision-maker and is not competing with

4    Zuffa.

5              THE COURT:  Thank you.

6              Counsel, I'm going to move on, because we have a lot

7    of ground to cover with respect to the discovery and the

8    document productions in this case, but I am going to find that

9    the defendant has not met its burden of establishing a need for

10   the highly confidential, attorneys' eyes only designation in

11   this case, and I will, therefore, adopt the proposed form of

12   protective order without that designation.  May counsel please

13   submit the proposed stipulation with the appropriate signatures

14   consistent with that decision?

15             Mr. Cove?

16             MR. COVE:  I -- thank you, your Honor.  I -- I heard

17   you rule.  I'm standing up for the next matter.

18             THE COURT:  That's fine.  I didn't know if you had

19   something to --

20             MR. COVE:  I'd be glad -- I'd be -- if you want to

21   hear more, I -- I have more to say, but --

22             THE COURT:  No, I don't usually allow argument after

23   I've ruled, but every once in a while someone --

24             MR. COVE:  I -- I assumed as much.

25             THE COURT:  -- needs a clarification.

1              So, let me turn now to -- you've had a few days to

2    react to Judge Boulware's decision with respect to the motion

3    to dismiss, and what, if any, ongoing discussions have you had

4    to get the discovery process under way?

5              **MR. DELL'ANGELO:**  So, your Honor, this --

6         **(Pause; voices and whispers off the record)**

7              **THE COURT:**  Mr. Dell'Angelo and Mr. Cove, go ahead,

8    and why don't you make nice and stand at the same podium.

9    How's that?

10             **MR. DELL'ANGELO:**  So -- so, we discussed this matter

11   this morning, your Honor, and I think we have a shared view

12   that we would like to present to the Court.

13             **THE COURT:**  Excellent.

14             **MR. DELL'ANGELO:**  Which is, the status that we put

15   together jointly at Docket 185 was largely put together with

16   the expectation that there would be some phasing that would be

17   dependent upon the outcome of the motion to dismiss.  And now

18   that we have that decision, which, you know, we're -- we're

19   certainly pleased with on our side, we think that there is some

20   more thinking that needs to go into the proposal, and what we

21   would like to do is spend a little bit of time with the

22   defendants, continuing to meet and confer, refining our

23   proposal, and then provide you with a joint status that

24   indicates where we have come out, and also, to the extent that

25   there are matters on which we do not agree, present them to you

1   as well, and in as short a time frame as possible have a

2   follow-up status.

3           Now, to be fair, you know, it was our hope that we

4   could do that in a couple weeks.  I understand Mr. Cove was

5   thinking about a longer time frame, like a month, but that's

6   sort of the general thinking that we had, and we'd also like to

7   use that time to develop a schedule that we, hopefully, can

8   jointly agree on.  We had -- that process was actually started

9   earlier in the case.  We would like to resume that process now

10  that we have a decision on the motion to dismiss --

11          **THE COURT:**  Right.

12          **MR. DELL'ANGELO:**  -- and, hopefully present that to

13  you as well --

14          **THE COURT:**  All right.  Mr. Cove?

15          **MR. COVE:**  Yes.  I -- I, basically, agree with

16  Mr. Dell'Angelo.  I want to make clear that we, you know, have

17  been proceeding diligently on discovery with the -- and we have

18  reached some agreements on some things, and we expect -- Zuffa

19  expects to make a -- a pretty major production sometime in

20  October.  We have not been -- it wasn't like we just discussed

21  it this morning.  We have been discussing it.

22          **THE COURT:**  No, I understand that.

23          **MR. COVE:**  For quite some time, and I --

24          **THE COURT:**  And you said you were going to be

25  collecting --

1          **MR. COVE:**  Yeah.

2          **THE COURT:**  -- materials in the meantime, not with --

3          **MR. COVE:**  Yes.  So, we -- I definitely believe that

4     additional meeting and conferring will be productive.  I think

5     a month is a more realistic time frame, because we would have

6     to get the report in a week in advance of that, in any event,

7     so that's -- that's our position.

8          **THE COURT:**  Have you talked about -- I know one of

9     the issues that was raised that stood out when I was reading

10    your joint status report is the need to redact personal

11    identifiers.  Do you really feel strongly that you need to

12    undertake that effort as opposed to impose on the receiving

13    party the burden of complying with Rule 5.1?

