1  WILLIAM A. ISAACSON (Admitted *Pro Hac Vice*)
   (wisaacson@bsfllp.com)
2  BOIES, SCHILLER & FLEXNER LLP
3  5301 Wisconsin Ave, NW, Washington, DC 20015
   Telephone: (202) 237-2727; Fax: (202) 237-6131
4
   JOHN F. COVE, JR  (Admitted *Pro Hac Vice*)
5  (jcove@bsfllp.com)
   BOIES, SCHILLER & FLEXNER LLP
6  1999 Harrison Street, Suite 900, Oakland, CA 94612
   Telephone: (510) 874-1000; Fax: (510) 874-1460
7
8  RICHARD J. POCKER #3568
   (rpocker@bsfllp.com)
9  BOIES, SCHILLER & FLEXNER LLP
   300 South Fourth Street, Suite 800, Las Vegas, NV 89101
10 Telephone: (702) 382 7300; Fax: (702) 382 2755
11
   DONALD J. CAMPBELL #1216
12 (djc@campbellandwilliams.com)
   J. COLBY WILLIAMS  #5549
13 (jcw@campbellandwilliams.com)
   CAMPBELL & WILLIAMS
14 700 South 7th Street, Las Vegas, Nevada 89101
   Telephone: (702) 382-5222; Fax: (702) 382-0540
15
16 *Attorneys for Defendant* Zuffa, LLC, d/b/a
   Ultimate Fighting Championship and UFC
17
18 *Additional counsel on signature page*
19                       UNITED STATES DISTRICT COURT
20                            DISTRICT OF NEVADA
21 Cung Le, Nathan Quarry, Jon Fitch, on behalf     Lead Case No.: 2:15-cv-01045-RFB-
22 of themselves and all others similarly situated,  (PAL)
23            Plaintiffs,                            Member Case Nos.:
24        v.                                             2:15-cv-01046-RFB-(PAL)
                                                         2:15-cv-01055-RFB-(PAL)
25 Zuffa, LLC, d/b/a Ultimate Fighting                   2:15-cv-01056-RFB-(PAL)
   Championship and UFC,                                 2:15-cv-01057-RFB-(PAL)
26
            Defendant.
27                                                  **JOINT STATUS REPORT**
28
   And Related Consolidated Cases

The parties in the above-captioned matters have met and conferred and submit the following Joint Status Report.

**I.      Outstanding Motions (Joint Statement)**

There are no currently outstanding motions.

**II.     Outstanding Proposed Stipulations (Joint Statement)**

On October 21, 2015, the parties filed a Stipulation To File A Consolidated Amended Complaint And To Extend Defendant Zuffa, LLC's Deadline to Answer Plaintiffs' Consolidated Amended Complaint Accordingly. (EFC 195). In the Stipulation, the parties proposed that within thirty (30) days of the entry of an Order approving this Stipulation by the Court, Plaintiffs may file a consolidated Amended Complaint that consolidates each of the five pending Complaints in *Le*, *Vazquez*, *Vera*, *Ruediger*, and *Kingsbury* into a single Consolidated Amended Complaint. The parties also proposed that Zuffa may have thirty (30) days from the filing of the Consolidated Amended Complaint to file a consolidated Answer to the Plaintiffs' proposed Consolidated Amended Complaint.

**III.    Discovery Progress**

Since the last Joint Status Report (ECF 185), the parties have made the following progress in discovery.

**A.  Discovery Sought From Plaintiffs**

**1.  Plaintiffs' Document Preservation (Plaintiffs' Statement)**

Zuffa posed certain questions to Plaintiffs regarding each of the individual Plaintiffs' Electronically Stored Information ("ESI"). In response, on October 20, 2015, Plaintiffs answered each of Defendant's questions by providing a detailed accounting of Plaintiffs' efforts to preserve ESI. Specifically, for each of the eleven Plaintiffs, Defendant was provided with the number of devices (and the type of device), the number of email accounts, and the company with which each Plaintiff maintained a social media account as well as the dates each Plaintiff commenced preservation of such account. Plaintiffs further provided information concerning all known

destruction of ESI outside of these preservation parameters.[1]

Further, despite having no control over them, between April 28, 2015 and May 6, 2015, Plaintiffs sent preservation letters to all persons who served as sports agents or managers for each of the Plaintiffs relating to their MMA careers. Plaintiffs provided Zuffa with the identities and contact information for such agents and/or managers to whom Plaintiffs sent preservation letters. Plaintiffs dispute Zuffa's position that any documents that may be possessed by any such agent or manager are within Plaintiffs' "possession, custody or control," but to the extent these agents and managers have been willing to cooperate with Plaintiffs, Plaintiffs have provided Defendant with information concerning the devices, social media accounts and number of email addresses that these individuals have (and have been preserved). Nevertheless, and out of an abundance of caution, on or about October 20, 2015, Plaintiffs also sent a second set of letters to the agents and managers at issue asking them to provide Plaintiffs with documents responsive to Zuffa's First Set of Document Requests to Plaintiffs and provided them a copy of those Requests.

## 2. Plaintiffs' Document Production (Joint Statement)

Defendant served its First Set of Requests for Production of Documents ("RFPs") on each of the named Plaintiffs on October 6, 2015, after its motion to dismiss was denied. Plaintiffs served their objections and responses to these RFPs on November 5, 2015. Zuffa's RFPs do not purport to set a relevant time period that governs Plaintiffs' response. Plaintiffs have requested that Zuffa specify a proposed relevant time period for its RFPs, but it has not yet done so. Zuffa has indicated that the relevant time frame may vary depending on the specific RFP at issue and possibly depending on the circumstances of different Plaintiffs—but nonetheless has declined to set such parameters to date. The parties will meet and confer regarding Plaintiffs' responses and objections at the parties' mutual convenience.

---

[1] Below, Zuffa argues that Plaintiffs have not provided information about data volumes held by each Plaintiff as part of its claim that Plaintiffs' request for such information from Zuffa is unreasonable. First, Zuffa never requested that information from Plaintiffs. Second, Plaintiffs' request for the information from Zuffa is based on Zuffa's objection of an "undue" burden, which objection carries with it an obligation to support it.

### B. Discovery Sought From Defendant

#### 1. Zuffa's Document Preservation (Zuffa's Statement)

Zuffa has made diligent efforts to preserve and collect ESI and hard copy documents from the outset of this matter. Zuffa has informed Plaintiffs that it began its preservation efforts immediately upon receipt of the first-filed complaint and issued an initial litigation hold notice on December 18, 2014 to all employees of the company at the time.  Zuffa also placed specific employees on a litigation hold on February 13, 2015, June 4, 2015, June 26, 2015, and October 20, 2015.  After Plaintiffs agreed that provision of information related to its litigation hold would not be construed as a waiver of work product privilege, Zuffa withdrew its work product privilege objection and provided Plaintiffs with a list of all employees subject to that hold on November 12, 2015.  The employees subject to the hold comprise roughly 15% of Zuffa's full time work force. Counsel has had, and continues to have, extensive discussions with Zuffa's information technology personnel, executives, and employees to determine the types of information stored at Zuffa and the various media on which that information is stored.  Zuffa has also spent dozens of hours responding to Plaintiffs' seriatim, and often repetitive, interrogatories and letters requesting information regarding its document preservation and collection.

#### 2. Zuffa's Document Production (Zuffa's Statement)

Since the last Status Conference, Zuffa has begun to produce documents responsive to Plaintiffs' RFPs. To date, Zuffa has made three productions:

1. A production of finalized organizational charts that were maintained by the company for the period after 2014 and draft organizational charts for the period from approximately December 2008 to 2015;[2]

2. Over 300 electronic compilations of detailed financial data and other documents showing Zuffa's revenues and expenses and other financial metrics, both on an annual basis and broken down by event (as requested by Plaintiffs).

---

[2] Zuffa did not maintain finalized organizational charts prior to 2015 and has provided the draft organizational charts maintained during the period from 2008 to 2014.

3

3.   Approximately 108,000 documents which include, but are not limited to, contracts and related emails with fighters, venues, sponsors, and content distributors, financial documents, business strategy documents, and documents relating to acquisitions that were previously produced to the Federal Trade Commission in conjunction with the FTC's investigation of Zuffa's affiliate's acquisition of Explosion Entertainment, LLC (dba Strikeforce).

**3.   Document Requests To Zuffa Where The Parties Have Reached Agreement or Have Not Yet Reached An Impasse (Joint Statement)**

- General corporate documents (Requests 1-6, 8, 18, 46): Plaintiffs have requested relevant documents responsive to these requests beginning in December of 2010.  Zuffa has agreed to Plaintiffs' proposal.

- Organizational charts (Request 7):  Zuffa has produced to Plaintiffs copies of the organizational charts in its possession.

- Financial information, fighter compensation, and third party analyses (Requests 9-16): Plaintiffs have requested information relevant to these requests beginning as of January 1, 2005. Zuffa has agreed to the proposed relevant time period and already produced some documents responsive to this Request.  To the extent Zuffa has collected documents responsive to this request that date prior to 2005, Zuffa has agreed to produce those documents as well.

- Documents relating to actual and potential rival MMA Promoters (Requests 16-17): Plaintiffs have requested information relevant to these requests beginning as of January 1, 2005. Zuffa has agreed to the proposed relevant time period and already produced some documents responsive to this Request.

- Documents relating to Plaintiffs and their managers, agents, and representatives (Request 43): Plaintiffs have requested Zuffa produce all documents relating to the Plaintiffs and their representatives regardless of date.  Zuffa has proposed to run search terms, to be agreed upon by the parties, that will produce information relevant to this request without a date limitation. The parties are continuing to meet and confer on this Request.

JOINT STATUS REPORT

- Unionization (Request 44): Plaintiffs have requested "All documents concerning any actual or potential attempt by MMA Fighters to unionize or organize into another form of collective or collective bargaining unit" beginning as of January 1, 2000.  Zuffa has agreed to negotiate producing documents responsive to this Request, but has not specifically agreed to a relevant time period or to the search terms for responsive documents.  The parties are continuing to meet and confer on this Request.

- O'Bannon case (Request 47): Plaintiffs request all documents relating to the O'Bannon case from the Northern District of California since April of 2009.[3]  Zuffa has agreed to provide documents responsive to this request.

- Registration with regulatory bodies (Request 53): Plaintiffs requested documents responsive to this Request beginning from December 2010.  Zuffa has agreed to this Request.

- Documents produced in response to other litigations (Requests 54, 56, 57, 59):  Zuffa has represented that it has been working to come up with a list of other potentially relevant litigation matters for which Zuffa will produce documents.  In the interim, Zuffa has represented that it has already produced a substantial quantity of documents responsive to these requests in its production of documents to Plaintiffs that were previously produced to the FTC in conjunction with the FTC's investigation of Zuffa's affiliate's acquisition of Explosion Entertainment, LLC (dba Strikeforce). The parties will continue to meet and confer regarding this Request.

**C.  Third-Party Discovery (Joint Statement)**

To date, Plaintiffs have issued fifteen subpoenas to third parties. The subpoena targets to date have been other current MMA Promoters as well as other entities and individuals that

---

[3] *O'Bannon v. NCAA* or *In re: NCAA Student-Athlete Name and Likeness Licensing Litigation*, 4:12-mc-80027-CW (N.D. Cal.), is a section 1 antitrust class action lawsuit filed against the National Collegiate Athletic Association ("NCAA"). The lawsuit, which former UCLA basketball player Ed O'Bannon filed on behalf of the NCAA's Division I football and men's basketball players, challenges the organization's rules restricting competition among its members including with regard to the images of its former student athletes for commercial purposes.

operated or were related to the operations of now-defunct MMA Promoters.  Plaintiffs anticipate serving more than 100 additional subpoenas in the coming weeks.

To date, Zuffa has issued three subpoenas.

**IV.    Current Discovery Disputes (Joint Statement)**

The parties have met and conferred on a wide range of issues.   With respect to certain issues, the parties are at an impasse. Specifically, the parties are at an impasse regarding:

1)    a relevant time period for Zuffa's search for and production of documents and ESI;

2)    the identity of (and the means to identify) Zuffa's custodians;

3)    objections to certain of Plaintiffs' Requests for Production of Documents ("RFPs");

4)    the number of interrogatories that each party may serve; and

5)    whether depositions should be calculated by total hours or the number of depositions and the proposed limits.

**A.  Plaintiffs' Positions Regarding Current Discovery Disputes (Plaintiffs' Statement)**

The parties have made relatively little progress on resolving Zuffa's objections to Plaintiffs' RFPs, even after the Court (a) denied Zuffa's motion to stay discovery pending resolution of the motion to dismiss, and then subsequently (b) sustained Plaintiffs' Complaints by denying Defendant's motions to dismiss from the bench on September 25, 2015. There are substantial disagreements regarding the search, retrieval and production of ESI as well as regarding conventional documents responsive to Plaintiffs' RFPs.

Zuffa has interposed numerous generalized burden objections, but has provided woefully insufficient bases to support its multiple objections, and in many instances, no factual basis at all. Indeed, beginning with the Rule 16 conference and continuing throughout the meet and confer process, Plaintiffs have asked a simple series of questions that remain unanswered:

- Who are Zuffa's custodians?

- What documents, devices, and ESI do such custodians have?

- For what time period do potentially relevant documents, devices and ESI exist?[4]

Zuffa's refusal to provide factual support for its objections has prevented the parties from being able to resolve them, and prevented Plaintiffs from finding ways to cure or ameliorate them if legitimate or reasonable. Zuffa's blanket unsupported objection approach to date is inconsistent with the principles underlying the 2006 amendments to the Federal Rules of Civil Procedure as well as the consensus of judicial officers, commentators and experienced practitioners. For instance, it is inconsistent with the principles of "cooperative, collaborative, and transparent discovery, electronic or conventional." *See* The Sedona Conference, *The Sedona Conference Cooperation Proclamation: Resources for the Judiciary* ("*SCCP*"), Preface, *available at* https://thesedonaconference.org/node/4300 (2012); *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354 (D. Md. 2008) ("It cannot be seriously disputed that compliance with the 'spirit and purposes' of these discovery rules requires cooperation by counsel to identify and fulfill legitimate discovery needs, yet avoid seeking discovery the cost and burden of which is disproportionally large to what is at stake in the litigation. Counsel cannot 'behave responsibly' during discovery unless they do both, which requires cooperation rather than contrariety, communication rather than confrontation." (citing Fed. R. Civ. P. 26(g)).[5]

Zuffa predicates its claims of undue burden—and consequent refusal to produce responsive documents—on generalized assertions of: the number of years in the relevant time period, the number of custodians Plaintiffs have requested, and speculative assertions of overbreadth of Plaintiffs' RFPs. Zuffa has done so, as just explained, while thwarting Plaintiffs' efforts to obtain and understand the facts underlying these assertions. As discussed below, the

---

[4] Plaintiffs have provided this information relating to individual Plaintiffs to Zuffa but Zuffa has refused to reciprocate.

