———2:15-cv-01045-RFB-PAL———

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                )
                                   )
5                Plaintiffs,       )  Case No. 2:15-cv-01045-RFB-PAL
                                   )
6        vs.                       )  Las Vegas, Nevada
                                   )  Friday, September 25, 2015
7  ZUFFA, LLC, d/b/a Ultimate      )  4:00 p.m.
   Fighting Championship and       )
8  UFC,                            )  MOTIONS HEARING
                                   )
9                Defendants.       )
   ─────────────────────────────────

10

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:          See Next Page

20  COURT REPORTER:    Patricia L. Ganci, RMR, CRR
                       United States District Court
21                     333 Las Vegas Boulevard South, Room 1334
                       Las Vegas, Nevada  89101

22

23
   Proceedings reported by machine shorthand, transcript produced
24  by computer-aided transcription.

25

```
                    ─────2:15-cv-01045-RFB-PAL ─────
```

1  APPEARANCES:

2  For the Plaintiffs:

3          **DON SPRINGMEYER, ESQ.**
           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4          3556 E. Russell Road, 2nd Floor
           Las Vegas, Nevada 89120
5          (702)341-5200

6          **ERIC L. CRAMER, ESQ.**
           BERGER & MONTAGUE, P.C.
7          1622 Locust Street
           Philadelphia, Pennsylvania 19103
8          (215)875-3000

9          **BENJAMIN DOYLE BROWN, ESQ.**
           COHEN, MILSTEIN, SELLERS & TOLL, PLLC
10         1100 New York Avenue, NW, Suite 500 West
           Washington, DC 20005
11         (202)408-4600

12         **MATTHEW SINCLAIR WEILER, ESQ.**
           THE JOSEPH SAVERI LAW FIRM, INC.
13         555 Montgomery Street, Suite 1210
           San Francisco, California 94111
14         (415)500-6800

15  For the Defendants:

16         **J. COLBY WILLIAMS, ESQ.**
           **DONALD J. CAMPBELL, ESQ.**
17         CAMPBELL & WILLIAMS
           700 South 7th Street
18         Las Vegas, Nevada 89101
           (702)382-5222
19
           **WILLIAM A. ISAACSON, ESQ.**
20         BOIES, SCHILLER & FLEXNER, LLP
           5301 Wisconsin Ave., NW
21         Washington, DC 20015
           (202)237-2727
22
           **JOHN F. COVE, JR., ESQ.**
23         **PERRY GROSSMAN, ESQ.**
           BOIES, SCHILLER & FLEXNER, LLP
24         1999 Harrison Street, Suite 900
           Oakland, California 94612
25         (510)874-1000
```

—2:15-cv-01045-RFB-PAL—

1        LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 25, 2015; 4:00 P.M.

2                              --oOo--

3                    P R O C E E D I N G S

4        THE COURT:  Please be seated.

5        COURTROOM ADMINISTRATOR:  Now calling Le, et al.,

6  versus Zuffa, LLC, Case No. 2:15-cv-1045-RFB-PAL; Kyle

7  Kingsbury, et al., versus Zuffa, LLC, Case

8  No. 2:15-cv-01046-RFB-PAL; Case No. 2:15-cv-01055-RFB-PAL, Luis

9  Javier Vasquez, et al., versus Zuffa, LLC; Brandon Vera, et al.,

10  versus Zuffa, LLC, Case No. 2:15-cv-01056-RFB-PAL; and Gabe

11  Ruediger versus Zuffa, LLC, Case No. 2:15-cv-01057-RFB-PAL.

12        This is the time for the motion hearing.  Counsel,

13  please note your appearances for the record.

14        MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

15  Springmeyer for the plaintiffs.

16        MR. WEILER:  Good afternoon, Your Honor.  Matt Weiler

17  for the plaintiffs.

18        MR. BROWN:  Good afternoon, Your Honor.  Benjamin Brown

19  for the plaintiffs.

20        MR. CRAMER:  Good afternoon, Your Honor.  Eric Cramer

21  for the plaintiffs.  I'd also like to introduce Your Honor to

22  three of the plaintiffs who are here today:  Mr. Kyle Kingsbury,

23  Mr. Cung Le, and Mr. Nathan Quarry.

24        THE COURT:  Good afternoon.

25        MR. ISAACSON:  Your Honor, it's Bill Isaacson, Boies,

—— 2:15-cv-01045-RFB-PAL ——

1   Schiller & Flexner for Defendant Zuffa.

2          MR. COVE:  Good afternoon, Your Honor.  John Cove from

3   Boies Schiller for Defendant Zuffa.

4          MR. GROSSMAN:  Good afternoon, Your Honor.  Perry

5   Grossman from Boies Schiller for Defendants.

6          MR. HENDRICK:  Good afternoon, Your Honor.  I'm

7   Executive Vice President and chief legal officer for Zuffa here

8   in Las Vegas and also admitted to Court.

9          MR. CAMPBELL:  Kurt Hendrick, Your Honor.

10  Donald Campbell, Campbell & Williams, on behalf of Zuffa, Your

11  Honor.

12         MR. WILLIAMS:  And Colby Williams, Campbell & Williams,

13  on behalf of Zuffa, Your Honor.

14         THE COURT:  Good afternoon, I appreciate your patience

15  in changing this time.  I had a TRO hearing that ran over that

16  required me to take care of some matters.

17         So we are here on the motion to dismiss that was filed

18  in these cases, and before I consider that, is there any other

19  information as to the status of the cases or what's happening

20  that the Court needs to be aware of before we proceed with the

21  discussion of the motions?  Anything that the parties want to

22  bring to my attention at this time?

23         MR. CRAMER:  No, Your Honor.

24         MR. ISAACSON:  Not on our behalf either, Your Honor.

25         THE COURT:  Okay.  So who's going to argue this motion

———— 2:15-cv-01045-RFB-PAL ————

1  for the defendants?

2          MR. ISAACSON:  I will, Your Honor, Bill Isaacson.

3          THE COURT:  Okay.

4          MR. ISAACSON:  Figure out the microphone situation.  I

5  don't know if I'll use them, but there's some slide materials we

6  prepared that I won't be putting on the screen.

7          Your Honor, we think that there are two issues that are

8  dispositive of the entire complaint.

9          THE COURT:  Okay.

10         MR. ISAACSON:  And a few other issues that are

11  dispositive of sections of the complaint.  So I will focus on

12  the two issues that are dispositive of the entire complaint.

13  And they are related to one another because one of them is

14  whether there's been an allegation that's plausible with respect

15  to whether there's a restraint on competition, and specifically

16  whether there's been foreclosure of a market.  And the second is

17  whether then -- whether there is a market definition that's

18  proper rather than purely circular.

19         Now, with respect to whether there's been foreclosure

20  of a market, plaintiffs have -- are alleging exclusive contracts

21  and they have basically four areas that they're looking at.  But

22  looking at them collectively and not just separately, one of

23  them, the allegations with respect to fighter contracts, is

24  wholly lacking in specifics and, therefore, implausible.

25         THE COURT:  Why is that?  They don't have to at the

———— 2:15-cv-01045-RFB-PAL ————

1   pleading stage allege specifics of all of the contracts.  What

2   they allege are the contracts are exclusive.  The contracts

3   don't let the fight -- if you're talking about the fighters'

4   contracts.

5            MR. ISAACSON:  Yes, yes.

6            THE COURT:  They don't let them fight with other

7   promoters or, I mean, I don't know if there's any other leagues

8   at this point.  They don't let them fight anywhere else.  They

9   artificially keep their prices down.  They control their images.

10  They control the number of bouts that they can fight in a given

11  year and don't even give them all of the bouts.  That they

12  oversubscribe the number of contracts within the market so that

13  they can control the number of fighters who can be available for

14  other competitors.  That collectively, through all of these

15  mechanisms, they're able to control your clients on both sides,

16  both monopoly and monopsony, the markets.  How is that at a

17  motion to dismiss stage -- and we're not talking about summary

18  judgment.

19           MR. ISAACSON:  Right.

20           THE COURT:  Those are specific allegations about sort

21  of exclusive conduct.  Why isn't that enough?

22           MR. ISAACSON:  The reason -- the reason, Your Honor, is

23  because if you just alleged exclusivity, the law is clear that a

24  one-year exclusive contract, a two-year exclusive contract, a

25  three- and five-year contract is entirely legal, in fact,

—2:15-cv-01045-RFB-PAL—

1  procompetitive and important to building a business such as

2  this.  And there is a reason why these plaintiffs who have --

3          THE COURT:  Well, let me stop you.  Do we have

4  information that I can consider in the complaint that says

5  specifically what the details of these contracts are such that I

6  can make that type of determination?

7          MR. ISAACSON:  No, and that's the issue.

8          THE COURT:  Okay.  So -- no, but the issue is can they

9  plausibly state a claim.  Right.  I don't have to at this point,

10  do I, decide that?  Do I have to require from them that they

11  state that with respect to the contracts?

12          MR. ISAACSON:  Yes, Your Honor, because --

13          THE COURT:  What law do you have that says that they

14  have to when they allege a contract in the complaint say what

15  the terms of the complaint are and what the term year is?

16          MR. ISAACSON:  So that's what happened in the PNY

17  Technologies case, and that's what happened in the Rheumatology

18  Diagnostics cases.  Both of which went through two rounds on a

19  motion to dismiss.

20          THE COURT:  Right.

21          MR. ISAACSON:  And this is -- this is the same as the

22  first round of those cases.  Those complaints achieved much

23  higher levels of specificity about what the contracts actually

24  stated.  If these plaintiffs said, We are locked into exclusive

25  two-year contracts, right, the complaint fails.  Right.

---2:15-cv-01045-RFB-PAL---

1          These plaintiffs have their contracts, and they have

2   hidden the ball and decided not to allege how long they are and

3   to generally describe provisions without telling the Court

4   specifically what they say.  They say, Well, this will lock us

5   in longer than that.  Some of these may lock us into perpetuity,

6   but they won't tell the Court that language.  That is plainly

7   insufficient specificity to say, Okay, we have an exclusive

8   contract case and we get to go forward into discovery.

9          There is no case that says to the -- to -- on the

10  opposite side, if you just march into court and say at a general

11  level, We're locked into exclusive contracts, we have a lot of

12  exclusive contracts, we're locked in, and that means we're

13  all -- we control the market because these are exclusive

14  contracts, that that can succeed because, otherwise, plaintiffs

15  can come in with plainly insufficient contracts to make such a

16  claim.

17          And, you know, they have their contracts.  They are

18  easily able to say, okay, that if they've got a five-year

19  contract, they can allege it.  Right.  They're not going to be

20  able to do that.

21          THE COURT:  Well, what you're saying is not that they

22  can say it.  You're saying that they're required to say it.

23          MR. ISAACSON:  Yes.  Yes.

24          THE COURT:  Right.

25          MR. ISAACSON:  Because, otherwise, you haven't alleged

1  an antitrust claim because if you just allege an exclusive

2  contract and that you allege that that controls a market, that's

3  not an antitrust claim because exclusive contracts by themselves

4  are naturally procompetitive and not anticompetitive.  Exclusive

5  contracts by themselves help build businesses such as this.  It

6  would make no sense, for example, and it's entirely implausible,

7  and Courts have said this about athletes' contracts, that you

8  wouldn't enter an exclusive contract with an athlete.  Right.

9  The issue is how long and to -- and how long are you locking

10 them and how many of them are you locking up.

11         So what they're lacking are --

12         THE COURT:  So what about their allegation about the

13 oversubscription in terms of the exclusivity of the contracts?

14         MR. ISAACSON:  I'm not sure --

15         THE COURT:  What I mean by this is that part of their

16 allegation relates to the fact that they sign up -- allegedly

17 your client signs up more fighters than they'll actually give

18 bouts to as a way to be able to increase the number of fighters

19 who are under the -- the authority of these contracts.  How

20 would you respond to that in terms of them working together?

21         MR. ISAACSON:  It's the same issue because if you were

22 to do that, even if you accept that as true, if you do that for

23 six months, you do not have an antitrust claim, all right,

24 because then you get the issue of after six months.  There's

25 people before the six months.  There's people after the six

─── 2:15-cv-01045-RFB-PAL ───

1   months.  You have to allege an antitrust claim.

2        THE COURT:  Yeah, but they're alleging that this occurs

3   -- this has been occurring over a period of a few years.  Right.

4   They're not saying that this -- that the market opens up

5   periodically in six months.  I don't understand their complaint

6   to say that there's a market window that appears.  They

7   basically said that this is for the past -- I have to go back

8   and look at the complaint -- for at least -- it looks like for

9   at least two to three years that there's been no ability to be

10  able to have any other competition in terms of these fighters

11  either selling their services or having the fights promoted.

12        MR. ISAACSON:  In a purely conclusory fashion, Your

13  Honor.  Okay.  Anybody can say, Look, we signed up exclusive

14  contracts.  There's lots of industries with exclusive contracts.

15  And they you can say, You've been signing exclusive contracts

16  for a long period of time.  There's lots of businesses that have

17  exclusive contracts for a very long period of time.  That

18  allegation -- and then you say, Well, you've been controlling

19  the market.  Right.

20        That allegation is not an antitrust claim.  It's

21  plainly insufficient.  They need to allege actual foreclosure on

22  this market, and with the fighters they have not done it because

23  they're not talking about the duration of the contract.  They

24  are making conclusions about what the contracts contain.

25  They're not telling you the language of the contract.  And

—2:15-cv-01045-RFB-PAL—

1  they're not telling you what happens before and after these

2  contracts, which is -- would be hard for them to do because they

3  won't tell you how long the contracts are.

4      And this really -- if you compare this, for example, to

5  the PN -- the PNY Technology case, at the second stage -- all

6  right.  In the first round of the motions to dismiss it was

7  dismissed because without allegations as to the portion of the

8  relevant market foreclosed by the exclusive agreement, the

9  lengths of the agreements, etc., this claim standing alone does

10  not adequately state a plausible exclusive dealing claim under

11  the Sherman Act.

12      So then the plaintiffs went back -- and that's what

13  we're asking for here because we don't think the plaintiffs will

14  be able to do this once they actually tell you what these

15  contracts say.

16      The plaintiffs in PNY Technologies then went back and

17  made a number of specific allegations, and the SanDisk had to do

18  with -- SanDisk sells their discs, and they were retailers.  And

19  they said, You are locking up the retailers.

20      THE COURT:  Right.

21      MR. ISAACSON:  And they said, You've locked up 11 of 16

22  major retailers.  No exclusive arrangement has ever been

23  terminated.  RadioShack, CVS, and Walgreen's have refused to

24  even entertain competing offers saying this market share has

25  grown merely 37 percent in the last seven years.  Right.  All of

—2:15-cv-01045-RFB-PAL—

1 that was ruled insufficient because the contracts themselves,

2 right, were of a reasonable duration and don't state an

3 antitrust claim.  It's very important --

4         THE COURT:  Okay.  Let me just -- I want to make sure

5 that we're talking about the same case.  This is the Northern

6 District of California case, right?

7         MR. ISAACSON:  Right, PNY Technologies versus SanDisk.

8         THE COURT:  Which is not binding on this Court, right?

9         MR. ISAACSON:  No, no.

10        THE COURT:  So is there a Ninth Circuit case that you

11 can point me to that says the same thing that's in PNY?

12        MR. ISAACSON:  I mean, the Ninth Circuit cases say the

13 principles about exclusive dealing, but in terms of the factual

14 situation, no, I'm not citing to you a factual situation.

15        THE COURT:  Well, I'm sorry, you are again?

16        MR. ISAACSON:  Bill Isaacson.

17        THE COURT:  Mr. Isaacson, part of it, as you know, the

18 Ninth Circuit has these pretty clear principles about threshold

19 pleading in Sherman Act cases that seems to suggest not that you

20 don't have to allege specificity, but that the certain -- there

21 are certain requirements of specificity with -- in relation to

22 the markets and identification of the markets in the contracts

23 that may not be necessary at the pleading stage.  And I know you

24 know the cases that I'm talking about.  I'm not going to cite

25 them.  Right.

—2:15-cv-01045-RFB-PAL—

1        So part of it is I understand why you would want to say

2   that.  It's not that I don't understand why you would want the

3   details of that.  The question is, at this stage what tells me

4   that I have to require that from them?

5        MR. ISAACSON:  Right.

6        THE COURT:  And it's not to say that at some point in

7   time and I'm not saying that at some point in time you couldn't

8   make that argument or that I wouldn't allow you to make that

9   argument.  But I'm dealing with the fact when I look at these

10  Ninth Circuit cases that talk about the pleading standard for

11  Sherman Act cases, it's actually a fairly forgiving standard in

12  some respects except with I think the issue of the

13  identification of the market.  I think there's much more

14  specific law that talks about you have to be clear about what

15  the market is.  You can't just sort of allege that there's a

16  market that exists.

17       But other than that, in terms of some of the

18  exclusionary conduct and how that works individually or

19  collectively, what can you direct me to that would support this

20  level of specificity?  Because that's -- those are the -- in

21  terms of the precedence the tension that I have to deal with

22  here.

23       MR. ISAACSON:  Right.  So you can't lump all of the

24  antitrust cases together because you have per se illegal cases.

25  And so at the level of specificity for a price-fixing case

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

——2:15-cv-01045-RFB-PAL——

1   you're sitting on the other side saying, Well, if this happened,

2   it's bad.  There's no countervailing interests here.  The cases

3   are uniform that in an exclusive dealing cases that the

4   exclusive -- that exclusive contracts are procompetitive.  They

5   avoid -- they stop free riding, and they promote investment.

6          And so specificity -- even in the nonbinding cases, the

7   District Courts are saying, following those principles, that

8   before you march forward to attack this, I'm going to say you

9   actually have to allege the specific facts about what

10  exclusivity is going on here.  And all we are asking for is the

11  details that are in these plaintiffs' contracts because we think

12  that once those are laid out, okay, they will plainly fail to

13  state an antitrust claim.

14          THE COURT:  Okay.

15          MR. ISAACSON:  So that would be the -- my answer to

16  your question.

17          THE COURT:  Okay.  Well, I mean, it may be a good time

18  to let them respond and then I know you have some other

19  arguments you think are dispositive, but I think this is a

20  significant enough issue that I will let them respond.

21          And who is going to argue for the plaintiffs?

22          MR. CRAMER:  I have a power point and I am just going

23  to point to one slide that I think will address --

24          THE COURT:  You know what?  You know, I said that --

25  you can hand that up.  I know that I said it ahead of time that

—————2:15-cv-01045-RFB-PAL—————

1  you guys could potentially present power points.  What I would

2  like to do, though, is focus on the arguments that we've had

3  thus far and the discussion that we've had thus far because

4  that's -- or those are the issues that the Court is reviewing at

5  this point in time.

6          MR. CRAMER:  I understand, and I'm just going to ask

7  Your Honor to turn to Slide 21, which I think will answer Your

8  Honor's question about the specificity of the contracts.

9          Slide 21 discusses specifically the clauses in the

10 contracts that we say make these contracts exclusive.

11         THE COURT:  Right.

12         MR. CRAMER:  And not just one to three years, which was

13 at issue in the PNY case, but essentially in perpetuity or for

14 as long as the fighters are elite or still in the major leagues.

15         And so what are those clauses?  The first clause is the

16 exclusivity clause.  Prohibits fighters from appearing in bouts

17 televised or organized by anyone other than the UFC.  The

18 champions clause, the UFC can unilaterally extend the term of

19 the contract as long as the fighter is a champion in his or her

20 weight class.  If you win, you're --

21         THE COURT:  Hold a second.  I'm sorry.

22         Mr. Isaacson, do you have a copy of this slide?  Do you

23 know?

24         MR. ISAACSON:  Yes.

25         MR. CRAMER:  Yeah, I handed it to him.

———2:15-cv-01045-RFB-PAL———

1            THE COURT:  Okay.  I just wanted to make sure that --

2            MR. ISAACSON:  No, we're -- he's a very collegial

3    lawyer.

4            THE COURT:  Okay.  Just wanted to make sure we're all

5    on the same page.

6            MR. CRAMER:  We're all on the same page.

7            The retirement clause, it grants the UFC the power to

8    retain the rights to a retired fighter in perpetuity.  In other

9    words, Your Honor, if you don't satisfy the number of bouts

10   because you want to retire and sit out the rest of your

11   contract, you cannot do that.  You owe the UFC.

12           And then, finally, the right to match clause, and this

13   is very important.  We have alleged that in the UFC's contracts

14   with the fighters the UFC has the right to match any rival offer

15   even after the contract expires.  What that means is that --

16           THE COURT:  I know what it means.

17           MR. CRAMER:  -- any fighter --

18           THE COURT:  No, I understand.

19           MR. CRAMER:  -- fighting for a rival is because the UFC

20   let them go.  And the UFC earns 90 percent of the revenues in

21   pro MMA in this country.  So what that means is if they want a

22   match, they can.  They can hold the fighter as long as they want

23   to hold the fighter.

24           And those aren't the only provisions.  There are other

25   provisions.  There are tolling provisions.  If a fighter is

 1   injured, they can't just sit out and wait out their contract.

 2   They still owe a number of bouts.  The UFC owns them.  A fighter

 3   is stuck with the UFC for as long as the UFC wants them.

 4        We have pled that in specificity that these contracts

 5   are not just long term, they're essentially forever in terms of

 6   as long as these -- these fighters -- these careers aren't that

 7   long.  They are elite and major league fighters for a certain

 8   amount of time.  It's a punishing sport.  And the UFC owns them

 9   for as long as it wants to own them.  That is long term.

10        And what it's doing with these contracts is it's

11   preventing rival promoters from getting access to hundreds --

12   they have contracts, as Your Honor noted, with 500 elite

13   fighters in this country per year.  They only use a small

14   fraction of those in bouts, and the reason why they do that, as

15   Your Honor noted, is to make sure that rivals don't get access

16   to elite fighters.  So they have long-term contracts that are

17   essentially in perpetuity, and we allege that with specificity.

18        The only motion to dismiss case that the UFC cites is

19   that Northern District of California case, the PNY case.  In

20   that case, the contracts were one to three years, and at the end

21   of that term there was open competition for those retailers.

22        Here, the contracts are essentially we allege in

23   perpetuity or at least as long as the UFC wants those fighters.

24   It holds those elite fighters as long as it can, as long as it

25   wants to, and it prevents rivals from getting access to them.

—2:15-cv-01045-RFB-PAL—

1           So I think we have -- we have specifically alleged an

2    exclusive dealing scheme that would meet any standard in the

3    Ninth Circuit or any circuit for exclusive dealing.  It

4    forecloses rivals from all elite major league fighters or nearly

5    all of them.

6           And I would just draw Your Honor's attention to the

7    International Boxing Club case that we cited in our papers.

8    It's a Supreme Court case from 1959, but it's an important case

9    because in many ways the UFC operates like boxing used to

10   operate in the '50s.  And in that case the scheme involved was

11   the -- the people who organized championship boxing, what did

12   they do?  They did three things to monopolize the market.  They

13   bought up their rivals, they had exclusive deals with the

14   fighters, and they had exclusives with all of the key venues:

15   Yankee Stadium, the Polo Grounds, Madison Square Garden where

16   championship fights were held --

17           THE COURT:  So basically your case.

18           MR. CRAMER:  That's our case.

19           THE COURT:  Right.

20           MR. CRAMER:  And the Supreme Court upheld that and

21   upheld in 1959.  That's directly on point.  It's the Supreme

22   Court, and the UFC doesn't deal with it at all.

23           THE COURT:  Okay.  Well, let me let them respond to

24   these arguments, and then we'll move onto I think they're going

25   to make obviously an issue about market -- the identification of

-------------------- 2:15-cv-01045-RFB-PAL --------------------

1   the market, but let me let Mr. Isaacson respond.

2           MR. CRAMER:  Thank you, Your Honor.

3           MR. ISAACSON:  Sure.  The thing that's unusual about

4   the complaint or one of the things and about this slide is that

5   the plaintiffs don't want you to read the actual contract

6   provisions.  The allegation of perpetuity is a conclusory

7   allegation, and the complaint neither attaches the contracts --

8           THE COURT:  Well, why would they have to?

9           MR. ISAACSON:  Because the contracts don't say that.

10          THE COURT:  Okay.  But -- okay.  We'll get back to --

11  again, I understand that you want me to look at the contracts,

12  and at some point if I deny the motion to dismiss, right, that's

13  what will happen, but part of the issue, though, again that I

14  focus you on is we're at the pleading stage.  They have alleged

15  that the contracts -- I mean, they've alleged actually five

16  different things, but there are other parts of their allegations

17  that talk about basically the contracts binding the fighters

18  either in perpetuity or for the entirety of their career, which

19  is basically I think the same in the context of the monopsony

20  with respect to the fighters.

21          So why aren't these allegations enough?  And I'm not --

22  again, I'm not going to get into necessarily right now whether

23  or not the contracts actually say that.  They say that the

24  contracts say that, and as you know, I am required at this point

25  to draw all factual inferences and to accept the allegations in

—— 2:15-cv-01045-RFB-PAL ——

1  the complaint.  Now, if it comes back and it turns out that

2  that's not what they say and you prevail, obviously there are

3  remedies for that.  So it's not as if there isn't an opportunity

4  to address that, but right now what I'm focussed on is that they

5  have said and they have alleged fairly clear statements about

6  fighters being bound in perpetuity.

7         MR. ISAACSON:  Right.  So Your Honor is not required to

8  accept conclusory allegations such as that these things are in

9  perpetuity.  They don't quote contractual language saying that

10 they're in perpetuity and they don't put any language in front

11 of you that suggests that.  So it's purely a legal conclusion

12 that these things are in perpetuity.  It's not an allegation

13 that actually establishes it.

14        And it's really important because, you know, these

15 principles that I'm talking about in the Ninth Circuit and where

16 he's -- where counsel is saying, Look, two-year contracts,

17 three-year contracts, your five-year contracts are okay, the

18 Ninth Circuit, you know, and not in a motion to dismiss case, in

19 the Omega Environmental case says short duration of agreements

20 negates substantially the potential to foreclose competition and

21 cites cases about two-year contracts.

22        We cited the Rheumatology case that I mentioned in

23 addition to the PNY case and the Catholic healthcare case which

24 were all motion to dismiss cases.

25        If --

—— 2:15-cv-01045-RFB-PAL ——

1          THE COURT:  So I recognize and I agree with you the law

2   says they can't be -- I think they said this fairly repeatedly.

3   It can't be temporary harmful or short-term effects.

4          MR. ISAACSON:  You don't go into expensive discovery

5   based on --

6          THE COURT:  Hold on.  Let me finish.

7          MR. ISAACSON:  I'm sorry.  Yeah, my fault.

8          THE COURT:  But, again, what I'm trying to focus you on

9   is I understand and I could potentially understand as a lawyer

10  being, let's say, dissatisfied with allegations that you think

11  are completely factually erroneous which is kind of what you're

12  suggesting basically.

13         MR. ISAACSON:  That's not my point, Your Honor.

14         THE COURT:  Well, your point, though, is then --

15  because if they're not factually erroneous, if in fact the

16  contracts do say that the, for example, the UFC has to match the

17  offer -- has the right to match an offer after a contract

18  expires, that's not a two- or three-year contract.  That's

19  forever.

20         MR. ISAACSON:  Right.  No, I understand.  When I say

21  that I'm not disagreeing on the grounds that it's factually

22  erroneous, I believe lots of things in the complaint are

23  factually erroneous, but as the Court has said, that's for

24  later.

25         THE COURT:  Right.

———— 2:15-cv-01045-RFB-PAL ————

1          MR. ISAACSON:  Right.  What I am saying is that about

2    these contractual provisions that they say are in perpetuity

3    that the perpetuity language is purely conclusory, right, and

4    not supported by anything.  And that at the motion to dismiss

5    stage a general allegation of perpetuity when you have contracts

6    in your hands, right, is not sufficient to go forward with an

7    antitrust claim, and a very expensive antitrust claim at that.

8          It is a very minimal requirement to say, Look, if you

9    really have contracts that -- that justify this general legal

10   conclusion you're saying -- and perpetuity of a contract is a

11   legal conclusion.  It's going to require a contract

12   interpretation.  It is a legal conclusion.  And it's not a

13   factual -- it's not a factual statement.

14         And the motion to dismiss cases, as Your Honor knows,

15   distinguish legal conclusions from factual conclusions.  And so

16   there is actually no factual allegation here that there is

17   simply the legal conclusions that they wish to draw.

18         And so you are lacking terms.  You are lacking any

19   language that says any of these things are -- go in perpetuity

20   as opposed to a one-time renewal.  And so in that sense the

21   complaint is woefully deficient in that respect and doesn't

22   survive.  That doesn't mean they don't get to replead that.

23   They can dig out their contracts and tell the Court what's

24   exactly going on here, but we think then this will be like the

25   PNY case.  We'll get to the second stage, and the complaint will

—2:15-cv-01045-RFB-PAL—

1   fail then.  But we will deal with it then.

2          THE COURT:  So your argument is that they actually have

3   to quote the contract in the complaint if they're going to use

4   contract terms as a basis for exclusionary conduct.

5          MR. ISAACSON:  In this context it's insufficient to

6   have a legal conclusion to state an antitrust claim.  You

7   actually have to have plausible facts, and there are no facts

8   alleged because they -- they don't say anything about what the

9   contract says.  And since they're relying on the contracts,

10  it's -- those are the facts that they say they are ultimately

11  going to bring forward.  They haven't alleged any of those

12  facts.

13         THE COURT:  Well, what about when they said the UFC can

14  unilaterally extend the term of a contract as long as a fighter

15  is a champion in his or her weight class?

16         MR. ISAACSON:  That's an interpretation of a contract

17  and a legal conclusion.

18         THE COURT:  So you are saying basically that they have

19  to quote the contract?

20         MR. ISAACSON:  If you're going to rely on the contract

21  in an antitrust claim such as this, right, in order to state an

22  antitrust claim and not just simply state legal conclusions,

23  yes, that's what I'm saying because, otherwise, you can say --

24  you can march in and say, This contract violates the antitrust

25  laws and forecloses competition and move forward into discovery.

—2:15-cv-01045-RFB-PAL—

1   And that's not -- that's not the way the law has evolved.  You

2   cannot rest these things on legal conclusions.

3            THE COURT:  But what about the idea that if they're

4   summarizing, right, or paraphrasing a contract, why doesn't that

5   meet the pleading standard?

6            MR. ISAACSON:  Because they're not paraphrasing, Your

7   Honor.  They're stating legal conclusions about what the

8   contract means.

9            THE COURT:  Okay.  Well, I think I know your position

10  on this.  I'll have to sort of take -- go back and look at some

11  of these decisions, but let's move on.  I think that the ...

12            MR. ISAACSON:  Perfect.

13            The second issue would be market definition where the

14  complaint has a qualitative and wholly circular definition of a

15  market, which plainly fails to state a market at the pleadings

16  stage.

17            THE COURT:  Right.

18            MR. ISAACSON:  The definition of the market is elite

19  MMA fighters, and that's why they're able to say we control the

20  market because then they say, The elite MMA fighters all work

21  for us.  We become a single-brand market.  If you work for us,

22  you're in the market.

23            THE COURT:  Well, I understand, though, that what

24  they're saying is that the elite fighters is not just in -- just

25  with respect to that term, but that term means fighters who are

———2:15-cv-01045-RFB-PAL———

1  in the top part of their field in MMA fighting, fighters who

2  have had a certain number of bouts who demonstrated mastery,

3  fighters who are basically at that level.  Right.  Isn't there a

4  law that says you can have a market that distinguishes between

5  skill level within a particular sport?  And so why -- why

6  shouldn't the Court simply interpret that, because there's

7  language in the complaint that talks about that, as this being a

8  market of sort of either advanced or accomplished MMA fighters

9  as opposed to those who are not accomplished and not

10  experienced?

11        MR. ISAACSON:  So two points on that.  One is you do

12  need a quantitative metric, and the second is that you can't be

13  purely circular within -- where you're defining the elite

14  fighter as the ones who are already working for you.  So -- so

15  if Bill Gates says, We have the best coders in the world at

16  Microsoft, that doesn't mean that Microsoft -- that coders from

17  Microsoft are a market.  The Ninth Circuit -- I'm sorry.  The

18  District Court in the Oracle case talked about how you need a

19  quantitative metric and something like high-functioning software

20  is insufficient.

21        The Courts talk about if you say the best films of the

22  year.  Now, I think I have an idea as to what were the best

23  films of last year.  I think I might be able to define it.  That

24  does not define an antitrust market.

25        And so when you just use a term like "elite" without

—2:15-cv-01045-RFB-PAL—

1   any quantitative metrics, then you could just say, All right,

2   then we have a market -- you know, then you start getting into

3   markets like the tough people, the athletic people, the

4   world-class people, the highly trained people.

5           THE COURT:  So let me let you comment on the

6   International Boxing Club case where they talk about -- and I'll

7   read you a quote from my notes.  It says:  *Championship boxing*

8   *is the cream of the boxing business and is a sufficiently*

9   *separate part of the trade or commerce that constitutes the*

10  *relevant market for the Sherman Act.*  Why --

11          MR. ISAACSON:  Right.

12          THE COURT:  Let me finish.

13          MR. ISAACSON:  Sorry.

14          THE COURT:  No, I understand as a lawyer we want to

15  jump in.  I get that.

16          MR. ISAACSON:  No, I thought you had finished.

17          THE COURT:  But why wouldn't I -- again, I have to draw

18  inferences -- reasonable inferences in favor of the complaint.

19  Why wouldn't I understand their complaint, because I think

20  that's probably the best way to understand it, at its best is

21  that they are this accomplished group of MMA fighters.  Why

22  wouldn't I understand it in the way that the Supreme Court

23  defined boxing, this group of boxing professionals, in the

24  International Boxing Club case?

25          MR. ISAACSON:  Right.  I think for the same two reasons

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1    I said.  You know, for one thing, the Supreme Court's definition

2    was not purely circular.  The way they've set this up is like I

3    described in the Bill Gates situation is that you know they're

4    elite if they're working for the UFC.  All of the elite ones

5    work for the UFC, and if there's a competitor, they're not

6    elite.  And we define them as the minor leagues, which gets you

7    what the Courts have said are single-brand markets which are at

8    a minimum extremely rare.  And you need to define some sort of

9    quantitative metric in order to find that, which I think the

10   Supreme Court did in that case.  It looked like they had

11   quantitative metrics.

12         Here they just say, These folks are really good at what

13   they do and they are elite.  Right.  That doesn't tell you

14   anything about how to define whether someone who works for

15   Bellator or who fights for Zuffa --

16         THE COURT:  But they don't say -- don't they give the

17   number of the fights they may have to -- I'll have to go back

18   and look at the complaint.  I thought they actually talked about

19   they have to have appeared in one or two fights or won one or

20   two tights to be recognized as having won one or two fights.

21   And maybe I'll go back and look at the language.  I thought they

22   gave some indication of that.

23         MR. ISAACSON:  That may be mentioned in passing.

24   That's not how they're defining in the market.  Right.

25         THE COURT:  So from your perspective what would it have

———— 2:15-cv-01045-RFB-PAL ————

1  to say?  Let's just say that it is the difference in the skill

2  level that I'm talking about.  What would it need to say to be

3  able to separate those types of sort of elite not as a term

4  that's used as a term of art, but as a more generic sense of

5  accomplished fighters?  What would they need to say from your

6  perspective to satisfy the pleading requirement?

7          MR. ISAACSON:  Something we can measure and something

8  where you can evaluate whether someone is working for Bellator

9  or, I'm sorry, fighting with Bellator or fighting with UFC.  So

10  you can decide who the competitors are and who the actual

11  marketplace is.  And it's not, as I said, purely the Bill Gates

12  situation the -- which is what they say here.

13          THE COURT:  Well, part of that is because they have

14  both a monopoly and a monopsony argument.  So, I mean, part of

15  it is those two factors.  Right.  So they're saying that in part

16  because there's also this allegation about a monopsony and

17  buying power for the fighters.  So -- but I take your argument

18  that you have to do more than simply say they're elite.

19          MR. ISAACSON:  Right.

20          THE COURT:  And so what I'm trying to figure out is,

21  giving their argument all reasonable inferences from what

22  they've alleged, what you think they'd have to say.  And it

23  sounds like what you're saying is they'd have to say something

24  to the effect of, I fought in four fights, have been certified

25  by the MMA -- I mean, because there is some certification that

—2:15-cv-01045-RFB-PAL—

1  happens in this process.  It's not clear to me exactly how that

2  works, but there does appear to be some level of certification

3  for fighters.

4      And so from your perspective in terms of your argument

5  you're saying there has to be something, whether it's

6  certification or not or something, there has to be something

7  that you can actually test and say, These individuals fall into

8  that category because if you look at one, two, three criteria

9  they fall into that and this person doesn't because they don't

10  have one, two, three criteria.

11      MR. ISAACSON:  Yeah, that's basically it, Your Honor.

12  Yeah, they've got to give us something so that we can understand

13  and so economists can do the work.  If you look -- the Oracle

14  case is not a motion to dismiss case, but it talks about, you

15  know, after expert opinions, you know, in an important merger

16  case that, you know, where the expert opposing the merger was

17  trying to talk about high-functioning software, two specific

18  companies.  And the Court said, No, you know, you don't say that

19  this software is better than others and that's a market.  That

20  doesn't work.  And I don't mean to lump software and human

21  beings together.

22      THE COURT:  No, I understand.

23      MR. ISAACSON:  It's the same principle.

24      THE COURT:  Look, I understand what you're saying.

25  What you're saying is you can't just say they're good fighters.

─────────── 2:15-cv-01045-RFB-PAL ───────────

1          MR. ISAACSON:  Yes.

2          THE COURT:  Right?

3          MR. ISAACSON:  Yes, that's it.

4          THE COURT:  It can't be the market is good fighters and

5  that's what it is.

6          MR. ISAACSON:  And in the same extent it's not

7  sufficient for them to say, Our folks say we have the best

8  fighters.  Of course we say we have the best fighters.  That's

9  not a market.

10          THE COURT:  I understand that argument.  And so from

11  the standpoint -- I understand why you're making it, but I

12  understand that portion of the argument to be related to the

13  monopsony aspect of their claim.  And so I would agree with you

14  if they didn't have the monopsony claim, this would sound a

15  little bit more strange than it is, but in the context they're

16  alleging them both at the same time.  So I think that creates

17  some sense of the circular feel that you're talking about

18  because they're saying both.  Your clients allegedly control the

19  promotion market, but they also control the market for fighter

20  services and that's necessarily going to feed back on itself,

21  right, in terms of the fighters who are designated as elite by

22  your client also being in this elite market.

23          But I wanted to focus on I think your larger I think

24  more significant argument which relates to you have to give a

25  quantifiable, identifiable market that can be discerned by clear

-------2:15-cv-01045-RFB-PAL-------

 1  criteria.

 2          MR. ISAACSON:  Yes.

 3          THE COURT:  Okay.

 4          MR. ISAACSON:  Now I can move onto other arguments or I

 5  could let -- if you want to do the tag team again.

 6          THE COURT:  Well, if you have other arguments on this

 7  particular issue --

 8          MR. ISAACSON:  Not on this issue.  Not on this issue.

 9          THE COURT:  Because what I want to do is I want to go

10  through -- because obviously in the Sherman Act they have these

11  different aspects of different portions of it.  I want to make

12  sure we take it issue by issue.  Otherwise, I'll forget the

13  arguments, perhaps.

14          MR. CRAMER:  Thank you, Your Honor.

15          So I have a Slide 6 that actually sets out some of the

16  aspects of what elite fighters are that I'd like to draw the

17  Court's attention to because I think it's important.  But before

18  I discuss that slide, I think it's important to recognize that

19  relevant market is defined by products or services that are

20  reasonably interchangeable with each other, and that is the

21  standard definition.  And sometimes it is fuzzy and, thus, in

22  the Oracle case they had experts that had a debate back and

23  forth who was -- what was in the market and what wasn't in the

24  market, and that is typically what economists do in these cases.

25  That's almost never done on a motion to dismiss unless the

1    relevant markets are so absurd or circular or problematic that

2    they can't be sustained, but, here, that is just not the case.

3         We have defined elite fighters in various ways, as Your

4    Honor recognized.  If you look at Slide 6, there are three main

5    aspects to it.  These are fighters who have reputations for

6    winning professional bouts or who have gained notoriety with the

7    MMA fan base and, thus, can attract a wide audience.  These are

8    rare multidisciplinary athletes who can perform at the very high

9    levels in more than one discipline, and these are fighters who

10   worked up the ranks in local and regional promotions.  These are

11   fighters who have fought in the minor leagues, Bellator and some

12   of these other MMA promotions, and who have made it to the major

13   leagues.

14        So we have made that distinction, and as Your Honor

15   recognized, it is precisely the same distinction that the

16   Supreme Court made in professional boxing, the cream of the

17   boxing.

18        THE COURT:  Right, championship boxing is what they

19   called it.

20        MR. CRAMER:  Championship boxing.  Those were the

21   better fighters.  Why were they the better fighters?  Because

22   they --

23        THE COURT:  They were champions.

24        MR. CRAMER:  They were champions, but also because they

25   attracted more money.  They attracted more crowds.  They were

 1   skilled.  They were highly skilled, and they were champions.

 2   And that's how we define the market here; not by the fact that

 3   you're a UFC fighter, but by the fact that you are an elite

 4   fighter.  So that I think is important.

 5          And it's not just the Supreme Court in International

 6   Boxing.  If you look at Slide 7, Your Honor, we cite the Rock v.

 7   NCAA case, which I think has a really good discussion of this

 8   issue in sports cases.  And it canvasses a number of different

 9   cases, and what it says is that Courts have consistently upheld

10   a relevant market definition based on a quality distinction of

11   one league over another, particularly where that distinction

12   results in increased revenue and opportunities for the

13   participants.

14          So it's that quality distinction, exact same one that

15   we're relying upon here.  And if you -- Your Honor turns to

16   Slide 9, we have two other cases, the O'Bannon case where

17   Mr. Isaacson argued successfully for the plaintiffs that top

18   division college football and basketball are their own markets.

19   Why?  Because they -- the players in those divisions are better

20   and they make -- they attract more revenue.

21          The Clarett v. NFL case, the NFL is a separate market

22   from other leagues, like arena football or the Canadian football

23   league.  Why?  Because it attracts a wider audience, because the

24   players are better.  Those are the elite players.  And so we

25   rely on those exact cases.

—2:15-cv-01045-RFB-PAL—

1          Now, Zuffa argues that our market is circular or

2   gerrymander to create a claim.  That's --

3          THE COURT:  I don't really -- I don't think you need to

4   spend time on that.

5          MR. CRAMER:  Okay.  All right.

6          THE COURT:  As I said to Mr. Isaacson, I understood

7   that particular issue to be really folded into arguing both a

8   monopoly and a monopsony at the same time.  And where there's an

9   allegation that a defendant has such control of a market on both

10  sides, that's necessarily go to happen, right.  You know, right,

11  that you're necessarily going to say the elite fighters are also

12  fighters who also services are exclusively within the purchasing

13  power of the defendant.  But, again, I view that more as a

14  confluence of those two factors in a given market than an

15  argument about a single brand because I think that's slightly

16  different from the Court's perspective.  So I'm not persuaded by

17  that particular argument, so I don't want you to spend time on

18  it.

19         MR. CRAMER:  Yeah, I mean, I think that's right.  For

20  example, if we define the market as elite pro basketball players

21  in the United States and it turned out that they all happen to

22  play for the NBA, that doesn't mean we defined a single-brand

23  market that's problematic.  It just means that all of the elite

24  players happen to play for the NBA.

25         THE COURT:  Right.

─────── 2:15-cv-01045-RFB-PAL ───────

1          MR. CRAMER:  And here we allege that's because of the

2     scheme in the case.  It's because of the UFC's abuse and

3     maintenance of its monopoly and monopsony power that it's able

4     to have all or nearly all of the elite fighters.

5          So -- and the one final point I would make on this is

6     that while we believe that the definitions make sense

7     economically and legally, i.e., including only elite fighters,

8     it's not relevant.  It's not necessary for us to prove monopoly

9     power or monopsony power because we've alleged that the UFC

10    earns 90 percent of all revenues of professional MMA in the

11    United States elite or no.

12         THE COURT:  Right.

13         MR. CRAMER:  So we don't even need that in the market

14    definition to satisfy relevant market.  So those are the points

15    I would make --

16         THE COURT:  Thank you.

17         MR. CRAMER:  -- on that point.

18         THE COURT:  Mr. Isaacson, your next argument.

19         MR. ISAACSON:  Can I just say something about what was

20    just said, Your Honor?  Because Mr. Cramer's showing exactly

21    what I'm talking about.  The NCAA case, the market's defined as

22    something that's completely knowable where you would --

23         THE COURT:  Division I or Division II or Division III.

24         MR. ISAACSON:  Exactly.  And, remember, that's not one

25    company, the NCAA.  That's a cartel case.  Same thing with the

—2:15-cv-01045-RFB-PAL—

1  NFL.  Okay.  Those are multiple competitors, all right, working

2  together.  It's not a one-company case where the employee --

3  where the fighters or athletes for one company are all defined

4  as a single market.

5      It's the same thing as the Supreme Court's case about

6  champions.  Championship bouts is an official designation.

7  Okay.  It's a level of fighting.  It's not that you are

8  qualitatively a champion.  It's the same thing as saying you're

9  Division I.  Okay.  It is -- it's an identifiable metric.  And

10  it is simply unheard of to say -- you know, to define a market

11  by great products, good products, great employees, or anything

12  like that.  To let that go forward has no support in the

13  antitrust law.  And just to say we're taking in 90 percent of

14  the money when you don't have a definition, you can say it's 50,

15  60, 70, 90, or 100 percent, if you don't have a definition, the

16  percentage doesn't matter.

17      All right.  And I would point out to you that the Apple

18  case that we've cited in our case is a motion to dismiss case

19  where they tried to say, Look, Apple products, the Apple -- the

20  Mac OS is distinctive from all other products, and that was put

21  out on a motion to dismiss because they said, It's not enough to

22  say this is just a really good and superior product.  That

23  doesn't define -- that doesn't define a market.

24      All right.  My other points.  There are segments of the

25  complaint that are woefully deficient and shouldn't survive in

─── 2:15-cv-01045-RFB-PAL ───

1   an antitrust case.  They're making the biggest push on exclusive

2   contracts and the fighter contracts, but they have sponsors,

3   they have venues, and they have television.  Right.  None -- all

4   of which fail the plausibilities test because it is absolute --

5   it is not just implausible, it's absurd to say that we've locked

6   up all of the television stations.  It's absurd to say that

7   we've locked up all of the venues in Las Vegas, much less around

8   the United States.  It's absurd to say that when we have a Bud

9   Light deal we've locked up all of the sponsors.

10          They'd like to use the term "threat," and what the

11  threat is is it's the same thing as exclusivity.  You need to

12  work with us.  Now, for pleading purposes, go ahead and call it

13  a threat.  It's not a threat, but it's just another way of

14  saying exclusivity.  And for all of those categories of

15  discovery to go forward, very expensive discovery, when they are

16  so wildly implausible doesn't make sense.

17          The other pieces of the complaint that I would point to

18  are the allegations of an anticompetitive fact, an injury, with

19  respect to the ancillary rights.  That is the -- the rights of

20  publicity because there all they're alleging is that the

21  restraints happen when you have a fighter with the UFC logo, so

22  when you're together with our trademark.  Right.

23          We have shown in our motion that -- which is plainly

24  legal.  We have shown in our motion that there is no restraint

25  when the fighters aren't associated with the UFC logo.  So that

————2:15-cv-01045-RFB-PAL————

1  allegation we feel is ...

2          THE COURT:  Is factually inaccurate?

3          MR. ISAACSON:  No.  No.  Because they have not alleged

4  anything different than what I'm talking about.  Is that they

5  are actually alleging that you can't control your own trademark

6  in those ancillary provisions.  And I do not think that they

7  are -- that they are alleging that we stopped any of their

8  fighters from going out, you know, by themselves without a UFC

9  logo on and doing whatever they want to do with their own

10 rights.

11         THE COURT:  Okay.  So your position is that I can

12 discern from the complaint that they are making the distinction

13 between the ability to control the fighters' ability to control

14 their images when they don't include a UFC logo versus when they

15 do.  And so based upon that, I can find that there's not

16 actually antitrust injury because it's not --

17         MR. ISAACSON:  Because --

18         THE COURT:  -- a wholly comprehensive control of that

19 particular image.

20         MR. ISAACSON:  Right.

21         THE COURT:  Or of those rights, basically.

22         MR. ISAACSON:  There's language in the complaint in

23 paragraphs 30S, T, and U --

24         THE COURT:  Okay.  Hold on.  Let me just get there with

25 you.

1              Go ahead.

2              MR. ISAACSON:  All of which make reference to how -- to

3    restrictions that are used in conjunction with UFC-licensed

4    merchandise, intellectual property owned or licensed by Zuffa,

5    or in connection with the UFC brand, UFC bouts, UFC pre-bout

6    events, etc.  So I'm talking exactly about what the complaint

7    says.

8              Now, the --

9              THE COURT:  And your argument then is that there's no

10   injury.  Is that what you're telling me?

11             MR. ISAACSON:  Right, no anticompetitive injury.

12             THE COURT:  Anticompetitive, right.

13             MR. ISAACSON:  That's not -- that's not antitrust.

14             The -- they bring up acquisitions that have taken place

15   in the past.

16             THE COURT:  Acquisitions.  Now, remember, you have

17   to -- because we have monopoly and monopsony, I always -- it's

18   helpful for me, Mr. Isaacson, to remind me which part of the

19   equation you're talking about.  And this part I assume you're

20   talking about the monopsony part because obviously you're

21   talking about images, but I just want to make sure when we go

22   back --

23             MR. ISAACSON:  I think they might have to answer that

24   question.

25             THE COURT:  No, but what I'm saying is I have to look

2:15-cv-01045-RFB-PAL

1  at it from both sides to figure out whether or not both theories

2  can go forward.  And so if you're arguing -- and they have to

3  establish the -- from my perspective, they'd have to establish

4  that injury with respect to their theories going forward.

5  Otherwise, I would have to decide that one of them hasn't --

6  they haven't established the injuries sufficient for one theory

7  to go forward.

8          MR. ISAACSON:  Right.

9          THE COURT:  So it's helpful for me if you're saying --

10  I think I understand because we're talking about the fighters.

11          MR. ISAACSON:  This would be on the monopsony side.

12          THE COURT:  That's what I thought, but, again, just if

13  we can clarify that so that we can always keep it straight since

14  we have both parts of that.

15          MR. ISAACSON:  All right.  So with respect to the

16  monopsony side of the equation -- you can do antitrust law for a

17  long time and still stumble over that term.

18          THE COURT:  I'm learning as I go, but, yes, thank you.

19          MR. ISAACSON:  It's they have to plausibly allege

20  specific facts -- this is I'm quoting CareFusion -- specific

21  facts showing the acquisition has the effect of lasting

22  competition.  And their own complaint lists five current

23  competitors to the UFC, including Bellator which is on Spike TV,

24  and the -- we've given you the other names in our pleadings:

25  Titan, Invicta, RFA, and Legacy, and also judicially noticeable

—2:15-cv-01045-RFB-PAL—

1  facts as to the MMA world series of fighting and BAMMA, which

2  includes the plaintiffs.  I mean, one of the reasons you know

3  they don't have exclusive contracts in perpetuity is because

4  they fought -- the plaintiffs have fought for other folks.

5       The -- so we think that part, going back to the history

6  of those acquisitions, is expensive, unnecessary discovery

7  because they don't have the beginnings of an antitrust claim

8  there.

9       And then the last part is allegations such as in

10  paragraph 17 of the complaint that we shut out rival promotion

11  opportunities for promoters and fighters because we don't

12  co-promote events.  It's now became form book antitrust law that

13  we have -- that competitors have no duty to deal with one

14  another in the absence of some past voluntary course of dealing,

15  which no one has alleged here or could allege here.

16       THE COURT:  No, I think the issue really is whether or

17  not the combined effect of potentially exclusive contracts would

18  have a certain impact.  I agree with you that simply not

19  co-promoting or simply trying to prevent a fighter or a promoter

20  from engaging in a contract with someone else by itself doesn't

21  necessarily seem to trigger that, but part of the issue is at

22  what point -- and I think that's part of their argument.  At

23  what point does the collective impact of different contracts and

24  the relative control in a particular market have that effect or

25  does that matter?

———2:15-cv-01045-RFB-PAL———

1          MR. ISAACSON:  Okay.  Yes, collective effect matters,

2     but two things.  Okay.  One is the fact that there's no duty to

3     deal is not just legal conduct.  Right.  It's conduct that the

4     antitrust law promotes that it's procompetitive.  So to throw --

5     to say that that gets combined with everything is completely

6     contrary to antitrust law.

7          THE COURT:  Okay.  Let's take that out.

8          MR. ISAACSON:  Right.  And -- but I would --

9          THE COURT:  Because that's not the only thing they

10    allege.

11         MR. ISAACSON:  I would say that about the other things,

12    though.

13         THE COURT:  Okay.

14         MR. ISAACSON:  So an exclusive contract with a beer

15    company, an exclusive contract with one television station, an

16    exclusive contract with a promotional venue, those are all

17    accepted as procompetitive things.  So if you just say, We're

18    going to mix these in all together, all right, you're not just

19    mixing in the legal and the allegedly illegal.  You're mixing in

20    things and subjecting to discovery and litigation things that we

21    are supposed to be promoting, that we're supposed to be moving

22    toward.

23         THE COURT:  But about the argument that if you take

24    them together, right, I mean --

25         MR. ISAACSON:  Right.

—— 2:15-cv-01045-RFB-PAL ——

1           THE COURT:  I don't know that I necessarily disagree

2   with you.  If their theory was based upon any one of them,

3   right, I think that it would be weaker, but I think their

4   argument is based upon the constellation of those things

5   together.

6           MR. ISAACSON:  Right.

7           THE COURT:  And so how do you respond to that?  Because

8   that's what I'm looking at.  I'm not looking at necessarily the

9   one particular contract or another particular contract.  I mean,

10  their argument taken, again as I think I'm require to, at its

11  best is if you look at all of these impacts together, that's

12  what we're talking about.  How do you respond to that?

13          MR. ISAACSON:  So some Courts have called that the

14  monopoly broth.  It's always fun to be the plaintiff and say,

15  We've got a big long complaint and all of this stuff goes in

16  there.  So let us go forward.

17          But I have spoken today to the Court about all of these

18  things together.  And the only point I think that -- that based

19  on our conversation is particularly difficult is the piece about

20  the fighter contracts in which I think is -- I think we prevail

21  there because they're relying on legal conclusions, as I've

22  said.  But the other pieces they want to say you should add them

23  in, which I've spoken about, I've said consider these together,

24  okay, you are talking about not just things that are not illegal

25  or legal, avoiding the double negative.  They are things that

─── 2:15-cv-01045-RFB-PAL ───

1  are procompetitive that the antitrust laws should be sponsored

2  that we should not dissuade.

3       And so to say we should lump those all in together and

4  proceed with a very big case, all right, would run contrary to

5  those antitrust principles.  And it's plainly not sufficient

6  just to say, Oh, we'll just -- you know, maybe that's not enough

7  by itself.  Just look at them all together.  It's a common

8  lawyer phrase.  I have probably said it myself, but, you know,

9  when you are looking at, again, not a cartel case, not a per se

10 illegal case, but a case about -- you know, Section 2 cases are

11 important, particularly with new businesses that built a popular

12 product from the ground up because we're supposed -- because the

13 antitrust laws are supposed to be enabling that and not

14 dissuading that.

15      THE COURT:  Well, look, I understand part of the

16 dilemma and even in antitrust law generally is that to some it

17 can appear when you get to be really good at what you do and you

18 as a result of that dominate the market, then you get hit with

19 an antitrust suit saying, Wait a minute.  We did what we're

20 supposed to do.  Why are we being penalized?

21      MR. ISAACSON:  Right.

22      THE COURT:  Now, part of that is it appears the Sherman

23 Act works in some ways that way anyway and that's the tension

24 that exists.  But I guess what you're saying to me is that the

25 Court should refrain from taking the collective approach to

—2:15-cv-01045-RFB-PAL—

1   those aspects or individual practices that are under -- our

2   antitrust law is considered to be procompetitive.  And so,

3   therefore, by that principle I shouldn't consider them

4   collectively.  I should consider them individually because to

5   consider them collectively would be to implicitly reject or

6   undermine their procompetitive quality.

7           MR. ISAACSON:  Right.  And on the flip side when you

8   look at them collectively, you've thrown in a whole bunch of

9   procompetitive activity, and it's that sort -- that sort of

10  litigation should just not be allowed to move forward.

11          THE COURT:  Okay.  Thank you.

12          MR. CRAMER:  Thank you, Your Honor.

13          Let me pick up on that last point because I think it's

14  important.  Those are good summary judgment arguments after we

15  have had experts take a look at whether there are procompetitive

16  effects of the UFC's contracts and what those are and whether

17  the anticompetitive effects outweigh those procompetitive, but

18  we're not at that stage at this point.  There are no

19  procompetitive effects pled in the complaint of any of the

20  contracts.

21          Second point --

22          THE COURT:  Why not?

23          MR. CRAMER:  Why?  Frankly, we don't believe that the

24  way the UFC operates is in any way procompetitive.  They have --

25  they're operating like the Wild West, like boxing in the '50s,

——— 2:15-cv-01045-RFB-PAL ———

1   like baseball before free agency.  This isn't an organization --

2   and you can see from the complaint where we quote Mr. Fertitta,

3   Mr. White, where they basically say, Look, we're the NFL.

4   Everybody else is the minor leagues.  We put everybody else out

5   of business.

6           Now, they can say these are fighting words, but this is

7   a company that's essentially admitting what it's doing in

8   public.  I can only imagine what the documents say, if we ever

9   get them, in private.

10          So let me address some of these issues that came up

11  because there are a lot of different issues.  As to the

12  antitrust injury point, the monopsony point, the antitrust

13  injury that we are claiming on behalf of the fighters, reduced

14  compensation for bouts, reduced compensation for identity

15  rights.  Those -- that's the injury that we allege.  In other

16  words, we allege that the UFC through this scheme put its rivals

17  out of business, prevented its rivals from competing with a

18  dominated output market.

19          THE COURT:  Promoters.

20          MR. CRAMER:  Promoters.  The market for promoting elite

21  MMA events.  And as a result, they're the dominant buyer of MMA

22  services.  There's nowhere else for elite players -- fighters to

23  go.

24          THE COURT:  And so that -- and the antitrust injury on

25  the monopsony part is that the fighters don't get the salaries

──────── 2:15-cv-01045-RFB-PAL ────────

1   that they want to get.  They don't get the number of fights that

2   they'd want to get.  They don't get to control their images.

3           MR. CRAMER:  Correct.  And the way we allege that is

4   that they get compensated less than they would get compensated

5   in a world where the UFC did not engage in this scheme.  The UFC

6   fighters get paid something like 17 percent of the revenues of

7   the sport.  Other sports are between 50 and 80 percent.  The UFC

8   fighters get paid less relative to the profits or revenues of

9   their sport than any other major sport in the United States.

10  Why is that?  Because they're a monopolist and a monopsonist.

11  That's why that is.  So that's the antitrust injury point.

12          THE COURT:  How do you respond to their argument about

13  the damage to the -- I should say the fighters' ability to

14  control their own images as it relates to the UFC trademark or

15  use of the trademark and that it's only limited to situations as

16  based upon the complaint in paragraphs 30S, T, U, and V, I

17  believe, to those situations in which the UFC merchandise or

18  trademark is involved.

19          MR. CRAMER:  Well, we have other allegations in the

20  complaint relating to that, but let me draw a distinction that I

21  think it's important.  The import of those particular

22  allegations is just further evidence, further allegations, that

23  the UFC is shutting the ability of rivals to get access to elite

24  pro MMA fighters.  It's not so much the injury.  The injury we

25  allege is just reduced compensation for identity rights and

—— 2:15-cv-01045-RFB-PAL ——

1   reduced compensation for bouts.  But the fact that a UFC fighter

2   fights for his entire professional major league career and is a

3   champion and then he is let go by the UFC because they no longer

4   think he's a leader or can make money, he can't promote himself

5   as a champion.  In boxing if you're a champion, you promote

6   yourself as the world champion.  You can't do that in the UFC.

7          So that is making it difficult for a rival.  So a rival

8   gets an older fighter who the UFC let's go, and that rival then

9   can't even promote that person as a former champion.  That is

10  part of the problem that's going on here.

11         Let me address the exclusive deals with sponsors and

12  the exclusive deals with venues.  Here's the import of that.

13  First of all, I heard Mr. Isaacson sort of say, Well, plaintiffs

14  are emphasizing the exclusive deals, exclusive contracts, with

15  the fighters, and if that goes forward, the rest of the

16  complaint shouldn't go forward.

17         Well, first of all, Your Honor is correct that all of

18  the elements of the claim need to be evaluated together.  That a

19  Section 2 claim is evaluated not one by one, but together.  And

20  here's one of the examples of that, exclusive deals with

21  sponsors.

22         So imagine if the Miami Heat had an exclusive deal with

23  all of LeBron James' sponsors, and LeBron James faced losing

24  hundreds of millions of dollars from Verizon and Kia and Nike

25  just because he wanted to go to the Cavaliers.  Would he be able

——2:15-cv-01045-RFB-PAL——

1   to go to the Cavaliers?  Probably not.  It wouldn't -- he would

2   never be able to make all of that up.  He would lose hundreds of

3   millions of dollars of endorsements.

4          And that is part of what goes on here.  The UFC has

5   exclusive deals with sponsors, and any fighter that leaves loses

6   all of his or her sponsors.  So that that works together with

7   the exclusive deals of the fighters to make it difficult for a

8   rival promoter to succeed.  So that's part of the synergistic

9   effect that goes on here.

10          The second point I would make is that the fact that the

11  UFC has not locked up or threatened every possible sponsor is

12  not relevant.  The complaint would survive without the

13  allegation.  And in any event, the UFC admits that all the

14  plaintiffs need to show is that conduct with respect to the

15  sponsors contributes to rival foreclosure.  They've made that

16  point.  All we have to show is that each of these aspects of the

17  scheme make it more difficult for a rival promoter, say Titan,

18  to compete in the major leagues of the MMA.  And if the UFC

19  locks up sponsors and threatens sponsors and says, If you

20  sponsor Bellator or Titan or a fighter that fights for any of

21  them, you can never sponsor the UFC again, as a monopolist and a

22  monopsonist, that is a substantial abuse of power and that

23  prevents rivals from being able to succeed and grow.

24          And the UFC has admitted itself that everybody else is

25  the minor leagues and that they are the major leagues, that

1    everybody else is the AAA.  We've alleged that in the complaint.

2          THE COURT:  I've read that portion and the pictures in

3    the complaint.

4          MR. CRAMER:  Yeah, they -- they're like the Soviet

5    Union in some ways where if someone crosses them, they delete

6    them.  They erase them from memory.  And that is a very powerful

7    thing.  There's no other sport in the country today where one

8    entity controls the entire professional major leagues of the

9    sport, and that's what we're dealing with here.  And so each of

10   those actions, exclusive deals with sponsors, exclusive deals

11   with venues -- if we look back to the International Boxing case

12   from the Supreme Court in 1959, there were three elements to

13   that scheme:  buying out rivals, exclusive deals with the

14   championship boxers, and exclusive deals with key venues, not

15   every venue in the United States, but the major ones:  the

16   Madison Square Garden, Yankee Stadium, the Polo Grounds, Chicago

17   Stadium.  You lock those up and it's difficult for a rival to

18   compete, and that's what we allege here.

19         This contributes to rival foreclosure, not necessarily

20   by itself, but together with the other aspects of the scheme,

21   and that's important.

22         And the same with buying out rivals.  Mr. Isaacson

23   said, Well, we don't allege specifically that buying out rivals

24   had any effect on monopoly or monopsony power.  That's just

25   false.  We allege that the UFC purchased Strikeforce, its only

────── 2:15-cv-01045-RFB-PAL ──────

1   major league rival, in 2011 and then shut it down in 2012.  And

2   we allege that the UFC admits and agrees and argues that it is

3   the only major league left after Strikeforce.  All of those

4   other supposed competitors are not competitors.  They're the

5   minor leagues.  They're basically -- the UFC has set it up so

6   they're developmental leagues.

7         Fighters with contracts with Bellator and Titan and all

8   of these other leagues, they all have outs.  If the UFC accepts,

9   you can go, because they're developmental leagues.  They're

10  minor leagues.  They can't compete with the UFC because of the

11  scheme we alleged in this case.

12        And we have alleged it with specificity.  They

13  purchased Strikeforce.  There's no other major league

14  competition.  That expands their monopoly power to 100 percent.

15  That is a number, 100 percent.  And we allege that with

16  specificity.

17        As to the duty to deal, we don't specifically argue

18  that there's a duty to co-promote, but the fact that the UFC

19  does not co-promote is important here because if you are a rival

20  and you -- Bellator happens to sign up an elite fighter, that

21  elite fighter is only going to stay with you if they can fight

22  other elite fighter.

23        THE COURT:  Right.

24        MR. CRAMER:  But if the UFC doesn't co-promote and they

25  have exclusive contracts with 500 fighters for essentially for

———2:15-cv-01045-RFB-PAL———

1  as long as the UFC wants them, that fighter is not going to stay

2  there for very long.

3          THE COURT:  Right.

4          MR. CRAMER:  And you can't put on a rival promotion if

5  you have nobody else to fight.  I mean, from -- the whole point

6  of a sports contest is you need two and more.  You need to put

7  on a whole card, in fact.  And these rivals can't put on cards

8  because the UFC has locked them up through the scheme we allege

9  in the case.

10          THE COURT:  Thank you.

11          MR. CRAMER:  Thank you.

12          MR. ISAACSON:  Your Honor's been very patient late on a

13  Friday, and we appreciate that.

14          THE COURT:  Yeah, not at all.

15          MR. ISAACSON:  And I guess it's our motion, so I'll say

16  some quick final words.  I thought it was interesting that

17  counsel says "imagine" because that's what's -- you know, when

18  he's talking about LeBron James and locking up all of the

19  sponsorship because that's what's happening here.

20          With the sponsors they allege we have an exclusive deal

21  with Bud Light, which leaves a lot of other beer companies.

22  That's it.

23          They allege, you know, just because -- you know, his

24  LeBron James example is exactly what's missing from this

25  complaint.  We don't have exclusive deals with all of the

 1   apparel companies.  It would be interesting if the Miami -- if

 2   the -- did you say Miami Heat?  If the Cleveland Cavaliers were

 3   to do exclusive deals with all of the shoe companies and try and

 4   lock LeBron out.  Not something I bet would happen, but that

 5   would be interesting.

 6           But if we have one exclusive deal with one apparel

 7   company, right, that's not only legal.  It's procompetitive

 8   because it helps build a business.  And other businesses can go

 9   to another apparel company.  And no one's alleging in this

10   complaint that we've locked all of the companies or even a

11   significant number of companies.

12           Same thing with the television outlets.  We are alleged

13   to have an exclusive deal with Fox and Fox Sports leaving ESPN,

14   ABC, HBO, Bellator which is on Spike, etc., etc., plainly

15   procompetitive conduct.

16           Same thing with the venues.  Right.  There is no

17   allegation that somehow we've locked up all of the venues.

18   Instead, what we put forward in the request for judicial notice

19   is listed all of the other venues that these fighters have been

20   in, including the Hard Rock Hotel here in Las Vegas, Planet

21   Hollywood, and there's a list.

22           So I would leave you with the words of on that point

23   the Ninth Circuit in Massimino, Clearly legal conduct cannot

24   contribute to an antitrust claim.  And exclusive contracts are

25   procompetitive when they're with -- when they're stated in that

───── 2:15-cv-01045-RFB-PAL ─────

1  context.

2       Now, the last point is we're getting into a lot of

3  lawyer rhetoric here and not what's actually in the complaint or

4  alleged, Wild West, etc.  And the complaint does put --

5       THE COURT:  Well, some of that is in actually the

6  complaint.  There's some very colorful statements and pictures.

7       MR. ISAACSON:  Exactly.

8       THE COURT:  That's what I assume.  I mean, I am not --

9  I have reviewed the complaint I think enough, even though it's

10  lengthy, to be able to distinguish between what you all have

11  said here because both of you have said things that were not in

12  the complaint, which I understand the desire to do that, versus

13  those things that are in the complaint.  I mean, some of the

14  aspects of what you're talking about, Mr. Isaacson, which relate

15  to the issue as to specificity, for example, regarding the

16  exclusive nature or not of these types of contracts.  I think

17  there's been more specificity offered by Mr. Cramer than was in

18  some of the complaints.  And you've offered some details about

19  what's on Spike, which is not necessarily in the complaint

20  either, but I understand that there's going to be some spillage

21  at the margins in terms of the facts.

22       But, obviously, the Court will look at and does look at

23  and has looked at the complaint and just the complaint.

24       MR. ISAACSON:  Right.  Well, in terms of this rhetoric,

25  I mean, as this company goes forward and as its rivals go

—— 2:15-cv-01045-RFB-PAL ——

1  forward, it's about fighters.  There will be colorful rhetoric

2  and that -- I'm sure if anybody wants to look at our internal

3  documents some day, there's going to be colorful rhetoric.

4  That's the nature of the business, but the Courts don't say that

5  antitrust claims are based on colorful rhetoric or about people

6  saying we're trying to beat up our competitors.

7          THE COURT:  But I agree with that.  I think it does

8  make it more interesting, perhaps, than my run-of-the-mill

9  antitrust complaint, but my question to you is that there are

10 actually some statements from people alleged to be involved with

11 the UFC.  And I wonder what weight should I give that at the

12 motion to dismiss stage?

13         I mean, you basically have Mr. White saying, We

14 dominate the market.  We dominate it on both sides.  He's not

15 particularly nuanced about saying that.  He says it in multiple

16 ways.  You know, we've destroyed companies.  We've destroyed our

17 competition.  There's a picture of him, you know, rest in peace

18 with competitors on it.

19         Now, I understand some of that obviously is bragard

20 show and rhetoric, but to what extent should I credit some of

21 it?  I mean, I don't credit certain aspects of it, but certainly

22 when you have one of the officers of the defendants saying, We

23 have done certain things in terms of competition, I can consider

24 that absent the language in terms of what's happened, can't I,

25 at the complaint stage?

—————— 2:15-cv-01045-RFB-PAL ——————

1          MR. ISAACSON:  You should credit it as competition, not

2    anticompetitive.

3          THE COURT:  Okay.

4          MR. ISAACSON:  That's what the Court in Sanderson said,

5    the Seventh Circuit, quote, Warfare amongst suppliers and their

6    different products is competition.  Antitrust law does not

7    compel your competitor to praise your product or sponsor your

8    work.  To require cooperation or friendliness amongst rivals is

9    to undercut the intellectual foundation of antitrust law.

10          THE COURT:  I wasn't talking about that.  I was

11    actually really talking about the statements Mr. White made

12    about basically eliminating competitors.  I mean, that's

13    different than saying -- and I understand saying everyone has to

14    get along and work together.

15          MR. ISAACSON:  Right.

16          THE COURT:  Right.  That there's no requirement for a

17    Kumbaya in the business environment.  I understand that, but

18    there's specific statements about elimination of competition and

19    dominance of the market that smack of monopolistic and

20    monopsonistic conduct in terms of what he says.  And so my

21    question to you is, what weight should I give that?

22          MR. ISAACSON:  Right.  The weight that I just said and

23    I'll explain why.  And I think there's two types of statements

24    that you're talking about.  There's ones where he says, you

25    know, We're the major leagues.  They're the minor leagues.  And

─── 2:15-cv-01045-RFB-PAL ───

1   that's where you are bad mouthing a competitor to look better.

2   That's competition.  All right.  The other -- the part -- the

3   other piece I think you're referring to is when Strikeforce goes

4   away and he says, RIP competitor.  That's one competitor.

5   There's five competitors left as we've put forward to you.

6   That's not RIP to the marketplace.  That's not RIP to all of the

7   competitors.  That piece standing by itself is fairly

8   inconsequential and not saying anything other than the fact that

9   we lawfully acquired another company.

10          THE COURT:  So, in other words, what you're telling me

11  is that I don't have full context for the statements.  Since I

12  don't have full context, I have to take them at face value or

13  less than face value basically.

14          MR. ISAACSON:  No, no.  I'm not telling you that.

15          THE COURT:  Okay.

16          MR. ISAACSON:  I'm telling you that at face value those

17  are procompetitive statements.  Those are statements that should

18  be credited as the words that competitors can and should say.

19          THE COURT:  Okay.

20          MR. ISAACSON:  If they decide that's appropriate in

21  their marketplace.

22          THE COURT:  Okay.  Thank you.

23          MR. CRAMER:  Your Honor, may I address that last point?

24          THE COURT:  I don't know that you really need to.  I

25  appreciate that, Mr. Cramer, but I think I -- well, if you want

--- 2:15-cv-01045-RFB-PAL ---

1  to say a few words, I don't know that you really need to say

2  anything about that.

3        MR. CRAMER:  All I would say as to that is that we've

4  used some of those statements like, Everyone else is the AAA and

5  we've -- and we are a football -- we are like football in the

6  NFL.  The sport of MMA is known by one name, UFC.  Everybody

7  needs to just concede and realize we're the bleeping NFL,

8  period, end of story.

9        The way we viewed some of those and the other

10  statements Your Honor is referencing was like Michael Kinsley,

11  the pundit, referred to a political gaff.  A political gaff is

12  where a politician accidently tells the truth.  And we think

13  these statements are like that.  They are where these -- the

14  heads of this company are telling the truth.

15        THE COURT:  Well, I understand that, but in the context

16  of the complaint, while they may be interesting or scintillating

17  statements, because there's no context in terms of the

18  statements themselves, it's difficult for the Court to figure

19  out how much I should credit that in the context of the overall

20  operation of Zuffa.  Right.  I mean, they're making these

21  statements, but not in connection necessarily with a specific

22  transaction.  Maybe in reference to a competitor, but there's no

23  elaboration of what these particular words mean.

24        And so from my perspective I just don't know that I can

25  really consider them to be anything other than, you know, an

—2:15-cv-01045-RFB-PAL—

1   officer of a company bragging about the accomplishments of the

2   company without necessarily reference to improper or unlawful

3   conduct.  But it doesn't mean that there aren't other aspects of

4   the complaint that I wouldn't consider it.  It just means those

5   particular statements which would appear on their face

6   potentially to simply be a statement of, We are a monopoly, we

7   are a monopsony.  I don't know that I can take them in that --

8   in that vein.

9        MR. CRAMER:  Well, hopefully, from our perspective we

10   get to take the depositions of Mr. White and Mr. Fertitta and we

11   can get the full context.  Thank you.  Your Honor.

12        THE COURT:  Certainly.  Hold on a moment.

13        (Court conferring with law clerk.)

14        THE COURT:  Okay.  What we're going to do is we're

15   going to a five-minute recess.  I'm going to rule from the bench

16   when I come back.  Well, actually, why don't we say 10 minutes.

17        (Recess taken at 5:21 p.m.)

18        (Resumed at 5:39 p.m.)

19        THE COURT:  Please be seated.  Hold on just a minute.

20   Let me get my notes.

21        Okay.  The Court is going to deny the five motions to

22   dismiss.  I'm going to issue a written order within the next two

23   to three weeks laying out explicitly the Court's reasons for

24   doing that, but the motions -- I think there are four motions --

25   three motions to dismiss, is that right, that we had.  I don't

——— 2:15-cv-01045-RFB-PAL ———

 1   know.  I think they are all basically the same.

 2          MR. ISAACSON:  Yeah, they are.  We've lost track of

 3   them.

 4          MR. CRAMER:  Yeah, and I think all of the cases have

 5   now been consolidated.

 6          THE COURT:  That's what I think, but I always have to

 7   make sure that I am doing that.  So I will do that and I will

 8   issue an opinion.  There will be a minute order today denying

 9   the motions and then the written order will come out subsequent

10   to that.  I understand that the motion to appoint counsel has

11   also been withdrawn.  That was Docket No. 34.  Is that correct?

12          MR. CRAMER:  Your Honor, the magistrate judge granted

13   one of those motions and so we withdrew the other one.  So she

14   has granted a motion to appoint lead counsel in the consolidated

15   case is what I understand has happened.

16          THE COURT:  Okay.

17          MR. CRAMER:  And liaison counsel.

18          THE COURT:  Okay.  So the other -- the other issue I

19   had was the stipulation for ESI.  So the reason why I want to

20   talk to you about discovery is I like to try to when I address a

21   dispositive motion figure out if there are discovery issues that

22   we need to address in a general sense now.  While I think in a

23   case this size that that may be difficult, but if there's

24   something you want to bring up with me now in terms of discovery

25   moving forward, you can do that now.  I can approve this

─────2:15-cv-01045-RFB-PAL─────

1   stipulation regarding electronically-stored information or you

2   can file something else based upon what you think would be

3   appropriate.  How do you wish to proceed?

4          MR. CRAMER:  We're okay with the ESI stipulation as

5   submitted.

6          MR. ISAACSON:  Yeah, that's fine, Your Honor.

7          THE COURT:  Okay.  So is there anything else that we

8   need to do today on this case?

9          MR. CRAMER:  Your Honor, we have a hearing before

10  Magistrate Judge Leen on Wednesday of next week, status

11  conference, where we're going to be addressing some of the

12  discovery issues.  So we just, in fact, submitted a joint report

13  to the Court today on a lot of the issues that have been going

14  back and forth.  Part of the issue was that she had denied a

15  motion to stay pending the motion to dismiss and allowed some

16  kind of staged or phased discovery in the interim.  And so we

17  were negotiating in that context which now may need to change a

18  little bit given that the motions have been denied.

19         THE COURT:  Right.

20         MR. CRAMER:  But I don't think there's anything that we

21  need to address today here.

22         THE COURT:  Okay.  Again, I just wanted to give you the

23  opportunity since we're all here together this late Friday

24  afternoon.  Mr. Isaacson, is there anything else that you think

25  the Court needs to address?

───────2:15-cv-01045-RFB-PAL───────

1          MR. ISAACSON:  Not today, Your Honor.  Thank you.

2          THE COURT:  Okay.  From anyone else here?

3          MR. CRAMER:  Thank you for staying so late.  We

4   appreciate it.

5          THE COURT:  Oh, no, not at all.  Okay.  Then we are

6   adjourned.  Thank you.

7          (Whereupon the proceedings concluded at 5:43 p.m.)

8                          --oOo--

9                 COURT REPORTER'S CERTIFICATE

10

11      I, PATRICIA L. GANCI, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter.

15

16   Date:  September 30, 2015.

17                              /s/ **Patricia L. Ganci**

18                              Patricia L. Ganci, RMR, CRR

19

20

21

22

23

24

25