**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**
Don Springmeyer
Nevada Bar No. 1021
Bradley S. Schrager
Nevada Bar No. 10217
Justin C. Jones
Nevada Bar No. 8519
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
jjones@wrslawyers.com

*(Additional counsel appear on signature page)*

*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Luis Javier*
*Vazquez, Brandon Vera, and Kyle Kingsbury*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,**<br><br>**Defendant.** | Lead Case No.: 2:15-cv-01045-RFB-(PAL)<br><br>**CONSOLIDATED AMENDED ANTITRUST CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# Table of Contents

I.     NATURE OF ACTION AND SUMMARY ................................................................. 1

II.    JURISDICTION AND VENUE .............................................................................. 9

III.   DEFINITIONS ...................................................................................................... 10

IV.    PARTIES .............................................................................................................. 13

V.     CLASS ACTION ALLEGATIONS ...................................................................... 16

    A.   The Bout Class ............................................................................................ 16

    B.   The Identity Class ........................................................................................ 19

VI.    THE UFC'S MONOPOLY AND MONOPSONY POWER .................................. 20

    A.   The UFC's Monopoly Power in the Relevant Output Market ....................... 20

        1.   The Relevant Output Market.................................................................. 20

        2.   The Relevant Geographic Market ......................................................... 22

        3.   The UFC's Monopoly Power with Respect to Promoting Live Elite
            Professional MMA Bouts ................................................................. 23

    B.   The UFC has Monopsony Power in the Relevant Input Market .................... 26

        1.   The Relevant Input Market .................................................................. 26

        2.   The Relevant Geographic Market ......................................................... 28

        3.   The UFC has Monopsony Power with Respect to Elite Professional
            MMA Fighter Services .................................................................... 29

    C.   Overview of the MMA Industry and the UFC's Dominance.......................... 30

    D.   The UFC's Complete Control of its Sport is Unique in the Context of Big-Time
        Professional Sports........................................................................................ 32

    E.   The Growth of MMA in the United States .................................................... 32

VII.   THE UFC'S ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST
      INJURIES TO PLAINTIFFS AND MEMBERS OF THE CLASSES ...................... 33

    A.   The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance
        Monopoly and Monopsony Power .................................................................. 33

1.      The UFC Has Leveraged its Monopoly and Monopsony Power to Deny Necessary Inputs to Would-Be Rival MMA Promoters. ..................................... 33

2.      After Impairing Actual or Potential Rival Promoters in the Relevant Output Market Through the Scheme Alleged Herein, the UFC Acquired Those Would-Be Rivals that it Did Not Put Out of Business or Relegate to the "Minor Leagues."........................................................................................ 44

3.      After Impairing Actual or Potential Rivals and Acquiring Virtually Every Would-Be Rival Promoter That it Did Not Put Out of Business, the UFC Relegated all Remaining MMA Promoters to "Minor League" Status. .............. 47

B.     The UFC's Exclusionary Scheme Harmed Competition in the Relevant Input and Output Markets. ............................................................................................ 51

C.     Plaintiffs and Members of the Bout Class Suffered Antitrust Injury.............................. 52

D.     The Identity Class Plaintiffs and Members of the Identity Class Suffered Antitrust Injury............................................................................................... 53

VIII.   INTERSTATE COMMERCE.............................................................................. 53

IX.     CLAIM FOR RELIEF FOR MONOPOLIZATION AND MONOPSONIZATION UNDER SECTION 2 OF THE SHERMAN ACT ................... 54

X.      DEMAND FOR JUDGMENT.............................................................................. 56

Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury ("Plaintiffs") file this action on behalf of themselves and as a class action on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendant Zuffa, LLC ("Zuffa"), operating under the trademark Ultimate Fighting Championship® or UFC® ("UFC" or "Defendant"). Plaintiffs seek treble damages and injunctive relief for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs complain and allege as follows based on: (a) their personal knowledge; (b) the investigation of Plaintiffs' counsel; and (c) information and belief:

## I.  NATURE OF ACTION AND SUMMARY

1.      This is a civil antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for treble damages and other relief arising out of Defendant's overarching anticompetitive scheme to maintain and enhance its (a) monopoly power in the market for promotion of live Elite Professional Mixed Martial Arts ("MMA") Fighter bouts,[1] and (b) monopsony power in the market for live Elite Professional MMA Fighter services. The relevant geographic market for both the Relevant Input Market and Relevant Output Market is limited to the United States and, in the alternative, North America. Regardless of whether the relevant geographic market includes the U.S., North America, or indeed the entire world, the UFC has monopoly and monopsony power, which it gained, enhanced, and maintained through the anticompetitive scheme alleged herein. As alleged below, the UFC has engaged in an illegal scheme to eliminate competition from would-be rival MMA Promoters by systematically preventing them from gaining access to resources critical to successful MMA Promotions, including by imposing extreme restrictions on UFC Fighters' ability to fight for would-be rivals during and after their tenure with the UFC. As part of the scheme, the UFC not only controls Fighters' careers, but also takes and expropriates the rights to their names and likenesses in perpetuity. As a result of this scheme, UFC Fighters are paid a fraction of what they would earn in a competitive marketplace.

2.      Plaintiffs Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury (the "Bout Class Plaintiffs") are Elite Professional MMA Fighters who have each fought in a bout

---

[1] A "bout," as used in this Complaint, is a professional live MMA contest between two Mixed Martial Artists promoted by an MMA Promoter.

promoted by the UFC during the Class Period (defined below). The Bout Class Plaintiffs bring this action on behalf of themselves and a proposed class of similarly situated UFC Fighters (the "Bout Class," defined in more detail below).

3.     Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury (the "Identity Class Plaintiffs") bring this action on behalf of themselves and a proposed class composed of all other similarly situated UFC Fighters whose identities were exploited or expropriated for use by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials (the "Identity Class," defined in more detail below).

4.     Through a series of anticompetitive, illicit, and exclusionary acts, the UFC has illegally acquired, enhanced, and maintained dominant positions in the markets for (a) promoting live Elite Professional MMA Fighter bouts (the "Relevant Output Market"), and (b) the market for live Elite Professional MMA Fighter services (the "Relevant Input Market"). The Relevant Output Market and Relevant Input Market are referred to collectively herein as the "Relevant Markets."

5.     Defendant's conduct, as alleged herein, has foreclosed competition and thereby enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market. By dominating the market for promoting live Elite Professional MMA bouts, Defendant makes the UFC the "only game in town" for Elite Professional MMA Fighters who want to earn a living in their chosen profession at the highest level of the sport of MMA. By dominating the market for live Elite Professional MMA Fighter services through the scheme alleged herein (including through long-term exclusive agreements with MMA Fighters and other exclusionary and anticompetitive acts), the UFC controls the talents of Elite Professional MMA Fighters, who are popular with national audiences. Because an MMA Promoter can attract a significant live or Pay-Per-View audience based on the public notoriety of the Elite Professional MMA Fighters scheduled to appear, would-be rival MMA Promoters require access to them in order to become significant players in the market for promoting live Elite Professional MMA bouts.

6.     The UFC has used the ill-gotten monopoly and monopsony power it has obtained and maintained through the scheme alleged herein to suppress compensation for UFC Fighters in the Bout Class artificially and to expropriate UFC Fighters' identities and likenesses inappropriately.

7.     The UFC, which (through the conduct alleged herein) now controls approximately 90% of the revenues derived from live Elite Professional MMA bouts (regardless of whether the geographic market is the U.S., North America, or the entire world), promotes and distributes professional live MMA bouts through various venues, in the U.S. and internationally, including physical venues such as the SAP Center and the HP Arena in San Jose, California, the Sleep Train Arena in Sacramento, California, the Key Arena in Seattle, Washington, the Honda Center in Anaheim, California, the United Center in Chicago, Illinois, the Prudential Center in Newark, New Jersey, the Amway Center in Orlando, Florida, the Mandalay Bay Events Center in Las Vegas, Nevada, the Philips Arena in Atlanta, Georgia, the Wells Fargo Center in Philadelphia, Pennsylvania, the Target Center in Minneapolis, Minnesota, the Patriot Center in Fairfax, Virginia, the TD Garden in Boston, Massachusetts, and through network television venues and Pay-Per-View events broadcast in the U.S. and North America. As part of the anticompetitive scheme alleged herein, the UFC has acquired, driven out of business, foreclosed the entry of, and/or substantially impaired the competitiveness of multiple actual and potential MMA Promotion rivals. As a result, the only remaining promoters of MMA bouts are either fringe competitors—which, as a general matter, do not and cannot successfully compete directly with the UFC—or entities that have essentially been conscripted by the UFC, through the scheme alleged herein, into acting as the UFC's "minor leagues," developing talent for the UFC but not competing directly with it. From October 1, 2012 to September 30, 2013, Zuffa's annual revenues were approximately $483 million, with approximately $256 million generated by the promotion of live events, and the remaining $227 million generated by ancillary revenue streams which include, but are not limited to, merchandising, licensing fees, sponsorships, advertising fees, video game fees, and digital media revenue streams. Zuffa's current revenues are estimated to exceed $500 million annually.

8.     In an April 2008, Forbes magazine article entitled "Ultimate Cash Machine," Lorenzo Fertitta was quoted as saying: "We are like football and the NFL. The sport of mixed martial arts is known by one name: UFC." By 2010, as a result of the anticompetitive conduct alleged herein, defendant Zuffa's President, Dana White, boasted that it had essentially eliminated all of its competition. White publicly proclaimed that, within the sport of MMA: "There is no competition. We're the NFL. You don't see people looking at the NFL and going, 'Yeah, but he's not the best player

in the world because there's a guy playing for the Canadian Football League or the Arena League over here.' We're the NFL. ***There is no other guy***." However, unlike the NFL—which has multiple teams vying for player services—within the UFC, there is no competition for Elite Professional MMA Fighter services. Due to the scheme alleged herein, for Elite Professional MMA Fighters, it's the UFC or nothing. To repeat Mr. White's boastful concession: "There is no other guy."

9.     As set forth in more detail below, Defendant acquired and maintained monopoly power in the Relevant Output Market through a series of exclusionary acts, including (a) direct acquisitions of actual or potential rivals (who were forced to sell to the UFC because they found it impossible to compete profitably due to the UFC's anticompetitive scheme), as well as (b) a multifaceted scheme to impair and foreclose competition by leveraging the UFC's market dominance—including its tight-fisted control over the supply of Elite Professional MMA Fighters—to block actual or potential rivals from accessing inputs (such as, *e.g.*, Elite Professional MMA Fighters, the best venues, and valuable sponsorships) necessary to compete successfully in the market for promoting live Elite Professional MMA bouts. The UFC has locked up the supply of Elite Professional MMA Fighters through, first, a series of acquisitions designed to remove competing rivals and would-be rivals and thereby championship titles from the marketplace by acquiring the contracts of Elite Professional MMA Fighters, shuttering the acquired promotions, and second, by, *inter alia*, forcing all UFC Fighters, if they want to engage in professional MMA fights at the elite level, to enter into contracts that bar them from working with would-be rival MMA Promotion companies all but indefinitely.

10.     Not content to control virtually all of the Elite Professional MMA Fighter services necessary for promoting a successful live MMA event, the UFC also forces major physical venues for MMA bouts to supply their services to the UFC exclusively. Further, under the scheme described herein, during the Class Period, the UFC has also required MMA sponsors to work exclusively with the UFC and UFC Fighters. Indeed, throughout most of the Class Period, the UFC refused to contract with any sponsor who agreed to work with an actual or potential rival MMA Promotion company or Fighter under contract with another MMA Promoter, whether an actual or potential rival, and prohibited these sponsors from appearing on UFC Fighters during UFC events. Through the scheme alleged herein, the UFC locked up: (i) all or virtually all Elite Professional MMA Fighters with substantial national or

regional notoriety; (ii) the vast majority of major sponsors; and (iii) key physical and television venues. Without access to, or the ability to compete for access to, the Elite Professional MMA Fighters, would-be UFC rivals cannot hope to attract enough viewers (either live or via Internet, television or Pay-Per-View broadcast) to make their promotions significantly profitable. Without access to key sponsors, venues, or major television distribution outlets, would be rivals cannot put together sufficiently attractive events either to attract Elite Professional MMA Fighters to work with them or to gain the kind of audience that could challenge the UFC's dominance.

11.     The UFC denied actual and potential rivals necessary inputs to run effective professional MMA Promotion companies, raising their costs and making it impossible for them to compete effectively. As a result of the UFC's exclusionary scheme, multiple actual or potential rivals were forced to sell to the UFC or exit the market entirely.

12.     The UFC has publicly touted its success in using the scheme alleged in this Complaint to squash its competition. For example, in November 2008, UFC President Dana White uploaded a pre-bout video blog to YouTube in which he held up the following mock tombstone prominently displaying the letters "RIP" as well as the logos and "dates of death" of the those MMA Promoters— International Fight League ("IFL"), Elite Xtreme Combat ("EliteXC"), and Affliction Entertainment ("Affliction"). Each promotion had been or would soon be put out of business by the UFC's anticompetitive conduct.



13.    After reading off the names of the MMA Promotion companies that the UFC had eliminated through the conduct alleged herein, White took credit for their demise, proclaiming, "I'm the grim reaper, motherf***ers."

14.    Similarly, on October 12, 2012, White boastfully responded on Twitter to a fan of the acquired and shuttered Pride Fighting Championships promotion by stating:



15.     In a June 14, 2010 interview with a leading MMA website, *MMA Junkie*, White stated:

> There was a time when it [competition in the MMA industry] was neck-and-neck. That time is over. There were times when we were in dogfights, but everybody needs to just concede and realize we're the [expletive] NFL. Period. End of story.

16.     While the UFC dominates the sport of MMA much like the NFL dominates the sport of football, the UFC does not contain rival teams that vie to sign players based on their estimated value in a competitive market nor is the UFC a "league" of any kind.

17.     The UFC is an individual sport that issues championship titles to athletes competing in, and winning, title bouts. The UFC follows no independent ranking criteria, nor does it establish any objective criteria for obtaining a title bout. By following no objective criteria, the UFC is able to exert considerable control over its roster of athletes who risk losing the opportunity to be afforded "title bouts" or to earn a living as an MMA fighter. Further, the UFC shuts out rival promotion opportunities for promoters and fighters by refusing to co-promote events with would-be rival MMA Promoters and prohibiting its athletes from competing against any non-UFC MMA Fighters in live Elite Professional MMA bouts. Such exclusivity, as part of the alleged scheme, bolsters the UFC's ability to maintain its iron-fisted control of Elite Professional MMA Fighters. As a result of the UFC's scheme, in order to generate any significant public notoriety and earn a living in their chosen profession, Elite Professional MMA Fighters are foreclosed from the opportunity to self-promote and must sign exclusively with the UFC and compete only against UFC athletes.

18.     Having thoroughly dominated the Relevant Markets, in November 2013, the UFC unveiled its plans for extending its dominance internationally from the U.S. and North American markets when it posted to Twitter the following image of White, flanked by Zuffa co-owners Frank and Lorenzo Fertitta, at a sports conference, in front of a screen stating, "World F**king Domination Reshaping the Sports World:"[2]

---

[2] The image has been edited to modify the offensive language appearing in the first line of the original text, as have various quotations from Dana White throughout this Complaint.

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17     19.     As a result of the anticompetitive scheme alleged herein, the UFC has foreclosed

18  competition and gained, maintained, and enhanced its position as the dominant promoter of MMA and

19  one of the most powerful organizations in professional sports. The UFC now generates over half a

20  billion dollars in annual revenues and has profit margins higher than all or nearly all other major

21  professional sports. This anticompetitive scheme, which has afforded the UFC dominance in the

22  Relevant Markets, allows it to exploit the MMA Fighters on whose backs the business rests. All UFC

23  Fighters are paid a mere fraction of what they would make in a competitive market. Rather than earning

24  paydays comparable to boxers, a sport with many natural parallels, Elite Professional MMA Fighters

25  go substantially undercompensated despite the punishing—and popular—nature of their profession.

26     20.     As described below, the UFC did not acquire and does not maintain its monopoly power

27  in the Relevant Output Market and monopsony power in the Relevant Input Market lawfully. The

28

UFC's anticompetitive and illegal scheme through which it obtained its unlawful monopoly/monopsony, as described herein, reaches virtually every aspect of the sport.

21.     As alleged below, by gaining, maintaining, and enhancing iron-fisted control over the Relevant Markets through the ongoing exclusionary scheme alleged herein, the UFC has foreclosed competition in the Relevant Markets, acquired, enhanced, and maintained (i) monopoly power in the Relevant Output Market and (ii) monopsony power in the Relevant Input Market, and used its dominant position to enter into and dominate other segments of the MMA Industry unrelated to the promotion of live Elite Professional MMA events. This conduct, taken together, has had substantial anticompetitive effects in the Relevant Markets, and has harmed members of the respective Classes defined herein in that: (i) compensation of members of the Bout Class has been and continues to be substantially and artificially suppressed; and (ii) compensation of members of the Identity Class for the expropriation and commercial exploitation of their likenesses and identities has been and continues to be substantially and artificially suppressed.

## II.     <u>JURISDICTION AND VENUE</u>

22.     This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2.

23.     Plaintiffs have been injured, and are likely to continue to be injured, as a direct result of Defendant's unlawful conduct.

24.     The United States District Court for the District of Nevada has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and section 4 of the Clayton Act, 15 U.S.C. § 15(a)(2).

25.     Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. Zuffa has promoted professional live MMA events in this District, and sold or licensed promotional, merchandising or ancillary materials throughout this District. Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

26.     The UFC has acquired, enhanced, and is illegally maintaining monopsony power in the Relevant Input Market and monopoly power in the Relevant Output Market through the anticompetitive scheme alleged herein.

### III.    **DEFINITIONS**

27.    As used herein:

a.    "Bout Agreement" means a contract between a UFC Fighter and Zuffa, or its affiliates, which designates, among other things, the opponent, weight class, and date of a scheduled bout.

b.    "Card" means the identification of all of the bouts that occur during a single MMA event. The Card typically consists of the Main Card and the Undercard.

c.    "Class Period" means the period from December 16, 2010 until the illicit scheme alleged herein ceases.

d.    "Elite Professional MMA Fighter" means any Professional MMA Fighter who has demonstrated success through competition in local and/or regional MMA promotions, or who has developed significant public notoriety amongst MMA Industry media and the consuming audience through demonstrated success in athletic competition. All UFC Fighters are Elite Professional MMA Fighters.

e.    "Exclusive Promotional and Ancillary Rights Agreement" means a contract between a UFC Fighter and Zuffa, pursuant to which Zuffa is the exclusive promoter of a UFC Fighter's bouts for a period of time, and the UFC Fighter grants certain ancillary rights to Zuffa in perpetuity.

f.    "Identity" of a UFC Fighter means the name, sobriquet, voice, persona, signature, likeness and/or biographical information of a UFC Fighter.

g.    "Main Card" consists of bouts between higher profile and more established MMA Fighters and are featured on the main broadcast of the event, ending with a main event featured bout, and frequently, a co-main event featured bout.

h.    "Merchandise Rights" means Zuffa's unrestricted worldwide rights to use, edit, disseminate, display, reproduce, print, publish, and make any other uses of the name, sobriquet, voice, persona, signature, likeness, and/or biographical information of a UFC Fighter solely in connection with the development, manufacture, distribution, marketing and sale of UFC Licensed Merchandise.

i.    "Merchandise Rights Agreement" means a contract between a UFC Fighter and Zuffa or its affiliates, pursuant to which the UFC Fighter grants Zuffa or its affiliates certain rights with regard to using a Fighter's Identity in marketing merchandise.

j.   "Mixed Martial Arts" or "MMA" means a competitive individual sport in which competitors use interdisciplinary forms of martial arts that include, *e.g.*, jiu-jitsu, judo, karate, boxing, kickboxing, taekwondo, and/or wrestling to their strategic and tactical advantage in a supervised match. Scoring in live professional MMA bouts is based on state athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission holds, chokeholds, throws or takedowns).

k.   "MMA Industry" means the business of promoting live MMA bouts and may also include the promotion of Pay-Per-View MMA events to generate Pay-Per-View revenues and ticket sales as well as ancillary activities such as: the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and fighter sponsorships, and the collection of MMA-related copyright and trademark royalties.

l.   "MMA Promoter" or "MMA Promotion" means a person or entity that arranges professional live MMA bouts for profit.

m.   "Pay-Per-View" or "PPV" means a type of pay television or broadcast service by which a subscriber of an Internet or television service provider can purchase events to view live via private telecast or Internet broadcast. The events are typically purchased live, but can also be purchased for several weeks after an event first airs. Events can be purchased using an on-screen guide, an automated telephone system, on the Internet or through a live customer service representative.

n.   "Post-Bout Event" means any post-bout interviews and press conferences that follow and relate to a Bout.

o.   "Pre-Bout Event" means training, interviews, press conferences, weigh-ins and behind-the-scenes footage that precede, and relate to, a bout.

p.   "Professional MMA" or "Professional MMA Fighter" means a person who is compensated as a combatant in a Mixed Martial Arts bout.

q.   "Promotional Rights and Ancillary Rights" means rights to site fees, live-gate receipts, advertising fees, sponsorship fees, motion pictures, all forms of radio, all forms of television (including live or delayed, interactive, home or theater, pay, PPV, satellite, closed circuit, cable, subscription, multi-point, master antenna, or other), telephone, wireless, computer, CD-ROM, DVD, any and all

Internet applications, films and tapes for exhibition in any and all media and all gauges, including but not limited to, video and audio cassettes and disks, home video and computer games, arcade video games, hand-held versions of video games, video slot machines, photographs (including raw footage, out-takes and negatives), merchandising and program rights, in connection with or based upon the UFC brand, the bouts, Pre-Bout Events or Post-Bout Events.

  r. "Standard Fighter Contract" means the form contract for Professional MMA Fighters required by the athletic commission (if any) in which the bout takes place.

  s. "UFC Fighter" means a person who is paid by the UFC for participating in one or more professional MMA bouts promoted by the UFC and/or whose Identities were acquired for use and/or used in UFC Licensed Merchandise and/or UFC Promotional Materials.

  t. "UFC Licensed Merchandise" means all apparel, footwear, hats, photographs, souvenirs, toys, collectibles, trading cards, and any and all other similar type products, including the sleeves, jackets and packaging for such products, that is (i) approved by Zuffa, (ii) contains the trademarks, trade names, logos and other intellectual property owned or licensed by Zuffa, including without limitation, the licensed marks, and (iii) not created, used or sold in connection with the promotion of any bouts, Pre-Bout Events or Post-Bout Events.

  u. "UFC Promotional Materials" means all advertising fees, sponsorship fees, motion pictures, all forms of radio, all forms of television (including live or delayed, interactive, home or theater, pay, PPV, satellite, closed circuit, cable, subscription, multi-point, master antenna, or other), telephone, wireless, computer, CD-ROM, DVD, any and all Internet applications, films and tapes for exhibition in any and all media and all gauges, including but not limited to, video and audio cassettes and disks, home video and computer games, arcade video games, hand-held versions of video games, video slot machines, photographs (including raw footage, out-takes and negatives), merchandising and program rights, in connection with or based upon the UFC brand, UFC bouts, UFC Pre-Bout Events or UFC Post-Bout Events.

  v. "Undercard" consists of preliminary bouts that occur before the Main Card of a particular Card and are typically not included on the main broadcast of the event. Typically, Promoters intend the Undercard to provide fans with an opportunity to see up-and-coming and/or local

professional MMA fighters or fighters who are not as well-known, popular, or accomplished as their counterparts on the Main Card.

**IV.    PARTIES**

28.    Defendant Zuffa, LLC is a Nevada limited liability company founded in 2000 and headquartered in Las Vegas, Nevada.

29.    Zuffa is a privately-held entity of which billionaire founders Lorenzo Fertitta, Zuffa's CEO, and Frank Fertitta each own, in trusts, approximately 40.5%. Zuffa's President, Dana White, owns approximately 9% of the entity in family trusts. In 2010, January Capital, a subsidiary of Flash Entertainment, itself a wholly-owned subsidiary of the Executive Affairs Authority of Abu Dhabi, purchased ten percent of Zuffa, and currently owns approximately 10%. Zuffa Pipco I, LLC, an entity established for an employee participation interest plan, owns an approximate 0.08% interest in Zuffa. The UFC was purchased by the Fertittas for $2 million in 2001 and is currently valued in excess of $2 billion.

30.    Zuffa is in the business of, among other things, promoting live Elite Professional MMA bouts in the U.S. and elsewhere, under the trade names of the Ultimate Fighting Championship® or UFC®. Under the UFC trademark, which is wholly owned by Zuffa, Zuffa promotes professional MMA events for live audiences as well as live television, Internet and PPV broadcasts, and licenses, markets, sells and distributes UFC Licensed Merchandise and/or Promotional Materials including, but not limited to, tickets to bouts, live and taped television programming, broadcasts over an Internet subscription service, sponsorships and other merchandise including video games, action figures, gyms, fitness products, athletic equipment, apparel, footwear, hats, photographs, toys, collectibles, trading cards and digital media products.

31.    All of Defendant's actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by Defendant's various owners, shareholders, officers, agents, employees, or other representatives, including but not limited to, Lorenzo Fertitta, Frank Fertitta, and Dana White, while actively engaged in the management of Defendant's affairs, within the course and scope of their roles or duties of employment, or with the actual, apparent, or ostensible authority of the UFC.

32.     Defendant has illegally acquired and continues to maintain monopsony power in the Relevant Input Market, *i.e.*, the market for Elite Professional MMA Fighter services, through various illicit market restraints and exclusionary conduct, including unlawful restraints and exclusionary conduct in the Relevant Output Market.

33.     Plaintiff Cung Le ("Le"), a resident of Elk Grove, California, is an Elite Professional MMA Fighter and a proposed representative of the Bout Class and the Identity Class. Le competed in UFC-promoted bouts in the United States and elsewhere from 2011 through the present. Le's compensation for participation in those UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Le appeared on *EA Sports UFC*, the fourth installment of the UFC video game franchise, initially released on June 17, 2014. *EA Sports UFC* is a mixed martial arts fighting video game developed by Electronic Arts which is based in the Northern District of California. Le has also appeared in Round 5 action figure sets, including limited edition sets, and Topps Trading Card sets. Le's Identity, including his autograph, was featured in UFC posters. Le's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed. Le was and continues to be injured as a result of the Defendant's unlawful conduct

34.     Plaintiff Nathan Quarry ("Quarry"), a resident of Lake Oswego, Oregon, is an Elite Professional MMA Fighter and is a representative of the Identity Class. Quarry competed in UFC-promoted bouts in the United States from April 2005 to March 2010. Quarry appeared in the UFC Undisputed 2010 video game that debuted on May 25, 2010, in North America, and is still sold today. UFC Undisputed 2010 has reportedly sold over 2 million units. Quarry has also been featured in a number of trading cards manufactured and sold by Topps Trading Cards, including a series in 2010, which are still sold today. Quarry's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed due to the scheme alleged herein. Quarry was and continues to be injured as a result of the Defendant's unlawful conduct.

35.     Plaintiff Jon Fitch ("Fitch"), a resident of Las Vegas, Nevada, is an Elite Professional MMA Fighter and is a proposed representative of the Bout Class and the Identity Class. Fitch competed

in UFC-promoted bouts in the United States and elsewhere from October 2005 through February 2013. Fitch's compensation for participation in those UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Fitch appeared in the first three versions of the UFC video game franchise, including UFC Undisputed 2009, UFC Undisputed 2010, and UFC Undisputed 3, debuting May 19, 2009, May 25, 2010, and February 14, 2012, respectively, each of which is still sold today. UFC Undisputed 2009 has reportedly sold over 3.5 million units, UFC Undisputed 2010 has reportedly sold over 2 million units, and UFC Undisputed 3 has sold a reported 1.4 million units. Fitch has also appeared in Round 5 action figure sets including limited edition sets, Topps Trading Card sets, and JAKKS Pacific action figure sets. Fitch's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed due to the scheme alleged herein. Fitch was and continues to be injured as a result of the Defendant's unlawful conduct.

36.     Plaintiff Brandon Vera ("Vera"), a resident of Chula Vista, California, is an Elite Professional MMA Fighter and is a proposed representative of the Bout Class and the Identity Class. Vera competed in UFC-promoted bouts in the United States and elsewhere from October 2005 through August 2013. Vera's compensation for participation in those UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Vera appeared in the first three versions of the UFC video game franchise, including UFC Undisputed 2009, UFC Undisputed 2010, and UFC Undisputed 3, debuting May 19, 2009, May 25, 2010, and February 14, 2012, respectively, each of which is still sold today. UFC Undisputed 2009 has reportedly sold over 3.5 million units, UFC Undisputed 2010 has reportedly sold over 2 million units, and UFC Undisputed 3 has sold a reported 1.4 million units. Vera also appeared in Topps Trading Card sets, including a series in 2012, which are still sold today. Vera's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed due to the scheme alleged herein. Vera was and continues to be injured as a result of the Defendant's unlawful conduct.

37.     Plaintiff Luis Javier Vazquez ("Vazquez"), a resident of Ontario, California, is an Elite Professional MMA Fighter and is a proposed representative of the Bout Class and the Identity Class. Vazquez competed in a UFC-promoted bout in the United States in June of 2011. Vazquez participated

in WEC-promoted bouts from August of 2009 through November of 2010, under Zuffa's ownership. Vazquez' compensation for participation in UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein. Vazquez appeared in Topps Trading Card sets, including a series in 2011, which are still sold today. Vazquez appeared on UFC Undisputed 3 by THQ, released in 2012. Vazquez's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed due to the scheme alleged herein. Vazquez was and continues to be injured as a result of the Defendant's unlawful conduct.

38.     Plaintiff Kyle Kingsbury ("Kingsbury"), a resident of Sunnyvale, California, is an Elite Professional MMA Fighter and is a proposed representative of the Bout Class and the Identity Class. Kingsbury competed in UFC-promoted bouts in the United States from December 2008 to July 2014. Kingsbury's compensation for participation in UFC bouts was artificially suppressed due to the anticompetitive scheme alleged herein.  Kingsbury appeared in Topps Trading Card sets, including a series in 2012, which are still sold today.  Kingsbury's Identity was expropriated and his compensation for appearing in UFC Licensed Merchandise and UFC Promotional Materials was artificially suppressed due to the scheme alleged herein.  Kingsbury was and continues to be injured as a result of the Defendant's unlawful conduct.

## V.     CLASS ACTION ALLEGATIONS

### A.     The Bout Class

39.     The Bout Class Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the "Bout Class" consisting of:

> All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.

40.     There are multiple questions of law and fact common to the Bout Class that predominate over any questions solely affecting individual members, including but not limited to:

a.   whether the market for promoting live Elite Professional MMA bouts, *i.e.*, the Relevant Output Market, is a relevant market in this case;

b.   whether the relevant geographic market is the United States, or alternatively, North America;

c.   whether the Defendant possesses monopoly power in the Relevant Output Market;

d.   whether the market for Elite Professional MMA Fighter services, *i.e.*, the Relevant Input Market, is an appropriate relevant market for analyzing the claims in this case;

e.   whether the Defendant possesses monopsony power in the Relevant Input Market;

f.   whether, through the conduct alleged herein, the Defendant willfully acquired, maintained and enhanced monopoly power;

g.   whether, through the conduct alleged herein, the Defendant willfully acquired, maintained and enhanced monopsony power;

h.   whether Defendant engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Output Market;

i.   whether Defendant entered into exclusionary agreements with actual or potential rival MMA Promoters, MMA venues, or other entities, that foreclosed the UFC's actual or potential rivals from competing in the Relevant Output Market;

j.   whether the terms in the UFC's contracts requiring exclusivity are, when taken together, anticompetitive;

k.   whether Defendant's exclusionary scheme had anticompetitive effects in the Relevant Markets;

l.   whether Defendant's actions alleged herein caused injury to Bout Class Plaintiffs and the members of the Bout Class in the form of artificially suppressed compensation for participating in UFC-promoted MMA bouts;

m.   the appropriate measure of damages; and

n.   the propriety of declaratory and injunctive relief.

41.   The members of the Bout Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals is currently

unknown, Plaintiffs believe that the number of members in the Bout Class is, at minimum, in the hundreds, and that the members reside across the United States, including in this District.

42.   The claims of the Bout Class Plaintiffs are typical of those of the class they seek to represent. Plaintiffs Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, like all other members of the Bout Class, were injured by Defendant's illegally obtained market and monopsony power that resulted in artificially suppressed compensation for competing in UFC bouts.

43.   The Bout Class Plaintiffs are more than adequate representatives of the Bout Class and their chosen Class Counsel (the undersigned) are more than adequate attorneys. The Bout Class Plaintiffs have the incentive, and are committed to prosecuting this action, for the benefit of the Bout Class. The Bout Class Plaintiffs have no interests that are antagonistic to those of the Bout Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

44.   This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendant has acted and refused to act on grounds that apply generally to the Bout Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Bout Class as a whole.

45.   This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Bout Class predominate over any questions affecting only individual members of the Bout Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that asserted in this Complaint. The Bout Class Plaintiffs are aware of no difficulties that would render this case unmanageable.

46.   The Bout Class Plaintiffs and members of the Bout Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of Defendant's acquisition, enhancement, or maintenance of monopsony power in the Relevant Input Market.

## B.   The Identity Class

47.     The Identity Class Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of "Identity Class" consisting of:

> Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials, during the Class Period in the United States.

48.     There are multiple questions of law and fact common to the Identity Class that predominate over any questions solely affecting individual members, including, but not limited to, all of the common questions set out with respect to the Bout Class above, in addition to the following:

a.   whether the Defendant expropriated or exploited the Identities of members of the Identity Class in UFC Licensed Merchandise or Promotional Materials during the Class Period;

b.   whether the Defendant's actions alleged herein caused injury to the Identity Class Plaintiffs and the members of the Identity Class in the form of suppressed compensation;

c.   the appropriate measure of damages; and

d.   the propriety of declaratory and injunctive relief.

49.     The number of members of the Identity Class is so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, Plaintiffs believe that the number of members is, at minimum, in the hundreds and that such individuals reside across the country, including in this District.

50.     The Identity Class Plaintiffs' claims are typical of those of the Identity Class they seek to represent. Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, like all other members of the Identity Class, have been injured by the UFC's illegally obtained monopoly and monopsony power, resulting in Plaintiffs' suppressed earnings from the UFC's exploitation of their Identities.

51.     The Identity Class Plaintiffs are more than adequate representatives of the Identity Class and their chosen Class Counsel (the undersigned) are more than adequate attorneys. The Identity Class Plaintiffs have the incentive, and are committed, to prosecuting this action for the benefit of the Identity

Class. The Identity Class Plaintiffs have no interests that are antagonistic to those of the Identity Class. The Identity Class Plaintiffs have retained counsel experienced in antitrust and class action litigation.

52.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because the UFC has acted and refused to act on grounds that apply generally to the Identity Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Identity Class as a whole.

53.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Identity Class predominate over any questions affecting only individual members of the Identity Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that asserted in this Complaint. The Identity Class Plaintiffs are aware of no difficulties which would render this case unmanageable.

54.     The Identity Class Plaintiffs and members of the Identity Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of the UFC's monopoly and monopsony power that has been acquired, enhanced, and maintained by the anticompetitive scheme challenged in this Complaint.

## VI.     THE UFC'S MONOPOLY AND MONOPSONY POWER

### A.     The UFC's Monopoly Power in the Relevant Output Market

#### 1.     The Relevant Output Market

55.     The Relevant Output Market is the promotion of live Elite Professional MMA bouts.

56.     Promoters of live professional MMA bouts arrange contests between Professional MMA Fighters who compete in one-one-one fights known as bouts.

57.     Live professional MMA bouts are held in venues for which admission tickets are sold. Revenues from the promotion of live professional MMA bouts may also include broadcast of the event on PPV, television, or over the Internet as well as through the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event sponsorships, and the collection of MMA-related copyright and trademark royalties.

58.     The successful promotion of a live Elite Professional MMA event requires Elite Professional MMA Fighters—*i.e.*, those Fighters who have reputations for winning professional bouts or who have gained notoriety with the MMA fan base and thus who can attract a wide audience. Mixed Martial Artists are skilled athletes who typically train for years before competing professionally. A successful promotion of a live Elite Professional MMA event also requires a suitable venue, access to PPV or television distribution outlets, sponsors and endorsements.

59.     MMA is a unique blend of various martial arts disciplines, including, *e.g*., boxing, Muay Thai (kick-boxing), judo, wrestling, Brazilian jiu-jitsu, taekwondo and karate. The rules of MMA differentiate it from other combat sports (such as boxing, which does not allow kicks, takedowns, chokeholds, joint-locks, or any strikes below the waist). Similarly, wrestling does not allow striking of any kind (kicks, punches, etc.), and does not have an outlet for elite amateur wrestlers to continue their athletic careers as wrestlers professionally.

60.     MMA is distinct from "professional" wrestling as currently promoted under the umbrella of the World Wrestling Entertainment ("WWE"). Professional wrestling is now acknowledged to be "staged"—that is, scripted entertainment involving acting with the outcome of individual matches predetermined. Combat sports such as boxing or those that are limited to a single martial art, such as judo, are not adequate substitutes for live Elite Professional MMA. There is no meaningful market substitute amongst the television-viewing and ticket-paying audience for the sport of MMA. Single discipline combat sports, such as boxing and kick-boxing, do not qualify as economic substitutes because they do not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming audience.

61.     Boxing does not combine different elements from a diverse set of martial arts, as it is limited to only strikes with the hands above the waist on an opponent, and hence does not provide a viewing experience akin to MMA. Indeed, while state athletic gaming commissions (or equivalents thereof) sanction both boxing and MMA events, such commissions impose strict requirements that define each sport separately. Such distinctions include the method of scoring, weight classes, the duration and number of rounds, and the methods of combat that may be employed. For example, scoring in live Professional MMA bouts is based on athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission, chokeholds, throws or takedowns), most forms of which are prohibited in boxing.

62.     Promotion of live Elite Professional MMA events is not reasonably interchangeable with promoting any other sport or entertainment, including boxing and/or kick-boxing. For instance, and on information and belief, raising the prices for live MMA events above competitive levels by a small but significant amount for a substantial period of time would not cause so many consumers to switch to other sporting events or entertainment options that such price inflation would be unprofitable. Moreover, dropping the price for attending or viewing any other sport relative to the price of attending or viewing an MMA event by a small but significant amount for a substantial period of time would not cause so many consumers to switch to the other sport that such relative price difference would be profitable for the non-MMA event.

## 2.     The Relevant Geographic Market

63.     The relevant geographic market for the Relevant Output Market is the United States, and, in the alternative, North America. In other words, the promotion of live MMA bouts in the United States—and in the alternative, North America—is the appropriate market for analyzing the claims in this case. For purposes of geographic boundaries of the Relevant Output Market, bouts that take place outside of the U.S. (or in the alternative, outside of North America), but which are typically broadcast live (or subject to a delay to account for differences among time zones) via television, Internet and/or PPV into the U.S. (or in the alternative, North America), are in the relevant geographic market. A bout which neither takes place in the U.S. nor is broadcast into the U.S. is not in the geographic market.

64.     MMA events involving Elite Professional MMA Fighters are typically broadcast in the U.S. on national television and reported on by national broadcasters (ESPN, FOX Sports, etc.) in national media outlets. U.S. consumers do not view MMA events staged or broadcast outside of the U.S. as reasonable substitutes for events staged in the U.S. or broadcast into it. Barriers associated with language, travel, and other costs separate non-U.S.-promoted bouts from bouts promoted in the U.S. The PPV, broadcast, and other rights to MMA promotions are sold separately in each country and region. Consumers in the U.S. would not view events which are neither fought nor broadcast widely in the U.S., and would not see such non-U.S. events as reasonable substitutes for bouts fought or broadcast in the U.S. A small but significant increase in ticket prices for bouts fought or viewable in the U.S. would not cause so many consumers to switch to bouts not fought or broadcast in the U.S. to make such an increase unprofitable.

65.     The United States is the only geographic area in which MMA Promoters operating in the U.S. can practically turn for supplies and inputs necessary for promoting and broadcasting profitable live MMA events to U.S. consumers. Staging a live event in the U.S. requires a venue in the U.S.. Broadcasting an event on television or PPV in the U.S., even if it takes place outside of the U.S., requires contracting with U.S. television broadcasting and/or PPV companies with licenses to operate in the U.S. Bouts in the U.S. typically require mainly U.S.-based medical staff, judges, referees, and athletic commissions.

66.     In the alternative, if the geographic market extends beyond the U.S., it would include North America, which has the same time zones as does the U.S., and includes countries that abut the U.S. geographically, cutting down on travel and other costs.

### 3.     The UFC's Monopoly Power with Respect to Promoting Live Elite Professional MMA Bouts.

67.     At all relevant times, the Defendant had monopoly power in the Relevant Output Market, *i.e.*, the market for promoting live Elite Professional MMA bouts in the U.S. In the alternative, even if the Relevant Output Market included North America, or indeed, the entire world, the UFC would have monopoly power.

68.     The UFC obtained and maintains monopoly power in the Relevant Output Market, in large part, through the anticompetitive conduct alleged herein. The UFC possesses the ability to control, maintain and increase prices associated with the promotion of professional live MMA bouts above competitive levels and to impair and exclude competitors from promoting professional live MMA bouts whether the Relevant Output Market is limited to the U.S. or, in the alternative, North America, or the entire world. The UFC has the ability to foreclose, and has in fact foreclosed, would-be rivals from the market for promoting live Elite Professional MMA bouts taking place or broadcast in the U.S., North America or the world.

69.     The UFC has, and has exercised, the power to impair and exclude competition in the Relevant Output Market no matter how it is geographically defined.

70.     The UFC is, by far, the dominant provider of live Elite Professional MMA events in the Relevant Output Market, regardless of whether the geographic market includes the U.S. only, North America only, or the entire world. According to Zuffa's President, Dana White, by 2010, the UFC had essentially eliminated all of its competition. He announced that, within the sport of MMA: "There is no competition. We're the NFL. You don't see people looking at the NFL and going, 'Yeah, but he's not the best player in the world because there's a guy playing for the Canadian Football League or the Arena League over here.' We're the NFL. ***There is no other guy***."

71.     The UFC possesses the ability to preclude or delay new entry into the Relevant Output Market, to raise would-be rivals' costs in that market, to impair the opportunities and efficiencies of would-be rivals, and to control prices and exclude competition.

72.     The UFC enjoys high profit margins on its sales in the Relevant Output Market in the U.S., North America, and around the world. The UFC's worldwide profit margins are among the highest, if not the highest, in professional sports.

73.     Because, as alleged below, the UFC possesses monopsony power in the Relevant Input Market, *i.e.*, the market for Elite Professional MMA Fighter services, the UFC has been able to use that dominance as a means to restrict access and limit expansion of actual or potential rivals into the Relevant Output Market. Through, *e.g.*, exclusive contracts with MMA Fighters, the UFC has deprived potential and actual competitors of Elite Professional MMA Fighter services. The UFC has also used its

ill-gotten power in the Relevant Markets to restrict its actual or potential rivals' access to top quality venues, sponsors, endorsements, PPV and television broadcast outlets. The UFC exercises its monopoly power to exclude competition for live Elite Professional MMA events, PPV access, athlete and event endorsement rights, taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and fighter sponsorships, and copyright and trademark royalties.

74.     As a result of its anticompetitive conduct, as alleged herein, the UFC receives approximately 90% of all revenue generated by MMA events from the Relevant Output Market in the U.S. and North America, and upon information and belief, throughout the entire world. From October 1, 2012 to September 30, 2013, Zuffa's annual revenues were approximately $483 million, with approximately $256 million generated by the promotion of live events, and the remaining $227 million generated by ancillary revenue streams, which include but are not limited to, merchandising, licensing fees, sponsorships, advertising fees, video game fees, and digital media revenue streams. Current UFC revenues are estimated to exceed $500 million annually.

75.     Barriers to entry in the Relevant Output Market are high for several reasons, including that, *inter alia*, establishing and maintaining a rival MMA promotion requires a substantial investment of capital to be able to promote professional MMA bouts involving Elite Professional MMA Fighters successfully. Successful promotion requires the ability to secure appropriate venues, sponsorships, endorsements, and PPV and/or television distribution rights. The UFC asserts that the "UFC brand is more recognizable than the sum of its individual fighters, as evidenced by its ability to nearly sell out venues even before announcing the main card to the public." According to Lorenzo Fertitta, "Zuffa has built the UFC into an international brand that, in many instances, has been synonymous with the rapidly growing sport of MMA." In terms of promotions, prospective market entrants cannot enter the Relevant Output Market unless they can attract and retain Elite Professional MMA Fighters. Actual or potential rival promoters cannot attract and retain necessary Elite Professional MMA Fighters unless they can demonstrate that they can promote a profitable bout that will result in potentially competitive compensation to the fighters. The UFC has also amassed an unparalleled content video library of bouts and continues to acquire rights to additional footage libraries which are an important component to

marketing Elite Professional MMA Fighters and bouts. The UFC's anticompetitive conduct—which deprives would-be rival promoters of MMA events of necessary inputs to pull off successful promotions, including through exclusionary contracts with Elite Professional MMA Fighters themselves—creates high barriers to entry for would-be rival promoters.

**B.    The UFC has Monopsony Power in the Relevant Input Market**

**1.    The Relevant Input Market**

76.    The Relevant Input Market is the market for Elite Professional MMA Fighter services.

77.    Elite Professional MMA Fighters are elite athletes who typically train for years before competing professionally. In live professional MMA bouts, Mixed Martial Artists compete by using multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing. Such bouts are registered with, sanctioned by and conducted according to rules promulgated by the Athletic Commission (or equivalent thereof) for the jurisdiction in which the bout is held.

78.    Elite Professional MMA Fighters are typically compensated for participating as a combatant in a live Elite Professional MMA bout.

79.    Athletes who have trained for, and now engage in, sports other than MMA, including professional boxing, and those who engage in a single martial art, such as judo, are not substitutes for Elite Professional MMA Fighters. For instance, boxers and those who engage in a single martial art are generally not trained in the additional forms of martial arts (which may include wrestling, judo, jiu-jitsu, taekwondo, Muay Thai and karate) necessary to become and successfully compete as an Elite Professional MMA Fighter.

80.    Importantly, there are no reasonably interchangeable sports to which Elite Professional MMA Fighters can turn when demand and compensation for Elite Professional MMA Fighters is artificially suppressed below competitive levels. Other martial arts disciplines do not have the audiences necessary for the fighters to earn competitive wages or even generally to be paid at all. For this and other reasons, no material number of Elite Professional MMA Fighters could successfully transition to other sports sufficient to prevent a monopsonist in the market for Elite Professional MMA

Fighter services from artificially suppressing Elite Professional MMA Fighter compensation by even a significant amount for a substantial period of time.

81.     For instance, with respect to judo, tournaments occur infrequently, and the major ones (World Championships, Olympics) are for "amateur" fighters, that is, unpaid athletes. Brazilian Jiu Jitsu ("BJJ") is a popular amateur sport, but there are very few tournaments that offer more than nominal prizes (as opposed to awarding salaries or prize money to competitors) and even those occur rarely. Karate and Muay Thai, much like BJJ and judo, are mainly amateur disciplines. Muay Thai and kick-boxing are striking disciplines that do not employ any of the grappling techniques of MMA of and in which knowledge and proficiency is required to successfully compete. None of these sports would be plausible alternatives for Elite Professional MMA Fighters who are facing artificial suppression of their compensation by a monopsonist in the market for Elite Professional MMA Fighter services.

82.     Neither boxing nor "professional" WWE wrestling provides reasonable alternatives for Elite Professional MMA Fighters. Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo. While Elite Professional MMA Fighters do train in boxing, that is but one of many martial arts disciplines Elite Professional MMA Fighters must practice, and it is not (and, indeed, cannot) be their sole focus. As a result, no material number of Elite Professional MMA Fighters could successfully transition to boxing sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing Elite Professional MMA Fighter compensation below competitive levels by even a significant degree for a substantial period of time.

83.     Although professional wrestling does pay compensation to its "wrestlers," professional wrestling events are staged, and depend predominantly on acting ability. It is extremely unusual for an athlete to possess the right combination of skills to excel in both MMA and professional wrestling, and furthermore, professional wrestling is not a sport at all requiring competition between athletes. For this reason alone, professional wrestling is not a reasonable substitute for MMA. No material number of Elite Professional MMA Fighters could successfully transition to professional wrestling sufficient to prevent a monopsonist in the market for Elite Professional MMA Fighter services from artificially suppressing MMA Fighter compensation by even a significant degree for a substantial period of time.

84.     Because other sports are not plausible alternatives for Elite Professional MMA Fighters, reducing the compensation of Elite Professional MMA Fighters below competitive levels by even a significant degree for a substantial period of time will not cause sufficient numbers of Elite Professional MMA Fighters to switch to other sports or professions to make the Elite Professional MMA Fighter compensation suppression unprofitable. Quite simply, MMA is a highly specialized and unique sport engaged in by elite athletes with years of cross-disciplinary training.

### 2.     The Relevant Geographic Market

85.     The relevant geographic market for the Relevant Input Market is the United States, and in the alternative, North America.

86.     A monopsonist in the Relevant Input Market would need to control only fighter services in the United States, or in the alternative in North America, to be able to suppress Elite Professional MMA Fighter compensation substantially below competitive levels.

87.     Elite Professional MMA Fighters in the United States, or in the alternative, North America, do not view participation in MMA bouts outside of the United States (or, in the alternative, North America) as a reasonable substitute for bouts in the United States (or, in the alternative, North America). Competing abroad imposes substantial costs on Elite Professional MMA Fighters, including higher costs of training, travel, and lodging and reduced sponsorship income. Moreover, Elite Professional U.S. MMA Fighters may have difficulty, or face significant costs associated with, obtaining necessary visas and approvals for themselves, family members, sparring partners, or trainers needed for fighting abroad. As a result, a U.S.-based MMA Fighter could not practically turn to a non-U.S.-based MMA Promotion company to earn a living or competitive compensation as an Elite Professional MMA Fighter.

88.     Nearly all non-U.S.-based MMA promotion companies focus on regional or local fighters. Moreover, non-U.S.-based MMA Promoters frequently hold only a few events per year—very few of which are generally or widely open to non-locals. Further, non-U.S.-based MMA Promoters lack the prestige of the UFC and most MMA Fighters would not view non-U.S.-based promoters as interchangeable with the UFC. In any case, the UFC deprives non-U.S.-based promoters of Elite

Professional MMA Fighters. Accordingly, no significant number of U.S. Fighters can earn competitive compensation for appearing in live Elite Professional MMA events in foreign geographic markets.

89.     Successful foreign fighters have immigrated to the U.S. to participate in Elite Professional MMA bouts. But, to the extent that a U.S. MMA Promoter such as the UFC is a net importer of foreign labor, this fact would serve to enhance its monopsony power and bargaining power vis-à-vis U.S. MMA Fighters and MMA Fighters as a whole.

### 3.     The UFC has Monopsony Power with Respect to Elite Professional MMA Fighter Services.

90.     At all relevant times, the UFC had and continues to have monopsony power in the Relevant Input Market, *i.e.*, the market for Elite Professional MMA Fighter services, whether that market includes only the United States, only North America, or, alternatively, the entire world.

91.     The UFC controls the vast majority of the market for Elite Professional MMA Fighter services whether the geographic market includes only the United States, only North America, or the entire world. The UFC possesses the ability to reduce the demand of, and compensation for, Elite Professional MMA Fighter services without losing so much revenue as to make their conduct unprofitable. As a result of the UFC's monopsony power in the Relevant Input Market, Elite Professional MMA Fighters do not have the ability to turn to alternative MMA Promoters to earn competitive compensation in response to the UFC's artificial suppression of demand and compensation for Elite Professional MMA Fighter services.

92.     The UFC's control of the Relevant Input Market affords it the ability to, *inter alia*, (i) compensate Elite Professional MMA Fighters below competitive levels profitably for a substantial period of time, (ii) artificially suppress demand for Elite Professional MMA Fighter services below competitive levels, (iii) require UFC Fighters to enter into restrictive contracts, (iv) impair or preclude UFC Fighters from engaging in their profession or working with would-be rival promoters; (v) expropriate the rights to UFC Fighters' Identities in perpetuity for little or no compensation (which is below competitive levels), and (vi) expropriate the Identities and deprive UFC Fighters of competitive levels of payment for the exploitation of their Identities in UFC Licensed Merchandise and/or Promotional Materials licensed or sold by the UFC or its licensees.

CONSOLIDATED AMENDED ANTITRUST CLASS ACTION COMPLAINT

93.     Whether the relevant market is the U.S. only, North America only, or the entire world, the UFC is capable of artificially reducing compensation—and has in fact artificially reduced compensation—of Elite Professional MMA Fighters without causing so many Elite Professional MMA Fighters to switch to other sports or professions so as to make that compensation reduction unprofitable.

94.     Barriers to entry in the Relevant Input Market are high. To become an Elite Professional MMA Fighter, one needs to be highly skilled and spend many years under specialized training in multiple martial arts disciplines. Because MMA is a unique blend of various martial arts disciplines, including boxing, Muay Thai (kick-boxing), judo, wrestling, BJJ, taekwondo and karate, a high level of proficiency in any one discipline alone is not sufficient to achieve elite level status as an Elite Professional MMA Fighter. For example, while a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as an Elite Professional MMA Fighter. Elite Professional MMA Fighters are rare multidisciplinary athletes who can perform at very high levels in more than one discipline. Also, training is costly and time consuming. To achieve elite status, Professional MMA Fighters train daily, making alternative simultaneous full-time employment nearly impossible. Training also requires the services of professional trainers and the relevant space and training equipment. To rise to the level of a fighter capable of being promoted by the UFC, *i.e.*, an Elite Professional MMA Fighter, a Professional MMA Fighter typically needs to work his or her way up the ranks in local and regional promotions, often earning very little money in the process.

## C.     Overview of the MMA Industry and the UFC's Dominance

95.     The popularity of MMA as a combat sport began to take off during the 1990s. Professional MMA has since become one of the most popular and fastest growing spectator sports in the U.S. and North America.

96.     Elite Professional MMA Fighters are among the most respected professional athletes in the world. Elite Professional MMA Fighters include world-class and Olympic athletes utilizing all disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, taekwondo, karate and boxing, in one-on-one bouts.

97.     Professional MMA Fighters typically achieve the status of Elite Professional MMA Fighters as UFC Fighters only after participating successfully in events organized by other local or regional MMA Promoters.

98.     MMA Promotions are not organized into leagues or teams as is common in many organized sports. Typically, Professional MMA Fighters compete against other Professional MMA Fighters who are under contract with the same promoter.

99.     MMA Promoters host events that ordinarily contain seven to twelve bouts on a Card, and bouts are organized by recognized weight classes. Together, all of the bouts for an event constitute the Card. The Card at a typical event includes an Undercard, or a set of preliminary bouts, that generally feature up-and-coming and/or local Professional MMA Fighters, and the Main Card, which typically features Professional MMA Fighters who are further along in their careers and/or possess higher levels of public notoriety.

100.    The strength of the Card draws ticket purchases for live events as well as viewers for broadcasts and purchases of PPV access (provided the promotion garners PPV coverage). During the Class Period, it has been and continues to be extremely rare for a bout that is not promoted by the UFC to garner PPV coverage. During the Class Period, no would-be rival MMA Promoter has staged a profitable PPV event featuring Professional MMA Fighters. The strength of the Card also draws merchandise sales and licensing fees, and contributes to the rates paid by sponsors, advertisers and broadcasters. The Card thus helps to determine the size and scale of the physical venue in which the event takes place, the scope and breadth of its distribution and event sponsorship rates, and the merchandising campaign for the event.

101.    Professional MMA events are sanctioned in the U.S. by the same state athletic commissions as boxing. Nearly all athletic commissions in North America are members of the Association of Boxing Commissions ("ABC"). All member commissions of the ABC have passed the Unified Rules of Mixed Martial Arts ("Rules") which govern professional MMA bouts and establish MMA weight classes, ring-fighting area requirements and equipment, length of and number of rounds in a bout, the rest period between rounds, the nature of the protective gear worn by fighters, judging requirements, fouls, and other bout rules and regulations.

**D.      The UFC's Complete Control of its Sport is Unique in the Context of Big-Time Professional Sports**

102.      As more fully set forth below, due to the anticompetitive scheme alleged herein, the UFC has been able to suppress Elite Professional MMA Fighters' compensation to a very low percentage of the revenues generated from bouts. On information and belief, UFC Fighters are paid approximately 10-17% of total UFC revenues generated from bouts. As alleged further below, all UFC Fighters—from the highest paid to the lowest—have had their compensation artificially reduced due to the anticompetitive scheme challenged in this Complaint.

103.      Athletes in sports such as boxing and the "Big 4," *i.e.*, football, baseball, basketball and hockey in the United States, generally earn more than 50% of league revenue, a significantly higher percentage of revenues than those paid to UFC Fighters.

104.      Boxers Floyd Mayweather and Manny Pacquiao take the number one and two spots, respectively, on the "Forbes 100-highest paid athletes list," earning upwards of $40 million in guaranteed purse for a single bout, before inclusion of PPV profits. Mayweather's compensation has reportedly topped $90 million for a single bout for an event that draws comparable PPV purchase rates to high-profile UFC events. As a result of the scheme alleged herein, UFC Fighters get a fraction of that level of compensation. Famed boxing promoter Bob Arum, for example, pays his fighters approximately 80% of the proceeds generated by a Card. Comparing the fighter compensation between boxing and the UFC, Arum accurately described the disparity between the UFC and boxing as follows: "Because of the monopoly that the UFC has, they [the UFC] pay[s] their fighters maybe 20% of the proceeds that come in on a UFC fight."

**E.      The Growth of MMA in the United States**

105.      MMA's initial growth in the 1990s was accompanied by the growth of competing MMA Promoters. The UFC was founded in 1993. By 2001, MMA Promotions were competing vigorously in the U.S. Prior to 2011, the existence of such competition allowed UFC Fighters—such as Mark Kerr, BJ Penn, Mark Coleman, and Carlos Newton—to receive higher purses with UFC competitors. In 2001, Zuffa purchased the UFC from Semaphore Entertainment Group ("SEG") for $2 million and appointed White as its President. The UFC initially claimed that it was seeking co-promotion

arrangements with its competitors. At that time, according to White's contemporaneous public statements, co-promoting MMA events would benefit both the UFC and its competitors by ensuring that MMA events featured the best bouts between Professional MMA Fighters regardless of the Fighter's Promoter. In fact, the UFC never intended to co-promote events.

106.     By the mid-2000s, professional MMA had gained even broader mainstream support in the United States. The UFC and its competitors actively promoted MMA events and began introducing the sport to the public through more extensive television programming and marketing activities. As an overall result of competition between rival promotions in the Relevant Input and Output Markets through the early 2000s, MMA's fan base grew dramatically; while fewer than 90,000 people purchased the UFC's first MMA PPV event, by 2006, the UFC's PPV events drew more than one million buyers.

## VII.   THE UFC's ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST INJURIES TO PLAINTIFFS AND MEMBERS OF THE CLASSES

### A.   The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance Monopoly and Monopsony Power

#### 1.   The UFC Has Leveraged its Monopoly and Monopsony Power to Deny Necessary Inputs to Would-Be Rival MMA Promoters.

107.     The UFC has illegally acquired, maintained, and exercised monopsony power in the market for Elite Professional MMA Fighter services, *i.e.*, the Relevant Input Market, through an aggressive series of exclusionary and anticompetitive acts. The anticompetitive effects associated with this ill-gotten monopsony power manifest themselves as artificially suppressed compensation for Elite Professional MMA Fighters in the Bout Class, and the improper expropriation of Elite Professional MMA Fighters' Identities, resulting in artificial underpayments (including non-payment) to UFC Fighters in the Identity Class.

108.     Unless an MMA Promoter can attract and retain Elite Professional MMA Fighters, develop a fan base, attract sponsors, secure a major television distribution outlet, and secure high-quality venues, it cannot compete successfully in the Relevant Output Market. MMA Promoters cannot attract and retain Elite Professional MMA Fighters unless they can demonstrate to such athletes that they can promote profitable bouts that will result in significant compensation to those Fighters over an

extended period of time. To achieve Elite status in the MMA Industry, Professional MMA Fighters must register wins in widely-viewed MMA events that build public notoriety, reputation, fan base, and earnings potential. Without big-ticket MMA Cards with Elite Professional MMA Fighters, MMA Promoters are unable to generate sufficient public demand to lock down sponsors and venues large enough to generate enough revenues to be able to offer sufficient bout purses that would enable them to attract Elite Professional MMA Fighters. The UFC, knowing this, has engaged in a scheme to deny its actual or potential rival MMA Promoters (and any potential future rivals) the access to inputs necessary to promote successful MMA events (*e.g.,* Elite Professional MMA Fighters, major sponsors, key venues).

### a. The UFC Uses Exclusive Contracts with UFC Fighters as Part of its Anticompetitive Scheme.

109.    The UFC has illegally obtained and maintained its monopoly position in the Relevant Output Market and its monopsony position in the Relevant Input Market (*i.e.*, the market for Elite Professional MMA Fighter services), through an anticompetitive scheme to exclude and impair actual or potential rival MMA Promoters such that they do not have access to the Elite Professional MMA Fighters necessary to sustain and grow a profitable rival promotion company. As a result, Elite Professional MMA Fighters have no effective alternative promoter with whom to contract for live Elite Professional MMA bouts.

110.    The UFC's illegal monopsony position is sustained, in part, through the use of exclusive dealing agreements with UFC Fighters that lock in Elite Professional MMA Fighter services perpetually and exclusively for the UFC. The UFC's exclusive contracts foreclose would-be rival promoters from vital inputs—namely Elite Professional MMA Fighter services with the notoriety needed to sustain a successful live Elite Professional MMA promotion. Discussing the UFC's exclusive contracts, White has conceded that, across the MMA Industry, "everybody knows how crazy we are about protecting our contracts."

111.    Through the anticompetitive scheme alleged herein, including by successfully eliminating and impairing actual or potential rivals in the Relevant Output Market, the UFC has garnered and maintained unrivaled bargaining power vis-à-vis Elite Professional MMA Fighters. The

UFC uses its monopsony power to extract exclusionary and restrictive concessions from all of its MMA Fighters.

112.   All UFC Fighters are classified as independent contractors that are compensated based on the number of fights in which they participate. But the UFC uses standard form agreements with all or nearly all of its UFC Fighters that require, *inter alia*, exclusivity and assignments of the rights to Fighters' Identities. Given that, through the alleged scheme, the UFC dominates the Relevant Output Market, *i.e.*, the market for promoting live Elite Professional MMA events, Elite Professional MMA Fighters have little choice but to accept the UFC's exclusionary terms if they want to try to earn a living as Elite Professional MMA Fighters.

113.   The UFC's standard agreements with Fighters have contained, during the 2000s and continuing into the Class Period, at least the following restrictive provisions:

a.   The "Exclusivity Clause," which binds UFC Fighters into a restricted relationship with the UFC and prohibits them from appearing in bouts televised or organized by actual or potential rival promotions unless approved by the UFC, thus preventing athletes from receiving competitive purses from co-promoted or competitor MMA events. This clause blocks actual or potential rival promotions from having access to Elite Professional MMA Fighters under contract with the UFC for protracted periods of time. Regardless of the term of the agreement, the provision includes various termination and extension clauses that can be triggered at the UFC's sole discretion, thereby effectively extending the exclusivity provisions indefinitely.

b.   The "Champion's Clause," which allows the UFC to extend a UFC Fighter's contract for as long as the athlete is a "champion" in his or her weight class, preventing the Fighter from financially benefiting from his or her "championship" status by soliciting competing bids from other MMA Promotions even after the end of his or her original UFC contract term. This clause specifically blocks actual or potential rival promotions from having access to Elite Professional MMA Fighters, which are needed for a would-be rival promotion event to be commercially successful. This clause also denies UFC Fighters free agency—despite their being independent contractors—thereby retaining the Fighter's services for the UFC effectively indefinitely.

c.   The "Right to First Offer" and "Right to Match" Clauses, which grant the UFC the option to match the financial terms and conditions of any offer made to a UFC Fighter for an MMA bout even after the Fighter's contract has expired. Because the UFC's contracts typically have already required the Fighters to divest themselves of ancillary rights associated with the sale of their Identities in perpetuity, rival offers, to the extent they could even exist, would not include compensation for rights associated with the Fighters' Identities and thus are artificially suppressed or would force would-be rivals to bid to such a level to make the investment no longer profitable.

d.   The "Ancillary Rights Clause," which grants the UFC exclusive and perpetual worldwide personality and Identity rights not only of the UFC Fighter, but of "all persons associated with" the athlete, in any medium, including merchandising, video games and broadcasts, *and for all other commercial purposes*, thus preventing MMA Fighters from financially benefiting from the reputations that they built during their MMA careers *even after death*, and locking UFC Fighters out of revenues generated by the exploitation of their Identities, including *after* the term of the contract. Thus, although a single loss could allow the UFC to terminate a UFC Fighter's contract, the Ancillary Rights Clause remains in effect in perpetuity. As a result, the UFC can restrict a UFC Fighter's ability to promote himself or herself for profit even after the UFC Fighter's career with the UFC has ended. Further, a separate clause in the agreement prevents a Fighter from ever referring to himself or herself as a "'UFC fighter'" or "using the term 'UFC' without written permission." Among other anticompetitive effects of this provision, even if a would-be rival promoter could get access to a current or former UFC champion, those champions cannot advertise their status as UFC champions. Accordingly, a potential rival promoter would be impaired in attempting to contract with the former UFC Fighter to headline live MMA bouts.

e.   The "Promotion Clause," which requires UFC Fighters to attend, cooperate and assist in the promotion of bouts in which they fight and, as required by the UFC, *any other* bouts, events, broadcasts, press conferences and sale of merchandise, for no additional compensation. By contrast, no affirmative obligation exists for the UFC to promote the UFC Fighter. In fact, the UFC regularly punishes athletes who do not bow to its whims. As just one example, UFC light-heavyweight champion Jon Jones refused to take a short-notice replacement of one of his opponents. After his refusal, the UFC

issued a press release stating, "Lorenzo Fertitta (UFC chairman and CEO) and I [Dana White] are disgusted with Jon Jones and Greg Jackson [Jones trainer]." White continued by stating, "UFC 151 will be remembered as the event Jon Jones and Greg Jackson murdered." By denigrating the UFC Fighter in public, the UFC drastically impacts a fighter's earnings ability as the consuming audience will support events featuring the UFC Fighter in lower numbers, leading to reduced payments for bouts and endorsements.

f. The "Retirement Clause," which gives the UFC the power "to retain the rights to a retired fighter in perpetuity."

g. Tolling provisions, which extend the term of the UFC Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with a would be rival promoter.

h. The "Sponsorship and Endorsement Clause," which grants the UFC sole discretion over all sponsorship and endorsement approvals. In effect, the Sponsorship and Endorsement Clause requires the approval of the UFC *before* an entity can contract with a UFC Fighter to sponsor or endorse the entity's product or service during any UFC events. This gives the UFC control over sponsors and Fighters and allows the UFC to block opportunities for sponsors where: (i) the UFC has decided to boycott the sponsor in retaliation for the sponsor having endorsed non-UFC Fighters or otherwise worked with actual or potential rival MMA Promoters; (ii) the sponsors have refused to pay the UFC's "sponsorship tax," which is a fee paid to the UFC for the right to sponsor a UFC Fighter; or (iii) the sponsors are engaged in ancillary business endeavors that compete with the UFC in any segment of the MMA Industry that the UFC intends to dominate, such as, *e.g.*, MMA publications, MMA video games, gyms, online MMA stores, energy drinks, online gaming sites, fan festivals and apparel providers. This clause gives substantial power to the UFC to block sponsors from working with actual or potential rival promoters and to deprive them of key revenue opportunities for themselves and their fighters, making actual or potential rivals less profitable and a less attractive option for Elite Professional MMA Fighters.

114. As the UFC gained and then maintained market and monopsony power through this anticompetitive scheme, including by eliminating actual or potential rivals, in or about January 2014, it

added provisions—such as, *e.g.*, the "unilateral demotion-in-pay" provision which resets a Fighter's pay to lower purse levels if a given UFC Fighter loses a bout, and additional restrictions on sponsorship rights—that further enhanced the UFC's control over its Fighters.

115.    None of the Plaintiffs in this matter is suing as part of this case, on behalf of himself or herself or any proposed class member, to enforce any rights or provisions of his or her particular UFC contract. Nor is any Plaintiff in this matter claiming, as part of this case, on behalf of himself or herself or any proposed class member, that his or her contract, standing alone, violates the antitrust laws. Rather, Plaintiffs allege here that all of the UFC's contracts with Fighters—and the exclusionary provisions therein—***taken together*** form part of the UFC's anticompetitive scheme to impair actual or potential rivals and enhance its monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market. Cumulatively, the exclusionary contractual provisions deprive the UFC's would-be rivals of all or virtually all of the critical input necessary to compete in the MMA Industry, that is, Elite Professional MMA Fighter services.

**b.    The UFC's Exclusionary Scheme Included the Use of Threats, Intimidation, and Retaliation Against MMA Fighters Who Work With or For Would-Be Rivals or Speak Out Against the UFC.**

116.    As part of its exclusionary scheme, the UFC has retaliated against (i) UFC Fighters who work or threaten to work with would-be rival promoters, (ii) MMA Fighters who might someday wish to compete in the UFC, and (iii) would-be rival promoters who work with UFC Fighters. As a result, UFC Fighters have refused offers to fight for actual or potential rival promoters, even those that offer higher compensation, out of fear that the UFC would retaliate against both the promoter and the Fighter. Professional MMA Fighters are deterred by the UFC's threats because Professional MMA Fighters recognize that being banned from future opportunities to fight for the UFC will substantially diminish their ability to earn income as Elite Professional MMA Fighters. Moreover, the UFC has control over key sponsors, sponsors the UFC threatens never to work with if they contract with an Elite Professional MMA Fighter against the UFC's wishes.

117.    For example, the UFC negotiated a deal with THQ, Inc. for the development of a UFC video game. Zuffa required its athletes, for no compensation, to assign exclusively and in perpetuity their likeness rights for video game use. Fighters who wished to negotiate this request were terminated.

White also publicly threatened all MMA Fighters, even those not under contract with Zuffa with a permanent ban from competing in the UFC if the Fighter chose to sign with EA Sports.

118.    Additionally, following his victory over Matt Hughes in a welterweight title bout that had been promoted by the UFC, UFC Fighter B.J. Penn informed the UFC that he planned to sign with an actual or potential rival promotion company for a much higher payday than UFC was then offering. In response, the UFC's Dana White called Penn and threatened that the UFC would ban Penn from fighting for the UFC forever if Penn worked with another promoter. White told Penn that Penn was "f***ing done! You'll never fight in the UFC again! You're finished. You're scorched earth, motherf***er. Scorched earth. Don't call me crying saying you want to come back because your f***ing done!" White also threatened to remove or blur Penn's face from UFC videos and promotions and said he would remove his bout with Hughes from the UFC's DVD library so that Penn "would be forgotten."

119.    The UFC punished and continues to punish Fighters that refuse, or consider refusing, the UFC's contractual terms, including by eliminating them from the UFC's Promotional Materials. Through the "Ancillary Rights Clause" of its Promotional Agreements with Fighters, the UFC retains rights to the names and likenesses of every UFC Fighter in perpetuity. Randy Couture, a well-known and historically accomplished UFC Fighter who has obtained championship titles in multiple weight classes, refused to assign his Ancillary Rights and, instead, attempted to negotiate control over his Identity. According to Couture, he had "issues with Zuffa" after "g[e]t[ting] off on the wrong foot over the ancillary rights in my contract and signing away my name and image, which then led to the [UFC] . . . having m[e] pulled out of the video game, pulled out of the ad campaigns with Carmen Electra and all those things. Because I wasn't willing to just sign those things away like most fighters had done to date at that point, I think that immediately put me on the outs with the manager, with Dana [White] and the people that own the company." In fact, Couture lost the benefit of being promoted by the UFC despite competing in bouts, including by being airbrushed out of the following UFC ad campaign for refusing to assign his Identity to the UFC for no compensation:



(Below, Couture is airbrushed out of the ad campaign.)



**c.**   **The UFC Uses Exclusive Contracts with Physical Venues and Sponsors to Impair and Foreclose Would-Be Rival MMA Promoters.**

120.   The UFC has also frustrated entry and retarded rival expansion through a series of exclusive arrangements that foreclose would-be rival promoters from holding or distributing live Elite Professional MMA events through various venues.

121.   Specifically, the UFC uses its control of the Relevant Input Market (garnered through the conduct alleged herein, including its exclusive contracts) to lock would-be rival promoters out of the highest revenue-generating physical venues for live Elite Professional MMA events in the U.S.

122.   As a result of the UFC's dominance in the Relevant Markets and as part of its exclusionary scheme, the UFC imposes exclusivity provisions into its physical venue agreements that severely limit, and in some cases remove altogether, the ability of any would-be competitor to hold MMA events at premier venues in the U.S. For example, before and continuing through the Class Period, the UFC has intentionally inserted provisions into its agreements with event venues that prohibit the venues from staging live Elite Professional MMA events promoted by a would-be UFC rival promoter within a specified time either before or after a UFC event at the venue. Throughout the Class Period, the UFC has entered into such exclusionary provisions with top event venues along the Las Vegas Strip and elsewhere. Intending to shut out actual or potential rivals with these "black out" provisions in its venue contracts, the UFC has, for example, staggered its events in such venues along the Las Vegas Strip so that no would-be rival promoter can hold live Elite Professional MMA Promotions anywhere along the Las Vegas Strip—some of the most important and profitable venues for MMA events in the world. As a result of the UFC's exclusionary conduct, competing MMA Promotions are therefore forced to use second-rate venues, thereby inhibiting their ability to promote successful and profitable events, sell tickets and merchandise, secure major television distribution outlets, attract Elite Professional MMA Fighters, and otherwise generate revenues from MMA events.

123.   As part of the scheme alleged herein, in or about June 2009 and continuing during the Class Period, the UFC fundamentally restructured MMA sponsorship to: (a) require that sponsors contract with and pay a fee to the UFC as a condition precedent to their ability to contract with any UFC Fighter, and (b) prohibit any sponsor who wants to work with the UFC from contracting with

actual or potential rival promotion companies or sponsoring non-UFC MMA Fighters. The UFC's conduct, as part of its anticompetitive scheme, impairs the ability of UFC Fighters to engage in individual or independent sponsor-fighter deals; blocks UFC Fighters from working with sponsors and brands that in any way support non-UFC events or fighters (and thereby blocks would-be rival MMA Promoters from access to important sponsors); and forces sponsors to drop deals with Professional MMA Fighters who do not want to sign with the UFC so as to coerce those Elite Professional MMA Fighters into signing exclusive contracts with the UFC. The UFC's scheme also enables the UFC to unjustifiably obtain lucrative exclusive event sponsorship deals for itself. Consider just two examples involving Quinton Jackson ("Jackson"). Jackson negotiated a deal with a company called "Round 5" to develop an action figure based upon his "Rampage" persona. The UFC blocked the deal, and subsequently entered into its own deal with Round 5 for the production of UFC action figures, a line that included Jackson's likeness. Likewise, Jackson negotiated a deal with Reebok for sponsorship, which had not been approved by the UFC, and the UFC used its dominance to block Jackson's proposed sponsorship deal with Reebok in order to subsequently obtain a deal for itself.

124.     The Sponsorship and Endorsement Clause in UFC contracts with UFC Fighters prohibits UFC Fighters from contracting with sponsors unless they first obtain approval from the UFC. Before a bout, the UFC notifies the UFC Fighters (and their respective managers) of the authorized list of sponsors that may appear on a UFC Fighter during an event. The UFC also requires sponsors in certain MMA Industry segments to pay anywhere from $50,000 to $250,000 in licensing fees, *i.e.*, a "sponsorship tax," directly to the UFC for the right to associate their brands with specific UFC Fighters. Only then may the sponsor negotiate with and sponsor a UFC Fighter during UFC events. This "tax," in conjunction with bans of other MMA Industry sponsorship segments, has been selectively utilized to essentially eliminate entire segments of the MMA Industry as income sources for UFC Fighters and was implemented to enable the UFC to obtain lucrative licensing fees ("tax") and event sponsorships for itself as well as to move into and dominate MMA Industry segments unrelated to the promotion of live events.

125.     Upon information and belief, during the Class Period, the UFC has regularly threatened UFC sponsors by indicating that if they work with actual or potential rival promoters or sponsor

Professional MMA Fighters who compete in the events of such MMA Promoters, the UFC will ban the sponsors from sponsoring UFC events or from sponsoring any UFC Fighters. As a result of these threats, on information and belief, sponsors have refused to sponsor Professional MMA Fighters in actual or potential rival promotions or to work with UFC Fighters on terms other than those demanded by the UFC. Since sponsors are well aware of the UFC's dominance, the UFC's exclusionary conduct effectively prevents many sponsors from entering into business relationships with would-be rival promotions and non-UFC Professional MMA Fighters. Among other things, this conduct impairs and forecloses actual and potential rival promoters by, *e.g.*, making it difficult for would-be rival promoters to offer competitive compensation packages (including sponsorships) to Elite Professional MMA Fighters and denies would-be rival promoters of the ability to earn sufficient revenues from their events to be significantly lucrative and profitable.

126.    Throughout the Class Period, the UFC has used the monopoly power that it has acquired and maintained by the exclusionary scheme alleged in this Complaint to threaten sponsors into pulling out of deals with non-UFC Elite Professional MMA Fighters as a means of coercing those Fighters to sign exclusive contracts with the UFC. For example, when Elite Professional MMA Fighter, Fedor Emelianenko, refused to sign a contract to fight for the UFC, the UFC demanded that Tapout, a prominent clothing company and MMA sponsor, "dump [Emelianenko] or lose access to UFC events," according to M-1 Global President Vadim Finkelchstein, Emelianenko's promoter/manager. In response, Tapout withdrew a potential seven-figure, one-year sponsorship deal with Emelianenko.

127.    Prime physical venues and marquee sponsors are "must-have" inputs for would-be rival MMA Promoters and, without them, such MMA Promoters are impaired in their ability to enter the market and/or compete effectively. Therefore, the UFC's exclusive arrangements with venues and sponsors, combined with the other aspects of the UFC's scheme, foreclose competitors from attracting Elite Professional MMA Fighters and thereby competing successfully in the MMA Promotion business at the highest level.

**2.      After Impairing Actual or Potential Rival Promoters in the Relevant Output Market Through the Scheme Alleged Herein, the UFC Acquired Those Would-Be Rivals that it Did Not Put Out of Business or Relegate to the "Minor Leagues."**

128.     The UFC's scheme successfully blocked actual or potential rival promoters from accessing inputs necessary to put on successful MMA events and to operate, sustain, and grow successful MMA Promotions that could eventually compete directly with the UFC. This scheme put several actual or potential rival MMA Promoters out of business. Those companies that were not forced to exit the MMA Promotion business by the scheme were weakened to such a degree that selling out to the UFC was the only realistic option. As a result, and as part of the alleged scheme, from December 2006 to March 2011, the UFC engaged in a series of strategic acquisitions of competing MMA Promoters, culminating with its acquisition of rival MMA promotion company, Strikeforce. The UFC's acquisitions, along with other aspects of the exclusionary scheme, resulted in the UFC becoming, by its own admission, the only meaningful Promoter of live Elite Professional MMA in the U.S. or North America, enhancing the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market.

129.     Beginning at least as early as December 2006, the UFC embarked on a campaign to monopolize and monopsonize the Relevant Markets. As part of a deliberate plan to consolidate the MMA Industry and more broadly solidify its control over the Relevant Markets, the UFC began acquiring its competitors one by one. In December 2006, the UFC announced the acquisition of actual or potential rival promoters World Extreme Cagefighting ("WEC") and World Fighting Alliance ("WFA"). Initially, the UFC operated WEC, based in California, as a separate MMA promotion company, broadcast on a separate cable network to block would-be rivals from being televised on the network. But in October 2010, the UFC announced that it was merging the WEC and all of its fighters with the UFC. The UFC's acquisition of WEC enabled the UFC to eliminate a would-be rival for Elite Professional MMA Fighters in heavier weight classes, while also acquiring the major promotion entity for Fighters in lighter weight classes. The UFC also acquired "Pride" and several other would-be rival promoters in 2007.

130.    Between 2008 and 2011, and continuing into the present, the UFC accelerated its aggressive anticompetitive campaign. As part of the scheme alleged herein, the UFC's efforts to prevent any successful competitive activity by new entrants directly contributed to the impairment and ultimate failure of the following MMA Promoters, including among others:

a.   Affliction Entertainment/Golden Boy Promotions. Golden Boy Promotions is the promotional arm of legendary boxer Oscar de la Hoya. Golden Boy partnered with Affliction Entertainment and entered the market for promotion of live Elite Professional MMA events for less than one year before being forced to pull out in 2009 after just two events. As part of its scheme, the UFC forced Affliction, a niche apparel provider, to exit the MMA promotion business by raising its costs and blocking Affliction from continuing to sponsor any UFC Fighters.

b.   HDNet Fights. HDNet Fights was founded in 2007 by billionaire owner of the Dallas Mavericks and HDNet founder, Mark Cuban. HDNet Fights briefly promoted its own live Professional MMA bouts. By 2009, the UFC had forced Cuban to shut down and, instead, become a bondholder in Zuffa. The combination of the UFC's Exclusive Promotional Agreements, its persistent refusal to co-promote, and its blocking of the ability of Elite Professional MMA Fighters to self-promote, even after the terms of their contracts had expired, prevented Cuban's promotion company from promoting potentially lucrative fights, including a proposed mega fight between Randy Couture and Russian superstar Fedor Emelianenko.

131.    By 2011, the only potentially robust competitor to the UFC was Strikeforce, an MMA promotion company that had been threatening to become a major force in the MMA Industry. Strikeforce had a strong roster of Elite Professional Mixed Martial Artists, and at the time was the only major MMA outfit promoting women's MMA. It also had signed lucrative broadcast deals with Showtime and CBS. In addition, Strikeforce had succeeded in obtaining significant promotional sponsors and entered an agreement with EA Sports to develop an MMA video game to compete with the UFC's MMA video game, which had been developed by THQ of Agoura Hills, California. Strikeforce also publicly announced its desire to co-promote high-level MMA events with international promoters, and had a number of co-promotional arrangements, including co-promotional arrangements with Russian promoter M-1 and the Japanese promotion Dream. Co-promotional arrangements,

common in boxing, mean athletes promoted by competing promoters fight against each other in co-promoted events with a split of profits generated.

132. As part of the alleged exclusionary scheme, in the years before 2011, the UFC had actively sought to use its market dominance to put Strikeforce out of business. For instance, as part of this scheme—even when it was not economically rational but for the potential for exclusion—the UFC regularly "counterprogrammed" against Strikeforce events, *i.e.*, purposely staged UFC events on the same nights as Strikeforce events to prevent Strikeforce from gaining adequate ticket sales, television viewers or public notoriety for its events. The UFC counter-programmed against Strikeforce not because it was profitable in the short-run, but rather because it was a means of using the UFC's dominance in the Relevant Markets to prevent Strikeforce from successfully promoting MMA events and thereby gaining adequate economies of scale or scope. Moreover, the UFC used its market power to pressure sponsors of Strikeforce's MMA fighters to withdraw their sponsorships by threatening to ban them from sponsoring UFC Fighters or otherwise appearing in UFC broadcasts.

133. In March 2011, as part of the scheme alleged herein, after the UFC had made it difficult for Strikeforce to compete profitably, Strikeforce was forced to, and did, sell to defendant Zuffa. Following the purchase, the UFC signed many of Strikeforce's top stars and champions, including Cung Le, Jason Miller, Nick Diaz, Dan Henderson, and Alistair Overeem. Under Zuffa's ownership, Strikeforce closed the promotion's men's weight classes below "lightweight." After an extension was reached to continue Strikeforce as a separate entity under the UFC's umbrella through 2012, the promotion's heavyweight division was merged into the UFC, and the UFC ended the promotion's "Challengers" series. The final show under the Strikeforce brand was "Strikeforce: Marquardt vs. Saffiedine" on January 1, 2013, after which the promotion was dissolved and all fighter contracts were either ended or absorbed into the UFC.

134. As a result of the UFC's acquisition of Strikeforce, the UFC controlled virtually all Elite Professional MMA Fighters in every weight class. The Strikeforce acquisition was part of a series of UFC acquisitions of actual or potential rival promotions that, together, enabled the UFC to consolidate and maintain its control over the revenue-generating core of the MMA Industry. While they proclaimed to promote the best in every weight class prior to the Strikeforce acquisition, following the Strikeforce

purchase, the UFC could accurately state that it now controlled virtually all Elite Professional MMA Fighters in every weight class. Going forward, this insured that, to obtain media acclaim as "elite" and corresponding public notoriety, an Elite Professional MMA Fighter must sign with and compete against UFC Fighters.

> **3.     After Impairing Actual or Potential Rivals and Acquiring Virtually Every Would-Be Rival Promoter That it Did Not Put Out of Business, the UFC Relegated all Remaining MMA Promoters to "Minor League" Status.**

135.    Beginning no later than March 2011, those few fringe MMA Promoters that the UFC had not yet acquired or put out of business, such as Bellator MMA ("Bellator"), effectively functioned and continue to function as "minor leagues" for the UFC. These MMA Promotion outfits provide no real access to top media rankings, public notoriety, lucrative bout purses, endorsements, or sponsorships. Thus, through its anticompetitive scheme, the UFC has come to dominate the Relevant Input and Output Markets.

136.    Professional MMA Fighters generally view non-UFC Promotion companies that still exist as the "minor leagues," *i.e.*, as training grounds for future UFC Fighters.

137.    Ben Askren ("Askren"), a former Bellator welterweight champion, represented the U.S. Olympic wrestling team in freestyle wrestling, was a four-time NCAA All-American, two-time national champion, and NCAA wrestler of the year. Askren publicly stated that the only means of moving up the MMA ranks and obtaining notoriety as an Elite Professional MMA Fighter was to join the UFC and defeat UFC Fighters.

138.    While skilled Professional MMA Fighters may emerge outside of the UFC or break off from the UFC, those Fighters cannot demonstrate their skill, garner attention, or otherwise maintain sustainable careers outside of the UFC. The measure of success of a Professional MMA Fighter is dependent upon the level of competition he faces and his success or failure when doing so. The success of an Elite Professional Mixed Martial Artist requires that he or she register wins over fighters seen by the viewing audience and media as Elite Professional MMA Fighters in widely-viewed MMA events to build public notoriety, reputation, fan base, sponsor interest and earnings potential. Professional MMA Fighters who compete at the highest level of the sport cannot "opt out" of UFC because the UFC's

anticompetitive conduct has made it impossible to maintain a successful MMA fighting career outside of the UFC.

139.    Likewise, because UFC Fighters are bound by non-compete agreements, and because the UFC will not co-promote, would-be rival MMA promotion companies cannot stage bouts between their own non-UFC fighters and UFC Fighters. Because the UFC Fighters are considered MMA's Elite Professional MMA Fighters, would-be rival MMA promotion companies cannot compete effectively. Without big-ticket MMA Cards with Elite Professional MMA Fighters, would-be rival promotions are unable to secure sufficient public interest or sponsors and venues large enough or prestigious enough to generate revenues and bout purses that can sustain the demands of training costs, travel, health coverage, gym membership, sparring partners, and other expenses necessary for sustaining a career as an Elite Professional MMA Fighter. As a result, would-be rival promoters do not and cannot promote MMA events that offer Elite Professional Mixed MMA Fighters substantial earnings potential on PPV broadcasts, major network or subscription-based broadcast outlets.

140.    Accepting and publicly acknowledging their minor league status, rather than competing with the UFC, potential rival promotions in the MMA Promotion Industry seek instead to work as developmental leagues for the UFC and to obtain the UFC's approval. Thus, instead of seeking to invest in and develop Professional MMA Fighters to their full potential, the UFC's potential rival promoters acknowledge that they can afford only small purses. Thus, "rival" promoters survive and attract Professional MMA Fighters by serving as a minor league training ground for the UFC and guaranteeing their release to the UFC—and only the UFC—should the Professional MMA Fighter achieve success and earn enough notoriety to elevate them to elite status, and thus potentially obtain an offer from the UFC.

141.    Resurrection Fighting Alliance ("RFA"), broadcast on AXS TV (formally HDNet), is one such UFC "minor league." The RFA is a regional-level promotion operated by Ed Soares, who stated that his "vision" for the RFA is "to build a developmental league for guys who want to move up into the UFC." According to Soares, the RFA is truly a "developmental" promotion for Professional MMA Fighters seeking to make it to the UFC, and for veteran Professional MMA Fighters released by the UFC to "test themselves against the guys who are coming up." Soares states that all RFA

Professional MMA Fighters who receive offers from the UFC will be released from their RFA promotional agreement. RFA promotional agreements contain an express "release" provision in the event a Mixed Martial Artist obtains an offer from Zuffa. Because of the UFC's dominance of the Relevant Markets through the scheme alleged herein, absent such a provision, it is unlikely that potential rival promotions such as RFA and others would be able to attract any Professional MMA Fighters. Scott Cutbirth, the former matchmaker responsible for arranging RFA bouts, has acknowledged, "[a]ll of our contract [sic] are exclusive with a Zuffa[-]out clause. So yes, if they get offered a deal with Zuffa, we will honor that. No other organizations will be honored." Purses paid by the RFA are minimal compared to the UFC. Soares is also a prominent manager of many Elite Professional MMA Fighters currently under contract with the UFC. Soares' promotion, the RFA, is currently the only MMA Promotion to which Zuffa has provided a license to advertise the use of, and to hold events in, the UFC's trademarked octagonal fenced enclosure.

142.    Titan Fighting Championship ("Titan FC"), broadcast on the CBS Sports cable network, is another existing MMA "minor league" promotion outfit. Titan FC is a regional promotion originally formed in 2006, and currently promoted by serial entrepreneur and multi-millionaire Jeff Aronson. Aronson advised the press in January 2014 that all Mixed Martial Artists signed to Titan FC will have a "Zuffa-out" clause in their contracts, meaning they will be released if Zuffa offers the fighter a bout. Aronson has acknowledged that Titan FC "is not looking to compete with Zuffa." Aronson explained that Titan FC's role is "to take the best guys that are out there, who may be scared to get into long-term deals, and give them a forum to get back" into the UFC.

143.    Legacy Fighting Championship ("Legacy FC"), broadcast on AXS TV (formally HDNet), is still another "minor league" MMA Promoter (formed in 2009) that does not dare compete directly with the UFC. Legacy FC has survived as an MMA Promoter, in part, by clearly establishing that it, too, does not and will not compete with the UFC. Rather, Mick Maynard, Legacy FC's President, has publicly stated that Legacy FC exists to supply the UFC with fighters rather than compete with the UFC.

144.    Invicta Fighting Championship ("Invicta FC"), broadcast on the UFC's Internet broadcast subscription service "Fight Pass," was formed in 2012, and solely promotes women's MMA

events. Shannon Knapp, the founder and owner of Invicta FC, is a veteran of the MMA Industry. Knapp insists that Invicta does not aim to compete directly with the UFC. Knapp has acknowledged that Invicta functions as a platform from which female Professional MMA Fighters can "graduate" or "advance" to the UFC. In 2015, Invicta FC will reportedly become the second MMA Promotion to which Zuffa has provided a license to advertise the use of, and to hold events in, the UFC's trademarked octagonal fenced enclosure.

145.    Responding to questions regarding whether Invicta (and all other MMA Promoters) were being established as "feeder" promotions to the UFC, White stated: "As bad as people don't want to believe it, they don't want to hear it, meaning the other owners of the other mixed martial arts organizations—that's what they all are, they're all the Triple-A [*i.e.*, the minor leagues] to the UFC." White continued by boasting that all promotions that resist minor league status "end up $30 million in the hole. All the people that don't embrace it, embrace losing sh*t loads of money."

146.    Another potential competitor, Bellator, is viewed within the MMA Industry—and by the UFC itself—as a minor league, a training ground for future UFC Fighters, or as a place for former UFC Fighters to compete after they have been released by the UFC.

147.    Bellator athletes lack significant public notoriety, in part, because it is a "minor league," and in part because the UFC refuses to co-promote with any of Bellator's fighters regardless of talent or merit, leaving Bellator unable to promote MMA events of relative significance. Bellator's bout purses, gate revenues, attendance figures, merchandise sales, television licensing fees and ad rates are minimal compared to those obtained by the UFC.

148.    As White said on November 14, 2013, of Professional MMA Fighters under contract with Bellator, "I feel sorry for the kids that fight there. I do. I truly feel sorry for the kids that have to be stuck in that s**thole."

149.    Even though the UFC has publicly stated that it views Bellator as a "minor league" that does not present a competitive threat to the UFC, as part of the exclusionary scheme alleged herein, the UFC has nevertheless engaged in aggressive conduct to inhibit Bellator's development into a viable rival promotion.

150.    Bellator held a nationally televised event on September 5, 2014, at the Mohegan Sun in Uncasville, Connecticut. In response, as part of the exclusionary scheme alleged herein, the UFC held "UFC Fight Night 50" at Foxwoods Resort Casino in Ledyard, Connecticut, on the same night, just ten miles away from Bellator's event. The UFC has thus used the same "counter-programming" strategy to prevent Bellator's growth that it successfully used to force actual or potential rivals Affliction, Strikeforce and EliteXC to stop promoting live professional MMA events.

**B.    The UFC's Exclusionary Scheme Harmed Competition in the Relevant Input and Output Markets.**

151.    The UFC's ongoing anticompetitive scheme has enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market. As a result of the UFC's scheme: (i) compensation associated with fighting in MMA bouts to members of the Bout Class has been and continues to be artificially suppressed, and (ii) the Identities of UFC Fighters continues to be expropriated and compensation by the UFC and its licensees for the expropriation of, exploitation of and right to exploit Identities of the members of the Identity Class has been and continues to be artificially suppressed. In addition, the anticompetitive effects of the UFC's exclusionary scheme in the Relevant Markets include, *inter alia*:

    a.   reduced competitiveness of live Elite Professional MMA events;

    b.   artificially suppressed output in the Relevant Output Market, including reduced number of live Elite Professional MMA bouts than would exist in the absence of the challenged anticompetitive scheme; and,

    c.   artificially suppressed demand in the Relevant Input Market.

152.    There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of the anticompetitive conduct standing alone. Even if, *arguendo*, such justifications existed, there are less restrictive means of achieving those purported procompetitive effects. To the extent the anticompetitive conduct or any aspect of the anticompetitive conduct has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

C. **Plaintiffs and Members of the Bout Class Suffered Antitrust Injury.**

153. As a direct and proximate result of the Defendant's anticompetitive conduct, as alleged herein, the Bout Class Plaintiffs and all members of the Bout Class suffered substantial losses to their business or property in that their compensation associated with fighting in one or more live Elite Professional UFC-promoted MMA bouts was artificially suppressed during the Class Period. The full amount of such damages will be calculated after discovery and upon proof at trial.

154. In return for signing a contract with the UFC, a UFC Fighter is scheduled, at the UFC's discretion, an average of fewer than two fights per year. The starting pay for a UFC Fighter, as of January 2013, is $6,000 to "show," *i.e.*, compete in a bout, and $6,000 if the UFC Fighter is victorious in a bout as a "win" bonus.

155. As part of its effort to foreclose potential rival MMA Promoters from accessing Elite Professional MMA Fighters, the UFC has contracted with more Fighters than it needs for bouts during any given year. For example, as of January 2013, the UFC staged an average of 1.66 MMA bouts per UFC Fighter per year, well under the three bouts per year the UFC claims it is obligated to make available to UFC Fighters. The UFC has approximately 500 Elite Professional MMA Fighters under contract, but only has plans for 45 events in 2015; each UFC event typically has 11 bouts. Each bout has slots for two UFC Fighters or a total of 990 slots across the planned 45 events—far below the 1,500 slots necessary to provide each UFC Fighter under contract with three bouts per year. In April 2014, UFC President Dana White acknowledged that the UFC has contracts with more Elite Professional MMA Fighters than necessary, stating: "We have 500 guys under contract, which is a lot more than we really need, and after each show, we really, really need to take a close look at what we do with guys."

156. Unlike boxing, where promoters frequently advance funds to cover the costs of medical tests, training camps, coaches, food and nutrition, sparring partners, and living expenses, UFC Fighters bear their own costs. UFC Fighters typically pay out approximately 15 to 25% of their MMA earnings to cover the costs of gym memberships and management fees and must pay the costs of any necessary sparring partners brought into the athlete's training camp in preparation for a bout.

157. As a result of the anticompetitive scheme, the UFC is able to compensate UFC Fighters below competitive levels even though UFC events have among the highest average ticket prices in all

of sports. Indeed, the UFC has been able to raise ticket and PPV prices significantly above competitive levels as the UFC consolidated its market dominance through the conduct alleged herein. Where the average live ticket price for a major UFC event was $178 in 2005, it is now approximately $300. Under Zuffa, the UFC has also increased its prices for PPV events from an average of $28.91 per event for its first broadcast in 2001 to the current price of $54.95 per event for HD broadcasts. Additionally, the number of PPV buys since the UFC's initial offer of PPV access to MMA fights has increased substantially since 2001.

158.    The conduct comprising the UFC's anticompetitive scheme is continuing and so are the damages suffered by the members of the Bout Class.

### D.    The Identity Class Plaintiffs and Members of the Identity Class Suffered Antitrust Injury.

159.    Defendant used its monopsony power in the market for Elite Professional MMA Fighter services and its monopoly power in the market for live MMA events to suppress the compensation for the exploitation of the Identities of members of the Identity Class.

160.    As a consequence of the alleged scheme, competition in the Relevant Markets was and is substantially harmed, and the Identity Class Plaintiffs and members of the Identity Class have sustained, and continue to sustain, substantial losses and damage to their business and property in the form of suppressed compensation for the exploitation and licensing of their Identities, during the Class Period. The full amount of such damages will be calculated after discovery and upon proof at trial.

161.    The conduct comprising the UFC's anticompetitive scheme is continuing and so are the damages suffered by the Identity Class resulting therefrom.

## VIII.    INTERSTATE COMMERCE

162.    The UFC engages in interstate commerce and in activities substantially affecting interstate commerce including (1) promotion of MMA events in nearly all of the states comprising the United States, (2) PPV, television, and Internet subscription-based broadcasts which occur throughout the United States, (3) sale, distribution or licensing of merchandise throughout the United States, and (4) production of television and Internet subscription-based programming which occurs throughout the United States.

1

2       **IX.    CLAIM FOR RELIEF FOR MONOPOLIZATION AND MONOPSONIZATION
        UNDER SECTION 2 OF THE SHERMAN ACT**

3
        **(On behalf of the Bout Class and Identity Class)**
4

5           163.    Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully

6       alleged herein.

7           164.    The relevant geographic market is the United States, and in the alternative, North

8       America.

9           165.    The Relevant Markets include the markets for (a) promoting live Elite Professional

10      MMA bouts in the United States (the "Relevant Output Market"), and (b) the market for live Elite

11      Professional MMA Fighter services (the "Relevant Input Market").

12          166.    UFC possesses monopoly power in the Relevant Output Market and monopsony power

13      in the Relevant Input Market, whether the geographic market includes the U.S. only, North America

14      only, or the entire world. The UFC has obtained, enhanced, and maintained dominance in both

15      Relevant Markets through the exclusionary scheme alleged herein. The UFC has abused and continues

16      to abuse that power to maintain and enhance its market dominance in the market for Elite Professional

17      MMA Fighter services through an exclusionary scheme to impair and foreclose competition by

18      depriving actual and potential competitors in the Relevant Output Market of necessary inputs

19      (including, *e.g.*, Elite Professional MMA Fighters, premium venues, and sponsors), and pursuing an

20      aggressive strategy of merging or purchasing the would-be rivals that its scheme had first competitively

21      impaired.

22          167.    The UFC's exclusionary scheme includes, but is not limited to, the following conduct:

23      (a) causing or directly and intentionally contributing to the failure of competing MMA Promotions and

24      acquiring actual or potential rival promotions to eliminate competing titles from the marketplace and to

25      obtain the contracts of Elite Professional MMA Fighters; and (b) leveraging its monopsony and

26      monopoly power in the Relevant Markets through the use of Exclusive Agreements with Elite

27      Professional MMA Fighters, venues, and sponsors.

28

168.     As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and members of the Bout and Identity Classes have suffered injury and damages in the form of artificially suppressed compensation in amounts to be proven at trial.

169.     Plaintiffs, on behalf of themselves and other members of the Bout Class and Identity Class, seek money damages from Defendant for these violations. For the Bout Class, these damages represent the additional compensation Plaintiffs and other members of the Bout Class would have received for their Elite Professional MMA Fighter services absent the anticompetitive scheme alleged herein. For the Identity Class, these damages represent the additional compensation Plaintiffs and other members of the Identity Class would have received for exploitation of their Identities in the absence of the violations alleged. Damages will be quantified on a class-wide basis for each proposed Class. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. §15. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendant's unlawful conduct.

170.     The Bout Class Plaintiffs, on behalf of themselves and other members of the Bout Class, seek injunctive relief barring Defendant from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendant's unlawful conduct.

171.     The Identity Class Plaintiffs, on behalf of themselves and other members of the Identity Class, seek injunctive relief barring Defendant from engaging in the anticompetitive scheme alleged herein. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted. The Identity Plaintiffs and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from the Defendant's unlawful conduct.

## X.      **DEMAND FOR JUDGMENT**

172.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Bout and Identity Classes, respectfully ask the Court for a judgment that:

a.   Certifies the Bout Class as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and appoints the Bout Class Plaintiffs and their attorneys as class representatives and class counsel, respectively;

b.   Certifies the Identity Class as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and appoints the Identity Class Plaintiffs and their attorneys as class representatives and class counsel, respectively;

c.   Awards Plaintiffs and each of the Classes treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

d.   Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of Defendant;

e.   Grants each member of both Classes three-fold the damages determined to have been sustained by each of them;

f.   Awards Plaintiffs and both of the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

/ / /

/ / /

/ / /

/ / /

/ / /

g.   Enters judgment against Defendant, holding Defendant liable for the antitrust violations alleged; and

h.   Directs such further relief as it may deem just and proper.

Dated: December 18, 2015

Respectfully Submitted,

By: /s/  Don Springmeyer
Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
Justin C. Jones (Nevada Bar No. 8519)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
jjones@wrslawyers.com

**Co-Lead Class Counsel:**

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Matthew S. Weiler (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Hiba Hafiz (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:     (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
hhafiz@cohenmilstein.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Jeffrey J. Corrigan (*Pro Hac Vice*)
William G. Caldes (*Pro Hac Vice*)
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jcorrigan@srkw-law.com
bcaldes@srkw-law.com

58

Frederick S. Schwartz (*Pro Hac Vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile: (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera,
Luis Javier Vazquez, and Kyle Kingsbury*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: December 18, 2015

Respectfully Submitted,

By: /s/ Don Springmeyer
Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
Justin C. Jones (Nevada Bar No. 8519)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
jjones@wrslawyers.com

**Co-Lead Class Counsel:**

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Matthew S. Weiler (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Hiba Hafiz (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:      (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
hhafiz@cohenmilstein.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Jeffrey J. Corrigan (*Pro Hac Vice*)
William G. Caldes (*Pro Hac Vice*)
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jcorrigan@srkw-law.com
bcaldes@srkw-law.com

61

Frederick S. Schwartz (*Pro Hac Vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile: (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera,*
*Luis Javier Vazquez, and Kyle Kingsbury*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of December, 2015, a true and correct copy

of **CONSOLIDATED AMENDED ANTITRUST CLASS ACTION COMPLAINT** was served via

the United States District Court CM/ECF system on all parties or persons requiring notice.

By   */s/ Christie Rehfeld*
Christie Rehfeld, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP