WILLIAM A. ISAACSON (Admitted *Pro Hac Vice*)
(wisaacson@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW, Washington, DC 20015
Telephone: (202) 237-2727; Fax: (202) 237-6131

JOHN F. COVE, JR (Admitted *Pro Hac Vice*)
(jcove@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000; Fax: (510) 874-1460

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382 7300; Fax: (702) 382 2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, Nevada 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01045-RFB-(PAL) |
| Plaintiffs, | **JOINT STATUS REPORT** |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendant. | |

The parties in the above-captioned matter have met and conferred and submit the following Joint Status Report.

**I.**     **Outstanding Motions (Joint Statement)**

There are no currently outstanding motions.

**II.**     **Update on Pleadings (Joint Statement)**

On December 18, 2015, Plaintiffs filed their Consolidated Amended Complaint and reduced the number of named Plaintiffs from eleven to six. Dkt. 208. On January 19, 2016, Zuffa filed its Answer. Dkt. 212.

**III.**     **Discovery Progress**

A.   **Plaintiffs' Statement**

Plaintiffs have continued to diligently engage Zuffa in attempting to make progress in discovery. The parties have regularly participated in meet and confer teleconferences concerning both Plaintiffs' and Defendant's Requests for Production of Documents ("RFPs"). Since the last status conference on December 8, 2015, Defendant has produced only 17,909 documents, comprising primarily a set of Promotional and Ancillary Rights Agreements and contract extension and termination letters.

Plaintiffs provided the names of six additional custodians during a meet and confer teleconference on January 8 as well as the names of three replacement custodians who would replace three "agreed custodians" who do not have any custodial documents.

Plaintiffs have also worked to provide Zuffa with proposals to address Zuffa's claims of burden and objections as to the alleged overbreadth of certain of Plaintiffs' RFPs. Specifically, on December 18, 2015, and January 11, 2016, Plaintiffs sent letters to Zuffa proposing limitations on Plaintiffs' RFP Nos. 27, 33, 35 and 37, among others.[1] Defendant's responding letters of December 21, 2015 and January 13, 2016, respectively refused to discuss these proposals. *E.g.*, January 13, 2016 Letter from Cove to Dell'Angelo ("[T]his letter does not address everything

---

[1] These letters also endeavored to obtain a response from Zuffa as to whether their objections had been resolved by the Court's various orders in the past few months for numerous RFPs including, *inter alia*, RFP Nos. 1-6, 16, 18, 41, 45, 48 and 59.

1  raised in your 11-page letter from January 11, 2016). When Plaintiffs' pressed these proposals on
2  meet-and-confer calls, Zuffa refused to engage in a discussion of the proposals, instead stating
3  that it would write us a letter with a response. No response has been forthcoming and requests for
4  a date by which a response would be available have gone unanswered. Now, below, Zuffa
5  "reserves its rights" as to these RFPs, a compromise position after Plaintiffs demanded that Zuffa
6  retract a request that the RFPs be stricken as overbroad because Zuffa had not yet responded to
7  Plaintiffs' proposals, which were over a month old.

8  Plaintiffs continue to remain open to meeting and conferring to resolve discovery disputes.
9  The areas on which the parties have reached an impasse and require the Court's guidance are
10  explained below.

11  **B.   Zuffa's Statement**

12  The parties have been working diligently since the last status conference on December 8
13  and continue to make progress in discovery.[2]  The parties have regularly met and conferred
14  regarding Plaintiffs' RFPs.  Since December 8, Zuffa has produced an additional 17,909
15  documents, totaling 239,923 pages, containing the production of the first tranche of Zuffa's
16  electronic fighter files, which Plaintiffs identified as their top priority.  Zuffa has made and
17  continues to make substantial progress towards collecting and processing both centrally
18  maintained and custodial files.  After Plaintiffs identified the six additional custodians on January
19  8, Zuffa arranged for its out-of-state vendor to complete the custodial collections and now
20  anticipates that the collection of custodial ESI and hard copy documents for the 22 agreed-upon
21  custodians will be complete within the next week.  Zuffa has also made substantial progress in
22  collecting non-custodial hard copy documents.  At present, Zuffa is reviewing for production the
23  hard copy fighter files for all athletes who have participated in a bout since December 16, 2010,
24  which Plaintiffs identified as a priority.  Zuffa is also prepared to make another production of
25  documents relating to agreements with third parties shortly after a revised Protective Order
26

27  [2] Zuffa disagrees with the Plaintiffs' characterization of the meet and confer process as explained
28  more fully in Section IV.B.2 below.

2

providing the higher designation of confidentiality requested by the third parties is in place. Discussion of the Protective Order is included in Section IV.F below.

The parties continue to meet and confer and exchange information relating to Plaintiffs' Responses to Zuffa's Requests for Production.  The areas on which the parties have reached an impasse and require the Court's guidance are explained below.

**IV.    Current Discovery Disputes (Joint Statement)**

The parties have met and conferred on a wide range of issues. With respect to certain issues, the parties are at an impasse. Specifically, the parties are at an impasse regarding the following 5 issues:

1) Custodians: Whether Plaintiffs should be permitted to add 3 custodians to replace Bryan Johnston, Sonja McKinney and Michael Pine.

2) Search Terms: Whether and to what extent search terms should be used.

3) Relevant Time Frame: What Relevant Time Period should apply to four of Zuffa's Requests for Production.

4) Non-MMA Related Income/Compensation: Whether Plaintiffs should be required to produce documents regarding income and compensation from activities unrelated to Mixed Martial Arts.

5) Medical and Drug-Test Records: Whether Plaintiffs should be required to produce documents relating to the reasons for any tolling or extension of their contracts, including suspensions for the use of performance-enhancing drugs or extensions for injuries.

6) Protective Order:  Whether the Revised Protective Order should allow a designation of "Highly Confidential – Attorneys' Eyes Only" for documents of a medical or highly personal nature from the files of athletes.

3

JOINT STATUS REPORT

1

2

A. **Custodians: Whether Plaintiffs Should Be Permitted to Add Additional Custodians to Replace 3 of the 16 "Agreed-Upon" Custodians: Bryan Johnson, Sonja McKinney and Michael Pine.**

3

1. **Plaintiffs' Statement**

4

5

6

7

8

9

10

11

12

13

14

15

Plaintiffs propose to replace the three "agreed custodians"[3] for whom Zuffa has recently informed Plaintiffs it has no documents whatsoever, but which Zuffa has refused to replace with custodians for whom it possesses documents. After the last Status and Dispute Resolution Conference held on December 8, 2015, Zuffa informed Plaintiffs that it has no documents or ESI for three of the parties' "agreed" custodians: Bryan Johnston, Sonja McKinney and Michael Pine. Defendant's rationale for refusing to replace the three "custodians" is that the Court ordered that the 16 previously identified "agreed custodians" must be included among the 22 custodians the Court authorized on December 8, 2015, without allowing for substitution or replacement. This position ignores the history of how the custodians at issue were identified (including the timing of information provided by Defendant). Further, Defendant's position misrepresents that the Court has decided this issue—in fact, it was specifically deferred based on Zuffa's statement that it was still searching for custodial data for some potential custodians.

16

17

18

19

20

Throughout the process of custodian selection, Zuffa has begrudgingly and selectively released information regarding its custodians (often after a case event or decision), forcing Plaintiffs to make decisions based on an incomplete picture of who Defendant's employees are, what they did and what documents they have.[4] Particularly prejudicial to Plaintiffs was the

21

22

23

24

25

26

27

28

---

[3] Reference to Zuffa's custodians as "agreed" is a misnomer. The "agreed" custodians were those about whom the parties did not have a disagreement as to whether they were appropriate custodians, not about whom the parties had agreed for purposes of searching their documents as custodians. Initially, with respect to certain other custodians Plaintiffs proposed, Zuffa did not agree that they should be considered among the custodians among whom Plaintiffs could choose.

[4] It remains the case, as it was at the time of the December 8, 2015 Status Conference, Zuffa has not provided email or other document volumes that are limited by the Court-ordered relevant time period. Rather, Zuffa has instead provided undeduplicated email volumes that include attachment volume and several months of emails that are not subject to search or review to inflate the volume for purposes of claiming an "undue burden." Similarly, Zuffa has not provided information on the devices in its possession, custody or control for some of the custodians, nor the volume of text messages or hard copy documents, if any.

4

sequencing of Zuffa's release of information regarding the potential custodians Johnston, McKinney, and Pine.

On September 8, 2015, Zuffa identified nine custodians,[5] providing information on email volume for each on September 28, 2015. On October 20, 2015, following a review of Zuffa's organizational charts, Plaintiffs proposed 19 additional custodians, including Johnston, McKinney and Pine.[6] In response, on October 28, 2015, Zuffa agreed to six of those additional custodians, including Johnston, McKinney and Pine.[7] Shortly thereafter, Zuffa informed Plaintiffs that Johnston, McKinney and Pine's emails were destroyed pursuant to Zuffa's document retention policies. Defendant stated, however, that "ESI and hard copy documents found in shared drives and central files related to these individuals will be collected and reviewed for production." Nov. 12, 2015 Letter from John Cove to Michael Dell'Angelo. Based on Zuffa's representation that documents and ESI existed for Johnston, McKinney and Pine, Plaintiffs continued to include them as "agreed" custodians in the discussions and correspondence. Following additional meet-and-confer teleconferences in late November and early December, Zuffa confirmed that it did not have documents for Johnston, McKinney and Pine in custodian-specific folders on Zuffa's network drive, at which point Plaintiffs questioned whether such "agreed" custodians should even be custodians at all. Dec. 2, 2015 Letter from Michael Dell'Angelo to John Cove. Defendant then confirmed on December 3, 2015, the eve of the last Joint Status Report, that it did not retain any devices or computers for McKinney, Johnston or Pine, but had not yet determined whether it possessed hard copy documents for the custodians. In response, Plaintiffs continued to question

---

[5] Those custodians are Tracey Bleczinski, Peter Dropick, Lawrence Epstein, Lorenzo Fertitta, Reed Harris, Michael Mossholder, Sean Shelby, Joe Silva and Dana White.

[6] Plaintiffs also proposed Marshall Zelaznik, Marc Ratner, Jackie Poriadjian, Donna Marcolini, Craig Borsari and Nakisa Bidarian, the six additional custodians Plaintiffs have identified in response to this Court's Order at the December 8, 2015 Status Conference. Despite the three months that have passed since these custodians were proposed, Zuffa still has not provided information on the custodial documents for these six custodians including, *inter alia*, devices and hard copy documents Defendant has in its possession, custody or control for each custodian.

[7] Defendant also agreed to add John Mulkey, Defendant's (now former) Chief Financial Officer, Michael Mersch, Defendant's former Senior Vice President of Talent Relations, and Kirk Hendrick, Defendant's former Chief Operating Officer and current Chief Legal Officer.

1    whether they should be custodians at all, but asked Zuffa to confirm whether or not it was in

2    possession, custody or control of hard copy documents for McKinney, Johnston or Pine.

3         Immediately prior to the last Status Conference on December 8, 2015, counsel for Zuffa

4    approached Plaintiffs' counsel and proposed deferring the dispute as to those custodians who did

5    not have any documents or ESI on Defendant's email servers or in custodian-specific folders on

6    the network drive to allow Zuffa additional time to search for any hardcopy custodial files that

7    may exist for them, a proposal to which Plaintiffs agreed before the start of the Conference.

8    Defendant then raised this agreement with the Court at the outset of the Conference:

9

10   **Mr. Williams**:    [W]ith respect to the, what I'll just characterize as the general list of
                          custodians. The plaintiffs had put in their status report that they believe it
11                        would be reasonable for Zuffa to go ahead and perform searches for those
                          custodians that we've identified that our preliminary review demonstrates
12                        that there are no ESI documents for them, there's no emails or custodian
                          specific files on the shared drive… [A]fter conferring with the client, we
13                        are willing to perform that search. So to the extent that … helps address the
                          issues regarding that category, I wanted to get that out there first.

14

15   **The Court**:      So you're going to do a search to confirm that you really don't have
                          anything?

16   **Mr. Williams**:   Well, that's right, Your Honor.

17                                                   …

18   **Mr. Dell'Angelo:** [J]ust to put a little bit of context on there. Part of the issue, Your Honor,
                          was with respect to 13[8] of the proposed custodians, Zuffa had reported
19                        that there was no email or custodian specific folders. And what we had
                          suggested, and as I understand that Zuffa has agreed to do is, as we get into
20                        the search for the rest of the custodians to just make a determination as to
                          whether or not there are other custodian specific files or folders that are
21                        custodian folders or documents within the larger ESI set that they have…
                          And then separately, outside of ESI, whether or not, for example, there are
22                        hard copied documents that may still exist at the facility … over at
                          headquarters or something like that, or in some archive facility, to just kind
23                        of close the loop on those individuals as custodians. That was our
                          recommendation and proposal and I think we have a general agreement on
24                        that ….

25

26   Dec. 8, 2015 Status Conf. Tr., at 4:13-6:15.

27   _____

28   [8] The 13 custodians specifically include McKinney, Johnston and Pine.

                                              6

1   After the Status Conference, on a December 22, 2015 meet-and-confer teleconference,

2   Defendant informed Plaintiffs that no documents (including hard copy documents) or ESI of any

3   kind had been retained for Johnston, McKinney or Pine. Thus, these "agreed custodians" are

4   neither "agreed" nor "custodians" because they are not the custodians of a single document or

5   piece of information, relevant or not. As a result, Plaintiffs propose to replace Johnston,

6   McKinney or Pine with three different custodians from those whom Plaintiffs identified in the

7   parties' December 4, 2015 Joint Status Report, thereby maintaining the Court-ordered number of

8   22 custodians. *See* Dec. 8, 2015 Status Conf. Tr., at 17:19-24.

9   Because three of the previously "agreed" "custodians" are not custodians of any

10  documents or information, a fact that neither Plaintiffs nor the Court were fully aware of at the

11  last Status Conference, Plaintiffs sought to replace those three with three custodians whom

12  Plaintiffs understand have documents from the relevant time period.[9] Zuffa refused, arguing that

13  the Court had already ruled on this issue on December 8 and made an informed decision to

14  include among Plaintiffs' 22 custodians three custodians for whom the Court knew Zuffa had no

15  documents or information. This belies Zuffa's representation on December 8, 2015, prior to the

16  Court's ruling that the parties had agreed to defer the issue of the custodians who were believed to

17  have no documents, including McKinney, Johnston and Pine. Now that Zuffa has provided

18  Plaintiffs with the information promised at the December 8, 2015 Status Conference and

19  confirmed that it has no documents or information for McKinney, Johnston and Pine, Plaintiffs

20  should be permitted to substitute three alternative custodians from the list of custodians presented

21  to the Court at the December 8, 2015 Status Conference.

22          2. **Zuffa's Statement**

23  At the last status conference, after considering clear submissions from the parties on the

24  documents available (or not available) from the agreed-upon custodians, the Court permitted the

25

26  [9] Though it bears noting that Defendant has yet to confirm whether one of the proposed additional
    custodians, Chad Hurley, has documents from the relevant time period since Defendant appears to

27  have excluded Mr. Hurley from its litigation hold. Plaintiffs have requested further information
    on Mr. Hurley but no information has been forthcoming.

28

1  Plaintiffs to choose an additional six custodians on top of the sixteen custodians already agreed-

2  upon by the parties, for a total of twenty-two custodians.  Dkt. 207.  On January 8, Plaintiffs

3  informed Zuffa of the six additional custodians they had chosen, and Zuffa is collecting and

4  processing these custodians' documents and ESI.  Plaintiffs now ask the court to revisit its ruling

5  and order production from three more custodians in addition to the six the Court ordered, on the

6  grounds that documents were not retained prior to the filing of the Complaint for three of the

7  sixteen initially agreed-upon custodians, each of whom left Zuffa's employ before this litigation

8  commenced.  The record, however, could not be clearer that the parties had fully informed the

9  Court of the situation with these three custodians' documents in the December status report and

10  that the Court expressly acknowledged this fact before ordering the production from the

11  additional six custodians.  There is no reason to revisit the Court's prior ruling.

12      First, Plaintiffs made it clear in the last status report that three of the sixteen agreed-upon

13  custodians at issue here had no documents, yet Plaintiffs specifically proposed that they still be

14  included as custodians.  Plaintiffs explained:

15         The parties have agreed on the identity of 16 custodians, 3 of whom, Defendant

16         has indicated do not have any documents on its E-mail Server, any documents in
       custodian-specific folders on Defendant's Network Drive, or any retained devices.

17         Plaintiffs propose including all 16 as custodians in this matter

18  Dkt. 206, Joint Status Report at 6.  Second, Plaintiffs used the lack of documents from these three

19  specific custodians as a basis to argue they should be entitled to additional custodians over the

20  agreed-upon sixteen since the burden associated with including these three custodians was low.

21  *Id.* at 6 n.12 ("Without identifying any discoverable material, there is no burden associated with

22  including these three individuals as custodians").  Finally, the hearing transcript leaves no doubt

23  that the Court fully understood the situation before ordering the six additional custodians:

24         If I get the gist, the parties have agreed on 16 custodians, however three of those

25         have no emails or ESI and custodian specific folders.  And the parties are at odds
       because Zuffa proposes that you perform a search and plaintiff make an election of

26         two additional custodians.  Plaintiffs want 44 additional or 44 total . . .

27  Dkt. 210, Dec. 8, 2015 Status Conf. Tr. 5:18-25.

28

8

JOINT STATUS REPORT

Plaintiffs should not be permitted to add three more custodians simply because Zuffa agreed to and did conduct additional due diligence to, as the Court described, "confirm that you don't really have anything" with regard to Pine, Johnston, and McKinney.  Dkt. 210, Dec. 8, 2015 Status Conf. Tr. 5:5-6.  This is especially true because while no separate custodial files have been maintained for these custodians, responsive documents associated with these former employees will be produced.  Zuffa has confirmed that the central contract files contain contracts and related documents signed and/or negotiated by Mssrs. Pine and Johnston that are being produced along with the other responsive documents in those files.  Zuffa has also confirmed that responsive correspondence from Ms. McKinney is found in the fighter contract files and will be produced.

The Court's previous Order was clear that the additional six custodians Plaintiffs were permitted to choose was on top of the sixteen already agreed-upon custodians, which included Pine, McKinney and Johnston.  Dkt. 207 ("The Court will allow Plaintiffs to select an additional 6 custodians beyond the agreed upon 16 custodians unless for good cause shown there is some essential person that has not been identified at this stage").  In coming to the determination that an additional six custodians was the appropriate number, the Court did so with the understanding of the burdens already associated with the agreed-upon sixteen custodians, a point made clear by Plaintiffs' demonstrative at the last Status Conference which specifically laid out the volume of documents associated with each of the agreed-upon sixteen custodians.  The Court never contemplated that Plaintiffs would get six additional custodians, plus the opportunity to swap out some of the agreed-upon sixteen custodians for three others.

Under the Court's current Order regarding custodians, Zuffa will already collect well over a million emails[10] and hundreds of thousands of non-email ESI and hard copy documents from the sixteen agreed-upon custodians and the six others Plaintiffs have chosen.  There is simply no

---

[10] Even before adding in the newly-designated six custodians, Zuffa has already collected and loaded (post-deduplication) over 1.2 million email documents from the initially agreed-upon sixteen custodians.  While the specific final number of documents to review cannot be known until the additional six custodians' documents finish loading and are de-duplicated across the universe of custodial documents and the June 30, 2015 cutoff date is applied, it is clear that the number will be substantial.

JOINT STATUS REPORT

1  reason at this point in the process to revisit the Court's prior Order on this issue and add three

2  additional custodians, especially since one of the three new custodians Plaintiffs seek to add is an

3  attorney (Tim Bellamy) with over 135,000 emails[11] on the email server alone.[12]

4      B.  **The Use of Search Terms**

5          1. **Plaintiffs' Statement**

6  Zuffa proposes to utilize an unreliable and patently under-inclusive list of proposed search

7  terms to search for responsive documents in its non-custodial "central" files and all of its

8  custodians' ESI.[13] This is the rare case that does not warrant the use of search terms as a tool to

9  further winnow the universe of discoverable documents proportional to the needs of the case. If

10  search terms are to be used, Plaintiffs propose that the Court adopt Plaintiffs' far more reliable

11  search terms which have been carefully tailored to the subject matter of the litigation.

12  As a preliminary matter, Defendant has already taken the unusual step of requesting that

13  the Court rule on the number of custodians whose documents will be searched based on an

14  overstated total volume of documents in the custodians' possession rather than the actual volume

15  of responsive documents and information. That approach acknowledges that at least a very high

16

17

18

19  [11] This figure is as of November 18, 2015 and the same caveat as discussed in footnote 8 regarding the cutoff date applies.

20  [12] In their footnotes 2 and 4, Plaintiffs complain that as Zuffa continues to collect documents,

21  Zuffa has not provided interim de-duplicated and timeframe specific counts of the documents for the agreed-upon and the contested custodians or that Zuffa has not provided specific volume

22  information regarding the additional six custodians that Plaintiffs chose on January 8.  As Zuffa has previously explained, there is a substantial monetary and resource burden to collect, load and

23  de-duplicate documents, and engaging in such an exercise before a final list of custodians is complete is inefficient, unnecessary and expensive.  Within 10 days of Plaintiffs' provision of its

24  final list of custodians, Zuffa coordinated for its counsel and its out-of-state vendor to be on-site to collect the remaining cell phone and computer data, as well as any hard copy documents from

25  the new custodians, and is in the process of collecting the remaining custodial documents this week and next.

26  [13] On December 21, 2015, for the first time, Zuffa sent Plaintiffs a list of search terms that it

27  proposed to use to identify responsive documents from the majority of all sources of documents to be searched in response to Plaintiffs' Document Requests.

28

1  percentage of each custodian's documents will need to be reviewed.[14] That stands to reason

2  because, during the meet and confer process, Zuffa has taken the position that the allegations at

3  issue cover virtually every aspect of its business. The Court should not permit Zuffa to first argue

4  about the total volume of documents as a means to limit the number of custodians, and then argue

5  that each custodian's document counts should be further reduced using Defendant's bare-bones

6  search term proposal, particularly in light of the unique aspects impacting the search for

7  documents in this case. To do so would prejudice Plaintiffs and calls into question whether the

8  number of custodians permitted was far too small because the volume of documents responsive to

9  the search terms pales in comparison to the scope and magnitude of the case.

10      Regardless, given the idiomatic nature of Zuffa's communications (discussed further

11  below), a factor that even Zuffa did not appreciate or solve for when devising its proposed search

12  terms, a set of search terms that will reliably identify responsive documents in this case is

13  particularly difficult to devise. Given the finite volume of documents in this case, Plaintiffs

14  propose that Zuffa should be required to conduct a linear review of its documents from non-

15  custodial "central" files and all of its custodians' ESI.

16      In the alternative, Zuffa should be required to use Plaintiffs' more comprehensive and

17  reliable list of search terms designed and targeted to capture a larger proportion of demonstrably

18  relevant and responsive documents.[15] Plaintiffs' search terms were carefully developed based on

19  the allegations in the Complaint, the identities of the proposed class members, the individuals and

20  ────────────────────
   [14] Plaintiffs even proposed that, for certain custodians, search terms could be used but that, for a

21  list of to-be-negotiated custodians, their entire set of documents would be reviewed linearly.
   Defendant summarily rejected Plaintiffs' proposal.

22  [15] Plaintiffs' proposed search terms are attached as Attachment A. Application of Plaintiffs'
   proposed search terms versus Zuffa's will not impose a greater burden on Zuffa in the search

23  phase. The number of search terms is immaterial to the burden imposed because all search terms
   can be simultaneously entered and searched automatically. Although Plaintiffs' terms will likely

24  yield more discoverable results, Plaintiffs' terms have been tailored to return relevant and
   responsive results. Ultimately, Plaintiffs' terms will result in a reduced burden on Zuffa and the

25  Court because it will lessen disputes and the identification of potentially myriad nicknames and
   other idiomatic terms and expressions used by Zuffa that are not yet known to Plaintiffs. Plaintiffs

26  further propose that, if search terms are to be used, Zuffa should be required to use Plaintiffs'
   search terms in conjunction with and in addition to whatever terms or methods were used by

27  Zuffa to search for the documents produced to the FTC.

28
─────────────────────────────────
11

entities that form or relate to the allegations (to the extent known), and the idiomatic nature of Zuffa's communications (to the extent known). Plaintiffs also propose that if the Court does not require a linear review of documents, it should permit Plaintiffs to add additional unique search terms likely to yield discoverable documents and information, as those terms become known.

### a. Zuffa's Use of Idioms (Many of Which Cannot Be Known Without Discovery), and the Substantial Number of Relevant Names and Nicknames Warrant a Linear Review of the Small Subset of Zuffa's Total ESI That Will Be Searched.

The application of search terms is not required by the Federal Rules nor appropriate in circumstances where, as here, the language that will lead to relevant documents is unpredictable and the volume substantial. Zuffa's custodians are prone to using idioms, most of the class members and many of the third parties are referred to by unusual nicknames and, given the high number of relevant names and terms, it is difficult to capture common or inadvertently misspelled instances of the terms and names. Therefore, the Court should require Zuffa to search for and identify responsive documents from Zuffa's limited number of custodians and central files without the use of search terms.

According to the Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery "Keyword searches work best when the legal inquiry is focused on finding particular documents and when the use of language is relatively predictable"; that is not so here. August 2014, at 232 ("Sedona Commentary"). Indeed, the Sedona Commentary recognizes that "simple keyword searching alone is inadequate in at least some discovery contexts." *Id.* at 233.[16]

---

[16] Zuffa argues that it attempted to apply Boolean and wildcard searches to address the shortcomings of simple keyword searches. However, of the 91 search terms that Zuffa proposed, approximately one-third are simple keywords. Zuffa's proposed Boolean and wildcard searches, are designed to further restrict the scope of documents and operate much as a simple keyword search. For example, Zufffa proposes many searches such as "Robert w/2 Roveta". Thus, any document that only refers to Robert Roveta as "Roveta" will not be returned as a result.

12

1    The inadequacy of Zuffa's search terms is due to at least two factors, which can only be

2    remedied to a limited extent with Plaintiffs' proposed search terms, and their inadequacy

3    demonstrates why this case does not lend itself well to the application of search terms.

4    First, Zuffa's proposed search terms are highly under-inclusive in several obvious and

5    important ways. Zuffa's proposed terms exclude the names of virtually all of the 950 fighters in

6    the proposed class[17] as well as most managers, agents, sponsors, merchandisers, venues,

7    promoters and other key names that directly relate to (and in many instances are expressly

8    included in)[18] the allegations in the Consolidated Amended Complaint.[19] The Sedona

9    Commentary observes that search terms present unique problems when applied to common

10   names, such as the first names of fighters, agents and manages (of which there well over 1,000 in

11   this case). The Sedona Commentary states that "[k]eyword searches can also exclude common or

12   inadvertently misspelled instances of the term (*e.g.*, "Phillip" for "Philip," or "strik" for "strike")

13   or variations on "stems" of words (*e.g.*, "striking")." Sedona Commentary, at 233. Zuffa has

---

15   [17] Ironically, despite Plaintiffs' view that medical records and drug test results for all 950 fighters
16   are not relevant, Zuffa continues to insist upon producing them but claims that inclusion of the
     names of "all fighters [*i.e.*, the members of the proposed class], however, is far too overbroad."
17   [18] For example, Defendant's proposed terms omit fighters B.J. Penn, Randy Couture, Quinton
18   "Rampage" Jackson, and Fedor Emelianenko, each of whom are alleged victims of specific
     threats and anticompetitive conduct in the Consolidated Amended Complaint ("CAC"). *E.g.*,
19   CAC ¶ 118 (discussing Dana White threatening Penn when he informed the UFC he planned to
     sign with another promotion company); *id.* ¶ 119 (discussing the UFC punishing Couture when
20   he refused to assign ancillary rights); *id.* ¶ 123 (discussing the UFC blocking Jackson's deal with
     Round 5 for developing an action figure); *id.* ¶ 130(b) (discussing the UFC blocking a lucrative
21   fight between Randy Couture and Fedor Emelianenko). Defendant's proposed terms also exclude
22   promoters and/or the names of individuals who ran the promotions. *E.g.*, *id.* ¶ 129 (discussing the
     World Fighting Alliance ("WFA")); *id.* ¶ 130(a) (discussing promotion run by Oscar de la Hoya);
23   *id.* ¶ 130(b) (discussing HDNet Fights and founder Mark Cuban); *id.* ¶ 141 (discussing Japanese
     promotion Dream which had co-promotional arrangements with Strikeforce prior to the UFC's
24   acquisition). Nor do Defendant's proposed terms include terms targeted to collect materials
     related to the various broadcasters named in the CAC, including CBS and Showtime (*id.* ¶¶ 131
25   & 142), AXS TV and HDNet (*id.* ¶¶ 141 & 143), or "Fight Pass" (*id.* ¶ 144). Defendant's
     proposed terms also exclude the names of sponsors specifically discussed in the CAC. *E.g.*, *id.* ¶
26   123 (discussing Jackson and the UFC's dealings with Round 5). These failings are just examples
     of the deficiencies of Defendant's proposed terms.
27   [19] The inclusion of the names of some, but not all, fighters, promoters and agents is a tacit
28   admission that the names of these individuals and entities are appropriate search terms.

---

13

JOINT STATUS REPORT

objected strenuously to the inclusion of common names in Plaintiffs' search terms and Plaintiffs' removed many of them from its current proposal. Inclusion or exclusion of common names will cause relevant documents to be unnecessarily missed during Zuffa's review. Thus, given that there are over 1,000 common names alone that will lead to relevant documents, a linear review is a far more reliable means of identifying documents in this case.

Even to the extent Zuffa includes the names of certain individuals and entities, many of the proposed class members are known as much, if not more so, by their given names as by their nicknames. For example, class representative Nate Quarry is known and often referred to in the MMA industry as "Rock". *See*, *i.e.*, https://en.wikipedia.org/wiki/Nate_Quarry. Quinton Jackson, a popular UFC fighter is often referred to as "Rampage" or "Rampage Jackson." *See*, *i.e.*, http://www.ufc.com/fighter/Quinton-Jackson?id=. Zuffa's proposed search terms do not include a single fighter nickname. Notably too, Zuffa's proposed search terms exclude names of many managers and agents from whom Zuffa insisted Plaintiffs collect documents, many third parties to whom Zuffa has issued subpoenas, and individuals and entities identified in the parties' Initial Disclosures.[20] Even those names Zuffa includes are unnecessarily narrow. For example, Zuffa requires agents' full names to be used (*e.g.*, "Rico w/2 Chiapparelli") thereby excluding any reference to the agents that only uses the first or last name (much less a nickname). Similarly, Zuffa's terms for rival promoters are overly-restrictive and not designed to capture responsive documents. For example, although the promotion known as "M-1 Global" is frequently referred to in the industry and colloquially only as "M1"[21] or "M-1," such references would not be found

---

[20] For example, Defendant sent a preservation letter to DeWayne Zinkin (as did Plaintiffs and Plaintiffs also served a subpoena on Zinkin's management agency, Zinkin Entertainment), who represented named Plaintiff Jon Fitch. But Defendant's search terms are not targeted to collect documents related to Mr. Zinkin or his management agency. Additionally, Plaintiffs served subpoenas on numerous other third parties who are not accounted for in Defendant's terms including, *inter alia*, Kurt Otto and Gareb Shamus (former executives with the International Fight League), Bob Meyrowitz (former head of the UFC before it was acquired by Zuffa), Jeremy Lappen (former principal of EliteXC who also worked with the WFA), and numerous agents and managers.

[21] In addition to the colloquial use, M1 employees used email addresses provided by gmail.com following the protocol FirstName.Lastname.M1@gmail.com. *E.g.*, ZUF-00452074 (email

1    using Zuffa's proposed term. Plaintiffs have attempted to remedy Zuffa's failure to add key

2    names and its use of overly-restrictive terms by compiling lists and adding them to Plaintiffs' list

3    of proposed search terms. Importantly, Plaintiffs' list of proposed search terms removes these

4    overly restrictive limits Zuffa imposes without using ubiquitous and common terms that would

5    generate a substantial number of non-responsive results. Thus, Plaintiffs' proposed list is targeted

6    to collect responsive materials and not impose an undue burden on Zuffa.

7         Second, a review of the Federal Trade Commission ("FTC") production reveals that

8    Zuffa's internal correspondence is highly idiomatic and, as such, is not susceptible to reliable

9    searching with search terms. The Sedona Commentary observes that "if authors of records are

10   inventing words 'on the fly,' as they have done through history, and now are doing with

11   increasing frequency in electronic communications, such problems are compounded." Sedona

12   Commentary, at 233. That is precisely the problem here.

13        For example, a potential competitor, Affliction Entertainment, appears numerous times in

14   Plaintiffs' Consolidated Amended Complaint as one that Zuffa put out of business as part of its

15   anticompetitive scheme. *See, e.g.*, CAC ¶¶ 12, 130(a) and 150. Yet, in the FTC documents

16   produced, Zuffa executives frequently referred to executives Tom Atencio and Todd Beard of

17   Affliction as "T-shirt Guy" rather than their given names. *See, e.g.*, ZUF-00153990 (email

18   discussing Affliction with the subject line: "Message from T-Shirt Guy")*.* Similarly, allegations

19   regarding another potential rival, Strikeforce, feature prominently in the CAC (*e.g.*, CAC ¶¶ 128,

20   131-134 & 150) and prompted the FTC's investigation of Zuffa, resulting in Zuffa's production

21   of documents to the FTC which Zuffa produced to Plaintiffs in this case.[22] In the FTC

22   Production, Zuffa executives refer to Strikeforce, as "Strikefarce" or "strike farce". *See*, *e.g.*,

23   ZUF-00342599 (email from Lorenzo Fertitta to John Mulkey stating "…is giving strikefarce our

24   financials"); ZUF-00342725 (email from Lorenzo Fertitta stating "I hear strike farce april is going

25   _____

     exchange between Strikeforce employee and M1 employee that does not include "M1 Global" as

26   a term). Thus, emails between Zuffa (or predecessor entities) and M1 employees could be
     improperly and unnecessarily excluded by Zuffa's proposed terms.

27   [22] The Sedona Conference identifies "strike" as a prime example of an "inadvertently misspelled
     instances of the term (*e.g.*, … "strik" for "strike")." Sedona Commentary, at 233.

28

to be at thomas and mack in vegas."); ZUF-00338841 (email from Bryan Johnston to Lorenzo Fertitta and Dana White stating "In case it comes up when you clip strikefarce…."). Notably, despite Plaintiffs' requests at the outset of the meet-and-confer process, Zuffa has refused to disclose whether it used search terms to identify documents produced to the FTC, the search terms used, if any, and which custodians and central files were searched. Other examples of such terms and slang abound. Although the idiomatic language used by Zuffa's officers and employees weighs heavily in favor of not using search terms at all, at a minimum, such language requires a broad range of search terms that seek to cover the various terms and permutations that are used as well as using alternative methods (such as including names and nicknames of the various categories of individuals and entities such as fighter-class members, agents, sponsors, venues and promoters) to capture responsive documents that traditional subject-matter-based search terms miss.

Zuffa argues that search terms are necessary because some of Plaintiffs' requests "call[] for essentially all documents relating to any communication with or about any fighter, any of his or her representatives, and any actual or potential venue, sponsor, merchandiser, retailer or TV distributor." That too is misleading. Plaintiffs have expended considerable effort during the meet-and-confer process to narrow the scope of their Requests to address just that very concern. Indeed, in December and early January, Plaintiffs again proposed ways to narrow many of the Requests (both those calling for "all documents" and more narrow requests). *See, e.g.*, December 18, 2015 and January 11, 2016 letters from M. Dell'Angelo to J. Cove. However, Zuffa has not yet responded to many of Plaintiffs' proposals and declined to say when they would do so. Thus, there is no basis to claim that search terms are necessary to address overbroad requests.[23]

---

[23] Regardless, the breadth of the requests has little bearing on whether search terms should be used to search custodial files. Plaintiffs' discovery requests are tailored to identify documents and information that are relevant to the parties' claims and defenses and proportional to the needs of the case. That some of the requests may be viewed as broad is indicative of the scope of the case, not the relevance of the material requested. Because the requests are properly targeted, the fact that the requests may be viewed as broad only means that a higher percentage of documents are responsive. Thus, the narrowing of the number of custodians and the targeting of custodians who are likely to have a higher percentage of responsive documents already accounts for the necessary

Zuffa's arguments regarding the propriety of search terms are misleading and not well-founded. First, in seeking to narrow the scope of discovery in this case, Zuffa has represented to the Court that it possesses over 3 petabytes of ESI. By limiting the universe of documents that will be searched to just 19 custodians and a handful of central files, the total universe of ESI at issue has necessarily been reduced to some number of gigabytes.[24] Zuffa argues below that the universe will be reduced to approximately 1 million documents. However, as it has done consistently, Zuffa has provided overstated document counts or estimates. Zuffa's document count, for example, does not account for the application of search terms, deduplication of *all* of the custodians' documents, email threading, limitation to documents during the relevant time period, the application of filtering techniques to reduce the volume of the legal custodians' potentially privileged documents, De-NISTing, or any other preproduction filtering techniques. Collectively, these methods will further significantly reduce the total number of documents in the custodial files before any search terms are applied.

Plaintiffs propose that search terms are not an appropriate discovery tool in light of the unique circumstances of this case, which include a vast number of proper names, entity names, nicknames and idioms. If, however, the search terms are to be used, Plaintiffs propose that Zuffa should be required to utilize Plaintiffs' search terms which are proportional to the needs of the case and to be applied to a fraction of Zuffa's ESI.

---

discovery efficiencies. Zuffa also claims that certain requests are overbroad because they will return irrelevant documents related to the everyday administrative tasks in connection with events (*e.g.*, production schedules). To the extent this objection has not been remedied through custodian selection (and Zuffa has offered no information or basis for believing it has not), it can be addressed by applying search terms to those specific custodians, as Plaintiffs previously proposed.

[24] Because 1 petabyte is equal to 1,000,000 gigabytes, the custodian selection process has already ensured that much less than 0.1% of Zuffa's data being subject to search and production. Given that this case challenges Zuffa's business practices in nearly all areas of its business, such a limited production should not be further limited by unnecessarily narrow search terms.

JOINT STATUS REPORT

1

2

**b. Plaintiffs' Proposed Search Terms Are Reliable, Tailored to The Allegations and Needs of the Case and Vastly Superior to Zuffa's Proposal.**

3

4

At a minimum, the adoption of Plaintiffs' search terms are necessary to reduce the obvious shortcomings of Defendant's proposed search terms.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The Sedona Conference expressly recognizes that "while basic keyword searching techniques have been widely accepted both by courts and parties as sufficient to define the scope of their obligation to perform a search for responsive documents, the experience of many litigators is that simple keyword searching alone is inadequate in at least some discovery contexts." Sedona Commentary, at 233-34. The inadequacy of Defendant's proposed terms is demonstrable. As the Court is aware, in response to Plaintiffs' Request No. 54, on November 2, 2015, Zuffa produced 107,649 documents to Plaintiffs which Zuffa had previously produced to the FTC in connection with the FTC's investigation of Zuffa in 2012 (the "FTC Production").[25] To test the reliability of Zuffa's search terms, Plaintiffs used Zuffa's search terms to search the FTC Production; the results are telling. When Zuffa's proposed search terms were applied to the FTC Production, the search terms returned only 52.86% or 56,902 of 107,649 documents contained in the production. In addition to the FTC Production, Zuffa has produced 18,641 additional documents for a total of 126,290 documents. Plaintiffs also tested the reliability of Zuffa's search terms against the entire production of documents; again, the results were poor. When Zuffa's proposed search terms were applied to Zuffa's entire production to date, the search terms returned only 57.41% or 72,506 of 126,290 documents. Therefore, under the best case scenario, Zuffa's proposed search terms *exclude 47.14*% of the documents that it produced in response to the FTC's investigation of Zuffa and *42.58%* of all of the documents that Zuffa has produced to date. By contrast, Plaintiffs' proposed search terms return 91.18% or 98,797 of 107,649 documents contained in the FTC Production.

25

26

27

28

---

[25] The FTC investigation has clear parallels to this case. The investigation was initiated in response to Zuffa's acquisition of Strikeforce and the attendant effect on the relevant markets alleged here.

JOINT STATUS REPORT

Zuffa's attempt to characterize the response rate of the application of its search terms to the productions to date as "misleading" is itself misleading in several ways. Zuffa states that its "proposed search terms 'hit' on 84% of the newly-produced Zuffa documents (those documents with a ZFL- Bates number prefix)...." However, it is unsurprising that Zuffa's search terms "hit" on 84% of the ZFL production because the ZFL production consisted almost entirely of Promotional & Ancillary Rights Agreements with members of the class. Plaintiffs' search terms, for example, "hit" 99.14% of the ZFL production. If Zuffa's search terms were well designed, they should return nearly 100% of those agreements, certainly more than 84%. Regardless, it is apparent that Zuffa has cherry picked a subset of documents that it has produced to maximize the "hit" rate which, in context only proves the point that Zuffa's search terms are not reliable. Zuffa also asserts that Plaintiffs' statement that Defendant's search terms return only 52.86% (56,902) is misleading because Zuffa will produce not only the documents which result in "hits" but also those documents attached to the "hits."[26] Zuffa states that, when the attachments are considered, Zuffa's terms return "69% of the re-production of documents produced to the FTC (those documents with a ZUF- Bates number prefix)." Plaintiffs have applied Zuffa's search terms, but have not yielded the same "hit" rate result claimed by Zuffa. Rather, when Plaintiffs run Defendant's search terms with these parameters, the search returns 64,549 documents, a mere 59.96%. Thus, regardless of whether Defendant's inflated returns that include the attachments are used, Defendant's search terms still fail to capture more than 40% of the documents produced to the FTC.[27] When Plaintiffs' proposed search terms are used to capture both the "hits" and attachments, the return is 100,756 of 107,649 (93.69%). That Defendant's terms are inadequate is not misleading, it is clear based on their application.

---

[26] Zuffa argues that Plaintiffs' figure does not account for the fact that Zuffa would also produce documents attached to the search hits. But whether attachments are included in this analysis does not give much comfort because other relevant yet-to-be-produced documents which are not so attached but are nevertheless relevant and responsive will be excluded. Thus, the viability of search terms must be determined based on the search term hit-rate not on the rate plus the number of documents that happen to be attached to the hits.

[27] Even if Defendant's 69% figure is correct, Defendant's method fails to return more than 30% of these responsive documents which is still inadequate by any reasonable measure.

JOINT STATUS REPORT

Zuffa has indicated that its search term proposal applies to Plaintiffs' Requests for Production of Documents 15-25, 27, 29, 31, 33, 35, 37, 40-45, 47 and 51.[28] However, Zuffa's proposed terms fail to sufficiently target many of these Requests and fail to target some at all. For example, in Request No. 15, Plaintiffs sought documents constituting and related to third-party analyst and consultant reports regarding Zuffa and the MMA industry, including "reports that analyze or project demand, revenues, income, profits or market share derived from or relating to MMA bouts, Merchandise Rights in the MMA Industry, or Promotional and Ancillary Rights in the MMA Industry." Aside from naming a few past and present promoters, Defendant's proposed search terms do not address Request 15 in any form.[29]  Similarly, Request 16 seeks documents comparing or analyzing athlete compensation models between different MMA promoters and other professional sports. Again, aside from naming a few past and present promoters, Defendant's proposed terms fall well short of targeting responsive documents. For example, Defendant's proposed terms do not target documents containing obvious key terms such as "compensation," "pay" and "professional sports."[30] Requests 15 and 16 are mere examples. Defendant's proposed search terms either fail to capture an adequate percentage of responsive documents in Defendant's custodians' possession, custody or control, as Defendant's terms fail to

---

[28] Plaintiffs' Requests for Production of Documents were filed in connection with the Motion to Stay and are available at Dkt. No. 107-1.

[29] Defendant argues below that Plaintiffs' argument is misleading because Defendant has proposed to respond by searching the finance department's files without the use of search terms for documents responsive to Request No. 15.  Notably, Defendant does not dispute that it is relying on search terms to collect responsive documents. Indeed, the quoted Response to Request No. 15 also expressly states, "Zuffa will also collect and review other documents responsive to this Request subject to an agreement on search terms designed to cull documents responsive to this Request." Thus, irrespective of any other method used to cull responsive documents, Defendant has proposed to use search terms to locate responsive documents and yet, Defendant's proposed terms fail to use search terms that are targeted to do so.

[30] In addition to the responsiveness of terms like "professional sports" and "NFL" to this Request, the Consolidated Amended Complaint makes reference to several instances where Zuffa's officers and employees compare the UFC to the NFL. CAC ¶¶ 8, 15, 70. At the motion to dismiss hearing, Judge Boulware indicated that he required context for these statements before ruling on their relevance and effect. Defendant's proposed search terms are also deficient for excluding terms such as the "NFL," notwithstanding the clear relevance of such terms to the Requests Defendant proposed to respond to with documents culled from search term hits.

adequately target documents responsive to any of these Requests. By contrast, Plaintiffs' search terms were designed to more reliably capture documents responsive to all of Plaintiffs' Requests, not just a select few.

Zuffa cites RFP 27 as an overbroad request arguing that its search terms are a practical way of narrowing the Request. However, during the meet-and-confer process, Plaintiffs have made several proposals to narrow the scope of RFP 27, all of which Zuffa rejected without a counterproposal. Regardless, Zuffa's argument is a red herring. Zuffa claims that its search terms are necessary because under the plain language of RFP 27, communications "between a Zuffa employee and a venue regarding any matter from insurance and indemnity to lighting and security to concessions is called for." Not only have Plaintiffs expressly told Zuffa that they are not seeking such documents, there is absolutely no indication that any of the 19 custodians at issue for whom Zuffa has documents ever communicated about or had day-to-day responsibilities for the subjects it identified, and Zuffa has not demonstrated otherwise. Rather than a practical tool to narrow Plaintiffs' Requests, Zuffa's search terms are a tool to shield relevant documents from production.

Zuffa argues that its approach is consistent with the requirement in Federal Rule of Civil Procedure 26(b)(1) that discovery must be "proportional to the needs of the case." However, Zuffa fails entirely to explain how or why its proposal is "proportional." Rule 26(b)(1) continues that the discovery sought must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Tellingly, Zuffa does not address any of the proportionality factors but rather simply states what it is searching for with search terms and without. The proportionality factors weigh heavily in Plaintiffs' favor. The issues at stake in the litigation are of paramount importance to the professional careers and livelihoods of over 1,000 professional athletes (whom Plaintiffs allege have been vastly underpaid and mistreated) and the future of the sport of MMA in the United States which is the fastest-growing and one of the largest sports in the country. Although

21

Plaintiffs have not formally quantified their damages and require documents and information from Zuffa to do so, Plaintiffs estimate that the amount in controversy is hundreds of millions of dollars. Zuffa's resources are vast. Zuffa's own President, Dana White, estimated that Zuffa was valued at over $3.5 billion dollars; 89% of the company is owned by billionaires Frank and Lorenzo Fertitta. *See, e.g.*, *Lunch with the FT: Dana White*, Financial Times, Mar. 21, 2014 (stating Zuffa's worth "$3.5bn. Some would say more"), *available at* http://www.ft.com/cms/s/2/03ccce22-aebf-11e3-aaa6-00144feab7de.html#axzz2wuELYEwq. Discovery is critically important to the proof of Plaintiffs' allegations as it is in every complex antitrust class action. Moreover, Plaintiffs allege that Zuffa's anti-competitive conduct was a deliberate scheme that relied, in part, on the use of threats and other illicit conduct that is the type of evidence gleaned from the company's internal documents and communications. Zuffa has not demonstrated what burden it would incur by not applying search terms or applying Plaintiffs' far more reliable terms. Regardless, as discussed above, applying Zuffa's search terms to the documents it has already produced results in hits for an unacceptably low proportion of the those documents. Thus, it is evident that the application of search terms (or at least applying Zuffa's search terms) does not outweigh the benefit or risk of not using them.

2. **Zuffa's Statement**

      a.    **Search Terms Are Necessary and Appropriate in this Case**

The use of search terms is a standard discovery tool that reduces the burden and expense of document review and production and increases the speed with which documents can be produced. *EEOC v. McCormick & Schmick's Seafood Restaurants, Inc.*, No. WMN-08-0984, 2012 WL 380048, at *4 (D. Md. 2012) ("Common practice governing the discovery of electronically stored information requires the use of search terms to make an extraordinarily burdensome search comply with the tenets of Fed. R. Civ. P. 26(b)(2)(C)"). This Court has already made clear that it wants the parties to manage discovery in an efficient and cost-effective way including the use of search terms as well as non-traditional methods of searching ESI to the extent possible. Dkt. 156, Jul. 28, 2015 Tr. 29:18-25; Dkt. 210, Dec. 8, 2015 Tr. 22:5-13, 30:10-16. Search terms are particularly necessary where, as here, the Requests for Production are vastly

1   overbroad, calling for essentially all documents relating to any communication with or about any

2   actual or potential venue, sponsor, merchandiser, retailer or TV distributor.[31]

3        With document requests of such broad scope, the use of search terms is necessary for the

4   efficient and cost-effective management of discovery.  Although Zuffa's collections are not yet

5   complete, the volume of documents in this case is already massive.  Before adding in the six

6   custodians Plaintiffs designated on January 8, Zuffa had already collected and processed over 1.2

7   million (de-duplicated) email documents from the sixteen agreed-upon custodians.  Even when

8   the end date of June 30, 2015 is applied, with the addition of the six additional custodians' emails

9   currently being processed, and the non-email ESI and hard copy documents from the twenty-two

10  total custodians, there will still be well over a million custodial documents that fall within the

11  Relevant Time Frame.

12       Moreover, the volume of non-custodial documents is also substantial.  In addition to the

13  Strikeforce documents already produced, Zuffa has already collected and processed over 45,000

14  hard copy documents and is in the process of collecting and processing more.  Zuffa has also

15  collected, or is in the process of collecting, more than 137,000 additional electronic files from

16  centralized drives.  When the collection and processing of the custodian-specific and non-

17  custodial electronic and hard copy files are complete, the number of documents collected in this

18  case will likely be in the millions.  Plaintiffs' proposal that Zuffa should be required to review

19

20  _____

21  [31] Plaintiffs' Requests for Production contain a number of substantially overbroad Requests
    demanding production of "All Documents" relating to various overbroad subjects.  For example,
    Request 20 calls for All Documents "discussing, evaluating, or analyzing actual or proposed

22  contractual terms or provisions."  Request 27 calls for "All Documents referencing or relating to
    agreements (and any amendments thereto) regarding venues for professional MMA bouts"

23  including "without limitation, communications and/or negotiations between You and any venue
    or owner, operator, agent or manager of any venue, draft agreements, proposals, presentations,

24  and internal communications, memoranda, spreadsheets and analyses referencing or relating to
    such negotiation, regardless of whether the negotiation resulted in an executed agreement."

25  Similarly overbroad Requests call for "All Documents" relating to sponsorships, merchandising
    relationships, retailers or broadcasters.  Dkt. 107-1, RFPs 33, 35, 37.  Since the Complaint only

26  alleges that certain aspects of the contracts with these third-parties are anticompetitive, (the
    alleged exclusivity provisions), these Requests are not tailored to the allegations of the

27  Complaint.

28

1  each of those documents without the use of search terms is wholly unreasonable and would be

2  prohibitively expensive.

3      Federal Rule of Civil Procedure 26(b)(1) was revised in December of 2015 to clarify that

4  discovery must be "proportional to the needs of the case."  Zuffa's approach is just that.  First,

5  Zuffa is collecting and reviewing substantial numbers of documents without the use of search

6  terms.  These include documents from (1) the hard copy fighter files, (2) the electronic fighter

7  files, (3) the hard copy venue and broadcaster files (including cable, TV, Pay-Per-View and

8  online distribution), (4) the hard copy partnership (sponsorship) files, (5) hard copy corporate

9  records, and (6) financial files, as well as certain other targeted searches for specific documents.

10  Zuffa has already produced close to 18,000 documents comprising almost 250,000 pages of

11  material from those sources as part of that review.[32]  Zuffa has also agreed to review text

12  messages without the use of search terms; because the custodians' cell phones contain both

13  personal and business text messages, Zuffa will have to cull and review large volumes of text

14  messages.  Zuffa proposes to use search terms, however, in order to help identify the universe of

15  relevant documents in response to Plaintiffs' broad Requests in the following locations:  (1)

16  Zuffa's relevant shared drives, which encompass Zuffa's non-custodial electronic "central" files,

17  and (2) the twenty-two custodians' ESI.  Zuffa has not proposed to limit its extensive hard copy

18  document collection through search terms.  Given the number of "All Documents" requests, Zuffa

19  believes this is the most efficient way to provide Plaintiffs the documents they have requested

20  while balancing the burdens and expense of the process.[33]

21      Although the party requesting documents traditionally supplies the initial list of search

22  terms, Plaintiffs requested, and Zuffa provided, a proposed list of search terms that could be used

23  to identify relevant documents responsive to Plaintiffs' Requests for Production on December 21,

24  2015.  Zuffa's list is comprised of 91 separate terms including broad terms central to the issues in

25

26  [32] When the Strikeforce production is added in, Zuffa has already produced, without the use of search terms, more than 125,000 documents comprising over 470,000 pages.

27  [33] The "handful of central files" to which Plaintiffs refer include a collection in excess of 400,000 pages of hard copy documents and over 200,000 centrally-maintained electronic documents.

28

JOINT STATUS REPORT

this case, such as "exclusive*," "extend* or extension", and "contract w/2 negotiat*".[34]  Zuffa has made it clear to Plaintiffs that it is willing to discuss the addition or modification of terms on this list and would be amenable to tailoring search terms to particular custodians based on their responsibilities.

Plaintiffs' suggestion that Zuffa has not responded to their "proposals" for narrowing is not accurate.  In the course of meet and confers, Plaintiffs have stated that they are not interested in documents such as those dealing with routine logistical matters or other concededly irrelevant matters such venue insurance or security.  The problem from Zuffa's point of view is that Plaintiffs have not made any proposal that would reduce the burden of reviewing all those irrelevant documents.  Zuffa has consistently told Plaintiffs it would review and produce from the central hard copy and electronic contract files without the use of search terms, but it believed that search terms were the only practical way to limit the search of the vast collection of ESI.  For example, with regard to RFP 33 (broadcasters), on January 11, Plaintiffs made a proposal that included, among other things; "(3) communications and/or negotiations between Zuffa and any broadcaster of professional MMA events (including PPV and online distribution), including negotiations which did not result in agreement," in other words, all communications with broadcasters regardless of subject matter.  Jan. 11, 2016 M. Dell'Angelo Letter to J. Cove.  Zuffa rejected this as overbroad because it was not limited as to subject matter and would encompass every aspect of Zuffa's day-to-day dealings with broadcasters.

Plaintiffs mischaracterize the record with regard to RFP 15 which calls for third party financial analyst report and similar documents.  In fact, Zuffa agreed to search the finance department for such documents, and then also use search terms to determine whether additional reports might exist.[35]

---

[34] Zuffa's list of search terms is provided as Attachment B.

[35] Sept. 29, 2015 Letter from J. Cove ("We are searching for and producing third-party analyst or consultant reports responsive to this request that are found in Zuffa's Finance department.  We are continuing to investigate what other reports may exist.  In any event, we will produce responsive third party reports from the documents of custodians agreed upon by the parties using search terms and other parameters that the parties will negotiate to cull such documents prior to

1   Plaintiffs' proposal that the substantial volumes of documents in this case should be

2   reviewed without the aid of search terms to narrow the scope to those documents likely to contain

3   relevant evidence should be rejected outright.  Plaintiffs' proposed approach is a significant

4   departure from common practice in modern antitrust cases with large numbers of documents,

5   grossly disproportionate to the needs of this case, inefficient and cost-prohibitive, and particularly

6   unwarranted in light of Plaintiffs' overbroad Requests.  Plaintiffs have not shown that this case is

7   so unique that the normal and efficient process of using well-chosen search terms should not be

8   used.  Zuffa remains open to working with Plaintiffs on devising a workable list of search terms

9   to streamline the review of the substantial volume of documents involved in this case.

10           **b.      Plaintiffs' Proposed Search Terms Are Vastly Overbroad and
                        Would Not Meaningfully Reduce the Burden of Complying with
11                      Plaintiffs' Overbroad RFPs**

12   On January 19, Plaintiffs provided for the first time a counter-proposal of search terms – a

13   single-spaced 8-page list consisting of over 2,500 search terms – that they believe should be used

14   if the Court determines search terms are appropriate.  On January 21, Plaintiffs sent a revised list

15   of search terms comprising over 2,300 terms.  Plaintiffs' list contains 8 categories of search

16   terms:  Promoters, Agents, Sponsors, Media, Broadcasters, Venues, General Terms, and Fighter

17   Names and Nicknames.  Plaintiffs appear to include, among other things, the last names and

18   nicknames and some first names of all UFC fighters as well as their managers or agents, and the

19   names of most or all sponsors, venues, or media or broadcasters that have done business with

20   Zuffa to be searched across all twenty-two custodians and all non-custodial ESI files.  Although

21   Plaintiffs yesterday withdrew many of the common first names such as "Steve," "Brian," and

22   "Joe," from their January 19 list, their revised list still include many others such as "Michael," or

23

24   review for responsiveness and privilege."); December 21, 2015 Letter from J. Cove ("Zuffa has
     been collecting and producing documents from Zuffa's finance department as well as many other
25   locations.  At this point, the collection and review process is still ongoing.  Zuffa will produce
     third party analyst or consultant reports from the finance department on a rolling basis.  Zuffa will
26   also collect and review other documents responsive to this Request subject to an agreement on
     search terms designed to cull documents responsive to this Request.")
27

28

"Jason," or "Lindsey," as well as common last names such as "Johnson or Jones or Jordan" or "Miller" or "Smith."[36]  Of course, Plaintiffs' statement suggests some of search terms that are appropriate to be added to the list, but their January 21 list of over 2,300 search terms will not reduce the burden of review nor address the overbreadth of the RFPs, is not tailored to the needs of the case, and does not serve as a useful starting point for discussion.

The effect of Plaintiffs' proposed search terms would be to capture every document that referred to any fighter, manager, venue, sponsor, or TV network, as well as any document that happened to mention any "Michael," "Jason," "Lindsey," etc., regardless of the subject matter.[37] Thus, this list is even broader than the Plaintiffs' already overbroad RFPs, which do not call for every document related to every fighter.  To be clear, Zuffa's original list included, and Zuffa has no objection to, search terms including the Plaintiffs and their managers' names; all fighters, however, is far too broad.  Further, Zuffa has already agreed to review the electronic and hard copy fighter files without the use of search terms in order to provide Plaintiffs with relevant documents and has already made a production of nearly 18,000 documents as a result of this review.  It also has already provided comprehensive financial information showing compensation paid to every fighter in the Relevant Time Period, broken down by category, e.g., bout purses, bonuses, Pay-Per-View shares, etc.  Targeted search terms like those Zuffa has proposed will also readily identify other relevant documents from other files.

Similar problems exist in Plaintiffs' proposal for search terms regarding venues, sponsors, media and broadcasters.  With regard to venues, Plaintiffs' Complaint alleges that Zuffa "imposes exclusivity provisions into its physical venue agreements that severely limit, and in some cases remove altogether, the ability of any would-be competitor to hold MMA events at premier venues in the U.S."  Cons. Am. Comp. ¶ 122.  But Plaintiffs' overbroad Request for Production seeks documents far beyond agreements and documents necessary to assess the scope of any alleged

---

[36] While the additional terms listed under "Promoters" are still somewhat overbroad, the Promoter list is at least a reasonable starting point for a discussion.

[37] These terms are certain to pull up significant numbers of documents having nothing to do with the fighters, given that many Zuffa employees also have these common names (as Plaintiffs are aware from the organizational charts that Zuffa provided).

JOINT STATUS REPORT

exclusivity provision.  Rather, it seeks "All Documents referencing or relating to agreements" including "communications and/or negotiations between You and any venue owner, operator, agent or manager of any venue, draft agreements, proposals, presentations, and internal communications, memoranda, spreadsheets, and analyses . . . ."  Dkt. 107-1, RFP 27.  Thus, under the plain language of Plaintiffs' Request, communications between a Zuffa employee and a venue regarding any matter from insurance and indemnity to lighting and security to concessions is called for.  While Plaintiffs have stated that they are not interested in documents related to the routine logistics of these events, their proposal to add as search terms of the names of venues that Zuffa has done business with in the United States (e.g., "MGM," "Mandalay," etc.) will likely pull up every document or communication with anyone from the venue relating in any way to the event or the venue, as well as every ad or promotional material that mentions the event (or any other event at that venue), the vast majority of which will be irrelevant but Zuffa will still have to go through the burden of reviewing.  The same is true for Plaintiffs' proposal regarding sponsors, media, and broadcasters.  Zuffa's search term proposal, on the other hand, is a practical way to narrow this overbroad Request, through the use of search terms, that would help to identify documents responsive to the Request that are relevant to the allegations in the Complaint.  Zuffa proposed search terms in order to accomplish this goal, such as:  exclusive*, (contract w/2 negotiat*) and (venue w/2 (agreement or contract)).

Plaintiffs claim that Zuffa's search terms are not a good fit because they "hit" on only a percentage of documents from the productions that Zuffa has already made.  These numbers are misleading.  As Plaintiffs are aware, and as is required in the ESI Stipulation, the parties are maintaining parent-child relationships when producing documents.  *See* Dkt. 160, ESI Stip. at 15.  What this means in practice is that if a search term "hits" on a document and that document is responsive, the entire family of documents will be reviewed and produced (unless protected by privilege) even if the family members do not contain any search terms.  Therefore, if a parent e-mail contains a search term and its five attachments contain no search terms, all six documents will be reviewed and produced.  Similarly, if one of the five attachments contains a search term (and neither the cover e-mail nor the other attachments do), the cover e-mail and all of the

1   attachments will be produced.  As a result, Plaintiffs' claim that Zuffa's proposed search terms

2   would have only hit on 57% of its already-produced documents is misleading.  When families are

3   included in the calculation – as they must be – Zuffa's proposed search terms "hit" on *84%* of the

4   newly-produced Zuffa documents (those documents with a ZFL- Bates number prefix) and on

5   *69%* of the re-production of documents produced to the FTC (those documents with a ZUF- Bates

6   number prefix).[38]

7           Further, many of the already produced documents that Plaintiffs claim do not contain

8   Zuffa's proposed search terms fall within the categories of documents for which Zuffa has not

9   proposed search terms, such as hard copy documents, corporate records and centralized financial

10  data.  For example, numerous documents that did not "hit" on Zuffa's proposed search terms are

11  financial pro formas and other financial ESI; these documents have been collected and produced

12  and will continue to be collected and reviewed without the aid of search terms in response to

13  RFPs 9 through 14.  Since Zuffa is not relying on search terms to identify these types of

14  documents in any event the "hit" figures above suggest a high degree of reliability for the

15  proposed search terms.[39]

16          At this stage, Plaintiffs' list of over 2,300 terms is so broad that it cannot be taken as a

17  serious proposal for search terms at all but rather an attempt to have Zuffa review every document

18  that it collects.  Zuffa is willing to meet and confer on these search terms in an attempt to address

19

20  _____

21  [38] Plaintiffs' assertion that, Zuffa refused to tell them "which custodians and central files were
searched" for this production is wrong.  As explained in M. Lynch's Oct. 22, 2015 email, Zuffa

22  provided the metadata fields that were produced to the FTC and even converted them into the
equivalent metadata fields agreed upon in the ESI stipulation for this case.  These fields provided

23  Plaintiffs with information regarding custodians from whom the documents were collected.

24  [39]  Plaintiffs cite the Sedona Conference's Best Practices Commentary on Search and Information
Retrieval.  As the Commentary makes clear, however, its concerns regarding "keyword searches"

25  relate to the use of "simple keyword" searches that do not include Boolean operators or variations
on words.  Commentary at 17.  Zuffa proposed numerous Boolean and wildcard searches in its

26  initial list of proposed search terms to address exactly this issue.  For example, rather than simply
proposing "sponsorship agreement," Zuffa proposed to run (sponsor* w/2 (agreement or

27  contract)) to help identify such documents.  In any event, Sedona Commentary is not the
governing law; the Federal Rules, which have been recently amended to ensure proportionality,
are the touchstone for this analysis.

28

some of the differences in scope of their respective proposals, but Plaintiffs must be willing to make a good faith effort as well.

If the parties cannot reach an agreement on search terms or other reasonable limits on the overbroad Requests, Zuffa reserves the right to move the Court to strike the overbroad and burdensome Requests in their entirety.

C.  **Relevant Time Period for Plaintiffs' Production of Documents in Response to Four of Zuffa's Requests for Production**

1. **Joint Statement:**

Through multiple meet-and-confer discussions and correspondence, the parties have largely come to an agreement regarding the Relevant Time Period for Zuffa's Requests for Production. The remaining dispute is the Relevant Time Period to be applied to Requests 3, 6, 14 and 20.

2. **Zuffa's Statement**

For a discrete set of Requests – 3, 6, 14 and 20 – Zuffa proposes that Plaintiffs be required to produce responsive documents back to January 1, 2000.  These four requests are not blunderbluss "All Documents" requests:  RFPs 3 and 6 call for relevant contracts;[40] RFP 14 calls for documents sufficient to show compensation for combat-sports related activity;[41] and RFP 20 calls for documents sufficient to show tolling or extensions of contracts.[42]  As explained more

_____

[40] Request 3 calls for "All AGREEMENTS between YOU and any PERSON related to the provision of YOUR services or RIGHTS in connection with any COMBAT SPORT, or the grant of any of YOUR IDENTITY RIGHTS, including without limitation participation in any BOUT or competition, serving as a commentator, or making a personal appearance."

Request 6 calls for "All AGREEMENTS between YOU and any SPONSOR."

[41] Request 14 calls for "DOCUMENTS sufficient to show all compensation paid to YOU by any PROMOTER, including but not limited to YOUR base salary, payment or compensation; bonuses of any kind; discretionary payments; signing bonuses; broadcast royalties; PAY-PER-VIEW shares; MERCHANDISE payments; appearance fees; or any other compensation, broken down by date, PROMOTER, amount of payment, and source of revenue."

[42] Request 20 calls for "DOCUMENTS sufficient to show any extensions to or tolling of the term of YOUR AGREEMENTS with any PROMOTER, including the duration and the reason for the tolling or extension."

fully below, obtaining the contracts, extensions, and compensation data for the period between January 1, 2000 and January 1, 2005 is vital for Zuffa's defense, including because for at least half of the Plaintiffs, it is likely to be the only way to obtain any of their pre-UFC contracts with Zuffa's competitors. Providing documents for only one year before Plaintiffs Quarry, Vera and Fitch's first UFC bout is not sufficient because, given the prevalence of multi-bout agreements, they may not have signed an agreement in that time period with another promoter even if they competed in a bout for another promoter during that time. Moreover, these discrete requests do not entail substantial or undue burden in searching for and producing the limited number of contracts that each Plaintiff signed in that period, along with related compensation and extension information, and is certainly not disproportionate either to the needs of this case or in relation to the extensive efforts, including producing documents back to 2000, that Zuffa is undertaking.

The following are some, but not all, of the examples of why evidence from this timeframe is necessary. First, Plaintiffs have alleged that a wide spectrum of Zuffa's contractual provisions and practices are anticompetitive. That other MMA or combat sports promoters, who Plaintiffs must concede lacked market power, used the same or similar provisions or practices (e.g., exclusivity provisions, certain rights "in perpetuity," or tolling or extension terms) tends to show that such provisions or practices serve legitimate business purposes and are not anticompetitive.[43] Second, these contracts are also relevant to test Plaintiffs' allegations that they were effectively coerced by Zuffa's alleged abuse of its alleged monopsony power to agree to these terms – allegations that would be undercut by Plaintiffs' voluntary agreement to these terms with other promoters. Third, Plaintiffs have alleged both that the scheme to monopolize/monopsonize began in 2006 and that Zuffa's acquisition of certain competing promoters' businesses or assets reduced competition. Information and data on Plaintiffs' compensation before this time is necessary to

---

[43] Plaintiffs argue that firms with market power should not engage in anticompetitive conduct, but the threshold issue is whether the conduct is in fact anticompetitive. This requires an in-depth analysis of, among other things, the history and legitimate business purpose of the contractual provision. The conduct of other firms using similar provisions is relevant to that analysis. *Polk Bros. Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985) (Easterbrook, J.) ("[one] must ask whether an agreement promoted enterprise and productivity at the time it was adopted").

test the before-and-after effect.  Fourth, Plaintiffs have alleged that Zuffa has forced Plaintiffs to give up certain identity rights without any compensation.  Zuffa is entitled to documents that could show that prior to signing with Zuffa, Plaintiffs entered into agreements with other promoters that, like Zuffa, compensated Plaintiffs under the agreement as a whole for a similar grant of identity rights.  Fifth, Plaintiffs' contracts with promoters other than Zuffa, and the compensation paid under those agreements, in particular any contracts prior to the start of the alleged "scheme," are important to evaluating the competitive options that the Plaintiffs had before signing agreements with Zuffa.

Unless Plaintiffs are ordered to produce contracts back to 2000, Zuffa will likely not be able to obtain any of the contracts that half of the named Plaintiffs signed with Zuffa's competitors before they signed with Zuffa.  Three of the named Plaintiffs, Jon Fitch, Brandon Vera, and Nathan Quarry, all began competing in the UFC in 2005 so all their pre-Zuffa contracts are with other promoters before that date.[44]  According to public sources, Brandon Vera had four bouts with competing promoters between 2000 and his first UFC bout in 2005,[45] Jon Fitch had thirteen bouts with competing promoters between 2000 and his first UFC bout in 2005,[46] and Nathan Quarry had six bouts with competing promoters between 2000 and his first UFC bout in 2005.[47]  Of the other Plaintiffs, Luis Javier Vazquez had eight bouts with competing promoters between 2000 and 2005,[48] and Kyle Kingsbury had none.  Cung Le apparently did not compete in any professional MMA bouts prior to 2006; however, Mr. Le did participate in other forms of combat sports, such as kickboxing and sanshou, prior to his MMA career, and any agreements and compensation related to his association with those other combat sports are also highly

---

[44] Vera and Fitch also fought with competitive promotions after they left the UFC.

[45] Brandon Vera, Fight History, http://www.sherdog.com/fighter/Brandon-Vera-4886 (last accessed Jan. 19, 2016).

[46] Jon Fitch, Fight History, http://www.sherdog.com/fighter/Jon-Fitch-4865 (last accessed Jan. 19,2016).

[47] Nate Quarry, Fight History, http://www.sherdog.com/fighter/Nate-Quarry-2383 (last accessed Jan. 19, 2016).

[48] Javier Vazquez, Fight History, http://www.sherdog.com/fighter/Javier-Vazquez-511 (last accessed, Jan. 19, 2016).

JOINT STATUS REPORT

relevant to the issue of market definition, among others.[49]  It would be grossly unfair to restrict Zuffa's ability to present evidence relating to these contracts with competitors and to inquire into this evidence with Plaintiffs in deposition or trial simply because the Plaintiffs may not maintain "sophisticated filing systems."

Providing this small number of contracts related to their pre-2005 events, along with any sponsorship contracts and requested compensation and extension information, entails minimal burden in light of the importance of this evidence, and the fact that equivalent evidence for these Plaintiffs after 2005 is either scarce or, for some Plaintiffs, non-existent.  Plaintiffs have proposed that they take on the burden of class representatives.  In light of the immense and expensive efforts that Zuffa is undertaking in this litigation, it is only a small burden to ask that Plaintiffs locate and produce their old contracts and the other requested information.  The suggestion that third parties, rather than Plaintiffs, should undertake this is wrong.  *Rocky Mountain Med. Mgmt., LLC v. LHP Hosp. Grp.*, No. 4:13-CV-00064-EJL, 2013 WL 6446704, at *4 (D. Idaho Dec. 9, 2013) ("non-parties should not be burdened with the annoyance and expense of producing the documents sought unless the requesting party is unable to discover them from a party") (citing *Bada Co. v. Montgomery Ward & Co.*, 32 F.R.D. 208, 209-10 (S.D. Cal. 1963)).

Finally, Plaintiffs requested, and Zuffa agreed to produce, its documents relating to Plaintiffs without limitation as to time, and its agreements and other related documents in the fighter files with proposed members of the alleged Bout Class back to 2000 or before, if applicable, as well as certain financial information back to 2000.  Zuffa believes that given the importance of these documents, the minimal burden, if any, of extending the time period for these narrow categories of Requests, and Zuffa's agreement to produce similar documents during this time frame, that parity from the Plaintiffs is appropriate.

### 3. **Plaintiffs' Position (Plaintiffs' Statement)**

Defendant seeks production of documents responsive to Requests for Production 3, 6, 14 and 20 back to January 1, 2000 – more than 16 years ago and nearly 10 years prior to the

---

[49] Cung Le Website, Fight Profile, http://cungle.com/fight-profile/ (last accessed, Jan. 19, 2016).

beginning of the proposed class period on December 16, 2010.[50] This proposed 16-year time period is unreasonable and disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b). Plaintiffs propose to produce responsive documents covering the time frame to which the parties have agreed for the remainder of Defendant's requests: documents dated on or after October 3, 2004 by Plaintiffs Fitch and Vera; documents dated on or after April 9, 2004 by Plaintiff Quarry; and documents dated on or after January 1, 2005 by the other three Plaintiffs.[51] This time frame is more reasonable and proportionate to the needs of the case, and corresponds more closely to the time frame the Court has applied to the vast majority of Plaintiffs' document requests: "a uniform time period of January 1, 2005, through June 30th of 2015." Nov. 17, 2015 Status Conf. Tr., at 20:8-10.

The only documents Defendant is producing from prior to January 1, 2005 are certain financial information and the fighter contracts with Bout Class members that, by Defendant's own admission, are "the core of the case."[52] Moreover, Defendant, unlike Plaintiffs, is a large corporation with a sophisticated filing system, including separate files for contracts, thereby reducing the burden to Defendant of searching for and producing its admittedly centrally relevant documents.

Plaintiffs are not corporations with sophisticated filing systems, and unlike Defendant, do not maintain separate files containing all of their contracts and related documents. Therefore, in order to produce the requested documents back to January 1, 2000, Plaintiffs' counsel would need to review *all* of Plaintiffs' documents – paper and electronic – back to January 1, 2000, even though the proposed class period begins in December 2010, and none of the Plaintiffs fought for Defendant before 2005. This creates a substantial, disproportionate burden in light of the minimal likelihood that Plaintiffs' documents dating more than one year before their first UFC bouts – and more than five years before the proposed class period – are relevant.

---

[50] These requests seek production of contracts, documents reflecting compensation, and documents reflecting tolling or extensions of contracts.

[51] The lone exception is Defendant's RFP 1, which the parties have agreed not to limit with respect to time frame.

[52] Nov. 17, 2015 Status Conf. Tr., at 20:23-24.

Defendant's purported justifications for this broad, disproportionate discovery ring hollow. First, Defendant speculates that other promoters may have used contractual provisions similar to those Plaintiffs claim are anticompetitive. Of course, the law is clear that entities with market power may not employ contractual provisions that are anticompetitive, even if those same provisions would be lawful if employed by an entity without market power. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1207 (9th Cir. 1997) ("Legal actions, when taken by a monopolist, may give rise to liability if anticompetitive.") (citation omitted). Moreover, Plaintiffs have agreed to produce these documents dating from 2004 (for three Plaintiffs) or 2005 (for the other three Plaintiffs) to the present. And Defendant is free to issue third-party subpoenas to other promoters to obtain samples of their class-period fighter contracts, rather than compel Plaintiffs to dig through 16 years' worth of paper and electronic files fishing for contracts and related documents pre-dating the proposed class period by more than 5 years.

Second, Defendant claims it is entitled to "test" Plaintiffs' claims that it used its market power to impose these anticompetitive terms on Plaintiffs. The contractual terms used by other promoters at an earlier stage of Plaintiffs' careers are entirely irrelevant to the question whether Defendant used its market power to impose anticompetitive terms on Plaintiffs and other class members during the proposed class period. Plaintiffs have agreed to produce these documents dating from 2004 (for three Plaintiffs) or 2005 (for the other three Plaintiffs). And again, Defendant is free to use third-party discovery to obtain samples of contracts other promoters used during the proposed class period, rather than force Plaintiffs to undergo a highly burdensome search for documents pre-dating the proposed class period by 5-10 years.

Third, Defendant claims these documents are relevant to test the before-and-after effect of Defendant's allegedly anticompetitive conduct. A small sample of very old contracts dug from the files of a few fighters will not permit any systematic analysis of the before-and-after effects of Defendant's conduct, and is essentially a red herring. There are much more statistically rigorous ways of analyzing the effects of Defendant's conduct, and both sides and their experts will undoubtedly employ them.

Fourth, Defendant speculates that other promoters' pre-class period contracts will contain similar "identity rights" provisions to those challenged by Plaintiffs. Again, even assuming Defendant speculates correctly, the same contractual provision that is lawful when employed by an entity without market power may be unlawful when employed by an entity with market power. *Image Tech. Servs.,* 125 F.3d at 1207. Moreover, the MMA market was very different from 2000-2005 than it is today; other promoters' "identity rights" provisions pre-dating the class period by 5-10 years are simply irrelevant. Plaintiffs have agreed to produce these documents dating from 2004 (for three Plaintiffs) or 2005 (for the other three Plaintiffs), and Defendant remains free to subpoena samples of class-period contracts from third-party promoters. That will enable Defendant to determine whether similar "identity rights" provisions were employed by other promoters during the relevant time period.

Fifth, Defendant contends that these contracts are relevant to determine what competitive options Plaintiffs had before signing with Zuffa. Again, these contracts, assuming they exist somewhere in Plaintiffs' files, pre-date the proposed class period by 5-10 years, and have little, if anything, to say about Plaintiffs' options during the 2010-2015 class period. Plaintiffs have agreed to produce these documents dating from 2004 (for three Plaintiffs) or 2005 (for the other three Plaintiffs) to 2015. These documents will provide Defendant with any information they need about Plaintiffs' contracts with other promoters, from a more relevant time frame closer to the events in dispute. A fishing expedition for Plaintiffs' contracts and other documents more than 11 years old is simply unwarranted, unduly burdensome, and disproportionate to the needs of the case.

D. **Plaintiffs' Production of Documents Regarding Compensation Unrelated to MMA**

1. **Zuffa's Statement**

Zuffa's Requests 2 and 15 call for information relating to income/compensation that Plaintiffs received from MMA-related sources and from sources outside of MMA, including

JOINT STATUS REPORT

income or compensation earned from other combat sports.[53]  Plaintiffs have objected to the provision of any information regarding non-MMA related compensation.  This information is relevant to a number of claims that Plaintiffs have put in issue in their Complaint, as well as Zuffa's anticipated defenses.  Here are some examples:

First, Plaintiffs have alleged that Plaintiffs granted Zuffa "exclusive and perpetual worldwide personality and Identity Rights" that prevent "MMA Fighters from financially benefitting from the reputations that they built during their MMA careers . . . and locking UFC Fighters out of revenues generated by the exploitation of their Identities, including *after* the term of the contract."  Cons. Am. Comp. ¶ 113(d).  Through that allegation, Plaintiffs have put at issue compensation they have earned from the use of their identity in MMA and elsewhere, for example, if Plaintiffs were compensated for an appearance in a movie or had a DVD workout video that used their name or likeness, including where the UFC name or brand may have been expressly used.  Zuffa is entitled to show that Plaintiffs' grant of rights to Zuffa is narrow and the sort commonly granted with copyrightable material and that Plaintiffs can and do still use and monetize their name and likeness in a variety of ways in MMA and elsewhere.  Plaintiffs' refusal to provide such information is an attempt to prevent Zuffa from discovering relevant information that will undermine their overbroad and misleading allegation.

Second, Plaintiffs allege that Zuffa manipulates contract extensions and tolling to extend contracts "indefinitely."  But some athletes choose to take time off from fighting during the term of their contracts and engage in other remunerative activities, either because they find other opportunities more lucrative or they simply want a break from training and competition (or a combination of those factors).  Plaintiff Cung Le, for example, has been able to parlay his renown

[53] RFP 2: All tax returns YOU filed in the past seven (7) years, with attached schedules, including all federal, state, and local returns you filed in the United States and any tax documents you filed in any foreign jurisdiction.

RFP 15:  DOCUMENTS sufficient to show all income YOU received from any source other than a PROMOTER since YOU became a Professional MMA fighter, including information showing the amount YOU received; the source of that income; the service rendered or property, whether tangible or intangible, delivered in exchange for any payment; the date on which the payment was received; and, for recurring payments, the frequency of such payments.

JOINT STATUS REPORT

1   as a martial artist and MMA athlete to land movie and TV roles.  The extent to which Plaintiffs

2   engaged in other activities besides MMA and were compensated for it is relevant to the issue of

3   why contracts extended beyond their original stated term.[54]

4        Third, Plaintiffs have asserted that "there are no reasonably interchangeable sports to

5   which Elite Professional MMA Fighters can turn when demand and compensation for Elite

6   Professional MMA Fighters is artificially suppressed below competitive levels."  Cons. Am.

7   Compl. ¶ 80.  Zuffa is entitled to understand what compensation Plaintiffs have received from

8   other sports and activities that Plaintiffs assert are not reasonably interchangeable.  To be clear,

9   Plaintiffs' proposal to exclude all income and compensation unrelated to MMA would exclude

10  the production of documents related to other combat sports in which at least one named Plaintiff

11  has competed at a professional level.[55]

12       Fourth, Plaintiffs have asserted "to achieve elite status, Professional MMA Fighters train

13  daily, making alternative simultaneous full-time employment nearly impossible."  Cons. Am.

14  Compl. ¶ 94.  Zuffa is entitled to information regarding the income Plaintiffs received outside of

15  MMA to test the validity of that assertion.

16

17  ─────────────────

18  [54] Plaintiff Cung Le's website clearly illustrates why information regarding non-MMA related
    compensation is necessary.  The Official Cung Le Website, Biography, http://cungle.com/bio/

19  (last accessed Jan. 20, 2016) ("In 2006, Le stepped into the mixed martial arts cage and showed
    the world that the loose MMA set of rules just meant more opportunities for him to work his

20  magic. Virtually all his fights have ended in resounding victories by KO. With his remarkable
    skills in Taekwondo, Vietnamese Kung-fu, wrestling, Thai boxing, and Brazilian Jiu-Jitsu,

21  combined with a rabid fan-base that grows exponentially with every appearance, Cung Le was a
    natural sponsorship choice for Throwdown Industries and Knoxx Gear.  So it should come as no

22  surprise that Hollywood has been knocking on Le's door. After appearing in a couple of
    independent films and an episode of Walker – Texas Ranger, Le is now signed with Insomnia

23  Entertainment and is awaiting the release of his first major feature film, Blizhniy Boy: The
    Ultimate Fighter, co-starring David Carradine, Eric Robers, and Gary Busey.")

24  [55] Plaintiffs' Complaint defines "MMA" or "Mixed Martial Arts" as a sport in which

25  "competitors use interdisciplinary forms of martial arts that include, *e.g.*, jiu-jitsu, judo, karate,
    boxing, kickboxing, taekwondo, and/or wrestling;" Cons. Am. Compl. ¶ 27(j).  MMA does not

26  refer to the individual sports, such as jiu-jitsu or boxing, that are limited to one of those
    disciplines.  Collectively, these forms of martial arts are called "combat sports."  Plaintiffs'

27  proposal, therefore, would exclude documents on all combat sports except MMA, and therefore
    exclude documents related to Plaintiffs' participation in, for example, professional kickboxing.

Fifth, Zuffa is entitled to evaluate the degree to which Plaintiffs' other revenue opportunities were related to or enhanced by their experience and exposure in the UFC. For example, if a Plaintiff owns a gym whose membership and profitability is enhanced by his association with the UFC, this is relevant to their incentives to contract with Zuffa, and tends to rebut the allegation that these athletes have no choice but to contract with Zuffa.

Plaintiffs cite a number of horizontal price-fixing cases to suggest that this information is not relevant to their claim. These cases are irrelevant because, unlike here, in none of those cases was there a reasonable connection between the requested discovery and the allegations of the Complaint, i.e., a horizontal conspiracy to fix prices. Here, as explained above, the requested information bears directly on the allegations made by Plaintiffs. Further, while Plaintiffs wish to portray this as a simple "undercompensation" case, in light of the scope of their allegations that challenge a variety of practices that Zuffa believes are procompetitive, the extent to which Zuffa's alleged conduct benefitted rather than harmed the Plaintiffs will be a contested issue on which Zuffa is entitled to obtain evidence, including potentially to support expert economic analysis.

In addition, Plaintiffs' assertion that non-MMA related income is irrelevant is contradicted by their own third party subpoenas which contain Requests virtually identical to the one served by Zuffa to which Plaintiffs now object.[56] Certainly if Plaintiffs seek to get this information from third parties, Zuffa is entitled to obtain that information from the named Plaintiffs themselves.

---

[56] *Compare* Zuffa RFP 15 ("DOCUMENTS sufficient to show all income YOU received from any source other than a PROMOTER since YOU became a Professional MMA fighter, including information showing the amount YOU received; the source of that income; the service rendered or property, whether tangible or intangible, delivered in exchange for any payment; the date on which the payment was received; and, for recurring payments, the frequency of such payments") to Plaintiffs' Subpoena to First Round Management RFP 11 ("Documents sufficient to show all income Your Clients or any other MMA Fighter received from any source other than a MMA Promoter since Your Clients or other MMA Fighters became a Professional MMA Fighter, including information showing the amount Your Clients or other MMA Fighters received; the source of that income; the service rendered or property, whether tangible or intangible, delivered in exchange for any payment; the date on which the payment was received; and, for recurring payments the frequency of such payments.")

JOINT STATUS REPORT

1    Finally, Plaintiffs have requested much more substantial and invasive financial

2    information from Zuffa.  There is nothing disproportionate or burdensome about Zuffa's request

3    to Plaintiffs.

4         2. **Plaintiffs' Position (Plaintiffs' Statement)**

5    Plaintiffs respectfully request that the Court reject Defendant's overbroad Requests for

6    Production Nos. 2 and 15, demanding that Plaintiffs provide tax returns and other information

7    regarding non-MMA-related income. Plaintiffs ask the court to require that Plaintiffs produce

8    only responsive documents and information "sufficient to show their income from MMA events,

9    as payments for bouts or other related services, and any sponsorship revenues they have received

10   related to MMA fighting, including merchandising and other payments for use of their identities."

11   It is worth noting at the outset that Plaintiffs' proposal, outlined above, would include any

12   relevant information sought by Defendant. Defendant states that "Plaintiffs have put at issue

13   compensation they have earned from the use of their identity in MMA and elsewhere, for

14   example, if Plaintiffs were compensated for an appearance in a movie or had a DVD workout

15   video that used their name or likeness, including where the UFC name or brand may have been

16   expressly used." Plaintiffs' proposal encompasses production of, among other things, documents

17   showing "any sponsorship revenues they have received related to MMA fighting, including

18   merchandising and other payments for use of their identities." Plaintiffs' proposal thus envisions

19   the production of documents of the type Defendants seek relating to movie appearances, DVD

20   workout videos, etc., so long as the opportunities came about at least in part as a result of

21   Plaintiffs' MMA careers. Information regarding income *entirely* unrelated to Plaintiffs' MMA

22   careers is simply irrelevant, and triggers substantial privacy concerns.

23   Plaintiffs allege that their *MMA-related income* was suppressed by Defendant's conduct,

24   and documents regarding non-MMA-related income simply have no relevance to those

25   allegations. Courts have consistently denied requests for financial information from antitrust

26   plaintiffs where, as here, plaintiffs are not seeking lost profits beyond alleged overcharges (in the

27   monopoly context) or underpayment (in the monopsony context). *See, e.g.*, *In re Press Sensitive*

28   *Labelstock Antitrust Litig.*, 226 F.R.D. 492, 496 (M.D. Pa. 2005) (rejecting defendants' effort to

40

compel plaintiffs' financial records in order to show certain plaintiffs might be "power buyers" who would have greater leverage or competitive ability to negotiate higher prices than fellow plaintiffs); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 302 (D.D.C. 2000) (holding that plaintiffs' financial information is not relevant to "demand elasticity" and industry-wide, public data is sufficient to calculate but-for prices); *In Re Wirebound Boxes Antitrust Litig.*, 131 F.R.D. 578, 578 (D. Minn. 1990) (denying defendant's motion to compel production of plaintiff's financial information where plaintiffs "do not and will not seek to recover lost profits," and the damages sought would be measured by "calculating the extent of unlawful overcharges imposed by defendants"); *In Re Folding Carton Antitrust Litig.*, No. MDL 250, 1978 U.S. Dist. LEXIS 20409, 1978 WL 218424, at *7-8 (N.D. Ill. May 5, 1978) (holding plaintiff's financial data irrelevant to the issue of whether defendants conspired to fix prices, stating that "[i]f plaintiffs are entitled to recover for an overcharge, they will do so regardless of whether their profits decreased or increased during the period of the conspiracy."). In sum, the case law overwhelmingly supports Plaintiffs' position that if they are entitled to recover for under-compensation with regard to their MMA-related income, they will do so regardless of their income from entirely unrelated sources.

Zuffa's arguments in favor of this overbroad discovery are unpersuasive. As to Defendant's first justification for these documents, Defendant does *not* claim that non-MMA-related compensation generated from Plaintiffs' identity rights licensing would be relevant for challenging Plaintiffs' allegations regarding the *terms* of Defendant's anticompetitive contracts. Rather, their request amounts to a fishing expedition for indirect indications of how Plaintiffs may or may not have *interpreted* those terms.

Second, Defendant claims that Plaintiffs' non-MMA-related income is relevant for evaluating Plaintiffs' comparisons of their compensation to those of athletes make in major team sports leagues such as the NBA. But Plaintiffs' Complaint, as cited by Defendant, only refers to fighter or player compensation as a *percentage of revenue generated from an individual bout*, or as a percentage of revenue generated by a particular league, and is thus entirely circumscribed within sports-related revenue. *See* Cons. Am. Compl. ¶¶ 19, 103-4. Defendant simply offers no

support for why the sports-related incomes of other athletes should be compared to *all* sources of Plaintiffs' income.

Third, Defendant claims that Plaintiffs' non-MMA-related income is relevant to why contracts extended beyond their original stated term. Again, as discussed above, Plaintiffs' interpretation of Defendant's contract terms are not relevant here. It is the contract terms themselves, as part of a larger anticompetitive scheme, that is relevant.

Fourth, Defendant claims documents sufficient to show Plaintiffs' non-MMA-related income are relevant for market definition. But Defendant misunderstands the law. The relevant markets in this case – whether the market for the promotion of elite MMA events or the market for elite MMA fighter services – cannot be challenged as proper markets based on Plaintiffs' non-MMA-related income since evidence of the former will turn on *promoter* pricing and evidence of the latter on what fighters could charge other promoters for their services. And Plaintiffs have agreed to produce documents sufficient to show such MMA-related income.

Finally, Defendant's fifth and sixth justifications – that Plaintiffs' non-MMA-related income is relevant to test their ability to engage in other full-time employment and their incentives for signing contracts with Defendant – have no bearing on Plaintiffs' claims pertaining to Defendant's anti-competitive conduct in the market for elite MMA fighter services. Plaintiffs have alleged that Defendant's market power distorts competition in the relevant markets, and Plaintiffs' non-MMA-related income sources would have no bearing on whether the UFC in fact unlawfully acquired and maintained its monopoly and monopsony power in the relevant markets.

E. **Plaintiffs' Production of Medical Records or Drug Test Results Relating to Suspensions or Tolling**

1. **Zuffa's Statement**

The parties have a remaining dispute about Zuffa's Requests for Production 19 and 20 which call for "All DOCUMENTS showing any medical or disciplinary suspensions" the Plaintiffs received and documents sufficient to show "any extensions to or tolling of" Plaintiffs'

1    contracts "and the reason for the tolling or extension."  The parties' dispute concerns whether

2    Plaintiffs must provide medical records and drug test results in response to these Requests.[57]

3         To be clear, Zuffa is not seeking an unlimited production of Plaintiffs' medical records or

4    drug test results.  Rather, its Requests are narrowly tailored to seek such documents only to the

5    extent that a specific medical injury or drug test result was the reason a Plaintiff's contract was

6    extended or tolled (whether formally or informally).  Responsive documents are relevant and

7    necessary for a number of reasons.

8         Plaintiffs contend that Zuffa has manipulated the provisions of its agreements with

9    Plaintiffs that provide for tolling or extension due to injury or suspension to improperly extend

10   the agreements, and that through these provisions, and others, Zuffa can extend an athlete's

11   agreement "all but indefinitely."  Cons. Am. Compl. ¶ 113(g); *see generally* ¶¶ 9, 113(a).  Where

12   Plaintiffs' claims put medical records at issue, such as here, courts have permitted discovery from

13   the named plaintiffs into such records.  *See In re National Hockey League Players' Concussion*

14   *Injury Litigation*, No. 14-2551, 2015 WL 1191272, at *5 (D. Minn. Mar. 16, 2015) (ordering the

15   named plaintiffs to produce medical records in a concussion-related lawsuit not just of treatment

16   to the head or brain but also other medical records or treatment which the court found may also be

17   relevant); *see also In re Gerber Probiotic Sales Practices Litig.*, 306 F.R.D. 527, 528-29 (D.N.J.

18   2015).  Zuffa is entitled to challenge Plaintiffs' allegation by showing, among other things, both

19   the legitimate purpose of the challenged provisions and that Plaintiffs' contract terms were

20   extended or tolled due to genuine medical or disciplinary reasons, including those arising out of

21   drug testing.  These documents are necessary for Zuffa to show that such short-term extensions or

22   tolling are necessary in order for Zuffa to have the opportunity to promote bouts for fighters when

23   they are healthy and to gain the benefit of its bargain under the contract.

24        This is not an abstract issue.  After the Complaint was filed, one of the named Plaintiffs

25   specifically accused Zuffa of mishandling his drug test results and engaging in other bad faith

26   _____

27   [57] Zuffa proposes that responsive documents not previously disclosed publicly will be marked
     and treated as "Confidential" or "Highly Confidential" under the Protective Order.  *See* IV.F.3.

28   Plaintiffs disagree that any "Highly Confidential" designation should be given to such documents.

43

1  activities to improperly extend his contract and/or to prevent him from engaging in other

2  competitive activities.  Mar. 24, 2015 Letter from S. Le to L. Epstein of Zuffa.[58]

3  Relatedly, whether there are claims and defenses that are unique to a proposed class

4  representative is relevant to class certification, including predominance, adequacy and typicality.

5  *Carr v. Int'l Game Tech.*, No. 3:09-CV-00584-ECR, 2012 WL 909437, at *6 (D. Nev. Mar. 16,

6  2012); *accord Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  For example,

7  Zuffa partnered with the United States Anti-Doping Agency (USADA) to institute what it

8  believes to be one of the strongest drug testing policy in organized sports.  Most of the putative

9  class members who compete in the UFC support this policy in order to further legitimize the sport

10  and ensure that athletes are competing on a level playing field.[59]  To the extent that the proposed

11  named class representatives have been disciplined or suspended for performance-enhancing drug

12  use, or been suspended for it, this presents not only unique claims and defenses, it may also pose

13  significant class conflicts with other members of the putative class who support this policy and

14  choose to compete fairly.

15  In light of the relevance of these documents, these documents should be produced.

16  **2. Plaintiffs' Position (Plaintiffs' Statement)**

17  Defendant has insisted that Plaintiffs produce sensitive documents that have no relevance

18  to any claim or defense, and are otherwise protected by the United States and California

19

20  [58] As another example, named Plaintiff Jon Fitch recently failed a drug test while under contract

21  with a competing promotion, the World Series of Fighting, and public sources indicate that he
   was suspended by the California State Athletic Commission for 9 months.  Shawn Al-Shatti, *Jon

22  Fitch flunks WSOF 16 drug test, suspended nine months*,
   http://www.mmafighting.com/2015/2/6/7994089/jon-fitch-flunks-wsof-16-drug-test-suspended-

23  nine-months (last accessed Jan. 20, 2016).  Zuffa is entitled to documents to see whether or not

24  the term of his agreement with the World Series of Fighting was tolled during the period of his
   suspension or extended beyond the suspension and the reasons for that action – an action the

25  Complaint alleges is anticompetitive if done by Zuffa.  Cons. Am. Compl. ¶ 113(g).
   [59] One of the interim class counsel, Rob Maysey, has also publicly criticized Zuffa's

26  implementation of its anti-doping policy, an opinion that is not shared by many fighters.
   September 17, 2015 Tweet by Rob Maysey's @MMAFA Twitter Account: "Don't rely on

27  promoters – take control of your sport.  Did you have any input into that USADA policy?  AC
   policies?  No."

28

Constitutions as well as other applicable provisions of the privacy laws of Nevada or the states in which Plaintiffs reside.

First, Defendant's Request for Production No. 19 seeks production of "All DOCUMENTS showing any medical or disciplinary suspension" any Named Plaintiff received "in any professional or amateur sport or any other circumstances that prevented [him] from participating for any period of time as an ATHLETE." Nothing on the face of the Request supports Zuffa's demand for Plaintiffs' production of their "individual medical records and drug test results." The Request is clearly qualified by the existence of a suspension or disciplinary action. Nor did Defendant initially expand this Request in its December 18, 2015 correspondence with Plaintiff clarifying the scope of this Request. Now, Defendant is insisting on receipt of Plaintiffs' private medical information and drug test results—without even attempting to tie the request to Plaintiffs' MMA careers. Medical records and drug test results—of any type—have no relevance to any claim or defense in this case. To the extent there is any tangential relevance of such sensitive documents, Ninth Circuit case law nonetheless precludes Defendant from obtaining such private information. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35, n. 21 (1984) (noting that "[a]lthough [Rule 26(b)(2)] contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule"); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (recognizing a limited privacy interest in the confidentiality of one's medical records derived from the U.S. Constitution); *Breed v. U.S. District Court*, 542 F.2d 114, 116 (9th Cir. 1976) (recognizing a constitutionally-based right of privacy that can be raised in response to discovery requests).

The Ninth Circuit has recognized that "[i]ndividuals have a constitutionally protected interest in avoiding disclosure of personal matters, including medical information." *Tucson Woman's Clinic v. Eden*, 379 F.3d, 531, 551 (9th Cir. 2004).[60] To evaluate a privacy objection,

---

[60] *See also Bloodsaw v. Lawrence Livermore Laboratory*, 135 F.3d 1260, 1269 (9th Cir. 1998) (constitutional right of privacy "clearly encompasses medical information and its confidentiality"); *Yin v. California*, 95 F.3d 864, 870 (9th Cir. 1996) (Due Process Clause protects right of privacy of personal medical information and records); *Caesar v. Mountanos*, 543

courts must balance the party's need for the particular information against the privacy right asserted. *Breed*, 542 F.2d at 1116. Given the lack of relevance of Plaintiffs' medical records and drug testing results to any claims or defenses in this case, Defendant's request should not trump Plaintiffs' protected privacy interests. *Hardie v. NCAA*, No. 13-cv-346-GPC, 2013 U.S. Dist. LEXIS 165312, at *10 (N.D. Cal. 2013) (distinguishing privacy interests at stake "in names, addresses and phone numbers from 'those more intimate privacy interests such as compelled disclosure of medical records and personal histories") (quoting *Artis v. Deere & Co.*, 276 F.R.D. 348, 353 (N.D. Cal. 2011)).

Defendant's Request for Production No. 20 seeks production of documents "sufficient to show any extensions to or tolling of the term of" Plaintiffs' agreements with any promoter, "including the duration and the reason for the tolling or extension." In Plaintiffs' initial responses to this Request, they agreed to "produce all agreements within [Plaintiffs'] possession, custody or control governing their professional MMA fights, including any extensions to such agreements," and in a letter from Plaintiffs' counsel to Defendant's counsel dated January 15, 2016, agreed to extend those responses to include all professional combat sports. To the extent Defendant's disagreement with that response is based on a demand for medical records or drug test results under the strained assumption that medical or drug-related reasons would be "the reason for the tolling or extension," Defendant's position is both conclusory and improper as seeking protected information.

Defendant states that Plaintiffs contend that Defendant has manipulated extensions or tolling to extend its contracts "all but indefinitely," citing paragraph 9 of the Consolidated Amended Complaint. *But that paragraph does not even mention tolling or extensions of contracts, nor does it accuse Defendant of manipulating tolling or extensions.*[61] Moreover, even

---

F.2d 1064, 1067, n.9 (9th Cir. 1976) (right to privacy encompasses the doctor-patient relationship); *Pagano v. Oroville Hosp.*, 145 F.R.D. 683, 695 (E.D. Cal. 1993) (the privacy interest in medical records is derived from Article 1, Section 1 of the California Constitution); California Constitution, Art. I, sec. 1.

[61] That paragraph does allege that Defendant "forc[ed] all UFC Fighters, if they want to engage in professional MMA fights at the elite level, to enter into contracts that bar them from working

1   if the CAC alleged what Defendant claims it alleged, that would not put Plaintiffs' confidential

2   medical records at issue.

3       The cases Defendant cites, such as the unpublished decision in *In re National Hockey*

4   *League Players' Concussion Injury Litigation*, No. 14-2551, 2015 WL 1191272 (D. Minn. Mar.

5   16, 2015), squarely involve plaintiffs' medical conditions, and thus put plaintiffs' medical records

6   at issue. This, conversely, is an antitrust case, alleging monopolistic and monopsonistic conduct

7   by the dominant MMA promoter, Zuffa.[62] It has nothing to do with plaintiffs' medical records,

8   nor with the private medical records of hundreds of absent class members. Defendant's attempts

9   to inject Plaintiffs' and class members' private medical information into this case are, quite

10  simply, an effort to impugn the character of Plaintiffs and class members who may have tested

11  positive for performance-enhancing drugs. Plaintiffs' private medical records, and those of absent

12  class members, are irrelevant to this case, and even if they had some marginal relevance, which

13  they do not, that relevance would be outweighed by the privacy concerns illustrated by the

14  important privacy concerns implicated by confidential medical records.

15      Defendant's suggestion of a purported "conflict" between Plaintiffs who may have had a

16  positive drug test and class members who support drug testing for MMA fighters strains credulity.

17  Plaintiffs do not challenge Defendant's drug-testing policy in this case; it is not even mentioned

18  in the CAC. That one of the Plaintiffs may have had an unrelated dispute with Defendant about

19  drug testing results has absolutely nothing to do with this action.

20      Finally, if Defendant extended or tolled a Plaintiff's contract for medical or disciplinary

21  reasons, Defendant already has the information it relied upon in doing so. There is simply no

22  reason for Plaintiffs to produce such sensitive, confidential documents.

23

24

---

25  with would-be rival MMA Promotion companies all but indefinitely." Cons. Am. Compl. ¶ 9. But

26  it says nothing about tolling or extensions of contracts, much less Defendant's manipulation of
    tolling or extensions.

27  [62] Notably, Defendant fails to cite any antitrust cases in which plaintiffs were compelled to
    produce their private medical records.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F.   **Protective Order**

1. **Joint Statement**

Both Parties have served discovery requests on third parties, many of whom have conditioned their production of responsive documents on the availability of a "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" ("AEO") designation. The Parties agree that allowing third parties to restrict access to documents containing their confidential or highly sensitive commercial or financial information or trade secrets to outside counsel makes sense. The third parties include other MMA promoters, fighter agents, venues, broadcasters, sponsors, and media outlets. Many of these third parties are understandably reluctant to share their sensitive commercial or financial information with Zuffa, including its in-house counsel, or with the fighters. For example, sponsors may be reluctant to share contracts or financial information, which could give the UFC negotiating leverage over the sponsors. Or agents may be reluctant to allow the Plaintiffs to see the details of the agents' contracts with other fighters, or agreements the agents may have with sponsors, promoters, etc. Plaintiffs and Defendant agree that third parties should be able to affix an AEO designation to their sensitive or confidential business information so that only outside counsel—not the parties or their executives, employees or in-house counsel— can see these documents. The parties disagree about whether an additional revision is required as explained below. The parties attach their respective Proposed Orders as Attachment C (Plaintiffs) and Attachment D (Zuffa).

2. **Plaintiffs' Statement**

The parties have exchanged several drafts of a revised protective order that includes an AEO provision for third parties. In its original draft of the revised protective order, Zuffa included the following language in section 2.8, which both sides were happy with:

HIGHLY CONFIDENTIAL—Attorneys' Eyes Only Information or Items: a Non-Party's extremely sensitive, highly confidential, non-public information, consisting either of trade secrets or other highly confidential information directly concerning business plans, strategies, revenues or costs, disclosure of which to a Party or another Non Party would create a substantial risk of significant competitive or business injury to the Designating Non-Party that could not be avoided by less restrictive means.

48

However, in Zuffa's draft dated January 14, 2016, it included language in section 2.4 which adds a provision for the *parties* to designate documents as AEO, to which the Plaintiffs are opposed:

> Designating Party: a Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" *or a Party that designates information or documents of a medical or highly personal nature, from the files of athletes who are not named as Plaintiffs in this action, as "HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY*" (italics signify the newly added language).

This Court has already ruled on this issue, in a Status Conference held on September 30, 2015. In its Minutes of Proceedings this court ordered that "Defense Counsel have not met their burden of establishing the need for the highly confidential 'attorneys eyes only' designation in this case, and the Court will adopt the proposed form of Protective Order without that designation." Dkt 190. Nothing has changed that requires the Court to reach a different conclusion on this issue.

Zuffa has defended its position on the basis that some documents included in its fighter contract files contain "medical and other sensitive non-public information relating to the extensions and tolling of certain fighters' contracts." As an initial matter, there is no connection between Plaintiffs' allegations that Zuffa selectively invoked contract extensions in order to keep fighters from competitors, and their medical records, or other sensitive information. Plaintiffs are not putting at issue every single reason a contract could be extended—the contractual provisions at issue are simply an example of Zuffa's anticompetitive conduct, locking fighters into contracts that were automatically renewed at Zuffa's sole election. *See* Cons. Am. Compl. ¶ 113(g) ("Tolling provisions … extend the term of the UFC Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with a would be rival promoter"). Nothing in Plaintiffs' allegations relates to whatever subjective reason Zuffa had for extending a fighter contract, or exercising a tolling provision.

Zuffa asserts that "[t]hese documents are clearly relevant to Plaintiffs' allegations and Zuffa's defenses because Plaintiffs' Complaint accuses Zuffa of manipulating tolling and various other 'extension clauses' to improperly extend the length of its agreements with fighters." This

49

misstates Plaintiffs' position, which is that the various contract tolling and extension clauses were part of Zuffa's overarching scheme to suppress fighter compensation. Plaintiffs do not seek to contest each specific instance where a tolling provision may or may not have been invoked, and they certainly do not seek to contest the individual bases (that is, the medical records) on which Zuffa may or may not have invoked a tolling provision. These records are not relevant to Plaintiffs' allegations, they are not relevant to Plaintiffs' damages calculation (this case is not about individual enforcement of contract clauses, it is about an overarching scheme that includes contract clauses among other factors), they are simply irrelevant to any claim or defense raised in this litigation.

Zuffa claims these records are responsive to Requests for Production 22 and 23, submitted by Plaintiffs to Zuffa. These RFPs seek documents pertaining to the contracts themselves, not incidental information about fighters' medical conditions. For example, RFP 22 seeks "All Document referencing or relating to the drafting or editing of, justification for, and the reasoning behind" various contract provisions. Reading that to be a request for medical records simply makes no sense. Similarly, RFP 21 seeks the contracts themselves, communications and negotiations with the fighters or their agents, and internal and external documents relating to the agreements or negotiations. Again, no mention of medical records, personnel files, or any other sensitive information about the fighters. Individual medical records are not contracts, nor do they relate to them, which is why Plaintiffs have not sought these records.

Plaintiffs' position is further supported by the fact that Zuffa seeks the "AEO" designation for documents which Plaintiffs have *neither requested nor sought protection for*. Plaintiffs have informed Zuffa that medical tests and drug tests are not responsive, and they do not seek them in any Request, as they are not relevant to any claim or defense raised in this litigation. Discussion of revising the Protective Order only came up because third parties have asked for an AEO provision. Defendant has seized on this opening and is trying push through its own AEO provision—which has already been rejected once by this Court. Plaintiffs ask that the Court stand by its prior opinion and deny Defendant's attempt to insert an AEO provision for the parties. Plaintiffs further ask that the Court approve a revised version of the Protective Order, which does

50

contain a "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" provision for non-parties only, which Plaintiffs have attached hereto as Attachment C.

### 3. Zuffa's Statement

In addition to the agreed-upon revision, Zuffa requests the Court permit a "Highly Confidential—Attorneys' Eyes Only" designation to a narrow set of documents consisting of: "documents or information of a medical or highly personal nature, from the files of athletes who are not named as Plaintiffs in this action." Attachment D, Zuffa's Proposed Revised Protective Order ¶ 2.8.

The reason for this provision is as follows. In reviewing the fighter contract files for documents responsive to Plaintiffs' Requests, Zuffa has come across documents containing medical and other sensitive personal information relating to the extensions and tolling of certain fighters' contracts. These documents are clearly relevant to Plaintiffs' allegations and Zuffa's defenses because Plaintiffs' Complaint accuses Zuffa of manipulating tolling and various other "extension clauses" to improperly extend the length of its agreements with fighters. Cons. Am. Compl. ¶ 113(a) ("Regardless of the term of the agreement, the [exclusivity] provision includes various termination and extension clauses that can be triggered at the UFC's sole discretion, thereby effectively extending the exclusivity provisions indefinitely"); ¶ 113(g) (regarding tolling provisions). Zuffa intends to produce documents from the contract files that reflect the reasons for the extensions. These documents are in the contract files because they relate to extensions. Subject to specific issues that may arise, Zuffa does not intend to collect or produce other medical records, which are stored in different files.

Zuffa requests the option to designate such information as "Highly Confidential" because the Plaintiffs, to the extent they still compete, are actual or potential competitors to other fighters in MMA and other combat sports bouts. To be clear, this "Highly Confidential" designation would not apply to any of Zuffa's corporate documents, but only to those medical records or other documents of a highly personal nature relating to an athlete. The "Highly Confidential" designation would only prevent the opposing party from viewing such documents. The parties' counsel of record would have full access to documents produced with this designation.

51

1   Plaintiffs justify their resistance to a higher level of protection for the putative class

2   members' sensitive information on the grounds that Plaintiffs do not view these documents as

3   relevant.[63]  This position should be rejected.  Plaintiffs' position is essentially a motion in limine

4   to exclude the production and introduction of these documents into evidence.  It is far too early in

5   the case for the Court to decide this issue.  This is particularly true given (1) these documents'

6   close relation to the allegations in Plaintiffs' Complaint, as discussed above, and (2) their clear

7   responsiveness to Plaintiffs' Requests for Production, Dkt. 107-1, *e.g.*, RFP 21 (requesting all

8   documents relating to any agreements or contracts between Zuffa and MMA fighters); RFP 22

9   (requesting all documents referencing or relating to any clauses granting Zuffa the right to extend

10  the term of an MMA fighter's contract).  These documents show both the purpose and operation

11  of the extension and tolling provisions and Zuffa's good faith in applying them.  Plaintiffs'

12  argument that they do not want to receive these documents or that they are not called for by the

13  RFPs amount to little more than an argument that they are not interested in responsive documents

14  relating to challenged contract terms that support Zuffa's defenses.

15      In order to balance Zuffa's need to produce and introduce documents to support its

16  defense while balancing the privacy interests of the athletes involved, Zuffa submits that a

17  designation of "Highly Confidential" for this narrow class of documents is the appropriate

18  solution.  This issue was not considered or addressed in the parties' earlier submissions regarding

19  the Protective Order or this Court's earlier Order.

20

21  Dated: January 22, 2016                BOIES, SCHILLER & FLEXNER LLP

22

23                                         By:  /s/ John F. Cove, Jr.
                                               John F. Cove, Jr.
24                                         *Attorneys for Defendant* Zuffa, LLC, d/b/a
                                           Ultimate Fighting Championship and UFC
25

26

27  _____
    [63] Plaintiffs' argument is even more confounding given their citation to numerous cases
28  discussing the importance of privacy interests involved in such medical records.  *See* IV.E.2.

52

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John F. Cove, Jr. (*Pro Hac Vice* granted)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA  94612
Tel: (510) 874-1000
Fax: (510) 874-1460
Email: jcove@bsfllp.com


William A. Isaacson (*Pro Hac Vice* granted)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
Email: wisaacson@bsfllp.com


Donald J. Campbell #1216
J. Colby Williams #5549
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada  89101
Tel: (702) 382-5222
Fax: (702) 382-0540
Email: djc@campbellandwilliams.com
           jcw@campbellandwilliams.com


Richard J. Pocker #3568
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV  89101
Tel: (702) 382 7300
Fax: (702) 382 2755
Email: rpocker@bsfllp.com

*Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
Fighting Championship and UFC

JOINT STATUS REPORT

Dated: January 22, 2016

Respectfully Submitted,

By:     /s/ Michael Dell'Angelo
          Michael Dell'Angelo

***Co-Lead Class Counsel:***

Eric L. Cramer
Michael Dell'Angelo
Patrick Madden
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net

Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
Justin C. Jones (Nevada Bar C. 8519)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
jjones@wrslawyers.com

JOINT STATUS REPORT

Joseph R. Saveri
Joshua P. Davis
Matthew S. Weiler
Kevin E. Rayhill
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown
Richard A. Koffman
Hiba Hafiz
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave., N.W., Suite 500, East
Tower Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408 4699
bbrown@cohenmilstein.com
hhafiz@cohenmilstein.com

***Additional Counsel for the Classes:***

Robert C. Maysey
Jerome K. Elwell
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Eugene A. Spector
Jeffrey J. Corrigan
William G. Caldes
SPECTOR ROSEMAN KODROFF & WILLIS,
P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
espector@srkw-law.com
jcorrigan@srkw-law.com
bcaldes@srkw-law.com

55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Frederick S. Schwartz
LAW OFFICE OF FREDERICK S.
SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile: (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative*
*Plaintiffs Cung Le, Nathan Quarry, Jon Fitch,*
*Luis Javier Vazquez, Dennis Lloyd Hallman,*
*Brandon Vera, Pablo Garza, Gabe Ruediger,*
*Mac Danzig, Kyle Kingsbury and Darren*
*Uyenoyama*

56

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION OF FILER**

The signatories to this document are myself and Michael Dell'Angelo, and I have obtained Mr. Dell'Angelo's concurrence to file this document on his behalf.


Dated: January 22, 2016


By:    _/s/ John F. Cove, Jr._____    _____

John F. Cove, Jr. (*Pro Hac Vice* granted)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Tel: (510) 874-1000
Fax: (510) 874-1460
Email: jcove@bsfllp.com

JOINT STATUS REPORT

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing **Joint Status Report** was served on January 22, 2016 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

_____/s/ Suzanne E. Jaffe_____

Suzanne E. Jaffe