─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    CUNG LE, et al.,                    )
                                         )
5              Plaintiffs,               )   Case No. 2:15-cv-01045-RFB-PAL
                                         )
6         vs.                            )   Las Vegas, Nevada
                                         )   January 26, 2016
7    ZUFFA, LLC, d/b/a Ultimate          )
     Fighting Championship and           )
8    UFC,                                )   STATUS CONFERENCE
                                         )
9              Defendants.

10   ─────────────────────────────────

11

12

13                    TRANSCRIPT OF PROCEEDINGS

14              THE HONORABLE PEGGY A. LEEN,
                UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19   APPEARANCES:            See Next Page

20   DIGITALLY RECORDED:     Liberty Court Recorder (LCR)
                             1:47:11 p.m.

21

22   TRANSCRIBED BY:         PATRICIA L. GANCI
                             (702) 385-0670

23

24   Proceedings recorded by electronic sound recording, transcript
     produced by mechanical stenography and computer.

25

```
————————————TRANSCRIBED FROM DIGITAL RECORDING————————————
```

1  APPEARANCES:

2  For the Plaintiffs:

3          **DON SPRINGMEYER, ESQ.**
            WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4          3556 E. Russell Road, 2nd Floor
            Las Vegas, Nevada 89120
5          (702)341-5200

6          **JOSEPH R. SAVERI, ESQ.**
            JOSEPH SAVERI LAW FIRM, INC.
7          555 Montgomery Street, Suite 1210
            San Francisco, California 94111
8          (415)500-6800

9          **MICHAEL C. DELL'ANGELO, ESQ.**
            BERGER & MONTAGUE, P.C.
10         1622 Locust Street
            Philadelphia, Pennsylvania 19103
11         (215)875-3000

12         **JEROME ELWELL, ESQ.**
            WARNER ANGLE HALLAM JACKSON FORMANEK, PLC
13         2555 E. Camelback Road
            Phoenix, Arizona 85016
14         (602)264-7101

15
    For the Defendants:
16
            **J. COLBY WILLIAMS, ESQ.**
17         CAMPBELL & WILLIAMS
            700 South 7th Street
18         Las Vegas, Nevada 89101
            (702)382-5222
19
            **MARCY N. LYNCH, ESQ.**
20         BOIES, SCHILLER & FLEXNER, LLP
            121 S. Orange Ave., Suite 840
21         Orlando, Florida 32801
            (407)425-7118
22
            **JOHN F. COVE, JR., ESQ.**
23         BOIES, SCHILLER & FLEXNER, LLP
            1999 Harrison Street, Suite 900
24         Oakland, California 94612
            (510)874-1000

25

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1    LAS VEGAS, NEVADA; TUESDAY, JANUARY 26, 2016; 1:47:11 P.M.

2                            --oOo--

3                  P R O C E E D I N G S

4         THE COURT:  Good afternoon.  Please be seated.

5         MR. WILLIAMS:  Good afternoon.

6         MR. SPRINGMEYER:  Good afternoon.

7         COURTROOM ADMINISTRATOR:  Your Honor, we are now

8  calling the status conference in the matter of Le versus Zuffa,

9  LLC.  The Case Number is 2:15-cv-1045-RFB-PAL.

10        Beginning with plaintiff's counsel, counsel, please

11 state your names for the record.

12        MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

13 Springmeyer from Wolf Rifkin.

14        MR. SAVERI:  Good afternoon, Your Honor.  Joseph Saveri

15 from San Francisco, California.

16        MR. DELL'ANGELO:  Good afternoon, Your Honor.  Michael

17 Dell'Angelo from Berger & Montague.

18        MR. ELWELL:  Good afternoon, Your Honor.  Joel Elwell

19 from Warner Angle.

20        MR. COVE:  Good afternoon, Your Honor.  John Cove,

21 Boies Schiller for Zuffa, LLC.

22        MR. WILLIAMS:  Good afternoon, Judge Leen.  Colby

23 Williams, Campbell and Williams, on behalf of Defendant Zuffa,

24 LLC.

25        MS. LYNCH:  Good afternoon, Your Honor.  Marcy Lynch

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  from Boies Schiller & Flexner on behalf of Zuffa, LLC.

2       MR. HENDRICK:  Good afternoon, Your Honor.  Kirk

3  Hendrick, Chief Legal Officer for Zuffa, LLC.

4       THE COURT:  This is the time set for the status

5  conference in this matter.  The parties have submitted a

6  59-paged joint status report with attached exhibits.  I have

7  read all of your materials.  We have a lot of ground to cover.

8       So let's start off first with an update from the

9  defendant concerning the discovery progress.  Your report in

10  your status report that since the last status conference on

11  December 8th you've, I'm going to round these numbers off,

12  produced approximately $18,000 additional -- 18,000 additional

13  documents, consisting primarily of promotional and ancillary

14  rights agreements and contract extensions and termination

15  letters.

16       Any additional progress with respect to documents and

17  custodian collections and productions?  Mr. Cove.

18       MR. COVE:  Yes, Your Honor.  Those were the -- some of

19  the fighter files that were the priority of -- it's an extensive

20  review because they require privilege review, but after we got

21  the plaintiffs' list of additional custodians on January 8th, we

22  arranged to have our vendor come out from New York.  And

23  Ms. Lynch has been down here for quite some time living down

24  here, continuing collection.  We've done I think all of the

25  custodial collections, and those documents are being prepared

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  for processing.  And we are working, you know, diligently and as

2  fast as we can to --

3        THE COURT:  And what are you fighting with respect to

4  the privilege review and what percentage of the files contain

5  any materials potentially or arguably privileged?

6        MR. COVE:  I don't have a percentage on that right now,

7  but I do know we have to review them page by page to see whether

8  they are privileged.  You know, they're fighter files that deal

9  with a particular fighter and the contract and who has the

10  contract and the extension letter and so forth.  And I think in

11  our original presentation to you we thought that there were not

12  going to be privileged documents there.  We reported to you last

13  time that there were, in fact, privileged documents --

14        THE COURT:  Right.  And so now I'm trying to figure out

15  if this is a little tiny problem or if this is a big problem

16  because --

17        MR. COVE:  Well, I don't think it's -- I mean, we're

18  going to do it.  It's just -- it just does require attorneys

19  sitting there and reviewing the documents, I mean.  So I am

20  not -- I'm not suggesting we need relief from it.  I'm just

21  saying we are going through the process as fast as we can and --

22        THE COURT:  And about what percentage through the

23  process are you?

24        MR. COVE:  Well, we have --

25        THE COURT:  And you can rely on cocounsel who is

———TRANSCRIBED FROM DIGITAL RECORDING———

1  actually doing --

2          MR. COVE:  Ms. Lynch has been doing it.  Why don't you

3  come on up?

4          THE COURT:  Ms. Lynch?

5          MS. LYNCH:  Your Honor, we are -- we are still in the

6  process of processing and loading the custodial documents.

7  Right now I would say that we are through a very small

8  percentage of the documents.  Once we have --

9          THE COURT:  For privilege review?

10          MS. LYNCH:  For all review.  We are doing privilege

11  review and responsiveness review at the same time.

12          MR. COVE:  So these are documents that are being

13  reviewed without search terms.  We're just going straight

14  through.  So that's where we are.

15          THE COURT:  All right.  And do you have an estimated

16  time in which you'll be through with the process of reviewing

17  the document categories that the plaintiffs have prioritized

18  with respect to the fighter files and promotional and ancillary

19  rights agreements?

20          MR. COVE:  Well, I think what they've prioritized is

21  the fighter files, and that's what we're doing first.  I don't

22  think we have -- do we have an estimate right now?

23          MS. LYNCH:  We do not have an estimate right now.

24          THE COURT:  Do you have an estimate of how far --

25          MR. COVE:  We are producing them on a rolling basis as

───TRANSCRIBED FROM DIGITAL RECORDING───

1  we get through.  We're not saving them up.

2          THE COURT:  Right.  And what, if any, progress have you

3  made with respect to the plaintiffs' letter requests proposing

4  limitations on certain other requests for production of

5  documents that as of the time of the status report was filed

6  Zuffa had not yet given its formal response?

7          MR. COVE:  Well, Your Honor, most of those are -- many

8  of those are dependent on the search term issue.  We have

9  discussed -- many, many of these requests are very broad and our

10  view is if --

11          THE COURT:  Great.  Now --

12          MR. COVE:  I'm sorry.

13          THE COURT:  -- they're broad.

14          MR. COVE:  Yeah.

15          THE COURT:  And some of them, if I understand

16  correctly, request all documents.

17          MR. COVE:  Yes.

18          THE COURT:  And the plaintiffs have agreed to reduce

19  them to a sufficient number of documents to show type of

20  language.

21          MR. COVE:  I disagree with that characterization, Your

22  Honor.  They haven't reduced them to document -- I mean, there

23  are certain ones, yes, they have reduced it or they started out

24  or have been reduced to documents sufficient to show.  And I

25  think we can work through those issues.  We've been focussed on

———TRANSCRIBED FROM DIGITAL RECORDING———

1   this issue for the last week of search terms.  We got the search

2   term list on Tuesday which had 2,500 search terms on it.  And I

3   have to admit, we didn't make much progress in addressing

4   anything else from that time until today.

5       But there are -- there are some certain -- there's some

6   extremely broad all document requests, RFPs.  There are others

7   that are more narrowly tailored, but we believe that could be

8   best searched using search terms with these custodians.  And

9   there's others, such as the corporate documents, what's the

10  relationship between Zuffa, LLC and Zuffa Holding, what are

11  the -- you know, certain board member material that were sent to

12  the board, and so forth.  Those are targeted requests that we

13  can deal with separately.  They've been somewhat back-burnered

14  because, you know, the issue of the relationship between Zuffa

15  and Zuffa Holding Company is not particularly key to this case,

16  and we'll -- I'm confident we'll be able to address those

17  issues.

18      But the problem is for a large category of the document

19  requests, they are extremely broad and we think that those that

20  aren't broad can be addressed by the search term issue as well.

21  We'll search, when we have search terms, all of the 22

22  custodians in addition to all of these documents that we're

23  already searching.  We don't need a -- the documents we're

24  searching page by page right now, we don't necessarily need any

25  limitations.  We're just going to do it.  If they're responsive,

1   even if the request is overbroad, we're producing them.

2        The concern is all of the other material, the 22

3   custodians, the noncustodial ESI that remains to be searched.

4   That's what we need the limitation on, and we think that we --

5   using search terms we can do that somewhat effectively and

6   address the problems of overbreadth as well as the practical

7   issue of addressing the remaining RFPs that aren't too broad.

8        I hope that was clear.

9        THE COURT:  All right.  So let's move on.  We have a

10  protective order in place.  You have meet and confer ongoing

11  regarding the breadth of the various discovery requests the

12  plaintiffs have propounded.  And now the first discovery dispute

13  that requires the Court's intervention in this case deals with

14  the number of custodians that the Court has allowed in this

15  case.

16       And if I understand correctly, this dispute is last

17  time there was a list of 16.  Three of those persons it was

18  disclosed did not have any specific ESI custodian files, and we

19  left here saying you were going to search to make sure you

20  didn't have materials for them.  And now plaintiffs are

21  requesting that they get an opportunity to swap out three

22  additional custodians for the three:  Bryan Johnson, Sonja

23  McKinney, and Michael Pine, who you have now confirmed do not

24  have custodian-specific files.

25       MR. COVE:  Yes.  Since Mr. Williams handled this last

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   time, I'm going to defer to him on this particular issue.

2       THE COURT:  All right.  Well, let me hear first from

3   counsel for plaintiffs on this issue.  And then I'll hear from

4   Mr. Williams.

5       Mr. Dell'Angelo.

6       MR. DELL'ANGELO:  Good afternoon, Your Honor.  Thank

7   you for the opportunity to address this issue.

8       In sum, your understanding of the issue is correct.

9   When we presented you with a list of custodians at the last

10  status, Your Honor, there were 44 proposed custodians on that

11  list.  13 at the top of the chart that we provided you as a

12  hand-up at the hearing were custodians for whom -- with respect

13  to certain categories.  As of the date of the last hearing,

14  Zuffa had indicated they had no documents for it, no ESI, no

15  custodial files.  And at the outset of the hearing, right before

16  we began, the parties agreed to defer with respect to those

17  custodians.  So we were talking about I think roughly 26 or 28

18  other custodians.

19      I think some confusion arose because there was a group

20  of 16 custodians who the parties kind of colloquially referred

21  to as agreed custodians.  Those are custodians as to which the

22  parties did not have a dispute as to whether or not they could

23  be included in the larger custodial mix.

24      The defendant's proposal at that time was that

25  plaintiffs could have the 16, plus any two of their choosing.

───────────────────── TRANSCRIBED FROM DIGITAL RECORDING ─────────────────────

 1   So in theory --

 2           THE COURT:  And you wanted a total of 44, and that's

 3   correct.

 4           MR. DELL'ANGELO:  Right.

 5           THE COURT:  And so I said you get the 16, and you can

 6   pick three or -- excuse me -- six additional of your choosing.

 7           MR. DELL'ANGELO:  That's correct.

 8           THE COURT:  And you did that.

 9           MR. DELL'ANGELO:  That's correct, Your Honor.  And --

10           THE COURT:  And now they confirm what they told you all

11   along is that the three of the 16 didn't have any ESI-specific

12   files.

13           MR. DELL'ANGELO:  Well, as of the time of the last

14   hearing there was an open question as to whether or not three of

15   those custodians:  Pine, McKinney, and Johnson, may have had

16   other files that Zuffa had not yet confirmed whether or not they

17   existed, like hard copy custodial files.

18           THE COURT:  Correct.  But if I understand their status

19   report position correctly, they're agreeing to produce any hard

20   copy files.  They believe those three individuals may have

21   documents in the fighter files and negotiation files and so

22   forth.  They're going to produce all of those.  They're going to

23   produce any hard copy files.  They're going to produce any

24   documents for those three custodians that are contained in ESI

25   of other custodians, but now you want more than that.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          MR. DELL'ANGELO:  I think the issue is somewhat

2    different, Your Honor, and I understand how Zuffa has framed the

3    issue, but I don't think it accurately reflects what a custodian

4    is.  So what they're really saying, as I understand it, is to

5    the extent Pine, McKinney, or Johnson has a document within the

6    larger collection of documents that they're otherwise going to

7    produce, they're not going to exclude them, you know, because

8    we're asking that they be replaced as a custodian.  But what the

9    defendant has now confirmed is that for those three custodians:

10   Pine, McKinney, and Johnson, they have no custodial documents

11   whatsoever.

12          THE COURT:  Correct, but you had a pretty good idea of

13   that before the last December 8th conference because they stood

14   up and told you that.

15          MR. DELL'ANGELO:  That's correct, Your Honor, but prior

16   to the conference, what we -- and I think what Mr. Williams laid

17   out for you is that with respect to the 13 custodians for whom

18   there was an understanding there very likely were no documents,

19   the parties had agreed to --

20          THE COURT:  Set those aside, of course.

21          MR. DELL'ANGELO:  -- set those aside.  Right.

22          THE COURT:  But with respect to these three, you had an

23   interest in confirming --

24          MR. DELL'ANGELO:  That's correct.

25          THE COURT:  -- whether --

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1      MR. DELL'ANGELO:  That's correct.  But hadn't confirmed

2  that these custodians have no documents.  They are not for all

3  intents and purposes a custodian of any kind, and certainly not

4  ones knowing fully that they had no documents whatsoever

5  custodians that we would have selected.  I think the problem is

6  they were swept in because they were part of the, quote,

7  unquote, agreed custodians.

8      THE COURT:  Well, they were swept in because you wanted

9  them included.

10      MR. DELL'ANGELO:  To the extent that they had some

11  documents, yes.  But that was a question as of --

12      THE COURT:  You included them as possible custodians

13  because you believed they were individuals likely to have

14  discoverable information that your side of the table wanted.

15      MR. DELL'ANGELO:  That's correct, Your Honor, and they

16  ultimately turned out to have no documents whatsoever.  So

17  there's no devices.  There's no ESI.  There's no custodial

18  electronic folders, as we understand it, no hard copy documents.

19  So, in effect, they're not custodians of anything.

20      And so what we would like is the opportunity to

21  actually identify alternative custodians for whom Zuffa has

22  documents.

23      THE COURT:  And so have you done that yet or --

24      MR. DELL'ANGELO:  We have, Your Honor.  We proposed

25  that Pine, McKinney, and Johnson be replaced with Sholler,

—TRANSCRIBED FROM DIGITAL RECORDING—

1  Hurley, and Bellamy.

2          THE COURT:  One of whom is in-house counsel?

3          MR. DELL'ANGELO:  That's correct.  And we submit would

4  fall within the provisions that the Court laid out at the last

5  hearing with respect to legal custodians, that is, that the

6  parties work to define a protocol to limit potentially

7  privileged documents.

8          THE COURT:  So you haven't yet received ESI from the

9  other side?

10          MR. DELL'ANGELO:  We have received a production, yes.

11  And some -- yes, those documents are in electronic form.  So I

12  don't think we've received any ESI with respect to any of the

13  custodians, but we have the FTC production --

14          THE COURT:  That's what I meant.

15          MR. DELL'ANGELO:  Yes.

16          THE COURT:  With respect to the 22 custodians that the

17  Court ordered.

18          MR. DELL'ANGELO:  Correct.  We've not received any of

19  their documents, as I understand it, as yet.

20          THE COURT:  And what were the criteria used to select

21  the additional three custodians, if I allow you to swap them out

22  for the three?

23          MR. DELL'ANGELO:  Well, first of all, we operated on a

24  pure numerical system.  That is, there were three with no

25  custodians so we in theory assumed that it would be possible

———TRANSCRIBED FROM DIGITAL RECORDING———

1   and, you know, fair to replace three.  And, really, what we did

2   was took the list that we prioritized as plaintiffs' counsel

3   with respect to the --

4          THE COURT:  And you went down the next three on the

5   priority of your list?

6          MR. DELL'ANGELO:  In terms of priority, yes, those are

7   the three that we recognized appeared, based on the information

8   that we were provided, to actually have documents and that --

9          THE COURT:  So address with specificity why it is that

10  you believe these three custodians should be included.

11         MR. DELL'ANGELO:  Okay.

12         So each of the custodians that we selected was really

13  based on filling in --

14         THE COURT:  Start with the -- custodian No. 1 that you

15  propose and tell me why that custodian is likely to have

16  critical information such that I should allow you to get

17  additional ESI.

18         MR. DELL'ANGELO:  Sure.  So Mr. Bellamy, for example,

19  was identified by Zuffa in its responses to plaintiffs'

20  interrogatories with respect to certain specific categories of

21  information or responsibilities that we were interested in.  And

22  that's one of the reasons why --

23         THE COURT:  But give me some more detail.

24         MR. DELL'ANGELO:  Just looking for my --

25         THE COURT:  I'm sure they gave you a huge number of

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   individuals' names with discoverable information in their Rule

2   26(a) disclosures, but I'm not going to give you ESI for all of

3   those names.

4          MR. DELL'ANGELO:  I understand that, Your Honor.

5   Actually, the list in the Rule 26(a) disclosures of Zuffa was

6   not all that substantial, but what we did in Interrogatory

7   No. 26 was provide Zuffa with a list in our interrogatory of

8   certain categories like responsibility for merchandising

9   sponsors, those sorts of key issues to the case, and asked who

10  were the people who had primary responsibility in those areas.

11  And Mr. Bellamy, for example, I'm just looking for my note, I

12  believe came back as one of the individuals with

13  responsibilities in that area.  Yes, as -- with respect to

14  broadcasters, Pay-Per-View, and marketing events.

15         And Mr. Hurley was identified as a custodian --

16         THE COURT:  Would you spell the name, please?

17         MR. DELL'ANGELO:  Yes.  H-U-R-L-E-Y.  Mr. Hurley was an

18  individual identified as having responsibility with respect to

19  merchandise.  He was the Senior Director of Consumer Products.

20  And I would just add, I'm just going through my list here, Your

21  Honor, that Mr. Bellamy also was identified as having and we

22  have separately I believe concluded that he had responsibility

23  with respect to venues.  And make sure I'm complete here.

24         And Mr. Sholler is the Vice President of Public

25  Relations and Athlete Marketing Development and was identified

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1    as having responsibilities with respect to public relations and

2    media relations.  And based on what we understand about

3    Mr. Sholler, he would have relevant responsive documents as

4    well.

5            And I would note that his documents as well as

6    Mr. Hurley's were actually fairly small.  I think it's 31,000

7    total e-mail documents and 3,300 network documents.  And for

8    Mr. Sholler I believe it's even smaller.  I think it was about

9    10,000 documents, e-mail documents, doing that from memory.

10           THE COURT:  So let me hear from counsel for defendants.

11   Mr. Williams, you have a point on this issue?

12           MR. WILLIAMS:  Thank you, Your Honor.

13           Good afternoon, Your Honor.  I think you absolutely

14   have an understanding of what the issues are here with respect

15   to this issue so I won't take a lot of time addressing it.

16   Where I'll start, Your Honor, is where we were last time we were

17   here, and these are not our words.  These are the words of the

18   plaintiffs.  And I'm reading from Document 206, the prior joint

19   status report, at page 6, beginning at line 8.  They state:  *The*

20   *parties have agreed on the identity of 16 custodians.  Three of*

21   *whom defendant has indicated do not have any documents on its*

22   *e-mail server, any documents in custodian-specific folders on*

23   *defendant's network drive, or any retained devices*.

24           They drop a footnote, Footnote 12:  *Without identifying*

25   *any discoverable material, there is no burden associated with*

—TRANSCRIBED FROM DIGITAL RECORDING—

1  *including these three individuals as custodians.*

2        Going back up plaintiffs say:  *Plaintiff proposed*

3  *including all 16 custodians in this matter.*

4        So the point is, Your Honor, there was no dispute with

5  respect to the status of these three individuals.  I did stand

6  up here and tell the Court, because I drew a very pointed

7  question from Her Honor when I said, We will go and look in

8  potentially other places, i.e., hard document files either on

9  property or archived to see if there's anything else for these

10 three custodians and other custodians, quite frankly.  To which

11 the Court said to me, So you're going to search to confirm that

12 you don't have anything?

13       And that's what we did, and we confirmed that down the

14 road.  So there was no ambiguity with respect to the state of

15 affairs regarding these three individuals.

16       The plaintiffs in the status report, Your Honor, had

17 four and a half pages to address the custodian issue, and

18 nowhere in the four and a half pages does it say, In the event

19 it turns out that after more due diligence it's confirmed with

20 respect to these three custodians that they do in fact have

21 nothing, we're reserving our right to ask for three additional

22 people to replace them.

23       Mr. Dell'Angelo did a very fine job last time he was

24 here standing up articulating the plaintiffs' position as well.

25 I reread the transcript before I got over here today.  At no

—TRANSCRIBED FROM DIGITAL RECORDING—

1  time did he say before the Court at the status conference that,

2  In the event it turns out these three people don't have

3  anything, we're reserving the right to replace them.

4        This came up after the fact, Your Honor.  The Court

5  knew what the state of affairs were.  Plaintiffs knew what the

6  state of affairs were, subject to us confirming whether we found

7  something or not.  There was no hiding the ball here.  They

8  still wanted them included as custodians.  They argued it was

9  wasn't as burdensome for us to search if they were included

10  because they didn't have anything.  And so they don't -- in our

11  view, they don't get to revisit this issue.

12        Now, with respect to Mr. Johnson, Mr. Pine, and

13  Ms. McKinney, I think it is important to note, I think the Court

14  understands this, it's not as if they're not going to have any

15  insight into what these individuals did.  In the contract files,

16  Your Honor, they're going to see contracts produced that were

17  negotiated and signed by Mr. Johnson and Mr. Pine.  In the

18  fighter files they're going to see correspondence authored by

19  Ms. McKinney.  They're going to have an understanding of what

20  these people did.  So to say that they aren't custodians is --

21  because they don't have anything isn't tantamount to saying that

22  they aren't going to know what these people were doing and what

23  their work roles were with the company.

24        So I don't -- you know, and with respect to the new

25  proposed custodians, Your Honor, I'll just say that with respect

────────── TRANSCRIBED FROM DIGITAL RECORDING ──────────

1   to venues, they identified Mr. Bellamy as having something to do

2   with venues.  Well, they have Pete Dropick and Donna Marcolini

3   already as custodians.  They are going to be getting information

4   regarding venues from those folks.  They don't need us to, you

5   know, go through the 135,000 e-mails that are presently

6   appearing for Mr. Bellamy to get them more information on that.

7          With respect to merchandising, they have Tracey

8   Bleczinski already, Your Honor, as a custodian.  So I don't

9   think that the selection of the new custodians is truly giving

10  them something that they don't already expect to get with

11  respect to people they've already named.

12         THE COURT:  Mr. Dell'Angelo, it was my intention, it

13  remains my intention, to limit you to the six additional beyond

14  the 16 that were selected for the first round.  I told you, and

15  I regard this as an iterative process, See what you get, and if

16  you in conducting the discovery and reviewing the information

17  that you do get find that there is some critical player or a

18  very important player who is appropriately subject to an

19  additional request, I will keep that door open, but I'm doing

20  this as a, Let's get focussed.  Let's see what you get.  Let's

21  see what information you have.  And then we'll fill in the holes

22  if you find those.

23         And so I'm leaving that door open, but for purposes of

24  making progress and get what you get, read what you read, and

25  find out if there are significant holes in the discovery.  And

————TRANSCRIBED FROM DIGITAL RECORDING————

1   if so, I'm going to entertain a reasonable request to require

2   the other side to supplement, but I'm limiting the custodians at

3   this point to the 22 that I initially ordered at the last

4   hearing.

5          MR. DELL'ANGELO:  Thank you, Your Honor.

6          THE COURT:  Moving onto our next dispute which is an

7   issue with respect to, keep them in the order you raised them in

8   the search terms, the plaintiffs submitted a list of 2,600

9   search terms.  You pared that down to 23.  The defendants want

10  91 search terms to be applied.  The plaintiffs' preference would

11  be a, quote, linear review.

12         So tell me, first of all, so that we have a record and

13  are clear on what you mean by a linear review, you want them to

14  review every single document that -- as opposed to applying any

15  filters at all?  Mr. Dell'Angelo?

16         MR. DELL'ANGELO:  Thank you, Your Honor.  Michael

17  Dell'Angelo.

18         No, we're not suggesting that a linear review would be

19  review with no filters at all.  In fact, Your Honor, we from the

20  outset back in September when we began discussing with the

21  defendants the process of reviewing, producing -- identifying,

22  reviewing, and producing documents discussed the number of ways

23  to reduce the overall volume and otherwise filter those

24  documents.

25         So first and foremost, as, you know, we're all aware,

─TRANSCRIBED FROM DIGITAL RECORDING─

1   the total -- you know, the many hundreds of potential custodians

2   at Zuffa has been reduced down to 19 custodians who actually

3   have documents.  So we began this process with, you know,

4   representations from Zuffa that the total ESI in this case

5   exceeded three petabytes of data.  We now have it down to some

6   order, you know, of gigabytes, possibly a terabyte.  I don't

7   think we have any specific detail yet on what that means, but

8   what we do have and we presented it to you at the last hearing

9   was the document counts.

10          Now, that's -- those document counts, however, are

11   somewhat overstated as we talked about --

12          THE COURT:  No, I understand.  You believe they're

13   grossly inflated because they don't involve -- you know, they're

14   not deduped.  They're not filtered using various techniques to

15   get down to the essentials, but they counter as saying, But you

16   have in place an ESI stipulation that has parent/child

17   relationships.  And so --

18          MR. DELL'ANGELO:  And to that point, Your Honor, that's

19   precisely the it, is the point I was going to make to you is in

20   addition to narrowing the entire universe of custodial documents

21   at Zuffa down to 19, who actually have documents, we then

22   discussed and agreed to things such as e-mail threading, which

23   gets rid of e-mails that are not exact dupes, but keeps a thread

24   of e-mail.  We've also agreed to de-duplication, which further

25   reduces that amount.  We've of course set and the Court has

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1   established a relevant time period which fixes the period of

2   time that documents would be pulled from.  We've also agreed to

3   demisting, you know, which is another technique which I can

4   discuss as -- you know, I think the Court's I think familiar

5   with the process, but happy to discuss, another technique to

6   reduce the overall volume.

7           And then of course with respect to the legal

8   custodians, in the process of negotiating with Zuffa about

9   various filters that can be put into place to reduce potentially

10  privileged documents.

11          So, you know, starting with this massive three

12  petabytes of data, we've gotten it down to a much smaller set

13  from a, you know, very finite set of custodians and then agreed

14  to a whole series of methods to further reduce that.  I mean,

15  there's a method, for example, that Zuffa had proposed which was

16  a form of linguistic review.  I think it was reported in one of

17  the earlier status reports that both parties participated in the

18  conference call with the linguistic review company.  And I think

19  we both concluded that that method, you know, may not be very

20  effective or at least I think from my perspective was more a

21  function of the method the particular vendor had devised maybe

22  rather than linguistic --

23          THE COURT:  They're selling the product.  Surprise,

24  surprise.

25          MR. DELL'ANGELO:  That's correct.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          So the -- it was our view for reasons that I'd like to

2     lay out for you that search terms, while, you know, arguably

3     workable in this case if you look at the set that we devised,

4     and I'd like to talk to you about how we devised those, but that

5     really the unique nature of the language used in this case just

6     doesn't lend itself very well to search terms.

7          So what we did was tried the develop a set of search

8     terms that would do a better job, at least, or a less

9     ineffective job than the search terms that Zuffa had presented.

10    And I would note, Your Honor, if you go back to the August

11    transcript from when the parties were before the Court, I

12    believe it was August 26th after the motion to stay was decided,

13    what the Court said, and I think it was right, is -- and this is

14    at page 29:  *I'd also urge you to consider nontraditional*

15    *methods of searching for ESI instead of key words or custodian*

16    *searches which are expensive and the data shows not particularly*

17    *accurate.*

18         So we've done two things here.  We've looked at lots of

19    nontraditional methods.  We've adopted all but one, which is the

20    linguistic review, and I think the parties are agreement that

21    doesn't work here.  And we've also used custodians to

22    substantially narrow what's possible.  The dispute really boils

23    down to whether or not search terms make sense and why.

24         Zuffa has talked in its status report about the

25    possibility about a million documents resulting from the

—— TRANSCRIBED FROM DIGITAL RECORDING ——

 1  custodians.  I don't know how accurate that estimate is because

 2  again these filters haven't yet been applied, but the reality is

 3  what we're trying to achieve is a set of documents that returns

 4  a reasonable and reliable set of responsive materials.  And I

 5  think that for a number of reasons that doesn't work well here

 6  with search terms.

 7          I mean, the reality is we don't want more than we need,

 8  but we do want the relevant responsive documents that we need to

 9  prove our case.  And the proposal that Zuffa has put forth

10  doesn't do that.

11          THE COURT:  On the other hand, you say that your search

12  terms, when applied to the documents that were produced by Zuffa

13  to the FTC, has a 91 percent reliability rate.

14          MR. DELL'ANGELO:  That's correct, Your Honor.  And we

15  actually had a unique opportunity in this case, which is we had

16  a meaningful production, which was the FTC production that arose

17  out of the UFC's investigation into the UFC's --

18          THE COURT:  All right.  So tell me a little bit about

19  that.  What was the nature of the FTC investigation such that it

20  gives you confidence in the documents that were culled for that

21  purpose?

22          MR. DELL'ANGELO:  As I understand it, Your Honor, the

23  UFC acquired a potential competitor by the name of Strikeforce.

24  And --

25          THE COURT:  Also known as Strikefarce in the --

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1          MR. DELL'ANGELO:  Strikefarce and Strike space Farce,

2   yes, Your Honor, and who knows what else.

3          So in response to the UFC's acquisition of Strikeforce,

4   as we understand it, the FTC opened up an investigation into

5   the, you know, competitive or procompetitive or anticompetitive

6   nature of that.

7          THE COURT:  Whether the acquisition violated trust

8   rules.

9          MR. DELL'ANGELO:  In effect, Your Honor.  And as a

10  result, as we understand it, the UFC collected documents and

11  produced them to the FTC.  Now, as Zuffa points out, we know the

12  custodians from whom they were collected.  We don't know --

13         THE COURT:  You got the metadata, though.  You know the

14  fields.

15         MR. DELL'ANGELO:  We know -- right, but we don't

16  know -- there's a lot that we don't know, but we do know

17  something.  That's exactly right.

18         THE COURT:  So how many custodians were used to collect

19  the documents that Zuffa produced to the FTC?

20         MR. DELL'ANGELO:  I don't know that -- I don't think I

21  have that information at my fingertips, Your Honor, but what I

22  can tell you is --

23         THE COURT:  But those are the -- those are documents

24  you'd like to have?

25         MR. DELL'ANGELO:  Well, we have -- we have the FTC

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1   production.  That has been --

2           THE COURT:  I understand that, but they are documents

3   that you believe were very probative of some of your claims,

4   correct?  So how many -- because I'm now talking to you about

5   the reasonableness of discovery --

6           MR. DELL'ANGELO:  Yes.

7           THE COURT:  -- and trying to assess proportionality and

8   tailor discovery appropriately.  So if Zuffa was able to cull

9   107,000 documents from X number of custodians on a key issue

10  that crosses over to your case, how many of those custodians

11  were involved?

12          MR. DELL'ANGELO:  I don't know the number of custodians

13  that were searched in the FTC production, Your Honor.  I

14  understand that information is contained within the metadata.

15          THE COURT:  You have it.  You just don't know the

16  answer.

17          MR. DELL'ANGELO:  I don't know the answer as we stand

18  here.

19          THE COURT:  That's fine.  I understand that.

20          MR. DELL'ANGELO:  I apologize for not having that at my

21  fingertips.

22          THE COURT:  The point is to try to assess they know who

23  their people are that were likely to have relevant information

24  that the FTC wanted in whatever form, document requests or

25  production requests or subpoenas, as demanded.  So they went to

TRANSCRIBED FROM DIGITAL RECORDING

1   the people that they knew would have the information.

2          MR. DELL'ANGELO:  Well, one point --

3          THE COURT:  And that would tell you who those people

4   are.

5          MR. DELL'ANGELO:  Right.  One would assume.  We didn't

6   really have any transparency into that process.  And as I

7   understand it, it was about four or five years ago.

8          But Your Honor is correct, and I think it is a unique

9   and useful data point here, that the documents produced in the

10  FTC production bear a relation to the allegations in our

11  complaint and they are a useful data point by which to compare

12  search terms.  And you are right.

13         So what we did is several things is we worked with, you

14  know, some of the experts that we have in this area that

15  developed a set of terms that we thought made sense for this

16  case, to the extent that we knew, but then we also went through

17  the FTC production, which is a slice, right, of the --

18         THE COURT:  But a pretty good slice.

19         MR. DELL'ANGELO:  It is a useful -- it's a useful

20  slice.  It's not the whole pie.

21         THE COURT:  It doesn't give you your damages or

22  other -- but it's a pretty good indication of what the FTC

23  was...

24         MR. DELL'ANGELO:  Right.  And I think that their -- the

25  FTC's focus was much more limited.  It was with respect to that

—TRANSCRIBED FROM DIGITAL RECORDING—

1   particular acquisition.  But, again, you know, for example,
2   we've asked for the requests that the FTC propounded.  We don't
3   know what they are, so be it.  So I can only -- I think we can
4   only surmise in this conversation, but you are correct.  It is a
5   useful insight.
6           And so what we did is we went through that production,
7   you know, as best we could to identify the names of individuals,
8   nicknames, other terms.  And that's where, for example, as Your
9   Honor noted, terms like Strikefarce came from as a, you know,
10  substitute for Strikeforce and Officers of Affliction, another
11  potential competitor --
12          THE COURT:  The T-Shirt Guy.
13          MR. DELL'ANGELO:  The T-Shirt Guy, right.  Things that
14  I think it would be impossible for us to know, and that absent
15  seeing those examples, search terms likely wouldn't capture; but
16  yes.
17          So to actually just correct one thing, we initially
18  devised a list of 2,500 search terms, and one of the reasons
19  that is a substantial number is because remember there are
20  nearly 1,000 fighters, you know.  So they have first and last
21  names.  We did reduce that list to 2,300 in response to Zuffa's
22  views that we don't necessarily agree with for reasons that I'm
23  happy to address, but we got rid of a lot of the common names,
24  reduced that list down to 2,300.  But a substantial portion of
25  that list, which is Attachment A to the status report, are names

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1 of individuals, fighters, promoters, managers, agents that we

2 believe, you know, have connection to the allegations in the

3 consolidated amended complaint during the relevant time period.

4        And what we did is then we ran our search terms on the

5 FTC production and we ran Zuffa's search terms.  And, you know,

6 our terms yielded a result that was of 91 percent, and Zuffa's

7 was substantially lower.  The number --

8        THE COURT:  57 to 69 percent depending on what you're

9 counting, and 84 percent if you include the parent/child

10 relationship documents, Zuffa tells me.

11        MR. DELL'ANGELO:  No.  So the 84 percent I think is

12 something that we should be clear about.  The 84 percent that

13 Zuffa returned, if I understand it, was not on the FTC

14 production.  It was on a ZFL production.  And a ZFL production

15 is a production of contractual material, not --

16        THE COURT:  And so that was your argument that they

17 cherry-picked the subset to get a higher result.

18        MR. DELL'ANGELO:  Right.  So when you have within

19 Zuffa's search terms terms that are essentially the name, you

20 know, embedded within the contract, inevitably you're going to

21 return, you know, a high rate of those contracts.  But I do

22 think it's telling that when you're searching those contractual

23 files and Zuffa's terms still only return 84 percent versus our

24 99 percent that, you know --

25        THE COURT:  The question is at what cost?

———TRANSCRIBED FROM DIGITAL RECORDING———

1          MR. DELL'ANGELO:  Well, applying the terms has no cost,

2    right.  It's just more terms that are designed to identify

3    documents that are relevant that come from known class members

4    that use their nicknames, that come from potential competitors,

5    etc.  So there's no cost in applying that.

6          Then there is the results.  And, certainly, our search

7    terms, plaintiffs' proposed search terms, will return a higher

8    number of hits, but the set of terms that we have proposed at

9    Attachment A are terms that were very thoughtfully developed

10   based on allegations in the complaint.  They're broken down by

11   key categories that we talked about throughout this process.  I

12   mean, they're not terms that were, you know, sometimes as

13   parties doing -- kind of doing -- you know, shooting in the

14   dark, if you will, are creating in a vacuum.  I mean, here we

15   had the opportunity to test them against an actual data set that

16   has some real relevance to the case.

17         And so we think the thoughtful design of those terms

18   will yield a meaningful subset of the roughly million or so

19   documents that Zuffa is talking about.  So you're already

20   dealing with a rather finite set.

21         So what's the cost?  It's the difference between the

22   production of whatever their search terms result -- returns

23   versus what ours do, but, you know, normally --

24         THE COURT:  Well, and the manual review for privilege

25   or other responsiveness.

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

 1          MR. DELL'ANGELO:  That's true, but among those 19

 2  custodians for whom the search terms will be used, the Court has

 3  already required that the parties implement a protocol for the

 4  legal custodians to filter out potential --

 5          THE COURT:  Right.  And so now my -- so my next

 6  question -- because I understand what you're saying.

 7          MR. DELL'ANGELO:  Okay.

 8          THE COURT:  And it's really an issue, are you willing

 9  to accept the product of your key word search without having

10  them identify the documents by discovery requests like they

11  would normally be required to do under Rule 33 or 34?

12          MR. DELL'ANGELO:  I think we would, Your Honor.  I

13  would like to maybe just quickly advise with my cocounsel, but I

14  think that's something --

15          THE COURT:  Well, I'm just --

16          MR. DELL'ANGELO:  -- that makes sense, yes.  And I

17  guess, you know, just add with respect to your questions, in my

18  experience typically when search terms are used, there is an

19  understanding that there's not going to be a subsequent, you

20  know, relevance review, for example, that --

21          THE COURT:  That dispute occurs with alarming frequency

22  before me.

23          MR. DELL'ANGELO:  Okay.  Correct.

24          THE COURT:  So, yes, some people -- and that's why I

25  asked the question.

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

1        MR. DELL'ANGELO:  Yes.

2        THE COURT:  Because I've had the experience of leaving

3   here and each side having a different assumption.  What about a

4   claw-back provision?

5        MR. DELL'ANGELO:  I believe that the current protocol

6   that the Court's already approved has a claw-back provision in

7   it.  If it requires revisiting, we can revisit it, but I think

8   that that issue has already been resolved.  I mean, in terms

9   of --

10       THE COURT:  And I guess the real question I'm asking

11  you is if I adopt your proposal with respect to the number of

12  search terms that you're requesting that they run, are you

13  willing to get the -- what some people would call a document

14  dump without review for responsiveness?

15       MR. DELL'ANGELO:  We are, Your Honor, but I would

16  submit to you that those terms were really very thoughtfully and

17  carefully developed.

18       THE COURT:  I'm not --

19       MR. DELL'ANGELO:  Since I don't think it will be a

20  document --

21       THE COURT:  Now, I'm testing your -- because it's one

22  of those be careful what you get.

23       MR. DELL'ANGELO:  I understand.

24       THE COURT:  And if you get 9 million documents and I

25  grant your request, the burden's going to be on your side to

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  review those 9 million documents and organize them, determine if

2  they're responsive, and so forth.

3        MR. DELL'ANGELO:  Well, we're prepared to accept that

4  risk, I mean, and there's a couple of I think pretty clear

5  reasons.  One, because it's necessary to get the relevant

6  documents.  Two, the list was very thoughtfully prepared

7  because, frankly --

8        THE COURT:  I understand.  I'm just testing you.

9        MR. DELL'ANGELO:  We don't want more than we need.  But

10 the other thing is, you know, Zuffa has laid out in its papers,

11 at least with respect to the custodians that we're dealing with,

12 at least in our world of cases of this complexity and size and

13 the amount in issue, a million documents as the potential

14 outside --

15       THE COURT:  It's not that many in this modern era.  I

16 get that.

17       MR. DELL'ANGELO:  -- is really not that many.  And if

18 our terms reduce it to 800,000, it's actually what I think we

19 would consider for this type of case to be a small set of

20 documents.  So we're fully prepared to accept that risk.

21 With -- I would like to make one just additional point,

22 particularly in light of Mr. Williams' argument with respect to

23 custodians about reservation of rights, and we did put this in

24 the joint status report.

25            But particularly because we're dealing with nicknames

—————TRANSCRIBED FROM DIGITAL RECORDING—————

 1  and idioms like Strikefarce and T-Shirt Guy that plaintiffs I

 2  think simply can't know without looking at documents, we would

 3  like to reserve the right to at least address with the defendant

 4  and the Court as, you know, additional idiomatic or, you know,

 5  sort of home-grown terms arise, we have the opportunity to --

 6          THE COURT:  Every civil case is like this.

 7          MR. DELL'ANGELO:  Okay.

 8          THE COURT:  You go out there.  You do your homework.

 9  You do your discovery.  You look at stuff.  And then you find

10  more information, and then you have a discussion about what's

11  reasonable follow-up.  And I always understand that.  It's not

12  written in stone.  That's why I told you with respect to the

13  number of custodians it's an interim process.  The 22 seemed to

14  me to be adequate to get you a fundamental understanding of your

15  claims and their defenses, but if things change and you find out

16  somebody's some critical person that you had no appreciation of,

17  that door remains open.

18          MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

19          THE COURT:  But...

20          So let me hear from defense counsel.  Okay.  Mr. Cove

21  will be addressing your position in this regard.

22          MR. COVE:  Thank you, Your Honor.

23          THE COURT:  So how many custodians did you have for the

24  FTC document production?

25          MR. COVE:  I don't have that number off the top of my

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1    head either.  We did not handle that document production.  It

2    was handled by another law firm back East.  And it was not quite

3    as formal as this.  My experience in responding to the FTC

4    requests and when I was at the justice in the antitrust division

5    doing the same thing is the process is a little more targeted

6    towards what documents they are looking for and can get in a

7    reasonable time and not as formalized as --

8            THE COURT:  Did you get a holder memo?

9            MR. COVE:  Pardon me?

10           THE COURT:  Did you get a holder memo request?

11           MR. COVE:  A holder memo request...

12           THE COURT:  Attorney General cooperate and waive or

13   your lack of cooperation will be used against you in a potential

14   criminal prosecution.

15           MR. COVE:  That -- I left the DOJ in about 2001.  So I

16   was out of that --

17           THE COURT:  The holder memo was 2002.

18           MR. COVE:  Yes.  He wrote a few -- he wrote a few

19   memos.  I was having trouble bringing them to mind.

20           THE COURT:  I was just dealing with it in another MDL,

21   so I --

22           MR. COVE:  Yes.  I remember when that -- when that came

23   out and the controversy that it caused.  And, quite frankly, I

24   didn't agree with it then and I don't agree with it now.

25           THE COURT:  I'm only asking you because it's pretty

——TRANSCRIBED FROM DIGITAL RECORDING——

1   good evidence of what some very bright people thought was

2   critical information that would satisfy the government of the

3   government's antitrust concerns.

4         MR. COVE:  Yes, and I think that was a little bit

5   different in that it was used -- it was more in the criminal

6   context.  Whereas, in the -- I was referring to the FTC.  DOJ

7   does both civil -- civil mergers and criminal price fixing.  So

8   on the civil side what we did was similar to what the FTC did,

9   is this transaction going to reduce competition or not.  You

10  need to decide pretty quickly before the -- before the -- so the

11  transaction needed to be blocked or proceed.  And the method of

12  getting the documents is to try and get the key documents

13  quickly and not --

14        THE COURT:  Precisely my point.

15        MR. COVE:  And not have a --

16        THE COURT:  That you go to the people that you know

17  have the key documents.

18        MR. COVE:  Exactly.  Exactly.  And I'm sure, having

19  just glanced at the production, that the key people who are --

20  we've identified all -- we identified in our original nine

21  custodians that we originally proposed who the key people were,

22  and I suspect that those -- I'm sure that some of those were

23  custodians.  And I'm not going to make a representation that no

24  one else was, but...

25        THE COURT:  Okay.  So now --

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1          MR. COVE:  Because that was several years ago.  So the

2   metadata is there.

3          THE COURT:  I understand your argument.  They've given

4   you a huge list, but they also point out, somewhat persuasively,

5   that your industry uses a lot of idioms and nicknames and

6   different things that typical simple key word searches are not

7   designed to capture.

8          MR. COVE:  Well, let me...  Could I back up before I

9   address your question?

10          THE COURT:  Of course.

11          MR. COVE:  I don't want to ignore your question, but I

12   think it's worthwhile to back up a little bit.

13          I think we've got to get this in context.  First, right

14   now at this point we have, thanks to Ms. Lynch's hard work,

15   identified that we have at least a million e-mails that are

16   separate de-duplicated e-mails and are --

17          THE COURT:  That's fine, but I also understand in this

18   day and age --

19          MR. COVE:  Right.

20          THE COURT:  -- that's not unusual at all.

21          MR. COVE:  And we have 100,000 -- over hundreds --

22   perhaps, hundreds of thousands of cell phone messages that have

23   been saved.  Now, those are not -- we haven't excluded personal

24   from business there, and most of those I hope will turn out to

25   be personal e-mails because people use their cell phones for

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1   both.  But those are going to be reviewed without search terms.

2        We're reviewing huge numbers of documents from the

3   contract files without search terms, which are the key documents

4   in the case.  They're alleging these contracts were

5   anticompetitive, and they're going to get all of the contracts

6   and all of the documents that were in the contract files without

7   any --

8        THE COURT:  Right.  But presumably a lot of those are

9   duplicated documents and the same form contract has been used or

10   maybe some addendums.  I mean, how many copies of a mortgage

11   agreement do you need before you know --

12        MR. COVE:  Well, that's true, but what they're asking

13   for -- I can turn that argument around.  They've named every

14   fighter in the punitive class, every venue that was used, which

15   would be on the name of every reference to the event that's

16   found in the documents, every sponsor that they could identify.

17   So it's essentially how many documents relating to every single

18   fighter.  Does every document relating to every single fighter

19   and to every single sponsor and every single venue need to be

20   reviewed and produced here?  And there 's an enormous time and

21   cost involved in the program --

22        THE COURT:  Which is exactly why I asked them if they

23   were willing to take the production, applying their terms,

24   without a review for responsiveness.  And they undertake that

25   review on their own dime.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1              MR. COVE:  Understood, but we still -- I mention the

2    claw-back provisions as well.  We're not in a position to and

3    we're not willing to provide documents that haven't been

4    reviewed for privilege.  The claw-back provision is, in our

5    view, an inadequate substitute.

6              THE COURT:  Sure, but there are going to be some

7    custodians that you absolutely know are unlikely to have legally

8    protected materials, aren't you?

9              MR. COVE:  No.

10             THE COURT:  That's the whole point of the discussion

11   last time about the filtering techniques to identify more likely

12   privileged than less likely privileged.

13             MR. COVE:  Those techniques were -- we had offered to

14   use with regard to the legal custodians.

15             THE COURT:  Correct, but --

16             MR. COVE:  The three legal custodians.  So if something

17   came from Mr. White's, the president's office, that would be

18   reviewed and privileged -- and if it were privileged, it would

19   be claimed as privileged under the normal course.  Now, we

20   could -- and we've got a separate proposal to deal with specific

21   people in the legal department, Mr. Hendrick, Ms. Long,

22   Mr. Mersch --

23             THE COURT:  I'm only asking you -- yes, you can look at

24   every single document that you produce for privilege, but you

25   can also say, The guy in the mail room is not going to have any

—TRANSCRIBED FROM DIGITAL RECORDING—

1   privileged documents in all likelihood and we can employ some

2   down and dirty techniques to screen out anything that might slip

3   through.

4          MR. COVE:  Well, this is a small company.  And the

5   issues we're dealing with here are all contract issues, which

6   the heart of the allegation of the complaint.  And lawyers are

7   consulted every day on these decisions, and it's always not

8   easy -- it's not always an easy call as to what's privileged or

9   what's not.  As we've said, you know, sometimes the lawyers, you

10  know, engage in business functions.  There's no question about

11  that.

12         And so we've got to do that review, and your reference

13  to the holder memo was interesting.  It's really giving up the

14  attorney/client privilege is a big, big step to take that we are

15  not willing to take.

16         So --

17         THE COURT:  Well, that's the point of the claw-back

18  agreement --

19         MR. COVE:  No, I understand.

20         THE COURT:  -- that you don't.  But -- and that's

21  really the point that I'm trying to raise with you is that

22  certainly there are certain things that I don't care how iron

23  tight your claw-back agreement is, you don't want the other side

24  to see.

25         MR. COVE:  That's true.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          THE COURT:  But there are lots of documents and lots of

2    custodians of documents that you know, based on your discussions

3    with your client, are unlikely to have that category of

4    sensitive document.

5          MR. COVE:  It's really -- and e-mail you can't -- it's

6    harder.  You can't tell in advance.  I mean, you can use various

7    screens, but somebody's going to have to review those documents.

8    And it's not just the e-mails, but it's all of the other

9    noncustodial documents we've agreed to search as well.

10          The problem here, I think, is -- well, let me -- if you

11    don't remind, I'll respond to some of the specific things that

12    Mr. Dell'Angelo said.  And I want to go back and talk about the

13    real problem here is the RFPs are not tailored to the needs of

14    this case.

15          THE COURT:  Well, that's why I started off by talking

16    to you about whether you've had the meet and confer to narrow

17    down those requests.

18          MR. COVE:  Yes.

19          THE COURT:  And your response to me was, that depends

20    on the search -- you know, the answers to those questions is

21    going to turn on what you do with the --

22          MR. COVE:  Yes.  I mean, well, we have that notice --

23    let me dress that issue right now.  We have had those

24    discussions and we pointed out -- let me take one issue, just

25    one contract, just an example to walk through.

TRANSCRIBED FROM DIGITAL RECORDING

1          What the complaint alleges is that Zuffa, quote,

2    imposes its exclusivity provisions into its physical venue

3    agreements that severely limit, in some cases remove altogether,

4    the ability of any would-be competitor to hold MMA events at

5    premiere venues in the United States.

6          And then it goes onto say that there are black-out

7    provisions that prevent the venue from holding a competing event

8    when there is a specified time before and after a UFC event.

9    That is it with regard to venues.  They don't allege any threats

10   with regard to venues.  That's it.  They allege that of the

11   maybe 20 or so events that the UFC holds or -- excuse me.  The

12   UFC -- this is an extraordinarily thin allegation.  UFC holds

13   events at approximately fewer than 20 venues in the United

14   States in the course of a year, 2015, fewer than 20 events.

15         And the allegation is that this is somehow more closed

16   access to competitors who want to put on MMA events.  That's an

17   extraordinarily thin allegation and it is a very limited

18   allegation.  But they have -- they've got two custodians now,

19   Mr. Dropick and Ms. Marcolini who are primarily related to

20   venues.  Ms. Marcolini is primarily a logistics person, which

21   we've told them, and they want every document related to any

22   contract with any venue.  Their request calls for all documents

23   relating to or from any agreements with a venue and all

24   negotiations relating to them regardless of whether an agreement

25   was reached or not.

44

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1         So this is an extraordinarily overbroad allegation in

2   the context of this case, and they're getting all of the

3   contract files anyway.  So they would now have to go and search

4   every time a venue was mentioned, which is -- and a venue is

5   mentioned in connection with every event because that's how they

6   identify it.  UFC 197 at Garden Center in Boston, for example.

7         That request does not meet the federal rules.  And what

8   we have consistent -- and we've raised these issues and they've

9   come back and said, Well, we don't -- you know, we don't need

10  documents relating to insurance.  We don't need documents

11  relating to security or routinely logistical documents, but

12  there's never been a specific proposal that's going to limit the

13  searching there.  So we're going to have to search every

14  document in order to respond to just this one --

15        THE COURT:  Correct.  So let's -- with respect to the

16  custodian that you've identified, who is the logistics person,

17  so if they get more than --

18        MR. COVE:  Well, Mr. Dropick is the person in charge of

19  venues.  He deals with negotiating the contracts.  He deals

20  with -- you know, he may deal with logistics --

21        THE COURT:  Right.  And so he is the person who is more

22  likely than the other woman you mentioned who handles the

23  logistics to have privileged documents.  If they're willing to

24  take -- and I am going to slaughter her pronunciation because I

25  don't remember.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          MR. COVE:  Marcolini.

2          THE COURT:  Marcolini.  If you give them everything

3   from Marcolini that is responsive to their search terms and they

4   have to slug through it instead of you, how are you harmed by

5   that?

6          MR. COVE:  Well, we do have to slug through it.  I

7   mean, that is the --

8          THE COURT:  I'm questioning that premise.

9          MR. COVE:  Pardon me?

10         THE COURT:  I'm questioning that premise.

11         MR. COVE:  Well, we have to -- we cannot -- to review

12   for privilege, we need a lawyer to do that and we got to pay a

13   lawyer.  And we're not paying, you know, associates to do that,

14   but we're paying people who have law degrees to do that, that

15   review, in the first instance.  And that is extremely burdensome

16   and expensive.  I mean, the -- you know, you did instruct us at

17   the beginning of the case to investigate linguistic review.  We

18   did --

19         THE COURT:  I didn't suggest a method.

20         MR. COVE:  No, not that you suggested it.  You

21   suggested it, I mean.  We investigated it.  We thought it was a

22   good idea.  I thought when we discussed it with the plaintiffs,

23   you know, our view was it wasn't going to be as effective or

24   with much assurance as search terms.  The things they have

25   agreed to, e-mail threading, de-duplication, relevant time

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1   period, first of all --

2           THE COURT:  Demisting.

3           MR. COVE:  Well, demisting does not -- does not apply

4   to e-mails is my understanding, but those are routine in every

5   case.  That's not a -- yeah.  It's certainly not a negotiating

6   concession.

7           I think it's -- I think, you know, one point they've

8   made is how many documents they found in the FTC...

9           THE COURT:  What confidence they have in your search

10  terms is what they're raising with me.

11          MR. COVE:  Yes.  Well, I understand.  First of all, we

12  proposed search terms back in December.  I've never been in a

13  search term negotiation that involved less than, you know, seven

14  or eight exchanges of various search terms.  We got one search

15  term.  We had two search term exchanges, 2,500 and then 2,300,

16  three days before the joint status report was due.

17          So certainly the -- they raised things like

18  Strikeforce.  Of course, we put that on the list.  Strikefarce,

19  of course we put that on the list.

20          Our list is not set in stone.  It was what we thought

21  were the relevant search terms, and we fully anticipated they

22  would add some.  We did not anticipate they would add 2,300 that

23  encompassed every --

24          THE COURT:  Have you provided their proposed search

25  terms to your consultant or vendor that's collecting?

1          MR. COVE:  Not as of yet because we only finished the

2   collection based on when they told us about --

3          THE COURT:  So do you have any idea of the number of

4   hits you're going to get if you run their search terms?

5          MR. COVE:  I would be shocked.  It's every -- it's

6   every fighter's name.  It's every sponsor's name.  It's every

7   venue's name.  Plus, it's a bunch of other things.  So I'd be

8   shocked if it -- if it came back with less than 95 percent.  We

9   can do that, and we'll do that when we -- as soon as we're able

10  to.  But, I mean, the fact -- I want to talk about the FTC,

11  their sampling of the FTC, because I think that's very

12  important.

13         There are reasons why documents that were provided in

14  the FTC would not turn up in search terms, and they're things

15  that we've addressed.  First, there's the parent/child

16  relationship.  Second, there's the issue of hard copy documents

17  that are OCR'ed.  Much of that FTC production was OCR'ed, and

18  that's not always a perfect procedure.  And that's exactly one

19  of the reasons why we -- we've agreed with hard copy documents

20  to review them one by one, and we're not proposing to use search

21  terms there.

22         And, in fact, the fact that their search terms,

23  applying all 2,300 of them, only hit 91 percent to me of the FTC

24  production is evidence that there is some problem with the FTC

25  production; that not all of those documents are -- something is

—TRANSCRIBED FROM DIGITAL RECORDING—

1  not coming up in the searches because with -- it would be

2  impossible to think of another search term that was left off of

3  that list that is any -- would be in any way relevant to this

4  case in any way, shape, or form.

5          So that, A, the fact that they got 91 percent using

6  that broad list suggests to me that something is wrong with that

7  whole universe, you know, in the search there.  And it also

8  includes financial stuff, financial documents, which aren't

9  going to turn up.

10          So, you know, all --

11          THE COURT:  It probably beats having a room full of

12  baby lawyers that don't know very much about litigation looking

13  at documents one by one and determining whether there was

14  relevant responsive to privilege.

15          MR. COVE:  Yeah, I think privilege is the big issue.

16  Somebody's got to -- and you know.

17          THE COURT:  Right, but you're not doing that at the

18  partner level.  You're not doing it at the level of somebody

19  that really has an appreciation of the case.  You're --

20          MR. COVE:  No, but what you do is you have the -- the

21  prudent way to do a privilege review is you have contract

22  lawyers of some sort --

23          THE COURT:  Right.

24          MR. COVE:  -- reviewing the documents, making the

25  initial call as to whether there's a privilege, and then you put

————TRANSCRIBED FROM DIGITAL RECORDING————

1  it up to one of the law firms of record to do a review and see

2  is that really privileged or not.  So it is a time-consuming and

3  expensive process.

4        THE COURT:  I've done that.  I absolutely appreciate

5  it.

6        MR. COVE:  I understand, but...

7        So, you know, there hasn't been any cherry-picking

8  here.  The ZFL production that he referred to is the priority

9  production that they wanted.  That's the contracts and the

10  contract files and the financial --

11        THE COURT:  No, they're just telling me those are the

12  easiest ones in which to get a good reliability return.

13        MR. COVE:  Well, that includes -- it includes a lot of

14  financial documents.  We gave them the financial stuff right up

15  front.  So it includes all of those, which may not necessarily

16  respond to search terms -- any production which we are searching

17  for without search terms.

18        THE COURT:  So how did you develop your 91 terms?  Did

19  you do it with consultants or did you do it with lawyers?

20        MR. COVE:  We did it with lawyers.  We looked at what

21  we thought was relevant, the competitors, the -- you know, we

22  focussed on the issue of exclusivity.  What they allege with

23  regard to venues, sponsors, merchandisers, TV networks is that

24  there's -- these contracts are exclusive or would have some

25  elements of exclusivity in them and that that is preventing

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1   people from competing.  And with regard to sponsors, they have

2   some additional elements that some threat was made somehow.

3          And so we focussed on that concept.  You know, is

4   there -- you know, things that would relate to exclusivity, why

5   there's exclusivity, and those sorts of things.  And we're

6   certainly willing to meet -- meet and confer and talk about

7   search terms further.  And we didn't really view when we sent

8   this list back in December that this was the last word on the

9   subject.

10         THE COURT:  No, I understand that.  Now, I'm trying to

11  make some progress.  And I have peppered both sides with some

12  questions about why your respective proposals are superior, and

13  you've answered some of my questions about the approaches that

14  you've taken.  And my inclination is to direct your consultants,

15  who will be doing the collection and review of the ESI, to talk

16  to one another about more meaningful narrowing of the search

17  terms that the plaintiffs have proposed.

18         MR. COVE:  Okay.  All right.

19         THE COURT:  Because there's nothing like the people

20  that actually do the work with the technical knowledge to talk

21  to one another to hone in on more efficient ways and

22  cost-effective ways of doing things.

23         MR. COVE:  Okay.  We're very happy to do that, Your

24  Honor.

25         THE COURT:  And, Mr. Dell'Angelo, is there any reason

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1  why you can't have your consultant -- do your folks know each

2  other?  A lot of times in our -- it's a rather small industry.

3          MR. COVE:  I don't think either side has identified

4  their consultant to the other, but we certainly are willing to

5  talk about that.

6          THE COURT:  Is there any reason why that can't be done,

7  for the consultants to meet and confer and with a view towards

8  reaching an agreed-upon key word search terms, not simple key

9  word searches because I understand your questions there, but to

10 narrow the universe and to arrive at a consultant-generated

11 list?

12         MR. DELL'ANGELO:  Well, Your Honor, I think that kind

13 of runs the risk of having the sort of non-lawyers devise the

14 list and gets us back to what's --

15         THE COURT:  Yeah.  That means you have to talk to your

16 consultants, and you have to tell them what you're -- what

17 you're most concerned about and what you're interested in and

18 what you're searching for.  I mean, there are all sorts of

19 people that do nothing but technology-assisted review --

20         MR. DELL'ANGELO:  I'm sure.

21         THE COURT:  -- who teach the computer what to look for.

22 And some of the studies say that's much more reliable than even

23 very seasoned lawyers looking at every document in the case.

24         MR. DELL'ANGELO:  Right.  To be clear, though, Your

25 Honor, as I tried to articulate in my presentation, and if I was

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  not clear on this point, I apologize, but not only did we not

2  develop search terms in a vacuum.  But we did develop the search

3  terms working with our vendor up to this point.  So --

4       THE COURT:  I understand that, but now you have 2,300

5  terms and they have 91 terms.  And now someone's going to have

6  to decide how many terms you get.  And before I make that

7  decision, and I will, I would like to hear the input from the

8  consultants who talk to one another as experts in their field

9  about what is really necessary in order to give you each what

10  you think is reasonable.

11       So I'm going to require you to identify to each other

12  the consultants and permit the lawyers, of course, to

13  participate in the discussions, but this should be a

14  consultant-driven exercise after the consultants know what your

15  goals are, your respective goals are.

16       MR. COVE:  Your Honor, I think that's a good idea and I

17  think off the top of my head without consulting with my client

18  that the vendor that we talked to about linguistic review may be

19  helpful in that process as well.  And I would suggest that we

20  include him or her.

21       THE COURT:  You can pick whoever you want to, but I'm

22  trying to suggest that sometimes the experts who just want to

23  get a job done do a better job than the lawyers who want to

24  fight with one another.  And if you can't agree, that's what I

25  get paid for doing is making decisions, but sometimes both sides

—————TRANSCRIBED FROM DIGITAL RECORDING—————

 1  hate it.

 2          MR. COVE:  Understood.  Understood.  Thank you, Your

 3  Honor.

 4          THE COURT:  All right.  So I'm going to hold the next

 5  conference on February the 23rd.  So I'm going to require that

 6  counsel make arrangements to have their consultants confer with

 7  one another after the consultants get their marching orders from

 8  counsel about your respective proposals concerning key word

 9  searches for ESI.  And let's move to the next issue here that

10  needs to be addressed.

11          Don't want to go out of order here.  The relevant time

12  frame for four of Zuffa's requests for production of documents

13  which have to do with Requests 3, 16, 14, and 20.  Zuffa

14  proposes that with respect to the named plaintiffs' contracts

15  dating back to January 1, 2000, be reviewed and produced.  And

16  plaintiffs are proposing a narrower time frame, roughly a year

17  prior, with respect to the six named plaintiffs.

18          So let me hear from first plaintiff with respect to the

19  rationale for your proposed -- I get that the -- Zuffa's asking

20  you for 16 years' worth of contracts and -- yes, sir.  You are

21  Mr. Saveri?

22          MR. SAVERI:  I am Mr. Saveri, Your Honor.

23          THE COURT:  All right.

24          MR. SAVERI:  Nice to meet you.

25          THE COURT:  Nice to meet you, sir.  And you'll be

—TRANSCRIBED FROM DIGITAL RECORDING—

1  addressing this issue?

2          MR. SAVERI:  Yes.  So I am happy to answer any

3  particular questions you have on it.  I think --

4          THE COURT:  Sure.  Start -- question No. 1, you have

5  six named plaintiffs.  Have you talked to your six named

6  plaintiffs about what documents they have, whether they have any

7  retained devices that are likely to have any materials dating

8  back to the time period for which Zuffa is seeking discovery?

9          MR. SAVERI:  We have spoken to our plaintiffs.  We have

10  made a collection at the beginning of the case.  We --

11          THE COURT:  How voluminous is the collection?

12          MR. SAVERI:  I beg your pardon?

13          THE COURT:  How voluminous is the collection?

14          MR. SAVERI:  I have the -- I have the information in

15  the statement.  I think that the...

16          Let me just...  I don't want to guess, Your Honor.  So

17  I can tell you the sources of the ESI and I can also, if you

18  give me a minute, come up with the numbers of e-mail accounts.

19  So -- and we've identified a number of different devices for

20  each of the named plaintiffs.  They include a number of e-mail

21  accounts.  They include laptops, desk tops, a number of mobile

22  devices, smart phones.  There are also, for a number of them,

23  social media accounts.  All of that information has been --

24  we've made efforts to preserve that, and we intend to do

25  searches on those devices.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          This particular question, though, in terms of the

2    e-mail accounts, let me give you the data.  For Mr. -- for

3    Mr. Le our count is 23,771 e-mails.

4          THE COURT:  Deduped or not?

5          MR. SAVERI:  I believe these are deduped, but I am

6    not -- I don't know -- when I hesitate, I don't know if all of

7    the other techniques that we talked -- you were talking about a

8    few minutes ago have been applied to these accounts, but I

9    believe these are deduped accounts.

10         THE COURT:  And the reason I'm asking you these

11   detailed questions is because you raised the issue of

12   burdensomeness.  I appreciate that they're asking for

13   information dating back to a 16-year period of time.  However,

14   you have also alleged in your complaint that Zuffa's

15   anticompetitive campaign began in 2006, and most of your

16   clients, in fact I don't think any of your clients, were

17   employed by Zuffa before 2004 or 2005, correct?

18         MR. SAVERI:  Correct.  Now, Mr. Quarry has about 8,000

19   e-mails.  Mr. Fitch about almost 2,000.  Mr. Vera almost 26,000.

20   Mr. Vasquez, another 25,000.  Mr. Kingsbury, another 13,000.

21   Rounded numbers, obviously.

22         THE COURT:  All right.  And so those are the e-mail

23   files.  And did your clients typically engage in contract

24   negotiations or contract execution via e-mail or the

25   old-fashioned way where they actually signed paper documents?

────────── TRANSCRIBED FROM DIGITAL RECORDING ──────────

1        MR. SAVERI:  Well, there are certainly -- there's

2   certainly e-mail traffic about these -- about these subjects.  I

3   mean, these are individuals.  So some of these e-mail accounts

4   are not what you would consider commercial accounts.  So they

5   were done through, you know, various ISPs and those types of

6   services.  So --

7        THE COURT:  Correct.  But the requests that are at

8   issue in here are relevant contracts, documents sufficient to

9   show compensation for combat sports-related activity, documents

10  sufficient to show tolling or extensions of contracts.  Those

11  are basically the three categories of materials that the

12  defendants are asking your clients to search for and produce

13  back to 1-1-2000.

14       MR. SAVERI:  Right, and that also includes contracts,

15  Your Honor, with entities outside, not with the UFC.  And so

16  there is a relevancy issue that obviously --

17       THE COURT:  That's a different issue.  Right now I'm

18  focusing on because you say it's too burdensome.  It's too

19  disproportional.  It is a 16-year period of time.  But in truth

20  and in fact, how many of your six named plaintiffs are likely to

21  have very many contracts such that it's so onerous on them to

22  search for them and produce them?

23       MR. SAVERI:  Your Honor, with respect to the contracts

24  themselves, within that time period, you are exactly correct

25  that the -- there are not a number of contracts.  And we're

——TRANSCRIBED FROM DIGITAL RECORDING——

 1  prepared to search for them, and we've told the -- the UFC that

 2  for Fitch and Vera we're willing to go back to October 2004.

 3          THE COURT:  I understand that.  And now I'm questioning

 4  why that's adequate given the nature of the claims that have

 5  been made in this case and the beginning period of the

 6  defendant's alleged anticompetitive monopolistic practices and

 7  weighing that against the burden to your six named plaintiffs to

 8  search their hard copy files for any contracts they have or any

 9  documents that they have that are sufficient to show their --

10  any tolling or extensions of contracts.

11          MR. SAVERI:  So with respect to the contracts

12  themselves, we can -- we can look for those.  I think where the

13  problem and the burden arises with any requests for documents

14  relating to contracts, because at that point you have a broad

15  enough request that you're kind of arguably sweeping in all -- a

16  lot of different --

17          THE COURT:  I didn't understand that they were asking

18  for all documents related to discussing, etc., but they're

19  asking for the contracts themselves.

20          MR. SAVERI:  And we're agreeing to produce the

21  contracts.  We've agreed for them to go back to the dates that

22  I've given you.  We think beyond that, because it precedes the

23  time that we've alleged in this case, it's before the time

24  period that Your Honor has set in this case, it's --

25          THE COURT:  But it gives them almost no information

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1   about your clients' prior background in the field, because they

2   only started with your client beginning in 2004 or '5.

3          MR. SAVERI:  Well, I don't -- I would push back, Your

4   Honor, and say I don't believe that it gives them almost no

5   information.  I mean, certainly, if you're talking about a

6   16-year period just full stop, there's a lot of information

7   about our clients' experience/activity in the field.  And, sure,

8   Your Honor, we think that we don't want to go back to the

9   beginning of time and we're trying to figure out some reasonable

10  limits of that, consistent with the Rule 26, you know, weighing

11  of burden and proportionality.  And so we believe --

12         THE COURT:  And how far back am I giving you

13  information with respect to the contract claim?

14         MR. SAVERI:  I beg your pardon?

15         THE COURT:  How far back am I giving you information

16  about contract -- fighter contracts?

17         MR. SAVERI:  To 2000.  And what -- and those aren't the

18  same numbers.  And what I would say is --

19         THE COURT:  Right, they have to produce 950 and you

20  have to produce six.

21         MR. SAVERI:  Well, there may be more.  And it's -- with

22  respect to the contracts themselves, it's -- we can go back to

23  2000 for those contracts.

24         THE COURT:  Good.  That's resolved.  So now let's move

25  to the next category.

—————————————TRANSCRIBED FROM DIGITAL RECORDING—————————————

1    MR. SAVERI:  Yeah.  So the next category is -- we've

2 talked about 3 and 6, I think.

3    THE COURT:  Correct.

4    MR. SAVERI:  And now we can talk about 14, which is the

5 document sufficient to show compensation.  Now, again, Your

6 Honor, going back to the period before the beginning of the case

7 in particular that have to do with sources of income from

8 outside of their business --

9    THE COURT:  Well, 14 requests compensation for combat

10 sports-related activity, not from all activity.  So I understand

11 your argument in the other places --

12    MR. SAVERI:  Okay.

13    THE COURT:  -- about whether they ran a gym or they --

14    MR. SAVERI:  Washed cars or were gardeners --

15    THE COURT:  Correct.  Different issue.  And they're not

16 asking for all documents or all tax returns or all income.

17 They're asking for documents sufficient to show compensation for

18 combat sports-related activities dating back to 1-1-2000.

19    MR. SAVERI:  And so, Your Honor, the reason why this is

20 beyond the permissible scope of discovery is because that --

21 information regarding other combat sports that are not the ones

22 that are particularly at -- the relationship with UFC here

23 doesn't have any --

24    THE COURT:  Isn't your claim is that they are the only

25 game in town and that they have no choice but to be tied to

——TRANSCRIBED FROM DIGITAL RECORDING——

1  their anchor?

2      MR. SAVERI:  Well, that's pretty close.  That's pretty

3  close, Your Honor.  I mean, I certainly think --

4      THE COURT:  So wouldn't information about their other

5  compensation in related fields be somewhat probative of that

6  claim?

7      MR. SAVERI:  I think arguably it would be probative.

8  I'm not saying that it is completely irrelevant.  I'm just

9  saying that under -- applying the Rule 26 standards that the

10  burden of going back in time to search e-mails --

11      THE COURT:  And that's why I started by asking --

12  because they're not asking for -- they are not asking for

13  everything and all.  They are asking, with respect to 14, for

14  documents sufficient to show compensation for combat

15  sports-related activity.  And they're either going to have a

16  1099 or a W2 or some -- if they kept them.  And if they don't

17  have them, that's easy.  We have no responsive documents.

18      MR. SAVERI:  And so, Your Honor, if we're talking about

19  things of the type that you identified, which are things that I

20  think you can reasonably expect even relatively unsophisticated

21  people to keep, that those materials to the extent they exist we

22  can look for and try to obtain or -- and produce, I mean.  And

23  your 1099s, W2s, things of that --

24      THE COURT:  Right, because they're not asking for

25  anything and all and I wouldn't give them that.  But they are

---TRANSCRIBED FROM DIGITAL RECORDING---

 1  asking, you know, Did you make $100,000 with the Kung Foo

 2  Academy?

 3          MR. SAVERI:  Yeah, or somewhere else.  The problem --

 4  and the reason I'm pushing back on this is there could be e-mail

 5  traffic that wouldn't necessarily take the form of the kind of

 6  documents that are readily accessible that people keep, W2s,

 7  1099s, things that are in -- you know, people just keep forever,

 8  that are going to be a little bit harder to find and --

 9          THE COURT:  And I'm not expecting you to search for or

10  look for that because the request is narrowed to documents

11  sufficient to show.

12          MR. SAVERI:  Okay.

13          THE COURT:  Not everything that touches upon, not

14  everything that mentions, not every -- you know, I got $10 for

15  signing an autograph, but the type of information that is

16  sufficient to show what income someone generated from a combat

17  sports-related activity.

18          MR. SAVERI:  And so with that kind of limitation and

19  that understanding about the types of materials that we're

20  looking for, we can certainly do that and look for --

21          THE COURT:  I think so.  And that's why I'm -- you

22  know, that's going to be the order.

23          MR. SAVERI:  And if -- we'll look, and if it doesn't

24  exist, I mean, that's going to be the answer.  There are no

25  responsive documents.  And we'll just -- that's fine, Your

─────────────TRANSCRIBED FROM DIGITAL RECORDING─────────────

1  Honor.

2        THE COURT:  All right.  And then the last category are

3  documents sufficient to show your clients' position regarding

4  any tolling or extensions of contracts.

5        MR. SAVERI:  Well, Your Honor, we don't think -- if

6  these are formal documents of the types we were talking about

7  before that -- like the contract themselves or addenda or those

8  sorts of things, those types of formal documents should be

9  relatively few or a limited number, we can identify and find

10 them and we'll pull them.

11        THE COURT:  Right.

12        MR. SAVERI:  But if there are other materials that have

13 to do with this, correspondence, going through e-mails, that's a

14 little bit more problematic.

15        THE COURT:  Sure, it is, but you have the benefit of

16 talking to your clients, just like they're required to talk to

17 their clients to find out who has relevant information in this

18 case.

19        MR. SAVERI:  Yes.

20        THE COURT:  Did you ever ask the UFC to not require you

21 to fight this fight or do certain things or engage in promotion

22 for any period related to your health or for anything that had

23 the effect of extending your contractual obligation to them?

24        MR. SAVERI:  And we can do that.  And if there's

25 correspondence with the UFC about it, I mean, we can certainly

────TRANSCRIBED FROM DIGITAL RECORDING────

 1  look for and produce it.

 2          THE COURT:  Sure, and your clients can certainly assist

 3  you in this process.

 4          MR. SAVERI:  Absolutely.

 5          THE COURT:  Because they know whether it exists or they

 6  don't.

 7          MR. SAVERI:  Absolutely, Your Honor.  We wouldn't

 8  undertake this without consulting with our clients and not just

 9  be poking around.  We want to do this efficiently, and the place

10  to start are the knowledgeable people.  So, I mean --

11          THE COURT:  And so I'm trusting you to use a reasonable

12  methodology to respond to these requests dating back to

13  1-1-2000.

14          MR. SAVERI:  Okay.  Sure.  Thank you, Your Honor.

15  We'll do that.

16          THE COURT:  All right.  That leaves us with item

17  No. 4 --

18          MR. COVE:  Excuse me, Your Honor.  I'm sorry.  I know

19  that --

20          THE COURT:  Mr. Cove, you're ahead on points on this

21  one.  Do you want to...

22          MR. COVE:  The last part of the colloquy there was an

23  example used of you can talk to UFC and say, Did you have an

24  agreement or did you get compensation from UFC?  And Mr. Saveri

25  responded with regard to UFC.  The question here regards all

1  combat sports promoters, and I wanted to make sure the record

2  was clear on that.

3       MR. SAVERI:  But -- and, Your Honor, just so we frame

4  this issue.  That is a request for extensions to toll contracts

5  or extensions with entities other than the UFC?  Is that what --

6       THE COURT:  I don't have the request in front of me.  I

7  presume you folks know what you are talking about.

8       MR. COVE:  But I didn't think --

9       THE COURT:  And neither side gave it to me.

10      MR. COVE:  Yes.

11      MR. SAVERI:  We're talking about 20, Your Honor?

12      THE COURT:  Correct.  The other one had to do with

13 compensation for combat sports activities -- combat

14 sports-related activity.  So that wasn't limited to the UFC.

15      MR. SAVERI:  And I understand that, Your Honor, and

16 let's just -- let's get on the same page.  20, let me just read

17 it verbatim, Documents sufficient to show any extensions to or

18 the tolling of the term of your agreements with any promoter,

19 including the duration and the reason for tolling or extension.

20 And just so we're clear, and I think Mr. Cove has fairly raised

21 the point, that this request calls for such extensions or

22 tolling of agreements with promoters other than the UFC.

23      THE COURT:  Correct, on the same rationale that if it's

24 common in the industry, if something happens and a fighter can't

25 fight or has a problem or whatever and they asked to be relieved

—TRANSCRIBED FROM DIGITAL RECORDING—

1    of their contractual obligations, did they do it with other

2    folks?  Did they do it with the UFC?

3              MR. SAVERI:  Your Honor, I think what we're -- and

4    we'll -- and maybe this is just the difference between the scope

5    of the discovery and what we're going to deal with at trial in

6    this matter, but we'll certainly argue that that evidence which

7    has to do with promoters that don't have anything to do with

8    this -- with the UFC, that's going to be irrelevant in the case.

9              THE COURT:  I understand you're going to argue it's

10   inadmissible.  I'm limiting it to promoters involved in combat

11   sports-related activities, not in any endeavor in which they've

12   engaged.

13             MR. SAVERI:  Okay.  Very well, Your Honor.  Okay.  And

14   we'll do the same search that we just talked about.

15             Thank you for the clarification, Your Honor.

16             THE COURT:  Thank you, Mr. Cove.

17             All right.  The next item is medical and drug test

18   records, whether plaintiffs should be required to produce

19   documents relating to the reasons for any tolling or extension

20   of their contracts, including suspensions for the use of

21   performance-enhancing drugs or extensions for injuries.  So let

22   me hear first from Mr. Cove to find out precisely what it is

23   that he wants.

24             MR. COVE:  Yes, Your Honor.  Document Request 20, as

25   you know, includes documents sufficient to show any extension or

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1  tolling of the term of your agreements with any promoter,

2  including the duration and the reason for the tolling of the

3  extension.

4          Now, this is relevant because plaintiffs allege, first,

5  that Zuffa's tolling and extension provisions are inherently

6  anticompetitive, and they allege that Zuffa has manipulated them

7  to extend contracts indefinitely.  So this is very limited

8  material that we've request here, and it's only documents

9  sufficient to show.  It's not all documents.  It's certainly not

10  all medical records.  It's not everything relating to the

11  plaintiffs' drug suspensions --

12          THE COURT:  You want to know if any time they've ever

13  been unable to work because of medical or drug test reasons

14  dating back to 2000 with any employer?

15          MR. COVE:  Yes.  Well, no, with any combat sports

16  promoter.  Yes, that's what we would like.

17          They're necessary for us to show that the tolling

18  provisions that we have are normal in the industry, that they

19  have a limit business purpose.  The law is --

20          THE COURT:  You certainly have that information with

21  respect to any fighter that -- whose agreement was tolled or

22  extended who tested positive or who presented medical evidence

23  they were unable to fight.  Now -- but you want it for prior

24  employers --

25          THE COURT:  We want it for other -- and it's not just

─────TRANSCRIBED FROM DIGITAL RECORDING─────

 1   prior.  Some of the plaintiffs we're talking about never fought

 2   after they stopped fighting for the UFC.  Some of them did,

 3   Mr. Vera and Mr. Fitch, maybe others.

 4          THE COURT:  Right.  So why can't you obtain the

 5   information I want?  What you are really talking about is

 6   industry standards.  Why aren't there less intrusive, more

 7   reasonable means of obtaining that information from others who

 8   are your competitors or engaged in your field?

 9          MR. COVE:  Well, these are the plaintiffs in the case,

10   and we have issued discovery to other promoters.  Naturally,

11   they're --

12          THE COURT:  Correct.  So why do you need to embarrass

13   an individual plaintiff about whether or not he tested positive

14   for something that --

15          MR. COVE:  Well, it's not a matter of embarrassment,

16   but if the plaintiff is alleging that these provisions are for

17   the purpose of impeding competition and those provisions have

18   been applied to him in circumstances that we believe are

19   legitimate, I think that's --

20          THE COURT:  Cannot an entire industry be

21   anticompetitive?

22          MR. COVE:  Pardon me?

23          THE COURT:  A whole industry can be negligent.  A whole

24   industry --

25          MR. COVE:  It can't -- it's certainly conceivable that

1  you could have anti -- you know, it's conceivable that --

2      THE COURT:  Isn't that what Silicon Valley just got in

3  trouble for?  Everybody creating --

4      MR. COVE:  No, but that's a different -- that's a

5  different -- that is collusion.  Those are people agreeing with

6  one another to do certain things, but what we have here, I think

7  the law is clear when a firm with no market power engages in a

8  contracting practice that's alleged to be anticompetitive when

9  somebody else agrees on it, that is relevant evidence as to

10  whether that contracting -- whether that contractual provision

11  has a legitimate business purpose because the small person's

12  doing it; clearly not doing it for the purpose of protecting or

13  extending market power, but doing it for some other reason which

14  presumably is going to be procompetitive.

15      It's not dispositive evidence that because A did it and

16  B did it that it's okay for B to do it, but it is certainly

17  relevant evidence that our expert would consider.  And when the

18  plaintiffs who have made these allegations that these provisions

19  are anticompetitive, it's a subject we should be able to examine

20  them about and examine them about how these provisions work not

21  only with regard to their experience with the UFC, but with

22  regard to their experience with other promoters.

23      Why did another promoter extend or toll your provision?

24  Was that wrongful?  Was it wrongful for you to still owe a

25  contract if you hadn't been able to complete, your client,

1  because of a drug suspension or a medical issue?  So that's

2  relevant.

3        Now, Zuffa does have some of this information with

4  regard to its fighters that it had a -- where it issued a formal

5  extension or tolling letter, which they often did.  But they did

6  not -- sometimes there were circumstances where a plaintiff was

7  injured or received -- let's do this situation, one in which a

8  plaintiff was injured.  Both sides sort of understood it, and no

9  formal -- there was no formal memorialization of the extension.

10        So there's extension letters, but then there's also

11  informal extensions that took place on the contract.  And I want

12  to be able to show that this contract was not extended

13  arbitrarily, but it was extended because the person plaintiff

14  was not ready to fight because of an injury or whatever.

15        So that's one issue.  And there also may be issues even

16  when a plaintiff is fighting for Zuffa where a commission takes

17  action after a fight, say the plaintiff was injured in the

18  fight, where the state athletic commission might issue a

19  suspension to the athlete and he may not communicate that or

20  Zuffa may not get word of it.  And so there's not a complete

21  identity between the universe of information between Zuffa and

22  the employments.

23        So that's what we -- I think you understand why the

24  evidence is relevant.  I won't belabor the point.

25        THE COURT:  It's relevant, but the utility of the

1  information weighed against the embarrassment and the personal

2  intrusion on the plaintiffs' medical history just doesn't

3  convince me that you're entitled to that information.  You have

4  the ability to obtain the information about contract terms in

5  the industry from other sources.  Your client has the bulk of

6  the information.  You can certainly obtain information from an

7  athletic commission about whether anyone was suspended and so

8  forth.  So I'm sustaining the plaintiffs' position on this one.

9        MR. COVE:  May I ask for a clarification, Your Honor,

10  just to make sure I understand?

11        THE COURT:  So long as it's not really another argument

12  guised as a clarification.

13        MR. COVE:  No, it's a clarification.

14        Where we say -- so if they receive -- if a plaintiff --

15  let me just get the precise hypothetical.  If a plaintiff

16  received an extension or tolling letter from another promoter,

17  they would still be obligated to provide that, but not the

18  underlying medical or drug suspension information.  Is that what

19  I understand?

20        THE COURT:  Correct.  I've required them to give you

21  inform -- any documents that they have with respect to a request

22  for or receipt of any tolling or extension of a contract with

23  another promoter in a combat field, but I'm not requiring them

24  to produce the underlying medical evidence or medical bases for

25  that.

1           MR. COVE:  Understood.  Thank you, Your Honor.

2           THE COURT:  Yeah.

3           MR. SAVERI:  Your Honor, we agreed with that last --

4           THE COURT:  I thought you did, but that's why we just

5    had this discussion.  So the last issue is with respect to a

6    proposed amendment to the protective order to include a

7    provision for attorneys'-eyes-only documents of a highly

8    personal nature from the files of athletes, and that again has

9    to do with medical issues and so forth.

10          You have agreed, if I understand correctly, to modify

11   it to accommodate the concerns of nonparty witnesses who -- from

12   whom you are requesting some discovery in this case, but you

13   disagree with respect to the necessity for attorneys'-eyes-only

14   treatment for information about other fighters from the contract

15   files.

16          MR. SAVERI:  Your Honor, I think that's almost

17   completely true.  Let me just try to focus that and touch on a

18   couple points.  We have resolved the issue with respect to the

19   third parties, and we have done that with the consent of Zuffa,

20   I think.  And I'm thankful for that.

21          I think the issue now is that when we were -- and I

22   wasn't here the last time, but there was litigation and a

23   dispute about whether Zuffa or any of the parties in the case

24   had the opportunity or the ability to designate materials as

25   attorneys' eyes only.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1           THE COURT:  Correct.  And I found that Zuffa had not

2   met its burden of establishing the need for attorneys'-eyes-only

3   provisions.  And now Zuffa is revisiting that with respect to a

4   smaller category of information that's described in paragraph

5   2.4 of their proposed amendment.

6           MR. SAVERI:  Right.  And what's kind of a head

7   scratcher to me, Your Honor, is that this is material that we

8   aren't asking for.  We -- and we just had a dialogue about

9   whether the other kind of personal and private information

10  regarding the medical conditions of the class members is

11  relevant.

12          THE COURT:  Right, but you're asking for the content of

13  all contract files of fighters.  And some of those contract

14  files may contain information, such as we've been describing,

15  about medical or other personal reasons why fighters weren't

16  fighting or why their contracts were extended during certain

17  periods of time.  And if I understand correctly, that is what

18  they are attempting to protect.

19          MR. SAVERI:  And so, Your Honor, to the extent that

20  this material is going to be produced, we don't think we've

21  asked for it and it may be contained in these files.  We

22  certainly want that -- we think that information is very

23  private, confidential to our fighters, and we want to have that

24  protected.  I just want to make it very clear that we -- by

25  having this discussion, we're not agreeing that that medical --

------ TRANSCRIBED FROM DIGITAL RECORDING ------

1   those medical records, I'm sorry, are relevant or probative of

2   anything and we haven't asked for them, but we certainly want

3   that material protected.

4           And I don't want anything about this to be taken to

5   indicate that we are agreeing that that's an issue that's

6   relevant or germane in the case.  We haven't raised it.

7           THE COURT:  Your clients understand that they were

8   bound by the terms of the protective order that's in place?

9           MR. SAVERI:  Absolutely, Your Honor.  And I hope the

10  same is true for Zuffa, so...

11          THE COURT:  Mr. Williams?

12          MR. WILLIAMS:  Yes, Your Honor.  I think you get it.

13  With all due respect to Mr. Saveri, this is a bit of a head

14  scratcher for us because all we're seeking to do is exactly what

15  he just said at the end of his presentation.

16          THE COURT:  Why doesn't the existing protective order

17  cover that?  Because why is it entitled to the extra layer of

18  attorneys'-eyes-only protection when everybody is bound by a

19  protective order that limits the disclosure for any purpose that

20  is not legitimate to this litigation?

21          MR. WILLIAMS:  Thank you, Your Honor.  Fair question

22  and let me answer it.

23          They represent six named plaintiffs.  There's a

24  potential punitive class out there of however many hundreds of

25  potential fighters.  We're producing all of the fighter files.

───────── TRANSCRIBED FROM DIGITAL RECORDING ─────────

1   Some of those fighters are still active fighters.  Some of those

2   fighters may be competing with one another, potentially.

3           Our position is is that one fighter -- setting aside

4   the six named plaintiffs, one member in the punitive class

5   shouldn't necessarily be permitted to see the medical records

6   depicting an injury of another fighter they may be competing

7   against.

8           So our position for having it to be attorneys' eyes

9   only is so that plaintiffs' counsel can see it and have the

10  information.  Yet, it's not disseminated to the wider group of

11  potential parties out there.  That's the reason for the higher

12  designation.

13          And --

14          THE COURT:  So because the punitive class are

15  competitors with one another you're concerned that the six named

16  plaintiffs may use the information that's contained to the

17  competitive disadvantage of a punitive class member?

18          MR. WILLIAMS:  Well, Your Honor, whether it's the six

19  or the other members of the punitive -- I presume other people

20  are going to be --

21          THE COURT:  Right now we don't have an issue with

22  respect to -- of class.

23          MR. WILLIAMS:  Right.

24          THE COURT:  We have an issue with respect to six

25  individuals.

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. WILLIAMS:  Right.  But, Your Honor, the discovery

2   isn't going to be limited to just those six individuals.  So to

3   the extent other people are deposed, I don't know how, you know,

4   portions of fighters' files are going to be used when

5   questioning other potential members in the class.  And so this

6   really is to protect them, as we've tried to emphasize.  It's

7   not -- we're not looking to revisit the issue with respect to

8   Zuffa's corporate files or those documents.  And we're not even

9   looking to revisit it because we want to dump a bunch of medical

10  records into this case.  What we're talking about --

11         THE COURT:  You may have a contract extension document

12  that says:  This will acknowledge we received your doctor's

13  reports indicating you have blank, blank, and blank --

14         MR. WILLIAMS:  Bingo.

15         THE COURT:  -- and, therefore, we're --

16         MR. WILLIAMS:  Exactly.  It is a very narrow category,

17  Your Honor.

18         THE COURT:  As they explained the narrow category of

19  information they are seeking protection for, do you really have

20  a problem with that, given your -- both sides want to protect

21  the medical privacy of your punitive class?

22         MR. SAVERI:  Well, Your Honor, we don't have -- we

23  don't plan to share this kind of information, spread it amongst

24  these different groups.  We're perfectly content and we think

25  it's appropriate enough to share the information that we were

1  just discussing.  So we don't have a problem with that

2  provision.  Frankly, Your Honor, we hope they don't produce it

3  to us and that we don't -- they don't create that problem.

4          THE COURT:  Okay.  But the problem is if it's contained

5  in a document, they either have to redact it and then give you a

6  privilege log or just give it to you with an

7  attorneys'-eyes-only provision.

8          MR. SAVERI:  Your Honor, and there is -- look, my view

9  is whenever there's an issue that -- where the production calls

10 for confidential financial information or medical information,

11 it's always a challenge to deal with that in the discovery

12 context.  And attorneys in these cases all the time have to

13 incur some additional cost to protect the -- to afford that

14 protection to the people whose interest would potentially be

15 violated by that disclosure.

16         It's not necessarily an answer to say, Well, look, the

17 protective order takes care of the problem.  We'd encourage them

18 not to -- to produce that medical information.  Frankly, if they

19 could redact it from the files, I think that would be a better

20 course of action.  If they don't want to do that, we'll

21 certainly not -- and they'll give it to us and make it our

22 problem, we'll certainly not distribute that unnecessarily or

23 provide other people we represent with private information of

24 someone else.  That's not the way we are going to conduct this

25 litigation.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          THE COURT:  And I believe you, but I get a rotating

2   list of different people that are in here from time to time.

3   And I've already had problems with misunderstandings about what

4   you did or didn't agree to.  So I'm going to allow them to have

5   attorneys'-eyes-only protection for that category of information

6   to eliminate the additional cost and expense of having to redact

7   relevant discoverable materials or portions of confidential

8   medical, but I do expect that any such designation will be very

9   circumspect.

10          MR. WILLIAMS:  Yes, Your Honor.

11          MR. SAVERI:  Thank you, Your Honor.

12          THE COURT:  And, of course, you're going to have the

13   reciprocal opportunity yourself.

14          MR. SAVERI:  Absolutely, Your Honor.

15          THE COURT:  Okay.  I'll see you back on February 23rd

16   at 1:45, unless folks have a problem or conflict with that date.

17   And then I'll hear from you, Mr. Cove.

18          MR. COVE:  Your Honor, we had the additional

19   outstanding issue of RFPs No. 2 and 15 which related to non-MMA

20   compensation generally.  I'm not sure if you ruled on that.

21          THE COURT:  I did see that and I thought that was -- I

22   didn't specifically address that, but I am not going to require

23   the plaintiffs to produce non-MMA or non-combat sports-related

24   activity materials.  I thought that was understood in the

25   limitations that I imposed with respect to the other categories.

 1           MR. COVE:  Okay.  So they would be all --

 2           THE COURT:  If they're related --

 3           MR. COVE:  -- combat sports.

 4           THE COURT:  Correct.  And as they've indicated, if they

 5   earn income because they're a well-known UFC fighter, and

 6   they've agreed to produce those materials and they will, but

 7   they're not going to produce everything about any -- you know,

 8   whether they worked at some other unrelated entity or individual

 9   or had an income or daddy left them a million dollars and they

10   manage an account and that type of thing.

11           MR. COVE:  Understood, Your Honor.

12           THE COURT:  All right.  So they've agreed that if

13   they've generated income and, you know, people are buying their

14   DVDs or going to their workout video because they're a star in

15   the UFC, that's combat related and that is MMA-generated income.

16   But if it is completely unrelated, they don't have to give you

17   everything about every dime they've ever earned from whatever

18   source for the period of time you're asking.

19           MR. COVE:  Understood, Your Honor.  Thank you.

20           THE COURT:  Yep.

21           MR. SAVERI:  We agree, Your Honor.  Thank you.

22           THE COURT:  I thought you did.  Okay.  All right.

23           2-23 at 1:45 work for you, gentlemen and lady?

24           MR. COVE:  Yes, Your Honor.

25           THE COURT:  All right.  We'll see you back then.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   Please file a joint status report the Friday before so that I

2   can be prepared to resolve your disputes as we go.  Thank you,

3   counsel.

4            MR. DELL'ANGELO:  Thank you, Your Honor.

5            MR. COVE:  Thank you, Your Honor.

6            MR. SAVERI:  Thank you, Your Honor.

7            (Whereupon the proceedings concluded at 3:30:35 p.m.)

8                           --oOo--

9        I, Patricia L. Ganci, court-approved transcriber, certify

10  that the foregoing is a correct transcript transcribed from the

11  official electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14       /s/ PATRICIA L. GANCI        FEBRUARY 2, 2016
            Patricia L. Ganci                 Date
15

16

17

18

19

20

21

22

23

24

25