WILLIAM A. ISAACSON (Admitted *Pro Hac Vice*)
(wisaacson@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW, Washington, DC 20015
Telephone: (202) 237-2727; Fax: (202) 237-6131

JOHN F. COVE, JR (Admitted *Pro Hac Vice*)
(jcove@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000; Fax: (510) 874-1460

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01045-RFB-(PAL) |
| Plaintiffs, | **JOINT STATUS REPORT** |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendant. | |

The parties in the above-captioned matter have met and conferred and submit the following Joint Status Report.

**I.       Outstanding Motions (Joint Statement)**

There are no outstanding motions.

**II.      Discovery Progress**

**A.  Plaintiffs' Statement**

**1. Documents Produced to Date**

Plaintiffs have continued to engage Zuffa in attempting to make progress in discovery. The parties regularly participated in meet and confer teleconferences concerning the parties' Requests for Production of Documents ("RFPs"). Since the last status conference, Defendant has made two productions: (1)12,429 documents on February 9, 2016 and (2) an additional 13,774 documents on February 18, 2016. These productions primarily comprise a set of Promotional and Ancillary Rights, Bout, and Merchandise Agreements as well as contract extension and termination letters. Thus, in the more than three months since the November status conference where the relevant time period was established and the scope of the production of contracts from Defendant's electronic and hardcopy contract files was ordered, Defendant has produced only 44,526 documents, almost entirely confined to centrally maintained fighter contracts.

At the January 26, 2016, Status and Dispute Resolution Conference the Court resolved a number of disputed issues regarding Plaintiffs' obligation to respond to Defendant's Request for Production, including the applicable timeframe. Plaintiffs are now processing the Plaintiffs' documents as part of their efforts to review and produce them to Defendant.

**B.  Zuffa's Statement**

**1.     Zuffa's Progress**

Since the last Status Conference on January 26, Zuffa has made two more productions of documents from the electronic and hard copy fighter files that Plaintiffs identified as a priority. On February 5, Zuffa produced to Plaintiffs 12,429 documents comprising 159,999 pages from

1

the electronic fighter files.  On February 18, Zuffa made another production to Plaintiffs of 13,774 documents consisting of 102,970 pages.  This production consisted of documents from the hard copy fighter files.  To date, Zuffa has produced over 150,000 documents comprising over 984,000 pages.  Zuffa is continuing to review documents and will continue the process of rolling productions.

Document collection from Zuffa's custodians is nearly complete, and Zuffa anticipates completing its collection of the remaining custodial and non-custodial documents during the week of February 22, 2016.  Zuffa's vendors are continuing to process collected devices and scan and OCR hard copy documents.

### 2.     Plaintiffs' Progress

Plaintiffs have yet to produce any documents to Zuffa in response to Zuffa's Requests for Production from October 6, 2015.

### III.    <u>Search Term Meet and Confer</u>

#### A. Zuffa's Statement

On December 21, 2015, Zuffa proposed an initial list of search terms for discussion with Plaintiffs.  Plaintiffs' first response was not to suggest additional terms, but to reject the use of search terms altogether:  "Plaintiffs believe that search terms are not capable of capturing a substantial proportion of responsive documents and, thus, are not appropriate, absent some limited exceptions."  Jan. 11, 2016 Letter from M. Dell'Angelo.

On January 19, 2016, 3 days before the last Joint Status Report was due, Plaintiffs for the first time provided a proposal for search terms.  Their proposal contained over 2,500 separate terms, including the last names, nicknames and many of the first names of all UFC fighters, as well as their managers or agents, and the names of most or all sponsors, venues, media companies, or broadcasters that have done business with Zuffa in North America.  One day before the Joint Status Report was due, Plaintiffs' revised their search term proposal to remove a few of the most common names that Zuffa had identified as particularly egregious ("Steve," "Brian," and

"Joe,"), but they left in many others.  Plaintiffs' revised list still consisted of over 2,300 terms, most without limiters.  Dkt. 213-A.

After agreeing on a schedule, the parties exchanged revised sets of search terms on February 5, and have exchanged several drafts and met and conferred several times since then. After each exchange, Zuffa's vendor compiled statistics showing the number of single documents that contain or are "hit" by each search term or string (collectively, "search terms"); the number of documents "hit" by the terms with families (i.e., the total number of documents that would have to be reviewed in connection with that term); and the list of unique documents, that is the number of documents that contain that one term and no other search term.[1]

In addition, at Plaintiffs' request, Zuffa reviewed and produced a random sample of 1,500 documents not captured by either party's search terms, which the parties analyzed in an attempt to identify and cure issues with the search term proposals.  In response to a subsequent request by Plaintiffs, Zuffa will produce 800 more sample documents shortly.

In order to minimize the differences between its and Plaintiffs' proposals, Zuffa substantially expanded its search term list by using Plaintiffs' previous proposal to the Court as its starting point.  Zuffa accepted many of Plaintiffs' proposed terms without alteration.  For example, Zuffa accepted nearly all the terms related to Zuffa's competitors, ensuring that any mention of a competitor will be caught.  In addition, Zuffa agreed to run without limiters many of the broader terms relating to particular subjects that Plaintiffs proposed (e.g., "exclusiv%", "competit%", "co-promotion", "extend%" or "extension%").  At this point, the parties' search term proposals both include 392 of the same terms.  When run across Zuffa's set of custodial emails, those 392 search terms capture a population of 435,668 reviewable documents or 30% of the total universe of e-mail documents.  The addition of Zuffa's search terms brings the total reviewable population to 534,577 documents or 37% of the total universe of e-mail documents.

---

[1] This unique document count is different for both parties' lists because it is dependent on the other terms on a party's list.

JOINT STATUS REPORT

This hit rate is in the range one typically sees in a search term exercise. Declaration of Helen Bergman Moure, ("Moure Decl.") at ¶ 19.

The parties continue to diverge,[2] however, on Plaintiffs' proposal to use as standalone search terms close to 2,000 names or nicknames of fighters (e.g., "Patrick" or "Smith" or "Answer"), venues (e.g., "MGM" or "Palms"), sponsors (e.g., "Microsoft" or "Nike"), and broadcasters (e.g., "Fox" or "Spike") without modifiers to connect these terms to any issues involved in the case.[3] As explained more fully below, for these terms, Zuffa proposes to use search strings and limiters that connect the names to terms that reflect the issues in the case and the RFPs to which they relate.

Finally, Plaintiffs' current proposal continues to use some of the most unreasonably overbroad and untethered terms from its previous proposal such as "google," "twitter," and "YouTube." These broad terms are frequently used in a variety of contexts having nothing to do with this antitrust case and are inappropriate as search terms. Any relevant documents containing these terms will be identified through the use of other search terms that are more firmly grounded in this case.

**B. Plaintiffs' Statement**

Since the last status conference, the Parties also exchanged updated search term proposals. On February 4, 2016, the parties exchanged their first revised lists. Plaintiffs proposed 2,349 terms that were similar to those previously proposed with modifications designed to address some of the issues Defendant identified in the last Joint Status Report. Although Defendant previously took issue with the volume of Plaintiffs' search term proposal, Defendant's February 4 proposal included 2,435 search terms.

---

[2] Zuffa's statement addresses the most important conceptual disagreements over search terms and does not attempt to detail every disagreement that may exist.

[3] Plaintiffs have agreed to certain limiters with regard to a few terms or names, for example, they have agreed to eliminate as a standalone term "May," which is the name of a fighter (Jack May) but also the name of a month and a word commonly used in other contexts. But Plaintiffs' approach of using most names or nicknames as standalone terms has not changed significantly from their original proposal.

JOINT STATUS REPORT

Defendant ran both parties' search terms against a set of 1.4 million email documents and, on February 8, 2016 provided a "hit report." The hit report showed the number of direct hits for each term, the number of document families where at least one document contained the search term, and the number of documents for which each term was a "unique hit," *i.e.*, where the term was the only term to hit the document. Following each iteration of hit results, Plaintiffs proposed changes to Plaintiffs' search term list based on the data provided in the hit report. After the third iteration, Plaintiffs' search term list of 2,625 terms returned 1,091,530 direct hits representing 75.75% of the overall production. Defendant's third iteration proposal of 18,172 terms returned 420,015 direct hits representing 29.15% of the production.

On February 15, 2016, Defendant provided a sample of 1,500 documents which Defendant randomly selected from the universe of documents that Defendant determined were not "hit" by search terms. Based on a review of the documents contained in the sample, Plaintiffs proposed additional filtering techniques to identify non-responsive documents in the "hit" set on February 16, 2016.

## IV.   The Use of Search Terms

### A.  Zuffa's Statement

There are a total of 392 search terms that appear on both parties search term proposals ("the non-disputed terms").  These 392 terms hit on approximately 435,668 documents, about 30% of the corpus of email documents that were subject to the parties' search term testing.[4] Exhibit A.  Zuffa's search terms go one step further, adding approximately another 100,000 documents to the reviewable population, for a total of approximately 37% of the email document corpus.  Exhibit B (by hits), Exhibit C (alphabetical) Zuffa believes that its proposal strikes the proper balance between identifying responsive documents and reducing the burden of potentially

---

[4] Because some of the non-email ESI, such as computer hard drives, had not been fully processed and de-duplicated, the parties' terms were only tested across the approximately 1.4 million de-duplicated, date-restricted email documents.  Thus, the hits counts and related data presented in this report are based on the subset of 1.4 million documents from the email server, and not all the ESI that will need to be reviewed in this case.

reviewing millions of non-responsive or irrelevant documents.  To date, Plaintiffs have provided no evidence that Zuffa's carefully crafted search terms are under-inclusive and do not capture relevant documents responsive to Plaintiffs' RFPs.

While the Plaintiffs have agreed to some concessions in the meet and confer process, they have with few exceptions continued to insist on using the first, last and nicknames of every fighter and agent and the names of every venue, sponsor, merchandiser or broadcaster as standalone search terms, regardless of any connection to the issues in the case.  This has resulted in a search term list that would require review of approximately 85.7% of the document corpus.[5] Exhibit D (by hits), Exhibit E (alphabetical).  The incremental cost of searching the additional documents (the difference between Zuffa's proposal and Plaintiffs' proposal) is approximately $1.4 million just for the documents from the email server alone, not counting additional ESI that needs to reviewed, such as the custodians' PC drives or the documents on Zuffa's shared drives and all the material that is being reviewed without the benefit of search terms.  This additional cost is unreasonable and disproportionate in light of the other discovery costs that Zuffa is absorbing and the minimal value of these other documents in relation to the documents that contain Zuffa's proposed search terms.  In short, Plaintiffs' proposal is not the appropriate place to start the difficult and expensive task of ESI review.[6]

---

[5] In their section, Plaintiffs refer to the "1,091,713 direct hits (representing 75.75% of the overall production [sic])" that their search terms hit on.  This metric does not take into account the reviewable population (direct hits plus families) of documents that Plaintiffs' search terms hit on, which is 1,235,677 documents out of the test population of 1.44 million, or 85% of the test population.  Plaintiffs have not agreed to allow Zuffa to review only direct hits and exclude the additional family members.

[6] In their section, Plaintiffs imply that Zuffa did not want to pursue non-traditional methods of searching ESI, including linguistic review.  The Parties' previous joint statement on this issue accurately describes the process as follows: "The parties also had a joint discussion with a vendor specializing in another alternative search method – linguistic review.  Plaintiffs raised concerns regarding the reliability of the vendor's linguistic review methodologies and capabilities, but remain open to evaluating alternative linguistic review vendors.  Zuffa believes that such concerns can be addressed, but also believes that an appropriate agreement on custodians, search parameters, and search terms may obviate the need for alternative search methods.  At this point, the parties believe it would be most productive to focus on reaching agreement on custodians,

Therefore, Zuffa respectfully requests that the Court order review of this ESI with the search terms not in dispute and the terms proposed by Zuffa, along with any other terms the parties can promptly agree upon.  Plaintiffs are free to suggest other terms they feel are necessary, and if Zuffa's proposed search terms prove inadequate, they can seek relief from the Court at the appropriate time.

In addition, Plaintiffs have served RFPs that are overbroad and unduly burdensome because, on their face, they request "all documents" related to expansive subjects, like venues and sponsors, and seek documents that are not tethered to the issues in this case and have proposed no way to limit these Requests with their search terms which include the name of every venue, sponsor, and the like.  As alternative relief, Zuffa requests that the Court strike RFPs 21, 27, 33, 35 and 37 as overbroad and unduly burdensome because they are far broader than appropriate considering the Complaint and the needs of the case.

**1. The Universe of Documents**

For 26 of the 59 Requests for Production that Plaintiffs have served, Zuffa proposes to use search terms across two categories of documents:  (1) emails and other ESI from its custodians, and (2) non-custodial ESI from Zuffa's network drives.  The de-duplicated, date-restricted custodial email documents comprise over 1.4 million documents.  The other custodial and non-custodial ESI, such as computer hard drives, user documents stored on the network drive, and network shared drives comprise at least another 500,000 documents (for a total searchable document corpus of almost 2 million documents).[7]  This number will increase once the computer hard drives from the custodians who Plaintiffs added in January complete processing.  Reviewing

---

search terms, and other search parameters, while remaining open to further discussion on the usefulness of predictive coding."  Sept. 25, 2015 Joint Status Report, Dkt. 185 at 16.

[7] Because some of the non-email ESI, such as computer hard drives, had not been fully processed and de-duplicated, the parties' terms were only tested across the approximately 1.4 million de-duplicated, date-restricted email documents.  Thus, the hits counts and related data presented in this report are based on the subset of 1.4 million documents from the email server, and not all the ESI that will need to be reviewed in this case.  Plaintiffs' statement that 1.44 million documents is the "entire universe of documents" is not true.

JOINT STATUS REPORT

all or even a substantial percentage of this universe of electronic documents without the use of search terms would be prohibitively time consuming and expensive and disproportionate to the needs of the case.[8]

## 2. Zuffa's Approach for Identifying Documents Relating to Fighters Is Reasonable

Plaintiffs' Requests for Production do not call for production of every document mentioning or related to any UFC fighter, and, to the extent they do, they are overbroad. But Plaintiffs' proposed search terms effectively expand the RFPs to include every document that mentions a fighter in any context. Many documents that may contain a fighter's name are not relevant or responsive to Plaintiffs' Requests, such as documents regarding hotel arrangements and event logistics or the myriad materials and documents that mention the fighter in describing or publicizing the fighter's bout or event. In order to limit review of documents to those relevant to issues in the case, Zuffa's proposes a series of standalone terms or strings that touch upon subjects potentially important to the case. Examples include "exclusiv%," "extend%" or "extension%," "grant," "new deal," "fighter w/2 pay," "right% w/2 match," among many others. All non-privileged, responsive documents identified by these terms would be produced. Further, in order to identify additional documents connected with specific fighters, Zuffa has taken Plaintiffs' list of names of UFC fighters and proposes proximity searches of these names to terms relevant in this case. The use of proximity searches is a common methodology of honing search terms to cull responsive documents. Moure Decl. ¶ 23. For example, taking Plaintiffs' proposal to run "Holly," a fighter name, Zuffa proposes the following limiter: Holly w/5 (contract% or agreement% or compensation or pay% or right% or purse% or LOA or royalty or offer% or negotia% or bout or match).[9] Zuffa proposes to run the same string limiter for every fighter and

---

[8] Plaintiffs' reference to the range of data being reduced from 3 petabytes is also grossly misleading. Plaintiffs' RFP 52 called for "All content posted to or deleted from any website or Social Media." Zuffa estimated that its data repository, including its video libraries that are or have been posted to its sites and that it maintains on its servers, comprised about 3 petabytes. This figure has nothing to do with the custodial ESI at issue here.

[9] Zuffa is running the names of all current and former Plaintiffs without limiters.

manager name Plaintiffs have proposed.  This approach balloons the number of search terms used to approximately 18,000, which Plaintiffs mock, but the high number is the result of Zuffa agreeing to almost every name proposed by Plaintiffs, coupled with limiters.  Zuffa's combination of broad but relevant standalone search terms and subject matter specific connectors tied to fighter names is a reasonable approach to identifying the documents responsive to Plaintiffs' Requests.

In contrast, Plaintiffs' approach is vastly overbroad and disproportionate to the needs of the case.  It is not hard to see why including a fighter's name or nickname as a search term is likely to cause problems. *See Brown v. Tellermate Holdings, Ltd.*, No. 2:11-cv-1122, 2014 WL 2987051, at *13 (S.D. Ohio July 1, 2014) ("Because some of the names and nicknames used are very common (e.g. 'Mike'), the production included a very large number of irrelevant and nonresponsive documents").  First, even if running a name as a search term would only pull up documents related to that fighter, as mentioned above, many documents containing a fighter's name are not relevant or responsive.[10]  Indeed, in light of the extensive list of terms that Zuffa has agreed to run, including but not limited to the proximity connectors, and Zuffa's agreement to review the hard copy and electronic fighter files without the use of search terms, it is difficult to imagine that a meaningful document that mentioned, for example, "Jones" would escape review.[11]  Second, many of the fighters' names are common names that are also held by Zuffa

---

[10] The following is an example.  Plaintiffs include the term "Jones" as search term, which would require a review of 141,350 documents with family members.  Zuffa's proposal, on the other hand, runs the term "Jones w/5 (agreement% or bout or compensation or contract or LOA or match or negotia% or offer% or pay% or purse% or right% or royalty)".  Zuffa's proximity searches narrow the reviewable population to those documents relating to Jones and potentially relevant issues in this case.  The difference in volume when the term is narrowed to hit only on documents responsive to the issues in the case is substantial.  Zuffa's terms hit on a reviewable population of 10,540 documents.  To be clear, if there were other documents containing the term "Jones" that also included one or more of Zuffa's proposed terms, such as "exclus%" or "extend%" or "competit%", those documents would still be reviewed.  And, all documents in Jones' fighter file are being reviewed without search term culling.  Only documents that contained just "Jones" without either a proximity connector or another search term would be excluded.

[11] As discussed above, Plaintiffs' statement that there are only 3,329 unique hits for the terms "Johnson", "Jones", "Jordan", "Miller" and "Smith" mischaracterizes the burden associated with

employees or third-parties that have nothing to do with the issues in the case, but whose documents will be captured by Plaintiffs' term regardless.  The use of nicknames as search terms also causes problems.  Many of the nicknames are common words that are used in a variety of contexts having nothing to do with the fighter, for example "Answer" and "Trouble" and "Kid." By connecting fighter names with relevant terms, Zuffa's proposal identifies documents that (a) relate to the fighter as opposed to someone else by that name and (b) touch upon concepts relevant to the case.

Plaintiffs' arguments rely heavily on supposedly low "unique hit" counts associated with particular terms.  But using unique hit counts to evaluate burden is not particularly helpful when the search terms are so numerous and broad that they hit upon 85% of the corpus because the vast majority of documents contain multiple terms, and the number of unique documents that contain only one term and not on any others will necessarily be low.  Moure Decl. ¶ 16.  To use a common example, because Plaintiffs have listed nearly every fighter's name without limiters and every bout involves two fighters, every document that mentions any bout (e.g., Smith vs. Jones) in any context will be captured regardless of any connection to any issue in the case, but none of them will involve a unique hit.  Also, the unique document count number does not include family members and thus does not encompass the total reviewable population of documents resulting from the application of that term.  *Id.*  In addition, the unique document count is misleading because it does not represent the total number of documents that would be removed from the reviewable population if that term were excluded.  Since unique documents do not include family members, many of these "unique" documents would remain in the review set because a different search term will hit on one of their family members.  *Id.*  For those reasons, discussing the burden of search terms based on "unique" hits is not particularly informative.

---

including these 5 terms.  The only appropriate way to assess how many documents will be reviewed as a result of the inclusion of a search term is to see how many documents with family members are hit by a specific term.  With family members, "Johnson" hits on 128,258 documents, "Jones" hits on 141,350 documents, "Jordan" hits on 58,721 documents, "Miller" hits on 92,331 documents and "Smith" hits on 98,785 documents.

JOINT STATUS REPORT

### 3. Zuffa's Approach for Identifying Documents Relating to Venues, Sponsors, Broadcasters and Merchandisers Is Reasonable

Zuffa proposes the same approach with regard to sponsors, venues, broadcasters, and merchandisers.  A set of search terms focused on the issues in this case are necessary not only to identify responsive documents efficiently but also to bring Plaintiffs' RFPs within the proper scope of discovery.  *Russo v. Lopez*, No. 2:11-cv-00284, 2012 WL 2576208 at *3 (D. Nev. July 3, 2012) (Under Rule 26(b)(1), "the scope of discovery under the federal rules is not boundless, the requests must be ***relevant*** and cannot be unreasonably cumulative, duplicative, or unnecessarily burdensome in light of their benefit") (emphasis added).

Plaintiffs' document requests regarding venues, sponsors, broadcasters and merchandisers are substantially broader than the allegations in the Complaint.[12]   For example, the Complaint alleges that Zuffa has locked up "key" venues in the United States.  Dkt. 208, ¶¶ 108, 121-22.

---

[12] Dkt. 107-1, RFP 27: "All Documents referencing or relating to agreements (and any amendments thereto) regarding venues for professional MMA bouts executed between You and any venue or owner, operator, agent or manager of any venue.  The word venue as used here includes without limitation stadiums, arenas, auditoriums, gymnasiums, television studios and any other facilities utilized for the purposes of holding live professional MMA events, whether promoted by You or another promoter.  Responsive Documents include, without limitation, communications and/or negotiations between You and any venue or owner, operator, agent, or manager of any venue, draft agreements, proposals, presentations, and internal communications, memoranda, spreadsheets and analyses referencing or relating to such negotiation, regardless of whether the negotiation resulted in an executed agreement."
RFP 33:  "All Documents referencing or relating to agreements (and any amendments thereto) entered into by You and any broadcaster of professional MMA events (including, e.g., cable, television, internet, PPV and online distribution), such as, without limitation, any communications and/or negotiations between You and any broadcaster of any professional MMA events (including PPV and online distribution), including negotiations which did not result in an agreement."
RFP 35:  "All Documents referencing or relating to agreements (and any amendments thereto) entered into by You and any third party merchandisers or retailers selling MMA related merchandise, including, without limitation, all such agreements (and amendments thereto), all communications and negotiations with any third party merchandisers or retailers selling MMA related merchandise, including negotiations which did not result in an agreement."
RFP 37:  "All Documents referencing or relating to agreements (and any amendments thereto) executed between You and any sponsors of the UFC or of the MMA Fighters under contract with the UFC, including, without limitation, Communications and/or negotiations between You and any sponsors of the UFC or of the MMA Fighters under contract with the UFC, including negotiations which did not result in an agreement."

---

11

However, rather than tailoring their document request to this allegation, Plaintiffs have requested all documents relating to any agreement with any venue, including all communications with any agent of the venue relating to that agreement (i.e., including logistical documents regarding the set-up and take down and delivery of items, signage, security, insurance, seating, and ticket holds and promotional materials, etc.). Dkt. 107-1, RFP 27. The plain language of their Request is far broader than the allegations in the Complaint and thus seeks documents that will not lead to the discovery of admissible evidence.

Plaintiffs' offers to "narrow" this Request do not ease the burden on Zuffa. For example, Plaintiffs offered to limit the scope of this request to venues in North America, i.e., to narrow their Request to the scope of their alleged geographic market. Dkt. 199 at 28. Since the Complaint does not (and could not) allege that Zuffa foreclosed competitors from venues on a worldwide basis, this is hardly a meaningful compromise. Plaintiffs have also stated that they are not interested in documents, for example, regarding the routine logistics of events or insurance or security. But Plaintiffs' proposed search terms which only use the name of the venue (such as "MGM", "Palms", and "SAP Center") without any connection to the RFPs or the relevant issues in the case are certain to pull the documents Plaintiffs claim they do not seek into the set of documents that Zuffa must review. In addition, since promotional materials and other documents relating to an event typically contain the name of the venue (e.g., "UFC 151 at Mandalay Bay"), all documents mentioning an event would be swept in. Thus, without proximity searches, all these documents would be pulled into the review, no matter how irrelevant to Plaintiffs' allegation that venues were foreclosed. Thus, neither Plaintiffs' so-called "narrowing" of their Request nor their search terms ease the burden on Zuffa. At best, Plaintiffs have indicated the sorts of documents they <u>want to receive</u> as responsive to their Request but their search terms have not narrowed the number of documents that Zuffa <u>must review</u> in order to identify the responsive documents – the burden lies in the latter. This same problem exists in Plaintiffs' Requests and search terms regarding sponsors, broadcasters and merchandisers. Dkt. 107-1, RFPs 33, 35 and 37.

To address this problem, Zuffa proposes a series of search terms and strings that capture both broad relevant issues with regards to venues, sponsors, broadcasters and merchandisers combined with terms designed to cull responsive documents relating to specific third parties themselves.  For issue-based search terms, Zuffa proposes terms like "exclusiv%"; "venue w/5 (hold or agreement% or contract% or deal% or revenue or income or license)"; "(key or prime) w/2 venue"; "(lock or hold or reserve) w/5 date."  Zuffa also proposes a series of search strings comprised of every venue that Plaintiffs have listed with a series of modifiers for each relating to contracts, terms, and exclusivity – the areas that have been put at issue by the Complaint.  For example, Zuffa proposes to run "MGM w/5 (contract% or agreement% or term% or negotia%) and MGM w/10 (lock% or hold% or reserv%)."  Zuffa believes that using these terms will allow it to identify the documents responsive to Plaintiffs' Requests while minimizing the burden of reviewing the documents that Plaintiffs concede are not relevant.  Zuffa's proposal uses a similar approach in regards to documents regarding sponsors, broadcasters and merchandisers.

Plaintiffs complain that for some venues or sponsors Zuffa's limiters return no hits whereas their broader terms, i.e., the name of the sponsor, contained hits.  But Zuffa's limiters are working precisely as they are supposed to by weeding out nonresponsive documents that only contain the name of a sponsor and no indication of relevance to the case.  Since the same proximity limiters that return zero hits for some sponsors and venues return hits for other sponsors and venues, it indicates that Zuffa's limiters are making meaningful distinctions.  Moure Decl. ¶ 45.  Further, even under Plaintiffs' overbroad approach, their search terms for certain sponsors they note, such as "Dead Game," and "Champion Nutrition" only yield a few documents that mention them at all.  Plaintiffs' Complaint alleges that Zuffa has locked up "key" sponsors and thereby foreclosed competition.  If a sponsor was mentioned by name only a few times in the 1.4 million email documents, the likelihood that a document mentioning only that sponsor's name and no other relevant terms will provide important evidence of foreclosure of key sponsors in support of a monopolization claim is minimal.

As alternative relief, to the extent that the Court does not adopt Zuffa's terms, Zuffa asks the Court to strike Requests 21, 27, 33, 35 and 37 as overbroad and unduly burdensome because they are far broader than appropriate considering the Complaint and the needs of the case.[13]

### 4. Zuffa's Search Term Proposal Meets the Goal of Identifying Relevant Documents While Excluding Irrelevant and Nonresponsive Documents From Review

Plaintiffs' suggestion that Zuffa did not do adequate investigation in crafting its search terms is incorrect. Counsel interviewed employees and reviewed and analyzed documents that have been collected, and carefully considered usage within the company and the industry, as well as the allegations of the Complaint in proposing terms. To name a few examples, Zuffa suggested the term "LOA" as a limiter in relation to the fighter names, because these "letters of agreement" are used in relation to fighters and consistently referred to by their acronym. Similarly, Zuffa proposed terms that do not appear on Plaintiffs' current list, such as "new deal%" or "fight deal%," which hit on over 8,000 documents with family members, because its investigation showed that company personnel frequently used these phrases in email about contractual terms, i.e., they have a high likelihood of precision. Moreover, before proposing search terms, Zuffa carefully considered the types of documents that would not be well-suited to search term winnowing in this case, and agreed to review such documents without the use of search terms. For example, Zuffa proposed that it would review the custodial cell phone text messages without the use of search terms in recognition that such text messages, though voluminous, are likely to contain typographical errors, shorthand, and linguistic anomalies that may not be conducive to search term winnowing. Zuffa also agreed to review hard copy documents in a linear fashion, recognizing that the limitations of OCR may make search terms

---

[13] In the final substantive exchange of drafts of the Joint Status Report today, Plaintiffs made specific proposals to narrow RFPs 27, 33, 35 and 37. Zuffa will review Plaintiffs' revised Requests and be prepared to discuss them at the hearing. As of 2pm today, Zuffa had not received from Plaintiffs a revised version of Mr. Kellner's declaration and thus has not had time to review or respond to his latest draft and accordingly reserves all rights.

less effective on hard copy documents than on ESI.[14]  This decision to pull certain categories of documents from the proposed universe of documents to apply search terms demonstrates a concerted effort on Zuffa's part to identify relevant document that might otherwise be missed.

Zuffa's proposed search terms hit on 534,577 of the email documents searched, approximately 37% of the total email volume.  A hit rate in this percentage range, rather than the 85% that Plaintiffs propose, is in the range one would expect from a search term process.  Moure Decl. ¶ 19.  Certainly a hit rate of less than 50% is to be expected.  *Cf. Progressive Cas. Ins. Co. v. Delaney*, No. 2:11-cv-00678-LRH, 2014 WL 3563467, at *3 (D. Nev. July 18, 2014) (the parties agreed upon search terms that hit on 565,000 of the 1.8 million document data set, a 31.3% hit percentage).  The terms with the highest hit rates on Zuffa's list are the ones that are likely to be most relevant to the issues in the case, for example, documents relating to contract terms ("exclusiv%," "ancillary w/5 right%," "extend%" or "extension%" and "venue w/5 hold"), the acquisition of competitors ("Pride" and "Strikef%") and general terms focused on the issues in the case ("competit%," "fighter w/2 pay," and "elite%").  In contrast, the terms with the highest hit rate on Plaintiffs' list are ones that are likely to include substantial amounts of irrelevant documents without some additional term connecting them to a disputed issue in the case, for example, "twitter," "facebook," and "hold%."

Zuffa estimates that the difference in costs between Zuffa's search term proposal and Plaintiffs' overbroad proposal is approximately $1.4 million, Moure Decl. ¶¶ 33-34, an expense that is far disproportionate to the minimal value of the possibility that relevant documents might be missed by Zuffa's comprehensive proposed search terms and the substantial numbers of documents Zuffa has already agreed to review linearly.  To be clear, this estimate is just the difference in the anticipated review costs on the email server part of the data.  No other discovery

---

[14] Zuffa has agreed to review linearly without the use of search terms:  (1) the hard copy and electronic fighter files, (2) hard copy venue, sponsor and broadcaster files, (3) hard copy corporate records, (5) financial files, (6) text messages sent to or from employees' phones, (7) direct private messages sent through social media, (8) all documents sent from scanner@ufc.com, as well as other targeted searches for specific documents responsive to Plaintiffs' Requests.

costs, which are already very burdensome, are included.  This substantial disparity in costs is one of the many reasons that Zuffa's proposal should be adopted in the first instance.

Search terms are designed to lead to efficiencies not only in the review process by narrowing the overall universe of documents to a more reasonable number but also by making it more likely that the documents in that universe are responsive.  Moure Decl. ¶ 15.  These goals cannot be met, however, when a set of overly broad search terms culls a large universe of documents with a large percentage of non-responsive documents within it.  Zuffa's proposal allows discovery to proceed in an iterative way – in the first instance, discovery can proceed with the review of hundreds of thousands of documents that hit on the carefully constructed set of search terms in Zuffa's proposal without incurring the additional costs to execute Plaintiffs' proposal.  After the production of documents, to the extent that the parties need to re-visit the inclusion of additional search terms to attempt to identify other categories of documents, they can do so on a specific and more well-informed basis.  Moure Decl. ¶ 18.

### 5. Plaintiffs Have Not Shown That Zuffa's Terms Are Under-Inclusive

In the last status report, Plaintiffs provided certain data points as to how many documents in the FTC production were identified by the parties' then-current search term lists, and concluded that Zuffa's terms were under-inclusive based upon their review of documents from the FTC production.  Given Zuffa's expanded list of search terms, Zuffa requested Plaintiffs provide relevant or responsive documents that it had identified from the FTC production that did not hit on its new search terms as an aid in understanding what, if anything, from its expanded terms was missing and potentially how it could be cured.  To date, Plaintiffs provided Zuffa with just a single example, ZUF-00033112, as an example of why Plaintiffs' proposed term of "hold%" was necessary and why Zuffa's proposed term of "hold% w/5 venue" was insufficient. The document, however, demonstrates that Zuffa's search terms are sufficient because that document "hits" on 2 other search terms that Zuffa has already agreed to include without any limiter ("exclusiv%" and "competit%").  In an effort to provide more assurances to Plaintiffs, however, Zuffa added additional terms "(lock or hold or reserv%) w/5 date" and "(lock% or

JOINT STATUS REPORT

hold% or reserv%) w/10 [every venue name]."[15]  To date, Plaintiffs have provided no documents from the FTC production that they believe are relevant that do not contain at least one of Zuffa's expanded search terms or are in the categories of documents that Zuffa has agreed to review without search terms.[16]

On the evening of February 17, Plaintiffs identified for the first time a document that included a screen shot image of a portion of an Excel spreadsheet, which, because it was an image, did not hit on either party's search terms.  This single document does not show that search terms are inappropriate.  First, Zuffa has already agreed to search the financial documents containing information such as this without the use of search terms, and spreadsheets containing this sort of data are among the documents that Zuffa is reviewing and has begun to produce.  Second, Zuffa has always been willing to discuss modifications of its proposed terms with Plaintiffs.  In order to address the issue presented in this document as well as potentially others, Zuffa will add three additional terms to its list:  "fighter w/5 comp," "athlete w/5 comp," "talent w/5 comp."  Applying this change captures this document in Zuffa's search terms.  Zuffa remains willing to discuss similar issues and examples.

Finally, Plaintiffs' argument that Zuffa has not established that Plaintiffs' proposal is burdensome because certain terms on Plaintiffs' list have low hit counts misses the point.  The cumulative burden of the entire list is the relevant metric.  The use of standalone names for every fighter, venue, sponsor, etc. is overbroad in relation to the allegations in the Complaint.  And

---

[15] By contrast, Plaintiffs' proposal to address the overbreadth of their search term hold% would not be effective.  Plaintiffs' proposed that for only the unique documents (i.e., the documents which contain the search hit "hold%" but no others) that Zuffa run the string "hold% 'but not' tickets or tix."  First, Plaintiffs' proposal only applies to 4,775 unique documents out of the 508,204 documents containing "hold%".  To the extent that another one of Plaintiffs' overbroad terms, such as any fighter's name, are mentioned in the document, Plaintiffs' proposal does nothing to limit that burden.  Second, the issue with the term "hold%" is not limited to holding tickets.  For example, the documents that Zuffa provided to Plaintiffs used variations of hold in discussing hotel rooms or plane reservations.  Plaintiffs' proposal does nothing to address these other uses.

[16] The day the status report was due, Plaintiffs provided Zuffa another document from the FTC production.  Zuffa will be prepared to address this document at the hearing.

1
2
3

while individually the inclusion of a term with 50 or 100 documents does not seem significant, when those small numbers are multiplied by the nearly 2,000 names that Plaintiffs include on their list, the burden becomes substantial.

4
5

### 6. Many of Plaintiffs Search Terms Are Unnecessary in Light of Zuffa's Other Production Commitments.

6
7
8
9
10
11
12
13
14
15
16
17
18

Plaintiffs complaint that Zuffa has not included search terms like "Flash," "Goldman" and "Abu Dhabi" that relate to financial and related information ignores the fact that Zuffa has agreed to produce information responsive to RFPs 9-14 through targeted searches without the use of search terms, some of which it has already produced.  Similarly, Zuffa has agreed to produce the acquisition agreements related to the sale of a part interest in Zuffa to Flash Entertainment's subsidiary January Capital, and any prospectus, offering, or "pitch" documents related to the transaction, plus information on any distribution or income paid to, or loans made to Zuffa by Flash or January Capital, in addition to board presentations, minutes and other categories of documents presented to the managers of Zuffa, which include January Capital's representative. Feb. 2, 2016, Letter from J. Cove.  There is no need for a further fishing expedition into every document that might mention Flash or Abu Dhabi (Flash is owned by the Executive Affairs Authority of Abu Dhabi).  Nor does filing an antitrust suit entitle Plaintiffs to obtain every communication between a defendant and a banker, which is what Plaintiffs proposed search terms would require.

19
20

### 7. Zuffa Has Cooperated in Providing Information Necessary to Negotiate Search Terms but Some of Plaintiffs' Requests Are Unrealistic and Unreasonable

21
22
23
24
25
26
27

In the course of meeting and conferring, Plaintiffs have requested a great deal of information.  Some of these requests and resulting discussions have been helpful in brainstorming ways to potentially exclude particular irrelevant documents, such as junk mail sent from particular domain names, and in identifying technical issues in the data or the production process, and, in several instances, led to Zuffa agreeing to broaden or add to its proposed terms or to review certain additional categories of documents without using search terms.  But other requests have been unrealistic and unreasonable.  For example, on Monday, February 15, among a number

28

of other requests, Plaintiffs requested that Zuffa provide a random sample of 500 hits for each term on Plaintiffs' list that Zuffa disputes is overbroad and 15% of the results returned by Zuffa's term, not to exceed 500.  Feb. 15, 2016 Email from M. Dell'Angelo.[17]

Since Zuffa's position had been clear since the last Joint Status Report that it considered the use of a thousand plus names without any limiters overbroad, it clearly would have been impossible to generate random samples of 500 documents each for every overbroad term, review and redact them for privilege and personal information[18] in the four days remaining before the status report was due.  Moreover, although it is easy to select documents from the collection that mention fighters, sponsors, venues, or broadcaster names that do not relate to issues in the case, engaging in extensive sampling and review exercises for each name would itself be expensive and time-consuming and would eviscerate any efficiency gains from the use of search terms.  Thus, in an attempt to arrive at a compromise, at a meet and confer the next day, Zuffa proposed that for one term or name from each category – fighter, venue, sponsor, and broadcaster – it would generate a random sample of 200 documents for each term in order to determine whether relevant documents were being missed by Zuffa's proposed search terms.  To avoid any suggestion that the sample was cherry-picked, Zuffa suggested that Plaintiffs pick the terms to test.  On Thursday, Plaintiffs responded, requesting a variation on this offer, which Zuffa agreed to and is currently undertaking.

---

[17] Other requests made on February 15 included "That Zuffa identify the content [sic] documents associated with venues that it can demonstrate, based on a reliable sample, are contained in the custodians' email and that Zuffa believes Plaintiffs are not entitled to" and parallel requests for sponsors and fighters.  *Id.*

[18] In reviewing the randomly generated 1500-document set provided to Plaintiffs, it became apparent that the email document corpus contained many personal emails, which ranged from relatively innocuous to material in which important privacy concerns are implicated, e.g., material relating to employees' or their spouses' medical conditions or family or personal photos.  It will be important to remove such non-responsive material before any production, whether by linear review or search terms.

**B. Plaintiffs' Statement**

Plaintiffs that propose that: (1) the Court should direct that Defendant verify and implement the proposals of Plaintiffs' consultant to reduce the size of the document set; (2) that the remaining document set should be reviewed for responsiveness without the use of search terms; (3) if the Court should determine that search terms can be reliably applied to the remaining document set that Defendant should be required to apply Plaintiffs' search terms; (4) or, if the Court determines that search terms can be reliably applied to the remaining document set and does not adopt Plaintiffs' proposal, Defendant should be required to apply the 392 terms in Plaintiffs' proposal that Defendant does not dispute, produce the results promptly and direct the parties to test and sample the results to continue to develop search terms to be applied to the remainder of the document set.

Defendant argues that search terms are appropriate based on the false premise that certain of Plaintiffs' Requests are overbroad. Defendant has not demonstrated that Plaintiffs' Document Requests are overbroad or how or why it will be unduly burdened by responding. Defendant then erects a straw man composed of a purportedly massive volume of ESI. Unsurprisingly, Defendant has offered no solutions about how to dismantle its straw man by eliminating non-responsive documents. At the same time, Defendant has summarily rejected nearly all of Plaintiffs' ideas for doing so. Defendant then claims that it must instead apply an unreliable method -- search terms -- to meet its obligation to identify responsive documents. Defendant claims that it can only be relieved of an undue burden if it applies its own highly restrictive and limited version of a subset of Plaintiffs' terms that yield far fewer documents and often no documents at all. Finally, Defendant dismisses as unrealistic and unproductive the proper testing of the Parties' search terms notwithstanding the fact that its terms do not withstand the limited scrutiny possible based on a sample of non-hits and comparison to the documents it produced to the FTC.

### 1. Plaintiffs' Document Requests Are Not Overbroad and Zuffa Has Not Demonstrated The Need to Apply Search Terms.

Defendant has failed to demonstrate that Plaintiffs' Document Requests are overbroad and

---

JOINT STATUS REPORT

will impose an undue burden in the context of the custodial production. "All discovery requests are a burden on the party who must respond thereto. Unless the task of producing of answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden" *Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Caton*, 136 F.R.D. 682, 684-85 (D. Kan. 1991). Tellingly, Defendant also never addressed the proportionality factors under Rule 26(b)(1) – or responded to Plaintiffs' proportionality argument. *See* Dkt. No. 213, at 22-23.

Despite Plaintiffs' numerous proposals—largely ignored by Defendant—to narrow the Requests, Defendant insists, before its own review of the subset at issue, upon narrowing the Requests even further by using overly restrictive search terms that do not match the syntax of the custodians or business. Plaintiffs are not opposed to the concept of narrowing the subset of documents at issue and welcome the opportunity to have their consultant work with Defendant to identify ways to reduce the volume before review and production. Indeed, as discussed below, one of Plaintiffs' suggestions alone will eliminate approximately 59,000 hits on Plaintiffs' proposed search terms simply by applying a filter designed to eliminate non-responsive documents. However, Defendant has neither independently made a reasonable effort to reduce the size of the document set by eliminating non-responsive documents nor approached the development of search terms in a way designed to return a reasonable number of responsive documents without unnecessarily eliminating other responsive documents. Rather, Defendant crafted an unduly narrow and overly restrictive set of terms based off an arbitrary selection of issue-based terms in the Consolidated Amended Complaint ("CAC") that was not based on any examination of the actual documents in the custodial collection. Indeed, as noted by Plaintiffs' consultant, Charles Kellner, "the use of a single qualifier of 'within 5' or 'within #', must be considered to be arbitrary, if applied without testing for content. It serves only to lower Defendant's number, and it cuts out thousands of potentially responsive documents from review." Declaration of Charles Kellner ("Kellner Decl.") ¶ 20(b). Defendant has still not properly tested its terms to demonstrate that they reliably achieve appropriate substantive results consistent with

1    Defendant's obligations under Rule 26.

2    **2. Plaintiffs Have Proposed to Narrow Each of the Requests About Which Zuffa Complains**

3

4    Defendant's proposal to apply search terms starts from the false premise that certain of

5    Plaintiffs' most central Document Requests are overbroad simply because they begin with the

6    phrase "all documents."

7    First, Defendant has not met its burden to demonstrate that these Requests are, in fact,

8    overbroad or that responding to them imposes an undue burden. Further, Defendant has resisted

9    or failed to pursue remedies that will reduce its burden without eliminating an unreasonable

10   number of responsive documents from review.[19] Rather, Defendant relies on *ipse dixit*.

11   ("Plaintiffs have served RFPs that are overbroad and unduly burdensome because, on their face,

12   they request "all documents" related to expansive subjects, like venues and sponsors, and seek

13   documents that are not tethered to the issues in this case.") The closest that Defendant comes to

14   meeting its burden of demonstrating the Requests' overbreadth falls flat because it is false.

15   Defendant asserts that Plaintiffs have requested "all documents relating to any agreement with

16   any venue, including all communications with any agent of the venue relating to that agreement

17   (*i.e.*, including logistical documents regarding the set-up and take down and delivery of items,

18   signage, security, insurance, seating, and ticket holds and promotional materials, etc.)." Yet,

19   Plaintiffs have made it abundantly clear to Defendant and the Court that they are not seeking such

20   documents and proposed ways to exclude them from search. Indeed, to date, Defendant has

21   provided only four examples of documents concerning "ticket holds" and Plaintiffs proposed a

22   solution to exclude these documents (which Defendant summarily rejected).

23   Second, Defendants' argument is a red herring because it ignores the Parties' extensive

24   meet and confers on this subject beginning in September 2015. In fact, Plaintiffs have proposed

25

26   [19] Defendant fails to square that position with the fact that it insisted – and Plaintiffs' agreed – that Plaintiffs produce "all documents" in response to Defendants' RFP 1, RFP 4, RFP 6, RFP 7, RFP 8, RFP 9, RFP 10, RFP 12, RFP 21, RFP 22, RFP 23, RFP 27, RFP 28, and RFP 31. See December 29, 2015 letter from Richard Kaufman to John Cove.

27

28

numerous ways to narrow the Requests, which Defendant has consistently disregarded. Defendant's arguments are without merit and should not be countenanced.[20]

### 3. The Universe of Documents and Custodians to Be Searched is a Fraction of the Whole and Can Be Reduced Further

Defendant's proposal also disregards the fact that searching limited sources of its ESI and only 19 custodians most likely to have responsive document is itself self-limiting.

First, Defendant has represented that its potentially responsive ESI is at least 3 petabytes. Defendant's custodial email totals 1.4 million email documents[21] and recently reported that it has identified approximately 500,000 other custodial and non-custodial ESI documents. Undoubtedly, the ESI of other Zuffa custodians contains responsive documents, but those documents have been excluded from the ESI that the Defendant is required to search and produce at this time. Thus, "all documents" can only mean all documents found within the subset of sources of ESI that are being searched and only then within the scope of the narrowed Requests.

Second, although Defendant has not made an effort to do so, the document set can be reduced further to exclude large numbers of likely non-responsive documents before a review is undertaken. As discussed below and in the attached Declaration of Plaintiffs' ESI consultant, Chuck Kellner, Plaintiffs' testing of a sample of 1,500 documents that neither Party's search terms hit reveals that the document set includes many "documents" that can be excluded, but are likely being returned within families of documents that hit on the Parties' search terms thereby inflating the total number of reported hits.[22] Such documents include electronic contact cards,

---

[20] For the avoidance of doubt, in Section 8, Plaintiffs have reproduced each of the Requests that Defendant claims should be stricken as overbroad or otherwise require the application of its search terms, and a proposal for how to narrow them consistent with the allegations in the Consolidated Amended Complaint and discoverable issues for purposes of Defendant's response and production of documents pursuant to Fed.R.Civ.P. 26.

[21] Defendant defines "email documents" to include all documents associated with an email including separate signature files, including those stating only "Sent by iPhone," embedded images such as the twitter logo, and other attachments.

[22] As noted by Plaintiffs' consultant, it was disappointing that Defendant produced the sample in unsearchable PDF images. "The whole point of providing sample non-hits to evaluate for missing potential search terms is to be able to evaluate them for missing search terms. It may be that these

blank documents, company logo images and banners, and documents that simply indicate that an email was sent from an iPhone, among others. Defendant did not self-identify and propose types and categories of documents that could be excluded from the document set and declined to pursue many of Plaintiffs' proposals, claiming that it was not worth the effort (apparently without investigation) or that its vendor lacks the technical capability.

In fact, *Plaintiffs proposed* numerous ways to exclude likely non-responsive documents based on data provided by Defendant[23] including the following suggestions.

- Proposing to exclude emails containing the term "unsubscribe" because the term tends to appear in various form commercial correspondence (*e.g.*, junk mail) and unnecessarily inflated the number of hits for terms like "twitter," "youtube" and even "(Promot* w/5 deal*)."

- Proposing to exclude certain documents, such as v-cards (electronic business cards or contact files), by eliminating their file types from the dataset.

- Identifying the cause of inflated hits for terms like "twitter" and "facebook" (which terms appear in some of Defendant's email footers) and engaging Plaintiffs' consultant to propose filtering solutions.[24]

- Proposing to filter certain "family" documents that contain no data (*e.g.*, blank pages), but are counted as a document in the document set.

- Proposing to filter certain "family" documents that contain no useful information (*e.g.*, documents containing only "Sent by iPhone"), but which are counted as a document in the document set.

- In addition, with each iteration, Plaintiffs have examined the data on "unique

---

unsearchable PDFs are how Defendant maintains these documents, but if they are searching emails and providing search reports, it is unlikely that this is the case. It appears that Defendant went to some trouble of taking native searchable emails and turned them into unsearchable PDFs for the purpose of delivering these samples." Kellner Decl. ¶ 26.

[23] When Plaintiffs lacked sufficient information to filter non-responsive documents, Plaintiffs requested information that would be helpful to proposing new solutions. As is Defendant's habit, each request was met with complaints of "discovery about discovery."

[24] Zuffa asserts that it lacks the technological capability of excluding the email signature file from its searches. Notwithstanding that this technological capability has been in widespread use for several years now, Zuffa has apparently decided not to obtain it to reduce its alleged "burden" in applying Plaintiffs' proposed search terms.

JOINT STATUS REPORT

hits"[25] and where terms returned high volumes of such hits, and reviewed the FTC Production and other public sources to attempt to narrow the terms to attempt to identify and filter out non-responsive documents.

- Requesting a listing of all domain names contained within the document set so that the Parties can attempt to identify potential domains that can be excluded entirely.

- Removing the contents of "junk" and "spam" folders from the document set.

- Removing from the entire document set non-responsive documents of the type that appeared in the sample of documents that were not returned by any search term, such as daily motivational quotes received by a custodian.

- Requesting a listing of all file types with associated text contained in the document set so that categories of documents not likely to be responsive can be excluded from the document set.

Notably, on February 18, 2016, Defendant reported that it had investigated Plaintiffs' proposals to exclude emails that contained "unsubscribe" and domain names that it believes may represent non-responsive documents; however, Defendant did not provide Plaintiffs with the requested listing of all domain names so that Plaintiffs could suggest additional domains to exclude from the document set. According to Defendant, Plaintiffs' proposal would remove approximately 59,000 documents from the reviewable population of network e-mails that hit on Plaintiffs' search terms. Plaintiffs need to clarify the technical aspects of the removal of these documents, but anticipate that that proposal alone would eliminate nearly 6% of the search hits from the review set—a very substantial savings. Defendant complains about the inclusion of "Facebook" and "Twittter" (which features prominently in paragraph 14 of the CAC) because of the high number of hits they return. As discussed in the Kellner Declaration, that appears to be because the terms appear in the signature lines of Defendant's emails. Plaintiffs have proposed ways to filter out such hits and asked Defendant to propose solutions. Defendant proposed to eliminate the terms altogether.

Defendant has agreed to investigate some of the remainder of Plaintiffs' proposals, but

---

[25] Because Plaintiffs' list of search terms includes numerous terms that are highly correlated, terms that return abnormally high numbers of unique hits were, in Plaintiffs' and Plaintiffs' consultant's view, ripe for narrowing.

JOINT STATUS REPORT

noted the incremental value may not be worthwhile. Collectively, Plaintiffs' thoughtful and data-driven proposals would substantially reduce the reviewable population before any non-traditional or traditional review methods are applied.[26]

Additionally, the parties are continuing to meet and confer regarding the application of various privilege filters to the legal custodians' ESI. Plaintiffs readily agreed to most of Zuffa's privilege filter proposal and are continuing to meet and confer on a few others. The application of privilege filters will further reduce the size of the document set, but Defendant has not quantified the savings that will result from the agreed upon filters.

Defendant's contention that it will be unduly burdensome to search for responsive documents in the document set should not be countenanced because Defendant has not attempted to apply reasonable methods of reducing its burden by removing non-responsive documents.

### 4. Defendants Have Not Tested Their Results and Have Constrained Plaintiffs' Ability to Test

Defendant proposes that the only way to topple its straw man of "overbreadth" and "undue burden" is with highly restrictive and narrow search terms that rely on concepts rather than syntax. However, Defendant has not and cannot meet its burden to establish that the application of search terms is appropriate in this case. Instead, Defendant asks the Court to endorse its untested theory that, if a document does not use a fighter's correctly spelled last name within five words of "compensation," then the document is not referring to the fighter's compensation; if a document does not use the term "hold" within five words of "venue" or the name of a venue, it is not referring to a period of contractual exclusivity with the UFC; and if the document does not say "market power" or "minor league" that the document is not an admission

---

[26] Also, as discussed below, during the analysis of search terms, the Defendant identified at least one category of discussion, regarding the holding of tickets to events for friends and family, that may include relevant terms, but not relate to a responsive topic. In response, Plaintiffs proposed a search aimed at identifying such documents and excluding them from the reviewable population. The Defendant rejected Plaintiffs' proposal in favor of very narrow search regarding "hold."

of the UFC's dominance over the industry. As explained in Section 5, however, examples of documents lost by this approach abound.

For those good reasons, Zuffa's approach has been rejected by courts that have considered the issue. *See, e.g.*, *Custom Hardware Eng'g & Consulting, Inc.*, 2012 U.S. Dist. LEXIS 146 at *12, 2012 WL 10496 ("Defendants' proposal would fail to produce discoverable ESI simply because of an inexact match in capitalization or phrasing between a search term and the ESI"). If search terms are to be narrowed, the proper way of assessing the appropriate scope is to have careful review of randomly-generated responses, including non-responsive documents. *See In re Lithium Ion Batteries Antitrust Litig.*, 2015 U.S. Dist. LEXIS 22915 (N.D. Cal. Feb. 24, 2015). Indeed, the ESI Protocol that this Court entered in *Progressive* provided that "[if requested] … with respect to any search term to which Progressive objects on the grounds that it is overly broad or unduly burdensome, Progressive shall also produce statistically random subsets of search-term-positive, non-privileged data for [the requesting party] to assess the utility of the search terms prior to final agreement on search terms ("test production")." (*Progressive Casualty Insurance Company v. Delaney, et al.*, No. 2:11–cv–00678–LRH–PAL (D.Nev.) (Dkt. 67, at p. 8). Here, Plaintiff did exactly what this Court approved in *Progressive* and requested that Defendant provide a sample for any search term to which Zuffa objected on the grounds that it is overly broad or unduly burdensome. Defendant refused and now characterizes Plaintiffs' request as "unrealistic and unreasonable;" instead Defendant offered only to provide Plaintiffs with a sample for only four of the Plaintiffs' 2,625 search terms which it claims, with no testing, are overbroad or unduly burdensome. Plaintiffs have not yet received the requested sample.

Defendant argues that "engaging in extensive sampling and review exercises for each name would itself be expensive and time-consuming and would eviscerate any efficiency gains from the use of search terms." However, the point of random sampling is to achieve exactly what Plaintiffs have done -- eliminate irrelevant documents from the group identified by a computerized search and focus the parties' search on relevant documents only. *Id.* at *51-53. Defendant has taken the opposite approach, but failed to demonstrate that its approach works

appropriately. Accordingly, Defendant's approach that examines only the gross "hit count" from a search term fails to assess the qualitative factors that are necessary to determine what materials are responsive. *See also United States v. O'Keefe*, 537 F. Supp. 2d 14 (D.D.C. 2008; whether search terms will yield desired information is a complicated question involving computer technology, statistics, and linguistics and requires nonlay evidence). Because Defendant is insisting upon the use of search terms, to make the requisite showing of burden it should be prepared to evaluate and test the search terms appropriately and adequately. Instead Defendant is dismissive of the notion.

Defendant also complains that Plaintiffs requested "[t]hat Zuffa identify the content documents associated with venues that it can demonstrate, based on a reliable sample, are contained in the custodians' email and that Zuffa believes Plaintiffs are not entitled to" and made similar requests in connection with terms for sponsors and fighters. Plaintiffs' request was intended to identify documents in the set that Defendant believes are not responsive. By doing so, the parties could then develop ways to exclude non-responsive documents further reducing the size of the document set and focusing the review on responsive documents. Defendant rejected Plaintiffs' proposal and has not enabled Plaintiffs to work together to further eliminate non-responsive documents.

### 5. Search Terms Are an Unreliable Search Method Ill Suited to the Document Set In This Case

This Court, along with many other courts and e-discovery thought leaders, has recognized that search terms can be an unreliable and ineffective means of searching ESI for responsive documents. Because the conduct at issue is not formulaic and involves state of mind and is discussed with myriad names, nicknames, symbols and idioms, the document set is particularly ill-suited to the application of search terms. That is particularly apparent because, as discussed in Section 7 below, Defendant's own efforts to recraft Plaintiffs' search terms fail to return any documents at all. Indeed, Defendant, presumably aided by its consultant, attempted to recraft Plaintiffs' 2,625 search terms into 18,172 search terms, of which 9,218 returned no hits at all.

This Court has consistently recognized that the application of search terms or key words is inefficient and unreliable. In *Progressive Casualty Insurance Company v. Delaney, et al.*, No. 2:11–cv–00678–LRH–PAL, 2014 WL 2112927, *8 (May 20, 2014 D.Nev.), this Court found that "traditional ways lawyers have culled the universe of potentially responsive documents for production—manual human review, or keyword searches—are ineffective tools to cull responsive ESI in discovery" and recognized that "keyword searches … have their own limitations." (Citing Maura R. Grossman & Gordon V.Cormack, Technology–Assisted Review in E–Discovery Can be More Effective and More Efficient Than Exhaustive Manual Review, Richmond J.L. & Tech. Vo. XVII, No. 3, Article 11 (2011) ("It may be more surprising to learn that keyword search is not nearly as effective at identifying relevant information as many lawyers would like to believe.") (citing David C. Blair and M.E. Maron, "An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval Sys.," 28(3) Comm. of the ACM 289 (1985) (showing lawyers estimated their search had identified 75% of the relevant documents when only about 20% were found); Douglas W. Oard, et al., Overview of the TREC 2008 Legal Track (March 17, 2009), (showing Boolean search identified only 24% of the relevant documents); Stephen Tomlinson, et al., Overview of the 2007 TREC Legal Track (April 30, 2008), (showing Boolean search identified only 22% of the relevant documents)). *See also* Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery, August 2014, (("simple keyword searching alone is inadequate in at least some discovery contexts." *Id.* at 233); ("Keyword searches work best when the legal inquiry is focused on finding particular documents and when the use of language is relatively predictable."); *id.* at 232. ("Sedona Commentary").

In this case, the Court has taken a consistent position. Indeed, during the Initial Status Conference in this case, the Court stated:

> I'd urge you to consider nontraditional methods of searching for ESI *instead of key words or custodian searches* which are expensive and the data shows not particularly accurate.

JOINT STATUS REPORT

Dkt. No. 156 at 29, lines 18-21 (Emphasis added). This Court's views regarding the unreliability of search terms are particularly well founded in this case. Nevertheless, Zuffa has insisted upon the application of search terms on the false premise that Plaintiffs' Requests are too broad.

As Plaintiffs explained in the prior Joint Status Report (Dkt. No. 213 at 11-23), the collection of documents in this case is particularly ill suited to the application of inherently unreliable search methods, such as search terms, due to the unique language and terms in this case and the syntax used by the relevant custodians. *See also, e.g.*, Kellner Decl. ¶ 11. Plaintiffs' continuing consultation with Kellner and analysis of data based on the ESI at issue confirms that view which was largely based on an analysis of Zuffa's FTC Production in this case.[27]

Moreover, as found by Plaintiffs' consultant, because Zuffa's search term proposal is unreliable and ineffective, to the extent Plaintiffs' terms are not appropriate, "[e]ither the collection [of custodial documents] is resistant to discriminating search terms, or the parties cannot find them." Kellner Decl. ¶ 21.

### a.    Syntax of Custodians

In addition to the idioms identified in the last Status Report, it is also important to note that the syntax used by the 19 custodians does not lend itself to the application of search terms. For example, a review of the documents in the FTC production reveals a highly probative February 2009 email from custodian Kirk Hendrick to a proposed custodian Chad Hurley in which Hendrick wrote: "We are 'mma'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." ZUF-00154095, attached as Exhibit F. Hendrick's email is probative of Plaintiffs' allegations in the CAC, but would not be captured by either party's search terms. *See, e.g.*, CAC ¶ 145 ("[T]he other mixed martial arts organizations … they're all the Triple-A … to the UFC.").

---

[27] As the Court is aware, Zuffa produced to Plaintiffs a set of documents that Zuffa produced to the FTC in 2010. As a result of Plaintiffs' analysis of the FTC production, Plaintiff identified a number of idioms and terms that were not and could not reasonably be known to Plaintiffs. *See id.* at 13. Analysis of the ESI and additional documents produced in the litigation confirm Plaintiffs' initial analysis.

### b.   Initial Analysis of Limited Third Party Production

Recent review of documents produced to Plaintiffs in response to a third-party subpoena further supports Plaintiffs' demonstration that the language usage of Defendant's custodians is ill-suited to the reliable application of search terms. For example, in an email from one of Zuffa's custodians, Joe Silva, to a third-party agent, Monte Cox, Silva made a compensation proposal for fighter and class member Ben Rothwell. *See* Exhibit G (COX-0072901). The language structure of the compensation proposals refers only to an amount of money the fighter would be paid to show up plus ("+") an amount of money the fighter would be paid if he won, *e.g.*, "$[]+ $[]." This language structure is not exclusive to Mr. Rothwell. *See, e.g.*, Exhibit H (COX-0001451) (email between Monte Cox and Zuffa custodian Sean Shelby negotiating compensation for fighter and class member Valerie Letourneau using the syntax "[]+[]"). The language usage of Defendant's custodians in discussing responsive and relevant compensation issues includes key terms such as "+" that Defendant did not propose and Defendant's search terms would not otherwise capture. These documents represent yet another example of case specific syntax that Defendant is aware of but Plaintiffs could not reasonably be expected to know without access the documents that very documents that Defendant's search terms would miss.

### c.   Misspellings

The Sedona Commentary observes that search terms present unique problems when applied to common terms and names, such as the first names of fighters, agents and managers (of which there well over 1,000 in this case). The Sedona Commentary states that "[k]eyword searches can also exclude common or inadvertently misspelled instances of the term (*e.g.*, 'Phillip' for 'Philip,' or 'strik' for 'strike') or variations on "stems" of words (*e.g.*, 'striking')." Sedona Commentary, August 2014, at 233. Ironically, Defendant and its uniform partner, Reebok, were recently criticized widely for misspelling the names and nicknames of the absent class members on their much hailed new uniforms. *See* http://www.mmamania.com/2015/6/30/8871617/reebok-fight-kit-uniform-fails-misspellings-anger-some-ufc-fighters-amuse-others-mma.

31

Plaintiffs attempted to anticipate some potential misspellings in their proposal, but anticipating all of them is likely impossible. As the Sedona Commentary predicts, an analysis of Plaintiffs' search terms hits as applied to the document set plainly reveals that the application of keywords will unnecessarily exclude common or inadvertent misspellings. For example, Plaintiffs included variations of potential misspellings of two absent class members Uriah Hall (search terms: "Hall w/5 Uriah" and "Hall w/5 Urijah"[28]) and Eliot Marshall (search terms: "Marshall w/5 Eliot" and "Marshall w/5 Elliot"). During testing, when Uriah Hall is spelled correctly it returns 3,312 hits in custodians' document set. However, spelled incorrectly as "Urijah," the term still returns return 140 hits, 81 of which were not captured by any of the other agreed terms. Similarly, spelled correctly, Eliot Marshall (an unusual variation), returns 500 hits, but the spelled incorrectly as "Elliot," the term returns 15 additional hits. Such misspellings are not limited to fighters' names. Plaintiffs also anticipated an alternative spelling for the sponsor "Metal Mulisha," and proposed the terms "Metal w/2 Mulisha" and "Metal w/2 Mullisha." Spelled correctly, the sponsor name returns 159 hits while the incorrectly spelled sponsor name returns 7 more hits. Because there are nearly 1,000 absent class members (virtually of whom are sometimes referred to by nicknames) and many other names for sponsors, merchandisers, broadcasters, venues, agents and more, the documents are ill-suited the use of search terms.

### d.   Initial Analysis of "Non-Hits" Found in Defendants' Document Set

At the suggestion of Plaintiffs' consultant, Chuck Kellner, Zuffa produced to Plaintiffs a random sample of 1,500 documents that were not "hit" by either Party's search terms. Plaintiffs' analysis of the non-hits reveal numerous ways in which the size of the document set can be reduced, as discussed below, and additional shortcomings associated with the application of search terms. One such document, LFERTITTA00034503, attached as Exhibit I, is an email from Tara Connell to custodian Lorenzo Fertitta showing a cut-and-pasted image of a spread sheet

---

[28] Confusingly, Defendant has agreed to search for the term with the misspelled name, but not the search term with the correct spelling.

JOINT STATUS REPORT

comparison of fighter compensation between UFC and Bellator for certain events. This document is highly probative of Plaintiffs' contention that Bellator is a "minor league" promoter that does not actually compete with the UFC. Yet, the document was not captured by either party's search terms. While Zuffa may argue that similar material may be produced among its financial documents, what is lost is discussion among Zuffa's custodians about these figures.

### 6. The Parties Have Agreed to Other Methods to Reduce the Volume of ESI

As directed by the Court, during the Parties' first meet and confer in September 2015, the Parties discussed various non-traditional methods for searching ESI and reducing the overall volume of ESI to be reviewed. Plaintiffs readily agreed to deduplication, email threading, DeNISTing, and the application of date range filters. As discussed in the Declaration of Chuck Kellner, the limitations of the technology that Defendant has chosen will expedite Defendant's review, but will not meaningfully reduce the size of the data set.

### 7. If The Court Requires The Application of Search Terms, It Should Adopt Plaintiffs' Proposal

Even assuming search terms should be used, Plaintiffs' terms should be adopted because Defendant's proposal is only a means to an end, not a serious, reasonable and thoughtfully crafted set of terms designed to identify responsive documents. As discussed at length in the Parties Joint Status Report and the Declaration of Chuck Kellner, Plaintiffs' search term proposal was carefully tailored to the extent possible, to the terms and issues in the case, and continually refined based on the available information.

### a.      Defendant's Search Term Proposal is Unreliable and Ineffective

Defendant has maintained a singular focus on crafting search terms that return the smallest number of hits with no real regard for the issues in the case, the substance and syntax of the documents, or sensitivity to the loss of large numbers of responsive documents. Defendant's counsel began by proposing a list of 91 search terms that it acknowledged were created by Zuffa's lawyers. (Transcript of January 26, 2016, Status and Dispute Resolution Conference, at p.

49, line 20 ("We did it with lawyers.").

### i.   Defendants Terms Are Not Well Designed

Following the last status conference, Defendant abandoned its position that Plaintiffs' 2,300 search terms were too numerous and now proposes to apply *18,172 search terms* which is seven times greater than Plaintiffs' current proposal of 2,625 search terms. Nevertheless, there are three basic problems with Defendants' search term proposal.

First, Zuffa's proposal, despite the number of terms, identifies only a handful of terms not first identified by Plaintiffs. Defendant's total number of search terms is high because it proposed myriad variations of some of Plaintiffs' terms – which have the effect of substantially reducing the total number of hits. Producing parties have "an independent duty to produce key relevant requested discovery even if plaintiff did not specifically list the precise ESI wording or spelling in its list of search terms." *Montana v. County of Cape May Bd. of Freeholders*, 2013 U.S. Dist. LEXIS 189464, *29-30 (D.N.J. Sept. 20, 2013). Thus, search terms cannot be used to "delegate to plaintiff the duty to identify its relevant requested documents." *Id.*[29] Courts therefore place affirmative obligations on responding parties to volunteer search terms, including requiring the producing party to confirm with their clients that the search terms proposed are consistent with how their clients' communicate. *See In re Fresh & Process Potatoes Antitrust Litig.*, 2012 U.S. Dist. LEXIS 139440, *29 (D. Idaho Aug. 31, 2012) (stipulation and case management orders required affirmative identification of "terms, phrases or acronyms used by the parties and/or their employees"). The requisite transparency did not occur here, and Zuffa has not met its obligation

---

[29] Defendant's position here is inconsistent with its obligations. Defendant asserts that Plaintiffs have not provided sufficient examples of relevant and responsive documents that Defendant's search terms do not hit. This argument puts the burden on Plaintiffs to identify documents in Defendant's possession, custody and control; which is unfair in inappropriate. Further, it bears noting that Plaintiffs have both (1) provided examples of relevant and responsive documents from the FTC Production and a third party that do not hit of Defendant's (or even Plaintiffs') proposed terms; and (2) identified one document from the 1,500 document sample of documents that did not hit on either parties' terms. That Plaintiffs found a relevant and responsive document in a sample comprising only 0.1% of the document corpus and only 0.7% of the documents outside of the reviewable population returned by Plaintiffs' proposed terms is extremely troubling.

to propose a robust set of terms that are used by its employees, or that reflect how Zuffa decision-makers communicate.

Defendant's failure to identify unique terms is further troubling because, as Plaintiffs demonstrated in the last Joint Status Report, there are numerous unique and idiomatic terms relevant to the case that could only be discovered by reviewing Defendant's documents or interviewing the custodians (*i.e.*, "Strikefarce" for Strikeforce and "T-Shirt Guys" for employees of Affliction). *See* Dkt. 213, at 15-16. Despite working with an ESI consultant for nearly a month as required by the Court after the last Status Conference and nearly 11 months after Plaintiffs served their document requests, Defendant has apparently failed to investigate, through either a review of the documents or interviews with custodians, any unique terms to add (or substitute for those terms alleged to be overbroad).

Notably, without any metrics, Defendant objected to Plaintiffs' proposed terms "AOL" and "Yahoo%" claiming they were "likely to incorporate large volumes of irrelevant documents due to the breadth of the search term itself and the terms' common use in documents unrelated to the allegations in the Complaint." (February 11, 2016 email from Marcy Lynch to Michael Dell'Angelo). In response, Plaintiffs explained that the terms were appropriate because they believed that AOL is or was a sponsor of the UFC and that Yahoo provides distribution of the UFC's video content, *i.e.*, it was an internet broadcaster. Zuffa responded that "we wanted to highlight that, in response to your email from this morning that noted that AOL was or is a sponsor of the UFC and that Yahoo was an internet broadcaster, we have added those terms with limiters to [Zuffa's] list [of search terms]." (February 17, 2016 email from Marcy Lynch to Michael Dell'Angelo). As the responding party, Defendant should not need to rely upon Plaintiffs to identify its own sponsors and broadcasters. It is evident that Defendant has not only failed to volunteer search terms and attempted to delegate to Plaintiff the duty to identify relevant requested documents but has compounded the problem by rejecting or modifying Plaintiffs' terms such that they return little or no results.

Second, Zuffa's proposal simply takes a subset of Plaintiffs' search terms and creates

myriad variations of a single term, *i.e.*, proximity limiters,[30] that yield many more terms, but far fewer results. That approach might be appropriate if the proximity limiters were designed to function properly, but they are not. The Court should be guided in its consideration of this search term dispute by the principle that "[b]road discovery is an important tool for the litigant, . . . ." *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1039 (8th Cir. 2011). Recognizing that using search terms are an "arbitrary choice of language to describe the targeted topic of interest," courts do not require exactitude in search terms precisely because too high a degree of exactitude can render them under-inclusive. *See Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, 2012 U.S. Dist. LEXIS 146, *7-8 (E.D. Mo. Jan. 3, 2012) (search terms "'exclude common or inadvertently misspelled instances of the term' and 'end up being both over- and under-inclusive in light of the inherent malleability and ambiguity of spoken and written English'") (quoting Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery, 8 Sedona Conf. J. 189, 201 (2007)). Plaintiffs could not possibly enumerate the variations in language used by Zuffa employees, who often referred to competitors by sarcastic epithets, and business partners with nicknames (such as "t-shirt guy") known only to one another. In fact, *approximately half of Zuffa's 18,000 search terms do not return a single result* in the document set.

Critically, Defendant has unduly narrowed Plaintiffs' terms without demonstrating to Plaintiffs of the Court how or why its proposed variations of Plaintiffs' proposed terms strike a reasonable balance between eliminating non-responsive documents without eliminating responsive documents or that Plaintiffs' terms actually capture an unacceptable number of non-responsive documents. For example, Zuffa objects to the inclusion of many "common" names and refuses to include any nicknames despite the fact that most of the absent class members are commonly referred to by their nicknames. *See* Dkt. 213, at p. 15. Defendant argues that some of

---

[30] "Proximity Limiters" require that a term appear within a specified number of words of another term. For example, Plaintiffs' proposed "Action Figures" as a search term and Zuffa's proposal was that "Action Figures" must appear within 5 words of either "sponsor*," "endors*," "licens*," "tax," "fee," "pay," "contract," "agreement," "term*," or "negotia*."

these nicknames are common terms that are used in other contexts. But this overbroad and blanket refusal to search *any* nicknames based on the unsubstantiated objection that *some* nicknames are returning non-responsive hits is inappropriate. Indeed, for the vast majority of nicknames, Defendant has not articulated any basis for refusing to include them.

Further, even Zuffa's proposed limitations based on articulated objections to Plaintiffs' search terms are not supported by any objective data that would show that Plaintiffs' proposed terms are overbroad. The fact that some non-responsive documents are produced in response to proposed search terms does not mean that they are overbroad. *See* Kellner Decl. ¶ 9; *see also Hennigan v. GE Co.*, 2010 U.S. Dist. LEXIS 115508, *17-18, 2010 WL 4189033 ( E.D. Mich. Aug. 3, 2010) ("search terms proposed by plaintiff, while they may force GE to review some documents that are not relevant to the claims asserted by plaintiffs (which will virtually always be the case when using search terms to identify responsive electronic evidence), they are sufficiently well-defined, narrow in scope, and reasonable under the circumstances."). For every sponsor Plaintiffs named as a search term that is included in Defendant's proposal, Defendant requires that the sponsor's name appear within 5 words of either "sponsor*," "endors*," "licens*," "tax," "fee," "pay," "contract*," "agreement*," "term*," or "negotia*." In its second iteration, Defendant proposed blanket proximity limiters for the names of sponsors, agents, venues and fighters (though Defendant still refuses to search fighters' nicknames).

These limiters are not tailored to the specific sponsor-based terms, however. For example, in Paragraph 117 of the CAC, Plaintiffs discussed the UFC's negotiation of a deal with THQ, Inq. for the development of a video game. Plaintiffs allege that Zuffa required "its athletes, for no compensation, to assign exclusively and in perpetuity their likeness rights for video game use." CAC ¶ 117. "Fighters who wished to negotiate this request were terminated." *Id.* "[UFC President Dana] White also publicly threatened all MMA Fighters, even those not under contract with Zuffa with a permanent ban from competing in the UFC if the Fighter chose to sign with EA Sports." *Id.* According to Yahoo! Sports, Plaintiff Jon Fitch and fighters with the American Kickboxing Academy (colloquially referred to as "AKA") were terminated. *See UFC Drops Fitch, AKA*

*Fighters*, Yahoo! Sports, Nov. 20, 2008, *available at* http://sports.yahoo.com/news/ufc-drops-fitch-aka-fighters-054200825--mma.html. To capture documents related to this issue, among other issues for discovery, Plaintiffs proposed the correlated search terms: "AKA," "THQ," "video game," "undisputed," "EA w/2 sport*" and "Electronic Arts." These six terms collectively returned 26,327 hits.[31] Defendant refused each of these proposed terms on the unsubstantiated basis that they were overbroad. Zuffa counterproposed the application of proximity limiters to each of Plaintiffs' six terms, each within five words of its ten blanket proximity limiters for a total of 60 terms. Defendant's proposed limiters were the same as all other "sponsors" and "merchandisers," and not at all designed to capture documents related to the allegations in the CAC. Unsurprisingly, Defendant's 60 terms with proximity limiters designed to exclude documents relevant to the allegations of the CAC returned only 9,577 hits.[32]

Third, Defendant simply disregarded many of Plaintiffs' search terms altogether without any apparent regard for the relevancy of the term. For example, Plaintiffs proposed the term "Challenger*," a term targeted to return documents related to Strikeforce Challengers television series on the Showtime cable network. In the CAC, Plaintiffs alleged that after Zuffa acquired Strikeforce, Zuffa merged the heavyweight division into the UFC and ended the Challengers series leading to the dissolution of Strikeforce shortly thereafter. *See* CAC ¶ 133. Plaintiffs' proposed search term "Challenger*" returns 6,954 total document hits, but only 22 unique hits, a small number that counsels against any real burden in including the term. Defendant has claimed that Plaintiffs' term is overbroad, but has not provided any substantive data or analysis to explain why and has refused to include any formulation of "Challenger*" as a search term.

---

[31] Video game returned the largest number of hits at 9,233. Because each of these terms are correlated, it is important to understand that the six terms did not necessarily return 26,327 separate hits because the terms may have found many of the same exact documents, but the same document would be counted each time was returned by a term. Plaintiffs do not know the extent of the double counting between these terms because it would require Defendant's vendor to prepare a separate report that compares the unique hits between them.

[32] As discussed in footnote 16, Defendant's 60 terms are likely to have returned far fewer hits because the 9,577 number does not account for the each instance when more than one of the 60 terms return the same document.

Similarly, Defendant has refused to include search terms that Plaintiffs proposed which are targeted to return documents responsive to Document Requests for which Defendant has indicated it would use search terms. For example, Plaintiffs' Request No. 15 seeks documents "created, produced, published or issued by third party analysts or consultants regarding Zuffa and the MMA Industry…." Plaintiffs proposed terms such as "@db.com," "@gs.com," "goldman," "deutsche," "moody*" and "S&P." These terms were targeted to return investor reports and analyses and the information exchanged between Zuffa and these entities in support of these reports and analyses.[33] These terms are further targeted to return results responsive to Request No. 9, which seeks, among other things, all "investor presentations" or "similar financial documents relating to Zuffa" as well as Request No. 10, which seeks all documents summarizing Zuffa's "annual financial activity," "issuance of equity or debt," and "loans." Zuffa has refused to include these (or similar terms) or any variation of these terms based on a bald assertion of overbreadth.

Zuffa's failure to craft useful search terms, regardless of the number, is represented in the following chart:

| Zuffa's Search Terms | # of Terms | Custodial Docs | | | |
|---|---|---|---|---|---|
| | | Without Family | % of Total | With Family | % of Total |
| Original Proposal | 91 | NP | NP | NP | NP |
| Revised Proposal | 2,435 | 301,820 | 20.94% | 402,910 | 27.96% |
| 2nd Revised Proposal | 19,767 | 395,104 | 27.42% | 504,851 | 35.03% |
| 3rd Revised Proposal | 18,172 | 420,015 | 29.15% | 534,577 | 37.10% |

Despite adding 15,737 search terms since its revised proposal after the last status conference,

[33] *See, e.g.*, *UFC Finances: New Standard & Poor's report reveals strong 2015 for Zuffa*, BloodyElbow.com (Nov. 25, 2015), available at http://www.bloodyelbow.com/2015/11/25/9773046/ufc-finances-new-standard-poors-report-reveals-strong-2015-for-zuffa (discussing 2015 S&P report on Zuffa); *What Investors Are Being Told About UFC Revenues*, BloodyElbow.com (Oct. 20, 2015), *available at* http://www.bloodyelbow.com/2015/10/20/9547333/what-deutsche-bank-moodys-and-standard-poors-tell-us-about-the-ufc (noting "Standard and Poor's and Moody's, both regularly issue reports on Zuffa, LLC's finances to its clients" and citing "reports issued by Deutsche, which was the 'Lead Arranger' for [Zuffa's] 2007 and 2009 loans"); *see also* http://www.zuffainvestoralerts.org/goldman-sachs/ (noting that Deutsche Bank, Goldman Sachs, J.P. Morgan and Bank of America Merrill Lynch were enlisted by Zuffa to refinance debt in 2012).

JOINT STATUS REPORT

Zuffa has made little headway in increasing its capture of responsive documents. Following Plaintiffs' request that Zuffa separately run all terms that Zuffa does not dispute are appropriate (392 in total), Zuffa reported that these terms return 331,392 hits (435,668 with family). Thus, Zuffa's 17,780 additional terms (which are designed only to unduly narrow Plaintiffs' proposed terms to drive down the number of hits) return only 88,623 additional documents (less than 5 documents per search term). In addition, as noted in the last Joint Status Report, Defendant's initial proposal of 91 search terms yielded only 56,902 hits in the FTC Production (only 52.86%). Dkt. No. 213 at 18. When Zuffa's new proposal is run on the FTC Production, the addition of 18,081 new terms only returns 70,482 documents (65.58%).[34] Thus, Zuffa's 18,081 terms only managed to return 13,580 additional FTC documents, less than one document per term. In effect, Zuffa's proposed search terms accomplished the only result they were intended to: they reduced the number of document hits. But this is not how search terms are meant to work.

### ii.    Zuffa Refused Plaintiffs Proposals to Use Search Terms to Filter Out Non-Responsive Documents

In contrast to Defendant's proposal, Plaintiffs' worked with their consultant to apply a substantive and data-driven approach intended to identify ways to filter out non-responsive documents that also hit on Plaintiffs' proposed search terms.

Plaintiffs' process began by conducting a sampling review of documents contained in a 107,649 document set produced by Defendant (the "FTC Production"),[35] and Plaintiffs crafted a set of more than 2,300 search terms designed to capture responsive documents contained in the set as well as documents related to other news articles and public statements by Defendant's custodians.

---

[34] Only 4,700 of Zuffa's 18,172 search terms returned any hits in the FTC Production.

[35] At the last status conference, the Court inquired as to the number of custodians whose documents were searched in connection with the FTC production. Although Plaintiffs do not know how many custodians' documents were searched, the production contains documents from 29 custodians (including 13 of the custodians in this case) and 10 central files.

JOINT STATUS REPORT

For example, during the Parties' meet and confer with their consultants, Defendant asserted that Plaintiffs' term "hold%" was overbroad because Zuffa executives are often asked to hold tickets for friends and family. Defendant proposed to address this issue by insert a proximity limiter such that "hold*" must appear within five words of "venue" or certain venue names. That formulation fails to capture common uses of the term "hold" to indicate that a venue was contractually obligated not to rent to actual or potential competitors of Zuffa that do not expressly use the term "venue" or a venue's name. In response, Plaintiffs explained that they identified the term among the FTC documents that discussed the restriction of access to venues.[36] For its part, Defendant provided Plaintiffs with four documents returned by the term "hold%" that relate to holding tickets. When pressed, Zuffa's counsel acknowledged that these four documents were not found in a statistically reliable random sample or with some other objectively reasonable method. Rather, Zuffa's counsel searched among documents unavailable to Plaintiffs and came up with four examples of documents hit on a search term but are non-responsive. That, however, does not establish that a term is overbroad. Indeed, it is equally likely that a proper sampling of the documents would reveal that the results returned a high number of responsive documents.

Regardless, rather than unduly limit the term "hold%" as Defendant suggested, Plaintiffs' proposed to narrow the term "hold%", which yields only 4,775 unique hits, by excluding from those unique hits documents that return a result for the term "(hold* w/5 tix*)" and "(hold* w/5 ticket*)." These exclusionary term proposals were based on the specific language and syntax of the sample emails Zuffa provided which is exactly how search terms should be developed. Zuffa rejected Plaintiffs' proposal, did not offer a counter-proposal and did not provide any data to support their view that Plaintiffs' proposed narrowing would not address their stated concerns.

---

[36] When presented with a document form the FTC production which demonstrate the use of "hold" as it relates to venue, without using the term "venue", Zuffa maintained its objection because a separate search term "Exclusiv*" appeared elsewhere in the document. But Zuffa misses the point. The fact that the term "hold" was used in this way without the terms "Exclusiv*" "venue" or any other search term needing to appear within the document to give "hold" its relevant meaning means that any of the proposed limiters would overly narrow the search and could exclude highly responsive documents.

JOINT STATUS REPORT

Zuffa's insistence on unnecessarily narrowing Plaintiffs' search terms must be supported by data demonstrating that a high volume of non-responsive material is returned by the allegedly overbroad terms. But Zuffa has not done this. Even if Zuffa had shown the overbreadth of the terms, Zuffa has not proposed reasonable limitations designed to better filter out non-responsive documents without also filtering out an unreasonable number of responsive documents. In fact, Defendant has consistently failed to offer solutions – which is disappointing given that Defendant's unique access to the document set gives them ample information to craft such solutions. Instead, Defendant simply applied blanket proximity limiters to Plaintiffs terms, without creating any unique terms of their own.

        **iii.**    **Defendant's Speculative Objections to Plaintiffs' Search Terms Are Wrong and Defendant Has Not Presented Any Reliable Testing To Establish Otherwise**

Prior to the last status conference, Plaintiffs provided Defendant with a list of approximately 2,300 proposed search terms. In response, before actually testing any of Plaintiffs' search terms and making any effort to first exclude non-responsive documents, Defendant argued to the Court that Plaintiffs' terms were surely "overbroad" and "certain to pull up significant numbers of documents having nothing to do" with this case. Dkt. 213 at 26-27. Since then, Defendant's vendor has run Plaintiffs' search terms against the document set. The results reveal that Defendant's predictions were not well founded. Yet, Defendant continues to object to Plaintiffs' terms based on unsubstantiated speculation that the terms are "likely to incorporate large volumes of irrelevant documents." What matters is what the terms actually return and Defendant has made no showing that its speculation will be borne out. In fact, the opposite is true.

1

### 1)    Proper Names

2          Plaintiffs' list of search terms included certain common names such as Johnson, Jones,

3   Jordan, Miller and Smith, which are the last names of fighter-class members.[37] Defendant claimed

4   that proper names should not be included because they were overbroad and would return a high

5   number of irrelevant documents. When Defendant's vendor actually ran Johnson, Jones, Jordan,

6   Miller and Smith against the document set, the names of those five absent class members yielded

7   only 3,329 unique hits. Rather than accept that its thesis was not valid, Defendant proposed to

8   apply proximity limiters to the each of the five names thereby creating 60 separate search terms

9   (*i.e.*, "(Johnson w/5 contract*)," (Johnson w/5 offer%)," etc.). This tactic achieved Defendant's

10  desired result: it dramatically reduced the already small number of extra documents returned by

11  the search terms. But, Defendant has only demonstrated that by adding proximity limiters, it can

12  reduce the number of hits returned. Critically, Defendant has not demonstrated that it eliminated

13  non-responsive documents or that it has not lost an unreasonable number of responsive

14  documents.

### 2)    Venue Names

15

16         Defendant also objected to Plaintiffs' inclusion of venue names without limiters because it

17  "will likely pull up every document or communication with anyone from the venue relating in any

18  way to the event or the venue, as well as every ad or promotion material that mentions the event

19  (or any other event at that venue)…." Dkt. 213 at 28. First, the document set is drawn from 19

20  custodians, 9 of whom Defendant self-identified as the most likely to have relevant documents. It

21  strains credulity that the highest level of management at the UFC has a vast number of emails

22  discussing the details regarding lighting and hot dog vendors. The data belies Defendant's

23  contention. Plaintiffs proposed 57 terms for 56 venues at which Defendant held events. These 57

24

25

26   ———————————

[37] Plaintiffs' initial lists also included names such as Steve, Brian, Joe, Michael and Jason, but

27  each time Defendant raised such names, Plaintiffs' agreed to remove them – provided Defendant
offered the opportunity before arguing it to the Court.

28

terms returned 4,345 unique hits.[38] Of Plaintiffs' venue terms, nine return no unique hits, only one returns more than 500 unique hits, and only two others return more than 225 unique hits.[39] Again, without actually sampling the results, Defendant contends that Plaintiffs' venue search terms are overbroad and proposed 385 terms for 55 venues.[40] Zuffa's proposal applies the same seven proximity limitations to each of 55 venue names: agreement*, contract*, lock*, hold*, negotia*, reserve* and term*. Yet, Defendant has not explained how or why it selected these terms or, more importantly, how they are designed to reflect the language actually used in the documents – versus the *concepts* at issue.

The data demonstrate that Defendant's arbitrarily applied proximity limiters that eliminated *all* documents concerning certain venues, even when the venues did not return many hits in the first place. For example, for Plaintiffs' terms "Bank Atlantic Center," "Colisee Pepsi," "IZOD Center," "Tingley Coliseum" and "US Bank Arena," a total of 2,058 hits were returned.[41] After Defendant claimed these terms were overbroad (without substantiation), Defendant applied its seven uniform blanket proximity limiters and reduced the 2,058 hits to zero. Yet, Defendant has done nothing to demonstrate that its proposal eliminates non-responsive documents without also eliminating an unreasonable number of responsive documents. Worse still, Plaintiffs proposed the term "jobing*," referring to the former Jobing.com Arena in Phoenix after reviewing a probative document in the FTC production. Plaintiffs even identified the document to Defendant, ZUF-00033112. "Jobing*" returned 44 results. Defendant, claiming overbreadth, has

---

[38] Defendant's likely retort is that the terms yield hits in over 108,000 documents. But to the extent those hits are also hits for other search terms, it is irrelevant because those documents would have to be reviewed anyway. Moreover, the 108,000 document hits is overstated to the extent that it double counts any document that contains the name of more than one venue. Eliminating (or narrowing) the Plaintiffs' venue terms would, at best, remove around 4,345 documents from Defendant's review.

[39] Even this low-volume unique hit count could be reduced by Plaintiffs' filtering proposals (such as removing automated emails containing the term "unsubscribe").

[40] As noted below, Zuffa has not included Plaintiffs' proposed term "jobing*" which Plaintiffs included to capture documents related to the formerly named Jobing.com Arena.

[41] Even these 2,058 hits are overstated to the extent these venue names may appear in the same document(s).

refused to include the term in any form, even refusing to apply its unreasonably narrow proximity limiters. In all, Zuffa's proposed limitations result in no document hits for 7 of the 55 venues and no unique hits for 18 of the 55 venues. In short, Zuffa's efforts to narrow Plaintiffs' terms are without any substantive basis, have not been tested and almost assuredly unnecessarily exclude responsive documents.

### 3) Sponsors

Defendant also applied proximity limiters to exclude all documents in the custodial collections related to numerous sponsors. For example, Plaintiffs proposed terms for "Champion Nutrition," "CSC Memorabilia," "Dead Game," "Dirty Boxer," "gamma labs" and "Hitman Fight Gear," among many others. Defendant made an unsubstantiated blanket claim that these terms were overbroad without sampling the results. Defendant applied its ten blanket proximity limiters to each of the sponsor names. With regard to these six sponsor names, Plaintiffs' six terms returned 94 total hits. Defendant, claiming these 94 total hits were due to overbreadth (without any substantiation), turned the six terms into 60 that returned zero hits. For other sponsor terms, Defendant's proposals narrowed the results even further. For example, Plaintiffs proposed "Ecko" (244 total hits) and "fight* w/2 fuel" (1,305 total hits), and Defendant claimed overbreadth without any substantiation. Defendant counter-proposed "fight fuel" and "Ecko Unlimited," each with Defendant's blanket 10 proximity limiters. Defendant's counter-proposal reduced the Plaintiffs' 1,549 hits to zero.

### 8. Plaintiffs RFP Nos. 21, 27, 33, 35 and 37 Should Not Be Stricken Because Plaintiffs Have Proposed to Narrow the Requests Which Nevertheless Draw Documents from A Narrow Subset of Zuffa's ESI.

Defendant's proposal to strike Plaintiffs' Requests 21, 27, 33, 35 and 37 is unfounded, unsupported and should be rejected. Defendant has not made a showing that the Requests are overbroad and, if so, cannot be cured. As discussed above, throughout the meet and confer process, Defendant (including in its submission) has ignored Plaintiffs' proposals to narrow the Requests and largely rebuffed Plaintiffs' ideas and proposals for narrowing the document set. Defendant has not proposed reasonable ideas of its own, instead insisting upon the application of

untested and unreasonably narrow search terms with extensive proximity limiters that often eliminate all documents from the search results.

Plaintiffs have attempted to rearticulate the Requests in a way that more explicitly parses the responsive aspects that relate to the discoverable issues. With the exception of Request 27, Defendant has not reasonably explained what non-responsive documents it believes the Requests capture that will be found within the subset of ESI at issue. Defendants' failure to do so limits Plaintiffs' ability to better hone the Requests. That is particularly true with Respect to Request 21, for which any responsive document is likely discoverable as the Request is directed to one of the most central issues in the case.[42] For the sake of clarity, Plaintiffs' propose to narrow Requests 27, 33, 35 and 37 as follows:

**Request 27 (Current):** All Documents referencing or relating to agreements (and any amendments thereto) and negotiations regarding venues for professional MMA bouts executed between You and any venue or owner, operator, agent or manager of any venue. The word venue as used here includes without limitation stadiums, arenas, auditoriums, gymnasiums, television studios and any other facilities utilized for the purposes of holding live professional MMA events, whether promoted by You or another promoter. Responsive Documents include, without limitation, communications and/or negotiations between You and any venue or owner, operator, agent or manager of any venue, draft agreements, proposals, presentations, and internal communications, memoranda, spreadsheets and analyses referencing or relating to such negotiation, regardless of whether the negotiation resulted in an executed agreement.

**Plaintiffs propose to limit Request 27 as follows:**

All documents, including communications, regarding Zuffa's actual or potential contracts or agreements and negotiations with venues for professional MMA bouts in North America (including the contracts themselves) regarding: the term or duration of the contract; the right to renew, extend or modify the terms; the financial terms; the rights or ability of either party to (or not) host or promote MMA bouts; the timing, period, duration or intervals at which the venue or any party, including Zuffa, may (or may not) host, advertise, broadcast or rebroadcast professional MMA bouts; and whether, with whom and under what circumstances or conditions

---

[42] Request 21: All Documents referencing or relating to any agreements or contracts (and any amendments thereto) entered into between You and any MMA Fighter, including, without limitation, all contracts and agreements between You and any MMA Fighter, all communications and/or negotiations with such MMA Fighters or their agents, managers or representatives, any internal documents referencing or relating to such agreements and negotiations, and any documents prepared by or sent to any Person outside Zuffa that reference or relate to such agreements or negotiations.

any party (including the venue and Zuffa), may (or may not) enter into an agreement with any other party regarding professional MMA bouts.[43]

**Request 33 (current):** All Documents referencing or relating to agreements (and any amendments thereto) entered into by You and any broadcaster of professional MMA events (including, e.g., cable, television, internet, PPV and online distribution), such as, without limitation, any communications and/or negotiations between You and any broadcaster of professional MMA events (including PPV and online distribution), including negotiations which did not result in an agreement.

**Plaintiffs propose to limit this Request as follows:**

All documents, including communications, regarding Zuffa's actual or potential contracts or agreements and negotiations with broadcasters of professional MMA bouts (including the contracts themselves) regarding: the term or duration of the contract; the right to renew, extend or modify the terms; the financial terms; the rights or ability of either party to broadcast, rebroadcast or promote MMA bouts; the timing, period, duration or intervals at which the broadcaster or any party, including Zuffa, may (or may not) host, advertise, broadcast, distribute, sell, license or rebroadcast professional MMA bouts; and whether, with whom and under what circumstances or conditions any party (including the broadcaster and Zuffa), may (or may not) enter into an agreement with any other party regarding the broadcasting, rebroadcasting, distribution, sale, licensing or promotion of professional MMA bouts.

**Request 35 (current)**: All Documents referencing or relating to agreements (and any amendments thereto) entered into by You and any third party merchandisers or retailers selling MMA related merchandise, including, without limitation, all such agreements (and amendments thereto), all communications and negotiations with any third party merchandisers or retailers selling MMA related merchandise, including negotiations which did not result in an agreement.

**Plaintiffs propose to limit this Request as follows:**

All documents, including communications, regarding Zuffa's actual or potential contracts or agreements and negotiations with any third party retailer, seller, merchandiser or distributor of MMA related merchandise (including the contracts themselves), regarding: the duration of the contract; financial terms; the rights or ability of either party to sell, license, distribute or redistribute MMA related merchandise; the right to renew, extend or modify the contract; rights regarding the timing, period, duration or intervals of time at which any third party retailer, seller, merchandiser or distributor of MMA related merchandise or any other party, including Zuffa, may sell, license, distribute or redistribute MMA related merchandise; and whether, with whom and under what circumstances or conditions any party (including the third party retailer, seller, merchandiser or distributor of MMA related merchandise and Zuffa), may (or may not) enter into an agreement with any party regarding MMA related merchandise.

---

[43] Plaintiff is not seeking logistical documents regarding the set-up and take down and delivery of items, signage, security, insurance, seating, ticket holds and promotional materials, concessions, lighting, and freight loading that may relate to responsive venues.

**Request 37 (current):** All Documents referencing or relating to agreements (and any amendments thereto) executed between You and any sponsors of the UFC or of the MMA Fighters under contract with the UFC, including, without limitation, Communications and/or negotiations between You and any sponsors of the UFC or of the MMA Fighters under contract with the UFC, including negotiations which did not result in an agreement.

**Plaintiffs propose to limit this Request as follows:**

All documents, including communications, regarding Zuffa's actual or potential contracts or agreements and negotiations with any sponsors of the UFC or of the MMA Fighters under contract with the UFC (including the contracts themselves), regarding: the duration of the contract; financial terms; the rights or ability of either party to act as a sponsor of the UFC or of any MMA Fighters under contract with the UFC; the right to renew, extend or modify the contract; rights regarding the timing, period, duration or intervals of time during with any sponsors of the UFC or of an MMA Fighters under contract with the UFC may act in that capacity as it relates to the UFC, an MMA Fighter under contract with the UFC or any other professional MMA fighter or promoter; and whether, with whom and under what circumstances or conditions any party (including sponsors of the UFC or of the MMA Fighters under contract with the UFC and Zuffa), may (or may not) enter into an agreement with any other party regarding the sponsorship of any MMA Fighters or promoters.

The extreme and draconian remedy of wholesale striking the Plaintiffs' Requests is unfounded and unwarranted and should be rejected.

Dated: February 19, 2016                    BOIES, SCHILLER & FLEXNER LLP


                                            By: /s/ John F. Cove, Jr.
                                            John F. Cove, Jr.
                                            *Attorneys for Defendant* Zuffa, LLC, d/b/a
                                            Ultimate Fighting Championship and UFC

                                            John F. Cove, Jr. (*Pro Hac Vice* granted)
                                            BOIES, SCHILLER & FLEXNER LLP
                                            1999 Harrison Street, Suite 900
                                            Oakland, CA 94612
                                            Tel: (510) 874-1000
                                            Fax: (510) 874-1460
                                            Email: jcove@bsfllp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William A. Isaacson (*Pro Hac Vice* granted)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
Email: wisaacson@bsfllp.com

Donald J. Campbell #1216
J. Colby Williams #5549
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
Tel: (702) 382-5222
Fax: (702) 382-0540
Email: djc@campbellandwilliams.com
        jcw@campbellandwilliams.com

Richard J. Pocker #3568
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Tel: (702) 382 7300
Fax: (702) 382 2755
Email: rpocker@bsfllp.com

*Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
Fighting Championship and UFC

JOINT STATUS REPORT

1

2   Dated: February 19, 2016                    Respectfully Submitted,

3                                               By:    /s/ Michael Dell'Angelo
                                                       Michael Dell'Angelo
4
                                                Eric L. Cramer
5                                               Michael Dell'Angelo
                                                Patrick Madden
6                                               BERGER & MONTAGUE, P.C.
                                                1622 Locust Street
7                                               Philadelphia, PA 19103
                                                Telephone: (215) 875-3000
8                                               Facsimile: (215) 875-4604
                                                ecramer@bm.net
9                                               mdellangelo@bm.net
                                                pmadden@bm.net
10
                                                ***Co-Lead Class Counsel:***
11
                                                Don Springmeyer (Nevada Bar No. 1021)
12                                              Bradley S. Schrager (Nevada Bar No. 10217)
                                                Justin C. Jones (Nevada Bar No. 8519)
13                                              WOLF, RIFKIN, SHAPIRO, SCHULMAN &
                                                RABKIN, LLP
14                                              3556 E. Russell Road, Second Floor
                                                Las Vegas, Nevada 89120
15                                              (702) 341-5200/Fax: (702) 341-5300
                                                dspringmeyer@wrslawyers.com
16                                              bschrager@wrslawyers.com
                                                jjones@wrslawyers.com
17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT

| | |
|---|---|
| 1 | Joseph R. Saveri |
| | Joshua P. Davis |
| | Matthew S. Weiler |
| 2 | Kevin E. Rayhill |
| | JOSEPH SAVERI LAW FIRM, INC. |
| 3 | 505 Montgomery Street, Suite 625 |
| | San Francisco, California 94111 |
| 4 | Telephone:     (415) 500-6800 |
| | Facsimile:      (415) 395-9940 |
| 5 | jsaveri@saverilawfirm.com |
| | jdavis@saverilawfirm.com |
| 6 | mweiler@saverilawfirm.com |
| | krayhill@saverilawfirm.com |
| 7 | |
| 8 | Benjamin D. Brown |
| | Richard A. Koffman |
| | Hiba Hafiz |
| 9 | COHEN MILSTEIN SELLERS & TOLL, |
| | PLLC |
| 10 | 1100 New York Ave., N.W., Suite 500, East |
| | Tower Washington, DC 20005 |
| 11 | Telephone: (202) 408-4600 |
| | Facsimile:  (202) 408 4699 |
| 12 | bbrown@cohenmilstein.com |
| | hhafiz@cohenmilstein.com |
| 13 | |

**Additional Counsel for the Classes:**

14

Robert C. Maysey
Jerome K. Elwell
15
WARNER ANGLE HALLAM JACKSON &
16
FORMANEK PLC
2555 E. Camelback Road, Suite 800
17
Phoenix, AZ 85016
Telephone: (602) 264-7101
18
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
19
jelwell@warnerangle.com

20

Eugene A. Spector
21
Jeffrey J. Corrigan
William G. Caldes
22
SPECTOR ROSEMAN KODROFF & WILLIS,
23
P.C.
1818 Market Street – Suite 2500
24
Philadelphia, PA 19103
Telephone: (215) 496-0300
25
Facsimile: (215) 496-6611
espector@srkw-law.com
26
jcorrigan@srkw-law.com
27
bcaldes@srkw-law.com

28

Frederick S. Schwartz
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile: (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez, Brandon Vera, and Kyle Kingsbury*

JOINT STATUS REPORT

1

## ATTESTATION OF FILER

2

3        The signatories to this document are myself and Michael Dell'Angelo, and I have

4   obtained Mr. Dell'Angelo's concurrence to file this document on his behalf.

5

6   Dated: February 19, 2016

7

8                                                  By: /s/ John F. Cove, Jr.

9                                                  John F. Cove, Jr. (*Pro Hac Vice* granted)
                                                   BOIES, SCHILLER & FLEXNER LLP
10                                                 1999 Harrison Street, Suite 900
                                                   Oakland, CA 94612
11                                                 Tel: (510) 874-1000
                                                   Fax: (510) 874-1460
12                                                 Email: jcove@bsfllp.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing **Joint Status Report** was served on February 19, 2016 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

/s/ Suzanne E. Jaffe

Suzanne E. Jaffe

54

JOINT STATUS REPORT