UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, and Jon Fitch, on behalf of themselves and all others similarly situated<br><br>　　　　　　　Plaintiffs,<br><br>　v<br><br>Zuffa LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>　　　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) DECLARATION OF<br>)<br>) HELEN BERGMAN MOURE<br>)<br>)<br>) |

I, Helen Bergman Moure, declare and state as follows:

1.　I am over the age of 18, competent to testify, and have personal knowledge of the matters set forth in this declaration.

## **BACKGROUND AND QUALIFICATIONS**

2.　I graduated from Bryn Mawr College with an AB (bachelors) degree in 1989 and from Boston University School of Law with a JD degree in 1992. I am an attorney licensed to practice and in continuous good standing in Florida since 1992 and in Washington State since 1996. Immediately following my law school matriculation, I clerked for two years for Magistrate Judge William C. Turnoff of the Federal District Court of the Southern District of Florida in Miami. Upon completion of my clerkship in 1994, I joined the law firm of Holland & Knight, as a commercial litigation associate. In 1996 I joined the law firm then known as Preston Gates & Ellis, again as a commercial litigation associate. I was named a partner in 2002 and in 2010 formed a legal and consulting practice, Lex Aperta, of which I am the sole principal.

3.　In my 24 years of litigation practice, I have represented a wide variety of clients, ranging from individuals and small businesses to Fortune 50 companies, in both state and federal courts nationwide, mostly in commercial disputes. Starting in about 1999, I began working on a number of matters on behalf of Microsoft Corporation involving the discovery of large volumes of email and other forms of electronically stored information (ESI). As Microsoft was an early

1

1  adopter and heavy user of email, those of us representing them in these matters were on the
2  cutting edge of what would evolve to be known as "e-discovery." Over a period of several years
3  I and the group of attorneys working on these matters at Preston Gates formed a distinct practice
4  group within the firm, eventually known as the Document Analysis Technology Group
5  ("DATG") (and later as the e-Discovery Analysis and Technology Group, or "eDAT"), to focus
6  on the efficient and defensible conduct of discovery of ESI. This practice group, of which I was
7  a founding member and partner, was at the forefront of e-discovery practice at a time when most
8  attorneys were unfamiliar with e-discovery. As leaders in the practice of e-discovery, we
9  developed and advised on best practices for our clients, represented numerous clients in complex
10 e-discovery matters, and created the well-respected Electronic Discovery Law blog, which was
11 designed to monitor, collect, and provide in searchable form key issues and caselaw in e-
12 discovery.

13     4.    As part of our efforts to create more effective and efficient methods of processing
14 and reviewing ESI, in about 2000, the partners of Preston Gates formed a company, Attenex, to
15 develop software to leverage the electronic form of information and make its presentation and
16 review more efficient. I worked with the developers at Attenex during the design and
17 development of the software tool known as Patterns which launched in 2001 and was the first
18 processing and review platform for ESI specifically designed for use in discovery in litigation
19 and investigations. The Patterns software also had the first known deduplication capabilities,
20 identifying and suppressing both exact duplicate documents (using MD5 hash values) and the
21 lower-included threads of email conversations.

22     5.    Through both my work with the Attenex developers and the years of experience
23 in collecting, processing, searching, reviewing, and producing ESI in the course of legal matters,
24 I acquired a deep understanding of both the technical and legal issues surrounding electronic
25 discovery. I retained an ownership interest in Attenex when it was spun out of the law firm in
26 2005. The company was acquired by FTI Consulting in 2008 and the software is now
27 incorporated into FTI's review platform, Ringtail.
28

1        6.      I was a leader of the eDAT practice group from 1999 until 2010. During these
2   years my practice was almost exclusively focused on electronic discovery. I was lead discovery
3   counsel on a variety of cases ranging from general commercial disputes to complex patent cases
4   to investigations by government agencies such as the Department of Justice. In most cases I was
5   the partner in charge of all aspects of the discovery efforts, working in concert with lead trial
6   counsel. In many cases, trial counsel were attorneys from firms other than my own, but the
7   client would retain our group to handle the discovery as special counsel. In 2010, I left the firm
8   to start my own practice, Lex Aperta, focused on electronic discovery legal advice and
9   consulting work.

10       7.      I am a frequent speaker on e-discovery topics at conferences and continuing legal
11  education seminars nationwide, and have been interviewed by national publications, including
12  the *Wall Street Journal*, on current events relating to e-discovery. I have been a long-time
13  member of the Sedona Conference, the internationally recognized, leading think tank on
14  electronic discovery matters.

15       8.      Since its formation in 2010, I have served on the Advisory Board of the
16  Association of Certified E-Discovery Specialists (ACEDS) and was deeply involved in that
17  organization's development of a certification exam for individuals (lawyers and non-lawyers)
18  working in the field of e-discovery. I assisted in the development of the rubric of testing topics,
19  and also wrote and edited many of the actual test questions. I wrote or edited most of the
20  ACEDS test preparation manual and conduct a 4½ hour preparation seminar for prospective test-
21  takers on a monthly basis. I have been continuously involved in the updating of the ACEDS
22  exam and preparation materials since 2010.

23       9.      Since its inception in 2012, I have served on the Advisory Board of Bryan
24  University's graduate school offering a certificate in E-Discovery Project Management. In this
25  capacity, I advised on the development of the eight month curriculum, offered to college and law
26  school graduates currently working in or planning to work in the area of e-discovery. In addition
27  to my work on the Board, I also developed and have taught one course in the program, on e-
28

1   discovery project management, which encompasses five 2-hour class sessions over the course of
2   three weeks. I have taught this course to nine cohorts of students since 2012.
3       10.    Since 2012, at the invitation of Professor Bill Bailey, I have been an annual guest
4   lecturer on electronic discovery at his University of Washington School of Law pretrial
5   procedure class.
6       11.    Since forming Lex Aperta in 2010, I have continued to focus my practice
7   exclusively on e-discovery work. I continue to serve as special discovery counsel in litigation,
8   and also provide consulting services to corporate, governmental, and law firm clients.
9       12.    As evidenced by my background outlined above, the bulk of my career has been
10  focused on the discovery phase of litigation. I have extensive experience with the technical and
11  logistical requirements for collecting, searching, reviewing, and producing large volumes of ESI.
12  I am also very familiar with negotiating the reasonable scope of discovery, meeting and
13  conferring with opposing counsel on discovery matters, and when necessary, bringing and
14  defending motions to compel or for protective order. I also have extensive experience with the
15  costs of conducting discovery and with the billing practices involved in litigation generally. For
16  most cases on which I worked at K&L Gates I was the billing partner, responsible for
17  establishing billing guidelines and for reviewing all of the billing entries on each of my cases,
18  ensuring that proper procedures were followed and making adjustments when necessary. In
19  addition, I have been involved in pricing technical service offerings and have worked with
20  clients to select e-discovery service providers through requests for proposals and by negotiation
21  preferred-provider agreements. I am aware of current market rates for e-discovery services for
22  processing, hosting, provisions of software as a service, and contract review.

## LE v. ZUFFA, LLC

24      13.    I have been retained by Zuffa, LLC as its search term consultant pursuant to this
25  Court's minute order of January 28, 2016. The parties agreed to a schedule and protocol for the
26  meet and confer process for this search term negotiation, which includes exchanging proposed
27  search terms, testing by Zuffa of both Zuffa's and Plaintiffs' proposed terms on the email
28  document corpus from the identified custodians, provision of the results of those searches, and

1  telephonic discussions of those results and each parties' analysis of them.  The protocol also
2  called for Zuffa to provide to Plaintiffs a set of 1,500 documents which are not captured by either
3  party's set of proposed search terms.  These documents were gathered through the use of
4  computer-randomized searching of the entire document corpus meeting the criteria of containing
5  no search hits from either party's proposed lists of search terms.  The stated intention of the
6  protocol was to reach as much agreement on the search terms to be employed in this case as
7  possible before the filing of the next Joint Status Report on February 19.
8        14.  On February 17, the parties exchanged first drafts of the Joint Status Report.  A
9  draft of this declaration (paragraphs 1 through 34) was provided to Plaintiffs' at the same time.
10  Defendants did not provide a draft of Mr. Kellner's declaration until the following day,
11  approximately 20 hours later.  Paragraphs 35 through 45 of this declaration respond to statements
12  made by Mr. Kellner in that draft.
13        15.  In my experience, the purpose of employing search terms prior to engaging in
14  human review for responsiveness and privilege is twofold:  (a) to focus the review on documents
15  that are more likely to contain responsive information and eliminate as much of the large volume
16  of irrelevant material from the review process as possible and (b) to limit the overall review
17  volume in order to control the costs of discovery.  In performing searches, two related concepts
18  are primary: recall and precision.  Recall is the measure of how well the terms capture relevant
19  information.  Precision is the measure of how accurately the terms capture *only* responsive
20  information.  Perfect recall would result in the capture of every relevant document in a given
21  dataset.  Perfect precision would mean that no irrelevant or non-responsive documents are
22  captured by the search terms.  It is generally accepted that perfect precision and perfect recall are
23  essentially unattainable, even if you are trying to achieve only **one** of these goals.  In crafting
24  search terms for litigation, the goal is to **balance** the maximization of both goals, i.e. obtain a
25  relevant set of data without also capturing a very high rate of irrelevant material.  Since it is
26  generally understood and accepted that perfection is impossible, attorneys use their knowledge of
27  the facts and the law of the case, the information they have about how specific words are used by
28

the custodians, and the testing and refining of possible search terms to reach the best possible compromise of these goals.

16. The process of reaching the balance of precision and recall usually involves at least a few rounds of testing, analysis, refinement, and retesting of proposed terms. The testing is reported through summaries of the "hits by term" showing how many documents in the corpus contain specific proposed search terms. That search number is then amplified by the inclusion of family members of those captured documents, because compound documents (e.g. an email with attachments) are reviewed and produced intact. That number of documents with families is a reflection of how many documents would be reviewed as a result of a single search term. Another important statistic is the total reviewable dataset that results from any set of proposed search terms. Because documents often include more than one search hit, a "hit by term" report may count a single document (and its family members, where they are counted) more than one time. The count of the total reviewable documents indicates the cumulative effect of including all of the terms in a proposed set (and is a smaller number than the total number of hits). In this case, Plaintiffs' counsel also requested that Zuffa's vendor calculate and provide a count of unique hits, that is the number of documents for each term where that particular search term is the only hit. As a practical matter, this number has limited utility in evaluating search terms because it both under-counts and over-counts the pertinent numbers due to the prevalence of compound documents. It does not take into consideration the number of family member documents that would be pulled into the review set if that search term was included and it is also not accurate to assume that exclusion of the term would actually exclude all unique hit documents because they might be included in the review set as family members of other search term hits. Particularly where, as here, there is a very large list of search terms, the chance that excluding any one term will actually exclude any sizable number of documents is low.

17. In recognition that modern discovery efforts have ballooned in both volume and expense, courts and the Federal Rules Advisory Committee have acknowledged the need for proportionality in the performance of discovery. This concept has been part of the Federal Rules of Civil Procedure (FRCP) since 1983. The most recent amendments to the FRCP, effective

1  December 1, 2015, reinstate the rule of proportionality directly into the scope of discovery
2  provision of Rule 26 (b)(1), which states that discovery should be "proportional to the needs of
3  the case, considering the importance of the issues at stake in the action, the amount in
4  controversy, the parties' relative access to relevant information, the parties' resources, the
5  importance of the discovery in resolving the issues, and whether the burden or expense of the
6  proposed discovery outweighs its likely benefit." The Rules Advisory Committee Notes to
7  current Rule 26 state that the effective use of search technology is explicitly contemplated as
8  being integral to the goal of proportionality: "Courts and parties should be willing to consider
9  the opportunities for reducing the burden or expense of discovery as reliable means of searching
10 electronically stored information become available." FRCP 26, Committee Notes.

11      18.   A component of proportionality in discovery is the *efficient phasing* of discovery
12 efforts. Phasing reflects the idea that initial discovery efforts can be evaluated and expanded if
13 necessary. In order to be efficient, this phasing should be designed to permit later possible
14 expansion in such a way as to eliminate (or at least minimize) duplication of effort. Efficient
15 phasing of document review involves structuring the process so that documents are reviewed
16 only one time and later phases of discovery, if they should prove necessary once the first results
17 are analyzed, will involve only newly added material. One of the most effective ways of
18 ensuring efficient phasing is through the use of search terms. As an illustration, once a set of
19 search terms has been finalized, the document corpus is essentially divided into two groups: (1)
20 documents going on for further review and potential production, and (2) documents not being
21 reviewed. If it is later determined that the initial efforts were not as comprehensive as necessary,
22 additional search terms can then be run against only the documents that have not previously been
23 reviewed, resulting in a unique new set of documents for review and possible production.

24      19.   In my experience, a typical reduction through use of search terms is at least 50%.
25 More commonly, I would estimate that most finalized search terms determined by the parties to
26 be effective capture 20% or less of the original document corpus.

27      20.   Zuffa's counsel and I participated in telephonic discussions with Plaintiffs'
28 counsel and Plaintiffs' search consultant Chuck Kellner, on February 5, 9, 10, and 16. These

1    calls addressed a variety of issues including straightforward technical matters (e.g. the precise
2    syntax required for particular terms to get the intended result), as well as the detailed reports
3    reflecting the number of hits captured by each proposed term.  As a result of these discussions,
4    each side made changes to their proposed terms.  Each set of revised terms were tested by Zuffa
5    on the document corpus from the email server and the results of those tests were shared with
6    Plaintiffs' counsel.

7        21.    As of the date of this declaration, the parties have agreed to run 391 specific
8    search terms (see Exhibit XX), but have reached an impasse regarding a large number of other
9    proposed terms (see Exhibits XX and XX).  As reflected in Exhibit XX, the agreed upon terms
10   result in a review set of 435,668 email server documents, or approximately 30% of the total
11   email server population.  Zuffa's proposed additional searches would result in the addition of
12   approximately 100,000 additional documents from the email server alone for review. The
13   Plaintiffs' proposed additional terms would result in the addition of approximately 800,000 more
14   documents from the email server for review.

15       22.    The meet and confers have resulted in some progress.  Each party has made
16   suggestions to address particular issues with particular terms or to exclude certain limited
17   categories of documents from review, for example, excluding certain irrelevant domain names
18   that contain junk mail, that have resulted in further agreements or started a process that I
19   anticipate could lead to further agreements.  While these agreements are helpful, their effect is
20   merely incremental in relation to the major issues separating the parties that I discuss below.

21       23.    As demonstrated by the statistics outlined above, there remains a large disparity
22   between what Zuffa and the Plaintiffs believe the scope of the search terms should be.  Zuffa's
23   proposed search term list was largely derived by taking Plaintiff's own terms as a starting point
24   and modifying them in ways that balance precision and recall to attempt to reach a more
25   effective result.  Probably the most fundamental difference between the two parties' respective
26   search approaches is the use of limiters.  Plaintiffs' original list appeared to include, among other
27   things, as separate terms the first name, last name, and nickname of almost every fighter that
28   fought in the UFC since sometime before 2010, as well as what appeared to be the name of every

sponsor, merchandiser, venue and mixed martial arts broadcaster.  Although Plaintiffs have suggested modifications to a few of these name terms to address particular issues, they have consistently insisted that almost all of these names be maintained as standalone search terms without any limiter demonstrating a connection to the issues in the case.  As explained below, Zuffa proposed certain proximity limiters (e.g., (MGM w/5 (contract% or agreement% or term% or negotia%) and MGM w/10 (lock% or hold% or reserv%)) designed to identify documents that were connected in some way to issues in the case.  Based on my years of experience in crafting search terms, such proximity limitations are the most useful approach to an overbroad term, effectively combining it with other terms in order to locate relevant uses of the term and reduce irrelevant uses.

24. Plaintiffs' requests for production 20 through 25 call for production of a variety of types of information related to UFC fighters.  Plaintiffs' search term proposal includes each of the UFC fighters' names, approximately 1,500 names, be searched as standalone terms.  For a variety of reasons, names are particularly difficult to employ as search terms.  They are often responsible for a large number of false hits (poor precision) because so many people have the same first or last names.  The results from this search were predictably vast, with 46 names or nicknames returning single document hits of over 20,000 documents.  While the review dataset of these combined search hits would be smaller due to duplicate hits in some documents, the resulting review set is undoubtedly still quite large.  Including every document that mentions a fighter by name without any link to the issues in the case would capture large numbers of documents that may mention a fighter but are not in a context that is related to this case. Moreover, some of the fighters have very common names (e.g. Clark, which is the name of a fighter but is also the name of at least two current or former UFC employees as well) so that the use of that name as a search term is not only capturing every instance of a reference to the fighter, but also to all the other people who share his or her name.  It will also capture all of the other routine communications with or about the fighter regarding such matters as hotel arrangements and promotional materials for bouts or events that do not appear to be called for by the Plaintiffs' requests.

25. In order to address these concerns regarding fighter names, Zuffa proposed to run each fighter's name in proximity to terms (contract%, agreement%, compensation, pay%, right%, purse%, LOA, royalty, offer%, negotia%, bout, match) designed to capture uses of the name in a context that is responsive. While Plaintiffs agreed to limit the searches on a small number of fighter names (e.g., Case) by running first and last names in proximity to each other, they have rejected Zuffa's proposal to limit the names with terms specifically designed to obtain the results they say they intend.

26. Similar issues arise with regard to venues, sponsors, and TV broadcasters. Promotional and other materials relating to every event televised on "Fox" are likely to mention both Fox and the name of a venue. To address this issue, Zuffa has proposed proximity limiters based on the relevant allegations that Zuffa has excluded competitors from these inputs. For example, for the broadcaster "Fox," Zuffa proposed Fox w/5 (agreement% or contract% or deal% or broadcast or negotia%) or for its sponsor "Monster" Zuffa proposed Monster w/5 (sponsor% or endors% or licens% or tax or fee or pay or contract% or agreement% or term% or negotai%).

27. In addition, many of Plaintiffs' proposed terms are extremely commonplace in regular usage, often in multiple contexts. As one example, they included the word "hold" expanded by a wildcard operator ("hold%") which searches for every instance of hold as a separate word and every other word that contains "hold" followed by any other letters (e.g. holdover, holdings, holder, Holdsworth). As reflected in Exhibit XX, the term "hold%" captures more than half a million documents (including family members) or 35% of the entire document corpus. It is my understanding that the intention of this search term was to capture references to "holds" being placed on particular event venues. In an effort to reach this potentially responsive use of the word hold, Zuffa proposed the terms "near((Venue, hold%),5)", along with similar terms "near((Venue, reserv%),5)" and (near(Venue, lock%),5) which are designed to capture any use of the terms "hold" and "reserve" and "lock" within five words of the term "venue." Zuffa's proposed term captures more than 200,000 documents (including family members), still a very large number, but only 14% of the entire document corpus, a reduction of 21% from Plaintiffs'

10

1  proposal. Zuffa's proposal also includes terms designed to identify documents regarding holding
2  a specific venue. Zuffa has also proposed to run the name of every venue on Plaintiffs' list w/10
3  of (hold% or reserv% or lock).

4       28.    The above example regarding the term "hold" is a perfect illustration of a
5  proximity limiter. In an attempt to demonstrate the effectiveness of Zuffa's proposed change to
6  the term, and the type of irrelevant documents captured by the Plaintiffs' overbroad term, prior
7  during the February 10 discussion with Plaintiffs' counsel, Zuffa provided examples of
8  documents captured by the term "hold*" without any limiters. As reflected in those documents,
9  the Plaintiffs' broad term "hold" captured logistical discussions of holding event tickets for
10 fighters and their families and holding plane reservations, while the documents provided from
11 Zuffa's search terms discussed the topic Plaintiffs contend is relevant: discussions of holds on
12 fight venues. After rejecting Zuffa's proposal, following the February 10 call, Plaintiffs'
13 counsel emailed a proposal designed to address the problem identified by Zuffa: to apply a
14 secondary search to only the unique hits on the term "hold%" to attempt to limit uses of the term
15 in proximity to "ticket" or "tix". For several reasons this proposal falls short of the mark. First,
16 there are only 4,775 unique hits for the term "hold%" when run against all of Plaintiffs' search
17 terms, so the impact of this secondary search would be minimal at best considering the overall
18 hit number of more than half a million documents. Second, as discussed above, eliminating a
19 unique hit through this sort of searching would not necessarily eliminate the document
20 component from the review dataset because it could be pulled into review as a component of a
21 compound document. Finally, this sort of two-tiered searching is extremely onerous and time-
22 consuming, unlikely to be worth the minimal impact described above. As discussed above,
23 where there is a very large number of search terms, and particularly where many of those terms
24 capture a large number of documents, the change to a single term – even one that has one of the
25 highest hit counts in the proposed set – will affect only minimal change on the size of the overall
26 review dataset (i.e. the number of documents that will require review for possible production).
27 Rather than focus on the likely incremental changes that might be achieved through changing a
28

handful of terms, Zuffa has focused on the overall approach to searching – using key concepts and terms to modify commonly-used broad terms.

29. A similar impasse was reached regarding the two terms on the Plaintiffs' proposed list which obtained the highest hit counts: "Facebook" and "Twitter." As reflected in Exhibit XX, these terms captured 625,055 and 678,182 documents (including families) respectively. These terms illustrate a very high rate of recall (lots of documents captured) with very low precision (many of the documents are not responsive). Many UFC employees use a signature line on their email that includes links to UFC's Facebook and Twitter feeds, a common practice at many companies, which results in every email with such language being captured by these search terms. Moreover, the use of these terms is ubiquitous in myriad contexts, many of which are likely to have no connection to the facts of this case. Such terms are the perfect example of the dilemma of precision and recall: there are likely a very high number of non-responsive instances so the inclusion of the term would result in potentially good recall, but very poor precision even if some uses of the words may be responsive. Further, the use of all the other agreed-upon search terms, such as competitor names, is highly likely to call up those documents that are responsive, such as a Facebook reference to a competitor.

30. Although Zuffa agreed to some of Plaintiffs' "one-off" suggestions to reduce burden, others involved logical but complicated work-arounds to identify a limited amount of material they would agree to forego searching. As of the date of this declaration, Zuffa is continuing to investigate some of Plaintiffs' proposals, and some of them may be useful in incremental ways, but given the complexities involved (for example multi-step searches and sampling of the results) and the number of terms, there is a point of diminishing returns on such efforts and many would likely be more costly to implement than simply reviewing the small number of documents that can be excluded by a particular "one-off" solution.

31. One example of what I believe is an unreasonable request is the request Plaintiffs made on Monday, February 15 that Zuffa provide a random sample of 500 documents captured by each of the terms on Plaintiffs' proposal that Zuffa considers overbroad and 15% (not to exceed 500 documents) of the documents captured by Zuffa's alternative term. Given the wide

1  disparity in proposed terms, this request would encompass the production of hundreds of
2  thousands of documents, all of which would require review before sharing them with Plaintiffs,
3  obviating the exercise of using search terms at all.  Faced with the impossibility of complying
4  with this request, Zuffa made an alternative proposal during the February 16 meet and confer
5  discussion:  to have Plaintiffs' select one of Zuffa's proposed terms from each of the categories
6  of fighter names, venues, sponsors, and broadcasters and produce a random sample of 200
7  documents for each of those terms (a total of 800 documents) so that Plaintiffs could evaluate
8  what, if any, material is not being captured by Zuffa's proposed terms.  Plaintiffs accepted the
9  offer on February 18 with some modifications and Zuffa is currently processing the request.

10       32.     In an attempt to understand the ways in which Plaintiffs believed Zuffa's search
11  terms to be lacking, Zuffa requested that Plaintiffs locate documents from the already-produced
12  FTC production that they believed were relevant and would be missed by Zuffa's expanded
13  proposed terms.  In my experience, this can be a useful exercise in order to facilitate a discussion
14  between the parties as to the appropriateness of certain terms.  In response, Plaintiffs provided a
15  single document as an example that Zuffa's proposed search term near((hold, venue),5) would
16  not have captured.  The significance of this sole example, however, was nullified because the
17  document contained two of Zuffa's other proposed terms, indicating that it would have been
18  captured if Zuffa's terms were being used.  To date, Plaintiffs have provided no other relevant
19  documents from the FTC production that they believe are missed by Zuffa's search terms.

20       33.     As discussed above, the twin goals of proportionality are (a) focusing on relevant
21  material while eliminating as much irrelevant material as possible and (b) reducing the overall
22  volume of material for review in order to contain the cost of that review.  To give some
23  indication of costs, I have examined Zuffa's cost estimates to review documents.  Zuffa is using
24  contract attorneys for the initial review and for the first level of quality control review with
25  attorneys from Zuffa's outside law firm conducting a second level quality control review.
26  Assuming a 50 documents per hour rate of review, the cost of reviewing just the set of
27  documents from the email server captured by Zuffa's search terms is estimated to be
28  approximately $1.1 million.

13

34. By comparison, the cost of the review if Plaintiffs' search terms are accepted (using the same cost assumptions) is estimated to be approximately $2.5 million.

**RESPONSES TO MR. KELLNER**

35. Mr. Kellner's statement that Zuffa rejected any use of domain names to reduce the hit counts as not feasible or worthwhile is inaccurate. This idea was discussed for the first time in the meet and confer call on February 16 and following that discussion Zuffa invested considerable time and effort in devising a proposal to make use of domains in filtering out spam messages so that they could be eliminated from searching and review. Plaintiffs have neither accepted nor rejected that proposal.

36. The idea of applying different groups of search terms to specific custodians was, in fact, proposed by Zuffa in email on February 4 which included a framework for applying this method. Specifically, Zuffa proposed that certain top custodians be searched with all the search terms the parties could agree upon, with others using search terms focused on their areas of responsibility. Mr. Kellner's assertion to the contrary is simply incorrect.

37. Mr. Kellner suggests that Zuffa's efforts in crafting effective search terms were deficient in part because he "did not see any offers of exclusive language to pare down searches that Defendants consider overly broad" through use of the NOT Boolean connector. From Zuffa's perspective, coming at the extraordinarily broad terms proposed by Plaintiffs (e.g. the name Patrick and 1,500 others) with exclusionary connectors (e.g. NOT XXXXX and NOT YYYYY and NOT ZZZZZ) would have been unwieldy and somewhat backward because it requires that the crafter of the terms think of all of the different irrelevant uses of every one of a large number of very broad terms that should be excluded. Instead, Zuffa chose the proximity search – essentially the flip side of a NOT exclusionary term – as the more logical approach. In point of fact, Zuffa did suggest the use of the NOT connector in an attempt to address the large numbers of documents being captured by the use of the terms "Facebook" and "Twitter." Plaintiffs took the proposal under advisement but as of the date of this declaration have not accepted nor rejected Zuffa's proposed approach.

38. The example document pointed to by Mr. Kellner in paragraph 24(c) would not, in fact, have been missed by Zuffa's proposed approach to the term "hold" because it contained two other very broad terms upon which Zuffa and Plaintiffs agree (exclusiv% and competit%), each of which independently would have resulted in review of the document.

39. Mr. Kellner casts aspersions on the software platform being used by Zuffa in this case as being "under-powered or outdated." There are dozens if not hundreds of software programs available to assist with the work involved in performing discovery on ESI. Each offered software tool is designed to maximize the usefulness and appeal of the tool to a highly diverse market. Not every piece of software can do every task that one might imagine doing on ESI in the course of discovery, so in selecting a platform, there are always tradeoffs. I have experience with many different discovery software platforms and believe that the software being employed by Zuffa is not in any way either "outdated" or "under-powered." I have had unfettered access to the service provider and they have provided complete answers to my questions about the capabilities of the software, which information we have passed along to Plaintiffs.

40. Without quibbling with Mr. Kellner's assertion that "most" discovery software tools can "mass-neutralize the inclusion of email footers from searches," I do not think that it is particularly unusual that the software selected by Zuffa in this case cannot perform this function. Indeed I am sure that some can, but whether they could be quantified as "most" is beyond either of our abilities to say with certainty. The footers in question are part of the text of each email and are, therefore, searchable which results in the words contained in them being searched. As discussed above, this represents one of the tradeoffs that one might be said to be making in selecting a particular software tool.

41. What is patently false on its face is Mr. Kellner's statement that Zuffa did not propose any solution to the problem of language in the email footers being captured by the terms "Facebook" and "Twitter." In fact, Zuffa has suggested an exclusionary search term that would capture documents containing "Facebook" and "Twitter" as those words alone, but would exclude documents where the words are embedded in the full URL addresses, which is precisely

the way these terms appear in the email footers. Plaintiffs have taken the proposal under advisement and neither accepted nor rejected it at the time of the writing of this declaration.

42. I have been involved in the negotiation of the search terms in this case since February 4. During that time, the Plaintiffs have provided to Zuffa four separate search term proposals for Zuffa's vendor to run so that Plaintiffs could analyze the results. With the exception of the first set of terms, which required a high degree of manual formatting by the vendor into the proper search syntax, each subsequent round has been returned to Plaintiffs in about twenty-four hours. The time it has taken for each round of testing has been well within the bounds of my experience in other cases using a variety of software tools and within industry standards. There is no basis for Mr. Kellner's assertion that the time required for testing has in any way hindered the parties' ability to test and experiment with iterations of the search terms.

43. At paragraph 29 of his declaration, Mr. Kellner states that the ability to search "within and outside of search sets"[ . . .] "may be limited or not available to the parties . . . . " If I understand this concept correctly, which I believe I do, it is something that Zuffa's vendor is perfectly capable of doing. Plaintiffs never asked about it, nor did Plaintiffs request any such search. It is unclear to me from Mr. Kellner's statements exactly what it is he is proposing to do with this search capability, but Zuffa would be happy to discuss it with him.

44. Mr. Kellner deduces that many of the documents in this case appear to have family members, which he characterizes as an "overcount" of the number of documents requiring review because he theorizes that many of the supposed family member documents have very little content and will require little review. His theory is derived from examples in which the document count with families for a particular search term are significantly higher than the document count for the hits without family members. His reasoning breaks down, however, when the universe of reviewable documents is considered rather than examples of specific terms. For Plaintiffs' current search term proposal, the total number of document hits (i.e, without including family members) is 1,091,530. When family members are included, the count increases by only 144,147 documents to 1,235,677. Contrary to Mr. Kellner's statement that "the Documents with Families factor is bringing in, on the average two more documents," in

reality, the documents with families factor is bringing in fewer than 1 non-hit document for every seven hits. If Mr. Kellner were right, we'd expect to see a document count of 1.091 million and a reviewable population of 3.273 million.

45. Mr. Kellner takes issue with the fact that many of Zuffa's limiters return zero hits for particular sponsors, venues, fighters, etc. But the fact that a limiter returns zero hits for a particular term does not mean the limiter is not working since the same proximity limiters return hits on other terms. For example, Zuffa's limiter of "w/5 sponsor%" returns zero hits for the sponsor "Dead Game" but returns a reviewable population of 5008 hits when applied to "MetroPCS." This indicates that the limiters Zuffa has proposed are making meaningful distinctions, which is the purpose of the proximity limiters to begin with.

DATED this 19th day of February, 2016.

*Helen Bergman Moure*
_____
Helen Bergman Moure