UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, and Jon Fitch, on behalf of themselves and all others similarly situated<br>　　　　　　　Plaintiffs,<br>　v<br>Zuffa LLC, d/b/a Ultimate Fighting Championship and UFC,<br>　　　　　　　Defendant. | DECLARATION OF<br>CHARLES KELLNER |

I, Charles Kellner, hereby declare:

1.　　I am Senior Vice President of Discovery Engineering at D4, LLC, a company that has been providing litigation support services to attorneys since 1997.

2.　　I have 25 years of experience in providing technology services to attorneys involved in litigation. Between 1989 and 1994, I developed litigation support systems at Debevoise & Plimpton in New York. There, I applied early full text search software to deposition transcripts and documents that were scanned and committed to optical character recognition. Between 1994 and 1997, I was director of a technology center in a "big eight" consulting firm. There, I supervised full text search operations for millions of documents in hundreds of projects and developed systems for statistically sampling the quality of bibliographic coding. Since 1997 I have been involved in the field of electronic discovery, collecting information from computer hard drives, among other things, and filtering the contents to find information that is potentially responsive in litigations and investigations. I have directly used or leveraged many different kinds of software tools to accomplish these tasks.

3.　　I have closely studied the uses and impact of keyword search for litigation discovery since the early 1990s. I served on the American Bar Association's Legal Technology Advisory

Declaration of Charles Kellner  -  1

Council in the early 1990s and served in a working group to write guidelines for the requirements of litigation support software. I was chair of the first committee for preservation and collection of ESI for the Electronic Discovery Reference Model ("EDRM"), a consortium of attorneys and technologists that publishes independent guidelines and best practices for eDiscovery. I participated in the Sedona Conference Working Groups 1 and 6 for Electronic Discovery and International Issues in Electronic Discovery. I am a member of the Board of Directors of the Boston-based New England Legal Technology Professionals, a successor to Boston's Association of Litigation Support Professionals ("ALSP") and organization committed to education in litigation support in New England. Since 2002, I have been a regular contributor and instructor for MCLE in Boston. With four Massachusetts attorneys I regularly teach the annual MCLE class "Key Issues in Discovery Practice." With Massachusetts attorneys, I originally co-wrote and regularly assist in the update of MCLE's binder service <u>Massachusetts Discovery</u>, Chapter 20, "Electronic Discovery." I have developed or participated in the development of CLE programs that have been certified for credit in more than a dozen states.

4.   I have a bachelor's degree from Brandeis University and a JD degree from Lewis & Clark Law School. I am not a practicing attorney. I have many hours of formal course training in various software and computer forensics tools. As part of my job and personal career development, I experiment with many kinds of software that can be used to search email and files for discovery in litigation.

5.   I have specialized training and experience in the use of key words to search full text. Beginning in the 1990s I studied and became certified in search programming and reporting by IDI-Batelle, then the developers of the BASIS and BASIS K software products that were used to automate the massive collections of tobacco litigation documents during that era. I have attended numerous trainings and seminars and have worked directly with and tested both mainstream and experimental litigation support systems since the 1990s. I have studied the body of literature in

information sciences that preceded and derives from the seminal Blair and Maron study[1] and includes the Sedona Conference treatises on best practices for search.[2] Since 2001 I have both developed and contributed to continuing legal education programs that teach the principles of full-text search for use by attorneys in filtering collections of ESI. Most recent examples of these programs were non-sponsored invitations to teach (a) Ethics in eDiscovery on two different panels of the ABA Employment Litigation Section, Ethics and Professional Responsibility Committee midwinter and annual meetings in 2015, and (b) to work with the Hon. Andrew J. Peck (U.S. Magistrate Judge, S.D.N.Y.), Maura Grossman, Esq., David Cohen, Esq. and Thomas Gricks III, in part, to teach the uses of full-text search within the context of predictive coding at the 2015 Georgetown Law Center Advanced eDiscovery Institute.

6.      Part of my responsibilities in Discovery Engineering at D4 is to assist attorneys in law firms and corporate law departments to filter ESI prior to review and production. I have assisted with keyword filtering in hundreds of cases, both for litigants seeking discovery and litigants responding to discovery requests. These cases have been among others, in antitrust, contract, financial services, environmental, patent, and products liability. The projects have ranged from fewer than 20,000 documents to more than 100 million. The numbers of individual search criteria have ranged between a handful to more than five thousand. There is no one-size-fits-all approach in terms of what effort is either proportionate or even worth pursuing. Not every project that attempts to develop search criteria is successful.

7.      I have learned through my experience in these projects and in numerous CLE seminars and court conferences that defensibility of a search process is at least as critical as proportionality. I understand proportionality in the eyes of either party is a subjective standard. But defensibility is something that often must be proven. Without it, a requesting party may be

---

[1] David C. Blair & M.E. Maron, An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval System, 1985
[2] Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery, 2013

deprived of important evidence. Defensibility requires meaningful participation in the development of search terms and a means to test the results against a standard of responsiveness. Toward defensibility, when I assist counsel in development and use of search terms on behalf of a responding party, I routinely ask them to do at least the following:

    a.    Identify search terms that are likely to yield responsive information.

    b.    Identify search terms that are likely to yield non-responsive information.

    c.    Identify search terms that are likely to yield privileged information.

    d.    Use the collection of ESI itself plus interviews with custodians to learn the language that is used by them in the context of the matters in dispute.

    e.    Evaluate the search results, both inside and outside the search hits.

    f.    Determine and discuss what is the opposing party's stake and involvement in developing search terms.

    g.    Be prepared meaningfully to disclose potentially relevant custodians and search terms, rather than to expect an opponent to guess first.

    h.    Be disabused of any pre-conceived notion of search result number or percentage.

    i.    Be prepared, if requested, to review samples of both search hits and non-hits

    j.    Be prepared for a statistical scoring of responsive documents found in non-hits.

8.    To prepare for this declaration, I reviewed the complaint, discovery requests, most recent Joint Statements and search reports, and I have participated in multiple meetings with plaintiffs' counsel and together with Defendant's counsel and their expert.

**USE OF SEARCH TERMS CAN SOMETIMES BE A BLUNT INSTRUMENT**

9.    The goal of using search terms in litigation discovery is to capture reasonably all responsive documents within the review set while reasonably filtering out non-responsive documents. By iteratively brainstorming, testing, sampling and revising search criteria, a party using search terms can hope to go from this result:



CORPUS

ideally to this.

No requesting party can or should reasonably expect to encircle all responsive documents. No responding party can or should reasonably expect to exclude all non-responsive documents from review. The exercise can technically be described as a balance between precision and recall.

10.     Sometimes search terms are readily devised and effective for filtering and sometimes they are not.[3] In, for example, consumer products litigation, a responding party can readily identify the people and product names and attributes associated with the product at issue. In pharma or device or high-tech patent litigation, the parties can trace back product names to project names to separate responsive endeavors from unrelated documents. Choices of key words

---

[3] "Whether search terms or 'keywords' will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread." *U.S. v O'Keefe*, 537 F Supp. 2d 14, 24 (D.D.C. 2008) (J. John. M. Facciola).

get dicey only when tracing back to basic R&D that may have a wide range of products in common. In, for example, financial services cases where allegations are based on behavior, the regulators and requesting parties have often found it difficult to identify useful search criteria, because the subjects of investigation use idiom creatively, and because behavior can be identified only through a timeline of seemingly unrelated communications.

11.     This difficulty in searching for behavior in financial services is one of the reasons regulators have imposed 17a-4 searchability requirements on all broker-dealer communications. Financial services regulators decided that after-the-fact development of search terms to find unwanted behavior in the communications of traders is very difficult, primarily because of the use of ever-changing idiom and opaque references. We have a similar situation in this case, as exemplified by "strikefarce", "tee shirt guys", and *e.g.*, references to the NFL to demonstrate Defendant's control of its industry.

**SEARCH TERMS HAVE TO DISCRIMINATE TO BE EFFECTIVE.**

12.     To achieve the desired result from search terms, several things must occur. The most important is that search criteria are "discriminating". That is to say that the words that are selected must have the effect of reasonably separating responsive from non-responsive documents. If the words are not discriminating, then the impact will be either a large loss of responsive documents or possibly an undesirable inclusion of non-responsive documents. This, in my opinion, is the situation in which the litigants currently find themselves.

13.     In my experience, it is possible but not frequent that a whole collection is highly responsive. It is more possible and frequent, however, that a collection is resistant to developing discriminating search terms.

14.     In this case, Defendant is engaged in a singular activity. They book fighters into venues with financing from sponsors. Allegations indicate that the focus is so singular as to have weeded competition out of selling fights or buying fighters' services. Defendant can apparently find and produce their contract documents for fighters, sponsors and venues readily and without search

terms, probably because these documents were purposely filed. They need no discriminating search terms to find them. But Defendant either cannot or will not willingly identify how to distinguish responsive from non-responsive communications about their business behavior with respect to fighters, venues, merchandisers, broadcasters, sponsors, managers, agents, matchmakers and potential competitors.

15. Defendant's first offer of search criteria was a list of 91 words. These appear to have been taken directly from Plaintiffs' complaint, yet Defendant excluded terms and relevant names alleged in the complaint. Many of the words that Defendant did include were conclusory legal terms, such as "monopsony" and "class action," which could not reasonably be expected to be found in Defendant's email communications. Even if Defendant's proposed legal terms were found in the Defendant's email communications, it is likely that they would arise only in the context of documents subject to attorney client privileged or work product documents. They provided no discrimination to identify substantively responsive documents.

16. Defendant complains that plaintiffs volunteered 2300-2500 search terms just prior to the last hearing. Given the sparse offering of Defendant's search terms described above, Plaintiffs really did not have a choice but to volunteer that list. And, if not for the existence of the prior FTC production, apart from the names of fighters, many of those 2300-2500 terms would not exist at all.

17. Defendant further complains that the lists proposed by Plaintiffs recall too high a percentage of their document population. In my opinion, this complaint has three serious substantive deficiencies.

18. First, there is no "magic number" that objectively indicates what percentage of a collection is responsive or even proportionate. Parties hope that by cooperating and volunteering real substance to discriminating search terms that they will find a savings in time and cost that justify their efforts. But there is no foregone conclusion that they can or will get there even with the best of cooperation and good will.

Declaration of Charles Kellner - 7

19.     Second, there is no magic number of search terms that will do the job effectively. Many cases, even complex cases, are amenable to a handful or a dozen or more search terms to encompass and ferret out reasonably all of the responsive documents. In other cases, the lists of key words may go legitimately into the thousands. Without at least that experimentation, there is no way for Plaintiffs to determine what terms will recall documents they are requesting.

20.     Third, and most importantly, Defendant has offered no viable alternative. Defendant should have offered search terms that yield from input from the ESI's custodians as to the words and abbreviations they used.[4] Defendant makes a lot of the notion that their second set of search terms yielded a volume of data equal to about a third of their collection, as if that percentage alone is somehow the goal. A granular look at Defendant's second set of search terms reveals the following:

   a.     Defendant took most of Plaintiffs list of 2300 search terms and turned it into more than 18,000 search terms. They did so by adding words like "contract", "exclusive", "LOA", "match", "pay", "offer", "rights", "royalty" and others to each of the terms associated with a fighter, a venue or a sponsor. Further, they uniformly added a proximity value of "within 5" for every one of the qualifying terms they added.

   b.     In projects on which I have participated in the development and limitation of search terms, the use of a single qualifier of "within 5" or "within #", must be considered to be arbitrary, if applied without testing for content. It serves only to lower Defendant's number, and it cuts out thousands of potentially responsive documents from review.

   c.     The qualifiers added by Defendant, in my opinion, are words we would expect to see in contract documents, which Defendant is producing anyway, without search terms.

   d.     The result of these modifications is that out of 18,172 search terms, a whopping 9,019 returned zero search hits. Many of these zeroes represent zero hits across the board for

---

[4] *Wm. A. Gross Constr. Assoc. v. Am. Manufacturers Mut. Ins. Co.*, 2009 U.S. Dist. Lexis 22903 (S.D.N.Y Mar. 19, 2009). Even in that case, thousands of search terms were proposed. Still, the court allowed search of the names of the participants in the fact pattern.

many fighters, venues and sponsors. Without families, 13,359 search terms returned between 1 and 10 hits and 16,158 search terms returned 100 or fewer hits. Defendant provides a few examples where there are still some search hits remaining, but cannot account for the fact that more than 10,000 rows of search terms representing several hundred of Plaintiffs' search terms now say zero instead of a positive number.

      e.      Defendant contributed no discriminating words of their own.

21.    Either the collection is resistant to discriminating search terms, or the parties cannot find them.

### DEFENDANT IS NOT HELPING THEIR OWN CAUSE.

22.    In this case, Defendant is the respondent and it is also the proponent of filtering by search terms. It has interview access to the custodians and it has command and searchable access to the collection of documents subject to discovery. Defendant should be in the best position to learn or know how to separate responsive from non-responsive. For example, Defendant objected to Plaintiffs' proposed terms "AOL" and "Yahoo%" as likely to incorporate large volumes of irrelevant documents due to the breadth of the search term itself and the terms' common use in documents unrelated to the allegations in the Complaint. However, Plaintiffs explained that the terms were appropriate because AOL is a sponsor of the UFC and Yahoo is an internet broadcaster for the company. In response, the Defendant agreed to add the terms. But in my experience, the exchange should not have required Plaintiffs to guess at the names of sponsors and broadcasters for the company.

23.    Despite the Defendant's superior access to information regarding the document set, Plaintiffs' access to the FTC production is a valuable tool that has enabled Plaintiffs to begin to perform the task that the Defendant has not.

24.    In cases in which I work with a responding party that wants to filter with search terms defensibly, the individuals most knowledgeable about the facts of the case brainstorm an extensive list of search terms and then test them against the collection for precision and

overbreadth. They know that their search term development will have to withstand statistical sampling of non-hits and also scrutiny from opposing counsel. They assume that as the responding party they have superior knowledge of the content and a duty to identify the responsive documents. In this case, I did not see Defendant volunteering search terms that were not on Plaintiffs' list, other than the subset of conclusory words taken from the complaint itself. In many cases, Defendant did not correct spelling mistakes that were not pointed out by Plaintiffs.

25.     In cases in which I work with a responding party to filter a collection prior to review, that party is interested in a variety of techniques to cut down on the time, cost or risk of review. These include:

a.     <u>Use a list of sender email addresses or "domain names" to identify and filter out junk or clearly non-responsive content from substantive communications</u>. In this case, the analysis of senders and domain names was initially dismissed by Defendant as not worth the trouble. Among tens of thousands of emails for many of the custodians, there is likely a recognizable percentage of junk email. Identifying even a thousand across the collection (less than one percent) would save a few days of attorney review and easily deliver return on investment for the effort. Defendant as of this writing has now offered up a list of domains that may provide a useful filter for junk. But it should have come earlier, without prompting or challenge, of Defendant's own volition. Defendant had proposed using domain filtering as part of its strategy for privilege screening; yet for junk mail screening to bring down hit counts it first appeared to Defendant to be not feasible or worthwhile. Since the initial offer and up to the time of this submission there has been some disclosure of email domains that might be worth exploring to limit the collection; however Defendant's draft statement continues to consider the potential of this effort as de minimis.

b.     <u>Apply different groups of keywords to different custodians</u>. This suggestion was proposed by Defendant and amenable in concept to Plaintiffs. The proposed framework for doing

it did not differ in substance from Defendant's other search offers. Only the limited number of agreed-upon search terms would be used for top-level custodians, still limiting those collections just to documents with contract language and likely excluding documents about behavior. In practice, the application of different groups of keywords to different custodians will not aid the Parties' efforts if an unreliable set of keywords are utilized.

    c.    <u>Use "NOT" Boolean logic to weed out overbreadth discovered in sampling</u>. When attorneys find false positives among search hits, they typically look for ways to weed those documents out using distinct language. I did not see any offers of exclusive language to pare down searches that Defendant considers overly broad. For example, the parties argued about the use of the search term "hold%." It appears in ZUF-00033112 in the FTC production in the context of a venue turning down a potentially competing event because "we have an existing relationship with UFC and have several holds at this time. It is our intention to remain exclusive with UFC…" Rather than looking for ways to exclude false hits based on the search of an ordinary word using "NOT" connectors, Defendant first argued that the document would be picked up anyway by the search term "exclusive," then attempted to limit "hold" as a search term except within 5 words of the name of a venue, which if used as proposed, would exclude this telling document.

    d.    The insistence on using certain qualifying words that are likely to show up only in contract documents in order to turn positive numbers to zeroes is more instructive when viewed in the following context: Plaintiffs have asked in several ways what kinds of documents naming fighters, sponsors and venues are not responsive and to which Plaintiffs are not entitled. In several discussions and drafts the answers from Defendant has occasionally contained references to incidental UFC matters like flights, hotels, concessions, complimentary tickets and the like. These are qualifiers <u>the existence and language for which are totally in Defendant's control</u>. However, none of this language shows up in offers to modify WORD1 NOT hotel or airline or

concession, or anything substantive that may in fact remove non-responsive material from the review set in ways that could be tested.

e. Instead, Defendant continues to rely on qualifying terms that would show up primarily in contract documents, which they intend to produce anyway without search. Defendant is uniformly shaping their approach to production as being about contract documents and not about UFC's behavior with respect to fighters, venues and sponsors.

f. The impact of this approach on Plaintiff is that Defendant is steadfastly struggling not to review and produce documents that are evidence of UFC's behavior. The gap between their numbers and our numbers are documents that do not have to do primarily with contract language. They have not been willing to volunteer language about fighters, venues and sponsors that could remove that to which Plaintiffs would agree are not responsive but leave in discussions about their behavior.

g. Defendant did not even correct the spelling of search criteria of their own venues and sponsors without Plaintiffs pointing them out. Many or all of these are now remedied, but it was primarily at Plaintiffs' request.

h. Despite Defendant's ownership of the searchable collection, it did not volunteer any meaningful terms that were not volunteered by Plaintiffs.

26. Defendant did indeed provide samples of 1500 non-hits for Plaintiffs to evaluate. I was disappointed to find that these samples were provided as unsearchable PDF images. The whole point of providing sample non-hits to evaluate for missing potential search terms is to be able to evaluate them for missing search terms. It may be that these unsearchable PDFs are how Defendant maintains these documents, but if they are searching emails and providing search reports, it is unlikely that this is the case. It appears that Defendant went to some trouble of taking native searchable emails and turned them into unsearchable PDFs for the purpose of delivering these samples.

**DEFENDANT'S TECHNOLOGY MAY NOT BE UP TO THE TASK.**

27. Over the past few weeks, Defendant has shared aspects of the technologies they are using that may not be commensurate with the protocols they are proposing. The technologies have been described as "proprietary," though the software product appears to be commercially available.

28. In some ways the technology being used and as described by Defendant appears not to be consistent with mainstream technologies that are typically employed in medium to large eDiscovery projects. Defendant's expert is truly an experienced eDiscovery consultant, but she is not directly associated with Defendant's eDiscovery technology vendor, so I am not able to ask firsthand questions of Defendant's technology provider.

29. One or two things may be possible: (a) Plaintiffs may not be getting complete or accurate descriptions of Defendant's technology capacity and capability, because the information is being passed second hand from the technology provider to Plaintiffs; and/or (b) Defendant's technology is somewhat under-powered or outdated for the proposed tasks. Defendant's counsel is by reputation known to be experienced with the management of very large discovery cases, so this under-power in technology is somewhat surprising.

30. Among Plaintiffs' concerns are the following:

31. <u>Email Threading</u>. I understand that prior to the last hearing, the parties agreed to the use of email threading. Email threading technology allows the user to "roll up" an email conversation into a cluster of emails topped by the longest and most inclusive thread. In eDiscovery, an advantage of email threading is that the parties can agree to review and produce the longest most inclusive thread in a chain of emails, so long as all the emails in the thread are identical components. This email threading capability is an eDiscovery industry standard.

    a. Defendant's email threading system will apparently identify and roll up email threads into clusters. However, it will <u>not</u> identify new participants or new content to the emails as a separate thread. Because of that inability to separate out differences in email chains into separate threads, Defendant cannot use it to reduce their volume to review. They may get some

advantage in speed of review by clustering similar content together, but it appears that due to the limitations of the technology that the Defendant has chosen to use, both Plaintiffs and Defendant are stuck with the email volume as if email threading does not exist.

b. In my experience, as an average, the ability to review and produce only the longest most inclusive email thread can reduce the size of a review and production by about one-third.

32. <u>Email Footers</u>. Modern business email systems abound with footers at the end of each email. The content ranges from claims about privilege, disclaimers about tax advice, or basic advertising and marketing information. In this case, Zuffa's email footers contain search terms that are responsive to Plaintiffs' requests, including "Twitter" and "Facebook." Most eDiscovery software systems that handle big cases with, among other things, email threading, concept clustering and other aspects of TAR (technology-assisted review) can also mass-neutralize the inclusion of email footers from searches. Defendant's system apparently cannot. In light of these limitations, Plaintiffs proposed various search concepts that they believed would filter out non-responsive emails that included the terms Twitter and Facebook. However, the Defendant did not elect to implement Plaintiffs' recommendations nor did it propose any solution of its own. Rather, the Defendant maintains that the terms "Facebook" and "Twitter" should be excluded altogether. If Defendant was using technology that was able to neutralize the false hits from email footers, Plaintiffs would at least have the opportunity realistically to test these search terms for useful responsive documents.

33. <u>Timing and Content of Search Term Reports</u>. At the outset of discussion among the parties and their experts, Plaintiffs requested that search reports contain at least these features: (i) a count of search hit by search term; (ii) a count of documents affected by that search term including "family" members, meaning attachments, so that messages and attachments get treated together; (iii) an indication of "unique" hits, which is the number of documents containing a search term where that term does not coincide with any other search term; and (iv) a total of all documents with families affected by the entire search.

a. Most large-case litigation support systems index all of the documents in advance and make them available for search. Once the documents are indexed, a single search takes seconds or less, and even searches with long lists of search terms take minutes.

b. Defendant claims that its search iterations would take a day or more, which is not terribly unusual. However, Defendant also claimed that the "unique" hits portion of the report requested by Plaintiffs would elongate the time required for each set of search reports by another day or more, because of the time it takes to tally unique hits. I find the claim unusual in that "unique hits" involves the same counting that is required to tally the total of "documents with families." If the claim was accurately conveyed, it may be another example of the limitations imposed by the technology available from Defendant's vendor. The time and apparent effort required to run Defendant's search reports hinders or slows the parties' ability to test and experiment iterations of search terms.

34. <u>Searching Within or Outside of Search Sets</u>. Plaintiffs recently asked Defendant to declare which search terms of Plaintiff are not in dispute. That request was not to solicit an offer of finality as to search terms, but to determine what number of documents these search terms included, so that the search terms in contention could be tested against the rest. Such an approach may help to narrow the number of search terms in contention. But it is still unclear to Plaintiffs as to whether Defendant can search within or outside of a defined search set. As a result, this approach may be limited or not available to the parties with respect to counting, testing or narrowing differences between them.

35. <u>Potential Over-count of Documents with Families</u>. This issue is perhaps the most troubling to Plaintiffs, and one for which we have not so far been able to find transparency. The search report metric of Documents with Families is the metric about which Defendant complains the most. Defendant's position is that there are just too many Documents with Families, representing an undue review burden.

a.	The Documents with Families metric is designed to bring in an email where the search hit is in the attachment, or to bring in an attachment where the search hit is in the email. The vast upward difference between the volume of search Hits and the volume Documents with Families is by a factor of more than three. It means that even if a document has only one hit in it, the Documents with Families factor is bringing in, on the average, two more documents.

b.	We know two things from looking at search reports and samples. First, the incidence of single-hit documents is very low in either Plaintiffs' or Defendant's search lists, because the numbers of "unique" hits is low. Second, we know from more than a thousand samples that the incidence of attachments in the email collection is not an average of two attachments to one email. So why is the Document with Families metric so high?

c.	One explanation is that many eDiscovery processing engines look for files embedded in emails and count them as "children" of the "parent" email. These are typically logos and graphics that companies use as part of their email footers. We know from samples that Zuffa has in most emails at least two embedded graphics and sometimes more. Our concern is that these graphics are artificially inflating the count of "Documents with Families" and do not represent the true need to review emails and substantive attachments.

36.	Defendant's expert refers to recent changes in the Federal Rules stressing the importance of proportionality, and included the quote from the Rules Advisory Committee Notes. "The Rules Advisory Committee Notes to current Rule 26 state that the effective use of search technology is explicitly contemplated as being integral to the goal of proportionality: 'Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.'" As an expert in this field, I support the spirit and the intent of the rules both with respect to proportionality and the use of technology.

### PROPORTIONALITY

37. "Proportionality" cannot be used to justify the wholesale exclusion of relevant information about behavior that is critical to Plaintiffs' case, just to reach an intended number or percentage.

38. The "effective use of search technology" includes not just the application of search terms. In this context, the terms "effective" and "reliable" are extremely meaningful. Plaintiffs are willing to go along with a search protocol, but it has to be both effective and reliable.

    a.    Tools that neutralize the searchability of hundreds of thousands of email footers have become commonly used in the last six years not just to be able to search for "Twitter" and "Facebook" when they are relevant. Those tools are also used to create effective privilege screens when even corporate clients who are not law firms use the word "privilege" and "confidentiality" in their email footers. The fact that Defendant does not have these available should not be counted against Plaintiff, and that fact makes Defendant's search protocol that much less effective.

    b.    Tools that make meaningful use of email threading to reduce the size of review and production are apparently not available to Defendant. Defendant's metrics and dollar amount estimates for cost and burden apparently contemplate a linear review of search hits. Not being able to take advantage of email threading to reduce those numbers are counting those numbers against Plaintiff. In my experience, using the longest and most-identically-inclusive email in the thread can reduce review volume by 30%.

39. Defendant attempts to justify its approach to excluding important relevant content through the use of "proportionality" and the prospect of large numbers and dollar amounts.

    a.    The content sought by Plaintiffs is about Defendant's behavior. Defendant controls this content and knows how it can best be searched, but it continues to point the search away from this content and toward documents containing contract terms. There is no other source of the content about Defendant's behavior and there is no substitute for it for responding to Plaintiffs' discovery requests.

  b. Defendant's expert provides the opinion that review of 535,668 documents will cost $1.1 million. The number of documents is derived from only the search terms upon which the parties currently agree plus 100,000 documents provided by Defendant's searches. It excludes significant content requested by Plaintiffs about Defendant's behavior. The dollar amount is apparently predicated on the use of contract attorneys and a review rate of 50 documents per hour.

  c. Taken on its face, this figure yields a blended billing rate of more than $100 per hour. If contract attorneys are used even with review managers at a ratio of 1:10 at $125 per hour and associates at a ratio of 1:20 at $300 per hour, then Defendant is contemplating paying contract attorneys a rate of $90 or more per hour. This rate is not consistent with industry standards. My own calculation of blended billing rates and ratios of review managers and associates to contract attorneys is closer to $67 per hour.

  d. Defendant goes further to say that Plaintiffs' proposal would add 800,000 documents to the review and cost $2.5 million. Adding 800,000 documents to the proffered 535,668 documents exceeds the number of de-duplicated documents in the email collection under consideration.

40. The fact that cost calculations or email counts are not reliable or at least disputable is not central to Plaintiff's concern. The primary concern is that "proportionality" is being used to direct search hits away from the content in which Plaintiff is most interested.

**APPROACHES TO RESOLUTION**

41. When using search terms to filter a collection prior to review or production, no absolute filtered number or percentage can be deemed objectively appropriate without a determination of what responsive material may be left behind. This must be particularly true where the responding party has proposed the use of search terms and controls the knowledge of the collection. Defendant in this case has only an adjectival claim of "too much" with no associated metric. Defendant is finding sampling difficult, time consuming and somewhat objectionable. Plaintiffs

cannot agree to Defendant's proposal without credible demonstration that its discovery requests are being reasonably met. Given the zeroes in Defendant's proposed search terms, it is not likely that this burden can be met.

42. Defendant appears unhappy with the numbers contained in Plaintiffs' proposed search results. There has been a lot of activity and even hard work, but it has not been directed necessarily toward narrowing the gap defensibly or providing more transparency into the collection itself.

43. In the last hearing, the parties and Court explored the possibility of a "privilege screen", by which Defendant could filter its collection for putatively privileged documents using a number of techniques, and then to produce the remainder under an unconditional clawback order. From my perspective, if Defendant is unwilling to review putatively responsive search hits, the parties could feasibly explore a privilege screen followed by production with an unconditional clawback.

Respectfully submitted on this 19th day of February.

/s/*Charles R. Kellner*

Charles R. Kellner