────TRANSCRIBED FROM DIGITAL RECORDING────

1                 UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                )
                                   )
5              Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                   )
6        vs.                       )  Las Vegas, Nevada
                                   )  February 23, 2016
7  ZUFFA, LLC, d/b/a Ultimate      )
   Fighting Championship and       )
8  UFC,                            )  STATUS CONFERENCE
                                   )
9              Defendants.

10 ────────────────────────────

11

12

13              TRANSCRIPT OF PROCEEDINGS

14          THE HONORABLE PEGGY A. LEEN,
           UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19 APPEARANCES:            See Next Page

20 DIGITALLY RECORDED:     Liberty Court Recorder (LCR)
                           1:45:44 p.m.

21

22 TRANSCRIBED BY:         PATRICIA L. GANCI
                           (702) 385-0670

23

24 Proceedings recorded by electronic sound recording, transcript
   produced by mechanical stenography and computer.

25

```
                    ──TRANSCRIBED FROM DIGITAL RECORDING──

 1   APPEARANCES:

 2   For the Plaintiffs:

 3           DON SPRINGMEYER, ESQ.
             WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
 4           3556 E. Russell Road, 2nd Floor
             Las Vegas, Nevada 89120
 5           (702)341-5200

 6           MICHAEL C. DELL'ANGELO, ESQ.
             PATRICK F. MADDEN, ESQ.
 7           BERGER & MONTAGUE, P.C.
             1622 Locust Street
 8           Philadelphia, Pennsylvania 19103
             (215)875-3000
 9
             MATTHEW SINCLAIR WEILER, ESQ.
10           THE JOSEPH SAVERI LAW FIRM, INC.
             555 Montgomery Street, Suite 1210
11           San Francisco, California 94111
             (415)500-6800
12
             JEROME ELWELL, ESQ.
13           WARNER ANGLE HALLAM JACKSON FORMANEK, PLC
             2555 E. Camelback Road, Suite 800
14           Phoenix, Arizona 85016
             (602)264-7101
15
16   For the Defendants:

17           J. COLBY WILLIAMS, ESQ.
             CAMPBELL & WILLIAMS
18           700 South 7th Street
             Las Vegas, Nevada 89101
19           (702)382-5222

20           MARCY N. LYNCH, ESQ.
             BOIES, SCHILLER & FLEXNER, LLP
21           121 S. Orange Ave., Suite 840
             Orlando, Florida 32801
22           (407)425-7118

23           JOHN F. COVE, JR., ESQ.
             BOIES, SCHILLER & FLEXNER, LLP
24           1999 Harrison Street, Suite 900
             Oakland, California 94612
25           (510)874-1000
```

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1       LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 23, 2016; 1:45:44 P.M.

2                              --oOo--

3                      P R O C E E D I N G S

4            THE COURT:  Good afternoon.  Please be seated.

5            COURTROOM ADMINISTRATOR:  Your Honor, we are now

6  calling the status conference in the matter of Le versus Zuffa,

7  LLC.  The Case Number is 2:15-cv-1045-RFB-PAL.

8            Beginning with plaintiff's counsel, counsel please

9  state your names for the record.

10           MR. DELL'ANGELO:  Michael Dell'Angelo from the law firm

11 of Berger & Montague on behalf of plaintiffs.

12           MR. MADDEN:  Patrick Madden from Berger & Montague on

13 behalf of plaintiffs.

14           MR. SPRINGMEYER:  Ronald Springmeyer from Wolf Rifkin

15 for plaintiffs.

16           MR. WEILER:  Matthew Weiler with The Joseph Saveri Law

17 Firm for plaintiffs.

18           MR. ELWELL:  Jerome Elwell of Warner Angle for the

19 plaintiffs.

20           MR. COVE:  Good afternoon, Your Honor.  John Cove on

21 behalf of Zuffa, LLC.

22           MS. LYNCH:  Good afternoon.  Marcy Lynch from Boies

23 Schiller & Flexner on behalf of Zuffa, LLC.  And with us we also

24 have Helen Moure, who is our search term consultant.

25           MR. WILLIAMS:  Good afternoon, Your Honor.  Colby

                     PATRICIA L. GANCI, RMR, CRR

—TRANSCRIBED FROM DIGITAL RECORDING—

1  Williams, Campbell and Williams, on behalf of Zuffa.

2         MR. COVE:  And, Your Honor, also with us is Tim

3  Bellamy, who is the Assistant General Counsel of Zuffa.

4         THE COURT:  Well, good afternoon and welcome.  We are

5  here on our monthly status and dispute resolution conferences.

6  I have read your joint status reports and the voluminous

7  attachments and declarations.

8         Let me just say, first of all, I am heartened by the

9  progress that the parties have made by involving their

10  consultants in direct discussions.  It is clear that both

11  consultants for both sides are eminently qualified to do what

12  they do and are very well respected nationwide.  Their

13  affidavits were both thoughtful and helpful to the Court in

14  having a better appreciation of what the parties' agreements and

15  disputes are about with respect to this process.

16         And let me start by asking counsel for the plaintiffs

17  to bring me up to date.  I know that it may sound like an

18  eternity for the people engaged in the process, but it appears

19  that the consultants have been dealing directly through counsel

20  in the discussions about the negotiation of key word searches

21  since February 4th.  And today is the 23rd.  So a lot has been

22  accomplished, although I appreciate people feel like it's a

23  matter of diminishing returns at this point.

24         So Mr. Dell'Angelo?

25         MR. DELL'ANGELO:  Thank you, Your Honor.  And I should

—TRANSCRIBED FROM DIGITAL RECORDING—

1   add with us is Mr. Chuck Kellner.  He's the vice president at

2   D4, who is our search term consultant.  He is in the courtroom.

3   I think he has identified himself.

4           Well, Your Honor, it is correct that a lot has

5   happened, and the parties have had a number of telephonic meet

6   and confers regarding the search term process.  And through that

7   process, Zuffa has continued to make revisions to its proposed

8   search terms and plaintiffs have done so as well.  And the basis

9   on which we've done that is we have taken those proposals, asked

10  Zuffa to have its vendor run those various search term proposals

11  against the data set of approximately 1.4 million documents.

12  That returns certain data points such as direct hits, direct

13  hits with family, and unique hits which we've explained and I

14  think that the Court is familiar with, but I'm happy to provide

15  more detail as it applies here if the Court wishes, but -- and

16  so what we've done with those results is examined them and

17  examined some limited samples that we've been provided with and

18  continued to communicate and make inquiries about the data set

19  itself.

20          For the plaintiffs' part what I can tell you about some

21  of the progress that we've made and where there is, I think, the

22  possibility for additional progress is we've approached the

23  process by trying to determine really getting to the fundamental

24  question that I think we presented to you last time, which is

25  trying to evaluate whether or not this data set is susceptible

——————————TRANSCRIBED FROM DIGITAL RECORDING——————————

1    reliably to the application of search terms, and if so, how and

2    whether that process is to devise search terms to reduce the set

3    by finding relevant documents or to reduce the set to weed out

4    nonresponsive documents.

5              And largely by --

6              THE COURT:  Your preference is for manual review, is to

7    weed out nonresponsive, and for manual review of the remainder,

8    if I am getting your drift correctly from your papers.

9              MR. DELL'ANGELO:  So what we think makes sense, Your

10   Honor, is because of the resistance of the document set to the

11   application of search terms to affirmatively remove or isolate

12   responsive documents, we think that actually a lot of efficiency

13   can be achieved by testing the results, looking at the file

14   types, the types of documents that are returned, the content of

15   those documents, examining them, trying to isolate nonresponsive

16   documents, and removing them from the set.

17             Without kind of getting into the weeds, just to give

18   you an example, one of the proposals that we hit on in looking

19   at the sample was whether or not documents, that is e-mail

20   messages in particular, that contain the term "unsubscribe"

21   could be isolated and removed on the theory that an e-mail that

22   contains the word "unsubscribe," particularly if you look at the

23   set of domains that they're associated with, are likely kind of

24   marketing, general e-mails that are not likely to be -- contain

25   responsive material.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          And in doing that we hit on at what we understand from

2     the analysis that we were provided something like 59,000 e-mails

3     that could just be excluded from the set altogether.

4          And so to that end, we have identified and proposed a

5     number of ways to reduce this set, which, frankly, I think as we

6     discussed last time, even at the outside of 2 million documents

7     that include the central files that have been identified in the

8     JSR, if all of those were produced in a case of this magnitude

9     where there are hundreds of millions of dollars at stake, the

10    documents wouldn't actually be that large.  But we're not asking

11    for that.  We don't think that's an efficient approach for

12    either party.

13         But what we do think makes sense is to find ways

14    through this process to winnow down that set to focus out all

15    the --

16         THE COURT:  Right.  You want to winnow down and claw

17    back?

18         MR. DELL'ANGELO:  Well, to the extent that Zuffa wants

19    to do a responsiveness review after the winnowing down, of

20    course.  There's a fairly robust procedure for privilege, but

21    one of the other things that, you know, the Court has directed

22    the parties to do and we've been working on with respect to the

23    legal custodians is to find ways to isolate --

24         THE COURT:  And that's really not all that tough.  You

25    folks have done that before.

--------TRANSCRIBED FROM DIGITAL RECORDING--------

1          MR. DELL'ANGELO:  Right.

2          THE COURT:  And it seems to me that you have pretty

3    much congruence on that issue --

4          MR. DELL'ANGELO:  That's right.

5          THE COURT:  -- about how to do that effectively,

6    efficiently, and that make sense for both sides.

7          MR. DELL'ANGELO:  Absolutely agree.  And I think it's

8    an easy, cheap, fast way to weed out documents because it really

9    balances two things.  I understand and respect the fact that the

10   defendant doesn't want to review nonresponsive documents because

11   it takes time and it costs money, but it also slows down the

12   process from the receiving party's side as well.  And certainly

13   you don't want to be on the other side --

14         THE COURT:  So how do you propose to review whatever it

15   is that you get?

16         MR. DELL'ANGELO:  That the plaintiffs will review?

17         THE COURT:  Yes.

18         MR. DELL'ANGELO:  So we would do it in the way that we

19   would typically do it in this case and, frankly, as we've been

20   doing with the FTC production.  So we would load it to a

21   platform.  We would sort the data based on criteria that --

22         THE COURT:  This is your work product.

23         MR. DELL'ANGELO:  Right.  Based on our work product

24   allocated to reviewers that fit within again a work product

25   formula for issues and those sorts of things, conduct a review,

——TRANSCRIBED FROM DIGITAL RECORDING——

 1  and code it accordingly.  But, you know, all of those documents

 2  end up being on a platform --

 3          THE COURT:  So you would rather undergo the time and

 4  effort of reviewing a larger universe of possibly nonresponsive

 5  documents to assure you got more than get a more targeted --

 6  because most people -- not most people.  A lot of people object

 7  to what they call document dumps.  Here, give me the universe

 8  and then it's a go fish type of thing.

 9          MR. DELL'ANGELO:  Right.

10          THE COURT:  But you would rather get a larger universe

11  of documents and have the responsibility for culling those for

12  relevant helpful documents to your side's case than you would

13  having them spend the effort to cull down the universe?

14          MR. DELL'ANGELO:  The short answer is yes, Your Honor,

15  but I think there's some important things to consider with

16  respect to that.  What -- what we're proposing to do and what we

17  think can be done, and the unsubscribed proposal, for example,

18  is a good example of that, is that --

19          THE COURT:  59,000 down, 1.3 something to go.

20          MR. DELL'ANGELO:  Right.  But there are lots of things

21  you can do when you look at file types, when you look at

22  associations and domains and, you know, the privilege and

23  whatever.  There are lots of ways to winnow down that set so

24  that what you are doing is, you know, you're throwing out the

25  bath water, if you will, without throwing out the baby rather

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1   than the opposite which is the concern.

2          And I agree with you normally, yes, you may be

3   concerned about a document dump, but we have a unique

4   opportunity in this case that we've spent a lot of time working

5   with is we have some very limited examples from the actual set.

6   But as the Court recognized last time, we have a relevant set of

7   documents from the FTC production that tell us a lot about how

8   amenable the document set is likely to be to the type of, kind

9   of, what I would call direct filtering where you're trying to

10  isolate responsive documents.

11         And one of the reasons we approached this the way we

12  did is because we spent a lot of time testing the FTC production

13  and developing search terms and thinking about --

14         THE COURT:  So what was the FTC protocol that produced

15  that set?

16         MR. DELL'ANGELO:  How did we -- oh.

17         THE COURT:  No.  What was the FTC protocol that

18  produced that set?

19         MR. DELL'ANGELO:  So I do not know that answer.  We

20  have --

21         THE COURT:  Well, one of the things your expert

22  addresses in his affidavit is, for example, the example of the

23  financial institution that has idiomatic language.

24         MR. DELL'ANGELO:  Right.

25         THE COURT:  That is difficult to capture.

———TRANSCRIBED FROM DIGITAL RECORDING———

1          MR. DELL'ANGELO:  Correct.

2          THE COURT:  And the repetitive theme of your expert's

3  affidavit is that the defendant's proposals for key search terms

4  are directed and targeted to contract-type documents where the

5  plaintiffs are really interested in behavioral-type documents.

6          MR. DELL'ANGELO:  That's correct.  And what I would

7  say, Your Honor, is it's really, as we see the search term

8  proposal from -- that the defendants have constructed, is it's

9  really an attempt to get at the language of contract and not at

10 the language of the conversation.

11         THE COURT:  I understand that.

12         MR. DELL'ANGELO:  Yeah.

13         THE COURT:  And so -- but you did get some really good

14 stuff from the FTC documents from your point of view?

15         MR. DELL'ANGELO:  Yes, we did.

16         THE COURT:  Correct.  And so it would seem that you

17 would be able to learn from whatever it was because your expert

18 refers to, I'll never remember the details of the exact

19 criteria, criteria that were developed by regulatory agencies

20 precisely to address that behavioral aspect and idiomatic

21 language in order to obtain documents using -- and people have

22 crossed over this bridge before.

23         MR. DELL'ANGELO:  Yes.

24         THE COURT:  And so there are ways of doing this.

25         MR. DELL'ANGELO:  Yes.

—TRANSCRIBED FROM DIGITAL RECORDING—

1        THE COURT:  And one of the points that you keep making

2  repetitively in your papers is that, Well, the defendants are

3  the sole custodians.  They have sole control.  They know exactly

4  what's in their own documents, and you of course don't.  On the

5  other hand, you have access to your clients who are members of

6  the organization --

7        MR. DELL'ANGELO:  Correct.

8        THE COURT:  -- who knew what the language is, who know

9  what the lingo is, who are able to educate you on the types of

10  information that they are aware of or the types of terms that

11  are used in the industry in which they are involved.  So it's

12  not exactly like you're operating in a blind.

13        MR. DELL'ANGELO:  And that's correct.  I think I -- we

14  made clear both in our oral presentation and in the JSR last

15  time which we referred to in the JSR this time, that is the

16  joint status report, that that is -- that is how we went about

17  developing the terms that we did.  So when you look at a term

18  like "hold," you know, it's not something that we pulled out of

19  thin air.  It's something that we pulled out of a document that

20  we found in the FTC production and we said, We see, this is

21  how...

22        THE COURT:  But you're afraid you are not going to get

23  the behavioral-type documents from the terms that the parties

24  have been exchanging.

25        MR. DELL'ANGELO:  I think we know that we're not going

— TRANSCRIBED FROM DIGITAL RECORDING —

1  to get them.  What we have been doing is going through the

2  samples that we have been provided and through the FTC

3  production --

4          THE COURT:  And what's the update on that?  Because

5  there was originally a term for 500 samples for each term and

6  then the proposal in return was --

7          MR. DELL'ANGELO:  Right.

8          THE COURT:  -- 200 random samples for categories.

9          MR. DELL'ANGELO:  Right.  So in the interest of time,

10 rather than trying to continue to negotiate a sample, we thought

11 that the proposed sample of 200 documents is not really

12 statistically reliable, but in the interest of getting something

13 done, we essentially accepted that proposal and moved on.

14          So late Sunday night we received an FTP link with the

15 sample that we had agreed on with the defendant and that sample

16 consisted of 200 documents that hit on the plaintiffs' terms,

17 but not on defendant's terms for four terms, one from each

18 category:  a fighter, a sponsor, a merchandiser, and a venue.

19 And we had some technical issues accessing that on Monday

20 morning that we worked with the defendant's counsel to resolve,

21 and we did.  And we've been trying to move through those as

22 quickly as possible.

23          And there's some interesting insights to be gleaned

24 from those.  I mean, there -- it raises some questions about,

25 you know, the -- some of the technical issues about

——TRANSCRIBED FROM DIGITAL RECORDING——

 1  de-duplication and some of the things that are actually in the

 2  production that maybe shouldn't be there in the first place that

 3  may be making the number of total documents larger than it needs

 4  to be, but it also identified some responsive documents that are

 5  resistant to the construction -- sort of the contractual

 6  non-conversational construction of terms that Zuffa's proposal

 7  contemplates.

 8          So the limited sample, though it may be, it has been

 9  productive, you know, thus far.  And I have some of those

10  examples that we can share with you, if the Court wishes.

11          THE COURT:  Well, what I'm trying to find out is what

12  you're learning and if you're able from what you're learning to

13  refine the process because both of the experts recognize that

14  this isn't a perfect process.  There's no such thing as a

15  development of a perfect search word protocol.  You -- you try

16  and test.

17          MR. DELL'ANGELO:  Correct.  And I agree with that

18  sentiment wholeheartedly, and I think it's really just a

19  question of what perspective we come at the testing and the

20  development.

21          THE COURT:  Well, and how long are you going to do it

22  and at what cost?

23          MR. DELL'ANGELO:  So I think there are a few more

24  things that we can do.  So we have been told and we talk about

25  in the JSR some possibilities for other ways to reduce the set.

———TRANSCRIBED FROM DIGITAL RECORDING———

1  One of them which from my perspective and I understand Mr. --

2  and Mr. Kellner can expand on this for you, if you wish, is to

3  use but-not searches.  For example, when the defendant says,

4  You're -- within the results for your term are likely to be

5  documents about a particular issue that is nonresponsive, so

6  hotel reservations for fighters, for example.  We'd say, Yes, we

7  agree.  Those documents are not responsive.  Neither of us

8  should be dealing with them.  Rather than removing all of the

9  fighter names, let's take the results, apply something like but

10  not, you know, and some terms like hotel and plane or whatever

11  to hit plane reservations, and take those out.

12          I think we proposed a lot and if they -- those

13  proposals could be applied, it would do a lot to reduce the set.

14  There are a few more that I think that we can develop if we have

15  a little more transparency into the vendor and kind of can move

16  a little more quickly with the sampling process and get some

17  more robust samples.

18          I think you had seen in the papers that the defendant

19  has taken the position that, you know, a lot of these efforts to

20  reduce the set are not worth the candle, but they're not really

21  quantified.  One of the reasons that we thought that they made

22  sense is having done it many times myself, both with consultants

23  and independently, is generally it's pretty cheap to apply

24  another level of search or to isolate a set of documents and

25  take them out than run the risk of returning them and having one

—TRANSCRIBED FROM DIGITAL RECORDING—

 1   or both parties reviewing them.

 2          THE COURT:  All right.  Let me hear from opposing

 3   counsel and see from your point of view how far you've come and

 4   how far you have to go and what intervention you need from the

 5   Court at this point.

 6          MR. COVE:  Yeah.  Thank you, Your Honor.  John Cove.

 7          Let me start out by just saying what we would like and

 8   what we think makes sense and then I'll tell you why.  We think

 9   right now we have a proposal -- and just to make clear the

10   universe of documents, there was 140 -- 1.44 million that were

11   tested.  There are another 500,000 or so, more than 500,000 that

12   have been added.  So the total universe we're talking about is 2

13   million documents in the potentially searchable category,

14   leaving aside all of the other documents we've agreed to search,

15   you know, without search terms.

16          The data and the statistics are based on the subset of

17   1.4 because we didn't have, you know, the PCs loaded and

18   de-duplicated in a way efficiently and correctly until very

19   recently.  So all our stats in the joint status report are based

20   on the subset.

21          But anyways, using that as the universe, our proposal

22   has hits on approximately 37 percent of the documents.

23          THE COURT:  But there's nothing magic about that.

24          MR. COVE:  No, I know that, Your Honor.  I

25   definitely -- I agree with you.  But I think it makes sense for

─TRANSCRIBED FROM DIGITAL RECORDING─

1    us to get started on those search terms now for the Court to

2    order us to move forward on those --

3            THE COURT:  But I'd like you to address the issue that

4    your search terms are expressly directed towards getting the

5    contract issue and avoiding the behavioral-type documents that

6    are indicative of the plaintiffs' claims.

7            MR. COVE:  Well, I disagree with that -- their

8    characterization of that.  I mean --

9            THE COURT:  I'm sure you would.  That's why I'm asking

10   about it.

11           MR. COVE:  -- we have -- we have proposed a number of

12   limiters because, you know, the universe of names that they are

13   starting with is extremely broad.  It's every fighter, almost

14   every --

15           THE COURT:  Right.  He started off with, what, 91 terms

16   and then they gave you 25.  And now we're at 392 and you have a

17   proposal for an extra 100,000 documents.  And so this goes on in

18   every negotiation.

19           MR. COVE:  Well, yeah, but usually there's one side

20   goes up and one side goes down.  And I don't really think

21   they've gone down.  They've isolated --

22           THE COURT:  That's because they don't trust the

23   methodology that you're using to arrive at -- they don't trust

24   you.

25           MR. COVE:  Yeah, I understand, but there has not been

—TRANSCRIBED FROM DIGITAL RECORDING—

1  any movement in the sense of compromise.  There's been isolated

2  things that can take off -- the unsubscribed example, which

3  we're not completely in agreement on, we think it can be broader

4  than what they've offered, is 60,000 documents.  And I think

5  that's the biggest one that we have or have the potential to

6  have right now.

7          So...

8          THE COURT:  But what about things like the footers and

9  headers?  I mean, those seem to be no-brainers of ways of mass

10  neutralizing documents from production.  There are certain

11  things -- if your letterhead is always on a document, if your

12  Twitter or Facebook reference is on every document that you send

13  out of a certain category, those seem to be things that --

14          MR. COVE:  We have investigated, and our system cannot

15  do it as easily as you posit.  We have an outstanding proposal

16  that deals with, you know, putting Facebook and Twitter within

17  certain other words which I think --

18          THE COURT:  You want proximity connectors and other

19  limits.

20          MR. COVE:  Yeah, I think that one is still open, if I

21  recall correctly.

22          But I don't think that 37 percent or the 5 -- the 37

23  percent that we've proposed now would be the final word.  We are

24  still very willing to listen to other proposals and other

25  suggestions they have based on the FTC production and based on

—TRANSCRIBED FROM DIGITAL RECORDING—

1  the samples that we've given them.

2         But, you know, as of right now they have never

3  suggested another limiter or subject matter limiter to go with

4  the 1,500 fighter names, and with all of the names of all of the

5  venues and all of the sponsors, you know, we --

6         THE COURT:  Have you produced a list?  One of the

7  comments that's made in Mr. Kellner's declaration is that they

8  had to explain to you why they wanted Yahoo and -- because it

9  was a broadcaster for you and...

10        MR. COVE:  The other one was AOL.

11        THE COURT:  AOL.  That's a sponsor for you.

12        MR. COVE:  Well --

13        THE COURT:  They shouldn't have to --

14        MR. COVE:  Well, there are two separate things there.

15 I don't believe that AOL was, in fact, a sponsor from our

16 investigation.  It may have -- there may have been an

17 advertising deal at one time.  It took investigation with the

18 client to get somebody who even remembered what that was.  So

19 that --

20        THE COURT:  You haven't --

21        MR. COVE:  I'm sure they had a basis for concluding

22 that it was a sponsor, but I'm not -- certainly not a major or a

23 recent --

24        THE COURT:  The point is that you're in exclusive

25 control of that information.  You know who you deal with.  You

———TRANSCRIBED FROM DIGITAL RECORDING———

1  know who your vendors are.  You know who your sponsors are.  You

2  know who your venues are.  Haven't you disclosed that

3  information in the written discovery that's been exchanged so

4  far?

5           MR. COVE:  No, we haven't -- they haven't asked for it.

6  I mean, they have, as far as I can tell, found pretty much every

7  sponsor, including ones that, you know, may have advertised in

8  one bout, you know, seven years ago.  I mean, all that stuff is

9  publicly available.  They know what all of the venues are

10 because it's all public.  And they did the work to compile a

11 list and included everything that they could possibly consider a

12 venue or sponsor.  And that's one of the things we suggested was

13 how about sampling, like get -- take 100 fighters and some

14 select number of sponsors and we'll run those searches without

15 any limiters.

16          You know, some of these sponsors are -- you know,

17 there's specific allegations in the complaint about them.  And,

18 you know, if there's some limitation on the 2,500 names, we

19 don't need the proximity limiters, but what they've insisted on

20 is every name no matter how peripheral.  Whatever role AOL

21 played, I'm sure -- as I said, I'm sure they had some basis for

22 saying it was a sponsor, but they certainly were not a major

23 sponsor and they weren't a sponsor for very long if they were

24 even a sponsor or did anything more than advertise.

25          So -- and similarly, Yahoo, it has a...

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          Because it is a sports broadcaster, it is an e-mail

2    domain, it offered some MMA over the, you know, over the

3    Internet.  It doesn't mean that they should get every document

4    that could possibly relate to Yahoo that has the Yahoo name on

5    it.

6          THE COURT:  On the other hand, is there likely to be

7    anything in there that's privileged that you wouldn't mind them

8    seeing?  If they want to go on a frolic of their own and read

9    every Yahoo reference, what do you care?

10          MR. COVE:  Well, it takes time to review that stuff and

11    it's not -- necessarily not privileged.  It would still have to

12    be -- obviously, if it was a communication outside the company,

13    it would likely not be --

14          THE COURT:  No, but it's not likely to have privileged

15    information in it.  And so if you have an irrevocable claw back

16    and they really want to see it just because they don't trust

17    you, once you make them do the work of filtering and screening

18    and searching Yahoo documents that don't mean anything --

19          MR. COVE:  Because -- because we have to look at them.

20    And let me say a word about --

21          THE COURT:  Well, do you?  That's my question.  If you

22    have an irrevocable claw back and if it's not likely to have

23    confidential or privileged material in it, why do you care if

24    they get more than they need?

25          MR. COVE:  Well, we don't know that it doesn't.  And

——TRANSCRIBED FROM DIGITAL RECORDING——

1  let me say a word about the privilege if I could digress for a

2  second because we actually already have had a claw-back

3  situation here unfortunately.

4          THE COURT:  Everybody does.

5          MR. COVE:  What happened was we produced the FTC

6  production, and in order to put it in the format that was called

7  for in this case as opposed to how it was produced last time,

8  the vendor transformed it.  To make a long story short, it

9  turned out that they didn't produce -- they produced certain

10 text -- not the documents that had been withheld or clawed back

11 from the FTC, but the underlying text files.

12         Plaintiffs noticed this.  They alerted us to it, you

13 know.  And we worked it out very -- you know, I want to be clear

14 what I'm saying here.  They notified us of it --

15         THE COURT:  They were responsible and ethical.

16         MR. COVE:  They were responsible and ethical and worked

17 appropriately, but now we have an issue as to the claim of

18 privilege.  There were five documents.  They were clawed back --

19 four of them were clawed back from the FTC without question

20 during the FTC investigation.

21         We've asked them, you know, Are you giving them back?

22 And they said, Well, we need more information.  And they've

23 asked us to provide the following information:  who drafted the

24 documents if not clear from the document itself and some of

25 the --

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1        THE COURT:  The usual Rule 26 requirements.

2        MR. COVE:  There's more than that.  And some of these,

3    you know, were clearly drafted by outside counsel.  Subject

4    matter of the legal representation issue, the nature of the

5    legal representation issue, the nature of the privilege

6    asserted, the basis for the privilege asserted, and whether the

7    document is attached to or otherwise associated with other

8    documents.  So if we're going to get this request -- these kinds

9    of requests every -- you know, and the FTC just sent these back.

10        If we're going to -- there's going to be a lot of work

11   and potential controversy involved in any claw back, which isn't

12   to say that they won't act ethically and appropriately as they

13   have already, but it's -- we anticipate that any claw back is

14   going to be -- involve lawyer work, looking all of the material

15   up.  I mean, it's time consuming and expensive.

16        THE COURT:  Right.  It's the balance -- sure, it's the

17   balance between the original search, give them more than they

18   need knowing most of it's not responsive, but they want it, and

19   which is -- which is more time and cost effective.

20        MR. COVE:  I think it's more cost effective to do it

21   right the first time.  It's both more time and cost effective to

22   do it right the first time and more --

23        THE COURT:  Well, perhaps, if you are talking about --

24        MR. COVE:  -- reassuring to the client and protective

25   of the client's rights.

─────────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────────

1      THE COURT:  Different issue.  Different issue.  But

2  there would seem to me to be categories of documents that you

3  really wouldn't have to worry about.

4      MR. COVE:  Well, these -- what we're really talking

5  about is e-mails among the top people about various things and

6  contractual issues and things like that.  And there is a lot of

7  privileged material in there and you have to be very careful.

8  These are -- these are all e-mails, you know, what's -- you

9  know, what are we going to do in this situation, what are we

10 going to do in that situation.  Some -- you know, I'm not saying

11 it's primarily privileged, but there is a great deal of

12 privileged material in there.

13      And those are the kind of things that they -- they have

14 to be looked at very, very carefully because, you know, there

15 were people in the company, custodians who perform both legal

16 and business roles.  And we have to do a conscientious job of

17 figuring out, you know, what was being done in a particular

18 instance.

19      So, you know, our proposal is not to -- that this would

20 be the final word because we know they can come back and we know

21 they will come back.  They're certain to come back.  And what we

22 have to do is -- what we have to do we have to make sure is

23 defensible, and if they raise issues with us we have to take

24 them into consideration and think, you know, how -- is this a

25 legitimate point and argue that you, Judge Leen, are going to

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

 1  find this to be a legitimate point.

 2          THE COURT:  Did you negotiate a search protocol with

 3  the FTC for the preparation of the documents that you produced

 4  to them?

 5          MR. COVE:  We did not handle that, but my -- another

 6  firm did.

 7          THE COURT:  I asked you that question last month, so I

 8  want to know the answer.

 9          MR. COVE:  My understanding is -- I'm sorry, I didn't

10  mean to interrupt Your Honor.

11          THE COURT:  It's okay.

12          MR. COVE:  My understanding is that they did not

13  negotiate a search protocol with the FTC.  They may have used

14  some internal search terms in looking for things, but they did

15  not negotiate or --

16          THE COURT:  And do you know what those internal search

17  terms are?

18          MR. COVE:  I don't have them right --

19          THE COURT:  Why not?  Because they produced a set of

20  documents that the plaintiffs think are excellently targeted for

21  this litigation.

22          MR. COVE:  I'm happy to try and get all of the search

23  terms and figure that out.  I would be surprised if they did --

24          THE COURT:  It's your client's work product.  I can't

25  imagine that that couldn't be turned over because that's one of

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  the trust issues they're saying is that they're testing what

 2  you're proposing against what they got as a result of the FTC

 3  production.

 4          MR. COVE:  Right.  And one point I want to make about

 5  the FTC production is I'm not sure that we've seen things that

 6  they've come up with, documents, that are really important that

 7  are missed there.  The whole document they referred to also had

 8  the word "exclusive."  It also had --

 9          THE COURT:  No, I got that, just the fact that it

10  doesn't have a unique hit doesn't mean that it's not going to be

11  picked up otherwise.

12          MR. COVE:  Yes.  And we've -- and we've tried to put

13  proximity limiters with "hold," but in these --

14          THE COURT:  I understand that, but the point is is that

15  they got a document set that they have some confidence is a

16  genuine search for relevant responsive documents.  You've

17  already done it.  You already agreed to it with the FTC.  If we

18  could both see what you did for the FTC, that might go a long

19  way to increasing the confidence in getting precision, not just

20  recall.

21          MR. COVE:  Okay, Your Honor.  I'm glad you --

22          THE COURT:  Do you get my drift?  I mean, do you see

23  where I'm going?

24          MR. COVE:  Yes, I do.

25          THE COURT:  Because I am trying to -- adversaries are

—TRANSCRIBED FROM DIGITAL RECORDING—

1  necessarily suspicious of the other side.

2      MR. COVE:  Yes.

3      THE COURT:  But there are some ways of testing both

4  sides' positions.

5      MR. COVE:  Yes, yes.

6      THE COURT:  Especially with respect to your burdensome

7  and your onerousness and the degree of privilege review, it

8  seems to me you've been through this process before, not you

9  personally, but your side of the table has.  And so that would

10 inform the process a great deal.

11     MR. COVE:  I'm glad to do that, Your Honor.

12         But, you know -- and if there's any term that is not on

13 the FTC list, the internal list that they used, we'd be glad to

14 add it.  I'm not --

15     THE COURT:  Yeah, I can't imagine why not.

16     MR. COVE:  If there is.  So we -- and I'm sure there

17 was not any hundreds of lists of terms in that list.  And,

18 again, it was not negotiated.  It was done internally, and it

19 has to be recreated.

20     THE COURT:  Correct, which means you did a pretty good

21 job of knowing what the issues were and you're dealing with the

22 federal government.  Were you dealing with a Holder Memo or a

23 Thompson Memo?

24     MR. COVE:  No, Your Honor.  The Holder Memo really only

25 applies when the corporation has done something improper and has

-TRANSCRIBED FROM DIGITAL RECORDING-

```
 1  to consider --
 2          THE COURT:  Or when the government suspects you have.
 3          MR. COVE:  -- whether to waive privilege or not.  Zuffa
 4  had not done anything improper so it wouldn't really apply
 5  there.  They were -- you know, the FTC was investigating and
 6  they, you know, investigated thoroughly.
 7          THE COURT:  They weren't threatening you with
 8  prosecution.
 9          MR. COVE:  No, no.  No, Your Honor.
10          So, you know, that would be our proposal is to move
11  forward and we can continue to meet and confer.  You know, some
12  of the samples that were provided, if they identify things in
13  there that we -- that we think are important or if there are
14  particular sponsors that they -- you know.  We're not insisting
15  on proximity limiters for every fighter and every sponsor.
16  We're writing all the plaintiffs' names without any limiters.
17  We're willing to talk about subsets of these things.  But 2,500
18  names without any limitation whatsoever --
19          THE COURT:  You need not fear that I'm going to
20  order --
21          MR. COVE:  It's just too many.
22          THE COURT:  -- every nickname and every first name and
23  every...
24          MR. COVE:  Right.  I mean, there are -- you know, as we
25  were thinking about it after the -- after the joint status
```

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   report was filed, you know, there probably are a couple of

2   nicknames where they actually are commonly referred to the

3   fighters that way, like Rampage.  But 99.99 percent of the time

4   the fighter has a nickname -- like, one of the plaintiffs whose

5   name -- his nickname is Brandon "The Truth" Vera.  All of the

6   publicity material says Brandon "The Truth" Vera, but when

7   they're talking about his contract or anything about him, they

8   call him Brandon and they call him Vera.  They won't say, What

9   are we going to offer "The Truth" today?

10           You know, so we can work to get the right nickname.  So

11   we can work if they have sponsors that they're interested in and

12   they want those reviewed, you know, without proximity limiters,

13   I think that's a reasonable compromise.  But we're still at a

14   point where they are at 85 percent of the corpus.  It's

15   extremely expensive.  And the ways that they have suggested of

16   narrowing, while helpful, are not very helpful and are not

17   really going to move the needle beyond, you know, maybe 85 to 82

18   or 83 percent.  And that's, you know, the difference is well

19   over a million dollars, which is, you know, it is still -- Zuffa

20   is a successful company, but --

21           THE COURT:  It's not chump chain.  I get that.

22           MR. COVE:  It's -- it's still a small company.

23           THE COURT:  You're the biggest show on earth, but

24   you're a small company.

25           MR. COVE:  We're not the biggest show on earth yet,

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1  Your Honor.  That's the goal.

2          And so, you know, and some of the requests that we've

3  gotten for sampling, for example, every term that we don't agree

4  with, run a sample of 500 documents on or --

5          THE COURT:  No, they can pare that down to 200.  And

6  now they say that your samples -- they're not confident that

7  your samples were --

8          MR. COVE:  Of course.  And, I mean, these people are

9  very creative and they're very experienced and they're very

10  intelligent.  And they can continue to ask questions and I'm not

11  saying every question is not worthwhile, but some of them are

12  extremely burdensome.  They take away from us producing the

13  materials.  We're running searches and doing things like that.

14  We did provide them the sample 1,500 documents.  We provided a

15  sample of 800 documents, not 200 documents.  It was 200 times

16  four for each of the categories.

17          THE COURT:  For each of the categories.

18          MR. COVE:  You know, they start out with a number that

19  is 500 for 1,000 terms is a million documents.  It's not

20  reasonable.  It is not a good way to start.  It is not a good

21  way to proceed.  And that's -- you know, our feeling is that one

22  of the problems here is there can always be burdensome requests

23  for more information, more information.  And if we run the terms

24  we have now and we work with them, you know, subject to them

25  coming back and telling Your Honor that what we did was not

───TRANSCRIBED FROM DIGITAL RECORDING───

1  enough, we think that's an efficient way to proceed because, you

2  know, we're not crazy.  We don't want to do this again in May or

3  June.  We want to get it done and --

4         THE COURT:  Well, and that's kind of the moral of the

5  story is sometimes a limitation that the Court later finds was

6  not adequate can cost you more money in the long run.

7         MR. COVE:  That's -- and that's certainly true.  And

8  that's a big hammer holding over our head which is an incentive

9  for us to be reasonable.  And right now I don't see that they

10  have any incentive to move off 85 percent, other than, you know,

11  little 10,000 things here.

12         You know, the -- Mr. Dell'Angelo said they proposed

13  lots of but-not solutions and I don't really -- I may -- I may

14  not be recalling, but I don't recall any but-not solutions that

15  were suggested other than those that related to hold tix and

16  home tickets.

17         THE COURT:  Mr. Kellner's affidavit says they proposed

18  and your consultant's expert says you proposed Boolean not

19  exclusions.

20         MR. COVE:  I'm just not recalling the specifics again,

21  Your Honor.  I've been doing this for a while and I'm not -- I'm

22  not saying they didn't do it, but I don't recall any right

23  sitting here today.  And the trouble with, say, for not -- let's

24  use the example of "hold."  There are 132,000 documents which

25  have the word "hold" in them in the 1.4 million testing subset.

—TRANSCRIBED FROM DIGITAL RECORDING—

1   And with families that's 500,000 documents.

2        THE COURT:  Let's go to the families because one of the

3   points that is made in the affidavit of Mr. Kellner is that they

4   don't understand why it is that when you include families you

5   have a -- three times as many documents hit if you're truly

6   trying to filter out and using exclusionary techniques.

7        MR. COVE:  I would like to address that, but I think --

8   if I could defer to Ms. Lynch on that.  This is something we

9   have been investigating.  I think she can probably explain our

10  most recent results better than I could, if that's okay with

11  you, Your Honor.

12       THE COURT:  Sure, because you keep telling me about

13  burden because of -- because of the connectors and the family

14  and the parent/child relationships.  And they make the point of,

15  If you're doing it right, you shouldn't have three times as many

16  documents on a hit with connectors.

17       MR. COVE:  Respectfully, I think he was speculating

18  there.  And we have examined what type of documents those

19  documents are, and the great majority of them are Microsoft

20  Office-type attachments such as Word, Excel.  Do you have the

21  statistics handy?

22       I'm going to defer to the person who knows the most.

23       THE COURT:  I have to have my staff's help in doing

24  rudimentary things on the computer, but I do read what you have

25  to say.

———TRANSCRIBED FROM DIGITAL RECORDING———

1          MS. LYNCH:  Thank you, Your Honor.

2          We believe Mr. Kellner looked at the non-hit documents

3   that we had produced.  We initially provided them with 1,500

4   documents that did not hit on any of the parties' search runs.

5   And from that group, Mr. Kellner concluded that there were

6   numerous attachments for every cover e-mail, but again those

7   were based on the documents that did not hit on search terms as

8   opposed to the documents that did hit on search terms.  And when

9   we ran --

10          THE COURT:  Well, here I'm looking at the -- Zuffa's

11   Search Term Proposals Sorted By Hits, your Exhibit B to the

12   status report.  And the first term on the list is exclusive,

13   without the E, and a percentage.  And the document hit count is,

14   I'm going to round it off, 70,000.  And the document count with

15   families is 187,000.

16          MS. LYNCH:  And so there are certain search terms that

17   had more than one attachment per search term, but if you look at

18   the overall documents, out of the 100 and -- 1.44 million, the

19   actual search terms that hit on those documents were a little

20   over a million.  And then it only brought in another 144,000

21   attachments that were not search term positive.

22          So on the whole, the vast majority of the plaintiffs'

23   search terms hit on documents and attachments as opposed to when

24   you look at them on a search-term-by-search-term basis.  And so

25   we investigated how many cover e-mails there were versus how

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

 1  many attachments there were to make sure that what Mr. Kellner

 2  was addressing was not an issue with extracted images or other

 3  extracted information that were showing up as attachments.

 4       And we found that out of the 1.44 million documents

 5  from the e-mail server, 1.125 million of them were cover

 6  e-mails.  So they were MSG files.  And then there were 315,000

 7  attachments out of that set.  And of the 315,000 attachments,

 8  over 200,000 of them were the types of documents you would

 9  anticipate being attached to business-type e-mails, Word

10  documents, Excels, PDFs, and power points.

11       THE COURT:  All right.  Thank you.

12       MR. COVE:  It appears that what he did was look at a

13  subset based on one particular search term and came up with the

14  one that --

15       THE COURT:  I just took the first one on the list --

16       MR. COVE:  Yeah.

17       THE COURT:  -- as an illustration of his point.

18       MR. COVE:  But in any event, I mean, we think this is

19  the best way to proceed.  You know, this is -- the review

20  process will be time consuming and expensive.  The status

21  report, I'm sure you -- I know you've mentioned before are

22  lengthy and, as you can imagine, are expensive and distracting

23  to produce.  We think that if we are -- you know, go forward

24  with these search terms, we continue to talk and to listen to

25  what they have to say based on sampling and things like that,

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1   that we can arrive at some reasonable place.  They will come

2   back and say, We want it all again.  And we'll have to contend

3   whether -- whether what we've done is reasonable and is enough,

4   and we think we can do that.

5          I mean, we're in a situation now where we haven't

6   gotten a single document from the plaintiffs.  We asked them for

7   at least the material that they had relied on in bringing the

8   complaint before we had to answer the consolidated amended

9   complaint.  We didn't get that.  So we're still waiting on

10  anything from them after all this time.  We feel we've been

11  working very, very hard.

12         And that this is -- the way I've suggested is one way

13  to go.  It will reduce the amount of lawyer time spent.  It will

14  get the process going fast, and it will have to be defended by

15  us at the end of the day, so...

16         THE COURT:  I am going to order the parties proceed

17  with Zuffa's proposal with respect to 392 search terms, plus the

18  additional 100,000 documents as part of, and, again, I emphasize

19  this, an iterative process, a-test-and-see-how-well-it's-working

20  basis.  I'm also going to order that Zuffa find and disclose and

21  have the experts discuss the FTC search protocols to inform the

22  process and to see if there are search terms that Zuffa

23  internally decided -- you've told me and represented that Zuffa

24  made the decision of how to respond to the FTC's inquiries and

25  that means Zuffa gave this some thought.

—TRANSCRIBED FROM DIGITAL RECORDING—

 1          MR. COVE:  Yeah, yeah.  Previous counsel certainly

 2   thought about it and tried to respond to the FTC as best they

 3   could.

 4          THE COURT:  I'm going to order you to proceed on that

 5   basis.  And, again, it's not with the expectation that that ends

 6   the inquiry, but that it's part of an iterative process.  That

 7   the plaintiffs see what they get.  They see where the holes are,

 8   if they believe there are holes in which you're producing, and

 9   update the process as we go along to obtain -- and I fully

10   appreciate their observation.  You proposed terms like

11   "monopoly" and "monopsony" that except in lawyer's briefs or

12   confidential communications between your top executives and the

13   lawyers are not going to be found in the pick-and-shovel

14   documents that establish a party's case or defense to that case.

15          MR. COVE:  Your Honor, I agree with the latter part,

16   but I really think it is a cheap shot in that every antitrust

17   case I've -- every antitrust case I've been in, the plaintiffs

18   and the defendants have always agreed on those terms,

19   conspiracy, cartel in a cartel case.  So I feel -- the fact that

20   we added them, those weren't the only terms.  We looked at --

21          THE COURT:  I'm not taking a shot at you for that

22   purpose.  I'm just telling you that, you know, everybody knows

23   that people don't send e-mails to each other, Let's engage in a

24   conspiracy to -- well, some -- actually people do do that.

25   There have been some examples of that, but that's not usually

——————TRANSCRIBED FROM DIGITAL RECORDING——————

```
 1  how sophisticated people act.
 2           MR. COVE:  Yes.
 3           THE COURT:  And so I appreciate their need to obtain
 4  not just the sanitized version of what your top people discuss
 5  with your lawyers and experts, but the down-and-dirty part of
 6  what it is.  And I don't mean that in a derogatory fashion, just
 7  colloquially what people do in real life every day and how they
 8  talk behind closed doors and how they communicate behind closed
 9  doors and how that may inform a relevant and admissible
10  evidence.
11           MR. COVE:  Thank you, Your Honor.
12           THE COURT:  Okay.
13           MR. DELL'ANGELO:  Your Honor?
14           THE COURT:  Yes, Mr. Dell'Angelo.
15           MR. DELL'ANGELO:  May I be heard for just a moment?
16           THE COURT:  You may.
17           MR. DELL'ANGELO:  Thank you.
18           I'll be very brief.  I just --
19           THE COURT:  Famous last words.
20           MR. DELL'ANGELO:  No, I will do my best.  Just one
21  observation and one request.  Just one observation about the FTC
22  production that I would like to kind of make clear to the Court,
23  to the extent that it's not, because it is -- has become --
24           THE COURT:  I know it's not the be all and end all.
25           MR. DELL'ANGELO:  Okay.
```

——TRANSCRIBED FROM DIGITAL RECORDING——

 1          MR. DELL'ANGELO:  It --

 2          THE COURT:  I understand that.

 3          MR. DELL'ANGELO:  But just it was a -- a subset of

 4  what's going on here.  You know, it only encompasses a small

 5  subset of the allegations in this case, and it didn't -- there's

 6  some overlap with the custodians, but then there are a lot of

 7  custodians as we understand it from the metadata were involved

 8  in the FTC production that are not custodians here.  So it -- I

 9  think it is a useful guide.  I'm not sure it is a proxy, but --

10          THE COURT:  No, and nothing I have said should be

11  construed as that.

12          MR. DELL'ANGELO:  Thank you.

13          THE COURT:  What I'm trying to do is get the parties

14  started in a meaningful way at some targeted discovery and take

15  it a step at a time to see what you get and where you think it's

16  either responsive or not, where you think it's lacking or not,

17  because you haven't reviewed anything so far, particularly -- I

18  mean, you've reviewed a limited universe of materials, and you

19  are speculating on what you might get based upon proposals that

20  both sides acknowledge is an imperfect process.

21          MR. DELL'ANGELO:  Well, there's actually an important

22  distinction there.  I don't think that we're -- in fact, I know

23  we're not really speculating at all.  I mean, we're making

24  substantive analyses based on the FTC production, the 1,500

25  documents that we got from the document set at issue that were

1  non-hits and the 800 that were hits.

2          Where I think you're saying is speculation and, you

3  know, the papers are rift with it, is from Zuffa telling you

4  that, you know, documents that use our terms will be of minimal

5  relevance or not likely to be responsive.  That actually hasn't

6  been tested, which is I think gets to the two requests that I'd

7  like to make.  One is just technical.

8          The samples that we've been provided thus far have been

9  non-searchable PDFs.

10          THE COURT:  And your expert tells you he was chagrinned

11  to find that out, which means to me that you didn't talk about

12  that before you got it in that format.

13          MR. DELL'ANGELO:  It is by far nonstandard.  All of

14  that said --

15          THE COURT:  Mr. Cove, can you answer that question?

16  Why it is that those samples were provided in PDF non-searchable

17  format?  Because that doesn't make sense to me either.

18          MR. COVE:  Yeah, I mean, these were done in a very

19  abbreviated period of time.  We never discussed it with the

20  plaintiffs.  We're certainly glad to give them -- I mean, we

21  made the offer on Tuesday of the 800 documents.  They got back

22  to us on Thursday.

23          THE COURT:  Didn't you have to change the format to

24  give it to them in PDF instead of giving it to them in native?

25          MR. COVE:  I don't know the answer to that question.

––––TRANSCRIBED FROM DIGITAL RECORDING––––

1            THE COURT:  Usually it's more work to convert it to PDF

2    than it is -- I mean, that's my understanding.  Again, I am

3    not --

4            MR. COVE:  That's a level of detail that I did not

5    focus on.  They hadn't asked it and it didn't occur to me until

6    this came up, but we can certainly provide it --

7            THE COURT:  The whole reason for them to test it is to

8    be able to do their own magic with --

9            MR. COVE:  No, I understand that.

10           THE COURT:  If they have to pull it up file by file,

11   then that's not particularly helpful and it doesn't move the

12   process.

13           MR. COVE:  I mean, I'm happy to provide them --

14           THE COURT:  I would think so.

15           MR. COVE:  -- in whatever our agreed-upon format is.

16   I'm sorry.  I can't answer your question.

17           THE COURT:  That's one of the reasons I do these status

18   conferences is to, you know, keep you on your feet and make you

19   think about these things instead of having to do it in formal

20   motion practice after months have gone by.

21           MR. COVE:  Understood, Your Honor.

22           MR. DELL'ANGELO:  Thank you, Your Honor.  And just the

23   last issue is, I do think, and again Mr. Kellner can address

24   this, but as we get -- as we continue down this process, I would

25   like to propose, to the extent that your direction here does not

─TRANSCRIBED FROM DIGITAL RECORDING─

1  explicitly encompass this, that we have the opportunity to do at

2  least two things.  One is to continue to sample the non-hits, if

3  you will, from these undisputed terms and that we get from Zuffa

4  a more robust explication or -- of what it is in the documents

5  that is not responsive.  We've gotten -- part of what has gotten

6  us here is we've gotten a very limited window from them about

7  what it is that's not responsive, plane reservations, hotel

8  reservations, loading bays, you know, for venues, but it's so

9  limited.  It has really made it sincerely very difficult for us

10  to figure out --

11       THE COURT:  Right, but I understand their perspective,

12  too, which is you're talking about our entire business.  We

13  could spend more time telling you what we do and why all of this

14  isn't responsive than -- and you're never going to be satisfied.

15       MR. DELL'ANGELO:  I think they need to spend some time

16  doing it, and that's all that we're asking.  It doesn't need to

17  be protracted, but these requests were served in April of last

18  year.

19       THE COURT:  And what about your responses to their

20  requests?  Let's move to that now.

21       MR. DELL'ANGELO:  In what respect, Your Honor?

22       THE COURT:  They tell me you haven't given them a

23  single document.  Is that true?

24       MR. DELL'ANGELO:  So if you recall at the last status

25  conference, there were a number of open issues which the Court

───TRANSCRIBED FROM DIGITAL RECORDING───

 1  resolved, including time frame so -- for example.  So all of

 2  those documents have long since been collected.  Once the --

 3          THE COURT:  Collected and produced is different.  Now

 4  you're reviewing them and it's taking you some time, isn't it?

 5          MR. DELL'ANGELO:  I understand that, Your Honor, but

 6  you could load them.  But you actually can't start processing

 7  them until we know what date range we're dealing with.

 8          THE COURT:  So what's the time frame for you getting

 9  them something?

10          MR. DELL'ANGELO:  They're all being loaded now, and as

11  I understand it, the loading should be completed within a week.

12  We have reviewers and a protocol in place.  And we're doing a

13  linear review of every document.  We're not proposing to apply

14  search terms and that sort -- way Zuffa has.  And we will move

15  those as expeditiously as possible and produce them on a rolling

16  basis.

17          THE COURT:  That's nice and vague, but it doesn't tell

18  me what schedule you have for production.

19          MR. DELL'ANGELO:  I don't have a schedule for

20  production for you, Your Honor.  I mean, what I can tell you is

21  as expeditiously as we can get them reviewed.  I mean, I think

22  I've been pretty clear about where they are in the process.

23  They're about done being loaded, within a matter of days.  There

24  are a group of people who are prepared to start reviewing those

25  and who will be dedicated to reviewing them and producing them

—————TRANSCRIBED FROM DIGITAL RECORDING—————

 1  on a rolling basis.  So --

 2          THE COURT:  Your feet are going to be put to the fire

 3  as well as Zuffa's in terms of meeting your discovery

 4  obligations.  They have produced about 984,000 pages so far.

 5          MR. DELL'ANGELO:  So -- and I'm perfectly comfortable

 6  with that, Your Honor, but I would also say that there's I think

 7  at least six months between the time that our requests were

 8  served versus theirs.  And what has been produced to us is

 9  largely the FTC production which would have been produced in

10  2000 --

11          THE COURT:  Correct.  And you've got fighter files now,

12  right?

13          MR. DELL'ANGELO:  And we have some fighter files.

14  That's correct.  So...

15          THE COURT:  Well, you've got 160,000 pages and you got

16  103,000 pages from fighter files, hard copy files, and total

17  documents produced to date by Zuffa is 984,000, right?

18          MR. DELL'ANGELO:  Right.  A substantial portion of

19  which is the FTC production, and largely the balance are the

20  fighter files which, you know, we -- I think we ruled on several

21  months ago.

22          THE COURT:  Correct.  And aren't those the items that

23  you prioritized?

24          MR. DELL'ANGELO:  It is.  And one of the reasons we did

25  is because what we understood is that they would be easy to

─── TRANSCRIBED FROM DIGITAL RECORDING ───

 1  produce and they'd be produced quickly.

 2          THE COURT:  And you both have a different view of what

 3  "quickly" means.

 4          MR. DELL'ANGELO:  I don't think it's something that we

 5  need to argue about here.

 6          THE COURT:  That's true.  I'm just telling you --

 7          MR. DELL'ANGELO:  I'm not suggesting that you do,

 8  but --

 9          THE COURT:  -- I'm going to be asking you every week or

10  every status reporting period what you've done and where you are

11  and why you can't do it faster.

12          MR. DELL'ANGELO:  I'm perfectly comfortable with that,

13  Your Honor.

14          THE COURT:  Okay.  I'm just giving you a heads-up.

15          MR. DELL'ANGELO:  Thank you.

16          THE COURT:  All right, counsel, at least we have a plan

17  of proceeding.  I'll set this for a further status and dispute

18  resolution conference in approximately 30 days, unless either

19  side feels that the time and effort of preparing and coming here

20  could be better spent actually doing what I just told you to do.

21          MR. COVE:  We are in the latter category, Your Honor.

22          THE COURT:  And, Mr. Dell'Angelo, would you rather

23  spend the effort working on your production and reviewing what

24  you got than seeing me every 30 days?

25          MR. DELL'ANGELO:  I think we are --

————TRANSCRIBED FROM DIGITAL RECORDING————

1          THE COURT:  As much as you love being here, I know.

2          MR. DELL'ANGELO:  I do.

3          THE COURT:  Okay.  Let's do -- let's set this for a

4   60-day status check to allow you to make some significant

5   progress, and I do expect you to make significant progress so

6   you're not side-tracked in coming here and using time that you

7   could be using to produce.

8          Mr. Miller, can you give us a date about 60 days out?

9   And feel free to get out your respective calendars and so forth,

10  devices, and make sure that the appropriate people can be here.

11         COURTROOM ADMINISTRATOR:  Your Honor, we will set this

12  matter for status check on Tuesday, April the 26th, 2016, at

13  1:45 p.m. in this courtroom.

14         THE COURT:  All right.  Now let's just be at ease for a

15  minute while folks check their calendars and schedules and so

16  forth.  Mr. Dell'Angelo, is that a problem?

17         MR. DELL'ANGELO:  I think it may be.  My device is

18  opening.

19         THE COURT:  Sure.  Just go off the record for a minute

20  and let everybody...

21         MR. DELL'ANGELO:  Thank you.

22         (Recess taken.)

23         COURTROOM ADMINISTRATOR:  Your Honor, we are now back

24  on the court record, resuming Le versus Zuffa.

25         THE COURT:  All right.  We've been consulting calendars

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1   off the record, and I think we settled on Monday, April 25th, at

2   1:45 p.m. for a further status and dispute resolution conference

3   in this matter.  And I'll see you back then, counsel.  Thank

4   you.

5          MR. COVE:  Thank you, Your Honor.

6          (Whereupon proceedings concluded at 2:46:43 p.m.)

7                          --oOo--

8       I, Patricia L. Ganci, court-approved transcriber, certify

9   that the foregoing is a correct transcript transcribed from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13      /s/ PATRICIA L. GANCI          FEBRUARY 29, 2016
           Patricia L. Ganci                 Date
14

15

16

17

18

19

20

21

22

23

24

25