WILLIAM A. ISAACSON (*Pro Hac Vice*)
(wisaacson@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW, Washington, DC 20015
Telephone: (202) 237-2727; Fax: (202) 237-6131

JOHN F. COVE, JR (*Pro Hac Vice*)
(jcove@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000; Fax: (510) 874-1460

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>      v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>        Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL)<br><br><br>**JOINT STATUS REPORT**<br><br>**REDACTED** |

The parties in the above-captioned matter have met and conferred and submit the following Joint Status Report.

**I.      Outstanding Motions (Joint Statement)**

Plaintiffs filed a motion to challenge the privilege designation of one Zuffa document. Zuffa has opposed the motion, which is fully briefed and before the Court.

**II.     Discovery Progress**

**A.  Plaintiffs' Statement**

**1. Plaintiffs' Production to Date**

In or around April and May, 2015, Plaintiffs gathered documents from the six named Plaintiffs, as well as Rose Gracie (the spouse of Javier Vazquez) and Suzanne Le (the spouse of Cung Le). Plaintiffs collected 323,000 emails and attachments from the account servers for their email accounts, and over 100,000 social media files from the account servers for their social media accounts. Plaintiffs also collected 6,643,042 files from the named Plaintiffs' electronic storage devices, including desktop and laptop computers, iPads and tablets, external hard drives, smart phones and any other electronic storage devices in their possession. Of those, 1,242,314 were deemed potentially responsive,[1] including 1,016,570 graphic files, 20,747 video files, 9,694 audio files, 51,608 mail files (in addition to the files collected from the account servers), 41,420 office files including word processing and pdf files, and documents contained in 102,275 container files (*e.g.*, .zip and RAR files). Plaintiffs deduplicated the total collection of documents to ensure that, for example, emails collected from the electronic storage devices were deduplicated against emails collected from the servers, and documents collected from the container files were deduplicated against the office files and email attachments. Plaintiffs are in the final stages of reviewing *all* of these potentially responsive documents. Plaintiffs have utilized numerous strategies to speed and facilitate the review of these documents, such as using a thumbnail viewer to quickly and efficiently identify responsive image files. To date, Plaintiffs

---

[1] The rest of the files, including system files, program files, software development files, help files, and other miscellaneous computer-generated files and unknown file types, were not potentially responsive. Plaintiffs did not review these files.

JOINT STATUS REPORT

have produced 14,068 responsive documents comprising 49,798 pages. Plaintiffs will produce approximately 24,231 documents totaling approximately 87,500 pages by the close of business on April 29, 2016, which will bring the total produced to approximately 38,299 documents comprising 137,298 pages. Plaintiffs expect to be complete the production of their responsive documents by May 6, 2016.

### B. Zuffa's Statement

#### 1. Zuffa's Production of Documents

To date, Zuffa has produced approximately 140,000 documents totaling about 950,000 pages and re-produced approximately 108,000 documents that were produced to the FTC in 2011. Since the last Joint Status Report, Zuffa has made 5 additional productions totaling over 96,000 documents and over 450,000 pages.  Three of these productions came from the application of the Undisputed Terms and Zuffa's Search Terms (collectively, the "Ordered Terms") from the custodians' email collection.

Counsel has exchanged over 130 pages of formal correspondence on these issues since January 1 in addition to voluminous emails on these subjects.

#### 2. Plaintiffs' Production of Documents

Plaintiffs have made productions of documents relating to 2 of the 6 named Plaintiffs, plus documents classified as "Documents Relied on for Complaint," totaling fewer than 50,000 pages. Over 2,000 of these documents were single page Facebook or Twitter messages.

### III.    Whether and to What Extent Search Terms Should Be Applied to Zuffa's ESI

#### A. Joint Statement

The parties have compiled the below chart for ease of reference in evaluating the current status of the email documents at issue.

| Email Document Corpus Statistics | |
|---|---|
| **Total Email Documents in Corpus[2]** | **2,030,858** |
|    Email Server Documents Set[3] | 1,441,121 |
|    Email Documents in the Hard Drive Documents Set[4] | 589,737 |
| | |
| **Total Effects of Meet and Confer:** | **563,931** |
|    De-Duplication Reduction | 223,191 |
|    Winnowing Proposals Reduction | 307,972 |
|    Legal Custodian Winnowing Proposals Reduction | 32,768 |
| | |
| **Emails (Total Remaining After De-Duplication and Winnowing):** | **1,466,927** |
|    Zuffa's Review Set[5] | 594,496 |
|    Remainder Set[6] | 819,406 |
|      Plaintiffs' Search Terms Set[7] | 603,431 |
|    Produced Email ESI Documents[8] | 53,025[9] |

---

[2] The "Total Email Documents in Corpus" number refers to the total number of email documents from the email server and the custodial hard drives.

[3] "Email Server Documents Set" refers to the emails and attachments collected from Zuffa's email servers. The Email Documents Set is the set discussed at the last Status Conference.

[4] "Email Documents in the Hard Drive Documents Set" refers to the emails and attachments housed on custodial hard drives (the "Hard Drive Documents Set").

[5] "Zuffa's Review Set" is the total number of emails and attachments from the Email Documents Set and the Hard Drive Documents Set that contain (1) the undisputed 392 search terms (Dkt. 218-1); (2) the terms from Zuffa's search term proposal (Dkt. 218-2); (3) the Original FTC Search Terms, a set of search terms used in connection with the 2011 FTC investigation (Exhibit 1); (4) the FTC Search Terms with New Fighter Names, a set of modifications to the Original FTC Search Terms that includes the first name, last name, and nickname of all athletes who have competed in a UFC bout after December 16, 2010 (Exhibit 2); (5) documents that contain any of the Additions to Zuffa's Search Terms List (Exhibit 3); and (6) all email documents that Zuffa has agreed to review without the use of search terms, see pg. 43. Zuffa's Review Set does not encompass documents from the above 6 categories which have already been produced.

[6] "Remainder Set" refers to those documents remaining after the documents in Zuffa's Review Set have been removed. Both Zuffa's Review Set and the Remainder Set figures represent documents in the respective Set after the agreed-upon de-duplication and winnowing processes and legal custodian proposals have been applied.

[7] "Plaintiffs' Search Term Set" refers to those documents in the Remainder Set that hit on Plaintiffs' Search Term Proposal but are not included in Zuffa's Review Set.

[8] "Produced Email ESI Documents" refers to the search term positive email documents that Zuffa has produced since the last Status Conference.

[9] None of these figures include the recently discovered FTC collection set discussed below.

JOINT STATUS REPORT

### B. Plaintiffs' Statement

#### 1. Plaintiffs' Proposal: The Court Should Order The Remainder Set And FTC Collection To Be Produced, With Or Without Plaintiffs' Search Terms, And The Production Of Responsive Clawed Back FTC Production Documents.

Since the last status conference, Defendant has remained dilatory in responding to Plaintiffs' efforts to make progress (many of Plaintiffs' requests for data and information remain outstanding) and Defendant has failed (despite repeated invitations) to propose methods to meaningfully reduce the set despite Defendants' superior access. In the sections below, Plaintiffs (1) set forth the history of Defendant's conduct; (2) describe the success Plaintiffs have had in winnowing the set based on the tiny samples that Zuffa has allowed Plaintiffs to review; and (3) propose that the Court order Defendant to produce the documents returned by Plaintiffs' search terms (subject to Defendant's right to review the documents for privilege and/or responsiveness).

Plaintiffs' Document Requests were served on April 25, 2015 and Defendant stipulated to substantial completion of its document production by June 1, 2015. Defendant has delayed discovery for months with unsubstantiated claims of burden and expense (much of which would result from its own conduct), while the parties have negotiated ad nauseam about the application of search terms. Plaintiffs' should not suffer further delay or be prejudiced by the failure to produce responsive documents in the Remainder Set, FTC Collection and documents clawed back from the FTC Production.

Accordingly, Plaintiffs propose that the Court order as follows.

**Remainder Set.** That the Court: (1) order the production of the Remainder Set; or, in the alternative (2) order the production of all responsive non-privileged documents in the Remainder Set after application of Plaintiffs' current Search Term Proposal.

**FTC Collection**. That the Court: (1) order application of all previously agreed upon reduction proposals (*i.e.*, deduplication, winnowing, two-tier searches and Legal Custodian privilege screens), deduplicate to remove the FTC Production and produce the remaining corpus; or, in the alternative, (2) order the production of all responsive non-privileged documents in the FTC Collection after application of proposal (1) and Plaintiffs' current Search Term Proposal.

**Clawed Back FTC Production Documents.** That the Court Order Defendant to conduct an independent review of all documents clawed back from the FTC Production on the basis that such documents were not produced to the FTC and to produce all non-privileged documents responsive to Plaintiffs' Document Requests in this litigation.

**Video Files**: That the Court order Defendant to review for responsiveness and produce its 4,045 video and audio files, as Plaintiffs did.

Plaintiffs also propose that, to the extent that either party identifies additional winnowing opportunities based on their actual experience reviewing Defendant's documents, any such agreed upon methods may be applied to the remaining document sets.

### 2. The Progress Plaintiffs Have Made Since the Last Status Conference

First, *Plaintiffs'* deduplication protocol and winnowing proposals have reduced Defendants' ESI from 2,030,858 Email Documents[10] to 1,466,927 Email Documents ("Reduced Set"). Of the Reduced Set, 819,406 documents do not hit on any of Defendant's Search Terms. ("Remainder Set"). Within the Remainder Set, Plaintiffs' revised Search Term Proposal hits on 533,357 documents or 603,431 with families. Thus, through Plaintiffs' efforts, the scope of the parties' dispute about how Zuffa should be required to review and produce the Remainder Set has been reduced to a potential universe of 819,406 documents or 603,431 when Plaintiffs' Search Terms Proposal is applied.  Defendant contends that it too made proposals. However, those "proposals" were generally counterproposals.

Second, *Plaintiffs'* inquires have led the Defendant to uncover a vast trove of additional ESI and documents consisting of approximately 1.8 million documents collected in 2011 ("FTC Collection Set"). As discussed below, the FTC Collection Set consists of documents for key custodians during a portion of the Relevant Time Period for which Zuffa claimed to have little or no ESI or documents in light of its aggressive document destruction policy.

Pursuant to a Stipulated Order, Defendant is required to substantially complete its production of documents by June 1, 2016. Zuffa's inexcusable failure to identify the FTC

---

[10] "Email Documents" refers to emails and their attachments.

Collection Set until April 25, 2016, *exactly one year to the day after Plaintiffs' Requests for Production of Documents ("RFPs") were served*, should not abate the substantial completion deadline or delay discovery more than Defendant's conduct already has.

a.   **Plaintiffs Uncovered Zuffa's Failure To Conduct A Reasonable Inquiry Which Concealed From Discovery 1.8 Million Key Custodial Documents Dating From The Relevant Time Period Which Zuffa Represented Did Not Exist**

Defendant's lack of, at best, fundamental diligence has left hidden from the view of Plaintiffs and the Court – until now – ***1.8 million additional documents*** sourced with the help of Zuffa's legal department from key custodians for the period prior to June 2011. Zuffa heretofore had represented that these documents did not exist. But for Plaintiffs' diligence, this massive trove of documents would have been shielded from discovery.

By way of background, exactly one year before Defendant's revelation, on April 25, 2015, Plaintiffs served their first set of RFPs. Request No. 54 sought documents provided to the Federal Trade Commission ("FTC") regarding Defendant's business practices and alleged anticompetitive conduct. In September 2015, Defendant proposed to produce the documents that it produced to the FTC ("FTC Production"). (Dkt. 185, at ECF 13:19-22.) In making this production, Defendant's counsel worked with the Defendant's prior counsel ("Axinn") and document vendor to recreate the FTC Production from the vendor's document database. Yet, Defendant's counsel apparently never asked the vendor or Axinn a simple question: Does the document collection from which the FTC Production was made still exist? It does.

Recognizing the value of the FTC Production, at the January 26, 2016 Status Conference, the Court asked Defendant about the details of the protocol used to create it ("FTC Search Protocol"). *See*, e.g., Jan. 26 Status Conf. Tr. at 35-36. Zuffa's counsel was unable to provide the information. Jan. 26 Status Conf. Tr. at 36:2-3. At the February Status Conference, the Court again asked Zuffa's counsel for the FTC Protocol. When Zuffa's counsel again failed to provide the information, the Court noted: "I asked you that question last month, so I want to know the answer" and ordered it to be produced. *See* Feb. 23 Status Conf. Tr. at 25:7-8; Dkt. 225.

On March 8, 2016, Defendant sent Plaintiffs the *search terms* purportedly used to create the FTC Production, but not the protocol itself. (March 8, 2016 correspondence from John Cove to Michael Dell'Angelo). Plaintiffs tested the FTC search terms against the FTC Production and determined that those terms did not hit on 19,000 documents (approximately 18% of the FTC Production), meaning that the protocol was broader than the search terms provided. On March 11, 2016, Plaintiffs again requested that Defendant produce the FTC Protocol. After repeated follow-up, Defendant's counsel wrote to describe generally the steps taken to collect the FTC Production. (J. Cove Letter to M. Dell'Angelo, Mar. 29, 2016). Defendant's letter explained that Zuffa's legal department and outside counsel " ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████ " On April 7, 2016, Plaintiffs asked:

> ████████████████████████████████████████
> ████████████████████████████████████████████ as referenced in John's March 29
> ██████████████████████████ letter, still exist and if so, whether they exist and were obtained by Zuffa. If
> Zuffa did not attempt to determine whether those materials still existed,
> please explain why.

(April 7, 2016 email from Michael Dell'Angelo to March Lynch). Plaintiffs' reiterated their request on April 11, 2016 and April 22, 2016.

On April 25, 2016, Defendant's counsel finally revealed that it had "discovered" that Zuffa's FTC Production vendor had retained the 1.8 million document collection from which the FTC Production was made. Prior to that shocking revelation, Defendant had represented to Plaintiffs that it applied a strict document retention policy that ██████████████████ ████████████████ (Sept. 15, 2015 Letter from J. Cove to Michael Dell'Angelo and Attachments A-C thereto). Defendant also represented that as a result of its search to identify sources of documents responsive to the RFPs, no ESI was available from the period pre-dating May 2010 – and only one custodian, Dana White, had any ESI pre-dating January 2012, and only five custodians possessed ESI pre-dating February 2014. *See* Dkt. 199 at 21 (recounting the time periods for individual custodians as provided by Defendant).

7

The paucity of ESI older than ███████ before the litigation hold in this case was implemented, and virtually none predating February 2014 is a significant factor in this case because Plaintiffs allege that the scheme at issue began at least as early as 2006 and the Court held that the Relevant Time period for most topics on which Zuffa must produce documents extends from January 1, 2005 to June 30, 2015. (Dkt. 200). Thus, the timing of Zuffa's creation of the FTC Collection is important and telling. In the March 29, 2016 letter, Defendant's counsel represented that shortly after Zuffa ████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ (March 29, 2016 letter from John Cove to Michael Dell'Angelo and Exhibit A thereto) (emphasis added).

A "Non-Hit" document produced by Zuffa in the April 25, 2016 sample (*i.e.*, a document that did not hit in either party's search terms), is revealing. The document, a June 10, 2011 email addressed to the UFC's employee list from custodian Kirk Hendrick, Zuffa's current Chief Legal Officer, ██████████████████████████████████ ██ ██ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ (*See* MZelaznikLT-00025833, Exhibit 4) (Emphasis in original). ███████████████████████████████████ *Id.* ████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████

---

[11] Plaintiffs' initial draft as provided to Defendant attached this document as an exhibit, but did not include this quote. In response, Defendant complained and threatened plaintiff in Defendant's response draft. In response, and to assuage Defendant's concern, notwithstanding the fact the Plaintiffs were attaching the document as an exhibit, Plaintiffs added the quoted language in their section.

JOINT STATUS REPORT

1 ███████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 █████████████████ *Id.*(Emphasis added). According to the March 29, 2016 letter, ████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ██████████████████████ *Id.* Thus, it appears that while Zuffa was ███████████

9 ██████████████████████████████████████████████████

10 ████████████████████████████████████████ (Ex. 4). Despite

11 Defendant's current strict retention policy and ███████████████████████

12 however, it managed to collect 1.8 million documents from key custodians.[12]

13       Zuffa has an "obligation is to make reasonable efforts to locate and produce information

14 responsive to the plaintiffs' legitimate discovery demands. Furthermore, how reasonable those

15 efforts are will depend in part on the importance of the documents; a cursory search may be all

16 that is required with respect to marginally relevant documents, while a far more diligent search

17 may be necessary where core documents are at stake." *Chen-Oster v. Goldman, Sachs & Co.*, 285

18 F.R.D. 294, 308 (S.D.N.Y. 2012). Zuffa' failed to meet that obligation. Likewise, "a party has an

19 obligation to conduct a reasonable inquiry into the factual basis of his responses to discovery,

20 and, based on that inquiry, a party responding to a Rule 34 production request is under an

21 affirmative duty to seek that information reasonably available to it from its employees, agents, or

22 others subject to its control." *A. Farber & Ptnrs., Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal.

23 2006) (internal quotations and citation omitted). This affirmative duty includes seeking

24 documents in the possession or control of prior counsel where—as here—a party is aware that

25 prior counsel may be in possession of responsive documents. *See Hobley v. Burge*, 2004 U.S.

26

27 [12] Wary of Defendant's representations that virtually no ESI older than ███████ existed in a $3.5 billion company with world-wide operations, Plaintiffs asserted "blind reliance on document retention policies [is] unreliable." Dkt. 199, at 9.

28

Dist. LEXIS 6858, at *27, 2004 WL 856439 (N.D. Ill. Apr. 20, 2004) ("documents in the possession of [defendant's] prior counsel are certainly documents in [defendant's] 'possession, custody or control'").[13] Defendant was well aware that Axinn ███████████████████████ ████████████████████████████████████████████ and handled the production. *See*, e.g., Jan. 26, 2016 TR. at 36:1-2.

The FTC Collection is of vital importance. The Court has also recognized the value of the FTC Production which came from the FTC Collection. (Jan 23, 2016 Tr. at ECF 28-29). More importantly, the FTC Collection consists of virtually the *only* ESI from the first five years of the Court ordered Relevant Time Period of January 1, 2005 to June 30, 2015 and from many of the very same custodians as those collected in this case, including Dana White, Kirk Hendrick, Lorenzo Fertitta, Lawrence Epstein, John Mulkey, Peter Dropick, Michael Mossholder, Bryan Johnston, Craig Borsari, Reed Harris, Joe Silva, Sean Shelby and Tracy Long. The documents and information in the FTC Collection (other than the FTC Production) would otherwise have been lost. It is beyond doubt that the Defendant and its counsel did not conduct the diligent or even basic search necessary where, as here, core documents such as those from key custodians – including many of the very custodians that the Defendant itself proposed – prior to 2011 were at stake. Defendant's year-long blind reliance has proven irresponsible and is inexcusable.

Defendant's failure to self-identify the documents collected in connection with the FTC investigation demonstrates a profound lack of fundamental diligence and an inexcusable failure to conduct a reasonable inquiry in response to Plaintiffs' RFPs and further calls into question Defendants' conduct throughout the discovery process. Defendant should be ordered to immediately produce the FTC Collection consistent with Plaintiffs' proposal.

### b. Plaintiffs' Winnowing of the ESI Has Been Very Successful

---

[13] *Accord Johnson v. Askin Capital Mgmt., L.P.*, 202 F.R.D. 112, 114-115 (S.D.N.Y. 2001) (citing the "general rule that a document held by prior counsel is deemed to be in a client's possession"); *McKenna v. City of Philadelphia*, 2000 U.S. Dist. LEXIS 5712, at *3 (E.D. Pa. Apr. 26, 2000) ("If counsel contends that any of these documents are not in his or his client's possession, custody, or control, we expect he will confer with prior counsel to confirm that these documents are not in her possession, as well.").

Defendant characterizes the process of winnowing its ESI as a cooperative process in which it was actively engaged and offering proposals. Plaintiffs take exception to that characterization. Nevertheless, Plaintiffs made numerous deduplication, winnowing and two-tier search proposals, eliminating approximately 530,000 documents. In fact, ***despite a 50% expansion of the document set***, the documents returned by Plaintiffs' Search Term Proposal ***were reduced by nearly 14% (nearly 100,000 documents)*** since the last Status Conference.

Plaintiffs' deduplication method (discussed in detail in Section 2(c) below) removed 223,191 documetns from 2,030,858 email documents. Plaintiffs' winnowing proposals eliminated another 307,972 documents. The parties' legal custodian proposals eliminated an additional 32,768 documents.[14] Thus, Zuffa's Review Set totals 594,496. The Remainder Set totals 819,406 documents. Within the Remainder Set, Plaintiffs' substantially narrowed Search Term Proposal hits on 533,357 documents or 603,431 with families. Thus, the total reviewable ESI has been reduced from 2,030,858, to 1,197,927, a 41% reduction.

Plaintiffs' proposals included, among others:

- Identification and elimination of non-responsive commercial emails, including searching for the term "unsubscribe";

- Culling emails (and attachments) from other email senders that are likely to be non-responsive based on a review of the samples produced by Defendant;

- Deduplication based on industry standards;

- Identification and exclusion of certain file types such as contact cards;

- Culling likely privileged documents concerning irrelevant legal matters (██████ ██████████████████████████████████████);

- Culling travel itineraries and other logistical emails and documents;

- Culling form documents which created false hits for Plaintiffs' search terms;

- Eliminating junk/spam emails;

---

[14] Approximately 110,000 were de-duplicated out of the Remainder Set, 98,000 were de-duplicated out of Zuffa's Review Set and 15,000 were de-duplicated out of the Exclusion Set.

JOINT STATUS REPORT

- Eliminating automated emails such as "out of office" emails;

- Excluding documents containing the term "ticket%" where a custodian's job duties relating to tickets yielded a high volume of non-responsive emails;[15] and

- Removed several search terms from Plaintiffs' Proposal,[16] collectively, eliminating hits on more than 500,000 documents with families (non-deduplicated)[17] out of the 1.4 million document set the Court considered at the February Status Conference and before accounting for the additional 5. *See* Dkt. 218-4.

In addition, Plaintiffs significantly narrowed several of the broader search terms in their proposal. Specifically, Defendant complained about the overbreadth of several terms including: "Facebook"; "Twitter"; "Hold%"; "Smith"; "Scott"; "Cook"; "Yahoo%"; and "AOL."[18] These complaints took several forms, and Plaintiffs addressed each with a specific proposal.

Thus, Defendant's contention that Plaintiffs' Search Term Proposal "is nearly identical to the one [Plaintiffs] proposed two months ago" is simply untrue. The proof is in the document counts. As of the last Status Conference, Plaintiffs' Search Term Proposal resulted in 1,091,530 document hits (1,235,677 with family) in the 1.4 million Email Documents Set. This count included the 534,577 documents with families hit by Defendant's search term proposal (for a net difference of 701,100 documents). Since the last Status Conference, Defendant added 737,882 documents from custodian's hard drives to the corpus (increasing the corpus by more than 50%). However, through Plaintiffs efforts to winnow the corpus and narrow Plaintiffs' Search Term Proposal, Plaintiffs existing proposal adds only 603,431 documents to the Defendant's review

---

[15] Not included in this list are proposals Plaintiffs have made such as the use of email threading, but which Defendant's vendor was unable to do.

[16] Plaintiffs removed "TUF", "The Ultimate Fighter", "Amanda", "Eduardo", "Denis", "Morgan" and "Pfister" from the proposal. In reviewing the samples, each name also captured hits pertaining to Zuffa employees.

[17] Plaintiffs do not have access to a de-duplicated figure.

[18] Plaintiffs also identified an issue with the term "Toll%" (relating to tolling contracts and contractual obligations) because it generated false hits where "Toll Free" appeared in connection with a telephone number and proposed a multi-tiered search to exclude such false hits.

JOINT STATUS REPORT

1   (and is subject to Plaintiffs willingness to implement additional winnowing proposals).[19] Thus,

2   ***despite a 50% expansion of the document set***, the documents returned by Plaintiffs' Search Term

3   Proposal ***were reduced by nearly 14% (nearly 100,000 documents)*** since the last Status

4   Conference. This reduction was due to Plaintiffs' hard work and persistence in dealing with an

5   unwilling partner in discovery.

6   **c.  Defendant Did Not Reliably Deduplicate Its ESI; Plaintiffs'<br>Deduplication Proposal Removed 223,191 Documents**

7

8   Although the parties stipulated (Dkt. No. 160 at 4 & 15), and represented to the Court that

9   ESI would be deduplicated across custodians, Defendant unilaterally (and without notice to

10  Plaintiffs) selected a deduplication method that could not deduplicate across custodians. Zuffa's

11  unilaterally applied method was designed to ***not*** deduplicate substantial volumes of documents

12  that standard industry practice recognizes as duplicates knowing that the Court and Plaintiffs

13  would make decisions about the scope of discovery based on the inflated numbers. Meanwhile, at

14  the January 26, 2016 Status Conference, Counsel for Zuffa represented that "right now at this

15  point we have, thanks to Ms. Lynch's hard work, identified that we have at least a million e-mails

16  that are separate deduplicated e-mails." (January 26, 2016, Tr. at p. 38; ln. 16-18). However, that

17  representation was based on an unreasonable deduplication standard that falls well below the

18  industry standard and was not consistent with the parties' agreement. *See* Second Declaration of

19  Charles Kellner ("Second Kellner Decl."), ¶¶ 13-33.

20  For months, Plaintiffs had raised the issue of deduplication of the document set based on

21  Plaintiffs' concern that the failure to deduplicate was inflating the document counts reported by

22  Defendant to Plaintiffs and the Court. Defendant resisted.[20] Following the February 23, 2016

23  _____

24  [19] In fact, substantial progress could still be made. Defendant has indicated that Plaintiffs' multi-
    tiered searches for Facebook and Twitter need to be refined further to reduce false hits still being
    encountered. Plaintiffs have invited Defendant to propose solutions.

25  [20] In the November 16, 2016 status report, Defendant asserted that Plaintiffs' request for
    "detailed information regarding the de-duplicated volume of data maintained among custodians"

26  could not be provided because the parties had yet to agree on custodians. Dkt. 199 at 50. But
    Defendant acknowledged that emails were "processed and de-duplicated" resulting in ever

27  changing document counts, meaning that Plaintiffs' requests could have been answered and Zuffa

28

13

status conference, Plaintiffs completed the processing of the sample documents Defendant had produced. The processing permitted Plaintiffs to determine that Defendant produced 98 documents in the limited sample, which, if deduplicated properly, would represent 40 distinct documents. Plaintiffs requested that Defendant investigate; in response, Zuffa (for the first time) gave insight into the method of deduplication used, stating:

> Zuffa's vendor used the most conservative form of deduplication which ensures that only identical documents, based on their metadata fields will be excluded. This means that documents whose substantive text may be identical may not be treated as duplicates because their respective metadata vary.

Def. Letter, Mar. 21, 2016 at 9.[21]

During a March 31, 2016 meet and confer with a representative of vendor and Plaintiffs' consultant Chuck Kellner, Plaintiffs determined that Defendant's method was even more restrictive than indicated as it  failed to deduplicate clear duplicates such as: (1) the sent and received versions of the same email sent between two custodians; or (2) the same email sent by a third-party and received by two different custodians, as these examples are received at different times or through different routing. *See* Second Kellner Decl., ¶ 17; *see also id.* ¶¶ 18-23. Despite Defendant's agreement to deduplicate across custodians, Defendant's chosen method of deduplication was not capable of doing so. *Id.* ¶ 24. The highly restrictive deduplication method unilaterally chosen and applied by Zuffa is far more narrow than the accepted norm in the litigation support industry. *See id.* ¶ 26.

---

knew well before November 16, 2015 exactly what deduplication *protocol* had been applied. *Id.* Plaintiffs again raised the issue of de-duplication, noting that Defendant would only state that the document counts had been de-duplicated and refused to identify what the set of documents were de-duplicated against. Dkt. 206, n.21. In the January 22, 2016 Status Report, Plaintiffs again noted that Zuffa had not provided document counts that reflected deduplication. Dkt. 213, at 4 & 17. Despite Plaintiffs' repeated requests, Zuffa did not *begin* to answer the question until March 28, 2016. (March 28, 2016 email from Marcy Lynch to Michael Dell'Angelo). Plaintiffs' inquiry was not fully addressed until March 31, 2016 when Zuffa made available a representative from its ESI vendor to speak with Plaintiffs' ESI consultant. Even then, the vendor representative was not familiar with Zuffa's ESI.

[21] Zuffa claimed that the 98 documents Plaintiffs identified were not duplicates based on Zuffa's method. Zuffa argued that because the documents were sent or received at different times (*e.g.*, one second apart) the documents were not identical.

JOINT STATUS REPORT

On April 6, 2016, after numerous requests, Defendant informed Plaintiffs that its deduplication process removed an astonishingly low **2,066 "email documents"** (reaching 11,575 documents across the network email and hard drive documents) out of a universe of more than 2,000,000 documents. That is, Defendant's purported "deduplication" method removed approximately 0.01% of the email documents. A producing party legitimately interested in reducing its burden would have raised this astonishingly low deduplication rate with Plaintiffs and tried to improve it. Instead, Defendant was content to argue that the effectively undeduplicated set was too burdensome to review and urged the Court to relieve it from reviewing what is now the Remainder Set. That tactic had no downside because Defendant can easily group and bulk code duplicate documents as responsive or not responsive, privileged or not privileged.

Plaintiffs provided Defendant with a deduplication protocol consistent with widely accepted industry standards. Over two weeks later, on April 25, 2016, Defendant provided the results as applied only to the yet-to-be-produced portion of the document corpus. (With respect to the documents Defendant has reviewed and produced to date, it has done so without the benefit of meaningful deduplication; thus, it needlessly increase its own burden.) Plaintiffs' process reduced the un-reviewed set by 223,191 Email Documents. Plaintiffs' proposal was exponentially more effective and reduced the universe of documents more than 10%.

### 3. Zuffa Should Be Ordered to Produce the Remainder Set Without the Application of Search Terms, or In the Alternative, After Applying Plaintiffs' Proposed Terms

By eliminating 223,191 duplicates and 340,740 non-responsive documents from the total ESI[22], the Remainder Set is now highly concentrated with documents likely to be responsive to Plaintiffs' RFPs. Therefore, the Court can have a much higher degree of certainty that ordering Zuffa to produce the entire Remainder Set will not require it to review the vast number of

---

[22] Plaintiffs have not been provided with data that breaks out the totals between the Review Set and the Remainder Set.

1
2
3
4

duplicates or non-responsive documents that existed in the set previously and when Zuffa claimed that the burden of review was too great. Alternatively, as discussed below, because Plaintiffs' Search Term Proposal reflects a high degree of precision and recall, Zuffa should be ordered to apply the proposal to the Remainder Set and to produce the 603,431 hits with families.

5
6
7

**a.  The Court Should Not Apply Search Terms Because The Document Set In This Case Is Not Well Suited To Their Application**

8
9
10
11

This Court has recognized that search terms can be an unreliable and ineffective means of searching ESI for responsive documents. Because the conduct at issue is not formulaic and involves state of mind and is discussed with myriad names, nicknames, symbols and idioms, the document set is not well suited to the application of search terms.

12
13
14
15
16
17
18

This Court has consistently recognized that the application of search terms or key words is inefficient and unreliable. In *Progressive Casualty Insurance Company v. Delaney, et al.*, No. 2:11–cv–00678–LRH–PAL, 2014 WL 2112927, *8 (May 20, 2014 D.Nev.), this Court found that "traditional ways lawyers have culled the universe of potentially responsive documents for production—manual human review, or keyword searches—are ineffective tools to cull responsive ESI in discovery" and recognized that "keyword searches … have their own limitations." (Collecting and citing authorities).

19
20
21

During the Initial Status Conference in this case, the Court stated:

> I'd urge you to consider nontraditional methods of searching for ESI *instead of key words or custodian searches* which are expensive and the data shows not particularly accurate.

22
23
24

Dkt. No. 156 at 29, lines 18-21 (Emphasis added). This Court's views regarding the unreliability of search terms are well founded here. Nevertheless, Zuffa has insisted upon the application of narrow search terms on the bald and false premise that Plaintiffs' RFPs are too broad.

25
26
27

As Plaintiffs explained in the prior Joint Status Report (Dkt. No. 213 at 11-23), the collection of documents in this case is not well suited to the application of inherently unreliable search methods, such as search terms, due to the unique language and terms in this case and the

28

syntax used by the relevant custodians. *See also, e.g.*, Dkt. 221, First Kellner Decl. ¶ 11.

Plaintiffs' continuing consultation with Kellner and analysis of data based on the ESI at issue

confirms that view which was largely based on an analysis of Zuffa's FTC Production in this

case.

Even in the April 25, 2016 Sample, consisting of 2,000 documents, which is highly

concentrated due to the various winnowing proposals Plaintiffs crafted based on the prior

sampling, Plaintiffs discovered highly relevant documents that are not hit by either party's terms.

For example, MZelaznikLT-0025833 is an email from now Chief Legal Officer Kirk Hendrick to

all employees of Zuffa dated June 10, 2011, ███████████████████████. Ex. 4; *see*

*also* discussion, *supra* at 8-9. This document is not hit by either party's search terms and would

be lost even under Plaintiffs proposal today. Similarly, KHENDRICK00040651 is a blank email

between two legal custodians, Kirk Hendrick and Michael Mersch. Ex. 5. However, the email

attaches a static pdf (*i.e.*, a pdf document lacking readable text) of █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████. *Id.* As a static pdf, the document necessarily escapes all application of

search terms, no matter how discerning. These documents demonstrate that because Zuffa's

search term proposal is unreliable and ineffective (and to the extent Plaintiffs' terms are not

appropriate), "[e]ither the collection [of custodial documents] is resistant to discriminating search

terms, or the parties cannot find them." *See* Dkt. 221, First Kellner Decl. ¶ 21.

> **b.     In the Alternative, Plaintiffs' Search Term Proposal Should be
> Applied to the Remainder Set and the FTC Collection Because it
> Demonstrates a High Degree of Precision and Recall.**

Plaintiffs' worked with their consultant to apply a substantive and data-driven approach to

identify ways to filter out non-responsive documents that also hit on Plaintiffs' proposed search

terms. Plaintiffs' conducted a sampling review of documents contained in a 107,649 document

FTC Production, and Plaintiffs crafted and refined a set of search terms designed to capture

responsive documents contained in the set, as well as documents related to other news articles and

public statements by Defendant's custodians. Plaintiffs then obtained four sets of samples from the Remainder Set,[23] which included both documents that hit on their search terms and those that did not in order to test the precision and recall of their search terms *and* to filter out non-responsive documents from the Remainder Set *and* the Defendant's Review Set.

As a result, Plaintiffs' Search Term Proposal is well-targeted and the terms comprising the proposal return an extremely reasonable number of hits, as follows:

- 775 of Plaintiffs' search terms (31.7%) including hundreds of Fighter names have no unique hits, but do hit on documents in the Remainder Set;

- 1,285 (52.6%) terms have 5 or fewer unique hits;

- 2,135 (87.4%) have fewer than 100 unique hits;

- 2,396 (98.1%) have fewer than 1,000 unique hits;

- 170 (7%) have no hits in the Remainder Set (*i.e.*, they were highly correlated with terms in Zuffa's set);

- 402 (16.5%) have 10 or fewer hits;

- 1,095 (44.8%) have fewer than 100 hits; and

- 2,099 (86%) have fewer than 1,000 hits.

Plaintiffs' search term proposal thus captures many of the documents lost by Defendant's overly restrictive and narrow proposal without being unreasonably broad. As such the documents returned by Plaintiffs' proposal are reasonable and proportionate to the needs of the case.

Defendant argues that Plaintiffs have "had the opportunity to review approximately 6,300 sample documents" and that these documents somehow demonstrate that Defendant's search

---

[23] Plaintiffs obtained a sample of 1,500 "non-hits" in mid-February. Right before the February 23 status conference, Plaintiffs obtained a sample of 718 documents which hit on certain of Plaintiffs' search terms but not Defendant's terms. In early April, Plaintiffs obtained a sample of 1,500 documents which hit on Plaintiffs Search Term Proposal and 500 documents which did not (both sets were pulled before the winnowing proposals and deduplication process were applied). Finally, on April 25, 2016, Plaintiffs received a sample of 1,500 documents which hit on Plaintiffs Search Term Proposal and 500 documents which did not after the winnowing and deduplication proposals were applied.

terms are effective at efficiently capturing responsive documents. *See infra* at 45. That statement is misleading and incorrect.

First, Plaintiffs received four samples from the Remainder Set, but only 3,718 of the 6,218 sample documents were drawn from documents that actually hit on Plaintiffs' Search Term Proposal. By design, the remaining 2,500 documents in the sample did not hit on either party's search terms. Thus, to suggest the sample size against which Plaintiffs' terms were tested was 6,300 is misleading. That said, the purpose of obtaining the 2,500 non-hits was to determine whether there were responsive documents not hit by Plaintiffs' Search Terms. The answer has been a clear "Yes." For example, as Plaintiffs noted in the February 19, 2016 Status Report, the initial sample of 1,500 "non-hits" revealed an email from Tara Connell to custodian Lorenzo Fertitta showing a cut-and-pasted image of a spreadsheet ███████████████████████ ██████████████████████████████. *See* Dkt. 218 at 33 & Exhibit I.

Second, as discussed *supra* at 13-16, Defendant's deduplication protocol eliminated a miniscule 0.01% of duplicates in its Email Documents. Plaintiffs' analysis of the first three samples enabled it to vastly improve upon Defendant's deduplication protocol and to devise many of the winnowing and multi-tier searches that ultimately eliminated approximately 530,000 documents from the ESI. Only the final, April 25, 2016 Sample reflects the application of Plaintiffs' deduplication protocol. Thus, the precision and recall of Plaintiffs' search terms as applied to the first three samples are of lesser utility than last sample.

The most reliable sample for testing the precision and recall are the 1,500 "hit" documents in the April 25, 2016 Sample, which reflect the various reductions and Plaintiffs' updated Search Term Proposal. As expected, the precision and recall increased. Although Defendant provided the sample on the evening of April 25th, Plaintiffs have already identified numerous documents that are both responsive *and* relevant, including, *inter alia*, the following.

- Discussing or implicating the qualifications of fighters for fighting in the UFC (*i.e.*, to be "Elite"). *See, e.g.*, JSILVA00003855 (Ex. 7) (███████████████████████ ████████████████████████████"); JSILVA00026915 (Ex. 8) (███████████████████████████████████ .

- Discussing fighter compensation and negotiation. *See, e.g.*, JSILVA00022022 (Ex. 9) (discussing fighter compensation in the "$X+$X" structure previously identified in the last Joint Status Report, Dkt. 218 at 31); KHENDRICK00091114 (Ex. 10) (████████████████████████████████████████████████ ███).

- Discussing sponsors of fighters who could no longer pay the charges Zuffa imposes and are forced to withdraw sponsorship of fighters. *See, e.g.*, MMERSCH00081719 (Ex. 11) (████████████████████████████████████████████████████ ███).

- Discussing event data that can be compared with actual or potential rival data including ticket prices (KHENDRICK00120249, Ex. 12); viewer data (KHENDRICK00057742, Ex. 13); event pay-per-view sales; (KHENDRICK00133949, Ex. 14).[24]

- Documents showing explaining and/or discussing the UFC's budget and forecasts on a per-event basis. *See, e.g.*, LEPSTEIN00094219 (Ex. 15).

- Documents circulating news articles discussing fighter compensation. *See, e.g.*, LEPSTEIN00143497 (Ex. 16).

Collectively, these documents demonstrate that, contrary to Defendant's unsupported and misleading argument, Plaintiffs' search terms *are* demonstrably effective at efficiently capturing responsive documents and, therefore, have a high degree of precision and recall. Zuffa has presented nothing that demonstrates otherwise. Moreover, the Court has observed that the FTC Production, though responding to issues far more limited in scope than Plaintiffs' case, is likely to contain documents that both parties believe are relevant. Plaintiffs' search terms were previously demonstrated to be approximately 90% correlated to the FTC Production (better than even the search terms Zuffa used in collecting the FTC Production), meaning that they return responsive and relevant documents. That fact serves as a "cross-check" on the precision and recall observed in the April 25 Sample and soundly supports the application of Plaintiffs search terms absent a production of the entire Remainder Set.

Finally, the April 25th Sample included an additional document that Plaintiffs believe is relevant and goes to directly to the claims at issue. Plaintiffs discussed that document in a draft of this JSR and had attached a copy for the Court's view. However, on the morning of April 29,

---

[24] KHENDRICK00133949 further demonstrates that the UFC ████████████████████████ ████████████████████████████████████████

JOINT STATUS REPORT

2016, Defendant purported to "claw back" the document on the basis of attorney-client privilege and demanded that Plaintiffs remove the discussion and exhibit. Plaintiffs question how a purportedly privileged document in a sample of 2,000 documents was able to escape Defendant's privilege review given that Defendant has insisted on a scrupulous review of all documents and has redacted documents in the samples for privilege. Nevertheless, Plaintiffs agreed to remove the discuss and exhibit and will challenge the claw back pursuant to the Protective Order. The presence of the clawed back document among the hits in the Remainder Set is further proof that the Remainder Set cannot be shielded from discovery and the real reason why Defendant refuses to apply Plaintiffs' search terms.

### 4. Defendant Should Review and Produce its Audio and Video Files

Defendant's ESI includes approximately 4,045 video and audio files. Because such files cannot be searched with terms, these documents and the documents in the family should be reviewed individually for production as Plaintiffs did 1,047,011 like files.

Initially, when Defendant identified just 1,100 audio and video files and refused to review them manually on the basis of burden, Plaintiffs suggested that Defendant provide directory, file path, and file names information for the files so that Plaintiffs could attempt to propose a mechanism for winnowing this small set of documents. Defendant refused to provide directory and file path information on the basis of "privacy" concerns.

On March 30, 2016, Defendant conceded that its video and audio files include responsive information. (March 30, 2016 letter from John Cove to Michael Dell'Angelo). Despite that, without any basis or demonstration of fact, Defendant asserted that "that many of these files are likely to be nonresponsive and that human review of these files for responsiveness would be unduly time consuming, burdensome and expensive." (*Id.*) Defendant then proposed Plaintiffs identify the video and audio files they believed should be reviewed for responsiveness based on a listing of file types and names provided by Defendant. ("Exhibit H"). Plaintiffs rejected Defendant's proposal absent the directory and file path information.

On April 11, 2016, Plaintiffs proposed that Defendant, in consultation with the custodians whose files contain audio and video files, identify a list of those files on Exhibit H that may not warrant manual review for responsiveness.[25] Plaintiff offered that if Defendant would commit to preparing such a list of video and audio files to exclude from the review based on consultation with and good faith recommendations by the custodians for the respective files, Plaintiffs would review Defendant's proposal and accept, reject or request additional information for Defendant's basis for the proposal with respect to any such designated files in an attempt to reduce the reviewable population. Again, Defendant refused.

During a meet and confer on April 25, 2016, Defendant set out the broad terms of a counter proposal and represented that they would make in the form of letter "shortly." As of April 29, 2016, Defendant still has not followed through. That said, a review of the file names and types on Exhibit H reveals that, once again, Defendant's protestations of "burden and expense" are a red herring intended to cause delay and are yet another unsupportable claim of burden. For example, many of the .wav files appear to simply be sounds associated with functions on a personal computer, such as the file in Row 740 "Windows Logoff Sound.wav". Even if the parties did not simply agree to exclude such files from review, the review of such files, of which there are many among the 4,045 documents would take seconds. Many of the .mp3 files appear to be songs, such as in Row 45, "Rage Against The Machine - Killing In the Name.mp3." By seeing the directory and file path information, Plaintiffs could have made a more reliable determination of those suppositions. By contrast, it is difficult or impossible to make a reliable determination based on the file name alone. For example, the following file names reveal little: Row 20, "new_chat_request1[1].mp3"; Row 745, "VoiceMsg[ID=22332198 G=40 F=228 A=354193DA-EAEA-4F66-9402-BEFDF624DC4C C=1].wav"; and Row 3950 "PROJECT PINK 10-3 12PM KLAS.wmv".

---

[25] Plaintiffs also requested an updated Exhibit H after Zuffa's vendor applied the FTC search terms and Plaintiffs' deduplication protocol. Defendant has not done so.

In less time than it took the Defendant to develop a proposal for the review to its own video and audio files (which it still have not completed), Plaintiffs conducted a manual review of 20,747 video files and 9,694 audio files in their own ESI.[26] Based on Plaintiffs experience manually reviewing 30,441 of their own audio and video files, the review of such files for responsiveness can be completed quickly and efficiently.

The time for proposal has past. Defendant should be required to review its audio and video files for responsiveness and produce them before the deadline for substantial completion.

### 5. Defendant's Search Term Proposal Remains Inadequate

#### a. Despite Numerous Opportunities, Zuffa Has Never Demonstrated That The Application of Search Terms is Warranted

Despite this Court's admonition that search terms are an ineffective tool, Zuffa asserts that search terms must be applied to its ESI. Defendant argues, without more, that Plaintiffs' RFPs are overbroad and unduly burdensome because some request "all documents".[27] Yet, Zuffa has consistently ignored Plaintiffs' efforts in the meet and confer process to narrow their requests. Nowhere in the record has Zuffa demonstrated how or why Plaintiffs' RFPs are actually overbroad or would result in an undue burden. Indeed, Zuffa has made no effort to address the substance of the proportionality factors under Rule 26(b)(1). *See* Dkt. No. 213, at 22-23; Dkt. 218, at 22. Rather, Zuffa has, in effect, simply claimed that it has too many documents to search through, done virtually nothing to reduce its own burden, and ignored Plaintiffs' well-articulated proportionality arguments.

Zuffa has an affirmative obligation to demonstrate why Plaintiffs' requests are overbroad, why it would suffer undue burden and to satisfy the proportionality factors. Plaintiffs first briefed the proportionality factors in the January Joint Status Report. *See* Dkt. 213 at 21-22. Plaintiffs did so again in the February Joint Status Report and pointed out that Zuffa failed to even address its

---

[26] During their review, Plaintiffs' asked if they should suspend their review based Defendant's view that that method of review was too burdensome. Defendant did not respond and Plaintiffs ultimately completed their manual review.

[27] Many of Defendant's Requests for Production of Documents likewise request "all documents."

1  burden. *See* Dkt. 218 at 21. Now, three status reports on, Zuffa continues to jump straight to the
2  remedy without demonstrating why it is entitled to one. The Court should demand more of Zuffa
3  and not countenance its repeated failure to address, let alone satisfy, its burden.

4       Rather than address its burden, in the February Status Report Zuffa requested that if the
5  Court did not adopt its search term proposal, in the alternative, it should strike RFPs 21, 27, 33,
6  35 and 37 as overbroad and unduly burdensome. *See* Dkt. 218 at 14. Plaintiffs set forth a detailed
7  proposal to narrow RFPs 21, 27, 33, 35 and 37. *See* Dkt. 218 at 46-48. Zuffa complained that it
8  did not have adequate time to consider Plaintiffs' proposal. Yet, more than two months hence
9  nothing has changed and in the intervening period Zuffa has never met and conferred on
10 Plaintiffs' narrowing proposal as a means of dealing with its claims of burden and overbreadth.
11 What that means is clear enough to Plaintiffs – the parties' disagreement is not really about
12 Zuffa's purported burden, or cost or proportionality. It is about Zuffa's effort to review and
13 produce the narrowest possible scope of documents by applying highly restrictive search terms
14 while creating the appearance of burden. That Zuffa was fully prepared to review hundreds of
15 thousands of duplicates and irrelevant documents (eliminated by *Plaintiffs'* proposals) proves the
16 point and reveals burden and expense are not the real issues.

17           **b.**    **Defendant Has Not Demonstrated That Its Search Terms Have a**
18                  **High Degree of Precision and Recall**

19      Defendant has refused to provide Plaintiffs with data regarding the rate of responsiveness
20 for its document production. That rate is the percentage of responsive documents found within the
21 set of documents hit by Defendant's search terms. Nor has Defendant even attempted to
22 demonstrate how its terms are superior in achieving precision and recall.

23           **c.**    **Defendant's Purported Effort to Develop Additional Search**
24                  **Term is Demonstrably Not Credible**

25      Despite Defendant's assertions that it has "substantially …. expand[ed] its search term
26 list" including by adding "approximately 300 new terms specifically designed to capture other
27 responsive documents by identifying additional concepts, names, colloquialisms or particular

28

JOINT STATUS REPORT

phrases used by UFC personnel or others in the industry….", Defendant's proposal remains inadequate and non-discriminating.[28]

The 296 terms that Defendant proposed to add on April 25, 2016 include 165 (55.7%) that returned *zero hits* – that is zero precision and recall. That Defendant conducted a "review of documents and further investigation" to identify 165 terms that failed to register a single hit demonstrates that Defendant's new search terms are mere window dressing designed to create the false impression of cooperation and independent effort. Notably, of the 18,172 search terms in Defendant's February 17, 2016 Search Term Proposal, 9,218 (50.7%) returned zero hits. Despite its superior knowledge, Defendant has not demonstrated an ability to develop search terms with superior precision and recall. Moreover, many of Defendant's purportedly "new" search terms are not new at all. For example, Plaintiffs had proposed "Reebok" as a search term before the last Status Conference and Defendant included ten terms derived from Plaintiffs' proposal. Defendant's addition of eight additional proximity limiters does little to advance the ball. Similarly, Plaintiffs had proposed the term "Eliot," referring to fighter Eliot Marshall. In the hit report filed with the Court, on February 19, Dkt. 218-4, "Eliot" returned 667 hits, 2,627 with family. After the documents Zuffa's terms hit were removed from the set against which Plaintiffs' terms were applied, "Eliot" hit on only 43 documents, 58 with family. Rather than simply adding "Eliot" as a term, Defendant proposes to apply 12 proximity limiters which result in zero hits.[29] Thus, Defendant's proposal to add 12 meaningless versions of Plaintiffs term is not an offer of

---

[28] While Defendant did agree to include the names of the 940 fighters in the Bout Class to two of the FTC Search Terms, that does not represent much movement on Defendant's part. Indeed, Defendant admits as much by stating that "[n]ot surprisingly, many of the FTC search terms were already on Zuffa search terms. 'Exclusiv*', for example, has always been a stand-alone Zuffa search term; all documents in the corpus containing that term will be reviewed for responsiveness and privilege." *Infra* at 42 n.47.

[29] Defendant's argument that this Court previously rejected Plaintiffs' proposal to include terms without limiters, such as fighter and sponsor names, ignores the hard work Plaintiffs have performed, in spite of Defendant's resistance, to narrow the document set to which these terms are applied. Plaintiffs have not proposed fighter names without limiters. Plaintiffs have proposed fighter names but limited them to the set that excludes hundreds of thousands of documents in which fighter names may hit but have been identified is non-responsive.

new terms, but rather a rejection of a term that returned a mere 58 possible hits without any demonstration that Plaintiffs' term is overbroad or returns a single non-responsive document. As such, Defendant's proposal is a continued waste of time and resources.

Moreover, while Defendant only provided a hit report for these 296 terms before applying the industry standard deduplication process, the results disclosed in the hit report do not lend credence to Defendant's assertion that the new terms add much meaningful material. Based on a universe of 944,697 documents, which was purportedly reduced by Plaintiffs' deduplication proposal to 819,406, Defendant's new terms returned only 15,563 hits with families.[30] This meager expansion of its review set does not resolve the shortcomings of Defendants' Search Terms proposal. Defendant has an obligation to investigate search terms. Rather than doing so, Defendant has shirked this responsibility and applied blanket proximity limiters regardless of whether they are necessary to reduce the results.

### d.   Defendant's Search Term Proposal Is Inconsistent With and More Restrictive Than Its Unilaterally Developed FTC Protocol

At the February 26 Status Conference the Court recognized the importance of the FTC Protocol as a tool to evaluate the reliability of the parties' search term proposals. In directing Defendant to finally produce its FTC Protocol, it stated, "If we could both see what you did for the FTC, that might go a long way to increasing the confidence in getting precision, not just recall." Feb. 26, 2016 Tr. at 27:17-20.

On March 11, 2016, Plaintiffs observed in a letter to Defendant's counsel that "the search terms [Defendant] provided from the FTC investigation do not use proximity limiters" but rather "use[] 'AND' as a[ Boolean Operator]." In other words, Defendant's search term proposal in this case requires that terms like "contract%" appear within five words of a fighter's name whereas Defendant's FTC search term proposal only required that "contract%" appear within the same document as the fighter's name. Defendant has never explained the disparity or offered a

---

[30] If you extrapolate from the duplication rate, which reduced the full set by 13.26%, the 296 terms only added approximately 13,500 documents to Zuffa's review.

JOINT STATUS REPORT

defensible reason why, when left to its own devices, it did not deem proximity limiters necessary, but now stridently believes they are necessary.

For example, in ZFL-0801077 (attached as Exhibit 17), the term "contract" is the sixth term following the fighter name "Martinez."[31] This relevant and responsive document, which speaks to ███████████████████████████████████████████████████, demonstrates the inadequacy of proximity limiters. Similarly, in the last Joint Status Report, Plaintiffs referred to ZUF-00154095 (Dkt. 218 at ECF 31), which stated "We are 'mma'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." The FTC Search terms picked up that document because "MMA" AND "licens%" were both contained in the document 13 terms apart, and in discrete and separate thoughts. Thus, applying proximity limiters such as requiring "MMA" to even be within 10 terms of "licens*" would have excluded this relevant and responsive document from review.

Given Defendant's prior willingness to use "AND" instead of proximity limiters, on March 11, 2016, Plaintiffs suggested that Zuffa should at least be willing to replace all proximity limiters in its proposal with "AND" operators. (March 11, 2016 letter from Michael Dell'Angelo to John Cove). Plaintiffs requested that Zuffa provide a search term hit report for its search terms using "AND" operators. On April 7, 2016 Plaintiffs reiterated the request for a hit report showing the effect or replacing Zuffa's unduly narrow proximity limiters with "AND" operators. Zuffa never provided the requested hit report. Instead, Zuffa responded, without any substantiation, that it "continue[s] to believe that proximity limiters are the most effective way to both recall responsive documents and to do so precisely without the burden of reviewing substantial numbers of nonresponsive documents." (M. Lynch Email to M. Dell'Angelo, Apr. 8, 2016). How Zuffa could definitively say so without (1) running a hit report; or (2) reviewing sample results, is unclear and impossible for Plaintiffs to test independently. Zuffa's position that the search terms

---

[31] Defendant produced this document to Plaintiffs as part of its custodial production. However, when Plaintiffs ran Defendant's search terms against it, none registered as a hit. Regardless, even if there is a search term hit in this document, the document demonstrates why there is no correlation between the proximity of a term like "contract" to a fighter's name.

here should be more restrictive than when responding to the FTC is telling. When discussing productions to the FTC in a colloquy with the Court at the February 26 Status Conference, Zuffa's counsel, Mr. Cove, stated that in "[m]y experience in responding to the FTC requests and when I was at the justice in the antitrust division doing the same thing is *the process is a little more targeted* towards what documents they are looking for and can get in a reasonable time". *Id.* at 36:3-7 (Emphasis added). Thus, if responding the FTC is a "more targeting" approach than responding to a litigant, why is Zuffa doing precisely the opposite? Zuffa's position is consistent with that of a party operating with the singular focus of suppressing results irrespective of whether the search terms are discriminating.

      e.      **Defendant's Inability to Thread Emails Is a Significant Source of its Burden**

In addition to the inadequate deduplication method, Defendant's claimed burden at the last status conference was significantly inflated by its inability to properly collapse threaded emails. As discussed in the parties' prior Joint Status Report, Dkt. No. 218 at 33, and the First Declaration of Chuck Kellner, Dkt. No. 221, at 13-14, Defendant's email threading capabilities do not meet industry standards resulting in an inflated number of documents counted by Defendant. Defendant is, however, able to cluster emails in the same thread for purposes of facilitating (and reducing the burden of) review for privilege and responsiveness.

Since the last Status Conference, Defendant has begun to review and produce documents on which its search terms and the search terms used in connection with the FTC Production hit. As of April 9, 2016, Defendant had produced 35,698 documents from custodians email files. Although Plaintiffs were not provided with the conversation metadata, which would permit a more accurate email threading analysis,[32] Plaintiffs identified only 4,835 unique email threads. Thus, Defendant's production of the custodial files to date reveals that up to 86% of the

---

[32] Instead, Plaintiffs implemented an algorithm that applied email subject normalization (*i.e.*, removing the "Re:" "fwd:" and similar indicators) and then sorts based on dates and email address matching to approximate the email conversation metadata.

1    production could have been eliminated by a widely-available email threading technology that

2    Defendant declined to obtain and use in this litigation.

3        Plaintiffs requested that Defendant provide the number of unique email threads in the

4    corpus of documents, but Defendant has stated it is unable to provide that information. Plaintiffs

5    do not understand why this number is not readily available (particularly since Defendant has

6    acknowledged using its ability to cluster emails in the same thread to facilitate its review).

7    However, extrapolating from the documents produced to date—and Defendant has declined to

8    provide information which would indicate if the production to date is a random sample or a

9    deliberately chosen, non-random sample—the entire corpus would contain fewer than 300,000

10   unique email threads. Based on the same extrapolation, the returns from Plaintiffs' Search Term

11   Proposal would contain fewer than 100,000 unique email threads. Defendant's failure to obtain

12   widely-available threading technology should not be a basis for a burden argument that would

13   result in denying Plaintiffs' otherwise appropriate discovery.[33]

14       In sum, Defendant's conduct has hampered the Court-ordered effort to engage in an

15   "iterative process" on a "test-and-see-how-well-it's-working basis" to identify potentially

16   responsive documents (Feb. 23, 2016 Status Conf. Tr. at 35), and inflated the apparent size of

17   Defendant's review.-[34]

18   _____

19   [33] In addition, Defendant has either failed to propose or account for the implementation of
     numerous processes which reduce the purported burden of review. For example, all image files
20   are easily reviewed in a thumbnail viewer. Plaintiffs reviewed over 1 million image files in this
     way for privilege and responsiveness. In the full corpus, Defendant has nearly 150,000 image
21   files that could be easily reviewed with almost no burden. But Defendant's 50 documents/hour
     estimate does not account for this savings.  Likewise, the set includes 31,824 htm files which,
22   based on Plaintiffs' review of the samples and production to date, are largely email signatures and
     blank pages. These files could be deduplicated based on hash values, which would dramatically
23   reduce the review burden for these 31,824 documents.

24   [34] In their consultant's declaration and at oral argument, Defendant claimed that Plaintiffs' search
     terms were overbroad by highlighting the "with family" results for individual search terms when
25   Defendant had inflated the "with family" results by failing to de-duplicate them. *See* Dkt. No.
     223, ¶ 27; Feb. 23, 2016 Hearing Tr. at 31-33. However, the counts on which Zuffa and its
26   consultant relied were overstated and inaccurate. Still, just prior to the February 23 Status
     Conference, Defendant attempted to bully Plaintiffs' consultant, Chuck Kellner, by demanding
27   that he retract a statement in his Declaration (Dkt. No. 221, ¶ 35) regarding the "Potential Over-

28

**6. Defendant's Surreptitious Clawback of over 5,700 Documents**

As alluded to at the last Status Conference, Plaintiffs alerted Defendant to an issue in which two documents were produced in the FTC Production with a TIFF slip sheet stating "Document Withheld as Privilege (sic)" (the "Privilege slip sheet") but where the OCR-ed text was produced. Defendant confirmed that the documents were inadvertently produced and requested that Plaintiffs cease review of the FTC Production until Defendant could investigate the scope of the inadvertent production.[35] Ultimately, Plaintiffs discovered that in fixing that issue, Defendant also surreptitiously clawed back 5,701 documents on the basis that they were non-

---

Count of Documents with Families" when Defendant, in fact, did over-count them. On February 23, 2016, Defendant's counsel provided Plaintiffs with a spreadsheet containing a count of all file extensions (*e.g.*, .pdf, .msg, and .doc) in the document corpus. Defendant's counsel wrote: "In light of the attached, please let us know if Plaintiffs will withdraw Mr. Kellner's unsubstantiated speculations regarding attachments in this collection set." However, at the Status Conference, Defendant finally described its method for calculating the "with family" hit counts for individual search terms. As discussed in the Second Kellner Declaration, ¶ 44 & Exhibit A thereto, this process dramatically overstated these counts. On March 21, 2016, Defendant acknowledged its "error" in the way it calculated the "with family" numbers and, as a result "the numbers were incorrect because the family members were not de-duplicated at the individual term level. Letter from John Cove to Michael Dell'Angelo, Mar. 21, 2016. Both Defendant's consultant and Defendant's counsel cited these counts in support of its prior arguments on the overbreadth of Plaintiffs' terms. Moreover, the over-counting referenced in Mr. Kellner's initial declaration, which Defendant attempted to bully Mr. Kellner into retracting, applied to the individual term counts.

[35] Defendant's email stated further—and Defendant doubles down on this fundamentally flawed reading of the Protective Order, Dkt. 217 in this Joint Status Report—that the "Protective Order requires the immediate return of inadvertently produced documents…." (Jan. 27, 2016 Correspondence J. Cove to M. Dell'Angelo); *see also Infra* at 58 ("if Zuffa wanted to engage in 'surreptitious' or obstructionist behavior, it could have, in keeping with the Protective Order, demanded return of the entire FTC []Production immediately upon learning of the inadvertently produced privileged material."). Of course, the Protective Order does not permit the producing party to demand the return of anything other than "all copies of such [inadvertently produced *privileged*] documents, testimony, information and/or protection." Dkt. 217 ¶ 11. Further, it would not be surreptitious to demand that Plaintiffs return the entire FTC Production under the Protective Order. First, doing so would have explicitly stated the scope of the clawback—which Defendant failed to do here. By definition, this act is not surreptitious. Second, doing so would have permitted Plaintiffs to refuse and challenge Zuffa's demand, which would not be endorsed by the Protective Order, with the Court. By, instead concealing its intent to claw back nearly 6,000 documents, Zuffa denied Plaintiffs their rights under the Protective Order and deprived Plaintiffs of the opportunity to challenge Defendant's action with the Court in the first instance. That is what makes Defendant's action improper and surreptitious.

responsive to the FTC inquiry. Worse yet, until Plaintiffs specifically asked on April 27th,

Defendant did not and had no intention of reviewing the clawed back documents for

responsiveness to Plaintiffs' RFPs apparently assuming Plaintiffs would be none the wiser.

On January 28, 2016, Defendant's counsel called Plaintiffs to discuss the issue. *See* Jan.

28, 2016 Correspondence M. Dell'Angelo to J. Cove (confirming the contents of the

conversation). Plaintiffs proposed to and did temporarily cease review of the FTC Production and

agreed that if the issue was unresolved when Plaintiffs' recommenced the review, Plaintiffs

would not review the text-view of documents with the Privilege slip sheet.[36] Defendant's counsel

also represented to Plaintiffs that their investigation of the underlying problem was "not as

extensive as [Defendant] had feared." *Id.*

On January 31, 2016, Defendant wrote to Plaintiffs identifying five documents that were

"initially produced to the FTC and subsequently recalled as privileged." Jan. 31, 2016

Correspondence M. Lynch to M. Dell'Angelo.[37] Plaintiffs segregated those documents as well.

Defendant proceeded to explain that, when the FTC Production was exported to Defendant for re-

production to Plaintiffs, "documents were erroneously exported to us with their extracted text,

including documents where the underlying text were withheld from the FTC on the basis of

privilege or responsiveness." *Id.*

Following the receipt of the January 31, 2016 email, Plaintiffs recommenced their normal

review process. Despite Zuffa's statement that Plaintiffs' counsel made "assurances that Plaintiffs

would not" review the underlying OCR-ed text of documents with Privilege slip sheets (based on

Defendant's reading of the January 28 correspondence), Plaintiffs only agreed to do so if

Defendant had not completed its investigation into the issue when Plaintiffs' recommenced

---

[36] Plaintiffs also segregated the two documents identified at that time from the production.

[37] Pursuant to Section 11 of the Revised Stipulation and Protective Order (the "Protective Order") (Dkt. 217), Plaintiffs retained copies of the disputed emails in order to assess the validity of the privilege claims. While Plaintiffs continue to believe that none of the documents is privileged, they elected not to challenge all but one, and notified Zuffa of their decision. Plaintiffs elected to challenge one document, ZUF-00031544, which is the subject of Plaintiffs' Motion to Challenge Privilege Designation currently pending before the Court, Dkt. No. 229. Plaintiffs expunged any remaining copies of the unchallenged documents from their files.

review. Zuffa was aware of this fact; though it ignores the notice Plaintiffs' provided of it. Indeed, through Plaintiffs' normal review practices, on February 3, 2016, Plaintiffs identified an additional document with the Privilege slip sheet but with readable text files.[38] Plaintiffs immediately notified Zuffa of the bates number and excluded the document from further review. Zuffa never responded to Plaintiffs' notice. Zuffa's failure to respond and willful ignorance of the notice Plaintiffs clearly provided of Plaintiffs' recommencement of normal review practices is not a basis to cast aspersions at Plaintiffs.

On February 12, Zuffa notified Plaintiffs that it had uploaded replacement text files for the FTC Production, and identified four documents that it was withholding, for which it was not producing replacement text files. Due to a miscommunication between Plaintiffs and their document hosting vendor, the replacement files were not downloaded at that time. Because Plaintiffs had already segregated the documents identified by Zuffa and Plaintiffs from review, Plaintiffs had no reason to believe the replacement files had not been downloaded (presumably, all other documents would have remained unchanged), and continued the review unaware of the omission for some time. Plaintiffs eventually realized their error, and notified Zuffa of this discovery on March 16. In that same letter, Plaintiffs identified additional documents exhibiting the Privilege slip sheet but also producing the underlying text.

Defendant immediately took exception to Plaintiffs' failure to load the corrected FTC Production and took particular issue with the fact that Plaintiffs had reviewed the additional documents Plaintiffs identified as potentially inadvertently produced. As discussed above however, Defendant's outrage is unfounded and disingenuous because Defendant was on notice for six weeks that Plaintiffs has recommencing normal review practices in a manner inconsistent with the purported "agreement" Defendant claims was in place.

---

[38] Defendant incorrectly speculates that Plaintiffs took advantage of its good faith efforts and "apparently reviewed the extracted text of every slipsheeted privileged document in the production". This is incorrect. Plaintiffs have not reviewed the text of any privilege slip sheeted document other than those specifically identified by Defendant as part of the claw back which Plaintiffs are entitled to do pursuant to terms of the Protective Order to evaluate a challenge.

However, when Plaintiffs loaded the replacement FTC Production, Plaintiffs came to understand that Defendant's purported outrage was due to Plaintiffs discovery of Defendant's surreptitious claw back of documents. Plaintiffs identified a number of documents that had text files which read "Document Withheld as Privileged."[39] Plaintiffs searched the set for that phrase and discovered there were 213 documents with these new text files. Although it is not clear that all 213 documents with the Privilege slip sheet had exhibited the inadvertent production issue, at least the additional documents Plaintiffs' identified by letter on March 16, which exhibited the error but were not previously identified as inadvertently produced by either party, were replaced.

Plaintiffs later discovered that another ***5,701 documents*** now contain the text of a slip sheet reading "Document withheld as non-responsive". Many (if not all) of these documents had produced the underlying OCR-ed text and Plaintiffs had reviewed them. Plaintiffs took notes on several of these documents which are decidedly responsive and non-privileged. For example, Plaintiffs have noted that ZUF-00094416 is a press release for a tournament that was co-promoted by two actual or potential competitor promotions to the UFC (Strikeforce and M-1 Global) and which would be televised on the Showtime network. This document was both relevant and responsive to Plaintiffs' RFPs.[40] When Plaintiffs replaced the FTC Production with the corrected production provided by Defendant, the underlying text for ZUF-00094416 was removed and replaced with "Document withheld as non-responsive." Plaintiffs were never notified of the claw back of this document and doing so was improper.

Similarly, Plaintiffs previously took note of a quote from ZUF-00342400, which was a news article in Lorenzo Fertitta's custodial files describing Dana White's strategy of taking down rivals. The article stated, in part:

---

[39] In the initial FTC Production, the slip sheets were not OCR-ed. Thus, regardless of whether the slip sheet indicated the document was withheld as privileged or "withheld as non-responsive," that language would not appear in a search using search terms.

[40] Regardless whether this document was responsive to the FTC's requests as part of that investigation, the document was responsive, relevant and not subject to any protection from discovery in this case, which is more broad than the FTC investigation (a fact Plaintiffs have reiterated on several occasions).

> You'd think White would be in his Vegas office, micromanaging every last detail of Saturday's Fight Night 14. Anderson Silva (maybe the best face-smasher on the planet) will battle James Irvin (he of the big right hand) in the 205-pound main event, but the show is really just one more example of White's clout, charm, organizational skill and ego. He has thrown together the card in five weeks in an attempt to choke out a dangerous upstart promoter, Affliction, which is staging its first event. White believes MMA is his turf; he's coaxed the sport to life. He's already taken down a cageful of rivals, including the IFL, EliteXC and Bodog Fight, but he's particularly irked at Affliction because the company boosted its rep putting T-shirts on the backs of his stars. 'I'm doing this fight for one reason, to make Affliction spend money,' he says. 'If they're in business in January, I'll be horrified.' (Affliction will stage an event in January, but has staged none since.)

ZUF-00342400. Now, that text (as well as any other contained in the previously produced OCR-ed text file) states only "Document withheld as non-responsive." Clearly, however, the document is both relevant and responsive.

Even if the Defendant was justified in withholding or withdrawing some of the 5,701 documents from the FTC on the basis that they were "non-responsive" to the FTC's requests, that does not justify Defendants' failure to evaluate whether those documents were responsive to Plaintiffs' RFPs *before* clawing them back. Accordingly, after raising the issue, Plaintiffs asked Defendant: did Zuffa "review the clawed back documents for responsiveness to Plaintiffs' Requests and determine none were responsive; claw them back on the basis that the documents were not responsive to the FTC's requests/inquiry; or both?" Zuffa, for the first time in its draft of the Joint Status Report, circulated at 11PM Eastern Time on April 28, 2016, indicated that it was only now reviewing these documents (which it heretofore represented it was incapable of identifying) for responsiveness. Absent Plaintiffs' diligence and raising the issue in their Joint Status Report, it is unclear if Defendant would have reviewed and re-produced these documents.

Confronted with Plaintiffs' knowledge of its misconduct, Defendant now claims that it provided, in its January 31 email and February 12 letter, notice of its replacement of nearly 6,000 documents. The record belies this contention. In light of Defendant's identification of specific affected documents (including those Plaintiffs' identified) and prior representation that the issue was "not as extensive" as originally feared, Plaintiffs' reasonable interpretation of the January 31 email and February 12 letter was that the specifically enumerated documents constituted the

JOINT STATUS REPORT

extent of the issue. Indeed, the broadest possible scope of the problem would have included every one of the more than 200 documents with Privilege slip sheets and all 5,701 documents with slip sheets stating "Document withheld as non-responsive." That Defendant expects Plaintiffs and the Court to interpret its correspondence as "notice" that it was clawing back the broadest possible scope of documents (nearly 6,000 in total) in light of its representation that the issue was "not as extensive" as originally feared strains credulity.[41]

Plaintiffs conduct throughout has been consistent with Plaintiffs' understanding. Plaintiffs repeatedly rejected Defendant's contention that it was entitled to claw back the entire FTC Production—including the more than 100,000 responsive documents that cannot be described as "inadvertently produced" or "privileged" and thus cannot by any stretch of the language or spirit of the Protective Order be clawed back. However, Plaintiffs made significant efforts to be cooperative, in recognition of the potential sensitivity of the issue to Zuffa. Plaintiffs determined, through consultation with Plaintiffs' vendor, that if an overlay of the entire production was provided, Plaintiffs would not lose their significant work product and coding that had already been performed. Zuffa never informed Plaintiffs that the provision of the overlay would replace anything other than the documents specifically identified by the parties. No correspondence, including those quoted by Defendant, explicitly say otherwise.

Even with notice, Plaintiffs are unaware of any authority or legitimate basis or justification, Defendant has yet to provide any, that would permit Defendant to claw back even inadvertently produced non-privileged documents without notice. No provision of law or the Protective Order permits a claw back of non-privileged, inadvertently produced documents (particularly responsive ones).

---

[41] This defense of Zuffa's surreptitious clawback is consistent with its approach to discovery and the meet and confer process. Zuffa's counsel speaks in vague terms and provides incomplete information. When Plaintiffs inquire further, they are lambasted for taking "discovery about discovery" or burdening Defendant with requests. When Plaintiffs do not inquire, they often discover that perception and reality diverge widely.

Defendant's purported justification is fundamentally flawed. Defendant asserts that "the *only* way to address th[e] issue [of the allegedly inadvertently produced privileged documents] was to either recall the entire FTC production or to replace the text files for the entire FTC production such that the text files provided matched exactly the set of documents that was provided to the FTC." (Apr. 27, 2016 Correspondence from M. Lynch to M. Dell'Angelo) (emphasis added). However, this assertion is specious. The fact that both parties are now readily capable of identifying each of the 5,701 documents containing the slip sheet "Document withheld as non-responsive," and 213 documents containing the Privilege slip sheet evidences Defendant's failure to diligently address the problem in a transparent way. Specifically, Defendant, whether through a lack of diligence, incompetence, duplicity or some combination thereof, failed to compare its proposed replacement production to the initial production. Doing so would have immediately made clear the scope of the claw back to Defendant and would have required Defendant to examine the 5,701 purportedly "non-responsive" and 213 purportedly "privileged" documents to ascertain whether the clawback was appropriate. Then, Defendant would be required to provide notice of the documents it sought to claw back under the Protective Order. Instead, Defendant skipped this step and, without notice to Plaintiffs, withdrew nearly 6,000 documents from the FTC Production.

Plaintiffs request that the Court Order Defendant review all documents clawed back from the FTC Production and produce all non-privileged documents responsive to Plaintiffs' RFPs.

### 7. Defendant Overstates Its Legal Custodian Proposals and Understates Plaintiffs' Cooperation

Zuffa argues that "Plaintiffs' search term proposal should also be rejected because it would substantially increase the burden on Zuffa with regard to reviewing the legal custodians' documents." *Infra* at 46. Despite this broad statement, Defendant has offered no data whatsoever that (1) any significant volume of material in the Legal Custodians' custodial files are actually hit by Plaintiffs' Search Term Proposal; or (2) that even if there is a significant volume of such material, that it is likely to be privileged or protected from disclosure. Instead, Defendant has

selectively provided the Court with information on proposals Defendant made while withholding the information on why the parties' have not reached agreement.

First, Zuffa complains that "few narrowing proposals [are] in place regarding the legal custodians," implying that the hundreds of thousands of documents that have been excluded by Plaintiffs' winnowing proposals and deduplication process were not applied to the legal custodians. This is untrue. The legal custodians were not carved out from these proposals. Defendant has offered no document counts for any custodians after the application of these proposals, nor has Defendant offered document counts for custodians after application of Plaintiffs' Search Term Proposal. Defendant's argument is no more than rank speculation and cannot be a basis for denying Plaintiffs' proposal. This is particularly so in light of the fact that this information is available to Defendant, making it appropriate to presume that the actual data does not support Defendant's position.

Second, Zuffa's complaints fail to acknowledge its failure to respond to numerous requests for information concerning the proposals. For example, on January 13, 2016, Zuffa proposed to exclude all communications between the Legal Custodians and several third-party consultants. Plaintiffs were unable to ascertain, from the names of the consultants, what work was performed for Zuffa and why that work would likely result in privileged or otherwise protected communications. On February 1, 2016, Defendant provided further information on these third party consultants, on which basis Plaintiffs agreed to exclude four vendors (two eDiscovery vendors, an office services company that provides document management systems, and a third-party vendor used to coordinate logistics for meetings and conferences). Plaintiffs asked follow-up questions concerning the basis for asserting categorically that communications with vendors providing various public relations and other non-legal services would likely be protected from disclosure by either privilege or work product claims. Defendant has declined to substantively respond, instead asserting that it would prefer to focus on "proposals that are likely to affect a material volume of documents," implying that these proposals do not. *See* Lynch Email to M. Dell'Angelo, Apr. 22, 2016. Thus, Plaintiffs neither rejected these proposals nor have been

dilatory in responding to them. Rather, Defendant has simply refused to provide information necessary to evaluate them.

Third, Zuffa writes that "significant disparities still exist between the parties' positions regarding communications with outside counsel, … Zuffa's in-house tax department and whether and what search terms could be used to exclude the documents most likely to be nonresponsive and/or privileged." *Infra* at 47-48. Defendant enumerates several concerns, many for the first time in its April 26, 2016 draft of the Joint Status Report,[42] that do not accurately capture the parties' meet and confer on the subject.

Defendant argues that Plaintiffs' proposed the search term "Lewis" in reference to fighter and Bout Class member Derrick Lewis, but that this term will also capture documents concerning the law firm "Lewis & Roca." Relatedly, Defendant complained that Plaintiffs' term "Hill" captured an employee in its Tax Department, "Jan Hill." Defendant never proposed to exclude all documents mentioning the law firm "Lewis & Roca" which would have been more efficient. Defendant did, however, propose to exclude communications between the Legal Custodians and users of the domain "@lrrc.com," which Plaintiffs' now understand refers to Lewis & Roca. Similarly, Defendant never proposed to exclude all emails mentioning other firms that share names with fighters, including Gordon Silver, Barry Friedman, or Morrison Foerster, but did provide certain domains for those firms, such as @mofo.com. Nevertheless, the terms "Lewis," "Barry", "Morrison" and "Gordon" register only 4,613 unique hits, hardly a significant burden to review. Plaintiffs were willing to find a way to reduce these hits, but Defendant is often dismisses of such efforts as "backwards." Raising it here is disingenuous.

Instead, Defendant proposed to exclude all communications between Legal Custodians and outside counsel as well as employees in Zuffa's Payroll, HR, and Tax Departments. Plaintiffs agreed to exclude emails between Zuffa's Payroll and HR Departments as well as emails between the Legal Custodians and outside counsel in this case. As to other outside counsel and the

---

[42] As detailed above, Plaintiffs have been extremely responsive in endeavoring to address Defendant's claims that particular search terms are overbroad. For example, Plaintiffs' proposed multi-tiered searches to narrow terms when they hit on employees' names as well as fighters.

employees in the Tax Department, Plaintiffs made a reasonable counterproposal due to Plaintiffs' discomfort with enabling Zuffa to apply a blanket exclusion of documents from review as potentially privileged without any oversight. Zuffa's conduct to date in this litigation makes such an agreement untenable from Plaintiffs' perspective. Plaintiffs' counterproposal was that Zuffa would automatically generate a list of communications between the Legal Custodians and the outside counsel domains and the Tax Department employees. This list would include the "To:" "From:" and "Cc:" fields as well as the subject line. Defendant could then review the subject lines for protected information,[43] and replace those with a statement of the subject matter at Defendant's discretion. This proposal would have nearly eliminated all burden with reviewing the subject documents and the burden of logging the documents into a privilege log, but would have permitted some oversight over the exclusion.

Furthermore, Plaintiffs have agreed to many of Defendant's proposals concerning the Legal Custodians. In addition to excluding communications with certain third-party vendors, Plaintiffs agreed to use nine of seventeen proposed search strings, which eliminated more than 20,000 documents from Zuffa's review set and 6,000 more from the Remainder Set.[44] Plaintiffs did not agree to categorically exclude from review or logging documents containing search terms which could appear in relevant material that is not privileged. Plaintiffs have on several occasions invited Defendant to propose additional terms. Defendant has not responded to those invitations. Plaintiffs have also agreed to exclude communications with various third-party regulators and governmental entities including the EEOC, the Nevada Department of Employment Training and Rehabilitation, the IRS and the Nevada Department of Taxation.

### C. Zuffa's Statement

At the last Status Conference, the Court ordered Zuffa to review email documents that contained  the 392 Undisputed Search Terms as well as Zuffa's Search Terms, which, at the time

---

[43] Plaintiffs would agree that the production of the subject lines would not waive any privilege.
[44] These terms include terms targeted at "separation agreements", "Severance packages" "discrimination", "unemployment insurance", "Patents" and "copyrights" or "trademarks" as well as "Piracy."

totaled over half a million documents.  Since that time, Zuffa has substantially expanded the documents it has agreed to review, both by expanding its search term list and by agreeing to review additional categories of documents without the use of search terms, as explained below. Zuffa has compromised by accepting some of Plaintiffs' proposals regarding search terms while also independently researching and crafting additional search terms to capture other categories of potentially relevant documents, as well as adding the original search terms used in the 2011 FTC investigation.  The result of these efforts is that Zuffa is now reviewing more documents based on more search terms with greater assurances that relevant documents will not be missed.  In addition to the email documents, Zuffa is also reviewing hundreds of thousands of pages of hard copy documents, text messages, financial and corporate documents, electronic fighter files, and other categories of documents that Zuffa has agreed to review without the use of search terms.

### 1. Progress Made Since the Last Status Conference

Notwithstanding the accusatory tone and often inaccurate characterizations in Plaintiffs' section, over the past two months, in addition to its ongoing review and production of documents, Zuffa has engaged in extensive discussions with Plaintiffs regarding various proposals that, in some cases, exclude or narrow certain categories of documents from review or, in other cases, increase the number of documents that Zuffa will review without the use of search terms. Through these discussions, Zuffa tested and applied dozens of different proposals made by both parties,[45] provided regular updates on data and the results of the testing, provided thousands of

_____

[45] One issue that was resolved since the last Joint Status Report is the discrepancy relating to family hit counts.  In the last JSR, Zuffa introduced a series of exhibits showing the hit count reports for each of the party's search term proposals using three metrics: (1) the number of single documents hit by each term, (2) the number of documents with family members associated with each search term, and (3) the number of unique documents containing that term.  Zuffa also provided overall statistics regarding the total number of documents that would have to be reviewed under each party's proposal.  Dkt. 218-1-5.  Due to an error in the way Zuffa's vendor calculated the "with family" numbers for the individual terms on the parties' proposed search term lists, the "with family" numbers were incorrect because the family members were not de-duplicated at the individual term level.  This error only affected the "document count with family" numbers associated with specific search terms and did not affect the total number of documents that would have to be reviewed that Zuffa correctly reported (at the time, 1,235,677 for Plaintiffs and 534,577 for Zuffa).  Zuffa corrected this error with Plaintiffs and provided

sample documents to Plaintiffs, and made the Chief Solution Officer of its e-discovery vendor available to respond to Plaintiffs' questions, all while reviewing and producing documents, and researching, revising and expanding its search term list.  The parties' efforts were successful in many ways.  The following summarizes some of the important areas in which the parties have either reached agreement or Zuffa has unilaterally undertaken to expand its search and review efforts, notwithstanding lack of agreement by Plaintiffs, such as in the case of search terms.

**Documents Collected During the FTC Investigation.**  Zuffa recently discovered that, contrary to its earlier understanding, a set of documents that had been collected during the 2011 FTC Investigation but not produced still existed in an Early Case Assessment archive of Zuffa's former eDiscovery vendor responsible for the 2011 productions to the FTC — a fact that was unknown to Zuffa, its current counsel, or its FTC counsel.  Zuffa instructed the vendor to recreate this database and will provide additional information regarding the contents of this collection to the Plaintiffs and the Court as soon as it is available.  All of the figures below are based on the existing corpus and do not include documents from the 2011 collection.

**De-Duplication.**  The parties have agreed on a refined de-duplication protocol which led to the reduction of 223,191 documents from the total email corpus.

**Narrowing Proposals.**  As discussed more fully below, the parties have agreed to exclude certain discrete categories of documents from further review ("narrowing" or "winnowing" proposals).  These include, for example, excluding emails from certain domain names to which the Plaintiffs have agreed, that reflect that the documents are junk, spam, newsletters, or sales/promotional documents.  In Zuffa's view, while these narrowing proposals were helpful in excluding certain irrelevant material, they are not sufficient to overcome the overbreadth of the Plaintiffs' requests or the disproportionate burden of reviewing over 600,000 additional documents in Plaintiffs' Search Terms Set (see chart at page 3) that do not contain any of the thousands of search terms on Zuffa's revised list.  Further, Zuffa believes that these sorts of

---

Plaintiffs with a revised hit count report with the corrected family hit counts at the individual term level on March 21.

JOINT STATUS REPORT

1  winnowing proposals that could meaningfully reduce the burden of review have largely already

2  been evaluated and adopted to the extent practicable, and that further reductions through these

3  kinds of exclusions are unlikely to meaningfully reduce the burden.  This is especially true

4  because, to be worthwhile, the proposal must be one where the effort and expense involved in

5  testing the proposal, compiling and reviewing the requested information, responding to the

6  inevitable follow-up questions, and negotiating with the Plaintiffs (discounted for the risk, as is

7  often the case, that the Plaintiffs will not ultimately agree), and implementing the proposal will

8  not be greater than the burden of simply reviewing and producing the particular documents at

9  issue.  *See* pg. 64.

10      **Expanded Linear Review.**  Zuffa has expanded the categories of documents it has agreed

11  to review without the use of search terms based on a variety of different metrics, e.g., certain

12  domains that suggest a message was sent to or from a mobile phone or sent from or forwarded

13  from a scanner.

14      **Expanded Search Terms.**  Zuffa expanded its search term list to include the Original

15  FTC Search Terms used during the 2011-12 FTC Investigation.[46]  Exhibit 1.  In addition, because

16  some of the Original FTC Search Terms were tied to the names of then-current Strikeforce

17  fighters, at Plaintiffs' request, Zuffa agreed to expand those terms to include the first names, last

18  names and nicknames of all fighters who competed in a UFC bout after December 16, 2010 (e.g.,

19

20

21  _____

22  [46] During the 2011 FTC Investigation of the Strikeforce acquisition that was closed without
     further action, ███████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████

24  █████████████    These terms are attached here as Exhibit 1. ███████████████████

25  ███████████████████████████████████████████████████████

26  ███████████████████████████    Zuffa believes the ███████████ are too overbroad to

27  apply to the additional 819,406 email documents in this case, particularly because they include
     such terms ██████████████████████████

28

"(contract or acquire% or exclusiv%[47] or exten% or release or terminate) AND (Stephen or Wonderboy or Thompson)").  Exhibit 2.

In addition, based on its review of documents and further investigation, Zuffa expanded its search term list further to include approximately 300 new terms specifically designed to capture other responsive documents by identifying additional concepts, names, colloquialisms or particular phrases used by UFC personnel or others in the industry, e.g., "disc bonus," or are arguably relevant to the issues in case.  Exhibit 3.  The expansion of these search terms further ensures that responsive documents are being captured and will be reviewed.[48]

The net result of the two months of work is that there are currently 594,496 email documents in Zuffa's current Review Set, in addition to approximately 65,000 hard copy documents that Zuffa is reviewing (or has already produced) without search term winnowing, and hundreds of thousands of non-email documents from the custodian hard drives and the network shared drives, some of which Zuffa believes should be reviewed after search term winnowing, as well as other discrete sources of documents that Zuffa is reviewing for responsiveness and privilege (subject to the continuing dispute regarding legal custodians described below).  The remaining 819,000 emails that either do not contain any of the expansive terms in Zuffa's expanded list or do not fall within the many categories of documents that Zuffa has agreed to review without the use of search terms should not be added to Zuffa's already substantial review burden.  In addition to the issues of overbreadth and disproportionality, the sample documents show that there are substantial amounts of personal and privileged information in the documents that must be carefully reviewed and redacted prior to production.  Zuffa's employees have a right to the privacy of personal materials that are unrelated to issues in this litigation.

---

[47] Not surprisingly, many of the FTC search terms were already on Zuffa's list of search terms.  "Exclusiv*", for example, has always been a stand-alone Zuffa search term; all documents in the corpus containing that term will be reviewed for responsiveness and privilege.

[48] For example, between Zuffa's terms "new deal%," "fight deal%," "last fight" and "fight% w/5 month%," Zuffa's terms capture the contract negotiation emails that occur between Zuffa's matchmakers and fighters or agents, to the extent that these documents are not already contained in the fighter files, which Zuffa is reviewing without the use of search terms.

JOINT STATUS REPORT

## 2. The Remainder Set Documents[49]

### a. Plaintiffs' Search Term Proposal Remains Virtually Unchanged and Is Still Vastly Overbroad

The search term list that Plaintiffs present today is nearly identical to the one they proposed two months ago. With the exception of a few terms, Plaintiffs have not reduced or narrowed their proposed 2,400-term list. The fundamental problems of overbreadth that Zuffa identified back in January still exist – namely their approach of using the names of fighters, venues, sponsors, and other common words without any relation to the issues in this case. Plaintiffs' list still includes hundreds of common names as standalone search terms – an approach that the Court rejected at the last Status Conference – as well as common words like Google, YouTube, Trouble, and Answer. Plaintiffs also continue to maintain that search terms should not be used at all. Plaintiffs have provided no justification for why Zuffa must undertake the massive burden and expense of reviewing every single document collected for this case that hits on these expansive and overbroad terms. Plaintiffs offer no reason why the Court should accept today a proposal the Court did not accept two months ago. Instead, the Court should accept Zuffa's significant concessions in expanding the scope of its search term list and its agreement to review additional categories of documents without search terms, and put an end to the dispute over search terms that has consumed well over 4 months.

That the parties have successfully excluded some of the most obviously nonresponsive documents through the use of narrowing proposals does not mean that the remaining 603,000 documents in Plaintiffs' Search Terms Set or 819,000 documents in the Remainder Set are responsive or that the expense and burden of reviewing these documents is proportionate to the needs of the case. The large sample sets (over 6,000 documents) provided to Plaintiffs show just

---

[49] In our calls leading up to the Joint Status Report, the parties agreed to exchange first drafts of each side's inserts for the Joint Status Report on Tuesday April 26 at 2 p.m. At 6 p.m. Pacific on April 28, the day before the Joint Status Report was due, Plaintiffs sent Zuffa a 17-page declaration from Mr. Kellner. Zuffa does not have adequate time to address Mr. Kellner's declaration, to the extent a response is necessary. Zuffa notes that Mr. Kellner's speculation about Zuffa's motives and state of mind is far beyond his area of expertise.

the opposite – that Zuffa's search terms have effectively captured relevant documents and Plaintiffs' search terms are still vastly and unnecessarily overbroad.

Plaintiffs have now had the opportunity to review approximately 6,300 sample documents, in addition to more than 250,000 documents that Zuffa has formally produced or re-produced. As discussed more fully below, the sample documents Plaintiffs chose to present to the Court demonstrate that Zuffa's combination of search terms, along with its targeted collection and review of documents without search terms, are effective in not allowing important evidence to escape review. Instead of refining their search term proposal, however, Plaintiffs have decided to stand firm on their search term list and methodology of using common words and names. Zuffa has accommodated to the best of its abilities Plaintiffs' repeated requests to engage in costly and time-consuming sampling procedures to the end of achieving some reasonable compromise on search terms. While the winnowing agreements are helpful and better than nothing, the fact that Plaintiffs have agreed to remove documents that require the least effort to review and immediately conclude are non-responsive, such as sales emails from Southwest Airlines, does not justify reviewing the remaining 600,000 documents that hit on their overbroad search terms.

With the June 1 substantial completion deadline fast approaching, discovery should proceed using Zuffa's comprehensive terms.

### i.   Use of Common Names

Plaintiffs' proposal still uses over a thousand fighter names and nicknames as standalone search terms despite the Court's previous directive that it would not order Zuffa to search every nickname and every first name of every fighter. Dkt. 226, Feb. 23, 2016 Status Conf. Tr. 28:19-23. The sample documents prove that Plaintiffs' approach of using common names leads exactly to the result that Zuffa predicted and common sense dictates would occur – names as standalone terms pull up significant numbers of nonresponsive documents unrelated to the purpose of the search term. As just one of many examples, of the 2,000 most recent samples provided to Plaintiffs, 29 documents hit on the term "Barboza" which is the name of an athlete, Edson Barboza. But all 29 documents contain false hits on that term from emails that include Zuffa

1  employee Tony Barboza.

2    Of course, the false hits generated by the names of Zuffa employees is a small subset of

3  the overbreadth problem because, among other reasons, Zuffa typically refers to its events by the

4  names of the headline athletes, e.g., "Jones v. Cormier."  Thus, any document with any reference

5  to any bout will be captured, regardless of its relation to the issues in the case.  Similarly,

6  although the Complaint's allegations with regard to sponsors are limited to the theory that Zuffa's

7  arrangements with its sponsors foreclose competitors from the marketplace, Plaintiffs have

8  included the names of all sponsors as stand-alone search terms without any connectors to the

9  issues in the case (e.g., Harley, Monster, Bud).  Thus, under their proposal, every document

10 mentioning any sponsor, including everything from approval of routine promotional materials,

11 discussion over the color, size, and placement of a particular sponsor's logo, and negotiations

12 over contract issues that have nothing to do with the competitive issues in this case, will be swept

13 in, regardless of relevance.  The same principle applies to venues.

14         **ii. Use of Common Words**

15   Plaintiffs' proposal also still contains common words like Google, Mac, football, and

16 NCAA, among many other common words that are used in a variety of contexts which have

17 nothing to do with this case.[50]

18   For 10 of the broadest terms on Plaintiffs' list, they have proposed a two-tier search

19 method that provides some "NOT" limiters on the broad terms.  Plaintiffs' approach, however, is

20 backwards.  It is more difficult to identify all of the ways that a term is nonresponsive than to

21 identify the few ways that it is.  Plaintiffs have refused to narrow the broadest of their terms by

22 attempting to identify ways that those terms are responsive, even though these terms on their face

23 (e.g., Facebook, Twitter, Yahoo%, etc.) have nothing to do with mixed martial arts or the issues

24 in this case.

25

26 [50] For example, Plaintiffs' inclusion of the term Mac leads to documents using a mac.com email address, a receipt including a meal for mac 'n cheese, and various references to Mac computers.
Similarly, the term "Machine" leads to a number of hits on documents relating to slot machines (a
27 phrase not uncommonly found in emails of Zuffa's Las Vegas based employees).

28

JOINT STATUS REPORT

### iii.   Legal Custodians

Plaintiffs' search term proposal should also be rejected because it would substantially increase the burden on Zuffa with regard to reviewing the legal custodians' documents.  At the last Status Conference, Plaintiffs represented that the parties were close to an agreement on legal custodians.  At this point, however, the Plaintiffs have agreed to only a few of Zuffa's proposals.  For example, Plaintiffs have agreed to exclude from review emails from just two law firms — the two that represent Zuffa in this litigation — and then only if such emails post-date when Plaintiffs' Complaint was filed.  In short, significant disparities still exist between the parties' positions regarding communications with outside counsel, various third party consultants, Zuffa's in-house tax department, and whether and what search terms could be used to exclude the documents most likely to be nonresponsive and/or privileged.  With few narrowing exclusions in place regarding the legal custodians, Plaintiffs' search term proposal would dramatically increase the magnitude of Zuffa's review burden of the legal custodian documents because its proposed terms include the names of law firms or individuals who are highly likely to have privileged or nonresponsive communications with the legal custodians.

For example, Plaintiffs' proposed search terms include the term "Lewis," presumably a reference to fighter Derrick Lewis.  However, Zuffa has also retained the law firm, Lewis Roca Rothgerber Christie for a number of matters.  The inclusion of the term "Lewis" ensures that every communication between the legal custodians and this firm will be captured by their search terms and will have to be reviewed.[51]  In Zuffa's January 13 letter, Zuffa identified these firms'

---

[51] The same is true for other terms on Plaintiffs' list, for example "Gordon" hits on all communications with Zuffa's outside law firm Gordon Silver, "Morrison" hits on Morrison Foerster, among others.  Plaintiffs also include both "Campbell" and "Williams" as separate search terms despite the fact that they are counsel in this matter, as well as having acted as litigation counsel on many other matters for Zuffa in the past.  Although Plaintiffs recently agreed to exclude certain communications between Zuffa employees and the campbellandwilliams.com domain after December 16, 2014, their search terms ensure that any communications prior to this time will be captured by Plaintiffs' terms and will need to be reviewed and logged if responsive and privileged.  Plaintiffs have not agreed to exclude communications with other law firms, including, for example, Zuffa's employment law and tax advisers, to reduce the burden of these false hits.

domain names as part of Zuffa's proposal to exclude communications between the legal custodians and these domains from review.  It is highly improbable that Plaintiffs' counsel was unaware, for example, that @mofo.com related to the law firm Morrison Foerster or that Plaintiffs were incapable of finding out that domain @lrrc.com related to Lewis Roca Rothgerber Christie.  More fundamentally, however, it is another example of the many ways in which use of names as standalone terms without proximity to issues relevant to the case can lead to overbroad and unintended results.

The same issue exists with Plaintiffs' refusal to exclude communications between Zuffa's legal custodians and its tax department.  Although Zuffa told Plaintiffs in January that its Tax Director is Jan Hill, and tax issues have nothing to do with this antitrust case, Plaintiffs have continued to maintain "Hill" as a search term, thus ensuring that all communications between the legal custodians and Zuffa's Tax Director will need to be reviewed under its proposal.  Thus, Plaintiffs' search terms would significantly increase the burden of privilege and responsiveness review for the 157,280 legal custodian documents in the Remainder Set or the 119,361 documents in Plaintiffs' Search Term hits beyond those Zuffa is already reviewing.  To be clear, Zuffa is not making a blanket assertion of privilege as to any documents.  Rather, these examples demonstrate the burden and expense of proceeding without either reasonable search terms or without reasonable limits on searches of legal custodians, and why Zuffa's proposal should be adopted.

Plaintiffs' proposal for dealing with communications from outside law firms would increase, rather than decrease, the burden on Zuffa.  Plaintiffs propose that Zuffa provide the information in the To:, From: and CC: lines as well as the date and subject line of the emails for all emails from those domains.  Zuffa rejected this request because the subject matter headings for all these emails would often provide either too little information, which Plaintiffs acknowledged would only lead to further requests from Plaintiffs for additional information, or would themselves reveal privileged information or work product, which would require redaction.  Thus, Plaintiffs' proposal would require a great deal of additional work without any assurance that the burden of review and logging would be reduced and with substantial reason to believe the

JOINT STATUS REPORT

attorney time and cost would be higher than simply reviewing for responsiveness and privilege.

### iv.    Plaintiffs' Sample Documents

Plaintiffs include a series of 14 exhibits in an attempt to demonstrate that Zuffa's search term methodology is unsound.  That these 14 documents are the best they can come up with out of the generous samples provided is persuasive evidence that Zuffa's Review Set combined with its agreed upon targeted review of documents does not omit a material number of meaningful documents.

**Already Produced**:  Three of the documents that Plaintiffs identify as evidence that search terms are ineffective have <u>already</u> been produced to Plaintiffs either as a result of Zuffa's linear review of all fighter files without the use of search terms or because the document actually does hit on Zuffa's search terms and has been produced, despite Plaintiffs' representation that it does not.  Plaintiffs' approach of including all fighter names as standalone terms is not only grossly overbroad but unnecessary in light of Zuffa's agreement to review the fighter files without the use of search terms.  Plaintiffs' examples show the effectiveness of Zuffa's approach.

- Ex. 9, JSILVA00022022:  Previously produced as ZFL-0468929 (from Zuffa's electronic fighter files); ZFL-0755373 (from Zuffa's hard copy fighter files, and part of an 11-page document filled with similar emails about fighters); ZFL-0756391 (from Zufa's hard copy fighter files).

- Ex. 5, KHendrick00040651:  Previously produced as ZFL-0756460 (from Zuffa's hard copy fighter files); ZFL-0469293 (same); and ZFL-0756464 (same).

- Ex. 17, ZFL-0801077 is in fact a produced document.  Plaintiffs claim that this document does not hit on Zuffa' search terms because "Martinez" is 6 words away from "contract." Contrary to Plaintiffs' position, this document does hit on Zuffa's search term because proximity limiters do not count stop words, such as "the." This document has already been produced because it hit on Zuffa's search terms and was deemed responsive.  A produced document does not prove Plaintiffs' point.

**Documents in Categories Zuffa Has Agreed to Review Without Search Terms**:

Plaintiffs also cite as examples documents that Zuffa has already agreed to review without the use of search terms.  It is not surprising these documents do not hit on Zuffa's search terms.  Zuffa did not spend time crafting search terms around categories of documents that it had already agreed to review without search terms.

- Ex. 5, KHendrick00040651:  This document has already been produced from Zuffa's linear review of the fighter files.  In addition, this document is captured in another set of documents that Zuffa has agreed to review without search terms – those that include scanned documents.  Specifically, in this instance, emails that contain "Message From" in the subject line and contain an attachment, an exception that Zuffa proposed precisely because the scanned attachments may not have OCR'd text.

- Ex. 15, LEpstein00094219:  This exhibit shows an attachment relating to ███████████ ███████████.  It is cumulative of the extensive financial documents Zuffa has agreed to produce without the use of search terms.

- Ex. 10, KHendrick00091114:  This document reflects past compensation paid to an athlete.  It is cumulative of the complete compensation information for each fighter that Zuffa has already agreed to produce without the use of search terms.

**Documents Hitting on Zuffa's New Search Terms**:  Several of Plaintiffs' examples also hit on search terms that Zuffa has added to its search term list.

- Ex. 9, JSILVA00022022:  Hits on Zuffa's search term "last fight".

- Ex. 10, KHENDRICK00091114:  Hits on Zuffa's search term "near((EA, compensat%), 10)".

After scouring 4,000 new sample documents, Plaintiffs present 14 examples for the Court, 3 of which have already been produced from Zuffa's review of targeted sources of documents that Zuffa agreed to review without search terms, like the fighter files, others which are hit by Zuffa's new search terms, or are among the categories of documents that Zuffa has agreed to review without search terms, and still others whose importance Plaintiffs deliberately misrepresent.  In

short, none of Plaintiffs' examples show significant omissions in identifying arguably relevant

documents, and the remaining exhibits contain information that is either cumulative of evidence

from categories of documents that Zuffa will review or is, at best, marginally relevant to this case.

E.g., LEPSTEIN00143497, in which Mr. Fertitta circulates without comment a link to a public

news article from Business Week, and Mr. Epstein responds, "Yes.  Saw this."

Finally, Plaintiffs' characterization of Exhibit 4 is false and misleading.  In all their

feigned outrage, Plaintiffs deliberately mischaracterize this document in order to malign Mr.

Hendrick.[52]  There is no ███████████████████████████ as Plaintiffs claim.

Rather, Mr. Hendrick reminds employees of Zuffa's existing policy ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Zuffa maintains significant

amounts of confidential information and works in a high profile business, and Zuffa's policy

████████████████████████████████████████ was previously provided to

Plaintiffs in Zuffa's document retention policy documents, provided to Plaintiffs on September

15, 2015.

In short, none of Plaintiffs' examples show significant omissions in identifying arguably

relevant documents.

### 3. Non-Email ESI

In addition to the nearly 2 million email documents, there are hundreds of thousands of

non-email hard drive documents and network shared drive documents.  Zuffa has already agreed

to review a portion of these documents without the use of search terms.  For the remaining

documents, Zuffa believes that search terms should be used to identify the documents from this

---

[52] In their description of the document in their 10:45am draft of the Report today, Plaintiffs
omitted any reference to the subject matter of the email, i.e., "████."  Only when threatened with
Zuffa seeking reprimand did Plaintiffs add that reference.  Their mischaracterization of the
document (*see* pg. 8-9, 17), however, is still dead wrong.

set for review.  These documents are at least as susceptible to successful search term identification as email documents because these documents are more likely to contain business information with more standard language and less likely to contain colloquialisms. Plaintiffs have disputed that search terms should be applied to this set of documents but have not explained why they believe the entirety of certain network drives, such as Marketing, would need to be reviewed in their totality or why search terms would be ineffective at culling responsive documents.[53]

### 4. Response to Plaintiffs' Attacks

Rather than meaningfully address the issues of burden and overbreadth, Plaintiffs choose instead to hitch their wagon on unwarranted, unfair, and in some instances outrageously disingenuous, attacks on Zuffa's efforts to provide Plaintiffs with information, cooperate in discovery, and collect, review, and produce a massive amount of documents.  In fact, Zuffa has produced an extraordinary amount of information to Plaintiffs on an ongoing basis, including providing Plaintiffs with thousands of sample documents and allowing Plaintiffs to question directly their eDiscovery vendor.  That information was not always provided within the time frame demanded or in the precise form Plaintiffs requested or that Zuffa discovered additional materials in the course of due diligence does not equate to bad faith, nor does it warrant the extraordinarily lengthy, unfounded, and misleading accusatory exposition in a Joint Status Report, much of it furnished in a draft provided at 8 p.m. Pacific the night before the Report was due.  We address the most important of Plaintiffs' complaints below.

**The FTC Production:**  Plaintiffs make a variety of unsubstantiated accusations regarding Zuffa's handling of the FTC Production.  A brief background on the history of this production is

---

[53] In their final exchange of Joint Status Report drafts at 10:45am the day the Report was due, Plaintiffs added a new section regarding the review of audio/video files found in the custodians' files and shared drives.  Zuffa does not agree with Plaintiffs' characterization of the parties' recent exchanges on this topic but has been investigating various means of identifying or segmenting responsive vs. non-responsive these materials and does not view this dispute, which is separate and apart from the search term issue and the massive review of ESI document production, as ripe for court resolution.  One concern is that while Plaintiffs argue now that it is simple and easy to quickly review these materials, they will undoubtedly be the first to call foul should anything be missed in any abbreviated process.

helpful to understanding the complaints that Plaintiffs raise.

### a.   Background of the FTC Re-Production

In their First Requests for Production of Documents, Plaintiffs requested "All Documents provided to or received from any governmental agency (including any party to any proceeding or the Federal Trade Commission, Department of Justice, or member or committee of Congress or any state legislature or other state governmental body or agency), investigating or litigating Your business practices including any claims or investigations related to any alleged anticompetitive conduct." RFP No. 54. Documents that Zuffa produced to the FTC in 2011 during its investigation of a Zuffa affiliate's acquisition of MMA promoter Strikeforce were responsive to this request. In order to expedite production of this material to Plaintiffs (which comprised over 100,000 documents), Plaintiffs and Zuffa agreed in October 2015 that Zuffa would re-produce the documents produced to the FTC during the 2011 Strikeforce investigation "in the form in which it was initially produced." Oct. 22, 2015 E-mail from M. Lynch to M. Dell'Angelo; October 22, 2015 E-mail from M. Dell'Angelo to M. Lynch. Zuffa agreed to do so without re-reviewing the documents because Plaintiffs stated that this re-production was a priority for them. On November 2, less than two weeks after the parties reached this agreement, Zuffa re-produced the Strikeforce production in the form in which it received those documents from the e-discovery vendor that handled the 2011 production.[54] Zuffa agreed to re-produce these documents on this expedited basis with the understanding that Plaintiffs had agreed to accept the documents as they were ultimately produced to the FTC, i.e., that Plaintiffs would accept that documents that been withheld from the FTC as non-responsive or privileged were not "produced" to the FTC. Absent that agreement, Zuffa could and would have refused to re-produce any documents produced to the FTC until each of the approximately 108,000 documents was reviewed for responsiveness and privilege.

### b.   The Parties' Discussion of the Production Error

---

[54] Zuffa needed to separate some of the documents from the initial FTC re-production to Plaintiffs in order to comply with its contractual notice obligations to third parties.

On January 27, 2016, Plaintiffs informed Zuffa by letter that two documents re-produced to Plaintiffs from the FTC production had a slipsheet stating that the document had been withheld as privileged but whose underlying text was viewable.  Zuffa promptly responded that same evening stating:  "We do not believe that these documents were intentionally produced to the FTC in the first instance - at least some were clawed back, but we will need to consult with counsel responsible for the FTC production to determine exactly what happened."  Jan. 27, 2016 E-mail from J. Cove to M. Dell'Angelo.  Zuffa also requested that Plaintiffs "defer review of the FTC production until we can determine the extent of this problem and provide you with a replacement production, if necessary."  *Id.*  Plaintiffs agreed to suspend their review of the FTC production until February 1, but stated that, after that time Plaintiffs would resume their review of the FTC production "with the caveat that Plaintiffs will not review the native or text view of any document preceded by a slipsheet indicating that the document was withheld on the basis of privilege or that Zuffa otherwise identifies as inadvertently produced, subject to the terms of the Protective Order."  Jan. 28, 2016 Email from M. Dell'Angelo to J. Cove.

Zuffa immediately investigated the issues raised in Plaintiffs' January 27 letter in an attempt to identify the scope of the issue and to cure any defect in its re-production.  Zuffa discovered two issues: (1) certain documents had been produced to and thereafter clawed back from production to the FTC in 2011; and (2) certain documents that had been produced to the FTC in 2011 with slipsheets reflecting that the documents had been withheld on the basis of privilege or non-responsiveness were mistakenly produced to Plaintiffs in 2015 with substantive extracted text, rather than with the text files that had been produced to the FTC in 2011.

On January 31, Zuffa provided Plaintiffs with an update on the status of its investigation, and described these two distinct issues.  Jan. 31, 2016 E-mail from M. Lynch to M. Dell'Angelo.  First, Zuffa's counsel identified the documents that had been clawed back from the FTC production in 2011, and also informed Plaintiffs, "(2) When the FTC production was exported to us for re-production to you, documents were erroneously exported to us with their extracted text, including documents where the underlying text were withheld from the FTC <u>on the basis of</u>

1    privilege or responsiveness.  As a result, documents that were originally produced to the FTC

2    with slipsheets were re-produced to you with the incorrect text file."  (Emphasis added.)

3           Zuffa continued to investigate the broader second issue so that it could cure the

4    technological defect in the production.  However, short of reviewing the approximately 108,000

5    documents in the re-production to identify which documents had slipsheets and identifying which

6    of the slipsheeted documents were erroneously produced with extracted text, Zuffa's counsel and

7    its vendors were unable to identify which slipsheeted documents had been produced with

8    extracted text.  Plaintiffs also confirmed that they had attempted to determine a way to identify

9    the slipsheet documents and could not do so.  During meet and confer sessions, both parties

10   discussed the best way to quickly cure the re-production error without fully replacing the entire

11   FTC re-production.  Although Zuffa was entitled to an immediate clawback of the entire

12   production under the Protective Order if necessary to cure the problem of inadvertently produced

13   privileged documents, Zuffa recognized that this would have impacted Plaintiffs' review progress

14   and their work product and endeavored to find a solution that would minimize the impact.  While

15   the parties discussed how to cure the technological error, Plaintiffs agreed that they would "not

16   review the underlying text or metadata for slipsheeted documents pending the parties' discussion

17   about the best way to correct the technical errors in the re-production."  February 2, 2016 e-mail

18   from M. Lynch to M. Dell'Angelo.  The parties agreed during a meet and confer session on

19   February 5, which included Mr. Dell'Angelo, Mr. Madden, Mr. Cove, and Ms. Lynch, that re-

20   producing all of the text files in the form that they were produced to the FTC in 2011 would cure

21   the technological error with minimal disruption to Plaintiffs' review process.

22          Zuffa provided the text file overlay to Plaintiffs on February 12, 2016.  In its production

23   cover letter, Zuffa's counsel confirmed that it was re-producing the text files to cure the issues

24   that had been discussed among the parties:

25          As we have discussed over the past two weeks after you alerted us to an issue with
            certain of the text files in that production, when the FTC production was exported
26          to us for reproduction to you, documents were erroneously exported to us with
            their extracted text, rather than their produced text, including documents where the
27          underlying text was withheld from the FTC on the basis of privilege or
            responsiveness. As a result, documents that were originally produced to the FTC
28

55

JOINT STATUS REPORT

1    with slipsheets were re-produced to you with the incorrect text file. We believe the
     replacement text files included in this production will fix this issue.

2    February 12, 2016 Letter from M. Lynch to M. Dell'Angelo and H. Hafiz (emphasis added).  The

3    February 12 letter also separately addressed the issue regarding the documents that had been

4    clawed back from the FTC in 2011.  The load file from the February 12 overlay showed that it

5    contained 107,645 files.

6              After February 12, Zuffa believed this issue had been fully resolved.  Indeed, at the last

7    Status Conference, Zuffa told the Court that it believed Plaintiffs "were responsible and ethical

8    and worked appropriately" regarding the handling of this issue.  Dkt. 226, 22:16-17.

9                        c.    **Plaintiffs' Mishandling of Inadvertently Produced Privileged**
                               **Documents in the Production**
10
              Almost three weeks later, Kevin Rayhill, one of Plaintiffs' counsel who had not been
11
     involved in any of the discussions, agreements, or representations regarding the production error
12
     and the resulting agreed solution to it, notified Zuffa that Plaintiffs had not applied the agreed text
13
     file overlay to its e-discovery platform to address and cure the technological re-production error.
14
     Rather, Plaintiffs had continued to review from the set of incorrectly produced documents and to
15
     review documents that had been produced to them with slipsheets indicating that the documents
16
     had been withheld from the FTC in 2011 on the basis of privilege and responsiveness.[55]
17
     Apparently as a result of continuing to review the incorrectly produced privileged text files
18
     connected with the documents with slipsheets stating they had been withheld as privileged, Mr.
19
     Rayhill stated that Plaintiffs identified four additional documents with the extracted text error that
20
     Plaintiffs had reviewed – three of them were produced with slipsheets that stated, "Document
21
     Withheld as Privileged," and one of them had been produced with a slipsheet that stated,
22
     "Document Withheld as Non-Responsive."  March 16, 2016 Letter from K. Rayhill to M. Lynch.
23
     Mr. Rayhill indicated that Plaintiffs disagreed with the assertion of privilege with the regard to
24
     the three documents with the privilege slipsheets but would not challenge the privilege claim.  He
25

26   ───────────────────
     [55] With regard to the failure to promptly download the February 12 replacement file, Plaintiffs
27   admitted that they had made a mistake; Zuffa did not pursue the issue further, other than to seek
     clarification that Plaintiffs eventually implemented the text file overlay solution.
28

did not indicate whether Plaintiffs had reviewed other documents with a privilege slipsheet in that letter but, as explained below, he later took the position that it was permissible do so despite Mr. Dell'Angelo's assurances that Plaintiffs would not do so.

Zuffa immediately inquired (1) why Plaintiffs had continued to review the text files that were incorrectly produced despite the fact that replacement files had been provided a month before and (2) why Plaintiffs had continued to review the extracted text files produced with slipsheeted privileged documents after the express assurances they would not do so.  Mr. Rayhill responded that it was his belief Zuffa was relying on Plaintiffs to search for and identify the inadvertently produced privileged documents, Mar. 18, 2016 Email from K. Rayhill to M. Lynch, despite the fact that this position directly contradicts Mr. Dell'Angelo's previous agreement not to review documents with a privilege slipsheet.  February 2, 2016 e-mail from M. Lynch to M. Dell'Angelo; February 3, 2016 Email from M. Dell'Angelo to M. Lynch.

This Court has previously explained that it is not a matter of "if" an inadvertent production issue will occur, but a matter of "when."  Because of the inevitability of these inadvertent productions, it is imperative that the parties act appropriately when these disclosures occur.  Zuffa did exactly that, and conferred with Plaintiffs throughout the process of identifying a solution to the production error.

> **d.    Zuffa Was Fully Transparent About the Scope of the Production Error and Worked Closely with Plaintiffs to Remedy the Error**

Apparently believing that the best response to one's own fault is to take the offensive against the other party, Plaintiffs now claim that Zuffa tried to "surreptitiously claw back documents."  This allegation is a fabrication.  Zuffa's February 12 production letter, as well as prior and subsequent correspondence on this issue, as well as the load file itself, made clear that the replacement overlay would remove the extracted text from all the documents that had been withheld or clawed back from the FTC, so that the Plaintiffs would receive exactly what was agreed upon – the production as it was provided to the FTC.[56]  Zuffa did not review previous

---

[56] *See also* Mar. 22, 2016 Letter from J. Cove to M. Dell'Angelo ("Zuffa provided a replacement text file for ***every document*** in the FTC production in order to resolve this issue, except for the

counsel's privilege claims nor their previous judgments as to responsiveness to the FTC's requests – a fact that both parties understood and that enabled Zuffa to make the November production within two weeks of agreeing to do so.  Since Zuffa made no independent assessment of previous counsel's privilege or responsiveness calls for the FTC reproduction, it was not possible simply to replace the text files of the documents that had been identified with a privilege slipsheet, as Plaintiffs contend.  Moreover, subsequent review of some of these documents withheld as non-responsive in 2011 shows they were also privileged.  This is not surprising because once a document is deemed non-responsive, it is not usually logged as privileged even if it is privileged.

Zuffa has never disputed reviewing, and indeed already has begun to review, the documents that were produced to the FTC with "Document withheld as non-responsive" slipsheets to see if the underlying documents are responsive to Plaintiffs' other Requests made in this litigation and will produce responsive documents and log those that are privileged.  Those documents are certainly not responsive to Request 54, which requested documents "provided to or received from" the FTC.  The November 2015 re-production responded only to that limited request.  Indeed, if Zuffa wanted to engage in "surreptitious" or obstructionist behavior, it could have, in keeping with the Protective Order, demanded return of the entire FTC Re-Production immediately upon learning of the inadvertently produced privileged material.  Instead, Zuffa engaged in multiple discussions with Plaintiffs about potential ways to fix the issue in a way that would be less disruptive to Plaintiffs, even though it meant that Plaintiffs continued to have access to documents, including privileged documents, that had not been produced to the FTC and had not been reviewed for production in this case.  Zuffa relied on Plaintiffs' statements that they would not review the slipsheeted privileged documents and based on those representations worked in good faith to provide a correction that would preserve Plaintiffs' work product.  Instead, Plaintiffs took advantage of Zuffa's good faith efforts, apparently reviewed the extracted

---

four documents identified to Plaintiffs as having been recalled for privilege from the FTC production and Zuffa's re-production to Plaintiffs").

text of every slipsheeted privileged document in the production, and now claim that Zuffa has done wrong.[57]

With regard to Plaintiffs' complaints about disclosure of the FTC search terms and protocol, some of which simply rehash complaints made in the last report, the record is clear. Zuffa disclosed the search terms that previous counsel used in connection with the earlier production to the FTC.  Zuffa also explained how the search terms were used:  (1) in response to the FTC's initial request for documents and data, Zuffa did not use search terms at all; it conducted targeted searches for responsive materials; (2) in response to the FTC's second, broader request, it used a combination of targeted searches and review of electronic and hard copy documents, as well as search terms.  Thus, it is hardly surprising that some portion of the FTC production does not hit on the FTC search terms, just as many documents that are being produced by Zuffa now do not hit on search terms.

**De-Duplication**:  Zuffa's vendor typically uses a conservative de-duplication protocol which provides the greatest assurances that documents that are not identical will not be eliminated through the de-duplication process.  In March, Zuffa and Plaintiffs discussed implementing a less conservative text-based de-duplication method, and Zuffa proposed a new method designed by its vendor.  In response to Plaintiffs' questions about this proposal, Zuffa provided comprehensive answers about this additional approach, including making the Chief Solutions Officer at Zuffa's vendor available for a lengthy telephone call for questioning by Mr. Dell'Angelo and Plaintiffs' consultant, Mr. Kellner.  In the end, Plaintiffs did not accept this approach, perhaps so they could claim as they do repeatedly in the JSR that the refinement in de-duplication process is solely the result of their efforts.  Instead, on April 7, Plaintiffs set out a different de-duplication protocol that

---

[57] Plaintiffs first accused Zuffa of surreptitiously clawing back documents in a fully briefed section on this topic in their first draft of the Joint Status Report on Tuesday afternoon.  This issue had never been previously raised to Zuffa, not when the parties exchanged topics for the Joint Status Report on Friday April 22 or in a meet and confer the parties had on Monday, April 25 in which the parties discussed the FTC re-production.  Until receiving Plaintiffs' draft, Zuffa had no reason to know there was any confusion, let alone a dispute, on this issue. Zuffa took the initiative to reach out to schedule a meet and confer about these issues, but Plaintiffs have refused to withdraw this accusation.

was more consistent with what they are familiar with on their e-discovery platform.  The parties discussed necessary, minor modifications to Plaintiffs' preferred approach, which Zuffa then applied.  This resulted in the removal of about 223,191 from the document corpus, but 819,406 documents still remain in the Remainder Set.

Plaintiffs claim that Zuffa applied a deduplication process without consulting with Plaintiffs, and that doing so was somehow improper.  First, Plaintiffs did not ask Zuffa about its process until well after it had been applied.  Second, as Zuffa's vendor explained to Plaintiffs, its deduplication process is conservative to ensure that false duplicates are not included.  The concern over somehow "missing" documents has been central to Plaintiffs' arguments, so a conservative deduplication method was a proper way to ensure that Plaintiffs would not later claim that Zuffa was concealing documents by over-deduplicating.  Notably, Plaintiffs describe their own deduplication efforts for the first time in this Joint Status Report; they never consulted with Zuffa regarding their own deduplication, and Zuffa did not expect them to do so.

Plaintiffs' suggestion that Zuffa intentionally created more work for itself for the purpose of misleading the Court is grossly offensive and dead wrong.  Plaintiffs' consultant's speculation about Zuffa's state of mind parroting Plaintiffs' groundless accusations is equally out of line, as well as far beyond his area of expertise.

**Email Threading**:  Plaintiffs criticize Zuffa for failing to "collapse" emails in threads.  However, as Plaintiffs note, Zuffa has implemented email threading to increase efficiency in the review process.  Indeed, Zuffa's estimated high rate of documents reviewed per hour reflects the use of email threading.  Zuffa was willing and able to thread emails to reduce the review population further, but Plaintiffs believed that this presented the danger of potentially missing side conversations that would be collapsed as part of the threading process.  Zuffa does not quarrel with Plaintiffs' position on this particular issue, but criticizing the vendor is gratuitous, irrelevant and unwarranted.  While Mr. Kellner's company is a Relativity provider, and he is a strong advocate for the Relativity platform, it is not the only platform, and all platforms have different strengths and weaknesses.  That Zuffa has chosen a vendor with a

different platform than Plaintiffs' preferred approach does not mean that its vendor's approach is wrong.

**Sample Documents**:  Although Zuffa has provided over 6,000 randomly sampled documents that do not hit on Zuffa's search terms at various times in the course of these discussions, Plaintiffs complain that the first 1,500 sample documents were initially not produced in native format and that a few of the sampled documents in the second sample set of 2,000 documents were junk or spam that should have been excluded by agreed upon filters.  The first complaint is mere quibbling – they did not request native format for the samples and once they did, it was provided.  As to the second, a few of the sample documents should have been excluded but were produced before certain agreed-upon exclusions were implemented, but others, although they were definitely junk, were correctly not excluded under the parties' winnowing proposal because Plaintiffs did not accept Zuffa's broader proposal to exclude all documents containing the term "unsubscribe" and only agreed to exclude "unsubscribe" emails only from certain enumerated domain names. Feb. 18, 2016 Email from M. Lynch to M. Dell'Angelo ("We understood from our discussions on Tuesday that Plaintiffs are unwilling to agree to exclude all e-mails containing the term unsubscribe.  We continue to believe that this would be a more efficient and far-reaching solution. . .").

**Search Term Limiters**:  Plaintiffs complain that the search terms used to winnow the 2011 Strikeforce documents did not use proximity limiters, but Zuffa has proposed proximity limiters for some of its terms.  There are a number of reasons for this.  First, Zuffa proposed 177 terms that have no limiters at all.  For example, any document that contains the term "exclusiv*" or the name of a listed MMA competitor will be reviewed.  Second, the Original FTC Search Terms used subject matter limiters connected by "AND" (for example "(sponsor* AND (agreement* or contract or contracts or plan or report or presentation nor bid or pay)) AND NOT 'sponsorship sales accounts manager')") in order to ensure there was a connection to the competitive issues in the investigation; they did not simply run all fighter names as Plaintiffs propose.  Third, the Original FTC Search Terms included approximately 89 fighter names that

were linked with subject matter "AND" limiters.  By contrast, Plaintiffs propose using

approximately 2,000 first and last names and nicknames, plus the names of all sponsors and

venues without any limitation whatsoever.  Zuffa is agreeing to run fighter names as well as

sponsors and venues but, as explained in previous Joint Status Reports, proximity limiters are

necessary to maintain some connection to the issues in the case and some bounds of

proportionality.[58]  Fourth, Plaintiffs complain about various aspects of Zuffa's proposal but,

unlike the standard process in a search term negotiation where each gives something in hopes of

reaching middle ground, Plaintiffs have not moved from their original, vastly overbroad position.

At this point, Zuffa's proposal is reasonable and should be ordered.

### 5. Miscellaneous Misstatements in Plaintiffs' Section

(1)  Plaintiffs claim repeatedly that Zuffa represented that no ESI existed before certain

dates.  Zuffa never made any such representation; it provided accurate dates ranges for the email

on the network server.  In fact, ESI including emails from a variety of sources such as shared

drives and custodians' hard drives, exist for a wide range of dates.

(2)  Plaintiffs claim that "nowhere in the record has Zuffa demonstrated how or why

Plaintiffs' RFPs are actually overbroad or would result in an undue burden."  In fact, the facial

overbreadth of the Plaintiffs' Requests was explained clearly.  *See, e.g.,* Dkt. 218 at 11-14; Dkt.

213 at 27-28.  The Court even referred to the "very broad request that [Plaintiffs] have submitted

to the defendants in this case . . . ." July 28, 2016 Hearing Tr. 30:4-6.  And, as explained earlier,

Plaintiffs' purported narrowing of the overbroad Request will not decrease the burden of

reviewing the material because their search terms will require Zuffa to review all documents

---

[58] Plaintiffs state that Zuffa's use of proximity limiters in its own search terms has reduced the number of hits associated with various names that Plaintiffs propose to run without any limiters. But not every document referencing a fighter's name, even if the term only pulled up documents related to that fighter, is responsive.  Zuffa's proximity limiters are designed to capture the ones that are.  Further, many of the newer or lower-level fighters have few hits even without the use of proximity limiters precisely because there are little to no responsive emails about that fighter. Zuffa has already agreed to provide (and has provided) substantial information about all fighters in the putative Bout Class, such as their contracts, merchandise agreements, all payment and compensation data, and other relevant information from each individual fighter's file.

related to every venue, sponsor and merchandiser even if Plaintiffs have acknowledged that not all of those documents are responsive.  Dkt. 218 at 12.

(3)  Plaintiffs' repeated claim that they have been the only party making narrowing proposals is not true.  Both parties have made proposals that led to the successful effort to exclude over 300,000 documents from the corpus.  *See, e.g.,* Mar. 11, 2016 Letter from M. Dell'Angelo ("Plaintiffs accept ***Defendant's proposal*** to exclude all emails (and the Email Documents if the sender's email address uses the email address and/or domains listed in Marcy Lynch's February 18, 2016 email"); ("***Defendant previously proposed*** to exclude all emails (and the documents in the same family) where the sender's address begins with (1) "donotreply@" (2) "newsletter@," (3) "newsletters@," (4) "noreply@," and (5) "shop@.")).

(4)  Plaintiffs complain that Zuffa did not always respond to their requests for information about various issues relating to narrowing proposals.  It is true that Zuffa did not always respond because in its judgment the cost of the requested information in terms of both the outside and in-house counsel resources necessary to obtain, verify, and draft a response (and respond to inevitable follow-up questions), coupled with the varying but often substantial chance that after such expenditures Plaintiffs would not agree or would request even more information was greater than the costs of simply reviewing the documents.  Triage is necessary sometimes.

Zuffa provides two of many examples:  ***First***, For example, Zuffa proposed to exclude all documents from certain domains where the sender's address begins with "newsletter@."  Plaintiffs, however, refused to accept this proposal for newsletter@quinnemanuel.com and requested "further information on the nine emails" from that domain.  Mar. 11, 2016 Letter from M. Dell'Angelo.  This required Zuffa to access the documents and show Plaintiffs that the documents were public newsletters sent out by the firm, a process more time consuming than simply reviewing nine documents.

Second, Plaintiffs proposed to exclude documents containing the term "Fight Week Schedules" but not if any family member of a document containing that term hit on another one of Plaintiffs' other search terms.  Obviously, as Plaintiffs are well aware, Fight Week Schedules

are routine documents about fighters' schedules with no information relevant to an antitrust case.  To implement Plaintiffs' proposal, Zuffa first had to identify all documents containing the term at issue, then run Plaintiffs' 2,400 search terms through that set of documents and its family members, then identify whether any of the family members contained another of Plaintiffs' terms, just to determine which documents could be excluded and which had to stay.  Zuffa proposed instead to exclude all documents and their families containing that term, a proposal that is much easier to implement.  Plaintiffs said they would need to see samples before they could agree to such an exclusion.  Zuffa provided Plaintiffs with 20 samples that demonstrated (1) the family members contained no substantive information beyond that which Plaintiffs already agreed to exclude and (2) many of these documents contained another of Plaintiffs' search terms and could not be excluded under Plaintiffs' current proposal.  Plaintiffs still did not agree and instead "encouraged Defendant to sample the cover emails further to determine if additional proposals to eliminate repeated false hits in the cover emails could be made."  Apr. 22, 2016 Letter form M. Dell'Angelo. Again, Plaintiffs cannot be unaware that intentionally churning Zuffa's resources in this manner will neither expedite nor reduce the burden of discovery.

Dated: April 29, 2016                        BOIES, SCHILLER & FLEXNER LLP


                                             By: /s/ John F. Cove, Jr.
                                                 John F. Cove, Jr.
                                             *Attorneys for Defendant* Zuffa, LLC, d/b/a
                                             Ultimate Fighting Championship and UFC

                                             John F. Cove, Jr. (*Pro Hac Vice*)
                                             BOIES, SCHILLER & FLEXNER LLP
                                             1999 Harrison Street, Suite 900
                                             Oakland, CA 94612
                                             Tel: (510) 874-1000
                                             Fax: (510) 874-1460
                                             Email: jcove@bsfllp.com

                                             William A. Isaacson (*Pro Hac Vice*)

64

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131
Email: wisaacson@bsfllp.com

Donald J. Campbell #1216
J. Colby Williams #5549
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
Tel: (702) 382-5222
Fax: (702) 382-0540
Email: djc@campbellandwilliams.com
          jcw@campbellandwilliams.com

Richard J. Pocker #3568
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Tel: (702) 382 7300
Fax: (702) 382 2755
Email: rpocker@bsfllp.com

*Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
Fighting Championship and UFC

65

JOINT STATUS REPORT

1

2    Dated: April 29, 2016                    Respectfully Submitted,

3                                             By:    Michael Dell'Angelo
                                                     Michael Dell'Angelo
4
                                             *Co-Lead Class Counsel:*
5
                                             Eric L. Cramer
6                                            Michael Dell'Angelo
                                             Patrick Madden
7                                            BERGER & MONTAGUE, P.C.
                                             1622 Locust Street
8                                            Philadelphia, PA 19103
                                             Telephone: (215) 875-3000
9                                            Facsimile: (215) 875-4604
                                             ecramer@bm.net
10                                           mdellangelo@bm.net
                                             pmadden@bm.net
11

12                                           Don Springmeyer (Nevada Bar No. 1021)
                                             Bradley S. Schrager (Nevada Bar No. 10217)
13                                           Justin C. Jones (Nevada Bar No. 8519)
                                             WOLF, RIFKIN, SHAPIRO, SCHULMAN &
14                                           RABKIN, LLP
                                             3556 E. Russell Road, Second Floor
15                                           Las Vegas, Nevada 89120
                                             (702) 341-5200/Fax: (702) 341-5300
16                                           dspringmeyer@wrslawyers.com
                                             bschrager@wrslawyers.com
17                                           jjones@wrslawyers.com

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT

Joseph R. Saveri
Joshua P. Davis
Matthew S. Weiler
Kevin E. Rayhill
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
mweiler@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown
Richard A. Koffman
Hiba Hafiz
COHEN MILSTEIN SELLERS & TOLL,
PLLC
1100 New York Ave., N.W., Suite 500, East
Tower Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:   (202) 408 4699
bbrown@cohenmilstein.com
hhafiz@cohenmilstein.com

***Additional Counsel for the Classes:***

Robert C. Maysey
Jerome K. Elwell
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Eugene A. Spector
Jeffrey J. Corrigan
William G. Caldes
SPECTOR ROSEMAN KODROFF & WILLIS,
P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
espector@srkw-law.com
jcorrigan@srkw-law.com
bcaldes@srkw-law.com

JOINT STATUS REPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Frederick S. Schwartz
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone: (818) 986-2407
Facsimile: (818) 995-4124
fred@fredschwartzlaw.com

*Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez, Brandon Vera, and Kyle Kingsbury*

68

JOINT STATUS REPORT

1

**ATTESTATION OF FILER**

2

3
     The signatories to this document are myself and Michael Dell'Angelo, and I have

4
obtained Mr. Dell'Angelo's concurrence to file this document on his behalf.

5

6
Dated: April 29, 2016

7

8
                        By:    /s/ John F. Cove, Jr.

9
                        John F. Cove, Jr. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP

10
                        1999 Harrison Street, Suite 900
Oakland, CA 94612

11
                        Tel: (510) 874-1000
Fax: (510) 874-1460

12
                        Email: jcove@bsfllp.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing **Joint Status Report** was served on April 29, 2016 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

_/s/ Michael Kim_____

An Employee of Boies, Schiller & Flexner

JOINT STATUS REPORT