**X.**     **Plaintiffs' Production to Date**

In or around April and May, 2015, Plaintiffs gathered documents from the six named Plaintiffs, as well as Rose Gracie (the spouse of Javier Vazquez) and Suzanne Le (the spouse of Cung Le). Plaintiffs collected 323,000 emails and attachments from the account servers for their email accounts, and over 100,000 social media files from the account servers for their social media accounts. Plaintiffs also collected 6,643,042 files from the named Plaintiffs' electronic storage devices, including desktop and laptop computers, iPads and tablets, external hard drives, smart phones and any other electronic storage devices in their possession. Of those, 1,242,314 were deemed potentially responsive,[1] including 1,016,570 graphic files, 20,747 video files, 9,694 audio files, 51,608 mail files (in addition to the files collected from the account servers), 41,420 office files including word processing and pdf files, and documents contained in 102,275 container files (*e.g.*, .zip and RAR files). Plaintiffs de-duplicated the total collection of documents to ensure that, for example, emails collected from the electronic storage devices were de-duplicated against emails collected from the servers, and documents collected from the container files were de-duplicated against the office files and email attachments. Plaintiffs are in the final stages of reviewing *all* of these potentially responsive documents. Plaintiffs have utilized numerous strategies to speed and facilitate the review of these documents, such as using a thumbnail viewer to quickly and efficiently identify responsive image files. To date, Plaintiffs have produced 15,106 responsive documents comprising 49,798 pages. Plaintiffs expect to be complete the production of their responsive documents by [].

**X.**     **Plaintiffs' Proposal: The Court Should Order The Remainder Set And FTC Collection To Be Produced, With Or Without Plaintiffs' Search Terms, And The Production Of Responsive Clawed Back FTC Production Documents.**

---

[1] The rest of the files, including system files, program files, software development files, help files, and other miscellaneous computer-generated files and unknown file types, were not potentially responsive. Plaintiffs did not review these files.

Since the last status conference, Defendant has remained dilatory in responding to Plaintiffs' efforts to make progress (many of Plaintiffs' requests for data counts and information remain outstanding) and Defendant has failed (despite repeated invitations) to propose methods to meaningfully reduce the set despite Defendants' superior access. In the sections below, Plaintiffs (1) set forth the history of Defendant's conduct; (2) describe the success Plaintiffs have had in winnowing the set based on the tiny samples that Zuffa has allowed Plaintiffs to review; and (3) propose that the Court order Defendant to produce the documents returned by Plaintiffs' search terms (subject to Defendant's right to review the documents for privilege and/or responsiveness).

Plaintiffs' Document Requests were served on April 25, 2015 and Defendant stipulated to substantial completion of its document production by June 1, 2015. Defendant has delayed discovery for months with unsubstantiated claims of burden and expense (much of which would result from its own conduct), while the parties have negotiated ad nauseam about the application of search terms. Plaintiffs' should not suffer further delay or be prejudiced by the failure to produce responsive documents in the Remainder Set, FTC Collection and documents clawed back from the FTC Production. Accordingly, Plaintiffs propose that the Court order as follows.

**Remainder Set.** That the Court: (1) order the production of the Remainder Set; or, in the alternative (2) order the production of all responsive non-privileged documents in the Remainder Set after application of Plaintiffs' current Search Term Proposal.

**FTC Collection**. That the Court: (1) the Court order Defendant to apply all previously agreed upon reduction proposals (i.e., deduplication, winnowing, two-tier searches and Legal Custodian privilege screens), deduplicate to remove the 2011 FTC Production and produce the remaining corpus; or, in the alternative, (2) order the production of all responsive non-privileged

documents in the FTC Collection after application of proposal (1) and Plaintiffs' current Search Term Proposal.

**Clawed Back FTC Production Documents.** Order Defendant to conduct an independent review of all documents clawed back from the FTC Production on the basis that such documents were not produced to the FTC and to produce all non-privileged documents responsive to Plaintiffs' Document Requests in this litigation.

Plaintiffs also propose that, to the extent that either party identifies additional winnowing opportunities based on their actual experience reviewing Defendant's documents any such agreed upon methods may be applied to the remaining document sets.

## X.   The Progress Plaintiffs Have Made Since the Last Status Conference

First, *Plaintiffs'* deduplication protocol and winnowing proposals have reduced Defendants' ESI from 2,030,858 Email Documents[2] to 1,466,927 Email Documents ("Reduced Set"). Of the Reduced Set, 819,406 documents do not hit on any of Defendant's Search Terms. ("Remainder Set"). Within the Remainder Set, Plaintiffs' revised Search Term Proposal hits on 533,357 documents or 603,431 with families. Thus, through Plaintiffs' efforts, the scope of the parties' dispute about how Zuffa should be required to review and produce the Remainder Set has been reduced to a potential universe of 819,406 documents or 603,431 when Plaintiffs' Search Terms Proposal is applied.

Second, *Plaintiffs'* inquires have led the Defendant to uncover a vast trove of additional ESI and documents consisting of approximately 1.8 million documents collected in 2011 ("FTC Collection Set"). As discussed below, the FTC Collection Set consists of documents for key

---

[2] "Email Documents" refers to emails and their attachments.

custodians during a portion of the Relevant Time Period for which Zuffa claimed to have little or no ESI or documents in light of its aggressive document destruction policy.

Pursuant to a Stipulated Order, Defendant is required to substantially complete its production of documents by June 1, 2016. Zuffa's inexcusable failure to identify the FTC Collection Set until April 25, 2016, *exactly one year to the day after Plaintiffs' Requests for Production of Documents ("RFPs") were served*, should not abate the substantial completion deadline or delay discovery more than Defendant's conduct already has.

        **x.**    **<u>Plaintiffs Uncovered Zuffa's Failure To Conduct A Reasonable Inquiry Which Concealed From Discovery 1.8 Million Key Custodial Documents Dating From The Relevant Time Period Which Zuffa Represented Did Not Exist</u>**

Defendant's lack of, at best, fundamental diligence has left hidden from the view of Plaintiffs and the Court – until now -- ***1.8 million additional documents*** sourced with the help of Zuffa's legal department from key custodians for the period prior to June 2011, which Zuffa heretofore represented did not exist. But for Plaintiffs' diligence, this massive trove of documents would have been shielded from discovery.

By way of background, exactly one year before Defendant's revelation, on April 25, 2015, Plaintiffs served their first set of RFPs. Request No. 54 sought documents provided to the Federal Trade Commission ("FTC") regarding Defendant's business practices and alleged anticompetitive conduct. In September 2015, Defendant proposed to produce the documents that it produced to the FTC ("FTC Production"). (Dkt. 185, at ECF 13:19-22). In making this production, Defendant's counsel worked with the Defendant's prior counsel ("Axinn") and document vendor to recreate the FTC Production from the vendor's document database. Yet, Defendant's counsel apparently never asked the vendor or Axinn a simple question: Does the

document collection from which the FTC Production was made still exist? As it turns out, it does.

Recognizing the probative value of the FTC Production, during the January 26, 2016 Status Conference, the Court asked Defendant about the details of the protocol used to create it ("FTC Search Protocol"). *See*, e.g., Jan. 26 Status Conf. Tr. at 35-36. Zuffa's counsel was unable to provide the information. Jan. 26 Status Conf. Tr. at 36:2-3. At the February Status Conference, the Court again asked Zuffa's counsel for the FTC Protocol. When Zuffa's counsel again failed to provide the information, the Court noted: "I asked you that question last month, so I want to know the answer" and ordered it to be produced. *See* Feb. 23 Status Conf. Tr. at 25:7-8; Dkt. 225.

On March 8, 2016, Defendant sent Plaintiffs the *search terms* purportedly used to create the FTC Production, but not the protocol itself. (March 8, 2016 correspondence from John Cove to Michael Dell'Angelo). Plaintiffs tested the FTC search terms against the FTC Production and determined that those terms did not hit on 19,000 documents (approximately 18% of the FTC Production), meaning that the protocol was broader than the search terms provided. On March 11, 2016, Plaintiffs again requested that Defendant produce the FTC Protocol. After repeated follow-up, Defendant's counsel wrote to describe generally the steps taken to collect the FTC Production. (J. Cove Letter to M. Dell'Angelo, Mar. 29, 2016). Defendant's letter explained that Zuffa's legal department and outside counsel ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ On April 7, 2016, Plaintiffs asked the obvious question:

████████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████ as referenced in John's March 29
letter, still exist and if so, whether they exist and were obtained by Zuffa.
If Zuffa did not attempt to determine whether those materials still existed,
please explain why.

(April 7, 2016 email from Michael Dell'Angelo to March Lynch). Plaintiffs' reiterated their

request on April 11, 2016 and April 22, 2016.

On April 25, 2016, Defendant's counsel finally revealed that it had "discovered" Zuffa's

FTC Production vendor had retained the 1.8 million document collection from which the FTC

Production was made. Prior to that shocking revelation, Defendant had represented to Plaintiffs

that it applied a strict document retention policy that ████████████████████████

████████ (Sept. 15, 2015 Letter from J. Cove to Michael Dell'Angelo and Attachments A-C

thereto). Defendant also represented that as a result of its search to identify sources of documents

responsive to the RFPs, no ESI was available from the period pre-dating May 2010 (and only

one custodian, Dana White, had any ESI pre-dating January 2012 (and only five custodians

possessed ESI pre-dating February 2014). *See* Dkt. 199 at 21 (recounting the time periods for

individual custodians as provided by Defendant).

The paucity of ESI older than ████████ before the litigation hold in this case was

implemented and virtually none predating February 2014 is a significant factor in this case

because Plaintiffs allege that the scheme at issue began at least as early as 2006 and the Court

held that the Relevant Time period for most topics on which Zuffa must produce documents

extends from January 1, 2005 to June 30, 2015. (Dkt. 200). Thus, the timing of Zuffa's creation

of the FTC Collection is important and telling. In the March 29, 2016 letter, Defendant's counsel

represented that shortly after Zuffa ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ (March 29, 2016 letter from John Cove to

Michael Dell'Angelo and Exhibit A thereto) (emphasis added). A "Non-Hit" document produced

by Zuffa in Sample [] (*i.e.*, a document that did not hit in either party's search terms), is

revealing. In that June 10, 2011 email, without any reference to a destruction hold in connection

with the FTC inquiry, addressed to the UFC's employee list, custodian Kirk Hendrick, Zuffa's

current Chief Legal Officer, ███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ (*See* MZelaznikLT-00025833, Exhibit XX) (Emphasis in original). ███

██████████████████████████████████████████████████

██████████████████ (March 29, 2016 letter from John Cove to Michael Dell'Angelo and

Exhibits B and C thereto). █████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████ *Id.* (Emphasis added). According to the March 29, 2016 letter, ████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ *Id.* Thus, it appears that while Zuffa was ███████████

████████████████████████████████████████████████████

█████████████████████████████████████████ (Ex. XX). Despite

Zuffa's current strict retention policy and ███████████████████████████████, however,

it did manage to collect 1.8 million documents from key custodians which are potentially highly relevant to this case.[3]

Zuffa has an "obligation is to make reasonable efforts to locate and produce information responsive to the plaintiffs' legitimate discovery demands. Furthermore, how reasonable those efforts are will depend in part on the importance of the documents; a cursory search may be all that is required with respect to marginally relevant documents, while a far more diligent search may be necessary where core documents are at stake." *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 308 (S.D.N.Y. 2012). Zuffa' failed to meet that obligation. Likewise, "a party has an obligation to conduct a reasonable inquiry into the factual basis of his responses to discovery, and, based on that inquiry, a party responding to a Rule 34 production request is under an affirmative duty to seek that information reasonably available to it from its employees, agents, or others subject to its control." *A. Farber & Ptnrs., Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006) (internal quotations and citation omitted). This affirmative duty includes seeking documents in the possession or control of prior counsel where—as here—a party is aware that prior counsel may be in possession of responsive documents. *See Hobley v. Burge*, 2004 U.S. Dist. LEXIS 6858, at *27, 2004 WL 856439 (N.D. Ill. Apr. 20, 2004) ("documents in the possession of [defendant's] prior counsel are certainly documents in [defendant's] 'possession, custody or control'").[4] Here, Zuffa and its counsel were well aware that Axinn ███████

---

[3] Wary of Defendant's representations that virtually no ESI older than ██████ existed in a $3.5 billion company with world-wide operations, Plaintiffs asserted that "blind reliance on document retention policies [is] unreliable" as a means of determining the time period for which documents are available, Dkt. 199, at 9.

[4] *Accord Johnson v. Askin Capital Mgmt., L.P.*, 202 F.R.D. 112, 114-115 (S.D.N.Y. 2001) (citing the "general rule that a document held by prior counsel is deemed to be in a client's possession"); *McKenna v. City of Philadelphia*, 2000 U.S. Dist. LEXIS 5712, at *3 (E.D. Pa. Apr. 26, 2000) ("If counsel contends that any of these documents are not in his or his client's

████████████████████████████████████████████ *See*, e.g., Jan.

26, 2016 TR. at 36:1-2.

The FTC Collection is of vital importance. The Court has also recognized the value of the

FTC Production which came from the FTC Collection. (Jan 23, 2016 Tr. at ECF 28-29). More

importantly, the FTC Collection consists of virtually the *only* ESI from the first five years of the

Court ordered Relevant Time Period of January 1, 2005 to June 30, 2015 and from many of the

very same custodians as those collected in this case, including Dana White, Kirk Hendrick,

Lorenzo Fertitta, Lawrence Epstein, John Mulkey, Peter Dropick, Michael Mossholder, Bryan

Johnston, Craig Borsari, Reed Harris, Joe Silva, Sean Shelby and Tracy Long. The documents

and information in the FTC Collection (other than the FTC Production) would otherwise have

been lost. It is beyond doubt that the Defendant and its counsel did not conduct the diligent or

even basic search necessary where, as here, core documents such as those from key custodians –

including many of the very custodians that the Defendant itself proposed -- prior to 2011 were at

stake. Defendant's year-long blind reliance has proven irresponsible and is inexcusable.

Defendant's failure to self-identify the documents collected in connection with the FTC

investigation demonstrates a profound lack of fundamental diligence and an inexcusable failure

to conduct a reasonable inquiry in response to Plaintiffs' RFPs and further calls into question

Defendants' conduct throughout the discovery process. Defendant should be ordered to

immediately produce the FTC Collection consistent with Plaintiffs' proposal.

xx.    <u>**Plaintiffs' Winnowing of the ESI Has Been Very Successful**</u>

Defendant characterizes the process of winnowing its ESI as a cooperative process in

which it was actively engaged and offering proposals. Plaintiffs take exception to that

---

possession, custody, or control, we expect he will confer with prior counsel to confirm that these
documents are not in her possession, as well.").

characterization. Nevertheless, Plaintiffs made numerous deduplication, winnowing and two-tier search proposals, eliminating approximately 530,000 documents. In fact, ***despite a 50% expansion of the document set***, the documents returned by Plaintiffs' Search Term Proposal ***were reduced by nearly 14% (nearly 100,000 documents)*** since the last Status Conference.

Plaintiffs' de-duplication method (discussed in detail in Section [] below) removed 223,191documetns from 2,030,858 email documents. Plaintiffs' winnowing proposals eliminated another 307,972 documents. The parties' legal custodian proposals eliminated an additional 32,768 documents.[5] Thus, Zuffa's Review Set totals 594,496. The Remainder Set totals 819,406 documents. Within the Remainder Set, Plaintiffs' substantially narrowed Search Term Proposal hits on 533,357 documents or 603,431 with families. Thus, the total reviewable ESI has been reduced from 2,030,858, to after application of Plaintiffs' Search Term Proposal, the total reviewable population of 1,197,927, a 41% reduction.

Plaintiffs proposals included, among others:

- Identification and elimination of non-responsive commercial emails, including searching for the term "unsubscribe";

- Culling emails (and attachments) from other email senders that are likely to be non-responsive based on a review of the samples produced by Defendant;

- Deduplication based on industry standards;

- Identification and exclusion of certain file types such as contact cards;

- Culling likely privileged documents concerning irrelevant legal matters ████ ███████████████████████████████████████

- Culling travel itineraries and other logistical emails and documents;

- Culling form documents which created false hits for Plaintiffs' search terms;

- Eliminating junk/spam emails;

- Eliminating automated emails such as "out of office" emails;

---

[5] Approximately 110,000 were de-duplicated out of the Remainder Set, 98,000 were de-duplicated out of Zuffa's Review Set and 15,000 were de-duplicated out of the Exclusion Set.

- Excluding documents containing the term "ticket%" where a custodian's job duties relating to tickets yielded a high volume of non-responsive emails;[6] and

- Removed several search terms from Plaintiffs' Proposal,[7] collectively, eliminating hits on more than 500,000 documents with families (non-deduplicated)[8] out of the 1.4 million document set the Court considered at the February Status Conference and before accounting for the additional 5. *See* Dkt. 218-4.

In addition, Plaintiffs significantly narrowed several of the broader search terms in their proposal. Specifically, Defendant complained about the overbreadth of several terms including: "Facebook"; "Twitter"; "Hold%"; "Smith"; "Scott"; "Cook"; "Yahoo%"; and "AOL."[9] These complaints took several forms, and Plaintiffs addressed each with a specific proposal.

Thus, Defendant's contention that Plaintiffs' Search Term Proposal "is nearly identical to the one [Plaintiffs] proposed two months ago" is simply untrue. The proof is in the document counts. As of the last Status Conference, Plaintiffs' Search Term Proposal resulted in 1,091,530 document hits (1,235,677 with family) in the 1.4 million Email Documents Set. This count included the 534,577 documents with families hit by Defendant's search term proposal (for a net difference of 701,100 documents). Since the last Status Conference, Defendant added 737,882 documents from custodian's hard drives to the corpus (increasing the corpus by more than 50%). However, through Plaintiffs efforts to winnow the corpus and narrow Plaintiffs' Search Term Proposal, Plaintiffs existing proposal adds only 603,431 documents to the Defendant's review (and is subject to Plaintiffs willingness to implement additional winnowing proposals).[10] Thus, ***despite a 50% expansion of the document set***, the documents returned by Plaintiffs' Search

---

[6] Not included in this list are proposals Plaintiffs have made such as the use of email threading, but which Defendant's vendor was unable to do.

[7] Plaintiffs removed "TUF", "The Ultimate Fighter", "Amanda", "Eduardo", "Denis", "Morgan" and "Pfister" from the proposal. In reviewing the samples, each name also captured hits pertaining to Zuffa employees.

[8] Plaintiffs do not have access to a de-duplicated figure.

[9] Plaintiffs also identified an issue with the term "Toll%" (relating to tolling contracts and contractual obligations) because it generated false hits where "Toll Free" appeared in connection with a telephone number and proposed a multi-tiered search to exclude such false hits.

[10] In fact, substantial progress could still be made. Defendant has indicated that Plaintiffs' multi-tiered searches for Facebook and Twitter need to be refined further to reduce false hits still being encountered. Plaintiffs have invited Defendant to propose solutions.

Term Proposal ***were reduced by nearly 14% (nearly 100,000 documents)*** since the last Status Conference. This reduction was due to Plaintiffs' hard work and persistence in dealing with an unwilling partner in discovery.

### xxx. Defendant Did Not Reliably De-Duplicate Its ESI; Plaintiffs' Deduplication Proposal Removed 223,191 Documents

Although the parties stipulated (Dkt. No. 160 at 4 & 15), and represented to the Court that ESI would be deduplicated across custodians, Defendant unilaterally (and without notice to Plaintiffs) selected a de-duplication method that could not deduplicate across custodians. Zuffa's unilaterally applied method was designed to ***not*** de-duplicate substantial volumes of documents that standard industry practice recognizes as duplicates knowing that the Court and Plaintiffs would make decisions about the scope of discovery based on the inflated numbers. Meanwhile, at the January 26, 2016 Status Conference, Counsel for Zuffa represented that "right now at this point we have, thanks to Ms. Lynch's hard work, identified that we have at least a million e-mails that are separate de-duplicated e-mails." (January 26, 2016, Tr. at p. 38; ln. 16-18). Except, that representation was based on an unreasonable deduplication standard that falls well below the industry standard and was not consistent with the parties' agreement. [Kellner Del.]

For months, Plaintiffs had raised the issue of deduplication of the document set based on Plaintiffs' concern that the failure to de-duplicate was inflating the document counts reported by Defendant to Plaintiffs and the Court. Defendant resisted.[11] Following the February 23, 2016

---

[11] In the November 16, 2016 status report, Defendant asserted that Plaintiffs' request for "detailed information regarding the de-duplicated volume of data maintained among custodians" could not be provided because the parties had yet to agree on custodians. Dkt. 199 at 50. But Defendant acknowledged that emails were "processed and de-duplicated" resulting in ever changing document counts, meaning that Plaintiffs' requests could have been answered and Zuffa knew well before November 16, 2015 exactly what deduplication *protocol* had been applied. *Id.* Plaintiffs again raised the issue of de-duplication, noting that Defendant would only state that the document counts had been de-duplicated and refused to identify what the set of documents were de-duplicated against. Dkt. 206, n.21. In the January 22, 2016 Status Report, Plaintiffs again noted that Zuffa had not provided document counts that reflected deduplication. Dkt. 213, at 4 & 17. Despite Plaintiffs' repeated requests, Zuffa did not *begin* to answer the question until March 28, 2016. (March 28, 2016 email from Marcy Lynch to Michael Dell'Angelo). Plaintiffs' inquiry was not fully addressed until March 31, 2016 when Zuffa made

status conference, Plaintiffs completed the processing of the sample documents Defendant had produced. The processing permitted Plaintiffs to determine that Defendant produced 98 documents in the limited sample, which, if deduplicated properly, would represent 40 distinct documents. Plaintiffs requested that Defendant investigate; in response, Zuffa (for the first time) gave insight into the method of deduplication used, stating:

> Zuffa's vendor used the most conservative form of de-duplication which ensures that only identical documents, based on their metadata fields will be excluded. This means that documents whose substantive text may be identical may not be treated as duplicates because their respective metadata vary.

Def. Letter, Mar. 21, 2016 at 9.[12]

During a March 31, 2016 meet and confer with a representative of vendor and Plaintiffs' consultant Chuck Kellner, Plaintiffs determined that Defendant's method was even more restrictive than indicated as it failed to de-duplicate clear duplicates such as: (1) the sent and received versions of the same email sent between two custodians; or (2) the same email sent by a third-party and received by two different custodians; because these examples are received at different times or through different routing. Declaration of Chuck Kellner. , Despite Defendant's agreement to deduplicate across custodians, Defendant's chosen method of deduplication was not capable of doing so. Kellner Decl. The highly restrictive deduplication method unilaterally chosen and applied by Zuffa is far more narrow than the accepted norm in the litigation support industry. Kellner Decl.

On April 6, 2016, after numerous requests, Defendant informed Plaintiffs that its de-duplication process removed an astonishingly low **2,066 "email documents"** (reaching 11,575 documents across the network email and hard drive documents) out of a universe of more than 2,000,000 documents. That is, Defendant's purported "deduplication" method removed

---

available a representative from its ESI vendor to speak with Plaintiffs' ESI consultant. Even then, the vendor representative was not familiar with Zuffa's ESI.

[12] Zuffa claimed that the 98 documents Plaintiffs identified were not duplicates based on Zuffa's method. Zuffa argued that because the documents were sent or received at different times (*e.g.*, one second apart) the documents were not identical.

approximately 0.01% of the email documents. A producing party legitimately interested in reducing its burden would have raised this astonishingly low deduplication rate with Plaintiffs and tried to improve it. Instead, Defendant was content to argue that the effectively undeduplicated document set was too burdensome to review and urged the Court to relive it from reviewing what is now the Remainder Set. That tactic had no downside because Defendant can easily group and bulk code duplicate documents as responsive or not responsive, privileged or not privileged.

Plaintiffs provided Zuffa with a deduplication protocol consistent with widely accepted industry standards. Over two weeks later, on April 25, 2016, Defendant provided the results as applied only to the yet-to-be-produced portion of the document corpus. (With respect to the documents Defendant has reviewed and produced to date, it has done so without the benefit of meaningful deduplication; thus, it has elected to needlessly increase its own burden.) Plaintiffs' process reduced the un reviewed  set by 223,191 Email Documents. Thus, Plaintiffs' proposal was exponentially more effective than Defendant's and reduced the universe of documents more than 10%.

## XX.     Zuffa Should Be Ordered to Produce the Remainder Set Without the Application of Search Terms, or In the Alternative, After Applying Plaintiffs' Proposed Terms

By eliminating 223,191 duplicates and 340,740 non-responsive documents from the total ESI[13], the Remainder Set is now highly concentrated with documents that are likely to be responsive to Plaintiffs' RFPs. Therefore, the Court can have a much higher degree of certainty that ordering Zuffa to produce the entire Remainder Set will not require it to review the vast number of duplicates or non-responsive documents that existed in the set previously and when Zuffa claimed that the burden of review was too great. Alternatively, as discussed below, because Plaintiffs' Search Term Proposal reflects a high degree of precision and recall, Zuffa

---

[13] Plaintiffs have not been provided with data that breaks out the totals between the Review Set and the Remainder Set.

should be ordered to apply the proposal to the Remainder Set and to produce the 603,431 hits with families.

### x.   The Court Should Not Apply Search Terms Because The Document Set In This Case Is Not Well Suited To Their Application

This Court has recognized that search terms can be an unreliable and ineffective means of searching ESI for responsive documents. Because the conduct at issue is not formulaic and involves state of mind and is discussed with myriad names, nicknames, symbols and idioms, the document set is not well suited to the application of search terms.

This Court has consistently recognized that the application of search terms or key words is inefficient and unreliable. In *Progressive Casualty Insurance Company v. Delaney, et al.*, No. 2:11–cv–00678–LRH–PAL, 2014 WL 2112927, *8 (May 20, 2014 D.Nev.), this Court found that "traditional ways lawyers have culled the universe of potentially responsive documents for production—manual human review, or keyword searches—are ineffective tools to cull responsive ESI in discovery" and recognized that "keyword searches … have their own limitations." (Collecting and citing authorities).

During the Initial Status Conference in this case, the Court stated:

> I'd urge you to consider nontraditional methods of searching for ESI *instead of key words or custodian searches* which are expensive and the data shows not particularly accurate.

Dkt. No. 156 at 29, lines 18-21 (Emphasis added). This Court's views regarding the unreliability of search terms are well founded here. Nevertheless, Zuffa has insisted upon the application of narrow search terms on the bald and false premise that Plaintiffs' RFPs are too broad.

As Plaintiffs explained in the prior Joint Status Report (Dkt. No. 213 at 11-23), the collection of documents in this case is not well suited to the application of inherently unreliable search methods, such as search terms, due to the unique language and terms in this case and the syntax used by the relevant custodians. *See also, e.g.*, Dkt. 218-4, Kellner Decl. ¶ 11. Plaintiffs'

continuing consultation with Kellner and analysis of data based on the ESI at issue confirms that view which was largely based on an analysis of Zuffa's FTC Production in this case.

Even in the April 25, 2016 Sample, consisting of 2,000 documents, which is highly concentrated due to the various winnowing proposals Plaintiffs crafted based on the prior sampling, Plaintiffs discovered highly relevant documents that are not hit by either party's terms. For example, MZelaznikLT-0025833 is an email from now Chief Legal Officer Kirk Hendrick to all employees of Zuffa dated June 10, 2011, ███████████████████████████. Ex. XX; *see also* discussion, *supra* at [INTERNAL CITE]. This document is not hit by either party's search terms and would be lost even under Plaintiffs proposal today. Similarly, KHENDRICK00040651 is a blank email between two legal custodians, Kirk Hendrick and Michael Mersch. Ex. XX. However, the email attaches a static pdf (*i.e.*, a pdf document lacking readable text) of ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ *Id.* As a static pdf, the document necessarily escapes all application of search terms, no matter how discerning. These documents demonstrate, as found by Plaintiffs' consultant, because Zuffa's search term proposal is unreliable and ineffective, to the extent Plaintiffs' terms are not appropriate, "[e]ither the collection [of custodial documents] is resistant to discriminating search terms, or the parties cannot find them." *Id.*, Kellner Decl. ¶ 21.

> xx.   **In the Alternative, Plaintiffs' Search Term Proposal Should be Applied to the Remainder Set and the FTC Collection Because it Demonstrates a High Degree of Precision and Recall.**

Plaintiffs' worked with their consultant to apply a substantive and data-driven approach to identify ways to filter out non-responsive documents that also hit on Plaintiffs' proposed

search terms. Plaintiffs' conducted a sampling review of documents contained in a 107,649 document FTC Production, and Plaintiffs crafted and refined a set of search terms designed to capture responsive documents contained in the set as well as documents related to other news articles and public statements by Defendant's custodians. Plaintiffs then obtained four sets of samples from the Remainder Set,[14] which included both documents that hit on their search terms and those that did not in order to test the precision and recall of their search terms *and* to filter our non-responsive documents from the Remainder Set *and* the Defendant's Review Set.

As a result, Plaintiffs' Search Term Proposal is well-targeted and the terms comprising the proposal return an extremely reasonable number of hits, as follows:

- 775 of Plaintiffs' search terms (31.7%) including hundreds of Fighter names have no unique hits, but do hit on documents in the Remainder Set;

- 1,285 (52.6%) terms have 5 or fewer unique hits;

- 2,135 (87.4%) have fewer than 100 unique hits;

- 2,396 (98.1%) have fewer than 1,000 unique hits;

- 170 (7%) have no hits in the Remainder Set (*i.e.*, they were highly correlated with terms in Zuffa's set);

- 402 (16.5%) have 10 or fewer hits;

- 1,095 (44.8%) have fewer than 100 hits; and

- 2,099 (86%) have fewer than 1,000 hits.

---

[14] Plaintiffs obtained a sample of 1,500 "non-hits" in mid-February. Right before the February 23 status conference, Plaintiffs obtained a sample of 718 documents which hit on certain of Plaintiffs' search terms but not Defendant's terms.  In early April, Plaintiffs obtained a sample of 1,500 documents which hit on Plaintiffs Search Term Proposal and 500 documents which did not (both sets were pulled before the winnowing proposals and deduplication process were applied). Finally, on April 25, 2016, Plaintiffs received a sample of 1,500 documents which hit on Plaintiffs Search Term Proposal and 500 documents which did not after the winnowing and deduplication proposals were applied.

Plaintiffs' search term proposal, thus, captures many of the documents lost by Defendant's overly restrictive and narrow proposal without being unreasonably broad. As such the documents returned by Plaintiffs' proposal are reasonable and proportionate to the needs of the case.

Defendant's deduplication protocol, eliminated a miniscule 0.01% of duplicates in its Email Documents. Plaintiffs analysis of the first three samples enabled it to vastly improve upon Defendant's deduplication protocol and to devise many of the winnowing and multi-tier searches that ultimately eliminated approximately 530,000 documents from the ESI. Only the final, April 25, 2016 Sample reflects the application of Plaintiffs' deduplication protocol. Thus, the precision and recall of Plaintiffs' search terms as applied to the first three samples are of lesser utility than last sample.

The most reliable sample for testing the precision and recall are the 1,500 "hit" documents in the April 25, 2016 Sample, which reflect the various reductions and Plaintiffs' updated Search Term Proposal. As expected, the precision and recall increased in that sample. Although Zuffa only provided the sample on the evening of April 25th, Plaintiffs have already identified numerous documents that are both responsive *and* relevant, including, *inter alia*, the following.

- Discussing or implicating the qualifications of fighters for fighting in the UFC (*i.e.*, to be "Elite"). *See, e.g.*, JSILVA00003855 (Ex. XX) ███████████████████████; JSILVA00026915 (Ex. ??) (███████████████████████

- Discussing fighter compensation and negotiation. *See, e.g.*, MMERSCH00066967 (Ex. XX) (███████████████████ JSILVA00022022 (Ex.XX) (███████████████████████ ███████████████████ KHENDRICK00091114 (Ex. ??) (███████████████████████ ███████████████).

- Discussing sponsors of fighters who could no longer pay the charges Zuffa imposes and are forced to withdraw sponsorship of fighters. See, e.g., MMERSCH00081719 (Ex. XX)

█████████████████████████████████████
████████████████████████████

- Discussing event data that can be compared with actual or potential rival data including ticket prices (KHENDRICK00120249, Ex. ??); viewer data (KHENDRICK00057742, Ex. ??); event pay-per-view sales; (KHENDRICK00133949, Ex. XX).[15]

- Documents showing explaining and/or discussing the UFC's budget and forecasts on a per-event basis. *See, e.g.*, LEPSTEIN00094219 (Ex. XX).

- Documents circulating news articles discussing fighter compensation. *See, e.g.*, LEPSTEIN00143497 (Ex. XX).

Collectively, these documents demonstrate that, contrary to Defendant's unsupported and misleading argument, Plaintiffs' search terms *are* demonstrably effective at efficiently capturing responsive documents and, therefore, have a high degree of precision and recall. Zuffa has presented nothing that demonstrates otherwise. Moreover, the Court has observed that the FTC Production, though responding to issues far more limited in scope than Plaintiffs' case, is likely to contain documents that both parties believe are relevant. Plaintiffs' search terms were previously demonstrated to be  approximately 90% correlated to the FTC Production (better than even the search terms Zuffa used in collecting the FTC Production), meaning that they return responsive and relevant documents. That fact serves as a "cross-check" on the precision and recall observed in the April 25 Sample and soundly supports the application of Plaintiffs search terms absent a production of the entire Remainder Set.

## X.    **Defendant's Search Term Proposal Remains Inadequate**

### x    **Despite Numerous Opportunities, Zuffa Has Never Demonstrated That The Application of Search Terms Is Warranted**

Despite this Court's admonition that search terms are an ineffective tool, Zuffa asserts that search terms must be applied to its ESI. Defendant argues, without more, that Plaintiffs' RFPs are overbroad and unduly burdensome because – exactly as Defendants' do – some request

---

[15] KHENDRICK00133949 further demonstrates that the UFC ███████████████████████████
███████████████████████████████████
██████████

"all documents". Yet, Zuffa has consistently ignored Plaintiffs' efforts in the meet and confer process to narrow their requests. Nowhere in the record has Zuffa demonstrated how or why Plaintiffs' RFPs are actually overbroad or would result in an undue burden. Indeed, Zuffa has made no effort to address the substance of the proportionality factors under Rule 26(b)(1). *See* Dkt. No. 213, at 22-23; Dkt. 218, at 22. Rather, Zuffa has, in effect, simply claimed that it has too many documents to search through, done virtually nothing to reduce its own burden, and ignored Plaintiffs' well-articulated proportionality arguments.

Zuffa has an affirmative obligation to demonstrate why Plaintiffs' requests are overbroad, why it would suffer undue burden and to satisfy the proportionality factors. Plaintiffs first briefed the proportionality factors in the January Joint Status Report. *See* Dkt. 213 at 21-22. Plaintiffs did so again in the February Joint Status Report and pointed out that Zuffa failed to even address its burden. *See* Dkt. 218 at 21. Now, three status reports on, Zuffa continues to jump straight to the remedy without demonstrating why it is entitled to one. The Court should demand more of Zuffa and not countenance its repeated failure to address, let alone satisfy, its burden.

Rather than address its burden, in the February Status Report Zuffa requested that if the Court did not adopt its search term proposal, in the alternative, it should strike RFPs 21, 27, 33, 35 and 37 as overbroad and unduly burdensome. *See* Dkt. 218 at 14. Plaintiffs set forth a detailed proposal to narrow RFPs 21, 27, 33, 35 and 37. *See* Dkt. 218 at 46-48. Zuffa complained that it did not have adequate time to consider Plaintiffs' proposal. Yet, more than two months hence nothing has changed and in the intervening period Zuffa has never met and conferred on Plaintiffs' narrowing proposal as a means of dealing with its claims of burden and overbreadth. What that means is clear enough to Plaintiffs -- the parties' disagreement is not really about Zuffa's purported burden, or cost or proportionality. It is about Zuffa's effort to review and produce the narrowest scope of documents by applying highly restrictive search terms while creating the appearance of burden. That Zuffa was fully prepared to review hundreds of thousands of duplicates and irrelevant documents (eliminated by *Plaintiffs'* proposals), proves the point and reveals burden and expense are not the real issues.

**Defendant Has Not Demonstrated That Its Search Terms Have a High
Degree of Precision and Recall**

Defendant has refused to provide Plaintiffs with data regarding the rate of responsiveness
for its document production. That is, the number of documents that it determined were
responsive as a percentage of the number of hits on its search terms that it reviewed for
production. Nor has Defendant even attempted to demonstrate how its terms

**Defendant's Purported Effort to Develop Additional Search Term is
Demonstrably Not Credible**

Despite Defendant's assertions that it has "substantially …. expand[ed] its search term
list" including by adding "approximately 300 new terms specifically designed to capture other
responsive documents by identifying additional concepts, names, colloquialisms or particular
phrases used by UFC personnel or others in the industry…." Defendant's proposal remains
inadequate and non-discriminating.[16]

The 296 terms that Defendant proposed to add on April 25, 2016 include 165 (55.7%)
that returned *zero hits* – that is zero precision and recall. Thus, Defendant conducted a "review of
documents and further investigation" to identify 165 terms that failed to register a single hit
demonstrates that Defendant's new search terms are mere window dressing designed to create
the false impression of cooperation and independent effort. Notably, of the 18,172 search terms
in Defendant's February 17, 2016 Search Term Proposal 9,218 (50.7%) returned zero hits.
Despite its superior knowledge, Defendant has not demonstrated an ability to develop search
terms with superior precision and recall. Moreover, many of Defendant's purportedly "new"
search terms are not new at all. For example, Plaintiffs had proposed "Reebok" as a search term

---

[16] While Defendant did agree to include the names of the 940 fighters in the Bout Class to two of
the FTC Search Terms, that does not represent much movement on Defendant's part. Indeed,
Defendant admits as much by stating that "[n]ot surprisingly, many of the FTC search terms
were already on Zuffa search terms. 'Exclusiv*', for example, has always been a stand-alone
Zuffa search term; all documents in the corpus containing that term will be reviewed for
responsiveness and privilege." [INTERNAL CITATION].

before the last Status Conference and Defendant included ten terms derived from Plaintiffs'
proposal. Defendant's addition of eight additional proximity limiters does little to advance the
ball. Similarly, Plaintiffs had proposed the term "Eliot," referring to fighter Eliot Marshall. In the
hit report filed with the Court, on February 19, Dkt. 218-4, "Eliot" returned 667 hits, 2,627 with
family. After the documents Zuffa's terms hit were removed from the set against which
Plaintiffs' terms were applied, "Eliot" hit on only 43 documents, 58 with family. Rather than
simply adding "Eliot" as a term, Defendant proposes to apply 12 proximity limiters which result
in zero hits.[17] Thus, Defendant's proposal to add 12 meaningless versions of Plaintiffs term is not
an offer of new terms, but rather a rejection of a term that returned a mere 58 possible hits
without any demonstration that Plaintiffs' term is overbroad or returns a single non-responsive
document. As such, Defendant's proposal is a continued waste of time and resources.

   Moreover, while Defendant only provided a hit report for these 296 terms before
applying the industry standard deduplication process, the results disclosed in the hit report do not
lend credence to Defendant's assertion that the new terms add much meaningful material. Based
on a universe of 944,697 documents, which was purportedly reduced by Plaintiffs' deduplication
proposal to 819,406, Defendant's new terms returned only 15,563 hits with families.[18] This
meager expansion of its review set does not resolve the shortcomings of Defendants' Search
Terms proposal. Defendant has an obligation to investigate search terms. Rather than doing so,
Defendant has shirked this responsibility and applied blanket proximity limiters regardless of
whether they are necessary to reduce the results.

### Defendant's Search Term Proposal Is Inconsistent With and More Restrictive Than Its Unilaterally Developed FTC Protocol

---

[17] Defendant's argument that this Court previously rejected Plaintiffs' proposal to include terms
without limiters, such as fighter and sponsor names, ignores the hard work Plaintiffs have
performed—in spite of Defendant's resistance—to narrow the document set to which these terms
are applied. Thus, Plaintiffs have not in fact proposed fighter names without limiters. Rather,
Plaintiffs have proposed fighter names but limited them to the set that excludes hundreds of
thousands of documents in which fighter names may hit but have been identified is non-
responsive.
[18] If you extrapolate from the duplication rate, which reduced the full set by 13.26%, the 296
terms only added approximately 13,500 documents to Zuffa's review.

At the February 26 Status Conference the Court recognized the importance of the FTC Protocol as a tool to evaluate the reliability of the parties' search term proposals. In directing Defendant to finally produce its FTC Protocol, it stated "If we could both see what you did for the FTC, that might go a long way to increasing the confidence in getting precision, not just recall." Feb. 26, 2016 Tr. at 27:17-20.

On March 11, 2016, Plaintiffs observed in a letter to Defendant's counsel that "the search terms [Defendant] provided from the FTC investigation do not use proximity limiters" but rather "use[] 'AND' as a[ Boolean Operator]." In other words, Defendant's search term proposal in this case requires that terms like "contract%" appear within five words of a fighters name whereas Defendant's FTC search term proposal only required that "contract%" appear within the same document as the fighter's name. Defendant has never explained the disparity or offered a defensible reason why, when left to its own devices it did not deem proximity limiters necessary, but now stridently believes they are necessary.

For example, in ZFL-0801077 (attached as Exhibit ??), the term "contract" is the sixth term following the fighter name "Martinez."[19] This relevant and responsive document, which speaks to ██████████████████ demonstrates the inadequacy of proximity limiters. Similarly, in the last Joint Status Report, Plaintiffs referred to ZUF-00154095 (Dkt. 218-??), which stated "We are 'mma'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." The FTC Search terms picked up that document because "MMA" AND "licens%" were both contained in the document 13 terms apart, and in discrete and separate thoughts. Thus, applying proximity limiters such as requiring "MMA" to even be within 10 terms of "licens*" would have excluded this relevant and responsive document from review.

---

[19] Defendant produced this document to Plaintiffs as part of its custodial production. However, when Plaintiffs ran Defendant's search terms against it, none registered as a hit. Regardless, even if there is a search term hit in this document, the document demonstrates why there is no correlation between the proximity of a term like "contract" to a fighter's name.

Given Defendant's prior willingness to use "AND" instead of proximity limiters, on March 11, 2016, Plaintiffs suggested that Zuffa should at least be willing to replace all proximity limiters in its proposal with "AND" operators. (March 11, 2016 letter from Michael Dell'Angelo to John Cove). Plaintiffs requested that Zuffa provide a search term hit report for its search terms using "AND" operators. On April 7, 2016 Plaintiffs reiterated the request for a hit report showing the effect or replacing Zuffa's unduly narrow proximity limiters with "AND" operators. Zuffa never provided the requested hit report. Instead, Zuffa responded, without any substantiation, that it "continue[s] to believe that proximity limiters are the most effective way to both recall responsive documents and to do so precisely without the burden of reviewing substantial numbers of nonresponsive documents." (M. Lynch Email to M. Dell'Angelo, Apr. 8, 2016). How Zuffa could definitively say so without (1) running a hit report; or (2) reviewing sample results, is unclear and impossible for Plaintiffs to test independently. Zuffa's position that the search terms here should be more restrictive than when responding to the FTC is telling. When discussing productions to the FTC in a colloquy with the Court at the February 26 Status Conference, Zuffa's counsel, Mr. Cove, stated that in "[m]y experience in responding to the FTC requests and when I was at the justice in the antitrust division doing the same thing is *the process is a little more targeted* towards what documents they are looking for and can get in a reasonable time". *Id.* at 36:3-7 (Emphasis added). Thus, if responding the FTC is a "more targeting" approach than responding to a litigant, why is Zuffa doing precisely the opposite? Zuffa's position is consistent with that of a party operating with the singular focus of suppressing results irrespective of whether the search terms are discriminating.

### Defendant's Inability to Thread Emails Is a Significant Source of Its Burden

In addition to the inadequate deduplication method, Defendant's claimed burden at the last status conference was significantly inflated by its inability to properly collapse threaded emails. As discussed in the parties' prior Joint Status Report, Dkt. No. 218 at 33, and the First Declaration of Chuck Kellner, Dkt. No. 221, at 13-14, Defendant's email threading capabilities do not meet industry standards resulting in an inflated number of documents counted by

24

Defendant. Defendant is, however, able to cluster emails in the same thread for purposes of facilitating (and reducing the burden of) review for privilege and responsiveness.

Since the last Status Conference, Defendant has begun to review and produce documents on which its search terms and the search terms used in connection with the FTC Production hit. As of April 9, 2016, Defendant had produced 35,698 documents from custodians email files. Although Plaintiffs were not provided with the conversation metadata, which would permit a more accurate email threading analysis,[20] Plaintiffs identified only 4,835 unique email threads. Thus, Defendant's production of the custodial files to date reveals that up to 86% of the production could have been eliminated by a widely-available email threading technology that Defendant declined to obtain and use in this litigation.

Plaintiffs requested that Defendant provide the number of unique email threads in the corpus of documents, but Defendant has stated it is unable to provide that information. Plaintiffs do not understand why this number is not readily available (particularly since Defendant has acknowledged using its ability to cluster emails in the same thread to facilitate its review). However, extrapolating from the documents produced to date—and Defendant has declined to provide information which would indicate if the production to date is a random sample or a deliberately chosen, non-random sample—the entire corpus would contain fewer than 300,000 unique email threads. Based on the same extrapolation, the returns from Plaintiffs' Search Term Proposal would contain fewer than 100,000 unique email threads. Defendant's failure to obtain widely-available threading technology should not be a basis for a burden argument that would result in denying Plaintiffs' otherwise appropriate discovery.[21]

---

[20] Instead, Plaintiffs implemented an algorithm that applied email subject normalization (*i.e.*, removing the "Re:" "fwd:" and similar indicators) and then sorts based on dates and email address matching to approximate the email conversation metadata.

[21] In addition, Defendant has either failed to propose or account for the implementation of numerous processes which reduce the purported burden of review. For example, all image files are easily reviewed in a thumbnail viewer. Plaintiffs reviewed over 1 million image files in this way for privilege and responsiveness. In the full corpus, Defendant has nearly 150,000 image files that could be easily reviewed with almost no burden. But Defendant's 50 documents/hour estimate does not account for this savings.  Likewise, the set includes 31,824 htm files which,

In sum, Defendant's conduct has hampered the Court-ordered effort to engage in an "iterative process" on a "test-and-see-how-well-it's-working basis" to identify potentially responsive documents (Feb. 23, 2016 Status Conf. Tr. at 35), and inflated the apparent size of Defendant's review.[22]

## X.   Defendant's Surreptitious Clawback of over 5,700 Documents

As alluded to at the last Status Conference, Plaintiffs alerted Defendant to an issue where two documents were produced in the FTC Production with a TIFF slip sheet stating "Document Withheld as Privilege (sic)" (the "Privilege slip sheet") but where the OCR-ed text was produced. Defendant confirmed that the documents were inadvertently produced and requested that Plaintiffs cease review of the FTC Production until Defendant could investigate the scope of the inadvertent production. Plaintiffs temporarily ceased review of the FTC Production and agreed that if the issue was unresolved when Plaintiffs' recommenced the review, Plaintiffs

---

based on Plaintiffs' review of the samples and production to date, are largely email signatures and blank pages. These files could be deduplicated based on hash values, which would dramatically reduce the review burden for these 31,824 documents.

[22] In their consultant's declaration and at oral argument, Defendant claimed that Plaintiffs' search terms were overbroad by highlighting the "with family" results for individual search terms when Defendant had inflated the "with family" results by failing to de-duplicate them. *See* Dkt. No. 223, ¶ 27; Feb. 23, 2016 Hearing Tr. at 31-33. However, the counts on which Zuffa and its consultant relied were overstated and inaccurate. Still, just prior to the February 23 Status Conference, Defendant attempted to bully Plaintiffs' consultant, Chuck Kellner, by demanding that he retract a statement in his Declaration (Dkt. No. 221, ¶ 35) regarding the "Potential Over-Count of Documents with Families" when Defendant, in fact, did over-count them. On February 23, 2016, Defendant's counsel provided Plaintiffs with a spreadsheet containing a count of all file extensions (*e.g.*, .pdf, .msg, and .doc) in the document corpus. Defendant's counsel wrote: "In light of the attached, please let us know if Plaintiffs will withdraw Mr. Kellner's unsubstantiated speculations regarding attachments in this collection set." However, at the Status Conference, Defendant finally described its method for calculating the "with family" hit counts for individual search terms. As discussed in the Kellner Declaration (CITE), this process dramatically overstated these counts. On March 21, 2016, Defendant acknowledged its "error" in the way it calculated the "with family" numbers and, as a result "the numbers were incorrect because the family members were not de-duplicated at the individual term level. Letter from John Cove to Michael Dell'Angelo, Mar. 21, 2016. Both Defendant's consultant and Defendant's counsel cited these counts in support of its prior arguments on the overbreadth of Plaintiffs' terms. Moreover, the over-counting referenced in Mr. Kellner's initial declaration, which Defendant attempted to bully Mr. Kellner into retracting, applied to the individual term counts.

would not review the text-view of documents with the Privilege slip sheet. Plaintiffs also segregated the two documents from the production. Over the ensuing days, Defendant identified additional documents exhibiting this problem and which were clawed back from the FTC. Plaintiffs segregated those documents as well. On February 3, 2016, because Zuffa had identified the documents inadvertently produced, Plaintiffs recommenced their normal review practices. Through those practices, on February 3, 2016, Plaintiffs identified an additional document with the Privilege slip sheet but with readable text files. Plaintiffs immediately notified Zuffa of the document's bates number and excluded the document from further review. Zuffa never responded to Plaintiffs' email on that document.

Pursuant to Section 11 of the Revised Stipulation and Protective Order (the "Protective Order") (Dkt. 217), Plaintiffs retained copies of the disputed emails in order to assess the validity of the privilege claims. While Plaintiffs continue to believe that none of the documents is privileged, they elected not to challenge all but one, and notified Zuffa of their decision.[23] Plaintiffs expunged any remaining copies of the unchallenged documents from their files.

On February 12, Zuffa notified Plaintiffs that it had uploaded replacement text files for the FTC Production, and identified four documents that it was withholding, for which it was not producing replacement text files. Due to a miscommunication between Plaintiffs and their document hosting vendor, the replacement files were not downloaded at that time. Because Plaintiffs had already segregated the documents identified by Zuffa and Plaintiffs from review, Plaintiffs had no reason to believe the replacement files had not been downloaded (presumably, all the other documents would remain unchanged), and continued unaware of the omission for some time. Plaintiffs eventually realized their error, and notified Zuffa of this discovery on March 16. In that same letter, Plaintiffs identified additional documents exhibiting the Privilege slip sheet but also producing the underlying text.

---

[23] Plaintiffs elected to challenge one document, ZUF-00031544, which is the subject of Plaintiffs' Motion to Challenge Privilege Designation currently pending before the Court, Dkt. No. 229.

Defendant took exception to Plaintiffs' failure to load the corrected FTC Production and took particular issue with the fact that Plaintiffs had reviewed the additional documents Plaintiffs identified as potentially inadvertently produced. Defendant asserted that Plaintiffs had specifically agreed (in January) not to open the underlying text view in their review. This position came as a surprise to Plaintiffs because: (1) Defendant had misunderstood Plaintiffs' agreement (which applied only to the time period Defendant was investigating the scope of the inadvertent production); (2) Plaintiffs had previously advised Defendant of an additional, potential inadvertently produced document on February 3 through these normal review activities (which Defendant never replied to); and (3) Plaintiffs had segregated every document Defendant identified as inadvertently produced meaning that there was no possibility of prejudice to Defendant caused by Plaintiffs' continued review of the non-replaced production.

However, following the re-production of the replacement FTC Production, Plaintiffs came to understand that Defendant's purported outrage was due to Plaintiffs unwitting discovery of Defendant's surreptitious claw back of documents. Plaintiffs almost immediately came across a number of documents that had text files which read "Document Withheld as Privileged."[24] Plaintiffs searched the set for that phrase and discovered there were 213 documents with these new text files. Although it is not clear, that all 213 documents with the Privilege slip sheet had exhibited the inadvertent production issue, at least the additional documents Plaintiffs' identified by letter on March 16, which exhibited the error but were not previously identified as inadvertently produced by either party, were replaced.

Another *5,701 documents* now contain the text of a slip sheet reading "Document withheld as non-responsive". Many (if not all) of these documents had produced the underlying OCR-ed text and Plaintiffs had reviewed them. Plaintiffs took notes on several of these documents – which are decidedly responsive. For example, Plaintiffs have noted that ZUF-

---

[24] In the initial FTC Production, the slip sheets were not OCR-ed. Thus, regardless of whether the slip sheet indicated the document was withheld as privileged or "withheld as non-responsive," that language would not appear in a search using search terms.

00094416 is a press release for a tournament that was co-promoted by two actual or potential competitor promotions to the UFC (Strikeforce and M-1 Global) and which would be televised on the Showtime network. This document was both relevant and responsive to Plaintiffs' RFPs.[25] But when Plaintiffs replaced the FTC Production with the corrected production provided by Defendant, the underlying text for ZUF-00094416 was removed and replaced with "Document withheld as non-responsive." Plaintiffs were never provided with any sort of notice or basis for clawing back this document and doing so was entirely improper.

Similarly, Plaintiffs previously took note of a quote from ZUF-00342400, which was a news article in Lorenzo Fertitta's custodial files describing Dana White's strategy of taking down rivals. The article stated, in part:

> You'd think White would be in his Vegas office, micromanaging every last detail of Saturday's Fight Night 14. Anderson Silva (maybe the best face-smasher on the planet) will battle James Irvin (he of the big right hand) in the 205-pound main event, but the show is really just one more example of White's clout, charm, organizational skill and ego. He has thrown together the card in five weeks in an attempt to choke out a dangerous upstart promoter, Affliction, which is staging its first event. White believes MMA is his turf; he's coaxed the sport to life. He's already taken down a cageful of rivals, including the IFL, EliteXC and Bodog Fight, but he's particularly irked at Affliction because the company boosted its rep putting T-shirts on the backs of his stars. 'I'm doing this fight for one reason, to make Affliction spend money,' he says. 'If they're in business in January, I'll be horrified.' (Affliction will stage an event in January, but has staged none since.)

ZUF-00342400. Now, that text (as well as any other contained in the previously produced OCR-ed text file) states only "Document withheld as non-responsive." Clearly, however, the document is both relevant and responsive.

Even if the Defendant was justified in withholding or withdrawing some of the 5,701 documents from the FTC on the basis that they were "non-responsive" to the FTC's requests, that does not justify Defendants' failure to evaluate whether those documents were responsive to

---

[25] Regardless whether this document was responsive to the FTC's requests as part of that investigation, the document was responsive, relevant and not subject to any protection from discovery in this case, which is more broad than the FTC investigation (a fact Plaintiffs have reiterated on several occasions).

Plaintiffs' RFPs. Accordingly, after raising the issue, Plaintiffs asked Defendant: "did Zuffa: review the clawed back documents for responsiveness to Plaintiffs' Requests and determine none were responsive; claw them back on the basis that the documents were not responsive to the FTC's requests/inquiry; or both?" Zuffa has failed to respond. That is no wonder because, based on Plaintiffs' review, the handful of documents which Plaintiffs knew of nevertheless responsive to Plaintiffs' RFPs.

Even so, Plaintiffs were unaware that Defendant planned to make any changes to any documents beyond withholding the documents specifically enumerated by Defendant to Plaintiffs or which Plaintiffs identified to Defendant. Zuffa gave Plaintiffs no notice they were removing text files from these 213 purportedly privileged documents or the 5,701 purportedly non-responsive documents. These unannounced changes to previously-produced discovery materials are highly irregular and are a cause of concern to Plaintiffs.

Plaintiffs are unaware of any authority or legitimate basis or justification—and Defendant has yet to provide any—that would permit Defendant to claw back even inadvertently produced privileged documents without notice to Plaintiffs. Worse still is Defendant's failure to provide notice of or any authority or justification for clawing back the thousands of purportedly non-responsive documents (at least many of which are both relevant and responsive). No provision of law or the Protective Order permits a claw back of non-privileged inadvertently produced documents (particularly responsive ones) regardless of whether notice was provided. Defendant's failure to provide notice of this surreptitious claw back is reprehensible.

Defendant justifies its conduct based on a false premise. Defendant asserts that "the *only* way to address th[e] issue [of the allegedly inadvertently produced privileged documents] was to either recall the entire FTC production or to replace the text files for the entire FTC production such that the text files provided matched exactly the set of documents that was provided to the FTC." (Apr. 27, 2016 Correspondence from M. Lynch to M. Dell'Angelo) (emphasis added). However, Defendant's assertion is specious. The fact that Plaintiffs are now readily capable of identifying each of the 5,701 documents containing the slip sheet "Document withheld as non-

responsive" and 213 documents containing the Privilege slip sheet evidences Defendant's failure to diligently address the problem in a transparent way. Specifically, Defendant, whether through a lack of diligence, incompetence, duplicity or some combination thereof, failed to compare its proposed replacement production to the initial production. Doing so would have immediately made clear the scope of the claw back to Defendant and would have required Defendant to examine the 5,701 purportedly "non-responsive" and 213 purportedly "privileged" documents to ascertain whether the clawback was appropriate. Instead, Defendant skipped this step and, without notice to Plaintiffs, withdrew nearly 6,000 documents from the FTC Production.

Regardless of its "justification," Defendant further defends its conduct by arguing that it did, in fact, provide Plaintiffs with notice. Specifically, Defendant points to two communications. First, on January 31, 2016, Defendant's counsel emailed Plaintiffs asserting that Zuffa discovered an error in the FTC Production that resulted in documents being produced with their extracted text "including documents where the underlying text were withheld from the FTC on the basis of privilege or responsiveness." (Jan. 31, 2016 Correspondence M. Lynch to M. Dell'Angelo). That same email identified five documents exhibiting this error, which were initially produced to the FTC, but which were subsequently clawed back. Plaintiffs interpreted the email as explaining how the five enumerated documents were inadvertently produced, not an indication of additional documents existing in the set. The second communication, a February 12, 2016 letter attaching the replacement production, identifies five specific documents that Zuffa maintained were privileged. Zuffa points to a paragraph in the letter which, again, identifies the nature of the inadvertent production (*i.e.*, that the production included documents that were "erroneously exported to [Defendant's counsel] with their extracted text rather than their produced text, including documents where the underlying text was withheld from the FTC on the basis of privilege or responsiveness." (Feb. 12, 2016 Letter M. Lynch to M. Dell'Angelo). Zuffa's reliance on these communications as "notice" for the clawback of 5,701 non-privileged documents (or even the more than 200 purportedly privileged documents) is misplaced. Nowhere in these letters does Zuffa state that it was replacing the text files for anything other than the

specifically enumerated and discussed documents. At best, Zuffa's correspondence evidences a misleading and ambiguous statement of Zuffa's intended conduct. This defense of Zuffa's surreptitious clawback is consistent with its approach to discovery and the meet and confer process. Zuffa's counsel speaks in vague terms and provides incomplete information. When Plaintiffs inquire further, they are lambasted for taking "discovery about discovery" or burdening Defendant with requests. When Plaintiffs do not inquire, they often discover that perception and reality diverge widely.

Plaintiffs request that the Court Order Defendant to immediately produce all of the 5,701 purportedly non-responsive documents, a list of all documents clawed back on the basis of privilege, and provide a justification for its deceptive conduct.

## X.   Defendant Overstates Its Legal Custodian Proposals and Understates Plaintiffs' Cooperation

Zuffa argues that "Plaintiffs' search term proposal should also be rejected because it would substantially increase the burden on Zuffa with regard to reviewing the legal custodians' documents." [INTERNAL CITATION].  Despite this broad statement, Defendant has offered no data whatsoever that (1) any significant volume of material in the Legal Custodians' custodial files are actually hit by Plaintiffs' Search Term Proposal; or (2) that even if there is a significant volume of such material, that it is likely to be privileged or protected from disclosure. Instead, Defendant has selectively provided the Court with information on proposals Defendant made while withholding the information on why the parties' have not reached agreement.

First, Zuffa complains that "few narrowing proposals [are] in place regarding the legal custodians," implying that the hundreds of thousands of documents that have been excluded by Plaintiffs' winnowing proposals and de-duplication process were not applied to the legal custodians. This is untrue. The legal custodians were not carved out from these proposals. Defendant has offered no document counts for any custodians after the application of these proposals, nor has Defendant offered document counts for custodians after application of

32

Plaintiffs' Search Term Proposal. Defendant's argument is no more than rank speculation and cannot be a basis for denying Plaintiffs' proposal. This is particularly so in light of the fact that this information is available to Defendant, making it appropriate to presume that the actual data does not support Defendant's position.

Second, Zuffa's complaints fail to acknowledge Zuffa's failure to respond to numerous requests for information concerning the proposals. For example, on January 13, 2016, Zuffa proposed to exclude all communications between the Legal Custodians and several third-party consultants. Plaintiffs were unable to ascertain, from the names of the consultants, what work was performed for Zuffa and why that work would likely result in privileged or otherwise protected communications. On February 1, 2016, Defendant provided further information on these third party consultants, on which basis Plaintiffs agreed to exclude four vendors (two eDiscovery vendors, an office services company that provides document management systems and a third-party vendor used to coordinate logistics for meetings and conferences). Plaintiffs asked follow-up questions concerning the basis for asserting categorically that communications with vendors providing various public relations and other non-legal services would likely be protected from disclosure by either privilege or work product claims. Defendant has declined to substantively respond, instead asserting that it would prefer to focus on "proposals that are likely to affect a material volume of documents," implying that these proposals do not. *See* Lynch Email to M. Dell'Angelo, Apr. 22, 2016. Thus, Plaintiffs neither rejected these proposals nor have been dilatory in responding to them. Rather, Defendant has simply refused to provide information necessary to evaluate them.

Third, Zuffa writes that "significant disparities still exist between the parties' positions regarding communications with outside counsel, … Zuffa's in-house tax department and whether and what search terms could be used to exclude the documents most likely to be nonresponsive and/or privileged." [INTERNAL CITATION]. Zuffa then enumerates several concerns—many of which were raised for the first time in Defendant's April 26, 2016 draft of its sections of the

Joint Status Report[26]—each of which do not accurately capture the parties' meet and confer on the subject.

Defendant argues that Plaintiffs' proposed the search term "Lewis" in reference to fighter and Bout Class member Derrick Lewis, but that this term will also capture documents concerning the law firm "Lewis & Roca." Relatedly, Defendant complained that Plaintiffs' term "Hill" captured an employee in its Tax Department, "Jan Hill." As a preliminary matter, Defendant never proposed to exclude all documents mentioning the law firm "Lewis & Roca."[27] Similarly, Defendant never proposed to exclude all emails mentioning other firms (that also happen to share names with fighters), including Gordon Silver, Barry Friedman, or Morrison Foerster.[28]

Instead, Defendant proposed to exclude all communications between Legal Custodians and outside counsel as well as employees in Zuffa's Payroll, HR, and Tax Departments. Plaintiffs agreed to exclude emails between Zuffa's Payroll and HR Departments as well as emails between the Legal Custodians and outside counsel in this case. As to other outside counsel and the employees in the Tax Department, Plaintiffs made a reasonable counterproposal due to Plaintiffs' discomfort with enabling Zuffa to apply a blanket exclusion of documents from review as potentially privileged without any oversight. Zuffa's conduct to date in this litigation makes such an agreement untenable from Plaintiffs' perspective. Plaintiffs' counterproposal was

---

[26] As recounted in detail above, Plaintiffs have been extremely responsive in endeavoring to address Defendant's claims that particular search terms are overbroad. For example, Plaintiffs' proposed multi-tiered searches designed to narrow terms when those terms hit on employees' names as well as fighters.

[27] Defendant did propose to exclude communications between the Legal Custodians and users of the domain "@lrrc.com," which on information and belief, because Defendant has never named the firm in the meet and confer process, refers to Lewis & Roca.

[28] Collectively, the terms "Lewis," "Barry", "Morrison" and "Gordon" register only 4,613 unique hits, hardly a significant burden to review. But Plaintiffs would have been willing to work to find a way to reduce these hits by removing those unique hits which hit on the law firm names. However, in Plaintiffs' experience, Defendant has been entirely unwilling to engage in a meet and confer that could reduce this small volume of documents. That Defendant saw fit to raise it here, is disingenuous.

that Zuffa would automatically generate a list of communications between the Legal Custodians and the outside counsel domains and the Tax Department employees. This list would include the "To:" "From:" and "Cc:" fields as well as the subject line. Defendant could then review the subject lines for protected information,[29] and replace those with a statement of the subject matter at Defendant's discretion. This proposal would have nearly eliminated all burden with reviewing the subject documents and the burden of logging the documents into a privilege log, but would have permitted some oversight over the exclusion.

Furthermore, Plaintiffs have agreed to many of Defendant's proposals concerning the Legal Custodians. In addition to excluding communications with certain third-party vendors, Plaintiffs agreed to use nine of seventeen proposed search strings, which eliminated more than 20,000 documents from Zuffa's review set and 6,000 more from the Remainder Set.[30] Plaintiffs did not agree to categorically exclude from review or logging documents containing search terms which could appear in relevant material that is not privileged. Plaintiffs have on several occasions invited Defendant to propose additional terms. Defendant has not responded to those invitations. Plaintiffs have also agreed to exclude communications with various third-party regulators and governmental entities including the EEOC, the Nevada Department of Employment Training and Rehabilitation, the IRS and the Nevada Department of Taxation.

Although Plaintiffs are willing to consider more filters and proposals, Defendant's unwillingness to provide information supporting its proposals is a significant barrier to progress. Plaintiffs cannot just take Defendant's word for it because Defendant's word has repeatedly been proven to be worth little.

---

[29] Plaintiffs would agree that the production of the subject lines would not waive any privilege.
[30] These terms include terms targeted at "separation agreements", "Severance packages" "discrimination", "unemployment insurance", "Patents" and "copryrights" or "trademarks" as well as "Piracy."