UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, and Jon Fitch, on behalf of themselves and all others similarly situated | ) ) ) |
| Plaintiffs, | ) |
| v | ) ) |
| Zuffa LLC, d/b/a Ultimate Fighting Championship and UFC, | ) ) ) |
| Defendants | ) ) ) ) |

DECLARATION OF HELEN BERGMAN MOURE

I, Helen Bergman Moure, declare and state as follows:

1.      I am over the age of 18, competent to testify, and have personal knowledge of the matters set forth in this declaration.

2.      Since the last status conference on February 23, 2016 I have continued to be involved in discussions with and have provided advice to Zuffa's counsel regarding additional search proposals and approaches.  I have reviewed correspondence between the parties, documents and data from the collection and production, and participated in telephone conferences between Zuffa's counsel and Plaintiffs' counsel on March 31, April 20, and April 25.

3.      I submit this declaration in response to Mr. Kellner's declaration submitted with the last Joint Status Report on April 29, 2016.  Plaintiffs first provided a draft of Mr. Kellner's declaration to Zuffa's counsel on Thursday, April 28 at 5:42 p.m. PT.  I did not have a chance to draft a response before the Joint Status Report was filed the next day.

4.      In his new declaration, Mr. Kellner makes a number of speculative and disparaging assertions regarding the motives of Zuffa's counsel in regards to the negotiation of search terms with Plaintiffs' counsel.  I see no basis for Mr. Kellner to make such speculations.  I have worked closely with Zuffa's counsel and my observations directly contradict Mr. Kellner's views.  In my observation, Zuffa's counsel has worked diligently not only to carry out the review

1  of hundreds of thousands of documents based on the Ordered search terms, but has

2  simultaneously continued to negotiate with Plaintiffs' counsel in good faith in regard to

3  additional possible search terms to apply and ways to narrow the results from existing search

4  term proposals.  These efforts, as further detailed below, were time-consuming and labor

5  intensive, necessarily detracting from the overall effort to perform discovery, and yet Zuffa's

6  counsel expended the efforts required to provide Plaintiffs' counsel with voluminous reports that

7  they demanded and to participate in extensive formal letter and email correspondence and

8  several telephone conferences to discuss various issues and proposals.

9      5.      As set out in the Joint Status Report, the parties did reach agreement on a number

10  of proposals that will reduce the total review set.  Since those proposals are not in dispute, I will

11  not address them in detail other than to describe the process for negotiating them, which was

12  time-consuming and costly.  It is my opinion that the low-hanging fruit of winnowing proposals

13  that will substantially reduce the burden of discovery have largely been either agreed to or

14  rejected, and that this portion of the process appears to have reached the point of diminishing and

15  marginal returns.

16      6.      Plaintiffs' counsel's proposals and requests in regard to the search term process

17  have mostly if not exclusively focused on one-off attempts to winnow down the voluminous

18  results of their extraordinarily broad search terms rather than on narrowing those proposed terms

19  themselves, which at this point, still call for the first, last and nick-name of hundreds of fighters,

20  plus the names of virtually every sponsor, venue, or broadcaster.  The winnowing proposals

21  required a great deal of time and effort to test, report back results, further negotiate, and

22  potentially implement.  Many of the proposals affected such a small number of documents that

23  the resulting benefit to the overall burden of discovery was outweighed by time and cost

24  expended, especially if one considers the time and costs involved in running down and providing

25  information on proposals and ideas to which Plaintiffs ultimately did not agree.

26      7.      I provide the following examples to illustrate how the burden of negotiating and

27  implementing these "winnowing" proposals can easily outweigh the savings in review.  After

28  Plaintiffs' counsel requested that Zuffa provide them with a list of all domain names from which

emails were sent that contained the word "unsubscribe" in the body of the email, Zuffa's counsel made the suggestion that all documents containing the term "unsubscribe" be excluded from the review because this term is almost invariably associated with commercial emails or spam. Plaintiffs' counsel was unwilling to agree to this exclusion. Several weeks later, Plaintiffs expressed surprise that certain documents containing the term "unsubscribe" had not been excluded from their sample set, suggesting that they had agreed to it, which they had not.  Apr. 8, 2016 Letter from M. Dell'Angelo.  When asked again whether they would agree to broaden the exclusion to include such documents, they failed to respond.  Apr. 20, 2016 Letter from J. Cove.

8.    After Plaintiffs rejected Zuffa's "unsubscribe" limitation, Zuffa's counsel suggested that documents be excluded from review if they were sent from (1) "donotreply@," (2) "newsletter@," (3) "newsletters@," (4) "noreply@," and (5) "shop@" – all of which reflect commercial emails.  Plaintiffs would not agree to exclude 69 documents sent from @quinnemmanuel.com and @insideicloud.icloud.com without further information.  Zuffa's counsel then had to review each of the newsletter@quinnemmanuel.com documents and describe them to Plaintiffs, resulting in the elimination of a total of nine emails that were obviously mass mailings based on the sender's address.  Zuffa's counsel explained that "The 60 emails from @insideicloud.icloud.com were all sent from noreply@insideicloud.icloud.com, i.e., from an email address to which the recipient cannot reply."  Rather than reviewing 60 emails to better describe them to Plaintiffs, Zuffa's counsel requested that they simply be excluded.  Plaintiffs' counsel refused.  This is an example of where the time and effort expended in the emails, correspondence, and examination of this proposal vastly outweighed any potential benefit even if they had agreed to the exclusion of this small number of documents.  Since they ultimately refused, it accomplished nothing.

9.    One way to test overbreadth is to review sample documents from the remaining corpus of documents.  Zuffa has provided Plaintiffs with 6,300 sample documents from the Remainder Set (which has changed over time as the parties continued to negotiate).  Plaintiffs have compiled what they consider the most probative documents in the JSR.  None of them suggest that a material number of key documents are being omitted, especially since the

Plaintiffs are receiving a variety of files that are being and have been reviewed without search term winnowing, including the hard copy and electronic central files maintained on each fighter in the putative bout class.

10.     Contrary to Mr. Kellner's assertion, since the last status conference Zuffa's counsel has in fact both broadened the search terms and added significant volumes of material to the review process without the application of any search terms at all.  First, Zuffa expanded its search term list to include the Original FTC Search Terms used during the 2011-12 FTC Investigation, and also expanded those terms to include the first names, last names and nicknames of all fighters who competed in a UFC bout after December 16, 2010.  Zuffa also added search terms, based on its ongoing review of its documents, that captured the "idiomatic language" and "behavioral-type documents" Plaintiffs claimed were excluded from Zuffa's initial search term list.

11.     Plaintiffs' continued position that all of the documents collected in the case should be reviewed without search term winnowing, or that their current search term list should be applied to the remaining corpus without changes to their terms, ignores the requirement that the discovery sought be proportional to the needs of the case.  As reflected in the Sedona Conference Best Practices Commentary, "A perfect review of the resulting volume of information is impossible. It is also not economical. But governing legal principles and best practices do not require perfection in making disclosures or in responding to discovery requests. Instead, best practices focus on reasonable and proportional actions taken by practitioners as part of their duties, which must include an appreciation for the particular challenges of electronic information."  *See The Sedona Conference Best Practices Commentary on Search and Retrieval*, 15 Sedona Conf. J. 217, 222 (2014).

12.     Mr. Kellner points to the lack of "hits" on particular search terms when applied to the remainder set as an indication that those terms are *de facto* ineffective.  This assertion relies on the assumption that there are a large number of potentially responsive documents in the Remainder Set.  But the fact that a document hits on an athlete's name, without more, is not an indication that a document is relevant or responsive.  In fact, the lack of hits on logical search

terms could equally if not more convincingly point to the **absence** of additional relevant documents in the Remainder Set.  Put another way, it could indicate that the search terms currently being applied are effectively capturing the bulk of the responsive material.

13.     Plaintiffs' counsel has also previously criticized Zuffa for failing to test whether certain terms, such as the use of fighter nicknames, are used in responsive documents.  Zuffa added some of the most common fighter nicknames to its search term list in relation to the issues relevant to the case.  Many of these new search terms show zero hits, thus proving Zuffa's point, that it is not necessary to include most fighters' nicknames as search terms to identify relevant documents.  Plaintiffs now criticize Zuffa for including new terms that hit on zero documents, but the inclusion of these terms prove the effectiveness, not ineffectiveness, of Zuffa's current search term approach.

14.     Although the issue of deduplication is moot since the parties have reached agreement on the additional deduplication method to be applied, there are a few issues that require clarification.  Mr. Kellner's lengthy disparagement of Zuffa's vendor's deduplication efforts amounts to little more than a critique of one valid approach over another.  Mr. Kellner is aligned professionally with a particular review platform, Relativity, since his company, D4, is a Relativity provider.  In our telephone conversations regarding the deduplication process, Mr. Kellner has repeatedly referred to the methods by which Relativity operates without regard to the way that Zuffa's vendor's tools have been designed.  Regardless of the relative virtues or shortcomings of any particular tool, however, Zuffa's counsel has made every reasonable effort to answer Plaintiffs' counsel's and Mr. Kellner's questions about the deduplication method and to implement additional deduplication efforts to increase the effectiveness of the process.  As with other proposals, Zuffa's efforts have been stymied by Plaintiffs' counsel's insistence that they be informed of and exercise approval over even the smallest adjustments and their frequent rejection of proposals because of their insistence on a standard of perfection rather than reasonableness.

15.     Further, my understanding is that Plaintiffs' primary concern regarding any narrowing proposal is to not miss any potentially responsive document.  The conservative

deduplication method that Zuffa's vendor initially applied provides the best assurances that non-identical documents will not be falsely de-duplicated out. Mr. Kellner criticizes the initial deduplication process, for example, for including the sent time of an email as part of the hash value. However, a simple example shows why this is done: "A" sends an email at 3pm that says "AAPL going down" **before** the market moves on news. "A" resends the email at 3:30pm that says "AAPL going down" **after** the market moves on news. Under the deduplication protocol that eliminates the time from consideration that Mr. Kellner insisted upon, the two emails "A" sent in each example are duplicates and one of them will be eliminated as a duplicate. While in some cases, the elimination of the unique documents above might be a reasonable tradeoff, in other cases where the timing of events is critical, it is obviously unacceptable. My understanding of Plaintiffs' priority throughout this process supports the use of a conservative deduplication protocol.

16.     During our discussions regarding the additional deduplication methods that Zuffa was willing to implement to address Plaintiffs' concerns, Plaintiffs specifically rejected Zuffa's vendor's additional proposed deduplication method, and instead requested that Zuffa apply a different method. While Zuffa's vendor explained that its proposed less conservative deduplication method would appropriately balance the risk of eliminating unique documents with reducing the volume of documents, Plaintiffs did not agree to application of that method, thereby delaying implementation of additional deduplication.

17.     I also submit this declaration to correct an inadvertent misstatement in the declaration I previously submitted in this case. Due to an error in reporting from Zuffa's vendor, the number of documents captured by each search term with family members ("Doc Count w/ Families"), was overstated at the individual term level. Therefore, some of the specific numbers that I previously cited for the number of documents that would have to be reviewed if a particular term (e.g., Facebook) was included were incorrect. This reporting error did not affect the total number of documents in the "review set" captured by each set of search terms – i.e., that Plaintiffs' proposed search terms at the time captured 1,235,677 of the 1,441,121 documents tested (85.7%). Therefore, my statements regarding the cost and burden of review at that time

1   were accurate.  Obviously, the parties' proposals and the document corpus itself have changed

2   since that time so the numbers previously cited are outdated for other reasons as well.  I

3   understand that Zuffa alerted Plaintiffs to this error on March 21 and provided revised hit counts

4   with the correct "w/ Families" number at that time.

5

6          DATED this 13th day of May, 2016.

7

8                                     Helen Bergman Moure

9                                     Helen Bergman Moure

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28