─────TRANSCRIBED FROM DIGITAL RECORDING─────

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4   CUNG LE, et al.,                    )
                                        )
5                   Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                        )
6         vs.                           )  Las Vegas, Nevada
                                        )  May 17, 2016
7   ZUFFA, LLC, d/b/a Ultimate          )
    Fighting Championship and           )
8   UFC,                                )  STATUS CONFERENCE
                                        )
9                   Defendants.
    ─────────────────────────────────

10

11

12

13                  TRANSCRIPT OF PROCEEDINGS

14            THE HONORABLE PEGGY A. LEEN,
               UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19  APPEARANCES:            See Next Page

20  DIGITALLY RECORDED:     Liberty Court Recorder (LCR)
                            8:50:19 a.m.

21

22  TRANSCRIBED BY:         PATRICIA L. GANCI
                            (702) 385-0670

23

24  Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.

25

```
                ───TRANSCRIBED FROM DIGITAL RECORDING───
```

1  APPEARANCES:

2  For the Plaintiffs:

3          **BRADLEY SCOTT SCHRAGER, ESQ.**
           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4          3556 E. Russell Road, 2nd Floor
           Las Vegas, Nevada 89120
5          (702)341-5200

6          **MICHAEL C. DELL'ANGELO, ESQ.**
           **PATRICK F. MADDEN, ESQ.**
7          BERGER & MONTAGUE, P.C.
           1622 Locust Street
8          Philadelphia, Pennsylvania 19103
           (215)875-3000

9
           **JOSEPH R. SAVERI, ESQ.**
10         **KEVIN RAYHILL, ESQ.**
           THE JOSEPH SAVERI LAW FIRM, INC.
11         555 Montgomery Street, Suite 1210
           San Francisco, California 94111
12         (415)500-6800

13         **JEROME ELWELL, ESQ.**
           WARNER ANGLE HALLAM JACKSON FORMANEK, PLC
14         2555 E. Camelback Road, Suite 800
           Phoenix, Arizona 85016
15         (602)264-7101

16
   For the Defendants:
17
           **J. COLBY WILLIAMS, ESQ.**
18         CAMPBELL & WILLIAMS
           700 South 7th Street
19         Las Vegas, Nevada 89101
           (702)382-5222

20
           **MARCY N. LYNCH, ESQ.**
21         BOIES, SCHILLER & FLEXNER, LLP
           121 S. Orange Ave., Suite 840
22         Orlando, Florida 32801
           (407)425-7118

23
           **JOHN F. COVE, JR., ESQ.**
24         BOIES, SCHILLER & FLEXNER, LLP
           1999 Harrison Street, Suite 900
25         Oakland, California 94612
           (510)874-1000
```

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  APPEARANCES CONTINUED:

2          **NICHOLAS WIDNELL, ESQ.**
           BOIES, SCHILLER & FLEXNER, LLP
3          5301 Wisconsin Avenue, NW
           Washington, D.C. 20015
4          (202)237-2727

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

──TRANSCRIBED FROM DIGITAL RECORDING──

1          LAS VEGAS, NEVADA; TUESDAY, MAY 17, 2016; 8:50:19 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Your Honor, we are now

5  calling the status conference in the matter of Le versus Zuffa,

6  LLC.  The Case Number is 2:15-cv-1045-RFB-PAL.

7          Beginning with plaintiffs' counsel, counsel, please

8  state your names for the record.

9          MR. DELL'ANGELO:  Michael Dell'Angelo on behalf of the

10  plaintiffs.

11          MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

12  on behalf of the plaintiffs.

13          MR. MADDEN:  Patrick Madden on behalf of the

14  plaintiffs.

15          MR. RAYHILL:  Kevin Rayhill on behalf of the

16  plaintiffs.

17          MR. ELWELL:  And good morning, Your Honor.  Jerome

18  Elwell on behalf of the plaintiffs.

19          MR. SCHRAGER:  Your Honor, Bradley Schrager on behalf

20  of the plaintiffs.

21          MR. COVE:  Good morning, Your Honor.  John Cove on

22  behalf of Zuffa, LLC.

23          MR. WILLIAMS:  Good morning, Your Honor.  Colby

24  Williams on behalf of Zuffa.

25          MS. LYNCH:  Marcy Lynch on behalf of Zuffa, LLC.

───TRANSCRIBED FROM DIGITAL RECORDING───

1           MR. HENDRICK:  Good morning, Your Honor.  Kirk Hendrick

2   with Zuffa, LLC.

3           MR. WIDNELL:  Good morning, Your Honor.  Nick Widnell

4   on behalf of Zuffa.

5           MS. MOURE:  Helen Moure on behalf of Zuffa.

6           THE COURT:  As an initial matter, prospectively, status

7   reports -- joint status reports will be limited to 40 pages with

8   20 pages per side.  Don't be tricky and put a bunch of really

9   tiny font size, put notes in there, too.  We've got some page

10  limitations.

11          There will be no supplemental status reports, unless

12  parties jointly agree that one is in order and the parties

13  jointly submit a joint status report.

14          Before I turn to the Joint Status Report itself and the

15  issues raised within it, I'll hear oral argument on the

16  plaintiffs' motion challenging the privilege designation, Docket

17  No. 250 and 251.

18          MR. SAVERI:  Good morning.  Joseph Saveri on behalf of

19  the plaintiffs.

20          THE COURT:  All right.  And you can raise the lectern

21  if it's uncomfortable for you.

22          MR. SAVERI:  Excellent.  That's the pro move in the

23  Supreme Court, right?  You always -- when you go in there, you

24  raise the lectern to show everybody you've been there before.

25  So I appreciate it.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

 1          So I'm certainly prepared to answer any questions that

 2  you have, but let me start this way.  First, it's clear that the

 3  document in question, which is an e-mail, is an e-mail reporting

 4  on negotiations that occurred in Japan.  The e-mail itself

 5  reports on those negotiations, describes what happened at those

 6  negotiations.  So to the extent that there's an argument here

 7  about a presumption of legal advice, I don't think it applies at

 8  all because really what we have here is a situation where

 9  there's a business representative conducting negotiations and

10  reporting back to Zuffa.

11          THE COURT:  This was part of the second batch of 2,000

12  samples that was done as part of the interim process to

13  determine if we could reach a common agreement on an ESI

14  protocol?

15          MR. SAVERI:  My recollection is -- I think that that's

16  correct.

17          THE COURT:  And --

18          MR. SAVERI:  Excuse me, Your Honor.

19          (Counsel conferring.)

20          MR. SAVERI:  Oh.  I'm sorry.  I thought you were asking

21  a different question.  This document was in the FTC production.

22          I think I have that right.

23          MR. DELL'ANGELO:  Yes, I think, Your Honor, if I may.

24  Maybe the issue is that there's --

25          THE COURT:  Mr. Dell'Angelo for the record.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1        MR. DELL'ANGELO:  I'm sorry, Your Honor.  Michael

2   Dell'Angelo.

3        There is a pending motion to challenge a document as

4   privileged --

5        THE COURT:  That is the one that I am talking about.

6   That is the argument that I invited first because you want to

7   use that document to argue the merits of the matters that are

8   raised in the status report.  So that's the argument I want to

9   hear about.

10        MR. DELL'ANGELO:  Okay.  Then I will address that, Your

11   Honor, I think -- oh, I'm sorry.

12        THE COURT:  Even though the motion was filed by

13   Mr. Rayball?

14        MR. DELL'ANGELO:  Well, Your Honor, so I think the

15   issue is --

16        THE COURT:  Or Rayhill.  Excuse me.

17        MR. DELL'ANGELO:  -- there are two separate documents.

18   There's a document that -- oh, I understand.  So -- I

19   understand.

20        So that there are two separate challenges, and I think

21   maybe we were unclear about which motion you were ...

22        THE COURT:  So you filed it and you're confused, but

23   it's okay to give all of the stuff to me?

24        Mr. Rayhill, let me hear from you about the motion that

25   you filed and about the document that you wish to challenge as

——————— TRANSCRIBED FROM DIGITAL RECORDING ———————

1  privileged, and I don't want to hear it referred to on the

2  record.  I have read it many times, including the parties'

3  interpretation of what it means and whether it is or is not

4  privileged.

5          MR. RAYHILL:  Your Honor, Kevin Rayhill for the

6  plaintiffs.  You know, this motion is not fully briefed at this

7  point.

8          THE COURT:  It is as far as I'm concerned.

9          MR. RAYHILL:  Okay.  Very good.  So...

10         Hang on just a second.

11         THE COURT:  You asked for expedited hearing, expedited

12 briefing.  This was filed, and you asked to be able to --

13         MR. SAVERI:  Your Honor, I just want to -- Joseph

14 Saveri, again --

15         THE COURT:  We're not going to have tag-team argument

16 in this case.  Okay?

17         MR. SAVERI:  I understand.

18         THE COURT:  We're going to decide who is going to be

19 arguing what ahead of time, and we're not going to hear serial

20 arguments from either side.

21         MR. SAVERI:  Your Honor, I just wanted to make sure

22 that the -- what I stood before you was on the motion that has

23 the Document No. 229, and I just want to make sure we're --

24         THE COURT:  I received about three copies of

25 everything, including sealed and public and a redacted one.  And

—TRANSCRIBED FROM DIGITAL RECORDING—

1   so...

2           MR. SAVERI:  And I apologize.  When I stood up, I was

3   standing up on 229.  I just want to make sure we're on the same

4   page.

5           THE COURT:  No, that's why I announced because I

6   thought the document numbers were 250 and 251.

7           MR. SAVERI:  Okay.  So I will sit down.

8           THE COURT:  Okay.

9           This is plaintiffs' motion to challenge the privilege,

10  and it has to do with a document referring to a contract

11  provision.  And that's all we're going to say about it on the

12  record.  So even though you didn't file this motion and didn't

13  sign it, who is going to be arguing the motion?

14          MR. RAYHILL:  Okay.  I'm Kevin Rayhill for the

15  plaintiffs.

16          THE COURT:  Yes, sir.

17          MR. RAYHILL:  Okay.  So the document in question is an

18  e-mail from an UFC attorney, Michael Mersch, to other UFC

19  executives, and it concerns a language in a contract.  And the

20  language has to do with a bonus clause.  It just quotes the

21  clause itself, which apparently is language that was suggested

22  by the fighter.  It is not --

23          THE COURT:  Counsel for the fighter.

24          MR. RAYHILL:  I believe it was -- yeah.  Okay.  Counsel

25  for the fighter.  And the attorney, Michael Mersch, simply asks,

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1   Are we okay with this language, to the two Zuffa executives.  So

2   it's clearly strictly a business purpose.  It's a straight-up

3   contract negotiation.  There are no legal issues raised.  It has

4   strictly to do with the amount of money --

5           THE COURT:  Where -- how do you get that read from

6   looking at it?  Are we okay with this language?

7           MR. RAYHILL:  Well, the language is about the -- the

8   language is proposed by the fighter, and the language is about

9   the amount of money that's going to be included in this bonus

10  clause.

11          And so the way the plaintiffs see that, Mr. Mersch is

12  asking, Are we okay with the $25,000 bonus for this particular

13  fighter?  Because, you know, there are no legal issues

14  implicated in the language.  It has strictly to do with the

15  amount of money and the ways that it would be -- you know, the

16  occasions on which it would be paid.  It doesn't ask if, you

17  know, there are any liability issues.  It doesn't raise any

18  legal issues whatsoever.  Just asking if we're okay with the

19  language.  And the language refers strictly to a monetary issue,

20  straight-up business issue.

21          THE COURT:  And where did you find this document?

22          MR. RAYHILL:  This document is from the sample set,

23  yes.  So I apologize for our confusion earlier.  We were

24  thinking we were going to be arguing the other document, but --

25  so, yeah, this is from the remainder set, which defendants have

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

 1  claimed are not relevant to the case, which we claim are

 2  relevant to the case.

 3          THE COURT:  And was there a negotiated agreement about

 4  the terms of your review of the sample set that was provided to

 5  you?

 6          MR. RAYHILL:  I believe the answer's yes.

 7          THE COURT:  And did you review that agreement before

 8  you reviewed the documents?

 9          MR. RAYHILL:  I believe the answer is yes.

10          THE COURT:  And did the agreement say that they were

11  providing these documents to you without waiver of any privilege

12  and that you would treat them as attorney/client privilege,

13  attorney's eyes only, highly confidential?

14          MR. RAYHILL:  Well, the agreement did say we would

15  treat them as highly confidential, attorney's eyes only.  And we

16  did treat them as highly confidential, attorney's eyes only.  To

17  my recollection, the agreement did not say that they were

18  privileged.  And to the extent that the --

19          THE COURT:  Did it not say they were being produced

20  without waiver of privilege to let you look at them for the

21  stated purpose of refining the ESI protocol?

22          MR. RAYHILL:  Well, even if it did say that they were

23  not waiving privilege, the fact that defendants are purporting

24  to claw it back under the protective order means that we have

25  also the rights that are granted under the protective order,

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  including the right to challenge.  And that's how we brought

2  this challenge.  If the defendant has the right under the

3  protective order to claw the document back, then certainly the

4  plaintiffs have the right under the protective order to

5  challenge the highly confidential designation.  And that's what

6  we are doing in the motion.

7        I guess, you know, in the correspondence between the

8  two parties afterwards, the defendant did claim that it was

9  privileged and that is where the challenge comes up.  We feel

10 strongly that it's not for the reasons that I have discussed

11 before.  It's a straight-up business -- you know, reporting of a

12 business transaction.

13       But our main point is that if the defendant has the

14 right to claw it back, then we have the right to challenge under

15 the protective order.

16       THE COURT:  Thank you.

17       MR. RAYHILL:  Thank you.

18       THE COURT:  Who will offer the opposing view?

19 Mr. Cove?

20       MR. COVE:  I will, Your Honor.  Good morning, Your

21 Honor.  John Cove for Zuffa.

22       I won't belabor much of the point here.  You've read

23 the e-mail.  It does not, as the plaintiffs assert, deal

24 strictly with a bonus amount.  It asks about the language of the

25 provision.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1      They flatly mischaracterize the document in their

2  briefing on this, and I think, quite frankly, it's something one

3  should keep in mind when reading the accusations that they make

4  about our motives in the status report.  This is an e-mail from

5  Mr. Mersch to -- who is an attorney to Mr. Hendrick who was the

6  chief legal officer at that time, his supervising attorney, and

7  to Mr. Epstein who was the chief operating officer.

8      It was clearly privileged, clearly asks for advice

9  about a contractual provision, and I won't belabor the point.

10  It's obvious.  The language was quite short.

11      Their argument about waiver is outrageous.  We provided

12  these samples under an agreement that provided that it would not

13  be a waiver.  It was inadvertently produced.  Ms. Lynch's

14  declaration describes how the inadvertent production occurred.

15  The fact that they've raised the issue of waiver here after we

16  had an express agreement is, again, outrageous.

17      The other point I'll make is that they try to make the

18  argument that this particular provision is somehow important to

19  the case, and we've shown in our pleadings that they have the

20  whole history of the contract negotiations here.  They have the

21  drafts that were exchanged by the parties.  They have the

22  amount.  They have everything they need to make an antitrust

23  case, if there was one to be made, about this performance bonus.

24  And as we say in the papers, there's no allegation that

25  performance bonuses are illegal or anticompetitive.  It's not

———— TRANSCRIBED FROM DIGITAL RECORDING ————

 1  part of their case.  They filed this motion to -- because this

 2  is one of the few documents that they had that could suggest

 3  that the search terms were missing something.  And it does not

 4  do that.

 5          We went out and we got the electronic contract files.

 6  We did our investigation.  We said, the documents relating to

 7  the contracts and exchanges between the fighters are found in

 8  these contract files, the hard copies files, the electronic

 9  contract files.  We produced those.  They have that whole

10  universe of documents.  And in our sample set on one isolated

11  document that is, frankly, immaterial and irrelevant and it

12  really goes to show how -- how well our search terms are doing,

13  quite frankly.  If this is the best they can do, this isn't

14  much.

15          So I think that's all I have to say on that.  This is a

16  motion that should never have been brought.  The document should

17  have been returned without question.  It shows why we have to be

18  as careful as we can in privilege review in this case.

19          So I'll leave it go at that, unless you have any

20  questions.

21          THE COURT:  You want the last word, Mr. Rayhill?

22          MR. RAYHILL:  I do.  Thank you, Your Honor.

23          Your Honor, in order for the plaintiffs to make their

24  case, an important part of our argument is that top-level

25  executives at the defendant were intimately involved in

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1  negotiating contract details with the class of plaintiffs.  And

2  the reason we feel this document is so important is that this is

3  a clear example of executives at Zuffa negotiating or talking

4  about and negotiating the terms of the contracts with the

5  fighters which are a central issue of plaintiffs' case here.

6          And in order for plaintiffs to be able to make their

7  case, we're going to be able to -- we're going to need to be

8  able to --

9          THE COURT:  So address Mr. Cove's arguments that you

10  have received the documents that were disclosed in discovery

11  about this contract, the drafts that the fighter proposed, the

12  final draft of the contract, and related negotiations.

13          MR. RAYHILL:  Your Honor, plaintiffs' position is that

14  we fear that defendant is going to withhold documents which are

15  not privileged which are central to our case.

16          THE COURT:  If your client writes you a letter and

17  says, Here's a contract that I've been handed.  Can I sign this?

18  Is he or she asking you for legal advice?

19          MR. RAYHILL:  Well, that's not what the e-mail says.

20  In that case I think it would depend on the circumstances of the

21  contract and the circumstances of the letter.  Maybe the -- my

22  client is asking, Am I getting enough money?  In which case the

23  answer is it is not privileged.  If the client is saying, Am I

24  exposing myself to liability, legal liability, then the answer

25  is it's privileged.

--- TRANSCRIBED FROM DIGITAL RECORDING ---

1          So without knowing the context, I think it's impossible
2   to answer one way or another.  It really depends on what the
3   client is asking.  And in this case the client is asking, Do we
4   want to pay the amount --
5          THE COURT:  No, that's not what the question was.
6          MR. RAYHILL:  Are we okay with the language?  Well, the
7   language --
8          THE COURT:  Not are we okay with the money.  Not is
9   this -- does this make sense to us in our budget.  Not can we
10  make a profit on this if we agree.  Are we okay with the
11  language?  Two lawyers -- of a contract, a specific contract
12  provision.  Two lawyers talking to each other.
13         MR. RAYHILL:  Well, not all the lawyers are acting in
14  their capacity as lawyers.  At the time I believe Mr. Hendrick
15  was chief operating officer, and I believe Mr. Epstein was the
16  former chief operating officer.  So in that capacity he's had to
17  wear both hats, both the recipients of the e-mail.  And, again,
18  as I said before, the contents of the contract paragraph refers
19  solely to the amount of the bonus and the circumstances under
20  which it is to be paid.
21         THE COURT:  You had that information from the fighter
22  files about what the discussions were about the amount of money,
23  what was proposed and what was adopted in the final contract, do
24  you not?
25         MR. RAYHILL:  I suppose we do.  Nonetheless, the

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  language of the paragraph itself, there are no legal issues

2  or -- there are no legal issues raised or implicated in the

3  paragraph.  It's strictly a business issue.

4          And the fact that, you know, Mr. Mersch, as in-house

5  counsel, can also act in both a business and a legal capacity --

6          THE COURT:  I'm a firm believer in that.  I understand

7  that and just because you told -- you're lawyers and stuff

8  doesn't mean it's privileged.  So just because a lawyer asks for

9  information doesn't mean it's privileged.  And the parties in

10 this case will be required to comply with their obligations on

11 privileged document logs, but this was a test set that you

12 received that has not been either listed on a privileged

13 document log or not listed on a privileged document log.  It was

14 done for a discrete purpose in this case.

15         MR. RAYHILL:  Well, I understand that, but once the

16 plaintiffs identified that document, the defendant purported to

17 claw it back under the protective order.  And --

18         THE COURT:  I'm not faulting you for filing the motion.

19 I'm addressing the merits.

20         MR. RAYHILL:  Okay.  Well, on the merits --

21         THE COURT:  Because you're arguing waiver based on an

22 inadequate privileged log, and we are not at the privileged

23 document log stage yet for documents that are reviewed as part

24 of a testing sample.

25         MR. RAYHILL:  Well, I think it primarily -- I'd like to

—TRANSCRIBED FROM DIGITAL RECORDING—

1   focus on the substance of the document itself and the

2   circumstances under which it was created, which is a business

3   negotiation and a document that contains business information.

4           And as I've stated before, in order for the plaintiffs

5   to be able to fully prosecute their case, they are going to need

6   to be able to see this kind of communication between top

7   executives at Zuffa, including executives who are or have been

8   acting at times in their role as attorneys.  And as with this

9   document, this document is a very good example of a case in

10  which they're trying to protect information that plaintiffs

11  would like to have and the plaintiffs have a right to have under

12  the guise of privilege and it is not a privileged document.

13          THE COURT:  How are they protecting it if they produce

14  the proposal from the fighter and the response and final draft?

15          MR. RAYHILL:  Well, the information that the plaintiffs

16  are interested in is the actual conversation among the Zuffa

17  executives themselves.  I think this is the -- what's --

18          THE COURT:  And you just told me context is everything.

19  So before they even have an opportunity to provide a privileged

20  log with context, you want to say from just reading the face of

21  that -- for example, if they did produce this and didn't claim

22  privilege, you would then be asking for any response and arguing

23  selective waiver, wouldn't you?

24          MR. RAYHILL:  I'm sorry.  Could you say that again,

25  please?

1    THE COURT:  Sure.  If they didn't claim privilege and

2 they did produce it to you, I can bet that you would be here

3 arguing that you're entitled to the response even if it was

4 legal advice between two lawyers, Nevada law includes a

5 provision that does blank, blank, and blank.  I agree.  I

6 disagree.  You'd be telling me they selectively waive by not

7 claiming a privilege on the document they produced.

8    MR. RAYHILL:  Well, without seeing the response, I

9 believe we would be arguing, yes.  But I feel like that's a

10 separate issue now.  We're talking about a separate --

11    THE COURT:  They have to claim the privilege, don't

12 they, if they in good faith believe that one lawyer is

13 communicating with another lawyer or a client and a lawyer are

14 communicating for the purpose of legal advice?

15    MR. RAYHILL:  Yeah.  If they in good faith believe

16 that, yeah, it's a legal communication, then, yes, they have to

17 claim privilege, but if they claim privilege, we have the right

18 to challenge.  And on the merits on the substance of the

19 document we feel strongly that it is not privileged and that it

20 represents a class of documents that we feel defendants may try

21 to claim is privileged when, in fact, they're not, the documents

22 which are vital to plaintiffs being able to make their case.

23    This is just a good example of a straight-up business

24 communication that does not implicate privilege issues.  And,

25 you know, part of why we're challenging it is to --

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          THE COURT:  Set the tone.

2          MR. RAYHILL:  Set the tone, yeah.  These are documents

3  that we want to see, and if they're not -- you know, if -- in

4  your hypothetical example, if there was a response and it said,

5  for example, No, we don't like the language because we feel that

6  it makes us vulnerable for reasons A, B, and C, we would

7  certainly acknowledge that that's a privileged communication.

8  But that's a hypothetical.

9          What we're talking about is a document that they

10  produced as part of the remainder set.  Then purported to claw

11  it back as privileged.  And we feel strongly that it's not

12  privileged based on the content of the e-mail.

13          THE COURT:  Thank you.

14          MR. RAYHILL:  Thank you.

15          THE COURT:  The motion is denied.  The document is

16  privileged.

17          Let's turn to the substance of the status report and

18  where we are in terms of coming to a conclusion with an ESI

19  protocol.  Who would like to address the plaintiffs' position?

20          MR. DELL'ANGELO:  Michael Dell'Angelo, Your Honor.  I

21  will address the plaintiffs' position.

22          THE COURT:  Yes, sir.

23          MR. DELL'ANGELO:  Your Honor, if I may, I'm happy to,

24  of course, take this in whatever order you wish, but there are a

25  few updates that I can provide to you not only about the

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1  plaintiffs' production, but about some issues that the parties

2  have communicated about after the filing of the JSR that I think

3  will be useful to address first?  If that's okay.

4          THE COURT:  Certainly.

5          MR. DELL'ANGELO:  Thank you, Your Honor.

6          First, I'd like to just give you a brief update about

7  the status of the plaintiffs' production.  So, we collected

8  documents from the six named plaintiffs as well as two spouses

9  from whom -- two spouses of plaintiffs whom we believed may have

10 had responsive documents.  So in total we collected 223,000

11 e-mails, 100,000 social media files, and 6.6 million files from

12 electronic devices.  Of those, we determined that about 1.24

13 million documents were potentially responsive.  The balance were

14 system files and things like that that aren't content-specific

15 documents.

16         We then deduplicated and reviewed all of those

17 documents.  That included --

18         THE COURT:  Using which deduplication method?

19         MR. DELL'ANGELO:  So we deduplicated globally and

20 across custodians using MD5 hash values.  And that included, you

21 know, notably there were over a million graphic files.  There

22 were 20,747 video files, almost 10,000 audio files, which were

23 all, you know, manually reviewed in a linear fashion.

24         So our production began on March 10th, 2016, and we

25 made another production -- we made a number of productions

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   since.  The last of which was yesterday.  And so in total we've

2   produced 52,000 documents, which totals roughly 157,000 pages.

3           And, you know, I think we are on track to meet the

4   substantial completion deadline set for June 1st.  You know,

5   notably, we did not apply search terms or other, you know,

6   winnowing methods, other than deduplication.  We just got

7   documents, collected them --

8           THE COURT:  You did it the old-fashioned way.

9           MR. DELL'ANGELO:  -- reviewed them, produced them.

10  We're done.  We have not heard any complaints.  Haven't heard

11  any issues with respect to how we did it or what we did.

12          And I guess the other thing I would just note is that

13  the defendants asked us to prioritize the Quarry production,

14  which we did, and that was the first wave of material to go out.

15  So unless you have any questions about that, Your Honor.

16          THE COURT:  No, sir.

17          MR. DELL'ANGELO:  Okay.  Thank you.

18          So there are a number of issues addressed in the JSR,

19  and after that was filed, on May 4th we wrote to the defendants

20  to try to continue to address these issues in the hopes of

21  finding resolution or agreement where we could.

22          So, first, with respect to audio and video files,

23  again, as I had noted, we had about 30,000 of those that we just

24  reviewed.  There was an issue which Zuffa was unwilling to do a

25  manual review of its roughly 4,055 audio and video files.  There

—TRANSCRIBED FROM DIGITAL RECORDING—

1  was a lot of back and forth about how to identify those and

2  their file names and their paths.

3          Ultimately what we did, we did not get all of the

4  information that we thought we really needed to make as

5  aggressive a reduction of that set as we could, but with the

6  information that we received, which were just the file names.

7  We didn't get the paths or the folders because just to put this

8  into context we thought if, for example, there were a number of

9  documents in a file that said, you know, iTunes music or

10  something like that, it's much easier for us to know from the

11  titles that those are probably just songs and we can get rid of

12  them.

13          But be that as it may, we did what we could with that

14  list, highlighted it, sent it to the defendants, and said, you

15  know, Based on the information that we know, we're comfortable

16  with just excluding these from review.  If you'd like to

17  recommend more, you know, we're happy to consider it.

18          The long and short is, Zuffa accepted our proposal, as

19  I understand it, and has agreed to review the balance of the

20  documents that we have not, you know, identified.  So I think

21  that issue is resolved.

22          And then the next is with respect to --

23          THE COURT:  Well, let me stop you right there.

24          MR. DELL'ANGELO:  Sorry.

25          THE COURT:  Counsel for Zuffa, do you conclude that

────────── TRANSCRIBED FROM DIGITAL RECORDING ──────────

 1  that issue is resolved?

 2          MR. COVE:  Yes, I do.  I don't agree with much of what

 3  led up to it, but it is resolved now.  I'm happy to elaborate

 4  or --

 5          THE COURT:  No, I don't need to hear the back and

 6  forth.  I've seen the exchanges.

 7          MR. COVE:  I understand.

 8          THE COURT:  I just want to make sure that we're on the

 9  same page --

10          MR. COVE:  Yes.

11          THE COURT:  -- and what he just said is that you have

12  reached a common agreement with respect to the video and audio

13  files is correct.

14          MR. COVE:  Absolutely.

15          THE COURT:  Thank you.

16          MR. DELL'ANGELO:  Okay.  So the next issue -- and there

17  is a lot of time spent on this in the JSR.  I will try to be

18  very brief.  With respect to this clawback of documents from the

19  FTC production, the issue for us really boiled down to -- I

20  mean, I think the parties could argue ad nauseam about whether

21  it was surreptitious or not or, you know, how that should have

22  happened or what anybody should have understood, but at the end

23  of the day there were, you know, 5,701 documents that --

24          THE COURT:  That were withheld as nonresponsive and

25  about 213 that were withheld as privileged.

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1          MR. DELL'ANGELO:  Correct.  And the issue ultimately --

2          THE COURT:  On February 12th you got the production as

3    it was produced to the FTC as opposed to the mistaken format in

4    which it was produced to you --

5          MR. DELL'ANGELO:  Right.

6          THE COURT:  -- containing the withheld documents.

7          MR. DELL'ANGELO:  Right.  So once we discovered the

8    clawback, I think the substantive issue, which I believe is

9    resolved, is regardless of where you come out on whether or not

10   they should have been clawed back or how or for disclosure or

11   etc., the substantive issue really is those documents are

12   nevertheless, as we view it, in the possession, custody, or

13   control of the defendant and should be reviewed for

14   responsiveness to the request generally.  My understanding is

15   that is now going to happen, and from our perspective that

16   solves the issue.

17         THE COURT:  That closes this issue.

18         MR. DELL'ANGELO:  Correct.

19         THE COURT:  Mr. Cove, do you concur?

20         MR. COVE:  Yes, with regard to the documents that were

21   inadvertently produced as privileged and nonresponsive within

22   that set; not with regard to the later-discovered ones which we

23   should get to.

24         THE COURT:  We are just talking now about those two

25   subsets.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          MR. COVE:  Yes, yes.  Again, we would -- I understand

2     you don't want to hear anything about surreptitiousness --

3          THE COURT:  It was a tortuous process, but now it's

4     resolved.

5          MR. COVE:  Yes.

6          THE COURT:  Okay.

7          MR. COVE:  Thank you, Your Honor.

8          MR. DELL'ANGELO:  Okay.  Moving along, I don't think

9     that this constitutes a resolution between the parties, but

10    there is some progress that I can report.

11          In that May 4th letter, what we also did was addressed

12    the number of the issues that the defendant raised in the JSR

13    with respect to certain of the documents that they believed were

14    being returned by overbroad terms.  So those are things such as

15    Facebook and Twitter, Google, the Lewis Law Firm, Morris and

16    Gordon, Barboza, football, Mac, and machine.  And we produced

17    some searches to deal with that and, you know, I think we have

18    addressed or proposed a way to address each of those specified

19    concerns.

20          And the effect of eliminating those terms, you know,

21    that the defendant believes are overbroad and that they

22    specified in the JSR would take another 10,000 -- you know,

23    roughly 10,000 documents out of the set.  I don't know that we

24    have an agreement on that point, but I just thought it was

25    important that you understood that we were thinking about those

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1    issues and have been active since the filing of the JSR to try

2    to address that.

3              And there are a few outstanding proposals more

4    generally, but I think they kind of go to the issues in the JSR

5    itself.  So I believe that's it for the updates.  And I can turn

6    to the substantive issues if Your Honor --

7              THE COURT:  All right.  Let me hear from Mr. Cove first

8    about the progress with specific terms that were mentioned in

9    the Joint Status Report that the defendants have had overbroad

10   issues with like Mr. Dell'Angelo just recited for the record.

11   Do you -- where are you in terms of --

12             MR. COVE:  We are evaluating those proposals.  I think

13   our major point here is that what they did was address things

14   that have been on the table for a long time, such as the name of

15   law firms, after they were raised in the Joint Status Report and

16   addressed specific --

17             THE COURT:  How long is it going to take you to

18   complete evaluation and either resolve or reach an impasse?

19             MR. COVE:  It should be -- it should be shortly, but I

20   think our point there is that this was -- this does not solve

21   the big problem of --

22             THE COURT:  I understand that part, but what I'm trying

23   to do is winnow down --

24             MR. COVE:  Right.

25             THE COURT:  -- to use the phrase that's been used

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

 1   several times --

 2        MR. COVE:  As far as those particular techniques that

 3   they have proposed, I mean, I think what we are going to do is

 4   either figure out whether they're practical, and some of them I

 5   think are and some of them may not be practical.  In which case

 6   we'll just -- we'll just review them with whatever order comes

 7   out from this hearing.

 8        So I don't think that's a long-term issue.  There are

 9   bigger issues.

10        THE COURT:  All right.  So let's go to the hard part.

11   Mr. Dell'Angelo, let's start with the first primary point of

12   contention.  I mean, where we are ultimately is at determining

13   an ESI search protocol, and the first choice would be to make

14   them review everything for responsiveness and privilege.

15        MR. DELL'ANGELO:  And, you know, I recognize that, on

16   the one hand, the Court has expressed concern about the

17   reliability of search terms.  I also recognize the Court has

18   asked us to engage in a process that attempts to evaluate the

19   utility and application of search terms.

20        So from --

21        THE COURT:  Just on the hope that reasonable people

22   acting reasonably could agree on something.

23        MR. DELL'ANGELO:  Well, I think we -- we all remain

24   hopeful, Your Honor.  And there are a couple sort of things I

25   think I can provide to you that might put this into context.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          So I think just a little bit of background about what

2   has happened since the last status report would be useful, if I

3   may.  So there were documents -- setting aside the FTC

4   collection, this newly discovered corpus of 1.8 million

5   documents, the documents that we -- the Court and the parties

6   have been discussing, which is the e-mail collection and the

7   hard drive documents, since the last status report and

8   conference that corpus has grown.  But at the same time the

9   number of documents on which plaintiffs' terms hit have dropped

10  by about 15 percent.

11         And we've been able to achieve that through a few

12  methods.  And one, most importantly -- well, one of the more

13  important ones is deduplication.  And, again, there's a lot of

14  time spent on deduplication.  From your earlier comments I take

15  it the Court is aware, you know, the --

16         THE COURT:  I spent a very long time preparing so that

17  I can do the best to give you the best decision possible.

18         MR. DELL'ANGELO:  It's obvious to me that you're well

19  prepared and I sincerely appreciate that, Your Honor.

20         The highlighted numbers here are, you know, we had

21  agreed early on in this case, and I think September of 2015, to

22  deduplicate across custodians.  Ultimately, as we understand it,

23  that didn't happen.  We spent a lot of time trying to get a

24  straight answer about what deduplication method was applied --

25         THE COURT:  And ultimately they used a conservative

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   approach that didn't deduplicate very much, if anything, and you

2   ultimately talked them into using your deduplication process.

3          MR. DELL'ANGELO:  I wouldn't characterize it as

4   conservative nor would I characterize it as consistent with our

5   agreement to deduplicate across custodians because it didn't do

6   that.  What they ultimately agreed to do was honor the agreement

7   which was to deduplicate across custodians.  We proposed a

8   method for doing that, and that took out about 200 --

9          THE COURT:  And 31,000 documents.

10          MR. DELL'ANGELO:  Correct.  223,000, I have, 9 -- 191,

11   which is roughly, you know, a quarter of a million documents.

12   It's, you know, nearly 10 percent of the total corpus of

13   documents before other methods are applied.

14          THE COURT:  Versus their .01 percent.

15          MR. DELL'ANGELO:  Yes.  It's a massive reduction,

16   right, in a case where defendant is telling you that it is too

17   burdensome to review these documents.  So effectively what we

18   did was, you know, applied our own agreement and substantially

19   reduced the burden that, you know, they have been telling you

20   prevents them from reviewing the documents.  We frankly thought

21   that that had already been done, but be that as it may, it is

22   now done.

23          We also developed a number of winnowing proposals.  As

24   I'm sure Your Honor has seen from the documents, the defendants

25   take issue with, you know, who's responsible for those, but I

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1  think we feel very strongly that we developed the majority of

2  those.  We were really the driving force behind those.  And what

3  they ultimately did was removed another nearly 308,000.  The

4  exact number is 307,972.  And then, of course, there's another

5  10,000 or so that I addressed this morning that we set out in

6  the May 4th letter.

7       So we have a total reduction of 531,000 documents.  So

8  it's roughly 25 percent of the corpus before any search terms

9  are even applied.  So what you have is a set that is not only

10  substantially reduced, but what has been removed from that set

11  are documents that are not responsive or highly likely to be not

12  responsive.  So you have a much more concentrated set of

13  documents to work from and to which search terms can be applied.

14       I think, as this Court is aware, there are competing

15  proposals for the application of those search terms, and

16  ultimately there's the remainder set.  The remainder set are the

17  documents to which Zuffa's proposed search terms and the FTC

18  terms don't apply or don't hit a document.  It's about 800,000

19  documents, and then when you --

20       THE COURT:  There's roughly in excess of 800,000

21  documents that if the search terms were to be run against them,

22  Zuffa's search terms, they would not produce any responsive

23  documents.

24       MR. DELL'ANGELO:  That's correct.  And --

25       THE COURT:  I just wanted to make sure I was on the

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   same page with you about what we're talking about.

2          MR. DELL'ANGELO:  That's correct.  And to be clear, and

3   the FTC search terms.  A couple of -- there are two of which

4   that have fighter name's --

5          THE COURT:  Right.  And you listed in your footnote all

6   of the subsets of what that consists of.

7          MR. DELL'ANGELO:  Right.  So that leaves about 800,000

8   documents of this kind of reduced set, you know, with all of the

9   winnowing and deduplication proposals.  And then when you apply

10  plaintiff's proposed search terms, you get about 600,000

11  documents that hit on -- hit on our terms.

12          So from our --

13          THE COURT:  600,000 of the 800,000?

14          MR. DELL'ANGELO:  Correct.  So it's about 75 percent.

15  That -- all of the numbers are in the JSR.  I haven't calculated

16  the percentage, but it's roughly 75 percent.  I just want to be

17  clear with respect to my representation of the number.

18          So what you have is about 600,000 documents at the end

19  of the day that don't hit on the defendant's terms, that hit on

20  the plaintiffs' term, and that have been sort of stripped of

21  their, you know, nonresponsive documents.  So what we then did

22  was we ran a series of samples, and there's one sample that was

23  provided since the last JSR.  And that was broken up into

24  roughly 500 documents that do not hit on any parties' search

25  terms because we wanted to see what neither of us was getting,

———TRANSCRIBED FROM DIGITAL RECORDING———

1   you know, and understand what ways we might be able to change

2   our terms or their terms and if something is being missed, or if

3   there are ways to develop additional winnowing proposals because

4   looking at those non-hits sometimes tells you there's some

5   category of document that we can weed out.  And then there are

6   about 1,500 or so documents that did hit on our terms.

7          And what we found from looking at those documents is

8   that there were, you know, quite a number of documents that were

9   responsive to our requests.  There are varying degrees of

10  relevance, but some of them were, you know, quite relevant from

11  our perspective.  And what it tells us is that our search terms

12  are really doing what they're designed to do, which is look in

13  this concentrated set of documents, find documents that are

14  responsive and, you know, return them.

15         THE COURT:  All right.  So to make sure I am

16  understanding you and we're on the same page, these are the 16

17  documents that you -- that you outline in the Joint Status

18  Report that were from the sample set that were not -- that would

19  not be produced according to Zuffa's search protocol?

20         MR. DELL'ANGELO:  That's correct, with the exception

21  that I believe the number was 14 documents.  But otherwise, yes,

22  exactly correct, Your Honor.

23         Now, Zuffa has, you know, as we would expect, taken

24  issue with those 14 documents, find ways to say that --

25         THE COURT:  You got them elsewhere.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          MR. DELL'ANGELO:  Got them elsewhere.  You know, what's

2  interesting is they say in there, in the Joint Status Report,

3  that we overstate their relevance, but they don't actually

4  explain why that is.  So I'm not really sure how to respond to

5  that, quite frankly.  We put them in there because we thought

6  that they were relevant.  Be that as it may, if we hear more

7  about it today, we can try to respond.

8          With respect to a few of them, they said those

9  documents exist elsewhere.  And I understand that argument, but

10  I don't really understand how it helps the defendant's position.

11  Quite frankly, I think it helps ours.  I think what it does is

12  it establishes that documents that are responsive and relevant

13  are being found within those 600,000 documents in the remainder

14  set that our search terms hit on.  So the fact that an e-mail

15  communication or a contract document is found in the hard-copy

16  files also shows up in those 600,000 documents tells us a couple

17  of things.

18          It tells us that the defendant recognizes that that

19  document in the 600,000 documents that our terms hit on is

20  responsive and relevant.  It was produced, you know.  It's a

21  type of document that belongs in this case.  And what I don't

22  think is that there's a proxy to say, We should just throw out

23  all 600,000 because some of the ones that you found exist

24  elsewhere in hard-copy files, etc.

25          And it actually goes -- I understand that -- I'm not,

———TRANSCRIBED FROM DIGITAL RECORDING———

1  you know, challenging your ruling on the privilege issue, but it

2  does -- that discussion does highlight something that we see

3  here, too.  One of the themes of our presentation here has been

4  the difference between the language of contract and the language

5  of communication.  And I think it's important that what you

6  don't hear about when the defendants talk about their search

7  terms is that they don't make a distinction.  They haven't

8  presented you with documents or a summary or some analysis that

9  says, Here's what defendant's terms are returning.  Here's

10 what's in the 600,000 documents that the plaintiffs' search

11 terms return.

12        But if you look at the 14 exhibits that we provided to

13 you, they're generally communication-type documents, the type of

14 documents that we're not seeing in the defendant's production.

15 And we did -- you know, we've been getting a fair number of

16 documents from the defendant that come in a number of

17 categories, but what we did do is we did the kind of a -- as

18 quick a triage-type review that we could to get through those

19 documents to provide some perspective.  And I think it's an

20 important perspective that's lacking, you know, in the materials

21 that the Court has before it right now.

22        And what we find in the defendant's production of

23 documents that hit on their search terms are to the extent that

24 there are -- there are a lot of contract-type documents and very

25 simple kind of form documents like -- in addition to duplicates,

──TRANSCRIBED FROM DIGITAL RECORDING──

 1  but to the extent that there are communications, they are very

 2  sort of routine communications that the very sort of precise

 3  proximity-limited search terms that they've developed would

 4  gather.  Right.  It's sign the attach contract and it's picking

 5  up the language in the contract, that sort of thing.

 6          What it's not getting are the type of documents that

 7  you see that we provided you in the Joint Status Report that hit

 8  on plaintiffs' search terms where there's actually a

 9  conversation happening.  And if you think about the privileged

10  document that you discussed with Mr. Rayhill and Mr. Cove a

11  little earlier, that document, you know, now is what it is based

12  on your ruling, but presumably there's a response.  And that

13  response could say -- it could say, No, we're not going to let

14  fighters dictate terms to us.  Those are the types of

15  communications we're after.  Those are the types of

16  communications we're finding with our search terms.  And they're

17  not the kind of communications we're seeing in the documents

18  we've gotten back from the defendant's production thus far from

19  the application of their terms.

20          And another way to put this into perspective is a point

21  that the Court raised at the Joint Status Report hearing.  What

22  you asked us to do was to get the FTC protocol from the

23  defendants and to look at that protocol and see what it taught

24  us about these documents.  And, again, you see a lot of back of

25  forth in the report about the production of that protocol.  And,

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  frankly, it was shockingly difficult to get a fulsome statement

2  of that protocol, but we got a fulsome enough statement which

3  led to a whole separate issue that I think, you know, we're here

4  to discuss with you, the FTC collection of documents.

5          But when you look at the FTC protocol that the

6  defendant in this case applied to the FTC production, what you

7  see is with a custodian like Mr. Scott Coker, who is the CEO of

8  Strikeforce, the entity that was acquired by the UFC, they used

9  no search terms whatsoever to look through his documents.  And

10  to the extent that they did use search terms to look through the

11  other custodians, they did not use these very restrictive

12  proximity limiters where it's, you know, exclusive within the

13  five of, you know, a name or --

14          THE COURT:  Correct.  But what was the FTC

15  investigation?  Whether there was anticompetitive behavior in

16  the acquisition of Strikeforce?

17          MR. DELL'ANGELO:  That's essentially correct, yes.

18          THE COURT:  Okay.

19          MR. DELL'ANGELO:  Right.  But my point is they used a

20  much broader method, right, where there's just a term or a

21  term -- not just a term --

22          THE COURT:  And a much more discrete legal problem.

23          MR. DELL'ANGELO:  That's true, but it's a much --

24          THE COURT:  Because you are here -- you are complaining

25  about 15 years' worth of unlawful conduct from your point of

 1  view.

 2          MR. DELL'ANGELO:  That takes various different forms,

 3  yes.  And, really, the heart of the case is how you get to that

 4  unlawful conduct, right.  We know the amount in the contract,

 5  right, with respect to the plaintiffs.  It's important to know

 6  the amount that was paid for the rest of the class, and we're

 7  getting those contract files.  What we don't often know is the

 8  communication internally about how they got there or how they're

 9  not giving this person a fight or they're not giving that person

10  a contract.  And if you look -- and we have some documents that

11  we can provide to you from the FTC production, for example,

12  where there are communications about banning sponsors, those

13  sorts of things.  Those are the types of communications that

14  we're looking for.  We're not seeing the defendants --

15          THE COURT:  Refresh my recollection.  Didn't they agree

16  to do a search for all vendors?

17          MR. DELL'ANGELO:  With these very tight proximity

18  limiters that get you to -- get you to documents that reflect

19  contractual language, right.  So they are limited with a very

20  specific term, right, like exclusive or right or whatever.  But

21  that doesn't tell you -- and what it's clearly not returning and

22  telling you from having looked through these documents and

23  having had a team of people look through them, and I don't think

24  there's anything before you from the defendants that says

25  otherwise, that what you're not seeing, the documents that are

——TRANSCRIBED FROM DIGITAL RECORDING——

1   produced as a result of the application of those proximity

2   limiters that the defendant's using are documents that have

3   communications about those things, right, that are the

4   communications that often I think, as the Court has seen, use

5   all sorts of idioms and nicknames and that sort of thing.  Some

6   of which we found.  Others we haven't.

7        But this very kind of rigid process of looking through

8   the documents that was not used in the FTC production that

9   Mr. Kellner, you know, has explained in his declaration is

10  really appropriate for finding very specific types of documents

11  or categories of documents is fine as far as it goes, but it

12  doesn't get to the type of documents that are what I would say

13  are really the rest of the type of documents that are really

14  critical to the prosecution of this case and the types of things

15  that you're seeing indicia of in the samples that we provided to

16  you in the Joint Status Report.

17        So there were -- but what you did see in the Joint

18  Status Report in the defendant's section, for example, they took

19  issue with Barboza, right, a term -- a name that exists.  It's a

20  fighter's name.  It's on our search term list.

21        THE COURT:  It's also a Zuffa employee's name.

22        MR. DELL'ANGELO:  It's also a Zuffa employee.  And they

23  said, Well, look, your terms are clearly overbroad because we

24  have 29 documents that hit on Barboza who is an employee of

25  Zuffa.  And so the logical step they're asking you to make is

——TRANSCRIBED FROM DIGITAL RECORDING——

1   you should, therefore, throw out 600,000 documents and not

2   take -- have any look at them, right, notwithstanding the fact

3   that we can show you lots of documents that are responsive and

4   are not being turned up by their search.

5          But the reality is we, you know, on May 4th proposed a

6   way to fix that, right, to just separate out for the particular

7   employee and for the fighter.  And the mantra from the

8   defendants has been or the defendant has been that's backwards,

9   right.  You can't just go and, you know, weed things out when

10   you see a problem, but that's precisely what this document set

11   calls for.  And whenever a problem has been raised or they say

12   this particular term is overbroad, we've attempted to propose

13   some way to resolve it, but what, you know, they're really

14   asking for is this sort of

15   throw-the-baby-out-with-the-bath-water approach that says, you

16   know, notwithstanding the fact that we know that there's

17   relevant stuff in there, don't look at it anyway.  And I don't

18   really think it addresses their obligations.  And I think

19   clearly doing -- you know, adopting Zuffa's proposal would

20   clearly toss out an awful lot of, you know, responsive documents

21   that are critical to the case.

22          And if you, you know, you think, for example, that they

23   take issue with the fact that we found 14 documents in the

24   sample, but it is a sample of 1,500 documents that if you also

25   look at the timing, we had precious little time to get through

— TRANSCRIBED FROM DIGITAL RECORDING —

1  it from the time that it was produced till the time that the JSR

2  was provided.

3       But I think it's a sufficiently reliable sample in

4  terms of number and -- to, you know, give you comfort that, you

5  know, the continued application of our terms to those 600,000

6  documents or, you know, review of those 600,000 documents will

7  continue to yield responsive documents.  And I think, you know,

8  putting all of that into perspective, defendant has a little

9  over 500,000 documents that its terms hit.  We're talking about

10  another 600,000 documents.

11       So, you know, early on in the discovery process we

12  often heard that we didn't know what we were doing, and I think

13  when you look at all of the sorts of things that we uncovered

14  like the FTC documents, the deduplication issues, and everything

15  else, we do know what we're doing.  And I've done plenty of

16  these and lots of productions, particularly with multiple

17  defendants that are substantially larger --

18       THE COURT:  I certainly don't question your competence,

19  your dedication, or that of your consultant's.  You have a bona

20  fide disagreement with -- about what is reasonable.

21       MR. DELL'ANGELO:  Right.

22       THE COURT:  Not what you can do, but what is reason to

23  do.

24       MR. DELL'ANGELO:  And that's precisely what I'm getting

25  to.  So having actually done this an awful lot over the last,

1  you know, 19 or so years, most cases of this type, the

2  production of documents vastly exceeds the number of documents

3  that Zuffa would be required to review for production.  So in an

4  antitrust case where there are hundreds of millions of dollars

5  at stake and the class is roughly 1,000, you know, consists of

6  roughly 1,000 class members where there are documents for each

7  of those class members, like we have the contract files and that

8  stuff, to produce 1.1 million documents would be a relatively

9  small production.  I mean, oftentimes these things go into 5, 10

10 million documents.  You're dealing with documents in multiple

11 languages.

12       THE COURT:  My first civil lawsuit was MDL 453.

13       MR. DELL'ANGELO:  There you are.

14       THE COURT:  I was the grunt at the -- baby lawyer

15 looking at documents.

16       MR. DELL'ANGELO:  And so from your early days, you

17 know, I think the Court can --

18       THE COURT:  I have some appreciation.

19       MR. DELL'ANGELO:  -- appreciate that reviewing 1.1

20 million documents for production represents a very small corpus

21 of documents.  I mean, it's actually kind of surprising how

22 small the corpus is.  And, I mean, frankly, it's also kind of

23 surprising to hear that from the defendant's perspective that

24 they sincerely believe that reviewing those 600,000 documents is

25 such a tremendous burden.  I think it's not disproportionate at

---TRANSCRIBED FROM DIGITAL RECORDING---

1  all to the needs of this case.

2          And I guess I would say, we said it before, but, you

3  know, there is a proportionality standard and there are steps,

4  right, that the Court should look to.  And what you've never

5  heard from this defendant is an analysis of those requirements

6  for proportionality, right.

7          You've got -- and I think we blow past them in this

8  case.  I mean, you've got a $3.5 billion company.  You've got

9  the livelihoods of over 1,000 professionals, you know, at stake.

10 You've got a relatively small set of documents, 1.1 million, to

11 choose from in an antitrust case --

12         THE COURT:  So you want me to apply your 2,000-plus

13 search terms to in excess of 1.1 million documents?  At the end

14 of the day that's what you're asking me for?

15         MR. DELL'ANGELO:  No, not -- well, not quite.  I think

16 the Court has ordered and defendant -- I think the Court has

17 already ordered the application of Zuffa's search terms and the

18 FT -- and at the last status conference there was a colloquy

19 between the Court and Mr. Cove, and Mr. Cove agreed to apply the

20 FTC's search terms to the documents.

21         What we're asking you to do is with respect to the

22 remainder set of roughly 800,000 documents is to apply our

23 search terms which would yield the roughly 600,000 documents and

24 have that 600,000 reviewed and -- for production in addition to

25 the --

TRANSCRIBED FROM DIGITAL RECORDING

1          THE COURT:  Okay.  So 500 and 600 is 1.1, right?

2          MR. DELL'ANGELO:  Yes, that's correct.  But I just

3  wanted to be clear about the application of our terms because

4  there's the set that's sort of carved out already.  So ...

5          THE COURT:  Thank you.

6          MR. DELL'ANGELO:  Yes.  And then I assume we'll address

7  the FTC production -- collection separately.  Is that correct?

8          THE COURT:  Yes.

9          MR. DELL'ANGELO:  Thank you, Your Honor.

10          THE COURT:  Let me hear from Mr. Cove on the ESI

11  protocol resolution here.

12          MR. COVE:  Thank you, Your Honor.

13          Well, I guess dealing with the FTC separately is an

14  issue that should be thought about now.  We believe that all the

15  figures that Mr. Dell'Angelo were giving you --

16          THE COURT:  Well, let's cut to the chase.  You're

17  arguing that you shouldn't have to review 1.1 million documents,

18  and plaintiffs are arguing -- applying plaintiffs' search terms,

19  not manually review them all, because they've already lost that

20  battle.  You're arguing that it's too much work and not

21  proportional to this case.

22          MR. COVE:  Yes, that's my only point.  Let me get to

23  the search terms in a second, but my only point was, assuming we

24  are going to have to review some of the 1.7 remaining from the

25  FTC production in 2005 --

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1        THE COURT:  The stuff you found out about after you'd

2   contacted outside counsel that conducted the 2011 investigation

3   and the vendor?

4        MR. COVE:  To be clear, we contacted outside counsel

5   well before that and they were not aware of this.  And it was

6   only the e-discovery vendor that had, unknown to our client and

7   to --

8        THE COURT:  Your client didn't know the vendor

9   collected 1.8 million --

10        MR. COVE:  No, the client was well aware that the --

11   that the documents had been collected.  At the end of the FTC

12   investigation the e-discovery vendor returned the documents, the

13   original media, to the client.  The client destroyed it in the

14   normal course of business.  There was no reason to have it any

15   longer once the investigation was closed.

16        THE COURT:  And you didn't know the vendor kept a copy.

17        MR. COVE:  And we did not know the vendor kept a copy

18   of it, and that's why it took us a while to figure that out.

19   The former -- the counsel for the FTC matter for Zuffa did not

20   know about it either, and obviously we have discovered now

21   probably the vendor was --

22        THE COURT:  Now we're going to have to deal with it.

23        MR. COVE:  Now we're going to have to deal with it.  So

24   the numbers that we've been -- that Mr. Dell'Angelo and you have

25   been discussing, probably not the final numbers as to what will

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1  have to be reviewed.  So let me go back to -- then to the search

2  terms.

3          So let me just tell you first what we've done to be

4  clear since the last -- since the last status conference.  First

5  we've added the original FTC search terms.  Now, those were --

6  they had 50 or so fighter names with various subject matter

7  connectors.  We added all -- to update them, we added all of the

8  fighters' names that were -- that fought for Zuffa or competed

9  for Zuffa since December 2010 with proximity limiters with those

10  same subject matter headings.  So we've expanded those terms,

11  including the name of every fighter with those limiters.

12          We've also added about 300 new search terms based on

13  the sample documents and based on, you know, further analysis of

14  the documents themselves and what language the people used.

15          So, you know, and then -- so that's what we've done.

16  We've expanded our list.  Really they have not moved on their --

17  Mr. Dell'Angelo made a statement, Whenever they raise an issue,

18  we address it.  Well, I think if you -- I don't think that's an

19  accurate statement.  Whenever we raise an issue that gets to the

20  Joint Status Report, sometimes they address it.  And I think the

21  legal custodian issue is a very clear one on that.

22          In January we gave them a list of law firms that did

23  work for the company.  We -- and asked to exclude those.  We

24  provided more information -- asked to exclude just

25  communications between the legal custodians and those outside

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  law firms.  We provided more information about -- they asked for

2  more information.  We provided more information about all of the

3  law firms that did -- you know, for which there was a

4  substantial number of e-mails.

5        Until the Joint Status Report the only concession we

6  had from the plaintiffs on that was that we need not produce

7  documents from Campbell and Williams and from Boies Schiller

8  after the date of the complaint.  No other concession.  Then

9  when we raised the issue of Lewis and fighter names being the

10 same as law firm names, they gave a slight concession there.  So

11 it's not accurate to say that whenever we've raised an issue,

12 they've addressed it.

13       So we've had a total of 6,300 samples here.  And as we

14 pointed out, to the extent that any of those documents were

15 relevant, they were included in the fighter files.  The

16 fighters --

17       THE COURT:  Some of them.

18       MR. COVE:  Well, the ones -- you know, I think we

19 explained -- and I'm glad to talk about, you know, any

20 particular document you wish to talk about, but I don't think

21 that they have produced in all of those 6,300 samples a document

22 that is important or relevant to their claim.  And to the extent

23 that some are -- you know, arguably touch upon these issues, I

24 think searches are not perfect.  They're not entitled to perfect

25 recovery.  They're entitled to a proportionate recovery here.

---TRANSCRIBED FROM DIGITAL RECORDING---

1  The search --

2          THE COURT:  Which is the question that I started off

3  asking you that you haven't answered yet, which is, we're down

4  to identifying what they want and what you want, at least

5  with -- setting aside the 1.8 million from the FTC production

6  that you just learned about.

7          MR. COVE:  Yes.

8          THE COURT:  Why is your proposal in a case of this

9  magnitude more reasonable and proportional than theirs?

10         MR. COVE:  Well, because it captures -- our search

11 terms capture all of the important issues.  They've -- I mean,

12 this -- talking about the total number of documents is not -- is

13 not necessarily meaningful here.  First, Zuffa is not --

14         THE COURT:  No, but you're arguing burden.

15         MR. COVE:  Right.  No.  But -- so it's true that in

16 antitrust cases there have been cases in which millions and

17 millions of documents have been produced, and there were

18 warehouses full of boxes, and those boxes contained sales

19 invoices.

20         THE COURT:  In the old days people used to do document

21 dumps and give you absolutely everything --

22         MR. COVE:  Right, right.

23         THE COURT:  -- and see if you could find anything.

24         MR. COVE:  I remember when I was with DOJ, I was a

25 defense attorney who negotiated the subpoena and called up a

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1    week before the subpoena was due to say, Where should -- should

2    I pull the truck right up to the courthouse?  I've got a tractor

3    trailer full of stuff here.

4         But what we're talking about here is not those kinds of

5    documents, not routine sales documents, not invoices, and all of

6    those things that can add up.  These are e-mails with at least

7    three legal custodians.  They need to be reviewed carefully for

8    privilege.  They need to be reviewed -- you know, I think we've

9    seen -- the idea that we can rely on a clawback provision here

10   and without -- without reviewing those documents is going to

11   ultimately not work.  There are personal stuff in there that has

12   to be looked at.  We have 750,000 cell phone messages at this

13   point in time which we are not using search terms for which we

14   are reviewing manually.

15        So I think when you look at the universe, you have to

16   look at all of the things we are reviewing manually as well.  So

17   what we're -- what this group of documents is is really the

18   e-mails that will have to be reviewed, you know, in many cases

19   word for word, and that's going to take a lot of time and a lot

20   of money.

21        And the search terms that we have are reasonable.  I

22   mean, they're extensive, you know.  They talk -- they have

23   stand-alone terms like all of the competitors' names and names

24   associated with the competitors and exclusive and terms that are

25   all generally developed to address the clauses in the contracts

——TRANSCRIBED FROM DIGITAL RECORDING——

 1  that are the subject of the complaint that they've complained

 2  about.  We've added things like performance bonus.  It isn't

 3  really in the complaint, but if they want documents about

 4  performance bonus, they can have it.  There's no antitrust

 5  theory where performance bonuses are an anticompetitive tactic,

 6  that I know of.

 7        So at this point we think what we've got is a very

 8  reasonable set to move forward on that we can move forward

 9  quickly on, and, you know, coupled with whatever we do on the

10  FTC production will get them what they need.  You know, I

11  understand as a plaintiff you don't want to leave any stone

12  possibly unturned anywhere, and there could be a one-word e-mail

13  which, you know, you think is probative.  But this is a

14  monopolization case.  They have to prove, you know, the effects

15  of the conduct.  They've got tremendous amounts of data.

16  They've got all of the exchanges and communications with

17  fighters.

18        And by the way, you mentioned sponsors.  We have in

19  fact agreed to provide and are providing the hard-copy vendor,

20  sponsor, and venue files -- merchandise, vendor, and sponsor

21  files so --

22        THE COURT:  Stand alone or are you doing a --

23        MR. COVE:  Those are being reviewed -- the hard copy --

24  they have a file for each sponsor, for each venue.  Those are

25  being reviewed.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1            THE COURT:  You're manually reviewing them now?

2            MR. COVE:  Manually reviewing those, yes.

3            THE COURT:  And not applying search terms to them?

4            MR. COVE:  Correct.  Hard-copy files, yes.

5            So, you know, those things are being addressed.  Is

6    it -- there's no dispute that there were lists of sponsors that

7    could not be used because they -- you know, if Bud Light is the

8    sponsor, a fighter could not come in with a Miller beer t-shirt.

9    That's not a -- that's not a dispute in the case, and they'll

10   get all of those documents as to why certain sponsors were

11   allowed and certain sponsors had a conflict and those sorts of

12   things.

13           So that kind of -- all of that stuff they would get.

14   They haven't shown through their sample documents that they are

15   missing anything that is in fact important or that is not

16   duplicative.  I mean, if there's a colorful e-mail that says,

17   you know, UFC is the biggest kid on this block, well, there's

18   going to be 10,000 documents in which people make statements

19   like that.  So the fact that one of them may -- some medical or

20   something like that may be missed is not -- does not justify the

21   millions of dollars that would be expended in reviewing those

22   other documents.  So that is our position.

23           We think we can move forward now.  I think we -- with

24   certain exceptions, we could satisfy the June 1st deadline, but

25   there are some exceptions.  Mr. Hendrick's file which we were

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1   delaying reviewing in hopes of making more progress on legal

2   custodians will probably not be ready by June 1st.  The cell

3   phone messages probably won't be ready by June 1st.  And this

4   FTC production won't.  But, otherwise, we were -- we have been

5   working very hard to get there.  We hope we can get there.  We

6   think we can get there based on that universe.  So that's where

7   we stand.

8           THE COURT:  Let me turn then to the FTC issue.

9   Mr. Dell'Angelo?

10          MR. DELL'ANGELO:  Thank you, Your Honor.

11          Can I just make a comment or two in response to

12  Mr. Cove's argument?

13          THE COURT:  Yes, sir.

14          MR. DELL'ANGELO:  Thank you.

15          You know, I just would note, because this has been --

16  this has been a continuing issue.  I mean, you asked the

17  question several times, and we listened carefully and I hope you

18  did as well.  But Mr. Cove never really answered the fundamental

19  question about, you know, why our terms are not reasonable or

20  demonstrated, you know, why reviewing and producing the 600,000

21  documents that our terms hit on are not --

22          THE COURT:  He's just told you that he can

23  substantially complete the production by June 1st except for a

24  couple of categories of information and not talking about the

25  1.8 million FTC issue.

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1          MR. DELL'ANGELO:  Okay.  That -- you know, I was really

2     getting to the proportionality issue.

3          THE COURT:  No, I understand.  And he told me it was

4     going to cost millions of dollars to do it.

5          MR. DELL'ANGELO:  Well, sure, but it still doesn't get

6     to the issue of what's actually -- why our terms are not

7     reasonable.  I mean, that showing has never really been made.

8     Or why their terms get at what --

9          THE COURT:  Didn't Ms. Moure's declaration last time

10    and now kind of clarify their consultant's view of this

11    situation?

12         MR. DELL'ANGELO:  Sure.  And I think Mr. Kellner

13    responded to that, and I understand your ruling --

14         THE COURT:  I know you disagree, but the point is

15    they're not ignoring it.

16         MR. DELL'ANGELO:  Well, you know, I listened carefully

17    and I still didn't hear the answer of why, you know, this is

18    really not proportional to the needs of this case or what the

19    issues are.  And I just, you know, would also add.  This is a

20    monopolization case.  So, you know, antitrust -- or

21    anticompetitive intent is critical.  So, you know, getting a

22    contract with the amount in it is fine as far as it goes, but

23    that language of communication that we've been talking about,

24    communications that reflect intent are not going to be found by

25    those proximity limiters.  All right.  I'll move onto the FTC

─TRANSCRIBED FROM DIGITAL RECORDING─

1   issue.

2          So I think the FTC issue, it raises a number of really

3   significant concerns for us.  The request --

4          THE COURT:  And so that we're on the same page, you're

5   talking about learning for the first time that there's 1.8

6   million documents that you didn't know existed before?

7          MR. DELL'ANGELO:  That's correct.  So --

8          THE COURT:  Because you were advised of Zuffa's

9   aggressive document destruction policy and you were concerned

10  about the dearth of e-mail communications and now know they

11  exist.

12         MR. DELL'ANGELO:  In effect.  I mean, the way -- I

13  think it's important to understand how this came to be.  At the

14  last status conference -- the last status conference or the last

15  two status conferences, you know, you asked for the FTC

16  protocol, the protocol that was applied to search for the FTC

17  documents.

18         THE COURT:  I asked if they knew about it, and then I

19  directly told them --

20         MR. DELL'ANGELO:  To get it, right.

21         THE COURT:  -- to produce it, yes.

22         MR. DELL'ANGELO:  And so what we got in response were

23  the search terms, and we ran those search terms against the

24  documents --

25         THE COURT:  And you figured out they had to have done

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1    something more because there's search terms --

2            MR. DELL'ANGELO:  Right.

3            THE COURT:  -- in the collection of documents.

4            MR. DELL'ANGELO:  So we said, What's the actual

5    protocol?  And the letter that we got back talked about the

6    collection of documents.  So we asked what I think is the

7    fundamental question that you would expect any producing party

8    to ask when they're collecting documents for production is, does

9    this collection still exist?  And I'd like to put a fine point

10   on this.

11           Look, we understood -- and I'm sure Mr. Cove will give

12   you his perspective here, but what we understood is that Zuffa

13   had to work with the vendor to recreate the FTC production.  So

14   as I understand it, Zuffa is dealing with prior counsel and the

15   vendor to recreate the FTC production that then led to all of

16   these clawback issues so it had to be done again.  Maybe they

17   did that with their current vendor, but nevertheless, they were

18   dealing with the vendor and never asked this fundamental

19   question about whether or not the documents still existed.

20           And what we were told and what you, the Court, relied

21   on in making decisions about custodians and all sorts of other

22   things that we've been dealing with since September of last

23   year, right, were that these documents didn't exist.  Or that

24   documents, you know, largely for this time period back to 2005

25   didn't exist because of, you know, the company's destruction

──────TRANSCRIBED FROM DIGITAL RECORDING──────

1   policy.

2          And so what we discover, right -- so we wrote to Zuffa

3   and said, you know, We have your protocol as far as it goes.  Do

4   these documents still exist?  Please ask, right.  And on April

5   25th we finally got -- so a year to the day after we filed our

6   document requests, we got the answer.  It turns out they do

7   exist, right.  We ask the basic question that we really should

8   have asked all along, and they exist.

9          So, we now have 1.8 million documents from the FTC

10  collection that are for many of the custodians who've already

11  been ordered by this Court to be produced.  They largely cover

12  the relevant time period.  I understand that there's some

13  portion of those documents that Zuffa's vendor could not

14  identify a date for, but many of them cover the date period.

15         I understand those documents have been deduplicated,

16  but no winnowing has been applied to them.  But, you know, these

17  documents from our perspective are really critical to this case

18  for a number of reasons.  The first is they cover the relevant

19  time period the Court's already ordered.  14 of the 22

20  custodians that the Court has already ordered have documents

21  within that set.

22         And what I find shocking, Your Honor, is we had a meet

23  and confer yesterday with the defendant about these documents.

24  And what they offered is that of the 14 custodians who have

25  documents within the FTC collection, who are also custodians

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1   that this Court has already ordered the defendant to produce

2   documents from, they would give documents to us from six of

3   those.  And the other eight they for custodians whom the Court

4   has already ordered, you know, at least as of this writing are

5   unwilling to even produce, which to me is not even complying

6   with the order the Court has already set into place.

7         But the documents are also important because they cover

8   a significant number of Strikeforce custodians.  So Strikeforce

9   was an entity, potential competitor, that from our perspective

10  Zuffa was, you know, trying hard to get rid of and did so by

11  acquiring.  And so there's no third-party discovery, as we

12  understand it, that could be done of Strikeforce.  That

13  Strikeforce discovery needs to come from Zuffa.

14        And during the negotiations about custodians --

15        THE COURT:  Well, presumably, the human beings still --

16        MR. DELL'ANGELO:  But their documents presumably -- you

17  know, we understood from Zuffa that they had, you know, acquired

18  the company and destroyed the documents in the regular course.

19  Turns out, you know, they exist.  They're in the FTC collection.

20        And what's particularly notable here is Scott Coker,

21  the former CEO of Strikeforce who I mentioned before, his

22  documents were searched with no search terms when Zuffa was

23  collecting documents to respond to the FTC.  We identified him

24  as a custodian early on and went several rounds with the

25  defendant because he was on their organizational charts as an

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1  employee for some time.  And we were really adamant we wanted

2  him as a custodian because we thought he was important given,

3  you know, the repeated allegations in the case that specifically

4  identify Strikeforce.

5        And we were told, you know, There are no documents from

6  Mr. Coker.  We don't have any.  So we didn't include him as a

7  custodian or at least ESI.  So it turns out that there's quite a

8  bit of documents from Mr. Coker in the FTC production.  So, you

9  know, at a minimum, I think what has to happen here and we'd

10  like to suggest is that there are three categories of

11  custodians.  So I think we got a slightly different breakdown by

12  letter on Friday night than what's provided in the supplemental

13  Joint Status Report that was filed on Friday as well.

14        But what Zuffa did is broke down the custodians into

15  three groups.  One is 14 ordered custodians.  So those were

16  custodians who the Court has already ordered Zuffa to produce

17  documents from who also have documents in the FTC collection.

18  That's Michael Mersch, Kirk Hendrick, Tracy Long, Lorenzo

19  Fertitta, Craig Borsari, John Mulkey, Peter Dropick, Bryan

20  Johnston, Joe Silva, Lawrence Epstein, Michael Mossholder, Dana

21  White, Reed Harris, and Sean Shelby.

22        I think really without question, wherever the Court

23  comes down on the application of search terms, those custodians

24  need to be included within the scope of the order, right.  They

25  are already the ordered custodians.  They have documents.

1  They're for the relevant time period.

2       There's also a second category which are Strikeforce

3  employees and then a third category which are other Zuffa

4  employees who are not ordered custodians.

5       I would like to suggest, Your Honor, with your

6  direction that if the Court is not prepared to just order the

7  application of the existing search terms, plaintiffs' terms and

8  defendant's terms, to the FTC production and just have them

9  produced after any additional, you know, winnowing and

10  already-agreed-to winnowing and deduplication may be applied,

11  that we have some opportunity to, you know, test those documents

12  and do it in a very short period of time.  I mean, there's

13  certainly a number of Strikeforce employees who I think are

14  critical custodians for this case that we thought, like

15  Mr. Coker as well as Andrew Abel, Michael Fromowitz, Richard

16  Chao, Shannon Knapp, that were really lost to this case and have

17  documents that are pretty critical.

18       And I want to hone in on one thing yesterday.  On our

19  meet and confer yesterday, there's something I sought to clarify

20  in the letter that we were provided by Zuffa on Friday night

21  that expanded on this FTC collection.  And what the letter said

22  is we have the 1.8 million documents.  We then extracted the FTC

23  production, the documents we've already produced to you, roughly

24  100,000.

25       THE COURT:  108,000.

1       MR. DELL'ANGELO:  Right.  So we now have roughly 1.7

2  million documents.  And we applied our search terms, that is

3  Zuffa's search terms, and the FTC search terms to that set of

4  1.7 million documents.  And that raises a couple of issues

5  because it doesn't tell me what happens if you apply plaintiffs'

6  search terms to those documents, you know, what the results are.

7  But there are some statistics about what happens.

8       But what was unclear to me and we clarified yesterday

9  is why Zuffa would apply the FTC search terms to the FTC

10  collection if it had already extracted, you know, the documents

11  that it produced.  And the answer was what I thought it would

12  be, which is, Well, your requests in this case are broader than

13  the scope of the requests in the FTC case.  So there are

14  documents in the FTC collection -- and this is the concession we

15  got yesterday, in effect.  There are documents in the FTC

16  collection that are responsive --

17       THE COURT:  Well, that's hardly surprising given what

18  the FTC was investigating.

19       MR. DELL'ANGELO:  That's precise -- but hardly

20  surprising that that collection would have responsive documents,

21  and I just want to be clear and I think we heard it yesterday

22  from the defendant during the meet and confer, that there are

23  potentially responsive documents in there.  And I think really

24  you know -- we know enough about this case to know that it's

25  really without a doubt that that's the case.

1        But, you know, we -- it took us a year of pushing this

2  defendant on all sorts of issues, you know, prying information

3  out about deduplication, about threading, about clawbacks, about

4  these FTC documents to get to this point.  We're 13 months after

5  the document requests in this case have been -- been served.

6  The motion to dismiss was decided in September.  Substantial

7  completion is supposed to be on June 1st.  We have been at this

8  process for months.

9        And what we have heard is that, you know, plaintiffs'

10  search terms shouldn't be applied because it's not proportional.

11  We're still not really clear why.  I don't think we've really

12  heard that answer.  That they're -- you know, it's too

13  burdensome, but, you know, you look at the evidence and you

14  realize the defendant has created its own burden in many ways by

15  the way it really can't thread without losing side

16  conversations, including hundreds of thousands of duplicates in

17  the set.  We think we need to get this case moving.  Stop this

18  process because --

19        THE COURT:  Have you reviewed everything that you've

20  received so far?

21        MR. DELL'ANGELO:  We have -- we have, actually.  Part

22  of what we did was that triage review that I talked to you about

23  with respect to the production.  I mean, we -- there's a

24  second-level review that will follow that, but, I mean, we're

25  sort of waiting at this point -- although let me be clear.

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

1          We actually did get a production the other day.  So to

2   be completely clear, no, we haven't reviewed the production we

3   got the other day.  But I also don't think it will take terribly

4   long to get through it.  But, you know, in the normal course we

5   would be taking depositions right now, not arguing about, you

6   know, applying search terms.

7          And I think the other thing I want to make clear is for

8   all of the proportionality and burden and expense arguments that

9   you've heard up here today, we, the plaintiffs, as I see it,

10  have removed about half a million documents or 550,000 documents

11  from the set from winnowing proposals and the deduplication

12  method that we asked to be applied.  We in effect are removing

13  the burden from the plaintiff, and we are spending an awful lot

14  of time and money to do it.

15         So whatever you may be hearing about the cost or burden

16  of reviewing, you know, what I think is a very reasonable number

17  of documents, that burden has effectively been shifted to us in

18  many ways to get the set down.  It's the sort of thing that I

19  would expect a producing party to do in any event, and those

20  sorts of things that we did and got it done.

21         So what I'd say is if the Court's not prepared,

22  although I would encourage it, to order production of the FTC

23  collection with the application of, you know, each of the

24  various search term proposals to at least get the ordered

25  custodians and the Strikeforce custodians produced so that we

──── TRANSCRIBED FROM DIGITAL RECORDING ────

 1  can get -- you know, have the search terms applied to them and

 2  get those documents produced so we can get this case to where it

 3  needs to be and kind of end this, you know --

 4        THE COURT:  If I follow your proposal and I apply your

 5  search terms to the FTC documents because there's documents that

 6  exist in that universe that no longer exist in Zuffa's

 7  possession.

 8        MR. DELL'ANGELO:  That's correct.

 9        THE COURT:  Are you willing to review them for

10  responsiveness, just take the whole collection culled of

11  privilege?

12        MR. DELL'ANGELO:  We absolutely are.  And I guess I

13  want to make one point there because I cut short my comments

14  about, you know, responding to Mr. Cove's earlier point.  You

15  know, I take exception to the comment about the clawback.  I

16  think the Court recognized last time, we have been very

17  professional I think and very quick --

18        THE COURT:  Everybody was nice last time and things

19  have deteriorated.

20        MR. DELL'ANGELO:  When we have identified a privileged

21  document, we've let them know, right.  The document at issue,

22  you know, I don't see it as a clawback issue, right.  You know,

23  it was produced.  We were told that there was lots of privilege

24  review being done.  It was clawed back by them.  We fought about

25  it, but the bottom line is when we've seen something that we

———TRANSCRIBED FROM DIGITAL RECORDING———

 1  think is privileged, we've promptly let them know.

 2          In fact, they wouldn't have even known I think until

 3  God if knows when about the, you know, numerous privileged --

 4  potentially privileged documents --

 5          THE COURT:  Because you followed your legal obligation

 6  to disclose.

 7          MR. DELL'ANGELO:  We did, and we'll continue to do

 8  that.  And I just want to be clear.  So there shouldn't be real

 9  hesitation about if the Court's prepared to order the FTC

10  collection for our review, we'll do it.  We'll do it

11  expeditiously.  If there are privilege issues, we'll handle them

12  professionally as we've -- you know, as we have throughout.

13  So ...

14          THE COURT:  Thank you.

15          MR. DELL'ANGELO:  You're welcome.

16          THE COURT:  Mr. Cove?

17          MR. COVE:  Yes.  Before I get to the FTC, let me make

18  clear, and I think I actually may have skipped it in my oral

19  remarks, as to why -- what is wrong with plaintiffs' search

20  terms.  It still includes as a stand-alone term every --

21          THE COURT:  I understand that.

22          MR. COVE:  Okay.

23          THE COURT:  I mean --

24          MR. COVE:  I hadn't mentioned it because I thought you

25  did.

```
─────── TRANSCRIBED FROM DIGITAL RECORDING ───────
```

1           THE COURT:  -- you're beating this to death.

2           MR. COVE:  But Mr. Dell'Angelo says he didn't hear it.

3    I wanted to make sure that it was out there.  Okay.  I won't

4    repeat that.  And the other terms like answer and so forth that

5    are --

6           THE COURT:  And trouble.

7           MR. COVE:  Yes.

8           Now, let's -- let me talk generally about the FTC

9    investigation.  It was an -- you know, the FTC doesn't always

10   say exactly what it's doing and what it's investigating.

11          THE COURT:  It did send you a subpoena duces tecum?

12          MR. COVE:  Yes.  Oh, yes.  They sent it to Zuffa.

13   Prior counsel handled it, and we've sent those -- we provided

14   the requests to the plaintiffs.  They were investigating the

15   Strikeforce acquisition.  But to investigate whether an

16   acquisition violates the antitrust laws, the FTC necessarily has

17   to investigate the entire market to see how competition

18   operates, and clearly they looked at things like sponsor

19   contracts and things like that.  That kind of material is in

20   the -- in the production, which isn't to say that their

21   investigation was as broad as the wide-ranging complaint that

22   the plaintiffs have issued here which includes things like

23   refusal to cooperate with competitors as an antitrust violation.

24   I'm sure the FTC was not investigating refusal to co-promote.

25          But anyways, when the FTC issue came up, the -- what we

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  tried to do to get -- to get the plaintiffs documents as quickly

2  as possible was to turn that corpus over that had been turned

3  over to the FTC as quickly as we could.  Some complications

4  arose because we had to notice certain third parties, which led

5  to the problems that led to the clawback.

6      But the idea was to get those core documents which

7  addressed the core issues relating to competition that the FTC

8  was looking at, including past acquisitions and so forth, in

9  addition to the Strikeforce acquisition.

10      So anyways, that's what happened.  And right now we

11  have a situation where we have discovered these other documents.

12  Should we have discovered them sooner?  I guess we should have,

13  but we didn't.  But right now we have, for the numbered

14  custodians, the ordered custodians, the 14 ordered, the 14

15  custodians who -- which is the subset of the 22 in this case

16  that have documents --

17      THE COURT:  Explain the 14 of the 22 subset that you

18  think is more appropriate than the 22.

19      MR. COVE:  Well, there's 22 custodians you ordered in

20  this case.

21      THE COURT:  Correct.

22      MR. COVE:  And of those 22, 14 have -- were custodians

23  for the FTC.

24      THE COURT:  For the FTC collection.  Okay.  Now I

25  understand.

TRANSCRIBED FROM DIGITAL RECORDING

1      MR. COVE:  And then there are a number of Strikeforce
2  custodians, and those documents -- Strikeforce documents that
3  were responsive were produced to the FTC.  So it's not as if
4  there was some implication that they hadn't gotten the
5  Strikeforce documents.  Whatever Strikeforce documents were
6  produced to the FTC, which are all in the possession of Zuffa at
7  that time --
8      THE COURT:  Sure, but the plaintiffs are looking for
9  much broader information than what the FTC was looking for.
10      MR. COVE:  Right.  Right, right.
11      And then there's a third category of other Zuffa
12  employees who -- who were not among the 22 ordered custodians
13  here.  We think they should completely be off the table.
14  They -- you know, they weren't ordered here.  When 22 custodians
15  were ordered, there was an understanding there would be some
16  kind of meaningful search terms and we think there's no reason
17  to add them now.
18      We think - our opening position with plaintiffs was
19  that, you know, we would provide -- stick to core custodians who
20  deal with the important issues in this case.  That's not set in
21  stone.  It was an opening offer.  We asked them what they really
22  wanted.  Didn't get an answer.
23      So what we proposed to do is go with those six
24  custodians, and if they want to pick a Strikeforce custodian or
25  two, and some of them have a lot of documents.  Mr. Abel has

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

1  250,000.

2  THE COURT:  Are there likely to be privileged documents

3  in those?

4  MR. COVE:  Yes.

5  THE COURT:  How so?

6  MR. COVE:  There are -- there are privileged documents

7  that Strikeforce's lawyers sent to Strikeforce employees or, you

8  know, in negotiating contracts and so forth, those sorts of

9  things.  So there were claims of privilege made in the FTC

10  production with regard to Strikeforce documents.  Obviously we

11  haven't gone back and reviewed those claims for privilege, but

12  they appear to be --

13  THE COURT:  So presumably you have a privilege list?

14  MR. COVE:  So, yeah, I mean, there was a -- there

15  was -- they're on the privileged log that was provided to the

16  FTC which we provided to the plaintiffs.  So, yes, there are

17  privileged documents, and presumably there are privileged

18  documents in the set that hasn't been reviewed of the 1.7

19  additional documents.

20  We think, you know, just turning things over, as

21  Mr. Dell'Angelo suggested at the end, we think is completely

22  inappropriate for any of these documents because, one, there is

23  personal material in here.  And people do have a privacy

24  interest in their personal material.  Two, when we talked about

25  the privilege -- the clawback issue at the last hearing, we

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1  agreed that Mr. Dell'Angelo had acted appropriately in notifying

2  us of these documents, but we set this out in the Joint Status

3  Report and I don't know if you want to hear it here.  But our

4  understanding and our agreement with Mr. Dell'Angelo was that

5  with -- that they would continue not to review things that had a

6  slip sheet with a privilege error.  And, you know, we suddenly

7  started getting letters from Mr. Rayhill which indicated that

8  they had reviewed such documents.  They did have these privilege

9  slip sheets, notwithstanding Mr. Dell'Angelo's letter in which

10  he represented -- well, notwithstanding his agreement --

11       THE COURT:  The theory is that the plaintiffs' team

12  isn't on the same page because you reached a deal with

13  Mr. Dell'Angelo that there isn't clearly enough communicated

14  with other members of the team.

15       MR. COVE:  We don't know what happened there.  We know

16  that we started getting letters from Mr. Rayhill on the subject.

17       THE COURT:  Not Mr. Dell'Angelo.

18       MR. COVE:  When we asked Mr. Dell'Angelo, he said, Talk

19  to Rayhill.  So that's -- you know.  This is an issue for us,

20  and it's a real genuine issue.  And the cost of fighting one

21  privilege motion can be very high.  We've already had to fight

22  two here because of clawbacks which, you know, if we don't do

23  the review up front is going to be an additional cost and a

24  burden going forward.

25            So I think, you know, right now our proposal to do --

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1    to pick the six core custodians or some number is the way to go.

2    I don't think that a long sampling process is going to be

3    necessarily productive --

4            THE COURT:  Here's what I'm going to do with respect to

5    the FTC documents.

6            MR. COVE:  Okay.

7            THE COURT:  I'm going to give you until Friday to

8    submit your competing proposed orders about what should be

9    ordered from the FTC production.  So meet and confer, agree to

10   the extent you can agree on anything, and give me your separate

11   proposals in the form of an order, and I'll pick one or do a

12   hybrid.

13           MR. COVE:  Thank you, Your Honor.

14           THE COURT:  Okay?  Friday at 4 o'clock, please.

15           MR. COVE:  I'm sorry.  I didn't hear you.

16           THE COURT:  Friday at 4 o'clock.  All right.

17           Did you have a question, Mr. Dell'Angelo?

18           MR. DELL'ANGELO:  No.  May I make a comment, Your

19   Honor?

20           THE COURT:  Yes, sir.

21           MR. DELL'ANGELO:  So I just want to make one comment

22   about the -- Mr. Cove's presentation about this clawback.  We

23   cite this in our JSR.  Their -- on page 32, line 2.  On February

24   3 we sent the defendants an e-mail that made it very clear that

25   we were resuming our normal review of the FTC documents.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1        THE COURT:  I read it.

2        MR. DELL'ANGELO:  Okay.  Just I -- just concerned

3  because I don't think the representation you received was

4  accurate, and I wanted to be clear that we --

5        THE COURT:  Resuming your normal review and reading the

6  text of something you agreed not to review are two different

7  things, aren't they?

8        MR. DELL'ANGELO:  Well, there's a separate issue there

9  because, first of all, what preceded that e-mail was a separate

10  discussion and e-mail where we said we were resuming our normal

11  review --

12        THE COURT:  And then you got the February 12th new and

13  improved version of what the FTC actually got, and you didn't

14  download it because you made a mistake on your side.

15        MR. DELL'ANGELO:  And, actually, there's a

16  miscommunication between us and the vendor, but let me be clear

17  about something.  And maybe this is not clear enough in the

18  Joint Status Report, and if it's not, I apologize, but when the

19  initial review of documents was done on the first set, attorney

20  notes were taken.  Right.

21        THE COURT:  Yes.  And you put it in your database and

22  coded them and so forth.

23        MR. DELL'ANGELO:  Right.  And then the problem is when

24  you put an overlay on and then you do a search --

25        THE COURT:  You have to do a do-over.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1        MR. DELL'ANGELO:  Well, but you realize that you have

2   attorney notes on documents that later had a slip sheet that we

3   weren't told were being clawed back.  So the review --

4        THE COURT:  It cost you extra work, too.

5        MR. DELL'ANGELO:  No, no.  The point is that the review

6   of those documents, those handful of documents with the slip

7   sheet, was not after they were reproduced, but before.  Right.

8   So they were reviewed with the first production.  Attorneys are

9   making notes, and then you get the overlay production.  So what

10  that overlay production does is it keeps the attorney note

11  there, because that's our work product that's in the database,

12  and it takes out the document that was clawed back and puts in a

13  slip sheet.  Right.  So it continues -- so what it does is it

14  associates that note with what's now a slip sheet.

15       So when we searched for all of the slip sheets, you

16  find, Oh, we actually had already reviewed that document because

17  it was just a document without a slip sheet.  And what they've

18  done is tried to flip that on its head and say, See, you

19  reviewed documents when you shouldn't have.  And it's just not

20  true and, frankly, it's offensive.  And I just wanted to be

21  clear because I think we've tried to act honestly in this

22  process.

23       THE COURT:  Thank you, sir.

24       MR. DELL'ANGELO:  Thank you.

25       THE COURT:  All right.  I'll hear your proposals until

Friday. I am going to adopt Zuffa's position with respect to Zuffa's search protocol with respect to the Zuffa collection and -- but I will enter a separate order with respect to the FTC collection of the 1.7 or 8, depending on what you count, production. And that's what I expect you to give me a proposed protocol and proposed order on by Friday. Okay?

MR. DELL'ANGELO: Thank you, Your Honor.

MR. COVE: Thank you, Your Honor.

THE COURT: We are adjourned.

(Whereupon proceedings concluded at 10:29:22 a.m.)

--oOo--

I, Patricia L. Ganci, court-approved transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ PATRICIA L. GANCI — May 20, 2016
Patricia L. Ganci — Date