# EXHIBIT A

# 2/8/2017 Zelaznik Depo Tr. Excerpts

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon )
Fitch, on behalf of )
themselves and all others )
similarly situated, )
)
          Plaintiffs,)
)
  v. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
          Defendant. )
_____)

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MARSHALL ZELAZNIK

SANTA MONICA, CALIFORNIA

FEBRUARY 8, 2017

11:18 A.M.

Reported by:
Cheryl M. Haab, CSR No. 13600, RPR, CLR
Job No. 48484

### Page 2

```
 1           UNITED STATES DISTRICT COURT
 2               DISTRICT OF NEVADA
 3
 4   Cung Le, Nathan Quarry, Jon  )
     Fitch, on behalf of          )
 5   themselves and all others    )
     similarly situated,          )
 6                                )
              Plaintiffs,)
 7                                )
         v.            ) Case No.
 8                     ) 2:15-cv-01045-RFB-(PAL)
     Zuffa, LLC, d/b/a Ultimate   )
 9   Fighting Championship and    )
     UFC,                         )
10                                )
              Defendant. )
11   _____)
12
13
14       CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARSHALL
15   ZELAZNIK, taken at 401 Wilshire Boulevard, Suite 850,
16   Santa Monica, California, on Tuesday, February 8, 2017,
17   at 11:18 a.m., before Cheryl M. Haab, Certified
18   Shorthand Reporter, in and for the State of California.
19
20
21
22
23
24
25
```

### Page 3

```
 1   APPEARANCES:
 2   For Plaintiffs:
 3     JOSEPH SAVERI LAW FIRM
       555 Montgomery Street, Suite 1210
 4     San Francisco, California 94111
       BY:  KEVIN E. RAYHILL, ESQ.
 5          krayhill@saverilawfirm.com
            MATTHEW S. WEILER, ESQ.
 6          mweiler@saverilawfirm.com
 7   For Defendants:
 8     BOIES, SCHILLER & FLEXNER LLP
       1401 New York Avenue, NW
 9     Washington, DC 20005
       BY:  NICHOLAS A. WIDNELL, ESQ.
10          nwidnell@bsfllp.com
11     BOIES, SCHILLER & FLEXNER LLP
       1999 Harrison Street, Suite 900
12     Oakland, California 94612
       BY:  BRENT K. NAKAMURA, ESQ.
13          bnakamura@bsfllp.com
14   Also Present:
15
       TIMOTHY BELLAMY, ESQ.
16     JOHN AZPILICUETA, Videographer
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1                        INDEX
 2   WITNESS:  Marshall Zelaznik
 3
 4   EXAMINATION                              PAGE
 5   By Mr. Rayhill                             7
 6   By Mr. Widnell                           189
 7
 8
 9
10                       * * *
```

### Page 5

```
 1                  INDEX TO EXHIBITS
 2   EXHIBITS                             MARKED
 3   Exhibit 173  E-mail string (ZFL-0916001-003)    44
 4   Exhibit 174  "Re: Canadian Broadcast            57
                  Agreement - UFC Content" dated
 5                March 4, 2011 (ZUF-00228479-486)
 6   Exhibit 175  E-mail string (ZFL-0916483-485)    77
 7   Exhibit 176  E-mail string (ZFL-2544420)        98
 8   Exhibit 177  E-mail string (ZFL-0949863-866)   105
 9   Exhibit 178  E-mail string (ZFL-09411497)      110
10   Exhibit 179  E-mail string (ZFL-1002878-879)   113
11   Exhibit 180  E-mail string (ZFL-1001761-763)   116
12   Exhibit 181  E-mail string (ZFL-2489879-881)   128
13   Exhibit 182  E-mail string (ZFL-1121583-585)   134
14   Exhibit 183  "ZFL1514933 12'13 Zuffa IS YTD    141
                  Side by Side"
15
     Exhibit 184  "Marketing and Promotion Services 151
16                Agreement" (ZUF-00228470-478)
17   Exhibit 185  E-mail string (ZUF-00108790-797)  155
                  and attachment (ZUF-00108886-928)
18
     Exhibit 186  E-mail string (ZFL-1448354)       168
19
     Exhibit 187  E-mail string (ZFL-2492376)       174
20
     Exhibit 188  E-mail string (ZFL-0973145-149)   177
21
     Exhibit 189  E-mail string (ZFL-1498982)       184
22
23
24
25
```

MARSHALL ZELAZNIK - CONFIDENTIAL

### 6

| | |
|---|---|
| 1 | FEBRUARY 8, 2017, 11:18 A.M. |
| 2 | SANTA MONICA, CALIFORNIA |
| 3 | --oOo-- |
| 4 | THE VIDEOGRAPHER: Good morning. This begins |
| 5 | Media No. 1 to videotaped deposition of Marshall |
| 6 | Zelaznik, in the matter of Cung Le et al., versus |
| 7 | Zuffa, LLC, et al. This case is in the United States |
| 8 | District Court, District of Nevada, with case number |
| 9 | 2:15-cv-01045-RFB. Today's date is |
| 10 | February 8, 2017, and the time is 11:18 a.m. |
| 11 | This deposition is taking place at |
| 12 | 401 Wilshire Boulevard, Suite 850, Santa Monica, |
| 13 | California 90401. The videographer is John |
| 14 | Azpilicueta, here with our court reporter, Cheryl |
| 15 | Haab. We're both with David Feldman Worldwide in |
| 16 | New York, New York. |
| 17 | At this time, would counsel please introduce |
| 18 | yourselves and state whom you represent. |
| 19 | MR. RAYHILL: I'm Kevin Rayhill from the |
| 20 | Joseph Saveri Law Firm, representing the plaintiffs. |
| 21 | MR. WIDNELL: I'm Nicholas Widnell with |
| 22 | Boies, Schiller & Flexner, representing Zuffa, LLC, |
| 23 | and Mr. Zelaznik. |
| 24 | MR. NAKAMURA: I'm Brent Nakamura, also from |
| 25 | Boies, Schiller & Flexner, representing Zuffa, LLC, |

### 7

| | |
|---|---|
| 1 | as well as the deponent. |
| 2 | MR. BELLAMY: And I'm Tim Bellamy. I'm an |
| 3 | in-house attorney with Zuffa, LLC. |
| 4 | THE VIDEOGRAPHER: Thank you. |
| 5 | May the court reporter please swear in the |
| 6 | witness. |
| 7 | (Whereupon, the witness was duly sworn by the |
| 8 | court reporter.) |
| 9 | --oOo-- |
| 10 | EXAMINATION |
| 11 | BY MR. RAYHILL: |
| 12 | Q Okay. Good morning. I'm Kevin Rayhill. I |
| 13 | represent the plaintiffs, and I'll be asking you |
| 14 | questions today about your role and your time at |
| 15 | Zuffa. |
| 16 | I understand you're an attorney. Isn't |
| 17 | that -- is that right? |
| 18 | A That's right. |
| 19 | Q I'm going to go through a few housekeeping |
| 20 | things, but probably it will be old news to you. |
| 21 | First of all, if you need to take a break, |
| 22 | just say the word, and you know, we can -- we can |
| 23 | certainly accommodate you, provided if I've asked |
| 24 | the question, I just ask that you answer the |
| 25 | question before taking a break. |

### 8

| | |
|---|---|
| 1 | Okay? |
| 2 | Of course, when I ask a question, your |
| 3 | attorneys can object. You want to let them get |
| 4 | their objection in, and then you can go ahead and |
| 5 | answer, unless they instruct you not to answer based |
| 6 | on the privilege. But otherwise, after the |
| 7 | objection, you can go ahead and answer the -- answer |
| 8 | the question. |
| 9 | Please make sure you reply verbally so that |
| 10 | it goes on the record. Shakes of the head don't get |
| 11 | recorded. |
| 12 | I think that's all I've got. |
| 13 | So can you state your name for the record. |
| 14 | A Sure. Marshall Zelaznik, Z-e-l-a-z-n-i-k. |
| 15 | |
| 16 | |
| 17 | |
| 18 | Is there any reason you cannot answer the |
| 19 | questions I put to you today fully, completely, |
| 20 | truthfully? |
| 21 | A No reason. |
| 22 | Q Any medications that might impair your |
| 23 | ability to -- |
| 24 | A No, sir. |
| 25 | Q -- answer? |

### 9

| | |
|---|---|
| 1 | Very good. Thank you. When would you say |
| 2 | you first learned about this lawsuit? |
| 3 | A Hmm. Within the last 18 months to 2 years, |
| 4 | maybe? I'm not sure. Somewhere in there. |
| 5 | Q That sounds about right. |
| 6 | Have you read the complaint? |
| 7 | A No. |
| 8 | Q Any of the court orders or filings? |
| 9 | A Just an order I signed, a document ensure -- |
| 10 | promising to maintain the privileges, I guess, and |
| 11 | the protective order. |
| 12 | Q Very good. Do you know any of the named |
| 13 | plaintiffs personally -- Cung Le, Nate Quarry, Kyle |
| 14 | Kingsbury? |
| 15 | A I know them as fighters of the UFC, but in |
| 16 | terms of what "personally" means, I didn't have a |
| 17 | personal relationship with them. But I would have |
| 18 | met some of them, I suspect. |
| 19 | Q Very good. Understood. |
| 20 | Do you still have any financial interest in |
| 21 | Zuffa? |
| 22 | A No. |
| 23 | Q So no deferred compensation or anything like |
| 24 | along those lines coming to you from Zuffa? |
| 25 | A |

3 (Pages 6 to 9)

MARSHALL ZELAZNIK - CONFIDENTIAL

14

broadcast on UFC.com?
   A  Well, there was a team that generated original content. So they would write stories, create video assets that would focus on an upcoming event or a fighter. It was primarily a marketing tool, is what UFC.com was. It was a way to get information to fans about what was coming up in the UFC or what just happened in the UFC, sort of news and information. So it was information like that, primarily. There were win/loss records maintained there. There were fighter bios that were updated. There were TV scheduling information so you knew where to go to watch the UFC. Things like that.
   Q  Uh-huh. So was any -- like, a fight tape content broadcasted through the UFC.com?
   A  Yeah. If there were -- if -- generally, the content was produced by the production group, which I didn't -- wasn't responsible for. So whatever content was produced, we looked for ways to distribute that content. Sometimes it would be on UFC.com, and sometimes it would be another place or multiple places.
   Q  So would -- in terms of the content of the -- the MMA content that was distributed on UFC.com, would that have included any of the tape libraries

15

that you or others at UFC acquired from other promoters?
      MR. WIDNELL: Objection. Form.
      THE WITNESS: I'm not sure what you mean by "tape library."
BY MR. RAYHILL:
   Q  So taped -- videotape of MMA events that other promoters had put on in -- in the past.
   A  It sounds like you're asking about the third -- what we would call third party MMA. The acquisitions we made regarding those libraries for Fight Pass --
   Q  Yes. That's correct.
   A  -- right?
     I don't know if we -- it wasn't part of our normal practice to put that content on UFC.com. But it doesn't mean that we didn't. I would -- it wouldn't surprise me if we had from time to time, but not usually.
   Q  I see. So it wasn't like a regular outlet -- let -- let me rephrase.
     And -- and a fan who wanted to view some of that content probably wouldn't go to UFC.com as an avenue to view it?
      MR. WIDNELL: Objection. Form.

16

      THE WITNESS: They might start at UFC.com as a way to get to the content. Because from UFC.com you could get to the area in the system where that content was available.
BY MR. RAYHILL:
   Q  And what area was that?
   A  It was primarily available within our Fight Pass product.
   Q  Okay. Fight Pass, that's a program that -- that you developed; is that correct?
   A  One of many that was a part of it. But I was part of the team that helped build that business.
   Q  Were you part of the team that sort of came up with the concept for the business?
   A  Yes. I think we were inspired to be creative about how we might take advantage of all of the library that UFC Zuffa had as a way to get it into the hands of the fans. So yeah. I think that would be a "yes."
   Q  And so -- I'm not sure if you said it, but I believe you started in 2013 as the chief content officer; is that correct?
   A  Yeah. I think that's around the right time frame, yeah.
   Q  Okay. And so when you started as chief

17

content officer, was that part of your portfolio that was part of your duties?
   A  It became part of the duties. It wasn't -- when I started -- when I -- my title shifted to chief content officer, Fight Pass wasn't a product we were incubating or developing at that time. It came later.
   Q  Okay. How much later? Do you remember, roughly, when it started?
   A  Well, if my math is right and I was about three years as chief content officer, and Fight Pass, I think, launched at the end of '13, it would have been somewhere in the -- that year, so to speak, or within months of me moving over to that title exclusively.
   Q  Okay. So while you were chief content officer, did you also negotiate other broadcasting contracts?
   A  Yes.
   Q  And can you tell me a little bit about the types of contracts that you would have negotiated?
   A  I was -- I just want to make sure, because you've got it when I was a chief content officer is the time period; right? So from '13?
   Q  Well, let's -- we'll start with that. And



```
                                    30                                              32
 1     Q  Okay.                                 1   BY MR. RAYHILL:
 2     A  I don't think it was recognized in the UK.  2     Q  Okay.
 3                                              3        Just going back to the Fight Pass for a
                                                4   minute.
                                                5        So did you personally negotiate contracts --
                                                6   agreements to acquire tape libraries from other
 7     Q  No.  And was there one subsidiary that sort  7   promoters -- third -- third -- so-called third party
 8   of covered international broadcasts, generally?  8   promoters?  I'm sorry.
 9     A  "Subsidiary" is a term that I -- even though  9     A  Yes.  Yeah.
10   I took corps in law school, I can't really remember 10     Q  About how many?
11   what it means.  But the -- the entity that        11     A  More than 15, less than 30 is my estimate.
12   contracted our media rights internationally was   12     Q  Did you negotiate the acquisition of the tape
13   generally Zuffa International, LLC, was the       13   library from Invicta?
14   contracting party for our media deals             14        MR. WIDNELL:  Objection.  Form.
15   internationally.                                  15        THE WITNESS:  I negotiated the rights for the
16     Q  Okay.  And so they would negotiate the deals, 16   distribution of the Invicta content on Fight Pass.
17   Zuffa International?                              17   BY MR. RAYHILL:
18        MR. WIDNELL:  Objection.  Form.
19        THE WITNESS:  Employees of Zuffa would
20   negotiate the deals.
21   BY MR. RAYHILL:
22     Q  Okay.  And so can you just sort of flesh out
23   for me where Zuffa International -- what were the --
24   what -- what parts of the nego- -- the setting up
25   the deal that Zuffa, LLC, takes care of and what

                                    31                                              33
 1   parts Zuffa International takes care of?        1   BY MR. RAYHILL:
 2        MR. WIDNELL:  Objection.  Form.           2     Q  And was that typical of the -- the
 3        THE WITNESS:  Yeah.  This is where corporate  3   acquisition contracts you would negotiate?
 4   structures and things like that, I'm not a hundred  4        Let me --
 5   percent positive about or maybe even half a percent  5        MR. WIDNELL:  Objection.
 6   positive about.  But generally, the people that   6   BY MR. RAYHILL:
 7   worked on my team and negotiated the deals were   7     Q  Let me rephrase.
 8   employees of Zuffa, LLC, if that's what you're    8        Did you ever negotiate an agreement to
 9   asking.                                           9   acquire the -- the tape library of another promoter
10   BY MR. RAYHILL:                                 10   where Zuffa acquired the possession of the -- the
11     Q  Uh-huh.                                    11   tape library itself, as opposed to a license?
12     A  And those employees negotiated contracts and 12        MR. WIDNELL:  Objection.  Form.
13   when the con- -- when it was time for the contract 13        THE WITNESS:  Would it help if I explain what
14   to be drafted, the contracting party was Zuffa   14   we were doing?  Because the question is a little
15   International, LLC.                              15   funky for me.
16     Q  I see.  And then the contracts themselves   16   BY MR. RAYHILL:
17   were drafted by attorneys at -- at Zuffa, or by  17     Q  Sure.
18   attorneys at Zuffa International?
19        MR. WIDNELL:  Objection.  Form.
20        THE WITNESS:  Yeah.  Each contract was
21   different.  There were certain forms that were
22   generated with our in-house lawyers, and sometimes
23   you used the other party's form.  It just -- it just
24   depended on the deal.
25        ///
```

MARSHALL ZELAZNIK - CONFIDENTIAL

```
                                            66
 1   avoid a confusion with other mixed martial arts
 2   promoters.
 3        Would you say that there was not a risk of
 4   confusion between mixed martial arts and boxing?
 5        MR. WIDNELL: Objection. Form.
 6        THE WITNESS: I think our concern about
 7   confusion was related to MMA. We didn't believe
 8   that there would be confusion around a boxing event
 9   or wrestling or judo, which are some of these
10   examples.
11   BY MR. RAYHILL:
12     Q  Does this disconnect show that MMA and boxing
13   are separate markets?
14        MR. WIDNELL: Objection. Form.
15        THE WITNESS: I'm sorry. You said, "is this
16   disconnected"?
17   BY MR. RAYHILL:
18     Q  The disconnect between mixed martial arts and
19   single martial arts.
20     A  Give it to me one more time. I'm sorry.
```

[redacted]

```
11        But if you -- if you give me the question --
12   are you asking is boxing a different market than
13   MM -- is boxing -- does a -- can I ask a question?
14        Is the question, "Does a broadcaster look at
15   boxing different than MMA?" Is that the question?
16   BY MR. RAYHILL:
17     Q  That's a good -- yeah. Let's -- let's start
18   with that question.
19     A  In my experience, they do look at boxing as
20   different than MMA.
21     Q  And the consumers? Do the consumers also
22   look at boxing as different than MMA?
23        MR. WIDNELL: Objection. Form.
24        THE WITNESS: I don't know. I don't know.
```

```
                                            68
 4   BY MR. RAYHILL:
```

[redacted]

```
17   BY MR. RAYHILL:
18     Q  Okay.
19     A  Or some of these other agreements, I didn't
20   negotiate those.
21     Q  Okay. I'm finished with that document.
22        Going back to Fight Pass. Did you say that,
23   you know, when you negotiated to acquire the rights
24   to other promoters' fight libraries, it was
25   primarily for the Fight Pass project?
                                            69
 1        MR. WIDNELL: Objection. Form.
 2        THE WITNESS: Yeah. Our licensing efforts
 3   were to try to build a content offering within Fight
 4   Pass, yes.
 5   BY MR. RAYHILL:
 6     Q  Uh-huh. And can you tell me why Zuffa wanted
 7   to acquire the content of other MMA providers?
 8        MR. WIDNELL: Objection. Form.
 9        THE WITNESS: The motivation to acquire the
10   content was to give a platform for all this MMA so
11   that fans could access it. The -- the content was
12   available in very many places around, and we thought
13   that, as a service to an MMA fan, that if we could
14   make it easy for them to see this content and
15   organize it, that it would continue to foster
16   interest in the sport of MMA. I mean, we had -- we
17   used to say we felt like archivists for the sport.
18   We were trying to make sure that this content was
19   available for people.
20   BY MR. RAYHILL:
21     Q  Uh-huh. I mean, pres- -- presumably, it was
22   to -- it was profitable as well?
23        MR. WIDNELL: Objection. Form.
24        THE WITNESS: Yeah. We -- we thought that by
25   having a complete or, you know, full MMA offering,
```

                                18 (Pages 66 to 69)

Page 70

1  it would make the product more interesting to a
2  consumer, yes.
3  BY MR. RAYHILL:
4     Q  But also more profitable to -- to Zuffa.
5  Presumably, the more people who are interested in
6  watching Fight Pass, the more subscriptions Zuffa
7  gets, the more money it makes?
8       MR. WIDNELL:  Objection.  Form.
9       THE WITNESS:  If we had people interested in
10 the product and they bought it, it would generate
11 more revenue, yes.
12 BY MR. RAYHILL:
13-25 [REDACTED]

Page 71

1-4 [REDACTED]
5  BY MR. RAYHILL:
6     Q  Okay.  Does Zuffa use some of the content
7  in -- in -- in these acquired libraries to generate
8  interest for specific fights?  For example, if a
9  fighter had fought for one of the acquired
10 promoters' library, fighter -- if a UFC fighter had
11 fought for one of the promoters whose library you
12 acquired, and then that fighter had a fight coming
13 up, it would help generate interest for that fight
14 for Zuffa to show some of his old fights, maybe --
15 his or hers?
16      MR. WIDNELL:  Objection.  Form.
17      THE WITNESS:  We would use fight footage from
18 the fighter that may have existed before they fought
19 in the UFC.
20 BY MR. RAYHILL:
21    Q  Yeah.
22    A  That --
23    Q  So it helps generate interest for upcoming
24 fights?
25      MR. WIDNELL:  Objection.  Form.

Page 72

1       THE WITNESS:  The use of that content?
2  BY MR. RAYHILL:
3     Q  Yes.
4     A  Yeah.  The use of that content with
5  everything else, it's a marketing effort, yes.
6     Q  Would you say that was one of the motivations
7  for kind of developing the Fight Pass program?
8       MR. WIDNELL:  Objection.  Form.
9       THE WITNESS:  Sorry.  What was one of the
10 motivations?
11 BY MR. RAYHILL:
12    Q  To sort of have access to these archival
13 materials that could generate interest for upcoming
14 UFC fights?
15      MR. WIDNELL:  Objection.  Form.
16      THE WITNESS:  Yeah.  I'm not -- I -- it
17 wasn't a motivating factor for us, as we were
18 developing the business, to acquire the rights to
19 some of this content.  It wasn't, in the way we
20 looked at it, no.
21 BY MR. RAYHILL:
22    Q  So I may have asked, but can you just tell me
23 what -- what was the -- the motivation?  What was
24 driving this -- the -- the desire to acquire these
25 libraries from other promoters?

Page 73

1       MR. WIDNELL:  Objection.  Form.
2       THE WITNESS:  Yeah.  You did, but yeah, I
3  don't mind answering again.
4       The idea was to broaden the interest in Fight
5  Pass by having more MMA content in it, and to expose
6  fans to more content in the space, make the offering
7  more interesting.  And then, as time went on, we
8  thought we were becoming archivists; we were trying
9  to make sure that this content was available and
10 accessible.
11 BY MR. RAYHILL:
12    Q  Based -- based on your experience working in
13 the industry for ten years, as you did, would you
14 say it gave Zuffa a competitive advantage to have
15 access to these libraries over other MMA
16 competitors?
17      MR. WIDNELL:  Objection.  Form.
18      THE WITNESS:  Yeah.  Competitive advantage in
19 what sense?
20 BY MR. RAYHILL:
21    Q  Gave them more of a market presence, let's
22 say.  Elevated their -- people's awareness of Zuffa
23 in the MMA market?
24      MR. WIDNELL:  Objection.  Form.
25      THE WITNESS:  I don't -- not sure how to

19 (Pages 70 to 73)

MARSHALL ZELAZNIK - CONFIDENTIAL

```
                                                    82
 1   "broadcast," that has a different meaning to me.
 2   BY MR. RAYHILL:
 3     Q  Okay.
 4     A  I don't think we broadcast these events.
 5     Q  I'm sorry?
 6     A  I don't think we broadcast these events.
 7   [REDACTED]
 8   [REDACTED]
 9   [REDACTED]
10   [REDACTED]
11   [REDACTED]
12   [REDACTED]
13   [REDACTED]
14   [REDACTED]
15   [REDACTED]
16   [REDACTED]
17   [REDACTED]
18   [REDACTED]
19   [REDACTED]
20   [REDACTED]
21   [REDACTED]
22   [REDACTED]
23   [REDACTED]
24   [REDACTED]
25   [REDACTED]
```

```
                                                    83
 1   [REDACTED]
 2   [REDACTED]
 3   [REDACTED]
 4   [REDACTED]
 5   [REDACTED]
 6   [REDACTED]
 7   [REDACTED]
 8   [REDACTED]
 9   [REDACTED]
10   [REDACTED]
11   [REDACTED]
12   [REDACTED]
13   [REDACTED]
14   BY MR. RAYHILL:
15     Q  Do you know why Zuffa didn't pay royalties to
16   the fighters?
17       MR. WIDNELL:  Objection.  Form.
18       THE WITNESS:  Again, I don't know if we did
19   or we didn't, so I would be speculating.
20   BY MR. RAYHILL:
21     Q  Okay.
22       Do you know if Zuffa refrained from paying
23   royalties to the fighters whose images were used in
24   the Fight Pass archives because of their ancillary
25   rights contracts?
```

```
                                                    84
 1       MR. WIDNELL:  Objection.  Form.
 2       THE WITNESS:  I don't.  I don't know one way
 3   or another.
 4       MR. WIDNELL:  Do you know if you're planning
 5   to stop for lunch at any point?
 6       MR. RAYHILL:  I think lunch is a good idea.
 7   It's fine -- any time is fine with me, so...
 8       MR. WIDNELL:  Okay.  I suggest --
 9       MR. RAYHILL:  Now's --
10       MR. WIDNELL:  That we take a break if you --
11       THE WITNESS:  Whatever.  What time is it?
12       MR. BELLAMY:  1:00.
13       THE WITNESS:  That's fine.  A quick lunch.
14       THE VIDEOGRAPHER:  Going off record.  The
15   time is 1:02 p.m.
16              --oOo--
17           (LUNCHEON RECESS)
18              --oOo--
19       THE VIDEOGRAPHER:  This marks the beginning
20   of video media No. 2 to the videotaped deposition of
21   Marshall Zelaznik.  Going back on the record.  Time
22   is 1:48 p.m.
23   BY MR. RAYHILL:
24     Q  Okay.  Good afternoon.  Welcome back.
25     A  Thank you.
```

```
                                                    85
 1     Q  So I want to go back to Pay-Per-Views.  And
 2   so does Zuffa require Pay-Per-View providers to
 3   charge, like, a minimum charge for Pay-Per-View
 4   content?
 5       MR. WIDNELL:  Objection.  Form.
 6       THE WITNESS:  The retail -- I think you're
 7   asking about the retail price.  The retail price is
 8   set by the distributor, if that's what you mean.
 9   BY MR. RAYHILL:
10   [REDACTED]
11   [REDACTED]
12   [REDACTED]
13   [REDACTED]
14   [REDACTED]
15   [REDACTED]
16   [REDACTED]
17   [REDACTED]
18   [REDACTED]
19   [REDACTED]
20   [REDACTED]
21   [REDACTED]
22   [REDACTED]
23   [REDACTED]
24   [REDACTED]
25   [REDACTED]
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

MARSHALL ZELAZNIK - CONFIDENTIAL

110

4   BY MR. RAYHILL:
5   Q   Okay. I'm finished with that document.
6   Thank you.
7       Yeah. All right. Okay. Fine.
8       Okay. Sorry for the delay.
9       (Plaintiffs' Exhibit 178 was marked.)
10      THE WITNESS: Okay.
11      MR. RAYHILL: Okay. You've been handed
12  what's been marked as Exhibit 178.
13      THE WITNESS: 178, I think. Did you say?
14      MR. RAYHILL: Yes. That's what I said.
15      THE WITNESS: Okay. Sorry.
16  BY MR. RAYHILL:
17  Q   It has the Bates number ZFL-0941497.
18      Do you recognize this document?
19  A   It looks like an e-mail I would have
20  received.
21  Q   And you would have received it in the
22  ordinary course of business?
23  A   Yes, sir.
24  Q   So looking at roughly in the middle of the
25  page -- excuse me. There's an e-mail from Steven

111

1   Tecci to John Mulkey and yourself.
2       First of all, can you tell me who Steven --
3   Steven Tecci is?
4   A   He worked in the research and analytics
5   department at the UFC.
10      THE REPORTER: Excuse me.
11      MR. RAYHILL: Sorry.
12      THE REPORTER: Could you read that one more
13  time?
14      MR. RAYHILL: Yes. Sorry about that.
15  BY MR. RAYHILL:

112

7   BY MR. RAYHILL:
8   Q   Do you know what your total Pay-Per-View
9   revenues were in 2014 -- Zuffa's?
10  A   I wouldn't remember.

113

8   Q   I see. Okay.
9       All right. I'm finished with that document.
10  Thank you.
11      (Plaintiffs' Exhibit 179 was marked.)
12      THE WITNESS: Okay. I have the document.
13  BY MR. RAYHILL:
14  Q   Okay. So this is Exhibit 179, I believe?
15  179. It has the Bates number ZFL-1002878.
16      Do you recognize this document?
17  A   Yes. This would have been an e-mail I
18  received at my time at the UFC.
19  Q   Okay. In the ordinary course of business?
20  A   Yes.
21  Q   Thank you.

