# EXHIBIT A

## 2/8/2017 Zelaznik Depo Tr. Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,

Defendant.

Case No. 2:15-cv-01045-RFB-(PAL)

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MARSHALL ZELAZNIK

SANTA MONICA, CALIFORNIA

FEBRUARY 8, 2017

11:18 A.M.

Reported by:
Cheryl M. Haab, CSR No. 13600, RPR, CLR
Job No. 48484

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon )
Fitch, on behalf of )
themselves and all others )
similarly situated, )
)
Plaintiffs,)
)
v. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
Defendant. )
____________________________)

CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARSHALL ZELAZNIK, taken at 401 Wilshire Boulevard, Suite 850, Santa Monica, California, on Tuesday, February 8, 2017, at 11:18 a.m., before Cheryl M. Haab, Certified Shorthand Reporter, in and for the State of California.

APPEARANCES:
For Plaintiffs:
JOSEPH SAVERI LAW FIRM
555 Montgomery Street, Suite 1210
San Francisco, California 94111
BY: KEVIN E. RAYHILL, ESQ.
krayhill@saverilawfirm.com
MATTHEW S. WEILER, ESQ.
mweiler@saverilawfirm.com
For Defendants:
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
BY: NICHOLAS A. WIDNELL, ESQ.
nwidnell@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
BY: BRENT K. NAKAMURA, ESQ.
bnakamura@bsfllp.com

Also Present:

TIMOTHY BELLAMY, ESQ.
JOHN AZPILICUETA, Videographer

INDEX
WITNESS: Marshall Zelaznik

| EXAMINATION | PAGE |
|---|---|
| By Mr. Rayhill | 7 |
| By Mr. Widnell | 189 |

* * *

INDEX TO EXHIBITS

| EXHIBITS | | MARKED |
|---|---|---|
| Exhibit 173 | E-mail string (ZFL-0916001-003) | 44 |
| Exhibit 174 | "Re: Canadian Broadcast Agreement - UFC Content" dated March 4, 2011 (ZUF-00228479-486) | 57 |
| Exhibit 175 | E-mail string (ZFL-0916483-485) | 77 |
| Exhibit 176 | E-mail string (ZFL-2544420) | 98 |
| Exhibit 177 | E-mail string (ZFL-0949863-866) | 105 |
| Exhibit 178 | E-mail string (ZFL-09411497) | 110 |
| Exhibit 179 | E-mail string (ZFL-1002878-879) | 113 |
| Exhibit 180 | E-mail string (ZFL-1001761-763) | 116 |
| Exhibit 181 | E-mail string (ZFL-2489879-881) | 128 |
| Exhibit 182 | E-mail string (ZFL-1121583-585) | 134 |
| Exhibit 183 | "ZFL1514933 12'13 Zuffa IS YTD Side by Side" | 141 |
| Exhibit 184 | "Marketing and Promotion Services Agreement" (ZUF-00228470-478) | 151 |
| Exhibit 185 | E-mail string (ZUF-00108790-797) and attachment (ZUF-00108886-928) | 155 |
| Exhibit 186 | E-mail string (ZFL-1448354) | 168 |
| Exhibit 187 | E-mail string (ZFL-2492376) | 174 |
| Exhibit 188 | E-mail string (ZFL-0973145-149) | 177 |
| Exhibit 189 | E-mail string (ZFL-1498982) | 184 |

FEBRUARY 8, 2017, 11:18 A.M.
SANTA MONICA, CALIFORNIA
--oOo--

THE VIDEOGRAPHER: Good morning. This begins Media No. 1 to videotaped deposition of Marshall Zelaznik, in the matter of Cung Le et al., versus Zuffa, LLC, et al. This case is in the United States District Court, District of Nevada, with case number 2:15-cv-01045-RFB. Today's date is February 8, 2017, and the time is 11:18 a.m.

This deposition is taking place at 401 Wilshire Boulevard, Suite 850, Santa Monica, California 90401. The videographer is John Azpilicueta, here with our court reporter, Cheryl Haab. We're both with David Feldman Worldwide in New York, New York.

At this time, would counsel please introduce yourselves and state whom you represent.

MR. RAYHILL: I'm Kevin Rayhill from the Joseph Saveri Law Firm, representing the plaintiffs.

MR. WIDNELL: I'm Nicholas Widnell with Boies, Schiller & Flexner, representing Zuffa, LLC, and Mr. Zelaznik.

MR. NAKAMURA: I'm Brent Nakamura, also from Boies, Schiller & Flexner, representing Zuffa, LLC,

as well as the deponent.

MR. BELLAMY: And I'm Tim Bellamy. I'm an in-house attorney with Zuffa, LLC.

THE VIDEOGRAPHER: Thank you.

May the court reporter please swear in the witness.

(Whereupon, the witness was duly sworn by the court reporter.)

--oOo--

EXAMINATION

BY MR. RAYHILL:

**Q Okay. Good morning. I'm Kevin Rayhill. I represent the plaintiffs, and I'll be asking you questions today about your role and your time at Zuffa.**

**I understand you're an attorney. Isn't that -- is that right?**

A That's right.

**Q I'm going to go through a few housekeeping things, but probably it will be old news to you.**

**First of all, if you need to take a break, just say the word, and you know, we can -- we can certainly accommodate you, provided if I've asked the question, I just ask that you answer the question before taking a break.**

**Okay?**

**Of course, when I ask a question, your attorneys can object. You want to let them get their objection in, and then you can go ahead and answer, unless they instruct you not to answer based on the privilege. But otherwise, after the objection, you can go ahead and answer the -- answer the question.**

**Please make sure you reply verbally so that it goes on the record. Shakes of the head don't get recorded.**

**I think that's all I've got.**

**So can you state your name for the record.**

A Sure. Marshall Zelaznik, Z-e-l-a-z-n-i-k.

**Is there any reason you cannot answer the questions I put to you today fully, completely, truthfully?**

A No reason.

**Q Any medications that might impair your ability to --**

A No, sir.

**Q -- answer?**

**Very good. Thank you. When would you say you first learned about this lawsuit?**

A Hmm. Within the last 18 months to 2 years, maybe? I'm not sure. Somewhere in there.

**Q That sounds about right.**

**Have you read the complaint?**

A No.

**Q Any of the court orders or filings?**

A Just an order I signed, a document ensure -- promising to maintain the privileges, I guess, and the protective order.

**Q Very good. Do you know any of the named plaintiffs personally -- Cung Le, Nate Quarry, Kyle Kingsbury?**

A I know them as fighters of the UFC, but in terms of what "personally" means, I didn't have a personal relationship with them. But I would have met some of them, I suspect.

**Q Very good. Understood.**

**Do you still have any financial interest in Zuffa?**

A No.

**Q So no deferred compensation or anything like along those lines coming to you from Zuffa?**

A

**broadcast on UFC.com?**

A Well, there was a team that generated original content. So they would write stories, create video assets that would focus on an upcoming event or a fighter. It was primarily a marketing tool, is what UFC.com was. It was a way to get information to fans about what was coming up in the UFC or what just happened in the UFC, sort of news and information. So it was information like that, primarily. There were win/loss records maintained there. There were fighter bios that were updated. There were TV scheduling information so you knew where to go to watch the UFC. Things like that.

**Q Uh-huh. So was any -- like, a fight tape content broadcasted through the UFC.com?**

A Yeah. If there were -- if -- generally, the content was produced by the production group, which I didn't -- wasn't responsible for. So whatever content was produced, we looked for ways to distribute that content. Sometimes it would be on UFC.com, and sometimes it would be another place or multiple places.

**Q So would -- in terms of the content of the -- the MMA content that was distributed on UFC.com, would that have included any of the tape libraries**

**that you or others at UFC acquired from other promoters?**

MR. WIDNELL: Objection. Form.

THE WITNESS: I'm not sure what you mean by "tape library."

BY MR. RAYHILL:

**Q So taped -- videotape of MMA events that other promoters had put on in -- in the past.**

A It sounds like you're asking about the third -- what we would call third party MMA. The acquisitions we made regarding those libraries for Fight Pass --

**Q Yes. That's correct.**

A -- right?

I don't know if we -- it wasn't part of our normal practice to put that content on UFC.com. But it doesn't mean that we didn't. I would -- it wouldn't surprise me if we had from time to time, but not usually.

**Q I see. So it wasn't like a regular outlet -- let -- let me rephrase.**

**And -- and a fan who wanted to view some of that content probably wouldn't go to UFC.com as an avenue to view it?**

MR. WIDNELL: Objection. Form.

THE WITNESS: They might start at UFC.com as a way to get to the content. Because from UFC.com you could get to the area in the system where that content was available.

BY MR. RAYHILL:

**Q And what area was that?**

A It was primarily available within our Fight Pass product.

**Q Okay. Fight Pass, that's a program that -- that you developed; is that correct?**

A One of many that was a part of it. But I was part of the team that helped build that business.

**Q Were you part of the team that sort of came up with the concept for the business?**

A Yes. I think we were inspired to be creative about how we might take advantage of all of the library that UFC Zuffa had as a way to get it into the hands of the fans. So yeah. I think that would be a "yes."

**Q And so -- I'm not sure if you said it, but I believe you started in 2013 as the chief content officer; is that correct?**

A Yeah. I think that's around the right time frame, yeah.

**Q Okay. And so when you started as chief**

**content officer, was that part of your portfolio that was part of your duties?**

A It became part of the duties. It wasn't -- when I started -- when I -- my title shifted to chief content officer, Fight Pass wasn't a product we were incubating or developing at that time. It came later.

**Q Okay. How much later? Do you remember, roughly, when it started?**

A Well, if my math is right and I was about three years as chief content officer, and Fight Pass, I think, launched at the end of '13, it would have been somewhere in the -- that year, so to speak, or within months of me moving over to that title exclusively.

**Q Okay. So while you were chief content officer, did you also negotiate other broadcasting contracts?**

A Yes.

**Q And can you tell me a little bit about the types of contracts that you would have negotiated?**

A I was -- I just want to make sure, because you've got it when I was a chief content officer is the time period; right? So from '13?

**Q Well, let's -- we'll start with that. And**

**Q Okay.**
A I don't think it was recognized in the UK.
[redacted]
**Q No. And was there one subsidiary that sort of covered international broadcasts, generally?**
A "Subsidiary" is a term that I -- even though I took corps in law school, I can't really remember what it means. But the -- the entity that contracted our media rights internationally was generally Zuffa International, LLC, was the contracting party for our media deals internationally.
**Q Okay. And so they would negotiate the deals, Zuffa International?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Employees of Zuffa would negotiate the deals.
BY MR. RAYHILL:
**Q Okay. And so can you just sort of flesh out for me where Zuffa International -- what were the -- what -- what parts of the nego- -- the setting up the deal that Zuffa, LLC, takes care of and what**

**parts Zuffa International takes care of?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Yeah. This is where corporate structures and things like that, I'm not a hundred percent positive about or maybe even half a percent positive about. But generally, the people that worked on my team and negotiated the deals were employees of Zuffa, LLC, if that's what you're asking.
BY MR. RAYHILL:
**Q Uh-huh.**
A And those employees negotiated contracts and when the con- -- when it was time for the contract to be drafted, the contracting party was Zuffa International, LLC.
**Q I see. And then the contracts themselves were drafted by attorneys at -- at Zuffa, or by attorneys at Zuffa International?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Yeah. Each contract was different. There were certain forms that were generated with our in-house lawyers, and sometimes you used the other party's form. It just -- it just depended on the deal.
///

BY MR. RAYHILL:
**Q Okay.**
**Just going back to the Fight Pass for a minute.**
**So did you personally negotiate contracts -- agreements to acquire tape libraries from other promoters -- third -- third -- so-called third party promoters? I'm sorry.**
A Yes. Yeah.
**Q About how many?**
A More than 15, less than 30 is my estimate.
**Q Did you negotiate the acquisition of the tape library from Invicta?**
MR. WIDNELL: Objection. Form.
THE WITNESS: I negotiated the rights for the distribution of the Invicta content on Fight Pass.
BY MR. RAYHILL:
[redacted]

BY MR. RAYHILL:
**Q And was that typical of the -- the acquisition contracts you would negotiate?**
**Let me --**
MR. WIDNELL: Objection.
BY MR. RAYHILL:
**Q Let me rephrase.**
**Did you ever negotiate an agreement to acquire the -- the tape library of another promoter where Zuffa acquired the possession of the -- the tape library itself, as opposed to a license?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Would it help if I explain what we were doing? Because the question is a little funky for me.
BY MR. RAYHILL:
**Q Sure.**
[redacted]

**avoid a confusion with other mixed martial arts promoters.**

**Would you say that there was not a risk of confusion between mixed martial arts and boxing?**

MR. WIDNELL: Objection. Form.

THE WITNESS: I think our concern about confusion was related to MMA. We didn't believe that there would be confusion around a boxing event or wrestling or judo, which are some of these examples.

BY MR. RAYHILL:

**Q Does this disconnect show that MMA and boxing are separate markets?**

MR. WIDNELL: Objection. Form.

THE WITNESS: I'm sorry. You said, "is this disconnected"?

BY MR. RAYHILL:

**Q The disconnect between mixed martial arts and single martial arts.**

A Give it to me one more time. I'm sorry.

But if you -- if you give me the question -- are you asking is boxing a different market than MM -- is boxing -- does a -- can I ask a question?

Is the question, "Does a broadcaster look at boxing different than MMA?" Is that the question?

BY MR. RAYHILL:

**Q That's a good -- yeah. Let's -- let's start with that question.**

A In my experience, they do look at boxing as different than MMA.

**Q And the consumers? Do the consumers also look at boxing as different than MMA?**

MR. WIDNELL: Objection. Form.

THE WITNESS: I don't know. I don't know.

BY MR. RAYHILL:

BY MR. RAYHILL:

**Q Okay.**

A Or some of these other agreements, I didn't negotiate those.

**Q Okay. I'm finished with that document.**

**Going back to Fight Pass. Did you say that, you know, when you negotiated to acquire the rights to other promoters' fight libraries, it was primarily for the Fight Pass project?**

MR. WIDNELL: Objection. Form.

THE WITNESS: Yeah. Our licensing efforts were to try to build a content offering within Fight Pass, yes.

BY MR. RAYHILL:

**Q Uh-huh. And can you tell me why Zuffa wanted to acquire the content of other MMA providers?**

MR. WIDNELL: Objection. Form.

THE WITNESS: The motivation to acquire the content was to give a platform for all this MMA so that fans could access it. The -- the content was available in very many places around, and we thought that, as a service to an MMA fan, that if we could make it easy for them to see this content and organize it, that it would continue to foster interest in the sport of MMA. I mean, we had -- we used to say we felt like archivists for the sport. We were trying to make sure that this content was available for people.

BY MR. RAYHILL:

**Q Uh-huh. I mean, pres- -- presumably, it was to -- it was profitable as well?**

MR. WIDNELL: Objection. Form.

THE WITNESS: Yeah. We -- we thought that by having a complete or, you know, full MMA offering,

it would make the product more interesting to a consumer, yes.
BY MR. RAYHILL:
**Q But also more profitable to -- to Zuffa. Presumably, the more people who are interested in watching Fight Pass, the more subscriptions Zuffa gets, the more money it makes?**
MR. WIDNELL: Objection. Form.
THE WITNESS: If we had people interested in the product and they bought it, it would generate more revenue, yes.
BY MR. RAYHILL:
[redacted]

[redacted]
BY MR. RAYHILL:
**Q Okay. Does Zuffa use some of the content in -- in -- in these acquired libraries to generate interest for specific fights? For example, if a fighter had fought for one of the acquired promoters' library, fighter -- if a UFC fighter had fought for one of the promoters whose library you acquired, and then that fighter had a fight coming up, it would help generate interest for that fight for Zuffa to show some of his old fights, maybe -- his or hers?**
MR. WIDNELL: Objection. Form.
THE WITNESS: We would use fight footage from the fighter that may have existed before they fought in the UFC.
BY MR. RAYHILL:
**Q Yeah.**
A That --
**Q So it helps generate interest for upcoming fights?**
MR. WIDNELL: Objection. Form.

THE WITNESS: The use of that content?
BY MR. RAYHILL:
**Q Yes.**
A Yeah. The use of that content with everything else, it's a marketing effort, yes.
**Q Would you say that was one of the motivations for kind of developing the Fight Pass program?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Sorry. What was one of the motivations?
BY MR. RAYHILL:
**Q To sort of have access to these archival materials that could generate interest for upcoming UFC fights?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Yeah. I'm not -- I -- it wasn't a motivating factor for us, as we were developing the business, to acquire the rights to some of this content. It wasn't, in the way we looked at it, no.
BY MR. RAYHILL:
**Q So I may have asked, but can you just tell me what -- what was the -- the motivation? What was driving this -- the -- the desire to acquire these libraries from other promoters?**

MR. WIDNELL: Objection. Form.
THE WITNESS: Yeah. You did, but yeah, I don't mind answering again.
The idea was to broaden the interest in Fight Pass by having more MMA content in it, and to expose fans to more content in the space, make the offering more interesting. And then, as time went on, we thought we were becoming archivists; we were trying to make sure that this content was available and accessible.
BY MR. RAYHILL:
**Q Based -- based on your experience working in the industry for ten years, as you did, would you say it gave Zuffa a competitive advantage to have access to these libraries over other MMA competitors?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Yeah. Competitive advantage in what sense?
BY MR. RAYHILL:
**Q Gave them more of a market presence, let's say. Elevated their -- people's awareness of Zuffa in the MMA market?**
MR. WIDNELL: Objection. Form.
THE WITNESS: I don't -- not sure how to

"broadcast," that has a different meaning to me.
BY MR. RAYHILL:
**Q Okay.**
A I don't think we broadcast these events.
**Q I'm sorry?**
A I don't think we broadcast these events.
[redacted]

[redacted]
BY MR. RAYHILL:
**Q Do you know why Zuffa didn't pay royalties to the fighters?**
MR. WIDNELL: Objection. Form.
THE WITNESS: Again, I don't know if we did or we didn't, so I would be speculating.
BY MR. RAYHILL:
**Q Okay.**
**Do you know if Zuffa refrained from paying royalties to the fighters whose images were used in the Fight Pass archives because of their ancillary rights contracts?**

MR. WIDNELL: Objection. Form.
THE WITNESS: I don't. I don't know one way or another.
MR. WIDNELL: Do you know if you're planning to stop for lunch at any point?
MR. RAYHILL: I think lunch is a good idea. It's fine -- any time is fine with me, so...
MR. WIDNELL: Okay. I suggest --
MR. RAYHILL: Now's --
MR. WIDNELL: That we take a break if you --
THE WITNESS: Whatever. What time is it?
MR. BELLAMY: 1:00.
THE WITNESS: That's fine. A quick lunch.
THE VIDEOGRAPHER: Going off record. The time is 1:02 p.m.
--oOo--
(LUNCHEON RECESS)
--oOo--
THE VIDEOGRAPHER: This marks the beginning of video media No. 2 to the videotaped deposition of Marshall Zelaznik. Going back on the record. Time is 1:48 p.m.
BY MR. RAYHILL:
**Q Okay. Good afternoon. Welcome back.**
A Thank you.

**Q So I want to go back to Pay-Per-Views. And so does Zuffa require Pay-Per-View providers to charge, like, a minimum charge for Pay-Per-View content?**
MR. WIDNELL: Objection. Form.
THE WITNESS: The retail -- I think you're asking about the retail price. The retail price is set by the distributor, if that's what you mean.
BY MR. RAYHILL:
[redacted]

BY MR. RAYHILL:

**Q Okay. I'm finished with that document. Thank you.**

**Yeah. All right. Okay. Fine.**

**Okay. Sorry for the delay.**

**(Plaintiffs' Exhibit 178 was marked.)**

THE WITNESS: Okay.

MR. RAYHILL: Okay. You've been handed what's been marked as Exhibit 178.

THE WITNESS: 178, I think. Did you say?

MR. RAYHILL: Yes. That's what I said.

THE WITNESS: Okay. Sorry.

BY MR. RAYHILL:

**Q It has the Bates number ZFL-0941497.**

**Do you recognize this document?**

A It looks like an e-mail I would have received.

**Q And you would have received it in the ordinary course of business?**

A Yes, sir.

**Q So looking at roughly in the middle of the page -- excuse me. There's an e-mail from Steven**

**Tecci to John Mulkey and yourself.**

**First of all, can you tell me who Steven -- Steven Tecci is?**

A He worked in the research and analytics department at the UFC.

THE REPORTER: Excuse me.

MR. RAYHILL: Sorry.

THE REPORTER: Could you read that one more time?

MR. RAYHILL: Yes. Sorry about that.

BY MR. RAYHILL:

BY MR. RAYHILL:

**Q Do you know what your total Pay-Per-View revenues were in 2014 -- Zuffa's?**

A I wouldn't remember.

**Q I see. Okay.**

**All right. I'm finished with that document. Thank you.**

**(Plaintiffs' Exhibit 179 was marked.)**

THE WITNESS: Okay. I have the document.

BY MR. RAYHILL:

**Q Okay. So this is Exhibit 179, I believe? 179. It has the Bates number ZFL-1002878.**

**Do you recognize this document?**

A Yes. This would have been an e-mail I received at my time at the UFC.

**Q Okay. In the ordinary course of business?**

A Yes.

**Q Thank you.**