# EXHIBIT 20

────────TRANSCRIBED FROM DIGITAL RECORDING────────

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   CUNG LE, et al.,                )
                                    )
5                 Plaintiffs,       )  Case No. 2:15-cv-01045-RFB-PAL
                                    )
6        vs.                        )  Las Vegas, Nevada
                                    )  November 17, 2015
7   ZUFFA, LLC, d/b/a Ultimate      )
    Fighting Championship and       )
8   UFC,                            )  STATUS CONFERENCE
                                    )
9                 Defendants.

10  ────────────────────────────────

11

12

13                   TRANSCRIPT OF PROCEEDINGS

14                THE HONORABLE PEGGY A. LEEN,
                  UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19  APPEARANCES:            See Next Page

20  DIGITALLY RECORDED:     Liberty Court Recorder (LCR)
                            9:29 a.m.

21

22  TRANSCRIBED BY:         PATRICIA L. GANCI
                            (702) 385-0670

23

24  Proceedings recorded by electronic sound recording, transcript
    produced by mechanical stenography and computer.

25

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1 | APPEARANCES:

2 | For the Plaintiffs:

3 |         **DON SPRINGMEYER, ESQ.**
        WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4 |         3556 E. Russell Road, 2nd Floor
        Las Vegas, Nevada 89120
5 |         (702)341-5200

6 |         **MICHAEL C. DELL'ANGELO, ESQ.**
        **PATRICK F. MADDEN, ESQ.**
7 |         BERGER & MONTAGUE, P.C.
        1622 Locust Street
8 |         Philadelphia, Pennsylvania 19103
        (215)875-3000

9 |

10 | For the Defendants:

11 |         **J. COLBY WILLIAMS, ESQ.**
        CAMPBELL & WILLIAMS
12 |         700 South 7th Street
        Las Vegas, Nevada 89101
13 |         (702)382-5222

14 |         **MARCY N. LYNCH, ESQ.**
        BOIES, SCHILLER & FLEXNER, LLP
15 |         121 S. Orange Ave., Suite 840
        Orlando, Florida 32801
16 |         (407)425-7118

17 |         **JOHN F. COVE, JR., ESQ.**
        BOIES, SCHILLER & FLEXNER, LLP
18 |         1999 Harrison Street, Suite 900
        Oakland, California 94612
19 |         (510)874-1000

20 |

21 |

22 |

23 |

24 |

25 |

──────TRANSCRIBED FROM DIGITAL RECORDING──────

1        LAS VEGAS, NEVADA; TUESDAY, JULY 28, 2015; 10:02 A.M.

2                            --oOo--

3                    P R O C E E D I N G S

4        THE COURT:  Good morning.  Please be seated.

5        COURTROOM ADMINISTRATOR:  This is the time set for the

6   status conference in 2:15-cv-1045-RFB-PAL, Le versus Zuffa, LLC.

7        Counsel, your appearances please.

8        MR. DELCOLLO:  Michael Dell'Angelo from the law firm of

9   Berger and Montague.

10       MR. MADDEN:  Patrick Madden from Berger and Montague on

11  behalf of the plaintiffs.

12       MR. SPRINGMEYER:  Adam Springmeyer, Wolf Rifkin, for

13  the plaintiffs.

14       MR. COVE:  Good morning, Your Honor.  Doug Cove on

15  behalf of Zuffa, LLC.

16       MS. LYNCH:  Good morning.  Marcy Lynch from Boies

17  Schiller & Flexner on behalf of Zuffa, LLC.

18       MR. WILLIAMS:  Good morning, Your Honor.  Colby

19  Williams of Campbell and Williams on behalf of Zuffa.

20       MR. HENDRICK:  Good morning, Your Honor.  Kirk

21  Hendrick, Chief Legal Officer for UFC.

22       THE COURT:  All right.  We're on calendar for a status

23  and dispute resolution conference which I set on October 29th.

24  We only have a half an hour today, so we need to make as much

25  progress as possible.  Prospectively, I'll leave some more time

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   for you so that we have a little more than 30 minutes, but -- so

2   let's be efficient this morning.

3         And as an initial housekeeping matter, there are two

4   stipulations, Docket No. 191 and 195, which the District Judge

5   just referred to me.  So I was going to reject them and send

6   them back to you, but I'll go ahead and approve your two

7   stipulations if you submit, please, a corrected image.  Please

8   comply with Local Rule 6-2 which requires -- no judge wants to

9   sign a blank piece of paper with an "It is so ordered" and their

10  name on it.  Okay?  So please don't do that.

11        It's one of those clerical functions.  It's been a

12  corrected image that comports with that requirement, and both of

13  these stipulations will be approved so we can get that out of

14  the way.  Okay?

15        MR. DELL'ANGELO:  Thank you, Your Honor.

16        THE COURT:  And so I got a courtesy copy of your joint

17  status report that was delivered at 4:40 yesterday afternoon.

18  So I have been able to read it, but it contains a lot of

19  information and, of course, I haven't been able to study it.  So

20  you have been making some substantial progress.  You have a

21  number of outstanding ongoing discussions that have to do with

22  ESI preservation and the number of appropriate custodians for

23  what searches and disputes concerning the relevant time period

24  for various production requests that have been made.

25        So let me hear first from counsel for the plaintiff to

—TRANSCRIBED FROM DIGITAL RECORDING—

1  bring me up to speed.  You were working on this until about noon

2  yesterday when I guess this was filed.  Where are you, if at

3  all, in moving forward on the disputes that are outlined in the

4  status report, all 63 pages of it?

5          MR. DELL'ANGELO:  Good morning, Your Honor.  Thank you,

6  Your Honor.

7          And I recognize that it is a long and complicated

8  document.  We've been working hard to try to find common ground

9  on issues, and there are a number of issues that are reflected

10  in the status where we have reached common ground.

11          THE COURT:  And so you're, Mr. ...

12          MR. DELCOLLO:  Dell'Angelo, Your Honor.

13          THE COURT:  That's what I thought, but just because I

14  don't have a court reporter, you need to identify yourselves so

15  that anyone who prepares the transcript will know who's

16  speaking.

17          MR. DELCOLLO:  Understood.  Thank you, Your Honor.

18          THE COURT:  All right.

19          MR. DELCOLLO:  But there are several key kind of

20  overarching issues where the parties have been unable to reach

21  agreement and as a result, you know, believe that it was

22  necessary at this time to submit them to Your Honor.

23          And in light of the time that we have, I'd like to kind

24  of cut straight to those issues without a lot of wind up.  The

25  key issues, Your Honor, are the relevant time period that are

—TRANSCRIBED FROM DIGITAL RECORDING—

1  applicable to discovery.  With respect to certain areas of

2  discovery and a number of the requests, we have reached

3  agreement.  There are certain categories where the parties have

4  been unable to reach agreement, and they break down, excuse me,

5  into a couple of groups.

6       The first is with respect to contracts from the

7  fighters and contract files from the fighters.

8       THE COURT:  Right.  And they've agreed to give you all

9  of the contracts without any historical limitation or date

10  cut-off that are part of the putative class.

11       MR. DELL'ANGELO:  Correct.

12       THE COURT:  And they've agreed to give you all of the

13  contract files for the documents that were electronically

14  scanned, but not all of the contract files that are in the

15  600,000-page universe.

16       MR. DELL'ANGELO:  Right.  And as we understand it, of

17  that 600,000-page universe, that in order to meet the request as

18  Zuffa has agreed -- to the extent that Zuffa has agreed, it

19  needs to review approximately one half of those 600,000 pages.

20  And we also understand that the scanning project that was

21  undertaken just in the regular course of business to collect

22  contracts that Zuffa has agreed to produce is not one that Zuffa

23  can certify is complete.

24       And this is -- this is an exceptionally important issue

25  from the plaintiffs' perspective because, first, what we're

—TRANSCRIBED FROM DIGITAL RECORDING—

 1   talking about is the -- what we see as a relatively modest

 2   incremental burden of just reviewing the other half of those --

 3          THE COURT:  Double isn't incremental.

 4          MR. DELL'ANGELO:  Okay.  Well, the -- this is an issue

 5   with respect to the contracts I think, Your Honor, that's

 6   vitally important to the case.  I mean, the scheme as we allege

 7   it began in 2006.  And the contracts -- the evolution of these

 8   contracts and how the clauses were inserted and evolved over

 9   time provide a -- the look-back as to how this scheme evolved

10   and give the historical perspective that's really necessary in

11   an antitrust case to understand where the scheme started.  And

12   that's the reason --

13          THE COURT:  You're getting all of the historical,

14   however, with respect to the putative class.  The question is

15   whether the additional 300,000 hard copy are relevant and are

16   proportional for the purposes for which you're seeking the

17   contracts for the nonclass members.  So I'd like you to go to

18   the heart of that, if you could.

19          MR. DELL'ANGELO:  Right.  So what -- what we're trying

20   to understand, Your Honor, is how these contracts evolved over

21   time.

22          THE COURT:  Which set of contracts are we talking about

23   now?

24          MR. DELL'ANGELO:  Pardon?

25          THE COURT:  With which set -- all contracts?

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          MR. DELL'ANGELO:  The fighter contracts.  This is --

2  this issue where we're asking --

3          THE COURT:  No, I understand that, but you're talking

4  about nonclass member contracts?

5          MR. DELL'ANGELO:  Yes.  Right.

6          THE COURT:  And you want them in perpetuity for as long

7  as they've kept them?

8          MR. DELL'ANGELO:  We want them back -- we're asking for

9  them back to the year 2000, Your Honor, because the -- these

10  fighter contracts are one of the sort of most important aspects

11  of the discovery in the case.  And it's vitally important from

12  our perspective to understand how those contracts evolved over

13  time.  And simply getting the set of fighter contracts from the

14  putative class don't tell us how those contracts --

15          THE COURT:  That part I understand.

16          MR. DELL'ANGELO:  Okay.

17          THE COURT:  And I understand you want others.  And I

18  understand --

19          MR. DELL'ANGELO:  Yes.

20          THE COURT:  -- they're willing to give you others.

21          MR. DELL'ANGELO:  Right.

22          THE COURT:  The question is, why isn't the huge

23  number -- you only have 940 fighters that are putative class

24  members, correct?

25          MR. DELL'ANGELO:  That's correct, Your Honor.

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          THE COURT:  All right.  And so of the 300,000 pages of

2   document or 300,000 documents, not pages of documents, documents

3   that they propose to produce to you because that information is

4   more readily accessible and searchable, why isn't that an

5   adequate universe for you to make out your claims concerning the

6   historical evidence?

7          MR. DELL'ANGELO:  Because it -- as I understand it --

8          THE COURT:  I understand it's not complete.

9          MR. DELL'ANGELO:  Right.

10          THE COURT:  I get that.

11          MR. DELL'ANGELO:  Because, as I understand it, Your

12   Honor, those 300,000 pages of the 600,000 are limited in Zuffa's

13   proposal to the contracts of the proposed class members.  Right.

14   So what it doesn't do is give us a complete picture, looking

15   back in time, of how those contracts evolved and how the company

16   used them and inserted clauses or didn't, as the case may be,

17   and changed them over time as the scheme evolved and the scheme

18   was implemented.

19          And so -- and just to be clear.  As I understand it,

20   the 600,000 is pages, not documents.  And the hesitation that we

21   have and the deep concern that we have is the electronic file,

22   you know, we have been told in the meet-and-confer process is

23   one that Zuffa can't certify is a complete set of contracts, you

24   know, historically.  And if you take a step back, I think part

25   of what we considered, Your Honor, is in the regular course of

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   business Zuffa undertook to create a set of contracts, right,

2   and that's the electronic file that they'd like to give to us.

3        So it seems that when --

4        THE COURT:  You're concerned about what the winnowing

5   process consisted of and whether you're going to get selected --

6        MR. DELL'ANGELO:  Well, right, and it's a process that

7   they undertook in the regular course of business, but now in the

8   discovery process, they've taken a position that it would be too

9   burdensome to actually provide -- to go essentially through the

10  same set of documents and provide a complete set.  So I don't --

11  in light of what the company has undertaken to do on its own in

12  the regular course of its own business, seems to me that going

13  through -- as they go through 600,000 pages, you know, seriatim,

14  taking out as you go through the one here and the one there that

15  relate to a fighter, it on some levels seems like it would be

16  more efficient to just go through them seriatim as they did in

17  the regular course of business and just provide a complete set.

18       THE COURT:  Let me hear from opposing counsel on this

19  issue.  So we'll take them a bite at a time.  And who will be

20  addressing the plaintiffs' -- excuse me -- the defendants' --

21       MR. COVE:  Me, Your Honor.  John Cove from Boies

22  Schiller & Flexner.

23       THE COURT:  Mr. Cove, what does the 600,000 -- first of

24  all, is it documents or pages?

25       MR. COVE:  It's pages.

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          THE COURT:  Okay.

2          MR. COVE:  It's pages of hard-copy documents.  And we

3   have gone through and estimated under our proposal how many of

4   those would need to be reviewed in order to --

5          THE COURT:  And what do those 600,000 pages consist of?

6          MR. COVE:  They consist of fighter files, sponsor

7   files, merchandise files, licensing files, acquisition files,

8   and corporate documents, oh, and venue and event files.  So it's

9   a smorgasbord of things that are in there.

10          THE COURT:  That's a preliminary collection of the

11   documents that you believe are relevant?

12          MR. COVE:  Those are the -- those are the 300 --

13   approximately half of them, of those 300,000, we believe fall

14   within what we've agreed to do, which is the fighter files for

15   all of the class members, the venue and sponsor files back to

16   2008, merchandise files back to 2008.  Not all of those will

17   ultimately be responsive, but those -- those boxes fall within

18   the time frame and the subject --

19          THE COURT:  No, but I'm trying to understand how it is

20   that you arrived at the universe of the collection.  And you

21   have identified 600,000 pages of documents in the case that are

22   potentially relevant and discoverable to the requests that have

23   been made in this case?

24          MR. COVE:  Well, no, there's 600,000 pages in various

25   places in storage.  Not all of those are relevant, but to

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1  actually look through them and determine what they are --

2       THE COURT:  You're talking about the process of

3  reviewing them to determine whether they contain relevant

4  documents?

5       MR. COVE:  Precisely.

6       THE COURT:  And you don't want to review all 600,000

7  pages of the hard-copy documents because it's inefficient?

8       MR. COVE:  Yes.  Well, Mr. Dell'Angelo referenced a

9  modest incremental burden.  Well, everything is incremental

10 here, and we're producing a huge number of electronic documents.

11      THE COURT:  Are the files likely to have privileged

12 materials in them?

13      MR. COVE:  Yes, some of -- some of them, they have

14 contract files for the -- fighter files, I should say, which are

15 files that contain the contracts, sometimes extension letters,

16 sometimes attorney notes relating to the contracts, things that

17 are important to the contract.  So what we've offered to do is

18 for all class members we'll search those entire class files, and

19 to the extent they have privileged documents, we'll log them --

20 withhold them and log them.  And that gives a cross-section of

21 9 -- approximately 940 members of the collateral -- 940 people

22 in that category.  They're not all members of the class, but

23 we're -- you have a date of anybody who fought after -- after

24 the statute period started to run.

25      THE COURT:  December 16th, 2010, is the date you keep

—TRANSCRIBED FROM DIGITAL RECORDING—

1  telling me.

2          MR. COVE:  That's exactly right, yes.

3          So we've got all those.  And in the course of

4  negotiations they said, That is not enough.  We said, Well, we

5  do have a contract -- electronic-filed contracts that have been

6  scanned which were mainly just the contracts.  They were scanned

7  in the normal course of business for business purposes and --

8          THE COURT:  Are these fighter contracts or they're also

9  vendor and sponsor --

10          MR. COVE:  No, these are the fighter contracts.

11          THE COURT:  Okay.

12          MR. COVE:  And we'll be -- because of the burden of

13  reviewing those things that have already been scanned and

14  typically --

15          THE COURT:  Correct, but how did you -- how did you

16  select which of the 600,000 pages of documents would be

17  electronically scanned?  What was the criteria that was used?

18          MR. COVE:  That was a business project that occurred

19  before the litigation which was --

20          THE COURT:  Okay.  But what was --

21          MR. COVE:  -- ostensibly to try to get a handle on the

22  documents and store them in a more efficient manner.  It's

23  important to have the fighter contracts because they contain

24  grants of rights that may be used in the future.  If they

25  replayed a bout that occurred in 2005, it's good to have the

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1    contract for that bout.

2         THE COURT:  So they were done for the business purpose

3    of making sure that you were getting your contractual rights?

4         MR. COVE:  Right, making sure we had a record of those

5    contractual rights, but we know that the process was not perfect

6    and that not everything got scanned, which is what we have

7    been -- you know, told them in the meet-and-confer process,

8    though, we thought it would -- they haven't been self-selected

9    to keep anything out.  What we're giving them is a combination

10   of all of the class members, plus anybody else that was in this

11   file that goes back.

12        In the class members, the plaintiffs have people that

13   fought back into the '90s before Zuffa existed.  So it gives

14   them a good cross-section of the history of these contracts.

15   And in our view, it's adequate and the so-called modest

16   incremental burden is not modest.  It's time and labor intensive

17   to go through hard-copy documents one by one.  To put it into

18   perspective, there's about 300 pages in a banker's box.  So

19   that's 100 extra boxes --

20        THE COURT:  I've done that pick-and-shovel work.  You

21   don't need to tell me about it.

22        MR. COVE:  Okay.  So it's a lot of documents in

23   addition to the 300,000 we're already doing, in addition to all

24   of the electronic information that is going to have to be

25   searched and reviewed for privilege.  If this were the only

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  thing that were in dispute, it wouldn't be the worst thing, but

2  everything we have is incremental to what we're already doing

3  which is already going to cost -- I'm not going to state a

4  figure because I don't know right now, but an enormous amount of

5  money.

6        We've given -- we're offering them electronically all

7  of the key custodian -- you know, all of the important decision

8  makers in the company, most important decision makers with

9  regard to the issues in the case, and this additional burden is

10  simply not worth it at this time.

11        THE COURT:  Would you be amenable to allowing all

12  600,000 pages to be available for spot-checking by the

13  plaintiffs so they could satisfy themselves that the 300,000 is

14  an appropriate cross-sample?

15        MR. COVE:  We wouldn't allow them open access to

16  hard-copy documents that might contain privileged material, no,

17  but we could think about some other sampling.  And we could

18  produce what's scanned and --

19        THE COURT:  I know -- you've offered to do that, and I

20  understand that.  And now -- it always gives the other side

21  angst when they don't get everything.

22        MR. COVE:  No, I understand it.  And, actually, when

23  they have the scanned material, they can see how far back in

24  time it goes and whether it satisfies their needs and how many

25  contracts of the -- of all of these class members that go back

—TRANSCRIBED FROM DIGITAL RECORDING—

1  in time and go back as far as they need.

2        THE COURT:  All right.  I'm going to adopt the

3  defendants' position with respect to these contract files at

4  this time without prejudice for plaintiffs to raise an issue

5  that you need them supplemented, or after you've had an

6  opportunity to review them to see what they contain, to see if

7  it appears that there are holes or there are incomplete -- I

8  understand they're incomplete in the sense you're not getting

9  them all.  The question is, you know, you also have to be

10  careful what you ask for sometimes.

11        So the procedure that defendants propose in this case

12  seems to me to be reasonable and gives you some fundamental

13  understanding of the types of documents of what exists in the

14  files and so forth.  And in order to get this process moving

15  forward, I will allow that again without prejudice for

16  plaintiffs to raise this issue again if upon review of the

17  actual documents once you get them you have identified some

18  holes or some reason to believe that they're not meeting your

19  discovery needs.  Okay?

20        All right.  Issue No. 2, the next set of issues with

21  respect to time frame have to do with -- well, you raise it in

22  the issue of importance to you.

23        MR. DELCOLLO:  Thank you, Your Honor.

24        THE COURT:  And this is again Mr. Dell'Angelo for the

25  record.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          MR. DELL'ANGELO:  Yes, it is, Your Honor, Michael

2    Dell'Angelo.

3          And I -- you know, I guess I just say, if I may, Your

4    Honor, the adoption of defendants' proposal with respect to the

5    contracts does give me some pause because I think what we heard

6    is that there's an acknowledgment that there are potentially

7    relevant documents in there that are not -- simply not going to

8    be looked at.  And the contracts of fighters who are not in the

9    proposed class are --

10          THE COURT:  I'm not boxing you out of an opportunity to

11    have a second pass at these, but what I am suggesting is look at

12    what you get in the first iteration and both sides will be in a

13    better position to evaluate and to advise me about what you

14    legitimately need that you haven't received.  So I want to make

15    that clear because in big, complex cases like this we can spend

16    months and months going through this process before you get a

17    single page of documents, and that's not going to happen.

18          MR. DELL'ANGELO:  Well --

19          THE COURT:  And if they underproduce and if they are

20    too obstreperous in not giving you what you legitimately need,

21    they're going to spend more time and money than if they gave it

22    to you in the first instance.  And they're smart enough to know

23    that.

24          MR. DELL'ANGELO:  I understand that, Your Honor.  And

25    that's, frankly, what we were trying to avoid.  And I guess I --

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1  I just -- I have tremendous pause at this point if what is being

2  represented is --

3          THE COURT:  I get it.  You don't like the order, but

4  that's it.  Okay.  Let's move on.

5          MR. DELL'ANGELO:  The next issue, Your Honor, is with

6  respect to the -- for the areas of discovery where there's not

7  already an agreement, and we have an agreement with respect to a

8  number of the other requests, the relevant time period.  And

9  what we're proposing for noncontractual documents, except for

10 those areas where there's an agreement, is that the relevant

11 time period should reach to January 1, 2005.  And that is a

12 little less than two years before the inception of the scheme as

13 it's alleged.

14          If you look at paragraph 129 of the complaint --

15          THE COURT:  Right.  You're alleging the scheme began in

16 December of 2006.

17          MR. DELL'ANGELO:  That's right.

18          THE COURT:  And so you're asking for two years

19 backwards for most category of documents.

20          MR. DELL'ANGELO:  That's correct, Your Honor.

21          And, you know, in an antitrust case like this there's

22 tremendous precedent, which we've cited in our status report to

23 you, for, you know, some lookback prior to the inception of the

24 scheme.  Zuffa is very focussed on the class period as a time

25 when the relevant time period should begin, but the reality in

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

1  these cases and what the case law recognizes is that the

2  demarcation point really needs to be the scheme itself because

3  there is this lookback that we talked about in trying to

4  understand, you know, how the scheme was implemented and how it

5  evolved.

6          And, you know, the documents that sort of form that and

7  go into the time that the scheme began and form kind of the

8  evidence that one looks at historically to understand what the

9  fore period looked like and then the during and then to the

10 extent that there's an after.  We don't really have an after

11 because we're alleging that there's a multifaceted ongoing

12 scheme.

13         So I think, frankly --

14         THE COURT:  But you did reach an agreement that June

15 30th of this year is the cut-off for prospective plaintiffs.

16         MR. DELL'ANGELO:  That's correct because there needs to

17 be a cut-off at some point, Your Honor.  And, you know, we're

18 trying to find ways to compromise and, you know, our document

19 requests were served in April of 2015.  The stay was lifted in

20 September.  I mean, we're trying very hard to sort of move this

21 along.  And I think that that January 1, 2005, cut-off is a

22 reasonable one in the context of this case.

23         And I point out there are other areas where the

24 defendant has agreed to 2005.  So if you look at documents

25 regarding acquisitions and then even if you look at the

—TRANSCRIBED FROM DIGITAL RECORDING—

1  agreement that we have with respect to unionization, which is

2  Request No. 44, as I understand it, defendants' position in the

3  status is that they're willing to go back to 2000.  I mean,

4  there's precedent for these time periods, but I think the case

5  law is the most important which establishes that, you know, the

6  nature of the time period that we're asking for here is

7  reasonable and appropriate.

8       THE COURT:  Right.  So you want a uniform time period

9  of January 1, 2005, through June 30th of 2015 for all categories

10  of documents aside from the fighter contracts?

11       MR. DELL'ANGELO:  That's correct, Your Honor, with

12  the -- with the exception of a few instances where we've reached

13  agreement.  So, for example, with respect --

14       THE COURT:  No, I'm just talking about the matters that

15  are in dispute.

16       MR. DELL'ANGELO:  Yes.  I just wanted to be clear.

17  There are some periods where we decided to make it 2010 for

18  organizational documents, that sort of thing, that a shorter

19  period will do.

20       THE COURT:  All right.  So let me hear from opposing

21  counsel.  Mr. Cove?

22       MR. COVE:  Thank you, Your Honor.

23       Yes, as noted, we've agreed to give contract files back

24  as far as they go in time because that's the core of the case.

25  We've agreed to provide the acquisitions back to 2005 because

—TRANSCRIBED FROM DIGITAL RECORDING—

1   that's something that they've talked about.  So the real issue

2   here is their overbroad requests for all documents relating to

3   contracts with merchandisers, with sponsors, with venues, with

4   TV broadcasters.

5          We think that, you know -- for example, let's take the

6   TV broadcasts.  We're going to give them the contracts with --

7   with Fox Now and with Spike TV in the past.  And those contracts

8   are, you know, substantially mutually exclusive.  So to keep

9   going -- the issue is whether having an exclusive contract with

10  Fox or with Spike TV is actually foreclosing on the competitors

11  from the hundreds of other TV venues or outlets who are out

12  there.

13         It's a similar analysis with regard to venues and with

14  regard to sponsors and with regard to merchandisers.  And these

15  are -- there are tremendous volumes of documents, especially,

16  again, in the hard-copy documents that go back to 2000 -- before

17  2008.

18         We're giving them some time -- we're offering them some

19  time before the -- before the statute run -- ran, but, again,

20  this would require us to go back and look at essentially three

21  additional years of all of these contracts for all of these

22  sponsors and all of these merchandisers, all of these venues,

23  which are voluminous and which they have not limited to the

24  contract files, but to all of the documents relating to the

25  contracts.  And we just think it's too much.  And it's -- the

──TRANSCRIBED FROM DIGITAL RECORDING──

1   burden is disproportionate at this point for the relation of

2   those allegations to the complaint.  They're going to get all of

3   this --

4          THE COURT:  And, yet, most of the key custodians don't

5   have ESI dating -- Mr. White I think is the one that has back to

6   2010, and the rest of them don't have ESI in --

7          MR. COVE:  Let me be clear on that because I'm not sure

8   it was clear from -- I hoped our part was clear, but I'm not

9   sure the whole discussion was clear.

10         What we've provided with regard to the time frames were

11  the documents that were -- that were maintained on e-mail

12  servers and the time frame when the litigation holds were

13  issued, what documents were there then.  That is not all of ESI

14  that those custodians have.  They still have shared drives.

15  They still have hard drives on their lap tops or desk tops.

16  They still have hard-copy documents.  None of those volumes or

17  time frames relate to those sources of ESI.

18         That being said, we're not contending that the ESI from

19  2008 to 2005 is that voluminous.  What we're contending is that

20  that -- having to go through all of those hard-copy files and

21  these venue files on events that happened eight, 10 years ago is

22  not relevant or probative.

23         One problem here is Zuffa, unlike, say, the NFL, at

24  some point was its own merchandiser and would contract with

25  manufacturers to have UFC merchandise:  coffee cups and t-shirts

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1 and pencils.  And then they would sell it on a retail basis.

2 All of that stuff is covered by their subpoena.  They had a deal

3 with Penney's at one time to -- a co-promotion deal with

4 Penney's to promote UFC apparel.  There's no way in the world

5 that a co-promotion deal with Penney's has any anticompetitive

6 effect or is relevant to a monopoly case.

7       But having to look through all of those documents, it's

8 just -- it's going to be enormously burdensome and unnecessary.

9 We've offered and we have a thought on the acquisitions, on the

10 fighters, the things that really need to go back in time, but to

11 have this tremendous searching through all of this paper just to

12 find things that are of marginal relevance is not worth it.

13       And, you know, if there are particular sponsors that

14 they are interested in, say, the video games or somebody like

15 that, we can do those kinds of searches, but to do the whole

16 gamut of everything back to that time is burdensome and wasteful

17 in our view.

18       THE COURT:  I'm adopting the plaintiffs' position with

19 respect to this issue and the documents as to which there are

20 still agreement shall be produced from the time period January

21 1st, 2005, forward.

22       Mr. Dell'Angelo, your next issue?

23       MR. DELL'ANGELO:  Thank you, Your Honor.

24       I think the next issue is kind of a global issue, and

25 it really relates to the identification of custodians.  So what

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

 1  we have been working hard to do and have been unsuccessful at is

 2  trying to identify --

 3          THE COURT:  Well, you've agreed on 16.

 4          MR. DELL'ANGELO:  Yes, we have in theory, Your Honor.

 5  The problem that we're having is identifying a universe of

 6  custodians from which to choose.

 7          THE COURT:  They've given me a pretty good list of how

 8  it is that they went about in identifying the custodians that

 9  they thought had the most -- they've given you the department

10  heads of the -- they've given you the CEO's and the decision

11  makers.  They've given you the chief operating officers of the

12  various departments over the various vendors, suppliers, TVs,

13  and so forth that go to the heart of what you're arguing about

14  here to the extent of their monopoly.

15          MR. DELL'ANGELO:  Well, I'm not sure that I share that

16  sort of understanding of what we've received, so...

17          THE COURT:  But who knows who has the most relevant

18  documents besides you on behalf of your client?

19          MR. DELL'ANGELO:  Well, so let me answer it this way.

20  One of the ways that we thought that we could work through this

21  issue was by -- was through a limited 30(b)(6) deposition.

22          THE COURT:  You want to do an initial discovery before

23  you do the discovery?

24          MR. DELL'ANGELO:  And so the response that we got, and

25  I think it's reflected in their papers, is it would be too

―TRANSCRIBED FROM DIGITAL RECORDING―

1   difficult for us to figure out who worked for us during the

2   relevant time period.  So that tells me that if Zuffa doesn't

3   know who worked for it during the relevant time period such that

4   it could, you know, address those issues at a 30(b)(6)

5   deposition, that the process of identifying all of the

6   potentially relevant custodians wasn't done at the level that it

7   should have been done.

8        And I think there's a couple of things that are

9   important to put it into perspective, and I think these things

10  are fairly clear, you know, between the parties.  That the

11  organizational charts that exist for 2015, we understand are

12  complete.  We also received partial organizational charts for

13  the period from years 2008 through 20 --

14       THE COURT:  And I understand that, and it's very clear

15  that the defendants are not going to tell you that they're

16  accurate or that they really reflect what people really did.

17  And that causes you some pause for concern.

18       MR. DELL'ANGELO:  And in addition to that, Your Honor,

19  we have no information that predates 2008.  And so if we take

20  into perspective the order that you just issued with respect to

21  the other discovery and allowing that to go back to 2005, we now

22  have this three-year gap where I have no insight.  And as those

23  incomplete organizational charts --

24       THE COURT:  Well, you know who the people at the top

25  are.  You don't know the people in the intermediate or lower

─── TRANSCRIBED FROM DIGITAL RECORDING ───

 1  tiers.

 2          MR. DELL'ANGELO:  That's right.  And there are all

 3  sorts of people for whom we've made it very clear we're not

 4  interested in knowing about really.  So --

 5          THE COURT:  And you've identified an additional 28

 6  custodians and you're talking with them about getting some

 7  information about who they are.

 8          MR. DELL'ANGELO:  Right.

 9          THE COURT:  And so you got those from the

10  organizational charts?

11          MR. DELL'ANGELO:  We did, Your Honor.

12          THE COURT:  And you got -- you basically took what the

13  description was and said, These look like the people that might

14  have information that we need.

15          MR. DELL'ANGELO:  That's correct, Your Honor.

16          THE COURT:  And they've agreed to provide additional

17  information for you.

18          MR. DELL'ANGELO:  With respect to those people.  What

19  they have not agreed to do is give us any perspective on who was

20  employed by the company from 2005 to 2008 and a more complete or

21  reliable list of people from --

22          THE COURT:  Sure.  But isn't that what usually happens?

23  Again, you know, in the...

24          Especially in complex cases, you start and then you

25  learn and then you find out if you need more or if you need to

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   fill in the holes.

2           MR. DELL'ANGELO:  Right.

3           THE COURT:  But to expect to understand the universe

4   before you start doing what I call the pick-and-shovel work is

5   really unrealistic and is not very efficient from my point of

6   view.  And I'm willing to allow you to disabuse me of that

7   notion, but you usually start by taking some depositions.  You

8   ask those fundamental questions of the people that presumably

9   have knowledge.  You know, who's the go-to person on this

10  subject matter?  Who's the one you rely on for this information?

11          And if you uncover additional names or -- so that you

12  can focus and tailor discovery and requests for the custodians'

13  reviews on those people, that's perfectly reasonable.  But to

14  across the board require them to tell you from day one who did

15  something in 2005 does not seem to me to be reasonable.

16          MR. DELL'ANGELO:  So, Your Honor, here's the issue that

17  we're struggling with is Zuffa has repeatedly represented and

18  taken the position that this case reaches most aspects of its

19  business, right.  So in many ways it's unlike a lot of antitrust

20  cases or other litigation where you're dealing with a certain

21  aspect of the company's business --

22          THE COURT:  Right.  You're saying everything they do is

23  anticompetitive.

24          MR. DELL'ANGELO:  Well, what we're saying is that the

25  anticompetitive scheme reaches many aspects of their business,

———TRANSCRIBED FROM DIGITAL RECORDING———

1  whether it's merchandising, sponsorship, deals with television,

2  you know --

3            THE COURT:  What else do they do?

4            MR. DELL'ANGELO:  Well, they have gyms, for example.

5  They have -- you know, there are some other things that they do

6  that we don't have a great deal of insight into, but that, you

7  know, I'm not so sure that they're necessarily part of this

8  scheme.

9            But the point being, Your Honor, it's not the more

10 typical case where we can say, Give us the organizational charts

11 for Departments 1 and 2, you know, and we can work through that

12 issue.  And, more typically, companies have organizational

13 charts that cover -- that are more reliable or that cover the

14 entire relevant time period.  And it's particularly this absence

15 of these three years that give us great pause because you have

16 employees that have left that remain entirely unidentified.

17            And what we were trying to do is to do this once,

18 right, is to limit or avoid altogether the possibility of coming

19 back to you and saying, you know, We've agreed on X number of

20 custodians, we've had all of these documents produced, and now

21 we've determined that there are really five or six other people

22 from this historical period where the company didn't have

23 organizational charts and wouldn't provide us any information.

24 And now we need five more custodians, you know, and have that

25 discussion with you in six months or nine months because --

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          THE COURT:  If that happens, I would expect -- well,

2     you wouldn't have to be in front of me on that because they

3     would acknowledge that you need that information.

4          MR. DELL'ANGELO:  Well, one would hope, Your Honor, but

5     given the process that has taken us here today, I'm not entirely

6     hopeful that that -- you know, or expect that that will be the

7     case, but --

8          THE COURT:  There are a lot of arrows in my quiver for

9     people that obfuscate.

10          MR. DELL'ANGELO:  Well, I guess, we -- I have great

11    pause, Your Honor, I mean, when we're being told today, you

12    know, that there is a universe of documents with potentially

13    relevant information that simply aren't going to be reviewed

14    when I don't have insight into who the universe of potentially

15    relevant custodians are.  I mean, I have this fear that -- you

16    know, we're very much trying to move this case and keep it on

17    track.

18          There's quite a bit of frustration that you've got

19    requests that were filed -- were served in April.  Discovery

20    stay that was denied in September.  And, you know, I feel like

21    we really haven't even begun in many ways, and we'd like to

22    keep -- I mean, we have this schedule before you that's largely

23    agreed.  We'd very much like to keep that as on track as humanly

24    possible.  My sense is --

25          THE COURT:  I'm going to be holding monthly status and

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   dispute resolution conferences.  And we're going to be dealing

2   with these without the necessity for formal motion practice and

3   deciding these things as we go so that, yes, that -- this is way

4   more time than most Federal Courts want to give you for this

5   type of a case, but there are limitations to what you can do

6   when you've been -- haven't made any progress so far.

7          MR. DELL'ANGELO:  Okay.  And I guess, lastly, I'd just

8   say, Your Honor, in the instances where what Zuffa has offered

9   to do is go back and research predecessors, that -- to people

10  who are on the organizational charts that we've identified,

11  that's helpful to a point.  But, again, when there are

12  individuals who don't appear in those charts at all or there's

13  that three-year period where we have absolutely no information

14  at all, it leaves us in the position of not knowing whether

15  we've even identified, you know, the person for whom there may

16  have been a predecessor to ask --

17         THE COURT:  Sometimes you get the best information out

18  of the people in the lower part of the food chains, yes.  I

19  understand that part.

20         MR. DELL'ANGELO:  Okay.

21         THE COURT:  All right.  Let me hear from Mr. Cove.

22         When can you get the additional information about the

23  additional custodians that have been requested from plaintiff?

24         MR. COVE:  They requested that on November 6th, and I

25  think we can get it to them early next week.

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1        And I don't want to belabor the point, but what they've

2  asked for is information on every employee and every independent

3  contractor who worked for Zuffa from 2005.  And the only

4  limitation that they've offered that I have seen is in the

5  status report where they say they don't want chefs, flight

6  attendants, or ring girls.  So I think we have a universe here.

7  The idea that we haven't given them information before 2005 is

8  wrong.  We've given them information about everyone's employment

9  history --

10        THE COURT:  Right.

11        MR. COVE:  -- back in time --

12        THE COURT:  But you've also told them you can't -- you

13  can't tell them it's accurate.

14        MR. COVE:  We -- well, we are -- we are doing the

15  research to see -- to make sure that we can -- you know, the --

16  these people are found on page 40, but they held various

17  positions.  So what we're going to do is say, Okay.  That person

18  was the senior manager at this time, but did he have a different

19  position?  And we give the whole history of what those positions

20  were.  And then if there's some gap for somebody who was

21  responsible for sponsorships, for example, who is not in here,

22  there's some gap in the time frame, we can research that as

23  well.

24        I mean, we're not playing hide the ball here and we're

25  perfectly willing to make sure they have a universe that is in

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  the zone of people within this 50 people who have responsibility

2  that we have here so that they understand who those people were.

3          But to have a deposition on it now, it would be

4  burdensome --

5          THE COURT:  I'm not going to order a Rule 30(b)(6)

6  deposition about discovery about discovery at this point, but

7  that will remain a possibility if I'm not persuaded that the

8  defendants are making good faith efforts to continue to

9  cooperate in identifying relevant custodians.  I'll require you

10  to provide the additional information concerning the custodians

11  that plaintiffs have provided to you by next week.  I'm going to

12  set this for a status and dispute resolution conference on

13  December the 8th at 1:45 in the afternoon, unless any counsel

14  whose presence is required cannot be available, so if you'd like

15  to consult your calendars.

16          You get Brownie points, Mr. Cove, for actually having a

17  physical calendar.

18          MR. COVE:  I am old-fashioned.  I can't visualize.

19          It is fine with the defendant.

20          MR. DELL'ANGELO:  It is as well for the plaintiffs,

21  Your Honor.

22          THE COURT:  All right, folks.  So I'm going to leave

23  all afternoon just to deal with you and your issues and your

24  problems so that we'll take as long as it takes.  And we are

25  going to make progress, and we are going to make the decisions

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  as we go along.  So I'll expect a joint status report --

2  December 8th, as I recall, is a Tuesday.

3          MR. COVE:  Tuesday.

4          THE COURT:  Tuesday?  So I'll require you to provide a

5  joint status report by the prior Friday.

6          MR. COVE:  We'll endeavor to make it shorter, Your

7  Honor.

8          THE COURT:  Well, just keep in mind there are

9  limitations as to how much I can read in how much a period of

10  time.  So that's fine.  We're making progress, and we're going

11  to get these issues resolved as we go along.

12          And I'll see you next December 8th.

13          MR. COVE:  Thank you, Your Honor.

14          MR. DELL'ANGELO:  Thank you, Your Honor.

15          THE COURT:  Thank you, counsel.

16          (Whereupon proceedings concluded at 10:08 a.m.)

17                          --oOo--

18      I, Patricia L. Ganci, court-approved transcriber, certify

19  that the foregoing is a correct transcript transcribed from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23      /s/ PATRICIA L. GANCI          DECEMBER 2, 2015
         Patricia L. Ganci                   Date
24

25