──────TRANSCRIBED FROM DIGITAL RECORDING──────

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5              Plaintiffs,             )  Case No. 2:15-cv-01045-RFB-PAL
                                       )
6        vs.                           )  Las Vegas, Nevada
                                       )  June 1, 2017
7  ZUFFA, LLC, d/b/a Ultimate          )
   Fighting Championship and           )
8  UFC,                                )  STATUS CONFERENCE
                                       )
9              Defendants.

10 ─────────────────────────────

11

12

13              TRANSCRIPT OF PROCEEDINGS

14          THE HONORABLE PEGGY A. LEEN,
            UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19 APPEARANCES:          See Next Page

20 DIGITALLY RECORDED:   Liberty Court Recorder (LCR)
                         9:32 a.m.

21

22 TRANSCRIBED BY:       PATRICIA L. GANCI
                         (702) 385-0670

23

24 Proceedings recorded by electronic sound recording, transcript
   produced by mechanical stenography and computer.

25

```
————————TRANSCRIBED FROM DIGITAL RECORDING————————
```

 1   APPEARANCES:

 2   For the Plaintiffs:

 3       **DON SPRINGMEYER, ESQ.**
         WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
 4       3556 E. Russell Road, 2nd Floor
         Las Vegas, Nevada 89120
 5       (702)341-5200

 6       **ERIC L. CRAMER, ESQ.**
         **MICHAEL C. DELL'ANGELO, ESQ.**
 7       BERGER & MONTAGUE, P.C.
         1622 Locust Street
 8       Philadelphia, Pennsylvania 19103
         (215)875-3000

 9

10       **JOSEPH R. SAVERI, ESQ.**
         **MATTHEW SINCLAIR WEILER, ESQ.**
         THE JOSEPH SAVERI LAW FIRM, INC.
11       555 Montgomery Street, Suite 1210
         San Francisco, California 94111
12       (415)500-6800

13       **ROBERT MAYSEY, ESQ.**
         WARNER ANGLE HALLAM JACKSON FORMANEK, PLC
14       2555 E. Camelback Road, Suite 800
         Phoenix, Arizona 85016
15       (602)264-7101

16   For the Defendants:

17       **J. COLBY WILLIAMS, ESQ.**
         CAMPBELL & WILLIAMS
18       700 South 7th Street
         Las Vegas, Nevada 89101
19       (702)382-5222

20       **STACEY K. GRIGSBY, ESQ.**
         **NICHOLAS A. WIDNELL, ESQ.**
21       BOIES, SCHILLER & FLEXNER, LLP
         1401 New York Avenue, NW
22       Washington, DC 20015
         (202)237-2727

23

24       **BRENT K. NAKAMURA, ESQ.**
         BOIES, SCHILLER & FLEXNER, LLP
         1999 Harrison Street, Suite 900
25       Oakland, California 94612
         (510)874-1000

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   APPEARANCES CONTINUED:

2          **MARCY N. LYNCH, ESQ.**
           BOIES, SCHILLER & FLEXNER, LLP
3          121 S. Orange Avenue, Suite 804
           Orlando, Florida 32801
4          (407)425-7118

5
    For Nonparty Bellator Worldwide:
6
           **PHILIP M. KELLY, ESQ.**
7          KENDALL BRILL & KELLY, LLP
           10100 Santa Monica Boulevard,
8          Los Angeles, California 90067
           (310)272-7908
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1              LAS VEGAS, NEVADA; THURSDAY, JUNE 9, 2017; 9:32 A.M.

2                             --oOo--

3                    P R O C E E D I N G S

4           COURTROOM ADMINISTRATOR:  Your Honor, we are now

5    calling Le versus Zuffa, LLC.  The Case Number is

6    2:15-cv-1045-RFB-PAL.

7           Beginning with plaintiffs' counsel, counsel, state your

8    names for the record.

9           MR. CRAMER:  My name is Eric Cramer from Berger and

10   Montague for the plaintiffs.

11          MR. DELL'ANGELO:  Good morning, Your Honor.  Michael

12   Dell'Angelo from Berger and Montague on behalf of the

13   plaintiffs.

14          MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri,

15   San Francisco, California, on behalf of the plaintiffs.

16          MR. WEILER:  Good morning, Your Honor.  Matthew S.

17   Weiler, San Francisco, California, also on behalf of plaintiffs.

18          MR. SPRINGMEYER:  Good morning, Your Honor.  Don

19   Springmeyer, Wolf Rifkin, on behalf of the plaintiffs.

20          MR. MAYSEY:  Good morning, Your Honor.  Robert Maysey

21   from Warren and Angle on behalf of plaintiffs.

22          MR. WILLIAMS:  Good morning, Your Honor.  Colby

23   Williams, Campbell and Williams, on behalf of the defendant,

24   Zuffa, LLC.

25          MS. GRIGSBY:  Good morning, Your Honor.  Stacey Grigsby

—TRANSCRIBED FROM DIGITAL RECORDING—

1  from Boies Schiller and Flexner on behalf of Zuffa.

2       MR. WIDNELL:  Good morning, Your Honor.  Nicholas A.

3  Widnell of Boies Schiller and Flexner on behalf of Zuffa, LLC.

4       MR. NAKAMURA:  Good morning, Your Honor.  Brent

5  Nakamura also on behalf of Defendant Zuffa, LLC, from Boies

6  Schiller Flexner.

7       MS. LYNCH:  Good morning, Your Honor.  Marcy Lynch from

8  Boies Schiller and Flexner on behalf of Zuffa, LLC.

9       MR. KELLY:  Good morning, Your Honor.  Phil Kelly from

10 Kendall Brill and Kelly on behalf of Nonparty Bellator

11 Worldwide.

12      THE COURT:  We have a lot of ground to cover this

13 morning and multiple matters on calendar.  So obviously your

14 request for a status conference, Docket No. 393, was granted.  I

15 originally set this for May 18th, but vacated it and reset it

16 when incoming additional papers were filed so that everything

17 could be resolved that is current.  And, of course, since then

18 there's been more incoming.

19      I have read all of the moving and responsive papers,

20 including everything that was filed up through yesterday.  So

21 I'm prepared to proceed.

22      We're going to proceed in the following order.  I'm

23 going to first hear argument from Nonparty Bellator on its

24 motion to quash, and plaintiff has the flip-side of that motion

25 which is a motion to compel.  And I'm not going to hear three

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   sets of arguments, responses, and replies.  So I'll have counsel

2   for Bellator make its arguments.  Counsel for plaintiff will go

3   next and respond.  Counsel for Zuffa will follow, and then

4   Bellator gets the last words.

5           So, again, I have read your moving and responsive

6   papers, but this is your opportunity for oral argument.

7           Let me just tell the parties a little bit of -- you can

8   approach the lectern.  Having reviewed all of these matters, the

9   voluminous papers that accompany the motions, I don't really

10  have an issue with respect to the timing -- the timeliness of

11  your motion to quash.  The subpoena was served a long time ago.

12  The parties have been engaged in extensive negotiation back and

13  forth.  It appears that you have produced a substantial amount

14  or agreed to produce a substantial amount of material, and

15  you've honed down the disputes among the parties here to two

16  categories of information, basically event-level profit and loss

17  statements and event-level fighter compensation.  And so I

18  really don't have an issue with respect to timeliness, and I

19  don't need to hear oral argument about that.

20          I also don't have an issue with respect to whether

21  Bellator has met its burden of showing that the documents that

22  are in dispute in this motion to quash and the plaintiffs'

23  countervailing motion to compel are sensitive financial and

24  commercial information; to which you are ordinarily entitled to

25  protection; and that of course one of the parties that seeks

———— TRANSCRIBED FROM DIGITAL RECORDING ————

 1  this information is a competitor.  The law's pretty clear the

 2  burden then shifts to the party seeking the information to show

 3  substantial need.

 4       So what I need to hear from Bellator is there is a

 5  protective order governing confidentiality in place.  It was

 6  amended precisely for the benefit of Bellator and others from

 7  whom the parties are seeking discovery in this case.  It would

 8  limit the dissemination of this information to outside counsel

 9  and experts.  And why isn't an attorneys' eyes only strict

10  limitation adequate?

11       And, two, I appreciate -- fully appreciate your

12  arguments with respect to burden.  You're not arguing that

13  production of the materials in this case is unduly burdensome in

14  the sense that it will be too time consuming or expensive to

15  locate and produce the documents the parties seek.  Rather, what

16  you are arguing is that the nature of the protective order and

17  the necessity for justifying documents being sealed on an

18  ongoing basis is unduly burdensome, and the time frame for

19  complying with your burden's unduly or your obligation as the

20  party seeking protection is unduly burdensome, and there is no

21  protection at trial.

22       So I will tell you, to me, it is -- the latter issue is

23  relatively easy to address because I can and will give you a

24  standing order deeming that you have initially met your burden

25  of showing that the documents are sensitive and may be -- any

──────── TRANSCRIBED FROM DIGITAL RECORDING ────────

1  documents that you produce are pursuant to attorney's eyes only,

2  may be sealed, and shifting the burden to any party seeking to

3  unseal to initiate any process and give you an opportunity to

4  weigh in.

5          So those are just -- having looked at all of this in

6  some detail, I want to let you know what I'm thinking about so

7  that you can tailor your arguments accordingly.

8          MR. KELLY:  Thank you very much, Your Honor.  And I

9  want to start by saying I appreciate the flexibility with the

10 hearing date.  That really helped me out personally.  And I

11 appreciate the guidance so that I can cut through a fair amount

12 of this.

13         I do want to address the substantial need test, which I

14 know is the party's burden, but what I really want to focus on

15 is the scope of the requests and the substantial burden --

16 substantial need showing that has been made.  You indicated that

17 there are two categories, and that's right.  One is event-level

18 financials, and then there are substantial need showing; their

19 saying why they're saying they need event-level financials.

20         What the requests actually call for is something far

21 detailed -- far more detailed than just event-level financials.

22 They're seeking every scrap of paper related to five or six

23 categories of expenses, five or six categories of revenues, for

24 every fight that Bellator has promoted in its nine-year history

25 throughout the world.  We're talking hundreds of fights here.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          They haven't made --

2          THE COURT:  First of all, you don't have to worry about

3    throughout the world because the lawsuit is limited to the

4    punitive class, and the lawsuit allegations are limited to the

5    United States or in the alternative to North America.

6          MR. KELLY:  Well, that's not a limitation that exists

7    in the request for production.  I appreciate that that's --

8    would be one narrowing.

9          The plaintiffs' showing of substantial need, and I'm

10   just going to read from their opposition brief, consists of the

11   following:  Bellator's financial information is clearly relevant

12   to plaintiffs' claims in the underlying litigation.  Plaintiffs

13   raise the issue of Bellator's financial performance in the CAC.

14   Accordingly, Bellator's financial information is clearly

15   relevant.  Plaintiffs have substantial need for this information

16   in order to prove claims made in the CAC regarding Bellator.

17         That's completely circular.  It's unsupported by any

18   evidentiary support.  There's not a declaration from one of the

19   parties.  There's not a declaration from an expert.

20         Zuffa, on the other hand, did offer a declaration from

21   an expert.  And on the financial issues his declarations offers

22   justifications or substantial need for financial information

23   generally.  What he hasn't offered and can't offer, I submit, is

24   substantial need justification for each and every event P&L,

25   each and every event expense, revenue.  What he's asking for is

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  information that will help him determine market-entry barriers,

2  growth of Bellator over time, whether Bellator's been able to

3  compete profitably.  All of that information can be provided in

4  other ways besides event-level detailed financial information.

5          And, by the way, let's not forget that Zuffa has two

6  requests related to financial information.  One is the

7  event-level financials.  The other is, Oh, by the way, if that

8  doesn't cover everything, we also want in as granular level as

9  exists every other financial document related to the operations

10 of Bellator's business.  That, I submit, is wildly overbroad,

11 and they haven't even tried to offer substantial need for that.

12         The -- there is a way -- first, I don't think any

13 financial documents should be produced or substantial need

14 hasn't been shown.  The expert offers fairly cursory

15 explanations as to why substantial need, but it's not tied to

16 elements of the case that they need to prove or defend.  And the

17 standard for substantial need is that it's essential to trying

18 its case, and I don't think they've met that burden.

19         The next category is unredacted fighter contracts and

20 all negotiations related to fighter contracts.  We have offered

21 to provide within whatever category the parties want to define

22 it anonymized exemplar contracts.  In other words, we

23 redacted --

24         THE COURT:  So let me -- I understand that.

25         MR. KELLY:  Okay.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          THE COURT:  So let me ask you a few questions about

2    that.

3          MR. KELLY:  Great.

4          THE COURT:  Does Bellator have essentially an exemplar

5    contract that it uses with filling in the blanks with different

6    numbers or does it tailor individual fighter contracts based on

7    a variety of business factors?

8          MR. KELLY:  Bellator has a standard form contract that

9    is used as a starting point and for many, many fighters.  And

10   there are other situations where specific terms are negotiated

11   in or out of certain fighter contracts.  And what we'd be

12   willing to do is provide the negotiated final contract without

13   names or identifying information.

14         THE COURT:  For all of your fighters?

15         MR. KELLY:  Well, I don't think we should have to do it

16   for all of them.  We're talking every fighter that Bellator's

17   ever signed in its nine-year history.  I think that's vastly

18   overbroad.  But we can --

19         THE COURT:  So tell me how many that is so I have a

20   clue.

21         MR. KELLY:  Excuse me?

22         THE COURT:  Tell me approximately how many that is so I

23   have a clue.

24         MR. KELLY:  It's in the hundreds.  I don't have an

25   exact number for you over the history.  And Bellator has

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

1    undergone significant changes over time.  Completely different

2    management now than it had when it started, and ownership.  And

3    so, you know, some of the older documents will be more

4    difficult.  Again, I'm not here to make an undue burden

5    argument.

6            Bellator's a, you know, significant company and it's

7    owned by Viacom.  They can throw resources at it, if necessary,

8    but there will be some difficulty in tracking down older

9    documentation.

10           But what we'd be willing to do, because I understand

11   there are arguments regarding different levels of fighters, is

12   to provide anonymized samples within whatever categories they

13   tell us.  You know, we don't need to decide that.  They can tell

14   us --

15           THE COURT:  Well, I understand from your papers one of

16   the issues that you had with them is neither side is willing to

17   define who an elite fighter is for purposes of their request.

18           MR. KELLY:  Well, I don't know that we ever got to that

19   point.  I think the plaintiffs agreed that this would be an

20   acceptable approach.  Zuffa never agreed to meet and confer.

21   And from our standpoint, unless they both agreed, doesn't do us

22   any good.

23           But, to me, for purposes of the substantial need test,

24   what they actually need to be able to defend or prove their

25   case, the anonymized contracts, which, by the way, one of the

—TRANSCRIBED FROM DIGITAL RECORDING—

1  arguments they say they need the names is so that they can see

2  if there are extensions or cancellations.  We can provide that

3  anonymously.  We can provide:  Here's a set of Fighter A that

4  has his contract, any extension, any cancellation.  The name --

5  they don't need to have the name.  And the concern --

6      THE COURT:  Right, they don't need to link the specific

7  contract terms with the specific athlete to know what your terms

8  are --

9      MR. KELLY:  That's exactly right, Your Honor.

10     THE COURT:  -- is what you're telling me.

11     MR. KELLY:  And the anonymized contract -- I've been

12  through Mr. May's declaration.  You can solve all of his

13  concerns with anonymized contracts if you provide the

14  sequential --

15     THE COURT:  Right, and that was my point about whether

16  there was any definition of clue note because they want to

17  find -- if I understand what the parties are saying is they want

18  to -- they need the names because they need to compare apples to

19  apples to see if your fighter -- your anonymous fighter is on

20  par with a UFC fighter in terms of the compensation package and

21  terms.

22     MR. KELLY:  I think the reality of this is, is these --

23  we're not -- we're talking about fighters who are either

24  Bellator fighters or UFC fighters.  And I'm not sure that

25  there's a way to say Bellator fighters --

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          THE COURT:  Is better than your guy, yeah.

2          MR. KELLY:  Yeah.

3          THE COURT:  And you provided a list of all of your

4   fighters, correct?

5          MR. KELLY:  We provided a list of our fighters, yes.

6          And certainly, you know, if they wanted to provide, you

7   know, some sort of -- out of these 10 fighters, we need example

8   contracts for, you know, five of them or six of them and it can

9   be anonymous, then we're okay with that because that at least

10  provides us some level of protection.  Obviously this is a

11  horrible situation for Bellator to be in to -- we're being asked

12  to turn over our most confidential and sensitive information to

13  not only the biggest competitor out there, but to the fighters

14  who we negotiate against.  And in either hands it could be

15  potentially devastating to Bellator, and CEO Scott Coker has

16  submitted a declaration laying that out in detail.

17          And, by the way, Mr. Coker, I believe the parties have

18  agreed, is going to be deposed and --

19          THE COURT:  I was going to get to that.  So you're not

20  going to resist having his deposition taken.  What you are

21  resisting is the level of detail that both sides are seeking in

22  this case and linking names with compensation packages.

23          MR. KELLY:  That's exactly right, and the detailed

24  financial information.  But we're okay with Mr. Coker being

25  deposed.  And, frankly, we'd prefer them ask the questions of

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   Mr. Coker than us turning over documents that are -- you know,

2   that contain all of this information.

3           And I think the vast majority, if not everything they

4   want, they can get from Mr. Coker in terms of, you know,

5   barriers to entry and growth of Bellator over the years and the

6   events that have been successful and haven't been successful,

7   profits and loss, you know, whether Bellator's been profitable.

8   They can get that from Mr. Coker.  And I think that is a

9   sufficient backstop such that they don't need all of the

10  documents that they're seeking here.

11          Frankly, I don't think they need any of them beyond

12  maybe anonymized contracts.  And, you know, Bellator does not

13  want to, but in a worst-case scenario would be willing to

14  provide high-level monthly/quarterly financial statements.  It

15  would not contain information about every single fight, but that

16  is something that Bellator is willing to do, if absolutely

17  necessary.  It doesn't solve the problem that, you know, Zuffa's

18  expert, plaintiffs' expert, and all of the lawyers now have a

19  road map to Bellator's business and how its growth is going.

20          And the concerns that we have -- we're not concerned

21  that the lawyers here are going to, you know, whisper to the

22  parties what happens, but there are a number of issues that we

23  have to deal with.  And I'm not sure the protective order, which

24  you raised as an issue, is sufficient.

25          The information that Bellator provides is going to be

1  used in an expert report.  I'm not sure how that expert report,

2  unless it is also marked as attorneys' eyes only --

3          THE COURT:  That's precisely my question.  How are they

4  ever going to be able to use the information without effectively

5  disclosing it?

6          MR. KELLY:  That's our concern.  And it may not be, you

7  know, Here are Bellator's numbers in an expert report, but it's

8  going to say, Bellator has been able to grow or Bellator is

9  profitable --

10          THE COURT:  This is what you've done right and this is

11  what you've done wrong in the opinion of the expert.

12          MR. KELLY:  That's exactly right.

13          THE COURT:  And this is why you're not competitive or

14  this is why you are competitive.

15          MR. KELLY:  That's right.  And same thing with the

16  fighters.  If they want to compare fighters, you know, Bellator

17  fighter compared to this fighter, they're disclosing our

18  information.  And I don't see a way that the expert report can

19  be done in a way that doesn't disclose, if not the very

20  specifics, the substance of the information.

21          And, to me, that's a very significant concern.  And

22  from Bellator 's standpoint we don't see how you get around

23  that, which effectively is releasing our information not only to

24  the parties, our competitor and the people we contract against,

25  but to the public.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          THE COURT:  Of course they accuse you of doing exactly

2     that in the District of New Jersey in connection with the

3     Alvarez litigation.

4          MR. KELLY:  Sorry?  I missed that.

5          THE COURT:  Perhaps, you weren't privy to that.  That's

6     exactly what Zuffa accused you of doing in New Jersey in the

7     Alvarez litigation you filed there.

8          MR. KELLY:  I was not involved in that one.  I honestly

9     don't know the details of it, but I understand that there has

10    been a fight going on or was a fight going on there.

11         It's -- I mean --

12         THE COURT:  Do you have any ongoing litigation with

13    Zuffa?

14         MR. KELLY:  I don't believe so, Your Honor, but perhaps

15    one of the other counsel here would know better than I.

16         The other issues we have with the protective order is

17    it's effectively drawing Bellator into this case, not directly,

18    but we now have to monitor every deposition that happens, every

19    motion that's being filed.  And I appreciate the blanket order

20    of sealing, but --

21         THE COURT:  Well, it wouldn't be a blanket order.  It

22    would be an order that you've made the specific finding with

23    respect to the attorneys' eyes only materials then shifting the

24    burden to any party seeking to unseal.

25         MR. KELLY:  Which means if somebody wants to unseal,

—————————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————————

1    Bellator has to be here to fight it.

2              THE COURT:  Correct.

3              MR. KELLY:  And there the other issue is trial.  And

4    I'm not sure if Your Honor would be able to address that.  I

5    know the parties have indicated a willingness to --

6              THE COURT:  I don't presume to tell the district judge

7    how to handle his case, so ...

8              MR. KELLY:  Right.  And so, you know, I think the

9    parties are willing to address that in some way, but sitting

10   here today I have no -- there's no solution.  My client is

11   facing full disclosure of its most confidential and sensitive

12   information at trial to its competitors and to the public, and

13   that's just not acceptable to us.  And I don't think -- you

14   know, in any situation where one competitor is being asked to

15   disclose -- by the way, not involved in the case at all being

16   asked to disclose its most confidential commercially-sensitive

17   information to others, there have to be limitations on that.  I

18   think the Court's recognized that.

19             The -- the final point that I want to make about the

20   harm and the burden is there are confidentiality provisions in,

21   for example, the fighter agreements and in the agreements we

22   have with vendors and sources of revenue and expenses.  All of

23   those people would have to be contacted, told that their

24   agreements are going to be produced, and at least in theory

25   those people could show up and assert a privacy right to, you

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1    know, preclude that particular document from being produced.

2            I think that's going --

3            THE COURT:  Of course, that's true any time information

4    is produced in any litigation anywhere in the country that

5    contains a confidentiality provision.  I mean, that's what we

6    do.

7            MR. KELLY:  I understand.  But from a burden

8    standpoint, and I know some of the parties have had this --

9    raised this as their own issue, if we have hundreds of

10   agreements to people we have to notify before producing them, I

11   mean, it's doable, but that is a -- you know, that is a point of

12   burden.

13           I just don't think -- certainly from the plaintiffs'

14   standpoint, I don't think they have come close to meeting the

15   substantial need test based on the papers that they've

16   submitted.  And I don't believe that Zuffa has shown a

17   substantial need to anything more than the anonymized contract

18   and at best summary financial information.

19           The details that they've asked for go far beyond what

20   their --

21           THE COURT:  You're objecting to event-level profit and

22   loss information, but you're willing to provide, if you

23   absolutely have to, quarterly financial information in broad

24   categories that gives them what they need.

25           MR. KELLY:  That's right, Your Honor.

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1          THE COURT:  Thank you.

2          MR. KELLY:  Thank you.

3          THE COURT:  Who will be arguing on behalf of the

4   plaintiffs?

5          PLAINTIFFS' COUNSEL:  Mr. Weiler.

6          MR. WEILER:  Good morning, Your Honor.  Matthew S.

7   Weiler on behalf of the plaintiffs.

8          I think at the outset I want to take a step back here

9   and talk about substantial need in connection with the elements

10  that the plaintiffs have to prove I think our case here.  This

11  is a Sherman Act Section 2 case.  It's about markets.  It's

12  about market power.  It's about --

13         THE COURT:  But your punitive class is only -- only

14  consists of people who have fought for UFC.

15         MR. WEILER:  That's correct.  And plaintiffs have

16  alleged there's no competition -- there is no competitor, right?

17  It's Zuffa.  And everybody else is the minor leagues, right.

18  But we have to prove that.  The plaintiffs have to prove that.

19  And there are material allegations.  There are material

20  allegations such as Zuffa controls 90 percent of the revenue in

21  the sport of MMA.  We need detailed -- we need detailed --

22         THE COURT:  Why do you need event-level detailed

23  information if you have aggregate information that you know how

24  many fighters they have.  You've reached an agreement with

25  respect to information you need in the vast majority of the 15

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  broad areas requested in the subpoena duces tecum, and you've

2  reached an accommodation with respect to sponsors, vendors, and

3  broadcasters.

4       Why do you need to know what every one of their

5  fighters makes and what every one of their fighter contracts

6  says linked to the name as opposed to the anonymous contracts

7  that don't identify the fighter, but identify the terms and

8  their compensation package and things like the duration that

9  you're concerned about?

10       MR. WEILER:  Well, let's back up a second here, Your

11  Honor.  We're -- the issue is that we need to have an

12  apples-to-apples comparison.  A Bellator fighter with X amount

13  of experience gets X amount of dollars.  A UFC fighter with Y

14  amount of experience gets Y amount of dollars.  The contracts

15  themselves won't necessarily tell you that.  How it works in the

16  MMA industry is that compensation is something that's, as

17  Mr. Kelly said --

18       THE COURT:  Or it might indicate that some fighters

19  have better agents and lawyers that negotiate better terms.

20       MR. WEILER:  Sure.

21       THE COURT:  I mean, if you have the aggregate

22  information and you know who the fighters are, why do you need

23  to know what each fighter makes in order for you to analyze

24  whether Zuffa has precluded any competition or precluded people

25  who want to fight from being fairly compensated?

-TRANSCRIBED FROM DIGITAL RECORDING-

1           MR. WEILER:  Well, we need to be able to -- we need to

2  be able to show on a fighter-by-fighter basis that --

3           THE COURT:  You keep saying, "We need to know," and now

4  I want to know why you need to know because I don't see it.

5           MR. WEILER:  Well, because we need to compare -- we

6  need to compare the compensation.  We need to compare the

7  compensation that fighters at Bellator -- this can be

8  anonymized.  We don't need to know their names.  We can just

9  know their experience and how much they get per bout.  They can

10 say, you know --

11          THE COURT:  Can't you find that information out from

12 the information you have received or will receive?

13          MR. WEILER:  No, no, no, no.  Your Honor, we cannot.

14 We do not know what the fighter compensation of Bellator's

15 fighters are.  We do not know that.  We do not know their

16 expenses.

17          If -- I mean, we provided Your Honor examples of the

18 information, the financial information, and I'm sure Your

19 Honor --

20          THE COURT:  Right.  But now you've heard counsel,

21 kicking and screaming.  They would agree to offer quarterly

22 financials in categories to give you more information.

23          MR. WEILER:  Well, they -- I mean, we could negotiate

24 within those parameters.  We would certainly want to know what

25 all of the fighter compensation is.

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1          THE COURT:  You've had 15 months or more to negotiate.

2     We're here to resolve this right now.  So now we're getting down

3     to the brass tacks.

4          MR. WEILER:  Okay.  Well, let's -- it -- Your Honor,

5     it's insufficient to have this information in summary form.

6     That's the bottom line.

7          THE COURT:  I get why it's -- what you've got so far is

8     not particularly helpful.

9          MR. WEILER:  We're going to have disputes about, you

10    know, whether certain fighters from Bellator should be

11    considered in the same market as fighters from Zuffa.

12         THE COURT:  This is why I started off asking, your

13    definition of an elite fighter for purposes of the consolidated

14    amended complaint is any professional MMA fighter who has

15    demonstrated success through competition in local and/or

16    regional MMA promotions or who has developed significant public

17    notoriety among MMA industry, media, and consuming audience

18    through demonstrated success in the athletic competition.  Why

19    isn't that information that you and Zuffa both have?

20         MR. WEILER:  Well, Zuffa -- I think what Zuffa is going

21    to try and do is going to try and say, Hey, look, these Bellator

22    guys are just as elite.  They're -- you know.

23         THE COURT:  Right, which is why I'm telling you --

24    because your clients know what the industry is.  Zuffa knows

25    what the industry is.  You know who Bellator's fighters are.

————— TRANSCRIBED FROM DIGITAL RECORDING —————

 1          MR. WEILER:  But we need to know the revenue-weighted

 2     value of these fighters.  We need to know the revenue-weighted

 3     value of these fighters, and in order to do that, we need to

 4     know what their compensation is.  We don't need to know who they

 5     are.  We can accept, for example, they've had five fights at

 6     either UFC or Bellator, right, and they get this amount.  And

 7     they can be fighter 1, fighter 2, fighter 3, fighter 4.  That's

 8     fine.  We're not looking to expose to the world what these

 9     fighters make.  We understand the importance of keeping that

10     information confidential.

11          And when these reports -- when these expert reports are

12     generated, they will be under -- they will be under seal, and

13     they will be make summary conclusions about the market, about

14     market power, right, about Zuffa's market power.  That is going

15     to be the ultimate -- it is going to be the ultimate conclusion,

16     and it's going to be more about Zuffa and the UFC than it is

17     going to be about Bellator.  We're certainly not going to

18     disclose what any of these -- what any of these people made,

19     what any of these fighters made, in those reports.  It's not

20     going to say, you know, This Bellator star gets this much

21     compared to this Zuffa guy.  That's not how it's going to be.

22     It's going to be summary.  It's going to be summary conclusions

23     about market power and also about foreclosure, right.

24          And it's critical to have the fighter -- this is a

25     monopsony case.  It's all about how much fighters get paid --

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  how much they should get paid, right.  You've got to compare,

 2  for example --

 3          THE COURT:  I get your argument in this case is that

 4  Zuffa's effectively by what it's done and how its conducted its

 5  business and how it's acquired and how it ties up sponsors,

 6  blah, blah, blah -- I'm not trying to be disparaging in that,

 7  but I've heard the long train of abuses many times before.

 8          MR. WEILER:  Sure.

 9          THE COURT:  Because of what Zuffa does, they're really

10  the only game in town.

11          MR. WEILER:  That's right.

12          THE COURT:  And that's your theory of this case.

13          MR. WEILER:  That's right.  And this evidence -- and

14  this is evidence we need to prove -- to prove those allegations.

15  We need the detailed financials.

16          And, Your Honor, if I could just go back to the

17  requests that we're talking about here so that we're all on the

18  same page.

19          I heard Mr. Kelly get up here and say, They're looking

20  for every scrap of paper about every financial term, every this,

21  every that.

22          THE COURT:  He was referring to Zuffa's catchall, if

23  you didn't give us everything in certain requests, then give us

24  everything in granular form.

25          MR. WEILER:  Okay.  But from the plaintiffs'

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   perspective, we're looking for documents sufficient to show, and

2   P&Ls, spreadsheets, these types of things would be sufficient to

3   show.  A spreadsheet with anonymized fighter compensation, this

4   amount of experience, this is what their compensation is.

5          And, again, just to back up.  You can't get this -- you

6   can't get this from looking at the contracts.  The contracts may

7   not have the side agreements that, you know, are a big part of

8   this industry, right.  They will not necessarily have the fight

9   agreements.  We need to know -- or will not have the side

10  agreements.  We need to know what the total compensation for

11  these fighters were in order to do a revenue-weighted valuation

12  of Bellator's fighters to know if any of them, if any of them,

13  right, are in the same category as UFC's fighters.

14         And I just I want to address, Mr. Kelly said, Hey, you

15  can just -- you can just depose Mr. Coker and get this

16  information.  No CEO that I've ever met has, you know, the

17  detailed -- you know, the details of, hey, what's the fighter

18  compensation with respect to --

19         THE COURT:  No, he's going to give you the big picture

20  about what he gets paid and what he does and how his business is

21  successful.  It's not he agrees that he's a competitor or he

22  doesn't.  He agrees that his fighters are well paid or he

23  doesn't.  He's going to give you the broad strokes.  I get that.

24         MR. WEILER:  Absolutely right.  He's not a CFO or

25  somebody like that.  So it's not a substitute for the

1   information that plaintiffs seek.

2          And I just wanted to point out with respect to this

3   argument that there are NDAs or there are other agreements that

4   prevent certain types of information from Bellator being

5   disclosed, with respect to the financial data that we seek, I'm

6   just going to say, look, that's hearsay.  There's no -- they

7   have not produced any contract that says, We cannot provide a

8   granular level fighter compensation or revenue -- revenue for

9   our business for one reason or another because of such an

10  agreement.  There's nothing in the record like that.  And

11  this -- the representations that are being made here are broad.

12  They're not specific.

13          And even if they had such an agreement, even if they

14  had such a contract, we have a protective order here.  We have a

15  protective order here that says this is attorneys' eyes only.

16  And so business competitors and people like that are not going

17  to see these documents.  Lawyers, lawyers are.  That's how --

18  that's how this is going to work.

19          THE COURT:  Lawyers and experts.

20          MR. WEILER:  What's that?

21          THE COURT:  Lawyers and experts.

22          MR. WEILER:  Lawyers, yes, and experts and economists.

23  They are not people who are going to go and compete with the

24  people of Bellator or Bellator's business partners.

25          And so -- and I just wanted to -- I can't -- you know,

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1   there was -- there was some discussion I think earlier this

2   morning about, Well, why didn't plaintiffs submit an expert, you

3   know, declaration or something like that.  Your Honor, the Todd

4   versus Tempur Sealy case, which is one of the cases that, you

5   know, we cited in our papers, I think it says that the

6   disclosure of who the experts are and what their methodologies

7   and strategies would be, especially at a preliminary stage

8   before the expert reports are due, is work product.  It would be

9   disclosing plaintiffs' work product.

10          I'm happy to address any questions that Your Honor has

11  about the strategy or broadly speaking, you know, how it relates

12  to the legal elements.  But those are arguments that should come

13  from counsel in our view; not from our experts who have not been

14  disclosed and who of course would be cross-examined on

15  representations that they made weeks before the reports were

16  complete.

17          And when -- and with that, Your Honor, I think --

18  unless you'd like to go over the financial information that

19  they've given us, it's --

20          THE COURT:  I understand you need more than what you

21  got.

22          MR. WEILER:  Okay.  Unless Your Honor has any other

23  questions, I think that's all I have.

24          THE COURT:  No, I've pretty much been skewering you as

25  we've gone along.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          So all right.  Let me hear -- who will be arguing on

2    behalf of Zuffa?

3          MR. WIDNELL:  Good morning, Your Honor.  Since this is

4    the first time I'm speaking before you, I thought I'd just

5    reintroduce myself.  I'm Nicholas Widnell with Boies Schiller

6    and Flexner.  Before working at my current firm, I worked in the

7    Federal Trade Commission.  I think that may be relevant to some

8    of the questions that are related to how you protect expert

9    reports.  And so I bring that up just in that context.

10          I want to be as brief as I can here.  I know that you

11   have a lot that you want to cover and need to cover today.  So

12   let me start by just making one quick note.  I believe Your

13   Honor had suggested that we would not need global information

14   because the plaintiffs have alleged a U.S. or North American

15   market.  I don't think that's entirely accurate because Zuffa

16   will want to argue that it is in fact a global market.  So we do

17   believe that --

18          THE COURT:  You think it's relevant to your defense

19   that the market isn't just the United States and North America.

20   The market is global.

21          MR. WIDNELL:  Precisely.  I think that there are a

22   number of important competitors --

23          THE COURT:  But, mind, I have read some of the

24   exchanges that your clients have produced in this case in

25   connection with other motions.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          MR. WIDNELL:  Okay.  Thank you, Your Honor.

2          The -- based on what I've heard today, I think it

3    sounds like sort of two central issues at least in terms of need

4    would be, one, the anonymity point which we are arguing, and we

5    have a unique position on that.  And then, second, the financial

6    information, the event-level financials information.

7          Let me start with the anonymity point.  I think that

8    the reason why we don't believe anonymity if you put it into

9    different categories works is because there would be so many

10   categories that we would effectively be identifying the

11   fighters.  So it seems to us like it's somewhat pointless.

12         THE COURT:  If you get what you want.

13         MR. WIDNELL:  Well, I think the reason why we think

14   that's important is because we don't believe that there is a

15   clearly defined elite professional MMA fighter category, and we

16   think that --

17         THE COURT:  That's been an argument since your motion

18   to dismiss in this case.

19         MR. WIDNELL:  Exactly.  But there are so many different

20   characteristics that we believe can have a relevant effect in

21   terms of compensation that fighters get; not just weight class;

22   but obviously things like notoriety which are very hard to

23   measure that by the time you actually identify categories that

24   account for that, I think we've basically identified all of the

25   fighters.

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1          So our issue with the categorization point isn't that

2    we wouldn't be prepared to do it.  It's just that we think that

3    by the time we identify what we think the relevant categories

4    are we're going to hear back, This is just -- this is asking for

5    detail that lets you identify the fighters.  And I think that's

6    right.  So rather than me sort of engaging in that exercise we

7    think it's better to just point head on.

8          The relevance for us in terms of the information we're

9    asking about specific fighters isn't just related to the market,

10   however.  It's also really necessary for us to put in context a

11   lot of the points that plaintiffs are making about what Zuffa

12   has done.

13         THE COURT:  You say that in your papers and I wasn't

14   sure what you meant by it.  Do you need the information to

15   contextualize the plaintiffs' allegations?

16         MR. WIDNELL:  Happy to talk about that.

17         So there are a number of different allegations, and

18   they're all occurring over time.  And allegedly all of those

19   sort of bad acts that plaintiffs are alleging give Zuffa

20   monopoly power which it then exercises their really monopsony

21   power to harm fighter compensation.

22         So among the various bad acts are things like

23   contractual provisions and how those contractual provisions are

24   enforced by Zuffa.

25         THE COURT:  You're talking about fighter compensation

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1   packages because you've got the information from them on

2   broadcasters, venues, sponsors.

3           MR. WIDNELL:  Yeah.  No, I don't think that any of

4   those matter.  I think we're really just focussed on fighter

5   contracts and the provisions of the fighter contracts.  But how

6   those provisions are actually used by another entity that we

7   believe at least is a competitor of ours is relevant to looking

8   at whether or not there are procompetitive justifications for

9   the clauses that we have in our contracts.

10          So, you know, take the -- take the champions clause.

11  Is it justifiable?  Well, if we can show that Bellator uses the

12  champions clause in much the way that we do, unless Bellator is

13  also an monopolist, it would suggest that there's a legitimate

14  business justification for having that clause.  But we can't

15  make those kind of determinations without having really granular

16  data about how the contracts are applied by Bellator.

17          You know, duration is another key point, and it's just

18  our own efforts to kind of track the duration of contracts with

19  our fighters that suggested that it would -- again, it would be

20  very difficult to get that information on a fighter-by-fighter

21  level for Bellator without giving us -- you know, and knowing

22  the context, the time when it happened, when they were applying

23  these different durations to different fighters without

24  effectively having the kind of information that would permit us

25  to identify all of the fighters.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          So a lot of the types of behavior that we are allegedly

2    engaged in that is allegedly leading to us becoming a

3    monopolist, we think it's really important to be able to

4    understand the extent to which entities that we believe at least

5    are competitors are engaging in that exact same behavior.

6          THE COURT:  The everybody-else-does-it defense?

7          MR. WIDNELL:  So in the context of monopolization, we

8    have a right to say that for the acts that we are engaged in

9    that there's a procompetitive reason for doing it.  That's, you

10   know, not completely established by the fact that everyone else

11   in the industry is doing it as well, but that is a relevant

12   factor in assessing that issue.

13         So, again, I mean, I completely understand the concerns

14   about confidentiality.  I think that we're prepared to do

15   whatever we possibly can to -- to ensure that confidentiality

16   and we can talk about that, but we don't know of a way for us to

17   be able to evaluate how Bellator is compensating its fighters,

18   how it's negotiating with these fighters, without having

19   fighter-level detail.  And we don't know of a way to do that

20   realistically and practically in a way that it can be anonymized

21   without missing relevant characteristics we think are important

22   to understand the interaction between Bellator and its fighters.

23         So I think one other point that we had discussed -- and

24   again, you know, we -- we're happy to try and find ways to make

25   this work, but we had also asked for the fighter negotiations.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1 And that, again, is important for us to understand how Bellator

2 negotiates with its fighters.  There are a number of things that

3 we believe are -- plaintiffs are alleging are bad acts --

4      THE COURT:  I can't imagine a competitor that wouldn't

5 want to know that.

6      MR. WIDNELL:  Well, just to be clear, we will not share

7 this with our client.  This is -- these are the attorneys trying

8 to put together an antitrust defense.

9      THE COURT:  But you tell me you effectively want enough

10 information to give to your experts so you can build a complete

11 model of Bellator's operations of business development

12 prospects.

13      MR. WIDNELL:  And that's essentially an antitrust

14 analysis.  You know, that is important both for assessing prior

15 industry and for assessing competition.  And, you know, our

16 economists will build that model, but they are not going to be

17 sharing that with our client, or we're happy to concede that

18 point.  It's -- this isn't about sharing information with our

19 client at all.  This is about developing the best defense for

20 our client facing a fairly significant potential liability, at

21 least as plaintiffs are describing it.

22      Event-level information for financial information, I

23 think you've already heard about it, but just one other point

24 that I think is really important from our perspective.

25 Plaintiffs need to establish not just that we obtained monopoly

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  power.  That in and of itself is not a violation.  They have to

2  show that our bad acts actually lead to an increase or a

3  maintenance of that monopoly power.  And to do that, they need

4  to be able to show that there was an impact from the alleged bad

5  acts, and these alleged bad acts, as we've said, are occurring

6  over a long period of time.

7        For us to be able to refute those claims, it's

8  important for us to be able to see what the actual impact on a

9  company like Bellator is from the various alleged bad acts that

10 plaintiffs are alleging.

11       So we can't do that effectively with just quarterly

12 financial reports, especially when some of the allegations are

13 things like, you know, that we deliberately tried to interfere

14 with one of their events.

15       THE COURT:  You scheduled another event 10 miles or 15

16 miles down the road on the same night.

17       MR. WIDNELL:  So obviously we -- we have issues about

18 whether or not those were, you know, actually attempts to impact

19 Bellator's -- Bellator's events, but the allegations are out

20 there.  And for us to be able to address what the potential

21 impact is, we need to be able to have event-level information.

22 And at least, you know, there is testimony right now in the

23 record from various deponents that in some cases scheduling that

24 event 10 miles down the road actually improves, you know, at

25 least TV ratings for both --

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          THE COURT:  It's the anchor store theory.

2          MR. WIDNELL:  Yeah.  I mean, I can tell you that, you

3    know, there are some people who have said, We think it's a bad

4    thing to --

5          THE COURT:  Of course, but I'm still struggling.  If

6    you have the quarterly and you know who all of the fighters are

7    and you know what all of their events are because that's all

8    public information, why you can't effectively figure it out?

9    You know, why do you need fight-by-fight event-by-event data to

10   analyze whether in a certain quarter in which there were five

11   fights you likely did or didn't engage in bad contact -- conduct

12   for lack of --

13         MR. WIDNELL:  So imagine a situation where -- and I'm

14   not using a specific example or a specific allegation, but

15   imagine an argument that we did something to impede Bellator's

16   ability to put on a specific event.  With the quarterly

17   information, we might see that, you know, that there was

18   actually a drop for that quarter, but we have no way of knowing

19   whether that drop is because they had other bad events that had

20   nothing to do with us or whether that --

21         THE COURT:  Well, that's what I'm questioning.  You

22   know what those events were.  That's not ...

23         MR. WIDNELL:  But we don't have the -- we don't have

24   the financial results of those events to assess.  We just have

25   an aggregate of those.  So you have three events.  One of them,

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1   you know, we've allegedly, you know, impeded, and two of which

2   we have not.  You know, the sum of those three events could be

3   the result of two really bad performances for the ones that we

4   aren't alleged to have impeded and a really good result for the

5   event that we're alleged to have impeded, or it could be vice

6   versa.

7         We need to at least understand how that works if the

8   plaintiffs are going to be able to make the allegation that

9   we've somehow impacted Bellator adversely by impeding a specific

10  event.  That's the easiest example for looking at this.

11        But more importantly, you know, to the extent that we

12  see that there are issues where Bellator has done well or

13  Bellator has done badly and we're tracking that against the

14  alleged, you know, violations and the many alleged violations

15  that have occurred, it's important for us to be able to try and

16  do some kind of measurement that is more granular than just a

17  quarter-by-quarter basis because we're missing, you know, what

18  happens from event to event.

19        And this is an industry that's characterized by wild

20  swings in terms of how events do.  So, you know, one really poor

21  event could explain a lot of what's happening to Bellator in a

22  particular quarter, but if we don't know that that's a poor

23  result for that event, there's no way for our economist to

24  assess that.

25        So I think -- I think beyond those two points I'll just

—TRANSCRIBED FROM DIGITAL RECORDING—

 1  say, I mean, I -- you know, I think that we've said in our brief

 2  and we stand by the position that we'll do any reasonable -- or

 3  we'll agree to any reasonable accommodation to protect the

 4  confidentiality of Bellator's information.  We completely agree

 5  that this is highly confidential information that should not be

 6  allowed out to the public or shared, even with our client in

 7  this instance.  In fact, there's potential antitrust risks for

 8  our client simply in seeing that information.

 9          That said, the expert report part of this, you know, it

10  is certainly the case in -- and I speak from personal experience

11  with government cases -- antitrust cases that you can have

12  expert reports where certain portions are redacted to address

13  this concern.  The government routinely gathers information from

14  third parties like this and incorporates that into expert

15  reports in litigation.  And I'd be happy to --

16          THE COURT:  It can be done, but it's not an easy chore.

17          MR. WIDNELL:  That's right, but it's something that,

18  again, we're prepared to make any reasonable accommodations.

19  Start with basic assumptions to make this much simpler and, you

20  know, we'll do whatever we can on the response.

21          THE COURT:  Thank you.

22          MR. WIDNELL:  Thank you.

23          THE COURT:  And, Mr. Kelly, you get the last word.

24          MR. KELLY:  Thank you, Your Honor.

25          Couple of quick points.  I want to start by just saying

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  that the way that the parties have gone about this I think has

2  created the problem.  They've gone about this by asking for

3  every piece of data about finances, every single fighter

4  contract, every negotiation.  Their justifications and their

5  substantial need are a bit here, a bit there, we need a little

6  bit here.  They should have asked us for the specific documents

7  that we needed and the parties could have tried to reach some

8  accommodation on that, but that's not where we are.  We spent 15

9  months trying to negotiate with them, and we didn't make a dent

10  in either of these categories.

11        And to justify a broad-sweeping request for production

12  of the most sensitive documents by saying, Well, there's a

13  substantial need for this one fight -- for P&Ls for this one

14  fight because we're alleging a counter-programming against that,

15  that's not sufficient to give them everything.  If they wanted

16  to identify the five fights where they are alleged to

17  counter-program and find out what happened with that fight, that

18  would be a different story.

19        The expert issue is -- and I think you raised it.  I

20  mean, you quoted from their expert declaration what they want to

21  do.  They want to create a model to recreate not only where we

22  have been, where we're going, and how we got there.  I mean,

23  that's -- that is -- you know, and I think we say in our brief

24  in any other context that's industrial espionage.  And we're

25  talking about, you know, in the context of an antitrust case.

-------- TRANSCRIBED FROM DIGITAL RECORDING --------

1   It's ironic to me sitting here that because we're in discovery

2   in an antitrust case they're entitled to a vast amount of

3   information that would enable them to engage in anticompetitive

4   behavior.

5          THE COURT:  It occurs in patent cases, for example, in

6   which, you know, somebody says you're infringing my patent, and

7   you get access to the source code of your opponent because it's

8   proof of whether or not there is --

9          MR. KELLY:  But we're a nonparty here.  We're not even

10  a party to this case.

11         THE COURT:  No, that part I understand.

12         MR. KELLY:  And the -- the argument that, Oh, our

13  expert report will just be in summary form, you know, I mean,

14  every lawyer here is highly competent and has lots of

15  experience.  An expert report that's only in summary form is

16  probably not going to be what's in a case of this magnitude.

17  There's going to need to be details, backup support, tables,

18  documentation for all of that.  And I just don't see how

19  Bellator's information stays out of that report.

20         THE COURT:  One of the plaintiffs' proposals was with

21  respect to fighter compensation is an anonymous spreadsheet that

22  does not identify the fighter, but identifies the compensation

23  with such things -- categories of information as the duration of

24  the contract and the fighter's experience or number of bouts.

25         MR. KELLY:  I don't believe that anything like that

———————— TRANSCRIBED FROM DIGITAL RECORDING ————————

1    exists, Your Honor, but --

2              THE COURT:  You'd have to create it, right.

3              MR. KELLY:  I mean, that's certainly better from

4    Bellator's perspective than turning over -- you know, basically

5    opening up our -- all of our financial information and letting

6    them have it all.

7              And I think the details would be the tricky part in

8    that, figuring out exactly how we would prepare that spreadsheet

9    based on what information, but I'm certainly open to that as a

10   compromise position.  I think they could get most, if not all,

11   of that information from anonymized contracts.

12             And I do think that to Zuffa's point about anonymized

13   contracts, it does matter.  It may not -- you know, they may

14   think, Well, from a practical standpoint what's the difference?

15   It matters to Bellator that some fighter contract with some name

16   attached is not going to be at risk of getting out there in

17   public, whether at trial or inadvertently or whatever.

18             And their expert says in his declaration, We need a --

19   enough fighter contracts to be able to do our model.  He doesn't

20   say how many.  He certainly doesn't say, We need all of them.

21   And to just say, Well, you know what, we just need all 100 of

22   the fighter contracts because it's just more practical for us to

23   do it that way, that's not the burden that they have.  They need

24   to meet a burden that each and every contract, each and every

25   document that we turn over, they have a substantial need for it.

——— TRANSCRIBED FROM DIGITAL RECORDING ———

 1  And they haven't done that here.  They need to break this down

 2  to a much more specific level than just say, Well, we have a

 3  substantial need.  Give us everything.  And that's where we are.

 4       THE COURT:  So what we have agreed to do, if I

 5  understand correctly from your reply, is you've agreed to

 6  identify all of events that you promoted, including the venues

 7  and the athletes, and all event income, including the actual and

 8  projected ticket prices, the gate receipts, the ad revenue, the

 9  broadcast revenue, the merchandise revenue, and the sponsorship

10  revenue.

11       MR. KELLY:  We haven't agreed, Your Honor, to all of

12  the -- to provide all of the revenue or expense information from

13  those fights.  We have agreed and in fact have already provided

14  information about the venues, the fights, the fighters, and

15  purses, but beyond the other revenue, I don't believe that we

16  ever agreed to that and I don't believe that's what we said in

17  our reply brief.

18       THE COURT:  I can't read my own notes, but that's what

19  the UFC wants.

20       MR. KELLY:  You worried me there for a second.

21       You know, the other thing -- the last point I want to

22  make is this.  We've been at this for 15 months, and both sides

23  are telling us today, We're willing to do whatever to protect

24  your information.  We still don't have a Court order about how

25  this would be used at trial.  We don't have any orders about

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   limitations on the experts.  We want this resolved.  And it's

2   not -- it's not prepared to be resolved to protect our

3   information.

4        As it stands now, if we turn over anything, we're

5   involved in the case in discovery and we have to risk, you know,

6   having our information disclosed publically.  I understand that

7   this is a discovery fight and they want to prepare the experts,

8   but that's where the case ends.  This case is going to go on,

9   and there is a very good possibility that under the public

10  policy of open records that a trial is going to take place.  And

11  it's going to be very difficult for Bellator to protect this

12  highly confidential information at trial.

13       We have no assurance of that, and while they're

14  interested, they don't get to make the decision on that.  So we

15  have lots and lots of concerns.  I know you understand, and I

16  appreciate the time and opportunity.

17       Thank you, Your Honor.

18       THE COURT:  Thank you.

19       All right.  Bellator's motion to quash is denied.

20  Their motion to modify subpoenas is granted.  Plaintiffs' motion

21  to compel is denied, except with respect to the countervailing.

22  I'm going to modify the subpoenas with respect to Bellator data.

23  I'm going to give each party until Friday, unless either one

24  tells me you can't do that, to submit a proposed order outlining

25  the -- what you propose to produce as a reasonable accommodation

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1   and compromise.  I expect at a minimum that you will have

2   quarterly financial data broken down by categories that you

3   understand are consistent with the parties' needs for their

4   documents in this case.  The parties will submit their competing

5   requests for what that order should say.  I'll pick one of them

6   or draft a hybrid.

7          Is there any reason why you can't give me a proposed

8   order by the close of business, and I'll put a time on that

9   because -- by 5 o'clock tomorrow?  Counsel for plaintiffs?

10          MR. CRAMER:  Your Honor, I think many of us will be

11  traveling tomorrow, so that might be difficult to get that done.

12          THE COURT:  Monday?

13          MR. CRAMER:  I would say we would really benefit from

14  over the weekend and have until the end of the day Monday.  Is

15  that ...

16          THE COURT:  Does that work for counsel for Zuffa as

17  well?

18          MR. WIDNELL:  Your Honor, that works for us.

19          THE COURT:  Mr. Kelly, can you do that?

20          MR. KELLY:  Yes, Your Honor.

21          THE COURT:  All right.  And so you will have the

22  written order that will tell you exactly what you do and don't

23  get, and both the parties on this side will be able to

24  articulate precisely what it is that you think you have to have.

25  And I've heard your arguments, I've ready all of your papers,

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1   and you'll get what you're going to get.  Okay?

2           MR. WEILER:  Thank you, Your Honor.

3           MR. KELLY:  Thank you.

4           MR. WIDNELL:  Thank you, Your Honor.

5           THE COURT:  All right.  Turn now to the decision on

6   plaintiffs' motion to challenge work product protection with

7   respect to the three Mercer documents that are disputed in this

8   case.

9           Just as an initial matter, I don't typically take

10  matters under advisement because of precisely what happened in

11  this case.  This, frankly, is an old motion that fell through

12  the cracks.  And so I really welcome you -- we have a procedure

13  under our local rules to enable you to bring to the Court's

14  attention that there is a matter that needs attention and has

15  been pending for some time.  I know a lot of lawyers are

16  reticent about doing that for obvious reasons.  I used to sit on

17  your side of the table.

18          But I assure you, especially in a complex case, any

19  time -- I'm not going to promise I'm going to be able to get to

20  it as fast as you want, but I never mind at all being reminded,

21  especially in something that has an impact on the schedule and

22  you making progress on discovery for you to, please, let me know

23  if I've left you hanging on something that you need to know.

24          So I've had a draft motion prepared and sitting there,

25  and I picked it up and put it down I can't tell you how many

─────────TRANSCRIBED FROM DIGITAL RECORDING─────────

1    times.  I will enter a written decision and order, but I will

2    just tell you in a nutshell what the decision is.

3        I am going to grant plaintiffs' motion, finding that

4    Zuffa has not met its burden that the three documents in dispute

5    in the clawback are work product protected.  And in a nutshell

6    I'll tell you why.  The documents of course weren't recognized

7    in the first instance by litigation counsel for Zuffa who

8    produced them as work product-protected materials.  There's

9    nothing on the face of the documents indicating they were

10   intended to be treated as work product-protected materials.  The

11   documents themselves do not contain legal analysis, legal

12   discussion, or any legal conclusions, or ask for legal advice on

13   any topic.

14       The documents follow on the heels of an earlier work

15   project performed by Mercer on non-fighter compensation.  And

16   according to the parties' papers, Zuffa indicates that Mercer

17   basically finished the non-fighter compensation study and made a

18   proposal to Zuffa about doing a fighter compensation assessment

19   study.  And that Zuffa says it elected not to do that.  And its

20   outside counsel said, We learned about it in September of 2013

21   and decided we thought it would be a good idea for our own

22   purposes because of reasonably foreseeable litigation.

23       And I find that the -- Zuffa has not established that

24   the documents in question are reasonably linked to anticipated

25   -- reasonably foreseeable anticipated litigation.  You cite the

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  need for preparing the study as a result of the Bellator/Alvarez

2  litigation.  And that case was filed and it involved a breach of

3  contract dispute between a fighter and a promoter because the

4  fighter was proposing, as I understand it, to leave Bellator and

5  go to work for UFC for more money.

6       And the contract dispute that Zuffa, excuse me,

7  anticipated it must be drug into had to do with the fact that

8  there were Doe defendants named and a tortious interference

9  claim asserted.  And Zuffa thought it was possible it could be

10  brought into the case as a result of the tortious interference

11  claim.

12       And, however, the Alvarez case was settled in August of

13  2013.  And I appreciate your arguments that the settlement

14  between Alvarez and Bellator involved anticipation that Zuffa

15  would need to agree on a confidentiality provision in order to

16  negotiate further with the fighter and that you had issues with

17  respect to Bellator on that, but these documents don't involve

18  disputes over what did or didn't happen in the Alvarez

19  litigation.  And the fact that we live in what some people call

20  a litigious society and the fact that the Alvarez litigation

21  generated interest in the compensation issues that were being

22  raised and the fact that Bellator attached one of your

23  contracts, which of course you were very upset about,

24  understandably so, does not mean that litigation was reasonably

25  foreseeable because the members of the media and members of the

─TRANSCRIBED FROM DIGITAL RECORDING─

1  fighters and their representatives were asking questions about

2  your compensation package.

3         So in a nutshell I find that and in a more articulate

4  written order I will tell you this, but that is the, I have

5  leave to say, the down and dirty of the rationale for my

6  decision.  So the motion is granted, and the documents will be

7  produced and may be used.

8         Yes, Mr. Weiler?

9         MR. WEILER:  Your Honor, may I be heard very briefly on

10 the Mercer ruling?

11        THE COURT:  Yes, sir.

12        MR. WEILER:  Thank you, Your Honor.

13        I was here in front of you in September arguing these

14 matters.  And so there are -- there are many other documents

15 that have been identified on the privilege log that relate to

16 the Mercer challenge, and I think that Your Honor's ruling would

17 be applicable to those as well.

18        THE COURT:  I'm not going to give you an advisory

19 ruling.  You got a 30,000 document privilege log just recently,

20 and it's not in front of me.  And I'm not going to spout things

21 off the top of my head, but you just heard what I had to say.

22 And both sides can take that into account in negotiating a

23 resolution of any documents you think have been inappropriately

24 withheld.

25        What Zuffa is saying -- and of course the party

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   claiming privilege has the burden of establishing and providing

2   a privileged log which allows you and the Court to evaluate

3   whether or not the privilege is appropriately asserted or not.

4   And what Zuffa is -- has said is that Mercer did some work for

5   business purpose and a proposal was made for another purpose and

6   that the work was never actually done.  The fighter

7   assessment -- and they've told you in the papers why it wasn't

8   done; because they ended up concluding that the data wasn't

9   statistically enough relevant or the comparator proposed group

10  from other sports weren't -- weren't worth the analysis.

11          But ...

12          MR. WEILER:  So they say.  And then I think that we are

13  entitled to see those documents and test those characterizations

14  and conclusions.

15          THE COURT:  Again, I'm not going to give you -- I'm not

16  finding subject matter waiver based on the three documents in

17  dispute.  You've got a privilege log, do the grunt work, and

18  talk to them about whether or not the privilege log is adequate

19  or it's not.

20          MR. WEILER:  I certainly will.  We certainly will, Your

21  Honor.  Thank you.

22          THE COURT:  All right.

23          MR. SPRINGMEYER:  Excuse me, Your Honor.  Would it

24  assist the Court to have all of us e-mail Word versions of our

25  proposed orders in addition to filing them in the case, copying

——————— TRANSCRIBED FROM DIGITAL RECORDING ———————

 1  them?

 2          Considering how detailed some of this stuff ...

 3          THE COURT:  Yeah, that's probably a good idea.  So if I

 4  don't accept any one and I'd have to do a hybrid, I don't burden

 5  my staff with -- my typing skills are very suspect.

 6          MR. SPRINGMEYER:  Cutting and pasting is the savior of

 7  practice.

 8          THE COURT:  And Mr. Miller will provide the e-mail

 9  number for my -- or e-mail address for my chambers to you

10  afterwards so you can -- thank you for the -- that's a very

11  helpful suggestion.

12          All right.  Let's turn then to the plaintiffs' motion

13  to produce a log that involves a dispute over the electronic

14  devices, meaning phones, of Mr. White.

15          Yes, sir.  Mr. Dell'Angelo for the record.

16          MR. DELL'ANGELO:  Good morning, Your Honor.  Yes,

17  Michael Dell'Angelo for the plaintiffs.

18          So we have filed a motion to produce a log of

19  communications of Mr. White.

20          THE COURT:  Right.  And you filed the motion while you

21  were still talking to them.  And Ms. Grigsby sent you an e-mail,

22  Why did you file this motion to compel when we were thinking

23  about it and we were working on getting you the information?

24          MR. DELL' ANGELO:  I don't think that's accurate, Your

25  Honor.  We had a meet and confer, and on the meet and confer we

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   requested a log of the communications.  And our understanding

2   from Ms. Grigsby is that Zuffa was not prepared or unwilling to

3   provide the log that we were requesting or in the alternative to

4   allow plaintiffs leave to issue subpoenas to request that same

5   information from --

6           THE COURT:  All right.  So let me ask exactly what it

7   is that you are asking for, because I know what -- I get it.

8   There are four different devices.  There's a Nokia with a

9   limited -- or a Nokia, however it's pronounced, flip phone with

10  limited data, storage capacity, and there's a timing issue with

11  respect to when the lawsuit was filed and when the phones were

12  obtained.  And one of them was lost and just found in a box

13  somewhere.

14          And there's been a long involved process and a back and

15  forth, and you've received almost 2,000 text messages.  And you

16  know from the document productions of other people that have

17  been produced that he used certain of these other phones for

18  which you didn't receive information because of, for example,

19  there are exchanges between other custodians on those other

20  phones.

21          MR. DELL'ANGELO:  So what we have, we believe, Your

22  Honor, is a systemic failure to identify, preserve, and collect

23  and produce electronically-stored information, and in particular

24  with respect to Mr. White, text messages.  Mr. White is a key

25  custodian of this case.  He's the President of the UFC.  He

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  features prominently in the consolidated amended complaint.

2      We have determined from the document production and I

3  think there's independent evidence of this as well that

4  Mr. White's primary method of communication and certainly the

5  document production suggests that this is true for many of the

6  key custodians in the case is that their primary method of

7  communication about, you know, relevant issues in the case is

8  through text messages.

9      So what we've determined is that there were at least

10  four phone numbers, and those phone numbers end in 20, 92, 27,

11  and 75.  Those four phone numbers relate to at least five

12  phones.  There's also evidence that there's --

13      THE COURT:  Right, because one of them was replaced

14  with an upgraded iPhone.

15      MR. DELL'ANGELO:  Right.

16      THE COURT:  A 4 --

17      MR. DELL'ANGELO:  There's also evidence that there is a

18  BlackBerry and a $10,000 TAG Heuer phone that we provided you

19  some information about in the initial motion.

20      What we have determined is that there are preservation

21  and collection and production issues with respect to each of the

22  phones, and that the information that the defendant, and I think

23  particularly notably Mr. White in his declaration, has provided

24  to the Court is not consistent and suggests that there are

25  serious failures to collect, preserve, and produce that

—TRANSCRIBED FROM DIGITAL RECORDING—

 1   information.  And I think it -- what it does is it informs a

 2   serious problem with respect to the identification with the ESI.

 3        And just to kind of give a kind of overview with these,

 4   with respect to the 20 phone, which was a Nokia phone, Mr. White

 5   says he transitioned that phone to a work phone in 2014, but we

 6   have relevant business texts that were produced from that

 7   phone --

 8        THE COURT:  In 2015, right?

 9        MR. DELL'ANGELO:  From 2012, actually, two years before

10   he says it became a work phone.  That's the phone that we were

11   told only recently is not reasonably accessible; notwithstanding

12   our meet and confer in the 26(f) conference back in 2015 when we

13   pointedly asked the question, Is there any ESI that's not

14   reasonably accessible and we were told no.  And it's very clear

15   from the papers and Zuffa's position, they reached that

16   determination in January of 2015.  We relied on that when we

17   attempted to negotiate and get our productions.

18        Likewise, with respect to the 92 phone -- the 92 number

19   that had an iPhone 4 and an iPhone 6, we have determined through

20   cross-referencing that there are at least 335 text messages

21   missing, and 186 of those postdate the litigation hold that

22   Zuffa says it implemented, right.  So those 186 messages should

23   absolutely have been on Mr. White's phone, and they weren't.

24   They were produced by other custodians, but not him.

25        There's the 27 Nokia phone.  In Mr. White's declaration

1  he says it wasn't used for work after January of 2015, but Zuffa

2  produced text messages as far forward as May 2015, well after

3  White, you know, put into his sworn declaration that he wasn't

4  using the phone for work.

5       And then there is the 75 phone, which again in

6  Mr. White's declaration he says became a personal phone in 2014,

7  but on May 26, 2017, just less than a week ago, after our

8  persistent inquiries and follow-up and asking Zuffa to find that

9  phone and making it clear to them that their custodians were

10  producing I think close to 1,400 text messages from that phone.

11  Some of which are the most relevant and -- text messages in the

12  case that bear out the allegations in the complaint.  They found

13  it.  They produced 69 text messages.  But, again, Mr. White in

14  his declaration says that it became a personal phone in 2014,

15  but the 69 text messages that were produced date from January

16  2015.

17       So I think what you have is a disconnect between the

18  investigation that was made and what counsel has determined,

19  counsel for defendant, what they may be told by their client, or

20  have been able to figure out, but by cross -- so you have that.

21  And then you have what we can independently determine, right.

22       We just by looking at the texts can tell that relevant

23  ESI is missing from Mr. White's phones, and there were serious

24  issues with preserving them.  We were told that the 75 phone was

25  not identified as a phone that would be subject to the

─── TRANSCRIBED FROM DIGITAL RECORDING ───

 1  litigation hold.  One of his other personal phones was lost, the

 2  27 phone, but there are relevant business texts produced from

 3  that phone which suggests that it should have been identified

 4  and preserved.

 5          So what we hoped to do was try to identify through

 6  other means what text messages were missing, and we thought that

 7  one party or the other could obtain a log of the communications

 8  for those phones.

 9          THE COURT:  And by "log," in some places in your papers

10  you're referring to a pen register or trap and trace.  You think

11  the providers contained information -- have information dating

12  back to the relevant time period for which -- from the

13  litigation hold forward that might tell you every number that

14  was called to and from the devices you've described.

15          MR. DELL'ANGELO:  So it is not uncommon, Your Honor, in

16  conspiracy cases to request exactly that information.

17          THE COURT:  No, but that is what you're asking for.

18          MR. DELL'ANGELO:  Yeah, we get it for -- in many cases.

19  Sometimes the carriers actually have the text messages.  Apple

20  is one that we understand depending on how the user has the

21  account set up may still have the messages and they may exist.

22          And I think it's important to understand here that as

23  we have gone through this process we've discovered some really

24  important things, right.  So we've discovered, for example, that

25  there are text messages that Mr. Fertitta did not produce, he's

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

 1  the former chairman, that postdate the litigation hold that were

 2  on Mr. White's phone, suggesting that there was ESI lost from

 3  Mr. Fertitta's phone.  The production that we received last week

 4  from the 75 phone contains text messages between Mr. White and

 5  Mr. Silva, another key custodian, matchmaker for Zuffa, that

 6  were not produced by Mr. Silva and that postdate the litigation

 7  hold, suggesting there was data lost from Mr. Silva's phone.

 8          There's a whole separate issue with respect to

 9  Mr. Mersch.  There were a small number of text messages produced

10  from other custodians --

11          THE COURT:  I understand.

12          MR. DELL'ANGELO:  Yeah.

13          THE COURT:  You've attached all of the logs.  You

14  showed me all of the phone numbers.

15          MR. DELL'ANGELO:  Right.

16          THE COURT:  I get -- but ESI production isn't perfect.

17  It's the nature of the beast.

18          MR. DELL'ANGELO:  There's a difference between

19  production and preservation.  And it's very clear, it's very

20  clear, that ESI that postdates the litigation hold has been

21  lost.

22          THE COURT:  All right.  So tell me if I grant your

23  request to serve the providers for each of the devices that are

24  the subject of your motion, how do you propose to deal with --

25  you're effectively asking for every number to and from, every

———TRANSCRIBED FROM DIGITAL RECORDING———

1  text, to the extent that data has been collected or kept further

2  by the provider.

3          MR. DELL'ANGELO:  Yes.

4          THE COURT:  Whether it has anything to do with this

5  case -- I mean, any time he called his doctor, his mom, his

6  friend.

7          MR. DELL'ANGELO:  So --

8          THE COURT:  You're asking for the man's life.

9          MR. DELL'ANGELO:  So it is clear that there are many,

10 many business texts.  Again, it was a key custodian's primary

11 form of communication.  We have phone numbers from the other key

12 custodians that are in the production.  Of the 45,000 or so text

13 messages that were produced, many of them indicate who the

14 sender or recipient is by name, right.  So there is a process

15 that we could go through to start --

16         THE COURT:  Sure, and that's what I'm now asking you

17 about.

18         MR. DELL'ANGELO:  Yes.

19         THE COURT:  How do you propose to do that to protect

20 the man's privacy for anyone he's ever contacted during the

21 entire relevant period?  Because that is patently overbroad and

22 unreasonable and an invasion of his privacy in my view.

23         MR. DELL'ANGELO:  Well, where we started, Your Honor,

24 was asking Zuffa to obtain the information.

25         THE COURT:  That part I understand.

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. DELL'ANGELO:  Yeah, and to provide it to us.

2          THE COURT:  Give them the burden of going through.  And

3    why -- if I grant that request, why shouldn't I limit it to

4    communications with the custodians for whom I've authorized ESI

5    and document productions?

6          MR. DELL'ANGELO:  Because doing so would substantially

7    limit the scope of what should have been on those phones and

8    should have been produced.  So I understand --

9          THE COURT:  But why aren't we setting up round two of

10   the same dispute?  If -- if I grant your request and I require

11   Zuffa to obtain the data directly from the providers and require

12   Zuffa then to go through the information that's available from

13   the providers and redact it, how should the redaction occur in a

14   way that you believe meets their preservation and production

15   obligations?

16         MR. DELL'ANGELO:  Well, I think it would depend on what

17   information comes back.  Certainly, if there's text message

18   content, they can continue to do what they are insisting they

19   do, which is conduct a linear review.  They can review any text

20   messages --

21         THE COURT:  Which they did for 45,000 texts, right?

22         MR. DELL'ANGELO:  They did for those that they

23   preserved, right.

24         THE COURT:  That part I get.

25         MR. DELL'ANGELO:  Yeah, but the question exists that

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  there needs to be a review for any that have not been preserved

2  and can be recovered.  So it's really just a continuation of the

3  obligation that they undertook in the first place.  And the

4  reason that they undertook that obligation, I think they were

5  quite clear, we had no issue with this, is that there's always a

6  nest of personal and business text messages.  We see that in

7  phones that Zuffa --

8      THE COURT:  Anybody that has your number one way or the

9  other, despite your best intentions --

10     MR. DELL'ANGELO:  Yeah, the two will nevertheless

11  cross, and they clearly did here.  And so Zuffa's mechanism for

12  dealing with that was they were going to do a linear review.  We

13  were absolutely fine with that.

14     So I see no reason why that procedure can't be applied

15  here.  I mean, we don't need to have the data in the first

16  instance, right, which is why we started with we would like you

17  to go get the information as a way to resolve it.  The problem

18  that we had, if I may, is that notwithstanding the fact we

19  started asking these questions in late March, it took the better

20  part of three weeks to get a very simple answer, which was, Did

21  you collect the 20 phone, the 27 phone, and the 75 phone?  Those

22  are answers that should have been known and no later than July

23  2016 when Zuffa --

24     THE COURT:  That's true, but if you could remember

25  everything that you ever did and said in the case of this

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1  complex --

2          MR. DELL'ANGELO:  I certainly think it is incumbent

3  upon any party to know what sources of ESI they collected and

4  produced.  And they're very clear in their declarations and in

5  their papers that they conducted a survey, right, and made lists

6  of phones and electronic devices, right.  And frankly -- so all

7  one needed to do was repair back to that list.

8          One of the reasons that we sort of started -- we

9  thought that multiple phones may have been produced is that the

10  phones were -- the productions from Mr. White's data kind of

11  came in tranches.  So it gave the sense that these might be

12  multiple phones when they weren't.

13          But, again, you know, we're not talking about whether

14  or not some manila folder in a remote and dusty corner of a

15  storage room was pulled and copied.  We're talking about which

16  phones from the key custodian did you collect and produce.  And

17  if you think about the 20 phone, Zuffa tried -- it represents

18  that it tried.  It kept two different vendors to collect that

19  phone in January and February of 2015 and that it failed.

20          So when we started asking in March, Did we get text

21  messages from that phone, I don't think anybody had to search

22  their memory bank or take three weeks to figure out what they

23  had long since known, right.

24          So the problem that that created was it moved the

25  clock, right, moved the clock so close to what was then the

─────────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────────

1   close of fact discovery that it wasn't possible for us to serve

2   the subpoenas for the information which we're now moving, right,

3   because we didn't have time under the fact discovery or, excuse

4   me, the fact discovery period.  Whereas, if Zuffa, for example,

5   in April of 2015 when we had a 26(f) conference had said, The

6   data's not reasonably accessible, we could start addressing

7   these things.  If they properly identified the 75 phone or the

8   27 phone as phones that had substantial amounts of work text

9   messages on them, notwithstanding the fact that Mr. White said

10  he primarily used them for business, we could have gone down

11  this road and resolved it long before.

12          But given the fact that the clock got run out on us, we

13  had to seek relief, and we tried to do it in what we thought was

14  the most efficient way which was just asking Zuffa to do it.

15  Failing that, we needed their agreement to serve a subpoena out

16  of time.  Frankly --

17          THE COURT:  I understand.

18          MR. DELL'ANGELO:  Yeah.

19          THE COURT:  All right.  Let me hear -- who is going to

20  be arguing on behalf of Zuffa?  Ms. Grigsby.

21          MS. GRIGSBY:  Stacey Grigsby, Your Honor.

22          Good morning, Your Honor.  May it please the Court.

23          So you heard plaintiffs say that this is some type of

24  systemic failure, but I think it's important to just make this

25  simple, which is the who, what, when, and where.  So when we're

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  talking about the who in plaintiffs' motion, although initially

2  the discussions and the meet and confer were focussed on the

3  text messages, plaintiffs have now raised the host of issues

4  that they want an entire inventory or communication logs for a

5  15-year span for every Court-ordered and agreed custodian.  So

6  that's unclear.  It's making it complicated.

7          And what.  This is a motion to compel.  This is not a

8  motion for sanctions under 37(e).  This is not a motion for

9  spoliation.  And the standard there, as you have said, is that

10  ESI is not meant to be perfect.  The real question is whether

11  Zuffa's efforts to preserve were reasonable.

12          And then, finally, when we're talking about --

13          THE COURT:  Okay.  With respect to Mr. White, let's cut

14  to the chase; because I understand your arguments with respect

15  to all of the other custodians.

16          MS. GRIGSBY:  Yes, Your Honor.

17          THE COURT:  However, with respect to Mr. White, you

18  have issues.

19          MS. GRIGSBY:  Your Honor, and I think we've

20  acknowledged that there were some issues with Mr. White.

21          THE COURT:  And issues that you did not discover.  You

22  fault the plaintiffs for not discovering or bringing the matter

23  to your attention until mid-March of this year, but you didn't

24  discover it until after they told you about it.

25          MS. GRIGSBY:  Your Honor, again, this was a large-scale

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1   production of Mr. White --

2          THE COURT:  Sure, and that's my point.

3          MS. GRIGSBY:  Right.

4          THE COURT:  Don't fault them for it because, you know,

5   it's very clear what's happening.  They're scurrying around

6   preparing for depositions, and they start noticing from their

7   review of documents something seems amiss.  So I'm not

8   sympathetic to your timing arguments on the issue, and now I

9   want to see what we can do to solve it, at least with respect to

10  Mr. White.

11         MS. GRIGSBY:  Yes, Your Honor.  And just to put this in

12  context, although there were dozens of messages exchanged, the

13  issues with Mr. White were raised along with a host of other

14  questions about the text messages, including the format, whether

15  it was possible to, you know, produce them in an Excel file.

16         THE COURT:  I understand you have worked with them on

17  this, and you reproduced the texts.  And you produced the

18  metadata with it.  So -- and you -- I fully appreciate that's

19  the nature of the beast, especially with electronically-stored

20  information and -- but the only issue that I really have -- and

21  you don't need to talk to me about the entire systemic failure

22  argument across the board.  What you need to talk to me and

23  persuade me, how do we resolve the identified problems with the

24  failure to preserve and produce materials from Mr. White's

25  devices.

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

 1          MS. GRIGSBY:  Sure, and I think it's important to go

 2   actually phone by phone because I think a lot of this is

 3   actually getting jumbled just in the plaintiffs' brief I think

 4   because the parties did not finish their negotiations.  I think

 5   some of the information just that's been presented on paper

 6   isn't exactly -- I wouldn't say -- it's just not --

 7          THE COURT:  Well, you kind of need a John Madden

 8   diagram to follow it.

 9          MS. GRIGSBY:  Well, we have a diagram of the phones

10   just to try to ease what's going on because really we're talking

11   about -- as you understand, we're talking about four different

12   lines.  And I think it's important to understand what happened

13   with each line.  If my technology can work.

14          But basically in terms of the timing with Mr. White, he

15   had an interview, not just with Zuffa's inside counsel, but with

16   Zuffa's outside counsel in January of 2015 to identify the

17   appropriate text message -- or phones.  So it's just simply not

18   the case -- there's a statement in this reply brief that counsel

19   never talked to Mr. White.  It's actually --

20          THE COURT:  No, but you did get different information

21   at different times.

22          MS. GRIGSBY:  That is correct.  And so the issue is,

23   once we got the information, what we did.  And once plaintiffs

24   raised the issue in March of 2017, we immediately started to

25   investigate.  I mean, there was just some confusion because

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1  there was so many text messages.

2        Also, when you look at the spreadsheets, at times it

3  doesn't even show the phone number that it's coming from.  It

4  may say in a custodian's file, if that person has a contact for

5  Dana White, it may say D.F. White; not necessarily the number.

6  We had multiple reviewers looking at all of the messages.

7        So we were not in the process of mirroring up, Okay.

8  It looks like there are 51 text messages over five years from

9  what appears to be this 3127 number.  Two of which were

10  Mr. White forwarding it to himself.  We had to make sure we

11  understood that it was actually his phone.  We had to go back to

12  Zuffa.  We had to go back to him.

13        But the thing that I think that plaintiffs are really

14  arguing over, I mean, the only device that has -- we have been

15  unable to collect is the 312 -- I'm sorry -- the 27 number,

16  which only had 51 responsive text messages over a five-year

17  period.  If we go through them line by line -- so we're talking

18  about the first Nokia flip phone, the 20 number.  That number

19  was collected in January -- or that phone was collected January

20  8th of 2015.  It was given to counsel for the purpose of -- oh,

21  sure.

22        So I actually -- if the Court will allow, I have this

23  chart.

24        THE COURT:  Sure.  And show it to the other side.

25        MS. GRIGSBY:  Also have a copy.

—TRANSCRIBED FROM DIGITAL RECORDING—

1       THE COURT:  Although I will tell you, I'm not going to

2  conduct a mini trial on the numbers and the lines and the number

3  of texts.

4       MS. GRIGSBY:  And I hope we don't have to do that.  I

5  just want to make sure that everything is clear because, like I

6  said, I feel like there were -- there was not enough

7  communication within -- between the parties to actually get an

8  accurate representation from all of the papers what has actually

9  happened.

10       So if we start with the 92 number, that number was

11  collected in January 2015.  It was subject to a litigation hold.

12  It was preserved.  The text messages were collected at different

13  times off of that phone in 2015 and also in -- the end of 2015

14  to the beginning of 2016.

15       Plaintiffs right now are alleging that -- and this was

16  not the subject of the meet and confer that -- the log.  That

17  this particular number somehow there was -- in the reply they

18  actually said there were text messages that were destroyed.  We

19  have no evidence of that.  It was preserved.  We excepted texts.

20  We preserved it before we even received a document request.

21       He did upgrade phones, and during this time there were

22  multiple times -- well, there was one time where carriers were

23  changed, between one carrier and another, but we just have no

24  evidence.  And I really think plaintiffs' complaints on this

25  phone come down to the fact that the production was not perfect.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  It's unclear what they'll gain from a pen register on this

2  particular number.

3          Then you have the Nokia flip phone, the 20.  That's the

4  one I was speaking about before where Mr. White literally

5  stopped using the phone in an effort to preserve it on January

6  2015.  So, again, we're talking about 2015 when the -- the

7  beginning of the litigation.  We collected it.

8          When plaintiffs raised the issue, we were already

9  looking into sending it to another vendor, as plaintiffs concede

10  in their papers.  And in the meantime, after plaintiffs filed

11  their motion, we were actually able to extract text messages.

12          Now, plaintiffs say at the Rule 26(f) conference that

13  happened in April of 2015 we didn't say it was reasonably

14  inaccessible because we had already tried in January 2015.  That

15  is -- that is actually just a slice of the picture because if

16  you look at Ms. Lynch's declaration, which is Exhibit G, it

17  shows that on paragraph 24 that we made another extraction

18  attempt in 2015 and -- at the end of 2015/the beginning of 2016.

19  It is simply not the case that at that point we had determined

20  we could not get any messages off of that phone.

21          So for that phone we had preserved it.  We made

22  multiple attempts and finally --

23          THE COURT:  You preserved it except to the extent that

24  when it was continued to be used with modified -- with limited

25  storage messages were probably overwritten.

---TRANSCRIBED FROM DIGITAL RECORDING---

1      MS. GRIGSBY:  Well, the issue there would be from

2  literally December 18th, 2014, to January 8th, 2015, but it was

3  identified as an issue.  I mean, again, this is just at the very

4  beginning of the litigation.  And the phone was shut off and he

5  stopped using it.

6      So, I mean, just the idea that plaintiffs write in the

7  reply that we concede that it was passively deleted, we do not

8  concede it was passively deleted.  In fact, Mr. White has a

9  submitted declaration saying that he stopped using the phone so

10 that that didn't occur.

11      Then we should get to -- I mean, just going on through

12 the devices.  Like, then we're talking about the 75 device.  I

13 mean, this is one of the devices where it was unclear at the

14 time we were collecting phones that that would have potentially

15 responsive ESI.  Once plaintiffs made an inquiry, we took --

16 undertook efforts to find that particular device, which was not

17 regularly being used for business at the time the collection had

18 occurred in January 2015.  We have in fact found the phone.  We

19 sent it to a vendor, and we've produced 69 messages off of that

20 phone.  Again, this is not an effort to prevent them from

21 getting any information to which they may be entitled.

22      And, finally, if we go to the 27 phone which is the

23 personal phone, just based on the sheer number -- we have a

24 graphic that there's 6,800 text messages from Mr. White.  There

25 are literally 51 that we've identified from other custodians

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1  that are text -- you know, text messages from that phone, and

2  two of which Mr. White sent to himself.

3           It's just not the case that this is something that

4  would have been glaring in our review and production of 45,000

5  text messages.

6           So in terms of where to go next, because I know that

7  this is what the Court is concerned about, in our opposition

8  we're responding to what plaintiffs have raised which is that

9  they want a 15-year log of these four devices from the cell

10  phone carriers.  And I think it's problematic for a few reasons

11  like, one, the length of time and also given the potential

12  responsiveness of some of the devices, such as the 27 device.

13  It appears to be completely overbroad.

14           The second problem is, and as we noted in our papers,

15  pen registers do not keep text message, the actual substance of

16  the text message.

17           THE COURT:  The terminology may be -- may not be

18  appropriate, but what they're basically seeking is subscriber

19  information that gives them as much information about the

20  various accounts over the relevant time period as is available

21  to make you then go through it all and determine if any of the

22  material that's currently available from the providers is

23  responsive to their discovery requests.  That's what they're

24  proposing, as I understand it.

25           MS. GRIGSBY:  And they were also proposing to do it

—TRANSCRIBED FROM DIGITAL RECORDING—

1   over a 15-year time period.  In the meet and confers I even

2   discussed with plaintiffs that we were going to be working and

3   see if we could get logs so that we can figure out what happened

4   with the various phones.  They were unsatisfied with that.

5        Part of it is that plaintiffs literally have escalating

6   demands.  First they ask us to look for one thing.  Then they

7   ask us to do another while we're in the process of meeting and

8   conferring.  Then they file a motion to compel.

9        THE COURT:  That's not all that unusual in litigation

10  in which the more you learn, the more you question and the more

11  you talk to each other.  And I'm sure you've had issues with

12  them in the same vein.

13       MS. GRIGSBY:  Well, Your Honor, we haven't filed a

14  motion to compel before meet-and-confer conferences were

15  complete.  Just last week I get another -- we have received

16  another e-mail from plaintiffs asking whether we are going to

17  honor the text message protocol, whether we were going to find

18  the listing of devices.  They've already made the decision to

19  argue and to file this motion to compel because we had agreed to

20  provide those things.

21       If plaintiffs would be satisfied with that, then, you

22  know, and have some reasonable scope to what they're requesting,

23  then obviously we'd be willing to work it out.  It was never our

24  intention to go before the Court over something like this where,

25  as we've told the plaintiffs, we believe the actual numbers

——TRANSCRIBED FROM DIGITAL RECORDING——

1  substance is very, very low.

2        But it's unclear to us what claims they'll be satisfied

3  with apart from a complete log of Mr. White's text

4  messages/calls for the past 15 years.

5        THE COURT:  Thank you.

6        Mr. Dell'Angelo, you have two minutes to tell me

7  exactly what you'd be satisfied with with respect to Mr. White

8  because I'm not going to order relief with respect to the other

9  custodians at this time.

10        MR. DELL'ANGELO:  I apologize, Your Honor.  I didn't

11  hear the last -- the very last part of this.

12        THE COURT:  You have two minutes to tell me exactly

13  what it is that you want with respect to Mr. White's devices

14  because I'm not going to allow or require the log that you

15  request for all of the custodians for a 15-year period of time.

16        MR. DELL'ANGELO:  Okay.  Well, let me be clear about

17  one thing.  We've heard a lot about 15 years, but there's no

18  indication that these phones have actually been in use for that

19  long.

20        THE COURT:  I understand that and that's -- but

21  that's --

22        MR. DELL'ANGELO:  So I think --

23        THE COURT:  That's why I'm asking.

24        MR. DELL'ANGELO:  Right.  So, first of all, we would

25  like a log for the period of time that the phones have been in

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  use.  I mean, one thing that we requested --

2          THE COURT:  And what would be on that log?

3          MR. DELL'ANGELO:  Information that indicates from whom

4  and what number the text was sent or -- and to whom and what

5  number it was received, to the extent that that's information --

6  that information's available, the date, the time, and the

7  content of the message.  And I think, Your Honor, to the extent

8  that there are some privacy concerns, as you telegraphed, in

9  addition to the linear review that I talked about, I certainly

10 think that we can fashion some parameters not only, you know, by

11 limiting things to Zuffa custodians as well as other relevant

12 third parties like agents, fighters, sponsors, you know, that we

13 know of that would be most likely to have relevant

14 communications, may be a way to sort of winnow this down.

15          And I also think it would be helpful to have the kind

16 of inventory that we have requested and understood that we were

17 going to get for each of the devices, you know, that we've

18 talked about today:  the 92, 20, 75, and 27, as well as any

19 other devices, like the BlackBerry and the TAG Heuer phone or

20 whatever others may be identified for Mr. White.

21          And, you know, lastly, something that we raised in our

22 brief that -- and you saw in the declaration is the defendant

23 has created an inventory of the electronic devices of the --

24 what are going to be custodians.  I see no reason why, and I

25 think it would aid the parties and the Court to understand these

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  issues, if we had just the basic inventory that they'd created

2  because I think it would make the process of identifying, you

3  know, which custodians and potential third parties we should be

4  looking at on the logs that I've indicated.  Make that more

5  efficient and kind of understand the universe of devices that

6  may be at issue and certainly that Mr. White may have used or

7  been in communication with during the relevant time period.

8          THE COURT:  Thank you.

9          MR. DELL'ANGELO:  Okay.

10          THE COURT:  Your motion is denied.  And I'm going to

11  take a 10-minute recess and take up the remaining matters on

12  calendar, including your Joint Status Report, the adjustment of

13  the discovery plan and scheduling order deadlines, and the scope

14  of discovery that you're going to get in the time I'm going to

15  give you.

16          All right?  So just take a 10-minute break, and then

17  we'll be right back.

18          COURTROOM ADMINISTRATOR:  All rise.

19          (Recess taken at 11:10 a.m.)

20          (Resumed at 11:22 a.m.)

21          THE COURT:  All right.

22          COURTROOM ADMINISTRATOR:  Your Honor, we are now back

23  on record in the matter of Le versus Zuffa, and that Case Number

24  is 2:15-cv-1045-RFB-PAL.

25          THE COURT:  All right.  So we have all of the same

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

1  parties except counsel for Bellator has left.  We now have

2  what's left, which is the plaintiffs' request for an extension

3  of the discovery plan and scheduling order deadlines, the

4  parties' update and status with respect to the discovery and

5  disputes about what, if any, additional discovery should be

6  allowed based on where we find ourselves here today.

7        So let me start by asking counsel for plaintiffs what

8  the status is concerning the motion to quash filed by AXS in the

9  Northern District of Texas.

10        PLAINTIFFS' COUNSEL:  Mr. Weiler will address that,

11  Your Honor.

12        THE COURT:  All right.  Mr. Weiler.

13        MR. WEILER:  Good morning, Your Honor.

14        So the status is that that matter is fully briefed.  We

15  have obtained local counsel.  And we seek the Court's guidance

16  on whether that is something the Court wishes to address as part

17  of the Court's consideration of discovery issues generally, and

18  if so, we will prepare in very short order a motion to transfer.

19        THE COURT:  All right.  So, well, I want to know --

20  obviously, lawyers have no leverage in Federal Court about when

21  their matters get heard, so I fully appreciate that.  But you

22  don't have a hearing set or you don't have --

23        MR. WEILER:  We don't have a hearing.  We just retained

24  local counsel.  The motion to quash is fully briefed.  It

25  relates to whether plaintiffs can take the deposition of Mark

————TRANSCRIBED FROM DIGITAL RECORDING————

1  Cuban who in -- who at one point wanted to create a promotion

2  that would compete with Zuffa.  There is dispute about an

3  important fighter --

4          THE COURT:  Here's what I was inclined to do with it.

5  You've got also a motion to compel that was filed with respect

6  to nonparty, Zinkin Entertainment, that's in the Eastern

7  District of California, correct?

8          MR. WEILER:  That's correct as well.

9          THE COURT:  And so obviously you need decisions on both

10  of those things either here or in the districts in which they

11  are originally filed in order to proceed with the -- getting the

12  documents and/or a deponent from each of those entities.

13          MR. WEILER:  Yes.  That's correct, Your Honor.

14          THE COURT:  And so what I was inclined to do is just

15  defer consideration of that until we see what the outcome of

16  those motions are and whether they're mine or they remain where

17  they are.  And -- because there's not much progress we can make

18  on them while -- I'm not going to hold up all of the remaining

19  discovery or adjust the schedule indefinitely, but if you are

20  granted leave to obtain documents or to depose individuals, take

21  up at that point timing and sequencing and whether they should

22  be allowed in this case.

23          MR. CRAMER:  Your Honor, can I raise one issue with

24  respect to the entity that Mr. Cuban -- the AXS entity?  The CEO

25  of the entity, Mr. Simon, has said he would willing be deposed.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          THE COURT:  I understand that, but do you want to

2    depose him without the documents?

3          MR. CRAMER:  I believe we --

4          MR. SAVERI:  Well, Your Honor, Joseph Saveri.  Sorry to

5    be the third person to stand up.

6          We certainly want the documents that are relevant to

7    those witnesses before we take the depositions.  That makes --

8          THE COURT:  That was my assumption, yes.  So it makes

9    no sense --

10          MR. CRAMER:  Excuse me, Your Honor.  I think we were

11    both saying that makes the most sense.  And so, I mean, one of

12    the things we're trying to do here today is do things in a

13    sense -- sensible logical way.  Our view is we should get the

14    documents, look at the documents, then get prepared for the

15    deposition, and take the deposition.

16          THE COURT:  Assuming you get them because --

17          MR. CRAMER:  And we'll get some.  We may not get

18    everything we want, but whatever we get I believe we should have

19    a chance to review it before we take the witness's deposition.

20          THE COURT:  Understood.  So that's my -- that was my

21    telling both sides my inclination is to defer a decision on what

22    we do with discovery from these two entities where there are

23    pending motions until we see the outcomes of the motions.

24          MR. WEILER:  Whether that's before Your Honor or

25    whether that's in Texas.

PATRICIA L. GANCI, RMR, CRR

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          THE COURT:  Correct.

2          MR. WEILER:  Okay.

3          THE COURT:  Just as a heads-up.

4          MR. WEILER:  Thanks, Your Honor.

5          THE COURT:  If the decision was intimate -- or

6  imminent, we could take that into account here, but we can't.

7  So -- all right.

8          So the plaintiffs want -- and you filed this originally

9  March 21st as an emergency request, and at that time you wanted

10  a 60-day extension of the deadlines and to run all of the fact

11  discovery deadline and to run all of the remaining deadlines out

12  consistent with that.  In the meantime, you've stipulated with

13  respect to the expert -- class and merits expert deadline which

14  is currently July 31st.  And we've resolved the work product

15  motions so we don't have to run a date out on a tentative

16  unknown date.

17          So you've got a lot to do in a case in which the

18  discovery cut-off has expired.

19          MR. CRAMER:  Your Honor, may I be heard on that?

20          THE COURT:  Yes, sir.

21          MR. CRAMER:  Thank you.  Eric Cramer for the plaintiff.

22          So in the -- since we filed our emergency motion for an

23  extension, there's been a lot of water under the bridge, a lot

24  of things have happened and haven't happened.  But I think we

25  learned this morning that there is a lot to do.  We now --

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1        THE COURT:  That's been evident since you started, you

2   know, really trying to schedule in earnest starting in March,

3   knowing you had a May 1 deadline.

4        MR. CRAMER:  Yes, but there have been a lot of things

5   that have happened that are beyond our control.  For example,

6   for whatever reason we didn't ask Your Honor to rule on the

7   Mercer document motion according to that process.  But that

8   motion was holding up not just the Mercer documents themselves,

9   but several 30(b)(6) depositions that Zuffa has agreed we can

10  take once we get those documents.  So presumably we'll get those

11  documents and at least be able to take those depositions with

12  one caveat.

13        Your Honor, Zuffa, after we filed this emergency

14  motion, for the first time produced its privilege log in April

15  with 30,000 entries.  Many of those entries related to the

16  Mercer documents.  Every time we scratch the surface in this

17  case we have found or at least often we've found that Zuffa has

18  used the work product and attorney/client privilege protections

19  broadly.  Your Honor has ruled in our favor in three of those

20  motions.

21        And so there are -- there's work that we need to do

22  with reference to that privileged log.  We've already noticed

23  problems with it, and we're going to need time.  We would like

24  time -- some time to address it.

25        There have been -- there are also other things that

─ TRANSCRIBED FROM DIGITAL RECORDING ─

 1  have come up, but even if you just look at the depositions that

 2  Zuffa has agreed we can take, it's going to take longer than

 3  until June 30th.  For example, Zuffa has agreed we can take four

 4  depositions, the key depositions of top Zuffa executives:  White

 5  Hendrick, Silva, and Mersch.  The White deposition kept being

 6  put off in part due to this text message issue which has now

 7  been resolved, and so we can go forward with the White

 8  deposition.  But that was being held up.

 9         I am taking Mr. Silva's deposition next week, but then

10  we have Mersch and Hendrick.  These -- we have at least three

11  days of 30(b)(6) depositions that I just mentioned.  There's

12  also a custodial 30(b)(6) deposition that needs to be taken that

13  Zuffa has agreed.  Zuffa has also agreed that if -- that once

14  the issues relating to the AXS subpoena that we just talked

15  about and the motion to quash in Texas are resolved that we can

16  take the depositions of Mr. -- of Mr. Cuban.  Actually, they

17  haven't, but Your Honor says we'll wait on that.  But those are

18  issues that we've been trying to deal with.

19         Zuffa has agreed, though, that we can take the

20  deposition of Mr. Coker, and that was awaiting the resolution of

21  the Bellator motion.  That is now in the process of being

22  resolved, but then documents will need to be produced.  We'll

23  need to review those documents.  That will take a bit of time.

24  And then prepare for and schedule that deposition.

25         Zuffa has agreed that plaintiffs can take a 30(b)(6)

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   deposition of WME, the entity that bought Zuffa in -- I think

2   they closed in August of 2016.  That deposition has been held up

3   in part because Zuffa has still -- WME is still producing

4   documents relating to our September 2016 subpoena to WME.  In

5   fact, since May 1 WME has produced 60,000 pages of documents.

6   That's not our fault.  And we need to be able to review those

7   documents and prepare for this deposition which Zuffa has agreed

8   we should be able to take.

9        Zuffa itself is continuing to produce documents.  Zuffa

10   told us -- Zuffa just told us that they're about to produce

11   documents next week relating to acquisitions.  Zuffa has

12   produced 50 -- 90,000 documents since November of 2016.  And so

13   we are not perfect on our side --

14        THE COURT:  And you tell me that you have spent 10,000

15   attorney hours since the document productions in this case, and

16   that is what you do in complex cases.

17        MR. CRAMER:  Yes.  We have been working very hard.

18   Zuffa produced 500,000 pages of documents after May of 2016.

19   We've gone through those documents.  We have -- we started

20   taking 30(b)(6) depositions in November and December.  We

21   started with fact depositions in January.  We've taken 21

22   depositions in this case, but there are, as we've just

23   mentioned, several key discovery issues that are left, some of

24   the most important depositions in the case which typically come

25   at the end.

1          The normal process is you get the documents.  You

2   review them.  You go through them.  Then you take the 30(b)(6)

3   depositions, and then you start with the lower fact witnesses

4   and you work your way up.

5          And for various reasons that we've discussed, many of

6   them beyond the plaintiffs' control, things have taken longer

7   than any of us had expected, starting with the 1.8 million FTC

8   documents that were discovered --

9          THE COURT:  I'm not going to go back to September of

10  2016.

11         MR. CRAMER:  You don't need to go back to it.  You

12  don't need to go back to it, and I won't go back to it.  That's

13  because I think all we need to look at is what needs to be

14  accomplished in the next 60 days and know that we can't do it by

15  June 30th.  And so what I'm asking Your Honor is that we extend

16  the discovery period for 60 days from today.  Move the expert

17  period from July 31 to August 31, 30 days.  And allow the

18  plaintiffs to take the discovery that they need to take within

19  the 60 days.  And we will work with Zuffa, with Bellator, as

20  hard as we can with third parties to get the discovery that we

21  need.

22         We -- I mean, we have served 70 subpoenas in this case.

23  We have -- I've never seen the amount of evasive action taken by

24  third parties to avoid being served and to avoid producing

25  documents.  The fact is people in this industry do not want to

--- TRANSCRIBED FROM DIGITAL RECORDING ---

1   get crosswise with Zuffa, and so they've been avoiding and

2   running.  And we've had to have long, long negotiations and file

3   motions to compel --

4          THE COURT:  All right.  You've served 70, but you are

5   down to 13 or 15 -- 17 --

6          MR. CRAMER:  Well, we received -- that's correct.  We

7   received a lot of documents.  We've abandoned several because

8   people couldn't be served.  We have worked very hard to try to

9   get the documents that we need, but I think the bottom line is

10  this case has gone on for two and a half years.  It's a case of

11  public import.  It deals with business practices of an entity

12  that runs a business that has lots of fans.  It deals with the

13  livelihoods of a thousand or more fighters.  And it's a case of

14  public import.  It's gone on for two and a half years.  There's

15  no trial date.  We're at least a year from trial right now given

16  the way the schedule plays out.  And all we're asking, Your

17  Honor, is for 60 days to complete discovery.

18         And there are some other very important things that we

19  need to do within that period of time.  We've subpoenaed

20  multiple boxing promoters.  We have two depositions scheduled of

21  boxing promoters for June 26 and June 28th.  Zuffa has opposed

22  those.  We've served a subpoena on Raine, which is an entity

23  that -- an investment banking firm that consulted in WME's 2016

24  acquisition of Zuffa.  We served that in August of 2016, and we

25  want to take that deposition and get those documents.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1      I mean, that acquisition in 2016 was a surprise to us,

2 and it opened up doors to a whole avenue of additional discovery

3 that we could not have anticipated when we initially negotiated

4 the fact discovery period.

5      Zuffa -- Zuffa went out, and to justify a $4 billion

6 valuation, it needed to demonstrate to the buyers that it had

7 market power.  Nobody pays $4 billion for an entity that

8 basically has no assets, unless it's convinced that it has

9 market power.  And what we've learned is that a lot of the

10 documents relating to that acquisition are highly relevant

11 documents, and that happened in August of 2016.  We immediately

12 served subpoenas to WME and to Zuffa, and we've been receiving

13 documents relating to that evidence and working very hard to try

14 to get to the bottom of it.

15      As I said, since May 1 WME --

16      THE COURT:  Have you reviewed what you have received to

17 date?

18      MR. CRAMER:  We've -- well, we've reviewed everything

19 reasonable -- we reasonably could.  We have a protocol in place.

20 When something gets in, it goes through a process of getting

21 reviewed, but we just got 50,000 pages of documents from WME on

22 May -- from May 1st to the present.  So we're working on those

23 documents, but it creates a difficult situation.

24      So, look, the bottom line, Your Honor, is we're asking

25 for 60 days to do what we can do, to work with Zuffa and

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1  Bellator and the other third parties to get done what we can get

2  done in that period of time.  And one other issue I would

3  make -- one other point I would make is the Mercer documents,

4  the privileged log, the WME acquisition, in the normal course of

5  discovery, what happens is you learn things.  As the plaintiff

6  you read documents, you take depositions, and you learn things.

7        And because Zuffa back-loaded its document production,

8  because of this surprise purchase in August 2016, because we

9  have a privileged log that was produced in late April of --

10  finally produced in late April --

11       THE COURT:  And how many months did it take you to log

12  less than 900 documents?

13       MR. CRAMER:  Well, I don't know the answer to that

14  question.  What I can say, though, is that Zuffa certified to

15  Your Honor that they had substantially completed production in

16  September of 2016.  Now, there was another RFP that we served in

17  part -- in large part relating to the WME acquisition, but there

18  was nothing preventing Zuffa from doing a privileged log on a

19  rolling basis; get the privileged log out relating to what

20  you've already produced and then update it later so that we're

21  not -- so that we're not facing April 2017 with an April 30th

22  fact discovery cut-off in a case that's been pending for two and

23  a half years of great public import and a lot of complexity,

24  30,000 entries, and no time, no ability to try to uncover what's

25  going on there.  We already know based on your ruling -- Your

—— TRANSCRIBED FROM DIGITAL RECORDING ——

 1  Honor's ruling relating to Mercer that there are documents on

 2  that log that are highly relevant and likely improperly

 3  withheld.

 4          So Zuffa shouldn't be able to benefit from its dilatory

 5  conduct in producing that privileged log in April of 2016 or in

 6  back-loading its production.  But the bottom line is all we're

 7  asking for is 60 more days.  So, Your Honor, we ask that you

 8  allow us that time, push back the schedule, the expert schedule,

 9  another month.  The only reason why we agreed to July 31 was

10  because --

11          THE COURT:  You might not get anything now.

12          MR. CRAMER:  Well, A, we might not get anything, and

13  when Your Honor moved the status conference from I think the day

14  before the expert -- we were facing an expert deadline.

15          THE COURT:  I understand, and it was perfectly

16  reasonable for you to do what you did.  And that's fine.  And so

17  now we're moving forward.

18          MR. CRAMER:  Good.  All right.  Well, I think I've made

19  my point.  I appreciate Your Honor hearing me.

20          If you have any questions, I'll be glad to answer them.

21          THE COURT:  So which depositions do you currently have

22  scheduled now?

23          MR. CRAMER:  Okay.  So we have scheduled the deposition

24  of Joe Silva.  I'm taking him next week.  We have several -- we

25  have two depositions from boxing promoters.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          PLAINTIFFS' COUNSEL:  Yes.  Warriors Boxing, Leon

2  Margueles and ...

3          MR. CRAMER:  For the end of June.

4          PLAINTIFFS' COUNSEL:  June 28th is DiBella.

5          MR. CRAMER:  We have several depositions that Zuffa has

6  agreed we can take, but have been awaiting various things to

7  happen before we can schedule them.  The White deposition --

8          THE COURT:  So let me -- I need to be on the same page

9  with you.

10          MR. CRAMER:  Okay.

11          THE COURT:  You have Silva scheduled?

12          MR. CRAMER:  Yes.

13          THE COURT:  You have DiBella scheduled.  You have -- is

14  it Margueles scheduled?

15          MR. CRAMER:  Yes.

16          MS. GRIGSBY:  Your Honor, can I just interject that

17  this is actually the first we've heard that DiBella and

18  Margueles are scheduled.

19          THE COURT:  I'm going to give you an opportunity.  I'm

20  just -- now I'm hearing from them because I've got a list of

21  about 50 people and trying to find out who's on first is where I

22  am right now.

23          MR. CRAMER:  Yeah.  I mean, the issue -- the reason

24  Zuffa doesn't know is we've been trying to schedule depositions.

25  Obviously Zuffa's taken the position that we can't --

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1          THE COURT:  Well, it's scheduled with respect to them,

2   but if Zuffa doesn't know about it, that's another issue.

3          MR. CRAMER:  Well, Zuffa's been taking the position we

4   can't take any depositions, other than --

5          THE COURT:  That part I get, but you still have the

6   issue you have to talk to each other.

7          MR. CRAMER:  Of course.

8          THE COURT:  All right.  So you have these three.  Are

9   there any others that have been set or are close to being final

10  with any of the nonparties?

11         MR. SAVERI:  Well, we talked -- excuse me, Your Honor.

12  Joseph Saveri.  We talked about Cuban.  We talked about Simon.

13  There was ...

14         MR. CRAMER:  There's Coker from Bellator, but those

15  haven't been scheduled.  But --

16         THE COURT:  Correct.  I'm asking about scheduled right

17  now.

18         MR. CRAMER:  Yes.  I apologize.  I think that's it,

19  Your Honor.

20         PLAINTIFFS' COUNSEL:  Your Honor, we have attempted to

21  schedule the other three boxing promoters, and they have been

22  advised by Zuffa's counsel --

23         THE COURT:  But you told me that --

24         PLAINTIFFS' COUNSEL:  -- the discovery period is over.

25         THE COURT:  I'm not faulting you for not -- I just want

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1    to know where you are right now here today.  Okay?

2         MR. CRAMER:  Well, I think we have --

3         THE COURT:  Because I get that, you know, when a party

4    hears that the discovery cut-off has run and we don't know if

5    the judge is going to grant any more time ...

6         MR. SAVERI:  Shuts it down.

7         THE COURT:  Stuff happens, yeah.

8         All right.  And so you have listed 10 depositions, and

9    of those -- of nonparties that you want of the various -- and

10   setting Simon and Cuban aside because we're waiting to see the

11   outcome of the pending motions in other districts, you've

12   scheduled two of the 10.  So that leaves you wanting to take six

13   more depositions of nonparties from the Raine Group to these

14   various individuals, including Moody's.  And if I give you 60

15   days, what are the odds you are going to be able to complete

16   them in the 60 days you just asked for?

17        MR. CRAMER:  So, Your Honor, the odds are we won't be

18   able to complete all of those, but I think from our perspective

19   the best outcome for everyone would be for Your Honor to give us

20   a certain amount of time and allow the parties to figure out

21   under the normal discovery rules what can get done within that

22   period.  As long as Zuffa's proceeding in good faith and third

23   parties are proceeding in good faith, the plaintiffs will be

24   forced to make some decisions, right.  We understand that.

25        THE COURT:  You know you're going to have to pare this

——TRANSCRIBED FROM DIGITAL RECORDING——

 1  list down in order to get it done.

 2          MR. CRAMER:  We understand that, Your Honor.  And I

 3  think the best way for Your Honor to handle it, in our opinion,

 4  is to push back the deadline, give us 60 more days, and allow

 5  the parties --

 6          THE COURT:  I just want to make sure that you

 7  understand that that's the inevitable consequence because I'm

 8  not going to say, Oh, well, we still need 15 left.

 9          MR. CRAMER:  No, no.

10          THE COURT:  15 more, 15 more.

11          MR. CRAMER:  We understand that, but the only caveat

12  being that there are -- there are things that might stem from

13  the privilege log or the --

14          THE COURT:  That's always the case.

15          MR. CRAMER:  Right.  So --

16          THE COURT:  You can take the last day of deposition and

17  you could have some atomic bomb go off in terms of information

18  that changes everything.

19          MR. CRAMER:  Right.  So putting that caveat aside,

20  we -- look, we do this all the time.  We're sophisticated

21  lawyers.  We understand we need to make tradeoffs.  So we think

22  the best way to handle it is for Your Honor to give us the 60

23  days and force us to make those decisions.

24          THE COURT:  All right.  Thank you.

25          MR. CRAMER:  Thank you, Your Honor.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1        THE COURT:  Who will be arguing Zuffa's position with

2   respect to this?

3        MS. GRIGSBY:  Stacey Grigsby, Your Honor.

4        THE COURT:  Ms. Grigsby.

5        MS. GRIGSBY:  Well, let's just start with two premises

6   here.  The first is that Zuffa has actually agreed to much of

7   the discovery that plaintiffs contemplate in this Joint Status

8   Report where most things have fallen out of their control or

9   where they can arguably say Zuffa played a role in their

10  inability to take discovery.  We've resolved it.  Key examples

11  are the four Zuffa witnesses who are being deposed in the next

12  few weeks.  Also WME-IMG, again, we did not oppose.  We reached

13  a stipulation concerning Mercer and the ability of plaintiffs to

14  call back witnesses, two particular witnesses, if they had not

15  been deposed.

16        We've been trying to work with them, but what we oppose

17  is a free-for-all for the next 60 days so that plaintiffs can be

18  exactly in the same situation that we're in now which is --

19        THE COURT:  Well, and that's why I just asked them this

20  question.  They've identified the universe of what they'd want

21  on their wish list if they get it all.  And they know they're

22  going to have to make compromises if I give them the 60 days and

23  they're going to have to pare it down.  And they're going to see

24  what is really realistic to do in 60 days.  Why isn't that a

25  reasonable approach?

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          MS. GRIGSBY:  Because I think that there needs to be

2   ground rules in terms of the discovery that they should focus

3   on; because additional issues even as recently as May 12th keep

4   appearing, issues that could have been raised long ago.  For

5   example, you saw two days ago there was a motion filed to double

6   the time for the remaining Zuffa witnesses from seven hours to

7   14 hours; notwithstanding that the parties have entered into a

8   stipulation on April 25th that two of those depositions would

9   only be seven hours and notwithstanding the fact that they noted

10  that all of these witnesses probably have as much information as

11  the former CEO, Lorenzo Fertitta.

12          Plaintiffs were able to do Mr. Fertitta in seven hours.

13  I mean, there is a burden on Zuffa as well.  And, again, it's

14  probably clear from our papers.  I mean, part of the problem is

15  that there were a lot of things set, rescheduled, moved, lack of

16  coordination.

17          So it is odd now that plaintiffs say that Zuffa has

18  been informing their parties that they don't have to show up.

19  Third parties have actually contacted Zuffa because they're --

20          THE COURT:  I understand that, but everybody's in limbo

21  because you don't know what additional time, if any, you're

22  going to get.

23          MS. GRIGSBY:  Right.  Their industrious lawyers looked

24  at the docket and have called us to say, I see that discovery is

25  closed.  I've informed them that we are opposing the extension.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

 1  But --

 2        THE COURT:  I'm not faulting you.  I know exactly what

 3  you're saying, and you can get in trouble for conducting

 4  discovery without leave of Court when it's a Court-imposed

 5  deadline so --

 6        MS. GRIGSBY:  Exactly.

 7        THE COURT:  But now here we are now and we still have a

 8  fair amount to do.  And they're asking for 60 days to do what

 9  can be done.

10        MS. GRIGSBY:  And again, Your Honor, I guess we're

11  asking that you limit it to the things that -- I mean, things

12  that are identified in their earlier papers.  I feel like for

13  the third parties, you know, where for whatever reason they did

14  not get documents for years, for literally years, decided to

15  notice the depositions at the last minute.  I mean, the Raine

16  Group, they noticed the deposition on April 20th for April 30th,

17  which is a Sunday.  You know, plaintiffs should not be able to

18  benefit from the fact that at the last minute they were

19  scrambling to notice all of these third parties.

20        So we just ask that there are reasonable limits.  Rule

21  45 subpoenas --

22        THE COURT:  And so tell me what you think a reasonable

23  limit is.

24        MS. GRIGSBY:  So we think a reasonable limit is to do

25  the current and former Zuffa employees.  We are not going to

————TRANSCRIBED FROM DIGITAL RECORDING————

1 oppose that.  We think it's reasonable to keep the normal limit

2 in Rule 30 of seven hours, which is the presumption here,

3 especially given the fact that two of the witnesses were

4 30(b)(6) designees.  They've gotten -- and, you know, they've

5 gotten 30(b)(6) testimony for four days.

6        THE COURT:  Did you discuss Mr. Epstein, as I

7 understand it, or "Epstine"?  I'm not sure how to pronounce his

8 name.  Did you discuss that?  Because he went for seven hours

9 and he's one of the deponents that they want again.  Has that

10 even been discussed with you?

11        MS. GRIGSBY:  That they want two days?

12        THE COURT:  No.  I thought he was deposed already for

13 seven hours.  Did they -- at the conclusion of the seven hours

14 did they say, We're not done with this witness, we need some

15 more time with him, or did you find out for the first time when

16 they filed their motion for additional time?

17        MS. GRIGSBY:  We found out the first time on May 12th

18 when we saw a draft of the joint status agenda that was

19 submitted to the Court that plaintiffs were going to seek, you

20 know, 14 hours.  So during the deposition not on the record I

21 had conversations with counsel about the fact that they wanted

22 two days.  On that particular day, I said, If you go a little

23 bit over the seven hours, we are not opposing, but we are

24 opposing the second day.

25        We are also opposing -- I mean, again, we will submit

———— TRANSCRIBED FROM DIGITAL RECORDING ————

 1    an opposition unless this Court is willing to rule now, but --

 2          THE COURT:  I am because we're going to eat up 30 days

 3    in briefing on a period of time in which they're asking for 60

 4    days.

 5          MS. GRIGSBY:  Right.  So this is an apex deposition.

 6    They were able to -- I mean, they were asking questions such as

 7    what is the business purpose of the champions clause.  And I did

 8    tell them if they're using their time this way, then I don't

 9    think there's a justification for them to take 14 hours with

10    this particular witness.  They used one document that they had

11    used with the same witness in the 30(b)(6).  So it was discussed

12    with Mr. Epstein.

13          THE COURT:  You believe that they're taking an

14    unreasonable amount of time and they're asking cumulative

15    questions that have already been answered.

16          MS. GRIGSBY:  Exactly, Your Honor, and --

17          THE COURT:  They say that, you know, you're not limited

18    to -- you can ask individual witnesses the same questions that

19    you ask the 30(b)(6) because you might get a different answer

20    from the guy that's binding the corporation than from the person

21    who has percipient knowledge.

22          MS. GRIGSBY:  True.  But, Your Honor, I'm just, you

23    know, going under Rule 26(c) and the case law on apex

24    depositions that, you know, there is grounds to ask for a

25    protective order given the fact that, you know, a COO who is --

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   of a company, of a large company, is a fairly busy individual.

2   And to take the time for him to provide answers that he's -- in

3   fact, he already provided some of these answers in his 30(b)(6)

4   just doesn't show the need for 14 hours worth of questioning.

5           That is our basis.  It's not that we think -- you know,

6   we're worried that he had some personal knowledge that was

7   different.  It was just that this is what they're using their

8   time to do.

9           We actually have a video of one of the last

10  depositions.  I don't know if technology's going to allow, but

11  if Your Honor could see some of the questions that are being

12  asked during this time, we just believe that, you know, allowing

13  them 14 hours just because these witnesses happen to be last is

14  unfair.

15          For example, Sean Shelby had the exact same title as

16  Joe Silva.  Lorenzo Fertitta was the CEO of the company.  They

17  were -- they were able to do the deposition in seven hours.  I

18  mean, this is a last-minute request that has come after the

19  close of discovery.  To really impose --

20          THE COURT:  I understand your arguments about that.

21  Now you tell me more specifically, however, how you propose that

22  I should order what can be done in the next 60 days --

23          MS. GRIGSBY:  Sure.

24          THE COURT:  -- if I give them the 60 days they're

25  asking for.

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          MS. GRIGSBY:  Sure.  So we'll go back.  So the four

2    remaining Zuffa employees for seven hours --

3          THE COURT:  White, Silva, Mersch, and Hendrick?

4          MS. GRIGSBY:  Exactly, Your Honor.

5          THE COURT:  And the Zuffa's custodian of records that

6    you agreed to?

7          MS. GRIGSBY:  Yes, Your Honor.

8          THE COURT:  And the Zuffa 30(b)(6) on fighter

9    compensation that you agreed to?

10          MS. GRIGSBY:  Yes, Your Honor.

11          THE COURT:  And the WME deposition that you agreed to?

12          MS. GRIGSBY:  Yes, Your Honor.

13          THE COURT:  And the Scott Coker deposition that you

14    agreed to?

15          MS. GRIGSBY:  Yes, Your Honor.

16          THE COURT:  All right.  And then with respect to the

17    other nonparties, we've got a list of 10 depositions.  Two of

18    which are on hold because of litigation in other districts.  Two

19    of which they have been tentatively scheduled at least with

20    respect to the deponents and/or their counsel, but haven't been

21    discussed with you.

22          MS. GRIGSBY:  Correct, Your Honor.  I mean, it seems

23    like this -- you know, we've agreed AXS TV will await the

24    outcome, but the rest of this is just a wish list.  It's not --

25    even if they were to get 60 days, it's not realistic to complete

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  it.

2      THE COURT:  And they know that.  And that's why I just

3  asked them that.  And now I'm asking you.  Okay?  He's going to

4  have to make choices based on what he can get done and what's

5  more important to the plaintiffs' case.  Why shouldn't I allow

6  him an opportunity to do some of this, whatever he can do within

7  a reasonable time, imposing on both sides a good faith

8  obligation to coordinate your respective schedules and to do --

9  get done what can be done on this list?

10      MS. GRIGSBY:  I mean, Your Honor, I think because the

11  answer for some of these witnesses is that plaintiffs have had

12  quite a bit of time to do this.  I mean, there are deadlines for

13  a reason.  So, for example, let's use Bob Aaron.  They noticed

14  his deposition in January.  They got a response from his counsel

15  that he was -- they sent -- served the notice in January.  They

16  got a response from his counsel that he was unavailable on May

17  16th, 2017.  There were no follow-up efforts on that account.

18  The various boxing promoters, they've been noticed around the

19  same time.  Again, there was no diligence on their part in

20  completing these depositions.

21      For Robert "Bob" Meyrowitz --

22      THE COURT:  So you want me to say that they don't get

23  anything.

24      MS. GRIGSBY:  No, we want you to say that they get what

25  they've actually diligently pursued during the time frame.

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

 1          THE COURT:  Yeah, but when you get down to brass tacks,

 2   these 10 that they've listed in the status report, you're

 3   telling me they shouldn't be able to depose any of them because

 4   they didn't schedule them or take appropriate action within the

 5   time period that was allowed under the plan?

 6          MS. GRIGSBY:  Yes, Your Honor.  When some of these

 7   earlier --

 8          THE COURT:  I just want to clarify that that's your

 9   position.

10          MS. GRIGSBY:  Yes.

11          THE COURT:  That's what you're telling me.  Don't give

12   them anything more on this list because they weren't

13   sufficiently diligent.

14          MS. GRIGSBY:  Yes, Your Honor.

15          THE COURT:  Okay.  And I take it that's your same

16   position with respect to the 17 subpoena duces tecum that have

17   been served, but have not been enforced in the face of

18   resistance.

19          MS. GRIGSBY:  Well, I mean, actually there's some

20   exceptions.  For example, one championship was --

21          THE COURT:  So you must want him, too.

22          MS. GRIGSBY:  So, again, they have actually tried to

23   enforce, to -- you know, to move to compel these subpoenas.

24   Then we don't object to them being able to do it.  It's just the

25   fact that they did nothing.  Some of these subpoenas were

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1  served, like Ed Schwartz, in December of 2015.  They've done

2  nothing.  They've done very, very little.

3          THE COURT:  And we just had oral argument on a motion

4  to quash Bellator in which you wanted all of that information

5  from them, too, and you didn't do anything to compel your

6  subpoena either, did you?

7          MS. GRIGSBY:  Your Honor, as you noticed, we didn't

8  move to compel.  We were just opposing the motion to quash.  You

9  know, at the end of the day --

10          THE COURT:  Correct, but you didn't do anything to get

11  information that your lawyer just stood up and said is

12  absolutely vital to this case.  So both sides -- this is tough.

13  This is hard litigation.  You've worked very hard in this case,

14  and I get that.  And now you find yourself where you are.  And

15  now I have to decide what's a reasonable limitation within a

16  reasonable period of time to get this case ready for trial.

17          MS. GRIGSBY:  Yes, Your Honor.

18          THE COURT:  Okay.  And you think that I should just cut

19  them off from the 17 custodian document -- production and from

20  the 10 third-party or nonparty witnesses and just proceed with

21  the ones you agreed that they should be able to take.

22          MS. GRIGSBY:  Well, I mean, I guess we would concede

23  for the document productions, you know, but for the depositions

24  there's actually been a real imposition even on opposing

25  counsel.  I mean, we've bought tickets before to travel,

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1  nonrefundable tickets, where plaintiffs have later cancelled the

2  depositions at the eleventh hour.  They've represented that

3  certain depositions are still on the schedule when they already

4  knew from the third party that the third party was unavailable.

5      It's just there should be some limits.  You know, we're

6  not asking you to cut them off.  We obviously have every

7  interest in them presenting their case because we think we'll

8  win on the merits, but in terms of these various fishing

9  expeditions to, you know, talk to every single third party when

10  they've been unable to do so in a year and a half, it's just

11  very difficult for us to concede that there's the need to do all

12  of this in 60 days when for certain of these items plaintiffs

13  have done nothing.

14      THE COURT:  Okay.

15      MS. GRIGSBY:  And then in terms of the new discovery,

16  again, Your Honor, completely understanding and being sensitive

17  to your concern about them being able to finish up their

18  efforts, the new discovery, it's our position that the new

19  discovery should not be allowed partly because plaintiffs --

20      THE COURT:  Except for one championship.

21      MS. GRIGSBY:  Because they received that information

22  in, you know, April/May of 2017.  So, again, we take no position

23  because we understand that plaintiffs, perhaps, did not have the

24  information.  But for the other ones -- January Capital, on the

25  certificate of interest it listed January Capital.  They've used

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1   January Capital documents since their first 30(b)(6) deposition.

2   I mean, the idea that they've just learned as of May 2017 that

3   January Capital could have information is just not credible.

4        The same with Showtime Networks.  They actually cite in

5   their complaint the fact that Zuffa has had contracts such as

6   with Showtime.  All of the information that plaintiffs are using

7   as the basis to take this deposition they've had in their

8   possession.  On December 2nd they asked Lawrence Epstein during

9   the 30(b)(6) of acquisitions about the last negotiations with

10  Showtime, and now in May -- we learned this in May that they

11  want to depose Showtime as well.

12        Vinci Partners, I mean, the other issue there, they've

13  defined the relevant market as you understand in the United

14  States and alternatively in North America.  Just unclear what,

15  you know, sending attorneys to Brazil is going to -- you know,

16  whatever relevance this is going --

17        THE COURT:  Your side of the table just told me the

18  world market is relevant and you think that's the -- that's the

19  relevant market.

20        MS. GRIGSBY:  Well, we would have deposed -- if we

21  thought that there was really a lack of value, we would have

22  noticed the depositions ourselves, but in any event, they've had

23  those documents since September of 2016.  Yes, it's our view

24  that the market is global.  It's not just North America, but

25  that's not their view and they're the ones asking for the

———TRANSCRIBED FROM DIGITAL RECORDING———

1   deposition.

2          And then for Malki Kawa, they have said based on a

3   deposition which took place in the beginning of May they have

4   this new need to depose the third party.  And just to be clear,

5   the particular text message is from Malki Kawa to a Zuffa

6   employee.  They've had this text message since July of 2016 when

7   the Zuffa employee testified that he didn't know what Malki Kawa

8   meant.  Then -- now plaintiffs say, Oh, this is a basis for new

9   discovery.  Again, they've had all of this information for

10  almost a year, and in fact they've asked about this same exact

11  negotiation in the 30(b)(6) deposition.

12         So it's just our position that plaintiffs are coming up

13  with a laundry list, much of which they haven't even presented

14  to Zuffa until May of -- May 12th of 2017.

15         And for that reason we ask that the Court limit

16  discovery if it's inclined to extend it.

17         THE COURT:  Thank you.

18         All right.  Let me hear from Zuffa why I should give

19  you 14 hours on another last-minute motion that was filed on May

20  the 9th when you were able to complete Mr. Fertitta's deposition

21  in seven hours.  Who wants to be on the chopping block for this

22  one?

23         MR. SAVERI:  So I had a lot of input on my way to the

24  lectern, Your Honor.

25         THE COURT:  Mr. Savarese.

———TRANSCRIBED FROM DIGITAL RECORDING———

1          MR. SAVERI:  Saveri, Your Honor.

2          THE COURT:  Saveri, excuse me.

3          MR. SAVERI:  I appreciate that.

4          So I was getting up.  I just want to make sure I heard

5  your question.  What -- do you want me to address the why --

6          THE COURT:  Why do you need 14 hours from all of these

7  people when you were able to complete Mr. Fertitta in seven

8  hours and why I am hearing about it and they're hearing about it

9  for the first time on May 9th?

10          MR. SAVERI:  Well, so let's do those in order.  First,

11  I think that the first point I would make is clearly this is a

12  complicated case.  There are a lot of documents.  All of the

13  cases we cited in our papers in which Courts have expanded or

14  enlarged the deposition time applies --

15          THE COURT:  I clearly have discretion to give you more

16  time.  The question is, if you could do Fertitta in seven hours,

17  why can't you do all of these other people if you're really

18  being efficient and you know your case and you're prepared?

19          MR. SAVERI:  Well, so I'd say a couple of things first.

20  Fertitta actually is an apex deposition.  He actually is the

21  CEO.  And so we took that seriously and we tried to do that as

22  efficiently as possible.

23          THE COURT:  And Dana White is the face of the UFC

24  you're telling me.

25          MR. SAVERI:  And -- but --

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1    THE COURT:  Come on.  Be serious here.  Why do you need

2  it?

3    MR. SAVERI:  Well, because there are many, many

4  documents, many, many text messages.  The case covers years of

5  time.  It's a complex antitrust case.  We will certainly try to

6  do these depositions as efficiently as possible, but clearly

7  this isn't a who-went-through-the-red-light case.  This isn't a

8  personal injury case.  This is a case where the documents that

9  are relevant to these witnesses.  All of these witnesses we

10  understand from the Rule 26 disclosures are going to testify at

11  trial.  So we have two -- a couple of things we need to do.

12    One, we need to elicit the information that we need in

13  order to prove our -- bear the burden to prove our

14  case-in-chief.  We also need to address and to determine, so

15  that we don't have a trial by ambush, what these witnesses are

16  going to be able or what they -- how they're going to testify at

17  trial.

18    So we clearly need in my mind more than seven hours

19  because of the complexity of this case.  It is not clear to me

20  that we need the whole 14 hours, and there are certainly ways of

21  trying to accommodate or negotiate something in between a

22  deposition that we -- I think we can agree in a complex case

23  would likely go more than seven hours and two days.  The

24  problem -- or the difficulty we have is it's important to note

25  before we take the depositions how much time we have.  I think

———TRANSCRIBED FROM DIGITAL RECORDING———

1  it's a reasonable thing for the attorney to know when he or she

2  is preparing that deposition how much time he or she has to work

3  with.  So just in terms of planning, that's why we need the

4  depositions, to be -- in large we need to know it in advance.

5       Candidly, Your Honor, I think that we -- as we were

6  getting ready for the end of the case and we fully appreciated

7  what we were dealing with in terms of the documentary record,

8  the text messages, the knowledge that these witnesses would

9  have, and that's partially informed by the depositions that came

10  before, it's clear that these witnesses have more knowledge

11  which is relevant to this case which is -- which reasonably will

12  take more than seven hours to examine the witness on.

13       And so when we have that come up, perhaps we should

14  have done it a little bit earlier, but we did it in advance of

15  the depositions and we think that's an appropriate time to do

16  that.  And frankly, Your Honor, there's no other way for us to

17  address this issue, to do it in advance of these important

18  witnesses, and you can give us the guidance about how much time

19  we have.

20       Our request is relatively simple.  Because of the

21  complexity of the issues for these witnesses, the amount of

22  documents, other information they have, the time period covered,

23  the fact that they are trial witnesses, we think it's reasonable

24  and it's important for us, the plaintiffs who have the burden,

25  to have more than seven hours of testimony on the record.

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1           And we don't need the whole 14 hours.  I can promise

2   you that, Your Honor, but we have to -- in order to get -- we

3   need to enlarge the time and we need your guidance from the --

4   we need your guidance, Your Honor, that we're allowed to go

5   beyond the seven hours.  And we'll do the best we can.

6           If you said we get seven or eight or 10 or whatever the

7   number is, we'll deal with it, but we think it's important to

8   have more time than just the seven hours.  That's the request.

9           And I would also say, we --

10          THE COURT:  And what about Mr. Epstein?

11          MR. SAVERI:  Well, so I took Mr. Epstein's deposition.

12          THE COURT:  Epstein, excuse me.

13          MR. SAVERI:  And a couple -- a couple points.  I think

14  it is incorrect that the testimony -- the questioning of

15  Mr. Epstein was cumulative in any significant way.  Certainly

16  whenever you ask a number of witnesses who are involved in

17  similar e-mail chains or similar events, similar meetings.  That

18  you ask the witnesses the same question.  Now, I don't think

19  that is cumulative.

20          Now, the -- so we need, with respect to Mr. Epstein,

21  some additional time for a couple reasons.  First, and I did

22  advise counsel during -- in advance of the deposition and during

23  the deposition that we wanted to have more time.

24          THE COURT:  And she tells me that when you got to the

25  seven hours she said, If you need a little more time, I'm

—TRANSCRIBED FROM DIGITAL RECORDING—

1  willing to -- we'll stay late.

2       MR. SAVERI:  Well -- and first of all, Your Honor, we

3  walked into the deposition, and the position was you're only

4  getting seven hours.  Now, we made plans and arrangements around

5  that, but we also have -- and so we were only told in the middle

6  of the afternoon, a couple -- an hour or so before the

7  deposition was to end, Hey, we're changing our position.  So

8  that feels a little bit like -- it's a little bit of a bait and

9  switch to be told, Hey, you only get seven hours for a

10  deposition.  That's all you're going to get.  We reserve our

11  rights.  And then in the fifth hour, Hey, we're changing the

12  rules.  I think that's unfair.

13       Now, with respect to Epstein, we have an agreement that

14  the deposition will be enlarged because of the -- depending on

15  how the Mercer motion was resolved.  So we do have additional

16  time.  Frankly, Your Honor, because I prepared for the

17  deposition, I know there are probably 25 or 30 more e-mails that

18  could have been used with Epstein that could easily fill another

19  day.  I'm probably going to take the second day of deposition of

20  Mr. Epstein, and I have no interest in just wasting my time for

21  another second day.

22       But, candidly, he had a big job at this case.  While

23  he's not an apex deposition, Mr. Fertitta is the apex, he's an

24  extremely knowledgeable witness who we understand is going to

25  testify at trial.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          And so some additional time I think is warranted, and

2   so that's really what we're -- why we would want additional time

3   for Epstein.  I don't -- I don't believe we need the full seven

4   hours, but we certainly need more.

5          THE COURT:  All right.

6          MR. CRAMER:  Your Honor, can I address the discovery

7   issue very briefly, the overarching discovery issue?

8          THE COURT:  Well, we're not going to keep doing

9   tag-team argument here.  And so --

10          MR. CRAMER:  Mr. Saveri was addressing the 14-hour

11   issue.  I just want to get back to the overall scope of the

12   extension, if we're going to get an extension.  And I don't

13   intend to go subpoena by subpoena and respond in a granular

14   fashion to the arguments that Ms. Grigsby made about each one

15   because I don't -- there's no motions pending relating to all of

16   those.  We would have responses about all of those, but I don't

17   think it's worthwhile.

18          And I think it points --

19          THE COURT:  No, and it's eaten up the time that you

20   have.

21          MR. CRAMER:  Right.

22          THE COURT:  So I'm not going to do it either.

23          MR. CRAMER:  And I just don't -- I think the best --

24   the best way to resolve it is to use an analogy.  Instead of

25   telling people they can go to dinner here and they can only shop

————TRANSCRIBED FROM DIGITAL RECORDING————

1  there when they're on travel, you give them a per diem.  You get

2  150 bucks a day and spend it however you want.

3          And that's the analogy I would use here.  You give us

4  the 60 days, and we spend it however we want.  And it's up to us

5  to decide what we need to pursue and what we can't pursue, what

6  we can drop and what we need to pick up.

7          And rather than trying to -- I can't even understand

8  exactly what line Ms. Grigsby wants, but whatever that line is,

9  we're going to litigate about it.  And rather than litigating

10  about the line, just give us the 60 days, and then we have to

11  figure it out ourselves.  That's the last point I would say.

12          One other thing on Mr. Silva.  I'm taking Mr. Silva

13  next week.  I can do him in 10 hours, if I could get the 10

14  hours.  There's a lot of documents.  They're key documents.

15  He's the key -- he's a key figure in the case.  He's a

16  matchmaker.  He negotiated with dozens and dozens of fighters.

17  There's hundreds of e-mails and texts with Mr. Silva and

18  fighters central to the case.  Many of the key documents in the

19  case are Silva either wrote, received, or is part of.  And that

20  deposition is going to be very difficult merely because of the

21  number of documents I would need to go through.

22          And I would address Mr. White.  One of the issues why

23  we need more time with Mr. White is that -- is the sheer number

24  of documents, including video that we need to authenticate

25  through Mr. White, and just showing Mr. White --

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1        THE COURT:  I thought you were going to take a Zuffa

2   custodian of records for authentication purposes.

3        MR. CRAMER:  That's true, but in order to -- but in

4   order to verify that certain -- that Mr. White's statements in

5   some television show are from Mr. White, we need Mr. White to

6   say, Yeah, that was me and I said that.  Otherwise, we would

7   need to go to the television show and each company that produced

8   whatever video that we're looking at, and there's lots of videos

9   of Mr. White.

10        THE COURT:  You haven't even had a discussion with the

11   other side about a stipulation authenticating documents the

12   other side produced in that category?

13        MR. CRAMER:  Some of these documents have not been

14   produced by Zuffa.  Some of these documents are clips of video

15   we've taken from the Internet, from television.  Mr. White

16   speaks a lot in public.  He says lots -- says a lot of things.

17   A lot of that is in the complaint.  That's important evidence

18   for us at trial.

19        And the sheer amount of time it takes to show that to

20   Mr. White and ask him to testify about it would consume a

21   seven-hour deposition.  He's one of the most important witnesses

22   in the case.  So if we could get the 14 hours with him, I think

23   that is fully justified.  That's the last thing I would say.

24        Thank you, Your Honor.

25        THE COURT:  All right.  The plaintiffs' request for an

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  extension with the discovery cut-off is granted.  July 31st,

2  2017, is the July cut-off with the remaining dates extended 60

3  days accordingly, including August 31st, 2016, for the class of

4  merits experts.

5         The plaintiffs will have up to 10 hours with respect to

6  the Zuffa employees whose depositions have been agreed among the

7  parties for deposition time.  The parties will make arrangements

8  to have the deponents available over a two-day period, if

9  necessary, subject to a motion to terminate or under Rule 30(d)

10  if you believe that examination is harassing or burdensome or

11  cumulative.  And I would encourage counsel, I'm not always

12  available, but if you're in a deposition or if you have a

13  discovery dispute, instead of getting involved in motion

14  practice or instead of arguing whether you get another 30

15  minutes or you don't get another 30 minutes, call chambers.  And

16  if I'm available, I'll resolve it for you on the record during

17  the deposition.

18         You have your court reporter available, and I do this

19  all the time for people.  And I'm happy to do this.  I can't

20  always be available.  I can't all always be available

21  immediately, but I can typically make myself available during a

22  time slot for which you're going to be taking depositions in

23  various locations.

24         MR. CRAMER:  That will be very helpful, Your Honor.

25  Thank you.

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1      THE COURT:  All right.  And I'm not going to encourage

2  you to have a bunch of discovery disputes so I'm on the phone

3  with you nonstop for the next 60 days.  So -- but I'm just

4  letting you know it's much preferable to motion practice

5  followed up by then a request to retake a deposition or rulings

6  on motions involving answers or instructions not to answer.

7      MR. CRAMER:  Your Honor, simply having that offer I

8  think is very therapeutic.  So thank you.

9      THE COURT:  That was my experience when I was on the

10  other side, too.

11      With respect to the 10 third-party depositions, I'm

12  going to defer decision on the two AXS depositions that the

13  plaintiffs want, Simon and Cuban, until we see where we are

14  after we get a decision or whether it's my decision or whether

15  it's going to be -- it's going to remain in the district.  And

16  then we'll address whether, and if so, the timing of those

17  depositions once you find out what you're going to get from the

18  applicable Court.

19      You'll be able to take the deposition of WME and

20  Mr. Coker, and of the -- of the remaining 10 on your list of

21  nonparties, pick four and you'll get four of those -- of the

22  remaining eight.  You'll be limited to four of the remaining

23  eight.

24      With respect to the list of 17 custodian -- custodians

25  or document depositions for subpoena duces tecum that have been

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1   served, but not yet responded to, pick five and you'll get five

2   of those.  So there will be a limitation, except both sides

3   agree on one competition so they won't count on your five.

4           Clear?

5           UNIDENTIFIED COUNSEL:  Your Honor, was that one

6   championship?

7           THE COURT:  Yeah.  Did I mispronounce it or is it --

8           MR. CRAMER:  I think you said one competition.

9           THE COURT:  Oh.  Sorry.  Yes.  One championship.  You

10  both agree on one championship so they don't count on your five

11  limit on the list of 17 that you want, but you'll be limited to

12  five plus one championship.  And you'll be limited to four, not

13  counting Cuban and Simon, while we await the decision on the

14  underlying merits.

15          MR. CRAMER:  What about Coker?

16          THE COURT:  I've said you've got those.

17          MR. CRAMER:  Okay.

18          THE COURT:  Both sides agree with that.  You got WME.

19  You got Coker.  I'm just talking the ones they disagree with you

20  on.  You want 10.  You're getting four.

21          MR. CRAMER:  Your Honor, if I may.  There is a witness

22  named Robert Meyrowitz who I'm just scanning through this

23  list -- oh, he is.  He's No. 4.

24          THE COURT:  He's on your list.

25          MR. CRAMER:  Thank you.  Thank you.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          THE COURT:  And with respect to the new discovery,

2     again, I'm not -- I'm not going to allow that and except for the

3     one championship discovery of Matt Hume or whatever designee

4     they pick.

5          All right.  Do either side believe -- does either

6     side -- I'm getting tired.  Can you tell?

7          MS. GRIGSBY:  Your Honor, sorry.  We actually -- it

8     seems to me there was another dispute between the parties with

9     respect just to telegraph --

10         THE COURT:  Go ahead, Ms. Grigsby.

11         MS. GRIGSBY:  So there appears to be another dispute

12    between the parties as to the Mersch deposition.  Plaintiffs

13    have -- do not want to schedule the Michael Mersch deposition

14    because they believe that there are relevant --

15         THE COURT:  They got other text issues.  I got that.

16         MS. GRIGSBY:  Right, but -- and so they've actually

17    sent a subpoena to -- we've agreed to accept the subpoena for

18    ESI for Mr. Mersch's phones.  The subpoena that plaintiffs sent

19    was actually a subpoena for all documents -- Zuffa documents for

20    the relevant time period, which just so you know and I think it

21    may be in here, you know, we object to given the fact --

22         THE COURT:  I understand that.  They're going to

23    schedule it.  You're going to give them what they're going to

24    get it and -- what you're going to give them.  If they dispute

25    and I think it's unreasonable, it's going to be on you to make

------ TRANSCRIBED FROM DIGITAL RECORDING ------

1  him available a second time.  So be reasonable.  If I don't,

2  then they're going to live with what they got.

3       So do not wait, hold off on -- you know, you think they

4  held back on you, they didn't give you what you needed to take a

5  meaningful deposition, we'll fuss about that later, but do not

6  hold off saying there's any more things that need to be decided

7  or you need to get more stuff before you finish what I've just

8  allowed you to do.  And we'll take up if one side or the other

9  hasn't met an obligation and what the consequences of that are

10  if and when it happens.  Okay?

11       MS. GRIGSBY:  All right.  Thank you, Your Honor.

12       THE COURT:  I understand.  We're beyond waiting for the

13  next thing, the next thing, and the next thing to happen.  So,

14  all right, folks.  Does either side want a follow-up status

15  conference or will that take -- be too time consuming and take

16  up some of the deposition days?

17       MR. CRAMER:  I think it might be a good idea to get one

18  on the calendar.  If we don't have any issues, then we can

19  cancel it.

20       THE COURT:  Well, and that's kind of my thought is if

21  we set one assigned, then if we do have some disputes, we can

22  take care of them and try to --

23       MR. SAVERI:  Your Honor, I think that's a good idea

24  with the extension.  It probably would make sense to me if we

25  got in to see you in advance of that date just to kind of --

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1          THE COURT:  Yes, of course.  That's why I was thinking

2   about 30 days from now.

3          MR. SAVERI:  Yeah.  That would be great.

4          THE COURT:  So we still have some time to maneuver

5   if --

6          MR. SAVERI:  Yeah, that makes sense.

7          THE COURT:  Because I'm sure everything's just going to

8   go glassine smooth.

9          All right.  Mr. Miller, what do we have in

10  approximately 60 days?  Don't make it the 4th of July.

11         COURTROOM ADMINISTRATOR:  I just noticed that was

12  Tuesday, Your Honor, the 4th of July.  Let's see.  Your Honor,

13  we do have the afternoon of Thursday, July 6th, available.  Your

14  Honor does have some hearings in the morning.  Or, Your Honor,

15  we do have -- well, I hate to hesitate -- to schedule anything

16  on Monday, July the 3rd, in case anyone's traveling.  Thursday,

17  July 6th, Your Honor, anything past 11 o'clock a.m. is available

18  on the Court's calendar.

19         THE COURT:  Does that work for you folks?

20         MR. SAVERI:  July 6th sounds good for us.

21         UNIDENTIFIED COUNSEL:  The afternoon helps with the

22  travel also.

23         THE COURT:  That's fine.  I tried to do that the last

24  time and none of -- it kind of shifted.

25         Yes, Ms. Grigsby.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          MS. GRIGSBY:  So I think we actually have a conflict on

2   our end.  Would it be possible to do it the following week?

3          THE COURT:  All right.  Mr. Miller, is that my duty

4   week or is that my dark week?

5          COURTROOM ADMINISTRATOR:  Your Honor, that is the

6   Court's dark week.

7          THE COURT:  Okay.  So that -- we share courtrooms

8   because there are more judges than there are courtrooms.  So

9   that means I don't have a physical courtroom, but I'm sure we

10  can find one.  Does Tuesday, July 11th, work for everybody?

11         MS. GRIGSBY:  All right.  I'm in court on another

12  matter on July 11th, but --

13         THE COURT:  Okay.  Let's go off the record for a half a

14  second and let's pick a date that week that everybody can work

15  on.

16         (Whereupon proceedings concluded at 12:21 p.m.)

17                         --oOo--

18      I, Patricia L. Ganci, court-approved transcriber, certify

19  that the foregoing is a correct transcript transcribed from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter.

22

23      /s/ PATRICIA L. GANCI        6/9/2017
        Patricia L. Ganci              Date
24

25