IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CUNG LE, NATHAN QUARRY, JON FITCH, BRANDON VERA, LUIS JAVIER VAZQUEZ, and KYLE KINGSBURY, on behalf of themselves and all others similarly situated, ) ) ) ) ) ) ) | |
| Plaintiffs, ) | Case No. 2:15-cv-01045-RFB-PAL |
| vs. ) ) ) | Las Vegas, Nevada<br>July 13, 2017<br>1:45 p.m. |
| ZUFFA, LLC, d/b/a Ultimate Fighting Championship and UFC, ) ) ) ) | |
| Defendant. ) | Status Conference |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PEGGY A. LEEN
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:

        JOSEPH R. SAVERI, ESQ.
        Joseph Saveri Law Firm, Inc.
        555 Montgomery Street, Suite 1210
        San Francisco, CA 94111

        ERIC L. CRAMER, ESQ.
        Berger & Montague, P.C.
        1622 Locust Street
        Philadelphia, PA 19103

Appearances continued on Page 2.

Recorded by:  Jeff Miller

Transcribed by:  Katherine Eismann, CSR, CRR, RDR
                (702)431-1919  ke@nvd.uscourts.gov

Proceedings recorded by electronic sound recording, transcript produced by mechanical stenography and computer.

1    APPEARANCES CONTINUED:

2    For the Defendant:

3           STACEY K. GRIGSBY, ESQ.
            Boies, Schiller & Flexner LLP
4           1401 New York Avenue, NW
            Washington, DC 20005

5
            MARCY N. LYNCH, ESQ.
6           Boies, Schiller & Flexner LLP
            121 S. Orange Avenue, Suite 840
7           Orlando, FL 32801

8           BRENT K. NAKAMURA, ESQ.
            Boies, Schiller & Flexner LLP
9           1999 Harrison Street, Suite 900
            Oakland, CA 94612

10
            J. COLBY WILLIAMS, ESQ.
11          Campbell & Williams
            700 South 7th Street
12          Las Vegas, NV 89101

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thursday, July 13, 2017, 1:45 p.m.)

2                        --oOo--

3                P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  All rise.

5          THE COURT:  Good afternoon.  Please be seated.

6          COURTROOM ADMINISTRATOR:  Your Honor, we are now

7   calling Le versus Zuffa, LLC.  The case number is

8   2:15-cv-1045-RFB-PAL.

9          Beginning with plaintiffs' counsel, counsel, please

10   state your names for the record.

11          MR. SAVERI:  Good afternoon, Your Honor.  Joseph

12   Severi on behalf the plaintiffs.

13          MR. CRAMER:  Good afternoon, Your Honor.  Eric Cramer

14   for the plaintiff.

15          MS. GRIGSBY:  Stacey Grigsby on behalf of Zuffa, LLC.

16          MR. WILLIAMS:  Colby Williams on behalf of Zuffa,

17   LLC.

18          MS. LYNCH:  Marcy Lynch on behalf of Zuffa, LLC.

19          MR. NAKAMURA:  Brent Nakamura on behalf of Zuffa,

20   LLC.

21          THE COURT:  This is the time set for the status

22   conference in this case.  I've received the parties' letter,

23   Docket No. 450, with its attachments requesting a dispute

24   resolution concerning plaintiffs' 30(b)(6) deposition notice.

25   That is an amended deposition notice with respect to a Zuffa

1    custodian of records request.  And the parties have also filed

2    a joint status report, Docket No. 454, which I have.

3          In the interim, the plaintiffs have filed an

4    emergency motion to compel production of withheld privileged

5    documents, which plaintiffs request be heard today; and defense

6    counsel indicates a responsive brief will be filed tomorrow in

7    accordance with the order briefing schedule.

8          So, let me start off by treating the parties' dispute

9    with respect to the 30(b)(6) deposition notices, Zuffa's motion

10   to modify and narrow.  That seems to be what the parties'

11   disputes involve.

12         And let me hear from counsel for Zuffa.  Who will be

13   articulating your position.

14         Miss Grigsby?

15         MS. GRIGSBY:  Thank you, Your Honor.  Just to give

16   you some background on this dispute, Zuffa has been forthcoming

17   and responsive to many, many questions in terms of how it has

18   collected, preserved, and produced electronically stored

19   information.

20         We have engaged in multiple meet and confer

21   conferences on these topics.  Even within the context of this

22   particular deposition, we've engaged in at least four separate

23   meet and confer conferences.

24         We've indicated that we are willing to go forward as

25   of May on various topics including 1, 3, 4, 5, 6, 8, 9, 10, 11,

1   12, 14, 18, 20, 22, 23, and 25.

2   Through the various meet and confer conferences, we

3   have reach agreement on topics 1 through 12 and other topics so

4   that there's only eight that remain.

5   But, the question still remains.  Given the amount of

6   information that we've given to the plaintiffs, the fact that

7   separately we filed a declaration that pretty much goes through

8   what our preservation and collection of the ESI entailed, which

9   is Docket No. E-409 when we had the declaration on the steps we

10   took after the litigation hold, it is somewhat unclear with

11   these remaining topics what plaintiffs need.

12   And we object to the topics, because we believe that

13   they are overbroad and unduly burdensome and unlikely to lead

14   to any discoverable evidence.  Plaintiffs have continued to

15   push for answers on these eight topics.  But one thing that we

16   think is that A, these topics aren't relevant to this

17   litigation at this stage of the proceeding.

18   So, for example, Topics 13, 15, 17, 19 and 21 seek

19   information regarding custodians and other employees' personal

20   and business devices, email communication accounts, social

21   media accounts, and other accounts over a 12-year period.

22   Initially, the period was longer and plaintiffs have

23   taken the position that they are willing to shorten it to 12

24   years.

25   For topics 27 through 29, they seek every --

1  information on every document, every piece of data and every

2  text messages that may have been deleted, from January 2014 to

3  the present, whether it was maintained by custodian in this

4  case and regardless of whether it's responsive to a discovery

5  request or whether Zuffa had an obligation to preserve that

6  particular data.

7      They are designed to reopen discovery in this case.

8  Through the course of the meet and confers, we've asked the

9  plaintiffs what they need this information for, especially

10  because when you look at Topics 1 through 12, it covers what

11  steps Zuffa took in anticipation of the litigation and after

12  litigation was filed to identify, preserve, collect

13  information.

14      So, in this case, these remaining topics already

15  disputed are just overbroad, and it's not clear why plaintiffs

16  need it and how it's even relevant to any claim or defense in

17  this case.

18      And the other thing that we think shows that

19  plaintiffs have not necessarily identified a need is that as we

20  pointed out, plaintiffs have the opportunity to ask the

21  individual custodians or any witness about the ESI they

22  maintained during the relevant period that might be important

23  to their claim.

24      So, the answers they want from the custodian of

25  records on what, for example, Denitza Batchvarova did with her

1    personal email accounts, they have actually not asked that

2    question.  They -- they deposed Denitza Batchvarova in January

3    of 2017.  And despite questioning her for a full day, they did

4    not ask any questions on social media or other personal

5    accounts.

6            The same holds true for Michael Pine, who is also a

7    former Zuffa employee who was deposed.  There was no question

8    at all on any of these topics that obviously the witnesses

9    would probably be in the best position to answer.

10           And, in fact, for one witness that they cite in their

11   filing, Joe Silva, where they say that there is actually a

12   question as to his ESI preservation and his text message

13   preservation, plaintiffs cite a question in his recent

14   deposition, which took place on June 7, 2017, that was asking

15   why he didn't have any text messages before January 30th, 2015.

16           Well, in fact, plaintiffs have, and I have in front

17   of me, text message productions from 2014 and 2015 from

18   Mr. Silva.  So, again, it's unclear why plaintiffs have chosen

19   to pursue this through a custodian of records deposition.

20           THE COURT:  Let me stop you there, because if I

21   understand the plaintiffs' papers correctly, they say, and they

22   ask the question during this deposition, excerpts are attached

23   to the papers indicating that; do you have any explanation for

24   why you don't have text messages for a discrete period of time,

25   and he said "I have no idea."

1          And you are telling me that -- and what they, the

2     plaintiffs, were telling me is that the reason they know he had

3     text messages is because they had text messages from other

4     custodians in which there were exchanges.

5          You are now telling me that they are just wrong?

6     That there were text messages that were produced from

7     Mr. Silva?

8          MS. GRIGSBY:  Correct, Your Honor.  And, in fact,

9     I -- I can hand it up.  And I am just going to hand it to the

10    plaintiffs.  These have already been produced in July of 2016

11    in this case.  I think there was just a misunderstanding.

12         And, in fact, we have another example where plaintiff

13    sent an email referencing -- it's highlighted; so, obviously,

14    the highlighting was not in the original email.  Here.

15         MR. SAVERI:  Thank you.

16         MS. GRIGSBY:  Where plaintiffs sent an email asking a

17    question about Mr. Silva's emails prior to January 30th, 2015,

18    because they, in fact, had it.

19         So, in the highlighted portion, they cite a text

20    message received by Joe Silva at January 13th, 2015, at

21    7:24 p.m., with a blank from field.

22         So, this is part of what you heard in the last status

23    conference, which was that the parties were going back and

24    forth about issues with the text message production.  But on

25    that particular point, plaintiffs are just -- it's just

1    incorrect that Zuffa did not produce any text messages from

2    Mr. Silva prior to January 30th, 2015.

3               So, again, you know, in these -- in these individual

4    depositions, they, until recently, haven't really pursued what

5    these custodians and other witnesses have done with their

6    personal accounts and their information or their text messages.

7    And here where they are representing to you that there's an

8    issue, in fact, in this particular case, there is not.

9               So, just kind of becoming more focused on why we

10   think it's burdensome.  So, turning to Topic 13, Topic 13 just

11   generally asks for identification, use, storage, location,

12   preservation, backup condition, and status of all personal or

13   individual non-company electronic devices, including without

14   limitation all desktop computers, PDAs, portable, laptop and

15   notebook computers, cell phones, et cetera, used by your

16   employees for business purposes.

17              And I think it is clear from our papers, our first

18   objection was that they define the time period again 16 years.

19   We're talking about personal devices.  So, it would be almost

20   impossible for us to locate all of the personal devices of all

21   the employees, even former employees who may or may not have

22   worked for Zuffa over that time period.

23              Plaintiffs have narrowed, in fairness, their

24   proposal, so that they want information for the 22

25   Court-ordered and agreed custodians, Denitza Batchvarova, whom

1    they've deposed, Shane Karpal, Scott Coker and Scott Adams.

2            We have advised plaintiffs that we could give them

3    information based on our collection and the interviews that we

4    did when the litigation was filed.  And at that time, we

5    specifically asked -- and as we've told plaintiffs during the

6    meet and confer conference, we have asked employees, during our

7    collection interviews, what personal email accounts they may

8    have used for business purposes.

9            But it is not possible for us to find out whether one

10   of the Court-ordered and agreed custodians had a Myspace

11   account from 2004 that no longer existed.  That would be a

12   Herculean task.

13           And that is our basic objection, and our language is

14   trying to -- is trying to narrow the topics such that we can

15   give plaintiffs information that we can actually have and

16   collect reasonably, without trying to hide anything from them.

17           In addition, there's another issue, which is that we

18   don't have the personal information, devices of former

19   employees.  So, for example, Scott Coker, he once worked for

20   Strikeforce.  That was acquired by Zuffa, but this was prior to

21   this litigation.  He has since moved on and now he works for

22   Bellator.  It's going to be extraordinarily burdensome and

23   basically impossible for to us collect that information from

24   Scott Coker.

25           We've made a reasonable investigation about personal

1    emails and electronic devices.  We've actually asked that

2    question in our custodial interviews.  So, it's just unclear to

3    us what plaintiffs actually expect to get out of that topic in

4    a 30(b)(6) deposition.

5            So, for Topic 15, we just have a similar-type issue.

6    Initially as written, it was a 16-year period.  Here it is

7    limited to the agreed and ordered custodians.  But again, it's

8    any electronic device at all that was ever used.

9            We've already collected information about the devices

10   and accountants that were in existence, the laptops that were

11   in existence at the time the litigation was filed.  So, to go

12   back and reinterview them would be extraordinarily difficult.

13           And again, that goes back to the earlier point, which

14   is if it didn't exist at the time litigation was filed and when

15   the litigation hold was put in place, I'm not sure what

16   plaintiffs expect Zuffa to do with that information.

17           You know, at that point, if there was a computer from

18   2005 that is no longer existed as of January or -- January 2015

19   or December 2014, there are no practical steps we can take to

20   get that computer back.  So, that's the nature of our objection

21   with that.

22           For Topic 17, which seeks all social media accounts,

23   we really, part of the issue is, goes back to the definition of

24   a business purpose.  As we've negotiated with plaintiffs, we

25   understand that they want everything that is relevant to the

1  litigation.  But it's our view there are -- there maybe many

2  mentions on a social media account (indiscernible) because

3  that's their job, but yet are not really for a business

4  purpose.

5          So, one example we have is for Court-ordered and

6  agreed custodian Donna Marcolini.

7          MR. SAVERI:  I'm sorry.  I don't know what you're

8  looking at.

9          MS. GRIGSBY:  (Indiscernible), in a minute.

10          THE COURT:  The record will reflect counsel has

11  provided opposing counsel with the two pages of materials that

12  have been handed to the Court.

13          MS. GRIGSBY:  So, for example, Miss Marcolini is on

14  social media.  Here it looks like a Twitter account where she

15  says, "Checking in for first athlete," because, you know, she's

16  in a different location.  And she also Tweets the same thing.

17  "Fight week.  Gabriel Angle check in her first athlete Marsan

18  Tuvera."

19          So, this obviously talks about the UFC.  Donna

20  Marcolini is doing it.  It is related somehow to fights that

21  take place in the UFC, but we would not define that as a

22  business purpose, and it would be incredibly burdensome for us

23  to identify every single instance where something like this

24  actually occurs.

25          So, just to make the objection concrete, for 19, just

1   kind of going through the line, again, we have an issue,

2   business purpose.  They seek the identification, use

3   preservation, backup, status of all personal individual

4   accounts, non-company, used by custodians for any business

5   purpose.

6          If we can agree on what business purposes is, which

7   we submit is furtherance of a business objective, like, you

8   know, as opposed to just some kind of incidental mention of the

9   UFC, then it's going to be incredibly difficult for us to

10  educate or to find or interview even the Court-ordered and

11  agreed custodians about this information.

12         So, for Topic 21, just to kind of move through, we

13  have a similar objection here.

14         THE COURT:  That, however -- and I'm having a hard

15  time applying your proposed definition of a business purpose to

16  Topic number 21.

17         MS. GRIGSBY:  Sure.

18         THE COURT:  When the topic calls for information

19  about business-related email accounts and instant messages

20  accounts, and you propose to limit it to regularly used for

21  business limitation, as you define it in your proposal, how --

22  and your proposal is to define the term business purposes

23  meaning the regular use of a social media or other non-Zuffa

24  account or service by an employee to carry out his or her

25  official job duties.

1           MS. GRIGSBY:  Right.

2           THE COURT:  How would any Zuffa business-related

3  email account or instant messages account not contain primarily

4  business-related materials?

5           MS. GRIGSBY:  So, all Zuffa or business-related email

6  accounts, instance messaging, I mean, if it -- if it's an

7  actual Zuffa account, then we've collected it.

8           THE COURT:  But that's not what your --

9           MS. GRIGSBY:  Correct.

10           THE COURT:  -- proposed change is.  You're -- the

11  request is for business-related accounts and then you -- you

12  propose a definition of business purposes that does not seem to

13  apply to this category of deposition topic.

14           MS. GRIGSBY:  So, we're not really arguing with the

15  Zuffa -- if it says all Zuffa-related accounts.  I think,

16  again, it's not just business purpose.  It's the term business

17  here, because the parties, I think, have a fundamental

18  disagreement as to what a business account would be.

19           So, if we're talking about --

20           THE COURT:  You don't tell me about that in your

21  papers, so that's why I'm asking.

22           MS. GRIGSBY:  I understand.

23           THE COURT:  Because it didn't make sense to me what

24  you were fussing about in that topic.

25           MS. GRIGSBY:  No, I understand.  So, I think what

1    we're just talking about is the non-company accounts.  If it's

2    really a Zuffa account, we would have collected it, produced

3    it, and had information about it.

4                THE COURT:  One would think.  Yes.

5                MS. GRIGSBY:  Right.  Yes, we have.  So --

6                THE COURT:  And what's your definition of a Zuffa

7    account, so that way don't have that dispute?

8                MS. GRIGSBY:  I mean, I think anything that's at UFC

9    that Zuffa runs --

10               THE COURT:  That you pay for?

11               MS. GRIGSBY:  I mean, that's a little bit difficult,

12   because if there's some kind of reimbursement for a different

13   account, I would have to think about that.

14               THE COURT:  That's why I'm asking, because I can

15   anticipate that this will be a topic of a future dispute.

16               If it's a Zuffa account, what does it mean to be a

17   Zuffa account?  It's a company account; it's one that it

18   provides, to a certain level of company executives, employees.

19   The company pays for it.  Why shouldn't you have to produce

20   that category of information?

21               MS. GRIGSBY:  So, I think we would agree that if

22   it's, you know, really a company account, that we would.  It's

23   just -- I think the parties need to agree and be precise about

24   the definition.

25               And I understand their concern with our definition of

1  business purpose.  But, for example, I'm thinking right now of,

2  like, the UFC Twitter account or the people who run that

3  Twitter account.  We don't dispute that that is a UFC account.

4         THE COURT:  All right.  But let me just give you, you

5  know, another example.  You have a company cell phone that the

6  company provides and the company pays for.

7         MS. GRIGSBY:  Uh-huh.

8         THE COURT:  Are you going to contest that that is a

9  company cell phone, a Zuffa cell phone even though the

10  individual may be reimbursed for it as opposed to Zuffa pays

11  for it on its own account?

12         MS. GRIGSBY:  Again, I don't think we do.  I mean,

13  we've actually collected information from those types of

14  devices.  So, for example, we had a bring your own device

15  policy, and we've already collected all that data.  So --

16         THE COURT:  I'm just trying to make sure that you are

17  not parsing --

18         MS. GRIGSBY:  No.

19         THE COURT:  -- in a way that is trying to hold back

20  on discovery on this category of information.

21         MS. GRIGSBY:  I don't think so.  I mean, Your Honor,

22  I just -- I think the point is, obviously, plaintiffs have

23  their own view, because they don't have complete transparency

24  into our process.

25         But, we've, you know, given them -- we've given them

1    text messages from peoples' private, you know, cell phones,

2    that sometimes Zuffa does pay for it.  And we haven't been

3    holding back on that.  And we've tried to, you know, figure out

4    whether they have personal email accounts that they are using

5    for business.

6            So, no.  If Zuffa's involved in kind of giving the

7    employee access to the account or enabling the employee to

8    conduct business on that account, that's not even -- that's not

9    something right now that we're even disputing.

10           THE COURT:  Well, I understand your argument talking

11   about if somebody's on Facebook saying, "Oh, I had fun at work

12   today."

13           MS. GRIGSBY:  Right.

14           THE COURT:  They mention work in -- on a social media

15   account doesn't mean that it should be discoverable on their

16   personal accounts.

17           MS. GRIGSBY:  Right.  So, I think, Your Honor, I

18   mean, obviously, that's a legitimate concern.  But I think, at

19   this point, it is -- it really is hypothetical, because, you

20   know, we've tried to explain to the plaintiffs what we have

21   done and the types of information that we have searched.

22           And, you know, they have just not been satisfied with

23   the definitions we've provided.  But, at the same point,

24   plaintiffs are well aware that in terms of the employees

25   bringing their own device and searching different, you know,

1    places where there could be ESI, we have done that.

2            So, for example, again, Joe Silva's text messages.

3    It's on his personal phone.  I have handed them to you, and

4    we've collected them and produced them.  And we are perfectly

5    willing to educate our custodian of records on the steps we've

6    taken for those and the things that were in existence when we

7    actually put in place the litigation hold and interviewed the

8    Court-ordered or the potential custodians.

9            So, for Topics 27 and -- through 29, they seek, you

10   know, identification of documents from or data that reference

11   the subject matter of the litigation that may have been deleted

12   or destroyed.  Some variation of that when you go from the time

13   frame of January 1st, 2014, to the present.

14           Again, to support it in their papers, they use

15   examples of a phone that's lost.  A marginally relevant text

16   message that a former employee didn't save.  And just

17   truthfully, inaccurate information about Joe Silva, which is

18   that he somehow had deleted or lost text messages.

19           It's nearly impossible, unless you're -- unless there

20   was actually some intentional destruction, it's impossible to

21   figure out what you don't have or things that were actually

22   deleted, which may have been deleted pursuant to a legitimate

23   document retention policy.  We don't necessarily log those

24   things.

25           And we've tried to explain to plaintiffs that is our

1    problem here, is that we don't keep records of things that were

2    deleted, especially from January 1st, 2014, to December 18th,

3    2014, that were, you know, part of this three-month -- this

4    three-month deletion policy.

5         And I think it also deserves note that they can look

6    at topics -- the answers to Topics 1 through 12, which talk

7    about our efforts after the service of the lawsuit, to

8    identify, preserve, collect and produce documents, to also get

9    very specific information.  It's just we would not have

10   information if something was actually destroyed.

11        THE COURT:  You don't know what you don't have.

12        MS. GRIGSBY:  Right.  Exactly.  So, that's our

13   objection there.  We just don't have the information

14   whatsoever.

15        And then just as a last point, I mean, I think

16   there's a lot in plaintiffs' statements and in their papers

17   about how Zuffa has tried to delay this process and that how we

18   are trying to withhold things from them.

19        But the time line is that plaintiffs raised the

20   custodian of records deposition to us asking for dates in April

21   of 2017.  Yes, it took us three weeks to get back to them with

22   dates.  But we did not receive a notice for this 30(b)(6)

23   deposition until May 18th, which included 29 topics.

24        We immediately tried to meet and confer with

25   plaintiffs given the scope of what they were asking for.

1    May 22nd, we served written objections.  However, we

2    approved -- we said we would proceed with the topics I listed

3    earlier, which are 1, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 18, 20,

4    22, 23, and 25, each of which went to our policies, our

5    document -- other information within our control in which we,

6    Zuffa, would normally maintain and which are maintained

7    centrally, as opposed to what the individual custodians or

8    witnesses.

9          Despite our willingness to move forward on the vast

10   majority of topics, the deposition, which was originally

11   scheduled for May 26, was taken off the calendar.

12         And the other thing is, in terms of this delay, I

13   think plaintiff had stated that they put it at the end based on

14   conversations in earlier status conferences from 2015.

15         And at that time, the Court had (indiscernible) in

16   that the custodian of records deposition would potentially be

17   something short that could be done at the end after they've

18   already --

19         THE COURT:  That was in the context of discussing

20   any -- the limitations and the appropriate limitations --

21         MS. GRIGSBY:  Yes.

22         THE COURT:  -- on discovery and making a distinction

23   between substantive depositions and 30(b)(6) custodian of

24   records depositions, which are typically done strictly to

25   authenticate.

1          MS. GRIGSBY:  Yes.  And just so Your Honor knows, and

2    I think we've said at various times, but in Docket No. 373,

3    we've actually stipulated to authenticate all the documents.

4    So, that's not even an issue here.

5          THE COURT:  Uh-huh.

6          MS. GRIGSBY:  I mean, I think the real issue is that

7    plaintiffs are curious about ESI and whether that they can

8    perhaps relitigate the motion that they brought with respect to

9    Mr. White and our ESI preservation efforts.

10         Zuffa has never maintained that it is unwilling to

11   provide them the information, much like the one we did in our

12   opposition to the motion, which is the steps we took to

13   preserve, collect, maintain ESI.

14         But this is a 29-topic deposition notice, which is in

15   addition to the 50 -- 56 topics that they've already noticed

16   for a separate 30(b)(6).

17         So, this is just coming kind of at the end of

18   discovery, where plaintiffs want just a wealth of information,

19   and it would be impossible, if not extremely time consuming and

20   burdensome, to educate a witness on everything that plaintiffs

21   wish to ask the witness about for this 30(b)(6).

22         So, for these reasons, we ask that you narrow or

23   modify their amended notice for the 30(b)(6).

24         THE COURT:  Thank you.

25         And who will be arguing the plaintiffs' position?

1  Mr. Saveri?

2          MR. SAVERI:  Yeah, I will.  I will, Your Honor.

3          MS. GRIGSBY:  Thank you.

4          MR. SAVERI:  I'll start wherever you want to start,

5  Your Honor, but let me maybe do a little bit of housekeeping

6  before I do that.

7          There may be a little bit of confusion about what

8  there is an agreement to.  There's a letter that's attached as

9  Exhibit 3 to Document 450, which is a June 20th letter from

10  Mr. Dell'Angelo to Ms. Lynch and the Boies Schiller firm that

11  reads:

12          ""The parties are in agreement that Zuffa shall

13      present a witness prepared to testify to Topics 1, 3,

14      5-12, 14, 16, 18, 20, and 22-26 as written.  Regarding

15      Topics 2 and 4, plaintiffs agree to the limits set forth

16      in your June 19th letter."

17          As far as I know, that's the current state of the

18  agreement.  I've flipped through the correspondence again to --

19          THE COURT:  They are arguing about a discrete set,

20  13, 15, 17, 19, 21 and 27 through 29.

21          MR. SAVERI:  Okay.  So, when -- there were a couple

22  of times, I think, when -- maybe I misheard it or the way

23  Miss Grigsby recited it, what there was an agreement on.

24          I just wanted to make sure we're all -- we're all on

25  the same page.  That's what I understand the agreement is.  So,

1    we can -- I'm prepared to start where -- with the ones where

2    there is no agreement.  Or let's be clear about --

3              THE COURT:  You were very close to getting to an

4    agreement, and then because it wasn't a global agreement, Zuffa

5    said, "If we can't agree on everything, everything's up in the

6    air."

7              MR. SAVERI:  Yeah, and that's -- it's still timely,

8    and that's true, and we're going to press reset.  So, we --

9              THE COURT:  Well, you don't get to negotiate and get

10   almost everything you want and then say you are going to take

11   to it the Judge if you don't get everything.

12             MR. SAVERI:  I understand that.  And, then, look.

13   I've been in lots of negotiations where people said either

14   there's a global deal or there's no deal.  That's fair.  That

15   happens all the time.

16             The only point of it is, is I think it is relevant to

17   look at those discussions, because it does indicate that there

18   are -- there will be some place where the parties are -- do --

19   have tried to reach an agreement and may be close to one.

20             So, Your Honor, first I want to be clear though that

21   part of what I heard from Miss Grigsby was that Zuffa generally

22   objects to the topics that are in dispute and raised an issue

23   about whether they were appropriate at all.

24             We have an agreement that at least with respect to

25   the eight that are in dispute, that at least there will be a

1    custodian produced to testify in some degree.  We are having a

2    dispute about what the nature of the scope of those topics are,

3    and I want -- I want to be clear about that.

4         So, I think the first issue that came up is this

5    definition of business purposes, because that comes up in, I

6    guess, 13, 15, 17, 19, 21, but it's not part of 27 through 29.

7         I think our concern is that Zuffa's definition is --

8    and I'm quoting from the letter -- "The regular use of social

9    media or other non-Zuffa account or service by an employee to

10   carry out his or her official job duties."

11        I think our concern is that with the term "regular

12   use," that is not an objective criteria.  That seems like a

13   subjective criteria and something that is not only, I think,

14   unfairly limiting, but it's going to be hard to apply and

15   perhaps may be the subject of even more litigation and parsing.

16        And I think our -- our view is we'd like to cut that

17   out and get these depositions taken.  We've proposed a slightly

18   different definition of business purpose.

19        Our proposal, which, at one point, we had agreement

20   on, was a device -- and I'm quoting --

21        "A device or account is used for a 'business purpose'

22        when the employees using the device or account sends or

23        receives communication, documents, or other content, and

24        that content; 1, furthers, discusses, or is otherwise

25        pertinent to the business objectives of Zuffa; and 2, was

1          sent or received by the Zuffa employee or employees

2          involved with an intent to further discuss or address a

3          business objective of Zuffa in connection therewith."

4          And I think that that more fairly describes what a

5   communication ESI for a business purpose is.

6          And, for example, we've seen examples of -- you know,

7   I guess it was a photograph of someone posted on Facebook of a

8   shot at -- taken in a Zuffa coffee room.  Our definition

9   doesn't ask for that.

10          So, I think that that -- what we've tried to do is

11   come up with a definition that is objective and workable.  And

12   it actually makes sense, because it ties -- it doesn't require

13   Zuffa to try to figure out or parse what a regular business

14   purpose is, but applies some common-sense concepts, like the

15   content further discusses or is otherwise pertinent to business

16   objectives of Zuffa.

17          That's not a photograph in a coffee room of Zuffa, or

18   it was sent or received by a Zuffa employee or employees

19   involved with an intent to further discuss or address a

20   business objective of Zuffa.

21          Again, I think that's a common-sense definition.  I

22   think it's consistent with the requirements of relevancy under

23   Rule 26.  That's our proposal.

24          Your Honor has our -- our position on that, and

25   can -- can make the decision on that.  So, that's our position

1    on -- on business purposes.

2            The second point, and we didn't -- we didn't hear

3    much about this, but we have a dispute about the time period.

4    We think that with respect to this discovery, the time period

5    that's relevant should be the same time -- relevant time period

6    for production of documents in this case.

7            THE COURT:  You're talking with respect to the

8    personal devices and personal accounts as well as the business

9    devices?

10           MR. SAVERI:  Yes, Your Honor.

11           THE COURT:  Because with respect -- they've agreed to

12   the time period with respect to the ones that aren't in dispute

13   in this hearing.

14           MR. SAVERI:  That's --

15           THE COURT:  But with respect to the personal devices

16   of individuals, many of whom are no longer employed by them --

17           MR. SAVERI:  Right.

18           THE COURT:  -- why is the time period -- I mean, do

19   you really expect someone to know what device they had and what

20   became of it dating back to January 1st, 2005?

21           MR. SAVERI:  Your Honor, to be fair, not

22   categorically, but certain -- certainly what we're just asking

23   them is within the scope of their obligations under the rule to

24   make the inquiry and to report on the results of that inquiry.

25           Now, to your point, if the inquiry was conducted and

1   the answer is, "Look, it's just too long ago.  We don't know

2   the answer, because it's too long ago," that's the answer.  And

3   we -- and we can't -- that's the answer.  And -- and that's --

4   that's the testimony.  That will be under oath, and we'll move

5   forward.

6           Candidly, Your Honor, I think there are some people

7   who actually do remember at least some of the information

8   going --

9           THE COURT:  (Indiscernible) has had his flip phone

10  for 10 years and didn't replace it until he had to maybe.

11          MR. SAVERI:  Well, Your Honor, I guess I don't want

12  to share too much information, but I have a file drawer in my

13  office of all my old phones that -- some of them going back

14  into the mid '90s, but that may -- but, so, let me stop there.

15          THE COURT:  Okay.

16          MR. SAVERI:  But I -- all we're asking is to conduct

17  the inquiry.  We're not saying that you have to take

18  unreasonable steps.

19          Under 30(b)(6), they are obliged to produce a

20  designee who conducts a reasonable inquiry.  If the designee

21  conducts that reasonable inquiry and doesn't -- isn't able to

22  answer the question, the -- the designee should answer

23  consistent with that.

24          But consistent with the relevant discovery in this

25  case or the relevant discovery period in this case that goes

1    back to 2005, it seems to me, Your Honor, that particularly in

2    a case where there is some significant record, that there are

3    devices or sources of ESI that are outside of the confines of

4    the Zuffa servers or the kind of traditionally ESI, that the

5    inquiry is appropriate.

6            And so that's really our position, and that's why we

7    think it's reasonable to have a single time period, which

8    includes the -- the personal devices.  And that's our position.

9    That's our position.

10           The -- the other, I guess, category of dispute is a

11   dispute about the terminology.  And I believe it's 13, 15, 19,

12   and 21, which -- which were -- those topics asked for the

13   witness to also be prepared to testify about the -- these are

14   the words we used -- the use, preservation, backup and status,

15   close quote, of the respective categories of ESI.

16           Again, this is a -- this is a subject where I thought

17   we were close to an agreement.  But then we kind of -- we

18   backed away from it when we couldn't reach a global agreement.

19           Right now, as I understand Zuffa's position, that the

20   only information that they are, well, willing to produce is

21   information regarding the identification of those -- of those

22   categories of ESI.

23           We think that we are entitled to the more broad set

24   of -- of topics.  The identification is -- is useful, but

25   doesn't answer all the relevant questions.

1          Questions regarding the -- the use, preservation,

2    backup and status of ESI is relevant for at least two purposes.

3    One will -- has to do with the admissibility of the evidence.

4          Now, we have a stipulation about authentication, but

5    we have no agreement about other foundational requirements for

6    these documents.

7          A number of these documents we believe will be

8    admissible under the business records exception to the hearsay

9    rule.  In order to establish that, establishing that the -- the

10   course -- the -- the practices and the -- the way these --

11   these documents were created, used, and maintained is relevant

12   to establishing the foundation for the -- for business records

13   under the hearsay rule.

14         THE COURT:  You are talking about the business record

15   exception with respect to relevant ESI that's contained on

16   personal devices that were used by various custodians for

17   business-related purposes.

18         MR. SAVERI:  That's part of it.  I mean, again,

19   there's a -- for each of these, there's a -- there's kind of a

20   business -- a business category of ESI, and then there's a

21   nonbusiness category of ESI which are these personal devices.

22         Now, I can imagine that when we get to trial, we will

23   have some dispute that ESI that comes from personal devices

24   whether -- or personal --

25         THE COURT:  Have you had that discussion with

1    opposing counsel in the efforts to stipulate to admissibility?

2    Because it seems to me if opposing counsel has produced

3    documents from personal devices, recognizing they are

4    responsive to your document request, that should be covered

5    within the ambit of an appropriately drafted stipulation on

6    authenticity.

7                MR. SAVERI:  So, my recollections of the

8    authenticity -- and we -- I don't think that -- this was

9    covered.  And I don't want to get to the point, Your Honor,

10   where we get to trial, and someone says --

11               THE COURT:  That part I understand.  But they have

12   indicated a willingness?  Because it's kind of a silly waste of

13   everybody's time to be fussing over authenticity in a case that

14   has 2 million documents that have been produced.

15               MR. SAVERI:  But if -- but if we can get a

16   stipulation, and it can be confirmed today, Your Honor, that

17   documents that are produced by Zuffa, for example, that come

18   from these sources that we're talking about, from the Zuffa

19   files, their ESI, their email servers, one; and, two, that come

20   from these other sources, which they've collected pursuant to

21   the document request, are going to be admissible as business

22   records --

23               THE COURT:  Okay.  Authentic is one thing.

24   Admissible is another.

25               MR. SAVERI:  Okay.  And I wanted to be very clear

1    about that.  I didn't -- and I was careful when I spoke not to

2    allied or confuse those two.

3           THE COURT:  Well, that's fine.  I'm asking it with

4    questions to flush it out, so --

5           MR. SAVERI:  And I appreciate that, Your Honor.  I

6    want to be very clear that the authentication part, which is

7    whether these are -- whether these are phony or not, is

8    something that they stipulated we don't have that problem.

9           We're talking about admissibility of these documents

10   pursuant to the business records exception of the hearsay rule.

11          THE COURT:  Right.  And so why don't you get the

12   admissibility under the business record exception information

13   in requests 1 through 12 of your notice?

14          MR. SAVERI:  We -- we may be able to do that.  And I

15   do -- I do -- I do recognize the fact that there is some -- the

16   way these are drafted, there is -- depending on how you

17   interpret those documents, those -- or the topics, there is --

18   there is the potential for overlap.  No doubt about that.

19          But lawyers do these kinds of things, and it may be a

20   little bit of belts and suspenders.  But to your point, Your

21   Honor, we -- regardless of what topics it's under, and we don't

22   want to have a dispute about whether this is the right person,

23   but we think -- and we think we are entitled to get the

24   information from a document custodian to address the

25   requirements of the business records exception to the hearsay

1    rule.  So, that's one purpose of the --

2              THE COURT:  Well, all of the custodians for whom ESI

3    has been produced plus you are asking for nine others.

4              MR. SAVERI:  Yes.  Yes, but they are also -- I mean,

5    just to be precise, I think there were also custodians that

6    were kind of centralized file custodians that might have been

7    kept on a server or in some centralized file location that

8    aren't attributed to a specific --

9              THE COURT:  An individual.  Just the company.

10             MR. SAVERI:  Right.  I mean, back in the old days,

11   they would be corporate files that might be sitting in the

12   middle of the office as opposed to in someone's personal

13   office.

14             But, nonetheless, we -- to -- I think it was

15   reasonable to include those, and they might not be a document

16   custodian technically.

17             So, but in addition, Your Honor, I think that we are

18   entitled, under Rule 26, to obtain the information regarding

19   the use, storage, location, preservation, backup, condition of

20   status of the ESI to determine whether there has been -- the

21   extent to which there has been destruction of documents despite

22   the existence of a litigation hold.  That -- there has been

23   some evidence in this record of that.  And --

24             THE COURT:  Except that you asked for a time period

25   that's 10 years prior to the litigation hold.  The topics

1    covered January 1st, 2005.  That's one of their objections.

2              Their proposed limitation is from the date the

3    litigation hold was in place through June 2015, which is the

4    date of the first response of your first document request.

5              MR. SAVERI:  Fair -- fair enough, Your Honor.  But I

6    do think that in the first instance, because it makes sense to

7    ask that question, to see whether there were documents that

8    predated the application of the litigation hold that were

9    destroyed or not maintained, I don't know the answer to that

10   question.

11             I think we're entitled to -- to know that under Rule

12   26.  I think there will be questions in the case and part of

13   the answer will --

14             THE COURT:  Even though there's no duty to preserve

15   that predates reasonably anticipated litigation.

16             MR. SAVERI:  Well, Your Honor, I think we're entitled

17   to know the facts regardless of whether -- of what we -- we do

18   with those facts.

19             Now, I agree that the argument of the relevancy of

20   those -- of that information is -- put it the other way.

21   Evidence regarding the time period affected by the litigation

22   hold is -- is clearly much more germane.

23             We just -- we thought that when we were proposing

24   the -- a time period, a time period consistent with the

25   relevant time period for -- of discovery makes sense.  It's

1   reasonable, it's objective, and it's worked throughout the

2   case.  And so, that's our -- that's our position, Your Honor.

3   I don't -- I don't think there's more gloss to put on it.  I

4   think -- so, that really addresses the topics, up to the last

5   three, which are 27, 28 and 29.

6          Now, again, so 27, 28 and 29 have to do with the

7   maintenance or destruction of documents during three discrete

8   time periods.  We broke it up because there are key time

9   periods in the case; the first being January 1, 2014, to

10  December 14, 2014; the second December 14, 2014, to

11  December 18, 2014; and the third December 18, 2014, and

12  afterwards.

13         And the -- the text of the topics is the same.  So,

14  whatever you rule will apply to all three.  So, the dispute

15  here is that Zuffa wants to, in response to the -- to limit

16  those topics to, as I understand it, an identification of the

17  document retention or destruction policy and a description of

18  those as well as known exceptions to those policies.

19         Now, I think our problem with that is we don't think

20  that's specific enough.  We've asked for more --

21         THE COURT:  How are they supposed to know what's no

22  longer on personal devices?

23         MR. SAVERI:  Well --

24         THE COURT:  I mean, it's just a practical problem.

25  How are they supposed to inquire and find out, "Oh, yeah.  I

1   remember that on December 14, 2014, I deleted an email from my

2   mom, and" --

3            MR. SAVERI:  So --

4            THE COURT:  How would they possibly know that

5   information?

6            MR. SAVERI:  Well, you know, I think -- I think there

7   is a difference and a wide gap between merely an identification

8   of the policy and -- and the description, which they have

9   agreed to provide, and your, I think, reasonable example, which

10  is people delete emails all the time.  Some have to do --

11           THE COURT:  Especially back in the old days when we

12  didn't have cloud storage and when there was limitation on what

13  you could store.  And people -- you know, Mr. Silva himself

14  testified, you know, "This is my to do list.  I -- I deleted

15  things when I took care of them, and that's how I knew I was up

16  to date."

17           MR. SAVERI:  Well, but, Your Honor, if -- if the

18  answer to the question is -- and you -- but I think there's a

19  reasonable common-sense way that this goes.

20           There is a custodian, and the lawyer or who's ever

21  preparing for this deposition goes to the custodian and says,

22  "During these -- one of these three periods, did you

23  destroy" -- or flip it the other way.  "Did you maintain all

24  your email?"

25           Let's say ask somebody, or destroy or -- and the

1     answer will be "Yes" or "No," and -- and there can be

2     reasonable --

3                THE COURT:  It's, "No," or "I have no idea.  I don't

4     remember."

5                MR. SAVERI:  Well, and if they don't -- if they don't

6     remember, they don't remember.  But I think that by the same

7     token, if the answer is, "I -- I recall that there were emails

8     that had to do with" -- we can come up with specific example --

9     "that, in fact, I destroyed," or "As a -- as a categorical

10    matter, I emptied my delete email box.  I had it set to delete

11    it every 90 days or something like that."

12               Those are -- those are the kinds of reasonable

13    answers that I think we entitled to.  And it seems to me that

14    that's -- that's a -- we're just talking about reasonable steps

15    here.

16               And it would seem to me that's part of the reasonable

17    inquiry.  We certainly do not want to have Zuffa go back to

18    every custodian and say, you know, "On March 1, 2010, do you

19    recall if you deleted emails?"  Okay.  You know, the next day,

20    "Do you recall deleting any emails?"  The next day, "Do you

21    recall" -- that -- that -- we're not asking for that, and I

22    don't think it would be reasonable to do so.

23               But we -- if the custodians have any specific

24    recollection of the deletion of documents or data that relate

25    or reference the subject matter of this litigation, that has

1    been deleted, physically destroyed, discarded, damaged,

2    physically or logically, or overwritten, and it goes on, I

3    think we are entitled to the answer to that question.

4              And there's -- and I want to be clear.  Individual

5    witnesses, individual custodians, individual users may not

6    always know about this, because some of this stuff that we're

7    talking about may happen at the system level or at the

8    administrator level.

9              And, so, part of the inquiry is not only to

10   individual custodians, but to -- excuse me, Your Honor --

11             THE COURT:  But again, why isn't that covered in

12   topics 1 through 12?

13             MR. SAVERI:  It -- I think, Your Honor, if it is, and

14   it's clear that we're getting that information, I think we're

15   fine.  Because we -- we want --

16             THE COURT:  But their comment is to me that we -- you

17   know, to make us go back to 22 separate custodians, plus the

18   additional nine that you want, and ask every single one of them

19   these specialized questions, for a period dating back to

20   January 1, 2005, is simply unreasonable and overly burdensome

21   given that we've agreed to provide a 30(b)(6) to address all of

22   the non-disputed topics.

23             MR. SAVERI:  As long as -- well, Your Honor, as

24   long -- if the -- if the inquiry includes an inquiry to

25   custodians, "Do you -- did you ever destroy any email during

1    the period?" and we're getting that answer one way or the

2    other, I'm -- we're fine with it, Your Honor.  And that's all

3    we -- that's all we need.  I think it's a reasonable inquiry,

4    and it's reasonable under the rules to --

5              THE COURT:  Why isn't that a better inquiry posited

6    to the individual deponents that you're most interested in as

7    opposed to a 30(b)(6) witness who has to contact that

8    custodian, try to translate what it is that you want, try to do

9    the best to get an answer, and provide the corporation's answer

10   to the question as opposed to the individual's best

11   recollection?

12             MR. SAVERI:  Because -- I say that the 30(b)(6) is

13   actually a better way to do it, Your Honor, because I think --

14             THE COURT:  A 30(b)(6) is far superior for lots of

15   things, but I'm questioning whether it's the best discovery

16   mechanism for what you're seeking; the level of detail that

17   you're seeking.

18             MR. SAVERI:  And I -- I hear you, you know, but let

19   me push back and try to answer your question.

20             I think that a 30(b)(1) deposition of a lay person to

21   whether he destroyed or maintained documents is a -- is a

22   legitimate question.  And a witness may or may not know the

23   answer.

24             I mean, you know, Mr. Silva's testimony is a pretty

25   good example of it.  You know, he said, "I don't -- I don't

1    know."  Maybe some witnesses -- sometimes witnesses do --

2              THE COURT:  He said "I had no idea," posited the

3    question, "Do you have any explanation for why there aren't

4    documents between this discreet period of time and that

5    discreet period of time," which is less than a month's period

6    of time.

7              And opposing counsel was telling me you were even

8    wrong about that, because they did produce documents.  And, of

9    course, he's not going to remember specific --

10             MR. SAVERI:  I -- excuse me, Your Honor.

11             THE COURT:  Go ahead.

12             MR. SAVERI:  I agree that it's -- and this is my

13   point.  I think that that -- that kind of inquiry to an

14   individual witness about document retention issues is -- is one

15   more often than not you're going to get an imprecise answer.

16   You are going to get an uninformed --

17             THE COURT:  Right.  But what you are asking them to

18   do is to go to each of those custodians, ask them those

19   questions, to get the imprecise answers, and then educate a

20   30(b)(6) to provide them to you.

21             MR. SAVERI:  But -- but, Your Honor, I think that the

22   difference is, is that as the Court -- 30(b)(6) obligates the

23   corporate designee to do an inquiry and to synthesize and bring

24   together and be prepared to answer that question in an

25   efficient way.

1          And it would include the custodians, but it would

2    also be other information, which may be at the administrator

3    level.  And my view is that -- and I think this was the insight

4    under Rule 30(B)(6), is that in certain issues, particularly if

5    you have a corporation, where it's not an individual, but it's

6    a -- it's a group of individuals, there is a -- a mechanism for

7    getting the knowledge of the corporation.

8          And that requires the corporate entity to synthesize

9    and pull together from a variety of sources the information to

10   answer the question.  And that's the insight of the drafters, I

11   believe, in drafting Rule 30(B)(6).  And we're trying to take

12   advantage of that.

13         So, we think it's more -- you asked me whether it's

14   better to go to each individual witness and ask them those

15   individual questions.  My position is that it's more efficient

16   to go to the -- use 30(b)(6) to get the corporation to do the

17   reasonable inquiry, collect that and produce the designee.

18   That's our position, and that's -- that's what -- that's why

19   we're trying to take advantage of the rule.

20         I just -- so, I think we've talked about the main

21   kind of overarching kind of definitional issues that have to do

22   with the topics.  So I think we've covered the business

23   records.  We talked about 13 through 19 and 21.  And then we

24   talked about 27 through 29.

25         So, I think I -- I think I've covered the landscape.

1    If you have other questions, Your Honor, I'm here and happy to

2    answer them.

3           THE COURT:  I'm not shy to ask, and I've been asking

4    as we've gone along.  So, all right.

5           MR. SAVERI:  All right.  So, with that, I'm done.

6    Thank you.

7           THE COURT:  So, Miss Grigsby, let me just go to the

8    one issue that seems to be a potential sticking point, because

9    you raised this in your papers that you agreed to stipulate to

10   authenticity of the records you produced in response to the

11   plaintiffs' document request.

12           His concern is whether with respect to individual

13   devices, the -- you will object on -- that the documents are

14   not business records for purposes of the rule.

15           Now, you may have other objections to the

16   admissibility of documents, but would you agree that if you

17   produce them in discovery, that they're Zuffa's business

18   records for purposes of the business records exception to the

19   hearsay rule?

20           MS. GRIGSBY:  Well, Your Honor, this is actually the

21   first time that plaintiffs have raised this, so I haven't -- we

22   haven't even considered that --

23           THE COURT:  And that's fine.  That's a fair response.

24   I'm just -- I understand that argument.

25           MS. GRIGSBY:  Yes.

1          THE COURT:  Because if you've collected the

2    devices --

3          MS. GRIGSBY:  Right.

4          THE COURT:  If you've culled them for relevant and

5    discoverable information, and if you've produced them on the

6    theory that it contains either relevant or discoverable

7    information, then it would not seem appropriate to say, because

8    they were personal devices, they are not Zuffa's business

9    records.

10          MS. GRIGSBY:  So, Your Honor, I think that, you know,

11    for 99 percent, I -- we'd probably be willing to stipulate.

12    It's just that I -- you know, again, we haven't really thought

13    about it, because plaintiffs haven't raised that --

14          THE COURT:  That's a completely fair answer, but that

15    is something that I do appreciate that argument.  You can't

16    produce them on the one hand, as relevant and discoverable, and

17    then claim that they are not business records.

18          You may have other objections to the documents, that

19    is that they are -- but with respect to the business record

20    exception, that's what one of their concerns is.  And I

21    understand that concern, and it's a legitimate concern.

22          MR. SAVERI:  Your Honor, if I may.  If the issue is

23    that we -- it hasn't been joined or there's some surprise, I

24    mean, candidly, I think it's -- it should be clear from the

25    face of the -- of the --

1          THE COURT:  It wasn't at all clear to me until you

2    raised it.

3          MR. SAVERI:  That is -- that is my fault, Your Honor.

4    But I -- I just -- my position is I don't want to be

5    foreclosed, while discovery is still open, from conducting the

6    inquiry I need and developing the evidence to get these

7    documents in at trial.  And discovery is still open, and

8    we're --

9          THE COURT:  I understand.  But, again, she's hearing

10   it for the first time.  I didn't clearly recognize the issue

11   until you raised it and questioned you about what your concern

12   was.  So, I'm not going to sandbag her and make her decide on

13   the fly without even talking to her co-counsel and the client.

14         MR. SAVERI:  And I don't want any -- anybody to be

15   sandbagged either.  And if we have to have more discussion and

16   if we have a dispute to come back here and have some

17   briefing --

18         THE COURT:  That's fine.  I'm happy to -- to do that.

19   But that does seem to be a legitimate concern that you have.  I

20   absolutely appreciate that.

21         And I would not expect opposing counsel to play games

22   at saying we produced it, because we thought it was

23   discoverable, but now they are not our business records.

24         But, on the other hand, there may be a category of

25   documents, there may be some examples of which they wouldn't be

1    willing to stipulate across the board.  And that's something

2    that you need to flush out with having meaningful discussions

3    among yourselves.

4         MR. SAVERI:  Absolutely, Your Honor.  And if there

5    are exceptions to a general rule, I mean, let's -- let's hash

6    that out, and everybody should have the opportunity to their

7    evidence on that.  And that's all I'm really asking for.

8         THE COURT:  That's fine.  All right.

9         MS. GRIGSBY:  Your Honor, just to add one thing.

10        In their request for admission, they had hundreds of

11   request for admission where they basically tried to lay the

12   foundation for authenticity and business records.  So, again, I

13   mean, I'm just saying I would probably have to investigate,

14   and, you know, just in terms of --

15        THE COURT:  I am allowing you that.  I'm not making

16   any ruling on it.  I'm just --

17        MS. GRIGSBY:  Uh-huh.

18        THE COURT:  -- telling you I expect you to discuss

19   that, and I appreciate that -- I don't want to burden any trial

20   judge with having days' worth of pretrial hearings on whether

21   documents qualify under the business records exception.

22        That's, you know, part of my job is to make it easy

23   on the -- easier on the trial judge to try to case.  So, we'll

24   reserve that for you to discuss and bring to a conclusion on

25   another day.

1          MR. SAVERI:  Thank you, Your Honor.

2          THE COURT:  So, here is -- I've reviewed your moving

3     and responsive papers, and the attachments and the proposals,

4     and the various versions, and my ruling with respect to the

5     eight disputes in -- or eight topics in dispute is that I will

6     grant Zuffa's request to modify the eight topics in accordance

7     with Exhibit 9 to the July 7th, 2017, dispute resolution

8     conference, which is the clean copy, basically, of what Zuffa

9     proposes, with the two exceptions.

10         One is that the Court will adopt the definition of

11    business purpose that Zuffa initially agreed to before changing

12    its position, when there was not a global resolution, as

13    articulated in the July 4th, 2007, letter that's attached to

14    the -- as an exhibit to the parties' dispute resolution

15    conference.

16         That's the area you thought you had agreement, but

17    then you didn't.  And the -- and that definition applies with

18    respect to Topics 13, 15, 17, 19 and 21.

19         And the second exception to Zuffa's Exhibit 9, which

20    articulates how the Court is going to modify the topics in

21    dispute, is with respect to Topic number 13.

22         Zuffa's 30(b)(6) designate will be required to

23    provide testimony on the subject matter for the 22 agreed-upon

24    or Court-ordered custodians and the two additional current

25    employees, Denitza, D-E-N-I-T-Z-A, Batchvarova.

1    B-A-T-C-H-V-A-R-O-V-A, and Shane Karpal, but not the remaining

2    seven of the nine the plaintiffs propose.

3           So, Zuffa's basically prevailing with respect to the

4    eight topics in dispute as is articulated, the narrowed

5    requests on Exhibit 9 to Docket No. 450, with the two

6    exceptions I just mentioned.

7           Any questions?

8           MR. SAVERI:  No, Your Honor.

9           THE COURT:  Okay.  You got it?

10          All right.  I didn't want to have any requests for

11   clarification.  I just want to make sure we're -- all right.

12          That leaves us with -- and I understand that

13   plaintiffs' opposition -- excuse me -- Zuffa's opposition to

14   the motion with respect to the attorney-client privilege is not

15   due until tomorrow.

16          I understand plaintiffs are most eager to get a

17   ruling, and an emergency procedure in place to rule on it,

18   because of the number of documents that have been withheld on

19   Zuffa's initial privilege log, which was 30,000.  And you have

20   a rounded off roughly 18,000 documents that you are most

21   interested in resolving.

22          And Miss Grigsby, first from you, you have a one

23   liner in the parties' joint status report that says you've

24   produced some additional documents that you no longer claim

25   privilege with respect to, and you think that the motion is

1 moot.

2          So, bring me up to date with what you've done and why

3 you think it's mute -- moot.  Just briefly.

4          MS. GRIGSBY:  Sure, Your Honor.  So, just to -- you

5 know, background, and you're probably aware from plaintiffs'

6 filing, plaintiffs raised the issues with -- or some issues

7 with Zuffa's privilege log in April of 2017.

8          THE COURT:  Well, you didn't produce it until

9 April 7th, and then you did an amended one on April 24th.  So,

10 that's pretty much the earliest they could have raised it.

11          MS. GRIGSBY:  All right.  No, no, no.  There is no

12 dispute as to whether their -- you know, their issues were

13 timely or not.

14          But the point is, they raised issues in April of

15 2017.  We basically did one revision of the privilege log,

16 which we produced to them in April 27th, the end of April in

17 2017.

18          Since that time, we actually met and conferred with

19 plaintiffs in person on June 20th of 2017, at which time we

20 told them that we were re-reviewing approximately half of the

21 30,000 entries and documents on the privilege log.

22          And we were doing it in accordance with their request

23 to look at fighter negotiations, acquisitions, and some other

24 discrete issues.  So, we did do that, and we were in the

25 process of doing that in June of 2017 when we had the meet and

1  confer.

2          At that point, you will see in our papers, plaintiffs

3  basically said -- plaintiffs' counsel said we couldn't really

4  ask for more.  Since that time, we've produced roughly 10,000

5  documents.

6          To be clear, Zuffa does believe it had a colorable

7  claim of privilege.  But after this Court's privilege rulings,

8  and based on various negotiations in the parties where there

9  was a close call, especially with respect to the custodian from

10  the legal department and the legal department itself that was a

11  custodian, we have tried to err on the side of disclosure in

12  order to avoid protracted litigation, costly, time-consuming.

13          It's taken hundreds of hours.  And when plaintiffs

14  filed this motion, we believed they were aware that we were

15  already in the middle of this effort.  So, that is reason --

16          THE COURT:  Well, time is ticking, because today's

17  July 13th, and you just have less than three weeks left in

18  discovery with the exception of Mr. White's deposition.

19          So, let me ask you this.  The plaintiffs' motion

20  cites, with respect to four depositions of your employees that

21  are set between July 14th and August 9th and 10th, that they --

22  they identify the number of documents belonging to those

23  individuals or referencing those individuals in the privileged

24  document log.

25          Are those -- were those numbers accurate before you

1    made your supplemental production and no longer claim

2    privilege?

3           MS. GRIGSBY:  Before we made our supplemental

4    production.  But again, just to be clear, we started producing,

5    on a rolling basis, starting in April -- April 26th, 2017.  The

6    largest part of our production occurred on July 7th and

7    July 10th.

8           But we did that -- we prioritized reviewing the

9    deponents' custodial -- the deponents' entries in the order

10   that they were to be deposed.  So, we tried to do it so that

11   they would have adequate time.

12          They mentioned, again, in their motion, that we're

13   doing it on a rolling basis, but we are actually trying to get

14   it out the door so that they would have as much time as

15   possible.

16          THE COURT:  Their complaint was that you were doing

17   it in dribs and drabs.  And you told me that your largest

18   production was July 7th and July 10th.

19          So, for example, with respect to Mr. White, they say

20   that there were 499 documents that were listed on the

21   privileged document log.  Are there still 499 documents for

22   Mr. White or do you know what's left?

23          MS. GRIGSBY:  I -- I am not sure.  I've seen the

24   revised log, but I -- I don't remember just in the -- like what

25   I've looked at the privilege log, his number's changing

1    substantially.  The ones that really changed were Michael

2    Mersch and perhaps Lawrence Epstein, because they were both

3    attorneys, so they had --

4             THE COURT:  Okay.  That makes sense based on the

5    orders that you've received in my written view of what's

6    privileged and what's not.

7             MS. GRIGSBY:  Right.  So, it's our view that

8    generally, if the president -- if Dana White was requesting

9    deal advice, it was probably more clear-cut than perhaps, you

10   know --

11            THE COURT:  All right.  And so here's what I'm going

12   to do.

13            I am going to require you to produce 25 percent of

14   the privileged documents, that is the documents still for which

15   you maintain privilege as to Dana White, to the Court for in

16   camera review, with a cover sheet.  Serve opposing counsel with

17   the cover sheet.

18            So -- and I expect it to be a -- every fourth

19   document.  So, no games on which ones you get to pick.  You

20   don't get to cherry pick.  You know, these are the ones we

21   really, really think are privileged.

22            You give me every fourth document to amount to

23   25 percent of the documents you are still withholding from Dana

24   White that are privileged and will give me a pretty good idea

25   of your approach to privileged document logs.

1          MS. GRIGSBY:  Yes, Your Honor.

2          THE COURT:  Okay.  Is there any reason why you can't

3   give me that, since the document numbers have been culled, by

4   Monday at noon?

5          MS. GRIGSBY:  Monday at noon.  Today is Thursday.  I

6   think we should be able to do it.  I'm just curious in terms of

7   our document vendor.  It usually takes them 24 hours to ready a

8   production, but --

9          THE COURT:  Best good faith effort.  And so you give

10  those and serve them with the list by some means that makes

11  both sides able to identify.

12          Give me a spreadsheet that contains the

13  identification of the document by docket number or document

14  number in your privilege log that correlates with the column

15  for me to check privilege, not privilege, or redactions.

16          Okay?  So that as I go through, I can decide as we

17  go.  And that, again, will give me a pretty good roadmap on how

18  well-taken your privilege objections are.

19          MS. GRIGSBY:  Yes, Your Honor.

20          THE COURT:  Okay.  Yes, Mr. Saveri.

21          MR. SAVERI:  Thank you, Your Honor.  A couple -- just

22  a couple points I want to raise.  With respect -- the procedure

23  I think that you described is -- makes sense.  I think that we

24  should -- we should see the spreadsheet.  We don't need to see

25  the documents.  The spreadsheet is --

1        THE COURT:  That's what I just told her.  I want to

2   serve you with the -- the listing of the documents that have

3   been provided to me, so that you can make sure she followed my

4   instructions, which is to give me every fourth document and not

5   cherry pick.

6        And so you'll know which documents I'm reviewing.

7   And by reviewing a quarter of the withheld documents, again, I

8   should have a very good idea of how well taken their privilege

9   objections are.

10        MR. SAVERI:  We also, though -- we don't know how

11  many of the -- the documents that we cited in our report for

12  White or the other custodians have now fallen off the list.

13        I -- I would suspect that most of the ones that are

14  falling off and have been produced and -- would have to do

15  with -- with Mersch and Epstein, because --

16        THE COURT:  That's what she just told me.

17        MR. SAVERI:  -- we, though, have Mr. Mersch's

18  deposition tomorrow.

19        THE COURT:  I understand that.  And there's no way I

20  can resolve this for you between tomorrow.

21        There are lots of arrows in my quiver.  If they

22  wrongfully withheld privileged documents, and you had to go

23  forward with the deposition, being inadequately prepared, and

24  there are some great documents in there that they should have

25  produced and they didn't, there are any number of devices that

1    I have available to me to address that.

2            MR. SAVERI:  I -- that's correct, Your Honor.  And I

3    appreciate that.  If -- I guess what I'm -- was going to say is

4    that in a -- I think that the -- in addition to the review of

5    White's, I do think there is a -- potentially a substantial

6    issue with respect to Mersch and Epstein.  Because this --

7            THE COURT:  There very well may be.  What -- I'm

8    giving you what I can do.  You're one of 700 cases that I have.

9            And I know Dana White is set for deposition on

10   August 9th and 10th, and I have a reasonable prayer of being

11   able to get through 25 percent of his privileged document log

12   in time for you to get whatever you are going to get in

13   addition to what they've given you for that deposition.

14           I don't have a reasonable prayer of going through the

15   rest.  So, I'm going to do what I can do, and then we'll

16   address the merits of the rest.

17           MR. SAVERI:  Okay.  Very well.  Very well.  Thank

18   you, Your Honor.

19           THE COURT:  All right.  I mean, that's my intention.

20   I was just --

21           MR. SAVERI:  There's a lot of documents -- I'm just

22   trying to come up with a practical way of doing it consistent

23   with the demands on your time and counsel's, so I appreciate

24   that you are.

25           THE COURT:  Well, we'll start with the Dana White.

1    And he has a discrete number of documents that have been

2    withheld.  And if I look at 25 percent of them, and I have a

3    chance of doing that before he's deposed, and then we'll take

4    up the rest.  Okay?

5            MR. SAVERI:  That -- very well, Your Honor.  Thank

6    you.

7            THE COURT:  All right.  Thank you, counsel.

8            Yes, Miss Grigsby.

9            MS. GRIGSBY:  Just one more question.  Do you want

10   hard copies?  Do you want it printed out or do you --

11           THE COURT:  Whatever's -- you're welcome to -- as

12   long as they are legible or readable, you are welcome to email

13   them to my chambers instead of hard copies, as long as they are

14   not 2,000 pages.

15           MS. GRIGSBY:  Thank you, Your Honor.  Mostly emails.

16   He doesn't really like to write that much.

17           THE COURT:  Whatever is the most efficient is fine

18   with me.  It's hard to read a whole lot online.  But, you know,

19   I'm imagining that most of these are email chains and

20   individual documents and the like, which is fine.

21           Thank you.  Just comply with the local rule regarding

22   in camera submissions.  There's a specific rule that tells you

23   the specifics of what you are supposed to do.

24           MR. SAVERI:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2          THE COURT:  Go forth and prosper.

3      (Recess, 3:02 p.m.)

4                       --oOo--

5               TRANSCRIBER'S CERTIFICATE

6      I, KATHERINE EISMANN, court-approved transcriber, certify

7  that the foregoing is a correct transcript from the official

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11

12  Date:     .

13                         /s/ *Katherine Eismann*

14                        Katherine Eismann

15

16

17

18

19

20

21

22

23

24

25