Jerome K. Elwell, State Bar No. 012699
Robert C. Maysey, State Bar No. 024204
WARNER ANGLE HALLAM
JACKSON & FORMANEK PLC
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 264-7101
jelwell@warnerangle.com
rmaysey@warnerangle.com

*Attorneys for Individual and Representative Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez, Brandon Vera, and Kyle Kingsbury*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In Re Subpoena Of<br><br>Top Rank, Inc. and Robert Arum | Case No.: 2:15-cv-01045-RFB-PAL |
| Cung Le, Nathan Quarry, and Jon Fitch, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant. | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THEIR SUBPOENA TO THIRD PARTY TOP RANK, INC. AND MOTION TO COMPEL ATTENDANCE AT DEPOSITION OF ROBERT ARUM, PRESIDENT OF TOP RANK, INC.** |

I.      **INTRODUCTION**

Plaintiffs submit this Motion to Compel Production of Documents Responsive to Their Subpoena to Third Party Top Rank, Inc., and Motion to Compel Attendance at Deposition of Robert Arum, President of Top Rank, Inc., and supporting Declaration of Robert C. Maysey filed in support of this motion, and a proposed form of order. This motion arises out of *Le. et. al. v. Zuffa, LLC,* case no.: 2:15-cv-01045-RFB-PAL (the "Related Case"), currently pending in this district. After extensive meet and confer

efforts, Plaintiffs' have been unable to resolve ongoing discovery disputes concerning Top Rank, Inc.'s document production in response to our subpoena, and Robert Arum's attendance at a deposition.

## II.   ARGUMENT

### A.   Legal Standard

Courts in the Ninth Circuit generally apply a three-step approach in determining whether to compel disclosure of confidential commercial information: first, the party resisting disclosure must establish that the information sought is confidential commercial information or a trade secret and that disclosure may be harmful; second, the party seeking disclosure must show the information is "relevant and necessary to the proper presentation of a claim or defense"; and third, the court then "weigh[s] the risk of disclosure of the trade secret to unauthorized parties with the risk that a protective order will impede prosecution or defense of the claims." *Capsugel Belgium NV v. Bright Pharma Caps, Inc.* ("*Capsugel*"), No. 3:15-cv-321-PK, 2015 U.S. Dist. LEXIS 130071, at *7-8 (D. Or. Sep. 28, 2015) (ordering production of trade secret documents subject to a protective order with an "attorneys' eyes only" provision) (quotations and citations omitted). "Once the moving party has established relevance and necessity, the discovery is virtually always ordered." *Id*.

### B.   Top Rank's Aggregated Financial Information Is Relevant And Necessary To Plaintiffs' Class Action Allegations.

In the Related Case, Plaintiffs allege that Zuffa exercised market power in two separate but related markets. First, Zuffa illegally acquired and maintained monopoly power in the market for promoting live professional Mixed Martial Arts ("MMA") events. Id. at ¶¶ 1-21). Zuffa acquired its monopoly power by acquiring its largest competitors, and by using a number of techniques to prevent other MMA promoters from competing. Zuffa locks the vast majority of top MMA fighters into long-term, exclusive contracts, which it coerces successful fighters to renegotiate before they expire, preventing these

fighters from seeking the greatest value for their services on the open market, and guaranteeing that other MMA promoters cannot sign top fighters. *Id.*, ¶¶ 109-115. Top fighters that can draw large audiences, boost pay-per-view sales, and drive advertising, sponsorship and merchandising revenues, are essential to success in the MMA industry. *Id.*, ¶¶ 5, 10, 58, 100, 108. By preventing the best fighters from signing with other promoters, Zuffa denies those promoters access to a critical ingredient for success. *Id.*, ¶¶ 108, 139. Zuffa locks the biggest advertisers and sponsors into exclusive contracts that prevent them from advertising with or sponsoring other MMA promoters, cutting off another crucial input for necessary for success in the MMA industry. *Id.*, ¶¶ 9-10, 132, 167. Zuffa counterprograms other promoters live MMA events, drawing customers away from those promoters' events. *Id.*, ¶¶ 132, 150. Zuffa has broadcast contracts with some of the biggest broadcasters in the world, and prevents other MMA promoters from advertising during Zuffa's MMA broadcasts, denying them a crucial chance to reach the MMA audience. *Id.*, ¶¶ 10. Zuffa has acquired a vast library of video recordings of past MMA events, which it refuses to license to other MMA promoters. *Id.*, ¶ 75. Past video of a fighter is crucial to marketing and generating interest in that fighter's upcoming fights. By locking up these libraries, Zuffa impairs other MMA promoters' ability to promote their own fights. *Id*. Using these and other techniques, Zuffa prevents other MMA promoters from rising above the level of the "minor leagues," unable to generate sufficient broadcast, advertising or sponsorship revenue to successfully challenge Zuffa. *Id.*, ¶¶ 7, 135.

      Because other MMA promoters cannot offer MMA fighters the money, exposure, and fame that Zuffa can, the fighters are left with no option but to sign with Zuffa, the "only game in town." *Id.*, ¶ 5. By eliminating competition among MMA promoters, Zuffa has acquired monopsony power in the market for acquiring the services of professional MMA fighters. *Id.*, ¶¶ 90-94. Zuffa exploits its monopsony power to impose restrictive contractual terms on its fighters, and to coerce them into re-signing before their prior contract expires, thereby locking them into long-term service for Zuffa and preventing

them from seeking the highest value for their services the way most professional athletes can since the advent of free agency. *Id*., ¶¶ 109-115. This has the effect of suppressing the fighters' compensation. As a result, Zuffa can pay its MMA fighters a small percentage of its revenues, unlike boxing promoters such as Mr. Arum.

Professional MMA events are sanctioned in the U.S. by the same state athletic commissions as boxing. Nearly all athletic commissions in North America are members of the Association of Boxing Commissions ("ABC"). *Id.* at ¶ 101. Unlike MMA, however, Plaintiffs allege that boxing and the other league sports, which enjoy competitive markets, athletes generally earn more than 50% of league revenue, a significantly higher percentage of revenues than those paid to UFC Fighters. *Id*. at 103.

Top Rank, Inc.'s president, famed boxing promoter Bob Arum agrees that boxing is a competitive marketplace with many promotions competing for talent.  Arum stated that he pays his fighters approximately 80% of the proceeds generated by a boxing event. Comparing the fighter compensation between boxing and the UFC, Arum described the disparity between the UFC and boxing as follows: "Because of the monopoly that the UFC has, they [the UFC] pay[s] their fighters maybe 20% of the proceeds that come in on a UFC fight." *Id*. at ¶ 104.[1]  Arum also stated that "UFC fighters because of the UFC monopoly get stiffed. . . we pay out 80% of the revenue to the fighters. . . [the UFC] doesn't pay out 20% to the fighters. . . They are a monopoly—and we are not."

To enable Plaintiffs' experts to benchmark percentages of revenues generated from boxing events paid to boxers, Plaintiffs' need disclosure of full year, aggregated financial data which includes total revenues generated from the promotion of boxing events, and total compensation paid to boxers.  To date, Top Rank has refused to provide this data, and instead has offered a non-representative limited sample consisting of a handful of low

---

[1] See also https://www.youtube.com/watch?v=boAcF029Dsc (Arum:  "UFC Fighters because of the UFC monopoly get stiffed. . . we pay out 80% of the revenue to the fighters. . . [the UFC] doesn't pay out 20% to the fighters. . .They are a monopoly—and we are not." See also https://www.youtube.com/watch?v=xTIJjoI6pnk&feature=youtu.be.

revenue events. The financial information Plaintiffs seek from Top Rank is directly relevant to Plaintiffs' claims and information that they cannot obtain from other sources.

### C. Top Rank Will Suffer No Harm Because Its Confidential Commercial Information Is Safeguarded By The Protective Order.

Courts in the Ninth Circuit have frequently ordered the production of confidential information subject to a protective order with an "attorneys' eyes only provision." *See e.g. Bare Escentuals Beauty, Inc. v. Costco Wholesale Corp.*, No. 07CV90, 2007 U.S. Dist. LEXIS 90893, at *11 (S.D. Cal. Dec. 11, 2007) (holding that where the subpoenaing party had shown the trade secret sought in discovery was relevant and necessary, the risk of disclosure was "adequately balanced" by the stipulated protective order); *Apple, Inc. v. Samsung Elecs. Co.*, No. C 11-1846 LHK (PSG), 2012 U.S. Dist. LEXIS 166724, at *16 (N.D. Cal. Nov. 21, 2012) (ordering production of a confidential agreement and noting that "[m]any third parties to this case have had their licensing agreements disclosed — without any redaction of financial terms — subject to an Attorneys-Eyes-Only designation because the confidential financial terms were clearly relevant to the dispute"); *Capsugel, supra,* 2015 U.S. Dist. LEXIS 130071, at *17 (ordering production of relevant trade secrets and noting "[t]he Stipulated Protective Order provides sufficient protection against disclosure to unauthorized parties").

Under the Revised Stipulation and Protective Order (the "Protective Order") adopted by the court in the Related Case, any document designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYSE ONLY can be shared only with outside counsel for the parties. *See* Dkt. 26-5 at 165 (§ 7.3). The parties themselves, including in-house counsel, are prohibited from viewing these documents.

Top Rank has asserted that the Protective Order does not afford adequate protection without elaborating on the objection.

### D. Bellator Will Not Be Subject To Undue Burden By Producing Its Event-Level Financial Information.

When considering undue burden Courts look at whether a) the discovery is unreasonably cumulative or duplicative or can be obtained from other sources, b) the party

seeking discovery has had opportunities to pursue the information through discovery, and c) the burden or expense of the proposed discovery outweighs its likely benefit. *Warren v. Bastyr Univ.*, No. 2:11-cv-01800-RSL, 2013 U.S. Dist. LEXIS 50408, at *13-14 (W.D. Wash. Apr. 8, 2013). Here, Plaintiffs cannot obtain Top Rank's aggregated event-level financial information from any other source, and the burden to Top Rank of procuring it will be minimal. Further, the Protective Order allows Top Rank to maintain the confidentiality of its financial data.

## III.  CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion to Compel.

DATED:  July 31, 2017.

                              WARNER ANGLE HALLAM JACKSON
                              & FORMANEK PLC


                              By:  /s/ Robert C. Maysey
                                   Robert C. Maysey
                                   Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2017, I electronically transmitted the PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THEIR SUBPOENA TO THIRD PARTIES TOP RANK, INC. AND APPEARANCE AT DEPOSITION OF ROBERT ARUM to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all registered users, and also served the same by mailing a copy via certified mail on the following, who are not registered participants of the CM/ECF System:

*/s/Teresa Baldridge*
Teresa Baldridge, an Employee of Warner Angle Hallam Jackson & Formanek PLC