DAVID MARROSO (Cal. S.B. #211655)
  dmarroso@omm.com
(*Admitted Pro Hac Vice*)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California  90067-6035
Telephone:    (310) 553-6700
Facsimile:    (310) 246-6779

ERIC D. HONE (NV Bar No. 8499)
  EHone@dickinson-wright.com
DICKINSON WRIGHT PLLC
8363 West Sunset Road, Suite 200
Las Vegas, Nevada 89113
Telephone:    (702) 550-4400
Facsimile:    (844) 670-6009

Attorneys for Non-Parties
Top Rank, Inc. and Robert Arum

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In Re Subpoena Of<br><br>Top Rank, Inc. and Robert Arum,<br>_____<br><br>Cung Le, Nathan Quarry, and Jon Fitch, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>               Defendant. | Case No. 2:15-cv-01045-RFB-PAL<br><br>**OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS TO TOP RANK, INC. AND MOTION TO COMPEL ATTENDANCE AT DEPOSITION OF ROBERT ARUM** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................... 1

II.     RELEVANT FACTUAL BACKGROUND ........................................... 4

III.    LEGAL STANDARD ............................................................................ 5

IV.    THE DOCUMENT SUBPOENA IS IMPROPER ................................ 6

      A.     The Requested Documents Are Not Relevant To The Underlying Dispute .......... 6

      B.     Plaintiffs Have Failed To Demonstrate A Substantial Need For Top Rank's Confidential Commercial Information ................................. 9

      C.     The Requested Discovery Is Overly Burdensome On A Non-Party .................... 12

V.     THE DEPOSITION SUBPOENA TO MR. ARUM IS IRRELEVANT AND OVERLY BURDENSOME ON A NON-PARTY ........................... 14

VI.    THE COURT SHOULD IMPOSE SANCTIONS FOR PLAINTIFFS' MISUSE OF THE DISCOVERY PROCESS ......................................... 14

VII.   ALTERNATIVELY, BOTH THE DOCUMENT AND DEPOSITION SUBPOENAS SHOULD BE LIMITED ................................................ 15

VIII.   CONCLUSION ..................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Aevoe Corp. v. AE Tech Co.*,
    2013 WL 5954570 (D. Nev. Nov. 6, 2013) ...................................................... 10, 12

*Dart Indus. Co. v. Westwood Chem. Co.*,
    649 F.2d 646 (9th Cir.1980) .......................................................................... 6

*Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*,
    2011 WL 1348401 (N.D. Tex. Apr. 8, 2011) ................................................ 10

*Edwards v. Cal. Dairies, Inc.*,
    2014 WL 2465934 (E.D. Cal. June 2, 2014) ............................................ 6, 10, 12

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*,
    213 F.3d 198 (5th Cir. 2000) ....................................................................... 7, 9

*Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
    333 F.3d 38 (1st Cir. 2003) ......................................................................... 13

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    161 F.R.D. 86 (N.D. Cal. 1995) .................................................................. 15

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2012 WL 4846522 (N.D. Cal. Aug. 7, 2012) ........................................... 14, 15

*Laxalt v. McClatchy*,
    116 F.R.D. 455 (D. Nev. 1986) .................................................................. 6, 9

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ......................................................... 7

*Magdaluyo v. MGM Grand Hotel, LLC*,
    2016 WL 2731672 (D. Nev. May 9, 2016) ................................................. 6, 9

*Med. Components, Inc. v. Classic Med., Inc.*,
    210 F.R.D. 175 (M.D.N.C. 2002) .............................................................. 12

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ...................................................................... 7, 9

*Painters Joint Comm. v. Emp. Painters Trust Health & Welfare Fund*,
    2011 WL 4549232 (D. Nev. Sept. 29, 2011) .............................................. 13

*Rezaq v. Nalley*,
    264 F.R.D. 653 (D. Colo. 2010) ................................................................. 5, 9

*Roberts v. Clark Cty. Sch. Dist.*,
    312 F.R.D. 594 (D. Nev. 2016) .................................................................. 13

*United States v. CBS, Inc.*,
    666 F.2d 364 (9th Cir. 1982) ...................................................................... 14

*Williams v. Las Vegas Metro. Police Dep't*,
    2015 WL 3489553 (D. Nev. June 3, 2015) ................................................. 6

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

**FEDERAL STATUTES**

4

Fed. R. Civ. P. 26 ................................................................................................................ 13

5

Fed. R. Civ. P. 45 .......................................................................................................... 6, 12

6

Fed. R. Civ. P. 45(d)(1) ...................................................................................................... 14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TOP RANK INC.'S AND ROBERT ARUM'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
PRODUCTION AND ATTENDANCE AT DEPOSITION

## I.    **INTRODUCTION**

Plaintiffs cannot have it both ways.  In their antitrust complaint, when it was important to define and confine the "relevant market" to the sport of mixed martial arts ("MMA"), plaintiffs went out of their way to repetitively assert that MMA and boxing are different sports, with separate fighters, offering a singular viewing experience, and with wholly differentiated revenue/profit structures.  Here are examples of plaintiffs' own words:

- "Combat sports such as boxing or those that are limited to a single martial art, such as judo, are not adequate substitutes for live Elite Professional MMA."  Compl. ¶ 60.

- "Single discipline combat sports, such as boxing and kick-boxing, do not qualify as economic substitutes because they do not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming audience."  *Id.*

- "Boxing does not combine different elements from a diverse set of martial arts, as it is limited to only strikes with the hands above the waist on an opponent, and hence does not provide a viewing experience akin to MMA."  *Id.* ¶ 61.

- "Promotion of live Elite Professional MMA events is not reasonably interchangeable with promoting any other sport or entertainment, including boxing and/or kick-boxing."  *Id.* ¶ 62.

- "Athletes who have trained for, and now engage in, sports other than MMA, including professional boxing, and those who engage in a single martial art, such as judo, are not substitutes for Elite Professional MMA Fighters.  For instance, boxers and those who engage in a single martial art are generally not trained in the additional forms of martial arts (which may include wrestling, judo, jiu-jitsu, taekwondo, Muay Thai and karate) necessary to become and successfully compete as an Elite Professional MMA Fighter."  *Id.* ¶ 79.

- "Neither boxing nor 'professional' WWE wrestling provides reasonable alternatives for Elite Professional MMA Fighters.  Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo."  *Id.* ¶ 82.

- "[W]hile a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as an Elite Professional MMA Fighter." *Id*. ¶ 94.

Having made the distinctions between MMA and boxing the centerpiece and tent-pole of their complaint, plaintiffs had no business subpoenaing Top Rank, Inc. ("Top Rank"), a non-party boxing promoter, seeking over ten years' worth of revenue, profit, loss, and payment information. Plaintiffs further had no business rejecting Top Rank's multiple offers to compromise and efforts to avoid embroiling the Court in needless motion practice. And, most of all, plaintiffs have no business reversing course and now arguing to the Court that Top Rank's profit-loss and payment information is not only relevant but essential to plaintiffs' experts' economic work.

Top Rank is a licensed *boxing* promoter. It is not a party to this case. Top Rank has never signed a fighter to an MMA contract. It has never promoted an MMA bout. And it has never earned a single dollar of revenue from an MMA event. Plaintiffs dispute none of this.

Plaintiffs also concede that Top Rank has no relevant dealings or interactions with either plaintiffs or defendants. Top Rank does not have agreements with members of the plaintiffs' class or with defendant Zuffa, and plaintiffs do not seek any such agreements through their subpoena. Top Rank has no relevant communications with plaintiffs or defendants, and plaintiffs do not seek any such communications through their subpoena. And Top Rank has never done any relevant business with members of the plaintiffs' class or with defendant Zuffa, and plaintiffs do not seek any such information through their subpoena.

Despite all this—and despite their repeated claims in their own complaint—plaintiffs nevertheless move to compel non-party Top Rank to produce years' worth of its confidential, highly sensitive commercial and proprietary information related to Top Rank's promotion of *boxing* events. Indeed, plaintiffs seek documents to show all revenue—annualized and aggregated—that Top Rank has earned from each of the approximately 120 boxing events and 700 boxing bouts that Top Rank has promoted from 2013 to 2016, all payments Top Rank has made to its boxers for each bout in those events, and the agreements Top Rank has used with its

2

boxers from 2013 to 2016.  If that were not sufficient, plaintiffs additionally seek to force Top Rank's founder and CEO to sit for a full-day deposition.

Plaintiffs contend this intrusive and burdensome discovery on a non-party with no relevant dealings with either plaintiffs or defendant is necessary so that their experts can compare financial data from Top Rank's promotion of *boxing events* to Zuffa's promotion of MMA events and create "benchmark percentages of revenues."  This sole attenuated proffer of relevance is groundless.  Plaintiffs have made no effort to show how the promotion of boxing events is sufficiently comparable to the promotion of MMA events such that it could be used as a benchmark here—indeed, plaintiffs expressly and repeatedly allege they are not comparable— much less how the financial data and agreements of Top Rank, one boxing promoter, are possibly representative of the boxing industry as a whole and thus a proper benchmark in this case.

Plaintiffs' motion additionally fails because, even if plaintiffs could show that Top Rank's financial data was a relevant benchmark for the entire MMA market, plaintiffs have not demonstrated a substantial need to require Top Rank to produce years' worth of its commercially sensitive agreements and financial documents or to overcome the substantial burden it seeks to impose on a non-party.  Indeed, plaintiffs have not even attempted to explain why their experts cannot rely on publicly available data on the boxing industry as a whole (Top Rank even identified sources of this publicly available data for plaintiffs to draw from and offered to help collect Top Rank's publicly available data) or publicly available data on other comparable markets for their benchmark or why they need financial data from *every* event Top Rank promoted from 2013 to 2016.  Nor have plaintiffs demonstrated why they need to depose Mr. Arum, who has spent the past fifty years in the boxing industry and has no experience in the MMA industry or promoting MMA events, for an entire day.

Plaintiffs' motion to compel should be denied.  And the Court should impose sanctions on plaintiffs for their misuse of the discovery process and harassment of a non-party with no relevance to the underlying dispute.

## II.    **RELEVANT FACTUAL BACKGROUND**

On January 23, 2017 and February 2, 2017, plaintiffs served a deposition subpoena on

Top Rank's founder and Chief Executive Robert Arum and a document subpoena on Top Rank.

*See* ECF No. 470, Exs. 6 & 7.  The document subpoena contained the following four requests:

- **REQUEST NO. 1**: Your Company's Income Statements, including event-level profit and loss statements for the Relevant Time Period [defined to be from January 1, 2005 to present], including without limitation All Documents, including depositions, declarations, affidavits, or other statements under oath, You produced in any lawsuits or arbitrations, or to any governing athletic commission or sanctioning body, relating to TOP RANK's accounting of its revenues, expenses, and profits.

- **REQUEST NO. 2**:  Data in as granular form as it is maintained (itemized ledger entries, if they exist) sufficient to show all bout-related revenues and expenses (including for championship bouts, bouts where victory leads to championship, and all other Professional Boxing Events), payments made to individual Professional Boxers (including purses, bonuses, pay-per view, and any other event and non-event related payments), and non-bout related revenues and expenses.

- **REQUEST NO. 3**:  To the extent not included in Your response to Request Nos. 1 and 2 above, documents sufficient to substantiate Bob Arum's statement that TOP RANK pays 80% of event revenue to the Professional Boxers who participate in bouts promoted by TOP RANK….

- **REQUEST NO. 4**:   A Representative Sample of All Agreements between TOP RANK and any Boxers, relating to participation in a Professional Boxing Fight or Professional Boxing Event, and any Documents and Communications relating to the negotiation, termination, cancellation or transfer thereof.   Responsive Documents include, without limitation, executed Agreements, draft Agreements, side letters, all negotiations between TOP RANK and any Boxer, including any Professional Boxer, or their agents, managers, promoters, or other representatives (regardless of whether such negotiations resulted in an executed Agreement), copies of any form agreements; and all Documents relating to the effects any such actual or potential Agreements between TOP RANK and any Athlete, including any professional Boxer, had on TOP RANK's revenues, valuation, or ability to operate profitably as a Boxing Promoter.

*Id.*, Ex. 6.  In sum, plaintiffs initially sought from non-party Top Rank, *inter alia*, Top Rank's

income statements from every boxing event it has promoted since January 1, 2005, documents to

show all revenues and expenses for every boxing bout Top Rank has promoted since January 1,

2005, and a representative sample of all of Top Rank's agreements with its boxers since

January 1, 2005, as well as all documents and negotiation history related to such agreements.

While Top Rank and Mr. Arum believed the requested discovery was facially improper as

it was overly burdensome on non-parties to the dispute, not at all relevant to the underlying

dispute between plaintiffs and Zuffa, and otherwise improper as it sought Top Rank's confidential

and proprietary agreements and financial data, Top Rank and Mr. Arum nevertheless sought to meet and confer with plaintiffs to narrow the requests in an effort to avoid embroiling the Court in a needless dispute.  After numerous discussions and numerous proposals by Top Rank to narrow the requests to a more limited corpus of documents, Top Rank made a final offer to plaintiffs to produce (1) the gross revenue generated from one event promoted by Top Rank in each of 2013, 2014, 2015, and 2016 with the goal of providing a "representative" sample of events promoted by Top Rank, and (2) the unredacted bout agreements for each fighter from the aforementioned events that was filed with each State's boxing/athletic commission.  *See* ECF No. 470, Ex. 10 (April 4, 2017 email from D. Marroso); Declaration of David J. Marroso ("Marroso Decl.") ¶¶ 3-7.  Additionally, Mr. Arum offered to appear for a deposition, provided that both sides agreed to limit their examination to three hours each.  *See* ECF No. 470, Ex. 10; Marroso Decl. ¶ 7.

Plaintiffs rejected Top Rank's and Mr. Arum's proposal with little explanation other than they wanted more documents from Top Rank and a full-day deposition with Mr. Arum.  *See* Marroso Decl. ¶ 8.  Accordingly, on April 25, 2017, both Top Rank and Mr. Arum served formal objections to their respective subpoenas.  ECF No. 470, Ex. 11; Marroso Decl. ¶ 9.  Over the four months since Top Rank and Mr. Arum served their objections, Top Rank and Mr. Arum have had several additional discussions with plaintiffs regarding the requested discovery and have continued to attempt to compromise to avoid needless motion practice.  Mr. Arum has also continued to offer to appear for a deposition and proposed dates for such deposition.  However, plaintiffs have rejected each attempt.  And at no point have plaintiffs agreed to further narrow their requests, limit Mr. Arum's deposition in any manner, or agree to the condition that if Mr. Arum appeared for a deposition now, he would not be subject to multiple depositions.  *See* Marroso Decl. ¶¶ 10-11.

On July 31, 2017—the last day of discovery—plaintiffs filed their motion to compel.

### III.  LEGAL STANDARD

A party moving to compel discovery bears the burden of demonstrating the relevance of the discovery.  *See Rezaq v. Nalley*, 264 F.R.D. 653, 656 (D. Colo. 2010) ("[W]hen a request for discovery is overly broad on its face or when relevancy is not readily apparent, the party seeking

the discovery has the burden to show the relevancy of the request."); *Magdaluyo v. MGM Grand Hotel, LLC*, 2016 WL 2731672, at *3 (D. Nev. May 9, 2016) (same).  While the scope of discovery is generally broad for discovery purposes, case law is clear that "discovery permissible from nonparties is narrower than that permissible from parties to the action," *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649–50 (9th Cir.1980) (broader restrictions on discovery appropriate to protect nonparties); *Laxalt v. McClatchy*, 116 F.R.D. 455, 458 (D. Nev. 1986) ("The rule is thus well established that nonparties to litigation enjoy greater protection from discovery than normal parties."), and the moving party must demonstrate "a stronger showing of relevance than for simple party discovery," *Laxalt*, 116 F.R.D. at 458.  Further, the Court must protect non-parties from overly broad discovery or discovery that requires the disclosure of confidential documents.  *See Edwards v. Cal. Dairies, Inc.*, 2014 WL 2465934, at *2 (E.D. Cal. June 2, 2014); *see also* Fed. R. Civ. P. 45.

## IV.   THE DOCUMENT SUBPOENA IS IMPROPER[1]

### A.   The Requested Documents Are Not Relevant To The Underlying Dispute

As an initial matter, none of plaintiffs' requested discovery is relevant to the underlying dispute.  In their complaint, plaintiffs allege that defendant Zuffa's purported exercise of market power in the MMA industry has suppressed the amount of money that Zuffa pays its MMA fighters and that athletes in "sports such as boxing and the 'Big 4,' i.e., football, baseball, basketball and hockey in the United States, generally earn more than 50% of league revenue," whereas Zuffa pays a lower percentage of revenue to its MMA fighters.  *See* Mot. at 4; *see also* Compl. ¶¶ 102-115.  Based on these allegations, plaintiffs argue that Top Rank—a non-party, not in the MMA industry, and with no business dealings with or connection to either plaintiffs or

---

[1] As set forth in Zuffa's opposition to plaintiffs' motion to compel, the untimeliness of plaintiffs' motion provides a separate and independent basis to deny the motion.  *See* ECF No. 475 at 3-4.  Case law is "clear that a party may not unduly delay in filing its motion to compel."  *See Williams v. Las Vegas Metro. Police Dep't*, 2015 WL 3489553, at *1 (D. Nev. June 3, 2015).  Here, plaintiffs served their subpoenas in January and February 2017, and Top Rank and Mr. Arum served their objections in April 2017, yet plaintiffs waited months and until the last day of discovery to file their motion to compel, thus ensuring that the discovery would not occur in the discovery period.  Plaintiffs have provided no explanation for their delay in filing their motion. This unexplained delay and the fact that the discovery will now happen over a month after the fact discovery cutoff provide a further basis to deny plaintiffs' motion to compel.

defendants—should be required to produce its proprietary financial data showing the amount of money it has made from its promotion of boxing events and the amount of money it has paid to its boxers for such events. Mot. at 4. While plaintiffs concede that Top Rank is in the boxing and not MMA industry, plaintiffs contend this discovery is necessary so that their experts can use Top Rank's proprietary financial information to create "benchmark percentages of revenues generated from boxing events paid to boxers," which they will then presumably compare to the percentages of revenues that Zuffa pays to MMA fighters for MMA events. *See id*. This sole proffer of relevance is meritless and must be rejected for two reasons.

*First*, plaintiffs have failed to show how the promotion of boxing events is sufficiently comparable to the promotion of MMA events such that it could be used as relevant benchmark evidence here. Case law is clear that a plaintiff who intends to use the benchmark method of damages bears the burden of establishing that the benchmark is sufficiently comparable and that the comparable industry must be "nearly identical" to plaintiff's industry. *See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow."); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851 (5th Cir. 2015) ("Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible."); *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) ("care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges'").

Here, plaintiffs' **only** argument that the promotion of boxing is comparable to MMA is that professional boxing and professional MMA events in the United States are both regulated by the same state athletic commissions. *See* Mot. at 4. But this single commonality does not make the industries "nearly identical"—as plaintiffs' own complaint makes clear:

> Indeed, while state athletic gaming commissions (or equivalents thereof) sanction both boxing and MMA events, such commissions impose strict requirements that define each sport separately. Such distinctions include the method of scoring, weight classes, the duration and number of rounds, and the methods of combat that may be employed. For example, scoring in live

7

Professional MMA bouts is based on athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission, chokeholds, throws or takedowns), most forms of which are prohibited in boxing. (Compl. ¶ 61.)

Moreover, if being regulated by the same commission or agency were the bar for relevance, plaintiffs could seek to compel every boxing promotional company, every kickboxing promotional company, every Muay-Thai promotional company, and every MMA promotional company to turn over their proprietary financial data for their experts to analyze and potentially use as a benchmark. Further, the bottled water and natural gas industries would also be "equivalents" and sufficiently comparable since they are both regulated by the EPA, and horse racing and Pai Gow poker would be relevant benchmarks for each other as they are both regulated by the Nevada Gaming Control Board. Plaintiffs, tellingly, cite no law in support of such a sweeping proposition, or a single case to suggest that an antitrust plaintiff can compel a non-party in a separate industry to produce years' worth of proprietary financial data simply because the non-party is part of a common association.

Aside from plaintiffs' assertion that both sports are regulated by the same state athletic commissions, plaintiffs have not set forth any evidence to suggest that the sports of boxing and MMA are comparable, that the promotion of the two sports is comparable, or that the market for the two is comparable such that a comparison of a promoter's revenues in the boxing industry or the amount that boxing promoters pay boxers is a relevant benchmark for plaintiffs here. To the contrary, in their complaint, plaintiffs go to great lengths to make clear that boxing and MMA are not the same sport, that the promotion of boxing events and promotion of MMA events are not comparable, and that the market for the two sports is entirely different. Plaintiffs admit that: boxing is "not [an] adequate substitute[] for live Elite Professional MMA," Compl. ¶ 60; boxing does "not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming audience," *id*.; and the "[p]romotion of live Elite Professional MMA events is not reasonably interchangeable with promoting any other sport or entertainment, including boxing and/or kick-boxing," *id*. ¶ 62.

1    *Second*, even if plaintiffs could show that the promotion of boxing events is sufficiently

2    comparable to the promotion of MMA events, that would not make the financial information of

3    Top Rank—one promoter in the boxing industry—relevant to this dispute.  There are dozens of

4    boxing promoters in the United States that make up the boxing industry.  Plaintiffs have not made

5    any proffer to suggest that the amount Top Rank pays its boxers, earns per event, or earns each

6    year is representative of the boxing industry.  Nor have plaintiffs established how the information

7    from one boxing promotional company could be used as relevant benchmark evidence in this

8    case.  Plaintiffs cannot indiscriminately take what one boxing promotional company has earned

9    and paid its boxers under promotional agreement to establish a benchmark percentage.  *See, e.g.*,

10   *Eleven Line*, 213 F.3d at 208 (rejecting proposed benchmark evidence where plaintiff

11   "indiscriminately" used one factor to establish a benchmark as that would be "like arguing that

12   because McDonald's franchises earn a certain average rate of return, a particular franchise will

13   perform to the average").

14        Ultimately, how much Top Rank earns in revenue and pays to its boxers pursuant to

15   individually negotiated promotional agreements with those boxers is not relevant to the

16   underlying dispute between plaintiffs and defendant or probative of whether defendant allegedly

17   exercised market power in the MMA industry.  Accordingly, while the standard for discovery is

18   broad, given plaintiffs' admissions that the boxing and MMA industries are not comparable, their

19   failure to show that the promotion of boxing events is even similar—much less "nearly

20   identical"—to the promotion of MMA events, and their inability to even establish a plausible link

21   between the financial data they seek from Top Rank and their antitrust claims, plaintiffs have

22   failed to carry their burden to demonstrate that the information requested would lead to relevant

23   benchmark evidence here.  *See Eleven Line*, 213 F.3d at 208; *MM Steel*, 806 F.3d at 851; *see also*

24   *Rezaq*, 264 F.R.D. at 656; *Magdaluyo*, 2016 WL 2731672, at *3; *Laxalt*, 116 F.R.D. at 458.

25   Plaintiffs' motion must be denied for this reason alone.

26        **B.    Plaintiffs Have Failed To Demonstrate A Substantial Need For Top Rank's**

27        **Confidential Commercial Information**

28        Even if plaintiffs could show that all of Top Rank's aggregated and annualized financial

9

1    data and all payments it has made to its boxers from 2013 to 2016 were relevant to this dispute,

2    plaintiffs' motion still must be denied as plaintiffs have not demonstrated a substantial need for

3    such intrusive discovery on a non-party.  A party seeking discovery of confidential commercial

4    information from a non-party bears the burden of showing a "substantial need" for the discovery.

5    *See Aevoe Corp. v. AE Tech Co.*, 2013 WL 5954570, at *2 (D. Nev. Nov. 6, 2013) ("The

6    determination of substantial need is particularly important in the context of enforcing a subpoena

7    when discovery of a trade secret or confidential commercial information is sought from non-

8    parties.").  Establishing a "substantial need" requires a showing that the requested discovery is

9    not only relevant but also "essential to a judicial determination of [the party's] case," *id.* at *3,

10   that is, the claim must "virtually rise[] or fall[] with the admission or exclusion of the proffered

11   evidence," *Edwards*, 2014 WL 2465934, at *5.  "If the party seeking discovery does not show

12   both the relevance of the information sought and the need for the material, there is no reason for

13   the discovery request to be granted, and the information is not to be revealed."  *Id.* at *4.

14          Here, there can be no dispute that the information requested—which includes Top Rank's

15   aggregated and annualized financial data showing revenues that Top Rank has earned from each

16   boxing event from 2013 to 2016—qualifies as confidential commercial information.  *See id.*

17   (finding that non-party's revenues and formula qualify as confidential commercial information

18   under Rule 45); *Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*, 2011 WL 1348401, at *2 (N.D.

19   Tex. Apr. 8, 2011) (non-party's sales and revenue information constituted "confidential

20   commercial information").  Indeed, plaintiffs concede as much in their motion.[2]  *See* Mot. at 3, 5

21   (referring to Top Rank's "confidential commercial information" and citing the standards for

22   discovery of such information).

23

24   _____

[2] For the avoidance of doubt, Top Rank also takes steps to protect the confidentiality of its event-
25   level profit and loss and annualized financial data, the total compensation paid to its boxers, and
     its promotional agreements with its boxers.  This is not publicly available information, and
26   disclosure of such information would hurt Top Rank's ability to compete in the marketplace.
     Further, Top Rank has agreements with numerous third parties, including sponsorship and
27   broadcasting agreements, and the public disclosure of the financial terms of such agreements
     would not only harm Top Rank but would also harm these third parties and their ability to
28   compete in the marketplace.  *See* Whitman Decl. ¶¶ 4-10.

However, while conceding that the information they seek is confidential commercial information, plaintiffs have made no showing that this information is necessary or essential to their claims.  Plaintiffs contend that they want their experts to "benchmark percentages of revenues generated from boxing events paid to boxers" and that they need aggregated financial data to calculate these benchmark percentages.  But the fact that plaintiffs want to perform this comparison does not make the information essential.  Plaintiffs have not shown or even suggested that their damages calculations depend on Top Rank's financial data or that their claims against defendant will "rise[] or fall[] with the admission or exclusion of [this evidence]."

Nor, aside from a conclusory assertion, have plaintiffs even attempted to address why they cannot obtain benchmark evidence from other sources.  *See* Mot. at 5.  Plaintiffs have not shown why their experts must rely on benchmark percentage revenues from the boxing industry as opposed to other industries, why their experts must rely on Top Rank's confidential financial information as opposed to information from other boxing, kickboxing, or MMA promoters, or why their experts cannot rely on publicly available revenue information on the boxing industry or market studies or generalized financial data from the boxing or other industries to create benchmark percentages.  Indeed, Top Rank has even pointed plaintiffs to a source for publicly available boxing bout agreements—the state athletic commissions.  The state athletic commissions, including the Nevada State Athletic Commission ("NSAC"), require promoters to file their bout agreements with boxers for each bout, and these agreements reveal the compensation promoters pay to boxers for each bout.[3]  Top Rank informed plaintiffs of this and even offered to help collect Top Rank's bout agreements filed with the NSAC for the past four years.  Plaintiffs do not even address that proposal and have never explained why these publicly available bout agreements filed by all promoters would be insufficient.  Having failed to make

---

[3] The home page of the NSAC, for instance, has a public records request link, which provides access to a form for people to make public records requests from the Commission.  Accordingly, rather than subpoenaing non-party Top Rank—one boxing promoter—for all of its confidential commercial data, plaintiffs could make a public records request of the state athletic commissions for all bout agreements filed in the past four years and use this information to create a relevant benchmark from the entire boxing industry.  Plaintiffs have not explained whether they have made such a request and, if so, how this information is insufficient for their purposes.

1    any showing that Top Rank's confidential financial information is essential to their claims or that

2    they cannot obtain similar information elsewhere, plaintiffs have failed to demonstrate the

3    requisite substantial need for Top Rank's confidential commercial information and the discovery

4    should be denied. *See Aevoe*, 2013 WL 5954570, at *2; *Edwards*, 2014 WL 2465934, at *5.

5      As plaintiffs have not shown that Top Rank's financial information is necessary or

6    essential to this dispute, it is irrelevant that there is a protective order in the underlying case. *See*

7    *Edwards*, 2014 WL 2465934, at *3 ("[T]he fact that the information may be covered by a

8    protective order does not address the initial question of whether the information must be

9    produced."). In any event, contrary to plaintiffs' assertions, the protective order in this case will

10    not adequately protect Top Rank's confidential commercial information. While plaintiffs have

11    stated that Top Rank can designate its materials "CONFIDENTIAL - ATTORNEYS' EYES

12    ONLY," plaintiffs have made clear that their experts intend to rely on this information in forming

13    their opinion, and thus the "benchmark percentages" will likely end up in expert reports and

14    expert testimony at deposition and trial. If Top Rank is the only boxing promoter whose data is

15    analyzed to create the benchmark percentages for payments in the boxing industry, any analysis

16    or discussion of the proposed benchmarks will reveal Top Rank's confidential commercial

17    information.[4] Plaintiffs have provided no guarantee that Top Rank's confidential information will

18    not ultimately be revealed during expert discovery. The protective order, accordingly, does not

19    adequately safeguard Top Rank's confidential commercial information here.

20    **C.**    <u>**The Requested Discovery Is Overly Burdensome On A Non-Party**</u>

21      Plaintiffs' requested discovery additionally fails because it is overly burdensome on a

22    non-party. A party issuing a subpoena "must take reasonable steps to avoid imposing undue

23    burden or expense on a [non-party]." Fed. R. Civ. P. 45; *cf. Med. Components, Inc. v. Classic*

24    *Med., Inc.*, 210 F.R.D. 175, 180 n.9 (M.D.N.C. 2002) (Rule 45 is "quite clear that the

25    subpoenaing party has a duty to take steps to avoid imposing undue burden or expense on a

26

---

27    [4] To the extent plaintiffs' experts will additionally be relying on general financial data from the
boxing industry or other boxing promoters' financial data, this further proves that Top Rank's

28    confidential commercial data is not necessary or essential here.

1   subpoenaed non-party and that the Court must enforce that duty").  In determining whether a

2   subpoena imposes undue burden or expense, courts apply the "proportionality" standard which

3   balances the importance and relevance of the requested information against the scope of the

4   requests and whether the information is confidential or proprietary.  *See Roberts v. Clark Cty.*

5   *Sch. Dist.*, 312 F.R.D. 594, 603 (D. Nev. 2016); *cf.* Fed. R. Civ. P. 26 (party discovery must be

6   "proportional to the needs of the case, considering the importance of the issues at stake in the

7   action . . . , the importance of the discovery in resolving the issues, and whether the burden or

8   expense of the proposed discovery outweighs its likely benefit.").  A court will deny potentially

9   relevant discovery when the requested discovery is overly burdensome and the requests are not

10  proportional given the proffer of relevance.  *See Roberts*, 312 F.R.D. at 603; *see also Heidelberg*

11  *Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003) (affirming motion to

12  quash subpoena on non-party due to burdensome nature of requests that "cast too wide a net");

13  *Painters Joint Comm. v. Emp. Painters Trust Health & Welfare Fund*, 2011 WL 4549232, at *2

14  (D. Nev. Sept. 29, 2011) (granting motion to quash overbroad subpoena on nonparty).

15          Here, in their subpoena, plaintiffs sought Top Rank's financial data from *every* boxing

16  event that Top Rank has promoted *since January 1, 2005*, a representative sample of all of Top

17  Rank's agreements with its boxers *since January 1, 2005*, and all documents and communications

18  related to the negotiation of such agreements.  In seeking financial data from every boxing event

19  Top Rank has promoted for over a decade and decades-old agreements and negotiation history,

20  plaintiffs' requests were plainly improper.  Plaintiffs' narrowed requests fare no better as

21  plaintiffs still seek both annualized and aggregated data to show all revenues that Top Rank has

22  earned from the promotion of each of its boxing events for the past four years and all payments

23  that Top Rank has made to boxers over that same period.  As Top Rank has explained to

24  plaintiffs, the burden and expense of collecting and organizing data from every event it has

25  promoted the past four years is massive.  Top Rank has promoted over 100 boxers in its events

26  since 2013 and, on average, Top Rank promoted approximately 30 events per year from 2013 to

27  2016 with each event having approximately six to eight bouts.  *See* Declaration of Harrison

28  Whitman ("Whitman Decl.") ¶ 11.  Plaintiffs are thus asking Top Rank to produce entry-level

13

1  revenue data for approximately 120 events and over 700 individual bouts.  Plaintiffs do not even

2  attempt to demonstrate a need for this volume of information, and it is unreasonable to require

3  such a volume from a non-party, particularly given the confidential nature of the information and

4  plaintiffs'—at best—tenuous proffer of relevance.

5  **V.     THE DEPOSITION SUBPOENA TO MR. ARUM IS IRRELEVANT AND**

6  **OVERLY BURDENSOME ON A NON-PARTY**

7          The deposition subpoena to Mr. Arum is similarly improper and should be denied.

8  Plaintiffs do not even attempt to explain how Mr. Arum's testimony could potentially be relevant

9  to the underlying dispute.  And it is not.  Mr. Arum is not involved in the MMA industry, does

10 not sign fighters to MMA contracts, and does not promote MMA events.  Mr. Arum, as the

11 founder and CEO of Top Rank, is involved in the boxing industry.  The fact that Mr. Arum, a

12 boxing promoter, discussed the UFC and his opinions on its pay structure in an interview does not

13 make Mr. Arum's opinion or testimony relevant to this dispute.  And, aside from potentially

14 questioning Mr. Arum on his statements from that interview, plaintiffs have not identified a single

15 topic that they intend to question Mr. Arum about, much less a reason why they need a full-day

16 deposition.  There is thus no basis for plaintiffs' request to depose Mr. Arum for a full day.

17 **VI.    THE COURT SHOULD IMPOSE SANCTIONS FOR PLAINTIFFS' MISUSE OF**

18 **THE DISCOVERY PROCESS**

19         "The Ninth Circuit has long held that nonparties subject to discovery requests deserve

20 extra protection from the courts."  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,

21 2012 WL 4846522, at *4 (N.D. Cal. Aug. 7, 2012).  This is because "nonparty witnesses are

22 powerless to control the scope of litigation and discovery."  *United States v. CBS, Inc.*, 666 F.2d

23 364, 371–72 (9th Cir. 1982).  For this reason, Rule 45 provides that a court must impose

24 sanctions if it finds a party misuses the discovery process and fails to take reasonable steps to

25 avoid imposing an undue burden on a non-party.  Fed. R. Civ. P. 45(d)(1); *NCAA*, 2012 WL

26 4846522, at *4 ("Rule 45 imposes a mandatory responsibility on this court to protect nonparties

27 from unduly burdensome discovery.").

28

Plaintiffs' actions here represent a flagrant misuse of the discovery process and warrant the imposition of sanctions.  When it suits them, plaintiffs have made clear that the promotion of boxing events and the promotion of MMA events have little in common and willingly concede there is no overlap between the sports or the promotion of the events and the two markets are not comparable.  Yet now, when it suits them to take the opposite position, plaintiffs not only argue that boxing and MMA are comparable benchmarks, but they are so comparable that Top Rank—a non-party with no connection to this dispute or relevant dealings with either plaintiffs or defendant—should be required to turn over years' worth of proprietary financial data detailing all of its revenues from every event it has promoted from 2013 to 2016.  But plaintiffs have made no attempt to explain how the markets or the promotion of events are actually comparable or how Top Rank's highly confidential commercial information is relevant, much less essential, to this dispute.  Nor have plaintiffs demonstrated why they need years' worth of Top Rank's financial data from every event Top Rank has promoted from 2013 to 2016.

Put simply, plaintiffs have made no showing of relevance, much less a showing sufficient to justify the substantial burden they ask the Court to place on a non-party with no connection to the underlying litigation.  In doing so, plaintiffs have failed to take reasonable steps to avoid burdening Top Rank, and the Court, accordingly, should issue sanctions to reimburse Top Rank for its attorneys' fees incurred in opposing plaintiffs' discovery.  *See, e.g.*, *NCAA*, 2012 WL 4846522, at *4 (awarding three non-parties their attorneys' fees incurred in opposing plaintiffs' burdensome subpoenas); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) (awarding sanctions for attorneys' fees where party failed to take reasonable steps to avoid imposing undue burden on non-party).

## VII.  <u>ALTERNATIVELY, BOTH THE DOCUMENT AND DEPOSITION SUBPOENAS SHOULD BE LIMITED</u>

In the event the Court determines that the requested discovery is both relevant to the underlying dispute and not overly broad and unduly burdensome, the discovery should be limited to reduce the burden on Top Rank and Mr. Arum and safeguard Top Rank's confidential information.  As set forth above, in an effort to avoid burdening the Court with a needless motion,

15

1    Top Rank offered to produce the gross revenue generated from one event in each of 2013, 2014,

2    2015, and 2016 and the state bout agreement for each fighter for the event, and Mr. Arum offered

3    to appear for a deposition limited to three hours per side.  The revenue data and bout agreements

4    from one bout per year will permit plaintiffs' experts to calculate the percentage of revenues paid

5    to boxers from boxing events from that sample.  Further, as plaintiffs have identified no topics for

6    Mr. Arum's deposition other than Mr. Arum's statements to the press regarding the UFC and its

7    payment model, three hours per side should be more than sufficient time for his deposition.

8            Aside from stating they want more financial data from Top Rank and more time with

9    Mr. Arum, plaintiffs have not provided a reason why Top Rank's proposed compromise is

10   insufficient.  Plaintiffs have provided no explanation for why they need the financial data from

11   every event that Top Rank has promoted from 2013 to 2016 as opposed to one event per year.

12   Nor have plaintiffs articulated why a three-hour deposition limit per side is unreasonable.  Given

13   Top Rank's status as a non-party in an unrelated industry, both limits are more than reasonable.

14   **VIII.   <u>CONCLUSION</u>**

15           For the foregoing reasons, plaintiffs' motion to compel should be denied in its entirety and

16   sanctions should be awarded against plaintiffs and in favor of Top Rank to reimburse Top Rank

17   for its attorneys' fees and costs incurred in opposing the improper discovery.  Alternatively, the

18   document subpoena to Top Rank should be limited, such that Top Rank is only required to

19   produce the gross revenue generated from one event in each of 2013, 2014, 2015, and 2016 and

20   the state bout agreement for each fighter for such event, and any deposition of Mr. Arum should

21   be limited to three hours per side.

22

23

24

25

26

27

28

Dated:  August 23, 2017             DICKINSON WRIGHT PLLC

                                    /s/ Eric D. Hone
                                    ERIC D. HONE (NV Bar No. 8499)
                                      EHone@dickinson-wright.com
                                    8363 West Sunset Road, Suite 200
                                    Las Vegas, Nevada 89113

                                    O'MELVENY & MYERS LLP
                                    DAVID MARROSO (Cal. S.B. #211655)
                                      dmarroso@omm.com
                                    (*Admitted Pro Hac Vice*)
                                    1999 Avenue of the Stars
                                    Los Angeles, California  90067-6035
                                    Telephone:    (310) 553-6700
                                    Facsimile:    (310) 246-6779

                                    *Attorneys for Top Rank, Inc. and Robert Arum*

# CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2017, I electronically transmitted the *OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS TO TOP RANK, INC. AND MOTION TO COMPEL ATTENDANCE AT DEPOSITION OF ROBERT ARUM* to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all registered participants of the CM/ECF System:

                                    /s/ Bobbye Donaldson
                                    Bobbye   Donaldson,   an   employee   of
                                    Dickinson Wright PLLC

LVEGAS 65571-2 160406v2

TOP RANK INC.'S AND ROBERT ARUM'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
PRODUCTION AND ATTENDANCE AT DEPOSITION