——————2:15-cv-01045-RFB-PAL——————

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                )
                                   )
5                   Plaintiffs,    )  Case No. 2:15-cv-01045-RFB-PAL
                                   )
6        vs.                       )  Las Vegas, Nevada
                                   )  Thursday, September 21, 2017
7  ZUFFA, LLC, d/b/a Ultimate      )  4:07 p.m.
   Fighting Championship and       )
8  UFC,                            )  MOTIONS HEARING
                                   )
9                   Defendants.

10 _____

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          THE HONORABLE RICHARD F. BOULWARE, II,
                  UNITED STATES DISTRICT JUDGE

15

16

17

18

19 APPEARANCES:          See Next Page

20

21

   COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
23                     Las Vegas, Nevada  89101

24

   Proceedings reported by machine shorthand, transcript produced
25 by computer-aided transcription.

—————————— 2:15-cv-01045-RFB-PAL ——————————

 1  APPEARANCES:

 2  For the Plaintiffs:

 3          **DON SPRINGMEYER, ESQ.**
            WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
 4          3556 E. Russell Road, 2nd Floor
            Las Vegas, Nevada 89120
 5          (702)341-5200

 6          **MICHAEL C. DELL'ANGELO, ESQ.**
            BERGER & MONTAGUE, P.C.
 7          1622 Locust Street
            Philadelphia, Pennsylvania 19103
 8          (215)875-3000

 9          **RICHARD A. KOFFMAN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
10          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
11          (202)408-4600

12          **JEROME ELWELL, ESQ.**
            WARNER ANGLE HALLAM JACKSON FORMANEK, PLC
13          2555 E. Camelback Road, Suite 800
            Phoenix, Arizona 85016
14          (602)264-7101

15          **JIAMIN CHEN, ESQ.**
            THE JOSEPH SAVERI LAW FIRM, INC.
16          555 Montgomery Street, Suite 1210
            San Francisco, California 94111
17          (415)500-6800

18  For the Defendants:

19          **J. COLBY WILLIAMS, ESQ.**
            CAMPBELL & WILLIAMS
20          700 South 7th Street
            Las Vegas, Nevada 89101
21          (702)382-5222

22          **WILLIAM A. ISAACSON, ESQ.**
            **EVAN EDMUND NORTH, ESQ.**
23          **NICHOLAS A. WIDNELL, ESQ.**
            BOIES, SCHILLER & FLEXNER, LLP
24          1401 New York Avenue, NW
            Washington, DC 20015
25          (202)237-2727

```
────────────── 2:15-cv-01045-RFB-PAL ──────────────
```

 1      LAS VEGAS, NEVADA; THURSDAY, SEPTEMBER 21, 2017; 4:07 P.M.

 2                              --oOo--

 3                   P R O C E E D I N G S

 4          COURTROOM ADMINISTRATOR:  Now calling Le, et al.,

 5  versus Zuffa, LLC, Case No. 2:15-cv-001045-RFB-PAL.  This is the

 6  time for the hearing regarding Docket 348, sealed motion for

 7  partial summary judgment; Docket 347, motion for partial summary

 8  judgment; and Docket 349, motion to seal Docket 347.

 9          Starting with counsel for plaintiff, please note your

10  appearance for the record.

11          MR. DELL'ANGELO:  Good afternoon, Your Honor.  Michael

12  Dell'Angelo from the law firm of Berger & Montague on behalf of

13  plaintiffs.  I would just note in the gallery is Mr. Quarry,

14  Nathan Quarry, one of the named plaintiffs in the case.

15          MS. CHEN:  Good afternoon, Your Honor.  Jiamie Chen on

16  behalf of the plaintiff.

17          MR. KOFFMAN:  Good afternoon, Your Honor.  Richard

18  Koffman of Cohen Milstein on behalf of plaintiffs.

19          MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

20  Springmeyer, Wolf Rifkin, for the plaintiffs.

21          MR. ELWELL:  Good afternoon, Your Honor.  Jerome

22  Elwell, Warner Angle in Phoenix, for the plaintiffs.

23          THE COURT:  Okay.

24          MR. ISAACSON:  Bill Isaacson, Your Honor.  Boies

25  Schiller and Flexner for Defendant Zuffa.

————2:15-cv-01045-RFB-PAL————

1          MR. WIDNELL:  Nicholas Widnell, Boies Schiller and

2   Flexner, for Defendant Zuffa.

3          MR. NORTH:  Good afternoon, Your Honor.  Evan North

4   with Boies Schiller and Flexner on behalf of Defendant Zuffa.

5          MR. CAMPBELL:  Good afternoon, Your Honor.  Hunter

6   Campbell, Executive Vice President and General Counsel for

7   Zuffa.

8          MR. WILLIAMS:  Good afternoon, Your Honor.  Colby

9   Williams, Campbell & Williams, on behalf of Zuffa, LLC.

10         THE COURT:  Good afternoon.

11         We are here on the motion identified by my deputy.

12  We're going to have some discussion about that, but first the

13  Court's going to go through what it finds to be the undisputed

14  facts as it relates to the summary judgment, and I want you to

15  listen carefully to the facts I'm going to describe.

16         First, Zuffa was formed in 2001 to purchase the

17  Ultimate Fighting Championship brand.  Zuffa promotes live

18  professional MMA bouts in the U.S. and elsewhere under the trade

19  names of the Ultimate Fighting Championship and UFC.

20         As part of this business, Zuffa contracts with athletes

21  to participate in live bouts and to grant Zuffa the unrestricted

22  worldwide right to use, edit, disseminate, display, reproduce,

23  print, publish, and make any other uses of the name, voice,

24  sobriquet, persona, signature, likeness, and/or biography of an

25  athlete and all persons associated with that fighter as it

───── 2:15-cv-01045-RFB-PAL ─────

1  appears in UFC bouts or in connection with the advertising and

2  promotion of UFC bouts or in connection with the advertising or

3  promotion of UFC.

4          Plaintiff Nathan Quarry is one athlete with whom Zuffa

5  has had and has contracted for the grant of his identity rights.

6  The last contract between Zuffa and Plaintiff Quarry relating to

7  his identity rights was entered into on January 13th, 2010.

8  Quarry's 2008 Promotional Agreement, his Merchandise Rights

9  Agreement, and 2010 Bout Agreement all predate the first

10  complaint filed in this action by more than four years.

11  Plaintiff Quarry was aware of the compensation Zuffa was giving

12  him for the use of his identity rights generally as of March

13  2010.

14          Quarry appeared in the UFC Undisputed 2010 video game

15  that debuted on May 25th, 2010, in North America and is

16  allegedly still sold today.

17          Zuffa licensed to Topps the right to feature Plaintiff

18  Quarry in UFC trading cards created by Topps, including the 2010

19  Topps UFC Knockout Series that was published in February 2011.

20  Zuffa did not provide compensation to Plaintiff Quarry

21  specifically in connection with this use of his identity.  Zuffa

22  licensed to Topps the right to feature Plaintiff Quarry's image

23  in the 2010 UFC Knockout Series as part of the Ultimate Knockout

24  Relics Set.  Zuffa did not compensate Plaintiff Quarry

25  specifically in connection with this exploitation or use of his

1  identity.

2         Zuffa has offered for sale throughout the limitations

3  period and continuing to this day posters autographed by

4  Plaintiff Quarry promoting his title fight in UFC 56 on the

5  ufcstore.com website for $999.99 and $1,149.99.  Zuffa did not

6  provide specific compensation to Plaintiff Quarry in connection

7  with this use of his identity.  Posters autographed by Plaintiff

8  Quarry promoting his title fight in UFC 56 are offered for sale

9  under the ufcstore.com website.

10         Zuffa licensed fighter identities to Reebok in 2014.

11  Reebok featured Plaintiff Quarry in a series of UFC jerseys that

12  Reebok first made available for sale in 2014.  Neither Zuffa nor

13  Reebok compensated Plaintiff Quarry specifically in connection

14  with this use of his identity.

15         Zuffa licensed fighter identities including that of

16  Plaintiff Quarry to Getty Images.  Zuffa business records show

17  revenues generated from sales of Getty Images featuring

18  Plaintiff Quarry after December 16, 2010.  Zuffa did not provide

19  compensation specifically to Plaintiff Quarry in connection with

20  this use of his identity.  Getty Images -- Getty Images offers

21  for sale dozens of photographs of Plaintiff Quarry, including a

22  medium resolution photograph of Plaintiff Quarry for $1,805.

23         Zuffa initiated its Fight Pass internet subscription

24  service in 2013.  Through Fight Pass, Zuffa makes available on

25  the internet to customers for payment recordings of past MMA

─────2:15-cv-01045-RFB-PAL─────

1  bouts from the UFC's own past events and also of MMA events put

2  on by other MMA promoters.  Through Fight Pass, which consumers

3  access through Zuffa's website, Zuffa charges consumers a

4  subscription fee.

5        After December 16, 2010, Zuffa made available for

6  purchase by consumers each of Plaintiff Quarry's fights in the

7  UFC and one of Plaintiff Quarry's fights with Gladiator

8  Challenge 14 on Fight Pass.  Zuffa did not provide any specific

9  compensation to Plaintiff Quarry for use of his image or the

10  content of these fights on Fight Pass.

11        Zuffa included a clip of Plaintiff Quarry's fight with

12  Rich Franklin as part of the opening segment of its Pay-Per-View

13  events throughout the limitations period until at least 2015.

14  Zuffa made available and sold videos of Plaintiff -- Plaintiff

15  Quarry's fights through Amazon, Sony, and XBox in 2011 and 2014.

16  Plaintiff Quarry was not specifically compensated with respect

17  to any of these sales.

18        In January 2012 Zuffa broadcast a video of Plaintiff

19  Quarry's fight with Demian Maia on its website deeming it the

20  Submission of the Week.  Zuffa did not provide specific

21  compensation to Plaintiff Quarry in connection with this use of

22  his identity.

23        Zuffa produced UFC Unleashed, a program that aired on

24  Spike TV.  Plaintiff Quarry was featured in episode No. 102 of

25  UFC Unleashed featuring Plaintiff Quarry's victory over UFC

─2:15-cv-01045-RFB-PAL─

1  Fighter Lodune Sincaid in the finale of Ultimate Fighter Season

2  1.  Although the fight occurred in 2005, this video was

3  published in 2013 to Zuffa's Brazilian language website.  Zuffa

4  did not provide specific compensation to Plaintiff Quarry in

5  connection with this publication.

6      Spike TV broadcast Plaintiff Quarry's win over UFC

7  Fighter Shonie Carter in episode No. 107 of UFC Unleashed.

8  Zuffa posted the content on its website in 2013.  Zuffa did not

9  provide specific compensation to Plaintiff Quarry in connection

10  with this content.

11      In November 2013 Zuffa published the Top 20 Knockouts

12  in UFC History on YouTube to commemorate the UFC's 20th

13  anniversary.  Zuffa did not provide Plaintiff Quarry specific

14  compensation in connection with this content.

15      A photograph of Plaintiff Quarry appears in a story

16  published on March 26, 2013, by UFC called 16 Bizarre Moments in

17  UFC History.  Zuffa did not provide specific compensation to

18  Plaintiff Quarry in connection with this use of his identity.

19      And on June 10, 2016, Zuffa published a photograph of

20  Plaintiff Quarry's fight with Rich Franklin in a story on its

21  website entitled Behind the Lens:  UFC's Photog's Favorite KOs.

22  Again, Zuffa did not provide specific compensation to Plaintiff

23  Quarry for this use of his identity.

24      I will start with the defendants in this case.  Do you

25  have any comments as relates to the Court's statements of

———— 2:15-cv-01045-RFB-PAL ————

1  undisputed facts?

2        And I understand when I say "compensation," the issue

3  is obviously going to be about the nature of whether or not

4  there's an ongoing violation here or not.  When I say "specific

5  compensation," it is to say that there was not a separate

6  agreement as it relates to payment for each of the content that

7  I described.  So I'm just going to say that up front to the

8  extent that you have an issue with that.

9        MR. ISAACSON:  Yes.  Your Honor, for purposes of this

10  motion, we accept this and we would -- we would be prepared to

11  argue why we prevail based on those statements of facts.

12        THE COURT:  Right.  Okay.  So the main thing is I want

13  to make sure that I was correct that there were not some

14  separate agreements as relates to compensation --

15        MR. ISAACSON:  Right.

16        THE COURT:  -- other than what would be the Promotional

17  Agreement, the Merchandise Rights Agreement, and the 2010 Bout

18  Agreement, and the -- the other agreements that were signed in

19  2010 as it relates to use of Mr. Quarry's image.

20        MR. ISAACSON:  Right.  And our motion's not premised on

21  whether the payments were specific or general.  Those are the

22  sorts of things that might be sorted out at trial.

23        THE COURT:  Right.

24        MR. ISAACSON:  But for purposes of this motion, we

25  would be prepared to argue, as I think we have in our papers,

———2:15-cv-01045-RFB-PAL———

1  that we prevail on those facts.

2           THE COURT:  Okay.  But you're not disputing the

3  undisputed facts as I've announced them at this point?

4           MR. ISAACSON:  They went off really fast, but they

5  sounded -- they sounded pretty right.

6           THE COURT:  It was a fairly conservative estimate.  I

7  mean, based upon the Court's review of the documents, there

8  doesn't really appear to be that much disagreement about the

9  parties -- about the facts.  Really, this is about what these

10 facts mean in the context of the law as it relates to what is an

11 ongoing or continuing violation, or not, and what the Ninth

12 Circuit and other cases say about that.  So I just didn't see

13 that much in terms of disagreement about the facts.

14          MR. ISAACSON:  I agree with that, Your Honor.

15          THE COURT:  And I was fairly conservative about how I

16 identified them.

17          MR. ISAACSON:  I agree with -- I agree with that, Your

18 Honor.  I think this is a legal issue based on what are

19 undisputed facts.

20          THE COURT:  Okay.  Thank you.

21          For the plaintiffs, any comments on the undisputed

22 facts as stated by the Court?

23          MR. DELL'ANGELO:  Thank you, Your Honor.  I --

24 Mr. Isaacson is correct.  It did go by quickly, and I did my

25 best to take notes.  I would ask if the Court would just indulge

———2:15-cv-01045-RFB-PAL———

1   me to repeat the fact, I think it was No. 3, with respect to

2   Mr. Quarry's knowledge?  Just to make sure I got that -- what

3   Your Honor said correctly.

4          THE COURT:  So what I -- what I wanted to make clear,

5   and I went back and read Mr. Quarry's deposition, is that he was

6   aware in March of 2010 that he was being compensated through the

7   agreement that he had for his identity, but not necessarily

8   aware of the specific manners in which it was being exploited.

9   But I do find undisputed the fact that he was aware of the fact

10  that he had an agreement, a general agreement, about the use of

11  his identity, and there's dispute as to what it means in the

12  context of the statute of limitations when that identity is used

13  for these different contracts or content.

14         MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.  That's

15  helpful, and I appreciate that.

16         THE COURT:  But I don't think there's a dispute about

17  the fact that he knew that he had this agreement and that he

18  knew that in some way that the UFC either was going to use it.

19  Now, I do think there's also a reference in the deposition,

20  which we'll get to, about the video game, which is around March

21  of 2010.

22         MR. DELL'ANGELO:  Right.

23         THE COURT:  And the timing of these things obviously

24  matters.  But the only thing I meant by that undisputed

25  statement was that he was not unaware of the fact that he had

---
2:15-cv-01045-RFB-PAL
---

 1  this arrangement and that he was being compensated in some way

 2  generally for the use of his image.

 3          MR. DELL'ANGELO:  Okay.  That's helpful, Your Honor.

 4  Thank you.

 5          THE COURT:  So, I'm sorry, Mr. -- is it --

 6          MR. DELL'ANGELO:  Dell'Angelo, Your Honor.

 7          THE COURT:  Dell'Angelo.  Okay.

 8          MR. DELL'ANGELO:  Yeah.  So I think based on that,

 9  that's fine and that's helpful and I appreciate that.  I think

10  there's some nuances, to the extent that they come up in the

11  argument, about knowledge that we can discuss, particularly with

12  respect to paragraphs 50 and 51 of the defendant's or

13  defendant's statement of undisputed fact.  But I'm not sure

14  based on the articulation of facts that you provided that it

15  will matter for purposes of this discussion.  But if it does, I

16  will certainly signal that for you, Your Honor.

17          And, you know, we do make, of course, an argument about

18  Zuffa's failure to meet its burden with respect to the scheme.

19  There are a few things like that that, again, if they come up --

20          THE COURT:  Okay.  That's an argument, though.  I'm

21  just talking about facts now.

22          MR. DELL'ANGELO:  Yeah.  Okay.

23          THE COURT:  You will have a chance to argue.

24          MR. DELL'ANGELO:  Fair enough.  Thank you, Your Honor.

25          THE COURT:  No, that's all right.

———— 2:15-cv-01045-RFB-PAL ————

1           MR. DELL'ANGELO:  Thank you.

2           THE COURT:  Okay.  So for the defendants, I'm sorry,

3   who's going to be arguing?

4           MR. ISAACSON:  Bill Isaacson, Your Honor.

5           THE COURT:  Okay, Mr. Isaacson.  Why don't you come up

6   to the podium.

7           MR. ISAACSON:  Sure.

8           THE COURT:  So, Mr. Isaacson, I see two challenges for

9   your particular argument.  One is the fact that you have the

10  burden.

11          MR. ISAACSON:  Yes.

12          THE COURT:  The other is Hennegan.  And part of the --

13  what I'm looking at in the context of these cases is that for --

14  other than the video, which I am inclined to find is outside of

15  the statute of limitations period and that there was knowledge

16  of it at the time, there are contracts that are entered into by

17  UFC/Zuffa that are separate contracts with separate entities

18  involving separate compensation arrangements, all using

19  Mr. Quarry's image, but certainly involve completely separate

20  arrangements with respect to payment.  Why does that not create

21  or satisfy the requirement as it relates to what is a continuing

22  violation?

23          And remember the Ninth Circuit in Samsung:  New and

24  independent act that is not merely the affirmation of a previous

25  act, right, and it must inflict new and accumulating injury on

---2:15-cv-01045-RFB-PAL---

1    the plaintiff.

2         MR. ISAACSON:  So Hennegan is a decent starting point

3    because -- and to contrast with the other Ninth Circuit cases,

4    Hennegan is a conspiracy case.  And certain antitrust cases are

5    conspiracy cases.  The cases against the NCAA are conspiracy

6    cases.  Hennegan is a conspiracy case.  And the case law in the

7    Ninth Circuit and elsewhere says that when conspirators enter

8    into contracts, and those become additional overt acts in

9    furtherance of the conspiracy.  Hennegan was about groups who

10   are reaching ongoing agreements to boycott somebody else.

11        THE COURT:  Right.

12        MR. ISAACSON:  O'Bannon and Bill Russell were alleging

13   that the NCAA I think, and I always said this was correct, was

14   an ongoing conspiracy.  And in addition the licensors, which was

15   the CLC, the college licensing system which was sort of part of

16   the NCAA -- when those licensing agreements were being entered,

17   they were being entered with coconspirators.  So each agreement

18   in those cases, right, is an agreement amongst coconspirators.

19   Each agreement becomes an additional act.

20        THE COURT:  Okay.  I understand all of that.  So

21   here --

22        MR. ISAACSON:  Now, here, we have a monopolization

23   case.

24        THE COURT:  -- are you saying that because there is a

25   contract here, this is sort of more like Aurora because there is

———— 2:15-cv-01045-RFB-PAL ————

1  essentially a reaffirmation of the fact that he has sold his

2  image?

3          MR. ISAACSON:  Right.  And in the context of a

4  unilateral conduct case, right.  So in a monopolization case,

5  right, which is what this is, you do not have a conspiracy.  You

6  can accuse us of a scheme.  That's just a term, right.

7          THE COURT:  Well, I don't read the Ninth Circuit in

8  terms of Samsung or other cases to say that the criteria they

9  lay out for a continuing violation are limited in terms of how

10 they are applied to conspiracy cases versus contract cases.  I

11 think those criterias still have to be met in either one.

12          And for me the question is, even in the context of

13 Aurora, Aurora doesn't say that there cannot ever be a

14 circumstance in which if there's a contract as it relates to

15 exploitation that you cannot have a continuing violation.

16          So the question for me is, where would that line be in

17 this case?  What would it look like -- let me ask you this

18 question -- if there was a continuing violation in this case

19 apart from what I see here?

20          MR. ISAACSON:  You would have it if you had additional

21 agreements where Mr. Quarry assigned or gave away his rights for

22 some compensation within the limitations period.

23          THE COURT:  So you're saying that -- okay.  Because I

24 want to make sure I understand your argument.  Your argument is

25 that the only way there could be a continuing violation is

---2:15-cv-01045-RFB-PAL---

1    Mr. Quarry himself signed another agreement, which he actually

2    couldn't sign given the agreement he had previously signed.

3              MR. ISAACSON:  Right.

4              THE COURT:  But for the counterfactual, you're saying

5    that the only way that there could possibly be a continuing

6    violation is if Mr. Quarry signed another agreement with UFC or

7    Zuffa within the limitations period and then there was

8    exploitation after that.

9              MR. ISAACSON:  Right.  Well, it -- and it's the

10   agreement itself that matters because it's that which gives away

11   the identity rights.  There's complete consideration at the

12   time, and it's from that that flows the injury.

13             But, yes, there are contracts.  There are amendments.

14   The Ninth Circuit also said if we had actually sued Mr. Quarry

15   to enforce the agreement --

16             THE COURT:  That would restart it, too.

17             MR. ISAACSON:  Right.  So -- and, you know, there's

18   probably a few examples I haven't thought of, acts of

19   enforcement.  The Ninth Circuit has said -- okay.  And I really

20   think the distinction between a conspiracy case and a

21   non-conspiracy case is important because you will not find a

22   Ninth Circuit case where the later agreements, whether in an

23   identity rights context or a contractual context, were deemed a

24   continuing act unless they were part of a conspiracy.

25             Where the subsequent contracts -- and, here, the -- you

1  know, the Topps or the posters or those conduct, where they flow

2  from a contract, where they are exercising rights from before

3  the limitations period, and where those contracts are not

4  themselves acts of a conspiracy, you will not -- all the cases

5  line up on our side in the Ninth Circuit.

6      THE COURT:  When you say "all the cases," right, let's

7  be clear.  As it relates to this type of violation, when you say

8  "all the cases," what cases are you talking about?  There are --

9  other than Aurora, what cases are you talking about that's close

10  to this type of contractual?  And just so I make sure I

11  understand the case you're talking about.

12      MR. ISAACSON:  Right.  So Aurora is very important to

13  us.  Eichman is also very important because that was a situation

14  where the allegation was that there was a franchise agreement

15  before the statute of limitations and a lease after that

16  continued with lease payments into the statute of limitations.

17      THE COURT:  So how do you distinguish -- and I ask you

18  this question, Mr. Isaacson.  How do you distinguish between a

19  contract that establishes payments, like Aurora and Eichman do,

20  and a contract where it says, We basically get to do whatever we

21  want.  We're not going to tell you what that is other than the

22  fact that you're going to get generally paid for that image.

23  And the reason why I'm thinking about that as it relates to the

24  other issue is speculative nature of the damages.

25      Let's assume for the moment that UFC doesn't use

——2:15-cv-01045-RFB-PAL——

1   Mr. Quarry's image until 2011 and not at all.  And so if we

2   take -- for example, let's take the video game out because I

3   think most of the content after that comes within the

4   limitations period.  Why would that not be a situation where the

5   damage is too speculative to bring a case where I wouldn't start

6   the statute there?  And notwithstanding the issue of the video

7   game and how that would play in, and I understand the

8   implication of that, but why wouldn't that -- why wouldn't that

9   be an issue about the speculative nature of the damages in this

10  case?

11         MR. ISAACSON:  Well, every instinct in my body says to

12  agree with you, but we have not raised speculative damages at

13  this point.

14         THE COURT:  Well, I know, but in the law there is an

15  issue that relates to --

16         MR. ISAACSON:  Sure.

17         THE COURT:  -- when this is established.  Because part

18  of what I have to decide is whether or not you've established

19  your burden because I could certainly, to the extent it went to

20  a jury trial, order factual determinations by the jury and then

21  rule based upon those, right.  So the issue for me is, as a

22  matter of law, do I rule now or is there enough dispute as

23  relates to these facts that I would send it to the jury and have

24  a special verdict form as relates to statute of limitations

25  regarding different aspects of the content with respect to

———2:15-cv-01045-RFB-PAL———

1   Plaintiff Quarry.

2           MR. ISAACSON:  I agree with you that our statute of

3   limitations defenses will be live regardless of the outcome of

4   this hearing.  The simple legal issue in front of you, though,

5   because everything, whether it was -- whether it's speculative

6   or not, was the exercise of rights granted as -- you know,

7   before March -- as of March 2010 or before because every one of

8   those was a -- was the exercise of a right from those contracts

9   and can't be deemed an act of a conspiracy, because we've got a

10  one-defendant case here.  That under Aurora, under Eichman, also

11  under Pace Industries -- Pace Industries has principles that are

12  important.  It uses a phrase that is -- you know, it establishes

13  the principle as consistent with the other cases that the

14  receipt of income, that the exercise of what you've already

15  achieved, does not -- is not a continuing act within the statute

16  of limitations.

17          The other phrase is from the Multidistrict Vehicle Air

18  Pollution case, which is the Ninth Circuit, talks about the

19  unabated inertial consequences.

20          THE COURT:  Right.

21          MR. ISAACSON:  Now, I think in simpler language that

22  means the continuing consequences, and that's what we have here

23  is contracts which had consequences, consequences that continued

24  into the limitations periods resulting in trading cards,

25  posters, things on the website, etc.  And the continuing

——2:15-cv-01045-RFB-PAL——

 1   consequences under all of these cases -- I think the Ninth

 2   Circuit's very clear on this.  The continuing consequences of a

 3   contract do not -- are not continuing violations for purposes of

 4   the statute of limitations.  You need an overt act, which is why

 5   the conspiracy cases will say, Well, if you have entered a

 6   further agreement with a conspirator within the conspiracy

 7   period, that can be an overt act.

 8        THE COURT:  Yes, but Hennegan isn't exactly like that.

 9   The agreement existed before, right.  There was an agreement

10   between the coconspirators to do what they actually did later,

11   right?

12        MR. ISAACSON:  I'm sorry.  In this case?

13        THE COURT:  No, in Hennegan there was, in fact, an

14   agreement, right --

15        MR. ISAACSON:  Yes.

16        THE COURT:  -- before -- outside the limitations

17   period --

18        MR. ISAACSON:  Yes.

19        THE COURT:  -- to do what was actually done within the

20   limitations period.  And so part of the issue is in the contract

21   case it sounds to me like you're saying that the contract

22   basically covers any conduct that could be potentially

23   attributed to what's agreed to in the contract.

24        MR. ISAACSON:  That is correct, but it's also --

25   correct, and I'll push a little bit on Hennegan with you, Your

—2:15-cv-01045-RFB-PAL—

1  Honor.  That there were -- there were agreements before the

2  statute of limitations.  There were conspiracy agreements

3  afterwards.  It wasn't here where there was one agreement before

4  and consequences afterwards.

5         THE COURT:  Yes, but here there are separate agreements

6  afterwards.  So you could make the argument, right, that it's

7  analogous to the conspiracies from the standpoint of you have

8  separate groups of individuals with whom UFC is contracting,

9  right, to exploit the identity.  Why is that not analogous to

10  new coconspirators as in the Hennegan case engaging in separate

11  conduct?

12         MR. ISAACSON:  Because these are innocent third parties

13  who have not been declared to be coconspirators, alleged to be

14  coconspirators, and could not be.  It's just --

15         THE COURT:  Okay.  So tell me why that matters.  In

16  terms of the Sherman Act violation, why does that -- they're not

17  named here.

18         MR. ISAACSON:  Right.

19         THE COURT:  So why does it matter here?  You're saying

20  in that case the agreement or the case can proceed against them

21  because they come into the case themselves as coconspirators

22  later?  Because some of them predated that.  So I'm trying,

23  again, to parse out this issue about Hennegan about why that

24  matters.  Are you saying that these other coconspirators were

25  involved in the same anticompetitive action, understood it, and

----------2:15-cv-01045-RFB-PAL----------

1   therefore they're in a slightly different position then say, for

2   example, Getty Images is in this case?

3           MR. ISAACSON:  Right.  Yes, without getting into the

4   complexity of the conspiracy in Hennegan.

5           THE COURT:  Right.

6           MR. ISAACSON:  At the very basic level that if you

7   contract for certain rights as a unilateral actor and that

8   contract is deemed illegal for some reason, here under the

9   antitrust laws is the allegation, and that contract took place

10  after -- I'm sorry -- before the statute of limitations, and

11  then within the statute of limitations you exercise the

12  contractual rights, including -- and where you are permitted to

13  contract with third parties, such as Topps.  Mr. Quarry gave us

14  the right to use his identity rights with Topps.

15          When we enter a contract with Topps within the statute

16  of limitations period, that is what he contracted for before.

17  That is not the same at all as where there is a multiparty

18  conspiracy and you're deciding whether there's an overt act

19  that -- if there's an agreement before and then there's another

20  agreement afterwards.  I mean, Pace Industry uses this language

21  which is the -- another Ninth Circuit case.

22          THE COURT:  Right.

23          MR. ISAACSON:  *An irrevocable* --

24          THE COURT:  *Immutable, permanent, and final decision*

25  *made outside the limitations period does not constitute a*

1  *continuing violation even if the injury continues within the*

2  *statutory period.*

3           MR. ISAACSON:  That's exactly what I would point you

4  to.

5           THE COURT:  *However, separate violations within the*

6  *limitations period that are not controlled by the previous act*

7  *or decision and which inflict new injury will restart the*

8  *statute of limitations.*

9           So you're saying that in this case the subsequent

10 decisions are, in fact, controlled by or dictated by the

11 previous contract which set forth UFC's ability to exploit

12 Mr. Quarry's identity?

13          MR. ISAACSON:  Yes, Your Honor.  It's the immutable

14 decision.  And when the immutable decision permits you to enter

15 licensing agreements with a Topps, that -- that the license

16 agreement with Topps does not become a separate act for purposes

17 of the statute of limitations.  And there isn't a case in the

18 Ninth Circuit where -- of unilateral conduct where the

19 consequence of a previous contract, the immutable consequence of

20 a previous contract, is deemed to be a continuing act or a

21 continuing violation.  And everything we think boils down to

22 that so that what matters is -- the initial recitation about

23 what happened before the statute of limitations and the facts

24 after the statute of limitations about how the identity rights

25 were used are immaterial to our argument.

—— 2:15-cv-01045-RFB-PAL ——

1          THE COURT:  So talk to me about this, whether or not

2    there should be a tolling as it relates to the speculative

3    nature of the damages.  If -- let's assume for the moment

4    Mr. Quarry does not become -- let's -- I take that back.

5          If we set aside the video game in this case, right, if

6    there's not even a separate contract to exploit his image until

7    the window of the statute of limitations period, why wouldn't

8    the statute of limitations be tolled, and I know you're aware of

9    the cases that talk about this, from the period in which you

10   could actually measure the damages?

11         MR. ISAACSON:  There's a difference between measuring

12   the quantum of damages and having knowledge of injury.

13         THE COURT:  That's true, but with respect -- right, but

14   the cases that talk about, right, speculative damages, I'm

15   talking about Zenith and other cases, deal with the issue of,

16   You don't really have a claim until you can actually in some

17   real sense be able to offer some manner in which the damages can

18   be assessed.  And that's always and necessarily going to be

19   based upon whatever subsequent usage arises from a contract in

20   this case, will it not?

21         MR. ISAACSON:  No, because he had a claim before the

22   statute of limitations.

23         THE COURT:  Yes, but he wouldn't know what the claim

24   was worth, right.  So if he didn't know what it was worth, how

25   does he have damages?

1          MR. ISAACSON:  So if I could explain.

2          THE COURT:  Right.

3          MR. ISAACSON:  So he had a claim and it had a certain

4   value before the statute of limitations.  And plaintiffs'

5   position is not that damages are speculative.  The plaintiffs'

6   position is they can measure it.

7          Now, that claim could become more valuable with the

8   passage of time.  It could be incorporated into a case, but that

9   does not mean -- that does not extend the statute of

10  limitations.  You don't get to say, I get to wait and see what

11  the total value of the case is in retrospect; because one of the

12  things you can also do, once you have a claim, is you can

13  estimate future damages.

14         In every -- it's very common in a case to have a

15  combination of past and future damages.  And the fact that you

16  have future damages that might be considered more difficult or

17  speculative does not mean you get to toll the statute of

18  limitations, and that's why I think that's a very different

19  situation, Your Honor.  Right.  The damage has been incurred

20  according to the plaintiffs by --

21         THE COURT:  But I don't know -- I'm not sure -- well,

22  I'll ask them about that, but it seems to me that it would be

23  hard to know some of these damages since I'm not sure how you

24  get damages as relates to a video game until you see what the

25  sales are for the video game or for the jerseys or for whatever

—————— 2:15-cv-01045-RFB-PAL ——————

1   the content would be if it's Pay-Per-View.  That seems to me to

2   be a very real issue as it relates to what occurred in this

3   case.

4         MR. ISAACSON:  There would be -- there are methods in

5   every case, as I think Your Honor knows, of measuring damages

6   based on benchmarks, yardsticks.  Plaintiffs are trying to do

7   that in this case.

8         And the same events -- type of events that took place

9   before the statute of limitations that took place afterwards

10   from which they are claiming damages are -- you know, allowed

11   them to bring this claim back then.  And there's no -- for

12   example, the plaintiffs are not going to be proffering a

13   different damages methodology for the -- for damages after the

14   statute -- during this period of the statute of limitations --

15         THE COURT:  Well, because they have the evidence now.

16   But my point is it seems to me the cases that deal with

17   speculative nature of damages and when causes of action accrue

18   really deal with when it would be reasonable and possible to

19   deal with -- to be able to assess damages and when it's both the

20   amount is speculative and the nature is -- of it is unprovable,

21   which is some of the language that's used in these cases.

22         MR. ISAACSON:  Any time you have what's alleged to be

23   an ongoing breach, which is what they allege here, an ongoing

24   breach that dates back to at least 2006, right, you have the

25   right to bring a claim during that period.  No one says --

————2:15-cv-01045-RFB-PAL————

1   plaintiffs could not say and have not said that they could not

2   have filed a case back in 2008.  They acknowledge -- they say

3   this conduct worked back then.

4          Another analogy would be if you had a per se illegal

5   price-fixing meeting back in 2008 and that became known, right,

6   you couldn't sit on your rights and say, I got to wait until all

7   of the price fixing has happened before I bring my case, right.

8   You have the right to bring a claim then even if you have the

9   possibility of future damages.

10          So I would disagree, Your Honor, that the principle

11  you're espousing would be a basis for tolling the statute of

12  limitations.

13          THE COURT:  You're saying that that's not what happens

14  in the Supreme Court cases or you're saying it doesn't apply

15  here?  Because certainly that's what they do and say.

16          MR. ISAACSON:  Not -- I do not believe that's correct

17  when there's already established damages and there's unknown

18  future -- what you might call future damages which are either

19  difficult or speculative to ascertain.

20          THE COURT:  So in this case just so we're clear, when

21  you're saying the established damages outside of the limitation

22  period, what are you talking about?

23          MR. ISAACSON:  I'm talking about use of the identity

24  rights before the statute of limitations.

25          THE COURT:  Right.  And what was that?

2:15-cv-01045-RFB-PAL

1          MR. ISAACSON:  Well, I --

2          THE COURT:  I mean, other than the contract, what was

3     it?

4          MR. ISAACSON:  I don't -- this has not been briefed,

5     but to the extent that there's -- that his posters, use of his

6     identity, when he was an active fighter.  And I don't think

7     there's -- I don't think there's probably a serious question

8     that his identity was used more when he was an active fighter

9     because he retired before the statute of limitations.  That the

10    use of the identity rights then would have set -- would have

11    given him the same sort of claim that he has now except for the

12    statute of limitations and --

13         THE COURT:  So you're saying even if there's an issue

14    of the speculative nature of the damages, you understand those

15    cases to mean potentially that it would only apply in the

16    circumstance in which there had been effectively no use at all,

17    and then the use actually starts to happen in the limitations

18    period.

19         MR. ISAACSON:  That's correct.

20         THE COURT:  So, in other words, if he wasn't even an

21    UFC fighter, they sign him, and they say, You may become an UFC

22    fighter at some point in time in the future, we just want to

23    sign you up because you look promising and we saw you work out

24    in the gym.  And then within the limitations period, four years

25    later, he becomes a fighter and they use his image.  You're

1   saying at that point, when he was signed up before he actually

2   became a fighter, that might be a circumstance in which the

3   damages would be too speculative because there wouldn't be at

4   that point a period in which there's a regular and ongoing use

5   of the image.

6           MR. ISAACSON:  Right, that might be that type of

7   circumstance.  And you just can't let people -- the whole

8   purpose, as you know, the whole purpose of the statute of

9   limitations is once you have incurred some damages, you don't

10  sit on your rights forever until you see what's the total going

11  to be some day down the road.

12          THE COURT:  Right.

13          MR. ISAACSON:  The statute of limitations begins to

14  run.

15          THE COURT:  Okay.  All right.  Thank you.

16          Mr. Dell'Angelo, so I'll ask you the opposite question,

17  which is why isn't this case like Aurora?  There is a contract

18  which is effectively payments for use of the identity and image,

19  right.  You're not disputing that?

20          MR. DELL'ANGELO:  That's correct, Your Honor.

21          THE COURT:  Your client's deposition basically says,

22  more or less, right, I don't even know how they're using it and

23  it's not fair what they're paying me for the different ways they

24  can use it.  But he's not saying he wasn't being paid to use it,

25  right?

———— 2:15-cv-01045-RFB-PAL ————

1          MR. DELL'ANGELO:  Correct.

2          THE COURT:  So what difference does it make how they

3   used it once they purchased that in terms of the running of the

4   limitations period?

5          MR. DELL'ANGELO:  It makes a difference, Your Honor,

6   because there are essentially a herd of elephants in the room,

7   if you will.  And one of those, one of those elephants, is the

8   anticompetitive scheme that the plaintiffs have alleged.  And

9   the issue is what the defendant would have you believe, right,

10  to make this contract argument is that the sole anticompetitive

11  conduct on which the case turns is Zuffa's contract with

12  Mr. Quarry, but that's not the case and that's not the

13  anticompetitive scheme that's alleged.  What we're doing -- or

14  what the defendant is trying to do is essentially relitigate the

15  motion to dismiss.

16          If Your Honor may recall, the defendant both in --

17          THE COURT:  So I want to make sure I am understanding.

18          MR. DELL'ANGELO:  Yes.

19          THE COURT:  What you're saying is that this isn't just

20  about the contract and the identity.

21          MR. DELL'ANGELO:  That's correct.

22          THE COURT:  The claim is broader than that.  So that

23  even if he can't get or receive damages as relates to certain

24  use of his image, that doesn't completely knock out his

25  antitrust claims altogether.

—— 2:15-cv-01045-RFB-PAL ——

1      MR. DELL'ANGELO:  It doesn't because, as the Court may

2 recall, the defendant went to great length both in its briefs

3 and at oral argument on the motion to dismiss to dismember the

4 scheme, right.  And the case law is quite clear that you can't

5 dismember a scheme.  And the Court rejected that argument.  In

6 the order on the motion to dismiss the Court wrote:  *Plaintiffs*

7 *allege multiple acts that as a whole constitute an*

8 *anticompetitive scheme.  Exclusive dealing arrangements are but*

9 *a part of this scheme.*

10      And Your Honor went on to hold:  *Defendant overlooks*

11 *the scheme that plaintiffs allege and concerns itself instead*

12 *with the validity of the exclusive dealing arrangements.  The*

13 *Court disagrees with the contention that a single element of a*

14 *scheme, if legal, makes legal the conduct as a whole.*

15      So what the defendant is trying to do here is

16 essentially what it failed to do at the motion to dismiss.  And

17 it's holding out for you a single contract in isolation and

18 saying, If you look -- if you dismember the scheme and you look

19 at this in isolation, you measure the statute from that

20 contract.  But that's not what we've alleged and it's not what

21 the Court found that we alleged.

22      And that's important.  And I can -- you know, if you

23 look at paragraph 34 of our complaint, paragraph 50 of the

24 complaint, we reiterate that.

25      THE COURT:  I have.

———— 2:15-cv-01045-RFB-PAL ————

1          MR. DELL'ANGELO:  But it's important and I'll tell you

2    why, Your Honor, because you went through a number of cases with

3    counsel for the defendant.  There's a number of cases in their

4    brief.  And they point to cases, right, that look at the

5    continuing violation, and what they do is they focus solely or

6    almost exclusively on tie-in cases.  Tie-in cases are single-act

7    cases, right, where the anticompetitive conduct --

8          THE COURT:  Stems from one particular contract.

9          MR. DELL'ANGELO:  Right.  And there's some merger

10   cases, and I'd happily walk through you that list of cases.

11         THE COURT:  You don't need to do that.  I'm aware.

12         MR. DELL'ANGELO:  Okay.  I mean, it's tie-in, tie-in,

13   tie-in, and there's merger and tie-in.  And it goes on, right.

14   Those are single acts.  That's not what we're alleging here.

15         We're alleging an ongoing scheme of which Mr. Quarry's

16   conduct -- contract is just one piece.  And that's particularly

17   important because it gets to one of the questions that Your

18   Honor began with.

19         Because if -- what a number of the cases say, as Your

20   Honor indicated, is that if the scheme is ongoing and there's an

21   overcharge, each time there's an overcharge it can reset the

22   statute of limitations.

23         Now, what's interesting is there's some back and forth

24   in the briefs about the O'Bannon case, for example, right.

25         THE COURT:  For interesting, but not necessarily

—————2:15-cv-01045-RFB-PAL—————

1   relevant reasons, but I find it interesting.

2          MR. DELL'ANGELO:  Okay.

3          THE COURT:  And curious.  And, again, I'm less

4   concerned with District Court cases and primarily concerned with

5   Ninth Circuit cases.  And I agree that there are -- there is

6   some difficulty in the context of cases where the Court has not

7   set out ahead of time what is the basis of the claim as it

8   proceeds.  Because one of the things I'm inclined to do in this

9   case is to deny the motion without prejudice to having the

10  merits motion decided so that I could see them all together to

11  decide the very issues which I denied on motion to dismiss, but

12  which when I have the facts, I might very well decide that, in

13  fact, the anticompetitive conduct or whatever the violative

14  conduct is derives directly from the contract.  I actually don't

15  know that now.  I'm not in a position to make that

16  determination.

17          And so one of the other course of action I was

18  contemplating would be simply to deny it without prejudice and

19  ask the defendants to envelop that into what would be a -- I

20  expect will be, right, a motion for summary judgment as it

21  relates to the overall alleged scheme in the case because it's

22  difficult for me at this juncture without having other evidence

23  to evaluate even the arguments that you are making as it relates

24  to what's the nature of the scheme.

25          MR. DELL'ANGELO:  I appreciate that, Your Honor.  And

─────── 2:15-cv-01045-RFB-PAL ───────

1    I'm certainly not going to push too hard against you denying the

2    motion without prejudice, but --

3              THE COURT:  Well, here's why, Mr. Dell'Angelo, I think

4    that matters.  Even if I deny their motion, I'm not going to

5    deny that this is an issue, right.  So it's going to -- it would

6    come back regardless, in part, because the factual aspects of

7    the case would have to be decided.

8              MR. DELL'ANGELO:  Right.

9              THE COURT:  I don't know that and I'm not inclined at

10   this point to find just as a matter of law that it absolutely

11   could not be raised subsequently.  I don't believe that I have

12   enough of the merits of the case before me to be able to make

13   that definitive determination.

14             So given that fact, it's unlikely that the statute of

15   limitations issue wouldn't potentially come up again even if I

16   denied the motion or partial summary judgment which is why I'm

17   mentioning this to you.

18             MR. DELL'ANGELO:  Fair enough.  Okay.  Thank you, Your

19   Honor.

20             Let me -- and I appreciate that and that may be the

21   best course.  I would like to identify one important set of

22   facts --

23             THE COURT:  Go ahead.

24             MR. DELL'ANGELO:  -- that Your Honor mentioned at the

25   outset of his statements, and it's this.  As you know, there

—2:15-cv-01045-RFB-PAL—

1  are -- in the briefing we talk about the series of overt acts

2  being the use of Mr. Quarry's identity over and over again, and

3  I think Your Honor's statement of facts at the outset of this

4  hearing laid those out quite nicely.  But there is a second set

5  of events or acts that we identify that are the second among the

6  herd of elephants in this room, and those are the Topps

7  contract, the Reebok contract, and Fight Pass which Your Honor

8  mentioned and which are not addressed by the defendant on reply.

9  And I think there's a very good reason for that; because, again,

10  we're not saying that the contract with Mr. Quarry in isolation

11  is the anticompetitive conduct.  There's a scheme, the scheme to

12  use the identity and not pay and undercompensate or not

13  compensate at all for it.

14          And Zuffa engaged not only in uses of Mr. Quarry's

15  identity and the identity of other class members during the

16  limitations period, but it also entered into new contracts that

17  were part of the scheme that we allege, Topps contract -- the

18  contract with Topps being one of them.  Contract with Reebok

19  being one of them.  You know, as we indicated, Mr. Quarry

20  appears on Topps playing cards.  You can buy jerseys with his

21  name on it.

22          Fight Pass is another very interesting one, issue

23  launched by Zuffa during the limitations period.  It's actually

24  particularly interesting because you need to subscribe to Fight

25  Pass which means Zuffa is entering into literally thousands of

———— 2:15-cv-01045-RFB-PAL ————

1   agreements with subscribers.  Now, Mr. --

2          THE COURT:  Let me ask you a question, though,

3   Mr. Dell'Angelo.

4          MR. DELL'ANGELO:  Yes.

5          THE COURT:  If I were to find as it relates to the

6   exploitation of the image of Mr. Quarry that the contract that

7   he signed in 2010 was central to that injury, right, and that

8   the subsequent injuries relating to the exploitation of the

9   image all derive from that contract, why wouldn't I then find

10  that those subsequent uses could not serve as a basis for a

11  claim in this case?

12         MR. DELL'ANGELO:  I think it's precisely the point that

13  each of those uses or the additional contracts that Zuffa enters

14  into as part of the scheme, they are the overt acts on which you

15  can base a decision to deny the motion.

16         I think Mr. Isaacson attempted to make a distinction,

17  right, trying to distinguish O'Bannon, for example, and the

18  Section 1 conspiracy cases by saying, Well, you know -- and

19  Hennegan saying, Well, there's a conspiracy between the

20  defendants to enter into these contracts.  The conspiracy itself

21  is not the linchpin, right.  It's entering into a contract that

22  perpetuates the use or the anticompetitive conduct, whether it's

23  a conspiracy as in a Section 1 case or a scheme as we allege

24  here.  Right.  There's nothing in those cases that says when you

25  enter into a contract that's an overt act that perpetuate the

——2:15-cv-01045-RFB-PAL——

1  scheme that it needs to be a conspiracy.

2        THE COURT:  Right.  But in Hennegan is the target of

3  the conspiracy part of the original agreement and contract?

4        MR. DELL'ANGELO:  It is, but if you look at Free

5  Freehand --

6        THE COURT:  Well, it's targeted, but is it getting

7  regular payments as part of the agreement?  Part of the

8  difficulty here is the tension between Hennegan and Aurora as it

9  relates to the language regarding the fact that you're receiving

10  benefits and payments and you may not have liked what they were

11  because you thought their value was low, but you don't get to

12  wait until you see how well they've exploited the image to argue

13  that the value was too low.

14        MR. DELL'ANGELO:  Well, the tension is really the

15  distinction between a single act, which is Aurora, where there's

16  passive -- just a passive receipt of payments by the defendant

17  and cases like Hennegan where there's an active conduct and

18  there's a reaffirmation of the scheme just like --

19        THE COURT:  But in Aurora they -- the syndication

20  potentially is no different, right, than separate contracts

21  here.  How is the syndication itself under your argument and

22  theory of the plaintiffs' case not also an overt act?

23        MR. DELL'ANGELO:  Right.

24        THE COURT:  You have to make a decision each time.

25  Whoever they syndicate with, right, there are going to be

—2:15-cv-01045-RFB-PAL—

1  separate arrangements for the syndication, right?

2          MR. DELL'ANGELO:  Yeah.  Well, I don't know.

3          THE COURT:  And they're not getting paid for the

4  separate arrangements for the syndication.  They get paid for

5  the syndication of the show itself, and then after that, where

6  the syndication occurs or how often it occurs, does that really

7  matter?

8          MR. DELL'ANGELO:  My recollection of the facts of

9  Aurora, Your Honor, is that they did not get to the level of

10 detail that would enable me to really answer that question

11 competently.  What I can tell you, though, is Aurora is pretty

12 clear that you're dealing with a single anticompetitive act

13 which is the tie-in, right, like all of the other cases that

14 defendant presents to you are these single-act cases which are

15 quite different from what you're seeing here.

16          And I would note, you know, the third among the

17 elephants in the room is the Free Freehand case that we cite.

18 Free Freehand is a Ninth Circuit case.  It's a monopolization

19 case, a Section 2 case, right.  And, there, the Court found that

20 there was a continuing violation because the defendant took

21 additional steps, right, to further the conspiracy to suppress

22 the software at issue, right.  So it's not to say that you can't

23 find a continuing violation in a Section 2 case.

24          And what's interesting, Your Honor, is in June after

25 the briefing in this case was completed, the Eighth Circuit

—— 2:15-cv-01045-RFB-PAL ——

1   Court of Appeals decided the In Re: Propane case.  It's a

2   Section 1 conspiracy case.  They found that there was a

3   continuing violation.  And in that case one thing that the -- I

4   have a copy, if you'd like for me to pass it up, Your Honor.

5           THE COURT:  You can just give me the citation.

6           MR. DELL'ANGELO:  Okay.

7           THE COURT:  Just so we have it for the record.

8           MR. DELL'ANGELO:  Sure.  Thank you, Your Honor.  So the

9   citation is In Re: Prefilled Propane Tank Antitrust Litigation,

10  860 F.3d 1059 (Eighth Circuit) filed June 23, 2017.

11          So in that case in evaluating the application of the

12  continuing violation theory, the Court quoted Midwestern

13  Machinery.  And I point this out, Your Honor, because the

14  Midwestern Machinery case makes a distinction, and it does it

15  this way.  Unlike a conspiracy or the maintaining of a monopoly,

16  a merger, like tie-in, is a discrete act; not an ongoing scheme.

17  A continuing violation theory based on overt acts that furthers

18  the objective of an antitrust conspiracy in violation of Section

19  1 of the Sherman Act, or that are designed to promote a monopoly

20  in violation of Section 2 of that act, cannot apply to mergers

21  under Section 7 of the Clayton Act.  A merger like a tie-in is a

22  single act.

23          And what I think Midwestern Machinery, as quoted by In

24  Re: Propane, can be read to say is that you can analyze a

25  Section 1 and Section 2 continuing violation the same way and

———2:15-cv-01045-RFB-PAL———

1  that you analyze single acts like mergers and tie-in

2  differently.

3       And so one of the things that I did in thinking about

4  that, Your Honor, afterward is look at some of the hornbooks.

5  And one of the hornbooks, Antitrust Laws and Trade Regulation,

6  The Second Edition, by Kalinowski, makes some distinctions,

7  right, and like Aurora and Hennegan, breaks down continuing

8  violations into different types of antitrust.

9       THE COURT:  So -- well, if I understand you correctly,

10  you are going back to the argument that you started with, right?

11  Right?

12       MR. DELL'ANGELO:  Just --

13       THE COURT:  I'm just saying, right, whether the Eighth

14  Circuit says it or not, I mean, what your argument basically is

15  is that there is more than the contract.  You're saying that

16  there is conduct that forms a scheme.

17       MR. DELL'ANGELO:  Correct.

18       THE COURT:  That's more than the contract.  Well, okay,

19  but --

20       MR. DELL'ANGELO:  And --

21       THE COURT:  Okay.  So when is the limitations period

22  for that conduct?

23       MR. DELL'ANGELO:  When --

24       THE COURT:  Let's assume I agree with you that there's

25  a scheme.  What's the limitations period for that?

————— 2:15-cv-01045-RFB-PAL —————

1          MR. DELL'ANGELO:  It's ongoing.  So it hasn't ended,

2     right.

3          THE COURT:  Okay.  I just want to understand your

4     position on it.

5          MR. DELL'ANGELO:  The defendant -- one of the issues

6     that we point out is one way in which you could find that the

7     defendant hasn't met its burden is to make this contract

8     argument, it has to establish that there's not an ongoing

9     scheme, right.  It hasn't even attempted to do that.

10          THE COURT:  Which is why I was inclined, as I said

11     before, to -- I've been contemplating whether or not I would do

12     that -- defer on this motion until I have the full extent of the

13     merits-based motion with respect to motion for summary judgment

14     to evaluate that particular argument and to evaluate the nature

15     and impact of the contract as relates to the exploitation of the

16     images in this case.

17          MR. DELL'ANGELO:  And there's one thing I would like to

18     add, if I could, Your Honor.  I think you can suss it out from

19     the various statements of facts, but it can be a bit of a

20     challenge.  But if you look at page 7, I believe it is, of the

21     defendant's brief when they list the various contracts, right,

22     the Merchandise Rights Agreement, the Bout Agreements, and the

23     Ancillary Rights Agreements, they note correctly that the

24     Merchandise Rights Agreement was entered into in October of

25     2008.  They also note that on Zuffa's election that contract --

 1  that the term of that contract is three years, and on Zuffa's

 2  election that contract renews every three years.

 3          And I think you can fairly read the statement of facts

 4  to indicate that they haven't taken any action to not renew the

 5  contract, and it's our understanding --

 6          THE COURT:  They must have had to renew.

 7          MR. DELL'ANGELO:  Otherwise, they'd have a serious

 8  problem, right, because they're using the merchandising rights

 9  in the Topps cards and in the Reebok, you know, contract that

10  were entered into during the limitations period.  So as I read

11  it, pursuant to Paragraphs 2.1 or Sections 2.1 and 2.2 of that

12  agreement, it was renewed in October of 2011, in October of

13  2014, and I think it's likely that it will be renewed in the

14  month coming, October of 2017.

15          And I think it's important to think about that in the

16  context of the scheme because that --

17          THE COURT:  Well, that's actually the very

18  counterfactual that Mr. Isaacson offered as it relates to when

19  the statute would be reset, which would be if there's a new

20  contract with Mr. Quarry.

21          MR. DELL'ANGELO:  Correct, Your Honor.

22          And I think it's an important point, because Paragraph

23  or Section 4.3 of the Merchandise Rights Agreement, which again

24  is attached to the statement of undisputed facts, I think it's

25  Exhibit B, Your Honor, Paragraph 4.3 identifies the identity

—————2:15-cv-01045-RFB-PAL—————

1  rights as, quote, special, unique, extraordinary, irreplaceable,

2  and of particular valuable.  And why is that important?  I mean,

3  I will confess I'm going back to it, but by entering into the

4  Topps agreement and by entering into the Reebok agreement and

5  Fight Pass, you're using these very -- what you, Zuffa,

6  recognizes is these very valuable rights, right, which is why

7  it's essentially renewing the contract, right, through what

8  we've identified as the limitation period whether you look at an

9  overt act as a reuse of Mr. Quarry's identity or through these

10 other contracts.

11           THE COURT:  Okay.  Thank you, Mr. Dell'Angelo.

12           MR. DELL'ANGELO:  You're welcome.  Thank you, Your

13 Honor.

14           MR. ISAACSON:  A few words if I may, Your Honor?

15           THE COURT:  Yes, Mr. Isaacson.

16           MR. ISAACSON:  I appreciate it.

17           THE COURT:  So, Mr. Isaacson, I want you first to

18 comment on my comments as it relates to denying the motion

19 without prejudice.  Given the nature of what plaintiffs are

20 arguing as it relates to the ongoing antitrust injury, the

21 submissions that I have before me don't allow me to effectively

22 evaluate that argument, and I think it's fairly significant in

23 the context of this case.  Why would I decide this now given

24 that?

25           Because normally I wouldn't decide a statute of

—————2:15-cv-01045-RFB-PAL—————

1    limitations argument, by the way, out front like this anyway,

2    but given the nature of this case, I thought it would be

3    worthwhile.  But it's not my practice anyway normally to take

4    partial motions for summary judgment when I expect there is

5    going to be another motion for summary judgment later.

6            MR. ISAACSON:  Right.

7            THE COURT:  So why would I even rule on this now?

8            MR. ISAACSON:  It's because of the plaintiffs' answer.

9    The plaintiffs' answer to that is, is because they have alleged

10   other things that are part of the scheme, right.

11           THE COURT:  But that's my next point.  One is the

12   renewal of the contracts.  I want you to address both of those,

13   too.

14           MR. ISAACSON:  Well, the renewal of the contract has

15   actually not been briefed.  It is not in the statement of facts.

16   It's actually thrown out here in oral argument for the first

17   time.  So it has actually not been raised by the plaintiffs.

18   The argument that has been raised by the plaintiffs is whether

19   this -- that they have alleged other things that are part of the

20   scheme.

21           Now, there's a gross inconsistency between that

22   position in their complaint and Ninth Circuit law.  If you

23   accept that anything -- you know, they're alleging acts to

24   enhance monopoly power and monopsony power, and they have

25   alleged certain acts within the limitations period.  If that

——2:15-cv-01045-RFB-PAL——

1  allows anything before the limitations period to be part of this

2  case, then --

3          THE COURT:  That's not what I am saying.  What I am

4  saying is I'm not in a position --

5          MR. ISAACSON:  Right.

6          THE COURT:  -- to make that determination.  I'm not

7  saying that it would allow it.  What I am saying is that I don't

8  know, right, and you all are asking me to evaluate certain

9  aspects of whether this is ongoing competitive conspiratorial

10 action or whether or not this is an action that derives from

11 primarily this one or other contracts.  It's that determination

12 which I think is actually fairly significant in deciding this

13 motion that to me has not been briefed in the papers that I have

14 fully.

15         Obviously, I'm aware of what was alleged in the

16 complaint and the Court has ruled on that, but there is a

17 concern in my mind about making this determination.  Now,

18 there's no reason for me to necessarily to do it now rather than

19 later when I look at all of the substantive merits of the case.

20         MR. ISAACSON:  Right.

21         THE COURT:  I mean, obviously the parties would prefer

22 to be able to, if you were to prevail obviously, address the

23 issues of resources, but again typically this is an argument

24 that would come also in this type of case, it seems to me, at

25 the time when I have the merits.  And so I'm just trying to

1  decide whether or not it would be important for me given the

2  nature of this discussion to defer.

3         MR. ISAACSON:  And we appreciate you giving us the

4  opportunity to talk to you about it, but the reason that that's

5  important is because they allege a scheme that goes back to

6  2006.  If it's simply sufficient to say, We have alleged acts of

7  the scheme within the limitations period, then there is, as he

8  says, no limitations period.  It goes back -- they have alleged

9  it since 2006, so it just keeps continuing.

10        So the question then is Mr. Quarry's identity rights,

11 right.  What -- you know, when were those lost?  And, you know,

12 just going back to, what were the continuing consequences?  Was

13 there an immutable final decision?

14        THE COURT:  But is that the only injury in this case?

15        MR. ISAACSON:  No, not of the case as a whole.

16        THE COURT:  Right.  So --

17        MR. ISAACSON:  But for Mr. Quarry who is only in the

18 identity rights case.  For example, he doesn't say, Oh, there

19 are recent acts of monopolization.  I get to take -- join the

20 bout class and go back to 2006.

21        THE COURT:  Right.  So you're saying that their

22 argument is more appropriate as it relates to the bout class

23 versus the identity class.

24        MR. ISAACSON:  It just -- you can just get rid of the

25 statute of limitations if you accept this argument that you've

—————————— 2:15-cv-01045-RFB-PAL ——————————

1    alleged a scheme that continues through the limitations period.

2         THE COURT:  For the identity class?

3         MR. ISAACSON:  For the identity class, yes.

4         THE COURT:  Okay.

5         MR. ISAACSON:  Because the -- the bout people could say

6    the same thing.  We had contracts back in 2007.  Let's bring

7    those up.  We were underpaid back then because you're still

8    underpaying people right now.

9         And the other point is, yes, Your Honor.  Absolutely we

10   agree.  The Court does not know, because we haven't spoken to

11   the Court since the motion to dismiss, about what the facts have

12   shown about the plaintiffs' allegations and what would be the

13   scope of the case.  Absolutely.

14        But the point -- the thing the Court does know because

15   it's not -- it's in the undisputed facts is that every use of

16   Mr. Quarry's identity rights was granted by specific contracts.

17   That's just a matter of contract law.  That's just a matter of

18   reading contracts.

19        So you can accept that for purposes of this motion.

20   There were additional acts of a scheme that happened within the

21   limitations period.  That doesn't matter to the grant of his

22   identity rights.  This motion can be decided now just by reading

23   contracts.  And that would be my point to you, Your Honor.

24        THE COURT:  I'm sorry.  You say can be decided now just

25   by ...

—————— 2:15-cv-01045-RFB-PAL ——————

1          MR. ISAACSON:  By reading the contracts.

2          THE COURT:  Reading the contracts that are involved.

3          MR. ISAACSON:  Right.  And by the silence of the

4    plaintiffs of saying, There's not some act within the

5    limitations period that granted some additional -- and no

6    dispute that everything we did was consistent with those

7    contracts.

8          THE COURT:  Well, let me ask you a question.  Did the

9    contracts renew within the limitations period?

10         MR. ISAACSON:  I'm going to have to go back and ...

11         THE COURT:  Okay.  Because you asked me to read them,

12   so I'm going to go back.

13         MR. ISAACSON:  Yeah, yeah, yeah.  Well, I can tell you

14   for the purpose of this summary judgment motion that argument

15   has certainly been waived.

16         THE COURT:  Well, you asked me to read it so obviously

17   I'm going to go back and read it.  I'm just saying if I find

18   that the contract renews, your argument is that that argument

19   has been waived because it wasn't raised as it relates to your

20   motion?

21         MR. ISAACSON:  Right.  That's right, Your Honor.

22         THE COURT:  But you don't know whether or not the

23   contract --

24         MR. ISAACSON:  Not sitting here -- not sitting in front

25   of you.  I'll be forthright with you about that.

-2:15-cv-01045-RFB-PAL-

1          THE COURT:  Okay.  All right.  Anything else,

2  Mr. Isaacson?

3          Well, let me ask you this question because part of this

4  also will impact my decision.  So, just remind me -- I tried to

5  look at the docket -- where we are with this case in terms of

6  discovery closing and dispositive motions.  When I looked at the

7  schedule, it looked like we wouldn't have dispositive motions

8  until early next year.

9          MR. ISAACSON:  That's correct.  And we've got -- and

10  you'll have class certification going on also, but we're

11  basically in the expert discovery period right now.

12          THE COURT:  Okay.  All right.  Thank you.

13          MR. ISAACSON:  Thank you, Your Honor.

14          THE COURT:  All right then.  I'm sorry,

15  Mr. Dell'Angelo.  Were you going to say something?

16          MR. DELL'ANGELO:  No, thank you.  Unless Your Honor

17  would like to hear further.

18          THE COURT:  No, I think I have it.

19          What I am going to do is consider the arguments that

20  have been raised here and then obviously issue my decision, but

21  I thank you all for staying a little bit later.  But we are

22  adjourned in this matter.  Thank you.

23          MR. DELL'ANGELO:  Thank you, Your Honor.

24          MS. CHEN:  Thank you, Your Honor.

25          (Whereupon the proceedings concluded at 5:12 p.m.)

2:15-cv-01045-RFB-PAL

--oOo--

COURT REPORTER'S CERTIFICATE


    I, PATRICIA L. GANCI, Official Court Reporter, United

States District Court, District of Nevada, Las Vegas, Nevada,

certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


Date:  September 23, 2017.

                                    /s/ **Patricia L. Ganci**

                                    Patricia L. Ganci, RMR, CRR

                                    CCR #937