─────TRANSCRIBED FROM DIGITAL RECORDING─────

1            UNITED STATES DISTRICT COURT

2               DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5             Plaintiffs,              )  Case No. 2:15-cv-01045-RFB-PAL
                                       )
6        vs.                           )  Las Vegas, Nevada
                                       )  September 29, 2017
7  ZUFFA, LLC, d/b/a Ultimate          )
   Fighting Championship and           )
8  UFC,                                )  MOTION TO COMPEL
                                       )
9             Defendants.

10 ─────────────────────────────────

11

12

13              TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE PEGGY A. LEEN,
         UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19 APPEARANCES:          See Next Page

20 DIGITALLY RECORDED:   Liberty Court Recorder (LCR)
                         9:31 a.m.

21

22 TRANSCRIBED BY:       PATRICIA L. GANCI
                         (702) 385-0670

23

24 Proceedings recorded by electronic sound recording, transcript
   produced by mechanical stenography and computer.

25

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1  APPEARANCES:

2  For the Plaintiffs:

3          **DON SPRINGMEYER, ESQ.**
           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4          3556 E. Russell Road, 2nd Floor
           Las Vegas, Nevada 89120
5          (702)341-5200

6          **JIAMIN CHEN, ESQ.**
           **KEVIN RAYHILL, ESQ.**
7          THE JOSEPH SAVERI LAW FIRM, INC.
           555 Montgomery Street, Suite 1210
8          San Francisco, California 94111
           (415)500-6800

9
   For the Defendants:
10
           **PHILIP R. ERWIN, ESQ.**
11         CAMPBELL & WILLIAMS
           700 South 7th Street
12         Las Vegas, Nevada 89101
           (702)382-5222
13
           **STACEY K. GRIGSBY, ESQ.**
14         BOIES, SCHILLER & FLEXNER, LLP
           1401 New York Avenue, NW
15         Washington, DC 20015
           (202)237-2727
16
           **SUZANNE JAFFE NERO, ESQ.**
17         BOIES, SCHILLER & FLEXNER, LLP
           1999 Harrison Street, Suite 900
18         Oakland, California 94612
           (510)874-1000

19

20

21

22

23

24

25

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1        LAS VEGAS, NEVADA; THURSDAY, SEPTEMBER 28, 2017; 9:31 A.M.

2                            --oOo--

3                      P R O C E E D I N G S

4        THE COURT:  Good morning.  Please be seated.

5        COURTROOM ADMINISTRATOR:  Your Honor, we are now

6   calling the motion hearing in the matter of Le versus Zuffa,

7   LLC.  The case number is 2:15-cv-1045-RFB-PAL.

8        Beginning with plaintiffs' counsel, counsel, please

9   state your names for the record.

10        MS. CHEN:  Good morning, Your Honor.  Jiamie Chen from

11   the Joseph Saveri Law Firm on behalf of the plaintiffs.

12        MR. RAYHILL:  Good morning.  Kevin Rayhill from the

13   Joseph Saveri Law Firm on behalf of plaintiffs.

14        MR. SPRINGMEYER:  Good morning, Your Honor.  Don

15   Springmeyer of Wolf Rifkin for the plaintiffs.

16        MS. GRIGSBY:  Good morning, Your Honor.  Stacey

17   Grigsby, Boies Schiller and Flexner, on behalf of Zuffa.

18        MS. NERO:  Good morning, Your Honor.  Susan Nero, Boies

19   Schiller and Flexner, on behalf of Zuffa, LLC.

20        MR. ERWIN:  Phil Erwin, Campbell and Williams, on

21   behalf of Zuffa.

22        THE COURT:  Thank you.

23        Mr. Miller, is my microphone on?

24        COURTROOM ADMINISTRATOR:  Yes, Your Honor.

25        THE COURT:  This is the time set for oral argument on

———TRANSCRIBED FROM DIGITAL RECORDING———

1  plaintiffs' emergency motion to compel production of documents

2  withheld on privilege grounds.  This has been a developing and

3  emerging set of issues.  I've previously conducted a limited in

4  camera review of the Dana White documents and sustained Zuffa's

5  claim of privilege with respect to the majority of those

6  documents, compelling the ones identified in my order to be

7  produced either in their entirety or redacted.

8          So, tell me where you are today and what, if any,

9  progress you have made and what order you're seeking of the

10  Court today.

11          Who will be arguing, counsel, for Zuffa's position?

12  Excuse me.  Counsel for plaintiffs.  I beg your pardon.

13          MS. CHEN:  Of course.

14          THE COURT:  I'm a little under the weather and I -- so

15  excuse me.  I have a lozenge, and I'm trying to keep my throat

16  moist.

17          MS. CHEN:  Absolutely, Your Honor.  Jiamie Chen for the

18  plaintiffs will be arguing the plaintiffs' position.

19          THE COURT:  Please.

20          MS. CHEN:  Thank you.  Would you like me to approach or

21  argue from the table?

22          THE COURT:  Wherever you're more comfortable.

23          MS. CHEN:  Okay.  Get a little bit closer.

24          Thank you, Your Honor.  You know, I wanted to start out

25  by addressing sort of the elephant in the room as in regard to

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1  this particular motion.  We completely recognize that waiver is

2  a pretty extreme and draconian remedy, and we do not seek it

3  lightly.

4       However, we do seek it because it's an extreme and

5  draconian remedy for extreme and egregious cases, cases like

6  this one.  In fact, the Ninth Circuit and this particular court,

7  the District of Nevada, have both ordered waiver in cases with

8  facts that are less egregious than this particular case.  And

9  given the facts of this particular case, which I'll get into in

10  a moment, it appears that waiver is really the only option here

11  in terms of a meaningful remedy, a remedy that will make sense

12  going forward with case progress.

13       So, let me start with essentially we are here today

14  because of defendant's assertion of privilege over certain

15  documents, and when they assert privilege over certain documents

16  to withhold them, they bring upon themselves obligations, legal

17  obligations, that are defined under Rule 26 and under Ninth

18  Circuit law, particularly in the Burlington case.

19       We are here today because they have repeatedly failed

20  and refused to meet those obligations, not by a little, not

21  once, but repeatedly and by a lot.  So let's start with the

22  operative privilege log.  The operative privilege log was

23  produced to us on, I believe, July 11th.  That would be 20 days

24  before the close of a two-year discovery period.

25       The July 11th privilege log was substantially different

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1  from the previous privilege logs in that -- and here's something

2  that I really want to get into because I think this is pretty

3  extreme and unique to this case.

4         In producing the operative privilege log, the defense

5  reviewed a corpus of approximately 17,000 documents, and of

6  those 17,000 documents, which represent a little more than half

7  of the total number of documents they originally assert a

8  privilege over, they found that over 12,000 of those documents

9  were improperly withheld, Your Honor.  That's 12,000

10  improperly-held documents out of approximately 17 --

11         THE COURT:  Yes, but that was only after I had -- I had

12  decided several motions outlining the scope of the dispute and

13  why I believed certain privilege claims were not well taken by

14  them.

15         MS. CHEN:  Correct.

16         THE COURT:  They modified their position as a result of

17  the Court's order and basically threw in the towel with respect

18  to those 12,000 documents.

19         MS. CHEN:  Right.  So what it showed was that the

20  privilege logs it produced previously for -- at least for that

21  17,000 body of documents was more or less 65 percent

22  overinclusive.  And as a result, we were given a dump of 12,000

23  documents in a span of 10 days approximately three weeks before

24  the close of discovery in this case.  And that in and of itself

25  renders this case more or less unique in terms of what happened

—TRANSCRIBED FROM DIGITAL RECORDING—

1  and all --

2        THE COURT:  And what did you find when you reviewed

3  those 12,000 documents?

4        MS. CHEN:  We found hot documents, Your Honor.  We

5  found approximately 200 hot documents.  And this is something I

6  was going to get into, but I can address it now.  We were

7  actually -- and, again, we received these documents

8  approximately 20 days before the close of discovery.  We got on

9  them right away.  We were able to complete review of them by

10  approximately the end of the July.

11        Now, the thing is by the end of July we had already

12  virtually completed discovery.  We'd taken the vast majority of

13  depositions.  Critically, we've had our experts prepare their

14  reports with the body of documents we had, not including those

15  12,000 documents.  But, nonetheless, because we sort of

16  scrambled to get this reviewed and done and made use of, we were

17  able to actually use some of those 200 hot documents from those

18  12,000 documents in the few remaining depositions that we had.

19        So getting back to the privilege log in this matter and

20  what the defendants did and didn't do with regard to meeting

21  their obligations, first of all, the privilege log is deficient

22  in a number of ways.  First, it is as we just discussed

23  demonstrably inaccurate and overbroad in a substantial capacity.

24  Secondly, it was untimely, and its untimeliness was distinctly

25  prejudicial to the plaintiffs.

8

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1      THE COURT:  And when did the plaintiffs first raise the

2  issue about the failure to produce a privileged document log?

3      MS. CHEN:  They -- we engaged -- we began engaging in

4  this dialogue after we received the first privileged log in

5  April of 2007.  And that's a good point to kind of harp on, Your

6  Honor, because, you know, this -- the law is clear and

7  undisputed in that when a party is seeking to withhold

8  responsive documents in discovery, it is their burden and their

9  obligation to provide --

10      THE COURT:  There's no question about that, but now I'm

11  here at this stage of the litigation and the plaintiff produced

12  -- the plaintiffs produced their privileged document log,

13  according to the declaration before me, on February 3rd, 2017.

14  And it contained only 855 entries.

15      MS. CHEN:  Correct.

16      THE COURT:  And so on April the 7th, six weeks after

17  you produced -- or April -- six weeks after approximately you

18  produced your privileged document log, Zuffa produced its first

19  privileged document log which contained 30,000 documents on it.

20      MS. CHEN:  That's correct, Your Honor.

21      THE COURT:  And that's when -- how soon after that did

22  the parties initiate discussions about the adequacy of that

23  30,000-document log?

24      MS. CHEN:  Almost immediately, Your Honor.  I believe

25  the exact communications are contained in the exhibits to our

—TRANSCRIBED FROM DIGITAL RECORDING—

1    motion, but I want to say within a week, something along those

2    lines.

3           And I'm glad you brought up that, you know, sort of --

4    and this is a point defendants bring up about the fact that we

5    filed our privilege log in February.  They filed theirs in

6    April.  So on the face of it, it doesn't look like theirs is

7    untimely because our is close in time, and I wanted to sort of

8    draw the Court's attention to why that's not a persuasive

9    argument.

10          The point of a privilege log is to enable you to -- is

11   to inform the parties essentially seeking the production to

12   provide information to those parties so that we can determine

13   whether or not the assertion of privilege as to each document

14   appears valid, correct.

15          We -- by the time they had produced their privilege log

16   in April and we were able to review it, we had already completed

17   the majority of our depositions at this point.

18          THE COURT:  Correct, but what you haven't told me --

19          MS. CHEN:  Yes.

20          THE COURT:  You have told me that of the 12,000

21   documents you admittedly received very late in the discovery

22   process and after a number of depositions were taken, 200 of

23   those --

24          MS. CHEN:  Correct.

25          THE COURT:  -- were hot documents.  And I take that to

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

 1  mean significant and important to the litigation, things you

 2  would have liked to have known earlier.

 3          MS. CHEN:  Correct.

 4          THE COURT:  How, if at all, did those 200 documents

 5  affect how you otherwise would have proceeded had you had them

 6  earlier in time?

 7          MS. CHEN:  We would have -- we looked at those 200

 8  documents.  Those 200 documents, essentially the bulk of them,

 9  relates to six or eight individuals.  These are six or eight

10  individuals who -- whose depositions we have already taken at

11  this point.  And looking at these 200 hot documents, we may have

12  asked different questions.  We may have used them in a

13  deposition.  We may have --

14          THE COURT:  Well, "may have" and absolutely, you know,

15  there's this -- every once in a while you do get a smoking-gun

16  document that changes the whole landscape of the case.

17          MS. CHEN:  Trust me, we've looked for that.  And we

18  would love to have it.

19          THE COURT:  And you didn't find one.

20          MS. CHEN:  We actually found relevant documents, and

21  I'm glad that Your Honor brought that up because I'm happy to

22  show them to the Court.

23          So -- one moment, please.

24          Again, we found 200 hot documents.  In the interest of

25  not overburdening the Court, I'm going to provide the Court with

-TRANSCRIBED FROM DIGITAL RECORDING-

1  a sample of five of these documents and --

2       THE COURT:  Make sure the other side knows which ones

3  you're showing to me.

4       MS. CHEN:  Yes, I will mark these as Plaintiffs'

5  Exhibit 1, and I will give a copy to the defense as well.

6       Okay.  And so what has just been passed to the defense

7  and the Court as Plaintiffs' Exhibit 1, the cover page shows it

8  is an excerpt of the privilege log, of Defense's privilege log,

9  with the entries that match the documents that follow them.  So

10 the Court can see the very limited description and information

11 that is provided us -- that was provided us with each one.

12      Now, calling the Court's attention to the document with

13 Bates No. Zuffa -- ZFL 2706585.  Again, this is a document that

14 was originally withheld, but was later produced.  In the

15 document it states that it's an e-mail chain between individuals

16 whose depositions we had already taken at that point.  And I

17 specifically want to direct the Court's attention to the bottom

18 of the e-mail chain, the statement from Sean Shelby that he and

19 Joe had -- Joe Silva have discussed bringing Spencer Fisher into

20 WEC.  That the -- that they now own the world at 135 and 145.

21 Again, going back to Spencer Fisher, he states:  He is at 26 and

22 26.  To make this a possibility, I would need to get him five

23 more fights, etc., but I need to keep the public perception of

24 his pay at about 10,000 less on the show site.  How can we make

25 this work?

─TRANSCRIBED FROM DIGITAL RECORDING─

1        And then going up a few e-mails, Lawrence Epstein

2   suggests:  We can handle this easily.  Let's just do a new

3   agreement with a side letter.

4        And what that seems to indicate, Your Honor, is that

5   Zuffa is actively trying to manipulate the public perception of

6   how much the fighters are paid, trying to make it look like --

7   or I'm sorry -- the perception by other fighters of how much the

8   fighters are paid to make it look like this particular fighter

9   makes less than he actually does.  And Lawrence Epstein

10  suggested accomplishing that through a side letter which would

11  pay this particular fighter $10,000 on the side that would not

12  be visible to other fighters.

13       Now, this is clearly a key document in that it

14  indicates the practice of Zuffa in manipulating the perception

15  of fighter pay and hiding it in a side letter.  And it involves

16  individuals whose depositions we've taken.  This is a document

17  that we could easily have used in the depositions of Lawrence

18  Epstein and others.

19       Would the Court like me to go through the rest of the

20  documents as such?

21       THE COURT:  You may if you wish.  You need -- that's up

22  to you.

23       MS. CHEN:  Sure.  The second of the five documents

24  on -- in this sample list is ZFL 2704847.  This has to do with

25  sponsorship, and again if you look at the original privilege

—TRANSCRIBED FROM DIGITAL RECORDING—

1  entry, it only states that it's an e-mail chain discussing legal

2  advice regarding fighter contracts which is a non-informative

3  conclusory description.

4         Looking at the actual document itself, it shows Zuffa's

5  essentially negotiating with sponsors and telling them that,

6  Look, if you're going to sponsor UFC fighters, you can't sponsor

7  any other fighter.

8         And they're saying that with regard to non -- I guess

9  at this point non-UFC fighters; that if a sponsor wants to

10  sponsor UFC fighters, they can only sponsor UFC fighters and

11  they cannot sponsor non-UFC fighters or other MMA fighters that

12  are non-UFC fighters.  And, again, this is communications

13  between individuals whose depositions we did in fact take in

14  this case, Michael Mersch and others.  And this is a document

15  that we could have asked him about, but we weren't able to.

16         The third document in this case or in this excerpt is

17  ZFL 2704608.  This is a document that relates to one of our

18  named plaintiffs, Jon Fitch.  Now, the facts and circumstances

19  surrounding this document indicate that around 2008-2009 Zuffa

20  changed its merchandising policy, and it required fighters to

21  now sign a Merchandising Rights Agreement.  It appears that Jon

22  Fitch originally refused to sign that agreement and Zuffa

23  immediately terminated him.  Fitch later relented and signed the

24  merchandising agreement, and then Zuffa rescinded the

25  termination letter.  That's all sort of context that other

—TRANSCRIBED FROM DIGITAL RECORDING—

1  documents in this case have indicated.

2      This particular document is interesting in that it was

3  in-between the recision of the termination letter and when Jon

4  Fitch had originally refused to sign the Merchandising Rights

5  Agreement.  So in no uncertain terms UFC, Lawrence Epstein, is

6  directing Zuffa to terminate Jon Fitch, and we believe it's

7  because he refused to sign the merchandising rights letter.

8  And, again, this is something that we could have used in our

9  deposition of Lawrence Epstein and asked him about --

10      THE COURT:  But this is also information in your

11  client's knowledge.

12      MS. CHEN:  Correct, but this -- I think when you show

13  someone something that they said in the past that has been

14  documented, it may lead to a different answer.  But the point is

15  we weren't able, we were prohibited from the opportunity to even

16  consider that as a strategy in our deposition-taking because we

17  didn't have these documents because they were still wrongfully

18  withheld at that point.  Excuse me.

19      The next exhibit is really short or, I'm sorry, the

20  next document is short.  It is ZFL 2704049.  And it's again an

21  e-mail with Lawrence Epstein and Jamie Pollack regarding a

22  fighter named Gomi.  And, again, this one has to do with signing

23  with competitor video games; that the UFC was prohibiting,

24  terminating, and/or punishing fighters for signing with rival

25  video game companies.

—TRANSCRIBED FROM DIGITAL RECORDING—

1       In this e-mail Jamie Pollack tells everyone else on

2  this e-mail that Gomi is close to signing with EA Sports, which

3  is a competitor video game creator, for their video game.  And

4  he asks specifically:  Would Gomi signing with a competitor

5  prevent us from signing him to fight?  And Lawrence Epstein

6  responds:  Definitely.  Definitely.  If he is going to license

7  out his naming and imaging rights to a competitor, we are --

8  that would definitely prevent us from signing him.

9       And, again, this is something that we could have asked

10  anyone on this e-mail chain about, but we were not able to

11  because we didn't have this document.

12       And, finally, the fifth document, the fifth sample

13  document is ZFL 2704614.  Again, another e-mail chain.  And this

14  has to do with the practice of UFC to pressure fighters to

15  resign and re-up their contracts before the last contract -- the

16  last fight, the last bout, when their contract is up.

17       Previously we've determined that part -- at least part

18  of the reason they do so is because, you know, if the fighter

19  never hits the free market, then he's never able to find out

20  sort of how much he's really worth on the free market if he's

21  continuously under exclusive contract with the UFC.

22       So in this case or in this e-mail it's specifically

23  with regard to a fighter -- let's see.  It's specifically with

24  regard to a particular fighter who turned down a fight

25  apparently and wasn't injured.  And the e-mail indicates that:

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1  Look, we are going -- you know, either he's going to sign the

2  agreement we offered him or he's done.  He's not fighting

3  anymore.  And we'll put the heat on them tomorrow, essentially

4  pressuring them to either sign it or not.  And, you know, for

5  turning down a fight, they did extend it -- their contract was

6  automatically extended.  So that provides further information

7  and illustration of that particular UFC practice.  And that is

8  something that we could have asked Joe Silva, Lawrence Epstein,

9  Tracy Hyman, anyone on this list of recipients and senders

10 about.

11        And, again, this is another document that we could have

12 used in depositions we in fact took, but we were not able to use

13 it, did not know about it, because this document was wrongfully

14 withheld at the time.

15        And, again, this is five out of approximately 200 hot

16 documents that we found.  And --

17        THE COURT:  Presumably, they're the more significant or

18 you wouldn't have -- would not have selected them as examples to

19 the Court.

20        MS. CHEN:  That's a fair statement, Your Honor.  And at

21 the same time I think it's also a fair statement to say that,

22 you know, the 12,000 documents that the defendants voluntarily

23 turned over are probably not the most significant and relevant

24 of the documents that it continues to withhold.  So that sort of

25 assumption might go both ways.

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1          So having just discussed how the un -- I'm sorry.  To

2   go back to kind of a previous point about us producing our

3   privilege log in February versus them producing their privilege

4   log in April, at the time we produced our privilege log in

5   February, they hadn't taken any depositions of plaintiffs'

6   witnesses except one.  And they chose to take the deposition of

7   Nate Quarry early in support of their motion for summary

8   judgment with regard to him.  Everyone else they hadn't yet

9   deposed.  So they were able to depose everyone else with the

10  benefit of the information on our privilege log.

11          And what's also important to note is that they have

12  never challenged a single entry on our privilege log as

13  improperly withheld, and they have never challenged the

14  sufficiency of the information on our privilege log with regard

15  to any entry.

16          And to the extent that they argue our privilege log

17  provides the same level of detail as theirs, that's comparing

18  apples and oranges, Your Honor.  And Your Honor's well familiar

19  with the differences between the plaintiffs' side and the

20  defendant's side to understand why.  The plaintiffs are natural

21  human beings.  They hired outside attorneys specifically with

22  regard to this litigation.  And every entry on a privilege log

23  is communications or documents that passed between human beings

24  and their outside counsel that they retained specifically for

25  this litigation.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1           On the other side the defense is a sophisticated

2   corporate entity that has an in-house legal department and,

3   excuse me, chose to install attorneys in senior positions within

4   the corporate structure such that those attorneys routinely

5   perform both business and legal functions.  Therefore, they

6   necessarily need to provide greater information so that you and

7   I are able to determine whether each individual entry appears to

8   be validly asserted as to privilege.

9           And I think now it's important to turn to the fact

10  that, you know, the defense's obligations with regard to their

11  privilege log and with regard to their assertions of privilege

12  are not sort of murky.  They have been well set out in an entire

13  body of law with regard to privilege logs and their obligations.

14  And for this particular case, however, I don't really think it's

15  necessary to look beyond the Ninth Circuit Burlington case for

16  two reasons.  One, the Ninth Circuit sets out -- it enunciates a

17  test in a way that is easily understandable and applicable to

18  this case.  And, two, the particular facts in Burlington that

19  the Ninth Circuit explicitly considered and based its upholding

20  of the waiver on, interestingly, are facts that are actually all

21  present in this case.

22          So turning to Burlington, and again I won't belabor the

23  point about the test that was enunciated in Burlington, I

24  believe it's undisputed between us and the defense that the

25  holistic reasonableness analysis that considers those four

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1  factors that is laid out in Burlington is, in fact, the

2  governing applicable test in this case.

3          So in discussing that, the Ninth Circuit found that to

4  assess whether a party that is seeking to assert privilege and

5  protect and withhold documents on that basis, you know, to

6  assess whether or not they met their legal obligations with

7  regard to asserting that privilege, there's four factors that

8  have to be taken into account, right.  And really briefly the

9  four factors are the extent to which they -- I'm sorry -- the

10 extent to which the objection or assertion of privilege enabled

11 the litigant seeking discovery and the Court to evaluate whether

12 each of the withheld documents is in fact privileged, the

13 timeliness of the objection, the magnitude of the document

14 production, and whether any particular circumstances of the

15 litigation renders it unusually easy or unusually difficult.

16          All right.  So those are the four factors that are to

17 be considered on a case-specific basis.  There's no -- in taking

18 this position the Ninth Circuit is basically saying, Look, we're

19 not going to say if you provide X, Y, and Z categories of

20 information, then it's automatically sufficient, or if you only

21 provide A, B, and C categories of information, it's

22 automatically insufficient.  The Ninth Circuit is saying it is a

23 fact-specific wholistic reasonableness analysis and here is kind

24 of the important considerations in that analysis.

25          If you apply that to this case, I think the first

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1 factor the Ninth Circuit enunciates, and what is most likely the

2 most important factor, the degree to which the information

3 contained in the privilege log would allow you and I to assess

4 whether the assertion of privilege is valid as to each entry.

5 That's the most important factor, and that's the factor that

6 really weighs most heavily in favor of insufficiency in this

7 case.

8 　　　　If the Court will look at the privileged log excerpts

9 that were included in the exhibits to the filings, the Court can

10 see that the only descriptions the defendants have provided are

11 conclusory and not informative.  The defense essentially

12 describes the content of each entry as containing legal advice.

13 Your Honor, that's not informative.  That's conclusory.  Whether

14 or not it contains legal advice is the conclusion we're trying

15 to reach through the information they're supposed to provide.

16 It's not -- it's -- it's a conclusory self-serving assertion.

17 　　　　THE COURT:  So give me -- pull out an example and give

18 me an example of what you think would be a sufficient

19 description --

20 　　　　MS. CHEN:  Absolutely.

21 　　　　THE COURT:  -- that wouldn't -- without revealing the

22 privilege itself.

23 　　　　MS. CHEN:  Of course, Your Honor.  And for the sake of

24 comparison, Your Honor, I will also submit to the Court as well

25 as to the defense what we believe to be a representative sample

1  of each of the three privilege logs that have been produced in

2  this case so far.  I'm going to mark them as Plaintiffs' Exhibit

3  2, 3, and 4.  And I will also present a copy to the defense.

4          May I approach?

5          THE COURT:  You may.

6          MS. CHEN:  So 2, 3, and 4 are excerpts from the first,

7  second, and third privilege logs that the defense has produced

8  in this case.  They are what we've considered to be

9  representative because they are the first page, the last page,

10  and a middle page of the privileged logs in the order the

11  defense happened to produce it to us.

12          If the Court will call its attention to the description

13  column, essentially that is the heart of what -- of the

14  information that this is supposed to provide, right.  And

15  essentially the defense is asserting conclusorily that this --

16  that each document contains legal advice without --

17          THE COURT:  Right.  And what would you have them say?

18  Let's pick the first one on Plaintiffs' Exhibit 2:  E-Mail chain

19  discussing legal advice regarding fighter contractors.

20          MS. CHEN:  Sure.

21          THE COURT:  What in your view would be an adequate

22  description that would enable you to assess the validity of the

23  assertion?

24          MS. CHEN:  Absolutely, Your Honor.  And I'm glad you

25  asked that.  Now, with regard to that particular entry, I can't

---TRANSCRIBED FROM DIGITAL RECORDING---

1   answer that because I don't have further information on the

2   document, but what I'd like --

3          THE COURT:  Precisely.

4          MS. CHEN:  What I'd like to call the Court's attention

5   to is Exhibit 7 to the -- to our motion.  Exhibit 7 --

6          THE COURT:  But you're not answering my question.  All

7   right.  On its face there's a representation signed under

8   penalty of Rule 26(g) that the e-mail chain discusses legal

9   advice regarding fighter contractors.

10          MS. CHEN:  Right, but --

11          THE COURT:  And what additional information do you

12   think would be required in order for them to meet their

13   obligation to provide the specificity needed for you to

14   evaluate?  Because if it's true on its face, how is that not

15   adequate?

16          MS. CHEN:  That's a good question, Your Honor.  And in

17   order for us to determine whether or not that is an adequate

18   assertion, Your Honor has determined in this case that not all

19   assertions of, quote, unquote, legal advice in this case by the

20   defense has been in fact legal advice.  They have considered

21   legal advice things like fighter contract negotiations, business

22   determinations.

23          THE COURT:  Correct.  And that's what resulted in their

24   producing an additional 12,000 documents when they saw that I

25   did not favor the extent of the or the scope of the privilege

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1  that they were asserting.

2          MS. CHEN:  Correct.

3          THE COURT:  And so then you got your 12,000 documents

4  on the -- that were initially listed on the privilege log.

5          MS. CHEN:  Correct.

6          THE COURT:  And now what we have is what is left.  And

7  I'm really questioning you why what is left is not on its face

8  an adequate description if it's truthful.  I understand the

9  inherent suspicion that zealous advocates have, but if it's

10  truthful that it's legal advice regarding fighter contracts, why

11  is that not a sufficient description?

12          MS. CHEN:  We would like -- we think it would be

13  adequate to provide more information in that, you know, it is

14  considering, for example, the legal ramifications of a contract

15  from -- proposed by the fighter's representative as opposed to,

16  say, a business purpose.  Zuffa's considering fighter

17  negotiations and advice regarding Zuffa's business position and

18  business goals.  I think that's an important distinction to make

19  simply because it has been so easy for the defense to conflate

20  business function and legal function, particularly with regard

21  to fighter contracts.  I believe Your Honor authored a pretty

22  detailed opinion already in distinguishing between the legal

23  advice -- what would be considered legal advice and

24  contractor -- in fighter contract negotiations and what is

25  purely business function or primarily business function.

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1          So to just simply call it legal advice with respect to

2    fighter negotiations, it's not -- it's conclusory in its

3    assertion that, you know, We're not going to give you

4    information to find that this is or isn't legal advice.  We're

5    just going to tell you that this is legal advice.

6          So we would like -- you know, legal advice is legal

7    opinion, legal analysis, something of that nature.  And we would

8    like to know what are you providing legal advice on.  Is it

9    something that would distinguish it from simply asserting legal

10   advice over things that Your Honor has found is not legal advice

11   with regard to contract negotiations?  If that makes sense.

12         And kind of to my earlier point about, you know, what

13   is sufficient versus what is not, the defense is actually --

14   they know very well what is deficient.  And they know this

15   because they've actually produced a very limited subset of

16   supplemental descriptions that we have explicitly told them, you

17   know, This is what we consider to be sufficient.  We are in

18   agreement that this is what we consider to be sufficient.

19         THE COURT:  All right.  So where you draw attention to

20   specific entries on the log and requested supplementation they

21   did supplement?

22         MS. CHEN:  Correct.  Correct.

23         THE COURT:  And you found their supplementation

24   adequate?

25         MS. CHEN:  Correct.  We found -- we found that the

————TRANSCRIBED FROM DIGITAL RECORDING————

1  supplementation that they provided is what would be adequate

2  under Burlington and under Rule 26 in providing information that

3  would allow us to determine whether or not it was a valid

4  assertion of privilege.  And those were attached as Exhibit 7 to

5  our motion.  And if Your Honor looks at them, you will see that

6  they are substantively, fundamentally, and in nature different

7  from the description Your Honor just read.

8          If Your Honor doesn't have it in front of you, I'm

9  happy to read them or --

10         THE COURT:  That's not necessary.  I have read all of

11 these exhibits.  I don't have them memorized.

12         MS. CHEN:  Sure.  Absolutely.

13         THE COURT:  But I have them before me tabbed and

14 indexed.

15         MS. CHEN:  All right.  It is, again, Exhibit 7 to our

16 motion.  There is an e-mail communication and then there's an

17 attachment.  And I'm specifically referring to the attachment.

18         Okay.  So in the attachment I'd like to point out two

19 relevant columns, the description column which is towards the

20 middle and the supplemental description column which is on the

21 far right-hand side.  The description column contains

22 essentially the same type of conclusory limited descriptions

23 that the defense has provided in each of its three privilege

24 logs, and that is substantively conclusory and insufficient.

25         If you look at the supplemental description column,

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  that provides actual factual information.  For example, you

2  know, the first one -- the first supplemental description

3  states:  Outside counsel, Milbank, discussing IRS forms required

4  by Asset Purchase Agreement.  That's clearly a legal function.

5  And in no way can you discern that from the description column

6  of:  E-mail chain providing legal advice regarding acquisitions.

7  That is completely substantively different, fundamentally

8  different.  One is adequate.  One is not.  One is conclusory.

9  One is informative.

10       So the fact that the defense has in fact provided these

11  kind of supplemental descriptions shows that they are not only

12  capable of providing sufficient information, but they actually

13  understand the difference between what is sufficient information

14  and what is not.  They get it.  They've done it.  They just

15  refuse to do it as to the rest of the privilege log for some

16  reason and they haven't done it.

17       And I think that's significant here because the

18  question of, you know, what we consider to be sufficient is

19  shown right here by something that they authored and created and

20  produced.

21       THE COURT:  All right.  I have a 10:30 criminal

22  hearing, so I'm going to need to speed you up a little bit and

23  give opposing counsel adequate time to respond.

24       MS. CHEN:  Absolutely, Your Honor.  So I want to close

25  with this.

—TRANSCRIBED FROM DIGITAL RECORDING—

1          Again, waiver is an extreme remedy and I get that.  We

2   understand it.  We don't seek it lightly.  However, given the

3   facts and circumstances of this case, it really is the only

4   reasonable remedy that could possibly put us close to where we

5   would be had the defense met their obligations.

6          The Ninth Circuit upheld -- it upheld a finding of

7   waiver in a case that has strikingly similar facts to us in a

8   case where the defendant substantially changed their privilege

9   log after they produced it in which the defendant is a

10  sophisticated corporate litigant and a repeat player in the kind

11  of litigation -- in a case where -- I'm sorry.  I don't have it

12  in front of me.

13         Correct.  Those are essentially the facts and

14  circumstances the Ninth Circuit relied on to find that waiver

15  was to be upheld.  And these facts and circumstances are also

16  present in this case, but even more so because -- because the

17  descriptions in the privilege log are so deficient and they have

18  been every single time.

19         Now, we're sitting here two months after the close of

20  discovery.  We're sitting here after we have completed

21  essentially all of our discovery conducts, all of our

22  depositions.  We've prepared our witnesses or we've prepared our

23  experts and the experts have prepared their reports with this

24  body of documents that doesn't include the improperly withheld

25  documents.

——TRANSCRIBED FROM DIGITAL RECORDING——

 1          THE COURT:  So what, if any, remedy are you asking,

 2    other than waiver and compel production of the entirety of the

 3    documents still withheld?

 4          MS. CHEN:  And that's a good question, and that's a

 5    question that Magistrate Judge Koppe actually specifically

 6    addressed in the Bullion case, essentially what are our other

 7    options here.  And one possibly other option she considered was,

 8    you know, if the defense were to be given another chance to

 9    produce a privilege log that would be sufficient and then, you

10    know, you and I can assess it.  You can -- we can challenge the

11    ones we think are insufficient --

12          THE COURT:  By then all of the discovery had been

13    completed.

14          MS. CHEN:  Correct.

15          THE COURT:  In that case it was produced days before

16    the disclose -- the close of discovery.  And there were 1,200

17    privileged documents; not 12,000.

18          MS. CHEN:  Right.

19          THE COURT:  And the total number of documents produced

20    in the case was 30,000, and the defendants spent their time

21    doing summary judgment motions instead of producing a privilege

22    document log.  And then Judge Koppe found that there was no

23    possible way that all of the steps could be accomplished in the

24    ordinary course in time for the defendants to meet the district

25    judge's extended deadline for filing responses to the summary

─TRANSCRIBED FROM DIGITAL RECORDING─

1  judgment motions.

2        MS. CHEN:  That is exactly true.  And then in this case

3  if we were to undertake something that's short of waiver,

4  something like, Look, let's give the defense a fourth bite at

5  the apple whereby you and I can then assess the privilege log

6  and, you know, we can make challenges and we can review them and

7  so forth, that's going to push this -- I mean, we're talking

8  about, like you said, a --

9        THE COURT:  But you're not asking me for that.  You are

10  not asking me to reopen any deposition.  You're not saying

11  there's any key documents that you've discovered that were

12  wrongfully withheld, that you've been irreparably damaged, or

13  that you haven't been able to respond to, or that you -- you now

14  have them for your experts to consider if it alters their

15  analysis.  You're not telling me that anything you were

16  produced -- that was produced of the 200 of the 12,000 that they

17  produced, admittedly late in the case, changed the landscape,

18  other than it would have been nice to have before you took the

19  depositions that you took.

20        MS. CHEN:  It would have -- I mean, because we didn't

21  get them until literally the very end and we had already

22  conducted all of discovery and formed our case strategy, it's

23  kind of hard to say, Well, if we had this in the beginning, this

24  is how it would be different because we have already gone so

25  far.

——————TRANSCRIBED FROM DIGITAL RECORDING——————

1        THE COURT:  Understood, but I'm asking you these

2   questions in the course of conducting the wholistic evaluation

3   I'm supposed to.

4        MS. CHEN:  Absolutely.

5        THE COURT:  I have been in cases in which after the

6   close of discovery or after a key witness was taken we'd get a

7   document in a plant explosion case that says, If we do this,

8   which they denied they did, we're going to have a crater the

9   size of a football field.  Now, that altered what the witness

10  had testified to and there were other remedies that were

11  available, but we don't have that type of situation here.  We

12  have a situation in which you had massive document productions.

13  You culled through 12,000 documents.  200 should have been

14  produced to you and were significant to you.

15        And what you can't tell me is that they changed

16  anything, changed any analysis, changed your expert reports,

17  changed -- they directly contradict something specifically

18  stated by a witness, were not available to respond to a

19  dispositive motion, and that changed or that materially changed

20  the outcome because I'm with you.  These documents should have

21  been produced.  And I had to enter several written decisions in

22  order to prompt the defendant in reevaluating its privilege

23  assertions.

24        MS. CHEN:  Sure.  Absolutely, Your Honor.  And, you

25  know, with regard to the experts, the experts take many months

—TRANSCRIBED FROM DIGITAL RECORDING—

1   to come up with their reports and their analyses and their

2   conclusions.  And at the time that these documents

3   had finally -- these 12,000 documents -- we had finally finished

4   reviewing them and we were in a position where we can say, Hey,

5   by the way, do you want to take a look at these and see if they

6   change our analysis in any way, we were already -- I mean, the

7   expert reports were already substantively done by that point,

8   and we were already coming up on a deadline for filing these

9   expert reports.

10          So we didn't -- I mean, I don't think we were really in

11  a position to scramble and say, Wait.  Let's go back to square

12  one and see if this could have changed anything.  I mean, the

13  expert reports have already been filed in this case.  In fact,

14  the defense has already completed taking the depositions of our

15  experts in this case based on the data that they had that didn't

16  include these hot documents or any of these 12,000 documents.

17          THE COURT:  All right.

18          MS. CHEN:  So it's -- you know, it necessarily involves

19  a degree of speculation to say whether or not the remainder of

20  the withheld documents can or will or may change the direction

21  of the case, but really the point, Your Honor, is that we --

22  because of the defense, we don't have a way to ever find out.

23  We never had a way to substantively or meaningfully change or,

24  I'm sorry, to substantively or meaningfully challenge any of

25  their assertions as to privilege on these remaining documents

───── TRANSCRIBED FROM DIGITAL RECORDING ─────

1  because the information they provided was so late and so --

2          THE COURT:  All right.  You're just repeating yourself

3  because I've heard these arguments now very thoroughly discussed

4  and let me hear from opposing counsel.

5          MS. CHEN:  Thank you, Your Honor.

6          THE COURT:  Ms. Grigsby.

7          MS. GRIGSBY:  Good morning, Your Honor.

8          Let's just start by, let's say, the elephant in the

9  room which is this Court has issued several rulings on

10 privilege, and we have taken those to heart.  And as a result,

11 Zuffa began reevaluating its privileged withholdings well before

12 we even had our first -- our in-person meet and confer with

13 plaintiffs on June 20th, 2017, as reflected in the fact we noted

14 in our paper it took 3,500 attorney hours for us to try to come

15 up with some system so that we could re-review, in light of the

16 Court's direction, what is privileged and what is not.

17         And as this Court is well aware, part of the

18 complication is that some of the primary custodians were the

19 legal department itself, three attorneys, and a paralegal who

20 did quite a bit of correspondence and did what they would

21 characterize as legal review as we've noted in Mr. Epstein's

22 deposition of many, many of the contracts.

23         The problem here, however, after this re-review we

24 produced 12,000 documents.  All of which were produced except

25 for a handful dealing with financial documents by July 10th,

———————TRANSCRIBED FROM DIGITAL RECORDING———————

1  2017.  And all of which were produced before the second

2  depositions of Mr. Hendrick, Mr. Mersch, Mr. Epstein, and the

3  White deposition.

4       So the question really is -- and I think the problem

5  here is not really the privilege log, but it's that plaintiffs

6  are trying to change the rules of the game and rewrite the

7  facts.

8       So opposing counsel handed up a list of exhibits.  We

9  did a fact check on these exhibits to see when were they -- when

10 they were produced and whether they could have been used in

11 depositions.  The first document, this Bates stamp ZFL 2706585,

12 was actually produced, a different version of it, on July 20th,

13 2016.  It was a year before all of the depositions, prior to

14 Ms. Long's deposition.  The reason it got reproduced is because

15 we noted that we had produced it before and that it was not

16 privileged.  It was just a mistaken withholding.

17       The second one was produced before June 30th, 2016.

18 The third video game exhibit, which is ZFL 2704608, was actually

19 produced in March of 2017 and, therefore, Mr. -- Mr. Epstein

20 could have -- a different version was produced in full.

21 Mr. Epstein could have been asked about this document.

22       And this fourth exhibit, ZFL 2704049, was produced

23 again before -- by June 30th, 2017.  Mr. Epstein had a

24 deposition on July 21st of 2017.  He could have been asked

25 during that time, and Mr. White's deposition didn't take place

---TRANSCRIBED FROM DIGITAL RECORDING---

1   until August 2017.

2           And, again, this Exhibit 5, ZFL 2704614, it's really

3   talking about an extension.  It was produced by June 30th, 2017.

4   You could have -- plaintiffs could have asked Mr. Epstein.  But,

5   furthermore, just to say the idea that Zuffa has used extensions

6   to somehow keep the fighters under control, we vigorously

7   dispute it.  But they have used other similar documents in their

8   depositions, and it's been one of the plaintiffs' theories of

9   the case from the very beginning.

10          And just to address the issue of the expert reports,

11  and as this Court is well aware, their expert reports were due

12  on August 31st, 2017.  So all of the documents they're pointing

13  out right now were produced over two months before their expert

14  reports were due.

15          So, here, they're trying to change the facts, but

16  they're not just trying to change the facts.  I think they're

17  trying to change the rules because we believe this dispute is

18  moot.  Again, as we said, we did a re-review based on this

19  Court's guidance, and as you saw, we did an in camera submission

20  to show how we had been determining privilege.  We engaged in

21  extensive negotiations.  We did several meet and confers with

22  plaintiffs starting in April of 2017 on how to resolve the

23  remaining issues with the privilege log.  And in fact, as noted

24  in the plaintiffs' original motion and in our opposition, we

25  actually had an in-person meet and confer on June 20th, 2017; in

—TRANSCRIBED FROM DIGITAL RECORDING—

1  which we informed them that we plan to re-review the areas, the

2  targeted areas, that they had pointed out.  We agreed that we

3  would produce them later in correspondence on June 24th, 2017,

4  by July 10th, 2017.  And we told plaintiffs that we would

5  provide similar descriptions for the re-reviewed entries to what

6  we had done earlier with acquisitions that they pointed out.

7  Plaintiffs' counsel said in person this was not -- that they

8  couldn't have asked for anything more.  Those were his precise

9  words.

10      Now that we've re-reviewed these and produced 12,000

11  documents, plaintiffs are asking for something different.  So

12  they're trying to change the agreement.

13      And, literally, they are trying to change the

14  requirements of Rule 26(b)(5), which does not create a bright

15  line, in order to advance their privilege dispute.  Even putting

16  aside the fact that the parties have this agreement, they have

17  little basis to claim that the revised log doesn't meet the

18  requirements of 26(b)(5).  I think we've noted this in our

19  opposition, but our descriptions are substantially similar to

20  those that plaintiffs have on their privilege log.

21      And, yet, they ask for a waiver --

22      THE COURT:  Well, they tell me that there's a

23  qualitative difference in their privilege log because of the

24  nature of the communications that involve individuals and

25  communications with outside counsel as opposed to a corporate

—TRANSCRIBED FROM DIGITAL RECORDING—

1  structure that uses lawyers in dual capacities.

2        MS. GRIGSBY:  I mean, they're saying that because

3  they're saying for the purposes of assessing -- I guess in the

4  very broad sense of (b)(5) it's harder for them to assess

5  because we have many, many lawyers, but that doesn't change the

6  requirements of the rule which is generally you write the

7  sender, the recipient, the general nature of the communication.

8  And where plaintiffs have asked for more information, as they

9  did in the meet-and-confer process on June 20th, 2017, we agreed

10  to provide it to them.

11        So, I mean, again, I think it's really, really

12  important to look at the Advisory Committee note which is on

13  (b)(5).  When this section was added to the rules, and as I'm

14  sure this Court is aware, the Advisory Committee in 1893 says:

15  The rule does not attempt to define for each case what

16  information must be provided when a party asserts a claim or

17  privilege or work product protection.  Details concerning time,

18  persons, general subject matter, etc., may be appropriate if

19  only a few items are withheld, but may be unduly burdensome when

20  voluminous documents are claimed to be privileged or protected,

21  particularly if the items can be described by categories.

22        I mean, this is what the Advisory Committee

23  contemplates.  Yes, it means to be substantially harder, but on

24  the other hand, it is incredibly burdensome.  I mean, Your

25  Honor, we took a substantial amount of resources in order to try

————— TRANSCRIBED FROM DIGITAL RECORDING —————

 1  to address issues with the privilege log, making sure that we

 2  were faithful to this Court's order.  It was not a small

 3  undertaking.  And now the plaintiffs merely want more because,

 4  again, they have this sense that there are items marked on the

 5  privilege log when the items they've shown you today they've

 6  already seen and they saw before the deposition.  And many

 7  items -- and I'm not going to -- I know this Court is in a

 8  hurry -- are really of very little significance.

 9       For example, the fact that they can point to 200 hot

10  documents out of 17,200 shows that many of these are just not

11  significant.  There were lists of communications between

12  associate general counsel and a paralegal which merely say:  Is

13  this contract okay?  Is this okay to review?

14       We've decided to withhold our claims of privilege

15  because it's not worth the effort to get the declarations for

16  every single one or to fight over it, but, I mean, every single

17  one is arguably --

18       THE COURT:  And I understand your arguments in that

19  regard, and I have looked at your privilege log and the revised

20  privilege log.  The one issue that I have is with respect to the

21  entries on the July 11th privilege log that include a third

22  party as a recipient or a sender.

23       MS. GRIGSBY:  So for the recipient or sender, for

24  example, for Bonnie Worth, Bonnie Worth is actually an agent,

25  was acting literally as an agent for Zuffa.  So that is our

—TRANSCRIBED FROM DIGITAL RECORDING—

1  basis to withhold based on privilege.  And I'll also note that

2  plaintiffs withheld communicate -- claimed privilege over

3  communications between lawyers and agents on their own privilege

4  log.

5        We would be happy to provide supplemental information

6  even to this Court on those particular instances and those

7  particular individuals and why we claimed privilege.  But,

8  again, this blanket argument that somehow our log is deficient

9  even after plaintiffs have made an agreement, we've lived up to

10 our end of the bargain, at this point seems unfair.  And, in

11 fact, I would --

12       THE COURT:  You're talking about the agreement to

13 narrow the category of documents on the privileged log that they

14 were most interested in, which is what you did.

15       MS. GRIGSBY:  We did, and we also revised descriptions

16 for those categories.  So we actually did go through, which is

17 why it took so many man hours, and attempted to revise the

18 descriptions to give them the information that they said they

19 thought was deficient and they couldn't ask for more.

20       But, I mean, here again, you know, if this Court is

21 inclined, we can have notes with respect to the third parties,

22 but it just seems significant that --

23       THE COURT:  No, you're representing to me as an officer

24 of the court that the third parties that you're referring to for

25 which documents were withheld on the basis of privilege were

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1   appropriately withheld because they involve individuals with

2   whom you have a good faith basis to believe they were acting as

3   agents and, therefore, covered by the privilege notwithstanding

4   that they were not part of your organization.

5           MS. GRIGSBY:  Correct, Your Honor.  I personally

6   reviewed the agreement between the entities.  So there was an

7   agency agreement, at least with respect to Bonnie Worth and

8   several others that plaintiffs had raised.  We actually did

9   conduct that assessment.  It was not -- we did not lightly take

10  their claim that we were adding third parties to destroy the

11  privilege.

12          So generally, again, I think Your Honor understands the

13  issues, understands the facts.  I'm willing to respond to more

14  questions, but I would like to keep this brief.  But just to

15  say, I mean, from our standpoint this really is an abuse of the

16  discovery process.  In fact -- the fact that the parties have

17  worked together, reached an agreement, and then a month later

18  they filed a motion to compel, and even after we've produced the

19  documents, changed our descriptions, have continued to take the

20  resources of both the parties to pursue this motion -- and, in

21  fact, just to note, their reply brief still points out errors,

22  but they had to correct their reply brief because initially

23  they --

24          THE COURT:  They said twice that you refused to meet

25  and confer.  I saw that.

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1        MS. GRIGSBY:  And, in fact, there was correspondence

2   that the same day offered to meet -- on Friday offered to meet

3   and confer on Monday and Tuesday, but also they said that Kirk

4   Hendrick was on several of the communications before he was

5   chief legal officer.  That was because he was general counsel of

6   the company at that time.  He was -- he had gone from general

7   counsel to COO solely to chief legal officer, but he was

8   actually general counsel.

9        I mean, this is an abuse of the discovery process, to

10  continue on and to kind of change the facts in order to pursue

11  this dispute and use the resources of the parties.  And with

12  that, we'd just respectfully request that this Court deny the

13  plaintiffs' motion to compel.

14        THE COURT:  Ms. Chen, you can have exactly two minutes

15  for brief rebuttal.

16        MS. CHEN:  Thank you, Your Honor.

17        I think for the defense to get up here and tell you

18  that we are the ones abusing the discovery process is quite rich

19  given the facts and circumstances of this case.  We're not the

20  ones that produced --

21        THE COURT:  She does have a point about you negotiated

22  an agreement about the documents you were most interested in and

23  got those agreements and -- got those documents and got the

24  revised description of the documents you were most interested

25  in, and now you're swinging for the fences on the rest of it.

—TRANSCRIBED FROM DIGITAL RECORDING—

1        MS. CHEN:  So it's -- her representation that they

2   lived up to their end of the agreement I believe is incorrect.

3   The agreement that we had was that they would re-review those

4   filed -- those 17,000 documents, which they did, and then

5   subsequently changed the descriptions on the entries such that

6   we were able to get the information we need to know whether or

7   not we want to challenge.  They didn't do that.  Your Honor, if

8   you look at the sampling of the July 11th log versus the April

9   7th log and the April 24th log, they are substantively the same.

10  They may have added a few words, but the words that matter, just

11  the conclusory assertion that this is legal advice without the

12  information that we need, that didn't change.

13       And, again, if you look at the descriptions in the July

14  11th log, they look nothing like the descriptions in Exhibit 7

15  which we agreed, again this was part of the agreement that she

16  referred to, we agreed that they would provide that kind of

17  information in the privilege log because that is the information

18  that is legally sufficient under Rule 26 and Burlington.  They

19  didn't do that.  They didn't do that in the July 11th log.

20  Instead, they gave us 12,000 documents 20 days before the close

21  of discovery that we weren't able to meaningfully use at that

22  point; because even though they gave it to us on June 30th, we

23  weren't able to review 12,000 documents until the very end of

24  July.  And at that point we had already finished mostly

25  preparing for the few depositions that we had left.  Our expert

—TRANSCRIBED FROM DIGITAL RECORDING—

1   reports were substantively completed.  They were submitted on

2   August 31st.  The experts aren't going to go back to square one

3   on August 1st when they've been working on this for months and

4   months and months.

5            So really to say that, you know, you didn't really do a

6   whole lot with what we gave you is looking at the argument

7   backwards.  We could not do a whole lot with it because we

8   thought --

9            THE COURT:  But you don't address the fact of the five

10  examples that you just gave me --

11           MS. CHEN:  Yes.

12           THE COURT:  -- Ms. Grigsby just told me that every one

13  of those were produced either earlier or in other productions or

14  in another iteration.

15           MS. CHEN:  The documents, I don't believe each and

16  every one was previously produced.  I believe some were in fact

17  produced for the first time on June 30th.  And to the extent

18  that previous versions --

19           THE COURT:  She told me that two of them were -- oh,

20  three of them were.

21           MS. CHEN:  Right.  And to the extent that previous

22  versions were produced, Your Honor, those versions were redacted

23  partially or in regard to the important parts of the document.

24  So the fact that they were produced doesn't mean that they were

25  produced in a meaningful usable way.

—————————TRANSCRIBED FROM DIGITAL RECORDING—————————

1              Thank you.

2              THE COURT:  Thank you.

3              Well, I have carefully reviewed and considered the

4     moving and responsive papers and put this in the context of a

5     very lengthy litigation and a series of disputes, including a

6     number of disputes resulting in written orders and decisions on

7     the scope of the privilege that has been claimed and the issues

8     as they pertain to this case.  And I am satisfied that the

9     defendants have with the revised privilege log and in connection

10    with the agreements of the parties negotiated in connection with

11    the issues in this case satisfied their obligations.  And I'm

12    particularly impressed with the in camera review of the Dana

13    White documents which everyone acknowledges is a -- one of the

14    central key figures involved in this case.

15             Of the documents that I ordered and submitted for in

16    camera review on a random basis, the defense privilege was

17    sustained on the overwhelming majority of the documents, and I

18    found that less than 10 percent of the documents withheld should

19    be produced, a couple in their entirety and several were

20    appropriately redacted.

21             And so having satisfied myself that defense counsel did

22    an excellent job under the circumstances -- I've conducted

23    document reviews.  And you can have 10 associates or 10 partners

24    review 100,000 documents a piece, and you'll have disagreement

25    among them about what should be produced, what's responsive,

──────TRANSCRIBED FROM DIGITAL RECORDING──────

1  what is appropriately privileged, what is not.  On balance, I

2  find that given the entire history of this case, the magnitude

3  of the document production, the way the parties have worked

4  through their disputes that the motion to compel should be

5  denied.  And that's the order.

6          Thank you.

7          MS. GRIGSBY:  Thank you, Your Honor.

8          (Whereupon the proceedings concluded at 10:29:33 a.m.)

9                         --oOo--

10      I, Patricia L. Ganci, court-approved transcriber, certify

11  that the foregoing is a correct transcript transcribed from the

12  official electronic sound recording of the proceedings in the

13  above-entitled matter.

14

15   /s/ PATRICIA L. GANCI        October 4, 2017
         Patricia L. Ganci               Date
16

17

18

19

20

21

22

23

24

25