# EXHIBIT 2

## FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEVADA

CUNG LE, NATHAN QUARRY, JON FITCH, )NO. 2:15-cv-01045-RFB-(PAL)
BRANDO VERA, LUIS JAVIER VAZQUEZ,  )
and KYLE KINGSBURY on Behalf of    )
themselves and all others          )
similarly situated                 )
                                   )
     - vs -                        )
                                   )
ZUFFA, LLC, d/b/a ULTIMATE         )
FIGHTING CHAMPIONSHIP and UFC      )
- - - - - - - - - - - - - - - - - -

            ORAL DEPOSITION OF GUY DAVIS, CPA, taken by and

before KRISTIN N. McCUSKER, Registered Merit Reporter,

Certified Realtime Reporter and Notary Public, at the offices

of BERGER & MONTAGUE, 1622 Locust Street, Philadelphia, PA, on

Tuesday, September 19, 2017, commencing at 10:54 a.m.

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 122

```
 1   if it would affect the mean or the median.
 2   It's not something I can do on the top of
 3   my head.
 4   Q.   Now, in compiling table 14 in
 5   Exhibit 4, did you look at the number of
 6   bouts each fighter fought per year?
 7   A.   No.
 8   Q.   Did you consider the impact of
 9   fighter contracts that Zuffa may have
10   acquired as opposed to -- as a result of
11   acquisitions?
12   A.   No.
13   Q.   Did you look at whether any of the
14   fighters negotiated better contracts with
15   Zuffa, meaning fighters who may have been
16   with Strikeforce or another promoter, after
17   Zuffa acquired that other MMA fighter?
18   A.   I did not look at that issue.
19   Q.   Did you consider the fighters -- the
20   number of fighters who were injured or
21   otherwise could not perform under their
22   agreements?
23   A.   No.
24   Q.   Did you analyze fighter compensation
```

Page 123

```
 1   trends over time?
 2   A.   No.
 3   Q.   Did you look for any particular
 4   trends by a particular group of fighters,
 5   for example, men versus women?
 6   A.   No.
 7   Q.   Did you analyze undercard fighters
 8   versus main-event fighters, their
 9   compensation?
10   A.   No.
11   Q.   Did you consider any differences of
12   cross-weight classes, meaning heavyweights
13   versus, say, bantamweight fighters?
14   A.   No.
15   Q.   Did you look at fighters' base
16   compensation based on rankings, meaning
17   headline fighters or headliners, I guess,
18   versus other fighters?
19   A.   No, I did not.  I wasn't asked to do
20   any of the things that you've mentioned.
21   Q.   And did you look at the impact of
22   compensation for fighters based on their
23   win/loss records?
24   A.   No.
```

Page 124

```
 1   Q.   And did you consider whether Zuffa
 2   matched or beat an offer from an MMA
 3   competitor?
 4   A.   No.
 5   Q.   Did you look at what the
 6   profitability of particular fighters were
 7   to Zuffa as an enterprise?
 8   A.   No.
 9   Q.   Did you attempt to look at the
10   profitability of any individual fighters to
11   Zuffa as an enterprise?
12   A.   No.
13   Q.   Did you consider whether fighters
14   received benefits from Zuffa for their
15   association with Zuffa other than the
16   identity compensation and by bout
17   compensation?
18   A.   Yes.
19   Q.   And what did you consider?
20   A.   I considered what was listed in
21   their detailed financial statements in
22   the -- included in the accounts that
23   related to medical insurance and what they
24   called other fighter costs.  And I included
```

Page 125

```
 1   them in value conveyed to the fighters to
 2   be conservative to make sure that I was
 3   capturing what the company had and what the
 4   company agreed to provide for its fighters
 5   in putting together the bouts.
 6   Q.   Did you assign any value to what the
 7   fighters benefited from their association
 8   with the UFC brand?
 9   A.   No.
10   Q.   Did you assign any value to any
11   benefits the fighters might have gotten
12   from being put -- being the UFC
13   distribution model?
14        MR. KOFFMAN:  Object to the
15     form.
16        Go ahead.
17   BY MS. GRIGSBY:
18   Q.   Well, did you account for any value
19   the fighters may have gotten, say, for
20   having their fights televised across the
21   country as a result of being in UFC?
22   A.   My analysis is limited to what --
23   the expenses they paid on their behalf to
24   insure and protect them and the
```

Page 126

```
 1  compensation that they received directly.
 2  Q.   So these other benefits such as the
 3  association with the UFC brand for
 4  potential exposure, sponsorship
 5  opportunities outside of the Octagon, there
 6  is no entry for the value of those in the
 7  fighter compensation, is there?
 8         MR. KOFFMAN:  Object to the
 9     form.
10         THE WITNESS:  That's correct.
11  BY MS. GRIGSBY:
12  Q.   In your report of Zuffa's loans and
13  borrowing, you discuss the portion that was
14  distributed to the owners.  Did you analyze
15  how the remaining loan proceeds were used
16  by Zuffa?
17  A.   Yes.
18  Q.   And what did you find?
19  A.   If you look at page 21, table 5 of
20  my expert report, we broke down the
21  proceeds from each of the loan issuances
22  from 2007 to 2014 and isolated what their
23  uses were in the columns out to the right.
24       And so the total borrowings were
```

Page 127

```
 8  Q.   Do you know if any of the working
 9  capital that came from either the
10  refinancing or the original loans
11  ultimately was paid out in the form of
12  compensation to fighters?
13  A.   No, I don't.
14  Q.   Did you allocate any of the interest
15  associated with the borrowing to the
16  benefits that the fighters received or the
17  value that the fighters received?
18  A.   No.
19  Q.   Then why did you allocate a portion
20  of the interest expense to the Zuffa equity
21  holders?
```

Page 128

```
 3  Q.   If some of the working capital was
 4  then used to pay for fighter compensation,
 5  then by the same token, shouldn't part of
 6  the interest then be attributable to the
 7  value the fighters received as well?
 8  A.   There's no -- there's no link that
 9  I'm aware of between the loan proceeds and
10  the fighter compensation.
11       You know, the working capital -- the
12  working capital component of this has to do
13  with changes in balances in accounts
14  payable and accounts receivable.  For a
15  company that's growing, you have increased
16  working capital requirements.  So it was
17  used for part of the management of the
18  balance sheet and liquidity of the company.
19       The fighter compensation was
20  financed by the sales of the company
21  throughout this time period.  So I don't
22  see a link at all between the small amount
23  of borrowings that falls over into working
24  capital and fighter compensation that would
```

Page 129

```
 1  cause me to allocate any portion of that
 2  remaining interest to fighter
 3  compensation -- to the fighters.
 4  Q.   So the answer then is, no, you
 5  didn't allocate any of the interest
 6  to fighter --
 7  A.   I did not.
 8  Q.   -- compensation?
 9       Then let's talk about Zuffa's
10  financial capacity to enhance compensation
11  to fighters.  And this starts on page 32 of
12  your report.
13       So in paragraph of 51, you write:
14  From 2005 to 2016 and at all times during
15  the class period, Zuffa had the financial
16  wherewithal to pay its fighters
17  substantially more than the amounts
18  actually paid.
19       What do you mean by "substantially"
20  in that sentence?
21  A.   It could have paid the fighters a
22  lot more than they were actually paid.
23  When you consider the distributions that
24  were made, the excess aviation costs and
```

Page 130

1  the management fees that were paid, which
2  are discretionary in nature, the executives
3  and shareholders of the company could have
4  elected not to pay those and pay the
5  amounts to the fighters and that would have
6  been a significant amount of money.
7  Q.   Other than the management fees and
8  the aviation expenses, what amount do you
9  believe should -- could have been paid to
10 the fighters during the class period?
11 A.   I didn't do that analysis.  I didn't
12 quantify that amount.  I just merely was
13 opining that more money could have been
14 paid to them.
15 Q.   So you don't have an opinion as to
16 how much more could have been paid to the
17 fighters during the class period by Zuffa?
18         MR. KOFFMAN:  Object to form.
19         You can answer.
20         THE WITNESS:  That's correct.
21 BY MS. GRIGSBY:
22 Q.   If you were to do the calculation,
23 how would you determine how much more Zuffa
24 could have paid to fighters during the

Page 131

1  class period?
2  A.   I'd have to think about that.  You
3  know, sitting here, I'm not sure exactly
4  how the calculation would be done.  I think
5  it would be -- it's a complicated analysis,
6  but I'm not sure that I could articulate
7  exactly how it would be put together.
8  Q.   And what factors would you consider
9  in performing this analysis of exactly how
10 much more fighters could be paid by Zuffa?
11         MR. KOFFMAN:  Object to form.
12         Asked and answered.
13         THE WITNESS:  Well, as I
14     said, there would be -- I'm not sure
15     I'll capture them all.  But you
16     would want to consider the cash
17     balance that the company has at
18     various points in time, the
19     company's operating cash flow, its
20     dividend policy and its borrowing
21     capacity, and then I'm sure there's
22     many other things that you'd want to
23     consider as well.
24         And in this context, you'd

Page 132

1  also want to consider how much money
2  could be paid by the foreclosed
3  competitors in a but-for world.
4        THE COURT REPORTER:
5  Competitors?
6        THE WITNESS:  In a but-for
7  world.
8  BY MS. GRIGSBY:
9  Q.   But you are not opining on whether
10 Zuffa engaged in any anti-competitive
11 behavior, are you?
12 A.   No.
13 Q.   So when you say the amount of money
14 paid by foreclosed competitors, how would
15 do you that analysis, the money Zuffa, you
16 know, would be paid by foreclosed
17 competitors?
18 A.   I'm not sure how that analysis would
19 be done.  But any time you -- any time you
20 are contemplating an increase in pay to the
21 fighters, you are introducing a but-for
22 world, which according to the economists
23 would involve a larger MMA industry and
24 more competitors.

Page 133

1      So I don't -- I don't know sitting
2  here today how you would model how large
3  Zuffa would be in that instance or how
4  large their competitors would be and how
5  much they could afford to pay.
6  Q.   In this but-for world, is it
7  possible that some MMA fighters who fought
8  for Zuffa would not be fighting at all,
9  competing at all?
10        MR. KOFFMAN:  Object to the
11    form.
12        THE WITNESS:  I don't have an
13    opinion one way or another on that.
14    I don't know.
15 BY MS. GRIGSBY:
16 Q.   Is it possible in this but-for world
17 that the compensation of certain fighters
18 might actually decrease?
19        MR. KOFFMAN:  Object to the
20    form.
21        THE WITNESS:  Because I don't
22    know sitting here how the analysis
23    would be done and I'm not part of
24    the economic team that put together

Page 134

```
 1    the analysis in analyzing what this
 2    but-for world would look like, I
 3    don't know how to answer that
 4    question.
 5  BY MS. GRIGSBY:
 6  Q.    Are you offering an opinion as to
 7  whether Zuffa provided an unreasonable rate
 8  of return to its equity holders?
 9  A.    No.
10  Q.    And are you offering an opinion that
11  it's inappropriate for a company to run its
12  business in a way that maximizes its return
13  to shareholders?
14  A.    I'm sorry.  Could you repeat that
15  again?
16  Q.    Are you offering an opinion that it
17  is inappropriate for a company to run its
18  business in a way that maximizes its return
19  to shareholders?
20  A.    I'm not offering an opinion one way
21  or another on that.  I've not been asked to
22  analyze that issue.
23  Q.    Now, in the next sentence of
24  paragraph 51, you say:  Zuffa's exceptional
```

Page 135

```
 1  revenue growth, profit margins and
 2  borrowing capacity afforded management and
 3  equity holders the ability to forego all or
 4  a portion of their discretionary
 5  distributions, excessive aviation expenses,
 6  and management fees to pay fighters more.
 7      I think that's what you testified
 8  about earlier.
 9      But what do you consider an
10  exceptional revenue growth?
    [redacted]
13  Q.    And at what rate would it no longer
14  be exceptional?
15        MR. KOFFMAN:  Object to the
16      form.
17        THE WITNESS:  Again, I don't
18      have a numeric threshold for those
19      types of things.  I think for a
20      company over a 12-year period of
21      time to grow double digits each and
22      every year is, as I've deemed here,
23      exceptional.
24  BY MS. GRIGSBY:
```

Page 136

```
 1  Q.    So what would you consider a normal
 2  growth rate for a company like Zuffa?
 3        MR. KOFFMAN:  Object to the
 4      form.
 5        THE WITNESS:  I haven't
 6      analyzed what normal growth rates
 7      are for -- in the sports industry or
 8      for this particular -- or for fight
 9      promoters.  So I don't really have
10      an opinion on that.
11  BY MS. GRIGSBY:
12  Q.    Now, in the next sentence in
13  paragraph 51, you talk about a hypothetical
14  shift to enhanced fighter compensation.  Do
15  you see that?
16  A.    Uh-huh.
17  Q.    When you say a hypothetical shift in
18  enhanced compensation, what exactly do you
19  mean there?
20  A.    Well, we're referring to an instance
21  where, say, for example, they took a
22  million dollars and didn't pay it to the
23  shareholders as part of a distribution and
24  they chose to pay it to the fighters.
```

Page 137

```
 1  That's a hypothetical shift where I'm
 2  taking dollars away from the shareholders
 3  and I'm giving it to the fighters.
 4      And the point that I'm making in
 5  this sentence is that doesn't affect your
 6  ability to honor your obligations.  It
 7  doesn't -- because you are taking away
 8  distribution dollars to equity holders,
 9  it's not -- it's not like you are taking
10  money away from a creditor where you have
11  an obligation to that creditor.  So it's
12  not something that would cause -- there
13  would be a risk of an inability to pay
14  creditors.
15  Q.    Did you calculate whether if you
16  shifted discretionary distributions, the
17  excessive aviation expenses and management
18  fees into fighter compensation, whether
19  Zuffa would have been profitable in all
20  years during the class period or from 2015
21  to the present?
22  A.    No, I didn't.  Because, again, once
23  you increase fighter compensation, you are
24  in that but-for world.  And the MMA
```

Page 138

1  industry would have larger output,
2  according to the economists, and it would
3  be different.  And Zuffa would be a
4  different company.  I don't know whether it
5  would be larger or smaller.  But -- so I
6  haven't done that analysis.
7  Q.    Well, did you determine whether the
8  hypothetical shift suggested here in
9  paragraph 51 would have rendered Zuffa
10 insolvent at any time from 2005 to 2016?
11 A.    I guess that's the point of this
12 sentence.  If you take money that it's a
13 distribution to equity holders, which I've
14 said before did not render the company
15 insolvent, and you chose to pay it to a
16 fighter, thereby increasing their
17 compensation, you are not going to change
18 the solvency of the company at all.
19     So, no, I don't believe it would
20 create an insolvency.
21 Q.    But here, I didn't ask about
22 borrowing.  So I'm just asking about --
23 here, that's assuming that Zuffa borrowed,
24 correct?  Because as we discussed, there

Page 139

1  were distributions that were made with
2  borrowing, correct?
3  A.    Well, not during the class period.
4  Q.    But I asked you about 2005 to 2016.
5  A.    I'm sorry.  Could you repeat your
6  question again?  I'm not trying to be
7  evasive.  I misunderstood.
8  Q.    So did you determine whether from
9  2005 to 2016, whether this hypothetical
10 shift would have rendered Zuffa insolvent
11 at any point?
12     MR. KOFFMAN:  Object as asked
13 and answered.
14     But you can answer.
15     THE WITNESS:  Indirectly.
16 Because all I'm saying here is that
17 they could have foregone all or a
18 portion of their distributions and
19 shifted it to shareholders.
20     So because I'm saying all or
21 a portion, there is -- you know,
22 there's -- there's -- and you are
23 dealing with distribution dollars
24 to -- distribution or dividends to

Page 140

1  shareholders, if you redirected
2  those to the fighters, it wouldn't
3  change the solvency of the company.
4      So I didn't create a schedule
5  to evaluate the solvency.  But
6  inherent in this statement is that
7  there would not be insolvency
8  created by what I'm suggesting in
9  this hypothetical shift.
10 BY MS. GRIGSBY:
11 Q.    What things would you look at to
12 determine whether a company is insolvent?
13 A.    The value -- the fair value of its
14 assets versus the fair value of its
15 liabilities.
16 Q.    Would you consider things such as
17 negative equity?
18 A.    That's used as a starting point for
19 a company in determining a solvency
20 opinion.  But it is rarely, if ever, a
21 final say in whether or not a company is
22 solvent.
23 Q.    Would you look at its ability to
24 raise capital in determining solvency?

Page 141

1  A.    Not typically.  It's -- it's an
2  indirect component of a company's --
3  adequate capitalization or ability to pay
4  debts.  So it's, yes, something that would
5  be relevant to one of those two tenets.
6  Q.    Now, if Zuffa became insolvent,
7  would it impact Zuffa's ability to obtain
8  financing?
9      MR. KOFFMAN:  Object to form.
10     THE WITNESS:  Yes.
11 BY MS. GRIGSBY:
12 Q.    Would it impact the terms of the
13 financing that Zuffa was able to obtain if
14 it became insolvent?
15     MR. KOFFMAN:  Object to the
16 form.
17     THE WITNESS:  Yes.
18 BY MS. GRIGSBY:
19 Q.    Did you determine whether the
20 hypothetical shift that you referred to in
21 paragraph 51 would impact Zuffa's
22 enterprise value?
23 A.    No.  Because, once again, when
24 you're -- when you're evaluating a scenario

Page 142

1  where the fighters are paid more money,
2  you've introduced this but-for world
3  wherein the MMA industry is larger, it has
4  a higher output and there are more
5  competitors.  So in that instance, I don't
6  know how much larger or smaller Zuffa would
7  be in that world because I haven't done
8  that analysis.
9  Q.   Now, referring back to paragraph 33,
10  you discuss how Zuffa's cumulative net
11  income from 2005 to 2015 was insufficient
12  to fund the distributions Zuffa paid to the
13  original equity holders and January
14  Capital.
15      If you converted those distributions
16  to expenses, meaning fighter compensation,
17  wouldn't that mean that Zuffa would be
18  suffering losses during that entire time or
19  during at least most of that time?
20  A.   Again, as soon as you introduce a
21  scenario where fighters are being paid
22  more, it's unclear to me whether Zuffa is
23  going to be a larger or smaller company.
24  Because as the economists will tell you --

Page 143

1  based on what the economists are saying, it
2  would have great -- the industry as a whole
3  would have a greater output and there would
4  be more competitors.
5      So I can't tell if you paid this
6  additional funds to the fighters, whether
7  Zuffa would be a much larger company or a
8  smaller company.  I don't have that
9  analysis, and I don't have the ability to
10  determine that sitting here today.
11  Q.   But where in your report do you say
12  that you are analyzing this in the but-for
13  world?
14       MR. KOFFMAN:  Object to the
15    form.
16       THE WITNESS:  I don't say
17    that in my report.  I'm responding
18    to your question, because you've
19    asked me how much more they could
20    pay, and I've said I haven't opined
21    on how much more they could.
22  BY MS. GRIGSBY:
23  Q.   Well, your report, Exhibit 1, deals
24  with how much you believe Zuffa could pay

Page 144

1  historically.  Isn't that right?  Meaning
2  you are looking at their historical
3  expenses, their historical distribution,
4  the amount of historical capital, income to
5  determine whether Zuffa could have paid
6  more to fighters.  Isn't that right?
7       MR. KOFFMAN:  Object to the
8    form.
9       THE WITNESS:  Yes.
10       VIDEOGRAPHER:  Excuse me,
11    Counsel.  We need to take a break
12    and change tapes.
13       This completes Tape Number 1.
14       (At this time, a short break
15    was taken.)
16       VIDEOGRAPHER:  We're now back
17    on the record.  This commences Tape
18    Number 2.
19       Please proceed.
20  BY MS. GRIGSBY:
21  Q.   So before the break, we were just
22  talking a little bit more about the
23  hypothetical shift you mentioned in
24  paragraph 51, which is the amount of

Page 145

1  enhanced fighter compensation.
2      Now, when you are discussing this
3  hypothetical shift for enhanced
4  compensation, are you talking about in a
5  but-for world?
6  A.   No.
7  Q.   So when you are talking about the
8  hypothetical shift to enhanced
9  compensation, then are you talking about
10  based on Zuffa's finances from 2005 to 2016
11  as they existed?
12  A.   Yes.  And I think it's important to
13  note that the reason that I refer to
14  distributions, excessive aviation and
15  management fees in this instance as I wrote
16  this paragraph was to rebut a possible
17  argument on behalf of Zuffa that they
18  couldn't afford to pay any more.  So this
19  is in rebuttal to the notion that they
20  couldn't afford to pay any more.  And
21  clearly, that's wrong.  You could take some
22  portion of these discretionary items and
23  pay more.
24      That's the extent of the analysis.

Page 146

```
 1   It does use actual data, but it's there to
 2   rebut that notion.  It's not there as a
 3   damage estimate or anything else.  It's
 4   just I think I wanted to make it clear for
 5   the record as to why it is that statement
 6   is made.
 7   Q.   But when you say, "Forego all or a
 8   portion of their discretionary
 9   distributions, excessive aviation expenses
10   and management fees to pay the fighters
11   more," you didn't calculate what portion
12   of, for example, the discretionary
13   distributions could have been foregone in
14   order to pay fighters more?
15            MR. KOFFMAN:  Object to the
16        form.
17            THE WITNESS:  I did not.
18   BY MS. GRIGSBY:
19   Q.   After this hypothetical shift, did
20   you look at whether EBITDA would be
21   negative for any of the years between 2015
22   and 2016?
23            MR. KOFFMAN:  You mean 2005
24        to 2016?
```

Page 147

```
 1   BY MS. GRIGSBY:
 2   Q.   Sorry, yes. Thank you. Yes. So
 3   let me rephrase.
 4            After this hypothetical shift, did
 5   you look at whether EBITDA would be
 6   negative for any of the years between 2005
 7   and 2016?
 8   A.   Again, since I didn't quantify the
 9   magnitude of the hypothetical shift -- I
10   mean, I did not do the analysis you are
11   suggesting there either -- it wouldn't have
12   been -- I mean, I couldn't have done that
13   analysis because I didn't quantify how much
14   the hypothetical shift would be.
15   Q.   Did you analyze at what point in
16   this hypothetical shift between
17   distributions, for example, and fighter
18   compensation Zuffa's borrowing capacity
19   would be affected from 2005 to 2016?
20   A.   I did not analyze that.
21   Q.   Could a company sustain a negative
22   EBITDA indefinitely?
23   A.   No.
24   Q.   Is it your opinion that a thousand
```

Page 148

```
 1   dollars paid to Zuffa's equity holders
 2   would affect Zuffa's financial condition in
 3   the same way as a thousand dollars paid in
 4   fighter compensation?
 5            MR. KOFFMAN:  Object to form.
 6        You can answer.
 7            THE WITNESS:  I'm not sure
 8        how to answer that question.  In
 9        either circumstance, the entity has
10        parted with the thousand dollars, so
11        its assets are less than -- by a
12        thousand dollars.
13            So in one instance, it has a
14        thousand dollars less cash, and in
15        another instance, it has a thousand
16        dollars more expenses.  But I'm not
17        really sure how to answer that
18        question.
19   BY MS. GRIGSBY:
20   Q.   Does a thousand dollars paid as an
21   equity distribution affect Zuffa's
22   enterprise value?  How does it affect
23   Zuffa's enterprise value?
24   A.   It reduces its cash.
```

Page 149

```
 1   Q.   But a thousand dollars paid as an
 2   equity distribution, how does that affect
 3   Zuffa's enterprise value?
 4   A.   It reduces its cash.  If you make a
 5   distribution to equity holders, you reduce
 6   the cash, and that would affect enterprise
 7   value.
 8   Q.   And how does a thousand dollars paid
 9   to fight -- in fighter compensation affect
10   Zuffa's enterprise value?
11   A.   Well, again, when you deal with
12   paying fighters more money, in any
13   hypothetical, I'm only cautious because of
14   what the economists have said about the
15   impact of paying fighters more.  At the
16   thousand-dollar level, it probably wouldn't
17   have the effect that the economists are
18   contemplating.  But they do say that the
19   industry would be larger and there would be
20   competitors.
21            At a thousand dollars, the EBITDA
22   would be lowered by a thousand dollars.  If
23   you paid it to the shareholders, your cash
24   would be lowered by a thousand dollars.
```

Page 150

```
 1        Both have an impact on enterprise
 2   value.
 3   Q.   Under the latter, which is the
 4   fighters get a thousand dollars in
 5   additional compensation, then Zuffa's
 6   valuation would actually decrease.  Is that
 7   right?
 8   A.   Again, it depends on what valuation
 9   method you are using.  If you are using an
10   asset method, it wouldn't have any impact.
11   If you are using an earnings method or a
12   market method, it probably would.
13        But in the but-for world, I don't
14   know whether Zuffa would be larger or
15   smaller because I haven't done that
16   analysis, and I'm not exactly sure how it
17   would be done because of the impact on the
18   market.
19   Q.   Well, let's stick with outside the
20   but-for but using what you used for your
21   analysis.  And you used EBITDA at some
22   point, which is -- would EBITDA decrease if
23   more were paid out in fighter compensation?
24   A.   Yes.
```

Page 151

```
 1   Q.   Now, for valuation experts, do they
 2   usually assess the value of a company
 3   using -- do they usually adjust for
 4   management fees?
 5   A.   Sometimes.
 6   Q.   Do valuations in assessing a company
 7   usually adjust for excessive aviation
 8   expenses?
 9   A.   Yes.
10   Q.   Would a shift of expenses from
11   management fees and aviation, excessive
12   aviation expenses, have an impact on
13   Zuffa's enterprise or would it affect
14   Zuffa's enterprise value?
15   A.   It depends on if you are talking
16   about the company in the hands of its
17   current owners or in the hands of somebody
18   else.
19        If it stays with the current owners
20   and you are going to continue to pay the
21   aviation expense, then it wouldn't have any
22   impact whether you pay the aviation expense
23   or you pay the fighters.
24        In the context of a sale, if the
```

Page 152

```
 1   buyer -- if the buyer is not going to
 2   continue to pay those aviation expenses,
 3   the value of the enterprise may go up.
 4   Q.   But what about to a lender or
 5   somebody who is looking to invest, would
 6   the value of a company shift if there
 7   was -- the amount from aviation expenses
 8   went to fighter compensation?
 9   A.   I'm not sure.  If a lender is
10   looking at a company and it knows it's
11   [REDACTED]
12   expenses and there's no plans to change
13   that, the lender is going to assume that
14   that aviation expense is going to continue.
15   If the aviation expense is shifted to the
16   fighters, then what's left to service the
17   debt is the same number.
18        So I am not exactly sure how a
19   lender would look at it.  They might look
20   at it differently from a sense that if they
21   had to foreclose on the property and --
22   upon the default of the loan, they might
23   have the ability to discontinue the
24   aviation expenses.  But, you know, that
```

Page 153

```
 1   would be in the context of a foreclosure,
 2   and there would have to be an underlying
 3   reason for the foreclosure.  And it gets
 4   very complicated.
 5   Q.   Don't lenders look at what would
 6   happen in the case that they would have to
 7   foreclose on a loan and if there's no
 8   ability to pay, how they would recover
 9   their investment?
10   A.   Sure, sure.  But, you know, when
11   they -- they look at orderly liquidation
12   value or they look at the value they would
13   get upon foreclosure, which is not always
14   equal to what a company would sell for if
15   you sold it as a going concern.
16        And they consider the fact that by
17   the time you get to a need to foreclose
18   that other bad things have happened.  So
19   it's -- you know, it's certainly not the
20   ideal scenario or the only scenario they
21   look at.
22        They would like to look at the cash
23   flows of the company to know what cash is
24   going to be there to service my debt so
```