# EXHIBIT 4

## FILED UNDER SEAL

Page 174

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEVADA

```
_____
                              )
CUNG LE, NATHAN QUARRY, JON   )
FITCH, BRANDO VERA, LUIS      )
JAVIER VAZQUEZ, and KYLE      )
KINGSBURY, on behalf of       )
themselves and all others     )   Case No.
similarly situated,           )
                              )   2:15-cv-01045-
        Plaintiffs,           )   RFB-(PAL)
                              )
vs.                           )
                              )
ZUFFA, LLC, d/b/a ULTIMATE    )
FIGHTING CHAMPIONSHIP and     )
UFC,                          )
                              )
        Defendants.           )
_____)
```

VOLUME 2

VIDEOTAPED DEPOSITION OF GUY A. DAVIS, CPA

Washington, D.C.

Tuesday, January 30, 2018

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 179

1  for defendant, Zuffa, LLC.
2       MS. GRIGSBY:  Stacey Grigsby, Boies
3  Schiller & Flexner, for Zuffa, LLC.
4       MR. KOFFMAN:  Rich Koffman, Cohen
5  Milstein, for plaintiffs.
6       THE VIDEOGRAPHER:  Will the court
7  reporter please swear in the witness.
8  Whereupon,
9         GUY A. DAVIS, CPA,
10 after having been first duly sworn or affirmed,
11 was examined and did testify under oath as
12 follows:
13              - - -
14         EXAMINATION
15 BY MR. NORTH:
16    Q.   Good morning, Mr. Davis.  You've been
17 deposed in this case before, so I'll skip a lot
18 of the formalities today.
19    A.   Okay.
20    Q.   But I'll just say that if you don't
21 understand a question, please let me know.  And
22 if you answer, I'll assume you understood the
23 question.  Is that fair?
24    A.   That's fair.

Page 180

1       (Exhibit 1, previously marked for
2    identification, is attached hereto.)
3       (Exhibit 2 marked for identification
4    and attached hereto.)
5  BY MR. NORTH:
6    Q.   So for reference today I have handed
7  you a document marked G. Davis Exhibit 1 that was
8  introduced at your first deposition.  It's your
9  original expert report in this case.
10      And I've also handed you your rebuttal
11 report which has been premarked G. Davis
12 Exhibit 2.
13      Do you have those documents?
14    A.   I do.  May I take a second to look at
15 them?
16    Q.   You may.
17    A.   Yes, these both appear to be complete
18 copies of both reports.
19    Q.   Are there any matters on which you
20 disagree with Elizabeth Davis that you don't note
21 in one of your reports?
22      MR. KOFFMAN:  Object to the form.
23      THE WITNESS:  I'm not -- I'm not sure
24 I can answer that with certainty.  She makes

Page 181

1  a lot of points in her lengthy original
2  report.  I think -- I think the counsel has
3  instructed me to address certain of her
4  points that she makes in her report in my
5  rebuttal.  But I can't think of any off the
6  top of my head.
7  BY MR. NORTH:
8    Q.   Can you turn to page 8 of your
9  original report, please.
10      Is this a complete list of the
11 assignments you received from plaintiffs' counsel
12 as of the date of your original report?
13    A.   Yes.  And it goes on to page 9.  Yes.
14    Q.   Let's look at page 9, Number 5,
15 entitled "Financial Capacity."
16      Is it correct that your assignment
17 here was to determine whether Zuffa had the
18 financial capacity to pay more compensation to
19 its fighters than the actual amounts paid?
20    A.   Yes.
21    Q.   And as part of your work in preparing
22 your original report, you didn't attempt to
23 determine how much more Zuffa could have paid
24 fighters, did you?

Page 182

1    A.   I did not.
2    Q.   Did you have all of the relevant data
3  available to you to perform such an analysis?
4    A.   Since the first report, there were a
5  few extra financial statements that were provided
6  to us between the date of the first report and
7  the second report.  I believe in particular they
8  related to 2016.  And there may have been one or
9  two other pieces of information that were relied
10 upon in preparing my second report that I may
11 have obtained through independent research.
12      But with the exception of those two, I
13 think a lot of the data that I had in connection
14 with my original report was much of the same data
15 that I used to prepare the second report.
16    Q.   You mentioned that there were a few
17 extra financial statements provided to us.  What
18 does the "us" refer to?
19    A.   To Protiviti; to my firm.
20    Q.   And why were those provided to
21 Protiviti?
22      MR. KOFFMAN:  Object to the form.
23      THE WITNESS:  We asked for them.  I
24 don't believe -- we asked for them -- I



Page 183

1  think we asked for them in the original
2  report as well, but I don't think they had
3  been produced yet.  And then we asked for
4  them again, and when we did the second
5  report they were available.
6  BY MR. NORTH:
7     Q.  Do you know one way or another whether
8  plaintiffs' counsel already had possession of
9  those reports when you served your original
10 expert report?
11    A.  I do not know.
12    Q.  But you asked for the reports before
13 the original report and you did not receive them.
14 Is that fair?
15       MR. KOFFMAN:  Objection; asked and
16    answered.
17       You can answer it again.
18       THE WITNESS:  I believe it was more of
19    a general request in connection with the
20    original report, could we have all the
21    available audited financial statements for
22    Zuffa.
23       The two reports that I'm referring to
24    are kind of unique.  I don't believe -- I

Page 184

1     mean, they're unique in the sense that there
2     were two different financial statements.  It
3     was a presale stub period in 2016 and then
4     there was a separate report for the post
5     sale.
6        So, you know, I think the accounting
7     reports were prepared in connection with the
8     sale, so they were sort of outside the
9     ordinary course of Zuffa's traditional audit
10    process.  So that may have distinguished
11    them from others.
12       But originally we asked for all the
13    audited financial statements that were
14    available.  We received through 2015.  And
15    then in connection with the second report we
16    were given a separate file.  I don't
17    honestly know or recall the timing or where
18    they came from, but we were given a separate
19    file that had presale data that was relevant
20    to the rebuttal report.
21 BY MR. NORTH:
22    Q.  Before your first deposition,
23 plaintiffs never asked you at any point to
24 determine how much more Zuffa could have paid

Page 185

1  fighters as part of your assignment.  Is that
2  correct?
3     A.  That's correct.
4     Q.  Before the date of your last
5  deposition, you never performed computations in
6  any way to determine how much more Zuffa could
7  have paid fighters.  Is that correct?
8     A.  Well, I made the determination as part
9  of my original report that they could pay more.
10 So I did -- I did look at the amount of
11 distributions that were paid and the profits of
12 the company.  And it wasn't difficult to
13 determine that there was a capacity to pay more.
14 But I did not do a detailed analysis to determine
15 how much more they could have paid.
16    Q.  Do you recall testifying that the
17 reason you contemplated a hypothetical shift of
18 income from Zuffa's original equity holders to
19 the athletes was to rebut a possible argument on
20 behalf of Zuffa that they couldn't afford to pay
21 more?
22    A.  I do.
23       MR. KOFFMAN:  Object to the form.
24       Sorry.  Go ahead.

Page 186

1       THE WITNESS:  Excuse me.  I do.
2  BY MR. NORTH:
3     Q.  But despite anticipating that argument
4  from Zuffa before your last deposition, you did
5  not seek to calculate how much more Zuffa could
6  afford to pay.  Is that right?
7        MR. KOFFMAN:  Objection; asked and
8     answered.
9        You can answer.
10       THE WITNESS:  Yes.
11 BY MR. NORTH:
12    Q.  Let's turn to the list of assignments
13 in your rebuttal report, Exhibit 2, starting on
14 page 7.
15       In Paragraph 5 you state that counsel
16 instructed you to determine how much more Zuffa
17 could have paid its fighters assuming alternative
18 but feasible expense and capital structures.
19       Is that correct?
20    A.  Yes.
21    Q.  Did you use any information for that
22 analysis that was not available to you at the
23 time you prepared your original report?
24       MR. KOFFMAN:  Object to the form.  I



4 (Pages 183 to 186)

Page 187

1  believe he's answered that, but you can
2  answer it again.
3       THE WITNESS: The only -- the only
4  information that I had that was new was the
5  2016. All the other information from 2005
6  to 2015 I had.
7  BY MR. NORTH:
8     Q.   And I think you testified previously
9  that you didn't know one way or another whether
10 those documents were actually available to you.
11 Is that correct?
12      MR. KOFFMAN: Objection; asked and
13 answered.
14      THE WITNESS: I think my response was
15 we made a general request for audited
16 financial statements. I had assumed we
17 received everything that was available, and
18 then subsequently, when they -- when I was
19 asked to do the analysis of how much more
20 they could pay, I asked again if there was
21 information available for 2016.
22 BY MR. NORTH:
23    Q.   Would you have been able to perform
24 the analysis in your rebuttal report when you did

Page 188

1  your original report even though you didn't have
2  those two additional financial statements?
3       MR. KOFFMAN: Object to the form.
4       THE WITNESS: I would have had to make
5  assumptions about 2016 or I would have had
6  to limit the analysis to the period ending
7  December 31, 2015. I could have done an
8  analysis, but it wouldn't have been as
9  thorough as the one that's done here.
10 BY MR. NORTH:
11    Q.   In Paragraph 4 of your rebuttal report
12 you state that "Zuffa's expert, Elizabeth Davis,
13 opined that Zuffa could not have afforded to pay
14 the damages as set forth in the Plaintiffs'
15 expert reports submitted by Drs. Zimbalist and
16 Singer."
17      Do you see that?
18    A.   Yes.
19    Q.   Is that the opinion you are responding
20 to in your rebuttal report?
21    A.   Yes.
22    Q.   Are you responding to any other
23 opinions from Zuffa's experts?
24    A.   I don't think so.

Page 189

1     Q.   And Ms. Davis opined using the damages
2  numbers provided by plaintiffs' experts. Is that
3  right?
4     A.   Yes.
5     Q.   And those numbers are 972 million from
6  Dr. Zimbalist and 848 million from Dr. Singer for
7  one model, and 1.6 billion from Dr. Singer for
8  another model. Is that generally accurate?
9     A.   I'll take your word for it. It seems
10 accurate to me. I don't have the exact numbers
11 in front of me.
12    Q.   Okay. Other than plaintiffs'
13 economists' numbers, is it your understanding
14 that Elizabeth Davis offered an opinion regarding
15 the financial effect of increasing fighter
16 compensation by some other amount?
17      MR. KOFFMAN: Object to the form.
18      THE WITNESS: I'm sorry. Could you
19 repeat that question again?
20 BY MR. NORTH:
21    Q.   Sure.
22      So backing up a second. Paragraph 4,
23 you acknowledged that Elizabeth Davis's opinion
24 regards whether Zuffa could have afforded to pay

Page 190

1  the damages provided by plaintiffs' experts. Is
2  that right?
3     A.   Well, to be clear, the next sentence
4  makes it -- makes it more specific. Ms. Davis
5  said that if there is no increased market output,
6  that Zuffa could not have afforded to pay the
7  damages set forth by Dr. Zimbalist and
8  Dr. Singer.
9       My rebuttal report says that if you
10 assume no additional market output, this is what
11 Zuffa could have afforded to pay.
12      But in both her report and my report,
13 the assumption is that there is no increased
14 market output despite the fact that the
15 economists have said that there would be.
16    Q.   I see. So setting aside increased
17 market output, does Ms. Davis opine on Zuffa's
18 ability to pay any amounts other than the damages
19 estimates provided by plaintiffs' experts?
20      MR. KOFFMAN: Object to the form.
21      THE WITNESS: I don't believe so.
22 BY MR. NORTH:
23    Q.   In Paragraph 6 of your rebuttal
24 report, under Opinion 1, you state that Zuffa



Page 191

1  could have paid its fighters between
2  525.2 million and 706.7 million more than the
3  amounts actually paid and remained a financially
4  healthy company providing certain changes were
5  made to the company's expense and capital
6  structure.
7       Is that right?
8    A.  I'm sorry, were you at page 6 or
9  Paragraph 6?
10   Q.  I'm sorry, page 10, Paragraph 6.  Your
11 summary of opinions.
12   A.  Yes.  Could you repeat the question,
13 please?
14   Q.  Certainly.
15       So under Opinion Number 1, you state
16 that Zuffa could have paid its fighters between
17 525.2 million, Scenario 1, and 706.7 million,
18 Scenario 6, more than the amounts actually paid
19 and remained a financially healthy company
20 offering substantial returns for its investors
21 without the benefit of any additional growth in
22 the MMA industry.
23       Did I read that right?
24   A.  Yes.

Page 192

1    Q.  You did not determine that Zuffa could
2  have afforded to increase athlete compensation by
3  more than 706.7 million.  Is that right?
4        MR. KOFFMAN:  Object to the form.
5        THE WITNESS:  I didn't put a scenario
6    in here that would allow Zuffa to pay more
7    than 706, but I was conservative in
8    constructing this.  There are other
9    scenarios where they could have paid more
10   than 706, but I limited my analysis to these
11   six scenarios.
12       The real point of the report is that
13   there's any number of scenarios wherein
14   Zuffa could have paid, you know, 500 to
15   $700 million more to its fighters.  And the
16   purpose of setting forth six different
17   scenarios is just to present some examples
18   of what some of those scenarios are.
19 BY MR. NORTH:
20   Q.  And Scenario 6 offers the highest
21 amount of increased compensation.  Is that fair?
22   A.  It's the highest amount that I
23 included in my report, yes.
24   Q.  Were there any additional amounts that

Page 193

1  you concluded that Zuffa could have afforded to
2  pay that you did not include in your report?
3    A.  There are other scenarios where you
4  could pay more than 706, as I mentioned.  I
5  elected not to put them in my report because I
6  wanted my report to be conservative.
7    Q.  And do you intend to offer an opinion
8  at trial on those scenarios?
9    A.  No.
10   Q.  So you, in this report, did not
11 determine that Zuffa could have afforded to
12 increase athlete compensation by more than
13 706.7 million.  Is that true?
14       MR. KOFFMAN:  Object to form.
15 BY MR. NORTH:
16   Q.  Is that correct?
17   A.  That is correct.
18   Q.  Would you agree that the increased
19 compensation amounts in all six of your scenarios
20 reflect amounts that are less than the damages
21 figures offered by Dr. Singer and Dr. Zimbalist?
22   A.  Mathematically, numerically they are
23 smaller numbers.  But these are not presented in
24 my report as alternative damage numbers.  These

Page 194

1  are -- the analysis here and the conclusions are
2  limited to the meaning that's associated with
3  them based on my instructions.  This is not an
4  alternative damages analysis.  This is a capacity
5  to pay analysis, which is what I was asked to do.
6    Q.  Did you attempt to determine the upper
7  bound of how much Zuffa could have increased
8  fighter compensation while remaining a
9  financially healthy company?
10   A.  Well, as I said before, I prepared the
11 analysis in a conservative fashion such that I
12 limited the analysis to Scenario 6, which is
13 38 percent of sales revenues.  But I did not
14 endeavor to calculate what the maximum possible
15 amount was.
16       If you -- as I mentioned, the analysis
17 I've done here is conservative so that the
18 financial health of the company is very strong
19 under any of these scenarios.  If I were less
20 conservative, the number would be higher.  And if
21 you assumed a higher market output, the number
22 would be higher as well.
23       So you could infer from this data that
24 with those two adjustments that these



Page 195

```
 1  compensations would fall within the range of what
 2  Dr. Singer and Dr. Zimbalist have opined.  But
 3  having said that, this is not an alternative
 4  damages analysis.
 5       Q.  In your report, did you analyze
 6  whether Zuffa could have afforded to pay the
 7  damages set forth by plaintiffs' experts Singer
 8  and Zimbalist?
 9            MR. KOFFMAN:  Object to the form.
10            THE WITNESS:  No.
11  BY MR. NORTH:
12       Q.  Did you analyze in any of your
13  scenarios, whether in your report or not, whether
14  Zuffa could pay $1.6 billion in additional
15  compensation to fighters?
16       A.  No.  But keep in mind the $1.6 billion
17  estimate assumes a larger output.  And I was
18  specifically instructed in the context of this
19  analysis to perform it based on an assumption of
20  no increased market output.
21       Q.  So your analysis -- is it fair to say
22  that your analysis does not address Elizabeth
23  Davis's opinion that Zuffa would have had a
24  cumulative operating loss and negative EBITDA
```

Page 196

```
 1  over the class period if it had increased athlete
 2  compensation by the amount of plaintiffs' damages
 3  estimates?
 4            MR. KOFFMAN:  Object to form.
 5            THE WITNESS:  I'm sorry.  Can you
 6       repeat that question?
 7  BY MR. NORTH:
 8       Q.  Sure.
 9            So is it fair to say that your report
10  does not address Elizabeth Davis's opinion that
11  Zuffa would have had a cumulative operating loss
12  and negative EBITDA over the class period if it
13  had increased athlete compensation by the amount
14  of plaintiffs' damages estimates?
15            MR. KOFFMAN:  Same objection.
16            THE WITNESS:  Well, it addresses it --
17       my report addresses that opinion in a sense
18       that her analysis and her conclusions do not
19       accurately reflect what the capacity of
20       Zuffa was or what capacity that Zuffa had to
21       pay additional fighters.
22            She did not alter the capital
23       structure within the -- within the means
24       that were available to the original equity
```

Page 197

```
 1  holders.  She did not consider the -- well,
 2  she did at one point consider the aviation
 3  expenses in a side note of her report.
 4       But I think the conclusion that she --
 5  that she has in her report is misleading
 6  because she's not really measuring the
 7  value -- the capacity of the company to pay
 8  additional fighter compensation.  She's
 9  merely subtracting the damage number that
10  the economists calculated from the status
11  quo financial statements of the business.
12       And there were many decisions that
13  were made by the original equity holders
14  that could have been made differently that
15  would have afforded anyone -- or enabled the
16  company to pay much higher compensation to
17  its fighters.
18  BY MR. NORTH:
19       Q.  Okay.  I appreciate that, but I think
20  I asked a slightly different question.  And that
21  is:  Is it fair to say that your report does not
22  address Elizabeth Davis's opinion that Zuffa
23  would have had a cumulative operating loss and
24  negative EBITDA over the class period if it had
```

Page 198

```
 1  increased athlete compensation by the amount of
 2  plaintiffs' damages estimates?
 3            MR. KOFFMAN:  Object to the form.
 4       That's exactly the question that he did
 5       answer.
 6            You can answer it again.
 7            THE WITNESS:  I addressed that
 8       specific issue in the sense that I have
 9       calculated what the profits would be and I
10       have calculated what the financial condition
11       of the company would be under alternative
12       capital structures for the amounts that are
13       in my -- the amounts that are set forth in
14       my report.
15            I do not in my report use the exact
16       same number that she has in hers, which I
17       didn't assess the $840 million number that
18       was in one of the economist's reports.  But
19       that wasn't my instruction.
20  BY MR. NORTH:
21       Q.  So looking back at Paragraph 4 of your
22  rebuttal report, you state that "Elizabeth Davis
23  did not address the portions of Dr. Singer's" --
24  "Dr. Zimbalist's and Dr. Singer's reports that
```



Page 199

```
 1  explained the larger industry (larger output
 2  market) that would have existed absent the
 3  alleged anticompetitive behavior."
 4         Did I read that right?
 5      A.  Yes, you did.
 6      Q.  Are you offering an opinion on the
 7  size of the output market that plaintiffs'
 8  economists contend would have existed absent the
 9  alleged anticompetitive behavior?
10      A.  No.
11      Q.  Did plaintiffs ask you to perform any
12  work that is not described in your rebuttal
13  report?
14         MR. KOFFMAN:  I'm sorry.  Do you mean
15      excluding the original report?
16         MR. NORTH:  Yes.  Thank you.
17         MR. KOFFMAN:  So why don't you ask the
18      question again, I'm sorry, just to make it
19      clear.
20         MR. NORTH:  Sure.  I'll try to clean
21      that up.
22  BY MR. NORTH:
23      Q.  So for purposes of the work that you
24  did for your rebuttal report, did plaintiffs'
```

Page 200

```
 1  counsel ask you to do any work for the report
 2  that is not included in the report?
 3      A.  No.
 4      Q.  Setting aside what plaintiffs' counsel
 5  asked you to do, did you perform any additional
 6  work that is not described in your rebuttal
 7  report in preparing it?
 8      A.  No.  I mean, there were -- there
 9  were -- as you can see from the exhibits, we
10  created a comprehensive model, and that model was
11  an evolutionary process.  We created it and then
12  we performed quality controls.  We refined it.
13  So there were previous versions of that same
14  model that -- that existed.  I didn't put every
15  previous version of the model in the report.  But
16  when the model was complete, then our quality
17  control model was also complete.  Then we
18  developed the six scenarios in there in the
19  report.
20         But there is nothing -- there is
21  nothing substantive or there are no conclusions
22  that I have reached in connection with this
23  assignment that are not in my report.
24      Q.  So let's walk through the six
```

Page 201

```
 1  hypothetical scenarios in the rebuttal report,
 2  looking first at Paragraph 6.
 7      A.  Yes.
 8      Q.  Why do you make that assumption?
 9      A.  The underpinnings of this analysis and
10  the point that I had made from the beginning is
11  that Zuffa could afford to pay more money to its
12  fighters by paying less money to its
13  shareholders.
16         So if I'm doing an analysis to reduce
17  the amount of money to shareholders, you would
18  need to remove that debt from the books in order
19  to determine what the company could afford to pay
20  its shareholders under -- under this analysis.
21  So when you -- when you remove that debt from the
22  books, the interest expense obviously and the
23  principal payments during the class period are
24  much lower, which frees up cash which could be
```

Page 202

```
 1  paid to fighters, which was the purpose of the
 2  analysis that I was doing.
 3      Q.  Are you offering an opinion that the
 4  loans harmed Zuffa in any way?
 5         MR. KOFFMAN:  Object to the form.
 6      Ambiguous.
 7         THE WITNESS:  They reduced Zuffa's
 8      capacity to pay fighters because they had to
 9      pay interest expense on those loans.
10  BY MR. NORTH:
11      Q.  But you're not offering an opinion
12  that the loans harmed Zuffa in any way?
13         MR. KOFFMAN:  Object to form.
14         THE WITNESS:  The loans created a cash
15      drain, a cash burden on the company for the
16      entire class period.  And if that is -- if
17      that is -- I don't know that I would
18      characterize that as financial harm, but
19      it's a financial burden.  It's an increased
20      requirement to pay interest expense on those
21      loans.
22  BY MR. NORTH:
23      Q.  Did you examine how the results of
24  these scenarios would have changed if you had not
```



Page 203

1   made this particular assumption?
2   A.  You mean if I had left all the debt on
3   the books?
4   Q.  Correct.
5   A.  No, I did not.  That wouldn't have
6   measured the -- that wouldn't have measured
7   Zuffa's ability to pay additional compensation to
8   the fighters during the class period.
9        Zuffa borrowed much more money than it
10  needed to prior to the class period.  And to
11  properly measure what Zuffa could pay to its
12  fighters, you need to assume that Zuffa only
13  borrowed what is needed to make its acquisitions
14  and operate its company, and then the rest of the
15  cash flow that Zuffa has is available to pay
16  fighters.  And that's exactly what I did in my
17  analysis.
18  Q.  Second in Paragraph 6 of Opinion 1,
19  you state all of your scenarios assume Zuffa's
20  shareholders receive minimum distributions equal
21  to 40 percent of pro forma net income for tax
22  purposes.  Is that correct?
23  A.  Yes.
24  Q.  Why did you make that assumption?

Page 204

1   A.  Well, Zuffa is an LLC, which is a
2   pass-through entity, what they call a
3   pass-through entity for tax purposes.  And if
4   under any of the scenarios Zuffa was producing a
5   profit, I thought it was reasonable to assume
6   that the company would distribute money to its
7   shareholders sufficient to pay the taxes that
8   they would owe on those profits.
9        So I didn't -- it was again an element
10  of conservatism.  I didn't want to assume that
11  there was extra cash to pay fighters if the
12  owners of the business were not given cash in
13  order to satisfy their tax obligations in any
14  given year.
15  Q.  And how were you able to determine the
16  tax obligations of the shareholders in any given
17  year?
18  A.  I assumed a 40 percent tax rate.
19  Q.  Are the pro forma distributions to
20  shareholders in your scenarios at least enough to
21  cover each shareholder's tax obligations?
22  A.  I'm sorry, could you repeat the
23  question?
24  Q.  Sure.

Page 205

1   Are the pro forma distributions to
2   shareholders in your scenarios at least enough to
3   cover each shareholder's tax liability?
4   A.  Generally speaking, a 40 percent
5   assumption for federal and state taxes in the
6   United States is conservative, meaning it is
7   generally more than enough.  In this instance
8   it's even more conservative because part of
9   Zuffa's profits were earned in other countries,
10  and the taxes for those countries are already
11  incorporated in the income statement.
12       So I left those taxes in and I added
13  another 40 percent of taxes on the total profits
14  of the company.  So really the profits on U.S. --
15  the taxes on -- the rate on -- that I've
16  accounted for for U.S. taxes is really more than
17  40 percent because I've given them 40 percent of
18  consolidated net income as a tax distribution,
19  and on top of that the company has escrowed money
20  for foreign taxes as well.
21       So I think the tax element is more
22  than taken care of in the analysis that I've
23  done.
24  Q.  How do your hypothetical distributions

Page 206

1   compare to the actual distributions to Zuffa's
2   shareholders?
3   A.  They are lower.
4   Q.  Can you estimate how much lower?
5        MR. KOFFMAN:  You should feel free to
6   refer to your report.
7        MR. NORTH:  Absolutely.
8        THE WITNESS:  I'll take -- Are you
9   referring to just the class period?
10  BY MR. NORTH:
11  Q.  So in all of your scenarios 1 through
12  6 you allocated distributions to shareholders
13  based upon different assumptions.  Is that fair?
14  A.  Yes.
15  Q.  Okay.  So for all six of the scenarios
16  can you estimate how those hypothetical pro forma
17  distributions compare to the actual
18  distributions?  Perhaps with a range.
19  A.  I think I can do it this way.  If you
20  look at Exhibit 3, which is page 1 of 7 in
21  Exhibit 3 -- actually, I'm sorry.  I apologize.
22  That exhibit is not going to tell you.



Page 207



12  So that's the -- that's the magnitude
13  of the difference for Exhibit 3 -- I mean for
14  Scenario 3. And I can go through the other
15  scenarios and give you a range. But the -- the
16  Scenarios 4, 5 and 6 are going to be --
17  actually --
18  Q. Why don't we just limit it to
19  Exhibit 3.
20  A. Okay. I will say in 4, 5 and 6 a lot
21  more money is distributed. It's complicated, but
22  I can explain that if you need me to.

Page 208

3  Q. But would you agree that your
4  hypothetical distributions are substantially
5  lower than the actual distributions?
6  MR. KOFFMAN: Object to the form.
7  THE WITNESS: Yes. And that's the
8  whole premise of the analysis, is to -- I've
9  taken the -- or I've approached the
10  assignment to say we're paying the
11  shareholders less in distributions and we're
12  paying more to the fighters, and how much
13  more can you do that -- how much can you do
14  that -- how much more can you pay the
15  fighters without creating a financial issue
16  for the company.
17  BY MR. NORTH:
18  Q. Did you make any other assumptions
19  that apply to all of your hypothetical scenarios?
20  MR. KOFFMAN: Object to the form.
21  THE WITNESS: I believe
22  Paragraph 6 was -- or Paragraph 6 we talk
23  about a few of those. Those are the two.
24  I'm sure there are many assumptions

Page 209

1  that are saying that would apply to all, but
2  these are the most -- these are the most
3  relevant or the most -- the ones that have
4  the most impact.
5  BY MR. NORTH:
6  Q. If they appear in some other part of
7  the report, could you direct my attention to
8  where -- what those other assumptions are or tell
9  me what other assumptions are?
10  MR. KOFFMAN: Object to the form.
11  THE WITNESS: One second, please.
12  Okay. One assumption, additional assumption
13  that applies to all the scenarios is that
14  there's several ways that you can get more
15  money to the shareholders. There's
16  generally three. You can pay -- excuse me,
17  to the fighters.
18  You can pay the shareholders less
19  money. You can avoid paying interest on
20  debt that you didn't need to borrow. And
21  you can shift excess aviation expenses and
22  management fees to the fighters as well.
23  So that third one applied to all six
24  scenarios where excess aviation expenses

Page 210

1  were assumed to be paid to the fighters
2  first and then -- and once that condition
3  was satisfied, then the -- any additional
4  compensation that came to the fighters
5  either came from interest savings or a
6  reduction in shareholder distributions.
7  BY MR. NORTH:
8  Q. Okay. And are there any other
9  assumptions that apply to all six scenarios?
10  A. There's an assumption that there is no
11  increased market, output market; there is no
12  change in the revenues of the company; there's no
13  change in expenses of the company other than
14  fighter comp and aviation and interest.
15  Those are the only ones I can think
16  of.
17  Q. Okay. Did you consider making any
18  other assumptions?
19  A. Well, in the -- in the process of
20  developing the six different scenarios there
21  were -- you know, the reason you build a model is
22  so that you can test different assumptions. So
23  there were other assumptions that were tested.
24  I tested -- you know, for example in

Page 211

1  the first three scenarios there is an assumption
2  that the higher compensation starts in 2005 and
3  that the company accumulates cash by not paying
4  as much distributions to shareholders, ▮
   ▮▮▮▮▮▮▮▮▮▮, and then uses the accumulated
6  cash to pay off all of the debt of the company in
7  2009.
8         Now, those assumptions are different
9  in 4 through 6, but I did take the assumptions
10 used in 1 through 3 and increased the revenue to
11 38 percent of sales to see how that would play
12 out.  And it, too, was feasible.
13        But that's just an example of, you
14 know, I'm sure dozens of different analyses that
15 we did or versions of the model that we did to
16 evaluate what the company could afford to pay.
17     Q.   And in testing some of those
18 alternative assumptions in the model, did you
19 come across any results that would have been
20 infeasible?
21        MR. KOFFMAN:  Object to the form.
22        THE WITNESS:  Well, sure.  I mean,
23     when you get to a point where the company is
24     no longer profitable, or you have a policy

Page 212

1     of distributing -- I tried to distribute as
2     much to the shareholders as I could because
3     under these scenarios the company is holding
4     a lot of cash.  And if you increase the
5     distribution to the shareholders by too
6     much, if you have the shareholders getting
7     paid too much, then you erode away your cash
8     balances.
9         So there were -- there was an exercise
10    that we naturally went through to determine
11    what were the scenarios that were within the
12    original shareholders' control that weren't
13    relied -- that didn't rely on third-party
14    lenders or investors that could have been
15    adopted such that the company could pay more
16    money to the fighters.
17        And as I said, there were probably
18    dozens of different scenarios that we ran,
19    and we settled on these six as being ones
20    that were very feasible because in each case
21    Zuffa is out of the company.
22 BY MR. NORTH:
23     Q.   And are any of those alternative
24 scenarios or changes in the model that you ran

Page 213

1  included in your pack of materials?
2         MR. KOFFMAN:  Object to the form.
3         THE WITNESS:  Well, the model was
4     produced, as I understand it, to -- to our
5     counsel, who produced it to you.  So the
6     ability to run any and all scenarios would
7     be included in the model that we gave you.
8         There is one model for Scenarios 1, 2
9     and 3, then there is a separate model for 4,
10    5 and 6, and you can input different
11    assumptions into those models and evaluate
12    the impact of any scenario you wanted.
13        But the only one that appears -- I
14    mean, so our work papers don't contain other
15    versions of the model.  It is the model.
16    And you can assess different scenarios by
17    changing the inputs.
18 BY MR. NORTH:
19     Q.   One of the things you mentioned is
20 that you had tested for Scenarios 1 through 3
21 increasing fighter compensation to 38 percent.
22 Do I have that right?
23     A.   Yes.
24     Q.   Why did you choose not to include that

Page 214

1  in your report, or why did you reject that?
2     A.   I wouldn't say that I rejected it.
3  It's feasible through 38 percent, the company
4  just has less cash along the way.  Because what
5  happens is that you are, in Models 1, 2 and 3
6  you're paying the higher compensation beginning
7  all the way back in 2005.  So it has a cumulative
8  effect on your cash balance.  So by the time you
9  get to the class period your cash is lower.
10        And we changed to the Scenarios 4, 5
11 and 6 and those assumptions to demonstrate that
12 there is a feasible scenario wherein the company
13 would have even more cash and still be able to
14 pay the fighters between 35 and 38 percent -- 36
15 and 38 percent -- excuse me -- yes, 36 and
16 38 percent.
17     Q.   So how did you arrive at these six
18 percentages of revenue that you analyzed in your
19 report?
20     A.   Well, as I mentioned before, we
21 constructed the model such that if you're going
22 to change your capital structure or the expense
23 structure, I wanted to be able to see the whole
24 portrait of the business, which is the income



Page 223

1  Section D of your report starting at Paragraph
2  12.
3        So you state that Scenarios 1 through
4  3 involve using operating cash to, among other
5  things, pay fighters between 33 and 35 percent of
6  revenue from 2005 through 2017.
7        Is that correct?  This is in
8  Paragraph 12.
9     A.   Yes, I said operating cash without the
10 burden of excess debt.
11    Q.   Is it your understanding that 2005 is
12 outside the class period in this case?
13    A.   Yes.
14    Q.   Using the other parameters in
15 Scenarios 1 through 3, did you model increasing
16 athlete compensation starting at the beginning of
17 the class period in 2010 for these scenarios?
18    A.   I'm sorry, could you repeat the
19 question again?
20    Q.   Using the other parameters in
21 Scenarios 1 through 3 that are listed in
22 Paragraph 12 --
23    A.   Uh-huh.
24    Q.   -- did you model increasing athlete

Page 224

1  compensation starting at the beginning of the
2  class period in 2010 as opposed to 2005?
3        MR. KOFFMAN:  Object to form.
4  BY MR. NORTH:
5     Q.   As you did for Scenarios 4 through 6?
6     A.   Oh, no, I did not.  I don't recall
7  doing that.  Let me think for a second.
8        Yes.  If I -- if I increased the
9  compensation from 33 to 35 percent beginning in
10 the class period as opposed to 2005, the company
11 would have had a lot more cash at the beginning
12 of the class period than what I projected in
13 1 through 3.
14       You know, with respect to 1 through 3,
15 I was being conservative in saying that if you
16 adopted a policy that paid between 33 to
17 35 percent, you start at the beginning of the --
18 the beginning of 2005 because there is a
19 cumulative effect of that extra cash use that I
20 wanted to make sure we accounted for in each of
21 the subsequent years.
22    Q.   And why did you begin with 2005?
23    A.   That was the first audited financial
24 statement that we had.  And prior to 2005, my

Page 225

1  understanding was the company was in more of a
2  developmental stage with its -- developing its
3  Ultimate Fighter TV program and establishing
4  regulations and developing its marketing plan.  I
5  didn't have the data prior to that, so I haven't
6  made any assumptions as to what the -- I didn't
7  have the data to assume what fighter compensation
8  would be prior to that.
9     Q.   Do you have any data about -- do you
10 have any data relating to Zuffa's financial
11 condition prior to 2005?
12       MR. KOFFMAN:  Object to the form.
13       MR. NORTH:  I can be a little more
14    specific if that helps with the objection.
15 BY MR. NORTH:
16    Q.   Do you have any information about
17 Zuffa's revenues or profitability that predates
18 2005?
19    A.   I'm noting in my original expert
20 report that in the documents that were produced
21 we do have monthly financial statements prior to
22 2005.  They were not audited.  I don't recall if
23 they had balance sheet information.  And I
24 remember them -- I remember there were issues

Page 226

1  associated with them that made it difficult to
2  match cost categories and other things.  But I
3  honestly don't remember, sitting here, what it is
4  that they contained.
5     Q.   Did you consider running any of your
6  models starting in 2001, or starting with the
7  earliest financial information you just
8  described?
9     A.   No.  I believed that it was
10 appropriate and credible to start the analysis
11 with the first audited financial statement I had
12 in 2005.  Which is, you know, five years or six
13 years before the class period began.
14       MR. NORTH:  Take a quick break?
15       MR. KOFFMAN:  Sure.
16       THE VIDEOGRAPHER:  The time is
17    11:53 a.m.  Off the record.
18       (Recess taken.)
19       THE VIDEOGRAPHER:  The time is
20    11:59 a.m.  We're on the record.
21 BY MR. NORTH:
22    Q.   Mr. Davis, you were just explaining
23 that Scenarios 1 through 3 begin with an
24 increased athlete compensation in 2005.  Is that



14 (Pages 223 to 226)

Page 227

```
 1  fair?
 2      A.  Yes.
 3      Q.  Are you offering an opinion on when
 4  Zuffa's alleged anticompetitive conduct began?
 5      A.  No.
 6      Q.  Are you offering an opinion on when
 7  the alleged anticompetitive conduct harmed
 8  Zuffa's competitors?
 9      A.  No.
10      Q.  You state in Paragraph 12 that in
11  Scenarios 1 through 3 operating cash is used to
12  retire all outstanding long-term debt by December
13  31, 2009.  Correct?
14      A.  Are you referring to the sentence that
15  says, "The funds produced from operations..."?
16      Q.  I am, yes.
17      A.  That would be -- if the funds produced
18  from operations are accumulated from operations
19  without the excess of -- without the extra debt
20  and the excessive aviation expenses, so cash is
21  accumulating during this time period.  And then
22  at the end of 2009 the company had sufficient
23  cash to pay off all of its debt,
```

Page 228

```
 1  what I call discretionary distribution debt.
 2      Q.  And how did you choose the date
 3  December 31, 2009?
 4      A.  That was the date on which the
 5  cumulative cash balance was sufficient to pay off
 6  all the debt.
 7      Q.  Is it your understanding that that
 8  date is prior to the beginning of the class
 9  period in this case?
10      A.  Yes.
11      Q.  Is it your opinion that Zuffa should
12  not have a capital structure that reflects debt?
13          MR. KOFFMAN:  Object to the form.
14          THE WITNESS:  It's my opinion that
15      they could have elected one.  They could
16      have chosen one that didn't have any debt.
17  BY MR. NORTH:
18      Q.  Are you offering an opinion --
19      A.  Let me restate that.
20          In Scenarios 1, 2 and 3, Zuffa,
21  because they were paying the higher compensation
22  beginning in 2005, required some level of debt
                                    in it might have
```

Page 229

```
 1  been 2007.  They needed the debt.  Because I
 2  began the increased fighter compensation earlier.
 3          In Scenarios 4 through 6 where I
 4  didn't increase fighter compensation until the
 5  beginning of the class period, they had enough
 6  cash on hand such that they didn't need to borrow
 7  any debt and they could still buy Pride and
 8  StrikeForce and meet all their other financial
 9  obligations.
10      Q.  So is it fair to say, based on your
11  analysis, that in Scenarios 1 through 3,
12  increasing fighter compensation by the amounts in
13  the scenarios partially required the company to
14  take on some debt?
15          MR. KOFFMAN:  Object to the form.
16          THE WITNESS:  In Scenarios 1 through
17      3, yes.  Which I've modeled in the report,
18      and then I modeled when they accumulated
19      enough cash to pay it off, they paid it off.
20  BY MR. NORTH:
21      Q.  Are you offering an opinion that
22  Zuffa's actual capital structure was improper?
23      A.  No.  I'm offering an opinion that the
24  original equity holders had the option, if they
```

Page 230

```
 1  chose to do so, to borrow a lot less money than
 2  they did.  And in Scenarios 4 through 6 they
 3  could have elected not to borrow any money.
 4      Q.  Are you offering an opinion that
 5  Zuffa's capital structure was indicative of
 6  anticompetitive conduct?
 7      A.  No.
 8          MR. KOFFMAN:  Object to the form.
 9          THE WITNESS:  No.
10  BY MR. NORTH:
11      Q.  Was Zuffa's capital structure simply
12  not as conservative as your models?
13      A.  That's one way of characterizing it,
14  yes.
15      Q.  Was there any requirement that Zuffa
16  had to retire its long-term debt by
17  December 2009?
18      A.  No.
19      Q.  In Paragraph 12 you also state that
20  "In the first three scenarios, funds produced
21  from operations without the burden of
22  discretionary distribution debt, excess aviation
23  expenses, and management fees are used to pay
24  shareholders the greater of 40 percent of pro
```

Page 231

1  forma net income for tax purposes or 50 percent
2  of available cash."
3       Did I read that right?
4       A.  Yes.
5       Q.  Why did you choose these levels for
6  shareholder distributions?
7       A.  Well, we talked about the 40 percent
8  before as being a conservative provision for the
9  income tax obligations of the original
10 shareholders.  And at a minimum, they got
11 40 percent.
12      If there was additional cash remaining
13 on the balance sheet -- excuse me, if there was
14 additional cash when compared to what was
15 actually distributed to them, I -- I chose to
16 distribute that to the shareholders as well.
17      So in Scenarios 1 through 3 there were
18 I think maybe one or two periods where the
19 shareholders got more than 40 percent tax
20 distribution; they also got a distribution of
21 profits.
22      Q.  Okay.  Let's skip ahead to Scenarios 4
23 through 6 on page 17, Paragraph 18.
24      So here you describe three

Page 232

1  modifications for Scenarios 4 through 6.  The
2  first two are that Zuffa does not increase
3  fighter compensation until the beginning of the
4  class period, and distributions to shareholders
5  are limited to 40 percent pro forma net income.
6  Is that right?
7       A.  Yes.
8       Q.  And you also state here that
9  distributions to shareholders and debt burdens
10 are reduced and the cash savings are used for
11 other business purposes.  Correct?  Just above
12 that Paragraph 18.
13      A.  Yes.
14      Q.  Why did you change the parameters for
15 Scenarios 4 through 6?
16      A.  Again, this is a -- this is additional
17 scenarios to show the feasibility of the company.
18 The point was that there are a number of
19 different alternative capital structures that
20 could have facilitated a distribution of between
21 500 and $700 million.  This is an additional one.
22      In these particular scenarios, because
23 you're not increasing the fighter compensation
24 until the class period, and because you're

Page 233

1  limiting distributions to 40 percent, both of
2  which were within the control of the original
3  equity holders, the company has substantial
4  amounts of cash on the balance sheet throughout
5  the class period, and that was one of several
6  reasons why we elected to include this particular
7  scenario, because it was feasible.
8       As I mentioned before, we -- we could
9  have just continued to use the underlying
10 assumptions in Scenarios 1, 2 and 3 leading up to
11 38 percent as a fee-simple compensation structure
12 as well.
13      Q.  Is it fair to say that for Scenarios 4
14 through 6 your assumption is that Zuffa
15 stockpiles its cash before the class period in
16 anticipation of increasing fighter compensation
17 at the beginning of the class period?
18      MR. KOFFMAN:  Object to the form.
19      THE WITNESS:  No.  No.  They would
20 have accumulated substantial amounts of
21 cash, but it would have nothing to do with
22 the anticipation of increasing fighter
23 compensation.
24      This particular model where you

Page 234

1  increase compensation the beginning of the
2  class period would emulate a situation where
3  a regulatory authority or a court of law
4  required Zuffa to increase its fighter
5  compensation at the beginning of the class
6  period.  So it's an analysis to look at what
7  that scenario would have looked like.
8  BY MR. NORTH:
9       Q.  But do Scenarios 4 through 6 involve
10 the company doing anything differently than it
11 actually did prior to 2010 that would have
12 increased its cash balances?
13      A.  The only thing that increases its cash
14 balances prior to the class period was that
15 excess aviation expenses are not paid, so that
16 accumulates in cash; and the company has no debt
17 at all.  So on the one hand they have to
18 self-fund the acquisition of Pride, but they also
19 don't have the associated interest expense with
20 the debt balances that they actually had during
21 that time period.
22      Q.  Other than increasing the percentage
23 revenue share, does anything else change about
24 the company's financial performance in Scenarios



16 (Pages 231 to 234)

Page 239

1  that sale stay on the company's balance sheet
2  rather than being distributed to the original
3  equity holders?
4        MR. KOFFMAN: Object to the form.
5        THE WITNESS: No. Actually I can show
6  you on -- if you look at Exhibit 1, I'm
7  looking at Exhibit 1.3, which is page 4 of
8  7.

Page 240

8                              It was one of the
9  years where the 40 percent number was
10 trumped by the fact that there was more cash
11 available to pay them.
12       That was a terribly long-winded
13 answer. I apologize for that.
14 BY MR. NORTH:
15       Q.   Let me see if I understand.

Page 241

9        Q.   In your opinion, is it improper for an
10 equity holder to sell shares and retain the
11 proceeds from that sale?
12       MR. KOFFMAN: Object to the form.
13       THE WITNESS: Is it improper for an
14 equity holder -- well, in this instance it
15 was Zuffa that was issuing shares. If the
16 equity holder -- if the equity holder is
17 being diluted by a new investor, the dollars
18 coming in from that new investor, you know,
19 if you left the money in the company, the
20 theory would be that that company is going
21 to create more value so that the sum of the
22 parts is actually greater than the
23 pre-transaction value.
24       So there are many instances where

Page 242

1  equity shares are issued and the money comes
2  into the company and creates additional
3  value such that your percentage interest
4  might be smaller but the value of that
5  smaller percentage interest is greater than
6  what you had before.
7        In this instance, some of the money
8  stayed in the company under my hypothetical
9  and some of the money was distributed to the
10 shareholders.
11       But in Scenarios 4 through 6 -- well,
12 there is no -- there is no investment in 4
13 through 6.                   So that's irrelevant.
15 BY MR. NORTH:
16       Q.   In your original report you assumed
17 that Zuffa had the financial wherewithal to
18 borrow funds to increase the compensation paid to
19 fighters. Do you recall that?
20       A.   Yes.
21       Q.   Is that still your opinion?
22       A.   Yes.
23       Q.   Why do your pro forma scenarios not
24 include this contingency?



Page 243

1  A. Well, the company had the capacity to
2  borrow money, particularly in 2010 right before
3  the class period. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6          But I chose to -- but to quantify how
7  much more they could have borrowed would have
8  required that I make assumptions about the risk
9  thresholds and covenants and decision-makers of
10 other third-party creditors, and I didn't want to
11 do that. I wanted to limit this analysis to -- I
12 wanted to make it more conservative and limit it
13 to scenarios where there was less debt rather
14 than more debt. So I wasn't relying upon the
15 decision of a bank to put more money into the
16 company.
17     Q. In each of your scenarios, isn't it
18 true that the pro forma purchase price of Zuffa
19 in 2016 is lower than the actual purchase price
20 of 3.775 million even after taking into account
21 the debt on Zuffa's balance sheet at the time of
22 the acquisition?
23     A. Yes.
24     Q. Zuffa's enterprise value was lower

Page 244

1  under your pro forma calculations at least in
2  part due to its higher expense structure. Would
3  you agree?
4      A. Yes, the majority was because of the
5  higher expense structure. And as you can see
6  from the exhibits, we were holding the valuation
7  multiple constant and recalculating what the
8  proceeds would have been under the different
9  scenarios. I mean, it's the proper way to do it.
10         It's also the way that Ms. Davis
11 suggested that that type of adjustment be done as
12 well. In her deposition, she acknowledged that
13 if there was a different EBITDA number, you would
14 hold the multiple constant and recalculate the
15 proceeds.
16         So I'm doing it the way it's supposed
17 to be done, but also consistent with the way
18 Ms. Davis did it.
19     Q. So you agree there is a relationship
20 between the EBITDA and the valuation of the
21 company?
22     A. Yes.
23     Q. Let's turn to a separate section of
24 your report. Are you aware of the

Page 245

1  characteristics of the but-for world as
2  constructed by plaintiffs' economists?
3      A. This is not in my report?
4      Q. I'm sorry. That was a little bit of a
5  misleading introduction.
6          In general, are you aware of the
7  characteristics of the but-for world as
8  constructed by plaintiffs' economists?
9          MR. KOFFMAN: Object to the form.
10         THE WITNESS: Generally but not
11 specifically.
12 BY MR. NORTH:
13     Q. Have you considered how those
14 characteristics might affect the analysis in your
15 rebuttal report?
16     A. No.
17     Q. Are you aware that one of the elements
18 of the but-for world is increased fighter
19 compensation?
20     A. Yes.
21     Q. Do you agree that when you're
22 evaluating a scenario where the fighters are paid
23 more money, you've introduced a but-for world
24 wherein the MMA industry is larger, it has higher

Page 246

1  output, and there are more competitors?
2          MR. KOFFMAN: Object to the form.
3          THE WITNESS: Generally speaking, I
4  understand that to be the case.
5  BY MR. NORTH:
6      Q. And you would agree that these
7  characteristics would apply to any hypothetical
8  involving paying fighters more money?
9          MR. KOFFMAN: Object to the form.
10         THE WITNESS: I believe I testified to
11 this in my earlier deposition.
12 Specifically, I said that the -- in a world
13 where there's larger output, it was not --
14 it was not made clear to me whether Zuffa
15 would be a larger company or a smaller
16 company. The analysis that I've done here,
17 as I testified before, assumes that there is
18 no change in the market output and there is
19 no change in Zuffa's revenues. That was the
20 instructions that I was given.
21         But I'm not offering an opinion on
22 what a larger market output would look like
23 and how it would affect Zuffa or any other
24 competitor.

Page 247

```
 1   BY MR. NORTH:
 2       Q.   Could Zuffa be a smaller company in
 3   the but-for world?
 4       A.   I don't know.  I guess it could be.
 5   That would be a question for the economists.
 6       Q.   Could Zuffa's revenues be lower in a
 7   but-for world?
 8           MR. KOFFMAN:  Object to the form.
 9           THE WITNESS:  I'm not certain.
10   BY MR. NORTH:
11       Q.   Would you agree that to perform an
12   analysis of how much more fighters could be paid
13   by Zuffa, you would need to consider a number of
14   factors?
15           MR. KOFFMAN:  Objection; vague.
16           THE WITNESS:  Do you mean including or
17       excluding the larger output?
18   BY MR. NORTH:
19       Q.   I can be specific.
20           Would one factor that you would need
21   to consider be how much money could be paid by
22   foreclosed competitors in a but-for world?
23           MR. KOFFMAN:  Object to the form.
24           THE WITNESS:  If I wanted to calculate
```

Page 248

```
 1       what?
 2   BY MR. NORTH:
 3       Q.   If you wanted to perform an analysis
 4       of how much more fighters could be paid by Zuffa.
 5           MR. KOFFMAN:  Object to the form.
 6           THE WITNESS:  Well, I wouldn't
 7       characterize it that way.  I would say
 8       that you would -- if you are going to
 9       contemplate a larger industry, and you want
10       to know how much Zuffa could pay as it's
11       part of that larger industry, you would need
12       to know whether Zuffa was a larger or
13       smaller company.
14           I think that's different than the way
15       you characterized it, but that's how I would
16       characterize it.  Again, I wasn't asked to
17       make an assumption on whether the industry
18       would be larger or smaller.
19   BY MR. NORTH:
20       Q.   Would you agree that, leaving aside
21   the but-for world, Zuffa's EBITDA would decrease
22   if it increased athlete compensation and held
23   everything else constant?
24       A.   Yes.
```

Page 249

```
 1       Q.   In testing the effect of Zuffa paying
 2   higher fighter compensation, did you consider how
 3   Zuffa paying higher fighter compensation would
 4   affect the size of the MMA market?
 5       A.   No.
 6       Q.   Are you offering an opinion on whether
 7   the compensation Zuffa pays athletes would affect
 8   the size of the MMA market?
 9       A.   I'm sorry.  Could you repeat that
10   again?
11       Q.   Are you offering an opinion on whether
12   the compensation Zuffa pays athletes would affect
13   the size of the MMA market?
14       A.   I'm not offering an opinion on that.
15   I believe the economists are covering that topic.
16       Q.   Did you consider how Zuffa paying
17   higher fighter compensation would affect the
18   number of competitors in the market?
19       A.   No.
20       Q.   Are you offering an opinion on it?
21       A.   No.
22       Q.   You previously testified that you did
23   not know whether Zuffa would be larger or smaller
24   if it increased athlete compensation at your
```

Page 250

```
 1   previous deposition.  Do you recall that?
 2       A.   Yes.
 3       Q.   Did you consider how Zuffa paying
 4   higher fighter compensation would affect Zuffa's
 5   size in your rebuttal report?
 6       A.   I assumed that Zuffa's size would not
 7   change at all in my rebuttal report.  This is
 8   simply an analysis to determine at the same size
 9   how much more could they have paid.
10       Q.   And on page 10, at Paragraph 6, you
11   state that "Additional growth in the MMA industry
12   would be a benefit to Zuffa."
13           Do you see that on the third line of
14   Opinion 1?
15           MR. KOFFMAN:  Sorry.  Where are you?
16           MR. NORTH:  Page 10, Paragraph 6,
17       Opinion 1, the third line.
18   BY MR. NORTH:
19       Q.   The clause of that sentence states:
20   "without the benefit of any additional growth in
21   the MMA industry."
22           Do you see that?
23       A.   Yes.
24       Q.   In what way would additional growth in
```



20 (Pages 247 to 250)

Page 251

```
 1   the industry be a benefit to Zuffa?
 2          MR. KOFFMAN:  Object to the form.
 3          THE WITNESS:  As I said before, I
 4      don't -- I'm not opining on whether larger
 5      market output would make Zuffa larger or
 6      smaller.  What I'm making clear here is that
 7      I am -- I was instructed to calculate how
 8      much more they could pay assuming that there
 9      is no increased market.  So not assuming if
10      Zuffa gets any bigger or any smaller.  I
11      don't have an opinion on how a larger market
12      would affect Zuffa.
13   BY MR. NORTH:
14      Q.  What is the basis for your
15   characterization of additional growth in the MMA
16   industry as a benefit for Zuffa?
17          MR. KOFFMAN:  Object to the form.
18          THE WITNESS:  Well, I guess in that
19      particular sentence I'm assuming that growth
20      is a benefit.  But I would clarify that
21      sentence and say that I'm not expressing an
22      opinion that a larger output market would
23      make Zuffa larger or smaller.
24   BY MR. NORTH:
```

Page 252

```
 1      Q.  Is it possible that additional growth
 2   in the industry would result in lower revenues
 3   for Zuffa?
 4          MR. KOFFMAN:  Object to the form.
 5          THE WITNESS:  I don't know.  You would
 6      have to ask the economists that question.
 7   BY MR. NORTH:
 8      Q.  You don't account for lower revenues
 9   or the possibility in your scenarios, do you?
10      A.  I do not.
11      Q.  Looking at page 11, at Opinion
12   Number 2, you state -- well, rather -- and we've
13   been through that so I'll just ask.
14          Over what time period would Zuffa's
15   equity holders receive your hypothetical
16   distributions as you describe in Opinion 2?
17      A.  Could you repeat the question, please?
18      Q.  Sure.
19          Over what time period would Zuffa's
20   equity holders receive the hypothetical
21   distributions that you describe in Opinion 2?
22          MR. KOFFMAN:  Object to the form.
23          THE WITNESS:  The entire time period
24      that I analyzed from 2005 to 2016.
```

Page 253

```
 1   BY MR. NORTH:
         [redacted]
 6          Do you see that?
 7      A.  I do.
 8      Q.  And under Table 2 you use the pro
 9   forma internal rate of return.
10          Do you see that?
11      A.  I do.
12      Q.  Are you using the term "internal rate
13   of return" interchangeably with "return on
14   investment"?
15      A.  Yes.
16      Q.  Is it your understanding that those
17   concepts are identical?
18      A.  I don't think they are identical.  The
19   return on their investment is not -- is not the
20   same as return on investment that you would look
21   up in a textbook.  The internal rate of return is
22   what I'm referring to here, which is a
23   calculation of cash flows over an investment
24   horizon.
```

Page 254

```
 1      Q.  So when you use the term "return on
 2   their investment" under Opinion 3, you are
 3   referring to the internal rate of return?
 4      A.  That's correct.
 5      Q.  In your prior deposition, do you
 6   recall testifying that you do not intend to offer
 7   an opinion on the reasonableness of the rate of
 8   return realized by Zuffa's former shareholders?
 9          MR. KOFFMAN:  Object to the form.
10          THE WITNESS:  I'll defer.  I recall
11      testifying about it.  I don't recall exactly
12      what I said.  In this instance I was asked
13      to calculate what it would be for purposes
14      of the rebuttal report, but it was not used
15      as a criteria for feasibility.
16   BY MR. NORTH:
17      Q.  Would you agree that you express that
18   opinion in your rebuttal report?
19      A.  Yes.
20      Q.  Would you agree that distributions to
21   the equity holders -- strike that.
22      A.  Excuse me.  If I could clarify.
23          I believe in my original deposition
24   that when asked if I was going to express a
```