# EXHIBIT 5

## Expert Report of
## Elizabeth Kroger Davis

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated, ⟩ ⟩ ⟩ ⟩ ⟩ | |
| Plaintiffs, ⟩ ⟩ | |
| v. ⟩ | Case 2:15-cv-01045-RFB-PAL |
| ⟩ | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, ⟩ ⟩ | |
| ⟩ | |
| Defendant. ⟩ | |

# EXPERT REPORT OF ELIZABETH KROGER DAVIS

Dated: October 27, 2017

Elizabeth Kroger Davis

## CONTENTS

I.      INTRODUCTION ................................................................................................ 3

II.     PROFESSIONAL EXPERIENCE ........................................................................ 3

III.    BACKGROUND ................................................................................................. 4

IV.     SCOPE OF ASSIGNMENT ............................................................................... 8

V.      SUMMARY OF OPINIONS ............................................................................... 9

VI.     ALLOCATING PLAINTIFFS' DAMAGES TO THE BOUT CLASS RESULTS IN
        INCREASES TO ATHLETE COMPENSATION OF MANY MULTIPLES OF THEIR
        ACTUAL COMPENSATION .............................................................................. 13

VII.    APPLYING PLAINTIFFS' DAMAGES ESTIMATES TO ZUFFA'S FINANCIAL
        STATEMENTS RESULTS IN MILLIONS OF DOLLARS OF LOSSES DURING THE
        CLASS PERIOD .................................................................................................. 21

        A.    Zuffa's Financial Results .......................................................................... 22

        B.    Comparison of Zuffa's Financial Results to Dr. Zimbalist's Damages .......................... 23

        C.    Comparison of Zuffa's Financial Results to Dr. Singer's Damages ............................. 26

        A.    Bellator ...................................................................................................... 30

        B.    Strikeforce ................................................................................................. 33

IX.     PLAINTIFFS' EXPERTS UNDERSTATE ZUFFA'S COMPENSATION OF
        ATHLETES ......................................................................................................... 34

X.      DR. ZIMBALIST UNDERESTIMATES COSTS INCURRED BY ZUFFA IN
        MARKETING AND PRODUCING ITS CONTENT FOR BROADCAST .................... 41

XIII.   MISCELLANEOUS .......................................................................................... 55

**HIGHLY CONFIDENTIAL**

## I.      INTRODUCTION

1.  I, Elizabeth Kroger Davis, have been retained by Boies Schiller Flexner LLP ("Counsel") on behalf of its client Zuffa, LLC ("Zuffa") in connection with the civil case filed in the United States District Court for the District of Nevada captioned as *Le et al. v. Zuffa, LLC*, Case 2:15-cv-01045-RFB-PAL.

## II.     PROFESSIONAL EXPERIENCE

2.  I am a Managing Director with Berkeley Research Group, LLC ("BRG"), a financial and economic consulting firm with over 1,000 professionals in offices across the United States and internationally.

3.  I am a Certified Public Accountant (CPA), registered in Illinois, and I am licensed as a Chartered Global Management Accountant.  I am a member of the American Institute of CPAs and the Illinois CPA Society.  I have a Master's in Business Administration from the University of Chicago Graduate School of Business (now known as the University of Chicago Booth School of Business) with a specialization in Finance.  I have a Bachelor's in Business Administration with a concentration in Accounting from the Cox School of Business at Southern Methodist University in Dallas, Texas.

4.  I have provided expert consulting or forensic accounting services on disputes across a broad variety of issues and industries, including commercial damages, class certification, post-acquisition disputes, business valuation, security valuation, shareholder dilution, fraud, Ponzi schemes, contract disputes, and alleged violations of accounting, auditing and other professional standards.  My professional experience includes over 25 years of providing forensic accounting, expert consulting and expert testimony services, as well as serving as a partner at a large international accounting firm.

**HIGHLY CONFIDENTIAL**

5. Appendix A includes my curriculum vitae, a list of all publications I have authored in the previous 10 years, and a list of all other cases in which, during the previous four years, I have provided a sworn statement or testimony.

## III.    BACKGROUND

6. This is an antitrust putative class action brought by current and former athletes in professional mixed martial arts ("MMA") against Zuffa.  Zuffa, which does business as the Ultimate Fighting Championship ("UFC"), is a global sports and media company that promotes and produces MMA events.[1]  The plaintiffs purport to represent two classes: a "Bout Class" and an "Identity Class."  The Bout Class is defined as MMA athletes who have competed in one or more live professional UFC bouts, and the Identity Class includes MMA athletes who allegedly had their identities expropriated or exploited by Zuffa, from December 16, 2010 to the present (the "Class Period").[2]

7. Zuffa purchased the UFC in 2001, at a time when MMA bouts were not sanctioned by most state athletic commissions.  Shortly after its acquisition, Zuffa secured licensing in Nevada and aired its first pay-per-view ("PPV") event on September 28, 2001.[3]   Since that time, Zuffa has transformed the UFC from a struggling business to the most popular MMA promotion in the world through its investments in the brand and the sport.[4]

---

[1] Zuffa Parent LLC – Predecessor Financial Statements – 3_31_17 – vFINAL.pdf.

[2] Consolidated Amended Antitrust Class Action Complaint, December 18, 2015, ¶¶ 3, 27.

[3] ZFL-2509465–518, at 493.

[4] 3/23/2017 Deposition of Lorenzo Fertitta, 147:15-25 ("You've got to understand, when we bought the UFC in 2001, it was probably the most tarnished brand in sports.  I mean, it's hard to get worse than Senator John McCain calling us human cockfighting and then living with that for a number of years as the moniker that when people hear the word UFC, the first thing that comes to mind is human cockfighting.  So through the work and the capital we invested and the business strategies that we put in place, yes, by 2010, I believe that the brand UFC represented something that was a positive."); *id.* at 67:24-25 ("I believe that UFC was the most identified brand in the sport of mixed martial arts.").

**HIGHLY CONFIDENTIAL**

8. Over this same period, regulation and public acceptance of MMA increased.  The sport is now sanctioned in 50 states.[5]  MMA has grown in popularity, contributing to organic growth of the UFC brand under Zuffa's ownership.  Zuffa also has grown through acquisitions of MMA promotions or the assets of other promotions, most notably World Extreme Cagefighting ("WEC") and World Fighting Alliance in 2006, Pride Fighting Championship in 2007, and Strikeforce in 2011.[6]



---

[5] ZFL-2649918–989, at 972.

[6] ZFL-1238033–070; ZUF-00374846; ZUF-00304127–171; ZUF-00172283–323.



**HIGHLY CONFIDENTIAL**



11. Zuffa also compensates certain athletes with merchandise royalties, sponsorship payments, and Athlete Outfitting Policy (AOP) payments.

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

Case 2:15-cv-01045-RFB-BNW   Document 517-7   Filed 02/16/18   Page 9 of 77

IV. SCOPE OF ASSIGNMENT

15. For this report, counsel asked me to:

a. calculate the hypothetical effect of increasing athlete compensation over the Class Period by amounts commensurate with Plaintiffs' damages claims, on (i) Zuffa's audited financial statements, and (ii) the bout compensation of individual athletes in the Bout Class;

b. analyze the financial statements of Bellator for the period January 1, 2010 through March 31, 2017, and Strikeforce for the period January 1, 2009 through March 31, 2011, to determine how the share of revenue those promotions paid to athletes impacted the profitability of their business models;

c. determine the amount of compensation paid to or on behalf of athletes by Zuffa, and compare to Plaintiffs' experts' calculations of Bout Class and Identity Class compensation;

8
HIGHLY CONFIDENTIAL

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

e.   review Zuffa's financial statements during the Class Period to analyze the variable or contracted nature of its main revenue sources; and

f.   analyze documents created by Zuffa's lenders to determine whether the lenders understood the proceeds from certain financings would be used to pay a dividend to shareholders.

## V.    SUMMARY OF OPINIONS

16. The following statements constitute a summary of my primary opinions as of the date of this report:

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████   █████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████   ████

███████████████████████████████████████████████

████████████████████████   ████████████████████████

███████████████████████████████████████████████

---

■ ████████████████████████████████████

**HIGHLY CONFIDENTIAL**

10



11
**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

## VI.  ALLOCATING PLAINTIFFS' DAMAGES TO THE BOUT CLASS RESULTS IN INCREASES TO ATHLETE COMPENSATION OF MANY MULTIPLES OF THEIR ACTUAL COMPENSATION

25. I have performed an analysis using Plaintiffs' experts' calculations of damages to determine the impact that such amounts would have on the compensation of individual athletes if such damages were awarded in this case.  I used two different amounts for damages in my analysis: both the highest figure and the lowest figure that have been measured by Plaintiffs' experts.  I further allocated damages to athletes based on two methodologies: (1) based on the number of bouts fought (ignoring compensation for those bouts); and (2) based on each athlete's pro rata share of total bout compensation.

26. Plaintiffs' experts used different damages methodologies and applied those methodologies to different time periods.  Dr. Zimbalist's damages analysis addressed Bout Class Damages from December 16, 2010 through December 31, 2016 (the "Zimbalist Damages Period").  Dr. Singer's damages analyses addressed both Bout Class Damages and Identity Class Damages from December 16, 2010 through June 30, 2017 (the "Singer Damages Period").  Dr. Singer also provided four alternative methodologies for Bout Class Damages.

**HIGHLY CONFIDENTIAL**

27. I first allocated damages to athletes based on the number of bouts fought by each athlete in each year of the Class Period[28] relative to the total number of bouts fought by all athletes in that year.[29] For example, if there were a total of 500 bouts in a calendar year (meaning there were 1000 athletes who fought in bouts in that year), and Athlete X fought twice in that year, I allocated 2/1000, or .2% of that year's damages, to Athlete X. For purposes of this calculation, I only included Zuffa athletes who fought in a bout during the Class Period.[30] For purposes of my computation, I relied on data in two spreadsheets that contained detailed compensation data by athlete.[31]



---

[28] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[29] I counted as a bout any line item within that data that contained a result of win, loss, draw, DNF, N/A, and N/C, and where both the "Show" compensation and "Total" compensation were greater than zero. ZFL-2603701; ZFL-2764800.

[30] I understand that the class definition of the Bout Class includes "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States." Consolidated Amended Antitrust Class Action Complaint, ¶ 39. For purposes of my calculations I did not consider geographic factors, such as the nationality of the athlete, whether a bout took place in the United States, or whether a bout that took place ex-United States was broadcast in the United States.

[31] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



17
**HIGHLY CONFIDENTIAL**

18

**HIGHLY CONFIDENTIAL**

19

20

HIGHLY CONFIDENTIAL

**VII.   APPLYING PLAINTIFFS' DAMAGES ESTIMATES TO ZUFFA'S FINANCIAL STATEMENTS RESULTS IN MILLIONS OF DOLLARS OF LOSSES DURING THE CLASS PERIOD**

43. I have analyzed the effect of the annualized damages estimates of Dr. Singer and Dr. Zimbalist on Zuffa's financial statements using three different measures of Zuffa's profitability: net income, operating income, and EBITDA.  In the sections that follow, I summarize Zuffa's financial results under each of the financial measures.  I then address

**HIGHLY CONFIDENTIAL**

each of Plaintiffs' experts' opinions and the impact of their damages estimates on these three financial measures.[33]

## A.  Zuffa's Financial Results



---

[33] For the sake of argument, and for purposes of the following analyses, I have relied upon the plaintiffs' calculations of Net Income, Operating Income and EBITDA as reflected in the Expert Report of Mr. Davis at Exhibit 1a.

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



48. For each year during the Zimbalist Damages Period, I adjusted the three financial metrics described above to reflect the impact of Dr. Zimbalist's Bout Class damages. The results of this analysis are presented in Exhibit A and summarized below.

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

55. For his highest damages estimate, Dr. Singer provided a breakdown of Bout Class damages by year.  But for Dr. Singer's lowest damages estimate, he only provided total Bout Class damages. For purposes of my analysis, I allocated those damages across the Singer Damages Period based on Dr. Singer's computation of annual event revenue.

**HIGHLY CONFIDENTIAL**



58. As discussed above, Dr. Singer utilized a slightly different Class Period than Dr. Zimbalist.  While the Zimbalist Damages Period ends at December 31, 2016, the Singer Damages Period continues through June 30, 2017.  To compute damages for the six months ended June 30, 2017, Dr. Singer utilized an estimate for event revenue equal to 50% of the actual 2016 event revenue.  To be consistent with Dr. Singer's approach, I used 50% of 2016 actual net income as an estimate for the six months' net income ending

**HIGHLY CONFIDENTIAL**

June 30, 2017.  My analysis using Dr. Singer's high end damages estimate is attached as

Exhibit C, and my analysis using Dr. Singer's low end damages estimate is attached as

Exhibit D.

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



## IX.   PLAINTIFFS' EXPERTS UNDERSTATE ZUFFA'S COMPENSATION OF ATHLETES

75. I have performed my own calculations of athlete compensation and determined that Dr. Zimbalist, Dr. Singer, and Mr. Davis all understate the compensation Zuffa paid to (or on behalf of) athletes during the Class Period.

---



**HIGHLY CONFIDENTIAL**

76. Plaintiffs' experts present several alternative measurements of Zuffa's athlete compensation for both the Bout Class and the Identity Class. All three of Plaintiffs' experts reach different conclusions regarding total athlete compensation and are inconsistent as to (1) the specific elements of athlete compensation included in their overall calculation and (2) their purported classification of certain elements of compensation as Bout Class compensation or Identity Class compensation.

77. For purposes of my analysis, I relied on internal financial statements produced by Zuffa (the "Internal Financial Statements") because the audited financial statements do not provide a sufficient level of detail. I reconciled the Internal Financial Statements to the audited financial statements for each year to ensure I took into consideration the effects of audit adjustments to the Internal Financial Statements, if any, on my computation of athlete compensation.[60]

---

[60] Zuffa's Internal Financial Statements are ZFL-1514870; ZFL-1514933; ZFL-1514944; ZFL-2764799; 12'15 IS YTD Side by Side Final.xls; 12'12 Zuffa IS YTD Side by Side ref to financials NEW.xls; 2010 Final IS Referenced to FS – Restated.xls. Zuffa's audited financial statements are ZFL-0000221 – 255; ZFL-0000031 – 063; ZFL0000113 – 135; ZFL-0000188 – 220; ZFL-0000064 – 087; ZFL-0000007 – 030; ZFL-0000088 – 112; ZFL0000169 – 187; ZFL-0000136 – 168; RAINE0016835 – 7416.



79. My calculation of athlete compensation is conservative in that it does not include any amounts related to travel and entertainment expenses.  Travel and entertainment expenses were included in the Internal Financial Statements as direct costs under the Content revenue and Live Event revenue expense categories.  These costs include the expenses incurred when an athlete travels to an event, such as the athlete's airfare, lodging, per diem, and meal costs in accordance with the terms of the athlete's contract[62] and also may



---

[62] 10/11/2017 Interview with Shane Kapral; LEPLAINTIFFS-0076636-653 at 642; LEPLAINTIFFS-0048763-781 at 769-770.

**HIGHLY CONFIDENTIAL**

include the travel-related expenses for the family or guests of athletes.  However, the Internal Financial Statements include in this expense category the costs of Zuffa employees, such as production crew members, who also traveled to specific events.[63] Because I lacked sufficient expense-level detail to allow me to make a reasoned allocation among athlete and non-athlete costs, I excluded travel and entertainment expenses from my calculation.





**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



39

84. Plaintiffs' experts are also inconsistent in their treatment of i) AOP payments, ii) participant insurance, iii) medical expenses, and iv) other fighter costs.  Dr. Zimbalist treats AOP as Bout Class compensation,[71] while Mr. Davis treats it as Identity Class compensation.[72]  While Dr. Singer does not provide a sufficient level of detail to determine how he computed athlete compensation, he does provide a general description of the elements of bout compensation and identity compensation, which indicates that he treats AOP as Identity Class compensation.[73]

85. Mr. Davis includes participant insurance and medical costs in "other value conferred by Zuffa to UFC Fighters,"[74] while Dr. Zimbalist excludes these amounts entirely.[75] Dr. Singer does not mention participant insurance or medical costs in his discussion of the elements of Bout Class compensation and Identity Class compensation, and therefore, also appears to exclude such amounts.[76]

86. Dr. Zimbalist includes other fighter costs in both his Bout Class and Identity Class compensation, while Mr. Davis includes all other fighter costs in either his "other benefits" category or Identity Class compensation.[77]  It is unclear how Dr. Singer treats these amounts, if he addresses them at all.

---

[71] Zimbalist working paper, Table 4.1.xls.

[72] G. Davis Report, Table 15.

[73] Singer Report, ¶ 35.

[74] G. Davis Report, ¶ 49.

[75] Zimbalist working papers, Table 4.1.xls.

[76] Singer Report, pages 21-27.

[77] G. Davis Report, Exhibit 5a and Tables 15 and 16.

**HIGHLY CONFIDENTIAL**

87. Mr. Davis also excludes from his bout related compensation certain payments that Zuffa made to athletes, such as some, but not all, signing and other bonuses that were not tied directly to a specific event but amounts nonetheless paid to its athletes.

## X.   DR. ZIMBALIST UNDERESTIMATES COSTS INCURRED BY ZUFFA IN MARKETING AND PRODUCING ITS CONTENT FOR BROADCAST





91. It is my understanding that Zuffa differs from other professional sports organizations in that it bears all of the costs of producing and promoting its content for broadcast. Each year, Zuffa incurs the costs of producing and marketing hundreds of hours of domestic

42

**HIGHLY CONFIDENTIAL**

and international live fight programming in a variety of formats, including free-to-air TV, closed-circuit TV, residential and commercial PPV, mobile apps and, in more recent years, through its own OTT content platforms, such as Fight Pass.[84]

92. Zuffa's former General Counsel and current Chief Operating Officer, Lawrence Epstein, has explained that Zuffa, unlike the NFL, bears the costs of marketing its broadcasts.[85] Similarly, Mr. Fertitta has described how UFC differs from other sports entities that license their events to TV networks, thus outsourcing the costs of promoting, marketing, and broadcasting events.[86]   And, as explained by Denitza Batchvarova, Zuffa's Senior Vice President of Strategy, each PPV event that Zuffa promotes is a standalone product, meaning Zuffa starts from scratch each time it markets a new event to consumers.[87]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[84] 3/23/2017 Deposition of Lorenzo Fertitta, 146:9-19.

[85] "When we do a pay-per-view event, … [w]e pay all of the marketing expenses.  We have to go out and pay for all these expenses associated with marketing the event.  All of them.  When the NFL is on Sunday Night Football on NBC, what is the NFL—what kind of marketing expenses are they paying?  It's all done by NBC Sports.  They're marketing to their digital channels, they're putting people on the Today show, they're doing all this stuff to get people to come watch the NBC broadcast of the event.  That's … not the way our business work[s].  We've got to pay the expenses." 7/21/2017 Deposition of Lawrence Epstein, 413:20-414:7.

[86] "UFC is very different from other sports entities and sport leagues.  And what I mean by that is that we bear all the cost of production and marketing for an event compared to, say, other leagues which, typically what they do is they take a license from a network, and they essentially hand that network the responsibility of broadcasting that event, promoting that event, marketing that event.  So there's significant built-in costs that we have to absorb which inflates our revenue number relative to other sports on an apples-for-apples basis."   3/23/2017 Deposition of Lorenzo J. Fertitta, 196:3-23.

[87] "There is much variation.  Because, just like the Pay-Per-View events, we sell a very different product every time.  Every one of our events is a different product from the previous event." 1/25/2017 Deposition of Denitza Batchvarova, 204:20-205:4.  "We still—as I said, we always look at a Pay-Per-View event[s] as an event in which we have to – there is no subscription in Pay-Per-View.  So for every single event we are starting from buy zero. You have to convince consumers to buy it." 1/25/2017 Deposition of Denitza Batchvarova, 202:6-11.



**HIGHLY CONFIDENTIAL**



## XI.   ZUFFA'S FINANCIAL RESULTS WERE HIGHLY DEPENDENT ON VARIABLE REVENUE STREAMS

96. I reviewed and analyzed Zuffa's sources of revenue for the period January 1, 2011

through December 31, 2016 as reflected in Zuffa's Internal Financial Statements.  Before

relying on these amounts, I reconciled each year's information to Zuffa's audited

45

financial statements to ensure that I understood the impact of audit adjustments, if any, on the accounting information. After performing this reconciliation, I reviewed each line item of revenue within Zuffa's Internal Financial Statements to ensure I understood Zuffa's categories of revenue and the types of accounting transactions that these revenue accounts captured. I then performed an analysis to estimate the percentage of Zuffa's revenue in each year that involved transaction-based revenues versus recurring revenue.

97. I use the term "transaction-based revenues" to describe revenue streams that are generally short-term and benefit a narrow accounting period. Conversely, recurring revenues involve predictability in the revenue stream and provide a reasonable assurance that in the future such amounts will occur at similar levels over a similar period of time.







100. PPV revenue is transaction-based revenue.[95]  It is short-term in nature and fluctuates based on the number of PPV events sponsored by Zuffa, the strength of the fighter cards, the number of purchasers for each event, and the price established for each event.  As Zuffa COO Lawrence Epstein testified, "It's not contracted.  We don't know what we're going to get.  We could sell a million pay-per-view for the year, we could sell 5 million, we could sell zero.  It's a hundred percent unsure.  Every time we sell an event, every single one of our subscribers leave, and we have to resell them the next time around.  It's



the business we're in."[96]  The financial consequences were significant when an event was

cancelled due to an athlete injury or for other reasons.





**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



112. If one were to assume that athlete compensation could have been paid at levels higher than actual levels, then, as demonstrated in Section VII, Zuffa's EBITDA would be lower and the debt ratios such as those reflected in the Confidential Information Memoranda would be higher.  Thus, it is speculative of Mr. Davis to opine that had Zuffa paid more to its athletes and therefore had a business model reflecting a different cost structure, Zuffa could still have obtained the financing that it did.  To the contrary, when asked in his deposition whether Zuffa's ability to borrow or to obtain credit would be affected if Zuffa's earnings were lower, Mr. Davis replied, "Yes."[118]

---

[118] 9/19/2017 Deposition of Guy Davis, 154:9-15.  Mr. Davis also agreed that a decrease in borrowing capacity can limit a company's ability to grow.



114.  Additionally, if Zuffa had a cost structure that reflected athlete compensation at the levels argued by Dr. Zimbalist and Dr. Singer, it is not certain that Zuffa would have been acquired at the same price, or at all, in 2016.  A common business valuation methodology is the EBITDA multiple, a valuation metric which is equal to the market value of invested capital divided by EBITDA.[122]  In conducting its due diligence, Zuffa's buyers considered the EBITDA multiple in connection with the approximately \$4 billion



---

[121] See Leveraged Finance Unit Report, undated, p. 67 (DB-ZUFFA-00006389-00006457).

[122] Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies, Fifth Edition* (New York, NY: McGraw-Hill, 2008), Chapter 11.

acquisition price.[123]   A *lower* hypothetical EBITDA resulting from applying Plaintiffs' damages as athlete compensation would *increase* the EBITDA multiple at any given enterprise value, making Zuffa less attractive from a buyer's standpoint.   Put another way, holding the EBITDA multiple constant, a *lower* EBITDA would result in a *lower* enterprise value.

### XIII. MISCELLANEOUS

115. Appendix B contains a listing of the documents that I have relied upon in forming my opinions.   My opinions are based on the facts of this case as I now understand them and on the analyses described in this report.   I reserve the right to revise or augment the findings and opinions set forth in this report in the event additional relevant information becomes available, in response to questions raised in my deposition, to take into account any report or analyses presented by experts retained by the Plaintiffs, or for other reasons.

116. Charges for my services are based on my hourly rate of $650 per hour.   I have been assisted by others at BRG working at my direction.   BRG's staff of employees includes professionals with expert credentials in accounting, finance, valuation, and fraud investigations.   Neither BRG's fees nor my compensation are contingent upon achieving any particular outcome in this litigation.

---

[123] WME_ZUFFA_00001149 – 00001150.00039, at 00001150.00029.

**HIGHLY CONFIDENTIAL**

# **<u>Appendix A</u>**

**Curriculum Vitae**



**ELIZABETH KROGER DAVIS, MBA, CPA, CGMA**
BERKELEY RESEARCH GROUP, LLC
70 West Madison, Suite 5000
Chicago, IL 60602

Direct: 312.429.7937
Cell: 708.714.4110
edavis@thinkBRG.com

## OVERVIEW

For over 25 years, Elizabeth Kroger Davis has provided forensic accounting, expert consulting, and expert testimony services to law firms on complex matters that require expertise in finance, accounting, auditing, economics, and valuation. She has provided expert consulting or forensic accounting services on some of the largest financial market disputes of the past decades, matters involving damages, market manipulation, the fair value of financial instruments, post-acquisition disputes, alleged shareholder dilution, Ponzi schemes, fraud, and pre-arranged, unauthorized, and tax-motivated trading. She has consulted on disputes involving a variety of financial instruments including credit default swaps, interest rate swaps, futures, options, collateralized mortgage obligations, government securities, auction rate securities, repurchase agreements, commodities and other securitized assets and derivatives.

Ms. Kroger Davis has also consulted and testified on a variety of matters involving commercial damages related to alleged false advertising, IP, contract and employment disputes, and matters and issues pertaining to class certification.

On certain high profile disputes, Ms. Kroger Davis has been retained by counsel to provide strategic consulting advice on liability and damages issues, to direct the focus of interrelated teams of accountants, academics, financial experts, and other technical experts, and to provide trial support.

With a background in auditing and a half decade as a partner in the office of general counsel at a large public accounting firm, Ms. Kroger Davis has also advised counsel on dozens of civil and criminal litigation matters and regulatory investigations involving alleged violations of accounting, auditing, and other professional standards. She has also led management consulting practices dedicated to advising the legal departments of Fortune 500 companies on strategic restructuring, operational improvement, and litigation financial management strategies.

Ms. Kroger Davis received her MBA from the University of Chicago Graduate School of Business (now Booth School of Business) and BBA from Southern Methodist University. She is a Certified Public Accountant. She was notably named to the first listing of the Lawdragon 100 "Legal Consultants You Need to Know" (2009), which recognized leading providers of strategic and leadership advice to the legal profession.



## EDUCATION

MBA (Finance)       University of Chicago Graduate School of Business, 1991
BBA (Accounting)    Southern Methodist University, Cox School of Business, 1984

## PRESENT EMPLOYMENT

Berkeley Research Group, LLC
        Managing Director, 2013–present

## PREVIOUS POSITIONS

Finance Scholars Group
        Managing Director, 2009–2013

Davis Consulting
        2009

CRA International
        Vice President, 2007–2008

Navigant Consulting
        Managing Director, 2005–2007

Arthur Andersen
        Partner, 1996-2002
        Manager, Senior, Staff Consultant, 1983–1996

## PROFESSIONAL CERTIFICATIONS

Licensed as a Chartered Global Management Accountant, 2012

Licensed as a Certified Public Accountant, 1986 (Texas and Illinois). Currently registered as a CPA
        in the State of Illinois.

Named to the first-ever listing of Lawdragon 100 "Legal Consultants You Need to Know" (2009),
        showcasing the leading providers of strategic and leadership advice to the legal profession.

## TESTIMONY AND EXPERT REPORTS

*In Re Credit Default Swaps Antitrust Litigation,* UNITED STATES DISTRICT COURT, SOUTHERN
DISTRICT OF NEW YORK. Declaration in support of class counsel's motion for award of attorneys'
fees, reimbursement of expenses, and incentive awards for class representations (2016).
Declaration describes work performed by BRG, and supervised by Davis, in regards to the
compilation and analysis of hundreds of millions of credit default swap transactions and billions of
related quotes, and the subsequent application of econometric models for purposes of estimating
bid-ask spread inflation on a class-wide basis and allocating claimant settlement proceeds.

2



*In Re Credit Default Swaps Antitrust Litigation,* UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK. Declaration in response to an appeal submitted by a claimant who sought to recover additional settlement proceeds.   Declaration explained the flaws and unusual characteristics in the claimant's submission, and described how the award of additional settlement proceeds would be inconsistent to the rigor applied to other submissions and create a windfall for claimant.  Judge Cote denied the appeal submitted by the claimant.

*Ross University School of Medicine, Ltd., vs. Brooklyn-Queens Healthcare, Inc., and Wyckoff Heights Medical Center*, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK. Expert report and deposition testimony on economic damages pertaining to breach of contract (2011). Of three components of damages, judge accepted Davis' computations on two elements prior to trial. The matter subsequently settled prior to trial for a confidential amount.

## PROFESSIONAL EXPERIENCE

### Litigation, Investigations, and Forensic Accounting Matters

*Retained on behalf of plaintiff's class (Quinn Emanuel Urquhart & Sullivan, LLP) in re: Credit Default Swaps Antitrust Litigation* to provide litigation support, mediation support, class certification analysis, damages analysis and post-settlement fund allocation analysis. Assignment involved the construction of an econometric model, incorporating hundreds of million transactions in the CDS market and over 1.8 billion quotes on such securities, to analyze the economic impact of allegations that the investment banks had conspired to block exchange trading in the credit default swaps market in order to keep trading prices artificially high. Following a series of mediations that incorporated the economic model, matter resulted in a favorable settlement of $1.86 billion to plaintiffs. At the concluding settlement conferences, Judge Cote recognized the work of BRG for its development of a settlement allocation model that would fairly allocate the proceeds associated with millions of transactions executed by over 14,000 class members, including banks, insurance companies, pension funds and hedge funds.

*Retained by Starr International Co. (Boies, Schiller and Flexner LLP, Skadden, Arps, Slate, Meagher & Flom LLP) in re: Starr International Company, Inc. v. The United States* as a strategic consultant to the law firms on liability and damages issues pertaining to the constitutional takings case against the United States brought by AIG shareholders in the Court of Federal Claims.  Advised on case experts and expert issues involving both the plaintiff and defendant experts (over a dozen experts), and coordinated expert testimony and expert trial support during the ensuing three-month 2014 trial. Court of Federal Claims found liability on behalf of the U.S. Government in July 2015.

*Retained by Hank Greenberg, CEO of AIG, and Howard Smith, CFO of AIG (Boies Schiller and Flexner LLP, Skadden Arps, Slate, Meagher & Flom LLP and Kaye Scholer LLP)* as a strategic consultant to the law firm on liability and damages issues pertaining to a securities litigation involving allegedly fraudulent reinsurance transactions.  Advised on case experts and experts issues involving both the plaintiff and defendant experts (over a dozen experts) and coordinated expert testimony and expert trial preparation.  After approximately a month of trial, matter favorably resolved on behalf of clients.

3



*Retained on behalf of the Corn Refiners Association (Winston and Strawn) in re: Western Sugar Cooperative et al. v. Archer-Daniels-Midland Company et. al.* to provide litigation support in response to allegations that the Corn Refiners Association and its member companies ran a multi-year, multi-media advertising campaign that induced consumers and food and beverage manufacturers to purchase or manufacture more products sweetened by high-fructose corn syrup ("HFCS") at the expense of sucrose sugar.  Developed a statistical model incorporating detailed stores sales scanner data to evaluate the effects of television, print and website challenged advertising on actual purchases of over 40 food and beverage products.  Parties reached a confidential settlement during trial.

*Retained by plaintiff class (Boies, Schiller & Flexner LLP) in re: Anwar, et al., v. Fairfield Greenwich Limited, et al.* as a strategic consultant to the law firm on liability issues pertaining to the demise of hedge funds operated and marketed by the Fairfield Greenwich Group that invested with Bernard Madoff.

*Retained on behalf of Bluestem Brands, Inc. (Faegre Baker Daniels LLP) in re: CIGPF I Corp. v. Bluestem Brands, Inc.,* to provide economic analysis related to the capital structure of Bluestem, allegations by plaintiff of damages associated with anti-dilution adjustments under a warrant agreement, and damages associated with alleged participation rights in a credit financing transaction. Matter settled.

*Retained by Halliburton (formerly Godwin Ronquillo) in re: Oil Spill by the Oil Rig "Deepwater Horizon (DWH)"* to lead litigation support team in development of expert report in support of objections by Halliburton to class certification and final approval of the DWH Economic and Property Damages Settlement Agreement of $6.5 billion. Though the expert report was excluded on the basis that Halliburton had no legal standing with regard to the settlement, after its submission lawyers for BP filed an emergency motion contending that the settlement "systematically produces illogical and absurd compensation awards to claimants," and is paying "hundreds of millions of dollars, and perhaps billions, to claimants with 'losses' that do not exist in reality." These outcomes are a direct consequence of the fundamental flaws in the economic damages settlement that were derived and later described in the expert report involving Davis.

*Retained by Barclays Bank (Boies, Schiller & Flexner LLP) in re: Lehman Brothers Holdings, Inc. et al.* to lead litigation support team and six-month trial support initiatives related to 2008 bankruptcy of Lehman Brothers Inc. and the resulting $45 billion acquisition by defendant Barclays of its North American broker dealer business. Primary financial and economic consulting work streams included defending a $5 billion damages component sought by plaintiffs involving the fair value of thousands of purchased securities including mortgage backed securities, auction rate securities, collateralized loan obligations and other securitized assets. Of $5 billion valuation damages sought by plaintiffs, $0 damages were awarded in 2010 trial.

*Retained by the Official Committee of Unsecured Creditors of the LandAmerica Financial Group, Inc. et al. (formerly Bingham McCutchen LLP, LeClairRyan)* to lead litigation support team in development of expert report pertaining to liability and damages in breach of fiduciary duty litigation bought against directors and officers as a result of massive financial losses suffered by LandAmerica and its subsidiary, Land America 1031 Exchange Services, which ultimately led to its implosion and Chapter 11 filing 2009. Matter favorably settled with recovery of most of the available insurance proceeds.

4



*Retained on confidential matter on behalf of hedge fund (Hogan Lovells)* to lead expert work pertaining to losses incurred on close out of credit default swaps with certain counterparties in the wake of the Lehman Brothers Holdings bankruptcy.

*Retained by DaimlerChrysler Financial Services (Thompson Coburn LLP)* to lead litigation support and expert work in defense of claims of alleged lending discrimination sought by Chrysler's dealer network. Compilation of an analytical dataset and subsequent statistical analysis of tens of thousands of financing transactions led to significant settlement savings within nine months of retention.

*Various matters on behalf of Arthur Andersen LLP.* Advisory partner in dozens of litigation and investigation matters. Provided litigation consulting or investigatory role on legal and regulatory matters involving alleged audit failures and violations of professional standards (GAAP/GAAS). Responsibilities included working paper review, assessment of compliance with policies and procedures, engagement team interviews and matter resolution strategies. Illustrative cases include: a civil/criminal matter pertaining to the forward-looking financial statements issued by real estate limited partnerships; civil litigation involving the unauthorized trading of mortgage-backed securities by a governmental entity; civil and regulatory matters involving revenue recognition of bill and hold transactions for a public company; and civil litigation involving revenue recognition issues of a biotechnology company.

*Retained by Grant Thornton (Mayer Brown)* in its defense of a broker–dealer audit client that allegedly executed sham government securities transactions and conferred tax losses on professional athletes. Work involved forensic reconstruction and financial analysis of trading and re-estimation of tax liabilities. Matter resolved favorably on behalf of accounting firm.

*Retained by the Chicago Board of Trade (Kirkland & Ellis LLP)* in response to a CFTC enforcement action against the exchange's internal audit division. Led engagement team that reviewed the work papers of the Office of Investigations and Audits (OIA), and subsequently uncovered a fraudulent accounting scheme at a broker dealer that the OIA had been unable to unravel. Case was favorably resolved. Subsequently retained by the OIA to advise on improvements to its policies and procedures to reduce execution risks on future audits.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP) and Deloitte & Touche* to assist in an independent investigation initiated by a consortium of Italian banks regarding grain trading losses reported by an Italian subsidiary.

*Retained by Ferruzzi USA (Sidley Austin LLP)* to lead litigation support team in response to a $150 million deficiency notice issued by the IRS over the tax treatment of futures and options hedges. Work involved forensic reconstruction of trading models and strategies and was subsequently used by Ferruzzi's outside auditor and tax preparer, PricewaterhouseCoopers, in advantageous settlement with IRS.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead engagement in response to a CFTC investigation into regulatory reporting issues. Matter favorably resolved based on analytical information and reports provided to regulators.



*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead litigation support team in defense of a securities class action alleging market manipulation and hundreds of millions of dollars of damages on thousands of futures market participants. Performed forensic reconstruction of global trading positions in cash, futures and forwards for purposes of analyzing speculative versus hedging positions and testing allegations of inflated market prices given market events and defendant holdings. Work resulted in narrowing of class and favorable settlement on behalf of client.

*Retained by First Chicago (now JPMorgan Chase) (Sidley Austin LLP)* in litigation involving the "run" on a real estate investment fund stemming from sudden investor redemption requests. Led litigation support team that modeled effects of participants' net asset values under various redemption scenarios and provided strategic advice in settlement negotiations. Client settled at amount below expectations. Subsequently retained to assist in the settlement discussions with the Office of the Comptroller of the Currency (OCC), which were timely resolved.

*Retained by Ferruzzi Finanziaria (Sidley Austin LLP)* to lead litigation support and three-month trial support initiatives in defense of a regulatory investigation by the Chicago Board of Trade Business Conduct Committee over allegations of market manipulation and multi-million dollar market damages. Performed forensic reconstruction of multi-legged soybean spot, forward, futures, options and CIF/FOB market transactions, and macroeconomic analysis of underlying market fundamentals. Client prevailed against charges. No findings of market manipulation were brought against client.

*Retained by the Legal Department of First Chicago (now JPMorgan Chase)* to consult on the valuation of employee stock options in regards to pending employment litigation matters.

*Retained by Conagra/Armour Swift Eckrich (formerly Pretty Schroeder Brueggemann & Clark)* in its defense against patent infringement charges pertaining to the meat processing and packaging division. Led litigation support and trial support team addressing damages. Jury award against client less than one-third the amount requested by plaintiff.

*Retained by Commonwealth Edison (Sidley Austin LLP)* in response to an EEOC complaint alleging discrimination in the recruitment and hiring of employees. Led litigation support engagement that constructed an applicant flow database and models for over 80,000 prospective employees spanning a half decade. Analytical work used in successful resolution of matter.

*Retained by Continental Grain (Sidley Austin LLP)* in its corporate investigation of a failed arbitrage trading subsidiary and ensuing multi-district litigation involving the trading fraud perpetrated by this entity. Led litigation support team that performed forensic reconstruction of hundreds of thousands of government securities, repurchase agreements and futures market transactions, and built computer models to test hypotheses of fictitious, fraudulent, prearranged, and tax-motivated trading on customer accounts. Coordinated analytical support for numerous experts. Provided trial support in first counter claim tried against a primary dealer for facilitating the fraud and achieved $140 million verdict for client. Subsequently participated in settlement discussions with hundreds of investors and achieved favorable resolution of all outstanding matters.

*Retained by Drexel Burnham Lambert (Sidley Austin LLP)* in conjunction with massive governmental investigation of insider trading in junk bonds by Mike Milken and Ivan Boesky. Led litigation support team in forensic investigation that entailed the review of millions of documents.

6



**Other Consulting Assignments**

*Retained by the legal department of Walmart* to advise on strategic technology initiatives. Developed a benchmarking survey on technology utilization by leading corporate legal departments.

*Retained by the legal department of Walmart* to advise on attorney compensation in the wake of the 2008 market collapse.

*Retained by the general counsel of General Dynamics* to advise on organizational structure and knowledge management. Delivered cutting-edge research to a peer group of Fortune 200 law departments with the highest reputations for innovation. Reported on the impact of law department organizational design on the ability of lawyers to identify, communicate and respond to critical legal and risk-related information.

*Retained by legal department of Amgen* to perform legal technology benchmarking and make recommendations on investments in matter management and e-billing software. Scope of recommendations included advice on enhancements/modifications to business processes and information flows.

*Retained by the general counsel of Walmart* to advise on the transformation of its attorney compensation and performance platform. Repositioned client to attract and retain top talent thru revised career paths, compensation packages and performance structures.

*Retained by an international accounting firm* to advise on knowledge management and data mining processes to identify patterns in causation factors in litigation matters and other troubled engagements.

*Retained by the Association of Corporate Counsel* (Dallas, Fort Worth, Houston, Austin and San Antonio chapters) to provide legal compensation surveys compiling trends in salary, bonus and other employee benefits.

*Retained by the Association of General Counsels,* an organization of Fortune 200 general counsels, to provide law department compensation survey. Retained to create and analyze statistical information on thousands of domestic and international law department positions. Study became industry benchmark for leading law departments. Findings presented at annual conference.
*Retained by University of North Carolina Chapel Hill* to advise on Governmental Accounting Standards Board reporting and disclosure requirements related to derivative investments in its endowment and other funds.

*Retained by International Netherlanden Bank (ING)* to perform a surprise audit of a futures commission merchant, Quantum Financial Services, and assess compliance with financial covenants. Subsequently retained to perform a business diagnostics review of Quantum to identify opportunities to enhance revenue and reduce costs over payout structures and floor brokerage operations, and improve both its organizational structure and accounting and business information systems.

*Performed financial statement audits* of banks, savings and loans, hotels, and real estate developers and operators. Also specialized in performing information systems reviews in support of complex



audits. Illustrative clients included First City Bank of Houston, University of Chicago Hospital, Continental Airlines, University Savings and Loan, Ben Franklin Savings, the Houstonian Hotel, and Romanek Properties.

**Other Professional Experience**

Global Risk Management partner at Arthur Andersen with international responsibilities to drive strategic alignment, risk management and cost reduction strategies across matrix structure of functional groups, firm management and the business operators/partners. Delivered firm's first international knowledge management initiatives, including the creation of a data mining function to analyze litigation and other troubled client engagements, identify patterns in causation and recommend policies and procedures to reduce recurrence.

Partner seconded to Arthur Andersen's Global Risk Management Executive Committee to monitor risk management action plans of the business units to peer reviews and compliance audits.

Partner leading Arthur Andersen's firm wide initiative to analyze risks associated with dozens of international mergers, acquisitions, alliances, joint ventures, equity deals and new country expansions totaling about $420,000,000 in investments. Responsibilities varied, but typically included an emphasis on deal quality control, integration execution management and identification of best practices.

Interim CFO/COO responsibilities for Arthur Andersen's legal department, a $100 million to $250+ million, 100-person international law department. Implemented top-down enhancements to the department's organizational structure, technology solutions, financial reporting policies and procedures, and management of outside counsel. Migrated service model from outside counsel to dedicated, in-house support, tripling headcount about twelve months and creating cost savings by reducing law firm expenditures and strategically outsourcing non-core activities.

Arthur Andersen partner liaison between the legal department and professional indemnity insurance representatives regarding the litigation portfolio, costs, risk benchmarks, and firm-wide risk management initiatives. Liaison responsibilities extended to status/management of cases.

Advised on the wind-down of Arthur Andersen's insurance consortium, the startup of a captive program, and the solicitation of reinsurance bids for certain attest and non-attest risk portfolios. Accounted for the coverage and collection on matters and performed financial modeling on various loss scenarios for the firm's captive insurance company.

Selected to perform the Litigation Services Quality Review Program of Andersen's Washington D.C. Specialty Consulting Practice.

## ARTICLES/INSTRUCTOR/LECTURER/PANELIST

"Liability Hot Buttons for 2014." Baruch College National Association of State Boards of Accountancy Center for the Public Trust (CPT), December 6, 2013, New York, NY.



"Update: A Brief Overview of Trends in PCAOB Inspection Reports, What Every Practitioner Should Know" (with Joe Moravy), in PLI Course Handbook, Basics of Accounting for Lawyers 2013: What Every Practicing Lawyer Needs to Know (2013).

Article commentary. Kmet, Carolyn. "Illinois' Big Four." *Insight Magazine,* The Magazine of the Illinois CPA Society, Sep. 2013: 38–41. Print.

"A Brief Overview of Trends in PCAOB Inspection Reports: What Every Practitioner Should Know" (with Joe Moravy), in PLI Course Handbook, Basics of Accounting for Lawyers 2011: What Every Practicing Lawyer Needs to Know (2011).

"Turning Litigation Data into Litigation Intelligence," National Organization of Women Lawyers Fourth Annual General Counsel Institute, November 6, 2008, New York, NY.

"Report on the Third Annual National Survey on Retention and Promotion of Women in Law Firms," National Association of Women Lawyers, November 2008.

"Managing Outside Counsel: From Bill Review to Benchmarking," Mitratech Interact Legal and Compliance Technology Forum, October 3, 2008, Marina del Rey, CA.

"Risk Management: How to Stay Ahead of the Next Big Development," Sixth Annual DELVACCA General Counsel Forum, 2008, Philadelphia, PA.

"Early Case Assessment and Preliminary Damages Analysis," Mitratech Interact Legal and Compliance Conference, September 9–11, 2007, Phoenix, AZ.

"Business Intelligence," Mitratech Interact 2007 Conference, September 9–11, 2007, Phoenix, AZ.

"Managing Matter Management," International Legal Technology Association, March 2, 2007, New York, NY.

"Risk Management is Good Management," National Association of Women Lawyers Third Annual General Counsel Institute, November 2007, New York, NY.

"2006 Association of General Counsel In-House Legal Department Survey," Association of General Counsel, October 2006, Washington, DC.

"How to Manage Document Retention and Destruction Issues in Illinois-Role of Inside Counsel," Lorman Education Series, June 22, 2006, Chicago, IL.

"10 Common Electronic Discovery Risks: How to Avoid Them, Fix Them and Learn from Them," Greenberg Traurig Annual Conference, May 19, 2006, Kohler, WI.

"Litigation Matter Management and Technology Trends," Jenner & Block (1999), Chicago, IL.

"Andersen Technology Platform and Litigation Case Assessment," DuPont In-House Legal Department, (1999), Wilmington, DE.



"Statistical Sampling and Regression Analysis," three-day course presented to Provident Life and Accident Insurance Company and the law firm of Steel, Hector and Davis LLP, St. Charles, IL.

"Partner/Manager Statistical Sampling"; developed and taught three-day sampling course for Andersen partners and managers (1993, 1994, 1995)

"Statistical Sampling and Regression Training"; developed and taught three-day sampling and regression analysis course for Andersen seniors and staff (1993, 1994).

# ELIZABETH KROGER DAVIS

## SUMMARY OF PUBLICATIONS FOR LAST TEN YEARS

| ARTICLE NAME | PUBLICATION/FORUM | YEAR |
|---|---|---|
| Update:  A Brief Overview of Trends in PCAOB Inspection Reports (with Joe Moravy) | PLI Course Handbook, Basics of Accounting for Lawyers 2013: What Every Practicing Lawyer Needs to Know | 2013 |
| Article Commentary, "Illinois' Big Four" | Carolyn, Kmet, "Illinois' Big Four", *Insight Magazine*, The Magazine of the Illinois CPA Society | 2013 |
| A Brief Overview of Trends in PCAOB Inspection Report (with Joe Moravy) | PLI Course Handbook, Basics of Accounting for Lawyers 2011: What Every Practicing Lawyer Needs to Know | 2011 |
| Turning Litigation Data into Litigation Intelligence | National Organization of Women Lawyers Fourth Annual General Counsel Institute | 2008 |
| Report on the Third Annual National Survey on Retention and Promotion of Women in Law Firm | National Association of Women Lawyers | 2008 |

## SUMMARY OF TESTIMONY FOR LAST FOUR YEARS

| TYPE | LAW FIRM | SUBJECT | MATTER NAME | VENUE | YEAR | TESTIFIED FOR |
|---|---|---|---|---|---|---|
| Declaration | Quinn Emanuel Urquhart & Sullivan, LLP | Respond to Class Action Challenge Submission | *In Re Credit Default Swaps Antitrust Litigation* | United States District Court for the Southern District of New York | 2016 | Plaintiff |
| Declaration | Quinn Emanuel Urquhart & Sullivan, LLP | Declaration in Support of Class Counsel for Fee Award & Reimbursement | *In Re Credit Default Swaps Antitrust Litigation* | United States District Court for the Southern District of New York | 2016 | Plaintiff |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                    **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| ITL | DESCRIPTION | BEGINNING | END |

**Pleadings**
    Consolidated Amended Antitrust Class Action Complaint, Docket 208
    Zuffa, LLC's Motion for Partial Summary Judgment, Docket 347
    Zuffa, LLC's Consolidated Notice of Motion and Motion to Dismiss, Docket 64

**Expert Reports**
    Expert Report of Hal J. Singer, Errata and Workpapers
    Expert Report of Andrew Zimbalist, Errata and Workpapers
    Expert Report of Guy A. Davis
    Guy Davis Backup Support "Cung Le v Zuffa - Protiviti Discovery.xls"

**Depositions**
    Deposition of Lorenzo Fertitta, March 23, 2017
    Deposition of John Mulkey, April 19, 2017
    Deposition of Ike Lawrence Epstein, December 2, 2016
    Deposition of Ike Lawrence Epstein, July 21, 2017
    Deposition of Ike Lawrence Epstein, May 26, 2017
    Deposition of Dana White, August 9, 2017
    Deposition of Dana White, August 10, 2017
    Deposition of Andrew Zimbalist, September 25, 2017
    Deposition of Guy Davis, September 19, 2017
    Deposition of Hal Singer, September 27, 2017
    Deposition of Scott Coker, August 3, 2017
    Deposition of Denitza Batchvarova, January 25, 2017
    Deposition of John Hertig, April 27, 2017
    Deposition of Jeff Aronson, April 25, 2017

**Other Documents without Bates Stamps**
    Fighter Comp Detail.xls
    12'12 Zuffa IS YTD Side by Side ref to financials NEW.xls
    12'15 IS YTD Side by Side FINAL.xls
    2010 Final IS Referenced to FS - Restated.xls
    Zuffa Parent LLC - Predecessor Financial Statements - 3_31_17 - vFINAL.pdf
    Zuffa Parent LLC - Successor Financial Statements - 3_31_17 - vFINAL.pdf
    Shannon P. Pratt and Alina V. Niculita, *Valuing a Business, the Analysis and Appraisal of Closely Held Companies* , Fifth Edition (New York, NY: McGraw-Hill, 2008), Chapter 11.
    BJPenn.com, *Report: Viacom tells Bellator officials to 'sign every single big name out there'* April 3, 2017 [http://www.bjpenn.com/mma-news/bellator/report-viacom-tells-bellator-officials-sign-every-single-big-name/]
    Bret Okamoto, "*Coker: '[Bellator NYC] is the best MMA PPV that's been offered in 2017'*" ESPN.COM, June 7, 2017 [http://www.espn.com/mma/story/_/id/19558519/bellator-scott-coker-best-mma-ppv-offered-2017]
    Ron Borges, "It was the Ultimate save: Business plan by Fertittas and White took from UFC from the brink to the hieghts" Boston Herald, August 26, 2010

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                                **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| **ITL** | **DESCRIPTION** | **BEGINNING** | **END** |

**Bates Stamped Documents**                                                                                                  -

| | | | |
|---|---|---|---|
| | **Bout Class Compensation** | | |
| | | ZFL-2603701 | ZFL-2603701 |
| | | ZFL-2764800 | ZFL-2764800 |
| | | ZFL-0000003 | ZFL-0000003 |
| | | ZFL-2458185 | ZFL-2458185 |
| | | ZFL-2458186 | ZFL-2458186 |
| | | ZFL-2603701 | ZFL-2603701 |
| | | ZFL-2700520 | ZFL-2700521 |
| | | ZFL-2700522 | ZFL-2700522 |
| | | ZFL-2764800 | ZFL-2764800 |
| | **Identity Class Compensation** | | |
| | | ZFL-2603704 | ZFL-2603704 |
| | | ZFL-2650184 | ZFL-2650184 |
| | | ZFL-2650185 | ZFL-2650185 |
| | | ZFL-2650186 | ZFL-2650186 |
| | | ZFL-2650188 | ZFL-2650188 |
| | | ZFL-2650189 | ZFL-2650189 |
| | | ZFL-2679053 | ZFL-2679053 |
| | **Zuffa Internal Financial Statements** | | |
| | | ZFL-2764799 | ZFL-2764799 |
| | | ZFL-1514712 | ZFL-1514712 |
| | | ZFL-1381761 | ZFL-1381761 |
| | | ZFL-1514900 | ZFL-1514900 |
| | | ZFL-1514804 | ZFL-1514804 |
| | | ZFL-1514966 | ZFL-1514966 |
| | | ZFL-1514769 | ZFL-1514769 |
| | | ZFL-1514933 | ZFL-1514933 |
| | | ZFL-1514944 | ZFL-1514944 |
| | | ZFL-1514713 | ZFL-1514713 |
| | | ZFL-1472224 | ZFL-1472224 |
| | | ZFL-1674096 | ZFL-1674096 |
| | | ZFL-1514870 | ZFL-1514870 |
| | | ZFL-1514770 | ZFL-1514770 |
| | | ZFL-1514901 | ZFL-1514901 |
| | | ZFL-1514837 | ZFL-1514837 |
| | | ZFL-1053223 | ZFL-1053223 |
| | | ZFL-1514836 | ZFL-1514836 |

**HIGHLY CONFIDENTIAL**                                                                                                  **Page 2**

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**       **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| ITL | DESCRIPTION | BEGINNING | END |
| | **Strikeforce Revenues** | | |
| | | ZFL-1472337 | ZFL-1472337 |
| | | ZFL-1472338 | ZFL-1472338 |
| | | ZFL-2458185 | ZFL-2458185 |
| | | ZFL-2458186 | ZFL-2458186 |
| | **Event Level Financials** | | |
| | | ZFL-2603702 | ZFL-2603702 |
| | | ZFL-2650187 | ZFL-2650187 |
| | | ZFL-2764797 | ZFL-2764797 |
| | | ZFL-2764798 | ZFL-2764798 |
| | **Event Revenues** | | |
| | | ZFL-0000267 | ZFL-0000267 |
| | | ZFL-0000268 | ZFL-0000268 |
| | | ZFL-0000366 | ZFL-0000366 |
| | | ZFL-0000368 | ZFL-0000368 |
| | | ZFL-0000370 | ZFL-0000370 |
| | | ZFL-0000372 | ZFL-0000372 |
| | | ZFL-0000379 | ZFL-0000379 |
| | | ZFL-0000380 | ZFL-0000380 |
| | | ZFL-0000381 | ZFL-0000381 |
| | | ZFL-0000382 | ZFL-0000382 |
| | | ZFL-0000383 | ZFL-0000383 |
| | | ZFL-0000385 | ZFL-0000385 |
| | | ZFL-0000386 | ZFL-0000386 |
| | | ZFL-0000387 | ZFL-0000387 |
| | | ZFL-0000389 | ZFL-0000389 |
| | | ZFL-0000390 | ZFL-0000390 |
| | | ZFL-0000391 | ZFL-0000391 |
| | | ZFL-0000392 | ZFL-0000392 |
| | | ZFL-0000394 | ZFL-0000394 |
| | | ZFL-0000395 | ZFL-0000395 |
| | | ZFL-0000396 | ZFL-0000396 |
| | | ZFL-0000398 | ZFL-0000398 |
| | | ZFL-0000399 | ZFL-0000399 |
| | | ZFL-0000400 | ZFL-0000400 |
| | | ZFL-0000401 | ZFL-0000401 |
| | | ZFL-0000402 | ZFL-0000402 |
| | | ZFL-0000403 | ZFL-0000403 |
| | | ZFL-0000405 | ZFL-0000405 |
| | | ZFL-0000406 | ZFL-0000406 |
| | | ZFL-0000407 | ZFL-0000407 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and** **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| **ITL** | **DESCRIPTION** | **BEGINNING** | **END** |
| | | ZFL-0000409 | ZFL-0000409 |
| | | ZFL-0000411 | ZFL-0000411 |
| | | ZFL-0000412 | ZFL-0000412 |
| | | ZFL-0000413 | ZFL-0000413 |
| | | ZFL-0000414 | ZFL-0000414 |
| | | ZFL-0003919 | ZFL-0003919 |
| | | ZFL-0003920 | ZFL-0003920 |
| | | ZFL-0003921 | ZFL-0003921 |
| | | ZFL-0003935 | ZFL-0003935 |
| | | ZFL-0003936 | ZFL-0003936 |
| | | ZFL-0003937 | ZFL-0003937 |
| | | ZFL-0003938 | ZFL-0003938 |
| | | ZFL-0003939 | ZFL-0003939 |
| | | ZFL-0003940 | ZFL-0003940 |
| | | ZFL-0003941 | ZFL-0003941 |
| | | ZFL-0003942 | ZFL-0003942 |
| | | ZFL-0003943 | ZFL-0003943 |
| | | ZFL-0003944 | ZFL-0003944 |
| | | ZFL-0003945 | ZFL-0003945 |
| | | ZFL-0003947 | ZFL-0003947 |
| | | ZFL-0003948 | ZFL-0003948 |
| | | ZFL-0003950 | ZFL-0003950 |
| | | ZFL-0003952 | ZFL-0003952 |
| | | ZFL-0003953 | ZFL-0003953 |
| | | ZFL-0003954 | ZFL-0003954 |
| | | ZFL-0003955 | ZFL-0003955 |
| | | ZFL-0003956 | ZFL-0003956 |
| | | ZFL-0003957 | ZFL-0003957 |
| | | ZFL-0003958 | ZFL-0003958 |
| | | ZFL-0003959 | ZFL-0003959 |
| | | ZFL-0003960 | ZFL-0003960 |
| | | ZFL-0003961 | ZFL-0003961 |
| | | ZFL-0003962 | ZFL-0003962 |
| | | ZFL-0003963 | ZFL-0003963 |
| | | ZFL-0003964 | ZFL-0003964 |
| | | ZFL-0003967 | ZFL-0003967 |
| | | ZFL-0003968 | ZFL-0003968 |
| | | ZFL-0003969 | ZFL-0003969 |
| | | ZFL-0003970 | ZFL-0003970 |
| | | ZFL-0003971 | ZFL-0003971 |
| | | ZFL-0003972 | ZFL-0003972 |
| | | ZFL-1001246 | ZFL-1001246 |
| | | ZFL-1001247 | ZFL-1001247 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**      **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| **ITL** | **DESCRIPTION** | **BEGINNING** | **END** |
| | | ZFL-1033791 | ZFL-1033791 |
| | | ZFL-1033792 | ZFL-1033792 |
| | | ZFL-1054659 | ZFL-1054659 |
| | | ZFL-1054660 | ZFL-1054660 |
| | | ZFL-1057705 | ZFL-1057705 |
| | | ZFL-1057706 | ZFL-1057706 |
| | | ZFL-1058008 | ZFL-1058008 |
| | | ZFL-1058009 | ZFL-1058009 |
| | | ZFL-1058999 | ZFL-1058999 |
| | | ZFL-1059000 | ZFL-1059000 |
| | | ZFL-1062694 | ZFL-1062694 |
| | | ZFL-1062695 | ZFL-1062695 |
| | | ZFL-1062696 | ZFL-1062696 |
| | | ZFL-1067455 | ZFL-1067455 |
| | | ZFL-1067456 | ZFL-1067456 |
| | | ZFL-1069205 | ZFL-1069205 |
| | | ZFL-1069206 | ZFL-1069206 |
| | | ZFL-1084338 | ZFL-1084338 |
| | | ZFL-1084339 | ZFL-1084339 |
| | | ZFL-1085023 | ZFL-1085024 |
| | | ZFL-1085025 | ZFL-1085025 |
| | | ZFL-1085026 | ZFL-1085026 |
| | | ZFL-1085223 | ZFL-1085223 |
| | | ZFL-1085224 | ZFL-1085224 |
| | | ZFL-1088469 | ZFL-1088469 |
| | | ZFL-1088470 | ZFL-1088470 |
| | | ZFL-1089627 | ZFL-1089627 |
| | | ZFL-1089628 | ZFL-1089628 |
| | | ZUF-00031995 | ZUF-00031995 |
| | | ZUF-00032038 | ZUF-00032038 |
| | | ZUF-00032039 | ZUF-00032039 |
| | | ZUF-00032040 | ZUF-00032040 |
| | | ZUF-00032043 | ZUF-00032043 |
| | | ZUF-00032044 | ZUF-00032044 |
| | | ZUF-00033613 | ZUF-00033613 |
| | | ZUF-00033614 | ZUF-00033614 |
| | | ZUF-00033633 | ZUF-00033633 |
| | | ZUF-00033634 | ZUF-00033634 |
| | | ZUF-00034209 | ZUF-00034209 |
| | | ZUF-00034210 | ZUF-00034210 |
| | | ZUF-00104684 | ZUF-00104685 |
| | | ZUF-00104686 | ZUF-00104686 |
| | | ZUF-00106615 | ZUF-00106615 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**  **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| ITL | DESCRIPTION | BEGINNING | END |
| | | ZUF-00106616 | ZUF-00106616 |
| | | ZUF-00106617 | ZUF-00106617 |
| | | ZUF-00106618 | ZUF-00106618 |
| | | ZUF-00106619 | ZUF-00106619 |
| | | ZUF-00106620 | ZUF-00106620 |
| | | ZUF-00106621 | ZUF-00106621 |
| | | ZUF-00106622 | ZUF-00106622 |
| | | ZUF-00106848 | ZUF-00106848 |
| | | ZUF-00106849 | ZUF-00106849 |
| | | ZUF-00106850 | ZUF-00106850 |
| | | ZUF-00106851 | ZUF-00106851 |
| | | ZUF-00106852 | ZUF-00106852 |
| | | ZUF-00106853 | ZUF-00106853 |
| | | ZUF-00106854 | ZUF-00106854 |
| | | ZUF-00106855 | ZUF-00106855 |
| | | ZUF-00106856 | ZUF-00106856 |
| | | ZUF-00107337 | ZUF-00107337 |
| | | ZUF-00107338 | ZUF-00107338 |
| | | ZUF-00107339 | ZUF-00107339 |
| | | ZUF-00107340 | ZUF-00107340 |
| | | ZUF-00107341 | ZUF-00107341 |
| | | ZUF-00107342 | ZUF-00107342 |
| | | ZUF-00107343 | ZUF-00107343 |
| | | ZUF-00107344 | ZUF-00107344 |
| | | ZUF-00107653 | ZUF-00107653 |
| | | ZUF-00107654 | ZUF-00107654 |
| | | ZUF-00107655 | ZUF-00107655 |
| | | ZUF-00107656 | ZUF-00107656 |
| | | ZUF-00107657 | ZUF-00107657 |
| | | ZUF-00107658 | ZUF-00107658 |
| | | ZUF-00107822 | ZUF-00107822 |
| | | ZUF-00107823 | ZUF-00107824 |
| | | ZUF-00107825 | ZUF-00107825 |
| | | ZUF-00107826 | ZUF-00107826 |
| | | ZUF-00107827 | ZUF-00107827 |
| | | ZUF-00107936 | ZUF-00107936 |
| | | ZUF-00107937 | ZUF-00107937 |
| | | ZUF-00107998 | ZUF-00107998 |
| | | ZUF-00107999 | ZUF-00108000 |
| | | ZUF-00108001 | ZUF-00108001 |
| | | ZUF-00108002 | ZUF-00108002 |
| | | ZUF-00108003 | ZUF-00108003 |
| | | ZUF-00108653 | ZUF-00108653 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**          **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| ITL | DESCRIPTION | BEGINNING | END |
| | | ZUF-00108654 | ZUF-00108654 |
| | | ZUF-00109208 | ZUF-00109208 |
| | | ZUF-00109209 | ZUF-00109209 |
| | | ZUF-00109742 | ZUF-00109742 |
| | | ZUF-00109743 | ZUF-00109743 |
| | | ZUF-00109744 | ZUF-00109744 |
| | | ZUF-00109745 | ZUF-00109745 |
| | | ZUF-00109746 | ZUF-00109746 |
| | | ZUF-00109747 | ZUF-00109747 |
| | | ZUF-00111359 | ZUF-00111359 |
| | | ZUF-00111360 | ZUF-00111360 |
| | | ZUF-00111361 | ZUF-00111361 |
| | | ZUF-00111362 | ZUF-00111362 |
| | | ZUF-00111363 | ZUF-00111363 |
| | | ZUF-00111364 | ZUF-00111364 |
| | | ZUF-00111365 | ZUF-00111365 |
| | | ZUF-00111366 | ZUF-00111366 |
| | | ZUF-00111367 | ZUF-00111367 |
| | | ZUF-00111368 | ZUF-00111368 |
| | | ZUF-00111369 | ZUF-00111369 |
| | | ZUF-00268689 | ZUF-00268690 |
| | | ZUF-00268691 | ZUF-00268691 |
| | | ZUF-00268692 | ZUF-00268692 |
| | **Zuffa Audited Financial Statements** | | |
| | | ZFL-0000221 | ZFL-0000255 |
| | | RAINE0016835 | RAINE0017416 |
| | | ZFL-0000031 | ZFL-0000063 |
| | | ZFL-0000113 | ZFL-0000135 |
| | | ZFL-0000188 | ZFL-0000220 |
| | | ZFL-0000064 | ZFL-0000087 |
| | | ZFL-0000007 | ZFL-0000030 |
| | | ZFL-0000088 | ZFL-0000112 |
| | | ZFL-0000169 | ZFL-0000187 |
| | | ZFL-0000136 | ZFL-0000168 |
| | **Competitor Financial Statements** | | |
| | | SBPCL00002101 | SBPCL00002102 |
| | **PPV Exemplar Contracts** | | |
| | | ZFL-0108084 | ZFL-0108093 |
| | | ZFL-0306658 | ZFL-0306822 |
| | | ZFL-0313388 | ZFL-0313590 |

**Cung Le, et al. v. Zuffa, LLC dba Ultimate Fighting Championship and**                    **APPENDIX B**
**Documents Relied Upon**

| | | BATES RANGE | |
|---|---|---|---|
| **ITL** | **DESCRIPTION** | **BEGINNING** | **END** |
| | | ZFL-0357812 | ZFL-0357820 |
| | | ZFL-0359721 | ZFL-0359729 |
| | | ZFL-0360737 | ZFL-0360745 |
| | | ZFL-0370265 | ZFL-0370272 |
| | | ZFL-0379019 | ZFL-0379028 |
| | | ZFL-0387495 | ZFL-0387504 |
| | **Debt Financing & Valuation** | | |
| | | RAINE0018791 | RAINE0018809 |
| | | ZFL-2649918 | ZFL-2649989 |
| | | ZFL-1677117 | ZFL-1677189 |
| | | ZFL-2509465 | ZFL-2509518 |
| | | RAINE0017417 | RAINE0017717 |
| | | RAINE0016835 | RAINE0017416 |
| | | DB-ZUFFA-00006237 | DB-ZUFFA-00006313 |
| | | DB-ZUFFA-00006389 | DB-ZUFFA-00006457 |
| | | DB-ZUFFA-00006712 | DB-ZUFFA-00006786 |
| | | ZFL-1240584 | ZFL-1240591 |
| | **Miscellaneous** | | |
| | | ZFL-2700584.00001 | ZFL-2700584.00001 |
| | | LEPLAINTIFFS-0076636 | LEPLAINTIFFS-0076653 |
| | | LEPLAINTIFFS-0048763 | LEPLAINTIFFS-0048781 |
| | | LEPLAINTIFFS-0048947 | LEPLAINTIFFS-0048953 |
| | | ZFL-1238033 | ZFL-1238070 |
| | | ZUF-00304127 | ZUF-00304171 |
| | | ZUF-00172283 | ZUF-00172323 |
| | | ZUF-00374846 | ZUF-00374846 |
| | | WME_ZUFFA_00001149 | WME_ZUFFA_00001150.00039 |

# [Exs. A-H redacted in full]