Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:      (215) 875-3000
Facsimile:      (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Luis Javier*
*Vazquez, Brandon Vera, and Kyle Kingsbury*

*(Additional counsel appear on signature page)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01045-RFB-PAL |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendant. | |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury ("Plaintiffs") will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23, for an order certifying this action as a class action and appointing Co-Lead and Liaison Class Counsel. Specifically, Plaintiffs move for an order certifying a Bout Class and an Identity Class, defined respectively as follows:

> **Bout Class**: All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States from December 16, 2010 to June 30, 2017. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.

> **Identity Class**: Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials in the United States from December 16, 2010 to June 30, 2017.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the attached Declaration of Eric L. Cramer, Esq. ("Cramer Declaration" or "CD"), the attached Expert Report of Hal J. Singer, Ph.D. (CD, Ex. 1 or "SR1"), the attached Rebuttal Expert Report of Hal J. Singer, Ph.D. (CD, Ex. 2 or "SR2"), the attached Expert Report of Andrew Zimbalist (CD, Ex. 3 or "ZR1"), the attached Expert Rebuttal Report of Andrew Zimbalist (CD, Ex. 4 or "ZR2"), the attached Expert Rebuttal Report of Professor Alan Manning (CD, Ex. 5 or "MR1"), the attached Expert Report of Guy Davis, CPA, CIRA, CDBV, CFE (CD, Ex. 6 or "DR1"), the attached Rebuttal Expert Report of Guy Davis, CPA, CIRA, CDBV, CRE (CD, Ex. 7 or "DR2"), all exhibits and appendices thereto, all of the pleadings and papers on file in this action, and any argument that may be presented to the Court.

## GLOSSARY OF EXPERT REPORT ABBREVIATIONS

For the convenience of the Court and efficiency, Plaintiffs' Memorandum of Points and

Authorities uses the following abbreviations for citations to Plaintiffs' expert reports:

| | |
|---|---|
| Expert Report of Hal J. Singer, Ph.D. (August 31, 2017) | SR1 |
| Rebuttal Expert Report of Hal J. Singer, Ph.D. (January 12, 2018) | SR2 |
| Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC* (August 30, 2017) | ZR1 |
| Expert Rebuttal Report of Andrew Zimbalist (December 26, 2017) | ZR2 |
| Expert Rebuttal Report of Professor Alan Manning (January 12, 2018) | MR1 |
| Expert Report of Guy Davis, CPA, CIRA, CDBV, CFE (August 31, 2017) | DR1 |
| Rebuttal Expert Report of Guy Davis, CPA, CIRA, CDBV, CRE (January 12, 2018) | DR2 |

Case No.: 2:15-cv-01045-RFB-(PAL)

## **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.    INTRODUCTION ......................................................................................1

II.   FACTUAL BACKGROUND .......................................................................5

      A.    The MMA Industry..........................................................................5

      B.    Zuffa Used the Scheme to Acquire and Maintain Substantial Market Power........6

            1.    The Relevant Markets.........................................................6

            2.    Zuffa's Market Power in the Relevant Markets .........................6

            3.    The Scheme .......................................................................8

                  a.    Zuffa Used Exclusive Contracts to Lock Up Fighters. .................8

                  b.    Zuffa Used its Market Power to Make its Exclusive Contracts Effectively Perpetual. .......................................................9

                  c.    Zuffa Acquired and Closed Down Potential Rivals. ...................10

      C.    The Scheme Substantially Foreclosed Competition.............................................11

      D.    The Scheme Had Marketwide Anticompetitive Effects that Outweigh Any Purported Procompetitive Benefits .........................................................12

      E.    The Scheme Caused Widespread Impact Across Class Members.......................14

            1.    The Scheme Suppressed Compensation Generally. ................................14

            2.    The Compensation Suppression Was Widespread Across the Class. .......15

      F.    Plaintiffs' Experts Reliably Calculated the Aggregate Damages to the Classes ..15

III.  PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(A) ............................16

      A.    Numerosity: The Proposed Classes Are Numerous..............................................16

      B.    Commonality: A Question of Law or Fact Is Common to Class Members .........16

      C.    Typicality: The Proposed Representatives' Claims Are Typical .........................17

      D.    Adequacy: Plaintiffs Will Fairly and Adequately Represent the Classes.............17

IV.   PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(3)........................18

V.    COMMON ISSUES PREDOMINATE IN THE CASE AS A WHOLE.........................20

VI.   COMMON ISSUES PREDOMINATE FOR EACH COMPONENT OF THE CLAIM 21

      A.    Classwide Evidence Is Capable of Proving an Antitrust Violation.....................21

iii

B.    Classwide Evidence Is Capable of Proving Common Impact ..............................21

      1.    Common Impact for the Bout Class in Two Steps...................................23

      2.    Common Impact for the Identity Class in Two Steps .............................29

C.    Classwide Evidence Is Capable of Proving Aggregate Damages ......................29

D.    Zuffa's Main Criticism of Plaintiffs' Analyses Is Wrong....................................30

VII.    A CLASS ACTION IS SUPERIOR TO INDIVIDUAL ACTIONS ................................33

VIII.    THE COURT SHOULD APPOINT CO-LEAD CLASS AND LIAISON COUNSEL ...34

IX.    CONCLUSION ............................................................................................................34

iv

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY-REDACTED**

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................................18, 21

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds*,
  568 U.S. 455 (2013)......................................................................................................... passim

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .................................................................................................34

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015).....................................................................................14, 19

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................................................30

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ......................................................................................................21

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) ...................................................................................................18

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...................................................................................................17

*Evon v. Law Offices of Sidney Mickell*,
  688 F.3d 1015 (9th Cir. 2012) .................................................................................................17

*Flood v. Kuhn*,
  407 U.S. 258 (1972).................................................................................................................12

*Greene v. Jacob Transp. Servs., LLC*,
  2017 WL 4158605 (D. Nev. Sept. 19, 2017)..................................................................2, 17, 20, 33

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014).............................................................................................................20

*Harris v. United States Physical Therapy, Inc.*,
  2012 U.S. Dist. LEXIS 184846 (D. Nev. Dec. 26, 2012) ..................................................................34

*In re Aftermarket Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011)................................................................................................19

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
<u>PUBLIC COPY-REDACTED</u>

*In re Air Cargo Ship. Services Antitrust Litig.*,
 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)..................................................................3, 19

*In re Cardizem CD Antitrust Litig.*,
 200 F.R.D 297 (E.D. Mich. 2001)...................................................................................29, 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 308 F.R.D. 606 (N.D. Cal. 2015) ...........................................................................................22

*In re Chocolate Confectionary Antitrust Litig.*,
 289 F.R.D. 200 (M.D. Pa. 2012) ....................................................................................3, 19

*In re Citric Acid Antitrust Litig.*,
 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)............................................................................17

*In re Domestic Drywall Antitrust Litig.*,
 2017 WL 3623466 (E.D. Pa. Aug. 23, 2017) .................................................................3, 19

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
 256 F.R.D. 82 (D. Conn. 2009) .............................................................................................33

*In re High-Tech Employee Antitrust Litig.*,
 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ......................................................................... passim

*In re Korean Ramen Antitrust Litig.*,
 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .................................................................3, 19

*In re Lidoderm Antitrust Litig.*,
 2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017)......................................21, 22, 29

*In re Nexium Antitrust Litig.*,
 777 F.3d 9 (1st Cir. 2015).......................................................................................22, 23, 29

*In re Optical Disk Drive Antitrust Litig.*,
 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ..........................................................................22

*In re Polyester Staple Antitrust Litig.*,
 2007 WL 2111380 (W.D.N.C. July 19, 2007)......................................................................19

*In re Rubber Chems. Antitrust Litig.*,
 232 F.R.D. 346 (N.D. Cal. 2005) ..................................................................................21, 22

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
 2008 U.S. Dist. LEXIS 107523 (N.D. Cal. Sept. 29, 2008) .................................................17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
 264 F.R.D. 603 (N.D. Cal. 2009) .........................................................................................21

vi

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ...................................................................22, 30, 33, 34

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
   571 F.3d 672 (7th Cir. 2009) ......................................................................................22

*Kristensen v. Credit Payment Servs.*,
   12 F. Supp. 3d 1292 (D. Nev. 2014)........................................................................2, 17

*Lee v. Enterprise Leasing Co.-West, LLC*,
   300 F.R.D. 466 (D. Nev. 2014) ...................................................................................16

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ......................................................................................20

*Magadia v. Wal-Mart Assoc.*,
   No. 17-CV-00062-LHK, ECF 84 (N.D. Cal. Jan. 9, 2018) ..........................................20

*Mazza v. Am Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ......................................................................................22

*McNeil v. National Football League*,
   1992 WL 315292 (D. Minn. Sept. 10, 1992) ...............................................................12

*Meijer, Inc. v. Abbott Labs*,
   2008 WL 40658399 (N.D. Cal. Aug. 27, 2008) ...........................................................29

*Messner v. Northshore Univ. Health Syst.*,
   669 F.3d 802 (7th Cir. 2012) ......................................................................................22

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ......................................................................................34

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D 270 (N.D. Cal. 2016). ....................................................................... passim

*Pecover v. Elec. Arts, Inc.*,
   2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .............................................................17

*Philadelphia World Hockey Club v. Philadelphia Hockey Club, Inc.*,
   351 F. Supp. 462 (E.D. Pa. 1972) ...............................................................................12

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ................................................................................16

*Robertson v. National Basketball Ass'n*,
   389 F. Supp. 867 (S.D.N.Y. 1975) ..............................................................................12

*Seaman v. Duke Univ.*,
  2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ...........................................................4, 26, 28

*Sobel v. Hertz Corp.*,
  291 F.R.D. 525 (D. Nev. 2013) .............................................................................17, 34

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) ..........................................................................................18

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
  209 F.R.D. 159 (C.D. Cal. 2002) ............................................................................17, 21

*Torres v. Mercer Canyons, Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ................................................................................. passim

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)......................................................................................................22

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ..............................................................................16, 33, 34

**<u>Rules</u>**

Federal Rule of Civil Procedure 23................................................................... passim

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**<u>PUBLIC COPY-REDACTED</u>**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

This case involves antitrust claims by mixed martial arts fighters ("MMA Fighters") against the dominant MMA event promoter, Zuffa, LLC (the "UFC" or "Zuffa"). Plaintiffs allege that Zuffa used an anticompetitive scheme (the "Scheme") to establish and maintain its market dominance, allowing it to pay its Fighters substantially less than it would have in a more competitive market. Plaintiffs seek certification of two classes of MMA Fighters—the Bout Class and the Identity Class—as the most efficient and effective way for this litigation to proceed.

The Scheme includes three categories of conduct: (1) <u>Contracts</u>: Zuffa used long-term exclusive contracts with Fighters to limit their mobility and prevent or substantially delay free-agency; (2) <u>Coercion</u>: Zuffa used its market dominance to coerce fighters to re-sign contracts, making its contracts effectively perpetual; and (3) <u>Acquisitions</u>: Zuffa acquired and closed down multiple MMA promoters. The contracts and coercion deprived potential rival MMA promoters of an essential input—the marquee Fighters they needed to compete with Zuffa. The acquisitions eliminated any potential remaining competition. Zuffa became the "major league" for MMA events and reduced other promoters to "minor leagues." Zuffa's President Dana White admitted in 2010: "There is no competition. . . There is no other guy. . . There was a time when it was neck-and-neck. That time is over."[1]

As a result of the Scheme, Zuffa pays its Fighters a much lower share of its revenues ("Wage Share") than do other MMA promoters with less market power, far less than sports leagues where athletes' mobility is less restrained, and less than Zuffa paid them when it had less market power. During the proposed "Class Period"—December 16, 2010 to June 30, 2017—Zuffa paid its Fighters less than ██ % of the revenues from its MMA events ("Event Revenues"). ████████████████ ████████████████████████████████ ████████████████ . ████████████████████████████ ████████████████ .[2] Boxing and

---

[1] CD, Ex. 45 (*Dana White stands by "pay for rankings" claim, says UFC is the NFL of MMA*, MMA JUNKIE (June 14, 2010), available at http://mmajunkie.com/2010/06/dana-white-stands-by-pay-for-rankings-claim-says-ufc-is-the-nfl-of-mixed-martial-arts) at 3.

[2] CD, Ex. 1 (SR1) ¶¶ 190, 247.

1

the four major U.S. team sports—the NBA, the NFL, the NHL, and MLB—all pay ███████████ ████████████████████████████.[3]

An economic expert retained by the Plaintiffs, Dr. Hal Singer, performed a regression analysis, finding that, as the portion of the MMA Fighter Services market subject to Zuffa's long-term exclusionary contracts increased over time ("Foreclosure Share"), Zuffa paid its Fighters a substantially lower share of Event Revenues. ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████.[4]

Plaintiffs and proposed class representatives are Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury. Each fought in the UFC and was artificially undercompensated for competing in MMA bouts ("Bouts"), for expropriation of their Identities, or both, due to the Scheme. All Plaintiffs but Quarry seek to represent the "Bout Class," consisting of all Fighters who competed in one or more live professional UFC-promoted MMA Bouts broadcast in the U.S. during the Class Period.[5] All Plaintiffs seek to represent the "Identity Class," consisting of all Fighters whose identities or likenesses Zuffa expropriated during the Class Period.[6]

The Court should certify the proposed classes because they satisfy the four requirements of Rule 23(a)—numerosity; commonality; typicality; and adequacy—and the two requirements of Rule 23(b)(3)—predominance of common issues; and superiority. *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016); *Greene v. Jacob Transp. Servs., LLC*, 2017 WL 4158605, at *2 (D. Nev. Sept. 19, 2017); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014); *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1229 (N.D. Cal. 2013). Class certification is appropriate here because Rule 23(a) is satisfied: (1) the Classes are numerous, each including over 1,200 members; (2) there are multiple common issues, including whether Zuffa engaged in the Scheme and whether it violated the antitrust laws; (3) the claims of the proposed Class representatives are typical of the Classes they seek to represent in that each Class member seeks to recover for the same

---

[3] *See* CD, Ex. 3 (ZR1) at Table 4.
[4] *See* SR1 ¶ 252 & Table 11; CD, Ex. 2 (SR2) ¶ 174.
[5] *See* Notice of Motion, *supra* (complete definition of Bout Class).
[6] *Id.* (complete definition of Identity Class).

type of harm (under-compensation) from the same conduct (the "Scheme"); and (4) the proposed Class representatives adequately represent the Classes, as do their counsel.

Class certification in antitrust cases usually turns on whether common issues predominate over individual issues under Rule 23(b)(3). Here common issues predominate for two fundamental reasons. *First*, common issues predominate in the case *as a whole. See Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 469 (2013); *Torres*, 835 F.3d at 1134; *High-Tech*, 985 F. Supp. 2d at 1186-87 (citing *Amgen*, 568 U.S. at 469). The litigation will focus overwhelmingly on issues that are the same for all Class members, including whether Zuffa engaged in the Scheme and whether the Scheme impaired competition, and thereby harmed Fighters and consumer welfare more generally. These common issues will predominate over any individual issues, rendering class treatment superior to individual litigation. *Torres*, 835 F.3d at 1134 ("[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class").

*Second*, Plaintiffs have shown in two ways—each of which is sufficient by itself—that they can use common evidence to prove that the Scheme caused widespread harm across the Classes, *i.e.*, common impact:

**Econometric Class Member Impact Analysis.** Dr. Hal Singer, an experienced and well-respected economist retained by the Plaintiffs. ████████████████████████████████████████████████████████████████ SR1 ¶¶ 230-31 & Table 8; CD, Ex. 9 (Deposition of Hal J. Singer, Ph.D. Exhibit 3 - UFC - Hal Singer Report - Errata II ("SE2")) at 4; SR2 ¶¶ 150-52 & Tables 2-3. *See In re Air Cargo Ship. Services Antitrust Litig.*, 2014 WL 7882100, *55 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted,* 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (certifying class in antitrust case based on the same econometric method); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221 (M.D. Pa. 2012) (same); *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3623466, at *27 (E.D. Pa. Aug. 23, 2017) (same); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017) (same).

**Regression Analyses *Plus* Pay Structure Evidence.** Dr. Singer used another traditional

method for showing common impact. First, he specified a regression model showing that Fighter compensation was generally suppressed by the Scheme. Second, he showed that the UFC maintained a pay structure such that by suppressing Fighter compensation generally, the Scheme lowered compensation to all or nearly all UFC Fighters. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ SR1 at IV.B.1; SR2 at III.B. Indeed, Zuffa's own economic expert, Dr. Topel, admitted that UFC Fighter compensation, at every level, moved together. CD, Ex. 23 (Deposition of Robert H. Topel ("Topel Dep. 1")) at 168:25-172:13; 183:5-185:5.

In addition, documents and deposition testimony—much of it from Zuffa itself—confirm ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. SR1 at IV.B. Joe Silva, the UFC's long-time chief matchmaker, who had primary responsibility for negotiating compensation with hundreds of UFC fighters over more than twenty years, admitted ██ ████████████████████████████████████████████████████████████████████████████████████████████████████████████."[7] Multiple courts in analogous antitrust class actions on behalf of workers have relied upon similar evidence of internal equity in finding common impact. *See, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1214 (plaintiffs' "internal equity hypothesis" offered a theory "subject to common proof for how Defendants' antisolicitation agreements suppressed compensation broadly"); *Seaman v. Duke Univ.*, 2018 WL 671239, at *4 (M.D.N.C. Feb. 1, 2018) (finding common impact where defendants imposed "internal equity structures—policies and practices that are alleged to have ensured relatively constant compensation relationships between employees—[which] spread the

---

[7] SR1 ¶ 226 (citing CD, Ex. 36 (ZUF-00296703) at 04) (emphasis added).

Case No.: 2:15-cv-01045-RFB-(PAL)

individual harm. . . to all faculty, thus suppressing compensation faculty-wide").[8]

Thus, here, largely uncontroverted common evidence is capable of showing impact that is widespread across Class members, making impact a common issue. *Nitsch*, 315 F.R.D. at 317 (certifying class of workers in antitrust case based on a showing of suppressed compensation generally, plus similar evidence of a pay structure); *High-Tech*, 985 F. Supp. 2d at 1206 (same).

Finally, the three Interim Co-Lead Counsel firms and Interim Liaison Counsel seek to be appointed Co-Lead Counsel and Liaison Counsel under Fed. R. Civ. P. 23(g). As a result, Plaintiffs respectfully submit that the Court should certify the proposed classes and remove the "Interim" designation from Co-Lead and Liaison Counsel.

## II.    FACTUAL BACKGROUND

### A.    The MMA Industry

MMA is a combat sport for Fighters trained in multiple fighting disciplines. Promoters stage Bouts for commercial entertainment at MMA Events. SR1 ¶ 19. Zuffa is the ███████████ ███████" CD, Ex. 29 (ZFL-1391183) (2010 Moody's Credit Opinion) at 1183. It requires all of its Fighters to sign nearly identical long-term Promotional & Ancillary Rights Agreements ("Fighter Contracts," "Contracts," or "PARs"). ████████████████████████████████████ ████████████████████████████. Zuffa treats its Fighters as independent contractors, paying them only when they fight. SR1 ¶ 21.[9] It does not pay for Fighter training, general health care, nutrition, sparring, or management.[10] ████████████████████████████████████ ████████████████████████████████████████████████

---

[8] *See also Nitsch*, 315 F.R.D. at 295 (finding common impact where "Plaintiffs' documentary evidence tends to show that Defendants maintained formal compensation structures and made significant efforts to maintain internal equity within those structures").

[9] *See also* CD, Ex. 13 (30(b)(6) Deposition of Kirk D. Hendrick ("Hendrick 30(b)(6) Dep.")) at 264:8-10.

[10] *See, e.g.*, CD, Ex. 19 (Deposition of Joe Silva ("Silva Dep.") at 186:18-187:21); CD, Ex. 21 (Deposition of Dana White Vol. 2 ("White Dep. 2")) at 435:9-437:3; CD, Ex. 17 (Deposition of Sean Shelby ("Shelby Dep.")) at 130:20-133:21; SR1 ¶ 21; CD, Ex. 13 (Hendrick 30(b)(6) Dep.) at 264:17-24.

█████████████████████████████████████████████████████████████████████ [11] As

Jeremy Lappen, a top executive at an MMA promotion where many UFC Fighters got their starts,

testified: "[T]he fighters are what draws. . . . That's what the business is about."[12] Events that lack

marquee Fighters are unlikely to attract a large audience, broadcasters, or sponsors.[13]

**B.    Zuffa Used the Scheme to Acquire and Maintain Substantial Market Power**

Zuffa used the Scheme to monopolize the market for MMA Events and to monopsonize the

market for MMA Fighter Services.

**1.    The Relevant Markets**

Dr. Singer defines two relevant markets: for "Fighter Services"—an input market in which

Fighters sell their services to MMA promoters; and for "MMA Events"—an output market in which

Promoters sell MMA Events to audiences.[14] The two are related. The "Relevant Output Market"

consists of live MMA Events broadcast in North America, featuring Fighters whose services are sold in

the "Relevant Input Market." SR1 at III.A.1, III.A.2. The geographic scope of the Relevant Input

Market is North America. SR1 at III.A.3.

**2.    Zuffa's Market Power in the Relevant Markets**

Abundant classwide evidence shows Zuffa possessed market power in the Relevant Markets.

Industry analysts touted Zuffa's market dominance: Goldman Sachs: "████████████████████

--------

[11] SR1 ¶ 20. *See also* CD, Ex. 19 (Silva Dep.) at 102:23-103:3 ("you would like people to buy tickets to
[an Event], to tune in on TV to watch it. And they're going to want to see the biggest stars that you
have"); CD, Ex. 41 (WME_ZUFFA_00001150) at 9 ████████████████████████████████████
█████████████████████████████; CD, Ex. 25 (Deposition of Roger D. Blair, Ph.D. ("Blair Dep.")) at 18:7-14
("Q. Is it fair to say that the unique set of skills that athletes have or their fame plays an important role
in the revenues generated by sports organizations? A. . . . [B]ecause of fan appeal and, you know, the
fans are more willing to pay to watch some of these so-called superstars.").
[12] CD, Ex. 15 (Deposition of Jeremy Lappen ("Lappen Dep.")) at 136:9-137:6.
[13] Zuffa also earns revenues by exploiting its Fighters' identities and likenesses. ████████████████
██████████████████████████████████████████████████████████████████████████████████████
Through these agreements, Zuffa promotes Events and the UFC brand, and licenses merchandise
featuring Fighters' identities, including in video games, trading cards, and clothing.
[14] Dr. Singer conservatively defined the Relevant Input Market very broadly, in one formulation
including the top 650 Fighters in every weight class, and in another including all MMA Fighters who
were tracked by FightMetric, an industry-standard statistics provider. SR1 at III.A.1; SR2 at I.A.1.

███████████████████████████████████████████████████,"[15]

Deutsche Bank: "████████████████████████████████████████████████

█████████,"[16] and Moody's Investor Service: Zuffa is the ████████████████ that

█████████████████[17]

     Zuffa's dominance is confirmed by Zuffa's President, Dana White, and now-former CEO, Lorenzo Fertitta: "There's not really any competition. You could pick a No. 2, but No. 2 is so far away that's [sic] it's not really competition;"[18] "[t]here never has been a comparable outlet [to the UFC]… We've dominated this, this sport, alright? We've dominated the space;"[19] "[w]hen you look at the top 10 in every division, we've got every fighter under our umbrella. All the fighters want to be with us because they want to fight the best competition. So from that standpoint . . . the competition isn't really relevant. . . .;"[20] "[c]ompetition? No. Not at all . . . [Other MMA promotions] they're like the Triple A."[21]

     Similarly, Dr. Singer found, using a conservative analysis, that Zuffa's share of the broadly defined Relevant Input Market ████████████████████████████████████. SR1 at III.A.4. Zuffa also dominates the Relevant Output Market; ██████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████ SR1 at III.A.5.

[15] CD, Ex. 28 (ZFL-1384297) at 311.
[16] CD, Ex. 38 (DB-ZUFFA-00006389) at 403.
[17] CD, Ex. 37 (ZUF-00336384) at 84-85; CD, Ex. 29 (ZFL-1391183) at 83; CD, Ex. 32 (ZFL-12543287) at 87-88.
[18] CD, Ex. 46 at 4 (*UFC President Dana White Discusses Heavyweight Partnership with EA Sports*, FORTUNE.COM (June 17, 2014), available at http://fortune.com/2014/06/17/dana-white-ufc-q-a/); *see also* CD, Ex. 21 (White Dep. 2) at 289:17-290:3 ("As bad as people don't want to believe it, they don't want to hear it, meaning the other owners of other mixed martial arts organizations, that's why they are—that's why . . . they all are the AAA to the UFC.").
[19] CD, Ex. 47 (Response to Pls. RFA No. 17) at 6 (admitting Lorenzo Fertitta made the statement in January 2012).
[20] CD, Ex. 47 (Response to Pls. RFA No. 32) at 10 (admitting that Lorenzo Fertitta made the statement in March 2014).
[21] CD, Ex. 48 (Deposition of Dana F. White, Vol.1) at 189:14-190:4.

### 3. The Scheme

The Scheme deprived other MMA promoters of crucial marquee Fighters—a necessary input to compete with Zuffa. Zuffa's CEO described its efforts to █████████████████████████████████████

████████████████████████████████"[22] Zuffa also boasted in 2016: ████████████████

██████████████████████████"[23]

### a. Zuffa Used Exclusive Contracts to Lock Up Fighters.

Zuffa's Fighter Contracts are ███████████████████████████[24] ████████████████████

███████████████████████████████████████████████████████████

▪ ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

▪ ████████

▪ ███████████████████████████████████████████████████████████████████

████████████████████████████████████ SR1 ¶¶ 70-72.

• ████████████████████████████████████████████████████████

████████████████████████████████████. SR1 ¶ 69; ZR1 ¶¶

10, 19; SR2 ¶ 65.

---

[22] *See* CD, Ex. 42 (30(b)(6) Deposition of Jeff Quinn Exhibit 3) at 68, Rows 1499-1502 (Lorenzo Fertitta text message compilation showing 2/25/14 text messages from Fertitta to Dana White); *see also* CD, Ex. 16 (Deposition of Lorenzo J. Fertitta) at 289:6-292:14 ("██████████████████████████

███████████████").

[23] CD, Ex. 40 (RAINE0020633) at 14. *See also* CD, Ex. 39 (DB-ZUFFA-00006712) at 51 (stating in May 2007 that ██████████████████████████████████████████████████████████

████████████████████████████").

[24] CD, Ex. 18 (30(b)(6) Deposition of Drew Goldman) at 70:21-72:24 ████████████████████

████████████████████████████████████████ Zuffa's economic expert Dr. Topel acknowledged that the challenged contractual provisions are "restrictions on athlete mobility." CD, Ex. 23 (Topel Dep. 1) at 75:15-19; *see also id*. at 80:7-16, 78:20-79:1.

[25] *See* SR1 at II.B.1, II.B.2; *see also* CD, Ex. 13 (Hendrick 30(b)(6) Dep.) at 118:13-123:19.

[26] *See* SR1 at II.B.1; SR2 ¶ 15; *see also id*. ¶ 65 ████████████████████████████████████

████████████████.

[27] WME-IMG noted that ████████████████████████████████████████████████████████

████████████████. *See* CD, Ex. 41 (WME_ZUFFA_00001150) at 11; *see also* SR2 ¶ 65.

- ████████████████████████████████████████████████████████
████████████████████████████████████████████████. SR1 ¶¶

68, 73, 84-88; ZR1 ¶¶ 10, 12, 77.

### b. Zuffa Used its Market Power to Make its Exclusive Contracts Effectively Perpetual.

Zuffa's Contracts prevented Fighters from *ever* becoming free agents for three reasons:

**(1) Control over Careers**. Zuffa dictated: the timing of Bouts; a Fighter's opponents; placement of a fight on the card; whether a Bout would be streaming-only, televised or pay-per-view ("PPV"); discretionary bonuses; and its promotion of a Fighter's career. Refusal to sign a new contract offered by the UFC—a signal of disloyalty—is perilous.[28] A Fighter risks costly delays between fights, dangerously mismatched opponents, and other adverse consequences. For instance, in an internal Zuffa email from Joe Silva, UFC "matchmaker," he stated that ████████████████████████ ████████████████████████████████████████████████████████ ████████████. *See* CD, Ex. 30 (ZFL-1421551) at 51.[29]

**(2) The Right to Match**. ████████████████████████████████ ████████████████████████████████████████. *See* SR1 ¶¶ 68, 73, 84-88; ZR1 ¶¶ 10, 12, 77. ████████████████████████████████████████ ████████████████████████████████████████.[30] For many Fighters that is effectively impossible. As this Court observed at the motion to dismiss hearing: "[I]f in fact the contracts do say. . ., for example, the UFC . . . has the right to match an offer after a contract expires, that's not a two- or three-year contract. That's forever."[31]

---

[28] ████████████████████████████████████████████████ ████████████████████████████. SR1 ¶¶ 66, 80. Thus ████████████████████████████████████████████████████

[29] *See also* CD, Ex. 19 (Silva Dep.) at 397:4-405:19.

[30] *See* CD, Ex. 13 (Hendrick 30(b)(6) Dep.) at 267:10-13 ████████████████████████████████████████████████ ████████. Dr. Singer determined that the median career length for a Fighter is approximately 5 Bouts spread over 41 months. SR1 ¶¶ 20, 90, 308. An internal Zuffa analysis prepared in 2014 ████ ████████████████████████████████████████████ CD, Ex. 27 (ZFL-1376378) at 78-79; *see also* SR2 ¶ 64 & Table 1.

[31] CD, Ex. 43 (Motion to Dismiss Tr.) at 21 (emphasis added).

1   **(3) <u>Control of Marquee Fighters.</u>** The Scheme deprived other promoters of the ability to stage

2   fights between top Fighters. Zuffa's own economist, Dr. Topel, admitted Fighters want to compete

3   against the best,[32] and by causing Zuffa to have the ████████████████████████████████████████

4   ████"[33] the Scheme forced Fighters to accept Zuffa Contracts. SR2 ¶¶ 21, 29-30, 55, 66-67.[34]

### c.   Zuffa Acquired and Closed Down Potential Rivals.

6   Between December 2006 and May 2007, Zuffa acquired its three most significant rivals at the

7   time: World Fighting Alliance ("WFA"), World Extreme Cagefighting ("WEC"), and PRIDE Fighting

8   Championship ("PRIDE"). SR1 ¶¶ 41-43. Following the WFA acquisition, Zuffa stated, "███████████

9   ████████████████████████████████████████████████████████████████"[35]

10  Similarly, Zuffa conceded ████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████." CD, Ex. 33 (ZUF-00031544) at 44.

13  In 2011, Zuffa acquired Strikeforce, its last remaining rival of any potential significance. Scott

14  Coker, then head of Strikeforce, testified that at a meeting between the two promoters in November

15  2010, Zuffa CEO Lorenzo Fertitta said, "I think Strikeforce is building a great brand, but we feel there

16  should only be one brand, so we'd like to buy your company."[36] Following the acquisition, Zuffa

17  required Strikeforce Fighters to sign its exclusive Contracts. According to Coker, after the acquisition a

18  "lot of people were disappointed. . . [b]ecause you know, I had managers call me and say: Now our

19  [Fighter] purses are going to go down. Now there's only one buyer and it's not going to be good for

20  MMA as an industry." *Id.* at 135:10-19. One year later, Fighter managers confirmed to Coker that

---

[32] *See* CD, Ex. 11 (Expert Report of Robert H. Topel ("Topel Rpt.")) ¶ 96 ("There is a natural tendency for a leading promoter to attract a significant share of the top athletes," which "follows from the complementarity of athlete talents in producing high-quality bouts, and the desire among athletes to compete against the best").

[33] CD, Ex. 35 (ZUF-00162329) (October 2009 Deutsche Bank CIM) at 47.

[34] Moreover, because of the Scheme, there were no promoters on par with Zuffa capable of making substantial offers. CD, Ex. 24 (Deposition of Robert H. Topel ("Topel Dep. 2")) at 370:16-371:13 (admitting that none of the competitors that Zuffa purchased had been able to "challenge Zuffa's dominance in either the input or output markets").

[35] *See* CD, Ex. 26 (ZFL-1240584) at 90.

[36] CD, Ex. 20 (Deposition of Scott Coker ("Coker Dep.")) at 118:16-119:5.

Fighter purse offers were about 20% lower. *Id*. at 137:14-21.

**C.      The Scheme Substantially Foreclosed Competition**

The Scheme substantially foreclosed competition. Marquee Fighters (and those with potential to become marquee) are essential inputs for MMA promoters. SR1 ¶¶ 20, 152, 156-68. These Fighters are necessary to attract audiences, broadcasters, and sponsors.[37] Zuffa used its Contracts to prevent Fighters from competing for other MMA promoters, thereby impairing the ability of any surviving promoters to compete. SR1 ¶¶ 159-66; SR2 ¶¶ 21, 42, 50-55, 65-67, 69-71. A 2012 Deutsche Bank Report confirms that "██████████████████████████████████████████

███████████████████████,[38] and thus that ██████████████████████

█████████████. *Id*. Zuffa's own expert, Dr. Topel, acknowledged that ██████████████

████████████████████████████████████████.[39]

He further conceded that it deprived promoters of what they would need to challenge Zuffa's dominance: ██████████████████████ *Id*. Further, Kurt Otto, President and Co-Founder of the now-defunct MMA promoter known as the IFL, testified that Zuffa's control of the vast majority of top Fighters made it impossible for the IFL to compete.[40] Without access to the marquee Fighters Zuffa locked up with its Contracts, other MMA promoters have given up on competing with the UFC for talent, and have become "feeder" leagues to the UFC or "minor" leagues. SR1 ¶¶ 104-07, 127, 134-36.

By restricting Fighter mobility, Zuffa foreclosed a substantial amount of competition. Dr. Singer empirically measured Zuffa's increasing foreclosure, computing the share of the Relevant Input Market that Zuffa had in its exclusive control, *i.e.*, Fighters subject to Zuffa's long-term Contracts. He found

████████████████████████████████████████████████

█████████████ SR1 at III.C.2 & Figure 3.

---

[37] SR1 ¶ 156. *See also* CD, Ex. 20 (Coker Dep.) at 87:19-89:7.

[38] CD, Ex. 38 (DB-ZUFFA-00006389) at 439.

[39] CD, Ex. 24 (Topel Dep. 2) at 435:17-437:22 (discussing Ex. 35 (ZUF-00162329) (Oct. 2009 Deutsche Bank CIM) at 47); *id*. at 440:10-441:10 (discussing Ex. 35 (ZUF-00162329) (Oct. 2009 Deutsche Bank CIM) at 71).

[40] CD, Ex. 14 (Deposition of Kurt Otto) at 246:19-247-19 ("If I need to go get fighters that are bigger names, they're not in the woods somewhere up in a tree hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter.").

**D.      The Scheme Had Marketwide Anticompetitive Effects that Outweigh Any Purported Procompetitive Benefits**

**Suppressed Compensation**. By impairing potential rival promoters and virtually eliminating competition for Fighter services, the Scheme increased Zuffa's monopsony power and decreased Fighter compensation. In a 2009 email, Scott Coker, then head of Strikeforce, explained:



[41]

These effects are not peculiar to MMA. A leading sports economist retained by Plaintiffs, Prof. Andrew Zimbalist, recounts a similar history for the four major U.S. professional sports and boxing. Each historically used restrictive clauses to inhibit players from becoming free agents. The athletes in each sport challenged these restrictive clauses under antitrust laws and through collective bargaining.[42] In each case, the clauses were deemed anticompetitive and to artificially deflate athlete compensation.[43]

---

[41] CD, Ex. 31 (ZFL-2469208) at 08; *see also* CD, Ex. 20 (Coker Dep.) at 97:18-99:3. Zuffa's economist, Dr. Blair, recognized this same dynamic, describing the effect on the compensation of a top-tier baseball player caused by a lack of teams competing for the player's services. CD, Ex. 25 (Blair Dep.) at 157:8-158:19; *see also* CD, Ex. 4 (ZR2) ¶ 19. Another of Zuffa's economists, Dr. Topel, conceded that the Scheme restricted Fighter mobility because eliminating the challenged contractual provisions would allow more Fighters to "move [to other promoters] because there's more [Fighters] subject to outside bidding." CD, Ex. 23 (Topel Dep. 1) at 78:20-79:1. Dr. Topel further conceded that eliminating the challenged contractual provisions would create "*a transfer of wealth from Zuffa to the athletes.*" *Id.* at 76:4-77:3 (emphasis added); *see also id.* at 84:11-18.

[42] *McNeil v. National Football League*, 1992 WL 315292 (D. Minn. Sept. 10, 1992 1992); *Robertson v. National Basketball Ass'n*, 389 F. Supp. 867 (S.D.N.Y. 1975); *Philadelphia World Hockey Club v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462 (E.D. Pa. 1972); *Flood v. Kuhn*, 407 U.S. 258 (1972).

[43] *See McNeil*, 1992 WL 315292, at *1 (jury found that NFL's "Right of First Refusal" had "a substantially harmful effect on competition in the relevant market for the services of professional football players" and that plaintiffs suffered economic injury as result); *Robertson*, 389 F. Supp. at 893 (NBA's player draft and perpetual reserve system "allow competing teams to eliminate competition in the hiring of players and invariably lower the cost of doing business"); *Philadelphia World Hockey Club, Inc.*, 351 F. Supp. at 508 ("the three year restraint following the expiration of a current contract (. . . along with the other numerous interlocking agreements NHL has fashioned and shaped over the years to monopolize a hockey player's professional career) is unreasonable, and in violation of Section 2 of the Sherman Act"); *see also Flood*, 407 U.S. at 292 (Douglas, J., dissenting) ("To non-athletes it might appear that petitioner was virtually enslaved by the owners of major league baseball clubs who bartered among themselves for his services. But, athletes know that it was not servitude that bound petitioner to the club owners; it was the reserve system."). Zuffa's own economist, Dr. Blair, testified that that the reserve systems were anticompetitive. Ex. 25 (Blair Dep.) at 38:8-39:3.

---

12

Case No.: 2:15-cv-01045-RFB-(PAL)

Once the restrictions were eased, the share of revenues going to athletes increased substantially.[44]

**Reduced Output.** The Scheme has also reduced output of live MMA Events. Dr. Singer found that, despite climbing for several years, the number of MMA Events fell after 2010—when Zuffa eliminated Strikeforce. SR1 at III.D.5; SR2 ¶¶ 47-49. Dr. Singer concluded that, absent the Scheme, total output of MMA Events would have continued to grow (or at least not declined). SR2 ¶ 47.[45]

**Speculation about Procompetitive Benefits.** Zuffa's economic experts have offered only speculation about the Scheme's *potential* procompetitive benefits. They performed no empirical analysis to show they in fact exist or to try and measure them if they did. The evidence contradicts Zuffa's speculation. For instance, Dr. Topel asserts that Zuffa's Fighter Contracts were necessary for it to spend on promoting Fighters and developing the sport. He conjectures that, absent the Scheme, MMA would not have reached its current status and would suffer in the future. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████ *See* SR2 ¶¶ 191, n.629, 216; ZR2 ¶ 13, n.19. Further, the evidence shows that (a) Zuffa does not so much promote the Fighters as it does its own brand (and Zuffa invests little or nothing on training, sparring, nutrition, *etc.*), SR2 ¶ 220; ZR2 ¶¶ 95, n.168, 104, and (b) Fighters would be able to better promote and invest in themselves if Zuffa paid them competitive compensation. SR2 ¶¶ 197-98, 212, 217; ZR2 ¶¶ 90, 99-102. Finally, not only do Zuffa's economists fail to quantify any benefits, they do not attempt to weigh them against the harm Plaintiffs' economic experts have *demonstrated and quantified*. SR2 ¶¶ 210-20.

Additionally, as Prof. Zimbalist explains, owners in other sports have historically claimed, as Zuffa does now, that allowing free agency and enhancing competition over athletes would be ruinous. ZR1 ¶¶ 48, 75-76, 79-84. As restrictions on athlete mobility in other sports were eased, however, those predictions have time and again proven false: teams *increased* their advertising and marketing, *improved* community relations, *upgraded* facilities, *enhanced* training, and otherwise *increased* their investments. ZR1 ¶¶ 79-80, 83-84; SR2 ¶¶ 197-98, 211, 234. Further, athletes' share of league revenues increased,

---

[44] *See, e.g.*, ZR1 ¶¶ 29, 36, 39, 49-50, 52, 60-62, 71, 80; *see also* ZR2 ¶¶ 9, 45, n.89 (player share of MLB revenues increased after the reserve clause was discontinued).

[45] Dr. Singer observed ███████████████████████████████████████ ██████████████████ SR1 ¶¶ 201-02; SR2 ¶¶ 44-46.

which, in turn, motivated the athletes to invest more in their own skills and careers. ZR1 ¶¶ 39, 49-50, 52, 62, 71; ZR2 ¶¶ 90, 99-102; SR2 ¶¶ 197-98, 212, 217. Indeed, Zuffa's own economist, Dr. Blair, admitted that the low salaries that prevailed in MLB's Reserve Era forced top-level professional athletes to take non-baseball employment in the offseason rather than focus on improving their sport-related skills, undermining the quality of the sport. CD, Ex. 25 (Blair Dep.) at 147:20-148:18. Drs. Singer and Zimbalist both concluded that, much like with other sports, increasing MMA Fighter compensation closer to competitive levels would cause Fighters to better promote themselves and to enhance their training, improving the quality of Fighters and, ultimately, Events. SR1 ¶¶ 287-90; SR2 ¶¶ 197-98, 212, 217; ZR2 ¶¶ 90, 99-102. The lesson is clear: competition off the field enhances competition on the field—and in the UFC Octagon.

### E.     The Scheme Caused Widespread Impact Across Class Members

Plaintiffs offer various forms of common evidence showing the Scheme had a widespread impact on Class members, using a two-step analysis: the first step involves common evidence that the Scheme deflated compensation below competitive levels *in general*; and the second step involves common evidence that the impact was *widespread* across Class members. *See Nitsch*, 315 F.R.D. at 297–98 (plaintiffs' expert analyses proceeded in two steps, first showing that "classwide evidence was capable of showing that the alleged conspiracy suppressed compensation of class members generally," then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) (noting that the "two-step method to prove antitrust impact is not novel").

#### 1.     The Scheme Suppressed Compensation Generally.

Common evidence of compensation suppression includes: documentary and testimonial evidence the Scheme decreased the share of Event Revenues that Zuffa's Fighters received; expert economic testimony showing that ███████████████████████████████; regression analyses showing ████████████████████████████████████████████ ███; and █████████████████████████████████████████████████ ████████████████████████████████████████████████████

█████████

**2.      The Compensation Suppression Was Widespread Across the Class.**

Common evidence also shows the Scheme had a widespread effect across the Class.

*Granular Common Impact Regression Model.* Plaintiffs' economic expert, Dr. Singer, performed classwide regression analyses showing ██████████████████████████████████ ████████████████████. SR1 ¶¶ 230-31 & Table 8; CD, Ex. 9 (SE2) at 4; SR2 ¶¶ 150-52 & Tables 2-3. When Zuffa's own economist re-ran Dr. Singer's model, ██████████████████ ███████████ SR2 ¶ 152 & Table 2.

*Pay Structure.* Classwide evidence establishes that ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ The evidence includes: business documents from Zuffa and testimony from Zuffa's executives showing that ████████ ██████████████████████████████████████████████ SR1 ¶¶ 212-26; regression analyses by Dr. Singer showing that common factors explain the majority—78%—of differences in pay between Fighters, SR1 ¶ 227; SR2 ¶¶ 155, 163-64; an additional regression analysis by Dr. Singer showing that ██ ██████████████████████████████████████, SR1 ¶¶ 228-29 & Table 7; SR2 ¶¶ 153, 158; and a regression analysis by Dr. Topel, Zuffa's own economist, ████████ ██████████████████████████████. SR2 ¶¶ 159-60.

**F.      Plaintiffs' Experts Reliably Calculated the Aggregate Damages to the Classes**

Plaintiffs have shown they can calculate the aggregate damages to Class members. Dr. Singer conducted the primary analysis, using a regression model to show that ██████████████████ ████████████████████████████████████████. SR1 ¶¶ 251-52 & Table 11. ████████████████████████████████ SR1 ¶ 186. The analysis demonstrates ████████████████████████████ ████████████████████████████████████████. SR 1 ¶ 252 & Table 11; SR2 ¶¶ 171-72, 174. Dr. Singer's analysis finds confirmation ████████████████ ████████████████████████████████████████████

Case No.: 2:15-cv-01045-RFB-(PAL)

1   ████████████████████████████████, SR1 ¶¶ 247-48 & Table 9; ZR2 ¶¶ 73-76, and (b) █████

2   ████████████████████████████████████████. ZR1 ¶¶ 104-26 & Tables 2-6; ZR2 ¶¶ 53-

3   72, 83-91.

4         Plaintiffs' experts have also shown that paying the Class members the additional compensation

5   implied by their damages models would have been feasible. One reason is that the additional revenues

6   need not come solely from Zuffa. In the "but for" world, which would have been more competitive,

7   multiple MMA promoters would have bid for UFC Fighters and paid them a competitive wage.

8   Moreover, Plaintiffs' experts found that the MMA industry would have continued to grow but for

9   Zuffa's anticompetitive Scheme, so that MMA promoters would have had substantially more revenue

10  available to pay the Fighters. SR1 ¶¶ 193-96, 203-207, 288-90 & Figures 4A, 4B; SR2 ¶¶ 197-98, 201-

11  07. In addition, ████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████

15  ████████████████████. *See* CD, Ex. 7 (DR2) at C-D & Table 1; CD, Ex. 6 (DR1) at C, D, E.2, E.3, E.5, F

16  & Tables 3, 7-13, 17; SR2 ¶¶ 208-09; ZR1 ¶¶ 135-38.

17  **III.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a)**

18        **A.     Numerosity: The Proposed Classes Are Numerous**

19        Rule 23(a), which "requires that a class be so numerous that joinder of all members is

20  impracticable," *Lee v. Enterprise Leasing Co.-West, LLC*, 300 F.R.D. 466, 469 (D. Nev. 2014), is

21  satisfied when a proposed class includes more than forty members. *Ries v. Arizona Beverages USA*

22  *LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012). Here, the proposed Bout and Identity Classes each contain

23  over 1,200 members. SR1 ¶3, n.10. Numerosity is satisfied.

24        **B.     Commonality: A Question of Law or Fact Is Common to Class Members**

25        Commonality requires only a single significant issue of law or fact common to a class. *Wolin v.*

26  *Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). Common issues here include:

27  (1) whether Zuffa violated the antitrust laws; (2) whether Zuffa possessed market power; (3) whether

28

Zuffa's Scheme had anti-competitive effects; (4) what injunctive relief, if any, is appropriate; and (5) the aggregate amount of damages caused by Zuffa's unlawful Scheme. Commonality is satisfied.

### C.    Typicality: The Proposed Representatives' Claims Are Typical

The claims of the Class representatives are typical of the claims of the Classes because the claims generally arise from the same events and the same legal arguments. *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002); *Kristensen*, 12 F. Supp. 3d at 1304–05. The nature of the claims must be the same, but the specific facts giving rise to the claims need not be. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). Typicality is generally satisfied in cases involving antitrust violations. *Pecover v. Elec. Arts, Inc.*, 2010 WL 8742757, at *11 (N.D. Cal. Dec. 21, 2010). Here, Plaintiffs' claims are typical because "they stem from the same event, practice, or course of conduct that forms the basis of the claims of the class and are based on the same legal or remedial theory." *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996); *Sobel v. Hertz Corp.*, 291 F.R.D. 525, 541 (D. Nev. 2013) (typicality satisfied where "the class members' claims arise from a standard practice and implicate common legal questions"), *affirmed in part*, 674 F. App'x 663, 666 (9th Cir. 2017) (affirming class certification); *see also Greene*, 2017 WL 4158605, at *4.

Plaintiffs' claims, like those of the Class members, stem from Zuffa's monopsonization of the market for professional MMA Fighter Services. Like all members of the Bout and Identity Classes, each of the proposed Class representatives alleges that due to the Scheme, Zuffa undercompensated him or her for at least one Bout during the Class Period, for the use of his likeness during the Class Period, or both. The proposed Class representatives' claims are typical of the Classes they seek to represent.

### D.    Adequacy: Plaintiffs Will Fairly and Adequately Represent the Classes

Plaintiffs satisfy the "adequacy" test because they: (1) do not have interests in conflict with those of the Classes regarding the litigation; and (2) are represented by qualified counsel competent to pursue the interests of the Classes. *See Greene*, 2017 WL 4158605, at *5 (citing *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107523, at *40 (N.D. Cal. Sept. 29, 2008). "This circuit does

not favor denial of class certification on the basis of speculative conflicts." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003). Here, the interests of the named Plaintiffs are fully aligned with those of absent Class members in proving that Zuffa violated the antitrust laws and thereby artificially undercompensated its Fighters. *See High-Tech*, 985 F. Supp. 2d at 1181 (finding adequacy where "named Plaintiffs and [absent] Class members share an interest in proving that Defendants' conduct violated the antitrust laws and suppressed their compensation"). In addition, Interim Class Counsel have capably pursued the interests of the proposed Classes and will continue to do so. *See* CD ¶¶ 3-8 (describing the work Interim Class Counsel have undertaken to date on behalf of the proposed classes).

## IV.   PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)(3)

Plaintiffs also satisfy Rule 23(b)(3), which requires that: (1) common questions predominate over individual ones; and (2) a class action is superior to other methods of adjudication.

Plaintiffs establish predominance in two independently sufficient ways: common issues predominate in the case as a whole; and common issues predominate as to each component of Plaintiffs' claims. The Supreme Court and the Ninth Circuit have held that Rule 23(b)(3) is satisfied if common issues predominate in the case *as a whole*; each element of Plaintiffs' claims need not be predominantly common. *See Amgen*, 568 U.S. at 469; *Torres*, 835 F.3d at 1134; *High-Tech*, 985 F. Supp. 2d at 1186-87 (citing *Amgen*, 568 U.S. at 469). Here, as in many antitrust cases, the litigation will focus overwhelmingly on common issues, particularly on Zuffa's conduct. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust laws.").

Plaintiffs also establish predominance by showing that they will attempt to prove *each* component of their case—violation; causation and impact; and damages—using common evidence. Proof of an antitrust violation often focuses on a defendant's conduct and is therefore entirely common. *Amchem*, 521 U.S. at 625; *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 336 (3d Cir. 2011) (*en banc*). And proof of damages in the aggregate to Class members as a whole—as Drs. Singer and Zimbalist both provide—is common. As a result, courts have held common issues predominate in antitrust cases if plaintiffs can establish *common impact*, that is, that they will rely on common evidence in attempting to show widespread harm to a class. *Torres*, 835 F.3d at 1138; *High-Tech*, 985 F. Supp. 2d at 1192.

Using a roadmap from past antitrust cases, Plaintiffs here show common impact through a two-step analysis. *See Nitsch*, 315 F.R.D. at 297–98 (granting class certification where plaintiffs' expert analyses proceeded in two steps, first showing that "classwide evidence was capable of showing that the alleged conspiracy suppressed compensation of class members generally," then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *Castro*, 134 F. Supp. 3d at 847 (noting that the "two-step method to prove antitrust impact is not novel").

As to the first step, Plaintiffs show that defendant's Scheme had a *general tendency* to harm the Class members—here, by decreasing wages below competitive levels. As explained below, Plaintiffs' evidence includes documents, testimony, and various forms of economic analysis.

As to the second step, Plaintiffs show the resulting impact was *widespread* across Class members—here, that the Scheme suppressed compensation broadly across the Classes. In this regard, Plaintiffs rely on two methods, each of which courts have found sufficient by itself: (1) a classwide model assessing compensation for each Class member and showing impact to ████████;[46] and (2) an analysis showing Zuffa ████████████████████████████████████████ ████████████████████████████████████████.[47]

---

[46] *See Air Cargo*, 2014 WL 7882100, at *55 (observing that defendants did not even dispute that an analogous "'customer model' is methodologically capable of showing the percentage of class members impacted, nor do they dispute that 96% would be sufficiently 'classwide' for purposes of common proof"); *Chocolate*, 289 F.R.D. at 221 (certifying class based on analogous customer impact model); *Drywall*, 2017 WL 3623466, at *27 (certifying class where similar econometric model showed 98% of class members impacted); *Korean Ramen*, 2017 WL 235052, at *6 (certifying direct purchaser class based in part on a similar multiple regression model confirming impact on 98% of class members).

[47] *See, e.g.*, *Nitsch*, 315 F.R.D. at 297–98 (plaintiffs' expert analyses proceeded in two steps, first showing that "classwide evidence was capable of showing that the alleged conspiracy suppressed compensation of class members generally," then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *High-Tech*, 985 F. Supp. 2d at 1206 (noting that Plaintiffs' expert "followed a roadmap widely accepted in antitrust class actions that use evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class"); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380, at *26 (W.D.N.C. July 19, 2007) (crediting use of pricing structure analysis to prove classwide impact); *In re Aftermarket Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 369–70 & n.3 (C.D. Cal. 2011) (certifying class based on pricing structure analysis showing classwide effect).

1

## V.      COMMON ISSUES PREDOMINATE IN THE CASE AS A WHOLE

2       Common questions of fact and law predominate in the case as a whole. As explained in *Amgen*,

3   Plaintiffs need not show they will *prevail* on the predominantly common issues; rather they must show

4   only that they can *offer evidence* common to the class. *Amgen*, 568 U.S. at 459. Predominance requires

5   that "*questions* common to the class predominate, not that those questions will be answered, on the

6   merits, in favor of the class." *Id.* (emphasis original). Further, the predominance inquiry is conducted

7   by reference to the litigation *as a whole*. *Torres*, 835 F.3d at 1134 (predominance inquiry asks court to

8   make a "global determination of whether common questions prevail over individualized ones"). Not

9   every element needs to be predominantly common. *See, e.g.*, *Amgen*, 568 U.S. at 459 (Rule 23(b)(3)

10  "does not require a plaintiff seeking class certification to prove that each element of her claim is

11  susceptible to class wide proof. What the rule does require is that common questions predominate over

12  any questions affecting only individual class members.").[48] Accordingly, courts have certified classes

13  even where some elements of the claim may give rise to individualized issues, such as proof of impact

14  or injury. *See, e.g.*, *Torres*, 835 F.3d at 1137 (certifying class because common issues predominated in

15  the case as a whole, even though *fact of injury* was an element of plaintiffs' claims and they had not

16  shown it was common to the class); *see also Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513–14 (9th

17  Cir. 2013) (holding common issues predominated in case as a whole despite individualized damages

18  issues); *Greene*, 2017 WL 4158605, at *5 (when "common questions present a significant aspect of the

19  case and they can be resolved for all members of the class in a single adjudication[,]" damages decided

20  on an individual basis will not preclude class certification); *Magadia v. Wal-Mart Assoc.*, No. 17-CV-

21  00062-LHK, slip op. at 11 (N.D. Cal. 2018) (Plaintiffs "need only show that common questions will

22

23

24

25
_____

26  [48] *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("[w]hile [the Defendants' defense] has the effect of leaving individualized questions of reliance in the case, there is

27  no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)"); *High-Tech*, 985 F. Supp. 2d at 1184 ("[P]laintiffs [a]re not required

28  to demonstrate that common questions w[ill] predominate with respect to each element.").

predominate with respect to their class as a whole.").[49]

As in most antitrust matters, this case will focus on the defendant's conduct, its illegality, and its effect on competition. *See Amchem*, 521 U.S. at 625.[50] As it has to date, the litigation and trial in this case will focus overwhelmingly on common issues, including: whether Zuffa engaged in the Scheme; whether it foreclosed competition and was anticompetitive; whether it generally suppressed Fighter compensation; what injunctive relief, if any, is appropriate; and aggregate damages. Neither Plaintiffs nor Zuffa will focus their case on which particular Class members, if any, were uninjured. *See Torres*, 835 F.3d at 1140-41 (noting a "class defendant's interest was 'only in the total amount of damages for which it will be liable,' not 'the identities of those receiving damage awards'").

## VI.   COMMON ISSUES PREDOMINATE FOR EACH COMPONENT OF THE CLAIM

### A.   Classwide Evidence Is Capable of Proving an Antitrust Violation

As discussed above, here the major factual and legal issues necessary to establish an antitrust violation are common to Class members and have dominated the litigation and will continue to do so.

### B.   Classwide Evidence Is Capable of Proving Common Impact

Courts have found in numerous antitrust cases that common issues predominate when, as here, plaintiffs offer evidence capable of showing "common impact," that is, when they offer evidence of fact of injury on a classwide basis. *See, e.g.*, *Thomas*, 209 F.R.D. at 166; *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352-53 (N.D. Cal. 2005). Evidence establishes "common impact" if it is

---

[49] *See also In re Lidoderm Antitrust Litig.*, 2017 U.S. Dist. LEXIS 24097, at *38 (N.D. Cal. Feb. 21, 2017) (certifying class treatment of direct and indirect purchaser antitrust claims even though "determining whether any particular plaintiff was injured and how to apportion damages between the plaintiffs necessarily involves individualized questions that are undeniably complex"); *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (reversing denial of class certification and cautioning, "Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted").

[50] *See also High-Tech*, 985 F. Supp. 2d at 1227 (the "question [of defendants' antitrust violation] is likely to be central to this litigation"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Plaintiffs need not show that there will be common proof on each element of the claim" especially where proof of the violation is "the predominant issue") (quotation omitted).

common to class members and is capable of showing that a defendant's conduct caused injury (or fact of damage) that is widespread across class members. *Torres*, 835 F.3d at 1136, 1138 (impact is common unless the class is "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct") (quotation omitted); *High-Tech*, 985 F. Supp. 2d at 1192 ("widespread" harm to class suffices). In other words, impact is a common issue so long as a proposed class does not contain "large numbers of class members who were never *exposed* to the challenged conduct to begin with." *Torres*, 835 F.3d at 1136 (emphasis in original) (citing, *inter alia*, *Mazza v. Am Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)).[51]

To establish common impact consistent with *Amgen*, Plaintiffs need merely offer common proof *capable* of showing harm—here, some degree of compensation deflation due to the Scheme—is widespread across the class; they need not *prove* classwide harm. *High-Tech*, 985 F. Supp. 2d at 1192; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 600 (N.D. Cal. 2010) ("*LCDs*") ("Plaintiffs need only advance a *plausible* methodology to demonstrate that antitrust injury can be proven on a class-wide basis." (emphasis added) (citations omitted)).[52] As the Supreme Court recently explained, plaintiffs need merely offer evidence common to the class that: (1) if believed, could support their claims; and (2) is admissible. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) ("The District Court could have denied class certification on th[e] ground [that it agreed with Defendants' experts] only if it concluded that *no reasonable juror* could have believed that" plaintiffs' experts were right on the merits (emphasis added)).

Further, impact (*i.e.*, some degree of compensation suppression) on a single occasion—of any amount—is sufficient to establish fact of damage to a class member, even if that amount was later offset. *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *93-94; *Nexium*, 777 F.3d at 27 ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a

---

[51] *See Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009) (class may contain uninjured members); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015) (same); *Messner v. Northshore Univ. Health Syst.*, 669 F.3d 802, 818–19 (7th Cir. 2012) (same).

[52] *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 629 (N.D. Cal. 2015) (holding plaintiffs' expert's method need only be "plausible"); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016) (plaintiffs' method need only be "adequate"); *Rubber Chems.*, 232 F.R.D. at 353 (plaintiffs' method need only be "realistic").

Case No.: 2:15-cv-01045-RFB-(PAL)

legal and factual matter—impact or fact of damage.").

To show that Plaintiffs have evidence capable of establishing a "widespread" effect, *High-Tech*, 985 F. Supp. 2d at 1192—*i.e.*, to establish "common impact"—Plaintiffs use a standard two-step impact analysis. *Id.*; *see also*, *supra* at 19, nn.46-47 & II.E (citing cases endorsing two-step common impact analysis). First, Plaintiffs offer common evidence capable of showing the Scheme tended to lower compensation *generally*. *High-Tech*, 985 F. Supp. 2d at 1206. Second, they present evidence capable of showing these effects were *widespread* across Class members. *Id.*

### 1.   Common Impact for the Bout Class in Two Steps

<u>**STEP 1: COMMON EVIDENCE OF GENERALLY DECREASED COMPENSATION**</u>: Plaintiffs offer two types of evidence capable of showing the Scheme deflated compensation:

**(1) Documentary and Testimonial Evidence of Suppressed Compensation:** As detailed in II.D. above, and by Dr. Singer in his reports, SR1 ¶¶ 188-92; SR2 ¶¶ 36-41, ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████. As Zuffa's current owner observed, ████████████████████████

████████████████████████████████████████████████████████

█████████ *See* CD, Ex. 41 (WME_ZUFFA_00001150) at 11.

**(2) Economic and Econometric Evidence of Suppressed Compensation**

Plaintiffs' and Zuffa's economists agree that when a firm has monopsony power, it pays workers less than it would in a competitive market. SR1 ¶¶ 93, 143-44; SR2 ¶¶ 38-39, 72, 92-93 (citing admissions by Zuffa's economists). Indeed, that is the definition of monopsony power—a firm with the power to pay below competitive compensation. SR1 ¶¶ 143-44; SR2 ¶¶ 36, 38-39, 72, 92-93. A monopsonist has sufficient control of the market that workers cannot go elsewhere, depriving them of the ability to pit potential employers against one other to drive up compensation. *See* CD, Ex. 22 (Deposition of Paul Oyer ("Oyer Dep.")) at 25:10-28:18. Zuffa's experts have conceded this point.[53]

---

[53] *See* CD, Ex. 44 (ROGER BLAIR, SPORTS ECONOMICS (Cambridge University Press 2012) at 354. Dr. Topel similarly admitted that "if there's monopsony power in the market, the athlete will get paid below his marginal revenue product." Ex. 23 (Topel Dep. 1) 46:4-10 ("Q. So if the market's

Further, Zuffa's own economic expert, Dr. Topel, acknowledged that the challenged contractual provisions in Fighter contracts are "restrictions on athlete mobility." CD, Ex. 23 (Topel Dep. 1) at 75:15-19; *see also id*. at 80:7-16. He also admitted that restrictions on Fighter mobility facilitate the exercise of monopsony power and thereby suppress compensation. *Id*. at 73:21-74:6; CD, Ex. 24 (Topel Dep. 2) at 345:1-8; *id*. at 346:1-8. Indeed, he went so far as to concede that eliminating the challenged contractual provisions in this case would reduce monopsony power and thereby create "a transfer of wealth from Zuffa to the athletes." CD, Ex. 23 (Topel Dep. 1) at 76:4-77:3, 84:11-18. In other words, without the restrictions on Fighter mobility, Zuffa would have to pay its Fighters more.

**Multivariate Regression Analyses.** Dr. Singer performed regression analyses to determine whether Zuffa's increase in Foreclosure Share over time decreased the share of Event Revenue that Fighters received. SR1 ¶¶ 180-87 & Tables 4-6.[54] ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████ SR1 ¶ 185. ███████████████

██████████████████ SR1 ¶ 186. ███████████████

█████████████████████████████

████████████ SR1 ¶¶ 186-87 & Table 6.

**Reduced Fighter Share of Event Revenue Over Time.** Dr. Singer also analyzed Fighter compensation as a percentage of Event Revenues over time. SR1 ¶¶ 188-89, 211. The percentage of Event Revenues going to Fighters decreased as Zuffa's Foreclosure Share increased. SR1 ¶ 188. Zuffa's own expert conceded this.[55] ███████████████████████████

---

competitive, the athlete will get paid equal to his marginal revenue product; and if there's monopsony power in the market, the athlete will get paid below his marginal revenue product, correct? A. Yeah. All athletes, not just Zuffa."). So did Dr. Oyer. *See also* Ex. 12 (Expert Report of Paul Oyer ("Oyer Report")) at ¶ 18.

[54] In addition to using Zuffa's Bout compensation data from 2001 to 2017, SR1 ¶ 293, Dr. Singer also included in the model Fighter compensation data from Strikeforce before it was acquired by Zuffa in 2010. SR1 ¶¶ 181, 300; SR2 ¶ 76.

[55] *See* CD, Ex. 11 (Topel Rpt.) ¶ 27 ████████████████████ ███████████████ ) (emphasis original).

1    ████████████████████████████████████████████████████ SR1 ¶ 189.

2    ████████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ███████ SR1 ¶¶ 190, 247. ██████████████████████████████

5    ████████████████████████████████████████████████████

6    ███████████████████████████████████████. *Id.*[56]

      **Comparison to Other Sports.** Dr. Zimbalist is one of the foremost sports economists. ZR1 ¶ 9. His analysis showed that major sports—the NBA, the NFL, the NHL, MLB, and boxing—all engaged in exclusionary conduct restraining the mobility of athletes in a manner similar to Zuffa's Scheme here, and all were forced to make significant concessions to competition over time. ZR1 ¶¶ 25-103. Once they did so, the proportion of their revenue they paid to athletes increased consistently and significantly. ZR1 ¶¶ 29, 36, 39, 49-50, 52, 60-62, 71, 80; ZR2 ¶¶ 9, 45, n.89 (player share of MLB revenues increased after the reserve clause was discontinued). As Dr. Zimbalist shows, once the labor markets became more competitive, athletes consistently received 50% or more of total revenues. ZR1 ¶¶ 109-26 & Tables 2-4. Using analogous professional sports as benchmarks, Dr. Zimbalist concluded that eliminating the Scheme would cause UFC Fighter compensation to ████████████████ ███████████ ZR1 ¶¶ 123-26 & Table 4. His analysis further shows that in contrast to Zuffa's claims here—which echo the hollow complaints of other professional sports owners in the past—improvement in competitive conditions for athletes' services would not only cause athletes to receive a greater share of revenue, but would also make MMA more popular, attract more talented athletes to MMA, cause athletes to work harder to compete effectively, and increase industry revenues substantially. ZR1 ¶¶ 80, 83-84, 139; ZR2 ¶¶ 9, 90, 97, 99.

      **STEP 2: COMMON EVIDENCE OF A WIDESPREAD EFFECT:** Plaintiffs also have two forms of common evidence capable of showing deflation of compensation was *widespread*: (1) econometric evidence showing ████████████████████████████████████ and (2) documentary, testimonial, and econometric evidence of ████████████████

---

[56] *See also* SR2 ¶¶ 77, 181, 199 (referencing Dr. Topel's admission that Bellator and Strikeforce are "████████████████").

Case No.: 2:15-cv-01045-RFB-(PAL)

█████████████████████████████████████████████████████████████████

**Econometric Evidence of Common Impact**. Dr. Singer performed a standard econometric analysis that courts have found sufficient for common impact. *See*, *supra* at 19, n.46 (citing cases). He used multivariate regression analyses to assess the compensation each Fighter would have received for each event if not for the Scheme, comparing those amounts to the compensation each fighter actually received. SR1 ¶¶ 230-231 & Table 8; CD, Ex. 9 (SE2) at 4. He concluded that ████████ ████████████████████████████████████████████████████████████████████ SR2 ¶ 152 & Table 2.

**Evidence of Zuffa's Pay Structure.** Plaintiffs show widespread impact in a second, independently sufficient way: with evidence that ████████████████████████████████ ████████████████████████████████████████

**Documentary Evidence**. First, documents and deposition testimony—much of it from Zuffa itself—███████████████████████████████████████████ █████████████████████████████████████████████████████████████████ SR1 ¶¶ 209, 212-26. Multiple courts in directly analogous antitrust class actions on behalf of workers have relied upon similar evidence of internal equity in finding common impact. *See, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1214 (plaintiffs' "internal equity hypothesis" offered a theory "subject to common proof for how Defendants' antisolicitation agreements suppressed compensation broadly").[57]

Joe Silva, the UFC's long-time chief matchmaker, who had primary responsibility for negotiating compensation with hundreds of UFC fighters over more than twenty years, ████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

---

[57] *See also Seaman*, 2018 WL 671239, at *4 (finding common impact where defendants imposed "internal equity structures—policies and practices that are alleged to have ensured relatively constant compensation relationships between employees—[which] spread the individual harm . . . to all faculty, thus suppressing compensation faculty-wide"); *Nitsch*, 315 F.R.D. at 295 (finding common impact where "Plaintiffs' documentary evidence tends to show that Defendants maintained formal compensation structures and made significant efforts to maintain internal equity within those structures").



. SR1 ¶¶ 216-17.

SR1 ¶ 217.

. *See* SR1 ¶¶ 217-22

). As explained by UFC matchmaker Sean Shelby, who negotiated mid- to low-end contracts,

[59]

Moreover,

. SR1 ¶ 212. As Scott Coker, former CEO of Strikeforce and current President of Bellator, explained at deposition, Zuffa's market power allows it to "*dictate what an entry [level] fighter would get and what a mid-tier fighter would get, what a top-tier fighter would get.*" SR1 ¶ 212 (quoting CD, Ex. 20 (Coker Dep.) at 97:18-99:3) (emphasis in SR1).

SR1 ¶¶ 213-26. None of Zuffa's economists responded to or contested *any* of this evidence.[60]

SR1 ¶ 223; *see also* SR1 ¶¶ 222-223 (

). Joe

---

[58] SR1 ¶ 226 (citing CD, Ex. 36 (ZUF-00296703)).
[59] SR1 ¶ 218 (citing CD, Ex. 34 (ZUF-00122280) (emphasis in SR1)); *see also* SR1 ¶ 219 (citing UFC's Shelby noting " ").
[60] *See* CD, Ex. 23 (Topel Dep. 1) at 176:9-12 (acknowledging he does not address internal equity in his report).

Silva confirmed Zuffa's philosophy was " ███████████████████████████████

████████████████████████," and that he worked " ███████████████████████

██████████████████" SR1 ¶ 225 (quoting CD, Ex. 19 (Silva Dep.) at 372:22-373:18).

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *Id.*

**Economic and Econometric Evidence**. Dr. Singer used two lines of

econometric analysis to confirm that Zuffa maintained a pay structure. First, he performed a regression

analysis to determine the percentage of fighter compensation that is explained by common factors. SR1

¶ 227. He concluded that 78% of the variation in fighter compensation is explained by common,

objectively measurable variables. *Id.* Those variables include weight class, rank, gender, placement on

the card, year, country, and venue. *Id.* So the great majority of Fighter compensation is formulaic and

any downward shift in compensation would affect the Bout Class as a whole. *Id.*[61] Second, Dr. Singer

performed additional regression analyses to assess the degree to which gains and losses in

compensation for individual Fighters were statistically associated with gains and losses to Fighters

overall ("Sharing Analysis"). SR1 ¶ 228. ██████████████████████████████. SR1 ¶ 229 &

Table 7. ███████████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* Courts have relied upon

similar sharing regressions in finding common impact in antitrust cases.[62]

**Admissions of Zuffa's Economists**. ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ SR2 ¶¶ 159, 165. He further conceded that compensation to

---

[61] *High-Tech.*, 985 F. Supp. 2d at 1209–10 (accepting as common proof of impact a regression analysis showing that a high share "of the variation in any individual employee's compensation can be explained by common factors"); *Nitsch*, 315 F.R.D. at 300 (finding fact that "common factors explain the majority of the variation in compensation" supported finding a price structure and common impact).
[62] *See, e.g., Seaman*, 2018 WL 671239, at *6 (Plaintiffs' "'sharing' regression analyses" were class-wide proof "that there is a correlation between faculty compensation and provides further support for Dr. Seaman's theory that the defendants managed faculty compensation with internal equity structures").

different Fighters moves together because it is determined by common factors.[63] ███████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. SR2 ¶ 165.

These concessions, combined with all of the other evidence, establish common impact.

### 2. Common Impact for the Identity Class in Two Steps

Plaintiffs also have established common impact for the Identity Class. Dr. Singer analyzed two subgroups of Fighters in the Identity Class. The first subgroup ("Identity Subgroup One") includes only those Fighters who received some identity-based payments during the Class Period, such as for sponsorship, video games, merchandise royalties, or pursuant to an athlete outfitting policy. SR1 ¶¶ 233, 236-37. The second subgroup ("Identity Subgroup Two") includes all fighters who entered a Promotional and Ancillary Rights Agreement ("PAR") with Zuffa ██████████████████████ during the Class Period, regardless of whether the fighter received any compensation specifically for use of his or her identity. *Id*. ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████ SR1 ¶¶ 236-237, 241-244; SR2 ¶ 168.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████. SR1 ¶ 239. ██

████████████████████████████ *Id*. ████████████████

██████████████████████████████████. SR1 ¶ 240; *see also* SR2 ¶¶ 169-70.

### C. Classwide Evidence Is Capable of Proving Aggregate Damages

Courts routinely hold that the amount of damages a defendant must pay is a common issue if, as

---

[63] CD, Ex. 23 (Topel Dep. 1) at 169:19-23 (conceding that the reason for the increase in Zuffa Fighter compensation in all ranking categories was "an increase in interest and demand for the services of MMA fighters generally").

here, plaintiffs demonstrate that they can use a common method or formula to calculate class damages on an aggregate basis. *See Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *76 (approving use of aggregate damages) (citing *Meijer, Inc. v. Abbott Labs*, 2008 WL 40658399, at *7 (N.D. Cal. Aug. 27, 2008)); *see also In re Nexium*, 777 F.3d at 19 (approving aggregate measure of classwide damages); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2011) ("As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper.'") (quotation omitted). Further, the calculation of aggregate damages need not be precise. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (confirming that damages "[c]alculations need not be exact"); *LCDs,* 267 F.R.D. at 600 ("Plaintiffs need only demonstrate a proposed method for determining damages that is 'not so insubstantial as to amount to no method at all.'" (quotation omitted)). It is also well established that any need to perform individual damages calculations will not defeat class certification. *See Torres*, 835 F.3d at 1136 ("The presence of individualized damages calculations. . . does not defeat predominance.").

As detailed in Section II.F above, Plaintiffs have not only proposed a common methodology for calculating the aggregate class damages, Drs. Singer and Zimbalist calculated those damages using standard econometric methods. Dr. Singer's sophisticated regression analysis found ███████████ ███████████████████████████████████████████████████ SR1 ¶¶ 180-87 & Tables 4-6; SR2 ¶¶ 3, 36, 40, 68, 73-74. █████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████. SR1 ¶¶ 250-51 & Table 11; SR2 ¶¶ 172-74. Drs. Singer and Zimbalist also used the standard yardstick approach to damages—including comparisons of the Wage Share of UFC Fighters to the Wage Shares of other MMA Promoters and those in other major sports. ████████████████████████████████████ ██████████████████ ZR1 ¶¶ 123-126 & Tables 4-6; ZR2 at VI; SR1 247-48 & Table 9; SR2 ¶¶ 171, 176-82. ███████████████████████████████████████████████ ████████████████. SR1 ¶¶ 253-56 & Table 12; SR2 ¶¶ 183-86.

### D.    Zuffa's Main Criticism of Plaintiffs' Analyses Is Wrong

Zuffa's main criticism of Plaintiffs' economic experts' analyses of impact and damages is that

they use an allegedly inappropriate measure—Wage *Share*—in assessing the effects of Zuffa's anticompetitive Scheme. Wage Share measures compensation as a *percentage* of a firm's revenues—or in this case a portion of those revenues, a percentage of *Event* Revenues.[64] Dr. Singer measures Wage Share by calculating the percentage of Zuffa's revenues from live MMA events that Fighters received as compensation. CD, Ex. 5 (MR1) ¶ 2; SR2 ¶¶ 36-38, 40, 68, 72-74. ████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ SR1 ¶¶ 180-87 & Tables 4-6; SR2 ¶¶ 36, 40, 68, 73-76; MR1 ¶ 2. Similarly, Dr. Zimbalist uses Wage Share to compare the compensation Zuffa pays its fighters to the compensation professional athletes receive in sports with more competitive labor markets. ZR1 ¶¶ 104-26; MR1 ¶ 2.

Zuffa's attack on use of Wage Share fails.[65] Both sides' economic experts agree that in a competitive labor market, workers would receive what economists call their "marginal revenue product of labor" ("MRP"). MRP is the monetary value that their efforts generate for their firms, holding all other inputs constant. MR1 ¶11 (discussing consensus of experts in this case). The value that Fighters provide to Zuffa—and other MMA promoters—is at minimum their ability to generate revenue by competing in MMA Events. MR1 ¶ 26; SR2 ¶¶ 108-09, 112-13, 120; ZR2 ¶¶ 28, 30, 35, 46. The more fans are willing to pay to watch a Fighter, the more Zuffa would have to pay the Fighter in a competitive market. MR1 ¶¶ 24-27; SR2 ¶¶ 108, 112-13, 120; ZR2 ¶¶ 28, 30, 35, 46. The Fighters are what drives fans to pay to watch events. MR1 ¶ 24; SR2 ¶¶ 108-09, 112-13, 120; ZR2 ¶¶ 28, 30, 35, 46; *see also* ZR2 ¶ 57 ("the athlete essentially *is* the product" (emphasis original)).

In this way, MMA Fighters—and professional athletes generally—are unusual. For many workers, the connection between their productivity and firm revenues is attenuated. MR1 ¶¶ 23-24;

---

[64] *See* MR1 ¶¶ 2-3; SR2 ¶¶ 3, 5, 72; ZR2 ¶ 36.

[65] The issue supports class certification even if Zuffa turns out ultimately to be right about Wage Share. If Plaintiffs are correct, then use of Wage Share is appropriate for all Class members. If, on the other hand, Zuffa is correct, then Plaintiffs' showing fails for all Class members. As Dr. Oyer (Zuffa's primary expert on this issue) made clear, his position is that it is *never* appropriate to use Wage Share, not that it can be used for *some* Class members. *See* CD, Ex. 22 (Oyer Dep.) at 88:13–19. In other words, the claims of the Class members rise and fall together; that common issue *supports* certification. *See Amgen*, 568 U.S. at 467–68, 481 (issues are common if claims of class rise or fall together).

SR2 ¶¶ 8, 92-95; ZR2 ¶ 30. But that's not true for professional athletes. So the correct way to measure how much Zuffa would pay its Fighters in a competitive market is in proportion to its *Event Revenues*: the more revenues Events generate, the more compensation the Fighters in those Events would receive. ███████████████████████████████████████████████████████████████████. SR2 ¶ 108, n.406 (citing Zuffa documents). So did Zuffa's own economists when evaluating compensation to MMA fighters and other professional athletes outside of this litigation. *See* SR2 ¶ 90 & n.321 (noting Dr. Topel himself used Wage Share to analyze compensation in the NFL). And so does the economics literature when assessing professional athlete compensation and determining the monopsony power of professional sports leagues,[66] or when assessing the impact of concentration on worker compensation generally.[67]

In contrast, using wage *levels*—as Zuffa's economists claim is necessary—is inappropriate here. It ignores increasing Fighter productivity and masks the anticompetitive effects of Zuffa's Scheme. As Zuffa's Event Revenues increased over time, even though Zuffa paid its Fighters more, it paid them an increasingly *smaller percentage* of the Event Revenues that Fighters generated and, thus, a smaller percentage of their MRP. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. SR2 ¶¶ 38-40, 94, 108-09; MR1 ¶ 21. Indeed, Zuffa's own economist, Dr. Topel, admitted using wage levels by themselves— unlike Wage Share—does *not* allow an assessment of whether Zuffa increasingly exercised monopsony power over time, the crucial issue in this case. SR2 ¶ 39, n.126 (discussing Topel's admission).

The weaknesses in Zuffa's position are further reflected in the testimony of another of its economists, Dr. Oyer. He admits that in a competitive labor market, workers would be paid an amount equivalent to their MRP.[68] He also admits that some workers—like commission salespeople—generate a percentage of incremental firm revenues. *See* CD, Ex. 12 (Oyer Rpt.) ¶ 16. But his position in this

---

[66] *See* SR2 at ¶¶ 6, 92-100 (discussing multiple published studies evaluating precisely the question at issue here—the effect of exercise of monopsony power on athlete compensation—using Wage *Share*); *see also* ZR2 ¶¶ 45-46 (discussing sports literature), ¶ 49 (discussing league practice).
[67] SR2 ¶¶ 103-07; ZR2 ¶ 47.
[68] CD, Ex. 12 (Oyer Rpt.) ¶¶ 15-18; CD, Ex. 22 (Oyer Dep.) at 19:19-23.

case is effectively that analysis of compensation "just is not done" with Wage Share. Yet when confronted with publication after publication assessing compensation to athletes in terms of Wage Share, Dr. Oyer admitted that he had never read them, that he had failed to address them in his report, that the publications did in fact use Wage Share, not wage levels,[69] and that he knew of no publication rejecting the use of Wage Share.[70]

Central to Dr. Oyer's opinion is his reliance on a book on monopsony power in labor markets by Prof. Alan Manning. *See* CD, Ex. 12 (Oyer Rpt.) ¶¶ 22-26. Dr. Oyer described Prof. Manning as "a recognized expert and leader . . . in analysis of monopsony in labor markets" and as "particularly authoritative."[71] Plaintiffs were able to obtain a rebuttal expert report from Prof. Manning. He explains that use of Wage Share can be appropriate for labor economists and that use of Wage Share *is appropriate in this case*. MR1 ¶¶ 5-31. Use of Wage Share is correct, according to Prof. Manning, when "(1) the goal is to compare compensation to marginal revenue product; (2) sufficient firm-level information is available to compute wage share; and (3) it is possible to obtain a reasonable estimate of the part of a firm's revenue that can be ascribed to the activities of a particular worker or group of workers." MR1 ¶ 6. As Prof. Manning explains, these criteria are met here: the goal here is to compare compensation to the MRP of Fighters, sufficient information is available about MMA Event Revenues to calculate Wage Share, and the contributions of Fighters are proportional to Event Revenues. MR1 ¶¶ 24-31; *see also* SR2 ¶¶ 89-90, 92-102, 111-13, 120. For these and other reasons, he concludes that use of Wage Share is appropriate in this litigation. MR1 ¶ 31.

## VII.   A CLASS ACTION IS SUPERIOR TO INDIVIDUAL ACTIONS

Class treatment is superior to many hundreds of individual claims in an antitrust case where common issues predominate. *LCDs*, 267 F.R.D. at 314 ("if common questions are found to predominate in an antitrust action . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied") (quotation omitted). Class members' individual damages, even after mandatory trebling, are insufficiently large to warrant individual litigation. *Id.* at 314–315; *see also Wolin*, 617 F.3d at 1175-76.

---

[69] *See* CD, Ex. 22 (Oyer Dep.) at 102:22-119:4.
[70] *See id.* at 123:7-124:9.
[71] *Id.* at 122:17-21 (admitting that "Alan Manning is a recognized expert and leader in the thinking of monopsony—analysis of monopsony in labor markets"); *id*. at 123:4-6 (same).

Class treatment will also be more manageable and efficient than hundreds of individual actions litigating the same issues with the same proof. *See, e.g.*, *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 104 (D. Conn. 2009); *Greene*, 2017 WL 4158605, at *6 ("Because the Court finds it would be more efficient and consistent to pool these claims together, the superiority requirement has been satisfied."). Either Zuffa engaged in the Scheme or it did not; either the Scheme was anticompetitive or it was not; either it artificially deflated wages or it did not. Any trial here will focus on the same questions and the same evidence, whether it involves a single fighter or the Classes as a whole. Moreover, if individual Class members cannot afford to bring claims on their own, that weighs in favor of certifying a class, not against it. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663–64 (7th Cir. 2015)); *LCDs*, 267 F.R.D. at 608; *Sobel*, 291 F.R.D. at 544 (quoting *Wolin*, 617 F.3d at 1176 ("[A] class action is particularly appropriate where, as here, the alternative involves class members filing hundreds of individual lawsuits that could involve duplicating discovery and costs that exceed the extent of the proposed class members' individual injuries.'")). This case will proceed best on a class basis.

## VIII. THE COURT SHOULD APPOINT CO-LEAD CLASS AND LIAISON COUNSEL

In addition to moving for class certification, Plaintiffs ask the Court to remove the term "Interim" for Plaintiffs' Interim Co-Lead Class Counsel and Interim Liaison Counsel. Under Fed. R. Civ. P. 23(g), if the Court grants class certification, it should appoint class counsel who will "fairly and adequately" represent the Classes. *See also Harris v. United States Physical Therapy, Inc.*, 2012 U.S. Dist. LEXIS 184846, at *32 (D. Nev. Dec. 26, 2012) (counsel should be "qualified and competent" to represent the class). Plaintiffs have retained highly skilled counsel with extensive experience in prosecuting antitrust class actions. Interim Court-appointed Co-Lead Counsel and Liaison Counsel have vigorously pursued the interests of the proposed Classes and will continue to do so. *See* CD ¶¶ 3-8 (describing the work Interim Class Counsel have undertaken to date). As a result, appointment of Co-Lead and Liaison Counsel is appropriate under Rule 23(g).

## IX. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should certify the Bout and Identity Classes and appoint Co-Lead Class Counsel and Liaison Counsel.

Dated: February 16, 2018

Respectfully Submitted,

By: /s/  Eric L. Cramer
         Eric L. Cramer

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215) 875-3000/Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Jiamin Chen (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Phone: (415) 500-6800/Fax: (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
jchen@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Daniel H. Silverman (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005
Phone: (202) 408-4600/Fax: (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dsilverman@cohenmilstein.com

**Co-Lead Class Counsel**

**Liaison Counsel for the Class**

Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Phone: (702) 341-5200/Fax (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Phone: (602) 264-7101/Fax: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Frederick S. Schwartz (*pro hac vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Phone: (818) 986-2407/Fax: (818) 995-4124
fred@fredschwartzlaw.com

William G. Caldes (admitted *pro hac vice*)
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Phone: (215) 496-0300/Fax: (215) 496-6611
wcaldes@srkw-law.com

John D. Radice (admitted *pro hac vice*)
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502
jradice@radicelawfirm.com

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on this 16th day of February, 2018 a true and correct copy of
3  **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** and supporting papers was served via
   email on all parties or persons requiring notice.

4

5                                    ___/s/ *Eric L. Cramer*_____
                                        Eric L. Cramer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28