# Exhibit 14

Deposition of Kurt Otto

(February 6, 2017)

(excerpted)

PUBLIC COPY

```
                                                            1
                UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF NEVADA



    CUNG LE; NATHAN QUARRY, JON    )
    FITCH, on behalf of            )
    themselves and all others      )
    similarly situated,            )
                                   )
              Plaintiffs,          )
                                   )
              vs.                  ) Case No.
                                   ) 2:15-cv-01045-RFB-(PAL)
                                   )
    ZUFFA, LLC, d/b/a Ultimate     )
    Fighting Championship and      )
    UFC,                           )
                                   )
              Defendant.           )
    _____)




                VIDEOTAPED DEPOSITION OF

                       KURT OTTO

                  New York, New York

                   February 6, 2017

                      10:00 a.m.



    Reported by:
    JUDITH CASTORE, CLR
    Job No. 48410
```

**PUBLIC COPY**

Page 242

OTTO

other revenue streams; otherwise, you're dead in the water.

Q  So, in order to compete on the level of the UFC, you need a ton of capital; is that right?

A  To start off with.

MR. SKAGGS:  Objection. Leading.

Q  You said "to start off with," a ton of capital; yes?

A  Yes.  To get that machine going so that you can prove to the TV network that you have the wherewithal to actually put on an event.  Not just a one-off situation; I'm talking about a season.  I am talking about, I'm going to deliver you 35 shows.

Q  You need a lot of top-level fighters in order to get the TV contract?

MR. SKAGGS:  Objection. Foundation.

Q  Is that right?

A  It's all linked.

Page 243

OTTO

Q  And you need the TV contract?

A  Yes.  And --

Q  It's hard to --

A  And then, the TV networks get upset if they can't sell time to Gatorade, the beer companies, the popcorn companies, and the Muscle Milk, and the HeadBlade, and whatever.  So, if someone is blocking you from doing that, it's a challenge.

Q  Hard to compete if you have a competitor out there blocking you from gettings top sponsors?

MR. SKAGGS:  Objection. Leading.  Foundation.

Q  Is that right?

A  That is 100 percent right.

Q  Sounds like there's a bit of a catch-22 because it's hard to get the top-level fighters unless you're already an established business with a top TV contract.  It's hard to get a TV contract unless you have the top-level fighters?

Page 244

OTTO

MR. SKAGGS:  Objection. Foundation.  Leading.

A  Correct.

Q  Go ahead.

A  And one more thing, it's tough to get the top fighters if you don't have a TV deal for them to strut their stuff.  You -- you know, everybody wants their 15 minutes of fame, right?

So it's not -- in the beginning, they say, Oh, Man, I want all the money; I want the sponsorship; I want to have the glory; I want to have all the stuff, but in reality, first, they just want to be shown on TV.  They want to show their parents that they're on TV and they're fighting.  I know it's crazy, but it's the truth.

And then -- but if you -- if you're on some wacky network on some crazy station that they're showing at 2:00 in the morning, who wants that?

Page 245

OTTO

How can you -- how could you generate revenue from that?

So, unfortunately, in that business, you have to go from first gear to sixth gear, like this.  And then you're all in; chips in, and it's do or die.  And then, if anything breaks, it's risky.

Q  So it's a difficult business to break into, in your opinion?

MR. SKAGGS:  Objection. Foundation.

A  It's as tough as it is.  And then, on top of that, you have people shooting arrows at you.

Q  Like Zuffa?

MR. SKAGGS:  Objection. Foundation.

A  Right.

Q  Are you aware that Zuffa acquired the World Fighting Alliance?

MR. SKAGGS:  Objection. Foundation.

Q  In about 2006?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

246

OTTO
  MR. SKAGGS: Leading.
  A  I know there is -- was a maybe three or four companies they acquired.
  Q  World Extreme Cage Fighting?
  MR. SKAGGS: Objection.
  A  Yes, WEC.
  Q  So you're aware that Zuffa acquired WEC?
  MR. SKAGGS: Objection. Foundation.
  A  At the time, yes.
  Q  And you're aware that Zuffa acquired Pride in 2007?
  MR. SKAGGS: Objection. Foundation.
  A  Yes.
  Q  Do you have an opinion about whether Zuffa's acquisition of Pride and WEC and WFA, in or about 2006 or 2007, made it more difficult or less difficult to compete with the UFC?
  MR. SKAGGS: Objection. Calls for speculation, and

247

OTTO
irrelevant.
  A  Well, you tell me. If I need to go get fighters that are bigger names, they're not in the woods somewhere up, in a tree, hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter.
  So I have to go all the way down to the gym level and go find a new gym rat that has talent and build them up and start from scratch. So, if you buy all the talent, your chances of finding Conor McGregor are slim to none; this one is out of town.
  Q  Is that, you believe, what Zuffa was engaged in, in part, in buying all of these companies?
  MR. SKAGGS: Objection. Calls for speculation. Leading. Foundation.

248

OTTO
  A  From a strategic standpoint if you have the capital to do it, I understand why they would do it. If that's, in fact, why they did it, I understand why they did it.
  But to directly answer your questions, Does it limit your fight pool? Yes. For free agents, yes.
  Q  For rivals?
  A  Yes.
  Q  Did Zuffa ever counter-program any of IFL's events?
  MR. SKAGGS: Objection.
  Q  Meaning, put up a Zuffa event or UFC event counter to an IFL event?
  MR. SKAGGS: Leading. Foundation.
  A  I do recall that. I don't know the specific event or the date or the year, but I do know that it may have crossed paths maybe once or twice. It could have been coincidental. Maybe not. I do remember some talk about that, or I do -- it directly relates to

249

OTTO
our season being exposed ahead of time, so I know that there was talk about that.
  Q  That Zuffa might have decided to put out an event counter to an IFL event in order to make sure that the IFL event was not as successful as it otherwise might have been?
  MR. SKAGGS: Objection. Leading. Foundation.
  A  Correct. And there is one more thing to that. Like -- and, again, this is just my opinion, okay? That if -- let's say I book something on a Saturday night in Dallas, Saturday night, midmonth. If another MMA event, let's say, the UFC, was two weeks before that or a week before that, not even on the same night, that arena could frown on that because it's, like, saturated, like, Oh, we just had an event there. I don't know. We're not going to sell as much Coca-Cola and popcorn; who's going to show up.

**Page 250**

```
1    OTTO
2        Okay.  So you have that kind
3    of effect, but again, that's just my
4    opinion from a business standpoint.
5    So -- but I do recall I know that they
6    had our schedule, because everybody and
7    their mother had it.  And I do recall
8    there was conflicting times.
9        Q   Did the IFL pay the health
10   benefits of its fighters?
11       A   Yep.  Yes.
12       Q   How did you go about -- what
13   was the nature of the benefits offered
14   by the IFL to fighters?
15       A   Well, we had an event policy,
16   twofold, that if anyone was ever
17   injured as a fighter in the event --
18   and then also people in the stands
19   sometimes fight, so you had that event
20   insurance for the, like, the Jets and
21   Phillies fans -- I'm just kidding.  And
22   the Raiders.
23       So we would have event
24   insurance that night.  And then, also,
25   every single time somebody was injured,
```

**Page 251**

```
1    OTTO
2    legitimately injured, whether it was
3    practice or whether it was in a fight,
4    or whether they lost a tooth or whether
5    they broke a nose or whether they
6    cracked an orbital or whatever the
7    situation was, we sent them to the
8    emergency room, and we paid for that in
9    full ourselves, every time.
10           MR. CRAMER:  All right.
11       Thank you.  I have no further
12       questions.
13           THE WITNESS:  Uh-huh.
14           MR. SKAGGS:  I need to take a
15       look at this.  Maybe 15 minutes;
16       does that work?
17           MR. CRAMER:  Sure.
18           MR. SKAGGS:  Cool.
19           VIDEOGRAPHER:  The time now
20       is 2:37.  Going off the record.
21           (Whereupon, a brief recess
22       was taken.)
23           VIDEOGRAPHER:  The time now
24       is 2:53.  This marks the beginning
25       of Tape Number 3.  We're back on
```

**Page 252**

```
1    OTTO
2    the record.
3        MR. CRAMER:  I was asked
4    before we finished, what the
5    nature of Exhibit 8 was, the
6    International Fight League Team
7    Member Fight Agreement, or the
8    provenance of it was, and it, for
9    whatever reason, the exhibit
10   version did not have a Bates
11   number, but it was produced to
12   Zuffa or Zuffa's counsel, bearing
13   the Bates range 8B-PLPF0001123
14   through 1141.
15       I don't know why the version
16   that we're using is not a version
17   that was Bates stamped.  I can't
18   answer that question.  But we --
19   apparently, this was sent to Zuffa
20   under cover of a letter, dated
21   January 12, 2007.
22       Over to you.
23   EXAMINATION BY MR. SKAGGS:
24       Q   How are you?  I'm Rory
25   Skaggs.  I'll be asking you some
```

**Page 253**

```
1    OTTO
2    questions.  If you don't understand
3    just let me know, and I will try to
4    rephrase.
5        We talked a little bit about
6    this at the beginning, but you said you
7    had probably met the named plaintiffs
8    in this case at some point.
9        Do you remember any
10   conversations you might have had with
11   them?
12       A   If anything, it would just be
13   like a hello and goodbye.  Maybe they
14   came to my event or I was at an event
15   that they were at, just like introduce,
16   hello.
17       Q   Nothing substantive?
18       A   No conversation but hello or
19   goodbye.  That's it.
20       Q   So we've been talking -- or,
21   you've been talking about your
22   experience with IFL.
23       Just so I'm clear, before you
24   started IFL, you had no previous
25   business experience in MMA promotion;
```