# Exhibit 16

Deposition of Lorenzo J. Fertitta

(March 23, 2017)

(excerpted)

PUBLIC COPY - REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,

Defendant.

Lead Case No. 2:15-cv-01045-RFB-(PAL)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF LORENZO J. FERTITTA

Las Vegas, Nevada

March 23, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 49608



282

situations where all boats rise in a rising tide.
**Q. Generally, however, on the instances where Bellator and UFC events aired at the same time, UFC events did substantially better, did they not?**
A. I don't know the specific events you're talking about, but in general, UFC events do perform better than Bellator events.
**Q. As of 2014, is it your view that fighters were trying to get out of Bellator?**
A. There was a period -- well, I should answer, yes, I believe so.
There was a period at Bellator where the gentleman that ran Bellator previous to Scott Coker didn't seem to have a very good relationship with the fighters that he had, and I was getting word -- and I don't know that I can speak of any specifics other than maybe Eddie Alvarez, who was more of a high-profile fighter -- from fighters that wanted to come over and fight for us in the UFC.
**Q. Do you recall saying that every kid on the roster at Bellator was trying to get out in 2014?**
A. I don't recall specifically, but that sounds like something I would have probably said because, once again, there seemed to be a discontent at Bellator at the time. I'm not sure exactly why or

283

what was going on over there, but just in talking to some people in the industry, there was a general sense in talking to managers that there was discontent over at Bellator.
**Q. Are you familiar with a fighter by the name of Jon Jones?**
A. Yes.
**Q. And did you engage in negotiations with Mr. Jones on behalf of Zuffa?**
A. Yes, I was involved in those negotiations.
**Q. And were you ultimately able to consummate a deal with Mr. Jones?**
A. Yes.
**Q. Do you recall having some pretty strong personal views about Mr. Jones?**
A. Yes.
**Q. They were not positive, correct?**
A. Yes.
**Q. You've been asked a number of times in the past about the unionization of UFC fighters.**
**Do you recall having been asked that from time to time?**
A. Yes.
**Q. Okay. Is it your understanding that UFC fighters are able to unionize?**

284

A. No.
**Q. And that's because they're independent contractors, correct?**
A. My understanding, and I'll be honest, I'm not versed in labor law by any way, shape, or form,

285





PUBLIC COPY - REDACTED



286

that.

As a standard tool for management, we had what we'll call minimums. And what that would mean was that most fighters when they first come in in their first fight in the UFC -- once again, not all but most fighters would sign for what we would call a minimum amount, which I believe is 10,000 to show, 10,000 to win, it could be 12,000 to show, 12,000 to win. I don't know where it is right now.

**Q. Could you look at Exhibit 24, page 33 of**

287

288

289





PUBLIC COPY - REDACTED



[redacted]
Bellator made him a significant offer that ended up being very much to his advantage.
**Q. But he, nevertheless, ended up contracting with UFC, correct?**
A. Yes.
**Q. Would you look at page 75 of Exhibit 24, please. That's at ZFL-1897726.**
A. Yes.
**Q. And if you go down to about the middle of the page, in the first-hand column in the from, there's a text from Dana White to your 6097 number,**

**that's February 25, 2014 at 7:00 and 4 seconds p m.**
**Do you see that?**
A. I do.
**Q. And as you read across, it seems to refer to negotiations that you had with a Melendez and another dude.**
**Do you have an understanding of what Mr. White is referring to there?**
A. Yes.
**Q. What is he referring to?**
A. He's referring to -- I believe he's referring to Eddie Alvarez who was a Bellator fighter.
**Q. He would be the other dude?**
A. Eddie, I'm assuming, was the other dude because he had done the same thing but in Bellator where he had decided to fight out the last contract in Bellator and test the free agency market.
**Q. And Mr. White's text continues through the next line. Do you see that?**
A. Yes.
**Q. I'll read the two texts for you. It says:**
**"Bro, you know I love you to fuckin' death as it is, but what you pulled off this week with Melendez**

**and 'other dude' is fuckin' badass. Fuckin' cut throat nasty business like you see in the movies. Good shit, homie. Congrats."**
**And what's your response there? Would you read that, please.**
[redacted]
**Q. All right. I think -- why don't we take a break. We're coming to a close on our record time.**
THE VIDEOGRAPHER: We're going off the record at approximately 5:26 p m.
(A recess was taken.)
THE VIDEOGRAPHER: We're going back on the record. The time is approximately 5:37 p m.
MR. DELL'ANGELO: So we'll note for the record that in light of counsel's objections about the introduction of publicly available documents that were not produced in discovery, the fact that the

Mercer issue has not been resolved and that we have not received a privilege log, we're not going to close the deposition, but we don't have any further questions subject to those issues.
MR. ISAACSON: I will note that the objection to which you referred to, I did not -- I did not stop you from asking any of your questions on the basis of that objection in all of your questions. You had the ability to ask all of your questions.
Are you done?
MR. DELL'ANGELO: Yes.
MR. ISAACSON: Okay.
THE VIDEOGRAPHER: No further questions from anyone?
MR. ISAACSON: I'm going to just ask a few questions while we're here.

EXAMINATION

BY MR. ISAACSON:
**Q. Do you have Exhibit 29 -- actually, Exhibit 27, sir?**
A. Yes.
**Q. Exhibit 27 was an article that you were shown with comments about Dana White and Quinton "Rampage" Jackson, and you were asked to look at the**

PUBLIC COPY - REDACTED