# Exhibit 22

Deposition of Paul Oyer

(November 29, 2017)

(excerpted)

PUBLIC COPY

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
 )
       Plaintiffs, )
 )
       vs. ) Case No.
 ) 2:15-cv-01045-RFB-(PAL)
 )
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
 )
       Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PAUL OYER

Washington, D.C.

November 29, 2017

8:36 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No: 52564

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

14

1        PAUL OYER - HIGHLY CONFIDENTIAL
2    of microeconomic analysis?
3        A.  It's a well-respected intermediate micro
4    textbook.
5        Q.  Anything in particular about the textbook
6    that you feel is unreliable in any way?
7        A.  I just haven't read -- read it in its
8    entirety.  So I certainly have no -- I can't vouch
9    for every sentence in this book.
10       Q.  Okay.  But it's a standard textbook?
11       A.  Yes.
12       Q.  Okay.  All right.  Let me introduce another
13   exhibit.  This will be Exhibit No. 2.
14              (Oyer Exhibit 2 was marked as
15               requested.)
16   BY MR. DAVIS:
17       Q.  Are you familiar with this document?
18       A.  Intimately.
19       Q.  Is this the report you prepared in this
20   case?
21       A.  Based on the cover, I would say yes.  I'm
22   going to assume the rest of it is the rest of what I
23   gave you.
24       Q.  If at some point you come to the conclusion
25   this is not your report, please let me know

15

1        PAUL OYER - HIGHLY CONFIDENTIAL
2    immediately.
3        A.  I'm going to trust you on that one.
4        Q.  And could you turn to page 18, please.  Is
5    that your signature?
6        A.  Yes.
7        Q.  Okay.  I just want to walk through now some
8    basic definitions so that we are talking about the
9    same thing when we're talking to each other today.
10   With that in mind, let's begin with the definition
11   of the marginal product of labor as you use that
12   term.
13          So if you turn to page 5, paragraph 15, the
14   last line, you seem to indicate that the marginal
15   product of the worker's labor is "The amount the
16   firm is willing to pay the worker" -- scratch that.
17   You say that the firm is willing to pay the worker
18   the additional value that the employee creates?
19       A.  Right.
20       Q.  Is that a reasonable definition of marginal
21   product of labor?
22       A.  So I would say the marginal product of
23   labor is the value -- the additional value that the
24   employee creates.
25       Q.  Great.  Great.  And then it's a separate

16

1        PAUL OYER - HIGHLY CONFIDENTIAL
2    notion that the firm in a competitive market is
3    willing to pay that amount?
4        A.  Exactly.
5        Q.  Perfect.  Okay.
6           I want -- a little clarification is
7    necessary here because it seems that the way you're
8    using marginal product of labor is the same as some
9    economists use the term the marginal revenue product
10   of labor.
11       A.  Uh-huh.
12       Q.  Is it fair to say that you are equating the
13   two in this context?
14       A.  I'd have to see the context in which others
15   use it, but I would use them -- I don't happen to
16   use the term marginal revenue product of labor, but
17   I would -- as far as I can think, those would be
18   equivalent.
19       Q.  Okay.  Let me just put a slightly finer
20   point on it.  Again, this is just so that when we're
21   talking to each other we're talking about the same
22   thing.  If we could stipulate that sometimes
23   economists would say that the marginal product of
24   labor is an output measure, and then when that is
25   multiplied by the marginal revenue of output you

17

1        PAUL OYER - HIGHLY CONFIDENTIAL
2    have the marginal revenue product of labor.  Does
3    that make sense what I just said to you?
4        A.  I didn't actually follow that.  I'm sorry.
5        Q.  That's quite all right.
6           Sometimes the marginal product of labor is
7    used as an output measure, not a revenue measure,
8    and so then the distinction -- there is a
9    distinction, and it seems to me in reading your
10   report that you were treating the marginal product
11   of labor as equal to the marginal revenue product of
12   labor and not an output measure?
13       A.  Right.  So I would think of the marginal
14   product of labor as being all the additional
15   revenues created by the employee minus all the costs
16   having that employee incurs other than the
17   compensation you pay.  So that might be a
18   distinction.  I'd have to go back to my old
19   definitions of marginal revenue product of labor.
20   So, for example, if bringing on a -- if I hire you
21   and I have to pay -- I have to also get a computer
22   for you to be able to work --
23       Q.  Right.
24       A.  -- I would imagine that the marginal
25   revenue product of labor would not net out that

5 (Pages 14 to 17)

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

18

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    computer, whereas my definition of marginal product
3    of labor would be all the additional revenue and
4    costs created by having you work for me.
5        Q. I think we're speaking about the -- I think
6    we're speaking about the same thing. I think the
7    distinction that is sometimes drawn is that the
8    marginal product of labor is sometimes used in terms
9    of output units other than revenue?
10       A. Uh-huh.
11       Q. It could be sneakers, for example, and then
12   the term marginal revenue product is used to convert
13   that into dollars, and I just want to be clear that,
14   if I understand you correctly, when you say marginal
15   product of labor you're talking in terms of revenue,
16   dollars?
17       A. That's right. I'm talk- -- I'm talking in
18   terms of net costs and benefits, including the
19   revenue brought in minus the additional costs other
20   than compensation related to having the employee
21   work there.
22       Q. Measured as dollars?
23       A. All measured in dollars.
24       Q. Okay. Good. Then we'll use marginal
25   product of labor --

19

1    PAUL OYER - HIGHLY CONFIDENTIAL
2        A. Sounds good.
3        Q. -- in that way.
4            Even if you agree with me, which I very
5    much enjoy, just if you could wait until the end of
6    what I've said to say that so the court reporter can
7    keep a tidy record. Thank you.
8        A. Fair enough.
9        Q. Okay.
10           While we're here we had -- I had said in
11   that same sentence, according to your report, a firm
12   is willing to pay a worker the additional value that
13   the employer creates in a competitive market; is
14   that correct?
15       A. I believe you said "employer" when you
16   meant to say "employee."
17       Q. Let me say it again so we have it right.
18       A. Got it.
19       Q. You say -- and I'll just read it -- "The
20   firm is willing to pay the worker the additional
21   value that the employee creates in a competitive
22   market"; is that correct?
23       A. That's right.
24       Q. Great. All right. Now let's define a
25   competitive market for labor, if we could.

20

1    PAUL OYER - HIGHLY CONFIDENTIAL
2            MR. WIDNELL: I apologize. I just wanted
3    to object. I think you slightly misstated what's in
4    the report. I just wanted to get that objection to
5    your last question.
6            MR. DAVIS: Okay.
7    BY MR. DAVIS:
8        Q. Let's confirm the definition of a
9    competitive market for labor. If we look at
10   para- -- at page 5, paragraph 18, the second
11   sentence, you speak about monopsonistic labor
12   markets as one in which a firm has power over --
13   market power over its workers. Would it be fair to
14   say that a competitive labor market is one in which
15   a firm has no market power over its workers?
16       A. Yes.
17       Q. And that a monopsonistic labor market is
18   one in which a firm has monopsony power, is one in
19   which the firm has power -- market power over its
20   workers?
21       A. Yes.
22       Q. All right. If we could turn to page 4,
23   paragraph 8. You describe labor share as the
24   percentage of a firm's total revenues paid out as
25   workers' compensation; is that correct?

21

1    PAUL OYER - HIGHLY CONFIDENTIAL
2        A. I do.
3        Q. Would you be comfortable using either the
4    label "labor share" or "wage share" to capture that
5    notion?
6        A. Okay.
7        Q. Okay. So when I say or you say "labor
8    share/wage share," for the rest of the deposition,
9    that's what we mean. Okay?
10       A. Okay.
11       Q. Great.
12           And in paragraph 12 I believe you have a
13   criticism of Dr. Singer that he uses labor share or
14   wage share as a benchmark for competitive markets;
15   is that right?
16       A. Labor share -- well, nothing in
17   paragraph 12 specifically talks about Dr. Singer's
18   report. It's a statement about labor share.
19       Q. Okay. Paragraph -- let's look at
20   paragraph 13. In paragraph 13 you are -- am I
21   correct that you're suggesting a criticism of
22   Dr. Singer that he uses labor share or wage share as
23   a benchmark for competitive markets?
24       A. That's not what the paragraph says
25   specifically, but that is the -- that's -- what you

6 (Pages 18 to 21)

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

```
                                                22
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2    just said is consistent with my argument.
 3         Q.  Okay.  Consistent with your opinion?
 4         A.  Uh-huh.
 5         Q.  Okay.  And --
 6         A.  Yes.
 7         Q.  All right.
 8         A.  By about 4:00 p.m. I will have gotten that
 9    figured out.
10         Q.  Not at all.
11              And then paragraph 12, the last sentence
12    you say "Labor share is driven by overall firm
13    revenues which includes many factors beyond the
14    control of and related to the value of the worker."
15    That is your view of the nature of labor share; is
16    that correct?
17         A.  Right.  Yes.
18         Q.  Okay.  All right.
19              Let's talk about level of pay.  So if we
20    look at page 5, paragraph 17, in talking about level
21    of pay you say "The level of the individual's
22    pay" -- I'm eliminating some words for simplicity.
23    "The level of the individual's pay is the relevant
24    benchmark and is a natural proxy of the worker's
25    marginal product of labor"; do you see that?
```

```
                                                23
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2         A.  I do.
 3         Q.  And that's consistent with your opinion?
 4         A.  Yes.
 5         Q.  And you also note that labor economists
 6    sometimes use the natural log of a worker's
 7    compensation or level of pay rather than the level
 8    of pay itself; is that correct?
 9         A.  That's correct.
10         Q.  Okay.  Can we use "wage level" to mean
11    level of pay or its natural log just for clarity of
12    our conversation today?
13         A.  Yes.
14         Q.  Okay.  And if there's a distinction at some
15    point between level of pay and the natural log of
16    level of pay, I'll ask you to draw that distinction.
17    Is that okay?
18         A.  Yes.
19         Q.  Okay.  All right.
20              I think we've been over this, but just
21    to -- just to confirm, the last sentence of
22    paragraph 15 it says "The firm is willing to pay the
23    worker the additional value that the employee
24    creates with the assumption that the market is
25    competitive."  That means that in a competitive
```

```
                                                24
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2    labor market the firm is willing to pay the worker
 3    the marginal product of his or her labor, yes?
 4         A.  Sorry.  I hate to be picky, but can you say
 5    that again?
 6         Q.  No, please.
 7         A.  Can you read that back to me?  Either
 8    way.
 9              MR. DAVIS:  Could you read that question
10    back, please.
11              (Record read as requested.)
12              MR. WIDNELL:  Objection, misstates the --
13    the report.
14    BY THE WITNESS:
15         A.  So the reason I asked her to read it back
16    is you put in a caveat that I'm going to quibble
17    with and it's like this is not that important, but
18    let's be careful.  You said in a competitive labor
19    market the firm is willing to pay the worker up to
20    his or her marginal product of labor.  In any labor
21    market the firm is willing to pay the worker up to
22    his or her marginal product of labor.  So in a
23    monopsonistic labor market they might not have to.
24    No firm wants to pay anybody their marginal product
25    of labor.  I want -- I want to pay you zero, right?
```

```
                                                25
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2         Q.  Okay.
 3         A.  In a competitive labor market you have --
 4    you have to pay the person their product -- marginal
 5    product of labor because somebody else will if you
 6    don't.  Or at least you have to pay -- at the very
 7    least you have to pay them their marginal product of
 8    labor at the next best opportunity for that person.
 9         Q.  Okay.  Good.
10              So I just want to be clear about this.  So
11    you say firms are always willing to pay the worker
12    the additional value that the employee creates,
13    period.  However, in some markets the firm has to
14    pay that amount, competitive markets, and in other
15    markets the firm may not have to pay that amount,
16    monopsonistic labor markets, for example.  Is that
17    right?
18         A.  I agree.
19              MR. WIDNELL:  Objection, misstates.
20    BY THE WITNESS:
21         A.  I basically agree with what you said, yes.
22         Q.  What part do you disagree with?
23         A.  Oh, I don't think I disagree with any of
24    it.  So I agree with it.
25         Q.  Okay.  Good.
```

7 (Pages 22 to 25)

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

**Page 26**

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    Q. Can you explain -- you started to do this
3    and I just want to make sure I understand. Why is a
4    firm forced in a competitive labor market to pay the
5    workers their marginal product of labor?
6       A. So in the most basic, truly competitive
7    labor market you can imagine labor is just a pure
8    commodity.
9       Q. Okay.
10      A. And so I can go be a professor, a teacher
11   at any school and I create as much value for all of
12   those different schools. So Stanford offers me a
13   salary and, you know, anytime I want I can call up
14   Berkeley and say what will you pay for me to move
15   over there, and they'll tell -- they'll make an
16   offer based on their expectation of my value. And
17   if the market is competitive, that means that over
18   time with some information gathering we can all
19   figure out how much marginal value I would bring.
20   So Berkeley will end up offering me, after some back
21   and forth, my marginal product of labor, and
22   Stanford essentially has -- has to at that point
23   choose whether to pay me my marginal product of
24   labor or let me go. As long as -- as long as my
25   marginal product of labor is as high or higher than

**Page 27**

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    my salary, they're going to go ahead and offer me
3    that. So it's just like any other competitive
4    market. We end up bidding up to the -- we end up
5    bidding up to the point where cost equals revenue --
6    marginal cost equals marginal benefit.
7       Q. Okay. I think I understand. I just want
8    to make sure I get the gist of what you just said.
9       A. Sure.
10      Q. So it sounds like in a competitive labor
11   market the competition between either present or
12   prospective employing firms forces a firm to pay up
13   to the marginal product -- well, to pay the marginal
14   product of labor of a worker; is that a fair
15   summary?
16      A. That's a fair summary.
17      Q. Okay.
18         Now, in -- on page 5, paragraph 18 you're
19   discussing a monopsonistic labor market, and in the
20   second sentence you say, in part, "In a
21   monopsonistic labor market where a firm has market
22   power over its workers the firm will pay its workers
23   less than their marginal product of labor." Why is
24   that?
25      A. Well, again, come back to my example I gave

**Page 28**

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    a minute ago about Stanford and Berkeley. If
3    Stanford is paying me X dollars but I'm actually
4    worth 2X to Stanford, like my -- and X has to be
5    greater than zero for this to work.
6       Q. It's good you can say this with no
7    bitterness in your voice.
8       A. Stanford has been very good to me. I have
9    no complaints, for the record.
10         Okay. So if -- if I'm producing 2X and
11   Stanford is only paying me X, in the world we talked
12   about before Berkeley is offering me -- first
13   they're offering me 1.1 times X and then we're --
14   you know, the bidding keeps going until we get to
15   2X, which is my marginal product of labor. But
16   without Berkeley there's no reason that that has to
17   happen. So that's what market power is all about,
18   the absence of that outside bidder.
19      Q. Okay. And I think you said before that in
20   drawing a distinction between what firms are willing
21   to pay and what they have to pay and what they will
22   pay that all firms want to pay as little as they
23   can. However, when they don't have to -- or not
24   however. And so when they don't have to, when
25   there's not competition, the absence of that

**Page 29**

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    competition allows them to pay lower amounts than
3    the marginal product of labor; and given that
4    option, that's what they'll do. Is that a fair
5    statement?
6       A. Yeah, I think so.
7       Q. Okay. What effect, if any, would standard
8    economics predict would be the effect on the number
9    of workers hired when a firm has monopsonistic power
10   and uses that to pay less than the marginal product
11   of labor to its workers?
12      A. So let's stop and think about that. So if
13   the product market is -- see, we'd have to think
14   this through carefully, but if the product market is
15   competitive, then I would presume that by
16   lowering -- by being able to lower the cost of the
17   input you would -- you would -- on the one hand the
18   firm's demand would be higher so that would lead you
19   to think that the numbers would go up; but by the
20   same token, if the wage is -- if a monopsonistic
21   wage is lower than a competitive market wage, so
22   that's going to push labor demand -- I'm sorry --
23   labor supply down.
24         So I don't know that -- off the top of my
25   head, I can't tell you that there's a -- that

8 (Pages 26 to 29)

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

Page 30

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  there's a simple answer to that. I know that -- I
3  know that in certain contexts we talk about when
4  monopsony -- when monopsony is undone, when a wage
5  is pushed up in a monopsonistic market that leads to
6  increases in labor supply that lead to an increase
7  in employment despite the price of wages going up,
8  but I think it can go the other way too.
9       So I'd have to think about it, but
10 my off-the-top-of-my-head answer is that you can't
11 make an assumption one way -- you cannot make a firm
12 prediction one way or the other. It depends on the
13 elasticity of the supply and the demand curves for
14 labor.
15     **Q. Let's -- let's simplify the hypothetical**
16 **slightly and see if that makes it easier to -- to**
17 **give a clear prediction. Let's assume the output --**
18 **the supply and demand curves -- hmm. Let me think**
19 **about this.**
20     **Let's assume the output in the product**
21 **market is not sensitive to cost.**
22     A. I'm not sure what that means. I mean --
23     **Q. Supposing there's a monopoly in the output**
24 **market.**
25     A. Uh-huh.

Page 31

1  PAUL OYER - HIGHLY CONFIDENTIAL
2     **Q. So the ordinary analysis of supply and**
3  **demand wouldn't play out as would occur in a**
4  **competitive market. Would that change your answer**
5  **in terms of the effect of a firm -- a monopsonistic**
6  **firm paying workers below the marginal product of**
7  **their labor?**
8     A. Okay. But in a monopsonistic labor -- in a
9  monopsonistic product market --
10     **Q. Yeah.**
11     A. -- so now you increase the wage which
12 increases the cost to the firm of -- if we -- sorry.
13 If we go from monopsonistic to nonmonopsonistic
14 labor market --
15     **Q. Do you mind if I -- what if we turn that**
16 **around.**
17     A. Okay.
18     **Q. So go from competitive to monopsonistic.**
19     A. Sure.
20     **Q. It should be the same theoretically, but**
21 **just to keep it fair.**
22     A. So that's going to lower the wage --
23     **Q. I'm sorry. I'm at least as guilty as you**
24 **are, but let's try to slow down.**
25     A. Yep. Okay. Are you ready?

Page 32

1  PAUL OYER - HIGHLY CONFIDENTIAL
2     So what we want -- what you want to think
3  about is a world where we have a competitive labor
4  market and then some firm starts to have the ability
5  to exert monopsony power on its workers and that
6  firm has monopsonistic power in the product
7  market.
8     **Q. Yes.**
9     A. So it lowers -- it starts -- it lowers the
10 wage and if nothing else changed, it -- if it didn't
11 change its quantity it would increase its profits
12 because everything has -- nothing has changed. It's
13 still charging the same in the product market.
14     Now, having said that -- now, the world
15 isn't that simple because once we lower the cost to
16 the firm it actually will lower its price in the
17 product market too. Even if it's a monopsonistic
18 firm it's going to lower its price in the product
19 market because it's always setting its marginal
20 revenue equal to its marginal cost. So its marginal
21 cost just went down. So it's going to lower its
22 price. It's going to want to sell more because its
23 profit -- its unit profits went up.
24     **Q. So you're saying a monopolist will set its**
25 **marginal costs equal to its marginal revenue?**

Page 33

1  **PAUL OYER - HIGHLY CONFIDENTIAL**
2     A. Sure. All firms set their marginal revenue
3  equal to their marginal cost. I have to caveat when
4  I say that. I could come up with some odd
5  situations where a firm doesn't set its marginal
6  revenue to its marginal cost. To a first
7  approximation, all firms set their marginal revenue
8  equal to their marginal cost.
9     THE REPORTER: You have to slow down,
10 please.
11 BY MR. DAVIS:
12    **Q. So even when you're making a small point**
13 **that you want your students not to write down,**
14 **please do speak slowly because our poor stenographer**
15 **has to write everything down.**
16    **All right. Let's walk through a**
17 **hypothetical. On page 5, paragraph 16 you use the**
18 **example of a salesperson, right? Do you see that?**
19    A. Yes.
20    **Q. Great. I want to use that example to**
21 **clarify some basic concepts. Is it fair to say that**
22 **in a competitive market we would expect the**
23 **salesperson's compensation to equal the marginal**
24 **product of his or her labor?**
25    A. Yes.

9 (Pages 30 to 33)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

**Page 34**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2     Q. To simplify the example and to make it more
3  concrete, please assume the salesperson sells
4  widgets -- I apologize for the lack of creativity --
5  and gets paid purely on commission. Okay. Let's
6  say the commission is 10 percent of the sales price
7  of a widget and, again, assume the labor market is
8  competitive. So that would mean that the marginal
9  product of labor of the salesperson is 10 percent of
10 the revenue generated from the sale; is that
11 correct?
12    A. I observe a firm that pays its salespeople
13 10 percent as a commission -- their compensation
14 structure is the salesperson has -- their pay is
15 zero plus 10 percent of all revenue generated
16 through their sales?
17    Q. Correct.
18    A. And so -- okay. So now what was your
19 question about that?
20    Q. Would that mean that the marginal product
21 of labor of the salesperson is 10 percent of the
22 revenue generated from the event, which is a sale?
23    A. Right. So it's a little more -- that's --
24 it's much more -- I know you wanted to keep it
25 hypothetical and simple, but, of course, the world

**Page 35**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  is much more complicated than that. So the
3  marginal -- I'm going to let her catch up. So the
4  marginal product of labor of that salesperson in
5  equilibrium over some period of time is such that
6  they're paid their marginal product of labor. That
7  doesn't mean that on every single unit that their
8  individual marginal product of labor was exactly
9  10 percent.
10    Q. To use your language from before, is it
11 fair to say to a first approximation that the
12 marginal product of the salesperson is 10 percent of
13 the revenue generated from the sale?
14    A. I would put it slightly differently.
15    Q. Please.
16    A. If we're in a competitive labor market and
17 the person is being paid 10 percent of their -- a
18 commission of 10 percent, then I would say that on
19 average over a period of time the person's marginal
20 product of labor is 10 percent of the revenue they
21 generate.
22    Q. Okay. And to be clear on the slippage, the
23 reason you say on average is in the real world a
24 firm may not be able to calculate exactly the
25 marginal product of labor on each sale, but it can

**Page 36**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  calculate that on the whole this salesperson's
3  marginal product of labor is 10 percent of the
4  revenue it generates from these various revenue-
5  generating events; is that fair to say?
6       MR. WIDNELL: Objection, form.
7  BY THE WITNESS:
8     A. That's more or less fair to say. I'm going
9  to put it slightly differently again.
10    Q. Okay.
11    A. Because when we talk -- there's a
12 natural -- there's a natural confusion that comes
13 out of using sales commissions here, which is that
14 the marginal -- let's say the marginal widget you're
15 thinking, okay, the salesperson gets 10 percent, so
16 that's their marginal product of labor. But when
17 deciding whether or not -- but when we think about
18 what's the marginal product of labor of the
19 employee -- when thinking about what's the marginal
20 product of labor of the employee, we want to think
21 about the firm making a decision do I hire this
22 person or don't I hire this person; and in a
23 competitive labor market, they're going to hire this
24 person and the amount they pay them over some period
25 of time is going to approximate the net benefits of

**Page 37**

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  bringing that person to work there.
3     Q. And in this particular case, though -- I
4  think I understand what you just said, but I'm not
5  sure it speaks directly to the issue I'm trying to
6  clarify.
7        So the firm wants to pay the net benefits
8  to the firm and that is the marginal product of
9  labor, and the firm's best estimate of that amount
10 in this instance is, on average, 10 percent of the
11 revenues generated by these event -- sorry --
12 revenue-generating events; is that fair to say?
13       MR. WIDNELL: Objection to form.
14 BY THE WITNESS:
15    A. I'm sorry, but I'm going to restate
16 slightly again.
17    Q. Okay.
18    A. First of all, you said the firm will --
19 wants to pay. The firm does not want to pay the
20 marginal product of labor. They're willing to pay
21 the marginal product of labor. They would prefer to
22 pay zero.
23    Q. Of course.
24    A. The other -- the other slight way I would
25 think about it is we mix up -- this commission is --

10 (Pages 34 to 37)

**PUBLIC COPY**

86

1      PAUL OYER - HIGHLY CONFIDENTIAL
2      Q. That is an okay definition?
3      A. That's an okay definition.
4      Q. Do you know whether Zuffa pays fighters
5   salaries?
6      A. So I know that they guarantee people
7   certain amounts for each fight and I know they have
8   contracts that specify some number of fights and
9   that sort of thing. I can't remember whether
10  there's any promise of how many fights will be in a
11  period of time.
12     Q. Do you know if they pay -- whether Zuffa
13  pays any fighters even if they don't fight?
14     A. Yeah. I don't remember that. I don't -- I
15  don't know.
16     Q. So presumably you don't know what
17  percentage, if any, of fighters receive salary from
18  Zuffa?
19     A. Yeah. I guess that -- I guess I don't know
20  that.
21     Q. Okay. Do you know whether Zuffa pays
22  fighters for training?
23     A. I don't know that for sure. I assume they
24  don't.
25     Q. You assume they don't, but you don't know?

87

1      PAUL OYER - HIGHLY CONFIDENTIAL
2      A. Right.
3      Q. Okay. Do you know how much -- do you know
4   the structure of the payments that Zuffa makes to
5   fighters for particular fights?
6      A. I have a pretty good general sense for it.
7      Q. What would that be?
8      A. That there's usually a guarantee, you know,
9   just if you engage in a fight you'll be paid X
10  dollars. There's usually a win pool, I believe is
11  the term. I could be wrong about the exact
12  terminology there.
13     Q. And what, to your understanding as you sit
14  here now, is a win pool? How does that work?
15     A. It's an extra payment if you win your
16  fight.
17     Q. Okay.
18     A. And it's usually equal to the show-up fee,
19  if I'm -- if I remember correctly.
20     Q. And are there any other payments of which
21  you're aware?
22     A. There are. Although I believe for the
23  majority of fighters and the majority of fights what
24  I just said is all there is. I could be wrong about
25  that. There are definitely examples of fighters who

88

1      PAUL OYER - HIGHLY CONFIDENTIAL
2   get a share of the Pay-Per-View. There's another --
3   and then there's a couple of other bonuses, some of
4   which are subjective, some of which are more
5   guaranteed along the lines of if you are fighter of
6   the night you get some amount of money.
7      Q. Okay. Do you know whether Zuffa provides
8   healthcare insurance to his fighters?
9      A. I don't know for a fact, but I would
10  imagine given that they're independent contractors
11  that they do not.
12     Q. Okay.
13        Do you think wage share is ever an
14  appropriate benchmark for competitive pay?
15     A. I can't think of an example right here
16  where I would say it was an appropriate benchmark.
17     Q. And that's true, as you sit here now at
18  least, for all workers in all circumstances?
19     A. Yes.
20     Q. And is that true even if compensation, say,
21  for a salesperson is set at a percentage of revenue
22  generation?
23     A. Yes.
24     Q. So to generalize a little bit to make sure
25  I'm clear, the form that compensation takes, for

89

1      PAUL OYER - HIGHLY CONFIDENTIAL
2   example, a percentage of revenue generation, doesn't
3   necessarily determine the right approach to how a
4   labor economist should analyze that compensation; is
5   that fair to say?
6      A. I don't understand the question in the
7   sense that you seem to be equating the commissions a
8   salesperson is paid to their labor share in the
9   sense that Singer used the term or wage share.
10     Q. And what would be -- what would be the
11  difference between, in your mind, wage share or
12  labor share as you use it in your opinion and paying
13  a salesperson a percentage of a revenue- generating
14  event such as a sale?
15     A. Right. So one is a share of a large event
16  to which the one person was potentially a very minor
17  party and the other is tied to that person's
18  individual output.
19     Q. So there's an empirical question that
20  matters here about how closely a particular worker's
21  output is tied to the generation of revenue; is that
22  fair to say?
23     A. Well, I'm not -- I think what you're --
24  there's an empirical question that you just said
25  that relates to -- that makes it so that our

23 (Pages 86 to 89)

**PUBLIC COPY**

90
1        PAUL OYER - HIGHLY CONFIDENTIAL
2   discussion of salespeople is, in my mind, a wholly
3   different thing than any discussion of -- of MMA
4   fighters.
5        Q. So let's stick to the salespeople for a
6   moment, though.
7        A. Okay.
8        Q. You're drawing that connection, but my
9   question didn't.
10       A. Okay. Okay.
11       Q. So just sticking to the salesperson, right.
12  Let's take a salesperson who is paid a percentage of
13  revenue generated by an event, a sale, and let's
14  assume that salesperson is paid purely in that way,
15  on commission.
16       A. Uh-huh.
17       Q. Would it be appropriate to use wage share
18  as a labor economist to analyze the marginal product
19  of labor of that salesperson?
20       A. No.
21       Q. And what I was doing is then just drawing
22  the more general point, which I think you're
23  agreeing with implicitly but I want to make
24  explicit.
25       A. Okay.

91
1        PAUL OYER - HIGHLY CONFIDENTIAL
2        Q. And that means that there isn't necessarily
3   a parallel between the form that compensation takes
4   in the case of a salesperson, a percentage of the
5   revenue from a revenue-generating event, and on the
6   other hand the appropriate form of analysis that a
7   labor economist would use in analyzing the marginal
8   product of labor; is that correct?
9        A. Yeah, I think I would agree with that.
10           MR. DAVIS: Why don't we take a break.
11           THE VIDEOGRAPHER: Going off the record at
12  10:47.
13           (A short break was had.)
14           THE VIDEOGRAPHER: We are going back on the
15  record at 11:01. This begins disk No. 3.
16  BY MR. DAVIS:
17       Q. Okay. So I'm looking at your report, which
18  is Exhibit 2, I believe. You probably don't need to
19  look at it for this question, but I'm looking at
20  page 24 where you list yourself as a referee for
21  various journals, primarily it seems economic
22  journals. And so you do serve as a referee for
23  numerous economic journals; is that correct?
24       A. Yes.
25       Q. Is one of the things you do as a referee

92
1        PAUL OYER - HIGHLY CONFIDENTIAL
2   for these journals review submissions to the
3   journals?
4        A. Yes.
5        Q. Can you briefly describe the process
6   through which you go for evaluating -- in evaluating
7   a submitted article?
8        A. So do you want me to talk about my role as
9   a referee, which is what you've pointed to, or as a
10  journal editor? Those are very distinct things.
11       Q. So as a referee when you receive an article
12  that you are going to assess, what is your process
13  for assessing whether that article might be
14  appropriate for publication or inappropriate for
15  publication?
16       A. So the first thing I do when I receive a
17  request from a journal to referee a paper is I look
18  quickly over the paper to see if it's something
19  about which I have an appropriate expertise.
20       Q. Okay.
21       A. So often I'll get a paper to referee and
22  I'll look at it -- I should say on occasion I will
23  get a paper to referee and I'll look at it, and I
24  will say I don't know enough about this topic to
25  offer an opinion about whether this paper should be

93
1        PAUL OYER - HIGHLY CONFIDENTIAL
2   published or not.
3        Q. Okay.
4        A. So that's the first step. Conditional on
5   it's appropriate for me to referee the paper, I will
6   then read the paper. Well, first you tell the
7   journal I will be able to provide you with a
8   refereed report. Some time goes by, which is always
9   longer than the editor wants and longer than you
10  think it's going to be, and you finally sit down,
11  usually on an airplane, and read through the paper
12  carefully and assess it on several -- and then -- so
13  you -- I assess it on several grounds. One is is it
14  correct, is it interesting, is it novel relative to
15  prior research on related topics. Those are the
16  fundamental criteria.
17           And then I write -- and then I write two
18  things. I write what's called a refereed report,
19  which can be anywhere from a paragraph to six pages,
20  in which I say here's what this paper does. These
21  are fundamentally critical things. Even on a
22  wonderful paper there's nothing good in a referee
23  report other than up front you say this is a good
24  paper or something. The rest is entirely critical
25  because that's how you make the paper -- that's the

94

1              PAUL OYER - HIGHLY CONFIDENTIAL
2    job of the referee is to point out the possible
3    flaws.
4          So, like I said, it can be anywhere from a
5    paragraph to pages and pages where you'll say things
6    like -- anything from this paper is derivative of
7    such and such, this paper is so poorly written I
8    don't even know what they're trying to accomplish,
9    and then -- but it can be other things like this
10   paper is really good on balance.  Here are some
11   things to think about, and it can be as little as
12   typos or as big as I think the assumption made here
13   is invalid.  I'd like to see how the results change
14   if you were to change that assumption.
15       **Q. Okay.**
16       A. Sorry.  That's No. 1.  Do you want -- the
17   full evaluation then requires a letter to the editor
18   of the journal because the editor of the journal has
19   to make a decision about what to do.  So you write a
20   letter to the editor of the journal, which is
21   usually just about a paragraph, and it says dear
22   editor, I've read this paper.  I have -- and I --
23   you know, here are -- you just basically at that
24   point say things that you don't necessarily want to
25   say directly to the author, and then you offer a

95

1              PAUL OYER - HIGHLY CONFIDENTIAL
2    recommendation.
3        **Q. Okay.  Okay.  You said you read the**
4    **article -- the paper carefully.  Why carefully?**
5        A. Well, okay.  So I'm going to have to
6    qualify that a little bit.  In any paper where I'm
7    going to recommend that they consider -- seriously
8    consider publishing the paper or where it's
9    possible -- or where I see any possibility that I'm
10   going to do that, then I have to read the paper
11   carefully.  The reason I qualified it is
12   occasionally you'll get a paper and after five
13   minutes to 45 minutes you realize this is just not a
14   good paper.
15       **Q. Okay.**
16       A. And you just write to the editor, and you
17   write a very short referee report explaining the
18   fundamental flaws of the paper, and you move on with
19   your life.
20       **Q. Okay.  Okay.**
21          **How many hours have you spent working on**
22   **this litigation?**
23       A. Off the top of my head I don't know.
24       **Q. Do you have any ballpark sense?**
25       A. More than 20 hours, less than 50 hours.

96

1              PAUL OYER - HIGHLY CONFIDENTIAL
2        **Q. Somewhere between 20 and 50 hours?**
3        A. I believe that's correct.
4        **Q. How many hours did you spend preparing your**
5    **report?**
6        A. The vast majority of what I just said was
7    spent preparing my report.
8        **Q. How many hours did you spend reviewing the**
9    **evidentiary record in this case?**
10       A. I just have no idea.
11       **Q. No idea?**
12       A. I mean, some large fraction of that number
13   I just gave you.
14       **Q. Okay.  When were you retained?**
15       A. I can look that up.  I don't remember.
16       **Q. Any general sense of the month?**
17       A. Late October maybe.
18       **Q. Late October of -- of --**
19       A. 2017.
20       **Q. -- 2017?**
21          **When you said that there's some large**
22   **fraction of the 20 to 50 hours you spent reviewing**
23   **the evidentiary record, by "large fraction" did you**
24   **mean a majority of your time?**
25       A. I don't -- off the top of my head I just

97

1              PAUL OYER - HIGHLY CONFIDENTIAL
2    don't know.
3        **Q. Do you have any sense of the proportions**
4    **between reviewing the evidentiary record and**
5    **drafting the report?**
6        A. I can't say anything reliable about that.
7        **Q. Did you read drafts of any of the -- of any**
8    **of the reports prepared by other experts that have**
9    **been retain by the UFC?**
10       A. Did I read drafts of other experts'
11   reports?
12       **Q. Of experts retained by the UFC.**
13       A. Other experts retained by the UFC.
14       **Q. In this case.**
15       A. In this case.  Are we -- are we discussing
16   this?  I thought we were --
17          MR. CRAMER:  We can know whether he read
18   them.
19          MR. WIDNELL:  Yeah.  So just to be clear,
20   I'm not sure that he -- Professor Oyer understands
21   the stipulation entirely, but you can answer
22   questions --
23          THE WITNESS:  My mistake.
24          MR. WIDNELL:  -- about whether you reviewed
25   a draft or reviewed an actual expert report.  But

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

98

PAUL OYER - HIGHLY CONFIDENTIAL
you do not need to answer questions -- and correct
me if you disagree -- about actual communication
with the -- that went into your preparing your
report.
    MR. DAVIS:  I guess with the -- we can see
if we disagree, but with -- well, why don't we start
with that --
    MR. WIDNELL:  Yeah.
    MR. DAVIS:  -- and then we can move on to
what --
    MR. WIDNELL:  There may just be nuances.
That's sort of a general overview.
    MR. DAVIS:  Fair enough.
BY THE WITNESS:
    A.  I believe I skimmed a copy of Topel's
report after I had drafted my own report.
    Q.  You skimmed it after you drafted your own
report?
    A.  Correct.
    Q.  And do you know whether it was the final
version of the Topel report or a draft of the Topel
report?
    A.  I would imagine it was a draft, but I don't
know for sure.

99

PAUL OYER - HIGHLY CONFIDENTIAL
    Q.  Did you communicate with any of the other
experts retained about the substance of your report
or of theirs?
    A.  No.
    Q.  And you say you reviewed the Topel report
only after you'd completed yours?
    A.  After I had drafted my own report.
    Q.  After you drafted your own report.  Did you
rely on anything in that report in your report?
    A.  I did not.
    Q.  You list materials on which you relied on
pages 26 and 27 of your report.  Did you review any
other materials on which you relied in your report?
    A.  No, I don't think so.
    Q.  Did you speak with any Zuffa employees or
executives in preparing your report?
    A.  No.
    Q.  Did you speak to any MMA fighters in
preparing your report?
    A.  No.
    Q.  Are you familiar with an article -- before
we change subjects, how did you obtain the materials
on which you relied in preparing your report?
    MR. WIDNELL:  I'm going to instruct you per

100

PAUL OYER - HIGHLY CONFIDENTIAL
the stipulation not to specifically address the back
and forth that you had with -- with outside counsel
in preparing.
BY THE WITNESS:
    A.  Okay.  So I think I can pretty safely
address that by just saying that the court documents
were provided to me.
    Q.  Did you select them from a list made
available, or did -- did you simply receive them and
then review them once you'd received them?
    A.  Oh, I -- I selected -- I said I want this,
this, and this.
    Q.  What were you given that allowed you to
select them?  What list did you receive?
    A.  My decisions were mostly based on
reading -- reading the two expert reports that I was
asked to comment on and the complaint.
    Q.  Okay.
    MR. WIDNELL:  Are you asking for a
description of the list that he would have gotten
from us?
    MR. DAVIS:  Just the nature of whether it
was a curated list or the full list of the documents
in the case.

101

PAUL OYER - HIGHLY CONFIDENTIAL
    MR. WIDNELL:  That's a description, right?
    MR. DAVIS:  Yes.
    MR. WIDNELL:  I think that's not covered by
the stipulation.
    MR. CRAMER:  He was moving on.
    MR. WIDNELL:  Okay.  Just to be clear,
though.
    MR. DAVIS:  Right.  When you say "not
covered by the stipulation" --
    MR. WIDNELL:  Well, it would be helpful for
us to know because we'll have the same level of
questioning for your experts.  So are you taking the
position that you can ask for an actual description
of the kind of information that was provided as a
sort of menu to the experts?
    MR. CRAMER:  If the expert relies upon it,
then the answer is yes.
    MR. WIDNELL:  Only if the expert relies
upon it.
    MR. CRAMER:  (inaudible)
    MR. WIDNELL:  So you weren't asking for
information about stuff that Professor Oyer did not
rely on, is that right, just to be clear?
    MR. DAVIS:  I guess what I'd say, since

26 (Pages 98 to 101)

**PUBLIC COPY**

102

PAUL OYER - HIGHLY CONFIDENTIAL

we're moving on --

MR. WIDNELL: Well, the nature of the questions you asked, I just want to make sure we're all on the same page, that you're not going to be using what's in any of his responses to suggest that -- that he either did or did not fully consider something based off of the questions you asked about what we provided him.

MR. DAVIS: Well, I guess -- I think this is a conversation best --

MR. WIDNELL: We can go off the record if you want.

MR. DAVIS: Let's go off record.

THE VIDEOGRAPHER: Going off the record at 11:15.

(Whereupon a discussion was had off the record.)

THE VIDEOGRAPHER: Going back on the record at 11:16.

BY MR. DAVIS:

Q. Are you familiar with the article by Gerald Scully, "Player Salary Share and the Distribution of Player Earnings," 25: Managerial and Decision Economics, page 77 is the first page, 2004?

103

PAUL OYER - HIGHLY CONFIDENTIAL

A. No.

MR. DAVIS: We're going to mark this as Exhibit No. 4, I believe.

(Oyer Exhibit 4 was marked as requested.)

BY MR. DAVIS:

Q. Okay. If you could turn to page 78. This is, as I just indicated, an article by Gerald W. Scully, "Player Salary Share and the Distribution of Player Earnings," 25: Managerial and Decision Economics, 77, year 2004; and on page 78, do you see in the bottom of the left column table 1?

A. Yes.

Q. And do you see where it says "Player compensation as a share of revenue in profession team sports"?

A. Yes.

Q. Is it fair to say that Professor Scully is analyzing professional athlete compensation using what we have called wage shares?

MR. WIDNELL: Objection, form.

BY THE WITNESS:

A. I mean, do you want me to -- I'm going to need some time to look this over and agree with

104

PAUL OYER - HIGHLY CONFIDENTIAL

that.

Q. If you need a few -- if you need a bit of time just to make sure that it's -- recall, all I'm asking you is whether he's using wage shares.

(Witness reviewing document.)

BY THE WITNESS:

A. Okay. I would -- yep.

Q. Does he appear to be using wage shares in his analysis?

A. I believe that's what he's doing.

Q. Okay. And without reviewing the paper any further, are you aware that Professor Scully analyzed compensation as a share of revenue for Major League Baseball, the National Basketball Association, the National Football League, and the National Hockey League to assess monopsony power?

A. I was not aware of that.

Q. Okay. Where in your report, if at all, do you discuss Dr. Scully's article?

A. I do not discuss Dr. Scully's article.

MR. DAVIS: Let's mark the next document as Exhibit 5.

(Oyer Exhibit 5 was marked as requested.)

105

PAUL OYER - HIGHLY CONFIDENTIAL

BY MR. DAVIS:

Q. Are you familiar with the article by Lawrence M. Kahn, "The Sports Business as a Labor Market Laboratory," 14: Journal of Economic Perspectives, 2000?

A. I am not familiar with this article.

Q. And that is the article that I just marked as Exhibit 5. Okay. Please turn to page 81. If you turn to the last sentence of the first full paragraph, the second paragraph but the first full paragraph. He says "Moreover, baseball salaries as a percentage of team revenues rose from 17.6 percent in 1974 to 20.5 percent in 1977 to 41.1 percent in 1982 further suggesting that free agency has had a structural effect on baseball salary determination" and cites Zimbalist 1992; do you see that?

A. I do.

Q. Okay. And then further down in the last paragraph, in the middle of the paragraph, again, beginning "Moreover," Professor Kahn writes "Moreover, salaries as a percent of revenues fell from about 40 percent in 1985 to 32 percent in 1989 during the collusion period," again citing Zimbalist. "In 1989 arbitrators levied a

**PUBLIC COPY**

```
                                                      106
 1          PAUL OYER - HIGHLY CONFIDENTIAL
 2     200-million-dollar -- 280-million-dollar back-pay
 3     penalty on the owners to be paid out over the 1989
 4     to 1991 period as compensation for the losses
 5     imposed by collusion," citing Staudohar.  Is that
 6     how it's pronounced, do you know?
 7         A.  I've never heard of this person.
 8         Q.  Okay.  "And salaries as a percent of
 9     revenue bounced back to 43 percent by 1991," again
10     citing Zimbalist.  "The collusion episode provides a
11     further illustration of the potential impact on
12     monopsony on salaries."
13             Am I correct that Professor Kahn is
14     analyzing professional athlete compensation using
15     wage shares?
16         A.  Professor Kahn is quoting a book written
17     for a lay audience by Andrew Zimbalist in which he
18     cites facts about labor share.
19         Q.  When you say "quoting," he's not actually
20     quoting is he?
21         A.  My mistake.  He is paraphrasing and citing
22     facts stated in a book for a lay audience written by
23     Andrew Zimbalist.
24         Q.  And is he relying on those underlying facts
25     in his analysis?
```

```
                                                      107
 1          PAUL OYER - HIGHLY CONFIDENTIAL
 2         A.  I would have to read the paper to let you
 3     know.
 4         Q.  Why don't you take a couple moments to read
 5     those two paragraphs to see if, in fact, he's
 6     relying on those facts as opposed to merely --
 7             MR. WIDNELL:  I'm going to instruct you
 8     read the entire paper -- or review the entire paper
 9     to the extent that you feel there may be more
10     information that could be relevant.
11             MR. DAVIS:  I suggest you read the
12     paragraphs briefly, and then if you feel like
13     there's more information that needs to be -- that
14     you would need to answer that narrow question, then
15     we can go from there.
16             MR. WIDNELL:  I think he should be entitled
17     to see the entire document, look through the entire
18     document at least before he makes some sort of
19     conclusion about what --
20             MR. DAVIS:  I haven't disputed that yet.
21             MR. WIDNELL:  Well, you're instructing him
22     just to review two paragraphs rather than to
23     consider the paper as a whole I think.
24             MR. DAVIS:  I'm asking him to see if he
25     needs to read more to answer that narrow question.
```

```
                                                      108
 1          PAUL OYER - HIGHLY CONFIDENTIAL
 2             (Witness reviewing document.)
 3     BY THE WITNESS:
 4         A.  So what's the question?
 5         Q.  The question is just whether Professor Kahn
 6     is analyzing professional athlete compensation using
 7     wage shares in these two paragraphs.
 8         A.  Well, let's be clear about the conclusion
 9     he draws here.  He says "The current episode
10     provides a further illustration of the potential
11     impact of monopsony on salaries."
12         Q.  That seems to be -- is that an answer to my
13     question?
14         A.  Well, I just want to be clear about what
15     we're -- so is that the analysis and conclusions
16     we're talking about?
17         Q.  Yes.
18         A.  Okay.  I mean, sure.  He states some facts,
19     and he says they're consistent with monopsony as a
20     potential illustration of that.
21         Q.  And are those facts wage-share facts?
22         A.  Yes, they are.
23         Q.  Without further reviewing the paper, are
24     you aware that Professor Kahn is analyzing the
25     effects of anticompetitive conduct on player
```

```
                                                      109
 1          PAUL OYER - HIGHLY CONFIDENTIAL
 2     compensation using wage shares?
 3             MR. WIDNELL:  I'm going to object for
 4     completeness.  I'm not sure how that -- it sounds
 5     like you're suggesting there's a conclusion about
 6     the entire paper by telling him not to consider the
 7     entire paper.
 8             MR. DAVIS:  I'm asking if he's aware.  If
 9     he's not aware without reading the paper, he could
10     simply answer the question I'm not aware one way or
11     the other.
12     BY THE WITNESS:
13         A.  So what's the question?
14         Q.  The question is, are you aware that in
15     particular Professor Kahn is analyzing the effects
16     of anticompetitive conduct on player compensation
17     using wage shares?
18         A.  Among other -- he is using wage share among
19     other means of -- among other methods and measures,
20     sure.
21         Q.  Okay.  And are you aware that Professor
22     Kahn is analyzing wage shares for Major League
23     Baseball to assess monopsony power?
24         A.  I -- now I think you've made it too strong.
25     I mean, it's an illustration of potential impact.
```

110

1    PAUL OYER - HIGHLY CONFIDENTIAL
2      Q. Okay. Where in your report do you discuss
3    Dr. Kahn's article?
4      A. I don't discuss Dr. Kahn's article.
5      Q. The next document should be -- is
6    Exhibit 6. Are you familiar with the article by
7    John Vrooman, "Theory of the Perfect Game:
8    Competitive Balance -- excuse me -- Competitive
9    Balance in Monopoly Sports Leagues," 34: Review of
10   Industrial Organization beginning on page 52009?
11     A. Not that I know of.
12       MR. DAVIS: Could you please mark this as
13   Exhibit 6.
14       (Oyer Exhibit 6 was marked as
15        requested.)
16   BY MR. DAVIS:
17     Q. The very first page is page 5 and that has
18   the abstract. In the middle of the abstract he says
19   "Evidence of the sportsman effect is provided by
20   erosion of monopsonistic exploitation in the four
21   major American sports leagues where players now
22   share about 60 percent of revenue." Am I correct
23   that Professor Vrooman in that sentence is analyzing
24   professional athlete compensation using wage shares?
25     A. I don't know what -- what is the sportsman

111

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    effect?
3      Q. It's actually explained two sentences just
4    above in the abstract.
5        (Witness reviewing document.)
6    BY THE WITNESS:
7      A. Okay. So I'm sorry. The question again?
8      Q. My question is just a very narrow one.
9    Where he says in the third sentence -- he's talking
10   about the erosion of monopsonistic exploitation in
11   the four major sports leagues and says where players
12   now share about 60 percent of revenues. My question
13   is just that. When he speaks of 60 percent of the
14   revenues in those leagues as what the players
15   receive, is he using wage share as we've defined
16   it?
17     A. I think so.
18     Q. Okay.
19       Are you aware just as you sit here without
20   reviewing the article, that Professor Vrooman
21   analyzed compensation as a share of revenue in the
22   NFL, Major League Baseball, NBA, and NHL to assess
23   monopsony power?
24       MR. WIDNELL: Objection, form.
25   BY THE WITNESS:

112

1    PAUL OYER - HIGHLY CONFIDENTIAL
2      A. Didn't I already answer that question?
3      Q. Not for this article.
4      A. You asked me if I was aware of this article
5    before.
6      Q. That probably is a logical corollary
7    that --
8      A. I was not aware of this article until you
9    showed it to me.
10     Q. Okay. So of course, you were not aware
11   that Professor Vrooman analyzes wage share for the
12   four major sports to assess monopsony power; is that
13   correct?
14       MR. WIDNELL: So you're not asking him
15   whether or not he believes that's what he does.
16   You're stating that's your belief about what he
17   does, and you're asking if he's aware of that -- of
18   whether or not that's the case; is that right?
19       MR. DAVIS: Yes.
20       MR. WIDNELL: Okay. Got it.
21   BY THE WITNESS:
22     A. I was not aware of this article until you
23   showed it to me. I'm going to leave it at that.
24     Q. So you're not aware one way or another of
25   any use that Professor Vrooman puts wage share to,

113

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    including assessing monopsony power?
3      A. That's right.
4      Q. Okay. Where in your report did you discuss
5    Dr. Vrooman's article?
6      A. I do not discuss Dr. Vrooman's article.
7      Q. Are you familiar with an article by John
8    Twomey and James Monks with the title "Monopsony and
9    Salary Suppression: The Case of Major League Soccer
10   in the United States," 56: The American Economist,
11   pages 20 to 28, and the year is 2011?
12     A. No.
13       MR. DAVIS: Let's mark this as Exhibit 7,
14   which is the article I just described.
15       (Oyer Exhibit 7 was marked as
16        requested.)
17   BY MR. DAVIS:
18     Q. If you could turn to page 20, and in the
19   abstract starting with the third sentence discussing
20   the monopsonistic structure of Major League Soccer,
21   the authors write "This monopsonistic structure was
22   designed to eliminate competition for players across
23   teams within the league and thus allow the league to
24   suppress player salaries. This paper investigates
25   how effective the MLS has been in achieving this

**PUBLIC COPY**

PAUL OYER. - HIGHLY CONFIDENTIAL

114

PAUL OYER - HIGHLY CONFIDENTIAL
goal and finds that the MLS devotes only about 25
percent of its revenues to player salaries compared
to 50 to 60 percent in most other U.S. professional
sports and professional soccer leagues abroad."
    My question is am I correct that Professors
Twomey and Monks are using wage share to analyze
athlete compensation?
    A.  It would appear so.
    Q.  Okay.  And are you aware that Professors
Twomey and Monks analyzed wage share for MLS to
assess monopsony power?
    A.  Until you showed me this article, I had
never heard of John Twomey, James Monks, or The
American Economist.
    Q.  Is it fair to say that you are -- that
means you're unaware that they analyze wage share
for MLS to assess monopsony power?
    A.  That's correct.
    Q.  Okay.  And where in your report do you
discuss this Twomey and Monks article?
    A.  I don't.
    Q.  Are you familiar with a paper by James
Monk -- Monks, "Revenue Shares and Monopsonistic
Behavior in Intercollegiate Athletics"?  It's dated

115

PAUL OYER - HIGHLY CONFIDENTIAL
on the paper itself September 2013.
    A.  No.
    MR. DAVIS:  Please mark this as Exhibit 8.
        (Oyer Exhibit 8 was marked as
         requested.)
BY MR. DAVIS:
    Q.  The paper I just described is Exhibit 8.
Please turn to the first page after the title page
where there's an abstract.  In the last two
sentences he writes, comparing the four major
sports -- baseball, basketball, football and
hockey -- to NCAA athletics, that whereas the major
sports have negotiated aggregate salaries that
represent over 50 percent of league-wide revenues,
he then says "In comparison analyzing data from the
post -- from the Office of Post-Secondary Education,
OPE, of the Department of Education on 2,068
institutions of higher education reveals that
intercollegiate athletes receive payments in kind
via athletic scholarships that constitute less than
22 percent of total athletic department revenues.
Clearly the monopsonistic practices of the NCAA are
effective in restricting the compensation of
athletes."

116

PAUL OYER - HIGHLY CONFIDENTIAL
    Looking at that, am I correct that
Professor Monks is using wage share to analyze
college athlete compensation?
    A.  I would guess so based on this.
    Q.  Based on that.  Okay.  And are you aware
that Professor Monks analyzes wage share for college
athletes to assess monopsony power?
    A.  Well, you've just made me aware of it.
    Q.  Okay.  So you're now aware of it?
    A.  That's right.
    Q.  Where in your report do you discuss this
paper by Monks?
    A.  This unpublished working paper that I've
never heard of and that leaps to a grand conclusion
in the last line of the abstract that seems
completely unwarranted, I don't refer to it.
    Q.  Have you read the whole paper?
    A.  I have not.
    Q.  So do you know whether the contents of the
paper justify the --
    A.  Yeah.  I mean, I can --
    Q.  -- conclusion?
    A.  The reason I say that in his abstract he
says "Clearly," which leads me to think he's saying

117

PAUL OYER - HIGHLY CONFIDENTIAL
clearly based on what he's presented in the abstract
that he can draw that conclusion, and I don't think
that's valid.
    Q.  Okay.  But based only on the abstract?
    A.  Agreed.
    Q.  Okay.
    Let's look back at Exhibit 1.  Can you find
that?  So Exhibit 1 you'll recall is the textbook on
microeconomics, Robert S. Pindyck and Daniel
Rubinfeld, Microeconomics.  The particular version
is 9th edition, 200- -- it's labeled 2018, but that
seems premature.
    If you look at pages 540 and 541, there's
an example 14.4, and the heading, do you see where
it says "Monopsony Power in the Market for Baseball
Players"?
    A.  Uh-huh.
    Q.  Okay.  And then if you turn to page 541,
the paragraph that spills over from the bottom of
this insert left column to the right column, it
begins "The result was an interesting experiment in
labor market economics.  Between 1975 and 1980 the
market for baseball players adjusted to a new post
reserve clause equilibrium.  Before 1975

30 (Pages 114 to 117)

**PUBLIC COPY**

                                                                    118

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    expenditures on player's contracts made up
3    approximately 25 percent of all team expenditures.
4    By 1980 those expenditures had increased to 40
5    percent."
6         In those last two sentences where the
7    authors are describing compensation to players as a
8    percentage of all team expenditures, would you
9    characterize that as a wage-share analysis?
10        A.  It's interesting you chose those two
11   sentences instead of anything else in this box; but
12   yes, I would characterize those that way.
13        Q.  You would characterize those that way.
14   Okay.  And where in your report do you discuss this
15   portion of the Pindyck and Rubinfeld book?
16        A.  I don't discuss the Pindyck and Rubinfeld
17   book.  I think it's fair to note for the record that
18   you've shown me a 2018 book and asked me where I
19   reference it.  It would be hard for me to reference
20   a book that's not yet available.
21        Q.  It is available, actually, to be clear.
22        A.  We don't know that that was true when I
23   wrote my report.
24        Q.  If that insert was in the previous edition,
25   then do you think it would have been possible for

                                                                    119

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    you to have reviewed it in drafting your report?
3         A.  Then I can't -- anyway, no, because I
4    didn't review that book, to be honest.
5         Q.  Fair enough.
6             Turning back to Exhibit 2, this is your
7    report.  Do you have that before you?
8         A.  I do.
9         Q.  Okay.  In your report you discuss a
10   particular book on monopsony power in the labor
11   markets, Alan Manning, Monopsony In Motion --
12            THE REPORTER:  I'm sorry.
13            MR. DAVIS:  I'm sorry.  Yes.  Should I
14   start from the beginning of that sentence?
15            THE REPORTER:  No.  After labor markets.
16       BY MR. DAVIS:
17        Q.  Alan Manning, M-A-N-N-I-N-G, Alan is
18   A-L-A-N, Monopsony In Motion, and suggests it does
19   not contain analysis -- analyses using wage share;
20   is that correct?
21        A.  Where are you pointing me to?
22        Q.  Pages --
23        A.  It's consistent --
24        Q.  -- 6 and 7 of your report.  I think you
25   begin the discussion of Professor Manning's work on

                                                                    120

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    page -- on paragraph 22.
3         A.  Okay.
4         Q.  So is it correct that you discuss his book,
5    the one I identified, Monopsony In Motion, and
6    suggest it does not contain analyses using wage
7    share?
8         A.  That's right.
9         Q.  Are you suggesting that Dr. Manning
10   explicitly rejects wage share concluding it is an
11   inappropriate basis for analyzing compensation in
12   labor markets?
13        A.  I have no recollection of him doing that.
14        Q.  Okay.  And there's nowhere in your report
15   that you're aware of where you cite him explicitly
16   rejecting wage share for analyzing compensation in
17   labor markets?
18        A.  That's right.
19        Q.  Okay.  Are you aware that there are
20   numerous other books on monopsony power including in
21   labor markets?
22        A.  I -- there must --
23            MR. WIDNELL:  Objection, form.
24       BY THE WITNESS:
25        A.  Am I aware that there are other books on

                                                                    121

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    monopsony in labor markets?
3         Q.  Yes.
4         A.  There are books on everything.
5         Q.  Okay.
6         A.  So I -- I can't say that I'm aware of other
7    books on monopsony in labor markets.  I can tell you
8    that I certainly would expect there are many other
9    books on monopsony in labor markets.
10        Q.  Okay.  Well, is there some reason you focus
11   on Dr. Manning's books -- book as opposed to the
12   others?
13        A.  Yes.  It's a well-known, well-cited, highly
14   regarded book among labor economists.
15        Q.  Is it possible that there are other books
16   on monopsony power in labor markets that are
17   similarly well known and similarly broadly cited?
18        A.  Is it possible?  I guess.  I mean,
19   anything's possible, right?  I have not done a
20   thorough search of all books on monopsony in the
21   labor market.
22        Q.  As a labor economist would you likely be
23   familiar with this particular literature?
24        A.  Sure.  I mean, yes and no.  I'm familiar
25   with this literature.  Books are a different story.

PAUL OYER. - HIGHLY CONFIDENTIAL

|  | 122 |
|---|---|
| 1 | PAUL OYER - HIGHLY CONFIDENTIAL |
| 2 | This was written for -- the main goal of this book |
| 3 | is not really to sell to other academic economists. |
| 4 | It's to sell to students and lay people interested |
| 5 | in the topic. |
| 6 | Q. Well, so then would economists find |
| 7 | Professor Manning's book and his opinions |
| 8 | authoritative? |
| 9 | A. Sure. |
| 10 | Q. Oh, they would? |
| 11 | A. Yeah. |
| 12 | Q. Do you think this is a particularly |
| 13 | authoritative source on labor markets and monopsony |
| 14 | power? |
| 15 | MR. WIDNELL: Objection, form. |
| 16 | BY THE WITNESS: |
| 17 | A. Alan Manning is a recognized expert and |
| 18 | leader in the thinking of monopsony -- analysis of |
| 19 | monopsony in labor markets. So his book and his |
| 20 | handbook chapter are authoritative sources among |
| 21 | labor economists. |
| 22 | Q. So it's more that you would say Professor |
| 23 | Manning is particularly authoritative, or I guess |
| 24 | you could say both, he and his book? |
| 25 | MR. WIDNELL: Objection, form. |

|  | 123 |
|---|---|
| 1 | PAUL OYER - HIGHLY CONFIDENTIAL |
| 2 | BY THE WITNESS: |
| 3 | A. So is there a question? |
| 4 | Q. Yeah. Are you saying that both Professor |
| 5 | Manning and his book are particularly authoritative? |
| 6 | A. Yes. |
| 7 | Q. Where in your report do you cite to any |
| 8 | publications that say it is inappropriate for a |
| 9 | labor economist to use wage share in conducting |
| 10 | microeconomic analysis? |
| 11 | A. I don't remember citing to that. |
| 12 | Q. Where in your report do you cite to any |
| 13 | publications that say it is inappropriate for a |
| 14 | labor economist to use wage share in assessing the |
| 15 | effects of monopsony power? |
| 16 | A. Is that different from the last question? |
| 17 | Q. The last question was about conducting |
| 18 | microeconomic analysis, and this second question was |
| 19 | more specifically addressing assessing the effects |
| 20 | of monopsony power. Should I read it back to you |
| 21 | just to be clear? |
| 22 | A. That would be great. |
| 23 | Q. Where in your report do you cite to any |
| 24 | publications that say it is inappropriate for a |
| 25 | labor economist to use wage share in assessing the |

|  | 124 |
|---|---|
| 1 | PAUL OYER - HIGHLY CONFIDENTIAL |
| 2 | effects of monopsony power? |
| 3 | A. I don't think I cite to that. |
| 4 | Q. Where in your report do you cite to any |
| 5 | publication that says it is inappropriate for a |
| 6 | labor economist to use wage share in determining the |
| 7 | marginal product of labor of a worker? |
| 8 | A. I don't. There would be no reason to say |
| 9 | that. |
| 10 | Q. Okay. Where in your report do you cite to |
| 11 | any publications that use wage level as a measure of |
| 12 | the marginal product of labor of professional |
| 13 | athletes? |
| 14 | A. That use wage level as a measure of -- so |
| 15 | can you -- I'm sorry. I need that one again. |
| 16 | Q. Sure. Where in your report do you cite to |
| 17 | any publications that use wage level as a measure of |
| 18 | the marginal product of labor of professional |
| 19 | athletes? |
| 20 | A. I have to think about that one. I don't |
| 21 | think I do. |
| 22 | Q. Where in your report do you cite to any |
| 23 | publications that measure the marginal product of |
| 24 | labor of professional athletes at all? |
| 25 | A. I don't that I can recall. |

|  | 125 |
|---|---|
| 1 | PAUL OYER - HIGHLY CONFIDENTIAL |
| 2 | Q. Where in your report do you cite to any |
| 3 | publications that assess the effects of monopsony |
| 4 | power on the compensation of professional athletes? |
| 5 | A. Sorry. Can you read that back? |
| 6 | Q. Where in your report do you cite to any |
| 7 | publications that assess the effects of monopsony |
| 8 | power on the compensation of professional athletes? |
| 9 | A. And we're not counting the other expert |
| 10 | reports as relevant publications on which I comment? |
| 11 | Q. You didn't cite to them or rely on them, |
| 12 | you said. |
| 13 | A. The Singer report and the -- |
| 14 | Q. Oh, the Singer -- oh, I misunderstood. |
| 15 | A. -- and the Zimbalist report? |
| 16 | Q. Oh, so the Singer report and the Zimbalist |
| 17 | report. |
| 18 | A. We're not counting those as whatever -- |
| 19 | however -- whatever you termed it. Studies? |
| 20 | Q. I had said publications. |
| 21 | A. Okay. But other than those, no. |
| 22 | Q. We were talking over each over and, again, |
| 23 | I'm as much at fault at least as you. |
| 24 | A. Sorry. |
| 25 | Q. Just to clarify, you did not cite to any |

32 (Pages 122 to 125)

**PUBLIC COPY**