# Exhibit 24

Deposition of Robert H. Topel

(December 6, 2017)

(excerpted)

PUBLIC COPY - REDACTED

267

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
CUNG LE; NATHAN QUARRY, JON     )
FITCH, on behalf of             )
themselves and all others       )
similarly situated,             )
                                )
            Plaintiffs,         )
                                )
      vs.                       )  Case No.
                                )  2:15-cv-01045-RFB-(PAL)
                                )
ZUFFA, LLC, d/b/a Ultimate      )
Fighting Championship and       )
UFC,                            )
                                )
            Defendant.          )
_____)
```

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

ROBERT TOPEL, VOL. II

Washington, D.C.

December 6, 2017

8:39 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52570

PUBLIC COPY - REDACTED

340

1  now you've inserted firm.  So no.
2      Q.  All right.  Firms in a market, if I change
3  the -- the -- all right.  I'll reask the question
4  this way.  A market can have an infinite number --
5  in order for a market to have a horizontal supply
6  curve there would need to be an infinite number of
7  equivalent workers at exactly the same wage; is
8  that right?
9      A.  No.
10     Q.  What was wrong with that?
11     A.  Infinite.  Does the -- the supply curve
12 needs to be -- can be perfectly elastic over a
13 relevant range where demand in this market is
14 shifting and there will be no material effect on
15 prices.  I mean, there's not an infinite number of
16 workers anywhere.
17     Q.  Okay.  So a firm would need to have a
18 substantial material number of equivalent
19 workers -- I mean, a market would need to have a
20 substantial number of equivalent workers at exactly
21 the same wage in order for there to be a horizontal
22 supply curve; is that right?
23     A.  I said over the relevant range.
24     Q.  Over the relevant --
25     A.  So if we -- if we have -- there needs to

341

1  be enough to prevent the wage from rising when
2  demand shifts.
3      Q.  All right.
4      A.  And enough depends on the circumstances.
5      Q.  Is it fair to say that when mobility of
6  workers is -- becomes restricted or is costly firms
7  in that market could obtain some monopsony power?
8      A.  Your statement is so broad and vague
9  that -- you know, I'll come back to my taco stands.
10 And there's some costs of going to the next taco
11 stand so that people who live closest to my taco
12 stand prefer my taco stand to the taco stand that's
13 further away even though our tacos are in all other
14 respects identical.  That means that if I cut the
15 price of my tacos more people come to me.  If I
16 raise the price of my tacos fewer people come to
17 me.  That is not a completely horizontal demand
18 curve.  So in that sense -- and that's the sense in
19 which George is using it here in a lot of this
20 discussion -- one might say that there's a degree
21 of monopsony power if we define -- if we define
22 monopsony power to mean that if I cut my price I
23 sell more and if I raise my price I say monopsony
24 power in that case.  And you can do the same thing
25 on the other side of the market.  So, you know, my

342

1  firm's here and there's other firms and I'm going
2  to hire -- instead of trying to attract people to
3  my taco stand I'm going to hire people from along
4  the road between my firm and another firm and
5  they're all uniformly distributed.  I'm making up
6  this model.  And I'll get the same taco stand kind
7  of thing on the input side.  If I want to hire more
8  I have to reach further down the road and it's
9  costly to drive.  So I'll increase the marginal
10 price that I pay -- I'll have to increase the
11 marginal price that I pay.
12     Q.  Okay.  So let's take your taco stand
13 example.  You have to taco stand A on one side of
14 the road and then a mile away you have taco stand
15 B.
16     A.  Yeah.
17     Q.  Now let's say somebody puts a toll on that
18 road and all of a sudden in order to get from taco
19 stand A to taco stand B it costs a hundred dollars
20 and before it used to cost zero dollars.  All
21 things equal, would that toll increase the mobility
22 costs of workers?
23         MR. WIDNELL:  Objection, form.
24 BY THE WITNESS:
25     A.  So now I'm -- just -- just so I'm clear,

343

1  now I'm hiring workers for my taco stand?
2      Q.  Yes.
3      A.  So there's a toll that prevents people
4  from the other side of town getting to my taco
5  stand?
6      Q.  Yes, and vice-versa.
7      A.  Okay.  So yeah, there's fewer people that
8  I can hire from the other side of town.
9      Q.  So now as compared to a world with the
10 hundred-dollar toll and the world without the
11 hundred-dollar toll, the two taco stands in the
12 world with the hundred-dollar toll have more
13 monopsony power than the world without the
14 hundred-dollar toll, correct?
15         MR. WIDNELL:  Objection, form.
16 BY THE WITNESS:
17     A.  I think what you're trying to say is
18 that -- let's say here's A and B taco stands and
19 the middle of town is halfway in between, and then
20 I build a wall, okay, the Berlin Wall there so
21 people can't get across from -- from -- so people
22 between halfway and my taco stand and the
23 percentage -- there's nobody else in town -- can
24 only work for my taco stand.  They can't go work
25 for the other taco stand.

20 (Pages 340 to 343)

**Page 344**

1  Q. Correct.
2  A. Is that what we're saying?
3  Q. Yes.
4  A. Yeah. So these people have fewer options.
5  I got it.
6  Q. And when you compare the world with the
7  Berlin Wall in your example in the world without
8  the Berlin Wall, the firm with the Berlin Wall has
9  more monopsony power, correct?
10  A. The firm with the -- the firm -- I -- I
11  won't be competing as aggressively to get people
12  from across the place where the border is now. So,
13  you know, I don't know how things played out in the
14  output market. I mean, I understand what you're
15  trying to say and you're saying the same thing
16  here, and you're saying the same thing that I said.
17  There's a degree of monopsony power. You didn't
18  need the wall. I already said there's a degree of
19  what some people would call monopsony power there
20  by the fact that it is -- it is costly to move from
21  A to B.
22  Q. And --
23  A. So if it became more costly to move from A
24  to B, that degree of -- of control over price would
25  increase a little bit.

**Page 345**

1  Q. So all things equal, the higher the
2  mobility costs in your example the higher the
3  monopsony power of the firms, correct?
4  MR. WIDNELL: Objection, form.
5  BY THE WITNESS:
6  A. Yeah. It depends on how we make the
7  mobility costs and things like that. It depends on
8  what we do with the mobility costs.
9  Q. We raise the costs. So go back to my toll
10  example. Assume that the Berlin Wall costs $100 to
11  get from one side to the other and now assume it
12  costs a thousand dollars to get from one side to
13  the other. As compared to the world where it costs
14  a hundred dollars to the world where it costs a
15  thousand dollars, the firms in the world where it
16  costs a thousand dollars would have a higher degree
17  of monopsony power than the -- all things equal,
18  than the firms in the world where it costs a
19  hundred dollars.
20  A. I think what you're trying to establish is
21  that the people on my side of the wall have fewer
22  places -- because there's only two places, have
23  fewer places at which they can work and that
24  affects the wage that I have to pay to get them to
25  work for me, and I agree with that.

**Page 346**

1  Q. So all things equal, the higher the
2  mobility costs in the example the more monopsony
3  power the firms in that example have, all things
4  equal; is that right?
5  MR. WIDNELL: Objection, form.
6  BY THE WITNESS:
7  A. It was important that you said twice "in
8  that example." So I agree.
9  Q. And in that example we're talking about
10  taco stands, right? These aren't Taco Bell, right?
11  It could be a small firm that has some degree of
12  monopsony power; is that right?
13  A. Yes. Well, as the term -- as we're using
14  the term. It's just a dangerous term on both sides
15  of the market.
16  Q. Is it fair to say that one reason why
17  non-Zuffa firms employ some of the challenged
18  contractual provisions that we've talked about is
19  to restrain the mobility of the fighters that work
20  for them?
21  A. It's to do all the things we've discussed
22  before that -- you know, to see to it that they get
23  the returns on their investments and that their
24  ability to manage a multi-bout career progression
25  is not interfered with.

**Page 347**

1  Q. And one way in which they achieve those
2  ends is by restricting the mobility of the workers,
3  correct?
4  A. In the sense that I just used, yes.
5  Q. And so in that sense even these smaller
6  promotions can use these contracts to gain some
7  measure of monopsony power; is that right?
8  A. No.
9  [REDACTED]

21 (Pages 344 to 347)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

**348**

1  MR. CRAMER: All right. I'd like to mark
2  as the next exhibit a piece of the testimony from
3  Scott Coker in this case. What exhibit?
4      THE REPORTER: 10.
5          (Topel Exhibit 10 was marked
6              as requested.)
7  BY MR. CRAMER:
8      Q. What you've just been handed is
9  Exhibit 10.
10     A. Yep.
11     Q. It is a portion of the transcript of the
12 deposition of Scott Coker that was taken August
13 3rd, 2017 and it was taken in this case.
14     A. This is the Bellator fellow?
15     Q. And Strike Force. He was at both.
16     A. Okay.
17     Q. Did you have an opportunity to review this
18 deposition transcript?
19     A. Not in its entirety.
20     Q. You read some of it?
21     A. Some of it, yeah. I believe so.
22     Q. Turn to page 245 of the transcript which
23 is on the third -- it's the third page of the
24 exhibit. Do you see that on the bottom right-hand
25 corner?

**349**

1   A. You said 245, right?
2   Q. Yes.
3   A. 245 is the bottom right of the second
4  page.
5   Q. Yes.
6   A. Okay.
7   Q. After the title page.
8      All right. I'm going to draw your
9  attention to the testimony beginning at line 3 on
10 page 245, and I'll read it into the record and then
11 we can discuss it.
12 [REDACTED]



**350**

[REDACTED]

**351**

1  [REDACTED]
2      Q. All right. You can put that aside.
3      Have you seen evidence that -- in the
4  record that certain MMA promotions other than
5  Zuffa, smaller MMA promotions have said that they
6  would abandon certain of the contractual provisions
7  if the UFC would?
8      A. That sounds like something that might get
9  you in antitrust trouble anyway, but the -- I
10 haven't seen statements to that effect, but I'm
11 sure you'll show me.
12     MR. CRAMER: Okay. All right. I'm going
13 to have the court reporter mark as the next exhibit
14 a series of e-mails.
15         (Topel Exhibit 11 was marked
16             as requested.)
17 BY MR. CRAMER:
18     Q. The court reporter has marked as
19 Exhibit 11 a two-page document bearing the Bates
20 range ZFL-1904802 through 4803, and I'd like to
21 draw your attention to the e-mail at the bottom of
22 the page from Michael Chiappetta to Anthony Evans
23 at the UFC.
24     A. Yes.
25     Q. And then I'm particularly talking about

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

**352**

1   the run -- one at 4:43 p.m. from Chiappetta who is
2   talking about a conversation he had with Bjorn
3   Rebney. Bjorn Rebney was the head of Bellator at
4   the time and this is dated September 25th, 2012.
5   And I'd like to turn your attention to the next
6   page where Chiappetta, who is a reporter, is
7   reporting a conversation that Chiappetta had with
8   Rebney to the UFC.
9       A. Can I -- can I just read the rest of
10  this.
11      Q. Please do.
12          (Witness reviewing document.)
13  BY THE WITNESS:
14      A. Remind me who Mike is because you've only
15  got a Gmail address.
16      Q. Mike Chiappetta is an MMA reporter.
17  Anthony Evans is an executive at the UFC.
18      A. So he's conveying some conversation that
19  he had with somebody at Bellator; is that what he's
20  doing?
21      Q. Correct. Chiappetta communicated with
22  Bjorn Rebney, who was the President of Bellator at
23  the time, and then he's communicating a
24  conversation that Chiappetta had with Rebney to the
25  UFC. And on the second page of the e-mail --

**353**

1       A. He says "Eventually"; is that sentence
2   you'd like me to read?
3   [REDACTED]
10      Q. Do you know whether Zuffa eliminated the
11  right to match clause in response to Rebney's
12  challenge?
13          MR. WIDNELL: Objection, form.
14  BY THE WITNESS:
15      A. Well, you know, I don't know if there was
16  an actual challenge. This is being relayed by a
17  reporter. We know how sometimes that can get
18  muddled. But I don't know if this is in -- this
19  sounds like it's in the context of a particular
20  transaction, but, you know, one wouldn't be
21  surprised if some competitor would say, hey, you've
22  invested a lot in all these folks, wouldn't you
23  like to get rid of this clause because then, you
24  know, it would give us greater access to the people
25  you've invested in. That's the point of having

**354**

1   these clauses is to protect the investments that
2   have already occurred.
3           Now, on the first page here it says that
4   [REDACTED]
9   is -- it's an equilibrium where this contract
10  restriction has not been used. It could be still
11  binding, but it hasn't been used.
12  [REDACTED]
16      Q. Is it your opinion that if the UFC has
17  never during -- had never during a right to match
18  period matched a rival's bid that that would mean
19  the right to match clause had no effect in the
20  marketplace?
21      A. That was the implication that I was trying
22  to convey at the end of my answer. That doesn't
23  mean that it's not binding. It doesn't mean that
24  it doesn't have an effect. It's not -- it's not
25  put into the contracts for nothing. It serves a

**355**

1   purpose.
2       Q. So even if the right to match clause has
3   never been, quote/unquote, used, it's still having
4   an effect in the marketplace, correct?
5       A. It could be having an effect in the
6   marketplace even if they've never had to invoke.
7       Q. And why is that?
8   [REDACTED]
17      Q. Sounds to me like that answer said the
18  right to match is not doing any work. How is the
19  right to match doing any work, procompetitive work
20  or anticompetitive work, economic work if Zuffa
21  would just outbid any potential rival? Why doesn't
22  Zuffa just get rid of the right to match, then, if
23  it knows it can just outbid any rival?
24      A. Well, we go through this in my report.
25  [REDACTED]

23 (Pages 352 to 355)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

356

3  if it came down to, oh, why don't they just -- why
4  don't they just outbid, well, if Bellator makes its
5  best offer and it knows that Zuffa will match,
6  then, you know, the returns to making its best
7  offer aren't as high as otherwise.  Now, take
8  that -- take away the right to match and you come
9  back to the example that I have in my report about
10 the holdup problem where you're more valuable to
11 Zuffa, the athlete knows it.  So now you've got a
12 bilateral negotiation where there's no determinant
13 solution in economics except that it's going to be
14 somewhere in between and depends on the relative
15 intransigence of the two parties where you're going
16 to end up.
17     Q.  So you just said --
18     A.  Let me finish.  So I said that the -- what
19 I've just described is the holdup problem that's in
20 my report that the right of first refusal is
21 designed to avoid.
22     Q.  One of the things you said is that if
23 Bellator makes its best bid during a UFC right to
24 match period the returns to Bellator to making that
25 bid aren't as high as they would be without the

357

1  right-to-match period in place; is that right?
2     A.  No.  I just said given that the right to
3  match is there, Bellator has to make a calculation
4  that says here's what this athlete is worth to us
5  and let us assume -- and that's the assumption of
6  my example -- that the athlete is worth more
7  because of past investments to Zuffa than to
8  Bellator.  So in making this offer you're not
9  certain of what the value to Zuffa is, but it's
10 very likely to be higher.  So I put all the -- I
11 put all the numbers into a contract, the athlete
12 takes the contract to Zuffa, and Zuffa says done,
13 we'll pay that, and that's our right of first
14 refusal.  And so we can invoke that.
15    Q.  So what effect, in your view, does that
16 have Bellator's incentives to make a bid?
17    A.  Bellator may have -- well, relative to
18 what because I don't -- if -- if it's -- I think we
19 went over this yesterday.  Suppose we canceled the
20 right -- in one guy's contract, everybody else's
21 contract stays the same.  I know we did this --
22    Q.  I think I can make it easier.
23    A.  I know we did this yesterday.
24    Q.  We did.  I think I can just make it
25

358

4  different once the right to match period expires
5  than during the right to match?
6     A.  They could be, though there's a question
7  of why Bellator make an offer in the right to match
8  period and they're gaining information about this
9  fighter from the fact that -- it's your
10 hypothetical.  There's no contract between Zuffa
11 and the fighter a year after the end of his
12 contract.  So you're -- Bellator's looking at that
13 at the end and saying, you know, winner's curse
14 might be operative here.  So if we win what is it
15 that Zuffa knew about this fighter that we don't.
16    Q.  Well, assume that Zuffa made a bid and the
17 fighter didn't accept it.
18    A.  Okay.
19    Q.  I'll withdraw it.  I'm going to move on.
20        Would you agree with me that the conduct
21 engaged in by a firm without market power could
22 be -- could have anticompetitive effects when that
23 same conduct is engaged in by a firm with market
24 power?
25    A.  That's conceivable.

359

1     Q.  How is that conceivable?
2     A.  Well, take the -- I mean, often in
3  contract disputes under section 2, like exclusive
4  dealing or loyalty discounts or something like
5  that, under certain prerestrictive conditions
6  things that have procompetitive effects can also
7  have anticompetitive effects if certain conditions
8  are satisfied.
9     Q.  Well, is bundling -- product bundling one
10 of those examples?  Product bundles has many
11 procompetitive effects and when engaged in by a
12 firm without market power in any of the markets in
13 which the products they're bundling --
14        MR. WIDNELL:  Objection, form.
15 BY MR. CRAMER:
16    Q.  I'll rephrase.  Could bundling be one of
17 those examples where product bundling can be
18 anticompetitive when engaged in by a firm with
19 market power and procompetitive when engaged in by
20 a firm without market power?
21    A.  Yes, that's -- I mean, that and a myriad
22 of other examples under section 2.
23        MR. WIDNELL:  I just want to make clear,
24 you're asking for an economic opinion here, not a
25 legal opinion; is that right?

24 (Pages 356 to 359)

PUBLIC COPY - REDACTED

**Page 360**

1  MR. CRAMER:  Yes.  I'm not asking for any
2  legal opinion.
3  MR. WIDNELL:  Okay.  I just want to
4  avoid --
5  THE WITNESS:  Yep, that's fine.
6  MR. WIDNELL:  -- making that objection
7  over and over.
8  THE REPORTER:  Guys.
9  BY MR. CRAMER:
10  Q.  Turn to paragraph 43, please.  All right.
11  In paragraph 43 you quote a document.  I believe
12  it's the Deutsche -- one of the Deutsche Bank
13  documents and I'm just looking for that.  All
14  right.  Towards the middle of paragraph 43 you say
15  [REDACTED]

**Page 361**

1  [REDACTED]
6  Q.  All right.  I'm going to show you the
7  document that Dr. Singer was quoting and have it
8  marked as Exhibit 12.
9  (Topel Exhibit 12 was marked
10  as requested.)
11  BY MR. CRAMER:
12  Q.  And I'll note that you cite this document
13  in footnote 45.
14  A.  Okay.
15  Q.  It is entitled "UFC/Zuffa, LLC DBA
16  Ultimate Fighting Championship, Confidential
17  Information Memorandum."  It's dated October 2009
18  and it was put out by Deutsche Bank.  You've seen
19  this document before, correct?
20  A.  Yes.
21  Q.  And you recognize that Zuffa management
22  had input into this document, correct?
23  A.  One would assume.
24  Q.  All right.  Turn to page 16 internally to
25  the document.

**Page 362**

1  MR. WIDNELL:  I just want to briefly note
2  an objection for completeness.
3  MR. CRAMER:  Okay.
4  BY MR. CRAMER:
5  Q.  If there's something as you read through
6  this document that you think is missing, please let
7  me know.  Okay?
8  A.  Okay.  Sorry.
9  MR. WIDNELL:  Just to be clear, it's not
10  in the document.  The document was an attachment to
11  an e-mail.
12  MR. CRAMER:  Oh, okay.  Fair enough.
13  BY MR. CRAMER:
14  Q.  Fair to say in your report you don't cite
15  any e-mail that attaches this document, right?
16  A.  Not that I'm aware of.
17  Q.  Okay.
18  All right.  On page 16 under the heading
19  [REDACTED]

**Page 363**

1  [REDACTED]
13  Q.  And is it your view that -- strike that.
14  I believe you testified that it is your
15  opinion that Zuffa is the market leader among MMA
16  promoters; is that right?
17  A.  Yes.
18  Q.  And would you agree that that was the case
19  since 2001?
20  A.  I don't recall the circumstances
21  completely in 2001.  The market was pretty small.
22  They might been the largest producer back then.
23  Q.  And that remained the case from the date
24  of this document, October 2009, to the present,
25  correct?

### Page 364

1  A. Correct, assuming the truth of what I just
2  agreed to. Back in 2001 the market was pretty
3  small.
4  Q. Okay. You can put that document aside for
5  the moment. I'm going to come back to it, but I'm
6  going to put it aside for the moment.
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 Q. Do you know who the audience of the
13 document was?
14 A. Probably potential lenders.
15 Q. And in putting together a document about
16 information relating to a company for potential
17 lenders one would need to be scrupulously accurate
18 about the information, correct?
19 A. Well, I mean, if I were creating a
20 document I would try to be accurate, you know, but
21 I've seen the disclaimers in documents like this
22 that say, you know, not everything in a document --
23 in our document is -- we can't verify that it's --
24 the total reliability of these things. There's all
25 kinds of caveats. I assume this was done under

### Page 365

1  standard business practice. Deutsche Bank was
2  involved and they would have been doing -- creating
3  this in the way they would have created it for
4  another organization.
5  Q. And they would attempt to be as accurate
6  as they possibly could be in this document,
7  correct?
8  A. They -- they would be as accurate as it
9  was valuable to be. There's costs to being
10 accurate. I assume that they -- they did a good
11 job here.
12 Q. It's fair to say that Deutsche Bank would
13 not want to make material misrepresentations in a
14 document like this to potential lenders, correct?
15 A. I think that would be a bad idea.
16 Q. All right. You can put that aside for the
17 moment.
18    Turn to paragraph 173, please.
19 A. Yes.
20 Q. Here you are discussing the promoters that
21 Zuffa acquired?
22 A. Yes.
23 Q. And you observe that Zuffa acquired
24 several MMA promotions between 2006 and 2011; is
25 that right?

### Page 366

1  A. Yes.
2  Q. And you note they acquired WFA and WEC in
3  2006, right?
4  A. Yes.
5  Q. And Pride in 2007; is that right?
6  A. Yes.
7  Q. And Affliction in 2009; is that right?
8  A. Yes.
9  Q. And Strike Force in 2011; is that right?
10 A. Yes.
11 Q. Do you know if they acquired any other
12 promoters?
13 A. As I sit here I can't remember, but I
14 believe they have. I can't remember their names.
15 Q. In the last sentence of paragraph 173 you
16 say "At the time of these acquisitions each of the
17 acquired MMA promoters was either too small to
18 appreciably change Zuffa's market share in either
19 the input or output market, was exiting the market,
20 or both"; do you see that?
21 A. Yes.
22 Q. I'm trying to understand you provide two
23 different characterizations. One that the promoter
24 was too small to change Zuffa's market share in the
25 input or output market; in the other that it was

### Page 367

1  exiting the market at the time of the acquisition,
2  right?
3  A. Yes. It's an either/or.
4  Q. Either/or. So now I'm going to ask you
5  which explanations apply to which promotions.
6  A. Oh, dear.
7  Q. So WFA, did the acquisition of WFA
8  appreciably change Zuffa's market share in either
9  the input or output market?
10 A. My recollection from our calculations
11 using Dr. Singer's data is that it did not.
12 Q. Did the acquisition of WEC appreciably
13 change Zuffa's market share in either the input or
14 output market?
15 A. Our calculations are on the input side and
16 my recollection is that it didn't affect any of
17 Dr. Singer's -- materially affect any of
18 Dr. Singer's share calculations.
19 Q. It did not affect?
20 A. I'm trying to remember, but that's my
21 recollection. It has to affect it, right, but it
22 didn't affect it much.
23 Q. Right. You used the word "appreciably."
24    With respect to Pride, did that
25 appreciably change Zuffa's market share in either

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

368

 1    the input or output market?
 2        A.  Let me answer your question this way.  I
 3    don't recall doing this firm by firm, acquisition
 4    by acquisition.  We did his -- his foreclosure --
 5    so-called foreclosure shares and calculated it with
 6    these firms and without those firms.
 7        Q.  And when you calculated the foreclosure
 8    share with all of these firms together versus a
 9    calculation without all of these firms, was there
10    an appreciable change in foreclosure share?
11        A.  I think we have an exhibit to that effect
12    and we said it was not an appreciable change.
13        Q.  So all of the acquisitions together, in
14    your understanding, did not appreciably change
15    Zuffa's market share in either the input or output
16    market; is that what you're saying?
17        A.  Yes.
18        Q.  So is it fair to say that what you're
19    saying is that all of these MMA promoters that
20    Zuffa acquired were essentially insignificant as
21    competitors to Zuffa?
22            MR. WIDNELL:  Objection, form.
23    BY THE WITNESS:
24        A.  No.  I didn't do an analysis of whether
25    they were insignificant or could have been

369

 1    significant or anything like that.  I'm just saying
 2    that it doesn't affect -- including them doesn't
 3    much affect Dr. Singer's calculations of his
 4    so-called foreclosure.
 5        Q.  So you have -- you have no opinion one way
 6    or another whether, for example, Zuffa's
 7    acquisition of Strike Force was the acquisition of
 8    a significant competitor or an insignificant
 9    competitor; am I right?
10            MR. WIDNELL:  Objection.
11    BY THE WITNESS:
12        A.  It doesn't have a material impact on
13    Zuffa's market share in the input or output market
14    is what -- is what we say here.  That's the opinion
15    I'm offering.
16        Q.  So was Strike Force a significant
17    competitor to Zuffa at the time that Zuffa
18    purchased Strike Force in 2010 in your opinion?
19            MR. WIDNELL:  Objection, form.
20    BY THE WITNESS:
21        A.  They were -- they were a competitor and
22    competitors are often acquired.  There can be
23    synergies between the two firms that make the
24    acquisition worthwhile and that are output
25    increasing and consumer welfare increasing because,

370

 1    after all, you're bringing the athletes of one less
 2    well-known entity under the brand name of another
 3    entity.  So it simply says here there -- they
 4    didn't change Zuffa's market share in the neither
 5    the input or the output market, appreciably change
 6    the market share in either the input or output
 7    market.
 8        Q.  Did --
 9        A.  I mean, was it a significant -- I don't
10    know what the word "significant" means in this
11    context.  It was a competitor.
12        Q.  Did Strike Force have significant share of
13    the input or output markets at the time it was
14    taken over by Zuffa?
15        A.  Evidently not.
16        Q.  Did any of the rivals that Zuffa purchased
17    as identified in paragraph 173 have a significant
18    share of the input or output markets at the time
19    they were purchased?
20            MR. WIDNELL:  Objection, form.
21    BY THE WITNESS:
22        A.  As I said, I didn't do the calculations
23    firm by firm.  They certainly weren't as big as
24    Zuffa.
25        Q.  Is it fair to say that none of the

371

 1    competitors that Zuffa purchased that you
 2    identified in paragraph 173, in your view, had been
 3    able to challenge Zuffa's dominance in either the
 4    input or output markets?
 5            MR. WIDNELL:  Objection, form.
 6    BY THE WITNESS:
 7        A.  Well, I don't know what it means to
 8    challenge dominance.  I've seen dominance used in
 9    the context that noneconomists would use it.  Zuffa
10    has a level of market share in a position in the
11    market.
12        Q.  Is it fair to say --
13        A.  It's been pretty stable over time.
14        Q.  Is it fair to say that none of the
15    promoters that Zuffa acquired, in your view, have
16    been able to successfully challenge Zuffa's market
17    share and market position that you say has been
18    stable over time in either the input or output
19    markets?
20            MR. WIDNELL:  Objection, form.
21    BY THE WITNESS:
22        A.  Well, it's fair to say that these acquired
23    firms did not grow to be as large as Zuffa.
24        Q.  Did any of these firms in your opinion as
25    an economist before they were purchased by Zuffa

27 (Pages 368 to 371)

PUBLIC COPY - REDACTED

**372**

1  present a competitive threat to the UFC?
2      A.  They might have.  I think all firms in
3  this market present a competitive threat to UFC.
4      Q.  So when Zuffa purchased Strike Force, for
5  example, it was eliminating, in your opinion, a
6  competitive threat; is that right?
7      A.  Well, no.  The -- take Strike Force, for
8  example.  You know, everybody in the -- if they
9  bought some small firm there's some competition
10 from that firm, that's all I'm saying.  I mean, we
11 wouldn't want to say that these firms are in the
12 market and they don't compete with Zuffa.  They
13 were competing for athletes, they were competing
14 for eyeballs, they were competing, and the question
15 is whether it was addressed by antitrust
16 authorities and the like is whether these
17 acquisitions materially affected competition in the
18 market.  Evidently they found that they didn't.
19 So -- but these were -- these were firms operating
20 and there are always benefits and potential costs
21 of allowing acquisitions.
22     Q.  At the time that Strike Force was
23 purchased in 2010, did Strike Force, in your
24 opinion as an economist, present a significant
25 economic threat to the UFC?

**373**

1          MR. WIDNELL:  Objection, form.
2  BY THE WITNESS:
3      A.  Not such a threat that the acquisition
4  would have -- would have materially affected
5  competition to the detriment of consumers and --
6  and fighters.
7      Q.  Did Pride at the time it was purchased
8  present a significant economic competitive threat
9  to Zuffa at the time it was purchased?
10     A.  And my answer's the same.
11     Q.  Would it be the same for all of the
12 entities?
13     A.  Yes.
14     Q.  Is it fair to say that even if we put the
15 promoters that Zuffa acquired aside --
16     A.  Let me finish -- let me say -- I should
17 have put the word "adversely" affect competition.
18     Q.  Is it fair to say, putting the promoters
19 that Zuffa acquired aside, that your report does
20 not identify a single MMA promotion other than
21 Zuffa that does business in the United States that
22 had substantial market share and was profitable?
23         MR. WIDNELL:  Objection, form.
24 BY THE WITNESS:
25     A.  Are we -- are we saying that Bellator's

**374**

1  not profitable and doesn't do business in the
2  United States?
3      Q.  Is it your opinion that Bellator has
4  substantial market share and is profitable?
5      A.  It's -- it's got a substantial position in
6  the market and it seems to be surviving.
7      Q.  Is it your opinion that Bellator is
8  profitable currently?
9      A.  Well, it's an ongoing entity.  So the
10 present discounted value of what those investors
11 think that this project is worth must be
12 positive.
13     Q.  Is it your opinion that the revenues that
14 Bellator brings in in any year exceed the costs of
15 running the organization in that year?
16     A.  I've not looked at the balance sheets of
17 Bellator, but given that they're still in business,
18 there must be some anticipation of positive cash
19 flow even if it's negative today.
20     Q.  So you're saying that it's your
21 understanding that there's an anticipation that
22 Bellator will one day be profitable, but you don't
23 understand that Bellator's profitable today; is
24 that right?
25         MR. WIDNELL:  Objection, form.

**375**

1  BY THE WITNESS:
2      A.  Well, I'm not -- I'm not offering an
3  opinion of whether they have positive cash flow
4  today.
5      Q.  When in your --
6      A.  Just as Zuffa did not have positive cash
7  flow when it was a young and nascent participant in
8  this market.
9      Q.  When, in your opinion, did Bellator come
10 to have significant market share in the United
11 States?
12     A.  I don't recall the time series on
13 Bellator's market share.  I recall that they have
14 television contracts.  They're backed by Viacom and
15 so on.
16     Q.  Putting Bellator aside for the moment, can
17 you identify another MMA promotion that does
18 business in the United States that has significant
19 market share, in your opinion, and is profitable?
20     A.  Well, a lot of these must be profitable.
21 King of the Cage has been around putting on dozens
22 of events every year for many years.  There's a
23 long list of promoters that are -- that are doing
24 this and -- you know, the market share you're
25 referring to is very limited in its scope because

428

1  A. Let's suppose we had a case that -- let me
2  see if I can help you out or you can help me out or
3  we can help each other out.
4     Q. Good.
5     A. Suppose there's a regression of wages on
6  some all-agreed-upon conduct indicator. Okay? So
7  there's -- and there's a before and after.
8     Q. Okay.
9     A. And we say that wages were 2 percent lower
10 controlling for other stuff in the conduct period,
11 okay, and we're not doing anything about the --
12 forget critiques of whether the conduct -- and
13 suppose it was a really good controlled experiment
14 before and after.
15    Q. Fair enough.
16    A. Then there's a 2 percent impact of the
17 conduct, okay, which, as I just said, we're all
18 going to agree that this is right -- the right way
19 to measure the conduct.
20    Q. Understood.
21    A. Then one would need the stipulation along
22 with that that the practices in question didn't
23 have some offsetting impact that would have raised
24 pay because -- but we have a before and after
25 that's the conduct period. So we've really taken

429

1  that into account.
2     Q. So let's say in your example with the
3  well-specified regression showing a 2 percent
4  decrease in wages after when compared to before
5  that revenues were different in the after period
6  and the before period. Would you multiply the 2
7  percent times the amount of revenues that you
8  thought would be existing in the but-for world or
9  the amount of revenues that would be existing in
10 the actual world?
11       MR. WIDNELL: Objection, form.
12 BY THE WITNESS:
13    A. Okay. Well, see, you know, I didn't
14 succeed in getting us on the same page because you
15 just multiplied by revenues. So revenues just came
16 sneaking in through the back door. It was a
17 2 percent change in their pay, their compensation,
18 their salary.
19    Q. Okay. I understand.
20    A. Revenues is gone.
21    Q. All right. Understood. Okay. So do you
22 multiply, then, by the total amount of compensation
23 paid to the workers in the actual world or the
24 total amount of compensation you believe would have
25 been paid to the workers in the but-for world?

430

1  A. For the experiment we just did, you know,
2  we controlled for growth and other stuff and it was
3  just the -- I think if we understand each other,
4  it's a 2 percent reduction in wages. So give them
5  2 percent of their wages.
6     Q. Let's say that the conduct in question had
7  another effect -- strike that. I get it. I'll
8  move on.
9        Paragraph 108, please. You state in
10 paragraph 108 on page 47 -- I think I have the
11 wrong paragraph here. Oh, I mean paragraph 109.
12       You quote or paraphrase something from
13 Dr. Singer. You say "As Dr. Singer notes, athletes
14 value the opportunity to develop their careers by
15 fighting against highly-ranked opponents and
16 audiences are drawn to fights among highly ranked
17 opponents"; do you see that?
18    A. Yes.
19    Q. Do you agree with Dr. Singer's
20 observation?
21    A. That people want to fight highly ranked
22 opponents?
23    Q. Yes.
24    A. Well, they want to fight highly-ranked
25 opponents when they think they're ready to fight

431

1  highly-ranked opponents.
2     Q. And are audiences drawn to fights among
3  highly-ranked opponents?
4     A. I think -- I think ratings are higher. I
5  think there was some evidence that ratings are
6  higher when highly-ranked people fight against each
7  other.
8     Q. Do you agree that MMA fighters value the
9  ability to develop their careers by fighting
10 against highly-ranked opponents when they're ready
11 to fight them?
12    A. Yeah. I think that's why they sign up.
13 That's one of the reasons they sign up.
14    Q. Is it fair to say that a fighter can't --
15 cannot advance in the rankings unless that
16 fighter's able to fight other fighters that are
17 ranked higher than them, right?
18       MR. WIDNELL: Objection, form.
19 BY THE WITNESS:
20    A. I don't think that's literally true, but
21 you don't have to fight somebody higher than you to
22 move up.
23    Q. But in order to substantially move up in
24 the rankings, all things equal, it would be better
25 for you to fight higher ranked fighters, correct?

**PUBLIC COPY - REDACTED**

432

1    MR. WIDNELL: Objection, form.
2    BY THE WITNESS:
3    A. Since I don't know exactly how the ratings
4    or the rankings happen, let's assume they're like
5    college football rankings, then you take into
6    account the types of opponents you've had and how
7    you did and somebody has a formula that tries to
8    take that into account. Same thing with golf
9    rankings and all sorts of things.
10   Q. All things equal, consumers will be
11   willing to pay more to see highly-ranked opponents
12   fight than lower-ranked opponents fight; is that
13   fair?
14   MR. WIDNELL: Objection, form.
15   BY THE WITNESS:
16   A. In every instance, no, but on average
17   probably yes.
18   Q. Higher ranked fighters, all things equal,
19   generate more revenues when they fight than
20   lower-ranked fighters, correct?
21   MR. WIDNELL: Objection, form.
22   BY THE WITNESS:
23   A. Not always, but on average that's probably
24   true.
25   Q. Turn to paragraph 96, please. In the

433

1    first sentence after the dash you state "There is a
2    natural tendency for a leading promoter to attract
3    a significant share of the top athletes"?
4    A. Yes.
5    Q. "This follows," you say, "from the
6    complimentarity of athlete talents in producing
7    high-quality bouts" --
8    A. That's the point we just made.
9    Q. -- "and the desire among athletes to fight
10   against the best"; do you see that?
11   A. Yes.
12   Q. And you agree with that?
13   A. Yes.
14   Q. Can you please explain the natural
15   tendency for a leading promoter to attract a
16   significant share of the top athletes. What does
17   that mean?
18   A. It means that athletes -- their talents
19   are complementary, that the good athletes want to
20   be in the places where the -- where the other good
21   athletes are so they can fight them. And then
22   it's -- it's kind of a feedback system that you
23   attract some of the good athletes, they fight well,
24   it makes it more attractive for the other good
25   athletes, and so on. So Zuffa kind of runs a

434

1    platform that has been successful in attracting the
2    top athletes and that complementarity plays a
3    role.
4    Q. How do you define "significant share" as
5    you use that term in this sentence?
6    A. All other things equal, a firm that is
7    attracting the top athletes will see its share
8    among the top athletes rise.
9    Q. And that's because fighters generally have
10   an interest in competing against the best fighters,
11   right?
12   A. Well, that's part of it, but the
13   complementarity is there's more energy created when
14   you put the good fighters against each other. So
15   the -- the customers like that too.
16   Q. And those are the fights that would likely
17   lead to career advancement and higher compensation
18   ultimately, correct?
19   MR. WIDNELL: Objection, form.
20   BY MR. CRAMER:
21   Q. The ones with higher energy.
22   A. Broadly speaking.
23   Q. Broadly speaking, yes?
24   A. Broadly speaking, if I -- if I'm
25   successful against higher-ranked people, I will

435

1    probably advance more and get paid more and so on,
2    as I understand the process.
3    Q. You can put that paragraph aside.
4    Would you agree with me that by
5    restricting fighter mobility used the challenged
6    contracts Zuffa's made it more difficult for other
7    MMA promotions to access UFC's top fighters, all
8    things equal?
9    A. No.
10   Q. Are you aware that Zuffa and banks working
11   with Zuffa have seen the challenged contracts and
12   describe the challenged contracts as barriers to
13   entry to rivals?
14   A. I think I know what you're -- to what you
15   are referring and I wouldn't characterize it that
16   way.
17   Q. All right. Would you take a look at what
18   has been marked as Exhibit 12. We marked it
19   earlier today. It was in the pile in front of you.
20   A. Exhibit --
21   Q. 12. It is the --
22   A. It's the Deutsche Bank?
23   Q. Correct.
24   A. What page do you want?
25   Q. I would like you to turn to page 7 of the

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

436

1  **Deutsche Bank document.**
2     A.  Yep.
3  [redacted]

437

[redacted]

438

[redacted]

439

[redacted]

44 (Pages 436 to 439)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

440

[redacted]

441

[redacted]

442

[redacted]

20   MR. CRAMER: All right. I'd like to show
21   you -- or have marked as Exhibit 17 the next
22   document.
23   (Topel Exhibit 17 was marked
24   as requested.)
25   BY MR. CRAMER:

443

1   Q. Exhibit 17 is a two-page series of e-mails
2   bearing the Bates range WME-Zuffa-00013978 through
3   979. The cover e-mail is from Brent Richard to
4   Al Pfitzenmaier and its subject is "Risks and
5   mitigants" and it's dated --
6   A. I'm a little confused. This one says it's
7   from Brent Richard to Brent Richard. So...
8   Q. -- and it's dated March 20, 2016. There's
9   an e-mail at the bottom that he must have been
10  sending it to himself --
11  A. That's my --
12  THE REPORTER: One at a time, please.
13  THE WITNESS: Sorry.
14  BY MR. CRAMER:
15  Q. Do you know who Brent Richards is?
16  A. It says here he's the global head of M&A
17  at WME and IMG.
18  Q. Okay. And you've seen this document
19  before, right?
20  A. Yeah, I probably saw this. I've seen
21  thousands of documents.
22  Q. Well, you rely upon it in your footnote 46
23  and 407; is that right?
24  A. Let's take a look at it, footnote 46 and
25  407. What is this supporting -- okay. Okay. And

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**



444
1  then what's the other footnote?
2     Q. 407.
3     A. Okay. Somewhere on there -- there it is.
4  Okay. Same quote. It appears twice.
5     **Q. Okay.**
6     A. Yes.
7     **Q. So you -- you believe this document is a**
8  **reliable source of information about Zuffa; is that**
9  **fair?**
10        MR. WIDNELL: Objection, form.
11 BY THE WITNESS:
12    A. I believe that Dr. Singer quoted it in the
13 context that it was used by him.
14    **Q. And you quote from it too, right?**
15    A. Well, I'm quoting -- didn't he quote that?
16    **Q. I'm sure that he did, and you did as well.**
17    A. That's his -- that's his quote. So I'm
18 quoting him.
19    **Q. All right. Do you believe that this**
20 **document is a reliable source of information**
21 **regarding Zuffa's business practices?**
22    A. I think it's a reliable source of
23 information for that quote that was provided by
24 Dr. Singer.
25    **Q. Okay.**

445
1     A. What -- what part are you pointing to?
2  And then we can talk about it.
3

447
13    **Q. You can put that aside.**
14    A. Okay.
15    **Q. Turn to footnote 233 on page 72 of your**
16 **report.**
17    A. Footnote 233?
18    **Q. Yeah. In the first sentence of footnote**
19
24 Okay?
25       (Witness reviewing document.)

46 (Pages 444 to 447)

**PUBLIC COPY - REDACTED**