# Exhibit 25

Deposition of Roger D. Blair, Ph.D.

(December 8, 2017)

(excerpted)

PUBLIC COPY - REDACTED

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
        Plaintiffs, )
)
        vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
        Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROGER D. BLAIR, Ph.D.

Orlando, Florida

December 8, 2017

7:57 a.m.

Reported By:
Dawn A. Hillier, RMR, CRR, CLR
Job No. 52572

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

Page 14

1  the NCAA cartel. I have another paper that's in
2  progress on rethinking baseball's antitrust exemption.
3       I have a chapter in the Oxford handbook on
4  sports economics regarding the -- you know, regarding,
5  again, baseball's antitrust exemption. And a paper in
6  the antitrust bulletin that was addressing the
7  inferences one might draw with respect to the treatment
8  that Barry Bonds got at the end of his career when his
9  contract ran out and he couldn't find anybody that
10 wanted to sign him.
11      There probably are some other things that I'm
12 not thinking of.
13      Q  It sounds like you've written pretty widely in
14 the economic analysis of sports or sports economics; is
15 that right?
16      A  Well, to some extent, yes.
17      Q  What, if anything, would you say defines
18 sports economics as a distinct field? Or distinguishes
19 the study of sports as an economist?
20      A  The economics is not different because we're
21 talking about sports. The institutions are -- you know,
22 may be different. There are -- when we're talking about
23 professional sports this spans all kinds of leagues and
24 organizations. So, you know, you could be talking about
25 the PGA Tour, which is an organization as opposed to the

Page 15

1  National Football League, which is a -- which is a
2  league. You know, as I say, the economics aren't really
3  different. The institutions are somewhat different.
4  The -- there are some unique or idiosyncratic rules that
5  show up in collective bargaining agreements that, you
6  know, that come into play that make things -- they
7  affect the analysis, but they don't change the central
8  focus which should be in terms of -- in most cases, in
9  terms of microeconomics. To some extent, there are
10 issues that surface in terms of, like, stadium financing
11 that -- or franchise location that, you know, that give
12 rise to economic impact studies which are kind of a
13 macroeconomics thing, although, you know, they're not
14 economy wide, they're, you know, focused in or
15 centralized in, you know, certain locations.
16      You know, and there were other sorts of
17 regulations that come into play, like Title IX and...
18      But now, of course, we're getting into the
19 amateur sports. You know, so there's the NCAA, which
20 has, you know, got, you know, certain -- you know, sort
21 of unique features. But nonetheless, you know, the
22 tools of analysis are common to, you know, the economist
23 tool kit, so to speak.
24      Q  Are there any -- I think -- well, you
25 mentioned there are some idiosyncratic rules and CBAs,

Page 16

1  but other than that, are there any other distinguishing
2  characteristics about the labor markets in sports as
3  compared to other industries?
4       A  Well, I mean, I don't know what you're
5  referring to or, you know, I mean, I'm assuming that
6  you've got something in mind.
7       But --
8       Q  Well let me -- let me clarify -- go ahead.
9       A  No. You go.
10      Q  All right. So, I guess what I'm getting at is
11 I guess some economists study industrial organizations
12 and study the way firms interact in a variety of
13 industries and don't necessarily separate out firms in
14 one industry from another. And I guess, is there
15 anything -- is there any reason -- is there any reason
16 why, looking at labor markets and sports, for example,
17 you might bring tools to bear that are different than a
18 standard -- than the standard methodologies of
19 industrial organizations?
20      A  Well, so, there are some things that are a
21 little -- I guess a little unusual. A lot of the
22 professional athletes are unionized. And the union
23 is -- what the union bargains for is a little strange in
24 this sense. That the unions don't appear to be at all
25 concerned with individual compensation. And, so,

Page 17

1  they're sort of bargaining for a pot of money that the
2  athletes can then fight over. And, you know, I mean,
3  so, you have, you know, dollars associated with, you
4  know, a particular team. And then the athletes that are
5  going to be employed by that team essentially have to
6  try to get as much of that pool as they can,
7  individually, which is, you know -- I mean, usually what
8  you think of with unions, is that they're trying to
9  negotiate so that, you know, everybody's getting more or
10 less the same thing. And, so, you know, that would
11 be -- that would be a difference, or something that's
12 sort of idiosyncratic.
13      You know, at some level, you know, for some of
14 the -- some of the athletes are -- well, all athletes
15 have some uniqueness to their set of skills and
16 abilities. You know, some are bigger, some are faster,
17 some are stronger, some are more durable. You know,
18 some have a better feel for the game than others. And,
19 you know, there are some that, you know, that are kind
20 of superstars. And, you know, and given their skill set
21 and their abilities, they make a lot of money that --
22 and there are players that play other positions that are
23 less talented, or at least less uniquely talented. And,
24 you know, and they make less money. And, you know, so
25 there are differences like that.

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

18

1  Q  I think you mentioned the uniqueness of a set
2  of skills and abilities that certain players have.  And
3  that in professional sports, tell me if I'm accurately
4  characterizing what you said, that in professional
5  sports, there are superstars as well; is that right?
6  A  Yes.
7  Q  Is it fair to say that the unique set of
8  skills that athletes have or their fame plays an
9  important role in the revenues generated by sports
10 organizations?
11 A  Yeah, sure.  I mean, because -- I mean,
12 because of fan appeal and, you know, the fans are more
13 willing to pay to watch some of these so-called
14 superstars.
15 Q  Exactly.
16 A  Yeah.  Sure.
17 Q  Does that characteristic of the product that's
18 being created in that -- in professional sports, does
19 that one characteristic that distinguishes it from other
20 industries where the customers of the product don't
21 really know or care who the workers are that made it,
22 necessarily?
23     MR. WIDNELL:  Objection, form.
24     THE WITNESS:  You mean, like when -- if I buy
25 a Toyota, I don't really have any idea who

19

1  assembled the parts and who designed it and that
2  kind of thing?
3  BY MR. SILVERMAN:
4  Q  Exactly.
5  A  And so I'm not willing to pay a premium for
6  that Toyota because some, you know, revered designer,
7  you know, sort of designed how --
8  Q  Right.
9  A  -- the car looked.
10    Okay.  So, that's -- you know, lots of
11 products that we buy are like that; right?  You know,
12 some of them -- some of the products, however, are
13 endorsed by movie stars or sports stars or, you know,
14 people that have certain appeal to consumers.  But I
15 guess your question is, you know, am I particularly
16 interested in going to watch the Orlando Magic play
17 because they're playing against the Cleveland Cavaliers
18 and I want to watch LeBron James play.
19 Q  For example.
20 A  Is that --
21 Q  Yeah.  Well, that's part of my question.  But,
22 yeah, can you answer that question?
23 A  Yeah.  Sure.  I mean, yeah.  Of course.  I
24 mean, you know, people --
25 Q  Yeah.

20

1  A  Yeah.  I mean, sure.  People want to, you
2  know, may well want to see somebody like LeBron James
3  play, even though he's playing for the visiting team.
4  Sure.
5  Q  So, given that sports has this characteristic,
6  which I won't call unique, but different then, let's
7  say, the Toyotas, for example, in that the ultimate
8  consumer is the fans may care about the identity of
9  the -- or the performance of the individual workers
10 producing the product, does that give rise to any unique
11 issues in studying sports as a field, as opposed to
12 other -- I'm sorry, sports as an industry as opposed to
13 other industries?
14     MR. WIDNELL:  Objection, form.
15     THE WITNESS:  Well, I mean, that's a specific
16 feature of the demand on the part of the fan base
17 or consumers, you know, that can influence how many
18 people are willing to buy tickets to watch.  And
19 how much they're willing to pay for those tickets.
20 But, you know, the determination of those issues
21 depends on, you know, a host of factors in addition
22 to whether some famous superstar is there or not.
23 You know, has to do with promotion and has to do
24 with how well the team is doing, or teams, and how
25 close the game might be and therefore how exciting

21

1  it might be to watch.  And there's a whole host of
2  things that are, you know, specific things that,
3  you know, one might want to think about when
4  analyzing questions in sports.
5  BY MR. SILVERMAN:
6  Q  Changing gears for a sec.  Have you testified
7  in court before as an expert witness?
8  A  I have, yes.
9  Q  How many times?
10 A  My best estimate is about 25 times.
11 Q  About how many of those cases were antitrust
12 cases?
13 A  Assuming that 25 is a good estimate, I would
14 say probably something in the order of the high teens.
15 Maybe as much as 20, but...
16    That's about as good as I can do.
17 Q  And have you testified on both the plaintiff's
18 side and defense side in antitrust cases?
19 A  I have, yes.
20 Q  How many times have you had your deposition
21 taken?  That might be a tough one.  If you can estimate.
22 A  Probably -- probably about 60 times.
23 Q  And how many times have you been retained by
24 Boies Schiller, Zuffa's attorneys in this matter?
25 A  In any matter?

6 (Pages 18 to 21)

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

---

Page 22

1  Q  In any matter, yeah.
2  A  All right. So, I'm hesitating because I guess
3  the answer's twice, although the retentions were kind of
4  simultaneous.
5  Q  What were the two matters?
6  A  Well, there was, you know, a preliminary, I
7  guess, investigation by the Seattle field office of the
8  FTC that dealt with matters that were, you know, pretty
9  much the same thing as the matters in this case. And
10  then there was this case.
11  Q  Have you been retained -- other than those two
12  matters, have you been retained as an expert witness in
13  any other cases involving the MMA industry?
14  A  No.
15  Q  Or combat sports?
16  A  No.
17  Q  Have you ever -- before working on this case,
18  have you ever studied combat sports?
19  A  Not in depth. But, you know, in teaching a
20  sports economics class, I made the mistake of sending
21  out a questionnaire to the class asking them, in the
22  beginning, what they might be interested in my making
23  sure that I covered. And a couple of them pointed that
24  they were interested in MMA. And so I had to go find
25  out something about it so that I could, you know,

Page 23

1  conduct a sensible class.
2     But beyond that, I would say no.
3  Q  What did you -- what did you research for the
4  purposes of your class on MMA?
5  A  I don't recall at this point.
6  Q  Have you retained -- other than the two --
7  this case and the other one you mentioned, have you ever
8  been retained as an expert witness in any other cases
9  involving other professional sports organizations?
10  A  Okay. So there was a matter involving the PGA
11  Tour that I did some work on a while ago. And then
12  there was -- well, this didn't deal with organizations.
13  But I mean, I worked on an RPM case that involved
14  Callaway Golf.
15  Q  By RPM, you mean resale price maintenance
16  or...
17  A  Yes.
18     And then there was another matter for Callaway
19  that dealt with a dispute with the -- I forget the name
20  of the organization, but it's the actors' guild, you
21  know, the union.
22  Q  SAG? Is that the Screen Actors Guild?
23  A  Yeah. Yeah.
24     Other than that, I don't -- I don't
25  remember -- well, there's something -- there was

Page 24

1  something that I worked on for Acushnet which is the
2  title that makes Titleist golf balls.
3     I don't remember any other cases.
4  Q  Okay. What was the PGA Tour case about?
5  A  Well, this was some time ago. But it had to
6  do with -- you know, there was some dispute about
7  eligibility requirements for the players. So, as you
8  might imagine, when they put on an event -- I think this
9  was for the -- I think this was actually for the senior
10  tour events.
11     You know, there's only so many players they
12  can have in the field. And they had eligibility
13  requirements. And somebody was objecting to the
14  eligibility requirements, I guess. I think that
15  that's -- as best I can remember, that was the issue.
16  Q  And who were you retained by in that case?
17  A  Well, it was -- I was retained by a lawyer
18  representing the PGA Tour, or the senior tour, or
19  whichever it was.
20  Q  And was the tour the defendant in that case?
21  A  Yes.
22  Q  Were the claims -- were there antitrust claims
23  involved, if you recall?
24  A  Well, you know, I don't recall specifically.
25  But there were probably some antitrust claims, you know,

Page 25

1  regarding the eligibility requirements.
2  Q  What was the basic opinion you offered in that
3  case, if you recall?
4  A  I don't remember.
5  Q  Has any portion of your testimony ever been
6  excluded by a court?
7  A  There was one case where I think that the
8  district court objected to the way that I defined a
9  relevant market for -- well, it was a relevant market
10  for the case, but it was, you know, driven by the -- you
11  know, a specific hospital in a, you know, fairly
12  isolated area. And, you know, I think that there was
13  some question about that that became moot because the
14  case that was on appeal was settled. I can't think of
15  anything beyond that.
16  Q  Do you remember the name of that case?
17  A  Not specifically, no.
18  Q  Was it M&M Medical Services -- some medical
19  supplies and services versus Pleasant Valley Hospital?
20  Does that sound familiar?
21  A  Okay. So, I know there were some -- these
22  were -- there were a couple of durable medical equipment
23  cases that I worked on. And, you know, and one of them
24  was the case that I'm referring to. But I don't
25  remember whether it was M&M specifically or not.

7 (Pages 22 to 25)

**PUBLIC COPY - REDACTED**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

**Page 26**

1  Q   And in that case, were you offering an opinion
2  on behalf of the plaintiff?
3  A   Yes.
4  Q   If we turn back to your report and look at
5  paragraph eight. The section is titled "assignment."
6  And you write that your assignment was to review the
7  report -- the expert report of Andrew Zimbalist and to
8  provide your economic evaluation of his analyses and
9  form expert opinions of his analyses. And you also say
10 that you were asked to analyze UFC compensation, taking
11 into account the athlete's experience as an athlete.
12     Was that the entire scope of your assignment?
13 A   As I recall, yes.
14 Q   And you mentioned that your colleague, is it
15 Dr. Durrance?
16 A   Yes.
17 Q   And that she assisted you and you also
18 mentioned in your report that OSKR staff assisted you;
19 is that right?
20 A   Yes. Yes. That's correct.
21 Q   What is OSKR?
22 A   It's a consulting firm located in -- I forget
23 where exactly. I always think of them as being in
24 Berkeley, but they're not actually in Berkeley, I don't
25 believe. California, that is.

**Page 27**

1  Q   Are you affiliated with OSKR?
2  A   I am not.
3  Q   Who at OSKR did you work with?
4  A   Andy Schwarz and Colin Weaver.
5  Q   Who retained OSKR to assist you?
6  A   I'm not sure who did. I didn't retain them
7  and they didn't retain me.
8  Q   Have you worked with them before?
9  A   Yes.
10 Q   Do you know who paid OSKR's bills?
11 A   I don't know for a fact, no.
12 Q   And in this case, have you been compensated by
13 Zuffa or OSKR?
14 A   So, administratively, what I do is submit
15 bills to OSKR. And, you know, then they deal with
16 whoever's paying the bills to get me paid. And I'm
17 assuming that it's Zuffa, but, you know, I don't -- I
18 don't know for a fact.
19 Q   Did OSKR perform any analyses for you that
20 informed the opinions in your report?
21 A   Well, they put together some information for
22 me that, you know, that was useful. You know, they
23 were -- whatever number crunching was involved, they
24 did.
25 Q   When were you retained by Zuffa in this case?

**Page 28**

1  A   So, initially, I was retained a couple of
2  years ago to -- and at that time, what was ongoing was
3  the class action was in its infancy so that that action
4  was -- you know, had been filed, but, you know, I don't
5  think that there was a whole lot of activity at that
6  point, although there may have been. The major focus of
7  my effort at that time was on the FTC matter.
8      And then, you know, and then there was a long
9  lull, in which I didn't do anything at all. And then,
10 you know, recently, I was asked to prepare a report in
11 this case.
12 Q   What work did you do in the FTC matter?
13 A   Well, the FTC, you know, I wasn't -- I didn't
14 participate in a lot of meetings. I went to one, you
15 know, where there was a presentation. And prior to that
16 meeting with the FTC, the FTC, as I recall -- it was a
17 couple years ago. But as I recall, they sent to Zuffa's
18 attorneys a list of items that they were interested in
19 gaining some understanding of or gaining some
20 information on. And I, you know, worked on putting
21 together the information and participating in the
22 meeting with the FTC field office to discuss the items
23 that they were interested in and to provide the
24 information that I've been able to put together at that
25 time.

**Page 29**

1  Q   Did you produce a report for the FTC?
2  A   You know, sort of. I mean, it's not -- I
3  mean, I wouldn't actually call it a report. But there
4  was, you know, sort of an outline of points that -- and
5  then there were some, you know, like illustrations or
6  figures to -- that addressed specific issues that the
7  FTC had raised.
8  Q   Did you draw upon that work that you had done
9  for the FTC in your report that you submitted in this
10 case?
11 A   No. I started over again.
12 Q   How many hours did you spend preparing your
13 report in this case?
14 A   Okay. That's a good question.
15     So, in the actual preparation of the report --
16 and by that, I'm talking about, you know, all of the
17 work that I did. I don't mean just the writing of the
18 report, but what I had to do. So, for example, you
19 know, in preparing the report, I was -- I read
20 Dr. Zimbalist's report; right? So that's -- I consider
21 that part of the preparation. Is that okay?
22 Q   Sure.
23 A   Okay. So, in that regard, my best estimate of
24 how much time I spent, that is about 60 hours. Now, I
25 want to qualify that in this sense. That's what I felt,

8 (Pages 26 to 29)

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

Page 30

1  you know, was reasonable for me to bill, the time that I
2  felt was okay to bill for.
3       Now, and the reason why I say that is that,
4  you know, when I work on some of these issues, you know,
5  the issues are sort of always swarming around to one
6  degree or another in my head.  But if I'm thinking
7  about, you know, something that, you know, that I've
8  read at some point, or something like that, I'm just
9  sort of thinking about that while I'm riding into the
10 university or if I'm taking a shower or, you know, on an
11 exercise bike or something, I don't bill for that time.
12 So there's a lot of time I actually spend that I
13 can't -- that I never bill for.  I mean, I don't know.
14 Maybe other people do, but I don't.
15      And, so, it was more than 60 hours of, you
16 know, of effort.  But, you know, but 60 hours is
17 probably about as close as I can come to the amount of
18 time that I actually billed for the preparation of the
19 report.
20    Q   Did you or your staff perform any analyses
21 which you decided not to put in your report?
22    A   Not that come to mind, no.
23    Q   Do you know how much time OSKR billed in
24 connection with preparing your report?
25    A   I have no idea.

Page 31

1    Q   How about Dr. Durrance?
2    A   I don't know how much time.  I would guess she
3  probably spent around the same amount of time that I
4  did.  But I can't say that with certainty.
5    Q   If we turn to appendix C of your report, which
6  I believe lists the materials you considered.  On the
7  second page of appendix C -- first, am I right that
8  appendix C is the materials that you considered in
9  preparing your report?
10   A   I believe so, yes.
11   Q   On the second page, it lists collective
12 bargaining agreements.  And it lists a series of, I
13 guess, Major League Baseball, NBA, NFL, and NHL
14 collective bargaining agreements starting in 2001.  But
15 there's less six of them total.  In preparing your
16 report, did you study how any of the CBAs in these
17 professional sports evolved before 2011?
18   A   Not -- not in -- not in connection with any
19 issue in this case.  I mean, I've thought about the
20 evolution of collective bargaining over, you know, from
21 the time that it began to surface in, you know, these
22 major league sports.  But, you know, I was thinking
23 about that in, you know, connection with, you know,
24 writing the book that I did and teaching the course that
25 I taught, and, you know, things like that, you know.

Page 32

1  And I just thought that out of curiosity is, you know,
2  it's somebody interested in sports, generally.  But, in
3  connection with this specific case, I didn't really look
4  at that, no.  I mean, other than, you know, there was
5  some description of that evolution in Dr. Zimbalist's
6  report.  So, but I mean, I wasn't studying it to -- for
7  the purposes of figuring out what the evolution was.
8    Q   In preparing your report, did you consider any
9  materials involving the reserve system that existed
10 before or, you know, prior to 2011?
11      MR. WIDNELL:  Are you asking about materials
12   that he relied on in the report?
13      MR. SILVERMAN:  Yes.  Let's put that.  Let's
14   put the question that.  Yeah.
15      THE WITNESS:  Okay.  So, are you talking about
16   the reserve system that was, you know, sort of in
17   place prior to collective bargaining?  Or are you
18   talking about the reserve system or parts of it
19   that survived the advent of collective bargaining?
20 BY MR. SILVERMAN:
21   Q   I'm talking about either of those things
22 pre-2011.
23   A   Okay.  Well, with -- you know in connection
24 with this matter, I think that the answer to that is no,
25 that I did not look at, you know, didn't consider that

Page 33

1  in particular.  You know, I mean, I've -- but, you know,
2  but generally speaking, you know, I've paid attention
3  to, you know, the reserve clause that had been in
4  baseball for, like, a hundred years before it got kind
5  of squashed by a mediator.  But not in connection with
6  the matters in this report.
7    Q   I believe you asked for an extension of time
8  to prepare your report in this case; is that right?
9    A   The -- I asked the attorneys if I could get an
10 extension on the due date, yes.
11   Q   Can you tell us what the reason was you needed
12 an extension of time?
13   A   I didn't think I could complete the report by
14 the due date.
15   Q   Did you write the book "Monopsony in Law and
16 Economics"?  Or a book entitled "Monopsony in Law and
17 Economics"?
18   A   Well, not by myself.  You know, Jeff Harrison
19 was co-author of that book.
20   Q   I'm going to mark as Blair Exhibit 3.
21      (Exhibit 3 was marked.)
22 BY MR. SILVERMAN:
23   Q   This is some select excerpts from that book
24 that I'd like to go over with you.
25      I apologize for the markings.  The copy of the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

130

1  first -- especially in the first three years before
2  the players are eligible for final offer
3  arbitration, you know, they get paid -- it almost
4  doesn't matter how popular they are.  The teams
5  don't have to pay them much.  And so you saw
6  players like Kris Bryant for the Cubs and Mike
7  Trout for the Angels getting paid, you know, 4- or
8  $500,000.  When their contribution -- I haven't
9  done any calculations, but I'm convinced, you know,
10 would have been far above that.
11     So -- and then even when they're eligible for
12 final offer arbitration, you know, I think that the
13 estimates I've seen suggest that the outcome of the
14 final arbitration, you know, if you actually go
15 through the arbitration, that the -- the values
16 tend to be, on average, a little somewhat below the
17 marginal revenue products, although they're
18 reasonably close.
19     So, the statement that I was sort of agreeing
20 with was for free agents.
21 BY MR. SILVERMAN:
22    Q   Gotcha.  So, for free agents, their marginal
23 revenue product -- strike that.
24       For free agents, their wage approaches their
25 marginal revenue product whereas it might not for

131

1  players whose mobility is restricted; is that right?
2     A   Yeah.  I mean, now, you know, there's a
3  bargaining element in there.  And so, you know, you get
4  a range of outcomes.  So it may not be exactly that.
5  But, you know, it should be -- it should be reasonably
6  close.  Because you've got -- usually you have an
7  experienced agent representing the player who's
8  bargaining with an experienced employer.  And so they
9  kind of know -- both sides know what's going on.  It's
10 not like the experienced employer can take advantage of
11 some, you know, player that's, you know, inexperienced
12 and doesn't know how to bargain.  You know, usually
13 they -- especially the really good players have got very
14 experienced agents who, you know, are a reasonable match
15 for the employers.
16    Q   So, in the league sports, I think you said in
17 the league sports, for free agents, they are, in your
18 opinion, paid something close to their marginal revenue
19 product?
20       MR. WIDNELL:  Objection, form.
21       THE WITNESS:  Yeah.  Aside from some frictions
22 and whatnot that arise during the bargaining
23 process, yes.
24 BY MR. SILVERMAN:
25    Q   But, in those same league sports, like looking

132

1  at the -- looking at baseball, for example -- and I'll
2  get more -- more into the details of this later.  But
3  you've mentioned that depending on the seniority of the
4  player and various other rules, some players aren't free
5  agents or they're restricted free agents of some sort;
6  is that right?
7     A   Yes.
8     Q   And in your opinion from your experience
9  studying baseball, is it true that players who aren't
10 free agents who don't have full free agency are
11 generally paid a smaller -- a smaller proportion of
12 their marginal revenue product than the free agents?
13    A   Yes.
14    Q   Why is that?  Can you explain why that is?
15    A   Well, you know, we talked about this, you
16 know, before lunch.  You know, when the player -- you
17 know, if you have a player that's in his second year in
18 the major leagues, you know, he's had a good rookie
19 season and he goes and he talks to the general manager
20 and, you know, along with his agent, and they're
21 bragging about what a great job he did, and the team
22 agrees and gives them a $10,000 raise or, you know,
23 whatever is permissible under the collective bargaining
24 agreement.
25       But the player, in bargaining, you know, the

133

1  player's next best alternative is not very good,
2  relative to what he's being offered.  Right?  So they
3  have to pay -- let's say they have to pay him at least
4  $450,000 under the terms of the -- you know, the
5  collective bargaining agreement.  They don't have to go
6  much above that because for most baseball players --
7  well, for most people, $450,000 is a lot more than the
8  next best alternative.  So, that tilts the bargaining
9  power in favor of the team.  And, you know, they're
10 not -- they just don't have to pay much more than, you
11 know, than what's being -- you know, what's either in
12 the collective bargaining agreement or some nominal
13 increase above the minimum salary or, you know,
14 whatever.
15    Q   Is it fair to say that for most professional
16 athletes, at least in -- that's, you know, baseball,
17 football, basketball, hockey in the United States,
18 alternative employment options outside of their
19 particular professional sport aren't a reasonable
20 substitute?
21       MR. WIDNELL:  Objection, form.
22       THE WITNESS:  Well, of course, it depends on
23 what we mean by reasonable substitute.
24       Now, if, you know, you know, if you're a
25 talented left tackle, you know, in the National

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

134

1  Football League, you know, you may command, you
2  know, millions of dollars in annual salary because,
3  as a free agent, you can negotiate with various
4  teams.
5      And, so, what would that -- if that left
6  tackle stopped playing football, you know, what
7  else would that person do?  Well, it depends on the
8  person, of course.  You know, we don't know what
9  the alternatives actually are, you know.  Maybe the
10 guy would be a rock singer and maybe make more
11 money, but, you know, or maybe he would be a high
12 school football coach and make a whole lot less
13 money.  You know, it just -- you know, it depends
14 on the individual what the -- what the alternative
15 employment opportunities are.
16 BY MR. SILVERMAN:
17     Q   Well, what if we look -- I mean, if we talk
18 about this in the terms of the DOJ and FTC, horizontal
19 merger guidelines, for example, and they talk about
20 reasonable substitutes.  And I think they ask the
21 question, well, if a hypothetical, in this case,
22 monopsonist, controlled -- let's say if we're talking
23 about football -- all of the teams in the NFL, which
24 could be accomplished in reality by them all just
25 colluding with each other, as essentially they did under

135

1  the reserve clause, could they profitably suppress the
2  wage below the competitive level; right?  Does that --
3  is that a reasonable way of assessing this question of,
4  well, are other -- are other jobs for the player a
5  reasonable substitute?
6      MR. WIDNELL:  Objection, form, misstates.
7      THE WITNESS:  Well, to some extent, that's
8  accepting the DOJ and FTC's interpretation of some
9  meaningful deviation in the compensation.
10     Usually it's expressed in terms of elevating
11 the price.  Here, we're talking about depressing
12 the price.  And, you know, when they, in
13 practice -- what they talk about under certain
14 conditions, implies elasticities of something like
15 20, and it's really hard to find products that
16 are -- you know, where you actually have an
17 elasticity of 20.
18     So, but, I understand what you're talking
19 about.  You're talking about, you know, you have
20 this hypothetical monopsonist that controlled all
21 employment options for labor that fits into a
22 certain category.  You know, could they depress the
23 wage by something on the order of five or
24 ten percent, I suppose, for a non-transitory amount
25 of time, and would that -- you know, and could they

136

1  do that profitably, which means that not so many
2  people would walk away that, you know, that it --
3  that it would be -- become unprofitable.
4      I mean, to some extent, I guess, you could --
5  you could look at it that way.
6  BY MR. SILVERMAN:
7      Q   Going back to earlier, I think you said that
8  in baseball, free agents are, today, I think we were
9  talking about today, are paid something close to their
10 marginal revenue product, and that younger players or
11 players who aren't free agents are probably paid
12 something less than their marginal revenue product.
13     Is the same thing true for the other three
14 major sports:  Hockey, football, and basketball, in the
15 U.S.?
16     MR. WIDNELL:  Objection, form.
17     THE WITNESS:  Well, they've got -- you know,
18 so these sports vary in terms of what happens for
19 the entry-level players.  So, the contracts are --
20 you know, the terms of the contracts and the
21 restrictiveness of the free agency is, you know,
22 varies in football, depending upon what round you
23 got drafted in.
24     You know, I don't know about basketball.  I'm
25 just not sure about the details of those, those

137

1  leagues.
2  BY MR. SILVERMAN:
3      Q   I guess to just abstract out a little bit away
4  from the details of the restricted free agency in
5  various leagues, is it fair to say that -- that while
6  the details varied by the type of player, potentially,
7  and the league, that all of them impose on some set of
8  players some limitation on mobility so they're not a
9  complete free agent for some substantive players; is
10 that right?
11     A   That's my understanding, yes.
12     Q   As a matter of economic theory, does it make
13 sense that those players, due to those restrictions,
14 would make something less than a full free agent, as
15 compared to their marginal revenue product, some smaller
16 percentage of their marginal revenue product than a full
17 free agent?
18     MR. WIDNELL:  Objection, form.
19     THE WITNESS:  You know, so, there are other --
20 there are other aspects of that; right?
21     So, they've got -- you know, originally -- not
22 originally.  Before the last change in football,
23 the first round draft picks got salaries that
24 probably far exceeded their marginal revenue
25 product.

35 (Pages 134 to 137)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

138

1  Now, now, what they've done in the last
2  agreement -- see, they put some limitations on
3  the -- how much a team can pay those early round
4  draft picks.  Nonetheless, we've seen some examples
5  in the last couple years of first-round draft picks
6  that were not ready to play.  There was -- I forget
7  one of the quarterbacks was not ready to play.  And
8  he basically didn't play much at all his rookie
9  season.  But he still made millions of dollars.
10 And so, you know, in that case, he must have been
11 paid far more than his marginal revenue product for
12 that year because he wasn't -- you know, it wasn't
13 that he wasn't contributing anything, but, you
14 know, basically he wasn't playing.  And, you know,
15 if he's sitting on the bench, fans aren't coming
16 out to watch him sit on the bench.
17    So, you know, I can't completely agree with
18 what you're saying.
19    You know, in basketball -- sorry about that.
20 You know, in basketball, you know, I think that
21 there's -- I think there's some limitations as
22 well.  Ordinarily, in basketball, it seems like
23 they don't have -- they don't -- people who aren't
24 ready to play don't get drafted very highly, and
25 therefore, you don't have those same examples that

139

1  you find in football.  And then I'm just not much
2  of a hockey fan, so I don't know much about hockey.
3  BY MR. SILVERMAN:
4    Q  And, for the NFL and for basketball, when
5  players are restricted free agents, the period of time
6  when they were restricted free agents, does it make
7  economic sense that they would get paid a lower
8  proportion of their marginal revenue product than if
9  they were full free agents?
10    MR. WIDNELL:  Objection, form.
11    THE WITNESS:  I'd have to -- you know, I
12 haven't looked at the -- you know, the specifics of
13 the impact of being a restricted free agent as
14 opposed to a free agent.  And without having some
15 specifics regarding any limitations, I have a hard
16 time answering that question, sorry.
17 BY MR. SILVERMAN:
18    Q  If we look at page 350 of your textbook, under
19 the reserve clause, you write [as read]:  As we saw in
20 the discussion of competitive balance, the reserve
21 clause in the standard player contract bound a team to
22 one -- excuse me, bound a player to one team for as long
23 as that team wanted to employ the player's services.
24 The player's only alternative was to retire from the
25 league and change occupations.  Once under contract

140

1  then, a player dealt with a pure monopsonist.  There was
2  no one else who could or would bid for his services.
3  For most premier athletes, there are no alternative
4  occupations that are even close in terms of
5  compensation.  A few athletes can play other sports and
6  can predibly -- can credibly threaten to go elsewhere,
7  but not many.
8    Do you agree, that as far as most premier
9  athletes are concerned, there are no alternative
10 occupations that are even close in terms of compensation
11 compared to their professional sport?
12    A  For most of them, yes.
13    You know, there are exceptions like Bo Jackson
14 and -- God, I'm drawing a blank on some of the other
15 names.  But, you know, there are other people that
16 played multiple -- actually played at the highest
17 level --
18    Q  Right.
19    A  -- in, you know, various sports.
20    Q  But just a few exceptions generally; right?
21    MR. WIDNELL:  Objection, form.
22    THE WITNESS:  Yeah.  There aren't very many,
23 no.
24 BY MR. SILVERMAN:
25    Q  So, I mean, you talk here in the same

141

1  paragraph about -- about -- I'll read what you write.
2  [As read]:  Michael Jordan, arguably the best basketball
3  player of all time, tried his hand at baseball.  He was
4  mediocre and could not play at the major league level.
5  And then you conclude, most successful, professional
6  athletes stick to one sport.
7    Does that sound right?
8    A  Yeah.  I mean, there's people, like, as I say,
9  Bo Jackson, Danny Ainge played basketball and pro
10 baseball.
11    Again, you know, there are a couple of others,
12 but, yeah, I mean, most of the -- you know, so, for
13 example, I mean, you didn't see Tom Brady trying his
14 hand at baseball or basketball.
15    Q  Right.  And if he did, he'd probably get paid
16 a lot less; right?
17    A  He probably wouldn't get paid anything at all.
18    Q  On the next page, page 351, you write [as
19 read]:  With the demise of the reserves -- reserve
20 clause, players gain the measure of freedom.  There are
21 still some limits which are part of the collective
22 bargaining agreement.  But there are completely
23 unrestricted free agents in all major league sports.
24 Free agents should get the benefit of competition for
25 those services which would mean higher salaries.  Faced

36 (Pages 138 to 141)

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

142

1  with that prospect, owners have simply colluded at times
2  to avoid competing in the player market.
3       Is that accurate?
4    A   I believe so, yes.
5    Q   And the limits that are placed on free agency
6  in the major league sports, those are the result of
7  collective bargaining between the players' union and the
8  team owners; right?
9    A   Yes.
10   Q   What did you mean in this paragraph that I
11 just read when you said -- or when you wrote [as read]:
12 Free agents should get the benefit of competition for
13 their services, which would mean higher salaries?  If
14 you recall?
15   A   You mean, why did I say "should" in some sort
16 of normative sense?
17   Q   Yeah, normative sense.  Is it better that free
18 agents get the benefit of competition for those
19 services?
20       MR. WIDNELL:  Objection, form.
21 BY MR. SILVERMAN:
22   Q   Or is that what you meant?
23   A   I guess, you know, if you think about what
24 else we're talking about by collusions, so, you know, in
25 the absence of collusion, you would expect that they

143

1  would get -- and again, this comes out of, you know,
2  there could be some frictions in the bargaining process
3  and that kind of thing that would -- would lead to some
4  differences.  And there are always uncertainties, so...
5       But, you would expect that they would get paid
6  pretty much what the marginal benefit that they make for
7  the team, which is the marginal revenue product.
8       And I think that the "should" in there, and I
9  mean, I wrote this a long time ago.  But I think the
10 "should" in there is opening up the possibility that
11 you're not getting this competition and that, you know,
12 if the owners are colluding as, you know, their
13 demonstrated episode in Major League Baseball.  And then
14 there was actually a subsequent episode that wasn't very
15 well publicized in baseball.  We know that the owners in
16 the NFL colluded when they had that -- I forget the -- I
17 forget the word now, when you get -- when you decide
18 that you're going to -- when the players just voted
19 to -- to get rid of the union.  I forget what the
20 word -- the name.
21   Q   Decertify?
22   A   Yeah.  When they decertified the union, you
23 know, there was supposed to be some -- there should have
24 been a free-for-all.  And apparently the owners agreed
25 among themselves not to engage in that free-for-all.

144

1  And that kept, you know, compensation down, or whatever
2  it was they were fighting over at the time.  So that,
3  you know, there were episodes where there's collusion.
4  And, you know, and then you don't get the results that
5  you would expect to get in the absence of collusion.
6    Q   And you talked earlier about the abstract
7  model of monopsony and how monopsony leads to -- in
8  labor markets, at least leads to workers getting paid
9  something below their marginal revenue product.  And
10 that that leads to socially non-optimal outcomes.
11      Is the same thing true in sports?
12      MR. WIDNELL:  Objection, form.
13      THE WITNESS:  Well, in the first part, you
14 know, what leads to social welfare loss is not the
15 depressed wage, but the restricted employment.
16 Because, by restricting the employment, what you're
17 doing is you're failing to employ inputs where the
18 value of using them in producing the product is
19 higher than the social cost of their being
20 employed, which is measured by the height of the
21 supply curve.
22      So that's what causes that.  What happens with
23 the depressed wage in that case is that there's a
24 transfer of what ordinarily would have been
25 supplier surplus or producer surplus, you know,

145

1  whatever term we want to apply to that in a labor
2  market.  You know, and that gets transferred to the
3  employers in the form of higher profits.
4       And, so, and that's kind of a transfer.  But
5  the welfare loss is from restriction in the
6  employment.  And, so, that's the way that's set up.
7       So, so, with that in mind, what was your
8  question about sports, then?
9  BY MR. SILVERMAN:
10   Q   Well, I guess the first question is:  Do you
11 think that monopsony in the -- in sports markets, let's
12 say through collusion by the clubs in Major League
13 Baseball, for example, leads to any social harm?
14      MR. WIDNELL:  You're just asking about
15 baseball now?
16      MR. SILVERMAN:  Yeah.  Let's talk about
17 baseball for now.
18      THE WITNESS:  Okay.  So, so the way that --
19 that the monopsony is manifested in baseball, for
20 example, has to do with things like the roster
21 size.  Okay?  So, so, there's a -- you know,
22 there's a limit to the roster size.  And, if you
23 assume -- now, I don't know for a fact, you know,
24 as an empirical matter whether this is, in fact,
25 correct, but if you assume that the binding

37 (Pages 142 to 145)

PUBLIC COPY - REDACTED

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

146

1  constraint so they would have more people on the
2  roster than they actually have in the absence of
3  that constraint.
4       You know, you would say -- you know, you would
5  infer the same sort of thing, that is that since
6  it's a binding constraint, the teams would get
7  additional value out of having more players on the
8  roster. And, you know, assuming that they could
9  find people to play, fill out that larger roster,
10 which let's just assume that's possible, you would
11 have the same sort of welfare loss. And that is
12 that you have players that would contribute to the
13 overall value and that are not being employed. And
14 so there's a loss in value there. So, in that
15 sense, you know, there would be a social welfare
16 loss by that restriction.
17      You know, the fact that, say, Kris Bryant, you
18 know, some budding star of the Chicago Cubs, you
19 know, to the extent that they're paying him, let's
20 say, $500,000 and his marginal revenue product is
21 far above that, that does not create any social
22 harm because he's still playing. It's just he's
23 getting paid less so there's a distributional
24 effect, but, you know, but there's not a welfare
25 loss there.

147

1  BY MR. SILVERMAN:
2     Q   Is it possible that paying players
3  substantially below their marginal revenue product could
4  alter their incentives to invest, let's say, in their
5  own training or their own professional development?
6  Could that lead to a potential welfare loss?
7       MR. WIDNELL: Objection, form.
8       THE WITNESS: Okay. So, so, if you think back
9  to -- of course, I'm a lot older than everybody
10 else in the room. But when I was a kid, the -- you
11 know, the players in Major League Baseball, in the
12 off season -- now, I think this -- this was
13 actually before I had a vivid -- any actual
14 recollection, but there were stories about, you
15 know, following the World Series. They would
16 actually have major league stars barnstorming
17 throughout the south playing exhibition games for
18 extra money instead of training and, you know, and
19 that kind of thing.
20      You know, they had people that were, I
21 remember being a Dodgers fan, that Carl Furillo
22 was, you know, one year he was a National League
23 batting champion. And he worked in construction.
24 He had a hard hat job in the off season. And so he
25 wasn't working on his baseball skills. He was just

148

1  trying to earn a living, you know, as a
2  construction worker. So, the quality of the play,
3  you know, had to suffer. I mean, now, you know,
4  again, you know, you'd have to -- you know, people
5  would ask for some empirical evidence of this. But
6  you would -- you would surmise that the play would
7  have to suffer when you've got players that are
8  working construction instead of what, instead of
9  training, instead of lifting weights, stretching,
10 perhaps, you know, taking a hundred swings in the
11 batting cage every day during the off season, or
12 whatever -- you know, whatever major league players
13 are doing now to maintain and advance their skills
14 during the off season.
15      Well, you know, a lot of players, back in the
16 days when they didn't make much money, had to work
17 at other jobs. And, you know, some of them sold
18 insurance and, you know, things like that.
19      So --
20 BY MR. SILVERMAN:
21    Q   And could --
22    A   And in that case -- well, your question is
23 what effect would this have. And, you know, I think the
24 effect that it would have is that the quality of the
25 play would be lower and that, you know, in turn, could

149

1  have an impact on fan demand for watching major league
2  games and, you know, and then, you know, to that extent,
3  the value of the product that's being offered, that is
4  the competition of the field, you know, is lower and
5  consumers are worse off as a result.
6     Q   And couldn't that -- isn't that also a form of
7  allocative inefficiency if the marginal revenue product,
8  let's say, of this athlete working in a construction job
9  is less than the social value or the value -- or the
10 revenue generated simply by the fan interest that they
11 would generate if they had devoted that time and energy
12 to training, let's say?
13    A   Yeah. You know, the problem -- the problem
14 with the way you worded that, is that allocative
15 inefficiency is -- sounds like it ought to be -- have a
16 more popular meaning than it does to economists. You
17 know, to an economist that allocative inefficiency is a
18 term of art and it means what I described earlier, that
19 is, that certain inputs in the case of, you know, where
20 we're talking about inputs or in terms of output that,
21 you know, things are either not being purchased or not
22 being produced, when the value is higher than the cost.
23      And so there's a foregone value, and that's
24 what the -- that's what the allocative inefficiency is
25 related to. So, you know, we say that the monopolists,

38 (Pages 146 to 149)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

150

1   you know, there's allocative inefficiency associated
2   with the monopolist, because the monopolist does not --
3   does not put in enough resources to produce the welfare
4   maximizing quantity of output that it -- because it
5   restricts output.
6         And on the purchase side for buying inputs or
7   hiring inputs, as the case may be, that the decision is
8   to -- is allocatively inefficient because too few
9   resources are being purchased or hired in the sense that
10  their value exceeds their social cost.  So that's
11  what -- so allocative inefficiency has a technical
12  meaning.  And you're asking me a question that relates
13  to what happens to perhaps shifts in the demand
14  functions.  And that's a different matter.
15      Q   Let me step back a beat and just ask you, is
16  it your opinion that the reserve system was
17  anticompetitive on balance, which is related to what
18  we're talking about?
19      A   You mean historically?
20      Q   Historically.  The historic reserve system.
21      A   Is anticompetitive?
22      Q   Um-hum.
23      A   Is that the question?
24      Q   Yeah.
25      A   Sure.

151

1       Q   And why?
2       A   Because the reserve system, you know, was in
3   agreement among the major league teams to use a standard
4   player contract that had the evergreen provision, or
5   provisions whenever a collection of terms in the
6   contract is what we commonly refer to as the reserve
7   clause, which, you know, may have been more than a
8   clause.  But constituted that reserve system so that,
9   you know, once a player was signed to a contract, that
10  the -- you know, the club had property rights in that
11  contract and, you know, no one else could gain access to
12  that unless they sold it or traded it.
13        And, you know, so the agreement among all the
14  teams to respect that provision in the contract for all
15  the other teams meant that they were agreeing, you know,
16  not to compete for the services of any player that was
17  under contract to a different team.
18      Q   What is -- how would you define -- as a
19  scholar of antitrust economics, how would you define
20  what it means for a practice to be anticompetitive?
21      A   Well, a practice -- I mean, ordinarily, we
22  think of a practice as being anticompetitive if it's --
23  if we're talking about the output market, at least the
24  higher prices, lower quantities, lower quality.
25        And, you know, similarly, on the buying side,

152

1   if it leads to, you know, lower prices paid and lower
2   quantities purchased, you know, we think of those --
3   that conduct as being anticompetitive.  You know, it's
4   you know, conduct or practices that prevent competition
5   between alternative producers or alternative employers,
6   you know, we think of as being anticompetitive.
7       Q   And we discussed how the reserve clause gave
8   teams monopsony power over the players and we discussed
9   how that led to suppressed salaries.  Did it also lead
10  to lower output?
11      A   I don't think it led to lower output in the
12  sense that, you know, the teams -- the leagues had, you
13  know, at that time, a -- you know, a schedule of 154
14  games.  And, you know, it's hard to say whether it led
15  to a reduction in outputs in the National League.  It
16  was in place back in the 1800s, you know, so...
17        But by the same token, it's hard to imagine
18  that you get many more games into a season anyway since
19  you only have basically six months to play, which is 180
20  days.  And if you got 154 games, back in those days, the
21  travel was by train and bus and stuff.  I mean, it's
22  just, you know, it's hard to imagine that they could
23  have played many more games than that anyway, but, you
24  know.
25        In principle, maybe there was some, you know,

153

1   marginal reduction in the number of games.  You know, I
2   can't -- I can't say, but...
3       Q   So, when you say that the reserve clause was
4   anticompetitive, then, are you referring mostly to its
5   effect on players' salaries on that input price?
6       A   Well, it's that and the -- I mean, just on its
7   face, when you describe, you know, what that reserve
8   system involved, you know, it did limit the competition
9   between teams for a particular player's services.
10  Right?  So, if you and I want to hire the same player,
11  and he's under contract to me, then you have to buy that
12  contract from me either for cash, or you could trade
13  somebody else's contract for that contract.
14        But, you can't simply go to the player and
15  say, hey, why don't you -- next season, why don't you
16  play for me, because there's an agreement that you and I
17  are not going to compete in that way.
18      Q   Does any agreement -- I'm sorry.  Does any
19  practice that limits the competition between teams for a
20  particular player's services anticompetitive?
21          MR. WIDNELL:  Objection, form.
22          MR. SILVERMAN:  Strike that.  Let me rephrase
23  that.
24  BY MR. SILVERMAN:
25      Q   Is any practice that limits the competition