WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>    v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>        Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL)<br><br>**ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST UNDER FED. R. EVID. 702 AND *DAUBERT***<br><br>**HEARING REQUESTED**<br><br>**[REDACTED]** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

BACKGROUND ...................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

LEGAL STANDARD .............................................................................................. 3

ARGUMENT ........................................................................................................... 4

    I.     Dr. Zimbalist's Method For Determining The Appropriate Damages Measure Is Not A Generally Accepted Method To Measure Antitrust Damages. ................ 4

          A.    Dr. Zimbalist Uses A Damages Method With No Standards ...................... 5

          B.    As Much In Common As Possible Does Not Mean Anything in Common ................................................................................................. 8

          C.    Dr. Zimbalist's Methods Create Selection Bias. ........................................ 9

          D.    Dr. Zimbalist Makes Comparisons Arbitrarily. ....................................... 10

          E.    Reliance On An Average Of Other Firms Increases Unreliability. .......... 15

          F.    Dr. Zimbalist Fails To Define A "But For" World That Establishes Causation ................................................................................................. 16

    II.    Dr. Zimbalist's PTRR Method For Determining The Appropriate Damages Measure Is Not an Accepted Method To Measure Antitrust Damages. ............... 18

    III.   Dr. Zimbalist's Boxing Data Does Not Reliably Measure PTRR In Boxing. ...... 20

CONCLUSION ...................................................................................................... 22

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1

## <u>TABLE OF AUTHORITIES</u>

2

3   **CASES**

4   *Allgood v. Gen. Motors Corp.,*
5       2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) ..................................................................... 10

6   *Apple, Inc. v. Samsung Elecs. Co.,*
        2012 WL 2571332 (N.D. Cal. June 30, 2012) ..................................................................... 17
7
    *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,*
8       152 F.3d 588 (7th Cir. 1998)................................................................................................. 9

9   *CDW LLC v. NETech Corp.,*
10      2014 WL 272167 (S.D. Ind. Jan. 24, 2014) ....................................................................... 16

11  *City of Pomona v. SQM N. Am. Corp.,*
        866 F.3d 1060 (9th Cir. 2017).............................................................................................. 4
12
    *Concord Boat Corp. v. Brunswick Corp.,*
13      207 F.3d 1039 (8th Cir. 2000)............................................................................................. 16

14  *Daubert v. Merrell Dow Pharm., Inc.,*
15      509 U.S. 579 (1993) ................................................................................................... passim

16  *Doan v. Astrue,*
        2010 WL 234935 (S.D. Cal. Jan. 12, 2010) ....................................................................... 20
17
    *Domingo ex rel. Domingo v. T.K.,*
18      289 F.3d 600 (9th Cir. 2002)............................................................................................... 18

19  *El Aguila Food Prod., Inc. v. Gruma Corp.,*
20      131 F. App'x 450 (5th Cir. 2005) ..................................................................................... 9, 14

21  *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.,*
        213 F.3d 198 (5th Cir. 2000)........................................................................................... 11, 15
22
    *Ellis v. Costco Wholesale Corp.,*
23      657 F.3d 970 (9th Cir. 2011)................................................................................................ 3

24  *Everett Fin., Inc. v. Primary Residential Mortg., Inc.,*
25      2017 WL 90366 (N.D. Tex. Jan. 10, 2017) .................................................................... 14, 16

26  *Fosmire v. Progressive Max Ins. Co.,*
        277 F.R.D. 625 (W.D. Wash. 2011) .................................................................................... 20
27
    *Gen. Elec. Co. v. Joiner,*
28      522 U.S. 136 (1997).................................................................................................... 15, 20

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

*Harris Wayside Furniture Co. v. Idearc Media Corp.*,
   2008 WL 7109357 (D.N.H. Dec. 22, 2008) ................................................................. 8, 11, 14

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ........................................................................... 21

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................................... 9, 14

*In re Online DVD Rental Antitrust Litig.*,
   2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) ............................................................... 16

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   2017 WL 5311533 (D.D.C. Nov. 13, 2017) ................................................................... 16

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ........................................................................... 8

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009) ......................................................................................... 2, 8

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ....................................................................................................... 3

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ............................................................................ 8, 11, 14

*Muffett v. City of Yakima*,
   2012 WL 12827492 (E.D. Wash. July 20, 2012) ........................................................... 4, 7, 13

*Murphy Tugboat Co. v. Crowley*,
   658 F.2d 1256 (9th Cir. 1981) ....................................................................................... 16

*R & R Int'l, Inc. v. Manzen, LLC*,
   2010 WL 3605234 (S.D. Fla. Sept. 12, 2010) ............................................................... 8, 10, 22

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ......................................................................................... 16

*Sebastian Int'l, Inc. v. Russolillo*,
   2005 WL 1323127 (C.D. Cal. Feb. 22, 2005) ............................................................... 17

*Thermotek, Inc. v. Orthoflex, Inc.*,
   2016 WL 4678888 (N.D. Tex. Sept. 7, 2016) ............................................................... 14

*Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*,
   1999 WL 1293 (4th Cir. Jan 14, 1999) ......................................................................... 21

*U.S. v. 87.98 Acres of Land*,
   530 F.3d 899 (9th Cir. 2008) ......................................................................................... 4

iii

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

*U.S. v. Vallejo*,
    237 F.3d 1008 (9th Cir. 2001)........................................................................................ 4

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003)................................................................................... 17

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1    Defendant Zuffa, LLC ("Zuffa" or "UFC") hereby moves to exclude the testimony of Dr.

2    Andrew Zimbalist as Plaintiffs' expert pursuant to Federal Rule of Evidence 702 and *Daubert v.*

3    *Merrell Dow Pharmaceuticals*.  In support of this Motion, Zuffa states as follows:

4                                    **BACKGROUND**

5    Plaintiffs retained Dr. Zimbalist to determine "whether the challenged conduct is

6    anticompetitive in character," to comment on "potential pro-competitive justifications" related to

7    the challenged conduct, and "to calculate the total amount of undercompensation that members of

8    the bout class suffered."  Decl. of Nicholas A. Widnell, Ex. 1, Expert Report of Andrew Zimbalist

9    ¶ 4.[1]  At his deposition, Dr. Zimbalist clarified that he was "not doing a liability report."  Ex. 2,

10   Dep. of Andrew Zimbalist, 9/25/17 at 43:24-25.  As a result, the primary purpose of Dr.

11   Zimbalist's testimony is to measure damages.

12   Dr. Zimbalist purports to measure damages by invoking what is known as the yardstick

13   method (*i.e.*, measuring the difference between two things).  This method of estimating antitrust

14   damages involves identifying a firm similar to the firm being measured in all material respects but

15   for the impact of the antitrust violation. (If there are other material differences between the firms,

16   then simple comparisons cannot succeed in measuring damages and differences are either too

17   great for a reliable comparison or a method must be used to control for these differences such as a

18   regression analysis.)  To conduct this analysis, one must analyze, among other things, if the firms

19   are in similar markets and stand in a similar relative position in those markets, offer a similar type

20   of products, have similar managements, and are comparable in all other respects. If the firms are

21   not similar in a material respect, the yardstick method does not work because it does not

22   accurately predict what would have happened but for the alleged antitrust violation.  Ex. 3,

23   Herbert Hovenkamp, *Federal Antitrust Policy* 670 (2nd ed. 1999).

24   Dr. Zimbalist did not apply the yardstick method; he used a different and previously

25   unknown basis of comparing firms.  Dr. Zimbalist said he was using a yardstick method, but

26   testified that he was not familiar with any standards in the field for conducting a yardstick

27   _____

28   [1] All exhibits cited herein are to the Widnell Declaration unless otherwise stated.

---

1

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

analysis. Ex. 2 at 149:22-150:2, 158:4-11, 165:22-166:8. A "scientific" method without generally accepted standards is the hallmark of what *Daubert* said must be excluded. Dr. Zimbalist's testimony has previously been excluded for that very reason. *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009) (affirming exclusion of Dr. Zimbalist's testimony because he "'used his own version' of [a] test, a version that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support within the scientific community, and was produced solely for purposes of the instant litigation"). Dr. Zimbalist admitted that he chose comparators that had "as much in common . . . as possible" from firms in the field of sports with which he was familiar. Ex. 2 at 150:3-13. Using his as-close-as-he-could-find method, Dr. Zimbalist then chose five comparators—the NFL, MLB, NBA, NHL, and a boxing promotion (the same comparators identified in the Consolidated Amended Complaint ("CAC"))[2]—because he was familiar with them. *Id.* at 237:20-238:16. Rather than economic principles, he referenced standards applicable to real estate appraisal to justify his analysis. *Id.* at 158:23-159:4, 161:4-162:12.

To compare these sports, Dr. Zimbalist then invented a metric called "labor share" (referred to herein as the pay-to-revenue ratio, or "PTRR") which represents the percentage of a firm's revenue it pays to its employees (or, in this case, a subset of its employees). Dr. Zimbalist uses PTRR to perform a simple mathematical calculation: he calculates Zuffa's PTRR and the comparators' PTRR and compares them. For boxing, he relied on excerpts from an expert report in another case containing 2.5 years of unverified data for a single boxing promoter. Dr. Zimbalist then added the five comparators' PTRR and averaged them. According to Dr. Zimbalist, this average is what Zuffa should have paid its athletes during the class period. As a result, he subtracts Zuffa's yearly PTRR from this average, generating the difference between what Zuffa paid and allegedly should have paid. Ex. 4, Errata to Zimbalist Report, Table 4-E, 5-E.

---

[2] ECF No. 208, CAC ¶ 103 ("Athletes in sports such as boxing and the 'Big 4,' *i.e.*, football, baseball, basketball and hockey in the United States, generally earn more than 50% of league revenue, a significantly higher percentage of revenues than those paid to UFC Fighters").

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

# STATEMENT OF FACTS

Dr. Zimbalist submitted an expert report that claims to explain why UFC athletes should be paid the same PTRR as the average of his five comparator sports.[3]  He first provides his interpretation of Zuffa's contracts with its athletes, and describes various actions he believes Zuffa did or could have taken under those contracts that he would describe as "anticompetitive in character." Ex. 1 ¶ 4.  Dr. Zimbalist then provides a lengthy history of team sports in North America, including a review of different contract provisions and numerous leagues that have come and gone in baseball, football, hockey, and basketball.  He also describes certain business practices in boxing.  Based on his assertion that the history of his comparator sports show they are more competitive than Zuffa, he then compares Zuffa's PTRR to an average of the comparators' PTRR and ███████████████████████████████████. Ex. 4, Table 5-E.

# LEGAL STANDARD

The admissibility of expert testimony is a question of law for the Court.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Court performs a "gatekeeping" function to ensure that expert testimony admitted pursuant to FRE 702 "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).  The Court is tasked with ensuring that "junk science that does not meet [FRE] 702's reliability standards" is excluded.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The Court should evaluate, among other things, (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *Daubert,* 509 U.S. at 592-95.  The Court must assess and make findings regarding "the scientific validity or methodology of [the expert's] proposed testimony" and must provide an "analysis or explanation" in addressing a motion filed pursuant to FRE 702.  *City of*

---

[3] None of the five comparators pays the PTRR Dr. Zimbalist claims Zuffa ought to have paid. Every year, at least three (and sometimes four) of the comparators paid a lower amount.

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

*Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017) (citations omitted).

Expert testimony must "(1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge." *U.S. v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).  In addition, under FRE 702, proposed expert testimony must be based on "sufficient facts or data," be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The proponent of expert testimony bears the burden of satisfying each of these elements.  *U.S. v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008) (citation omitted).

## ARGUMENT

I.  <u>Dr. Zimbalist's Method For Determining The Appropriate Damages Measure Is Not A Generally Accepted Method To Measure Antitrust Damages.</u>

The "yardstick" method is an accepted method to measures damages in an antitrust case. *Muffett v. City of Yakima*, 2012 WL 12827492, at *2 (E.D. Wash. July 20, 2012).  Dr. Zimbalist says that he is using the yardstick method to measure antitrust damages in this case, but does not apply that method at all.  Instead, he compared Zuffa to other firms chosen based on his selecting comparison firms that had "as much in common as possible" with Zuffa as could be found:

> Q. In picking a yardstick, would you agree with the statement that you should identify a firm or firms that are similar to Zuffa in all respects except for the impact of the alleged antitrust violation?
>
> A. I believe that, as I said a moment ago, that you try to pick comparators that have as much in common with the base enterprise or industry as possible but vary in the important respect that you're trying to identify.
> …
> We're doing the real world, not a laboratory experiment here, and so you try to find as much as possible in common except for the variable that you're trying to identify the impact of.  That's what I believe.

Ex. 2 at 150:3-13, 151:13-18.

Even in applying his "as much in common as possible" standard, Dr. Zimbalist did not do a broad review of potentially comparable firms.  He testified that he chose his five comparator sports because he was familiar with them from his previous work:

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1  Q:    So why didn't you include any firms outside of sports that sell tickets and media
2  rights?

3  A:    Well, one of the reasons I didn't look further, other than to have a footnote about
the movie industry, which you were kind enough to notice, is because I'm a sports
economist and I understand the sports industry and I might have gone out and looked for
4  Showcase Cinemas, for instance. They sell tickets. They don't sell television rights, but
they sell tickets.  So I might have tried to find some of those firms, but I don't know a
5  great deal about them. And I felt comfortable with the nature of what happens in the sports
leagues and the team sports leagues and in boxing to say that it's sufficiently similar and
6  that I can account for and understand any differences with Zuffa. And so I chose them.

7  Ex. 2 at 237:20-238:16.

8      Dr. Zimbalist's method is junk science that fails *Daubert* standards for several reasons.

9      A.    <u>Dr. Zimbalist Uses A Damages Method With No Standards.</u>

10     As Dr. Zimbalist repeatedly testified at his deposition—in dispositive admissions that

11  *Daubert* standards were not met here—he was not familiar with any standards for using either the

12  actual yardstick method or his "as much in common" method, and could not identify any such

13  standards:

14     Q. All right.  Now, you say there would have to be as much in common. Is there a field of
study that I would look to, a type of article, a type of study? How do I go about
15  determining what are the standards for an economist in choosing a yardstick or benchmark
in a situation such as this?
16
     A. I can't point you to any journal article.
17  Ex. 2 at 149:22-150:2.

18     Q. Is there any literature in your field, any textbook, anything that you can point to that
says that the appropriate way to select a yardstick or benchmark is to find firms that are as
19  similar as possible?

20     A. As I said before, I cannot cite today any literature or specific journal articles.

21  *Id.* at 158:4-11.
22
     Q. . . In the field of economics, you can't point me to any literature or discussion or
23  anything else in the field that discusses how to appropriately select a yardstick for an
analysis such as you've conducted; is that right?
24
     A. I think I said before at least once, and I'll say it again, that I cannot point you to any
25  journal article that would identify a methodology for selecting yardsticks.

26  *Id.* at 165:22-166:8.
27

28

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

As he explained in his deposition, Dr. Zimbalist claims to have incorporated a method for appraising real estate when conducting his yardstick analysis.  Ex. 2 at 158:23-159:4, 161:4-162:12.  He further explained in his rebuttal report that "The yardstick method I use to calculate damages, namely, selecting a group of comparators with *as much similarity as possible* with the target industry or company is one that is used commonly in real estate appraisals" and is "one of the three basic methodologies (comparable sales) employed to value companies."  Ex. 5, Expert Rebuttal Report of Andrew Zimbalist ¶ 53 (emphasis added).

Dr. Zimbalist has not explained how he reached his conclusion to use real estate standards or the "as much in common" standard, or pointed to any objective source for using those standards in an antitrust case.  Dr. Zimbalist is neither appraising real estate nor valuing a company.  Nor could he be, as Dr. Zimbalist has admitted he is not a real estate expert and has not actually identified those standards or shown that he is familiar with them.  Ex. 2 at 162:13-163:5.  Simply because a method compares two things—like real estate appraisal—does not mean it is the same as the accepted yardstick method for measuring damages in an antitrust case.   There are standards for such a measurement, but Dr. Zimbalist waves off any such standards in his rebuttal report as "impractical."  Ex. 5 ¶ 55.

Contrary to Dr. Zimbalist's assertions about the lack of standards in the field of yardstick antitrust damages, there are well-accepted standards for using the yardstick method to estimate antitrust damages which Dr. Zimbalist did not even attempt to apply. Those standards are not "as much in common" as you can find from the firms you happen to know about; the standards require that firms be similar in all respects except for the alleged antitrust violation. In *Federal Antitrust Policy,* Professor Herbert Hovenkamp describes the yardstick method:

> The "yardstick" method of estimating lost profit can sometimes simplify the court's calculations, although it can be used in limited situations. Under the yardstick approach the plaintiff attempts to identify a market or firm similar to the plaintiff in all respects but for the impact of the antitrust violation. For example, in *Bigelow*, the plaintiff compared its own revenue during the injury period with that earned by a comparable theater operated by one of the defendants. In such circumstances, *if* the markets of the two firms are identical, and *if* the plaintiff's firm and the firm used for comparison stand in the same relative position in those markets, offer the same product mix, have comparable managements and are comparable in all other respects, then the fact finder may infer that the two would have had comparable revenues or profits but for the violation.

6

> The above statement of the "yardstick" methodology gives some indication of its inherent weaknesses. To the extent that either the markets or the firms being compared are dissimilar, the yardstick theory will not produce a trustworthy estimate of what the plaintiff would have earned but for the defendant's conduct. The method therefore works best in markets that are both local and relatively homogeneous.

Ex. 3 at 670 (footnotes omitted).  Former Department of Justice chief economist Dr. Daniel Rubinfeld has also described the yardstick method:

> A yardstick can come from a different, but related product market in the same or similar geographic market or from a different, but related geographic market in which the same product or products are sold.
>
> Ideally, the comparable market product should reflect the same degree of competition, the same costs, and the same demand conditions that would have prevailed in the market at issue had there been no wrongful behavior. Of course, it is quite possible for there to be no suitable yardstick in some cases. If an appropriate yardstick is available, it is important to take into account any differences in costs and the extent of competition between the yardstick market and the market at issue in the but-for world.

Ex. 6, Daniel Rubinfeld, *Research Handbook on the Economics of Antitrust Law* 4 (Nov. 21, 2009) ("Rubinfeld").

In *Antitrust Law*, the preeminent treatise on antitrust law,[4] Profs. Areeda, Hovenkamp, and Blair explain the importance of firms being comparable in all important respects:

> The major difficulty encountered in the use of a yardstick is finding one. The central idea behind the yardstick approach is to find a firm that is comparable in all important respects to the plaintiff. The economic performance of the yardstick firm is then used as an estimate of the performance that the plaintiff would have experienced "but for" the antitrust violation. The ideal yardstick is a clone or an identical twin of the plaintiff. Short of this, one must identify a firm that is truly comparable in order for the inferences drawn to be reliable rather than speculative.

Ex. 7, Phillip Areeda, Herbert Hovenkamp, Roger D. Blair, & Christine Piette Durrance, *Antitrust Law* (4th ed. 2014), Volume IIA, § 392f, pp. 383-84.

When employing the yardstick method, courts agree that comparability is key.  *Muffett*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012) ("the reliability of the yardstick approach is based on the comparability of that yardstick to the business (or proposed business) involved in

---

[4] Dr. Zimbalist agrees that *Antitrust Law* is "the leading legal antitrust treatise."  Zimbalist Rebuttal ¶ 108.

the litigation"); *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (citation omitted) ("This is often referred to as the 'yardstick approach.' Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural"); *Harris Wayside Furniture Co. v. Idearc Media Corp.*, 2008 WL 7109357, at *2 (D.N.H. Dec. 22, 2008) ("Evidence of the similarities between the businesses enables reasonable conclusions to be drawn about how plaintiff may have performed based on the yardstick company's performance, but for the alleged intervening cause"). Absent comparability, it is impossible to know whether "the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *R & R Int'l, Inc. v. Manzen, LLC*,  2010 WL 3605234, at *10 (S.D. Fla. Sept. 12, 2010) (citation omitted).

Dr. Zimbalist does not claim to use these standards in his testimony.  His method is not the yardstick method—it is "junk science."  Using no standards or the wrong standards to measure antitrust damages is not "the product of reliable principles and methods" and results in unreliable conclusions which would lead the jury to speculate.  Fed. R. Evid. 702; *Kentucky Speedway*, 588 F.3d at 918-19 (affirming exclusion of Dr. Zimbalist's testimony for using an untested method with no controlling standards).  And "any step that renders [the expert's] analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." Fed. R. Evid. 702 Advisory Committee's Notes 2000 (citation and internal quotation marks omitted); *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 898 (C.D. Cal. 2004) (excluding expert testimony for failure to apply appropriate standard).

B.      As Much In Common As Possible Does Not Mean Anything in Common

A key problem with Dr. Zimbalist's "as much in common as possible" standard is that it allows for any level of dissimilarity between the comparators. "As much in common" can mean not much in common at all.  This standard entirely disregards that "it is quite possible for there to be no suitable yardstick in some cases."  Ex. 6, Rubinfeld at 4.

8

Dr. Zimbalist's comparisons fail to control for any of the differences between the firms he is comparing.[5]  Dr. Zimbalist assumes that Zuffa's allegedly anticompetitive conduct is literally the only factor causing UFC athletes' compensation to differ from the NFL, MLB, NBA, NHL, and boxing.  As a result, Dr. Zimbalist engages in a simplistic analysis: Zuffa pays its athletes one amount, his chosen comparators pay their athletes a higher amount, and the entire difference is because Zuffa engaged in anticompetitive conduct and his comparators did not.

This "methodology" of calculating damages is similar to that employed by the purported expert in *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012).  In that case, Plaintiffs alleged that certain concert promoters engaged in anticompetitive conduct which raised the price of tickets.  Plaintiffs' expert calculated damages by looking at the difference in average ticket prices for concerts promoted by the defendants versus other promoters, and multiplied that by the number of tickets sold.  The Court excluded this yardstick analysis, explaining that it "simply assumes—without further examination—that the difference in average ticket prices observed by [Plaintiffs' expert] is due entirely to Defendants' allegedly anticompetitive conduct. The analysis does not account for *any* other possible explanation(s) for this disparity." *Id.* at 975; *see also El Aguila Food Prod., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453–54 (5th Cir. 2005) (affirming district court opinion which found yardstick model "wholly unreliable insofar as it attributed all of the measured lost profits to the alleged antitrust injury"); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 592–93 (7th Cir. 1998) (properly adjusting the yardstick is "vital" when trying to prove damages because "[a]ny nonconspiratorial factors . . . had to be taken into account in order to make a responsible estimate of the prices that [Plaintiff] would have paid had it not been for the conspiracy.") (citation omitted).

C.   Dr. Zimbalist's Methods Create Selection Bias.

Compounding the absence of a generally accepted method, choosing comparators for a yardstick analysis because you are "comfortable" with them is not a reliable or verifiable method

---

[5] Ex. 2 at 227:4-9 ("Q. When you say you 'have controlled for most of the outside influences,' you have not done that actually within your model, correct?  A. Not within the model itself. . .").

9

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

that meets the standards under FRE 702 or *Daubert*.  Rather, Dr. Zimbalist's analysis suffers from

selection bias, as he chose the comparators most convenient to him without using any scientific

method to determine whether they were the most appropriate.  "Under the 'yardstick' test,

sampling choice lies at the heart of an expert's methodology."  *Manzen*, 2010 WL 3605234, at

*13 (S.D. Fla. Sept. 12, 2010) (citation omitted).  Similar to the "method" employed by Dr.

Zimbalist, in *Manzen*, the purported expert admitted that he chose his comparators by "call[ing]

people with whom he happened to have had pre-existing relationships."  *Id.* at *11.  The Court

held that the expert "implicitly admitted that part of the basis for his analysis, his 'sampling,'

could not be tested" because it was merely based on comparators he was familiar with, which

"does not constitute scientific testing that can be duplicated by another researcher."  *Id.* (citing

cases); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006)

(excluding expert testimony for selection bias).

      D.     <u>Dr. Zimbalist Makes Comparisons Arbitrarily.</u>

Regardless of the standard of comparability, Dr. Zimbalist failed to conduct any analysis

to determine whether Zuffa and his improperly chosen comparators are similar.  In the absence of

analyzing the comparison firms he selected, Dr. Zimbalist's application of his method to the facts

of this case fails under any conceivable description of that method.  He makes no effort to

compare any factors that may differ between Zuffa and the comparators.  Aside from

(inaccurately) comparing a single type of cost (television production costs), Dr. Zimbalist admits

he did not take any other factor into account:

> Q:     Did you look at any other differences that would pollute the comparison between the other sports as a yardstick and Zuffa?
>
> A:     As I sit here today, I can't think of anything off the top of my head.  There might be in my report, but I can't think of anything.

Ex. 2 at 157:10-17.

Professors Hovenkamp and Rubinfeld identify a number of factors to consider when

assessing comparability: the markets of the two firms, if the target firm and the comparator firm

stand in the same relative position in those markets, the product mix, company managements,

degree of competition in the markets, costs, and demand conditions.  Ex. 3, *Federal Antitrust*

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

*Policy* at 670; Ex. 6, Rubinfeld at 4.  Dr. Zimbalist did not consider these factors.  Ex. 2 at 157:10-17, 173:7-9.  Courts analyze the same or similar factors when assessing the reliability of expert testimony using the yardstick method.  *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000) (noting a lack of evidence with respect to "the geographical location, size or attractiveness of those facilities, the size and type of the soccer player market that they served, the relative costs of operation, the amounts charged per team, or the number of seasons run"); *Harris*, 2008 WL 7109357, at *2 (D.N.H. Dec. 22, 2008) (in a yardstick analysis, "Among the factors to consider are: similarity of products sold; respective markets of the two companies; the capital and organizational structures of the two firms; and whether the plaintiff and its yardstick conducted business, administratively and operationally, in the same way."); *see also Loeffel*, 387 F. Supp. 2d at 811–14 (rejecting expert testimony where expert failed to adequately identify the basis for choosing his comparators).

In his rebuttal report, Dr. Zimbalist attempts to remedy this obvious shortcoming by claiming that Zuffa and the comparators are similar in all important respects.  Ex. 5 ¶ 57.  Notably, these assertions are accompanied by no empirical data or analysis.  Dr. Zimbalist does not know, and did not even attempt to find out, whether Zuffa and the comparator sports are sufficiently similar, but simply assumes it must be so.

The differences between the UFC and long-established major league sports are also obvious and legion.[6]  The "Big Four" comparators (NFL, NBA, MLB, and NHL) are team sports with regional fan bases; have been around for decades (if not centuries); have 30-32 teams (each with different PTRRs) competing and trading with each other for players within (but not without) the confines of the league structure; have defined seasons; have player drafts which control which team incoming prospects contract with; have revenue sharing arrangements between teams; three of the four have salary floors and caps (meaning a certain range of revenue must be spent on players); have owners which often own both the stadium the team plays in (frequently paid for

---

[6] Boxing is also dissimilar from the UFC in a variety of ways: it is governed by federal legislation; has a different business structure; has no recognizable brand(s) responsible for promoting the sport; has existed for centuries; etc.

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1    with public financing) and the television channel the team plays on; and so on. ███████

2    ████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████

5    ██████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ██████████████████████████████

12          In the "Big Four" sports, the players are also unionized.  The owners of the teams

13   negotiate with the players' unions to determine compensation. As Dr. Zimbalist testified in his

14   deposition, unions wield pricing power and push wages up.  Ex. 9, Dep. of Andrew Zimbalist,

15   1/26/18 at 82:7-83:15. When asked what factors affect worker compensation, Dr. Zimbalist stated

16   that "I think that the major element there would be the ability of the workers to come together,

17   usually through a union, not always, but usually through a union and that would give them more

18   bargaining power." *Id.* at 86:22-87:2.  In his rebuttal report, Dr. Zimbalist admits "When they

19   collectively bargain, the league owners as well as the players' association use economists and

20   finance experts to help them settle upon an appropriate labor share." Ex. 5 ¶ 49.

21          Not only is Dr. Zimbalist's lack of comparability analysis contrary to standards in the field

22   and case law, but it runs contrary to his own work prepared outside the context of litigation.  In

23   response to an article comparing PTRR between the NFL, NBA, and MLB, Dr. Zimbalist claimed

24   that "it is not a simple matter to compare player salary shares because the accounting systems, the

25   roster sizes and the number of games played vary across the leagues."  Ex. 10, Andrew Zimbalist,

26   *There's more than meets the eye in determining players' salary shares*, Sports Business Journal

27   (March 10, 2008).  Similarly, in his own rebuttal report in this case, Dr. Zimbalist explained that

28   "there are numerous random factors that could influence the player share in a particular sport,

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

such as a new television deal, new facilities, economic conditions, strength and creativity of management, the subgroup of players who come up for free agency in any given year, work stoppages, among many others." Ex. 5 ¶ 70.  In addition, Dr. Zimbalist testified that before making a comparison between Zuffa and the entertainment industry, he would want to study "the share of [] costs as a share of total revenue," the "variability of revenue," and other factors.  Ex. 2 at 206:13-17, 207:3-10, 208:16-20.

What Zuffa does have in common with the comparator firms are the contract provisions at issue in this case. ███████████████████████████████████████████████████ ████████████████████████████ and all of the comparators have at least some of those provisions (exclusivity, ancillary rights, multi-year contracts, etc.).  If the contracts would be the same in and out of the "but for" world, they cannot have caused the alleged damages.

Dr. Zimbalist does not analyze any of the factors he claims impact his measure of damages: accounting systems, roster sizes, number of games played, television deals, facilities, economic conditions, managements, work stoppages, costs, or variability of revenues.  Nor does he measure any of the other factors identified by courts or the academic literature as intrinsic to the yardstick method.[8]  Courts routinely exclude expert testimony as speculative and unreliable under these circumstances.  *Muffett*, 2012 WL 12827492, at *3 (excluding application of yardstick method comparing adult cabarets in different cities where expert "did not include any consideration or evidence suggesting that Yakima is a similar market to La Habra, Anaheim, or Seattle. . . . The Court agrees that more information is required to establish a comparison with the

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████.

[8] That Dr. Zimbalist failed to analyze or control for differences in demand is particularly remarkable given that Plaintiffs themselves have asserted that "Single discipline combat sports, such as boxing . . . do not qualify as economic substitutes because they do not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming audience."  ECF No. 208, CAC ¶ 60.

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

yardstick method"): *In re Live Concert*, 863 F. Supp. 2d at 975 (excluding yardstick testimony on difference in concert ticket prices where comparison "simply assumes—without further examination—that the difference in average ticket prices . . . is due entirely to Defendants' allegedly anticompetitive conduct. The analysis does not account for *any* other possible explanation(s) for this disparity," including failure to account for difference in venue sizes); *El Aguila*, 131 F. App'x at 453 (affirming district court's exclusion of yardstick testimony where expert "made no effort to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses whose earnings data he relied on as a benchmark"); *Loeffel*, 387 F. Supp. 2d at 813, 815 (citations omitted) (excluding yardstick testimony where expert "at his deposition admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability. . . [meaning the] economic fortunes [of the comparators] would not be a 'reliable' predictor of how [plaintiff] would have fared"; "Even in cases involving far more comparability than is apparent here, courts have refused to allow the seemingly comparable companies to be used as a yardstick").[9]

This is not a case where Dr. Zimbalist analyzed 12 factors and Zuffa claims he should have analyzed 14. This is also not a case where Zuffa argues that Dr. Zimbalist did not do a good enough job analyzing his 12 factors. In this case, Dr. Zimbalist performed no empirical analysis at all. He is therefore implicitly asserting that there are no other factors—none—that differentiate

---

[9] *See also Everett Fin., Inc. v. Primary Residential Mortg., Inc.*, 2017 WL 90366, at *7 (N.D. Tex. Jan. 10, 2017) (excluding yardstick testimony where "Although [the expert] used data from comparable locations (the same or nearby counties as the [plaintiff] branches), [plaintiff] has not attempted to show that the data represent businesses of comparable size, market served, or costs to those of the 19 affected branches") (footnote omitted); *Harris*, 2008 WL 7109357, at *2 (excluding yardstick testimony where "How closely plaintiffs resembled the companies surveyed in the NHFA Report, however, was not determined. . . . [the expert] did not know, nor did he investigate to find out, any characteristics of the NHFA members to develop even a basic profile of an NHFA member to compare with plaintiffs here"); *Thermotek, Inc. v. Orthoflex, Inc.*, 2016 WL 4678888, at *12 (N.D. Tex. Sept. 7, 2016), *aff'd sub nom.*, 875 F.3d 765 (5th Cir. 2017) (excluding yardstick testimony where expert "did not otherwise adduce any evidence that the Orthoflex companies were sufficiently closely comparable to ThermoTek such that their profits could be used as a yardstick for ThermoTek's profits").

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1   Zuffa from the five sports, without doing any analysis to understand if this is in fact true.[10]   That

2   each of the comparators is a sport does not mean they are necessarily similar any more than

3   McDonald's is to a Michelin-starred steakhouse, despite the fact that they are both restaurants.

4   This is exactly the type of opinion "connected to existing data only by the *ipse dixit* of the expert"

5   that creates "simply too great an analytical gap between the data and the opinion proffered." *Gen.*

6   *Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

E.   Reliance On An Average Of Other Firms Increases Unreliability.

8       Dr. Zimbalist's attempt to hide his lack of comparability by using an average of his

9   comparators is improper and unreliable.  As he admits, "there are numerous random factors that

10  could influence the player share in a particular sport."  Ex. 5 ¶ 70.  Because he did not measure

11  those factors, Dr. Zimbalist instead uses an average of the comparator PTRRs because, according

12  to him, "taking the average of a larger sample of comparators abstracts from these variations and

13  from outliers, and, hence, provides a more reliable yardstick."  *Id.*  Dr. Zimbalist apparently

14  believes that using an average cures a problem so severe that he would "not tak[e] the case" if he

15  only had one comparator.  Ex. 2 at 146:16-23.  What he fails to mention, however, is that "an

16  average of unknowns is also an unknown."  *Eleven Line*, 213 F.3d at 208.

17      In *Eleven Line*, the purported expert also presented a yardstick comprising the average of

18  yardstick comparators.  As that court explained, "The purpose of averaging, the economist said,

19  was to gauge PBSC's future performance by the blended performance of Higginson's more- and

20  less-profitable facilities . . . To apply those arenas' average 'rates of return' indiscriminately to

21  PBSC is like arguing that because McDonald's franchises earn a certain average rate of return, a

22  particular franchise will perform to the average. Neither the yardstick arenas' rates of return nor

23  their average was shown to be 'as nearly identical to (PBSC) as possible.'" *Id.* at 208–09; *see also*

---

24

25  [10] Plaintiffs have asserted that there are differences between MMA and other sports.  ECF No.
    208, CAC ¶ 60 ("Combat sports such as boxing . . . are not adequate substitutes for live Elite
26  Professional MMA. There is no meaningful market substitute amongst the television-viewing and
    ticket-paying audience for the sport of MMA"); ¶ 79 ("Athletes who have trained for, and now
27  engage in, sports other than MMA, including professional boxing . . . are not substitutes for Elite
    Professional MMA Fighters"); ¶ 80 ("there are no reasonably interchangeable sports to which
28  Elite Professional MMA Fighters can turn").

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

1    *Everett Fin.*, 2017 WL 90366, at *8 ("Furthermore, when using a yardstick method, profitability

2    figures from businesses in the same industry may not simply be averaged without demonstrating

3    their similarity to the plaintiff's business."); *CDW LLC v. NETech Corp.*, 2014 WL 272167, at *3

4    (S.D. Ind. Jan. 24, 2014) ("The magistrate judge's explanation that the wide variations in office

5    performance as well as the lack of relevant similarities between the offices and the use of an

6    average of these offices undermines the methodology employed by Mr. Hosfield in coming to his

7    conclusions is entirely sound.").

8         F.     Dr. Zimbalist Fails To Define A "But For" World That Establishes Causation

9         To prevail in a monopsonization case, Dr. Zimbalist's damages opinions must show that

10   the challenged conduct caused the damages he estimates. *Rebel Oil Co. v. Atl. Richfield Co.*, 51

11   F.3d 1421, 1433 (9th Cir. 1995) ("To show antitrust injury, a plaintiff must prove that his loss

12   flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to

13   the antitrust laws to award damages for losses stemming from acts that do not hurt competition").

14   To demonstrate antitrust injury, parties are "required to construct a hypothetical market, a 'but

15   for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat*

16   *Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted).  In such a

17   "hypothetical economic construction," "economic rationality must be assumed . . . Otherwise it

18   will be impossible to keep speculation in check." *Murphy Tugboat Co. v. Crowley*, 658 F.2d

19   1256, 1262 (9th Cir. 1981).  In addition, "expert testimony cannot substitute for market facts—

20   and cannot defeat them, when the facts themselves render plaintiffs' theory of injury

21   unreasonable." *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *15 (N.D. Cal.

22   Nov. 23, 2011), *aff'd sub nom.*, 779 F.3d 914 (9th Cir. 2015).  The but for world must show that

23   the challenged conduct caused the damages by demonstrating that absent the challenged conduct

24   those damages would not have been incurred. *In re Rail Freight Fuel Surcharge Antitrust Litig.*,

25   2017 WL 5311533, at *58 (D.D.C. Nov. 13, 2017).

26        Dr. Zimbalist admits that he failed to evaluate the damages for the different types of

27   conduct he identifies as included within the challenged conduct. Ex. 5 ¶ 93. Dr. Zimbalist

28   confirmed this lack of reliable causation analysis in his deposition.  He testified that his only

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

analysis was between a "but for" world with more competition (the five comparator sports he used to estimate damages) to a world with less competition (Zuffa).  Ex. 2 at 71:22-25.  This "but for" world fails to show causation and is contrary to the facts in this case.  Zuffa would not look like the comparators even in the "but for" world where the challenged conduct did not occur, notably because compensation would not be collectively bargained.  If, as Dr. Zimbalist asserts, players' unions (and not "more competition") caused higher PTRR in his Big Four comparators, then part of the difference in PTRR between Zuffa and those comparators is because of the unions—not the challenged conduct.  Zuffa would only be expected to have the same PTRR as the unionized sports if it also had a union.  There is no UFC union in Dr. Zimbalist's but for world.  As a result, it is speculative and unreliable for Dr. Zimbalist to claim that the challenged conduct caused the entire difference in PTRR, when a major factor in PTRR (unionization) is different between Zuffa and the comparators in the but for world.[11]

Dr. Zimbalist testified that for purposes of his damages model, *any* conduct that reduced competition would lead to the same damages result, regardless of whether it is the challenged conduct in this case.  Ex. 2 at 72:22-73:4.  Dr. Zimbalist thus fails to distinguish between damages caused by the challenged conduct and "other causes unrelated to the alleged wrong." *Sebastian Int'l, Inc. v. Russolillo*, 2005 WL 1323127, at *7 (C.D. Cal. Feb. 22, 2005).  A damages model that does not connect the challenged conduct to the purported damages is contrary to law and should be excluded.  *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322-23 (11th Cir. 2003) (affirming exclusion of expert testimony that defendants engaged in collusion when the expert's definition of collusion conflicted with controlling case law); *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) (holding that if a damages estimate "is contrary to law, it is unreliable under FRE 702 and *Daubert* and unduly prejudicial under FRE 403").

---

[11] Boxing alone cannot support Dr. Zimbalist's damages analysis because, among other reasons, he would "not tak[e] the case" if he only had one comparator.  Ex. 2 at 146:16-23.

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

II.     Dr. Zimbalist's PTRR Method For Determining The Appropriate Damages Measure Is Not an Accepted Method To Measure Antitrust Damages.

Dr. Zimbalist measures damages by comparing PTRR: the percentage of revenue Zuffa paid to its athletes versus the average percentage of revenue the comparator sports paid to their athletes.  As Prof. Blair explained, "PTRR has no foundation in economic theory" and "even in competitive circumstances, labor shares of total revenue can vary widely."[12]  Ex. 8 ¶¶ 44, 47.  Dr. Zimbalist has not cited a single instance in which a court has permitted testimony based on the methods he uses, or identified an economist who has used PTRR to determine what PTRR should have been at one firm by comparing it to another firm.  Ex. 2 at 218:20-219:3.  Nor could Dr. Zimbalist identify a single instance in which such a method of showing antitrust damages— comparing one sport's PTRR to another—has ever been tested.  *Id.* at 222:6-13.  Untested and speculative methods do not qualify as "reliable" under FRE 702.  *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 603 (9th Cir. 2002) (affirming exclusion of plaintiffs' expert where there was a "lack of any objective source, peer review, clinical tests, establishment of an error rate or other evidence to show that [the expert] followed a valid, scientific method in developing his theory").

Faced with Prof. Blair's observation that PTRR is not a valid metric for measuring monopsony damages, Dr. Zimbalist explained in his rebuttal the basis for his use of PTRR:

> The degree of exploitation is the amount that wages diverge from MRP.  It can be expressed as a ratio w/MRP, where "w" represents wages, and MRP is the marginal revenue product of the fighters.  Because MRP cannot be measured directly, I instead measure the ratio of compensation to a reasonable measure of athlete-related revenues – such as event revenue in MMA.  If the ratio of MRP of labor to revenue is the same in both MMA and in my yardsticks, my analysis is equivalent to comparing the wage to the MRP of labor . . . [and therefore] substituting (Athlete Comp/Revenue) for (Athlete Comp/MRP of Labor) would lead to an accurate or conservative estimate of damages.

Ex. 5 ¶¶ 36-37 (footnotes omitted).

This methodology relies on an assumption that Dr. Zimbalist admits cannot be tested.  Dr. Zimbalist states that damages should be measured using the ratio of athlete compensation to marginal revenue product (MRP), but he instead uses a proxy: PTRR.  According to Dr.

---

[12] The use of PTRR as a metric to measure damages is invalid for the reasons described in the Motion To Exclude The Testimony of Dr. Hal Singer, filed simultaneously herewith.

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

Zimbalist, the PTRR proxy is adequate as long as "the ratio of MRP of labor to revenue is the same in both MMA and in my yardsticks." *Id.* ¶ 36. Put another way, as long as MRP divided by revenue gives the same result in all the comparators and Zuffa, PTRR is a proper metric. But as Dr. Zimbalist states repeatedly, *MRP cannot be measured. Id.* ("MRP cannot be measured directly"); ¶ 30 ("there is no accepted way to empirically measure MRP of labor in the economics literature"); ¶ 31 (it is "impossible to derive an exact measure of fighter MRP in MMA"). Thus, Dr. Zimbalist's critical assumption—that MRP/revenue is the same for each comparator—has not and cannot be tested, because MRP is unknown. It is unreasonable for an expert to assert that an unknown methodology is reliable when it relies on an unprovable assumption.

Dr. Zimbalist's only defense is that he "believes" his assumption is accurate:

> A. Just to make sure I understand, you are asking me about the ratio of combined athlete MRP to event revenue in baseball relative to the same ratio in football and you are saying within all baseball games, it's the same, and within all football games, it's the same. And, now, you are asking me, again, I think you asked me this already, whether or not I believe, sitting here today, that those two ratios would be different and I told you earlier that I think they would be very similar, maybe not identical, but very similar and -- I will stop there.
>
> Q. Have you done any actual quantitative analysis to determine whether or not they are similar?
>
> A. In the last 12 seconds, I just did an exhaustive analysis. No, I told you earlier that I have not subjected either of those two to formal study.
>
> Q. Outside of your belief, you don't have any empirical study that would demonstrate that, correct? . . . That the relationship between the ratio of marginal revenue product of athletes to event revenue is what you've described in your last answer?
> . . .
> A. The question I thought you asked was whether I had done any empirical work on that subject and I am saying correct, I have not done any empirical work on that subject.

Ex. 9 at 112:9-113:23; *see also* 116:7-9 ("I believe that there is a close correlation between compensation and marginal revenue product in those leagues"); 120:3-6 ("I'm saying that I think there is a close correspondence between MRP and compensation, so there is an indirect relationship there. It's not direct.").

Sound methodology and empirical testing is the touchstone of admissible expert testimony. Absent such empirical evidence, the expert's opinion is simply "a guess not supported

1   by actual data," *Doan v. Astrue*, 2010 WL 234935, at *4 (S.D. Cal. Jan. 12, 2010), and "is

2   connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.  The only

3   "empirical analysis" Dr. Zimbalist could identify for his MRP assumption was his expert report in

4   this case.  Ex. 9 at 116:16-22.  Dr. Zimbalist's belief in the accuracy of his unknown assumption

5   to support his unknown methodology does not make it tested or testable.  Absent some indication

6   that Dr. Zimbalist's belief is actually true, another expert cannot verify whether Dr. Zimbalist's

7   opinions are true or false.  This is neither good science nor admissible testimony.

8   III.    Dr. Zimbalist's Boxing Data Does Not Reliably Measure PTRR In Boxing.

9        A single boxing promoter is one of the five comparator sports Dr. Zimbalist uses to create

10   his yardstick average.  Dr. Zimbalist claims that he used revenue and fighter expenses data for

11   2014, 2015, and the first half of 2016 for a single boxing promoter, Golden Boy, to calculate the

12   share of revenue going to athletes in the boxing industry.  Ex. 1 ¶ 111.  His source for this data

13   was publicly available excerpts of the Expert Report of Gene Deetz in a lawsuit between Golden

14   Boy and a boxing manager named Al Haymon (the "Deetz Report Excerpts").  *Id.*; Ex. 4 (Errata)

15   Table 2-E; Ex. 15 (backup to Table 2-E).  Based on the figures from the Deetz Report Excerpts,

16   Zimbalist calculated an average share of revenue for boxers at Golden Boy from 2014-June 30,

17   2016, applied that average across the entire class period, and inserted that average to represent the

18   boxing industry as one-fifth of his yardstick average.  Ex. 4 (Errata) Table 4-E.

19        Federal Rules of Evidence 702 and 703 "do not permit an expert to rely upon opinions

20   developed by another expert for purposes of litigation without independent verification of the

21   underlying expert's work . . . Under such circumstances, courts have held the expert's testimony

22   to be inadmissible." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash.

23   2011); *Doan*, 2010 WL 234935, at *4 (S.D. Cal. Jan. 12, 2010) (holding that data "came from a

24   newspaper article, not from a primary source . . . However, there is no mention that Dr. Lackritz

25   ever viewed this source and verified the data.  Thus, the Court finds that the productivity opinion,

26   based on numbers Dr. Lackritz created without supporting data, is unreliable.").  Courts disallow

27   reliance on third party expert reports because "an opinion which is generated solely for the

28

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

purposes of litigation" does not "bear independent indicia of reliability." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003).

Dr. Zimbalist did not independently verify the data in the Deetz Report Excerpts:

Q:      With respect to the data in the Dietz [sic] report, what steps did you take to independently verify the data?

A:      I didn't take any steps to independently verify the data.

Ex. 9 at 152:20-24.  Dr. Zimbalist does not know the purpose behind Deetz's report, how the data may have been manipulated for the purposes of the Golden Boy litigation, or whether the information in the Deetz Report Excerpts accurately reflects the underlying data.[13]  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████     ██  ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████     But Dr. Zimbalist has no way to verify this, as he did not see the underlying data and cannot confirm Deetz's methodology or calculations.  This is exactly why courts routinely disallow expert testimony based on unverified data from other expert reports—there is no way to know whether it is accurate or complete.

Zuffa also has no way of testing the foundation of the data in the Deetz Report Excerpts, as Deetz is not a witness in this case subject to cross-examination.  Given Zuffa's inability to question the basis for the information in the Deetz Report Excerpts, it makes sense that "one expert may not give the opinion of another expert who does not testify. . . . [and that] [t]he hearsay quality of a report may not be cured merely by having another expert testify that he agrees with its conclusions." *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44, 1999 WL 1293, at *4 (4th Cir. Jan 14, 1999) (citation omitted).

---

[13] Nor could Dr. Zimbalist have verified the Deetz report—only excerpts are publicly available, and Dr. Zimbalist does not cite (or apparently have access to) the entire report, underscoring its unreliability.

█ █████████████████████████████████████████████████████     ██████████████

██████████████████████████████████████

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

The unreliability of Dr. Zimbalist's boxing data renders his entire damages model unreliable. The model is based on the difference between Zuffa's PTRR and the *average* of his comparators—not the difference between Zuffa and each of the comparators. Because one input into Dr. Zimbalist's average—boxing—is unreliable, he is left with no reliable damages measure.

Even if Dr. Zimbalist had verified the Deetz Report Excerpts, it would be an unreliable source of data to represent all of boxing. As discussed above, Dr. Zimbalist uses 2.5 years of data from a single boxing promoter to represent the entire boxing industry. But as Dr. Zimbalist noted, "There are at least five different boxing promoters who are prominent enough to promote major championship fights every year, and probably over ten . . . There are at least twenty boxing promoters in the U.S. today who have promoted nationally televised events." Ex. 1 ¶ 91. Dr. Zimbalist has offered no evidence to suggest that Golden Boy is representative of these promoters, other boxing promoters, or the boxing industry. He has also offered no evidence to suggest that the 2.5 years of data he cites is representative of the entire class period.

At his deposition Dr. Zimbalist could not vouch for the reliability of his boxing analysis given the paucity of data:[15]

> Q:      Would you have taken the case if you were asked to do a benchmark
> analysis based on a comparison to boxing with the data you have?
>
> A:      So if I knew what I know today in terms of the amount of boxing data that
> I have . . . and I was back in last December when I was approached about
> working on this case, would I have taken the case?
>
> Q:      Correct.
>
> A:      I would have to think about it.

Ex. 2 at 153:1-16.

## CONCLUSION

For the foregoing reasons, Zuffa's Motion should be granted.

---

[15] Insufficient data does not excuse the requirements of FRE 702. *Manzen*, 2010 WL 3605234, at *16 ("The Court appreciates that Reynolds has spent years evaluating companies in the beverage industry and that R & R had limited data upon which to determine potential lost profits. Lack of data, however, cannot overcome Reynolds's failure under Daubert to employ scientific methods or rely on adequate data in performing his future lost profits analysis").

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

Dated:  February 16, 2018                    BOIES SCHILLER FLEXNER LLP


                                             By: /s/ Nicholas A. Widnell
                                                 Nicholas A. Widnell (*Pro Hac Vice*)
                                                 BOIES SCHILLER FLEXNER LLP
                                                 1401 New York Avenue, NW
                                                 Washington, DC 20005
                                                 Tel: (202) 237-2727
                                                 Fax: (202) 237-6131
                                                 Email: nwidnell@bsfllp.com

                                                 *Attorney for Defendant* Zuffa, LLC, d/b/a
                                                 Ultimate Fighting Championship and UFC

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing **Zuffa, LLC's Motion to Exclude The Testimony of Dr. Andrew Zimbalist** was served to opposing counsel on February 16, 2018 via email and the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.


/s/ Roderick Crawford

An employee of Boies Schiller Flexner LLP

ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. ANDREW ZIMBALIST