WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL)<br><br>**ZUFFA, LLC'S MOTION TO EXCLUDE THE TESTIMONY OF DR. HAL SINGER UNDER FED. R. EVID. 702 AND *DAUBERT***<br><br>**HEARING REQUESTED**<br><br>**[REDACTED]** |

i

1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................... 1

LEGAL STANDARD ............................................................................................... 6

    I.        THE *DAUBERT* STANDARD............................................................... 6

STATEMENT OF FACTS ....................................................................................... 7

    I.        Plaintiffs' Economic Expert Dr. Singer ................................................ 7

    II.      Zuffa's Economic Expert Professor Topel.......................................... 9

    III.    Zuffa's Labor Economist Professor Oyer .......................................... 11

    IV.   Plaintiffs' Rebuttal Labor Economist Professor Manning ................... 11

ARGUMENT ....................................................................................................... 12

    I.        Dr. Singer's Impact and Damages Regression Models Should be
           Excluded............................................................................................ 12

          A.   Dr. Singer Relies on a Novel and Untested Theory for Injury and
              Damages. ................................................................................... 12

          B.   Dr. Singer Assumes Market Foreclosure, He Does Not Prove it. ........ 20

          C.   Dr. Singer Includes Improper Data in His Regression. ...................... 23

    II.      Dr. Singer's Other Opinions related to Damages Analysis Should Be
           Excluded............................................................................................ 24

          A.   Dr. Singer Fails to Properly Define a But-For World ................... 24

          B.   Dr. Singer Does Not Apply the Correct Methodology to his
              Assessment of Strikeforce and Bellator Benchmarks.................... 27

          C.   Singer's Identity Class Damages Calculation is Unreliable and Not
              Expert Testimony. ..................................................................... 27

    III.    Singer's Definition of Relevant Input and Output Markets Should Be
           Excluded............................................................................................ 28

          A.   Singer Fails to Use the Correct Methodology under the *Merger
              Guidelines* to Define Input Markets. ........................................ 28

          B.   Singer's Input Market Definition Analysis is Not Reliable and Lacks
              Economic Analysis. ................................................................... 29

          C.   Dr. Singer's Output Market is Flawed............................................. 32

    IV.   Singer's Market Share Calculation Is Unreliable and Should Be
           Excluded............................................................................................ 33

    V.      Dr. Singer's Unsupported Assertions Regarding Alleged Evidence of
           Competitive Effects Should Be Excluded............................................ 35

          A.   Dr. Singer's Opinion that Zuffa Reduced MMA Events is Not
              Reliable. ................................................................................... 36

          B.   Dr. Singer's Opinion that PPV Price Increases Are Direct Evidence
              of Monopoly Power is Not Reliable. .......................................... 37

i

C.  Dr. Singer's Opinion that a Change in Sponsorship Rules Evidences Monopsony Power is Not Reliable. ................................................................ 38

CONCLUSION ......................................................................................................... 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1

# TABLE OF AUTHORITIES

2

3 **CASES**

4
*AFMS LLC v. United Parcel Serv. Co.*,
5
   No. CV105830JGBAJWX, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ................................. 5

6 *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
   592 F.3d 991 (9th Cir. 2010).................................................................................................... 26

7 *Apotex, Inc. v. Cephalon, Inc.*,
8    321 F.R.D. 220 (E.D. Pa. May 19, 2017)......................................................................... 3, 22, 26

9 *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
   789 F. Supp. 2d 1201 (C.D. Cal. 2011) .................................................................................. 21

10 *Cabrera v. Cordis Corp.*,
11    134 F.3d 1418 (9th Cir. 1998).............................................................................................. 6, 17

12 *Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000).................................................................................................. 24

13 *Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977).................................................................................................................... 28
14

15 *Cooper v. Brown*,
   510 F.3d 870 (9th Cir. 2007).................................................................................................... 6

16 *Craftsmen Limousine, Inc. v. Ford Motor Co.*,
17    363 F.3d 761 (8th Cir. 2004).................................................................................................... 37

18 *Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993)........................................................................................................... passim

19 *Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002).................................................................................................. 6, 35
20

21 *Golden Boy Promotions LLC v. Haymon*,
   No. CV 15-3378-JFW, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017)........................................ 32

22 *Grason Elec. Co. v. Sacramento Mun. Utility Dist.*,
   571 F. Supp. 1504 (E.D. Cal. 1983)......................................................................................... 30
23

24 *In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015)............................................................................................. 13

25 *In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*,
   No. 09–ML–2048–C, 2011 WL 6826813 (W.D. Okla. Dec. 28, 2011) ............................... 3, 27
26

27 *In re Florida Cement & Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012)............................................................................................... 22

28

*In re High-Tech Employee Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013)............................................................................. 13

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................... 30, 31

*In re Online DVD Rental Antitrust Litig.*,
   No. M 09-2029 PJH, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) ................................ 24, 26

*In re Pharmacy Benefit Managers Antitrust Litig.*,
   No. CV 03-4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ...................................... 26

*In re Photochromic Lens Antitrust Litig.*,
   No. 8:10-cv-00984-T-27EA, 2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) ........................... 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   No. MC 07-0489, 2017 WL 5311533 (D.D.C. Nov. 13, 2017) ...................................... 24

*In re Rezulin Product Liability Litigation*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................... 36

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010).......................................................................... 13

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
   250 F.3d 972 (6th Cir. 2000)................................................................................ 21

*Jarrett v. Insight Commc'ns Co., L.P.*,
   No. 3:09-cv-00093-JHM, 2014 WL 3735193 (W.D. Ky. Jul. 29, 2014)................................ 36

*Johnson v. Arizona Hospital & Healthcare Ass'n*,
   No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. Jul. 14, 2009) ......................... 14

*Kamakahi v. Am. Soc. For Reproductive Medicine*,
   305 F.R.D. 164 (N.D. Cal. 2015).......................................................................... 38

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009)......................................................................... 32, 33

*King Drug Company of Florence, Inc. v. Cephalon, Inc.*,
   2015 WL 12645766 (E.D. Pa. 2015) ...................................................................... 22

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................... 6, 35

*Little Rock Cardiology Clinic PA v. Baptist Health*,
   591 F.3d 591 (8th Cir. 2009)............................................................................... 29

*Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN),
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ........................................................ 3, 22, 32

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991)............................................................................. 28

*Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*,
   531 F.2d 910 (8th Cir.1976)............................................................................... 30

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ........................................................................ 24

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) ...................................................................... 13

*SMS Systems Maintenance Servs., Inc. v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999) ............................................................................. 35

*Spinelli v. Nat'l Football League*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................. 21

*Thurman Indus. v. Pay'N Pak Stores*,
  875 F.2d 1369 (9th Cir. 1989) ......................................................................... 28

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...................................................................... 4, 28

*U.S. v. Rice Growers Ass'n of Cal.*,
  Civ. No. S–84–1066 EJG, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986) .................... 34

*U.S. v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ................................................................ 5, 33, 34

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................... 28, 32

*Waymo LLC v. Uber Techs., Inc.*,
  No. C-17-00939, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) .......................... 27

*Woman's Clinic, Inc. v. St. John's Health Sys., Inc.*,
  252 F. Supp. 2d 857 (W.D. Mo. 2002) ............................................................ 21

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ................................................................ 36, 37, 38

**OTHER AUTHORITIES**

David Autor, David Dorn, Lawrence Katz, Christina Patterson, and John Van Reenen,
  *Concentrating on the Fall of the Labor Share*,
  107 Am. Econ. Rev.: Papers & Proceedings 180 (2017) ..................................... 15

Gerald Scully,
  *Pay and Performance in Major League Baseball*,
  64 Am. Econ. Rev. 915 (1974) .................................................................. 14, 15

Gerald Scully,
  *Player Salary Share and the Distribution of Player Earnings*,
  25 Managerial and Decision Economics 77 (2004) ........................................... 15

Herbert Hovenkamp, *Federal Antitrust Policy* 670 (2nd ed. 1999) .......................... 27

Jan De Loecker & Jan Eeckhou,
  *The Rise of Market Power and the Macroeconomic Implications*,
  Working Paper (August 24, 2017) .................................................................. 15

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

Kevin Murphy & Robert Topel,
 "The Economics of NFL Team Ownership,"
 Chicago Partners (2009)..........................................................................................16

Michael W.L. Elsby, Bart Hobijn, and Aysegul Sahin,
 *The Decline of the U.S. Labor Share*,
 Brookings Papers on Economic Activity, 1-42 (2013)............................................15

Richard McGowan & John Mahon,
 *Demand for the Ultimate Fighting Championship:*
 *An Econometric Analysis of PPV Buy Rates*, 6 J. Bus. &. Econ. 1032, 1046 (2015)..........18, 19

Roger D. Blair & Jeffrey L. Harrison,
 *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991) ................................4, 28

Sabien Dobbelaere & Jacques Mairesse,
 *Panel Data Estimates of the Production Function*
 *and Product and Labor Market Imperfection*,
 28 J. of Applied Econometrics 1 ............................................................................15

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010)...........4, 5, 28

**RULES**

Fed. R. Evid. 702 ...................................................................................................... passim

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

Defendant Zuffa, LLC ("Zuffa") hereby moves to exclude certain opinions of Plaintiffs' expert Dr. Hal Singer pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  In support of this motion, Zuffa states as follows:

**PRELIMINARY STATEMENT**

Plaintiffs have alleged that, as a result of the Challenged Conduct identified in the Consolidated Amended Complaint, Zuffa has monopolized the market for the promotion of live MMA events and monopsonized the market for MMA fighter services.  Order Denying Mot. to Dismiss.  ECF No. 314 at 3.  Plaintiffs retained Dr. Hal Singer to present economic evidence to support their claims, including (1) whether the members of the two plaintiff classes were compensated at lower levels than would have existed but for the Challenged Conduct (antitrust injury); (2) aggregate damages; (3) whether indirect evidence demonstrates that Zuffa had monopoly or monopsony power in properly defined antitrust markets; (4) whether the Challenged Conduct foreclosed competition; and (5) whether direct evidence exists of harm in a monopoly output market.  Declaration of Nicholas A. Widnell ("Widnell Decl."), Ex. 1, Expert Report of Dr. Hal Singer ("Singer Rep.") ¶¶ 2-4.[1]  Dr. Singer estimates damages anywhere from $811.2 million to $1.6 billion for Plaintiffs' Bout Class. *Id.* ¶ 245.

**Injury and Damages**:  Dr. Singer concludes that there is antitrust injury and damages to the Bout Class based on regression analyses he has conducted.  The regressions find a negative relationship between two things:  (1) the percentage of athletes signed by Zuffa to multi-bout, exclusive contracts—which  Dr. Singer titles "foreclosure share"; and (2) the percentage of athlete compensation of total event revenues (the athletes' "wage share").  Singer Rep. at ¶ 186, Table 6.  In Dr. Singer's model, he selected the wage share at UFC events as the dependent variable for his regressions.  Dr. Singer uses these regressions to conclude that the conduct Plaintiffs challenge adversely affected (had a negative relationship with) athletes' wage share in order to estimate injury and damages.  Zuffa's expert Professor Robert Topel has shown that

---

[1] All exhibits referenced in this motion are exhibits to the Declaration of Nicholas A. Widnell in Support of Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer.  For a definition of "Challenged Conduct" and other terms cited in the motion, *see* Ex. 20 (Glossary of Terms).

1   when the same regressions are run with actual compensation of athletes as the dependent variable,

2   rather than a percentage share of event revenue, the negative relationship disappears and there is

3   no finding of injury or damages.  Ex. 3, Expert Rep. of Prof. Robert Topel ("Topel Rep.") ¶¶ 142,

4   146-49.

5          If these economic models are admitted as evidence, this would be *the first known case*

6   *where a wage share is used to measure an alleged anticompetitive effect, antitrust injury or*

7   *damages*.  The common method applied by labor economists and applied in all known courts

8   accepting regression analyses in antitrust cases to measure an anticompetitive effect on

9   compensation is regressions with actual compensation as the dependent variable.  Dr. Singer and

10  other experts for Plaintiffs argue that wage share is often referenced, particularly in "sports

11  economics," in discussions of the bargaining power of sports leagues, but have identified no

12  example where wage share was used in a reputable economic article as the dependent variable in

13  a regression evaluating anticompetitive effect, impact or damages.  Nor have Plaintiffs or their

14  experts identified any previous case where a textbook, reputable peer reviewed journal, or court

15  has endorsed a regression finding an anticompetitive effect by a relationship to "wage share"

16  when the same regressions, with actual compensation as the dependent variable, show no

17  anticompetitive effect.

18         The other side of Dr. Singer's regression, his "foreclosure share" is also unheard of as a

19  measure of market foreclosure.  For purposes of injury and damages, Dr. Singer defines

20  "foreclosure" as contracts of 30-months or longer (with a champion's clause).  This method of

21  establishing foreclosure of a market defines the conclusion:  the 30-month multi-bout contracts

22  are defined as foreclosure.  There is no econometric analysis found in Dr. Singer's report to show

23  that the contracts actually foreclose competition.  His "but for" world illustrates the problem

24  because Dr. Singer admits that in his but for world (the world that assumes the conduct Plaintiffs

25  challenge no longer takes place), Zuffa could have a 90 percent market share with no additional

26  competitors.  Ex. 4, Dep. of Dr. Hal J. Singer, 9/27/17 ("Singer Dep. I") 185:18-186:11.  Dr.

27  Singer's "foreclosure" share assumes its own conclusion as it is an input to (not the result of) his

28  regressions based on the weighted fraction of athletes in the market signed to standard Zuffa

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

promotional agreements.  Any other provision also present in the standard Zuffa agreement, including the choice of law clause, would produce the same mathematical results in Dr. Singer's regressions.  Case law does not accept that contracts of this duration foreclose competition.  Foreclosure of a market may not be assumed; an econometric study is required to show such an effect and that has not happened here.  Courts have previously excluded testimony of Dr. Singer that assumed its own conclusions, including a "foreclosure share." *Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2016 WL 7231941, at *12 (S.D.N.Y. Dec. 9, 2016); *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220 (E.D. Pa. May 19, 2017).

Dr. Singer also uses an undefined but-for world, an established requirement for his damages model.  Instead, he assumes a but-for world that lacks a causal connection between specific Challenged Conduct and damages.  Dr. Singer's but-for world is also based on an irrational assumption—that Zuffa would only use short-term, non-exclusive contracts—that is not supported by record evidence, economic theory or Ninth Circuit precedent.

With respect to the Bout Class, Dr. Singer also calculates damages by comparing Zuffa's wage share to the wage shares of two other MMA promoters, Strikeforce and Bellator.  This method, like the analysis of Plaintiffs' expert Dr. Zimbalist, fails to apply or meet accepted standards for a "yardstick" or "benchmark" analysis.  The court in *In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation*, No. 09–ML–2048–C, 2011 WL 6826813, at *16 (W.D. Okla. Dec. 28, 2011), criticized similar simplistic comparisons by Dr. Singer when, to estimate damages in an antitrust case, he compared rental rates for premium cable boxes in Oklahoma and Canada:  "In light of the failure to consider the differences regarding regulations and costs imposed on Canadian and American cable providers, the application of the Benchmark method rests on unstable ground."

**Market Definition:**  In defining a market, Dr. Singer defines three relevant input markets for the purchase of athlete services in which he contends that Zuffa is a monopsonist.  He defines one input market based on the athletes tracked by "FightMetric," a service that ranks Zuffa's athletes for Zuffa and also tracks bout statistics for other firms that pay for the service.  Singer Rep. ¶ 99(1).  Dr. Singer also defines another market and a "submarket" using a different ranking

1  service, "FightMatrix" of all ranked FightMatrix athletes who competed for promoters in North

2  America or ONE Championship, and his submarket of the FightMatrix athletes who were ranked

3  in the top 15 (so called "headliners"). *Id.* ¶¶ 99(2)(3). Dr. Singer goes on to define three separate

4  output markets "related to MMA events that include athletes in his input markets." *Id.* ¶ 115;

5  Singer Dep. I 284:4-284:13.

6        Dr. Singer claims that he applied the established "hypothetical monopolist" or "SSNIP"

7  test from the Horizontal Merger Guidelines[2] to define each relevant input or output market.

8  Singer Rep. ¶¶ 99, 120; Singer Dep. I 55:8-19; 280:13-282:20. Even a cursory reveiw

9  demonstrates he did not perform an analysis to meet the requirements for market definition under

10  Rule 702 and *Daubert*. When defining an input market for purposes of assessing monopsony

11  using the SSNIP test, "'the market is not the market of competing sellers but of competing

12  buyers. This market is comprised of buyers who are seen by sellers as being reasonably good

13  substitutes.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (quoting

14  Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297,

15  324 (1991)). Rather than examining a market of competing buyers (MMA promoters), Dr. Singer

16  ignores the requirements of the SSNIP test and uses available rankings of athletes to determine

17  when ***athletes*** (not buyers) are substitutes for one another. He does no analysis of the extent to

18  which other MMA firms constrain Zuffa from imposing a "small but significant and non-

19  transitory" decrease in wages on athletes. Horizontal Merger Guidelines at 9. As to the output

20  markets, Dr. Singer conceded at his deposition that he did not perform a SSNIP analysis of cable

21  networks, broadcasters or sponsors. Ex. 5, Dep. of Dr. Hal J. Singer, 1/23/17 ("Singer Dep. II")

22  551:7-24, 544:3-15.

23        Further, in the context of defining relevant markets, "courts have made clear that a

24  detailed examination of market data and a thorough economic analysis are required for

25        _____

26  [2] This test seeks to define a relevant market by starting at the individual product level and then
adding close substitutes so as to construct the narrowest group of products over which a

27  hypothetical monopolist profitably could impose a "small but significant and non-transitory
increase in price ('SSNIP')." Ex. 6, U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal
Merger Guidelines (2010), at 9 ("Horizontal Merger Guidelines").

28

1    admissibility of 'antitrust economics' opinions." *AFMS LLC v. United Parcel Serv. Co.*, No.

2    CV105830JGBAJWX, 2014 WL 12515335, at *8 (C.D. Cal. Feb. 5, 2014).  Dr. Singer based his

3    conclusion solely on his interpretation of "record evidence of – of what fighters and promoters

4    thought about substitution possibilities."  Singer Dep. I at 290:16-291:12.  But Dr. Singer is not

5    an industry expert; he has no specialized knowledge that would aid the trier of fact in

6    understanding the record evidence he interprets.  Dr. Singer's analyses of the geographic markets

7    for his input markets are equally flawed.  Dr. Singer asserts that athletes cannot easily move to

8    promoters outside the U.S., but he provides nothing more than a layman's interpretation of the

9    record evidence to reach his conclusion.  Singer Rep. ¶¶ 124-27.

10          **Market Shares:**  Dr. Singer calculates shares in the input markets to assess Zuffa's

11   alleged market share in the input market.  He calculates the input share by "weighting" athletes by

12   promoter revenue (i.e. sales in the downstream market).  *Id.* ¶ 128.  Once again, Dr. Singer's

13   method improperly assesses monopsony power.  While section 5.2 of the Horizontal Merger

14   Guidelines identifies "revenue" as an appropriate metric for calculating share in an output market,

15   the input market requires a measurement of purchases in the input market (not sales in the

16   downstream output market).  *E.g.*, *U.S. v. Syufy Enters.*, 903 F.2d 659, 666 n.10 (9th Cir. 1990)

17   (rejecting use of box office receipts to calculate share of the purchases in the input market for

18   first-run movies because box office receipts reflect the luck and skill of the theater in picking

19   which first-run movies to show).  Even Plaintiffs' other economic expert, Dr. Zimbalist, agreed

20   that the correct metric for calculating share of an input market should be sales in that market

21   (compensation, followed by athlete bouts), not sales in the output market.  Ex. 7, Dep. of Andrew

22   Zimbalist 1/26/18 ("Zimbalist Dep. II") 42:14-19; 43:9-12.

23          **Competitive Effects:**  Finally, Dr. Singer draws unwarranted conclusions with regard to

24   three changes in market conditions—a decrease in the number of UFC events on Pay-Per-View

25   ("PPV"), an increase in PPV revenue, and a change to how Zuffa enforced its sponsorship rules

26   with athletes—that he labels "direct evidence" of competitive effects.  In each instance, Dr.

27   Singer fails to perform any analysis to account for additional factors that could explain his

28

1   observed effects, instead he concludes that if Zuffa's PPV events decrease, its PPV prices

2   increase, or athletes are affected by a rule change, each change must be anticompetitive.

3                                   **LEGAL STANDARD**

4   I.      THE *DAUBERT* STANDARD

5           The legal standards for admissibility of expert testimony are set forth in the separate

6   *Daubert* motion concerning Plaintiffs' expert Dr. Zimbalist filed simultaneously herewith.  In

7   *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999), the Court explained that the

8   *Daubert* inquiry may include:  "Whether a 'theory or technique . . . can be (and has been)

9   tested'"; "Whether it 'has been subjected to peer review and publication'"; "Whether, in respect

10  to a particular technique, there is a high 'known or potential rate of error' and whether there are

11  'standards controlling the technique's operation'; and "Whether the theory or technique enjoys

12  'general acceptance' within a 'relevant scientific community.'"  *Id.* at 149-50 (quoting *Daubert*,

13  509 U.S. at 592-94).

14          Applying these principles, this Circuit has regularly affirmed exclusion of untested

15  scientific methods in a number of scientific fields.  *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir.

16  2007) (excluding results of chemical test because the "application of mass spectrometry to

17  forensic analysis "has been offered"—but never applied—"to courts only twice before" and the

18  testing "has not been subjected to peer review and there has been no discussion of forensic EDTA

19  testing in scientific literature since a 1997 article that headlines the need for a better analytical

20  method"); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) (affirming

21  exclusion of plaintiffs' causation expert where there was a "lack of any objective source, peer

22  review, clinical tests, establishment of an error rate or other evidence to show that [expert]

23  followed a valid, scientific method in developing his theory"); *Cabrera v. Cordis Corp.*, 134 F.3d

24  1418, 1422 (9th Cir. 1998) (affirming exclusion of expert who testified that his "test had never

25  been peer-reviewed" and a separate expert where that expert "could not identify any peer-

26  reviewed research justifying his conclusion about reaction to hard silicone").

27

28

**STATEMENT OF FACTS**

I.     Plaintiffs' Economic Expert Dr. Singer

Dr. Singer submitted an expert report that concluded that MMA athletes in the Bout Class and the Identity Class were harmed as a result of the Challenged Conduct alleged in Plaintiffs' Consolidated Amended Complaint and put forward various methods of calculating damages.  Dr. Singer describes the nature of the Challenged Conduct in the case, including contractual provisions, which he claims Zuffa exploits to make "effectively perpetual" and horizontal conduct, such as the acquisition of MMA promoters and counter-programming.  *Id*. § 2.

Dr. Singer attempts to show Zuffa's market power both directly and indirectly.  For his indirect evidence of the input market, Dr. Singer defines two input markets and one sub-market.  Under his Tracked market, he includes all MMA athletes who competed with a promoter that appears in the third-party website FightMetric database*, id.* ¶ 99(1), a service that ranks athletes for Zuffa and tracks bout statistics for firms that pay for the service.  *Id.* ¶ 108; Ex. 36, Decl. of Abraham Genauer (founder of FightMetric) ¶¶ 7-11.  For his Ranked market, he includes all athletes from the Tracked market and also those ranked by the third-party website FightMatrix.  *Id.* ¶ 99(2).  Dr. Singer then defines a sub-market of "Headliners" which consists of athletes ranked in the top 15 in FightMatrix.  *Id.* ¶ 99 (3).  For his output market, Dr. Singer defines it as "Live MMA Events in which the participating Fighters are in either the Relevant Input Market (however measured) or the Relevant Input Submarket."  *Id.* ¶ 115.  In the Output Market, Dr. Singer explains that "MMA Promoters are the sellers; their customers include viewers, cable networks, broadcast networks, and sponsors."  *Id.*  For both the input and output markets, he defines the geographic market as North America.  *Id.* ¶¶ 121, 124.

Dr. Singer concludes that Zuffa has dominant shares in both the input and output markets.  For the input market, Dr. Singer uses two different weighting techniques to calculate Zuffa's share.  Singer Dep. I 74:5-8.  First, he weights athletes by their associated promoters' PPV and gate revenues.  Singer Rep. ¶ 128.  Second, for the "Headliner" submarket, he weights athletes by the inverse of their rank according to FightMatrix, so, for example the sixth ranked athlete is weighted twice as much as the twelfth ranked athlete.  *Id.*; Singer Dep. I 140:19-141:8.  He

7

1    concludes that Zuffa's share has fluctuated between 71-91% under his Ranked market. Singer

2    Rep. ¶ 129. Dr. Singer calculates share of the output market by the revenues earned by MMA

3    promoters and concludes that Zuffa's market share has ███████████████████████ *Id.*

4    ¶¶ 130-31.

5         Dr. Singer also cites various acts that he says constitutes direct evidence of market power,

6    including a PPV price increase and a reduction in the number of PPV events Zuffa holds per year.

7    *Id.* § III.B.

8         To show antitrust impact, Dr. Singer runs a regression that uses wage share—that is the

9    fraction of event revenue paid to athletes as compensation—as the dependent variable in his

10   regression, *id.* ¶ 180; Singer Dep. I 105:1-16, and as the key variable of interest. Singer Dep. II

11   483:18-484:9. Dr. Singer defines an athlete as foreclosed if the athlete has a contract that

12   contains terms that could extend to 30-months in length and if the contract contains a champion's

13   clause. *Id.* ¶ 171. Dr. Singer calculates his "foreclosure share" by dividing the total number of

14   "foreclosed" Zuffa athletes by the total number of athletes in his relevant market definitions, with

15   each athlete weighted (like his market share) with the revenues of the promoters. *Id.* ¶ 170. Dr.

16   Singer's regression shows that an increase in Zuffa's foreclosure share is correlated with a

17   decrease in athletes' wage share. *Id.* ¶ 183. He concludes that athletes' compensation as a share

18   of event revenue in the Bout Class would have been higher but for the Challenged Conduct. *Id.*

19        Dr. Singer also offers an opinion that common impact can be shown on the Bout Class.

20   Dr. Singer offers two proposed methodologies: first, he argues that any impact on athletes' wages

21   would be broadly shared across the class because of alleged documentary evidence of a

22   compensation structure and a regression he ran showing the extent to which average

23   compensation paid to athletes overall is correlated with the compensation for an individual

24   athlete. *Id.* ¶¶ 215, 228. This analysis does not measure any actual injury or damages and Dr.

25   Singer agreed "I would not offer this model by itself as proof of common impact." Singer Dep. I

26   102:7-18. Second, Dr. Singer used his impact regression models to predict the but-for wage share

27   for each athlete in each event in the but-for world and compared predicted and actual wage shares

28   to estimate the fraction of Zuffa athletes who were allegedly undercompensated. *Id.* ¶¶ 230-31.

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1   Dr. Singer uses "three simulations" in calculating the but-for foreclosure shares at 0%, 20% and

2   30% foreclosure levels.  Singer Dep. I 36:7-15.  Dr. Singer also finds common impact on Identity

3   Class members.  *Id.* ¶ 234.

4        Dr. Singer calculates damages between $811.2 million and $1.6 billion for the Bout Class

5   and $32.6 million for Identity Subgroup 1 and $4.5 million for Identity Subgroup 2.  Dr. Singer

6   uses three methodologies for determining damages for the Bout Class.  First, Dr. Singer calculates

7   damages by comparing Zuffa's wage share to the wage share of two "benchmark" MMA

8   promoters—Strikeforce and Bellator.  *Id.* ¶ 248.  Second, Dr. Singer calculates damages using a

9   modified version of his impact regression that removes the pre-acquisition Strikeforce data'.  *Id.* ¶

10  249.  Third, Dr. Singer uses his impact regression, including the pre-acquisition Strikeforce data.

11  *Id.* ¶ 252.  In both the second and third calculation Dr. Singer assumes that Zuffa's foreclosure

12  share would fall to 30% in the but-for world, but is "not specifying exactly how you get there"

13  and acknowledged that there were "many ways to get your foreclosure share down."  *Id.* ¶ 250;

14  Singer Dep. I 46:24-47:1, 47:11-13.

15       Dr. Singer calculates damages to Identity Class Subgroup 1 using his foreclosure

16  regression and calculates damages for Identity Class Subgroup 2 assuming that all class members

17  would have received ███████████████████████  *Id.* ¶¶ 254-55.

18       In deposition, Dr. Singer defined the but-for world and made clear that exclusive contracts

19  of one year duration could still exist with the "caveat" that there wouldn't be "contractual

20  impediments" if an athlete under contract with the UFC wanted to go and compete at a rival

21  promoter's event during the contract.  Singer Dep. II 392:7-393:16.  Dr. Singer did not take a

22  position on whether other portions of the Challenged Conduct unrelated to contract length exist in

23  the but-for world.  Singer Dep. II 401:11-19, 401:20-403:14, 404:12-20; 388:20-389:13.

24  II.     Zuffa's Economic Expert Professor Topel

25       Zuffa's economic expert Professor Robert Topel concludes that Dr. Singer's methodology

26  of determining classwide impact and damages is flawed.  Professor Topel explains that Dr.

27  Singer's decision to evaluate athletes' wage share rather than the actual compensation levels paid

28  to athletes does not comport with the standard models of labor economics.  Topel Rep. § VI.

Professor Topel explains that standard economic models evaluating workers' compensation in allegedly monopsonized markets evaluate the level of workers' pay, not wage share.  *Id.*  He explains that Dr. Singer's approach is flawed because wage share could decline (and "foreclosure share" increase) for entirely procompetitive reasons, so documenting a negative correlation between the two provides no evidence of anticompetitive impact.  *Id.* ¶¶ 135-36, 224.

Aside from the use of wage share as the dependent variable in Dr. Singer's regression, Professor Topel identifies two other problems with Dr. Singer's regression: *first*, Dr. Singer's inclusion of pre-acquisition Strikeforce data in his regression leads to unreliable and biased results that nearly doubles his damages figure; *second*, Dr. Singer's use of revenue-weighted foreclosure share leads to a mechanical negative correlation between his foreclosure share and wage share variables.[3]  *Id.* § VII.

Professor Topel explains that Dr. Singer's focus on wage share rather than actual compensation is wrong.  First, athlete pay has consistently gone up over the class period, an effect which is contrary to the exercise of monopsony power and masked by the use of wage share as the dependent variable.  *Id.* § VIII.  Second, running Dr. Singer's exact regression on athletes' level of compensation (as opposed to their compensation as a fraction of event revenue) shows no impact or damages.  *Id.* ¶¶ 146-47, Ex. 13.

Professor Topel also explains why Dr. Singer's calculation of foreclosure is arbitrary and not based on the length of time that athletes are actually unavailable to competitors.  *Id.* § 10. Professor Topel goes on to explain the flaws in Dr. Singer's market definition, including the lack of any economic analysis in Dr. Singer's approach.  *Id.* §§ XIII, XIV.F.  Professor Topel then explains why Dr. Singer's two weighting structures for his market definition— revenue-weighting and inverse-rank weighting are wrong.  *Id.* § XIV.   Professor Topel also refutes Dr. Singer's evidence of direct market power, including contesting that Zuffa raised PPV prices or that there was a decline in output.  *Id.* § XV.

---

[3] This occurs because Dr. Singer chooses to weight his foreclosure shares with event revenues so as event revenues increase, it enlarges Zuffa's "foreclosure share" but also decrease the wage share since event revenues are also the denominator of his dependent variable.  Topel VII.B.3.

With regards to common impact, Professor Topel argues that Dr. Singer's econometric evidence of a compensation structure is biased by the use of pre-class period data and that his common factors regression is unreliable. *Id.* § XVI. With regards to damages, Professor Topel explains that Dr. Singer's definition of foreclosure is arbitrary, his assumption of the but-for foreclosure share is untenable, and that corrections to Dr. Singer's impact regression reveal no evidence that class members' compensation was reduced below competitive levels. *Id.* XVII.A.

III.     Zuffa's Labor Economist Professor Oyer

Zuffa expert Paul Oyer, the Editor in Chief of The Journal of Labor Economics[4], submitted a report to explain the common and economically-accepted methods of evaluating compensation particularly as it relates to allegedly monopsonized markets and evaluate Dr. Singer's (and Professor Zimbalist's) reliance on wage share. Ex. 8, Expert Rep. of Prof. Paul Oyer ("Oyer Rep.") ¶¶ 1, 5. Professor Oyer explained that "Labor share is not accepted in the economics community as the proper basis to evaluate compensation and it is not used in benchmarking competitive markets." *Id.* ¶ 12. Rather, economists "typically look at the *level* of pay . . . because it is a better proxy for the value the worker adds." *Id.* Professor Oyer explained that labor share "is not widely researched by labor economists, and it has not been widely studied in particular industries by labor economists." *Id.* ¶ 30.

IV.     Plaintiffs' Rebuttal Labor Economist Professor Manning

On rebuttal, Plaintiffs' labor economist Alan Manning submitted a report responding to Professors Topel's and Oyer's opinions regarding the inappropriateness of Dr. Singer's use of wage share. He offers two opinions: (1) wage share can be an appropriate way for a labor economist to analyze compensation and (2) wage share is an appropriate way to analyze the compensation of MMA athletes in this case. Ex. 9, Expert Rep. of Prof. Alan Manning Rep. ("Manning Rep.") ¶ 5.

Professor Manning opines that the use of wage share is appropriate when three circumstances exist: (1) the goal is to compare compensation to marginal revenue product; (2)

---

[4] Dr. Singer described The Journal of Labor Economics as one of the top-tier labor economics journals. Singer Dep. II 454:23-455:16

1   sufficient firm-level information is available to compute wage share; and (3) it is possible to

2   ascribe a measurable part of a firm's revenue to the activities of a particular worker or group of

3   workers.  *Id.* ¶¶ 6, 31.  Professor Manning includes no citation for his assertion that labor

4   economists use wage share under these three circumstances.  At his deposition, he made clear that

5   he has never seen these three factors included in any published work.  Ex. 10, Prof. Alan Manning

6   2/8/18 Dep. ("Manning Dep.") 33:13-39:19.  Instead, he combined individual ideas from various

7   works and put together a "particular combination which [he] chose to be appropriate to this case."

8   *Id*. 37:3-18.  Professor Manning also concluded the three factors were met in this case because of

9   his belief that the "marginal revenue product of an MMA fighter is plausibly proportional to event

10  revenue."  Manning Rep. ¶ 24.  The basis for Manning's opinion is his belief that athletes are the

11  key driver of event revenue because "fighters are people with media articles written about them,

12  and often Wikipedia pages."  *Id.*  Professor Manning reviewed no record evidence or deposition

13  testimony and cites only one article about a boxing match in support of his opinion.  Manning

14  Rep. ¶ 27, n.28; Manning Dep. 70:24-71:16.

15  **ARGUMENT**

16  I.   Dr. Singer's Impact and Damages Regression Models Should be Excluded.

17       A.   Dr. Singer Relies on a Novel and Untested Theory for Injury and Damages.

18            1.   Wage Share Is Not A Reliable or Widely Accepted Method for Evaluating
                  Antitrust Impact or Damages.
19

20       Dr. Singer uses an untested regression methodology to attempt to prove impact and

21  damages in this case.  Rather than measure actual compensation—the standard method used by

22  economists in the field and accepted by courts—Dr. Singer uses ***wage share*** as the dependent

23  variable in his regression to diagnose the existence of alleged anticompetitive activity and assess

24  the degree of antitrust injury and damages.  Dr. Singer's use of wage share to measure damages is

25  untested and neither he nor Plaintiffs' rebuttal labor economist, Professor Manning, identified a

26  single independent source using the wage share as the dependent variable in a regression in an

27  antitrust case.  Singer Dep. I 114:1-18, 118:15-21; Manning Dep. 121:2-13.  Dr. Singer even

28  argued at his deposition that antitrust damages are not a "topic that is going to get a lot of

12

attention by economists in peer reviewed journals."  Singer Dep. I at 113:3-23.  Even if wage

share were being used in regressions in the field of economics, there is no previous case in the

field of economics or a court relying on a regression that shows a relationship between "wage

share" and a regressor (in this case, "foreclosure share") when the same regressions show no

relationship between actual wages and that regressor.

Wage share is a ratio:  the percentage of event revenue paid to athletes as compensation.

Wage share says nothing about the actual compensation of athletes.  Actual compensation is what

matters:  compensation earners are not better off taking 50% of $10 than 15% of $100.  The same

is true of price fixing cases.  Damages and injury are estimated in price fixing cases based on

regressions testing the effect of conduct on actual prices, not on the percentage of product prices

to revenues.  *E.g. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 601 (N.D. Cal.

2010) (plaintiffs' expert using "regression analysis to examine the determinants of panel prices"

and to examine "the variation in transaction prices" resulting from the allegedly anticompetitive

price fixing conspiracy); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D.

Cal. 2015) (plaintiffs' expert "conducted a regression analysis of the relationship between CRT

prices, market demand and supply variables, and the presence of the conspiracy to estimate the

impact of the alleged conspiracy on prices while holding constant supply-demand effects.  This

'reduced form' model is widely used by economists").

Zuffa's economists Professors Topel and Oyer recognize that the standard way to evaluate

compensation in an allegedly monopsonized labor market is by running regressions using the

actual compensation, not wage share, as the dependent variable.  Topel Rep. ¶ 127; Oyer Rep. ¶

30.  This is the standard methodology that has been accepted by courts in many cases.  *E.g. Reed

v. Advocate Health Care*, 268 F.R.D. 573, 581-598 (N.D. Ill. 2009) (considering actual

compensation, *not* wage share, in evaluating monopsony claims); *In re High-Tech Employee

Antitrust Litig.*, 289 F.R.D. 555, 558 (N.D. Cal. 2013).  Dr. Singer fails to use the standard

methodology, likely because using levels of compensation as the dependent variable in his

regression shows no impact on damages (which Plaintiffs' experts Dr. Singer and Professor

1  Manning do not dispute).  Topel Rep. ¶¶ 146-48, Ex. 13; Manning Dep. 142:13-143:3; Singer

2  Dep. I 295:6-296:8.

3         No court previously has accepted a regression analysis of anticompetitive effect or

4  damages using wage share as the dependent variable.  Dr. Singer cites a single case (*Arizona*

5  *Travel Nurses*)[5] where the expert used the wage share method—*and he was that expert*.  Dr.

6  Singer used wage share because the travel nurses there, unlike UFC athletes, were paid a

7  "percentage of their billings"—that is, actual compensation was specifically determined as a share

8  of revenue.  Singer Rebuttal ¶ 89, n.318.  In that antitrust case, *Johnson v. Arizona Hospital &*

9  *Healthcare Ass'n*, 2009 WL 5031334 at *7-8, the court concluded that class certification was

10  appropriate as to only one class (per diem nurses), but not the other (traveling nurses) class based

11  on Dr. Singer's wage share method.  The court came to that conclusion for reasons that did not

12  require the court to evaluate the validity of the wage share method.

13         Dr. Singer does not cite a single academic source from a peer reviewed journal using

14  wage share as he does—as the dependent variable in a regression to diagnose the existence of

15  alleged anticompetitive activity and assess the degree of antitrust injury and damages.  At most,

16  Dr. Singer cites articles that reference the share of wages that athletes receive.  For example, Dr.

17  Singer relies heavily on what he describes as the "pioneering" work of Gerald Scully in a 1974

18  article on Major League Baseball.  Singer Rebuttal ¶ 94.  However, Scully does not use wage

19  share as the dependent variable in his regression.  He uses salary, just as Professor Topel did and

20  as Professors Topel and Oyer explain is the widely accepted method.[6]  (Scully also attempts to

21  estimate players' marginal revenue product of labor, and then compares that to players' salaries

22  using a ratio; but the regressions Scully runs do not use wage share as the dependent variable).

23  Dr. Singer erroneously claims that the articles he cites in his rebuttal report used regression

24  analysis with labor share of revenue as the dependent variable in measuring the anticompetitive

25

26  [5] *Johnson v. Arizona Hosp. & Healthcare Ass'n*, No. CV07-1292-PHX-SRB (D. Ariz. 2009).

27  [6] Ex. 11, Gerald Scully, *Pay and Performance in Major League Baseball*, 64 Am. Econ. Rev.
28  915, 926 (1974) .

1    effect, impact, or damages resulting from monopsonistic conduct.  Singer Rebuttal ¶¶ 103-04;

2    Singer Dep. II 487:14-22; 498:22-500:2.  They do not.[7]

3         The fundamental difference between many of the articles that Dr. Singer cites regarding

4    wage share and his approach is that the articles attempt to analyze the impact of an observed

5    *change* in monopsony power whereas Dr. Singer attempts to infer the *existence* of monopsony

6    power using wage share.  A fatal flaw in Dr. Singer's approach is that wage share can decline as

7    foreclosure share rises as a result of entirely procompetitive conduct unrelated to the assertion of

8    monopsony power.  For example, if Zuffa succeeds in promoting MMA, its brand and its events,

9    Zuffa's event revenue would increase and it would attract more athletes.  Even though actual

10   compensation to athletes goes up, compensation as a fraction of revenue will decline because

11   revenues rise faster than compensation.  Wage share masks the rising compensation of athletes by

12   tying it to event revenue which can increase as a result of procompetitive efforts by Zuffa.  To

13   establish monopsony power, Dr. Singer must be able to reject procompetitive reasons his

14   regression would show identical results—*i.e.*, rising foreclosure levels leading to a decline in

15   wage share—which he has not even attempted to do.  Singer Dep. I 119:8-24.

16        In addition, references to wage share in other contexts do not support the use of wage

17   share to evaluate the existence of monopsony power.  Zuffa, for example as Dr. Singer points out,

18

---

19   [7]  Singer Rebuttal ¶ 104 n. 370 (citing David Autor, David Dorn, Lawrence Katz, Christina
     Patterson, and John Van Reenen, *Concentrating on the Fall of the Labor Share*, 107 Am. Econ.
20   Rev.: Papers & Proceedings 180 (2017) [Ex. 12] (considering both procompetitive and
     anticompetitive hypotheses, devise a test to distinguish between the two, and concluding that a
21   decline in labor share has been driven by procompetitive activity)); *id.* ¶ 94 (citing Scully, *Pay
     and Performance*, 64 Am. Econ. Rev. 915 (no regression with wage share as the dependent
22   variable)); *id.* ¶ 95 (citing Gerald Scully, *Player Salary Share and the Distribution of Player
     Earnings*, 25 Managerial and Decision Economics 77 (2004) [Ex. 13] (no regression with labor
23   share as the dependent variable)); *id.* ¶ 103 n.367 (citing Sabien Dobbelaere & Jacques Mairesse,
     *Panel Data Estimates of the Production Function and Product and Labor Market Imperfection*,
24   28 J. of Applied Econometrics 1 [Ex. 14] (no regression with wage share as the dependent
     variable)); *id.* ¶107 n.395 (citing Jan De Loecker & Jan Eeckhou, *The Rise of Market Power and
25   the Macroeconomic Implications*, Working Paper (August 24, 2017),
     http://www.nber.org/papers/w23687 [Ex. 15] (no analysis of market power and referring to
26   labor's share of income but performing no test applying this share to increases in price markup));
     *id.* ¶¶ 105 n.379, 107 nn. 396-98 (citing Michael W.L. Elsby, Bart Hobijn, and Aysegul Sahin,
27   *The Decline of the U.S. Labor Share*, Brookings Papers on Economic Activity, 1-42 (2013) [Ex.
     16] (examining the drivers of the labor's share of income but without considering the impact of
28   monopsony power)).

sometimes compares its compensation costs as a share of revenue. Singer Rebuttal ¶ 108. It is not surprising that labor costs, like any other cost item, are sometimes examined as a percentage of firm revenues to understand their significance. This type of commonplace business evaluation of a cost structure—one that is unrelated to examining whether a firm has market power—is not probative of whether wage share is an appropriate or reliable scientific method for evaluating monopsony power.

Similarly, Dr. Singer cites to a 2009 paper by Zuffa expert Professor Topel that makes reference to wage share. Singer Rebuttal ¶ 90.[8] The 2009 paper involved the negotiations between the union representing NFL athletes and the NFL where the bargaining parties negotiated revenue sharing, which is not the same as a scientific examination of the effects of a monopsony in an antitrust case.[9]

On rebuttal, Plaintiffs retained Professor Alan Manning, a labor economist, to attempt to justify Dr. Singer's use of wage share by offering an opinion on the use of wage share in the labor economics community. Professor Manning's report discusses the unfamiliar and untested methodology that Dr. Singer chose. Professor Manning opines that labor economists might use wage share to evaluate compensation when three circumstances exist: (1) the goal is to compare compensation to marginal revenue product; (2) sufficient firm-level information is available to compute wage share; and (3) it is possible to ascribe a measurable part of a firm's revenues to the activities of a particular worker or group of workers. Manning Rep. ¶¶ 6, 31. Professor Manning includes no citation for his "three circumstances" standard because, as he confirmed at his deposition, no economic support for this standard exists. Manning Dep. 33:13-39:19. Instead, Professor Manning explains: "what I'm doing here is taking well-established ideas individually and drawing on ideas from established work, well-established, and combining them in a way that

---

[8] Citing Kevin Murphy & Robert Topel, "The Economics of NFL Team Ownership," Chicago Partners (2009) [Ex. 17].

[9] The purpose of the study was to determine whether the NFL could afford to pay players the amounts set forth in the previously agreed-upon 2006 extension of the Collective Bargaining Agreement ("CBA")—it was a study about business costs and revenue, *not* about how much (or what proportion of revenue) athletes should be paid or whether monopsony power existed.

is appropriate for this case." *Id.* 38:12-20; *see also id.* 37:8-18.  Professor Manning's testimony

confirms that he has created a *new* standard expressly for the purposes of this litigation as to

when wage share is appropriate to evaluate compensation.  This standard has not been published

in economic literature, subjected to peer review, and has not been tested in other contexts.  In

short, it is the type of "unsubstantiated and undocumented information [that] is the antithesis of

the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera*, 134

F.3d at 1423 (citation omitted).  That Plaintiffs had to retain a rebuttal expert to come up with a

previously unwritten standard to justify the use of wage share in this case illuminates the

obscurity of Dr. Singer's chosen technique.

> 2.  Dr. Singer Relies on an Assumption That Cannot be Tested to Justify the Use
> of His Econometric Model.

Dr. Singer premises his application of the methodology on an argument advanced in his

rebuttal report and supported by Plaintiffs' expert Manning as "plausible."  No matter what

justification is given for the method, the regression analysis Dr. Singer advances has not been

endorsed by any court or leading journal.  But in defending his premise for this untested method,

Dr. Singer admitted he was unaware of any studies measuring the Marginal Revenue Product of

Labor ("MRPL") using a percentage of revenues of a firm.  Singer Dep. I 118:15-21.  Even his

justification for the method rests on an untested assumption.

Dr. Singer explains that the appropriate way to measure damages is to compare athletes'

compensation to their MRPL.  The MRPL is, according to Dr. Singer, the value of the additional

output created when a firm adds a worker.  Singer Dep. I 115:21-116:3; Singer Rebuttal ¶ 8.

According to Dr. Singer, the difference between actual compensation the MRPL, which is what a

worker would be paid in a perfectly competitive labor market, is an appropriate measure of

damages.  Singer Rebuttal ¶¶ 36, 38.

Dr. Singer does not measure (or attempt to measure) MRPL.  Singer Dep. II 433:13-

434:1.  Instead, Dr. Singer assumes that event revenue is a reasonable proxy for MRPL, and thus

swaps event revenue for MRPL in his equations.  Singer Rebuttal ¶ 8.  Professor Manning does

not go so far, and can only conclude that the relationship between event revenue and MRPL is

"plausible" and because the relationship is "plausible," Professor Manning concludes that Dr.

Singer's method is "reasonable."  Manning Report ¶ 24; Manning Dep. 92:17-94:2.  As Dr.

Singer admits, "MRP is not directly observable."  Singer Rep. ¶ 8; *see also* Ex. 18, Rebuttal

Report of Andrew Zimbalist ¶ 30 ("there is no accepted way to empirically measure MRP of

labor in the economics literature"); Manning Rep. ¶ 14.  If MRPL is not directly observable, and

there is no accepted way to empirically measure it, there is no way to test whether it equals or

even reasonably approximates event revenue.  The entire basis for employing the wage share

method—that MRPL is a reasonable proxy for event revenue—therefore cannot be tested.  Even

if the method were previously known, a method premised on an untestable assumption is not

reliable, not based upon sufficient facts and data, and should be excluded under Rule 702.[10]

          To support his assumption, Dr. Singer asserts that the "vast majority of event revenue is

attributable to the fighters" based on one article he cites in his report.   Singer Dep. 441:10-19;

Singer Rep. ¶ 28 & n.56.   Dr. Singer would have a jury believe based on this lone article that the

vast majority of Zuffa event revenue will be earned regardless of Zuffa's promotional efforts, the

quality of its television production, management, matchmaking decisions, or other drivers of a

quality event.  In actuality, the article concludes only that individual athletes are more important

*than the titles for which they are competing* in estimating the number of PPV purchases (not event

revenue).  Ex. 19, Richard McGowan & John Mahon, *Demand for the Ultimate Fighting

Championship: An Econometric Analysis of PPV Buy Rates*, 6 J. Bus. &. Econ. 1032, 1046

(2015) ("The most important takeaway is that the identities of the fighters competing matter more

than any title they would be competing for").  There is no published economic analysis which

actually shows that the vast majority of event revenue is tied to fighters.  Dr. Singer offers no

support for this statement from MMA promoters and he disregards contrary testimony.  Dep. of

Carlos Silva 169:2-9 (CEO of World Series of Fighting, now Professional Fighters League)

---

[10] Dr. Singer has been criticized in the past for his choice of data inputs in his regressions, which
led to an unwarranted finding of impact.  *In re Photochromic Lens Antitrust Litig.*, No. 8:10-cv-
00984-T-27EA, 2014 WL 1338605, at *24 (M.D. Fla. Apr. 3, 2014) (magistrate judge "faulted
Dr. Singer for using 'price card' data" rather than actual transactional data which, when used,
showed that only two of fourteen lens casters were found to have been impacted by the alleged
anticompetitive conduct").

(disagrees with the statement "better known fighters in terms of consumer awareness generally attract more viewers" because "it's unclear what attracts more viewers").

Dr. Singer also has not attempted to replicate or validate the regression work in the article. Singer Dep. II 448:17-449:4 (admitting that he did not "obtain a copy of [the article's] data set in an attempt to replicate any of their work"). The article also shows that other factors other than the athletes play an important role in event revenue. For example, the authors conclude that "the higher the ratio of free to PPV UFC events, the higher the buy rate will be for the PPV events." *Id.* at 1046. Zuffa's promotional investments in staging these free events, despite the lack of PPV revenue, actually contribute to and drive event revenue at PPV and other events. This and other conclusions suggest that Zuffa's promotional efforts, *not* merely athlete identity, drive PPV buys.

Dr. Singer's assertion that "the vast majority of event revenue is attributable to fighters" also stands in stark contrast to every other one of Plaintiffs' and Zuffa's experts in this matter, all of whom state that other inputs, such as management, television production quality, promotion, and brand or team loyalty all have significant impacts on event revenue. Zimbalist Dep. II 124:3-125:19; Zimbalist Rebuttal ¶ 27; Topel Report ¶¶ 126, 134; Ex. 21, Dep. of Prof. Roger Blair ("Blair Dep.") 302:1-303:22; Manning Dep. 64:22-64:10. As Professor Blair demonstrates, changes in market conditions, such as changes in supply or demand that are unrelated to competition for labor can change the percentage of event revenue that would be paid to athletes. Ex. 22, Expert Rep. of Prof. Roger Blair ("Blair Rep.") ¶¶ 43-48. Furthermore, as Professors Topel and Oyer both note, changes in the respective contribution of each input to event revenue will affect the percentage of event revenue athletes would be expected to receive in a world where there is no change to competition for the purchase of athlete services. Topel Rep. ¶¶ 32, 130, 133-138; Oyer Rep. ¶¶ 36-37. For example, if Zuffa increases its advertising and generates more viewers, wage share would decrease, but through a purely procompetitive effect.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ By excluding factors that drive event revenues other than athlete pay, Dr. Singer

1  is not able to reliably estimate injury or damages.  Topel Rep ¶¶ 134, 142, 224; *see also* Singer

2  Dep. I. 120:1-121:21 (admitting that promotional investments can drive interest in MMA events

3  and he did not do actual study of contribution of athletes to event revenue).

4  B.  <u>Dr. Singer Assumes Market Foreclosure, He Does Not Prove it.</u>

5  Dr. Singer's method of assessing differences in compensation (regardless of whether it is

6  measured by wage share or actual compensation) is also unheard of because he is testing whether

7  30-month exclusive contracts affect *compensation*, not *competition.*  The only link that Dr. Singer

8  makes between such contracts and competition is his label "foreclosure."  Foreclosure is not an

9  output of the regression analysis; it is an input from Dr. Singer that gets "spit out" of a Microsoft

10  Excel file.  Singer Dep. I 39:1-9, 40:4-41:21.  "The regression doesn't get to specify the

11  foreclosure share, just as the regression doesn't get to specify how many punches a fighter

12  threw."  *Id.* 38:15-19.[11]

13  The foreclosure share is an input to Singer's regressions and not the result of his

14  regressions.  Singer Dep. 39:1-4.  Any other contracted provisions also present in the standard

15  Zuffa promotional agreement, including the choice of law clause, if inputted in the regression

16  would produce the same mathematical results as an input to the regressions.  Dr. Singer disagrees

17  with the validity of this point, but could not at his deposition deny that it was mathematically true.

18  Singer Dep. I 178:15-179:7.

19  Dr. Singer's regressions assume that 30-month contracts are anticompetitive without

20  demonstrating that they actually are anticompetitive or have any effect on the market share of

21  Zuffa or its competitors.  The "foreclosure share" is just the weighted fraction of athletes in each

22  market who are signed to exclusive Zuffa contracts of 30-months in duration (with a champion's

23  clause).  No economic analysis by Dr. Singer measures the effect of these contracts on the market

---

[11] To justify his foreclosure specification, Dr. Singer does a faulty analysis of the average duration of a Zuffa athlete's career.  Singer Rep. ¶ 90; Singer Rebuttal ¶ 64.  His initial approach artificially limited a "career" to bouts in his Tracked market (not an athlete's entire professional career) and his rebuttal approach calculates average career length by including both Zuffa athletes and those athletes who have never competed with Zuffa.  But, regardless of the duration of an athlete's career, Singer nowhere demonstrates that Zuffa's market share is caused by 30-month exclusive contracts.

share of Zuffa or its competitors.  The foreclosure share, according to Dr. Singer, is even "agnostic to the market share . . . just to be clear, you can have a high market share and zero foreclosure share."  Singer Dep. I 42:5-18.

Dr. Singer has even admitted that he assumed that the legal durations of the contracts in this case will be established by the court and that he believes he has set foreclosure shares consistent with past court cases.  Singer Dep. II 370:23-372:1.  He asserted that he was "familiar with various case law that speaks to what constitutes a contract of sufficient duration to be considered exclusionary."  Singer Dep. I 152:1-9. (Singer is also wrong because courts do not hold that 30-month exclusive contracts are anticompetitive).[12]  Dr. Singer explained his method for determining the duration of an anticompetitive contract as follows:  "It's tautological.  It depends on where you draw the cutoff."  *Id.* 44:16-45:12.  Dr. Singer's impact and damage regression analyses are intended only to measure what happens if Zuffa contracts have a shorter duration than "some level that a Court would deem exclusionary."  Singer Dep. II 375:7-376:12.  "It's going to depend on where the Court would draw the line."  *Id.* 376:13-24.  Dr. Singer even admitted that his injury and damages estimates would be the same if the court ruled that exclusive contracts of two years or less were legal because the court's definition would automatically be the "foreclosure share" in his regression.  *Id.* 384:22-386:9.  Again, Singer explained that his foreclosure analysis is "almost tautological."  *Id.* 385:7-17.

---

[12] *E.g. Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1203, 1212 (C.D. Cal. 2011) (granting partial summary judgment dismissing claim that defendant used exclusive dealing contracts to monopolize a market where the contracts required purchasers to purchase a full line of products exclusively for "three (3) or five (5) years"; the contracts were part of "lawful and procompetitive conduct"); *see also Woman's Clinic, Inc. v. St. John's Health Sys., Inc.*, 252 F. Supp. 2d 857, 869-72 (W.D. Mo. 2002) (granting summary judgment in a Sherman Act action alleging anticompetitive conduct through the use of exclusive contracts and finding that an exclusive dealing contract of five-years was reasonable); *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000) (affirming grant of summary judgment on plaintiff's antitrust action which alleged injury as a result of defendant's exclusive contracts of five to ten years with nineteen facilities); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (holding NFL's exclusive licensing agreements of three years "do not foreclose competition and are not anticompetitive as a matter of law").

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1    Other courts have excluded the testimony of Dr. Singer where it was based on his "legal

2    musings" and "legal opinions."  *King Drug Co. of Florence, Inc. v. Cephalon, Inc*., 2015 WL

3    12645766 n. 21 & 22 (E.D. Pa. 2015).  Here Dr. Singer's regressions establish estimates of injury

4    and damages expressly based on his legal assumptions about the legality of 30-month contracts,

5    rather than evidence of any anticompetitive effect of those contracts.

6    Dr. Singer's testimony has also been criticized previously because of what he has done in

7    this case:  slapping the label of "foreclosure" on conduct without actual analysis.  In *Mazda*, the

8    court found that a reasonable jury could not rely on Dr. Singer's foreclosure analysis in an

9    antitrust case concerning vehicle history reports (VHRs).  2016 WL 7231941, at *12.  In that

10   case, similar to what he does here, Dr. Singer estimated a "foreclosure share" based on dividing

11   the number of VHRs implicated by exclusive agreements as a share of all VHRs.  The court

12   found that Dr. Singer was missing data, but the court also saw through his attempt to assume his

13   own conclusions about the extent of foreclosure of competition:

14          Finally, there is an additional flaw in Dr. Singer's foreclosure conclusion—
            namely, that Dr. Singer assumed that all of the "exclusive" CPO Agreements
15          foreclosed competition.  *See* Singer Rep. ¶ 55. As this Court has held, however,
            no reasonable jury could find that the majority of the CPO Agreements were of a
16          sufficient duration to foreclose competition. Accordingly, no reasonable
            jury would include VHR sales resulting from these short-term CPO Agreements in its
17          assessment of the share of the VHR market that the CPO Agreements foreclosed.
            While the Court cannot say at summary judgment precisely how much correcting
18          for this error would affect Dr. Singer's analysis, a reasonable jury would have to
            conclude that this omission artificially inflated the 30% foreclosure estimate he
19          provided.

20   *Id.* at *13.  Other courts have also excluded Dr. Singer's testimony for assuming, as he does in

21   this case, his own conclusions.  In *Apotex*, the court excluded testimony of Dr. Singer in a

22   pharmaceutical antitrust case where "Dr. Singer essentially admits that he is unaware of any

23   factual basis to support a scenario where the Generic Defendants would agree to forfeit their 180

24   days of exclusivity."  321 F.R.D. at 235.  Similarly, that court excluded a calculation of Dr.

25   Singer that "measures lost profits in excess of those stemming from the alleged anticompetitive

26   activity."  *Id.*; *see also In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685

27   (S.D. Fla. 2012) (holding that Dr. Singer offers no methodology for determining whether pass-

28

1    through actually occurred; instead, he assumes "the pass through rate would typically be one

2    hundred percent").

3            C.   Dr. Singer Includes Improper Data in His Regression.

4            Dr. Singer includes irrelevant data from a non-Zuffa company in his impact regression.

5    Although Dr. Singer is attempting to determine whether Zuffa's alleged exercise of monopsony

6    power affected Zuffa athletes' compensation, he runs a regression that includes data from another

7    MMA company, Strikeforce (before Zuffa acquired it), in his regression model.  Singer Rep. ¶

8    181, n.452. ████████████████████████████████████████████████████

9    ███████████████████ Singer Rep. ¶¶ 245, 248, 250, 252.

10           As a theoretical matter, it does not make sense to include data on the wage share of non-

11   Zuffa athletes—from a different company, of a different size, with different skills, and a different

12   business model—into a regression attempting to determine if Zuffa's alleged exertion of

13   monopsony power impacted Zuffa athletes' compensation.  Topel Rep. ¶¶ 152-154; Topel Dep.

14   Tr. 311:4-6. ████████████████████████████████████████

15   ████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ██████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   █████████████████████████████████████████████████ For this

25   reason, including pre-acquisition Strikeforce bouts in his regression model is the primary and

26   artificially manufactured cause of the negative relationship Dr. Singer "measures" between

27   athlete compensation as a share of event revenue and "foreclosure share."

28

II.     Dr. Singer's Other Opinions Related to Damages Analysis Should Be Excluded.

      A.   Dr. Singer Fails to Properly Define a But-For World

To demonstrate antitrust injury, parties are "required to construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted).  In such a "hypothetical economic construction," "economic rationality must be assumed," as "Otherwise it will be impossible to keep speculation in check." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981).  In addition, "expert testimony cannot substitute for market facts— and cannot defeat them, when the facts themselves render plaintiffs' theory of injury unreasonable." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2011 WL 5883772, at *15 (N.D. Cal. Nov. 23, 2011), *aff'd sub nom. In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914 (9th Cir. 2015).  The but-for world must show that the Challenged Conduct caused the damages by demonstrating that absent the Challenged Conduct, those damages would not have been incurred.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. MC 07-0489, 2017 WL 5311533, at *58 (D.D.C. Nov. 13, 2017).

      1.   Dr. Singer Fails to Define a But-For World That Establishes Causation.

Dr. Singer concedes that identifying the but-for world is a necessary predicate to estimating damages,[13] but he failed to evaluate injury or damages for the different types of conduct he identifies as included within the Challenged Conduct.  Singer Dep. I 20:12-21:5; Singer Rep. § III.  Dr. Singer's report and occasional testimony defines his but for world as a world without the conduct challenged in Plaintiffs' Complaint.  Singer Rebuttal ¶ 188; Singer Dep. II 399:15-20; 400:19-401:2.  But his models for establishing antirust injury and estimating damages employ a but-for world where "the restrictions on fighter mobility are lessened sufficiently so as to permit 30, 20, or zero percent foreclosure shares and there's a lot of ways that you can get there."  Singer Dep. I 181:11-181:20.

---

[13]   Singer Dep. II 400:9-401:2 ("I think if it's part of the Challenged Conduct and if plaintiffs are including that in the Challenged Conduct, then we are – as economists, what we are trying to do is model a world in which the Challenged Conduct is absent.")

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

Dr. Singer conducted no econometric or other qualitative analysis to determine how the many specific items of Challenged Conduct in the Complaint, if they no longer existed, would reduce foreclosure share would change in the but-for world absent the Challenged Conduct. Singer Dep. II 367:19-368:15, 370:2-371:13.  For example, other than shorter contracts, Dr. Singer could not say if the ancillary rights provision and specifically the ability for Zuffa to contract for the identity rights of athletes for a specific bout in perpetuity challenged in the Complaint would continue in the but-for world.  Singer Dep. II 401:11-19.  Instead, Dr. Singer testified that he specified his injury and damages model with 0%, 20% and 30% foreclosure shares because:

> Those levels, as I explained a few minutes ago, are levels that I thought a Court would deem at least not anticompetitive based on my understanding of precedent in the similar cases.  So I think that's where the zero, 20 and 30 percent come from, let's just be clear.  It's not – it's not from anywhere else.  We are trying to find a level of foreclosure that would be deemed not anticompetitive by a Court.

*Id.* 370:23-371:13.  Dr. Singer also does not identify with specificity what Zuffa would have done differently in the but-for world that would have caused this reduction.  He testified that there were multiple but-for worlds that might have reduced Zuffa's share, Singer Dep. I 47:10-21, Singer Dep. II 374:15-22, and that there are "lots of ways that you could restructure the contract" to reduce Zuffa's share.  Singer Dep. II 378:12-379:10.

In his rebuttal report, Dr. Singer vaguely describes the but-for world as one with "enhanced mobility" and "an easier and more certain route to free-agency."  Singer Rebuttal ¶ 198.  Nowhere does Dr. Singer define what Zuffa would have done differently in his but-for world such that compensation would have been higher than what the Plaintiffs and putative class plaintiffs received.  Dr. Singer testified that in thinking about what contracting the but-for world would look like "you could go to boxing as an example."  Singer Dep. II 356:4-15. ███████

████████████████████████████████████████████████████████████████

---

14 ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Without knowing how the but-for world is different from the real world, it is impossible to know what caused Plaintiffs' alleged injury. *In re Pharmacy Benefit Managers Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *20 (E.D. Pa. Jan. 18, 2017), *reconsideration denied*, No. CV 03-4730, 2017 WL 1493029 (E.D. Pa. Apr. 26, 2017) ("In the context of *Daubert*, the failure to match the damages model to the theory of antitrust impact renders the expert opinion unfit").

### 2. Dr. Singer Assumes an Irrational Economic World.

Dr. Singer does assume in his otherwise vague but-for world, that Zuffa's exclusive contracts only last 12 months or less. Singer Rebuttal ¶ 198. With respect to these 12-month contracts, Dr. Singer further assumes that if an athlete wanted to compete for another promoter during that 12-month period, the athlete would be permitted to do so. Singer Dep. II 392:22-393:5. If an athlete is free to compete for another promoter during the term of the contract, then by definition the contract is not actually exclusive. Assuming the but-for world consists of short term non-exclusive contracts means assuming a vastly different market structure than *any* successful promoter uses today. This strays from assuming "economic rationality" in the but-for world and ignores "market facts" that "render plaintiffs' theory of injury unreasonable." *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *15. It also prohibits Zuffa from using contracts which the Ninth Circuit acknowledges have "well-recognized economic benefits . . . including the enhancement of inter-brand competition." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010) (quoting *Omega Envtl.,* 127 F.3d at 1162). Dr. Singer's opinions have been excluded in the past for unsupported assertions regarding how a business would treat its exclusivity rights in the but-for world. *Apotex*, 321 F.R.D. at 235 ("I agree with Defendants that the record does not support Dr. Singer's assertion that the Generic Defendants would have agreed to stay off the market through 2012, while simultaneously forfeiting their first filer right of 180 days exclusivity").

//

//

//

//

1

2

### B.  Dr. Singer Does Not Apply the Correct Methodology to his Assessment of Strikeforce and Bellator Benchmarks.

3

4

5

6

7

8

9

10

11

In addition to Dr. Singer's estimate of damages based on his regression models, Dr. Singer also calculates damages by comparing the wage share of Zuffa athletes to the wage share of two other MMA promotions, Strikeforce (now defunct) and Bellator.  Singer Rep. ¶¶ 247-48.  This method is unreliable and should be excluded because Dr. Singer fails to abide by economic standards for using a benchmark.  Dr. Singer's damages calculations have been criticized in the past for failure to use a proper benchmark.  *In re Cox Enterprises*, 2011 WL 6826813, at *16 ("In light of the failure to consider the differences regarding regulations and costs imposed on Canadian and American cable providers, the application of the Benchmark method rests on unstable ground").

12

13

14

15

16

17

18

19

In order to properly apply a benchmark or yardstick standard, Dr. Singer would have to identify a firm similar to the firm being measured in all material respects but for the impact of the antitrust violation, and analyze, among other things, if the firms stand in a similar relative position in their markets, have similar managements, and are comparable in all other respects.  Ex. 23, Herbert Hovenkamp, *Federal Antitrust Policy* 670 (2nd ed. 1999). ███████

███████████████████████████████████████████████████████

███████████████████████████████████████ Singer Rep. ¶ 24; Singer Dep. I 209:20-210:4.

20

21

### C.  Singer's Identity Class Damages Calculation is Unreliable and Not Expert Testimony.

22

23

24

25

26

27

In Dr. Singer's rebuttal report, he concluded that in the but-for world each Identity Subgroup 2 class member would have received ███████████████████████████. Singer Rebuttal ¶ 169.  Dr. Singer does not conduct any expert analysis to reach his conclusion.  All he does is transcribe a dollar value from a document which is not a valid way to assess impact or calculate damages.  *Waymo LLC v. Uber Techs., Inc.*, No. C-17-00939, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (excluding expert's opinion on damages for lack of specialized

28

knowledge where the expert "simply adopted the opinions of others and performed grade-school

arithmetic counsel can do on an easel" and where the record evidence "can speak for itself").

III.    Singer's Definition of Relevant Input and Output Markets Should Be Excluded.

Market definition is "indispensable to a monopolization claim." *Morgan, Strand, Wheeler*

*& Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1491(9th Cir. 1991) (quoting *Thurman Indus. v.*

*Pay'N Pak Stores*, 875 F.2d 1369, 1373 (9th Cir. 1989)); *see also Cont'l T. V., Inc. v. GTE*

*Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977) ("an antitrust policy divorced from market

considerations would lack any objective benchmarks").

A.  Singer Fails to Use the Correct Methodology under the *Merger Guidelines* to
     Define Input Markets.

Under the *Merger Guidelines*, market definition for an **input** market requires a "focus on

the alternatives available to sellers."  Horizontal Merger Guidelines §12; *see also Todd*, 275 F.3d

at 204 ("the market is not the market of competing sellers but of competing buyers. This market is

comprised of buyers who are seen by sellers as being reasonably good substitutes.") (citing Blair

& Harrison, *supra*, at 324). Under the Merger Guidelines, the test for defining an input market for

MMA promoters is to assess whether a hypothetical monopsonist could profitably decrease

compensation to athletes.  If enough athletes would switch to other promoters such that a

compensation decrease would not be profitable, those promoters should be included in the

market.  Under "standard" antitrust analysis, "courts determine the degree to which price

increases will cause marginal buyers to turn to other products or marginal suppliers to increase

output of the product."  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1118 (N.D. Cal.

2004).

Dr. Singer claims that he analyzed "alternatives to which fighters could reasonably

substitute," Singer Rep. ¶ 99, but two sentences later, he defines the market participants by

identifying the sellers (*athletes*)—not buyers (*promoters*)—that are in the market.  *Id.* (a

"hypothetical monopsonist over all" the **athletes** in each of his three groups—Tracked, Ranked,

and Headline—"could profitably exercise monopsony power.") (emphasis added).  By identifying

which athletes should be included in the market instead of which promoters are in the market, Dr.

Singer abandons the use of a SSNIP test to define the market.  Singer Dep. II 533:19-534:6.[15]  Dr. Singer claims that because he includes in his input markets "Fighters associated with non-Zuffa promoters, these market definitions are *likely* overbroad and thus conservative," Singer Rep. ¶104, but he cannot say whether they actually are overbroad because he has not used a SSNIP test to assess what *promoters* should be included in the market.

The Eighth Circuit explained the fallacy of such an approach in the context of defining a relevant output market to address monopolization claims for cardiology services.  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009).  In that case, the plaintiff argued that the output market for healthcare services should be limited to customers with private insurance because customers with government insurance were not interchangeable with customers with private insurance.  "The trouble with this theory is that it analyzes the issue from the *wrong side of the transaction.*"  *Id.* (emphasis added) ("from the patients' perspective, private insurance and Medicare/Medicaid are not reasonably interchangeable. . . . But this lawsuit is not about the options available to patients, it is about the options available to shutout cardiologists").  Here, the relevant question that Dr. Singer failed to ask is whether enough competing promoters who have been denied access to athletes would be able to hire enough athletes to make a price decrease unprofitable.

B.  Singer's Input Market Definition Analysis is Not Reliable and Lacks Economic Analysis.

Apart from whether Dr. Singer has correctly applied the Merger Guidelines SSNIP test, the question remains whether his novel approach to market definition is appropriate under Rule 702 and *Daubert*.  Market definition "generally requires a detailed examination of 'market data, figures or other relevant material adequately describing the nature, cost, usage or other features of competing products.'"  *Grason Elec. Co. v. Sacramento Mun. Utility Dist.*, 571 F. Supp. 1504,

---

[15] "Q [I]n the ranked market, did you test whether fighters in that market would move to another buyer in that market such as World Series of Fighting if their individual pay declined other than what you have said, you looked at revenue evidence? A. I would say no. They are – they are already in the ranked market and so we are not looking at substitution within the ranked market. That's not the relevant inquiry."

1521 (E.D. Cal. 1983) (quoting *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*,

531 F.2d 910, 919 (8th Cir.1976)).  Dr. Singer has performed no such analysis, instead defining

the markets based on (1) record evidence, Singer. Dep. I 290:6-291:19; and (2) the results of his

impact regression, Singer Dep. I 292:7-294:3.  Dr. Singer is wrong on both counts.

Dr. Singer relies on his interpretation of record testimony as sufficient to support his

finding that his two input markets and his submarket are relevant antitrust markets.  Singer Rep.

¶¶ 104-14.  The court in *Live Concert* addressed a similar issue.  In that case, the court found that

Dr. Phillips' (the expert economist's) only basis for defining a market was his assessment of

"industry recognition."  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993 (C.D. Cal.

2012).  The court concluded in that case that "close scrutiny" was necessary to evaluate the

expert's proposed relevant market to ensure that his analysis was "sufficiently robust" to warrant

admission under Rule 702 and *Daubert*.  *Id.* at 986.

The court ultimately excluded the expert's testimony on two grounds.  First, the court

found a lack of relevant industry expertise:

> to the extent that Dr. Phillips relied on his own subjective opinion in order to
> determine which performers qualify as "rock" artists, he is not qualified to make
> this determination. Further, to the extent that Dr. Phillips purported to rely on
> "industry information" in order to categorize the artists at issue, he did not utilize a
> reliable methodology for interpreting and applying this information.

*Id.* at 994.  Second, the court noted that, "a key ingredient missing from Dr. Phillips' Expert

Report is *economic analysis* (be it quantitative or qualitative) tying these statements by industry

observers to Dr. Phillips' ultimate conclusion that the relevant market is comprised of "'live rock

music concerts.'"  *Id.* at 993.

If those same factors are applied to Dr. Singer's report, it is clear that Dr. Singer's market

definition opinions should be excluded.  Dr. Singer has no industry expertise to assess the record

evidence he is interpreting and many of his findings reflect a limited understanding of the

underlying market dynamics at issue.  For example, Dr. Singer concedes that, during the class

period, there were at least 213 to 429 promoters with athletes in his "ranked" measure.  Singer

Rep. ¶ 111.  Yet, despite his claim that "nearly all non-Zuffa promoters are small regional outfits

1    that have none of the top Fighters in any weight class and do not even seek to compete with the

2    UFC for talent," *id.* ¶104, he only provides qualitative descriptions of a handful of promoters.

3         In other instances, Dr. Singer disregards or was ignorant of contrary record evidence

4    related to findings he made.  For example, a key theory Dr. Singer propounds is that other

5    promoters "do not have access to a sufficiently deep pool of talented Fighters to provide

6    competitive matchups to advance a Zuffa Fighter's career."  Singer Rep. ¶ 104.  Dr. Singer fails

7    to address testimony from third party promoters who testified that they are able to sign talented

8    athletes.  Ex. 24, Dep. of Jeremy Lappen (former executive at EliteXC) 138:13-23; Ex. 25, Dep.

9    of Scott Coker (former head of Strikeforce, current CEO of Bellator) 131:11-135:9; Ex. 26, Dep.

10   of Thomas Atencio (former V.P. of Affliction) 87:19-24; Ex 27, C. Silva Dep. 204:23-25.

11        In some cases, Dr. Singer's representations are wholly unfounded.  In one case, Dr.

12   Singer claims that Conor McGregor was unable to negotiate favorable contract terms based on a

13   document related to a different fighter, Conor Huen.  Singer Rep. ¶ 218; Ex 28, ZUF-00122280

14   (showing title of email is "Re: Conor Huen" and where McGregor is not mentioned in the

15   document).  Similarly, he claims that "FightMatrix is recognized by Zuffa itself as an

16   authoritative source of MMA Fighter rankings."  Singer Rep. ¶ 108.  But his only citation to

17   support that assertion is to a deposition of one of the named plaintiffs where Zuffa's **counsel** was

18   asking Mr. Vazquez whether FightMatrix rankings provide enough information "to tell you

19   whether a fighter was elite or not."  *Id.* ¶ 108 n.300; Ex. 29, Dep. of Javier Vazquez 67:11-68:23,

20   74:23-75:6.  Mr. Vazquez's response hardly supports the notion that FightMatrix's rankings are

21   an "authoritative source":

22            Again, rankings were opinions, some of which some people have them and they
             may or may not know much about the sport.  I don't know who does
23            FightMatrix's rankings and I don't know who does a lot of people's rankings.  So
             anybody can say anything.
24   *Id.*

25        The point to these examples is to highlight Dr. Singer's lack of unique industry

26   specialization that would otherwise permit more informed understanding of the record evidence.

27   Like Dr. Phillips' opinion in *Live Concert*, Dr. Singer's testimony also lacks the "key ingredient"

28   of "economic analysis (be it quantitative or qualitative) tying these statements by industry

observers" to his ultimate conclusion that the relevant input markets are comprised of athletes who are ranked by Dr. Singer.  *See also Golden Boy Promotions LLC v. Haymon*, No. CV 15-3378-JFW, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017) (holding there was no reliable basis for expert's product market of managers of Championship-Caliber boxers in the U.S. where there was no empirical evidence supporting expert's opinion and there was contrary record evidence). Dr. Singer's market definitions have been excluded in the past for failing to properly define the scope of the market.  *Mazda*, 2016 WL 7231941, at *12 (excluding Dr. Singer's opinion in part because "Dr. Singer's foreclosure estimate was based on an artificially small figure for Carfax's VHR sales, and therefore an artificially small estimate of the overall size of the market").

As to Dr. Singer's regression analysis, even if his findings were accurate, the argument that his damages regression can define a market is circular:  the regression results are meaningful only if the market has been properly defined.  Dr. Singer also misconstrues the relevance of the results of his econometric model to market definition.   Dr. Singer admitted that he never assessed whether Zuffa suppressed actual athlete compensation during the class period.  Singer Dep. I 295:6-296:8.  Dr. Topel has performed that analysis and concluded that compensation increased for Zuffa athletes throughout the class period.  Topel Rep. ¶¶ 169-171, Ex. 17.  Even if you ignore the many flaws in his impact regression, Dr. Singer contends that, absent Zuffa's conduct, wages would have been even higher than the already increasing wages.  Such a finding does not act as a SSNIP test of the effect of reductions in wages by Zuffa on the actions of rival promoters. *Oracle Corp.*, 331 F. Supp. 2d at 1118 (test is whether rivals to monopsonist increase output).

C. Dr. Singer's Output Market is Flawed.

Dr. Singer states that "[i]n the Relevant Output Market, MMA Promoters are the seller; ***their customers include viewers, cable networks, broadcast networks, and sponsors.***"  Singer Rep. ¶ 115 (emphasis added).  In sports and entertainment cases, courts have excluded expert testimony when a market definition is too narrow and disregards relevant substitutes.  *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009) (affirming exclusion of Dr. Zimbalist's testimony because "he had included only Busch series and open-wheeled races as possible substitutes for attending or watching  NASCAR stock-racing

32

events but "should have considered other sports – and possibly other forms of entertainment – as substitutes").  In *Kentucky Speedway*, the court explained that "[c]orporate sponsors, for example, could choose to advertise their products in conjunction with another sporting event, and broadcasters could select non-auto racing programming, or non-sports programming altogether in lieu of airing a Sprint Cup race."  *Id.* at 917.

Dr. Singer admits that he did not perform a SSNIP test on behalf of where cable distributors, sponsors, or cable networks would go in the face of a SSNIP, and looked only to the substitutability of viewers.  Singer Dep. II 551:7-24 ("I was looking as to where viewers would go in response to a SSNIP in the output market, not where cable distributors would go, not where cable networks would go."), 544:3-15 ("I don't recall looking at substitution by sponsors or substitution by cable distributors.").  Dr. Singer's own admission that he did not look to the substitutability of the other customers he identified in his opening report requires the exclusion of Dr. Singer's output market definition.

IV.    Singer's Market Share Calculation Is Unreliable and Should Be Excluded.

Dr. Singer calculates market shares for purposes of market definition using revenue-weighted athlete shares (to calculate impact and damages, he calculates his "foreclosure" share using revenue weights as well).  Singer Rep. ¶¶ 128, 170.  Dr. Singer does not simply identify the number of athletes in each of his three market specifications (ranked, tracked, or headliner) and calculate what percentage of those athletes Zuffa has under contract.  Instead, Dr. Singer uses a variety of weighting methods which distort an otherwise simple market share exercise.  Dr. Singer claims his primary weighting method—by promoter revenue—is meant to control for "differences in average quality."  Singer Rep. ¶ 128.  Dr. Singer's revenue-based weighting system, however, does not calculate quality differences as he claims.  Zuffa is more successful at generating event revenues from viewers, networks, and sponsors than other promoters and Dr. Singer's market definition uses that to inflate Zuffa's share of the ***input*** market of athletes.

There is no economically sound basis to use downstream revenue from viewers, networks, and sponsors to weight the shares of the input market and this approach has been explicitly rejected in the Ninth Circuit.  In *Syufy*, the court rejected DOJ's argument to use the cinemas' box

1   office receipts (*i.e.,* output market revenue) to measure concentration in the purchase of first-run

2   movies because, like here, cinemas purchase first-run movies with no certainty regarding the

3   movie's likely success.  903 F.2d at 666 n.10; *see also United States v. Rice Growers Ass'n of*

4   *Cal.*, Civ. No. S–84–1066 EJG, 1986 WL 12562, at *10-11 (E.D. Cal. Jan. 31, 1986) (using

5   volume of rice **purchases** to calculate share in an input market).  This approach is not used or

6   accepted in the field of economics and is not found in the Merger Guidelines.  Plaintiffs' own

7   expert, Dr. Zimbalist, identified the correct approach (which Dr. Singer did not use):  "if you

8   wanted to look at the concentration of purchase of the input, then you would be defining it in

9   terms of the number of fighters and I think you would also be looking at a weighting of the

10  fighters according to their compensation."  Zimbalist Dep. II 42:14-19; *see also id.* 43:9-12 ("And

11  then, secondly, you would want to weight it according to the importance of the fighters and that

12  would be the payment to those inputs").

13         The unreliability of Dr. Singer's revenue-weighted approach becomes obvious when

14  applied to the real world.  For example, according to FightMatrix, the third and fourth-ranked

15  light-heavyweight athletes, Ryan Bader and Phil Davis, are currently under contract with Bellator.

16  The 184th ranked light heavyweight, James Bochnovic, is currently under contract with Zuffa.

17  But in Dr. Singer's calculation, ████████████████████████████████████████████

18  ██████████████████████████████████████████████ Topel Rep. ¶ 221.[16]  This result

19  occurs because it is downstream revenue Zuffa succeeds in earning that is heavily weighting the

20  shares of Zuffa athletes in the **input** market of fighters.

21         Under Dr. Singer's regression, Zuffa athletes are automatically worth orders of magnitude

22  more simply because they are under contract with Zuffa, regardless of their "quality."  Athletes at

23  other promoters are automatically worth orders of magnitude less simply because they compete

24  for other promoters, regardless of their "quality."  All this proves is that Zuffa makes the most

25  money.  It does not answer the pertinent question—what is Zuffa's share of MMA athletes.  A

26  methodology that does not answer the question being asked cannot be said to have been reliably

27  _____

28  [16] At the time of Professor Topel's report, Bochanovic was the 183rd ranked light heavyweight.

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

applied to the facts of the case.  *Domingo*, 289 F.3d at 607 (affirming exclusion of expert testimony where expert's "conclusion simply did not follow from his analysis").

Dr. Singer's own testimony shows that the application of his regression is not producing reliable results.  He testified that the same group of athletes competing for another organization "would, in fact, generate something close to what was generated at Zuffa."  Singer Dep. II 440:24-441:24.  If athletes generate the same revenue at each promoter, then it makes no sense that his regression weights athletes so drastically differently.

To make matters worse, Dr. Singer improperly cherry-picks data to artificially inflate Zuffa's share of the market.  Dr. Singer explains that the revenue he uses to "revenue-weight" consists of PPV revenue and gate revenues, and not broadcast TV revenue.  Singer Rep. ¶ 128.  But Dr. Singer acknowledges that "Zuffa was essentially the only MMA promoter offering PPV events over this timeframe."  Singer Rep. ¶ 148.  Other promoters, including Bellator (owned by media giant Viacom), use a television broadcast model.  Dr. Singer does not include any equivalent of PPV revenue for these promoters.  Singer Dep. I 78:20-79:18. Dr. Singer assumes that Bellator makes no money from broadcasting its events on major national television.  This is not the "level of intellectual rigor that characterizes the practice of an expert" in regression analysis or economics.  *Kumho Tire*, 526 U.S. at 152; *see SMS Systems Maintenance Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("Expert opinions, however, are no better than the data and methodology that undergird them").

V.   Dr. Singer's Unsupported Assertions Regarding Alleged Evidence of Competitive Effects Should Be Excluded.

In three separate instances, Dr. Singer observes a market effect and concludes that the effect is direct evidence of Zuffa's use of monopoly or monopsony power.  In each case, Dr. Singer made no attempt to investigate the possibility that some other cause could account for the effect he observed.  Courts recognize that "social science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable" and that failure to conduct such an analysis—as Dr. Singer failed to do with respect to each opinion addressed in this section—renders his opinion unreliable under *Daubert*.  *Zenith Elecs. Corp. v. WH-TV*

*Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (excluding expert testimony where economist failed to either conduct a regression analysis or explain why such an analysis could not be done).

A.   Dr. Singer's Opinion that Zuffa Reduced MMA Events is Not Reliable.

Dr. Singer claims that Zuffa implemented a profitable restriction in the number of PPV events that it promoted between 2010 and 2015 based on Zuffa holding less events than Singer projects using a trend line.  Singer Rep. ¶ 148.  Again, Singer makes no attempt to adjust for other factors, such as reduced demand, that could affect the number of MMA events put on each year. Furthermore, there is at least one obvious explanation for the reduction in PPV events between 2010 and 2015—Zuffa signed a contract with Fox in 2011 that shifted more events to its broadcast partner.  Ex. 30, ZFL-1224424.  Dr. Singer responds by asserting that a rational MMA promoter would not transition PPV shows to broadcast.[17]  Not only is Singer's assumption about Zuffa's intentions improper, *In re Rezulin Product Liability Litigation*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony"), it is also wrong.  Ex. 31, Dep. of Lorenzo Fertitta 146:5-13 ("We had a number of events which typically are on pay-per-view or a few times were broadcast, on Fox broadcast").  Moreover, although there are variations from year to year, the overall number of Zuffa events has consistently gone up both before and during the class period.  Singer Rep. Figures 4(a)-(c).  By failing to account for any other explanation for the variance in the number of events Zuffa held, Dr. Singer's opinion clearly violates the reasonableness standard articulated in *Zenith.*  His type of speculation regarding record evidence is inadmissible, as other courts have found.  *Jarrett v. Insight Commc'ns Co., L.P.*, No. 3:09-cv-00093-JHM, 2014 WL 3735193, at *7 (W.D. Ky. Jul. 29, 2014) ("Second, Dr. Singer's opinion that Insight digital cable TV subscribers who provide their own set-top box suffer quality degradation is not supported by the record").

_____

[17] █████████████████████████████████████████████████████████████████

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1

**B.  Dr. Singer's Opinion that PPV Price Increases Are Direct Evidence of Monopoly
Power is Not Reliable.**

2

3    Based on his analysis of Zuffa's PPV revenue, Dr. Singer asserts that Zuffa implemented

4    ██████████████ PPV prices charged by cable companies between 2010 and 2015 and

5    that the increase is direct evidence of Zuffa's monopoly power.  Singer Rep. ¶ 147.  Dr. Singer's

6    opinion is methodologically unsound and conflicts with assumptions he makes elsewhere in his

7    report.  *Compare* Singer Dep. I 74:13-24 ████████████████████████████

8    ████████████████████████████████████████████

9    *with id*. 325:12-326:8 ████████████████████████████

10   ████████████████████████).  Record evidence is clear that, between 2008 to 2015, ████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████

13   ████████  Ex. 33, Dep. of Denitza Batchvarova 201:10-202:3.

14   More importantly, Dr. Singer's opinion is not reliable under *Zenith* because he fails to

15   account for any of the other factors that could lead to a price increase.  There are many reasons

16   why businesses raise their prices aside from the exercise of monopoly power, for example, rising

17   costs for goods or increased demand.  Dr. Singer fails to run a regression or any other

18   econometric test that controls for any other potential factor that could also lead to a price

19   increase; instead, Dr. Singer assumes that the price increase must be a reflection of Zuffa's power

20   over price.  Expert opinions are not helpful to the jury if they merely assume the answer to the

21   question and are not able to properly account for other rational alternatives.  *See Craftsmen*

22   *Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (holding that expert's

23   testimony could not aid the jury since expert simply "*assumed*" that plaintiff had lost growth as a

24   result of the alleged conspiracy but "did not determine whether other factors, including the

25   emergence of tow direct competitors, may have affected [plaintiff's] growth rate").

26

27

28

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1

### C. Dr. Singer's Opinion that a Change in Sponsorship Rules Evidences Monopsony Power is Not Reliable.

2

3

Dr. Singer claims that Zuffa's imposition of a so-called "sponsorship tax," in which over

4

time Zuffa required different types of sponsors (apparel, supplement) to pay a brand affiliation fee

5

in order to sponsor athletes during a UFC event, creates a "natural experiment" in which to

6

evaluate Zuffa's ability to restrict athlete compensation.  Singer Rep. ¶ 192.  Once again, Dr.

7

Singer conducts no regression or other econometric test with regards to the sponsorship tax to

8

attempt to isolate the effect of that tax on the compensation of athletes holding everything else

9

constant.  Many other factors would have impacted athlete compensation at the time of the so-

10

called sponsorship tax, including the fact that athlete compensation was consistently increasing,

11

Topel Rep. ¶¶ 169-71, and the fact that the purpose and result of the brand affiliation fee was to

12

increase the compensation for athletes.  Ex. 34, Zuffa 30(b)(6) Fighter Compensation 8/15/17

13

Dep. 156:12-158:5.  Dr. Singer's opinions were previously excluded under *Daubert* for failure to

14

conduct a reliable "natural experiment."  *Kamakahi v. Am. Soc. For Reproductive Medicine*, 305

15

F.R.D. 164, 182 (N.D. Cal. 2015) (criticizing Dr. Singer's "natural experiment" for failing to

16

limit his experiment to the scope of Plaintiffs' allegations).  Barring an effort on Dr. Singer's part

17

to isolate the effect of Zuffa's alleged monopsony power from other factors that could affect

18

athletes' compensation, Dr. Singer's opinion must be excluded under the reasoning of *Zenith*.

### CONCLUSION

19

20

For the foregoing reasons, Zuffa respectfully requests this Court exclude Dr. Singer's

opinions.

21

//

22

//

23

//

24

//

25

//

26

//

27

//

28

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1    Dated: February 16, 2018                    BOIES SCHILLER FLEXNER LLP

2

3                                                By: _/s/ Nicholas A. Widnell_____
4                                                     Nicholas A. Widnell (*Pro hac vice*)
                                                      BOIES SCHILLER FLEXNER LLP
5                                                     1401 New York Avenue, N.W.
                                                      Washington, DC 20005
6                                                     Tel: (202) 237-2727
                                                      Fax: (202) 237-6131
7                                                     Email: nwidnell@bsfllp.com

8                                                     *Attorney for Defendant* Zuffa, LLC, d/b/a
9                                                     Ultimate Fighting Championship and UFC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Zuffa's *Daubert* Motion to Exclude Testimony of Dr. Hal Singer

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that service of the foregoing **Zuffa, LLC's** *Daubert*

3

**Motion to Exclude Testimony of Dr. Hal Singer under Fed. R. Evid. 702 and** *Daubert* was

4

served to opposing counsel on February 16, 2018 via email and the Court's CM/ECF electronic

5

filing system addressed to all parties on the e-service list.

6

7

_\_/s/ Roderick Crawford_____

An employee of Boies Schiller Flexner LLP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28