# EXHIBIT 4

# Redacted First Deposition of

# Hal J. Singer Excerpts

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                      :  Civil Action
                            :  DOCKET NO.
CUNG LE, NATHAN QUARRY,      :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,     :  (PAL)
LUIS JAVIER VAZQUEZ and      :
KYLE KINGSBURG, on behalf    :  CLASS ACTION
of themselves and all        :
others similarly             :
situated,                    :
                            :
            Plaintiffs,      :
                            :
            v.               :
                            :
ZUFFA, LLC, d/b/a            :
ULTIMATE FIGHTING            :
CHAMPIONSHIP and UFC,        :
                            :
            Defendants.      :

- - -

Wednesday, September 27, 2017
- - -

          Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.
              *   *   *
          MAGNA LEGAL SERVICES
            (866) 624-6221
            www.MagnaLS.com



Page 18

1  Zuffa's foreclosure share, you used the
2  regression in Table 6 but you made an
3  adjustment and you removed data points
4  for Strikeforce prior to its acquisition
5  by Zuffa?
6      A.   Correct.
7      Q.   Okay.  Thank you.
8          Then your next damages
9  model, which is on the next page, page
10  164.
11     A.   Yes.
12     Q.   Impact regression model
13  benchmark.  The -- here you also use
14  the -- in this benchmark -- in this
15  analysis, you are also examining the
16  statistical relationship between the
17  Zuffa foreclosure share and the fighters'
18  share, the share of revenues to fighters
19  over time, correct?
20     A.   Are we looking at Table 10?
21     Q.   This would actually, I
22  think, tie to Table 11.
23         MR. CRAMER:  11.
24         THE WITNESS:  Okay.

Page 19

1  BY MR. ISAACSON:
2      Q.   You have your tables below
3  the sections.
4      A.   Sorry.  Let me just -- let
5  me just get this straight in my head.
6          And before we move to this
7  one, something has just been troubling me
8  with regard to a question you just asked
9  a second ago, and I think I may have
10  misunderstood the question.  Is it okay
11  if I just -- if we can just get some
12  clarification.
13     Q.   Sure.
14     A.   Because I just want the
15  record to be sure.
16         You asked me if -- if the
17  foreclosure measure is capturing the
18  challenged conduct or something to that
19  effect.
20     Q.   What do you want to say
21  about -- just say what you want to say.
22     A.   Okay.  Let me just tell you
23  because I just don't want there to be
24  any -- any misunderstanding.

Page 20

1          I think that my prior answer
2  was correct, but it wasn't -- it wasn't
3  precise, and I just want to be precise
4  about what it's capturing.
5          It is -- it is capturing
6  the --
7      Q.   When you say "it," you're
8  talking about the foreclosure?
9      A.   The foreclosure share
10  measure.
11     Q.   Okay.
12     A.   Right.  And how it relates
13  to the challenged conduct.  I think that
14  the answer I gave you might create the
15  impression that all aspects of the
16  challenged conduct were being captured
17  by -- by the foreclosure variable, and I
18  just want to make it -- it clear that
19  there are only certain aspects of the
20  challenged conduct that are being
21  captured by the foreclosure variable, and
22  in that sense, the model is conservative
23  in the sense that it is not -- it is not
24  necessarily picking up the effect of all

Page 21

1  elements of the challenged conduct, but
2  instead only -- it's really capturing
3  certain restrictions that relate to
4  exclusivity of the fighter contracts and
5  the duration.
6          So I just want to -- I just
7  want to clarify that.  I don't know if
8  that -- if that was what you were asking,
9  but I just want to make sure that that
10  is --
11     Q.   Well, we're still going to
12  get to that subject at some point.
13     A.   Okay.
14     Q.   So I appreciate the preview.
15     A.   Okay.  So now -- now, let's
16  come back to -- I'm sorry for that
17  digression, but --
18     Q.   All right.  So your fourth
19  measure of damages is also based on the
20  statistical relationship between a Zuffa
21  foreclosure share and the fighter shares,
22  the share of revenues that went to labor,
23  correct?
24     A.   So we're in Subsection C on



Page 22

1    164?
2       Q.   Yes.
3       A.   Okay.  So this -- this
4    method, as the language suggests, goes
5    back and makes use of the pre-Strikeforce
6    acquisition data to inform the parameter
7    of the --
8       Q.   What's the --
9       A.   I'm sorry, the foreclosure
10   share parameter in the regression.
11      Q.   Both the -- both of these
12   regression benchmarks look at the
13   statistical relationship between Zuffa's
14   foreclosure share and its -- and the
15   fighters' share to fighters over time,
16   but one excludes the Strikeforce -- the
17   data before the Strikeforce acquisition
18   and one includes it?
19      A.   Exactly.
20      Q.   And for common impact for
21   injury in terms of actual modeling, and
22   now I'm just referring to the bout class.
23      A.   So are we leaving damages?
24      Q.   Yes.

Page 23

1       A.   We're going to common impact
2    now.
3       Q.   Yes.
4       A.   Okay.
5       Q.   Referring to just -- and I
6    should say those damages models that we
7    just went over were just for the bout
8    class and not the identity class?
9       A.   I wouldn't put it exactly
10   that way.
11      Q.   How would you put it?
12      A.   Well, if you recall, I used
13   the results from the bout class
14   regression to inform the -- the deflation
15   factor for the identity class as well.
16      Q.   But the four -- the four
17   models we just described estimate damages
18   for the bout class rather than the
19   identity class; is that correct?
20      A.   I think that when the model
21   appears -- when the write-up appears in
22   the bout class section it's speaking to
23   bout class, and when the model invoked in
24   the identity class section, it's speaking

Page 24

1    to the identity class.
2       Q.   All right.  There are two
3    econometric models that you use for
4    purposes of the common impact analysis,
5    am I correct about that?
6          MR. CRAMER:  Objection to
7    form.
8          THE WITNESS:  Can I hear
9    that back?  I'm sorry.
10         (Pertinent portion of the
11   record is read.)
12         THE WITNESS:  Are you -- I'm
13   going to interpret the question,
14   unless it's wrong, with now you're
15   referring to the bout class
16   subsection of the common impact?
17   BY MR. ISAACSON:
18      Q.   Yes.
19      A.   So I wouldn't -- I wouldn't
20   quite put it that way.
21      Q.   All right.  Well, let me ask
22   you.  So if you look at page 151 of your
23   report, there's a section on Econometric
24   Evidence of a Compensation Structure?

Page 25

1       A.   Yes, I see that section.
2       Q.   And broadly speaking, the
3    first type of econometric evidence that
4    you looked at was you performed
5    regressions to determine whether gains or
6    losses in compensation amongst fighters
7    were broadly shared across the bout
8    class.
9          Do I have that right?
10         MR. CRAMER:  You're asking
11   him to put aside the foreclosure
12   regression?
13         MR. ISAACSON:  I'm just
14   talking about common impact, yes.
15         MR. CRAMER:  Okay.
16   Objection, misstates the system.
17         THE WITNESS:  As part of the
18   two-part proof of common impact,
19   the -- in the second part of the
20   proof, I used econometric methods
21   as well as records evidence to
22   demonstrate a pricing structure.
23         But I think that the
24   question assumes away the



Page 34

1  but-for world of a lower foreclosure
2  share, are you referring to the specific
3  foreclosure share that you would find in
4  one of your regressions as opposed to
5  some part of that, you know, say half of
6  it?
7        MR. CRAMER:  Objection to
8     form.
9        THE WITNESS:  I don't
10     understand the question.  I'm
11     sorry.
12  BY MR. ISAACSON:
13     Q.   So -- and that's my fault,
14  but let me keep trying.
15        The -- when you refer to the
16  but-for world of a lower foreclosure
17  share, do you mean the full lower
18  foreclosure share that would be specified
19  in whatever regression you're looking at
20  as opposed to some fraction of it?
21     A.   No, I wouldn't put it that
22  way.
23     Q.   So for example, if I was
24  looking at a -- just one of your

Page 35

1  regressions and it specified a
2  foreclosure share, give me an example of
3  a foreclosure share.
4     A.   Well, the question -- I'm
5  just trying -- the regression doesn't --
6     Q.   Help me out and give me an
7  example of a foreclosure share, a number
8  that would express it.
9     A.   90 percent.
10     Q.   Okay.
11     A.   It could have been
12  90 percent at a given point in time
13  depending upon the market definition used
14  and depending upon the weighting method
15  used.
16     Q.   Right.
17     A.   The actual foreclosure at a
18  given point in time could have been
19  90 percent, that would have entered in on
20  the right-hand side of regression, but as
21  we -- as we move to the but-for
22  world we're going --
23     Q.   Let me ask a question
24  because all I asked you for was a

Page 36

1  percentage.
2     A.   We're not going to have it.
3  But I keep hearing did I have it or did I
4  take a percentage of it.  The answer is
5  no.  I didn't -- I didn't do that.  No
6  simulation halves the foreclosure share.
7     There are three simulations:  One
8  simulation projects what the fighter wage
9  shares would be at zero percent
10  foreclosure share, another simulation
11  projects what fighter wage shares would
12  be at 20 percent foreclosure levels, and
13  another simulation projects what fighter
14  wage shares would be at 30 percent
15  foreclosure.
16        So I'm getting tripped up on
17  do I -- does the regression halve it.
18  The regression doesn't halve anything.
19  Halve as in cut in half.  The regression
20  takes the data as it is, right?
21     Q.   Right.
22     A.   It understands the
23  relationships between foreclosure share
24  and wage share controlling for all

Page 37

1  other -- all other things, right, and
2  then it's done.  Regression is done.
3        The regression doesn't get
4  to say what the but-for world looks like.
5  I'm using the regression parameters to
6  project what fighter wage shares would be
7  in a but-for world in which the
8  foreclosure share was either zero
9  percent, 20 percent or 30 percent.
10     Q.   All right.  The -- so if you
11  had a regression that specified a
12  foreclosure share of 90 percent,
13  depending on which model you were using,
14  your but-for world would have a
15  foreclosure percent of zero percent,
16  20 percent or 30 percent, do I have that
17  correct?
18     A.   No, you don't have it right.
19     Q.   Hum?
20     A.   You don't have it right.
21  I'm getting tripped up on the word if the
22  regression specifies a foreclosure share
23  of 90 percent.
24     Q.   Well, let me take that out



Page 38

1    of the question then.
2         For each of your models, you
3    have a but-for world where the
4    foreclosure share for Zuffa is either
5    zero percent, 20 percent or 30 percent.
6         Do I have that right?
7         A.   I think you've got that
8    right.
9         Q.   Okay.  And that's regardless
10   for what foreclosure is specified in the
11   regression?
12        A.   I'm just -- I wish we could
13   use a different word than specified.
14        Q.   What word would you use?
15        A.   The regression doesn't get
16   to specify the foreclosure share, just as
17   the regression doesn't get to specify how
18   many punches a fighter threw, right, or
19   how many successful punches.
20        Q.   Tell me what word you want
21   me to use.
22        A.   So the regression takes the
23   data as the world presents it.  The
24   regression doesn't get to specify.

Page 39

1         Q.   Foreclosure is an output of
2    the regression?
3         A.   No, it's an input.  It's an
4    input.
5         Q.   Okay.  So --
6         A.   But the regression doesn't
7    get to -- doesn't get to pick what
8    foreclosure is or specify it.  Maybe I'm
9    misinterpreting what you mean by--
10        Q.   I'm just trying to find a
11   word that you're comfortable with.
12        A.   The regression takes the
13   data as the world presents it and looks
14   for relationships between those data.
15        Q.   Right.
16        A.   All right?  So it doesn't
17   specify.  The -- maybe what would be
18   helpful is that the market definition --
19   the market definition that I choose and
20   the weights that I apply generate a
21   measure of foreclosure share.
22        Q.   Okay.
23        A.   Right?  And then I'm going
24   to apply a regression analysis.  But the

Page 40

1    regression doesn't get to specify, the
2    regression takes the foreclosure share as
3    an input.
4         Q.   So regardless of the measure
5    of foreclosure share that's generated by
6    any specific model, the world -- you are
7    going to assume for purposes of
8    estimating impact or damages that the
9    actual foreclosure share of Zuffa will be
10   zero, 20 percent or 30 percent depending
11   on the model?
12        MR. CRAMER:  Objection to
13   form.
14   BY MR. ISAACSON:
15        Q.   That's correct?
16        MR. CRAMER:  Objection to
17   form.
18        THE WITNESS:  It was close.
19   You said the model to start the
20   question, and just again to be --
21   to be specific, the regression --
22   the regression doesn't get to pick
23   the foreclosure share.  The
24   foreclosure share flows from which

Page 41

1    market definition and which
2    weighting method I use, right?
3    That -- that will generate a
4    foreclosure share that gets spit
5    out, I think, of a Microsoft Excel
6    file, and that foreclosure share
7    is going to be spit out alongside
8    each observation in the dataset.
9         The regression finds a
10   relationship between that
11   foreclosure share and the
12   fighters' wage share controlling
13   for all other things and then the
14   regression is done.
15        At that point, I -- I can
16   make use of the parameters that
17   come out of the regression to
18   project what a fighter's wage
19   share would be in a but-for world
20   in which the foreclosure share was
21   lower.
22        Sorry, I'm being -- I'm
23   being attacked here by a gnat.
24   And -- thank you.



Page 42

```
1        And I use three different
2    scenarios: Zero percent,
3    20 percent and 30 percent.
4  BY MR. ISAACSON:
5        Q.   Now, when you use a world in
6    which there -- Zuffa has zero percent
7    foreclosure, how does that translate into
8    any -- a market share for Zuffa?
9        A.   Oh, it could accommodate
10   many different market shares for Zuffa.
11   It is -- one way of putting it is almost
12   agnostic to the market share.  It
13   could -- it could accommodate many.
14        You can have -- just to be
15   clear, you can have a high market share
16   and zero foreclosure share if all of your
17   fighters are under, say, 12-month
18   contracts.
19        Q.   And do I understand
20   correctly that if all the Zuffa fighters
21   were under 12-month contracts, you would
22   expect the foreclosure share of Zuffa to
23   be zero or close to zero?
24        MR. CRAMER:  Objection to
```

Page 43

```
1    form.
2        THE WITNESS:  So I -- I deem
3    a fighter to be foreclosed, or to
4    be working or employed pursuant to
5    an exclusionary contract if, as
6    you know, the contract is
7    exclusive and if the duration
8    exceeds a certain number of
9    months.  I use 30 months I think
10   as my -- my baseline approach.
11        And so if you -- if you
12   allow me to use that 30-month
13   baseline or cutoff as a measure
14   for whether a fighter is
15   foreclosed, and if your question
16   posits that every Zuffa fighter
17   under contract is -- is at
18   12 months, then by construction,
19   12 months is less than 30 months,
20   and therefore, under that
21   particular measure of foreclosure,
22   no fighter would be foreclosed.
23   BY MR. ISAACSON:
24        Q.   All right.  Is there any --
```

Page 44

```
1    is there any measure of foreclosure where
2    a 12-month contract, in your opinion,
3    would not result in the zero or near zero
4    foreclosure?
5        MR. CRAMER:  Objection to
6    form.
7        THE WITNESS:  Let me hear it
8    back.  But I don't think I
9    understood it, but let me just
10   hear it.
11   BY MR. ISAACSON:
12        Q.   Well, because you just told
13   me about how your 30-month baseline, and
14   you confined your answer to that
15   particular measure of foreclosure.
16        And I'm asking you, is there
17   any measure of foreclosure where a
18   12-month contract for all Zuffa fighters
19   would not result in zero or near zero
20   foreclosure?
21        MR. CRAMER:  Objection to
22   form.
23        THE WITNESS:  Well,
24   certainly not if you use 30 months
```

Page 45

```
1    as the cutoff, but if -- if the
2    court, for example, were to deem
3    that 12 months with an
4    exclusion -- with an exclusive
5    arrangement were exclusionary,
6    then contracts with 12 months
7    would be exclusionary.  It's
8    tautological.  It depends on where
9    you draw the cutoff and what --
10   what conditions you require for --
11   for one to conclude that a
12   contract was exclusionary.
13   BY MR. ISAACSON:
14        Q.   All right.  So I'm not
15   asking you any questions about what
16   courts rule, I'm asking you questions
17   that come out of your models.
18        Is there any measure of
19   foreclosure in any of your models where a
20   12-month contract for all Zuffa fighters
21   would not result in zero or near zero
22   foreclosure?
23        MR. CRAMER:  Objection to
24   form.  Asked and answered.
```



12 (Pages 42 to 45)

Page 46

1      THE WITNESS:  I'd have to
2   think about it some more, but I
3   think I -- I think I gave you -- I
4   think I gave you what the answer
5   was, which is that it depends
6   on -- on how you draw the -- the
7   line.
8   BY MR. ISAACSON:
9      Q.   All right.  And how would
10  you define zero percent foreclosure?  You
11  said some of your models assume zero
12  percent foreclosure.  How do you define
13  zero percent foreclosure?
14     A.   So no model assumes it.
15  Just to be clear, I'm projecting but-for
16  worlds in which the foreclosure share is
17  zero, 20 or 30 percent.  But I'm
18  interpreting the question as how could
19  Zuffa get to zero percent foreclosure?
20     Q.   Right.  How would you define
21  Zuffa with zero percent foreclosure?
22     A.   It can get -- you could get
23  to zero percent foreclosure in myriad
24  ways.  So I'm not -- I'm not specifying

Page 47

1   exactly how you get there.  I can give
2   you examples, I think we just did, in
3   which the legal standard is 30 percent --
4   30 months -- sorry.  If the legal
5   standard were 30 months and if counter-
6   factually all of -- well, and if Zuffa's
7   contracts all were 12-month contracts,
8   then the foreclosure share by my measure
9   would be zero percent.
10     But that's just one way.
11  There are -- there are many -- there are
12  many ways to get your foreclosure share
13  down.  You can -- you can divest --
14  divest fighters and send -- send fighters
15  to a -- to an independent organization
16  thereby decreasing your market share and
17  thereby decreasing your foreclosure
18  share.
19     There's -- there are many
20  ways to get to -- to a lower foreclosure
21  share.
22     Q.   All right.  So can you give
23  me some other examples of ways that Zuffa
24  could get to zero percent foreclosure

Page 48

1   share?
2      MR. CRAMER:  I'm going to
3   object to the extent it calls for
4   a legal conclusion.
5      But you can answer.
6      And asked and answered.
7      THE WITNESS:  I think I've
8   covered -- I've covered the basis.
9   I think that the most -- the most
10  obvious way to construct it is by
11  coming up with a baseline in terms
12  of number of months in which an
13  exclusive contract is deemed
14  exclusionary and positing a world
15  in which Zuffa's contracts come
16  under that -- that cutoff.  They
17  could be 15 months long, they
18  could be 17 months long.
19  BY MR. ISAACSON:
20     Q.   All right.  And that cutoff
21  that needs to be posited, is that a legal
22  cutoff or is that a matter of economics?
23     MR. CRAMER:  Objection to
24  form.

Page 49

1      THE WITNESS:  I think it is
2   ultimately a legal decision, but
3   it can be informed through
4   economics.  I hope economics can
5   inform the law at times.
6   BY MR. ISAACSON:
7      Q.   All right.  You mentioned
8   reducing the baseline number of months
9   for the exclusive contracts, and you
10  mentioned divesting fighters to -- to an
11  independent organization from Zuffa.
12     Are there any other examples
13  that you can think of as to how Zuffa
14  could reach zero or near zero
15  foreclosure?
16     A.   Sure.  I can keep on coming
17  up with examples.
18     One example would be that
19  there's no exclusivity provision in the
20  contracts.
21     Q.   All right.  That's one.  Are
22  there any other examples?
23     MR. CRAMER:  Asked and
24  answered, form.



**Page 50**

1       THE WITNESS:  I can't think
2   of others.
3   BY MR. ISAACSON:
4       Q.   All right.  Now, you do
5   define markets in your report at a high
6   level.  Let me see if I've got what
7   you've got.
8           For input markets, you've
9   defined a tracked market by referring to
10  data from FightMetric -- FightMetrics
11  (sic) right?
12      A.   I certainly use FightMetrics
13  (sic), but I prefer to say that I have --
14  I have a relevant input market and a
15  relevant input submarket, and I use two
16  different standard industry databases to
17  identify the fighters in the relevant
18  input market.
19      Q.   Right.
20      A.   One is FightMetric, the
21  other one is Fight Matrix.  I'm very
22  upset about those names, but that's --
23      Q.   Right, they're not helpful
24  to us.

**Page 51**

1       A.   They're not helpful.
2       Q.   But we'll live with them.
3           But -- so you have two
4   relevant input markets:  A tracked market
5   which -- for which you draw data from
6   FightMetric, and a ranked market which
7   draws from data from Fight Matrix,
8   together with the data from FightMetric.
9           Do I have that right?
10      A.   Again, I would prefer to say
11  there's one relevant input market that
12  we're -- that we're trying to measure and
13  I have two different ways of measuring
14  it.  One relies on a database from
15  FightMetrics (sic), which I refer to as
16  the tracked method.  That's -- that's
17  really the beginning, because as you
18  probably are aware, there's a few
19  additions that I tack on to -- to even
20  that measure.
21          And then as we move from the
22  tracked measure to the ranked measure,
23  I -- I include everybody who made it into
24  the tracked and I add on additional

**Page 52**

1   fighters who were ranked, but not
2   tracked, as well as one other MMA
3   organization.
4       Q.   So those are two -- do I
5   understand it right, those are two
6   different relevant input markets that
7   you -- that you have defined?
8       A.   This -- this could be a
9   matter of semantics, but I prefer to say
10  there's one relevant input market and
11  these are two different ways to measure
12  it.
13      Q.   What is the one relevant
14  input market?
15      A.   It's -- I think I've defined
16  it in the report.
17      Q.   Feel free to point me in the
18  report.
19      A.   Okay.
20      Q.   If it helps you, the
21  relevant input market discussion is on
22  page 66.
23      A.   Well, if we're going to call
24  it anything by shorthand, I would prefer

**Page 53**

1   to use the term relevant input market.  I
2   think that the language in the report
3   explains what I'm trying to get at, which
4   is a set of fighters with MMA fighter
5   services that would be used by an MMA
6   promotion organization to stage live
7   events.
8       Q.   You told me you preferred to
9   say there's one relevant input market and
10  there's two different ways to measure it.
11          What is the one relevant
12  input market?
13          MR. CRAMER:  Asked and
14  answered.
15          THE WITNESS:  These are --
16  these are MMA fighters who are
17  used as input to the production of
18  live MMA events.
19          And to clarify it, I said
20  two.  Of course there's a --
21  there's a third -- a submarket.  I
22  don't know if --
23  BY MR. ISAACSON:
24      Q.   Yeah, we'll get to the



Page 54

1  submarket.
2      A.   Okay.
3      Q.   The -- all right.  And the
4  submarket is the -- you used the
5  headliner definition; is that right?
6      A.   Correct.
7      Q.   And am I correct that in
8  your opinion, there would be no broader
9  market than the markets you have defined
10 using the tracked measure or the ranked
11 measure?
12     A.   Correct, there's no broader
13 market.  Already I think that the ranked
14 market is -- is potentially overly broad.
15     Q.   And when you -- when you say
16 there's no broader market, that would
17 mean there's no reasonable substitutes
18 outside those markets if, for example,
19 fighter pay where to go up?
20     A.   That's not quite what I
21 mean.
22     Q.   Well, let me ask you this.
23 Then let me just ask you this question:
24 In your opinion, are there no reasonable

Page 55

1  out -- substitutes outside the tracked
2  market and the ranked market if fighter
3  pay rises?
4          MR. CRAMER:  From what level
5  to what level?
6          MR. ISAACSON:  It goes up.
7          MR. CRAMER:  Okay.
8          THE WITNESS:  So I do
9  allow -- before I answer the
10 question, I just want to make sure
11 you understand how I get to the
12 market.  It's not entirely driven
13 by reasonable substitutes.  I'm
14 asking -- I'm trying to employ the
15 SSNIP test from the merger
16 guidelines, and I'm looking for
17 the smallest set of fighters such
18 that a hypothetical monopsonist
19 could exercise market power.
20         And that -- that is the
21 question that -- that drives the
22 analysis.
23 BY MR. ISAACSON:
24     Q.   And I'll ask you about your

Page 56

1  SSNIP analysis, which is S-S-N-I-P.
2          But just returning to my
3  question, in your opinion, are there no
4  reasonable substitutes outside the
5  tracked market and the ranked market if
6  fighter pay goes up?
7      A.   So that -- you haven't
8  posited the correct question for market
9  definition.  It's not if fighter pay goes
10 up.  It's -- the question is if -- if
11 Zuffa were to control a certain set of
12 fighters, could -- could Zuffa exercise
13 market power in the form of pushing wages
14 down?  You keep saying if prices go up.
15 That's not the -- that's not market --
16     Q.   I appreciate you telling me
17 I'm not asking the correct questions --
18     A.   Well, I mean --
19     Q.   But let's stick with --
20 let's stick with answering my questions.
21     A.   Okay.  Well, okay, but if
22 you ask me a question that makes no sense
23 as a matter of economics, I can't give
24 you an answer.

Page 57

1      Q.   In your opinion -- in your
2  opinion, are there no reasonable
3  substitutes for the fighters outside the
4  tracked market and outside the ranked
5  market?
6      A.   I would put the caveat that
7  if a hypothetical monopsonist controlled
8  all of the fighters in either of those
9  two markets, it would be able to
10 successfully exercise a wage suppression
11 below competitive levels without having
12 to fear that a sufficient number of
13 fighters inside of its net would -- would
14 substitute to something outside of the
15 net.
16         And that's a long way of
17 answering your question, but I think
18 doing so more precisely as to what is
19 considered reasonable.
20         If you -- if you have, say,
21 all of the ranked fighters, and you're
22 looking at it from the perspective of a
23 given ranked fighter, let's suppose a
24 highly ranked fighter, he or she will not

MAGNA
LEGAL SERVICES

1  offered alternative methodologies, they
2  all point to numbers that create a range,
3  and I think that -- that any one of them
4  would be a reasonable estimate of
5  damages.
6      Q.   And within that range, every
7  number within that range you consider to
8  be reasonable, correct?
9          MR. CRAMER:  Objection to
10         form.  Misstates the testimony.
11         THE WITNESS:  No, because
12     I -- I don't want to pick some
13     number that's -- that's -- that
14     just is randomly chosen between
15     two of my estimates.
16 BY MR. ISAACSON:
17     Q.   All right.  That's fair.
18         So every -- you've -- you've
19 estimated a range of damages.  Every
20 number within that range that you've
21 estimated, you would consider a
22 reasonable award of damages in this case?
23         MR. CRAMER:  Form.
24         THE WITNESS:  Every number

1      associated with one of my damages
2      methodologies represents a
3      reasonable estimate of aggregate
4      damages.
5  BY MR. ISAACSON:
6      Q.   All right.  And amongst the
7  numbers associated with one of your
8  damages methodologies, you do not have an
9  opinion as to which one is more or less
10 appropriate as an award of damages; is
11 that correct?
12         MR. CRAMER:  I'm going to
13     object to the extent it calls for
14     a legal conclusion.
15         THE WITNESS:  I don't think,
16     at least sitting here today, I'm
17     prepared to speak to which is more
18     or less appropriate.  They can be
19     evaluated on other dimensions such
20     as more or less conservative.  But
21     more or less appropriate, I'm --
22     I'm not even sure I understand
23     what that means.
24 BY MR. ISAACSON:

1      Q.   Okay.  You mentioned the --
2  you mentioned the FightMetric database
3  which is used in connection with your
4  tracked input market as well as your
5  ranked input market.  FightMetrics (sic)
6  is a service that promotions pay to --
7  pay FightMetric for; is that right?
8      A.   I think that a promotion can
9  subscribe and purchase the FightMetrics
10 (sic) data.  I know, for example, that
11 Zuffa uses it in its day-to-day business
12 operations.
13     Q.   Is it the case if you do not
14 subscribe, if you don't pay, that you're
15 not on FightMetric?
16     A.   That is not my
17 understanding.
18         MR. ISAACSON:  Can we mark
19     this as Exhibit 4?
20         (Exhibit No. Singer-4, Excel
21     spreadsheet, Weight Data for
22     Foreclosure Shares, was marked for
23     identification.)
24 BY MR. ISAACSON:

1      Q.   Exhibit 4 is a backup file
2  we were provided.  It's titled Weight
3  Data for Foreclosure Shares.  We've
4  printed out a tab called Combined Event
5  Tab.  We've not altered the content, but
6  in order to have the columns fit on one
7  page, we rotated the first row to make
8  the column names vertical, and we also
9  added page numbers and shrunk the columns
10 to fit the content.
11         MR. CRAMER:  Which did you
12     add?
13         MR. ISAACSON:  We did add no
14     content.  We -- we did some things
15     to make it fit on the page.
16         MR. CRAMER:  You said you
17     added combined --
18         THE WITNESS:  No, I think he
19     said he rotated the titles, the
20     headers of the columns so that it
21     would fit.
22         MR. CRAMER:  Thank you.
23 BY MR. ISAACSON:
24     Q.   Now, as I understand this,





Page 74

1  this would be pay-per-view revenue data
2  that you relied on when you did your
3  foreclosure regression?
4       A.   It depends on which
5  weighting technique I used, right?  I've
6  done three different weighting
7  techniques:  The revenue weighted, the
8  ranked weighted and unweighted.
9       Q.   Okay.  So this would be the
10  data that you used when you weighted by
11  revenue; is that correct?
12       A.   I believe so.

Page 76

23       Q.   The -- now, looking down the
24  column called Gate.  You have some

Page 75

Page 77

1  entries, but a lot of entries where it's
2  blank.  And am I correct that where you
3  did not have actual data for the gate,
4  you used some sort of average?
5       A.   Well, I wouldn't put it that
6  way.
7       Q.   Okay.  How would you put it?
8       A.   I would say that I computed
9  an average across a year for a given --
10  for a given promoter, and if there was a
11  blank in the field, the blank, by
12  construction, could not inform the
13  average.
14       Q.   I just asked you if you used
15  an average, but okay.
16          You did use -- where the
17  field was blank for gate, you used an
18  average across a year for the given
19  promoter?
20       A.   I believe that's the rule.
21  I'd want to go back and check that, but I
22  believe that we calculated an average
23  revenue per event, per fighter across the
24  promotion within a given year for

MAGNA
LEGAL SERVICES

Page 78

1    whatever data we had, and that became the
2    weight under the revenue weighting
3    method.
4         Q.   And some of these not only
5    were blank, some of them have question
6    marks.  When there were question marks,
7    you were applying the average as you
8    described it, correct?
9         A.   That sounds reasonable.  I'd
10   have to -- I'd have to -- I'd want to
11   double-check on that, but that sounds
12   like a reasonable rule, and I'll leave it
13   at that.

20        Q.   All right.  Now, the data
21   that you have for revenue is limited
22   to -- I'm sorry, the data that you used
23   for revenue was limited to pay-per-view
24   and gate revenue; is that correct?

Page 79

1         A.   For the purpose of this part
2    of the report, which is the revenue
3    weighting method, I believe those are the
4    components that informed the average
5    revenue per event, per fighter.
6         Q.   All right.  So if a promoter
7    such as Bellator received television
8    money other than pay-per-view, that would
9    be excluded from this, is that correct?
10        A.   If -- if we had data from
11   Bellator from something like television
12   revenue, that -- the problem is that -- I
13   guess I'm stumbling on the question.  I
14   don't see how you get television revenue
15   with respect to one event.  You would
16   sign a television contract that would
17   cover a range of events.  I'll leave it
18   at that.
19        Q.   Okay.  But in terms of doing
20   this foreclosure, this weighting -- this
21   revenue weighting for foreclosure shares,
22   you excluded money received from
23   television networks by promoters such as
24   Bellator, correct?

Page 80

1         MR. CRAMER:  Objection to
2    the form.
3         THE WITNESS:  Well, to the
4    extent we did, we would have
5    treated all promotions the same;
6    that is, we didn't -- we didn't
7    count box revenues for UFC and
8    ignore television revenue -- non-
9    pay-per-view television revenue
10   for some other promoter.  We would
11   have applied a -- a consistent
12   rule across all promotors.
13   BY MR. ISAACSON:
14        Q.   But that was the rule you
15   did apply was to exclude the television
16   revenue?
17        A.   I think that -- I think
18   that's correct.  I think again, if you --
19   if you think about what we were trying to
20   do, we were trying to figure out what --
21   what revenue was being generated at the
22   margin, what is -- what is truly
23   incremental created by that event, and so
24   it's hard to take a lump sum or a fixed

Page 81

1    source of revenue and -- and attribute
2    some portion of that to an event.
3         Q.   All right.  The pay-per-view
4    numbers here, are these actual numbers?
5         A.   I believe -- I believe
6    they're actual.  I believe -- let me put
7    it this way:  They were the best
8    estimates we could get in the data -- in
9    the record.
10        Q.   All right.  Do you know
11   where they came from?
12        A.   Not off the top of my head,
13   but I'm fairly confident that in the
14   report I tell you where it comes from.
15        Q.   Okay.  The gate numbers, are
16   those estimates?
17        A.   That -- that sounds
18   reasonable.  That sounds reasonable.
19        Q.   And do you know how you did
20   the estimates?
21        A.   I listed the source in the
22   report.  I'm -- sitting here, I'm having
23   a hard time recalling if it came from
24   Zuffa or if it came from some third



Page 98

1    Q.   You have not done any impact
2  models or damages models where you --
3  where you use as an input the actual
4  amount of fighter pay as opposed to the
5  fighter share?
6        A.   I don't think that's true.
7  I have -- in my impact section, I've run
8  a model on levels, not related to
9  foreclosure share, but levels of fighters
10  compared to what other fighter were being
11  paid.
12        But if you're asking have
13  I -- have I run a model that relates
14  foreclosure share to the levels, I have
15  not done that.
16        Q.   All right.  I think I
17  understand you, but let me get it
18  straight.
19        You have not run any models
20  that establish the -- that establish the
21  fact of injury or the amount of damages
22  that rely on the actual salaries that
23  are -- not salaries, the actual
24  compensation paid to fighters as opposed

Page 99

1  to the fighters' share?
2        MR. CRAMER:  Objection to
3    form.
4        THE WITNESS:  No, I'm going
5    to -- I'm going to say no to that
6    one.  I thought I just clarified.
7  BY MR. ISAACSON:
8        Q.   Just say no and I'll ask you
9  a follow-up question.
10        A.   Fine.  No.
11        Q.   The -- when you look at
12  actual fighter pay, that's when you
13  were -- when you used actual fighter pay
14  as opposed to fighter share, that's when
15  you performed regressions to determine
16  whether gains or losses in a compensation
17  were broadly shared across the bout
18  class, correct?
19        A.   Correct, as part of an
20  impact model.
21        Q.   Right.  And does that model
22  generate an amount of impact or amount of
23  damages?
24        A.   No, that model was to

Page 100

1  establish the fact of common impact.
2        Q.   And the results showed that
3  individual fighter compensation per event
4  moves together with per event
5  compensation paid to other fighters; is
6  that correct?
7        A.   Yes.
8        Q.   Okay.  And while it
9  establishes that the compensation moves
10  together, the output of that model does
11  not actually demonstrate injury to any
12  specific fighter; is that correct?
13        MR. CRAMER:  Objection to
14    form.
15        THE WITNESS:  I would say
16    the output of that model in
17    conjunction with other steps in
18    that two-part proof show impact to
19    all fighters.
20  BY MR. ISAACSON:

Page 101



Page 102

[REDACTED]

3      A.   This analysis must be
4  understood in conjunction with other
5  analyses in the section, the totality of
6  which establishes common impact.
7      Q.   I agree with that.  What I'm
8  saying is this -- this model by itself
9  would not show any injury to any specific
10  fighter, it would have -- it would have
11  to be considered in conjunction with
12  other analysis that you've done?
13      A.   I think that's fair.  I
14  would not -- I would not offer this model
15  by itself as proof of common impact.  I
16  would offer it, as I did, in conjunction
17  with other models in the section, and
18  record evidence, of course.
19      Q.   Right.  So the models that
20  actually conclude by themselves that
21  there was damage or impact to individual
22  fighters are all expressed in terms of
23  fighters' share and don't rely on data
24  but actual fighter pay; is that correct?

Page 103

1          MR. CRAMER:  Objection to
2  form.
3          THE WITNESS:  No, that's not
4  correct.
5  BY MR. ISAACSON:
6      Q.   The models that show actual
7  impact or damages by themselves all are
8  expressed in terms of the fighters' share
9  of revenue, correct?
10      A.   I wouldn't put it that way
11  either.
12      Q.   Okay.  For each of those
13  models you were looking at what the
14  fighter share of revenue actually was
15  compared to what it would be in the
16  but-for world using the models that
17  you've relied on, correct?
18      A.   For certain models, the
19  left-hand side variable of the regression
20  was expressed in terms of fighter share
21  as opposed to absolute level.
22          But I want to make clear for
23  the record that the numerator is the
24  fighters' pay.  So when you say the

Page 104

1  models aren't taking into consideration
2  the fighters' pay, I have to -- I have
3  to -- I have to reject that.
4      Q.   All right.  So there is a
5  variable in each of your impact models
6  and damages models that actually estimate
7  a dollar effect on fighters that relies
8  on the fighters' share as opposed to the
9  absolute level of compensation of the
10  fighter.  Do I have that right?  What you
11  call the variable on the left-hand side.
12      A.   Yeah, the dependent variable
13  in certain models is expressed in terms
14  of fighter's share, and to figure out
15  what the effect is on a fighter's
16  absolute pay, it's a ministerial change
17  to convert from an actual fighter share
18  to a but-for fighter's share, and then
19  knowing what the event revenue was to
20  convert to a but-for fighter pay.
21          So I think that -- I think
22  that to say that it's -- it's not making
23  use of actual fighter pay just misses
24  what's -- what's going on.

Page 105

1      Q.   All right.  So on page 155,
2  Table 8.
3      A.   Okay.
4      Q.   Which reports on a
5  regression you did for impact.  The
6  dependent variable there was the
7  fighter's share of revenue rather than
8  the absolute level of compensation, am I
9  correct?
10      A.   Correct.
11      Q.   Okay.  And the same would be
12  true for each of the regressions in your
13  damages models; is that correct?
14      A.   I believe that's fair, that
15  the dependent variable in those models
16  was fighter share of revenues.
17      Q.   I'm going to take a big
18  chance here and ask if you can explain
19  for our audience what you mean by a
20  dependent variable.
21      A.   Sure.  So the dependent
22  variable is the variable that we are
23  trying to understand and explain what --
24  what drives it to -- to move around.  And

MAGNA
LEGAL SERVICES

Page 106

1   so we -- you'll also hear the expression
2   the left-hand side variable, but -- but
3   it's -- it's the variable of interest.
4   We are -- we are trying to -- to
5   understand the world through -- through
6   that variable and to explain what causes
7   it to vary.
8        Q.   All right.  So I'd like -- I
9   think variable of interest is a phrase
10  you use in your report, and I guess it's
11  also comfortable calling it a dependent
12  variable for a layperson, the variable
13  we're trying to explain.  Both of those
14  would be acceptable?
15       A.   Sure.
16       Q.   Okay.  The --
17       THE VIDEOGRAPHER:  We're ten
18  minutes left on this tape,
19  Counsel.
20       MR. ISAACSON:  All right.
21  We'll go about five more minutes
22  and take a break.
23  BY MR. ISAACSON:
24       Q.   Have you done damages

Page 107

1   analysis before where you had used the
2   percentage of -- the percentage of
3   revenue as opposed to the absolute level
4   of compensation as the variable of
5   interest?
6        A.   It's possible.  Sitting here
7   I'm thinking of another -- of another
8   wage case that I did, which was -- which
9   I refer to as Arizona Travel Nurses, and
10  it's possible that we -- when we did our
11  modeling there, we expressed -- in fact,
12  it's kind of coming back to me.  I think
13  we were interested in a nurse's payment
14  relative to her bill rate.  So -- so yes,
15  I believe I've -- I've done something
16  like that before.
17       Q.   You say something like that,
18  have you done -- have you used as the
19  variable of interest before the share of
20  total revenue that goes to the labor
21  force, whether that labor force is an
22  employee or -- or contractors?
23       A.   I think so.
24       Q.   Okay.  And you think you did

Page 108

1   that in Arizona Travel Nurses?
2        A.   Yeah, it's an old case, but
3   I -- some -- some faint memories are
4   coming back, and I -- I believe that
5   to -- to establish similar things, common
6   impact there, we were -- we were looking
7   at the bill rate as the denominator,
8   that's how much the hospital was -- was
9   charging for the -- for the nurse, and
10  the numerator was the wage that went to
11  the -- to the nurse, and so it's an
12  analogous construction of a dependent
13  variable.
14       Q.   Any other cases that you --
15  where you've estimated damages using the
16  variable of interest or the dependent
17  variable as the share to labor?
18       A.   I'm not sure.  I'm not sure
19  how many other wage suppression cases
20  I've done besides -- besides these two.
21  I'd have to -- I'd have to go back and
22  think about it.
23       Q.   Okay.
24       MR. ISAACSON:  All right.

Page 109

1   Why don't we take a break?
2        MR. CRAMER:  Sure.
3        THE VIDEOGRAPHER:  The time
4   is 11:26 AM.  We are going off the
5   record, and this is the end of
6   Disk 1.
7        (Recess.)
8        THE VIDEOGRAPHER:  The time
9   is 11:40 AM.  This is the start of
10  Disk 2, and we are now on the
11  record.
12  BY MR. ISAACSON:
13       Q.   So I want to continue our
14  discussion of the percentage of revenue
15  paid to labor as the variable of
16  interest.
17       Is there economic literature
18  that you're familiar with that discusses
19  the percentage of revenue that's paid to
20  labor in a competitive industry as
21  opposed to an industry that's less
22  competitive?
23       A.   Is there economic
24  literature?



Page 110

1    Q.   Yes.
2    A.   Yes.  I would say that
3 the -- the application of micro theory to
4 labor markets posits that in a
5 competitive market, a laborer captures
6 100 percent of their marginal revenue
7 products.  So it's natural to express the
8 dependent variable here as -- as labor
9 share of revenue.
10   Q.   All right.  And I'll return
11 to my -- you said that about
12 microeconomic theory in your report and
13 I'll return to that, and I understand
14 that that's included within your answers.
15 But is there any actual economic
16 literature that you're aware of that
17 discusses what are the actual percentages
18 of revenue paid to labor in a competitive
19 industry as opposed to a less competitive
20 industry?
21   A.   Sure.  I've cited various
22 texts, but I would take you just to a
23 basic elementary micro text to look at
24 where labor's share of revenue should

Page 111

1 go -- labor's share of its marginal
2 revenue product should go in a
3 competitive versus a noncompetitive
4 industry.
5    Q.   All right.  Maybe you're
6 misunderstanding me.  I understand that
7 you're saying that microeconomic
8 literature and textbooks would express
9 that labor should capture 100 percent of
10 their marginal revenue product.
11        What I'd like to know, is
12 there any actual literature that
13 discusses, for any specific industries,
14 what percentages of -- what percentages
15 of revenue are paid to labor in a
16 competitive industry as opposed to a less
17 competitive industry?
18   A.   I believe I cite to -- to
19 various articles in the literature, but
20 the notion of a wage share is commonly
21 used throughout labor economics.
22   Q.   And are there studies where
23 actual wage shares, as you say -- as you
24 call them, are discussed in specific

Page 112

1 industries?
2    A.   I believe so.
3    Q.   Okay.  Can you tell me any
4 of those studies or industries that I
5 should be looking for?
6    A.   I don't know if sitting here
7 I'm going to be able to tell you specific
8 industries, but it's possible that I have
9 some citations to it already.
10        But I -- I think that the
11 concept of -- of labor's share of his or
12 her marginal revenue product is the
13 foundation of labor economics.  It's
14 going to be something that is widely
15 researched and studied in the abstract
16 and in particular industries.
17   Q.   Can you identify for me any
18 peer-reviewed literature that looks at
19 labor's share of revenues in estimating
20 damages, either for an antitrust case
21 or -- antitrust situation or any other
22 situation?
23        MR. CRAMER:  Form.
24        MR. ISAACSON:  Okay.  Let me

Page 113

1        rephrase it.
2 BY MR. ISAACSON:
3    Q.   Can you identify for me any
4 peer-reviewed literature looking where --
5 at the labor's share of revenues as valid
6 or reliable for estimating damages?
7        MR. CRAMER:  Form.
8        Answer it if you understand
9 it.
10        THE WITNESS:  So the notion
11 that an economist is going to be
12 writing about damages
13 methodologies would only show up
14 in a very applied and practical
15 journal.  Say something like the
16 Antitrust -- something that's put
17 out by the ABA antitrust section.
18 I don't -- I don't think damages
19 is a topic that is going to get a
20 lot of attention by -- by
21 economists in peer-reviewed
22 journals outside of some -- some
23 kind of practitioner guide.
24 BY MR. ISAACSON:

MAGNA
LEGAL SERVICES

Page 114

```
1        Q.   All right.  Let me try it
2  this way then.  Can you identify any
3  peer-reviewed literature looking at
4  labor's share of revenues as the variable
5  of interest in determining
6  anticompetitive impact?
7             MR. CRAMER:  Form.  Asked
8        and answered.
9             THE WITNESS:  I don't know
10        if I'm -- if I'm going to be able
11        to call up names of particular
12        articles off the top of my head,
13        but I can tell you that -- that
14        the wage share of marginal revenue
15        product is the way that you
16        understand competition in
17        competitive labor markets and how
18        you understand the opposite.
19  BY MR. ISAACSON:
20        Q.   All right.  The -- and I
21  think -- and I'll come to that subject
22  right now, but right now you can't tell
23  me any peer-reviewed literature that
24  looked -- that analyzes anticompetitive
```

Page 115

```
1  impact by looking at labor share of
2  revenues; is that right?
3             MR. CRAMER:  Asked and
4        answered.
5             THE WITNESS:  I believe I've
6        cited some in my report, but
7        sitting here I can't -- I can't
8        tell you a particular article.
9  BY MR. ISAACSON:
10        Q.   All right.  If you look at
11  page 120 of your report, footnote 454?
12        A.   Yes.
13        Q.   You talk about elementary
14  economics which shows that competitive
15  firms paid labor a share of revenue
16  commensurate with labor's productivity
17  based on a marginal product to labor.
18             That's the principle that
19  you were just discussing with me?
20        A.   Yes.
21        Q.   Is that right?
22             And -- now the marginal
23  revenue product labor is the value of the
24  additional output created when a firm
```

Page 116

```
1  adds a worker, am I correct?
2        A.   I think that's a fair -- a
3  fair concept.
4        Q.   And is it -- is it correct
5  that standard economics would predict
6  that a worker's compensation would be
7  equal to that marginal revenue product of
8  labor?
9        A.   In a competitive
10  environment, the labor's share of his or
11  her marginal revenue product tends
12  towards higher values, and the limit
13  would -- would approach his or her
14  marginal revenue product.
15        Q.   And in a competitive
16  environment, standard economics would say
17  that the -- actually, let me start over.
18             When you expressed that
19  marginal revenue product is labor or
20  wages, do you ordinarily do that in
21  dollar terms or in a fraction of the
22  firm's revenue?
23             MR. CRAMER:  Objection to
24        form.
```

Page 117

```
1             THE WITNESS:  Do I
2        ordinarily do it?  I'm sorry, I'm
3        just not following.
4  BY MR. ISAACSON:
5        Q.   How about in standard
6  economics?
7             MR. CRAMER:  Same objection.
8             THE WITNESS:  I think that
9        in standard economics you would
10        put the wage in the numerator and
11        you'd put the marginal revenue
12        product in the denominator.
13  BY MR. ISAACSON:
14        Q.   And the marginal revenue
15  product would be expressed as a dollar
16  value?
17        A.   Yes.
18        Q.   And do economists ordinarily
19  measure the productivity of the
20  additional output -- well, let me put it
21  differently.
22             Do economists generally
23  measure the productivity created when a
24  firm adds a worker in dollar terms as
```

MAGNA
LEGAL SERVICES

Page 118

1   opposed to as a percentage of revenue?
2       MR. CRAMER: Objection to
3   form, to generally. For what
4   purpose?
5       THE WITNESS: A firm could,
6   if a firm bills -- if a law firm
7   bills an associate out at $400 an
8   hour, it could express what the --
9   what the young lawyer's salary on
10  an hourly basis is as a -- under
11  an assumed utilization rate as a
12  percentage of that young lawyer's
13  bill rate.
14  BY MR. ISAACSON:
15      Q.   And are you aware of any
16  studies which express the marginal
17  revenue product of labor in terms of the
18  percentage of revenue of the firm?
19      A.   I'm not aware, but as you've
20  expressed it, that's not quite what I'm
21  doing either.
22      Q.   Now, in terms of -- did you
23  make any effort to measure the marginal
24  revenue product of labor of UFC fighters?

Page 119

1       A.   Yes.
2       Q.   Okay. And what would you
3   point to me for that?
4       A.   What I did, which is I -- I
5   calculated the average revenue per event,
6   per fighter, and I'm using that as a
7   proxy for the marginal revenue product.
8       Q.   All right. If the
9   average -- when you look at the average
10  revenue per event, per fighter, how do
11  you determine what part of that revenue
12  is the contribution of the fighter as
13  opposed to, for example, marketing,
14  promotions, production or the work of the
15  overall firm?
16      A.   So for my purposes, I don't
17  need to figure out that -- that
18  decomposition. I will note, however,
19  that I cite a study in my literature
20  review section that suggests that the
21  fighter is responsible for, if not all,
22  the vast majority of -- of the
23  pay-per-view revenues that are captured
24  and not the brand.

Page 120

1       Q.   Well, I didn't ask about the
2   brand.
3       The -- you would agree --
4   you would agree with me that effective
5   marketing and promotion could increase
6   the average revenue per event, correct?
7       A.   Yes.
8       Q.   And you would agree with me
9   that super- -- improving television
10  production can increase the average
11  revenue per event?
12      MR. CRAMER: All things
13  equal?
14      MR. ISAACSON: Yes.
15      THE WITNESS: I'm not sure
16  what -- what you mean by improving
17  television production.
18  BY MR. ISAACSON:
19      Q.   A better production that
20  people enjoy more.
21      MR. CRAMER: Objection to
22  form.
23      THE WITNESS: And you're
24  asking me if I can conceive of

Page 121

1   this as a matter of theory?
2   BY MR. ISAACSON:
3       Q.   Yes.
4       A.   As opposed to whether it
5   actually happened?
6       Q.   Yes.
7       A.   I think I'm -- I'm going to
8   grant you that as a matter of theory one
9   could -- one could add value by
10  increasing the quality of the production.
11      Q.   Okay. Now, in this case,
12  you did not do an actual study yourself
13  of the contribution of the UFC fighters
14  to the average revenue per event; is that
15  right?
16      MR. CRAMER: Asked and
17  answered.
18      THE WITNESS: I think that's
19  correct. As I noted a few moments
20  ago, that was not necessary for my
21  purposes.
22  BY MR. ISAACSON:
23      Q.   By using the average revenue
24  per event, per fighter as a proxy, were



Page 150

1      Q.   All right.  Let's talk about
2  the non-headliners.
3           So in your inverse ranking
4  method, the number 100 fighter would be
5  worth six times that of the number 600
6  fighter?
7      A.   Sure.
8      Q.   And what in the record shows
9  that magnitude of difference in value?
10     A.   Oh, I think that you can go
11 to -- so we have a lot of evidence that
12 speaks to qualitatively the difference in
13 value, and I think what you're pressing
14 on is quantitatively.
15     Q.   Yes.
16     A.   Right?  Well, I just want to
17 make sure that --

Page 151

Page 152

Page 153

23     Q.   All right.  So for some of
24 your models you used a foreclosure share



Page 174

6      Q.   The -- would another factor
7  that would increase the foreclosure share
8  for the revenue weighted measures be
9  increased revenue generated by Zuffa
10 compared to its competitors?
11          MR. CRAMER:  Objection to
12     form.  Incomplete hypothetical.
13          THE WITNESS:  I can say that
14     holding all things equal, Zuffa's
15     market share, the share of Zuffa
16     fighters who are fighting pursuant
17     to an exclusionary contract, that
18     under the revenue weighting based
19     measure, and only under the
20     revenue weighting based measure of
21     foreclosure, would an increase in
22     the relative revenues per event,
23     per fighter for Zuffa cause the
24     foreclosure share to increase.

Page 175

1  BY MR. ISAACSON:
2      Q.   And for the revenue weighted
3  foreclosure measures, holding all other
4  things equal, if Zuffa increased the
5  number of events it was holding during
6  the year, that would increase its
7  foreclosure share, am I right about that?
8      A.   Well, I have to -- I have to
9  add again a bunch more to the
10 hypothetical to be able to say whether an
11 added event would change the foreclosure
12 share.  But I can't answer the
13 hypothetical as you've -- as you've
14 stated it.
15     Q.   Well, for the revenue
16 weighted foreclosure events, holding --
17 foreclosure measures, holding all other
18 things equal, if Zuffa increased the
19 number of events that earned revenue, its
20 foreclosure share would increase; is that
21 correct?
22     A.   I would need to add more --
23 more layers to the hypothetical.  So I
24 guess I would say I can't -- I just can't

Page 176

1  answer that question.
2      Q.   Well, what would be a reason
3  that, assuming Zuffa did increase the
4  number of events and all other things
5  were held equal, its foreclosure share
6  would not increase?
7          MR. CRAMER:  Asked and
8     answered.  Form.
9          Go ahead.
10         THE WITNESS:  For example,
11    if -- if that fighter fought
12    pursuant to a non-exclusionary
13    contract in that new event, then
14    that fighter would not make it
15    into the numerator of the -- of
16    the foreclosure share.
17 BY MR. ISAACSON:
18     Q.   Okay.  Any -- any other
19 reasons you can think of?
20     A.   I think you have to specify
21 what's happening to the non-Zuffa events
22 around the time that you're taking the
23 measure.  So the mere advent of a Zuffa
24 event doesn't necessarily increase the

Page 177

1  foreclosure shares.



MAGNA
LEGAL SERVICES

Page 178

Page 179

```
 8        Q.   All right.  Now, if I
 9   understand your answers earlier today, in
10   estimating damages and impact, you have
11   proposed a world where there would be,
12   depending on the model, a zero,
13   20 percent or 30 percent foreclosure, but
14   in those worlds you're not assuming any
15   specific market share or any specific
16   conduct by Zuffa; is that right?
17        MR. CRAMER:  Objection to
18   form, misstates the testimony.
19        THE WITNESS:  You put
20   something at the end that's
21   causing me to pause.
22        I did testify earlier that
23   I'm not assuming any particular
24   market share.  With respect to the
```

Page 180

```
 1        conduct, I'm assuming that in a
 2   but-for world these vertical
 3   restrictions in the fighter
 4   contracts that impose exclusivity
 5   and duration of a certain extent
 6   would disappear.
 7        Now -- with one caveat, and
 8   it's important, is that when I go
 9   to, say, a 30 percent foreclosure
10   level, so long as a small enough
11   share of Zuffa fighters, given its
12   market share, were fighting
13   pursuant to one of these contracts
14   with 30-month duration or more,
15   you could, you could make that
16   consistent with a but-for
17   foreclosure share of 30 percent.
18   BY MR. ISAACSON:
19        Q.   Okay.  And in your but-for
20   world -- let me ask you this.  What do
21   you mean by the but-for world in this
22   circumstance?
23        A.   Well, it is a -- it is a
24   world -- it's a more competitive labor
```

Page 181

```
 1   market, a world with fewer restrictions
 2   on labor mobility.
 3        Q.   So in estimating impact and
 4   damages, you have estimated the world --
 5   you compared the world as it is to a
 6   world that would have more competitive --
 7   a more competitive labor market for UFC
 8   fighters; is that correct?
 9        MR. CRAMER:  Objection to
10   form.
11        THE WITNESS:  My -- my
12   construction of but-for world in
13   this regression model, is -- is
14   envisioning a world in which the
15   restrictions on fighter mobility
16   are lessened sufficiently so as to
17   permit 30, 20 or zero percent
18   foreclosure shares, and there's a
19   lot of ways that you can get
20   there.
21   BY MR. ISAACSON:
22        Q.   And by fighter mobility, you
23   mean the ability to work for different
24   promoters; is that right?
```



A. An impediment to mobility or restrictions that preclude you from -- from working for rivals or for shopping your contract around or testing your market value.

Q. When you say a but-for world -- you've done a comparison of the real world to the but-for world, you've estimated the world -- you compared the world as it is to a world with more mobility in the MMA labor market.

A. I think in very broad terms that's what I'm trying to get at. And mathematically the way that I express that is a world in which Zuffa's foreclosure share is 30 percent, 20 percent or zero percent.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Q. All right. The -- and I think you told me also this morning that you're not assuming -- in terms of market share in the world with more mobility, your but-for world of zero, 20 percent or 30 percent foreclosure, Zuffa could have a very high market share; is that right?

A. Absolutely.

Q. Right. And could Zuffa have a market share of 90 percent and still have a foreclosure of zero?

A. Yes.

Q. And you're not predicting what Zuffa's market share would be in a world with zero percent foreclosure?

MAGNA LEGAL SERVICES

Page 186

1      A.   I'm not predicting a precise
2  number for what Zuffa's market share
3  would be in that but-for world.
4      Q.   And you are not predicting
5  with a zero percent foreclosure, for
6  example, how many competitors there would
7  be in the marketplace?
8          MR. CRAMER:  Objection to
9  form.
10         THE WITNESS:  I don't think
11  so, no.
12  BY MR. ISAACSON:
13     Q.   Okay.  And you are not
14  predicting with zero percent foreclosure
15  your but -- one of your but-for worlds
16  the market share of any competitor -- of
17  any competitor or potential competitor,
18  correct?
19     A.   Correct.
20     Q.   And do you consider the
21  markets you defined to have high barriers
22  to entry other than any of the acts of
23  Zuffa you've identified?
24     A.   I have a section titled

Page 187

1  Natural Barriers to Entry, and so I
2  think -- I think there are some.  They
3  are important and they would exist in the
4  but-for world as well.
5          I think that in this case,
6  the artificial barriers to entry are more
7  important, they're more economically
8  significant than the natural barriers to
9  entry.
10     Q.   All right.  And do you
11  consider the natural barriers to entry in
12  this case to represent high barriers to
13  entry?
14     A.   They're barriers.  They
15  are -- they're not trivial, they're
16  economically significant, and you saw
17  what I -- what I think of them in the
18  paragraph that I discuss them in.
19     Q.   I haven't met an economist
20  yet who hasn't used the phrase high
21  barriers to entry?
22     A.   Who hasn't?
23     Q.   Who hasn't used it at some
24  point or the other.

Page 188

1      A.   Oh.
2      Q.   I assume you've used the
3  phrase at some point or the other?
4      A.   Of course I have.  I've
5  done -- I've done many antitrust cases.
6      Q.   Sure.
7      A.   So I have to.
8      Q.   So do you consider the
9  natural barriers to entry here to be high
10  barriers to entry?
11     A.   I think they're --
12         MR. CRAMER:  Asked and
13  answered.
14         THE WITNESS:  Yeah, I like
15  putting it this way.
16         MR. ISAACSON:  Asked, but
17  not answered.
18         MR. CRAMER:  Well --
19         THE WITNESS:  What's
20  important.  I mean, I'm going --
21  I'm going to give you an answer,
22  but we can't lose sight of the
23  fact when we're doing an indirect
24  approach to -- to product -- to

Page 189

1  market power, we're asked to look
2  at high shares and relevant market
3  and high barriers to entry.  They
4  don't have to all come from
5  natural barriers to entry, it can
6  be a combination of natural
7  barriers to entry and artificial
8  barriers to entry.
9          In this case, I think the
10  natural barriers to entry are
11  significant, but on a relative
12  basis, I think they're -- they're
13  less important than are the
14  artificial barriers to entry.
15  BY MR. ISAACSON:
16     Q.   You've told me several times
17  that you consider the artificial barriers
18  to be more important than the natural
19  barriers.  Standing alone, are the
20  natural barriers to entry here high
21  barriers to entry?
22         MR. CRAMER:  Objection to
23  form, asked and answered.
24         THE WITNESS:  So perhaps

Page 206

1      when you go to damages, if you
2      remove the vertical restrictions
3      and fighters start fleeing, USC
4      and going instead to Bellator,
5      where does the UFC go in terms of
6      its wage share?  That's the
7      relevant question.
8  BY MR. ISAACSON:
9      Q.   All right.  I sometimes have
10 other questions even if you deem them
11 irrelevant, so I'm going to ask them.
12     The -- when you do a
13 yardstick analysis between two firms to
14 determine damages or an anticompetitive
15 effect, should the two businesses be
16 comparable in all important respects
17 other than the competition differences?
18     MR. CRAMER:  Objection,
19     asked and answered three times.
20     MR. ISAACSON:  He didn't
21     answer it.
22     MR. CRAMER:  He did.
23     THE WITNESS:  I don't think
24     it's necessary that they be

Page 207

1      comparable in all respects.  I
2      mean, here's the problem, here --
3  BY MR. ISAACSON:
4      Q.   I didn't say in all
5  respects.
6      A.   You did say all.
7      Q.   I said all important
8  respects.
9      A.   All important respects.
10 Sometimes you're not going to get that.
11 And here, the biggest difference between
12 the two is -- is caused, at least in
13 part, by the conduct.  The conduct is
14 restricting the output of Bellator, the
15 conduct restricted the output of
16 Strikeforce.
17     And so for you now to claim
18 that we can't look at these market-based
19 transactions because of the harm that we
20 inflicted, it's -- it's partly your
21 problem as well.
22     Q.   All right.  You've said the
23 reasons that Bellator and Strikeforce are
24 comparable to UFC, other than the

Page 208

1      competition restrictions, you listed that
2      they're competing in the same relevant
3      input market, they're both MMA promoters,
4      they're both trying to go after the same
5      set of fighters.  Anything else that
6      makes them comparable?
7      A.   Same business models, same
8  industry.  I don't know -- I don't know
9  what else I can cite, but I think those
10 name them pretty good comparables.
11     Q.   Right.  When you do a
12 yardstick comparison, would you
13 ordinarily look at the respective sales
14 and marketing of the two businesses?
15     A.   It depends on the
16 application of the yardstick.
17     Q.   Okay.  In assessing damages
18 or anticompetitive effect, using the
19 yardstick between two firms that you're
20 considering as potential comparables,
21 would you ordinarily look at the
22 respective sales and marketing of those
23 businesses?
24     A.   Well, I think I am in an

Page 209

1      indirect way in a sense that to the
2      extent marketing pushes up demand and
3      pushes out revenue by -- by controlling
4      for differences in revenue, I'm -- I'm
5      capturing that.
6      Q.   When you do the yardstick,
7  how do you control -- when you do the
8  yardstick comparison, how are you
9  controlling for the amount of revenue?
10     A.   I'm denominating the pay in
11 terms of fighter share per revenue.
12     Q.   Right.  But if the -- you're
13 assuming that the amount of revenue won't
14 affect the percentage fighter share?
15     A.   I wouldn't put it that way.
16     Q.   Okay.  But going back to my
17 question, because I would like to get an
18 answer, because you said -- you said in
19 an indirect way you were looking at it.
20 But in assessing anticompetitive effect
21 or damages using a yardstick measure,
22 would you ordinarily directly compare the
23 respective sales and marketing of those
24 businesses?

Page 210

1          MR. CRAMER:  Objection to
2   the form ordinarily.  Form.
3          THE WITNESS:  It would
4   depend on the application.
5   BY MR. ISAACSON:
6       Q.   And when you say -- you've
7   said you used yardsticks or benchmarks
8   often before and you mentioned appraisal?
9       A.   Of fair market value.
10      Q.   Appraisals of fair market
11  value.  Have you -- other than Arizona
12  nurses, have you used them previously in
13  estimating anticompetitive effect or
14  damages in an antitrust cases?
15      A.   I'd have to -- I'd have to
16  go back case-by-case, but nothing is
17  popping in my head right this second.
18      Q.   Is there any literature in
19  your field that establishes standards for
20  how you determine what's an appropriate
21  yardstick, what -- you know, to what
22  extent you should decide they're
23  comparable?
24      A.   I -- I imagine there are

Page 211

1   papers again in very applied antitrust
2   journals that would talk about standards
3   for yardsticks, but you wouldn't find
4   something in a general economics journal.
5       Q.   Are you familiar with any
6   published articles sets standards for
7   what's an appropriate yardstick in
8   estimating damages or an anticompetitive
9   effect?
10      A.   I believe I've seen some
11  articles, but I'm not going to be able to
12  call up the name of the author for you
13  right now.
14      Q.   Right.  Those are -- those
15  aren't -- before you chose your
16  yardstick, you did not look at any
17  published standards for determining
18  what's an appropriate yardstick; is that
19  correct?
20      A.   Well, I've just told you
21  I've looked at those things.  I don't
22  know if I looked at them the moment that
23  I seized upon the Strikeforce and
24  Bellator.

Page 212

1       Q.   Right.
2       A.   But I have looked at them
3   and I'm familiar with them, and I'm using
4   my economic judgment to tell you they are
5   good benchmarks.
6       Q.   All right.  I understand
7   you're using your economic judgment and
8   you're saying they're good benchmarks.
9   But at the time you selected the
10  benchmarks, did you have -- were you
11  able -- did you have -- did you know
12  any -- any published standards for
13  selecting the yardstick for determining
14  anticompetitive effect or damages?
15      A.   Did I have a particular
16  article in my mind as I --
17      Q.   Not just the article, just
18  any standards.
19      A.   Sure, I know -- I know what
20  you're trying to do.  I know generally
21  what you're trying to do to abide by the
22  standards.
23      Q.   What's -- when you say abide
24  by the standards, what standards are you

Page 213

1   referring to?
2       A.   The standards of good
3   practice in economics.
4       Q.   Okay.  And the standards for
5   good practice in economics for
6   determining yardstick or determining
7   anticompetitive effect or antitrust
8   damages, you're not aware today of any
9   list of those standards; is that right?
10      A.   A list of the standards?
11      Q.   Or a --
12      A.   I don't understand what that
13  means.
14      Q.   A list or a description.
15      A.   I know -- I know what you're
16  trying to do, which is to find a
17  competitive rate, right?  You're trying
18  to find a rate that is offered by a firm
19  that is similarly situated that -- that
20  is not engaged in the challenged conduct.
21  Right?  And so for me, I think it's
22  perfectly reasonable to go looking for
23  the rates that are offered by competitive
24  firms in the same industry for fighters.



Page 282

1    you have used are consistent with the
2    merger guidelines, but you're not able to
3    say whether they were sufficient to
4    define those markets based on the merger
5    guidelines?
6            MR. CRAMER:  Objection to
7        form.
8            THE WITNESS:  I don't -- I
9        just don't know what sufficient
10       means in that context.
11   BY MR. ISAACSON:
12       Q.   Okay.  And when you say
13   they're consistent with the guidelines,
14   what do you mean?
15       A.   I think the guidelines tell
16   us, and I even quote the guidelines when
17   it comes to defining input markets, and
18   I'm faithful to the -- to the teachings
19   and to the standards that are articulated
20   in the guidelines.
21       Q.   All right.  And the output
22   markets that you define -- well, actually
23   let me break it down.
24           There's three -- two input

Page 283

1    markets and one submarket, and there' a
2    geographic market for each of those,
3    correct?
4        A.   Correct.
5        Q.   And the geographic market
6    for all three would be North America?
7        A.   Yes.
8        Q.   Okay.  And then you define
9    an output market.  Is that an output
10   market that's tied to each input market
11   or is there one output market?
12       A.   There's one output market,
13   but it does depend on how you have
14   defined the input market.  You may recall
15   that when I -- when I chart, for example,
16   the number of events in the relevant
17   output market, it depends on -- I'm
18   making it as a condition that an event --
19   an MMA event had to feature at least one
20   fighter that belonged to the relevant --
21   to the associated relevant input market.
22   You probably recall --
23       Q.   Yes.
24       A.   Those charts, 4A, B and C.

Page 284

1            So -- so the way that I've
2    implemented the output market, it depends
3    on -- on the associated input market.
4        Q.   Right.  And that's why
5    mathematically I'm trying to understand
6    whether you have three output markets
7    tied -- each one tied to an associated
8    input market or there's one output market
9    tied to the three input markets.
10       A.   Again, I like to think of
11   there being one output market and one
12   input market and these are just different
13   ways to measure them.
14       Q.   And the -- when you defined
15   the output market, you used revenue
16   weighting; is that right?  Oh, no, it's
17   other way around.  Never mind.
18           The revenue earned by the
19   output market is the revenue that you use
20   when you do revenue weighting in the
21   input markets, correct?
22       A.   It is possible to think of
23   it that way, but when I was finding my
24   weights, my revenue weighting measures

Page 285

1    of, say, market share or foreclosure
2    share, I wasn't thinking about the fact
3    that those revenues occur in the output
4    market.  But that's fair, if that's how
5    you would like to think about it.  Of
6    course the -- the output is the
7    production of the event and the revenue
8    is associated with that output.
9        Q.   Right.  And can you describe
10   to me a situation where a firm would have
11   monopoly (sic) power in the output market
12   based on revenue, and would not have
13   monopsony power in the input market once
14   you use the revenue weighting?
15           MR. CRAMER:  Incomplete
16       hypothetical.  Talking about this
17       industry or just generally?
18           MR. ISAACSON:  Generally.
19           MR. CRAMER:  Incomplete
20       hypothetical.
21           THE WITNESS:  I don't
22       understand the question because
23       the revenue weighting isn't really
24       affecting my -- my conclusions

MAGNA
LEGAL SERVICES

Page 286

1      with respect to, say, a finding of
2      monopsony power in the input
3      market.
4  BY MR. ISAACSON:
5      Q.   Well, you do have findings
6  of monopsony power that do rely on
7  revenue weighting, right?
8      A.   I think that under the --
9  under the indirect approach and under
10 only one pass through the indirect
11 approach, I weight fighters by -- by
12 revenues to make an inference about
13 Zuffa's high shares in that relevant
14 input market.
15     Q.   Right.
16     A.   But as you know, that's only
17 one of many, many approaches that allow
18 me to get to the conclusion of monopsony
19 power.
20     Q.   Okay.
21     A.   I actually prefer --
22     Q.   So let's return --
23     A.   Can I finish?
24     Q.   I thought you were.

Page 287

1      A.   I prefer direct evidence
2  generally, and I think that I've -- I
3  offer a slew of evidence that speaks to
4  how you can prove directly that Zuffa
5  exercises monopsony power.
6      Q.   I understand that you
7  offered direct and indirect evidence, but
8  I need to ask about them one at a time
9  and we can cover both.
10     A.   Okay.
11     Q.   So in terms of when you
12 define a market, can you describe to me a
13 situation where if you use revenue
14 weighting in the input market, where
15 the -- a monopoly firm would not
16 necessarily have a monopoly in the input
17 market?
18          MR. CRAMER:  Incomplete
19     hypothetical, form.
20          THE WITNESS:  I've never
21     given thought to that, and I'd
22     like to think about it and maybe
23     we'll come back.  But I don't
24     think I'm prepared to -- to

Page 288

1      construct a scenario about how
2      that could occur.
3  BY MR. ISAACSON:
4      Q.   All right.  The -- and then
5  you've described geographic market for
6  the output market also.  And is that also
7  North America?
8      A.   Yes.
9      Q.   All right.  The -- and in
10 terms of your SSNIP analysis -- all
11 right.  So did you do -- well, my
12 colleague wants to know so it seems like
13 a good question.
14     A.   I'm sure it is.
15     Q.   In the out -- in the output
16 market, what is being sold?  In the
17 output markets that you have defined.
18     A.   Sure.  I think that you
19 are -- the production or the product that
20 is being produced are -- is live MMA
21 events and the revenue associated with
22 those events can take the form of gate
23 revenue or pay-per-view.  That's from --
24 from the consumer side.  Of course,

Page 289

1  there's -- there's revenues from the
2  advertiser's side as well.
3          But I hope that answers your
4  question.
5      Q.   All right.  And does
6  pay-per-view compete with broadcast?
7          MR. CRAMER:  Objection to
8      form.
9          THE WITNESS:  I did not
10     conduct that inquiry.
11 BY MR. ISAACSON:
12     Q.   Do you have an opinion one
13 way or another about that?
14     A.   No.
15     Q.   All right.  With respect to
16 the -- does -- do the live venue events
17 compete with pay-per-view events?
18     A.   I don't even understand the
19 question.  Many of the pay-per-view
20 events are live.
21     Q.   Meaning I watch it on
22 pay-per-view as opposed to go see it
23 live.
24     A.   I haven't -- I haven't



Page 290

1   studied that and I imagine for someone
2   who lives very far from the venue where
3   the live event is staged, they would not
4   be considered reasonably close
5   substitutes.
6       Q.   So for your input markets,
7   what evidence did you take into account
8   to assess customer's likely response to
9   price increase in the SSNIP analysis?
10  And feel free to point me to the sections
11  of your report that --
12      A.   Did you mean to say -- I
13  think you just conflated the input
14  markets and customers.  Maybe we should
15  start over.
16      Q.   Yes, I said price increase
17  rather than wage decrease, but let me
18  just put it this way:  What evidence in
19  your report did you take into account to
20  assess the likely response to a SSNIP in
21  the input markets?
22      A.   Sure.  So there it's the
23  perspective of the fighters not the
24  customers.  So I was tripping up over

Page 291

1   your --
2       Q.   Yes.
3       A.   -- injecting customers when
4   we're talking about input markets.
5           So I can take you to the
6   relevant sections, and I will, but of
7   course at high levels, I'm looking at
8   record evidence of -- of what fighters
9   and promoters thought about substitution
10  possibilities as you -- if you were to
11  move away from Zuffa to counteract a
12  hypothetical wage cut.
13      Q.   Okay.  So the first thing
14  you looked at was record evidence of
15  substitution.
16      A.   Or the perception of
17  substitution from the stakeholders, the
18  fighters, the promoters, and I'll just
19  point you, if you --
20      Q.   That's -- that's sufficient
21  for -- for item 1.
22      MR. CRAMER:  You asked him
23  to look at his report.
24      MR. ISAACSON:  I'm going

Page 292

1       to --
2       MR. CRAMER:  Okay.
3       MR. ISAACSON:  I'm not going
4   to ask him to recite all the
5   documentary evidence.
6   BY MR. ISAACSON:
7       Q.   And I understand that
8   there's documentary evidence that you're
9   not reciting today.
10          Okay.  Other than the record
11  evidence of the -- about sub- --
12  perceptions of substitutability from the
13  stakeholders, what would be other parts
14  of your SSNIP analysis for the input
15  market?
16      A.   I would direct you to
17  Section 3A 1 for all of the evidence that
18  I used to inform the construction of the
19  relevant input market.
20      Q.   That would be the record
21  evidence that you were referring to?
22      A.   Well, record evidence is
23  fairly broad, right, because it
24  encompasses almost everything.  But I

Page 293

1   will point -- to me the -- what helps to
2   guide me to the findings that I made with
3   respect to the input market was the fact
4   that Zuffa was able to successfully
5   suppress fighter wages, wages either
6   measured by -- by wage share, regression
7   or by knowledge of the fact that wage
8   shares were falling over time from
9   26 percent to 18 percent, yet Zuffa did
10  not suffer sufficient defection so as to
11  render that wage decrease unprofitable.
12          Now, that -- that tells you,
13  as a matter of economics, that a -- that
14  a reasonable starting place for defining
15  the contours of the relevant input market
16  is just the fighters under Zuffa's
17  control.  That was the -- the first thing
18  that occurred to me.
19          And once you -- once you
20  start there, you can start looking at
21  record evidence to determine whether
22  additional fighters from -- from rival
23  promotions ought to be included so that
24  you eventually get to the smallest set of

MAGNA
LEGAL SERVICES

Page 294

1   fighters such that a hypothetical
2   monopsonist could profitably exercise
3   monopsony power.
4        Q.   All right.  And you said
5   that Zuffa was able to successfully
6   suppress fighter wages -- wage share.
7   You were talking only about the share of
8   revenues there, correct?
9        A.   Correct.

Page 295

5   BY MR. ISAACSON:
6        Q.   All right.  But in your --
7   in your hypothetical there you held
8   revenues constant.  Did you look at, as
9   part of your analysis of the input market
10  and defining that market, as to whether
11  Zuffa actually suppressed actual wages?
12       MR. CRAMER:  Objection to
13  form.
14  BY MR. ISAACSON:
15       Q.   As opposed to wage share?
16       MR. CRAMER:  Same objection.
17       THE WITNESS:  I'm focused on
18  wage share, of course, because
19  it's the right thing to look at
20  from an economic perspective.
21  We're trying to measure
22  exploitation, and the textbooks
23  tell you to do it as a share of
24  marginal revenue product.

Page 296

1   BY MR. ISAACSON:
2        Q.   So my actual question was --
3   I understand you're focused on that, but
4   my question is, did you look at whether
5   Zuffa actually suppressed actual wages?
6        A.   Without controlling for
7   revenues, no.  Because it's incorrect to
8   do so.
9        Q.   So in performing your SSNIP
10  analysis for the input markets, is it
11  fair to say that you relied on the record
12  evidence about the issue of perceived
13  substitution from the stakeholders along
14  with your observations that when Zuffa
15  suppressed fighter wage shares, there
16  weren't significant defections?
17       A.   I think -- I think that
18  encompasses a lot.  I also think that
19  Zuffa in its ordinary course of business
20  made use of a FightMetrics (sic)
21  database.  I had -- the very first thing
22  I did when I -- when I got this case was
23  I started reading the economic literature
24  on the MMA industry, and almost every

Page 297

1   article I read, the FightMetrics (sic)
2   database formed the foundation of their
3   empirical analysis.
4        So I thought that that was a
5   reasonable place to begin to posit what
6   the smallest set of fighters that could
7   be under the control of a hypothetical
8   monopsony would be in order for it to
9   exercise market power.
10       Q.   All right.  Why did you use
11  the smallest set of fighters not the
12  smallest amount of promoters?
13       A.   Well, because we're looking
14  at the input market.  The fighters form
15  the elements of the input market.  They
16  happen to belong to promoters, but
17  fighters are the elements or the
18  ingredients.
19       But I'm -- if I'm a
20  fighter -- just to make it clear, if I'm
21  a fighter and I'm thinking about
22  substituting, defecting from UFC and
23  going to a rival promotion, I don't care
24  what the name of the promotion is or

Page 322



8          Q.    But as to the -- when you
9    say significantly compared to the total
10   number of Zuffa fighters, would that mean
11   at least 50 or would you not have an
12   opinion on that?
13           MR. CRAMER:  Objection to
14   form.
15           THE WITNESS:  Oh, sitting
16   here today, I can't put a number
17   on it.
18   BY MR. ISAACSON:
19         Q.    Okay.  The -- and in a world
20   with zero percent foreclosure by Zuffa,
21   the fighters who were maintained by Zuffa
22   under contract that they -- you say they
23   could not use, in that world would those
24   fighters still be Zuffa fighters?

Page 323

1          A.    They may be Zuffa fighters
2    and they may not be.  I think -- I think
3    a plausible scenario is those fighters
4    break out when you relax their
5    restrictions and go fight.  They want to
6    fight.  You know, there's -- Dan White
7    has this notion of rusting.  He's got a
8    phrase for it, what happens when a
9    fighter sits around and doesn't get to
10   fight.
11           I understand that it hurts
12   their -- their careers, it hurts their
13   ability to elevate in the profession when
14   they're sitting around.  Not only are
15   they not fighting, but their muscles and
16   the experience of being in a fight, it's
17   hard to replicate in practice, and
18   moreover, you don't get the opportunity
19   to elevate by fighting other ranked
20   fighters.
21           And you don't earn money.  I
22   mean, that's the -- that's the real
23   thing.  You don't get paid in this
24   profession unless you fight.

Page 324

1          Q.    In a world -- in a world
2    with -- where Zuffa has zero percent
3    foreclosure, would Zuffa contract with
4    fewer fighters?
5          A.    I think directionally you
6    would see leakage and defective from
7    Zuffa to rivals.
8            You had asked me earlier if
9    I put an exact market share associated
10   with it and I said no because I -- I
11   can't, but I feel comfortable saying, at
12   least directionally, that in a more
13   competitive world with fewer restrictions
14   on fighter mobility, you would see more
15   mobility.  I mean, it's almost -- it's
16   almost tautological.
17         Q.    I think previously you told
18   me that in a world where Zuffa had a zero
19   percent foreclosure, it still could have
20   a market share as high as 90 percent.  If
21   that were the case, if it had zero
22   percent foreclosure and a 90 percent
23   market share, would Zuffa be contracting
24   with fewer fighters than it is today?

Page 325

1            MR. CRAMER:  Incomplete
2    hypothetical.
3            THE WITNESS:  I think that
4    it's a complicated -- it's a
5    complicated one.  I'd probably
6    have to think about it.
7    BY MR. ISAACSON:

21         Q.    So to infer the price
22   increase, did you take the amount of
23   revenue for pay-per-view and divide it by
24   the number of units?

MAGNA
LEGAL SERVICES

Page 326

```
1        A.   I think revenue and units
2   were elements of my calculus, yes.
3        Q.   All right.  You did not look
4   at the actual amounts charged by the
5   cable company for the pay-per-view event?
6        A.   I think -- I think I agree
7   with you that in this case I was looking
8   at it from the perspective of Zuffa.
9        Q.   All right.
10       A.   Which is the relevant
11  perspective to determine whether it was
12  profitable for Zuffa.
13       Q.   Well, does the revenue
14  percentage of Zuffa vary even when the
15  pay-per-view price remains the same?
16       MR. CRAMER:  Incomplete
17  hypothetical.
18       THE WITNESS:  I'm sorry, the
19  revenue percentage of what?
20  BY MR. ISAACSON:
21       Q.   So you were looking at Zuffa
22  revenue times pay-per-view units,
23  correct?  I mean, divided by pay-per-view
24  units.
```

Page 327

```
1        A.   Correct.
2        Q.   Correct.  And Zuffa's
3   revenue by pay-per-view would be the
4   revenue share it gets from the cable
5   company?
6        A.   Correct.
7        Q.   Correct?  And is it the case
8   that -- that the revenue share percentage
9   goes up and goes down irrelevant (sic) to
10  the price of the actual pay-per-view?
11       MR. CRAMER:  Objection to
12  form.
13       THE WITNESS:  And I don't
14  know.  I think that it would all
15  depend.  I would have to think
16  about it.
17  BY MR. ISAACSON:
```

Page 328

Page 329



Page 330

7     Q.    So you're characterizing all
8   of the pay-per-view events as marquee
9   events when you say marquee events?
10     A.   I think that you might be
11  able to find counterexamples, a handful
12  of counterexamples of a pay-per-view that
13  doesn't feature a headliner, but in
14  general it would be really hard to sell
15  it unless it featured a headliner.
16     Q.   Right.  And did the -- and
17  if Zuffa -- if a firm decided that it
18  wanted to move marquee events from
19  pay-per-view to broadcast, would you
20  consider that direct evidence of power to
21  restrict supply?
22        MR. CRAMER:  Incomplete
23     hypothetical, form.
24        THE WITNESS:  Well, you're

Page 331

1   asking me to assume something that
2   I understand to be an unprofitable
3   move.
4        But if -- if your experts
5   can show evidence that these
6   marquee events moved one-for-one
7   from pay-per-view to -- to
8   television, I'd be happy to
9   consider such evidence.  But I
10  don't have an opinion on it right
11  now.
12  Q.    Okay.
13        THE VIDEOGRAPHER:  Excuse
14  me, Counsel.  We're approaching
15  ten minutes left on the disk.
16        MR. ISAACSON:  I think I'm
17  done.
18        Give me one minute, but I
19  think I'm about done for the day.
20        Give us a minute.
21        MR. CRAMER:  Let's go off
22  the record.
23        THE VIDEOGRAPHER:  The time
24  is 4:28 PM.  We are going off the

Page 332

1   record.
2        (Recess.)
3        THE VIDEOGRAPHER:  The time
4   is 4:31 PM.  We have been on the
5   record for five hours and
6   36 minutes.
7        MR. CRAMER:  All right.  We
8   have no questions.
9        MR. ISAACSON:  Thanks.
10        MR. CRAMER:  Let's go off
11  the record.
12        THE VIDEOGRAPHER:  All
13  right.  The time is 4:31 PM.
14        This concludes the
15  deposition and this is the end of
16  Disk 3.
17        (Witness excused.)
18        (Deposition concluded at
19  approximately 4:31 PM.)
20
21
22
23
24

Page 333

2        CERTIFICATE
3
5     I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.
7
8     It was requested before
    completion of the deposition that the
    witness, HAL J. SINGER, Ph.D., have the
9   opportunity to read and sign the
    deposition transcript.
10
11
12
    _Constance Kent_
    Constance S. Kent, CCR, RPR,
13  Certified Court Reporter
    Registered Professional Reporter
14  Certified LiveNote Reporter
    and Notary Public in and for the
15  Commonwealth of Pennsylvania
    Dated:  October 1, 2017
16
17
18
19
20     (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

