# EXHIBIT 5

## Second Deposition of

## Hal J. Singer Excerpts

Page 338

        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEVADA
                    -  -  -

CUNG LE, NATHAN QUARRY, JON: CIVIL ACTION
FITCH, BRANDON VERA, LUIS  :
JAVIER VAZQUEZ, and KYLE    :
KLINGSBURY on behalf of     :
themselves an others        :
Similarly situated,         :
           Plaintiffs  : CASE NO.
                       : 2:15-cv-01045-RFB
        vs.            : (PAL)
                       :
ZUFFA, LLC d/b/a ULTIMATE   :
FIGHTING CHAMPIONSHIP and   :
UFC,                        :
           Defendants  :


                -  -  -
        Tuesday, January 23, 2018
                  DAY 2
                -  -  -

        Continuation of videotaped

deposition of HAL J. SINGER, Ph.D., taken

pursuant to notice, was held at the

offices of BERGER & MONTAGUE, P.C., 1622

Locust Street, Philadelphia, PA 19103,

commencing at 10:19 a.m., on the above

date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.
                -  -  -
        MAGNA LEGAL SERVICES
            866.624.6221
           www.MagnaLS.com



Page 355

1    co-promotion works in that sport.
2         I think that when I -- in
3    this section that you are asking
4    about, I think that I largely
5    contained the evidence to evidence
6    inside of the MMA.  But I think
7    that it -- a reasonable proxy for
8    contracting in the but-for world
9    could be, for example, to look at
10   boxing.  That's certainly
11   reasonable.
12   BY MR. ISAACSON:
13       Q.  Okay.  So other than boxing
14   or other MMA promoters, are there any
15   other sports firms that you consider
16   similar to the plausible but-for world
17   that you describe in paragraph 198 of
18   your report?  And, again, I am not asking
19   you if there are other firms that you can
20   draw lessons from.  You have quite
21   clearly said you can draw lessons from
22   other firms.
23       MR. CRAMER:  Objection to
24   form.

Page 356

1         THE WITNESS:  I think what I
2    am trying to do here -- and you
3    can try again if -- if we are
4    talking past each other.  But I am
5    trying to inform what I think the
6    contracting, what Zuffa's
7    contracting would look like in a
8    but-for world.  And so there was a
9    reason why I limited my -- my
10   analyses, at least in that
11   section, to other MMA promoters.
12       But I think at this time, I
13   don't want to start offering new
14   opinions, but I will say that I
15   think you could -- you could go to
16   boxing as an example and it's
17   conceivable you could go into
18   other sports, but I just
19   haven't -- I haven't really
20   thought a lot about doing that, so
21   I don't feel comfortable offering
22   a new opinion right now.
23   BY MR. ISAACSON:
24       Q.  All right.  The -- in your

Page 357

1    opening report, would you agree with me
2    you described a but-for world where there
3    would be more fighter mobility and which
4    Zuffa's foreclosure share was either
5    zero, 20 percent or 30 percent, depending
6    upon the model that you were looking at?
7        A.  I think those were salient
8    characteristics of the but-for world as
9    described in my -- in my initial report.
10       Q.  All right.  So the plausible
11   but-for world that you describe in your
12   rebuttal report, is that -- is that a
13   but-for world where the foreclosure share
14   is zero, 20 percent or 30 percent?
15       A.  Oh, it's certainly
16   consistent with foreclosure shares that
17   are -- that are in that range, yes.
18       Q.  All right.  Is the plausible
19   but-for world that you describe in
20   paragraph 198 as a result of any specific
21   foreclosure share, zero, 20, 30?
22       A.  I don't think that it's
23   associated with a specific share 27.5,
24   no.  I think that it's trying to capture

Page 358

1    what the contracting most likely would
2    look like in a world absent the
3    challenged conduct.
4        Q.  All right.  And are you --
5    is it still the case in your rebuttal
6    report that you are projecting impacting
7    damages in a world in which the
8    foreclosure share is zero, 20 or 30
9    percent?
10       A.  I think there might be some
11   confusion between impact and damages and
12   anticompetitive effects.  Remember, I
13   don't -- I can describe impact and
14   anticompetitive effects without regard to
15   a specific foreclosure share number.  In
16   contrast, when I am trying to estimate
17   aggregate damages, for example, if I am
18   going to use my model, I have to -- I
19   have to specify a precise foreclosure
20   level.  And so I am concerned by hearing
21   the question that there might be some
22   conflation between what I need to assume
23   for the purposes of impact and, say,
24   anticompetitive effects, on the one hand,



Page 363

1 understand if that means it gets you
2 there.
3         Does it get you to 30
4 percent or lower?
5      A.   Well, I don't think it works
6 that way.  I don't think that you -- I
7 think that you might have -- I think that
8 the origins of what the section is doing
9 might be confused.  I don't -- I don't
10 need something to get me there.  I think
11 that there is a criticism by Dr. Topel
12 that I needed to specify in more concrete
13 terms what I think certain aspects of the
14 but-for world would look like, including
15 the contracting practices.  And so this
16 section lays out what I think some
17 plausible contracting practices would
18 look like using Dr. Topel's own
19 methodology or insight that we should
20 look to MMA rivals with less market power
21 as a proxy.
22      Q.   In your opinion, would the
23 plausible but-for world that you describe
24 in paragraph 198 result in a foreclosure

Page 364

1 share of 30 percent or lower?
2         MR. CRAMER:  Asked and
3      answered.
4         THE WITNESS:  Yeah, I just
5      can't -- I can't make sense -- I
6      am sorry.  I just can't make sense
7      of the question.  It doesn't -- it
8      doesn't work that way.
9 BY MR. ISAACSON:
10      Q.   So you don't -- when you say
11 "it doesn't work that way," would you
12 explain what you mean?
13      A.   Sure.  To step back, you
14 probably recall that when estimating a
15 wage effect here, I had to simulate a
16 world in which the foreclosure share was
17 at a level that would be deemed
18 pro-competitor or at least not
19 anticompetitive by an antitrust court.
20 And so that caused me to run simulations
21 at zero and 20 and 30 percent foreclosure
22 shares, and I was able to estimate a wage
23 effect based on my model.
24         The criticism that came back

Page 365

1 from Dr. Topel was that he wanted more
2 granularity on what that but-for world
3 looked like, and this was -- this section
4 was my response to that -- to that
5 criticism.  And that's how the world
6 works.
7      Q.   All right.  Have you done
8 any analysis that would -- any
9 econometric analysis that would lead to
10 the conclusion that the plausible but-for
11 world that you describe in 198 would lead
12 to a foreclosure share of 30 percent or
13 lower?
14         MR. CRAMER:  I think you
15      asked this several times in the
16      last deposition, but I will allow
17      it.  Asked and answered.
18         THE WITNESS:  If I am -- I
19      just don't --
20         MR. ISAACSON:  I couldn't
21      because he didn't have paragraph
22      198 then.  But...
23         MR. CRAMER:  Well, you asked
24      about econometric analyses

Page 366

1      relating to the --
2         MR. ISAACSON:  Not
3      paragraph 198.
4         MR. CRAMER:  But go ahead.
5         THE WITNESS:  Well, let's
6      just be -- I mean, let's be clear
7      that if I am interpreting your
8      question literally -- and maybe
9      you don't mean to use the word
10      "econometric."  But econometric
11      means based on statistical
12      methods.
13         MR. ISAACSON:  Yes, I do
14      intend to use that.
15         THE WITNESS:  But think
16      about what the question said then.
17      Could you use statistical methods
18      to try to project what a contract,
19      you know, would look like when we
20      are talking about things like
21      would a right-to-match clause
22      exist in the but-for world.  So, I
23      mean, you know what I did.  I
24      looked at -- I looked at what MMA



Page 367

1    rivals were saying about the
2    right-to-match clause and with
3    respect to it's only there because
4    we are doing it in response to
5    Zuffa.
6        It's just some things don't
7    lend themselves to econometric
8    analysis.  I don't know if you
9    meant economic in the question,
10   but with respect to the question
11   on econometric --
12       MR. ISAACSON:  I did not.
13       THE WITNESS:  -- I mean,
14   certain things don't lend
15   themselves to statistical methods.
16   And when they don't, I can't use
17   statistics.
18   BY MR. ISAACSON:
19       Q.   All right.  So just to boil
20   it down, because that was long, it's fair
21   to say you did not use an econometric
22   method to determine whether the plausible
23   but-for world you outline in your report
24   would lead to a 30 percent foreclosure

Page 368

1    share lower because econometric methods
2    would not lend themselves to that
3    purpose?
4        A.   I think I like the way that
5    I answered it a second ago.  We are
6    trying to fill in certain nonquantitative
7    aspects of a contract in a but-for world,
8    such as whether or not it includes a
9    right-to-match provision, such as whether
10   or not it would -- it would allow for
11   co-promotion, such as whether or not it
12   would allow fighters to leave and go
13   fight for a rival promoter.  Those
14   aspects, in my opinion, don't lend
15   themselves to econometric analysis.
16       Q.   Okay.  And that -- all
17   right.  And is there some method that you
18   have used, some nonquantitative method
19   you have used to determine that the
20   plausible but-for world you outline in
21   your report, in your rebuttal report,
22   would cause a foreclosure share of 30
23   percent or lower?
24       MR. CRAMER:  Asked and

Page 369

1    answered in the last deposition.
2        THE WITNESS:  I think -- I
3    think -- respectfully, I think you
4    have got the causation running in
5    the wrong direction.
6    BY MR. ISAACSON:
7        Q.   I just -- I would ask that
8    --
9        A.   Okay.  So just the question
10   doesn't make sense to me from an economic
11   perspective.  That's just not how --
12   that's not how the model works.
13       Q.   Is the model -- and the
14   model does not permit -- with respect to
15   the plausible but-for world that you
16   describe in your rebuttal report, the
17   model does not allow you to determine
18   what would be the foreclosure share that
19   would result in that world; is that
20   correct?
21       MR. CRAMER:  Objection to
22   form.
23       THE WITNESS:  No, that's not
24   correct.

Page 370

1    BY MR. ISAACSON:
2        Q.   Okay.  And you told me
3    that's not how the model works.  My
4    question is, is there some method you
5    have used, some nonquantitative method to
6    determine that the plausible but-for
7    world you outline in your rebuttal report
8    would cause a foreclosure share of 30
9    percent or lower?
10       MR. CRAMER:  Asked and
11   answered.
12       THE WITNESS:  I had arrived
13   at the zero -- the answer is no.
14   I have arrived -- well, let me
15   just say -- strike that.
16       I have arrived at the zero,
17   20 and 30 percent but-for
18   foreclosure share levels in my
19   prior report before having ever
20   written this.  So there is nothing
21   that I -- that I needed in this
22   rebuttal report to simulate those
23   levels.  Those levels, as I
24   explained a few minutes ago, are



Page 371

1   levels that I thought a Court
2   would deem at least not
3   anticompetitive based on my
4   understanding of precedent in the
5   similar cases.
6         So I think that that's where
7   the zero, 20 and 30 percent come
8   from, let's just be clear.  It's
9   not -- it's not from anywhere
10  else.  We are trying to find a
11  level of foreclosure that would be
12  deemed not anticompetitive by a
13  Court.
14        So the questions that you
15  asked me in the last five minutes
16  are -- seem like you are looking
17  for an alternative motivation for
18  how I got to zero, 20 and 30
19  percent.  I am telling you what
20  got me to the zero, 20 and 30
21  percent, I was trying to come up
22  with levels that would basically
23  give Zuffa -- would shield Zuffa
24  from liability in exclusive

Page 372

1   dealing case.
2   BY MR. ISAACSON:
3        Q.   All right.  So I am not here
4   to discuss your motivations about this.
5   I am just here to ask you questions.
6             And my next question is, is
7   there anything in your rebuttal report
8   where you analyze how a but-for world
9   that you have described would achieve a
10  foreclosure rate of 30 percent or lower?
11       A.   I don't think so, but the
12  question, again, has the -- has the
13  causality going in the wrong direction.
14       Q.   All right.  And when you say
15  the causality is going in the wrong
16  direction, by that I am asking you how
17  the but-for world causes a lower
18  foreclosure share.  Are you saying the
19  correct causality is how a lower
20  foreclosure share causes the but-for
21  world?
22       A.   It's closer.  I would say
23  that if what we are trying to do is to --
24  first, we are trying to figure out what

Page 373

1   the wage effect was from Zuffa taking the
2   foreclosure share from the low digits,
3   low single digits up into the -- up into
4   the 90s, say, over the course of the
5   damages period, for the class period.
6   And I say, okay, let's roll it back,
7   let's see what the relationship was
8   between wage share and foreclosure share
9   and then just roll it back to levels that
10  would -- that would give Zuffa -- that
11  would shield Zuffa from antitrust
12  liability.  Okay.
13            And then the next question
14  is, okay, what are -- what are other --
15  you know, you had asked me during the
16  first deposition, how does Zuffa get
17  there, what would they have to do to
18  their contracts to come into compliance
19  with or to ensure that foreclosure was no
20  higher than 30 percent.  And we went
21  through all sorts of different ways that
22  they could restructure their contracts so
23  that it wouldn't -- so that foreclosure
24  levels wouldn't be above 30 percent.

Page 374

1             And Dr. Topel says, I want
2   to know more, not just what they'd have
3   to do to come into compliance, but tell
4   me what other elements would look like,
5   would there be -- would there be
6   co-promotion, would there be the
7   right-to-match clause, would there be
8   this and that and the other.
9             And so in this reply report,
10  I am trying to fill in a little more
11  granularity as to what a plausible
12  but-for world would look like that would
13  be consistent with foreclosure shares of
14  zero, 20 and 30 percent.
15       Q.   Now, when you say that the
16  but-for world you describe in paragraph
17  198 is a plausible but-for world, are
18  there other plausible but-for worlds in
19  your opinion that would be consistent
20  with foreclosure shares of 30 percent or
21  lower?
22       A.   Sure.  Remember, in a
23  footnote I say that while co-promotion
24  would be likely based on these proxies,

MAGNA
LEGAL SERVICES

Page 375

```
 1    it's not -- it's certainly not necessary
 2    to engender competitive outcomes so long
 3    as the markets are more open, less
 4    restrictive and rivals get a foothold and
 5    are able to put forward compelling
 6    matches for MMA audiences.
 7        Q.   Are there -- at this point,
 8    following your rebuttal report, is it
 9    your opinion that there are many ways to
10    get to a lower foreclosure share that
11    would constitute an appropriate but-for
12    world?
13        A.   Well, remember, all that
14    needs to happen to get to a lower
15    foreclosure share is that Zuffa would
16    need to change the parameters of its
17    contracts with fighters in such a way as
18    to ensure that the cumulative duration of
19    the restrictions don't take you over some
20    level that a Court would deem
21    exclusionary.
22             That's all you need to get
23    the foreclosure share down.  We had
24    talked about whether 30 months -- 36
```

Page 376

```
 1    months was too long and, you know, what
 2    would be a -- what would be a duration
 3    that would be acceptable to a Court.
 4             That, to me, is really the
 5    key element of what you need in a
 6    contract to bring the foreclosure share
 7    down to levels of zero, 20 or 30 percent.
 8    After that, what we are doing here is we
 9    are just filling in other aspects of the
10    but-for world that would complement or be
11    consistent with that -- with that
12    outcome.
13        Q.   All right.  So in your
14    opinion, does but-for world have to
15    include contracts that are -- exclusive
16    contracts that are no longer than one
17    year?
18        A.   Well, I think we went
19    through this in the first -- in the first
20    deposition.  But, again, I mean, my
21    answer is not going to change.  It's
22    going to be -- it's going to depend on
23    where -- where the Court would draw the
24    line as to what's considered to be an
```

Page 377

```
 1    exclusionary arrangement.
 2             Now, I have tried to inform
 3    the Court based on what I think is the
 4    average career span of a fighter and
 5    that -- and that when we -- when we
 6    figure out how to draw that line, we
 7    ought to take into consideration how much
 8    of a fighter's remaining career span is
 9    left after they sign with Zuffa.
10             But depending on where that
11    line gets drawn, Zuffa could then
12    construct its contracts in such a way as
13    to comply with that -- with that line,
14    and with an important caveat:  So long as
15    30 percent, say, is tolerated, they
16    could -- they could carve off 30 percent
17    or, in fact, more if the market share is
18    not quite 100 percent.  They could carve
19    off a certain portion of their fighters
20    and subject them to potentially longer
21    contracts.
22             So there is not -- there is
23    not a -- there is not one way to get a
24    foreclosure share under 30, as we
```

Page 378

```
 1    discussed.  There are a lot of ways to
 2    get it down.  But these other parameters
 3    that I am informing right now are things
 4    that help fill in what the but-for world
 5    would look like.  They are meant to
 6    complement or be consistent with.  But
 7    they're -- I think that while we have
 8    been going in circles, these other
 9    parameters, while important, aren't the
10    levers that are pushing foreclosure down
11    to 30, 20 or zero percent.
12        Q.   Okay.  One simple point I
13    had been wondering about based on the
14    support, you had told me before that
15    there is not one way to get foreclosure
16    share under 30; there are a lot of ways
17    to get it down.
18             That's still your opinion?
19        A.   Oh, sure.  I just gave
20    you -- I just gave you two ways to do it.
21    One could be across the board, every
22    single contract contains the same
23    provision.  That would get you down.
24    Another way to do it would be to do a
```

MAGNA
LEGAL SERVICES

Page 379

1   carve-out for a certain set of contracts,
2   but you would have to make sure that
3   those contracts don't account for too
4   large of a share of a market.
5         There are lots of ways that
6   you could restructure the contract, and I
7   have -- of course, I have opinions as to
8   how it could be done to come into
9   compliance with, say, a 30 percent
10  foreclosure requirement.
11        Q.   All right.  And at this
12  point, following your rebuttal report,
13  you are still, depending on your analysis
14  about where the Court draws the line as
15  to what's an exclusionary arrangement.
16        Am I correct about that?
17        MR. CRAMER:  Objection to
18  form.
19        THE WITNESS:  I think that
20  that ultimately would fall to the
21  fact-finder.  I have tried to
22  inform the decision-making based
23  on my experience, my reading of
24  other cases, other economic

Page 380

1   articles and, of course, most
2   importantly, I go back to this,
3   the average career length of a
4   fighter.  I think that all those
5   things should inform what the line
6   should be.
7         I have tried to -- I have
8   tried to offer what I think would
9   be a fair number.  I have -- in
10  fact, in this report, I have
11  pointed to the duration in Zuffa's
12  contracts when it had less market
13  power than it does now as what I
14  think would be a reasonable proxy
15  for the duration of the contract.
16  BY MR. ISAACSON:
17        Q.   All right.  And just to make
18  sure I understand where you are now at
19  the end of your rebuttal report, if the
20  Court were to determine that contracts --
21  exclusive contracts of one year or more
22  were exclusionary, would that -- if --
23  would an appropriate but-for world
24  include one-year contracts or less, plus

Page 381

1   some other parameters or some other
2   possible parameters, as Zuffa said, and
3   that would result in a foreclosure share
4   of 30 percent or lower?
5         MR. CRAMER:  Objection to
6   form.
7         THE WITNESS:  Well, I think
8   we are close.  I think what I am
9   getting tripped up on is you said
10  one year or more would be
11  exclusionary.  And then, of
12  course, if you did it at one year,
13  you wouldn't be in compliance.
14  But how about can we try a
15  different hypothetical or did
16  you -- maybe you meant to do that.
17  BY MR. ISAACSON:
18        Q.   Well, no.  I was not trying
19  to put significance of 365 days versus
20  366.
21        But if the Court drew the
22  line at exclusionary contract of
23  something that's more than one year and
24  instead, that a one-year contract or less

Page 382

1   was not exclusionary --
2         A.   Got it.  Got it.  Sorry.
3   Then I didn't hear that the first time,
4   but I am with you now.
5         Q.   Okay.  With that assumption,
6   in your opinion, would an appropriate
7   but-for world be contracts that were one
8   year or less in duration, plus some other
9   potential parameters that you pointed to
10  in your report and that but-for world
11  result in foreclosure shares of 30
12  percent or less?
13        A.   Well, it's certainly getting
14  closer to what I think would be the
15  appropriate but-for world.  It seems like
16  we could -- we could restructure the
17  contracts by reducing the duration, such
18  that when I went back and calculated
19  foreclosure, it would no longer be in
20  excess of 30 percent, and I think that
21  getting the duration below what the
22  fact-finder deem exclusionary and in
23  violation of the antitrust laws is a
24  smart way to go about it.

MAGNA
LEGAL SERVICES

Page 383

1      Q.   And from that -- and from
2   that, your models -- your damages models
3   and your second impact model would
4   estimate -- would estimate damages impact
5   from that but-for world?
6         MR. CRAMER:  Objection to
7   form.
8         Go ahead.
9         THE WITNESS:  If you give me
10   a but-for foreclosure share, I can
11   tell you what the -- what the --
12   how much wages would go up by.
13   BY MR. ISAACSON:
14      Q.   All right.  Now, if the
15   Court were to rule that an exclusionary
16   contract is over two years and it's not
17   exclusionary, it's two years or less, if
18   you -- would an appropriate but-for world
19   then be contracts that were two years or
20   less, plus some other parameters, and
21   that would achieve a foreclosure share of
22   30 percent or less?
23         MR. CRAMER:  I am going to
24   object to the extent that this

Page 384

1   calls for a legal conclusion.
2         But go ahead and answer, if
3   you understand the question.
4         THE WITNESS:  Let me -- it
5   was a two-parter and let me take
6   the second part, which is probably
7   easier.  And that is, would it --
8   would it get you to a foreclosure
9   share below 30 percent?  And I
10   think that by the construction of
11   your hypothetical, it would, if I
12   understood it correctly.  You are
13   saying the Court deems anything in
14   excess of 24 months --
15         MR. ISAACSON:  Right.
16         THE WITNESS:  -- to be
17   exclusionary -- let me finish --
18   and you asked me to posit a world
19   in which the contracts were
20   exactly 24 months.
21   BY MR. ISAACSON:
22      Q.   My intent is this question
23   two is the same as the last question.  If
24   the Court has ruled that above two years

Page 385

1   is exclusionary and in the first
2   question, that they ruled that above one
3   year was exclusionary.  Everything else
4   -- everything else is the same.
5         MR. CRAMER:  Same objection.
6   BY MR. ISAACSON:
7      Q.   You would still -- if Zuffa
8   moved its contracts down to two years or
9   less, that would achieve foreclosure
10   shares of 30 percent or less?
11      A.   I think that if we draw the
12   line, if one were to draw the line at 25
13   months and if -- and if all of the
14   contracts came in at 24 months, then it's
15   almost tautological.  If that's how we
16   define foreclosure, then the foreclosure
17   would come in at less than 30 percent.
18      Q.   And in that situation, you
19   would reach the same conclusion as to the
20   amount of damages and your second impact
21   analysis -- second impact model would
22   remain the same?
23         MR. CRAMER:  Objection to
24   form, incomplete hypothetical,

Page 386

1   calls for a legal conclusion.
2         THE WITNESS:  I want to
3   think about it a little more, but
4   sitting here, it's not -- it's not
5   obvious how I would change my
6   impact model or damages model
7   based on that hypothetical.  I
8   probably would want to think about
9   it a little more.
10         But my -- what's giving me
11   some reservation is that -- I
12   wouldn't draw the line at 24.  I
13   think the 24 represents too much
14   of a fighter's life span or career
15   span.
16         And so that -- while it
17   would be a significant improvement
18   over where things are today, it's
19   conceivable that a movement
20   from 36, roughly where we are
21   today, to 24, would it engender
22   different competitive effects than
23   a movement from 36 to 12?  I mean,
24   certainly at 12, the market is

MAGNA
LEGAL SERVICES

Page 387

1    more open, there is more worker
2    mobility.
3         Whether or not my model can
4    accommodate that distinction, I
5    would want to think about it some
6    more. I just haven't thought
7    about it yet.
8  BY MR. ISAACSON:
9       Q.   Looking at paragraph 198,
10   there is a couple things you have listed
11   in your plausible but-for world, the
12   third of which is clauses that allow
13   fighters enhanced mobility.
14        What do you mean by that?
15       A.   I guess since I have already
16   listed right-to-match, I would certainly
17   include right-to-match in that. But I am
18   thinking of the other -- the other
19   clauses that are extending the duration
20   or otherwise, tying up or sewing up of
21   fighters with Zuffa.
22       Q.   And the various tolling
23   provisions?
24       A.   Correct. Tolling or

Page 388

1    exclusive -- the exclusive provision. I
2    mean, we could -- we could go through
3    each one, but anything that --
4       Q.   I would rather not.
5       A.   Okay.
6         MR. CRAMER:  Were you done
7    with your answer? Anything that
8    you were about to say.
9         THE WITNESS:  Yeah, anything
10   that extends the duration or
11   otherwise lessens mobility.
12   BY MR. ISAACSON:
13       Q.   Okay. So but when you are
14   saying a plausible but-for world includes
15   clauses that allow fighters enhanced
16   mobility, what are you referring to?
17         MR. CRAMER:  Asked and
18   answered.
19   BY MR. ISAACSON:
20       Q.   For example, are you
21   referring to eliminating all of those
22   tolling restrictions that you have
23   pointed to or something less? I am
24   trying to get an idea of what you are --

Page 389

1    what you are doing here.
2         MR. CRAMER:  Asked and
3    answered.
4         THE WITNESS:  I am referring
5    to any of the restrictions. I am
6    not -- I am saying that it would
7    be plausible that most, if not
8    all, of them would go away. It's
9    conceivable that some would stick
10   around. But I think that what I
11   am trying to capture is a world in
12   which -- in which fighters have
13   greater mobility.
14   BY MR. ISAACSON:
15       Q.   So when you are referring to
16   clauses that allow fighters enhanced
17   mobility, are you assuming that most or
18   all of the tolling provisions go away?
19       A.   If those tolling provisions
20   have the effect of extending the duration
21   of the contracts beyond, say, 12 months,
22   then I think that in a more open and
23   competitive environment, those tolling
24   restrictions would likely go away.

Page 390

1       Q.   All right. So by clauses
2    that allow fighters enhanced mobility,
3    you are thinking of tolling provisions
4    that have the effect of extending the
5    duration of the contracts beyond 12
6    months?
7       A.   Correct.
8       Q.   And in your plausible
9    but-for world, all of those tolling
10   provisions would go away, most of them?
11       A.   I think I gave you an
12   example where I could conceive of a
13   champion's clause staying around but
14   effectively being negated by virtue of
15   other more mobility. I think the point
16   that I am trying to make here, just so
17   that it's clear if it wasn't, is that I
18   am trying to give some granularity to
19   what Zuffa's most likely or most
20   plausible contract would be in a but-for
21   world, and given the -- given the record
22   evidence, this is the best that I can do
23   at trying to give some granularity to
24   that contract.



Page 391

1    Q.   Okay.  The next thing you
2  say is an easier and more certain route
3  to free-agency.
4          What does that mean beyond
5  what you have already described?
6    A.   I think that might just be a
7  restatement of the things that I have
8  described.
9    Q.   All right.  And then
10  enhanced co-promotion, what do you mean
11  by that?
12    A.   So I mean co-promotion in
13  the sense that there would be no
14  restrictions on fighters to participate
15  in an event with a rival MMA promoter.
16  So it's perhaps a broader definition than
17  literally engaging in the -- in the
18  co-promotion.  I think that it would make
19  sense in that world for both promoters to
20  engage in promotion, they would have
21  incentives to do so.
22          But the restriction that I
23  am -- that I have in mind is the
24  restriction that would prevent, say, a

Page 392

1  Zuffa fighter for participating in an
2  event with a non-Zuffa or Zuffa rival
3  promoter.
4    Q.   So you have referred in this
5  to exclusive contracts of one year or
6  less.  Well, maybe not.
7          When you said -- when you
8  say "substantially shorter duration
9  fighter contracts of one year or less,"
10  are those exclusive contracts or
11  nonexclusive contracts?
12    A.   Well, they are exclusive
13  contracts but with a caveat, which is
14  that if there is an opportunity to
15  participate in an event with a rival
16  promoter, if I have No. 1 and you have
17  No. 2 and there is an opportunity to put
18  on an incredible show, that there
19  wouldn't be impediments, contractual
20  impediments to preventing that from
21  happening.
22    Q.   So in your -- in this world,
23  there would be one-year exclusive
24  contracts; however, if there was a

Page 393

1  Bellator event that a UFC fighter wanted
2  to fight in, the UFC fighter could go do
3  that even during the one-year period?
4    A.   I think that's what I have
5  in mind.
6    Q.   And the result of that would
7  be that the UFC and Bellator or other
8  promoters would end up co-promoting
9  events; is that your assumption?
10    A.   I think that once you set in
11  motion the event and it -- and it
12  features a Zuffa fighter, that Zuffa
13  would have strong unilateral incentives
14  to want to promote that event, just as
15  they did with the Conor McGregor boxing
16  match.
17    Q.   And in your opinion, what
18  would happen to MMA in this world, would
19  most events be co-promoted?
20    A.   Well, I don't -- I don't
21  have an opinion as to -- as to whether
22  most would be.  I am just suggesting that
23  there would be more -- there would be
24  more co-promotion than what occurs today.

Page 394

1    Q.   All right.  And is it -- am
2  I correct that with regards to each one
3  of these pieces of your but-for world,
4  such as enhanced co-promotion, you don't
5  have an opinion as to how much that piece
6  would reduce foreclosure share?
7        MR. CRAMER:  Objection to
8  form.
9        THE WITNESS:  I just don't
10  understand the question.  I don't
11  think that foreclosure share, as I
12  have constructed it, would be
13  sensitive to the level of
14  co-promotion.  I think, again, we
15  might have the causality running
16  in the other way.
17  BY MR. ISAACSON:
18    Q.   So in terms -- in terms of
19  your estimates of damages -- various
20  estimates of damages, you are not able to
21  isolate how much of those damages, for
22  example, are due to the lack of the
23  enhanced co-promotion that you describe
24  here?

MAGNA
LEGAL SERVICES

Page 399

1    Without going back over your
2  answers, have your opinions on that
3  changed from the first deposition?
4    MR. CRAMER:  Objection to
5  form.
6    You can answer.
7    THE WITNESS:  No, my
8  opinions haven't changed on that.
9  BY MR. ISAACSON:
10    Q.  Your plausible but-for world
11  in paragraph 198 doesn't mention the
12  ancillary rights provision.
13    Does the ancillary rights
14  provision exist in your but-for world?
15    A.  If it's -- if it's part of
16  the challenged conduct -- I am just going
17  to say something that's tautological.  If
18  it's part of the challenged conduct, then
19  I think it most appropriately leaves in
20  the but-for world.
21    But I don't think that I --
22  in this section, just by memory, I don't
23  recall finding what a -- sorry -- what a
24  smaller rival does with respect to the

Page 400

1  ancillary rights provision or what Zuffa
2  did with respect to ancillary rights
3  provision when it had less market power.
4    So I don't think that in the
5  rebuttal report I gave any kind of
6  specificity or granularity with respect
7  to that provision, and I am reluctant to
8  offer anything new today.
9    Q.  All right.  This is purely a
10  grammatical question.  You said:  I think
11  it most appropriately leaves in the
12  but-for world.
13    By that, do you mean that
14  the ancillary rights provision most
15  appropriately is no longer in existence
16  in the but-for world?
17    MR. CRAMER:  Misstates the
18  testimony.
19    THE WITNESS:  I think if
20  it's part of the challenged
21  conduct and if plaintiffs are
22  including that in the challenged
23  conduct, then we are -- as
24  economists, what we are trying to

Page 401

1    do is model a world in which the
2    challenged conduct is absent.
3  BY MR. ISAACSON:
4    Q.  And in your but-for world,
5  is Zuffa still able to contract for some
6  identity rights?
7    A.  I don't think that there is
8  anything that I have written or read that
9  would suggest that it couldn't contract
10  for identity rights.
11    Q.  And in your but-for world,
12  can Zuffa contract for the identity
13  rights of a fighter for one specific bout
14  in perpetuity?
15    A.  I don't think that I have
16  offered an opinion with that kind of
17  granularity, and I don't think that I am
18  prepared to say that it couldn't or could
19  in a but-for world, sitting here.
20    Q.  All right.  Does the but-for
21  world you describe in your rebuttal
22  report include the sponsorship and
23  endorsement clauses?
24    MR. CRAMER:  Objection to

Page 402

1    form.
2    THE WITNESS:  There are
3    certain aspects of the sponsorship
4    arrangement, in particular what I
5    have referred to as the
6    sponsorship tax, that I thought
7    were anticompetitive in my report.
8    And so I would be loathed to say
9    that we ought to just look the
10    other way with respect to that
11    one.
12    But at the end of the day, I
13    don't -- I don't think that I am
14    offering a firm opinion as to --
15    as to the nature of those aspects
16    of the agreement.
17  BY MR. ISAACSON:
18    Q.  So if hypothetically Zuffa
19  was broadcasting on Fox television and it
20  prohibited a fighter from wearing an ESPN
21  logo on their shorts, you wouldn't have
22  an opinion -- or you wouldn't have an
23  opinion one way or the other as to
24  whether that's in your but-for world; is

MAGNA
LEGAL SERVICES

Page 403

1   that fair?
2       A.   I haven't expressed an
3   opinion.  It seems to me a restriction of
4   that nature could be consistent with a --
5   with a lower foreclosure share, and so as
6   an economist, remember, I go back -- my
7   model turns on the foreclosure share.
8   And so that's how I would attempt to
9   answer that question in the first
10  instance.  And I don't think that I -- my
11  model or anything that I have written or
12  read can inform in any kind of
13  intelligent way an answer to that
14  question.
15      Q.   Okay.  The -- in looking,
16  again, at the substantially shorter
17  duration fighter contracts of one year or
18  less, does that -- does that put any
19  limit on Zuffa re-signing or extending
20  the contract before the year expires in
21  exchange for paying the fighter more
22  money?
23      A.   Well, I think that the
24  plaintiffs are complaining that Zuffa is

Page 404

1   strategically using certain provisions of
2   the contract to lock fighters into
3   effectively perpetual extensions when
4   they want them.  And given that that is
5   part of the challenged conduct, I
6   would -- I would at least hope that if we
7   were to rewrite these in a way that they
8   were in compliance with the antitrust
9   laws, that that sort of gamesmanship
10  would be -- would be either disallowed or
11  much harder to engage in.
12      Q.   Right.  But in your opinion,
13  would those rewrite of the contracts
14  prohibit Zuffa from simply offering
15  fighters more money to extend the
16  contract beyond one year?
17          MR. CRAMER:  Incomplete
18  hypothetical.
19          THE WITNESS:  I don't think
20  that I have an opinion on that.
21  BY MR. ISAACSON:
22      Q.   And if Zuffa did
23  successfully extend the contracts beyond
24  one year by simply paying the fighters

Page 405

1   more money and did that with the same
2   amount of fighters as today, have two- or
3   three-year contracts, would that be
4   anticompetitive?
5           MR. CRAMER:  Incomplete
6   hypothetical, form.
7           THE WITNESS:  Well, when you
8   say did it the same as today, I
9   mean --
10  BY MR. ISAACSON:
11      Q.   The same amount, same
12  numbers.
13          MR. CRAMER:  Objection to
14  form, incomplete hypothetical.
15          THE WITNESS:  I think I
16  would need more specificity in the
17  hypothetical.  But if Zuffa
18  engaged in some of the same
19  tactics that it did today to
20  secure extension, such as refusing
21  to either give a fighter a fight
22  or giving the fighter an
23  inappropriate match-up as a
24  punishment for not extending, I

Page 406

1   think that -- I think that that --
2   that is part of the challenged
3   conduct and I think that those
4   sorts of tactics would be absent
5   in a but-for world.
6   BY MR. ISAACSON:
7       Q.   Okay.  But all I am focused
8   on is if Zuffa pays more money to extend
9   the contract, not the other -- not the
10  other things you are pointing to.
11      A.   I hear you.
12      Q.   If Zuffa did that and
13  extended these contracts to the point
14  where they had the same effective
15  duration as the contracts have today,
16  would that have an anticompetitive effect
17  in your view?
18          MR. CRAMER:  Objection to
19  form, incomplete hypothetical.
20          THE WITNESS:  I mean, the
21  way that I am hearing the question
22  is that if Zuffa were to behave
23  competitively, and that is compete
24  on the merits, and keep fighters

MAGNA
LEGAL SERVICES

Page 431

1   saying is that the but-for wages and wage
2   shares that I am estimating are closer to
3   the fighters' marginal revenue product
4   than what they are currently being paid.
5       Q.   But in your opinion, are the
6   but-for wages that you are estimating
7   approximating the marginal revenue
8   product of the fighters?
9       A.   I am getting caught up on
10  the word "approximating." Can we -- can
11  we agree on something that's a little
12  less strong? How about we are -- we are
13  getting closer to in the but-for world.
14  The simulation is putting fighters at a
15  wage share and wage level that is closer
16  to their marginal revenue product. I am
17  not -- I am not prepared to say that it
18  would -- it would approximate or be
19  exactly equal to 100 percent of the
20  but-for wages.
21      Q.   I need to follow up because
22  getting closer to could mean a little
23  closer to or very closer to. So I could
24  stand in -- at the back of this room and

Page 432

1   take one step forward and get closer to
2   you but still be far away.
3       A.   That's fair.
4       Q.   The -- is the -- are the
5   but-for wages -- but-for wages that you
6   are estimating in your regression, are
7   those close to or -- let me put it this
8   way: The but-for wages that you are
9   estimating in your regression, how close
10  are they to the marginal revenue product
11  of the fighters in your opinion?
12      A.   I haven't estimated the
13  marginal revenue products, so to answer
14  that question, I would have to -- I would
15  have to engage in a -- in a different
16  exercise than what I did here.
17          But I -- what I -- what I
18  can tell you is that when we take the
19  foreclosure share down to 30 percent, we
20  are eviscerating a large part of Zuffa's
21  market power. What I am -- what I am
22  hesitant -- what I am hesitating on and
23  what I am reluctant to say is that the 30
24  percent foreclosure completely

Page 433

1   eviscerates Zuffa's market power to the
2   point that Zuffa is forced to pay
3   fighters equal to their marginal revenue
4   product. That's -- that's quite a
5   statement.
6           And I want to allow for the
7   possibility that with 30 percent
8   foreclosure share, Zuffa could still have
9   some, not as much, but some buying power,
10  such that it could push wages below
11  marginal revenue product, just not to the
12  extent that it's doing today.
13      Q.   Now, you said you haven't
14  estimated the marginal revenue product of
15  the fighters. If you could estimate
16  those, would that -- would you then use
17  that as the dependent -- a dependent
18  variable in your impact regression?
19      A.   No. I intentionally did not
20  estimate the marginal revenue product
21  because it would be one unnecessary step
22  in the process, and I didn't want to
23  introduce an unnecessary step. I did
24  what was needed to be done to simulate

Page 434

1   but-for wage shares.
2       Q.   In your opinion, does the
3   individual marginal revenue product vary
4   among fighters?
5       A.   It could as a matter of
6   theory, yes.
7       Q.   Beyond theory, based on the
8   investigation that you have done in this
9   case, in your opinion, does it actually
10  vary amongst the fighters?
11      A.   Most likely, yes, based on
12  my investigation, I am thinking in
13  particular of a regression in which I
14  estimated the relationship between event
15  revenues and the rank of the highest
16  ranked fighter featured, and it seems to
17  me that so long as rank is capturing
18  productivity, it appears to be that if
19  you put on a fight with a high productive
20  fighter, all things equal, you are going
21  to generate higher event revenue.
22          So that tells me there is
23  going to be variation among the fighters
24  with respect to their ability, basically

Page 435

1  their revenue generation capabilities.
2        Q.   And assuming the status quo,
3  current Zuffa contracts and practices, is
4  there a relationship in your opinion
5  between fighters' marginal revenue
6  product and their individual
7  compensation?
8             MR. CRAMER:  Do you mean in
9        the current world?
10            MR. ISAACSON:  Yes.
11            THE WITNESS:  Yes, I think
12       in the current world, all things
13       equal, the more productive you
14       are, the higher you get paid.
15  BY MR. ISAACSON:
16       Q.   And I think you have said
17  this, but I will just confirm.  You do
18  think that what you would describe as a
19  competitive world, there would be a
20  relationship between marginal revenue --
21  individual marginal revenue product and
22  individual compensation?
23       A.   Well, there is always a
24  relationship, right?  There is a

Page 436

1  relationship in the actual world, there
2  is a relationship in the but-for world.
3  That's Labor Theory 101.  The -- what we
4  are trying to figure out is how the
5  challenged conduct affected or thwarted
6  that relationship.
7        Q.   Okay.  And you have said
8  that event revenue is a proxy for the
9  collective marginal revenue product of
10  the fighters of the event.
11            Is there a way of looking at
12  event revenue to use that as proxy for
13  individual fighter marginal revenue
14  product?
15       A.   Well, I think, again, the
16  way that I have constructed my impact
17  regressions, I have -- I have used the
18  individual compensation relative to the
19  event revenue as my dependent variable.
20  So in a sense, I am trying to decompose
21  event revenue that way.
22       Q.   All right.  And when you say
23  you use individual compensation relative
24  to event revenue, as I understand it, you

Page 437

1  are looking -- some fighters are paid
2  more, some are paid less, and you are
3  using their payments relative to one
4  another to see -- and comparing that to
5  event revenue?
6        A.   I wouldn't -- I wouldn't
7  quite put it that way.
8        Q.   Let me try to put it this
9  way:  The -- I am trying to get something
10  simple here.
11       A.   Okay.
12       Q.   You have someone who is
13  being paid a million dollars for a fight
14  and someone who is being paid $50,000 for
15  a fight.
16       A.   Got it.
17       Q.   You are assuming that the
18  person being paid $50,000 is making --
19  has a lower marginal revenue product than
20  the person being paid a million dollars?
21            MR. CRAMER:  Objection to
22       form.
23            THE WITNESS:  I am not
24       assuming anything.  Just to make

Page 438

1        your hypothetical concrete, let's
2        assume they both fought in the
3        same fight.
4             MR. ISAACSON:  Same event.
5             THE WITNESS:  Okay.  You
6        didn't say that, but I am trying
7        to --
8             MR. ISAACSON:  Right.
9             THE WITNESS:  Right.
10            Let's assume that they both
11       fought in the same event.  What my
12       model is trying to do, it's not
13       assuming anything.  It's letting
14       the data explain to us the
15       relationship between the fighters'
16       attributes and how much of the
17       event revenue that fighter was
18       able to take home as compensation.
19  BY MR. ISAACSON:
20       Q.   All right.  But for your
21  dependent variable, the -- you are
22  relying on the -- for your dependent
23  variable, the person earning $50,000
24  would be making less of a contribution

MAGNA
LEGAL SERVICES

Page 439

1   than the person being paid a million
2   dollars?
3        A.   It makes sense as a matter
4   of theory, but I am not assuming
5   anything.  I am going to let the data
6   explain to me the relationships,
7   basically explain to me why the person
8   who made a million made a million.
9        Q.   But in -- for your -- for
10  your regression in your dependent
11  variable, you are going to input in that
12  example the $50,000 and the million
13  dollars for the two different fighters?
14            MR. CRAMER:  Objection to
15       the form.
16            THE WITNESS:  With a slight
17       adjustment.  Remember, the
18       left-hand side variable is the
19       ratio of the fighters paid to the
20       event revenue.  So with that
21       caveat, yes, those would be -- if
22       you are looking at this as an
23       Excel spreadsheet, those would be
24       two rows in the spreadsheet.  But,

Page 440

1        of course, you need to populate it
2        with all the other variables in
3        the right-hand side.
4            MR. ISAACSON:  All right.
5   BY MR. ISAACSON:
6        Q.   And do you believe that the
7   same group of fighters at a Zuffa event,
8   if they went to a Bellator event, would
9   generate the same event revenue?
10            MR. CRAMER:  Objection to
11       form.
12            THE WITNESS:  To add a
13       little specificity to this
14       question, are we speaking in the
15       actual world or in the but-for
16       world?
17            MR. ISAACSON:  Let's do
18       both.
19            THE WITNESS:  Okay.  Because
20       the answer might -- the answer
21       might depend.  That's the only
22       reason why I bring it up.
23   BY MR. ISAACSON:
24        Q.   In the actual world, the

Page 441

1        present, the current world, if you take
2        the same group of fighters at a Zuffa
3        event and transport them to a Bellator
4        event, same -- everything else equal,
5        same location, same period of time, would
6        you expect that they would generate the
7        same event revenue?
8             MR. CRAMER:  Objection to
9        form, incomplete hypothetical.
10            THE WITNESS:  So I
11       haven't -- I haven't modeled that
12       particular scenario.  I can tell
13       you based on a published article
14       in the literature that I cite and
15       rely on, there is a finding that
16       suggests that the vast majority of
17       event revenues are driven by the
18       identity of the fighters as
19       opposed to the platform.
20            And so to the extent that
21       was your guide, it would suggest
22       to you that the event would, in
23       fact, generate something close to
24       what was generated at Zuffa.

Page 442

1             But I -- in thinking about
2        my model and the way it works in
3        the other analyses that I have
4        performed, I don't know if I
5        have -- if I have conducted that
6        particular estimation.
7   BY MR. ISAACSON:
8        Q.   So you have said -- you both
9   pointed me to an article and said you
10  don't know if you have conducted that
11  particular estimation.  So let me get
12  back over this.
13            Do you have an opinion
14  whether in the actual world, if you take
15  the same group of fighters at a Zuffa
16  event and transport them to a Bellator
17  event that is equal in all other
18  respects, same venue, location,
19  et cetera, that the -- that the Bellator
20  event would generate the same event
21  revenue as the Zuffa event?
22            MR. CRAMER:  Asked --
23  BY MR. ISAACSON:
24        Q.   Do you have an opinion on

MAGNA
LEGAL SERVICES

Page 447

1    A.   I believe so.
2    Q.   Okay.
3         MR. ISAACSON:  We can mark
4    it as 6, just so you have it handy
5    in case you want it.
6              - - -
7         (Singer-6 marked for
8         identification at this time.)
9              - - -
10   BY MR. ISAACSON:
11   Q.   Exhibit-6 is an article by
12   McGowan and Mahon titled Demand For the
13   Ultimate Fighting Championship, an
14   Economic Metric Analysis, a Pay-Per-View
15   Buy Rate.
16        That's the article that you
17   just referred to a little bit before in
18   your testimony?
19   A.   Correct.
20   Q.   And this is -- you cite this
21   in your rebuttal report to support the
22   conclusion that the fighters are the ones
23   who drive event revenue?
24   A.   I also cited it in my

Page 448

1    original report, but I think -- I think I
2    cite it in both reports.
3    Q.   All right.  And did you do
4    anything to replicate, validate or
5    confirm the econometric work that was
6    done in this -- in this article?
7    A.   Yes.
8    Q.   Okay.  What did you do?
9    A.   I estimated a related
10   relationship between event revenues and
11   the rank of the highest ranked fighter
12   featured in the event.
13   Q.   And I will come back to
14   that.  Just in terms of the -- McGowan
15   and Mahon had a data set and performed
16   some regressions.
17        Did you obtain a copy of
18   that data set in an attempt to replicate
19   any of their work?
20   A.   I didn't obtain a copy of
21   their data sent.  However, I have largely
22   the same set of data with respect to
23   pay-per-view sales and event revenues.
24   In fact, I think that one could -- one

Page 449

1    could say I even have a better data set
2    than these guys do by virtue of the
3    discovery that's been propounded in this
4    litigation.
5    Q.   All right.  And the Journal
6    of Business and Economics, are you
7    familiar with that journal?
8    A.   Yes.
9    Q.   Okay.  Who are the editors?
10   A.   I don't know the names of
11   the editors.
12   Q.   All right.  Are you aware of
13   any other studies that agree with this
14   published work?
15   A.   Besides my own?
16   Q.   Yeah, any other published
17   studies?
18   A.   I am not aware of other
19   published studies.
20   Q.   All right.  Paragraph 94 of
21   your rebuttal report, you describe a 1974
22   article by Scully.
23   A.   Would you -- I am sorry.
24   Could I just ask you to give me a second

Page 450

1    to get there?
2    Q.   Sure.
3    A.   It's 97?
4    Q.   Yes.
5         MR. CRAMER:  94 or 97?
6         MR. ISAACSON:  Oh, I am
7    sorry.
8         MR. CRAMER:  94 on page 73.
9         THE WITNESS:  Okay.  I am at
10   94.
11   BY MR. ISAACSON:
12   Q.   All right.  And you refer to
13   the prestigious American Economic Review?
14   A.   Yes.
15   Q.   What makes the American
16   Economic Review a prestigious journal?
17   A.   I think it's considered
18   among economists to be a top-tiered
19   journal in the profession.  Economists
20   have a way of ranking journals.  It --
21   one measure is based on number of
22   citations to the journal and that --
23   that's -- if you can get in AER, you are
24   doing pretty well.

MAGNA
LEGAL SERVICES

Page 451

1    Q.   What would you consider the
2  other top-tiered journals in your
3  profession alongside the American
4  Economic Review?
5    A.   Oh, I think I said that I
6  would put Journal of Economic Literature
7  in there.
8        Are we -- we could go into
9  certain subfields, such as labor journals
10 or sports journals.  Everything has
11 become very specialized these days, but
12 that's -- AER is a -- is a general
13 journal that I think stands out among its
14 peers.  I would put Econometrica in the
15 same category.
16   Q.   Okay.  Journal of Economic
17 Literature, American Economic Review,
18 Econometrica.
19       Any others within -- at the
20 top level field of economics?
21   A.   I am sure there are others,
22 but those are -- those are the most
23 elite, if you will.
24   Q.   Okay.  And within you said

Page 452

1  the subfield of labor economics, what
2  would you consider the prestigious or
3  top-tiered journals there?
4        MR. CRAMER:  Foundation.
5        MR. ISAACSON:  What's the
6  basis of that objection?
7        MR. CRAMER:  The basis of
8  that objection?
9        MR. ISAACSON:  Yes.
10       MR. CRAMER:  I don't -- I
11 don't know that he's studied the
12 top-tiered journals in economics.
13 If he has, he can say so.
14       THE WITNESS:  I believe
15 there is something titled Journal
16 of Labor Economics.  I would -- I
17 would do it the same way.  I
18 would -- I could have the name
19 slightly off.  It could be Review
20 of Labor Economics.  But the
21 important thing is that there
22 are -- there are ways to rank
23 specialty journals, and it's very
24 similar.  And so if you wanted to

Page 453

1        see what the highest ranked labor
2        journals were, you would -- you
3        could go to various rankings that
4        are on the Internet.
5  BY MR. ISAACSON:
6    Q.   And have you done that
7  within the field of labor economics?
8    A.   I seem to recall doing that
9  at some point in my life, not as part of
10 preparation for this deposition or this
11 report.  But I seem to recall studying
12 the rankings or reading an article about
13 rankings of economic journals somewhere
14 during my career.
15   Q.   So at some point during your
16 career, you probably looked at some
17 rankings of the journals of labor
18 economics.
19       But is it fair today you
20 would not be able to identify what were
21 the -- what are the top prestigious
22 journals in the field of labor economics
23 in the way that you did for the field of
24 economics journals that you did

Page 454

1  generally?
2    A.   I think that I would do it
3  the same way that I did it for the
4  general journals.  I think my answer was
5  I would -- I would go to -- I would go to
6  a set of rankings and find it.
7    Q.   I am not -- I am not asking
8  you about the method.  I understand the
9  method that you would look at but in
10 terms of actually being able to name
11 names.
12   A.   Yeah.  Well, of course.  I
13 mean, I could name names, Review of Labor
14 Statistics, for example.  But the
15 question is there is -- the Federal
16 Reserve Bureau puts out I believe
17 specialty journals that are -- that are
18 looking at labor economics, but it's
19 not -- I don't know -- I wouldn't go by
20 my memory or articles that I happened to
21 read.  I would -- I would point you to
22 rankings.
23   Q.   All right.  Today you would
24 not be able to tell me by name the names

Page 455

1    of the top-tier labor economics journals?
2            MR. CRAMER:  Misstates the
3    testimony.
4            THE WITNESS:  Beyond the
5    ones that I just gave you?  I
6    don't know if I could -- if I
7    could give you others.
8    BY MR. ISAACSON:
9        Q.   Well, which ones have you
10   named by name?
11       A.   I think I gave you
12   the Journal of Labor Economics.  I think
13   I gave you Review of Labor Statistics, I
14   believe is one.  I am going by memory
15   here.  I think I have seen some specialty
16   journals as well.
17           I certainly cite articles,
18   but I don't -- I don't -- in various
19   labor journals.  But I would refer you to
20   the rankings instead of going by my
21   memory of labor journals.
22       Q.   Okay.  And you mentioned the
23   subfield of sports.  Are there leading
24   journals in that field that you could

Page 456

1    name?
2        A.   I don't know if I could name
3    them.  I certainly cited articles from
4    them, but I would refer you to the same
5    rankings.
6            THE VIDEOGRAPHER:  Excuse
7    me, Counsel.  We are approaching
8    ten minutes left on the disc.
9            MR. ISAACSON:  Okay.
10            - - -
11           (Off the record at this
12   time.)
13            - - -
14           MR. ISAACSON:  Why don't we
15   just change the tape.
16           THE VIDEOGRAPHER:  The time
17   is 12:22 p.m.  This is the end of
18   Disc 1.  We are off the record.
19            - - -
20           (Off the record at this
21   time.)
22            - - -
23           THE VIDEOGRAPHER:  The time
24   is 12:31 p.m.  This is the start

Page 457

1    of Disc 2.  We are on the record.
2    BY MR. ISAACSON:
3        Q.   You talked before about how
4    individual marginal revenue product
5    varies between fighters, and I think we
6    agree that fighter compensation agrees
7    between various fighters.
8            Does current fighter
9    compensation vary between fighters in the
10   same way that the individual marginal
11   revenue product varies between the
12   fighters?
13           MR. CRAMER:  Objection to
14   form.
15           THE WITNESS:  You used the
16   word "same" and that's what I am
17   tripping up on.  There is
18   certainly a relationship between a
19   fighter's MRP and his or her
20   compensation.
21   BY MR. ISAACSON:
22       Q.   Would you describe that
23   relationship as significant, substantial
24   or minimal or --

Page 458

1        A.   Again, I am going to go back
2    to just basic labor theory, that in a
3    competitive market, the fighter's
4    compensation would be equal to his or her
5    MRP, in a perfectly competitive -- let me
6    stipulate or let me add that caveat.  In
7    a monopsonized labor market, there is a
8    wedge between the MRP and the
9    compensation.
10           And there is certainly a
11   relationship under both extremes, of the
12   monopsonized market and the perfectly
13   competitive market.  And part of the
14   theory of the case is, as you know, that
15   the conduct here upset that normal
16   transmission mechanism, that is, it upset
17   what would have otherwise -- what gains
18   to fighter productivity that would have
19   otherwise been passed along in the form
20   of higher wages didn't occur, in my view,
21   as they -- as they would have in a world
22   absent the restrictions on fighter
23   mobility.
24       Q.   All right.  I understand you

MAGNA
LEGAL SERVICES

Page 479

1    impact that used the labor share event
2    revenue as the dependent variable to
3    measure the alleged anticompetitive
4    effect, including the impact and damages,
5    of a monopsony?
6            MR. CRAMER:  Objection to
7    form.
8            THE WITNESS:  Very close.
9    At the very end of a monopsony, of
10   a monopsonist who engaged in
11   certain challenged conduct.
12   Remember, we are trying to isolate
13   the effect of the challenged
14   conduct.  And I think as you put
15   it, it sounded as if we were
16   trying to isolate the effect
17   Zuffa's monopsony.
18   BY MR. ISAACSON:
19       Q.   So the regression analysis
20   that you used for damages in one case of
21   impact used the labor share of that
22   revenue as the dependent variable to
23   measure the anticompetitive effect,
24   including the impact or damages, of

Page 480

1    alleged monopsonistic conduct?
2            MR. CRAMER:  Objection to
3    form.
4            THE WITNESS:  I don't -- I
5    don't like that one as much as the
6    one that I gave you.
7            MR. ISAACSON:  I thought
8    that's what you gave me.
9            THE WITNESS:  Monopsonistic
10   conduct is fairly broad, and I
11   think that we are looking at a
12   very particular type of conduct.
13   It's the challenged conduct here,
14   the exclusionary conduct.  And
15   so --
16   BY MR. ISAACSON:
17       Q.   All right.  I am just trying
18   to --
19       A.   Okay.
20       Q.   I equated those things.
21       A.   Okay.
22       Q.   But I am trying to use your
23   words.
24       A.   Okay.

Page 481

1        Q.   So your regression analyses
2    for damages in one case for impact used
3    the labor share of event revenues as the
4    dependent variable to measure the
5    anticompetitive effect, including the
6    impact and damages, of the conduct that's
7    challenged in this case?
8        A.   I think that's fair.
9        Q.   Okay.  All right.  Now, can
10   you point me to any journal that has used
11   a regression analysis using the labor
12   share of revenue -- need not be on an
13   event basis -- the labor share revenue as
14   the dependent variable to measure the
15   anticompetitive effect, impact or damages
16   of any conduct by -- any conduct by a
17   monopsonist?
18       A.   As you put it, I think there
19   are several articles in my literature
20   review on the use of labor share to study
21   monopsony in the economics industry and
22   in general, and in sports economics, in
23   particular, that use labor share as the
24   dependent variable in an econometric

Page 482

1    analysis.
2        Q.   Which ones would you point
3    to as having -- again, focusing on the --
4    on the use as the dependent variable?
5        A.   Sure.
6        Q.   If it helps you locate
7    things, you start talking about Scully
8    around paragraph 94.  I am not trying to
9    limit you but to sort of give you a
10   general location in your report.
11       A.   What page?  I am sorry.
12       Q.   Paragraph 94, page 73.
13           MR. CRAMER:  And Section C
14   starts with page 69, the section
15   where you discussed wage shares.
16           MR. ISAACSON:  I am sure you
17   have to go before and after where
18   I pointed you to.
19           THE WITNESS:  I think that I
20   would start with the Scully
21   article.  I plan to march through
22   these one by one, if that's okay
23   with you.
24

MAGNA
LEGAL SERVICES

Page 483

1   BY MR. ISAACSON:
2      Q.   If you would just list them.
3      A.   Sure.  So the Scully article
4   from '74 uses labor share as the
5   dependent variable in the context of an
6   analysis of the impact of monopsony on
7   labor share and the relaxation of certain
8   restrictions, similar to the restrictions
9   that are being challenged here.
10         In footnote 340, I list
11  articles that themselves refer back to
12  Scully's approach to estimating the
13  impact of various changes in labor
14  restrictions in professional sports that
15  also -- let me finish, please -- that
16  also study the impact using the same lens
17  that I did, which is that of labor share.
18      Q.   All right.  My question is
19  only who ran regressions with the labor
20  share as a dependant variable?
21      A.   I would -- I would want to
22  confirm each of those.  Sitting here, I
23  can't tell you that, in fact, they ran
24  regressions.  Sometimes the analysis is

Page 484

1   to look at changes in labor share before
2   and after a change was made to the
3   restrictions in a sport.  And I just --
4   sitting here, I can't be certain that
5   each one of them used regressions.  I can
6   be certain that the dependent variable or
7   the variable of interest was labor share.
8         I would put Scully's article
9   from 2004 into this category.
10      Q.   And when you say you would
11  put it in this category, are you saying
12  Scully in 2004 ran a regression with
13  labor shares of the dependent variable?
14      A.   I believe so.  I know
15  that -- I know that the article uses
16  labor share as the lens with which to
17  view the impact of a change in a labor
18  market restriction in the sport, and I
19  know that there is econometrics in the
20  article.  I can remember, for example,
21  Scully estimating marginal revenue
22  products using econometric models.  I
23  will leave it at that.
24      Q.   Please -- so far, you have

Page 485

1   cited Scully '74 and 2004.
2      A.   Oh, and then I cited -- in
3   footnote 340, the way that we found these
4   articles was by -- was by looking back to
5   citations to Scully where the authors
6   invoked the same lens of analysis to
7   study the impact of a -- of a change,
8   typically in a restriction, but generally
9   of labor mobility on compensation in the
10  sport among athletes.
11      Q.   I think you said, sitting
12  here today, you don't know whether any of
13  the citations in footnote 340 ran a
14  regression with labor share as a
15  dependent variable?
16      A.   That's correct.
17      Q.   Okay.  So please continue
18  with answering my question about any
19  other things you have cited where a
20  regression was run with labor share as a
21  dependent variable.
22      A.   Okay.  Again, I am going to
23  put Kahn in the same category.  This is
24  the cite on 346 and 347.  I think I had

Page 486

1   earlier cited to Kahn, but Kahn is using
2   labor share as the lens of analysis to
3   study a change to labor rules governing
4   baseball, and sitting here, I am
5   hard-pressed to tell you that he used a
6   regression, which is I think the heart of
7   the question, to control for other
8   factors that may have changed around the
9   same time.
10         But whether or not he did, I
11  think the bone of contention between me
12  and your economist was whether -- was
13  whether labor share was the appropriate
14  lens with which to study the change in a
15  labor restriction on player compensation.
16      Q.   My actual question is not --
17         MR. ISAACSON:  And I move to
18  strike the answer.
19  BY MR. ISAACSON:
20      Q.   -- is not -- what's your
21  response to the bones of contention
22  between the economist in this case?  I
23  just want you to list articles with
24  regression analyses where the dependent

Page 487

1   variable was labor share.
2       A.   Okay.
3            MR. CRAMER:  And Dr. Singer
4   is doing that, but he is providing
5   some context as he is discussing
6   these reports and articles.
7            MR. ISAACSON:  I disagree
8   with that.  I move to strike the
9   last answer.
10  BY MR. ISAACSON:
11      Q.   So please --
12           MR. CRAMER:  We oppose.
13  BY MR. ISAACSON:
14      Q.   -- just list articles that
15  you believe have regression analyses with
16  labor share as the -- as the dependent
17  variable.
18           And so far, you believe that
19  includes the Scully article in 1974, you
20  believe it may include the Scully article
21  in 2004.
22      A.   Correct.
23      Q.   So please tell me any
24  others.

Page 488

1       A.   Well, I'm going to -- I am
2   amending that again because I think that
3   footnote that I pointed you to of all
4   the -- of all the articles that were
5   spawned by Scully's approach, which was
6   to use labor share as the lens of
7   analysis, could have, and indeed most
8   likely, did use regression analysis given
9   that that is the primary tool in the tool
10  kit of an economist.
11           But the reason I am
12  hesitating, as I sit here and I look at
13  the passages that I have cited, is that a
14  lot of the analysis is occurring through
15  a method that we refer to as the
16  before/after approach where it's
17  effectively getting at what a regression
18  would do but it's not controlling for all
19  the other things that could influence
20  labor share.
21           And so the fact that an
22  author used a before/after analysis to
23  compute the effect of a change in labor
24  restriction of a wage share, to me, is a

Page 489

1   distinction without -- a difference
2   without a distinction.
3            MR. ISAACSON:  I will move
4   to strike as nonresponsive.
5   BY MR. ISAACSON:
6       Q.   I just -- I understand you
7   don't accept the premise of the question.
8   I just want you to answer the question
9   and tell me articles that you do know,
10  not that could but articles you do know,
11  used a regression analysis with labor
12  share as the dependent variable to
13  measure the effect of monopsony.
14           MR. CRAMER:  Dr. Singer is
15  doing that, but he is allowed to
16  provide context to his answers.
17           MR. ISAACSON:  He's not
18  allowed to make speeches beyond
19  the question.
20           But please go on.
21           MR. CRAMER:  I disagree that
22  he is not allowed to provide
23  context.
24           THE WITNESS:  The Autor

Page 490

1   paper that Dr. Oyer originally
2   cited to use as labor share as the
3   dependent variable in econometric
4   analysis.
5            But I wanted to be thorough
6   and march one by one through the
7   citations that I made.  So I would
8   like to -- I would like to keep
9   going.
10  BY MR. ISAACSON:
11      Q.   Yes, please so.  Why don't
12  you do that.
13      A.   I am going to say the same
14  thing with respect to the Vrooman article
15  in 34 -- cited in footnote 348.  This
16  time in the context --
17      Q.   When you say I want to say
18  the same thing, are you saying that there
19  was a regression with a dependent
20  variable using labor share?
21      A.   My belief is there was.  I
22  don't cite that part of the article.  I
23  am citing -- I am citing the text that I
24  think reveals the author's use of this

Page 495

1  cited in your report used a regression
2  analysis with labor shares as a dependent
3  variable with the exception of the Scully
4  articles and the, is it, Autor?
5      A.   Autor, yes.
6      Q.   Autor paper?
7      A.   Oh, there could be more.  I
8  mean, I would like to go through.  But
9  just sitting here by memory, those two I
10 certainly recall reading econometric --
11 reading about econometric models.
12     Q.   And I am --
13     A.   And in others, I -- my only
14 memory is reading about when they would
15 try to look at what happened to labor
16 share before and after a rule change.
17     Q.   Right.
18     A.   And I just can't tell you,
19 sitting here -- because those are the
20 portions I cited, I can't tell you,
21 sitting here, that I recall with
22 certainty that they also used a
23 regression analysis.  I think that I
24 would have to go back and open up the

Page 496

1  article to see.
2      Q.   All right.  And so I am not
3  trying to preclude you.  I would like to
4  get an answer to my question about what
5  you recall today about regressions using
6  labor share as the dependent variable.
7  And you have named two -- you have named
8  two authors.  You have said there may be
9  others, but you don't recall.
10          Would it assist you in
11 recalling any further to review the
12 citations in your report?
13     A.   It could.  It could but
14 my --
15     Q.   Please complete your review.
16     A.   Okay.  Okay.  I think that
17 what I was doing for each of these
18 citations was finding where the authors
19 described in words what the effect of a
20 rule change was of governing labor
21 restrictions on wage shares.  That was --
22 that was the -- that was the motivation
23 behind the literature review.
24     Q.   I would like you to be

Page 497

1  motivated by answering the question.
2      A.   Fine.
3      Q.   And not identifying these
4  other things.
5          So just focusing on
6  regression analyses with labor share as
7  the dependent variable, please finish
8  reviewing your citations and see if that
9  assists your memory in identifying any
10 that did that.
11     A.   Okay.  I am just going to
12 skip over Topel because my recollection
13 here actually is that he did not use
14 econometrics but, instead, used a
15 before/after method to study wage share.
16          Okay.  So I am going to put
17 the article cited in 367 in the category
18 of using econometric models with labor
19 share as the dependent variable.
20     Q.   All right.
21     A.   370 -- footnote 370 is the
22 Autor paper that I mentioned earlier.
23     Q.   Thank you.
24     A.   I repeat in footnote 379,

Page 498

1  the literature review that Autor gives
2  about the use of labor share as the
3  dependent variable, but, again, sitting
4  here, I can't tell you with certainty
5  that each of these used regression
6  analysis in their approach.
7      Q.   Can you say that any of them
8  did?
9      A.   Sitting here by memory, I
10 just -- I can't say one way or the other.
11          Three -- footnote 395, the
12 De Loecker piece from 2017 uses labor
13 share as the dependent variable and it
14 uses an econometric -- and in conjunction
15 with an econometric analysis.
16          I would put the 2013 paper
17 by Elsby, et al, cited in 396 in the
18 category of labor share as the variable
19 of interest and also using an econometric
20 model.  So I think that takes me to the
21 end of the section.
22     Q.   All right.  So just to sum
23 it up, because we got a bit of narrative,
24 in terms of what you recall today, there

MAGNA
LEGAL SERVICES

Page 499

1   may be others in your footnotes or text,
2   but in terms of what you recall today,
3   the published articles that you recall
4   using regressions to measure a
5   monopsonistic effect with labor share as
6   the dependent variable are the two Scully
7   articles, the Autor article cited in
8   footnote 370, the article cited in
9   footnote 367 by Dobbelaere and
10  Mairesse -- I am probably mangling that
11  name -- the De Loecker article at
12  footnote 395, and the Elsby article at
13  footnote 396.
14          MR. CRAMER:  Did you leave
15  out the Monks articles?
16          MR. ISAACSON:  He did -- he
17  did not put Monks in his
18  regression.
19          THE WITNESS:  I can't say
20  with certainty that Monks did --
21  used regression.  But, of course,
22  anything that's cited in the
23  section could have used
24  regression.  I just -- sitting

Page 500

1          here, I can't say with certainty
2          that it did.
3   BY MR. ISAACSON:
4       Q.   All right.  Now, are
5   there -- can you identify any literature?
6   Let's start with where econometric
7   analysis was used to study the effect of
8   monopsony power on labor that looked at
9   labor -- at the labor share revenue but
10  didn't look also at actual wages.
11      A.   I don't think you can do one
12  without the other.  Even I, when I
13  computed labor share, I had to have wages
14  as my numerator.
15      Q.   Okay.  But in terms -- you
16  don't use actual wages to determine
17  whether there was a monopsony effect
18  either for purposes of impact or damages;
19  is that correct?
20      A.   No, that's not correct.  I
21  used wages in the numerator.
22      Q.   Right.  You use it as an
23  input, but you don't -- I am not going to
24  say this correctly, but I think I have it

Page 501

1   in my head right.
2           You don't use econometric
3   analysis showing the effect -- showing
4   the effect on wages to determine whether
5   there was a monopsonistic effect --
6           MR. CRAMER:  Objection to
7   form.
8   BY MR. ISAACSON:
9       Q.   -- from the challenged
10  conduct?
11      A.   Not on wages in isolation,
12  but wages as stated as a proportion of
13  event revenues.
14      Q.   Right, right.
15      A.   Right.
16      Q.   So are you aware of any
17  articles, published articles, which used
18  econometric analysis to determine the
19  monopsonistic effect on labor share
20  revenue that also didn't look at the
21  effect on actual wages?
22      A.   I think at the end of the
23  day, once you have the effect on wage
24  share, it's a ministerial calculation to

Page 502

1   look at the effect on wages, as I have
2   done.  So I don't think that any of the
3   articles would have just stopped the
4   analysis at wage share.
5       Q.   Are there any
6   before-and-after analyses that look at
7   the before-and-after effect of
8   monopsonistic conduct on the labor share
9   revenue that also don't look at the
10  before-and-after effect on actual wages?
11          MR. CRAMER:  Form.
12          MR. ISAACSON:  And I am
13  referring to published articles.
14          THE WITNESS:  Can I get that
15  back?
16            -  -  -
17          (The reporter read from the
18  record as requested.)
19            -  -  -
20          THE WITNESS:  I think my
21  answer is the same as the last
22  question, which is once you have
23  the effect on labor share, it's a
24  trivial transformation to state

Page 531

1    pertained to Bellator, I think, and
2    Bellator is inside of the tracked.  And
3    so it doesn't make sense to ask whether a
4    fighter in this hypothetical market would
5    substitute to Bellator.  It's already in
6    there.  We are asking if you control all
7    of those fighters, in addition to Zuffa's
8    fighters, in addition to whoever else is
9    inside of the tracked market, would that
10   be enough to permit you to exercise
11   monopsony power.
12        So I could help you along,
13   but asking if they would substitute to
14   Bellator isn't -- is nonsensical.
15        Q.   Well, you agree with me that
16   for the tracked market, Bellator,
17   EliteXC, WEC and other promoters are
18   participants in that market?
19        A.   I don't like to put it that
20   way, no.
21        Q.   All right.  Do you agree
22   that they are customers for the fighters?
23        A.   They are buyers in that --
24   in that market, yes.

Page 532

1        Q.   Okay.  So in the tracked
2    market, did you test whether fighters in
3    that market would move to another buyer
4    in that market such as Bellator if their
5    individual pay declined other than
6    looking at record evidence?
7        A.   No, and that's not
8    the relevant experiment to perform.
9        Q.   Okay.  And in the tracked
10   market, did you test whether fighters in
11   that market would move to another buyer
12   in that market such as World Series of
13   Fighting if their individual pay declined
14   other than looking at record evidence?
15        A.   World Series of Fighting, I
16   just can't recall if that's a promoter
17   that was tracked by FightMetric.  You
18   might -- you might be able to help me
19   out, and then I could give you an answer.
20        Q.   World Series of Fighting is
21   included in the -- is included in Fight
22   Matrix in your tracked -- in your
23   tracked --
24        A.   Did you mean to say Fight --

Page 533

1    FightMetric?
2        Q.   Ranked market.
3        A.   Oh, ranked market.
4        Q.   Yes.
5        A.   So have you identified -- I
6    think it would help me.  You have
7    identified a promoter now for the first
8    time in the series of questions that sits
9    outside of the tracked but inside of the
10   ranked.
11        Q.   Yes.
12        A.   Got it.
13        Q.   And maybe it will help if I
14   repeat the question --
15        A.   Okay.
16        Q.   -- if anybody ever reads
17   this.
18        A.   Okay.
19        Q.   The -- in the -- in the
20   ranked market, did you test whether
21   fighters in that market would move to
22   another buyer in the market such as World
23   Series of Fighting if their individual
24   pay declined other than what you have

Page 534

1    said, you looked at revenue evidence?
2        A.   I would say no.  They are --
3    they are already in the ranked market and
4    so we are not looking at substitution
5    within the ranked market.  That's not the
6    relevant inquiry.
7        Q.   Okay.  And -- all right.
8    Now, for each of those markets, let's go
9    to promoters that are outside the market.
10   Okay.
11        So for the tracked market,
12   did you look at -- did you test whether
13   fighters in that -- let me start over.
14        In the tracked market, other
15   than looking at record evidence, did you
16   test whether fighters in that market
17   would move to another buyer outside the
18   market such as World Series of Fighting
19   if their individual pay declined?
20        A.   I think that it was largely
21   informed through record evidence and
22   through other inferences that I made,
23   such as the profitability of Zuffa's
24   weight suppression with a much smaller

MAGNA
LEGAL SERVICES

Page 535

1   set of fighters.  I think that there was
2   not a separate empirical analysis of
3   defection of fighters from -- the
4   promoters included -- in tracked, for
5   example, into the promoters included in
6   ranked but not in tracked.
7       Q.   And your answer would be the
8   same for ranked that -- in terms of the
9   type of analysis you used?
10      A.   Yes.
11      Q.   And your answer would be the
12  same for the headliner submarket?
13      A.   Correct.
14          MR. CRAMER:  Whenever it's a
15      good time for a break, we have
16      been going for over an hour.
17          MR. ISAACSON:  I think I may
18      be almost finished with something
19      here.
20          MR. CRAMER:  Sure.
21  BY MR. ISAACSON:
22      Q.   Did you consider any
23  narrower definitions to the market, by
24  which I mean did you consider a smaller

Page 536

1   market of buyers than your tracked
2   market?
3       A.   Sure, the headliner market.
4   The headliner submarket, as I like to
5   call it.
6       Q.   Was the headliner submarket
7   the smallest market you considered?
8       A.   That is the smallest market
9   I considered.
10          MR. ISAACSON:  All right.
11      Why don't we take a break.
12          THE VIDEOGRAPHER:  The time
13      is 2:33 p.m.  We are going off the
14      record.
15              - - -
16      (Off the record at this
17      time.)
18              - - -
19          THE VIDEOGRAPHER:  The time
20      is 2:51 p.m.  We are back on the
21      record.  This is the start of
22      Disc 3.
23  BY MR. ISAACSON:
24      Q.   Before the break, we were

Page 537

1   talking about the markets you defined.
2   With respect to the tracked market, did
3   you include all of the fighters that
4   fought for all of the buyers in that
5   market?
6       A.   It's conceivable that there
7   are some fighters who were out listed in
8   FightMetric but are affiliated with a
9   promoters who is.  It's conceivable.  But
10  I think I am more comfortable saying that
11  we let the FightMetric data dictate who
12  was in the market.  It's just whoever
13  they tracked.
14      Q.   Okay.  And the reason that
15  you didn't include all of the fighters
16  for all of the promoters in the tracked
17  market is because you let the FightMetric
18  data dictate who was in the market?
19      A.   Not really.  I think that we
20  are -- we are getting confused again
21  about -- about the market definition
22  exercise and the way that I measured and
23  identified fighters in the market.
24          I used various techniques,

Page 538

1   indirect and direct, of the SSNIP test to
2   try to inform the contours.  And I got to
3   an MMA fighter relevant input market, and
4   then I went out and found two databases,
5   one by FightMetric, another by Fight
6   Matrix, that would allow me to inform or
7   populate who the fighters were in that
8   market after we have defined it using the
9   SSNIP test.
10          So I -- I am just hesitating
11  on the way that you put the question.
12  It's not as if the database dictated who
13  was in the market.  We defined a market
14  as MMA -- professional MMA fighters, and
15  then we went out looking for databases
16  that would allow us to populate that
17  market with actual fighters.
18      Q.   Did you use the SSNIP test
19  to populate who were the buyers in the
20  market you defined?
21      A.   No.
22      Q.   Why -- why didn't you
23  include all of the fighters who fought
24  for buyers in the tracked market in your



Page 543

1    A.   Yes.
2    Q.   Now, your output markets are
3   the live MMA events in which the
4   participating fighters are either in the
5   relevant input market or the relevant
6   input submarket?
7    A.   Yes.
8    Q.   Okay.  And the consumers of
9   the output market include viewers, cable
10  networks, broadcast networks and
11  sponsors; is that fair?
12   A.   Well, certainly, viewers and
13  consumers.
14       Can I hear -- can I hear --
15   Q.   Viewers, cable networks,
16  broadcast networks, sponsors.
17   A.   I feel more comfortable
18  saying that viewers are the -- are the
19  primary consumers in the output market,
20  not the -- not the cable distributors.
21  That's just an intermediary between the
22  viewer and the -- and the producer of the
23  event.
24   Q.   So I am not -- I wasn't

Page 544

1   trying to assess anybody as primary or
2   secondary.
3        Rather, consumers -- do the
4   consumers in your output market include
5   viewers, cable networks, broadcast
6   networks and sponsors?
7        MR. CRAMER:  Asked and
8   answered.
9        THE WITNESS:  I don't recall
10  looking at substitution by
11  sponsors or substitution by cable
12  distributors.  I think that the
13  right lens is that of the
14  consumer's perspective, ultimately
15  the viewer.
16  BY MR. ISAACSON:
17   Q.   All right.  Well, let me use
18  a -- maybe it's my word choice.
19       Are the customers in your
20  relevant output market viewers, cable
21  networks, broadcast networks and
22  sponsors?
23       MR. CRAMER:  Objection to
24  form.

Page 545

1        THE WITNESS:  And let's just
2   focus on cable networks.  Are
3   you -- I took your first question
4   to mean cable distributors.  Are
5   you -- are you intentionally
6   making a distinction between cable
7   networks and cable distributors
8   now?
9   BY MR. ISAACSON:
10   Q.   No.  I am not even sure what
11  you mean by a cable distributors.
12   A.   Oh, a cable distributor
13  would be like Comcast, and a cable
14  network would be like a station or a
15  network that appears on the cable system.
16   Q.   I mean -- well, let's --
17  let's do both.
18   A.   Okay.
19   Q.   So -- so Comcast is under
20  your definition a cable distributor?
21   A.   No.  Comcast is a
22  distributor.
23   Q.   A distributor.  Okay.
24   A.   Comcast happens to be

Page 546

1   vertically integrated into certain
2   networks as well.  But...
3    Q.   All right.  Okay.  So are
4   the customers in your relevant output
5   market viewers, cable stations, cable
6   networks, broadcast networks and
7   sponsors?
8        MR. CRAMER:  Form.
9        THE WITNESS:  I think that
10  I -- the most natural customer to
11  think of in the output market,
12  which is the consumption of the
13  event, is the viewer.  I think
14  that we could -- we could talk
15  about the way that sponsors -- the
16  role that sponsors play in this
17  market and the role that cable
18  networks play, but I -- they are
19  not -- they are not symmetrically
20  aligned with the viewers.  And I
21  think that if -- I am trying to
22  recall the methods that I used to
23  define the contours, and I think
24  it was largely from the

Page 547

1    perspective of viewers.
2  BY MR. ISAACSON:
3        Q.   So for your relevant output
4  market, are sponsors customers in that
5  market?
6        MR. CRAMER:  Asked and
7        answered.
8        THE WITNESS:  I just don't
9        like using -- I don't like using
10       the word "customer."
11 BY MR. ISAACSON:
12       Q.   Okay.  Are -- in your output
13 market, are sponsors buyers in that
14 market?
15       MR. CRAMER:  Asked and
16       answered.
17       THE WITNESS:  Sponsors are
18       buying advertising slots that are
19       associated with the event itself,
20       but I think the consumption of the
21       event is most properly understood
22       from the lens of the viewer, the
23       consumer.
24

Page 548

1  BY MR. ISAACSON:
2        Q.   So does that mean sponsors
3  are not buyers in your relevant output
4  market?
5        MR. CRAMER:  Asked and
6        answered.
7        THE WITNESS:  They buy
8        advertising slots that are sold
9        alongside the event itself, but I
10       am -- I am considering the event
11       as the -- as what's being
12       produced.
13 BY MR. ISAACSON:
14       Q.   Okay.  In your relevant
15 output market, are broadcast networks --
16 I guess you don't like using the term
17 "customers" for broadcast networks; is
18 that --
19       A.   They are certainly not
20 the -- not the ultimate customer.  They
21 are an intermediary that gets them
22 between the ultimate customer and the
23 producer.  And only for a small sliver of
24 events.

Page 549

1        I think the action, the
2  television action at least, is occurring
3  on the pay-per-view side, not on the
4  non-pay-per-view viewing side.
5        Q.   As you define your relevant
6  output market, are broadcast networks
7  customers or buyers?
8        A.   I think the broadcast
9  networks are buying the rights to
10 distribute the events to the ultimate
11 consumer, which is the viewer.  So I
12 still like to think about the consumer or
13 the buyer in the output market, the
14 event, the production of the event as the
15 consumer, the viewer, ultimately.
16       Q.   And so I just need to go
17 over this again because I understand you
18 think the consumer -- you think about the
19 consumer as the -- I guess as the -- as
20 the buyer ultimately, but I am trying to
21 figure out who you are excluding.  I
22 understand you have got the consumers in
23 there.
24       Are broadcast networks

Page 550

1  customers or buyers in your -- in the
2  relevant output market you have defined?
3        MR. CRAMER:  Asked and
4        answered.
5        THE WITNESS:  I think they
6        are an intermediate -- an
7        intermediary that stands between
8        the customers and the producers of
9        the events, and only for a small
10       sliver of what I consider the
11       valuable television that's being
12       produced here.
13 BY MR. ISAACSON:
14       Q.   So does that mean they are
15 or are not customers or buyers in your
16 relevant output market?
17       A.   I think -- sorry.
18       MR. CRAMER:  I was going to
19 say, same objection.
20       Go ahead.  You may answer.
21       THE WITNESS:  I would -- I
22       would say it depends on how you
23       want to -- what question are you
24       trying to answer?



Page 551

1    BY MR. ISAACSON:
2        Q.   I am talking about the
3    questions you are answering that you are
4    defining in your market.  I am talking
5    about your relevant output market.
6        A.   Sure.
7        Q.   Are the buyer -- are the
8    broadcast networks buyers or customers in
9    that market?
10            MR. CRAMER:  Same objection.
11            THE WITNESS:  I think
12       that -- I would have to go back to
13       my initial report, but if I am
14       remembering correctly, I was
15       looking at to where viewers would
16       go in response to a SSNIP in the
17       output market, not where cable
18       distributors would go, not where
19       cable networks would go.  I was
20       looking at where viewers would go.
21       That's my memory, sitting here
22       today, as to -- as to how I
23       performed the SSNIP in the output
24       market.

Page 552

1    BY MR. ISAACSON:
2        Q.   So at the -- by the end of
3    your reply report, you have not done a
4    SSNIP analysis for your output market for
5    sponsors; is that correct?
6            MR. CRAMER:  Objection to
7       form.
8            THE WITNESS:  I would have
9       to go back and look at my initial
10      report, but I -- my -- sitting
11      here, I don't -- I don't recall
12      doing that.
13   BY MR. ISAACSON:
14       Q.   Okay.  And at the end of
15   your reports, for your -- for the
16   relevant output market you have defined,
17   you haven't done a SSNIP analysis for
18   broadcast networks; is that correct?
19       A.   I think the same answer.
20   It's possible I had record evidence that
21   spoke to the views of broadcasters, but
22   I -- sitting here, that's not what I
23   recall.
24       Q.   Okay.  For your relevant

Page 553

1    output market as you define it, you
2    didn't do a SSNIP analysis for cable
3    stations or cable networks?
4        A.   I don't recall doing a
5    SSNIP, but I would have to go back and
6    refer to my -- from that perspective, but
7    I would have to go back and refer to my
8    initial report.
9        Q.   Okay.  And do you -- are you
10   able to say today whether cable stations
11   or cable networks are customers in the
12   relevant output market that you defined?
13       A.   I think that with the caveat
14   that we are studying the non-pay-per-view
15   events, which, of course, are not the
16   important or salient or marketable or
17   valuable component of the content that's
18   being created, I think that you could say
19   that the cable networks can serve as a
20   proxy for the preferences of the ultimate
21   consumers, but I think that I conducted
22   my relevant output market analysis from
23   the perspective of the ultimate consumers
24   or customers, namely, the viewers.

Page 554

1        Q.   Are the consumers the only
2    relative -- relevant customers in the
3    output market you have defined?
4        A.   Can I have it back?
5                 - - -
6            (The reporter read from the
7       record as requested.)
8                 - - -
9    BY MR. ISAACSON:
10       Q.   And by "consumers," I mean
11   individuals who attend or watch events,
12   such as myself.
13       A.   I am going to have it back.
14   I am sorry.
15       Q.   Sure.  I don't blame you.
16                - - -
17           (The reporter read from the
18      record as requested.)
19                - - -
20   BY MR. ISAACSON:
21       Q.   And by "consumers," I mean
22   individuals who attend events or watch
23   them.
24       A.   I don't know what it means

MAGNA
LEGAL SERVICES