# EXHIBIT 10

# Deposition of Alan Manning Excerpts

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                         :  Civil Action
                               :  DOCKET NO.
CUNG LE, NATHAN QUARRY,        :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,       :  (PAL)
LUIS JAVIER VAZQUEZ and        :
KYLE KINGSBURG, on behalf      :  CLASS ACTION
of themselves and all          :
others similarly               :
situated,                      :
                               :
          Plaintiffs,          :
                               :
          v.                   :
                               :
ZUFFA, LLC, d/b/a              :
ULTIMATE FIGHTING              :
CHAMPIONSHIP and UFC,          :
                               :
          Defendants.          :

- - -

Thursday, February 8, 2018
- - -

          Videotaped deposition of
ALAN MANNING, taken pursuant to notice,
was held at the law offices of Berger &
Montague, P.C., 1622 Locust Street,
Philadelphia, Pennsylvania 19103,
beginning at 9:16 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter,
and Notary Public in and for the
Commonwealth of Pennsylvania.
                    *   *   *
          MAGNA LEGAL SERVICES
             (866) 624-6221
             www.MagnaLS.com



1    Q.   That's fine.
2    A.   -- as I come to them.
3         So in paragraph 6, I mean, I
4    expressed the view that it is possible to
5    think in this case that MMA fighters
6    are -- you know, part of the firm's
7    revenue can be ascribed to their
8    activities.
9    Q.   All right.  And I'm looking
10   for anything that you have stated in your
11   report that supports that conclusion,
12   which is similar to your conclusion in
13   paragraph 24.
14   A.   I mean, in the conclusion as
15   well I made the same point that this is.
16   But I think what I would say is that that
17   is the paragraph that makes the case that
18   the fighters are the key workers, but
19   there are -- I would not -- I do not
20   think that I express in that paragraph
21   the totality of the evidence that one
22   could produce to reach that conclusion.
23   I mean, in a way, I think it is fairly
24   straightforward to think that the people

1    are there to watch the fighters, the
2    audience, and so they are the key
3    workers.
4    Q.   All right.  If we can look
5    now at paragraph 31 again where you cited
6    three factors which would be the
7    appropriate circumstances for labor
8    economists to use wage sharing in
9    analyzing compensation.
10        The -- are there any
11   publications or written materials where
12   you have seen these three factors
13   previously described?
14        MR. CRAMER:  Form.
15        You may answer.
16        THE WITNESS:  I mean, I
17   think that -- I mean, perhaps if I
18   work through them one at a time.
19        I think it is, you know,
20   very common if one is trying to
21   assess monopsony power to seek to
22   compare compensation to marginal
23   revenue product.  So that is very
24   well attested.

1         The use of wage share as
2    informative about the extent of
3    competition in the labor markets
4    is well attested, especially in
5    the field of sports economics.
6         I think the second statement
7    that you can't compute wage share
8    if you haven't got data on wage
9    share, I think of that really as a
10   statement of the obvious.  It
11   would be hard to get an academic
12   article published saying you can't
13   compute something if you haven't
14   got data on it.
15        And the third one is that I
16   think it is -- relates to the fact
17   that the nature of the data in
18   this case is unusually rich, that
19   you have something akin to event
20   revenue.
21   BY MR. ISAACSON:
22   Q.   All right.  Have you -- you
23   say -- you list these three factors and
24   say, These are the appropriate

1    circumstances for when labor economists
2    use wage share in analyzing compensation.
3         What I'd like to know is,
4    have you ever seen these three factors
5    articulated before in anything in
6    writing, a publication, an article, a
7    textbook, et cetera?
8         MR. CRAMER:  Asked and
9    answered.
10        THE WITNESS:  I mean, I feel
11   I've answered that one.
12   BY MR. ISAACSON:
13   Q.   Well, you told me about how
14   you've seen them individually, but have
15   you ever -- can you point to me to any
16   publication or other -- anything in
17   writing where someone has said that it's
18   appropriate -- labor economists use wage
19   share in analyzing compensation when
20   three appropriate circumstances are met,
21   and then list these three circumstances?
22   A.   I -- in expressing my
23   opinion, I'm not simply copying out
24   conclusions that are -- it is not a



1  cut-and-paste job from someone else's
2  article.  It is using well-attested
3  techniques and measures from the existing
4  literature, but combining them in a way
5  that I think is wholly appropriate to
6  this particular case.  And that is what I
7  think of actually as trying to express an
8  expert opinion.
9      Q.   All right.  And I understand
10  you think that these are the appropriate
11  circumstances and you stated your reasons
12  for such, but I'd still like to know if
13  anybody -- of you've seen anybody write
14  out before that these are the three
15  appropriate circumstances for labor
16  economists to use wage share in analyzing
17  compensation?
18      MR. CRAMER:  Asked and
19      answered.
20      THE WITNESS:  I feel I've
21      answered it.  These are my own
22      words.  Did I cut and paste these
23      from someone else?  No.
24  BY MR. ISAACSON:

1      Q.   All right.  And when you
2  say -- I know you didn't cut and paste
3  them, but have you seen any -- have you
4  seen anybody list these three criteria,
5  you know, in substance as the appropriate
6  circumstance for when you -- labor
7  economists would use wage share in
8  analyzing compensation?
9      A.   I mean, I -- in my report
10  here I'm trying to express an opinion on,
11  you know, the particular questions I was
12  asked to address, and obviously that
13  is -- in some sense it is -- you know, it
14  is a particular case.  So I am combining
15  well-attested, well-established ideas in
16  a way that is appropriate to that case,
17  and I think that is appropriate to
18  expressing an expert opinion.
19      Q.   Right.  And you've said to
20  me a couple times that you think these
21  three things are appropriate and I
22  understand that.  And you said to me
23  they're not a cut and paste,
24  word-for-word.

1      My question is:  Even if
2  they're not word-for-word, have you seen
3  any publication that lists these three
4  things, in sum and substance, as the
5  appropriate circumstance for a labor
6  economist to analyze wage -- to use wage
7  share in analyzing compensation?
8      A.   I mean, wage share is very,
9  you know, commonly used in the sport
10  economics literature, so I'm drawing --
11  drawing from that.
12      I think the statement of the
13  question, which is the first criterion is
14  really just a statement of the question
15  in this case as I understand it.  So I'm
16  not quite sure how I would take the
17  question in this case from some other
18  pre-existing -- pre-existing.
19      I mean, I think in cases
20  where one is trying to assess the impact
21  of anticompetitive practices, one is
22  trying to compare the actual compensation
23  in this case with compensation in the
24  but-for world.

1      So I think that's completely
2  standard.
3      Q.   All right.  I still don't
4  know whether you're telling me anybody
5  has listed these three things before.
6      A.   I mean, I haven't seen -- I
7  mean, they're totally appropriate, and
8  you know, I'm combining well-attested
9  ideas, well-established ideas in a way
10  that's appropriate to that case, for that
11  combination -- because I'm not aware of
12  somebody who has written about this
13  particular case, that particular
14  combination which I chose to be
15  appropriate to this case and what I
16  think -- that is what I think I should be
17  doing when expressing an expert opinion,
18  I haven't got that.
19      Q.   All right.  So you've
20  reached the opinion that these three
21  factors are the appropriate circumstances
22  to consider in this particular case.
23      Can you point me to
24  anything -- any literature where these



1    three factors were considered appropriate
2    for some other -- for some other type of
3    facts or some other case?
4         A.   Well, I think that -- I
5    mean, let me take them in order.
6         Q.   I would like them in
7    combination.  Not individually, in
8    combination, all three?
9         A.   I think --
10              MR. CRAMER:  Form.
11              You may answer.
12              THE WITNESS:  I mean, what
13         I'm doing here is taking well-
14         established ideas individually and
15         drawing on ideas from established
16         work, well-established, and
17         combining them in a way that is
18         appropriate for this case.  I
19         think that is appropriate to what
20         one is asked to do as an expert.
21    BY MR. ISAACSON:
22         Q.   You've told me that several
23    times.
24         A.   Yeah.

1         Q.   You've got it on the
2    record --
3         A.   Yes.
4         Q.   -- that you feel it is
5    appropriate to combine these three
6    circumstances in this -- for the facts of
7    this case.
8              And what I'm asking you now,
9    have you run across, in any of your
10   research or writing or teaching, any
11   other specific facts or cases where
12   someone said the three circumstances that
13   you've identified are the appropriate way
14   to determine that wage share should be
15   used in analyzing compensation, all three
16   in combination?
17        A.   But there is no equivalent
18   to this case in -- you know, it's about
19   the particular case.
20        Q.   So looking at paragraph 10,
21   you discussed the question in this
22   litigation.
23             "In this litigation, the
24   question to be considered is different.

1    It is, "How do the earnings of fighters
2    compare to what they would have earned in
3    a competitive market?"
4              Is that the appropriate
5    question in this case?
6              MR. CRAMER:  Form.
7         Objection to form.
8              THE WITNESS:  I mean, I
9         think one is seeking a comparison
10        of the actual earnings to what
11        they would have been in the
12        but-for world, which is the
13        absence of the challenged conduct,
14        and I was using the phrase there
15        "competitive market" to refer to
16        absence of the challenged conduct.
17   BY MR. ISAACSON:
18        Q.   And do you understand that
19   Dr. Singer is using foreclosure share and
20   using that to define both the actual
21   world and the reduced foreclosure share
22   as the but-for world?
23        A.   I mean, I haven't studied
24   that or expressed an opinion on it.

1         Q.   Do you have any
2    understanding of -- what is your
3    understanding of foreclosure share as
4    Dr. Singer expresses it?
5         A.   I mean, I haven't studied
6    that to express an opinion on that.
7         Q.   And would you agree with the
8    statement that when monopsony power is
9    high, a firm is able to suppress a
10   worker's compensation below the
11   competitive level?
12        A.   In general, yes, that is
13   what I think happens when you have
14   monopsony in the labor market.
15        Q.   All right.  And is it your
16   understanding that Dr. Singer is using
17   his definition of foreclosure share to
18   express Zuffa's degree of monopsony
19   power?
20        A.   I mean, I haven't expressed
21   an opinion on that.  I haven't been asked
22   to address that.
23        Q.   Do you even -- I understand
24   you haven't expressed an opinion on



1  whether that's appropriate.  Is that your
2  understanding of what Dr. Singer is doing
3  here, that he's using foreclosure share
4  to express Zuffa's amount of monopsony
5  power?
6      A.   I mean, he uses foreclosure
7  share in the actual world and then in a
8  but-for world, but I have not studied his
9  interpretation of it or expressed an
10  opinion -- expressed an opinion on what
11  his interpretation is or reflected on
12  what his interpretation is.
13     Q.   Do you have an opinion about
14  whether the appropriate analysis in this
15  case would look at whether, when
16  foreclosure share is high, wages are low,
17  compared to when foreclosure share is
18  lower?
19          MR. CRAMER:  Objection to
20  form.
21          MR. ISAACSON:  It didn't
22  come out very well.  I agree with
23  you.
24  BY MR. ISAACSON:

1      Q.   Would you agree that the
2  question in this case would look -- would
3  compare high foreclosure shares to lower
4  foreclosure shares and look at
5  compensation in those two situations?
6          MR. CRAMER:  Same objection.
7  You may answer if you
8  understand it.
9          THE WITNESS:  No.
10  BY MR. ISAACSON:
11     Q.   Okay.  All right.  Do you
12  think it's -- do you think Dr. Singer's
13  model would be -- would be appropriate if
14  foreclosure share is not correlated with
15  the marginal revenue product of labor?
16     A.   I'm sorry, I didn't really
17  understand that.
18     Q.   How about this?  Would it be
19  a proper task of Dr. Singer to relate
20  foreclosure share to the level of athlete
21  pay?
22          MR. CRAMER:  Objection to
23  form.
24          THE WITNESS:  I mean, you're

1      now talking about level of pay
2      rather than wage share.
3  BY MR. ISAACSON:
4      Q.   Yes.
5      A.   It's important -- the
6  question here is to compare actual
7  compensation to what the compensation
8  would have been in the but-for world, so
9  it's a comparison not of the level.
10     Q.   Okay.  Would it be a proper
11  test of Dr. Singer's theory to relate
12  foreclosure shares to the actual
13  compensation in the real world compared
14  to the but-for world?
15          MR. CRAMER:  Objection to
16  form.  What do you mean by proper
17  test?
18          If you understand it, you
19  may answer it.
20          THE WITNESS:  I mean, I
21  think my answer to the previous
22  question I think that I was
23  answering, I didn't really
24  understand the distinction between

1      the two questions.
2  BY MR. ISAACSON:
3      Q.   Well, you said the question
4  here is to compare actual compensation to
5  the compensation that would have been in
6  the but-for world.
7          Is it your understanding
8  that you should be comparing actual --
9  under Dr. Singer's analysis that when
10  you're comparing actual compensation to
11  but-for world compensation, you should be
12  looking at two different foreclosure
13  shares, a high foreclosure share and a
14  lower for foreclosure share?
15     A.   I mean, I haven't -- I would
16  have to think about that.  I haven't
17  expressed an opinion on -- on that.  I
18  haven't thought about it.
19     Q.   All right.  Now, in your
20  report, do you reach any conclusions as
21  to whether non-athletic inputs as opposed
22  to just the contribution of athletes
23  contribute to event revenues?
24     A.   I don't reach an opinion on



Page 54

1  to our -- to this case?
2       A.  Yeah.
3       Q.  It would be necessary in
4  this case for that third factor to be
5  true in order to use wage share to
6  analyze compensation?
7       A.  I mean, I haven't -- I
8  haven't given thought to that and I would
9  have to think about that -- I would have
10  to think about that before expressing an
11  opinion on that.
12       Q.  Okay.  Well, let me try it
13  this way:  If that third factor is not
14  met, you would not -- you would not have
15  an opinion in this case that it was
16  appropriate to use wage share to analyze
17  compensation?
18       A.  I mean, I would not put it
19  like that.  I mean, I expressed my
20  opinion that it is appropriate because
21  these facts are there.  I have not
22  considered at all whether if that
23  situation was not satisfied there would
24  be some other way to do that.  So I do

Page 55

1  not have an opinion on whether there
2  isn't another alternative way or not.
3       Q.  All right.  And -- but if
4  you remove that third factor, as of
5  today, you would not have an opinion one
6  way or the other as to whether it was
7  appropriate to use wage share in
8  analyzing compensation in this case?
9       A.  I mean, I'm not sure.  When
10  you say remove -- remove --
11       Q.  If the third factor were not
12  satisfied.
13       A.  So that we didn't have event
14  revenue at all in this case you mean?
15       Q.  No.  No.  So if -- if it was
16  not possible to ascribe a measurable part
17  of a firm's revenue to the activities of
18  a particular worker or group of workers
19  in this case --
20       A.  But I feel one has to --
21       Q.  Let me finish the question.
22       A.  I'm sorry.
23       Q.  If that were not possible,
24  you would not have an opinion today, one

Page 56

1  way or other, as to whether it's
2  appropriate to use wage share in
3  analyzing compensation?
4       A.  But that alternative
5  world -- I mean, I don't feel all the
6  relevant factors in that alternative
7  world and suddenly event revenue is not
8  available are specified.  So I mean, I
9  have concentrated on expressing an
10  opinion on how one should analyze things
11  with the data that is available.  I have
12  not given thought to it or expressed any
13  opinion on what would happen if you
14  suddenly said event revenue was -- was
15  not there.
16       Q.  All right.
17       A.  I mean, there are other --
18       Q.  Let me ask -- I don't mean
19  to interrupt.  Let me ask questions here.
20            So I want to be clear.  I'm
21  not just saying if event revenue is not
22  here.  I'm talking about your third --
23  because I'm not sure what you mean by if
24  event revenue disappears.

Page 57

1            You said something specific
2  here, that it's possible to ascribe a
3  measurable part of a firm's revenue to
4  the activities of a particular worker or
5  group of workers.  If that were not
6  possible, am I correct that as of today,
7  you would not have an opinion that it is
8  appropriate to use wage share in
9  analyzing compensation?  It is possible
10  that you could go do additional analysis
11  and find other factors to justify it, but
12  as of today with that third condition,
13  assuming that third condition has not
14  been met, you would not have an opinion
15  about whether it was appropriate to use
16  wage share in analyzing compensation?
17       A.  Well, I think -- I'm still
18  getting a little bit confused here.  The
19  event revenue is in this case, the part
20  of the firm's revenue which is linked to
21  the activities of a particular group of
22  workers.  So when you say that is not
23  there, I find that hard to imagine what
24  that means except that event revenue is



Page 62

1      THE WITNESS:  I mean, I
2  think that that is -- no, I don't
3  really accept that.  I think it is
4  more generally just saying that
5  the workers are the key people.
6  BY MR. ISAACSON:
7      Q.  All right.  Now, why does
8  what you say in paragraph 24 together
9  with workers being key people mean that a
10  measurable part of a firm's revenue is --
11  can be ascribed to a group -- to a group
12  of fighters in this case?  Where do you
13  get the measurable part?
14      A.  I mean, I think the -- I
15  mean, what I meant by measurable part
16  here is really that there are techniques
17  available in order to control for this.
18      So if one takes Dr. Singer's
19  approach, he's seeing how variation in
20  the foreclosure effect affects the worker
21  share.  All things being equal.
22      Q.  All right.  So as part of
23  your report, you did not do any work as
24  to whether -- do any work that would

Page 63

1  allow you to conclude that a measurable
2  part of a firm's revenue can be
3  attributed to any group of UFC fighters;
4  is that correct?
5      MR. CRAMER:  Asked and
6  answered, form.
7      THE WITNESS:  I mean, I
8  would simply, you know, repeat
9  what I said earlier that here is
10  some revenue coming from this
11  particular event, the fighters are
12  in that event, and so there is a
13  connection between the fighters in
14  that event and the revenue that
15  flows through that event.
16  BY MR. ISAACSON:
17      Q.  But you did not try to
18  measure the amount of that connection; is
19  that correct?
20      A.  I have not worked with the
21  data in this case.
22      Q.  All right.  And is all of
23  the event revenue for the Zuffa event
24  attributable to the fighters?

Page 64

1      MR. CRAMER:  Objection to
2  form.
3      THE WITNESS:  No.  I mean,
4  the claim is not the workers
5  should have 100 percent of the
6  event revenue, that they would
7  have that in the but-for world.
8  The claim is that they would have
9  a higher share than they actually
10  had.
11  BY MR. ISAACSON:
12      Q.  All right.  And based on
13  your -- the work you've done in this
14  case, what is your understanding of what
15  factors contribute to event revenues?
16  You've named the role of athletes.  What
17  else would contribute?
18      A.  I mean, I haven't studied
19  that so I don't have an opinion on that.
20      MR. CRAMER:  We've been
21  going for almost an hour.  If this
22  is a good time to break, we can
23  break.
24      MR. ISAACSON:  Sure.

Page 65

1      THE VIDEOGRAPHER:  The time
2  is 10:12 AM.  We're going off the
3  record.
4      (Recess.)
5      THE VIDEOGRAPHER:  The time
6  is 10:25 AM.  We are back on the
7  record.
8  BY MR. ISAACSON:
9      Q.  Professor Manning, how
10  much -- approximately how many hours did
11  you spend preparing your report in this
12  case?
13      A.  I mean, I haven't got the
14  exact figure in my head.  I mean, I kept
15  a record of how many hours, so I think it
16  was -- I mean, up to what point?
17  Obviously I'm working on it now.
18      Q.  Up to this submission --
19  spent on the report.
20      A.  Okay.  I'm afraid I haven't
21  got the exact figure in my head.
22      Q.  All right.  Can you give me
23  an approximate range?
24      A.  I think it's around about



Page 66

1    30 hours.
2        Q.    All right.  Did anyone
3    assist you in preparing the report?
4        A.    What do you mean by assist
5    in that sense?
6        Q.    However you want to define
7    assist.  Anybody who helped you in any
8    way?
9        A.    Well, they are my opinions.
10   I mean --
11       Q.    That wasn't my question.  I
12   know that they're your opinions.
13            MR. CRAMER:  You mean did he
14   have some kind of --
15   BY MR. ISAACSON:
16       Q.    As broad as you want to take
17   it.  I don't know.
18       A.    Okay.  Well, I mean, the
19   standard -- you know, like the front page
20   and the traditional way that that is
21   presented.
22       Q.    Okay.
23       A.    It was -- you know, that was
24   done for me.

Page 67

1        Q.    Other than the caption on
2    this, you know, the actual report,
3    paragraphs 1 through 31.
4        A.    Okay.
5            MR. CRAMER:  Just so we're
6        clear, we have a stipulation in
7        this case that to the extent you
8        had communications with Counsel
9        that you're not relying upon, for
10       example, not relying upon for the
11       title page, that those
12       communications are not
13       discoverable.
14           MR. ISAACSON:  We'll forgive
15       you if you relied on Counsel for
16       the title page.
17   BY MR. ISAACSON:
18       Q.    But in terms of paragraphs 1
19   through 31, did anyone assist you in
20   preparing paragraphs 1 through 31?
21       A.    I mean, not really assist.
22   I mean, I submitted a draft and then
23   there were minor edits after that draft
24   so...

Page 68

1        Q.    Did you have -- did you work
2    with -- did you work with any non-lawyer
3    on the report?
4        A.    Non-lawyer, no.
5        Q.    Okay.  And if you can look
6    at Exhibit B to the report.
7        A.    Where is this?
8        Q.    It's actually the last
9    page -- last page of the documents, I
10   believe?
11       A.    Okay.  Materials Relied
12   Upon.
13       Q.    Yes, Material Relied Upon.
14   So Exhibit B is a complete set of
15   materials that you relied upon in
16   preparing paragraphs 1 through 31 of your
17   report; is that right?
18       A.    Well, it's my general
19   experience of being a labor economist
20   that informs the views, but I'm not
21   citing every article that I've ever read
22   as a labor economist that has given me,
23   you know, knowledge that I think is
24   useful.

Page 69

1            I mean, these are the court
2    documents that I, you know, relied on,
3    and in the academic literature, those are
4    the ones that I -- the specific ones that
5    I referred to in my report.
6        Q.    Right.  So Exhibit B, which
7    is a requirement for these reports, talks
8    about materials.  So it's not -- I don't
9    need to know about things that were in
10   your head from your experience, I
11   understand that.  But are these materials
12   you relied upon -- is this a complete
13   list of the materials you relied upon in
14   preparing your report?
15           MR. CRAMER:  Asked and
16       answered.
17           THE WITNESS:  Yes.  I mean,
18       they're the ones that I read when
19       I was doing this.
20   BY MR. ISAACSON:
21       Q.    All right.  And so it's fair
22   to say you did not review any piece of
23   the discovery record in this case?
24       A.    I'm not --



Page 70

1        MR. CRAMER:  Objection to
2    form.
3        THE WITNESS:  I'm not quite
4    sure I understand.  Discovery
5    record means?
6    BY MR. ISAACSON:
7        Q.   Depositions, documents
8    produced, testimony, interrogatory
9    responses.  The things that happen in
10   discovery.
11       MR. CRAMER:  That were not
12   cited in any of the reports that
13   he reviewed?
14       MR. ISAACSON:  I'm asking
15   him.
16   BY MR. ISAACSON:
17       Q.   If you reviewed any of the
18   discovery.
19       A.   This is in the report.  Have
20   I read any of the transcripts of the
21   depositions and so on in producing --
22       Q.   Well, let's start with that.
23   Okay.  Let's break it down.
24            In preparing your report,

Page 71

1    did you review any deposition
2    transcripts?
3        A.   No.
4        Q.   Okay.  In preparing your
5    report, did you review any documents that
6    were produced by plaintiffs, defendants
7    or third parties?
8        A.   Not -- I mean, the report --
9    the expert reports refer to some of those
10   but I have not referred to those.
11       Q.   And when expert reports
12   referred to documents, you did not go
13   back and review the documents that they
14   were referring to?
15       A.   I mean, that was not part of
16   my assignment, no.
17       Q.   All right.  And you have not
18   read any deposition transcripts of --
19   well, prior to your report, you did not
20   review any deposition transcripts of any
21   of the experts in this case; is that
22   correct?
23       A.   That's correct.
24       Q.   Okay.  And have you read any

Page 72

1    of the deposition transcripts since your
2    report of the experts?
3        A.   I have.
4        Q.   Okay.  And whose deposition
5    transcripts have you reviewed?
6        A.   Of Dr. Singer and
7    Dr. Zimbalist.
8        Q.   All right.  You have served
9    as an expert witness in one previous
10   case; is that right?
11       A.   Yes.
12       Q.   And that was High Tech
13   Employee Antitrust -- I almost called it
14   a High Tech worker?
15       MR. CRAMER:  Employee.
16   BY MR. ISAACSON:
17       Q.   High Tech Employee antitrust
18   litigation?
19       A.   Yes.
20       Q.   All right.  And were you
21   retained in that case by the Saveri firm?
22       A.   They were one of the -- I
23   mean, I'm not sure, they were not the
24   actual main people I had the contract

Page 73

1    with, but they were involved in the case,
2    I know that.  I'm not quite sure what
3    retained -- you know, what the technical
4    term for that is.
5        Q.   All right.  And who first
6    contacted you about working in this case?
7        A.   In this case?
8        Q.   Yes.
9        A.   I think that was -- my
10   recollection is that that was -- that was
11   Josh.
12       Q.   All right.  And did you give
13   a deposition in High Tech Employees?
14       A.   I did.
15       Q.   Have you ever given
16   testimony at trial as an expert witness?
17       A.   At trial?
18       Q.   Yes.
19       A.   No, that case did not go to
20   trial.
21       Q.   All right.  That's the only
22   other -- this is the second case in which
23   you've served as an offered expert
24   witness?



Page 90

1   product of labor, then you can conclude
2   that if event revenues double, then
3   marginal revenue product of labor has
4   doubled?
5       A.   I'm sorry, could you just
6   read that back?
7       Q.   Sure.
8       A.   I'm a bit confused.
9       Q.   So is what you're saying is
10  that if revenues are proportional to the
11  marginal revenue product of labor, then
12  you can conclude that if event revenues
13  double, then the marginal revenue product
14  of labor has doubled?
15          MR. CRAMER:  Objection to
16      form.
17          You may answer if you
18      understand.
19          THE WITNESS:  I think the if
20      at the start I didn't really
21      agree, and I think I prefer my
22      previous answers to --
23  BY MR. ISAACSON:
24      Q.   Have you done any work in

Page 91

1   this case -- have you done any work
2   reflected in your report that shows
3   that -- that in order for event revenue
4   to double, the marginal revenue product
5   of athletes at the event has to double?
6           MR. CRAMER:  Objection to
7       form.
8           You may answer.
9           THE WITNESS:  I mean, I
10      haven't studied, you know, the
11      data, the particular situations,
12      so I haven't got an opinion on
13      that.
14  BY MR. ISAACSON:
15      Q.   All right.  Is -- the first
16  sentence in paragraph 27 is followed by
17  the sentence, "So the marginal revenue
18  product will be proportional to the event
19  revenue," are you -- is the first
20  sentence in paragraph 27 an example of
21  what happens when event revenue and
22  marginal revenue product are proportional
23  to one another?
24          MR. CRAMER:  Is that all it

Page 92

1   is or -- form.
2           You may answer if you
3   understand.
4           THE WITNESS:  Yeah, I'm
5       sorry, I'm not quite sure I'm
6       understanding.  Can you either
7       read it back or re-express it.
8   BY MR. ISAACSON:
9       Q.   All right.  So paragraph 27
10  concludes -- again this is my effort to
11  understand what you have written.
12      A.   Okay.
13      Q.   Paragraph 27 concludes:
14          "The marginal revenue" --
15  "So the marginal revenue product will be
16  proportional to the event revenue."
17          Is the first sentence in
18  that paragraph an example -- are you
19  presenting an example of what happens
20  when marginal revenue product is
21  proportional to event revenue?
22          MR. CRAMER:  Form.
23          You may answer.
24          THE WITNESS:  The first

Page 93

1       sentence in paragraph 27 is, you
2       know, inviting them to think about
3       a hypothetical situation in which
4       event revenue doubles, and to say
5       that, yes, then the marginal
6       revenue product of labor will
7       double as well.  So they're not --
8       they can vary independently in
9       that example.  So it's simply a
10      way of expressing proportionality,
11      although perhaps it seems not a
12      very clear way.
13  BY MR. ISAACSON:
14      Q.   And maybe it's helpful just
15  to state that the first sentence in
16  paragraph 27 is a hypothetical that
17  you're discussing; is that correct?
18          MR. CRAMER:  Objection to
19      form.
20          You may answer.
21          THE WITNESS:  I mean, I
22      haven't worked with the data in
23      this case.  I mean, so it's
24      hypothetical, but I think it's --



Page 94

1   you know, it's a very plausible,
2   reasonable hypothetical.
3   BY MR. ISAACSON:
4       Q.   And do you have an opinion
5   as to whether the marginal revenue
6   product of inputs to events other than
7   the athlete is proportional to event
8   revenue?
9       A.   I mean, I haven't worked
10  with the data in this case, so I haven't
11  got an opinion on that in this case.
12      Q.   And for your opinion in this
13  case in paragraph 5, that wage share is
14  an appropriate way to analyze the
15  compensation of MMA fighters in this
16  case, is one premise for that conclusion
17  that event revenue is plausibly
18  proportional to marginal revenue product?
19      A.   I mean, this is holding, you
20  know, other things equal, yes.
21      Q.   And if marginal revenue
22  product is not shown to be proportional
23  to event revenue in this case, am I
24  correct you would not be able to reach an

Page 95

1   opinion, without at least further
2   analysis, of whether wage share is an
3   appropriate way to analyze the
4   compensation of MMA fighters in this
5   case?
6           MR. CRAMER:  Objection to
7       form.
8           You may answer.
9           THE WITNESS:  I mean, I
10      haven't considered the other case,
11      so that, I mean, I haven't got an
12      opinion.  I would have to -- have
13      to think about that.  But that
14      isn't the same as saying it would
15      not be possible.
16  BY MR. ISAACSON:
17      Q.   All right.  Would you agree
18  that if the marginal revenue product of
19  the inputs other than the athletes was
20  not proportional, then the -- to event
21  revenue, then the marginal revenue
22  product of the fighters would also not be
23  proportional?
24          MR. CRAMER:  Objection to

Page 96

1       form.
2           THE WITNESS:  I don't think
3       that -- I mean, I haven't thought
4       about that, so I would have to
5       think about that.
6   BY MR. ISAACSON:
7       Q.   All right.  Based on your
8   work as a labor economist, do you think
9   it's accepted that higher wages for
10  workers means that they will be retained
11  more effectively?
12      A.   I mean, higher wages
13  relative to alternatives that they might
14  have.  I mean, so I think it's more an
15  expression not of the level of wages, but
16  wages in one firm relative to other
17  opportunity.  And obviously in this case
18  those other opportunities are being
19  restricted.
20      Q.   Do you agree that those in
21  higher paid jobs are less likely to look
22  for other jobs?
23          MR. CRAMER:  Objection to
24      form.

Page 97

1           THE WITNESS:  I have -- you
2       know, I have done some, I believe
3       in the book that I wrote in 2003
4       there was some regressions that
5       they were looking at -- and this
6       is controlling for other factors,
7       and one has to understand that
8       that's across the whole of the
9       market, so I would not draw the
10      conclusion from that, that that
11      was -- the conclusions of those
12      regressions would be applicable in
13      this particular case, to this type
14      of labor, which is -- you know, is
15      rather different in some ways from
16      what most people are doing.
17  BY MR. ISAACSON:
18      Q.   So while you would not
19  necessarily apply that conclusion here,
20  it's fair to say that based on the work
21  you've done, that generally in the labor
22  market, those in higher paid jobs are
23  less likely to look for other jobs?
24      A.   It's higher paid relative to



Page 118

1  dependent variable; is that correct?
2      A.   The datasets that I'm using
3  in this chapter simply would -- do not
4  have data that's available to use, a
5  computer wage share.
6      Q.   But am I correct that for
7  this regression you used wages, not wage
8  share as the dependent variable?
9      A.   These are the -- I mean, the
10  log of wages, but I think there are also
11  some regressions in which I do it the
12  other way round, what I call the reverse
13  regression.
14      Q.   Well, let's go to the
15  reverse regression, which is page 91.
16  Let me just -- let me make sure. We're
17  going to go through each one of these.
18      A.   Sure.
19      Q.   Let me just -- for the first
20  regression at page 81, you used the log
21  wages, meaning you used actual wages and
22  not wage shares as the dependent
23  variable; is that correct?
24      A.   I could not have used wage

Page 119

1  share, so this is not a choice, this was
2  a necessity.
3      Q.   Right. But you did use
4  wages?
5      A.   I did -- yes, log wages is
6  what ends up on the left-hand side of
7  these regressions.
8      Q.   All right. Now, on 4.3,
9  Reverse Regressions, this method involves
10  estimating a regression on employment on
11  wages, correct?
12      A.   Well, log employment and log
13  wages without a controlling --
14      Q.   All right. And you just
15  referred to log wages. This method used
16  wages not wage shares though as the
17  dependent variable; is that right?
18      A.   It's the same dataset, so
19  again, that was not a choice but a
20  necessity.
21      Q.   All right.
22          THE VIDEOGRAPHER: Excuse
23  me, Counsel. We're about ten
24  minutes away from the end.

Page 120

1          MR. ISAACSON: All right.
2  Let me see if I can get through
3  this chapter.
4  BY ISAACSON:
5      Q.   Now -- then going to page
6  96. This is another -- a third method
7  that you're proposing.
8      A.   I think I would say I'm
9  discussing.
10      Q.   Discussing. Okay. The
11  third method that you're discussing. And
12  this method involves estimating the
13  elasticity of recruitment and elasticity
14  of quitting, comparing the two; is that
15  right?
16      A.   I'm not sure -- it's
17  estimating how sensitive are separations
18  to wages holding other things equal.
19      Q.   All right. And this method
20  doesn't use wage share in any way; is
21  that correct?
22      A.   Again, the same datasets and
23  so there is no way to compute wage share
24  in these datasets, and so that is not a

Page 121

1  choice but a necessity.
2      Q.   All right. Is there a
3  regression you believe that would be
4  found in your book in which you proposed
5  any methods for testing monopsony that
6  involved wage share as the dependent
7  variable?
8      A.   I mean, the datasets -- of
9  the datasets that I used in that book,
10  and there are really quite a lot of
11  datasets, I don't think there was any
12  datasets which would have allowed the
13  computation of wage share.
14      Q.   All right.
15          MR. ISAACSON: Why don't we
16  change tape?
17          MR. CRAMER: Take a break?
18          THE VIDEOGRAPHER: The time
19  is 11:21 AM. We're going off the
20  record. This is the end of Disk
21  1.
22          (Recess.)
23          THE VIDEOGRAPHER: The time
24  is 11:33 AM. This is the start of

MAGNA
LEGAL SERVICES

1      Disk 2.  We're on the record.
2  BY MR. ISAACSON:
3      Q.   If we can look at paragraph
4  30 of your report.  You discuss a
5  criticism of Dr. Topel's report and you
6  discuss the concept of endogeneity, if
7  I'm saying that correctly?
8      A.   Endogeneity.  I would say --
9  it's a British, you know, accent.  I
10  don't know if you prefer to say our way
11  of --
12      Q.   Yeah.  How do you say it
13  your way?
14      A.   Endogeneity.
15      Q.   Endogeneity.  Okay.  The --
16          MR. ISAACSON:  That's how
17      it's spelled no matter how you
18      pronounce it.
19  BY MR. ISAACSON:
20      Q.   All right.  Now, as I
21  understand it, under your critique, event
22  revenue, which Professor Topel includes
23  on the right-hand side of his regression
24  is endogenous with the level of athlete

1      Q.   All right.  So do I have
2  this right:  So your -- the criticism
3  would be that event revenue on the
4  right-hand side of the regression -- let
5  me start over.
6          So assuming that event
7  revenue is correlated with part of the
8  dependent variable, then you're unable
9  to -- then the regression is flawed, is
10  that the critique?
11      A.   I mean, I think that way of
12  expressing it -- I mean, I prefer, and
13  this is a technical concept, so I
14  prefer -- I mean, I understand the
15  attempt to express it in perhaps less
16  technical language, but I think in order
17  to be accurate, that wouldn't be a way in
18  which it would be technically expressed.
19      Q.   Well, you're right about
20  what I'm attempting to do, but I'm not
21  trying to be inaccurate.  So let's see if
22  we can meet with something that a
23  layperson can understand but that's also
24  technically accurate.

1  compensation, which is Professor Topel's
2  dependent variable.
3          Do I have that correct?
4      A.   Well, endogeneity refers to
5  a situation when the right hand, which is
6  the variable here, event revenue, is
7  correlated with the residual and
8  regression.  So this is the part of the
9  dependent variable that cannot be
10  explained by the other variables.
11          So it's not -- I don't think
12  it's quite the way you expressed it.  So
13  it's more about the correlation -- it is,
14  it is not more about, it is about a
15  situation where the residual of the
16  regression is correlated with the -- a
17  regressive, in this case event revenue.
18      Q.   By the residual in the
19  regression, do you mean the dependent
20  variable or something else?
21      A.   No, that's something else.
22  That's the part of the dependent variable
23  that you cannot explain using the
24  regressors.

1          The -- so under your
2  critique, event revenue is endogenous
3  because if athlete compensation goes up,
4  then event revenue goes up; is that
5  right?
6      A.   I'm -- I'm sorry, could you
7  say this again?  That if --
8      Q.   Well, let me -- so the --
9  the endogeneity here comes from event
10  revenue; is that right?
11      A.   So event revenue is, yeah,
12  the endogenous variable in this.
13      Q.   Right.  And the event
14  revenue is the endogenous variable
15  because if fighter compensation goes up,
16  then event revenue goes up; is that
17  correct?
18      A.   I mean, that's -- I mean I
19  think that's not really how it would be
20  expressed.  I mean, if I translated that
21  into technical language, that is not the
22  technical definition of endogeneity.  So
23  what -- I'm slightly worried that that
24  would then be misinterpreted as an