# Exhibit 52

Deposition of Hal J. Singer, Ph.D. (September 27, 2017) (excerpted)

PUBLIC COPY - REDACTED

PUBLIC COPY - REDACTED

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURY, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -
Wednesday, September 27, 2017
- - -

    Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

\* \* \*
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

**PUBLIC COPY - REDACTED**



Page 118

1  opposed to as a percentage of revenue?
2          MR. CRAMER:  Objection to
3      form, to generally.  For what
4      purpose?
5          THE WITNESS:  A firm could,
6      if a firm bills -- if a law firm
7      bills an associate out at $400 an
8      hour, it could express what the --
9      what the young lawyer's salary on
10     an hourly basis is as a -- under
11     an assumed utilization rate as a
12     percentage of that young lawyer's
13     bill rate.
14 BY MR. ISAACSON:
15     Q.  And are you aware of any
16 studies which express the marginal
17 revenue product of labor in terms of the
18 percentage of revenue of the firm?
19     A.  I'm not aware, but as you've
20 expressed it, that's not quite what I'm
21 doing either.
22     Q.  Now, in terms of -- did you
23 make any effort to measure the marginal
24 revenue product of labor of UFC fighters?

Page 119

1     A.  Yes.
2     Q.  Okay.  And what would you
3  point to me for that?
4     A.  What I did, which is I -- I
5  calculated the average revenue per event,
6  per fighter, and I'm using that as a
7  proxy for the marginal revenue product.
8     Q.  All right.  If the
9  average -- when you look at the average
10 revenue per event, per fighter, how do
11 you determine what part of that revenue
12 is the contribution of the fighter as
13 opposed to, for example, marketing,
14 promotions, production or the work of the
15 overall firm?
16     A.  So for my purposes, I don't
17 need to figure out that -- that
18 decomposition.  I will note, however,
19 that I cite a study in my literature
20 review section that suggests that the
21 fighter is responsible for, if not all,
22 the vast majority of -- of the
23 pay-per-view revenues that are captured
24 and not the brand.

Page 120

1     Q.  Well, I didn't ask about the
2  brand.
3          The -- you would agree --
4  you would agree with me that effective
5  marketing and promotion could increase
6  the average revenue per event, correct?
7     A.  Yes.
8     Q.  And you would agree with me
9  that super- -- improving television
10 production can increase the average
11 revenue per event?
12         MR. CRAMER:  All things
13     equal?
14         MR. ISAACSON:  Yes.
15         THE WITNESS:  I'm not sure
16     what -- what you mean by improving
17     television production.
18 BY MR. ISAACSON:
19     Q.  A better production that
20 people enjoy more.
21         MR. CRAMER:  Objection to
22     form.
23         THE WITNESS:  And you're
24     asking me if I can conceive of

Page 121

1     this as a matter of theory?
2  BY MR. ISAACSON:
3     Q.  Yes.
4     A.  As opposed to whether it
5  actually happened?
6     Q.  Yes.
7     A.  I think I'm -- I'm going to
8  grant you that as a matter of theory one
9  could -- one could add value by
10 increasing the quality of the production.
11     Q.  Okay.  Now, in this case,
12 you did not do an actual study yourself
13 of the contribution of the UFC fighters
14 to the average revenue per event; is that
15 right?
16         MR. CRAMER:  Asked and
17     answered.
18         THE WITNESS:  I think that's
19     correct.  As I noted a few moments
20     ago, that was not necessary for my
21     purposes.
22 BY MR. ISAACSON:
23     Q.  By using the average revenue
24 per event, per fighter as a proxy, were



**PUBLIC COPY - REDACTED**

Page 122

1  you using that as a proxy for the
2  marginal revenue product of that labor?
3    A.  Yes.
4    Q.  Okay.  And you were assuming
5  that all of that average revenue per
6  event, per fighter was the product of
7  that labor as opposed to some other
8  source?
9        MR. CRAMER:  Form.
10       THE WITNESS:  No, I don't
11   think I'm assuming that.
12 BY MR. ISAACSON:
13   Q.  When -- when you look at
14 average revenue -- I'm sorry.  When you
15 ordinarily look at the marginal revenue
16 product of labor, do you talk about
17 everybody who works in the firm including
18 management?
19       MR. CRAMER:  Objection to
20   form.
21       THE WITNESS:  If -- if this
22   were some other case and you were
23   interested in computing the
24   marginal revenue product of

Page 123

1    management, you might -- you might
2    be interested in that.  But that
3    wasn't what I was trying to do
4    here.
5  BY MR. ISAACSON:
6    Q.  All right.  Here, have you
7  attempted to actually estimate the
8  marginal revenue product of the fighter
9  portion of the labor force of the UFC?
10       MR. CRAMER:  Objection to
11   form.
12       THE WITNESS:  I think you're
13   getting at the same question now,
14   just asked in a different way
15   which is have I done a
16   decomposition of the marginal
17   revenue product between the
18   fighters and -- and Zuffa, and the
19   answer is no, I have not done that
20   decomposition.
21 BY MR. ISAACSON:

Page 124

[redacted]

Page 125

4    Q.  You, yourself, have not
5  looked at the levels of pay over time
6  paid to Zuffa's fighters other than
7  looking at this study?
8        MR. CRAMER:  Objection to
9    form.
10       THE WITNESS:  So I wouldn't
11   put it that way.
12 BY MR. ISAACSON:
13   Q.  How would you put it?
14   A.  I am absolutely looking at
15 their pay over time in the sense that I'm
16 recording their pay as the numerator of
17 my dependent variable.  So to suggest
18 that I'm not looking at their -- their
19 pay is erroneous.
20   Q.  All right.  The -- was there
21 a period where the average revenue per
22 event in UFC had -- have you looked at
23 any periods where there were abrupt jumps
24 in that?

PUBLIC COPY - REDACTED

MAGNA LEGAL SERVICES

Page 290

```
 1   studied that and I imagine for someone
 2   who lives very far from the venue where
 3   the live event is staged, they would not
 4   be considered reasonably close
 5   substitutes.
 6        Q.   So for your input markets,
 7   what evidence did you take into account
 8   to assess customer's likely response to
 9   price increase in the SSNIP analysis?
10   And feel free to point me to the sections
11   of your report that --
12        A.   Did you mean to say -- I
13   think you just conflated the input
14   markets and customers.  Maybe we should
15   start over.
16        Q.   Yes, I said price increase
17   rather than wage decrease, but let me
18   just put it this way:  What evidence in
19   your report did you take into account to
20   assess the likely response to a SSNIP in
21   the input markets?
22        A.   Sure.  So there it's the
23   perspective of the fighters not the
24   customers.  So I was tripping up over
```

Page 291

```
 1   your --
 2        Q.   Yes.
 3        A.   -- injecting customers when
 4   we're talking about input markets.
 5        So I can take you to the
 6   relevant sections, and I will, but of
 7   course at high levels, I'm looking at
 8   record evidence of -- of what fighters
 9   and promoters thought about substitution
10   possibilities as you -- if you were to
11   move away from Zuffa to counteract a
12   hypothetical wage cut.
13        Q.   Okay.  So the first thing
14   you looked at was record evidence of
15   substitution.
16        A.   Or the perception of
17   substitution from the stakeholders, the
18   fighters, the promoters, and I'll just
19   point you, if you --
20        Q.   That's -- that's sufficient
21   for -- for item 1.
22            MR. CRAMER:  You asked him
23        to look at his report.
24            MR. ISAACSON:  I'm going
```

Page 292

```
 1        to --
 2            MR. CRAMER:  Okay.
 3            MR. ISAACSON:  I'm not going
 4        to ask him to recite all the
 5        documentary evidence.
 6   BY MR. ISAACSON:
 7        Q.   And I understand that
 8   there's documentary evidence that you're
 9   not reciting today.
10            Okay.  Other than the record
11   evidence of the -- about sub- --
12   perceptions of substitutability from the
13   stakeholders, what would be other parts
14   of your SSNIP analysis for the input
15   market?
16        A.   I would direct you to
17   Section 3A 1 for all of the evidence that
18   I used to inform the construction of the
19   relevant input market.
20        Q.   That would be the record
21   evidence that you were referring to?
22        A.   Well, record evidence is
23   fairly broad, right, because it
24   encompasses almost everything.  But I
```

Page 293

```
 1   will point -- to me the -- what helps to
 2   guide me to the findings that I made with
 3   respect to the input market was the fact
 4   that Zuffa was able to successfully
 5   suppress fighter wages, wages either
 6   measured by -- by wage share, regression
 7   or by knowledge of the fact that wage
 8   shares were falling over time from
 9   26 percent to 18 percent, yet Zuffa did
10   not suffer sufficient defection so as to
11   render that wage decrease unprofitable.
12            Now, that -- that tells you,
13   as a matter of economics, that a -- that
14   a reasonable starting place for defining
15   the contours of the relevant input market
16   is just the fighters under Zuffa's
17   control.  That was the -- the first thing
18   that occurred to me.
19            And once you -- once you
20   start there, you can start looking at
21   record evidence to determine whether
22   additional fighters from -- from rival
23   promotions ought to be included so that
24   you eventually get to the smallest set of
```


PUBLIC COPY - REDACTED

```
                                                Page 294
 1   fighters such that a hypothetical
 2   monopsonist could profitably exercise
 3   monopsony power.
 4        Q.   All right.  And you said
 5   that Zuffa was able to successfully
 6   suppress fighter wages -- wage share.
 7   You were talking only about the share of
 8   revenues there, correct?
 9        A.   Correct.
                                  [REDACTED]

                                                Page 295
                                  [REDACTED]
 5   BY MR. ISAACSON:
 6        Q.   All right.  But in your --
 7   in your hypothetical there you held
 8   revenues constant.  Did you look at, as
 9   part of your analysis of the input market
10   and defining that market, as to whether
11   Zuffa actually suppressed actual wages?
12           MR. CRAMER:  Objection to
13        form.
14   BY MR. ISAACSON:
15        Q.   As opposed to wage share?
16           MR. CRAMER:  Same objection.
17           THE WITNESS:  I'm focused on
18        wage share, of course, because
19        it's the right thing to look at
20        from an economic perspective.
21        We're trying to measure
22        exploitation, and the textbooks
23        tell you to do it as a share of
24        marginal revenue product.

                                                Page 296
 1   BY MR. ISAACSON:
 2        Q.   So my actual question was --
 3   I understand you're focused on that, but
 4   my question is, did you look at whether
 5   Zuffa actually suppressed actual wages?
 6        A.   Without controlling for
 7   revenues, no.  Because it's incorrect to
 8   do so.
 9        Q.   So in performing your SSNIP
10   analysis for the input markets, is it
11   fair to say that you relied on the record
12   evidence about the issue of perceived
13   substitution from the stakeholders along
14   with your observations that when Zuffa
15   suppressed fighter wage shares, there
16   weren't significant defections?
17        A.   I think -- I think that
18   encompasses a lot.  I also think that
19   Zuffa in its ordinary course of business
20   made use of a FightMetrics (sic)
21   database.  I had -- the very first thing
22   I did when I -- when I got this case was
23   I started reading the economic literature
24   on the MMA industry, and almost every

                                                Page 297
 1   article I read, the FightMetrics (sic)
 2   database formed the foundation of their
 3   empirical analysis.
 4           So I thought that that was a
 5   reasonable place to begin to posit what
 6   the smallest set of fighters that could
 7   be under the control of a hypothetical
 8   monopsony would be in order for it to
 9   exercise market power.
10        Q.   All right.  Why did you use
11   the smallest set of fighters not the
12   smallest amount of promoters?
13        A.   Well, because we're looking
14   at the input market.  The fighters form
15   the elements of the input market.  They
16   happen to belong to promoters, but
17   fighters are the elements or the
18   ingredients.
19           But I'm -- if I'm a
20   fighter -- just to make it clear, if I'm
21   a fighter and I'm thinking about
22   substituting, defecting from UFC and
23   going to a rival promotion, I don't care
24   what the name of the promotion is or
```



PUBLIC COPY - REDACTED

Page 298

1  who's running it or who the chief
2  matchmaker is, I want to make sure that
3  I'm going to be put inside of a pool
4  of -- of fighters such that I have a
5  prospect of elevating through the ranks.
6  It's the fighters that determine what a
7  reasonable substitute is when fighters
8  are considering defecting.
9      Q.  Now, you're not suggesting
10 that Zuffa used the Fight Matrix data to
11 define a market, are you?
12     A.  Well, you just toggled from
13 FightMetrics (sic) to Fight Matrix.
14     Q.  I'm sorry, FightMetrics
15 (sic).  Sorry.  I was bound to do that
16 today.
17         But you're not suggesting
18 that Zuffa used FightMetrics (sic) data
19 to define a market?
20     A.  I'm suggesting that firms
21 are not -- are not employed -- firms are
22 not in the businesses of defining
23 relevant product markets as the normal
24 course of business, right?  They're doing

Page 299

1  something else.  Defining markets is the
2  task of an antitrust economist.
3      Q.  All right.
4      A.  But I do think it's
5  important that Zuffa uses and relies on
6  the FightMetrics (sic) database in its
7  ordinary course of business.
8      Q.  All right.  And is that part
9  of -- do you consider that -- that
10 observation that Zuffa relies on the
11 FightMetrics (sic) database to be part of
12 your SSNIP analysis?
13     A.  I think it undergirds the
14 conclusion that -- that this is the
15 relevant set of fighters that would need
16 to be under the control of a hypothetical
17 monopsonist so that the wage decrease
18 below competitive levels would not be
19 rendered unprofitable.
20     Q.  Right.  So does your SSNIP
21 analysis for the input markets consist of
22 anything other than the things that
23 you've listed so far:  The record
24 evidence of substitution -- of

Page 300

1  perceptions of substitutability from
2  stakeholders, your observations about how
3  Zuffa suppressed fighter wage shares
4  without defections or significant
5  defections, and Zuffa's reliance on the
6  FightMetrics (sic) database?
7          MR. CRAMER:  Would you like
8      him to look at his report, is that
9      what you're asking?
10         MR. ISAACSON:  He can look
11     at his report in answering the
12     questions.  I've allowed him to do
13     that for every question.
14         MR. CRAMER:  Okay, good.
15         THE WITNESS:  By looking at
16     it, it refreshes my memory that in
17     paragraph 101, for example, I'm
18     looking at evidence, again from
19     the perspective of what I call
20     stakeholders, or mostly fighters,
21     as to whether or not some -- some
22     sport outside of MMA would
23     constitute a reasonable substitute
24     to defect to in response to a wage

Page 301

1      decrease.
2          And we can go through
3      paragraph-by-paragraph.  I don't
4      know if that's how you want me to
5      use the time --
6  BY MR. ISAACSON:
7      Q.  I thought -- I thought that
8  as encompassed within the record evidence
9  of perceptions of substitute billing.
10     A.  Right.  But why -- I mean, I
11 wouldn't say why we go by my memory of
12 what I used, we have the report and we
13 can go paragraph-by-paragraph and I
14 can --
15     Q.  Your report is long, I'm
16 trying to see if I can get a summary of
17 your conclusions with you having access
18 to your report.
19         MR. CRAMER:  So he wants you
20     to take your time and make sure
21     that you've adequately summarized
22     your conclusions and the evidence
23     upon which they're based.
24         THE WITNESS:  Okay.



PUBLIC COPY - REDACTED

Page 326

```
 1      A.   I think revenue and units
 2  were elements of my calculus, yes.
 3      Q.   All right.  You did not look
 4  at the actual amounts charged by the
 5  cable company for the pay-per-view event?
 6      A.   I think -- I think I agree
 7  with you that in this case I was looking
 8  at it from the perspective of Zuffa.
 9      Q.   All right.
10      A.   Which is the relevant
11  perspective to determine whether it was
12  profitable for Zuffa.
13      Q.   Well, does the revenue
14  percentage of Zuffa vary even when the
15  pay-per-view price remains the same?
16          MR. CRAMER:  Incomplete
17      hypothetical.
18          THE WITNESS:  I'm sorry, the
19      revenue percentage of what?
20  BY MR. ISAACSON:
21      Q.   So you were looking at Zuffa
22  revenue times pay-per-view units,
23  correct?  I mean, divided by pay-per-view
24  units.
```

Page 327

```
 1      A.   Correct.
 2      Q.   Correct.  And Zuffa's
 3  revenue by pay-per-view would be the
 4  revenue share it gets from the cable
 5  company?
 6      A.   Correct.
 7      Q.   Correct?  And is it the case
 8  that -- that the revenue share percentage
 9  goes up and goes down irrelevant (sic) to
10  the price of the actual pay-per-view?
11          MR. CRAMER:  Objection to
12      form.
13          THE WITNESS:  And I don't
14      know.  I think that it would all
15      depend.  I would have to think
16      about it.
17  BY MR. ISAACSON:
```

Page 328

[redacted]

Page 329

[redacted]

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED