# Exhibit 55

Deposition of Paul Oyer
(November 29, 2017) (excerpted)

PUBLIC COPY - REDACTED

PUBLIC COPY - REDACTED

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON          )
FITCH, on behalf of                  )
themselves and all others            )
similarly situated,                  )
                                     )
            Plaintiffs,              )
                                     )
     vs.                             )   Case No.
                                     )   2:15-cv-01045-RFB-(PAL)
                                     )
ZUFFA, LLC, d/b/a Ultimate           )
Fighting Championship and            )
UFC,                                 )
                                     )
            Defendant.               )
_____ )


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PAUL OYER

Washington, D.C.

November 29, 2017

8:36 a.m.


REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No: 52564

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

14

PAUL OYER - HIGHLY CONFIDENTIAL

of microeconomic analysis?

A. It's a well-respected intermediate micro textbook.

Q. Anything in particular about the textbook that you feel is unreliable in any way?

A. I just haven't read -- read it in its entirety. So I certainly have no -- I can't vouch for every sentence in this book.

Q. Okay. But it's a standard textbook?

A. Yes.

Q. Okay. All right. Let me introduce another exhibit. This will be Exhibit No. 2.

(Oyer Exhibit 2 was marked as requested.)

BY MR. DAVIS:

Q. Are you familiar with this document?

A. Intimately.

Q. Is this the report you prepared in this case?

A. Based on the cover, I would say yes. I'm going to assume the rest of it is the rest of what I gave you.

Q. If at some point you come to the conclusion this is not your report, please let me know

---

15

PAUL OYER - HIGHLY CONFIDENTIAL

immediately.

A. I'm going to trust you on that one.

Q. And could you turn to page 18, please. Is that your signature?

A. Yes.

Q. Okay. I just want to walk through now some basic definitions so that we are talking about the same thing when we're talking to each other today. With that in mind, let's begin with the definition of the marginal product of labor as you use that term.

So if you turn to page 5, paragraph 15, the last line, you seem to indicate that the marginal product of the worker's labor is "The amount the firm is willing to pay the worker" -- scratch that. You say that the firm is willing to pay the worker the additional value that the employee creates?

A. Right.

Q. Is that a reasonable definition of marginal product of labor?

A. So I would say the marginal product of labor is the value -- the additional value that the employee creates.

Q. Great. Great. And then it's a separate

---

16

PAUL OYER - HIGHLY CONFIDENTIAL

notion that the firm in a competitive market is willing to pay that amount?

A. Exactly.

Q. Perfect. Okay.

I want -- a little clarification is necessary here because it seems that the way you're using marginal product of labor is the same as some economists use the term marginal revenue product of labor.

A. Uh-huh.

Q. Is it fair to say that you are equating the two in this context?

A. I'd have to see the context in which others use it, but I would use them -- I don't happen to use the term marginal revenue product of labor, but I would -- as far as I can think, those would be equivalent.

Q. Okay. Let me just put a slightly finer point on it. Again, this is just so that when we're talking to each other we're talking about the same thing. If we could stipulate that sometimes economists would say that the marginal product of labor is an output measure, and then when that is multiplied by the marginal revenue of output you

---

17

PAUL OYER - HIGHLY CONFIDENTIAL

have the marginal revenue product of labor. Does that make sense what I just said to you?

A. I didn't actually follow that. I'm sorry.

Q. That's quite all right.

Sometimes the marginal product of labor is used as an output measure, not a revenue measure, and so then the distinction -- there is a distinction, and it seems to me in reading your report that you were treating the marginal product of labor as equal to the marginal revenue product of labor and not an output measure?

A. Right. So I would think of the marginal product of labor as being all the additional revenues created by the employee minus all the costs having that employee incurs other than the compensation you pay. So that might be a distinction. I'd have to go back to my old definitions of marginal revenue product of labor. So, for example, if bringing on a -- if I hire you and I have to pay -- I have to also get a computer for you to be able to work --

Q. Right.

A. -- I would imagine that the marginal revenue product of labor would not net out that

---

5 (Pages 14 to 17)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

18

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    computer, whereas my definition of marginal product
3    of labor would be all the additional revenue and
4    costs created by having you work for me.
5          **Q. I think we're speaking about the -- I think**
6    **we're speaking about the same thing.  I think the**
7    **distinction that is sometimes drawn is that the**
8    **marginal product of labor is sometimes used in terms**
9    **of output units other than revenue?**
10        A. Uh-huh.
11        **Q. It could be sneakers, for example, and then**
12   **the term marginal revenue product is used to convert**
13   **that into dollars, and I just want to be clear that,**
14   **if I understand you correctly, when you say marginal**
15   **product of labor you're talking in terms of revenue,**
16   **dollars?**
17        A. That's right.  I'm talk--- I'm talking in
18   terms of net costs and benefits, including the
19   revenue brought in minus the additional costs other
20   than compensation related to having the employee
21   work there.
22        **Q. Measured as dollars?**
23        A. All measured in dollars.
24        **Q. Okay.  Good.  Then we'll use marginal**
25   **product of labor --**

19

1          PAUL OYER - HIGHLY CONFIDENTIAL
2        A. Sounds good.
3        **Q. -- in that way.**
4        **Even if you agree with me, which I very**
5    **much enjoy, just if you could wait until the end of**
6    **what I've said to say that so the court reporter can**
7    **keep a tidy record.  Thank you.**
8        A. Fair enough.
9        **Q. Okay.**
10       **While we're here we had -- I had said in**
11   **that same sentence, according to your report, a firm**
12   **is willing to pay a worker the additional value that**
13   **the employer creates in a competitive market; is**
14   **that correct?**
15       A. I believe you said "employer" when you
16   meant to say "employee."
17       **Q. Let me say it again so we have it right.**
18       A. Got it.
19       **Q. You say -- and I'll just read it -- "The**
20   **firm is willing to pay the worker the additional**
21   **value that the employee creates in a competitive**
22   **market"; is that correct?**
23       A. That's right.
24       **Q. Great.  All right.  Now let's define a**
25   **competitive market for labor, if we could.**

20

1          PAUL OYER - HIGHLY CONFIDENTIAL
2          MR. WIDNELL: I apologize.  I just wanted
3    to object.  I think you slightly misstated what's in
4    the report.  I just wanted to get that objection to
5    your last question.
6          MR. DAVIS: Okay.
7    BY MR. DAVIS:
8        **Q. Let's confirm the definition of a**
9    **competitive market for labor.  If we look at**
10   **para- -- at page 5, paragraph 18, the second**
11   **sentence, you speak about monopsonistic labor**
12   **markets as one in which a firm has power over --**
13   **market power over its workers.  Would it be fair to**
14   **say that a competitive labor market is one in which**
15   **a firm has no market power over its workers?**
16       A. Yes.
17       **Q. And that a monopsonistic labor market is**
18   **one in which a firm has monopsony power, is one in**
19   **which the firm has power -- market power over its**
20   **workers?**
21       A. Yes.
22       **Q. All right.  If we could turn to page 4,**
23   **paragraph 8.  You describe labor share as the**
24   **percentage of a firm's total revenues paid out as**
25   **workers' compensation; is that correct?**

21

1          PAUL OYER - HIGHLY CONFIDENTIAL
2        A. I do.
3        **Q. Would you be comfortable using either the**
4    **label "labor share" or "wage share" to capture that**
5    **notion?**
6        A. Okay.
7        **Q. Okay.  So when I say or you say "labor**
8    **share/wage share," for the rest of the deposition,**
9    **that's what we mean.  Okay?**
10       A. Okay.
11       **Q. Great.**
12       **And in paragraph 12 I believe you have a**
13   **criticism of Dr. Singer that he uses labor share or**
14   **wage share as a benchmark for competitive markets;**
15   **is that right?**
16       A. Labor share -- well, nothing in
17   paragraph 12 specifically talks about Dr. Singer's
18   report.  It's a statement about labor share.
19       **Q. Okay.  Paragraph -- let's look at**
20   **paragraph 13.  In paragraph 13 you are -- am I**
21   **correct that you're suggesting a criticism of**
22   **Dr. Singer that he uses labor share or wage share as**
23   **a benchmark for competitive markets?**
24       A. That's not what the paragraph says
25   specifically, but that is the -- that's -- what you

6 (Pages 18 to 21)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

22

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    just said is consistent with my argument.
3          Q. Okay.  Consistent with your opinion?
4          A. Uh-huh.
5          Q. Okay.  And --
6          A. Yes.
7          Q. All right.
8          A. By 4:00 p.m. I will have gotten that
9    figured out.
10          Q. Not at all.
11          And then paragraph 12, the last sentence
12    you say "Labor share is driven by overall firm
13    revenues which includes many factors beyond the
14    control of and related to the value of the worker."
15    That is your view of the nature of labor share; is
16    that correct?
17          A. Right.  Yes.
18          Q. Okay.  All right.
19          Let's talk about level of pay.  So if we
20    look at page 5, paragraph 17, in talking about level
21    of pay you say "The level of the individual's
22    pay" -- I'm eliminating some words for simplicity.
23    "The level of the individual's pay is the relevant
24    benchmark and is a natural proxy of the worker's
25    marginal product of labor"; do you see that?

23

1          PAUL OYER - HIGHLY CONFIDENTIAL
2          A. I do.
3          Q. And that's consistent with your opinion?
4          A. Yes.
5          Q. And you also note that labor economists
6    sometimes use the natural log of a worker's
7    compensation or level of pay rather than the level
8    of pay itself; is that correct?
9          A. That's correct.
10          Q. Okay.  Can we use "wage level" to mean
11    level of pay or its natural log just for clarity of
12    our conversation today?
13          A. Yes.
14          Q. Okay.  And if there's a distinction at some
15    point between level of pay and the natural log of
16    level of pay, I'll ask you to draw that distinction.
17    Is that okay?
18          A. Yes.
19          Q. Okay.  All right.
20          I think we've been over this, but just
21    to -- just to confirm, the last sentence of
22    paragraph 15 it says "The firm is willing to pay the
23    worker the additional value that the employee
24    creates with the assumption that the market is
25    competitive."  That means that in a competitive

24

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    labor market the firm is willing to pay the worker
3    the marginal product of his or her labor, yes?
4          A. Sorry.  I hate to be picky, but can you say
5    that again?
6          Q. No, please.
7          A. Can you read that back to me?  Either
8    way.
9          MR. DAVIS:  Could you read that question
10    back, please.
11          (Record read as requested.)
12          MR. WIDNELL:  Objection, misstates the --
13    the report.
14    BY THE WITNESS:
15          A. So the reason I asked her to read it back
16    is you put in a caveat that I'm going to quibble
17    with and it's like this is not that important, but
18    let's be careful.  You said in a competitive labor
19    market the firm is willing to pay the worker up to
20    his or her marginal product of labor.  In any labor
21    market the firm is willing to pay the worker up to
22    his or her marginal product of labor.  So in a
23    monopsonistic labor market they might not have to.
24    No firm wants to pay anybody their marginal product
25    of labor.  I want -- I want to pay you zero, right?

25

1          PAUL OYER - HIGHLY CONFIDENTIAL
2          Q. Okay.
3          A. In a competitive labor market you have --
4    you have to pay the person their product -- marginal
5    product of labor because somebody else will if you
6    don't.  Or at least you have to pay -- at the very
7    least you have to pay them their marginal product of
8    labor at the next best opportunity for that person.
9          Q. Okay.  Good.
10          So I just want to be clear about this.  So
11    you say firms are always willing to pay the worker
12    the additional value that the employee creates,
13    period.  However, in some markets the firm has to
14    pay that amount, competitive markets, and in other
15    markets the firm may not have to pay that amount,
16    monopsonistic labor markets, for example.  Is that
17    right?
18          A. I agree.
19          MR. WIDNELL:  Objection, misstates.
20    BY THE WITNESS:
21          A. I basically agree with what you said, yes.
22          Q. What part do you disagree with?
23          A. Oh, I don't think I disagree with any of
24    it.  So I agree with it.
25          Q. Okay.  Good.

7  (Pages 22 to 25)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

26

PAUL OYER - HIGHLY CONFIDENTIAL

1            Can you explain -- you started to do this
2 and I just want to make sure I understand.  Why is a
3 firm forced in a competitive labor market to pay the
4 workers their marginal product of labor?
5       A.  So in the most basic, truly competitive
6 labor market you can imagine labor is just a pure
7 commodity.
8       Q.  Okay.
9       A.  And so I can go be a professor, a teacher
10 at any school and I create as much value for all of
11 those different schools.  So Stanford offers me a
12 salary and, you know, anytime I want I can call up
13 Berkeley and say what will you pay for me to move
14 over there, and they'll tell -- they'll make an
15 offer based on their expectation of my value.  And
16 if the market is competitive, that means that over
17 time with some information gathering we can all
18 figure out how much marginal value I would bring.
19 So Berkeley will end up offering me, after some back
20 and forth, my marginal product of labor, and
21 Stanford essentially has -- has to at that point
22 choose whether to pay me my marginal product of
23 labor or let me go.  As long as -- as long as my
24 marginal product of labor is as high or higher than
25

27

PAUL OYER - HIGHLY CONFIDENTIAL

1 my salary, they're going to go ahead and offer me
2 that.  So it's just like any other competitive
3 market.  We end up bidding up to the -- we end up
4 bidding up to the point where cost equals revenue --
5 marginal cost equals marginal benefit.
6       Q.  Okay.  I think I understand.  I just want
7 to make sure I get the gist of what you just said.
8       A.  Sure.
9       Q.  So it sounds like in a competitive labor
10 market the competition between either present or
11 prospective employing firms forces a firm to pay up
12 to the marginal product -- well, to pay the marginal
13 product of labor of a worker; is that a fair
14 summary?
15       A.  That's a fair summary.
16       Q.  Okay.
17       Now, in -- on page 5, paragraph 18 you're
18 discussing a monopsonistic labor market, and in the
19 second sentence you say, in part, "In a
20 monopsonistic labor market where a firm has market
21 power over its workers the firm will pay its workers
22 less than their marginal product of labor."  Why is
23 that?
24       A.  Well, again, come back to my example I gave
25

28

PAUL OYER - HIGHLY CONFIDENTIAL

1 a minute ago about Stanford and Berkeley.  If
2 Stanford is paying me X dollars but I'm actually
3 worth 2X to Stanford, like my -- and X has to be
4 greater than zero for this to work.
5       Q.  It's good you can say this with no
6 bitterness in your voice.
7       A.  Stanford has been very good to me.  I have
8 no complaints, for the record.
9       Okay.  So if -- if I'm producing 2X and
10 Stanford is only paying me X, in the world we talked
11 about before Berkeley is offering me -- first
12 they're offering me 1.1 times X and then we're --
13 you know, the bidding keeps going until we get to
14 2X, which is my marginal product of labor.  But
15 without Berkeley there's no reason that that has to
16 happen.  So that's what market power is all about,
17 the absence of that outside bidder.
18       Q.  Okay.  And I think you said before that in
19 drawing a distinction between what firms are willing
20 to pay and what they have to pay and what they will
21 pay that all firms want to pay as little as they
22 can.  However, when they don't have to -- or not
23 however.  And so when they don't have to, when
24 there's not competition, the absence of that
25

29

PAUL OYER - HIGHLY CONFIDENTIAL

1 competition allows them to pay lower amounts than
2 the marginal product of labor; and given that
3 option, that's what they'll do.  Is that a fair
4 statement?
5       A.  Yeah, I think so.
6       Q.  Okay.  What effect, if any, would standard
7 economics predict would be the effect on the number
8 of workers hired when a firm has monopsonistic power
9 and uses that to pay less than the marginal product
10 of labor to its workers?
11       A.  So let's stop and think about that.  So if
12 the product market is -- see, we'd have to think
13 this through carefully, but if the product market is
14 competitive, then I would presume that by
15 lowering -- by being able to lower the cost of the
16 input you would -- you would -- on the one hand the
17 firm's demand would be higher so that would lead you
18 to think that the numbers would go up; but by the
19 same token, if the wage is -- if a monopsonistic
20 wage is lower than a competitive market wage, so
21 that's going to push labor demand -- I'm sorry --
22 labor supply down.
23       So I don't know that -- off the top of my
24 head, I can't tell you that there's a -- that
25

8 (Pages 26 to 29)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

30

PAUL OYER - HIGHLY CONFIDENTIAL

1   there's a simple answer to that. I know that -- I
2   know that in certain contexts we talk about when
3   monopsony -- when monopsony is undone, when a wage
4   is pushed up in a monopsonistic market that leads to
5   increases in labor supply that lead to an increase
6   in employment despite the price of wages going up,
7   but I think it can go the other way too.
8        So I'd have to think about it, but
9   my off-the-top-of-my-head answer is that you can't
10  make an assumption one way -- you cannot make a firm
11  prediction one way or the other. It depends on the
12  elasticity of the supply and the demand curves for
13  labor.
14       Q. Let's -- let's simplify the hypothetical
15  slightly and see if that makes it easier to -- to
16  give a clear prediction. Let's assume the output --
17  the supply and demand curves -- hmm. Let me think
18  about this.
19       Let's assume the output in the product
20  market is not sensitive to cost.
21       A. I'm not sure what that means. I mean --
22       Q. Supposing there's a monopoly in the output
23  market.
24       A. Uh-huh.

---

31

PAUL OYER - HIGHLY CONFIDENTIAL

1        Q. So the ordinary analysis of supply and
2   demand wouldn't play out as would occur in a
3   competitive market. Would that change your answer
4   in terms of the effect of a firm -- a monopsonistic
5   firm paying workers below the marginal product of
6   their labor?
7        A. Okay. But in a monopsonistic labor -- in a
8   monopsonistic product market --
9        Q. Yeah.
10       A. -- so now you increase the wage which
11  increases the cost to the firm of -- if we -- sorry.
12  If we go from monopsonistic to nonmonopsonistic
13  labor market --
14       Q. Do you mind if I -- what if we turn that
15  around.
16       A. Okay.
17       Q. So go from competitive to monopsonistic.
18       A. Sure.
19       Q. It should be the same theoretically, but
20  just to keep it fair.
21       A. So that's going to lower the wage --
22       Q. I'm sorry. I'm at least as guilty as you
23  are, but let's try to slow down.
24       A. Yep. Okay. Are you ready?

---

32

PAUL OYER - HIGHLY CONFIDENTIAL

1        So what we want -- what you want to think
2   about is a world where we have a competitive labor
3   market and then some firm starts to have the ability
4   to exert monopsony power on its workers and that
5   firm has monopsonistic power in the product
6   market.
7        Q. Yes.
8        A. So it lowers -- it starts -- it lowers the
9   wage and if nothing else changed, it -- if it didn't
10  change its quantity it would increase its profits
11  because everything has -- nothing has changed. It's
12  still charging the same in the product market.
13       Now, having said that -- now, the world
14  isn't that simple because once we lower the cost to
15  the firm it actually will lower its price in the
16  product market too. Even if it's a monopsonistic
17  firm it's going to lower its price in the product
18  market because it's always setting its marginal
19  revenue equal to its marginal cost. So its marginal
20  cost just went down. So it's going to lower its
21  price. It's going to want to sell more because its
22  profit -- its unit profits went up.
23       Q. So you're saying a monopolist will set its
24  marginal costs equal to its marginal revenue?

---

33

PAUL OYER - HIGHLY CONFIDENTIAL

1        A. Sure. All firms set their marginal revenue
2   equal to their marginal cost. I have to caveat when
3   I say that. I could come up with some odd
4   situations where a firm doesn't set its marginal
5   revenue to its marginal cost. To a first
6   approximation, all firms set their marginal revenue
7   equal to their marginal cost.
8        THE REPORTER: You have to slow down,
9   please.
10  BY MR. DAVIS:
11       Q. So even when you're making a small point
12  that you want your students not to write down,
13  please do speak slowly because our poor stenographer
14  has to write everything down.
15       All right. Let's walk through a
16  hypothetical. On page 5, paragraph 16 you use the
17  example of a salesperson, right? Do you see that?
18       A. Yes.
19       Q. Great. I want to use that example to
20  clarify some basic concepts. Is it fair to say that
21  in a competitive market we would expect the
22  salesperson's compensation to equal the marginal
23  product of his or her labor?
24       A. Yes.

---

9  (Pages 30 to 33)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

34

PAUL OYER - HIGHLY CONFIDENTIAL
1
2     Q. To simplify the example and to make it more
3  concrete, please assume the salesperson sells
4  widgets -- I apologize for the lack of creativity --
5  and gets paid purely on commission. Okay. Let's
6  say the commission is 10 percent of the sales price
7  of a widget and, again, assume the labor market is
8  competitive. So that would mean that the marginal
9  product of labor of the salesperson is 10 percent of
10 the revenue generated from the sale; is that
11 correct?
12    A. I observe a firm that pays its salespeople
13 10 percent as a commission -- their compensation
14 structure is the salesperson has -- their pay is
15 zero plus 10 percent of all revenue generated
16 through their sales?
17    Q. Correct.
18    A. And so -- okay. So now what was your
19 question about that?
20    Q. Would that mean that the marginal product
21 of labor of the salesperson is 10 percent of the
22 revenue generated from the event, which is a sale?
23    A. Right. So it's a little more -- that's --
24 it's much more -- I know you wanted to keep it
25 hypothetical and simple, but, of course, the world

35

1  is much more complicated than that. So the
2  marginal -- I'm going to let her catch up. So the
3  marginal product of labor of that salesperson in
4  equilibrium over some period of time is such that
5  they're paid their marginal product of labor. That
6  doesn't mean that on every single unit that their
7  individual marginal product of labor was exactly
8  10 percent.
9
10    Q. To use your language from before, is it
11 fair to say to a first approximation that the
12 marginal product of the salesperson is 10 percent of
13 the revenue generated from the sale?
14    A. I would put it slightly differently.
15    Q. Please.
16    A. If we're in a competitive labor market and
17 the person is being paid 10 percent of their -- a
18 commission of 10 percent, then I would say that on
19 average over a period of time the person's marginal
20 product of labor is 10 percent of the revenue they
21 generate.
22    Q. Okay. And to be clear on the slippage, the
23 reason you say on average is in the real world a
24 firm may not be able to calculate exactly the
25 marginal product of labor on each sale, but it can

36

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  calculate that on the whole this salesperson's
3  marginal product of labor is 10 percent of the
4  revenue it generates from these various revenue-
5  generating events; is that fair to say?
6     MR. WIDNELL: Objection, form.
7  BY THE WITNESS:
8     A. That's more or less fair to say. I'm going
9  to put it slightly differently again.
10    Q. Okay.
11    A. Because when we talk -- there's a
12 natural -- there's a natural confusion that comes
13 out of using sales commissions here, which is that
14 the marginal -- let's say the marginal widget you're
15 thinking, okay, the salesperson gets 10 percent, so
16 that's their marginal product of labor. But when
17 deciding whether or not -- but when we think about
18 what's the marginal product of labor of the
19 employee -- when thinking about what's the marginal
20 product of labor of the employee, we want to think
21 about the firm making a decision do I hire this
22 person or don't I hire this person; and in a
23 competitive labor market, they're going to hire this
24 person and the amount they pay them over some period
25 of time is going to approximate the net benefits of

37

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  bringing that person to work there.
3     Q. And in this particular case, though -- I
4  think I understand what you just said, but I'm not
5  sure it speaks directly to the issue I'm trying to
6  clarify.
7     So the firm wants to pay the net benefits
8  to the firm and that is the marginal product of
9  labor, and the firm's best estimate of that amount
10 in this instance is, on average, 10 percent of the
11 revenues generated by these event -- sorry --
12 revenue-generating events; is that fair to say?
13    MR. WIDNELL: Objection to form.
14 BY THE WITNESS:
15    A. I'm sorry, but I'm going to restate
16 slightly again.
17    Q. Okay.
18    A. First of all, you said the firm will --
19 wants to pay. The firm does not want to pay the
20 marginal product of labor. They're willing to pay
21 the marginal product of labor. They would prefer to
22 pay zero.
23    Q. Of course.
24    A. The other -- the other slight way I would
25 think about it is we mix up -- this commission is --

10 (Pages 34 to 37)

PUBLIC COPY - REDACTED

78

Q. And why -- why -- why is that?

A. Have you heard of the -- would you understand the term if I use the term "teaching to the test"?

**Q. I do, but just for purposes of clarity, if you don't mind providing a brief explanation, that would be appreciated.**

A. So if I pay -- let me -- let me give you -- let me give you a slightly simplified -- not terribly, but slightly simplified version of what a teacher does. To a first approximation a teacher -- and we're talking here like elementary -- let's just say elementary school. Is that okay?

**Q. Absolutely.**

A. So let's take an elementary school teacher. To a first approximation, an elementary school teacher does two things. They teach you -- what's the right word here? They teach you reading and writing and other skills that are going to be directly valuable because they make you more educated in the traditional sense and they teach you life skills. Okay. How to think creatively, how to interact with other people, what's good and what's bad behavior, what's appropriate and what's not.

79

I can -- at the end of -- or during or at the end of years students take standardized tests, and I think it's generally accepted among people who study this -- and labor economists study this quite rigorously -- it's generally accepted that those standardized tests can do a pretty good job of assessing the degree to which you've learned those first set of skills, what we'll call the productive -- reading and writing. Let's just call it reading and writing. Those standardized tests do not do a very good job of measuring the degree to which you have attained life skills.

So big debate in the public policy literature and education literature is should we pay teachers based on the standardized tests because it does a very good job of motivating them to do part of their job, but it does so at a big cost which is demotivating them to do a different part of their job.

**Q. Okay. Okay.**

**Let me just take a step back. I originally framed each of these questions in terms of the marginal product of labor, and I think we've slid into a discussion to some extent of incentives and I**

80

**think that's in part because the two are related in important ways. I just want to make sure I'm clear on what that relationship is.**

**So I asked you is it harder to estimate the marginal product of labor for a nurse than a salesperson, and you indicated why it would be and spoke in part I think in terms of incentives. So can you just draw the connection for me. What's the connection you have in mind between marginal product of labor and incentives?**

MR. WIDNELL: Objection, misstates.

MR. DAVIS: You can answer.

BY THE WITNESS:

A. There's a very tight connection between measurability of the marginal product of labor --

**Q. Okay.**

A. -- and incentives.

**Q. Okay. And what is that --**

A. And that's -- and that's when I can measure -- I'm going to repeat it -- I'm going to come very close to repeating an answer from about five minutes ago. When I can measure your marginal product of labor --

**Q. Yes.**

81

A. -- I don't have to supervise you, I don't have to do all these other things. So I have -- when there's a way to map your marginal product of labor, I can pay you based on that and I can design an incentive system that pays you based on that. So the marginal product of labor itself has nothing to do with incentives whatsoever. The ability to measure the marginal product of labor just leads by its very nature to using an incentive system.

**Q. I see. Good. So you were explaining the incentives that should or should not be given to school teachers in part because incentives are inappropriate or must be dealt with cautiously because of the difficulty of measuring the marginal product of labor for a school teacher as compared to a salesperson; is that right?**

A. I think that's right.

**Q. Is there a way in which you would want me to reframe that or you would want to -- or you would want to reframe that?**

A. I'm just going to say it slightly differently, but I think it's --

**Q. Okay.**

A. -- more or less in agreement. For

21 (Pages 78 to 81)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

82

PAUL OYER - HIGHLY CONFIDENTIAL

1
2  salespeople we have very good measures that do a
3  good job of approximating their marginal product of
4  labor, and so we use -- we use incentive systems
5  because we -- because that's an efficient way to get
6  them to -- to do their job.  For teachers we have
7  less good measures of their marginal product of
8  labor and we're therefore more cautious about using
9  incentive systems.
10     **Q. Okay.  So all things equal, if you see a**
11  **firm using incentive payments or an incentive**
12  **payment system, that firm likely would be one with a**
13  **relatively good ability to measure the marginal**
14  **product of labor of its workers; is that fair to**
15  **say?**
16     A. Yes, I think that's fair to say.
17     **Q. I'm about to shift topics.  The next**
18  **section is relatively short.  Should we take a break**
19  **now, or do you want to go just a little bit longer**
20  **and then take a break?  What's your preference?**
21     A. We're not going to keep talking about this?
22     **Q. I will keep reading and enjoying it, but I**
23  **think we're not going to keep talking about it for**
24  **the moment.  My apologies.**
25     A. I'm fine with whatever.

---

83

PAUL OYER - HIGHLY CONFIDENTIAL

1
2     **Q. Okay.  We'll do one more section.  I don't**
3  **think it will take very long, although that can be**
4  **hard to predict.**
5        **Do you think it's reasonable to assume that**
6  **the supply curve for the labor of fighters is**
7  **perfectly horizontal from Zuffa's perspective?**
8     A. So let's think about that for a second, the
9  supply curve of labor from Zuffa's perspective.  I
10  mean, the reason I'm hesitating is that we're no
11  longer in a world of perfect substitutes.
12     **Q. And what do you mean by that?  Why are**
13  **fighters not perfect substitutes one for the other?**
14     A. Well, some are bigger attractions than
15  others.
16     **Q. Okay.  So some are bigger attractions than**
17  **others and what does that -- what effect does that**
18  **have on the supply curve?**
19     A. Well, what you end up -- what you end up --
20  see, supply curves are -- the traditional supply
21  curve would be for substitutable goods.  So it would
22  be for widgets, it would be for hours of janitorial
23  service, something like that.  And so an individual
24  fighter is going to have his or her own supply
25  curve.

---

84

PAUL OYER - HIGHLY CONFIDENTIAL

1
2     **Q. Okay.**
3     A. Okay.  So they'll -- they'll do -- if I put
4  on the X axis number of fights per year and I put on
5  the Y axis dollars per fight --
6     **Q. Right.**
7     A. -- they're going to have a supply curve.
8  So they might be willing to provide one fight for --
9  I'm going to make up crazy numbers, but whatever --
10  for $100.  They might be willing to do two fights
11  for $150 -- sorry.  Let's make it more realistic.
12  They might be willing to do one fight for $100, two
13  fights for $250, and three fights for $500.  So we
14  could map out that person's supply curve.  But a
15  different fighter might have a different supply
16  curve and it's based -- and those differences are
17  going to be based on at least two things.
18     **Q. Okay.**
19     A. One is their outside options and the other
20  is how much they like fighting.
21     **Q. Let's just focus on the first of those two,**
22  **the outside options.  How does -- you said earlier**
23  **that some fighters are bigger attractions than other**
24  **fighters.  How does that relate to the outside**
25  **options of the fighter?**

---

85

PAUL OYER - HIGHLY CONFIDENTIAL

1
2     A. So the supply curve to Zuffa that I just
3  gave you is -- one of the factors that goes into
4  that is how much someone other than Zuffa is willing
5  to pay for those services.
6     **Q. And if a fighter is a bigger attraction,**
7  **then presumably someone else would be willing to pay**
8  **more for their services?**
9     A. That's right.
10     **Q. And so that would violate the all workers**
11  **are fungible assumption of a horizontal supply**
12  **curve; is that fair to say?**
13     A. That's fair to say.
14     **Q. Okay.  Do you know whether Zuffa pays all**
15  **fighters the same amount?**
16     A. Zuffa does not pay all fighters the same
17  amount.
18     **Q. Do you know whether a part of their**
19  **compensation takes the form of salaries?**
20     A. What's your definition here of a salary?
21     **Q. Would it be -- would you accept it as a**
22  **reasonably standard definition to say a guaranteed**
23  **fix amount of annual compensation separate and apart**
24  **from any incentives?**
25     A. Okay, sure.

---

22 (Pages 82 to 85)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL



86

PAUL OYER - HIGHLY CONFIDENTIAL
Q. That is an okay definition?
A. That's an okay definition.
Q. Do you know whether Zuffa pays fighters salaries?
A. So I know that they guarantee people certain amounts for each fight and I know they have contracts that specify some number of fights and that sort of thing. I can't remember whether there's any promise of how many fights will be in a period of time.
Q. Do you know if they pay -- whether Zuffa pays any fighters even if they don't fight?
A. Yeah. I don't remember that. I don't -- I don't know.
Q. So presumably you don't know what percentage, if any, of fighters receive salary from Zuffa?
A. Yeah. I guess that -- I guess I don't know that.
Q. Okay. Do you know whether Zuffa pays fighters for training?
A. I don't know that for sure. I assume they don't.
Q. You assume they don't, but you don't know?

87

PAUL OYER - HIGHLY CONFIDENTIAL
A. Right.
Q. Okay. Do you know how much -- do you know the structure of the payments that Zuffa makes to fighters for particular fights?
A. I have a pretty good general sense for it.

88

Q. Okay. Do you know whether Zuffa provides healthcare insurance to his fighters?
A. I don't know for a fact, but I would imagine given that they're independent contractors that they do not.
Q. Okay.
Do you think wage share is ever an appropriate benchmark for competitive pay?
A. I can't think of an example right here where I would say it was an appropriate benchmark.
Q. And that's true, as you sit here now at least, for all workers in all circumstances?
A. Yes.
Q. And is that true even if compensation, say, for a salesperson is set at a percentage of revenue generation?
A. Yes.
Q. So to generalize a little bit to make sure I'm clear, the form that compensation takes, for

89

PAUL OYER - HIGHLY CONFIDENTIAL
example, a percentage of revenue generation, doesn't necessarily determine the right approach to how a labor economist should analyze that compensation; is that fair to say?
A. I don't understand the question in the sense that you seem to be equating the commissions a salesperson is paid to their labor share in the sense that Singer used the term or wage share.
Q. And what would be -- what would be the difference between, in your mind, wage share or labor share as you use it in your opinion and paying a salesperson a percentage of a revenue- generating event such as a sale?
A. Right. So one is a share of a large event to which the one person was potentially a very minor party and the other is tied to that person's individual output.
Q. So there's an empirical question that matters here about how closely a particular worker's output is tied to the generation of revenue; is that fair to say?
A. Well, I'm not -- I think what you're -- there's an empirical question that you just said that relates to -- that makes it so that our

23 (Pages 86 to 89)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

90

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  discussion of salespeople is, in my mind, a wholly
3  different thing than any discussion of -- of MMA
4  fighters.
5      Q. So let's stick to the salespeople for a
6  moment, though.
7      A. Okay.
8      Q. You're drawing that connection, but my
9  question didn't.
10     A. Okay. Okay.
11     Q. So just sticking to the salesperson, right.
12  Let's take a salesperson who is paid a percentage of
13  revenue generated by an event, a sale, and let's
14  assume that salesperson is paid purely in that way,
15  on commission.
16     A. Uh-huh.
17     Q. Would it be appropriate to use wage share
18  as a labor economist to analyze the marginal product
19  of labor of that salesperson?
20     A. No.
21     Q. And what I was doing is then just drawing
22  the more general point, which I think you're
23  agreeing with implicitly but I want to make
24  explicit.
25     A. Okay.

91

PAUL OYER - HIGHLY CONFIDENTIAL
1
2      Q. And that means that there isn't necessarily
3  a parallel between the form that compensation takes
4  in the case of a salesperson, a percentage of the
5  revenue from a revenue-generating event, and on the
6  other hand the appropriate form of analysis that a
7  labor economist would use in analyzing the marginal
8  product of labor; is that correct?
9      A. Yeah, I think I would agree with that.
10     MR. DAVIS: Why don't we take a break.
11     THE VIDEOGRAPHER: Going off the record at
12  10:47.
13         (A short break was had.)
14     THE VIDEOGRAPHER: We are going back on the
15  record at 11:01. This begins disk No. 3.
16  BY MR. DAVIS:
17     Q. Okay. So I'm looking at your report, which
18  is Exhibit 2, I believe. You probably don't need to
19  look at it for this question, but I'm looking at
20  page 24 where you list yourself as a referee for
21  various journals, primarily it seems economic
22  journals. And so you do serve as a referee for
23  numerous economic journals; is that correct?
24     A. Yes.
25     Q. Is one of the things you do as a referee

92

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  for these journals review submissions to the
3  journals?
4      A. Yes.
5      Q. Can you briefly describe the process
6  through which you go for evaluating -- in evaluating
7  a submitted article?
8      A. So do you want me to talk about my role as
9  a referee, which is what you've pointed to, or as a
10  journal editor? Those are very distinct things.
11     Q. So as a referee when you receive an article
12  that you are going to assess, what is your process
13  for assessing whether that article might be
14  appropriate for publication or inappropriate for
15  publication?
16     A. So the first thing I do when I receive a
17  request from a journal to referee a paper is I look
18  quickly over the paper to see if it's something
19  about which I have an appropriate expertise.
20     Q. Okay.
21     A. So often I'll get a paper to referee and
22  I'll look at it -- I should say on occasion I will
23  get a paper to referee and I'll look at it, and I
24  will say I don't know enough about this topic to
25  offer an opinion about whether this paper should be

93

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  published or not.
3      Q. Okay.
4      A. So that's the first step. Conditional on
5  it's appropriate for me to referee the paper, I will
6  then read the paper. Well, first you tell the
7  journal I will be able to provide you with a
8  refereed report. Some time goes by, which is always
9  longer than the editor wants and longer than you
10  think it's going to be, and you finally sit down,
11  usually on an airplane, and read through the paper
12  carefully and assess it on several -- and then -- so
13  you -- I assess it on several grounds. One is is it
14  correct, is it interesting, is it novel relative to
15  prior research on related topics. Those are the
16  fundamental criteria.
17        And then I write -- and then I write two
18  things. I write what's called a refereed report,
19  which can be anywhere from a paragraph to six pages,
20  in which I say here's what this paper does. These
21  are fundamentally critical things. Even on a
22  wonderful paper there's nothing good in a referee
23  report other than up front you say this is a good
24  paper or something. The rest is entirely critical
25  because that's how you make the paper -- that's the

24 (Pages 90 to 93)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

94

PAUL OYER - HIGHLY CONFIDENTIAL

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    job of the referee is to point out the possible
3    flaws.
4         So, like I said, it can be anywhere from a
5    paragraph to pages and pages where you'll say things
6    like -- anything from this paper is derivative of
7    such and such, this paper is so poorly written I
8    don't even know what they're trying to accomplish,
9    and then -- but it can be other things like this
10   paper is really good on balance.  Here are some
11   things to think about, and it can be as little as
12   typos or as big as I think the assumption made here
13   is invalid.  I'd like to see how the results change
14   if you were to change that assumption.
15   Q.  Okay.
16        A.  Sorry.  That's No. 1.  Do you want -- the
17   full evaluation then requires a letter to the editor
18   of the journal because the editor of the journal has
19   to make a decision about what to do.  So you write a
20   letter to the editor of the journal, which is
21   usually just about a paragraph, and it says dear
22   editor, I've read this paper.  I have -- and I --
23   you know, here are -- you just basically at that
24   point say things that you don't necessarily want to
25   say directly to the author, and then you offer a

95

1    recommendation.
2    Q.  Okay.  Okay.  You said you read the
3    article -- the paper carefully.  Why carefully?
4         A.  Well, okay.  So I'm going to have to
5    qualify that a little bit.  In any paper where I'm
6    going to recommend that they consider -- seriously
7    consider publishing the paper or where it's
8    possible -- or where I see any possibility that I'm
9    going to do that, then I have to read the paper
10   carefully.  The reason I qualified it is
11   occasionally you'll get a paper and after five
12   minutes to 45 minutes you realize this is just not a
13   good paper.
14   Q.  Okay.
15        A.  And you just write to the editor, and you
16   write a very short referee report explaining the
17   fundamental flaws of the paper, and you move on with
18   your life.
19   Q.  Okay.  Okay.
20        How many hours have you spent working on
21   this litigation?
22        A.  Off the top of my head I don't know.
23   Q.  Do you have any ballpark sense?
24        A.  More than 20 hours, less than 50 hours.

96

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    Q.  Somewhere between 20 and 50 hours?
3         A.  I believe that's correct.
4    Q.  How many hours did you spend preparing your
5    report?
6         A.  The vast majority of what I just said was
7    spent preparing my report.
8    Q.  How many hours did you spend reviewing the
9    evidentiary record in this case?
10        A.  I just have no idea.
11   Q.  No idea?
12        A.  I mean, some large fraction of that number
13   I just gave you.
14   Q.  Okay.  When were you retained?
15        A.  I can look that up.  I don't remember.
16   Q.  Any general sense of the month?
17        A.  Late October maybe.
18   Q.  Late October of -- of --
19        A.  2017.
20   Q.  -- 2017?
21        When you said that there's some large
22   fraction of the 20 to 50 hours you spent reviewing
23   the evidentiary record, by "large fraction" did you
24   mean a majority of your time?
25        A.  I don't -- off the top of my head I just

97

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    don't know.
3    Q.  Do you have any sense of the proportions
4    between reviewing the evidentiary record and
5    drafting the report?
6         A.  I can't say anything reliable about that.
7    Q.  Did you read drafts of any of the -- of any
8    of the reports prepared by other experts that have
9    been retain by the UFC?
10        A.  Did I read drafts of other experts'
11   reports?
12   Q.  Of experts retained by the UFC.
13        A.  Other experts retained by the UFC.
14   Q.  In this case.
15        A.  In this case.  Are we -- are we discussing
16   this?  I thought we were --
17        MR. CRAMER:  We can know whether he read
18   them.
19        MR. WIDNELL:  Yeah.  So just to be clear,
20   I'm not sure that he -- Professor Oyer understands
21   the stipulation entirely, but you can answer
22   questions --
23        THE WITNESS:  My mistake.
24        MR. WIDNELL:  -- about whether you reviewed
25   a draft or reviewed an actual expert report.  But

25  (Pages 94 to 97)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

98

PAUL OYER - HIGHLY CONFIDENTIAL

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    you do not need to answer questions -- and correct
3    me if you disagree -- about actual communication
4    with the -- that went into your preparing your
5    report.
6        MR. DAVIS: I guess with the -- we can see
7    if we disagree, but with -- well, why don't we start
8    with that --
9        MR. WIDNELL: Yeah.
10       MR. DAVIS: -- and then then we can move on to
11   what --
12       MR. WIDNELL: There may just be nuances.
13   That's sort of a general overview.
14       MR. DAVIS: Fair enough.
15   BY THE WITNESS:
16       A. I believe I skimmed a copy of Topel's
17   report after I had drafted my own report.
18       Q. You skimmed it after you drafted your own
19   report?
20       A. Correct.
21       Q. And do you know whether it was the final
22   version of the Topel report or a draft of the Topel
23   report?
24       A. I would imagine it was a draft, but I don't
25   know for sure.

99

1    PAUL OYER - HIGHLY CONFIDENTIAL
2        Q. Did you communicate with any of the other
3    experts retained about the substance of your report
4    or of theirs?
5        A. No.
6        Q. And you say you reviewed the Topel report
7    only after you'd completed yours?
8        A. After I had drafted my own report.
9        Q. After you drafted your own report. Did you
10   rely on anything in that report in your report?
11       A. I did not.
12       Q. You list materials on which you relied on
13   pages 26 and 27 of your report. Did you review any
14   other materials on which you relied in your report?
15       A. No, I don't think so.
16       Q. Did you speak with any Zuffa employees or
17   executives in preparing your report?
18       A. No.
19       Q. Did you speak to any MMA fighters in
20   preparing your report?
21       A. No.
22       Q. Are you familiar with an article -- before
23   we change subjects, how did you obtain the materials
24   on which you relied in preparing your report?
25       MR. WIDNELL: I'm going to instruct you per

100

1    PAUL OYER - HIGHLY CONFIDENTIAL
2    the stipulation not to specifically address the back
3    and forth that you had with -- with outside counsel
4    in preparing.
5    BY THE WITNESS:
6        A. Okay. So I think I can pretty safely
7    address that by just saying that the court documents
8    were provided to me.
9        Q. Did you select them from a list made
10   available, or did -- did you simply receive them and
11   then review them once you'd received them?
12       A. Oh, I -- I selected -- I said I want this,
13   this, and this.
14       Q. What were you given that allowed you to
15   select them? What list did you receive?
16       A. My decisions were mostly based on
17   reading -- reading the two expert reports that I was
18   asked to comment on and the complaint.
19       Q. Okay.
20       MR. WIDNELL: Are you asking for a
21   description of the list that he would have gotten
22   from us?
23       MR. DAVIS: Just the nature of whether it
24   was a curated list or the full list of the documents
25   in the case.

101

1    PAUL OYER - HIGHLY CONFIDENTIAL
2        MR. WIDNELL: That's a description, right?
3        MR. DAVIS: Yes.
4        MR. WIDNELL: I think that's not covered by
5    the stipulation.
6        MR. CRAMER: He was moving on.
7        MR. WIDNELL: Okay. Just to be clear,
8    though.
9        MR. DAVIS: Right. When you say "not
10   covered by the stipulation" --
11       MR. WIDNELL: Well, it would be helpful for
12   us to know because with -- we have the same level of
13   questioning for your experts. So are you taking the
14   position that you can ask for an actual description
15   of the kind of information that was provided as a
16   sort of menu to the experts?
17       MR. CRAMER: If the expert relies upon it,
18   then the answer is yes.
19       MR. WIDNELL: Only if the expert relies
20   upon it.
21       MR. CRAMER: (inaudible)
22       MR. WIDNELL: So you weren't asking for
23   information about stuff that Professor Oyer did not
24   rely on, is that right, just to be clear?
25       MR. DAVIS: I guess what I'd say, since

26  (Pages 98 to 101)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

```
                                         102
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2    we're moving on --
 3         MR. WIDNELL:  Well, the nature of the
 4    questions you asked, I just want to make sure we're
 5    all on the same page, that you're not going to be
 6    using what's in any of his responses to suggest
 7    that -- that he either did or did not fully consider
 8    something based off of the questions you asked about
 9    what we provided him.
10         MR. DAVIS:  Well, I guess -- I think this
11    is a conversation best --
12         MR. WIDNELL:  We can go off the record if
13    you want.
14         MR. DAVIS:  Let's go off record.
15         THE VIDEOGRAPHER:  Going off the record at
16    11:15.
17         (Whereupon a discussion was had
18              off the record.)
19         THE VIDEOGRAPHER:  Going back on the record
20    at 11:16.
21    BY MR. DAVIS:
22         Q.  Are you familiar with the article by Gerald
23    Scully, "Player Salary Share and the Distribution of
24    Player Earnings," 25: Managerial and Decision
25    Economics, page 77 is the first page, 2004?
```

```
                                         103
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2         A.  No.
 3         MR. DAVIS:  We're going to mark this as
 4    Exhibit No. 4, I believe.
 5         (Oyer Exhibit 4 was marked as
 6              requested.)
 7    BY MR. DAVIS:
 8         Q.  Okay.  If you could turn to page 78.  This
 9    is, as I just indicated, an article by Gerald W.
10    Scully, "Player Salary Share and the Distribution of
11    Player Earnings," 25: Managerial and Decision
12    Economics, 77, year 2004; and on page 78, do you see
13    in the bottom of the left column table 1?
14         A.  Yes.
15         Q.  And do you see where it says "Player
16    compensation as a share of revenue in profession
17    team sports"?
18         A.  Yes.
19         Q.  Is it fair to say that Professor Scully is
20    analyzing professional athlete compensation using
21    what we have called wage shares?
22         MR. WIDNELL:  Objection, form.
23    BY THE WITNESS:
24         A.  I mean, do you want me to -- I'm going to
25    need some time to look this over and agree with
```

```
                                         104
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2    that.
 3         Q.  If you need a few -- if you need a bit of
 4    time just to make sure that it's -- recall, all I'm
 5    asking you is whether he's using wage shares.
 6         (Witness reviewing document.)
 7    BY THE WITNESS:
 8         A.  Okay.  I would -- yep.
 9         Q.  Does he appear to be using wage shares in
10    his analysis?
11         A.  I believe that's what he's doing.
12         Q.  Okay.  And without reviewing the paper any
13    further, are you aware that Professor Scully
14    analyzed compensation as a share of revenue for
15    Major League Baseball, the National Basketball
16    Association, the National Football League, and the
17    National Hockey League to assess monopsony power?
18         A.  I was not aware of that.
19         Q.  Okay.  Where in your report, if at all, do
20    you discuss Dr. Scully's article?
21         A.  I do not discuss Dr. Scully's article.
22         MR. DAVIS:  Let's mark the next document as
23    Exhibit 5.
24         (Oyer Exhibit 5 was marked as
25              requested.)
```

```
                                         105
 1         PAUL OYER - HIGHLY CONFIDENTIAL
 2    BY MR. DAVIS:
 3         Q.  Are you familiar with the article by
 4    Lawrence M. Kahn, "The Sports Business as a Labor
 5    Market Laboratory," 14: Journal of Economic
 6    Perspectives, 2000?
 7         A.  I am not familiar with this article.
 8         Q.  And that is the article that I just marked
 9    as Exhibit 5.  Okay.  Please turn to page 81.  If
10    you turn to the last sentence of the first full
11    paragraph, the second paragraph but the first full
12    paragraph.  He says "Moreover, baseball salaries as
13    a percentage of team revenues rose from 17.6 percent
14    in 1974 to 20.5 percent in 1977 to 41.1 percent in
15    1982 further suggesting that free agency has had a
16    structural effect on baseball salary determination"
17    and cites Zimbalist 1992; do you see that?
18         A.  I do.
19         Q.  Okay.  And then further down in the last
20    paragraph, in the middle of the paragraph, again,
21    beginning "Moreover," Professor Kahn writes
22    "Moreover, salaries as a percent of revenues fell
23    from about 40 percent in 1985 to 32 percent in 1989
24    during the collusion period," again citing
25    Zimbalist.  "In 1989 arbitrators levied a
```

27 (Pages 102 to 105)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

106

PAUL OYER - HIGHLY CONFIDENTIAL

1   200-million-dollar -- 280-million-dollar back-pay
2   penalty on the owners to be paid out over the 1989
3   to 1991 period as compensation for the losses
4   imposed by collusion," citing Staudohar.  Is that
5   how it's pronounced, do you know?
6       A. I've never heard of this person.
7       Q. Okay.  "And salaries as a percent of
8   revenue bounced back to 43 percent by 1991," again
9   citing Zimbalist.  "The collusion episode provides a
10  further illustration of the potential impact on
11  monopsony on salaries."
12      Am I correct that Professor Kahn is
13  analyzing professional athlete compensation using
14  wage shares?
15      A. Professor Kahn is quoting a book written
16  for a lay audience by Andrew Zimbalist in which he
17  cites facts about labor share.
18      Q. When you say "quoting," he's not actually
19  quoting is he?
20      A. My mistake.  He is paraphrasing and citing
21  facts stated in a book for a lay audience written by
22  Andrew Zimbalist.
23      Q. And is he relying on those underlying facts
24  in his analysis?

---

107

PAUL OYER - HIGHLY CONFIDENTIAL

1       A. I would have to read the paper to let you
2   know.
3       Q. Why don't you take a couple moments to read
4   those two paragraphs to see if, in fact, he's
5   relying on those facts as opposed to merely --
6       MR. WIDNELL: I'm going to instruct you
7   read the entire paper -- or review the entire paper
8   to the extent that you feel there may be more
9   information that could be relevant.
10      MR. DAVIS: I suggest you read the
11  paragraphs briefly, and then if you feel like
12  there's more information that needs to be -- that
13  you would need to answer that narrow question, then
14  we can go from there.
15      MR. WIDNELL: I think he should be entitled
16  to see the entire document, look through the entire
17  document at least before he makes some sort of
18  conclusion about what --
19      MR. DAVIS: I haven't disputed that yet.
20      MR. WIDNELL: Well, you're instructing him
21  just to review two paragraphs rather than to
22  consider the paper as a whole I think.
23      MR. DAVIS: I'm asking him to see if he
24  needs to read more to answer that narrow question.

---

108

PAUL OYER - HIGHLY CONFIDENTIAL

1       (Witness reviewing document.)
2   BY THE WITNESS:
3       A. So what's the question?
4       Q. The question is just whether Professor Kahn
5   is analyzing professional athlete compensation using
6   wage shares in these two paragraphs.
7       A. Well, let's be clear about the conclusion
8   he draws here.  He says "The current episode
9   provides a further illustration of the potential
10  impact of monopsony on salaries."
11      Q. That seems to be -- is that an answer to my
12  question?
13      A. Well, I just want to be clear about what
14  we're -- so is that the analysis and conclusions
15  we're talking about?
16      Q. Yes.
17      A. Okay.  I mean, sure.  He states some facts,
18  and he says they're consistent with monopsony as a
19  potential illustration of that.
20      Q. And are those wage-share facts?
21      A. Yes, they are.
22      Q. Without further reviewing the paper, are
23  you aware that Professor Kahn is analyzing the
24  effects of anticompetitive conduct on player

---

109

PAUL OYER - HIGHLY CONFIDENTIAL

1   compensation using wage shares?
2       MR. WIDNELL: I'm going to object for
3   completeness.  I'm not sure how that -- it sounds
4   like you're suggesting there's a conclusion about
5   the entire paper by telling him not to consider the
6   entire paper.
7       MR. DAVIS: I'm asking if he's aware.  If
8   he's not aware without reading the paper, he could
9   simply answer the question I'm not aware one way or
10  the other.
11  BY THE WITNESS:
12      A. So what's the question?
13      Q. The question is, are you aware that in
14  particular Professor Kahn is analyzing the effects
15  of anticompetitive conduct on player compensation
16  using wage shares?
17      A. Among other -- he is using wage share among
18  other means of -- among other methods and measures,
19  sure.
20      Q. Okay.  And are you aware that Professor
21  Kahn is analyzing wage shares for Major League
22  Baseball to assess monopsony power?
23      A. I -- now I think you've made it too strong.
24  I mean, it's an illustration of potential impact.

---

28 (Pages 106 to 109)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

110

PAUL OYER - HIGHLY CONFIDENTIAL

1  Q. Okay. Where in your report do you discuss
2  Dr. Kahn's article?
3  A. I don't discuss Dr. Kahn's article.
4  Q. The next document should be -- is
5  Exhibit 6. Are you familiar with the article by
6  John Vrooman, "Theory of the Perfect Game:
7  Competitive Balance -- excuse me -- Competitive
8  Balance in Monopoly Sports Leagues," 34: Review of
9  Industrial Organization beginning on page 52009?
10  A. Not that I know of.
11  MR. DAVIS: Could you please mark this as
12  Exhibit 6.
13  (Oyer Exhibit 6 was marked as
14  requested.)
15  BY MR. DAVIS:
16  Q. The very first page is page 5 and that has
17  the abstract. In the middle of the abstract he says
18  "Evidence of the sportsman effect is provided by
19  erosion of monopsonistic exploitation in the four
20  major American sports leagues where players now
21  share about 60 percent of revenue." Am I correct
22  that Professor Vrooman in that sentence is analyzing
23  professional athlete compensation using wage shares?
24  A. I don't know what -- what is the sportsman
25

111

PAUL OYER - HIGHLY CONFIDENTIAL

1  effect?
2  Q. It's actually explained two sentences just
3  above in the abstract.
4  (Witness reviewing document.)
5  BY THE WITNESS:
6  A. Okay. So I'm sorry. The question again?
7  Q. My question is just a very narrow one.
8  Where he says in the third sentence -- he's talking
9  about the erosion of monopsonistic exploitation in
10  the four major sports leagues and says where players
11  now share about 60 percent of revenues. My question
12  is just that. When he speaks of 60 percent of the
13  revenues in those leagues as what the players
14  receive, is he using wage share as we've defined
15  it?
16  A. I think so.
17  Q. Okay.
18  Are you aware just as you sit here without
19  reviewing the article, that Professor Vrooman
20  analyzed compensation as a share of revenue in the
21  NFL, Major League Baseball, NBA, and NHL to assess
22  monopsony power?
23  MR. WIDNELL: Objection, form.
24  BY THE WITNESS:
25

112

PAUL OYER - HIGHLY CONFIDENTIAL

1  A. Didn't I already answer that question?
2  Q. Not for this article.
3  A. You asked me if I was aware of this article
4  before.
5  Q. That probably is a logical corollary
6  that --
7  A. I was not aware of this article until you
8  showed it to me.
9  Q. Okay. So of course, you were not aware
10  that Professor Vrooman analyzes wage share for the
11  four major sports to assess monopsony power; is that
12  correct?
13  MR. WIDNELL: So you're not asking him
14  whether or not he believes that's what he does.
15  You're stating that's your belief about what he
16  does, and you're asking if he's aware of that -- of
17  whether or not that's the case; is that right?
18  MR. DAVIS: Yes.
19  MR. WIDNELL: Okay. Got it.
20  BY THE WITNESS:
21  A. I was not aware of this article until you
22  showed it to me. I'm going to leave it at that.
23  Q. So you're not aware one way or another of
24  any use that Professor Vrooman puts wage share to,
25

113

PAUL OYER - HIGHLY CONFIDENTIAL

1  including assessing monopsony power?
2  A. That's right.
3  Q. Okay. Where in your report did you discuss
4  Dr. Vrooman's article?
5  A. I do not discuss Dr. Vrooman's article.
6  Q. Are you familiar with an article by John
7  Twomey and James Monks with the title "Monopsony and
8  Salary Suppression: The Case of Major League Soccer
9  in the United States," 56: The American Economist,
10  pages 20 to 28, and the year is 2011?
11  A. No.
12  MR. DAVIS: Let's mark this as Exhibit 7,
13  which is the article I just described.
14  (Oyer Exhibit 7 was marked as
15  requested.)
16  BY MR. DAVIS:
17  Q. If you could turn to page 20, and in the
18  abstract starting with the third sentence discussing
19  the monopsonistic structure of Major League Soccer,
20  the authors write "This monopsonistic structure was
21  designed to eliminate competition for players across
22  teams within the league and thus allow the league to
23  suppress player salaries. This paper investigates
24  how effective the MLS has been in achieving this
25

29 (Pages 110 to 113)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

114

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  goal and finds that the MLS devotes only about 25
3  percent of its revenues to player salaries compared
4  to 50 to 60 percent in most other U.S. professional
5  sports and professional soccer leagues abroad."
6      My question is am I correct that Professors
7  Twomey and Monks are using wage share to analyze
8  athlete compensation?
9      A. It would appear so.
10     Q. Okay.  And are you aware that Professors
11 Twomey and Monks analyzed wage share for MLS to
12 assess monopsony power?
13     A. Until you showed me this article, I had
14 never heard of John Twomey, James Monks, or The
15 American Economist.
16     Q. Is it fair to say that you are -- that
17 means you're unaware that they analyze wage share
18 for MLS to assess monopsony power?
19     A. That's correct.
20     Q. Okay.  And where in your report do you
21 discuss this Twomey and Monks article?
22     A. I don't.
23     Q. Are you familiar with a paper by James
24 Monk -- Monks, "Revenue Shares and Monopsonistic
25 Behavior in Intercollegiate Athletics"?  It's dated

115

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  on the paper itself September 2013.
3      A. No.
4      MR. DAVIS:  Please mark this as Exhibit 8.
5          (Oyer Exhibit 8 was marked as
6          requested.)
7  BY MR. DAVIS:
8      Q. The paper I just described is Exhibit 8.
9  Please turn to the first page after the title page
10 where there's an abstract.  In the last two
11 sentences he writes, comparing the four major
12 sports -- baseball, basketball, football and
13 hockey -- to NCAA athletics, that whereas the major
14 sports have negotiated aggregate salaries that
15 represent over 50 percent of league-wide revenues,
16 he then says "In comparison analyzing data from the
17 post -- from the Office of Post-Secondary Education,
18 OPE, of the Department of Education on 2,068
19 institutions of higher education reveals that
20 intercollegiate athletes receive payments in kind
21 via athletic scholarships that constitute less than
22 22 percent of total athletic department revenues.
23 Clearly the monopsonistic practices of the NCAA are
24 effective in restricting the compensation of
25 athletes."

116

PAUL OYER - HIGHLY CONFIDENTIAL
1
2      Looking at that, am I correct that
3  Professor Monks is using wage share to analyze
4  college athlete compensation?
5      A. I would guess so based on this.
6      Q. Based on that.  Okay.  And are you aware
7  that Professor Monks analyzes wage share for college
8  athletes to assess monopsony power?
9      A. Well, you've just made me aware of it.
10     Q. Okay.  So you're now aware of it?
11     A. That's right.
12     Q. Where in your report do you discuss this
13 paper by Monks?
14     A. This unpublished working paper that I've
15 never heard of and that leaps to a grand conclusion
16 in the last line of the abstract that seems
17 completely unwarranted, I don't refer to it.
18     Q. Have you read the whole paper?
19     A. I have not.
20     Q. So do you know whether the contents of the
21 paper justify the --
22     A. Yeah.  I mean, I can --
23     Q. -- conclusion?
24     A. The reason I say that in his abstract he
25 says "Clearly," which leads me to think he's saying

117

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  clearly based on what he's presented in the abstract
3  that he can draw that conclusion, and I don't think
4  that's valid.
5      Q. Okay.  But based only on the abstract?
6      A. Agreed.
7      Q. Okay.
8      Let's look back at Exhibit 1.  Can you find
9  that?  So Exhibit 1 you'll recall is the textbook on
10 microeconomics, Robert S. Pindyck and Daniel
11 Rubinfeld, Microeconomics.  The particular version
12 is 9th edition, 200- -- it's labeled 2018, but that
13 seems premature.
14     If you look at pages 540 and 541, there's
15 an example 14.4, and the heading, do you see where
16 it says "Monopsony Power in the Market for Baseball
17 Players"?
18     A. Uh-huh.
19     Q. Okay.  And then if you turn to page 541,
20 the paragraph that spills over from the bottom of
21 this insert left column to the right column, it
22 begins "The result was an interesting experiment in
23 labor market economics.  Between 1975 and 1980 the
24 market for baseball players adjusted to a new post
25 reserve clause equilibrium.  Before 1975

30 (Pages 114 to 117)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

118

PAUL OYER - HIGHLY CONFIDENTIAL

1 expenditures on player's contracts made up
2 approximately 25 percent of all team expenditures.
3 By 1980 those expenditures had increased to 40
4 percent."
5        In those last two sentences where the
6 authors are describing compensation to players as a
7 percentage of all team expenditures, would you
8 characterize that as a wage-share analysis?
9        A. It's interesting you chose those two
10 sentences instead of anything else in this box; but
11 yes, I would characterize those that way.
12       Q. You would characterize those that way.
13 Okay.  And where in your report do you discuss this
14 portion of the Pindyck and Rubinfeld book?
15       A. I don't discuss the Pindyck and Rubinfeld
16 book.  I think it's fair to note for the record that
17 you've shown me a 2018 book and asked me where I
18 reference it.  It would be hard for me to reference
19 a book that's not yet available.
20       Q. It is available, actually, to be clear.
21       A. We don't know that that was true when I
22 wrote my report.
23       Q. If that insert was in the previous edition,
24 then do you think it would have been possible for

---

119

PAUL OYER - HIGHLY CONFIDENTIAL

1 you to have reviewed it in drafting your report?
2       A. Then I can't -- anyway, no, because I
3 didn't review that book, to be honest.
4       Q. Fair enough.
5       Turning back to Exhibit 2, this is your
6 report.  Do you have that before you?
7       A. I do.
8       Q. Okay.  In your report you discuss a
9 particular book on monopsony power in the labor
10 markets, Alan Manning, Monopsony In Motion --
11       THE REPORTER: I'm sorry.
12       MR. DAVIS: I'm sorry.  Yes.  Should I
13 start from the beginning of that sentence?
14       THE REPORTER: No.  After labor markets.
15 BY MR. DAVIS:
16       Q. Alan Manning, M-A-N-N-I-N-G, Alan is
17 A-L-A-N, Monopsony In Motion, and suggests it does
18 not contain analysis -- analyses using wage share;
19 is that correct?
20       A. Where are you pointing me to?
21       Q. Pages --
22       A. It's consistent --
23       Q. -- 6 and 7 of your report.  I think you
24 begin the discussion of Professor Manning's work on

---

120

PAUL OYER - HIGHLY CONFIDENTIAL

1 page -- on paragraph 22.
2       A. Okay.
3       Q. So is it correct that you discuss his book,
4 the one I identified, Monopsony In Motion, and
5 suggest it does not contain analyses using wage
6 share?
7       A. That's right.
8       Q. Are you suggesting that Dr. Manning
9 explicitly rejects wage share concluding it is an
10 inappropriate basis for analyzing compensation in
11 labor markets?
12       A. I have no recollection of him doing that.
13       Q. Okay.  And there's nowhere in your report
14 that you're aware of where you cite him explicitly
15 rejecting wage share for analyzing compensation in
16 labor markets?
17       A. That's right.
18       Q. Okay.  Are you aware that there are
19 numerous other books on monopsony power including in
20 labor markets?
21       A. I -- there must --
22       MR. WIDNELL:  Objection, form.
23 BY THE WITNESS:
24       A. Am I aware that there are other books on

---

121

PAUL OYER - HIGHLY CONFIDENTIAL

1 monopsony in labor markets?
2       Q. Yes.
3       A. There are books on everything.
4       Q. Okay.
5       A. So I -- I can't say that I'm aware of other
6 books on monopsony in labor markets.  I can tell you
7 that I certainly would expect there are many other
8 books on monopsony in labor markets.
9       Q. Okay.  Well, is there some reason you focus
10 on Dr. Manning's books -- book as opposed to the
11 others?
12       A. Yes.  It's a well-known, well-cited, highly
13 regarded book among labor economists.
14       Q. Is it possible that there are other books
15 on monopsony power in labor markets that are
16 similarly well known and similarly broadly cited?
17       A. Is it possible?  I guess.  I mean,
18 anything's possible, right?  I have not done a
19 thorough search of all books on monopsony in the
20 labor market.
21       Q. As a labor economist would you likely be
22 familiar with this particular literature?
23       A. Sure.  I mean, yes and no.  I'm familiar
24 with this literature.  Books are a different story.

31 (Pages 118 to 121)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

122

PAUL OYER - HIGHLY CONFIDENTIAL
1  PAUL OYER - HIGHLY CONFIDENTIAL
2  This was written for -- the main goal of this book
3  is not really to sell to other academic economists.
4  It's to sell to students and lay people interested
5  in the topic.
6      Q. Well, so then would economists find
7  Professor Manning's book and his opinions
8  authoritative?
9      A. Sure.
10     Q. Oh, they would?
11     A. Yeah.
12     Q. Do you think this is a particularly
13 authoritative source on labor markets and monopsony
14 power?
15         MR. WIDNELL: Objection, form.
16 BY THE WITNESS:
17     A. Alan Manning is a recognized expert and
18 leader in the thinking of monopsony -- analysis of
19 monopsony in labor markets.  So his book and his
20 handbook chapter are authoritative sources among
21 labor economists.
22     Q. So it's more that you would say Professor
23 Manning is particularly authoritative, or I guess
24 you could say both, he and his book?
25         MR. WIDNELL: Objection, form.

123

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  BY THE WITNESS:
3      A. So is there a question?
4      Q. Yeah.  Are you saying that both Professor
5  Manning and his book are particularly authoritative?
6      A. Yes.
7      Q. Where in your report do you cite to any
8  publications that say it is inappropriate for a
9  labor economist to use wage share in conducting
10 microeconomic analysis?
11     A. I don't remember citing to that.
12     Q. Where in your report do you cite to any
13 publications that say it is inappropriate for a
14 labor economist to use wage share in assessing the
15 effects of monopsony power?
16     A. Is that different from the last question?
17     Q. The last question was about conducting
18 microeconomic analysis, and this second question was
19 more specifically addressing assessing the effects
20 of monopsony power.  Should I read it back to you
21 just to be clear?
22     A. That would be great.
23     Q. Where in your report do you cite to any
24 publications that say it is inappropriate for a
25 labor economist to use wage share in assessing the

124

1  PAUL OYER - HIGHLY CONFIDENTIAL
2  effects of monopsony power?
3      A. I don't think I cite to that.
4      Q. Where in your report do you cite to any
5  publication that says it is inappropriate for a
6  labor economist to use wage share in determining the
7  marginal product of labor of a worker?
8      A. I don't.  There would be no reason to say
9  that.
10     Q. Okay.  Where in your report do you cite to
11 any publications that use wage level as a measure of
12 the marginal product of labor of professional
13 athletes?
14     A. That use wage level as a measure of -- so
15 can you -- I'm sorry.  I need that one again.
16     Q. Sure.  Where in your report do you cite to
17 any publications that use wage level as a measure of
18 the marginal product of labor of professional
19 athletes?
20     A. I have to think about that one.  I don't
21 think I do.
22     Q. Where in your report do you cite to any
23 publications that measure the marginal product of
24 labor of professional athletes at all?
25     A. I don't that I can recall.

125

1  PAUL OYER - HIGHLY CONFIDENTIAL
2      Q. Where in your report do you cite to any
3  publications that assess the effects of monopsony
4  power on the compensation of professional athletes?
5      A. Sorry.  Can you read that back?
6      Q. Where in your report do you cite to any
7  publications that assess the effects of monopsony
8  power on the compensation of professional athletes?
9      A. And we're not counting the other expert
10 reports as relevant publications on which I comment?
11     Q. You didn't cite to them or rely on them,
12 you said.
13     A. The Singer report and the --
14     Q. Oh, the Singer -- oh, I misunderstood.
15     A. -- and the Zimbalist report?
16     Q. Oh, so the Singer report and the Zimbalist
17 report.
18     A. We're not counting those as whatever --
19 however -- whatever you termed it.  Studies?
20     Q. I had said publications.
21     A. Okay.  But other than those, no.
22     Q. We were talking over each over and, again,
23 I'm as much at fault at least as you.
24     A. Sorry.
25     Q. Just to clarify, you did not cite to any

32 (Pages 122 to 125)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

---

126

1          **PAUL OYER - HIGHLY CONFIDENTIAL**
2  **publications that assess the effects of monopsony**
3  **power on the compensation of professional athletes**
4  **with the possible exception of the Singer and**
5  **Zimbalist reports that you reviewed in this case?**
6     A. That's correct.
7     **Q. What publications have you written that**
8  **measure the marginal product of labor of**
9  **professional athletes?**
10     A. I have not written a publication that does
11  that.
12     **Q. What publications have you written that**
13  **assess the effect of monopsony power on the**
14  **compensation of professional athletes?**
15     A. I have not written a paper on that.
16     **Q. I think I'm just reaffirming what we've**
17  **already established, but it sets a predicate for my**
18  **next question.  So let me just confirm.  Your view**
19  **is that wage share is not an appropriate way to**
20  **evaluate worker compensation or to benchmark**
21  **competition in competitive labor markets; is that**
22  **correct?**
23     A. That's correct.
24     **Q. Do you think that's a standard view for**
25  **economists?**

---

127

1          **PAUL OYER - HIGHLY CONFIDENTIAL**
2     A. For labor economists I believe that would
3  be a standard view.
4     **Q. Do you think other economists would share**
5  **your view, other labor economists would share your**
6  **view?**
7     A. I do.
8     **Q. Do you think, for example, David Autor,**
9  **A-U-T-O-R, whom you cite, would share that view?**
10     A. I do.
11     **Q. How about Barry Hirsh or Edward Shumacher?**
12     A. I do.
13     **Q. You think they would share that view too?**
14     A. I do.
15     **Q. Alan Manning, do you think he would share**
16  **that view?**
17     A. I do.
18     **Q. Edward Leamer, do you think he would share**
19  **that view?**
20     A. Edward Leamer is not a labor economist.
21  He's a very good economist.  Based on the very
22  redacted version of his expert report in high-tech
23  workers, I would guess he would share that view.
24     **Q. Okay.  What about Suresh Naidu?**
25     A. I would assume he would share -- I would

---

128

1          PAUL OYER - HIGHLY CONFIDENTIAL
2  guess that he would share that view.
3     MR. DAVIS:  I am at a good breaking point.
4  On the other hand, I could go forward.  What do
5  folks prefer?
6     MR. WIDNELL:  Is lunch here?
7     MR. NAKAMURA:  Lunch is here.
8     MR. DAVIS:  Shall we take a break?  Okay.
9  Let's go off the record.
10     THE VIDEOGRAPHER:  Going off the record at
11  11:51.
12        (Whereupon, at 11:51 a.m., the
13        deposition was recessed, to
14        reconvene at 12:35 p.m., this
15        same day.)
16
17
18
19
20
21
22
23
24
25

---

129

1          PAUL OYER - HIGHLY CONFIDENTIAL
2          AFTERNOON SESSION
3        (12:41 p.m.)
4     THE VIDEOGRAPHER:  We are going back on the
5  record at 12:41.  This begins disk No. 4.
6        PAUL OYER,
7  the witness at the time of recess, having been
8  previously duly sworn, was further examined and
9  testified as follows:
10        EXAMINATION
11       (Resumed)
12       (Oyer Exhibit 9 was marked as
13        requested.)
14  BY MR. DAVIS:
15     **Q. Okay.  I'd like to introduce Exhibit No. 9,**
16  **I think is the next one.  Yes.  It should be Kevin**
17  **Murphy and Paul Oyer, "Discretion in Executive**
18  **Incentive Contracts, Theory and Evidence," a draft**
19  **marked June 2001.  Do you recognize this document?**
20     A. I have much less fond memories of this one;
21  but yes, I do.
22     **Q. Okay.  What is it?**
23     A. It's a paper -- it's a working paper
24  version of a paper I wrote many years ago.
25     **Q. Okay.**

---

33  (Pages 126 to 129)

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

170

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    sports.
3          Q.  That's a bit of a mouthful.  I guess, sure,
4    if you prefer the Zimbalist sports.  It doesn't trip
5    off the tongue like major sports.
6          A.  Okay.  We'll call them the major sports if
7    it means a lot to you.
8          Q.  The major sports.  Thank you.  All right.
9          So I'm going to just give a very short
10   description of each category of reason to make sure
11   that we are on the same page, and then we can talk
12   more about each of those perhaps in depth.
13         In paragraph 56 you offer what might be
14   labeled the nascent business explanation, and that
15   says generally that nascent businesses often face
16   different cost and revenue structures than
17   established businesses with nascent sports leagues
18   possibly paying lower revenue share than established
19   sports leagues.  Is that a fair summary?
20         A.  Yes.
21         Q.  Okay.  And then in paragraph 57 you offer
22   what I -- what we might call the substitutability
23   explanation, that marginal fighters may be better
24   substitutes for top fighters compared to marginal
25   athletes in the major sports.  Is that a fair

171

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    summary?
3          A.  Yes.
4          Q.  Okay.  And then in paragraph 58 you offer
5    the scale of revenue explanation, which broad-brush
6    is that the scale of revenue may explain the
7    difference such that leagues with greater -- greater
8    revenue may pay a higher share of their revenue to
9    athletes in leagues with lesser revenue.  Is that
10   a fair broad-brush description?
11         A.  Yes.
12         Q.  Okay.  So just to summarize, we have the
13   nascent business explanation, the substituted --
14   substitutability explanation, and the scale of
15   revenue explanation.  Are you aware of any other
16   reasons why the UFC might pay a lower share of
17   revenue to its athletes than the major sports?
18         A.  I mean, I guess there are other differences
19   that could affect the shares of revenue one way or
20   the other.  I haven't thought off the top of my head
21   about whether it would -- which way -- which way it
22   would fall.
23         Q.  Okay.  So these are the only ones that
24   you've analyzed in your report and that you are
25   using -- that you're opining about in this

172

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    litigation?
3          A.  They're the ones that are in my report.
4          Q.  Let's start with the nascent business
5    explanation.  Is it your opinion that, all else
6    equal, if a league is earlier in its development it
7    would be expected to pay a lower share of its
8    revenue to its fighters than it would pay as it
9    matures?
10         A.  Not necessarily.
11         Q.  Not necessarily.  So it's possible that you
12   have it exactly backwards, that nascent sports
13   businesses pay a higher share of revenue so that the
14   major sports are a conservative benchmark in this
15   regard?
16         A.  That's empirically not true, right.  So I
17   don't think that -- I don't think I have it exactly
18   backwards like as a general rule or something.  I
19   don't think we know the general rule.  I think that
20   we can't make a comparison about how things get done
21   in a nascent sport versus a not nascent sport, for
22   lack of a better way of saying it.
23         Q.  So you have no idea one way or the other,
24   though?
25         MR. WIDNELL:  Objection, form.

173

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    BY THE WITNESS:
3          A.  I have no idea one way or the other about
4    what?
5          Q.  You have no idea whether a nascent sport or
6    a mature sport pays a higher revenue share or if, in
7    fact, a nascent versus mature sport, that
8    distinction doesn't matter at all?
9          A.  I wouldn't say I have no idea.  I mean,
10   we're looking at a bunch of nascent sports that have
11   very low shares.  You've shown me a bunch of papers
12   that show that these other sports over time increase
13   the share that went to the players.
14         Q.  Do you know whether that share increased
15   because the sport matured or whether it increased
16   because of the elimination of anticompetitive
17   practices?
18         A.  I don't -- I mean, certainly my guess would
19   be some of the latter, but I don't know about -- you
20   know, would I guess some of the former too?  Depends
21   on the timing, of course.
22         Q.  Do you have any evidentiary basis in your
23   report that the distinction between a nascent and a
24   mature league actually matters for these purposes at
25   all?

44 (Pages 170 to 173)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

**PUBLIC COPY - REDACTED**

PAUL OYER. - HIGHLY CONFIDENTIAL

190

PAUL OYER - HIGHLY CONFIDENTIAL
1
2      Q.  Virtually never?
3      A.  Virtually never.
4      Q.  Okay.  So when you say "monotonicity and
5  even linearity of sharing rules are common in
6  organizations," what you're saying is that
7  there's -- it's quite common for there to be a
8  positive share that the worker gets as output goes
9  up and even for that share to be linear.  So even
10 for that share to be a fixed share of the marginal
11 output?
12     A.  It's -- correct.  Monotonicity is -- you
13 could say something much stronger than common.
14 Monotonicity is virtually always true.
15     Q.  Okay.
16     A.  And linearity is common.
17     Q.  Okay.  And the linearity, though, is
18 realistically going to be positive, there's some
19 positive share?
20     A.  Well, flat would be a very common thing
21 too.
22     Q.  Okay.
23     A.  There's no -- you just have a salary.
24     Q.  So flat could be common, but it's also
25 common to see positive linearity?

191

PAUL OYER - HIGHLY CONFIDENTIAL
1
2      A.  Correct.
3      Q.  Okay.  Okay.
4         Let's turn to page 1813 of the same
5  exhibit.  Do you see the header on page 18 -- 1813,
6  "3.2.9, Hiring, Agglomeration, and Firm Location"?
7      A.  I do.
8      Q.  Okay.  And then starting with the second
9  sentence -- the first paragraph, the second sentence
10 says "Larger and more concentrated populations
11 typically lead to thicker labor markets which may
12 reduce search costs and can also lead to better
13 average matches between firms and workers.  While
14 this will tend to increase surplus, thicker labor
15 markets also lead to greater competition in the
16 labor market.  So while total surplus may be greater
17 in thicker labor markets, firms may have to settle
18 for a smaller share of that surplus because it is
19 more difficult to generate monopsony power."  Do you
20 see that?
21     A.  I do.
22     Q.  Okay.  So I'm going to ask you a bunch of
23 questions that are largely designed to just
24 understand what you're saying there and what those
25 words mean.  Okay.

192

PAUL OYER - HIGHLY CONFIDENTIAL
1
2         What do you mean by "thicker labor
3  markets"?
4      A.  I have a chapter in one of my books that
5  goes into this in great detail which I highly
6  recommend.
7      Q.  I look forward to reading it.
8      A.  A thicker labor market -- or a thicker
9  market, forget about labor market, is just one where
10 there's more buyers and sellers.
11     Q.  Okay.  Where there's -- okay.  Good.  So
12 then what is a thicker labor market?
13     A.  A thicker labor market is -- let's take the
14 simplest example -- let's take a simple example, an
15 on-line job board.  Okay.  So if you go to
16 careerbuilder.com there's literally thousands of
17 firms listing jobs and literally probably millions
18 of people looking for jobs.  It's a very thick labor
19 market.  There's a lot of opportunities to match and
20 meet each other.
21     Q.  Okay.
22     A.  If I take another labor market, which is
23 the classified ads of the Palo Alto Weekly, probably
24 doesn't even exist -- that probably does not even
25 exist anymore, but there was a time where that was a

193

PAUL OYER - HIGHLY CONFIDENTIAL
1
2  thin labor market.  It listed a few jobs, a few
3  people read it, maybe they would find each other,
4  and, you know, it was probably not a very efficient
5  way to go about looking.  So there was not a lot of
6  transactions.
7         You know, you can take it outside of the --
8  again, sorry, but to take it to another example, you
9  can have a stock that sells in a very thin market
10 where there's only a few buyers and sellers and a
11 few shares transact every day, and then there's
12 something like --
13     Q.  So you have to slow down a little bit, if
14 you could.
15     A.  -- and then you have something like Google
16 which, you know, there's literally thousands of
17 people buy it every day and literally thousands of
18 others sell it every day.
19     Q.  Okay.  So a thicker labor market is one
20 with more participants and a thinner one is one with
21 fewer participants; is that fair to say?
22     A.  Yes.
23     Q.  And a thicker labor market could be one
24 with more employers, it can be one with more
25 employees or workers, not necessarily employees, or

49  (Pages 190 to 193)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

194

1        PAUL OYER - HIGHLY CONFIDENTIAL
2   both; is that fair to say?
3        A.  I would say that -- I'd have to think this
4   through, but a thicker labor market is going to
5   be -- you're really -- thickness involves more of
6   both.
7        Q.  Okay.  Usually more of both.  Okay.  Both
8   employers and workers?
9        A.  That's right.
10       Q.  Okay.  Why do thicker labor markets lead to
11  greater competition in the labor markets?
12       A.  Well, thicker markets lead to greater
13  competition, period.  That's a fundamental point in
14  economics.
15       Q.  Okay.
16       A.  So --
17       Q.  But just to stick to the labor market in
18  particular, why do thicker labor markets lead to
19  greater competition?
20       A.  Right.  So if it's costly -- so there's a
21  class of models in labor economics called search
22  models -- and people have won the Nobel Prize for
23  this -- and it's a very important point, and it just
24  says that if I want to go hire a worker I have to
25  go -- there's some costs to that.

---

195

1        PAUL OYER - HIGHLY CONFIDENTIAL
2        Q.  Okay.
3        A.  I have to search for them, I have to find
4   them, I have to interview them, I have to run a
5   background check on them, all sorts of things like
6   that.  The background -- some of those things I just
7   said aren't that relevant to thicker markets, but
8   one of them is I have to go find them.  So in a
9   thick labor market if I can find ten candidates
10  immediately and quickly determine who are the better
11  ones, that -- that's better -- that's better for me
12  as a firm.
13       Q.  Okay.
14       A.  It's also better for the worker because
15  they don't have to interview as often, they don't
16  have to -- they don't have to spend time sending out
17  resumes.
18       Q.  Okay.  Maybe it's implicit in what you
19  said, but I just want to be clear.
20       A.  Sure.
21       Q.  How does that lead to greater competition?
22       A.  Oh.  So just by -- if each worker is
23  talking to ten firms simultaneously and finding the
24  best match and each firm is talking to ten workers
25  simultaneously and finding the best match, that's a

---

196

1        PAUL OYER - HIGHLY CONFIDENTIAL
2   much more -- that leads to each side having better
3   options and more competition to hire or to be hired
4   than if there were two workers and two firms.
5        Q.  Okay.
6        So you say -- you say in this paragraph, if
7   I'm interpreting it correctly, that in a thicker
8   labor market it is more difficult for presumably
9   employers to generate monopsony power; is that -- is
10  that correct?
11       A.  Right.  I mean, it's almost by definition.
12       Q.  Okay.  And just -- I'm sorry, but just --
13  just walk me through that.  I think you've just
14  described it, but just walk me through that.
15       A.  Well, a monopsonistic labor market is one
16  where there's one firm in the extreme.
17       Q.  In the -- okay.
18       A.  I would still call it monopsonistic if you
19  had a few firms acting as a cartel or, you know,
20  something like that, but that by definition is a
21  thinner market because the employees have fewer
22  options.
23       Q.  And so then what happens is because -- am I
24  right that what happens is because the workers can't
25  go to different prospective employers and play them

---

197

1        PAUL OYER - HIGHLY CONFIDENTIAL
2   off against each other, the employer with
3   monopsonistic power is able to pay lower wages than
4   it would in a competitive market; is that fair?
5        A.  That's right.  That's exactly right.
6        Q.  Okay.
7        Now, you also indicate that total surplus
8   may be greater in thicker markets.  Why is that?
9        A.  Okay.  So this is -- so this is where the
10  stock market is different from the labor market.
11  The labor market is a market of differentiated
12  goods.  So workers are not perfect substitutes for
13  each other for reasons we discussed this morning.
14  It's closer to true in the case of a lower -- some
15  low skill labor markets, but even then no two
16  people are exactly the same.
17       Q.  Okay.
18       A.  So if you have two -- now we're going to go
19  back to a very simple world.  We have two firms, two
20  workers, and those two workers are differentiated in
21  a way where one is more productive on average than
22  the other and it's likely that they have what we
23  would call a comparative -- each has what we would
24  call a comparative advantage.
25       Q.  Okay.

---

50  (Pages 194 to 197)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

198

PAUL OYER - HIGHLY CONFIDENTIAL

1
2    A. So there might be one who is just more --
3    who went to college and is just more productive,
4    they can read better or something like that, and
5    that person has what we call an advantage.
6    But they might -- but then if you look at the two
7    different firms, if they're producing different
8    things, it might be the case that these two
9    different employees have -- two different workers
10   have what we would call a comparative advantage.
11       So you might be a better fit for both --
12   you might be more productive at either firm than
13   Eric, right?  Is that -- you might be more
14   productive than Eric at either firm, but you might
15   be especially more productive at firm A.  And at
16   firm B you would be more productive than him, but
17   it's better -- the overall amount we're going to
18   produce is higher if you go to firm A and he goes to
19   firm B.
20       Q. I see.  So in general in a labor market
21   having more employers and more workers, a thicker
22   market is likely to result in, as you say, a greater
23   surplus -- total surplus?
24       A. That's right.
25       Q. Okay.  And presumably does that mean

---

199

PAUL OYER - HIGHLY CONFIDENTIAL

1
2    greater productivity?
3       A. Yeah, I would say that's right.
4       Q. And then presumably that would also lead in
5    turn to greater compensation, all else equal?
6       A. Yeah, I think that's right.
7       Q. You also say that while there's that
8    greater total surplus -- I'm paraphrasing -- that
9    any given firm may have to settle for a smaller
10   share of that surplus and that ties into the
11   monopsony power I think, but can you just explain
12   why the firms would have to settle for a smaller
13   share of that surplus?
14       A. So -- well, so let's think about that.  Let
15   me give you a very simple example.  If you go to
16   work at firm A, you produce ten.  If you go to work
17   at firm B, you produce eight.
18       Q. Okay.
19       A. If Eric goes to work at firm A, he produces
20   seven.  If Eric goes to work at firm B, he produces
21   six.
22       Q. Okay.
23       A. Okay.  So they have to pay you seven -- I'm
24   sorry.  Firm B is willing to pay you up to eight, so
25   firm A hires you and pays you eight, okay, because

---

200

PAUL OYER - HIGHLY CONFIDENTIAL

1
2    your outside option is eight.
3       Q. Okay.
4       A. So you go work for that firm.  You create
5    two of surplus for that firm and they keep two and
6    you keep eight.  Now let's throw in a third firm and
7    a third worker.  So that third worker if -- so I'm
8    going to mess this example -- I always mess these
9    examples up when I do them on the fly.  But if we
10   add a third worker, it's quite likely -- a third
11   firm and a third worker and let's say -- let's say
12   at this third firm you would produce nine.  So now
13   you have ten, nine, and eight.  Eric is seven, six,
14   and five or something like that.  So now that first
15   firm has to pay you ten -- I'm sorry -- nine to get
16   you to go work there.  And so the surplus is the
17   same because we still created ten, but you now have
18   one more unit of it than you had before in the
19   thinner labor market.
20       Q. Okay.  So in the thicker labor market with
21   more employers and more workers, all else equal,
22   what we expect is greater surplus and greater
23   productivity, but any given firm is likely to get a
24   smaller share of that surplus because the
25   competition, among other things, can force the firm

---

201

PAUL OYER - HIGHLY CONFIDENTIAL

1
2    to pay higher wages to the worker?
3       A. yeah.  And -- exactly.  And so the reason
4    we have greater surplus in the example I just gave
5    you is that second firm, that's a nothing -- the
6    example I gave you that we worked out told you
7    nothing about total surplus.  We need Eric to come
8    back in for there to be total surplus because that
9    second firm now hires him where he produces -- I'm
10   going to mess the numbers up, but he produces a
11   little more than he did before and his wage also
12   goes up.
13       Q. Nice.
14       A. Well, we don't know because we don't have a
15   third -- we need a third person to set his
16   outside -- a third firm to set his outside...
17       Q. But without -- fair enough.  It's very
18   challenging to do these hypotheticals on the fly,
19   but I think we're -- I think we've got clarity that
20   the -- about the general dynamic, right, of a
21   thicker market causing there to be more -- well,
22   means that there are more employers and more workers
23   and will tend to create overall surplus and overall
24   productivity and higher wages or higher
25   compensation, but lower amounts of surplus may go to

---

51 (Pages 198 to 201)

PUBLIC COPY - REDACTED

PAUL OYER. - HIGHLY CONFIDENTIAL

---

202

1          PAUL OYER - HIGHLY CONFIDENTIAL
2    any one employer; is that fair?
3        A. Yes.
4        Q. Okay. Okay. Let me switch -- switch
5    topics.
6          Are you a sports economist?
7        A. I don't know how one would define that.
8        Q. Do you think of sports economics as a
9    distinctive area of economics?
10       A. Not really. I mean, sort of, but not...
11       Q. But you haven't ever analyzed -- written a
12   paper analyzing compensation to workers in the
13   sports context; is that fair to say?
14       A. I don't believe I've written a paper
15   analyzing sports.
16       Q. Have you taught sports economics?
17       A. You mean like a whole class in sports
18   economics?
19       Q. Yes.
20       A. No.
21       Q. Okay. Have you worked as a consultant or
22   other expert for a sports league?
23       A. I've worked -- I've worked for sports --
24   I've worked as a consultant for sports
25   organizations.

---

204

1          PAUL OYER - HIGHLY CONFIDENTIAL
2        A. Yes.
3        Q. Yeah. Which side were you on? Were you
4    retained by the coaches or by the NCAA?
5        A. The NCAA.
6          MR. DAVIS: Why don't we take a short
7    break.
8          THE WITNESS: Okay.
9          THE VIDEOGRAPHER: Going off the record at
10   2:35.
11         (A short break was had.)
12         THE VIDEOGRAPHER: We are going back on the
13   record at 2:47. This begins disk No. 5.
14   BY MR. DAVIS:
15       Q. Have you ever testified at deposition or
16   trial for a Plaintiff in an antitrust case?
17       A. At deposition or at trial, no.
18       Q. Have you ever testified in any other
19   context for a Plaintiff in an antitrust case?
20       A. So what do you mean? What do you mean by
21   "testified"? What -- "testified" meaning in a
22   situation such as this?
23       Q. Have you ever supported in any way as an
24   expert a Plaintiff in an antitrust case?
25       A. Yes.

---

203

1          PAUL OYER - HIGHLY CONFIDENTIAL
2        Q. In that work did you do any analysis of the
3    compensation of athletes?
4        A. Athletes, no.
5        Q. Which sports organization did you work for?
6        A. These are consulting arrangements I had.
7    What are the rules on sort of -- I have to be
8    fair to -- you know, these were prior litigation
9    cases. I don't know to what -- I can give you --
10       Q. Right.
11       A. I don't know exactly what's public and
12   what's not on these.
13       Q. Were you ever disclosed as an expert in a
14   litigation?
15       A. I'm trying to think if I -- I mean, I just
16   don't know the answer to that. Yeah, in one I was
17   disclosed as an expert to the other side for sure.
18   I don't know what happened. The case then ended and
19   I was told to destroy all documents. What happens
20   in that case?
21       Q. What case -- what case was that at least?
22       A. It was a case between the NCAA and some
23   former coaches at Penn State University.
24       Q. And was it -- was it about coach
25   compensation; was that the issue generally?

---

205

1          PAUL OYER - HIGHLY CONFIDENTIAL
2        Q. In what context was that?
3        A. So I was the -- I was going to work -- I
4    briefly worked as Plaintiff's expert in the
5    High-Tech worker litigation -- yeah, the High-Tech
6    workers' litigation case, the antitrust case.
7        Q. In the Northern District of California?
8        A. That's right.
9        Q. Did you offer any written opinion in that
10   case?
11       A. No.
12       Q. Did you ever testify -- and you didn't
13   testify at deposition or at trial?
14       A. No.
15       Q. With whom did you work?
16       A. Joseph (indecipherable).
17         THE REPORTER: I'm sorry?
18   BY THE WITNESS:
19       A. Lieff Cabraser Heimann & Bernstein.
20       Q. Interesting.
21         And so you only consulted in that matter;
22   is that fair to say?
23       A. I was -- I left the case before it got very
24   far.
25       Q. Okay. Is that the only time that you

52 (Pages 202 to 205)

**PUBLIC COPY - REDACTED**