# Exhibit 56

Deposition of Robert H. Topel
(December 5, 2017) (excerpted)

PUBLIC COPY - REDACTED

PUBLIC COPY - REDACTED

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
            Plaintiffs,           )
                                 )
      vs.                        )  Case No.
                                 )  2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
            Defendant.            )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROBERT TOPEL

Washington, D.C.

December 5, 2017

9:34 a.m.




REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52568

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

42

1      Q.  And in computing or determining the
2  marginal revenue product of either an NBA player or
3  a WNBA player, does it matter to you how the NBA
4  came to have a larger market than the WNBA?
5      MR. ISAACSON:  Objection to form.
6  BY THE WITNESS:
7      A.  For the -- could you read the beginning of
8  the sentence?
9      Q.  Yes.  In computing the marginal revenue
10  product or in determining the marginal revenue
11  product of an NBA player versus a WNBA player, does
12  it matter to you as an economist how it was that
13  the WNBA [sic] came to have a larger market than
14  the WNBA does?
15      A.  I mean, for simply the purpose of you're
16  assuming that he could compute this.
17      MR. ISAACSON:  You said WNBA having a
18  larger market than WNBA, which I don't think you
19  want.
20      MR. CRAMER:  Correct.  I'll stand
21  corrected.  I'll ask it again.
22  BY MR. CRAMER:
23      Q.  For the simple purpose of just determining
24  the marginal revenue product of an NBA player and a
25  WNBA player, does it matter to you how the NBA came

43

1  to have a larger market than the WNBA?
2      MR. ISAACSON:  Objection to form.
3      MR. CRAMER:  You can answer.
4      A.  Well, it can, but you've asked it in the
5  sense of if you were simply -- assuming I could do
6  this computation because marginal revenue product
7  is a concept, it's not something that I've --
8  you've just got a spreadsheet, you can press a
9  button and get it.  In certain context it would
10  matter, depends on what you're analyzing, and in
11  certain context it wouldn't.  But if all you wanted
12  to know is what's the marginal revenue product of
13  Lebron James if -- when he's added to the roster
14  of -- I'll change teams -- Oklahoma City, then as
15  opposed to -- and I can't remember the names of any
16  WNBA athletes and maybe that's your point -- when I
17  move one of those players from one franchise to
18  another what's the marginal revenue product,
19  conceptually I don't need to know what caused it.
20  But then it has different -- what caused it has
21  different implications for the form of contracts
22  and all sorts of things.
23      Q.  It's fair to say that in this case you
24  made no effort to compute the marginal revenue
25  product of any MMA fighters, correct?

44

1      A.  If what you're asking is did I compute the
2  addition to revenues that would come from adding a
3  marginal fighter to the stock of fighters holding
4  constant everything else about the organization,
5  no, no one's done that in this case.
6      Q.  Is it fair to say that the marginal
7  revenue product of MMA fighters as a whole is
8  roughly equivalent to the degree to which they
9  contribute to MMA event revenues?
10      MR. ISAACSON:  Objection to form.
11  BY THE WITNESS:
12      A.  I don't know what you mean by "as a
13  whole."
14      Q.  Is it fair to say that the marginal
15  revenue product of MMA athletes or a MMA fighter,
16  put it that way --
17      A.  Let's do a MMA fighter.
18      Q.  Okay.  All right.  Is it fair to say that
19  the marginal revenue product of a MMA fighter is
20  roughly equivalent to the degree to which he or she
21  contributes to event revenues?
22      A.  Well, I mean --
23      MR. ISAACSON:  Objection to form.
24  BY THE WITNESS:
25      A.  -- there's all sorts of revenue sources.

45

1  The way I described it a minute ago -- and I'm
2  going to prefer my definition to yours -- is that
3  the marginal revenue product of an individual is
4  the addition to the organization's revenues from
5  all sources when that individual is added to the
6  labor force of the organization holding constant
7  everything else that the organization does to
8  generate revenue.
9      Q.  And you made no effort in this case to
10  compute again the marginal revenue product of any
11  MMA athlete, correct?
12      MR. ISAACSON:  Asked and answered.
13  BY THE WITNESS:
14      A.  I don't think anybody in this case has --
15  has done that.  The marginal revenue product is a
16  concept.
17      Q.  Have you made an effort to estimate in any
18  way the marginal revenue product of MMA fighters in
19  your work in this case?
20      A.  As a -- as a measure of what they add to
21  revenues, no one's done that, but to the extent --
22  if the market was competitive, then the marginal
23  revenue product would be equal to what they get
24  paid.
25      Q.  So --

12  (Pages 42 to 45)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

46

1      A.  It comes back to a sentence you asked me
2  about -- about 45 minutes ago.  So I'm just
3  restating the obvious.
4      Q.  So if the market's competitive, the
5  athlete will get paid equal to his marginal revenue
6  product; and if there's monopsony power in the
7  market, the athlete will get paid below his
8  marginal revenue product, correct?
9      A.  Yeah.  All athletes, not just Zuffa
10  athletes.
11      Q.  And are you assuming for your work in this
12  case that the MMA market is competitive?
13      A.  I don't know whether it's perfectly
14  competitive, but it's -- it's highly competitive.
15      Q.  Is that an assumption of yours or a
16  finding of yours?
17      A.  It's a finding because other people are
18  competing for athletes and Zuffa has to compete for
19  athletes.
20      MR. CRAMER:  The court reporter would like
21  us to take a break and she's in charge.
22      THE VIDEOGRAPHER:  Going off the record at
23  10:31.
24          (A short break was had.)
25      THE VIDEOGRAPHER:  We are going back on

47

1  the record at 10:43.  This begins disk No. 2.
2  BY MR. CRAMER:
3      Q.  The court reporter has told me that we
4  have a tendency to talk over each other.  So let's
5  really both do our best to try and stop doing that.
6  I will try to do my part.
7      All right.  Turn to paragraph 32, please.
8  The bottom of page 12, the last sentence begins
9  "Overall attendance at MMA events immediately

[redacted]

20      Q.  Okay.  And you would agree that the growth
21  in viewership has increased the amount of revenue
22  that Zuffa generates from the average UFC event,
23  correct?
24      A.  Yes.
25      Q.  And this growth in revenues has also

48

1  increased the amount of revenues generated by UFC
2  fighters at each Zuffa event, right?
3      A.  It -- it increased the revenue that
4  generated by fighters.
5      MR. ISAACSON:  Object to form.
6  BY THE WITNESS:
7      A.  It's too vague.
8      Q.  Okay.  I will -- I will restate the
9  question.  The growth in revenues that flowed in
10  part from the growth in viewership during this
11  period also was a reflection of the increased
12  marginal revenue product of UFC fighters,
13  correct?
14      MR. ISAACSON:  Objection to form.
15  BY THE WITNESS:
16      A.  I think I understand what you're saying.
17  I'm going to agree with it, but I'm not quite sure
18  what you're saying, but go ahead.
19      Q.  Okay.  I don't want -- I don't want you
20  not to be sure.  I don't think Mr. Isaacson wants
21  you not to be sure either.  So let me ask it a
22  different way.  Is it fair to say that the
23  increased fighter marginal revenue product would be
24  correlated with the growth in UFC event revenues
25  over this period?

49

1      MR. ISAACSON:  Objection to form.
2  BY THE WITNESS:
3      A.  Well, not necessarily.  It depends on
4  what -- to what the increase in event revenues is
5  attributable.
6      Q.  Is it your opinion that fighter marginal
7  revenue product at the UFC did not increase from
8  2009 to 2016?
9      A.  No, that's not what I said.
10      Q.  So you do --
11      A.  But the mere fact -- sorry if we talked
12  over each other, but I think I'm completing a
13  thought.  The mere fact that more people watched
14  doesn't mean that the marginal revenue product of
15  any particular input has -- has increased.
16      Q.  If we assume for purposes of this question
17  that the marginal revenue product of fighters has
18  indeed increased from 2009 -- strike that.
19      Turn to paragraph 126, please.  At the
20  beginning of paragraph 126 you say "To state the
21  obvious, an athlete's pay as a share of event
22  revenue can easily decline even if pay measured as
23  it should be in dollars per athlete is increasing.
24  This is especially likely if Zuffa's promotional
25  investments drive greater interest in its MMA

13  (Pages 46 to 49)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

50

1    events so that Zuffa's revenues at each event
2    increased because the greater attendance -- because
3    of great attendance or viewership"; do you see
4    that?
5        A. Yes.
6        Q. So would you agree that in general the
7    share of UFC event revenues going to fighters did,
8    in fact, decline over time, say, from 2009 to 2016
9    even as fighter compensation measured in dollars
10   per fight increased?
11       A. I'm not sure it declined in every year,
12   but I think that -- I think the evidence is that
13   fighter compensation increased at a different rate,
14   a slightly lower rate -- or somewhat lower rate
15   than the increase in revenues so that the ratio
16   would be lower.
17       Q. So what is happening over time, in your
18   view, is that the UFC event revenue pie is
19   increasing while the UFC's share of event revenues
20   relative to the fighter's collective share is
21   increasing; is that fair?
22       MR. ISAACSON: Objection to form.
23   BY THE WITNESS:
24       A. Well, I don't know that. You're defining
25   a pie. The ratio of fighter compensation to total

51

1    event revenue in which they fight was on average
2    lower as those revenues increased.
3        Q. Okay. That's fair. In other words, the
4    UFC as a business is keeping a larger share of
5    event revenues for itself over time as event
6    revenues increase; is that fair?
7        MR. ISAACSON: Objection to form.
8    BY THE WITNESS:
9        A. No.
10       Q. In other words, the UFC is paying -- I'll
11   strike that.
12       And, in your view, the fact that UFC
13   fighter compensation is growing slower than UFC's
14   event revenues can be explained because Zuffa's
15   promotional investments drive greater interests in
16   MMA events?
17       A. That would happen if the last part of your
18   sentence is true.
19       Q. So one explanation, in your view -- one
20   possible explanation, in your view, for the fact
21   that growth in event revenues is outstripping
22   growth in fighter compensation is that Zuffa's
23   promotional investments drive greater interest in
24   MMA events; is that right?
25       A. That could make it happen, yes.

52

1        Q. Is it your opinion that Zuffa's
2    promotional investments drive greater interest in
3    MMA events that that explanation is what's causing
4    fighter compensation to grow more slowly than event
5    revenues?
6        A. Well, that combined with the market
7    structure, yes.
8        Q. And what is that opinion -- putting the
9    market structure part aside for the moment, what is
10   that opinion based upon?
11       A. Well, I look at the -- these sort of
12   poster child for Zuffa investment is the ultimate
13   fighter television program that generated so much
14   interest and that grew interest in the -- in the
15   event, but advertising, choosing the right com- --
16   finding the right athletes, choosing the right
17   combinations of athletes to compete against each
18   other, designing the sequence of fights that a
19   fighter's going to be in, those are all activities
20   that Zuffa engages in to -- as part of its business
21   model.
22       Q. Which one of those activities you just
23   described would enhance event revenues without also
24   enhancing fighter marginal revenue product, if any?
25       A. Well, any one of them actually could do

53

1    that because the definition of marginal revenue
2    product is what this individual added to the stock
3    adds to my revenues holding everything else
4    constant. And so the television program could have
5    increased the event revenues without for any
6    particular fighter changing that fighter's marginal
7    revenue product, because the marginal revenue
8    product does not identify the particular event. I
9    mean, the firm's making a calculation of how much
10   it's going to sell and at what prices over time and
11   what all other investments it's going to make. And
12   so marginal revenue product is far removed from
13   simply the event revenue which a fight -- fighter
14   is fighting.
15       Q. Where in your report, if anywhere, do you
16   provide an analysis of those portions of Zuffa's
17   investments that do not contribute to fighter
18   marginal revenue product?
19       A. Are you -- I'm confused as to what you're
20   asking. Are you saying that certain inputs to the
21   process of producing Zuffa's product are
22   complementary with -- with the talents of athletes
23   so that if I advertise that raises the productivity
24   of an athlete, it's sort of what in technical
25   jargon it would be Q complements or something?

14 (Pages 50 to 53)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

54

1   They're all com- -- they can all be complementary
2   if that's what you're asking, but I don't know.
3       **Q.  So all of the investments that you have**
4   **discussed that have generated additional revenues**
5   **for Zuffa over time, event revenues for Zuffa over**
6   **time could well be complements to fighter talent,**
7   **correct?**
8       A.  Any of the inputs used could be
9   complements to fighter talent.
10      **Q.  And if those inputs used are complements**
11  **to fighter talent, then adding those inputs would**
12  **increase the marginal revenue product of the**
13  **fighter, all things equal, correct?**
14      A.  Well, holding constant all the other
15  things that happen, it can shift marginal product.
16  Whether in equilibrium it changes marginal revenue
17  product at the quantity that's actually employed is
18  another question.
19      **Q.  You do not in your report evaluate whether**
20  **any of the inputs that Zuffa has invested in over**
21  **time are complements to fighter talent or are not**
22  **complements to fighter talent, correct?**
23      A.  Well, since the event revenues that are
24  being generated are higher and some of that's
25  attributable to the investments that Zuffa has

55

1   made, that shifted the demand for talent and even
2   in a perfectly competitive labor market that would
3   raise compensation.  So in that sense we've --
4   we've analyzed that complementarity.
5       **Q.  So to the extent you've analyzed the**
6   **complementarity --**
7       A.  And let me -- I'm sorry to speak over you,
8   but let me just finish the thought.  You know, with
9   rising supply price at the industry label in a
10  perfectly competitive labor market it would
11  increase compensation.
12      **Q.  To the extent you've analyzed in your**
13  **report whether Zuffa's inputs to the growth in**
14  **event revenues over time are or are not complements**
15  **to athlete talent, you have shown that the inputs**
16  **are indeed complements to athlete talent, correct?**
17      A.  Complements in the sense of producing --
18  you've got to define the units of output by which
19  then you're multiplying by marginal revenue to get
20  marginal revenue product, and the -- it can be
21  raising marginal revenue product by raising the
22  marginal revenue product -- marginal revenue
23  product, or it can be making them as I did in that
24  example you showed them in the appendix -- you
25  showed in the appendix making each individual.  So

56

1   that appendix example was a complementarity [sic]
2   between the investments made by Zuffa and the
3   effective amount of entertainment that's being
4   provided by a Zuffa athlete.
5       **Q.  The example from the appendix was one in**
6   **which Zuffa's investments made its fighters better**
7   **at generating revenue when they fight, correct?**
8       A.  Yes.
9       **Q.  So that's an example of Zuffa's**
10  **investments enhancing the marginal revenue product**
11  **of its fighters, correct?**
12      A.  Yes.  Enhancing the product of its
13  fighters.
14      **Q.  Do you have any examples of Zuffa's**
15  **investments that add to event revenues without**
16  **enhancing the revenue-generating power of their**
17  **fighters in your report?**
18      Well, let's be careful about what I just
19  said.  In the appendix what happens is that the
20  number of units of entertainment or interest
21  generated by an athlete is increased by the
22  investments that Zuffa makes.  Whereas in that
23  example the price per unit of interest was given
24  and the -- the point of that example was even if
25  there was no market power downstream in the output

57

1   **market or upstream in the input market, you'd get**
2   **the kind of pattern that we're talking about.  So**
3   **that's What I mean by Q complementarity, those**
4   **inputs raise the productivity of -- of an athlete.**
5   **It didn't necessarily change marginal revenue.**
6   **You're dancing around one with a -- a related**
7   **concept which is that the investments increase the**
8   **market's willingness to pay for the athlete for any**
9   **given amount of talent that the athlete has.**
10  **Zuffa's doing many complicated things that affect**
11  **both of those.**
12      **Q.  Where in your report do you evaluate that**
13  **latter concept?**
14      MR. ISAACSON:  Objection to form.
15      MR. CRAMER:  By "latter concept" I mean
16  investments that increase the willingness to pay
17  for the athlete given the talent and revenue
18  generating power of that athlete.
19      A.  Well, I provide examples.  The television
20  show did that, increased willingness to pay for
21  what those athletes bring to the party.  Now, you
22  can view that as -- it's -- it's -- we're getting
23  down into the nuances of the models, that you can
24  view that as increase in the amount of
25  entertainment that they provide and entertainment

15  (Pages 54 to 57)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

58

1    has a -- units of entertainment have a fixed price,
2    or you can say it increases the price per unit of
3    entertainment to -- it's -- I mean, you could model
4    it either way or you could re-think about it either
5    way.
6        Q. Did you model it one way or the other?
7        A. Well, in the back I did it for the
8    purposes of that example as it increased the number
9    of units of entertainment.  You know, in the
10   report, you know, I think it would be easier to
11   think about it in terms of -- of -- like the
12   television show is increasing people's willingness
13   to pay to see athletes with a given amount of
14   talent.
15       Q. Let's switch topics slightly.  Is it fair
16   to say that if all you knew about a firm was that
17   worker compensation increased over time that you
18   could not determine as an economist that the firm
19   was or was not exercising monopsony power?
20       A. You would need to know more.
21       Q. What more would you need to know?
22       A. I can't infer that -- a firm with
23   monopsony power, I mean, you view -- I think you've
24   alluded to this in questions over an hour ago.  If
25   demand increase can move out along the average

59

1    factor cost curve and end up paying a higher
2    price.
3        Q. So one thing you would need to know is
4    whether or not demand had increased over time where
5    you saw worker compensation going up; is that fair?
6        A. No.  That wouldn't provide the evidence of
7    monopsony power.
8        Q. What would you need to know in order to
9    know -- if you saw a firm whose worker compensation
10   was increasing over time, what would you need to
11   know in order to determine that that firm was
12   exercising monopsony power?
13       A. You'd need to know relative to some
14   but-for world that compensation would have been
15   even higher.  So you'd need some kind of controlled
16   experiment about how a firm in similar
17   circumstances employed people and paid people or
18   maybe in some market in identifiably similar
19   circumstances where arguably the existence of that
20   market power you refer did not exist or existed
21   at some lower level.
22       Q. Assume for this question that the market
23   is perfectly competitive.  Over some period of time
24   you then determine that the marginal revenue
25   product of that firm's workers in a hypothetical

60

1    labor market go up -- goes up about 50 percent, but
2    the wages only go up about 10 percent.  Could you
3    conclude from that that monopoly power -- monopsony
4    the power is being exercised over that period?
5            MR. ISAACSON:  Objection to form.
6    BY THE WITNESS:
7        A. No.
8        Q. What more would you need to know?
9        A. Well, the outcome that you've described is
10   consistent with a competitive labor market.  I
11   think you started by saying assume a perfectly
12   competitive labor market and then you switched in
13   the middle to the exercise of monopsony power,
14   which is --
15       Q. Fair enough.
16       A. -- a total contradiction.  So we can't --
17   but the facts you describe are consistent with the
18   operation of a competitive labor market.
19       Q. So let me reask the question.  Assume the
20   market is perfectly competitive at time T.  Then
21   over some period of time you determine that the
22   marginal revenue product of the firm's workers goes
23   up about 50 percent and you also determine that the
24   wages only go up about 10 percent.  Could you based
25   on those facts determine that monopsony power is

61

1    being exercised?
2        A. Absolutely not.
3        Q. Why not?
4        A. Well, your premise was that the market was
5    perfectly competitive.  In fact, this is -- this is
6    what the example in the appendix does.  The
7    marginal revenue product of some firm increases.
8    Let's define perfectly competitive here as, you
9    know, perfectly elastic supply at the industry
10   level.  Then wages aren't going to change.  The
11   revenues of the firm that got this technological
12   advance that raised its demand for labor are going
13   to be higher.  So the wage I pay each person didn't
14   change and revenues went up.  That would happen in
15   perfect competition.
16       Q. Right.  So in the example you just gave
17   the increased revenues resulted from some
18   technological advance?
19       A. Some investments, some -- something that
20   raised the marginal revenue product of labor in
21   this firm.  They hired Dana White, hey, and he's a
22   like a tech -- he's a walking, talking
23   technological advance.  I don't know.  So he makes
24   demand for the output of this firm or the
25   productivity of the fighters, whatever, goes up.

16  (Pages 58 to 61)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

62

1  Then revenues at this firm are going to rise,
2  they're going to sell more stuff, but the price
3  they have to pay for labor because you told me to
4  assume perfect competition and I took perfect
5  competition in your -- not just to mean the market
6  is perfectly competitive, but also that it's
7  perfectly competitive at a fixed wage.  And that
8  will do it for the example, that's all I have to
9  prove.  Wages didn't change and revenues went up,
10  period.
11      **Q.  So in that example because there's a**
12  **horizontal supply curve, the firm does not need to**
13  **increase its wages even though the marginal revenue**
14  **product of the workers rise because the outside**
15  **alternatives of the workers are -- is going to set**
16  **the compensation level; is that fair?**
17      MR. ISAACSON:  Objection to form.
18  BY THE WITNESS:
19      A.  Fair's always a dangerous term, but the
20  marginal revenue product in any given level of
21  employment went up.  Marginal revenue product at
22  the level of employment ultimately chosen didn't go
23  up.  That's just an equilibrium concept.  But yes,
24  this firm by assumption was taking the wage rate
25  that it had to pay as given and at the market level

63

1  that wage rate didn't change.  So the ratio of the
2  wage to the revenues of the firm went down.
3      **Q.  And in order -- and -- and --**
4      A.  So that's what competition does.
5      **Q.  Okay.**
6      **Turn to paragraph 130, please.  In this**
7  **paragraph you provide an analogy to the University**
8  **of Chicago and professors; is that right?**
9      A.  Yes.
10      **Q.  And you posit a situation where demand for**
11  **the University of Chicago education increased**
12  **sharply relative to other schools allowing the**
13  **university to charge much higher tuition, right?**
14  **That's your example?**
15      A.  That sounds familiar.  I'm not sure that
16  the exact words are mine, but keep going.
17      **Q.  Okay.  And you also posit a situation in**
18  **that -- in that situation you say your salary would**
19  **still be determined by what it costs to attract and**
20  **retain faculty of comparable skill; is that right?**
21      A.  Yes.
22      **Q.  And you say that your salary would remain**
23  **unchanged, but that your salary as a share of**
24  **revenue would decline; is that right?**
25      MR. ISAACSON:  Not quite, but...

64

1  BY THE WITNESS:
2      A.  I say it would be little changed.
3      **Q.  Okay.  It would be little changed and that**
4  **your salary as a share of the revenues to the**
5  **University of Chicago would decline, correct?**
6      A.  Correct.
7      **Q.  And in your example, in your view, that**
8  **would say nothing about the exercise of monopsony**
9  **power; is that right?**
10      A.  Absolutely nothing.
11      **Q.  Now, your example says that the demand for**
12  **the University of Chicago education increased**
13  **sharply relative to other schools for some reason,**
14  **correct?**
15      A.  Yes.
16      **Q.  You don't -- you don't provide the reason,**
17  **correct?**
18      A.  Not in this paragraph, no.
19      **Q.  Okay.  Let me give you a reason and then**
20  **we can talk about it.  Let's say for this question**
21  **that you knew that the reason Chicago revenues**
22  **increased relative to other schools is that Chicago**
23  **hired all the superstar business professors from**
24  **the other top schools.  Understood?**
25      A.  Well, you can assume that, but that's not

65

1  what I'm assuming here.
2      **Q.  Okay.  I'm changing the -- the**
3  **hypothetical.**
4      A.  Fine.
5      **Q.  Okay.  In other words, it's the**
6  **administration's wise decision to recruit, hire,**
7  **and promote the superstar professors that caused**
8  **all of these increased revenues that you observed.**
9  **Got it?  Is that fair?**
10      MR. ISAACSON:  Objection to form.
11  BY THE WITNESS:
12      A.  We al- -- we already have all the
13  superstars.
14      **Q.  Okay.  This is a hypothetical.**
15      A.  Okay.
16      MR. ISAACSON:  I'm objecting to that term
17  in the hypothetical.
18  BY THE WITNESS:
19      A.  Okay.  Anyway, they're going to hire
20  really good professors from somewhere else.
21      **Q.  Right.  They bring them in, they assemble**
22  **them, and it turns out that as a result of doing**
23  **that the revenues increased.  Do you understand the**
24  **hypothetical?  Yes?**
25      A.  Yes.  It's not this hypothetical, but keep

17 (Pages 62 to 65)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

66

1  going.
2      Q.  Okay.  Is it fair to say that in that
3  instance the collective marginal revenue product of
4  this new stock of professors increased relative to
5  the increase in revenues?
6      MR. ISAACSON:  Objection to form.
7      MR. CRAMER:  In my hypothetical.
8  BY THE WITNESS:
9      A.  Depends on what we have to pay them.  If
10 we had to pay them what they were worth somewhere
11 else but they were paid more than the average
12 professor who we already have, then the ratio of
13 the wages of those professors could either rise
14 or -- well, they weren't there before.  So the
15 professors who are already there to whom we don't
16 have to pay more because their outside
17 opportunities haven't changed would still find that
18 their salary divided by the university's revenue
19 declines.
20     Q.  All right.  I had a different question,
21 though.  We'll get there.  All my question was was
22 that the -- if you took the marginal revenue
23 product of the collective group of new professors
24 and you compared it to the marginal revenue product
25 of the collective group of professors before you

67

1  brought in all the superstars, the marginal revenue
2  product of the new professors would be higher than
3  the marginal revenue product that -- of the old set
4  of professors, correct?
5      MR. ISAACSON:  Objection to form.
6  BY THE WITNESS:
7      A.  I think you've assumed your answer.  If
8  the new professors are more productive in some
9  value sense than the old professors, so they either
10 generate more revenue -- more tuition revenue or
11 bigger grants or something like that, then adding
12 one of them to the stock raises productivity --
13 raises revenues by some amount and removing
14 another -- one of the old professors from the stock
15 decreases revenues by some amount; and I think
16 you're just assuming that the former is bigger than
17 the latter.
18     Q.  Yes.
19     A.  So I'm with you.
20     Q.  Okay.
21         All right.  I'm going to move on.
22 Paragraph 38, please.  In the second sentence you
23 state "Antitrust economics distinguishes between
24 benign monopoly power that is obtained through a
25 superior product, business acumen, or historic

68

1  accident and monopoly power that is obtained or
2  maintained through anticompetitive conduct"; do you
3  see that?
4      A.  Yes.
5      Q.  Is the same true for monopsony -- I'm
6  sorry.  You said monopoly or monopsony power.  Is
7  the same -- could you rewrite that sentence --
8  strike that.
9         Could you rewrite that sentence and
10 substitute monopoly -- monopsony power for monopoly
11 power and it would be equally true?
12     A.  I believe so, yes.
13     Q.  So you could say "Antitrust economics
14 distinguishes between benign monopsony power that
15 is obtained through a superior product, business
16 acumen, or historic accident and monopsony power
17 that is obtained or maintained through
18 anticompetitive conduct"; do you see that?
19     A.  Yes.
20     Q.  Or would that be fair?
21     A.  Yes.
22     Q.  Okay.  Is your opinion in this case that
23 Zuffa has monopsony power but that it was obtained
24 legally or that it doesn't have monopsony power at
25 all?

69

1      A.  I've -- I've seen no evidence of the
2  exercise of monopsony power.  So I have seen that
3  Zuffa competed aggressively on the merits and has
4  become a very successful enterprise.  So I don't
5  think you should read this paragraph of saying I'm
6  acknowledging the existence of monopsony power.
7  I'm saying that if such monopsony power existed,
8  then one has to ask how it came about.
9      Q.  So your --
10     A.  And how it's -- and how it's maintained.
11     Q.  So your opinion in this case is that Zuffa
12 does not have any monopsony power; is that right?
13     A.  You said -- we've been around on this.  I
14 told you that term is so dangerous because the --
15 you know, any firm that has some degree of
16 influence over the price at which it sells its
17 product like the local Corner Bakery over here at
18 the corner has some degree of power over the price
19 at which it sells.  I probably wouldn't conclude
20 that it had market power, but it has some control
21 over the price.  So I'm not opining that Zuffa has
22 no control over the price that it pays for -- for
23 athletes or no control over the price that it
24 charges for tickets, especially on the ticket side.
25 You know, they have a pricing strategy whatever it

18  (Pages 66 to 69)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

70

1    is. I haven't studied it.
2        Q. So your opinion is that Zuffa has some
3    degree of monopsony power but that degree is small;
4    is that fair?
5        A. If they have a degree of monopsony power,
6    there's been no evidence to indicate what it is or
7    that they've -- the evidence does not indicate that
8    they've exercised monopsony power in this market.
9    Whether they have some monopsony power or not is --
10   is another question. If they tried to hire a whole
11   bunch more athletes would they have to pay a higher
12   wage? Maybe.
13       MR. CRAMER: I'm marking as Topel
14   Exhibit 3 the next document. Oh, excuse me.
15       THE WITNESS: Same guys.
16       MR. CRAMER: Oh, yes, same guys.
17           (Topel Exhibit 3 marked as
18           requested.)
19   BY MR. CRAMER:
20       Q. So what you've been handed is Topel
21   Exhibit 3. It's a different chapter from the
22   Ehrenberg and Smith textbook that you cite in
23   footnote 205; is that right?
24       A. Is this the same footnote? Sorry. I
25   don't need to turn --

71

1        Q. Yes.
2        A. Okay. Go ahead.
3        Q. And this is chapter 5 of the Ehrenberg
4    text "Modern Labor Economics" and the chapter's
5    entitled "Frictions in the Labor Market"; do you
6    see that?
7        A. Yes.
8        Q. Okay. Please turn to -- before I ask you
9    to turn -- I'm sorry. Turn to page 131. All
10   right. I'd like you to look at the second full
11   paragraph, first sentence on page 131 beginning
12   with "Thus"; do you see that? It says --
13       A. Oh, we're above the monopsonistic page.
14   Okay.
15       Q. Correct.
16       A. "Thus the higher worker's mobility."
17       Q. Yes.
18       A. Okay.
19       Q. I'll read it to you. It says "Thus, the
20   higher worker's mobility costs are the steeper the
21   labor supply curve facing a firm will tend to be.
22   Conversely as mobility costs fall other things
23   equal, the labor supply curve to firms will flatten
24   and become more elastic"; do you see that?
25       A. Yes.

72

1        Q. Do you agree with that?
2        A. Well, it depends on a lot of things that
3    go on above that paragraph. I think I know what
4    they have in mind. So if there are --
5        Q. Well -- go ahead.
6        A. If there are -- just the mere existence of
7    mobility costs doesn't do it because -- I mean, if
8    there were constant mobility costs then -- then
9    there's kind of a wedge between here and there, so
10   to speak, but if what they mean is rising mobility
11   costs so that the more people I try to hire from
12   elsewhere the marginal person has to incur greater
13   mobility costs to get from there to me, me as
14   hiring somebody, then that, at least in the short
15   run, can -- would be sort of the -- the level of
16   compensation that I have to pay at the margin to
17   attract people.
18       Q. So am I right that decreasing worker
19   mobility, making worker mobility more difficult all
20   things equal makes the labor supply curve steeper?
21       A. Decreasing labor mobility.
22       MR. ISAACSON: Objection to form.
23   BY MR. CRAMER:
24       Q. Doing something to make it more difficult
25   for one worker to move from one firm to another,

73

1    raising the costs of a worker moving from one firm
2    to another, that's what I mean.
3        A. Then it just raises the cost of a
4    worker --
5        MR. ISAACSON: Objection to form.
6        THE WITNESS: Tina's getting frustrated
7    because we're all talking at once. So let's let
8    her catch up. Are you caught up? Okay.
9    BY THE WITNESS:
10       A. This sentence here refers to mobility
11   costs and it could be the mobility costs of going
12   from A to B or from B to A; and if it's from B to A
13   and I'm A, then I have to compensate people at the
14   margin for that mobility cost to get them to come
15   work for me. So I have to pay a higher wage than
16   if that wasn't there. And if we're talking about
17   going from B to A, then I can pay less than what
18   the other guys pay because the worker has to take
19   into account the mobility costs of going from A to
20   B.
21       Q. So if firm A raises the costs somehow of
22   moving from firm A to firm B, firm A can pay the
23   worker less than if he hadn't raised the cost of
24   mobility, right?
25       MR. ISAACSON: Objection to form.

19 (Pages 70 to 73)

PUBLIC COPY - REDACTED

**74**

BY THE WITNESS:
 A. Can pay the worker less than firm B.
That's not what we see in this case, but that's
true.
 Q. By "this case" you mean the Zuffa case?
 A. Yes.
 Q. Okay. Let's still talk about the -- about
the hypothetical. It's fair to say that, all
things equal, if a firm is able to make it more
difficult and expensive for its workers to move
from its firm to another firm, the lower it is able
to pay its workers; is that right?
 A. No.
 Q. Why is that wrong?
 A. Well, the -- I mean, we're -- you're
sneaking up on the rules and -- and contract stuff,
and to the extent that those rules make investments
more valuable and allow the firm in question to
collect on the returns on its investment, those
rules can and generally will increase the amount
that workers pay. I mean, if there were zero
mobility costs ex post and no restrictions on
going, then I -- I as firm A, I'm not investing in
these people because it raises their general
productivity. It's like I don't want to train -- I

**75**

don't want to train -- incur the cost of training
plumbers for my firm because I make them into good
plumbers and they go work somewhere else for the
marginal product that I generated.
 Q. All right. Well, I -- I'll move on.
 Turn to paragraph 200 and in particular
I'd like to focus your attention on a part of
paragraph 200 that is on page 88. The second
sentence -- or the first full sentence on the page
says "In particular the restrictions on athlete
mobility address potential market failures due to
transaction costs and the free rider problem"; do
you see that?
 A. Yes, I do.
 Q. And by "restrictions on athlete mobility"
in this sentence you're referring to the
contractual provisions that Plaintiffs are
challenging in this case, correct?
 A. Generally speaking, yes.
 Q. How is it that the -- strike that.
 Turn to paragraph 68, please. In
paragraph 68 you opine in the first sentence "It
may be true that eliminating the challenged
contract provisions could promote entry by
competing promoters, at least temporarily, because

**76**

new entrants could expropriate existing Zuffa
investments in athletes"; do you see that?
 A. Yes, I do.
 Q. Could you explain the mechanism by which
eliminating challenged contractual provisions could
promote entry by competing promoters?
 A. Sure. Zuffa has invested in its athletes,
in their personas, in matching them with the right
opponents, and so on, things we've discussed
elsewhere. Those are costly investments by Zuffa.
The challenged contract provisions partially
protect the returns on those investments. So it
makes it worthwhile for Zuffa to makes those
investments in the first place.
 Now, after the investments are made if
suddenly you change the rules and say, oh no, all
of these restrictions on, you know, right of first
refusal, champion's clause, the whole thing are out
the window and now you've got these athletes that
Zuffa made valuable, raised their productivity. If
they can just leave because somebody else -- this
is the plumber example I just gave you -- then they
can go somewhere else. So there would be a
transfer of wealth from Zuffa to the athletes, but
in equilibrium it's not going to last long because

**77**

now that everybody can just up and leave nobody's
going to invest. That's what the paragraph is
saying.
 Q. Okay. So you're postulating a change from
the current world to a world where none of the
challenged contractual provisions exist, is that
right, in this paragraph?
 A. Yes. And it's -- it's not just a change
of two hypotheticals like what if it had been this
way forever on one planet and the other way forever
on the other planet. It's in the middle of the
existence of this you say no, all the contracts you
wrote are out the window.
 Q. Okay. And in that instance with the
challenge provisions out of the way, other MMA
promoters could immediately retain Zuffa's
athletes, right, if they wanted to?
 A. Well, they could as long as they're
willing to pay up to the value that's been created
by Zuffa. Some of that value's going to be Zuffa
specific, but not all of it.
 Q. So, in your view, because Zuffa has
invested in promoting these athletes they as a
group are more valuable, all things equal, to a
rival promoter than unranked fighters sitting in an

20 (Pages 74 to 77)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

78

1    MMA gym somewhere; is that right?
2        A. I think what you said is right, yeah.
3        Q. And what it means to be more valuable in
4    this context is that these fighters are capable of
5    bringing in more revenues when they fight, correct?
6        A. Yeah. The identification process and so
7    on raises their interest, the public's interest in
8    these particular fighters. Some of that return, as
9    I said, was Zuffa specific, some of it's totally
10   general like the plumbers.
11       Q. And in this instance where you had the
12   challenged provisions and then they're gone, a new
13   or another MMA promotion could, in your words,
14   expropriate existing Zuffa investments in its
15   athletes; is that right?
16       A. Yes. So Zuffa would have lost money on
17   its investments that it made in the past. It
18   wouldn't have -- it would not have gotten the
19   returns on its investments.
20       Q. So, in your view, at least in the short
21   run, eliminating the challenged contractual
22   provisions will enhance the mobility of the
23   fighters; is that fair?
24       A. I don't know if you would call it enhance
25   the mobility. More of them will move because

79

1    there's more subject to outside bidding. This is
2    kind of like expropriating a -- you know, declaring
3    a patent suddenly invalid and then anybody can make
4    that formula, whereas they couldn't before. That
5    helps for a little while, but nobody's going to
6    invest in the research and development again.
7        Q. So the athletes here are like a patent and
8    with respect to a patent, say a pharmaceutical
9    patent, once the patent expires or ends, the price
10   tends to drop dramatically, correct?
11       MR. ISAACSON: Objection to form.
12   BY THE WITNESS:
13       A. The generics -- now we're into patents.
14   The generics tend to sell for less than the
15   previous price of the brand name. As an aside,
16   whether the brand name drug actually sells for a
17   lower price is another more complicated question.
18       Q. Bill and I have been through that together
19   a long, long time ago.
20       A. Okay.
21       Q. All right. I'm going to move back to
22   Zuffa. It's fair to say that in the short
23   run -- strike that. Well, let me -- let me ask
24   this question again.
25       I think you said that the challenged

80

1    contracts are in effect restrictions on athlete
2    mobility in paragraph 200, right? We worked
3    through it.
4        A. I don't know if I agree with your phrase.
5    They are restrictions that protect the investments
6    that Zuffa has made in athletes.
7        Q. Turn to paragraph 200, please.
8        A. Okay.
9        Q. The second sentence or the first full
10   sentence on page 88 says "In particular the
11   restrictions on athlete mobility address potential
12   market failures" --
13       A. Okay. I'm referring to those challenged
14   business practices. So in that sense they are
15   restrictions on mobility that say you can't just up
16   and leave.
17       Q. And in your opinion, enhancing fighter
18   mobility by removing restrictions from the
19   contract -- that the contracts create in the short
20   run at least would in your view facilitate rival
21   entry; is that right?
22       A. It might facilitate rival entry depending
23   on fixed costs and things like that and what they
24   foresee about this market because they
25   can't -- well, it does get complicated. Forgive

81

1    me. If we say that Zuffa can't use these and other
2    people can, then rival entry will occur.
3        Q. So there are two options, either Zuffa
4    would pay its fighters more or the rivals will come
5    in and expropriate the value that Zuffa has created
6    by investing in its fighters; is that fair?
7        A. No. You're -- you're -- I said a little
8    while ago that when you get rid of these
9    restrictions Zuffa's not going to be able to invest
10   in fighters and the interest in fights and things
11   like that the way they did before because they
12   can't capture their returns. So the -- the
13   question I offer -- I just asked is what are you
14   assuming about the entry. Do they come in under
15   the same rules as Zuffa?
16       Q. Oh, I see.
17       A. Okay. Or are they allowed to do things
18   that Zuffa did from the beginning and now we turn
19   around and say Zuffa, you can't do that anymore but
20   everybody else can and that's -- that's my
21   question.
22       Q. Okay. In paragraph 68 -- and I believe
23   you referred to that in your answer earlier -- you
24   say in the sentence beginning with "Suppose"; do
25   you see that? I'd like you to look at that. It's

21 (Pages 78 to 81)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

82

1    the third sentence of paragraph 68; do you see
2    that?
3        A. I'm not there yet.
4        Q. "Suppose" is on the right-hand margin.
5        A. Oh, here we are.  Okay.  Second
6    sentence.
7        Q. Yeah.
8        A. Third sentence.
9        Q. Third sentence.  It says "Suppose Zuffa's
10   contract provisions are found to be
11   anticompetitive, then a potential competitor could
12   recruit and contract with the existing stock of
13   developed Zuffa athletes enjoying the fruits of
14   Zuffa's past investments in developing those
15   athletes.  This would create a transfer of wealth
16   to the stock of existing Zuffa athletes."  Do you
17   see that?
18       A. Yes.  That's what I said a few minutes
19   ago.
20       Q. You did.  And I just want to understand
21   what you mean here.  What you're talking about when
22   you talk about a transfer of wealth is from Zuffa
23   to its fighters; is that fair?
24       A. Zuffa would be worse off by having lost
25   the returns on its investments.

83

1        Q. And what you mean by "lost the returns on
2    its investments" is that in this situation, at
3    least in the short run, Zuffa would pay its
4    fighters more, correct?
5        A. Well, I don't necessarily mean that at
6    all.  I mean that those athletes would go -- we've
7    defined this now as a reduction in mobility costs.
8    Some of these guys go somewhere else because
9    somebody else pays for the productivity that Zuffa
10   produced with its investments.  It's the plumbers
11   problem again.  And, you know, whether Zuffa stays
12   in business after this I don't even know because
13   the premise of much of this is that these
14   competitors -- I think we had it in this
15   paragraph -- these competitors get to use rules
16   that are now prohibited for Zuffa.  So Zuffa's
17   definitely at a competitive disadvantage in that
18   world.
19       Q. Okay.  But I just want to understand what
20   you mean by transfer of wealth.  Presumably the
21   Zuffa fighters who now are free of the contractual
22   restrictions would move if they could get paid
23   more, right, and that's what you mean by the
24   transfer --
25       A. Move -- the -- the amount that someone is

84

1    willing to pay -- I can leave immediately because
2    we've assumed away these contractual restrictions
3    and somebody's bid the value of what Zuffa created
4    for my services, at least the value of what Zuffa
5    has created to that firm for my services.  So to
6    the extent that I go I will be paid more ex post
7    than I would have been paid, and so that is a
8    transfer of wealth from one party to another.
9    You've expropriated the investments that Zuffa
10   made.
11       Q. It's a transfer of wealth, in your view,
12   from Zuffa to the fighters because in this instance
13   Zuffa would either have to pay the fighters more or
14   someone else would pay the fighters more, right?
15       MR. ISAACSON:  Objection to form.
16   BY THE WITNESS:
17       A. I think I see where you're going with it
18   and yes.
19       Q. So at least in the short run enhancing
20   fighter mobility by removing the challenged
21   contracts would lead to higher UFC fighter
22   compensation, right?
23       A. For people who have already been invested
24   in, but Zuffa's not going to invest again.
25       Q. So for the existing stock of Zuffa

85

1    athletes eliminating the challenged contracts, at
2    least in the short run, would enhance fighter
3    mobility and lead to higher fighter compensation,
4    correct?
5        A. It could do that.
6        MR. ISAACSON:  Objection to form.
7    BY THE WITNESS:
8        A. As I said, it depends on what we're
9    assuming about what other firms can do.  I mean, if
10   we had a world where nobody could do this, then the
11   other firms probably aren't going to want to hire
12   them either because in equilibrium this business
13   model's not going to work.
14       Q. But the transfer of wealth occurs --
15   presumably the transfer of wealth only occurs if
16   someone is willing to pay the fighters more,
17   correct?
18       A. You have to have some market structure in
19   place where someone is willing to pay more, but if
20   the more is just a -- a -- the more relies on the
21   fact that, hey, we get to hire these guys that we
22   didn't have to invest in, great, and then we can
23   write multi-contract -- multi-fight contracts with
24   them and everything else.  So it could be Bellator,
25   terrific, they invested and we get to get him.

22  (Pages 82 to 85)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

86

1    **Q.  Is it fair to say in the short run if we**
2    **eliminate the challenged contractual provisions,**
3    **one immediate effect is that fighters get paid**
4    **closer to the amount of event revenues that they**
5    **generate for the promotion; is that fair?**
6    MR. ISAACSON:  Objection to form.
7    BY THE WITNESS:
8    A.  They'll get paid more than they would have
9    because they're getting some of the returns on the
10   investment that were previously shared with -- with
11   the investing firm.
12   **Q.  So in your view, the challenged**
13   **contractual provisions are what is allowing Zuffa**
14   **to pay the fighters below the marginal revenue**
15   **product of those fighters, correct?**
16   MR. ISAACSON:  Objection to form.
17   BY THE WITNESS:
18   A.  No.  I mean, it's -- in the long run --
19   when you think about investments you have to think
20   about the costs and the returns.  So anybody who's
21   making investments in -- any firm that's paying for
22   some of the investments in human capital has to
23   get, you know, at least a competitive return on
24   those investments.  So it's not a one-period thing.
25   It's a multi-period thing.  There's a kind of

87

1    before and -- period 1 and period 2 and the firm
2    invests and it gets the returns.  So even under
3    competition if you turned around to firms and said,
4    look, you don't get the returns, that would be a
5    transfer of wealth to -- in the second period to
6    the people who are invested in in the first period.
7    So getting more of your marginal revenue product
8    you're thinking about it like at a single point in
9    time whereas the relevant thing is it's dynamic.
10   It's -- it's how many periods are you going to be
11   here and what I do -- what I do with you when
12   you're young and a novice and unknown and how do I
13   get the returns on what I just did for you to make
14   you more productive.
15   **Q.  Okay.  I understand you're making a**
16   **dynamic long-run argument.  I'm just trying to**
17   **understand how it works in the short run for the**
18   **existing stock of Zuffa athletes.  And for the**
19   **existing stock of Zuffa athletes in the short run**
20   **what is allowing Zuffa to pay fighters below their**
21   **marginal revenue product are the challenged**
22   **contractual restrictions, correct?**
23   MR. ISAACSON:  Objection to form, asked
24   and answered.
25   BY THE WITNESS:

88

1    A.  They're getting a return.  So their
2    marginal revenue product over the -- I can't answer
3    this outside of the context of two periods because
4    I have to take the costs into account.  Now, if
5    what you're trying to say -- let me just phrase it
6    so we're on the same page.  Come back to my example
7    of the plumbers.  For the marginal plumber in two
8    periods the return -- the investment cost is going
9    to be equal to -- what I pay has to be compensated
10   by a wedge between what his productivity would be
11   somewhere else and what I have to pay him in the
12   second period.  Okay.  So I might have some
13   restriction on whether he can leave right away and
14   all that.  And now you tell me that restriction's
15   gone.  So, yeah, somebody else will pay up to what
16   that guy's worth in the second period, but that
17   doesn't mean his marginal revenue product doesn't
18   take into account what I paid for him in the first
19   period, but -- but that's in the past now and it's
20   gone and we let him go, he's gone.  I'll never make
21   that investment again, but he's gone and he'll get
22   paid more, and that's the sense in which there's a
23   transfer of wealth relative to the outcome that we
24   had when we had a contract that protected the
25   investments.

89

1    **Q.  Turn to paragraph 113, please.**
2    MR. CRAMER:  Do you need a break?
3    THE REPORTER:  After this.
4    MR. CRAMER:  We'll take a break after
5    this.
6    BY MR. CRAMER:
7    **Q.  Towards the end of that paragraph,**
8    **paragraph 113, you have a sentence that begins "As**
9    **explained above, if athletes"; do you see that?**
10   A.  Yes.
11   **Q.  This says "As explained above, if athletes**
12   **can freely switch to competing promoters that pay**
13   **'competitive compensation' given the athlete's**
14   **human capital, human capital that was largely**
15   **developed by an initial promoter, then there is**
16   **little incentive for the initial promoter to make**
17   **the investments that contribute to that human**
18   **capital in the first place"; do you see that?**
19   A.  Yes.
20   **Q.  So here you're positing a world without**
21   **the challenged contracts, right?  In other words,**
22   **if athletes can freely switch; is that right?**
23   A.  I think that's a fair statement, yeah.
24   **Q.  And in this world you are opining**
25   **that -- strike that.**

23  (Pages 86 to 89)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

162

1  agree with me that you did not quantify I believe
2  because you said it was impossible the amount of
3  revenues that would have been lost, MMA revenues
4  that would have been lost in any but-for world?
5      MR. ISAACSON:  Objection to form.
6  BY MR. CRAMER:
7      Q.  Is that fair?
8      MR. ISAACSON:  Argumentative.
9  BY THE WITNESS:
10     A.  As I said, first of all, you prefaced your
11 question by saying I didn't understand the but-for
12 world.  That's not what I said.  I said you didn't
13 specify and neither did Dr. Singer any but-for
14 world, anything that would -- could be used as a
15 guide.  So all I can tell you is that in -- if the
16 contract restrictions were abolished there would be
17 less investment by promoters in promoting MMA, in
18 promoting the personas of athletes, in finding the
19 right matches and all those other things that are
20 costly activities, and that's why the contract
21 restrictions are what they are.
22     Q.  Where in your report do you quantify that
23 amount of lower investment?
24     A.  Forgive me.  We've been over this.
25     Q.  I didn't get an answer.  Tell me where.

163

1  Show me which paragraph.
2      A.  There's paragraphs in here that say they
3  wouldn't invest.  That's -- I don't have to
4  quantify because you're going -- you're pulling
5  away -- are you going to pull away one contract
6  restriction, two, three, four, all of them, and for
7  whom?  You never -- you've never specified what the
8  but-for world would be.  So there's no way anybody
9  could put a number on 75 but-for worlds, and I have
10 no idea which one you -- what the -- what you think
11 the market's going to look like.
12     Q.  So it's fair to say that in your report
13 you did not specify any particular but-for world,
14 right?
15     A.  I couldn't.  That's -- that's not my
16 job.
17     Q.  And therefore you didn't compute the
18 amount of lost revenues in any particular but-for
19 world, correct?
20     A.  All I can tell you is that the revenues
21 would be -- produced by the promoters would be
22 lower.
23     Q.  But you didn't compute the amount by which
24 they would be lower, correct?
25     A.  I can't because I don't know what the

164

1  but-for world is.
2      Q.  And you didn't compute the amount of
3  alleged lost compensation as a result of lost
4  revenues that there would have been in the but-for
5  world or any but-for world, correct?
6      A.  What we've looked for is evidence that
7  compensation was affected by the things that you
8  and your experts have specified as having an impact
9  and there's no impact.  So the -- the alleged
10 amount of foreclosure as punitively measured by
11 Dr. Singer's foreclosure measure, there's no
12 evidence that it's affected compensation, and in
13 the period where that foreclosure allegedly rose
14 the earnings of Zuffa fighters increased
15 materially, significantly, dramatically.  So
16 there's no evidence here that they were impacted.
17     Q.  I think you misunderstood my question.  I
18 believe you've argued that in the but-for world or
19 any but-for world absent the challenged conduct MMA
20 revenues would be lower, correct?
21     A.  Any is a hard thing.  I mean, I don't know
22 what but for -- what contracts these guys would
23 come up when you say you can't use these contracts,
24 but these are the contracts they chose.  So...
25     MR. ISAACSON:  And I'll object to the

165

1  question as compound.
2  BY MR. CRAMER:
3      Q.  Okay.
4      A.  These are the contracts they chose.
5      Q.  I'll move on.
6      A.  They would invest less.
7      Q.  Turn to paragraph 92.  In the last
8  sentence of paragraph 92 on page 40 you say "The
9  reduction in transaction costs achieved by
10 internalizing decisions about upcoming matches" --
11     A.  Wait a minute.  Hold -- hold on.  You're
12 on paragraph 92?
13     Q.  Paragraph 92, page 40, the last --
14     A.  Oh, okay.  Okay.  I'm sorry.  I'm on 30 --
15 it begins on 39.
16     Q.  The last sentence reads "In addition the
17 reduction in transaction costs achieved by
18 internalizing decisions about upcoming matches
19 increases the number of matches thereby expanding
20 output to the benefit of consumers and athletes";
21 do you see that?
22     A.  Yes.
23     Q.  It's fair to say that you did not quantify
24 the additional output that you believe is generated
25 by the reduced transaction costs, correct?

42  (Pages 162 to 165)

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

166

1    A.  No.  I'm making a -- a statement about
2  implications of economic analysis.
3    Q.  And you did not -- it's fair to say -- am
4  I correct that you did not quantify the amount of
5  reduced output that -- strike that.
6      You say "Thereby expanding output to the
7  benefit of consumers and athletes."  It's fair to
8  say that you did not quantify the amount of
9  additional output to the benefit and consumers --
10  of consumers and athletes that you believe
11  occurred, correct?
12    MR. ISAACSON:  Objection to form.
13  BY THE WITNESS:
14    A.  Are you asking me -- let me read the
15  entire context of my paragraph here.
16      (Witness reviewing document.)
17  BY THE WITNESS:
18    A.  Yes.  Ask your question again, please.
19    Q.  Did you quantify the amount of expanded
20  output that you referred to in the last sentence of
21  paragraph 92?
22    A.  Relative to some world without those --
23  economic theory tells us -- economic analysis tells
24  us that in the presence of these transaction costs
25  the ability to internalize these things, organize

167

1  matches, promote identities and so on, increases
2  the amount of output of the property measured.  So
3  it benefits consumers and -- and the athletes.
4  So -- and that's what I say here.  Do I have to
5  quantify a number?  Again, relative to what?  All I
6  know from you is less.  All I know from Dr. Singer
7  is less of what we object to, and even in the -- at
8  the level of saying 30 percent rather than some
9  other number he never tells us what less means.  So
10  even if such a calculation were achievable, there's
11  been no specification of what the but-for world
12  would look like other than less.
13    Q.  Did you quantify the amount of expanded
14  output that you referred to in the last sentence of
15  paragraph 92?  Yes or no.  Did you quantify it?
16    MR. ISAACSON:  Don't raise your voice,
17  Eric.
18  BY THE WITNESS:
19    A.  Absent a benchmark of saying what it would
20  be in the absence all I can tell you is that it's
21  lower and the contracts themselves as used by other
22  people are indicative of the procompetitive
23  benefits and this is what economic analysis offers.
24  As to your specific question, since there's no
25  benchmark offered I cannot have offered a number

168

1  relevant to some benchmark that was never stated.
2    Q.  So you didn't, correct?  You did not
3  quantify it, correct?
4    MR. ISAACSON:  Objection, asked and just
5  answered.
6  BY THE WITNESS:
7    A.  That's what I just said.
8    MR. CRAMER:  Let's take a -- let's take a
9  break.
10    THE VIDEOGRAPHER:  Going off the record at
11  2:38.
12      (A short break was had.)
13    THE VIDEOGRAPHER:  We are going back on
14  the record at 2:55.  This begins disk No. 5.
15  BY MR. CRAMER:
16    Q.  Please turn to paragraph 171 of your
17  report on page 75.
18    A.  Yes.
19    Q.  There you specified a regression that you
20  say in the first sentence of paragraph 171 can
21  "Measure changes in compensation separately for
22  athletes with different rankings"; do you see
23  that?
24    A.  Yes.
25    Q.  And you find with this regression that

169

1  between 2011 and 2016 Zuffa increased inflation-
2  adjusted compensation to fighters in all of your
3  ranking categories, correct?
4    A.  Well, in each of the categories we
5  considered it, yes.
6    Q.  And you report those results in
7  Exhibit 17; is that right?
8    A.  Yes.
9    Q.  So in your opinion the compensation of
10  Zuffa's fighters in every ranking category that you
11  testified moved together from 2011 through 2016,
12  correct?
13    MR. ISAACSON:  Objection to form.
14  BY THE WITNESS:
15    A.  I don't think I said they moved together.
16  They just went up.
17    Q.  Well, they all moved up, correct?
18    A.  Yes.
19    Q.  What in your opinion was -- why in your
20  opinion was Zuffa fighter compensation in all
21  ranking categories moving up during this time?
22    A.  Well, there's an increase in interest and
23  demand for the services of MMA fighters generally,
24  much of which was due to the efforts of Zuffa and
25  perhaps other promoters as well in advancing the

43 (Pages 166 to 169)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL



170

1   sport.
2   **Q.  And it's fair to say that you would expect**
3   **that if demand for MMA fighters rises generally,**
4   **the compensation of MMA fighters in every ranking**
5   **category would generally rise as well, correct?**
6       MR. ISAACSON:  Objection to form.
7   BY THE WITNESS:
8       A.  Supply slopes up.
9   **Q.  Is the answer yes?**
10      A.  The answer is if supply slopes up.  I
11  think you're asking me an analytical question, and
12  I gave you an analytical answer.  So it did -- it
13  did -- compensation increased.  That's consistent
14  with a general increase in demand along with upward
15  sloping supply of people with different
16  attributes.
17      **Q.  And so this general increase in demand for**
18  **MMA fighters, in your opinion, caused the**
19  **compensation of UFC fighters in every ranking**
20  **category to go up from 2011 to 2016; is that right?**
21      A.  Well, all this shows is that it went up.
22  There's nothing in the table that says it was an
23  increase in demand.  I mean, that's certainly
24  consistent with the way Zuffa's activities affected
25  the market, but there's nothing on the table that

171

1   says, oh, this was demand unless you take the
2   usually way of often thinking about these things.
3   If price went up then -- and quantities were rising
4   too, then it must be shifts in the demand curve.
5   **Q.  Why is it that the shift in demand curve**
6   **for MMA fighters caused the compensation of MMA**
7   **athletes in all ranking categories to move up**
8   **during this period?**
9       A.  First of all, it's not something that we
10  express an opinion about with regard to this table,
11  I don't recall.
12      **Q.  I'm asking.**
13      A.  What could do it?
14      **Q.  Yeah.**
15      A.  That there's general --
16      MR. ISAACSON:  Objection to form.
17  BY THE WITNESS:
18      A.  There's a general increase in the demand
19  for MMA events and there's rising supply price of
20  people across the talent spectrum.
21      **Q.  If -- is it also fair to say that it's**
22  **fair to expect that if there's a general decrease**
23  **in demand for MMA fighters you would expect the**
24  **compensation of MMA fighters in every rank and**
25  **category to fall?**

172

1       A.  If the demand reduction applies across the
2   board for all categories, you could -- I could also
3   imagine a demand shift that was -- that was
4   specific to particular categories.  So if people
5   become less interested in some category and more
6   interested in another, that would be a relative
7   demand shift.
8   **Q.  Here the demand shift that appears to be**
9   **at play is a general demand shift given that we saw**
10  **between 2011 and 2016 that the inflation-adjusted**
11  **compensation to fighters increased in all of your**
12  **rank and categories, correct?**
13      A.  The evidence is consistent with that.
14      **Q.  Turn to paragraph 262 of your report.  The**
15  **first sentence states "Dr. Stinger" -- excuse me.**
16  **Dr. Stinger.  He won't like me for that.**

173

25      **Q.  You would agree that Zuffa had a minimum**

44 (Pages 170 to 173)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL

174

1    pay per bout, correct?
2        A.  I can't recall if it was a minimum pay per
3    bout.  People's contracts had a pay per bout.
4        Q.  Well, you referenced a document in which
5    Zuffa discussed its minimum bout compensation,
6    right?  You discuss it in this paragraph,
7    correct?
8        A.  That's my recollection.  In other words,
9    the minimum pay document, okay, if that's what
10   you're talking about, yes.

176

1    term, but so that we're on the same page it would
2    be good if you define what you mean and then I'll
3    tell you whether I'm familiar with it and can talk
4    about it.
5        Q.  Well, you're aware that Dr. Singer in his
6    report discusses the concept of internal equity as
7    it relates to this case?
8        A.  I recall something about that.
9        Q.  It's fair to say that you do not in your
10   report discuss internal equity, correct?
11       A.  I don't believe I discuss internal
12   equity.
13       Q.  Turn to paragraph 266.  You provide
14   another example in this paragraph, I believe.  I
15   have the citation wrong.  Give me a moment.  Oh,
16   yeah.  On page 116, paragraph 266, the last
17   sentence.  You say "The fact that my pay as an
18   economist tends to move with the average pay of
19   other economists does not imply the existence of a
20   'pricing structure' that determines the pay of
21   economists"; do you see that?
22       A.  Yes.
23       Q.  What do you mean by "pricing structure"
24   here?
25       A.  Well, Dr. Singer seems to be referring to

175

3        Q.  Okay.  Well, why was, then, raising the
4    minimum pay projected to effect the pay even of
5    those fighters who were being paid above the
6    minimum?
7        A.  Because you're using a pay scale for
8    people of different talents and different levels of
9    effort.  So taken individual -- we'll do it within
10   a fight.  I guess we can think of it this way.  If
11   I raise the minimum show, I have to raise the
12   minimum win to maintain incentives.

23       Q.  Are you familiar with the concept of
24   internal equity?
25       A.  Well, it's -- I've probably heard the

177

1    a -- almost a schedule, a formulaic way of
2    determining the pay of people, and within the
3    market for economists there is no formulaic
4    structure, there is no spreadsheet in which we put
5    people and get a number that we're going to pay
6    them.  There's a market and that's what I mean.
7    There's a pricing structure in the sense that it's
8    used in this case doesn't exist in the market for
9    economists, but if you regressed my pay -- if you
10   regressed individual economist's pay on the average
11   of economists you'd get an effect.
12       Q.  And that effect, as you would expect, that
13   an individual's economist pay would be related to
14   the pay of the average economist, correct?
15       A.  Yes, even though there was no coordinated
16   plan.  It's like if I ran a taco stand in Chicago
17   and prices of tacos varied over time, my taco
18   prices went up when the other guy's taco prices
19   went up.  So what they charged would probably be a
20   pretty good predictor of what we charge on my taco
21   stand.  That doesn't -- there's no structure, no
22   central planner of taco prices.  That's the way
23   markets work.
24       Q.  And let's talk about your economist
25   example.  Is the reason why the compensation of an

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL

178

1  individual economist -- economist would be related
2  to the compensation of average economists that
3  there are similar factors that are at work in the
4  compensation of economists in a market generally?
5      MR. ISAACSON:  Objection to form.
6  BY THE WITNESS:
7      A.  There are common market forces.
8      Q.  So -- so that -- so the reason why an
9  individual economist's compensation would tend to
10 move with the average compensation of economists is
11 that there are common market forces that are
12 affecting the compensation of all economists in
13 this market; is that fair?
14     A.  You know, I don't know if it's affecting
15 the compensation of all, but the general answer to
16 your question is yeah.
17     Q.  Let's talk about --
18     A.  Yes, to be more proper about whole
19 thing.
20     Q.  Thank you.
21         Let's talk about your economist example.
22 Let's assume you mean testimonial or consulting
23 economists.
24     A.  It's a smaller market.
25     Q.  It is.  You agree that your pay as a

179

1  consulting economist tends to move generally with
2  the average pay of all consulting economists,
3  right?
4      A.  Well, never having studied the general
5  pay, I can give you an economics answer --
6      Q.  What's the economics --
7      A.  -- which is kind of like the previous
8  answers to my question.  Economic principles
9  telling me that that should be true.
10     Q.  And thus even though different testimonial
11 economists charge different rates based on various
12 factors like experience and credentials, the pay of
13 consulting economists tends to move together,
14 right?
15     MR. ISAACSON:  Objection to form.
16 BY THE WITNESS:
17     A.  I believe that would be true.
18     Q.  And that's because there are certain
19 common factors influencing the demand for
20 testimonial economist services, correct?
21     A.  Or the supply.
22     Q.  Or the supply.  Would you agree, for
23 example, that if Congress passed a rule providing
24 that parties could no longer retain economists in
25 antitrust litigation the demand for a consulting

180

1  economist would fall, all things equal?
2      A.  Well, it would fall to zero under that
3  rule and I can assure you that we would all invest
4  less in the skills of becoming consulting
5  economists.
6      Q.  Well, you could still testify in other
7  kinds of cases, correct?
8      A.  Yes, but we would invest less.
9      Q.  And you would expect that if the demand
10 for consulting economists falls, the average
11 compensation of testimonial economists would also
12 fall, correct?
13     A.  Assuming the supply of people with the
14 talents to do the sorts of things that consulting
15 economists do, the answer is yes.
16     Q.  And you would expect that your
17 compensation would fall along with the average,
18 correct?
19     A.  Unless there's something about the
20 change -- this goes back to what you did with
21 Exhibit 17.  Unless there's something that caused a
22 relative demand shift towards, I don't know, people
23 who teach at the University of Chicago, okay?  And
24 I just want to be clear that there's always -- you
25 know, there's all kinds of variation.

181

1      Q.  Right.  But unless you knew about some
2  variation directed at you that wasn't directed to
3  economists generally, you would expect that your
4  compensation as a testimonial economist would fall
5  with the average compensation of testimonial
6  economists, correct?
7      MR. ISAACSON:  Objection to form.
8  BY THE WITNESS:
9      A.  Yes.
10     Q.  Turn to paragraph 267, please.
11     A.  Okay.
12     Q.  In the second sentence you say "There are
13 many reasons why the compensation of athletes would
14 be correlated that are unrelated to a compensation
15 structure, just as the earnings of any other
16 individuals working in the same profession or for
17 the same employer are likely correlated"; do you
18 see that?
19     A.  Yes.
20     Q.  What do you mean by "compensation
21 structure" here?
22     A.  My understanding is that Dr. Singer was --
23 was referring to a compensation structure,
24 something formulaic within Zuffa, so that
25 compensation was not determined individually based

46 (Pages 178 to 181)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL



**182**

1  on the attributes of individuals, but rather was
2  determined by a compensation structure that said if
3  you're -- if this is your second fight you're going
4  to get paid that and everybody's going to get paid
5  that for their second fight and so on.
6  **Q. In other words, it's your understanding**
7  **that what Dr. Singer means by "compensation**
8  **structure" is that there's essentially a pay**
9  **schedule that applies to every fighter regardless**
10 **of individual circumstance?**
11 A.  No.  I didn't say regardless.  Even he
12 would have to acknowledge that individual
13 attributes affect what gets negotiated.
14 **Q. But something close to it.  So, for**
15 **example, what you think he's saying is that there's**
16 **a structure that says for fighters with this level**
17 **of experience and this record the pay is some set**
18 **level based on some kind of pay matrix?**
19 A.  What was the question?
20 **Q. I'll withdraw it.**
21 **Why would you expect that the earnings of**
22 **individuals working in the same profession or for**
23 **the same employer to be correlated?**
24 A.  Well, for the same -- for the same
25 profession, it's back to my taco example that the

**183**

1  market conditions affecting taco stands are common.
2  So changes in the prices of corn to produce the
3  tortillas and changes in the price of avocados
4  affect all the taco stands.
5  **Q. Turn to paragraph 266, please.  You're**
6  **talking in paragraph 266 about one of the**
7  **regressions that Dr. Singer runs, correct?**
8  A.  Are you talking about the second -- well,
9  he runs a regression of Zuffa athletes annual
10 average compensation.  Okay?
11 **Q. Right.  And you point out that -- excuse**
12 **me one moment.**
13 **All right.  At the -- towards the end of**
14 **page 115, paragraph 266 there's a sentence that**

**184**

1  BY THE WITNESS:
2  A.  I mean, it's correlated, yes.  I mean,

**185**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL - HIGHLY CONFIDENTIAL



**186**

**188**

```
 1   that?
 2        A.  Yes.
 3        Q.  What similarities are you talking about
 4   here?
 5        A.  Simply that they're the high-paid
 6   athletes.
 7        Q.  Those are the only ones?
 8        A.  No.  I'm just saying that these are two
 9   examples.
10        Q.  And you say that despite these --
11        A.  And well-known athletes too.  Even I know
12   who they are.
13        MR. ISAACSON:  You're not letting him
14   finish.  So you're talking over him.
15        MR. CRAMER:  Fair enough.  I thought he
16   was finished.
17   BY MR. CRAMER:
```

```
24        Q.  Is your view that an appropriate model
25   would find that similarly situated athletes, all
```

**187**

**189**

```
 1   things equal, would be impacted by the challenged
 2   conduct to the same degree?
 3        A.  No.
 4        Q.  So why is it that the fact that
 5   Dr. Singer's regression provides different results
 6   for McGregor and Rousey problematic in any way?
 7        A.  Well, I'm going to have -- the -- the
 8   coefficients on his model is simply that the
 9   foreclosure share is the thing that's generating
10   the change and taking it down from whatever it is
```

```
12        Q.  All right.  Turn to paragraph 279, please.
13   I'm sorry.  Turn to paragraph 281.  You say -- you
14   have a sentence about a third of the way down in
15   paragraph 281 that says "Despite these athletes'
16   similarities"; do you see that?
17        A.  Yes.
18        Q.  All right.  So you're referring to Conor
19   McGregor and Ronda Rousey; is that right?
20        A.  Yeah.  I don't mean to imply that they
21   look alike or something.
```

```
25        Q.  All right.  You can put that aside.
```

48 (Pages 186 to 189)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROBERT TOPEL - HIGHLY CONFIDENTIAL



238

1     Q.  And in the left-hand column there's a
2  chart entitled "Ranking," right?  Correct?
3     A.  Yes.
4     Q.  And in the right-hand column there's a
5  chart -- there's a column entitled "Average
6  remaining bouts," correct?
7     A.  Correct.
8     Q.  And what this shows is that the average
9  remaining bouts on a champion's contract is 6.5,
10 correct?
11    A.  That's what it says.
12    Q.  And the average remaining bouts on
13 fighters ranked 1 to 5 is 5.5, correct?
14    A.  Correct.
15    Q.  And the average remaining bouts on fighter
16 contracts ranked 6 to 10 is 3.6, right?
17    A.  Yes.
18    Q.  And the average remaining bouts on fighter
19 contracts ranked 11 to 15 is 3.2, correct?
20    A.  Yes.
21    Q.  So it's fair to say that as the ranking
22 goes from low to high, the average remaining bouts
23 falls, correct?  Or let me ask it this way.  It's
24 fair to say --
25    A.  We're not on the same page about low to

240

1  don't, then on average the guys ranked 11 to 15
2  have 3.2 bouts left.  So this doesn't surprise
3  me.
4     Q.  Okay.
5        Is there a logical connection between the
6  degree to which Zuffa has its top fighters signed
7  to long-term deals and Zuffa's ability to maintain
8  its fighter wage share at or below current levels?
9     A.  Not that I know of.

239

1  high --
2     Q.  Yes.
3     A.  -- but I know what you're saying.
4     Q.  It's fair to say that the better ranked an
5  athlete is the more likely that athlete has longer
6  bouts remaining on their contract with Zuffa,
7  correct?
8     A.  The average remaining bouts of champions
9  is higher than the average remaining bouts of
10 fighters in other ranking intervals.  That's what
11 the chart shows.
12    Q.  And that's consistent with your
13 understanding of UFC contracts generally, right?
14    A.  When you say "generally," I don't know if
15 it's true in all cases.
16    Q.  Just --
17    A.  I have no reason to believe that this
18 calculation is inaccurate.
19    Q.  In other words, the better ranked a
20 fighter is the -- all things equal, the longer the
21 contract -- the bout requirement in the Zuffa
22 contract; is that fair?
23    A.  No.  It says remaining bouts.  So if
24 champions reup early and extend their contracts,
25 then -- and the guys that are ranked 11 to 15

241

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED