# Exhibit 57

Deposition of Robert H. Topel
(December 6, 2017) (excerpted)

PUBLIC COPY - REDACTED

PUBLIC COPY - REDACTED

267

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| CUNG LE; NATHAN QUARRY, JON | ) | |
| FITCH, on behalf of | ) | |
| themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:15-cv-01045-RFB-(PAL) |
| | ) | |
| ZUFFA, LLC, d/b/a Ultimate | ) | |
| Fighting Championship and | ) | |
| UFC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

ROBERT TOPEL, VOL. II

Washington, D.C.

December 6, 2017

8:39 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52570

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



**300**

1  between McGregor and Mayweather in boxing -- other
2  boxing matches in the future?
3      A.  It would depend on whether it's in the,
4  you know, management of UFC judges that it's in
5  their business interest and whether someone comes
6  along who's got the talents to compete at that
7  level and whether they want to risk it.
8      Q.  And you understand that the fight between
9  Mayweather and McGregor was profitable, correct?
10     A.  One assumes for the promoter of that
11  fight.
12     Q.  And for the fighters, correct?
13     A.  One assumes.
14     Q.  All right.  Back to Strike Force data.
15  You testified yesterday relating to the Chow test
16  and I have some follow-up questions.
17     A.  Okay.
18     Q.  You testified that when you ran your Chow
19  test that Zuffa and Strike Force data did not come
20  from the identical data-generating process,
21  correct?
22     A.  I recall saying something like that, yeah.
23     Q.  And you testified that your Chow test
24  could tell you if there was any reason to put these
25  guys, the Strike Force guys in your words, in the

**301**

1  regression, correct?
2      A.  I don't know if -- I would never have
3  phrased it that way, but --
4      Q.  I'm quoting you.
5      A.  I don't remember saying it that way, but
6  go ahead.

**302**

16     Q.  You've heard of the term "yardstick,"
17  right?
18     A.  Yeah.

**303**

4      Q.  All right.  You believe that your Chow
5  test justifies the discarding of the Strike Force
6  data unless the data-generating process for Strike
7  Force is identical to the data-generating process
8  for Zuffa; is that right?
9      A.  The point I'm making is that this is a
10  different company and the Chow test demonstrates
11  that it was different.  Why you would put it in in
12  the first place escapes me.
13     Q.  All right.
14     A.  So having said -- this is a different
15  company, this is -- these athletes were not under
16  management of Zuffa, their compensation was not
17  determined by Zuffa, the contracts they signed were
18  not signed by anybody from Zuffa, and yet they're
19  being used for this.  And what the Chow test
20  demonstrated was, you know, not only shouldn't you
21  put them in there in the first place, but they
22  really are different.  That's what the Chow test is
23  demonstrating.
24     Q.  Strike Force was in the same market as
25  Zuffa, correct?

10  (Pages 300 to 303)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



304

1    A.  Yes.
2    Q.  They're in the same business as Zuffa
3  was?
4    A.  Yes.
5    Q.  And in your view Strike Force doesn't have
6  market power or didn't at the time, correct?
7    A.  That's my view, yes.
8    Q.  All right.  So you have two reasons to
9  exclude the data, as you said.  One, you don't know
10  why it was included in the first place for all the
11  reasons that you just testified and the other is
12  the Chow test.  I want to focus on the Chow test.
13    A.  That's fine.
14    Q.  Can we just talk about that?
15    A.  The Chow test is just a demonstration of
16  the other point.
17    Q.  Okay.  But I just want to talk about the
18  Chow test for now.  All right.
19        You believe that you're justified in
20  excluding or discarding Strike Force data -- strike
21  that.
22        All right.  Let me give you an example of
23  something that would cause the data-generating
24  process between the Strike Force data and the Zuffa

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

340

1  now you've inserted firm.  So no.
2      Q.  All right.  Firms in a market, if I change
3  the -- the -- all right.  I'll reask the question
4  this way.  A market can have an infinite number --
5  in order for a market to have a horizontal supply
6  curve there would need to be an infinite number of
7  equivalent workers at exactly the same wage; is
8  that right?
9      A.  No.
10      Q.  What was wrong with that?
11      A.  Infinite.  Does the -- the supply curve
12  needs to be -- can be perfectly elastic over a
13  relevant range where demand in this market is
14  shifting and there will be no material effect on
15  prices.  I mean, there's not an infinite number of
16  workers anywhere.
17      Q.  Okay.  So a firm would need to have a
18  substantial material number of equivalent
19  workers -- I mean, a market would need to have a
20  substantial number of equivalent workers at exactly
21  the same wage in order for there to be a horizontal
22  supply curve; is that right?
23      A.  I said over the relevant range.
24      Q.  Over the relevant --
25      A.  So if we -- if we have -- there needs to

341

1  be enough to prevent the wage from rising when
2  demand shifts.
3      Q.  All right.
4      A.  And enough depends on the circumstances.
5      Q.  Is it fair to say that when mobility of
6  workers is -- becomes restricted or is costly firms
7  in that market could obtain some monopsony power?
8      A.  Your statement is so broad and vague
9  that -- you know, I'll come back to my taco stands.
10  And there's some costs of going to the next taco
11  stand so that people who live closest to my taco
12  stand prefer my taco stand to the taco stand that's
13  further away even though our tacos are in all other
14  respects identical.  That means that if I cut the
15  price of my tacos more people come to me.  If I
16  raise the price of my tacos fewer people come to
17  me.  That is not a completely horizontal demand
18  curve.  So in that sense -- and that's the sense in
19  which George is using it here in a lot of this
20  discussion -- one might say that there's a degree
21  of monopsony power if we define -- if we define
22  monopsony power to mean that if I cut my price I
23  sell more and if I raise my price I say monopsony
24  power in that case.  And you can do the same thing
25  on the other side of the market.  So, you know, my

342

1  firm's here and there's other firms and I'm going
2  to hire -- instead of trying to attract people to
3  my taco stand I'm going to hire people from along
4  the road between my firm and another firm and
5  they're all uniformly distributed.  I'm making up
6  this model.  And I'll get the same taco stand kind
7  of thing on the input side.  If I want to hire more
8  I have to reach further down the road and it's
9  costly to drive.  So I'll increase the marginal
10  price that I pay -- I'll have to increase the
11  marginal price that I pay.
12      Q.  Okay.  So let's take your taco stand
13  example.  You have to taco stand A on one side of
14  the road and then a mile away you have taco stand
15  B.
16      A.  Yeah.
17      Q.  Now let's say somebody puts a toll on that
18  road and all of a sudden in order to get from taco
19  stand A to taco stand B it costs a hundred dollars
20  and before it used to cost zero dollars.  All
21  things equal, would that toll increase the mobility
22  costs of workers?
23      MR. WIDNELL:  Objection, form.
24  BY THE WITNESS:
25      A.  So now I'm -- just -- just so I'm clear,

343

1  now I'm hiring workers for my taco stand?
2      Q.  Yes.
3      A.  So there's a toll that prevents people
4  from the other side of town getting to my taco
5  stand?
6      Q.  Yes, and vice-versa.
7      A.  Okay.  So yeah, there's fewer people that
8  I can hire from the other side of town.
9      Q.  So now as compared to a world with the
10  hundred-dollar toll and the world without the
11  hundred-dollar toll, the two taco stands in the
12  world with the hundred-dollar toll have more
13  monopsony power than the world without the
14  hundred-dollar toll, correct?
15      MR. WIDNELL:  Objection, form.
16  BY THE WITNESS:
17      A.  I think what you're trying to say is
18  that -- let's say here's A and B taco stands and
19  the middle of town is halfway in between, and then
20  I build a wall, okay, the Berlin Wall there so
21  people can't get across from -- from -- so people
22  between halfway and my taco stand and the
23  percentage -- there's nobody else in town -- can
24  only work for my taco stand.  They can't go work
25  for the other taco stand.

20  (Pages 340 to 343)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

344

1      Q.  Correct.
2      A.  Is that what we're saying?
3      Q.  Yes.
4      A.  Yeah.  So these people have fewer options.
5  I got it.
6      Q.  And when you compare the world with the
7  Berlin Wall in your example in the world without
8  the Berlin Wall, the firm with the Berlin Wall has
9  more monopsony power, correct?
10     A.  The firm with the -- the firm -- I -- I
11  won't be competing as aggressively to get people
12  from across the place where the border is now.  So,
13  you know, I don't know how things played out in the
14  output market.  I mean, I understand what you're
15  trying to say and you're saying the same thing
16  here, and you're saying the same thing that I said.
17  There's a degree of monopsony power.  You didn't
18  need the wall.  I already said there's a degree of
19  what some people would call monopsony power there
20  by the fact that it is -- it is costly to move from
21  A to B.
22     Q.  And --
23     A.  So if it became more costly to move from A
24  to B, that degree of -- of control over price would
25  increase a little bit.

345

1      Q.  So all things equal, the higher the
2  mobility costs in your example the higher the
3  monopsony power of the firms, correct?
4      MR. WIDNELL:  Objection, form.
5  BY THE WITNESS:
6      A.  Yeah.  It depends on how we make the
7  mobility costs and things like that.  It depends on
8  what we do with the mobility costs.
9      Q.  We raise the costs.  So go back to my toll
10  example.  Assume that the Berlin Wall costs $100 to
11  get from one side to the other and now assume it
12  costs a thousand dollars to get from one side to
13  the other.  As compared to the world where it costs
14  a hundred dollars to the world where it costs a
15  thousand dollars, the firms in the world where it
16  costs a thousand dollars would have a higher degree
17  of monopsony power than the -- all things equal,
18  than the firms in the world where it costs a
19  hundred dollars.
20     A.  I think what you're trying to establish is
21  that the people on my side of the wall have fewer
22  places -- because there's only two places, have
23  fewer places at which they can work and that
24  affects the wage that I have to pay to get them to
25  work for me, and I agree with that.

346

1      Q.  So all things equal, the higher the
2  mobility costs in the example the more monopsony
3  power the firms in that example have, all things
4  equal; is that right?
5      MR. WIDNELL:  Objection, form.
6  BY THE WITNESS:
7      A.  It was important that you said twice "in
8  that example."  So I agree.
9      Q.  And in that example we're talking about
10  taco stands, right?  These aren't Taco Bell, right?
11  It could be a small firm that has some degree of
12  monopsony power; is that right?
13     A.  Yes.  Well, as the term -- as we're using
14  the term.  It's just a dangerous term on both sides
15  of the market.
16     Q.  Is it fair to say that one reason why
17  non-Zuffa firms employ some of the challenged
18  contractual provisions that we've talked about is
19  to restrain the mobility of the fighters that work
20  for them?
21     A.  It's to do all the things we've discussed
22  before that -- you know, to see to it that they get
23  the returns on their investments and that their
24  ability to manage a multi-bout career progression
25  is not interfered with.

347

1      Q.  And one way in which they achieve those
2  ends is by restricting the mobility of the workers,
3  correct?
4      A.  In the sense that I just used, yes.
5      Q.  And so in that sense even these smaller
6  promotions can use these contracts to gain some
7  measure of monopsony power; is that right?
8      A.  No.

21 (Pages 344 to 347)

PUBLIC COPY - REDACTED



348

1      MR. CRAMER:  All right.  I'd like to mark
2  as the next exhibit a piece of the testimony from
3  Scott Coker in this case.  What exhibit?
4      THE REPORTER:  10.
5          (Topel Exhibit 10 was marked
6              as requested.)
7  BY MR. CRAMER:
8      Q.  What you've just been handed is
9  Exhibit 10.
10     A.  Yep.
11     Q.  It is a portion of the transcript of the
12 deposition of Scott Coker that was taken August
13 3rd, 2017 and it was taken in this case.
14     A.  This is the Bellator fellow?
15     Q.  And Strike Force.  He was at both.
16     A.  Okay.
17     Q.  Did you have an opportunity to review this
18 deposition transcript?
19     A.  Not in its entirety.
20     Q.  You read some of it?
21     A.  Some of it, yeah.  I believe so.
22     Q.  Turn to page 245 of the transcript which
23 is on the third -- it's the third page of the
24 exhibit.  Do you see that on the bottom right-hand
25 corner?

349

1      A.  You said 245, right?
2      Q.  Yes.
3      A.  245 is the bottom right of the second
4  page.
5      Q.  Yes.
6      A.  Okay.
7      Q.  After the title page.
8          All right.  I'm going to draw your
9  attention to the testimony beginning at line 3 on
10 page 245, and I'll read it into the record and then
11 we can discuss it.

350

351

2      Q.  All right.  You can put that aside.
3          Have you seen evidence that -- in the
4  record that certain MMA promotions other than
5  Zuffa, smaller MMA promotions have said that they
6  would abandon certain of the contractual provisions
7  if the UFC would?
8      A.  That sounds like something that might get
9  you in antitrust trouble anyway, but the -- I
10 haven't seen statements to that effect, but I'm
11 sure you'll show me.
12     MR. CRAMER:  Okay.  All right.  I'm going
13 to have the court reporter mark as the next exhibit
14 a series of e-mails.
15         (Topel Exhibit 11 was marked
16             as requested.)
17 BY MR. CRAMER:
18     Q.  The court reporter has marked as
19 Exhibit 11 a two-page document bearing the Bates
20 range ZFL-1904802 through 4803, and I'd like to
21 draw your attention to the e-mail at the bottom of
22 the page from Michael Chiappetta to Anthony Evans
23 at the UFC.
24     A.  Yes.
25     Q.  And then I'm particularly talking about

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

352

1  the run -- one at 4:43 p.m. from Chiappetta who is
2  talking about a conversation he had with Bjorn
3  Rebney.  Bjorn Rebney was the head of Bellator at
4  the time and this is dated September 25th, 2012.
5  And I'd like to turn your attention to the next
6  page where Chiappetta, who is a reporter, is
7  reporting a conversation that Chiappetta had with
8  Rebney to the UFC.
9      A.  Can I -- can I just read the rest of
10 this.
11     Q.  Please do.
12         (Witness reviewing document.)
13 BY THE WITNESS:
14     A.  Remind me who Mike is because you've only
15 got a Gmail address.
16     Q.  Mike Chiappetta is an MMA reporter.
17 Anthony Evans is an executive at the UFC.
18     A.  So he's conveying some conversation that
19 he had with somebody at Bellator; is that what he's
20 doing?
21     Q.  Correct.  Chiappetta communicated with
22 Bjorn Rebney, who was the President of Bellator at
23 the time, and then he's communicating a
24 conversation that Chiappetta had with Rebney to the
25 UFC.  And on the second page of the e-mail --

353

1      A.  He says "Eventually"; is that sentence
2  you'd like me to read?

10     Q.  Do you know whether Zuffa eliminated the
11 right to match clause in response to Rebney's
12 challenge?
13         MR. WIDNELL:  Objection, form.
14 BY THE WITNESS:
15     A.  Well, you know, I don't know if there was
16 an actual challenge.  This is being relayed by a
17 reporter.  We know how sometimes that can get
18 muddled.  But I don't know if this is in -- this
19 sounds like it's in the context of a particular
20 transaction, but, you know, one wouldn't be
21 surprised if some competitor would say, hey, you've
22 invested a lot in all these folks, wouldn't you
23 like to get rid of this clause because then, you
24 know, it would give us greater access to the people
25 you've invested in.  That's the point of having

354

1  these clauses is to protect the investments that
2  have already occurred.
3         Now, on the first page here it says that

9  is -- it's an equilibrium where this contract
10 restriction has not been used.  It could be still
11 binding, but it hasn't been used.

16     Q.  Is it your opinion that if the UFC has
17 never during -- had never during a right to match
18 period matched a rival's bid that that would mean
19 the right to match clause had no effect in the
20 marketplace?
21     A.  That was the implication that I was trying
22 to convey at the end of my answer.  That doesn't
23 mean that it's not binding.  It doesn't mean that
24 it doesn't have an effect.  It's not -- it's not
25 put into the contracts for nothing.  It serves a

355

1  purpose.
2      Q.  So even if the right to match clause has
3  never been, quote/unquote, used, it's still having
4  an effect in the marketplace, correct?
5      A.  It could be having an effect in the
6  marketplace even if they've never had to invoke.
7      Q.  And why is that?

17     Q.  Sounds to me like that answer said the
18 right to match is not doing any work.  How is the
19 right to match doing any work, procompetitive work
20 or anticompetitive work, economic work if Zuffa
21 would just outbid any potential rival?  Why doesn't
22 Zuffa just get rid of the right to match, then, if
23 it knows it can just outbid any rival?
24     A.  Well, we go through this in my report.

23 (Pages 352 to 355)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

356

3  if it came down to, oh, why don't they just -- why
4  don't they just outbid, well, if Bellator makes its
5  best offer and it knows that Zuffa will match,
6  then, you know, the returns to making its best
7  offer aren't as high as otherwise.  Now, take
8  that -- take away the right to match and you come
9  back to the example that I have in my report about
10  the holdup problem where you're more valuable to
11  Zuffa, the athlete knows it.  So now you've got a
12  bilateral negotiation where there's no determinant
13  solution in economics except that it's going to be
14  somewhere in between and depends on the relative
15  intransigence of the two parties where you're going
16  to end up.
17      Q.  So you just said --
18      A.  Let me finish.  So I said that the -- what
19  I've just described is the holdup problem that's in
20  my report that the right of first refusal is
21  designed to avoid.
22      Q.  One of the things you said is that if
23  **Bellator makes its best bid during a UFC right to**
24  **match period the returns to Bellator to making that**
25  **bid aren't as high as they would be without the**

357

1  **right-to-match period in place; is that right?**
2      A.  No.  I just said given that the right to
3  match is there, Bellator has to make a calculation
4  that says here's what this athlete is worth to us
5  and let us assume -- and that's the assumption of
6  my example -- that the athlete is worth more
7  because of past investments to Zuffa than to
8  Bellator.  So in making this offer you're not
9  certain of what the value to Zuffa is, but it's
10  very likely to be higher.  So I put all the -- I
11  put all the numbers into a contract, the athlete
12  takes the contract to Zuffa, and Zuffa says done,
13  we'll pay that, and that's our right of first
14  refusal.  And so we can invoke that.
15      Q.  So what effect, in your view, does that
16  **have Bellator's incentives to make a bid?**
17      A.  Bellator may have -- well, relative to
18  what because I don't -- if -- if it's -- I think we
19  went over this yesterday.  Suppose we canceled the
20  right -- in one guy's contract, everybody else's
21  contract stays the same.  I know we did this --
22      Q.  I think I can make it easier.
23      A.  I know we did this yesterday.
24      Q.  We did.  I think I can just make it

358

4  **different once the right to match period expires**
5  **than during the right to match?**
6      A.  They could be, though there's a question
7  of why Bellator make an offer in the right to match
8  period and they're gaining information about this
9  fighter from the fact that -- it's your
10  hypothetical.  There's no contract between Zuffa
11  and the fighter a year after the end of his
12  contract.  So you're -- Bellator's looking at that
13  at the end and saying, you know, winner's curse
14  might be operative here.  So if we win what is it
15  that Zuffa knew about this fighter that we don't.
16      Q.  **Well, assume that Zuffa made a bid and the**
17      **fighter didn't accept it.**
18      A.  Okay.
19      Q.  **I'll withdraw it.  I'm going to move on.**
20      **Would you agree with me that the conduct**
21  **engaged in by a firm without market power could**
22  **be -- could have anticompetitive effects when that**
23  **same conduct is engaged in by a firm with market**
24  **power?**
25      A.  That's conceivable.

359

1      Q.  **How is that conceivable?**
2      A.  Well, take the -- I mean, often in
3  contract disputes under section 2, like exclusive
4  dealing or loyalty discounts or something like
5  that, under certain prerestrictive conditions
6  things that have procompetitive effects can also
7  have anticompetitive effects if certain conditions
8  are satisfied.
9      Q.  **Well, is bundling -- product bundling one**
10  **of those examples?  Product bundles has many**
11  **procompetitive effects and when engaged in by a**
12  **firm without market power in any of the markets in**
13  **which the products they're bundling --**
14      MR. WIDNELL:  Objection, form.
15  BY MR. CRAMER:
16      Q.  **I'll rephrase.  Could bundling be one of**
17  **those examples where product bundling can be**
18  **anticompetitive when engaged in by a firm with**
19  **market power and procompetitive when engaged in by**
20  **a firm without market power?**
21      A.  Yes, that's -- I mean, that and a myriad
22  of other examples under section 2.
23      MR. WIDNELL:  I just want to make clear,
24  you're asking for an economic opinion here, not a
25  legal opinion; is that right?

24  (Pages 356 to 359)

**PUBLIC COPY - REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



**360**

1     MR. CRAMER:  Yes.  I'm not asking for any
2  legal opinion.
3     MR. WIDNELL:  Okay.  I just want to
4  avoid --
5     THE WITNESS:  Yep, that's fine.
6     MR. WIDNELL:  -- making that objection
7  over and over.
8     THE REPORTER:  Guys.
9  BY MR. CRAMER:
10    **Q.  Turn to paragraph 43, please.  All right.**
11  **In paragraph 43 you quote a document.  I believe**
12  **it's the Deutsche -- one of the Deutsche Bank**
13  **documents and I'm just looking for that.  All**
14  **right.  Towards the middle of paragraph 43 you say**

**361**

6    **Q.  All right.  I'm going to show you the**
7  **document that Dr. Singer was quoting and have it**
8  **marked as Exhibit 12.**
9     **(Topel Exhibit 12 was marked**
10     **as requested.)**
11  BY MR. CRAMER:
12    **Q.  And I'll note that you cite this document**
13  **in footnote 45.**
14    A.  Okay.
15    **Q.  It is entitled "UFC/Zuffa, LLC DBA**
16  **Ultimate Fighting Championship, Confidential**
17  **Information Memorandum."  It's dated October 2009**
18  **and it was put out by Deutsche Bank.  You've seen**
19  **this document before, correct?**
20    A.  Yes.
21    **Q.  And you recognize that Zuffa management**
22  **had input into this document, correct?**
23    A.  One would assume.
24    **Q.  All right.  Turn to page 16 internally to**
25  **the document.**

**362**

1     MR. WIDNELL:  I just want to briefly note
2  an objection for completeness.
3     MR. CRAMER:  Okay.
4  BY MR. CRAMER:
5    **Q.  If there's something as you read through**
6  **this document that you think is missing, please let**
7  **me know.  Okay?**
8    A.  Okay.  Sorry.
9     MR. WIDNELL:  Just to be clear, it's not
10  in the document.  The document was an attachment to
11  an e-mail.
12     MR. CRAMER:  Oh, okay.  Fair enough.
13  BY MR. CRAMER:
14    **Q.  Fair to say in your report you don't cite**
15  **any e-mail that attaches this document, right?**
16    A.  Not that I'm aware of.
17    **Q.  Okay.**
18    **All right.  On page 16 under the heading**

**363**

13    **Q.  And is it your view that -- strike that.**
14    **I believe you testified that it is your**
15  **opinion that Zuffa is the market leader among MMA**
16  **promoters; is that right?**
17    A.  Yes.
18    **Q.  And would you agree that that was the case**
19  **since 2001?**
20    A.  I don't recall the circumstances
21  completely in 2001.  The market was pretty small.
22  They might been the largest producer back then.
23    **Q.  And that remained the case from the date**
24  **of this document, October 2009, to the present,**
25  **correct?**

25  (Pages 360 to 363)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

364

1      A.  Correct, assuming the truth of what I just
2   agreed to.  Back in 2001 the market was pretty
3   small.
4      Q.  Okay.  You can put that document aside for
5   the moment.  I'm going to come back to it, but I'm
6   going to put it aside for the moment.

[REDACTED]

12      Q.  Do you know who the audience of the
13   document was?
14      A.  Probably potential lenders.
15      Q.  And in putting together a document about
16   information relating to a company for potential
17   lenders one would need to be scrupulously accurate
18   about the information, correct?
19      A.  Well, I mean, if I were creating a
20   document I would try to be accurate, you know, but
21   I've seen the disclaimers in documents like this
22   that say, you know, not everything in a document --
23   in our document is -- we can't verify that it's --
24   the total reliability of these things.  There's all
25   kinds of caveats.  I assume this was done under

365

1   standard business practice.  Deutsche Bank was
2   involved and they would have been doing -- creating
3   this in the way they would have created it for
4   another organization.
5      Q.  And they would attempt to be as accurate
6   as they possibly could be in this document,
7   correct?
8      A.  They -- they would be as accurate as it
9   was valuable to be.  There's costs to being
10   accurate.  I assume that they -- they did a good
11   job here.
12      Q.  It's fair to say that Deutsche Bank would
13   not want to make material misrepresentations in a
14   document like this to potential lenders, correct?
15      A.  I think that would be a bad idea.
16      Q.  All right.  You can put that aside for the
17   moment.
18      Turn to paragraph 173, please.
19      A.  Yes.
20      Q.  Here you are discussing the promoters that
21   Zuffa acquired?
22      A.  Yes.
23      Q.  And you observe that Zuffa acquired
24   several MMA promotions between 2006 and 2011; is
25   that right?

366

1      A.  Yes.
2      Q.  And you note they acquired WFA and WEC in
3   2006, right?
4      A.  Yes.
5      Q.  And Pride in 2007; is that right?
6      A.  Yes.
7      Q.  And Affliction in 2009; is that right?
8      A.  Yes.
9      Q.  And Strike Force in 2011; is that right?
10      A.  Yes.
11      Q.  Do you know if they acquired any other
12   promoters?
13      A.  As I sit here I can't remember, but I
14   believe they have.  I can't remember their names.
15      Q.  In the last sentence of paragraph 173 you
16   say "At the time of these acquisitions each of the
17   acquired MMA promoters was either too small to
18   appreciably change Zuffa's market share in either
19   the input or output market, was exiting the market,
20   or both"; do you see that?
21      A.  Yes.
22      Q.  I'm trying to understand you provide two
23   different characterizations.  One that the promoter
24   was too small to change Zuffa's market share in the
25   input or output market; in the other that it was

367

1   exiting the market at the time of the acquisition,
2   right?
3      A.  Yes.  It's an either/or.
4      Q.  Either/or.  So now I'm going to ask you
5   which explanations apply to which promotions.
6      A.  Oh, dear.
7      Q.  So WFA, did the acquisition of WFA
8   appreciably change Zuffa's market share in either
9   the input or output market?
10      A.  My recollection from our calculations
11   using Dr. Singer's data is that it did not.
12      Q.  Did the acquisition of WEC appreciably
13   change Zuffa's market share in either the input or
14   output market?
15      A.  Our calculations are on the input side and
16   my recollection is that it didn't affect any of
17   Dr. Singer's -- materially affect any of
18   Dr. Singer's share calculations.
19      Q.  It did not affect?
20      A.  I'm trying to remember, but that's my
21   recollection.  It has to affect it, right, but it
22   didn't affect it much.
23      Q.  Right.  You used the word "appreciably."
24   With respect to Pride, did that
25   appreciably change Zuffa's market share in either

26  (Pages 364 to 367)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

368

1  the input or output market?
2      A. Let me answer your question this way. I
3  don't recall doing this firm by firm, acquisition
4  by acquisition. We did his -- his foreclosure --
5  so-called foreclosure shares and calculated it with
6  these firms and without those firms.
7      Q. And when you calculated the foreclosure
8  share with all of these firms together versus a
9  calculation without all of these firms, was there
10  an appreciable change in foreclosure share?
11      A. I think we have an exhibit to that effect
12  and we said it was not an appreciable change.
13      Q. So all of the acquisitions together, in
14  your understanding, did not appreciably change
15  Zuffa's market share in either the input or output
16  market; is that what you're saying?
17      A. Yes.
18      Q. So is it fair to say that what you're
19  saying is that all of these MMA promoters that
20  Zuffa acquired were essentially insignificant as
21  competitors to Zuffa?
22      MR. WIDNELL: Objection, form.
23  BY THE WITNESS:
24      A. No. I didn't do an analysis of whether
25  they were insignificant or could have been

369

1  significant or anything like that. I'm just saying
2  that it doesn't affect -- including them doesn't
3  much affect Dr. Singer's calculations of his
4  so-called foreclosure.
5      Q. So you have -- you have no opinion one way
6  or another whether, for example, Zuffa's
7  acquisition of Strike Force was the acquisition of
8  a significant competitor or an insignificant
9  competitor; am I right?
10      MR. WIDNELL: Objection.
11  BY THE WITNESS:
12      A. It doesn't have a material impact on
13  Zuffa's market share in the input or output market
14  is what -- is what we say here. That's the opinion
15  I'm offering.
16      Q. So was Strike Force a significant
17  competitor to Zuffa at the time that Zuffa
18  purchased Strike Force in 2010 in your opinion?
19      MR. WIDNELL: Objection, form.
20  BY THE WITNESS:
21      A. They were -- they were a competitor and
22  competitors are often acquired. There can be
23  synergies between the two firms that make the
24  acquisition worthwhile and that are output
25  increasing and consumer welfare increasing, because,

370

1  after all, you're bringing the athletes of one less
2  well-known entity under the brand name of another
3  entity. So it simply says here there -- they
4  didn't change Zuffa's market share in the neither
5  the input or the output market, appreciably change
6  the market share in either the input or output
7  market.
8      Q. Did --
9      A. I mean, was it a significant -- I don't
10  know what the word "significant" means in this
11  context. It was a competitor.
12      Q. Did Strike Force have significant share of
13  the input or output markets at the time it was
14  taken over by Zuffa?
15      A. Evidently not.
16      Q. Did any of the rivals that Zuffa purchased
17  as identified in paragraph 173 have a significant
18  share of the input or output markets at the time
19  they were purchased?
20      MR. WIDNELL: Objection, form.
21  BY THE WITNESS:
22      A. As I said, I didn't do the calculations
23  firm by firm. They certainly weren't as big as
24  Zuffa.
25      Q. Is it fair to say that none of the

371

1  competitors that Zuffa purchased that you
2  identified in paragraph 173, in your view, had been
3  able to challenge Zuffa's dominance in either the
4  input or output markets?
5      MR. WIDNELL: Objection, form.
6  BY THE WITNESS:
7      A. Well, I don't know what it means to
8  challenge dominance. I've seen dominance used in
9  the context that noneconomists would use it. Zuffa
10  has a level of market share in a position in the
11  market.
12      Q. Is it fair to say --
13      A. It's been pretty stable over time.
14      Q. Is it fair to say that none of the
15  promoters that Zuffa acquired, in your view, have
16  been able to successfully challenge Zuffa's market
17  share and market position that you say has been
18  stable over time in either the input or output
19  markets?
20      MR. WIDNELL: Objection, form.
21  BY THE WITNESS:
22      A. Well, it's fair to say that these acquired
23  firms did not grow to be as large as Zuffa.
24      Q. Did any of these firms in your opinion as
25  an economist before they were purchased by Zuffa

27 (Pages 368 to 371)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

372

1    present a competitive threat to the UFC?
2        A. They might have. I think all firms in
3    this market present a competitive threat to UFC.
4        Q. So when Zuffa purchased Strike Force, for
5    example, it was eliminating, in your opinion, a
6    competitive threat; is that right?
7        A. Well, no. The -- take Strike Force, for
8    example. You know, everybody in the -- if they
9    bought some small firm there's some competition
10   from that firm, that's all I'm saying. I mean, we
11   wouldn't want to say that these firms are in the
12   market and they don't compete with Zuffa. They
13   were competing for athletes, they were competing
14   for eyeballs, they were competing, and the question
15   is whether it was addressed by antitrust
16   authorities and the like is whether these
17   acquisitions materially affected competition in the
18   market. Evidently they found that they didn't.
19   So -- but these were -- these were firms operating
20   and there are always benefits and potential costs
21   of allowing acquisitions.
22       Q. At the time that Strike Force was
23   purchased in 2010, did Strike Force, in your
24   opinion as an economist, present a significant
25   economic threat to the UFC?

373

1            MR. WIDNELL: Objection, form.
2    BY THE WITNESS:
3        A. Not such a threat that the acquisition
4    would have -- would have materially affected
5    competition to the detriment of consumers and --
6    and fighters.
7        Q. Did Pride at the time it was purchased
8    present a significant economic competitive threat
9    to Zuffa at the time it was purchased?
10       A. And my answer's the same.
11       Q. Would it be the same for all of the
12   entities?
13       A. Yes.
14       Q. Is it fair to say that even if we put the
15   promoters that Zuffa acquired aside --
16       A. Let me finish -- let me say -- I should
17   have put the word "adversely" affect competition.
18       Q. Is it fair to say, putting the promoters
19   that Zuffa acquired aside, that your report does
20   not identify a single MMA promotion other than
21   Zuffa that does business in the United States that
22   had substantial market share and was profitable?
23           MR. WIDNELL: Objection, form.
24   BY THE WITNESS:
25       A. Are we -- are we saying that Bellator's

374

1    not profitable and doesn't do business in the
2    United States?
3        Q. Is it your opinion that Bellator has
4    substantial market share and is profitable?
5        A. It's -- it's got a substantial position in
6    the market and it seems to be surviving.
7        Q. Is it your opinion that Bellator is
8    profitable currently?
9        A. Well, it's an ongoing entity. So the
10   present discounted value of what those investors
11   think that this project is worth must be
12   positive.
13       Q. Is it your opinion that the revenues that
14   Bellator brings in in any year exceed the costs of
15   running the organization in that year?
16       A. I've not looked at the balance sheets of
17   Bellator, but given that they're still in business,
18   there must be some anticipation of positive cash
19   flow even if it's negative today.
20       Q. So you're saying that it's your
21   understanding that there's an anticipation that
22   Bellator will one day be profitable, but you don't
23   understand that Bellator's profitable today; is
24   that right?
25           MR. WIDNELL: Objection, form.

375

1    BY THE WITNESS:
2        A. Well, I'm not -- I'm not offering an
3    opinion of whether they have positive cash flow
4    today.
5        Q. When in your --
6        A. Just as Zuffa did not have positive cash
7    flow when it was a young and nascent participant in
8    this market.
9        Q. When, in your opinion, did Bellator come
10   to have significant market share in the United
11   States?
12       A. I don't recall the time series on
13   Bellator's market share. I recall that they have
14   television contracts. They're backed by Viacom and
15   so on.
16       Q. Putting Bellator aside for the moment, can
17   you identify another MMA promotion that does
18   business in the United States that has significant
19   market share, in your opinion, and is profitable?
20       A. Well, a lot of these must be profitable.
21   King of the Cage has been around putting on dozens
22   of events every year for many years. There's a
23   long list of promoters that are -- that are doing
24   this and -- you know, the market share you're
25   referring to is very limited in its scope because

28 (Pages 372 to 375)

PUBLIC COPY - REDACTED

420

1  compensation is, in part, determined by the
2  willingness of people to pay to see fighters fight?
3      A.  To the extent that we're talking about
4  things that change the demand for fighters and in
5  moving along a supply curve, then greater
6  willingness to pay downstream raises the demand for
7  fighters and compensation should rise to the
8  extent -- depending on the elasticity of supply of
9  fighters.
10     Q.  So it's fair to say that both fighter
11 compensation and event revenues are both, in part,
12 determined by the willingness of individuals to pay
13 to see fighters fight; is that right?
14     A.  Would you -- can you read that back?
15     Q.  I'll say it again.  That fighter
16 compensation and event revenues are both, in part,
17 determined by the willingness of people to pay to
18 watch fighters fight; is that fair?
19     A.  Yeah, subject to the conditions I gave.
20     Q.  Okay.
21     Turn to paragraph 200.  Now, in paragraph
22 200 you're criticizing Dr. Singer's damages
23 analysis in part, and in particular in the fourth
24 ████████████████████████████████

421

1  ████████████████████████████████████

422

3      Q.  So, in your view, the challenged conduct
4  alters the amount of UFC's revenues and that would
5  in turn alter the total amount of dollars that
6  would be paid to UFC fighters in the but-for world,
7  right?
8      A.  You're connecting things from all other
9  the place now.
10     Q.  It's my job.
11     A.  I know, and I'm -- my job is to listen
12 carefully.
13     Q.  It is.
14     A.  Zuffa's producing a product and it's
15 putting on what they call shows, and these -- the
16 challenged conduct here or the restrictions enable
17 them to increase the valuable of those shows and
18 produce a more valuable product.  So when we talk
19 about holding revenues constant, you can't take --
20 you can't take one piece away and leave the other
21 piece intact.
22     Q.  So, in other words, when you're
23 determining damages you can't just assume that the
24 revenues would be what they were in the actual
25 world because the revenues, in your view, might be

423

1  less, right?
2      A.  Yeah.  If we took these things away from
3  the entire industry, the whole industry might be
4  less valuable.
5      Q.  So it's not appropriate, in your view, to
6  hold revenues constant because the challenged
7  conduct alters the amount of UFC's revenues, right?
8      A.  I'm trying to figure out where you're
9  going here, but that's a fact.  If you're
10 holding -- he's holding revenues constant.
11     Q.  Okay.  And, in your view, it's not
12 appropriate in evaluating the total possible
13 damages to fighters in this case to use the amount
14 of revenues that UFC actually brought in in the
15 actual world, right?
16     MR. WIDNELL:  Objection, form.
17 BY THE WITNESS:
18     A.  Yes.  Let me put it another way.  You
19 referred to the pie yesterday and changing the
20 contract restrictions doesn't mean -- just mean
21 that the same pie is divided up in a different way.
22     Q.  Okay.  So your view is that if the
23 but-for world we would expect the UFC to bring in
24 lower levels of revenues from their events, that
25 would likely lead to lower athlete compensation,

40  (Pages 420 to 423)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

424

1  right?
2      A. Depending on how everything else plays
3  out, yeah.
4      Q. I mean, you say in paragraph 200 -- we
5  looked at this before in the same paragraph on page
6  [REDACTED]
9      Q. Okay. So just so I understand, it's your
10 view that in computing damages in this case the
11 appropriate pool of total event revenues is the
12 amount of event revenues that the UFC would have
13 brought in in the but-for world, not the actual
14 world; am I right about that?
15     A. Well, I mean, I don't want you to sneak in
16 some sort of back-handed endorsement of the way
17 Dr. Singer's performing the whole exercise, that
18 it's based on some division of some share of
19 revenues because I think that's a major critical
20 mistake.
21     Q. All right. I'm not trying to sneak that
22 in.
23     A. Well, I just -- but I've got to be careful
24 here because you're getting me to endorse some
25 concept that's -- you know, endorsing some aspect

425

1  of a -- of a -- an inappropriate procedure. But
2  the only point I'm making here is that the value
3  produced is going to be different in the but-for
4  world than in the world we're in, and -- because,
5  remember, my opinion is there aren't any damages.
6  So what it means to calculate those damages by the
7  procedures that Dr. Singer's using is kind of a --
8  let's just put it this way, a very vague concept.
9      Q. I understand you have your critiques of
10 Dr. Singer's analysis. I'm just trying to
11 understand the principles behind this particular
12 criticism, and as I understand it the particular
13 criticism is that to the extent Dr. Singer is
14 assuming that revenues are constant in the actual
15 world, that is not an appropriate assumption
16 because what he should be focused on in computing
17 damages are the revenues in the but-for world; is
18 that right?
19     A. Let's just say that you -- if I read back
20 your entire sentence there, it was kind of long,
21 and I just stopped with "because" -- I put a period
22 before the "because" and if you'll read back what
23 that says, I think I can agree with that
24 statement.
25     Q. Dr. Singer is assuming that revenues are

426

1  constant in the actual world that is not an
2  appropriate assumption?
3      A. Yes.
4      Q. Okay. And the reason why that's not
5  appropriate is because what an economist should do
6  in computing damages in an antitrust trust is take
7  into account all of the differences that would
8  occur in the but-for world, including the total
9  amount of revenues available to pay damages, right?
10     A. Well, you're assuming -- you're assuming
11 the appropriateness in that statement of
12 Dr. Singer's damage calculation that's based on a
13 share of revenues, and I'm -- so I'll just put it
14 in the context of his damage calculation, which is
15 just wrong, even within that context if you assumed
16 arguendo it was a way to calculate damages, you'd
17 still have to take into account that the world's
18 going to be different when those contract
19 restrictions are removed.
20     Q. Okay. Let's assume that we're talking
21 about an economist that didn't use share in his or
22 her damages analysis. They used wage level. So we
23 don't have the share problem that I think we're
24 getting hung up on. In that situation in
25 attempting to compute the effect of challenged

427

1  conduct on compensation one would need to assess
2  the total amount of revenues in the but-for world,
3  not the actual world; is that right?
4          MR. WIDNELL: Objection, form.
5  BY THE WITNESS:
6      A. Now I don't know -- where do revenues come
7  into this now? We just took it out of the
8  left-hand side. Maybe -- you know, if I wanted to
9  do a proper analysis I might have to compute the
10 market equilibrium in a world where revenues have
11 changed, but for the purposes of some -- if all
12 we're changing is the regression and saying we're
13 going to put compensation on the left-hand side or
14 the log of compensation on the left-hand side
15 rather than the share of revenues of -- the wage of
16 an athlete divided by event revenue, well, now
17 revenues aren't in the model, correct? They just
18 disappeared.
19     Q. Well, let's say that the regression
20 produced a percentage by which compensation was
21 reduced as between the actual world and the but-for
22 world. That's something that could happen with a
23 regression, right?
24          MR. WIDNELL: Objection, form.
25  BY THE WITNESS:

41 (Pages 424 to 427)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

428

1    A.  Let's suppose we had a case that -- let me
2   see if I can help you out or you can help me out or
3   we can help each other out.
4       Q.  Good.
5       A.  Suppose there's a regression of wages on
6   some all-agreed-upon conduct indicator.  Okay?  So
7   there's -- and there's a before and after.
8       Q.  Okay.
9       A.  And we say that wages were 2 percent lower
10  controlling for other stuff in the conduct period,
11  okay, and we're not doing anything about the --
12  forget critiques of whether the conduct -- and
13  suppose it was a really good controlled experiment
14  before and after.
15      Q.  Fair enough.
16      A.  Then there's a 2 percent impact of the
17  conduct, okay, which, as I just said, we're all
18  going to agree that this is right -- the right way
19  to measure the conduct.
20      Q.  Understood.
21      A.  Then one would need the stipulation along
22  with that that the practices in question didn't
23  have some offsetting impact that would have raised
24  pay because -- but we have a before and after
25  that's the conduct period.  So we've really taken

429

1   that into account.
2       Q.  So let's say in your example with the
3   well-specified regression showing a 2 percent
4   decrease in wages after when compared to before
5   that revenues were different in the after period
6   and the before period.  Would you multiply the 2
7   percent times the amount of revenues that you
8   thought would be existing in the but-for world or
9   the amount of revenues that would be existing in
10  the actual world?
11          MR. WIDNELL:  Objection, form.
12  BY THE WITNESS:
13      A.  Okay.  Well, see, you know, I didn't
14  succeed in getting us on the same page because you
15  just multiplied by revenues.  So revenues just came
16  sneaking in through the back door.  It was a
17  2 percent change in their pay, their compensation,
18  their salary.
19      Q.  Okay.  I understand.
20      A.  Revenues is gone.
21      Q.  All right.  Understood.  Okay.  So do you
22  multiply, then, by the total amount of compensation
23  paid to the workers in the actual world or the
24  total amount of compensation you believe would have
25  been paid to the workers in the but-for world?

430

1       A.  For the experiment we just did, you know,
2   we controlled for growth and other stuff and it was
3   just the -- I think if we understand each other,
4   it's a 2 percent reduction in wages.  So give them
5   2 percent of their wages.
6       Q.  Let's say that the conduct in question had
7   another effect -- strike that.  I get it.  I'll
8   move on.
9           Paragraph 108, please.  You state in
10  paragraph 108 on page 47 -- I think I have the
11  wrong paragraph here.  Oh, I mean paragraph 109.
12          You quote or paraphrase something from
13  Dr. Singer.  You say "As Dr. Singer notes, athletes
14  value the opportunity to develop their careers by
15  fighting against highly-ranked opponents and
16  audiences are drawn to fights among highly ranked
17  opponents"; do you see that?
18      A.  Yes.
19      Q.  Do you agree with Dr. Singer's
20  observation?
21      A.  That people want to fight highly ranked
22  opponents?
23      Q.  Yes.
24      A.  Well, they want to fight highly-ranked
25  opponents when they think they're ready to fight

431

1   highly-ranked opponents.
2       Q.  And are audiences drawn to fights among
3   highly-ranked opponents?
4       A.  I think -- I think ratings are higher.  I
5   think there was some evidence that ratings are
6   higher when highly-ranked people fight against each
7   other.
8       Q.  Do you agree that MMA fighters value the
9   ability to develop their careers by fighting
10  against highly-ranked opponents when they're ready
11  to fight them?
12      A.  Yeah.  I think that's why they sign up.
13  That's one of the reasons they sign up.
14      Q.  Is it fair to say that a fighter can't --
15  cannot advance in the rankings unless that
16  fighter's able to fight other fighters that are
17  ranked higher than them, right?
18          MR. WIDNELL:  Objection, form.
19  BY THE WITNESS:
20      A.  I don't think that's literally true, but
21  you don't have to fight somebody higher than you to
22  move up.
23      Q.  But in order to substantially move up in
24  the rankings, all things equal, it would be better
25  for you to fight higher ranked fighters, correct?

42 (Pages 428 to 431)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

432

1    MR. WIDNELL: Objection, form.
2  BY THE WITNESS:
3    A. Since I don't know exactly how the ratings
4  or the rankings happen, let's assume they're like
5  college football rankings, then you take into
6  account the types of opponents you've had and how
7  you did and somebody has a formula that tries to
8  take that into account. Same thing with golf
9  rankings and all sorts of things.
10   Q. All things equal, consumers will be
11 willing to pay more to see highly-ranked opponents
12 fight than lower-ranked opponents fight; is that
13 fair?
14   MR. WIDNELL: Objection, form.
15 BY THE WITNESS:
16   A. In every instance, no, but on average
17 probably yes.
18   Q. Higher ranked fighters, all things equal,
19 generate more revenues when they fight than
20 lower-ranked fighters, correct?
21   MR. WIDNELL: Objection, form.
22 BY THE WITNESS:
23   A. Not always, but on average that's probably
24 true.
25   Q. Turn to paragraph 96, please. In the

433

1  first sentence after the dash you state "There is a
2  natural tendency for a leading promoter to attract
3  a significant share of the top athletes"?
4    A. Yes.
5    Q. "This follows," you say, "from the
6  complimentarity of athlete talents in producing
7  high-quality bouts" --
8    A. That's the point we just made.
9    Q. -- "and the desire among athletes to fight
10 against the best"; do you see that?
11   A. Yes.
12   Q. And you agree with that?
13   A. Yes.
14   Q. Can you please explain the natural
15 tendency for a leading promoter to attract a
16 significant share of the top athletes. What does
17 that mean?
18   A. It means that athletes -- their talents
19 are complementary, that the good athletes want to
20 be in the places where the -- where the other good
21 athletes are so they can fight them. And then
22 it's -- it's kind of a feedback system that you
23 attract some of the good athletes, they fight well,
24 it makes it more attractive for the other good
25 athletes, and so on. So Zuffa kind of runs a

434

1  platform that has been successful in attracting the
2  top athletes and that complementarity plays a
3  role.
4    Q. How do you define "significant share" as
5  you use that term in this sentence?
6    A. All other things equal, a firm that is
7  attracting the top athletes will see its share
8  among the top athletes rise.
9    Q. And that's because fighters generally have
10 an interest in competing against the best fighters,
11 right?
12   A. Well, that's part of it, but the
13 complementarity is there's more energy created when
14 you put the good fighters against each other. So
15 the -- the customers like that too.
16   Q. And those are the fights that would likely
17 lead to career advancement and higher compensation
18 ultimately, correct?
19   MR. WIDNELL: Objection, form.
20 BY MR. CRAMER:
21   Q. The ones with higher energy.
22   A. Broadly speaking.
23   Q. Broadly speaking, yes?
24   A. Broadly speaking, if I -- if I'm
25 successful against higher-ranked people, I will

435

1  probably advance more and get paid more and so on,
2  as I understand the process.
3    Q. You can put that paragraph aside.
4    Would you agree with me that by
5  restricting fighter mobility used the challenged
6  contracts Zuffa's made it more difficult for other
7  MMA promotions to access UFC's top fighters, all
8  things equal?
9    A. No.
10   Q. Are you aware that Zuffa and banks working
11 with Zuffa have seen the challenged contracts and
12 describe the challenged contracts as barriers to
13 entry to rivals?
14   A. I think I know what you're -- to what you
15 are referring and I wouldn't characterize it that
16 way.
17   Q. All right. Would you take a look at what
18 has been marked as Exhibit 12. We marked it
19 earlier today. It was in the pile in front of you.
20   A. Exhibit --
21   Q. 12. It is the --
22   A. It's the Deutsche Bank?
23   Q. Correct.
24   A. What page do you want?
25   Q. I would like you to turn to page 7 of the

43 (Pages 432 to 435)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY - REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



440

441

442

```
20        MR. CRAMER:  All right.  I'd like to show
21   you -- or have marked as Exhibit 17 the next
22   document.
23            (Topel Exhibit 17 was marked
24              as requested.)
25   BY MR. CRAMER:
```

443

```
1        Q.  Exhibit 17 is a two-page series of e-mails
2   bearing the Bates range WME-Zuffa-00013978 through
3   979.  The cover e-mail is from Brent Richard to
4   Al Pfitzenmaier and its subject is "Risks and
5   mitigants" and it's dated --
6        A.  I'm a little confused.  This one says it's
7   from Brent Richard to Brent Richard.  So...
8        Q.  -- and it's dated March 20, 2016.  There's
9   an e-mail at the bottom that he must have been
10   sending it to himself --
11        A.  That's my --
12        THE REPORTER:  One at a time, please.
13        THE WITNESS:  Sorry.
14   BY MR. CRAMER:
15        Q.  Do you know who Brent Richards is?
16        A.  It says here he's the global head of M&A
17   at WME and IMG.
18        Q.  Okay.  And you've seen this document
19   before, right?
20        A.  Yeah, I probably saw this.  I've seen
21   thousands of documents.
22        Q.  Well, you rely upon it in your footnote 46
23   and 407; is that right?
24        A.  Let's take a look at it, footnote 46 and
25   407.  What is this supporting -- okay.  Okay.  And
```

45  (Pages 440 to 443)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

444

1　then what's the other footnote?
2　　**Q. 407.**
3　　A. Okay.  Somewhere on there -- there it is.
4　Okay.  Same quote.  It appears twice.
5　　**Q. Okay.**
6　　A. Yes.
7　　**Q. So you -- you believe this document is a**
8　**reliable source of information about Zuffa; is that**
9　**fair?**
10　　　MR. WIDNELL:  Objection, form.
11　BY THE WITNESS:
12　　A. I believe that Dr. Singer quoted it in the
13　context that it was used by him.
14　　**Q. And you quote from it too, right?**
15　　A. Well, I'm quoting -- didn't he quote that?
16　　**Q. I'm sure that he did, and you did as well.**
17　　A. That's his -- that's his quote.  So I'm
18　quoting him.
19　　**Q. All right.  Do you believe that this**
20　**document is a reliable source of information**
21　**regarding Zuffa's business practices?**
22　　A. I think it's a reliable source of
23　information for that quote that was provided by
24　Dr. Singer.
25　　**Q. Okay.**

445

1　　A. What -- what part are you pointing to?
2　And then we can talk about it.



446

447

13　　**Q. You can put that aside.**
14　　A. Okay.
15　　**Q. Turn to footnote 233 on page 72 of your**
16　**report.**
17　　A. Footnote 233?
18　　**Q. Yeah.  In the first sentence of footnote**

23　　A. Hold on.  Let me read it in context.
24　Okay?
25　　　(Witness reviewing document.)

46 (Pages 444 to 447)

PUBLIC COPY - REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

476

1    high-ranked -- high-quality people or low-ranked
2    quality people, but the profession would become
3    more attractive relative to other professions.
4        **Q.  And, all things equal, if you therefore**
5    **increase fighter compensation relative to other**
6    **sports, that would improve the quality of MMA for**
7    **consumers, right?**
8        MR. WIDNELL:  Objection, form.
9    BY THE WITNESS:
10       A.  There would be some effect there, yeah.



478

1        **Q.  Yeah.  Can you identify any MMA promoter**
2    **that was not in the FightMetric database that had**
3    **or has a material share of the MMA promotion**
4    **business?**
5        A.  Well, if I don't have anybody in here,
6    we've talked about the identities before, but I
7    can't remember.
8        **Q.  So sitting here today, you cannot identify**
9    **a single MMA promoter with a material share of the**
10   **MMA market that was not in the FightMetric**
11   **database; is that right?**
12       MR. WIDNELL:  Objection, form.
13   BY THE WITNESS:
14       A.  I don't recall the names of the promoters
15   that were not in there.  I didn't keep track of
16   that.

23       **Q.  And Mr. Genauer who created it sells the**
24   **data tracking MMA fighters and their records to MMA**
25   **promoters; is that right?**

477

11       MR. CRAMER:  For the court reporter there
12   have been two words, FightMetric,
13   F-I-G-H-T-M-E-T-R-I-C, and Fight Matrix, F-I-G-H-T,
14   M-A-T-R-I-X.
15       THE REPORTER:  Thank you.
16       MR. CRAMER:  You're welcome.
17   BY MR. CRAMER:
18       **Q.  Can you identify a single MMA promoter**
19   **that you believe was excluded from the FightMetric**
20   **database that has or had a material share of the**
21   **MMA promotion business?**
22       A.  I'm sorry.
23       MR. WIDNELL:  Objection, form.
24   BY THE WITNESS:
25       A.  I'm sorry.  Could you say that again.

479

1        A.  That's my recollection.
2        **Q.  Did you speak to Mr. Genauer --**
3        A.  No.
4        **Q.  -- in the course of your work?**
5        A.  No.

10   BY THE WITNESS:
11       A.  To keep track of perform -- my
12   recollection is to keep track of performance of
13   athletes in the octagon.
14       **Q.  And MMA promoters use the FightMetric**
15   **database in tracking fighters as part of the**
16   **regular course of their businesses, as far as you**
17   **understand it; is that right?**
18       MR. WIDNELL:  Objection, form.
19   BY THE WITNESS:
20       A.  Some do and some don't.
21       MR. WIDNELL:  Misstates.
22   BY MR. CRAMER:
23       **Q.  In paragraph 211 you quote Mr. Genauer,**
24   **we've got a declaration from him; is that right?**
25       A.  Well, I think this is a -- I can't

54  (Pages 476 to 479)

**PUBLIC COPY - REDACTED**