# Exhibit 58

Deposition of Roger D. Blair, Ph.D.
(December 8, 2017) (excerpted)

**PUBLIC COPY**

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
 )
       Plaintiffs, )
 )
       vs. ) Case No.
 ) 2:15-cv-01045-RFB-(PAL)
 )
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
 )
       Defendant. )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROGER D. BLAIR, Ph.D.

Orlando, Florida

December 8, 2017

7:57 a.m.


Reported By:
Dawn A. Hillier, RMR, CRR, CLR
Job No. 52572

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

```
                                          14
 1   the NCAA cartel.  I have another paper that's in
 2   progress on rethinking baseball's antitrust exemption.
 3         I have a chapter in the Oxford handbook on
 4   sports economics regarding the -- you know, regarding,
 5   again, baseball's antitrust exemption.  And a paper in
 6   the antitrust bulletin that was addressing the
 7   inferences one might draw with respect to the treatment
 8   that Barry Bonds got at the end of his career when his
 9   contract ran out and he couldn't find anybody that
10   wanted to sign him.
11         There probably are some other things that I'm
12   not thinking of.
13     Q   It sounds like you've written pretty widely in
14   the economic analysis of sports or sports economics; is
15   that right?
16     A   Well, to some extent, yes.
17     Q   What, if anything, would you say defines
18   sports economics as a distinct field?  Or distinguishes
19   the study of sports as an economist?
20     A   The economics is not different because we're
21   talking about sports.  The institutions are -- you know,
22   may be different.  There are -- when we're talking about
23   professional sports this spans all kinds of leagues and
24   organizations.  So, you know, you could be talking about
25   the PGA Tour, which is an organization as opposed to the
```

```
                                          15
 1   National Football League, which is a -- which is a
 2   league.  You know, as I say, the economics aren't really
 3   different.  The institutions are somewhat different.
 4   The -- there are some unique or idiosyncratic rules that
 5   show up in collective bargaining agreements that, you
 6   know, that come into play that make things -- they
 7   affect the analysis, but they don't change the central
 8   focus which should be in terms of -- in most cases, in
 9   terms of microeconomics.  To some extent, there are
10   issues that surface in terms of, like, stadium financing
11   that -- or franchise location that, you know, that give
12   rise to economic impact studies which are kind of a
13   macroeconomics thing, although, you know, they're not
14   economy wide, they're, you know, focused in or
15   centralized in, you know, certain locations.
16         You know, and there were other sorts of
17   regulations that come into play, like Title IX and...
18         But now, of course, we're getting into the
19   amateur sports.  You know, so there's the NCAA, which
20   has, you know, got, you know, certain -- you know, sort
21   of unique features.  But nonetheless, you know, the
22   tools of analysis are common to, you know, the economist
23   tool kit, so to speak.
24     Q   Are there any -- I think -- well, you
25   mentioned there are some idiosyncratic rules and CBAs,
```

```
                                          16
 1   but other than that, are there any other distinguishing
 2   characteristics about the labor markets in sports as
 3   compared to other industries?
 4     A   Well, I mean, I don't know what you're
 5   referring to or, you know, I mean, I'm assuming that
 6   you've got something in mind.
 7         But --
 8     Q   Well let me -- let me clarify -- go ahead.
 9     A   No.  You go.
10     Q   All right.  So, I guess what I'm getting at is
11   I guess some economists study industrial organizations
12   and study the way firms interact in a variety of
13   industries and don't necessarily separate out firms in
14   one industry from another.  And I guess, is there
15   anything -- is there any reason -- is there any reason
16   why, looking at labor markets and sports, for example,
17   you might bring tools to bear that are different than a
18   standard -- than the standard methodologies of
19   industrial organizations?
20     A   Well, so, there are some things that are a
21   little -- I guess a little unusual.  A lot of the
22   professional athletes are unionized.  And the union
23   is -- what the union bargains for is a little strange in
24   this sense.  That the unions don't appear to be at all
25   concerned with individual compensation.  And, so,
```

```
                                          17
 1   they're sort of bargaining for a pot of money that the
 2   athletes can then fight over.  And, you know, I mean,
 3   so, you have, you know, dollars associated with, you
 4   know, a particular team.  And then the athletes that are
 5   going to be employed by that team essentially have to
 6   try to get as much of that pool as they can,
 7   individually, which is, you know -- I mean, usually what
 8   you think of with unions, is that they're trying to
 9   negotiate so that, you know, everybody's getting more or
10   less the same thing.  And, so, you know, that would
11   be -- that would be a difference, or something that's
12   sort of idiosyncratic.
13         You know, at some level, you know, for some of
14   the -- some of the athletes are -- well, all athletes
15   have some uniqueness to their set of skills and
16   abilities.  You know, some are bigger, some are faster,
17   some are stronger, some are more durable.  You know,
18   some have a better feel for the game than others.  And,
19   you know, there are some that, you know, that are kind
20   of superstars.  And, you know, and given their skill set
21   and their abilities, they make a lot of money that --
22   and there are players that play other positions that are
23   less talented, or at least less uniquely talented.  And,
24   you know, and they make less money.  And, you know, so
25   there are differences like that.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

18

1  Q  I think you mentioned the uniqueness of a set
2  of skills and abilities that certain players have.  And
3  that in professional sports, tell me if I'm accurately
4  characterizing what you said, that in professional
5  sports, there are superstars as well; is that right?
6  A  Yes.
7  Q  Is it fair to say that the unique set of
8  skills that athletes have or their fame plays an
9  important role in the revenues generated by sports
10 organizations?
11 A  Yeah, sure.  I mean, because -- I mean,
12 because of fan appeal and, you know, the fans are more
13 willing to pay to watch some of these so-called
14 superstars.
15 Q  Exactly.
16 A  Yeah.  Sure.
17 Q  Does that characteristic of the product that's
18 being created in that -- in professional sports, does
19 that one characteristic that distinguishes it from other
20 industries where the customers of the product don't
21 really know or care who the workers are that made it,
22 necessarily?
23    MR. WIDNELL:  Objection, form.
24    THE WITNESS:  You mean, like when -- if I buy
25 a Toyota, I don't really have any idea who

19

1  assembled the parts and who designed it and that
2  kind of thing?
3  BY MR. SILVERMAN:
4  Q  Exactly.
5  A  And so I'm not willing to pay a premium for
6  that Toyota because some, you know, revered designer,
7  you know, sort of designed how --
8  Q  Right.
9  A  -- the car looked.
10    Okay.  So, that's -- you know, lots of
11 products that we buy are like that; right?  You know,
12 some of them -- some of the products, however, are
13 endorsed by movie stars or sports stars or, you know,
14 people that have certain appeal to consumers.  But I
15 guess your question is, you know, am I particularly
16 interested in going to watch the Orlando Magic play
17 because they're playing against the Cleveland Cavaliers
18 and I want to watch LeBron James play.
19 Q  For example.
20 A  Is that --
21 Q  Yeah.  Well, that's part of my question.  But,
22 yeah, can you answer that question?
23 A  Yeah.  Sure.  I mean, yeah.  Of course.  I
24 mean, you know, people --
25 Q  Yeah.

20

1  A  Yeah.  I mean, sure.  People want to, you
2  know, may well want to see somebody like LeBron James
3  play, even though he's playing for the visiting team.
4  Sure.
5  Q  So, given that sports has this characteristic,
6  which I won't call unique, but different then, let's
7  say, the Toyotas, for example, in that the ultimate
8  consumer is the fans may care about the identity of
9  the -- or the performance of the individual workers
10 producing the product, does that give rise to any unique
11 issues in studying sports as a field, as opposed to
12 other -- I'm sorry, sports as an industry as opposed to
13 other industries?
14    MR. WIDNELL:  Objection, form.
15    THE WITNESS:  Well, I mean, that's a specific
16 feature of the demand on the part of the fan base
17 or consumers, you know, that can influence how many
18 people are willing to buy tickets to watch.  And
19 how much they're willing to pay for those tickets.
20 But, you know, the determination of those issues
21 depends on, you know, a host of factors in addition
22 to whether some famous superstar is there or not.
23 You know, has to do with promotion and has to do
24 with how well the team is doing, or teams, and how
25 close the game might be and therefore how exciting

21

1  it might be to watch.  And there's a whole host of
2  things that are, you know, specific things that,
3  you know, one might want to think about when
4  analyzing questions in sports.
5  BY MR. SILVERMAN:
6  Q  Changing gears for a sec.  Have you testified
7  in court before as an expert witness?
8  A  I have, yes.
9  Q  How many times?
10 A  My best estimate is about 25 times.
11 Q  About how many of those cases were antitrust
12 cases?
13 A  Assuming that 25 is a good estimate, I would
14 say probably something in the order of the high teens.
15 Maybe as much as 20, but...
16    That's about as good as I can do.
17 Q  And have you testified on both the plaintiff's
18 side and defense side in antitrust cases?
19 A  I have, yes.
20 Q  How many times have you had your deposition
21 taken?  That might be a tough one.  If you can estimate.
22 A  Probably -- probably about 60 times.
23 Q  And how many times have you been retained by
24 Boies Schiller, Zuffa's attorneys in this matter?
25 A  In any matter?

6 (Pages 18 to 21)

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

22

1   Q   In any matter, yeah.
2   A   All right. So, I'm hesitating because I guess
3   the answer's twice, although the retentions were kind of
4   simultaneous.
5   Q   What were the two matters?
6   A   Well, there was, you know, a preliminary, I
7   guess, investigation by the Seattle field office of the
8   FTC that dealt with matters that were, you know, pretty
9   much the same thing as the matters in this case. And
10  then there was this case.
11  Q   Have you been retained -- other than those two
12  matters, have you been retained as an expert witness in
13  any other cases involving the MMA industry?
14  A   No.
15  Q   Or combat sports?
16  A   No.
17  Q   Have you ever -- before working on this case,
18  have you ever studied combat sports?
19  A   Not in depth. But, you know, in teaching a
20  sports economics class, I made the mistake of sending
21  out a questionnaire to the class asking them, in the
22  beginning, what they might be interested in my making
23  sure that I covered. And a couple of them pointed that
24  they were interested in MMA. And so I had to go find
25  out something about it so that I could, you know,

23

1   conduct a sensible class.
2       But beyond that, I would say no.
3   Q   What did you -- what did you research for the
4   purposes of your class on MMA?
5   A   I don't recall at this point.
6   Q   Have you retained -- other than the two --
7   this case and the other one you mentioned, have you ever
8   been retained as an expert witness in any other cases
9   involving other professional sports organizations?
10  A   Okay. So there was a matter involving the PGA
11  Tour that I did some work on a while ago. And then
12  there was -- well, this didn't deal with organizations.
13  But I mean, I worked on an RPM case that involved
14  Callaway Golf.
15  Q   By RPM, you mean resale price maintenance
16  or...
17  A   Yes.
18      And then there was another matter for Callaway
19  that dealt with a dispute with the -- I forget the name
20  of the organization, but it's the actors' guild, you
21  know, the union.
22  Q   SAG? Is that the Screen Actors Guild?
23  A   Yeah. Yeah.
24      Other than that, I don't -- I don't
25  remember -- well, there's something -- there was

24

1   something that I worked on for Acushnet which is the
2   title that makes Titleist golf balls.
3       I don't remember any other cases.
4   Q   Okay. What was the PGA Tour case about?
5   A   Well, this was some time ago. But it had to
6   do with -- you know, there was some dispute about
7   eligibility requirements for the players. So, as you
8   might imagine, when they put on an event -- I think this
9   was for the -- I think this was actually for the senior
10  tour events.
11      You know, there's only so many players they
12  can have in the field. And they had eligibility
13  requirements. And somebody was objecting to the
14  eligibility requirements, I guess. I think that
15  that's -- as best I can remember, that was the issue.
16  Q   And who were you retained by in that case?
17  A   Well, it was -- I was retained by a lawyer
18  representing the PGA Tour, or the senior tour, or
19  whichever it was.
20  Q   And was the tour the defendant in that case?
21  A   Yes.
22  Q   Were the claims -- were there antitrust claims
23  involved, if you recall?
24  A   Well, you know, I don't recall specifically.
25  But there were probably some antitrust claims, you know,

25

1   regarding the eligibility requirements.
2   Q   What was the basic opinion you offered in that
3   case, if you recall?
4   A   I don't remember.
5   Q   Has any portion of your testimony ever been
6   excluded by a court?
7   A   There was one case where I think that the
8   district court objected to the way that I defined a
9   relevant market for -- well, it was a relevant market
10  for the case, but it was, you know, driven by the -- you
11  know, a specific hospital in a, you know, fairly
12  isolated area. And, you know, I think that there was
13  some question about that that became moot because the
14  case that was on appeal was settled. I can't think of
15  anything beyond that.
16  Q   Do you remember the name of that case?
17  A   Not specifically, no.
18  Q   Was it M&M Medical Services -- some medical
19  supplies and services versus Pleasant Valley Hospital?
20  Does that sound familiar?
21  A   Okay. So, I know there were some -- these
22  were -- there were a couple of durable medical equipment
23  cases that I worked on. And, you know, and one of them
24  was the case that I'm referring to. But I don't
25  remember whether it was M&M specifically or not.

7 (Pages 22 to 25)

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

26

1   Q   And in that case, were you offering an opinion
2   on behalf of the plaintiff?
3   A   Yes.
4   Q   If we turn back to your report and look at
5   paragraph eight. The section is titled "assignment."
6   And you write that your assignment was to review the
7   report -- the expert report of Andrew Zimbalist and to
8   provide your economic evaluation of his analyses and
9   form expert opinions of his analyses. And you also say
10  that you were asked to analyze UFC compensation, taking
11  into account the athlete's experience as an athlete.
12      Was that the entire scope of your assignment?
13  A   As I recall, yes.
14  Q   And you mentioned that your colleague, is it
15  Dr. Durrance?
16  A   Yes.
17  Q   And that she assisted you and you also
18  mentioned in your report that OSKR staff assisted you;
19  is that right?
20  A   Yes. Yes. That's correct.
21  Q   What is OSKR?
22  A   It's a consulting firm located in -- I forget
23  where exactly. I always think of them as being in
24  Berkeley, but they're not actually in Berkeley, I don't
25  believe. California, that is.

27

1   Q   Are you affiliated with OSKR?
2   A   I am not.
3   Q   Who at OSKR did you work with?
4   A   Andy Schwarz and Colin Weaver.
5   Q   Who retained OSKR to assist you?
6   A   I'm not sure who did. I didn't retain them
7   and they didn't retain me.
8   Q   Have you worked with them before?
9   A   Yes.
10  Q   Do you know who paid OSKR's bills?
11  A   I don't know for a fact, no.
12  Q   And in this case, have you been compensated by
13  Zuffa or OSKR?
14  A   So, administratively, what I do is submit
15  bills to OSKR. And, you know, then they deal with
16  whoever's paying the bills to get me paid. And I'm
17  assuming that it's Zuffa, but, you know, I don't -- I
18  don't know for a fact.
19  Q   Did OSKR perform any analyses for you that
20  informed the opinions in your report?
21  A   Well, they put together some information for
22  me that, you know, that was useful. You know, they
23  were -- whatever number crunching was involved, they
24  did.
25  Q   When were you retained by Zuffa in this case?

28

1   A   So, initially, I was retained a couple of
2   years ago to -- and at that time, what was ongoing was
3   the class action was in its infancy so that that action
4   was -- you know, had been filed, but, you know, I don't
5   think that there was a whole lot of activity at that
6   point, although there may have been. The major focus of
7   my effort at that time was on the FTC matter.
8       And then, you know, and then there was a long
9   lull, in which I didn't do anything at all. And then,
10  you know, recently, I was asked to prepare a report in
11  this case.
12  Q   What work did you do in the FTC matter?
13  A   Well, the FTC, you know, I wasn't -- I didn't
14  participate in a lot of meetings. I went to one, you
15  know, where there was a presentation. And prior to that
16  meeting with the FTC, the FTC, as I recall -- it was a
17  couple years ago. But as I recall, they sent to Zuffa's
18  attorneys a list of items that they were interested in
19  gaining some understanding of or gaining some
20  information on. And I, you know, worked on putting
21  together the information and participating in the
22  meeting with the FTC field office to discuss the items
23  that they were interested in and to provide the
24  information that I've been able to put together at that
25  time.

29

1   Q   Did you produce a report for the FTC?
2   A   You know, sort of. I mean, it's not -- I
3   mean, I wouldn't actually call it a report. But there
4   was, you know, sort of an outline of points that -- and
5   then there were some, you know, like illustrations or
6   figures to -- that addressed specific issues that the
7   FTC had raised.
8   Q   Did you draw upon that work that you had done
9   for the FTC in your report that you submitted in this
10  case?
11  A   No. I started over again.
12  Q   How many hours did you spend preparing your
13  report in this case?
14  A   Okay. That's a good question.
15      So, in the actual preparation of the report --
16  and by that, I'm talking about, you know, all of the
17  work that I did. I don't mean just the writing of the
18  report, but what I had to do. So, for example, you
19  know, in preparing the report, I was -- I read
20  Dr. Zimbalist's report; right? So that's -- I consider
21  that part of the preparation. Is that okay?
22  Q   Sure.
23  A   Okay. So, in that regard, my best estimate of
24  how much time I spent, that is about 60 hours. Now, I
25  want to qualify that in this sense. That's what I felt,

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

```
                                                                    30
 1   you know, was reasonable for me to bill, the time that I
 2   felt was okay to bill for.
 3        Now, and the reason why I say that is that,
 4   you know, when I work on some of these issues, you know,
 5   the issues are sort of always swarming around to one
 6   degree or another in my head.  But if I'm thinking
 7   about, you know, something that, you know, that I've
 8   read at some point, or something like that, I'm just
 9   sort of thinking about that while I'm riding into the
10   university or if I'm taking a shower or, you know, on an
11   exercise bike or something, I don't bill for that time.
12   So there's a lot of time I actually spend that I
13   can't -- that I never bill for.  I mean, I don't know.
14   Maybe other people do, but I don't.
15        And, so, it was more than 60 hours of, you
16   know, of effort.  But, you know, but 60 hours is
17   probably about as close as I can come to the amount of
18   time that I actually billed for the preparation of the
19   report.
20   Q    Did you or your staff perform any analyses
21   which you decided not to put in your report?
22   A    Not that come to mind, no.
23   Q    Do you know how much time OSKR billed in
24   connection with preparing your report?
25   A    I have no idea.
```

```
                                                                    31
 1   Q    How about Dr. Durrance?
 2   A    I don't know how much time.  I would guess she
 3   probably spent around the same amount of time that I
 4   did.  But I can't say that with certainty.
 5   Q    If we turn to appendix C of your report, which
 6   I believe lists the materials you considered.  On the
 7   second page of appendix C -- first, am I right that
 8   appendix C is the materials that you considered in
 9   preparing your report?
10   A    I believe so, yes.
11   Q    On the second page, it lists collective
12   bargaining agreements.  And it lists a series of, I
13   guess, Major League Baseball, NBA, NFL, and NHL
14   collective bargaining agreements starting in 2001.  But
15   there's less six of them total.  In preparing your
16   report, did you study how any of the CBAs in these
17   professional sports evolved before 2011?
18   A    Not -- not in -- not in connection with any
19   issue in this case.  I mean, I've thought about the
20   evolution of collective bargaining over, you know, from
21   the time that it began to surface in, you know, these
22   major league sports.  But, you know, I was thinking
23   about that in, you know, connection with, you know,
24   writing the book that I did and teaching the course that
25   I taught, and, you know, things like that, you know.
```

```
                                                                    32
 1   And I just thought that out of curiosity is, you know,
 2   it's somebody interested in sports, generally.  But, in
 3   connection with this specific case, I didn't really look
 4   at that, no.  I mean, other than, you know, there was
 5   some description of that evolution in Dr. Zimbalist's
 6   report.  So, but I mean, I wasn't studying it to -- for
 7   the purposes of figuring out what the evolution was.
 8   Q    In preparing your report, did you consider any
 9   materials involving the reserve system that existed
10   before or, you know, prior to 2011?
11        MR. WIDNELL:  Are you asking about materials
12   that he relied on in the report?
13        MR. SILVERMAN:  Yes.  Let's put that.  Let's
14   put the question that.  Yeah.
15        THE WITNESS:  Okay.  So, are you talking about
16   the reserve system that was, you know, sort of in
17   place prior to collective bargaining?  Or are you
18   talking about the reserve system or parts of it
19   that survived the advent of collective bargaining?
20   BY MR. SILVERMAN:
21   Q    I'm talking about either of those things
22   pre-2011.
23   A    Okay.  Well, with -- you know in connection
24   with this matter, I think that the answer to that is no,
25   that I did not look at, you know, didn't consider that
```

```
                                                                    33
 1   in particular.  You know, I mean, I've -- but, you know,
 2   but generally speaking, you know, I've paid attention
 3   to, you know, the reserve clause that had been in
 4   baseball for, like, a hundred years before it got kind
 5   of squashed by a mediator.  But not in connection with
 6   the matters in this report.
 7   Q    I believe you asked for an extension of time
 8   to prepare your report in this case; is that right?
 9   A    The -- I asked the attorneys if I could get an
10   extension on the due date, yes.
11   Q    Can you tell us what the reason was you needed
12   an extension of time?
13   A    I didn't think I could complete the report by
14   the due date.
15   Q    Did you write the book "Monopsony in Law and
16   Economics"?  Or a book entitled "Monopsony in Law and
17   Economics"?
18   A    Well, not by myself.  You know, Jeff Harrison
19   was co-author of that book.
20   Q    I'm going to mark as Blair Exhibit 3.
21        (Exhibit 3 was marked.)
22   BY MR. SILVERMAN:
23   Q    This is some select excerpts from that book
24   that I'd like to go over with you.
25        I apologize for the markings.  The copy of the
```

9 (Pages 30 to 33)

**PUBLIC COPY**

114

1  But, you know, one of the things that we're
2  implicitly assuming is that all units of the input
3  are homogenous so that, you know, whoever, you
4  know, you know, widgits are the same thing and
5  they're identical.  And now, it may be that in
6  order to get more of them, you have to up the
7  price.  But that doesn't mean that they somehow
8  become different then.  They'll still provide, you
9  know, the quality and, you know, in every dimension
10 is the same.
11     The other thing is that, you know, that model
12 is a kind of, you know, spot market model in the
13 sense that, you know, we're talking about, you
14 know, I'm going to buy, you know, rolls of copper
15 wire because, you know, for, you know, an
16 electrical contracting company.  And in looking at
17 that, you know, I'm going to -- you know, the issue
18 is, I'm going to buy five rolls instead of four
19 and, you know, what does that do and, you know,
20 and, you know, but the transaction's taking place,
21 bang, all at once.  You know, now, that's not true
22 in, you know, what you're talking about because
23 you're talking about, you know, contracts that
24 have, you know, some inter-temporal dimension to
25 them.  And -- now, and then when we start to talk

115

1  about some of these terms, you know, one would
2  expect -- maybe -- maybe not -- maybe not
3  initially, but you would expect the terms to wind
4  up being roughly the same, you know, in a market,
5  you know, just through adjustments over time as you
6  move to an equilibrium.  You know, again, now, you
7  know, I don't think that we've -- we emphasized
8  this enough when we teach economics, that most of
9  the models that we talk about are equilibrium
10 models.  So I can tell you that, you know, we start
11 from competition, and now you say to me, okay, so,
12 for example, in one of the things that we were
13 looking at before, you know, we started out with
14 competition and there was a whole bunch of mergers
15 and that created a dominant firm.
16     And then we want to say, okay.  So, now, let's
17 compare what happens with this dominant firm in a
18 fringe to what we started with.  Well, what we
19 never tell you about is how you get from that
20 competitive equilibrium to the new dominant firm
21 equilibrium.  And in between -- I mean, first of
22 all, as economists -- now, some labor economists
23 may actually look at this and try to estimate this
24 adjustment process.  But by and large, you know, we
25 don't really focus on how long does it get to --

116

1  I'm sorry, how long does it take to get from that
2  equilibrium one to equilibrium two.  And we don't
3  really -- we don't really have much to say,
4  theoretically, about any kind of variations that
5  may exist during that transition period.
6     Now, one would expect, once you get into
7  equilibrium, again, that the terms would be, if not
8  identical, they would be the value of the total
9  compensation -- bundle of compensation would have
10 to be valued pretty much the same by the
11 individual -- if we're talking about labor, the
12 individual workers, if they're -- if they have
13 identical skills so that this model is really
14 appropriate, then, you know, it may well be that,
15 you know, I'm -- I'm more risk averse than you are.
16 So when I am trying to land a job, I want some
17 protection.
18     Now, you can't get protection for nothing.  So
19 the value of this set of terms, you know, I may get
20 less in retirement benefits.  I may get less in,
21 you know, perhaps vacation time.  I may get less in
22 terms of, you know, monthly salary or something.
23 But in exchange for that, I get some protection
24 against, you know, being unemployed or, you know,
25 losing benefits if I get injured or something like

117

1  that.
2     You know, on the other hand, somebody that is
3  less risk averse doesn't value those protections as
4  much as I do and, you know, and doesn't want them,
5  and, you know, may take a different set of terms
6  that might involve, you know, higher salary or, you
7  know, some higher monetary benefit and, you know,
8  as trade-off against absorbing more of the risk.
9     So it's hard to -- it's hard to say exactly
10 what's going to happen in that regard.
11     MR. SILVERMAN:  Yeah.  Why don't we take a
12 break.  We have to change the tape.
13     THE VIDEOGRAPHER:  This is the end of media
14 unit number two to be continued on media unit
15 number three.  12:18 p.m., off the record.
16     (A luncheon recess is had from 12:18 p.m. to
17 1:14 p.m.)
18     THE VIDEOGRAPHER:  Here begins media unit
19 number three in the continued deposition of
20 Roger D. Blair.  We're going back on the record at
21 1:14 p.m.
22 BY MR. SILVERMAN:
23   Q  Welcome back.  I would like to turn your
24 attention back to the -- your textbook, "Sports
25 Economics," that we were looking at before.  And on page

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

```
                                                         118
 1   343 of that book, you write in a section called Demand
 2   for Athletic Talent, [as read]:  We begin our analysis
 3   of the sports labor market by assuming that it is
 4   competitively structured.  For the most part, however,
 5   sports labor markets are not competitive.  Nonetheless,
 6   the competitive model provides a useful benchmark for
 7   comparison with the actual results.  In addition, it
 8   introduces a way of measuring a player's value to his
 9   club.  Athletes are employees of their respective clubs
10   which are business firms that produce athletic
11   competition that is sold to the fans.  We begin our
12   analysis with the principles that drive the employment
13   decisions of profit maximizing firms.  In general, labor
14   is an input in the production process.  No one demands
15   labor services for their own sake.  Instead, labor is
16   demanded because it can be used to produce something
17   that the employer can sell.  Consequently, the demand
18   for labor is a derived demand.  It is derived from the
19   demand for the output that the labor is used to produce.
20   In the sports business, players, coaches, and managers
21   are employed by their clubs to produce athletic
22   competition which is what the clubs sell to the fans.
23   The demand for athletic talent is derived from the fans'
24   demand for watching the games that the athletes play.
25        So, can you explain for me -- well, let me
```

```
                                                         119
 1   start by asking, do you agree that labor is a derived
 2   demand?
 3        MR. WIDNELL:  Objection, form.
 4        THE WITNESS:  I think you misspoke slightly.
 5   BY MR. SILVERMAN:
 6     Q   Sorry.  Yeah.
 7        Do you mean that -- scratch that.  Let me ask
 8   the question again.
 9        Do you agree that the demand for labor is a
10   derived demand, it is derived from the demand for the
11   output that the labor is used to produce?
12     A   Yes.
13     Q   Okay.  What is the output that the UFC
14   produces using the athlete's labor in MMA?
15     A   It provides -- what it's supplying are, you
16   know, events that consist of a number of bouts, MMA
17   fights.
18     Q   Do you agree that with this quote that I just
19   read, that the demand for athletic talent is derived
20   from the fans' demand for watching the games that the
21   athletes play?
22     A   Yeah.  That's the same question.
23     Q   Yeah.  Essentially.
24        Just specific to sports and fans, I guess.
25     A   Yes.
```

```
                                                         120
 1     Q   Okay.  Is the demand for fighter talent in MMA
 2   derived from the fans' demand for watching MMA events
 3   featuring those fighters?
 4        MR. WIDNELL:  Objection, form.
 5        THE WITNESS:  Well, it may not be those
 6   fighters, but the demand for MMA talent is -- you
 7   know, is a derived demand from -- it's derived from
 8   the demand by fans for watching MMA bouts.
 9   BY MR. SILVERMAN:
10     Q   Given that MMA is an individual sport which
11   pits certain fighters against other fighters, is it
12   possible that fans have very different levels of demand
13   for bouts featuring certain fighters rather than others?
14        MR. WIDNELL:  Objection, form.
15        THE WITNESS:  Sure.
16   BY MR. SILVERMAN:
17     Q   Have you analyzed how much fan demand is
18   affected by the particular fighters who appear in an MMA
19   event?
20     A   Not specifically, no.
21     Q   I think we covered this, but in a competitive
22   market, an employer pays their employees the marginal
23   revenue product of their labor; is that right?
24     A   Yeah.  In a competitive market, the firm is
25   going to expand employment to the point where the
```

```
                                                         121
 1   marginal revenue product is equal to the wage that is,
 2   you know, comes from the demand and supply in the market
 3   as a whole.
 4     Q   And so then the wage that that firm pays will
 5   equal that margin revenue product; is that right?
 6     A   Yes.  And assuming that the -- that we're in a
 7   profit maximizing equilibrium, that is that the firm has
 8   been successful in actually maximizing profit.  And when
 9   that's the case, the marginal revenue product will be
10   equal to their wage.
11     Q   And we discussed how a monopsonist pays
12   something less than the marginal revenue product of
13   labor; right?
14     A   Yes.
15     Q   And that leads to a transfer of surplus from
16   the worker to the monopsonist; right?
17     A   Relative to the competitive solution, yes,
18   that's correct.
19     Q   At page 345 of your textbook, you write [as
20   read]:  A professional team's focus on marginal revenue
21   product is illustrated by the Cincinnati Reds'
22   assessment of Ken Griffey, Jr.'s presence in 2000.  The
23   team expected to gain 20 million in new revenues due to
24   his presence in the line-up.  Attendance rose by some
25   500,000 fans during the 2000 season which translated
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

122

1 into 16 million in additional gate receipts and
2 concession revenues. Merchandise sales rose another
3 1.9 million. Arguably, Griffey's marginal revenue
4 product, or MRP was nearly 18 million which was less
5 than the Reds had hoped for, but more than Griffey was
6 paid, which was 7 million.
7     Does this paragraph illustrate the sort of
8 analysis that an economist would engage in to try to
9 estimate an athlete's marginal revenue product?
10    MR. WIDNELL: Objection, form.
11    THE WITNESS: I don't know if you would do
12 that on -- I don't know if you could do that on a
13 very broad basis. What I was trying to do --
14 that's an illustration. And, you know, what it
15 indicates, of course, is that Griffey didn't do a
16 good job bargaining for, you know, for his salary
17 because he wound up getting substantially less than
18 what one might think was the -- his marginal
19 revenue product.
20    Now, as an illustration of -- you know, that
21 general idea of looking at marginal revenue
22 products, it got those -- there's a source for, you
23 know, where I got the information in order to write
24 up that. You know, if you were looking at, you
25 know, marginal revenue products, you know, more

123

1 generally, you might want to -- to see whether that
2 increase in attendance of 500,000 was motivated by
3 something else. I mean, you know, Griffey may not
4 have been the only player that was attracting fan
5 attention. You know, it could have been that the
6 ball club had invested in, you know, other
7 promotional activities that led to increased
8 attendance, at least in part. I mean, I wouldn't
9 say that Griffey had nothing to do with it, but,
10 you know.
11    And, so, if you were looking at this in, you
12 know, a broader context, than just to provide an
13 illustration for students, you know, you would
14 probably want to look at some other things as well.
15 BY MR. SILVERMAN:
16    Q   So I understand, you're saying it can be --
17 you know, this is just an illustration and it's not
18 obvious to that you can attribute, you know, 500,000
19 fans, specifically, to Griffey, for example. But is
20 the -- is the method of analysis correct in the sense
21 that to measure the marginal revenue product of an
22 athlete, one acceptable way to approach that problem
23 would be to try to measure the additional -- the number
24 of additional fans that that athlete brings to their
25 employer, essentially?

124

1    MR. WIDNELL: Objection, form.
2    THE WITNESS: Well, that's certainly one of
3 the -- you know, one of the benefits; right? I
4 mean, presumably, with Ken Griffey, Jr., you were
5 getting, you know, one of the best baseball players
6 that ever lived. And, you know, that would do a
7 couple of things to -- in terms of benefits for the
8 team. I mean, number one, just because, you know,
9 he was a remarkable player and people would be
10 interested in watching him play. You know, that
11 would have a positive effect. But in addition to
12 that, you know, because of his talent, they should
13 have won -- all else being equal, they should have
14 won more games --
15 BY MR. SILVERMAN:
16    Q   Um-hum.
17    A   -- as a result. And that usually makes the
18 fans happier and, you know, and might well lead to some
19 additional attendance as well. But, you know -- but,
20 again, what you would want to be sure is that you're
21 taking into account other sources of those changes. If
22 you're just looking at the change in attendance from one
23 year to the next, it's 500,000 fans. And you say, well,
24 we added Griffey. Well, if you attribute all of that
25 increase to Ken Griffey, Jr., that might be a mistake

125

1 because, you know, we'd have to take into account what
2 else happened. I mean, there may well have been, you
3 know, a change in economic conditions that led to, you
4 know, fans spending more money on going to baseball
5 games. It could have been, you know, any number of
6 things, as I mentioned before.
7 BY MR. SILVERMAN:
8    Q   Is this -- it sounds like you're -- it sounds
9 like you're pointing out a correlation causation issue
10 with this example; is that right?
11    A   Not entirely. I mean, to some extent, it is a
12 distinction between correlation and causation. But
13 it's -- you know, I would feel comfortable -- you know,
14 if everything else was constant, which is, you know,
15 sort of hard to, you know, find situations like that
16 empirically. But if everything else was constant and,
17 you know, the only real difference that you can see is
18 that Ken Griffey, Jr., is now playing right field or
19 wherever he was playing, instead of somebody else, then,
20 you know, I wouldn't feel uncomfortable attributing
21 causation to the increase in attendance being due to Ken
22 Griffey, Jr. It's just that if you're going to try to
23 do that, you still have to control for all the other
24 things that actually aren't constant. Because, you
25 know, in -- you know, real empirical settings, you know,

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

126

1  there's a lot -- there are a lot of things that are
2  changing.  And you have to try to control for them.  And
3  some of them are going in opposite directions.
4      Q   Sure.
5      A   You know, you might have lost somebody that,
6  you know, somebody may have retired or quit that was,
7  you know, a fan favorite.  And, you know, I can't go
8  watch that guy and I don't really care about Ken
9  Griffey, Jr.  I mean, you know, I would, personally,
10 but, you know.
11     Q   Right.
12     A   But, hypothetically, I might not care about
13 him, but I care about this other guy, and so I stopped
14 going to the games.  And, you know, so, that means that,
15 you know, that Ken Griffey, Jr., offset that loss as
16 well as having some impact on, you know, positive impact
17 on the total attendance.  But, again, you know, you have
18 to look to see, you know, do we have a new manager, do
19 we have, you know, some, you know, rookie phenom
20 that's --
21     Q   Right.
22     A   -- come into play.
23     Q   So abstract -- but abstracting away from
24 the -- from the empirical measurement difficulties,
25 which I understand you to be talking about, just asking

127

1  conceptually, what is it we're trying to measure, when
2  we're trying to measure an athlete's marginal revenue
3  product?  So, for example, is it fair to say that,
4  assuming it's possible, maybe there's no -- maybe
5  there's no empirical experiment that would let you do
6  this.  But assuming it's possible, holding all other
7  things equal, essentially the question you're trying to
8  ask is, how much revenue that this organization
9  generates can be attributed directly to the efforts of
10 this -- of this athlete.  Is that fair?
11         MR. WIDNELL:  Objection, form.
12         THE WITNESS:  Yeah.  I mean, you're trying to
13 look at the -- you know, the marginal benefit of,
14 you know, of that athlete's contribution.
15 BY MR. SILVERMAN:
16     Q   Um-hum.
17     A   Yes.
18     Q   And, in the sports context, the marginal
19 benefit of that athlete's contribution is going to
20 manifest it -- well, it's revenue.  We're talking about
21 revenue to the organization ultimately; right?
22     A   Well, ultimately what they're interested in is
23 profit -- right? -- but revenue's part of that; right?
24 So...
25     Q   And, and, that revenue in the sports context

128

1  for a sports organization is generally related to the
2  number of fans who buy tickets or gate receipts,
3  concession revenues, merchandise sales, licensing rights
4  for television.  Those are the main types or sources of
5  revenue that, that an athlete would generate for a
6  sports organization; is that right?
7          MR. WIDNELL:  Objection, form.
8          THE WITNESS:  Parking.  Yeah.  Parking,
9  concessions, gate receipts.  You know, the
10 broadcast licensing, you know, differs from league
11 to league -- right? -- because of the way they
12 handle that.  You know, there's more local stuff in
13 baseball, for example, than in football, whatever.
14 You know, pretty much you've got national contracts
15 that, you know, they're league-wide.  And, you
16 know, so that's -- you know, that's somewhat
17 different, but, yeah, I mean, sure.  Jersey sales,
18 any kind of souvenirs and that kind of stuff.
19 BY MR. SILVERMAN:
20     Q   And, so, it's fair to say that Ken
21 Griffey, Jr.'s ability to put fans in the seats paying
22 for tickets and concession and merchandise and all of
23 these things, that made him more valuable to the
24 Cincinnati Reds; right?
25     A   I wouldn't say it made him more valuable.  It

129

1  made him valuable --
2      Q   Right.
3      A   -- to the Cincinnati Reds.
4      Q   Or his value was related to his ability to do
5  those things, essentially?
6      A   Yes, that's correct.
7      Q   So, players who can generate more ticket sales
8  generate more revenue because they generate more fan
9  interest.  Those players are also generally paid more;
10 right?
11         MR. WIDNELL:  Objection, form.
12         THE WITNESS:  You mean, they're paid more than
13 other athletes that don't have the same level fan
14 appeal.
15 BY MR. SILVERMAN:
16     Q   That's right.  That's my question.
17         MR. WIDNELL:  Same objection.
18         THE WITNESS:  I think generally that would be
19 correct.
20 Well, let me modify that.  I mean, so, you
21 know, as a broad statement, I think, that that's,
22 that's probably correct.  Now in, you know, Major
23 League Baseball, for example, you know, the -- you
24 know, the rookie contracts don't provide for any
25 free agency for six years.  And, so, in the

33 (Pages 126 to 129)

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

130

1  first -- especially in the first three years before
2  the players are eligible for final offer
3  arbitration, you know, they get paid -- it almost
4  doesn't matter how popular they are.  The teams
5  don't have to pay them much.  And so you saw
6  players like Kris Bryant for the Cubs and Mike
7  Trout for the Angels getting paid, you know, 4- or
8  $500,000.  When their contribution -- I haven't
9  done any calculations, but I'm convinced, you know,
10 would have been far above that.
11      So -- and then even when they're eligible for
12 final offer arbitration, you know, I think that the
13 estimates I've seen suggest that the outcome of the
14 final arbitration, you know, if you actually go
15 through the arbitration, that the -- the values
16 tend to be, on average, a little somewhat below the
17 marginal revenue products, although they're
18 reasonably close.
19      So, the statement that I was sort of agreeing
20 with was for free agents.
21 BY MR. SILVERMAN:
22      Q   Gotcha.  So, for free agents, their marginal
23 revenue product -- strike that.
24          For free agents, their wage approaches their
25 marginal revenue product whereas it might not for

131

1  players whose mobility is restricted; is that right?
2      A   Yeah.  I mean, now, you know, there's a
3  bargaining element in there.  And so, you know, you get
4  a range of outcomes.  So it may not be exactly that.
5  But, you know, it should be -- it should be reasonably
6  close.  Because you've got -- usually you have an
7  experienced agent representing the player who's
8  bargaining with an experienced employer.  And so they
9  kind of know -- both sides know what's going on.  It's
10 not like the experienced employer can take advantage of
11 some, you know, player that's, you know, inexperienced
12 and doesn't know how to bargain.  You know, usually
13 they -- especially the really good players have got very
14 experienced agents who, you know, are a reasonable match
15 for the employers.
16      Q   So, in the league sports, I think you said in
17 the league sports, for free agents, they are, in your
18 opinion, paid something close to their marginal revenue
19 product?
20          MR. WIDNELL:  Objection, form.
21          THE WITNESS:  Yeah.  Aside from some frictions
22 and whatnot that arise during the bargaining
23 process, yes.
24 BY MR. SILVERMAN:
25      Q   But, in those same league sports, like looking

132

1  at the -- looking at baseball, for example -- and I'll
2  get more -- more into the details of this later.  But
3  you've mentioned that depending on the seniority of the
4  player and various other rules, some players aren't free
5  agents or they're restricted free agents of some sort;
6  is that right?
7      A   Yes.
8      Q   And in your opinion from your experience
9  studying baseball, is it true that players who aren't
10 free agents who don't have full free agency are
11 generally paid a smaller -- a smaller proportion of
12 their marginal revenue product than the free agents?
13     A   Yes.
14     Q   Why is that?  Can you explain why that is?
15     A   Well, you know, we talked about this, you
16 know, before lunch.  You know, when the player -- you
17 know, if you have a player that's in his second year in
18 the major leagues, you know, he's had a good rookie
19 season and he goes and he talks to the general manager
20 and, you know, along with his agent, and they're
21 bragging about what a great job he did, and the team
22 agrees and gives them a $10,000 raise or, you know,
23 whatever is permissible under the collective bargaining
24 agreement.
25         But the player, in bargaining, you know, the

133

1  player's next best alternative is not very good,
2  relative to what he's being offered.  Right?  So they
3  have to pay -- let's say they have to pay him at least
4  $450,000 under the terms of the -- you know, the
5  collective bargaining agreement.  They don't have to go
6  much above that because for most baseball players --
7  well, for most people, $450,000 is a lot more than the
8  next best alternative.  So, that tilts the bargaining
9  power in favor of the team.  And, you know, they're
10 not -- they just don't have to pay much more than, you
11 know, than what's being -- you know, what's either in
12 the collective bargaining agreement or some nominal
13 increase above the minimum salary or, you know,
14 whatever.
15     Q   Is it fair to say that for most professional
16 athletes, at least in -- that's, you know, baseball,
17 football, basketball, hockey in the United States,
18 alternative employment options outside of their
19 particular professional sport aren't a reasonable
20 substitute?
21         MR. WIDNELL:  Objection, form.
22         THE WITNESS:  Well, of course, it depends on
23 what we mean by reasonable substitute.
24         Now, if, you know, you know, if you're a
25 talented left tackle, you know, in the National

34 (Pages 130 to 133)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123   1.800.642.1099

**PUBLIC COPY**

134

1  Football League, you know, you may command, you
2  know, millions of dollars in annual salary because,
3  as a free agent, you can negotiate with various
4  teams.
5       And, so, what would that -- if that left
6  tackle stopped playing football, you know, what
7  else would that person do?  Well, it depends on the
8  person, of course.  You know, we don't know what
9  the alternatives actually are, you know.  Maybe the
10 guy would be a rock singer and maybe make more
11 money, but, you know, or maybe he would be a high
12 school football coach and make a whole lot less
13 money.  You know, it just -- you know, it depends
14 on the individual what the -- what the alternative
15 employment opportunities are.
16 BY MR. SILVERMAN:
17      Q   Well, what if we look -- I mean, if we talk
18 about this in the terms of the DOJ and FTC, horizontal
19 merger guidelines, for example, and they talk about
20 reasonable substitutes.  And I think they ask the
21 question, well, if a hypothetical, in this case,
22 monopsonist, controlled -- let's say if we're talking
23 about football -- all of the teams in the NFL, which
24 could be accomplished in reality by them all just
25 colluding with each other, as essentially they did under

135

1  the reserve clause, could they profitably suppress the
2  wage below the competitive level; right?  Does that --
3  is that a reasonable way of assessing this question of,
4  well, are other -- are other jobs for the player a
5  reasonable substitute?
6       MR. WIDNELL:  Objection, form, misstates.
7       THE WITNESS:  Well, to some extent, that's
8  accepting the DOJ and FTC's interpretation of some
9  meaningful deviation in the compensation.
10      Usually it's expressed in terms of elevating
11 the price.  Here, we're talking about depressing
12 the price.  And, you know, when they, in
13 practice -- what they talk about under certain
14 conditions, implies elasticities of something like
15 20, and it's really hard to find products that
16 are -- you know, where you actually have an
17 elasticity of 20.
18      So, but, I understand what you're talking
19 about.  You're talking about, you know, you have
20 this hypothetical monopsonist that controlled all
21 employment options for labor that fits into a
22 certain category.  You know, could they depress the
23 wage by something on the order of five or
24 ten percent, I suppose, for a non-transitory amount
25 of time, and would that -- you know, and could they

136

1  do that profitably, which means that not so many
2  people would walk away that, you know, that it --
3  that it would be -- become unprofitable.
4       I mean, to some extent, I guess, you could --
5  you could look at it that way.
6  BY MR. SILVERMAN:
7       Q   Going back to earlier, I think you said that
8  in baseball, free agents are, today, I think we were
9  talking about today, are paid something close to their
10 marginal revenue product, and that younger players or
11 players who aren't free agents are probably paid
12 something less than their marginal revenue product.
13      Is the same thing true for the other three
14 major sports:  Hockey, football, and basketball, in the
15 U.S.?
16      MR. WIDNELL:  Objection, form.
17      THE WITNESS:  Well, they've got -- you know,
18 so these sports vary in terms of what happens for
19 the entry-level players.  So, the contracts are --
20 you know, the terms of the contracts and the
21 restrictiveness of the free agency is, you know,
22 varies in football, depending upon what round you
23 got drafted in.
24      You know, I don't know about basketball.  I'm
25 just not sure about the details of those, those

137

1  leagues.
2  BY MR. SILVERMAN:
3       Q   I guess to just abstract out a little bit away
4  from the details of the restricted free agency in
5  various leagues, is it fair to say that -- that while
6  the details varied by the type of player, potentially,
7  and the league, that all of them impose on some set of
8  players some limitation on mobility so they're not a
9  complete free agent for some substantive players; is
10 that right?
11      A   That's my understanding, yes.
12      Q   As a matter of economic theory, does it make
13 sense that those players, due to those restrictions,
14 would make something less than a full free agent, as
15 compared to their marginal revenue product, some smaller
16 percentage of their marginal revenue product than a full
17 free agent?
18      MR. WIDNELL:  Objection, form.
19      THE WITNESS:  You know, so, there are other --
20 there are other aspects of that; right?
21      So, they've got -- you know, originally -- not
22 originally.  Before the last change in football,
23 the first round draft picks got salaries that
24 probably far exceeded their marginal revenue
25 product.

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

138

1  Now, now, what they've done in the last
2  agreement -- see, they put some limitations on
3  the -- how much a team can pay those early round
4  draft picks. Nonetheless, we've seen some examples
5  in the last couple years of first-round draft picks
6  that were not ready to play. There was -- I forget
7  one of the quarterbacks was not ready to play. And
8  he basically didn't play much at all his rookie
9  season. But he still made millions of dollars.
10 And so, you know, in that case, he must have been
11 paid far more than his marginal revenue product for
12 that year because he wasn't -- you know, it wasn't
13 that he wasn't contributing anything, but, you
14 know, basically he wasn't playing. And, you know,
15 if he's sitting on the bench, fans aren't coming
16 out to watch him sit on the bench.
17     So, you know, I can't completely agree with
18 what you're saying.
19     You know, in basketball -- sorry about that.
20 You know, in basketball, you know, I think that
21 there's -- I think there's some limitations as
22 well. Ordinarily, in basketball, it seems like
23 they don't have -- they don't -- people who aren't
24 ready to play don't get drafted very highly, and
25 therefore, you don't have those same examples that

139

1  you find in football. And then I'm just not much
2  of a hockey fan, so I don't know much about hockey.
3  BY MR. SILVERMAN:
4      Q   And, for the NFL and for basketball, when
5  players are restricted free agents, the period of time
6  when they were restricted free agents, does it make
7  economic sense that they would get paid a lower
8  proportion of their marginal revenue product than if
9  they were full free agents?
10     MR. WIDNELL: Objection, form.
11     THE WITNESS: I'd have to -- you know, I
12 haven't looked at the -- you know, the specifics of
13 the impact of being a restricted free agent as
14 opposed to a free agent. And without having some
15 specifics regarding any limitations, I have a hard
16 time answering that question, sorry.
17 BY MR. SILVERMAN:
18     Q   If we look at page 350 of your textbook, under
19 the reserve clause, you write [as read]: As we saw in
20 the discussion of competitive balance, the reserve
21 clause in the standard player contract bound a team to
22 one -- excuse me, bound a player to one team for as long
23 as that team wanted to employ the player's services.
24 The player's only alternative was to retire from the
25 league and change occupations. Once under contract

140

1  then, a player dealt with a pure monopsonist. There was
2  no one else who could or would bid for his services.
3  For most premier athletes, there are no alternative
4  occupations that are even close in terms of
5  compensation. A few athletes can play other sports and
6  can predibly -- can credibly threaten to go elsewhere,
7  but not many.
8      Do you agree, that as far as most premier
9  athletes are concerned, there are no alternative
10 occupations that are even close in terms of compensation
11 compared to their professional sport?
12     A   For most of them, yes.
13     You know, there are exceptions like Bo Jackson
14 and -- God, I'm drawing a blank on some of the other
15 names. But, you know, there are other people that
16 played multiple -- actually played at the highest
17 level --
18     Q   Right.
19     A   -- in, you know, various sports.
20     Q   But just a few exceptions generally; right?
21     MR. WIDNELL: Objection, form.
22     THE WITNESS: Yeah. There aren't very many,
23 no.
24 BY MR. SILVERMAN:
25     Q   So, I mean, you talk here in the same

141

1  paragraph about -- about -- I'll read what you write.
2  [As read]: Michael Jordan, arguably the best basketball
3  player of all time, tried his hand at baseball. He was
4  mediocre and could not play at the major league level.
5  And then you conclude, most successful, professional
6  athletes stick to one sport.
7      Does that sound right?
8      A   Yeah. I mean, there's people, like, as I say,
9  Bo Jackson, Danny Ainge played basketball and pro
10 baseball.
11     Again, you know, there are a couple of others,
12 but, yeah, I mean, most of the -- you know, so, for
13 example, I mean, you didn't see Tom Brady trying his
14 hand at baseball or basketball.
15     Q   Right. And if he did, he'd probably get paid
16 a lot less; right?
17     A   He probably wouldn't get paid anything at all.
18     Q   On the next page, page 351, you write [as
19 read]: With the demise of the reserves -- reserve
20 clause, players gain the measure of freedom. There are
21 still some limits which are part of the collective
22 bargaining agreement. But there are completely
23 unrestricted free agents in all major league sports.
24 Free agents should get the benefit of competition for
25 those services which would mean higher salaries. Faced

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

142

1  with that prospect, owners have simply colluded at times
2  to avoid competing in the player market.
3          Is that accurate?
4      A   I believe so, yes.
5      Q   And the limits that are placed on free agency
6  in the major league sports, those are the result of
7  collective bargaining between the players' union and the
8  team owners; right?
9      A   Yes.
10     Q   What did you mean in this paragraph that I
11 just read when you said -- or when you wrote [as read]:
12 Free agents should get the benefit of competition for
13 their services, which would mean higher salaries?  If
14 you recall?
15     A   You mean, why did I say "should" in some sort
16 of normative sense?
17     Q   Yeah, normative sense.  Is it better that free
18 agents get the benefit of competition for those
19 services?
20         MR. WIDNELL:  Objection, form.
21 BY MR. SILVERMAN:
22     Q   Or is that what you meant?
23     A   I guess, you know, if you think about what
24 else we're talking about by collusions, so, you know, in
25 the absence of collusion, you would expect that they

143

1  would get -- and again, this comes out of, you know,
2  there could be some frictions in the bargaining process
3  and that kind of thing that would -- would lead to some
4  differences.  And there are always uncertainties, so...
5          But, you would expect that they would get paid
6  pretty much what the marginal benefit that they make for
7  the team, which is the marginal revenue product.
8          And I think that the "should" in there, and I
9  mean, I wrote this a long time ago.  But I think the
10 "should" in there is opening up the possibility that
11 you're not getting this competition and that, you know,
12 if the owners are colluding as, you know, their
13 demonstrated episode in Major League Baseball.  And then
14 there was actually a subsequent episode that wasn't very
15 well publicized in baseball.  We know that the owners in
16 the NFL colluded when they had that -- I forget the -- I
17 forget the word now, when you get -- when you decide
18 that you're going to -- when the players just voted
19 to -- to get rid of the union.  I forget what the
20 word -- the name.
21     Q   Decertify?
22     A   Yeah.  When they decertified the union, you
23 know, there was supposed to be some -- there should have
24 been a free-for-all.  And apparently the owners agreed
25 among themselves not to engage in that free-for-all.

144

1  And that kept, you know, compensation down, or whatever
2  it was they were fighting over at the time.  So that,
3  you know, there were episodes where there's collusion.
4  And, you know, and then you don't get the results that
5  you would expect to get in the absence of collusion.
6      Q   And you talked earlier about the abstract
7  model of monopsony and how monopsony leads to -- in
8  labor markets, at least leads to workers getting paid
9  something below their marginal revenue product.  And
10 that that leads to socially non-optimal outcomes.
11         Is the same thing true in sports?
12         MR. WIDNELL:  Objection, form.
13         THE WITNESS:  Well, in the first part, you
14 know, what leads to social welfare loss is not the
15 depressed wage, but the restricted employment.
16 Because, by restricting the employment, what you're
17 doing is you're failing to employ inputs where the
18 value of using them in producing the product is
19 higher than the social cost of their being
20 employed, which is measured by the height of the
21 supply curve.
22         So that's what causes that.  What happens with
23 the depressed wage in that case is that there's a
24 transfer of what ordinarily would have been
25 supplier surplus or producer surplus, you know,

145

1  whatever term we want to apply to that in a labor
2  market.  You know, and that gets transferred to the
3  employers in the form of higher profits.
4          And, so, and that's kind of a transfer.  But
5  the welfare loss is from restriction in the
6  employment.  And, so, that's the way that's set up.
7          So, so, with that in mind, what was your
8  question about sports, then?
9  BY MR. SILVERMAN:
10     Q   Well, I guess the first question is:  Do you
11 think that monopsony in the -- in sports markets, let's
12 say through collusion by the clubs in Major League
13 Baseball, for example, leads to any social harm?
14         MR. WIDNELL:  You're just asking about
15 baseball now?
16         MR. SILVERMAN:  Yeah.  Let's talk about
17 baseball for now.
18         THE WITNESS:  Okay.  So, so the way that --
19 that the monopsony is manifested in baseball, for
20 example, has to do with things like the roster
21 size.  Okay?  So, so, there's a -- you know,
22 there's a limit to the roster size.  And, if you
23 assume -- now, I don't know for a fact, you know,
24 as an empirical matter whether this is, in fact,
25 correct, but if you assume that the binding

37 (Pages 142 to 145)

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

146

1  constraint so they would have more people on the
2  roster than they actually have in the absence of
3  that constraint.
4      You know, you would say -- you know, you would
5  infer the same sort of thing, that is that since
6  it's a binding constraint, the teams would get
7  additional value out of having more players on the
8  roster. And, you know, assuming that they could
9  find people to play, fill out that larger roster,
10 which let's just assume that's possible, you would
11 have the same sort of welfare loss. And that is
12 that you have players that would contribute to the
13 overall value and that are not being employed. And
14 so there's a loss in value there. So, in that
15 sense, you know, there would be a social welfare
16 loss by that restriction.
17     You know, the fact that, say, Kris Bryant, you
18 know, some budding star of the Chicago Cubs, you
19 know, to the extent that they're paying him, let's
20 say, $500,000 and his marginal revenue product is
21 far above that, that does not create any social
22 harm because he's still playing. It's just he's
23 getting paid less so there's a distributional
24 effect, but, you know, but there's not a welfare
25 loss there.

147

1  BY MR. SILVERMAN:
2      Q   **Is it possible that paying players**
3  **substantially below their marginal revenue product could**
4  **alter their incentives to invest, let's say, in their**
5  **own training or their own professional development?**
6  **Could that lead to a potential welfare loss?**
7          MR. WIDNELL: Objection, form.
8          THE WITNESS: Okay. So, so, if you think back
9  to -- of course, I'm a lot older than everybody
10 else in the room. But when I was a kid, the -- you
11 know, the players in Major League Baseball, in the
12 off season -- now, I think this -- this was
13 actually before I had a vivid -- any actual
14 recollection, but there were stories about, you
15 know, following the World Series. They would
16 actually have major league stars barnstorming
17 throughout the south playing exhibition games for
18 extra money instead of training and, you know, and
19 that kind of thing.
20     You know, they had people that were, I
21 remember being a Dodgers fan, that Carl Furillo
22 was, you know, one year he was a National League
23 batting champion. And he worked in construction.
24 He had a hard hat job in the off season. And so he
25 wasn't working on his baseball skills. He was just

148

1  trying to earn a living, you know, as a
2  construction worker. So, the quality of the play,
3  you know, had to suffer. I mean, now, you know,
4  again, you know, you'd have to -- you know, people
5  would ask for some empirical evidence of this. But
6  you would -- you would surmise that the play would
7  have to suffer when you've got players that are
8  working construction instead of what, instead of
9  training, instead of lifting weights, stretching,
10 perhaps, you know, taking a hundred swings in the
11 batting cage every day during the off season, or
12 whatever -- you know, whatever major league players
13 are doing now to maintain and advance their skills
14 during the off season.
15     Well, you know, a lot of players, back in the
16 days when they didn't make much money, had to work
17 at other jobs. And, you know, some of them sold
18 insurance and, you know, things like that.
19     So --
20 BY MR. SILVERMAN:
21     Q   And could --
22     A   And in that case -- well, your question is
23 what effect would this have. And, you know, I think the
24 effect that it would have is that the quality of the
25 play would be lower and that, you know, in turn, could

149

1  have an impact on fan demand for watching major league
2  games and, you know, and then, you know, to that extent,
3  the value of the product that's being offered, that is
4  the competition of the field, you know, is lower and
5  consumers are worse off as a result.
6      Q   **And couldn't that -- isn't that also a form of**
7  **allocative inefficiency if the marginal revenue product,**
8  **let's say, of this athlete working in a construction job**
9  **is less than the social value or the value -- or the**
10 **revenue generated simply by the fan interest that they**
11 **would generate if they had devoted that time and energy**
12 **to training, let's say?**
13     A   Yeah. You know, the problem -- the problem
14 with the way you worded that, is that allocative
15 inefficiency is -- sounds like it ought to be -- have a
16 more popular meaning than it does to economists. You
17 know, to an economist that allocative inefficiency is a
18 term of art and it means what I described earlier, that
19 is, that certain inputs in the case of, you know, where
20 we're talking about inputs or in terms of output that,
21 you know, things are either not being purchased or not
22 being produced, when the value is higher than the cost.
23     And so there's a foregone value, and that's
24 what the -- that's what the allocative inefficiency is
25 related to. So, you know, we say that the monopolists,

38 (Pages 146 to 149)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

**Page 150**

1  you know, there's allocative inefficiency associated
2  with the monopolist, because the monopolist does not --
3  does not put in enough resources to produce the welfare
4  maximizing quantity of output that it -- because it
5  restricts output.
6      And on the purchase side for buying inputs or
7  hiring inputs, as the case may be, that the decision is
8  to -- is allocatively inefficient because too few
9  resources are being purchased or hired in the sense that
10 their value exceeds their social cost. So that's
11 what -- so allocative inefficiency has a technical
12 meaning. And you're asking me a question that relates
13 to what happens to perhaps shifts in the demand
14 functions. And that's a different matter.
15     Q  Let me step back a beat and just ask you, is
16 it your opinion that the reserve system was
17 anticompetitive on balance, which is related to what
18 we're talking about?
19     A  You mean historically?
20     Q  Historically. The historic reserve system.
21     A  Is anticompetitive?
22     Q  Um-hum.
23     A  Is that the question?
24     Q  Yeah.
25     A  Sure.

**Page 151**

1      Q  And why?
2      A  Because the reserve system, you know, was in
3  agreement among the major league teams to use a standard
4  player contract that had the evergreen provision, or
5  provisions whenever a collection of terms in the
6  contract is what we commonly refer to as the reserve
7  clause, which, you know, may have been more than a
8  clause. But constituted that reserve system so that,
9  you know, once a player was signed to a contract, that
10 the -- you know, the club had property rights in that
11 contract and, you know, no one else could gain access to
12 that unless they sold it or traded it.
13     And, you know, so the agreement among all the
14 teams to respect that provision in the contract for all
15 the other teams meant that they were agreeing, you know,
16 not to compete for the services of any player that was
17 under contract to a different team.
18     Q  What is -- how would you define -- as a
19 scholar of antitrust economics, how would you define
20 what it means for a practice to be anticompetitive?
21     A  Well, a practice -- I mean, ordinarily, we
22 think of a practice as being anticompetitive if it's --
23 if we're talking about the output market, at least the
24 higher prices, lower quantities, lower quality.
25     And, you know, similarly, on the buying side,

**Page 152**

1  if it leads to, you know, lower prices paid and lower
2  quantities purchased, you know, we think of those --
3  that conduct as being anticompetitive. You know, it's
4  you know, conduct or practices that prevent competition
5  between alternative producers or alternative employers,
6  you know, we think of as being anticompetitive.
7      Q  And we discussed how the reserve clause gave
8  teams monopsony power over the players and we discussed
9  how that led to suppressed salaries. Did it also lead
10 to lower output?
11     A  I don't think it led to lower output in the
12 sense that, you know, the teams -- the leagues had, you
13 know, at that time, a -- you know, a schedule of 154
14 games. And, you know, it's hard to say whether it led
15 to a reduction in outputs in the National League. It
16 was in place back in the 1800s, you know, so...
17     But by the same token, it's hard to imagine
18 that you get many more games into a season anyway since
19 you only have basically six months to play, which is 180
20 days. And if you got 154 games, back in those days, the
21 travel was by train and bus and stuff. I mean, it's
22 just, you know, it's hard to imagine that they could
23 have played many more games than that anyway, but, you
24 know.
25     In principle, maybe there was some, you know,

**Page 153**

1  marginal reduction in the number of games. You know, I
2  can't -- I can't say, but...
3      Q  So, when you say that the reserve clause was
4  anticompetitive, then, are you referring mostly to its
5  effect on players' salaries on that input price?
6      A  Well, it's that and the -- I mean, just on its
7  face, when you describe, you know, what that reserve
8  system involved, you know, it did limit the competition
9  between teams for a particular player's services.
10 Right? So, if you and I want to hire the same player,
11 and he's under contract to me, then you have to buy that
12 contract from me either for cash, or you could trade
13 somebody else's contract for that contract.
14     But, you can't simply go to the player and
15 say, hey, why don't you -- next season, why don't you
16 play for me, because there's an agreement that you and I
17 are not going to compete in that way.
18     Q  Does any agreement -- I'm sorry. Does any
19 practice that limits the competition between teams for a
20 particular player's services anticompetitive?
21     MR. WIDNELL: Objection, form.
22     MR. SILVERMAN: Strike that. Let me rephrase
23 that.
24 BY MR. SILVERMAN:
25     Q  Is any practice that limits the competition

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

174

1  of causation but, you know, but I think that the facts
2  unroll, you know, more or less the way that they're
3  spelled out there.
4          MR. WIDNELL:  We've been going for about an
5      hour and a half.  Can we take a break when you get
6      to a convenient stopping point?
7          MR. SILVERMAN:  Sure.  Yeah.  Let me do just a
8      couple more and then, yeah.
9          MR. WIDNELL:  Okay.
10  BY MR. SILVERMAN:
11      Q   On page 434, you discuss the National
12  Basketball Players Association.  And you write on the
13  second to last paragraph, the bottom of that paragraph.
14  [As read]:  With the settlement of the lawsuit, the NBA
15  players enjoyed true, unrestricted free agency.  Now
16  when an individual player's contract expires, the
17  player's completely free to sign with the highest bidder
18  or any other team willing to hire them.  As long as the
19  clubs do not collude in a free agent market, a player
20  can negotiate a contract that will pay him something
21  very close to his marginal revenue product.
22      Does that sound accurate to you?
23      A   Yes.
24      Q   And on page 435, you write about the national
25  hockey league.  [As read]:  The NHLPA has had some

175

1  internal problems, but appears to be on relatively solid
2  ground now.  As with the other leagues, NHL players have
3  the usual array of benefits.  Their salaries are
4  substantial as they are protected by market forces
5  through free agency.
6      Is that accurate?
7      A   I believe so, yes.
8      Q   And on page 438, you write [as read]:  The
9  NFLPA, the NBAPA, and the NHLPA bargain over the total
10  wage bill.  The results are expressed as salary caps
11  which limit the total payroll of each club.  In Major
12  League Baseball, there is no salary cap, but there's a
13  luxury tax that is imposed on clubs that spend more than
14  some threshold amount.  The unions have little to do
15  with the allocation of the salary dollars.  Players
16  bargain for salary dollars on their own with the help of
17  an agent.  Most of the other terms of employment,
18  working conditions, pensions, contract terms are subject
19  to negotiations between the union and the league.  The
20  player's salary however is an individual matter between
21  the club and the player.
22      So, is it accurate to say that other than in
23  Major League Baseball, collective bargaining determines
24  the total share of league revenues that can go to
25  players as compensation?

176

1      A   Well, I think that all of those contracts
2  are -- yeah.  I think that they're specified in terms of
3  shares of, you know, percentages of some amount which is
4  defined as -- you know, as revenue.  So, the -- you
5  know, what you and I might think of as revenue might
6  not -- some of those items might not be counted.
7      You know, I think that the definition of what
8  constitutes league revenue is -- you know, is set out in
9  the collective bargaining agreement so that they're not,
10  you know, squabbling over, you know, what the size of
11  the total pie is that's supposed to be split up.
12      And, as I recall, you know, it's pretty much,
13  you know, these are -- these are forecasted, you know,
14  based on, you know, recent experience.
15      Yeah.  And as I said, in there, in the NFL,
16  that gets translated into salary caps, which specify how
17  much each team can spend.  But, I think what they do is
18  they take, you know, whatever that percentage of the
19  anticipated league revenue, whatever that amount is,
20  they divide by 32 because that's how many teams there
21  are.  And, you know, and each team gets 1/32 of that
22  amount to spend on players because they have a pretty
23  hard salary cap, although there's a lot of strategic
24  manipulation of that amount.  It's not quite as simple
25  as it sounds.

177

1      Q   So, the team -- so, the collective bargaining
2  is determining a -- strike that.
3      So, through collective bargaining in the NFL,
4  the NBA, and the NHL, the players in the leagues are
5  splitting some measure of league revenue; is that right?
6      A   Yes.
7      Q   And that split sets a -- for those three
8  sports, at least, that split sets a salary cap; is that
9  right?
10      A   Yes.
11      Q   Or is it used to set a salary cap?
12      A   Yes.
13      Q   But the actual salaries that the players end
14  up negotiating with their teams are determined by market
15  forces for free agents, at least; is that right?
16          MR. WIDNELL:  Objection, form.
17          THE WITNESS:  Yeah.  And the bargaining that
18      goes on between the player and his agent with the
19      team.
20  BY MR. SILVERMAN:
21      Q   On page 443 --
22          MR. WIDNELL:  You know, I apologize.  I really
23      do need to take a break.
24          MR. SILVERMAN:  Oh, you need to do it now?
25      Okay.  All right.  Let's do it then.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123   1.800.642.1099

**PUBLIC COPY**