# Exhibit 61

Deposition of Alan Manning
(February 8, 2018) (excerpted)

PUBLIC COPY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -

Thursday, February 8, 2018

- - -

Videotaped deposition of
ALAN MANNING, taken pursuant to notice,
was held at the law offices of Berger &
Montague, P.C., 1622 Locust Street,
Philadelphia, Pennsylvania 19103,
beginning at 9:16 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter,
and Notary Public in and for the
Commonwealth of Pennsylvania.

* * *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



PUBLIC COPY

Page 34

```
 1   cut-and-paste job from someone else's
 2   article.  It is using well-attested
 3   techniques and measures from the existing
 4   literature, but combining them in a way
 5   that I think is wholly appropriate to
 6   this particular case.  And that is what I
 7   think of actually as trying to express an
 8   expert opinion.
 9       Q.   All right.  And I understand
10   you think that these are the appropriate
11   circumstances and you stated your reasons
12   for such, but I'd still like to know if
13   anybody -- of you've seen anybody write
14   out before that these are the three
15   appropriate circumstances for labor
16   economists to use wage share in analyzing
17   compensation?
18           MR. CRAMER:  Asked and
19       answered.
20           THE WITNESS:  I feel I've
21       answered it.  These are my own
22       words.  Did I cut and paste these
23       from someone else?  No.
24   BY MR. ISAACSON:
```

Page 35

```
 1       Q.   All right.  And when you
 2   say -- I know you didn't cut and paste
 3   them, but have you seen any -- have you
 4   seen anybody list these three criteria,
 5   you know, in substance as the appropriate
 6   circumstance for when you -- labor
 7   economists would use wage share in
 8   analyzing compensation?
 9       A.   I mean, I -- in my report
10   here I'm trying to express an opinion on,
11   you know, the particular questions I was
12   asked to address, and obviously that
13   is -- in some sense it is -- you know, it
14   is a particular case.  So I am combining
15   well-attested, well-established ideas in
16   a way that is appropriate to that case,
17   and I think that is appropriate to
18   expressing an expert opinion.
19       Q.   Right.  And you've said to
20   me a couple times that you think these
21   three things are appropriate and I
22   understand that.  And you said to me
23   they're not a cut and paste,
24   word-for-word.
```

Page 36

```
 1       My question is:  Even if
 2   they're not word-for-word, have you seen
 3   any publication that lists these three
 4   things, in sum and substance, as the
 5   appropriate circumstance for a labor
 6   economist to analyze wage -- to use wage
 7   share in analyzing compensation?
 8       A.   I mean, wage share is very,
 9   you know, commonly used in the sport
10   economics literature, so I'm drawing --
11   drawing from that.
12           I think the statement of the
13   question, which is the first criterion is
14   really just a statement of the question
15   in this case as I understand it.  So I'm
16   not quite sure how I would take the
17   question in this case from some other
18   pre-existing -- pre-existing.
19           I mean, I think in cases
20   where one is trying to assess the impact
21   of anticompetitive practices, one is
22   trying to compare the actual compensation
23   in this case with compensation in the
24   but-for world.
```

Page 37

```
 1           So I think that's completely
 2   standard.
 3       Q.   All right.  I still don't
 4   know whether you're telling me anybody
 5   has listed these three things before.
 6       A.   I mean, I haven't seen -- I
 7   mean, they're totally appropriate, and
 8   you know, I'm combining well-attested
 9   ideas, well-established ideas in a way
10   that's appropriate to that case, for that
11   combination -- because I'm not aware of
12   somebody who has written about this
13   particular case, that particular
14   combination which I chose to be
15   appropriate to this case and what I
16   think -- that is what I think I should be
17   doing when expressing an expert opinion,
18   I haven't got that.
19       Q.   All right.  So you've
20   reached the opinion that these three
21   factors are the appropriate circumstances
22   to consider in this particular case.
23           Can you point me to
24   anything -- any literature where these
```



```
                                                        Page 38
 1    three factors were considered appropriate
 2    for some other -- for some other type of
 3    facts or some other case?
 4         A.   Well, I think that -- I
 5    mean, let me take them in order.
 6         Q.   I would like them in
 7    combination.  Not individually, in
 8    combination, all three?
 9         A.   I think --
10              MR. CRAMER:  Form.
11              You may answer.
12              THE WITNESS:  I mean, what
13    I'm doing here is taking well-
14    established ideas individually and
15    drawing on ideas from established
16    work, well-established, and
17    combining them in a way that is
18    appropriate for this case.  I
19    think that is appropriate to what
20    one is asked to do as an expert.
21    BY MR. ISAACSON:
22         Q.   You've told me that several
23    times.
24         A.   Yeah.
```

```
                                                        Page 39
 1         Q.   You've got it on the
 2    record --
 3         A.   Yes.
 4         Q.   -- that you feel it is
 5    appropriate to combine these three
 6    circumstances in this -- for the facts of
 7    this case.
 8              And what I'm asking you now,
 9    have you run across, in any of your
10    research or writing or teaching, any
11    other specific facts or cases where
12    someone said the three circumstances that
13    you've identified are the appropriate way
14    to determine that wage share should be
15    used in analyzing compensation, all three
16    in combination?
17         A.   But there is no equivalent
18    to this case in -- you know, it's about
19    the particular case.
20         Q.   So looking at paragraph 10,
21    you discussed the question in this
22    litigation.
23              "In this litigation, the
24    question to be considered is different.
```

```
                                                        Page 40
 1    It is, "How do the earnings of fighters
 2    compare to what they would have earned in
 3    a competitive market?"
 4              Is that the appropriate
 5    question in this case?
 6              MR. CRAMER:  Form.
 7              Objection to form.
 8              THE WITNESS:  I mean, I
 9    think one is seeking a comparison
10    of the actual earnings to what
11    they would have been in the
12    but-for world, which is the
13    absence of the challenged conduct,
14    and I was using the phrase there
15    "competitive market" to refer to
16    absence of the challenged conduct.
17    BY MR. ISAACSON:
18         Q.   And do you understand that
19    Dr. Singer is using foreclosure share and
20    using that to define both the actual
21    world and the reduced foreclosure share
22    as the but-for world?
23         A.   I mean, I haven't studied
24    that or expressed an opinion on it.
```

```
                                                        Page 41
 1         Q.   Do you have any
 2    understanding of -- what is your
 3    understanding of foreclosure share as
 4    Dr. Singer expresses it?
 5         A.   I mean, I haven't studied
 6    that to express an opinion on that.
 7         Q.   And would you agree with the
 8    statement that when monopsony power is
 9    high, a firm is able to suppress a
10    worker's compensation below the
11    competitive level?
12         A.   In general, yes, that is
13    what I think happens when you have
14    monopsony in the labor market.
15         Q.   All right.  And is it your
16    understanding that Dr. Singer is using
17    his definition of foreclosure share to
18    express Zuffa's degree of monopsony
19    power?
20         A.   I mean, I haven't expressed
21    an opinion on that.  I haven't been asked
22    to address that.
23         Q.   Do you even -- I understand
24    you haven't expressed an opinion on
```



**PUBLIC COPY**

Page 126

1  inaccurate statement in a technical sense
2  of endogeneity.
3      Q.  Let's see if I -- as a
4  result of event revenue being endoge- --
5  well, why do you conclude that event
6  revenue is an endogenous variable?
7      A.  Well, one possible reason
8  relates to what I -- we discussed a bit
9  earlier, which is that the actual
10 realized event revenue depends, you know,
11 on how many people, you know, sign up for
12 pay-per-view on the night, but when it
13 comes -- that part of event revenue
14 realized is not, for most of the fighters
15 going to be determined -- influence their
16 compensation, which is set before the
17 fight takes place, and if one works
18 through the algebra of that, that kind of
19 situation leads to the event revenue
20 being correlated with the residual in the
21 regression, and so that makes Dr. Topel's
22 regression flawed.  Although not
23 withstanding, of course, he does still
24 find a significant relationship between

Page 127

1  event revenue and compensation.
2      Q.  The residual in the
3  regression is the residual in the
4  dependent variable of actual wages; is
5  that right?
6      A.  I mean, the residual -- I
7  mean, in a regression, one normally has a
8  variable one is trying to explain, we
9  call that the dependent variable, and
10 some of the variation in that would be
11 explained through the regresses, the
12 variables that we put on the right-hand
13 side of that regression.  But because in
14 almost all situations you can't explain
15 all of the variation in the dependent
16 variable using your chosen regressors,
17 the bit that you can't explain is called
18 the residual.
19     Q.  All right.  So I think that
20 was helpful.  Let's just break that down
21 for people.
22         So you have a dependent
23 variable that you're trying to explain,
24 in this case for Dr. Topel, it's the

Page 128

1  actual wages of the fighters, and then
2  you have -- that's on the left-hand side?
3      A.  Yeah.
4      Q.  On the right-hand side you
5  have explanatory variables.  Ordinarily
6  in a regression, the right-hand side
7  variables won't explain everything in the
8  dependent variable and what's left over
9  would be the residual?
10     A.  Yeah.
11     Q.  Okay.  The -- and if there
12 is a variable on the right-hand side that
13 explains part of what's happening on the
14 left-hand side, then it's endogenous?
15     A.  No, not all of them.  It's
16 about whether the variable on the
17 right-hand side is correlated with the
18 residual, so...
19     Q.  All right.  So if a
20 variable -- if one of the explanatory
21 variables on the right-hand side is
22 correlated with what you've defined as a
23 residual, then it's endogenous?
24     A.  Yes, that would be the

Page 129

1  definition.
2      Q.  And the variable on the
3  right-hand side that we're discussing
4  here in this critique with Dr. Topel is
5  event revenue?
6      A.  Yes, that's correct.
7      Q.  All right.  And it's
8  possible, in your view, that event
9  revenue is correlated with the residual
10 of -- of the dependent variable of actual
11 wages?
12     A.  I mean, not just possible, I
13 think it is very likely.  I mean, if you
14 look at Dr. Topel's regression, the
15 coefficient on -- I mean, the consequence
16 of this endogeneity would be that the
17 coefficient gets biased towards zero,
18 meaning that it's much smaller than it
19 truly is.  And when he estimates
20 coefficient, which is about .08, I think
21 he should have had alarm bells going off
22 in his head that there was something
23 wrong with it.
24     Q.  All right.  So you're



PUBLIC COPY