WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, <br><br> Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL) <br><br> **ZUFFA, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **HEARING REQUESTED** <br><br> **[REDACTED]** |

1

2

**TABLE OF CONTENTS**

3

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 4

    I.     Athletes Willingly Contract With Zuffa For Many Distinct Reasons. ................... 4

    II.    Athlete Compensation. ....................................................................................... 8

    III.   The Proposed Classes. ....................................................................................... 8

    IV.   Proposed Evidence of Antitrust Injury and Damages. ........................................ 10

LEGAL STANDARD FOR CLASS CERTIFICATION ................................ 11

    I.     A "Rigorous" Analysis is Required To Certify A Class Under Rule 23. .............. 12

    II.    Class Certification Is Not Routine In Actions Involving The Type of Antitrust Claims Plaintiffs Assert. ................................................................... 13

    III.   Class Certification Standards Are More Stringent Than *Daubert* Standards. ........................................................................................................ 14

ARGUMENT ..................................................................................................... 15

    I.     Named Plaintiffs Do Not Meet Rule 23(a)'s Requirements Of Typicality. ........... 15

         A.   Named Plaintiffs' Alleged Lack of Bargaining Power Is Not Typical Of The Class. .............................................................................................. 15

         B.   Zuffa Has Individualized Defenses As To Certain Named Plaintiffs' Claims. ......................................................................................................... 16

    II.    Named Plaintiffs Do Not Meet Rule 23(a)'s Requirement of Adequacy. ............. 17

    III.   Individual Evidence Of Liability Predominates Over Common Evidence. ........... 19

         A.   Plaintiffs' Alleged "Scheme" Is Incapable Of Proof Of Liability With Common Evidence. ............................................................................ 20

         B.   Individualized Evidence Will Be Required to Determine Injury. ................. 22

         C.   Individualized Evidence Will Be Required To Show An Antitrust Violation In A Properly Defined Relevant Market. ..................................... 22

    IV.   Rigorous Analysis Shows No Common Impact From the Alleged "Scheme." ..................................................................................................... 24

         A.   Rigorous Analysis Using Actual Wages Rather Than A Novel Wage Share Theory Shows No Common Antitrust Injury. ..................................... 24

         B.   The "Foreclosure Share" Has Not Proven Common Impact. ....................... 26

            1.   Dr. Singer Does Not Prove Foreclosure of Competition. ..................... 26

            2.   Dr. Singer's Foreclosure Shares Use Averages that Do Not Show Impact on Individual Class Members. ............................................ 27

         C.   Plaintiffs' Other Evidence Fails to Show Common Antitrust Injury. ........... 29

            1.   Plaintiffs' Other Methods of Proving Common Impact Raise Individual Issues. ................................................................................. 29

            2.   Plaintiffs' Econometric Evidence Of A Compensation Structure Does Not Show Common Impact. ....................................... 34

i

V.     Plaintiffs' Evidence Does Not Establish Injury Or Damages To Support
       Class Certification. ................................................................................. 35

       A.    Plaintiffs' Experts' Methods Of Showing Impact And Damages
             Rely On A Theory Of Liability That Is Inconsistent With The
             Alleged "Scheme." .......................................................................... 35

       B.    Plaintiffs' Econometric Evidence Of Common Impact Is Deficient
             Under *Comcast*. ............................................................................. 36

VI.    A Class Action Is Not The Superior Method For Relief Because
       Plaintiffs Cannot Show Which Class Members Would Have Been
       Harmed. ................................................................................................... 37

VII.   The Identity Class Involves Predominantly Individual Issues. ............... 38

       A.    Identity Subgroup 1. ....................................................................... 39

       B.    Identity Subgroup 2. ....................................................................... 40

VIII.  Plaintiffs Do Not Have Standing To Bring A Claim For Injunctive
       Relief. ...................................................................................................... 40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Alfred v. Pepperidge Farm, Inc.*,
  2016 WL 7655793 (C.D. Cal. Aug. 5, 2016) ................................................................. 18

*Allen v. Dairy Farmers of Am., Inc.*,
  279 F.R.D. 257 (D. Vt. 2011) ....................................................................................... 18

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) .................................................................................. 14

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................................... 17

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
  789 F. Supp. 2d 1201, 1203 (C.D. Cal. 2011) .............................................................. 13

*Auto Ventures, Inc. v. Moran*,
  1997 WL 306895 (S.D. Fla. Apr. 3, 1997) ................................................................... 21

*Backus v. ConAgra Foods, Inc.*,
  2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) .............................................................. 16

*Bernstein v. Virgin Am., Inc.*,
  2016 WL 6576621 (N.D. Cal. Nov. 7, 2016) ............................................................... 12

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ........................................................................................ 24

*Brazil v. Dole Packaged Food, LLC*,
  2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ............................................................... 37

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................................... 13

*Casey v. Home Depot*,
  2016 WL 7479347 (C.D. Cal. Sept. 15, 2016) ............................................................. 29

*Chmieleski v. City Products Corp.*,
  71 F.R.D. 118 (W.D. Mo. 1976) ................................................................................... 23

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................ passim

*Deiter v. Microsoft Corp.*,
  436 F.3d 461 (4th Cir. 2006) ................................................................................. 14, 16

*Doyle v. Chrysler Grp.*,
  663 F. App'x 576 (9th Cir. 2016) ................................................................................. 35

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ................................................................................. passim

*Espinosa v. Ahern*,
  881 F.3d 679 (9th Cir. 2018) ........................................................................................ 13

*Fishman v. Wirtz*,
807 F.2d 520 (7th Cir. 1986)..................................................................... 23

*Fleischman v. Albany Med. Ctr.*,
2008 WL 2945993 (N.D.N.Y. Jul. 28, 2008)............................................. 32

*Free World Foreign Cars, Inc. v. Alfa Romera, S.p.A.*,
55 F.R.D. 26 (S.D.N.Y. 1972) .................................................................... 18

*Growers 1-7 v. Ocean Spray Cranberries, Inc.*,
2016 WL 10849499 (D. Mass. May 10, 2016) .......................................... 14

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992).............................................................. 15, 16

*Hecht v. Pro-Football, Inc.*,
570 F.2d 982 (D.C. Cir. 1977) ................................................................... 23

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006)............................................................... 12, 23

*In re Beer Distribution Antitrust Litig.*,
188 F.R.D. 557 (N.D. Cal. 1999) ........................................................ 21, 24

*In re Florida Cement and Concrete Antitrust Litig.*,
278 F.R.D. 674 (S.D. Fla. 2012) ................................................................ 40

*In re Graphics Processing Units Antitrust Litig.* ("GPU"),
253 F.R.D. 478 (N.D. Cal. 2008) ............................................................... 15

*In re High-Tech Employee Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ............................................................... 24

*In re High-Tech Employee Antitrust Litigation*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..................................................... 12

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)....................................................................... 24

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
2013 WL 5979327 (N.D. Cal. Nov. 8, 2013).............................................. 22

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ............................................................... 28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
2017 WL 5311533 (D.D.C. Nov. 13, 2017) ......................................... 14, 24

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014).................................................................... 35

*Johnson v. Arizona Hosp. & Healthcare Ass'n*,
2009 WL 5031334 (D. Ariz. Jul. 14, 2009) ......................................... 25, 32

*Kottaras v. Whole Foods Mkt., Inc.*,
281 F.R.D. 16 (D.D.C. 2012)............................................................... 14, 36

*Newcal Indus. Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008).................................................................... 22

*Nguyen v. BDO Seidman, LLP*,
2009 WL 7742532 (C.D. Cal. Jul. 6, 2009) ............................................... 38

iv

*Quesada v. Banc of America Inv. Services, Inc.*,
2013 WL 623288 (N.D. Cal. 2013) ....................................................................... 12

*Radcliffe v. Experian Info. Sols. Inc.*,
715 F.3d 1157 (9th Cir. 2013)................................................................................. 17

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)....................................................................... 28, 32

*Reyes v. Netdeposit, LLC*,
802 F.3d 469 (3d Cir. 2015)................................................................................... 12

*Rosenberg v. Renal Advantage, Inc.*,
2013 WL 3205426 (S.D. Cal. June 24, 2013) ...................................................... 29

*Senne v. Kansas City Royals Baseball Corp.*,
315 F.R.D. 523 (N.D. Cal. 2016)........................................................................... 41

*Smith v. Denny's Restaurants, Inc.*,
62 F.R.D. 459 (N.D. Cal. 1974).................................................................... 19, 21

*Somers v. Apple, Inc.*,
258 F.R.D. 354 (N.D. Cal. 2009)........................................................................... 14

*Standard Oil Co. v. United States*,
337 U.S. 293 (1949)............................................................................................... 23

*State of Alaska as Parens Paatriae v. Suburban Propane Gas Corp.*,
1995 WL 441987 (D. Alaska Jan. 12, 1995) ........................................................ 15

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961)............................................................................................... 23

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036, 1049 (2016)................................................................................. 13

*Ungar v. Dunkin' Donuts of America, Inc.*,
531 F.2d 1211 (3d Cir. 1976)........................................................................... 20, 21

*United States v. Syufy Enterprises*,
903 F.2d 659 (9th Cir. 1990).................................................................................. 23

*Valenzuela v. Union Pac. R.R. Co.*,
2017 WL 679095 (D. Ariz. Feb. 21, 2017) ..................................................... 12, 16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................................... 12

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013).......................................................................... 12, 19

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001)............................................................................... 38

**RULES**

Fed. R. Civ. P. 23 ......................................................................................... passim

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**INTRODUCTION**

Six named Plaintiffs seek to represent two broad classes of athletes who contracted with Zuffa, LLC ("Zuffa"), doing business as the Ultimate Fighting Championship ("UFC"), over a six-and-a-half-year period.  Plaintiffs, all of whom are retired or compete for rivals of the UFC, assert that athletes suffered a common antitrust injury from a "Scheme" defined in their motion for class certification.  Pls. Mot. for Class Certification ("Pls. Mot."), ECF No. 518 at 1. Previously, in their Complaint, Plaintiffs alleged a different scheme to monopolize the market for live Mixed Martial Arts ("MMA") bouts *and* monopsonize the market for "Elite MMA Fighter Services."  Plaintiffs' Consolidated Amended Complaint ("CAC"), ECF Nos. 208 ¶ 1; ECF No. 1 ¶ 1 (Original Complaint).  The Court denied Zuffa's motion to dismiss based on those allegations. ECF No. 314 at 15-16.  Plaintiffs' new "Scheme" omits any allegations of monopolization of venues, television outlets, or sponsors, now focuses only on alleged acts to create a monopsony for athlete services.  Plaintiffs' reconstituted case does not survive the rigorous scrutiny needed to establish that the requirements of Rule 23 have been met.

According to Plaintiffs, Zuffa succeeded through anticompetitive conduct rather than its documented efforts to bring the sport of MMA from a niche into the mainstream.  But the remarkable growth of the sport is a testament to Zuffa and its owners' substantial investment and business acumen.  When Frank and Lorenzo Fertitta bought the UFC in 2001 for $2 million, the sport was banned in 36 states and had been labeled by Senator John McCain as "human cockfighting."[1]  Through its extensive investment of time and resources, Zuffa was instrumental in persuading regulators to legalize the sport, which is now legal in all 50 states, and in changing the public perception of MMA.[2]  During the early years, Zuffa lost nearly $40 million.[3]  Only after

---

[1]  Declaration of Stacey K. Grigsby ("Grigsby Decl.") (attached as Ex. A to Declaration of William A. Isaacson), Ex. 1, Decl. of Robert H. Topel ("Topel Decl.") ¶ 8; Ex. 2, Expert Report of Robert Topel ("Topel Rep.") ¶ 49.  All exhibits referenced in this motion are exhibits to the Grigsby Decl., unless otherwise noted.

[2]  Topel Decl. ¶ 9; Ex. 34, Bryan Armen Graham, "New York ends ban and becomes 50th state to legalize mixed martial arts," The Guardian (March 22, 2016).

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Zuffa took a risk on an untested reality show, *The Ultimate Fighter*, did Zuffa begin to turn a profit.[4]  As its momentum grew, Zuffa invested heavily in its athletes and in its brand.[5]  Zuffa prided itself on being an industry leader both "from a compensation perspective" and from a "service perspective"[6] and, as a result, attracted some of the sport's brightest talent.  The number of events Zuffa promoted grew from 18 in 2006 to 41 in 2015, creating more opportunities for athletes in the sport and more quality events for viewers to enjoy.[7]  As Zuffa's business became more profitable, UFC athletes, including the named Plaintiffs, shared in that success with continually rising compensation.[8]

Plaintiffs do not dispute that athletes' pay for competing in the UFC increased during the class period.  Instead, they assert that Zuffa paid its athletes a lower share of its revenue than otherwise would exist absent Zuffa's "Scheme" of monopsony.  Plaintiffs seek to represent a class of athletes who competed in UFC bouts during the class period (the "Bout Class") and a class of athletes whose identities Zuffa allegedly "expropriated" (the "Identity Class").  Plaintiff Quarry is only proposed as a representative for the Identity Class.

The proposed Bout Class is defective for myriad reasons, the first of which is that Plaintiffs cannot adequately represent the class because none of them currently compete in UFC-promoted bouts, and their claims are not typical of others in the putative class, such as the current athletes they seek to represent.  The class representatives, in contrast to many in the putative class, have no interest in the continued viability of the UFC and are interested only in damages.  For this reason, courts regularly reject proposed class actions by class representatives who are no

---

[3]  Topel Decl. ¶ 10; Ex. 62, Michael A. Hitt, R. Duane Ireland, Robert E. Hoskisson, *Strategic Management Cases: Competitiveness and Globalization* (10th Edition, 2012) at 360.

[4]  *Id.* n.3.

[5]  Ex. 8, Hendrick 30(b)(6) Dep. ("Contracts Dep.") at 147:13-148:17, 151:4-15; Ex. 9, Fitch Dep. at 29:22-24 ("no other organization gives you that notoriety to pull you into an elite status just because you fought for them.  But the UFC does do that").

[6]  Ex. 10, Batchvarova Dep. at 72:5-12.

[7]  Topel Rep. Ex. 30; Ex. 11, Epstein 30(b)(6) Dep. ("Acquisitions Dep.") 98:20-99:3.

[8]  Topel Decl. ¶¶ 17-18 ("In short, athletes at all levels of rankings enjoyed increases in compensation over the class period").

longer part of the defendant's business, much less those who work for a rival.  The class representatives also have individual issues and unique defenses requiring mini-trials and are pursuing arguments that would reduce or eliminate the damage claims of other class members.

Second, Plaintiffs also cannot establish all the elements of an antitrust violation with common evidence.  Plaintiffs broadly claim that Zuffa engaged in a "Scheme" to obtain market dominance through exclusive contracts, and rely on allegations that they were "coerced" into entering those contracts.  Whether an athlete was exposed to (or even knew about) alleged coercive acts is an inherently individualized inquiry.  There is no example in law of a class of 1,200 "coerced" individuals.  Furthermore, the existence of local markets for live MMA entertainment means that individual issues predominate for all of those markets.

To meet the standards of 23(b)(3), Plaintiffs must show that all or virtually all class members suffered antitrust injury (called "common impact").  Antitrust injury is ordinarily measured by lost money, in this case, lost compensation.  Plaintiffs do not show that Zuffa decreased athlete compensation; instead they assert that athletes are entitled to a larger share of Zuffa's revenues or "wage share."  Plaintiffs rely on a regression analysis from their expert Dr. Singer to attempt to show that Zuffa has reduced the wage share of athletes, but the same regression, when applied to actual compensation, shows no antitrust injury.  Unsurprisingly, no court has certified a monopsony class action, where, as here, the plaintiffs tried to offer evidence of a lower wage share to show all or virtually all class members suffered antitrust injury, much less when such evidence conflicted with analyses showing no impact on actual compensation.

Plaintiffs' evidence of common impact also falls far short of the rigorous analysis standard required for class certification in other ways.  First, the only econometric model that Plaintiffs offer to prove that all or virtually all class members suffered antitrust injury cannot show individual impact because it improperly relies on averages that assume, rather than prove, common impact.  Second, although Plaintiffs broadly assert that documentary and testimonial evidence reflect that athlete compensation was artificially low during the class period, this evidence consists of individual anecdotes and does not prove impact with common evidence.  Third, Zuffa does not have a pay structure or follow a policy of "internal equity," and Plaintiffs'

expert's regression attempting to demonstrate such a structure cannot distinguish whether common or individual factors account for the variations in athlete compensation.

Plaintiffs' proposed methodologies for proving impact and damages also run afoul of the Supreme Court's holding in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because the regressions of Plaintiffs' expert cannot separate lawful from unlawful conduct nor have their experts translated the alleged "Scheme" into the theory of damages. And Plaintiffs have offered no model tying the actual allegations of their Amended Complaint to any injury or damages.

Additionally, the putative class is also unmanageable. Plaintiffs argue that as part of the "Scheme," Zuffa has contracted with more athletes than it needs and that in a but-for world many UFC athletes would not be competing for Zuffa. Plaintiffs have not identified which athletes would still be competing for Zuffa or any other MMA promoter. The proposed class is riddled with flaw after flaw, each of which individually has caused courts to reject class certification. The proposed Identity Class is similarly flawed because individual issues predominate. Finally, as former UFC athletes, Plaintiffs lack standing to pursue injunctive relief.

## FACTUAL BACKGROUND

I.    <u>Athletes Willingly Contract With Zuffa For Many Distinct Reasons.</u>

The athletes on the UFC's roster during the class period are not interchangeable. The over 1,200 athletes in the proposed Bout Class have varying levels of experience, skill, potential, and notoriety. Each one chose to sign, and sometimes re-sign, with Zuffa based on his or her subjective assessment of the value of participating in UFC bouts. For example, athletes (including the named Plaintiffs) have offered the following explanations for their choice to sign a contract with Zuffa:

- "I like fighting for UFC for a lot of reasons. I get good compensation; they put a lot of resources into marketing and promoting me and my fights. . . ." (Ex. 12, Decl. of Stephan Bonnar).

- "Participating in the UFC has increased my exposure to sponsorship opportunities due to the amount of television air time and recognition that it generates. Other opportunities have followed along with increased notoriety and respect, such as the opportunity to commentate on MMA for ESPN and the chance to open my own training center." (Ex. 13, Decl. of Kenny Florian).

- "There are several reasons why I believe the UFC is the best MMA organization to fight in.  First, it has provided me with the best compensation and incentives. Second, it has expended the most resources in promoting me and the events I fought in . . . . Fourth, the UFC has attracted some of the best fighter talent, assuring me the opportunity to fight other elite fighters, to try to become the best fighter in the world at my weight class, and to build my reputation so I can earn more money in the form of sponsorships and PPV shares.  Fifth, the UFC is extremely well-run and organized." (Ex. 14, Decl. of Brandon Vera).

- "At the time, I wanted to compete against what was looked at as – as the top guys." (Ex. 15, Plaintiff Vazquez describing why he joined the Zuffa-owned WEC, Vazquez Dep. at 38:19-39:-2).

- "I think the goal of every fighter is to fight at the highest level and to become champion one day.  And if you're trying to fight, it doesn't matter if you're the champion, you know, big fish in a small pond.  You could be the best of a small community.  But really to test yourself and to know that you're the best in the world, that takes becoming champion of the UFC."  (Ex. 16, Kingsbury Dep. at 51:15-22).

- "I could fight in many other promotions, but choose the UFC because I trust how they handle their business and I know how I will be treated." (Ex. 17, Decl. of Joe Lauzon).

- "The UFC sets itself apart within MMA by being the most professional and complete organization in the world from top to bottom.  This starts with the staff that the UFC has and the way that the organization and staff treat the fighters both personally and professionally."  (Ex. 18, Decl. of Jim Miller).

The contract provisions that Plaintiffs challenge as anticompetitive have been central to Zuffa's ability to succeed and grow the sport of MMA.  For example, the exclusivity provision, which is at the heart of Plaintiffs' claim, encouraged investment in both the UFC's brand and in individual athletes and allowed Zuffa to grow its business and the sport of MMA.  Topel Decl. ¶¶ 12-13.  Zuffa's tolling provisions ensure Zuffa has a reasonable amount of time to provide the athlete with the contracted number of bouts under the agreement, taking into account injuries and athletes' decisions to take time off.[9]  Zuffa's executives have confirmed the importance of these

---

[9] Ex. 8, Contracts Dep. 122:20-123:7, 201:17-202:12; Ex. 22 at - 40 (█████████████ ██████████"); Ex. 23 (█████████████); Topel Decl. ¶ 14 (██████████████ ████████████████████████████████████████████.

provisions (which are common in many industries, including sports)[10] to the successful operation of their business and their ability to expand the output of MMA events.[11]

Contrary to Plaintiffs' allegations, Zuffa's contracts with athletes are not perpetual. The contracts between Zuffa and athletes last for a defined term, which is the shorter of the negotiated number of bouts or number of months.[12] Athletes leave Zuffa in a variety of ways. Some athletes may be cut before the end of their contract, rendering them free to immediately sign with Zuffa's competitors.[13] Others complete the negotiated term of their contracts and enter free agency.[14] Some free agents re-sign with Zuffa and others sign with Zuffa's competitors.[15] ████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████[16]

Other athletes re-sign with Zuffa before their contracts expire. Before an athlete's last bout on a contract, Zuffa often offers higher guaranteed compensation for that next bout as an incentive to sign a new agreement.[17] Athletes are free to reject this offer, but many willingly accept, and others specifically request to re-sign new contracts.[18] Whether an athlete will accept Zuffa's offer "is a decision that would have to be made by each individual fighter on a case by case basis" because "there are many, many factors that go into an individual fighter and/or his

---

[10] Ex. 3, Expert Report of Roger D. Blair ("Blair Rep.") ¶ 33.

[11] Ex. 11, Acquisitions Dep. 130:20-131:15; Ex. 8, Contracts Dep. 97:17-98:10, 243:24-244:13.

[12] Ex. 19 at § 5.1 (████████████████████████████████████████████████); Ex. 20 at § 5.1 (██████████████████████████████████████████████); Ex. 21 at § 5.1 (███████████████████████████████████).

[13] Ex. 24 (███████████████████████████████████████); Ex. 40, Marc Raimondi, "Will Brooks announces he was cut by the UFC, is entering PFL's $ 1 million tournament," MMA Fighting (Feb. 14, 2018).

[14] Ex. 25 (████████████████████████████████████████).

[15] Ex. 26 (███████████████████████████████████); Ex. 27, Damon Martin, "Aljamain Sterling inks new deal to stay with the UFC," Fox Sports (Feb. 15, 2016).

[16] Ex. 20 at § 13.2; Ex. 8, Contracts Dep. 256:16-257:13.

[17] Ex. 30; Ex. 28, Mersch Dep. at 359:16-362:3.

[18] Ex. 29 ("████████████████████████████"); Ex. 31; Ex. 33; Ex. 32; Ex. 35.

representatives determinations of the bases on whether they may choose to enter into a new agreement or to serve out the term of an existing agreement" including "compensation" and "different opportunities that may exist other places." Ex. 28, Mersch Dep. 230:9-230:19.

During the class period, many other established and well-funded MMA promoters competed to sign MMA athletes. In every year from 2011 to 2016, over 200 former UFC athletes competed for other promoters,[19] including:

- **Bellator**, which is owned by media giant Viacom and run by Scott Coker, former head of Strikeforce.[20] Bellator has put on events that have repeatedly attracted more viewers than UFC events and have reached up to 2.7 million viewers, Topel Decl. ¶ 16, with 1.3 million viewers recently watching the bout between former UFC athletes Quinton "Rampage" Jackson and Chael Sonnen[21];

- **Professional Fighters League ("PFL")** (previously known as "World Series of Fighting" or "WSOF"), which has a broadcasting relationship with NBC Sports Network and recently announced a partnership with MGM Television and Mark Burnett in advance of its "season" that will culminate with playoffs and crown winners with $1 million prizes for each weight-class champion[22];

- **ONE Championship** (previously known as ONE FC), the self-proclaimed "World's Largest Martial Arts Organization" broadcasts to 1.7 billion potential viewers worldwide[23]; and

- **Absolute Championship Berkut,** a Russia-based promotion that has held over twenty events for each of the past two years. Topel Decl. ¶ 16.

There is no testimony that promoters could not obtain MMA athletes during the class period. The only evidence Plaintiffs cite of a promoter actually having problems accessing MMA athletes is a misstatement of Prof. Topel's deposition testimony[24] and testimony about the IFL

---

[19] Blair Rep. ¶ 37.

[20] Ex. 36, Coker Dep. at 168:8-19, 175:3-8.

[21] Ex. 37, Steve Juon, *Bellator 192 Ratings: 1.3 million viewers tune in for 'Rampage vs Sonnen' main event*, MMAMania.com (Jan. 24, 2018).

[22] Ex. 38, Carlos Silva Dep. at 60:11-15; Ex. 39, "Emmy-winning producer Mark Burnett joins Professional Fighters League as investor advisor," MMAjunkie (April 1, 2018).

[23] Ex. 41, About ONE Championship.

[24] Prof. Topel stated that promoters "can't just sign all of the fighters on the same day . . . . But every year a substantial number of fighters are coming off contract and they're open to

(which existed from 2006-2008).  Pls. Mot. at 11.  Competing promoters have testified that Zuffa has not impeded their ability to obtain athletes,[25] and that MMA athletes are readily available.[26]

## II.     Athlete Compensation.

Compensation for Zuffa's athletes varies widely and is the product of negotiations with athletes and their representatives.  Ex. 42, Fertitta Dep. at 220:16-221:7.  The top paid athletes in the UFC make millions of dollars per bout, while less experienced athletes make tens of thousands of dollars, and others fall somewhere in between.

Zuffa does not have a formal compensation structure.  A group of Zuffa executives negotiate compensation with athletes.  Ex. 43, Silva Dep. at 370:17-23.  These executives consider a variety of objective and subjective factors when deciding what to offer an athlete.  *See* p. 31 n.47, *infra*.  While these executives may consider an athlete's record, rank, and weight class when putting together an offer, they also look at the athlete's notoriety, popularity, and long-term potential.  *Id.*  As Zuffa's COO explained, "all athletes are different . . . . so every negotiation's different."  Ex. 44, Epstein 30(b)(6) Dep. ("Compensation Dep.") at 31:5-33:3.  The result, as reflected in Zuffa's compensation data, is that the amount and form of athlete compensation varies widely, although compensation for all UFC athletes has increased throughout the class period.  Blair Rep. ¶ 79 & App. F, Exs. 87-89; Ex. 92; Topel Decl. ¶¶ 17-18.

## III.    The Proposed Classes.

Notwithstanding Zuffa's role in the exceptional growth of the sport of MMA and the increase in athlete compensation, the six former UFC athlete Plaintiffs seek to represent the proposed "Bout Class" and "Identity Class" and allege that Zuffa systematically suppressed the compensation paid to athletes for their participation in bouts and for their identity rights.  Plaintiff

---

competition from others."  Ex. 137, Topel Dep. 439:10-24.  Plaintiffs claim that his subsequent statement that a document is consistent with the statement nevertheless supports their claim that promoters were deprived "of what they would need to challenge Zuffa's dominance."  Pls. Mot. at 11.

[25] Ex. 38, Carlos Silva Dep. at 205:12-18; Ex. 138, Knapp Dep. at 225:5-11.

[26] Ex. 38, Carlos Silva Dep. at 204:23-25; Ex. 36, Coker Dep. 269:5-270:10 ("There's not going to be a fighter on the planet . . . [Bellator] can't afford and have access to").

1    Quarry is only proposed as a representative for the Identity Class.  None of the named Plaintiffs

2    are current UFC athletes, and the two that are still active professional MMA athletes—Brandon

3    Vera and Jon Fitch—compete for Zuffa's competitors.[27]

4         In their Amended Complaint, Plaintiffs allege that Zuffa gained and enhanced monopoly

5    and monopsony power using exclusive arrangements with athletes, venues, and sponsors, and by

6    acquiring certain rival MMA promoters.  CAC ¶¶ 7, 10.  This Court denied Zuffa's motion to

7    dismiss based on Plaintiffs' allegations of both monopoly and monopsony power.  ECF No. 314

8    at 15-16 ("Plaintiffs allege multiple acts that, as a whole, constitute an anticompetitive scheme"

9    including "exclusive dealing arrangements," "use of threats" and that "the UFC has also used its

10   ill-gotten power in the Relevant markets to restrict its actual or potential rivals' access to top

11   quality venues, sponsors, endorsements, PPV and television broadcast outlets").

12        In seeking class certification, Plaintiffs now abandon the combination of monopoly and

13   monopsony allegations on which this Court denied the motion to dismiss, and recast the alleged

14   anticompetitive conduct as a multi-faceted "Scheme" of only monopsony-related claims.

15   According to Plaintiffs, the first part of the "Scheme" is the use of contractual provisions that

16   require exclusivity or extend the duration of UFC contracts with athletes.  Pls. Mot. at 8-9.

17   Plaintiffs no longer include exclusive contracts with venues, sponsors or broadcasters as part of

18   their "Scheme."  *Compare* CAC ¶ 10 *with* Pls. Mot. at 11.  The second part is "coercion."

19   According to Plaintiffs, Zuffa coerced athletes to re-sign contracts, supposedly making Zuffa's

20   contracts "effectively perpetual."  Pls. Mot. at 9.  The third part is Zuffa's acquisitions, which

21   Plaintiffs contend limited competitive opportunities for athletes.[28]  (In contrast, Plaintiffs'

22   economic expert Dr. Singer concluded that Zuffa's acquisitions were not anticompetitive standing

23

---

24   [27] Ex. 45 (Brandon Vera's contract with One Championship); Ex. 46; Ex. 47 (Jon Fitch's
25   contracts with World Series of Fighting); Ex. 48, Ariel Helwani, "Jon Fitch signs with Bellator,"
     MMA Fighting (Mar. 1, 2018).

26   [28] Zuffa acquired World Extreme Cagefighting, World Fighting Alliance, and PRIDE before the
     class period.  Only Zuffa's acquisition of Strikeforce occurred during the class period. ████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████

9

1   alone and were questionable only if they were followed by exclusive contracting with athletes.

2   Ex. 49, Singer Dep. 251:10-252:1, 253:6-254:9).

3       Plaintiffs' reimagined "Scheme" appears to abandon their prior theory that athletes were

4   harmed as a result of granting certain perpetual identity rights to Zuffa.  *Compare* CAC ¶ 92 *with*

5   Pls. Mot. II.B.3.

6       IV.    Proposed Evidence of Antitrust Injury and Damages.

7       Plaintiffs purport to show antitrust injury across the class (common impact) and class-

8   wide damages through econometric, documentary, and testimonial evidence of (1) suppressed

9   compensation and (2) widespread effect.  Plaintiffs' sole econometric evidence of injury across

10   the class is Dr. Singer's regression analysis.  Pls. Mot. at 24, 26; Ex. 5, Expert Report of Hal

11   Singer ("Singer Rep.") ¶¶ 180-87, 230-31.  That regression purports to measure the relationship

12   between Zuffa's "foreclosure share"—defined as the number of Zuffa athletes signed to 30-month

13   exclusive contracts—to athletes' wage share—defined as athletes' event compensation as a

14   percentage of the event's revenue.  Singer Rep. ¶¶ 180-86, 306; Pls. Mot. at 24.

15       To calculate damages (as opposed to common impact), Plaintiffs introduce testimony

16   from two economists, Drs. Singer and Zimbalist.  Pls. Mot. at 25.  Dr. Zimbalist compared Zuffa

17   athletes' compensation as a percentage of event revenue to the percentage of revenues paid to

18   athletes in the NBA, NFL, NHL, MLB, and one boxing promoter.  Ex. 7, Expert Report of

19   Andrew Zimbalist ("Zimbalist Rep.") ¶¶ 104-139.  Dr. Zimbalist assumed that Zuffa's wage share

20   is low because of anticompetitive conduct, and he concluded that Zuffa athletes' compensation

21   should be the average wage share of his comparator sports.  *Id.* ¶¶ 123-26.  Dr. Singer relied on

22   regression analyses to estimate damages and also compared Zuffa athletes' wage share to the

23   wage share paid by two other MMA promoters.  Pls. Mot. at 25; Singer Rep. ¶¶ 190, 247-52.  He

24   concluded that Zuffa's lower wage share resulted from its monopsony power.  *Id.*

25       Zuffa retained three economic experts, Professors Robert Topel, Paul Oyer, and Roger

26   Blair, to examine the opinions and methodologies of Plaintiffs' experts.  Prof. Topel found Dr.

27   Singer's analysis flawed both as a matter of economic theory (for example, in the use of wage

28   share) and in methodology.  When Prof. Topel examined the alleged effect of the "Scheme" on

1   actual compensation (not wage share) using Dr. Singer's own regression, he found that athletes

2   were not harmed, Topel Decl. ¶ 22, which Dr. Singer does not dispute, Singer Dep. 295:6-296:8.

3   Prof. Topel also found serious errors in Dr. Singer's proposed methodology of proving class-wide

4   impact; importantly, that Dr. Singer's regression is incapable of separating out impact as a result

5   of the "Scheme" as opposed to legal and procompetitive conduct.  Topel Decl. ¶¶ 19-20.

6          Analyzing Dr. Zimbalist's opinions, Prof. Blair concluded that using wage share to

7   measure monopsony damages is improper.  Prof. Blair also noted that Dr. Zimbalist violated

8   fundamental economic principles in comparing the UFC to improper yardsticks like the "Big 4"

9   sports and boxing.  Blair Rep. ¶¶ 49-71.  Prof. Blair further explained why comparing Zuffa's

10  wage share to Strikeforce and Bellator is economically unsound.  *Id.* ¶¶ 73-74.  Prof. Blair also

11  described the high variability in Zuffa athlete compensation during the class period.  *Id.* ¶ 79.

12         Professor Oyer evaluated both Drs. Singer's and Zimbalist's use of labor share of revenue

13  to see if it was consistent with industry-accepted practices in labor economics and determined it

14  was not.  Prof. Oyer explained that "labor economists do not use labor share as a way to evaluate

15  worker compensation or to benchmark competition" and detailed the various flaws with

16  Plaintiffs' experts' approaches.  Ex. 4, Expert Report of Paul Oyer ¶¶ 12-15.

17                    **LEGAL STANDARD FOR CLASS CERTIFICATION**

18         To certify a class, Plaintiffs "must affirmatively demonstrate" compliance with Rule

19  23(a)'s requirements of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  Fed. R.

20  Civ. P. 23(a)(1)-(4); *Comcast*, 569 U.S. at 33.  If Plaintiffs meet all of the threshold requirements

21  of 23(a), the court must determine if Plaintiffs satisfy at least one of the provisions of Rule 23(b).

22  *Id.*  Plaintiffs claim to satisfy Rule 23(b)(3), which requires that "the questions of law or fact

23  common to class members predominate over any questions affecting only individual members"

24  (predominance), "and that a class action is superior to other available methods for fairly and

25  efficiently adjudicating the controversy" (superiority).  Many courts have held that Plaintiffs must

26

27

28

carry this burden by a preponderance of the evidence.[29]  "If a plaintiff had a lesser burden, then a motion to certify a Rule 23(b)(3) class would be granted despite the motion judge's belief that it is more likely than not that individual issues would predominate."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 233 (2d Cir. 2006).

Plaintiffs' operative Complaint also included a class for injunctive relief under Rule 23(b)(2), CAC ¶ 44, but Plaintiffs have not offered that class in their motion.

I.      A "Rigorous" Analysis is Required To Certify A Class Under Rule 23.

To certify Plaintiffs' proposed classes, the Court must undertake a "rigorous analysis" and determine that the prerequisites of Rule 23 have been satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (citation omitted); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011).  The "rigorous analysis," as the Supreme Court emphasized, "will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"  *Comcast*, 569 U.S. at 33 (citation omitted); *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013); *Ellis*, 657 F.3d at 980.  The court must assess the admissibility of evidence, including expert opinions; but that is not all:  the court must also "resolve any factual disputes necessary to determine whether" the challenged conduct "could affect the class *as a whole*."  *Ellis*, 657 F.3d at 983; *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) ("*High-Tech II*").  The court, not the jury, performs this "rigorous analysis."  *Id.*

Plaintiffs attempt to minimize their burden by claiming they need "merely *offer* common proof *capable* of showing harm . . . is widespread across the class; they need not *prove* classwide harm."  Pls. Mot. at 22 (only first emphasis added).  Plaintiffs are wrong because the court must resolve factual disputes in its rigorous analysis of whether the requirements of Rule 23 have been met.  "Offering" proof is not enough.  *Dukes*, 564 U.S. at 354 (where expert "testimony does

---

[29] *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (citation omitted); *Bernstein v. Virgin Am., Inc.*, 2016 WL 6576621 at *5 (N.D. Cal. Nov. 7, 2016); *Quesada v. Banc of America Inv. Services, Inc.*, 2013 WL 623288, at *4 (N.D. Cal. 2013); *accord Valenzuela v. Union Pac. R.R. Co.*, 2017 WL 679095, at *1 (D. Ariz. Feb. 21, 2017) (citations omitted) ("At least four circuits have held that Plaintiffs must carry this burden by a preponderance of the evidence" and that this "standard appears to be the trend in federal courts").

nothing to advance respondents' case," plaintiffs could not satisfy commonality requirement);

*Ellis*, 657 F.3d at 984 (vacating district court certification where court found commonality

because the evidence of plaintiffs and defendant were both admissible and failed to resolve

factual disputes).[30]

II.     Class Certification Is Not Routine In Actions Involving The Type of Antitrust
         Claims Plaintiffs Assert.

Class actions are "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979);

*Espinosa v. Ahern*, 881 F.3d 679, 689 (9th Cir. 2018).  Plaintiffs suggest the situation is different

in antitrust cases, citing Sherman Act Section 1 antitrust cases involving conspiracies among

competitors to fix prices or limit supply.  Plaintiffs then refer to Zuffa's unilateral conduct as a

"Scheme," a term commonly used to describe horizontal price fixing arrangements among

competitors.  But Plaintiffs have brought a Section 2 Sherman Act claim against a single business,

using an evolving theory of monopsonization.  Plaintiffs rely on conduct like exclusive contracts,

which are ordinarily legal, not *per se* illegal, like price fixing.[31]  Where, as here, Plaintiffs allege

---

[30]  Plaintiffs attempt to circumvent this standard by distorting *Tyson Foods*, *Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) and inserting their own bracketed language: "The District Court could have denied class certification on th[e] ground [that it agreed with Defendants' experts] only if it concluded that *no reasonable juror* could have believed that" plaintiffs' experts were right on the merits (emphasis added))."  Pls. Mot. at 22.  In *Tyson*, the appeal followed a jury trial, and the Petitioner never moved to exclude the expert testimony on sampling.  The actual quote refers to a factual issue that was for the jury to decide, with the Court concluding that whether class certification could be denied based on such a factual issue required the traditional standards for review of a jury verdict:

> Reasonable minds may differ as to whether the average time Mericle calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the jury. The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing.

136 S. Ct. at 1049.  The standards of Rule 23 at issue in this motion, by contrast, are for the Court and not the jury to decide.  *Supra* p. 12.

[31]  *E.g.*, *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1203, 1212 (C.D. Cal. 2011) (contracts requiring purchasers to purchase a full line of products exclusively for

---

13

an "array of anticompetitive conduct having an indirect effect on, among other things, the general price level," class certification is not routinely granted because business conduct impacts market participants differently. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 166 (C.D. Cal. 2007).

Although Plaintiffs suggest class certification in antitrust cases is routine, no court has granted class certification in a Sherman Act Section 2 monopsonization case involving allegations based on unilateral conduct. Zuffa is aware of only one class action monopsonization case claiming unilateral exclusionary conduct, and the court denied the motion to certify a class. *Growers 1-7 v. Ocean Spray Cranberries, Inc.*, 2016 WL 10849499, at *1 (D. Mass. May 10, 2016) ("multi-step liability theories" denied on predominance and other grounds).[32] And for the combined monopoly and monopsony theories presented in the Complaint and on which the Court denied the motion to dismiss, Plaintiffs have cited no cases certifying a class.

III.    Class Certification Standards Are More Stringent Than *Daubert* Standards.

Although Zuffa has moved to exclude the opinions of Drs. Singer and Zimbalist under *Daubert*, ECF Nos. 522 & 524, this Court need not grant those motions to conclude that class certification should be denied based on the required rigorous analysis. *Ellis*, 657 F.3d at 982 (vacating class certification because "the district court seemed to have confused the *Daubert* standard . . . with the 'rigorous analysis' standard to be applied when analyzing commonality"). "A conclusion that an expert's testimony is admissible under *Daubert* "does not preclude the Court from denying class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2017 WL 5311533, at *12 (D.D.C. Nov. 13, 2017) (citation omitted).

---

three or five years were part of "lawful and procompetitive conduct"); *see* Mot. to Exclude Testimony of Dr. Singer, ECF No. 524 ("Singer *Daubert*") at 21 n.12 (collecting cases).

[32] Courts frequently deny class certification in Section 2 monopolization cases. *E.g.*, *Comcast*, 569 U.S. at 27; *Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012); *Somers v. Apple, Inc.*, 258 F.R.D. 354 (N.D. Cal. 2009); *Allied Orthopedic*, 247 F.R.D. at 156; *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915 (W.D. Wash. May 3, 2006).

**ARGUMENT**

I.       Named Plaintiffs Do Not Meet Rule 23(a)'s Requirements Of Typicality.

Plaintiffs contend that the six named Plaintiffs meet the Rule 23(a)(3) typicality requirements because their claims "generally arise from the same events and the same legal arguments" as the more than 1,200 absent putative class members.  Pls. Mot. at 17.  But Plaintiffs ignore that they have "'unique background and factual'" circumstances subject to defenses atypical of the rest of the class.  *Ellis*, 657 F.3d at 984-85 (citation omitted).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

A.       Named Plaintiffs' Alleged Lack of Bargaining Power Is Not Typical Of The Class.

Named Plaintiffs do not meet the typicality requirements of Rule 23(a)(3) because they concede that they had little or no negotiating leverage compared to other more prominent UFC athletes.  *In re Graphics Processing Units Antitrust Litig.* ("GPU"), 253 F.R.D. 478, 489 (N.D. Cal. 2008) (named Plaintiffs "who had no negotiating power at all" were not typical of "wholesale customers [who] purchased a vast array of products on individually negotiated terms"); *State of Alaska as Parens Paatriae v. Suburban Propane Gas Corp.*, 1995 WL 441987, at *7 (D. Alaska Jan. 12, 1995) ("the existence of widespread negotiating of price terms by purchasers of propane and the disparate bargaining power of various purchasers…renders it impossible for them to represent the class adequately").  The evidence reflects that athletes routinely negotiated individualized compensation and contract terms.[33] ███████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████ Ex. 52, at 10-16.

The "test of typicality" also looks to "'whether other class members have been injured by the same course of conduct.'"  *Hanon*, 976 F.2d at 508 (citation omitted).  But Plaintiffs' expert's

---

[33] *E.g.*, Ex. 53; Ex. 54; Ex. 55; *see also* Ex. 92, Forms of UFC Compensation.

1   model, if accepted, shows that athletes with the most bargaining power were not injured by, and

2   actually benefitted from, the alleged conduct.  Dr. Singer's regression model predicts *negative*

3   damages for ███████████████, meaning that in Plaintiffs' but-for world absent the alleged

4   "Scheme" these athletes would have made *less* money.  Topel Decl. ¶ 27; Ex. 2, Topel Rep. Ex.

5   34 (████████████████████████████████████████████).  ██████

6   ██████ account for 27% of the total event compensation paid to UFC athletes in Dr. Singer's

7   regression data during the class period.  Declaration of Brent K. Nakamura (attached as Ex. B to

8   Isaacson Decl.) at ¶ 14.  ████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10   █████████████.  Topel Rep. Ex. 33.  The evidence named Plaintiffs will use to prove impact

11   would harm the athletes with the most bargaining power, meaning named Plaintiffs' claims are

12   not typical of these absent class members.  *See Deiter*, 436 F.3d at 466-67 ("Plaintiff's claim

13   cannot be so different from the claims of absent class members that their claims will not be

14   advanced by plaintiff's proof of his own individual claim").

15          B.  Zuffa Has Individualized Defenses As To Certain Named Plaintiffs' Claims.

16          "'Class certification is inappropriate where a putative class representative is subject to

17   unique defenses which threaten to become the focus of the litigation.'"  *Hanon*, 976 F.2d at 508

18   (collecting cases); *Ellis*, 657 F.3d at 984.  The "unique and substantial vulnerability" of class

19   representatives with atypical circumstances and defenses supports denial of certification.  *Backus*

20   *v. ConAgra Foods, Inc.*, 2016 WL 7406505 at *4-5 (N.D. Cal. Dec. 22, 2016); *accord*

21   *Valenzuela*, 2017 WL 679095, at *14-16.

22          Zuffa has at least these unique defenses against the named Plaintiffs:

23   •   **Nathan Quarry**:  As Zuffa explained in its motion for partial summary judgment,
24       Plaintiff Quarry did not enter into an agreement or compete in a bout with Zuffa
         during the class period.  As a result, Zuffa has specific statute of limitations defenses
25       that apply to Quarry that will not affect all other class members.  Zuffa's Mot. for
         Partial Summ. J., ECF No. 347 (Motion); ECF No. 493 (Reply).

26   
27   •   **Brandon Vera**:  Zuffa will present unique defenses to Plaintiff Vera's claims:
         (1) Vera was released at *his* request and left the UFC to compete for a rival MMA
28       promoter, and testified he was not coerced into signing a Zuffa contract, Ex. 56, Vera

Dep. at 182:7-24, (3) he executed a separate ratification that his execution of Zuffa's promotional agreements were not coerced,[34] and (4) he competes for a rival MMA promoter outside of the relevant geographic market. Pls. Mot. at 6.

- **Cung Le**: Plaintiff Le sent a letter to the California State Assembly in May 2012 stating: "I have representatives and advisors that assist me in negotiating agreements and I do not believe any of the provisions of the agreements contain provisions that are in any manner coercive." Ex. 58. Le also intends to present a long individualized tale at trial alleging that Zuffa improperly suspended him for a failed drug test, and after the suspension was lifted, did not apologize to him. Ex. 68, Le Dep. 48:5-56:19, 61:7-66:19, 159:14-168:10.

- **Javier Vazquez**: Plaintiff Vazquez competed in only one bout for the UFC before retiring in part because he did not want to attend a Zuffa-organized athlete summit. Ex. 15, Vazquez Dep. 111:17-112:25. Vazquez also did not enter an agreement during the class period, his last agreement was with the WEC and was assigned to the UFC. Ex. 21; Ex. 59.

- **Jon Fitch**: Plaintiff Fitch claims that he was specifically targeted for unfair treatment because of a dispute over video game licensing rights, Ex. 9, Fitch Dep. 79:12-21, 82:2:14, 161:4-171:23, and that executives at Zuffa did not like his fighting style and deprived him of opportunities to fight for a championship title, *id.* at 83:1-85:2, 236:9-242:22. Plaintiff Fitch also testified that his "biggest problem with [Zuffa] is they are the sanctioning body and the promoter all in one." *Id.* at 206:14-19. This conduct is not part of the "Scheme."

- **Kyle Kingsbury**: Plaintiff Kingsbury believed he "was being punished" in his matchups since he was asked to compete against "extremely talented" athletes that were not well-known. Ex. 16, Kingsbury Dep. 116:16-22. Kingsbury's representative also asked Zuffa ████████████████████████████████ Ex. 94; Ex. 60, contradicting Plaintiffs' claim that Zuffa has complete control over an athlete's careers and the timing of their bouts. Pls. Mot. 9.

II.    <u>Named Plaintiffs Do Not Meet Rule 23(a)'s Requirement of Adequacy.</u>

The purpose of the "adequacy" requirement is to "uncover conflicts of interest between named parties and the classes they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (adequacy requirement designed to ensure an "'absence of antagonism and a sharing of interests between representatives and absentees'").

Named plaintiffs who do not have a current relationship with Zuffa are inadequate

---

[34] Ex. 57, Ratification by Brandon Vera.

1   representatives for purposes of Rule 23(a)(4) for class members who do.  *See Ellis*, 657 F.3d at

2   986 ("As former employees, Ellis and Horstman would not share an interest with class members

3   whose primary goal is to obtain injunctive relief.  Thus, as the class currently stands, Ellis and

4   Horstman will not adequately protect the interests of the class"); *Alfred v. Pepperidge Farm, Inc.*,

5   2016 WL 7655793 at *3 (C.D. Cal. Aug. 5, 2016) ("significant, potential conflict" between

6   named Plaintiffs who were all former distributors and current distributor class members).

7          The named Plaintiffs either compete for Zuffa's competitors or are retired from

8   professional MMA; none currently competes for the UFC.  As a result, their incentive is to pursue

9   damages over injunctive relief and to maximize money damages regardless of the impact on

10  Zuffa's business or current athletes.  The named Plaintiffs in seeking damages or injunctive relief

11  need not have regard to the health of the business of the UFC—and the Plaintiffs competing for

12  competitors have an incentive to hurt the UFC business. ██████████████████

13  ████████████████████████████████████ Ex. 61, Expert Report of

14  Elizabeth Kroger Davis ¶ 59.

15          These interests of the competing and retired named Plaintiffs conflict with current UFC

16  athlete class members who "presently depend on the economic viability of the defendant" and

17  have an incentive to ensure that it survives beyond this litigation.  *See Free World Foreign Cars,*

18  *Inc. v. Alfa Romera, S.p.A.*, 55 F.R.D. 26, 29 (S.D.N.Y. 1972) (denying class certification in part

19  because named Plaintiff was a former franchisee whose "sole interest is in the recovery of

20  damages" in contrast to current franchisees who have an incentive "that defendant remain in

21  business"); *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (denying class

22  certification where current members "cannot be said to have their interests adequately represented

23  by parties that seek to financially recover from, punish, and prohibit those very same

24  activities").[35]

25

26  _____

    [35] *See* Ex. 63, Mark Raimondi, "Leslie Smith launches Project Spearhead, a fighter-driven effort
    to get UFC athletes unionized," MMA Fighting (Feb. 13, 2018) ("'That's the goal of the

27  MMAFA, to skewer the UFC and break it apart with this antitrust lawsuit,' Smith said. 'And I am
    not down with that, either. I actually really like fighting for the UFC. I like fighting for the UFC

28

Further, Plaintiffs are arguing that Zuffa should never have contracted with or paid hundreds of class members.  Plaintiffs allege that Zuffa restricted MMA athlete supplies to rivals "by consistently maintaining significantly more Fighters under contract than it could use," thereby depriving rivals of athletes' services needed to compete.  Singer Rep. ¶¶ 193-94; Pls. Mot. at 11; Ex. 49, Singer Dep. 312:18-23 (throughout the class period, Zuffa maintained significantly more fighters under contract than it could use: "Yes").  According to Plaintiffs, without the restrictions they challenge, Zuffa would contract with hundreds of fewer athletes over the class period.  Pls. Mot. 16; CAC ¶ 155 (calculating that Zuffa has 990 fight slots each year, "far below the 1,500 slots necessary to provide each UFC Fighter under contract with three bouts per year").  Plaintiffs assume, without proving, that in their preferred world that new rivals would appear and contract with these class members.  Ex. 50, Zimbalist Dep. 200:3-201:3; Ex. 49, Singer Dep. 324:1-16.  Plaintiffs thus are seeking relief that would result in hundreds of athletes being let go by Zuffa, with no certain positions with other MMA promoters available to them.

### III.   Individual Evidence Of Liability Predominates Over Common Evidence.

"Rule 23(b) (3) provides that class certification is permissible if: 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"  *Wang*, 737 F.3d at 545 (quoting Fed. R. Civ. P 23(b)(3)).  Rule 23(b)(3) is an "'adventuresome innovation'" and thus subject to "Congress's addition of procedural safeguards" and "the court's duty to take a 'close look' at whether common questions predominate over individual ones."  *Comcast*, 569 U.S. at 34 (citations omitted).

Plaintiffs contend that "Proof of an antitrust violation often focuses on a defendant's conduct and is therefore entirely common."  Pls. Mot. at 18.  The Section 1 antitrust cases on

---

and I want to continue to do so. I think that the UFC's business model is what has managed to bring MMA to the mainstream and general public and I don't want to just blow up the vehicle that got us to where we are right now'").

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    which Plaintiffs rely are not comparable to the complex theory of liability that Plaintiffs propose

2    here, which requires individualized proof and mini-trials for each class member.

3                     A.  Plaintiffs' Alleged "Scheme" Is Incapable Of Proof Of Liability With
                          Common Evidence.
4

5            Plaintiffs' "Scheme" consists of a long list of different actions and contractual provisions,

6    but none determine "in one stroke" whether Zuffa violated the antitrust laws.  *See Dukes*, 564

7    U.S. at 350.  In particular, Plaintiffs say that they and class members were "coerced" to enter into

8    and even to renew their exclusive contracts with Zuffa for *higher compensation*.  Pls. Mot. at 1, 9-

9    10.  Absent such coercion, even Plaintiffs' expert acknowledged that a renewal of a contract for

10   more money cannot be considered anticompetitive.  Ex. 64, Singer Dep. II 406:7-407:9; *see*

11   *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976) ("the art of

12   persuasion and influence – is inherent in competition").  Moreover, each of these "coerced"

13   contracts was individually negotiated, many by or with the assistance of legal counsel, managers,

14   or other representatives.  Ex. 58.[36]

15           Plaintiffs' claims require mini-trials for each plaintiff and class member on the issue of

16   whether they voluntarily entered into their contracts.  Whether any particular athlete was

17   "coerced" in the Section 2 sense requires individualized inquiry into (among other things):

18   (1) the facts and circumstances facing each Plaintiff at the time the original contract and any

19   renewal contracts were signed; (2) the market reality *for each Plaintiff as of the time each*

20   *Plaintiff entered into and renewed any such contract*, including Zuffa's supposed bargaining

21   leverage (which Plaintiffs say has grown over time, Pls. Mot. at 24); (3) the terms and conditions

22   Zuffa agreed to at any point in time; and (4) the competitive landscape at any given moment,

23   including each athlete's outside options and their attempts, if any, to pursue those options.[37]

24   _____

25   [36]


28   Ex. 13 at § 3 (Kenny Florian:  "I have never leveraged one promotion against another in

Courts routinely deny motions for class certification premised on claims of coercion.  Of particular relevance here are antitrust claims asserted by franchisees who say they were "coerced" into contracting with or purchasing goods or services from their franchisors.  For obvious reasons, whether any particular franchisee class member was "coerced" demands individualized inquiry and complex, time-consuming fact-finding that defies class treatment.  *See, e.g.*, *In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 557, 563-64 (N.D. Cal. 1999) (evaluation of whether defendant forced independent distributors into exclusive contracts "would necessarily involve an examination of the hundreds of individual relationships" including "the degree of control Anheuser-Busch maintained over each distributor").[38]  As the Third Circuit emphasized in *Ungar*, "What is sufficient to coerce one buyer's choice may not be sufficient to coerce another buyer's choice; an item that one buyer might accept voluntarily, another might accept only if forced to do so."  531 F.2d at 1219.

Plaintiffs' reliance on *High-Tech II* and other Section 1 conspiracy cases is improper and unpersuasive.  Section 1 claims involving, for example, *per se* illegal price-fixing conspiracies may proceed on a class basis because liability questions are premised on the common proof of a single conspiracy.  If any class action in the antitrust context has been certified where the claims included coercion of class members, Zuffa is not aware of it.

Plaintiffs also cannot rely on their theory that Zuffa's alleged "control" of "marquee fighters" forces other MMA athletes to contract with Zuffa who otherwise would not.  Pls. Mot. at 10.  The issues of coercion of "marquee fighters" and who qualifies as a "marquee fighter" require evidence unique to each athlete.  And whether other MMA athletes signed with Zuffa because of these "marquee fighters" depends on those athletes' decision-making rationales at the time of contracting.

---

contract negotiations.  However, this has to do with the fact that I choose to fight in the UFC and not to shop my services as an athlete to another organization."); Ex. 18 at § 2 (Jim Miller:  "I have never made the choice to leverage one promotion against another in contract negotiations").

[38]  *See also Auto Ventures, Inc. v. Moran*, 1997 WL 306895, at *3-4 (S.D. Fla. Apr. 3, 1997) (collecting cases); *Smith v. Denny's Restaurants, Inc.*, 62 F.R.D. 459, 462 (N.D. Cal. 1974) (proof of coercion of each franchisee precludes certification).

B. <u>Individualized Evidence Will Be Required to Determine Injury.</u>

Plaintiffs argue that hundreds of class members should never have been under contract with Zuffa, *supra* Argument II, but they offer no mechanism or method to determine *which* members of the putative bout and identity classes would have contracted with Zuffa in the but-for world (or upon entry of injunctive relief) or who would have had longer or shorter careers during the class period in the absence of the "Scheme."  This failure means that Plaintiffs cannot reliably and predictably determine which class members were actually injured as a result of the "Scheme."  For example, in *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013), where the plaintiffs challenged certain limits on student-athlete compensation, the court determined that changing those limits would result in a "substitution effect" whereby different athletes may accept scholarships.  The court denied certification of a damages class under Rule 23(b)(3) because the "substitution effect among individual" athletes "contributes to the impossibility of determining which class members were actually injured."  *Id.* at *9; *see also NCAA I-A Walk-On Football Players*, 2006 WL 1207915, at *8-9 (W.D. Wash. May 3, 2006) (declining to certify class of student-athletes challenging NCAA cap on scholarships because raising the cap would require each class member to prove that they would have obtained a scholarship).  Similarly, individualized evidence would be required for each athlete to show who would have been among the fewer athletes under contract with Zuffa absent the challenged conduct.  These inquiries would predominate over common questions.

C. <u>Individualized Evidence Will Be Required To Show An Antitrust Violation In A Properly Defined Relevant Market.</u>

An essential element of each class member's claims is proof of the relevant market.  Order Denying Mot. to Dismiss, ECF No. 314, at 9-10 (citing *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008)).  Market Definition has both a product and geographic component.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961).  The relevant geographic market is the area to which purchasers can "practicably turn to areas outside their own area for supply of the relevant product."  *Heerwagen*, 435 F.3d  at 228 (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n.5 (1949)).  Here, Plaintiffs assert the

1  existence of both output markets of locally staged MMA events and input markets of MMA

2  athletes as national geographic markets.

3      With respect to the output market of MMA events, Dr. Singer identifies the customers as

4  viewers (both attendees at live event venues and viewers of television broadcasts), cable

5  networks, broadcast networks, and sponsors.  Ex. 49, Singer Dep. 288:15-289:2; Singer Rep.

6  ¶ 115.  Courts have consistently and overwhelmingly found that purchasers of tickets for local

7  entertainment events would not be able to turn to events outside their local region.[39]

8      Plaintiffs lack evidence that output markets of MMA events staged at local venues are

9  national.  In Dr. Singer's deposition, he admitted that he did not analyze whether and to what

10  extent cable networks, broadcast networks, sponsors at venues, and purchasers of tickets to live

11  events could practicably turn to areas outside their own geographic area for supply of the relevant

12  product.  Singer *Daubert* at 33; Ex. 49, Singer Dep. 289:15-290:5.  Dr. Singer even described

13  UFC "counter-programming" of competitors' events by holding events at nearby venues—

14  highlighting how competition for live events is local in nature.  Singer Rep. ¶¶ 54, 56.

15      If the geographic market is not national, proof of monopoly power requires multiple

16  inquiries into localized markets, raising issues that are not common to a broad national class.

17  *E.g.*, *Heerwagen*, 435 F.3d at 228-29 (affirming denial of class certification: "despite

18  Heerwagen's argument that the relevant market for concert tickets is national, the district court

19  determined that it is local.  The court concluded that Heerwagen could not therefore satisfy Rule

20  23(b)(3)"); *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 177 (W.D. Mo. 1976) ("questions

21  of 'geographic markets' presented by these claims are not likely to be subject to proof by

22  evidence relating to the class or subclass as a whole"); *In re Beer Distribution Antitrust Litig.*,

23  188 F.R.D. 549, 555-556 (N.D. Cal. 1998) ("individual questions would predominate in the

24  determination of Plaintiffs' attempted monopolization claim" because "the proof that will be

25

26  [39] *E.g., Heerwagen*, 435 F.3d at 228 (concert production); *Fishman v. Wirtz*, 807 F.2d 520, 532 &

27  n.9 (7th Cir. 1986) (professional basketball games); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988-89 (D.C. Cir. 1977) (professional football ticket sales); *United States v. Syufy Enterprises*,

28  903 F.2d 659 (9th Cir. 1990) (first-run motion picture exhibitors).

relevant to that determination will be based on facts specific to each local area").

IV.    Rigorous Analysis Shows No Common Impact From the Alleged "Scheme."

"In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005).  To meet the predominance requirement of Rule 23(b)(3), plaintiffs must show common impact (antitrust injury) to all or virtually all class members.  *In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013); *In re Rail Freight*, 2017 WL 5311533, at *87–88 (collecting cases and concluding that under 23(b)(3), "5% to 6% constitutes the outer limits of a de minimis number of uninjured class members" above which certification is not appropriate (emphasis in original)).

Plaintiffs offer multiple arguments to support common impact, but only Dr. Singer's regression, which Plaintiffs contend shows ████████████████████████, attempts to demonstrate that the "Scheme" harmed all or virtually all class members.  Pls. Mot. at 26.[40] Contrary to Plaintiffs' assertion, the evidence does not show that all or virtually all class members were injured.

A.    Rigorous Analysis Using Actual Wages Rather Than A Novel Wage Share Theory Shows No Common Antitrust Injury.

Dr. Singer concludes that there is antitrust injury to all or virtually all of the Bout Class based on regression analyses finding a negative relationship between two things:  (1) the number of 30-month exclusive contracts—which Dr. Singer labeled the "foreclosure share"; and (2) the

---

[40] Plaintiffs also estimate average damages, not individual injury, by Dr. Singer's comparison of Zuffa's wage share to two other MMA promoters, and Dr. Zimbalist's comparison of athletes' share of Zuffa's revenue to the share of revenue paid in the NFL, NBA, NHL, MLB and one boxing promoter which they include in their Motion as evidence of impact.  Pls. Mot. at 25; Singer Rep. ¶¶ 247-48; Ex. 7, Zimbalist Errata Table 4-E, 5-E.  These estimates of "average" damages do not attempt to estimate antitrust injury to individual class members or to demonstrate that all or virtually all class members within such average estimates were damaged.  Ex. 50, Zimbalist Dep. 38:15-25; Ex. 49, Singer Dep. 62:16-63:6, 227:17-22.

percentage of athlete compensation of total event revenues (the athletes' "wage share").  Singer

Rep. ¶¶ 180-87, 230-31, 306.  A central and fatal flaw to Dr. Singer's regression is his use of

wage share as the dependent variable in his regression.  Singer Dep. 105:1-16; Singer Dep. II

481:1-8.  As set forth in Zuffa's separate *Daubert* motion to exclude Dr. Singer's testimony,

Plaintiffs seek to make this the first known case to use wage share to measure an alleged common

impact.  The common method applied by labor economists and accepted by courts in antitrust

cases to measure an anticompetitive effect on compensation is regressions with actual

compensation as the dependent variable.  Singer *Daubert* at 13-20.  For example, in *High-Tech II*,

on which Plaintiffs rely, those plaintiffs showed that all or virtually all class members were

injured based on a regression using actual wages, and not wage share, as the variable of interest.

985 F. Supp. 2d at 1207-08.  Dr. Singer has cited a single case, *Arizona Travel Nurses*,[41] where an

expert has used the wage share method, and that expert was Dr. Singer (and, as explained *infra*,

his analysis was not accepted by the Court).  Dr. Singer used wage share because the nurses there,

unlike athletes competing in the UFC, were paid a "percentage of their billings"—that is, actual

compensation was specifically measured as a share of revenue.  Singer *Daubert* at 14.

Plaintiffs' expert assesses impact only in relation to athletes' wage share.  Singer Dep.

105:1-16.  However, it is undisputed that the compensation in dollars paid to Zuffa athletes has

increased during the class period.  Topel Decl. ¶¶ 17-18 ("In short, athletes at all levels of

rankings enjoyed increases in compensation over the class period."); Ex. 49, Singer Dep. 124:15-

125:3.  When Plaintiffs' regression is run to determine if the "Scheme" impacted athletes'

compensation, not their compensation as a fraction of event revenue, it shows that athletes were

not harmed.  Topel Decl. ¶ 22.  If this class were certified, it would be the first class certified

based on purported impact to athletes' wage share when Plaintiffs' own regression model applied

to actual wages shows no impact on actual compensation.  Singer *Daubert* I.A.1.

---

[41] *Johnson v. Arizona Hosp. & Healthcare Ass'n*, 2009 WL 5031334 (D. Ariz. Jul. 14, 2009) ("*Arizona Travel Nurses*").

Plaintiffs wrongly assert that the viability of wage share is not a class issue.  Pls. Mot. at 31 n.65.  At the class certification stage, Plaintiffs are required to put forward a method capable of proving injury and damages with class-wide evidence, and the Court is required to "resolve any factual disputes necessary" to determine if Plaintiffs can put forward a methodology "that could affect the class *as a whole*."  *Ellis*, 657 F.3d at 982 (emphasis in original).  Wage share is incapable of doing so.

  B.  <u>The "Foreclosure Share" Has Not Proven Common Impact.</u>

   1.  Dr. Singer Does Not Prove Foreclosure of Competition.

Dr. Singer's foreclosure share is the foundation of his finding of impact to all or virtually all class members—namely, he concludes that as Zuffa's foreclosure share increased, athletes' wage share decreased.  Singer Rep. ¶ 186.  But, by Dr. Singer's own admissions, foreclosure share is "tautological."  Ex. 49, Singer Dep. 44:16-45:12.  Dr. Singer's regressions do not estimate the degree to which Zuffa foreclosed any market; rather, foreclosure is an input into the regression.  *Id.* at 39:1-4; 40:4-41:24.  Because foreclosure is an input for measuring the effect of exclusionary conduct, the definition of foreclosure depends on what someone concludes is exclusionary.[42]  "If one were to draw the line at 25 months and if all of the contracts came in at 24 months, then it's almost tautological.  If that's how we define foreclosure, then the foreclosure would come in at less than 30 percent."  Ex. 64, Singer Dep. II 385:7-17.  Here, Dr. Singer defines foreclosure as 30-month exclusive contracts.  Singer Rep. ¶ 306.  Zuffa's foreclosure share is "spit out" of a Microsoft Excel file and "the regression finds a relationship between that foreclosure share and the fighters wage share."  Ex. 49, Singer Dep. 40:23-41:14.  Dr. Singer never does an econometric analysis of whether contracts of that duration foreclose competition and what contract durations might have anticompetitive effects.  Topel Decl. ¶ 24. The term "foreclosure" is merely a label Dr. Singer attaches to a tabulation of 30-month contracts.

---

[42]  Even for purposes of proving average class wide damages, the Ninth Circuit has held that the "proposed damages model must measure only the damages that are attributable to the theory of liability."  *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016).

When he calculates alleged impact, Dr. Singer does not measure the difference between the real world and a world without the Plaintiffs' "Scheme." Instead his regressions measure the differences from a "but-for world where in which the foreclosure share wasn't as high as it was in the actual one." Ex. 49, Singer Dep. 31:10-32:1. Dr. Singer chooses a 0%, 20% or 30% foreclosure share for his but-for world based on his understanding and legal review of "levels that I thought a Court would deem at least not anticompetitive based on my understanding of precedent in the similar cases." Ex. 64, Singer Dep. II at 370:23-371:5. These but-for world foreclosure percentages are "not from anywhere else. We are trying to find a level of foreclosure that would be deemed not anticompetitive by a Court." *Id.* at 371:8-13; *see* Topel Decl. ¶¶ 24. He acknowledged "there's a lot of ways that you can get there." Ex. 49, Singer Dep. 181:3-20.

> 2. Dr. Singer's Foreclosure Shares Use Averages that Do Not Show Impact on Individual Class Members.

Although Dr. Singer claims his regressions are capable of evaluating impact on individual class members, they are not. Dr. Singer's foreclosure shares are only averages. At no point does Dr. Singer evaluate whether each class member was compensated less when a foreclosure share was high than when foreclosure share was low. Instead, Dr. Singer applies the same foreclosure share, an average across athletes and bouts, to all athletes competing at a given point in time and measures the average correlation between this average foreclosure share and all athletes' actual compensation share. Topel Decl. ¶ 25; Ex. 49, Singer Dep. 31:18-32:1; 40:4-41:21; 237:5-11; Ex. 64, Singer Dep. II 564:16-22; Singer Rep. ¶¶ 230, 310 & Table 6. He then compares the compensation share these athletes received in the actual world (using the average foreclosure share) to the compensation they receive in the but-for world (*i.e.*, in a world where Dr. Singer inputs a lower average foreclosure share), which is determined by the average correlation across all athletes. At no point does he consider, nor does his model allow for, any differences in the foreclosure that athletes might face at a given time. This says nothing about whether individual class members were impacted because it *assumes* that class members were equally foreclosed in the actual world.

1   These assumptions mask the different market conditions athletes face at the time of

2   contracting.  Prof. Topel's analysis demonstrates that the assumption of identical impact is

3   unfounded.  Dr. Singer's foreclosure share differs dramatically for athletes of different rankings.

4   Topel Decl. ¶ 26; Topel Rep. Exs. 28-29.  ████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████

6   █████████████████████████████████████████████████████████████████████

7   ██████    *Id.*  (Nonetheless, ████████████████████████████, comprising 27 percent of the

8   compensation paid to the class, suffered zero damages or actually benefitted by the higher

9   foreclosure share according to Singer's model.  *Supra* p. 15-16.)  As a result, Zuffa's alleged

10  ability to exert monopsony power over athletes' wages will necessarily differ among athletes who

11  have different options for purchasers of their services at the time of contracting.  Dr. Singer

12  acknowledges this is true in theory, but uses a methodology that masks these differences by using

13  the average relationship between foreclosure share and wage share for athletes of different ranks.

14  In denying class certification, courts have rejected assumptions based on averaging like

15  those of Dr. Singer.  *See In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal.

16  2014) (regression in an antitrust case insufficient to support class certification where the

17  regression provided an aggregate overcharge percentage but did not attempt "to show that all or

18  nearly all purchasers were overcharged in that amount, or any amount at all"); *Reed v. Advocate

19  Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009) (rejecting methodology which used "average

20  base wage" because it "does not indicate whether each putative class member suffered harm").[43]

21  Plaintiffs justify Dr. Singer's methodology by citing to four Section 1 cases in which regressions

22  were run to show individual impact.  Pls. Mot. at 19 n.46.  But it does not suffice that courts have

23  accepted *some* regressions that are capable of proving individual impact; Dr. Singer must show

24  that *his* regression is capable of doing so, which it is not.

25

26  _____

[43] "Averages can hide substantial variation across individual cases, which may be key to
27  determining whether there is common impact."  *Reed*, 268 F.R.D. at 591 (quoting ABA Section
of Antitrust Law, *Econometrics: Legal, Practical and Technical Issues* 220 (2005)).
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C. <u>Plaintiffs' Other Evidence Fails to Show Common Antitrust Injury.</u>

Plaintiffs rely on Dr. Singer's regression analysis to show that all or virtually all class members were injured. Only that analysis actually is offered as an attempt to identify individual injury. Plaintiffs do rely on other evidence to support their arguments on common impact, but that evidence, without the regression analysis, does not show widespread actual injury. Nor does Plaintiffs' expert assert that it would. Singer Dep. 100:8-19; *id.* 102:7-18 ("I would not offer this model [showing compensation moving together] by itself as proof of common impact").

Even if this other evidence did support Plaintiffs' arguments, because the Supreme Court requires rigorous analysis of class certification, courts do not consider evidence such as this sufficient without a valid econometric or statistical analysis showing that all or virtually all class members were injured. *Dukes*, 564 U.S. at 358 (anecdotal evidence alone insufficient to certify a companywide class); *Casey v. Home Depot*, 2016 WL 7479347, at *23 (C.D. Cal. Sept. 15, 2016) ("anecdotal evidence . . . may not necessarily be representative of the Proposed Class"). Plaintiffs cite no cases certifying a class based only on the type of evidence discussed in this section.

1. Plaintiffs' Other Methods of Proving Common Impact Raise Individual Issues.

a. Documentary and Testimonial Evidence.

Plaintiffs contend that "documentary and testimonial evidence of suppressed compensation" is capable of proving impact with common evidence. Pls. Mot. at 23. But this evidence is not common to the class and instead speaks to issues affecting individual class members. *Rosenberg v. Renal Advantage, Inc.*, 2013 WL 3205426, at *12 (S.D. Cal. June 24, 2013), *aff'd*, 649 F. App'x 580 (9th Cir. 2016) (Rule 23(b)(3) not satisfied where the "Court would have to resort to a series of mini-trials to determine hours worked for each class member").

For example, Plaintiffs point to Zuffa's implementation of a so-called "sponsorship tax" as common evidence reflecting suppressed compensation as a result of Zuffa's monopsony power. Pls. Mot. at 23. But the "sponsorship tax's" impact on athletes is far from uniform. ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

29

█ [44] The policy also changed during the class period once Zuffa began its apparel sponsorship with Reebok. Ex. 65. Moreover, the purpose the "sponsorship tax" was to increase overall compensation to athletes by improving the reputation of the sport of MMA, and Prof. Topel has demonstrated that other streams of revenues to athletes were increasing at the same time. Ex. 44, Compensation Dep. 156:12-158:5; Topel Decl. ¶ 31. Thus, any assessment that the "sponsorship tax" impacted an athlete's compensation would require an individualized assessment of: when the athlete was under contract with Zuffa; the sponsors the athlete had at a particular point in time; whether the "tax" affected those sponsors during that time; and whether the athlete negotiated an exception.

Other documents Plaintiffs cite would similarly require individualized assessments, are inadmissible hearsay, or are misquoted.[45]

Plaintiffs also contend that Dr. Singer "analyzed Fighter compensation as a percentage of Event Revenues over time" and that the reduced share over time is evidence of impact. Pls. Mot. at 24. Dr. Singer again looks at averages and not individual class members. And this "analysis" consists of reciting statistics from a few documents referencing athlete share. Singer Rep. ¶ 189. Dr. Singer in no way analyzes the data involved let alone attempts to determine whether, if athlete share was going down, it was the result of the "Scheme" as opposed to individual issues. █

█ Ex. 7, Zimbalist Errata Tables 4-E-5-E.

b. Zuffa Does Not Have A Compensation Structure.

Plaintiffs claim that, to the extent they show individual antitrust injury, the effect would have been widespread because, according to Plaintiffs, Zuffa follows a compensation structure.

---

[44] Ex. 66, Epstein 30(b)(6) Dep., ("Sponsorship Dep. II") at 292:8-19, 297:23-299:8 (█████████████████████████████████); Ex. 67, at -450 (███████████████); Ex. 69; Ex. 70; Ex. 71; Ex. 72.

[45] Pls. Ex. 41 (cited at Pls. Mot. 23) ████████████████████████████████████████████; CD Ex. 31 (███████████████████████); Singer Rep. ¶ 189 n.462 (██████████████████████████████████).

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   The documentary and testimonial evidence shows Zuffa does not.  For athletes of various skill

2   and experience levels, Zuffa negotiates the compensation terms of its contracts with athletes and

3   their representatives.[46] ██████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████   Ex. 44, Compensation Dep. 31:5-33:3.  As a result, Zuffa's

6   compensation decisions are based ████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████   *Id.* at 29:17-33:3.[47]  These compensation decisions

9   may differ because Zuffa executives often have different views and assessments of the

10  appropriate compensation for any given athlete because "everybody's judgment is different."  Ex.

11  43, Silva Dep. 370:19-21. Negotiations over compensation relate to the form of compensation,

12  not just the amount.[48]  Ex. 92 (Forms of UFC Compensation).

13      Zuffa's athlete compensation includes discretionary elements as well.  During each event,

14  athletes are eligible to receive four performance-based bonuses for Performance of the Night or

15  Fight of the Night.  Ex. 92.  Zuffa also gives out other discretionary bonuses to "fighters that

16

17

18  _____

19  [46] Ex. 42, Fertitta Dep. 220:16-221:7; Ex. 43, Silva Dep. 356:19-358:3, 361:4-8; Ex. 44,
    Compensation Dep. 24:15-25.

20  [47] Ex. 44, Compensation Dep. 111:25-112:19 (████████████████████████████████

21  ████████████████████████████████████████; Ex. 10, Batchvarova Dep. 69:15-25

22  ████████); Ex. 43, Silva Dep. 452:12-18 (explaining athlete got paid "out of the ordinary for his
    accomplishments" because "he had value in Korea, which was a potential place for us to go"); *Id.*

23  at 357:8-19 ("special talent"); Ex. 73, Mark LaMonica, "Dana White says Sage Northcutt
    deserves big paycheck," Newsday (Jan. 30, 2016) ("star quality"); Ex. 74 ("██████████████");

24  Ex. 75 (██████████████████████████████████████████████████████████);

25  Ex. 9, Fitch Dep. 74:24-75:3 ("there is no meritocracy in the sport.  It's kind of hit or miss.  They
    like somebody, they pay them more.  If somebody is more agreeable to do things outside of their

26  contract, they pay them more").

    [48] Ex. 76 at -99 (████████████████████████████████████; Ex. 77 (signing bonus); Ex. 78

27

28  ██████████████████████; Ex. 43, Silva Dep. 436:8-25; Ex. 80, Shelby Dep. 115:15-22.

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

participated on a fight card that performed exceptionally well."  Ex. 42, Fertitta Dep. 179:1-10.[49]

The result of individualized negotiations over compensation and bonuses is that athlete

compensation shows substantial variation across various characteristics (rank, wins, UFC

experience, weight class).  Exs. 87-89; Blair Rep. ¶ 79 & App'x F.

Courts have consistently denied class certification where compensation is based on

individualized factors rather than a standard compensation structure.  *E.g., Reed*, 268 F.R.D. at

583, 591-92 (denying class certification despite plaintiffs' claim of a "fixed pay structure" and

"wage grid"); *Fleischman v. Albany Med. Ctr.*, 2008 WL 2945993 at *6 (N.D.N.Y. Jul. 28, 2008)

("the reasons affecting the wage of a particular nurse or class of nurses, though contested, involve

too many variables and provide too much ambiguity to carry a motion for class certification on

the issue of injury-in-fact").  In *Arizona Travel Nurses*, the court rejected Dr. Singer's opinion

that a compensation structure existed for traveling nurses, as opposed to nurses paid on a per diem

basis, because individualized assessments would have been needed to determine compensation.

*Johnson*, 2009 WL 5031334 at *9 ("traveling nurses often negotiate individual compensation

arrangements," including differences in bonuses and benefits; "these numerous individual issues

mean that antitrust impact cannot be shown effectively with common proof for traveling nurses").

Plaintiffs rely heavily on *High-Tech II*, in which the district court certified a narrow class

of technical employees, based on a regression analysis using actual wages to show common

impact along with findings that "all Defendants used formal administrative compensation

structures and divided jobs into pay bands, zones, grades, and ranges by which they evaluated and

paid employees in groups in relationship to other groups."  985 F. Supp. 2d at 1197-98.  Here,

there is no clear way to categorize athletes at Zuffa and Plaintiffs have not proposed one.  Instead,

Dr. Singer acknowledges "negotiations centered around the compensation of comparable

Fighters."  Singer Rep. ¶ 225; Pls. Mot. at 28.  But identifying "comparable Fighters" is

---

[49] Ex. 43, Silva Dep. 440:18-441:22 (explaining he and Sean Shelby would make "recommendations" on discretionary bonuses and then it was "up to Dana and Lorenzo to finalize"); Ex. 82; Ex. 83; Ex. 84.  Plaintiffs themselves challenge the discretionary nature of bonuses as part of the "Scheme."  Pls. Mot. 9.

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

necessarily individualized and incapable of common proof.  Zuffa's determination of who constitutes a "comparable athlete" is based on athlete-specific factors such as record, popularity, notoriety, nationality, and accomplishments that are debated between Zuffa and an athlete's representative and has to be individually determined for each athlete.[50]  In other words, there is no "grid" to categorize different athletes[51] and Plaintiffs offer none; rather, a determination of impact would require hundreds if not thousands of "mini trials" which would overwhelm the predominance of common questions.  Blair Rep. ¶ 79 & App'x F, Ex. 87-89.

For the same reasons, Plaintiffs' argument that Zuffa maintains a policy of "internal equity" also fails.  Pls. Mot. at 27-28.  Plaintiffs rely on one former Zuffa employee's testimony that he tried to make sure that "comparable fighters with comparable records are getting paid comparable amounts."  *Id.*  Plaintiffs have not established a policy applicable to all of Zuffa.  Even taking the testimony as a policy, the evidence is clear that who constitutes a "comparable athlete" is an individual assessment incapable of class-wide proof.[52]

Plaintiffs also support their compensation structure argument with a handful of documents, but these documents do not evidence a compensation structure and cannot overcome the vast documentary, testimonial, and actual compensation evidence in this case.  For example,

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████  The evidence shows that Zuffa's

---

[50] Ex. 43, Silva Dep. 369:4-12 ("you can have a difference of opinion of where I'm going, I think that he is similar to this guy, they can counter and go, we don't see him as similar to that guy, we see him as similar to this guy."); Ex. 85, White Dep. 370:22-372:16.

[51] Ex. 44, Compensation Dep. 34:2-9; *see also id.* 112:9-12.

[52] Even the documents Plaintiffs cite show the wide variation in compensation form and amount for "comparable" athletes.  Ex. 86, cited at Singer Rep. ¶ 225, n.543 (████████████████

████████████).

compensation did not proceed in such a lock-step manner.  Ex. 87.[53]  Finally, Plaintiffs'

inaccurately state that Zuffa's economists did not respond or contest any of this evidence.  Topel

Decl. ¶ 28; Blair Rep. ¶ 79, Table 4, App'x F.

> 2.  Plaintiffs' Econometric Evidence Of A Compensation Structure Does Not Show Common Impact.

Plaintiffs assert that a separate econometric analysis by Dr. Singer can account for the

substantial variation in athlete compensation (but is not offered to establish antitrust injury).  Ex.

49, Singer Dep. 102:7-15.  Specifically, Plaintiffs rely on Dr. Singer's:  (1) regression that

attempts to identify the percentage of athlete compensation that is explained by "common factors"

and (2) "sharing analysis" that tries to assess the degree to which gains or losses are broadly

shared across the class.  Pls. Mot. at 28.  Dr. Singer errs in both steps.

Dr. Singer's "common factors" regression cannot distinguish whether common or

individual factors account for the variation in athlete compensation. Dr. Singer runs a regression

with only common variables (rank, gender, etc.) that purports to explain 78% of the variation in

compensation.  *Id.*  But when the same regression is run with only athlete-specific factors (i.e.,

variables requiring individual proof), such as strikes or takedowns landed in a bout, the results

show that these variables account for 79% of the variation in athlete compensation.  Topel Decl. ¶

29. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

Dr. Singer's "sharing analysis" is similarly flawed.  The analysis includes data from an

11-year period, five years of which fall outside the class period, and purportedly assesses the

degree to which gains or losses in one athlete's compensation is statistically associated with gains

or losses to athletes overall.  Pls. Mot. at 28.  For class certification, Plaintiffs need to show the

degree to which this is true *during the class period*.  When Prof. Topel ran Dr. Singer's exact

---

[53] Ex. 43, Silva Dep. 355:12-356:18.

regression but excluded the pre-class data, there is no longer evidence that an individual athlete's compensation is correlated with other athletes' compensation.  Topel Decl. ¶ 30.[54]

V.      Plaintiffs' Evidence Does Not Establish Injury Or Damages To Support Class Certification.

In *Comcast*, the Supreme Court made clear that where an expert's methodology cannot distinguish between impact and damages caused by the theory of harm or other unchallenged conduct, class certification must be denied.  569 U.S. at 38 ("In light of the model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding, Rule 23(b)(3) cannot authorize treating subscribers within the Philadelphia cluster as members of a single class").  Following *Comcast*, a "methodology for calculation of damages that [can] not produce a class-wide result [i]s not sufficient to support certification." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014); *Doyle*, 663 F. App'x at 579 (same).

A.      Plaintiffs' Experts' Methods Of Showing Impact And Damages Rely On A Theory Of Liability That Is Inconsistent With The Alleged "Scheme."

Neither Dr. Singer nor Dr. Zimbalist performs a damages analysis isolating the conduct alleged in the "Scheme" described in Plaintiffs' motion.  Pls. Mot. at 8-11.  Dr. Singer's regressions are based on the number of athletes Zuffa has signed to exclusive contracts lasting at least 30 months,[55] but he has acknowledged that his regressions do not account for other aspects of the "Scheme."  Ex. 49, Singer Dep. 20:7-21:5 ("it is clear that only certain aspects of the challenged conduct that are being captured by the foreclosure variable"); *id.* at 30:3-23 ("the set of actions encompassed in the challenged  conduct is broader than the set of  actions that are

---

[54]  Plaintiffs wrongly assert that Prof. Topel admitted that a change in compensation to one Fighter is correlated with changes to compensation of all Fighters in the prior year.  Pls. Mot. at 30. Topel Decl. ¶ 30.  Prof. Topel corrects Dr. Singer's error in two steps: (1) by running a single regression with athlete compensation data; and (2) by removing the improperly included pre-class data.  Topel Rep. ¶¶ 270-71.  Plaintiffs cite the incomplete result after step 1 as Prof. Topel's alleged "concession," but fail to include that after step 2, the regression shows no correlation.
[55]  Courts have routinely found contracts of that length are not anticompetitive or illegal.  Singer *Daubert* Mot. at 21 n.12 (citing cases).

being captured by the regression approach").  Dr. Zimbalist measured a world with "more

competition" to a world with less competition (Zuffa).  Mot. to Exclude Testimony of Dr.

Zimbalist, ECF No. 522 at 16-17 ("Zimbalist *Daubert*") at 16-17.  Dr. Zimbalist testified that for

purposes of his damages model, *any* conduct that reduced competition would lead to the same

damages result, regardless of whether it is the challenged conduct in this case.  *Id.*

This incongruity violates the Supreme Court's holding in *Comcast* that the "first step in a

damages study is the translation of the *legal theory of the harmful event* into an analysis of the

economic impact *of that event*."  *Comcast*, 569 U.S. at 38 (emphasis in original).  Plaintiffs'

motion abandons core allegations in the Complaint and defines a different "Scheme."  They argue

that by focusing on only part of the "Scheme" that damages are underestimated, but that is an

unproven assumption.  Zuffa has submitted evidence that the conduct that was once part of the

Amended Complaint is pro-competitive.  Topel Decl. ¶¶ 11-15, 32-34.  Plaintiffs accordingly

offer no model to show that the allegations of their Amended Complaint cause injury or damages.

Even if Plaintiffs were to abandon their Amended Complaint and narrow their claims to

the "Scheme," Dr. Singer's model does not test the effect of the entirety of the "Scheme,"

including pro-competitive acquisitions of firms that otherwise would have gone out of business.

Topel Decl. ¶ 32; *see* Singer Dep. 251:10-254:9 (Singer did not test effect of acquisitions

standing alone).  This failure to measure the benefits to class members of Zuffa's acquisitions is

fatal to the 23(b)(3) analysis. *Kottaras*, 281 F.R.D. at 25 (denying certification of class seeking

damages from an unlawful merger: "Since benefits must be offset against losses, it is clear that

widespread injury to the class simply cannot be proven through common evidence").

Without a proper link between liability and damages, Plaintiffs have no reliable evidence

to show that the "Scheme"—as opposed to some other combination of conduct—caused common

impact and damages to the putative class.

### B.  Plaintiffs' Econometric Evidence Of Common Impact Is Deficient Under *Comcast*.

Even if it was focused on a coherent theory of liability, Plaintiffs' methodology suffers

from the inability to separate lawful from unlawful conduct described in *Comcast*.  Dr. Singer's

1   regression shows that as foreclosure share increases, athletes' wage share decreases, which he and

2   Plaintiffs contend is evidence of anticompetitive impact.  Pls. Mot. at 24; Singer Rep. ¶ 186.  But

3   athletes' wage share will fall any time event revenues rise or rise faster than athletes'

4   compensation at that event.  Dr. Singer's regression does not control for the variety of legal and

5   pro-competitive conduct that impact event revenues, for example Zuffa advertising and

6   promoting an event.  Topel Decl ¶¶ 19-20; *see also* Singer *Daubert* at 19.  Plaintiffs even

7   discount to zero Zuffa's demonstrated success in building a business and growing MMA as a

8   sport as having any role in generating event revenues.  Topel Decl ¶¶ 8-10. ████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████████

13       Dr. Singer even admitted in his deposition that he never attempted to disaggregate the

14  value added by athletes from that added by Zuffa.  Singer Dep. 123:6-20 ("I think you're getting

15  at the same question now, just asked in a different way which is have I done a decomposition of

16  the marginal revenue product between the fighters and—and Zuffa, and the answer is no, I have

17  not done that decomposition"); *id.* 119:8-24.  As a result, Dr. Singer's regression is

18  methodologically incapable of demonstrating impact or damages caused by the challenged

19  conduct or "Scheme" as opposed to impact from other, legal and pro-competitive conduct.  Topel

20  Decl. ¶ 20.  In such a circumstance, "*Comcast* requires the Court to find that the Rule 23(b)(3)

21  predominance requirement has not been satisfied."  *Brazil v. Dole Packaged Food, LLC*, 2014

22  WL 5794873, at *13 (N.D. Cal. Nov. 6, 2014) (decertifying a class where expert's model could

23  not identify "how much of the identified premium was due to Dole's 'All Natural Fruit' labeling

24  claim [*i.e.*, the challenged conduct] and how much was due to its advertising expenditures").

25  VI.     A Class Action Is Not The Superior Method For Relief Because Plaintiffs Cannot
26          Show Which Class Members Would Have Been Harmed.

27       The Ninth Circuit has "held that when the complexities of class action treatment outweigh

28  the benefits of considering common issues in one trial, class action treatment is not the 'superior'

method of adjudication" for purposes of Rule 23(b)(3)(D).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  *Id.* at 1192 (citations omitted).  As set forth above, numerous individual issues concerning each class member, including the issue of coercion, is required in this case, rendering the class action not superior.

Moreover, when "damages suffered by each putative class member are large, this factor weighs [against] certifying a class action.'"  *Zinser*, 253 F.3d at 1190.  In *Nguyen v. BDO Seidman, LLP*, 2009 WL 7742532 (C.D. Cal. Jul. 6, 2009), the putative class was "well-paid employees" who were "seeking years worth of overtime back-pay, penalties, and attorney fees. This weighs heavily against class certification here, as the putative class members have sufficient monetary incentive to pursue their own claims."  *Id*. at *8.  So too here—Plaintiffs allege over $1 billion in damages for a putative class of around 1,200 members, making individual actions both viable and superior.

## VII.    The Identity Class Involves Predominantly Individual Issues.

Plaintiffs have abandoned their initial theory of liability for the Identity Class and now claim that the "Scheme's" alleged restrictions to athlete mobility depressed compensation for their identity rights.  Background § III, *supra*.  Plaintiffs have failed to present a methodology to show common impact to the Identity Class given the wide variety of identity rights at issue.

There are at least four categories for which athletes grant Zuffa the use of their identities: (1) in UFC events and broadcasts; (2) in the UFC-branded video game; (3) in UFC-branded merchandise; and (4) in appearances and advertising for Zuffa's sponsors.  Ex. 92.  Not all athletes grant Zuffa all of these rights, and within each grant of right there are variations in the scope, exclusivity, and/or compensation for that grant of right that make proof of impact across all grants of identity rights incapable with class-wide evidence.  *Id.*

Plaintiffs' class definition incorporates all athletes whose identities were "expropriated or exploited" after December 16, 2010.  Pls. Mot. at i.  But Dr. Singer only evaluates impact and damages for putative class members who received a payment during the class period or entered an

agreement in the class period.  Plaintiffs have put forward no evidence of impact or damages for any putative member of the class falling outside either of Dr. Singer's sub-classes.

A. Identity Subgroup 1.

Plaintiffs define Identity Subgroup 1 as any athlete "who received some identity-based payments during the class period, such as for sponsorship, video games, merchandise royalties, or pursuant to an athlete outfitting policy."  Pls. Mot. at 19.[56]  Dr. Singer does not evaluate how his "foreclosure share" impacts the various forms of identity right payments that athletes receive.  For example, he does not evaluate how (or if) athletes' compensation for merchandise rights (or any other grant of identity rights) differed based on Zuffa's foreclosure share.  Nor does he conduct any econometric analysis of the impact of the "Scheme" on athletes' grant of or compensation for identity rights. ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████ Ex. 92.  For example, Zuffa's merchandise rights agreements are voluntary and non-exclusive and thus do not prohibit athletes from contracting with other third parties for merchandise deals.  Id.[57] ██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████[58]  Plaintiffs and their expert have not established impact to the Identity Class, much less analyzed the significant variations in grants of and compensation for identity rights throughout the Identity Class.

---

[56] Zuffa's Motion for Partial Summary Judgment against Plaintiff Quarry on statute of limitations grounds relates to him and other class members in Identity Subgroup 1.  ECF No. 347.

[57] Ex. 90 ██████████████████████████████████████████████████████████████████ ; Ex. 91.

Ex. 72, Mossholder 30(b)(6) Dep., ("Sponsorship Dep. I") at 100:9-103:21; 144:1-18.

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### B.   Identity Subgroup 2.

Plaintiffs define Identity Subgroup 2 as all athletes who entered a Promotional and Ancillary Rights Agreement with Zuffa during the class period.  Pls. Mot. at 29. ████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████  Dr. Singer's unsupported assertion does not prove common impact as required by Rule 23, rather it *assumes* that impact to all class members occurred.  *See In re Florida Cement and Concrete Antitrust Litig.*, 278 F.R.D. 674, 684-685 (S.D. Fla. 2012) (denying certification where "Dr. Singer offers no methodology for determining whether pass-through actually occurred; instead, he simply assumes that for indirect purchasers who bought pursuant to a cost plus contract, 'the pass through rate would typically be one hundred percent'"). ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████[59]

### VIII.   Plaintiffs Do Not Have Standing To Bring A Claim For Injunctive Relief.

Plaintiffs' Motion does not argue for class certification pursuant to Rule 23(b)(2), but they pled that such certification is proper and previously requested that the Court so certify the classes. CAC ¶¶ 39, 44, 52, 172(a) and (b).  Even if they did, Plaintiffs do not have standing to bring a Rule 23(b)(2) claim for injunctive relief because they are former UFC athletes.  "As the Supreme Court explained, only current employees have standing to seek injunctive relief."  *Ellis*, 657 F.3d at 988 (vacating a district court's Rule 23(b)(2) certification in part because the class included former employees who lacked standing to seek injunctive relief); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 584 (N.D. Cal. 2016).

---

[59] *E.g.*, Ex. 93; Ex. 94; Ex. 95; Ex. 96; Ex. 97.

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   Dated:  April 6, 2018                      Respectfully Submitted,

2                                              BOIES SCHILLER FLEXNER LLP

3

4

                                               By: /s/ William A. Isaacson
5                                                  William A. Isaacson
                                               *Attorneys for Defendant* Zuffa, LLC, d/b/a
6                                              Ultimate Fighting Championship and UFC

7

8

9

10

11

12

13                           **CERTIFICATE OF SERVICE**

14          The undersigned hereby certifies that the foregoing **Zuffa's Opposition to Plaintiffs'**

15   **Motion for Class Certification** was served on April 6, 2018 via the Court's CM/ECF electronic

16   filing system addressed to all parties on the e-service list.

17

18

19                                               Roderick Crawford

20                                          An employee of Boies Schiller Flexner

21

22

23

24

25

26

27

28

ZUFFA'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION