# EXHIBIT 1

# Redacted Declaration of Professor Robert H. Topel

WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, Nevada 89101
Tel: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS  #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
Tel: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant | No.: 2:15-cv-01045-RFB-(PAL)<br><br>**DECLARATION OF PROFESSOR ROBERT H. TOPEL, PH.D, IN SUPPORT OF ZUFFA, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Robert H. Topel, declare as follows:

1. I am Robert H. Topel, the Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics with tenure at The University of Chicago Booth School of Business.

2. I make this declaration in support of Zuffa, LLC's ("Zuffa") Opposition to Plaintiffs' Motion for Class Certification ("Opposition").

3. On October 27, 2017, I submitted an expert report ("Report") in this case that contained my opinions about the merits of Plaintiffs' claims as well as the suitability of this case for class certification. This Declaration summarizes certain material contained in my Report that is pertinent to the pending class certification motion. This Declaration is not a complete list or summary of my opinions and conclusions from my Report, which is included in full as Exhibit 2 to the Declaration of Stacey K. Grigsby.

4. Based on my review of the files, records, and materials included in the Materials Relied Upon list in my Report, I have personal knowledge of the facts and conclusions set forth in this Declaration and, if called to testify, could and would testify competently to those facts under oath.

5. I am an economist, and I specialize in (among other things) microeconomics, which is the study of markets, pricing, and firm and industry behavior. I received a B.A. in economics from the University of California, Santa Barbara in 1974, and a Ph.D. in economics from the University of California, Los Angeles in 1981. In addition to my tenured position at the Booth School of Business at The University of Chicago, I have been a member of the faculties in the Department of Economics at The University of Chicago and the Department of Economics at the University of California, Los Angeles. At these institutions, I have taught undergraduate and graduate courses in the subject areas of Markets and Prices, Economic Theory, Labor Markets, Empirical Methods in Economics, Compensation and Personnel Policies, Industrial Organization and Antitrust, Business Strategy, and Law and Economics. I am also the Director of the George J. Stigler Center for the Study of the Economy and the State and the Co-Director of the Energy Policy Institute at Chicago, both at The University of Chicago.

6. From 1993 to 2003, I served as the Editor of the *Journal of Political Economy*, and

from 1991 to 1993 I was a member of the Editorial Board of the *American Economic Review*, two of the leading professional publications in economics and economic theory. I am also a past founding editor of the *Journal of Labor Economics* (1982 to 1992), and I currently am a member of the Editorial Advisory Board of the *International Journal of the Economics of Business* and the Advisory Board of the Economics Research Network. I am a Research Associate of the National Bureau of Economic Research, an elected member of the Council on Income and Wealth, an elected Founding Member of the National Academy of Social Insurance, and a Fellow of the Stanford University Center for the Study of Poverty and Inequality. In 2004, I was elected a Fellow of the Society of Labor Economists. In 2005, I received the Eugene Garfield Award for contributions to the economics of medical research, and, in 2007, I received the Kenneth Arrow Award from the International Health Economics Association.

7. I am also a Senior Consultant at Charles River Associates ("CRA"), an economics consulting firm specializing in the application of economic theory and statistics to legal and regulatory issues. I have consulted and served as an expert on liability, damages, and class certification issues in a number of antitrust matters. CRA is paid $1,050 an hour for my time spent on this matter, and I receive compensation from CRA based on its billings in this case. My analysis is supported by colleagues at CRA. However, all of my opinions and conclusions are my own.

8. <u>Zuffa is successful because it created a superior forum for MMA events</u>: In Section III of my Report (paragraphs 49-63), I explain how the Ultimate Fighting Championship ("UFC") is a prime example of the kind of superior skill, foresight and industry that is the hallmark of vigorous competition. When Zuffa acquired the UFC in 2001, MMA was a fringe sport. There were few standard rules, no weight classes, and state athletic commissions would not sanction MMA bouts. In 1996, Senator John McCain referred to MMA as "human cock-fighting" and called for states to ban MMA events. Political and public pressure led 36 states to ban MMA. When Frank and Lorenzo Fertitta purchased the UFC in 2001 for $2 million, they purchased little more than an idea.

9. Following the acquisition of the UFC, Zuffa expended significant resources in legitimizing MMA. Zuffa created a department devoted to regulatory issues and hired regulatory consultants. It became a prime mover in creating a unified set of rules for MMA. As of 2016, MMA

1  is now legal in all 50 states. Much of this change in the regulatory landscape was a direct result of
2  the work that Zuffa did over a 15-year period.

3      10.    The company struggled for many years after its purchase, with losses of almost $40
4  million. The Fertittas almost chose to get out of the failing business, but ultimately chose to continue
5  investing. Realizing that they needed broadcasting opportunities to increase the profile of the brand
6  and MMA athletes, the Fertittas and UFC President Dana White created and funded an MMA reality
7  show—*The Ultimate Fighter*—that would promote MMA athletes by highlighting their athletic skills
8  and allowing viewers to get to know athletes on a personal level. This show significantly increased
9  consumer demand for UFC events. For a more detailed discussion on Zuffa's early years, its success,
10 and its role in developing the sport of MMA see paragraphs 49-63 of my Report.

11     11.    <u>Zuffa's contract provisions are procompetitive</u>: In section V of my Report
12 (paragraphs 80-123), I explain that the contract provisions Plaintiffs challenge have procompetitive
13 purposes and effects. [REDACTED]
14 [REDACTED]
15 [REDACTED] Those purposes are detailed more fully in my Report but are
16 summarized below.

17     12.    Exclusivity and multi-bout contracts assist in protecting promoters' investments and
18 building a business. They are the solution to a free riding problem. Free riding occurs when one
19 party makes the financial commitment of an investment in the other party but a third party is able to
20 capitalize on that investment without any of the costs. For example, a promoter invests in an athlete
21 to increase the marketability and publicity of that athlete. Absent contractual restrictions, if that
22 athlete was able to switch promoters at any time, a competing promoter could free ride on the
23 investments made by the original promoter. This free riding would reduce MMA promoters'
24 incentives to make investments in MMA events and MMA athletes, decreasing the value of MMA
25 events to consumers, athletes and promoters.

26     13.    Exclusivity provisions also increase efficiencies and decrease transaction costs. The
27 contractual authority to arrange matches ensures that the promoter can pair opponents that will
28 generate the most fan interest, promote its events, and drive revenue to the benefit of consumers as

1  well as the promoter and its athletes. It is also integral to Zuffa's ability to maintain its current output
2  of events by internalizing decisions about upcoming matches without individually renegotiating
3  contracts before every bout. This is particularly important given that MMA is a high-risk sport in
4  which injuries are common. Having a roster of available athletes from which to secure a replacement
5  athlete for a bout reduces the significant transaction costs and delays that would otherwise occur. For
6  a further discussion of the procompetitive purposes and effects of the exclusivity provision, see
7  paragraphs 85-97 of my Report.

8    14.    Zuffa's tolling provisions also serve procompetitive benefits by ensuring that Zuffa
9  has sufficient time to promote the designated number of bouts under the contract. Without this
10 provision, an athlete could get injured once and be unavailable for the remaining duration of the term
11 of Zuffa's contract thus depriving Zuffa of the benefit of the multi-bout contract it bargained for. ▮
12 ▮
13 ▮
14 ▮
15 ▮
16 ▮
17 ▮

18   15.    Zuffa's Champion's Clause ▮
19 ▮
20 ▮ This provision allows Zuffa to reap the returns on its most successful and valuable
21 investments and creates an incentive for Zuffa to invest in the development of an athlete. These
22 investments include contracting with and providing opportunities to compete against other highly-
23 ranked athletes and staging events. If Zuffa believed it would not benefit from its investment ex-post,
24 it would not make the investment in the first place.

25   16.    <u>Many promoters compete for MMA athletes and viewership of MMA events</u>: As
26 detailed in paragraphs 69-78 of my Report, Zuffa faces significant competition from other MMA
27 promoters in producing MMA events as well as in signing MMA athletes. Zuffa faces significant
28 competition in the United States and across the world. For example, Bellator is a prime example of

how a new promoter can enter the market and rapidly develop into a significant competitor. Bellator started promoting fights in 2009 and was acquired by Viacom in 2011. Bellator's events are broadcast on the Spike TV network (now called the "Paramount Network") where they have reached an audience of up to 2.7 million viewers and have sometimes attracted more viewers than UFC events. The Professional Fighters League (previously World Series of Fighting) has a broadcast agreement with NBC Sports and other networks around the world. A recent World Series of Fighting event drew nearly a million viewers in the United States. A Russian-based promotion, Absolute Championship Berkut, demonstrates the speed with which new MMA promoters can get established in the marketplace. It hosted six events in 2013 and had increased output to twenty-two events by 2016.

17. <u>Properly assessing the impact of Plaintiffs' allegations requires an analysis of actual compensation paid to athletes</u>: Compensation to Zuffa's athletes has increased considerably between 2005 and 2016, including throughout the class period. Surprisingly, Dr. Singer never examines what Zuffa has actually paid to athletes over time. This examination is essential to any meaningful analysis of Plaintiffs' claims because economic theory predicts that a firm acting as a monopsonist would suppress workers' wages as the firm's market power increases. If Plaintiffs' allegations were correct, we should observe Zuffa decreasing compensation to its athletes during the Class period. However, I found that Zuffa has *increased* compensation to athletes both prior to and during the Class period. To demonstrate this, I estimated a regression that measures changes in Zuffa's compensation of athletes while controlling for other relevant variables. In short, Zuffa athletes at all levels of rankings enjoyed increases in compensation over the class period. This analysis is described further in paragraphs 58 and 169-171 and Exhibits 17 and 18 to my Report.

18. I separately considered whether Zuffa's acquisition of Strikeforce impacted athletes' compensation. Plaintiffs have challenged this acquisition as anticompetitive because it allegedly lessened competition by eliminating a potential rival. However, Dr. Singer provided no evidence that Zuffa's acquisition of Strikeforce (or any other promoters) harmed Zuffa's athletes. When I analyzed Strikeforce athletes' compensation before and after Strikeforce was acquired, I found that their compensation substantially increased following the acquisition. This is the opposite of what

5

Plaintiffs' monopsony theory would predict. The econometric tests I ran and a discussion of my results are included in paragraphs 180-186 and Exhibits 21 and 22 of my Report.

19.     <u>Athletes' share of event revenues is an inappropriate variable to assess impact on athletes</u>: Instead of analyzing compensation, Dr. Singer studies the effect of Zuffa's alleged foreclosure on athletes' collective share of event revenues ("wage share"). Dr. Singer ignores basic labor economics in using wage share as the dependent variable in his regression. The standard economic models of competitive labor markets explain the determination of workers' wages, measured in dollars per worker. They do not explain the determination of a worker's pay as a percentage of the employer's revenue.

20.     Just as the price paid by consumers is the proper metric for evaluating anticompetitive impact and harm in a monopoly case, actual compensation of athletes—the price they receive—is the proper metric in a monopsony case. The exercise of monopsony power would reduce compensation below the competitive level. In contrast, Dr. Singer's "wage share" will decline for reasons having nothing to do with the exercise of monopsony power; in fact, it will decline if Zuffa's conduct is procompetitive. For example, consider a firm that increases its investment in advertising. If the advertising is effective it will generate greater sales and more revenues. The greater demand might induce the firm to hire more workers, but in a competitive labor market the firm will be able to expand employment without paying a higher wage. Then the wage as a share of the firm's revenue declines, but this decline has nothing to do with monopsony power—it is an outcome of competition. The same is true with Zuffa. Much of Zuffa's revenue is generated by Zuffa's investments, for example skillfully promoting events and athletes, scheduling fights involving compelling matchups, advertising, and other investments. Elementary economics predicts that Zuffa's revenue should be paid to compensate the inputs necessary to make those investments. The better Zuffa is at making these investments and producing high-quality events and effectively promoting athletes, the more Zuffa's revenue increases and the smaller the compensation of an athlete as a share of event revenue will be. This occurs even if the level of athletes' compensation rises. Thus, the negative correlation Dr. Singer finds between foreclosure share and wage share would exist if, on the one hand, Zuffa succeeded in increasing event revenue through wholly procompetitive means without the exercise of

monopsony power, or if, on the other hand, Zuffa was exercising monopsony power and reducing pay to its athletes. Dr. Singer's inability to separate lawful from unlawful conduct is discussed further in paragraphs 133-38 and in Appendix A of my Report.

21. <u>Dr. Singer's measure of "foreclosure" does not provide a reliable basis for assessing the common impact of Plaintiffs' allegations</u>: Dr. Singer's regression purports to demonstrate anticompetitive impact on MMA athletes' compensation due to "foreclosure." In other words, he finds that as Zuffa's share of (a defined group of) MMA athletes under contract increased, a typical athlete's pay as a fraction of event revenue declined. But this correlation between foreclosure share and an athlete's wage share is not informative of whether Zuffa has exercised monopsony power because this negative correlation would exist if Zuffa succeeded in increasing event revenue through wholly procompetitive means without the exercise of monopsony power. Dr. Singer's proposed test cannot distinguish between a negative correlation resulting from Zuffa's exercise of monopsony power and a negative correlation resulting from competition on the merits. At most, all Dr. Singer has shown is that as Zuffa's business grew relative to its competition, its revenue grew at a faster rate than the earnings of MMA athletes. This reveals nothing about the Challenged Conduct or its effects. This topic is discussed further in paragraphs 124-141 and Appendix A of my Report.

22. In my Report, I estimated compensation regressions that Dr. Singer did not. In keeping with standard practices in economics, I corrected Dr. Singer's regression model so that it measures the relationship between athletes' actual compensation (not wage share) and Dr. Singer's measure of foreclosure. When I did this, I find that there is no negative correlation between compensation and Dr. Singer's flawed measure of "foreclosure." Therefore, I was able to conclude that Dr. Singer's model does not provide any evidence of anticompetitive impact or that members of the class were harmed. For a further discussion of this issue, see paragraphs 146-148 and Exhibit 13 of my Report.

23. My Report also detailed two other significant flaws with Dr. Singer's regression methodology that cause his results to be biased and unreliable: (1) the improper inclusion of pre-acquisition Strikeforce bouts in his data and (2) his weighting of his "foreclosure share" with Zuffa's revenue, which introduces a mechanical negative correlation between his foreclosure share and wage

7

share. These errors are discussed further in my Report at paragraphs 150-167.

24. <u>Dr. Singer's arbitrary definition of foreclosure for the purpose of assessing injury and damages is unreliable</u>: Dr. Singer's regression is also incapable of reliably calculating impact and damages because he fails to analyze how the MMA marketplace would operate with and without the challenged contract provisions—he fails to specify a but-for world that would exist in the absence of the Challenged Conduct. Dr. Singer defines foreclosure as 30-month exclusive contracts with a Champion's Clause, without any economic analysis of whether contract durations foreclose competition and what durations might have that effect. With regard to the but-for world, Dr. Singer simply presumes that the foreclosure share will fall to 30 percent, but he makes no attempt to project how the market share for Zuffa would change without the challenged contract provisions but with all of the other legitimate sources of Zuffa's competitive advantage relative to competing promoters. Dr. Singer testified that there are many ways that foreclosure share could become 30 percent, and indeed explained that how Zuffa's foreclosure share fell to that level does not matter for his purposes. But it does not make economic sense that, for example, Zuffa having 30 percent of the athletes each with a 30-month contract would have the same impact on competition as Zuffa having 90 percent of the athletes, of whom a third have a 30-month contract and two-thirds have a 28-month contract. The fact that Dr. Singer treats them as identical indicates the insufficiency of his competitive analysis of the but-for world. This error is discussed further in paragraphs 195-97 of my Report.

25. <u>Dr. Singer's model is incapable of measuring individual impact or damages</u>: Dr. Singer does not present a model capable of evaluating whether each Bout Class member suffered impact or damages. Dr. Singer uses the relationship between athlete compensation as a share of revenue and his foreclosure share to calculate damages to members of the Bout Class. But nowhere does Dr. Singer examine whether any particular athlete's compensation was lower when his measures of foreclosure were higher. Rather, Dr. Singer uses his regression model to measure an average correlation between his flawed measures of foreclosure (discussed further in my Report at paragraphs 161-167, 195-197, 219-226) and athlete compensation across all athletes and bouts in his data. He then uses this average correlation to calculate the average underpayment (measured as a percentage of revenue) for athletes within the Bout Class, and he applies that underpayment to an

estimate of total event revenue during the Class Period. I discuss this issue in paragraph 279 of my Report.

26. I examined whether Dr. Singer's foreclosure share differed depending on the ranking of the athletes under contract with Zuffa. Exhibits 28 and 29 to my Report show that █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

27. <u>Dr. Singer's model predicts that some athletes were overcompensated:</u> In paragraph 281 and Exhibit 34 of my Report, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

28. <u>Athletes' compensation is driven by individual factors:</u> In paragraphs 260-265 of my Report, I contested Dr. Singer's assertion that Zuffa follows a formulaic compensation structure. I explained that how compensation evolves over time is specific to each athlete and cannot be reduced to a formula. Rather, there is substantial testimony that compensation is primarily driven by individual factors that depend on athletes' unique attributes, and not common factors.

29. Dr. Singer's regression purporting to show that "common" factors explain 78 percent of the variation in Zuffa athletes' compensation is unreliable. As explained further in paragraph 272 of my Report, when I use Dr. Singer's exact methodology to determine the fraction of athletes' compensation that is explained by athlete-specific variables (*i.e.*, explanatory variables that are not common), such as athlete fixed effects and performance data such as percentage of strikes landed, I find that these athlete-specific factors explain 79 percent of the variation in athletes' compensation.

9

As a result, I conclude that Dr. Singer's methodology does not reliably measure the fraction of athletes' compensation explained by common factors.

30. My Report also includes a detailed analysis of why Dr. Singer's regression showing that changes to one athletes' compensation is correlated with other athletes' compensation (described in Plaintiffs' class certification motion as Dr. Singer's "sharing analysis") is flawed and unreliable. After correcting key flaws in Dr. Singer's analysis, I showed that his regression provides no evidence of a compensation structure or that any harm from the Challenged Conduct would have been broadly shared across all members of the Bout Class. For example, Dr. Singer uses compensation data from 2005 through 2016. It is unclear why Dr. Singer would use compensation information that predates the Class period, since the relevant issue for class certification is whether there was a common compensation structure during the Class period. When I made only one change to Dr. Singer's regression by limiting the analysis to the Class period (2010-2016), there is no evidence that an athlete's own compensation is correlated with others' compensation. For a further discussion of this issue and other flaws that I identified with Dr. Singer's regression, see paragraphs 266-271 of my Report.

31. <u>There is no direct evidence that Zuffa suppressed athlete compensation below competitive levels</u>: Dr. Singer cites Zuffa's implementation of a "sponsorship tax" as evidence that Zuffa was able to suppress athlete's compensation. But some of UFC's sponsorship revenues flow directly back as payouts to athletes and during this same time period compensation paid to athletes for bouts has increased. Thus, the impact of the sponsorship tax on total athlete compensation is far more complex than the simplistic picture painted by Dr. Singer. See paragraphs 238-243 for a further discussion on this issue.

32. <u>Zuffa's acquisitions did not affect its market power</u>: In paragraphs 173-77 of my Report, I explain that Zuffa's acquisitions of WEC and WFA in 2006, Pride in 2007, Affliction in 2009, and Strikeforce in 2011 did not appreciably change Zuffa's share in the input or output markets because the acquired promoters were small, already exiting the market, or both. For example, before Zuffa purchased Pride there had been public reports about its ties to the Yakuza and it had lost its broadcasting arrangement. Strikeforce's owners were seeking to exit the business.

1  Other promoters had failed to successfully turn a profit and were looking to get out of their
2  remaining contractual obligations. Exhibit 20 to my Report shows that ███████████
3  ████████████████████████████████████████████████████████████████
4  ██████████████████████████████ In paragraphs 187-92 of my Report, I
5  explain that given the low barriers to entry—due in part to Zuffa's efforts to have the sport of MMA
6  regulated—competitors can rapidly enter the market and compete.

7  33.   Dr. Singer asserts that Zuffa exploited the terms of its contracts to extend and renew
8  athlete contracts, which created incentives for athletes to renew their contracts on terms favorable to
9  Zuffa before their prior contracts expired. There is no evidence in support of Dr. Singer's assertion.
10 ████████████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████
13 ████████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████████
15 ██████████████████████████████████████████████████ This
16 analysis is discussed further in paragraphs 119-23 of my Report.

17 34.   <u>Other aspects of the challenged conduct are pro-competitive</u>: In paragraphs 292-306
18 of my Report, I address other arguments included in Dr. Singer's Challenged Conduct and explain
19 why this conduct is not anticompetitive and, in many cases, enhances competition. For example, Dr.
20 Singer includes counter-programming, the act of scheduling UFC events on the same day as other
21 MMA promoters' events, as part of the Challenged Conduct. Head-to-head competition forces MMA
22 promoters to increase quality and reduce prices in order to attract customers from rivals, and
23 increases consumer choice. This sort of behavior is what the antitrust laws were designed to protect.
24 This issue and other refutations of Dr. Singer's arguments concerning the Challenged Conduct are
25 discussed further in my Report.

1  I declare under penalty of perjury under the laws of the United States of America that the
2  foregoing facts are true and correct. Executed this 6th day of April 2018 in Chicago, Illinois.

_____
Robert H. Topel, Ph.D.