# EXHIBIT 9

# Redacted Excerpts from Deposition of Plaintiff Jon Fitch

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


Cung Le, Nathan Quarry, Jon Fitch )Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vasquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
           Plaintiffs,            )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
           Defendants.            )




VIDEO DEPOSITION OF JON FITCH

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:23 A.M.

and ending at 4:54 P.M.on Wednesday, February 15, 2017




Reported by:
Sarah Padilla, CCR NO. 929
Job No.  296624 Pages 1-257



1    professional fighter.  He fought in -- at Pride.
2    He's friends with Gary Goodrich, former Pride
3    fighter and UFC fighter and Mark Coleman.  And they
4    would come to town and train.  And that kind of
5    piqued my interest.
6        Q   And then it says that after Purdue, you
7    trained at American Kickboxing Academy.  Is that
8    correct?
9        A   Uh-huh.
10       Q   Am I missing anything in terms of --
11       A   No.  Yeah.  I graduated Purdue, and I
12   spent a year as a grad assistant, and a volunteer --
13   I volunteered and I coached wrestling while I
14   started my fight career.  And after a rough start in
15   my career, I realized that wrestling and hitting a
16   heavy bag weren't enough to get where I wanted to
17   be, so I moved to California to get some real
18   training.
19       Q   So how did you find out about American
20   Kickboxing Academy?
21       A   I found out about American Kickboxing
22   Academy because my manager -- who was not my manager
23   at the time -- DeWayne Zinkin was an ex-All-American
24   Wrestler and fan of the sport and wanted to get into
25   the sport and start managing people.  So DeWayne is

1    pretty smart.  He would call colleges and
2    universities with wrestling teams and talk to the
3    coaches, introduce himself, tell them who he was,
4    and ask if they had anybody who was interested in
5    fighting.  And when they called Tom, Tom was like,
6    "I got a guy."
7        So I started talking with DeWayne, and he
8    didn't like my record because I did have a rough
9    stock.  I was like 5 and 2 when I started talking to
10   DeWayne.  And I drove up to Minnesota with Brian
11   Ebersole to see if we would get some fights.  And
12   luckily they had some guys for us to fight.  And I
13   fought twice that night for, I think, like $600, 500
14   and then another 100.
15       And then Sean Sherk was there at the
16   fights and Sean Sherk was represented by DeWayne at
17   the time.  And Sean saw me fight and called DeWayne
18   and said that he should sign me, said I was an
19   animal, and I was tough.  So after that, that night
20   of fights, we made it official that I was
21   represented by DeWayne.  And Crazy Bob was a part of
22   that too.
23       And they at the time were working with
24   Frank Shamrock and Javier Mendes with American
25   Kickboxing Academy.  So I started doing more and

1    more research.  I went out for a week.  The training
2    was great.  And I made the decision to move out when
3    I could.  When my grad -- when my year of grad
4    school was up, I moved.  I had a final on a Friday,
5    and I think I drove out on a Saturday.
6        Q   I'm going to hand you another exhibit, but
7    I'd ask that you keep the interrogatories responses
8    handy because I'll be referring back to them.  So
9    I'm going to be handing you what's now Exhibit 50.
10           (Exhibit 50 was marked.)
11   BY MR. WIDNELL:
12       Q   Does this document look familiar to you?
13       A   This appears to be a printout of my
14   incorrect record on Sherdog.
15       Q   Okay.  That was going to be one of my
16   questions.  Does it look like this is an accurate
17   representation of what Sherdog has on its site?
18       A   It is not.  Because when I first started
19   fighting, there weren't people reporting on all the
20   shows.  So there are shows on here that aren't on
21   here.  There are fights I had in Mexico that aren't
22   on here.  I'm not sure which ones, but I have a
23   total of 41 fights.
24       Q   Okay.  So just to be clear, though, is it
25   inaccurate because what's on Sherdog is inaccurate,

1    or because --
2        A   It is inaccurate because Sherdog doesn't
3    have all of the info.
4        Q   Okay.  So I'll represent to you that this
5    is what I -- I captured from the Internet from
6    Sherdog.  I --
7        A   It may only be only be missing one fight,
8    actually.
9        Q   Which fight do you think?
10       A   There was a fight in Mexico before the
11   Jensen -- well, no, that was -- before the Gabe
12   Garcia fight, I believe, I fought in Mexico, which
13   was --
14       Q   Do you recall who you fought in Mexico?
15       A   It's either -- yeah, I don't remember his
16   name.  Because on my website I have it different.  I
17   have it blank.  I've got a video of it.
18       Q   But you can't remember his name?
19       A   No.
20       Q   So the fights that you were talking about
21   before you left for San Jose, are any of those on
22   this history?
23       A   My first fight with American Kickboxing
24   Academy was Kyle Jensen, which was July 19, 2003.
25       Q   Okay.  So this actually would capture the



1   fights you were talking about right after you
2   graduated from Perdue --
3       A   Yes.
4       Q   -- and you were?
5       A   Uh-huh.
6           MR. DELL'ANGELO:  You have to let him
7   finish the question.
8           THE WITNESS:  Excuse me.  Sorry.
9           MR. DELL'ANGELO:  It's okay.
10  BY MR. WIDNELL:
11      Q   So if you look on the third page, which
12  is -- has earlier fights in your history, about the
13  middle of the page there is a fight -- I may do a
14  horrible job pronouncing names.  I'm going to try to
15  get them right -- Shonie Carter?
16      A   Yes.
17      Q   Who is he?
18      A   Shonie Carter is an international super
19  star.  Shonie Carter, he's a legend.  He's fought a
20  lot of times, maybe a hundred times.  He was a big
21  name when I was coming up.  He fought in the UFC.
22  His famous spinback, his knockout over Matt Serra.
23  He's a well-respected fighter, and he was an elite
24  level fighter at the time I fought him.
25      Q   So do you feel that you were an elite

1   fighter by that point --
2           MR. DELL'ANGELO:  Objection to the form to
3   the extent it calls for a legal conclusion.
4   BY MR. WIDNELL:
5       Q   -- as well as at the time?
6       A   It's difficult to say.  Because I think
7   I'm awesome.  And when I graduated from Purdue, I
8   automatically thought that I was elite.  I was
9   trying to get my coach, Tom Ericson, to get me a
10  fight in Pride for my first fight.  So my opinion of
11  myself and my status over the years goes up and
12  down.  So my personal opinion of whether I was elite
13  before that or not, I mean, it's hard to tell.
14          I knew once I beat Shonie Carter that I
15  was definitely on the radar of people, because when
16  you're an up-and-comer, whether it was back then
17  while I was with UFC or today, if you're trying to
18  make a name for yourself, you're trying to fight UFC
19  veterans.  Those are the guys you want to beat.  You
20  beat UFC veterans, you get more notoriety, you get a
21  bigger paycheck, you get invited to the big show.
22  BY MR. WIDNELL:
23      Q   Thank you.  So I think I heard you say
24  that Shonie Carter was an elite fighter, in your
25  opinion; is that right?

1       A   Yes, at that time.
2       Q   And that's because he had demonstrated
3   that and developed -- well, actually, why was that?
4       A   In my opinion, he was an elite fighter
5   because he fought in the UFC.
6       Q   Is that the only reason he was an elite
7   fighter?
8       A   Not the only reason, but it was a highly
9   qualifying -- I believe the most highly qualifying
10  piece.
11      Q   Okay.  What other factors?
12          MR. DELL'ANGELO:  Object to the form to
13  the extent it calls for a legal conclusion.  You can
14  answer.
15          THE WITNESS:  Well --
16  BY MR. WIDNELL:
17      Q   Let me ask the question slightly more
18  clearly.
19          What other factors would have made him an
20  elite fighter at that time?
21          MR. DELL'ANGELO:  Same objection.
22          THE WITNESS:  So the fact that Shonie was
23  a UFC vet made him an elite-level fighter.  But if
24  he had never fought in the UFC, he still would have
25  been an elite fighter because he also had

1   demonstrated a high level of skill at an amateur
2   level in wrestling and other martial arts, and he
3   showed a lot of skill on other smaller scale shows
4   in multiple disciplines.  He fought kickboxing
5   Sanshou boxing, multiple things.  So he demonstrated
6   in other ways and built his notoriety outside of the
7   UFC to make himself elite.  But if he had only
8   fought in UFC, he still would have been considered
9   elite.
10  BY MR. WIDNELL:
11      Q   So just by fighting in the UFC, you're an
12  elite fighter?
13      A   I believe, yes.
14      Q   Okay.  So do you believe that all UFC
15  fighters are therefore elite?
16      A   By that definition, I believe so, yes.
17      Q   Are there any other organizations that you
18  can fight in that make you elite?
19          MR. DELL'ANGELO:  Object to the form to
20  the extent it calls for a legal conclusion.
21          THE WITNESS:  It is my personal opinion
22  that no other organization gives you that notoriety
23  to pull you into an elite status just because you
24  fought for them.  But the UFC does do that.
25

MAGNA
LEGAL SERVICES

1  BY MR. WIDNELL:
2      Q   So going back in time, if you look at WEC
3  before it ceased to exist as a separate entity, were
4  WEC fighters elite simply by fighting in WEC?
5          MR. DELL'ANGELO:  Object to -- objection
6  to the form to the extent it calls for a legal
7  conclusion.  It calls for speculation.  You can
8  answer.
9          THE WITNESS:  I would -- it would
10 definitely have to be speculation, because WEC
11 existed for a long period of time.  They were going
12 to shows at Apache Palace for a long time.  They'd
13 do ten-hour long shows.  You'd be there 3:00 in the
14 morning.  It was at an Indian reservation.
15         So would you consider WEC fighters elite?
16 It depends on what time period you're talking about.
17 If you are talking about the year or two runup
18 before UFC bought them, then they're starting to get
19 there.  When UFC bought WEC, I would say
20 definitively those guys became UFC elite fighters
21 once the UFC bought them.
22     Q   Okay.
23     A   Because in my eyes and the fans' eyes and
24 the media's eye, that legitimized them in the weight
25 classes.

1      Q   Okay.  How about Pride?
2          MR. DELL'ANGELO:  Objection to the form to
3  the extent it calls for a legal conclusion and it
4  calls for speculation.  You can answer.
5  BY MR. WIDNELL:
6      Q   Actually, let me just make it really
7  clear.  With respect to Pride, would you say that if
8  you fought in Pride, you were an elite fighter?
9          MR. DELL'ANGELO:  Objection to the form to
10 the extent it calls for a legal conclusion and for
11 speculation.
12         THE WITNESS:  Again, yeah, it's a lot of
13 speculation, because there's -- things change,
14 different time periods throughout the sport.  The
15 answer to that question at different times in the
16 timeline is different.  It's like a lot of the
17 statements I'm making now are statements from my
18 opinion now.  It's my opinion now that, looking
19 back, anybody who fought for UFC was immediately an
20 elite status because I can look back and see the
21 reaction of the people around them and what
22 notoriety that gave them.
23         But at the time, when Pride was still on
24 par with UFC or actually doing better than UFC, it
25 might have been even more prestigious to be a Pride

1  vet than a UFC vet.  But that switched once the
2  power kind of shifted.
3  BY MR. WIDNELL:
4      Q   And when did the power shift?
5      A   Power started shifting with the buyouts,
6  when UFC started buying up everything and
7  eliminating all their competition.
8      Q   So I just want to make sure I understand.
9  So UFC acquired Pride in around 2007.  Would you say
10 that before 2007 fighters in Pride were elite --
11         MR. DELL'ANGELO:  Objection.
12 BY MR. WIDNELL:
13     Q   -- by fighting in Pride?
14         MR. DELL'ANGELO:  Objection to the form to
15 the extent it calls for a legal conclusion.
16         THE WITNESS:  It is difficult to say
17 because Pride grew and started Bushido, which was
18 the lightweights.  So they had more athletes and --
19 I mean, it's not enough.  It wasn't enough.  You had
20 to have some amateur stuff.  You had to have had
21 multiple wins in Pride, whereas just being on the
22 card on the UFC was enough to put you in that
23 status.
24         I have guys, a jiujitsu guy I was working
25 with, his only goal was to fight in the UFC once,

1  because he could then put that on his credentials as
2  a teacher and charge more.  It raised his notoriety
3  just to have "UFC veteran" on his credentials.  It
4  didn't matter if he won or lost or sucked or
5  anything.  If he just had that credential, he
6  immediately got a huge pay bump from his students.
7  But I've never seen any other organization give that
8  power to anyone.
9  BY MR. WIDNELL:
10     Q   Okay.  So Pride didn't have that power?
11     A   No.
12     Q   Is it fair to say that some fighters in
13 Pride were elite?
14     A   Yes.
15         MR. DELL'ANGELO:  Objection to the form to
16 the extent it calls for a legal conclusion.
17         THE WITNESS:  Yes, in my opinion, because
18 there are multiple ways to become elite other than
19 just fighting for the UFC.  Your amateur history and
20 your display of talent in other sports, your
21 notoriety, Pride especially, they had freak show
22 fights sometimes, and those were notoriety fights.
23 You put a 400-pound guy versus a 150-pound guy, it's
24 a freak show fight, but that notoriety that they had
25 to get into that fight made them elite.



1 BY MR. WIDNELL:
2    Q   Okay.
3    A   Well, no.  I wouldn't say it made them
4 elite.  Because in Pride you kind of had to -- you
5 had to win.  You had to win to maintain elite
6 status.  If you just got beat up all the time, it
7 wouldn't work so great.  But UFC, they're the only
8 ones that just getting that one fight for them
9 changes things.
10   Q   So would you say Kimbo Slice is an elite
11 fighter?
12       MR. DELL'ANGELO:  Object to the form to
13 the extent it calls for a legal conclusion.
14       THE WITNESS:  Again, under my definitions
15 of an elite fighter, he was, because he built
16 himself up to a place of notoriety far exceeding
17 people who may have a higher skill set in fighting
18 than him.  Kimbo, I believe his last fight before he
19 passed away is the most viewed fight ever, most
20 viewed MMA fight.  I'm kind of guessing at this, but
21 I think his numbers, more people have watched that
22 fight than any other fight in the history of the
23 sport.
24       So I would have to say, yeah, that guy's
25 an elite-level fighter just because of that

1 notoriety.  If you go down the street and ask
2 different people a list of different fighters,
3 chances are Kimbo is the name they're going to
4 recognize.
5 BY MR. WIDNELL:
6    Q   So we're talking about Pride, how about
7 K-1?  If you fought in K-1 would that make you
8 elite?
9        MR. DELL'ANGELO:  Objection to the form to
10 the extent it calls for a legal conclusion.
11       THE WITNESS:  Again, going back to what I
12 said before, one of the ways to become elite is to
13 fight in the UFC.  The other way is notoriety and
14 amateur and small regional performance.  If you're
15 an awesome Olympic wrestler and you have some
16 notoriety, your first fight could be with a big
17 organization and you'd be elite.  In order to
18 maintain elite status, you have to win, you have to
19 continue winning and you have to maintain your
20 notoriety.  And that is usually done through
21 winning.
22 BY MR. WIDNELL:
23   Q   Yeah, that's a good point.  I should have
24 asked before going on to K-1.  So I think if I heard
25 you correctly, if you have a winning record in

1 Pride, does that make you elite?
2        MR. DELL'ANGELO:  Objection to the form to
3 the extent it calls for a legal conclusion.
4        THE WITNESS:  No, that's not what I'm
5 saying.
6 BY MR. WIDNELL:
7    Q   Okay.
8    A   I'm saying that if you fought in Pride or
9 another one of those organizations, you'd have to --
10 because they would be the critical lower-level shows
11 we're talking about, you would have to perform well
12 in that lower-level show.
13   Q   So what does performing well mean?  That's
14 what I am trying to understand.
15   A   That's a difficult question.  That's kind
16 of speculation because everyone has their own
17 opinion of what performing well is in this sport.
18 In my opinion, performing well is winning.
19   Q   So but I just asked if a winning record at
20 Pride was enough, and it sounded like you weren't --
21   A   It wasn't, but you had to have a winning
22 record.  Because, like, my friend Phil Baroni might
23 not have had a winning record over there, but he may
24 win one, lose two, win one, lose two type of things
25 where he's still competitive.  He's still

1 competitive with the other elites, which makes him
2 elite.
3    Q   I see.  So is it fair to say that if you
4 have a winning record for a certain number of fights
5 at an organization -- at an organization like Pride,
6 that you are an elite fighter?
7        MR. DELL'ANGELO:  Objection to the form to
8 the extent it calls for a legal conclusion.
9        THE WITNESS:  Not necessarily.  There's so
10 many factors that can go into it.  But I find it
11 would be difficult to win a bunch of fights in one
12 of the top tier organizations and not be considered
13 elite.  Because if you're winning a lot of fights in
14 Pride or another show with comparable eyeballs on
15 it, your notoriety is going to rise.  You know,
16 people like winners.  They're going to watch
17 winners.  If you're a winner, people are going to
18 come back and watch you.  So under that notoriety
19 balance that's going on there, yeah.
20   Q   Okay.  So you just used a term that I
21 would really like to understand.  You said "top tier
22 organizations."  What do you mean by a top tier
23 organization?
24   A   Top tier, well, there's the UFC which
25 controls like 90 percent of the market, and then



1   everybody else controls small-time percentages.  So
2   you have like Pride, Strike Force, whoever
3   underneath the top UFC.  And the reason is, with the
4   contracts, they control the contracts and they keep
5   the better fighters to themselves, which allows --
6   which doesn't allow growth in the smaller shows.
7       Q   Okay.  So you said that UFC controls
8   90 percent of the market.  What's your basis for
9   saying that?
10      A   Well, I'm not an economist, but the things
11  that I've read online point to them numerically
12  controlling a large 90-percentile portion of the
13  market.
14      Q   And what --
15      A   Again, I'm not an expert.  I'm not an
16  economist.  So I don't really know what I'm talking
17  about with that.  That's just stuff I've read.  I
18  could do a Google search for you.
19      Q   Can you give me JUST an example of what
20  you've read online that -- is it trade press
21  articles?
22      A   I have just -- just there have been things
23  mentioning how much the companies are making per
24  year, what's the profit ratio per year.  Nobody's
25  anywhere near what UFC is bringing in.

1       Q   Okay.  So you recall seeing reporting on
2   what the different organizations were making in
3   terms of revenue -- is that?
4       A   Yeah.  There have been some reports on the
5   revenue.
6       Q   Okay.  And do you recall any specific
7   place where you saw this?
8       A   Not specifically, no.
9       Q   Okay.  Thank you.  Can you give me an
10  example of other top tier organizations?  I think
11  you mentioned Pride.  I think you mentioned Strike
12  Force.  Are there others that you would describe as
13  being a top tier organization?
14      MR. DELL'ANGELO:  Objection
15  mischaracterizes the witness's testimony.
16  BY MR. WIDNELL:
17      Q   Okay.  I apologize, actually.  Maybe I
18  misheard that.  I think you just said something.
19  You referenced Pride and Strike Force in connection
20  with top tier organizations.  Would you consider
21  Pride to have been a top tier organization at the
22  time it existed?
23      A   The -- I believe that Pride was a
24  competitor.  They were actually competing with the
25  UFC at the time of acquisition.

1       Q   What do you mean by "competitor"?
2       A   That they had a lot of the big names
3   signed.  They had people watching the show, people
4   talking about them, people arguing about which
5   fighters are better, you know, UFC's or Pride's
6   champ.  And then UFC got rid of them by buying them
7   off, all of their champs, bought all of their top
8   guys up.  That's one reason why they bought them
9   because they were top tier.  They couldn't allow
10  another top tier organization to hang around, cut
11  into their profits.
12      Q   So it sounds to me like you're saying that
13  Pride was competing with UFC for fighters.  Is that
14  fair to say?
15      A   Yes.  Yeah.  Fighters, MMA fighters,
16  athletes compete for belts and titles.  Promoters,
17  event hosts they compete for the athletes so, yes.
18      Q   Okay.  So athletes that would consider
19  going to UFC to fight for UFC would have thought of
20  Pride as being a reasonable substitute; is that
21  accurate?
22      MR. DELL'ANGELO:  Objection.  Calls for
23  speculation, and to the extent it seeks a legal
24  conclusion.
25      THE WITNESS:  I, yeah.  It would have to

1   be speculation on my part, but I can go from my
2   experience.  I signed with UFC in 2005.  And it was
3   not an option for me because in 2005 I do not
4   believe Bushido was around, and Pride did not have
5   my weight class.  I would have had to have tried to
6   put on, like, 30-pounds to fight over there.  And
7   I -- I didn't want to do that.  But my only option
8   was the UFC.  I had nowhere else to go.
9   BY MR. WIDNELL:
10      Q   Okay.  But would you say -- I mean, you
11  said that Pride competed for fighters.  Would you
12  say that they were fighters that would consider
13  going to UFC and also going to Pride?
14      MR. DELL'ANGELO:  Objection.  Calls for
15  speculation.
16      THE WITNESS:  Again, it would have to be
17  speculation, but if you were a 205-pounder to heavy
18  weigh, there was reason to give pause to decide
19  which organization to go to.
20  BY MR. WIDNELL:
21      Q   Okay.  And is that because your
22  understanding is that Pride offered a comparable
23  opportunity for fighters to UFC?
24      MR. DELL'ANGELO:  Objection.  Leading.
25  You can answer.



Page 70

1    A   Zinkin Entertainment has handled all of my
2  fight-related contracts since I signed with them in
3  2002.
4    Q   Okay.  At the time that you were
5  contracting for the Brock Larson fight, who would
6  you have dealt with at Zinkin Entertainment?
7        MR. DELL'ANGELO:  Objection to form.
8        THE WITNESS:  Who would I have dealt with
9  at Zinkin Entertainment?  The person I would have
10  talked to is Crazy Bob.  Robert Cook would have been
11  the number one person, but DeWayne.  I've also
12  talked to DeWayne extensively.  So it's pretty much
13  those two, and then, yeah, DeWayne's brother is a
14  lawyer and the family has a family business, so they
15  use some of their resources and assets from their
16  family business with the management.
17  BY MR. WIDNELL:
18    Q   So how would contracting play out for you?
19  I'm really just trying to understand the process.
20  You know there's interest or you hear from your
21  manager that there's interest to potentially go
22  fight for the UFC.  What happens after that?
23        MR. DELL'ANGELO:  Objection to form.
24        THE WITNESS:  Okay.  So typical breakdown
25  of how you got your UFC fights.

Page 71

1  BY MR. WIDNELL:
2    Q   Okay.
3    A   Crazy Bob would call you and say, "Joe
4  Silva as an opening.  Take it or leave it."
5    Q   Okay.  And then you make a decision about
6  whether to take it or leave it?
7    A   Yup.
8    Q   Let's say you decide you want to take it.
9  What happens after that?
10    A   You -- for me I signed the bout agreement,
11  promotional agreement, signed the bout agreements,
12  and then fought.
13    Q   So how did you get the promotional
14  agreement and the bout agreement, just in a can --
15    A   I'm sorry.  I don't know if I remember if
16  I got an extended promotional agreement.  I might
17  have.  I can't remember.  I can't remember.  Because
18  it was just one fight, it might have just been the
19  bout agreement.
20    Q   Okay.
21    A   I don't know if I signed a promotional
22  agreement, necessarily.  I don't remember.
23    Q   Okay.  We can get to what the contracts
24  are exactly, but what I'm after really is just the
25  mechanics of it, who would have -- who would have

Page 72

1  sent you whatever agreement you signed?  Would it
2  have been someone at Zinkin Entertainment?
3    A   Yes, Crazy Bob would have e-mailed me,
4  sent it to me like that.
5    Q   Okay.  When you get the agreement --
6    A   Or he would have -- a lot of times what
7  Bob did was not great technically.  He would just
8  bring the contracts in.  He'd have them printed out,
9  and he would get them printed at practice and he
10  could go to the office and fax them out from the
11  office.
12    Q   Okay.  So when you say bring the contracts
13  in, into?
14    A   Into the gym in physical printout form.
15    Q   Would this be AKA?
16    A   Yes.
17    Q   So at that point you were at AKA, he would
18  have come to the gym with the contracts?
19    A   Yes.  That was fairly usual procedure,
20  yeah.
21    Q   And when he brought the contracts to you,
22  did you talk with him about the contracts?
23    A   Not really, because the contracts were
24  take it or leave it.  So everybody knew that
25  already.  Bob had 30 other guys in other

Page 73

1  organizations all over the place.  He'd seen
2  everybody's promotions contract and seen what's
3  going on.  And it was, you want to make money, you
4  sign it.  That's the only way; there's nowhere else
5  to go.
6    Q   So you had no option at all in terms of
7  changing the contract, as far as you knew?
8    A   There's no real wiggle room, especially
9  when you don't have any notoriety and you're just
10  getting in.
11    Q   As you became a more experienced fighter
12  and had fought for the UFC for a longer period of
13  time, does that change?
14    A   When I had fought for them and started
15  winning, Bob would be able to negotiate slight
16  incremental pay increases when the -- the re-up, the
17  resigning contracts would come through.  Like, you
18  got one fight left, they would send a new set of
19  contracts and Bob would have minimal ability to
20  negotiate pay increases.  They're usually only a few
21  thousand dollars increase.
22    Q   Okay.  So --
23    A   So it wasn't really a negotiation.  It's
24  pretty standardized across the board for all the
25  fighters to get the same basic pay.



Page 74

1    Q   The basic pay increase, do you mean?
2    A   Yeah. But they're fairly simple, like
3  the starting amount's like 5,000 with dollar bumps
4  in between wins and reduced to like 3,000. And I
5  don't even know where they're at now.
6    Q   Okay.
7    A   That's the only reason I made so much is I
8  won all the time.
9    Q   Okay. So would your contracts have been
10  -- your contracts, would they have been different
11  from other fighter who didn't win as much as you
12  did?
13    A   The fighters who did not win as much as me
14  would not have gotten pay bumps. Because you have
15  to win to get a pay bump. So if you didn't win as
16  much, you weren't going to make as much as me.
17    Q   Is it your --
18    A   But the language of the contracts is the
19  same.
20    Q   Is it your understanding that if you had
21  won the same number of times, regardless of what
22  kind of fighter you are, you would have the same pay
23  bumps?
24    A   Not necessarily, because there is no
25  meritocracy in the sport. It's kind of hit or miss.

Page 75

1  They like somebody, they pay them more. If somebody
2  is more agreeable to do things outside of their
3  contract, they pay them more. If you're a good
4  company boy, you do what you're told, you get better
5  options, you get more.
6    Q   So is it your understanding that there's a
7  significant variation in terms of what different
8  fighters are paid?
9    MR. DELL'ANGELO: Objection to form.
10  Misstates the witness's testimony.
11    THE WITNESS: I wouldn't say that. No.
12  I'd say we have pretty standardized treatment in
13  contract across the board, yet there is like a
14  .00001 percent of the fighters who get maybe special
15  treatment.
16  BY MR. WIDNELL:
17    Q   Okay. And what is that special treatment?
18    A   More title shots, the ability to lose more
19  fights without being released, more opportunities to
20  make money through sponsors and doing paid
21  appearances rather than free appearances where you
22  only get $50 per diem.
23    Q   Are there other examples of special
24  treatment in your mind?
25    A   Certain fighters would get better airline

Page 76

1  flights, better hotels. Certain fighters had
2  trainers or part of their training camp paid for my
3  by Zuffa. I remember recently there was something
4  that was quite public about them paying to help a
5  guy lose weight for a fight.
6    Q   So it sounds to me like you're saying all
7  those kinds of special treatment were things that
8  weren't given to every fighter, it was just fighters
9  who Zuffa liked; is that your understanding?
10    MR. DELL'ANGELO: Object to the form.
11  Mischaracterizes the witness's testimony.
12    THE WITNESS: No. It's more along the
13  lines of if you grumbled or complained or fought
14  them on anything, they would punish you. They would
15  punish you. They would give you the feeling that if
16  you questioned them or didn't just say yes, that you
17  would get put on the bench and not get to fight.
18  You would get cut after one loss. You would just
19  not get any preferential treatment at all. You'd
20  get the earliest morning interviews, like stuff
21  that's not really tangible to measure, but there's
22  things that you can feel through their actions.
23  BY MR. WIDNELL:
24    Q   Did that happen to you?
25    A   I believe so, yeah. I was ranked No. 2 in

Page 77

1  the world independently, which can't -- which is a
2  difficult thing to measure. For a long period of
3  time. I won 14 fights in a row before I fought for
4  a title. And I won another five, and they weren't
5  looking to give me another title shot any time soon
6  just because they knew I fought them on things.
7  They didn't want me to have the title because I
8  would have fought them like McGregor is giving them
9  a hard time now.
10    Q   So you were punished because you fought
11  them on what kind of things.
12    A   Mostly -- one of the things I complained
13  about was there's the no meritocracy, there's no
14  merit system. Winning doesn't mean anything for
15  them, and that is not a sport. You know, it's pro
16  wrestling. It doesn't matter if you win or lose.
17    Q   So how did you fight them with respect to?
18    A   Just --
19    MR. DELL'ANGELO: Wait until he's
20  finished.
21  BY MR. WIDNELL:
22    Q   I apologize I thought that pause meant
23  that you finished, but if you were still saying
24  something, please continue?
25    A   Go ahead. Now I forget what I was.



20  (Pages 74 to 77)

Page 78

1    Q    So you said you fought them and one of the
2  things you fought them on was that there was no
3  meritocracy; is that correct.
4    A    Yeah.  And to say we fought, it's not like
5  we sat in the room and battle it over.  It's
6  through the press, through interviews and media,
7  giving my open and honest opinion.  That was frowned
8  upon, keep your mouth shut and fight.
9    Q    So can you give me an example of something
10  you said in the press?
11    A    Just calling for title shots.  I had to
12  win eight fights in a row without losing in the UFC
13  to get a title shot.  No one has ever had to do that
14  before.  No one had to win that many fights to get a
15  title shot.  It was 14 undefeated -- or I had 14
16  wins before in a row before I got to the UFC.  So
17  there was -- there was -- if there was a merit
18  system in place, I would have been granted multiple
19  title shots.
20    Q    And because you -- so I think you said
21  that because you spoke about that, then you were
22  punished; is that right?
23    A    Yeah.
24    Q    Okay.  Can you give me an example of how
25  you spoke out about that?

Page 79

1    A    Like I said, just interviews, you know, if
2  I'd get interviewed, I'd speak my mind, I didn't
3  keep mouth shut.
4    Q    Was there anything else -- so how did you
5  know that that's why you were being punished?
6    A    Because I was winning.  I was poplar.  I
7  had a big following.  There was no reason for me not
8  to get title shots and get accolades and get pushed
9  into the public other than they didn't like me or
10  they had a problem with me and the contracts or what
11  I was doing.
12    Q    Did anyone actually -- did anyone at Zuffa
13  specifically tell you that you were being punished
14  because of how you were speaking out?
15    A    Over that, no.
16    Q    Okay.
17    A    The obvious thing I was punished over that
18  they did speak out about -- publicly about, was
19  being fired for refusing to sign the video game
20  rights agreement for my image and likeness forever
21  for zero dollars.
22    Q    Okay.  Is there anything besides the video
23  game instance where they actually spoke to you and
24  communicated to you that you were unhappy with
25  something that you had done?

Page 80

1    A    I received --
2      MR. DELL'ANGELO:  Objection to the form.
3  You can answer.
4      THE WITNESS:  I had received an e-mail
5  once from Joe Silva threatening me about something I
6  said in an interview.
7  BY MR. WIDNELL:
8    Q    Do you recall when you received that
9  e-mail?
10    A    It was sometime before I fought Luigi
11  Fioravanti because they were pulling me in -- or it
12  was I fought on a main card, and then they put me
13  back on the under card and I complained about it.
14  And when I complained about it, Joe Silva sent me a
15  one sentence e-mail said something like "This isn't
16  helping you."  Kind of like, I mean, "You speaking
17  like this sent helping your situation."
18    Q    And you interpreted that e-mail to
19  suggestion --
20    A    It was a threat.
21    Q    -- that they would have punished you, or
22  as a threat?
23    A    That was a threat.  I took it as a threat.
24  Everyone I showed it to took it as a threat.
25    Q    Who did you show it to?

Page 81

1    A    My management; some teammates.
2    Q    Which teammates?
3    A    Thomson, Josh Koscheck, then a couple guys
4  probably would have seen that.  It was a long time
5  ago, though.  I don't remember.  They have their own
6  stories.
7    Q    Is there anything else that you did where
8  someone communicated to you from Zuffa that they
9  were unhappy with what you had done?
10      MR. DELL'ANGELO:  Objection to the form.
11  Overbroad.  Vague.
12      THE WITNESS:  Other than public
13  statements, no, not really anything personal.  You'd
14  have to probably also talk to management about that
15  also.  Because I made sure to -- I tried to always
16  make sure to keep a barrier between me and
17  promoters, because that's what the manager's
18  supposed to do.  He's supposed to be the in between.
19  There shouldn't be a direct connection between the
20  fighter and the promoter, which another tactic that
21  the UFC does a lot is they try to get in between the
22  manager and the fighter and talk to the fighters
23  directly, which usually ends up in bad situations
24  for the fighter.
25



Page 82

1    BY MR. WIDNELL:
2        Q    Okay.  So did anyone as Zinkin tell you
3    about communications they had had with Zuffa that
4    indicated that Zuffa was unhappy with something you
5    had done?
6        A    No.  Not that I can remember, but I'm not
7    ruling it out.
8        Q    So how in your mind were your punished by
9    Zuffa?
10       A    I was fired for not wanting to sign a
11   contract for no money forever.
12       Q    That was the video game incident, isn't
13   it?
14       A    Yup.
15       Q    Okay.  Were there other instances where
16   you were punished by Zuffa?
17       A    Other than -- nothing that is like a
18   blatant measurable thing.  They used a number of
19   different tactics in order to create enough power to
20   reign over us and instill fear over us with minor
21   comments.  You know, trying to get us to perform for
22   them before the fights in their prefight speeches.
23   You know, there were threats there.  If you don't
24   fight a certain way, you're not going to be
25   rewarded.

Page 83

1        Q    So can you give me an example of that?
2        A    Before the fights, Dana would always pull
3    all the fighters into a room without manager
4    management or the corner, just fighters and him and
5    his security.  And he would give a speech about how
6    we're all in this together, and then somewhere in
7    throughout that, there would be a minimal threat
8    about leaving it all in the cage and, you know,
9    putting on a show or whatever.  If you couldn't live
10   up to that, there would be -- you wouldn't get
11   the -- you wouldn't get the good stuff, which wasn't
12   necessarily a threat, but it's do it the way we want
13   you to do or you're not going to get anything.
14       Q    So what was the way that Zuffa wanted you
15   to do it?
16           MR. DELL'ANGELO:  Objection to the form.
17           THE WITNESS:  Whatever their opinion on
18   what sold their fights, they wanted, right, they
19   didn't care, well, I don't know how to -- I mean,
20   they wanted stand-up fights.  They wanted Muay Thai.
21   They wanted Muay Thai with small gloves.  Guys who
22   wrestled too much, guys who didn't fight their style
23   that they liked wouldn't be given certain
24   opportunities.  They wouldn't be allowed to progress
25   and fight the next toughest guy.

Page 84

1    Demian Maia is in a position right now he
2    should be fighting for title, but since they don't
3    like his fighting style, he's being punished and not
4    given a chance to fight for title.
5           And that sends a clear message to every
6    other single fighter in the world, that if you're a
7    ground-based fight, you will not succeed on the same
8    level in UFC, not because you're not good enough and
9    you can't beat the guys at the top, but because they
10   just don't like that style.
11   BY MR. WIDNELL:
12       Q    Do you know why they don't like that
13   style?
14           MR. DELL'ANGELO:  Objection to the form.
15   You can answer if you know.
16           THE WITNESS:  They don't understand it.
17   They're not good at it.  I don't know.
18   BY MR. WIDNELL:
19       Q    So it's never been communicated to you why
20   they don't like the style that you are describing, a
21   ground -- what did you call it?
22       A    A ground-oriented-type fight.
23       Q    Okay.  And would that be more wrestling?
24       A    More wrestling, grappling based, dimension
25   based.

Page 85

1        Q    Rather than standing up and --
2        A    Rock'em Sock'em Robots.
3        Q    So no one at Zuffa has ever explained to
4    you why they have a preference for one style over
5    another?
6           MR. DELL'ANGELO:  Object to form.
7    BY MR. WIDNELL:
8        Q    Did anyone at Zuffa ever explain to you
9    why they have a preference for one style over
10   another?
11       A    No.  They never -- I never had
12   conversations with somebody from Zuffa explaining to
13   me why I was not getting benefits because of my
14   style.  I never had that conversation.
15       Q    Has anyone at Zuffa ever made a public
16   statement that you recall that explains why they
17   prefer one style over another?
18       A    I think Dana has made statements.  He's
19   called things boring.  He doesn't like certain
20   things.  But I think that's his opinion.  And he
21   pushes his opinion a lot of times.
22       Q    So we're talking about the ways that you
23   had been punished.  We talked about the video game
24   incident.  And then I think you said that there were
25   subtle ways that you interpreted as threats.  Is


MAGNA
LEGAL SERVICES

1  that accurate, that description?
2      A    Threats, fear, intimidation type of
3  things.
4      Q    So can you give me an example of that kind
5  of threat?
6          MR. DELL'ANGELO:  Objection.  Asked and
7  answered.
8          THE WITNESS:  Yeah, I've answered that.
9  BY MR. WIDNELL:
10     Q    So we talked about how Dana would get the
11  fighters together before an event and say that he
12  preferred a certain style over another.  Was that
13  the only example -- is that the only kind of threat
14  that he made?
15     A    I mean, no.  There is just little things,
16  things he makes in public statements, the fights he
17  gives to certain people, the place on the -- your
18  place in the pay-per-view lineup, whether you fight
19  on the pay per view or you fight on the TV card,
20  whether you get sent overseas, the opponents you get
21  matched up against.  One of the ways they punished
22  me a lot of the times is they found me the toughest
23  guy they could find that nobody had ever heard of
24  before.
25          So they took really tough amateur-type

1  guys, but the crowd didn't know who they were.  It's
2  a lose-lose fight for somebody with notoriety.
3  Because if you don't go in there -- if you go in
4  there and completely beat the guy up, fine, you were
5  supposed to.  They didn't know who the other guy
6  was.  You go in there and you win, but you don't
7  destroy the guy, oh, you suck now because you didn't
8  destroy a guy with no name.  Or you lose, you lose
9  to a guy who has no name, and now your notoriety and
10  your value drops immensely.  They may even cut you
11  because you lost.
12          So that is one of the most subtle ways
13  that they really put fear into people, is they
14  control your destiny.  They control who you fight,
15  when you fight, and how much you fight for.
16     Q    So which guys in your fight history fit
17  that category of really tough guys that nobody knew
18  about?
19          MR. DELL'ANGELO:  At the UFC?
20  BY MR. WIDNELL:
21     Q    At the UFC.  Well, I assume it's at the
22  UFC since --
23          MR. DELL'ANGELO:  Just want to be clear.
24          THE WITNESS:  Well, my first fight, Brock
25  Larson, I hadn't done anything to irritate them yet.

1  BY MR. WIDNELL:
2      Q    Did you have notoriety at that point?
3      A    I did, enough to almost make it onto the
4  Ultimate Fighting television show.  I had enough
5  notoriety.
6      Q    So let me just ask a quick question about
7  that.  Would you say if you made it onto the
8  Ultimate Fighting show, that that makes you an elite
9  fighter?
10          MR. DELL'ANGELO:  Objection to form to the
11  extent that it calls for a legal conclusion.
12          THE WITNESS:  Man, I don't like it.  It's
13  an opinion, I don't like it.  But in a sense, like I
14  said, if you get that rubber stamp, it doesn't
15  necessarily make you elite to be on the show.  But
16  if you win the show and you fight for the UFC, like
17  I said that rubber stamp, I'm a UFC veteran.
18  BY MR. WIDNELL:
19     Q    Yeah.  That's the distinction I'm trying
20  to get at.
21     A    Yeah.
22     Q    So if you fight for the UFC --
23     A    So being on the show, maybe not.
24     Q    Maybe not?
25     A    Yeah.

1      Q    Okay.
2      A    If you fight on the show and you lose and
3  you don't get the contract, maybe not.  But that
4  show may give you the ability to raise your
5  notoriety, you fight at a smaller show and your
6  notoriety gains some more, and then you get the --
7  then you get the call.
8      Q    Okay.  And in your case, the fact that you
9  were being considered for the show meant that you
10  had the kind of notoriety that made you an elite
11  fight; is that correct?
12     A    Yeah.  Especially since it was the first
13  show.  It's different, though.  It's different now.
14  That first show, if you look at the level of
15  experience and competition to all the guys who were
16  on that show, they had all been around a long time.
17  You know, there were no newbies on that show.
18  Everybody there had ten fights or so.
19     Q    So is it fair to say that in that first
20  show they were all elite fighters?
21     A    It's a little different.  The first maybe
22  two or three, I can't remember, and they even had a
23  come-back show, and those were old guys that had
24  fought in the UFC before.  But, yeah, it's a sliding
25  scale.  Because now it's less experienced guys



1  that company by going with them to do the UFC game.
2      Q   And were you in the video game?
3      A   Yes.
4      Q   And when did you first find out about the
5  video game?
6      A   I don't -- I do not recall at this moment.
7  It was -- yeah, because we had -- the merchandising
8  agreement had come out already, and a lot of gyms
9  and a lot of people had had it, but nobody was
10  signing it yet.  And then sometime after my fight
11  with Georges St-Pierre, they sent the video game
12  agreement to be signed and --
13      Q   So sometime in the fall of 2008?
14      A   Yes.  And then that can be seen by when
15  they released me from my contract.  That was
16  probably a day or two after I got the video game
17  agreement and said I wouldn't sign it.
18      Q   Okay.
19      A   And I asked for -- the only thing I asked
20  for was an extension.  I wanted the agreement to end
21  in 20 years, and that was it.  I didn't ask for any
22  money; I didn't ask for anything.  I just said, can
23  this not be forever.  I just want my image and
24  likeness back in 20 years.  I don't know what
25  technology's going to be like.  I don't know if I'll

1  be in a position to do a video game on my own in 20
2  years.  I'd like to be able to own my own image and
3  likeness at that time.  And they said -- excuse my
4  expletive -- but "F" you.  You're done.
5      Q   Okay.  So let me just go back to the video
6  game itself.  Do you know when you were first
7  incorporated into the video game?  How did that
8  process work?
9          MR. DELL'ANGELO:  Objection to the form.
10  Compound.
11          THE WITNESS:  I had -- I don't really
12  understand -- I don't remember.
13          MR. DELL'ANGELO:  You've answered your
14  question.
15  BY MR. WIDNELL:
16      Q   I see.  Let me start out.  How did they
17  get your likeness incorporated into the video game
18  itself?
19          MR. DELL'ANGELO:  Objection to the form.
20          THE WITNESS:  I'm not sure I understand
21  the question.
22  BY MR. WIDNELL:
23      Q   So you said you were in the video game; is
24  that right?
25      A   Uh-huh.

1      Q   So your likeness was incorporated into the
2  video game, there was a character that looked like
3  you; is that right?
4      A   Correct.
5      Q   How did they make the character look like
6  you?
7          MR. DELL'ANGELO:  Object to the form.  You
8  can answer if you know.
9          THE WITNESS:  I'm not sure the technical
10  ways.  I'm not a video game programmer.  But I do
11  remember them taking pictures of my tattoos and my
12  face --
13  BY MR. WIDNELL:
14      Q   Okay.
15      A   -- for that first video game.  I think
16  they did one or two other video games.  And one of
17  the times they did an actual like mapping thing.
18      Q   Okay.
19      A   Yeah.
20      Q   So I believe I've seen a YouTube video
21  where you say that that occurred before the Diego
22  fight.  Does that sound right to you?
23      A   Might have been, yeah, might have been
24  that they started doing captures, I think, maybe for
25  that.  I can't remember, because that could have

1  been -- I don't know if that was for the video game
2  or if that was for the action figure.  That video
3  capture or whatever they were doing might have --
4  for Diego Sanchez might have been the action figure.
5  Because I know the action figure came before the
6  video game.
7      Q   In the YouTube video you described
8  standing with your arms out and having pictures
9  taken of you.  Does that sound like the process that
10  they used to capture your likeness for the video
11  game?
12      A   It sounds like it.  I think they also did
13  that for the action figures too, though.  I can't
14  remember if it was the same thing.  If they did the
15  video capture, if they did all the video capture
16  stuff at once, because they needed our tattoos and
17  our face and our other things for the dolls too.
18      Q   Yeah, in the -- in the YouTube video you
19  talk about the video game and that it was for the
20  video game.
21      A   Uh-huh.
22      Q   But that would be the Diego Sanchez fight;
23  is that right?  That you would have been referring
24  to if you said Diego fight?
25      A   That seems right.  I do remember there



Page 158

1   were other pictures taken there too.  There was some
2   coach book that we had to do pictures in the parking
3   lot before that too.
4      Q   Okay.  So it sounds like you may have been
5   involved in some of the prep work for the video game
6   as early as the fall of 2007.  Does that sound right
7   to you?
8         MR. DELL'ANGELO:  Object to the form.
9         THE WITNESS:  I mean, I guess so.  Yeah.
10  BY MR. WIDNELL:
11     Q   And in terms of how the video game itself
12  came out, were you happy with it?
13     A   No.  I didn't get paid.  I got fired.  I
14  got bullied.  I got my image and likeness taken away
15  from me forever.  I can't do video games now.  No.
16  I was not happy with the video game at all.
17  BY MR. WIDNELL:
18     Q   I meant the video game itself, not how you
19  were treated.
20     A   The video game itself, I do play a lot of
21  video games.  I used to before I had kids, but I was
22  not happy with the game play.  I did not like it.
23  If I was a consumer, I wouldn't have bought it.
24  Other than that -- I won't say that.  As a consumer,
25  I would not have bought it based on the merit of the

Page 159

1   game.  I would have bought it based on the athletes
2   in the game, because I was a fan of the particular
3   athletes in the game.  That's why I would have
4   purchased it.
5      Q   Who's Joanne Spracklen.  Does that name
6   sound familiar to you?
7      A   MMA Girls, yeah.  Yeah, I remember MMA
8   girls.
9      Q   So what is MMA girls?
10     A   She did an online thing years ago.  And
11  she would just go around and talk to fighters and do
12  interviews.  I think we did a cribs episode in my
13  condo.
14     Q   So you remember her interviewing you in
15  your condo at some?
16     A   Yes.
17     Q   Do you recall playing the video game with
18  her?
19     A   Yeah.  I'm sure that I probably did.
20     Q   Was that something that was your doing
21  because it was a promotional thing?
22     A   I mean, yeah.  You learn there's certain
23  things that you need to say are awesome even though
24  you don't like.  Todd Duffee is a perfect example.
25  He was at the airport and some woman started talking

Page 160

1   to him about UFC fighting, because she saw his
2   cauliflower ear, and she brought up the video game.
3   And he made a negative statement about being in the
4   video game because he didn't get paid and whatever,
5   same stuff as I'm saying.  And then he ended up
6   being fired, and disciplined because that woman he
7   was talking to was friends with the Fertittas.
8      Q   When did this occur?
9      A   I cannot remember.  But I can talk to Todd
10  and he would know.  I can send a text message.
11     Q   Do you think the video game helped UFC
12  fighters in terms of gaining more notoriety?
13        MR. DELL'ANGELO:  Objection to the form.
14  Calls for speculation.
15        THE WITNESS:  I would agree that having
16  extra consumable media for fans does help.  But
17  without the athletes, that stuff doesn't even exist.
18  BY MR. WIDNELL:
19     Q   Okay.
20     A   You couldn't sell a UFC video game with no
21  stars in it.  Who are you going to play?  Yourself?
22     Q   I believe when you played in the interview
23  with Joanne Spracklen you played yourself and you
24  beat GSP whom she was playing?  Does that sound
25  familiar to you?

Page 161

1      A   I am a winner.  I like to win, so I'm
2   going to play with the best character, the most
3   handsome character.
4      Q   All right.  So let's go to negotiations.
5   You got this -- you got this announcement, and then
6   you objected.  You said that you wanted a longer
7   time period and then you were cut; is that right?
8      A   Yes.
9      Q   Who told you that you were cut?
10     A   My manager told me.  But it was -- it was
11  everywhere.  It was online.  They made a public
12  statement of it.  It was a public display because
13  they were trying to make an example of me.  They
14  were whipping me to get me to go in line, to make
15  everybody else fall into line.  I was a perfect
16  whipping boy too.  Because I had 14 wins in a row, a
17  Fight of the Night decision loss to GSP, I was in a
18  perfect position to make an example of because I had
19  done all these things.  I was that good.  People
20  could see that somebody this good and wins this much
21  can still be disciplined in this way.  Oh, my God.
22  Scared people.  Terrified people.  I had fighters
23  come up to me and tell me that worried them, that
24  they don't feel safe in their jobs and in their
25  fight contracts anymore, because that happened.

MAGNA▶
LEGAL SERVICES

Page 162

1    Q   So you heard about this from public
2   sources and you also heard about it from your
3   manager?
4    A   Yes.  Because -- yeah, the whatever, the
5   firing papers came through before I think I even
6   talked to Crazy Bob.  I think he called me and I
7   checked my e-mail after he called me, and I had my
8   walking papers.
9    Q   And did Bob Cook just get your walking
10   papers or did he have a conversation with someone at
11   UFC about it?
12       MR. DELL'ANGELO:  Objection to the form.
13   BY MR. WIDNELL:
14    Q   Actually, let me ask it a slightly
15   different way.  That's a good point.
16       What did Bob Cook tell you, to the extent
17   that you recall, about what he had heard from UFC
18   when he called you?
19       MR. DELL'ANGELO:  Object to the form.
20       THE WITNESS:  It's hard to remember
21   exactly.  But Bob's not a man of many words.  And he
22   just said that you have been released.
23   BY MR. WIDNELL:
24    Q   So did you ask him if there'd been any
25   more of an explanation than that?

Page 163

1    A   No.  I mean, we kind of know.  We kind of
2   knew that it was really ballsy and risky for me to
3   say that I wasn't going to sign the video agreement,
4   even ask for something else.  But I couldn't not.
5   It was too bad of a contract.  There was no way I
6   could not say anything, so I had to.
7       It wasn't like it was like completely
8   unexpected.  But I did feel that -- I felt that I
9   was a little safe because I had won so much and I
10   had done so well, and I did so well in that GSP
11   fight, and I had a huge level of notoriety.  And
12   that just made me a bigger target to knock down when
13   I stepped out of line, scared a lot of people.
14    Q   So just in terms of timing for this, it
15   sounds like you found out that you were cut from Bob
16   Cook, but then at some point you ended changing your
17   mind, signing the agreement, and being reinstated;
18   is that -- is that correct?
19    A   Well, the reason I changed my mind was
20   because they were threats made against my teammates.
21   Christian Wells was also fired because of my state
22   -- my stance on the video game agreement.  He was
23   fired because he was coming off a loss.  And all the
24   other guys that we had that had not lost yet, Josh
25   Koscheck, Cain Velasquez, and then a number of

Page 164

1   Strike Force fighters that are later UFC fighters
2   and champions, even, they were threatened with being
3   fired -- threatened with never being hired by the
4   UFC.
5       And my management company was threatened
6   by all of their people that they represent not
7   having a chance to ever fight in the UFC again and
8   getting cut.  So I had like 30 people's lives and
9   careers placed on my shoulders on my decision.
10   Because I was okay with leaving.  I was so
11   frustrated with the treatment from them, I was okay
12   with going to Strike Force at the time.  They had a
13   number of fighters there that I could have fight.
14   It would have been less money, but, at that point, I
15   just wanted to be treated with respect.
16       So when I didn't beg and grovel to be
17   taken back right away when they fired me, they
18   started firing everybody else and threatening
19   everybody else, and it got put on my shoulders to
20   sign, not only the video game agreement, but they
21   piggybacked the merchandising agreement on top of
22   it.  Sign these or you guys are done.  And
23   there's -- there's quotes online, stuff from Dana
24   saying, "Who the 'F' is Cain Velasquez?  They're not
25   going to work with us.  They're gone.  They're

Page 165

1   done."
2       Cain went on to be a heavyweight champ.
3   Damien Cormier went on to be a light heavyweight
4   champ.  Luke Rockhold went on to middleweight champ.
5   All those guys would never have had the opportunity
6   to fight in the UFC, as I was lead to believe,
7   unless I signed those contracts.  And most
8   importantly, that stuff was done publicly so that
9   every other fighter in the world can see what
10   happens when you step up to the UFC, you're gone.
11    Q   So that's an awful lot that happened
12   between the point when Bob Cook notified you --
13    A   It's like a day and a half.  All this
14   happened in a day and a half.
15    Q   Wow.  So can you kind of walk through?  I
16   mean, you said Bob Cook didn't tell you anything at
17   the time.  But there must have been a lot more that
18   happened after that first call with Bob Cook.  Can
19   you tell me more, kind of walk me through how that
20   all played out?
21       MR. DELL'ANGELO:  Object to the form.
22   Mischaracterizes the witness's testimony.
23       THE WITNESS:  No.  I mean, that was pretty
24   much it.  I mean, it wasn't a lot of conversations.
25



1  BY MR. WIDNELL:
2  Q   Okay. So --
3  A   It was, this is the way it is. And then
4  there was a back-and-forth. And then later I ended
5  up having to call Fertitta and just bow down.
6  Q   Okay, so --
7  A   This is the agreement. This is what
8  everybody has to sign. Everybody signs the same
9  thing. There's nothing special we can do for you.
10 You have to sign this. And you're going to have to
11 sign the merchandising agreement.
12 Q   Okay. So what I'd gotten initially was
13 Bob Cook called you and told you that you had been
14 released.
15 A   Uh-huh.
16 Q   When did you find out that others were
17 being threatened?
18 A   Man, we were probably at the gym and we
19 started hearing about people who had -- Christian
20 got fired, he was the first one to go. And then
21 they started making public statements about it.
22 Q   So when did Christian get fired?
23 A   I mean, all this happened within -- you
24 can pull the files and see when the stuff was sent.
25 But it was within that -- you know, 24-to-48-hour

1  period all that stuff happened. Not even 48, it was
2  probably 36.
3  Q   So do you know if Christian was fired at
4  the same time you were fired, or was it?
5  A   I believe.
6  Q   That happened at the same time?
7  A   Like, you're both gone. They sent out the
8  letters as far as I'm aware.
9  Q   Do you know if Christian had agreed to
10 sign the video game agreement?
11 A   Christian was not asked. He wasn't even a
12 player in it. He didn't have skin in the game. And
13 they fired him anyways. Luckily, he's smart,
14 though. He became a lawyer. So he didn't return
15 into one of those sad guys that destroyed themselves
16 getting beat up all the time for pennies just to get
17 by. He went to join law school.
18 Q   So who else was threatened? You said Cain
19 Velasquez was threatened?
20 A   Cain Velasquez, well, my whole team. So
21 anybody who joined under the Banner American
22 Kickboxing Academy.
23 Q   Uh-huh.
24 A   And anybody who was represented by Zinkin
25 Entertainment at that time. Everybody except for

1  Mike Swick because Mike Swick had signed the
2  agreement way earlier already.
3  Q   Had Cain Velasquez signed the agreement?
4  MR. DELL'ANGELO:  Object to the form.
5  THE WITNESS:  I wouldn't know. I do not
6  know when he signed it. But I do know, once I was
7  forced to sign, that was like the flood gates,
8  because then everybody else was so scared that they
9  just started signing the video game agreement and
10 they started signing the merchandising agreement. I
11 mean, I haven't looked at it, but I'm guessing or
12 I'm speculating that if you look at all those
13 agreements signed, they probably came not too far
14 after my agreement was signed.
15 BY MR. WIDNELL:
16 Q   Did Zuffa ever explain to you why it was
17 important to them to have you sign the agreement?
18 A   Other than the usual PR stuff that they
19 told, like, no. Dana gave us a speech at our gym,
20 and it was the exact same speech that he gave to
21 some media people, word for word. Just, yeah.
22 Q   Without your signature, do you think that
23 the UFC or the video game would have gone forward?
24 MR. DELL'ANGELO:  Objection to the form.
25 Calls for speculation.

1  THE WITNESS:  Without any fighters signing
2  the agreement, there was no video game.
3  BY MR. WIDNELL:
4  Q   Did you think about the effect of not
5  having a video game on other UFC fighters when you
6  were making your decision?
7  A   I mean, I wasn't the only one getting a
8  screwed -- a bad deal on the agreement. We all
9  signed the same crappy agreement to be on a video
10 game, image and likeness forever for no
11 compensation. That's not a deal.
12 Q   Did anybody get any special benefits to
13 sign the agreement?
14 A   To my knowledge, I do not know. There
15 were rumors like guys like Chuck got special deals,
16 but I don't know. I have no way of knowing.
17 Q   How about Mike Swick?
18 A   To my knowledge, I don't know. Mike Swick
19 is -- he was always a company man. He always tried
20 his best to do right by the company. Even though
21 they've turned on him a few times.
22 Q   So I'm handing you an exhibit marked 55.
23 (Exhibit 55 was marked.)
24 BY MR. WIDNELL:
25 Q   This is an article that was on the web



1    page Fight Network.  Take some time and take a look
2    at it.
3         So this is an article titled "Jon Fitch
4    Accuses UFC of Strong-arm Tactics."  It's dated
5    November 28, 2008.  It's an article that includes a
6    number of quotes from you.  Do those quotes look
7    like they're actual quotes, things you said at the
8    time.
9       A    It appears so.
10      Q    If you turn to the second page.
11      A    Uh-huh.
12      Q    And if you go to the third paragraph from
13   the bottom.
14      A    Yes.
15      Q    It says "Dana is saying, 'Oh, Swick said
16   he doesn't care what his manager said or whatever,"
17   began Fitch.  "No, Swick has a special deal with
18   video game agreements and a some of this other
19   stuff.  A lot of these guys that he says he doesn't
20   have a problem with are guys that got special
21   contracts along the way.  They don't have the same
22   contracts as everybody else, they get special
23   things.  Which is fine, and I'm not even asking for
24   those things."
25         Is that something that you said at the

1    time?
2       A    At that time, yeah, it was something I
3    said.
4       Q    What were the special things that you
5    thought Mike Swick was getting at the time?
6       A    Through my perception at the time, Swicky
7    talked to me about things they had told him about
8    him -- because he was doing a lot of poker stuff.
9    And he was doing a lot of stuff that used his image
10   in video, video-type things.  And he said that he
11   had a verbal agreement with Dana and those guys that
12   if something came up with those, he'd still be
13   allowed to do them.
14      Q    Okay.  You say that -- in that quote, I
15   think you also said -- let me read it.  "A lot of
16   these guys that he says he doesn't have a problem
17   with are guys that got special contracts along the
18   way."
19         Who are those other guys?
20      A    At that time, I'm speculating at rumors.
21   I hadn't seen anything.  But like I said earlier,
22   there were rumors about certain guys having special
23   contracts on video games.
24      Q    So would those guys have gotten something
25   of value in terms of signing for the video game?

1         MR. DELL'ANGELO:  Objection to the form.
2    Calls for speculation.  And foundation.
3         THE WITNESS:  I don't.  I wouldn't know
4    why.
5    BY MR. WIDNELL:
6       Q    Did your managers tell you that you should
7    sign the agreement?
8       A    Yes.
9       Q    When did they tell you?
10      A    Immediately.  They told us you don't have
11   an option.  There's nothing we can do about it.  If
12   you want to keep fighting, then you're going to have
13   to just take whatever they give you.
14      Q    If you go up another two paragraphs from
15   the paragraph I just read on page 2, there's another
16   quote from you.  "It's 100 percent personal," the
17   former welterweight title challenger said.  "They're
18   making an example of me because I haven't done
19   anything wrong.  I'm the perfect example of what a
20   UFC fighter should be; someone who goes out
21   there" -- it says at, I think it means and -- "and
22   lays it on the line and fights their ass off.  I
23   never say anything negative about the company.  I
24   always put a positive light on everything and
25   anything that's happened to me.  Even the "S" about

1    getting left at the airport from the first season of
2    The Ultimate Fighter."
3         Was this something that was a hundred
4    percent personal for you?
5         MR. DELL'ANGELO:  Objection to the form.
6       A    In my state of mind at this time, it felt
7    very personnel.  When I was there it felt very
8    personnel, because in a merit -- in a sport there's
9    merit.  And if you hit certain thresholds you move
10   to the next thing, and that wasn't exactly happening
11   with me.  And I couldn't figure out why they were
12   doing it, other than assuming that it was some kind
13   of personal thing.  But it was also before I really
14   understood how many other guys were going through
15   very similar things or the exact same thing.  It
16   wasn't really until I got cut the second time that
17   all the guys started coming out of the woodwork and
18   telling me their stories.
19   BY MR. WIDNELL:
20      Q    So who were all the other guys who told
21   you their stories?
22      A    Other plaintiffs on this named plaintiffs
23   on this case, teammates, other people who are
24   represented by my management.  I mean, it's a small
25   community.  We talked to fighters.  I am doing work



Page 174

1 with the fighter's association, and I talk to a lot
2 of guys about their history and past and what
3 they've gone through.
4     Q   Can you name any of the people that you've
5 talked to outside of your teammates and the current
6 plaintiffs in this lawsuit?
7         MR. DELL'ANGELO:  Objection to the form.
8         THE WITNESS:  I mean, it's -- if I just
9 sit here and just list names of, people that I think
10 that I had discussions about that were unhappy with
11 the treatment that the UFC gave them, I mean, we
12 would be here a long, long time.  Yeah.
13 BY MR. WIDNELL:
14     Q   So can you give me some examples, then?
15     A   Examples of -- excuse me.  One more time.
16 What was it?  Examples of what?
17     Q   People that you have spoken to who were
18 unhappy with the UFC who had similar experiences to
19 your experience?
20     A   I have not spoken to a fighter in my
21 career that was 100 percent happy with the UFC and
22 their treatment and thought it was okay.  But I do
23 know there's some guys that I haven't talked with
24 that might say something like they liked it, and
25 those were guys that were taken care of like Matt

Page 175

1 Hughes.
2     Q   Can you name any specific fighters outside
3 of your teammates and that aren't plaintiffs who
4 are -- were unhappy because they were treated in a
5 way that was similar to the way you felt you were
6 treated?
7         MR. DELL'ANGELO:  Objection to the form.
8         THE WITNESS:  I honestly would have to say
9 every single fighter who hasn't written in to remove
10 himself from in this -- this class action lawsuit is
11 in agreement with that.  And you can write all their
12 names down.
13 BY MR. WIDNELL:
14     Q   So you have had conversations --
15     A   I have literally -- it's impossible.  I've
16 had hundreds and hundreds, if not thousands of
17 conversations with fighters.  I could not sit here
18 and name all of these guys.
19     Q   I'm not to asking you to.  I'm asking you
20 to name an example of some of them.  You can't name
21 any --
22     A   Well, you said none of my management.
23         MR. DELL'ANGELO:  You are badgering the
24 witness.
25         THE WITNESS:  You said none of the guys

Page 176

1 who were on my management team and on my fight team.
2 I mean, that's like 60 guys right there.  I feel
3 weird about throwing people under the bus who don't
4 want to say anything because they're afraid of their
5 job.  I remember Vladimer Tchanturia approaching me
6 and talking about how scared he was for his job and
7 his family.  And, man, this unlimited number of guys
8 who had incidences over the years, Tito, Frank
9 Shamrock, Ken Shamrock, I mean, I don't know.
10 There's plenty of guys who had major problems with
11 them, even BJ Penn has had problems with them.
12 BY MR. WIDNELL:
13     Q   Let me refer you back to Exhibit 49.  If I
14 have done this right, that is the first amended
15 answers to defendant Zuffa LLC's first set of
16 interrogatories.
17     A   Uh-huh.
18     Q   And specifically, if I could have you turn
19 to pages 34 to 35, start with 34 -- actually, I
20 apologize.  Let me just go back and make sure that
21 you see the interrogatory he's responding to.  So if
22 you turn to page 30.  See at the top of the page,
23 interrogatory No. 5.  It says "Identify each
24 instance where Zuffa enforced or threatened to
25 enforce the terms in any signed agreement between

Page 177

1 you and Zuffa."
2         So if you then turn -- do you understand
3 that question?
4     A   Any time that they, Zuffa enforced or
5 threatened to enforce the terms of any signed
6 agreement between you and Zuffa.  Yes, I understand
7 that.
8     Q   Okay.  So if you go to page 34, there is a
9 heading "Plaintiff Fitch."  And what is under that
10 is meant to be your response to the interrogatory.
11 And if you look at the last sentence of that first
12 paragraph, it reads "As Zuffa president White
13 proclaimed in an interview with Yahoo sports,
14 'Affliction is still out there still trying to build
15 its company, let" -- and in brackets -- "Fitch, go
16 work with them.  Let him go see what he thinks of
17 those [expletives].  [Expletive,] him.  These guys
18 aren't partners with us.  [Expletive them.]  All of
19 them every last [expletive] one of them.'
20         "White continued" -- this is on the next
21 page, on 35.
22         "White continued by threatening other
23 members of the AKA team.  'Chuck Liddell has that
24 language in his contract.  Randy Couture has it.
25 Anderson Silverio has it.  And Cain [expletive]



Page 202

1  had such a large fan base, because being, you know,
2  from Hawaii.  He had the entire Hawaiian Islands and
3  he had exciting fights.  So BJ was an outlier with a
4  lot of his behavior.
5      Q   Okay.  So apart from Dana White --
6      A   So he made out all right.  But the
7  chilling effect from everything that was said by UFC
8  over that incidence, that was -- that stayed.
9      Q   Do you know when that happened?
10     A   I don't remember.
11     Q   Does 2004 sound about right to you?
12     A   Yeah, that's -- seems like that might be
13  before I was with UFC.  I think that sounds about
14  right.
15     Q   So do you know when he came back?
16     A   I'm not sure.
17     Q   After he came back, did it still have a
18  chilling effect?
19     A   Yeah.  Because I still knew it happened.
20  It happened.  Even BJ Penn can be treated like this
21  by the company.  Even BJ Penn the unicorn can be
22  treated like this and be bullied and talked bad
23  about.  I mean, that doesn't happen in any other
24  sport.  That just doesn't happen.
25     Q   People don't talk bad about athletes in

Page 203

1  any other sport?
2      A   Not --
3          MR. DELL'ANGELO:  Objection to form.
4  Mischaracterizes the witness testimony.
5          THE WITNESS:  Team owners and promoters
6  don't necessarily bad mouth and rag on their
7  athletes the way that Dana White and the UFC has
8  been able to with their athletes.
9  BY MR. WIDNELL:
10     Q   Outside of BJ Penn, can you think of any
11  other examples where a fighter has been threatened
12  with punishment if he left the UFC?
13     A   I mean, that's the -- the threat was being
14  forced out of the UFC a lot of the times.  I can't
15  think of anything off the top of my head about a
16  very specific point in time.
17     Q   Are there any other examples of threats to
18  fighters that stand out in your mind other than the
19  ones we've talked about so far?
20     A   There's nothing, yeah.  I mean, there
21  might be some out there.  If I had time to think
22  about it, I might come up with more stuff.  But
23  right now that's about all I have.
24     Q   When your attorneys were preparing the
25  answers to the interrogatories, did they have

Page 204

1  conversations with you about instances that were --
2  there were threats?  Did you try and identify those
3  at that time when this document was being prepared?
4          MR. DELL'ANGELO:  Objection to form.  You
5  can answer the question without really -- if you can
6  do so without revealing the substance of the
7  communications between yourself and the attorneys in
8  the case.
9          THE WITNESS:  We tended to focus on our
10  own -- our own personal experiences.  And through
11  each one of us talking about our own personal
12  experiences, you can see patterns and tendencies and
13  things that are similar to everybody.  So even
14  though we told all our personal stories, the bigger
15  picture, they were all pretty much exactly the same.
16  We were all going through the same stuff, we had the
17  same contracts, we were receiving the same type of
18  treatment, same intimidation, same limited options
19  in finding work as we started to buy up all the
20  other promotions.
21  BY MR. WIDNELL:
22     Q   Could you turn to page 20 of Exhibit 49.
23  So at the bottom of that page, is interrogatory
24  No. 3, and the interrogatory is "Identify each
25  provision in any of your signed agreements with

Page 205

1  Zuffa that you contend is anti-competitive or
2  violates the anti-trust laws."
3          And if you turn the page to page 21, there
4  is an answer about middle of the page.  There's
5  No. 1, the exclusivity clause.  Do you see that?
6      A   Exclusivity clause.  Yes, I see that.
7      Q   Do you need a second to read that?
8      A   Yeah, I'll just take a second to make sure
9  I understand.
10     Q   Let me know when you're ready to answer a
11  question.
12     A   Yeah.  I finished with that statement.
13     Q   So do you agree that the exclusivity
14  clause is one of the aspects of the contract that
15  Zuffa has with fighters that raises concerns from
16  your perspective?
17     A   An exclusivity clause with the extended
18  provisions, the pressure on signing before your
19  agreement comes to term, they are, together, part of
20  that problem.
21     Q   Okay.  Does your WSOF contract have an
22  exclusivity clause?
23          MR. DELL'ANGELO:  Object to the form.
24          THE WITNESS:  Yes.  They do.  But they're
25  such a small promotion that they don't wield that --



Page 206

1    that weapon very powerfully. I'd like to say it's
2    like if I give my three-year-old a baseball bat, he
3    can do some damage with it. But if I give a
4    900-pound gorilla the same baseball bat, he's going
5    to do a lot of damage with it. The UFC is the
6    900-pound gorilla.
7        Q    So is the problem the baseball bat or the
8    gorilla?
9        A    I think the gorilla --
10       Q    Okay.
11       A    -- is the problem.
12       Q    Not the baseball bat?
13       A    Yeah.
14       Q    So it's not the agreement itself that is
15   necessarily problematic. It's --
16       A    The way it's enforced and the fact that
17   they are a monopoly. My biggest problem with them
18   is they are the sanctioning body and the promoter
19   all in one.
20       Q    If you look about five lines from the
21   bottom, there's a sentence that starts moreover,
22   the UFC's agreements with its fighters include
23   various extension clauses that be triggered at the
24   UFC's sole discretion, thereby effectively extending
25   the exclusivity provisions for all or critical

Page 207

1    portions of many fighters' professional careers
2    including periods when fighters are most
3    marketable."
4        A    Part of those are -- those extending
5    exclusivity provisions are things like putting a
6    pause on your contract if you retire, or an injury,
7    you get injured and have to pull out of a fight,
8    they can put you on hold, your contract on hold
9    until you're eligible to fight again. They abuse
10   this sometimes, I believe, by using that for
11   post-fight restrictions given by the commission.
12   You got a concussion or you got a cut or you got
13   injured and we give you a 30-day suspension, we give
14   you a 60-day suspension.
15            You can go to a doctor and have those
16   suspensions lifted. A lot of guys don't. But the
17   UFC can -- I don't think it's legal, but I think
18   sometimes they do put the pause on your contract
19   based on those commission suspensions, even though
20   they're only supposed to do it if it pulls you out
21   of a fight.
22       Q    Has the UFC ever done that to you?
23       A    I think I had my contract put on pause
24   because I had a couple of injuries. I had a
25   shoulder injury that required surgery, and then I

Page 208

1    had -- I think. I'm guessing, but I think I had a
2    knee surgery that pulled me out of a fight. And --
3        Q    So --
4        A    Definitely had a --
5        MR. DELL'ANGELO: Were you finished with
6    your answer?
7        THE WITNESS: Yeah.
8    BY MR. WIDNELL:
9        Q    I'm sorry. I apologize. You sometimes
10   sort of pause and then you start speaking again.
11       A    I'm thinking.
12       Q    And I don't mean to cut you off in any
13   way. If you hold your hand up or something, I'll
14   try not to jump in.
15            So I think what I heard you is that
16   sometimes you believe Zuffa uses the tolling -- is
17   it the tolling provision? Is that what we're
18   talking about here that tolls the period of contract
19   pending?
20       A    I believe -- is that what they're
21   referring to in this -- exclusively --
22       Q    So if you --
23       A    -- extending, yeah, under the
24   discretion -- clauses that extend. I never
25   personally, I don't think, experienced that. I'm

Page 209

1    not sure.
2        Q    So if you turn to page 23, maybe that will
3    shed some more light on it. I think that's what's
4    being discussed here. This is your plaintiff's
5    attorney's answer. So I don't want to speak for
6    your attorneys, but I think what's being discussed
7    is if you look at No. 5 it says "tolling provisions,
8    which extend the term of the UFC fighter contracts
9    during periods when UFC determines that he or she is
10   injured, the fighter retires or otherwise declines
11   to compete."
12            Is that what you were talking about?
13       A    Yes, to the best of my understanding they
14   would extend the contract.
15       Q    So is it the case that you were saying
16   that you think sometimes Zuffa extends the contract
17   inappropriately?
18       A    I don't know from personal experience. I
19   think I've heard people mentioning that sometimes
20   they have had that enforced from a commission
21   injury, not like a pulled out of a fight --
22   actually, maybe I did. Because I wasn't under a
23   bout agreement when I had my shoulder issue. If
24   they put me on a -- like, suspended my contract
25   during that time period, I don't think they are

Page 210

1  allowed to do that, but they did.  Because I wasn't
2  missing a fight.  I didn't get a bout agreement.
3  This was after a fight.  I had a post-fight injury
4  and was getting it fixed.
5       Q   When was this?
6       A   2011.
7       Q   What was the fight?
8       A   BJ Penn.
9       Q   Okay.  So you think that they extended
10  your contract after the BJ Penn fight
11  inappropriately?
12       A   I would have to check.  But I think that
13  happened.
14       Q   And that's because you actually -- they
15  extended it, but you could have fought during that
16  time period?
17       A   No.  To my understanding, they're only
18  supposed to do that if you're under a bout agreement
19  and have to pull out of a fight.
20       Q   So if you're not under a bout agreement,
21  but you're not able to fight --
22       A   Well, I didn't have a fight offered.
23       Q   Okay.
24       A   It wasn't like I was saying I can't fight
25  because I'm injured.  I was just injured.  And

Page 211

1  because I was injured they put a pause on my
2  contract.
3       Q   So how did they know you were injured?
4       A   I said I was injured and I used the
5  insurance through the fight to get my injury taken
6  care of.
7       Q   Okay.  Could you have fought during that
8  time period?
9       A   I've seen guys fight with worse injuries.
10       Q   So if someone -- if they had offered you a
11  fight, you would have fought?
12            MR. DELL'ANGELO:  Objection to the form.
13  Calls for speculation.
14            THE WITNESS:  I mean, it's hindsight's
15  20/20.  Looking back at what happened.  Because I
16  was having shoulder surgery and I didn't need it, so
17  knowing what I know now, yeah.  Because I got kind
18  of screwed over because I was supposed to rematch
19  with BJ, and I was title contention fighter.  If I
20  would have won that, supposedly, and there was no
21  merit system, it was just supposedly, I was supposed
22  to get a title shot.  But I kind of got iced and had
23  to have my shoulder taken care of, and they skipped
24  over me and had somebody else fight for the title.
25  They had BJ Penn and Nick Diaz fight for a title

Page 212

1  shot.
2       Q   When you say you had shoulder surgery,
3  after you had the surgery, would you have been able
4  to fight?
5            MR. DELL'ANGELO:  Objection to the form.
6  Calls for speculation.
7            THE WITNESS:  Yeah, I mean, it is a guess.
8  But I would have to say, no, because I know how my
9  arm felt after being cut into.  But before I was cut
10  into, I would have been okay.  You know, that's kind
11  of a weird situation too, because -- I don't know.
12  I could have had the shoulder taken care of sooner,
13  but the UFC kind of made me go to their doctor who
14  made me wait.  And I have a strong suspicion the
15  reason I had to wait was not because of medical
16  reasons, but because they wanted to make me wait to
17  have surgery so they could send me to England to
18  Fight Expo.
19  BY MR. WIDNELL:
20       Q   I'm sorry.  To the fight?
21       A   There was a Fight Expo in England.  And if
22  I would have gotten my shoulder taken care of when
23  it should have been taken care of, I wouldn't have
24  been able to make it to that.  So they made me wait
25  through their doctor to get shoulder surgery that I

Page 213

1  didn't need.
2       Q   And that's your belief.  What's your basis
3  for that belief?
4       A   And that's what -- that's what happened.
5  There is no real other reason why I shouldn't have
6  been able to take care of my shoulder sooner.  I
7  don't know why.  I went to this guy, and he made me
8  do rehab for six weeks, knowing in his head that I
9  needed surgery, even though I really didn't need
10  surgery.  So he sent me away to get rehabbed for six
11  weeks.  Why, if he already knew he was going to cut
12  into me?  He'd already made that decision, but he
13  wanted to send me away to do rehab for six weeks?
14  Why?  Why am I doing rehab that I don't need?
15       Q   And during that time you also went to the
16  Fight Expo, is that ...
17       A   Yes, I went to the Fight Expo, and I had
18  to sign left-handed and shake hands with my left arm
19  because I was injured.
20       Q   If you turn to page 22 of Exhibit 49, No.
21  3.  It's the champion's clause.
22       A   Uh-huh.
23       Q   Now, the champion's clause didn't apply to
24  you while you were at the UFC; is that correct?
25       A   Incorrect.  The championship clause

MAGNA
LEGAL SERVICES

1    Q   Do you think that fighters that have more
2  knockouts have greater notoriety?
3    A   Not always, no.
4    Q   Do you think that UFC had the perspective
5  that you were a boring fighter?
6    A   It's a sport.  Sports are about winning.
7  Meritocracy is about winning.  It's not Pro
8  Wrestling.  It's a sport.
9    Q   But you said that part of the value of a
10 fighter to an MMA organization was the notoriety of
11 the fighter; is that right?
12   A   Yup.  People likes winners.  Their opinion
13 is their opinion.  I have a large fan base.  I have
14 a large following.  When I go to do signings, I'm
15 there for half hour to an hour after the signing is
16 over.  But their opinion of me doesn't translate
17 into my fan base.
18   Q   You said that you'd seen some portions of
19 Nate Quarry's deposition?
20   A   Uh-huh.
21   Q   Did you see the portion where he was asked
22 about you, specifically?
23   A   No, but we've talked about it.
24   Q   So what exactly did Nate Quarry say?
25   A   That, yeah, that I was boring.  I don't

1  have a problem with that.  I don't care.
2    Q   So that's a perspective that's shared not
3  just by UFC, but by some of the named plaintiffs in
4  this case?
5        MR. DELL'ANGELO:  Objection to the form.
6  Mischaracterizes the testimony.
7        THE WITNESS:  Yeah.  Mischaracterizes it
8  for sure.  People have opinions.  Nate's remarks
9  about my fighting style reflect on the market that
10 the UFC has created.  He was speaking on behalf of
11 the vantage point of a promoter.  The promoter wants
12 quick finishes, he wants mismatches, he wants people
13 getting beat up bad.  That's exciting to people.
14       The most viewed -- the most watched videos
15 on YouTube are people getting beat up and getting
16 into crashes and falling off their skateboard and
17 breaking their legs.  People like that.  I believe
18 that it's more Pro Wrestling geared, but that's kind
19 of what the UFC has created.  There's no
20 meritocracy, so you get this freak show, in my
21 opinion.
22   Q   So I believe there was a document in which
23 Nate Quarry wrote "I don't care if Jon Fitch wants
24 to fight for free.  No one wants to see him fight.
25 I'd rather have an unknown fighter fight for every

1  minute of every round."
2        Does that sentiment, have you heard that
3  sentiment from other people as well.
4        THE WITNESS:  Again, he's speaking as a
5  promoter, right?  He's speaking as somebody who has
6  to compete with the mark created by Zuffa.  So he
7  has to think of what's going to bring in eyeballs.
8  So we have to copy what the elephant in the room is
9  we have to copy what that guy's doing.
10   Q   And why would you have to copy what Zuffa
11 is doing?
12   A   Surviving as a promotion.
13   Q   Because you wouldn't be successful
14 offering something different than what Zuffa is
15 doing?
16       MR. DELL'ANGELO:  Object to the form.
17 Calls for speculation.
18       THE WITNESS:  I mean they created the
19 market.  They created the behavior of the other
20 promoters.  They control the most desired belt.
21 They have the most big-name fighters.  You have to
22 either, you know, in a monopoly-type structure, you
23 have to copy the monopolistic entity or you have to
24 be worse, you have to be even more monopolistic to
25 survive.  That's why we see so many of these

1  organizations fall away without even being purchased
2  by the UFC.
3  BY MR. WIDNELL:
4    Q   So you said that Zuffa created this?
5    A   Uh-huh.
6    Q   How'd you know that Zuffa created this
7  instead of just meeting a demand that's out there?
8    A   Because, looking through the history of
9  prize fighting and the fact that the Fertittas were
10 more involved in the commissions, boxing
11 commissions, they knew the history of prize
12 fighting.  They knew about -- they knew about
13 commissions.  They knew about sanctioning bodies,
14 they knew about the balance and the split of power.
15 They knew about that.  And in knowing that, they
16 still set up this monopolistic system for running
17 the sport.  It's impossible for them to ignore 150
18 years of prize fighting and do this by accident in
19 my opinion.
20   Q   So is it your opinion that, if you'd been
21 allowed to fight more at UFC, you would have had
22 more fans as a result?
23   A   I mean, that's -- I don't know.  I think
24 there is a degree of promotion that needs to come
25 from the promoter, because not every promoter is



Page 234

1   good.  Not every promoter promotes their athletes
2   correctly.  Dana White himself apologized to me
3   before I fought Roan Carneiro, at the weigh-ins,
4   because they had not promoted me.  I'd slipped under
5   the radar and I didn't get any push at all from
6   them.  The next fight, I think, after Roan was
7   Diego, and Diego was the first time they actually
8   put any effort into promoting me.  And at the
9   weigh-ins, I remember him saying, "See, look what we
10  can do for you.  Look how we can build you."
11          Because I went from virtually kind of
12  unknown to that weigh-in with Diego, I had a huge
13  fan base.  At the weigh-ins everything was like ah,
14  that's the first time that really happened.  And he
15  knew what he was doing, and he expressed to me that
16  happened because they let it happen and they made it
17  happen.  We can make you a star.  I don't feel like
18  they put that promotional push behind me through my
19  career with them.
20      Q   I guess what I am asking is it possible
21  that they didn't because they ultimately felt that
22  you were a boring fighter?
23          MR. DELL'ANGELO:  Objection to the form.
24  Calls for speculation.
25          THE WITNESS:  I would have no idea what

Page 235

1   they thought of me.  They never ever approached me
2   or talked to me about my fighting style or needing
3   to do anything differently.  They never suggested to
4   do anything differently in any way.  I didn't hear
5   anything from fans or spectators or anybody about
6   being borrowing until my fight before the second
7   time I fought Thiago Alves.  I'd never even had
8   anybody criticize my fighting style, because my
9   fighting style was the same as Georges St-Pierre's,
10  current champion, who they pushed and publicized and
11  said was amazing.
12          But our fighting styles were identical.
13  If you made us fight in a whole body black suit, you
14  probably couldn't tell the difference between either
15  one of us, yet I was not treated the same as him.
16  And in my opinion, it was because they already had
17  one of him.  They don't care about the sport and a
18  meritocracy.  We already have this grappling-based
19  fighter at the top.  We don't need that other one.
20  Get him away.
21  BY MR. WIDNELL:
22      Q   Okay.  I'm going to hand you a document
23  that is -- I'm going to label this Exhibit 56.
24          (Exhibit 56 was marked.)
25

Page 236

1   BY MR. WIDNELL:
2       Q   This is a printout of an article on --
3   from MMAjunkie that is titled "Despite Promised
4   Title Fight, UFC 117's Jon Fitch Now in Waiting
5   Mode."  Let me know when you have had a chance to
6   look at this.
7       A   I'm reading this now, but I don't remember
8   reading this at the time.
9       Q   Okay.  On the second page there's a quote
10  from Dana White, and I believe he's talking about
11  you, where he says "He's not the exciting fighter
12  you hope for, but the guy is so dominant so what are
13  you going to do," a generally perplexed White asked.
14  "You've got to give him his respect.  He's one of
15  the best guys in the world.  But tonight out of the
16  entire card, my Twitter [followers] were not -- not
17  too excited about Jon."  Do you see that?
18      A   Where is it on the page there?
19      Q   It's the second page at the top?
20      A   Okay.  Yeah.  That was the fight leading
21  to the Thiago Alves fight.  That was the first fight
22  I'd ever heard anybody call me boring and not like
23  my fighting style.  And I believe that was a
24  purposeful push by the UFC because they started at
25  that point in time started taking things away from

Page 237

1   winning, because there was a focus a lot on winning
2   before in UFC, and then they flipped it right in
3   that time period, I remember, to putting everything
4   on exciting.  Exciting, exciting, exciting fights
5   exciting fights, exciting fights.  They in my
6   opinion, did an online push to get people to agree
7   that winning doesn't matter and just being excited
8   does, which benefits them greatly.  Because if guys
9   go out there and fight haphazardly, they lose more
10  often, they're easier to manipulate, they're easier
11  to keep low wages on them, it's easier to keep their
12  careers short because their bodies take a lot more
13  damage.
14          Then you're talking about Twitter
15  followers, how many of those are Twitter followers
16  are followers that were paid for and how many of
17  those followers were people who were in employment
18  by Zuffa?  I mean, companies pay people to go online
19  and push public opinion all the time.  And unless
20  you have a list of every single one of those people
21  who tweeted it and know who they are, I wouldn't
22  take it seriously unless you can put a face to the
23  name.  Because when I go do signings there's lines
24  out the door.  I'm there for two hours, and I have
25  to sit an extra hour to sign everybody else who

**MAGNA**
LEGAL SERVICES

1    brought stuff to sign.  That doesn't make sense why
2    there's online hate, but in real life it doesn't
3    match.  I don't know.  I think all the fake news in
4    the last year has really opened up my eyes to how
5    online sentiment doesn't really mean anything.
6        Q   So do you think when he's talking about
7    his Twitter followers, that was actually something
8    he generated himself?
9        A   I think that the UFC, by publicly stating
10   over and over and over again that exciting was more
11   important that winning and numerous ways, kind of
12   helped sway public opinion.  Because I've never
13   heard of another sport where they said, you don't
14   give that guy a shot at the championship because
15   he's borrowing.  Floyd Mayweather is very boring.
16   He's extremely boring.  I've never enjoyed watching
17   Floyd Mayweather fight, ever.  But he's the most
18   successful boxer ever.  He's made more money than
19   anybody else ever, and he's got to fight for plenty
20   of titles.  So whatever.  It's B.S.  It's just
21   another way of them trying to manipulate and control
22   people.
23       Q   So do you think that's how Mr. Quarry was
24   led to the opinion that you're boring also?
25           MR. DELL'ANGELO:  Object to the form.

1    Mischaracterizes Mr. Quarry's testimony.
2            THE WITNESS:  Yeah.  I don't believe
3    that's exactly what he was saying.  But, again, he
4    was talking from the perspective of a promotor.  In
5    a promoter's eyes, the system that was created by
6    Zuffa makes him have to operate like every other
7    promoter.  That's the only way to survive.
8    BY MR. WIDNELL:
9        Q   Did you ever watch Mr. Quarry's show, when
10   he had a show that was called MMA Uncensored?  Does
11   that ring a bell at all?
12           MR. DELL'ANGELO:  You have to answer
13   audibly.
14           THE WITNESS:  I have not seen Nate Quarry
15   have a show.  I did not.  I was not aware.
16   BY MR. WIDNELL:
17       Q   Okay.  So on episode 7 of MMA Uncensored,
18   he was an anchor on that show, he said "It's true,
19   they'll get the take-down and they'll even get the
20   W, and sooner or later the promoters are going to
21   say we don't want to see the lay and pray.  They
22   don't want to see the wall and stall.  We want to
23   see guys go into finished fights, Jon Fitch."
24           And then someone, one of the other anchors
25   says, "He's not stalling."

1            And Nathan Quarry says, "Jon Fitch who has
2    relegated the under card."
3            That is a quote from MMA Uncensored, which
4    was a TV show where he appeared.  Do you think he
5    was speaking as a promoter in that instance?
6            MR. DELL'ANGELO:  Objection to the form.
7            THE WITNESS:  Regardless of whether or not
8    I am or am not a boring fighter, I'm a good fighter.
9    And mixed martial arts is a sport, and it's supposed
10   to be a sport, and the sports have merits about
11   winning.  It doesn't matter if you're boring.  If
12   you want to succeeded in the sport, you win.  It
13   doesn't matter if you are the 49ers, you're Floyd
14   Mayweather, you're Cael Sanderson.  It does not
15   matter.  Sports winners move forward.
16           Regardless of how borrowing I am, if I'm
17   the best welterweight in the world, I deserve the
18   right to fight for the title and defend my title
19   against the other best guys in the world.  It
20   doesn't matter if I'm exciting or not.  If I'm
21   exciting or not that, will impact my sponsorship
22   pay, and it will affect my percentage of the bout,
23   bout revenue.  That's it.  It will hurt my
24   pocketbook, but I should not be limited from my
25   ability to fight for titles and put myself in that

1    situation because of excitement.  Change your rule.
2    Do something like that if you really have a problem
3    with it.  Sports have merits; MMA is supposed to be
4    a sport.
5    BY MR. WIDNELL:
6        Q   I guess what I am asking really, though,
7    is it possible that you aren't getting the fights
8    that you wanted because UFC felt that they wouldn't
9    generate as much revenue rather than because they
10   didn't like you personally?
11           MR. DELL'ANGELO:  Objection to form.
12   Calls for speculation.
13           THE WITNESS:  I would say if that's the
14   case, then this isn't a sport.  And if it's not a
15   sport, then you're going to have some serious issues
16   with the commission and you're going to have some
17   serious issues with all the guys that have brain
18   damage these days, if it's not a sport.
19           And I seriously could not think of any
20   other situation where somebody wins and is not
21   lifted up to the next level or championship, doesn't
22   matter.  It's a sport.  It's not a television show.
23   We're not Pro Wrestling.
24   BY MR. WIDNELL:
25       Q   Okay.  So just to be clear, you had fought

Page 242

1    a championship bout with GSP?
2       A   Uh-huh.
3       Q   And your concern was that the next three
4    bouts after that weren't bouts that you felt were
5    good bouts for you; is that correct?
6       A   Incorrect.  My problem with that situation
7    is that I was clearly the next best guy.  And
8    because I was the next best guy, I should have been
9    allowed to fight for that title more than I was
10   allowed to.  In a real sport like boxing, there is a
11   separate group, sanctioning body, that controls the
12   ranking and the titles.
13         If that happened in MMA today or back when
14   I was fighting then, I would have fought Georges, I
15   lost, and then if I maintained my number two ranking
16   or my number one contender ranking, within 12 months
17   he would have to fight me again.  Because it's a
18   sport.  It's merit based.  And based on merits under
19   that system, I would have been able to put myself in
20   position to fight for the title once every 12 months
21   as long as I maintained my number one contender
22   status.
23         MR. WIDNELL:  Okay.  Let me take a quick
24   break.
25         THE VIDEOGRAPHER:  We are now going off

Page 243

1    record.  The time is 4:30 P.M.
2         (A short recess was taken.)
3         THE VIDEOGRAPHER:  We are now back on the
4    record.  Time is 4:39 P.M.
5    BY MR. WIDNELL:
6       Q   Mr. Fitch, I've just handed you what's
7    marked as Exhibit 57.
8         (Exhibit 57 was marked.)
9    BY MR. WIDNELL:
10      Q   This is another MMAjunkie article.  It's
11   entitled, this title is Jon Fitch: Bjorn Rebney
12   Would Be 'Stealing Millions of Dollars' From
13   Athletes With Lawsuit Settlement."  Does this
14   article look familiar to you?
15      A   I believe it looks fairly familiar.  The
16   quote at the bottom does.
17      Q   What is your quote at the bottom?
18      A   "It's very troubling that Bjorn Rebney
19   publicly stated his plans to settle the class action
20   lawsuit, which would undercut -- who knows? --
21   hundreds of millions of dollars of money that should
22   be recovered to fighters who fought in the UFC in
23   order to make a profit for himself."
24      Q   When you use the term "hundreds of
25   millions of dollars", do you have any basis for

Page 244

1    thinking that --
2       A   Um.
3         MR. DELL'ANGELO:  I don't think he's quite
4    finished the question.
5         THE WITNESS:  Okay.
6    BY MR. WIDNELL:
7       Q   -- that the lawsuit would lead to the
8    recovery of hundreds of millions of dollars for
9    fighters?
10        MR. WIDNELL:  I will instruct the witness
11   that you can answer the question to the extent you
12   don't reveal the substance of your communications
13   with your attorneys.
14        THE WITNESS:  To my understanding, the
15   class action suit that was filed was a suit for
16   $800 million.  And class action lawsuits pay
17   treble -- am I pronouncing that correctly? -- which
18   is three times.  That would put that number into the
19   hundreds of millions.  It's a guess.  But it was a
20   guess, I mean, based on information I already had.
21   BY MR. WIDNELL:
22      Q   And that $800 million is money that would
23   have been paid to fighters if there had been a
24   competitive market; is that your understanding?
25      A   Yes.

Page 245

1         MR. DELL'ANGELO:  Again, same instruction.
2    You can answer the question to the extent you can
3    without revealing the substance of your
4    communications with your attorneys.
5         THE WITNESS:  Yes, that's the point of a
6    class action lawsuit.  One of the points of our
7    class action lawsuit is to recover damages that we
8    believe would have been earned by the athletes in an
9    open market.
10   BY MR. WIDNELL:
11      Q   And do you know what relevant period of
12   time that would have covered?
13      A   Our lawsuit covers, I believe, 2010 to
14   present, because you have a four-year window from
15   when you file.
16      Q   Okay.  So approximately, it would be about
17   200 million a year that would have been paid to
18   fighters if it had been a competitive market?  Does
19   that sound right?
20        MR. DELL'ANGELO:  Objection to the form.
21   Foundation.  Basis, and mischaracterization of the
22   witness's testimony.
23        THE WITNESS:  No.  I mean, the quote
24   hundreds of millions is because the lawsuit itself
25   was for -- that we filed was 800 million.  That's

MAGNA
LEGAL SERVICES

1    the number that I remember from the lawsuit.  And I
2    know that class action lawsuits pay three times out,
3    and then Rebney publicly stated he was going to try
4    to settle, steal the class and settle the lawsuit
5    personally.
6            Well, in my opinion, he's already saying
7    he wants to settle.  So by not finishing through
8    with the lawsuit, he's already saying that he's
9    giving up a large portion of what those damages are.
10   BY MR. WIDNELL:
11       Q   Okay.  So let personal opinion ask the
12   question a slightly different way.  You said you
13   thought the damages were about 800 million, and you
14   thought it was for a four-year period; is that
15   correct?
16       A   No.  That is not correct.
17           MR. DELL'ANGELO:  I'll object.  You are
18   mischaracterizing the witness's testimony.  You're
19   going to have to go a little more carefully if you
20   want to formulate questions out of them.  It's
21   unfair.
22   BY MR. WIDNELL:
23       Q   So what is the $800-million number that
24   you were talking about?
25       A   The $800 million number that I'm talking

1    about is what was on the initial lawsuit that we
2    filed, that was what was read.  That's what I
3    remember reading.
4        Q   Okay.  And what time period was that
5    covering?
6        A   That time period covers four years prior
7    to when we filed, which is about 2010, until present
8    day.
9        Q   And when you say the 800 million, you mean
10   800 million in damages that fighters could recover?
11       A   I believe --
12           MR. DELL'ANGELO:  Objection to the extent
13   it calls for a legal conclusion.
14           THE WITNESS:  Yeah, I'm not an expert.
15   All I know is that we -- the lawsuit mentions it's
16   for $800 million.  I know that class action lawsuits
17   pay out triple.  That is how I came up with it.
18   BY MR. WIDNELL:
19       Q   Okay.  So I'm sorry.  Maybe I
20   misunderstanding.  Let me ask this.  Did you think
21   that 800 million was the damages trebled, i.e.
22   whatever damages you are entitled to times three, or
23   did you think that that was the damages that would
24   be trebled?
25           MR. DELL'ANGELO:  Objection.  Compound.  I

1    will instruct the witness that you can answer the
2    question to the extent you can do so without
3    revealing the substance of your communications with
4    your attorneys.
5            THE WITNESS:  Yes, again, my understanding
6    is the 800 million was what was filed.  That's what
7    we asked for in the class action lawsuit.  And to my
8    understanding, that pays out triple.  So it would be
9    three times that number, through my understanding.
10   BY MR. WIDNELL:
11       Q   Okay.  So if it is 800 million for a
12   period of four years, it averages --
13       A   It's not.
14       Q   I'm sorry.  When you said "it's not,"
15   which part am I getting wrong there?
16       A   You said four years.  You said 2010 until
17   present, that's seven years.
18       Q   Okay.  So it would work out to be
19   800 million for -- divided by 7.  So it's
20   approximately.  So it would be more like a hundred
21   million dollars a year that the UFC should have
22   paid, if it had been in a competitive market; is
23   that accurate?
24           MR. DELL'ANGELO:  Objection to the form.
25   I think either you are misunderstanding or grossly

1    attempting to mischaracterize the previous
2    testimony.  I doubt you are intentionally doing the
3    latter, so I suspect that you are misunderstanding
4    the testimony.
5    BY MR. WIDNELL:
6        Q   So let me ask it this way.  Maybe this is
7    a better way.  On an average, how much more do you
8    think fighters would have been paid a year in a
9    competitive market?
10           MR. DELL'ANGELO:  Object to the form to
11   the extent it calls for a legal conclusion.
12           THE WITNESS:  I am not an economist.  I'm
13   not an economist.  So I can't name that number.  I
14   am basing my statements off of what I have seen and
15   our lawsuit was $800-million.  That's where I got
16   the number from.  I didn't do the calculations
17   myself.  I am not an economist.  I made those
18   statements based on the information that I had from
19   the class action lawsuit and from my understanding
20   of what class action lawsuit damages paid out are.
21   BY MR. WIDNELL:
22       Q   So you have an understanding of what you
23   think the overall damages would be of 800 million;
24   is that correct?
25           MR. DELL'ANGELO:  Objection.



Page 254

1 promote, and you could fight for those belts from
2 those independent sanctioned bodies.
3      Q   Is it your understanding that all
4 promoters right now basically require you to fight
5 fighters within their promotion?
6           MR. DELL'ANGELO:  Objection to the form.
7 Vague.
8           THE WITNESS:  To my understanding, most of
9 the time guys are going to be restricted to fighting
10 for one organization.  Scott Coker does do some
11 things where he actually co-promotes a little bit.
12 But it's -- it's very, very minimal.
13 BY MR. WIDNELL:
14      Q   Does WSOF co-promote at all?
15      A   I do not believe that they do.  But I
16 think I remember -- I think when Ali was the match
17 maker/vice president, he did extend an offer to
18 Bellator to fight champions.  But it's very, very
19 unlikely.  It doesn't happen often, and, yeah, that
20 was more of a publicity stunt.  He was trying to
21 prove his organization was better than Bellator, so
22 he was trying to get fights between champions set
23 up.  Boxing, they co-promote all the time.  And I
24 think that would be a much better scenario for us.
25      Q   Why do you think smaller promoters don't

Page 255

1 co-promote?
2           MR. DELL'ANGELO:  Objection to the form.
3 Calls for speculation.
4           THE WITNESS:  In my opinion, the smaller
5 promotions generally are happy being number two to
6 big dog, UFC.  And they are mostly fighting against
7 each other for the up-and-coming guys and acting as
8 feeder systems to the UFC rather than competitors
9 of.
10           MR. WIDNELL:  Okay.  I have no further
11 questions.
12           MR. DELL'ANGELO:  Okay.  We will read and
13 sign.
14           THE VIDEOGRAPHER:  We are now off the
15 record.  The time is 4:54 P.M.
16
17
18
19
20
21
22
23
24
25

1           CERTIFICATE OF WITNESS
2 PAGE  LINE  CHANGE              REASON
3
   _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20           * * * * *
21      I, Jon Fitch, witness herein, do hereby
   certify and declare under penalty of perjury the within and
22 foregoing transcription to be my deposition in said action;
   that I have read, corrected and do hereby affix my signature
23 to said deposition.
24 _____   _____
   Jon Fitch
25 Witness                    Date

1 STATE OF NEVADA)
             ) ss
2 COUNTY OF CLARK)
3
4      I, Sarah Padilla, a duly commissioned and
5 licensed court reporter, Clark County, State of Nevada,
   do hereby certify:  That I reported the taking of the
6 deposition of the witness, Jon Fitch, commencing on
7 Wednesday, February 15, 2017, at 9:23 A.M.; That prior to
   being examined, the witness was, by me, duly sworn to
8
9 testify to the truth; That thereafter I transcribed my
10 shorthand notes into typewriting and that the typewritten
11 transcript of said deposition is a complete, true, and
12 accurate record of said shorthand notes.  I further certify
13 that I am not a relative or employee of any attorney or
14 counsel of any of the parties nor a relative or employee of
15 an attorney or counsel involved in said action, nor a person
16 financially interested in the action; that a request
17 [x] has [] has not been made to review the transcript.
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand in the County of Clark, State of Nevada, this __
20 day of _____.
21
22
23                    _____
                      SARAH PADILLA, CCR 929
24
25

