# EXHIBIT 15

# Excerpts from Deposition of Javier Vazquez

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch,) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vazquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
          Defendants.             )

VIDEO DEPOSITION OF JAVIER VASQUEZ

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:15 A.M.

and ending at 3:46 P.M.on Wednesday, February 14, 2017

Reported by:
Sarah Padilla, CCR NO. 929
Job No. 296624 Pages 1-205



Page 34

1  A   Matt Serra.
2  Q   At the time, would you have considered
3  Matt Serra an elite MMA fighter?
4        MR. DELL'ANGELO: Object to the form to
5  the extent it calls for a legal conclusion.
6        THE WITNESS: I believe that Matt Serra
7  was a very good fighter, yes. Elite, I would say
8  so, yes.
9  BY MR. McSWEENEY:
10  Q   Do you recall who Matt Serra ultimately
11 fighted in UFC 46?
12        MR. DELL'ANGELO: Object to the form.
13 Foundation.
14        THE WITNESS: I believe so, but I wouldn't
15 bet my whole house on it.
16 BY MR. McSWEENEY:
17  Q   Fair enough. But who is it you believe
18 Matt Serra fought?
19  A   I believe he fought Rich Crunkilton.
20  Q   Well, good thing you didn't bet.
21  A   I didn't bet.
22  Q   I'm saying good thing you didn't bet your
23 house.
24  A   Who was it?
25  Q   Jeff Curran?

Page 35

1  A   Curran, there you go.
2  Q   At the time, would have been believed Jeff
3  Curran be an elite MMA fighter?
4  A   Yes, I believe so.
5  Q   Do you recall the outcome of the fight
6  between Jeff Curran and Matt Serra at UFC 46?
7  A   I believe so. I believe so.
8  Q   Do you recall that Jeff Curran lost to
9  Matt Serra?
10  A   Yes. That's what I remember.
11  Q   Despite his loss to Matt Serra at UFC 46,
12 would you still have considered Jeff Curran an elite
13 MMA fighter?
14        MR. DELL'ANGELO: Object to the form to
15 the extent it calls for a legal conclusion.
16        THE WITNESS: Yes.
17 BY MR. McSWEENEY:
18  Q   Returning to the paragraph at the bottom,
19 the second to the last paragraph on this page, you
20 go on to say "With respect to talks with UFC, we
21 were talking to them (UFC). They had offered me a
22 potential fight with a couple of people, and it just
23 wasn't the right time. I got offered the fight with
24 Din Thomas, who is a really good fighter, but it
25 just wasn't the right time." Do you see that?

Page 36

1  A   Yes.
2  Q   Do you recall why it wasn't the right time
3  for you to accept the fights offered by UFC?
4  A   I would be speculating because I don't
5  remember the exact, but I have an idea of what it
6  might have been.
7  Q   And what's that idea?
8  A   I believe I hadn't recovered from my knee
9  yet. I didn't feel comfortable with it yet, I don't
10 think.
11  Q   Are you referring to injuries you
12 sustained in your fight with Alberto Crane?
13  A   I have had multiple.
14  Q   Fair enough. You say that UFC offered you
15 a potential fight with a couple of people. Do you
16 recall who those people were?
17  A   I don't.
18  Q   Do you recall how many people?
19  A   I do not.
20  Q   You mentioned specifically that you were
21 offered a fight with Din Thomas who you described as
22 a really good fighter. At the time, would you have
23 regarded Din Thomas as an elite MMA fighter?
24        MR. DELL'ANGELO: Object to the form to
25 the extent it calls for a legal conclusion.

Page 37

1        THE WITNESS: In my opinion, Din is -- is
2  very, very good. He was top of the top bracket, so,
3  yes.
4  BY MR. McSWEENEY:
5  Q   Ultimately, you signed with WEC in 2009;
6  correct?
7  A   Yes.
8  Q   Do you recall when you first came in
9  contact with Zuffa regarding a possible contract?
10        MR. DELL'ANGELO: Object to the form.
11 Vague.
12        THE WITNESS: Yeah. I remember talking to
13 them. I don't remember the time frame.
14 BY MR. McSWEENEY:
15  Q   Do you remember who initiated contact
16 between you and Zuffa?
17  A   I do not.
18  Q   Did anyone assist you in contacting Zuffa?
19  A   I don't remember if they contacted me or
20 we contacted them. I honestly don't remember.
21  Q   Did you have a manager working on your
22 behalf at that point?
23        MR. DELL'ANGELO: Object to the form.
24 Vague as to time.
25        THE WITNESS: Repeat the question. It



```
                                                    Page 38
 1    wasn't clear.
 2        BY MR. McSWEENEY:
 3        Q    Sure.  When you were in contact with Zuffa
 4    prior to -- immediately prior to your fight with LC
 5    Davis, were you represented by a manager?
 6        A    Yes.
 7        Q    And who was that?
 8        A    My wife.
 9        Q    Mr. Aram had no role in contacting Zuffa,
10    to your recollection?
11             MR. DELL'ANGELO:  Object to the form.
12    Misstates the witness's testimony.
13             THE WITNESS:  I -- I don't recall.  I know
14    my wife was there the whole time.  There was a
15    period during that time when Mr. Aram eventually
16    wasn't doing anything else for us.  I don't remember
17    when that time was.
18        BY MR. McSWEENEY:
19        Q    Fair enough.  Do you recall why you wanted
20    to fight in the WEC?
21             MR. DELL'ANGELO:  Object to the form.
22    Foundation.
23             THE WITNESS:  I do.
24        BY MR. McSWEENEY:
25        Q    And why is that?

                                                    Page 39
 1        A    At the time I wanted to compete against
 2    what was looked at as -- as the top guys.
 3        Q    In the time period when you were
 4    considering joining WEC immediately before your
 5    fight with LC Davis, did you consider joining any
 6    competing promotions?
 7             MR. DELL'ANGELO:  Object to the form to
 8    the extent it calls for a legal conclusion.
 9             THE WITNESS:  One more time, please.
10        BY MR. McSWEENEY:
11        Q    Sure.  When you were considering whether
12    to sign a contract with WEC before your fight with
13    LC Davis, were you considering the possibility of
14    signing a contract with, for instance, Strike Force?
15        A    I was open to a possibility, but the WEC
16    had my weight class, which is very important, and
17    they had the top guys.  I don't even know if Strike
18    Force had my weight class.
19        Q    Did you investigate the possibility of
20    joining any other promotion beside WEC at this time
21    period?
22        A    Again, because of the time frame, it was
23    very limited for that weight class.  So I believe at
24    the time the WEC had the weight class, which was
25    problem No. 1.  And then problem No. 2 that they had

                                                    Page 40
 1    elite guys at that weight class, so.
 2        Q    So is it your recollection that there --
 3    that competing promotions did not have elite
 4    fighters at your weight class?
 5        A    No.
 6             MR. DELL'ANGELO:  Object to the form to
 7    the extent it calls for a legal conclusion.
 8             THE WITNESS:  That's not what I said.
 9    What I said was there was no weight classes with
10    elite fighters at that time anywhere other than the
11    WEC.  I don't believe so.  If there were other
12    organizations with elite fighters, I was not privy
13    to that information at that time.
14        BY MR. McSWEENEY:
15        Q    What do you mean by weight class?
16        A    MMA fights are conducted in weight
17    divisions.  So a guy who's 200-pounds isn't going to
18    fight a guy who's 140-pounds.
19        Q    And at this time what was your --
20        A    At that time.  At that time.  Before, yes,
21    but during this era, because we've gone through
22    eras.  During this era, weight classes were
23    established as well as regulation.
24        Q    And at this time when you were considering
25    the possibility of joining WEC immediately before

                                                    Page 41
 1    your fight with LC Davis, what was your weight
 2    class?
 3        A    My weight class was 145 pounds.
 4        Q    Is there a common name for that weight
 5    class?
 6        A    Yes.
 7        Q    What is that?
 8        A    Featherweight.
 9        Q    Do you recall whether at the time you were
10    considering joining WEC, featherweight was the
11    lightest weight class in WEC?
12        A    One more time.  I want to make sure I
13    answer the correct question.
14        Q    Sure.  Maybe I can phrase it a little more
15    clearly.
16             At that time, was featherweight the
17    lightest class that WEC offered?
18        A    No.
19        Q    Do you recall what the lightest weight
20    class was?
21        A    Yes.
22        Q    What was that?
23        A    Bantamweight.  I believe it was
24    bantamweight.
25        Q    And to your recollection, competing
```



Page 42

1  promotions such as Strike Force did not have
2  featherweight classes?
3       MR. DELL'ANGELO: Object to the form.
4  Vague.
5       THE WITNESS: I don't believe so. I don't
6  believe so.
7  BY MR. McSWEENEY:
8     Q  Do you recall at that time what promotions
9  did have featherweight classes?
10      MR. DELL'ANGELO: Object to the form.
11 Vague.
12      THE WITNESS: I do not.
13 BY MR. McSWEENEY:
14    Q  Can you name any other promotions beside
15 WEC that had featherweight class at that time?
16      MR. DELL'ANGELO: Object to the form.
17 Vague.
18      THE WITNESS: What was the -- what was the
19 time frame?
20 BY MR. McSWEENEY:
21    Q  When you were considering joining WEC in
22 2009, immediately before your fight with LC Davis?
23    A  It's a difficult question. It's a
24 difficult question. Promoters can make up fights in
25 any weight class. But having a division, a group of

Page 43

1  elite individuals, is a different thing. So for
2  example I can get offered a fight anywhere at a
3  weight class or maybe at a catch weight. But that's
4  not the same thing as being in a promotion that is
5  grouping the top guys and putting them against each
6  other. So you can get fights maybe, maybe not,
7  depending. But at that time the focal weight
8  classes were 155 and up.
9     Q  And you used the term "catch weight" in
10 that response. Can you explain what that is?
11    A  A catch weight is basically a fight
12 between two individuals on an agreed weight. They
13 agree on a weight that doesn't necessarily have to
14 fall into a particular weight class.
15    Q  Are you able -- strike that.
16       Could you have fought in a higher weight
17 class?
18      MR. DELL'ANGELO: Object to the form.
19 Vague as to time.
20 BY MR. McSWEENEY:
21    Q  In the time period we've been discussing,
22 2009, when you are considering whether to join WEC
23 prior to your fight with LC Davis, could you have
24 fought in a higher weight class?
25      MR. DELL'ANGELO: Objection. Calls for

Page 44

1  speculation. You can answer.
2       THE WITNESS: Again, tricky. Tricky
3  question because in theory, I probably could have.
4  But the size -- it wouldn't have been advantageous
5  for me to do so.
6  BY MR. McSWEENEY:
7     Q  You testified earlier that WEC had lighter
8  weight classes than featherweight. Do you recall
9  that?
10    A  Yes.
11    Q  Could you, in this time period that we've
12 been discussing, have fought in a lighter weight
13 class?
14    A  No.
15    Q  Why not?
16    A  Because I didn't want to die making
17 weight.
18    Q  Did you consider joining other promotions
19 besides WEC in a higher weight class at this time?
20    A  At that -- in that era, I was not
21 interested in fighting in a higher weight class.
22    Q  Can we return to the complaint, I think it
23 was the first Exhibit No. 37, if my recollection is
24 correct. Can you turn to page 13 of the complaint.
25 Pardon me. I think it is actually page 10. My

Page 45

1  mistake.
2       Do you see on page 10 below the heading
3  definitions there is a subparagraph D, elite
4  professional MMA fighter. Do you see that?
5     A  Yes.
6     Q  It reads "Elite Professional MMA fighter
7  means any professional MMA fighter who has
8  demonstrated success through competition in local
9  and/or regional MMA promotions or who has developed
10 significant public notoriety amongst MMA industry
11 media and the consuming audience through success in
12 athletic competition. All UFC fighters are elite
13 professional MMA fighters." Do you see that?
14    A  Yes.
15    Q  Do you agree with that definition of elite
16 professional MMA fighter?
17      MR. DELL'ANGELO: Object to the form to
18 the extent it calls for a legal conclusion. You can
19 answer.
20      THE WITNESS: During what time frame?
21 BY MR. McSWEENEY:
22    Q  During the time frame -- if you look up
23 from that paragraph, you'll see a definition,
24 subparagraph C, class period. Class period reads --
25 "means the period from December 16, 2010, until the



Page 106

1  Q  Did you regard yourself as the best
2  Pancrase fighter in 1998 when you lost to Victor
3  Hunsaker?
4  A  That wasn't even -- I just looked at the
5  people right in front of me, tried to get through
6  them. At the time, information wasn't as easily for
7  accessibility.
8  Q  Uh-huh.
9  A  -- for the Pancrase rankings. I don't
10 even know what the rankings Pancrase rankings were
11 at the time. So we just basically used a rule set.
12 Q  Had there been rankings, would you have
13 relied on them to determine whether you were the
14 best Pancrase fighter?
15     MR. McSWEENEY: Object to the form. Calls
16 for speculation.
17     THE WITNESS: I don't know, man. At the
18 time I don't even think -- I don't even know what
19 was going on with rankings back then. I have no
20 clue. It was early in the sport, so.
21 BY MR. McSWEENEY:
22 Q  Did you regard yourself as better than
23 Victor Hunsaker after having lost to him in 1998?
24 A  After losing to him, did I think I was
25 better?

Page 107

1  Q  Uh-huh.
2  A  I know I was better.
3  Q  Uh-huh. I see. Do you regard yourself
4  today as an elite MMA fighter?
5     MR. DELL'ANGELO: Object to the form to
6  the extent it calls for a legal conclusion.
7     THE WITNESS: I'm not an MMA fighter
8  currently.
9  BY MR. McSWEENEY:
10 Q  So you do not consider yourself an elite
11 MMA fighter?
12 A  I'm not an MMA fighter right now
13 currently. So it's like do you consider yourself
14 the best lawyer? Well, I'm not even practicing law
15 anymore. Well, do you consider yourself the best
16 lawyer? It's like, dude, I'm not even doing it.
17 Q  Uh-huh.
18 A  So I don't know.
19 Q  So you don't have an opinion on whether
20 you're the --
21 A  I don't care. It's not what I'm into.
22 It's not what I'm doing. It's not my focus in my
23 life.
24 Q  Uh-huh.
25 A  When I was focused at it, I thought I was

Page 108

1  the best. That's not my focus right now.
2  Q  So is it the case that you ceased being an
3  elite MMA fighter when you retired from professional
4  MMA fighting?
5     MR. MAYSEY: Object to the form.
6  Misstates testimony.
7     THE WITNESS: If -- how can you be
8  considered an elite MMA fighter if you're not
9  fighting?
10 BY MR. McSWEENEY:
11 Q  So did you cease becoming -- pardon me --
12 strike that.
13     Did you cease being an elite MMA fighter
14 the moment you -- or, pardon me -- the moment after
15 you won against Joe Stevenson on June 26, 2011?
16 A  I mean, maybe -- maybe your definition and
17 my definition are different.
18 Q  Uh-huh?
19 A  Doesn't matter -- I mean, in my opinion,
20 once you're done fighting, you're done fighting.
21 Like doesn't matter what you think, doesn't matter
22 what anybody else thinks, the skill set I have, the
23 following I have, I have, but I'm not trying to
24 fight.
25 Q  Yeah.

Page 109

1  A  So I mean, it's not like you can just
2  erase the data. So I'm not exactly sure what you're
3  asking. I mean, if I was fighting, do I still think
4  I'm great, yeah. But I'm not fighting, so it
5  doesn't matter.
6  Q  When did you cease being an MMA fighter?
7  A  I think -- excuse me. I believe it was
8  after my last fight.
9  Q  How soon after your last fight did you
10 cease being an MMA fighter?
11 A  After my last fight. I didn't fight after
12 that, so the second -- I mean, I'm not exactly sure
13 what you mean. I mean, if you're -- if you're an
14 MMA fighter, you're fighting. You have a contract,
15 you have -- I mean, I think once you decide to stop
16 fighting, it doesn't mean that your level drops or
17 anything like that, it just -- you just stop
18 fighting. So I don't understand the question. I
19 mean --
20 Q  When did you stop fighting?
21 A  2011, I believe, like June, somewhere
22 around that time frame.
23     MR. McSWEENEY: I've been keeping an eye
24 on the elevator because I believe lunch is coming,
25 and though I haven't seen it, rather than start a

Page 110

1  new line of questioning, maybe we should just break
2  and --
3       THE WITNESS:  Yeah.
4       MR. McSWEENEY:  -- grab and bite and we
5  can all return?
6       THE WITNESS:  Sure.
7       THE VIDEOGRAPHER:  We are now going off
8  the record.  The time is now approximately 12:09
9  P.M.
10      (A lunch recess was taken.)
11      THE VIDEOGRAPHER:  We are now back on the
12 record.  The time is approximately 1:09 P.M.
13 BY MR. McSWEENEY:
14    Q   Welcome back.  Before the break,
15 Mr. Vazquez I think I heard you say that you are no
16 longer an elite MMA fighter because you are, in
17 fact, no longer an MMA fighter; is that correct?
18    A   Basically.
19    Q   And you said before the break also that
20 you stopped being an MMA fighter after your final
21 fight in 2011; right?
22    A   Yes.
23    Q   When after your last fight in 2011 did you
24 stop being an MMA fighter?
25    A   I don't remember the exact date.

Page 111

1     Q   Was it immediately after the fight in
2  2011?
3     A   No.  No.
4     Q   How long after the fight in 2011 would you
5  say it was?
6     A   I was deliberating for I would say at
7  least two or three months.
8     Q   Two or three months?
9     A   Maybe more, but I don't remember.
10    Q   A couple?
11    A   Yeah.  You know, it's a career change.
12 Just took my time.  There was no rush.
13    Q   And after two or three months or whatever
14 the period was, you decided that you were no longer
15 going to fight professionally; is that correct?
16    A   Yes.
17    Q   And why did you decide that you were no
18 longer going to fight professionally?
19    A   There were several reasons.
20    Q   And what were those reasons?
21    A   One of them was a summit that the UFC
22 wanted me to attend, which I didn't feel -- which I
23 didn't mind attending, but there -- you're kind of
24 just forced into doing it.  You have no say so in
25 it.

Page 112

1          Another one was the pay, you know, for me
2  to achieve the kind of pay that I was willing to,
3  would have probably taken, you know, more time than
4  I wanted to put into it, basically.
5     Q   Were there any other reasons?
6     A   I'm sure there were.  I mean, you know,
7  I'm not thinking of them off the top of my head
8  right now.  But you know, I'd been doing it for 13
9  years.
10    Q   So you -- the two reasons, the two
11 specific reasons you mentioned were the summit and
12 that you felt forced you had to do, and that for you
13 to achieve the kind of pay that you were -- it would
14 have taken you more time than you wanted to put into
15 it.  Can you elaborate on the second reason?
16    A   You know, we have a contract, you know.
17 There's -- there's no real renegotiation, anything
18 like that.  So you sign for what you sign for.  And
19 for me, the idea was, I don't mind fighting the top
20 guys, but what I wanted to do was get compensated
21 for fighting the top guys.  If you want to keep
22 feeding me these guys that are, you know, not
23 guiding me towards my ultimate goal, which is a
24 title shot and all these things, then, you know.
25 These training camps that we go through are very

Page 113

1  difficult physically, emotionally, psychologically,
2  so there's wear and tear that I didn't feel that I
3  was compensated enough to be putting my body through
4  the kind of wear and tear, even though, you know --
5  I felt like I was wasting my time basically.  The
6  squeeze wasn't worth the juice.
7     Q   How much more time would it have taken in
8  terms of pay for it to be worthwhile?
9     A   Substantial.
10    Q   Can you estimate what substantial would
11 mean?
12    A   I mean, for the time -- this is my
13 opinion.  For the time that I've put in and the
14 things that I've shown over the years, at least six
15 figures.
16    Q   And is that six figures for an annual
17 salary or is it --
18    A   Per fight.
19    Q   -- per fight?
20    A   Per fight.
21    Q   Returning to the other reason you gave,
22 which was the summit that you felt forced to attend,
23 can you explain what it is that -- what the summit
24 is?
25    A   To be honest, I really don't know what the

Page 114

1  summit is. We did one the previous year. They
2  educated us on social media, etiquette, you know,
3  basically fighter conduct, things of that nature.
4  What you should and shouldn't on social media,
5  things of that nature. How you should promote
6  yourself, create corporations, how to run your
7  career like a business, organizing you a little bit
8  more.
9      Q   And what specifically about this -- pardon
10 me. Let me back up.
11         You testified that you attended at least
12 one summit.
13     A   Uh-huh.
14     Q   Do you recall attending any other summits,
15 or was it just the one?
16     A   I attended just the one.
17     Q   And is it the case that you were then
18 asked to attend another summit and you declined?
19     A   Yes.
20     Q   So at some time after declining to attend
21 this second summit is when you decided you would no
22 longer fight professionally; is that correct?
23     A   Yeah. I was -- you know, that happened
24 and then I had some surgeries, my hand, my knee. So
25 that was all -- I don't remember the exact timeline,

Page 115

1  but, yeah, that was all part of the ultimate
2  decision.
3      Q   Do you remember roughly when the summit
4  that you declined to attend took place?
5      A   No, I have no idea.
6      Q   Do you have a rough idea at least in year?
7      A   No.
8      Q   Sometime after your last fight?
9      A   Sometime after my last fight.
10     Q   Since that time when you decided you were
11 no longer going to fight professionally, have you
12 ever changed your mind?
13     A   No.
14     Q   You've never thought -- you've never felt
15 the urge to return to the octagon or whatever the
16 shape of the fighting arena may be, professionally?
17     A   See, there's two things to fighting.
18 There's fighting, and then there's the camp. The
19 camp sucks. Fighting, just go out and fight, like,
20 that's easy. It's the 12 weeks prior. So any time
21 I would think, yeah, I want to go back. Fuck that,
22 I don't want to go through a camp. That's what it
23 is. Fighting itself is easy.
24     Q   That's fine.
25         MR. DELL'ANGELO: Curse word.

Page 116

1          THE WITNESS: Did I curse?
2  BY MR. McSWEENEY:
3      Q   That's okay.
4      A   Sorry.
5      Q   I'm not offended.
6          Can we get tab 87?
7      A   I don't even know when I did it.
8      Q   That's fine.
9          The court reporter is going to hand you
10 what's been marked as Exhibit 45.
11         Sorry. Need one over here too.
12         (Exhibit 45 was marked.)
13 BY MR. McSWEENEY:
14     Q   This is a document Bates stamped
15 Le-Plaintiffs-0184254. Can you just take a moment
16 to review it quickly, or however much time you need.
17 Have you had an opportunity to read it?
18     A   Just a second, please.
19     Q   Sure.
20         MR. DELL'ANGELO: Counsel, could I confer
21 with the witness to make an assessment as to whether
22 or not any portion of this is privileged. Based on
23 the contents, I'm concerned that it may be.
24         MR. McSWEENEY: What portion do you
25 believe to be privileged?

Page 117

1          MR. DELL'ANGELO: That's why I want to
2  consult with my client.
3          MR. WIDNELL: Can you identify who the
4  attorney would be?
5          MR. McSWEENEY: Or the legal matter being
6  discussed?
7          MR. DELL'ANGELO: Well, if you look at the
8  subject line, that may give you some indication.
9          MR. McSWEENEY: Can you identify what
10 about the subject line you believe to be privileged?
11 Are we looking at the same document?
12         MR. DELL'ANGELO: I don't know. Are we?
13         MR. McSWEENEY: Bates stamped
14 Le-Plaintiffs-0184254?
15         MR. DELL'ANGELO: No.
16         MR. McSWEENEY: Well, we were given --
17 we've given you the wrong -- tab 87.
18         MR. DELL'ANGELO: I was --
19         MR. McSWEENEY: That resolves that.
20         MR. DELL'ANGELO: I know you're a tough
21 advocate, but if you couldn't figure that one, I
22 wasn't sure how we couldn't be on the same page.
23         MR. McSWEENEY: Sure. Sorry there seems
24 to be an error in our file keeping.
25         MR. DELL'ANGELO: It is okay.

Magna Legal Services

Page 202

1  My memory's a little bit foggy. So we got here
2  yesterday. Yesterday was Sunday; right? Or
3  yesterday was Monday? No, yesterday was Monday.
4     Q   Yesterday was Monday. It's a little foggy
5  was well?
6     A   Yeah. I don't know. Yesterday we got
7  here and we went to go eat. I don't know what to
8  tell you. We got here and went to go eat.
9  Honestly, I don't remember what we talked about at
10 that time. I'm not even kidding.
11    Q   Why don't we take a short break. We'll
12 review where we are, and that should probably be
13 close to the end.
14       THE VIDEOGRAPHER: We are now going off
15 the record. The time is approximately 3:39 P.M.
16       (A short recess was taken.)
17       THE VIDEOGRAPHER: We are back on the
18 record. The time is approximately 3:45 P.M.
19 BY MR. McSWEENEY:
20    Q   Mr. Vazquez, are you aware of something
21 called MMAAA?
22    A   Yes.
23    Q   And can you tell me what your
24 understanding of what the MMAAA is?
25    A   I have no clue, to be honest with you. I

Page 203

1  don't know what they're doing. They're supposed to
2  be another fighter organization, not organization,
3  like an association. I have no clue what the heck
4  they're doing.
5     Q   So I take it you have no involvement in
6  the MMAAA?
7     A   No.
8     Q   Do you have any understanding of how their
9  aims may differ from the MMAFA?
10    A   No.
11       MR. McSWEENEY: No further questions.
12       MR. DELL'ANGELO: Okay. Thank you. We'll
13 read and sign.
14       MR. McSWEENEY: Okay.
15       MR. DELL'ANGELO: I guess just, while
16 we're here, pursuant to the protective order, we're
17 going to claw back lead Plaintiffs 0175299. Is that
18 exhibit that I think you inadvertently handed out as
19 45 or 48 or whatever it was? We'll get you a letter
20 on that.
21       MR. McSWEENEY: We'll look forward to it.
22       THE VIDEOGRAPHER: This concludes the
23 video deposition of Javier Vazquez. We are now
24 going off the record. The time is 3:46 P.M.
25       (TIME NOTED: 3:46 P.M.)

---

1           CERTIFICATE OF WITNESS
2 PAGE  LINE  CHANGE          REASON
3
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20           * * * * *
21    I, Javier Vazquez, witness herein, do hereby
   certify and declare under penalty of perjury the within
22 and foregoing transcription to be my deposition in said
   action; that I have read, corrected and do hereby affix
23 my signature to said deposition.
24 _____  _____
   Javier Vazquez
25 Witness              Date

---

1  STATE OF NEVADA)
         ) ss
2  COUNTY OF CLARK)
3
4     I, Sarah Padilla, a duly commissioned and
5  licensed court reporter, Clark County, State of Nevada,
6  do hereby certify: That I reported the taking of the
7  deposition of the witness, Javier Vazquez, commencing on
8  Tuesday, February 14, 2017, at 9:15 A.M.; That prior to
9  being examined, the witness was, by me, duly sworn to
10 testify to the truth; That thereafter I transcribed my
11 shorthand notes into typewriting and that the typewritten
12 transcript of said deposition is a complete, true, and
13 accurate record of said shorthand notes. I further certify
14 that I am not a relative or employee of any attorney or
15 counsel of any of the parties nor a relative or employee of
16 an attorney or counsel involved in said action, nor a person
17 financially interested in the action; that a request
18 [x] has [] has not been made to review the transcript.
19    IN WITNESS WHEREOF, I have hereunto set my
20 hand in the County of Clark, State of Nevada, this __
21 day of _____.
22
23         _____
        SARAH PADILLA, CCR 929
24
25

