# EXHIBIT 36

## Excerpts from the Deposition of Scott Coker

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON FITCH, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

ZUFFA, LLC, d/b/a Ultimate Fighting Championship and UFC,

Defendant.

Case No. 2:15-cv-01045-RFB-(PAL)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

SCOTT COKER

LOS ANGELES, CALIFORNIA

AUGUST 3, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 51251

162

**SCOTT COKER - HIGHLY CONFIDENTIAL**

**preacquisition, did that cease once UFC had completed the acquisition of Strikeforce?**

**MS. GRIGSBY: Objection to form.**

THE WITNESS: Yes.

BY MR. DELL'ANGELO:

**Q. So for example, after the UFC acquired Strikeforce, Mr. White stopped calling Strikeforce Strikefarse?**

A. Yes, that's correct.

**Q. Okay. And after the UFC acquired Strikeforce, to the best of your knowledge, did Mr. White stop making personal attacks with respect to you?**

A. To my knowledge.

**Q. I apologize if I asked this before. I just wanted to be clear about this point.**

**Were you involved in the decision to cease operations of Strikeforce after the acquisition by UFC?**

A. No.

**Q. Did anyone at the UFC discuss with you some of the changes that you've testified about after the UFC's acquisition of Strikeforce, such as with respect to fighters and sponsorship tax, those sorts**

163

**SCOTT COKER - HIGHLY CONFIDENTIAL**

**of things?**

A. Can you repeat that one more time.

**Q. Sure. So I think you testified a little earlier that there were some changes at Strikeforce after it was acquired by the UFC, some of those things including like moving fighters from Strikeforce to the UFC and imposition of the sponsorship tax to Strikeforce fighters.**

**Did anybody at the UFC talk to you about those decisions?**

A. No. My role, really, was almost like an on-call consultant, and I had no decision-making ability at my time at the UFC.

**Q. All right. Did there come a time -- did there come a time when you ceased to be involved with Strikeforce and the UFC altogether?**

A. Yes.

**Q. When was that?**

A. March of '14.

**Q. Okay. And why in March of '14 did you come to no longer be involved with Strikeforce or the UFC?**

A. That is when my three-year deal with the UFC ran out.

**Q. And what, if anything, did you do after**

164

**SCOTT COKER - HIGHLY CONFIDENTIAL**

**March of 2014?**

MR. KELLY: Objection, vague and ambiguous.

MR. DELL'ANGELO: Fair. I'll withdraw the question.

BY MR. DELL'ANGELO:

**Q. After March of 2014, were you employed?**

A. No.

**Q. Did you become involved in any other MMA promotion?**

A. In June of '14, I did.

**Q. And in June of 2014, what MMA promotion did you become involved in?**

A. Bellator MMA.

**Q. And I think you mentioned a little earlier that your agreement with the UFC after the acquisition of Strikeforce was essentially a noncompete; is that right?**

A. It was an employment agreement, but as we were negotiating the deal with my partners, they approached me, and they said look, you know, UFC is not going to just let you open up another company in two months.

**Q. Sure.**

A. So there's going to be an employment

165

SCOTT COKER - HIGHLY CONFIDENTIAL

agreement, to me, which I interpret that as a noncompete agreement. And I think there was some noncompete language in there, I can't remember.

But essentially, that's what the deal was was that, you know, in order for the sale to go through, I basically had to agree to this three-year deal.

**Q. And you interpreted the three-year deal as part of the sale of Strikeforce to the UFC as, at least in part, effectively a noncompete?**

A. That's correct.

**Q. That is, in the MMA industry?**

A. Yes.

**Q. So by March of 2014, that agreement had expired, and as of June of 2014, you became involved in Bellator, correct?**

A. Yes.

**Q. Okay. And tell me about -- tell me about that. How did you become involved in Bellator?**

A. Had a meeting with Kevin Kay, and I was actually on my path to start another organization. And after meeting Kevin, I felt very comfortable in jumping on the Bellator ship and try to get them, you know, situated properly and make this a real

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

166

SCOTT COKER - HIGHLY CONFIDENTIAL

legitimate MMA company.

**Q. And prior to your involvement in Bellator in June of 2014, how would you characterize it as an MMA promoter?**

A. How would I characterize?

**Q. Bellator --**

A. Bellator.

**Q. -- as an MMA promoter before you got involved in June of 2014.**

A. Bellator was run by Bjorn Rebney, and at that time, I felt like it was a dying brand.

**Q. Why did you view Bellator as a dying brand before you got involved in June of 2014?**

A. I don't think it -- to me, the way I felt was it didn't have the respectability and the credibility of the MMA community, the managers, the fighters, and lacked star power.

**Q. And what do you mean it lacked star power?**

A. They didn't have very big names at Bellator.

**Q. Just so we're clear, I'm going to ask you a series of questions that are all pre of June '14. I'll try to preface them, make it clear if I'm asking something different, so I don't have to keep**

167

**SCOTT COKER - HIGHLY CONFIDENTIAL**

**repeating it and we understand each other.**

**Before you got involved with Bellator in June of 2014 -- well, did you have an understanding as to why Bellator lacked, as you've used the term, star power before June of 2014?**

**MS. GRIGSBY: Objection, foundation.**

THE WITNESS: My belief is that the founder and the promoter, Bjorn Rebney at that time, quite frankly, a lot of people didn't like him and didn't want to do business with him.

So that makes it tough when you're trying to recruit fighters.

BY MR. DELL'ANGELO:

**Q. Are there any other reasons that you can think of?**

A. You're talking specifically about 2014.

**Q. Before June of 2014 why Bellator didn't have big names or star power?**

**MS. GRIGSBY: Objection, foundation.**

THE WITNESS: I think it comes to leadership, and I think that there was lacking -- there was a lack of leadership.

BY MR. DELL'ANGELO:

**Q. So when you joined Bellator in 2014, did**

168

**SCOTT COKER - HIGHLY CONFIDENTIAL**

**you have an opportunity to develop an understanding of its financial condition?**

A. I'm not sure.

**Q. So you've been involved in the mixed martial arts industry since at least 2006, right?**

A. Yes.

**Q. Okay. And from 2006 to June of 2014 when you became involved in Bellator, do you know during what period of time within that time frame Bellator existed?**

A. Bellator started as a product that was created by the founder, Bjorn Rebney, I think they started in '06 or '07, and I can't be sure, it might have been later than that. They were not backed by Viacom at that time, and they were ESPN Deportes product, which was made for Spanish television. That's why they called it Bellator because in Latin, it means warrior.

**Q. So you were involved in the MMA industry for basically the whole time that Bellator was in business, right?**

A. Well, yes, but I mean, I would say that there's probably two years or a year-and-a-half that I basically unplugged and wasn't really actively on

169

SCOTT COKER - HIGHLY CONFIDENTIAL

the websites or talking to people and really more focused on things that I wanted to do.

**Q. What period of time was that?**

A. That was from the time that Strikeforce closed until, let's say, March of '14.

**Q. So Strikeforce closed in March of '11, right? I think that's what you testified to.**

A. No. It was bought in March of '11, then it ran for a year-and-a-half.

**Q. I'm sorry. When you say closed, I was thinking the transaction closed. You mean the business closed?**

A. The business closed, yeah.

So the last year-and-a-half, really, if I wanted to go to a fight, a UFC, I would call and they would arrange tickets. Other than that, I was doing a lot of personal things.

**Q. Okay. So from the time Bellator closed -- excuse me. Withdraw that.**

**From the time that Strikeforce closed in 2013 to roughly March of 2014, you were not a student of the MMA industry; is that right?**

A. I was studying martial arts myself. I was traveling with my girlfriend and playing a lot of

golf.

**Q. You weren't a student of the MMA promotion industry or business, right?**

A. No.

**Q. So about three months later, you become involved in Bellator, correct? So June of 2014, about three months after you kind of emerged from your --**

A. Yes.

**Q. -- your hiatus, if you will? Okay.**

**And so, from the time of March 2014 to the time of June 2014, did you study or research Bellator to try to understand it more and why it may have lacked star power?**

A. No. The mindset really wasn't to, you know, like to study anything, really. It was stop and smell the roses, unwind a little bit, just relax. Go on vacation, travel, you know, travel all over the world for a year-and-a-half, and then, play a lot of golf and just relax.

**Q. Right. Yes, I appreciate that. All I was really trying to understand is up to June of 2014 how dialed in you really were to Bellator's business and why, you know --**

A. I had no idea. Honestly, it was Kevin Kay requesting a meeting, and I didn't even know who Kevin Kay was, to be honest with you. So I said, okay, I'll go meet him. But really, I'm going to go open another company. I remember telling some friends: I'm not in the business of building other people's businesses, I'm go to build my own business again and I'm going to go back and do this.

And I sat down with Kevin Kay, and he's telling me what he's doing, telling me what he wants to do, wants to make a move in the top position.

Originally, I thought he wanted me to work with Bjorn Rebney. I said, well, this is not -- you know, by committee, this is -- something that has to be very, you know -- somebody has to make the decision. I don't want to argue with somebody else.

And I said, Kevin, I go, your brand has really been dented. And you know, I'm coming up off a very, very -- you know, time in my life where Strikeforce was great, I want to create something else great.

I remember telling Kevin this. I said, your ship is kind of like the Titanic. You know? Do I want to jump on the Titanic as you guys are

tilting? I go: I don't know. I go -- I had to think about that.

And I said something to him, and I wanted to see how he'd react. And what I said was, I said: Kevin, you don't only have a black eye in the business, you have an orbital fracture, and I'm not a surgeon. I don't even know if I can help you.

He said: Well, hey, think about it. I said: Well, I'll think about it.

And I didn't call him back for a month because I wasn't looking for a job, I didn't want to be employed by anybody.

But he kept calling me and talking. And the more I talked to him, I started feeling good about his vision.

And so, finally, after much -- you know, thinking about it for two-and-a-half months, I said: You know what, F it. Let's go for it. I'm going to go and try my best and try to help build Bellator. And then, they made the move to remove Bjorn, and I came in two days later. And that was March of '14, yeah, March of '14.

**Q. In your estimation, as you just sort of articulated, was Bellator's lack of star power part**

**of what made it like the Titanic in the MMA industry?**

A. I think it comes from leadership at the top, and it was that tournament format. To me, the tournament format, my belief is this -- and I worked for K-1 for eight years, which was the greatest tournament format, you know, entity ever, that and Pride.

And you should do tournaments when you have eight stars because then, everybody can identify with these eight fighters, just like we did for the heavyweight tournament.

These were tournament formats that were happening every week in a different city in a little town that, you know, a lot of people didn't hear about. You know, I didn't even know what some of these cities were. And a 1500, 1800-seat stadium. It just looked very small, very dark, very dingy, and the product was just subpar. And this is before, you know, Viacom came in and took it over.

So that's what I was referring to. Kevin was like, you know. And he goes: Well, have you watched our product lately? I says: No, not really. And I really hadn't even watched one episode to that point. He goes: Well, check it out.

174

SCOTT COKER - HIGHLY CONFIDENTIAL

And I said: You know, Kevin, the tournament format doesn't work. I'm telling you, you've got to have eight stars. And then, your overlapping of tournaments were -- you know, because this is what I was hearing from the managers and the fighters and even some of my friends that are hard core MMA fans can't keep up with which tournament is fighting today and which one is next week and who, what weight class. They just get confused because there's so many tournaments going on at the same time.

**Q. Right.**

A. So I told Kevin, I said: We have to change the format. We have to go back to star fights, you know, star versus star, and we have to --

MR. KELLY: Slow down a little bit.

THE WITNESS: I'm getting excited, you know.

But I just told Kevin that we have to change the format, and he was agreeable. He said: Look, if we give you the reigns, we're going to give you the reigns, and you go do it.

And I said: All right, let's go do this.

175

SCOTT COKER - HIGHLY CONFIDENTIAL

BY MR. DELL'ANGELO:

**Q. Before June of 2014, did Bellator have a -- you mentioned Viacom. Did Bellator have a relationship with Viacom?**

A. Before 2014?

**Q. June of 2014, yeah.**

A. That was coming out of -- yes, they did.

**Q. And did Bellator's pre-June 2014 relationship with Viacom mean that Bellator had, you know, access to capital to pay fighters that, you know, had an upstart promotion might not otherwise have?**

**MS. GRIGSBY: Objection to form.**

MR. KELLY: Objection, foundation, calls for speculation.

THE WITNESS: Yeah, I would have to speculate at this point.

BY MR. DELL'ANGELO:

**Q. Are you familiar with Dana White's statements about, you know, the importance of Bellator's relationship with Viacom as it relates to Bellator's access to what he has characterized as $5 billion in cash? Have you heard those statements?**

A. No.

176

SCOTT COKER - HIGHLY CONFIDENTIAL

**Q. In your experience as an MMA promoter, was having access to, you know, cash alone as an MMA promoter sufficient to attract top talent?**

A. Is cash enough?

**Q. In and of itself.**

A. That's -- that's a very tricky question, and I'll tell you why. Because if I went to a fighter and I was trying to recruit a fighter and let's say UFC was coming in and we're making the same offer, right, they would have familiarity with both of us. But let's say, you know, somebody else came in and was willing to pay even more money.

A lot of times, a fighter will take what they're familiar with, and it might be less money.

So I don't think money is the only, you know, consideration because there has to be a comfort level for them to trust you and want to fight for you.

**Q. And do the fighters also need to know that they will have the opportunity to be matched against fighters of, you know, comparable quality?**

**MS. GRIGSBY: Objection to form, foundation.**

177

SCOTT COKER - HIGHLY CONFIDENTIAL

BY MR. DELL'ANGELO:

**Q. In your experience.**

A. I mean, I've never had a fighter that I've offered a contract to say, well, I want to fight this guy and then I want to do this and that. They want to know their deal, and then, they'll go deal with the division is my experience.

**Q. I guess thinking about it differently, let's take Fedor as an example since we talked about him.**

**In your experience, would a fighter like Fedor, would it be beneficial to his career to join a promotion that only had unknown, untested fighters?**

**MS. GRIGSBY: Objection, calls for speculation.**

THE WITNESS: My opinion is that he would -- he would take that into consideration, yes.

BY MR. DELL'ANGELO:

**Q. Do you know if he was ever presented with that kind of opportunity?**

A. I will say this, he did fight in Russia many times for small organizations that he felt that he wanted to fight in Russia. So he fought for these companies and they paid him, and he fought several

times there that were not big, big, you know, worldwide companies.

**Q. So let's get back to sort of Bellator post -- let's get back to Bellator post June 2014. Or get to it, as the case may be.**

**Does Bellator have a policy regarding its fighters' ability to sign sponsorship deals with Bellator sponsors?**

**MS. GRIGSBY: Objection, form.**

THE WITNESS: Yes, it has a policy, yes.

BY MR. DELL'ANGELO:

**Q. Does that policy include a sponsorship tax like the one that you testified about at the UFC?**

**MS. GRIGSBY: Objection, form.**

**THE WITNESS: No.**

**BY MR. DELL'ANGELO:**

**Q. And does Bellator have a policy that governs its fighters' ability to sign with sponsors that are not Bellator sponsors?**

A. Yes.

**Q. And what is that policy?**

A. I'll just explain the policy.

**Q. Sure.**

A. The basic policy is simple. You can't have

a competing sponsor on a fighter that competes against your league, you know, league sponsors.

So we have like Dave & Busters, our fighters can't go get Buffalo Wild Wings, let's say, kind of the same area. Or if he has Bud Light and ours is Miller, then there's a conflict. So they can't do that.

Other than that, they're free to go as long as it falls under the rules and the regulations of Viacom Media Company.

**Q. Otherwise, they're not -- aside from those limitations, Bellator doesn't restrict its fighters' right to have sponsors when they're fighting for Bellator?**

A. Other than that, there's no other restrictions.

**Q. And does Bellator have a policy regarding co-promotion for its fighters?**

A. Can you explain that?

**Q. Sure. Are you familiar with the term "co-promotion" as it relates to the promotion of MMA bouts?**

A. It could mean -- it could mean several things.

**Q. Okay. So what is your understanding of what it is?**

A. My understanding is when another league, like, say, for instance Rizin or KSW wants to co-promote, then it becomes a co-promotion between Bellator and Rizin or Bellator and, you know, KSW or One FC. That's what I think of as a co-pro.

**Q. Does Bellator have a policy regarding co-promotion as you think of it?**

A. No.

**Q. So it doesn't prohibit co-promotion, right?**

A. No.

**Q. Does Bellator have a policy with respect to whether or not a fighter under contract with Bellator can fight for other promotions? Other MMA promotions, that is.**

A. Repeat that one more time just to make sure I understand.

**Q. Yes. Does Bellator have a policy regarding whether or not fighters under contract with Bellator may fight for other MMA promotions?**

A. Yes.

**Q. And what is that policy?**

A. Under the contract, it's an exclusive

contract with the fight company. So they are not allowed to compete.

**Q. And do you know when that policy came into being?**

**MS. GRIGSBY: Objection, foundation.**

THE WITNESS: I don't. And I will say this. If we have a fighter that wants to fight in Japan, then we'll send him. If we have a fighter that wants to fight in another league, we'll send them. We send fighters to Vienna sometimes.

I do believe, and again, I'm not a hundred percent, but my belief is that we do have in some fighters' contracts that they actually are allowed to compete in a fight league in another country if we're not -- if it doesn't hurt our business in the sense that we have certain obligations to these athletes, they have to fight two or three times a year. And we want to make sure that we're able to make that happen for the athlete. Otherwise, you know, we could be in breach of the deal.

So that's kind of in a nutshell what that agreement is.

BY MR. DELL'ANGELO:

**Q. Right. So for example, you might not agree**

**contenders in UFC after Strikeforce.**

**Do you remember that?**

A. Yes.

**Q. And I don't think I can go through the entire list, but examples were Antonio Silva; is that right?**

A. He was one.

**Q. Gilbert Melendez?**

A. Yes.

**Q. Alistair Overeem?**

A. Yes.

**Q. Ronda Rousey?**

A. Yes.

**Q. Luke Rockhold?**

A. Yes.

**Q. And there are others?**

A. Yes.

**Q. So do you know if like, for example, Antonio Silva got paid less at the UFC than he did at Strikeforce?**

A. I don't know.

**Q. Do you know if Gilbert Melendez got paid less at the UFC than he did at Strikeforce?**

A. I'm not sure.

**Q. Do you know if Alistair Overeem got paid less than he did at Strikeforce in the UFC?**

A. I'm not sure.

**Q. Do you know if Ronda Rousey got paid less at the UFC than she did in Strikeforce?**

A. I'm sure she got more, but I'm not familiar with these contracts.

**Q. So is it your understanding, then, that some of the fighters who came from Strikeforce and went to the UFC, at least some of them actually ended up getting paid more at the UFC; is that right?**

A. Yes.

MR. DELL'ANGELO: Objection to form.

BY MS. GRIGSBY:

**Q. Now, just moving on through your career now as president of Bellator, are you familiar with Bellator's venue contracts, its contracts with different venues?**

A. Can you be more specific.

**Q. So for example, when, you know, Bellator makes a contract, have an event at SAP, do you see those contracts?**

A. I do not see the contracts.

**Q. Do you know -- well, have you ever signed a**

**contract, an agreement with a venue?**

A. Yes.

**Q. On behalf of Bellator?**

A. I can explain the process.

**Q. Sure.**

A. The process is, basically, we have a venue staff member that goes out and find the venues, and they negotiate the deal.

I say green light it. Then it goes to legal, and that's how it works.

**Q. But as president of Bellator, sometimes it is your responsibility to sign the venue agreements; is that right?**

A. Oh, yeah. I'm not saying not sign. But as far as, you know, look through every agreement and negotiate the nuances of the deal, that's where our legal team steps in.

(Exhibit 27 was marked for identification by the reporter.)

BY MS. GRIGSBY:

**Q. So I'm showing you what has been marked as Exhibit 27.**

**Exhibit 27 has been Bates-stamped SBPCL00000225 with the last number that should be**

**SBPCL00000247.**

MR. KELLY: Is there a question on that?

MS. GRIGSBY: Yes, I do have a question. I just wanted to let him look through.

MR. KELLY: Oh, okay. Sorry.

MS. GRIGSBY: You know --

MR. KELLY: I didn't know if you --

MS. GRIGSBY: If you want me to move it, I can move it --

MR. DELL'ANGELO: -- were waiting for an answer.

MS. GRIGSBY: -- you know. I just didn't want to jump in there before you had time to read the exhibit.

BY MS. GRIGSBY:

**Q. Let's look at paragraph 15, which is on SBPCL00000230.**

**Now, paragraph 15 reads:**

**"Exclusivity. Licensor understands and agrees that during the 90-day period of time prior to the event and for the period of time extending to 45 days after the event, it shall not host any other**

**combat event aside from the event set forth herein."**

**Let me just back up. Do you recognize this document?**

A. No.

**Q. So on the last page, or the page that ends with 234.**

A. My signature.

**Q. So that's your signature. So you were the signatory for this contract; is that right, on behalf of Bellator?**

A. Yes. I mean, we do have my signature stamp on some of these documents, you know, that they're authorized -- our legal team is authorized to sign it on behalf of myself.

**Q. So you don't remember entering into this contract; is that right?**

A. I can tell you, I've never read any venue document probably ever in the history of my combat sports promoting business.

**Q. Well, would it surprise you if venue contracts have a provision, such as this one, where it is exclusive and it cannot host other combat sports during a certain window?**

**MR. DELL'ANGELO: Objection to form.**

THE WITNESS: You know, I'm just not sure.

BY MS. GRIGSBY:

**Q. We'll put that one to the side.**

**(Exhibit 28 was marked for identification by the reporter.)**

**BY MS. GRIGSBY:**

**Q. And I'm going to hand you what has been marked as Exhibit 28, and you might have similar answers, but we'll see.**

A. I'll try my best.

**Q. So Exhibit 28 has been Bates-stamped SBPCL00000324 with the ending Bates stamp of SBPCL00000341.**

**Just turning to the last page.**

A. Yes.

**Q. Is that your signature on the last page?**

A. Yes.

**Q. Do you recognize this document?**

A. No.

**Q. Do you recall entering into a site agreement with the Chickasaw Nation at all, between Bellator and the Chickasaw Nation?**

A. Yes. I believe this document is in

reference to our Thackerville, Oklahoma event. And we go there, I think two or three times a year. And I think it came up for renewal in '16, and this looks like the extension.

But again, the process would be, you know, our venue staff member talking to the casino and the host venue, and then, basically, I would green light the terms and the conditions that they're proposing or make changes. And then, it just goes to legal, and that's how it operates.

**Q. Well, looking at SBPCL00000332, which is under heading 3, subparagraph Q, it says:**

**"Exclusivity. Nation understands and agrees that during the term, it shall not host any other MMA events aside from the event set forth herein."**

**Is this the type of term that you would approve?**

A. I didn't even know that was in the agreement.

**Q. Now, would you say that Bellator is a national promotion of MMA bouts events?**

A. Yes.

(Exhibit 29 was marked for identification by the reporter.)

BY MS. GRIGSBY:

**Q. I'm handing you what has been marked as Exhibit 29.**

**Now, this is an article from SB Nation, which is "Spike TV president: Bellator MMA on an even footing with the UFC." MMA fighting is the category. It's by Mark Raimondi, dated February 8th, 2015.**

**Now, I just want to direct your attention to the last page. On the last page, you're quoted as saying:**

**"There's not going to be a fighter on the planet. We can't afford and have access to."**

**Do you see that?**

A. Yes, I see it.

**Q. Did you make that statement?**

A. Yes.

**Q. And do you believe it's true that there's not going to be a fighter on the planet that Bellator can't afford and have access to?**

**MR. DELL'ANGELO: Objection to form.**

THE WITNESS: Let me just explain the steps.

So basically, it's -- access to, meaning if they're a free agent, obviously, we have to -- we can't just go steal fighters. So that's maybe a misstep on my part.

But I believe that we will be able to afford the fighters that are getting the top dollar out there.

BY MS. GRIGSBY:

**Q. So with that correction, which is there's not going to be a free agent fighter on the planet that we can't afford and have access to, would you say it's true that there's not going to be a free agent fighter that Bellator can't afford or have access to?**

**MR. DELL'ANGELO: Objection to form.**

THE WITNESS: I believe it's true.

(Exhibit 30 was marked for identification by the reporter.)

BY MS. GRIGSBY:

**Q. I'm handing you what has been marked as Exhibit 32 --**

THE REPORTER: Exhibit what?

MS. GRIGSBY: 32. Oh, sorry. 30. Exhibit 30.

BY MS. GRIGSBY:

**Q. Exhibit 30 is another article from SB Nation called "AJ McKee re-ups for multiple years. Will remain in Bellator MMA for foreseeable future."**

**Now, I just want to direct your attention to the second page where the article starts. The last paragraph at the bottom. The beginning of the sentence reads:**

**"We have many of the best featherweights in the world fighting for Bellator, and AJ has left no doubt in my mind that he belongs in that group."**

**Did you make that statement?**

A. Yes.

**Q. And do you believe it to be true?**

A. Yes.

**Q. So you believe that Bellator has some of the best featherweight fighters in the world, is that right, fighting for Bellator?**

**MR. DELL'ANGELO: Sorry. I'm going to just object to the form. Vague and ambiguous as to time.**

**BY MS. GRIGSBY:**

**Q. So this article is dated December 21st, 2015.**

**So as of December 2015, do you believe that Bellator has or had some of the best featherweight fighters fighting for Bellator in the world?**

A. Yes.

**Q. You can put that to the side.**

**(Exhibit 31 was marked for identification by the reporter.)**

**BY MS. GRIGSBY:**

**Q. So I'm handing you what has been marked as Exhibit 31, which is an article, again, from SB Nation, which reads, "Scott Coker: Bellator did talk to Alistair Overeem's reps, but 'we chose' not to make an offer." It's dated February 16th, 2016.**

**Now, I just want to direct your attention to the third page in this article. In the third paragraph up from the bottom, which starts as -- through to the last one in the article. The third paragraph up from the bottom. It starts with, "And same thing with Sterling."**

**Now, the last sentence in this box says:**

**"There are other free agents that**

**are on the market that we're going after. There's a lot of fighters out there right now."**

A. Um-hmm.

**Q. Did you make that statement in 2016?**

A. Yes.

**Q. And do you believe it to be true, that in February 2016, there were a lot of fighters out there on the market that Bellator could go after?**

A. Yes.

**Q. You can put that to the side.**

**(Exhibit 32 was marked for identification by the reporter.)**

**BY MS. GRIGSBY:**

**Q. I'm handing you what has been marked as Exhibit 32.**

**Exhibit 32 is an L.A. Times article entitled "Bellator goes after free agents as it digs in as alternative to UFC," dated January 21st, 2017, by Lance Pugmire.**

**Now, in the article, in the third paragraph of the second page, there's a quote from you that says:**

**"We picked up a hundred percent of**

274

SCOTT COKER - HIGHLY CONFIDENTIAL

the guys we went after last year.
It's a commitment by Spike TV and Viacom."
Do you see that?

A. Yes.

Q. Did you make that statement?

A. Yes.

Q. And is it true that in last year, meaning that as of January 2017, Bellator picked up a hundred percent of the free agent MMA fighters that it went after?

A. Yes.

(Exhibit 33 was marked for identification by the reporter.)

BY MS. GRIGSBY:

Q. I'm handing you what has been marked as Exhibit 33.

Now, since you've been president of Bellator, have you followed the ratings that Bellator's events have gotten either on free TV or on pay-per-view?

A. Yes.

Q. Now, this article is another SB Nation Bloody Elbow article entitled "Kimbo versus Shamrock

275

SCOTT COKER - HIGHLY CONFIDENTIAL

Bellator MMA (main event) averages 2.1 million viewers on Spike," dated June 22nd, 2015.

Now, is it true that in June of 2015, Bellator's Kimbo Slice/Shamrock event topped 2.1 million viewers on Spike?

A. Yes.

Q. And in your view, is that a sizeable audience, 2.1 million viewers, for an MMA event?

A. Yes.

MR. DELL'ANGELO: Objection to the form.

THE WITNESS: Sorry.

(Exhibit 34 was marked for identification by the reporter.)

BY MS. GRIGSBY:

Q. So let's look at -- this is Exhibit 34.

Exhibit 34 is another production from Shark Entertainment. The first email is really a long forward, but it's from David I. Schwarz at Spike TV, subject: Spike press June 22nd, 2015, Bellator 138, and then, it looks like there's a forward from Scott Coker at Bellator on the same date, and finally, from Christian Printup to you, Scott Coker, with a cc to a number of individuals on June 22nd, 2015. Oh, Christian Printup.

276

SCOTT COKER - HIGHLY CONFIDENTIAL

Do you recognize this document?

A. It looks like a document that traditionally comes to us, including myself from after an event, from the press guys at Spike TV, David Schwarz.

Q. Now, on the second page, do you see the quote:

"Bellator produced an entertaining night of fights that certainly brought with it more headlines and media attention than its main competitor, the UFC," by SB Nations.

Do you see that?

A. Yes.

Q. And that is referring to -- all these quotes are referring to the Shamrock/Kimbo Slice fight; is that correct?

A. Yes.

Q. And do you agree with SB Nation that Bellator produced an entertaining night of fights that brought with it more headlines and media attention than its main competitor, the UFC, for the Shamrock/Slice fight?

A. I believe for that event, we did.

///

277

SCOTT COKER - HIGHLY CONFIDENTIAL

(Exhibit 35 was marked for identification by the reporter.)

BY MS. GRIGSBY:

Q. I'm showing you what has been marked as Exhibit 35, which is an SB Nation article, dated November 10, 2015 with a headline "Bellator slightly tops UFC in total viewers over the weekend."

Now, do you remember the event discussed in this article, which is Bellator St. Louis event in November of 2015?

A. Yes.

Q. And do you agree that the St. Louis event got better ratings than the UFC by drawing 814,000 viewers?

A. Yes.

Q. So during your time there, there have been a number of times where Bellator's ratings have either met or exceeded that of the UFC event during the same time period; is that right?

A. Yes.

Q. And just to be clear, so during your time at Bellator, there are a number of times when Bellator's ratings have been the same or exceeded the UFC? I was just clarifying the question.

STATE OF ______________ )
) :ss
COUNTY OF ______________)

I, SCOTT COKER, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
SCOTT COKER

Sworn and subscribed to before me, this day of , 2017.

______________________________
Notary Public

CERTIFICATE OF REPORTER

I, Cynthia K. DuRivage, a Certified Shorthand Reporter of the State of Nevada, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

Reading and signing by the witness was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 16, 2017

______________________
CYNTHIA K. DuRIVAGE
CCR No. 451

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE
___ ___ CHANGE:________________________
REASON:______________________________
___ ___ CHANGE:________________________
REASON:______________________________
___ ___ CHANGE:________________________
REASON:______________________________
___ ___ CHANGE: ________________________
REASON:______________________________
___ ___ CHANGE: ________________________
REASON:______________________________
___ ___ CHANGE: ________________________
REASON:______________________________

________________________ ____________
WITNESS' SIGNATURE DATE