# EXHIBIT 43

## Redacted Excerpts from Deposition of Joe Silva

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON FITCH, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

ZUFFA, LLC, d/b/a Ultimate Fighting Championship and UFC,

Defendant.

Case No. 2:15-cv-01045-RFB-(PAL)

VIDEOTAPE DEPOSITION OF JOSEPH SILVA

Richmond, Virginia

June 7, 2017

8:11 a.m.

Reported by:
KIMBERLY L. RIBARIC, RPR, CCR
JOB NO. 50374

SILVA

**you wouldn't renegotiate until the eighth fight on the deal?**

A. You wouldn't have to.

**Q. You wouldn't have to. Right.**

A. There was many who did; where you'd just look at it and go, your accomplishments outweigh where you're at on here, so we will -- let's renegotiate early.

**Q. I see.**

A. But you did not actually have to.

**Q. You didn't have to. All right.**

**And part of what you were proposing here is locking fighters coming off the TUF show into longer term contracts; is that right?**

A. No.

**Q. No?**

A. It was the exact same length of time.

**Q. The same length of time.**

A. The other ones were three-year-period type of contracts what the exact time was. But it was to reflect -- it's like, no, this is how much it would break down to per fight. But actually they could also get through this contract a lot faster. The original TUF contracts simply had an end date on it



SILVA

unless you fought more than four fights in a year.

**Q. I see.**

A. It was just going to end here. Here, if you fought rapidly, you could actually burn through the contract quicker.

A. Yeah. A better deal than the standard four-fight deal.

**Q. For you, for Zuffa?**

A. Yes.

**Q. Why?**

A. That you put the investment of having these guys on TV for however long they would. So that's why with the old contracts they were under long-term contracts. Like, look, it's still -- it -- we're getting a good amount of time out of it, so there's still that value to us, but it's more fair to the fighters, they make more money and can get through the contract if they're acted faster.

**Q. Okay. All right.**

MR. CRAMER: Like to mark the next



SILVA

document as Silva Exhibit 35.

(Silva Deposition Exhibit 35 marked for identification.)

**Q. So Silva 35 is a document entitled Minimum Fighter Pay January 2015, UFC, and it bears the Bates range ZFL-0895314 through 5317.**

**And the first page has this Fighter Compensation Overview chart, and then the second page of the document has Moving the Minimum.**

**Have you seen this document before?**

A. I don't know that I've seen it.

**Q. Look at under Moving the -- do you know who created it by looking at it?**

A. I do not know.

**Q. Okay. Who at Zuffa at this time do you think would have been the type of person who would create this kind of document?**

A. Maybe Deni.

**Q. Deni who?**

A. I actually don't know her last name.

**Q. Okay. Someone named Deni.**

A. Yes.

**Q. Who knows Excel or something like that.**

A. Yeah, I think kind of just financial stuff,



SILVA

but not somebody I -- I dealt with a whole lot.

**Q. Okay. All right. All right. So it says Moving the Minimum.**

**Do you see that, Fighter Contracts, and then there's First Contract, Second Contract, Third**

**that under Fighter Contracts in the left, under Moving the Minimum?**

A. Which page?

**Q. The first page -- the page after the chart.**

A. Okay. Got it.

**Q. It's 5316.**

A. Okay.

**Q. So Fighter Contracts, it says First Contract, Second Contract, Third Contract.**

A. Yes.

**Q. And under First Contract, there is the current as of January 2015 minimum --**

A. Uh-huh.

**Do you see that?**

A. Yes.

**Q. And do you recall that there was a proposal**



354

SILVA

**to potentially change that to make the minimum 10 or 12 or 14?**

A. Yes.

**Q. Okay. So there was a conversation that you were a part of to potentially move the minimum in different ways?**

A. Yes.

**Q. And what was ultimately decided with regard to the minimum?**

A. Well, this is different than the other minimums. As I stated before, there were no official, it was just kind of what, you know, I felt this should be, and then they looked at it.

This was an official one that -- I don't know if it was Lorenzo or -- it was brought to me, going, hey, how about this. And where it was different was the bonus for the fighters, and this one was -- when I did it before, it wasn't retroactive, it was like, all right, well, now I feel it's time, so anybody that I'm signing now, this is what they'll get, but it didn't affect people who were previously signed.

This changed where nobody would be under a 10 and 10 who was under contract. That if they were,

355

SILVA

we'd go and give them the bigger contract.

**Q. The 12 and 12, or the 14 and 14?**

A. No, just -- like, say, if they were on 8 and 8 --

**Q. I see.**

A. -- which was the minimum before.

**Q. I see.**

A. Even if you are already on that, we're going to change it and bump you up. Even though you're not a new signee. You were at that previously.

**Q. So the first contract, this is sort of the standard model, first contract is 8 and 8, 10 and 10, 12 and 12, and 14/14; is that right?**

A. Yes, at that time.

**Q. And then it was changed to 10 and 10, 12 and 12, 14/14, 16/16?**

A. Yes.

**Q. Okay. And the second contract standard became 19/19, 22/22, 25/25, 28/28?**

A. No. They -- those were just projections where they're trying to figure out how much. After the -- the first contract's fairly standard.

**Q. I see.**

A. Unless you came in with a big reputation,

356

SILVA

like why would you get more than that.

**Q. Right.**

A. But once you got through a contract, it could vary. If you just happened to, like, I fought three really good guys, three ranked guys, I'm going to continue to fight -- face higher-ranked guys than that, I deserve a bigger bump than somebody who's kind of fighting middle-of-the-pack guys, and that was not unusual to happen.

So it was not any strict -- it's like, okay, now the second --

**Q. Right.**

A. -- contract is this.

I think they were just trying to look -- trying to figure out an average, like, okay, if we make these changes, what are some projected costs for that.

**Q. Okay. So the first contract tends to be standard unless there's some particular reason some --**

A. Right. And it's still an average. If you're a heavyweight and -- and I wanted you, and -- and I felt like there was other bidders and I needed you, I -- I was not restricted --

357

SILVA

**Q. Right.**

A. -- to that. But if you're just sort of, oh, you're an interesting talent but you haven't proven anything yet, this is standard.

**Q. This is what you would -- standard, and that's what you would work from.**

**And you would deviate from it in the case of a heavyweight or in the case of someone -- if there's somebody else bidding for them?**

A. Or they just struck me as more special, and I know it's like, no, this -- this person -- especially -- you know, I try to make fair match-ups, and if it's your first UFC, your first couple UFCs, you're -- you're fighting usually people in that similar situation. If you seemed like somebody, like, wow, this is a special talent and he could be fighting better people sooner, that could also affect.

**Q. Okay. I think you said that if there were somebody else bidding for someone's services, you might increase your offer a little bit; is that right?**

A. Yeah. If I really wanted them and they were, like, I'd love to, but this guy has offered me

SILVA

this, well, all right, you know, all right, I'll offer you that.

**Q. So you might -- the fact that someone else is bidding for their services might cause you to pay them a bit more, match maybe what they're offered by somebody else?**

A. Yes.

**Q. All right. You can put that document aside.**

MR. CRAMER: All right. Like mark the next as Silva Exhibit 36.

(Silva Deposition Exhibit 36 marked for identification.)

**Q. Now, apparently the Bates number is cut off a bit from the exhibit, but I will represent that this is COX-0072584. This was produced to the parties by Mr. Cox.**

A. Uh-huh.

**Q. It is an April 2015 e-mail exchange between you and Monte Cox.**

A. Uh-huh.

**Q. I think we have talked about him before.**

A. Yes.

**Q. And it's about Leo Kuntz?**

A. Kuntz, yes.

SILVA

**Q. Kuntz. He was a fighter?**

A. Yes.

**Q. And you write to him: "We are moving the minimum wage up to 10 plus 10 and anyone who is below it is getting bumped up. Merry Christmas early."**

**And he can't believe it.**

**So this is what you were explaining before, that when you moved the minimum from 8 and 8 to 10 to 10, everybody got raised?**

A. Correct. And that was not how it happened before.

**Q. Right. So previously it wouldn't be retroactive, and the determination was to increase the minimums not only going forward but retroactive?**

A. Correct.

**Q. So that the minimum now is 10 and 10, and so everyone who was at 8 and 8, or would have gotten 8 and 8, now starts at 10 and 10?**

A. Correct.

**Q. And so everyone's benefitted by that?**

A. Yes.

**Q. Yes?**

A. Yes.

**Q. Okay. All right. You can put that document**

**SILVA**

**aside.**

MR. ISAACSON: I guess I will say objection to form. I don't think you meant everyone. I think you meant everyone with a contract.

**Q. Yeah. Everyone with a contract providing for 8 and 8, or everyone that would otherwise have gotten 8 and 8, now got 10 and 10; right?**

A. Yes.

**Q. So everyone in that situation, either new people coming in who would otherwise have gotten 8 and 8, or people who were on an 8 and 8, now increased to 10 and 10; correct?**

A. Correct.

**Q. Now, I believe you testified that you tended to have kind of a compensation structure that you used for certain fighters but you departed from it depending upon the circumstances; correct?**

A. Correct.

**Q. Okay. So sometimes the -- the situation warranted for fighters to receive an enhancement on the standard minimum deal; is that right?**

A. That there was first-timers that I brought in, and they got better than the standard deal?

SILVA

**Q. Yeah.**

A. Yes.

**Q. Okay. For example, if a fighter was already ranked when they came in, you might give them something better than the standard deal?**

A. If they were ranked, they would most definitely get better rates.

**Q. Did someone have to sign off on deviating from the standard deal, or --**

A. No.

**Q. -- did you do that?**

A. It was within reason. Now, I was never given any, I just used my better judgment. It's like, I feel comfortable doing this, or like, I'm going to give this to Dana or Lorenzo.

**Q. I see. So if it was deviating beyond a certain point, you would defer to Dana and Lorenzo?**

A. Yes.

**Q. As a general rule of thumb, was it important that you not allow the compensation paid to fighters who were similarly situated in terms of ranking and talent and popularity in the same weight classes to differ all that much; is that fair?**

MR. ISAACSON: Objection to form.

362

SILVA

A. I would prefer to be able to point out when somebody says, why is this the offer that you made me, to be able to go, well, this is what other of your peers who have accomplished similar things to you have gotten and that's why it is in line. That certainly made life easier when you could do that and more difficult if there was an outlier.

**Q. Fighters and their managers have this sense of justice; right?**

MR. ISAACSON: Object --

A. I think most human beings --

**Q. Yeah.**

A. -- do.

MR. ISAACSON: Objection to form.

**Q. Like kids, they want to be treated fairly?**

A. I would say --

MR. ISAACSON: Objection to form. Argumentative.

A. I would say they don't want to be treated fairly. I would say they want to be treated unfairly in their favor.

**Q. In their favor. Okay.**

**And one of the ways in which you can respond to a fighter or a manager who wants to be treated**

363

SILVA

**unfairly in their favor is to say -- is to compare them to other fighters that you believe are comparable or are better, and say, look, you're getting more than this person and -- and he's even done better than you; is that right?**

MR. ISAACSON: Objection to form.

A. Correct.

MR. CRAMER: All right. Like to mark the next document as Silva Exhibit 37. Thank you.

(Silva Deposition Exhibit 37 marked for identification.)

**Q. All right. This is a December 2010 e-mail exchange between you and Sven Bean. It bears the Bates range ZFL-2207629 through 631.**

**Who is -- and it says, "Re: Bang."**

**Who is Bang?**

A. That would be Bang Ludwig, Duane "Bang" Ludwig.

**Q. Fighter?**

A. Yes.

**Q. Okay. And who is Sven Bean?**

A. Sven is his manager.

**Q. Okay. Turn to the last page. This is an e-mail -- at 631, this is an e-mail that you wrote to**

364

SILVA

**Bean, "Subject: Bang," dated Wednesday, September 8, 2010, and you say: "He's on his last fight at 14 plus 14. I'll drop that and give him a new deal at 16/16, 18/18, 20/20 and 22/22."**

**Do you see that?**

A. Yes.

**Q. So this is an instance of him being on the -- his last fight?**

A. Yes.

**Q. And you saying, let's negotiate a new deal?**

A. Uh-huh.

**Q. And that would mean that he wouldn't fight his last fight at 14 and 14, instead, if he took this deal, he'd fight the first fight under a new four-fight deal at 16 and 16; is that right?**

A. Correct.

**Q. Okay. And then if you turn to the next page, Bean counters -- I'm sorry -- yeah, Bean counters, this is December 8, 2010, he says: "Can I please ask that if we go ahead and sign for 4 more fights, he would be able to start at 18 plus 18?"**

**Do you see that?**

A. Yes.

**Q. Yeah. And you received this e-mail;**

365

SILVA

**correct?**

A. Yes.

**Q. Okay. And then you say to him -- you respond to him on Wednesday, December 10th, a little bit later, you say: "I can't give him more. I didn't cut him after two losses. Then he got the gift decision against Osipczak. Everybody has it tough. I have to do what is fair to everyone. You make what you make based on performance and popularity. He has been bonused by us as well. I am giving him a raise to re-sign as it is."**

**Do you see that?**

A. Yes.

**Q. When you say that you have to do what is fair to everyone, is it -- am I right that what you mean is that it would be problematic for you to pay Ludwig more than what comparable fighters in the same weight class are being paid?**

MR. ISAACSON: Objection to form.

A. Yes. What I'm stating to him is that if -- coming off of two losses and then a decision win that everybody thought he should have lost, that as I'm speaking to another fighter who has done better than that, and he jumps up that much off of that kind of

366

SILVA

run, it's like, how would I justify that to the other fighter. He could point that out and I'd have to go, you have a point there.

**Q. Right. And in general, you believed you had to adhere as closely as possible to the structure of -- of compensation so that you didn't confront the next guy, saying why did you overpay this guy, I'm better than him; is that fair?**

MR. ISAACSON: Objection. Misstates his testimony. Objection to form.

**Q. I didn't mean to misstate. So if I said something you didn't agree with, let me know.**

A. I think anytime that you try to renegotiate, you're going to give your point of view, the manager's job is to give their point of view, and you try to work it out.

For me, I like being able to justify. I don't -- I'm not saying here's just random numbers, accept them unquestioningly. It's like, here's my rationale for it, and it's a rationale that I'm also going to have to apply to other people who are involved in this as well.

**Q. Right. Your compensation system isn't -- isn't random; that would be a problem for you, wouldn't it?**

A. Yes.

**Q. When you say "everyone knows what everyone makes," what do you mean by that?**

A. That if I was to increase Bang's contract -- most of the managers out there -- quite a few of the managers anyways, they do research, they're looking at what's being posted that the -- what these guys are making. So if somebody was to see in his next fight the disparity in what he got paid this time as opposed to last time, they -- just red flags would go up.

It's like, wait, how, after coming off of two losses and a questionable decision, did his pay jump up that much, that people look and research that.

**Q. Right. And so if you were to jump someone's pay up above what a comparable person believes they should be paid, that would cause you problems with other fighters; right?**

MR. ISAACSON: Objection. Form. You're being vague.

A. Yeah, I think that I want to reward performance and be able to justify the -- the numbers

367

SILVA

368

SILVA

that I'm offering them. And if you're not performing as well, it would make sense that your compensation would be below those who are performing well.

**Q. In your experience, fighters want to know they are being treated -- or you want to be able to tell fighters that they're being treated fairly relative to other fighters at similar skill levels and records; right?**

MR. ISAACSON: Objection. Misstates the testimony.

**Q. I'm asking. Is that right?**

A. I would like people to believe that I am dealing with them fairly.

**Q. And one way you -- you convey to them, the managers and fighters that you're negotiating with, that you're dealing with them fairly is to honestly tell them where you believe they fit, their compensation fits, relative to other fighters at their level; correct?**

MR. ISAACSON: Objection to "their level."

**Q. Is that right?**

A. That's correct.

**Q. And you negotiated with hundreds of fighters during your career at the UFC; correct?**

369

SILVA

A. Probably more than a thousand, I would think.

**Q. And you experienced often fighters or their representatives trying to negotiate, as you just said, using compensation levels of other fighters they believed were similar to their guy; right?**

A. Right. And that can be where you can have a difference of opinion of where I'm going, I think that he is similar to this guy, this guy, they can counter and go, we don't see him as similar to that guy, we see him as similar to this guy.

So then that's -- it's still -- it's a matter of opinion. I try to present what I think I -- are the facts I have to back up my argument. But sometimes in -- there have been times where a outlier has been pointed out to me, where I'll go, this is what I think is fair because this is what other guys -- and they'll make a case of, wait a sec now, look what he did here, this is outside of that, and I've gone, you've actually got a point, I'll up it.

It's not rare because I usually do my homework pretty well on these. But there has been occasions like, I missed out on that, you are

SILVA

correct, I would not want to hurt my credibility by acting like what they have in black and white is not true.

**Q. So if you -- if they brought to you like what you have described as an outlier, where some fighter may have diverted from what you thought they should have gotten based on their background and their skill level, you'd -- you'd certainly -- sometimes you would hear it from the fighters or their representatives about that outlier; right?**

A. Yes.

**Q. And if, by creating that outlier, that sometimes causes other fight -- you have to then raise the compensation then of some other fighters because you made that one mistake; is that right?**

A. Well -- well, you'd have to -- one, I don't know I'd say it was a mistake. And it's -- it's a matter of opinion. And that I did deals, Sean did deals, Dana did deals, Lorenzo did deals, and everybody's judgment is different. So you have to weigh those in. So that's all people who are getting deals in the UFC.

But a manager's job is to negotiate the best deal that they can. And my job is to try to

SILVA

negotiate a deal that I thought was fair.

**Q. So if -- if, for example, Shelby had been -- had been systematically kind of paying fighters a bit more than you did or Dana was systematically paying comparable fighters a little bit more than you did, you then might feel pressure then to kind of pay fighters more because you would be hearing from reps about comparables from Dana or Shelby; is that right?**

A. I'm sure it would be brought up.

**Q. So if -- if there are some -- if one of the three of you are kind of raising the level per equivalent fighter, that's going to put pressure on that third person to kind of raise as well?**

A. I don't think it's pressure in that me and Sean did the vast majority of deals, and me and Sean were in constant communication every day and knew what each other were doing. So it's not like I was going, Sean, what are you doing here? We knew. But we would still, on our own, choose to, let's move people up, we feel like it's time to do it.

So Dana and Lorenzo did do deals, but they did, like I said, maybe 10, 15 percent of deals.

**Q. Yeah, if you turn to the first page of this document, Bean says: "Can you meet me in the middle?**

**SILVA**

**You said 16, I asked for 18. Could you agree to 17?"**

**He says that towards the bottom.**

A. Uh-huh.

**Q. And then you say on December 9, 2010: "Not trying to be a dick but no. Everyone knows what everyone makes. Our purses are public. I have to justify everyone's pay to everyone else."**

**Do you see that?**

A. Yes.

**Q. What did you mean by that, "I have to justify everyone's pay to everyone else"?**

A. I feel it was important in my job to actually engage with people and not just dictate to them. So if somebody was going to say, what about this guy, I would have to engage that and not go, too bad.

**Q. Right.**

A. I'd have to go, okay, you've got a point, let's try and figure this out. So, yeah, I'm just making him aware of that.

**Q. Right. And so you wanted to make sure that you did your best to try to make sure that comparable fighters with comparable records are getting paid comparable amounts; is that fair?**

**SILVA**

MR. ISAACSON: Objection. Form.

A. Yeah, that was my goal.

**Q. And one of the reasons why you did that is because you had to justify everyone's pay to everyone else, and if you -- if you were doing this poorly or inefficiently, you'd constantly have fighters demanding more money, they'd say, hey, wait, you paid this guy this much and that guy that much, and you wouldn't be able to justify to them if -- if you hadn't been doing this well; is that right?**

A. It would just seem unfair to give somebody something that somebody else, equally deserving, didn't get.

**Q. And you attempted, at least in your mind, to be fair, to impose a sense of equity between the different fighters; correct?**

A. I did.

**Q. All right. You can put that document aside.**

MR. CRAMER: Like to mark the next document as Silva Exhibit 38.

(Silva Deposition Exhibit 38 marked for identification.)

**Q. Silva 38 is a series of e-mails bearing the Bates range ZFL-2641095 through 1099. The one at the**

SILVA

**top is from Kim Lynch to Mr. Silva and Mr. Mersch, dated October 16, 2007, regarding Ricardo Almeida.**
**Who is Ricardo Almeida?**
A. He was a UFC fighter.
**Q. All right. And Ally Almeida is his wife?**
A. Was his wife.
**Q. Was his wife, okay.**
**And she was his representative at the time?**
A. Yes.
**Q. Okay. Turn to page 2 of the document. I'd like to draw your attention to the e-mail in the middle of the page from you to Ally Almeida.**
**Do you see that?**
A. Yes.
**Q. Dated Wednesday, October 10, 2007.**
**This is an e-mail that you sent to Ms. Almeida; is that right?**
A. Yes.
**Q. Okay. And you wrote a little bit into the e-mail: "As I have" -- "as I said, I have 200 fighters under contract and our purses are public. I have to justify to all my other fighters what I pay out. There are people under contract to me now that are not making as much as I offered Ricardo and they**

SILVA

**are better known to our fans and have more UFC fights then he does."**
**Do you see that?**
A. Yes.
**Q. So what did you mean?**
A. That I was explaining to her that I thought the offer for him was very good, out of the normal, I would have to justify that as it is, which was going to be an uphill battle, but yet she wanted even more than that.
**Q. And this was one of the ways that you told her you're not going to give her more, is by saying he's already out of the normal; right?**
A. Yes.
**Q. Okay. You say there a little bit above the part that I read: "If I am building fighters I need to know that they are going to be with me for a while."**
**What did you mean by that?**
A. Well, that you're investing in the fighter and putting time in getting people to know who they are. And if they just fought one fight, then you don't know, are they coming back again. That's not as good an investment.

SILVA

**Q. It's a better investment for the UFC if they have fighters locked up under longer term deals than shorter term deals?**
A. Well, and also with -- if you're insisting on that you want a higher than normal amount of money, if I go, well, if I normally do four fights, how do I justify giving you more than I would for a four-fight deal, well, you committed to six fights, so that's worth more money to me. You're giving me something, I'm giving you something. And to anybody who disputes that, I have something I can explain.
**Q. Okay. All right. Please turn to page 29 of Exhibit Silva 20. It's one of these phone -- here it is. I'll pull it out for you. It's a text message compilation.**
A. Thank you. What page?
**Q. Exhibit 20, and turn to page --**
**MR. MADDEN: 29.**
**Q. -- 29.**
**So this is from the text message compilation that Zuffa produced to us from Lorenzo Fertitta. And on page 29 is a series of texts that begin on October 4, 2013, at 2:20:59 p.m. Yeah. Okay. So 2:20:59 p.m., there's a text from the 702 number to a**

SILVA

**group, that includes several people. Do you see that?**
A. Yes.
**Q. And then it says: "What's the situation with Schaub?"**
**And then you respond to this group: "He fought the last fight on his TUF deal. I offered him new deal and they balked, saying they wanted to talk to you guys about it. He's not top ten and he wants more than top ten guys like Stipe and Travis Browne are making."**
**And then someone says: "What's the difference in numbers."**
**And you say: "He was making 18 plus 18, and I offered 21/21, 24/24, 27/27, and 30/30."**
**And you say also: "Stipe is making 20/20 for the next fight -- for next fight. He beat the crap out of Roy Nelson. Schaub got knocked out by Nelson."**
**Do you see that?**
A. Yes.
**Q. Do you recall who this conversation was with? Was Lorenzo a part of this?**
A. I'm sure he was.

430

SILVA

A. Yes.

**Q. That's M-A-T-Y-U-S-H-E-N-K-O.**

**And he's known as Vlad to some?**

A. I usually call him Vladimir, but I think Nima would refer to him as Vlad.

**Q. Okay. As Vlad.**

**And this is an e-mail that you sent; is that right?**

A. Yes.

**Q. All right. And you say to Nima on April 21, 2010: "That is the fight I am offering. You don't really get multiple choices. Unless he has some convincing reason for not accepting the fight, like a verifiable injury his contract would be extended and he would have to wait until another show to fight for turning down a legitimate opponent."**

**Do you see that?**

A. Yes.

**Q. And what you were stating was essentially Zuffa's policy and -- and its contractual rights with regard to fighters turning down fights; is that right?**

MR. ISAACSON: Objection to form.

**Q. Let me rephrase.**

431

SILVA

**What were you attempting to convey to Ms. Safapour in this e-mail?**

A. He wanted to fight on that show, in the fight that I had available, light heavyweight, similar to heavyweight, it's the second smallest weight class we have as far as talent. So when you're a good guy at that, there's only so many of those guys who've already fought each other, it greatly limits who are the credible guys you can fight.

It's like, for you to fight on this show, the guy that I have for you to fight is Jon Jones. That's the option that I have. I don't have a bunch of 205 legitimate guys.

Vlad was a veteran and fought in a bunch of big shows at -- at that time, so that was the kind of opponent that made sense for him to fight. And it's like, if you will not fight Jon Jones, you're going to have to fight in another show.

**Q. You write to Ms. Safapour: "That's the fight I'm offering" --**

A. Mister.

**Q. I'm sorry, Mr. Safapour. Thank you.**

**"That's the fight I'm offering. You don't**

432

SILVA

**really get multiple choices."**

**Is it correct that it was not Zuffa's practice or policy to give fighters multiple choices on who they fight?**

A. That's incorrect.

**Q. It was incorrect; sometimes you did give them options?**

A. Correct, if I had options.

**Q. If you had options, you would give them; if you didn't, you wouldn't?**

A. Correct.

**Q. Let's say a fighter doesn't want to fight with the UFC anymore and -- so they're just unwilling to fight. They say, I don't want to fight with the UFC, I want to fight somewhere else, but they're still under contract with Zuffa, and they keep turning down fights. Would it be Zuffa's policy to invoke this provision to keep them under exclusive contract with Zuffa?**

A. It would -- the decision would be ultimately up to Dana and Lorenzo. It's like, what do you want to do, this is his stance, and they would make that decision.

**Q. It did happen from time to time that there**

433

SILVA

**were fighters who said, look, I just don't want to be with UFC anymore; right?**

A. Yeah. And I believe that there have been people who were released.

**Q. Fair to say that if Zuffa doesn't want to release them, it doesn't have to in that instance; correct?**

A. I don't believe so.

**Q. In other words, under Zuffa's contracts, if a fighter didn't want to fight for the UFC anymore but still was under the exclusive contract with Zuffa, the fighter would -- the fighter could not get out of the contract simply by turning down fights; correct?**

A. Correct.

**Q. All right. All right. I asked you earlier, another topic, some questions about pay-per -- I'm sorry, some questions about compensation other than win and show. I want to ask you some other questions about that.**

**So in addition to show and win money, there were other ways in which fighters were compensated by Zuffa; correct?**

A. Correct.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

SILVA

**Q. Okay. Certain fighters received a share of Pay-Per-View revenues when they defend -- when they -- I'm sorry.**

**Certain fighters received a share of Pay-Per-View revenues; correct?**

A. Correct.

**Q. Who was offered at Zuffa a share of Pay-Per-View revenues?**

A. That would be up to Dana and Lorenzo who they're willing to give a share of Pay-Per-View revenues to.

**Q. Is it fair to say that only champions defending their title were given a share of Pay-Per-View revenues at the UFC?**

A. No.

**Q. There were others?**

A. There were others. I think if you would become a -- a big attraction even without a title, you could still be worthy of Pay-Per-View, but it was rarer.

**Q. It was rare.**

**Most of the times that fighters were offered a share of the Pay-Per-View revenues, they were defending a title; correct?**

**SILVA**

A. I'd say most, yes.

MR. CRAMER: I'd like to mark as Silva Exhibit 48 the next document.

(Silva Deposition Exhibit 48 marked for identification.)

**Q. This is an e-mail from Shelby to White and Mr. Silva -- I'm sorry. It's just an e-mail from Fertitta, Lorenzo Fertitta, to Shelby, cc'd to White and Silva --**

A. Uh-huh.

**Q. -- dated Thursday, March 13, 2014. The subject is Holly Holm, and it bears the Bates number ZFL-1005485.**

**At the top Mr. Fertitta says: "We can get something done. For ppv bonus she must be defending."**

**PPV bonus refers to Pay-Per-View bonus?**

A. Yes.

**Q. And was Mr. Fertitta correct that in order for Holly Holm to get a Pay-Per-View bonus, she had to be defending a title?**

A. He was saying that he was not willing to give her Pay-Per-View if she's not a champion defending her title.

SILVA

**Q. And was that -- that's just for her or that was -- that was not a general policy?**

A. I think most of them were that way, is that you needed to be a -- a champion defending your belt to get it. Not -- there were some exceptions, but for the majority.

**Q. Okay. You can put that aside.**

**Is it fair to say that fighters frequently asked for Pay-Per-View cuts in compensation negotiations?**

A. Some do. There's actually quite a few fighters who did not care about that because they felt that they were not marketable enough that it was not enticing to them because they weren't really convinced they were going to sell a bunch of Pay-Per-Views.

If you were somebody who -- who had a demonstrable popularity, then you feel, it's like this is going to be a windfall for me, I will sell a bunch of Pay-Per-Views. Not everybody felt they would. Some kind of saw themselves as more workmanlike, it's like, look, I put in my time and I work hard and this and that, I'm not a fan favorite, who cares.

SILVA

**Q. Okay. So I think I asked you briefly about this, but Zuffa also paid other kinds of discretionary bonuses?**

A. Correct.

**Q. In addition to win and show; correct?**

A. Correct.

**Q. Okay. And by "discretionary," the -- these other bonuses that I'm going to ask you about, other than win and show, and potentially Pay-Per-View, they were not contractually required to pay structured or discretionary bonuses; correct?**

A. Correct.

**Q. All right. How were the -- how were these structured or discretionary bonuses determined?**

A. And you're not talking about like the end-of-the-night bonuses, you're talking about just like up and down -- because we had -- for every show you had, like, say $50,000 bonus for performances of the night, for fight of the night, that both would get it, so that was standard on every show.

**Q. So every --**

A. So that was one kind of bonus.

**Q. So one kind of bonus is a fight-of-the-night bonus?**

438

SILVA

A. Correct. We -- and that would go to -- the winner would get it, and also the loser would get the same amount, because it takes two to tango.

**Q. Right.**

A. So they would both get -- they'd get $50,000 apiece. And then we'd have two more, they call performances. Could be just a great knockout, a great submission, just a great, you know, performance. But those would also be $50,000. So they give away four $50,000 bonuses.

**Q. Did Zuffa at some point commit to paying structured bonuses like this in fighter contracts?**

A. No.

MR. CRAMER: All right. I'd like to mark as Silva 49 and 50, a cover e-mail and then an attachment. The cover e-mail will be 49 and the attachment will be 50.

(Silva Deposition Exhibit 49 marked for identification.)

(Silva Deposition Exhibit 50 marked for identification.)

**Q. So Silva 49 is an e-mail from Denitza Batchvarova -- or Batchvarova, to Joe Silva.**

A. That was the Deni that I referred to

439

SILVA

earlier.

**Q. I see. That was Deni. Deni Batchvarova.**

**And this was received, it says, February 10, 2015, at 9:18 p.m. And it has the Bates number ZFL-0819625. And the cover e-mail indicates that it's attaching something entitled Discretionary Bonus Payments Version -- v02.pptx.**

**And then the attachment starts at the next Bates number, so it's ZFL-0819626 through 9631. And the attachment document is entitled Fighter Bonus Payments, February 2015.**

**So did you receive this e-mail and the attachment in the regular course of your business at the UFC?**

A. Probably. I -- I don't recall for sure, but it wouldn't surprise me to get this kind of e-mail.

**Q. Right. And it was addressed to you; correct?**

A. Well, yeah. If it was to me, then I definitely got it.

**Q. Yeah. Okay. So you -- you -- do you recall why Deni sent you this PowerPoint presentation?**

A. I'm sure I think being in that I'm the only one on it, that it was given to everybody, but I'm

440

SILVA

not in the office, so they most likely were given a handout and it was e-mailed to me.

**Q. I see. And you worked -- you didn't work in Las Vegas?**

A. I did for the first almost two years that Zuffa -- after they bought the company, I lived in Las Vegas, and then I was like, I really miss home.

**Q. And home is Richmond, Virginia?**

A. Yes, sir.

**Q. All right. And exhibit -- I'm sorry, what was the --**

MR. MADDEN: Exhibit 50.

**Q. Exhibit 50 is a PowerPoint presentation that was attached to that e-mail. And there are various different types of bonuses that are described in this document.**

**So the first page says "Discretionary Bonus Overview." And there's a discussion of how much is spent on those bonuses.**

**So one of those bonuses is a fight-of-the-night bonus; is that right?**

A. No. These are different kind of bonuses. So you had those of-the-night bonuses --

**Q. Right.**

441

SILVA

A. -- then they -- what they -- we would do is after a show, generally I would do it -- sometimes Sean if, like, he was attending a show that I didn't, but I would basically send the card out to Sean, Dana, Lorenzo, probably Lawrence and John Mulkey, and give my recommendations.

So everybody who would be on the card, their names would be on there, and I'd kind of just describe the fight. It's like, this was a great fight, this guy did incredible. Maybe he didn't -- this is for the people who did not get an of-the-night bonus. It's like, but they still came and still fought hard, so let's give them something extra.

And you just -- I would give my opinions, like I think it would be worth this, but ultimately it was up to Dana and Lorenzo to finalize and go, yes, this is what we will give each one, and I wouldn't -- me sending it out, what with my recommendations, would be the last that I would hear of it.

So like every now and then a fighter's manager would ask me, it's like, oh, did he get a bonus? It's like, I -- I don't know what they

442

SILVA

ultimately approved. You could ask Brad Smuckler in finance if he's -- was told to cut a check, but I actually -- I don't know. All I know is what I recommended.

**Q. So you made a recommendation regarding these discretionary bonuses, and then Dana and Lorenzo decided how much to give?**

A. Correct.

**Q. And it was -- it was discretionary to them, and they were the only ones who decided; is that right?**

A. Correct.

**Q. Turn to the second-to-last page of the document included -- I'm sorry, entitled "Financial Impact of Moving Minimum Compensation."**

**I'd like to draw your attention to the left-hand side of the page. It says: "As of February 3, 2015 we have 574 athletes under contract."**

**Do you see that?**

A. Yes.

**Q. And, "Based on upcoming 'to show' money," there's a list of the various different athletes and the levels of their contracts; is that right? Are --**

443

**SILVA**

**are these --**

A. Am I on the right page? Which --

**Q. Page 630.**

A. Yes.

**Q. So this is a listing of the various different athletes that were on contracts that were at or near -- that had had a fight at or near the bottom, the minimum. Is that what this is?**

A. It looks like it.

**Q. Okay. All right. You can put that document aside.**

**Fight of the night is a structured bonus; is that right?**

A. No. It would -- it's something that at the end of the night -- it's structured in that every show has them.

**Q. Right.**

A. But it's not structured as to who gets them. It's whatever is decided upon that was the best fight of the night. But that --

**Q. And who makes that decision?**

A. It would be discussed between me, Dana, Lorenzo, Sean. Sometimes it was pretty unanimous, and sometimes it was more debated.

444

SILVA

**Q. And fight-of-the-night bonuses go to two fighters from each event who participated in the best fight as determined by the group that decides?**

A. Correct.

**Q. And the amount of the fight-of-the-night bonuses are set in advance and is part of the budget for the event?**

A. Correct. There was a time where the bonuses varied from show to show, kind of depending on, like a bigger show would have a bigger bonus, which is something I recommended changing and they did change, because you would naturally have people who would not want to -- if you were an exciting fighter, who it was not unusual for you to win bonuses, why would you want to fight on a show where you know the -- the ceiling is lower on that show for the bonus you could win. So it made more sense, it's like, it's got to be across the board, whatever the show is, you got the shot at that same bonus.

**Q. I see.**

**Do you recall in or about what date -- or year that policy changed?**

A. I don't recall the date. But it's been for a while that it's been the current, the 50 and 50.

445

SILVA

**Q. Okay. And then knockout of the night is also a discretionary bonus?**

A. Well, it used to be called that. We had two besides that that they called knockout of the night and submission of the night, and then they decided to change the name of it to performance. Because sometimes you'd have night with no knockouts, and maybe, you know, multiple submissions. So it gave you a lot more flexibility if you just call it performance and it could be anything. Maybe you did have a knockout, but there was two way-cooler submissions, so you had that flexibility. It's like, no, it's -- these are the two best things that happened. And it wouldn't be as stuck to that label.

**Q. And when, do you recall, did the knockout of the night become the performance of the night?**

A. A few years ago.

**Q. Okay. And, again, that's a discretionary bonus that was decided by you and Shelby and White and Fertitta?**

A. Correct. They're all decided at the same time, immediately after the fights ended, because that would usually be something that would be announced at the press conference --

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

446

SILVA

**Q. I see.**

A. -- after the fight.

**Q. And the amount of the performance of the night or the knockout of the night stayed the same for each event?**

A. Eventually. We had changed it where it kind of varied on the size of the event to becoming uniform for all events.

**Q. Other than the performance-of-the-night bonus and the other bonuses we have just discussed, are there other bonuses that are set in the event budget?**

A. No -- not --

**Q. Is there a locker room bonus?**

A. No. I -- that's what they mean -- when people use the term "locker room bonus," that's what they mean, the one that I give my thoughts on of, well, I think this guy should get this much extra, that's what they're terming "locker room bonus."

**Q. And that's different than the performance-of-the-night bonus?**

A. Correct. That's the ones that we talked about where I said I went through the entire card --

**Q. I see.**

447

SILVA

A. -- and said, you know, this guy, he had a great fight, this guy, he did not have a good fight, you know, I don't recommend a bonus for him.

**Q. And the locker room bonus was discretionary?**

A. Yeah. We didn't call it a locker room bonus, that's just what people in the media would term that.

**Q. I see. Okay. And --**

A. We called -- we called them discretionary bonus --

**Q. I see.**

A. -- is what we called them.

**Q. And they were in the event budget as well?**

A. I believe so.

**Q. Did you also have letters of agreement with some fighters that provided for additional payments for those fighters?**

A. I never did any of those deals, but I know there were such deals.

**Q. And the letters of agreement were not reported to the athletic commissions; is that right?**

MR. ISAACSON: Earlier today you asked him about letter agreements and side letters.

MR. CRAMER: Yes.

448

SILVA

MR. ISAACSON: Are you asking about the same agreements?

MR. CRAMER: Yes, it's the same thing.

MR. ISAACSON: I think it's asked and answered.

**Q. But you can answer.**

A. Yeah, so you'd have to get with legal as to exactly what they report, and I don't know that every commission's rules are the -- the same about that.

MR. CRAMER: Okay. I'd like to mark the next document as Silva Exhibit 51. I'm going to get a bonus for the most exhibits.

(Silva Deposition Exhibit 51 marked for identification.)

**Q. Silva Exhibit 51 is an e-mail with a Bates number ZFL-2443283. And it is an e-mail that you sent to Dana White and Lorenzo Fertitta on January 15, 2010.**

**Do you see that?**

A. Yes.

**Q. You sent this?**

A. Yes.

**Q. All right. And you said -- and this is about Kimbo. That's Kimbo Slice; is that right?**

449

**SILVA**

A. Yes.

[REDACTED]

**Do you see that?**

A. Yes.

**Q. And what did you mean by that?**

A. I thought that Kimbo's purse was way outsized for his accomplishments. He was an extremely popular fighter, but had not -- was not a championship caliber fighter in my opinion.

**Q. And you thought that if other UFC fighters found out about how much his bonus was, they'd be upset because he was getting paid more even though he may not have been as skilled as some of these other fighters; is that fair?**

A. Yes.

**Q. And did you find a way to publicly hide his purse in this instance?**

A. I wouldn't -- that would not be my thing to do. That's what I was telling them.

450

SILVA

There was -- when they did different deals, some were --

MR. ISAACSON: I would object to form, "publicly hide his purse," but --

**Q. You said "publicly hide his purse."**

**Did they find a way to hide his purse from the public, so that it wouldn't become publicly known?**

A. I don't recall what ended up -- how his deal ended up being structured.

There were people -- side deals kind of came about -- especially if you acquired fighters from Strikeforce or another thing where their deals are just structured differently. So they weren't apples-to-apples type of contracts, so you'd get side letters, and then for some people like this, where it was just an unusual contract for an unusual guy, it's like, well, if other guys have side letters, maybe that would be a better way to handle that.

How they handled it in the end, I don't know, I would have to see the -- the contract. I don't recall.

**Q. And when you said here "to publicly hide his purse," you mean -- you meant find a way to hide his**

451

**SILVA**

**purse so that it would not be publicly known; correct?**

A. Correct.

**Q. All right. You can put that aside.**

MR. CRAMER: Like to mark the next document as Silva Exhibit 52.

(Silva Deposition Exhibit 52 marked for identification.)

**Q. Silva Exhibit 52 is a series of e-mails on one page, bearing the Bates number ZFL-2543576.**

**And you say on January 29th, 2009, to Jaime Pollack, Lorenzo Fertitta, Dana BlackBerry, Lawrence Epstein -- strike that. Let me withdraw that.**

**Did you send this e-mail on Thursday, January 29, 2009, to the people identified in the e-mail?**

A. Yes.

**Q. Okay. The subject is Akiyama. Who is that?**

A. Akiyama was a Korean fighter.

**Q. And who is Jaime?**

A. Jaime Pollack worked for the UFC.

**Q. Dana Blackberry is just a name for Dana White's e-mail address?**

A. Yes, his BlackBerry e-mail.

452

SILVA

**Q. Okay. So this went to Pollack, Fertitta, Dana White and Lawrence Epstein; is that right?**

A. Yes.

[redacted]

**Do you see that?**

A. Yes.

**Q. What did you mean by that?**

A. Akiyama was a fighter who was getting paid out of the ordinary for his accomplishments because we were looking to -- he had value in Korea, which was a potential place for us to go, so he was worth the money to them, but as far as just at that stage of his career what he was accomplishing, the money was outsized.

**Q. Relative to what other comparable fighters at the UFC would get?**

A. Correct.

**Q. And that, therefore, if other fighters found out that this relatively less-accomplished guy would get this kind of money to show, you said that would piss off a lot of our guys?**

453

**SILVA**

A. And there were fighters like that, and you're trying to explain, it's like this guy delivers a country, where you're an American fighter where I have 80 percent American fighters, it's not the same thing, but they would just see, but I beat these guys and he didn't, so -- and that was the reason for the difference in pay.

**Q. And then Epstein says to you and others on January 29th, 2009: "Let's just do a 50K per fight side letter."**

**Do you see that?**

A. Yes.

**Q. Do you know whether that happened?**

A. I -- it said, please write it up, explaining it to them, and I'll send it back to them. So I'm guessing that they agreed to it.

**Q. So the 50K-per-fight side letter was a letter of agreement essentially that did not become public; is that right?**

A. Yes.

**Q. And the idea was that -- strike that.**

**You can put that document aside.**

MR. CRAMER: I'd like to mark the next document as Silva Exhibit 53.

454

SILVA

(Silva Deposition Exhibit 53 marked for identification.)

**Q. Silva 53 is an e-mail from you to Lorenzo Fertitta and Dana, Dana's BlackBerry e-mail address, dated November 24, 2008, and it has the Bates Number ZUF-00332586.**

**This is an e-mail that you sent to Fertitta and Dana White on November 24, 2008; is that right?**

A. Yes.

**Q. And the subject was "Money for Vera and Alves."**

A. Yeah. Alves, yes.

**Q. Alves. Okay.**

**And these were Filipino fighters; is that right?**

A. No. Alves is Brazilian.

**Q. Okay. So Alves is Brazilian and Brandon Vera is Filipino; is that right?**

A. Correct.

**Q. And Brandon Vera is one of the plaintiffs in this lawsuit; is that right?**

A. Correct.

**Q. Do you know all of the plaintiffs in this lawsuit -- do you know who they are?**

455

**SILVA**

A. Yes.

**Q. All right. And both Vera and Alves were UFC fighters?**

A. Yes.

**Q. Okay. And you write: "Thiago" -- and that's Thiago Alves?**

A. Yes.

**Q. -- "is currently at 32K and 32K. He is on a 7 fight win streak and is the number 1 contender to fight the winner of GSP versus B.J. Penn."**

**Do you see that?**

A. Yes.

**Q. So he was on a 32 show/32 win contract; is that right?**

A. Yes.

**Q. He'd -- he'd won seven in a row. Was that in the UFC?**

A. Yes.

**Q. And at that point he was the number one contender to fight GSP -- was that George St-Pierre?**

A. Yes.

**Q. The winner of GSP versus B.J. Penn, is that accurate at the top?**

A. Yes.

456

SILVA

**Q. Okay. And is it fair to say then that Alves's next fight was going to be for the title?**

A. Possibly likely. That -- that's what I would have liked to have happened.

[REDACTED]

**Do you see that?**

A. Yes.

**Q. What did you mean by that?**

A. Well, now you're -- they're willing to extend into a longer deal because they're getting more money.

**Q. And why would you want to lock someone in for a longer deal if they become a champ?**

A. The benefits, as we've gone over multiple times, to having somebody under contract is that you can more easily promote fights long-term with them.

**Q. And you could ensure that if you became champ you'd have them locked up for a longer period of time; correct?**

A. Yes. That's what this -- the championship tier would do.

457

SILVA

**Q. It's better to lock him in before he becomes a champ than to allow him to become a champ and then potentially use that leverage to negotiate a better deal?**

A. I would say contractually it's good to have somebody under contract before fighting for a championship.

**Q. And that's what -- that's what Zuffa tried to do; is that right?**

A. Well, I offered that as -- and I don't actually remember what strategy they went with. What I'm -- I suggested to them, this is based on the Brandon Vera example beforehand, that you have some fighters who will come to you, as Brandon Vera did, and go, I'm going to be your next champion and because of that I deserve a high level contract; it's -- it's just a no-brainer, it's going to happen, I will be a champion. And then they don't perform at that level. It's like, you were willing to pay them that much money because they promised they would do these things, you thought they would do those things, and they didn't, and now you're stuck with this high contract.

That's why for Thiago, I think -- thought

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

SILVA

THE WITNESS: Thank you.

MR. ISAACSON: I've got very few questions.

- - -

EXAMINATION

BY MR. ISAACSON:

**Q. You said you still watch all or almost all Bellator, UFC, and World Series of Fighting?**

A. Correct.

**Q. Okay. You were asked about a couple unentertaining Bellator matches. Have you watched entertaining Bellator matches?**

A. There's many entertaining Bellator matches. Michael Chandler's a super exciting guy. His fights with Eddie Alvarez are excellent fights.

I -- I don't think I've ever seen any MMA promotion that did not have exciting fights. It's kind of the nature of the sport. And that's why people -- people -- we'd have a great show and people would come up to me and congratulate me, like, great job, and it was kind of puzzling to me. And I just always let them know, it's like, I didn't do any different a job on this show than I did on that show you didn't like so much, you're -- it's kind of in

SILVA

the hands of the fighters and what they choose to do that night.

But it's a great sport, so hopefully more times than not it -- it's exciting. So I've seen many exciting -- there's probably -- I probably more have critical text about World Series of Fighting, some of the fighters that they've used, but they've also been some excellent fights in World Series of Fighting as well.

**Q. Okay. I'm not going to keep you long.**

**Can you see if you can dig out 47 out of this pile.**

A. Is it a bigger one, a smaller one?

**Q. It's a big one.**

A. 48, 47.

MR. CRAMER: Which one, 47?

THE WITNESS: 47?

MR. ISAACSON: I don't know, it's 47.

MR. CRAMER: I have it, thank you.

**Q. And this was an e-mail exchange that you were asked about, some parts of it, with a Mr. Safapour. Do you remember this?**

A. Yes.

**Q. And you were asked about -- you read -- it**

**SILVA**

**was read to you -- you read or -- or was read to you some statements you made on page 5 about this is -- "That is the fight I am offering, you don't really get multiple choices."**

**And then on page 4, the first thing Safapour -- Safapour says to you is: "Thanks for the e-mail. Vlad has never turned down a fight in his entire career," and it goes on at some length.**

**And then you respond to Mr. Safapour on page 3, continuing on to page 4.**

**Do you see that?**

A. Yes.

**Q. Would you just read in -- read for us what you said to Mr. Safapour there?**

A. Starting with the "Jon is"?

**Q. Yes.**

A. "Jon is extremely talented and a hot prospect. That is the kind of fight Vladdy needs to be in now. His 2 UFC fights have not been exciting against lower level competition. Now he is a respected vet" -- "he needs a respected veteran to" -- that's weirdly worded -- "he's a respected veteran to show if Jones is the real deal or not. This is Vladdy's big chance to be in the spotlight

SILVA

and show the world that he is a contender in this weight class and not just a guy picking up a payday. If he wants to fight the established big name stars he's going to need a win like this to get there."

**Q. All right. And then Mr. Safapour says in response: "Sounds good, Joe. We will give a great show for the fans."**

A. Yes.

**Q. Is that right?**

A. Correct.

MR. ISAACSON: No more questions.

MR. CRAMER: Let me just ask you one question.

- - -

RE-EXAMINATION

BY MR. CRAMER:

**Q. Did you speak with your counsel during the break after my questions and before Mr. Isaacson asked -- asked you questions about the subject matter of the deposition?**

A. I don't understand. "The subject matter"?

**Q. Did you have a conversation with Mr. Isaacson after I finished my questions today before you came back in the room?**

482

SILVA

A. Did I speak with him?

**Q. Yes.**

A. Yes.

**Q. And did you -- did that conversation concern the subject matter of the deposition?**

**Were you talking about the weather or were you talking about the deposition?**

A. I think we were just talking about -- I don't know in detail about this deposition, I don't understand what you're looking --

**Q. Did he tell you what he was going to ask you after the break?**

A. No. I did not expect this question at all. I 100 percent did not anticipate this question.

**Q. The question before that, did he tell you he was going to ask you that?**

A. He had asked me before just if I ever enjoyed fights in other organizations.

**Q. All right. Let me ask you about that. You said you were asked questions about whether you enjoyed fights in other organizations -- strike that.**

MR. CRAMER: I withdraw that question. I'm done.

THE VIDEOGRAPHER: This concludes the

483

SILVA

videotaped deposition of Joseph Silva. We're off the record at 6:52.

(Time noted: 6:52 p.m.)

484

STATE OF ______________ )

) :ss

COUNTY OF ______________)

I, JOSEPH SILVA, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________

JOSEPH SILVA

Sworn and subscribed to before me, this ________ day of ___________, 2017.

______________________________

Notary Public

485

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, KIMBERLY L. RIBARIC, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 21st day of June, 2017.

My commission expires: August 31, 2020