# EXHIBIT 49

## Redacted Excerpts from the First Deposition of Dr. Hal Singer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -

Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

*   *   *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 6

1          (Exhibit No. Singer-1,
2    Expert Report of Hal J. Singer,
3    Ph.D., No. Singer-2, Errata, and
4    No. Singer-3, Errata II, were
5    marked for identification.)
6          THE VIDEOGRAPHER:  We are
7    now on the record.
8          This begins videotape No. 1
9    in the deposition of Hal J. Singer
10   in the matter of Cung Le versus
11   Zuffa, LLC, in the US District
12   Court for the District of Nevada.
13         Today is Wednesday,
14   September 27th, 2017, and the time
15   is 9:24 AM.
16         This deposition is being
17   taken at 1622 Locust Street in
18   Philadelphia, PA 19103 at the
19   request of Boies, Schiller &
20   Flexner, LLP.
21         The videographer is Sol Tran
22   of Magna Legal Services, and the
23   court reporter is Connie Kent of
24   Magna Legal Services.

Page 7

1          Will counsel and all parties
2    present, please state their
3    appearances and whom they
4    represent.
5          MR. CRAMER:  Eric Cramer
6    from Berger & Montague for the
7    plaintiffs.
8          MR. DAVIS:  Joshua Davis on
9    behalf the Saveri Law Firm for
10   plaintiffs.
11         MR. SILVERMAN:  Dan
12   Silverman, Cohen Milstein Sellers
13   & Toll, on behalf of plaintiffs.
14         MR. SUTER:  Mark Suter,
15   Berger & Montague, on behalf of
16   the plaintiffs.
17         MR. ISAACSON:  Bill
18   Isaacson, Boies, Schiller &
19   Flexner for defendant Zuffa.
20         MR. WIDNELL:  Nicholas
21   Widnell, Boies, Schiller &
22   Flexner, for defendant Zuffa.
23         MR. NAKAMURA:  Brent
24   Nakamura, Boies, Schiller &

Page 8

1    Flexner also for defendant Zuffa.
2          MR. CRAMER:  And on the
3    phone is Augie --
4          THE WITNESS:  Augie Urschel.
5          MR. CRAMER:  Augie Urschel
6    from Economists, Inc.?
7          THE WITNESS:  Correct.
8          MR. CRAMER:  You can spell
9    his name for the court reporter.
10         THE WITNESS:  I don't know.
11   Maybe Augie can spell his last
12   name, Urschel.
13         MR. URSCHEL: U-R-S-C-H-E-L.
14         THE WITNESS:  Thanks, Augie.
15         THE VIDEOGRAPHER:  All
16   right. Will the court reporter
17   please swear in the witness.
18         HAL SINGER, having been
19   first duly sworn, was examined and
20   testified as follows:
21            - - -
22         E X A M I N A T I O N
23            - - -
24   BY MR. ISAACSON:

Page 9

1          Q.   So Dr. Singer, for ease of
2    reference, we're putting in front of you
3    Exhibits 1, 2 and 3.  Exhibit 1 is your
4    report, Exhibit 2 is your first errata
5    and Exhibit 3 is your second errata.  And
6    I'll be asking questions about those two
7    today, and if -- when you want to refer
8    to them, I wanted to make sure you had
9    them in front of you.
10         A.   Okay.
11         Q.   All right.  Now, I'm going
12   to ask you hopefully some detailed
13   questions about the various models that
14   you've -- that are included in your
15   report, but let me just ask you some high
16   level questions to make sure I understand
17   what models you have in -- in the report.
18         Now, for purposes of
19   damages, your first two damages models
20   are benchmark -- benchmarks against
21   Strikeforce and Bellator based on the
22   percentage of revenue paid to fighters;
23   is that correct?
24         A.   That is correct.



Page 10

1  Q.   Okay.  And those -- those
2  models don't include any explanatory
3  variables, they're a simple comparison of
4  the percentage of revenues between firms?
5  A.   I wouldn't put it that way.
6  They are a comparison of fighter wage
7  shares across the two firms.
8  Q.   Right.
9  A.   You said revenues.
10  Q.   You're correct, I misspoke.
11  So thank you.
12  They are -- they don't
13  include any other explanatory variables,
14  they're just a comparison of the
15  percentage of revenue paid to fighters
16  between firms?
17  A.   Well, these -- these are
18  benchmarks and -- and I think by the
19  construction of a benchmark, as opposed
20  to, say, a regression model, which I've
21  also included, these particular damages
22  models don't control for variables --
23  other variables in the same way that a
24  regression model might.

Page 11

1  Q.   Okay.  Then your next damage
2  model is a regression model, and that
3  shows the relationship -- attempts to
4  show the relationship between Zuffa's
5  foreclosure share and its own percentage
6  of revenue shared with fighters.
7  Do I have that right?
8  A.   Controlling for all other
9  things that could explain variations in
10  Zuffa's fighter wage share, yes.
11  Q.   Okay.  And that model
12  assumes that challenged conduct in this
13  case, as you've defined it in your
14  report, caused the foreclosure.
15  A.   No, I'm -- no, that's not
16  correct.
17  Q.   Okay.  Does it assume
18  that -- well, what caused the foreclosure
19  other than the challenged conduct?
20  MR. CRAMER:  Form.
21  THE WITNESS:  Can I have
22  that question back?
23  (Pertinent portion of the
24  record is read.)

Page 12

1  MR. CRAMER:  Misstates the
2  testimony, foundation, form.
3  THE WITNESS:  I believe the
4  challenged conduct is the -- is
5  the cause of the foreclosure
6  share, that's correct.
7  BY MR. ISAACSON:
8  Q.   Okay.  And for foreclosure
9  in your regression, you used what -- what
10  you called the tracked fighters
11  foreclosure measure; is that right?
12  A.   Are you speaking of the
13  regression in the damages section?
14  Q.   Well, I think you've used it
15  for several different things, but your
16  foreclosure regression, and maybe if you
17  want to look at Table 6 of your report,
18  page 125.
19  A.   Sorry, the page?
20  Q.   125.
21  A.   Okay.
22  Q.   Now, Table 6 on page 125 is
23  the output of your foreclosure
24  regression, correct?

Page 13

1  A.   It is the output of one
2  regression specification that appears in
3  a different section of the report,
4  correct.
5  Q.   Okay.  But it is an output
6  of your foreclosure regression, correct?
7  A.   I wouldn't put it -- I would
8  put it -- just to be -- just to clarify
9  what this is, it is the output of the
10  regression of one specification of the
11  regression that I ran in the
12  anticompetitive effects section of the
13  report.  I just want to make sure that we
14  don't conflate anticompetitive effects
15  with damages.
16  Q.   And I'm not trying to.  I
17  understand that this then gets used in
18  damages.  I'll take that next step.  But
19  let's give it a shorthand name?
20  A.   Okay.
21  Q.   Can we call it your
22  foreclosure regression or -- and this
23  would be one output because it's what --
24  the result of one specification, one

MAGNA
LEGAL SERVICES

1  output of your foreclosure regression.
2      A.   If you want to call it the
3  foreclosure regression, I think that I'll
4  go with that.
5      Q.   Okay.  And by the
6  foreclosure regression, I mean, the
7  regression where you -- where you say
8  that you are showing that the -- when
9  there's an increase in share of
10  foreclosure, there's a decrease in share
11  of revenue paid to fighters.
12      A.   Can I hear that back?
13          (Pertinent portion of the
14      record is read.)
15          THE WITNESS:  The regression
16      shows that when controlling for
17      all other things that could
18      explain variations in fighter wage
19      shares, that the higher
20      foreclosure is causing lower
21      fighter wage shares, yes.
22  BY MR. ISAACSON:
23      Q.   All right.  And when you
24  use -- and you use -- you have three

1  columns in Table 6, Tracked, Ranked,
2  Headliner.
3          Do you see that?
4      A.   Column 6 of, sorry?
5      Q.   Table 6.
6      A.   Oh, Table 6.
7      Q.   The table you've been
8  looking at.
9      A.   Yes.
10     Q.   You see you have three
11  columns, Tracked, Ranked, Headliner?
12     A.   Yes.
13     Q.   When you -- when you
14  calculate damages using Zuffa's
15  foreclosure share, you rely on that first
16  column, right, tracked fighters?
17     A.   Correct.
18     Q.   And then the next damages
19  model you have, I think you called it
20  impact regression model for damages.
21  That -- that's where you take your model
22  for -- one of your models for showing
23  common impact and use that to reach a
24  damages result, correct?

1          MR. CRAMER:  Objection to
2      form.
3          THE WITNESS:  You're going
4      to have to show me where --
5  BY MR. ISAACSON:
6      Q.   Sure.  The -- if you look
7  at -- so just look at page 162 of your
8  report.
9      A.   Okay.
10     Q.   Section A on page 162 has
11  paragraphs 247 and 248.  That's
12  discussing the Strikeforce and Bellator
13  benchmarks we've discussed, correct?
14     A.   Correct.
15     Q.   And then Section B on the
16  next page, page 163, paragraphs 249 and
17  250, that discusses the foreclosure
18  benchmark that we just discussed,
19  correct?
20     A.   It is -- it is certainly
21  related to the one that we just
22  discussed, but it is not identical.
23     Q.   Well, for purposes of
24  damages, you -- let's just make sure I

1  have this right.  For purposes of
2  estimating damages for the foreclosure
3  regression benchmark, what you did was
4  look at the statistical relationship
5  between Zuffa's foreclosure share and the
6  fighters' shares, the share revenue of to
7  fighters over time, correct?
8      A.   Correct.
9      Q.   And for -- in looking at the
10  statistical relationship between Zuffa's
11  foreclosure share, for that foreclosure
12  share, you used the regression that we
13  saw in Table 6?
14     A.   No, that's incorrect.
15     Q.   Okay.  Explain to me why
16  that's incorrect?
17     A.   As I -- as I explained in
18  Section B, I made a variation to the
19  model.
20     Q.   Yeah, you're absolutely
21  right.  So let me ask -- rephrase the
22  question here.
23     A.   Okay.
24     Q.   I think -- so for looking at



Page 18

1    Zuffa's foreclosure share, you used the
2    regression in Table 6 but you made an
3    adjustment and you removed data points
4    for Strikeforce prior to its acquisition
5    by Zuffa?
6        A.   Correct.
7        Q.   Okay.  Thank you.
8            Then your next damages
9    model, which is on the next page, page
10   164.
11       A.   Yes.
12       Q.   Impact regression model
13   benchmark.  The -- here you also use
14   the -- in this benchmark -- in this
15   analysis, you are also examining the
16   statistical relationship between the
17   Zuffa foreclosure share and the fighters'
18   share, the share of revenues to fighters
19   over time, correct?
20       A.   Are we looking at Table 10?
21       Q.   This would actually, I
22   think, tie to Table 11.
23           MR. CRAMER:  11.
24           THE WITNESS:  Okay.

Page 19

1    BY MR. ISAACSON:
2        Q.   You have your tables below
3    the sections.
4        A.   Sorry.  Let me just -- let
5    me just get this straight in my head.
6            And before we move to this
7    one, something has just been troubling me
8    with regard to a question you just asked
9    a second ago, and I think I may have
10   misunderstood the question.  Is it okay
11   if I just -- if we can just get some
12   clarification.
13       Q.   Sure.
14       A.   Because I just want the
15   record to be sure.
16           You asked me if -- if the
17   foreclosure measure is capturing the
18   challenged conduct or something to that
19   effect.
20       Q.   What do you want to say
21   about -- just say what you want to say.
22       A.   Okay.  Let me just tell you
23   because I just don't want there to be
24   any -- any misunderstanding.

Page 20

1            I think that my prior answer
2    was correct, but it wasn't -- it wasn't
3    precise, and I just want to be precise
4    about what it's capturing.
5            It is -- it is capturing
6    the --
7        Q.   When you say "it," you're
8    talking about the foreclosure?
9        A.   The foreclosure share
10   measure.
11       Q.   Okay.
12       A.   Right.  And how it relates
13   to the challenged conduct.  I think that
14   the answer I gave you might create the
15   impression that all aspects of the
16   challenged conduct were being captured
17   by -- by the foreclosure variable, and I
18   just want to make it -- it clear that
19   there are only certain aspects of the
20   challenged conduct that are being
21   captured by the foreclosure variable, and
22   in that sense, the model is conservative
23   in the sense that it is not -- it is not
24   necessarily picking up the effect of all

Page 21

1    elements of the challenged conduct, but
2    instead only -- it's really capturing
3    certain restrictions that relate to
4    exclusivity of the fighter contracts and
5    the duration.
6            So I just want to -- I just
7    want to clarify that.  I don't know if
8    that -- if that was what you were asking,
9    but I just want to make sure that that
10   is --
11       Q.   Well, we're still going to
12   get to that subject at some point.
13       A.   Okay.
14       Q.   So I appreciate the preview.
15       A.   Okay.  So now -- now, let's
16   come back to -- I'm sorry for that
17   digression, but --
18       Q.   All right.  So your fourth
19   measure of damages is also based on the
20   statistical relationship between a Zuffa
21   foreclosure share and the fighter shares,
22   the share of revenues that went to labor,
23   correct?
24       A.   So we're in Subsection C on



1    164?
2        Q.   Yes.
3        A.   Okay.  So this -- this
4    method, as the language suggests, goes
5    back and makes use of the pre-Strikeforce
6    acquisition data to inform the parameter
7    of the --
8        Q.   What's the --
9        A.   I'm sorry, the foreclosure
10   share parameter in the regression.
11       Q.   Both the -- both of these
12   regression benchmarks look at the
13   statistical relationship between Zuffa's
14   foreclosure share and its -- and the
15   fighters' share to fighters over time,
16   but one excludes the Strikeforce -- the
17   data before the Strikeforce acquisition
18   and one includes it?
19       A.   Exactly.
20       Q.   And for common impact for
21   injury in terms of actual modeling, and
22   now I'm just referring to the bout class.
23       A.   So are we leaving damages?
24       Q.   Yes.

1        A.   We're going to common impact
2    now.
3        Q.   Yes.
4        A.   Okay.
5        Q.   Referring to just -- and I
6    should say those damages models that we
7    just went over were just for the bout
8    class and not the identity class?
9        A.   I wouldn't put it exactly
10   that way.
11       Q.   How would you put it?
12       A.   Well, if you recall, I used
13   the results from the bout class
14   regression to inform the -- the deflation
15   factor for the identity class as well.
16       Q.   But the four -- the four
17   models we just described estimate damages
18   for the bout class rather than the
19   identity class; is that correct?
20       A.   I think that when the model
21   appears -- when the write-up appears in
22   the bout class section it's speaking to
23   bout class, and when the model invoked in
24   the identity class section, it's speaking

1    to the identity class.
2        Q.   All right.  There are two
3    econometric models that you use for
4    purposes of the common impact analysis,
5    am I correct about that?
6            MR. CRAMER:  Objection to
7    form.
8            THE WITNESS:  Can I hear
9    that back?  I'm sorry.
10           (Pertinent portion of the
11   record is read.)
12           THE WITNESS:  Are you -- I'm
13   going to interpret the question,
14   unless it's wrong, with now you're
15   referring to the bout class
16   subsection of the common impact?
17   BY MR. ISAACSON:
18       Q.   Yes.
19       A.   So I wouldn't -- I wouldn't
20   quite put it that way.
21       Q.   All right.  Well, let me ask
22   you.  So if you look at page 151 of your
23   report, there's a section on Econometric
24   Evidence of a Compensation Structure?

1        A.   Yes, I see that section.
2        Q.   And broadly speaking, the
3    first type of econometric evidence that
4    you looked at was you performed
5    regressions to determine whether gains or
6    losses in compensation amongst fighters
7    were broadly shared across the bout
8    class.
9            Do I have that right?
10           MR. CRAMER:  You're asking
11   him to put aside the foreclosure
12   regression?
13           MR. ISAACSON:  I'm just
14   talking about common impact, yes.
15           MR. CRAMER:  Okay.
16   Objection, misstates the system.
17           THE WITNESS:  As part of the
18   two-part proof of common impact,
19   the -- in the second part of the
20   proof, I used econometric methods
21   as well as records evidence to
22   demonstrate a pricing structure.
23           But I think that the
24   question assumes away the



1    existence of another econometric
2    model that undergirds the first
3    part of the two-part proof;
4    namely, the demonstration of a
5    general wage effect.
6         The two-part proof is
7    designed to show that first there
8    is a general wage effect, and 2,
9    there is a mechanism by which that
10   general wage effect gets
11   transmitted to all members of the
12   class.
13   BY MR. ISAACSON:
14        Q.   All right.  So I'm just
15   looking at your section of Econometric
16   Evidence of a Compensation Structure.
17   All right.  So I'm trying just -- the
18   first thing that you have in there, if I
19   have it right, are regressions that you
20   performed to determine whether gains or
21   losses in compensation were broadly
22   shared across the bout class?
23        A.   I think that's fair.
24        Q.   Okay.  And that -- those

1    regressions don't depend on your
2    foreclosure analysis; is that correct?
3         A.   That is correct.  They're
4    doing something different.
5         Q.   All right.  The -- the next
6    type of econometric method are -- is
7    found on page 154, the standard
8    econometric methods that the vast
9    majority of bout class members receive
10   lower compensation than they would have
11   in the but-for world.  Am I right, that
12   would be the next piece of econometric
13   evidence that you look at?
14        A.   So just to be clear, we're
15   moving to a different method now --
16        Q.   Yes.
17        A.   -- in demonstrating common
18   impact?
19        Q.   Yes.
20        A.   And I'm going to employ a
21   different econometric technique to test
22   for common impact.
23        Q.   Right.  The first technique
24   that you -- econometric technique rather

1    than looking at documents, the first
2    econometric technique you employed was to
3    look whether gains or losses in
4    compensation were shared across the bout
5    class, and the second is the econometric
6    methods that are in Section C of your
7    report on page 154; is that correct?
8         A.   I just want to clarify, and
9    I don't know if this is on purpose, but
10   the first proof involves two econometric
11   elements:  There's an econometric element
12   to part 1, which is establishing a
13   generalized wage effect relating to the
14   foreclosure share, and the second part is
15   to show that there was a mechanism by
16   which that generalized wage effect gets
17   transmitted to the -- to the entire bout
18   class.  So --
19        Q.   I was trying to encompass
20   both of those because I'm doing these in
21   summary form.
22        So you know -- but that's
23   what's in your Section 2, paragraphs 227
24   to 229 that you just described, correct?

1         A.   Correct.
2         Q.   Okay.  And the results are
3    reported at Table 7?
4         A.   Well, the results for the --
5    for the second part, and this is just
6    one -- one result of the second part, so
7    I wouldn't say that Table 7 is the -- is
8    the summary or end-all, be-all of this
9    two-part proof.  It's a fairly elaborate
10   proof and it unfolds in multiple parts.
11        Q.   All right.  So Table 7 is a
12   result of the regressions that you
13   describe in Section 2, paragraphs 227 to
14   229?
15        A.   It is a result, yes.  It is
16   a result.
17        Q.   And the next econometric
18   method that you describe is found in the
19   next section, Section C, correct?
20        A.   Correct.
21        Q.   All right.  And that's where
22   you did use the regression models from
23   the -- from the foreclosure analysis to
24   predict but-for compensation share for



Page 30

```
1       each fighter, correct?
2            A.   Correct.
3            Q.   Okay.  And that's where I go
4       back to Table 6, which is on page 125,
5       and this is one of the regression outputs
6       that you used to predict the
7       compensation -- the compensation for each
8       fighter in the absence of the
9       antitrust -- alleged antitrust
10      violations; is that correct?
11           A.   Can I hear that back?  I'm
12      sorry.
13               (Pertinent portion of the
14           record is read.)
15               THE WITNESS:  So I wouldn't
16           exactly put it that way.  I just
17           think the absence of the antitrust
18           violations is too broad given that
19           the set of actions encompassed in
20           the challenged conduct is broader
21           than the set of -- of actions that
22           are being captured by this
23           regression approach.
24      BY MR. ISAACSON:
```

Page 31

```
1            Q.   All right.  So would I have
2       it correct if I said that -- that you
3       used the regression that's found at Table
4       6, page 125, as one of the regression
5       outputs that you used to predict the
6       compensation absent the alleged
7       challenged conduct?
8            A.   Again, I wouldn't -- I
9       wouldn't quite put it that way.
10           Q.   Well, absent -- I've tried
11      absent antitrust violations and I've
12      tried absent challenged conduct.  Can you
13      give me something else?  Absent what?
14           A.   Absent -- how about in a
15      but-for world where in which the
16      foreclosure share wasn't as high as it
17      was in the actual one.
18           Q.   All right.  So in Table --
19      in -- for purposes of determining common
20      impact, you used the regression on Table
21      6, page 125, to predict the compensation
22      that would exist for each fighter if
23      foreclosure shares were not as high as
24      they actually were?
```

Page 32

```
1            A.   Correct.
2            Q.   Now, when you say the
3       foreclosure shares were not as high as
4       they otherwise were, do you mean the full
5       foreclosure shares that are in the
6       regression or could it be any piece of
7       the foreclosure share?
8                MR. CRAMER:  Objection to
9            form.
10               THE WITNESS:  For each
11           regression there's three different
12           specifications shown in Table 6.
13           There is a different foreclosure
14           share at any point in time
15           depending upon the market
16           definition that I used.  And also
17           depending on the weighting method
18           that I used.
19               So whichever -- whichever
20           assumption I used, that is
21           associated with a precise measure
22           of foreclosure at a given point in
23           time, and what the simulation is
24           doing, it's taking the parameters
```

Page 33

```
1       of the regression model and
2       asking, what would that fighter
3       have been paid as a percentage of
4       event revenue had the foreclosure
5       share not been what it actually
6       was, but instead would have been
7       something else, and I believe for
8       Table 8 I'm positing a world in
9       which the foreclosure share goes
10      to zero.
11      BY MR. ISAACSON:
12           Q.   All right.  The -- I think
13      it was helpful, but I don't think it's
14      understandable to anybody outside of this
15      room, so excuse me if we repeat some of
16      this.
17               The -- in each of your
18      individual regressions, and I understand
19      you have regressions for different
20      markets, many different regressions, so
21      there will be a range -- there will be a
22      number of foreclosure shares depending on
23      the regressions.
24               When you are talking about a
```



Page 34

1    but-for world of a lower foreclosure
2    share, are you referring to the specific
3    foreclosure share that you would find in
4    one of your regressions as opposed to
5    some part of that, you know, say half of
6    it?
7             MR. CRAMER:  Objection to
8        form.
9             THE WITNESS:  I don't
10       understand the question.  I'm
11       sorry.
12   BY MR. ISAACSON:
13       Q.   So -- and that's my fault,
14   but let me keep trying.
15            The -- when you refer to the
16   but-for world of a lower foreclosure
17   share, do you mean the full lower
18   foreclosure share that would be specified
19   in whatever regression you're looking at
20   as opposed to some fraction of it?
21       A.   No, I wouldn't put it that
22   way.
23       Q.   So for example, if I was
24   looking at a -- just one of your

Page 35

1    regressions and it specified a
2    foreclosure share, give me an example of
3    a foreclosure share.
4        A.   Well, the question -- I'm
5    just trying -- the regression doesn't --
6        Q.   Help me out and give me an
7    example of a foreclosure share, a number
8    that would express it.
9        A.   90 percent.
10       Q.   Okay.
11       A.   It could have been
12   90 percent at a given point in time
13   depending upon the market definition used
14   and depending upon the weighting method
15   used.
16       Q.   Right.
17       A.   The actual foreclosure at a
18   given point in time could have been
19   90 percent, that would have entered in on
20   the right-hand side of regression, but as
21   we -- as we move to the but-for
22   world we're going --
23       Q.   Let me ask a question
24   because all I asked you for was a

Page 36

1    percentage.
2        A.   We're not going to have it.
3    But I keep hearing did I have it or did I
4    take a percentage of it.  The answer is
5    no.  I didn't -- I didn't do that.  No
6    simulation halves the foreclosure share.
7    There are three simulations:  One
8    simulation projects what the fighter wage
9    shares would be at zero percent
10   foreclosure share, another simulation
11   projects what fighter wage shares would
12   be at 20 percent foreclosure levels, and
13   another simulation projects what fighter
14   wage shares would be at 30 percent
15   foreclosure.
16            So I'm getting tripped up on
17   do I -- does the regression halve it.
18   The regression doesn't halve anything.
19   Halve as in cut in half.  The regression
20   takes the data as it is, right?
21       Q.   Right.
22       A.   It understands the
23   relationships between foreclosure share
24   and wage share controlling for all

Page 37

1    other -- all other things, right, and
2    then it's done.  Regression is done.
3             The regression doesn't get
4    to say what the but-for world looks like.
5    I'm using the regression parameters to
6    project what fighter wage shares would be
7    in a but-for world in which the
8    foreclosure share was either zero
9    percent, 20 percent or 30 percent.
10       Q.   All right.  The -- so if you
11   had a regression that specified a
12   foreclosure share of 90 percent,
13   depending on which model you were using,
14   your but-for world would have a
15   foreclosure percent of zero percent,
16   20 percent or 30 percent, do I have that
17   correct?
18       A.   No, you don't have it right.
19       Q.   Hum?
20       A.   You don't have it right.
21   I'm getting tripped up on the word if the
22   regression specifies a foreclosure share
23   of 90 percent.
24       Q.   Well, let me take that out

MAGNA
LEGAL SERVICES

Page 38

```
 1      of the question then.
 2            For each of your models, you
 3      have a but-for world where the
 4      foreclosure share for Zuffa is either
 5      zero percent, 20 percent or 30 percent.
 6            Do I have that right?
 7         A.   I think you've got that
 8      right.
 9         Q.   Okay.  And that's regardless
10      for what foreclosure is specified in the
11      regression?
12         A.   I'm just -- I wish we could
13      use a different word than specified.
14         Q.   What word would you use?
15         A.   The regression doesn't get
16      to specify the foreclosure share, just as
17      the regression doesn't get to specify how
18      many punches a fighter threw, right, or
19      how many successful punches.
20         Q.   Tell me what word you want
21      me to use.
22         A.   So the regression takes the
23      data as the world presents it.  The
24      regression doesn't get to specify.
```

Page 39

```
 1         Q.   Foreclosure is an output of
 2      the regression?
 3         A.   No, it's an input.  It's an
 4      input.
 5         Q.   Okay.  So --
 6         A.   But the regression doesn't
 7      get to -- doesn't get to pick what
 8      foreclosure is or specify it.  Maybe I'm
 9      misinterpreting what you mean by--
10         Q.   I'm just trying to find a
11      word that you're comfortable with.
12         A.   The regression takes the
13      data as the world presents it and looks
14      for relationships between those data.
15         Q.   Right.
16         A.   All right?  So it doesn't
17      specify.  The -- maybe what would be
18      helpful is that the market definition --
19      the market definition that I choose and
20      the weights that I apply generate a
21      measure of foreclosure share.
22         Q.   Okay.
23         A.   Right?  And then I'm going
24      to apply a regression analysis.  But the
```

Page 40

```
 1      regression doesn't get to specify, the
 2      regression takes the foreclosure share as
 3      an input.
 4         Q.   So regardless of the measure
 5      of foreclosure share that's generated by
 6      any specific model, the world -- you are
 7      going to assume for purposes of
 8      estimating impact or damages that the
 9      actual foreclosure share of Zuffa will be
10      zero, 20 percent or 30 percent depending
11      on the model?
12            MR. CRAMER:  Objection to
13      form.
14      BY MR. ISAACSON:
15         Q.   That's correct?
16            MR. CRAMER:  Objection to
17      form.
18            THE WITNESS:  It was close.
19      You said the model to start the
20      question, and just again to be --
21      to be specific, the regression --
22      the regression doesn't get to pick
23      the foreclosure share.  The
24      foreclosure share flows from which
```

Page 41

```
 1      market definition and which
 2      weighting method I use, right?
 3      That -- that will generate a
 4      foreclosure share that gets spit
 5      out, I think, of a Microsoft Excel
 6      file, and that foreclosure share
 7      is going to be spit out alongside
 8      each observation in the dataset.
 9            The regression finds a
10      relationship between that
11      foreclosure share and the
12      fighters' wage share controlling
13      for all other things and then the
14      regression is done.
15            At that point, I -- I can
16      make use of the parameters that
17      come out of the regression to
18      project what a fighter's wage
19      share would be in a but-for world
20      in which the foreclosure share was
21      lower.
22            Sorry, I'm being -- I'm
23      being attacked here by a gnat.
24      And -- thank you.
```



Page 42

1    And I use three different
2    scenarios: Zero percent,
3    20 percent and 30 percent.
4  BY MR. ISAACSON:
5    Q.   Now, when you use a world in
6  which there -- Zuffa has zero percent
7  foreclosure, how does that translate into
8  any -- a market share for Zuffa?
9    A.   Oh, it could accommodate
10 many different market shares for Zuffa.
11 It is -- one way of putting it is almost
12 agnostic to the market share.  It
13 could -- it could accommodate many.
14    You can have -- just to be
15 clear, you can have a high market share
16 and zero foreclosure share if all of your
17 fighters are under, say, 12-month
18 contracts.
19    Q.   And do I understand
20 correctly that if all the Zuffa fighters
21 were under 12-month contracts, you would
22 expect the foreclosure share of Zuffa to
23 be zero or close to zero?
24    MR. CRAMER:  Objection to

Page 43

1    form.
2    THE WITNESS:  So I -- I deem
3  a fighter to be foreclosed, or to
4  be working or employed pursuant to
5  an exclusionary contract if, as
6  you know, the contract is
7  exclusive and if the duration
8  exceeds a certain number of
9  months.  I use 30 months I think
10 as my -- my baseline approach.
11    And so if you -- if you
12 allow me to use that 30-month
13 baseline or cutoff as a measure
14 for whether a fighter is
15 foreclosed, and if your question
16 posits that every Zuffa fighter
17 under contract is -- is at
18 12 months, then by construction,
19 12 months is less than 30 months,
20 and therefore, under that
21 particular measure of foreclosure,
22 no fighter would be foreclosed.
23 BY MR. ISAACSON:
24    Q.   All right.  Is there any --

Page 44

1  is there any measure of foreclosure where
2  a 12-month contract, in your opinion,
3  would not result in the zero or near zero
4  foreclosure?
5    MR. CRAMER:  Objection to
6  form.
7    THE WITNESS:  Let me hear it
8  back.  But I don't think I
9  understood it, but let me just
10 hear it.
11 BY MR. ISAACSON:
12    Q.   Well, because you just told
13 me about how your 30-month baseline, and
14 you confined your answer to that
15 particular measure of foreclosure.
16    And I'm asking you, is there
17 any measure of foreclosure where a
18 12-month contract for all Zuffa fighters
19 would not result in zero or near zero
20 foreclosure?
21    MR. CRAMER:  Objection to
22 form.
23    THE WITNESS:  Well,
24 certainly not if you use 30 months

Page 45

1  as the cutoff, but if -- if the
2  court, for example, were to deem
3  that 12 months with an
4  exclusion -- with an exclusive
5  arrangement were exclusionary,
6  then contracts with 12 months
7  would be exclusionary.  It's
8  tautological.  It depends on where
9  you draw the cutoff and what --
10 what conditions you require for --
11 for one to conclude that a
12 contract was exclusionary.
13 BY MR. ISAACSON:
14    Q.   All right.  So I'm not
15 asking you any questions about what
16 courts rule, I'm asking you questions
17 that come out of your models.
18    Is there any measure of
19 foreclosure in any of your models where a
20 12-month contract for all Zuffa fighters
21 would not result in zero or near zero
22 foreclosure?
23    MR. CRAMER:  Objection to
24 form.  Asked and answered.



1    THE WITNESS:  I'd have to
2  think about it some more, but I
3  think I -- I think I gave you -- I
4  think I gave you what the answer
5  was, which is that it depends
6  on -- on how you draw the -- the
7  line.
8  BY MR. ISAACSON:
9    Q.    All right.  And how would
10 you define zero percent foreclosure?  You
11 said some of your models assume zero
12 percent foreclosure.  How do you define
13 zero percent foreclosure?
14   A.    So no model assumes it.
15 Just to be clear, I'm projecting but-for
16 worlds in which the foreclosure share is
17 zero, 20 or 30 percent.  But I'm
18 interpreting the question as how could
19 Zuffa get to zero percent foreclosure?
20   Q.    Right.  How would you define
21 Zuffa with zero percent foreclosure?
22   A.    It can get -- you could get
23 to zero percent foreclosure in myriad
24 ways.  So I'm not -- I'm not specifying

1  exactly how you get there.  I can give
2  you examples, I think we just did, in
3  which the legal standard is 30 percent --
4  30 months -- sorry.  If the legal
5  standard were 30 months and if counter-
6  factually all of -- well, and if Zuffa's
7  contracts all were 12-month contracts,
8  then the foreclosure share by my measure
9  would be zero percent.
10     But that's just one way.
11 There are -- there are many -- there are
12 many ways to get your foreclosure share
13 down.  You can -- you can divest --
14 divest fighters and send -- send fighters
15 to a -- to an independent organization
16 thereby decreasing your market share and
17 thereby decreasing your foreclosure
18 share.
19     There's -- there are many
20 ways to get to -- to a lower foreclosure
21 share.
22   Q.    All right.  So can you give
23 me some other examples of ways that Zuffa
24 could get to zero percent foreclosure

1  share?
2    MR. CRAMER:  I'm going to
3  object to the extent it calls for
4  a legal conclusion.
5    But you can answer.
6    And asked and answered.
7    THE WITNESS:  I think I've
8  covered -- I've covered the basis.
9  I think that the most -- the most
10 obvious way to construct it is by
11 coming up with a baseline in terms
12 of number of months in which an
13 exclusive contract is deemed
14 exclusionary and positing a world
15 in which Zuffa's contracts come
16 under that -- that cutoff.  They
17 could be 15 months long, they
18 could be 17 months long.
19 BY MR. ISAACSON:
20   Q.    All right.  And that cutoff
21 that needs to be posited, is that a legal
22 cutoff or is that a matter of economics?
23     MR. CRAMER:  Objection to
24 form.

1    THE WITNESS:  I think it is
2  ultimately a legal decision, but
3  it can be informed through
4  economics.  I hope economics can
5  inform the law at times.
6  BY MR. ISAACSON:
7    Q.    All right.  You mentioned
8  reducing the baseline number of months
9  for the exclusive contracts, and you
10 mentioned divesting fighters to -- to an
11 independent organization from Zuffa.
12     Are there any other examples
13 that you can think of as to how Zuffa
14 could reach zero or near zero
15 foreclosure?
16   A.    Sure.  I can keep on coming
17 up with examples.
18     One example would be that
19 there's no exclusivity provision in the
20 contracts.
21   Q.    All right.  That's one.  Are
22 there any other examples?
23     MR. CRAMER:  Asked and
24 answered, form.



1    find it reasonable to go to an
2    organization that cannot afford him or
3    her any quality opponents to fight.  If
4    you can't fight a highly-ranked opponent,
5    you have no chance of moving up the
6    rankings.
7         And so I'm answering a
8    related question, which I think is the
9    more important question.  And I'll leave
10   it at that.
11        Q.   Okay.  So in general it's
12   going to help me today if you answer my
13   questions and not the related questions
14   you think are more important.  You'll
15   have the opportunity to do the related
16   questions you think are more important
17   with your counsel, but I'm under time
18   limits.
19        And I understand you gave an
20   explanation, but was the answer to my
21   question, yes, that in your opinion there
22   are no reasonable substitutes for the
23   fighters outside of the tracked market
24   and outside the ranked market?

1         MR. CRAMER:  Objection to
2    form.
3         THE WITNESS:  I'm saying for
4    certain fighters inside of that
5    category or class, depending on
6    how you define the market, there
7    might be what that one fighter
8    considers to be a reasonable
9    substitute, but that doesn't end
10   the inquiry.
11        The question is would there
12   be a sufficient number of fighters
13   inside of that definition such
14   that a hypothetical monopsonist
15   trying to exercise market power
16   would be -- would be defeated in
17   the sense that it would suffer a
18   profit loss by trying to push
19   wages below competitive wages.
20        One fighter within the set
21   finding an outlet to be
22   reasonable, right, doesn't cut it.
23   BY MR. ISAACSON:
24        Q.   The -- okay.  I think I

1    understand.  So what I -- if I understand
2    what you're saying is, in your opinion,
3    there's not a sufficient number of
4    reasonable substitutes of fighters
5    outside the tracked markets and outside
6    the ranked market to affect your market
7    definition?
8         A.   I wouldn't put it that way.
9         Q.   I understand you were
10   saying -- before I said there are no
11   reasonable substitutes and you're saying
12   one doesn't matter.  The -- so tell me
13   how you would put it.
14        A.   There would have to be
15   enough fighters in your -- in your
16   defined set that would consider these
17   outside options reasonable so as to
18   defeat the wage decrease -- so as to
19   render the wage decrease unprofitable.
20        Q.   Okay.  All right.  So just
21   to sum it up, in your opinion, there's
22   not a sufficient number of reasonable
23   substitutes of fighters outside the
24   tracked market or outside the ranked

1    market to defeat a wage decrease if that
2    were to happen?
3         A.   I'd like to put it back in
4    my own words, that once you've defined
5    the set as I've done it, there wouldn't
6    be sufficient defection or substitution
7    away to forums or venues outside of the
8    definition by fighters inside of the
9    market so as to render this hypothetical
10   wage decrease unprofitable.
11        Q.   Right.  Okay.  Now, is it --
12   would it be the case that, in general,
13   fighters outside of the ranked and
14   tracked markets would not be affected by
15   wage increases within those markets?
16        MR. CRAMER:  Form.
17        THE WITNESS:  That is --
18   that is outside I believe of the
19   scope of anything that -- that
20   I've studied.  I'd have to think
21   about it.  But it's unrelated to
22   what I think the relevant question
23   is for determining the relevant
24   product market -- the relevant



Page 62

```
 1        input market.
 2            MR. CRAMER:  Is it a good
 3        time for a break?  We've been
 4        going for about an hour.  I need
 5        to use the men's room.
 6            MR. ISAACSON:  Sure.
 7            MR. CRAMER:  Thank you.
 8            THE VIDEOGRAPHER:  The time
 9        is 10:22 AM.  We are going off the
10        record.
11            (Recess.)
12            THE VIDEOGRAPHER:  The time
13        is 10:33 AM.  We are back on the
14        record.
15        BY MR. ISAACSON:
16            Q.   So using the models in your
17        report, can you tell me how you would go
18        about estimating the damages suffered by
19        the individual plaintiffs in this case?
20        Just take an example, John Fitch.
21            A.   So I haven't done that and
22        I'd have to think about it.  I interpret
23        that to mean how I would go about doing
24        an allocation of aggregate damages, and
```

Page 63

```
 1        that would be the closest thing to
 2        getting to an individual underpayment.
 3        But I haven't -- I haven't performed that
 4        yet and so I really don't -- I can't
 5        offer you a concrete way of how I'd do it
 6        at this time.
 7            Q.   The -- if you look at your
 8        impact analysis, which does show impact
 9        as to individual fighters, correct?
10            A.   One of the two methods of
11        the impact section looks at -- from the
12        perspective of the individual fighters,
13        yes.
14            Q.   So if you were going -- if I
15        wanted to know the individual impact
16        using that method of the alleged
17        conduct on Mr. Fitch, how would I go
18        about that?
19            MR. CRAMER:  Objection to
20        the term "individual impact" as
21        being vague.  You mean whether or
22        not he was impacted or by how
23        much?
24        BY MR. ISAACSON:
```

Page 64

```
 1            Q.   By how much.
 2            A.   Well, under that second
 3        approach, I compare what a fighter's
 4        actual wage share was against his or her
 5        but-for wage share based on the
 6        parameters of the regression model, and
 7        an assumed but-for foreclosure level.
 8            Q.   And so within your data,
 9        would it show what, for example,
10        Mr. Fitch's actual wage was compared to
11        the assumed but-for foreclosure level?
12            MR. CRAMER:  Objection to
13        form.  I don't think that's what
14        he just testified.
15            THE WITNESS:  Can I hear
16        that back?
17        BY MR. ISAACSON:
18            Q.   Well, let me put it
19        differently.
20            A.   Okay.
21            Q.   You know, under your
22        second -- under that approach, do you
23        have within your data what Mr. Fitch
24        would have earned using your but-for
```

Page 65

```
 1        foreclosure shares?
 2            A.   That particular model can
 3        project what Mr. Fitch would have earned
 4        on a particular fight given an assumed
 5        but-for foreclosure share.
 6            Q.   And in your impact model,
 7        your assumed foreclosure share is zero
 8        percent or 20 percent, is that right, you
 9        look at it both ways?
10            A.   You'd have to take me back
11        to the page, but my -- I thought that I
12        had -- maybe I'm getting confused for
13        impact and anticompetitive effects, but I
14        believe that I've -- I've performed
15        projections at zero, 20 percent and
16        30 percent.
17            Q.   If you just look at Table 8,
18        which is on page 155.
19            A.   Okay.
20            MR. CRAMER:  And I'll note
21        for the record there's an errata
22        that adjusts Table 8.
23            MR. ISAACSON:  Help me out
24        which errata we want to look at.
```

MAGNA
LEGAL SERVICES

Page 66

1      MR. CRAMER:  The one you
2  got.
3      MR. ISAACSON:  Oh, yes, yes,
4  yes.  I don't know if that affects
5  this, but...
6  BY MR. ISAACSON:
7      Q.  Let's look at Exhibit 3,
8  line -- item 77, which is page 4.
9      A.  Got it.
10      Q.  The two but-for foreclosure
11  shares you looked at for impact analysis
12  were zero and 20 percent; is that right?
13      A.  Oh, in this table, yes.  For
14  the purpose of performing this test, I
15  used zero and 20 percent, correct.
16      Q.  The -- and for your damages
17  analysis, excluding your Bellator and
18  Strikeforce benchmarks, you used a
19  but-for foreclosure share of 20 percent
20  or 30 percent; is that right?
21      A.  I used those and it's
22  possible that I also projected damages in
23  a world in which -- in a but-for world in
24  which foreclosure was set to zero.

Page 67

1      Q.  All right.  In terms of
2  actual damage estimates you state in your
3  report, do you use either but-for
4  20 percent or 30 percent rather than zero
5  percent?
6      A.  I'd have to go back and
7  check the report.
8      Q.  You know, one question I
9  should ask you before the day is over, so
10  let's do it now.
11      You have different damages
12  numbers reported.  What is your opinion
13  of the amount of damages in this case?
14      A.  I think that all the methods
15  that I put forward are reasonable and
16  viable and are economically sound.  It's
17  hard for me to say that I'm partial to
18  one over the other.  I realize that
19  there's a range, but I think they're all
20  good.
21      Q.  And I understand that you
22  believe they're all good.  Within that
23  range, do you have an opinion as to
24  what's the appropriate method --

Page 68

1  appropriate amount of damages in this
2  case?
3      A.  I think the appropriate
4  amount of damages would span the range
5  that I offered.
6      Q.  But there's no number within
7  that range that you have -- you don't
8  have an opinion as to any specific number
9  within the range of damages that you've
10  estimated that's the appropriate number
11  of damages in this case?
12      MR. CRAMER:  That misstates
13  the testimony.  Form.
14      THE WITNESS:  I think
15  that -- that certain methods were
16  designed in a way to be especially
17  conservative.  And so to that
18  extent, it may -- it may not
19  capture the -- the full impact.
20      I also will note again that
21  I'm -- with respect to these
22  regression based approaches, it's
23  turning entirely on -- on one
24  mechanism; namely, funneling

Page 69

1  fighters through these
2  exclusionary fighter contracts,
3  and because it does not capture
4  other forms of the challenged
5  conduct, it's going to understate
6  what total damages are.
7      But I'm -- I'm loath at this
8  point to say that I -- I like one
9  number in that range.  I think --
10  I think the range covers the
11  reasonable range of what -- of
12  what the damages are in this case.
13  BY MR. ISAACSON:
14      Q.  And within that range, you
15  would not give an opinion as to what's
16  the appropriate amount of damages --
17  within that range you're not going to
18  give an opinion about what's the
19  appropriate range -- the appropriate
20  number of damages, any number within that
21  range is fine to you?
22      A.  I don't think any number
23  within the range.  I don't think that was
24  my testimony.  I think that I've -- I've



Page 98

```
 1        Q.   You have not done any impact
 2   models or damages models where you --
 3   where you use as an input the actual
 4   amount of fighter pay as opposed to the
 5   fighter share?
 6        A.   I don't think that's true.
 7   I have -- in my impact section, I've run
 8   a model on levels, not related to
 9   foreclosure share, but levels of fighters
10   compared to what other fighter were being
11   paid.
12            But if you're asking have
13   I -- have I run a model that relates
14   foreclosure share to the levels, I have
15   not done that.
16        Q.   All right.  I think I
17   understand you, but let me get it
18   straight.
19            You have not run any models
20   that establish the -- that establish the
21   fact of injury or the amount of damages
22   that rely on the actual salaries that
23   are -- not salaries, the actual
24   compensation paid to fighters as opposed
```

Page 99

```
 1   to the fighters' share?
 2            MR. CRAMER:  Objection to
 3       form.
 4            THE WITNESS:  No, I'm going
 5       to -- I'm going to say no to that
 6       one.  I thought I just clarified.
 7   BY MR. ISAACSON:
 8        Q.   Just say no and I'll ask you
 9   a follow-up question.
10        A.   Fine.  No.
11        Q.   The -- when you look at
12   actual fighter pay, that's when you
13   were -- when you used actual fighter pay
14   as opposed to fighter share, that's when
15   you performed regressions to determine
16   whether gains or losses in a compensation
17   were broadly shared across the bout
18   class, correct?
19        A.   Correct, as part of an
20   impact model.
21        Q.   Right.  And does that model
22   generate an amount of impact or amount of
23   damages?
24        A.   No, that model was to
```

Page 100

```
 1   establish the fact of common impact.
 2        Q.   And the results showed that
 3   individual fighter compensation per event
 4   moves together with per event
 5   compensation paid to other fighters; is
 6   that correct?
 7        A.   Yes.
 8        Q.   Okay.  And while it
 9   establishes that the compensation moves
10   together, the output of that model does
11   not actually demonstrate injury to any
12   specific fighter; is that correct?
13            MR. CRAMER:  Objection to
14       form.
15            THE WITNESS:  I would say
16       the output of that model in
17       conjunction with other steps in
18       that two-part proof show impact to
19       all fighters.
20   BY MR. ISAACSON:
```

Page 101

Page 102

[REDACTED]

3        A.   This analysis must be
4    understood in conjunction with other
5    analyses in the section, the totality of
6    which establishes common impact.
7        Q.   I agree with that.  What I'm
8    saying is this -- this model by itself
9    would not show any injury to any specific
10   fighter, it would have -- it would have
11   to be considered in conjunction with
12   other analysis that you've done?
13       A.   I think that's fair.  I
14   would not -- I would not offer this model
15   by itself as proof of common impact.  I
16   would offer it, as I did, in conjunction
17   with other models in the section, and
18   record evidence, of course.
19       Q.   Right.  So the models that
20   actually conclude by themselves that
21   there was damage or impact to individual
22   fighters are all expressed in terms of
23   fighters' share and don't rely on data
24   but actual fighter pay; is that correct?

Page 103

1        MR. CRAMER:  Objection to
2    form.
3        THE WITNESS:  No, that's not
4    correct.
5    BY MR. ISAACSON:
6        Q.   The models that show actual
7    impact or damages by themselves all are
8    expressed in terms of the fighters' share
9    of revenue, correct?
10       A.   I wouldn't put it that way
11   either.
12       Q.   Okay.  For each of those
13   models you were looking at what the
14   fighter share of revenue actually was
15   compared to what it would be in the
16   but-for world using the models that
17   you've relied on, correct?
18       A.   For certain models, the
19   left-hand side variable of the regression
20   was expressed in terms of fighter share
21   as opposed to absolute level.
22       But I want to make clear for
23   the record that the numerator is the
24   fighters' pay.  So when you say the

Page 104

1    models aren't taking into consideration
2    the fighters' pay, I have to -- I have
3    to -- I have to reject that.
4        Q.   All right.  So there is a
5    variable in each of your impact models
6    and damages models that actually estimate
7    a dollar effect on fighters that relies
8    on the fighters' share as opposed to the
9    absolute level of compensation of the
10   fighter.  Do I have that right?  What you
11   call the variable on the left-hand side.
12       A.   Yeah, the dependent variable
13   in certain models is expressed in terms
14   of fighter's share, and to figure out
15   what the effect is on a fighter's
16   absolute pay, it's a ministerial change
17   to convert from an actual fighter share
18   to a but-for fighter's share, and then
19   knowing what the event revenue was to
20   convert to a but-for fighter pay.
21       So I think that -- I think
22   that to say that it's -- it's not making
23   use of actual fighter pay just misses
24   what's -- what's going on.

Page 105

1        Q.   All right.  So on page 155,
2    Table 8.
3        A.   Okay.
4        Q.   Which reports on a
5    regression you did for impact.  The
6    dependent variable there was the
7    fighter's share of revenue rather than
8    the absolute level of compensation, am I
9    correct?
10       A.   Correct.
11       Q.   Okay.  And the same would be
12   true for each of the regressions in your
13   damages models; is that correct?
14       A.   I believe that's fair, that
15   the dependent variable in those models
16   was fighter share of revenues.
17       Q.   I'm going to take a big
18   chance here and ask if you can explain
19   for our audience what you mean by a
20   dependent variable.
21       A.   Sure.  So the dependent
22   variable is the variable that we are
23   trying to understand and explain what --
24   what drives it to -- to move around.  And

**MAGNA**
**LEGAL SERVICES**

Page 106

1   so we -- you'll also hear the expression
2   the left-hand side variable, but -- but
3   it's -- it's the variable of interest.
4   We are -- we are trying to -- to
5   understand the world through -- through
6   that variable and to explain what causes
7   it to vary.
8       Q.   All right.  So I'd like -- I
9   think variable of interest is a phrase
10  you use in your report, and I guess it's
11  also comfortable calling it a dependent
12  variable for a layperson, the variable
13  we're trying to explain.  Both of those
14  would be acceptable?
15      A.   Sure.
16      Q.   Okay.  The --
17          THE VIDEOGRAPHER:  We're ten
18      minutes left on this tape,
19      Counsel.
20          MR. ISAACSON:  All right.
21      We'll go about five more minutes
22      and take a break.
23  BY MR. ISAACSON:
24      Q.   Have you done damages

Page 107

1   analysis before where you had used the
2   percentage of -- the percentage of
3   revenue as opposed to the absolute level
4   of compensation as the variable of
5   interest?
6       A.   It's possible.  Sitting here
7   I'm thinking of another -- of another
8   wage case that I did, which was -- which
9   I refer to as Arizona Travel Nurses, and
10  it's possible that we -- when we did our
11  modeling there, we expressed -- in fact,
12  it's kind of coming back to me.  I think
13  we were interested in a nurse's payment
14  relative to her bill rate.  So -- so yes,
15  I believe I've -- I've done something
16  like that before.
17      Q.   You say something like that,
18  have you done -- have you used as the
19  variable of interest before the share of
20  total revenue that goes to the labor
21  force, whether that labor force is an
22  employee or -- or contractors?
23      A.   I think so.
24      Q.   Okay.  And you think you did

Page 108

1   that in Arizona Travel Nurses?
2       A.   Yeah, it's an old case, but
3   I -- some -- some faint memories are
4   coming back, and I -- I believe that
5   to -- to establish similar things, common
6   impact there, we were -- we were looking
7   at the bill rate as the denominator,
8   that's how much the hospital was -- was
9   charging for the -- for the nurse, and
10  the numerator was the wage that went to
11  the -- to the nurse, and so it's an
12  analogous construction of a dependent
13  variable.
14      Q.   Any other cases that you --
15  where you've estimated damages using the
16  variable of interest or the dependent
17  variable as the share to labor?
18      A.   I'm not sure.  I'm not sure
19  how many other wage suppression cases
20  I've done besides -- besides these two.
21  I'd have to -- I'd have to go back and
22  think about it.
23      Q.   Okay.
24          MR. ISAACSON:  All right.

Page 109

1   Why don't we take a break?
2       MR. CRAMER:  Sure.
3       THE VIDEOGRAPHER:  The time
4   is 11:26 AM.  We are going off the
5   record, and this is the end of
6   Disk 1.
7       (Recess.)
8       THE VIDEOGRAPHER:  The time
9   is 11:40 AM.  This is the start of
10  Disk 2, and we are now on the
11  record.
12  BY MR. ISAACSON:
13      Q.   So I want to continue our
14  discussion of the percentage of revenue
15  paid to labor as the variable of
16  interest.
17          Is there economic literature
18  that you're familiar with that discusses
19  the percentage of revenue that's paid to
20  labor in a competitive industry as
21  opposed to an industry that's less
22  competitive?
23      A.   Is there economic
24  literature?



1    opposed to as a percentage of revenue?
2         MR. CRAMER: Objection to
3    form, to generally. For what
4    purpose?
5         THE WITNESS: A firm could,
6    if a firm bills -- if a law firm
7    bills an associate out at $400 an
8    hour, it could express what the --
9    what the young lawyer's salary on
10   an hourly basis is as a -- under
11   an assumed utilization rate as a
12   percentage of that young lawyer's
13   bill rate.
14   BY MR. ISAACSON:
15        Q.   And are you aware of any
16   studies which express the marginal
17   revenue product of labor in terms of the
18   percentage of revenue of the firm?
19        A.   I'm not aware, but as you've
20   expressed it, that's not quite what I'm
21   doing either.
22        Q.   Now, in terms of -- did you
23   make any effort to measure the marginal
24   revenue product of labor of UFC fighters?

1         A.   Yes.
2         Q.   Okay. And what would you
3    point to me for that?
4         A.   What I did, which is I -- I
5    calculated the average revenue per event,
6    per fighter, and I'm using that as a
7    proxy for the marginal revenue product.
8         Q.   All right. If the
9    average -- when you look at the average
10   revenue per event, per fighter, how do
11   you determine what part of that revenue
12   is the contribution of the fighter as
13   opposed to, for example, marketing,
14   promotions, production or the work of the
15   overall firm?
16        A.   So for my purposes, I don't
17   need to figure out that -- that
18   decomposition. I will note, however,
19   that I cite a study in my literature
20   review section that suggests that the
21   fighter is responsible for, if not all,
22   the vast majority of -- of the
23   pay-per-view revenues that are captured
24   and not the brand.

1         Q.   Well, I didn't ask about the
2    brand.
3         The -- you would agree --
4    you would agree with me that effective
5    marketing and promotion could increase
6    the average revenue per event, correct?
7         A.   Yes.
8         Q.   And you would agree with me
9    that super- -- improving television
10   production can increase the average
11   revenue per event?
12        MR. CRAMER: All things
13   equal?
14        MR. ISAACSON: Yes.
15        THE WITNESS: I'm not sure
16   what -- what you mean by improving
17   television production.
18   BY MR. ISAACSON:
19        Q.   A better production that
20   people enjoy more.
21        MR. CRAMER: Objection to
22   form.
23        THE WITNESS: And you're
24   asking me if I can conceive of

1    this as a matter of theory?
2    BY MR. ISAACSON:
3         Q.   Yes.
4         A.   As opposed to whether it
5    actually happened?
6         Q.   Yes.
7         A.   I think I'm -- I'm going to
8    grant you that as a matter of theory one
9    could -- one could add value by
10   increasing the quality of the production.
11        Q.   Okay. Now, in this case,
12   you did not do an actual study yourself
13   of the contribution of the UFC fighters
14   to the average revenue per event; is that
15   right?
16        MR. CRAMER: Asked and
17   answered.
18        THE WITNESS: I think that's
19   correct. As I noted a few moments
20   ago, that was not necessary for my
21   purposes.
22   BY MR. ISAACSON:
23        Q.   By using the average revenue
24   per event, per fighter as a proxy, were

MAGNA
LEGAL SERVICES



**Page 122**

1  you using that as a proxy for the
2  marginal revenue product of that labor?
3      A.   Yes.
4      Q.   Okay.  And you were assuming
5  that all of that average revenue per
6  event, per fighter was the product of
7  that labor as opposed to some other
8  source?
9          MR. CRAMER:  Form.
10          THE WITNESS:  No, I don't
11      think I'm assuming that.
12  BY MR. ISAACSON:
13      Q.   When -- when you look at
14  average revenue -- I'm sorry.  When you
15  ordinarily look at the marginal revenue
16  product of labor, do you talk about
17  everybody who works in the firm including
18  management?
19          MR. CRAMER:  Objection to
20      form.
21          THE WITNESS:  If -- if this
22      were some other case and you were
23      interested in computing the
24      marginal revenue product of

**Page 123**

1      management, you might -- you might
2      be interested in that.  But that
3      wasn't what I was trying to do
4      here.
5  BY MR. ISAACSON:
6      Q.   All right.  Here, have you
7  attempted to actually estimate the
8  marginal revenue product of the fighter
9  portion of the labor force of the UFC?
10          MR. CRAMER:  Objection to
11      form.
12          THE WITNESS:  I think you're
13      getting at the same question now,
14      just asked in a different way
15      which is have I done a
16      decomposition of the marginal
17      revenue product between the
18      fighters and -- and Zuffa, and the
19      answer is no, I have not done that
20      decomposition.
21  BY MR. ISAACSON:

**Page 124**

**Page 125**

4      Q.   You, yourself, have not
5  looked at the levels of pay over time
6  paid to Zuffa's fighters other than
7  looking at this study?
8          MR. CRAMER:  Objection to
9      form.
10          THE WITNESS:  So I wouldn't
11      put it that way.
12  BY MR. ISAACSON:
13      Q.   How would you put it?
14      A.   I am absolutely looking at
15  their pay over time in the sense that I'm
16  recording their pay as the numerator of
17  my dependent variable.  So to suggest
18  that I'm not looking at their -- their
19  pay is erroneous.

MAGNA
LEGAL SERVICES

Page 126



Page 127

8     Q.   How do I -- with the
9  understanding that you've said that
10  marginal revenue product of labor is the
11  value of the additional output created
12  when the firm adds a worker, how do I
13  know how much increased percentage of
14  revenue should be paid to a worker based
15  on the marginal revenue product of their
16  labor?
17     A.   I don't think I understand
18  that question.
19     Q.   Okay.  Looking at 450 --
20  that footnote 454, you say firms that
21  wield monopsony power pay a smaller share
22  of revenue of labor and they do that in
23  two ways, right?
24     A.   Yes.

Page 128

1     Q.   And one way is restricting
2  the amount of labor hired and the other
3  is restricting the compensation paid to
4  labor?
5     A.   Correct.
6     Q.   And a traditional economy
7  theory of monopsony would restrict the
8  amount of labor hired, do I have that
9  correct?
10     A.   Well, here the way that it
11  manifests itself is -- is a bit different
12  but -- because I'm, of course, thinking
13  of the shelving, but in other
14  applications, you can think about not
15  merely hiring, a monopsonist, all things
16  equal, generates less output and less
17  inputs than -- than does a competitive
18  firm.
19        I think as it's applied
20  here, the way that the suppression of
21  fights and output occurred was -- was in
22  part due to the shelving of fighters.  So
23  fighters were being hired, but not
24  necessarily deployed.

Page 129

1     Q.   All right.  Now, you were
2  telling me how that was applied here, but
3  am I correct that in traditional economic
4  therapy, a monopsony restricts the amount
5  of labor that's hired?
6     A.   Yes.
7     Q.   Now, we've been talking
8  about --
9     A.   I would amend hired or
10  deployed.
11     Q.   The -- we've been talking
12  about labor share or fighter share.  You
13  mentioned weighting by revenue before.
14  Let's come back -- let's go to that topic
15  now.
16        If we look at paragraph 128
17  of your report.
18     A.   Oh, did you want page 128 or
19  paragraph 128?
20     Q.   Paragraph 128.
21     A.   Give me one second.
22     Q.   Page 87.
23     A.   Okay.  Paragraph 128.
24     Q.   Yes.  Then there's a Figure

MAGNA
LEGAL SERVICES



Page 174

```
6         Q.   The -- would another factor
7    that would increase the foreclosure share
8    for the revenue weighted measures be
9    increased revenue generated by Zuffa
10   compared to its competitors?
11            MR. CRAMER:  Objection to
12       form.  Incomplete hypothetical.
13            THE WITNESS:  I can say that
14       holding all things equal, Zuffa's
15       market share, the share of Zuffa
16       fighters who are fighting pursuant
17       to an exclusionary contract, that
18       under the revenue weighting based
19       measure, and only under the
20       revenue weighting based measure of
21       foreclosure, would an increase in
22       the relative revenues per event,
23       per fighter for Zuffa cause the
24       foreclosure share to increase.
```

Page 175

```
1    BY MR. ISAACSON:
2         Q.   And for the revenue weighted
3    foreclosure measures, holding all other
4    things equal, if Zuffa increased the
5    number of events it was holding during
6    the year, that would increase its
7    foreclosure share, am I right about that?
8         A.   Well, I have to -- I have to
9    add again a bunch more to the
10   hypothetical to be able to say whether an
11   added event would change the foreclosure
12   share.  But I can't answer the
13   hypothetical as you've -- as you've
14   stated it.
15        Q.   Well, for the revenue
16   weighted foreclosure events, holding --
17   foreclosure measures, holding all other
18   things equal, if Zuffa increased the
19   number of events that earned revenue, its
20   foreclosure share would increase; is that
21   correct?
22        A.   I would need to add more --
23   more layers to the hypothetical.  So I
24   guess I would say I can't -- I just can't
```

Page 176

```
1    answer that question.
2         Q.   Well, what would be a reason
3    that, assuming Zuffa did increase the
4    number of events and all other things
5    were held equal, its foreclosure share
6    would not increase?
7             MR. CRAMER:  Asked and
8        answered.  Form.
9             Go ahead.
10            THE WITNESS:  For example,
11       if -- if that fighter fought
12       pursuant to a non-exclusionary
13       contract in that new event, then
14       that fighter would not make it
15       into the numerator of the -- of
16       the foreclosure share.
17   BY MR. ISAACSON:
18        Q.   Okay.  Any -- any other
19   reasons you can think of?
20        A.   I think you have to specify
21   what's happening to the non-Zuffa events
22   around the time that you're taking the
23   measure.  So the mere advent of a Zuffa
24   event doesn't necessarily increase the
```

Page 177

```
1    foreclosure shares.
```

MAGNA
LEGAL SERVICES



Page 178

[redacted]

Page 179

[redacted]

8      Q.   All right.  Now, if I
9  understand your answers earlier today, in
10  estimating damages and impact, you have
11  proposed a world where there would be,
12  depending on the model, a zero,
13  20 percent or 30 percent foreclosure, but
14  in those worlds you're not assuming any
15  specific market share or any specific
16  conduct by Zuffa; is that right?
17      MR. CRAMER:  Objection to
18  form, misstates the testimony.
19      THE WITNESS:  You put
20  something at the end that's
21  causing me to pause.
22      I did testify earlier that
23  I'm not assuming any particular
24  market share.  With respect to the

Page 180

1  conduct, I'm assuming that in a
2  but-for world these vertical
3  restrictions in the fighter
4  contracts that impose exclusivity
5  and duration of a certain extent
6  would disappear.
7      Now -- with one caveat, and
8  it's important, is that when I go
9  to, say, a 30 percent foreclosure
10  level, so long as a small enough
11  share of Zuffa fighters, given its
12  market share, were fighting
13  pursuant to one of these contracts
14  with 30-month duration or more,
15  you could, you could make that
16  consistent with a but-for
17  foreclosure share of 30 percent.
18  BY MR. ISAACSON:
19      Q.   Okay.  And in your but-for
20  world -- let me ask you this.  What do
21  you mean by the but-for world in this
22  circumstance?
23      A.   Well, it is a -- it is a
24  world -- it's a more competitive labor

Page 181

1  market, a world with fewer restrictions
2  on labor mobility.
3      Q.   So in estimating impact and
4  damages, you have estimated the world --
5  you compared the world as it is to a
6  world that would have more competitive --
7  a more competitive labor market for UFC
8  fighters; is that correct?
9      MR. CRAMER:  Objection to
10  form.
11      THE WITNESS:  My -- my
12  construction of but-for world in
13  this regression model, is -- is
14  envisioning a world in which the
15  restrictions on fighter mobility
16  are lessened sufficiently so as to
17  permit 30, 20 or zero percent
18  foreclosure shares, and there's a
19  lot of ways that you can get
20  there.
21  BY MR. ISAACSON:
22      Q.   And by fighter mobility, you
23  mean the ability to work for different
24  promoters; is that right?



Page 182

1     A.   An impediment to mobility or
2 restrictions that preclude you from --
3 from working for rivals or for shopping
4 your contract around or testing your
5 market value.
6     Q.   When you say a but-for
7 world -- you've done a comparison of the
8 real world to the but-for world, you've
9 estimated the world -- you compared the
10 world as it is to a world with more
11 mobility in the MMA labor market.
12     A.   I think in very broad terms
13 that's what I'm trying to get at.  And
14 mathematically the way that I express
15 that is a world in which Zuffa's
16 foreclosure share is 30 percent,
17 20 percent or zero percent.

Page 184

Page 183

Page 185

10     Q.   All right.  The -- and I
11 think you told me also this morning that
12 you're not assuming -- in terms of market
13 share in the world with more mobility,
14 your but-for world of zero, 20 percent or
15 30 percent foreclosure, Zuffa could have
16 a very high market share; is that right?
17     A.   Absolutely.
18     Q.   Right.  And could Zuffa have
19 a market share of 90 percent and still
20 have a foreclosure of zero?
21     A.   Yes.
22     Q.   And you're not predicting
23 what Zuffa's market share would be in a
24 world with zero percent foreclosure?

MAGNA
LEGAL SERVICES

Page 246

1      arrangement.
2            So by construction, if I --
3      if I assume in a but-for world
4      these restraints are removed, then
5      the foreclosure falls. I don't
6      need an econometric proof of that.
7      It -- it just follows from
8      elementary logic.
9   BY MR. ISAACSON:
10       Q.   Right. Well, for example,
11  when we looked at Figure 3, you told me
12  things you thought were important, but
13  you didn't have any sort of mathematical
14  analysis to say, here's a clause that
15  relates to a specific foreclosure
16  percentage; is that right?
17       A.   That is correct. I think --
18  I did not perform an inquiry as to the
19  causes or drivers historically of a
20  foreclosure share. One could do that.
21  It sounds like there would be another
22  econometric exercise. But the
23  foreclosure share, as I've measured it,
24  is what it is, and it's an explanatory

Page 247

1      variable model.
2        Q.   Okay. Let's go to paragraph
3   1 of your report.
4        A.   Paragraph 1?
5        Q.   Yes. Page -- somehow that's
6   page 4 and 5.
7        A.   Got it.
8        Q.   I'm sorry, paragraph 2.
9        A.   Oh, paragraph 2.
10       Q.   You see in the middle
11  there's the definition of challenged
12  conduct?
13           "Plaintiffs allege that
14  these actions taken together, the
15  'challenged conduct.'"
16       A.   Yes.
17       Q.   Okay. And the -- and in
18  paragraph 2 you list three things.
19           "1, Zuffa" -- Zuffa's
20  alleged to have, 1, eliminated potential
21  rival MMA promoters through horizontal
22  acquisitions; 2, deprived potential
23  rivals of key inputs, the fighters
24  themselves, by entering" -- "entering

Page 248

1      into allegedly exclusionary contracts
2   with the vast majority of top fighters,
3   and 3, taken other steps to use its
4   alleged dominance to impair potential
5   rivals."
6            And then you've also.
7   Footnoting in footnote 2, the complaint.
8   Though that's -- I'm not clear on whether
9   that's not a footnote to the challenged
10  conduct.
11           MR. CRAMER: No, that's a
12      footnote to the sentence at the
13      top of the page.
14           MR. ISAACSON: Right.
15  BY MR. ISAACSON:
16       Q.   So is the challenged conduct
17  a subset of the allegations in the
18  complaint?
19           MR. CRAMER: Objection to
20      form. Foundation.
21           THE WITNESS: I don't think
22      so. I think that when I lay out
23      my understanding of the challenged
24      conduct, I try to -- I try to

Page 249

1      trace the conduct that's being
2      challenged in the complaint.
3   BY MR. ISAACSON:
4        Q.   Okay. And I'm -- we're
5   going to focus on taken other steps to
6   use its alleged dominance to impair
7   potential rivals, because perhaps you'll
8   agree with me that that lacks
9   specificity, but that's okay for an
10  introduction.
11       A.   Exactly.
12       Q.   Right, right, right.
13       A.   It's made very explicit
14  later on in the draft.
15       Q.   And then footnoting to
16  that --
17       A.   In the report, sorry.
18       Q.   -- at the end of that
19  sentence, it's to part VII A. If I
20  wanted to understand the complete
21  challenged conduct, is that where I would
22  look to?
23       A.   I don't think so. Let me
24  look at part 7A. That could be a typo.

Page 250

```
 1        Q.   It even gets confusing, your
 2   Table of Contents doesn't have a 7A.
 3        A.   Right.  So let me --
 4             MR. CRAMER:  I think it
 5   means 2.
 6             THE WITNESS:  Yeah.
 7             MR. ISAACSON:  2A?
 8             THE WITNESS:  Yeah.
 9             MR. CRAMER:  There's a
10   section of the report called --
11   under Roman II called Nature of
12   the Challenged Conduct.
13             MR. ISAACSON:  That would
14   make more sense, yes.
15             THE WITNESS:  You want to
16   strike the V there.
17   BY MR. ISAACSON:
18        Q.   All right.  So II A is the
19   horizontal conduct?
20        A.   Yes.
21        Q.   And so is that the item 3 in
22   your paragraph 2, the other -- the other
23   conduct, is it the horizontal conduct?
24        A.   No.
```

Page 251

```
 1        Q.   Okay.  Would it be
 2   everything in No. II that's -- would
 3   your -- would the -- Roman numeral II,
 4   would that section capture the challenged
 5   conduct?
 6        A.   Roman II captures the
 7   challenged conduct.
 8        Q.   Okay.  Maybe I just got us
 9   another errata.
10             The -- now, the esti- --
11   your challenged conduct includes
12   horizontal conduct and vertical conduct.
13   As I understand it, from what you've said
14   today, that you are not estimating injury
15   or damages from the horizontal conduct;
16   is that right?
17        A.   I think I'm not -- I'm not
18   estimating any -- any impact or damages
19   that flow entirely through the
20   horizontal.  What -- what's important and
21   what drives the damages and the impact in
22   my models are the vertical restraints.
23   They're doing the -- that is the
24   mechanism of harm that I'm capturing,
```

Page 252

```
 1   that I'm measuring.
 2        Q.   All right.  The -- you are
 3   measuring an increase in foreclosure due
 4   to the acquisition of rivals by Zuffa; is
 5   that right?
 6             MR. CRAMER:  Asked and
 7   answered, form.
 8             THE WITNESS:  Conditional on
 9   Zuffa using exclusive contracts of
10   a sufficient duration, then yes,
11   bringing on more fighters and
12   funneling them through that
13   mechanism is causing foreclosure
14   to go up.
15             In contrast, if Zuffa were
16   not using exclusive contracts of a
17   sufficient duration and made a
18   horizontal acquisition, then by my
19   regression model, at least, there
20   would be no increase in
21   foreclosure share and there would
22   be no anticompetitive effects.
23             In other words, the vertical
24   restrictions on fighter mobility
```

Page 253

```
 1   are doing -- is the only necessary
 2   condition, it is doing all the --
 3   all the lifting, if you will,
 4   according to my model.
 5   BY MR. ISAACSON:
```

MAGNA
LEGAL SERVICES



Page 254

10      BY MR. ISAACSON:
11          Q.   Fine.  You discuss
12      counter-programming in your report.  I
13      can refer you to that, but if you're
14      general familiar with the topic.
15          A.   Yes.
16          Q.   All right.  You are -- am I
17      correct that you are not attributing any
18      increase in foreclosure percentage to
19      counter-programming or would you know?
20          A.   I'll give you the same
21      answer I just gave you for the
22      acquisitions.  If you strip away the
23      restrictions on the fighter mobility, the
24      exclusive long-term contracts, then the

Page 255

1       presence of the counter-programming would
2       not engender higher foreclosure shares
3       according to my model, would not generate
4       the wage effects that -- that my model is
5       showing.

Page 256

Page 257



Page 258

Page 260

Page 259

Page 261

```
12        Q.   In general, we'll save time
13   if you tell me whether you have opinions
14   as opposed to what you imagine.
15        A.   Okay.
16        Q.   Or could imagine.  I don't
17   mean that as a criticism, I mean that as
18   constructive.
19        MR. CRAMER:  Constructive
20   criticism.
21        MR. ISAACSON:  No, not even
22   that.  A constructive way to get
23   through the day.
24        MR. CRAMER:  Advice.
```



Page 262

1          MR. ISAACSON:  Yes.
2   BY MR. ISAACSON:

Page 264

Page 263

Page 265

21          Q.   Well, part of what drives
22   the increase in foreclosure share is the
23   increase in Zuffa's market share, right?
24          A.   Correct.

Page 282

1    you have used are consistent with the
2    merger guidelines, but you're not able to
3    say whether they were sufficient to
4    define those markets based on the merger
5    guidelines?
6           MR. CRAMER: Objection to
7       form.
8           THE WITNESS: I don't -- I
9       just don't know what sufficient
10      means in that context.
11   BY MR. ISAACSON:
12      Q.   Okay. And when you say
13   they're consistent with the guidelines,
14   what do you mean?
15      A.   I think the guidelines tell
16   us, and I even quote the guidelines when
17   it comes to defining input markets, and
18   I'm faithful to the -- to the teachings
19   and to the standards that are articulated
20   in the guidelines.
21      Q.   All right. And the output
22   markets that you define -- well, actually
23   let me break it down.
24         There's three -- two input

Page 283

1    markets and one submarket, and there' a
2    geographic market for each of those,
3    correct?
4       A.   Correct.
5       Q.   And the geographic market
6    for all three would be North America?
7       A.   Yes.
8       Q.   Okay. And then you define
9    an output market. Is that an output
10   market that's tied to each input market
11   or is there one output market?
12      A.   There's one output market,
13   but it does depend on how you have
14   defined the input market. You may recall
15   that when I -- when I chart, for example,
16   the number of events in the relevant
17   output market, it depends on -- I'm
18   making it as a condition that an event --
19   an MMA event had to feature at least one
20   fighter that belonged to the relevant --
21   to the associated relevant input market.
22   You probably recall --
23      Q.   Yes.
24      A.   Those charts, 4A, B and C.

Page 284

1           So -- so the way that I've
2    implemented the output market, it depends
3    on -- on the associated input market.
4       Q.   Right. And that's why
5    mathematically I'm trying to understand
6    whether you have three output markets
7    tied -- each one tied to an associated
8    input market or there's one output market
9    tied to the three input markets.
10      A.   Again, I like to think of
11   there being one output market and one
12   input market and these are just different
13   ways to measure them.
14      Q.   And the -- when you defined
15   the output market, you used revenue
16   weighting; is that right? Oh, no, it's
17   other way around. Never mind.
18         The revenue earned by the
19   output market is the revenue that you use
20   when you do revenue weighting in the
21   input markets, correct?
22      A.   It is possible to think of
23   it that way, but when I was finding my
24   weights, my revenue weighting measures

Page 285

1    of, say, market share or foreclosure
2    share, I wasn't thinking about the fact
3    that those revenues occur in the output
4    market. But that's fair, if that's how
5    you would like to think about it. Of
6    course the -- the output is the
7    production of the event and the revenue
8    is associated with that output.
9       Q.   Right. And can you describe
10   to me a situation where a firm would have
11   monopoly (sic) power in the output market
12   based on revenue, and would not have
13   monopsony power in the input market once
14   you use the revenue weighting?
15         MR. CRAMER: Incomplete
16      hypothetical. Talking about this
17      industry or just generally?
18         MR. ISAACSON: Generally.
19         MR. CRAMER: Incomplete
20      hypothetical.
21         THE WITNESS: I don't
22      understand the question because
23      the revenue weighting isn't really
24      affecting my -- my conclusions

MAGNA
LEGAL SERVICES

Page 286

1          with respect to, say, a finding of
2     monopsony power in the input
3     market.
4     BY MR. ISAACSON:
5          Q.   Well, you do have findings
6     of monopsony power that do rely on
7     revenue weighting, right?
8          A.   I think that under the --
9     under the indirect approach and under
10    only one pass through the indirect
11    approach, I weight fighters by -- by
12    revenues to make an inference about
13    Zuffa's high shares in that relevant
14    input market.
15         Q.   Right.
16         A.   But as you know, that's only
17    one of many, many approaches that allow
18    me to get to the conclusion of monopsony
19    power.
20         Q.   Okay.
21         A.   I actually prefer --
22         Q.   So let's return --
23         A.   Can I finish?
24         Q.   I thought you were.

Page 287

1          A.   I prefer direct evidence
2     generally, and I think that I've -- I
3     offer a slew of evidence that speaks to
4     how you can prove directly that Zuffa
5     exercises monopsony power.
6          Q.   I understand that you
7     offered direct and indirect evidence, but
8     I need to ask about them one at a time
9     and we can cover both.
10         A.   Okay.
11         Q.   So in terms of when you
12    define a market, can you describe to me a
13    situation where if you use revenue
14    weighting in the input market, where
15    the -- a monopoly firm would not
16    necessarily have a monopoly in the input
17    market?
18         MR. CRAMER:  Incomplete
19    hypothetical, form.
20         THE WITNESS:  I've never
21    given thought to that, and I'd
22    like to think about it and maybe
23    we'll come back.  But I don't
24    think I'm prepared to -- to

Page 288

1          construct a scenario about how
2     that could occur.
3     BY MR. ISAACSON:
4          Q.   All right.  The -- and then
5     you've described geographic market for
6     the output market also.  And is that also
7     North America?
8          A.   Yes.
9          Q.   All right.  The -- and in
10    terms of your SSNIP analysis -- all
11    right.  So did you do -- well, my
12    colleague wants to know so it seems like
13    a good question.
14         A.   I'm sure it is.
15         Q.   In the out -- in the output
16    market, what is being sold?  In the
17    output markets that you have defined.
18         A.   Sure.  I think that you
19    are -- the production or the product that
20    is being produced are -- is live MMA
21    events and the revenue associated with
22    those events can take the form of gate
23    revenue or pay-per-view.  That's from --
24    from the consumer side.  Of course,

Page 289

1     there's -- there's revenues from the
2     advertiser's side as well.
3          But I hope that answers your
4     question.
5          Q.   All right.  And does
6     pay-per-view compete with broadcast?
7          MR. CRAMER:  Objection to
8     form.
9          THE WITNESS:  I did not
10    conduct that inquiry.
11    BY MR. ISAACSON:
12         Q.   Do you have an opinion one
13    way or another about that?
14         A.   No.
15         Q.   All right.  With respect to
16    the -- does -- do the live venue events
17    compete with pay-per-view events?
18         A.   I don't even understand the
19    question.  Many of the pay-per-view
20    events are live.
21         Q.   Meaning I watch it on
22    pay-per-view as opposed to go see it
23    live.
24         A.   I haven't -- I haven't

MAGNA
LEGAL SERVICES

Page 290

1    studied that and I imagine for someone
2    who lives very far from the venue where
3    the live event is staged, they would not
4    be considered reasonably close
5    substitutes.
6        Q.   So for your input markets,
7    what evidence did you take into account
8    to assess customer's likely response to
9    price increase in the SSNIP analysis?
10   And feel free to point me to the sections
11   of your report that --
12       A.   Did you mean to say -- I
13   think you just conflated the input
14   markets and customers.  Maybe we should
15   start over.
16       Q.   Yes, I said price increase
17   rather than wage decrease, but let me
18   just put it this way:  What evidence in
19   your report did you take into account to
20   assess the likely response to a SSNIP in
21   the input markets?
22       A.   Sure.  So there it's the
23   perspective of the fighters not the
24   customers.  So I was tripping up over

Page 291

1    your --
2        Q.   Yes.
3        A.    -- injecting customers when
4    we're talking about input markets.
5            So I can take you to the
6    relevant sections, and I will, but of
7    course at high levels, I'm looking at
8    record evidence of -- of what fighters
9    and promoters thought about substitution
10   possibilities as you -- if you were to
11   move away from Zuffa to counteract a
12   hypothetical wage cut.
13       Q.   Okay.  So the first thing
14   you looked at was record evidence of
15   substitution.
16       A.   Or the perception of
17   substitution from the stakeholders, the
18   fighters, the promoters, and I'll just
19   point you, if you --
20       Q.   That's -- that's sufficient
21   for -- for item 1.
22       MR. CRAMER:  You asked him
23   to look at his report.
24       MR. ISAACSON:  I'm going

Page 292

1        to --
2        MR. CRAMER:  Okay.
3        MR. ISAACSON:  I'm not going
4    to ask him to recite all the
5    documentary evidence.
6    BY MR. ISAACSON:
7        Q.   And I understand that
8    there's documentary evidence that you're
9    not reciting today.
10           Okay.  Other than the record
11   evidence of the -- about sub- --
12   perceptions of substitutability from the
13   stakeholders, what would be other parts
14   of your SSNIP analysis for the input
15   market?
16       A.   I would direct you to
17   Section 3A 1 for all of the evidence that
18   I used to inform the construction of the
19   relevant input market.
20       Q.   That would be the record
21   evidence that you were referring to?
22       A.   Well, record evidence is
23   fairly broad, right, because it
24   encompasses almost everything.  But I

Page 293

1    will point -- to me the -- what helps to
2    guide me to the findings that I made with
3    respect to the input market was the fact
4    that Zuffa was able to successfully
5    suppress fighter wages, wages either
6    measured by -- by wage share, regression
7    or by knowledge of the fact that wage
8    shares were falling over time from
9    26 percent to 18 percent, yet Zuffa did
10   not suffer sufficient defection so as to
11   render that wage decrease unprofitable.
12           Now, that -- that tells you,
13   as a matter of economics, that a -- that
14   a reasonable starting place for defining
15   the contours of the relevant input market
16   is just the fighters under Zuffa's
17   control.  That was the -- the first thing
18   that occurred to me.
19           And once you -- once you
20   start there, you can start looking at
21   record evidence to determine whether
22   additional fighters from -- from rival
23   promotions ought to be included so that
24   you eventually get to the smallest set of

## Page 294

1  fighters such that a hypothetical
2  monopsonist could profitably exercise
3  monopsony power.
4      Q.   All right. And you said
5  that Zuffa was able to successfully
6  suppress fighter wages -- wage share.
7  You were talking only about the share of
8  revenues there, correct?
       A.   Correct.

[REDACTED]

## Page 295

[REDACTED]

BY MR. ISAACSON:
6      Q.   All right. But in your --
7  in your hypothetical there you held
8  revenues constant. Did you look at, as
9  part of your analysis of the input market
10  and defining that market, as to whether
11  Zuffa actually suppressed actual wages?
12      MR. CRAMER: Objection to
13  form.
14  BY MR. ISAACSON:
15      Q.   As opposed to wage share?
16      MR. CRAMER: Same objection.
17      THE WITNESS: I'm focused on
18  wage share, of course, because
19  it's the right thing to look at
20  from an economic perspective.
21  We're trying to measure
22  exploitation, and the textbooks
23  tell you to do it as a share of
24  marginal revenue product.

## Page 296

BY MR. ISAACSON:
1      Q.   So my actual question was --
2  I understand you're focused on that, but
3  my question is, did you look at whether
4  Zuffa actually suppressed actual wages?
5      A.   Without controlling for
6  revenues, no. Because it's incorrect to
7  do so.
8      Q.   So in performing your SSNIP
9  analysis for the input markets, is it
10  fair to say that you relied on the record
11  evidence about the issue of perceived
12  substitution from the stakeholders along
13  with your observations that when Zuffa
14  suppressed fighter wage shares, there
15  weren't significant defections?
16      A.   I think -- I think that
17  encompasses a lot. I also think that
18  Zuffa in its ordinary course of business
19  made use of a FightMetrics (sic)
20  database. I had -- the very first thing
21  I did when I -- when I got this case was
22  I started reading the economic literature
23  on the MMA industry, and almost every

## Page 297

1  article I read, the FightMetrics (sic)
2  database formed the foundation of their
3  empirical analysis.
4      So I thought that that was a
5  reasonable place to begin to posit what
6  the smallest set of fighters that could
7  be under the control of a hypothetical
8  monopsony would be in order for it to
9  exercise market power.
10      Q.   All right. Why did you use
11  the smallest set of fighters not the
12  smallest amount of promoters?
13      A.   Well, because we're looking
14  at the input market. The fighters form
15  the elements of the input market. They
16  happen to belong to promoters, but
17  fighters are the elements or the
18  ingredients.
19      But I'm -- if I'm a
20  fighter -- just to make it clear, if I'm
21  a fighter and I'm thinking about
22  substituting, defecting from UFC and
23  going to a rival promotion, I don't care
24  what the name of the promotion is or

Page 306

1       look at the perspective of -- of
2   different stakeholders.  That's
3   why I didn't limit myself to the
4   perspective of fighters.  When you
5   go through those multiple
6   paragraphs in the section, you
7   will see other promoters giving
8   opinions about what they think
9   about -- about rival MMA
10      promotions, what they think about
11      options outside of -- of the MMA.
12  BY MR. ISAACSON:
13      Q.   All right.  So let's move to
14  your output markets.
15          I'm assuming that for your
16  output markets you relied on the record
17  evidence of the perception of
18  substitutability from the point of view
19  of the stakeholders.
20          MR. CRAMER:  Is that a
21      question?
22  BY MR. ISAACSON:
23      Q.   Am I correct on that?
24      A.   I think that encompasses a

Page 307

1   lot, yes.
2       Q.   Right.
3       A.   And it's a good place --
4       Q.   And --
5       A.   It would be a good place to
6   begin.
7       Q.   And as I understand it, what
8   you -- you also relied on the effect on
9   consumers of an increase in pay-per-view
10  prices.
11      A.   This is really important,
12  right?  I mean, if -- we're not talking
13  about a not-so hypothetical --
14      Q.   We'll go into that in some
15  detail.
16      A.   Exercising a profitable
17  price increase, we have a real one, and
18  we need to make an inference about it
19  from an economic perspective.
20          This -- this not so
21  hypothetical monopsonist raised prices
22  and yet saw a revenue increase because
23  the demand that it faced was so lasting.
24  That tells you a lot about constructing a

Page 308

1   relevant output market.
2       Q.   Actually, I might have
3   gotten that confused.
4           Was that part of your direct
5   evidence I think?
6       A.   It's part of the direct, but
7   I can't help from -- from thinking about
8   direct evidence when I go about
9   constructing my relevant markets.
10      Q.   The -- I'll come to this --
11  the direct evidence.  In the -- and so we
12  will take as on the record that in
13  constructing your input and output
14  markets, you also considered your direct
15  evidence, okay, so that you don't need to
16  repeat that.
17      A.   I can tell you like it,
18  though.  So this is the last time I can
19  ever say it in a deposition?
20      Q.   No, I'm trying to save you
21  some time.
22      A.   Okay.
23      Q.   The -- in analyzing the
24  output market other than the record

Page 309

1   evidence of substitute -- perceptions of
2   substitutability, did you do anything
3   else in your SSNIP analysis?
4           MR. CRAMER:  Objection to
5       form, misstates the testimony.
6       You're excluding one of the things
7       he said he did.
8           MR. ISAACSON:  You're doing
9       a lot of speaking objections now.
10      I realize it's getting late in the
11      day but...
12          THE WITNESS:  I would just
13      like to look at the sections which
14      go from 115 -- paragraph 115 to
15      119, and see if there's anything
16      outside of the umbrella of record
17      evidence of the perceptions of the
18      relevant stakeholders as to how
19      they would respond to -- how a
20      consumer would respond to a price
21      increase.
22          I'll note that there are a
23      few articles in Forbes, I'm
24      looking at footnote 317, 318 and

MAGNA
LEGAL SERVICES

Page 310

1      321, that we came to outside of
2      the record evidence --
3  BY MR. ISAACSON:
4      Q.   Okay.
5      A.   -- that speak to, for
6  example, whether wrestling would be
7  perceived as a -- as a reasonable
8  substitute from the perceptive of
9  consumers to a live MMA event.  I think
10 that those Forbes articles and the record
11 evidence and knowledge that Zuffa was
12 able to profitably impose a price
13 increase on pay-per-view, all guided me
14 in reaching the final conclusion as to
15 the relevant output market.
16     Q.   I'm going to have you repeat
17 that because that was at the end of a
18 very long answer about what you were
19 going to look at.  Or I'll repeat it to
20 you.
21         In doing your SSNIP analysis
22 for the output markets, you relied on
23 Forbes articles and record evidence that
24 caused you to conclude that Zuffa would

Page 311

1  be able to profitably impose -- along
2  with knowledge that Zuffa was profitably
3  impose a price increase on pay-per-view
4  to reach your conclusions as to the
5  relevant output market?
6      A.   That's fair.
7      Q.   And your direct evidence is
8  discussed on page 98 -- beginning on page
9  98.
10     A.   Uh-huh.
11     Q.   All right.  The first item
12 of direct evidence is the power to
13 suppress fighter competition below
14 competitive levels.
15         And you list several items.
16 Each of those relate to reduced fighter
17 share; that is, the share of revenues
18 other than your reference to its
19 sponsorship tax.
20         Do I understand that right?
21     A.   Yes.
22     Q.   Okay.  The -- and how
23 significant was the sponsorship tax?
24         MR. CRAMER:  Objection to

Page 312

1      form.
2  BY MR. ISAACSON:
3      Q.   Can you quantify that tax
4  for me?
5      A.   I'm not sure I'm able to
6  that quantify the sponsorship tax.
7      Q.   Okay.  The second type of
8  direct evidence you talk about is the
9  direct -- is the evidence to restrict the
10 supply of fighter services, and you talk
11 about Zuffa consistently maintains
12 significantly more fighters under
13 contract than it could use.
14         Now, when you say
15 consistently, what years are you
16 referring to?
17     A.   The class period.
18     Q.   And so it's your opinion
19 that consistently throughout the class
20 period, that Zuffa maintained
21 significantly more fighters under
22 contract than it could use?
23     A.   Yes.
24     Q.   And when you say "than it

Page 313

1  could use," do you mean that it was
2  unable to give those fighters -- give
3  fights to those fighters?
4         MR. CRAMER:  Objection to
5  form.
6         THE WITNESS:  It was unable
7      to give fights to fighters in a
8      timely fashion.
9  BY MR. ISAACSON:
10     Q.   All right.  And when you say
11 a timely fashion, do -- were they able to
12 give the fights to the fighters within
13 the time period of the contract?
14         MR. CRAMER:  Objection to
15 form.
16         THE WITNESS:  I'm -- I'm
17     hesitating because I'm aware of
18     record evidence suggesting that
19     Zuffa on occasion would toll the
20     clock either for real or imagined
21     injury or --
22 BY MR. ISAACSON:
23     Q.   All right.  But I'm -- I'm
24 talking about a fighter who is ready,

MAGNA
LEGAL SERVICES

Page 314

```
 1    willing and able to fight.
 2         A.   Yes.  I've got record
 3    evidence of Zuffa denying that fighter a
 4    fight.  Yes, I do.
 5         Q.    Within the time period of
 6    the contract?
 7              MR. CRAMER:  Objection to
 8         the form.
 9              THE WITNESS:  Yes, within
10         the time period of the contract.
11    BY MR. ISAACSON:
12         Q.    So that --
13         A.    The fighters were
14    complaining that they were having to wait
15    very long times in between fights and
16    they were worried about what that was
17    doing to their careers, and you had --
18    you had Silva complaining that -- that he
19    didn't have enough opportunities to place
20    fighters into fights.
21              So there was a -- there was
22    a problem, and it's a -- it's a
23    convenient problem for a monopsonist, and
24    it's -- it generates anticompetitive
```

Page 316



Page 315

```
 1    effects.
```

Page 317

```
11    BY MR. ISAACSON:
12         Q.    Yes.
13         A.    Yes.
14         Q.    Okay.  Are you -- can you
15    identify any record evidence of Zuffa
16    breaching any of the agreements with
17    fighters by failing to offer the required
18    number of bouts?
19              MR. CRAMER:  Objection, to
20         the extent it calls for a legal
21         conclusion, form.
22              THE WITNESS:  Yeah, I wasn't
23         citing episodes of breaches of
24         contracts.  I think that what
```

MAGNA
LEGAL SERVICES

Page 318

1    Zuffa was doing was -- was likely
2    inside of the letter of the law of
3    the contract, but nevertheless,
4    they were strategically delaying
5    fighters for many reasons,
6    including trying to lock a fighter
7    into the next contract.
8  BY MR. ISAACSON:
9    Q.   All right.  The -- are you
10  aware of an -- any plaintiff or proposed
11  class member who has alleged that Zuffa
12  failed to -- failed to offer them the
13  number of bouts that were required under
14  a contract within the term of that
15  agreement?
16     MR. CRAMER:  Same objection.
17  Objection to form.  Objection to
18  the extent it calls for a legal
19  conclusion.
20     THE WITNESS:  That's -- by
21  memory, that's not -- that's not
22  how I recall the evidence shaking
23  out.  The evidence shakes out in
24  a -- in a different way.

Page 319

1  BY MR. ISAACSON:
2    Q.   All right.  When you say
3  significantly more fighters than it could
4  use, what's the magnitude of fighters
5  that you're talking about?
6    A.   Well, there's been a study
7  by -- by some economists looking at -- I
8  think trying to measure just by how much
9  the capacity problem was, but sitting
10  here, I -- I can't tell you how big it
11  was.  I can only describe it in
12  qualitative terms.
13    Q.   All right.  The study -- did
14  you do any -- the study that you're
15  referring to is quoted in your report?
16    A.   Yes.

Page 320

4    Q.   Did you do anything to
5  replicate the work of that study?
6    A.   I did not.  I did not
7  replicate the work of that study.
8    Q.   Okay.  And can you give me
9  any magnitude of fighters that -- that we
10  are talking about.  50 fighters, 100
11  fighters in a year?
12     MR. CRAMER:  Objection to
13  form.
14     THE WITNESS:  I don't have
15  a -- I don't have a precise number
16  for you.
17  BY MR. ISAACSON:
18    Q.   When you say significantly
19  more fighters, can you give me a range?
20    A.   I don't know if I can
21  denominate it in terms of a range.  The
22  mechanism here is denying rivals access
23  to fighters and not being able to deploy
24  those assets in a timely fashion.  That's

Page 321

1  the -- that's the mechanism.
2    Q.   Right.  But when you say in
3  your report that they consistently
4  maintain significantly more fighters
5  under contract than they could use, was
6  that more than ten fighters?
7    A.   I believe so, but sitting
8  here, I'm not in a position to give you a
9  quantitative estimate.
10    Q.   All right.  Would you be
11  able to say whether it was more than 50?
12    A.   Sitting here, I don't think
13  I can, but it's conceivable I can do
14  that.  If that were an assignment, I
15  could go try to estimate that.

Page 322

8      Q.   But as to the -- when you
9   say significantly compared to the total
10  number of Zuffa fighters, would that mean
11  at least 50 or would you not have an
12  opinion on that?
13         MR. CRAMER:  Objection to
14  form.
15         THE WITNESS:  Oh, sitting
16  here today, I can't put a number
17  on it.
18  BY MR. ISAACSON:
19      Q.   Okay.  The -- and in a world
20  with zero percent foreclosure by Zuffa,
21  the fighters who were maintained by Zuffa
22  under contract that they -- you say they
23  could not use, in that world would those
24  fighters still be Zuffa fighters?

Page 324

1      Q.   In a world -- in a world
2   with -- where Zuffa has zero percent
3   foreclosure, would Zuffa contract with
4   fewer fighters?
5      A.   I think directionally you
6   would see leakage and defective from
7   Zuffa to rivals.
8         You had asked me earlier if
9   I put an exact market share associated
10  with it and I said no because I -- I
11  can't, but I feel comfortable saying, at
12  least directionally, that in a more
13  competitive world with fewer restrictions
14  on fighter mobility, you would see more
15  mobility.  I mean, it's almost -- it's
16  almost tautological.
17      Q.   I think previously you told
18  me that in a world where Zuffa had a zero
19  percent foreclosure, it still could have
20  a market share as high as 90 percent.  If
21  that were the case, if it had zero
22  percent foreclosure and a 90 percent
23  market share, would Zuffa be contracting
24  with fewer fighters than it is today?

Page 323

1      A.   They may be Zuffa fighters
2   and they may not be.  I think -- I think
3   a plausible scenario is those fighters
4   break out when you relax their
5   restrictions and go fight.  They want to
6   fight.  You know, there's -- Dan White
7   has this notion of rusting.  He's got a
8   phrase for it, what happens when a
9   fighter sits around and doesn't get to
10  fight.
11         I understand that it hurts
12  their -- their careers, it hurts their
13  ability to elevate in the profession when
14  they're sitting around.  Not only are
15  they not fighting, but their muscles are
16  the experience of being in a fight, it's
17  hard to replicate in practice, and
18  moreover, you don't get the opportunity
19  to elevate by fighting other ranked
20  fighters.
21         And you don't earn money.  I
22  mean, that's the -- that's the real
23  thing.  You don't get paid in this
24  profession unless you fight.

Page 325

1         MR. CRAMER:  Incomplete
2   hypothetical.
3         THE WITNESS:  I think that
4   it's a complicated -- it's a
5   complicated one.  I'd probably
6   have to think about it.
7   BY MR. ISAACSON:
21      Q.   So to infer the price
22  increase, did you take the amount of
23  revenue for pay-per-view and divide it by
24  the number of units?

MAGNA
LEGAL SERVICES

Page 326

1       A.   I think revenue and units
2   were elements of my calculus, yes.
3       Q.   All right.  You did not look
4   at the actual amounts charged by the
5   cable company for the pay-per-view event?
6       A.   I think -- I think I agree
7   with you that in this case I was looking
8   at it from the perspective of Zuffa.
9       Q.   All right.
10      A.   Which is the relevant
11  perspective to determine whether it was
12  profitable for Zuffa.
13      Q.   Well, does the revenue
14  percentage of Zuffa vary even when the
15  pay-per-view price remains the same?
16          MR. CRAMER:  Incomplete
17      hypothetical.
18          THE WITNESS:  I'm sorry, the
19      revenue percentage of what?
20  BY MR. ISAACSON:
21      Q.   So you were looking at Zuffa
22  revenue times pay-per-view units,
23  correct?  I mean, divided by pay-per-view
24  units.

Page 327

1       A.   Correct.
2       Q.   Correct.  And Zuffa's
3   revenue by pay-per-view would be the
4   revenue share it gets from the cable
5   company?
6       A.   Correct.
7       Q.   Correct?  And is it the case
8   that -- that the revenue share percentage
9   goes up and goes down irrelevant (sic) to
10  the price of the actual pay-per-view?
11          MR. CRAMER:  Objection to
12      form.
13          THE WITNESS:  And I don't
14      know.  I think that it would all
15      depend.  I would have to think
16      about it.
17  BY MR. ISAACSON:



MAGNA
LEGAL SERVICES

Page 330

[redacted]

7    Q.   So you're characterizing all
8  of the pay-per-view events as marquee
9  events when you say marquee events?
10   A.   I think that you might be
11  able to find counterexamples, a handful
12  of counterexamples of a pay-per-view that
13  doesn't feature a headliner, but in
14  general it would be really hard to sell
15  it unless it featured a headliner.
16   Q.   Right.  And did the -- and
17  if Zuffa -- if a firm decided that it
18  wanted to move marquee events from
19  pay-per-view to broadcast, would you
20  consider that direct evidence of power to
21  restrict supply?
22   MR. CRAMER:  Incomplete
23  hypothetical, form.
24   THE WITNESS:  Well, you're

Page 331

1  asking me to assume something that
2  I understand to be an unprofitable
3  move.
4   But if -- if your experts
5  can show evidence that these
6  marquee events moved one-for-one
7  from pay-per-view to -- to
8  television, I'd be happy to
9  consider such evidence.  But I
10  don't have an opinion on it right
11  now.
12  Q.   Okay.
13   THE VIDEOGRAPHER:  Excuse
14  me, Counsel.  We're approaching
15  ten minutes left on the disk.
16   MR. ISAACSON:  I think I'm
17  done.
18   Give me one minute, but I
19  think I'm about done for the day.
20   Give us a minute.
21   MR. CRAMER:  Let's go off
22  the record.
23   THE VIDEOGRAPHER:  The time
24  is 4:28 PM.  We are going off the

Page 332

1  record.
2   (Recess.)
3   THE VIDEOGRAPHER:  The time
4  is 4:31 PM.  We have been on the
5  record for five hours and
6  36 minutes.
7   MR. CRAMER:  All right.  We
8  have no questions.
9   MR. ISAACSON:  Thanks.
10   MR. CRAMER:  Let's go off
11  the record.
12   THE VIDEOGRAPHER:  All
13  right.  The time is 4:31 PM.
14   This concludes the
15  deposition and this is the end of
16  Disk 3.
17   (Witness excused.)
18   (Deposition concluded at
19  approximately 4:31 PM.)
20
21
22
23
24

Page 333

1
2        CERTIFICATE
3
4
5    I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6   deposition is a true record of the
   testimony given by the witness.
7
     It was requested before
8   completion of the deposition that the
   witness, HAL J. SINGER, Ph.D., have the
9   opportunity to read and sign the
   deposition transcript.
10
11
12   Constance S. Kent, CCR, RPR, CLR
   Certified Court Reporter
13   Registered Professional Reporter
   Certified LiveNote Reporter
14   and Notary Public in and for the
   Commonwealth of Pennsylvania
15   Dated:  October 1, 2017
16
17
18
19
20     (The foregoing certification
21   of this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)

Page 334

INSTRUCTIONS TO WITNESS

        Please read your deposition
over carefully and make any necessary
corrections.  You should state the reason
in the appropriate space on the errata
sheet for any corrections that are made.
        After doing so, please sign
the errata sheet and date it.
        You are signing same subject
to the changes you have noted on the
errata sheet, which will be attached to
your deposition.
        It is imperative that you
return the original errata sheet to the
deposing attorney within thirty (30) days
of receipt of the deposition transcript
by you.  If you fail to do so, the
deposition transcript may be deemed to be
accurate and may be used in court.

Page 335

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

Page 336

ACKNOWLEDGMENT OF DEPONENT

        I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 337, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
HAL J. SINGER, Ph.D.            DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 337

LAWYER'S NOTES
PAGE  LINE
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

