# EXHIBIT 50

## Redacted Excerpts from the First Deposition of Dr. Andrew Zimbalist

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

- - - - - - - - - - - - - - - - - - - x

Cung Le, Nathan Quarry, John Fitch Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,

Plaintiffs,

Case No. 2:15-cv-01045-RFB(PAL)

V.

Zuffa, LLC, d/b/a Ultimate, Fighting Campionship and UFC,

Defendants.

- - - - - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

ANDREW ZIMBALIST, Ph.D.

Northampton, Massachusetts

Magna Legal Services
(866) 624-6221
Www.MagnaLS.com

Reported By:
MaryJo O'Connor, RMR/CSR
Job No: 345726



A. Again, my estimate of damages is based upon the overall impact of a panoply of restrictive clauses. 09:26:40 09:26:42 09:26:48

I did identify one such clause that appears in some contracts, which is known as the options clause, which does not seem to be listed. 09:26:50 09:26:52 09:26:54 09:26:56

Q. Okay. Let me add in the options clause. 09:26:57 09:27:00

You've identified a package, or a panoply, of exclusionary contracts and behavior that flows from that on the basis of which you have estimated damages. You've done that by listing paragraphs of the complaint and also referencing the options clause. 09:27:02 09:27:07 09:27:08 09:27:11 09:27:13 09:27:15 09:27:18

Is there any other contract provision or behavior that you would point to as material to your damages estimate that you have not listed? 09:27:18 09:27:21 09:27:24 09:27:26

A. All right. As I sit here today, I don't think there is. And as I repeat my previous answer, probably not. 09:27:28 09:27:31 09:27:34

Q. And if there is conduct that is not part of that package of exclusionary 09:27:37 09:27:39

contract provisions and behavior that you have described for me, you have not estimated damages from such conduct; is that correct? 09:27:44 09:27:46 09:27:48 09:27:55

MR. CRAMER: Asked and answered. 09:27:55

A. I believe that I have answered that very question. 09:27:56 09:27:58

Q. I don't think you did, and I'd ask you to answer it. 09:27:59 09:28:00

If there is conduct that's not part of the package of exclusionary contract provisions and behavior that flows from that that you've described for me, you have not estimated damages from such conduct; is that correct? 09:28:02 09:28:03 09:28:06 09:28:08 09:28:11 09:28:14

A. Exclusionary contract provisions and behavior that flows from that? 09:28:16 09:28:18

Q. Correct. 09:28:20

A. That I have not -- that's correct, yes. 09:28:21 09:28:21

Q. Now, you're referring to that package with a panoply of contract provisions and behavior that flows from it. You have not broken down that package to estimated damages from any parts, 09:28:33 09:28:37 09:28:38 09:28:41 09:28:45

individual parts, of the package, correct? 09:28:49

A. That's correct. 09:28:51

Q. And your damage estimate doesn't -- would not -- let me start over. 09:28:52 09:28:56

Your damage estimate does not include any method by which you could break down the individual pieces of the package of exclusionary contracts and behavior such that you could estimate damages from any part of that package, correct? 09:29:00 09:29:04 09:29:07 09:29:09 09:29:15 09:29:17

A. Not unless I was able to perform natural experiments. I can't with my existing data and existing methodology, that's correct. 09:29:20 09:29:22 09:29:25 09:29:28

Q. And the same is true whether you're talking about individual pieces or subsets of the package; is that correct? 09:29:29 09:29:35 09:29:38

And by that, I mean if you were to break down the exclusionary contracts and behavior that you've relied on into subsets, you would not be able to estimate damages from the methods you've used from those individual subsets? 09:29:41 09:29:43 09:29:46 09:29:49 09:29:52 09:29:55

MR. CRAMER: Let me just object, because I think it's a little 09:29:56 09:29:58

misleading when you said "behavior you relied upon," because Professor Zimbalist was clear to say behavior he relied upon that flowed from the contract. 09:29:59 09:30:02 09:30:05 09:30:06 09:30:09

MR. ISAACSON: And I'm using that as a shorthand for that, if I may. 09:30:11 09:30:12

A. I'll agree with your statement. 09:30:15

Q. Now, does your report provide, or the methods you use, provide you to -- give you the ability to estimate the damages for any individual class member in this case? 09:30:22 09:30:25 09:30:33 09:30:35

A. Indirectly, it does. Not directly. 09:30:38 09:30:51

Q. Would you explain to me what you mean by that indirect method? 09:30:51 09:30:53

A. I think that if the Plaintiffs win this case and if there is a damages amount that's awarded, that the fighters could use that, along with some algorithm they decided upon, like the number of fights that they were in or the aggregate attendance at the fights that they were in, to divide up the total damages amongst the fighters. 09:30:56 09:30:59 09:31:01 09:31:06 09:31:10 09:31:12 09:31:16 09:31:18 09:31:21

MAGNA LEGAL SERVICES

Q. All right. And when you say if they win this case, they could use an algorithm they decided upon, what do you mean by "they decided upon"? 09:31:22 09:31:30 09:31:35 09:31:38
A. I think what I'm saying is that there were over the class period 1,172 fighters who were -- who suffered damages because of the restrictive contracts, exclusionary contracts. And that they could decide amongst themselves of the 09:31:42 09:31:47 09:31:50 09:31:57 09:32:01 09:32:04
[redacted]
tripled, so whatever that number was, they could decide what would be a fair way to distribute that bounty amongst them. 09:32:12 09:32:15 09:32:18
Q. So I understand that your opinion that they could decide amongst themselves a fair way to decide an aggregate damages amount. Does your calculation of damages actually calculate an individual damages amount? 09:32:24 09:32:26 09:32:29 09:32:32 09:32:36 09:32:40
A. No. 09:32:40
Q. Does it actually -- your damages estimate, am I correct, does not estimate the individual injury of any class member? 09:32:40 09:32:43 09:32:45
A. That's correct. 09:32:49

THE WITNESS: Can I have a break? 09:32:55
VIDEO TECHNICIAN: We're off the record at 9:32. 09:32:58 09:33:02
(Proceedings recessed at 9:32 a.m., and reconvened at 9:40 a.m.) 09:33:04 09:33:04 09:39:30
VIDEO TECHNICIAN: We're back on the record at 9:40 a.m. 09:40:00 09:40:31
BY MR. ISAACSON: 09:40:35
Q. Professor, if I could ask you to return to Paragraph 1 of your report. 09:40:36 09:40:47
A. Okay. 09:41:03
Q. And I want to make sure I've understood your testimony correctly in light of the last sentence of Paragraph 1: "The challenged conduct includes, among other things: (a) entering multi-fight exclusive contracts with a large share of the top Professional MMA Fighters thereby keeping this allegedly necessary input from other MMA promotions." 09:41:03 09:41:06 09:41:08 09:41:13 09:41:15 09:41:19 09:41:22 09:41:25 09:41:27
Little (a) of that sentence, that was part of your damages calculation, correct? 09:41:30 09:41:33 09:41:35
A. Yes. 09:41:36

Q. (b), it says, "Acquiring multiple actual or potential rival MMA promotion companies." 09:41:37 09:41:41 09:41:45
You did not estimate damages flowing from that item (b) of the challenged conduct, correct? 09:41:45 09:41:48 09:41:50
A. Correct. 09:41:51
Q. "(c) impairing other MMA promoters by using its alleged dominance to threaten sponsors, promoters, and fighters who worked with or considered working with the UFC's potential rivals." 09:41:52 09:41:56 09:42:00 09:42:03 09:42:05
Did your estimate of damages include some or all of the conduct in item (c)? 09:42:07 09:42:10 09:42:13
A. Yes. 09:42:13
Q. Well, that was an either/or. Is it some or all? 09:42:13 09:42:18
A. Oh. 09:42:18
Q. Because you've listed "threatening sponsors, threatening promoters, and threatening fighters." 09:42:19 09:42:22 09:42:24
A. Right. But are you saying all generically to those categories, or are you saying every single threat that they made 09:42:27 09:42:30 09:42:32

was -- 09:42:35
Q. I mean the categories. 09:42:35
A. The categories, yes. 09:42:36
Q. And returning to (a), when you refer to "entering multi-fight exclusive contracts with a large share of the top Professional MMA Fighters," what do you mean by "a large share"? 09:42:45 09:42:48 09:42:51 09:42:53 09:42:55
A. If you're looking for a percentage, I'm not going to give it to you, because I don't have one. 09:42:57 09:43:00 09:43:02
Q. Can you give me a range? 09:43:03
A. Well, today they're somewhere in the neighborhood of 90 percent; that that's a number that's a share that's been growing over time. But I think certainly for the entire class period, they had a dominant share of the fighters. They had a strong majority share of the top fighters. 09:43:05 09:43:08 09:43:13 09:43:15 09:43:17 09:43:21 09:43:22
Q. And how do you define "the top fighters"? 09:43:25 09:43:28
A. Well, there are metrics that are out there that identify the top 15 fighters in each weight class, and I remember going through that at some point early on. And I 09:43:29 09:43:38 09:43:40 09:43:43



don't remember exactly how it came out, but Zuffa in, say, two years ago had at least 90 percent of the top 15 fighters in the weight classes that I looked at. So it was somewhere along those lines. 09:43:48 09:43:51 09:43:56 09:43:59 09:44:02

Obviously, prior to the acquisition of Strikeforce in 2011, they had somewhat of a lower share, but it was always a dominant share, at least in the class period. 09:44:03 09:44:05 09:44:08 09:44:10 09:44:15

Q. When you're referring to metrics that identify top fighters, are you referring to published rankings? 09:44:15 09:44:17 09:44:19

A. Yes. 09:44:21

Q. And your report does not do any actual work on identify who are the top fighters and who are not? 09:44:24 09:44:25 09:44:28

A. That's correct. 09:44:30

Q. And when you say "a large share," do you count that large share by the number of fighters, that is by counting the individuals? 90 percent would be nine out of ten of the individual fighters? 09:44:32 09:44:37 09:44:39 09:44:43 09:44:45

A. As opposed to weighting them by the -- 09:44:47 09:44:49

Q. Weighting by anything. 09:44:50

A. Yes. I'm talking about a straight headcount. 09:44:51 09:44:53

Q. Now, I asked -- one more assumption I want to check on. Are you assuming that the challenged conduct as a whole is in violation of the antitrust laws? 09:44:55 09:45:22 09:45:23 09:45:25 09:45:28

MR. CRAMER: For which purpose? 09:45:30

MR. ISAACSON: For purposes of estimating damages. 09:45:31 09:45:32

A. I think the answer is yes. 09:45:34

Q. In Paragraph 4 you talk about your assignment in this case. "Counsel for Plaintiffs have asked me to determine." In (a) it says, "whether the challenged conduct is anticompetitive in character and thus would have anticompetitive effects if engaged in an entity with monopoly or monopsony power." 09:45:55 09:46:00 09:46:04 09:46:08 09:46:11 09:46:13 09:46:16 09:46:19

I want to know what you mean by "anticompetitive character." Is that different from saying it's anticompetitive? 09:46:21 09:46:25 09:46:29

A. So I'm not doing a liability report here. I was not asked to define 09:46:31 09:46:33

"market." I was not asked to do cross elasticity of demand or snip tests. I've done no formal analysis of market power here. 09:46:35 09:46:39 09:46:43 09:46:48

And so I'm -- when I say "anticompetitive in character," I mean if a company that had market power engaged in this behavior, would it have anticompetitive effects. 09:46:49 09:46:54 09:46:57 09:47:00 09:47:04

Q. All right. And does your report do any analysis of the extent of the anticompetitive effects from the challenged conduct assuming that Zuffa had market power? 09:47:15 09:47:17 09:47:21 09:47:26 09:47:29

A. Does it do any analysis? Say that again? 09:47:29 09:47:32

Q. Of the extent of the anticompetitive effect. 09:47:34 09:47:36

MR. CRAMER: Other than the damages analysis? Or are you including that? 09:47:37 09:47:38 09:47:40

Q. Well, is there an analysis of an anticompetitive effect in your report other than the damages analysis? 09:47:41 09:47:51 09:47:54

A. So I'm not clear what you're 09:48:02

driving at. I have a discussion and analysis of how the individual exclusionary clauses impact the market and how it forecloses the market. And then on the basis of that, I do an empirical damage estimate. 09:48:03 09:48:06 09:48:12 09:48:15 09:48:20 09:48:23

So when you said have I done any analysis of the effect, I'm not sure what you're... 09:48:24 09:48:30 09:48:32

Q. In your view, the damages in this case would be an anticompetitive effect that flowed from the challenged conduct in this case if that conduct were true and if Zuffa had market power, correct? 09:48:33 09:48:35 09:48:38 09:48:40 09:48:42

A. Yes. Yes. 09:48:45

Q. Is there any other anticompetitive effect that you have measured or quantified that flows from the alleged exclusionary conduct in this case assuming that Zuffa had market power? 09:48:46 09:48:49 09:48:51 09:48:54 09:49:02

A. Not that I have quantified, no. 09:49:04

Q. When you say "anticompetitive in character" in your report, would it mean the same thing if you just said "anticompetitive"? 09:49:05 09:49:09 09:49:11 09:49:13

MAGNA LEGAL SERVICES

A. Except that I think that by using the phrase "in character," it underscores the fact that I am not doing a market analysis. 09:49:17 09:49:19 09:49:23 09:49:24
Q. All right. And in terms of your damages estimate, to what extent does your report distinguish between any anticompetitive effects of the alleged exclusionary conduct as opposed to Zuffa simply providing a better product or service than its competitors? 09:49:25 09:49:39 09:49:42 09:49:44 09:49:47 09:49:51 09:49:53
MR. CRAMER: Form. 09:49:58
THE WITNESS: I'm sorry, you said what? Form? 09:50:01 09:50:03
MR. CRAMER: I'm sorry, objection to form. Objection to form. I didn't understand it. If you did, go ahead and answer it. 09:50:04 09:50:05 09:50:07 09:50:09
A. I was going to ask for clarification. 09:50:10 09:50:11
Q. Sure. Does the method that you used to estimate damages, does it allow you to distinguish between the anticompetitive effects of the alleged exclusionary conduct as opposed to Zuffa providing a superior 09:50:11 09:50:14 09:50:17 09:50:19 09:50:23

product or service? 09:50:27
A. That's an ambiguous question and has a premises that hasn't been established. Even if we could establish that Zuffa is providing a superior product, I'm not sure what that question means. 09:50:39 09:50:42 09:50:44 09:50:46 09:50:49
As an economist, I hear that a company is performing superior management and offering superior service, I think that revenues are going to go up. Right? 09:50:51 09:50:55 09:50:59 09:51:01
So is your question asking me or is it suggesting implicitly that the reason why there is a low fighter share is because revenues have gone up so rapidly? Is that the meaning of your question? 09:51:05 09:51:08 09:51:11 09:51:13 09:51:16
Q. So does your report contain any method that allows you to distinguish between -- let me start over. 09:51:18 09:51:22 09:51:25
Assuming Zuffa has a dominant market share as you have done, does your report include any method that would allow you to distinguish whether they achieve that dominant share due to their superior product and services as opposed to any exclusionary acts? 09:51:28 09:51:31 09:51:34 09:51:37 09:51:40 09:51:43 09:51:48

A. If you're asking about my empirical work and whether my methodology enables me to make that distinction, the answer is no. 09:51:52 09:52:01 09:52:05 09:52:08
Q. If Zuffa obtained a dominant market share through completely legal conduct, would your damages method still find the same damages result? 09:52:08 09:52:14 09:52:17 09:52:23
MR. CRAMER: Form. Objection to form. 09:52:28 09:52:28
A. Well, look, here is what I would say. If Zuffa believes that the outcomes that we observe in the UFC have to do with their superior management and their superior entrepreneurship and superior conduct and shepherding of the industry, and that's all that matters, then they should do away with the exclusionary clauses in the contracts and look at the same results. I find that to be a preposterous proposition. 09:52:34 09:52:35 09:52:37 09:52:42 09:52:44 09:52:50 09:52:53 09:52:57 09:52:57 09:52:57 09:53:01
Q. That's not quite my question. I'm asking you about the actual empirical methods that you used here. 09:53:01 09:53:03 09:53:06
If you assumed that Zuffa has a 09:53:07

dominant market share and that it achieved that through providing a superior product or service, would your empirical method still show the same damages result from that monopoly as if that came from illegal exclusionary acts? 09:53:12 09:53:14 09:53:16 09:53:23 09:53:27 09:53:36
MR. CRAMER: Objection to form. Incomplete hypothetical. You can answer if you understand. 09:53:37 09:53:39 09:53:41
A. It's an implausible hypothetical. I can't answer it. 09:53:42 09:53:46
Q. All right. Have you done any empirical work -- you say it's implausible that Zuffa achieved a dominant market share through providing a superior product or service. 09:53:48 09:53:50 09:53:53 09:53:56 09:53:58
Does your report contain any analysis as to how Zuffa achieved a dominant market share? 09:53:59 09:54:00 09:54:03
A. Yes. 09:54:05
Q. Does it contain any empirical work on that question? 09:54:05 09:54:09
A. If my empirical work you're meaning did I quantify -- did I have a quantified analysis to tease that out? No, 09:54:10 09:54:25 09:54:27



anticompetitive. 11:43:08
Q. Correct. 11:43:09
A. No. 11:43:10
Q. If the UFC has contracts with venues that have a period of exclusivity with that venue, is that part of the challenged conduct that you have assumed would reduce competition from which you have estimated damages? 11:43:10 11:43:17 11:43:23 11:43:25 11:43:29 11:43:31
A. I think potentially, yes. But I would want to look at the contract and the timing and the period and the context of the contract. 11:43:32 11:43:35 11:43:38 11:43:40
Q. So in this case, and in your report, you have not looked at whether the exclusivity provisions in the UFC contracts with venues have any anticompetitive aspects? 11:43:41 11:43:44 11:43:49 11:43:52 11:43:54
A. I have read references to it, but I haven't looked at any original documents or done much work on it. 11:43:55 11:43:57 11:43:59
Q. You haven't reached any opinions in this case as to whether the exclusivity provisions in venue contracts have any effect of reducing competition or in 11:44:00 11:44:03 11:44:06 11:44:09

causing damages? 11:44:12
A. You're asking me if I reached conclusions about it? 11:44:12 11:44:15
Q. Yes. 11:44:17
A. I haven't reached conclusions about it. And, as I said to you just a moment ago, I think this potentially could be anticompetitive. 11:44:17 11:44:19 11:44:21 11:44:25
Q. I understand you say it's potentially, but you have not reached any opinions on -- 11:44:25 11:44:27 11:44:29
A. Correct. 11:44:30
Q. -- that in this case. 11:44:30
A. Other than that it's potentially anticompetitive. That's a conclusion - I think. 11:44:31 11:44:33 11:44:34
Q. If I can ask you to look at paragraph -- are you familiar with the term "Counter programing"? 11:44:35 11:44:39 11:44:49
A. Yes. 11:44:50
Q. And what's your understanding what counterprogramming would be in this context? 11:44:51 11:44:52 11:44:53
A. Strikeforce has an event on Pay-Per-View and Zuffa doesn't want it to 11:44:54 11:44:58

be widely watched, so they at the same time on a different Pay-Per-View channel put on an event that maybe they think is a more appealing event. Or Strikeforce has an event at Barclays Center in New York, and Zuffa puts on an event at Madison Square Garden on the same night so the attendance at the Barclays Center in Brooklyn would be reduced. 11:45:05 11:45:09 11:45:12 11:45:16 11:45:20 11:45:24 11:45:28 11:45:30 11:45:33
Q. Is counterprogramming one piece of the challenged conduct from which you have assumed there is reduced competition based on which you've estimated damages? 11:45:37 11:45:39 11:45:44 11:45:47
A. It's potentially a very small piece of it, but I don't view it as particularly significant. 11:45:49 11:45:51 11:45:57
Q. Have you assumed that the counterprogramming, as you've described it, would be anticompetitive in nature? 11:45:58 11:45:59 11:46:01
A. Again, potentially it could be. 11:46:03
Q. I guess I'm confused by your answer. Because I've asked: Have you assumed for purposes of your report that counterprogramming as you've described it would be anticompetitive? 11:46:05 11:46:21 11:46:23 11:46:25 11:46:27

A. It's not relevant to the damages estimate that I did. 11:46:28 11:46:32
If I might elaborate, and I've said this several times, but I don't think that any of the individual acts, restrictive acts, exclusionary acts, exclusionary clauses, are things that are directly reflected in my damages analysis. 11:46:46 11:46:49 11:46:51 11:46:54 11:46:56 11:46:58
What my damages analysis does is it says here is a bunch of -- here are exclusionary clauses in the fighter contract, and that those clauses are necessary to maintain the monopoly control that Zuffa has -- or the monopsony that Zuffa has in the MMA market. 11:47:01 11:47:04 11:47:07 11:47:10 11:47:13 11:47:16 11:47:19
And it's because of that monopsony control that fighters have this very low percentage of revenue. And I compare that to comparators that have more competition in their labor markets. And, as a result of that additional competition, they have higher labor shares. 11:47:21 11:47:24 11:47:27 11:47:30 11:47:35 11:47:38 11:47:40
MR. CRAMER: Bill, once you finish this line of questioning, can we take a break? We've been going 11:47:59 11:47:59 11:48:04

MAGNA LEGAL SERVICES

for over an hour and it's gotten hot 11:48:06
in here again. 11:48:07
MR. ISAACSON: We should take a 11:48:08
break now. 11:48:08
MR. CRAMER: Okay, that's fine. 11:48:09
THE WITNESS: So are we taking a 11:48:09
normal five-minute break or are we 11:48:11
going for a half-an-hour lunch? 11:48:11
MR. CRAMER: Let's go off the 11:48:11
record. 11:48:14
VIDEO TECHNICIAN: 11:47. Off 11:48:14
the record 11:58:46

A F T E R N O O N S E S S I O N 11:58:46
(Whereupon the deposition was 11:58:46
resumed at 12:43 p.m.; appearances 11:58:46
same as noted.) 12:44:04
VIDEO TECHNICIAN: We're back on 12:44:04
the record at 12:43 p.m. 12:44:10
BY MR. ISAACSON: 12:44:13
Q. Before our break, Professor, you 12:44:13
resummarized your damages model. And I 12:44:17
want to make sure I understand it. 12:44:22
One thing you said was there are 12:44:25
exclusionary contracts or provisions in the 12:44:30
fighter contracts and those clauses are 12:44:32
necessary to maintain the control that 12:44:34
Zuffa has in the MMA market. 12:44:35
I am correct, though, that the 12:44:38
conclusion that those clauses are necessary 12:44:43
to maintain Zuffa's control over the MMA 12:44:45
market, that may be a belief of yours, but 12:44:48
that's not an opinion that you've reached 12:44:51
in your report? 12:44:54
A. It's not in my expert opinion. 12:44:55
Q. And you also said that because of 12:44:56
this monopsony, fighters have this very low 12:44:59
percentage of revenue. 12:45:03

That also is maybe a belief of 12:45:05
yours, but it's not an opinion that's 12:45:07
reached in your report, correct? 12:45:08
A. Yes. 12:45:10
Q. And then your method of damages 12:45:11
you explain, as you explained before, is 12:45:22
that you compare the MMA market to more 12:45:25
competitive labor markets. And a result of 12:45:29
that competition in those other labor 12:45:32
markets, you say they have higher labor 12:45:36
shares of revenue. By that you mean the 12:45:38
percentage of total revenue that goes to 12:45:40
labor; is that correct? 12:45:43
MR. CRAMER: Objection to form. 12:45:45
Compound. 12:45:46
A. Yes. 12:45:47
Q. And you have reached an opinion 12:45:47
on the aggregate amount of damages assuming 12:45:58
liability in this case -- 12:46:01
A. Can I interrupt you? Sorry. Is 12:46:02
that okay? 12:46:04
Q. Yes. 12:46:05
A. No, I just want to -- I want to 12:46:05
clarify when you said "labor," there are 12:46:06
the athletes who are laborers, and then 12:46:09

there are executives and administrators who 12:46:12
are laborers also. And so I was talking 12:46:15
about the athlete component of labor. 12:46:18
Sorry for interrupting, sir. 12:46:20
Q. Okay. And I understood that, but 12:46:22
thank you. 12:46:24
When you talk about Zuffa's 12:46:24
control in the market, you used the term 12:46:26
"monopsony." In your report, you referred 12:46:29
to "monopsony" and "monopoly." 12:46:32
Are you assuming for purposes of 12:46:35
estimating damages, that Zuffa had both 12:46:37
monopsony and monopoly control of the MMA 12:46:39
market? 12:46:44
A. Yes. 12:46:44
Q. And you have not done any damages 12:46:44
estimate where you assume that Zuffa had 12:46:52
either monopsony control or monopoly 12:46:54
control, but only one. I didn't say that 12:46:59
very well, but I think you get the point. 12:47:03
I'll say it again. 12:47:06
A. I didn't make any separate 12:47:07
estimates at all. I made one estimate. 12:47:08
There is one bout damages estimate for the 12:47:10
condition that the athletes in Zufra's 12:47:13



Page 134

labor market experience. 12:47:19
Q. And because you have assumed that 12:47:22 Zuffa has monopsony and monopoly control 12:47:26 over the MMA market, that market is less 12:47:29 competitive. And when you compare it to 12:47:32 more competitive labor markets, referring 12:47:34 to athletes or fighters, then you are able 12:47:37 to estimate damages by that comparison; is 12:47:39 that correct? 12:47:41
MR. CRAMER: Objection to form. 12:47:41
A. That's correct. 12:47:46
Q. All right. And because you are 12:47:47 making assumptions about whether there was 12:47:50 a monopsony or a monopoly or whether there 12:47:54 were exclusionary acts, you are not 12:47:58 reaching any expert opinions in your report 12:48:02 about whether Zuffa caused the aggregate 12:48:05 damages that you have estimated; is that 12:48:10 correct? 12:48:12
A. I'm not making an assumption 12:48:12 about it? 12:48:16
Q. No. I think I got to make sure I 12:48:17 speak up because of the background noise. 12:48:19
You were making assumptions about 12:48:21 whether there was a monopsony or monopoly 12:48:24

Page 135

and about whether there was an exclusionary 12:48:28 act. Because of that, you are not reaching 12:48:28 any expert opinions in your report about 12:48:30 whether Zuffa caused the aggregate damages 12:48:31 that you have estimated; is that correct? 12:48:33
A. It's correct. Let me clarify it, 12:48:38 if I might; that I am not reaching expert 12:48:43 opinions on the matters that you described. 12:48:46
I am asserting that the 12:48:49 evidentiary basis in the record suggests to 12:48:53 me that monopsony and monopoly did prevail 12:48:57 and that Zuffa's corresponding behavior is 12:49:03 the cause. But I am not making an expert 12:49:07 opinion on that. 12:49:10
Q. Now, in terms of how you went 12:49:12 about estimating aggregate damages, you are 12:49:25 doing a simple comparison between sports 12:49:31 leagues with more competition and Zuffa 12:49:37 with less competition as you -- 12:49:40
A. There is more competition in the 12:49:44 labor market. 12:49:45
Q. All right. Fair. 12:49:46
A. In the case of the sports league. 12:49:48
MR. CRAMER: I don't think he was 12:49:50 done with the question, so you have 12:49:51

Page 136

to -- 12:49:53
THE WITNESS: Okay. 12:49:53
MR. CRAMER: -- let him finish. 12:49:54
THE WITNESS: Sorry. 12:49:55
Q. You went about estimating damages 12:49:55 by doing a simple comparison between sports 12:49:56 leagues with more competition in the labor 12:49:59 market and with, in your opinion, Zuffa 12:50:01 with less competition? 12:50:03
MR. CRAMER: Objection to form. 12:50:04 Objection to the use of the term 12:50:05 "simple." Objection to the 12:50:06 characterization. 12:50:08
A. And yes, with the qualification 12:50:09 that you only talked about team sports. 12:50:11 And one of the comparators is boxing. 12:50:13
Q. The model that you have used, 12:50:27 when I say "a simple comparison," means you 12:50:30 have not tried to inject any potential 12:50:33 alternative variables or explanations that 12:50:35 might explain the differences between the 12:50:36 percentages of revenues other than what you 12:50:39 have assumed are anticompetitive acts; is 12:50:41 that correct? 12:50:43
MR. CRAMER: Objection to form. 12:50:43

Page 137

A. I don't think that's quite right, 12:50:49 although I think I understand what you 12:50:51 mean. Because I am making a comparison to 12:50:53 sports that, sometimes team sports, 12:50:58 sometimes boxing, that do have restraints 12:51:02 on their labor markets. They're not 12:51:06 totally free labor markets. 12:51:08
So what I do say is that when I 12:51:10 compare what Zuffa would be in a 12:51:12 competitive environment to these sports 12:51:14 that are not fully competitive 12:51:19 environments, that it ends up producing a 12:51:20 conservative estimate of the difference 12:51:22 that Zuffa fighters would earn in the 12:51:33 but-for world. 12:51:35
Q. And with the understanding that 12:51:38 you say your estimate is conservative, when 12:51:40 you compare Zuffa to the other sports, you 12:51:42 do not try to control for or take into 12:51:48 account of any other variables that may 12:51:51 explain the differences in compensation to 12:51:54 labor in terms of percentage between those 12:51:56 sports; is that correct? 12:51:59
MR. CRAMER: Asked and answered. 12:51:59 I think he just answered that 12:52:00

MAGNA LEGAL SERVICES

Page 194

Q. My question was about management practices. 01:47:49 01:47:51
A. Yes. So management practices have to do with the wage rate that's paid their employees, doesn't it? 01:47:51 01:47:53 01:47:56
Q. I understand that you say -- when you say that "each of the teams adapted to higher player costs by employing more effective management practices" -- 01:47:57 01:48:00 01:48:06 01:48:08
A. Yes. 01:48:10
Q. -- you're not just -- is the more effective management practice you're talking about higher pay? 01:48:10 01:48:11 01:48:13
A. No. I mean, but you -- 01:48:14
Q. So are there any -- 01:48:15
A. -- any interest after Zuffa. 01:48:16
Q. Have you done any study or any investigation of any management practices by Zuffa that could be more effective? 01:48:18 01:48:20 01:48:22
MR. CRAMER: Other than the one he just identified. 01:48:26 01:48:27
Q. Other than paying fighters more. 01:48:28
A. Covering their healthcare, making sure that they have good diets, paying for their gymnasiums, paying for their travel 01:48:35 01:48:39 01:48:44

Page 195

when they're not coming to a bout, using analytic techniques. I wrote a whole book about labor management practices in baseball. It's called Sabermetrics. 01:48:48 01:48:50 01:48:54 01:48:56
It explains how baseball began to use other methods of analysis to figure out how productive players were because players became more and more expensive. And when you're playing $15 million for a player who doesn't pan out, you want to try to figure that out. You want to learn more about the player's background and training and different physical characteristics that he has on the field or the trajectory of the speed of the ball off the bat has, and so on. 01:49:00 01:49:01 01:49:03 01:49:06 01:49:08 01:49:11 01:49:12 01:49:15 01:49:17 01:49:20 01:49:24 01:49:27
So that there are presumably analytics that can -- as Zuffa fighters get paid more, they're going to be more careful about these are expensive assets that we have. We want to make sure they're in good shape. We want to make sure if we give them a particular bout, that that's the bout that they ought to have. 01:49:27 01:49:28 01:49:29 01:49:32 01:49:35 01:49:37 01:49:39 01:49:41
So the whole slew of more 01:49:42

Page 196

competitive and more responsive and more productive policies can follow from that. 01:49:45 01:49:48
Q. All right. So as part of your report, have you done any investigation of what Zuffa is doing as management practices, either with regards to analytics or any other type of management? 01:49:50 01:49:52 01:49:55 01:49:59 01:50:01
A. I've seen no evidence that they're doing analytics. I've read quite a bit about how workers are treated in a variety of ways and circumstances. I've read about the absence of medical care. I've read about the absence of paying them for the cost of their gym and their training. 01:50:03 01:50:05 01:50:08 01:50:10 01:50:13 01:50:18 01:50:26 01:50:28
So, yes, I have read about it and I have thought about it. 01:50:29 01:50:32
Q. All right. So let me point out to you, for example, you say in Paragraph 80, you again discuss this topic. You talk about in the second sentence "As salaries rose, and rose rapidly, owners began to treat their clubs as true businesses, engaging in advertising, marketing, planning, improved community 01:50:32 01:50:34 01:50:38 01:51:06 01:51:11 01:51:14 01:51:15 01:51:17

Page 197

relations, facility upgrades, strategic pricing policies, rationalized scouting and player evaluation," and so on. 01:51:19 01:51:22 01:51:25
Have you done any investigation of any of those topics as they're handled at the UFC, advertising, marketing, planning, community relations, facility upgrades, strategic pricing policies, scouting and player evaluation? 01:51:28 01:51:29 01:51:32 01:51:35 01:51:40 01:51:40
MR. CRAMER: Other than what he just testified to. 01:51:42 01:51:43
MR. ISAACSON: I don't think he testified to any of that. 01:51:44 01:51:45
A. I think that I did testify to it. I've read an inordinate number of documents in this case from depositions, to reports, to the e-mails, to analyses. On the basis of all of that, I've come to certain opinions about these areas that you're mentioning. 01:51:46 01:51:47 01:51:51 01:51:53 01:51:59 01:52:04 01:52:05
Q. And do you have opinions about whether the UFC's advertising has been deficient? 01:52:06 01:52:09 01:52:12
A. I haven't studied that in detail. I think that that's one area where I 01:52:19 01:52:21

MAGNA LEGAL SERVICES

Page 198

probably did not look for a deficiency, but 01:52:22
I haven't studied it in detail. 01:52:25
Q. What about marketing? 01:52:27
A. Same thing. 01:52:29
Q. What about community relations? 01:52:30
A. Well, again, I haven't studied 01:52:33
that in detail, but I have seen a number of 01:52:34
comments that have been made by Dana White 01:52:37
and others that suggest to me that 01:52:39
community relations could be improved. 01:52:41
Q. What about facility upgrades? 01:52:42
A. They rent their facilities, as 01:52:45
far as I know. Although, I guess they are 01:52:48
now building a gymnasium. But as far as I 01:52:50
know, they rent their facilities. I don't 01:52:53
know of any upgrades that they've done. 01:52:55
Q. Are you aware of any current 01:52:57
upgrades, facility upgrades, the UFC has? 01:52:59
A. As I just mentioned, I'm aware 01:53:03
that they're building a gym now. And then 01:53:05
it's -- and it's at least touted to be a 01:53:09
very well equipped and modern facility, but 01:53:13
that's all that I know about it. 01:53:15
Q. Do you know the status of that 01:53:16
facility? 01:53:18

Page 199

A. No. 01:53:19
Q. Do you know anything about the 01:53:19
quality of that facility? 01:53:20
A. No. 01:53:21
Q. What about strategic pricing 01:53:21
policies by the UFC, do you have any 01:53:26
criticism of whether they've engaged in 01:53:28
inappropriate strategic pricing policy? 01:53:31
A. I haven't seen reference to 01:53:33
dynamic pricing or other kinds of pricing, 01:53:36
pricing market studies. So I'm not sure if 01:53:42
they do it or not. 01:53:45
Q. What about scouting and player 01:53:46
evaluation, do you know anything about the 01:53:47
scouting and evaluation of fighters by the 01:53:49
UFC? 01:53:52
A. Well, I have read depositions by 01:53:53
people, and one of them is Joe Silva, who 01:53:55
is responsible for doing scouting and 01:54:00
signing talent. And I've read comments 01:54:02
about it, but I have not subjected that to 01:54:07
systematic study. 01:54:10
Q. Have you done any study of the 01:54:12
potential additional demand for MMA events? 01:54:25
MR. CRAMER: Objection to form. 01:54:37

Page 200

A. I haven't done my own study of 01:54:38
that, no. 01:54:41
Q. What are the methods an economist 01:54:41
would normally employ to determine whether 01:54:43
a business has the ability to grow 01:54:45
significantly? 01:54:47
MR. CRAMER: Objection to form. 01:54:51
A. More typically, economists would 01:54:53
not be doing studies of particular 01:55:07
businesses' growth potential. To the 01:55:13
extent that an economist was asked to do 01:55:14
such a study, they would look at the rate 01:55:16
of growth in the recent past. 01:55:19
They would probably do pilot 01:55:21
studies with consumers. They might do 01:55:25
consumer surveys. They would probably look 01:55:29
at macroeconomic conditions, or statewide 01:55:32
economic conditions, if it was an industry 01:55:36
within a particular state. 01:55:38
They'd look at interest rates and 01:55:40
see whether the interest rate environment 01:55:42
was favorable for loan capital to be 01:55:44
applied. So those are some of the things 01:55:48
that would be considered. 01:55:50
Q. Have you done any of those things 01:55:52

Page 201

in this case to determine the capacity of 01:55:54
either Zuffa or MMA to expand? 01:55:58
A. No. 01:56:00
Q. Can I ask you to look at 01:56:00
Paragraph 25 footnote 54 -- and footnote 01:56:09
54. 01:56:17
A. Are we leaving the subject of 01:56:17
management? 01:56:19
Q. Yes. 01:56:20
A. All right. I was hoping I get to 01:56:21
say one other thing. 01:56:24
MR. CRAMER: Are you going to 01:56:29
allow him to say that other thing? 01:56:29
MR. ISAACSON: I'm going to let 01:56:31
you ask your own questions. 01:56:32
MR. CRAMER: Okay. We'll save it 01:56:34
for rebuttal. 01:56:36
MR. ISAACSON: I'm under time 01:56:37
limits. So the free-form process 01:56:38
doesn't suit me well. 01:56:42
MR. CRAMER: Was there a question 01:56:43
that was on the table that you felt 01:56:44
was incompletely answered? I just 01:56:45
want to know whether -- 01:56:47
MR. ISAACSON: You can do that at 01:56:47

MAGNA LEGAL SERVICES

the end of the deposition on your 01:56:49
time. 01:56:51
MR. CRAMER: Okay. That's fair. 01:56:51
BY MR. ISAACSON: 01:57:03
Q. So we've talked extensively about 01:57:03
the comparisons to baseball, football, 01:57:06
hockey and basketball. In Paragraph 25 you 01:57:08
say, "The parallels also extend to the 01:57:11
entertainment industry outside of 01:57:15
professional sports." 01:57:17
I just want to make sure I 01:57:18
understand what you have to say in this 01:57:20
area. There are parallels to what you say 01:57:21
are the assumed anticompetitive conduct by 01:57:24
Zuffa and what has happened in the 01:57:28
entertainment industry in the past; is that 01:57:30
correct? 01:57:33
A. There are parallels you're 01:57:33
saying? 01:57:35
Q. Yes. 01:57:35
A. Yes. 01:57:36
Q. And when you say "the 01:57:36
entertainment industry," are you talking 01:57:38
about movies? Television? Both? 01:57:40
A. Movies. 01:57:43

Q. And as I understand it, 01:57:43
historically at some point movie actors 01:57:45
were not free agents due to a studio system 01:57:49
which employed long-term exclusive 01:57:53
contracts? 01:57:54
A. Yes. 01:57:55
Q. And the long-term exclusive 01:57:55
contracts had a number of extension 01:57:57
provisions? 01:57:58
A. Yes. 01:57:59
Q. And the studio system eventually 01:57:59
ended; is that right? 01:58:03
A. Yes. 01:58:04
Q. And it ended when a court in 01:58:04
California held that personal service 01:58:08
contracts can't extend beyond seven 01:58:10
calendar years. 01:58:12
A. That's correct. 01:58:13
Q. And once the Court held that a 01:58:14
personal service contract could not extend 01:58:16
beyond seven calendar years, that ended the 01:58:18
studio system and essentially created free 01:58:21
agency. 01:58:26
MR. CRAMER: Objection to form. 01:58:26
A. That's largely correct. 01:58:27

Q. Well, that's exact -- well. 01:58:28
And you say "Under the modern 01:58:33
system, studios renegotiate contracts for 01:58:35
every new project"; is that right? 01:58:38
A. Does it say that in the footnote? 01:58:40
Q. I believe -- 01:58:44
A. Can I look at the footnote? 01:58:44
Q. You have it right in front of 01:58:46
you. 01:58:47
A. Well, I need to know what page 01:58:48
we're looking at. 01:58:51
Q. Page 18. 01:58:52
A. (Document review.) Okay. It does 01:59:20
say that. Yup. 01:59:23
Q. And are there any contracts in 01:59:24
this case that you've identified that 01:59:26
extend beyond seven calendar years? 01:59:28
MR. CRAMER: Objection to form. 01:59:33
A. In the contract itself you're 01:59:34
saying as opposed to the -- 01:59:36
Q. Let's start with the contract 01:59:38
itself. 01:59:40
A. Not that I know of. The longest 01:59:40
one I think I saw was three or four years. 01:59:43
Q. And based on the yardsticks 01:59:45

you've applied, you would expect that 01:59:54
[REDACTED]
actors in a movie; is that right? 02:00:01
A. Not necessarily. 02:00:14
Q. Why? 02:00:19
A. Because I want to study more 02:00:20
about the cost structure of moviemaking. 02:00:22
Q. What is it about the cost 02:00:27
structure that would cause you to say that 02:00:29
something less than 50 percent of revenues 02:00:31
should go to the movie actors? 02:00:33
A. I'm just saying that I would want 02:00:36
to study it. I know a great deal about 02:00:38
professional sports, and I was comfortable 02:00:41
in making that comparison. And before I'd 02:00:44
be making such a comparison with the movie 02:00:47
business, I'd want to study it. 02:00:49
Q. What about the cost that you 02:00:51
would be looking at to determine why that 02:00:53
comparison would or would not be valid? 02:00:56
MR. CRAMER: Asked and answered. 02:00:59
He said he wanted to study it. 02:01:00
Q. That's what I'm saying. He 02:01:02
hasn't answered. 02:01:04
What is it you would be looking 02:01:05

MAGNA LEGAL SERVICES

Page 254

[redacted]

Page 255

[redacted]
certain as I sit here today whether I added 03:18:01
that in or not. I did add that in when I 03:18:01
was calculating the Zuffa fighter share. 03:18:04
So I would add those -- I'd add 03:18:07
those lines up. 03:18:09
MR. ISAACSON: All right. At 03:18:15
this point, I would like, unless you 03:18:15
have some questions, I would like to 03:18:17
continue the deposition until it's 03:18:19
resumed. 03:18:21
MR. CRAMER: All right. Let's go 03:18:22
off the record for a minute. 03:18:23
MR. ISAACSON: Sure. 03:18:25
VIDEO TECHNICIAN: Off the 03:18:26
record. 03:18:33
(Proceedings recessed at 03:18:34
3:18 p.m., and reconvened at 3:20 03:18:34
p m.) 03:20:39
VIDEO TECHNICIAN: We're back on 03:20:39

Page 256

the record at 3:20 p.m. 03:20:54
MR. CRAMER: We understand from 03:20:56
the videographer that there is five 03:20:57
hours and three minutes of running 03:20:59
time taken so far. And the attorneys 03:21:01
have no further questions -- or no 03:21:04
questions. 03:21:07
We can go off the record. 03:21:07
VIDEO TECHNICIAN: Okay. It is 03:21:09
now 3:20 p.m., and we're suspending 03:21:11
today's deposition. Off the record. 03:21:18
(Time noted: 3:20 p m.) 03:21:27

Page 257

CERTIFICATE

I, ANDREW ZIMBALIST, Ph.D., do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

Page Line Correction

Signed under the pains and penalties of perjury this day of , 2017.

ANDREW ZIMBALIST, Ph.D.

MAGNA LEGAL SERVICES

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, MaryJo O'Connor, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That ANDREW ZIMBALIST, Ph.D., the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 2nd day of October 2017.

MARYJO O'CONNOR, RMR/CSR
Notary Public

My Commission expires:
September 28, 2018

