# EXHIBIT 56

## Redacted Excerpts from the Deposition of Brandon Vera

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon     )
Fitch, Brandon Vera, Luis Javier)
Vazquez, and Kyle Kingsbury on  )
behalf of themselves and all    )
others similarly situated,      )
                                )
        Plaintiffs,             )
                                )
  vs.                           ) Case No. 2:15-cv-
                                ) 01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate      )
Fighting Championship and UFC,  )
                                )
        Defendants.             )
                                )

DEPOSITION OF BRANDON VERA

Taken at the Offices of Boies, Schiller & Flexner
300 South 4th Street, Suite 800
Las Vegas, Nevada

On Thursday, February 16, 2017
At 9:11 a.m.

Reported by:  Jane V. Efaw, CCR #601, RPR



Page 178

```
 1     A.  Uh-huh.
 2     Q.  Which is in May of 2014.
 3     A.  Yes, sir.
 4     Q.  And then the next day you got sent a new
 5  contract.
 6     A.  Okay.
 7     Q.  Which you did not sign.  That was in May of
 8  2014.  And then you were released in June of 2014.
 9  Is that the correct timeline?
10         MR. KOFFMAN:  Object to the form.  He's
11  already answered this question.
12         THE WITNESS:  Are you asking me is that the
13  timeline in my understanding, that this is the
14  timeline?
15  BY MR. SKAGGS:
16     Q.  Yes.
17     A.  I understand this is the timeline.
18     Q.  And so at the time you were released in June
19  of 2014, did you still have one fight left on your
20  last Zuffa contract?
21         MR. KOFFMAN:  Object to the form.
22         THE WITNESS:  I don't know.  I don't know.
23  BY MR. SKAGGS:
24     Q.  All right.
25     A.  I'd have to refer back to my contract when I
```

Page 179

```
 1  fought Ben to see what else is on there.
 2     Q.  It's Exhibit 64.  So if you go back to
 3  Exhibit 64.  So if you go to 682.
 4     A.  Okay.
 5     Q.  Well, first let's start -- so the last page
 6  of the document shows that you signed this on
 7  December 3rd, 2009.  Do you agree?
 8     A.  Yes, sir.  That's what it shows.
 9     Q.  And then if we go back to 682, it says under
10  section 5.1, "The term is 26 months or six bouts."
11  Do you see that?
12     A.  Yes, sir.
13     Q.  So if you go to the Sher Dog list.  It looks
14  like -- do you agree that it looks like your first
15  fight after this contract that was signed was against
16  Jon Jones?
17     A.  Yes, sir.
18     Q.  And then you had -- did you have a fight
19  against Thiago Silva after that?
20     A.  Yes, sir.
21     Q.  Did you have a fight against Eliot Marshall
22  after that?
23     A.  Yes, sir.
24     Q.  Did you have a fight against Mauricio Rua
25  after that?
```

Page 180

```
 1     A.  Yes, sir.
 2     Q.  And did you have a fight against Ben
 3  Rothwell after that?
 4     A.  Yes, sir.
 5     Q.  So is that five fights total?
 6     A.  Yes, sir.
 7     Q.  And your contract was for six bouts?
 8     A.  Yes, sir.
 9     Q.  So you would have had one bout left at the
10  end of the contract when you were released?
11     A.  Yes, sir.
12     Q.  And you said two weeks after you were
13  released, you started talking to One?
14     A.  About two weeks, yeah.
15     Q.  About two weeks, okay.  So that in
16  Plaintiff's interrogatory responses, quoting from the
17  interrogatory responses, Part of the scheme involving
18  fighter intimidation, Zuffa also engaged in the
19  practice of benching fighters with as little as one
20  fight left in their promotion and ancillary rights
21  contracts, providing unfavorable match-ups when the
22  fighter refused to sign a new contract.  I'm
23  paraphrasing.
24         Being benched essentially meant that a
25  fighter would be forced to sit out for a lengthy
```

Page 181

```
 1  period of time prior to being given the last fight on
 2  his or her contract.  Then it says, "Zuffa could
 3  essentially use benching as a means to punish
 4  fighters for disobeying or for seeking to negotiate
 5  better terms, or simply to prevent fighters from
 6  fighting for rival promoters or even from negotiating
 7  with rival promoters."
 8         Were you benched in the way that this
 9  response describes?
10         MR. KOFFMAN:  Object to form.  That's a
11  pretty long thing that you just read, and part of
12  that you said you were paraphrasing.  So if you could
13  show him a copy of that.
14         MR. SKAGGS:  Okay.  We can do that.
15         (Whereupon Defendant's Exhibit 69
16         was marked for identification.)
17  BY MR. SKAGGS:
18     Q.  I think we're up to 69.  So you've been
19  handed Exhibit 69.  Do you recognize this document?
20     A.  Yes, sir.
21     Q.  Did you help put this together and
22  provide -- strike that.  Did you help provide
23  information that went into this document?
24     A.  Yes, sir.
25     Q.  If you go to page 33.  And the last
```



Page 182

```
 1   paragraph starts on line 20.  You can read it over.
 2   I'm going to read it over again into the record,
 3   but --
 4       A.  Which line?
 5       Q.  Starting with line 20.  You're good.
 6       A.  Yes, sir.
 7       Q.  So were you benched in the way that is
 8   described in this paragraph?
 9           MR. KOFFMAN:  Object to form.  Calls for a
10   legal conclusion.  You can answer.
11   BY MR. SKAGGS:
12       Q.  In 2014.
13           MR. KOFFMAN:  Same objection.
14           THE WITNESS:  2014.  It doesn't -- it does
15   not appear to be.
16   BY MR. SKAGGS:
17       Q.  And you were, in fact, released with one
18   fight left on your contract; is that right?
19           MR. KOFFMAN:  Object to form.
20           THE WITNESS:  At that time, yes, sir.
21   BY MR. SKAGGS:
22       Q.  And very shortly there afterwards, you
23   started negotiations with another MMA promoter?
24       A.  Yes, sir.
25       Q.  While you were under contract with Zuffa,
```

Page 183

```
 1   were you popular in the United States?
 2           MR. KOFFMAN:  Object to the form.
 3   BY MR. SKAGGS:
 4       Q.  Do you need to take a break?
 5       A.  No, sir.  I'm trying to figure out when I
 6   was cut.  Sorry.  It's really bugging me.
 7       Q.  That's okay.
 8       A.  I don't need to take a break.  Sorry.
 9       Q.  You can set that aside.  While you were
10   under contract with Zuffa, were you popular in the
11   United States?
12       A.  Yes, sir.
13       Q.  And did you have a fan base in the
14   United States?
15       A.  Yes, sir.
16       Q.  And had you achieved notoriety in the
17   United States?
18       A.  Yes, sir.
19       Q.  And while you were under contract with
20   Zuffa, were you popular in any countries other than
21   the United States?
22       A.  Yes, sir.
23       Q.  Which countries?
24       A.  Southeast Asia.
25       Q.  So that whole area?
```

Page 184

```
 1       A.  That region, yes, sir.
 2       Q.  Did you have a fan base in southeast Asia?
 3       A.  Yes, sir.
 4       Q.  Had you achieved notoriety in southeast
 5   Asia?
 6       A.  Yes, sir.
 7       Q.  Okay.  Are you still popular in the
 8   United States?
 9       A.  Yes, sir.
10       Q.  And are you still popular in countries other
11   than the United States?
12       A.  Yes, sir.
13           MR. KOFFMAN:  I know we haven't been going
14   that long after lunch, but I kind of need a bathroom
15   break when you're in a good spot.
16           MR. SKAGGS:  We can do it now.
17           MR. KOFFMAN:  Okay.
18           THE VIDEOGRAPHER:  We are going off the
19   record.  The time is approximately 2:17 p.m.
20           (A brief recess was taken.)
21           THE VIDEOGRAPHER:  We are now back on the
22   record.  The time is approximately 2:32 p.m.
23           (Whereupon Defendant's Exhibit 70
24           was marked for identification.)
25   ///
```

Page 185

```
 1   BY MR. SKAGGS:
 2       Q.  Sob you've been handed what's been marked
 3   Exhibit 70.  It's an article called "The Controlled
 4   Fury of Brandon Vera," dated October 21st of 2014.
 5   Do you remember this article?
 6       A.  I don't, but I'll read it.
 7       Q.  Yeah.  Just let me know when you're ready.
 8   So do you see that paragraph maybe two-thirds of the
 9   way down?  It starts, "When the UFC offered me a
10   contract extension."  Do you see that paragraph?
11       A.  Yes, sir.
12       Q.  It says "When UFC offered me a contract
13   extension, that was so ridiculous, I said 'hell no.'
14   I thought that it was like a slap on my face, so they
15   can take it and shove it wherever you want."
16           Does that quote refresh your recollection
17   whether you had received a contract extension from
18   Zuffa?
19           MR. KOFFMAN:  Object to the form.
20           THE WITNESS:  That doesn't put this contract
21   in my mind.  Reading this, it might have been when
22   they had a verbal from somebody.  I don't know who
23   the verbal was, but it was half of what I was making,
24   is what I remember.  And then I remember talking to
25   Dana, the last time I talked to him, he said he would
```

Page 186

```
 1  call me back when I got back from China to make this
 2  right, and I never heard anything else.
 3  BY MR. SKAGGS:
 4      Q.  So you're saying you had received a contract
 5  offer from Zuffa that was half of what you had been
 6  currently making?
 7      A.  On the verbal.  I remember it being half.  I
 8  remember thinking in my head, I remember thinking,
 9  No, I'm not going to accept that.  That's why Dana
10  ended up calling me.
11      Q.  Was that before -- was that shortly after
12  the Rothwell fight?
13      A.  I thought it was.  I thought it was.
14      Q.  Okay.  And then subsequent to that, you
15  received the contract offer that we discussed
16  earlier?
17          MR. KOFFMAN:  Object to the form.  That's
18  not what he testified.
19          THE WITNESS:  I never received -- I don't
20  remember looking at that contract ever.  I don't
21  remember looking at a contract.
22  BY MR. SKAGGS:
23      Q.  But the email shows that it was at least
24  sent by Tracy Long to you?
25          MR. KOFFMAN:  Object to the form.
```

Page 187

```
 1          THE WITNESS:  Was it sent to me or to Matt?
 2  BY MR. SKAGGS:
 3      Q.  We can go back and look.  I believe it was
 4  both.  Exhibit 68.  Excuse me.  Exhibit 67 shows to
 5  bvera8@gmail.com and Matt.
 6      A.  It does show my email address, that it went
 7  to my email address.
 8      Q.  Okay.  But you don't think -- the contract
 9  extension you're referencing here you think is a
10  different contract extension than Exhibit 67?
11      A.  Yes, sir.
12      Q.  And the contract extension in Exhibit 67, I
13  believe we already looked at this on 001 of that
14  document.  The fighter purse for the first bout would
15  be $73,000 to show and $73,000 to win; is that right?
16          MR. KOFFMAN:  Objection.  Asked and
17  answered.
18          THE WITNESS:  That's what it's showing.
19  BY MR. SKAGGS:
20      Q.  Would that offer have been a slap in the
21  face?
22          MR. KOFFMAN:  Object to the form.
23          THE WITNESS:  I'm pretty sure I said this
24  wasn't the offer I was talking about.
25  ///
```

Page 188

```
 1  BY MR. SKAGGS:
 2      Q.  Would you have considered -- strike that.
 3  Would you have considered an offer of 73/73 a slap in
 4  the face?
 5      A.  No, sir.  I don't think I would have.
 6              (Whereupon Defendant's Exhibit 71
 7              was marked for identification.)
 8  BY MR. SKAGGS:
 9      Q.  I've handed you what's been marked as
10  Exhibit 71.  Do you recognize this document?
11      A.  Yes, sir.
12      Q.  This is an email from Victor Cui to you.
13  Who is Victor Cui?
14      A.  Victor Cui is the CEO of One.
15      Q.  This is an email on October 26th 2014.  And
16  I'm looking at the, I guess, third sentence.  It
17  says, "Tell me how we can get in contact with the
18  decision-maker from those Bluetooth guys and get them
19  on board as a One FC partner.  For any cash sponsor
20  you bring on board, you also get a 15 percent
21  finder's commission."
22          Who are the Bluetooth guys that he's
23  referencing in the email?
24          MR. KOFFMAN:  Object to form.  Go ahead.
25          THE WITNESS:  It would have been Floyd
```

Page 189

```
 1  Evangelista.
 2  BY MR. SKAGGS:
 3      Q.  And what is Floyd Evangelista's connection
 4  with Bluetooth?
 5      A.  He owns Dome Piece Audio.
 6      Q.  Okay.  So is Bluetooth that Mr. Cui is
 7  referencing, he actually means Dome Piece Audio in
 8  this email?
 9          MR. KOFFMAN:  Objection to the form.
10          THE WITNESS:  I believe so.
11  BY MR. SKAGGS:
12      Q.  Okay.  And was it your understanding that --
13  strike that.
14          Were you in talks with Floyd Evangelista
15  about Dome Piece Audio becoming your sponsor?
16      A.  No, sir.  I was -- Floyd Evangelista asked
17  me how he could become a partner with One.  So I just
18  mentioned something somewhere, sent an email, to see
19  if that could happen.  I think they started talking
20  on the phone.
21      Q.  Is Dome Piece Audio one of your sponsors?
22      A.  Not technically.
23      Q.  What do you mean by that?
24      A.  There's no cash prize.  I was just trying
25  to help him, help him get his company started.
```

Page 254

1  A. I don't have any connection between them?
2  Q. I'm saying, are you aware of any connection
3  between Mr. Rednee's association and this lawsuit?
4  A. No, sir.
5  Q. If you can go back to Exhibit 77, which I
6  think should be the last one. And on page 2 of that
7  document, 037, which we discussed, Heather Miller
8  said, "If you have any questions regarding the
9  information contained in the letter, or if you do not
10 agree with some of the information included, please
11 let me know and changes will be made before you
12 sign."
13     And that was in regards to the declaration
14 that you signed in 2011. Do you agree that you were
15 offered the opportunity to make changes to the
16 declaration before you signed it?
17     MR. KOFFMAN: Object to the form. Calls for
18 a legal conclusion.
19     THE WITNESS: In my opinion, I was offered,
20 yes, sir.
21 BY MR. SKAGGS:
22  Q. And why didn't you?
23  A. So before I received this, I received a call
24 from Dana White. And he said, Hey, kid, the FTC is
25 doing an investigation. So I need you to get with my

Page 255

1  legal team and handle that for me. Handle this for
2  me. Handle that for me. One of those words. And
3  Dana doesn't really call you unless it's something
4  big. So I figured Dana White was asking for a favor.
5  And seeing how I was coming off of my record right
6  when he needed this done, I was 0 and 3, one of the
7  most outspoken people in the company when he asked me
8  to do this. I don't even think I read it. I think I
9  just signed it and sent it back over in fear of
10 getting cut.
11  Q. Did he tell you that you were not allowed to
12 make changes to the declaration?
13  A. What he told me was, I need this kid.
14 Handle it for me.
15  Q. Did he tell you that you weren't allowed to
16 make changes to the document?
17  A. No, sir.
18  Q. Have you personally had any contact with
19 anyone at the FTC?
20  A. No, sir.
21  Q. Okay.
22  A. I don't think I have. I honestly -- I don't
23 remember this far back. I don't know if somebody
24 called me from the FTC or not. I don't know.
25  Q. But you don't have any recollection of

Page 256

1  having any contact with someone from the FTC?
2  A. No, sir.
3  Q. And when did that call with Dana White that
4  you just referenced occur?
5  A. Before I signed this. Before the legal team
6  got in touch with me.
7  Q. A week before? A day before?
8  A. I don't know. That's a long time ago. I
9  don't know.
10  Q. Were there any other reasons that you chose
11 to not make any changes to the declaration before you
12 signed it?
13  A. Other than not wanting to cut and lose my
14 livelihood, no, sir.
15  Q. Did Dana White say if you didn't sign the
16 declaration, you would get cut and lose your
17 livelihood?
18     MR. KOFFMAN: Object to the form. You can
19 answer.
20     THE WITNESS: No, sir. He said, I need
21 this, kid. So I would assume that that was a favor.
22 He's never called me "kid," and he's never told me he
23 needed anything.
24     MR. SKAGGS: I have nothing further.
25     MR. KOFFMAN: I have one question. We don't

Page 257

1  need to go off the record.
2
3         EXAMINATION
4  BY MR. KOFFMAN:
5  Q. Does One FC promote MMA fights in North
6  America?
7     THE WITNESS: No, sir.
8     MR. KOFFMAN: That's all I have.
9     MR. SKAGGS: I think we're good.
10     THE VIDEOGRAPHER: This concludes the video
11 deposition of Brandon Vera. We are now going off the
12 record. The time is approximately 4:26 p.m.
13     MR. DELL'ANGELO: We'll read and sign.
14     (Thereupon the taking of the
15     deposition was concluded at
16     4:26 p.m.)
17     * * * * *

Page 258

```
 1           CERTIFICATE OF DEPONENT
 2      PAGE  LINE  CHANGE          REASON
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15            *   *   *   *   *
16
17       I, BRANDON VERA, deponent herein, do hereby
    certify and declare the within and foregoing
18  transcription to be my deposition in said action;
    that I have read, corrected and do hereby affix my
19  signature to said deposition.
20
21
22       _____
              BRANDON VERA, Deponent
23
24
25
```

Page 259

```
 1           REPORTER'S CERTIFICATE
 2  STATE OF NEVADA  )
                    ) SS:
 3  COUNTY OF CLARK )
 4     I, Jane V. Efaw, CCR No. 601, do hereby certify:
 5     That I reported the taking of the deposition of
 6  the witness, BRANDON VERA, at the time and place
 7  aforesaid;
 8     That prior to being examined, the witness was by
 9  me duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth;
11     That I thereafter transcribed my shorthand notes
12  into typewriting and that the typewritten transcript
13  of said deposition is a complete, true and accurate
14  transcription of said shorthand notes taken down at
15  said time, and that a request has been made to review
16  the transcript.
17     I further certify that I am not a relative or
18  employee of counsel of any party involved in said
19  action, nor a relative or employee of the parties
20  involved in said action, nor a person financially
21  interested in the action.
22     Dated at Las Vegas, Nevada, this _____ day of
23  _____, 2017.
24
            _____
25       Jane V. Efaw, CCR #601
```

