# EXHIBIT 64

## Redacted Excerpts from the Second Deposition of Dr. Hal Singer

Page 338

IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF NEVADA
              -  -  -

CUNG LE, NATHAN QUARRY, JON: CIVIL ACTION
FITCH, BRANDON VERA, LUIS  :
JAVIER VAZQUEZ, and KYLE    :
KLINGSBURY on behalf of     :
themselves an others        :
Similarly situated,         :
            Plaintiffs  : CASE NO.
                         : 2:15-cv-01045-RFB
        vs.              : (PAL)
                         :
ZUFFA, LLC d/b/a ULTIMATE   :
FIGHTING CHAMPIONSHIP and   :
UFC,                        :
            Defendants  :


              -  -  -
     Tuesday, January 23, 2018
             DAY 2
              -  -  -

        Continuation of videotaped

deposition of HAL J. SINGER, Ph.D., taken

pursuant to notice, was held at the

offices of BERGER & MONTAGUE, P.C., 1622

Locust Street, Philadelphia, PA 19103,

commencing at 10:19 a.m., on the above

date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.
              -  -  -
        MAGNA LEGAL SERVICES
           866.624.6221
          www.MagnaLS.com



Page 379

1  carve-out for a certain set of contracts,
2  but you would have to make sure that
3  those contracts don't account for too
4  large of a share of a market.
5       There are lots of ways that
6  you could restructure the contract, and I
7  have -- of course, I have opinions as to
8  how it could be done to come into
9  compliance with, say, a 30 percent
10  foreclosure requirement.
11     Q.  All right.  And at this
12  point, following your rebuttal report,
13  you are still, depending on your analysis
14  about where the Court draws the line as
15  to what's an exclusionary arrangement.
16     Am I correct about that?
17     MR. CRAMER:  Objection to
18  form.
19     THE WITNESS:  I think that
20  that ultimately would fall to the
21  fact-finder.  I have tried to
22  inform the decision-making based
23  on my experience, my reading of
24  other cases, other economic

Page 380

1  articles and, of course, most
2  importantly, I go back to this,
3  the average career length of a
4  fighter.  I think that all those
5  things should inform what the line
6  should be.
7     I have tried to -- I have
8  tried to offer what I think would
9  be a fair number.  I have -- in
10  fact, in this report, I have
11  pointed to the duration in Zuffa's
12  contracts when it had less market
13  power than it does now as what I
14  think would be a reasonable proxy
15  for the duration of the contract.
16  BY MR. ISAACSON:
17     Q.  All right.  And just to make
18  sure I understand where you are now at
19  the end of your rebuttal report, if the
20  Court were to determine that contracts --
21  exclusive contracts of one year or more
22  were exclusionary, would that -- if --
23  would an appropriate but-for world
24  include one-year contracts or less, plus

Page 381

1  some other parameters or some other
2  possible parameters, as Zuffa said, and
3  that would result in a foreclosure share
4  of 30 percent or lower?
5     MR. CRAMER:  Objection to
6  form.
7     THE WITNESS:  Well, I think
8  we are close.  I think what I am
9  getting tripped up on is you said
10  one year or more would be
11  exclusionary.  And then, of
12  course, if you did it at one year,
13  you wouldn't be in compliance.
14  But how about can we try a
15  different hypothetical or did
16  you -- maybe you meant to do that.
17  BY MR. ISAACSON:
18     Q.  Well, no.  I was not trying
19  to put significance of 365 days versus
20  366.
21     But if the Court drew the
22  line at exclusionary contract of
23  something that's more than one year and
24  instead, that a one-year contract or less

Page 382

1  was not exclusionary --
2     A.  Got it.  Got it.  Sorry.
3  Then I didn't hear that the first time,
4  but I am with you now.
5     Q.  Okay.  With that assumption,
6  in your opinion, would an appropriate
7  but-for world be contracts that were one
8  year or less in duration, plus some other
9  potential parameters that you pointed to
10  in your report and that but-for world
11  result in foreclosure shares of 30
12  percent or less?
13     A.  Well, it's certainly getting
14  closer to what I think would be the
15  appropriate but-for world.  It seems like
16  we could -- we could restructure the
17  contracts by reducing the duration, such
18  that when I went back and calculated
19  foreclosure, it would no longer be in
20  excess of 30 percent, and I think that
21  getting the duration below what the
22  fact-finder deem exclusionary and in
23  violation of the antitrust laws is a
24  smart way to go about it.

MAGNA
LEGAL SERVICES

Page 383

```
1        Q.    And from that -- and from
2  that, your models -- your damages models
3  and your second impact model would
4  estimate -- would estimate damages impact
5  from that but-for world?
6           MR. CRAMER:  Objection to
7        form.
8           Go ahead.
9           THE WITNESS:  If you give me
10       a but-for foreclosure share, I can
11       tell you what the -- what the --
12       how much wages would go up by.
13 BY MR. ISAACSON:
14       Q.    All right.  Now, if the
15 Court were to rule that an exclusionary
16 contract is over two years and it's not
17 exclusionary, it's two years or less, if
18 you -- would an appropriate but-for world
19 then be contracts that were two years or
20 less, plus some other parameters, and
21 that would achieve a foreclosure share of
22 30 percent or less?
23          MR. CRAMER:  I am going to
24       object to the extent that this
```

Page 384

```
1  calls for a legal conclusion.
2           But go ahead and answer, if
3       you understand the question.
4           THE WITNESS:  Let me -- it
5       was a two-parter and let me take
6       the second part, which is probably
7       easier.  And that is, would it --
8       would it get you to a foreclosure
9       share below 30 percent?  And I
10      think that by the construction of
11      your hypothetical, it would, if I
12      understood it correctly.  You are
13      saying the Court deems anything in
14      excess of 24 months --
15          MR. ISAACSON:  Right.
16          THE WITNESS:  -- to be
17      exclusionary -- let me finish --
18      and you asked me to posit a world
19      in which the contracts were
20      exactly 24 months.
21 BY MR. ISAACSON:
22      Q.    My intent is this question
23 two is the same as the last question.  If
24 the Court has ruled that above two years
```

Page 385

```
1  is exclusionary and in the first
2  question, that they ruled that above one
3  year was exclusionary.  Everything else
4  -- everything else is the same.
5           MR. CRAMER:  Same objection.
6  BY MR. ISAACSON:
7        Q.    You would still -- if Zuffa
8  moved its contracts down to two years or
9  less, that would achieve foreclosure
10 shares of 30 percent or less?
11       A.    I think that if we draw the
12 line, if one were to draw the line at 25
13 months and if -- and if all of the
14 contracts came in at 24 months, then it's
15 almost tautological.  If that's how we
16 define foreclosure, then the foreclosure
17 would come in at less than 30 percent.
18       Q.    And in that situation, you
19 would reach the same conclusion as to the
20 amount of damages and your second impact
21 analysis -- second impact model would
22 remain the same?
23          MR. CRAMER:  Objection to
24       form, incomplete hypothetical,
```

Page 386

```
1  calls for a legal conclusion.
2           THE WITNESS:  I want to
3       think about it a little more, but
4       sitting here, it's not -- it's not
5       obvious how I would change my
6       impact model or damages model
7       based on that hypothetical.  I
8       probably would want to think about
9       it a little more.
10          But my -- what's giving me
11      some reservation is that -- I
12      wouldn't draw the line at 24.  I
13      think the 24 represents too much
14      of a fighter's life span or career
15      span.
16          And so that -- while it
17      would be a significant improvement
18      over where things are today, it's
19      conceivable that a movement
20      from 36, roughly where we are
21      today, to 24, would it engender
22      different competitive effects than
23      a movement from 36 to 12?  I mean,
24      certainly at 12, the market is
```

MAGNA
LEGAL SERVICES

1    more open, there is more worker
2    mobility.
3        Whether or not my model can
4    accommodate that distinction, I
5    would want to think about it some
6    more.  I just haven't thought
7    about it yet.
8    BY MR. ISAACSON:
9        Q.   Looking at paragraph 198,
10   there is a couple things you have listed
11   in your plausible but-for world, the
12   third of which is clauses that allow
13   fighters enhanced mobility.
14        What do you mean by that?
15        A.   I guess since I have already
16   listed right-to-match, I would certainly
17   include right-to-match in that.  But I am
18   thinking of the other -- the other
19   clauses that are extending the duration
20   or otherwise, tying up or sewing up of
21   fighters with Zuffa.
22        Q.   And the various tolling
23   provisions?
24        A.   Correct.  Tolling or

1    exclusive -- the exclusive provision.  I
2    mean, we could -- we could go through
3    each one, but anything that --
4        Q.   I would rather not.
5        A.   Okay.
6        MR. CRAMER:  Were you done
7    with your answer?  Anything that
8    you were about to say.
9        THE WITNESS:  Yeah, anything
10       that extends the duration or
11       otherwise lessens mobility.
12   BY MR. ISAACSON:
13       Q.   Okay.  So but when you are
14   saying a plausible but-for world includes
15   clauses that allow fighters enhanced
16   mobility, what are you referring to?
17       MR. CRAMER:  Asked and
18       answered.
19   BY MR. ISAACSON:
20       Q.   For example, are you
21   referring to eliminating all of those
22   tolling restrictions that you have
23   pointed to or something less?  I am
24   trying to get an idea of what you are --

1    what you are doing here.
2        MR. CRAMER:  Asked and
3    answered.
4        THE WITNESS:  I am referring
5    to any of the restrictions.  I am
6    not -- I am saying that it would
7    be plausible that most, if not
8    all, of them would go away.  It's
9    conceivable that some would stick
10   around.  But I think that what I
11   am trying to capture is a world in
12   which -- in which fighters have
13   greater mobility.
14   BY MR. ISAACSON:
15       Q.   So when you are referring to
16   clauses that allow fighters enhanced
17   mobility, are you assuming that most or
18   all of the tolling provisions go away?
19       A.   If those tolling provisions
20   have the effect of extending the duration
21   of the contracts beyond, say, 12 months,
22   then I think that in a more open and
23   competitive environment, those tolling
24   restrictions would likely go away.

1        Q.   All right.  So by clauses
2    that allow fighters enhanced mobility,
3    you are thinking of tolling provisions
4    that have the effect of extending the
5    duration of the contracts beyond 12
6    months?
7        A.   Correct.
8        Q.   And in your plausible
9    but-for world, all of those tolling
10   provisions would go away, most of them?
11       A.   I think I gave you an
12   example where I could conceive of a
13   champion's clause staying around but
14   effectively being negated by virtue of
15   other more mobility.  I think the point
16   that I am trying to make here, just so
17   that it's clear if it wasn't, is that I
18   am trying to give some granularity to
19   what Zuffa's most likely or most
20   plausible contract would be in a but-for
21   world, and given the -- given the record
22   evidence, this is the best that I can do
23   at trying to give some granularity to
24   that contract.



1      Without going back over your
2  answers, have your opinions on that
3  changed from the first deposition?
4      MR. CRAMER:  Objection to
5      form.
6      You can answer.
7      THE WITNESS:  No, my
8      opinions haven't changed on that.
9  BY MR. ISAACSON:
10     Q.   Your plausible but-for world
11 in paragraph 198 doesn't mention the
12 ancillary rights provision.
13     Does the ancillary rights
14 provision exist in your but-for world?
15     A.   If it's -- if it's part of
16 the challenged conduct -- I am just going
17 to say something that's tautological.  If
18 it's part of the challenged conduct, then
19 I think it most appropriately leaves in
20 the but-for world.
21     But I don't think that I --
22 in this section, just by memory, I don't
23 recall finding what a -- sorry -- what a
24 smaller rival does with respect to the

1  ancillary rights provision or what Zuffa
2  did with respect to ancillary rights
3  provision when it had less market power.
4      So I don't think that in the
5  rebuttal report I gave any kind of
6  specificity or granularity with respect
7  to that provision, and I am reluctant to
8  offer anything new today.
9      Q.   All right.  This is purely a
10 grammatical question.  You said:  I think
11 it most appropriately leaves in the
12 but-for world.
13     By that, do you mean that
14 the ancillary rights provision most
15 appropriately is no longer in existence
16 in the but-for world?
17     MR. CRAMER:  Misstates the
18     testimony.
19     THE WITNESS:  I think if
20     it's part of the challenged
21     conduct and if plaintiffs are
22     including that in the challenged
23     conduct, then we are -- as
24     economists, what we are trying to

1      do is model a world in which the
2      challenged conduct is absent.
3  BY MR. ISAACSON:
4      Q.   And in your but-for world,
5  is Zuffa still able to contract for some
6  identity rights?
7      A.   I don't think that there is
8  anything that I have written or read that
9  would suggest that it couldn't contract
10 for identity rights.
11     Q.   And in your but-for world,
12 can Zuffa contract for the identity
13 rights of a fighter for one specific bout
14 in perpetuity?
15     A.   I don't think that I have
16 offered an opinion with that kind of
17 granularity, and I don't think that I am
18 prepared to say that it couldn't or could
19 in a but-for world, sitting here.
20     Q.   All right.  Does the but-for
21 world you describe in your rebuttal
22 report include the sponsorship and
23 endorsement clauses?
24     MR. CRAMER:  Objection to

1      form.
2      THE WITNESS:  There are
3      certain aspects of the sponsorship
4      arrangement, in particular what I
5      have referred to as the
6      sponsorship tax, that I thought
7      were anticompetitive in my report.
8      And so I would be loathed to say
9      that we ought to just look the
10     other way with respect to that
11     one.
12     But at the end of the day, I
13     don't -- I don't think that I am
14     offering a firm opinion as to --
15     as to the nature of those aspects
16     of the agreement.
17 BY MR. ISAACSON:
18     Q.   So if hypothetically Zuffa
19 was broadcasting on Fox television and it
20 prohibited a fighter from wearing an ESPN
21 logo on their shorts, you wouldn't have
22 an opinion -- or you wouldn't have an
23 opinion one way or the other as to
24 whether that's in your but-for world; is

MAGNA
LEGAL SERVICES

Page 403

1  that fair?
2      A.   I haven't expressed an
3  opinion.  It seems to me a restriction of
4  that nature could be consistent with a --
5  with a lower foreclosure share, and so as
6  an economist, remember, I go back -- my
7  model turns on the foreclosure share.
8  And so that's how I would attempt to
9  answer that question in the first
10  instance.  And I don't think that I -- my
11  model or anything that I have written or
12  read can inform in any kind of
13  intelligent way an answer to that
14  question.
15      Q.   Okay.  The -- in looking,
16  again, at the substantially shorter
17  duration fighter contracts of one year or
18  less, does that -- does that put any
19  limit on Zuffa re-signing or extending
20  the contract before the year expires in
21  exchange for paying the fighter more
22  money?
23      A.   Well, I think that the
24  plaintiffs are complaining that Zuffa is

Page 404

1  strategically using certain provisions of
2  the contract to lock fighters into
3  effectively perpetual extensions when
4  they want them.  And given that that is
5  part of the challenged conduct, I
6  would -- I would at least hope that if we
7  were to rewrite these in a way that they
8  were in compliance with the antitrust
9  laws, that that sort of gamesmanship
10  would be -- would be either disallowed or
11  much harder to engage in.
12      Q.   Right.  But in your opinion,
13  would those rewrite of the contracts
14  prohibit Zuffa from simply offering
15  fighters more money to extend the
16  contract beyond one year?
17          MR. CRAMER:  Incomplete
18  hypothetical.
19          THE WITNESS:  I don't think
20  that I have an opinion on that.
21  BY MR. ISAACSON:
22      Q.   And if Zuffa did
23  successfully extend the contracts beyond
24  one year by simply paying the fighters

Page 405

1  more money and did that with the same
2  amount of fighters as today, have two- or
3  three-year contracts, would that be
4  anticompetitive?
5          MR. CRAMER:  Incomplete
6  hypothetical, form.
7          THE WITNESS:  Well, when you
8  say did it the same as today, I
9  mean --
10  BY MR. ISAACSON:
11      Q.   The same amount, same
12  numbers.
13          MR. CRAMER:  Objection to
14  form, incomplete hypothetical.
15          THE WITNESS:  I think I
16  would need more specificity in the
17  hypothetical.  But if Zuffa
18  engaged in some of the same
19  tactics that it did today to
20  secure extension, such as refusing
21  to either give a fighter a fight
22  or giving the fighter an
23  inappropriate match-up as a
24  punishment for not extending, I

Page 406

1  think that -- I think that that --
2  that is part of the challenged
3  conduct and I think that those
4  sorts of tactics would be absent
5  in a but-for world.
6  BY MR. ISAACSON:
7      Q.   Okay.  But all I am focused
8  on is if Zuffa pays more money to extend
9  the contract, not the other -- not the
10  other things you are pointing to.
11      A.   I hear you.
12      Q.   If Zuffa did that and
13  extended these contracts to the point
14  where they had the same effective
15  duration as the contracts have today,
16  would that have an anticompetitive effect
17  in your view?
18          MR. CRAMER:  Objection to
19  form, incomplete hypothetical.
20          THE WITNESS:  I mean, the
21  way that I am hearing the question
22  is that if Zuffa were to behave
23  competitively, and that is compete
24  on the merits, and keep fighters

MAGNA
LEGAL SERVICES

Page 407

```
1        with higher payments as opposed to
2    the exclusionary provisions, you
3    know, would that competition on
4    the merits be barred?  And I would
5    say that most likely not.  If it's
6    not part of the challenged
7    conduct, then I think that it
8    sticks around in the but-for
9    world.
10   BY MR. ISAACSON:
11       Q.   And if Zuffa offered
12   fighters contracts of one year or less
13   and the fighters then bargained on their
14   own behalf for longer contracts, is that
15   permitted in the but-for world?
16       MR. CRAMER:  Incomplete
17   hypothetical.
18       THE WITNESS:  I am loathed
19   to say that the economic model
20   permits or disallows anything.
21   The economic model requires, as
22   its input, foreclosure share.  And
23   what we are trying to do now in
24   this rebuttal report is to give
```

Page 408

```
1        more flavor or more granularity to
2    what a but-for world would look
3    like consistent with that lower
4    foreclosure share.
5        And so when you ask me a
6    question like this, it's not --
7    it's not obvious how with that --
8    with those ground rules how I can
9    rule in or rule out certain
10   aspects, unless they are obviously
11   part of the challenged conduct.
12   BY MR. ISAACSON:
13       Q.   I want to go over this again
14   because I don't understand your answer.
15       A.   Okay.
16       Q.   The -- you have written that
17   the plausible but-for world would have
18   fighter contracts of one year or less.
19       Is that a result to have to
20   end up one year or less, even if fighters
21   ask for contracts greater than one year?
22       MR. CRAMER:  Objection to
23   form.  Do you mean contracts
24   exactly like the contracts that
```

Page 409

```
1        exist today or guaranteed
2    contracts?  Or -- incomplete
3    hypothetical.  You need to
4    specify.
5        MR. ISAACSON:  You are doing
6    speaking objections now.  So...
7        MR. CRAMER:  You are asking
8    unfair and incomplete questions
9    that are vague.
10       THE WITNESS:  I guess I
11   would just have to think about it.
12   I am not -- it's hard for me to
13   understand how the duration of the
14   contract would ever -- why a
15   fighter would ever want to -- want
16   to extend the duration all things
17   equal.  It just seems like that
18   would represent a restriction on
19   that fighter's mobility.  So it's
20   hard to -- it's hard to understand
21   it, I guess, from an economic
22   perspective.
23   BY MR. ISAACSON:
24       Q.   You can't understand why a
```

Page 410

```
1        fighter would ever want the certainty of
2    a multiyear contract?
3        MR. CRAMER:  Objection to
4    form, incomplete hypothetical.
5        THE WITNESS:  Certainly not
6    the way that these contracts work.
7    I think that, you know, they work
8    as one-way ratchets, and I think
9    that you don't get paid unless you
10   fight.  And so the notion that I
11   would -- that I would, all things
12   equal, want to extend the contract
13   is just -- it's not obvious to me
14   why that would be in the fighter's
15   economic incentive.
16   BY MR. ISAACSON:
17       Q.   All right.  But in your
18   but-for world, can you conceive of
19   fighters who would want to have contracts
20   of greater than one year?
21       MR. CRAMER:  Objection to
22   form, incomplete hypothetical.
23       THE WITNESS:  It's hard for
24   me to conceive -- if the standard
```

Page 411

```
1    offering was 12 months, it's hard
2    for me to conceive -- we could
3    perhaps come up with some
4    hypothetical, but it's hard for me
5    to conceive of a fighter saying,
6    you know what, I really would like
7    this stuff to tie me up for two
8    years as opposed to one year.  I
9    just think that's -- that's a hard
10   thing for me to conceive.
11        MR. CRAMER:  Bill, we have
12   been going about an hour.
13   Whenever it's a good time to take
14   a break, I would like to take a
15   break.
16        MR. ISAACSON:  Sure.
17        MR. CRAMER:  Now?
18        MR. ISAACSON:  Yeah.
19        MR. CRAMER:  Okay.  Let's go
20   off the record.
21        THE VIDEOGRAPHER:  The time
22   is 11:23 a.m.  We are going off
23   the record.
24             - - -
```

Page 412

```
1         (Off the record at this
2    time.)
3             - - -
4         THE VIDEOGRAPHER:  The time
5    is 11:36 a.m.  We are back on the
6    record.
7    BY MR. ISAACSON:
8         Q.   Dr. Singer, if you could
9    look at paragraph 236 of your rebuttal
10   report.  In paragraph 236 --
11        A.   I am sorry.  I am almost
12   there.
13        Q.   Page 173.
14        A.   Okay.  Got it.
```
[redacted]
```
22        The -- and then you go on to
23   describe the record evidence that you
24   are -- that you are referring to.
```

Page 413

```
1         Are you assuming that
2    Zuffa's competitors in your but-for world
3    would use the same level of
4    nonrestrictive competition contract
5    provisions as Zuffa?
6         A.   Let me hear that back.
7         Q.   Let me -- let me try it a
8    different way.
9         A.   Okay.
10        Q.   We looked at your plausible
11   but-for world.  And in that plausible
12   but-for world, do you assume that Zuffa's
13   competitors have the same types of
14   contractual provisions as Zuffa does in
15   that -- in that world?
16        MR. CRAMER:  Objection to
17   form.
18        THE WITNESS:  I think that
19   there would be competition over
20   each of those dimensions in the
21   but-for world.  And what -- and
22   what this piece of record evidence
23   is suggesting is that if Zuffa
24   were, say, barred from
```

Page 414

```
1    incorporating a right-to-match
2    clause in its provision, then the
3    best response of its rivals would
4    be to take out the right-to-match
5    clause in their own.
6         So in that sense, they would
7    be likely the same on that
8    dimension but the same in a
9    different way, in an open way, as
10   opposed to the same in a closed
11   way as they are today.
12   BY MR. ISAACSON:
13        Q.   I know you have given the
14   reasons for your testimony.  I am just
15   trying to understand your conclusions.
16        If Zuffa is restricted to
17   contracts of one year or less in
18   duration, are you assuming that its --
19   that its competitors will also offer only
20   contracts of one year or less in
21   duration?
22        A.   I don't -- I don't want to
23   say that they will necessarily be
24   identical, but I will say that Zuffa's
```



Page 475

1       MR. ISAACSON:  All right.
2   This would be a good time to break
3   for lunch.
4       MR. CRAMER:  All right.
5   Sure.  We can go off the record.
6       THE VIDEOGRAPHER:  The time
7   is 12:51 p.m.  We are going off
8   the record.
9           - - -
10      (Off the record at this
11  time.)
12          - - -
13      THE VIDEOGRAPHER:  The time
14  is 1:24 p.m.  We are back on the
15  record.
16  BY MR. ISAACSON:
17      Q.   If we could look at
18  paragraph 46 of your rebuttal report, in
19  46 you have a statement that Dr. Topel --
20  at the bottom of the paragraph that's on
21  page 37:  Dr. Topel's use of price
22  indices for, quote, Sporting Events,
23  unquote, and quote, Movies, Theaters and
24  Concerts, end quotes, baselessly assumes

Page 476

1   that market power is absent in these
2   industries as well.
3       Do you have -- which markets
4   are you referring to for sporting events?
5       A.   I would have to go back and
6   check Dr. Topel's backup.  These are --
7   this is a proxy that he is putting
8   forward.
9       Q.   All right.  It was for
10  certain major league sports, correct?
11      A.   I don't -- I do not recall.
12      Q.   All right.  Do you have an
13  opinion whether market power is present
14  in any of the industries for any of the
15  major league sports that sell tickets?
16      A.   I think it's a fairly
17  reasonable assumption that the major
18  sports leagues have -- and their teams
19  have market power.
20      Q.   All right.  I just want to
21  make sure -- we covered this before, but
22  I just want to make sure we are speaking
23  the same language.
24          You did a regression

Page 477

1   analyses for damages and one for impact
2   that used the labor share of revenue as
3   the dependent variable to measure the
4   existence or exercise of monopsony power;
5   is that fair?
6       A.   Can I hear that back?
7           - - -
8       (The reporter read from the
9   record as requested.)
10          - - -
11      THE WITNESS:  So there are
12  two alterations that I would like
13  to make to that, just so that we
14  are precise.  You said share of
15  revenue, and, of course, I am
16  using share of events revenue,
17  which is an important distinction.
18  BY MR. ISAACSON:
19      Q.   All right.
20      A.   The second point, of course,
21  is that the primary purpose of the model
22  was to speak to anticompetitive effects,
23  impact and, of course, damages, and I
24  think you were asking me whether I also

Page 478

1   used the model for -- to demonstrate
2   monopsony power.
3       Q.   The existence or exercise of
4   monopsony power.
5       A.   And I think that in my
6   monopsony section of my original report,
7   I made reference to the model and its
8   results to corroborate other evidence
9   that I brought forward on the issue of
10  monopsony power, but I think the
11  motivation of the model was for a
12  different purpose.
13      Q.   Was -- the model was -- you
14  used the model to determine
15  anticompetitive effect, including impact
16  and damages?
17      A.   Right.  So you could say
18  that the model represents direct evidence
19  of Zuffa's monopsony power and that it
20  shows that Zuffa was able to push wages
21  down below competitive levels.
22      Q.   All right.  So I can
23  describe it as a regression analysis that
24  you used for damages and in one case

MAGNA
LEGAL SERVICES

Page 479

1   impact that used the labor share event
2   revenue as the dependent variable to
3   measure the alleged anticompetitive
4   effect, including the impact and damages,
5   of a monopsony?
6          MR. CRAMER:  Objection to
7   form.
8          THE WITNESS:  Very close.
9   At the very end of a monopsony, of
10  a monopsonist who engaged in
11  certain challenged conduct.
12  Remember, we are trying to isolate
13  the effect of the challenged
14  conduct.  And I think as you put
15  it, it sounded as if we were
16  trying to isolate the effect
17  Zuffa's monopsony.
18  BY MR. ISAACSON:
19     Q.   So the regression analysis
20  that you used for damages in one case of
21  impact used the labor share of that
22  revenue as the dependent variable to
23  measure the anticompetitive effect,
24  including the impact or damages, of

Page 480

1   alleged monopsonistic conduct?
2          MR. CRAMER:  Objection to
3   form.
4          THE WITNESS:  I don't -- I
5   don't like that one as much as the
6   one that I gave you.
7          MR. ISAACSON:  I thought
8   that's what you gave me.
9          THE WITNESS:  Monopsonistic
10  conduct is fairly broad, and I
11  think that we are looking at a
12  very particular type of conduct.
13  It's the challenged conduct here,
14  the exclusionary conduct.  And
15  so --
16  BY MR. ISAACSON:
17     Q.   All right.  I am just trying
18  to --
19     A.   Okay.
20     Q.   I equated those things.
21     A.   Okay.
22     Q.   But I am trying to use your
23  words.
24     A.   Okay.

Page 481

1          Q.   So your regression analyses
2   for damages in one case for impact used
3   the labor share of event revenues as the
4   dependent variable to measure the
5   anticompetitive effect, including the
6   impact and damages, of the conduct that's
7   challenged in this case?
8          A.   I think that's fair.
9          Q.   Okay.  All right.  Now, can
10  you point me to any journal that has used
11  a regression analysis using the labor
12  share of revenue -- need not be on an
13  event basis -- the labor share revenue as
14  the dependent variable to measure the
15  anticompetitive effect, impact or damages
16  of any conduct by -- any conduct by a
17  monopsonist?
18         A.   As you put it, I think there
19  are several articles in my literature
20  review on the use of labor share to study
21  monopsony in the economics industry and
22  in general, and in sports economics, in
23  particular, that use labor share as the
24  dependent variable in an econometric

Page 482

1   analysis.
2          Q.   Which ones would you point
3   to as having -- again, focusing on the --
4   on the use as the dependent variable?
5          A.   Sure.
6          Q.   If it helps you locate
7   things, you start talking about Scully
8   around paragraph 94.  I am not trying to
9   limit you but to sort of give you a
10  general location in your report.
11         A.   What page?  I am sorry.
12         Q.   Paragraph 94, page 73.
13         MR. CRAMER:  And Section C
14  starts with page 69, the section
15  where you discussed wage shares.
16         MR. ISAACSON:  I am sure you
17  have to go before and after where
18  I pointed you to.
19         THE WITNESS:  I think that I
20  would start with the Scully
21  article.  I plan to march through
22  these one by one, if that's okay
23  with you.
24

MAGNA
LEGAL SERVICES

1  BY MR. ISAACSON:
2       Q.   If you would just list them.
3       A.   Sure.  So the Scully article
4  from '74 uses labor share as the
5  dependent variable in the context of an
6  analysis of the impact of monopsony on
7  labor share and the relaxation of certain
8  restrictions, similar to the restrictions
9  that are being challenged here.
10          In footnote 340, I list
11  articles that themselves refer back to
12  Scully's approach to estimating the
13  impact of various changes in labor
14  restrictions in professional sports that
15  also -- let me finish, please -- that
16  also study the impact using the same lens
17  that I did, which is that of labor share.
18       Q.   All right.  My question is
19  only who ran regressions with the labor
20  share as a dependant variable?
21       A.   I would -- I would want to
22  confirm each of those.  Sitting here, I
23  can't tell you that, in fact, they ran
24  regressions.  Sometimes the analysis is

1  to look at changes in labor share before
2  and after a change was made to the
3  restrictions in a sport.  And I just --
4  sitting here, I can't be certain that
5  each one of them used regressions.  I can
6  be certain that the dependent variable or
7  the variable of interest was labor share.
8          I would put Scully's article
9  from 2004 into this category.
10       Q.   And when you say you would
11  put it in this category, are you saying
12  Scully in 2004 ran a regression with
13  labor shares of the dependent variable?
14       A.   I believe so.  I know
15  that -- I know that the article uses
16  labor share as the lens with which to
17  view the impact of a change in a labor
18  market restriction in the sport, and I
19  know that there is econometrics in the
20  article.  I can remember, for example,
21  Scully estimating marginal revenue
22  products using econometric models.  I
23  will leave it at that.
24       Q.   Please -- so far, you have

1  cited Scully '74 and 2004.
2       A.   Oh, and then I cited -- in
3  footnote 340, the way that we found these
4  articles was by -- was by looking back to
5  citations to Scully where the authors
6  invoked the same lens of analysis to
7  study the impact of a -- of a change,
8  typically in a restriction, but generally
9  of labor mobility on compensation in the
10  sport among athletes.
11       Q.   I think you said, sitting
12  here today, you don't know whether any of
13  the citations in footnote 340 ran a
14  regression with labor share as a
15  dependent variable?
16       A.   That's correct.
17       Q.   Okay.  So please continue
18  with answering my question about any
19  other things you have cited where a
20  regression was run with labor share as a
21  dependent variable.
22       A.   Okay.  Again, I am going to
23  put Kahn in the same category.  This is
24  the cite on 346 and 347.  I think I had

1  earlier cited to Kahn, but Kahn is using
2  labor share as the lens of analysis to
3  study a change to labor rules governing
4  baseball, and sitting here, I am
5  hard-pressed to tell you that he used a
6  regression, which is I think the heart of
7  the question, to control for other
8  factors that may have changed around the
9  same time.
10          But whether or not he did, I
11  think the bone of contention between me
12  and your economist was whether -- was
13  whether labor share was the appropriate
14  lens with which to study the change in a
15  labor restriction on player compensation.
16       Q.   My actual question is not --
17          MR. ISAACSON:  And I move to
18  strike the answer.
19  BY MR. ISAACSON:
20       Q.   -- is not -- what's your
21  response to the bones of contention
22  between the economist in this case?  I
23  just want you to list articles with
24  regression analyses where the dependent

Page 559

1   authoritative source of MMA Fighter
2   rankings.
3          And for that, you cite the
4   definition of Javier Vazquez?
5          Is there anything else that
6   you would point to to support that?
7          MR. CRAMER: He signed the
8   exhibits, too.
9          MR. ISAACSON: Yes, he
10  signed the deposition exhibits.
11         MR. CRAMER: Let me just
12  lodge an objection. You've had
13  many hours to depose the witness
14  on the opening report, and this
15  report was written a long time
16  ago. You should have asked this
17  question at the opening report.
18         MR. ISAACSON: No. We -- we
19  allocated our -- we were allowed
20  to allocate our hours as to how we
21  wanted and whether we wanted to.
22  So we were allowed to do both
23  reports. That was the original
24  deal.

Page 560

1          MR. CRAMER: That's not my
2   understanding. I am not going to
3   direct him not to answer.
4          MR. ISAACSON: That was
5   actually written down because I
6   was --
7          MR. CRAMER: All right.
8   Well, I am not going to direct him
9   not to answer. I am just saying
10  you are asking him to remember
11  something from a long time ago.
12         But go ahead.
13         THE WITNESS: You are asking
14  me if there are other sources of
15  authority beyond those cited in
16  footnote 300 --
17         MR. ISAACSON: Yes.
18         THE WITNESS: -- which
19  includes these exhibits, 42, 43
20  and 44, as to whether Zuffa
21  considers the Fight Matrix data to
22  be authoritative?
23  BY MR. ISAACSON:
24     Q.   Yes.

Page 561

1      A.   Sitting here, I am not going
2   to be able to recall others, but it's
3   certainly conceivable that throughout my
4   report I mentioned others.
5      Q.   Okay. In your rebuttal
6   report, paragraph 124?
7      A.   Okay. I have got it.
8      Q.   Right. So there is a
9   discussion of coefficients that were not
10  statistically significant. And you say
11  that's not at all surprising that some
12  are not individually statistically
13  insignificant, and you explain why.
14     A.   I think you said -- oh,
15  never mind. Just keep -- keep going. I
16  am sorry.
17     Q.   All right. And your
18  conclusion is it's not at all surprising
19  that coefficients of some are
20  individually statistically significant,
21  but this does not apply that these
22  control variables are not collectively
23  significant.
24     A.   You almost said it right,

Page 562

1   but I think you used significant when you
2   meant to say insignificant. It's not
3   surprising that some are --
4      Q.   You are right. You are
5   right. Let me rephrase.
6      A.   -- individually -- I will
7   finish -- individually significant when
8   you consider the fact that they are
9   colinear with other -- a myriad of other
10  right-hand side variables in the
11  regression.
12     Q.   Let me rephrase my question.
13  In your opinion, it's not at all
14  surprising that coefficients on some are
15  individually statistically insignificant,
16  but that does not apply to control
17  variables are not collectively
18  significant?
19     A.   Well, let me hear the end of
20  that.
21         - - -
22         (The reporter read from the
23         record as requested.)
24         - - -

MAGNA
LEGAL SERVICES

Page 563

1      THE WITNESS:  I don't know
2  if that -- if that was phrased as
3  a question.  I can't -- I can't
4  hear the question.  I can't make
5  out the question.
6      No, I hear it, I hear it.  I
7  just can't figure out what the
8  question is.
9  BY MR. ISAACSON:
10     Q.   That's your opinion.
11     A.   But I think we have a common
12 understanding of what -- of what
13 happened.  But --
14     Q.   In your opinion, it's not
15 surprising that coefficients and some of
16 your coefficients in your regression are
17 individually statistically insignificant,
18 that does not apply that control
19 variables are not collectively
20 significant?
21     A.   If I could put it in my own
22 words, it's not surprising that -- that
23 some of the individual variables are --
24 are statistically insignificant in light

Page 564

1  of the fact that there is collinearity
2  among many of the explanatory variables
3  in the model.
4      Q.   You looked at the question
5  in this case how do earnings.  How do --
6  how does the labor share of revenue of
7  fighters compare to what they would have
8  earned in the competitive market; is that
9  fair?
10     A.   I would like to say how it
11 compares to a but-for world in which the
12 challenged conduct were absent or a
13 but-for world in which the foreclosure
14 share at tolerable levels, 30 percent
15 or below.
16     Q.   Okay.  So the relevant
17 question in this -- in this case to you
18 is what is the labor share of revenue to
19 fighters in a world in which the
20 foreclosure share is at what you call
21 tolerable levels, 30 percent or below?
22     A.   Correct.
23     Q.   Okay.  And do you think it's
24 an incorrect question in this case, how

Page 565

1  do the earnings of fighters compare to
2  what they would have earned in a
3  competitive market?
4      A.   I would certainly relate it
5  to what I did.  I think what we are
6  quibbling over is the end of your
7  sentence, which is a competitive market.
8  I want to allow for the possibility that
9  even when the foreclosure share gets as
10 low as 30 percent or 20 percent, there
11 still could be some residual monopsony
12 power enjoyed by Zuffa.
13     Q.   All right.  So do you think
14 you looked at the question of how do the
15 earnings of fighters compare to what they
16 would have earned in a market with
17 foreclosure shares of 30 percent or
18 lower?
19     A.   Sure.
20     Q.   Okay.
21      MR. ISAACSON:  If we can
22 mark this as whatever the next
23 exhibit is.  We don't have many,
24 but I have already lost track.

Page 566

1      MR. CRAMER:  I think we are
2  up to 9.
3      - - -
4      (Singer-9 marked for
5  identification at this time.)
6      - - -
7  BY MR. ISAACSON:
8      Q.   Exhibit-9 is an excerpt from
9  a Guide to Econometrics, Fifth Edition,
10 by Peter Kennedy.
11      Are you familiar with this
12 work?
13     A.   Yes.
14     Q.   Do you consider this a
15 reliable work in the field of
16 econometrics?
17     A.   Sure.
18     Q.   If you look at page 397,
19 there is a section called Getting the
20 Wrong Sign.
21     A.   Yes.
22     Q.   And it says:  A remarkably
23 common occurrence when doing applied work
24 is to run an a priori favorite

MAGNA
LEGAL SERVICES

Page 567

1  specification and discover a, quote/end
2  quote, wrong sign. Rather than
3  considering this a disaster, a researcher
4  should consider it a blessing -- this
5  result is a friendly message that some
6  detective work needs to be done -- there
7  is undoubtedly some shortcoming in one's
8  theory, data, specification or estimation
9  procedure -- theory, data, specification
10  or estimation procedure.
11       And then he goes on to talk
12  about what you should do for some
13  additional detective work.
14       Is that something you agree
15  with?
16       A.   Yes.
17       Q.   Okay.  And --
18       A.   Just to put this in context,
19  your expert is jumping up and down and
20  saying that there is the wrong sign, it
21  must be a --
22       Q.   Sir, there is no question.
23       A.   -- a specification error.
24       Q.   There is no question

Page 568

1  pending.
2       Now, then he goes on to list
3  ten reasons for getting the wrong signs,
4  potential reasons.
5       Do you see No. 1 is omitted
6  variable?
7       A.   Yes.
8       Q.   All right.  And then after
9  that, there is high variances?
10       A.   Do you want me to turn to
11  3 -- the next page?
12       Q.   398, right.  It's 398, yes.
13  It's actually --
14       A.   This may have been
15  mis-stapled, but I can't -- I can't see
16  --
17       Q.   It's actually just the way
18  you folded it.  If you look at page --
19  you were on page 397.
20       A.   Correct.
21       Q.   Now you are on page 398.
22       A.   I know.  I am looking to how
23  to get to 398, and I don't -- I don't see
24  it.  My next thing is 392, 393.

Page 569

1       MR. CRAMER:  Go in the other
2  direction.
3       THE WITNESS:  Okay.  I am at
4  398 now.
5       MR. CRAMER:  You owe me one.
6       THE WITNESS:  Okay.
7  BY MR. ISAACSON:
8       Q.   Okay.  And so it lists
9  omitted variable, high variances,
10  selection bias, a Latin phrase, ceteris
11  paribus confusion, data
12  definitions/measurements, outliers,
13  interaction terms, specification error,
14  simultaneity/lack of identification and
15  bad instrument.
16       Now, when you ran your
17  regression, did you believe any of the
18  signs in your variables appeared to be,
19  quote, wrong in the sense that
20  Mr. Kennedy is discussing?
21       A.   No, that's not something
22  that would concern me.
23       Q.   All right.  Did you analyze
24  whether any of these ten factors were

Page 570

1  present determined whether -- as an
2  explanation for the signs that you were
3  getting on your coefficients?
4       A.   Well, now I have been forced
5  to analyze multicollinearity as an
6  explanation for why we would get the
7  wrong expected sign on two of the
8  variables.  Same thing happened, of
9  course, in Dr. Topel's model.
10       But this shouldn't change
11  any inferences for what's important here,
12  which is getting the best unbiased
13  estimate of the foreclosure share on the
14  wage share.
15       Q.   So -- just so I understand,
16  after you got the results from your
17  coefficients, you looked at the issue of
18  collinearity.
19       Did you analyze any of the
20  other ten factors as explanations for the
21  signs you were getting on your
22  coefficients?
23       A.   Well, I was certainly
24  conscientious, in fact, more

MAGNA
LEGAL SERVICES

Page 647

1    Q.   All right.
2         MR. ISAACSON:  Thank you.  I
3    don't have any more questions.
4         MR. CRAMER:  Very good.
5         THE VIDEOGRAPHER:  Okay.
6    The time is 5:12 p.m.  This is the
7    end of Dr. Hal Singer's
8    deposition.  We are going off the
9    record.
10         - - -
11         (The deposition concluded at
12    5:12 p.m.)
13         - - -
14
15
16
17
18
19
20
21
22
23
24

Page 649

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4    carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8         After doing so, please sign the
9    errata sheet and date it.
10    You are signing same subject to the
11    changes you have noted on the errata
12    sheet, which will be attached to your
13    deposition.
14         It is imperative that you return
15    the original errata sheet to the deposing
16    attorney within thirty (30) days of
17    receipt of the deposition transcript by
18    you.  If you fail to do so, the
19    deposition transcript may be deemed to be
20    accurate and may be used in court.
21
22
23
24

Page 648

1         CERTIFICATE
2
3
4         I HEREBY CERTIFY that the
5    witness was duly sworn by me and that
6    the deposition is a true record of
7    the testimony given by the witness.
8
9
10
11
12    _____
13    Lori A. Zabielski
14    Registered Professional Reporter
15    CaseViewNet Reporter
16    Dated:  January 24, 2018
17
18
19
20
21
22         (The foregoing certification
      of this transcript does not apply to any
23    reproduction of the same by any means,
      unless under the direct control and/or
24    supervision of the certifying reporter.)

Page 650

1         - - - - - -
2         E R R A T A
3         - - - - - -
4    PAGE  LINE CHANGE
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____



Page 651

```
 1        ACKNOWLEDGEMENT OF DEPONENT
 2        I, _____, do
 3   hereby certify that I have read the
 4   foregoing pages,  338-652 PGS, and that
 5   the same is a correct transcription of
 6   the answers given by me to the questions
 7   therein propounded, except for the
 8   correction or changes in form or
 9   substance, if any, noted in the attached
10   Errata Sheet.
11
12   _____
     HAL J. SINGER, Ph.D.        DATE
13
14
15
16
17   Subscribed and sworn
18   to before me this
19   _____ day of _____, 20_____.
20   My commission expires:
21   _____.
22
23   _____
     Notary Public
24
```

Page 652

```
 1        LAWYER'S NOTES
 2   PAGE  LINE
 3   _____ _____ _____
 4   _____ _____ _____
 5   _____ _____ _____
 6   _____ _____ _____
 7   _____ _____ _____
 8   _____ _____ _____
 9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
```

