# EXHIBIT 66

## Redacted Excerpts from 30(b)(6) Deposition of Lawrence Epstein on Sponsorships

242

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


| CUNG LE; NATHAN QUARRY, JON | ) |
| FITCH, on behalf of | ) |
| themselves and all others | ) |
| similarly situated, | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
|        vs. | )   Case No. |
| | )   2:15-cv-01045-RFB-(PAL) |
| | ) |
| ZUFFA, LLC, d/b/a Ultimate | ) |
| Fighting Championship and | ) |
| UFC, | ) |
| | ) |
|        Defendant. | ) |
| | ) |


CONFIDENTIAL

VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

BY IKE LAWRENCE EPSTEIN

July 21, 2017

LAS VEGAS, NEVADA

11:00 a.m.



Reported by:
DEBRA D. SMALLEY, CCR #537
Job No. 51247-A

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

287

1    Q   But during those events surrounding a UFC fight,
2  the fighter would have to comply with the sponsorship
3  policies established in the league affiliation agreement?
4    A   I would --
5       MS. GRIGSBY:  Objection to form.
6       THE WITNESS:  I would say official UFC events.
7  And I think that migrated over a period of time, too.
8  I mean, I think initially it was just like the event
9  itself and athletes were wearing whatever they wanted
10  at those weigh-ins and at the, you know, the press
11  conference and all that stuff.
12       So it changed over a period of time, but just
13  so we're clear, it would only be UFC events.  If it
14  wasn't a UFC event, an athlete was doing an interview,
15  you know, with the media, Fight Week or chat -- you know,
16  sending Instagram pictures out of themselves, do whatever
17  they want.
18  BY MR. SILVERMAN:
19    Q   Before the approved sponsor program went into
20  effect, could an athlete wear    have an apparel sponsor,
21  wear that sponsor's logo into the Octagon, without that
22  sponsor paying any exposure fee?
23    A   It depended on whether the imagery contained
24  in those particular, you know, apparel items were --
25  were not derogatory in nature.  We had some sponsors

288

1  that had some sort of White Supremacist Nazi-type stuff
2  which we would not allow, so if there were certain images
3  we felt were inappropriate to associate with our brand,
4  no.  They couldn't wear those.
5    Q   But if the -- if the logo otherwise complied
6  with the existing policies about content, is it right
7  that before the approved sponsorship program went into
8  effect, the fighter could wear a sponsor's -- an apparel
9  company sponsor's logo into the Octagon without paying
10  an exposure fee?
11    A   That's correct.
12    Q   And starting some time around 2009?
13    A   I don't know when.
14    Q   But at some point --
15    A   Some time before, if this is accurate -- if
16  this email date is accurate as of August 4th, 2009, some
17  time before that.
18    Q   But at some point, Zuffa's policy on apparel
19  sponsors changed; is that right?
20    A   That's correct.
21    Q   Okay.  And at first did this change only apply
22  to apparel sponsors?
23    A   That's my recollection, yes.
24    Q   And I think you said this, but just to clarify,
25  in order to join the -- in order for an apparel company

289

1  to join the approved sponsor program after it went into
2  effect, at least the beginning stages of that program, is
3  it correct that they would have to sign a league or brand
4  affiliation agreement?
5    A   No, they could have signed a larger sponsorship
6  deal.
7    Q   Okay.  One or the other?
8    A   One or the other.
9    Q   But some agreement with Zuffa?
10    A   Correct.
11       I mean, other than the examples I gave you
12  before where we allowed Nike, we allowed, you know,
13  other brands, for certain reasons, or fighters
14  individually negotiated particular provisions that
15  allowed them to wear some of their brands into the
16  Octagon.
17    Q   And the only exception you can recall right
18  now to that was Nike, and were there any others?
19       MS. GRIGSBY:  Objection to form.  Misstates
20  testimony.
21       THE WITNESS:  I mean, I said -- I previously
22  mentioned I think for certain periods of time we allowed
23  Clinch Gear.  For certain periods of time we allowed
24  Punishment brands for Tito Ortiz.  Those are the ones
25  that I can remember off the top of my head.

290

1  BY MR. SILVERMAN:
2    Q   And none of those sponsors had any agreement
3  whatsoever with Zuffa or the UFC?
4    A   I mean, Nike never had any agreement ever.  I
5  know that for sure.
6       I don't recall any arrangements with Punishment
7  or Clinch Gear.
8    Q   So it's possible that they had agreements with
9  the UFC?
10    A   I guess anything is possible.  I just don't
11  recall one way or the other.
12    Q   Okay.  Yeah, what I'm asking for now are
13  exceptions that you can recall with confidence where
14  a fighter was able to wear a sponsor's logo into the
15  into the Octagon where that sponsor had no agreement
16  whatsoever with Zuffa or the UFC.
17    A   Yeah, and I guess the reason why it's hard to
18  answer your question is the athletes aren't just there
19  for one event.  Some of these athletes are for many
20  different events.  So the answer with respect to Dan
21  Henderson could be -- maybe at some time he entered
22  into an affiliation agreement, but I know -- I'm very
23  confident there are certain periods of time where he
24  negotiated an agreement that he could wear Clinch Gear.
25    Q   Now, in the case of Dan Henderson and Clinch

13  (Pages 287 to 290)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN



291

1   Gear, do you know if Dan -- was Clinch Gear owned by
2   Dan Henderson?
3       A   He had some connection to it, yeah.  I don't
4   know whether he owned it or not.
5       Q   Were -- at some point in time were -- did the
6   approved sponsor program expand to cover sponsors other
7   than just apparel sponsors?
8       A   Yes.
9       Q   What other types of sponsors were added?
10      A   Essentially all sponsors had to be approved
11  via some sort of league affiliation agreement.
12      Q   Do you recall when that change in policy went
13  into effect?
14      A   No.
15      Q   Is it fair to say it was some time after August
16  2009?
17      A   Yes.
18      Q   Because here Mr. Mersch is saying it only
19  pertains to tshirt and apparel companies in August 2009;
20  right?
21      A   Correct.
22      Q   Okay.  Actually, it's already been marked.  I'm
23  handing you what's been previously marked Mossholder
24  Exhibit 41.  Let me know when you've you had a chance
25  to look at it.

292

1       A   Okay.
2       Q   Here Mr. Mersch sends out an email, it looks
3   like to a bunch of -- a bunch of sponsors, looking at
4   the bottom half of the page Bates stamped 339.
5       A   Yeah.
6       Q   Just for the record, this is Bates stamped
7   ZFL-2198339.
20      Q   And this is the same program -- this approved
21  sponsor program, is this just what we were talking about,
22  essentially?
23      A   I don't know about -- about these on-line stores
24  because I --

293

15      A   You'd have to ask Mr. Mersch what he meant by
16  it.
17      Q   But Mr. Mersch was sending this email in his
18  official capacity implementing Zuffa's sponsorship
19  policies; is that right?
20      A   Absolutely.
21      Q   And is it true -- I mean, I think we've already
22  covered this, but just to -- just to make sure we're on
23  the same page, for sponsors who were included in the
24  approved sponsor program as it expanded, they did, in
25  fact, have to pay Zuffa exposure fees in order to

294

1   continue to sponsor fighters in the Octagon; right?
2       A   As I testified previously, I mean, that
3   was generally the rule, but there were a variety of
4   exceptions where we allowed brands like Nike and other
5   brands to put their logos on athletes in the Octagon.
6       Q   Is it fair to say that Nike is a special case
7   compared to, let's say, Combat Corner Professional, for
8   example?
9           MS. GRIGSBY:  Objection to form.
10          THE WITNESS:  I have no idea what you mean by
11  "special."
12          MR. SILVERMAN:  Yeah, let me -- let me clarify
13  it.
14  BY MR. SILVERMAN:
15      Q   So was it a benefit for Zuffa   for Zuffa's
16  brand to be associated with other highly acclaimed
17  major brands such as Nike?  Well established brands?
18      A   Certainly.
19      Q   Particularly brands outside the MMA space that
20  could bring legitimacy to Zuffa's brand in other areas
21  outside of MMA?
22      A   I wouldn't say they're out of the MMA space,
23  but, you know, we wanted to associate ourselves with
24  high-quality brands.
25          COURT REPORTER:  Pardon?

14  (Pages 291 to 294)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

295

1    THE WITNESS:  We wanted -- we wanted to
2  associate ourselves with high-quality brands.
3  BY MR. SILVERMAN:
4    Q   Was Zuffa's policy for negotiating sponsorship
5  arrangements with high quality brands, major brands,
6  different than for smaller brands who couldn't bring
7  Zuffa the   who couldn't bring the same patina to
8  to UFC's brand?
9    MS. GRIGSBY:  Objection to form.
10    THE WITNESS:  Not necessarily, no.
11  BY MR. SILVERMAN:
12    Q   But isn't it true that Zuffa sought to associate
13  itself with brands such as Nike?
14    A   And we continue to this day to want to associate
15  ourselves with high-quality brands.
16    I wouldn't consider Clinch Gear, by the way, a
17  high-quality brand, but we negotiated a separate deal
18  with Dan to allow that to happen, and there were many
19  other examples.
20    (Plaintiffs' Epstein Exhibit 34 was marked
21    for identification.)
22  BY MR. SILVERMAN:
23    Q   Okay.  So I'm handing you what's been marked
24  Epstein Exhibit
25    COURT REPORTER:  34.

296

1  BY MR. SILVERMAN:
2    Q   -- 34.
3    Let me know when you've had a chance to look
4  at it.
5    A   Okay.
6    Q   So at the bottom of the first page ending in
7  Bates stamp 374 -- oh, and for the record, this is
8  Bates stamped LEPLAINTIFFS-0032374.
9    This is another email exchange between
10  Mr. Mersch and Nate Quarry; right?
11    A   It looks like it.

297

3    Is that   is Mr. Mersch accurately stating
4  Zuffa's policy that   there in that email that he
5  responds to Nate that I just read?
6    A   Well, I think he responds to the first half
7  by saying "email me at Mike Mersch," and that's the
8  best way to -- you know, "The standard procedure is to
9  have the prospective sponsors contact me directly and I
10  will handle working out an agreement with them so they
11  can sponsor you and other fighters in the UFC," and he
12  leaves his email address, so the first half he answers
13  with that response.
14    Q   Is that an accurate description of the standard
15  procedure that Zuffa used?
16    A   It's -- it seems fine to me.  I don't remember
17  there being an official standard procedure, but it makes
18  sense they would contact Mike.
19    Q   Yeah.  And then
20    A   And with respect to Strikeforce, yeah, we
21  required Strikeforce -- the same -- the same things
22  applied to the Strikeforce brand.

298

3    Was that an accurate -- well, let me ask
4  first, is he describing the exposure fees that --
5  that companies are required to pay in their league
6  affiliation agreements as of June 10th, 2011?
7    A   I believe he is.  You'd have to ask him,
8  though.
9    Q   And -- but when he's communicating this
10  information to Nate Quarry, he was a fighter at the
11  time, he's acting in his official capacity as Zuffa's
12  representative for dealing with fighters as they deal
13  with their sponsors?
14    A   I guess so.  I mean, I don't know exactly what
15  deal with fighters dealing with sponsors means, but yeah.
16  I mean, in general, yes.  He certainly wasn't doing this
17  on his free time.
18    Q   Okay.  Was it part of his job to communicate
19  to fighters what Zuffa's policies were with respect to
20  which sponsors they could use or couldn't use?
21    A   Yes.

15  (Pages 295 to 298)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

299

███████████
███████████

3  So is it true that at some point supplement
4  companies were also added to the approved sponsor
5  program?
6  A  Yes.
7  Q  Okay. Do you recall when that was?
8  A  No.
9  Q  And did it depend on whether or not Zuffa
10  found -- or did the timing of that depend on when Zuffa
11  found a dominant player to be an official sponsor of the
12  UFC in the supplement category?
13  A  No.
14  Q  So is Mr. Mersch inaccurately characterizing
15  Zuffa's approach to adding supplements to the approved
16  sponsor program there?
17  A  No.
18  MS. GRIGSBY: Objection to form.
19  BY MR. SILVERMAN:
20  ███████████████████████
21  ███████████████████████
22  ███████████████████████
23  ███████████████████████
24  ███████████████████████
25  MS. GRIGSBY: Objection to form.

300

1  THE WITNESS: No, you're all over the place.
2  First of all, BSN was an official sponsor
3  previously, so I assume there was a program -- I mean,
4  there could have been a program in place when they were
5  sponsors. Now saying there's no sponsors, so you can
6  lock in an affiliation agreement probably at a lower
7  amount of money.
8  I mean, no, your question is -- I guess I don't
9  understand your question.
10  MR. SILVERMAN: Okay.
11  THE WITNESS: Because I don't believe those two
12  things are at all inconsistent.
13  BY MR. SILVERMAN:
14  Q  Okay. So when BSN was the official sponsor of
15  the UFC in the supplement category, did other supplement
16  companies who wanted to sponsor individual fighters in
17  the Octagon have to pay higher exposure fees?
18  A  I don't recall.
19  Q  Do you recall if, after BSN was out as the
20  official sponsor, they were replaced by another
21  dominant player in the -- in the supplement category
22  as an official sponsor of the UFC?
23  A  At some point MusclePharm came on. I don't
24  know if they became a dominant player. I don't know
25  what Mike meant by that, but MusclePharm certainly came

301

1  on as an official UFC sponsor at some point after BSN.
2  Q  And at that point, how did Zuffa's policy -- at
3  that point after MusclePharm became an official sponsor
4  of the UFC, do you know what Zuffa's policy was with
5  regards to other nutritional supplement companies
6  sponsoring individual fighters in the Octagon?
7  A  I don't specifically recall, no.
8  Q  I believe earlier you said that part of Zuffa's
9  goal or purpose in implementing the approved sponsor
10  program was to reduce the number of logos that appeared
11  on the fighters in the Octagon; is that right?
12  A  Correct.
13  Q  And I think you said also that as a -- as a
14  result of that, the number of sponsors who appeared in
15  the Octagon did, in fact, decline; is that right?
16  A  That's my recollection, yeah.
17  Q  As a result of that, were there some UFC
18  fighters who were receiving money from sponsors who
19  were no longer able to wear those sponsors' logos into
20  the Octagon?
21  A  I mean, as a result of what?
22  Q  The implementation of the approved sponsor
23  program.
24  A  That they were no longer allowed to wear
25  certain logos then?

302

1  Q  Um-hm. Yes.
2  A  Of course.
3  Q  As a result, did some fighters lose sponsorship
4  income that they were getting from those sponsors?
5  MS. GRIGSBY: Objection. Foundation.
6  THE WITNESS: You'd have to ask them.
7  BY MR. SILVERMAN:
8  Q  Was Zuffa concerned about losing UFC fighters
9  to other MMA promotions as a result of the implementation
10  of their approved sponsor program?
11  A  Yes. And to this day it continues to be used
12  as a significant negotiating point, particularly with
13  our main rival, Bellator, where every time they make
14  an offer to a fighter, they tell them "You can wear
15  anything you want into the Octagon."
16  In fact, I heard recently they are willing to
17  pay multi-million dollar fees if they ever change their
18  policy to the fighters.
19  Q  Why is that a selling point to a fighter?
20  A  Because I assume, you know, they're selling
21  it to them because they think, you know, the athletes
22  perceive they can make additional money via sponsors.
23  MS. GRIGSBY: Is now a good time to just take
24  a three-minute break?
25  MR. SILVERMAN: Sure. That's fine. Yeah. Why

16 (Pages 299 to 302)

303

1   don't we do that. Let's try to keep -- I mean, yeah,
2   let's do it.
3       THE VIDEOGRAPHER: This marks the end of media
4   one. We're off the record at 12:21 p.m.
5       (Off the record)
6       THE VIDEOGRAPHER: Back on the record. The time
7   is 12:31 p.m. This marks the beginning of media two in
8   the continuing video-recorded deposition of Lawrence
9   Epstein.
10      (Plaintiffs' Epstein Exhibit 35 was marked
11          for identification.)
12  BY MR. SILVERMAN:
13      **Q  I'm handing you what has been marked -- 35.
14  Epstein 35.**
15      A  Thank you.
16         Do you want me to read all this?
17      **Q  Why don't I point you to parts of it, and if
18  you want to read the rest let me know.**
19      A  Okay.
20      **Q  I mean, my first question, and if you have to
21  read the whole thing to answer this, then feel free, is
22  a bunch of these emails are from Michael Mersch to Nate
23  Quarry.
24         I guess all of them are a conversation between
25  Mersch and Quarry; is that right?**

304

1   A  It looks like it.
2       **Q  Did Mersch send these emails in his official
3   capacity?**
4   A  I assume he did, yes.
5       **Q  I mean, look at it long enough to determine if
6   there's anything that Zuffa would not have authorized.**
7   A  Well, those are two different questions. I
8   mean, I assume he's sending these emails to a fighter
9   in his official capacity. Whether he was authorized to
10  make every statement here, I don't know. I'd have to
11  read them all. But he certainly appears to have done
12  it in his official capacity as a UFC employee.
13      **Q  Okay. I think you mentioned that Zuffa's
14  creation of the approved sponsor program    well,
15  strike that.
16         Were fighters    were some fighters, at least,
17  unhappy with the approved sponsor program?**
18  A  I believe they were.
19      **Q  I believe you testified that Bellator uses it
20  as a selling point in fighter negotiations?**
21  A  They do.
22      **Q  Okay. Are you aware of the UFC ever losing a
23  fighter specifically to another MMA promotion because
24  of the approved sponsor program?**
25  A  I mean, I'm certainly aware of it, and once

305

1   again, now we're in a world where, if you call the
2   current situation with Reebok an approved sponsor
3   program, we're in a world where that is continually
4   a negotiating point. Every time an athlete hits the
5   free market, Bellator or other -- ONE FC, whoever the
6   competitor is, says "This is something we can offer
7   you that the UFC can't."

25      **MS. GRIGSBY: Objection to form.**

306

1       THE WITNESS: I assume so. You have to ask him,
2   though, but it looks like that.
3   BY MR. SILVERMAN:
4       **Q  But it's true that some time prior to February
5   2010, as we know from Mersch's earlier emails, Zuffa
6   created the approved sponsor program which did apply
7   to apparel companies; right?**
8   A  That's correct.

15      **MS. GRIGSBY: Objection to form.**
16      THE WITNESS: As I mentioned previously,
17  when it comes to fighters, that this has been a factor
18  that has been part of the negotiation process where
19  our competitors will use now the Reebok situation --
20  and previously the approved sponsor program -- as a
21  negotiating tool to get fighters to leave or to, you
22  know, go with them when they hit the free market.
23         So, I mean, that's just the reality of the
24  situation. That's the competitive environment we live
25  in.

17  (Pages 303 to 306)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN



339

1
3       **Did Mr. Mersch write that in his official**
4   **capacity?**
5       A   Of course.
6       **Q   Is he correct that Zuffa had a policy in 2010**
7   **of transitioning all of the sponsors to exclusivity with**
8   **Zuffa promoted fighters only?**
9       A   I don't recall whether we had a policy in place.
10  I think we were, at this point, phasing in the approved
11  sponsor program, but I can't say there was a firm policy.
12      (Plaintiffs' Epstein Exhibit 43 was marked
13      for identification.)
14  BY MR. SILVERMAN:
15      **Q   Handing you what's been marked as Epstein**
16  **Exhibit 43, which is Bates stamped ZFL-2149167.**
17

341

1       **Q   Okay.  What do you think he meant by that joke?**
2       A   You'd have to ask him, but clearly, he didn't
3   read the fact that there was a smiley face afterwards,
4   which clearly would indicate that it's a joke, so --
5       (Plaintiffs' Epstein Exhibit 44 was marked
6       for identification.)
7   BY MR. SILVERMAN:
8       **Q   I'm handing you what's been marked as Epstein**
9   **Exhibit 44, which is Bates stamped ZFL-2174221.**
10      **Have you had a chance to look at it?**
11      A   No.
12      Do you want me to read it?
13      **Q   Yeah, why don't you read it.  This is going**
14  **to be our last one.  Then we'll -- then we'll be done.**
15      A   Okay.
16      **Q   Okay.  So if you look at the second page, Bates**
17  **stamped 222, there's an email from Steve Izzy at SPRAWL**
18  **Fight Short Company to Mr. Mersch.**
19      **Do you know what SPRAWL Fight Short Company is?**
20      A   A fight short company.
21      **Q   Okay.  And that's apparel?**
22      A   Yeah.  They're -- they're one of the more
23  respected MMA-style short companies.
24

5       **Did Mr. Mersch write that email in his official**
6   **capacity?**
7       A   Yes.
8       **Q   Is it fair to say that the approved sponsorship**
9   **program -- the approved sponsor program was being phased**
10  **in in 2010 based on Mr. Mersch's representation in August**
11  **2010?**
12      A   It looks like it.
13

20      **Did Mr. Mersch write that email in his**
21  **official capacity?**
22      A   He even includes the smiley face.
23      **Q   There is a smiley face.**
24      **Yes?**
25      A   He was obviously joking.

16      **Did Mr. Mersch write that email on July 13th,**
17  **2010 in his official capacity?**
18      A   Yes.
19      **Q   Okay.  Do you know why he said that Zuffa was**
20  **particularly looking at Strikeforce and Bellator?**
21      A   Both major competitors, both were doing what
22  I said previously, which is making their product look
23  exactly like ours, with a similar enclosure, with similar
24  sponsors and so, you know, we were enforcing it with
25  respect to them because of what their business model

26 (Pages 339 to 342)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

343

1  was.
2  **Q   And that was before Zuffa acquired Strikeforce;**
3  **is that right?**
4  A   Yes.



24  **Did Mr. Mersch write that email in his official**
25  **capacity?**

344

1  A   Yes.
2  **Q   Okay.  Why do you think -- strike that.**
3        **What was he referring to -- strike that.**
4        **Why do you think he referred specifically to**
5  **providing Strikeforce fighters with a revenue stream?**
6  A   You should ask him.  I have no idea.
7        MR. SILVERMAN:  All right.  That's all I've got.
8        THE WITNESS:  Thank you very much.
9        MR. SILVERMAN:  Thanks.  Sorry we ran a bit
10  over.
11        THE VIDEOGRAPHER:  This concludes today's
12  deposition of Lawrence Epstein.  We're off the record
13  at 1:46 p.m.
14        (Time Noted:  1:46 p.m.)
15
16
17
18
19
20
21
22
23
24
25

345

2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____)
5
6
7        I, IKE LAWRENCE EPSTEIN, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15        _____
16        IKE LAWRENCE EPSTEIN
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2017.
22
23  _____
24        Notary Public
25

346

1        REPORTER'S CERTIFICATION
2
3        I, Debra D. Smalley, Registered Merit Reporter,
4  Certified Shorthand Reporter, in and for the State
5  of California, do hereby certify:
6
7        That the foregoing witness was by me duly sworn;
8  that the deposition was then taken before me at the
9  time and place herein set forth; that the testimony and
10  proceedings were reported stenograhically by me and
11  later transcribed into typewriting under my direction;
12  that the foregoing is a true record of the testimony
13  and proceedings taken at that time.
14
15        IN WITNESS WHEREOF, I have subscribed my name this
16  date:
17
18
19
20        _____
21        DEBRA D. SMALLEY, RMR
21        CSR NO. 8513
22
23
24
25

27  (Pages 343 to 346)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

347

1          INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7       After doing so, please sign the errata sheet
8    and date it.
9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

348

1          E R R A T A
2
3
4
5       I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE:_____
18   REASON:_____
19   ___ ___ CHANGE:_____
20   REASON:_____
21
22   _____  _____
23    WITNESS' SIGNATURE        DATE
24
25

28  (Pages 347 to 348)