# EXHIBIT 37
# Redacted Excerpts of First Deposition of Dr. Hal Singer (Singer Dep. I)

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEVADA

                      - - -

IN RE:                          :  Civil Action
                                :  DOCKET NO.
CUNG LE, NATHAN QUARRY,         :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,        :  (PAL)
LUIS JAVIER VAZQUEZ and         :
KYLE KINGSBURG, on behalf       :  CLASS ACTION
of themselves and all           :
others similarly                :
situated,                       :
                                :
           Plaintiffs,           :
                                :
           v.                    :
                                :
ZUFFA, LLC, d/b/a               :
ULTIMATE FIGHTING               :
CHAMPIONSHIP and UFC,           :
                                :
           Defendants.           :

                      - - -
            Wednesday, September 27, 2017
                      - - -

           Videotaped deposition of
   HAL J. SINGER, Ph.D., taken pursuant to
   notice, was held at the law offices of
   Berger & Montague, P.C., 1622 Locust
   Street, Philadelphia, Pennsylvania 19103,
   beginning at 9:24 AM, on the above date,
   before Constance S. Kent, a Certified
   Court Reporter, Registered Professional
   Reporter, Certified LiveNote Reporter, and
   Notary Public in and for the Commonwealth
   of Pennsylvania.
                    *  *  *
             MAGNA LEGAL SERVICES
                (866) 624-6221
                www.MagnaLS.com
```



Page 50

1      THE WITNESS:  I can't think
2   of others.
3   BY MR. ISAACSON:
4      Q.   All right.  Now, you do
5   define markets in your report at a high
6   level.  Let me see if I've got what
7   you've got.
8           For input markets, you've
9   defined a tracked market by referring to
10  data from FightMetric -- FightMetrics
11  (sic) right?
12     A.   I certainly use FightMetrics
13  (sic), but I prefer to say that I have --
14  I have a relevant input market and a
15  relevant input submarket, and I use two
16  different standard industry databases to
17  identify the fighters in the relevant
18  input market.
19     Q.   Right.
20     A.   One is FightMetric, the
21  other one is Fight Matrix.  I'm very
22  upset about those names, but that's --
23     Q.   Right, they're not helpful
24  to us.

Page 51

1      A.   They're not helpful.
2      Q.   But we'll live with them.
3           But -- so you have two
4   relevant input markets:  A tracked market
5   which -- for which you draw data from
6   FightMetric, and a ranked market which
7   draws from data from Fight Matrix,
8   together with the data from FightMetric.
9           Do I have that right?
10     A.   Again, I would prefer to say
11  there's one relevant input market that
12  we're -- that we're trying to measure and
13  I have two different ways of measuring
14  it.  One relies on a database from
15  FightMetrics (sic), which I refer to as
16  the tracked method.  That's -- that's
17  really the beginning, because as you
18  probably are aware, there's a few
19  additions that I tack on to -- to even
20  that measure.
21          And then as we move from the
22  tracked measure to the ranked measure,
23  I -- I include everybody who made it into
24  the tracked and I add on additional

Page 52

1   fighters who were ranked, but not
2   tracked, as well as one other MMA
3   organization.
4      Q.   So those are two -- do I
5   understand it right, those are two
6   different relevant input markets that
7   you -- that you have defined?
8      A.   This -- this could be a
9   matter of semantics, but I prefer to say
10  there's one relevant input market and
11  these are two different ways to measure
12  it.
13     Q.   What is the one relevant
14  input market?
15     A.   It's -- I think I've defined
16  it in the report.
17     Q.   Feel free to point me in the
18  report.
19     A.   Okay.
20     Q.   If it helps you, the
21  relevant input market discussion is on
22  page 66.
23     A.   Well, if we're going to call
24  it anything by shorthand, I would prefer

Page 53

1   to use the term relevant input market.  I
2   think that the language in the report
3   explains what I'm trying to get at, which
4   is a set of fighters with MMA fighter
5   services that would be used by an MMA
6   promotion organization to stage live
7   events.
8      Q.   You told me you preferred to
9   say there's one relevant input market and
10  there's two different ways to measure it.
11          What is the one relevant
12  input market?
13          MR. CRAMER:  Asked and
14     answered.
15          THE WITNESS:  These are --
16     these are MMA fighters who are
17     used as input to the production of
18     live MMA events.
19          And to clarify it, I said
20     two.  Of course there's a --
21     there's a third -- a submarket.  I
22     don't know if --
23  BY MR. ISAACSON:
24     Q.   Yeah, we'll get to the



14 (Pages 50 to 53)

Page 54

1  submarket.
2     A.  Okay.
3     Q.  The -- all right.  And the
4  submarket is the -- you used the
5  headliner definition; is that right?
6     A.  Correct.
7     Q.  And am I correct that in
8  your opinion, there would be no broader
9  market than the markets you have defined
10 using the tracked measure or the ranked
11 measure?
12    A.  Correct, there's no broader
13 market.  Already I think that the ranked
14 market is -- is potentially overly broad.
15    Q.  And when you -- when you say
16 there's no broader market, that would
17 mean there's no reasonable substitutes
18 outside those markets if, for example,
19 fighter pay where to go up?
20    A.  That's not quite what I
21 mean.
22    Q.  Well, let me ask you this.
23 Then let me just ask you this question:
24 In your opinion, are there no reasonable

Page 55

1  out -- substitutes outside the tracked
2  market and the ranked market if fighter
3  pay rises?
4        MR. CRAMER:  From what level
5     to what level?
6        MR. ISAACSON:  It goes up.
7        MR. CRAMER:  Okay.
8        THE WITNESS:  So I do
9     allow -- before I answer the
10    question, I just want to make sure
11    you understand how I get to the
12    market.  It's not entirely driven
13    by reasonable substitutes.  I'm
14    asking -- I'm trying to employ the
15    SSNIP test from the merger
16    guidelines, and I'm looking for
17    the smallest set of fighters such
18    that a hypothetical monopsonist
19    could exercise market power.
20       And that -- that is the
21    question that -- that drives the
22    analysis.
23 BY MR. ISAACSON:
24    Q.  And I'll ask you about your

Page 56

1  SSNIP analysis, which is S-S-N-I-P.
2        But just returning to my
3  question, in your opinion, are there no
4  reasonable substitutes outside the
5  tracked market and the ranked market if
6  fighter pay goes up?
7     A.  So that -- you haven't
8  posited the correct question for market
9  definition.  It's not if fighter pay goes
10 up.  It's -- the question is if -- if
11 Zuffa were to control a certain set of
12 fighters, could -- could Zuffa exercise
13 market power in the form of pushing wages
14 down?  You keep saying if prices go up.
15 That's not the -- that's not market --
16    Q.  I appreciate you telling me
17 I'm not asking the correct questions --
18    A.  Well, I mean --
19    Q.  But let's stick with --
20 let's stick with answering my questions.
21    A.  Okay.  Well, okay, but if
22 you ask me a question that makes no sense
23 as a matter of economics, I can't give
24 you an answer.

Page 57

1     Q.  In your opinion -- in your
2  opinion, are there no reasonable
3  substitutes for the fighters outside the
4  tracked market and outside the ranked
5  market?
6     A.  I would put the caveat that
7  if a hypothetical monopsonist controlled
8  all of the fighters in either of those
9  two markets, it would be able to
10 successfully exercise a wage suppression
11 below competitive levels without having
12 to fear that a sufficient number of
13 fighters inside of its net would -- would
14 substitute to something outside of the
15 net.
16       And that's a long way of
17 answering your question, but I think
18 doing so more precisely as to what is
19 considered reasonable.
20       If you -- if you have, say,
21 all of the ranked fighters, and you're
22 looking at it from the perspective of a
23 given ranked fighter, let's suppose a
24 highly ranked fighter, he or she will not

Page 58

1  find it reasonable to go to an
2  organization that cannot afford him or
3  her any quality opponents to fight.  If
4  you can't fight a highly-ranked opponent,
5  you have no chance of moving up the
6  rankings.
7          And so I'm answering a
8  related question, which I think is the
9  more important question.  And I'll leave
10 it at that.
11    Q.   Okay.  So in general it's
12 going to help me today if you answer my
13 questions and not the related questions
14 you think are more important.  You'll
15 have the opportunity to do the related
16 questions you think are more important
17 with your counsel, but I'm under time
18 limits.
19          And I understand you gave an
20 explanation, but was the answer to my
21 question, yes, that in your opinion there
22 are no reasonable substitutes for the
23 fighters outside of the tracked market
24 and outside the ranked market?

Page 59

1          MR. CRAMER:  Objection to
2      form.
3          THE WITNESS:  I'm saying for
4      certain fighters inside of that
5      category or class, depending on
6      how you define the market, there
7      might be what that one fighter
8      considers to be a reasonable
9      substitute, but that doesn't end
10     the inquiry.
11         The question is would there
12     be a sufficient number of fighters
13     inside of that definition such
14     that a hypothetical monopsonist
15     trying to exercise market power
16     would be -- would be defeated in
17     the sense that it would suffer a
18     profit loss by trying to push
19     wages below competitive wages.
20         One fighter within the set
21     finding an outlet to be
22     reasonable, right, doesn't cut it.
23 BY MR. ISAACSON:
24    Q.   The -- okay.  I think I

Page 60

1  understand.  So what I -- if I understand
2  what you're saying is, in your opinion,
3  there's not a sufficient number of
4  reasonable substitutes of fighters
5  outside the tracked markets and outside
6  the ranked market to affect your market
7  definition?
8     A.   I wouldn't put it that way.
9     Q.   I understand you were
10 saying -- before I said there are no
11 reasonable substitutes and you're saying
12 one doesn't matter.  The -- so tell me
13 how you would put it.
14    A.   There would have to be
15 enough fighters in your -- in your
16 defined set that would consider these
17 outside options reasonable so as to
18 defeat the wage decrease -- so as to
19 render the wage decrease unprofitable.
20    Q.   Okay.  All right.  So just
21 to sum it up, in your opinion, there's
22 not a sufficient number of reasonable
23 substitutes of fighters outside the
24 tracked market or outside the ranked

Page 61

1  market to defeat a wage decrease if that
2  were to happen?
3     A.   I'd like to put it back in
4  my own words, that once you've defined
5  the set as I've done it, there wouldn't
6  be sufficient defection or substitution
7  away to forums or venues outside of the
8  definition by fighters inside of the
9  market so as to render this hypothetical
10 wage decrease unprofitable.
11    Q.   Right.  Okay.  Now, is it --
12 would it be the case that, in general,
13 fighters outside of the ranked and
14 tracked markets would not be affected by
15 wage increases within those markets?
16         MR. CRAMER:  Form.
17         THE WITNESS:  That is --
18     that is outside I believe of the
19     scope of anything that -- that
20     I've studied.  I'd have to think
21     about it.  But it's unrelated to
22     what I think the relevant question
23     is for determining the relevant
24     product market -- the relevant



Page 114

1  Q.  All right.  Let me try it
2  this way then.  Can you identify any
3  peer-reviewed literature looking at
4  labor's share of revenues as the variable
5  of interest in determining
6  anticompetitive impact?
7      MR. CRAMER:  Form.  Asked
8      and answered.
9      THE WITNESS:  I don't know
10     if I'm -- if I'm going to be able
11     to call up names of particular
12     articles off the top of my head,
13     but I can tell you that -- that
14     the wage share of marginal revenue
15     product is the way that you
16     understand competition in
17     competitive labor markets and how
18     you understand the opposite.
19 BY MR. ISAACSON:
20  Q.  All right.  The -- and I
21 think -- and I'll come to that subject
22 right now, but right now you can't tell
23 me any peer-reviewed literature that
24 looked -- that analyzes anticompetitive

Page 115

1  impact by looking at labor share of
2  revenues; is that right?
3      MR. CRAMER:  Asked and
4      answered.
5      THE WITNESS:  I believe I've
6      cited some in my report, but
7      sitting here I can't -- I can't
8      tell you a particular article.
9  BY MR. ISAACSON:
10  Q.  All right.  If you look at
11 page 120 of your report, footnote 454?
12  A.  Yes.
13  Q.  You talk about elementary
14 economics which shows that competitive
15 firms paid labor a share of revenue
16 commensurate with labor's productivity
17 based on a marginal product to labor.
18      That's the principle that
19 you were just discussing with me?
20  A.  Yes.
21  Q.  Is that right?
22      And -- now the marginal
23 revenue product labor is the value of the
24 additional output created when a firm

Page 116

1  adds a worker, am I correct?
2   A.  I think that's a fair -- a
3  fair concept.
4   Q.  And is it -- is it correct
5  that standard economics would predict
6  that a worker's compensation would be
7  equal to that marginal revenue product of
8  labor?
9   A.  In a competitive
10 environment, the labor's share of his or
11 her marginal revenue product tends
12 towards higher values, and the limit
13 would -- would approach his or her
14 marginal revenue product.
15  Q.  And in a competitive
16 environment, standard economics would say
17 that the -- actually, let me start over.
18      When you expressed that
19 marginal revenue product is labor or
20 wages, do you ordinarily do that in
21 dollar terms or in a fraction of the
22 firm's revenue?
23      MR. CRAMER:  Objection to
24      form.

Page 117

1      THE WITNESS:  Do I
2      ordinarily do it?  I'm sorry, I'm
3      just not following.
4  BY MR. ISAACSON:
5   Q.  How about in standard
6  economics?
7      MR. CRAMER:  Same objection.
8      THE WITNESS:  I think that
9      in standard economics you would
10     put the wage in the numerator and
11     you'd put the marginal revenue
12     product in the denominator.
13 BY MR. ISAACSON:
14  Q.  And the marginal revenue
15 product would be expressed as a dollar
16 value?
17  A.  Yes.
18  Q.  And do economists ordinarily
19 measure the productivity of the
20 additional output -- well, let me put it
21 differently.
22      Do economists generally
23 measure the productivity created when a
24 firm adds a worker in dollar terms as



30 (Pages 114 to 117)

Page 118

1  opposed to as a percentage of revenue?
2       MR. CRAMER:  Objection to
3    form, to generally.  For what
4    purpose?
5       THE WITNESS:  A firm could,
6    if a firm bills -- if a law firm
7    bills an associate out at $400 an
8    hour, it could express what the --
9    what the young lawyer's salary on
10   an hourly basis is as a -- under
11   an assumed utilization rate as a
12   percentage of that young lawyer's
13   bill rate.
14 BY MR. ISAACSON:
15   Q.   And are you aware of any
16 studies which express the marginal
17 revenue product of labor in terms of the
18 percentage of revenue of the firm?
19   A.   I'm not aware, but as you've
20 expressed it, that's not quite what I'm
21 doing either.
22   Q.   Now, in terms of -- did you
23 make any effort to measure the marginal
24 revenue product of labor of UFC fighters?

Page 119

1    A.   Yes.
2    Q.   Okay.  And what would you
3  point to me for that?
4    A.   What I did, which is I -- I
5  calculated the average revenue per event,
6  per fighter, and I'm using that as a
7  proxy for the marginal revenue product.
8    Q.   All right.  If the
9  average -- when you look at the average
10 revenue per event, per fighter, how do
11 you determine what part of that revenue
12 is the contribution of the fighter as
13 opposed to, for example, marketing,
14 promotions, production or the work of the
15 overall firm?
16   A.   So for my purposes, I don't
17 need to figure out that -- that
18 decomposition.  I will note, however,
19 that I cite a study in my literature
20 review section that suggests that the
21 fighter is responsible for, if not all,
22 the vast majority of -- of the
23 pay-per-view revenues that are captured
24 and not the brand.

Page 120

1    Q.   Well, I didn't ask about the
2  brand.
3         The -- you would agree --
4  you would agree with me that effective
5  marketing and promotion could increase
6  the average revenue per event, correct?
7    A.   Yes.
8    Q.   And you would agree with me
9  that super- -- improving television
10 production can increase the average
11 revenue per event?
12      MR. CRAMER:  All things
13   equal?
14      MR. ISAACSON:  Yes.
15      THE WITNESS:  I'm not sure
16   what -- what you mean by improving
17   television production.
18 BY MR. ISAACSON:
19   Q.   A better production that
20 people enjoy more.
21      MR. CRAMER:  Objection to
22   form.
23      THE WITNESS:  And you're
24   asking me if I can conceive of

Page 121

1    this as a matter of theory?
2  BY MR. ISAACSON:
3    Q.   Yes.
4    A.   As opposed to whether it
5  actually happened?
6    Q.   Yes.
7    A.   I think I'm -- I'm going to
8  grant you that as a matter of theory one
9  could -- one could add value by
10 increasing the quality of the production.
11   Q.   Okay.  Now, in this case,
12 you did not do an actual study yourself
13 of the contribution of the UFC fighters
14 to the average revenue per event; is that
15 right?
16      MR. CRAMER:  Asked and
17   answered.
18      THE WITNESS:  I think that's
19   correct.  As I noted a few moments
20   ago, that was not necessary for my
21   purposes.
22 BY MR. ISAACSON:
23   Q.   By using the average revenue
24 per event, per fighter as a proxy, were



31 (Pages 118 to 121)

Page 122

1  you using that as a proxy for the
2  marginal revenue product of that labor?
3      A.  Yes.
4      Q.  Okay.  And you were assuming
5  that all of that average revenue per
6  event, per fighter was the product of
7  that labor as opposed to some other
8  source?
9          MR. CRAMER:  Form.
10         THE WITNESS:  No, I don't
11     think I'm assuming that.
12 BY MR. ISAACSON:
13     Q.  When -- when you look at
14 average revenue -- I'm sorry.  When you
15 ordinarily look at the marginal revenue
16 product of labor, do you talk about
17 everybody who works in the firm including
18 management?
19         MR. CRAMER:  Objection to
20     form.
21         THE WITNESS:  If -- if this
22     were some other case and you were
23     interested in computing the
24     marginal revenue product of

Page 123

1     management, you might -- you might
2     be interested in that.  But that
3     wasn't what I was trying to do
4     here.
5  BY MR. ISAACSON:
6      Q.  All right.  Here, have you
7  attempted to actually estimate the
8  marginal revenue product of the fighter
9  portion of the labor force of the UFC?
10         MR. CRAMER:  Objection to
11     form.
12         THE WITNESS:  I think you're
13     getting at the same question now,
14     just asked in a different way
15     which is have I done a
16     decomposition of the marginal
17     revenue product between the
18     fighters and -- and Zuffa, and the
19     answer is no, I have not done that
20     decomposition.
21 BY MR. ISAACSON:

Page 124



4       Q.  You, yourself, have not
5  looked at the levels of pay over time
6  paid to Zuffa's fighters other than
7  looking at this study?
8           MR. CRAMER:  Objection to
9      form.
10          THE WITNESS:  So I wouldn't
11     put it that way.
12 BY MR. ISAACSON:
13     Q.  How would you put it?
14     A.  I am absolutely looking at
15 their pay over time in the sense that I'm
16 recording their pay as the numerator of
17 my dependent variable.  So to suggest
18 that I'm not looking at their -- their
19 pay is erroneous.



| | |
|---|---|
| Page 126 | Page 128 |

Page 126 (redacted)

Page 128:
```
 1        Q.   And one way is restricting
 2   the amount of labor hired and the other
 3   is restricting the compensation paid to
 4   labor?
 5        A.   Correct.
 6        Q.   And a traditional economy
 7   theory of monopsony would restrict the
 8   amount of labor hired, do I have that
 9   correct?
10        A.   Well, here the way that it
11   manifests itself is -- is a bit different
12   but -- because I'm, of course, thinking
13   of the shelving, but in other
14   applications, you can think about not
15   merely hiring, a monopsonist, all things
16   equal, generates less output and less
17   inputs than -- than does a competitive
18   firm.
19             I think as it's applied
20   here, the way that the suppression of
21   fights and output occurred was -- was in
22   part due to the shelving of fighters.  So
23   fighters were being hired, but not
24   necessarily deployed.
```

Page 129:
```
 1        Q.   All right.  Now, you were
 2   telling me how that was applied here, but
 3   am I correct that in traditional economic
 4   therapy, a monopsony restricts the amount
 5   of labor that's hired?
 6        A.   Yes.
 7        Q.   Now, we've been talking
 8   about --
 9        A.   I would amend hired or
10   deployed.
11        Q.   The -- we've been talking
12   about labor share or fighter share.  You
13   mentioned weighting by revenue before.
14   Let's come back -- let's go to that topic
15   now.
16             If we look at paragraph 128
17   of your report.
18        A.   Oh, did you want page 128 or
19   paragraph 128?
20        Q.   Paragraph 128.
21        A.   Give me one second.
22        Q.   Page 87.
23        A.   Okay.  Paragraph 128.
24        Q.   Yes.  Then there's a Figure
```

Page 127 (redacted, partial):
```
 8        Q.   How do I -- with the
 9   understanding that you've said that
10   marginal revenue product of labor is the
11   value of the additional output created
12   when the firm adds a worker, how do I
13   know how much increased percentage of
14   revenue should be paid to a worker based
15   on the marginal revenue product of their
16   labor?
17        A.   I don't think I understand
18   that question.
19        Q.   Okay.  Looking at 450 --
20   that footnote 454, you say firms that
21   wield monopsony power pay a smaller share
22   of revenue of labor and they do that in
23   two ways, right?
24        A.   Yes.
```



Page 190

1   what you're asking me to assume is
2   to assume there are no artificial
3   restrictions. I -- I don't know.
4   I'm trying -- when you say stand
5   alone, you need to give me more
6   context.
7   BY MR. ISAACSON:
8       Q.  That would be fine. Go
9   ahead and assume there are no artificial
10  barriers to entry, there would remain the
11  natural barriers to entry that you've
12  identified, do you consider those to be
13  high barriers to entry?
14      A.  I consider them to be
15  economically significant in the sense
16  that it might be hard for you or I to
17  enter tomorrow in a timely and seamless
18  way. But I think that a person like Mark
19  Cuban with access to capital and
20  experience in television and having his
21  own TV channel, there -- could likely
22  overcome the natural barriers.
23      Q.  The Strikeforce and Bellator
24  benchmarks, we talked about those this

Page 191

1   morning for purposes of damages.
2       A.  Yes.
3       Q.  I'm going to return to that
4   topic.
5           In those benchmarks, you are
6   using two competitors of -- of Zuffa
7   comparing the percentage of their
8   revenues paid to labor or paid to the
9   fighters to that of Zuffa. I think we've
10  established that, correct?
11      A.  Correct.
12      Q.  Okay. Why in economic
13  theory would you use the percentage of
14  revenue paid to labor by a competitor as
15  a benchmark?
16      A.  Because this is a voluntary
17  transaction between a willing buyer and a
18  willing seller as to the appropriate wage
19  in the -- in the MMA industry. And so I
20  think if we're looking for -- for
21  reasonable comparables that exist within
22  the same relevant market, this is the
23  logical place to start looking.
24      Q.  When you use the term

Page 192

1   appropriate wage.
2       A.  Yes.
3       Q.  Are the Bellator -- is
4   Bellator paying the fighters higher
5   average wages than the UFC?
6       A.  I'd say it depends on which
7   fighter you're talking about, but --
8       Q.  I said average.
9       A.  Yeah, the weight -- sorry.
10          MR. CRAMER: I was going to
11  say you mean today, Bellator?
12          MR. ISAACSON: At any time.
13          THE WITNESS: ▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮.
18  BY MR. ISAACSON:
19      Q.  So why, in economic theory,
20  would you use the percentage of revenues
21  that a competitor allocates to the labor
22  as a benchmark as opposed to the -- the
23  actual appropriate wage that they decided
24  to pay?

Page 193

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9           Now, imagine a but-for world
10  in which you strip out the exclusionary
11  contracts and Strikeforce and Bellator
12  and others are able to evolve into
13  legitimate and viable contenders for this
14  market, what would likely happen is that
15  their output would expand, their revenues
16  would expand and now ▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would start
19  to draw fighters away from UFC and
20  towards those rivals.
21          And now the question is what
22  does Zuffa have to do in this -- in this
23  but-for world? Is Zuffa able to stay on
24  its ▮▮▮▮▮▮▮▮▮▮ when were all of its

Page 194

```
 1   rivals are drawing the fighters away at
 2   ▮▮▮▮▮▮▮▮▮▮?  No.  They'd have
 3   to -- they'd have to come up.  And the
 4   question is where would they come up to.
 5   And I think a very reasonable estimate of
 6   where they would -- where they would come
 7   up to in a competitive market are the
 8   actual numbers that -- that its rivals
 9   are offering.
10        Q.   Are there competitive
11   markets where different firms pay very
12   different percentages of their revenues
13   to laborers?
14        A.   It's possible.
15        Q.   Is there any reason to
16   believe in a competitive market that
17   firms would not make different decisions
18   about what percentage of revenues to pay
19   to labor as long as they were all paying
20   what they thought was the appropriate
21   wage?
22             MR. CRAMER:  Objection to
23        form.
24             THE WITNESS:  Let me hear it
```

Page 195

```
 1   back?
 2             (Pertinent portion of the
 3        record is read.)
 4             MR. CRAMER:  Form.
 5             THE WITNESS:  In a
 6        competitive market appropriately,
 7        what you and I think is
 8        appropriate may not matter, right?
 9        If you start to lose your
10        employees because your rivals are
11        offering a higher wage share than
12        what you thought was appropriate,
13        may no longer be appropriate for
14        retaining your -- your labor
15        force.
16   BY MR. ISAACSON:
17        Q.   Right.  So I was trying to
18   echo your words.  You told me that you
19   thought it was appropriate to look at
20   Strikeforce and Bellator because this was
21   a voluntary transaction between a willing
22   buyer and willing seller as to the
23   appropriate wage in the MMA industry.
24        Is there any reason to
```

Page 196

```
 1   believe in a competitive market the firms
 2   would not make different decisions about
 3   what percentages of revenues to pay?
 4             MR. CRAMER:  Same objection,
 5        form.
 6   BY MR. ISAACSON:
 7        Q.   Pay to labor.
 8        A.   I think that in a
 9   competitive market I can -- I could be
10   sufficiently open minded to -- to
11   contemplate small differences in wage
12   shares that -- that are paid by different
13   firms.
14             What I -- what I can't
15   accept is the notion that one firm would
16   be able to pay -- in a competitive
17   market, one firm would be able to pay
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19   ▮▮▮▮▮▮.
20        Q.   Right.
21        A.   That equilibrium is not
22   sustainable in a competitive market.
23        Q.   And are you aware of any
24   economic literature or studies that have
```

Page 197

```
 1   looked at the issue of the relative --
 2   comparisons of the percentages of revenue
 3   paid to labor in competitive markets?
 4        A.   I'm invoking economic theory
 5   here, so I'm not prepared to tell you a
 6   particular study that captures that
 7   particular effect.
 8        Q.   Right.  Do you know for a
 9   fact whether there are -- whether or not
10   there are industries where one company
11   decides to allocate ▮▮▮▮▮▮▮▮ its --
12   let's start this over.
13             I don't know, in fact,
14   whether there are competitive markets
15   where one company decides to allocate
16   ▮▮▮▮▮▮▮▮ of its revenues to labor and
17   another decides to allocate ▮▮▮▮▮▮
18   and then they compete?
19        A.   I can't tell you examples of
20   those, and I think -- I think it would
21   be -- it would be an unlikely equilibrium
22   in a competitive market.  I mean, I
23   imagine a world in which Boies Schiller
24   tries to pay its associates who bill at
```



50 (Pages 194 to 197)

Page 198

1  $400 an hour, 5 percent of their bill
2  rate, and Covington is paying 20 percent.
3  It would be very hard for Boies Schiller
4  to retain its staff under those
5  conditions.
6      Q.  Assuming both firms are of
7  approximately equal size?
8      A.  In a competitive market,
9  correct.
10     Q.  And have you previously in
11 estimating damages or -- or anti-
12 competitive effect ever looked to a
13 benchmark of the percentage of revenues
14 paid by a competitor to labor?
15     A.  Yes, I have.
16     Q.  And what was that?
17     A.  That would be the Arizona
18 travel case -- Arizona travel nurse case.
19     Q.  And tell me the competitive
20 firms you looked at in terms of
21 percentage of revenue and the benchmark
22 you used?
23     A.  I used neighboring states
24 that were not subject to the conspiracy,

Page 199

1  allegedly subject to the conspiracy as a
2  benchmark for the competitive rate of
3  the -- portion of the bill rate that
4  flowed through to the -- to the travel
5  nurses.
6         But I do benchmarking
7  analyses for fair market value studies in
8  many applications.  I'm thinking about my
9  work for the Baltimore Orioles and trying
10 to figure out fair market value of the
11 rights fees for the Nationals.  We fight
12 like cats over this, and we're always
13 looking for comparables, and what we want
14 to do is go out and find a recent
15 transaction between a willing buyer and a
16 willing seller and we want to control for
17 the size of the market.
18     Q.  I'm not --
19     A.  Let me just finish.
20         One expert might say let's
21 use Los Angeles as the -- as the --
22 hypothetically as the proper benchmark
23 for what the Nationals should be paid by
24 the television network, and we fight out

Page 200

1  about, well, don't you need to control
2  for the fact that the revenues in the
3  population of Los Angeles are this much
4  bigger than Washington.
5         So this notion of going out
6  and looking for comparables and
7  correcting for market size or revenue is
8  a very common occurrence in my business.
9      Q.  I understand you've used
10 benchmarks before.  I'm being much more
11 specific just in terms of the benchmark
12 of a competitor.  Now, when you looked --
13 when you looked at other states in
14 Arizona, you weren't looking at
15 competitors within the state, right?
16     A.  No, we were.
17     Q.  Okay.
18     A.  We were, right, because
19 those were hospitals that were not-- no,
20 but this is important.  These were
21 hospitals that were not subject to the
22 conspiracy.  The conspiracy was alleged
23 to have only occurred in Arizona.
24         So when we look at the

Page 201

1  neighboring southwestern states, we're
2  finding a comparable, we're finding a
3  firm that is not -- that is paying what
4  we think is the competitive share of
5  the -- of the bill rate to the nurses.
6      Q.  My question is just simply:
7  You were saying you looked at competitive
8  hospitals outside of state -- outside the
9  state?
10     A.  Correct.
11     Q.  Okay.  And the -- and what
12 was the number of firms outside of the
13 state that you looked at to get that
14 percentage of, I think, billing?
15     A.  We got -- we got state level
16 aggregates and we used the state level
17 aggregates as our benchmark.
18     Q.  So would the state level
19 aggregates consist of all the hospitals
20 in the neighboring states?
21     A.  Correct.
22     Q.  So it's quite a number of --
23 of firms that you were going the
24 comparison to?



Page 274

1  transportation of those at any point.  I
2  understand that's a separate issue.
3      A.  Okay.
4      Q.  Okay?  But in terms of the
5  use of identity in Fight Pass clips, in
6  posters, in television clips, all right,
7  are those acts that tend to foreclose
8  competition as opposed to being possibly
9  acts that are the result of restrictions
10 on competition?
11     A.  I don't think I take an
12 opinion on -- on the use of the fighter's
13 rights in a -- in a video clip as being
14 anticompetitive.  I don't think I offer
15 that opinion.
16         MR. ISAACSON:  Okay.  Now
17     we'll take a break.
18         THE VIDEOGRAPHER:  The time
19     is 3:19 PM.  We are going off the
20     record.
21         (Recess.)
22         THE VIDEOGRAPHER:  The time
23     is 3:31 PM.  We are back on the
24     record.

Page 275

1  BY MR. ISAACSON:
2      Q.  The Table 6, which shows
3  results of your foreclosure regression,
4  125 and 126.
5      A.  Okay.
6      Q.  126 has a line towards the
7  bottom, "Fighter Fixed Effects?"  Right
8  above observation.
9      A.  Yes.
10     Q.  Now, am I right that for
11 fighter fixed effects, you use a dummy
12 variable for each fighter?
13     A.  Correct.
14     Q.  And there are a list of
15 fixed effects in the notes, gender, win
16 method, weight class, card placement,
17 bout number, promoter, year, country and
18 venue.  Were there individual dummies for
19 each one of those fixed effects?
20     A.  No.  So a fixed effect like
21 gender doesn't require individualized
22 variables, right?  In contrast, fighter
23 fixed effects does -- does vary -- does
24 require an individual dummy for each

Page 276

1  fighter.
2      Q.  All right.  So it -- so it
3  was one -- fighter fixed effects was one
4  dummy variable for each fighter?
5      A.  Correct.
6      Q.  And was that a variable you
7  turned on and off?
8      A.  Well, this is code in statu
9  where you can say that on the next time
10 you run this regression, I want you to --
11 to control for the identity of the
12 fighter.  So every time you see an
13 observation where John is present, let
14 that dummy turn on, and that causes the
15 regression to do different things.  And
16 that is a different dummy than, say, a
17 gender dummy or a weight class dummy,
18 which -- which would be defined
19 differently.
20     Q.  Right.  So would the -- you
21 had one dummy for fighter fixed effects,
22 was that turned on for each fighter then?
23     A.  Just to make things simple,
24 imagine that you have 100 unique fighters

Page 277

1  in your dataset.
2      Q.  Yes.
3      A.  If you were going to do this
4  mechanically -- you don't have to do, by
5  the way, it's programmed into the -- into
6  the code.
7      Q.  I understand.
8      A.  It's a known command.  You
9  can just say, this time run the
10 regression with fixed effects.
11         But mechanically, if you
12 wanted to do it by hand, you could create
13 a John Doe dummy such that every time
14 John Doe was fighting, the dummy turned
15 on, and then in the next column over, you
16 make a Jane Smith dummy, and the dummy
17 would turn on to 1 every time Jane
18 appeared.
19         You have to omit -- you have
20 to omit one fighter when you do this.
21 You know, if there are 100, you make 99
22 dummies.
23     Q.  So just so -- I understand
24 this is a computer command even though



Page 278

```
 1   I'm using manual language, but was the
 2   dummy variable for fighter fixed effects
 3   turned on for each fighter?
 4       A.  I wouldn't put it that way.
 5   When you use a fighter fixed effects,
 6   imagine we are -- with 100 unique
 7   fighters, we're going to add now 100 or
 8   99 new columns in Microsoft Excel.
 9   Right?  And the first column is going to
10   be the John Doe dummy, it's a new
11   variable, and it's set to zero for -- for
12   every observation except for when John
13   Doe is fighting.  Right?
14            And then the Jane Smith
15   being the second fixed effect dummy is
16   set to zero for every time you see an
17   observational database, it will show up
18   as one when Jane Smith is fighting.
19            So that's what -- that's
20   what the fighter fixed effect is.
21       Q.  Okay.  Let's talk about
22   market definition.
23            We discussed before the
24   three -- the two input markets and the
```

Page 279

```
 1   one submarket that you defined.  Now, for
 2   each of those input markets, in your
 3   view, did you do a merger guidelines
 4   analysis to define those markets?
 5          MR. CRAMER:  Objection to
 6       form.
 7          THE WITNESS:  I testified
 8       earlier that -- that I had the
 9       SSNIP test from the merger
10       guidelines in my head as I was
11       trying about how to construct the
12       relevant input markets.
13   BY MR. ISAACSON:
14       Q.  All right.  Well, was the --
15   were the methods that you used to define
16   the input markets sufficient, in your
17   mind, for a complete merger guidelines
18   analysis?
19          MR. CRAMER:  Objection to
20       form.  Objection to the extent it
21       calls for a legal conclusion.
22          THE WITNESS:  I think that
23       I -- and my methods were
24       consistent with the standards and
```

Page 280

```
 1       practices suggested by the merger
 2       guidelines.
 3            I -- as you know, I also do
 4       a direct approach to establishing
 5       market power.
 6            I -- I think that we get can
 7       into the details of how I came to
 8       those decisions, but I think that
 9       it obeyed by the -- by the
10       standards of the merger
11       guidelines.
12   BY MR. ISAACSON:
13       Q.  So I asked you -- I
14   wasn't -- I'm not sure whether you're --
15   if that's a qualified yes or a yes.  So
16   let me try it this way.  Were the methods
17   that you used to define input markets
18   sufficient to define those markets under
19   the standards of the merger guidelines?
20          MR. CRAMER:  Objection to
21       form.
22          THE WITNESS:  I don't know
23       what sufficient means in that
24       context, but I am ready to testify
```

Page 281

```
 1       that they're consistent with the
 2       standards articulated in the
 3       guidelines.
 4   BY MR. ISAACSON:
 5       Q.  Consistent with is -- is not
 6   helping me because I don't know what that
 7   means.  The -- are you able to tell me
 8   today whether the input markets you
 9   defined were sufficiently defined
10   according to the guidelines of the --
11   according to the merger guidelines?
12          MR. CRAMER:  Objection to
13       the form, asked and answered.
14          THE WITNESS:  I just don't
15       know what sufficient means in that
16       context.
17   BY MR. ISAACSON:
18       Q.  Would you have the same
19   answer for the output markets that you
20   defined?
21       A.  Yes.
22       Q.  So with respect to the input
23   markets and the output markets you have
24   defined in your report, the methods that
```



Page 282

1  you have used are consistent with the
2  merger guidelines, but you're not able to
3  say whether they were sufficient to
4  define those markets based on the merger
5  guidelines?
6      MR. CRAMER: Objection to
7  form.
8      THE WITNESS: I don't -- I
9  just don't know what sufficient
10  means in that context.
11  BY MR. ISAACSON:
12     Q. Okay. And when you say
13  they're consistent with the guidelines,
14  what do you mean?
15     A. I think the guidelines tell
16  us, and I even quote the guidelines when
17  it comes to defining input markets, and
18  I'm faithful to the -- to the teachings
19  and to the standards that are articulated
20  in the guidelines.
21     Q. All right. And the output
22  markets that you define -- well, actually
23  let me break it down.
24      There's three -- two input

Page 283

1  markets and one submarket, and there' a
2  geographic market for each of those,
3  correct?
4     A. Correct.
5     Q. And the geographic market
6  for all three would be North America?
7     A. Yes.
8     Q. Okay. And then you define
9  an output market. Is that an output
10  market that's tied to each input market
11  or is there one output market?
12     A. There's one output market,
13  but it does depend on how you have
14  defined the input market. You may recall
15  that when I -- when I chart, for example,
16  the number of events in the relevant
17  output market, it depends on -- I'm
18  making it as a condition that an event --
19  an MMA event had to feature at least one
20  fighter that belonged to the relevant --
21  to the associated relevant input market.
22  You probably recall --
23     Q. Yes.
24     A. Those charts, 4A, B and C.

Page 284

1  So -- so the way that I've
2  implemented the output market, it depends
3  on -- on the associated input market.
4     Q. Right. And that's why
5  mathematically I'm trying to understand
6  whether you have three output markets
7  tied -- each one tied to an associated
8  input market or there's one output market
9  tied to the three input markets.
10     A. Again, I like to think of
11  there being one output market and one
12  input market and these are just different
13  ways to measure them.
14     Q. And the -- when you defined
15  the output market, you used revenue
16  weighting; is that right? Oh, no, it's
17  other way around. Never mind.
18      The revenue earned by the
19  output market is the revenue that you use
20  when you do revenue weighting in the
21  input markets, correct?
22     A. It is possible to think of
23  it that way, but when I was finding my
24  weights, my revenue weighting measures

Page 285

1  of, say, market share or foreclosure
2  share, I wasn't thinking about the fact
3  that those revenues occur in the output
4  market. But that's fair, if that's how
5  you would like to think about it. Of
6  course the -- the output is the
7  production of the event and the revenue
8  is associated with that output.
9     Q. Right. And can you describe
10  to me a situation where a firm would have
11  monopoly (sic) power in the output market
12  based on revenue, and would not have
13  monopsony power in the input market once
14  you use the revenue weighting?
15      MR. CRAMER: Incomplete
16  hypothetical. Talking about this
17  industry or just generally?
18      MR. ISAACSON: Generally.
19      MR. CRAMER: Incomplete
20  hypothetical.
21      THE WITNESS: I don't
22  understand the question because
23  the revenue weighting isn't really
24  affecting my -- my conclusions

Page 286

1    with respect to, say, a finding of
2    monopsony power in the input
3    market.
4  BY MR. ISAACSON:
5       Q.   Well, you do have findings
6  of monopsony power that do rely on
7  revenue weighting, right?
8       A.   I think that under the --
9  under the indirect approach and under
10 only one pass through the indirect
11 approach, I weight fighters by -- by
12 revenues to make an inference about
13 Zuffa's high shares in that relevant
14 input market.
15      Q.   Right.
16      A.   But as you know, that's only
17 one of many, many approaches that allow
18 me to get to the conclusion of monopsony
19 power.
20      Q.   Okay.
21      A.   I actually prefer --
22      Q.   So let's return --
23      A.   Can I finish?
24      Q.   I thought you were.

Page 287

1       A.   I prefer direct evidence
2  generally, and I think that I've -- I
3  offer a slew of evidence that speaks to
4  how you can prove directly that Zuffa
5  exercises monopsony power.
6       Q.   I understand that you
7  offered direct and indirect evidence, but
8  I need to ask about them one at a time
9  and we can cover both.
10      A.   Okay.
11      Q.   So in terms of when you
12 define a market, can you describe to me a
13 situation where if you use revenue
14 weighting in the input market, where
15 the -- a monopoly firm would not
16 necessarily have a monopoly in the input
17 market?
18           MR. CRAMER:  Incomplete
19      hypothetical, form.
20           THE WITNESS:  I've never
21      given thought to that, and I'd
22      like to think about it and maybe
23      we'll come back.  But I don't
24      think I'm prepared to -- to

Page 288

1    construct a scenario about how
2    that could occur.
3  BY MR. ISAACSON:
4       Q.   All right.  The -- and then
5  you've described geographic market for
6  the output market also.  And is that also
7  North America?
8       A.   Yes.
9       Q.   All right.  The -- and in
10 terms of your SSNIP analysis -- all
11 right.  So did you do -- well, my
12 colleague wants to know so it seems like
13 a good question.
14      A.   I'm sure it is.
15      Q.   In the out -- in the output
16 market, what is being sold?  In the
17 output markets that you have defined.
18      A.   Sure.  I think that you
19 are -- the production or the product that
20 is being produced are -- is live MMA
21 events and the revenue associated with
22 those events can take the form of gate
23 revenue or pay-per-view.  That's from --
24 from the consumer side.  Of course,

Page 289

1  there's -- there's revenues from the
2  advertiser's side as well.
3           But I hope that answers your
4  question.
5       Q.   All right.  And does
6  pay-per-view compete with broadcast?
7           MR. CRAMER:  Objection to
8       form.
9           THE WITNESS:  I did not
10      conduct that inquiry.
11 BY MR. ISAACSON:
12      Q.   Do you have an opinion one
13 way or another about that?
14      A.   No.
15      Q.   All right.  With respect to
16 the -- does -- do the live venue events
17 compete with pay-per-view events?
18      A.   I don't even understand the
19 question.  Many of the pay-per-view
20 events are live.
21      Q.   Meaning I watch it on
22 pay-per-view as opposed to go see it
23 live.
24      A.   I haven't -- I haven't



```
                                   Page 334                                          Page 336
 1          INSTRUCTIONS TO WITNESS             1
 2                                              2          ACKNOWLEDGMENT OF DEPONENT
 3          Please read your deposition         3
 4   over carefully and make any necessary      4          I,_____, do
 5   corrections.  You should state the reason  5   hereby certify that I have read the
 6   in the appropriate space on the errata     6   foregoing pages,  1 - 337, and that the
 7   sheet for any corrections that are made.   7   same is a correct transcription of the
 8          After doing so, please sign         8   answers given by me to the questions
 9   the errata sheet and date it.              9   therein propounded, except for the
10          You are signing same subject       10   corrections or changes in form or
11   to the changes you have noted on the      11   substance, if any, noted in the attached
12   errata sheet, which will be attached to   12   Errata Sheet.
13   your deposition.                          13
14          It is imperative that you          14
15   return the original errata sheet to the   15   _____
16   deposing attorney within thirty (30) days 16   HAL J. SINGER, Ph.D.          DATE
17   of receipt of the deposition transcript   17
18   by you.  If you fail to do so, the        18
19   deposition transcript may be deemed to be 19
20   accurate and may be used in court.        20   Subscribed and sworn
21                                                  to before me this
22                                             21   _____ day of _____, 20____.
23                                             22   My commission expires:_____
24                                             23
                                                    _____
                                               24   Notary Public
```

```
                                   Page 335                                          Page 337
 1         - - - - - -                          1             LAWYER'S NOTES
           E R R A T A                          2   PAGE  LINE
 2         - - - - - -                          3   ____ ____ _____
 3   PAGE  LINE  CHANGE                         4   ____ ____ _____
 4   ____ ____ _____    5   ____ ____ _____
 5   ____ ____ _____    6   ____ ____ _____
 6   ____ ____ _____    7   ____ ____ _____
 7   ____ ____ _____    8   ____ ____ _____
 8   ____ ____ _____    9   ____ ____ _____
 9   ____ ____ _____   10   ____ ____ _____
10   ____ ____ _____   11   ____ ____ _____
11   ____ ____ _____   12   ____ ____ _____
12   ____ ____ _____   13   ____ ____ _____
13   ____ ____ _____   14   ____ ____ _____
14   ____ ____ _____   15   ____ ____ _____
15   ____ ____ _____   16   ____ ____ _____
16   ____ ____ _____   17   ____ ____ _____
17   ____ ____ _____   18   ____ ____ _____
18   ____ ____ _____   19   ____ ____ _____
19   ____ ____ _____   20   ____ ____ _____
20   ____ ____ _____   21   ____ ____ _____
21   ____ ____ _____   22   ____ ____ _____
22   ____ ____ _____   23   ____ ____ _____
23   ____ ____ _____   24   ____ ____ _____
24   ____ ____ _____
```

