# EXHIBIT 42
Excerpts of Deposition of Professor Alan Manning

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | |
|---|---|
| IN RE: | Civil Action |
| | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | (PAL) |
| LUIS JAVIER VAZQUEZ and | |
| KYLE KINGSBURG, on behalf | CLASS ACTION |
| of themselves and all | |
| others similarly | |
| situated, | |
| Plaintiffs, | |
| v. | |
| ZUFFA, LLC, d/b/a | |
| ULTIMATE FIGHTING | |
| CHAMPIONSHIP and UFC, | |
| Defendants. | |

- - -
Thursday, February 8, 2018
- - -

Videotaped deposition of
ALAN MANNING, taken pursuant to notice,
was held at the law offices of Berger &
Montague, P.C., 1622 Locust Street,
Philadelphia, Pennsylvania 19103,
beginning at 9:16 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter,
and Notary Public in and for the
Commonwealth of Pennsylvania.
* * *
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 26

1  revenue for an event.  Is there any other
2  part of your report that you would point
3  to me that would support that conclusion?
4          MR. CRAMER:  Objection to
5      form.  You're being unclear about
6      "that part of your report."  You
7      read a part of a sentence.
8          MR. ISAACSON:  The part I
9      read.  The part I read.
10         MR. CRAMER:  And not the
11     entire section that it's in?
12         MR. ISAACSON:  Yes.
13         MR. CRAMER:  Take your time
14     if you need to go through --
15         THE WITNESS:  Okay.  Do you
16     want me to go through every
17     paragraph and say --
18 BY MR. ISAACSON:
19     Q.   Whatever you do.
20     A.   Okay.  And could you just
21 read back the question?
22     Q.   Sure.  I'm focusing on --
23 you said that fighters are people with
24 media articles written about them and

Page 27

1  often Wikipedia pages, and your report
2  says, it's right after that:
3          "It's reasonable to conclude
4  that the fighters are the key workers in
5  the event that the customers are watching
6  (sic) to watch and so play an important
7  role in generating event revenue."
8          Are there any other factors
9  that you would point to in your report
10 that support your conclusion that it's
11 reasonable to conclude that the fighters
12 are the key workers in the event the
13 customer -- in the event the customers
14 are paying to watch and play an important
15 role in generating event revenues, other
16 than your reference to media articles and
17 Wikipedia pages?
18         MR. CRAMER:  So take your
19     time to go through the report to
20     answer that question.
21         THE WITNESS:  Well, the last
22     part is not the only -- I mean, I
23     think it is simply fair to say
24     when the audience are watching --

Page 28

1  BY MR. ISAACSON:
2      Q.   I would ask you to point --
3  I'm asking you what's in your report.
4          MR. CRAMER:  Were you
5      finished with your answer?
6      Because you can give the answer
7      and then --
8          THE WITNESS:  Well, I don't
9      think that it is only the fact
10     that they have media articles and
11     Wikipedia pages written about
12     them, which is the source of the
13     belief that the fighters are the
14     key people in these events.  I
15     feel that it's when one is in the
16     event and there's some -- a fight
17     going on, that the eyes of the
18     people watching will be on those
19     fighters.  They are the key
20     people.
21 BY MR. ISAACSON:
22     Q.   All right.  And I think
23 that's --
24         MR. CRAMER:  And now he's

Page 29

1  also asked you to go through the
2  report and identify -- do you
3  still want him to answer that
4  question?
5          MR. ISAACSON:  Yes.  Let me
6      handle it though.
7  BY MR. ISAACSON:
8      Q.   Is there anything else in
9  your report that you can point to that
10 support that -- your conclusion that
11 customers are paying to watch and so play
12 an important role in generating event
13 revenue.  That fighters are key -- let me
14 start that over.
15         Is there anything else you
16 would point to to support your conclusion
17 that it's reasonable to conclude that
18 fighters are the key workers in the event
19 that the customers are paying to watch
20 and so play an important role in
21 generating event revenue?
22     A.   I mean, just as I go through
23 this, I'll maybe point them out, it's
24 easy if I go through it --



Page 30

1  Q. That's fine.
2  A. -- as I come to them.
3     So in paragraph 6, I mean, I
4  expressed the view that it is possible to
5  think in this case that MMA fighters
6  are -- you know, part of the firm's
7  revenue can be ascribed to their
8  activities.
9  Q. All right. And I'm looking
10 for anything that you have stated in your
11 report that supports that conclusion,
12 which is similar to your conclusion in
13 paragraph 24.
14 A. I mean, in the conclusion as
15 well I made the same point that this is.
16 But I think what I would say is that that
17 is the paragraph that makes the case that
18 the fighters are the key workers, but
19 there are -- I would not -- I do not
20 think that I express in that paragraph
21 the totality of the evidence that one
22 could produce to reach that conclusion.
23 I mean, in a way, I think it is fairly
24 straightforward to think that the people

Page 31

1  are there to watch the fighters, the
2  audience, and so they are the key
3  workers.
4  Q. All right. If we can look
5  now at paragraph 31 again where you cited
6  three factors which would be the
7  appropriate circumstances for labor
8  economists to use wage sharing in
9  analyzing compensation.
10    The -- are there any
11 publications or written materials where
12 you have seen these three factors
13 previously described?
14    MR. CRAMER: Form.
15    You may answer.
16    THE WITNESS: I mean, I
17 think that -- I mean, perhaps if I
18 work through them one at a time.
19    I think it is, you know,
20 very common if one is trying to
21 assess monopsony power to seek to
22 compare compensation to marginal
23 revenue product. So that is very
24 well attested.

Page 32

1  The use of wage share as
2  informative about the extent of
3  competition in the labor markets
4  is well attested, especially in
5  the field of sports economics.
6     I think the second statement
7  that you can't compute wage share
8  if you haven't got data on wage
9  share, I think of that really as a
10 statement of the obvious. It
11 would be hard to get an academic
12 article published saying you can't
13 compute something if you haven't
14 got data on it.
15    And the third one is that I
16 think it is -- relates to the fact
17 that the nature of the data in
18 this case is unusually rich, that
19 you have something akin to event
20 revenue.
21 BY MR. ISAACSON:
22 Q. All right. Have you -- you
23 say -- you list these three factors and
24 say, These are the appropriate

Page 33

1  circumstances for when labor economists
2  use wage share in analyzing compensation.
3     What I'd like to know is,
4  have you ever seen these three factors
5  articulated before in anything in
6  writing, a publication, an article, a
7  textbook, et cetera?
8     MR. CRAMER: Asked and
9  answered.
10    THE WITNESS: I mean, I feel
11 I've answered that one.
12 BY MR. ISAACSON:
13 Q. Well, you told me about how
14 you've seen them individually, but have
15 you ever -- can you point to me to any
16 publication or other -- anything in
17 writing where someone has said that it's
18 appropriate -- labor economists use wage
19 share in analyzing compensation when
20 three appropriate circumstances are met,
21 and then list these three circumstances?
22 A. I -- in expressing my
23 opinion, I'm not simply copying out
24 conclusions that are -- it is not a



9 (Pages 30 to 33)

Page 34

1 cut-and-paste job from someone else's
2 article.  It is using well-attested
3 techniques and measures from the existing
4 literature, but combining them in a way
5 that I think is wholly appropriate to
6 this particular case.  And that is what I
7 think of actually as trying to express an
8 expert opinion.
9     Q.   All right.  And I understand
10 you think that these are the appropriate
11 circumstances and you stated your reasons
12 for such, but I'd still like to know if
13 anybody -- of you've seen anybody write
14 out before that these are the three
15 appropriate circumstances for labor
16 economists to use wage share in analyzing
17 compensation?
18         MR. CRAMER:  Asked and
19     answered.
20         THE WITNESS:  I feel I've
21     answered it.  These are my own
22     words.  Did I cut and paste these
23     from someone else?  No.
24 BY MR. ISAACSON:

Page 35

1     Q.   All right.  And when you
2 say -- I know you didn't cut and paste
3 them, but have you seen any -- have you
4 seen anybody list these three criteria,
5 you know, in substance as the appropriate
6 circumstance for when you -- labor
7 economists would use wage share in
8 analyzing compensation?
9     A.   I mean, I -- in my report
10 here I'm trying to express an opinion on,
11 you know, the particular questions I was
12 asked to address, and obviously that
13 is -- in some sense it is -- you know, it
14 is a particular case.  So I am combining
15 well-attested, well-established ideas in
16 a way that is appropriate to that case,
17 and I think that is appropriate to
18 expressing an expert opinion.
19     Q.   Right.  And you've said to
20 me a couple times that you think these
21 three things are appropriate and I
22 understand that.  And you said to me
23 they're not a cut and paste,
24 word-for-word.

Page 36

1     My question is:  Even if
2 they're not word-for-word, have you seen
3 any publication that lists these three
4 things, in sum and substance, as the
5 appropriate circumstance for a labor
6 economist to analyze wage -- to use wage
7 share in analyzing compensation?
8     A.   I mean, wage share is very,
9 you know, commonly used in the sport
10 economics literature, so I'm drawing --
11 drawing from that.
12         I think the statement of the
13 question, which is the first criterion is
14 really just a statement of the question
15 in this case as I understand it.  So I'm
16 not quite sure how I would take the
17 question in this case from some other
18 pre-existing -- pre-existing.
19         I mean, I think in cases
20 where one is trying to assess the impact
21 of anticompetitive practices, one is
22 trying to compare the actual compensation
23 in this case with compensation in the
24 but-for world.

Page 37

1         So I think that's completely
2 standard.
3     Q.   All right.  I still don't
4 know whether you're telling me anybody
5 has listed these three things before.
6     A.   I mean, I haven't seen -- I
7 mean, they're totally appropriate, and
8 you know, I'm combining well-attested
9 ideas, well-established ideas in a way
10 that's appropriate to that case, for that
11 combination -- because I'm not aware of
12 somebody who has written about this
13 particular case, that particular
14 combination which I chose to be
15 appropriate to this case and what I
16 think -- that is what I think I should be
17 doing when expressing an expert opinion,
18 I haven't got that.
19     Q.   All right.  So you've
20 reached the opinion that these three
21 factors are the appropriate circumstances
22 to consider in this particular case.
23         Can you point me to
24 anything -- any literature where these



Page 38

1  three factors were considered appropriate
2  for some other -- for some other type of
3  facts or some other case?
4        A.  Well, I think that -- I
5  mean, let me take them in order.
6        Q.  I would like them in
7  combination.  Not individually, in
8  combination, all three?
9        A.  I think --
10              MR. CRAMER:  Form.
11              You may answer.
12              THE WITNESS:  I mean, what
13       I'm doing here is taking well-
14       established ideas individually and
15       drawing on ideas from established
16       work, well-established, and
17       combining them in a way that is
18       appropriate for this case.  I
19       think that is appropriate to what
20       one is asked to do as an expert.
21  BY MR. ISAACSON:
22        Q.  You've told me that several
23  times.
24        A.  Yeah.

Page 39

1        Q.  You've got it on the
2  record --
3        A.  Yes.
4        Q.  -- that you feel it is
5  appropriate to combine these three
6  circumstances in this -- for the facts of
7  this case.
8              And what I'm asking you now,
9  have you run across, in any of your
10 research or writing or teaching, any
11 other specific facts or cases where
12 someone said the three circumstances that
13 you've identified are the appropriate way
14 to determine that wage share should be
15 used in analyzing compensation, all three
16 in combination?
17       A.  But there is no equivalent
18 to this case in -- you know, it's about
19 the particular case.
20       Q.  So looking at paragraph 10,
21 you discussed the question in this
22 litigation.
23             "In this litigation, the
24 question to be considered is different.

Page 40

1  It is, "How do the earnings of fighters
2  compare to what they would have earned in
3  a competitive market?"
4              Is that the appropriate
5  question in this case?
6              MR. CRAMER:  Form.
7              Objection to form.
8              THE WITNESS:  I mean, I
9       think one is seeking a comparison
10      of the actual earnings to what
11      they would have been in the
12      but-for world, which is the
13      absence of the challenged conduct,
14      and I was using the phrase there
15      "competitive market" to refer to
16      absence of the challenged conduct.
17 BY MR. ISAACSON:
18       Q.  And do you understand that
19 Dr. Singer is using foreclosure share and
20 using that to define both the actual
21 world and the reduced foreclosure share
22 as the but-for world?
23       A.  I mean, I haven't studied
24 that or expressed an opinion on it.

Page 41

1        Q.  Do you have any
2  understanding of -- what is your
3  understanding of foreclosure share as
4  Dr. Singer expresses it?
5        A.  I mean, I haven't studied
6  that to express an opinion on that.
7        Q.  And would you agree with the
8  statement that when monopsony power is
9  high, a firm is able to suppress a
10 worker's compensation below the
11 competitive level?
12       A.  In general, yes, that is
13 what I think happens when you have
14 monopsony in the labor market.
15       Q.  All right.  And is it your
16 understanding that Dr. Singer is using
17 his definition of foreclosure share to
18 express Zuffa's degree of monopsony
19 power?
20       A.  I mean, I haven't expressed
21 an opinion on that.  I haven't been asked
22 to address that.
23       Q.  Do you even -- I understand
24 you haven't expressed an opinion on



11 (Pages 38 to 41)

Page 42

1  whether that's appropriate. Is that your
2  understanding of what Dr. Singer is doing
3  here, that he's using foreclosure share
4  to express Zuffa's amount of monopsony
5  power?
6      A.  I mean, he uses foreclosure
7  share in the actual world and then in a
8  but-for world, but I have not studied his
9  interpretation of it or expressed an
10 opinion -- expressed an opinion on what
11 his interpretation is or reflected on
12 what his interpretation is.
13     Q.  Do you have an opinion about
14 whether the appropriate analysis in this
15 case would look at whether, when
16 foreclosure share is high, wages are low,
17 compared to when foreclosure share is
18 lower?
19         MR. CRAMER: Objection to
20     form.
21         MR. ISAACSON: It didn't
22     come out very well. I agree with
23     you.
24 BY MR. ISAACSON:

Page 43

1      Q.  Would you agree that the
2  question in this case would look -- would
3  compare high foreclosure shares to lower
4  foreclosure shares and look at
5  compensation in those two situations?
6         MR. CRAMER: Same objection.
7     You may answer if you
8     understand it.
9         THE WITNESS: No.
10 BY MR. ISAACSON:
11     Q.  Okay. All right. Do you
12 think it's -- do you think Dr. Singer's
13 model would be -- would be appropriate if
14 foreclosure share is not correlated with
15 the marginal revenue product of labor?
16     A.  I'm sorry, I didn't really
17 understand that.
18     Q.  How about this? Would it be
19 a proper task of Dr. Singer to relate
20 foreclosure share to the level of athlete
21 pay?
22         MR. CRAMER: Objection to
23     form.
24         THE WITNESS: I mean, you're

Page 44

1  now talking about level of pay
2  rather than wage share.
3  BY MR. ISAACSON:
4      Q.  Yes.
5      A.  It's important -- the
6  question here is to compare actual
7  compensation to what the compensation
8  would have been in the but-for world, so
9  it's a comparison not of the level.
10     Q.  Okay. Would it be a proper
11 test of Dr. Singer's theory to relate
12 foreclosure shares to the actual
13 compensation in the real world compared
14 to the but-for world?
15         MR. CRAMER: Objection to
16     form. What do you mean by proper
17     test?
18         If you understand it, you
19     may answer it.
20         THE WITNESS: I mean, I
21     think my answer to the previous
22     question I think that I was
23     answering, I didn't really
24     understand the distinction between

Page 45

1  the two questions.
2  BY MR. ISAACSON:
3      Q.  Well, you said the question
4  here is to compare actual compensation to
5  the compensation that would have been in
6  the but-for world.
7         Is it your understanding
8  that you should be comparing actual --
9  under Dr. Singer's analysis that when
10 you're comparing actual compensation to
11 but-for world compensation, you should be
12 looking at two different foreclosure
13 shares, a high foreclosure share and a
14 lower for foreclosure share?
15     A.  I mean, I haven't -- I would
16 have to think about that. I haven't
17 expressed an opinion on -- on that. I
18 haven't thought about it.
19     Q.  All right. Now, in your
20 report, do you reach any conclusions as
21 to whether non-athletic inputs as opposed
22 to just the contribution of athletes
23 contribute to event revenues?
24     A.  I don't reach an opinion on


Page 46

1 that in my report.
2     Q.   All right.  Do you have an
3 opinion about whether not -- inputs not
4 related to the contribution of athletes
5 contribute to success of sports such as
6 the NFL, NBA, Major League Baseball?
7     A.   I mean, I don't have an
8 opinion.  I haven't studied those sports
9 and so I don't have an opinion on it.
10     Q.   All right.  Do you have an
11 opinion about whether the television --
12 the quality of the television production
13 would contribute to the revenues of, for
14 example, the NFL?
15     A.   I mean, I haven't studied
16 that so I couldn't express an opinion on
17 that.
18     Q.   Do you have an opinion about
19 whether the television production quality
20 would contribute to the success of the --
21 to the event revenues of the UFC?
22     A.   I mean, I haven't studied
23 that and so I don't have an opinion on
24 that.

Page 47

1     Q.   All right.  Do you have an
2 opinion about whether the UFC, apart from
3 its fighters, has taken actions that
4 contribute to event revenues?
5     A.   I mean, I haven't studied
6 that so I don't have an opinion on that.
7     Q.   All right.  So do you have
8 an opinion about whether advertising of
9 an athletic -- of UFC athletic event
10 contributes to event revenue?
11     A.   I haven't studied that so I
12 don't have an opinion on that.
13     Q.   Do you have an opinion about
14 whether promotional efforts for a UFC
15 event contribute to event revenue?
16     A.   I haven't studied that to
17 have an opinion on that.  I would have to
18 think about it and I haven't thought
19 about it.
20     Q.   All right.  Do you have an
21 opinion about whether the matchmaking of
22 two athletes as opposed to the individual
23 contribution of the athletes contribute
24 to events revenues; in other words, that

Page 48

1 the pairing of two fighters contributes
2 to the event revenue as opposed to the
3 individual contributions of both?
4     A.   I mean, I haven't -- I would
5 have to think about that, I haven't
6 studied that, so I haven't got an opinion
7 on it.
8     Q.   All right.  You've said that
9 fighters do play a role in generating
10 event revenue.  We've gone over that.
11           The -- if a specific
12 athlete -- if an individual athlete
13 fights at a UFC event and then -- or
14 fights at a Bellator event, if you're
15 looking at those two alternatives, would
16 you expect that the same athlete would
17 contribute the same amount of event
18 revenues to a UFC event as a Bellator
19 event?
20           MR. CRAMER:  Form,
21     incomplete hypothetical.
22           You may answer if you
23     understand.
24           THE WITNESS:  I mean, I --

Page 49

1 you know, I would have to think
2 about it.  I mean, you're talking
3 about a hypothetical but about two
4 real companies -- two real
5 companies.
6 BY MR. ISAACSON:
7     Q.   Yes.
8     A.   And I'm not quite sure
9 how -- what part of the world is changing
10 for that to -- for that to happen.
11     Q.   All right.  If you have an
12 event at the same time, in the same
13 location and the -- and the fighters
14 between the -- and the other fighters of
15 the event are of relatively equal ranking
16 and the one thing -- but the only thing
17 you're going to change is the fighter at
18 the UFC event will now be at the Bellator
19 event, would you expect the contribution
20 to event revenues to be the same as at
21 the UFC event and the Bellator event?
22           MR. CRAMER:  Incomplete
23     hypothetical, form.
24           You may answer if you



Page 50

```
 1   understand.
 2          THE WITNESS:  I mean, I
 3   haven't thought about that, and it
 4   would need thought before
 5   expressing opinion.
 6   BY MR. ISAACSON:
 7      Q.   Right.  In thinking through
 8   that, what factors would you look at
 9   before you would reach an opinion?
10      A.   I would need to think about
11   what factors are relevant as well.
12      Q.   Are there any relevant
13   factors you can tell me today that you
14   would look at?  And understanding you
15   would not be able to give me a complete
16   list today.
17      A.   No, I would want to have
18   some time to think about it.
19      Q.   Do you have an opinion
20   about -- you said that the fighters play
21   a role in contributing to event revenues.
22   Do you have an opinion -- have you done
23   any work that would allow you to quantify
24   that contribution?
```

Page 51

```
 1      A.   I -- I mean, I haven't done
 2   any work with data in this case, so no,
 3   without having done that, I couldn't
 4   express an opinion.
 5      Q.   All right.  Do you have an
 6   opinion about whether there are other
 7   substantial factors that contribute to
 8   event revenue other than the contribution
 9   of fighters, referring to UFC events?
10      A.   I would have to think about
11   that, but I haven't been asked to think
12   about that and so I haven't got an
13   opinion.
14      Q.   All right.  Let's go back to
15   your third factor, paragraph 31 where you
16   list for three factors.
17           Why is it necessary to
18   obtain -- let me start that question
19   over.
20           Why is it necessary to
21   ascribe a measurable part of a firm's
22   revenue to the activities of a particular
23   worker or group of workers in order to
24   use wage share in analyzing compensation?
```

Page 52

```
 1      A.   Sorry, can you just read
 2   that back?  I'm sorry about that.
 3      Q.   Let me try it again to make
 4   it easier.  I just want -- you listed the
 5   third factor.  I won't re-read it.
 6      A.   Okay.
 7      Q.   Why is that third factor
 8   necessary in order for a labor economist
 9   to use wage share in analyzing
10   compensation?
11      A.   I mean, that's mixing up a
12   number of different things.  I mean -- I
13   mean, what I would say is -- I mean,
14   first of all, if one is trying to measure
15   the marginal revenue product, one wants
16   to make sure that one is focusing on a
17   part of the revenue which the work of
18   that particular worker has gone towards
19   generating.
20           And then at the end of the
21   question, you put in that wage share, and
22   I wasn't quite sure what that was doing
23   there.
24      Q.   All right.  Well, because --
```

Page 53

```
 1   I'm just referring to your first sentence
 2   here:
 3           "Dr. Oyer," -- "Drs. Oyer
 4   and Topel are incorrect in asserting that
 5   labor economists do not use wage share in
 6   analyzing compensation."
 7      A.   Yeah.
 8      Q.   "We do under appropriate
 9   circumstances."
10      A.   Yes.
11      Q.   "Those circumstances arise
12   when," and you list three things?
13      A.   Yes.
14      Q.   So am I correct that
15   these -- that items three there is
16   necessary in order for it to be
17   appropriate to use wage share in
18   analyzing compensation?
19      A.   I mean, I would put it as it
20   is sufficient.  I'm not saying that there
21   are no other conceivable possible
22   circumstances in which it would be
23   appropriate to use wage share.
24      Q.   All right.  Let's limit us
```



```
                                                    Page 54
 1   to our -- to this case?
 2       A.   Yeah.
 3       Q.   It would be necessary in
 4   this case for that third factor to be
 5   true in order to use wage share to
 6   analyze compensation?
 7       A.   I mean, I haven't -- I
 8   haven't given thought to that and I would
 9   have to think about that -- I would have
10   to think about that before expressing an
11   opinion on that.
12       Q.   Okay.  Well, let me try it
13   this way: If that third factor is not
14   met, you would not -- you would not have
15   an opinion in this case that it was
16   appropriate to use wage share to analyze
17   compensation?
18       A.   I mean, I would not put it
19   like that.  I mean, I expressed my
20   opinion that it is appropriate because
21   these facts are there.  I have not
22   considered at all whether if that
23   situation was not satisfied there would
24   be some other way to do that.  So I do
```

```
                                                    Page 55
 1   not have an opinion on whether there
 2   isn't another alternative way or not.
 3       Q.   All right.  And -- but if
 4   you remove that third factor, as of
 5   today, you would not have an opinion one
 6   way or the other as to whether it was
 7   appropriate to use wage share in
 8   analyzing compensation in this case?
 9       A.   I mean, I'm not sure.  When
10   you say remove -- remove --
11       Q.   If the third factor were not
12   satisfied.
13       A.   So that we didn't have event
14   revenue at all in this case you mean?
15       Q.   No.  No.  So if -- if it was
16   not possible to ascribe a measurable part
17   of a firm's revenue to the activities of
18   a particular worker or group of workers
19   in this case --
20       A.   But I feel one has to --
21       Q.   Let me finish the question.
22       A.   I'm sorry.
23       Q.   If that were not possible,
24   you would not have an opinion today, one
```

```
                                                    Page 56
 1   way or other, as to whether it's
 2   appropriate to use wage share in
 3   analyzing compensation?
 4       A.   But that alternative
 5   world -- I mean, I don't feel all the
 6   relevant factors in that alternative
 7   world and suddenly event revenue is not
 8   available are specified.  So I mean, I
 9   have concentrated on expressing an
10   opinion on how one should analyze things
11   with the data that is available.  I have
12   not given thought to it or expressed any
13   opinion on what would happen if you
14   suddenly said event revenue was -- was
15   not there.
16       Q.   All right.
17       A.   I mean, there are other --
18       Q.   Let me ask -- I don't mean
19   to interrupt.  Let me ask questions here.
20            So I want to be clear.  I'm
21   not just saying if event revenue is not
22   here.  I'm talking about your third --
23   because I'm not sure what you mean by if
24   event revenue disappears.
```

```
                                                    Page 57
 1            You said something specific
 2   here, that it's possible to ascribe a
 3   measurable part of a firm's revenue to
 4   the activities of a particular worker or
 5   group of workers.  If that were not
 6   possible, am I correct that as of today,
 7   you would not have an opinion that it is
 8   appropriate to use wage share in
 9   analyzing compensation?  It is possible
10   that you could go do additional analysis
11   and find other factors to justify it, but
12   as of today with that third condition,
13   assuming that third condition has not
14   been met, you would not have an opinion
15   about whether it was appropriate to use
16   wage share in analyzing compensation?
17       A.   Well, I think -- I'm still
18   getting a little bit confused here.  The
19   event revenue is in this case, the part
20   of the firm's revenue which is linked to
21   the activities of a particular group of
22   workers.  So when you say that is not
23   there, I find that hard to imagine what
24   that means except that event revenue is
```



```
                                            Page 58
 1   not available.
 2           I mean, there is also, in
 3   Dr. Zimbalist's report, he does have
 4   comparison of wage share in UFC with wage
 5   share in other sports, and I think that's
 6   also an important part of information --
 7   evidence in this case, although it's not,
 8   you know, the part of the evidence that I
 9   was addressing in my report.
10       Q.   I'm going to -- I understand
11   you're saying I don't know how this could
12   be.
13       A.   Yeah.
14       Q.   Right?  For purpose of my
15   question --
16       A.   Yeah.
17       Q.   -- I'm going to ask you to
18   assume that in this case it was not
19   possible to ascribe a measurable part of
20   a firm's revenue to the activities of a
21   particular worker or group of workers.
22   Once your third proposition is removed,
23   am I correct that you don't have an
24   opinion one way or another as to whether
```

```
                                            Page 59
 1   wage share is appropriate in analyzing
 2   compensation?  You make the proviso that
 3   you might be able to go look, do an
 4   analysis and find other factors, but as
 5   of today, you would not have an opinion?
 6       A.   I would have to think about
 7   how one might seek to, you know, analyze
 8   what data was available.  I have not, you
 9   know, thought about that hypothetical
10   situation and so I don't have an opinion
11   on it.
12       Q.   All right.  And you
13   mentioned Dr. Zimbalist's comparison to
14   others -- between Zuffa and other sports.
15   Do you reach any opinions in your report
16   as to whether it was appropriate to
17   compare revenue -- labor share in one
18   sport to another sport?
19       A.   No, I was not asked for --
20   to express an opinion on that.  I have
21   not thought about that.
22       Q.   All right.  Now, in Item 3,
23   there's an or at the end.  It is possible
24   to ascribe a measurable part of a firm's
```

```
                                            Page 60
 1   revenue to the activities of a particular
 2   worker or group of workers.  Does that
 3   mean it's sufficient to meet either one,
 4   do you need both?  I'm trying to
 5   understand your -- because you mentioned
 6   both, of a particular worker or group of
 7   workers?
 8       A.   Well, I think of it as an
 9   or, so it's one of the two.
10       Q.   Right.  And is it your
11   opinion that the record in this case
12   makes it possible to ascribe a measurable
13   part of a firm's revenue to the
14   activities of a particular worker?
15       A.   I have -- I mean, I have not
16   been asked to express an opinion about
17   that.  I have not given thought to that,
18   so I don't have an opinion on that.
19       Q.   Okay.  Is it your opinion in
20   this case that it's possible to ascribe a
21   measurable part of a firm's revenue to
22   the activities of a particular group of
23   workers?
24       A.   I think that the event
```

```
                                            Page 61
 1   revenue is -- you know, the fighters in
 2   that event are -- the revenue from that
 3   event is connected to the activities of
 4   the workers in that fight, yes.
 5       Q.   And you reach that opinion
 6   based on what you said in paragraph 24;
 7   is that correct?
 8       A.   I mean, not only that.
 9   That's what I expressed, that's how I
10   summarized that view, but I would go back
11   to just simply saying that I think the
12   fighters are the key people here, that
13   that is who all eyes are on when there is
14   a fight going on.
15       Q.   But in terms of what you
16   have actually said in your report, your
17   reasons for concluding that it's possible
18   to ascribe a measurable part of a firm's
19   revenue to the activities of a particular
20   group of workers, what you've said in
21   your report about that can be found in
22   paragraph 24?
23           MR. CRAMER:  Objection to
24       form.
```



Page 62

```
 1        THE WITNESS:  I mean, I
 2     think that that is -- no, I don't
 3     really accept that.  I think it is
 4     more generally just saying that
 5     the workers are the key people.
 6  BY MR. ISAACSON:
 7     Q.    All right.  Now, why does
 8  what you say in paragraph 24 together
 9  with workers being key people mean that a
10  measurable part of a firm's revenue is --
11  can be ascribed to a group -- to a group
12  of fighters in this case?  Where do you
13  get the measurable part?
14     A.    I mean, I think the -- I
15  mean, what I meant by measurable part
16  here is really that there are techniques
17  available in order to control for this.
18        So if one takes Dr. Singer's
19  approach, he's seeing how variation in
20  the foreclosure effect affects the worker
21  share.  All things being equal.
22     Q.    All right.  So as part of
23  your report, you did not do any work as
24  to whether -- do any work that would
```

Page 63

```
 1  allow you to conclude that a measurable
 2  part of a firm's revenue can be
 3  attributed to any group of UFC fighters;
 4  is that correct?
 5        MR. CRAMER:  Asked and
 6     answered, form.
 7        THE WITNESS:  I mean, I
 8     would simply, you know, repeat
 9     what I said earlier that here is
10     some revenue coming from this
11     particular event, the fighters are
12     in that event, and so there is a
13     connection between the fighters in
14     that event and the revenue that
15     flows through that event.
16  BY MR. ISAACSON:
17     Q.    But you did not try to
18  measure the amount of that connection; is
19  that correct?
20     A.    I have not worked with the
21  data in this case.
22     Q.    All right.  And is all of
23  the event revenue for the Zuffa event
24  attributable to the fighters?
```

Page 64

```
 1        MR. CRAMER:  Objection to
 2     form.
 3        THE WITNESS:  No.  I mean,
 4     the claim is not the workers
 5     should have 100 percent of the
 6     event revenue, that they would
 7     have that in the but-for world.
 8     The claim is that they would have
 9     a higher share than they actually
10     had.
11  BY MR. ISAACSON:
12     Q.    All right.  And based on
13  your -- the work you've done in this
14  case, what is your understanding of what
15  factors contribute to event revenues?
16  You've named the role of athletes.  What
17  else would contribute?
18     A.    I mean, I haven't studied
19  that so I don't have an opinion on that.
20        MR. CRAMER:  We've been
21     going for almost an hour.  If this
22     is a good time to break, we can
23     break.
24        MR. ISAACSON:  Sure.
```

Page 65

```
 1        THE VIDEOGRAPHER:  The time
 2     is 10:12 AM.  We're going off the
 3     record.
 4        (Recess.)
 5        THE VIDEOGRAPHER:  The time
 6     is 10:25 AM.  We are back on the
 7     record.
 8  BY MR. ISAACSON:
 9     Q.    Professor Manning, how
10  much -- approximately how many hours did
11  you spend preparing your report in this
12  case?
13     A.    I mean, I haven't got the
14  exact figure in my head.  I mean, I kept
15  a record of how many hours, so I think it
16  was -- I mean, up to what point?
17  Obviously I'm working on it now.
18     Q.    Up to this submission --
19  spent on the report.
20     A.    Okay.  I'm afraid I haven't
21  got the exact figure in my head.
22     Q.    All right.  Can you give me
23  an approximate range?
24     A.    I think it's around about
```



Page 86

1   the basis for the opinion.
2       A.   Yup.
3       Q.   If revenue for the fight is
4   twice as large, then the MR -- marginal
5   revenue product is twice as high.
6       A.   Yup.
7       Q.   I'm not getting the double
8   twice there.
9       A.   Well, I'm imagining if we
10  can talk about a hypothetical --
11      Q.   Right.
12      A.   -- situation, that, you
13  know, there's a certain amount of people
14  watching money -- watching this and
15  paying money to watch, whether it's in
16  person or the event, and then we double
17  the amount of the people who are paying,
18  then that would imply that the marginal
19  revenue product of the labor of the
20  fighters has -- has doubled.
21      Q.   All right.  So I'm -- maybe
22  I'm understanding this now.  So when you
23  say if revenue for the fight is twice as
24  large, then the marginal revenue product

Page 87

1   is twice as high, are you hypothesizing
2   both that the revenue for the fight is
3   twice as large and that the marginal
4   revenue product is twice as high?
5       A.   No, I'm saying if the
6   revenue for the fight is twice as high,
7   then the marginal revenue product will be
8   twice as high.
9       Q.   All right.  And what is it
10  that supports that -- what work in your
11  report shows that if the revenue goes up
12  by a factor of two, then that means that
13  the marginal revenue product was twice as
14  high?
15      A.   Because that is -- the
16  revenue has doubled and so that is -- the
17  marginal revenue product is doubling.
18      Q.   All right.  And what is it
19  that allows you to ascribe all of the
20  doubling of revenue for the fight to the
21  marginal revenue product?
22          MR. CRAMER:  Objection to
23      form.
24          THE WITNESS:  I mean, the

Page 88

1       margin -- no, it's not ascribing
2       all of it to the marginal revenue
3       product, it's that -- a work
4       that's marginal revenue product
5       can change without the actual
6       physical act of work changing, the
7       fighters can stay the same, but
8       there's just twice as many people
9       watching and so the revenue is
10      twice as high and so the marginal
11      revenue is twice as high.
12          So it doesn't require -- for
13      the marginal revenue to go up when
14      revenue goes up, it doesn't
15      require, you know, the workers to
16      have been -- the fighters to have
17      been doing anything different.
18  BY MR. ISAACSON:
19      Q.   Well, if the revenue for the
20  fight grows by a factor of two, why does
21  that mean that the marginal revenue
22  product of labor is twice as high?
23          MR. CRAMER:  Asked and
24      answered.

Page 89

1           THE WITNESS:  I feel I've
2       answered that.  I do feel I've
3       answered that.
4   BY MR. ISAACSON:
5       Q.   Well, what -- I'm going to
6   go over it.  I'm not even saying you
7   haven't answered it.
8       A.   Okay.  No, that's all right.
9       Q.   I swear to you I haven't
10  understood your answer, so I'm going to
11  over it until I understand it.
12          The -- are you saying that
13  if event revenues double, it is
14  necessarily true that the marginal
15  revenue product of the athletes had to
16  have doubled?
17      A.   Yes, I think that is what
18  it's saying.  I mean, it's saying it is
19  plausibly proportional -- sorry,
20  proportional means that a doubling leads
21  to a doubling.
22      Q.   Okay.  So am I correct that
23  what you're saying is if the revenues are
24  proportional to the marginal revenue



```
                                          Page 90
1    product of labor, then you can conclude
2    that if event revenues double, then
3    marginal revenue product of labor has
4    doubled?
5         A.   I'm sorry, could you just
6    read that back?
7         Q.   Sure.
8         A.   I'm a bit confused.
9         Q.   So is what you're saying is
10   that if revenues are proportional to the
11   marginal revenue product of labor, then
12   you can conclude that if event revenues
13   double, then the marginal revenue product
14   of labor has doubled?
15             MR. CRAMER:  Objection to
16        form.
17             You may answer if you
18        understand.
19             THE WITNESS:  I think the if
20        at the start I didn't really
21        agree, and I think I prefer my
22        previous answers to --
23   BY MR. ISAACSON:
24        Q.   Have you done any work in
```

```
                                          Page 91
1    this case -- have you done any work
2    reflected in your report that shows
3    that -- that in order for event revenue
4    to double, the marginal revenue product
5    of athletes at the event has to double?
6              MR. CRAMER:  Objection to
7         form.
8              You may answer.
9              THE WITNESS:  I mean, I
10        haven't studied, you know, the
11        data, the particular situations,
12        so I haven't got an opinion on
13        that.
14   BY MR. ISAACSON:
15        Q.   All right.  Is -- the first
16   sentence in paragraph 27 is followed by
17   the sentence, "So the marginal revenue
18   product will be proportional to the event
19   revenue," are you -- is the first
20   sentence in paragraph 27 an example of
21   what happens when event revenue and
22   marginal revenue product are proportional
23   to one another?
24             MR. CRAMER:  Is that all it
```

```
                                          Page 92
1    is or -- form.
2              You may answer if you
3         understand.
4              THE WITNESS:  Yeah, I'm
5         sorry, I'm not quite sure I'm
6         understanding.  Can you either
7         read it back or re-express it.
8    BY MR. ISAACSON:
9         Q.   All right.  So paragraph 27
10   concludes -- again this is my effort to
11   understand what you have written.
12        A.   Okay.
13        Q.   Paragraph 27 concludes:
14             "The marginal revenue" --
15   "So the marginal revenue product will be
16   proportional to the event revenue."
17             Is the first sentence in
18   that paragraph an example -- are you
19   presenting an example of what happens
20   when marginal revenue product is
21   proportional to event revenue?
22             MR. CRAMER:  Form.
23             You may answer.
24             THE WITNESS:  The first
```

```
                                          Page 93
1    sentence in paragraph 27 is, you
2    know, inviting them to think about
3    a hypothetical situation in which
4    event revenue doubles, and to say
5    that, yes, then the marginal
6    revenue product of labor will
7    double as well.  So they're not --
8    they can vary independently in
9    that example.  So it's simply a
10   way of expressing proportionality,
11   although perhaps it seems not a
12   very clear way.
13   BY MR. ISAACSON:
14        Q.   And maybe it's helpful just
15   to state that the first sentence in
16   paragraph 27 is a hypothetical that
17   you're discussing; is that correct?
18             MR. CRAMER:  Objection to
19        form.
20             You may answer.
21             THE WITNESS:  I mean, I
22        haven't worked with the data in
23        this case.  I mean, so it's
24        hypothetical, but I think it's --
```



Page 94

```
 1           you know, it's a very plausible,
 2           reasonable hypothetical.
 3   BY MR. ISAACSON:
 4       Q.    And do you have an opinion
 5   as to whether the marginal revenue
 6   product of inputs to events other than
 7   the athlete is proportional to event
 8   revenue?
 9       A.    I mean, I haven't worked
10   with the data in this case, so I haven't
11   got an opinion on that in this case.
12       Q.    And for your opinion in this
13   case in paragraph 5, that wage share is
14   an appropriate way to analyze the
15   compensation of MMA fighters in this
16   case, is one premise for that conclusion
17   that event revenue is plausibly
18   proportional to marginal revenue product?
19       A.    I mean, this is holding, you
20   know, other things equal, yes.
21       Q.    And if marginal revenue
22   product is not shown to be proportional
23   to event revenue in this case, am I
24   correct you would not be able to reach an
```

Page 95

```
 1   opinion, without at least further
 2   analysis, of whether wage share is an
 3   appropriate way to analyze the
 4   compensation of MMA fighters in this
 5   case?
 6           MR. CRAMER:  Objection to
 7       form.
 8           You may answer.
 9           THE WITNESS:  I mean, I
10       haven't considered the other case,
11       so that, I mean, I haven't got an
12       opinion.  I would have to -- have
13       to think about that.  But that
14       isn't the same as saying it would
15       not be possible.
16   BY MR. ISAACSON:
17       Q.    All right.  Would you agree
18   that if the marginal revenue product of
19   the inputs other than the athletes was
20   not proportional, then the -- to event
21   revenue, then the marginal revenue
22   product of the fighters would also not be
23   proportional?
24           MR. CRAMER:  Objection to
```

Page 96

```
 1       form.
 2           THE WITNESS:  I don't think
 3       that -- I mean, I haven't thought
 4       about that, so I would have to
 5       think about that.
 6   BY MR. ISAACSON:
 7       Q.    All right.  Based on your
 8   work as a labor economist, do you think
 9   it's accepted that higher wages for
10   workers means that they will be retained
11   more effectively?
12       A.    I mean, higher wages
13   relative to alternatives that they might
14   have.  I mean, so I think it's more an
15   expression not of the level of wages, but
16   wages in one firm relative to other
17   opportunity.  And obviously in this case
18   those other opportunities are being
19   restricted.
20       Q.    Do you agree that those in
21   higher paid jobs are less likely to look
22   for other jobs?
23           MR. CRAMER:  Objection to
24       form.
```

Page 97

```
 1           THE WITNESS:  I have -- you
 2       know, I have done some, I believe
 3       in the book that I wrote in 2003
 4       there was some regressions that
 5       they were looking at -- and this
 6       is controlling for other factors,
 7       and one has to understand that
 8       that's across the whole of the
 9       market, so I would not draw the
10       conclusion from that, that that
11       was -- the conclusions of those
12       regressions would be applicable in
13       this particular case, to this type
14       of labor, which is -- you know, is
15       rather different in some ways from
16       what most people are doing.
17   BY MR. ISAACSON:
18       Q.    So while you would not
19   necessarily apply that conclusion here,
20   it's fair to say that based on the work
21   you've done, that generally in the labor
22   market, those in higher paid jobs are
23   less likely to look for other jobs?
24       A.    It's higher paid relative to
```



Page 98

```
 1  their other alternatives.
 2      Q.  Yes.  And those higher
 3  paid -- those individuals in higher paid
 4  jobs are also likely to search for other
 5  jobs less intensively; is that correct?
 6      A.  Higher paid relative to
 7  other alternatives.
 8      Q.  All right.  And in general
 9  in the labor markets, the higher the
10  salary offered by the current job, the
11  less likely the worker is to seek
12  alternative opportunities and to move
13  jobs, is that fair?
14          MR. CRAMER:  Asked and
15      answered.
16          THE WITNESS:  Yeah.  I mean,
17      I feel I've answered that.  I
18      mean, it's relative wages not the
19      absolute level.
20  BY MR. ISAACSON:
21      Q.  And it's also true, I gather
22  from your previous work, that empirical
23  studies of labor market have concluded
24  that there's a variation in wages that
```

Page 99

```
 1  cannot be explained by the skills and
 2  experience of the individual worker; is
 3  that right?
 4      A.  I mean, I think there are
 5  two issues there.  I mean, one is in
 6  datasets, you have a measure of skills
 7  and experience, and typically those
 8  measures are not perfect measures.  So
 9  first of all, one of -- I mean, part of
10  this is can you right -- estimate, you
11  know, things like earnings equations,
12  which haven't asked where one would fit
13  the data perfectly, no, you cannot, just
14  using measured skills and experience.
15  That's one reason skills and experience
16  are not perfectly measured.
17          The other is that there is
18  evidence that who you work for matters,
19  and that's consistent with the view that
20  labor markets have some degree of
21  monopsony power in them.
22      Q.  I ask you to look at
23  footnote 28 of your report.
24      A.  Which page is this?
```

Page 100

```
 1      Q.  This would be --
 2          MR. CRAMER:  Six.
 3          MR. ISAACSON:  Page 6.
 4  BY MR. ISAACSON:
 5      Q.  I also encourage your people
 6  who helped you with your caption to help
 7  you with the font of your footnotes in
 8  the future.
 9      A.  Okay.
10          MR. CRAMER:  I think you
11      might have to deal with Bill Gates
12      on that.
13          MR. ISAACSON:  Yeah.
14  BY MR. ISAACSON:
15      Q.  All right.  You say there:
16          "The identity of the
17  fighters participating in an event can
18  make a great deal of difference to how
19  much revenue it generates."
20      A.  Yeah.
21      Q.  And what do you mean by the
22  identity of the fighters in that
23  sentence?
24      A.  Well, this means that, you
```

Page 101

```
 1  know, people, you know -- it's going back
 2  to this idea that the fighters are the
 3  product in this case.  People are paying
 4  not just to see a fight, any other fight,
 5  they're paying to see a fight between two
 6  individuals -- particular individuals.
 7      Q.  And then you say that the
 8  recent fight -- well, actually let me go
 9  over that.
10          The -- and then you cite:
11          "The recent fight between
12  Floyd Mayweather and Conor McGregor is
13  illustrative.  Substituting two other
14  fighters in their place would have been
15  expected to generate far lower revenues."
16          Do you have an opinion of
17  whether the promotion of the McGregor/
18  Mayweather fight played a role in how
19  much generated -- how much revenue it
20  generated?
21      A.  I mean, I have not studied
22  that.  I have no opinion on that, no.
23      Q.  All right.  In footnote 28
24  you then cite an article from MMA Junkie.
```



```
                                          Page 166                                          Page 168
 1                                                    1            - - - - - -
 2            CERTIFICATE                                          E R R A T A
 3                                                    2            - - - - - -
 4                                                    3    PAGE  LINE  CHANGE
 5       I HEREBY CERTIFY that the                    4    ____  ____  _____
     witness was duly sworn by me and that the        5    ____  ____  _____
 6   deposition is a true record of the               6    ____  ____  _____
     testimony given by the witness.                  7    ____  ____  _____
 7                                                    8    ____  ____  _____
           It was requested before                    9    ____  ____  _____
 8   completion of the deposition that the           10    ____  ____  _____
     witness, ALAN MANNING, have the                 11    ____  ____  _____
 9   opportunity to read and sign the                12    ____  ____  _____
     deposition transcript.                          13    ____  ____  _____
10                                                   14    ____  ____  _____
11                                                   15    ____  ____  _____
12   ____Constance Kent____                          16    ____  ____  _____
         Constance S. Kent, CCR, RPR,                17    ____  ____  _____
13       Certified Court Reporter                    18    ____  ____  _____
         Registered Professional Reporter            19    ____  ____  _____
14       Certified LiveNote Reporter                 20    ____  ____  _____
         and Notary Public in and for the            21    ____  ____  _____
15       Commonwealth of Pennsylvania                22    ____  ____  _____
         Dated:  February 9, 2018                    23    ____  ____  _____
16                                                   24    ____  ____  _____
17
18
19
20       (The foregoing certification
21   of this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)

                                          Page 167                                          Page 169
 1       INSTRUCTIONS TO WITNESS                      1
 2                                                    2        ACKNOWLEDGMENT OF DEPONENT
 3          Please read your deposition               3
 4   over carefully and make any necessary            4        I,_____, do
 5   corrections.  You should state the reason        5   hereby certify that I have read the
 6   in the appropriate space on the errata           6   foregoing pages,  1 - 170, and that the
 7   sheet for any corrections that are made.         7   same is a correct transcription of the
 8          After doing so, please sign               8   answers given by me to the questions
 9   the errata sheet and date it.                    9   therein propounded, except for the
10          You are signing same subject             10   corrections or changes in form or
11   to the changes you have noted on the            11   substance, if any, noted in the attached
12   errata sheet, which will be attached to         12   Errata Sheet.
13   your deposition.                                13
14          It is imperative that you                14
15   return the original errata sheet to the         15   _____
16   deposing attorney within thirty (30) days       16   ALAN MANNING             DATE
17   of receipt of the deposition transcript         17
18   by you.  If you fail to do so, the              18
19   deposition transcript may be deemed to be       19
20   accurate and may be used in court.              20   Subscribed and sworn
21                                                        to before me this
22                                                   21   _____ day of _____, 20____.
23                                                   22   My commission expires:_____
24                                                   23
                                                     24   Notary Public
```



43 (Pages 166 to 169)