# EXHIBIT 43
Redacted Excerpts of Deposition of Professor Robert Topel

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
CUNG LE; NATHAN QUARRY, JON    )
FITCH, on behalf of            )
themselves and all others      )
similarly situated,            )
                               )
          Plaintiffs,          )
                               )
     vs.                       )   Case No.
                               )   2:15-cv-01045-RFB-(PAL)
                               )
ZUFFA, LLC, d/b/a Ultimate     )
Fighting Championship and      )
UFC,                           )
                               )
          Defendant.           )
_____)
```

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROBERT TOPEL

Washington, D.C.

December 5, 2017

9:34 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52568

10

1  revenues produced by the additional output?
2      A.  Yes.
3            (Topel Exhibit 2 was marked as
4               requested.)
5  BY MR. CRAMER:
6      Q.  I've had the court reporter mark as Topel
7  Exhibit 2 another document.  I'll ask my colleague
8  to hand copies of them to -- across the table.
9  What I've handed you is a book called "Modern" -- a
10 chapter from a book called "Modern Labor Economics"
11 by Ehrenberg and Smith; do you see that?
12     A.  Yes.
13     Q.  And you cite this book in note 205 in your
14 report?
15     A.  Among other books, yes.  Although I'm
16 looking for this one in particular.  There it is.
17     Q.  Okay.  So you cite this book as a resource
18 in your report, correct?
19     A.  Yes.
20     Q.  Is it a reliable resource for labor
21 economics, in your view?
22     A.  Well, I can't vouch for every word in it,
23 but I know the authors and they're good economists.
24     Q.  Okay.  Please turn to page 61 of Topel
25 Exhibit 2, and I'd like to draw your attention to a

11

1  sentence that appears in the paragraph under the
2  heading "Marginal income from additional unit of
3  input."
4      A.  Uh-huh.  Yes.
5      Q.  And there's a sentence that begins "For
6  example, if"; do you see that towards the middle of
7  the paragraph?
8      A.  I'm sorry.  My eye is being drawn to the
9  things that are underlined.
10     Q.  Yeah.  That -- the underlining is not done
11 by us.  It was --
12     A.  So this is a -- what paragraph are we in?
13     Q.  That same paragraph where the underlining
14 is.
15     A.  Well, there's underlining above and below.
16     Q.  Right.  So the --
17     A.  Under the heading "Marginal income"?
18     Q.  Yes.
19     A.  Okay.
20     Q.  There's a sentence that begins "For
21 example" towards the end of the paragraph.
22     A.  Oh, towards the end.  "For example."
23     Q.  Do you see that?
24     A.  Yes.
25     Q.  I'll read it to you.  It says --

12

1         THE REPORTER:  Guys.
2  BY MR. CRAMER:
3      Q.  -- "For example, if the presence of a
4  tennis star increases attendance at a tournament by
5  20,000 spectators and the organizers net $25 from
6  each additional fan, the marginal income produced
7  by this star is equal to her marginal product,
8  20,000 fans, times the marginal revenue of $25 per
9  fan.  Thus, her marginal revenue of product equals
10 $500,000."  Do you see that?
11     A.  Yes.
12     Q.  Would you agree with this?
13     A.  Well, it assumes that if -- that the
14 tennis star increases attendance at the tournament
15 by 20,000 spectators.  So if that's her marginal
16 product, then you multiply marginal product by --
17 by the $25.  It's not exactly right because that's
18 not necessarily the marginal revenue in the output
19 market, but that's okay.  So this is the value of
20 the marginal product is price times marginal
21 product.
22     Q.  And that's -- the textbook says her
23 marginal revenue of product is equal to $500,000;
24 is that fair?
25     A.  That's what it says, yeah.

13

1      Q.  And you disagree with that?
2      A.  No.  What I'm -- what I'm saying is
3  marginal revenue product is a little bit more
4  complicated because marginal revenue is less than
5  price if there's -- unless the firm's a price-taker
6  in the output market.  So it could -- maybe they're
7  assuming that this tennis tournament organization
8  is a price-taker in the output market, in which
9  case, fine, it would be the -- $25 is marginal
10 revenue per person, per attendee, and then you
11 multiply price times marginal product and you get
12 the value of the marginal product.
13     Q.  So what you're saying when you say that
14 the promoter, the tennis promoter here is a
15 price-taker in the output market, what you're
16 saying is that the tennis promoter has no market
17 power in the output market?
18     A.  That would be a consequence of being a
19 price-taker in the output market.
20     Q.  Okay.  And assuming that this computation
21 of the marginal revenue product is correct in your
22 view, correct?
23     A.  If by assumption she increases attendance
24 at the tournament by 20,000 spectors- -- spectators
25 holding everything else constant, like the

ROBERT TOPEL - HIGHLY CONFIDENTIAL

14

1  promotional activities of the tournament owner and
2  all that other jazz, then that's her marginal --
3  that's the value of her marginal product.
4     Q. And thus that's her marginal revenue
5  product; is that right?
6     A. Because price is equal to marginal revenue
7  by -- just assume, yes.
8     Q. Okay.
9        Would you turn -- you can put that aside
10 for the moment. Would you turn to paragraph 169 of
11 your report.
12    A. Are we going to come back to this?
13    Q. I don't think so.
14    A. Okay.
15    Q. We might.
16       Paragraph 169, page 74 of your report.
17 Towards the middle of the paragraph you say
18 "Economic theory"; do you see that?
19    A. Uh-huh. Yes, I do.
20    Q. You say economic theory predicts that an
21 employer acting as a monopsonist would suppress its
22 employees's wages as the employer's market power
23 increases"; do you see that?
24    A. Yes.
25    Q. Why is it that an employer acting as a

15

1  monopsonist would suppress its employee's wages as
2  the employer's market power increases?
3     A. Because in the case of a -- an employer
4  that faces rising supply price or rising average
5  factor cost for the -- for employees, marginal
6  factor cost exceeds average factor cost and the
7  amount that you pay is average factor cost. So
8  that the -- the wage will be less than marginal
9  factor cost. It will be equal to average factor
10 cost.
11    Q. All right. Turn to paragraph 130 of your
12 report, please.
13    A. Yes.
14    Q. In this paragraph in the middle of the
15 first sentence you define a worker's marginal
16 product as "What he or she can add to the value of
17 output in competing uses"; do you see that?
18 Paragraph 130, second sentence. I'm sorry.
19 "Competition for labor services causes the wage to
20 equal the value of a worker's marginal product -
21 what he or she can add to the value of output in
22 competing uses."
23    A. Yes.
24    Q. What you are saying is that the worker's
25 marginal product is equal to or is what he or she

16

1  can add to the value of output in competing uses,
2  correct?
3     A. I think you just read the part after the
4  hyphen there.
5     Q. Right. I'm just trying to clarify that
6  you are defining in this sentence worker's marginal
7  product, correct?
8     A. No.
9     Q. Okay. What is the part after the
10 sentence -- what does that mean? Why is that
11 there?
12    A. When I'm -- when I'm hiring labor in a
13 competitive labor market the price I have to pay is
14 what the person can add to the value of output
15 somewhere else because that's what other people are
16 willing to pay. So if -- if we're talking about
17 strawberry pickers, then I'm going to hire people
18 up to the point where the value that the person
19 adds to my output is equal to the price I have to
20 pay to get that person to work in my organization,
21 my strawberry picking organization. And if someone
22 else is willing to pay $10 an hour for that
23 person's services, then that's going to pin down
24 the value of the marginal product at my firm at $10
25 because I hire up to that point.

17

1     Q. Okay.
2     A. So that's the competing use.
3           (Whereupon a discussion was had
4              off the record.)
5  BY MR. CRAMER:
6     Q. At the beginning of this sentence -- or in
7  this sentence you talk about the worker's marginal
8  product. Did you mean in that sentence the
9  worker's marginal revenue product?
10    A. Well, I refer in that sentence to the
11 value of a worker's marginal product, which coming
12 back to the example you showed me from Ehrenberg
13 and Smith here is the marginal product. In this
14 world we're talking about competitions. So we're
15 going to have price of output times marginal
16 product or marginal revenue times marginal product.
17 So it's measured in dollars per unit.
18    Q. Okay. Is it fair to say that according to
19 basic economic principles labor in a competitive
20 market receives compensation equal to its marginal
21 revenue product in competing uses?
22    A. Yes, in a perfectly competitive market.
23    Q. Understood.
24       Would you agree that all things equal
25 higher levels of monopsony power in a labor market

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

18

1  would result in lower compensation for workers in
2  that market?
3      A.  What was the preface to that?
4      Q.  Higher levels of monopsony power in a
5  labor --
6      A.  You say would I agree and then --
7      Q.  All things equal.
8      A.  All things equal.  Sorry.  We're talking
9  -- forgive us, Tina.
10         MR. ISAACSON:  Maybe repeat the
11  question.
12         MR. CRAMER:  Yes, I will.
13  BY MR. CRAMER:
14     Q.  Would you agree that all things equal
15  higher levels of monopsony power in a labor market
16  would result in lower compensation for workers in
17  that market?
18     A.  If we're in a market where everybody is
19  paid the same price, yes.
20     Q.  What do you mean by that, where everyone
21  is same -- paid the same price?
22     A.  Well, the -- just as in the usual case of
23  monopoly where we're talking about a single price
24  seller, then a greater degree of market power on
25  the output side will result in a higher price

19

1  because demand is more inelastic and every
2  seller -- every unit has to trade for the same
3  price.  So if I want to expand at the margin --
4  sales at the margin I have to reduce price on every
5  unit.  And the issue here is that if I want to
6  expand employment at the margin and I face rising
7  supply price, then I have to pay every unit more.
8      Q.  When you say you face rising supply price,
9  is that the same as a downward sloping supply
10  curve -- I'm sorry -- upward sloping supply --
11     A.  Yeah, you don't want a downward sloping
12  supply curve.
13     Q.  Upward sloping supply curve.
14     A.  Demand down, supply up.
15     Q.  Okay.
16     A.  Yeah.  Yeah, upward sloping.  The firm
17  itself faces an upward sloping supply curve.
18     Q.  And when a firm faces an upward sloping
19  supply curve, that firm by definition has monopsony
20  power; is that correct?
21     A.  Has some degree of -- the term "monopsony
22  power" is dangerous, as you know, the way the term
23  monopoly power is dangerous.  It has some market --
24  some power some influence over the price at which
25  it transacts.

20

1      Q.  Monopsony power is measured in degrees.  A
2  firm can have a lot of monopsony power and a small
3  amount of monopsony power, correct?
4      A.  I presume you're talking about different
5  firms, but, yes, okay.
6      Q.  Or over time?
7      A.  Yeah.
8      Q.  Would you agree that the degree to which
9  firms in a market pay workers less than their
10  marginal revenue product depends on the elasticity
11  of labor supply?
12     A.  To the firm.
13     Q.  To the firm.
14     A.  Yes.
15     Q.  So the answer is yes.
16        Is it fair to say that even though a firm
17  with some degree of monopsony power pays its
18  workers below the worker's marginal revenue product
19  that the worker pay is nonetheless correlated with
20  the marginal revenue product?
21     A.  You mean that you're moving up and down
22  along an upward sloping supply curve?
23     Q.  Yes.
24     A.  So in something that increases -- with
25  rising supply price something that increases

21

1  marginal revenue product would cause you to move
2  out along the -- along the average factor cost
3  curve; is that what you're saying?
4      Q.  Well, let me ask it this way.  Is it fair
5  to say that, all things equal, when marginal
6  revenue product of a firm's workers rise, a firm
7  with monopsony power will pay its workers more?
8      A.  Yeah.  Over the -- over some period of
9  time, yeah.  There's contracts and things like
10  that.  Some simple shocks are not going to do it.
11     Q.  But over some period of time, all things
12  equal, when a firm's marginal revenue of product of
13  its workers rises, a firm with monopsony power will
14  pay its workers more; is that fair?
15     A.  I think that's fair, yeah.
16     Q.  And similarly, all things equal, when the
17  marginal revenue product of a firm falls over time
18  a firm with monopsony power will pay its workers
19  less; is that fair?
20     A.  Moving along an average factor cost curve
21  which you've presumed to slope up.  So that's
22  fair.
23     Q.  And that condition that the supply curve
24  is presumed to slope up is another way of saying
25  that the firm has monopsony power; is that right?

210

1  Q. So you didn't read a draft of Professor
2  Blair's report, correct?
3  A. No.
4  Q. Meaning correct you did not read it? Am I
5  correct that you did not read a draft of Professor
6  Blair's report before it was submitted, to your
7  understanding?
8  A. I did not read -- I do not recall reading
9  a draft of his report, and my testimony as I sit
10 here is I don't believe I did.
11 Q. Did you have a conversation with Professor
12 Blair in the context of this case?
13 A. No.
14 Q. Did you have a conversation with
15 Professor Oyer in the context of this case?
16 A. No.
17 Q. Did you read Professor Oyer's report in
18 this case?
19 A. You know, I might have looked at it. I
20 can't remember.
21 Q. Did you notice in Professor Blair's report
22 that he identifies one of his concentrations as
23 sports economics?
24 A. I seem to recall that. I know he's worked
25 in that area.

211

1  Q. Do you know that he includes sports
2  economics as one of his academic concentrations?
3  A. Didn't you just ask me that?
4  Q. I did. You're right.
5  A. Asked and answered.
6  Q. Sustained.
7     Are you aware that Professor Blair wrote a
8  textbook entitled "Sports Economics"?
9  A. You know, I might have been aware.
10 Q. Have you ever seen that textbook?
11 A. I don't recall as I sit here.
12 Q. Are you aware that Professor Zimbalist is
13 an expert for the Plaintiffs in this case?
14 A. Yes.
15 Q. Did you read his report?
16 A. You know, I think I read some excerpt from
17 his report. It would have been submitted that -- I
18 think we have a footnote somewhere in here, in my
19 report about his report, but that's all I know
20 about his report.
21 Q. Would you agree that Professor Zimbalist
22 is a well-known sports economist?
23 A. I have no opinion. I don't know
24 Professor -- if well known is that I know him, no.
25 Q. You had not heard of Professor Zimbalist

212

1  before you worked on this case?
2  A. That's correct.
3  Q. Okay. Is it fair to say that you have not
4  published in the field of sports economics?
5  A. Oh, no.
6  Q. Can you identify your publications in the
7  field of sports economics for me, please?
8  A. We wrote a report on -- in negotiations
9  between the NFL Players Association and the NFL.
10 Q. And by "we" you mean you and Professor
11 Murphy?
12 A. Yes.
13 Q. Was that report published?
14 A. I don't know. It was not in a
15 professional journal. I don't think we ever
16 submitted it.
17 Q. Other than this report that you just
18 identified for the NFL Players Association, can you
19 identify another paper that you've published in the
20 field of sports economics?
21 A. Oh my goodness. Not that I recall.
22 Q. Have you ever testified or submitted an
23 expert report in an antitrust case relating to
24 sports economics other than this case?
25 A. Not that I recall.

213

17 Q. Other than what you just identified, did
18 you ever consult for a professional sports team?
19 A. For a team? You know, I don't -- I might
20 have. I can't recall.
21 Q. Did you ever consult for a professor --
22 professional sports league?
23 A. I don't think I've consulted for a league.
24 Q. Other than your work for the NFL Players
25 Association, have you ever consulted for

ROBERT TOPEL - HIGHLY CONFIDENTIAL

214

1  professional athletes?
2      A.  Yes.
3      Q.  What was the nature of that consulting?
4      A.  I participated in negotiations and
5  calculations and thinking and modeling and thinking
6  about the union negotiations between the NBA
7  Players Association and the NBA.
8      Q.  And you did that on behalf of the Players
9  Association or the NBA?
10     A.  On behalf of -- we were paid by the
11 Players Association.
12 [REDACTED]
13 [REDACTED]
14 [REDACTED]
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18     Q.  So did you in the course of your
19 consulting work for the NF- --- NBA Players
20 Association use players' share of revenue in your
21 analysis for that consulting work?
22     A.  I don't know what you mean by "use," but
23 the -- the -- if the contract called for a share we
24 would have taken that into account, but I don't
25 recall what we did.

215

1      Q.  How long ago was this work?
2      A.  Oh, ten years ago.
3      Q.  Other than the work that you've just
4  identified over the past 10 or 15 minutes, what
5  other work have you done relating to sports or
6  sports leagues?
7      A.  You mean in a consulting context or --
8      Q.  In any context.
9      A.  I once deconstructed one of my colleague's
10 papers on -- on putting, of all things.  I didn't
11 write a paper about it.  I just told him where his
12 mistakes were.
13     Q.  Did this have to do with Tiger Woods?
14     A.  Yeah.
15     Q.  I think I've read that paper.
16        Other than the --
17     A.  Never mind.
18     Q.  Other than the analysis that you just
19 described in the last 10 or 15 minutes and the
20 deconstruction of the paper on putting, is there
21 anything else -- any other work that you can recall
22 sitting here right now that you've done in the
23 field of sports or sports economics?
24     A.  I mean, you're saying work.  Can you -- my
25 colleagues worked on various things.  One of them

216

1  was aging for Yao Ming.  I might have talked to him
2  about some of the stuff he was doing, but there's
3  nothing formal that I can recall.
4      Q.  Have you ever taught a course in sports
5  economics?
6      A.  With the title sports economics, no.  No.
7      Q.  Have you ever submitted a report in an
8  antitrust case relating to sports economics other
9  than this case?
10     A.  No.
11     Q.  You're aware, are you not, that sports
12 economists have used athlete's share of revenue as
13 a benchmark for assessing the relative balance of
14 power between athletes and ownership in
15 professional sports, correct?
16        MR. ISAACSON:  Objection to form,
17 foundation.
18 BY THE WITNESS:
19     A.  Well, I don't know if they've used it
20 for -- maybe that sentence occurred somewhere, but
21 the relative balance of power, I don't even know --
22 I don't know what that means.  So I have seen
23 papers where either the teams or someone else or a
24 union contract would calculate the share of revenue
25 that's paid to the players.

217

1      Q.  Did you read Professor Oyer's deposition
2  in this case?
3      A.  No.
4      Q.  You are aware that economists have in
5  published works and peer reviewed journals, are you
6  not, used athlete share of revenue to test whether
7  and to what degree professional owners were
8  exercising monopsony power, are you not?
9         MR. ISAACSON:  Objection, foundation.
10 BY THE WITNESS:
11     A.  I think they might have used it to
12 illustrate the effects of -- maybe we're not on the
13 same page -- the effects of ending monopsony power
14 when they had reason to believe that nothing else
15 had changed, but I haven't seen -- I don't recall
16 it as a test where I -- in the context of -- where
17 I would define test of the existence of monopsony
18 power.
19     Q.  Can you identify the articles that you're
20 referring to in your last answer sitting here
21 today?
22     A.  I've seen papers where -- you know, you
23 referred to the end of the reserve clause and I've
24 seen papers that calculate the share before and
25 after the end of the reserve clause, but they also

**218**

1  calculate salaries before and after the end of the
2  reserve clause. That's the one that comes to mind.
3  **Q. Have you seen a published paper in a**
4  **peer-reviewed journal that evaluates Major League**
5  **Soccer using wage share?**
6     A. I've seen a paper that evaluates Major
7  League Soccer. I can't remember if it's in a
8  peer-reviewed journal.
9     **Q. Fair to say that you have not cited in**
10 **your report any of the articles that we've just**
11 **discussed in response to the last two answers?**
12    A. I think that's a fair statement, yes.
13    **Q. Do you cite in your report any**
14 **publications that say it's not appropriate for an**
15 **economist to use wage share in conducting**
16 **microeconomic analysis?**
17    A. That's like asking me to prove a negative.
18 I mean, you shouldn't use it and, you know,
19 economists won't use it because it doesn't
20 represent the outcome in question. It can rise or
21 fall whether there's, in the context of this case,
22 monopsony power or not. So why would somebody
23 write a paper about that?
24    **Q. So you haven't cited one, it follows,**
25 **correct?**

**219**

1     A. Yeah, but I mean, you wouldn't like -- you
2  wouldn't use the weight of the athletes to
3  ascertain monopsony power either and nobody's going
4  to write a paper about that.
5     **Q. You don't in your report cite to any**
6  **publications that say it's not appropriate for an**
7  **economist to use wage share in assessing the**
8  **effects of monopsony power, do you?**
9     A. Didn't you just -- isn't that what you
10 just asked me?
11    **Q. The last question had to do with**
12 **conducting microeconomic analysis, or did I not --**
13 **I'll ask it this way.**
14    A. You mean might they being doing a
15 macroeconomic analysis; is that your question is?
16    **Q. Yes.**
17    A. Okay. Repeat the question.
18    **Q. Do you cite in your report any**
19 **publications that say it's not appropriate for an**
20 **economist to use wage share in conducting**
21 **microeconomic analysis?**
22       MR. ISAACSON: That's the one he's
23 answered.
24 BY MR. CRAMER:
25    **Q. Okay. All right. Then if he's answered**

**220**

1  that I'll ask the next question. **Did you cite any**
2  **publications in your report that say it's not**
3  **appropriate for an economist to use wage share in**
4  **assessing the effects of monopsony power?**
5     A. It sounds like the same question, but, you
6  know, I don't recall any citations like that.
7     **Q. Okay. Do you cite in your report any**
8  **publications that use wage level as a measure of**
9  **the marginal product of labor of professional**
10 **athletes?**
11    A. Well, in a competitive marketplace, as we
12 discussed before, the principles apply so that the
13 wage level in a competitive marketplace would be
14 the marginal product of -- the marginal revenue
15 product, the value of the marginal product of -- of
16 a worker.
17    **Q. Can you identify for me the articles you**
18 **cited in your report that use wage share -- or wage**
19 **level specifically as a measure of the marginal**
20 **product of labor of professional athletes?**
21    A. Well, I've stated a general principle of
22 economics. So all of the citations that I made to
23 labor economics textbooks, microeconomics
24 textbooks, and so on indicate what the marginal
25 revenue product of labor is and there's nothing

**221**

1  special about -- for these purposes about the fact
2  that these people perform the particular kind of
3  services that they perform because economics
4  applies.
5     **Q. Do you in your report cite to any**
6  **publications that specifically assess the effects**
7  **of monopsony power on the compensation of**
8  **professional athletes?**
9     A. I don't recall citing any of the papers
10 that you have in mind.
11    **Q. Do you cite in your report any**
12 **publications or papers that attempt to measure the**
13 **marginal product of labor of professional athletes?**
14    A. Not that I recall.
15    **Q. All right. You testified earlier that you**
16 **authored a document with Professor Murphy that**
17 **evaluates the economics of team ownership in the**
18 **NFL; is that right?**
19    A. Yes.
20    **Q. All right. I'd like to show that document**
21 **to you and mark it as Topel Exhibit next.**
22       THE REPORTER: 5.
23       MR. CRAMER: 5.
24          (Topel Exhibit 5 was marked as
25          requested.)

**262**

1  test said is there any reason to put these guys in
2  here, let's find out whether we improve precision
3  by having those guys.  The answer is no.  I mean,
4  they're different.  It's about getting more
5  reliable information.  It's not about Zuffa, it's
6  about somebody else.
7      **Q.  And if you come up with a source for that**
8  **proposition from an econometric text I hope you**
9  **provide it to me because I didn't hear one.**
10         MR. CRAMER:  Let's go off the record.
11         THE VIDEOGRAPHER:  Going off the record at
12  5:28.
13            (Whereupon, at 5:28 p.m. the
14             taking of the instant
15             deposition was adjourned until
16             8:30 a.m., Wednesday,
17             December 6, 2017.)

**263**

    STATE OF _____ )
                             ) :ss
    COUNTY OF _____ )

        I, ROBERT TOPEL, the witness
    herein, having read the foregoing
    testimony of the pages of this deposition,
    do hereby certify it to be a true and
    correct transcript, subject to the
    corrections, if any, shown on the attached
    page.

            _____
                ROBERT TOPEL


    Sworn and subscribed to before
    me, this      day of
             , 2017.

    _____
        Notary Public

**264**

        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

        I, TINA M. ALFARO, Registered Professional
    Reporter, Certified Realtime Reporter, and Notary
    Public, the officer before whom the foregoing
    deposition was taken, do hereby certify that the
    foregoing transcript is a true and correct record
    of the testimony given; that said testimony was
    taken by me stenographically and thereafter reduced
    to typewriting under my direction; that reading and
    signing was requested; and that I am neither
    counsel for, related to, nor employed by any of the
    parties to this case and have no interest,
    financial or otherwise, in its outcome.
        IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my notarial seal this 18th day of
    December, 2017.
    My Commission expires October 31, 2020.


            _____
    NOTARY PUBLIC IN AND FOR THE
    DISTRICT OF COLUMBIA

**265**

        INSTRUCTIONS TO WITNESS

        Please read your deposition over carefully
    and make any necessary corrections. You should state
    the reason in the appropriate space on the errata
    sheet for any corrections that are made.
        After doing so, please sign the errata sheet
    and date it.
        You are signing same subject to the changes
    you have noted on the errata sheet, which will be
    attached to your deposition.
        It is imperative that you return the original
    errata sheet to the deposing attorney within thirty
    (30) days of receipt of the deposition transcript by
    you. If you fail to do so, the deposition transcript
    may be deemed to be accurate and may be used in court.