# EXHIBIT 45
Excerpts of Deposition of Carlos Silva

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
      Plaintiffs, )
)
    vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
      Defendant. )
)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CARLOS SILVA

Las Vegas, Nevada

April 18, 2017

9:16 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
Job No. 49524

198

1  A. Yes.
2  Q. Have you heard of a champion's clause or a
3  championship clause?
4  A. I have.
5  Q. And what is that?
6  A. It could be a few things. It could mean
7  that you get a bonus if you're a champion and win.
8  It could mean that your contract gets renewed
9  automatically if you're a champion and in a
10 promotion.
11 Q. Okay. So talking about the latter, the
12 latter form of a champion's clause where the contract
13 gets automatically renewed, is that something that
14 World Series Of Fighting has in its contracts with
15 its athletes?
16 A. Sometimes.
17 Q. Why would it have that type of clause in
18 its contracts? Strike that.
19    Why would World Series Of Fighting have
20 that type of champion clause in its contracts with
21 its athletes?
22 A. You don't want -- you don't want champions
23 to leave.
24 Q. And why don't you want them to leave?
25 A. Because they're your champions. Simple as

199

1  that.
2  Q. Okay. And they're valuable to the
3  organization?
4  A. I think all the fighters are valuable to
5  the organization, but the public likes champions, so
6  champions represent the organization, so you'd like
7  to keep your champions happy. Sometimes keeping them
8  happy is giving them a clause to renew; sometimes it
9  isn't.
10 Q. So are there fighters that prefer to have
11 that type of clause in their contract?
12 A. There's fighters that prefer it, and
13 there's fighters that do not prefer it.
14 Q. Is it your understanding that having that
15 type of champion's clause in a contract is customary
16 in the MMA industry?
17 A. I think it's been customary. I think it's
18 changed.
19 Q. Have you heard of something called an
20 exclusive negotiation period
21 A. Yes.
22 Q.    in contracts?
23    And is that something the World Series Of
24 Fighting has in its contracts with its athletes?
25 A. At times, yes.

200

1  Q. And what is the purpose of that type of
2  clause? Well, strike that.
3     What is that type of clause? What does an
4  exclusive negotiating period mean?
5  A. It's a window that gives you the
6  opportunity to talk to your currently-under-contract
7  fighter prior to them looking at other places to go
8  become a professional.
9  Q. What is the purpose of having that clause
10 in the contracts?
11 A. It's a -- you know, you're a lawyer and I'm
12 not. It's to protect the company.
13 Q. Have you heard of something called a right
14 to match?
15 A. Sure.
16 Q. Is that something the World Series has in
17 its contracts with its athletes?
18 A. At times, we do.
19 Q. What is the purpose of that -- well, strike
20 that.
21    What is the right to match?
22 A. The ability -- if a fighter needs to go --
23 if a fighter is allowed to go look at other
24 opportunities, it gives the organization an
25 opportunity to match the bidders that are on the

201

1  outside of World Series Of Fighting.
2  Q. What is the purchase of having that type of
3  clause in a contract with athletes?
4  A. Optionality for us to retain an athlete.
5  Q. What do you mean by optionality?
6  A. It gives us the ability to match an offer
7  if we would like to. Gives us the option to match
8  the offer.
9  Q. Have you heard of something called an
10 ancillary rights clause?
11 A. You'd have to tell me what that is.
12 Q. In your -- in World Series Of Fighting's
13 contracts with its athletes, do the athletes grant
14 World Series Of Fighting identity rights?
15 A. Partial identity rights, yes.
16 Q. And do they grant World Series Of Fighting
17 ancillary rights, meaning for example, rights to the
18 fight footage that World Series creates?
19 A. No. They don't have any right to grant us
20 the right to our fight footage.
21 Q. Because you inherently own that footage?
22 A. Correct.
23 Q. Okay. And do they grant you ancillary
24 rights to any intersection of where they're involved
25 in a World Series Of Fighting related event?

Carlos Silva - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

202

1  A. Do they grant us?
2  Q. Is that part of the contract?
3  A. For the fighter to grant World Series Of
4  Fighting the right?
5  Q. Right.
6  A. No. They don't have the right to give it
7  to us.
8  Q. Okay. Because you own it?
9  A. Correct.
10 Q. And you presumably would never grant the
11 athlete those rights?
12 A. We do at times. If they need it for a
13 sponsor, a documentary, a movie, something like that.
14 Q. So you would give written permission for
15 them to use it to for a specific purpose?
16 A. Correct.
17 Q. But ultimately, you would own the rights to
18 that --
19 A. Correct.
20 Q. -- intellectual property?
21 A. We're not giving them the rights, we're
22 letting them borrow the rights. There's a big
23 difference.
24 Q. Why is it important that World Series Of
25 Fighting retains those intellectual property rights?

203

1  A. An asset of the company.
2  Q. It's an important asset?
3  A. All assets are important.
4  Q. Well, what makes these particular assets
5  important?
6  A. It's media. It's a -- it's a library, an
7  asset of a media company, of a sports property, is
8  the live footage is owned by the company.
9  Q. When broadcasting an event on television,
10 do you compete for television viewers?
11 A. Yes.
12 Q. And are you competing only with other MMA
13 promoters for television viewers, or are you also
14 competing with other sports and entertainment
15 programming for viewers?
16 A. Competing with everything that's on
17 television.
18 Q. So not just sports and entertainment
19 programming?
20 A. Correct.
21 Q. Are you competing with anything other than
22 what is on television?
23 A. Yes.
24 Q. What else would you be competing with?
25 A. A pretty day.

204

1  Q. What do you mean by that?
2  A. If you're on television from 8:00 to
3  10:00 at night, you're competing with everything else
4  that people could do from 8:00 to 10:00 at night.
5  Anything. Live sport event, theater, television,
6  cable, broadband, pay services, Amazon, Netflix.
7  Q. Do you compete with other organizations to
8  sign MMA athletes?
9  A. Yes.
10 Q. And when looking for athletes to sign, do
11 you look only for those athletes in North America, or
12 do you look around the world?
13 A. Around the world.
14 Q. And are you competing to sign those
15 athletes against MMA promoters that are located only
16 in North America or other promoters around the world?
17 A. Both, but primarily North America.
18 Q. But there are some promoters around the
19 world that you would compete with --
20 A. There's a few.
21 Q. -- to sign some athletes?
22 A. There's a few around the world.
23 Q. Is there a large talent pool available from
24 which World Series Of Fighting can sign MMA athletes?
25 A. Yes.

205

1  Q. Do you think MMA promoters should be able
2  to make their own business decisions about whether to
3  co promote bouts?
4  A. Yes.
5  Q. Do you think the term "elite professional
6  MMA fighter" is a subjective term?
7  A. Yes.
8  Q. Are you aware of any sort of certification
9  that an MMA athlete can get that certifies them as an
10 elite professional MMA fighter?
11 A. No.
12 Q. Has the UFC blocked the World Series Of
13 Fighting from any inputs necessary to put on
14 successful MMA events?
15 A. No.
16 Q. Has the UFC done anything to impede your
17 ability to compete with them?
18 A. No.
19 Q. Is MMA as big as the NFL?
20 A. Not yet.
21 Q. And how are they different?
22 A. How are what different?
23 Q. The NFL and MMA.
24    MR. COUVILLIER: Objection, vague.
25    THE WITNESS: You have to be a little more

52 (Pages 202 to 205)

Carlos Silva - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

206

1  specific about your question.
2  BY MR. SKAGGS:
3      Q.  Let's say financially, would you say
4  they're on the same playing field?  No pun intended.
5      A.  No.  NFL is the biggest -- the biggest
6  sport in America, undoubtedly.  UFC, MMA, Bellator,
7  World Series Of Fighting combined in North America,
8  along with all of the regionals, aren't as big as the
9  NFL.
10     Q.  Okay.  You mentioned earlier that
11 Ali Abdel Aziz was a manager of MMA athletes at the
12 same time he was a senior vice president or whatever
13 his title was at World Series Of Fighting; is that
14 correct?
15     A.  Is it correct that he managed athletes at
16 the same time that he was working as a full-time
17 contractor at World Series Of Fighting?
18     Q.  Right.
19     A.  Correct.
20     Q.  Do you think that created the risk of a
21 conflict of interest?
22     A.  Yes.  That's why it was the first thing
23 that I did when I took over the organization was to
24 change that.
25     Q.  And what was your   why did you make that

207

1  decision?
2      A.  Because it was a conflict of interest.
3      Q.  So Mr. Maysey introduced some emails
4  earlier from Mr. Aziz about releasing certain
5  fighters.
6          Could you tell based on those emails
7  whether Mr. Aziz was acting in his capacity as a
8  manager of fighters or an executive of the World
9  Series Of Fighting when he sent those emails?
10     A.  I could not tell from those emails.
11 However, they were signed by him indicating that he
12 was with World Series Of Fighting.
13     Q.  But you don't know for sure what he thought
14 his role was when he was making those decisions?
15     A.  Yeah.  I can't -- I can't answer what I
16 thought was in Ali's head.
17     Q.  That's fair.
18     A.  Nobody could.
19         MR. SKAGGS:  I have no more questions.
20         THE VIDEOGRAPHER:  Do you have anything?
21         MR. MAYSEY:  No.
22         THE VIDEOGRAPHER:  This concludes today's
23 deposition of Carlos Silva.
24         The number of media used was three, and we
25 are off the record at 3:28 p.m.

208

1          MR. MAYSEY:  Can we stand and close it?
2          THE VIDEOGRAPHER:  I'm sorry.  We're still
3  on the record.  Go ahead, Counsel.
4          MR. MAYSEY:  Yes.  We will read and sign.
5          We're going to reserve the right to
6  reconvene this deposition in the event additional
7  financial information is disclosed that we have not
8  seen to date.
9          MR. SKAGGS:  Zuffa does not consent to that
10 reservation of rights.
11         MR. MAYSEY:  That's fine.
12         MR. COUVILLIER:  Neither do we.
13         MR. MAYSEY:  We are reserving our rights.
14 We don't anticipate we're going to have to call you
15 back, but we're not closing the deposition as of
16 today.
17         MR. WIDNELL:  And just to be clear, we'll
18 designate the entire -- I think we've already said
19 this, but designate the entire transcript as highly
20 confidential until we've had a chance to review
21 and --
22         MR. SKAGGS:  And you've had a chance to
23 review.
24         MR. COUVILLIER:  Well, I want him released
25 from the subpoena, though.  I mean, we're here, we've

209

1  produced the documents.  I think if you have the
2  questions, he's prepared to answer whatever questions
3  you may have that are left, but we will object and we
4  will state that from our consideration, he has been
5  relieved of the subpoena and has complied with it
6  fully.
7          MR. SKAGGS:  And Zuffa agrees.
8          MR. MAYSEY:  We do not, and we have stated
9  our position for the record.
10         But I appreciate that.
11         THE VIDEOGRAPHER:  Okay.  Are we off, then?
12         We are off the record at 3:30 p.m.
13         (Time Noted:  3:30 p.m.)

53 (Pages 206 to 209)

Carlos Silva - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Page 210

```
 1
 2    STATE OF                )
 3                       ) :ss
 4    COUNTY OF               )
 5
 6
 7         I, CARLOS SILVA, the witness
 8    herein, having read the foregoing
 9    testimony of the pages of this deposition,
10    do hereby certify it to be a true and
11    correct transcript, subject to the
12    corrections, if any, shown on the attached
13    page.
14
15
16                CARLOS SILVA
17
18
19
20    Sworn and subscribed to before
21    me, this        day of
22             , 2017.
23
24
25         Notary Public
```

## Page 211

```
 1         CERTIFICATE OF REPORTER
 2         I, Cynthia K. DuRivage, a Certified
 3    Shorthand Reporter of the State of Nevada, do hereby
 4    certify:
 5         That the foregoing proceedings were taken
 6    before me at the time and place herein set forth;
 7    that any witnesses in the foregoing proceedings,
 8    prior to testifying, were duly sworn; that a record
 9    of the proceedings was made by me using machine
10    shorthand which was thereafter transcribed under my
11    direction; that the foregoing transcript is a true
12    record of the testimony given.
13         I further certify I am neither financially
14    interested in the action nor a relative or employee
15    of any attorney or party to this action.
16         Reading and signing by the witness was
17    requested.
18         IN WITNESS WHEREOF, I have this date
19    subscribed my name.
20    Dated:  April 27th, 2017
21
22
23              CYNTHIA K. DuRIVAGE
                   CCR No. 451
24
25
```

## Page 212

```
 1              INSTRUCTIONS TO WITNESS
 2
 3         Please read your deposition over carefully
 4    and make any necessary corrections. You should state
 5    the reason in the appropriate space on the errata
 6    sheet for any corrections that are made.
 7         After doing so, please sign the errata sheet
 8    and date it.
 9         You are signing same subject to the changes
10    you have noted on the errata sheet, which will be
11    attached to your deposition.
12         It is imperative that you return the original
13    errata sheet to the deposing attorney within thirty
14    (30) days of receipt of the deposition transcript by
15    you. If you fail to do so, the deposition transcript
16    may be deemed to be accurate and may be used in court.
```

## Page 213

```
 1                    E R R A T A
 2
 3
 4
 5    I wish to make the following changes,
 6    for the following reasons:
 7
 8    PAGE LINE
 9         CHANGE:
10    REASON:
11         CHANGE:
12    REASON:
13         CHANGE:
14    REASON:
15         CHANGE:
16    REASON:
17         CHANGE:
18    REASON:
19         CHANGE:
20    REASON:
21
22
23    WITNESS' SIGNATURE         DATE
```