Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:   (215) 875-3000
Facsimile:    (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

*Co-Lead Counsel for the Classes and*
*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Luis Javier*
*Vazquez, Brandon Vera, and Kyle Kingsbury*

*(Additional counsel appear on signature page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>          Defendant. | Case No.: 2:15-cv-01045-RFB-PAL<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................1

II.  ARGUMENT .....................................................................................................3

    A.   Zuffa Misstates the Rule 23 Standards...............................................3

    B.   Evidence of the Antitrust Violation Is Entirely Common and Will Predominate ..4

    C.   Zuffa Fails to Rebut Plaintiffs' Showing of Common Impact............................6

        1.   Dr. Singer's Use of Wage Share Is Proper. ................................................7

        2.   Dr. Singer's Use of Foreclosure Share Is Proper. ....................................9

        3.   Dr. Singer Shows Common Impact Based on a Pay Structure. ...............12

    D.   Plaintiffs' Claims Are Typical of the Class Claims ...............................................16

    E.   Plaintiffs Satisfy the Adequacy Requirement.......................................................19

    F.   Plaintiffs' Showing Complies with *Comcast* ......................................................21

    G.   Class Litigation Is Superior to Individual Actions................................................23

    H.   Common Issues Predominate for the Identity Class ............................................24

    I.   Plaintiffs Have Standing to Seek Injunctive Relief..............................................25

III. CONCLUSION..................................................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Alexander v. JBC Legal Grp., P.C.*,
   237 F.R.D. 628 (D. Mont. 2006) ....................................................................19

*Allen v. Dairy Farmers of Am., Inc.*,
   279 F.R.D. 257 (D. Vt. 2011) .......................................................................20

*Allen v. Dairy Farmers of Am., Inc.*,
   No. 5:09-cv-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012) .........................4, 21

*Allen v. Holiday Universal*,
   249 F.R.D. 166 (E.D. Pa. 2008) ...................................................................19

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ....................................................................4

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
   568 U.S. 455 (2013) ...........................................................................3, 4, 5

*Backus v. ConAgra Foods, Inc.*,
   No. C 16-00454, 2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) ...................17, 18

*Barnes v. AT&T Pension Benefit Plan*,
   270 F.R.D. 488 (N.D. Cal. 2010) ...............................................................19, 25

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) .........................................................................25

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ............................................................................6

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) .........................................................................20

*Boyd v. Bank of Am. Corp.*,
   300 F.R.D. 431 (C.D. Cal. 2014) ...................................................................24

*Braintree Labs., Inc. v. McKesson Corp.*,
   No. 11-80233, 2011 WL 5025096 (N.D. Cal. Oct. 20, 2011) .........................20

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ................................................................11

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ..................................................................................21, 22

ii

*Edmonds v. Levine*,
    233 F.R.D. 638 (S.D. Fla. 2006) ...................................................................................18

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..................................................................................3, 17

*Fears v. Wilhelmina Model Agency, Inc.*,
    No. 02-cv-4911, 2003 WL 21659373 (S.D.N.Y. July 15, 2003).....................................17

*Fleischman v. Albany Med. Ctr.*,
    No. 1:06-cv-765, 2008 WL 2945993 (N.D.N.Y. 2008) .................................................15

*Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*,
    55 F.R.D. 26 (S.D.N.Y 1972)........................................................................................20

*Fujita v. Sumitomo Bank of Cal.*,
    70 F.R.D. 406 (N.D. Cal. 1975) ...................................................................................19

*Gilkey v. Cent. Clearing Co.*,
    202 F.R.D. 515 (E.D. Mich. 2001).................................................................................18

*Growers 1-7 v. Ocean Spray Cranberries, Inc.*,
    No. 12-12016, 2016 WL 10849499 (D. Mass. May 10, 2016) .........................................4

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .................................................................................16, 17

*Haro v. Sebelius*,
    747 F.3d 1099 (9th Cir. 2014) .....................................................................................25

*Herrera v. LCS Fin. Servs. Corp.*,
    274 F.R.D. 666 (N.D. Cal. 2011) .................................................................................17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2004).....................................12

*In re Domestic Drywall Antitrust Litig.*,
    13-MD-2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017)............................................19

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) .................................................................................16

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013).......................................................................9, 14

*In re Korean Ramen Antitrust Litig.*,
    No. 13-cv-04115, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .....................................17

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
    311 F.R.D. 532 (N.D. Cal. 2015) ........................................................................ *passim*

*In re NCAA I-A Walk On Football Players Litig.*,
No. 04-cv-1254, 2006 WL 1207915 (W.D. Wash. May 3, 2006) ..........................................6

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
No. 09-cv-1967, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013)...........................................6

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ....................................................................................12

*In re Organogenesis Sec. Litig.*,
241 F.R.D. 397 (D. Mass. 2007) .....................................................................................18

*In re Polyurethane Foam Antitrust Litig.*,
No. 1:10-md-2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014)...............................13

*In re Processed Egg Prod. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D. Pa. 2015)................................................................................13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017) ..................................................................................22

*In re Se. Milk Antitrust Litig.*,
No. 2:08-md-1000, 2010 WL 3521747 (E.D. Tenn. Sept. 7, 2010)..................................4

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ......................................................................................4

*In re Tricor Direct Purchaser Antitrust Litig.*,
252 F.R.D. 213 (D. Del. 2008).....................................................................................5, 6

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .............................................................................................5

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
No. 04-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008) .............................................17

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
527 F. Supp. 2d 1053 (N.D. Cal. 2007).........................................................................19

*In re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) ...................................................................................17

*In re Syngenta AG MIR 162 Corn Litig.*,
No. 14-md-2591, 2016 WL 5371856 (D. Kan. Sept. 26, 2016)........................................3

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) .....................................................................................3

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
No. 07-cv-1292, 2009 WL 5031334 (D. Ariz. July 14, 2009) ...............................8, 15, 19

iv

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102 (N.D. Cal. 2008) .................................................................................20

*Kelen v. World Fin. Network Nat'l Bank*,
    295 F.R.D. 87 (S.D.N.Y. 2013) .................................................................................18

*Le v. Zuffa, LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016) .................................................................. *passim*

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ...............................................................................21, 25

*McDonough v. Toys R Us, Inc.*,
    638 F. Supp. 2d 461 (E.D. Pa. 2009) ..........................................................................3

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    262 F.R.D. 58 (D. Mass. 2008) ...................................................................................3

*NicSand, Inc. v. 3M Co.*,
    457 F.3d 534 (6th Cir. 2006) .......................................................................................5

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ..............................................................................17

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) ...............................................................................12

*Sarviss v. Gen. Dynamics Info. Tech., Inc.*,
    663 F. Supp. 2d 883 (C.D. Cal. 2009) .....................................................................19

*Seaman v. Duke Univ.*,
    No. 1:15-cv-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ................................ *passim*

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
    No. 15-cv-5440, 2018 WL 2172667 (E.D.N.Y. May 10, 2018) ...............................22

*State of Alaska as Parens Patriae v. Suburban Propane Gas Corp.*,
    No. A93-291 CIV, 1995 WL 441987 (D. Alaska Jan. 12, 1995) ..............................16

*Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*,
    No. SACV 13-177 JLS (JCx), 2014 WL 5033219 (C.D. Cal. Sept. 22, 2014) ....................25

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) .....................................................................................4

*Troy v. Kehe Food Distribs., Inc.*,
    276 F.R.D. 642 (W.D. Wash. 2011) ..........................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................ *passim*

v

*Valenzuela v. Union Pac. R.R. Co.*,
   No. CV-15-01092, 2017 WL 679095 (D. Ariz. Feb. 21, 2017) ..........................................18

*White v. Nat'l Collegiate Athletic Ass'n*,
   No. 06-cv-999, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006)........................................8, 9

*Wofford v. Safeway Stores, Inc.*,
   78 F.R.D. 460 (N.D. Cal. 1978) .....................................................................................19

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...........................................................................................3

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .......................................................................................24

## **Rules**

Fed. R. Civ. P. 23............................................................................................... *passim*

Case No.: 2:15-cv-01045-RFB-(PAL)

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY - REDACTED**

## GLOSSARY OF ABBREVIATIONS

For the convenience of the Court and efficiency, Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification uses the same defined terms as they used in their opening brief, as well as additional abbreviations for citations to the parties' respective filings and expert reports, all of which are summarized below:

| Description | Abbreviation | Location |
|---|---|---|
| **Declarations of Eric L. Cramer, Esq.** | | |
| Declaration of Eric L. Cramer, Esq. (February 16, 2018) | CD | ECF No. 518-1 |
| Declaration of Eric L. Cramer, Esq. (April 6, 2018) | CD2 | ECF No. 534-1 |
| Declaration of Eric L. Cramer, Esq. (May 30, 2018) | CD3 | Filed contemporaneously |
| **Other Briefs** | | |
| Plaintiffs' Motion for Class Certification (February 16, 2018) | CB | ECF No. 518 |
| Zuffa, LLC's Opposition to Plaintiffs' Motion for Class Certification (April 6, 2018) | OB | ECF No. 540 |
| Zuffa, LLC's Motion to Exclude the Testimony of Dr. Hal Singer Under Fed. R. Evid. 702 and *Daubert* (February 16, 2018) | SD | ECF No. 524 |
| Zuffa, LLC's Motion to Exclude the Testimony of Dr. Andrew Zimbalist Under Fed. R. Evid. 702 and *Daubert* (February 16, 2018) | ZD | ECF No. 522 |
| Plaintiffs' Consolidated Brief in Opposition to Zuffa, LLC's Motion to Exclude the Testimony of Drs. Hal Singer and Andrew Zimbalist (April 6, 2018) | SZDO | ECF No. 534 |
| Zuffa, LLC's Reply in Support of Motion to Exclude the Testimony of Dr. Hal Singer Under Fed. R. Evid. 702 and *Daubert* (May 7, 2018) | SDR | ECF No. 551 |
| **Expert Reports and Declarations** | | |
| Expert Report of Hal J. Singer, Ph.D. (August 31, 2017) | SR1 | ECF No. 518-3 |
| Rebuttal Expert Report of Hal J. Singer, Ph.D. (January 12, 2018) | SR2 | ECF No. 518-4 |
| Supplemental Expert Report of Hal J. Singer, Ph.D. (April 3, 2018) | SR3 | ECF No. 534-3 |
| Second Supplemental Reply Report of Hal J. Singer, Ph.D. (May 28, 2018) | SR4 | CD3, Exhibit 86 |
| Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC* (August 30, 2017) | ZR1 | ECF No. 518-5 |
| Expert Rebuttal Report of Andrew Zimbalist (December 26, 2017) | ZR2 | ECF No. 518-6 |
| Expert Rebuttal Report of Professor Alan Manning (January 12, 2018) | MR1 | ECF No. 518-7 |

vii

| | | |
|---|---|---|
| Expert Report of Professor Robert H. Topel (October 27, 2017) | TR1 | ECF Nos. 528, 524-5 |
| Professor Robert H. Topel's Reply to the Supplemental Expert Report of Hal J. Singer, Ph.D. (May 7, 2018) | TR4 | ECF No. 551-16 |
| Expert Report of Paul Oyer (October 27, 2017) | OR1 | ECF No. 524-10 |
| Expert Report of Roger D. Blair (November 15, 2017) | BR1 | ECF No. 522-10 |
| **Depositions** | | |
| Excerpts from the Deposition of Javier Vazquez (February 14, 2017) | Vazquez Tr. | ECF No. 540-19 |
| Excerpts from the Deposition of Kyle Kingsbury (February 17, 2017) | Kingsbury Tr. | ECF No. 540-20 |
| Excerpts from the Deposition of Jon Fitch (February 15, 2017) | Fitch Tr. | ECF No. 540-13 |
| Excerpts from the Deposition of Cung Le (April 11, 2017) | Le Tr. | ECF No. 540-72 |
| Excerpts from the Deposition of Hal J. Singer, Ph.D. (September 27, 2017) | S.Tr. | CD3, Exhibit 87 |
| Excerpts from the Deposition of Paul Oyer (November 29, 2017) | O.Tr. | ECF No. 518-24 |
| Excerpts from the Deposition of Robert H. Topel (December 5, 2017) | T.Tr.1 | ECF No. 534-10 |
| Excerpts from the Deposition of Robert H. Topel (December 6, 2017) | T.Tr.2 | CD3, Exhibit 88 |
| **Other Defined Terms** | | |
| Consolidated Amended Antitrust Class Action Complaint (December 18, 2015) | CAC | ECF No. 208 |
| Zuffa's "Scheme," defined at CB at 1, 8-11 | Scheme | |
| Zuffa's Promotional and Ancillary Rights Agreements with Fighters that constrained the Fighters from fighting for and/or freely negotiating with other MMA promoters for a period of at least 30 months or longer and a Champion's Clause | Exclusive Contracts | |
| Zuffa's Promotional and Ancillary Rights Agreement | PAR | |

**I.   INTRODUCTION**

Zuffa's opposition to class certification is premised on four fundamental errors.

**No Immunity.** Zuffa errs first in asserting that its business success insulates its conduct from legal challenge. Plaintiffs do not contest that Zuffa's owners could use their *legal* earnings as entrepreneurs to fly around on private jets and enrich themselves with huge cash "shareholder distributions," while borrowing money to run the UFC. The problem for Zuffa is that it engaged in various forms of *illegal* conduct—the "Scheme." That illegal conduct allowed Zuffa to tie up the vast majority of top MMA Fighters, impair competition for MMA Fighter services, and suppress Fighter compensation below competitive levels.[1] Zuffa's untenable position is that even absent its exclusionary Scheme, it would somehow have been able to keep virtually all of the growing revenues from the UFC, and it mischaracterizes Plaintiffs' approach as similarly overreaching. But, as Plaintiffs' experts show, even in a more competitive market, Zuffa's take would have been as high as ▮▮ of the growing UFC Event Revenues—just not in excess of ▮▮ as it is now—leaving the UFC's owners substantial profits.

Zuffa similarly insists the only way to evaluate compensation is by using wage level. That is just a technical way to make the same incorrect claim: that even in a more competitive market, Zuffa would have been able to keep virtually all of the increasing revenues from UFC events. Use of wage level masks Zuffa's abuse of monopsony power. Wage level measures compensation in dollars. Zuffa claims it caused no injury as long as "the compensation in dollars paid to Zuffa athletes has increased during the class period." OB at 25. Zuffa implies that it is immune from antitrust liability even if Zuffa would have paid the Fighters substantially more in a competitive market. *Id.* In contrast, Plaintiffs' experts demonstrate that the right way to measure the effects of Zuffa's illegal accretion of market power is through wage *share* ("Wage Share"). Wage Share measures compensation as a percentage of revenues. Unlike most workers—but like other professional athletes—Fighters are the main draw at MMA events and responsible for a percentage of revenues. SR2 ¶¶89-93, 111-13, 120; MR1 ¶¶24-28.

---

[1] As this Court has held, "While Defendant attempts to characterize its own behavior as 'strong competition,' the Court does not construe Plaintiffs' *Complaint* to allege that Zuffa's behavior is merely 'strong competition.' Rather, Plaintiffs argue that Zuffa's conduct 'has foreclosed competition and thereby enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market.' Compl. ¶5. These claims state an antitrust violation." *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1164–65 (D. Nev. 2016).

For that reason, economists assessing monopsony power in professional sports, including Zuffa's own economists, routinely use Wage Share. SR2 ¶¶92-102; MR1 ¶¶6-23. So do Plaintiffs' experts, finding, absent the Scheme, Zuffa would have increased its Fighter compensation *in proportion* to the growth of its MMA event revenues, paying a Wage Share of ███████.

**Common Evidence of a Violation**   Zuffa's second error is to misunderstand the antitrust violation: a Scheme to acquire and maintain monopsony power. By its nature, the claim depends on the effect of Zuffa's Scheme on the market *as a whole*. Whether Zuffa acquired or maintained monopsony power is binary: it either did or did not. That issue does not depend on who brings the claim. It has no special significance for a Class member, for example, whether Zuffa coerced that *particular* Class member into signing a contract. What matters is the *cumulative effect* of Zuffa's conduct on its monopsony power. Whether Zuffa violated federal antitrust law thus raises only common issues.

**Unrebutted Evidence of Common Impact.**   Zuffa's third error is one of omission: it has failed to respond effectively to the ways in which Plaintiffs show common impact. When, as here, plaintiffs offer common evidence capable of proving that harm was widespread across a class, courts routinely certify classes in antitrust cases. CB at 21-23 (citing cases). Plaintiffs show common impact using a standard two-step process, *id.* at 19, 23: (1) using common evidence to show a general effect on price (*e.g.*, pay)—here, that Zuffa's Scheme generally suppressed compensation to Fighters, *id.* at 23-25; and (2) showing that the price (or pay) effect was *widespread* across Class members—which Plaintiffs do here in two ways: (a) an impact regression showing Zuffa ████████████████████ ██████, and (b) additional regression analyses and other evidence showing Fighter compensation was governed largely by common factors, causing individual Fighter pay to move together. *Id.* at 25-28. Zuffa does not refute that Dr. Singer's impact regression, if admissible, shows ███████████████ ██████████. Nor do Zuffa's economists effectively refute the evidence that compensation for MMA Fighters moved together—indeed, Zuffa's economists *confirm* that result. *Id.* at 28-29.

**Harming Class Members to "Protect" Them.**   Finally, Zuffa's arguments that the named Plaintiffs are not typical or adequate all fail for two main reasons: (a) in the guise of protecting absent Class members, Zuffa seeks to deprive them of any meaningful opportunity to vindicate their legal rights, and (b) Zuffa's arguments do not satisfy the relevant legal standards, relying, as they do, on

speculation and a mischaracterization of Plaintiffs' claims.

## II.    ARGUMENT

### A.    Zuffa Misstates the Rule 23 Standards

The issue at class certification is not which party should ultimately prevail but whether common issues will predominate in litigating the merits. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 459 (2013). Zuffa's summary of Rule 23 standards incorrectly implies that plaintiffs must prove their claims now. OB at 12-13. That is contrary to *Amgen*. Indeed, *Tyson Foods* held that if evidence is reliable and *capable of proving* an element on a classwide basis, nothing more is needed for class certification. CB at 22 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016)).[2]

Zuffa also incorrectly suggests that courts more readily certify Section 1 than Section 2 claims. OB 13-14. In reality, the two are analytically comparable.[3] Accordingly, the multiple classes certified to address conspiracies to monopsonize markets under Section 1 are directly relevant.[4] The issues are also analogous for sellers seeking recovery for underpayments and buyers seeking recovery for overcharges, particularly in those antitrust decisions certifying classes, based, as here, on the *cumulative effect* of hundreds of exclusionary agreements.[5] And Zuffa is also wrong that courts have not previously certified classes in monopsonization cases. OB at 14. In addition to multiple cases certifying

---

[2] *See also Seaman v. Duke Univ.*, 2018 WL 671239, at *3 (M.D.N.C. Feb. 1, 2018) (under *Tyson Foods*, plaintiffs need not prove the elements of their claims, but rather merely must present classwide evidence that a "reasonable juror could believe" sufficient to support their claims); *In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *7 (D. Kan. Sept. 26, 2016) (same).
  Zuffa draws an incoherent distinction between evidence supporting a fact, on one hand, and the fact itself, on the other. OB at 13, n.30. But *Tyson Foods* says that where a set of facts—if reasonably accepted by a jury—would satisfy some element, a court should not deny class certification on the ground that it was not persuaded by the evidence that could have reasonably underpinned a jury's finding. 136 S. Ct. at 1049. If that evidence is an expert opinion—as it was in *Tyson Foods*—then under that decision, "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Id.* at 1049. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), OB at 13, not only pre-dates *Tyson Foods*, but is not to the contrary. In *Ellis*, the suitability of class treatment depended upon showing that the defendant operated under a policy of nationwide discrimination that could affect the class as a whole. *Id.* at 983. Mere admissibility of the expert evidence was insufficient because even if the plaintiffs' expert's use of "aggregate data" was admissible (*id.* at 982), it would not have supported a finding of widespread discrimination.
[3] *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, n.9 (3d Cir. 2012) ("Exclusive dealing claims may be brought under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.").
[4] *See, e.g.*, CB at 4 & n.61; *infra* at 12, 14 & nn.22-23.
[5] *See, e.g.*, *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 468–72, 491–92 (E.D. Pa. 2009); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 225 F.R.D. 208, 211, 217–21 (S.D. Ohio 2003); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 60, 64-69 (D. Mass. 2008).

conspiracies to monopsonize just mentioned, courts have also certified unilateral conduct cases. *See, e.g.*, *Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at \*17 (D. Vt. Nov. 19, 2012) (certifying classes of dairy farmers alleging unilateral exclusionary conduct suppressed price of milk); *In re Se. Milk Antitrust Litig.*, 2010 WL 3521747, at \*13 (E.D. Tenn. Sept. 7, 2010) (same).[6]

**B. Evidence of the Antitrust Violation Is Entirely Common and Will Predominate**

Plaintiffs showed that common issues predominate here because the issue of a violation (a) is common to the Class as a whole, and (b) will predominate in this litigation as a whole. CB at 20-21. Zuffa does not cite—much less distinguish—binding precedent confirming that when the issue of a legal violation is predominant and common, Rule 23(b)(3) can be satisfied even without a showing of common impact. *See* CB at 20-21 (citing, *e.g.*, *Amgen*, 568 U.S. at 459; *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134, 1137 (9th Cir. 2016)).[7] Nor does Zuffa contest that the predominant issue in this case will be whether it violated federal antitrust law. Instead, Zuffa makes three incorrect arguments. All fail for one common reason: they mistakenly assume Plaintiffs seek damages that flow directly from their individual contracts and circumstances; in fact, Plaintiffs seek only those damages that flow from Zuffa's *overall* Scheme, as they have consistently maintained since filing their complaint.[8] As a result, all of Zuffa's acts that contributed incrementally to Zuffa's monopsony power are equally relevant to all Class members. All pertain to whether Zuffa's Scheme *as a whole* violated the antitrust laws and enabled Zuffa to suppress compensation marketwide. Those merits issues by their nature are common.

---

[6] Zuffa's citations to *Growers 1-7 v. Ocean Spray Cranberries, Inc.*, 2016 WL 10849499 (D. Mass. May 10, 2016), and *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), OB at 14, do not help them. *Growers* is inapposite because, unlike here, there was no objective way to tell which class members were injured and plaintiffs' theory there did not even purport to affect "most of the putative class members." 2016 WL 10849499 at \*5. *Allied* is off point because the alleged exclusionary conduct in that case involved giving class members "discounts and deals" from which, the court found, many class members "may have benefitted[.]" 247 F.R.D. at 168-69. By contrast, here, the challenged conduct includes no class member benefits. Finally, Zuffa cites five additional decisions denying class certification in Section 2 cases. *See* OB at 14, n.32. But class was not denied in any of those cases due to something peculiar to Section 2, but rather because, unlike here, plaintiffs in those cases had not presented a plausible showing of widespread impact.
[7] *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Plaintiffs need not show that there will be common proof on each element of the claim" especially where proof of the violation is "the predominant issue[.]") (quotation omitted).
[8] *See* CAC ¶115 ("None of the Plaintiffs in this matter is suing as part of this case. . . to enforce any rights or provisions of his or particular UFC contract. Nor is any Plaintiff in this matter claiming. . . that his or her contract, standing alone, violates the antitrust laws. Rather, Plaintiffs allege here that all of the UFC's contracts with Fighters. . . ***taken together*** form part of the UFC's anticompetitive scheme").

4

*Amgen*, 568 U.S. at 459. And the question properly before this Court is not whether Plaintiffs will ultimately prevail on them, but whether they will predominate. *Id*. Zuffa does not deny they will.

Zuffa's first argument is that evidence showing it coerced Fighters to re-sign contracts gives rise to individualized issues regarding an antitrust violation. OB at 3, 20-22. But whether a particular Fighter was coerced has no special significance to *that Fighter's claim*. Zuffa does not even argue coercion is an element of each Fighter's claim. It isn't. *See, e.g.*, *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1161 (D. Nev. 2016) (setting out Sec. 2 claim elements).[9] Nor do Plaintiffs seek damages for discrete acts of coercion, but only for the cumulative effect of Zuffa's conduct. The relevant issue regarding a violation, then, is the *overall effect* of Zuffa's Scheme. *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 528-29 (3d Cir. 2004) (making this point about misrepresentations in §2 case).[10]

The same holds true for Zuffa's second argument: that individualized evidence is necessary to show particular Class members were injured by Zuffa's "shelving" of Fighters—signing more Fighters than Zuffa needed for bouts. OB at 22. But no Class member's claim flows directly from having been shelved. Rather, as Dr. Singer observes, Zuffa's use of this practice is (a) evidence of its monopsony power, SR1 ¶¶193-96, and (b) part of its overarching Scheme to foreclose potential rivals from access to top Fighters. SR1 ¶¶152-208, esp. ¶¶193-96. Whether Zuffa "shelved" for anticompetitive reasons or procompetitive ones is a common question. So too is whether the practice contributed to market foreclosure. That a particular Fighter was shelved has no special significance for *that Fighter's claim*.[11]

---

[9] Courts have recognized that persons, even absent formal coercion, enter into illegal exclusive agreements that collectively confer market power on a dominant buyer or seller. *See, e.g.*, *NicSand, Inc. v. 3M Co.*, 457 F.3d 534, 544 (6th Cir. 2006) ("The reason that a series of exclusive dealing contracts may be anticompetitive is that distributors, in agreeing to the terms of such contracts, may fall victim to a collective action problem[.]").

[10] As this Court previously explained: "The Court therefore finds that, *as a whole*, Plaintiffs plead facts showing that the scheme is anticompetitive such that the 'effect is to "foreclose competition in a substantial share of the line of commerce affected."'" *Le*, 216 F. Supp. 3d at 1169 (emphasis added) (citation omitted).

[11] Nor need Plaintiffs show that they would have fought for Zuffa but for the Scheme. All a class member needs to show to recover damages is that he or she did in fact fight for Zuffa and that his or her pay was artificially suppressed as a result of the antitrust violation. The law provides that each transaction at the artificially affected level constitutes injury, and whether that transaction might not have taken place at all in the but-for world is not relevant. *See In re Tricor Direct Purchaser Antitrust Litig.*, 252 F.R.D. 213, 230-31 (D. Del. 2008) ("defendants assert that [plaintiffs] must prove that all class members who would not have purchased TRICOR® in the 'but for' world nevertheless would have continued to buy. . . a less expensive generic formulation. . . . [P]laintiffs only are required to show that they, in fact, did purchase TRICOR® at a higher price once an antitrust violation and causal

5

So Zuffa is incorrect that Plaintiffs must identify *which* Fighters would have had contracts with Zuffa if not for the Scheme. OB at 22.[12]

The same flaw undermines Zuffa's third argument: that the output market is regional, not national. Even if Zuffa defined regional markets (it hasn't even tried), that would not give rise to individualized issues. The output market involves promotion of live MMA Events, largely through pay-per-view or broadcast television, but also through tickets to attend in person. SR1 ¶115. The relevance of the output market is to show Zuffa's Scheme not only harmed Fighters—Plaintiffs' sole basis for damages—but also had other anticompetitive effects. SR1 ¶¶197-207; SR2 ¶¶44-49; SR4 ¶¶4, 6, 10. Whether the Scheme did have such effects depends on evidence entirely common to Class members.

## C. Zuffa Fails to Rebut Plaintiffs' Showing of Common Impact

Plaintiffs also establish common impact, *i.e.*, that common evidence is capable of showing Zuffa's Scheme widely suppressed Fighter pay. CB at 21-29. Plaintiffs establish common impact through a standard two-step process, *id.* at 19, 23, showing, first, general compensation deflation and, second, a widespread effect across Class members.[13] They show a widespread effect in two ways: (1) using Dr. Singer's impact regression model to analyze impact for each Class member, demonstrating ███████████████, *id.* at 25-26; and (2) using econometric and other evidence to show Fighter compensation moved together in response to common factors, so that generally suppressing Fighter pay would harm virtually all Class members. *Id.* at 26-29. Crucially, as to the first method of showing a widespread effect, Zuffa admits that a class may contain 5% to 6% uninjured members. OB at 24; *see also* CB at 22 & n.51. Zuffa thus does not deny that Plaintiffs' showing █████████████████████ ██████, if done properly, suffices. Further, other than (erroneous) attacks on Dr. Singer's regression

---

relationship are established"); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295–96 (2d Cir. 1979) (each purchase from the monopolist at a monopoly price constitutes injury because "[a]n unlawful monopolist must be 'deprived of the fruits' of its wrongful conduct").

[12] Further, Zuffa is incorrect to imply that some Fighters may have benefited from shelving. Zuffa pays Fighters only when they compete. So binding Fighters to exclusive contracts, preventing them from competing for anyone else, and then "shelving" them benefited no one but Zuffa. Eliminating that practice would create no losers—only winners. As a result, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013), and *In re NCAA I-A Walk On Football Players*, 2006 WL 1207915 (W.D. Wash. May 3, 2006), OB at 22, are inapposite.

[13] Zuffa confuses the two steps in the common impact analysis, complaining that Plaintiffs rely in the first step on an "average." OB at 24, n.40 (citing CB at 25). But averaging is perfectly appropriate in the first step, which addresses only the *general* effect on compensation, leaving to the second step to determine—without averaging—how widespread that effect was across Class members.

model, Zuffa fails to refute Dr. Singer's finding or distinguish the multiple cases endorsing this very method for demonstrating common impact. CB at 19 & n.46 (citing cases). As to the second method of showing a widespread effect—*i.e.*, an implicit pay structure—Zuffa claims that "Plaintiffs cite no cases certifying a class based only on th[is] type of evidence." OB at 29. In fact, Plaintiffs cited numerous cases that did so. CB at 4-5, 19 & nn.47 & 61-62. Zuffa discusses only one of them, and successfully distinguishes none of them. OB at 32 (discussing *High-Tech II*).

### 1.   Dr. Singer's Use of Wage Share Is Proper.

Zuffa's main argument echoes its *Daubert* motion: that Dr. Singer's impact regressions should use wage level, not Wage Share. OB at 24-26. Specifically, Dr. Singer ran regressions ███████████ ██████ to assess the relationship between (1) "Foreclosure Share": the percentage of the MMA market subject to Zuffa's Exclusive Contracts, and (2) Wage Share: the percentage of Zuffa's MMA Event Revenues it paid its Fighters. He shows that as Zuffa's Foreclosure Share increased, its Wage Share decreased. SR1 ¶¶180-87 & Tbl.6; SR2 ¶¶36-38, 40, 68, 73-75, 85, 121; SZDO at 7-8, 10-11. Dr. Singer applies his impact regression to compare the amount Zuffa paid each Fighter to the amount it would have paid if not for the anticompetitive effects of the Scheme—that is, in a world where Foreclosure Share was substantially lower. SR1 ¶¶230-31 & Tbl.8; CD, Ex. 9 (Singer Errata) at 4; SR2 ¶¶36, 40, 150-52 & Tbls. 2-3. That enables him to show ██████████████████████. *Id.*

As detailed in Plaintiffs' *Daubert* opposition, Zuffa has abandoned its original argument against Wage Share. SZDO at 2-3, 11-12. All of its experts had opined that Wage Share has no relevance to this case. Zuffa even offered the testimony of an economist, Dr. Oyer, solely to support that position. Dr. Oyer relied centrally on the work of Dr. Alan Manning, who, Dr. Oyer proclaimed, is "a recognized expert and leader. . . in analysis of monopsony in labor markets" and is "particularly authoritative." O.Tr. at 123:4-6, 122:17-21. However, Dr. Manning explains that use of Wage Share *is appropriate in this case*. MR1 ¶¶6, 24-31. Further, Dr. Oyer admitted numerous economics publications assessing monopsony power in professional sports use Wage Share. SZDO at 2. So have Zuffa, its experts, and its business partners. *Id.* at 11-12. And Zuffa now remarkably *concedes* use of Wage Share is proper when economists "attempt to analyze the impact of an observed *change* in monopsony power." SD at 2, 15. *That is precisely what Plaintiffs' experts do here*. SZDO at 3, 12-14. Zuffa nonetheless continues to

claim that Plaintiffs' use of Wage Share is inappropriate, arguing that its Scheme could not have caused harm because "the compensation in dollars paid to Zuffa athletes has increased during the class period." OB at 25. But the real issue is whether, if not for Zuffa's Scheme, Fighters would have received a *larger share* of Zuffa's growing Event Revenues than they actually did. For that reason, even Zuffa's own economist, Dr. Topel, admitted that monopsony power may suppress worker pay even where wage levels are rising. SR2 ¶39, n.126 (discussing Topel admission).[14]

Zuffa also criticizes Dr. Singer's regression as novel. OB at 25. As detailed in Plaintiffs' *Daubert* opposition, SDZO at 14-18, that claim is false and irrelevant. As noted above, Zuffa has admitted that it is appropriate to use Wage Share to assess the effects of changes in monopsony power, SD at 2, 15, and that is what Dr. Singer does. Indeed, economists routinely use Wage Share in assessing the effects of monopsony power on professional athletes, including as the dependent variable in regressions. SDZO at 11-12, nn.18-19 (citing papers). What makes Dr. Singer's analysis unusual relative to academic publications such as Dr. Manning's textbook is that this litigation has afforded Dr. Singer access to detailed compensation data that economists rarely have. MR1 ¶¶14-23; SR3 ¶¶13-16. That makes his regressions unusually rigorous. Further, as Zuffa admitted in its *Daubert* brief, *Johnson v. Arizona Hosp. & Healthcare Ass'n*, 2009 WL 5031334 (D. Ariz. July 14, 2009) ("*Arizona Nurses*"), certified a class based on Dr. Singer's proposal to use Wage Share in a regression to measure impact and damages.[15] In addition, the court in *White v. NCAA*, at 2006 WL 8066803, *5 (C.D. Cal. Oct. 19,

---

[14] Zuffa also argues that Dr. Topel ran a similar regression to Dr. Singer's but used wage level rather than Wage Share. That regression, Zuffa claims, "shows that athletes were not harmed." OB at 25. Not so. Dr. Topel's wage level regression suffers from a fatal flaw known as endogeneity, a criticism that Drs. Singer and Manning have both made and to which Zuffa does not respond in its opposition brief. SR2 ¶¶116, 118-19; MR1 ¶30; OB at 25. Endogeneity can explain why Dr. Topel could not reach statistically significant results. Further, Dr. Topel's regression cannot assess whether increases in Foreclosure Share suppress compensation because it *assumes* that Zuffa's foreclosure had no effect on the proportion of Event Revenue paid out to Fighters, and thus *assumes* that the small share of Event Revenue that Zuffa pays to its Fighters is a competitive outcome. SR2 ¶¶116-17; SR3 ¶¶34-37. Finally, Dr. Topel's wage level regression, even if meritorious, would have no bearing on class certification. If Dr. Singer's use of Wage Share is deemed admissible, Dr. Topel's critique using another method just creates a common issue to be resolved at trial. *Tyson Foods*, 136 S. Ct. at 1049 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for a jury.").

[15] Zuffa tries to distinguish that case in two ways. SDR at 4. First, it argues that the nurses were paid a percentage of their billings. However, Zuffa's own expert, Dr. Oyer, admitted that the form of pay a worker receives—in dollars or as a percentage of revenues—does not determine the right way to analyze worker compensation—wage levels or Wage Share. O.Tr. at 91:2-9. Second, the issue is how Fighters would have been paid in a competitive market, not how they were paid subject to Zuffa's

2006), specifically relied on a Wage Share-based analysis to certify a class of student athletes using federal antitrust law to challenge the NCAA's cap on financial aid awards. The study at issue compared NCAA athlete Wage Share—*i.e.*, the cost of paying players' room and board divided by the revenues of NCAA institutions—to the Wage Share of professional athletes.[16]

Zuffa also cites *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1207–08 (N.D. Cal. 2013) ("*High-Tech II*"), which used wage level. OB at 25. But, as Dr. Manning explains, the workers there were software engineers and the like, and there was no reason to think that an engineer's compensation would be proportionate, for example, to the overall corporate revenues of Google or Microsoft. MR1 ¶22. In contrast, Dr. Singer's Wage Share analysis is based on revenues from *specific* MMA Events featuring *specific* Fighters. SR2 ¶¶72, 108; SR1 ¶181, n.451. As noted above, economists have long recognized that professional athletes have a significant, measurable impact on revenues and the best way to assess the effect of monopsony power on their compensation is to use Wage Share. SR2 ¶¶89-102; MR1 ¶¶6, 24-28, 31. Indeed, Zuffa does not cite to a single case or publication rejecting the use of Wage Share to measure the effects of monopsony power on professional athlete pay.

**2.    Dr. Singer's Use of Foreclosure Share Is Proper.**

**a)    Dr. Singer Demonstrates Foreclosure of Competition.**

Zuffa claims that Dr. Singer assumes rather than proves Foreclosure Share. OB at 26-27. Zuffa is wrong. First, Dr. Singer compares the length of Zuffa's contracts with the length of the average MMA Fighter career. He conservatively treats as adding to Foreclosure Share only contracts that last at least 30 months (*and* that have additional provisions enabling Zuffa to extend them in perpetuity). He also shows the average professional career of an MMA Fighter ranges from about ███████. SZDO at 26; SR1 ¶90; SR2 ¶¶64 & Tbl.1. He explains Exclusive Contracts that last as long as or

---

[16] *Id*. at *5, n.4 ("This [Wage Share] percentage is extremely low when compared with the professional sports markets that Division I athletes may eventually enter. Professional markets are different from college markets, but they share important characteristics. The production function (types and number of capital and labor inputs) and revenue generation models are similar. In the NBA and NFL, player compensation is approximately 55-65% of total revenues. These percentages offer a reasonable comparison and estimate of player inputs in the production of sports entertainment.").

Scheme. As Drs. Singer, Manning, and Zimbalist explain, MMA athletes are responsible for a proportion of event revenues and so their pay in a competitive market would have been based on a percentage of anticipated Event Revenues (whether set as a dollar amount or as a percentage). CB at 31-32. Finally, some MMA athletes were paid a percentage of revenues from, for example, pay-per-view. *See* SZDO at 15, n.29 (citing SR1 ¶32).

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY - REDACTED**

longer than the average professional career foreclose competition. SR1 ¶¶88-91; SR2 ¶¶64-66. Zuffa ignores that evidence. OB at 26-27. Second, documentary evidence confirms Zuffa and other industry participants █████████████████████████████████████████████████████████████████████████

████ . SZDO at 27. Dr. Topel himself *admitted* that ████████████████████████████████████████

█████████████████████████████████ CB at 11. Third, Dr. Singer's measure of Foreclosure Share has a statistically significant, inverse relationship with Wage Share. SR1 ¶¶186-87 & Tbl.6. His approach to Foreclosure Share explains the effect of changes in Zuffa's market foreclosure (and thus in its monopsony power) on Fighter pay with a high degree of statistical significance. If Dr. Singer's measure of Foreclosure Share were improper, it would not explain changes in Fighter compensation so well.[17] Zuffa offers no credible alternative account for Dr. Singer's regression's results.[18]

Finally, Zuffa oddly asserts that Dr. Singer does not compare the actual world to one without the Scheme but rather to one with various levels of Foreclosure Share (*i.e.*, 0%, 20%, or 30%). OB at 27. But a world without the Scheme would have 0% Foreclosure Share—a scenario Dr. Singer analyzes— and the other approaches are conservative, showing impact and damages even if Zuffa retained some Foreclosure Share. SR1 ¶¶230-31, 250, 252 & Tbls.8, 10; SR2 ¶¶152, 188, 199 & Tbls.2-3.

### b) Zuffa's Criticism of "Averaging" Misunderstands Foreclosure Share.

Zuffa accuses Dr. Singer of improperly using "averages." OB at 27-28. He does not. He performs a regression including hundreds of variables that allows him to determine the amount that, without the Scheme, Zuffa would have paid each Class member for each Bout. SR1 ¶¶230-31 & Tbl.8;

---

[17] Zuffa claims in its *Daubert* reply that this argument is circular. SDR at 14. It is not. Picking an appropriate measure of Foreclosure Share is similar to trying to figure out which key on a chain matches the lock on your front door. That a key opens the lock provides compelling evidence it is the right one. Similarly, Zuffa takes Dr. Singer's use of the word "tautological" at deposition out of context to argue that Dr. Singer assumes foreclosure. OB at 26. For the reasons set forth in the text, Zuffa is wrong. Dr. Singer merely made the technical point that Foreclosure Share will depend on the minimum contract duration that one defines as sufficient to contribute to foreclosure. *Id.* If he had decided to be less conservative, he could have included a lower minimum than 30 months. But that does not mean that Dr. Singer picked his definition arbitrarily, that he lacked support for his definition, or that an arbitrary definition would yield the striking and significant results that Dr. Singer's regression does.
[18] Zuffa asserts that there are "procompetitive" reasons Zuffa would keep for itself a larger share of Event Revenues over time. SD at 15, 18-19. More specifically, Zuffa has belatedly suggested that increased "advertising," or increased non-Fighter event spending more broadly, could explain falling Wage Share. SD at 19; SDR at 10-11. But the evidence is that ████████████████████████████████████████ ███████████████████████████ . SR3 ¶¶29-33; SR4 ¶¶34-35 & Fig.1; SZDO 22-25. So Zuffa has no evidence that its "investments" were disproportionately driving Event Revenues. *See also infra* at n.27 & pp. 22-23.

Case No.: 2:15-cv-01045-RFB-(PAL)

CB at 19 & 26. He then compares that amount to the compensation Zuffa in fact paid each Class member. That analysis uses common evidence to determine impact for each Class member *individually*, not using averages. SR2 ¶¶150-51 & Tbls.2-3; S.Tr. at 229:8-232:20. Dr. Singer finds Zuffa's Scheme ███████████████████████. Plaintiffs cited four recent cases that certified classes based on this methodology. CB at 3 & n.46 (citing *Air Cargo*; *Chocolate*; *Drywall*; *Ramen*). Zuffa neither refutes those opinions nor distinguishes Dr. Singer's model from the ones in those cases. OB at 28.

Zuffa also applies its "averages" argument to Foreclosure Share. OB at 26-28. Zuffa complains that "Dr. Singer applies the same foreclosure share . . . to all athletes competing at a given point in time," OB at 27, and that he "*assumes* that class members were **equally foreclosed** in the actual world." *Id.* (bold added). But Foreclosure Share measures an effect on competition in the market *as a whole*, not in regard to *any particular Fighter*.[19] At a given time, using a particular measure, Zuffa has only a single marketwide Foreclosure Share (just as it has only a single market share). SR4 ¶44. Using that Foreclosure Share does not involve averaging at all.[20]

Zuffa next notes Dr. Topel calculated different Foreclosure Shares for different rankings of Fighters, OB at 28 (citing TR1 ¶¶25-26, Exs. 28-29), suggesting Dr. Singer should have done the same. *Id.* But that analysis misses the point. As explained above, Foreclosure Share measures Zuffa's monopsony power for the market *as a whole*, not only for those Fighters who are included in the Foreclosure Share analysis. So, for example, Dr. Singer shows that Zuffa's high Foreclosure Share for

---

[19] *See Le*, 216 F. Supp. 3d at 1169 ("The Court therefore finds that, *as a whole*, Plaintiffs plead facts showing that the scheme is anticompetitive such that the 'effect is to "foreclose competition in a substantial share of the line of commerce affected."'") (emphasis added) (citation omitted); *see also Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) ("evidence showing foreclosure of Novartis is common to the class, and 'anticompetitive harm exists only if a substantial share of the *entire market* is restricted.' . . . The evidence showing foreclosure in this matter is classwide") (emphasis added); *id*. at 847, n.15 (same).

[20] Zuffa mingles the above point with an argument that Dr. Singer does not "evaluate whether each class member was compensated less when a foreclosure share was high than when a foreclosure share was low." OB at 27. But that simple comparison—of individual Fighter compensation to Foreclosure Share—would reveal nothing by itself. What is necessary is a regression analysis that controls for hundreds of variables, using a large enough data set to detect the relationship between Foreclosure Share and Fighter compensation. That is what Dr. Singer does to show ███████████████████████. Further, a simple comparison *supports* Plaintiffs' point. For instance, according to a 2013 internal Zuffa document, ████████████████████████████████████████████████, CD2, Ex. 85 (ZFL-1484034-37) at 35, █████████████████████████████████████████████████ SR1 ¶173 & Fig. 3 (using the Tracked definition).

Headliners—the top-15 ranked Fighters in each of the ten major MMA weight classes, SR1 ¶¶99, 112—gives it monopsony power over *all* Fighters in the relevant input market, not just over the Headliners. SR1 ¶¶112-14, 156-67; SR2 ¶¶54-55, 59. Headliners determine the success of an MMA Event and, as a result, a promoter's control of the Headliners yields monopsony power for Fighters' services *generally*. *Id.*[21]

### 3.   Dr. Singer Shows Common Impact Based on a Pay Structure.

Dr. Singer also establishes common impact by showing an implicit pay structure, *i.e.*, Zuffa's compensation of Fighters moved together in response to common factors. SR1 IV.B; SR2 III.B-C. In other words, changes in the pay of particular Fighters corresponded to changes in pay to Fighters in general. With such a structure, a common factor—like the Scheme—that suppressed pay generally would have had a widespread effect. Plaintiffs cite numerous cases finding just this sort of evidence sufficient to establish common impact. *See, e.g.*, CB at 4-5, 19, 28 & nn.47, 61-62 (citing *Nitsch*; *High-Tech*; *Polyester Staple*; *Aftermarket Lighting Prods.*; *Seaman*). Zuffa erroneously asserts that "Plaintiffs cite no cases certifying a class based only on the type of evidence discussed in this section." OB at 29. Yet Zuffa cites only one of Plaintiffs' cases and successfully distinguishes none of them.

### a)   Dr. Singer's "Sharing Analysis" Establishes Common Impact.

One way that Dr. Singer shows a pay structure is through a "Sharing Analysis." SR1 ¶¶228-29 & Tbl.7. He performs a regression showing that changes in individual Fighter compensation correlate to changes in overall Fighter compensation. *Id.* That kind of evidence has often been used to establish common impact. CB at 4, 28, n.62 (citing, *e.g.*, *Seaman*). When Dr. Topel performed the same analysis

---

[21] The cases that Zuffa cites to criticize averaging—OB at 28—are inapposite because they call for the very kind of analysis that Dr. Singer undertakes here. Zuffa admits that the plaintiffs of *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014), relied on a single "aggregate overcharge percentage," OB at 28, and did not—as Dr. Singer does here—assess impact for each class member. The same was true—again, by Zuffa's own admission—in *Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009), where plaintiffs relied on an "average base wage," OB at 28, as well as a single overcharge. *Reed*, 268 F.R.D. at 590–91. That contrasts with Dr. Singer's method of using a common model to analyze individual Class member injury. SR1 ¶¶230-31 & Tbl.8. *See also, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *55 (E.D.N.Y. Oct. 15, 2014) (approving expert's use of same regression method used here to test impact for each class member separately). Further, in *Reed* the court found the pay of different nurses did not move in parallel, 268 F.R.D. at 592, whereas Dr. Singer here shows—and Dr. Topel admits—that compensation of different Fighters did move together. *E.g.*, OB at n.8.

in the same way he reached the same result. CB at 28-29; *see* T.Tr.1 at 184:14-185:5 (admitting

correlation between compensation of different Fighters); *id*. 183:20-184:2 (same).[22] Zuffa concedes

that point, but notes that Dr. Topel was able to reach a different conclusion by arbitrarily discarding

data that pre-dates the Class Period. OB at 34-35 & n.54. That was improper. All else equal, the more

data analyzed, the more reliable an analysis is. SR2 ¶¶161-62. And Zuffa provides no reason the pre-

Class Period data are biased (or materially different) when it comes to assessing the ongoing

relationship between the compensation of different Fighters. OB at 34-35. In contrast, Dr. Singer did

the proper statistical test to see if factors affecting changes in pay pre-Class Period were relevantly

different than during the Class Period and found they were not. SR2 ¶162. As a result, the most reliable

approach is the one Dr. Singer adopts: using all of the data. True, what matters is the correlation of pay

among Fighters during the Class Period, but the best way to detect such a correlation is to analyze as

much relevant data as possible. That is what Dr. Singer did.

              **b)**       **The "Common Factors" Regression Establishes Common Impact.**

        Another way that Dr. Singer shows common impact is by demonstrating with a regression that

common factors—weight class, rank, *etc.*—explain 78% of the variation in the compensation of Zuffa

Fighters. SR1 ¶227; SR2 ¶¶156, 163-64. That commonality is powerful evidence that any conduct that

had a significant effect on Fighter compensation overall would affect virtually all Class members. *Id.*

Dr. Topel's only response is to invert the analysis, running a model with purely individual factors

(excluding common factors) and finding it explains 79% of variation in Fighter compensation. OB at

34. Zuffa then leaps to the unfounded conclusion that "████████████████████████████████

████████████████████████████

---

[22] Zuffa cites Dr. Topel's testimony admitting the compensation of "athletes at all levels of rankings" moved together. OB at 2, n.8. Indeed, Dr. Topel conducted his own separate regressions that "████████████████████████████████████████████████████████████████████ ██████████████████████████████" SR2 ¶165 (quoting TR1 ¶171), and he conceded that Fighter pay "of people with different attributes" and "across the talent spectrum" moved together because it is determined by common factors. *See* T.Tr.1 at 170:2-16 ("Q. And it's fair to say that you would expect that if demand for MMA fighters rises generally, the compensation of MMA fighters in every ranking category would generally rise as well, correct? A. That's consistent with a general increase in demand along with upward sloping supply of people with different attributes."); *see id.* at 171:5-20. Evidence that class member prices or pay moves together has repeatedly been used to support a finding of common impact. *See, e.g., In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 426 (E.D. Pa. 2015) (co-movement analysis is a "reliable analytical form" that is "relevant to showing a common impact"); *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *55, 65 (N.D. Ohio Nov. 17, 2014) (same).

████████████████████████████████████████████████" *Id.* But all Dr. Topel has shown is that some individual factors correlate to some common factors—that is why the two analyses add up to more than 100%. They are not mutually exclusive. So, for example, a Fighter may be highly ranked (common factor) in part because he lands a lot of strikes in a fight (individual factor). That Fighter compensation can be predicted in more than one way—through common factors *or* individual factors—does not undermine Dr. Singer's finding that common factors predict almost 80% of the variation in compensation. Given that finding, Zuffa's exercise of monopsony power would be expected to suppress the compensation of virtually all Zuffa Fighters. SR2 ¶¶163-64.[23]

### c)      Evidence of Pay Equity Confirms Common Impact.

In addition, Plaintiffs offer extensive evidence, SR1 ¶¶213-26; SR2 III.B-C, showing that Zuffa maintained "internal pay equity"—consistency in pay for comparable Fighters and in the ratio of pay between different levels of Fighters. CB at 26-28. As *High-Tech II* and *Seaman* held, a showing of internal pay equity is compelling common evidence that conduct that suppressed pay generally will have a classwide effect. *See* CB at nn.57, 61-62 (citing cases). Zuffa's *economists* are silent on this issue. T.Tr.1 at 176:9-12. Zuffa's *lawyers*, on the other hand, assert that Plaintiffs rely "on one former employee's testimony" that it maintained internal pay equity. OB at 33. But that former employee, Joe Silva, was the UFC's chief matchmaker, responsible for negotiating with hundreds of UFC Fighters over more than twenty years! CB at 26.[24] Further, his testimony was corroborated by admissions from

███████████████████████████████████████████████████████████████

---

[23] Plaintiffs' price structure analysis is consistent with *High-Tech II*, 985 F. Supp. 2d at 1197-98, the main case on which Zuffa relies. OB at 32. Class certification was more challenging in *High-Tech II* than here, and plaintiffs' showing there was not as robust as here, yet the court found common impact and certified a class. For instance, unlike here, where the class includes about 1,200 Fighters in the same profession and the same market competing for the same entity with monopsony power, the class there contained: about 60,000 members, *id.* at 1180; (2) working in a great variety of salaried positions in the "technical, creative, and/or research and development fields," *id.* at 1177; (3) paid by seven different companies in different product areas, *id.* at 1171–72; (4) with no showing of monopsony power. Further, plaintiffs' evidence in *High-Tech II* was less robust because their expert was not able to assess impact on a Class member by Class member basis—as Dr. Singer does here—but rather had to rely on statistical evidence—which Dr. Singer also presents—that common factors explained most of the variability in compensation and that compensation for different class members moved together over time, *id.* at 1212–13; and, in performing that analysis, had to rely on averages rather than individual compensation, *id.* at 1218–20, while Dr. Singer is able to perform the analysis at an individual level.

[24] Dr. Topel admitted that Silva was a reliable source for information on negotiations with UFC Fighters. *See* T.Tr.2 at 501:21-502:11; *id.* at 499:23-500:6.

Case No.: 2:15-cv-01045-RFB-(PAL)

██████. CB at 27-28. Zuffa's lawyers also argue compensation to Fighters "did not proceed in . . . a lock-step manner," OB at 34, noting there was *some* element of individual negotiation, *id*. at 31, *some* discretionary bonuses based on performance, *id*. at 31-32, and no "grid" setting compensation to Fighters. *Id*. at 33. All of that is consistent with internal pay equity and a pay structure. SR2 ¶¶153-54, 156. Establishing a structure does not require showing that there was *no* individual variation in compensation. Rather what is necessary is that common factors explain enough of the pay variation that Fighter compensation generally moved together, *as Zuffa itself admits is true here*. OB at 2, n.8. So individual factors do not refute a pay structure here, but instead are relevant only to determining "where a Fighter falls *within Zuffa's compensation structure*." SR2 ¶156.[25]

Zuffa also suggests that Plaintiffs do not show the Scheme, as opposed to other factors, caused the suppression of compensation. Not true. Dr. Singer's regression shows Zuffa's Foreclosure Share from the Scheme *was the cause*, controlling for literally hundreds of other variables (*i.e.*, other possible causes). CB at 24 (citing SR1 ¶¶180-87).[26] Zuffa has not shown any variable Dr. Singer omitted from his regression can explain away Dr. Singer's statistically significant results.[27]

---

[25] *Fleischman v. Albany Med. Ctr.*, 2008 WL 2945993 (N.D.N.Y. 2008), OB at 32, does not support Zuffa because: (1) the court *certified a class* even though impact was not classwide, *id*. at *17-*18; and (2) unlike here, plaintiffs there did not show that common factors could explain the great majority of variation in compensation. *Id*. Similarly, *Arizona Nurses did* certify a class of per diem nurses based on Dr. Singer's expert testimony, 2009 WL 5031334, at *40, although his opinion in support of class certification was less strong than here, as multiple employers and geographic markets were involved there and he had to engage in sampling to show a correlation in compensation, *id*. at *30-*31, unlike the complete data on which he relies here. As to the traveling nurses—a proposed class for which the court denied certification in *Arizona Nurses*—there was no evidence of internal pay equity or common factors determining compensation comparable to the showing Dr. Singer makes here. *Id*. at *33.

[26] Zuffa makes two other arguments regarding common impact. First, Dr. Singer relies on a ███████████████████████████████████████████████████████ SR1 ¶¶144, 188 191-92. Zuffa erroneously implies that this evidence is relevant to show common impact. OB at 29-30. It is not (and the page Zuffa cites in Plaintiffs' opening brief does not discuss the "sponsorship tax," *id*. at 29 (citing CB at 23)). Plaintiffs do not seek any damages based on lost sponsorship compensation from third parties. They seek damages based only on suppression of Fighter pay for bouts and identity rights. The second issue involves Zuffa's confusion of the two steps for showing common impact. The first step involves evidence that Zuffa's Scheme suppressed compensation *generally* and the second step that the resulting harm was *widespread* across Class members. CB at 19, 23-29. As part of the first step, Plaintiffs offer evidence showing that as Zuffa's Foreclosure Share increased, it was able to decrease Fighter Wage Share, *generally* deflating Fighter compensation. *Id*. at 24-25 (citations include SR1 ¶¶180-89). Zuffa incorrectly suggests that this evidence is meant to address the second step: *widespread* harm. OB at 30 (citing CB at 24). It is not. Evidence of widespread harm is discussed separately. CB at 25-29.

[27] In Dr. Topel's fourth submission, TR4, he *finally* suggests a supposed missing variable—namely, ████████████████████████████████. TR4 ¶¶15, 20-22. He claims that including that variable in Dr.

**D. Plaintiffs' Claims Are Typical of the Class Claims**

Zuffa raises two meritless challenges to typicality. OB at 15-17. It observes first that under Dr. Singer's common impact analysis, a handful of Class members may have been uninjured. *Id*. at 15-16; *see also* SR2 Tbl.2 (between ████████████ of Bout Class impacted). Zuffa argues that the named Plaintiffs' claims "are not typical of *these* absent class members." *Id*. (emphasis added). But Zuffa cites no law—there is none—providing that Plaintiffs must show all class members were harmed to satisfy typicality. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (claims are typical "if they are reasonably co-extensive with those of absent class members; they need not be substantially identical"). To the contrary, courts have consistently held classes may be certified containing uninjured members, as Zuffa admits. *See supra* at 6.[28] Further, Zuffa concedes that typicality is undermined *only* where the named plaintiffs are "'subject to unique defenses which threaten to become the focus of the litigation.'" OB at 16 (quoting *Hanon*, 976 F.2d at 508). Zuffa does not argue that defenses relating to a

---

Singer's impact regression undoes the results. *Id*. He is wrong for four main reasons. *First*, Dr. Topel's results are driven by an elementary data error, which caused him to drop "missing" data that were not actually missing. SR4 ¶¶1, 15, 27. Dr. Singer shows that simply adding the "missing" data back into Dr. Topel's own regression—without any additional modifications—restores Dr. Singer's findings. SR4 ¶¶1, 15, 27 & Tbl.A1. *Second*, despite Dr. Topel's claim that Dr. Singer's findings ██████████████ ██, TR4 ¶23, Dr. Singer shows that ████████████████████████████ ████████████████████████████, Dr. Singer's findings about impact and damages are reinstated. SR4 ¶28 & Tbl.A1. *Third*, for a factor to explain why Zuffa's share of Event Revenues are growing disproportionately, that factor (or its effects) would need to grow disproportionately as well. But ████████████████████████████████████████████████████████████. SR4 ¶¶34-35 & Fig. 1. And Zuffa has made no showing that the *effects* of ████████████████████████████████████ ████████████. SR4 ¶¶14, 17-19, 25, 40. *Fourth*, as explained *infra* at 22-23, efforts by Zuffa to increase the demand for its events will also inevitably increase the demand for its Fighters and *vice versa*. SR3 ¶¶26-27; SR4 ¶¶14, 17, 24-25, 40. Thus, there is no plausible mechanism by which Zuffa's ████████████████ would decrease the proportion of Event Revenues attributable to Fighters. Because in a competitive market, Fighters would be paid closer to the marginal revenues they produce, SR3 ¶¶11, 12, 21; SR4 ¶¶14, 40, and because Fighter productivity would be expected to rise in proportion to Zuffa's productivity, Zuffa's theory that Wage Share would fall for procompetitive reasons is false and wholly unsupported. SR3 ¶¶21, 24-27, 29; SR4 ¶¶14, 16-17, 25, 40.

[28] Tellingly, in the only two cases Zuffa cites, OB at 15, the named plaintiffs' claims were deemed materially different from those of *the vast majority of proposed class members*. In *In re Graphics Processing Units Antitrust Litig. ("GPU")*, 253 F.R.D. 478, 480-81 (N.D. Cal. 2008), the court rejected typicality because the named plaintiffs were individual consumers who bought the product online at list prices, whereas 99.5% of the relevant commerce involved large wholesalers who did not pay list price. *State of Alaska as Parens Patriae v. Suburban Propane Gas Corp*., 1995 WL 441987 (D. Alaska Jan. 12, 1995), is unhelpful to Zuffa for the same reason. There the court found that the uses to which buyers put propane was highly material to determining whether members of a proposed class of propane buyers were affected by an alleged scheme and that the uses to which the named plaintiffs put propane were "not representative" of *most* of the class. *Id*. at *7-8.

Case No.: 2:15-cv-01045-RFB-(PAL)

handful of Class members who may have had sufficient negotiating power to avoid the Scheme's effects could become *the focus of the litigation*.[29] Courts have long held that differences in negotiating power do not impair typicality.[30] As discussed above, *supra* at 12-15, Zuffa's Fighter pay is structured, causing compensation to move in unison. OB at n.8 (conceding Fighter pay "at all levels of rankings" moved together). Thus, evidence relevant to Plaintiffs' claims is also relevant to the claims of nearly all Class members—satisfying typicality.[31]

Zuffa's second meritless typicality argument is that the Plaintiffs purportedly face a grab bag of defenses. OB at 16-17. But, as noted above, the presence of unique defenses does not destroy typicality, unless they threaten to become *the* central issue.[32] Zuffa does not even argue any of the supposed defenses it identifies could rise to that level. Zuffa raises three categories of issues.[33] First, Zuffa asserts

---

[29] Zuffa claims Dr. Singer's model shows ▮ Class members are uninjured (out of over 1200). OB at 16. In fact, per Dr. Singer, there are between ▮▮▮ potentially uninjured Class members. SR2 ¶152 & Tbl.2. The number depends on Zuffa's assumed but-for foreclosure share: 0%, 20%, or 30%. *Id.*

[30] *See, e.g., Fears v. Wilhelmina Model Agency, Inc.*, 2003 WL 21659373, at *5 (S.D.N.Y. July 15, 2003) (named plaintiff fashion models typical even though some absent class members "may have even been able to negotiate rates [paid to defendant modelling agencies] below the industry 'standard'"); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *17-18 (N.D. Cal. Jan. 19, 2017) (typicality satisfied even though plaintiffs paid different prices based on variations in purchasing power).

[31] If the Court is concerned that issues pertaining to a small handful of Class members would unduly distract the trial, these Fighters could be excluded from the Class. *Tyson Foods*, 136 S. Ct. at 1049-50 (uninjured class members can be excluded after trial at allocation stage); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *10 (E.D. Pa. May 2, 2008) ("If, at some later stage in the proceedings, it becomes apparent that certain Direct Purchasers were not injured . . . the Court retains the authority to remove those members from the class."). Note that these few persons were uninjured according to Dr. Singer's model, so excluding them would have no material effect on the aggregate damages computed by that same model. SR4 ¶¶42-43.

[32] *See, e.g., In re Yahoo Mail Litig.*, 308 F.R.D. 577, 593–94 (N.D. Cal. 2015) (named plaintiffs subject to unique defense does not "defeat[] Plaintiffs' showing of typicality"); *Troy v. Kehe Food Distribs., Inc.*, 276 F.R.D. 642, 654 (W.D. Wash. 2011) ("Individual defenses applicable to the proposed class representative do not preclude a finding of typicality unless there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 678-79 (N.D. Cal. 2011) (rejecting argument that potential defense to proposed class representative defeated typicality because the defendant did not show that the defense would be "central" to the plaintiff's case); *see also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284–85 (N.D. Cal. 2016) ("the fact that Defendants may have affirmative defenses against some absent class members does not affect the Court's typicality analysis").

[33] None of Zuffa's cases, OB at 16, supports its argument: (a) *Hanon*, 976 F.2d at 508, was a securities case where the defendant asserted the plaintiff was atypical because, unlike here, a core element of his claims (reliance on the integrity of the market) would be subject to serious dispute "as a result of [*inter alia*] his extensive experience in prior securities litigation[.]" (b) *Ellis*, 657 F.3d at 984, declined to decide whether supposed individual defenses precluded typicality. (c) In *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *4-5 (N.D. Cal. Dec. 22, 2016), the plaintiff claimed under state consumer protection laws that the labeling of margarine products "misleadingly implied" to the "lay consumer" that such products were healthy. The plaintiff was atypical because his "extensive history" with prior

---

Case No.: 2:15-cv-01045-RFB-(PAL)

that Plaintiffs Le, Fitch, Kingsbury, and Vasquez have concerns about the UFC purportedly unrelated to the Scheme.[34] But Zuffa relies on examples of its mistreatment of Class members flowing from its market dominance. *See, e.g.*, CB at 9. These facts, if presented at trial, would provide incremental support for—and be typical of—the Class claims. Regardless, they would not be "the focus of the litigation."[35] Second, Zuffa implies certain minor differences in the Plaintiffs' circumstances present typicality problems. OB at 16-17 (Vera and Le, while under UFC contract, said the UFC did not "coerce" them; Vasquez fought for the UFC under a contract assigned to the UFC by another promoter; Vera competed for another promoter after the UFC). None of these issues affects typicality because none is relevant to the sufficiency of any Fighter's claim.[36] This case is about the collective effect of Zuffa's Scheme on foreclosing marketwide competition. Thus, no class member's case depends on showing *anything* about his or her individual contracts or circumstances.[37] Third, Zuffa's statute of limitations defense against one of the six identity rights plaintiffs (Quarry) does not preclude typicality.[38] That defense cannot focus the litigation on individual issues because whether exploitation,

---

similar litigation made his claims "uniquely vulnerable" to defenses regarding whether he truly was misled—a fundamental issue in that case. *Id.* Zuffa does not even argue here that any such "unique" vulnerability exists here. (d) In *Valenzuela v. Union Pac. R.R. Co.*, 2017 WL 679095, at \*4-8 (D. Ariz. Feb. 21, 2017), the plaintiffs were atypical because, unlike here, proving the underlying state law property claims depended upon "a complex and unique set of factual legal issues" that differed for each class member. *Id.* at \*8.

[34] *E.g.*, (a) Zuffa's matching Kingsbury against tough but unknown Fighters, OB at 17; Kingsbury Tr. at 116:16-22; (b) Zuffa's mistreatment of Le surrounding his suspension, OB at 17; Le Tr. at 48:5-56:19; (c) Zuffa's power to deprive Fitch of opportunities to become a champion (despite his solid record) because it "did not like his fighting style," OB at 17; Fitch Tr. at 83:1-85:2, 236:9-242:22; and, (d) Zuffa's ability to force Vasquez to attend Zuffa promotional events (without compensation). OB at 17; Vazquez Tr. at 111:17-112:25.

[35] *See In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 405 (D. Mass. 2007) (additional misrepresentations made to the named plaintiffs beyond what was common to the class did not preclude typicality); *see also Kelen v. World Fin. Network Nat. Bank*, 295 F.R.D. 87, n.5 (S.D.N.Y. 2013) ("irrelevant 'unique defenses'" do not preclude typicality).

[36] *See, e.g.*, *Gilkey v. Cent. Clearing Co.*, 202 F.R.D. 515, 524 (E.D. Mich. 2001) (facts irrelevant to the elements of the claim cannot not defeat typicality); *Edmonds v. Levine*, 233 F.R.D. 638, 641–42 (S.D. Fla. 2006) (differences that do not go to the elements of the claim are irrelevant to typicality).

[37] *See, supra*, n.8, *quoting* CAC ¶115 (alleging case is about Zuffa's contracts "taken together"). Further, no class member, for instance, needs to show he was "coerced" into signing his contract with Zuffa to prove his claim. *See supra* at 2, 5.

[38] Zuffa filed a summary judgment motion, claiming that the statute has run against Quarry because he did not execute an identity rights agreement during the limitations period. ECF No. 347. Plaintiffs respond by pointing out Quarry's identity rights were exploited during the limitations period, and a Fighter is harmed each time he or she is undercompensated for such uses, and also that Quarry's agreement appears to have been renewed during the limitations period. ECF No. 365.

18

on one hand, or contract execution, on the other, defines injury for Identity Class members is a classwide issue. Regardless, as a legal matter, statute of limitations defenses do not destroy typicality.[39]

### E. Plaintiffs Satisfy the Adequacy Requirement

Zuffa argues the named Plaintiffs are not adequate because, as former UFC Fighters, they purportedly will not protect the interests of current Fighters. OB at 17-19. Zuffa is wrong. First, even if UFC Fighters were employees—Zuffa insists they are not—in the Ninth Circuit "there is ample support for the position that former employees may represent present employees." *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 489 (N.D. Cal. 1978).[40] Indeed, courts have recognized that former employees may be less susceptible to employer coercion and thus *better representatives*.[41] That principle is apt here where the underlying claim involves Zuffa's misuse of its market dominance. Second, given that Fighters' careers with the UFC are transitory[42]—and that Zuffa can terminate Fighters so easily[43]—requiring current Fighters as named Plaintiffs would enable Zuffa to immunize itself from this suit. *See, e.g.*, *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.* ("*Grant-In-Aid*"), 311 F.R.D. 532, 537, 540 (N.D. Cal. 2015) (that plaintiffs were "no longer eligible to participate in NCAA athletics" did not make them inadequate class representatives). Third, Zuffa's argument is based on pure speculation: that Plaintiffs' pursuit of money damages here could harm current Fighters. OB at 18. Zuffa *hints* that this

---

[39] *See, e.g.*, *Alexander v. JBC Legal Grp., P.C.*, 237 F.R.D. 628, 631 (D. Mont. 2006); *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999, at *5 (E.D. Pa. Aug. 24, 2017); *Arizona Nurses*, 2009 WL 5031334, at *4.

[40] *See Barnes v. AT&T Pension Benefit Plan*, 270 F.R.D. 488, 495 (N.D. Cal. 2010) (named plaintiff's "status as a former employee . . . does not preclude him from satisfying the adequacy requirement"); *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 911 (C.D. Cal. 2009) (same); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1064 (N.D. Cal. 2007) (same). *See also Allen v. Holiday Universal*, 249 F.R.D. 166, 181 (E.D. Pa. 2008) (former health club members not inadequate even though suit could potentially reduce quality of the club for current members).

[41] *Fujita v. Sumitomo Bank of Cal.*, 70 F.R.D. 406, 411 (N.D. Cal. 1975) (formers "who are free from any possible coercive influence on the part of the employer, may well be better situated than . . . present employees to present [a] . . . strongly adverse case" against the employer).

[42] This case was filed on December 16, 2014, and will be tried no earlier than 2019. By contrast, the median Zuffa Fighter career is 0.82 years; the mean is 2 years. SR2 ¶64 & Tbl.1.

[43] Zuffa's reference to MMA Fighter Leslie Smith, OB at 18, n.35, highlights the problem. Zuffa observes that Smith, who at the time it filed its brief was under contract with the UFC, had been organizing "to get UFC athletes unionized." *Id.* Despite having won two fights in a row, and being ranked in the top 10, on April 20, 2018, Zuffa refused to renew Smith's contract in apparent retaliation for her union organizing. *See* CD3, Ex. 89 (Liz Mullen, *Fighter Files NLRB Claim Against UFC Around Union Effort*, Sports Business Daily (May 2, 2018), *available at* https://www.sportsbusinessdaily.com/Daily/Closing-Bell/2018/05/02/UFC.aspx).

---

19

suit, if successful, could imperil its economic viability.[44] But it studiously avoids *arguing* that—
presumably because it's likely telling lenders and business partners the opposite.[45] Zuffa's failure to
provide evidence of an actual current conflict is fatal to its argument.[46] In any event, Zuffa gets the
adequacy test backwards,[47] perversely critiquing the named plaintiffs because they are interested in
maximizing class damages—which is what they are obligated to do.[48] Fourth, Zuffa asserts that
Plaintiffs are "seeking relief" that would harm current Fighters because it could halt Zuffa's
exclusionary practice of "shelving," in which it locks up "more Fighters under contract than it could
use," a means of foreclosing competition. OB at 19 (citing SR1 ¶¶193-94). That argument is incoherent.
*See supra* at 5-6 & n.12. No Fighter benefits from being locked into an exclusive contract, not being

---

[44] Zuffa's unsupported assertion that the two plaintiffs currently competing for other MMA promotions
(Fitch and Vera) "have an incentive to hurt the UFC business," OB at 18, is false. A key premise of this
suit is that vigorous competition among MMA promoters for Fighter services benefits all Fighters,
regardless of the promotion. SR1 ¶¶286-91. Thus, Fitch and Vera—like all MMA Fighters—have an
interest in expanding the number of potential bidders for Fighter services, *not* in putting the UFC out of
business. Zuffa has not cited any evidence that a named plaintiff is motivated by anything other than a
common goal of creating more competition in MMA for the benefit of all Fighters and the sport.
[45] The market has operated as if Zuffa can meet its financial obligations if hit with a large damages
award. After the suit was filed, ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████
*Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) ("particularly as they regard damages,"
conflicts will not defeat class unless they are "apparent, imminent, and on an issue at the very heart of
the suit"); *Grant-In-Aid*, 311 F.R.D. at 541 (quoting *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir.
2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative
conflicts.")).
[47] *Braintree Labs., Inc. v. McKesson Corp.*, 2011 WL 5025096, at *2 (N.D. Cal. Oct. 20, 2011) (finding
no conflict exists where "the interests of [certain large class members] and the named plaintiffs are
aligned: to recover any overcharge"); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008)
(adequacy of representation satisfied where "named plaintiffs have the incentive to maximize the
recovery" of the class).
[48] Zuffa cites two cases, OB at 18, that are not to the contrary: (a) *Free World Foreign Cars, Inc. v.
Alfa Romeo, S.p.A.*, 55 F.R.D. 26, 29 (S.D.N.Y 1972), found an imminent conflict between a named
plaintiff (former auto dealer/franchisee) and a class of current dealers because, unlike here, the
defendants demonstrated the "real rather than fanciful" likelihood that merely making the defendants
face the "threat" of a class action judgment could "force defendant to terminate all existing dealers"
and pull out of the U.S. entirely. Zuffa has made no such showing here; after the "threat" of this class
action, Zuffa's market value has *increased* by billions of dollars; and (b) *Allen v. Dairy Farmers of
Am., Inc.*, 279 F.R.D. 257 (D. Vt. 2011), found a conflict between former members of a dairy farm
cooperative and a class including current members because the defendants in the case were the dairy
farm cooperatives and, as result, any damages award would be "paid to some extent" *by the class
members themselves, id.* at 274, putting these class members in the position of "both plaintiff and quasi-
defendant." *Id.* at 273, n.19. Nearly two dozen class members filed "sworn declarations" opposing the
suit and sought relief. *Id.* at 273. None of these unusual facts is present here.

Case No.: 2:15-cv-01045-RFB-(PAL)

1   given fights, *and* not being paid.[49] There is no cognizable conflict.[50]

2       **F. Plaintiffs' Showing Complies with *Comcast***

3           Zuffa also makes a series of cursory "*Comcast* arguments." OB at 35-37. *Comcast* involved

4   highly unusual facts. The plaintiffs there offered four theories of liability, only one of which the trial

5   court allowed to proceed on a class basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 31 (2013). The

6   problem was that plaintiffs had calculated only the cumulative damages from all four theories and their

7   expert admitted he could not separate out the damages for the one theory that survived. *Id.* at 32, 37.

8   The Supreme Court reached the unexceptional conclusion that plaintiffs' theory of liability and their

9   measure of damages have to match. *Id.* at 35. Antitrust defendants have regularly over-read the case at

10   class certification ever since and the courts have regularly rejected that over-reading. *See, e.g.*, *Leyva v.*

11   *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

12           Dr. Singer shows that Zuffa's Foreclosure Share—the proportion of MMA Fighters subject to

13   its Exclusive Contracts—affects its Wage Share. SR1 ¶¶180-87 & Tbl.6. The theory of liability tested

14   by his model—that Zuffa's Exclusive Contracts are part of an unlawful Scheme—matches his measure

15   of damages—Zuffa's underpayment of its Fighters because of illegal foreclosure from the Exclusive

16   Contracts. He confirms his damages analysis using as benchmarks other MMA promoters—Bellator

17   and Strikeforce (before Zuffa acquired it)—to offer alternative, conservative measures of damages

18   based on a competitive Wage Share ████████ SR1 ¶¶247-48 & Tbl.9. Dr. Zimbalist uses other

19   major sports as benchmarks and concludes that in a reasonably competitive market Zuffa would have

20   paid Fighters ████████████████. ZR1 ¶¶104-26 & Tbls.4-6.

21           Zuffa's first *Comcast* argument is that Plaintiffs' experts err by measuring damages only from

22   the Exclusive Contracts, and not the rest of the Scheme. OB at 35-36. That argument fails, first,

23   because Dr. Singer shows that the Exclusive Contracts were *necessary* to all of the harm Drs. Singer

24   _____

25   [49] Further, even if (counterfactually) some Fighters would benefit from an exclusionary practice, the law does not recognize a conflict that arises only because parties would prefer the continuation of illegal conduct. *Grant-In-Aid*, 311 F.R.D. at 542; *Allen*, 2012 WL 5844871, at *7 ("these putative class members should not be heard to complain that the court has ordered the discontinuation of illegal conduct even if they find such conduct beneficial and would like to preserve the status quo").

27   [50] While Plaintiffs do not believe it is necessary, if for any reason the Court concludes that the Class would benefit from having a current Fighter as a class representative, Class Counsel are aware of a current UFC Fighter willing to so serve. Given that that Fighter would be putting his career at risk by coming forward, Class Counsel request that that step be taken only if necessary.

and Zimbalist measure. Eliminate the Exclusive Contracts, and Zuffa's Foreclosure Share would drop to 0% and its Wage Share would rise from about ███ to about ███ or more. SR1 Tbls.9-11; SR2 ¶152. All of Zuffa's other actions that make up its Scheme—*e.g.*, acquiring potential rivals, coercing Fighters to sign contracts—ensnared Fighters, increasing the number of them subject to Zuffa's Contracts. As a result, the Contracts *caused* all of the damages. Second, Zuffa's argument fails under precedent holding that *Comcast* does not require plaintiffs to separate out the damages caused by different parts of an anticompetitive scheme, as is confirmed by a case in Zuffa's *Daubert* motion. *In re Rail Freight Fuel Surcharge*, 2017 WL 5311533, at *56 (D.D.C. Nov. 13, 2017); *see also Le*, 216 F. Supp. 3d at 1168; *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 2018 WL 2172667, at *6 (E.D.N.Y. May 10, 2018) (at urging of Boies Schiller (Zuffa's counsel here), economist's damages model deemed reliable even though it "does not attempt to disaggregate damages for each of th[e] three types of [alleged] conduct," which the court held "was not required for his model to be admissible").

Zuffa also argues that Plaintiffs' measure of damages includes "pro-competitive acquisitions of firms" and other (unspecified) beneficial conduct. OB at 36. That argument also fails for two reasons. First, again, Plaintiffs' damages reflect only the harm caused by Zuffa's illegal Exclusive Contracts. Even if some of Zuffa's acquisitions were procompetitive or Zuffa attracted Fighters through other procompetitive means, it required those Fighters to sign illegal Exclusive Contracts that contributed to marketwide foreclosure. No matter the means by which Zuffa attracted Fighters—procompetitive or anticompetitive—it remains liable for the harm from its Exclusive Contracts. Zuffa's argument to the contrary is like an armed robber saying he is not liable for the full amount of the money he stole because he bought his gun legally. Second, Zuffa has not shown its acquisitions or any parts of its Scheme were procompetitive. *See* SR1 ¶¶257-85; SR2 ¶¶210-41; SR3 ¶¶25-27, 29.

Zuffa also contends an increase in Event Revenues can decrease Wage Share and argues that "████████████████████████████████████████████████████████████ ██████████████████" OB at 37 (emphasis in original). But Plaintiffs do not assume—or claim—████████ ████████████████████████████████████████. *See* SZDO at 19-24. Rather Plaintiffs *show*— through expert and other evidence—that ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████. SR1 ¶¶185 & Tbl.6;

1   SR3 ¶29; MR1 ¶¶26-274; SR4 ¶¶14, 16-17, 25, 40. For instance, █████████████████

2   ████████████████████████████████████████████████████. SR4 ¶¶34-35

3   & Fig.1. So there is no evidence █████████████████████████████████████████

4   ████████████████████████████████████. SR3 ¶¶26, 33; SR4 ¶¶1, 14-19,

5   25-26, 34-37, 40. Moreover, as Dr. Singer explains, what Zuffa contributes enhances the value of what

6   Fighters contribute, and *vice versa*. ████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   █████████████████████████████████. SR3 ¶¶26-27; SR4 ¶¶14, 16-17, 25, 40. None of

10  Zuffa's economists has ever refuted this "proportionality" principle. Indeed, Dr. Topel *concedes* that

11  ███████████████████████████████████████████. SR2 ¶¶113, n.420, 136; SR4

12  ¶¶14, 17, 15, 40. That is why Zuffa and Dr. Topel have repeatedly tried, and failed, to come up with a

13  missing variable that could explain away the clear link between rising Foreclosure Share and falling

14  Wage Share: ██████████████████████████████████████

15  ███████████████. SR4 ¶¶1, 14-17, 25, 40. █████████████████████████

16  ██████████████████████████. SR3 ¶¶21-22, 26-27, 29; SR4 ¶¶14, 16-17, 25,

17  40.[51] As a result, in a more competitive market, Zuffa would have paid a proportion of growing Event

18  Revenues to its Fighters, as the damages analyses of Drs. Singer and Zimbalist reflect. Zuffa, however,

19  implausibly asserts it was *solely* responsible for all of the growth in Event Revenues. Only that

20  implausible assumption can justify its argument that as long as it increased Fighter compensation

21  *slightly*, even while Event Revenues increased dramatically, its Scheme did not cause any harm to its

22  Fighters. OB at 25. Yet on that crucial point—its assumption that Fighters did not contribute

23  *proportionally* to Event Revenue growth—Zuffa provides no evidence.

24      **G. Class Litigation Is Superior to Individual Actions**

25          Zuffa argues that class treatment is inferior to individual litigation, pointing again to its coercion

---

[51] This proportionality principle is integral to sports economics. It is why economists and industry participants in measuring the effects of monopsony power on the compensation of professional athletes consistently use Wage Share—because those athletes generate a proportion (or percentage) of revenues. SR1 ¶¶185 & Tbl.6; SR2 ¶¶88-109; SR3 ¶¶20-33; MR1 ¶¶6, 23.

of Fighters. OB 37-38. As explained above, however, neither coercion nor any of the other issues Zuffa raises give rise to individualized proof. *Supra* II.C. Zuffa also implies that large damages make class certification inappropriate. But that is not a proper basis for denying class certification.[52] Further, most Class members here have modest damages, and thus this is just the sort of case in which a class action is necessary to vindicate important federal statutory rights.

### H. Common Issues Predominate for the Identity Class

Zuffa makes four arguments challenging certification of the Identity Class. OB at 38-40. None is based on any expert testimony. *Id.* None is persuasive.[53] First, Zuffa claims the Identity Class includes all Fighters whose identities were expropriated or exploited during the Class Period, but Dr. Singer evaluates impact and damages only for Class members who received a payment or entered an agreement during the Class Period. *Id.* Zuffa does not explain, however, how Dr. Singer's approach would cause difficulties for class certification. The failure to receive a payment or enter an agreement during the Class Period implies that a Fighter's identity was not expropriated. In any case, the Identity Class can be limited, if necessary, to Fighters who received a payment or entered an agreement during the Class Period. Second, Zuffa asserts that Dr. Singer ███████████████████. OB at 39. That argument misunderstands the significance of Dr. Singer's regression. █████████████

██████████████████████████████

██████████████████████████████

████████████████. SR1 ¶253. Third, Zuffa claims that Plaintiffs prove common impact for Fighters who entered PARs based on Dr. Singer's assumption that █████████████. OB at 40. That argument confuses impact and damages. █████. ███ represents Dr. Singer's estimate of the *amount* of damages. It is not his proof of impact—which

---

[52] *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190–91 (9th Cir. 2001), which Zuffa misquotes, OB at 38, holds that small claims support certification and large claims are neutral, not a reason to deny certification. *See Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 444 (C.D. Cal. 2014) ("potentially high value of the claims does not weigh against class certification") (analyzing *Zinser*).
[53] Zuffa also asserts that Plaintiffs have changed their theory, OB at 38, but the complaint alleged Zuffa's conduct suppressed Fighter compensation for identity rights. CAC ¶92 (v)&(vi).

Case No.: 2:15-cv-01045-RFB-(PAL)
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY - REDACTED**

1  derives from all Fighters, in the actual world, signing away certain Identity rights in perpetuity without

2  compensation, something they would not have done absent the Scheme, which suffices for impact.[54]

3  **I.  Plaintiffs Have Standing to Seek Injunctive Relief**

4      Plaintiffs seek class treatment of their damages *and* injunctive relief claims under 23(b)(3), as

5  the law allows.[55] Plaintiffs have standing to seek injunctive relief for various reasons. First, two of the

6  named Plaintiffs, Fitch and Vera,[56] are current MMA Fighters, and thus would benefit from injunctive

7  relief. *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014) (setting out test for standing to pursue

8  injunctive relief). Zuffa's Scheme continues to impair the viability of potential rival MMA promoters—

9  and thus continues to harm *all Fighters* in the relevant market. *E.g.*, SR1 ¶¶134-39, 159-66; SR2 ¶¶21,

10  29-30, 42, 50-55, 65-67, 69-71. Second, one of the Plaintiffs, Le, was under contract with the UFC at

11  the time the suit was filed. He has standing too. *See Haro*, 747 F.3d at 1109 (named plaintiff had

12  standing to pursue injunctive relief where the "alleged injury was ongoing at the time the complaint

13  was filed"); *see also Grant-In-Aid*, 311 F.R.D. at 537 (rejecting mootness of former NCAA athletes'

14  injunctive relief claims given their "inherently transitory" careers); SR2 ¶64 & Tbl.1. Third, courts

15  frequently certify classes of former employees seeking injunctive relief.[57]

16  **III.  CONCLUSION**

17      For the foregoing reasons, the Court should certify the proposed Classes and appoint co-lead

18  and liaison counsel as proposed.

19

20

21

22  [54] Fourth, Zuffa claims that Dr. Singer does not address that Zuffa paid some of its Fighters for the
    "ancillary rights" in the PARs. OB at 40. But Zuffa provides only unexplained exhibits suggesting ███

23  ███████████████████████████████████████████████████. Any
    compensated Fighters can be excluded from the Class definition or can receive no recovery from the

24  Class damages—an issue of damages allocation, not class certification. *Tyson Foods*, 136 S. Ct. at
    1049-50 (uninjured class members can be excluded at allocation stage); *Leyva*, 716 F.3d at 513–14

25  (individual damages issues do not preclude class certification).
    [55] *E.g.*, *Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*, 2014 WL 5033219, at *1 (C.D. Cal. Sept. 22, 2014)

26  ("because a class certified under Rule 23(b)(3) may still seek injunctive relief, there was no reason for
    the Court to assume that Plaintiff sought certification of a damages only Rule 23(b)(3) class").

27  [56] "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates
    v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

28  [57] *See, e.g.*, *Grant-In-Aid*, 311 F.R.D. at 537, 545-47 (certifying class where named plaintiffs were
    former collegiate athletes); *Barnes*, 270 F.R.D. at 496–97 (former employee could sue "for injunctive
    and declaratory relief on behalf of himself and the class").

Case No.: 2:15-cv-01045-RFB-(PAL)

1    Dated: May 30, 2018                    Respectfully Submitted,

2                                           By: /s/ Eric L. Cramer

3                                               Eric L. Cramer

4                                           Eric L. Cramer (*Pro Hac Vice*)

5                                           Michael Dell'Angelo (*Pro Hac Vice*)
                                            Patrick F. Madden (*Pro Hac Vice*)

6                                           Mark R. Suter (*Pro Hac Vice*)
                                            BERGER & MONTAGUE, P.C.

7                                           1622 Locust Street
                                            Philadelphia, PA 19103

8                                           Phone: (215) 875-3000/Fax: (215) 875-4604
                                            ecramer@bm.net

9                                           mdellangelo@bm.net

10                                          pmadden@bm.net
                                            msuter@bm.net

11

12                                          Joseph R. Saveri (*Pro Hac Vice*)
                                            Joshua P. Davis (*Pro Hac Vice*)

13                                          Jiamin Chen (*Pro Hac Vice*)
                                            Kevin E. Rayhill (*Pro Hac Vice*)

14                                          JOSEPH SAVERI LAW FIRM, INC.
                                            601 California Street, Suite 1000

15                                          San Francisco, California 94108
                                            Phone: (415) 500-6800/Fax: (415) 395-9940

16                                          jsaveri@saverilawfirm.com
                                            jdavis@saverilawfirm.com

17                                          jchen@saverilawfirm.com

18                                          krayhill@saverilawfirm.com

19                                          Benjamin D. Brown (*Pro Hac Vice*)
                                            Richard A. Koffman (*Pro Hac Vice*)

20                                          Daniel H. Silverman (*Pro Hac Vice*)

21                                          COHEN MILSTEIN SELLERS & TOLL, PLLC
                                            1100 New York Ave., N.W., Suite 500

22                                          Washington, DC 20005
                                            Phone: (202) 408-4600/Fax: (202) 408 4699

23                                          bbrown@cohenmilstein.com

24                                          rkoffman@cohenmilstein.com
                                            dsilverman@cohenmilstein.com

25

26                                          **Co-Lead Class Counsel**

27

28

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY - REDACTED**

1

**Liaison Counsel for the Class**

2

Don Springmeyer (Nevada Bar No. 1021)
3
Bradley S. Schrager (Nevada Bar No. 10217)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
4
RABKIN, LLP
3556 E. Russell Road, Second Floor
5
Las Vegas, Nevada 89120
Phone: (702) 341-5200/Fax (702) 341-5300
6
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
7

8

**Additional Counsel for the Classes**:

9

Robert C. Maysey (*Pro Hac Vice*)
10
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
11
FORMANEK PLC
2555 E. Camelback Road, Suite 800
12
Phoenix, AZ 85016
Phone: (602) 264-7101/Fax: (602) 234-0419
13
rmaysey@warnerangle.com
jelwell@warnerangle.com
14

15

Frederick S. Schwartz (*pro hac vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
16
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
17
Phone: (818) 986-2407/Fax: (818) 995-4124
fred@fredschwartzlaw.com
18

19

William G. Caldes (admitted *pro hac vice*)
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
20
1818 Market Street – Suite 2500
Philadelphia, PA 19103
21
Phone: (215) 496-0300/Fax: (215) 496-6611
wcaldes@srkw-law.com
22

23

John D. Radice (admitted *pro hac vice*)
RADICE LAW FIRM, P.C.
24
34 Sunset Blvd.
Long Beach, NJ 08008
25
Phone: (646) 245-8502
jradice@radicelawfirm.com
26

27

28

Case No.: 2:15-cv-01045-RFB-(PAL)

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**PUBLIC COPY - REDACTED**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of May, 2018 a true and correct copy of Plaintiffs' **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** and supporting papers was served via email and the Court's CM/ECF system on all parties or persons requiring notice.

<u>     <i>/s/ Eric L. Cramer</i>     </u><br>
Eric L. Cramer

Case No.: 2:15-cv-01045-RFB-(PAL)

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
**<u>PUBLIC COPY - REDACTED</u>**