# Exhibit 87

Deposition of Hal J. Singer, Ph.D. (September 27, 2017) (excerpted)

PUBLIC COPY – REDACTED

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -
Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

\* \* \*
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



PUBLIC COPY – REDACTED

Page 118

```
 1   opposed to as a percentage of revenue?
 2       MR. CRAMER:  Objection to
 3       form, to generally.  For what
 4       purpose?
 5       THE WITNESS:  A firm could,
 6       if a firm bills -- if a law firm
 7       bills an associate out at $400 an
 8       hour, it could express what the --
 9       what the young lawyer's salary on
10       an hourly basis is as a -- under
11       an assumed utilization rate as a
12       percentage of that young lawyer's
13       bill rate.
14   BY MR. ISAACSON:
15       Q.   And are you aware of any
16   studies which express the marginal
17   revenue product of labor in terms of the
18   percentage of revenue of the firm?
19       A.   I'm not aware, but as you've
20   expressed it, that's not quite what I'm
21   doing either.
22       Q.   Now, in terms of -- did you
23   make any effort to measure the marginal
24   revenue product of labor of UFC fighters?
```

Page 119

```
 1       A.   Yes.
 2       Q.   Okay.  And what would you
 3   point to me for that?
 4       A.   What I did, which is I -- I
 5   calculated the average revenue per event,
 6   per fighter, and I'm using that as a
 7   proxy for the marginal revenue product.
 8       Q.   All right.  If the
 9   average -- when you look at the average
10   revenue per event, per fighter, how do
11   you determine what part of that revenue
12   is the contribution of the fighter as
13   opposed to, for example, marketing,
14   promotions, production or the work of the
15   overall firm?
16       A.   So for my purposes, I don't
17   need to figure out that -- that
18   decomposition.  I will note, however,
19   that I cite a study in my literature
20   review section that suggests that the
21   fighter is responsible for, if not all,
22   the vast majority of -- of the
23   pay-per-view revenues that are captured
24   and not the brand.
```

Page 120

```
 1       Q.   Well, I didn't ask about the
 2   brand.
 3       The -- you would agree --
 4   you would agree with me that effective
 5   marketing and promotion could increase
 6   the average revenue per event, correct?
 7       A.   Yes.
 8       Q.   And you would agree with me
 9   that super- -- improving television
10   production can increase the average
11   revenue per event?
12       MR. CRAMER:  All things
13       equal?
14       MR. ISAACSON:  Yes.
15       THE WITNESS:  I'm not sure
16       what -- what you mean by improving
17       television production.
18   BY MR. ISAACSON:
19       Q.   A better production that
20   people enjoy more.
21       MR. CRAMER:  Objection to
22       form.
23       THE WITNESS:  And you're
24       asking me if I can conceive of
```

Page 121

```
 1       this as a matter of theory?
 2   BY MR. ISAACSON:
 3       Q.   Yes.
 4       A.   As opposed to whether it
 5   actually happened?
 6       Q.   Yes.
 7       A.   I think I'm -- I'm going to
 8   grant you that as a matter of theory one
 9   could -- one could add value by
10   increasing the quality of the production.
11       Q.   Okay.  Now, in this case,
12   you did not do an actual study yourself
13   of the contribution of the UFC fighters
14   to the average revenue per event; is that
15   right?
16       MR. CRAMER:  Asked and
17       answered.
18       THE WITNESS:  I think that's
19       correct.  As I noted a few moments
20       ago, that was not necessary for my
21       purposes.
22   BY MR. ISAACSON:
23       Q.   By using the average revenue
24   per event, per fighter as a proxy, were
```



31 (Pages 118 to 121)

PUBLIC COPY – REDACTED

Page 122

1  you using that as a proxy for the
2  marginal revenue product of that labor?
3      A.  Yes.
4      Q.  Okay. And you were assuming
5  that all of that average revenue per
6  event, per fighter was the product of
7  that labor as opposed to some other
8  source?
9          MR. CRAMER: Form.
10         THE WITNESS: No, I don't
11     think I'm assuming that.
12 BY MR. ISAACSON:
13     Q.  When -- when you look at
14 average revenue -- I'm sorry. When you
15 ordinarily look at the marginal revenue
16 product of labor, do you talk about
17 everybody who works in the firm including
18 management?
19         MR. CRAMER: Objection to
20     form.
21         THE WITNESS: If -- if this
22     were some other case and you were
23     interested in computing the
24     marginal revenue product of

Page 123

1      management, you might -- you might
2      be interested in that. But that
3      wasn't what I was trying to do
4      here.
5  BY MR. ISAACSON:
6      Q.  All right. Here, have you
7  attempted to actually estimate the
8  marginal revenue product of the fighter
9  portion of the labor force of the UFC?
10         MR. CRAMER: Objection to
11     form.
12         THE WITNESS: I think you're
13     getting at the same question now,
14     just asked in a different way
15     which is have I done a
16     decomposition of the marginal
17     revenue product between the
18     fighters and -- and Zuffa, and the
19     answer is no, I have not done that
20     decomposition.
21 BY MR. ISAACSON:

Page 124

[redacted]

Page 125

4      Q.  You, yourself, have not
5  looked at the levels of pay over time
6  paid to Zuffa's fighters other than
7  looking at this study?
8          MR. CRAMER: Objection to
9      form.
10         THE WITNESS: So I wouldn't
11     put it that way.
12 BY MR. ISAACSON:
13     Q.  How would you put it?
14     A.  I am absolutely looking at
15 their pay over time in the sense that I'm
16 recording their pay as the numerator of
17 my dependent variable. So to suggest
18 that I'm not looking at their -- their
19 pay is erroneous.
20     Q.  All right. The -- was there
21 a period where the average revenue per
22 event in UFC had -- have you looked at
23 any periods where there were abrupt jumps
24 in that?

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 218

```
 1  Class where I demonstrate what I consider
 2  to be a rigid pricing structure when it
 3  comes to identity payments.
 4       Q.  Okay.  And did you do any
 5  separate economic modeling such as you
 6  did for the bout class?
 7       A.  No, I did not.
 8       Q.  The -- and you have two
 9  methods of estimating damages for the
10  identity class as I understand it.  One
11  is that you take the percentage increase
12  in revenue that would be paid as the
13  fighter share, the increased percentage.
14  So for example, if the fighter share went
15  from 50 to 75 percent, that would be a 25
16  increase in fighter share, and then you
17  apply that percentage increase to the
18  identity payments actually made to
19  fighters?
20       A.  Close.  As stated in
21  percentage terms, and I give the -- I
22  give the sample in paragraph 253 where I
23  put the but-for share --
24       Q.  Yes.
```

Page 219

```
 1       A.  Over the -- right, over the
 2  actual share, and then I multiply that by
 3  the payments that were made, correct.  I
 4  mean, so long as that's what you're
 5  saying, we're on the same page.
 6       Q.  I think we're saying the
 7  same thing.
 8       A.  Okay.
 9       Q.  But you're applying the
10  percentage increase in the fighter share
11  to the absolute payments for the identity
12  payments?
13       A.  Yes.
14  [REDACTED]
```

Page 220

```
[REDACTED]
13       MR. ISAACSON:  Okay.  All
14  right.  Why don't we take a break?
15       THE VIDEOGRAPHER:  The time
16  is 2:10 PM.  This is the end of
17  Disk 2.  We are off the record.
18       (Recess.)
19       THE VIDEOGRAPHER:  The time
20  is 4:26 PM (sic).  This is the
21  start of Disk No. 3 and we are now
22  on the record.
23  BY MR. ISAACSON:
24       Q.  You can look at --
```

Page 221

```
 1       MR. CRAMER:  The time is
 2  what?
 3       THE VIDEOGRAPHER:  2:26 PM.
 4  I'm sorry.
 5       MR. CRAMER:  Okay.
 6  BY MR. ISAACSON:
 7       Q.  If you could look at page
 8  154 of your report, Table 7, which
 9  displays the results of your first
10  analysis of common -- econometric
11  analysis of common impact.  We've looked
12  at this before.
13       A.  Yes.
14       Q.  And it says bout class
15  compensation structure.  And in paragraph
16  228 when you're discussing this, in the
17  first sentence -- I've actually said this
18  sentence several times, I think:
19       "I performed regressions to
20  determine whether gains or losses in
21  compensation are broadly shared across
22  the bout class."
23       A.  Yes.
24       Q.  Was -- did you use for the
```

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 222

1  regressions in Table 7 the Zuffa bout
2  class data?  And by that I mean, that's
3  defined at page 203 of your report,
4  Appendix 2, the first dataset.
5          MR. CRAMER:  Take your time
6      to look at the appendix he's
7      talking about.
8          THE WITNESS:  Do you want to
9      take me to the appendix?
10 BY MR. ISAACSON:
11     Q.  Sure.  On page 203.  The
12 first dataset, Zuffa's bout compensation
13 data.
14     A.  I believe that that dataset
15 would be sufficient to use to generate
16 the analysis and the results in Table 7.
17     Q.  Does that mean that's what
18 you did use?
19     A.  I'm pretty sure that's what
20 I did do.
21     Q.  Okay.  And then looking at
22 Table 8 where you report the results of
23 your other impact, the econometric
24 analysis, and there are different numbers

Page 223

1  reported in the errata that are slightly
2  higher?
3      A.  Right.
4      Q.  The -- I guess we can look
5  at those.  That would be Exhibit 3, which
6  reports ranging from 99.1 percent to
7  96.3 percent, depending on which part of
8  the table you're looking at.
9          Now, as I understand the way
10 you did this is that you took the -- the
11 increased fighter share of revenue, you
12 translated that into a percentage
13 increase in -- a predicted percentage
14 increase in pay, and then you applied
15 that to individual events?
16     A.  Not quite.
17     Q.  Close?
18     A.  I can say it better.
19     Q.  Yeah.  Go ahead.
20     A.  Okay.  So you have for each
21 fighter/event pair the actual share of
22 the event revenue that went to the
23 fighter in the real world, right?
24     Q.  Okay.

Page 224

1      A.  And now what you're going to
2  do is predict, given that fighter's
3  attributes and everything that happened
4  in the fight and all the other right-hand
5  side variables, what that fighter would
6  have received in a but-for world with
7  either zero or 20 percent foreclosure
8  share, right, and you're going to ask a
9  simple question:  Did the predicted
10 share, fighter wage share for that
11 fighter/event pair, did that exceed or
12 was it below the actual share.  That's
13 how -- we're going to make judgments on
14 each -- on each observation whether they
15 were impacted that way.
16     Q.  All right.  So a couple
17 pieces here just to make sure I
18 understand the math.  So when you were
19 doing this calculation, you're increasing
20 the total fighter's share for the
21 fighter's at the event, but between two
22 fighters, would their proportional share
23 remain the same?  Let me --
24     A.  The premises is wrong.

Page 225

1  You're not increasing anyone's share.
2      Q.  Okay.
3      A.  This is just a comparison.
4  You're comparing the actual fighter share
5  for a given event, right?
6      Q.  Right.
7      A.  To his predicted share based
8  on the regression model when you set the
9  foreclosure share equal to zero or
10 20 percent.  It's all -- it's just a
11 comparison.  No one is getting moved up
12 or down.
13     Q.  Right.  I understand it's a
14 comparison.  I'm trying to get comparison
15 right, so be patient with me.
16     A.  But the premise was -- the
17 premise was wrong in the question.
18     Q.  Well, don't -- say the
19 premise is wrong and I'll ask a new
20 question.
21     A.  Okay.
22     Q.  The -- so for the predicted
23 share, right, if you had a group of
24 fighters at an event, their predicted

57 (Pages 222 to 225)

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 226

1    shares would all rise once the total
2    fighters' share rose; is that correct?
3        A.   That's not how I'd put it.
4        Q.   Okay.  Well, you calculate a
5    total -- an increase in total fighters'
6    share, correct?
7        A.   Not for this model.
8        Q.   No, I know.  But are you
9    applying --
10       A.   I thought we were on Table
11   8.
12       Q.   Yes.  Yes, we are.
13       A.   But there's no -- there's
14   no --
15       Q.   You're not taking your
16   predicted increase in fighter share from
17   somewhere else and applying it in here?
18       A.   No.
19       Q.   Okay.  Then how -- you're
20   doing a separate but-for analysis of
21   predicted fighters' share for each event;
22   is that right?
23       A.   I would say for each
24   fighter/event pair.  We're going to use

Page 227

1    the regression from the anticompetitive
2    effects section and we are going to
3    project what -- what we think that
4    fighter would have received as a
5    percentage of the event revenue
6    conditional on the foreclosure share
7    being equal to zero or 20 percent, and
8    we're going to compare that predicted
9    fighter share to the actual fighter
10   share, right?  And we're going to make a
11   call for each observational database, is
12   it predicted above or is it below.
13       Q.   Right.
14       A.   And then we're going to make
15   it -- then we're going to fill in these
16   boxes here.
17       Q.   So I'm trying to understand
18   how you get there.  So you're not running
19   an individual regression on each fight or
20   event share?
21       A.   We don't do individual
22   regressions, no.
23       Q.   The -- I'm glad you thought
24   I got that right.

Page 228

1            The -- you run the
2    regression, and you're not running the
3    regression at the event level either?
4        A.   Well, remember what an
5    observation is in regression, it's a
6    fighter/event pair, right, so a given
7    fighter with a given event, we can
8    calculate what he or she earned as a
9    percentage of event revenue.  That's the
10   left-hand side variable.
11       Q.   Right.
12       A.   And then you have all these
13   host of variables that could explain what
14   that share was, the key one being the
15   foreclosure share.
16           So we fit a model based on
17   actual world data, and then to make a
18   projection for each individual fighter,
19   we use the parameters that came from that
20   one aggression model and we're going to
21   project what that fighter's wage share
22   would have been had a foreclosure share
23   been either equal to zero or 20 percent.
24       Q.   So I do understand that

Page 229

1    you're doing the projection and I'm just
2    trying to understand how you're doing the
3    projection.
4        A.   Okay.
5        Q.   The -- and I appreciate you
6    staying with me on that.
7        A.   I'm okay.
8        Q.   The -- so when you run the
9    foreclosure regression, does that result
10   in observations that create the
11   prediction for an individual fight or
12   event?
13       A.   You can use the regression
14   to project or predict what a fighter
15   would have received in a but-for world
16   where the foreclosure share is zero or
17   20 percent.
18       Q.   Right.  And is that -- when
19   you do that projection, is that
20   projection specific to that event or are
21   you taking an average from the regression
22   and applying it across events?
23           MR. CRAMER:  Objection to
24       form.



PUBLIC COPY – REDACTED

Page 230

```
 1             THE WITNESS:  You're using
 2        the parameters that came out of
 3        the -- the regression to then make
 4        a prediction.  And so, right, you
 5        have the coefficients and you've
 6        got a given fighter's right-hand
 7        side variables, right?  And now we
 8        can -- we can predict based on one
 9        slight modification to the actual
10        world, which is that we're going
11        to take the foreclosure share down
12        to zero or 20 percent, and we're
13        going to predict what that
14        fighter's wage share would have
15        been, and then we're going to
16        compare it to the actual wage
17        share for that event.
18   BY MR. ISAACSON:
19        Q.   Does the prediction
20   within -- does the prediction within a
21   year -- I'm sorry.  Does the prediction
22   for events within a year, if it predicts
23   a 15 percent increase in fighter's
24   share --
```

Page 231

```
 1        A.   Oh, it's not -- it's not
 2   doing that.  It's not -- I think this
 3   might be the disconnect.  It's not
 4   predicting an increase, right?  It's just
 5   predicting a wage share.  And it's our
 6   job to then, as the last step, compare
 7   the prediction to the actual.
 8        Q.   I'm sorry.  I --
 9        A.   In some cases it's above.
10        Q.   I meant a 15 percent
11   increase in wage share?
12        A.   But it's not -- it's not
13   uniformly predicting that everyone would
14   get a 15 percent increase relative to
15   what they actually got.  It's literally
16   predicting what they would have gotten
17   conditional on all of their --
18        Q.   Right.
19        A.   -- explanatory --
20        Q.   So for each event during the
21   year, is it predicting the fighters would
22   get the average increase in wage share
23   for that year?
24        A.   No.
```

Page 232

```
 1        Q.   Okay.  Is it getting -- is
 2   it predicting for each event during the
 3   year, a specific increase in wage share?
 4        A.   No.
 5        Q.   Okay.  So you have two
 6   events during the year?
 7        A.   You don't have two, you have
 8   a ton.
 9        Q.   I know but for purposes of a
10   really simple example --
11        A.   Okay.
12        Q.   -- that's going to help
13   educate me.
14        A.   Okay.
15        Q.   The -- during the same year,
16   and during that year you've predicted
17   that, through the regression, that the
18   overall wage share or fighter share is
19   going to increase.  All right?
20        A.   Yes.
21        Q.   Okay.  Tell me what would
22   be -- how -- how will that play out in
23   terms of the prediction for those two
24   events?
```

Page 233

```
 1        A.   It would --
 2             MR. CRAMER:  Incomplete
 3        hypothetical.
 4             THE WITNESS:  It would tend
 5        to predict that most fighters can
 6        be shown to be worse off in the --
 7        in the actual world compared to
 8        the but-for world.
 9   BY MR. ISAACSON:
10        Q.   Right.  But in terms of --
11   I'm trying -- in terms of your Table 8?
12        A.   Yes.
13        Q.   The -- if the fighter share
14   for that year according -- in the but-for
15   world was going to rise by 15 percent?
16        A.   Okay.
17        Q.   Would you be calculating
18   that the fighter share for the event as a
19   whole would go up by 15 percent?
20        A.   Not for the purpose of this
21   exercise, no.
22        Q.   Okay.  How would you -- if
23   the fighter's share for the year was
24   going up by 15 percent, how would you
```



59 (Pages 230 to 233)

PUBLIC COPY – REDACTED

Page 234

```
 1   translate that into a fighter's share for
 2   the fighters at a specific event?
 3       A.   It depends on what exercise
 4   you're doing.  If you want to do
 5   something different from what can he did
 6   here.
 7       Q.   I don't want to do something
 8   different.  I want to do what you did
 9   here.
10       A.   Well, then, you need -- you
11   need to get away from starting with the
12   aggregate effects in a given year.
13   That's not -- that's not working here.
14   All right?  What's working here is that
15   we're going to fit a model based on these
16   thousands of observations and we're going
17   to go back and project for each member of
18   the bout class for each event what his or
19   her but-for wage share would have been if
20   foreclosure had been zero or 20 percent.
21   Then we are going to compare that
22   prediction, which is different for
23   everyone, right, because everyone has a
24   different set of right-hand side
```

Page 235

```
 1   characteristics, we're going to get a --
 2   we're going to get a different prediction
 3   for everyone and we're going to compare
 4   it to their actual.
 5           And what you're saying in
 6   the tables is that most people would have
 7   been better -- most people in the class
 8   would have been better pursuant to this
 9   model.  There is a very small fraction,
10   it's under 1 percent now, who would not
11   have been better off under this
12   particular model.
13       Q.   Is it -- the dependent
14   variable was the -- actually, it was
15   different.
16           The fighter share is a right
17   hand or left hand?
18       A.   It's left hand.  It's the
19   dependent variable.
20       Q.   Yeah, yeah, okay.  So is it
21   that you're looking at the fighter share
22   on the left hand, the right hand has a
23   number of characteristics that are
24   individual to each fighter, they're
```

Page 236

```
 1   listed in your variables, did they have
 2   knockdowns and things like that, and
 3   you're seeing -- and from that you're
 4   getting your prediction?
 5       A.   Correct.  What we're trying
 6   to do is best we can to figure out what
 7   can explain movements in a given
 8   fighter's wage share for given events,
 9   correct.
10       Q.   Right.  Okay.  I think I'm
11   getting closer now.
12           So you've got the left hand
13   and the right hand, and if on the left
14   hand, the fighter's share increases, then
15   you have a prediction as to what will
16   happen based on the individual
17   characteristics of the fighter and the
18   event and then -- and you compare that to
19   what actually happened?
20       A.   I wouldn't put it that way.
21       Q.   Okay.
22       A.   A model, once it's fit, can
23   make a prediction for each fighter as to
24   what his or her wage share would have
```

Page 237

```
 1   been in this but-for world.  It's that
 2   simple.  And then we're going to compare
 3   the predicted wage share to the actual
 4   wage share.
 5       Q.   Okay.  Then it's the --
 6   you're putting in the foreclosure amount
 7   along with the individual characteristics
 8   and then getting the wage share and
 9   comparing that to the actual -- what
10   actually happened?
11       A.   Yes.
12       Q.   Okay.  Thank you.
13           The -- and the -- when you
14   do this analysis fighter-by-fighter or by
15   fighter/event pairing, the foreclosure
16   percentage that you're putting in there,
17   is that the same for all fighters for
18   each year?
19       A.   Oh.  So when we go into a
20   but-for world --
21       Q.   Yes.
22       A.   -- whether it's the zero
23   percent scenario, the 20 percent
24   scenario, or the 30 percent, that is used
```



Page 290

1  studied that and I imagine for someone
2  who lives very far from the venue where
3  the live event is staged, they would not
4  be considered reasonably close
5  substitutes.
6      Q.   So for your input markets,
7  what evidence did you take into account
8  to assess customer's likely response to
9  price increase in the SSNIP analysis?
10 And feel free to point me to the sections
11 of your report that --
12     A.   Did you mean to say -- I
13 think you just conflated the input
14 markets and customers.  Maybe we should
15 start over.
16     Q.   Yes, I said price increase
17 rather than wage decrease, but let me
18 just put it this way:  What evidence in
19 your report did you take into account to
20 assess the likely response to a SSNIP in
21 the input markets?
22     A.   Sure.  So there it's the
23 perspective of the fighters not the
24 customers.  So I was tripping up over

Page 291

1  your --
2      Q.   Yes.
3      A.   -- injecting customers when
4  we're talking about input markets.
5          So I can take you to the
6  relevant sections, and I will, but of
7  course at high levels, I'm looking at
8  record evidence of -- of what fighters
9  and promoters thought about substitution
10 possibilities as you -- if you were to
11 move away from Zuffa to counteract a
12 hypothetical wage cut.
13     Q.   Okay.  So the first thing
14 you looked at was record evidence of
15 substitution.
16     A.   Or the perception of
17 substitution from the stakeholders, the
18 fighters, the promoters, and I'll just
19 point you, if you --
20     Q.   That's -- that's sufficient
21 for -- for item 1.
22         MR. CRAMER:  You asked him
23     to look at his report.
24         MR. ISAACSON:  I'm going

Page 292

1  to --
2          MR. CRAMER:  Okay.
3          MR. ISAACSON:  I'm not going
4      to ask him to recite all the
5      documentary evidence.
6  BY MR. ISAACSON:
7      Q.   And I understand that
8  there's documentary evidence that you're
9  not reciting today.
10         Okay.  Other than the record
11 evidence of the -- about sub- --
12 perceptions of substitutability from the
13 stakeholders, what would be other parts
14 of your SSNIP analysis for the input
15 market?
16     A.   I would direct you to
17 Section 3A 1 for all of the evidence that
18 I used to inform the construction of the
19 relevant input market.
20     Q.   That would be the record
21 evidence that you were referring to?
22     A.   Well, record evidence is
23 fairly broad, right, because it
24 encompasses almost everything.  But I

Page 293

1  will point -- to me the -- what helps to
2  guide me to the findings that I made with
3  respect to the input market was the fact
4  that Zuffa was able to successfully
5  suppress fighter wages, wages either
6  measured by -- by wage share, regression
7  or by knowledge of the fact that wage
8  shares were falling over time from
9  26 percent to 18 percent, yet Zuffa did
10 not suffer sufficient defection so as to
11 render that wage decrease unprofitable.
12         Now, that -- that tells you,
13 as a matter of economics, that a -- that
14 a reasonable starting place for defining
15 the contours of the relevant input market
16 is just the fighters under Zuffa's
17 control.  That was the -- the first thing
18 that occurred to me.
19         And once you -- once you
20 start there, you can start looking at
21 record evidence to determine whether
22 additional fighters from -- from rival
23 promotions ought to be included so that
24 you eventually get to the smallest set of



Page 294

```
1  fighters such that a hypothetical
2  monopsonist could profitably exercise
3  monopsony power.
4       Q.   All right.  And you said
5  that Zuffa was able to successfully
6  suppress fighter wages -- wage share.
7  You were talking only about the share of
8  revenues there, correct?
9       A.   Correct.
```

[lines 10-24 redacted]

Page 295

[lines 1-4 redacted]

```
5  BY MR. ISAACSON:
6       Q.   All right.  But in your --
7  in your hypothetical there you held
8  revenues constant.  Did you look at, as
9  part of your analysis of the input market
10 and defining that market, as to whether
11 Zuffa actually suppressed actual wages?
12      MR. CRAMER:  Objection to
13 form.
14 BY MR. ISAACSON:
15      Q.   As opposed to wage share?
16      MR. CRAMER:  Same objection.
17      THE WITNESS:  I'm focused on
18 wage share, of course, because
19 it's the right thing to look at
20 from an economic perspective.
21 We're trying to measure
22 exploitation, and the textbooks
23 tell you to do it as a share of
24 marginal revenue product.
```

Page 296

```
1  BY MR. ISAACSON:
2       Q.   So my actual question was --
3  I understand you're focused on that, but
4  my question is, did you look at whether
5  Zuffa actually suppressed actual wages?
6       A.   Without controlling for
7  revenues, no.  Because it's incorrect to
8  do so.
9       Q.   So in performing your SSNIP
10 analysis for the input markets, is it
11 fair to say that you relied on the record
12 evidence about the issue of perceived
13 substitution from the stakeholders along
14 with your observations that when Zuffa
15 suppressed fighter wage shares, there
16 weren't significant defections?
17      A.   I think -- I think that
18 encompasses a lot.  I also think that
19 Zuffa in its ordinary course of business
20 made use of a FightMetrics (sic)
21 database.  I had -- the very first thing
22 I did when I -- when I got this case was
23 I started reading the economic literature
24 on the MMA industry, and almost every
```

Page 297

```
1  article I read, the FightMetrics (sic)
2  database formed the foundation of their
3  empirical analysis.
4            So I thought that that was a
5  reasonable place to begin to posit what
6  the smallest set of fighters that could
7  be under the control of a hypothetical
8  monopsony would be in order for it to
9  exercise market power.
10      Q.   All right.  Why did you use
11 the smallest set of fighters not the
12 smallest amount of promoters?
13      A.   Well, because we're looking
14 at the input market.  The fighters form
15 the elements of the input market.  They
16 happen to belong to promoters, but
17 fighters are the elements or the
18 ingredients.
19           But I'm -- if I'm a
20 fighter -- just to make it clear, if I'm
21 a fighter and I'm thinking about
22 substituting, defecting from UFC and
23 going to a rival promotion, I don't care
24 what the name of the promotion is or
```

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 298

```
 1   who's running it or who the chief
 2   matchmaker is, I want to make sure that
 3   I'm going to be put inside of a pool
 4   of -- of fighters such that I have a
 5   prospect of elevating through the ranks.
 6   It's the fighters that determine what a
 7   reasonable substitute is when fighters
 8   are considering defecting.
 9        Q.   Now, you're not suggesting
10   that Zuffa used the Fight Matrix data to
11   define a market, are you?
12        A.   Well, you just toggled from
13   FightMetrics (sic) to Fight Matrix.
14        Q.   I'm sorry, FightMetrics
15   (sic).  Sorry.  I was bound to do that
16   today.
17             But you're not suggesting
18   that Zuffa used FightMetrics (sic) data
19   to define a market?
20        A.   I'm suggesting that firms
21   are not -- are not employed -- firms are
22   not in the businesses of defining
23   relevant product markets as the normal
24   course of business, right?  They're doing
```

Page 299

```
 1   something else.  Defining markets is the
 2   task of an antitrust economist.
 3        Q.   All right.
 4        A.   But I do think it's
 5   important that Zuffa uses and relies on
 6   the FightMetrics (sic) database in its
 7   ordinary course of business.
 8        Q.   All right.  And is that part
 9   of -- do you consider that -- that
10   observation that Zuffa relies on the
11   FightMetrics (sic) database to be part of
12   your SSNIP analysis?
13        A.   I think it undergirds the
14   conclusion that -- that this is the
15   relevant set of fighters that would need
16   to be under the control of a hypothetical
17   monopsonist so that the wage decrease
18   below competitive levels would not be
19   rendered unprofitable.
20        Q.   Right.  So does your SSNIP
21   analysis for the input markets consist of
22   anything other than the things that
23   you've listed so far:  The record
24   evidence of substitution -- of
```

Page 300

```
 1   perceptions of substitutability from
 2   stakeholders, your observations about how
 3   Zuffa suppressed fighter wage shares
 4   without defections or significant
 5   defections, and Zuffa's reliance on the
 6   FightMetrics (sic) database?
 7             MR. CRAMER:  Would you like
 8        him to look at his report, is that
 9        what you're asking?
10             MR. ISAACSON:  He can look
11        at his report in answering the
12        questions.  I've allowed him to do
13        that for every question.
14             MR. CRAMER:  Okay, good.
15             THE WITNESS:  By looking at
16        it, it refreshes my memory that in
17        paragraph 101, for example, I'm
18        looking at evidence, again from
19        the perspective of what I call
20        stakeholders, or mostly fighters,
21        as to whether or not some -- some
22        sport outside of MMA would
23        constitute a reasonable substitute
24        to defect to in response to a wage
```

Page 301

```
 1        decrease.
 2             And we can go through
 3        paragraph-by-paragraph.  I don't
 4        know if that's how you want me to
 5        use the time --
 6   BY MR. ISAACSON:
 7        Q.   I thought -- I thought that
 8   as encompassed within the record evidence
 9   of perceptions of substitute billing.
10        A.   Right.  But why -- I mean, I
11   wouldn't say why we go by my memory of
12   what I used, we have the report and we
13   can go paragraph-by-paragraph and I
14   can --
15        Q.   Your report is long, I'm
16   trying to see if I can get a summary of
17   your conclusions with you having access
18   to your report.
19             MR. CRAMER:  So he wants you
20        to take your time and make sure
21        that you've adequately summarized
22        your conclusions and the evidence
23        upon which they're based.
24             THE WITNESS:  Okay.
```

**PUBLIC COPY – REDACTED**

MAGNA LEGAL SERVICES