# Exhibit 6

UFC's Dana White_ 'Insane' If You Don't Worry About Competition

Forbes / SportsMoney / #SportsMoney

FEB 28, 2018 @ 07:30 AM          1,476                                                                2 Free Issues of Forbes

# UFC's Dana White: 'Insane' If You Don't Worry About Competition



**Paul Gift,** CONTRIBUTOR
*I write about MMA biz, analytics, and officiating* FULL BIO ⌄
Opinions expressed by Forbes Contributors are their own.

As the antitrust lawsuit against the UFC sprang to life again with a recent Plaintiffs class certification filing and three UFC *Daubert* motions to exclude expert testimony, some of the more interesting material could be found in the exhibits. Among the four motions, 103 exhibits contained everything from partially-redacted expert reports to academic research papers to 2 ½ years of Golden Boy Promotions boxing financials to 27 deposition excerpts from current and former MMA promoters, economist expert witnesses and others.



UFC President Dana White was deposed in the ongoing class-action, antitrust lawsuit on August 9, 2017 in Las Vegas. (Photo by [+]

Some of deposition excerpts were humorous — such as a purported text exchange between two UFC matchmakers following a rival promoter's matchup of legendary yet past-their-prime fighters, Tito Ortiz and Rampage Jackson, describing Bellator throwing "a curve ball... Into the stands" and its "'was relevant 5 years ago' division."

But the filings also provided a glimpse of the sometimes brash, oft-outspoken UFC president Dana White when he's under oath rather than serving as the public face of the promotion.

**Dana White on Competition**

The Plaintiffs – a group of six now-former UFC fighters – are suing the world's top MMA promotion alleging an anticompetitive "Scheme" that includes long-term, exclusive contracts with fighters, coercion of fighters to re-sign contracts and acquiring and closing down competing promoters. In so doing, Plaintiffs believe the UFC reduced other MMA promoters to "minor leagues."

Part of the Plaintiffs case involves identifying public statements from White on the alleged lack of competition facing the UFC, such as this one from 2010: "There is no competition. We're the NFL… There is no other guy."

Yet White's recently released deposition excerpts paint a very different picture once he's out of the public promoter realm and under oath in a private conference room.

In his August 9th deposition in Las Vegas, Plaintiff attorneys asked White to read his answer to an *ESPN The Magazine* question on how he felt about the International Fight League (IFL), Bodog, EliteXC and other competition. His answer at the time, "It's good for us. I don't look at those guys as competition at all. They're nowhere near the league that we're in. I need shows like this. They're the feeder leagues. All the guys who fight in those shows aspire to be in the UFC someday. They're creating all the UFC talent of tomorrow."

When asked if he believes that was true in July 2007, White responded, "Should I said [*sic*] I'm horrified and terrified of all this competition?"

Pressed further, White explained it would be "insane" not to worry about competition.

> **Q. Just so I'm clear, are you saying that take the time in 2007 that you were scared about EliteXC and Bodog as competing promotions to the UFC?**
> A. Well, you're insane if you don't worry about your competition. You absolutely have to worry about your competition.
>
> **Q. And so, was EliteXC and Bodog competition that you were concerned about in 2007?**
> A. Yeah. So Bodog, this guy had nothing but cash. The guy lived on an island somewhere, Calvin Ayre, who was doing illegal gaming and was offering guys huge money just to fly out and hang out with him on the island. And yeah, you got to. You got to worry about that.

*Q. So you were legitimately concerned about Bodog as a competitor as well?*

*A. Definitely.*

In another exchange, White was asked about a post-fight interview he gave following an event in Macau, China. At the time, in response to a question about ONE FC and other MMA promoters in the area, White purportedly said "grassroots companies" were great for the UFC. "So having small organizations out there is a great thing. It's not a – you know, I love it."

When asked in his deposition whether smaller promotions like ONE FC were a good thing for the UFC, a much different answer emerged. "I will tell you what drives me crazy," White replied, "what cracks me up, is we're trying to get into Asia; so we have been working on Asia for a long time. And every time I do interviews over there, they say, 'Are you guys like ONE FC? Is that what you are. [*sic*]' Yeah. Yeah. So it's owned by a billionaire. And every time I do interviews in Asia, they ask if the UFC is like ONE FC. What are you guys, like ONE FC? Yeah, no. We're like the UFC, but yeah. They're not a minor grassroots organization. They're a monster." When asked if he was talking about "In Asia," White clarified, "Yeah."

While fight promoters have an incentive to hype, exaggerate and embellish their public statements, defendants in an antitrust lawsuit have an incentive to overstate the level of competition they face. But they're also under oath to tell the truth with the penalty of perjury at stake, no fights to hype, no tickets or pay-per-views to sell.

A different picture of UFC president Dana White emerged in that world.

**Value of the UFC Brand**

Former UFC CEO Lorenzo Fertitta was deposed on March 23, 2017 in Las Vegas. His publicly-available excerpts were relatively brief, but in one exchange on his view of the UFC as a brand, Fertitta explained that the promotion was "probably the most tarnished brand in sports" in 2001. "I mean, it's hard to get worse than Senator John McCain calling us human cockfighting and then living with that for a number of years as the moniker that when people hear the word UFC, the first thing that comes to mind is human cockfighting."

By 2010, Fertitta believed the UFC brand represented something that was positive. When asked about the UFC brand from a consumer's perspective, Fertitta likened it to the Tiffany's turquoise box.

"From the standpoint of our branding and our marketing, the idea was that when the consumer saw that there was a UFC fight, they would think they were – or, assume that they were watching the best.

"It's no different than if you go to – if you go to Tiffany's and buy a diamond, in the consumer's mind, for whatever reason, it's better than the same exact diamond that maybe you buy down the street. It's the same product, but because it's in the little turquoise box, there's perceived value in that brand. Brands have value, and we believe that we created consumer value in the UFC brand."

The publicly-released transcript of Fertitta's answer to a follow-up question on whether Zales and Van Cleef & Arpels sell comparable products was cut off after six words.

### Rival MMA Promoters

The underlying economic theory behind the UFC's alleged acquisition and maintenance of monopoly/monopsony power is *raising rivals' costs*; i.e., keeping rivals from having sufficient access to critical inputs needed to compete (fighters and possibly venues, sponsors and television networks).

In the deposition excerpts made public, five representatives of past or current UFC rival promotions – Tom Atencio, former VP at Affliction; Carlos Silva, former CEO of the World Series of Fighting (WSOF) and current president of the Professional Fighters League; Jeremy Lappen, former president of fight operations for EliteXC; Kurt Otto former co-founder of the IFL; and Scott Coker, former founder and CEO of Strikeforce and current president of Bellator MMA – were asked varying degrees of questions about whether the UFC's conduct made it difficult to compete.

This is a potentially important issue because in a high-profile boxing antitrust case last year – in which Golden Boy Promotions claimed manager Al Haymon had anticompetitively tied his boxing managerial services to the use of one of his "sham" promoters – the judge granted summary judgment for Haymon while specifically noting "not a single boxer" testified to feeling coerced into working with a particular promoter or prevented from selecting the promoter of his choice.

In the recently released MMA deposition excerpts, when asked if the UFC's market dominance made it difficult to attract fighters, Atencio replied, "Actually, no. I don't think it did." Asked if he had any difficulty obtaining event sponsors, he answered, "I don't think we did."

In Silva's deposition, when asked if there's a large talent pool from which to sign MMA fighters, he stated, "Yes." Asked if the UFC blocked WSOF from inputs necessary to put on successful shows, "No," Silva replied.

Jeremy Lappen was asked if EliteXC had difficulty attracting top fighters who could draw on the same level as Kimbo Slice. Lappen first noted that Slice was an EliteXC fighter and, upon further questioning, stated, "Is it hard to find fighters of his caliber, his fame... ability to draw a crowd? ... Yes, definitely... It's trying to find a star. I mean, it's hard to

find a star. They have a certain X factor. That's what the business is about, I think."

Lappen was later asked if the UFC's use of exclusive contracts affected EliteXC's ability to attract fighters with that X factor, to which he responded, "Well, assuming that UFC had people who would draw an audience that was under exclusive contract and we couldn't sign them, then yes, that would affect us."

On follow-up, attorney's asked if Lappen was able to sign fighters the caliber of Randy Couture. "Well, I wasn't able to sign a fighter if he was under contract with UFC, I couldn't sign them," Lappen said. "But I signed many fighters that were very high-level fighters."

Otto was asked if the UFC's purchases of Pride, WEC and WFA around 2006-2007 made it more or less difficult to compete. "Well, you tell me," he responded. "If I need to go get fighters that are bigger names, they're not in the woods somewhere up, in a tree, hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter.

"So I have to go all the way down to the gym level and go find a new gym rat that has talent and build them up and start from scratch. So, if you buy all the talent, your chances of finding Conor McGregor are slim to none; this one is out of town."

Upon follow-up, Otto noted, "But to directly answer your questions, does it limit your fight pool? Yes. For free agents, yes."

Scott Coker, the only representative of a current and early UFC competitor in the group, didn't appear to be asked in unredacted portions of the transcript about the effect of UFC exclusive contracts on his ability to compete, which may be a wise legal strategy since we know the UFC asked for and received at least a 20% sample of Bellator contracts from January 1, 2010 through June 13, 2017 and will likely conduct a comparative analysis of the two promotions' key contract clauses.

In a portion of the transcript immediately following a redaction, Coker was asked if "that" was something he viewed as important to Strikeforce. It's unclear exactly what "that" was, but Coker responded, "Yes... My goal was to build this company as big as we could, become a -- you know, a sizeable player in the mixed martial arts world. And I felt like we had a lot of pieces in place. We started -- we started recruiting top talent, that we were building from the ground up with, say, like Ty Woodley, Luke Rockhold, Daniel Cormier, a lot of the stars that are currently stars today for the UFC."

Fighter attorneys subsequently moved the conversation into the UFC's purchase of Strikeforce's fighters and a June 18, 2015 interview in which Coker describes the MMA industry following his sale of Strikeforce with a supposed downward hand motion. Plaintiffs will no doubt focus on the fact that Coker's roster of fighters ultimately went to

the UFC and a purported quote claiming fighter managers told him purse offers were down "about 20%" after the acquisition, while the UFC will likely focus on Coker's ability as a competitor, in spite of the UFC's claimed anticompetitive behavior, to build out his roster through fighter development and acquisitions.

At least two current or former promotion representatives were also deposed, but not heard from, in the recent transcript release. They are Shannon Knapp from multiple MMA promotions, most notably Invicta FC, and Andrew Simon from AXS TV Fights.

Overall, the documents provide a taste of MMA executives' thoughts on the industry from behind closed doors and sworn to truthfulness, from Dana White's thoughts on competition to Lorenzo Fertitta's view of the UFC brand to rival MMA promoters' beliefs on the effects of the UFC's business strategies.

Representatives from two rival promoters, Atencio and Silva, essentially denied that the UFC hindered their ability to compete. Lappen's admission that he signed many high-level fighters including Kimbo Slice who "still holds the record for the most watched fight in the U.S. mixed martial arts fight [*sic*]" should help UFC attorneys. Both Otto and Coker had negative statements following UFC acquisitions, but neither appeared to fully describe a raising rivals' costs scenario, although Otto may have come the closest.

There's still much about this case that's unknown. Significant portions of expert reports were redacted and some deposition transcripts were either excluded in their entirety or had only small parts that were public and unredacted.

It's appeared from the beginning that Plaintiffs would have an uphill battle in this case due to the nature of Sherman Act Section 2 claims, the increased flexibility that single-firm conduct allows over an alleged conspiracy, the elements needed for exclusive contracts to foreclose rivals and the consumer welfare standard. The most recent class certification and *Daubert* filings seem to support that notion.

For more, see my early thoughts the morning after the documents were released, Jason Cruz's pieces at MMA Payout, John Nash's piece at Bloody Elbow and our next Show Money podcast with more thoughts on the matter, which should be released by next week.

A UFC representative did not respond to a request for comment as of this writing.

*Paul is an associate professor of economics at Pepperdine Univ. and an ABC-certified referee and judge for the California Amateur MMA Organization (CAMO). Follow him on Twitter @MMAanalytics.*