14         **MR. COVE:**  I hate to mention this, your Honor, but

15    there was a -- there was a error in the Northern District of

16    California on that, so we're very sensitive on that point.  But

17    I think we can talk to them about it.  I -- I -- their --

18         **THE COURT:**  I'll just tell you the U.S. Attorney's

19    office in this district, when we have white-collar crime and

20    bank fraud and wire fraud claim, they agree to produce

21    documents to defense counsel under a protective order without

22    redacting the information to expedite discovery review.  I

23    appreciate whether that gets everybody's panties in a knot, but

24    that means there is hell to pay if whoever discloses something

25    that shouldn't be disclosed occurs --

1          **MR. COVE:**  Yes.

2          **THE COURT:**  -- and no one wants to see that happen.

3    The question is whether or not you can reach an accommodation

4    that doesn't involve the busy work of redaction.

5          **MR. COVE:**  I'm certainly willing to talk about it

6    with them, and, obviously, I would have to run that by my

7    client as well.

8          **THE COURT:**  Of course.  Of course.

9          **MR. COVE:**  And we have privilege issues on some of

10   it, you know.  The -- the contract files, which are one of the

11   things that we proposed, really core documents that we proposed

12   in phase one --

13         **THE COURT:**  Sure.

14         **MR. COVE:**  -- that we're pushing forward on, they are

15   privilege intensive.  They have a lot of counsel stuff in them,

16   and it's going to take a substantial amount of time and effort

17   to push through privilege review in any event.  So --

18         **THE COURT:**  Are you going to be able to screen

19   potential privileged documents by custodians?  In other words,

20   do you have a limited number of lawyers that would have been

21   involved, or do you have the problem of, "Our lawyers told us

22   the category of documents"?

23         **MR. COVE:**  Well, I think one of -- one of the things

24   we agreed to prioritize first was the contract files that are

25   maintained for each fighter.  And they would contain the

1  contracts, the extension letters, things the fighter received

2  that aren't privileged.  It might include some non-privileged

3  internal stuff, and it would also, in many cases, include

4  advice to counsel in those files relating to the contracts.

5  So, they're hard copy.  Those are hard-copy contracts, so they

6  have to be --

7          **THE COURT:**  Manually reviewed, yeah.

8          **MR. COVE:**  -- manually reviewed, which is, I think,

9  quite a burden, and, you know, there's a -- there's a lot of

10  fighters with a lot of files --

11          **THE COURT:**  Uh-huh.

12          **MR. COVE:**  -- one of the things we'll talk about

13  further with --

14          **THE COURT:**  Okay.

15          **MR. COVE:**  -- with them.

16          **THE COURT:**  Just being realistic, 30 days is about

17  the soonest turnaround I can give you anyway,

18          **MR. COVE:**  Okay.

19          **THE COURT:**  And, consistent with being able to read

20  your joint status report and be prepared and address any issues

21  that you have.  So, I will let this for a status and dispute

22  resolution conference in 30 days, and, by all means, please

23  continue to meet and confer and decide what you think the most

24  efficacious way is of pursuing discovery and prioritizing what

25  it is that you need.  And I know you're talking about perhaps

32

1   sample files or a representative sample of files and which

2   custodians you're going to select; you're talking about

3   organizational charts and who was who in terms of days of yore

4   before you have a formal chart, and so forth.  So, you have a

5   lot of legwork to do.

6           Have you had the detailed discussions about the ESI

7   in terms of who has what type of ESI and what types of devices

8   and so forth that -- so you have a common understanding on

9   that?

10          **MR. COVE:**  We -- we've had several discussions on

11  that, and some -- some -- some parts of those discussions are

12  dependent on, hopefully, reaching some limits as to who has to

13  be searched, because figuring out --

14          **THE COURT:**  No, I know that's an ongoing --

15          **MR. COVE:**  Yeah.

16          **THE COURT:**  -- concern, but devices are often an

17  issue as well, not just the company servers or the company

18  individual laptops, but the blacktops and the black -- or the

19  Blackberry's, rather, and the -- and all that kind of stuff --

20          **MR. COVE:**  Yeah.  Yes.

21          **THE COURT:**  -- that people sometimes don't think

22  about until way down the line when it's a problem.

23          **MR. COVE:**  We have preserved -- right.  Zuffa has

24  preserved that material.  We have agreed that voice -- the

25  voicemail need not be preserved, and that was in our ESI

1   (indiscernible), but I think we're --

2          **MR. DELL'ANGELO:**  Right.  So -- all that's correct.

3   I think one of the gating issues for us up to this point is not

4   having a clear picture on, you know, who all of the custodians

5   may be, what devices they have, that sort of thing.  So, kind

6   of absent that, I think we have more work to do until we really

7   understand what it is --

8          **THE COURT:**  Very well.

9          **MR. DELL'ANGELO:**  -- that we're dealing with.

10         **THE COURT:**  All right.  And you folks are from

11  divergent places of the country.  Is there a particular day or

12  time that's better or worse for you in terms of having -- what

13  I would intend to do is probably set a standing discovery and

14  dispute resolution hearing approximately every 30 days, unless

15  you didn't have any problem, in which case I'm happy to vacate

16  it for you, but just to give you a regular schedule so that you

17  could take time out and schedule around that.  Have you

18  discussed -- and I don't have to do it right now, but I'm

19  looking at about 30-day intervals, so if you'd like to talk to

20  each other, I know with travel and everything else, and if you

21  have one of your member that would like to appear

22  telephonically, I'm happy to accommodate you in that regard.

23  It's hard for the primary speaker to appear telephonically,

24  but -- do you gentlemen have a day that's better or worse for

25  you in terms of -- gentlemen and counsel?  Didn't mean to

34

1    slight you there.

2            **MR. DELL'ANGELO:**  So --

3            **THE COURT:**  I was just seeing ties.

4            **MR. DELL'ANGELO:**  Sorry, your Honor.  There -- I

5    mean, there are a couple of days with respect to the next

6    conference that I can identify for the Court that would be

7    problematic, which would be October 26, 27, and November 3rd.

8    And I think, as a general matter, to the extent that we have

9    East Coasters traveling out, you know, it would be preferable

10   if we could avoid doing it on a Friday if it's late in the

11   afternoon, because otherwise it leaves us taking the redeye

12   home.

13           **THE COURT:**  It's --

14           **MR. DELL'ANGELO:**  But, you know, we'll certainly

15   accommodate that if that's --

16           **THE COURT:**  I'm too old for redeyes myself, so I

17   fully appreciate that.

18           **MR. DELL'ANGELO:**  -- what's convenient for the Court.

19   I mean, we're happy to do it if need be, but ideally would

20   prefer not.

21           **MR. COVE:**  Yeah, I'd -- I'd like to consult with

22   Mr. Isaacson on that, and I -- I come from California, I'm in

23   the Oakland office, but Mr. Isaacson has to make -- trek across

24   the country.

25           **THE COURT:**  All right.  Why don't you folks talk

1   among yourselves and then see if you have a preference for a

2   date and a.m. or p.m.  My normal civil calendar to hear motions

3   is on a Tuesday, so that probably wouldn't work; I'd rather

4   give you your specific time slot.  And, then, confer with

5   Mr. Miller and see if we can't give you a -- Mr. Miller would

6   be my courtroom deputy -- and we'll give you a date and time

7   that's mutually agreeable to you.

8           **MR. COVE:**  Okay.

9           **THE COURT:**  Okay?  And, then, what I typically do is

10  require you to give me the joint status report two or three

11  days ahead of the hearing.  That gives you an opportunity to

12  talk up to the relatively last minute, and it gives me enough

13  time to actually pore over it and read it.  So, with that in

14  mind, you can talk about scheduling and what -- what works in

15  terms of dates and times.  Okay?

16          **MR. DELL'ANGELO:**  If I could ask one follow-up

17  question --

18          **THE COURT:**  Yes, sir.

19          **MR. DELL'ANGELO:**  -- with respect to the next status.

20  So, in the event that it wasn't sufficiently clear from my

21  articulation of kind of the notion that I had about how to

22  handle the next status in light of the denial of the motion to

23  dismiss, my hope was, so that, you know, we could spend this

24  time to try to meet and confer and reach a global resolution

25  and just identify what issues, if any, we can't agree on, and

```
 1   the hope was to then present them in advance of the status so

 2   we could get them resolved, given that those issues might be

 3   somewhat more complicated.  Hopefully, there are, you know,

 4   few, if any.  At that point we'll --

 5           THE COURT:  My intention is to -- you tell me what

 6   you can agree on, and we rock and roll and I decide at the

 7   hearing.

 8           MR. DELL'ANGELO:  Okay.

 9           THE COURT:  And I try, to the best of my ability, to

10   give you a decision right there at the hearing.  Sometimes

11   things intervene and I have other things that I have to address

12   and I have to put you, you know, aside for a bit, but that's

13   the intention of having these status and dispute resolution

14   conferences is to give you a decision as you go and to allow

15   you as much time as possible to try to work it out, but those

16   things that you can't work out I decide.

17           MR. DELL'ANGELO:  Very good.  Thank you, your Honor.

18           THE COURT:  Okay?

19           MR. COVE:  Thank you, your Honor.

20           THE COURT:  Thank you, Counsel.  It's been a

21   pleasure.  Thank you.  We're adjourned.

22           THE CLERK:  All rise.

23       (Proceeding was adjourned at 2:48 p.m.)

24

25
```

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          October 7, 2015 _

                    TONI HUDSON, TRANSCRIBER