[5] *Kelley v. Smith's Food & Drug Centers, Inc.*, 2014 WL 6474026, at *3 (D. Nev. Nov. 19, 2014) (citing the Cooperation Proclamation in finding that the defendant's refusal to produce certain ESI "runs counter to the paramount goals of transparency, collaboration, and efficiency in the discovery process") (citing *Apple v. Samsung*, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013) ("[T]ransparency an collaboration [are] essential to meaningful, cost-effective discovery."); *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 929 (N.D. Ill. 2010) (quoting SCCP principles and observing that "[s]electing search terms and data custodians should be a matter of cooperation and transparency among parties…").

information regarding ESI, for example, has generally been insufficient to enable Plaintiffs to make informed evaluations of Zuffa's documents and information.

In particular, Plaintiffs need to know the identity of custodians who possess relevant ESI, and their respective positions, jobs titles, and duties during the relevant time period. Plaintiffs also need to understand certain quantitative or statistical facts regarding the ESI—facts ordinarily exchanged in a collaborative and orderly ESI negotiation. Plaintiffs require, for example, information regarding the number of documents possessed by the various potential custodians or stored in another search location. Without this information, Plaintiffs cannot evaluate any burden claims, propose solutions, or negotiate reliable ESI protocols or procedures in this case.

For example, on September 28, 2015, Zuffa provided Plaintiffs with email volumes for the 9 custodians as of September 15, 2015, whose ESI Zuffa has proposed to search. Late in the evening on November 12, just as this Status Report was being prepared, Zuffa sent Plaintiffs a lengthy letter with additional, but conflicting information regarding the same custodians' ESI post-processing and loading, which information is depicted in the following chart:

| Proposed Custodian | September Email Count | November Email Count |
|---|---|---|
| Tracey Bleczinski | 65,679 | 76,777 |
| Peter Dropick | 66,223 | 75,759 |
| Lawrence Epstein | 167,105 | 149,654 |
| Lorenzo Fertitta | 86,805[6] | 79,344 |
| Reed Harris | 33,944 | 41,808 |
| Michael Mossholder | 35,706 | 34,606 |
| Sean Shelby | 22,220 | 20,123 |
| Joe Silva | 31,730 | 29,656 |
| Dana White | 65,049 | 60,283 |

During the meet and confer process that took place between September and early November, Zuffa had argued that the above September Email Counts alone demonstrated the burden associated with the proposed custodians and argued that the inclusion of additional custodians would impose additional burdens. Comparing the data provided, the November Email

---

[6] Zuffa's counsel had previously advised Plaintiffs that Mr. Fertitta had 161,107 emails. On November 14, 2015, Zuffa's counsel corrected that statement, advising that the September count for Mr. Fertitta was incorrect as the result of an arithmetic error.

Count for several custodians indicated fewer emails than the September report. Zuffa's counsel has provided a vague explanation concerning different time periods applicable to the counts and processing/de-duplicating the available emails. Regardless, it is evident that the information Zuffa has provided is generally incomplete, contradictory, unreliable, and offered without necessary context. Such information has often raised more questions in the meet and confer process than it has answered.

Similarly, Zuffa has complained, for example, that Plaintiffs had inquired, for any individual subject to a litigation hold, "is Zuffa aware of any documents or ESI destroyed prior to December 16, 2014 [(before the filing of the Complaints)]." Yet, on November 12, for the first time, Zuffa revealed:

> On the pre-complaint preservation issues, we note that approximately two years ago, Zuffa experienced a flood at the archives in its office which destroyed certain hard copy documents dating back before the class period. Zuffa scanned those documents that were salvageable, but disposed of any hard copy documents that were able to be preserved electronically as well as documents that were not salvageable due to water damage and unable to be preserved electronically.

(*See* November 12, 2015 J. Cove Letter to M. Dell'Angelo.) Zuffa has yet to provide any details regarding the custodians implicated, the volume of documents and the categories of documents that were destroyed. Waiting until November 12—months after the meet and confer process had begun in earnest and on the eve of this Status Report—to provide such material information is inconsistent with cooperative and transparent discovery process. Moreover, companies and custodians do not implement document retention policies in a vacuum; litigation holds, regulatory holds and other circumstances that an inquiring party cannot know of make blind reliance on document retention policies unreliable. Such information is extremely important to Plaintiffs' evaluation of what discovery to seek, which custodians to select, etc.

Below, Zuffa asserts that one basis for its refusal to provide basic information concerning its available documents and ESI is that Plaintiffs' requests are purportedly "too broad." Zuffa asserts that Plaintiffs "are entitled to documents that *may tend to prove* [their] allegations" but not

9

JOINT STATUS REPORT

1  "every scrap of paper or bit of data from every Zuffa employee or contractor who ever worked

2  with a fighter, sponsor, venue, or broadcaster."[7] (Emphasis added). Zuffa then recites the standard

3  that "discovery must be tailored to the claims and defenses of the case and must be 'proportional

4  to the needs of the case'" (citing Fed. R. Civ. P. 26(b)(1)). Zuffa's position regarding its

5  discovery obligations is too narrow and is inconsistent with the requirements imposed by the

6  Federal Rules of Civil Procedure. Specifically, the scope of discovery defined by Fed. R. Civ. P.

7  26(b)(1) is that "[p]arties may obtain discovery regarding any non-privileged matter that is

8  relevant to any party's claim or defense." *See*, *e.g.*, *Branch Banking and Trust Company v. Iny*,

9  2015 WL 1413144 (D. Nev. Mar. 26, 2015). Zuffa's assertion that Plaintiffs are not entitled to

10  relevant and responsive discovery concerning fighters, sponsors, venues and broadcasters because

11  such requests are not "tailored to the claims and defenses of this case" ignores that the

12  Complaints specifically allege an anticompetitive scheme involving Zuffa's dealings with each of

13  those categories of third parties.

14      Plaintiffs' requests for basic information concerning Zuffa's custodians, available ESI and

15  documents, and the location and storage of such discovery, are necessary to evaluate whether the

16  burden is "proportional to the needs of the case." Zuffa's refusal to provide such information,

17  _____

18  [7] Zuffa also misstates Plaintiffs' allegations, incorrectly limiting them to "Zuffa's contracts with
fighters, sponsors, venues and broadcasters" and how these contracts "have prevented competitors
from working with these entities." Plaintiffs' allegations include other actions, including
acquisitions of rivals, threats and other conduct to enforce contracts and enforce the UFC's
monopoly and monopsony power more generally. *See, e.g.*, *Le* Compl. ¶¶ 128-134 (alleging the
UFC acquired those would-be rivals that it did not put out of business or relegate to the "minor
leagues" and specifying acquisitions); *id.* at ¶ 116 (alleging the UFC retaliated against "UFC
Fighters who work or threaten to work with would-be rival promoters"; "MMA Fighters who
might someday wish to compete in the UFC"; and "would-be rival promoters who work with
UFC Fighters"); *id.* at ¶ 117 (alleging the UFC terminated fighters who wished to negotiate the
UFC's demand that they sign away exclusively and in perpetuity, their likeness rights for video
game use for no compensation); *id.* at ¶ 118 (alleging the UFC threatened fighter B.J. Penn when
he informed the UFC that he planned to sign with an actual or potential rival). Collectively, these
allegations, among the many others in the Complaints demonstrate that the scope of discovery
must be significantly broader than the contracts themselves.

JOINT STATUS REPORT

1    after repeated requests from Plaintiffs should not be countenanced by the Court.

2             **B.  <u>Zuffa's Position Regarding Current Discovery Disputes (Zuffa's Statement)</u>**

3             Although Zuffa is continuing to provide information in response to Plaintiffs' requests and

4    intends to continue to meet and confer on these subjects, Zuffa believes that it has provided

5    sufficient information for the Plaintiffs to negotiate a reasonable set of custodians and other

6    limitations on document requests.  Zuffa has undertaken an extensive investigation and provided

7    Plaintiffs with substantial information about Zuffa's ESI, hard copy documents, and relevant

8    custodians, including organizational charts and other information about its executives and

9    employees, its document retention policies, the steps it has taken to preserve ESI, and the nature

10   and extent of its ESI, including the identity of custodians who use smart phones and other hand-

11   held devices in the business, an estimate of the amount of data preserved from such devices, and

12   an estimate of the volume of potentially relevant hard-copy documents.  On this front, Zuffa has

13   been cooperative and has sought to provide Plaintiffs with available information about its

14   proposed custodians.  However, cooperation does not mean providing information on everything

15   a company maintains.  Zuffa cannot undertake what Plaintiffs have requested, that is, providing

16   information and data on everyone who has ever worked for or provided services to Zuffa.  Rather,

17   Zuffa has cooperated by providing Plaintiffs with: (1) information on its full time employees over

18   a period of eight years; (2) proposing custodians that Zuffa believes are most relevant to the case

19   and have the data and documents most relevant to the case; and (3) providing detailed information

20   about those custodians and their documents, to the extent that information is readily available.

21            Unfortunately, in this area, additional questions can always be asked and Zuffa believes

22   that many of Plaintiffs' demands for information have gone beyond those necessary to negotiate

23   reasonable limits on their requests, into unnecessary, time- and resource- consuming "discovery

24   about discovery" that have impeded, rather than assisted, the resolution of negotiations over

25   custodians and the relevant time period, as well Zuffa's efforts to collect, review, and produce

26

27

28

**JOINT STATUS REPORT**

documents.[8]  Plaintiffs' continuous and seriatim requests for information about the volume of data maintained by the entire company, and by particular individuals, has likewise delayed and confused the process.  Not surprisingly, ESI is generated every day at Zuffa and the volume of data increases over time.  Zuffa's efforts to be transparent over time are now being used against it, that is, as Plaintiffs ask different questions.  For example, the difference between the September and November email counts the Plaintiffs discuss above are the result of two different inquiries: (1) Overall e-mail volume on Zuffa's servers on a given date in September as opposed to (2) the e-mail volume that Zuffa has collected, processed, and de-duplicated as of November.  In short, the Plaintiffs are comparing apples and oranges and crying foul.  It is exactly this risk – that volumes of data change over time and as custodians are added – that makes it impractical to provide definitive information on ESI volume until the parties agree on custodians.

For example, Plaintiffs have repeatedly asked Zuffa to identify and list all ESI that was destroyed in the normal course of business or otherwise before the first complaint was filed.  *See* September 7, 2015 M. Dell'Angelo Letter to J. Cove.  Even after being provided with Zuffa's document retention policies and being informed that under those policies, email and other documents were regularly deleted in the normal course of business prior to the filing of this litigation, Plaintiffs asked, for any individual subject to a litigation hold, "is Zuffa aware of any documents or ESI destroyed prior to December 16, 2014 [(before the filing of the complaint)]?"  October 20, 2015 M. Dell'Angelo letter to J. Cove.  This kind of question is not only impossible to answer even with a Herculean effort, but it is not calculated to advance negotiations about production because documents and data that do not exist cannot be produced.  Similarly, despite being provided with organizational charts and other information on predecessors to current executives, Plaintiffs demanded a "complete list of Zuffa's employees (including independent contractors other than fighters) during the proposed relevant time period," i.e., every cameraman,

---

[8] Plaintiffs' claim that they have provided information that Zuffa has refused to reciprocate is false.  Plaintiffs provided the names of Plaintiffs' ESI devices, e.g., a Mac laptop, Samsung smart phone, and a Gmail or social media account, but have not provided any data on volumes or similar metrics as Zuffa has. This is not to suggest that such data is necessary, but Plaintiffs are incorrect to suggest that they have provided the same metrics they have demanded of Zuffa.

JOINT STATUS REPORT

secretary, free-lance writer, and accountant back to 2005, in order to resolve the issue of custodians. As explained further in section C.1.(b) below, none of this information is necessary to resolve the issues presented here. Zuffa has provided Plaintiffs with more than sufficient information to engage in educated discussions regarding a reasonable list of custodians or a reasonable relevant time period.

The fact that the Complaints have survived a motion to dismiss does not mean Plaintiffs are entitled to unlimited discovery. Discovery needs to be effectively managed in antitrust cases to avoid allowing costs to balloon out-of-control. In *Twombly*, Justice Stevens emphasized the need for courts to manage the scope of discovery based upon the allegations in the complaint, explaining in dissent that, while he would not have dismissed the allegations in the complaint, he also "would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 593 (2007) (Stevens, J., dissenting); *see also SD3, LLC v. Black & Decker Inc.*, 801 F.3d 412, 434 (4th Cir. 2015) (affirming denial of a motion to dismiss but explaining the decision is not "a license for unlimited discovery" and recognizing "the substantial cost that discovery in an antitrust case can impose" when not appropriately managed).

Plaintiffs have alleged that Zuffa's contracts with fighters, sponsors, venues, and broadcasters, and related alleged threats to enforce the contracts, have prevented competitors from working with these entities. They are entitled to documents that may tend to prove these allegations; they are not entitled to every scrap of paper or bit of data from every Zuffa employee or contractor who ever worked with a fighter, sponsor, venue, or broadcaster. Rather, discovery must be tailored to the claims and defenses of the case and must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (eff. Dec. 1, 2015).

**C.   Specific Discovery Disputes**

    **1.   Plaintiffs' Proposed Fed.R.Civ.P. 30(b)(6) Deposition of Zuffa, LLC**

        **a.   Plaintiffs' Position (Plaintiffs' Statement)**

Because the meet and confer process did not yield sufficient progress, Plaintiffs have proposed to address the parties' disputes (such as, *e.g.*, Zuffa's refusal to provide information on

the alleged burdens, to provide the identities of all potential custodians or to identify the sources of Zuffa's ESI) through an early and extra deposition of Zuffa pursuant to Fed. R. Civ. P. 30(b)(6), limited to topics regarding the identity of potential custodians (*e.g.*, the purpose of departments, the roles of employees within a department, the identity of individuals performing these roles and functions, and how each have changed during the relevant time period) and the location and methods of storing documents and ESI.

A Rule 30(b)(6) deposition limited to custodial and discovery topics is warranted here. As discussed below, during the meet and confer process Zuffa has already sought to correct some inaccurate information Zuffa initially provided to Plaintiffs via Zuffa's corporate organizational charts—the principal source of custodian information Zuffa has provided to Plaintiffs and on which (incomplete and inaccurate information) Zuffa relies to support its assertion that Zuffa has met its obligation to provide custodian information. Zuffa has also indicated through the meet and confer that the organizational charts are not necessarily accurate for the period prior to 2015.

Even to the extent that Zuffa's draft organizational charts are useful and accurate, on their face, they do not even purport to provide information for the period prior to December 2008. Because of the inadequacy of the information provided, Plaintiffs have requested that Zuffa identify all of its present or former employees, executives, directors, owners, shareholders, consultants, accountants, attorneys, or other agents. During the meet and confer process, Plaintiffs made clear that they are not seeking information regarding irrelevant employees such as Zuffa's corporate flight attendants, in-house chefs and so-called "ring girls." Rather, Plaintiffs seek a complete listing of potentially relevant custodians and reliable information regarding their titles or duties. Given Zuffa's refusal to provide Plaintiffs with complete and reliable information voluntarily, a Rule 30(b)(6) deposition is the most efficient way to obtain it. Given that this deposition has only become necessary due to Zuffa's refusal or inability to provide information necessary for Plaintiffs to make informed decisions about document custodians—which decisions will in many ways guide the entire discovery process for the rest of the case—Plaintiffs should not be penalized by giving up the right to take another Rule 30(b)(6) deposition of Zuffa in the case on substantive topics. Conducting such a limited deposition at this early stage would be

14

JOINT STATUS REPORT

efficient and productive, and may be the only way for Plaintiffs to obtain the information they need to complete the ESI meet and confer process.

Plaintiffs will seek information on custodians, ESI volumes and storage, as well as preservation issues during a Rule 30(b)(6) deposition regardless of whether such deposition occurs now or at some later stage. Delaying the deposition on these limited issues creates the possibility that Plaintiffs will discover important information later on that could require duplication of Zuffa's discovery efforts, if Plaintiffs later learn from this 30(b)(6) deposition that important documents were in the files of custodians that Zuffa never searched. Such an outcome is avoidable.

Notwithstanding these clear efficiencies, Zuffa has rejected Plaintiffs' proposal, claiming that it would be more burdensome than informally providing the information Plaintiffs have requested, such as, *e.g.*, a more complete listing of its employees during the relevant time period. As discussed in Section IV.A.4, however, Zuffa has refused to provide this information voluntarily. Thus, Plaintiffs need to obtain this information in a limited Rule 30(b)(6) deposition.

### b.  Zuffa's Position (Zuffa's Statement)

Zuffa has agreed to investigate and provide additional information to the extent available for the current and former employees listed in section 4.a.(i) below and is open to further requests with regard to specific positions, but Plaintiffs have stated that they cannot complete a negotiation of relevant custodians without "a complete list of Zuffa's employees (including independent contractors other than fighters) during the proposed relevant time period"—that is from 2005 to the present. Oct. 20 Letter from M. Dell'Angelo at p. 3; Nov. 6 Letter from M. Dell'Angelo at p.1. The early deposition they propose would also seek the volume of ESI and other documents (on the email server, individual computers, smart phones or other hand held device, network drives, shared drives, and hard copy documents) for every one of Zuffa's "present or former employees, executives, directors, owners, shareholders, consultants, accountants, attorneys, or other agents". *See* section C.1.a, above. The burden of compiling this information is unwarranted at this point, and will distract from the task of actually moving forward with discovery.

While lists of employee names could likely be compiled for some period based on payroll and tax records to the extent they are still maintained, Zuffa does not maintain a list of every employee and independent contractor, with their titles and a description of their roles, for a 10-year period.  More importantly, Plaintiffs have provided no reason why they need a list, for example, of every video editor, IT support person, data entry clerk, runner, receptionist, and security guard who has provided services to Zuffa since 2005.  Plaintiffs have lists and charts, for eight years, of all the managerial employees and executives of Zuffa, as well as lists of the individuals who reported to those employees, which taken together identify all the individuals in a position to be meaningful witnesses in an alleged monopolization case.  To the extent that this information is not sufficient, Zuffa has offered to research information regarding specific employees and/or positions on those lists and charts.  Indeed, Zuffa is doing so right now in response to Plaintiffs' November 6th request.

In short, preparing a witness for the wide-ranging deposition requested by Plaintiffs would be very difficult, and again, result in little but churning of resources.  This is why Plaintiffs request for an "early and extra" 30(b)(6) should be denied: if they wish to take their 30(b)(6) deposition on all topics now, Zuffa will do its best to prepare.  But they should not be permitted to take multiple, resource-churning depositions at different times as the mood strikes.

### 2.   Relevant Time Period and Specific Requests (Joint Statement)

The parties agree that the cut-off date for the end of the relevant time period for documents and information to be searched and produced is June 30, 2015. The parties agree that the June 30, 2015 cut-off does not limit their obligations to preserve documents regarding the litigation from June 30, 2015 forward. The parties disagree about the beginning date for the relevant time period.

### a.   Plaintiffs' Proposal (Plaintiffs' Statement):

The parties have been unable to agree on the relevant time period that should govern the beginning of discovery of Zuffa's production of documents and information in this case. Plaintiffs' RFPs define the relevant time period as beginning January 1, 2000.

Through the meet and confer process, Plaintiffs have proposed: that the relevant time

16

JOINT STATUS REPORT

1     period for contractual and financial information should begin on January 1, 2000; that the relevant

2     time period for general corporate documents regarding Zuffa's ownership and structure should

3     begin in December 2010; and that the relevant time period for all other categories of documents

4     should begin on January 1, 2005, less than two years prior to the time that Plaintiffs allege the

5     anticompetitive scheme began, *i.e.*, in December 2006. *See, e.g.*, *Le* Compl. ¶ 129 ("Beginning at

6     least as early as December 2006, the UFC embarked on a campaign to monopolize and

7     monopsonize the Relevant Markets.").

8         Zuffa has proposed: to produce its centrally maintained fighter contract and

9     correspondence files, with no beginning time limitation, but only for those fighters who fought

10    for the UFC on or after December 16, 2010, and to produce its electronic contract files that

11    contain scanned contracts from 2000 that Zuffa scanned in the normal course of business; that the

12    relevant time period for general corporate documents regarding Zuffa's ownership and structure

13    should begin in December 2010; and that the relevant time period for all other categories of

14    documents derived from ESI should not predate 2009 and that discovery of all other central file

15    documents and information should not pre-date 2008.

16        Zuffa's proposals are woefully inadequate.  In antitrust cases, it is well recognized that

17    documents pre-dating the alleged anticompetitive scheme are *critical* both to understanding its

18    formation and initiation as well as for getting a potentially competitive baseline on economic and

19    market information to assess the effects of the scheme. Discovery that pre-dates the statutory

20    period and provides information before the alleged scheme began is important to understanding

21    the scheme and is typically provided in antitrust cases.[9] Courts in this circuit have long permitted

22

23

24

25

26

27

28

[9] *See, e.g.*, *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 2003 U.S. Dist. LEXIS 14014, at *9-10 (D. Kan. July 22, 2003) ("the temporal scope of discovery in antitrust cases should not be confined to the limitations period of the antitrust statutes or the damage period, and plaintiff is ordinarily permitted to discover defendant's activities for a 'reasonable period of time' antedating the earliest possible date of the actionable wrong"). *See also Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 95 F.R.D. 398, 399 (S.D.N.Y. 1982); *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1143 (4th Cir. Va. 1980); *Federal Trade Com. v. Lukens Steel Co.*, 444 F. Supp. 803, 805 (D.D.C. 1977). Discovery is especially broad in antitrust cases, as here: "[t]he scope of relevance in discovery in antitrust actions is indeed broad.… Where allegations of conspiracy or

"historical" discovery in antitrust cases. In *Cyntegra, Inc. v. IDEXX Labs., Inc.*, 322 Fed. Appx. 569, 571 (9th Cir. Cal. 2009), the court affirmed a discovery order permitting discovery requests "without temporal limitation" regarding the "reasons or strategy for" agreements central to an alleged antitrust conspiracy. Plaintiffs were allowed to "conduct significant 'historical' discovery" into the agreements. The court held that the district court had "reasonably balanced [the plaintiff's] need for historical discovery and the burden on [the defendant] of producing decades-old documents that are only remotely relevant to the case" in issuing the order. *Id.* at 571-72.[10]

### i. Discovery of Non-Contractual Documents and Non-Financial Information (Plaintiffs' Statement)

Plaintiffs proposed to limit the search for responsive documents for the great majority of their document requests (except contractual and financial documents, as discussed below) to documents and information dated after January 1, 2005. Plaintiffs also agreed to an even shorter time frame for certain other documents, such as documents regarding Zuffa's organizational structure. Plaintiffs' compromise makes sense because it would capture documents created less than two years before the scheme pleaded in Plaintiffs' Complaints began. Plaintiffs specifically allege in paragraph 129 of the *Le* Complaint that "[b]eginning at least as early as December 2006, the UFC embarked on a campaign to monopolize and monopsonize the Relevant Markets." Plaintiffs also allege that "as part of [Zuffa's] alleged scheme, from December 2006 to March 2011, the UFC engaged in a series of strategic acquisitions of competing MMA Promoters, culminating with its acquisition of rival MMA promotion company, Strikeforce." *Id.* at ¶ 128.

Plaintiffs allege specific examples of anti-competitive conduct throughout the 2006-2011 time period including, for example, that "[i]n December 2006, the UFC announced the acquisition

---

monopolization are involved, broad discovery may be needed to uncover evidence of design, pattern, or intent." *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2012 U.S. Dist. LEXIS 5648, at *15-16 (N.D. Cal. Jan. 18, 2012).

[10] *See also In re Toyota Motor Corp. Sec. Litig.*, 2012 U.S. Dist. LEXIS 124438, at *11, (C.D. Cal. Mar. 9, 2012) (approving discovery period pre-dating the class period by four years); *Wortman v. Air N.Z.*, 2012 U.S. Dist. LEXIS 131714, at *15 (N.D. Cal. Sept. 14, 2012) (approving discovery of documents pre-dating first alleged antitrust violation by two years).

of actual or potential rival promoters World Extreme Cagefighting … and World Fighting Alliance" and that "[t]he UFC also acquired 'Pride' and several other would-be rival promoters in 2007" (*id.* at ¶ 129) as part of the scheme. The Complaints also allege that "[b]etween 2008 and 2011, and continuing into the present, the UFC accelerated its aggressive anticompetitive campaign. As part of the scheme alleged herein, the UFC's efforts to prevent any successful competitive activity by new entrants directly contributed to the impairment and ultimate failure of the following MMA Promoters." *Id.* at ¶ 130. Plaintiffs further allege that, as Zuffa acquired or put competing promoters out of business and increased its market power, Zuffa used exclusive dealing arrangements to raise the barriers to entry for actual or potential rival promoters and to lock Elite MMA Fighters into exclusive deals. *E.g.*, *id.* at ¶¶ 109-11.

Zuffa has agreed to produce documents related to Zuffa's or Zuffa's affiliates' acquisitions back to January 1, 2005. However, as stated, Plaintiffs allege that Zuffa's scheme to monopolize and monopsonize the Relevant Markets began as early as December 2006, with the acquisition of a potential rival and other conduct. Zuffa has construed this allegation to suggest that a relevant time period of January 1, 2005 should relate *only* to acquisitions. That restriction is too narrow. The Complaints allege that central to the implementation of the alleged scheme which *began* with an acquisition are, for example, Zuffa's relationships with sponsors, venues, merchandisers, or broadcasters (Requests Nos. 27, 29, 31, 33, 35, 37, 39). Indeed, the Complaints include allegations that Zuffa "substantially impaired the competitiveness of multiple actual and potential MMA Promotion rivals" with its scheme. *See Le* Compl., ¶ 7. Conduct that impaired actual or potential rivals included the use of exclusionary provisions in venue and sponsor contracts, *e.g.*, *id.* at ¶¶ 10, 122 & 167.  The Complaints allege Zuffa impaired rivals "before and continuing through the Class Period [by] intentionally insert[ing] provisions into its agreements with event venues that prohibit the venues from staging live Elite Professional MMA events promoted by a would-be UFC rival promoter within a specified time either before or after a UFC event at the venue." *Id.* at ¶ 122. These provisions were "intend[ed] to shut out actual or potential rivals." *Id.* The Complaints further allege that "the UFC refused to contract with any sponsor who agreed to work with an actual or potential rival MMA Promotion company or Fighter under

19
JOINT STATUS REPORT

contract with another MMA Promoter … and prohibited these sponsors from appearing on UFC Fighters during UFC events." *Id.* at ¶¶ 10.  The Complaints also allege that "As part of the alleged exclusionary scheme, in the years before 2011, the UFC had actively sought to use its market dominance to put Strikeforce out of business. For instance, as part of this scheme—even when it was not economically rational but for the potential for exclusion—the UFC regularly "counterprogrammed" against Strikeforce events, *i.e.*, purposely staged UFC events on the same nights as Strikeforce events to prevent Strikeforce from gaining adequate ticket sales, television viewers or public notoriety for its events." *Le.* Compl. ¶ 132.

Based on these allegations, Zuffa's proposal to limit all remaining discovery (excluding acquisitions) to 2008 serves no purpose but to shield from discovery years of documents relevant to the implementation and conduct of the scheme at issue and is inconsistent with its agreement to produce documents regarding acquisitions back to January 1, 2005. Zuffa's proposed relevant time period for non-contractual and non-financial documents is premised on an unquantified claim of burden. Notwithstanding the foregoing, Plaintiffs believe—but Defendant will not confirm—that the volume of documents and ESI available for the period from 2005 to 2008-2009 is substantially less than the volume for more recent years. That is so because the document retention policies produced by Zuffa to date suggest the many otherwise discoverable documents may have been destroyed pursuant to those policies.[11]

Indeed, after Plaintiffs repeatedly requested email volumes for the proposed custodians, on November 12, 2015, Defendant provided email volumes and the approximate available time periods[12] that volume represents for 12 agreed custodians. However, even the November 12, 2015 data does not support Defendant's "undue" burden objections. For example, the time periods for which Defendant has emails and attachments is inconsistent with Defendant's claimed

---

[11] And, as Zuffa informed Plaintiffs on November 12, some other documents from the earlier period were apparently destroyed in a flood approximately two years ago.

[12] Defendant had previously provided email volumes for nine agreed custodians but did not state what time periods were available, only that the counts were as of September 15, 2015. To date, Defendant has not provided any information regarding the volume or approximate time period for Zuffa's Chief Financial Officer, John Mulkey.

burden in searching for and reviewing documents of custodians prior to its proposal of January 1, 2009.

| Proposed Custodian | Period for which Emails Are Available on Server |
|---|---|
| Tracey Bleczinski | September 2014 to August 2015 |
| Peter Dropick | June 2014 to August 2015 |
| Lawrence Epstein | April 2013 to July 2015 |
| Lorenzo Fertitta | January 2012 to July 2015 |
| Reed Harris | June 2014 to September 2015 |
| Kirk Hendrick | April 2013 to July 2015 |
| Tracy Long (Hyman) | February 2014 to October 2015 |
| Michael Mersch | October 2013 to March 2015 |
| Michael Mossholder | October 2014 to October 2015 |
| Sean Shelby | September 2014 to July 2015 |
| Joe Silva | September 2014 to July 2015 |
| Dana White | May 2010 to July 2015 |

Only one custodian, Dana White, has any emails available on Defendant's servers from the period prior to January 2012, and even White's emails only go back to May 2010.[13] Of the remaining eleven, only four have emails available on Defendant's server from the period prior to June 2014. Additionally, Zuffa has confirmed that the entire email boxes of three Zuffa custodians proposed by Plaintiffs, former employees Sonja McKinney, Bryan Johnston, and Michael Pine, have been destroyed pursuant to Zuffa's document retention policies.

---

[13] The document preservation policies provided by Defendant to Plaintiffs indicate that emails on the server should be maintained for ninety days and that Zuffa's IT department maintains emails for thirty days after that. However, based on this information, the process is not automated as some custodians have materials from significantly longer than the automated process would indicate.  Defendant has provided no information for how or why this is so. Furthermore, based on Defendant's policies, emails should be available for all custodians at least as of August 2014 since IT should have had copies of all emails 120-days prior to the filing of the *Le* Complaint.

Based on this information, the burden of searching for and producing documents prior to May 2010 (and back to January 2005) for any custodians has not been articulated by Defendant at all and thus, after many months of refusing to provide this information, the objection should be waived. Moreover, whether any burden is "undue" is, in part, a function of whether the same information can be gleaned from less burdensome sources. Therefore, if anything, the fact that Defendant lacks emails for this period makes discovery of whatever documents and ESI Defendant has not destroyed from the period prior to June 2014 all the more important to produce.

The relevant time period for documents and information other than general corporate documents, fighter files (including contacts), financial information and venue, merchandise, broadcaster and sponsor contracts and related documents, should begin on January 1, 2005, less than two years prior to the time that Plaintiffs allege the anticompetitive scheme began. Indeed, Zuffa's representations to this Court suggest that its obligation to preserve documents related to the antitrust claims at issue arose in 2006. Specifically, Zuffa argued to this Court in its Memorandum in Support of Zuffa, LLC's [PROPOSED] Protective Order that Plaintiffs' Counsel Rob Maysey allegedly "used the threat of an antitrust lawsuit to attempt to induce Zuffa to recognize [the MMA Fighters Association] as a negotiating authority on behalf of MMA athletes." ECF No. 159-1 at 4. Zuffa unsuccessfully argued that that purported threat was a sufficient basis to impose a Highly Confidential designation on its documents thereby shielding them from inspection by Mr. Maysey. To the extent Zuffa rightly or wrongly interpreted Mr. Maysey's statement as a legitimate threat of an antitrust lawsuit (as it appears to have argued to this Court), that interpretation should have triggered an obligation to preserve relevant documents as of 2006. Had Zuffa complied with its obligation to preserve documents in anticipation of litigation, a potentially substantial volume of relevant and discoverable documents could exist as early as 2006.

ii.   **Discovery of Contractual Documents and Financial Information  (Plaintiffs' Statement)**

For certain classes of documents, *e.g.*, fighter contracts (RFP Nos. 20-25, 30 & 55) and

financial records,[14] Plaintiffs propose a longer relevant period dating to 2000 because contracts are key evidence of Defendant's scheme. For example, Plaintiffs' Complaints highlight specific contractual provisions that Plaintiffs allege were introduced and/or enforced as part of Zuffa's exclusionary scheme. *See, e.g., Le Compl*. ¶ 113(c) (highlighting the "Right to Match" clause which grants the UFC the option to match the financial terms and conditions of any offer made to a UFC fighter and enables Zuffa to effectively renew, in perpetuity, its contract with the fighter as long as Zuffa wishes). When these contractual provisions were introduced and the extent to which they were enforced during various times is relevant to determining the motivation for, as well as the effects of, Defendant's alleged scheme. Documents relating to the establishment of these clauses, and internal discussions of the effects of these clauses on actual or potential rivals' ability to gain key inputs—such as, access to championship fighters—will be relevant to establishing the anticompetitive character and effect of the scheme.

Zuffa has proposed to produce the entire file for each fighter who fought for the UFC from 2010 to June 30, 2015, and to produce an electronic collection of fighter contract files recently created by Zuffa selected from paper records. However, Zuffa has acknowledged that the electronic collection is incomplete and that a complete hard copy set is available. Zuffa has acknowledged that it also has approximately 600,000 pages of hard copy documents which likely contain responsive documents, including additional fighter contracts that were not electronically stored, including for the period before 2010. The burden of producing the complete files appears to be limited, particularly because Zuffa has proposed to review and produce fighter files and other documents from approximately one-half of the 600,000 pages. Thus, the question is whether Plaintiffs' right to receive a complete and reliable set of contract files warrants a review of the other half rather than production of an admittedly incomplete and unreliable scan of the files created for an entirely different purpose.

Plaintiffs believe that a complete set of fighter contracts—irregardless of whether such

---

[14] Defendant has agreed to produce financial records from as early as 2000 to the extent such documents exist.

JOINT STATUS REPORT

1    fighters are in the classes Plaintiffs seek to represent—will constitute critical evidence; that

2    limiting the universe of such documents is unwarranted; and that identifying a complete set of

3    contracts from Zuffa's files is not unduly burdensome given the importance of such documents in

4    this case.

5             Zuffa's fighter contracts are centrally relevant and discoverable.  During the meet and

6    confer process, Defendant has argued that Plaintiffs are only entitled to contracts of fighters

7    potentially within the alleged classes. This argument has no merit. One of the key ways that

8    Plaintiffs allege Zuffa foreclosed rival competition and obtained, enhanced, and maintained

9    monopoly and monopsony power is through the fighter contracts. They are a key element of the

10   anticompetitive scheme alleged in the case. Whether all or even any of such contracts are with

11   members of the class is simply *not relevant* to the potential anticompetitive effects of such

12   contracts collectively in depriving key inputs from rivals and thereby foreclosing competition

13   generally.  Just as Plaintiffs are entitled to obtain Zuffa's contracts with sponsors even though the

14   sponsors are not in the class, Plaintiffs are similarly entitled to the entire population of fighter

15   contracts—whether or not they happen to be with class members.

16            These fighter contracts constitute fundamental evidence of the origin, development and

17   effects of Defendant's exclusionary scheme. They are, collectively, part of the means by which

18   Zuffa put rivals out of business and bolstered its monopoly and monopsony power. Indeed,

19   "Plaintiffs specifically allege the UFC's scheme resulted in substantial foreclosure in the market

20   for promoting Elite MMA Events and the market for purchasing Elite MMA Fighter services[,

21   by] … 'deny[ing] its actual or potential rival MMA Promoters (and any potential future rivals) the

22   access to inputs necessary to promote successful MMA events (*e.g.*, Elite Professional MMA

23   Fighters, major sponsors, key venues)." Pls. Opp. to Motion to Stay, ECF No. 120 (quoting *Le*

24   Compl. ¶ 108).[15] The contracts that Defendant used to deny actual or potential rival MMA

25   Promoters access to these inputs are necessarily evidence of this scheme. *See, e.g.*, *Le* Compl. ¶

26

27   _____

     [15] Plaintiffs have made comparable allegations concerning venues, sponsors, and other necessary
28   inputs. *See, e.g.*, *Le* Compl. ¶¶ 10, 120-27 & 167.

                                                      24

                                          JOINT STATUS REPORT

110 ("The UFC's illegal monopsony position is sustained, in part, through the use of exclusive dealing agreements with UFC Fighters that lock in Elite Professional MMA Fighter services perpetually and exclusively for the UFC."). Furthermore, "Plaintiffs allege here that all of the UFC's contracts with Fighters—and the exclusionary provisions therein—***taken together*** form part of the UFC's anticompetitive scheme to impair actual or potential rivals and enhance its monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market." *Id.* at ¶ 115; *see also id.* at ¶ 111 ("The UFC uses its monopsony power to extract exclusionary and restrictive concessions from all of its MMA Fighters."). Moreover, such contracts likely evolved over time as Zuffa tightened its chokehold on the relevant markets. Defendant disputes these facts. Thus, the contracts throughout the relevant time period, *i.e.*, from before the enactment of Defendant's anticompetitive scheme through the present, are highly relevant to proving these allegations.

Zuffa's proposal to produce the scanned contract collection does not satisfy Plaintiffs' discovery needs and the review and production of Zuffa's source contract files will not impose an undue burden. Plaintiffs understand that, several years ago, Zuffa commenced a project to scan fighter contracts as a means to store relevant business documents in electronic form.[16] Although Zuffa has also represented that its scanned electronic contract file has "most" fighter contracts since 2000, it has represented that it cannot certify that the collection includes all or nearly all of the fighter contracts that the company maintained in its centralized hardcopy files. Zuffa also stated that it identified fighter contracts and other potentially responsive materials (subject to the parties' negotiations regarding the Relevant Time Period) comprising approximately 600,000 pages of hardcopy documents in archives and other central files.[17] Thus, Plaintiffs understand that a complete set of all of the contract files it is seeking back to 2000 is readily identifiable and

[16] Zuffa did so without consultation with Plaintiffs.

[17] Importantly, Plaintiffs understand that the electronic files include only the contracts themselves and not the related materials that comprise a portion of the 600,000 pages of hardcopy documents. Defendant does not dispute that these related materials are relevant and responsive to Plaintiffs' RFPs, including, without limitation Nos. 20-25, 30 and/or 55 (relating to fighters and their contracts), and thus has no legitimate basis to withhold these documents.

JOINT STATUS REPORT

consists of no more than 600,000 pages. Zuffa has already agreed to review about half of these hard copy files, but it has refused to collect, process, and review the other half. Rather than produce a contract set which the parties know to be incomplete, Zuffa should produce a complete set of its identified extant fighter contract files from January 1, 2000 to June 30, 2015. The incremental burden of Zuffa's review and production of the remaining approximately 300,000 pages is not undue given the centrality of the contract files to this case.

### iii.        Discovery as to Specific Document Requests (Plaintiffs' Statement)

Zuffa has also objected to the burden imposed by what it believes to be the overbreadth of many of Plaintiffs' RFPs involving venues, broadcasters, merchandise vendors and sponsors. Specifically, Defendant has objected to Plaintiffs' RFP Nos. 27 & 29 relating to venues, 33 relating to broadcasters, 35 relating to merchandise, and 37 & 39 relating to sponsors, as overbroad and unduly burdensome because of the volume of such agreements, the volume of the documents and ESI requested related to such agreements, and that these Requests are overbroad because "all documents related to" these agreements and relationships will necessarily include a large number of relevant documents.[18]

In response, Plaintiffs have agreed to limit their venue, broadcast, merchandise and sponsor requests to those located in or relevant to their North American business and events (the Complaints' alleged geographic market). Plaintiffs have also requested additional information concerning how Defendant's assertion of overbreadth creates an undue burden in light of Defendant's planned search for and production of documents.  For example, Defendant argues that "all documents referencing or relating to agreements … regarding venues for professional MMA bouts…." requests many documents relating to the logistics of the event itself (*e.g.*, hiring production workers, coordinating film crews, agreeing upon set-up and tear-down times). However, Plaintiffs' understanding is that Defendant will conduct a search of documents and ESI

---

[18] Defendant also objected to the relevant time period, but as with other RFPs, Plaintiffs have proposed a January 1, 2005 cut off consistent with the allegations of their Complaints.  However, as with the Fighter Requests, Plaintiffs' cut off does not apply to the contracts themselves, which have been requested going back to 2000 because they are evidence of the anticompetitive scheme and are maintained in a centralized location thereby imposing relatively little burden.

1  in the possession of certain agreed custodians as well as certain shared files and servers.

2  Defendant has not explained how such "logistics" documents would be captured in that search.

3  Plaintiffs do not believe that the proposed custodians (or the various shared files and servers) will

4  contain a significant amount of such documents and Defendant has provided no information

5  supporting its asserted burden.  Without such information, Defendant's assertions of burden are

6  speculative and unsupported and cannot constitute grounds for resisting Plaintiffs' RFPs.

7                        **b.   <u>Zuffa's Proposal (Zuffa's Statement)</u>**

8            The parties have conferred extensively in recent weeks and have been able to reach

9  agreement or continue to negotiate productively on the relevant time period applicable to many of

10  Plaintiffs' document requests.  *See* Section IV.B.3 *supra*.  With respect to the remaining requests

11  in dispute, the parties have a fundamental disagreement over which allegations are at the "heart"

12  of Plaintiffs' Complaints and thus entitle Plaintiffs to "significant 'historical' discovery."

13  *Cyntegra*, *Inc. v. Idexx Labs., Inc.*, 322 Fed. App'x. 569, 571 (9th Cir. 2009) (affirming discovery

14  order "limiting certain discovery to a five-year period . . . [and] permit[ting] without temporal

15  limitation . . . discovery into the distribution agreements *at the heart of this case*") (emphasis

16  added).  Zuffa disagrees with Plaintiffs' contention that every allegation in its Complaints, e.g.,

17  that Zuffa has foreclosed competitors from merchandisers, venues and broadcasters, is so much at

18  the "heart" of its claim that they all require "significant historical discovery," that is, documents

19  dating back more than 10 years and more than five years before the start of the limitations period,

20  especially in light of the breadth of their requests on these subjects.  Instead, Zuffa has agreed to

21  provide documents going back ten or more years responsive to requests regarding the core

22  allegations of Plaintiffs' complaints, namely:

23            (1)      Contract files, including related correspondence and other relevant documents,

24                     for athletes who are in the putative "Bout Class"[19] with no date restriction;

25            (2)      All contracts for athletes who did not fight in the UFC after December 16,

26  _____

27  [19] This includes all fighters who fought in a UFC bout after December 16, 2010, including
fighters excluded from the putative class because their claims do not meet the requirements of the
Foreign Trade Antitrust Improvements Act (FTAIA).

28

2010 and that are stored electronically back to 2000;

(3)     Zuffa's financial information back to at least 2005, and before where available;

(4)     Documents related to Zuffa's or Zuffa's affiliates' acquisitions of other promoters back to 2005, and

(5)     Documents relating to the named Plaintiffs without any date restriction.

Together, these sets of documents provide Plaintiffs with the longitudinal perspective they desire, including the ability to establish a "competitive baseline" in proportion to the allegations that constitute the gravamen of the Complaint.

But Plaintiffs' general allegations of a "scheme" dating back to 2006 do not justify broad requests for all documents over a period of 10 years or more related to Zuffa's relationships with sponsors, venues, merchandisers, or broadcasters (Requests Nos. 27, 29, 31, 33, 35, 37, 39); all content from Zuffa's web site and social media accounts (Requests Nos. 48, 49, 50, 51, 52); or all communications that relate to any allegation in the Complaints (Request No. 45). As a compromise, Zuffa has proposed a relevant time period cut off of January 1, 2008 for all categories of documents, except as otherwise agreed upon, offering Plaintiffs nearly 8 years of documents related to their ancillary allegations, dating back nearly 3 years before the start of the Class Period.

Zuffa's proposal is consistent with the principles that discovery should be "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), and that Plaintiffs' entitlement to "significant historical discovery" should be related to the allegations at the "heart" of the case. *Cyntegra*, *Inc.*, 322 F. App'x at 571. On the other hand, Plaintiffs' proposal makes no distinction of importance among their allegations. Moreover, Plaintiffs' position also ignores the significant burden on Zuffa in terms of collecting, processing, and reviewing hundreds of thousands of pages of hard copy documents.

### i.     <u>Documents Related to Fighters</u>

Zuffa has proposed to produce: (1) the complete file for each of the approximately 940 athletes to participate in a UFC bout during the Bout Class Period, which includes the athlete's contracts as well as correspondence related to the contract and other relevant documents; and (2)

28

every contract between Zuffa and athletes that is maintained in electronic form, which includes the majority of Zuffa's contracts with athletes dating back 10 years.  Zuffa has already agreed to provide all documents related to Plaintiffs and their managers.  These three sets would provide Plaintiffs with documents responsive to these requests as they relate to every putative class member.  Those files are voluminous and add to the burden of collection, review, and production that Zuffa has already agreed to undertake.  As explained to Plaintiffs, Zuffa has identified approximately 600,000 pages of hard copy documents that relate to allegations in the Complaint, but many of these hard copy documents pre-date the class periods.  Zuffa has already committed to collecting and reviewing about half of these hard copy files, which include the fighter-related files for fighters who participated in a UFC bout during the Bout Class Period, as well as other documents and contracts responsive to other requests.  By demanding that Zuffa collect, process, and review all 600,000 pages of hard copy documents to find contracts and correspondence that pre-date the alleged scheme and do not directly bear on the claims of either the named Plaintiffs or any putative class members, Plaintiffs propose to subject Zuffa to a burden that is grossly disproportionate to the marginal benefit of fulfilling their demand.

## ii.   Documents Related to Venues, Broadcasters, Merchandises and Sponsors (Zuffa's Statement)

Plaintiffs' requests related to venues, broadcasters, merchandisers, and sponsors are disproportionately broad with respect to the Complaints' actual allegations that Zuffa has used exclusive contracts to foreclose rivals access to these groups.  For example, regarding venues, the Complaints allege only that "before and continuing through the Class period," Zuffa "imposes exclusivity provisions into its agreements with event venues that severely limit, and in some cases remove altogether, the ability of any would-be competitor to hold MMA events at premier venues in the U.S."  Le Compl. ¶ 122.  To prove this allegation, Plaintiffs need only Zuffa's agreements with venues to determine whether and to what extent these agreements contain these provisions.  But Plaintiffs' Request 27 seeks not only the agreements themselves dating back to 2000, but all documents "referencing or relating to" those agreements, including "without limitation, communications and/or negotiations between You and any venue," dating back to 2005.  Based

on the one and only specific allegation regarding the alleged foreclosure of venues, Plaintiffs have not and cannot show why they need any communication between Zuffa and any venue — let alone every communication between Zuffa and every venue for the past 10 years — to determine whether a venue's agreement with Zuffa contains an exclusivity provision. Zuffa has offered Plaintiffs documents responsive to their requests dating back nearly three years before the Class Period. Plaintiffs have failed to show how the breadth of their request is "proportionate to the needs of the case." Fed. R. Civ. P. 26(b)(1) (eff. Dec. 1, 2015).

Plaintiffs' requests for production regarding sponsors, merchandisers, and broadcasters suffer from similar defects of substantial overbreadth. With regard to broadcasters, Zuffa will produce its contracts with broadcasters, which will include its contract(s) with Fox, which is substantially mutually exclusive, as well as its earlier contract(s) with SpikeTV,[20] which were also substantially mutually exclusive. Plaintiffs cannot justify a fishing expedition for every document potentially touching upon this contract or its predecessors, merely to prove the degree of exclusivity, which is governed by the contract. Nevertheless, for each of these categories, Zuffa has offered to produce responsive documents dating nearly three years before the start of the Class Period. Plaintiffs continue to demand documents dating back to 2005 for each of these requests, but they have failed to demonstrate why they are entitled to a wide range of documents pre-dating the Class Period by more than 10 years. Furthermore, as discussed previously, most of the additional documents that Plaintiffs seek above and beyond Zuffa's offer are hard copy documents, which are particularly costly and time-consuming to collect, process, and review.

Finally, Plaintiffs have offered to "compromise" by limiting their request related to venues to only those documents that would support their alleged relevant geographic market of North America. Since the Complaints allege only that Zuffa has foreclosed "key" venues in the United States, this limitation reflects no more than the contours of the complaint. However, for the avoidance of any doubt, Zuffa states that it intends to contest Plaintiffs' alleged geographic market with evidence that the relevant market is global.

---

[20] SpikeTV now has a contract with UFC competitor Bellator.

JOINT STATUS REPORT

### 3. <u>Statute of Limitations</u>

#### <u>Zuffa's Statement Regarding Statute of Limitations (Zuffa's Statement)</u>

The parties' continuing dispute over the relevant time period applicable to most of Plaintiffs' requests is due in large part to Plaintiffs' insistence on maintaining claims that are barred by the applicable statute of limitations.  Plaintiffs' causes of action under Section 2 of the Sherman Act are subject to a four-year statute of limitations period, which bars claims prior to December 16, 2010.  15 U.S.C. § 15b; *see* Le Compl. ¶ 30(c) (defining "Class Period" as beginning December 16, 2010, four years before filing of the *Le* Complaint).  The claims of Plaintiffs Quarry, Vazquez, and Ruediger, as well as substantial portion of putative class members arise out of agreements executed outside the limitations period and are therefore time-barred, because their injury, if any, occurred when the contract was signed, not when Zuffa allegedly benefitted from the rights granted in the contract.  Plaintiff Quarry, for example, neither fought in the UFC nor signed a contract with Zuffa within the statute of limitations period, and therefore suffered no injury in the statute period.  *Aurora Enters., Inc. v. Nat'l Broad. Co.,* 688 F.2d 689, 694 (9th Cir. 1982) ("[T]he mere fact that defendants receive a benefit today as a result of a contract executed" outside the limitations period "in which [Plaintiffs were] purportedly coerced to part with [certain] rights, is not enough to restart the statute of limitations."); *accord Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004).  Any obligations performed or benefits received by either Zuffa or Quarry, Ruediger, or Vazquez are "but unabated inertial consequences of some pre-limitations action" and cannot serve to revive those plaintiff's time-barred claims for damages.  *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979) (quoting *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975), cert. denied, 423 U.S. 1054 (1976)).  Zuffa has offered to produce the contracts and related documents of Plaintiffs and putative class members who executed agreements with Zuffa within the limitations period dating back 10 years or more, but Zuffa disputes Plaintiffs' position that they are entitled to discovery related to the claims of Plaintiffs and putative class members who entered agreements with Zuffa outside of the limitations period.  Zuffa believes that there is or will be no material factual dispute over this issue and the legal issue could be resolved by a

1   motion for summary judgment on stipulated facts or with relatively brief discovery.  Zuffa

2   suggests that the parties meet and confer on a process to bring this issue to resolution in an

3   expeditious fashion.

4                        **a.   Plaintiffs' Statement Regarding Statute of Limitations**

5           Zuffa argues that the claims of Plaintiffs Nate Quarry, Gabe Ruediger and Javier Luis

6   Vazquez are barred by the statute of limitations because they did not execute an agreement during

7   the Plaintiffs' proposed relevant time period. This issue is not appropriate for resolution in a

8   Status Report and best resolved through dispositive motion practice. This issue has no relevance

9   to the scope of discovery or any other issue properly before the Court at this time. Indeed,

10  although Zuffa identified this issue during the meet and confer process, this Status Report is the

11  first time that Zuffa has suggested to Plaintiffs that "The parties' continuing dispute over the

12  relevant time period applicable to most of Plaintiffs' requests is due in large part to Plaintiffs'

13  insistence on maintaining claims that are barred by the applicable statute of limitations."

14  Regardless, even if that were true, Zuffa's contention is a red herring because, as framed, the

15  statute of limitations issue has no bearing on the other eight Plaintiffs in this action. Thus, even if

16  Zuffa were correct regarding Quarry, Ruediger and Vazquez, that is no reason to limit the

17  relevant time period as to the remaining eight Plaintiffs.

18          Moreover, Zuffa's also has the facts wrong. It contends, for example, that Plaintiff Quarry

19  could not have suffered an injury in the statutory period because he did not fight for the UFC or

20  sign a contract during that time. However, Plaintiff Quarry is not a member of the proposed Bout

21  Class which consists of those who fought for Zuffa during the Class Period (*see Le* Compl., ¶ 2).

22  Quarry is only pled as a member of the proposed Identity Class which consists of fighters whose

23  Identity was expropriated or exploited by the UFC during the Class Period. *Id.* at ¶ 3. Regardless,

24  because Zuffa has elected to raise the statute of limitations issue in the context of a Status Report,

25  Plaintiffs provide the following brief response.

26          Here, Plaintiffs have alleged their injury was caused by Zuffa's ongoing and multifaceted

27  scheme as a whole—which includes hundreds of contracts with multiple entities (including

28  sponsors, venues, merchandisers and fighters) *and* other conduct unrelated to contracts—not any

                                              32
                                    JOINT STATUS REPORT

1    individual contract. *See*, *e.g.*, *Le* Compl. ¶¶ 153-58. The complaints plainly allege that Zuffa's

2    scheme is ongoing[21] and multifaceted.[22] Thus, contrary to Zuffa's argument, the date any

3    member of either the Bout Class or the Identity Class executed his or her agreement(s) is

4    irrelevant to the date of injury, the accrual of the claim, or the statute of limitations. A class

5    member could, in theory, possess a valid claim without having signed any contract at all, let alone

6    one outside of the limitations period--just as long as due to the ongoing Scheme, that class

7    member was undercompensated for a bout or identity rights during the limitations period.

8         In addition, the statute of limitations has not run regarding an antitrust violation if the

9    illegal conduct continues into the limitations period. *Hanover Shoe, Inc. v. United Shoe*

10   *Machinery Corp.*, 392 U.S. 481, 502, n.15, 88 S. Ct. 2224, 2236, n.15 (1968)). Courts repeatedly

11   find that monopolists that use their power, illicitly gained, to charge supracompetitive prices have

12   no claim on the repose that the statute of limitations provides. *See, e.g.*, *Berkey Photo Inc. v.*

13   *Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) (a monopolist that "continues to use the

14

---

15   [21] Plaintiffs allege that "by gaining, maintaining, and enhancing iron-fisted control over the
     Relevant Markets through the *ongoing* exclusionary scheme alleged herein, the [Zuffa] has
16   foreclosed competition in the Relevant Markets, acquired, enhanced, and maintained (i)
     monopoly power in the Relevant Output Market and (ii) monopsony power in the Relevant Input
17   Market, and used its dominant position to enter into and dominate other segments of the MMA
     Industry unrelated to the promotion of live Elite Professional MMA events." *See Le* Compl., ¶ 21
18   (emphasis added). Plaintiffs also allege that Zuffa's "*ongoing* anticompetitive scheme has
     enhanced and maintained the UFC's monopoly power in the Relevant Output Market and
19   monopsony power in the Relevant Input Market. As a result of the UFC's scheme: (i)
     compensation associated with fighting in MMA bouts to members of the Bout Class has been and
20   continues to be artificially suppressed, and (ii) the Identities of UFC Fighters continues to be
     expropriated and compensation by the UFC and its licensees for the expropriation, exploitation
21   of and right to exploit Identities of the members of the Identity Class has been and continues to be
     artificially suppressed." *See id.* at ¶ 151 (emphasis added). *See also id.*, at ¶¶ 158, 161 (alleging
22   Zuffa's anticompetitive scheme is "continuing" and so are the damages suffered by the members
     of the Bout Class and Identity Class).
23
24   [22] The complaints allege that the ongoing scheme consists of "a series of exclusionary acts" and
     is "multifaceted" (*see id.* at ¶ 9), and provide specific examples of the various aspects of Zuffa's
25   scheme. For example, Plaintiffs allege "Through the scheme alleged herein, the UFC locked up:
     (i) all or virtually all Elite Professional MMA Fighters with substantial national or regional
26   notoriety; (ii) the vast majority of major sponsors; and (iii) key physical and television venues."
     *See*, *e.g.*, *id.* at ¶ 10. Each aspect of the scheme is alleged in detail; there is no mistaking that
27   Plaintiffs allege the scheme is ongoing and not limited to fighter contracts.
28

---

JOINT STATUS REPORT

power it has gained illicitly to overcharge its customers . . . has no claim on the repose that a statute of limitations is intended to provide"); *id.* ("[i]t is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser 'feels the adverse impact' of the violation"); *Marchbanks Truck Serv. v. Comdata Network, Inc*., 2011 U.S. Dist. LEXIS 158011, *81, 2011 WL 11559549 (E.D. Pa. Mar. 24, 2011) (citing *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc*., 530 F.3d 204, 217 (3d Cir. 2008) ("[I]n the context of a continuing conspiracy to violate antitrust laws, a claim accrues each time a plaintiff is injured by an act of the defendant and, as to those damages, the statute of limitations runs from the commission of the act.").[23]

A prime example in this Circuit is Judge Koh's decision in *Free FreeHand Corp. v. Adobe Systems, Inc.*, 852 F. Supp. 2d 1171, 1187-88 (N.D. Cal. 2012). In *FreeHand*, Judge Koh considered a similar argument to Zuffa's in another Section 2 case. Judge Koh held "[u]nder the 'continuing violation' doctrine, 'each overt act that is part of the [antitrust] violation and that injures the plaintiff … starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Id.* (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). "In the Ninth Circuit, an overt act restarts the statute of limitations if it: (1) is 'a new and independent act that is not merely a reaffirmation of a previous act'; and (2) 'inflict[s] new and accumulating injury on the plaintiff." *Id.* (quoting *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987)).

---

[23] *See also Univac Dental Co. v. Dentsply Int'l, Inc.*, 2008 WL 719227, at *4 (M.D. Pa. March 14, 2008) ("The continuing violation theory authorizes antitrust recovery for a defendant's time-barred actions if the plaintiff demonstrates that they caused the plaintiff to incur damage within the limitations period."); *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005) (in "purchaser antitrust actions" such as this one, "the requisite injurious act within the limitations period can include being overcharged as a result of an unlawful act which took place outside the limitations period"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004) ("Plaintiffs have alleged that they were overcharged and paid supra-competitive prices for K-Dur as a result of Defendants' settlement agreements.  As such it appears that Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and overpaid for K-Dur within the applicable time limitations."); *In re Buspirone Patent Antitrust Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").

Zuffa's multi-faceted scheme is a continuing violation of the antitrust laws, alleged to be composed of several elements including, *inter alia*, a series of acquisitions of actual and potential rivals, including Zuffa's acquisition of Strikeforce, during the statute of limitations period, *id.* at ¶ 128, exclusionary deals with fighters, *id.* at ¶¶ 109-15, exclusionary deals with venues and sponsors, *e.g.*, *id.* at ¶¶ 10, 122 & 16, and enforcement and threatened enforcement of these exclusionary deals, *e.g.*, *id.* at ¶ 110. This scheme, thus includes independent elements that occurred during the statutory period and caused new injury to Plaintiffs and the Classes. For example, the acquisition of actual and potential rivals (and the impairment of potential rivals) extends to the present and has injured all Plaintiffs in the suppressed compensation available to them as a result of the anticompetitive scheme (regardless whether the fighter is under contract with Zuffa). Zuffa's argument even acknowledges that Plaintiffs Nate Quarry, Gabe Ruediger and Javier Luis Vazquez have a claim for injury during the statutory period, and coupled with the well-pleaded allegations of new and independent acts in furtherance of the anticompetitive scheme, Plaintiffs demonstrate a continuing violation.

Zuffa relies principally on the Ninth Circuit decision of *Aurora Enterprises, Inc. v. National Broadcasting Company, Inc.*, 688 F.2d 689 (9th Cir. 1982). In *Aurora Enterprises*, the plaintiff, Xanadu Productions, Inc. ("Xanadu") was a television production company that had a role in developing the television series The High Chaparral ("Chaparral"). Defendant National Broadcasting Co. ("NBC") had purchased the rights to broadcast Chaparral, which included syndication rights. After the Federal Communications Commission ordered NBC to divest itself of syndication rights, including the rights to Chaparral, NBC sold the rights to another defendant. Xanadu sued defendants alleging a tying violation of the Sherman Act, that as a condition to purchasing the Chaparral exhibition rights, NBC insisted on purchasing the syndication rights which unreasonably restrained trade. The district court dismissed Xanadu's tying claims as barred by the four-year statute of limitations under 15 U.S.C. § 15(b) because Xanadu's claims arose from the sale of syndication rights that occurred more than four years before the filing of the complaint. The court recognized that certain exceptions can apply to renew the statute of

limitations, including a "continuous antitrust violation," but that no exceptions applied to Xanadu's claims. Zuffa's reliance on *Aurora Enterprises* is misplaced.

### 4. Custodians

#### a. Plaintiffs' Proposal (Plaintiffs' Statement):

The parties have not agreed upon a complete set of custodians whose files and records will be searched for responsive documents, including ESI. However, the parties have agreed on 16 custodians, although Zuffa may no longer maintain the email box of three of those custodians. Zuffa has refused to add 12 additional custodians proposed by Plaintiffs. And Plaintiffs have requested additional information regarding 19 other custodians. Plaintiffs believe that the list of potential custodians that they proposed to Zuffa may be under-inclusive and reserve the right to propose additional custodians.[24] Plaintiffs reserve the right to revise their list of 16 agreed custodians once they have the opportunity to consider the additional information that they have requested regarding Zuffa's custodians.

#### i. Status of Negotiations Regarding Custodians (Plaintiffs' Statement)

The status of the parties' negotiations regarding custodians is reflected in the following chart:

---

[24] For example, because Defendant has yet to provide information concerning its employees prior to 2008, Plaintiffs' proposal is likely under-inclusive as to that time period.

JOINT STATUS REPORT

| Name | Title | Custodian Status | Volume of Emails and Attachments[25] |
|---|---|---|---|
| Bleczinski, Tracey | Senior Vice President of Global Consumer Products | Agreed | 76,777 |
| Dropick, Pete | Senior Vice President, Event Development & Operations | Agreed | 75,759 |
| Epstein, Lawrence | Senior Executive Vice Present and COO and (former) General Counsel | Agreed | 149,654 |
| Fertitta, Lorenzo | Chairman and Chief Executive Officer | Agreed | 79,344 |
| Harris, Reed | Vice President of Community Relations and (former) Vice President of Athlete Relations | Agreed | 41,808 |
| Hendrick, Kirk | (former) COO, (former) General Counsel, and Executive Vice | Agreed (with contested limitations as discussed in Section IV.A.4.) | 177,034 |

[25] These document counts were provided in Defendant's November 12, 2015 letter. They differ substantially as noted herein from the counts provided in September 2015. Plaintiffs assume the more recent number is correct but have not received an explanation concerning the discrepancies. The email and related document counts provided, require clarification. As counsel for Zuffa has explained:

> For purposes of the [] document counts, an "e-mail document" refers to each document that would potentially be reviewed and, if produced, would have an individual identifier in a DAT file.  For example, if a produced e-mail family had a cover e-mail and three attachments, the documents would be listed in a DAT file as four individual records (with familial relationships).  In the below document counts, that e-mail family would be represented as four e-mail documents.

> For purposes of the below dates, however, I only looked at the "Sent Time" to determine the date ranges of the cover e-mails.  Some of the attachments have a Document Date as early as 2002.

| | | | |
|---|---|---|---|
| | President and Chief Legal Officer | | |
| Johnston, Bryan | (former) Chief Marketing Officer | Agreed | $0^{26}$ |
| Long, Tracy | Director, Athlete Relations and (former) Paralegal | Agreed (with contested limitations as discussed in Section IV.A.4.) | 121,171 |
| McKinney, Sonja | (former) Paralegal | Agreed | $0^{27}$ |
| Mersch, Michael | (former) Senior Vice President of Athlete Relations and (former) Associate General Counsel | Agreed | 114,743 |
| Mossholder, Michael | Senior Vice President of Global Marketing Partnerships | Agreed | 34,606 |
| Mulkey, John | Chief Financial Officer | Agreed | Not Provided |
| Pine, Michael | (former) Head/Global Sales and Vice President | Agreed | $0^{28}$ |
| Shelby, Sean | Director of Talent Relations | Agreed | 20,123 |
| Silva, Joe | Senior Vice President of Talent Relations | Agreed | 29,656 |
| White, Dana | President | Agreed | 60,283 |
| Bidarian, Nakisa | Executive Vice President of | Contested | Not Provided |

---

[26] Although Zuffa agreed to Plaintiffs' proposal to include Mr. Johnston, a former employee, as a custodian, Zuffa has since informed Plaintiffs that Mr. Johnston's email box has apparently been deleted.

[27] Although Zuffa agreed to Plaintiffs' proposal to include Ms. McKinney, a former employee, as a custodian, Zuffa has since informed Plaintiffs that Ms. McKinney's email box has apparently been deleted.

[28] Although Zuffa agreed to Plaintiffs' proposal to include Mr. Pine, a former employee, as a custodian, Zuffa has since informed Plaintiffs that Mr. Pine's email box has apparently been deleted.

| | Strategy and Business Ventures | | |
|---|---|---|---|
| Borsari, Craig | Executive Vice President of Operations and Productions | Contested | Not Provided |
| Cook, Garry | Executive Vice President and Chief Global Brand Officer | Contested | Not Provided |
| Grab, Ryan | Director of Athlete Strategy | Contested | Not Provided |
| Haddon, Jason | Talent Relations Manager | Contested | Not Provided |
| Henricks, Melissa | Senior Director of Event Operations | Contested | Not Provided |
| Marcolini, Donna | Vice President of Event Operations | Contested | Not Provided |
| Poriadjian, Jackie | Senior Vice President of Global Brand Marketing | Contested | Not Provided |
| Ratner, Marc | Senior Vice President of Government and Regulatory Affairs | Contested | Not Provided |
| Sholler, Dave | Vice President of Public Relations and Athlete Marketing and Development | Contested | Not Provided |
| Sorenson, William | Director of Event Operations, CANZ | Contested | Not Provided |
| Zelaznik, Marshall | Chief Content Officer and (former) President of UK Division and Managing Director International | Contested | Not Provided |
| Adams, Scott | Co-General Manager of WEC | Plaintiffs' request for additional | Not Provided |

39

| | | information is pending.[29] | |
|---|---|---|---|
| Akpom, Akosa | Senior Manager of Consumer and Brand Insights | Plaintiffs' request for additional information is pending. | Not Provided |
| Bellamy, Tim | Senior Vice President and Associate General Counsel | Plaintiffs' request for additional information is pending. | Not Provided |
| Coker, Scott | Zuffa title is unknown. Founder and CEO of Strikeforce which was sold to Zuffa. | Plaintiffs' request for additional information is pending. | Not Provided |
| Cuthbert, Chari | Executive Assistant to Dana White | Plaintiffs' request for additional information is pending. | Not Provided |
| D'Urso, Tom | Vice President and General Manager of UFC Consumer Products Group | Plaintiffs' request for additional information is pending. | Not Provided |
| Evans, Anthony | Senior Communications Manager | Plaintiffs' request for additional information is pending. | Not Provided |
| Frevola, Jim | Senior Director of Marketing Partnerships | Plaintiffs' request for additional information is pending. | Not Provided |
| Gold, Don | (former) Executive Vice President of Entertainment | Plaintiffs' request for additional information is | Not Provided |

[29] On November 6, Plaintiffs requested that Zuffa provide, for each of the individuals listed as "Plaintiffs' request for additional information is pending", *inter alia*, that individual's job titles, job description, and the department in which they were employed at Zuffa, in addition to the volume of that individual's ESI. Zuffa has represented that it is investigating this request. Zuffa has represented that some of the titles listed by Plaintiffs are inaccurate and many of these individuals do not currently work for Zuffa. Plaintiffs generally sourced the titles from the organizational charts Zuffa produced in this litigation. The inaccuracy of the charts is further evidence of Plaintiffs' need for the information requested of Zuffa notwithstanding Zuffa's production of the organizational charts.

JOINT STATUS REPORT

| | | | |
|---|---|---|---|
| | | pending. | |
| Harting, Doug | Vice President of Marketing & Distribution | Plaintiffs' request for additional information is pending. | Not Provided |
| Hendrick, Greg | Manager of Event Operations | Plaintiffs' request for additional information is pending. | Not Provided |
| Hollis, Richard | Affiliate Marketing Manager | Plaintiffs' request for additional information is pending. | Not Provided |
| Hurley, Chad | Director of Merchandising | Plaintiffs' request for additional information is pending. | Not Provided |
| Klein, Randy | Vice President of Licensing and Merchandising | Plaintiffs' request for additional information is pending. | Not Provided |
| Levine, Aimee | Commercial Relations Coordinator | Plaintiffs' request for additional information is pending. | Not Provided |
| Locheur, Elizabeth | Commercial Relations Manager | Plaintiffs' request for additional information is pending. | Not Provided |
| Pollack, Jamie | Senior Vice President Latin America Affairs | Plaintiffs' request for additional information is pending. | Not Provided |
| Shaw, David | Director of Business and Sport Development | Plaintiffs' request for additional information is pending. | Not Provided |
| Wenk, Jen | Director of Public Relations | Plaintiffs' request for additional information is pending. | Not Provided |

JOINT STATUS REPORT

ii.      **Identification of Custodians/Organizational Charts (Plaintiffs' Statement)**

Since Plaintiffs do not know—and reasonably should not know—the identities and responsibilities of each of Zuffa's personnel who may possess discoverable information, Plaintiffs have asked for directories, organization charts, HR records or other information sufficient to identify Zuffa's custodians. Zuffa has represented that it did not maintain organizational charts prior to 2015 and that the draft organizational charts that it possesses and produced for the period from 2008 to 2014 are incomplete. Therefore, Plaintiffs have requested that Zuffa identify its present or former employees, executives, directors, owners, shareholders, consultants, accountants, attorneys, or other agents.

Even to the extent Plaintiffs have been able to identify potential custodians beyond the 16 on whom the parties have agreed, Defendant has made blanket assertions of burden without providing Plaintiffs with sufficient information regarding the volume of ESI or other custodial documents associated with each custodian. On November 12, 2015, Zuffa agreed to confirm the title, role, department and entity for the custodians identified above as those for whom "Plaintiffs' request for additional information is pending." Zuffa has also agreed to inform Plaintiffs whether the email boxes of such custodians exist and the volume thereof. That exercise is more appropriately and efficiently performed after Plaintiffs identify proposed custodians based on complete and reliable information.

iii.      **Number or Identity of Custodians (Plaintiffs' Statement)**

It is difficult to negotiate or understand a proposal regarding the number or identity of custodians without information regarding who held what jobs during the relevant time period. The number of custodians appropriate in a given case is a function of the scope of the complaint's allegations, the size of the party from whom discovery is sought, and the turnover in relevant positions. Zuffa has acknowledged that Plaintiffs' Complaints and corresponding discovery concern nearly every aspect of its business. Indeed, in its Motion to Stay, Zuffa asserted that "Plaintiffs should not be permitted to subject Defendant … to wide-ranging, costly and burdensome discovery unless or until the Court determines that Plaintiffs' Complaints can

42

survive a motion to dismiss." Motion to Stay, ECF No. 103, at 1. Now that the Court has decided the motion to dismiss and sustained Plaintiffs' Complaints in full, Defendant still objects to the scope of discovery.

As a result of the scope of this case, the appropriate number of relevant custodians will likely consist of a larger percentage of Zuffa's personnel than in a typical case. But Zuffa has refused to expand the list of custodians. Rather, it has proposed to allow Plaintiffs to select any two custodians in addition to the 16 agreed custodians. Plaintiffs, however, are seeking to select the most appropriate custodians and require additional information to do so. Zuffa has not been forthcoming with such information, and even when it does provide information, it is inconsistent and not adequately detailed.

Defendant has still not provided (or confirmed) the job titles of numerous potential custodians for whom Plaintiffs have requested information nor has Defendant provided information about their roles and duties. Although Defendant's production of an incomplete set of organizational charts has given Plaintiffs some information on job titles, Defendant has expressly disputed the accuracy of some of those job titles and implicitly disputed others by providing a table of job titles in its November 12, 2015 letter that differs from those provided in organizational charts.

Without accurate and reliable information on (1) the job titles and duties of potential custodians; and (2) the volume of documents and ESI available for the custodians, Plaintiffs are unable to evaluate the limitations proposed by Defendant on the identity or number of custodians.

Regardless of the information Defendant provides on custodians, Defendant has indicated it is unwilling to provide a reasonable number of custodians. Experience in other cases may be useful to consider. For example, in *Oracle USA, Inc. et al. v. Rimini Street, Inc. et al.*, No. 2:10-cv-106-LRH-PAL (D. Nev.), this Court approved a stipulation submitted by the same counsel representing Zuffa in this case, pursuant to which its client in that case would receive documents from 55 agreed custodians in a company that employed fewer than 200 people. *See* November 2011 Joint Status Report, ECF No. 167. Specifically, in *Rimini Street*, counsel for Zuffa here, representing the plaintiff Oracle, sought and agreed to the defendant Rimini's production from 55

1  custodians from whom over 750,000 documents totaling over 6 million pages along with over
2  81,000 native files were produced.[30]

3      Like *Rimini Street*, Zuffa has 200 employees or fewer. Plaintiffs' Complaints allege an
4  anticompetitive scheme involving numerous substantial aspects of Zuffa's business, including,
5  without limitation, its relationships with fighters, venues, sponsors, merchandise vendors,
6  broadcasters and other actual or potential rival MMA Promoters. The scope of these allegations
7  implies that a substantial proportion of Defendant's employees are likely to have discoverable
8  information. Indeed, Plaintiffs' Rule 26(a) Disclosures, consistent with the scope of the
9  Complaints' allegations, identified 31 current and former Zuffa employees and the limited
10 discovery conducted to date has indicated the identity of additional potential custodians. Plaintiffs
11 have attempted, and will continue to attempt to work with Zuffa to limit the number of custodians
12 but, in order for such attempts to be productive, Zuffa must provide the necessary information. If
13 Zuffa is unwilling to do so, then all custodians must be fair game.

14                  iv.      **Producing Documents from Zuffa's Legal Officers**
                            **(Plaintiffs' Statement)**
15

16     Zuffa has proposed to limit the custodial searches and productions for certain of Plaintiffs'
17 proposed custodians because the custodians are (or were at relevant times) members of Zuffa's
18 in-house legal department ("Legal Custodians"). Specifically, the Legal Custodians at issue are
19 Kirk Hendrick, Tracy Long and Michael Mersch.

20     Zuffa asserts that conducting a privilege review of all potentially responsive email
21 documents associated with its Legal Custodians would be too burdensome. Specifically, Zuffa
22 proposes that, during any time period that the Legal Custodians worked in the legal department, it
23 would not search their communications between one another and any other Zuffa employee,
24 based, at least in part, on the assumption that the majority of these documents would be privileged
25 so the burden of conducting privilege review would not be justified. There are several flaws in

26 _____

27 [30] Note that, notwithstanding the inflated document counts expressed by Zuffa here, Zuffa's
counts are of gross document volume and are not the number of documents that would be
28 produced.

this position. First, a blanket application of the attorney-client privilege is not allowed: "A party claiming the attorney-client privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted. Blanket assertions of attorney-client privilege are extremely disfavored." *Elan Microelectronics Corp. v. Pixcir Microelectronics Co.*, 2013 U.S. Dist. LEXIS 114788, at *11-12 (D. Nev. Aug. 13, 2013) (internal quotations omitted). Second, documents are "not entitled to protection by the [attorney client] privilege simply because in house counsel were involved in the transactions." *Diagnostics Sys. Corp. v. Symantec Corp.*, 2008 U.S. Dist. LEXIS 123915, *31, 2008 WL 9396387 (C.D. Cal. Aug. 12, 2008). "[A] party attempting to demonstrate that an internal communication involving in-house counsel deserves privileged status must make a clear showing that the speaker made the communication for the purpose of obtaining or providing legal advice." *Oracle Am., Inc. v. Google Inc.*, 2011 U.S. Dist. LEXIS 121446, at *23, (N.D. Cal. Oct. 20, 2011). Third, a party seeking to withhold discovery based on the burden of producing it must "present specific information — generally supported by an affidavit or declaration — demonstrating that the information is not reasonably accessible because of undue burden or cost." *Tyler v. City of San Diego*, 2015 U.S. Dist. LEXIS 56309, *4 (S.D. Cal. Apr. 29, 2015).

The proposed Legal Custodians likely possess substantial responsive, non-privileged ESI. These individuals performed many non-legal functions. For example, Kirk Hendrick served as Zuffa's Chief Operating Officer as well as its General Counsel and/or Chief Legal Officer. As Chief Operating Officer, Mr. Hendrick would have provided substantial non-privileged business advice, not just legal advice, to Zuffa. Documents and communications evidencing and related to such business advice cannot likely be cabined to the time period that this employee served as Chief Operating Officer. Thus, Defendant's proposed exclusion of this category of documents is overbroad.

In addition, as with its other custodian objections, Zuffa has not disclosed sufficient information regarding the volume of documents and ESI that it claims would be too burdensome to search and review for privilege. Without such information, Defendant cannot meet its burden to resist producing these responsive documents on that basis. For example, with respect to the

45

Legal Custodians, Zuffa has provided only the following ESI information:

| Employee | Number of E-Mail Account Documents[31] | E-Mail Time Period | Tenure in Legal Department |
|---|---|---|---|
| Hendrick, Kirk | 177,034 | April 2013 to July 2015 | General Counsel (2003-2007); Chief Legal Officer (2013-Present) |
| Long, Tracy | 121,171 | February 2014 to October 2015 | |
| Mersch, Mike (former employee) | 114,743 | October 2013 to March 2015 | |

These email account document volumes are overstated such that, for example, Mr. Hendrick does not have 177,034 emails. Rather, he has 177,034 documents in his email box, including email and attachments, not all of which are privileged. The volume is further overstated by the fact that it includes materials which are non-responsive and would presumably not be identified as responsive through agreed upon search terms. Importantly, the foregoing counts to do not distinguish between purely internal communications and communications with persons or entities outside Zuffa (not including outside counsel working for Zuffa). That distinction is important because with respect to the Legal Custodians, Zuffa "propose[d] to search and produce their ESI and documents for responsive communications with persons or entities outside of Zuffa (not including outside counsel working for Zuffa. Purely internal communications would be excluded from the search." (Cove letter to Dell'Angelo, October 28, 2015, at p. 4). Thus, only a subset of Mr. Hendrick's documents includes "purely internal communications" which Zuffa proposes to exclude, but Zuffa has not provided sufficient information to enable Plaintiffs to evaluate the burden associated with the volume of such material.

Absent such information, Plaintiffs propose that Zuffa should be required to search, review and produce all responsive, non-privileged email for each of the proposed Legal Custodians. In the alternative, Plaintiffs further propose that several techniques can be applied to

---

[31] As discussed in note 30, the purported "email count" includes both emails and attachments.

reduce the burden of Zuffa's privilege review, including, a Rule 502/quick peek stipulation,[32] the use of search terms to exclude likely privileged documents, limitations on the obligation to log privileged material and eliminating the obligation to  log privileged redactions provided metadata for such documents is produced.

### b.  Zuffa's Proposal (Zuffa's Statement):

On September 8th, Zuffa made a straightforward proposal for 9 document custodians broken down by topic who Zuffa believes are most knowledgeable and have the most relevant information about the allegations in the Complaint.  Zuffa's proposal included the three highest level executives at the company (CEO and Chairman Lorenzo Fertitta, President Dana White, and Chief Operating Officer Lawrence Epstein), the two individuals responsible for fighter relations and, subject to the direction or participation of the preceding three executives, negotiating contracts with fighters (SVP of Talent Relations Joe Silva and Talent Relations Director Sean Shelby), an additional individual responsible for fighter relations (Vice President of Community Relations and co-founder of the WEC, Reed Harris), and the department heads for sponsors, merchandise and venues (EVP of Global Marketing Partnerships Michael Mossholder; SVP of Global Consumer Products Tracey Bleczinski; and SVP of Event Development & Operations Peter Dropick).  After making the proposal, Zuffa continued to respond to Plaintiffs' requests for information, including providing available organizational charts, at least one per year, since 2008, information on predecessor custodians, and employment dates.  Zuffa also agreed to provide any documents that still existed from any predecessors who served in these positions.  In response to Plaintiffs' request, Zuffa also provided Plaintiffs with data on the number of emails maintained by the custodians it proposed.  Further, to the extent that Plaintiffs wanted additional information on

---

[32] The Court can enter a Fed. R. Ev. 502 order without Zuffa's agreement. *See* http://www.gpo.gov/fdsys/pkg/CREC-2008-09-08/pdf/CREC-2008-09-08-pt1-PgH7817.pdf#page=2 at H7819) (statement in the congressional record relating to the enactment of Rule 502). Under Rule 26(c)(1), the court can enter a clawback order where not all parties agree, using its authority to create a protective order. *See*, *e.g.*, *Rajala v. McGuire Woods LLP*, 2010 WL 2949582 (D. Kan. July 22, 2010) (Waxse, J.).

other individuals on the organizational chart, Zuffa offered to research and provide such information on any person whom the Plaintiffs requested.

Plaintiffs made a counterproposal regarding custodians six weeks later, on October 20, 2015.  That counterproposal requested a list of 28 different custodians including multiple custodians from the same department, former employees, and five current or former lawyers and paralegals from Zuffa's legal department, and reserved the right to ask for additional custodians.

In an effort to compromise, on October 28, 2015,  Zuffa proposed to provide Plaintiffs with documents from 16 custodians (the 9 agreed to from Zuffa's initial list and 7 others from Plaintiffs' proposed custodians), and further offered to provide documents from two additional custodians of Plaintiffs' choosing, for a total of 18 custodians.  To reduce the burden of privilege review and logging, Zuffa also proposed certain limitations on the documents from the lawyers and paralegals in Zuffa's legal department, as discussed below.

Instead of working towards a compromise and reducing the number of custodians sought, on November 6th, Plaintiffs broadened their proposal.  Plaintiffs continued to push for the same 28 individuals to act as document custodians, but also now proposed the inclusion of executive assistants on top of the 28 proposed custodians.  On November 6, Plaintiffs also requested information on 19 other individuals who they reserved the right to propose as custodians upon receipt of further information (listed in their chart above).  Although Zuffa objects to any further custodians, Zuffa has provided some of the requested information in meet and confers and is investigating their remaining inquiries.

Zuffa believes that its proposal of 18 document custodians is more than sufficient in this case.  First, this is an alleged monopolization case where the important decision-making documents will be maintained by the highest level employees.  Zuffa's October 28th proposal gives Plaintiffs documents from the highest decision-making authorities at the company and the department heads in the areas of the business related to Plaintiffs' Complaints.  Second, among the proposed custodians are all the individuals in the organization with substantive responsibility for fighter contracts – the core of the Plaintiffs' Complaints:  Fertitta, White, Epstein, Silva, Shelby, and attorneys Hendrick and Mersch.  To the extent that Plaintiffs believe that other

1    individuals are necessary, Zuffa's proposal contemplates that they can choose two other

2    document custodians.

3          Second, the burden from Zuffa's proposal alone is already high.  As Zuffa informed

4    Plaintiffs on October 28th, the e-mail boxes alone for the 16 custodians Zuffa proposes contain

5    over one million documents.[33]  This does not include the document counts for the non-email ESI

6    that has been or will need to be collected, processed, and reviewed for these custodians, including

7    laptops, cell phones, and network-stored ESI, as well as any hard copy documents in those

8    custodians' files.  Each additional custodian that Plaintiffs seek to add magnifies this burden.

9          Plaintiffs state that Zuffa has not provided information regarding the total volume of its

10   proposed custodians' ESI to allow it to assess volume.  But Plaintiffs' approach turns the

11   traditional process on its head.  Zuffa cannot accurately assess an employee's volume of ESI,

12   which includes text messages, hard drives, external drives, etc. until that information is collected

13   and processed.  That process is time consuming and expensive and is an appropriate analysis after

14   the parties have reached an agreement on custodians, not before.  Nonetheless, to ensure that

15   Plaintiffs understood the scope of the relevant ESI for the custodians Zuffa proposed, it has

16   provided Plaintiffs with counts of the emails in their inbox and confirmed, for the proposed

17   custodians who maintain personal network drives, the number of documents maintained on such

18   drives.  An analysis of hard drive volume is particularly difficult at this stage because determining

19   hard drive volume requires forensic collection and processing.  It does not make sense for Zuffa

20   to bear the burden, in terms of time and cost, of collecting, imaging, and processing hard drives

21   _____

22   [33] Prior to November 12, Plaintiffs had not agreed to an end date for e-mail collections, which led
     to varying e-mail counts as Zuffa employees created and received additional e-mails on a daily
     basis.  Now that Plaintiffs have agreed to an end date of June 30, 2015, Zuffa will provide
23   Plaintiffs with an updated e-mail count for the requested period.  Moreover, Plaintiffs' claims that
     Zuffa has somehow overstated its e-mail counts are unfounded and purposefully misleading.  For
24   example, Plaintiffs claim that the 177,000 plus e-mail documents contained in Mr. Hendrick's e-
     mail collection indicate that "Mr. Hendrick does not have 177,034 emails".  For purposes of
25   review and production, there are over 177,000 documents – including cover e-mails and
     attachments – that Zuffa will need to search, review, and potentially produce.  Whether the
26   documents are called e-mails or documents does not reduce the burden of review and production.
     Indeed, attachments to e-mails are often more burdensome to review than the cover e-mails
27   themselves.

28

JOINT STATUS REPORT

for custodians before an agreement has been reached regarding custodians.  Moreover, Plaintiffs have requested detailed information regarding the de-duplicated volume of data maintained among custodians.  By definition, Zuffa cannot determine the de-duplicated volume of data until it has collected, processed, and loaded the ESI into a database, thereby adding to the cost and burden of discovery before the parties have even agreed on custodians.

With regard to the conflicting volume information listed in Plaintiffs' chart on page 8, the September e-mail count that was provided to Plaintiffs represented the volume in their retained e-mail boxes as of a specific date in time, whereas the November e-mail counts represented the processed and de-duplicated volumes of what has been collected, in response to Plaintiffs' demands for de-duplicated e-mail counts.  Plaintiffs erroneously claim that the data provided to them is what is available on Zuffa's servers and that the e-mail counts have decreased, despite the fact that Zuffa specifically explained, "Each of the proposed custodians' e-mails listed in this chart are subject to a continuing legal hold.  The end dates of the Approximate E-Mail Collection period vary because e-mails have been collected on an ongoing basis and at different times.  To the extent the parties cannot agree on an end date for collection and production, Zuffa will need to perform updated email collections for the custodians, which will necessarily increase the e-mail counts for those individuals."  Moreover, counsel for Zuffa identified an error in the September counts for Mr. Fertitta's e-mails, and promptly corrected the error as soon as it was brought to their attention.

These data volume discrepancies underscore why the parties need to agree on relevant custodians before embarking on an analysis of the potential volume of documents maintained by various employees and former employees at Zuffa.  From the outset, Zuffa proposed that the parties should agree on a list of custodians and then address the volume of those custodians' ESI and hard copy documents once the documents were collected, processed, and de-duplicated.  Those documents would then be subject to search terms.  However, Plaintiffs rejected this proposal – the type of iterative process used in many cases – and noted that search terms may not be warranted in this case because the allegations of the Complaints touch on all aspects of Zuffa's business.  Despite that position, Plaintiffs now claim that the e-mail counts (which Zuffa was

hesitant to provide until all ESI had been collected and processed, to avoid confusion and risk of error) are inaccurate because many of the collected documents will be irrelevant.  While Zuffa does not disagree that some of the collected e-mails will be irrelevant, they may be still be responsive to Plaintiffs' broad requests and Zuffa may still have to review each and every one of the irrelevant documents if Plaintiffs will not agree to use search terms to winnow down the collected documents.  Plaintiffs cannot argue that Zuffa's burden is reduced simply because not every document in a custodian's possession is responsive to Plaintiffs' document requests.  Zuffa will still bear the burden of collection, processing, and review of the documents.

With every iteration of its proposal, Zuffa has worked to provide more information and concessions to Plaintiffs in an effort to reach an agreement.  Plaintiffs' refusal to engage in meaningful negotiation regarding custodians and to continually demand more with every request has driven this discussion to a standstill.

### i. Producing Documents from Zuffa's Legal Officers (Zuffa's Statement)

Plaintiffs propose full custodial production of three lawyers – Mr. Epstein, Mr. Hendrick and Mr. Mersch – and two paralegals – Ms. Long and Ms. McKinney – who work under the direction of one or more attorneys of these and other Zuffa attorneys.  In order to reduce the burden of reviewing for and logging privileged documents from lawyers and paralegal files, Zuffa proposes some reasonable limitations on the collection, search and review of two lawyers, Mr. Hendrick and Mr. Mersch, and one paralegal, Ms. Long.[34]  Mr. Hendrick, as Chief Legal Officer,

---

[34] Mr. Epstein preceded Mr. Hendrick as the Chief Legal Officer or General Counsel for the company, and succeeded him as Chief Operating Officer.  Aside from Zuffa's position with regard to the relevant time period, Zuffa does not propose any limits on the search and production of either of their custodial documents from their respective times as COO, despite the fact that Mr. Hendrick's tenure as General Counsel overlapped with his tenure as COO.  Because Mr. Epstein email box has fewer than a thousand email documents from his time as general counsel (in contrast to Mr. Hendrick, who has over 100,000), Zuffa also does not propose any limitations on the search and production of Mr. Epstein's documents.  Further, given that Ms. McKinney left the company in 2014, there are no emails on the email server retained from her time with Zuffa, and Zuffa agrees to search and produce all non-email ESI and hard copy documents from Ms. McKinney's files without limitation.  Ms. McKinney is a former employee who left prior to the

was responsible for overseeing all litigation and potential litigation for the company, providing

legal advice, supervising outside counsel, etc.  As a result, his files and email contain a substantial

number of documents that are protected by the attorney-client privilege and/or work product

doctrine and the burden of searching, collecting, and reviewing those files for privileged

information outweighs the likelihood that they will contain non-privileged relevant information

that is not found in other custodian's files.  Similarly, as Assistant General Counsel, Michael

Mersch provided a variety of legal advice and services to the company.  Tracy Long, who worked

primarily at the direction of the legal department, will likely also have significant volumes of

privileged materials in her custodial documents.  However, each of these individuals on occasion

dealt with third parties, such as athletes and their agents and attorneys, in connection with

contract negotiations and other subjects.[35]  Thus, to reduce the burden of privilege review and

logging for these custodians, while still providing Plaintiffs with potentially responsive non-

privileged communications with third parties, Zuffa proposes to search and produce their ESI and

documents for responsive communications with persons or entities outside Zuffa (not including

outside counsel working for Zuffa).  Purely internal communications would be excluded from the

search.  Under this proposal, responsive emails, texts and other communications between these

individuals and fighters and their representatives, venues, sponsors, and other third parties in

these custodians' files would be reviewed and produced but purely internal communications

would not be.  To be clear, this limitation would apply only to the custodial files of these

custodians during their time in the legal department.  Documents in the custodial files of these

custodians from their tenure outside Zuffa's legal department or other custodians outside the legal

department would still be searched and produced including logging privileged documents in a

manner to be agreed upon by the parties.  For example, an email sent by Mr. Epstein to Mr.

filing of this litigation.  Her emails were deleted well before the first Complaint was filed in
accordance with Zuffa's standard document preservation protocols.

[35] Plaintiffs' assertion that "Zuffa has not provided Plaintiffs with sufficient information
regarding the volume of documents and ESI that it claims would be too burdensome to search and
review for privilege" is wrong.  Zuffa responded to Plaintiffs' request about burden with a
specific count of the number of email documents for each lawyer or paralegal and an approximate
number of network drive files for each such custodian.

JOINT STATUS REPORT

Hendrick and found in Mr. Epstein's files from his time as COO, would still be reviewed and either produced or withheld and logged as privileged.  Zuffa believes this compromise provides Plaintiffs with these custodians' responsive communications with all the third parties relevant to the allegations in the Complaint, while reducing the immense burden of privilege review and logging documents for custodians whose primary responsibility was performing legal functions.[36] In making this proposal, Zuffa was not asserting a blanket claim of privilege.  Rather, Zuffa sought to reduce the burden of privilege review and logging through a reasoned compromise.

### D.  Case Management Issues (Joint Statement)

#### 1.  Discovery Limitations

The parties agree that they are obligated to continue to preserve documents relating to the litigation.

In order to facilitate the production of documents and to reduce the burden and cost associated with the review and production, the parties agree that documents and information may be produced without redacting Personally Identifiable Information ("PII"), as long as the party that seeks to file the document with, or introduce the document to, the Court redacts the PII before such use.

The parties disagree as to the number of interrogatories that will be permitted and the number of depositions that will be permitted without leave of the Court.

#### a.  Interrogatories

**Defendant's Proposal:**  Zuffa proposed limiting the number of party interrogatories in this case to 40 per side, with no more than 20 interrogatories requiring a separate response by each plaintiff – the balance could be answered collectively, *i.e.*, once by all Plaintiffs.  In exchange, Zuffa agreed to only count Plaintiffs' First Set of Interrogatories as 6 interrogatories

---

[36] Plaintiffs raise once again the possibility that Zuffa could turn attorney-client privileged documents over to its litigation adversaries under a quick-peek stipulation.  Zuffa's decision to continue to protect its privilege remains unchanged since the April 26(f) conference and the previous Joint Status Report.

1   despite the multiplicitous nature of the questions.[37]

2       **Plaintiffs' Proposal:** Plaintiffs accept the structure of Zuffa's proposal but disagree with

3   the numbers responding to 240 potential interrogatories would be unduly burdensome.  Plaintiffs

4   propose that Plaintiffs may collectively serve no more than 40 interrogatories on Defendant and

5   Defendant may serve no more than 10 interrogatories that require a separate response by each

6   Plaintiff as well as 20 additional interrogatories that could be answered collectively, *i.e.*, once by

7   all Plaintiffs.

8                          **b.   Depositions**

9       **Plaintiffs' Proposal:**  Plaintiffs propose that each party be permitted to take 70

10  depositions but has offered to limit the number of depositions of current Zuffa employees to no

11  more than 25.[38] Plaintiffs' proposal of 70 depositions takes into account the unique allegations in

12  the Complaints. Specifically, Plaintiffs have alleged that Defendant engaged in an anticompetitive

13  scheme to monopolize the market for promoting Elite Professional MMA Events and

14  monopsonize the market for Elite Professional MMA Fighter services over the course of many

15  years.  To effectuate this scheme, Defendant entered into exclusive contracts with more than

16  1,000 Elite Professional MMA Fighters (who were represented by at least 24 third-party

17

18  [37] Interrogatory 3, for example, called for not only the identity of each Internet site, blog, or on-
19  line message board on which Zuffa posted any content but identity of each person who posted
    content and every date on which each such person posted any content: "Interrogatory 3: **Identify**
20  any online social networking, blog, website, or online message board account whereon **you** post
    any information related to the **MMA Industry**, and for each such online social media account,
21  state the following:
        (a)The type of account (*e.g.*, Facebook, LinkedIn, Twitter, mixedmartialarts.com, etc.);
22      (b)The Uniform Resource Locator ("URL") for your profile page associated with the
    account;
23      (c)The **identity** of the **person(s)** (including **employees**) who have authority from you to
    post any information, **documents**, photographs, videos, statements, internet links and any other
24  content;
        (d)The **identity** of any **person(s)** who have posted any information, **documents**,
25  photographs, videos, statements, internet links and any other content on your behalf;
        (e)The dates wherein the persons you **identify** in your responses to parts (c) and (d) of this
26  Interrogatory did post any content on your behalf."
    [38] To the extent that a Zuffa employee would need to be deposed for more than one 7-hour day,
27  Plaintiffs have proposed to count additional days as individual depositions.

28

managers or agents), dozens of event venues, dozens of sponsors and merchandizers, as well as media broadcasters and distributers.  Moreover, Plaintiffs allege that Defendant's scheme concerned the impairment of actual and potential competitors—both those currently in business and those which went out of business or were acquired by Defendant.  Plaintiffs' Complaints specifically identify a dozen such promoters, *see, e.g., Le* Compl. ¶¶129-50, Plaintiffs have already subpoenaed 15 MMA Promoters and/or individuals or entities who operated now-defunct MMA Promoters and, as noted in Section III.C., anticipate serving more than 100 additional subpoenas in the coming weeks. Furthermore, Plaintiffs' Rule 26(a) Disclosures, consistent with the scope of the Complaints' allegations, identified 31 current and former Zuffa employees and more than 80 third-party entities and individuals likely to have discoverable information. *See* ECF No. 107-2. In light of the scope of these allegations and the number of relevant third parties, Defendant's proposal of 150 deposition hours (equivalent to less than 22 seven-hour depositions) is inadequate and would hamstring Plaintiffs' ability to meet their burdens of proof in this litigation. Plaintiffs' proposal of 70 depositions—with an express limitation of 25 depositions of Zuffa employees—reflects the scope of the case, is reasonable under the circumstances, and should be permitted.

**Defendant's Proposal:** Defendant's proposal is that depositions be counted by hours, not deposition, and that each party be limited to 150 hours of depositions. Pursuant to that proposal, a party could take approximately 21 7-hour depositions or could divide their allotted time in other ways.

### 2.  Case Schedule (Joint Statement)

The parties have agreed to a substantial portion of a proposed case schedule and propose the following agreed deadlines:

| Case Event | Date |
|---|---|
| Parties Certify Substantial Completion of Document Discovery | June 1, 2016 |
| Deadline to Amend Pleadings | September 1, 2016 |
| Close of Fact Discovery | March 31, 2017 |
| Plaintiffs' Opening Expert Reports (class and merits) | April 28, 2017 |
| Last Day to Depose Experts Concerning Opening Reports | May 26, 2017 |
| Opposition Expert Reports | June 23, 2017 |
| Last Day to Depose Opposition Experts | July 21, 2017 |

| Reply Expert Reports | August 4, 2017 |
| Daubert Motions | September 1, 2017 |
| Class Certification Motion | September 1, 2017 |
| Daubert Opposition Briefs | October 27, 2017 |
| Class Certification Opposition Brief | October 27, 2017 |
| Daubert Reply Briefs | November 24, 2017 |
| Class Certification Reply Brief | December 15, 2017 |
| Class Certification Hearing | Court's Convenience |

**Plaintiffs' Proposal:** In addition, Plaintiffs propose that the Court include a Summary Judgment Motion briefing schedule, Pretrial Conference and Trial on the calendar as follows:

| Case Event | Date |
|---|---|
| Summary Judgment Motions | February 22, 2018 |
| Summary Judgment Opposition Briefs | March 23, 2018 |
| Summary Judgment Reply Briefs | April 20, 2018 |
| Pretrial Conference | May 2018 |
| Trial | July 2018 |

**Defendant's Proposal:** Because the contours of the case will be affected by whether the Court certifies a class and, if so, which one(s), Defendant proposes that the deadlines for further proceedings await the Court's resolution of the class certification motion. Defendant reserves its right to file one or more motions that would dispose of the case in whole or in part prior to the deadline.

JOINT STATUS REPORT

Dated: November 16, 2015           BOIES, SCHILLER & FLEXNER LLP


                                   By: /s/ John F. Cove, Jr.
                                       John F. Cove, Jr.
                                   *Attorneys for Defendant* Zuffa, LLC, d/b/a
                                   Ultimate Fighting Championship and UFC

                                   John F. Cove, Jr. (*Pro Hac Vice* granted)
                                   BOIES, SCHILLER & FLEXNER LLP
                                   1999 Harrison Street, Suite 900
                                   Oakland, CA 94612
                                   Tel: (510) 874-1000
                                   Fax: (510) 874-1460
                                   Email: jcove@bsfllp.com

                                   William A. Isaacson (*Pro Hac Vice* granted)
                                   BOIES, SCHILLER & FLEXNER LLP
                                   5301 Wisconsin Ave, NW
                                   Washington, DC 20015
                                   Tel: (202) 237-2727
                                   Fax: (202) 237-6131
                                   Email: wisaacson@bsfllp.com

                                   Donald J. Campbell #1216
                                   J. Colby Williams #5549
                                   CAMPBELL & WILLIAMS
                                   700 South 7th Street
                                   Las Vegas, Nevada 89101
                                   Tel: (702) 382-5222
                                   Fax: (702) 382-0540
                                   Email: djc@campbellandwilliams.com
                                           jcw@campbellandwilliams.com

                                   Richard J. Pocker #3568
                                   BOIES, SCHILLER & FLEXNER LLP
                                   300 South Fourth Street, Suite 800
                                   Las Vegas, NV 89101
                                   Tel: (702) 382 7300
                                   Fax: (702) 382 2755
                                   Email: rpocker@bsfllp.com

                                   *Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
                                   Fighting Championship and UFC

57

JOINT STATUS REPORT

1

2   Dated: November 16, 2015                 Respectfully Submitted,

3                                            By:    /s/ Michael Dell'Angelo
                                                    Michael Dell'Angelo
4

5                                            Michael Dell'Angelo
                                             Eric L. Cramer
6                                            Patrick Madden
                                             BERGER & MONTAGUE, P.C.
7                                            1622 Locust Street
                                             Philadelphia, PA 19103
8                                            Telephone: (215) 875-3000
                                             Facsimile:  (215) 875-4604
9                                            ecramer@bm.net
                                             mdellangelo@bm.net
10                                           pmadden@bm.net

11                                           *Co-Lead Class Counsel:*

12                                           Don Springmeyer (Nevada Bar No. 1021)
                                             Bradley S. Schrager (Nevada Bar No. 10217)
13                                           Justin C. Jones (Nevada Bar No. 8519)
                                             WOLF, RIFKIN, SHAPIRO, SCHULMAN &
14                                           RABKIN, LLP
                                             3556 E. Russell Road, Second Floor
15                                           Las Vegas, Nevada 89120
                                             (702) 341-5200/Fax: (702) 341-5300
16                                           dspringmeyer@wrslawyers.com
                                             bschrager@wrslawyers.com
17                                           jjones@wrslawyers.com

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT

Joseph R. Saveri
Joshua P. Davis
Matthew S. Weiler
Kevin E. Rayhill
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown
Richard A. Koffman
Hiba Hafiz
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave., N.W., Suite 500, East
Tower Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408 4699
bbrown@cohenmilstein.com
hhafiz@cohenmilstein.com

***Additional Counsel for the Classes:***

Robert C. Maysey
Jerome K. Elwell
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

JOINT STATUS REPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eugene A. Spector
Jeffrey J. Corrigan
Jay S. Cohen
William G. Caldes
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611
espector@srkw-law.com
jcorrigan@srkw-law.com
jcohen@srkw-law.com
bcaldes@srkw-law.com

Frederick S. Schwartz
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile:  (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez, Dennis Lloyd Hallman, Brandon Vera, Pablo Garza, Gabe Ruediger, Mac Danzig, Kyle Kingsbury and Darren Uyenoyama*

JOINT STATUS REPORT

# ATTESTATION OF FILER

The signatories to this document are myself and Michael Dell'Angelo and I have obtained Mr. Dell'Angelo's concurrence to file this document on his behalf.


Dated: November 16, 2015


By:      /s/ John F. Cove, Jr.

John F. Cove, Jr. (*Pro Hac Vice* granted)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
Email: jcove@bsfllp.com

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that service of the foregoing **Joint Status Report** was

3

served on November 16, 2015 via the Court's CM/ECF electronic filing system addressed to all

4

parties on the e-service list.

5

6

    /s/ Suzanne E. Jaffe

7

Suzanne E. Jaffe

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT