WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>            v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>        Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL)<br><br>**DEFENDANT ZUFFA, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>**HEARING REQUESTED**<br><br>**[REDACTED]** |

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

CONCISE STATEMENT OF UNDISPUTED FACTS ...................................................... 3

  History Of Zuffa And The UFC ......................................................................................... 3

  Growth Of The UFC In Events And Compensation ......................................................... 4

  Zuffa And MMA Contracts ............................................................................................... 6

  MMA Competition ............................................................................................................. 7

  Venues, Sponsors, And Broadcasters ............................................................................. 11

  Plaintiffs' Experts Opinions ............................................................................................ 12

LEGAL STANDARD ......................................................................................................... 13

ARGUMENT ....................................................................................................................... 15

I.    Plaintiffs Have Not Defined A Legally Sufficient Input Or Output Market Because They Attempt To Define The Market By The Athletes In The Market, And Not The MMA Promoters Which Compete. ................................................................................. 16

    A.   Plaintiffs' Evidence Does Not Define An Input Market. ................................... 18

    B.   Plaintiffs' Evidence Does Not Define An Output Market. ................................ 19

II.   Zuffa is Entitled to Summary Judgment on Plaintiffs' Monopsonization Claim ......... 20

    A.   Undisputed Competition Shows that the UFC Lacks Monopsony Power. ......... 20

    B.   Plaintiffs Lack Evidence Of Monopsony Power .................................................. 21

        1.   There Is No Direct Evidence Of Lower Compensation. ............................ 21

            a.   Impact To Wage Share Is Not Evidence Of A Price Decrease. ........ 21

            b.   Zuffa's Purportedly Lower Wage Share Than Strikeforce Or Bellator Is Not Evidence Of Monopsony Power. ........................................... 23

            c.   The So-Called "Sponsorship Tax" Does Not Constitute Direct Evidence Of Harm To Compensation. ............................................... 24

        2.   Plaintiffs Have Not Shown a Restriction in Output for Athlete Services. . 24

        3.   Plaintiffs Have Not Shown Circumstantial Evidence of Market Power. ... 25

    C.   Zuffa Did Not Engage in Exclusionary Anticompetitive Conduct. .................... 26

        1.   Zuffa Was Not Engaged In Predatory Hiring. ........................................... 26

        2.   Zuffa's Contracts Did Not Substantially Foreclose Competitors. ............ 28

a.   Plaintiffs Assume But Do Not Prove That Zuffa's Exclusive
Contracts Foreclose A Substantial Share Of Competition................ 29

b.   Plaintiffs Have Failed To Quantify The Extent To Which
Competition Is Foreclosed. ............................................................. 31

c.   Zuffa's Has Legitimate Business Justifications for its Exclusive
Contracts. ...................................................................................... 33

3.   Plaintiffs Have Not Adduced Evidence That The Remaining Challenged
Conduct Is Anticompetitive. .................................................................. 34

a.   Plaintiffs Have Presented No Evidence Of Anticompetitive Effects
From Zuffa's Acquisitions Of MMA Promoters. ............................. 34

b.   Plaintiffs Have Not Presented Evidence Of Anticompetitive
"Coercion." ................................................................................... 35

III.   Zuffa Is Entitled To Summary Judgment On Plaintiffs' Monopolization Claim. ....... 36

A.   Plaintiffs Lack Direct Evidence of Zuffa's Alleged Monopoly Power. ............ 38

1.   No Supracompetitive Prices. ................................................................. 38

2.   No Reduction In Output. ........................................................................ 38

IV.   Plaintiffs Have Failed To Support Their Identity Class Claim With Admissible
Evidence. ........................................................................................................ 39

V.   Plaintiffs Do Not Have Standing To Bring Claims For Injunctive Relief .................. 40

CONCLUSION ..................................................................................................................... 40

1

2

**TABLE OF AUTHORITIES**

**CASES**

3

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*
  836 F.3d 1171 (9th Cir. 2016) ................................................................................ 37

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*
  592 F.3d 991 (9th Cir. 2010) .................................................................................. 28

*Am. Ad. Mgmt. Inc. v. Gen. Tel. Co. of Cal.*
  190 F.3d 1051 (9th Cir. 1990) ................................................................................ 14

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*
  108 F.3d 1147 (9th Cir. 1997) ........................................................................... passim

*Atlantic Richfield Co. v. USA Petroleum, Inc.*
  495 U.S. 328 (1990) ............................................................................................... 23

*Balaklaw v. Lovell*
  14 F.3d 793 (2d Cir. 1994) ..................................................................................... 35

*Barry Wright Corp. v. ITT Grinnell Corp.*
  724 F.2d 227 (1st Cir.1983) ................................................................................... 29

*Boardman v. Pac. Seafood Grp.*
  822 F.3d 1011 (9th Cir. 2016) ................................................................................ 34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*
  509 U.S. 209 (1993) ............................................................................................... 39

*Cal. Comp. Prods., Inc. v. Int'l Bus. Machs. Corp.*
  613 F.2d (9th Cir. 1979) ......................................................................................... 34

*City of Vernon v. S. Cal. Edison Co.*
  955 F.2d 1361 (9th Cir. 1992) ................................................................................ 15

*Dominick v. Collectors Universe, Inc.*
  2012 WL 6618616 (C.D. Cal. Dec. 18, 2012) ....................................................... 22

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*
  357 F.3d (1st Cir. 2008) ......................................................................................... 28

*Eastman v. Quest Diagnostics Inc.*
  724 F. App'x 556 (9th Cir. 2018) ........................................................................... 14

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*
  848 F.2d 976 (9th Cir. 1988) .................................................................................. 30

*Gen. Bus. Sys. v. N. Am. Philips Corp.*
  699 F.2d 965 (9th Cir. 1983) .................................................................................. 33

*Golden Boy Promotions LLC v. Haymon*
  2017 WL 460736 (C.D. Cal. Jan. 26, 2017) ...................................................... passim

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*
  895 F.2d 1417 (9th Cir. 1990) ................................................................................ 33

*Heerwagen v. Clear Channel Commc'ns*
  435 F.3d 219 (2d Cir. 2006) ................................................................................... 19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
125 F.3d 1195 (9th Cir. 1997) ................................................................. 14, 25, 33

*In re Apple iPod iTunes Antitrust Litig.*
796 F. Supp. 2d 1137 (N.D. Cal. 2011) .................................................................. 39

*In re Beef Antitrust Litig.*
907 F.2d 510 (5th Cir.) ...................................................................................... 21, 24

*In re Ebay Seller Antitrust Litig.*
2010 WL 760433 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504 (9th Cir. 2011) ............. 38

*In re Live Concert Antitrust Litig.*
863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................... 16, 17, 18

*It's My Party, Inc. v. Live Nation, Inc.*
811 F.3d 676 (4th Cir. 2016) ........................................................................... 17, 36

*Le v. Zuffa*
216 F. Supp. 3d 1154 (D. Nev. 2016) ....................................................... 2, 15, 17, 21

*Magnetar Techs. Corp. v. Intamin, Ltd.*
801 F.3d 1150 (9th Cir. 2015) ......................................................................... 14, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ................................................................................................ 36

*Mazda v. Carfax, Inc.*
2016 WL 7731941 (S.D.N.Y. 2016) ...................................................................... 30

*McGlinchy v. Shell Chem. Co.*
845 F.2d 802 (9th Cir. 1988) ................................................................................. 15

*Mercatus Grp., LLC v. Lake Forest Hosp.*
641 F.3d 834 (7th Cir. 2011) ................................................................................. 27

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*
859 F.3d 408 (7th Cir. 2017) ................................................................................. 31

*Midwest Radio Co. v. Forum Pub. Co.*
942 F.2d 1294 (8th Cir. 1991) ............................................................................... 26

*NCAA v. Bd. of Regents of the Univ. of Okla.*
468 U.S. 85 (1984) ................................................................................................ 38

*Ohio v. Am. Express Co.*
138 S. Ct. 2274 (2018) ................................................................................ 14, 16, 21

*Omega Envtl v. Gilbarco, Inc.*
127 F.3d 1157 (9th Cir. 1997) ................................................................... 28, 31, 37

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*
555 U.S. 438 (2009) .............................................................................................. 13

*Paladin Assocs, Inc. v. Montana Power Co.*
328 F.3d 1145 (9th Cir. 2003) ............................................................................... 19

*Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*
614 F.3d 57 (3d Cir. 2010) ............................................................................... 34, 35

*Rebel Oil Co. v. Atlantic Richfield Co.*
51 F.3d 1421 (9th Cir. 1995) ........................................................................ *passim*

*SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*
    88 F.3d 780 (9th Cir. 1996)..................................................................... 14

*St. Alphonsus Med. Ctr-Nampa Inc. v. St. Luke's Health Sys., Ltd.*
    778 F.3d 775 (9th Cir. 2015)................................................................... 16

*Sterling Merch., Inc. v. Nestle, S.A.*
    656 F.3d 112 (1st Cir. 2011).................................................................. 35

*Tanaka v. Univ. of S. Cal.*
    252 F.3d 1059 (9th Cir. 2001)................................................................. 14

*Taylor Pub. Co. v. Jostens, Inc.*
    216 F.3d 465 (5th Cir. 2000)................................................................... 26

*The Movie 1 & 2 v. United Artists Commc'ns, Inc.*
    909 F.2d 1245 (9th Cir. 1990)................................................................. 26

*Theee Movies of Tarzana v. Pac. Theatres, Inc.*
    828 F.2d 1395 (9th Cir. 1987)................................................................. 36

*Theme Promotions, Inc. v. News Am. Mktg. FSI*
    546 F.3d 991 (9th Cir. 2008).................................................................. 14

*Ticketmaster Corp. v. Tickets.Com, Inc.*
    2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005)30, 32, 36

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*
    2009 WL 2596493 (D. Colo. Aug. 21, 2009) .......................................... 27

*United States v. Syufy Enterprises*
    903 F.2d 659 (9th Cir. 1990).............................................................. *passim*

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*
    914 F.2d 1256 (9th Cir. 1990)......................................................... 26, 27, 28

*Verizon Commc'ns Inc. v. Curtis V. Trinko, LLP*
    540 U.S. 398 (2004)...................................................................... 2, 14, 22

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*
    549 U.S. 312 (2007)................................................................... 2, 13, 31, 35

*Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*
    45 F. Supp. 2d 1164 (D. Kan. 1999) ....................................................... 26

**STATUTES**

15 U.S.C. § 18 ............................................................................................. 34

Fed. R. Civ. P. 56(a)..................................................................................... 13

15 U.S.C. § 2 ..................................................................................... 13, 14, 33

**OTHER AUTHORITIES**

4 Phillip E. Areeda *et al.*
    Antitrust Law ¶ 901a (2009) ............................................................ 21, 34

U.S. Dep't of Justice & Fed. Trade Comm'n
    Horizontal Merger Guidelines (2010).................................................... 17

v

1   Defendant Zuffa, LLC ("Zuffa") submits this motion for summary judgment and

2   supporting memorandum of points and authorities and seeks judgment in its favor as to all of

3   Plaintiffs' claims on the grounds described below.

4                                   **INTRODUCTION**

5   The history of Zuffa's ownership of the Ultimate Fighting Championship ("UFC") shows

6   the rewards of risk taking and competition for the U.S. economy:  Zuffa has built a business and a

7   sport from nothing to success that benefits its athletes, its shareholders, and the regions in which

8   it operates.  Zuffa purchased the UFC in 2001 for $2 million when all it represented was a

9   tarnished brand name and a failing business.  Concise Statement of Undisputed Facts ("SUF") ¶ 3

10   Ex. 1, Fertitta Dep. 147:15-17, 296:8-9[1].  The UFC grew into a $4 billion professional sport by

11   2016.  *Id.* 32:13-17, 33:11-13.  Without Zuffa's efforts to legitimize Mixed Martial Arts

12   ("MMA"), MMA athletes in this proposed class action literally would not have had the

13   opportunity to fight and earn a living from this sport.  And as the UFC has grown, Zuffa has

14   consistently increased the amount paid to athletes who compete in MMA bouts and been an

15   industry-leader in compensation.  SUF ¶¶ 8-9.

16   Plaintiffs, none of whom currently are under contract to compete in UFC bouts (SUF

17   ¶ 26), brought this antitrust putative class action, alleging that Zuffa monopolized the market for

18   the promotion of "Elite Professional MMA bouts" and monopsonized the market for "Elite

19   Professional MMA Fighter services."  Plaintiffs seek to represent a "Bout Class" comprising

20   athletes who have competed in a UFC bout during the Class Period from December 16, 2010 to

21   present, as well as an "Identity Class" comprising athletes whose identities Zuffa allegedly

22   expropriated during the Class Period.  Cons. Am. Compl., ECF No. 208 ("CAC") ¶¶ 27, 39, 47.

23   In opposition to Zuffa's motion to dismiss, Plaintiffs explained that their complaint

24   described a combined theory of monopsonization and monopolization, and the Court denied the

25   motion to dismiss on that basis.  *Le v. Zuffa*, 5:14-cv-05484-EJD, ECF. No. 71 at 1-2 (N.D. Cal.

26

27   ─────────────────────
[1] All citations are to exhibits to the Declaration of Suzanne Jaffe Nero ("Nero Decl.") unless

28   otherwise noted.

1  Apr. 10, 2015) ("the UFC's monopoly and monopsony power were mutually reinforcing. The

2  scheme enabled the UFC to injure MMA fighters . . ."); *Le v. Zuffa*, 216 F. Supp. 3d 1154, 1163

3  (D. Nev. 2016) ("In this case, as in *Weyerhaeuser*, the Plaintiffs allege that the Defendant

4  engaged in both monopolistic and monopsonistic behavior").  After two years of discovery, in

5  seeking class certification, Plaintiffs abandoned their monopolization theory, alleging a "Scheme"

6  that makes no mention of Zuffa's alleged monopolization of the market for promotion of live

7  Elite Professional MMA Fighter bouts.  Pls. Mot. for Class Certification, ECF No. 518.

8  Opposing Zuffa's *Daubert* motions, Plaintiffs admitted that they "seek to recover only for under-

9  compensation so Zuffa's monopoly power is not relevant to their theory of injury."  *Daubert* Opp.

10  ECF No. 534 at 36-37.

11       The remaining monopsonization theory standing on its own—the type of claim that the

12  Ninth Circuit has questioned as "counterintuitive"—fails as a matter of law.  *Le*, 216 F. Supp. 3d

13  at 1163 (quoting *United States v. Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir. 1990)).  This

14  case runs contrary to accepted antitrust principles and seeks a ruling that would undermine

15  competition, innovation, and new businesses.

16       First, Plaintiffs have failed to define a monopsony market because, contrary to the

17  accepted small but significant non-transitory increase in price (SSNIP) test for defining a market,

18  Plaintiffs have not attempted to identify the MMA promoters in the market and instead have

19  relied on arbitrary rankings of athletes.

20       Second, Plaintiffs cannot show direct evidence of monopsony power.  It remains

21  undisputed that, in actual dollars, Zuffa has paid athletes progressively more throughout the Class

22  Period.  SUF ¶ 8.  In place of looking at actual compensation, Plaintiffs argue that wage share

23  (the percentage of event revenue paid as athlete compensation) can serve as direct evidence of

24  harm.  No case supports this view and the theory fails as a matter of law because it disregards the

25  carefully crafted limits of antitrust law that do not allow courts to act as "central planners."  *See*

26  *Verizon Commc'ns Inc. v. Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).  Plaintiffs' other

27

28

allegations also do not establish that Zuffa *underpaid* its athletes during the Class Period. Furthermore, nothing suggests that Zuffa restricted output or had more athletes than it needed.

Third, the record demonstrates that Zuffa did not engage in exclusionary conduct. Throughout the Class Period, competitors had access to top athletes, and every MMA promoter who has testified in this case has said so.  SUF ¶¶ 21-27.  There is no testimony or document that shows that Zuffa's competitors have insufficient access to top athletes to compete.

Finally, summary judgment is appropriate on claims related to the Identity Class. Plaintiffs have not independently analyzed the impact of the challenged conduct on the Identity Class apart from their expert's pronouncement that each member of the Identity Class is entitled to ▮▮▮▮.  This type of conclusory analysis is insufficient to prove antitrust injury.

## CONCISE STATEMENT OF UNDISPUTED FACTS

1.      MMA is an interdisciplinary sport that combines attributes of boxing, wrestling, karate, Muay Thai, Brazilian jiu jitsu, judo and other sports.  CAC ¶ 59.

2.      Zuffa puts on live MMA events where athletes compete in bouts for a ticketed audience. CAC ¶ 30.  Zuffa broadcasts these events on pay-per-view ("PPV"), network and cable television, and through its streaming service, Fight Pass.  Ex. 2 at -095; Ex. 3 at -205.

### History Of Zuffa And The UFC

3.      In 2001, two businessmen and siblings, Frank and Lorenzo Fertitta, purchased the MMA promotion, the UFC, for $2 million through their company, Zuffa.  Ex. 1, Fertitta Dep. 30:13-16. When Zuffa bought the UFC "there really wasn't much to it except for an idea."  *Id.* 296:3-4. The UFC was "losing money" and "probably the most tarnished brand in sports."  *Id.* 147:15-17, 296:8-9.

4.      At the urging of Senator John McCain—who infamously labeled MMA "human cockfighting"—and others, 36 states banned MMA events.  Ex. 1, Fertitta Dep. 147:17-21; Ex. 4, Topel I, ¶ 49; Ex. 5 at -983.  By 1999, many PPV outlets refused to air MMA events, and PPV subscribers dropped.  Ex. 4, Topel I ¶ 49.

5.      To rehabilitate the UFC brand and grow the sport of MMA, Zuffa invested considerable time and tens of millions of dollars in the UFC.  Ex. 4, Topel I ¶ 50; Ex. 6 at -440; Ex. 8, Epstein Dep. 460:20-461:6.  Zuffa enlisted attorneys and regulatory consultants, Ex. 4, Topel I ¶ 51; Ex. 8, Epstein Dep. 15:16-20:6, and appeared before regulators in nearly every state.  Ex. 8, Epstein Dep. 17:4-16.  This effort to move MMA into the mainstream took years—in the early 2000s, "MMA, you know, was still a very niche market.  It was something that, you know, not a lot of people knew about or people had misconceptions about it."  Ex. 9, Acquisitions Dep. 35:3-6.

6.      In 2005, Zuffa agreed to pay $10 million to produce *The Ultimate Fighter*, a reality show contest where multiple athletes competed for a contract with the UFC.  Ex. 8, Epstein Dep. 200:8-201:24; Ex. 1, Fertitta Dep. 198:10-13; Ex. 10, Lawenda Decl. ¶ 3 ("Zuffa ultimately agreed to provide Spike with the show, all-expenses-paid").  When Spike "first began airing The Ultimate Fighter, most of [its] advertisers at Spike blacklisted the show."  Ex. 10, Lawenda Decl. ¶ 4.  The show, however, debuted to successful ratings, and, for the first time, Zuffa's owners could secure a television contract.  Ex. 1, Fertitta Dep. 198:2-17.  The Fertittas personally invested millions before they realized any profit from operating the UFC.  Ex. 4, Topel I ¶ 50; Ex. 6 at -440; Ex. 8, Epstein Dep. 460:20-461:6.

<u>Growth Of The UFC In Events And Compensation</u>

7.      Since 2001, the number of UFC events steadily increased.  In 2002, Zuffa promoted just 7 UFC events.  Ex. 11.  That number increased to 18 events in 2006, 32 events in 2010, and 41 in 2016.  *Id.*; Ex. 8, Epstein Dep. 98:20-99:3; Ex. 4, Topel I ¶ 93.

8.      Athlete compensation has increased since Zuffa acquired the UFC, including through the Class Period.  Ex. 12, Singer Dep. II 459:22-23 (Plaintiffs' expert acknowledging that fighter compensation was rising); Ex. 13, Vera Decl. ¶ 3 ("Since joining the UFC, my compensation has increased substantially"); Ex. 14, Mersch Dep. 476:10-477:11 ("███████████████████████████████████████ ████████████████████████████████████████"); Ex. 15, Batchvarova Dep. 65:2-6 ("████████████████████████████████████████████ ███████████████████████████████."); *id.* 75:10-11 ("████████████████████

1  ██████████████████████████████████████████ ”); Ex. 4, Topel I ¶¶ 169-71 & Ex. 17-18

2  ("athletes at all levels of rankings enjoyed increases in compensation over the class period").

3  9.      Zuffa often pays athletes more to compete in MMA bouts than other MMA promoters.

4  Ex. 16, Singer Dep. 192:13-17 ("the levels of a Bellator or a Strikeforce fighter on average would

5  tend to be below the levels of the UFC fighters"); Ex. 17, Fitch Dep. 146:12-23 (WSOF paid

6  Plaintiff Fitch 50-60% less than UFC previously paid him); Ex. 18, Le Dep. 102:11-16 (Plaintiff

7  Le confirming that Zuffa paid him more than under his Strikeforce contract).

8  10.     Some UFC athletes have chosen to compete for UFC because of its high compensation

9  and skill as a promoter.  Ex. 19, Serra Decl. ¶ 5 ("There are several reasons why I believe the

10  UFC is the best MMA organization to fight in," including providing "the best compensation and

11  incentives"); Ex. 20, Alves Decl. ¶ 3 ("My life changed when I started fighting in the UFC.  I

12  now live a comfortable life where I can provide for my family"); Ex. 21, Reinhardt Dec. ¶ 3

13  ("Everything is better with the UFC than other promotions . . . Not only did my compensation

14  increase, my popularity, my fan base, my recognition, and everything else has increased as

15  well"); Ex. 22, Vera Dep. 233:10-17, 234:21-235:4 (Recognizing Zuffa's promotional ability and

16  well-run organization); Ex. 23, Edwards Decl. ¶ 5 ("the potential for fighters to earn bonuses" and

17  "the visibility of the fighters is beyond comparison"); Ex. 24, Belfort Decl. ¶ 6 (UFC "has

18  expended the most resources in promoting me and the events I fought in"); Ex. 25, Lauzon Decl.

19  ¶ 8 ("I could fight in many other promotions, but choose the UFC because I trust how they handle

20  their business and I know how I will be treated"); Exs. 26-45.

21  11.     Between 2008 and 2015, Zuffa's residential PPV price was $45 for standard definition

22  and $55 for high definition.  Ex. 46 at -020.  In 2015, Zuffa implemented one $5 increase in PPV

23  prices.  Ex. 15, Batchvarova Dep. 201:10-15; Ex. 16, Singer Dep. 74:13-24.  Zuffa executives

24  explained that the reason for this increase ████████████████████████████████████

25  ████████████████████████████████████        Ex. 15, Batchvarova Dep. 201:16-25 ("████████

26  ████████████████████████ ").

27

28

<u>Zuffa And MMA Contracts</u>

12.     Zuffa enters into Promotional and Ancillary Rights Agreements ("Promotional Agreements") with athletes for the exclusive right to secure, promote, arrange and present any and all of their MMA bouts during the term of the agreement. *E.g.*, Ex. 47 § 1; Ex. 48, Contracts Dep. 95:22-96:20.

13.     The term of the agreement is typically 20 months with the possibility of tolling for events such as injury, retirement, and refusal to compete. Ex. 47 §§ 4.1, 9.1-9.3. Factoring in tolling and voluntary renegotiation of contracts, according to Plaintiffs' expert, an athlete's average career at Zuffa lasts 2 years and the median is 0.82 years. Ex. 49, Singer II ¶ 64 & Table 1. By contrast, for athletes who competed in at least one Zuffa bout, the total average career length in MMA overall is 8.7 years. Ex. 50, Topel II ¶¶ 39-40.

14.     Multi-bout exclusive contracts enable Zuffa to have enough athletes available to compete in the numerous UFC events Zuffa promotes each year. As Zuffa's corporate representative explained, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Ex. 48, Contracts Dep. 153:6-12; *see also id*. 97:23-98:10; 243:24-244:13. Other Zuffa witnesses similarly testified to the importance of exclusive contracts to Zuffa's operations. Ex. 9, Acquisitions Dep. 177:15-178:5; Ex. 8, Epstein Dep. 98:5-99:17; 103:6-105:7; Ex. 51, Shelby Dep. 120:1-16; Ex. 14, Mersch Dep. 104:19-25; Ex. 52, J. Silva Dep. 247:10-248:10, 120:20-121:20. Zuffa has had similar exclusivity provisions in its Promotional Agreements since it first purchased the UFC. Ex. 53 § 2(a).

15.     At various points in time, Zuffa's Promotional Agreements have included an exclusive negotiation period of ██████████. Ex. 54 § 13.1; Ex. 55 § 12.1. The Promotional Agreements also normally have a right to match clause, which provides Zuffa the right to match a competing promoter's offer for a short period of time after the expiration of the agreement. Ex. 47 §12.1; Ex. 55 §12.2. During the matching period, athletes can receive offers from other promoters. *Id*. Zuffa then has ██████████ to match or beat the competitor's offer. *Id*.

16.     Other MMA promoters have exclusivity provisions in their promotional agreements with athletes.  Ex. 4, Topel I Ex. 5 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮); Ex. 56, Coker Dep. 180:20-181:3; Ex. 57, C. Silva Dep. 196:8-12; Ex. 58 (lists Strikeforce exclusive contracts); Ex. 59 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 60 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 61 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

17.     Zuffa's Promotional Agreements grant Zuffa athletes' identity rights in connection with the UFC brand and UFC bouts.  Ex. 47 Art. II.  Athletes can and do profit from their identities if they do not use the UFC name, brand, and intellectual property.  Ex. 62 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 63 (▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 1, Fertitta Dep. 246:4-247:9; Ex. 15, Batchvarova Dep. 27:15-23; Ex. 64 (Ronda Rousey's appearances and brand partners outside of UFC); Ex. 18, Le Dep. 16:8-18:17 (Plaintiff Le appeared in movies during and after UFC career); id. 119:19-25 (Le understood that when he wasn't wearing the UFC brand, he could appear in movies); Ex. 65, Quarry Dep. 239:25-241:14 (Plaintiff Quarry appeared on television shows MMA Uncensored and American Cage Fighter after UFC career); Ex. 22, Vera Dep. 241:6-242:16 (Plaintiff Vera appeared in movies and television commercials after UFC career); Ex. 66 (Plaintiff Fitch released documentary film during UFC career).

MMA Competition

18.     Other MMA promotions compete with Zuffa to put on MMA events, including:

- Bellator, a promotion founded in 2008 and currently owned by Viacom, which according to its President Scott Coker "has steadfastly grown its market, signing numerous new athletes from the United States and abroad, commanding record attendance, and continuing to expand its television audience, with distribution in more than one hundred forty countries."  Ex. 67, Coker Decl. ¶ 4; Ex. 56, Coker Dep. 173:20.  In June 2018, Bellator announced a nine-figure deal to broadcast Bellator bouts on DAZN, the self-described "world's largest dedicated live sports streaming services."  Ex. 68, Topel Supp. ¶ 2.

7

- Professional Fighters League (PFL), the successor to MMA promotion World Series of Fighting (WSOF), which was established in 2012.  PFL is putting on a MMA tournament with six weight class champions each earning a $1 million prize, with $10 million in total compensation.  Ex. 68, Topel Supp. ¶ 8.  PFL purchased the fighting operations and event infrastructure of WSOF in early 2017.  Ex. 69, "This is the Professional Fighters League."  When deposed in this case, Carlos Silva, PFL League President, was WSOF President of Business Operations.

- One Championship (One), founded in 2011 and the self-described "world's largest martial arts organization" with a valuation approaching $1 billion, Ex. 70, Singer I ¶ 128 n.350, and "a roster of blue-chip Fortune 500 sponsors, including Disney, Marvel, LG, Sony, Facebook, Haier, Kawasaki, L'Oreal, Casio, Bayer, and more."  Ex. 71, "About One."

- Absolute Championship Berkut (ACB), a promotion established in 2014 that prides itself as "the world's fastest growing MMA promotion."  Ex. 72, ACB Facebook post.  Absolute Championship Berkut held 27 events in 2017, Ex. 73 (list of ACB events), and has signed many former UFC athletes, including Thiago Silva, Pat Healy, Nam Phan, and Efrain Escudero.  Ex. 74, Sherdog profiles.

19.    During the Class Period, entrants to the MMA promotion business PFL, One, and ACB expanded output.  One increased its output from 1 event its first year in 2011 to 16 events in 2016; PFL increased its output from 1 event its first year in 2012 to 8 events in 2016; and ACB increased its output from 1 event its first year in 2012 to 22 events in 2016.   Ex. 75 (annual events by promoter); Ex. 4, Topel I ¶ 192 & Ex. 23.  Collectively, these promoters, along with Bellator, have increased the number of MMA events from 22 events in 2010 to 68 events in 2016.  Ex. 75; Ex. 4, Topel I ¶ 192 & Ex. 23.

20.     New MMA promoters are continuing to emerge.  For example, Golden Boy Promotions, a boxing promoter, recently signed former UFC champions Chuck Liddell and Tito Ortiz to headline its first MMA event on PPV later this year.  Ex. 68, Topel Supp. ¶ 5.  As one former UFC athlete put it, "the global market for MMA is huge" and the number of MMA companies "just keeps on growing."  Ex. 76, Ortiz Decl. ¶ 8.

21.    MMA promoters have been able to access talented MMA athletes during the Class Period.  Ex. 57, C. Silva Dep. 204:23-25 (affirming WSOF can sign MMA athletes from "a large talent pool"); Ex. 77, Knapp Dep. 226:9-12 (Invicta has been able to contract with elite MMA athletes); *id.* 220:17-20 (President of Invicta, when asked if UFC prevents her from signing athletes: "Heck

8

no"); Ex. 78, Aronson Dep. 26:3-28:8 (Aronson started MMA promotion because there were so many "incredibly talented" prospects); *id.* 52:23-25 (Titan FC athletes "were of the top level in the world and there was no promotion I wouldn't put my guys up against"); *id.* 40:22-23; Ex. 56, Coker Dep. 273:8-11 (affirming that Bellator could go after a lot of fighters on the market); *id.* 272:5-8 (Bellator has some of the best featherweight athletes in the world); Ex. 79, Campbell Decl. ¶¶ 3-4, 9-11 (discussing free agents). From 2011 to 2016, more than 230 former UFC athletes competed for other promotions. Ex. 80, Blair Rep. ¶ 37, Fig. 1.

22.     MMA promoters have successfully outbid Zuffa and contracted with athletes during the period where Zuffa had a right to match a competitor's compensation. Ex. 8, Epstein Dep. 182:2-14 (Ryan Bader and Rory McDonald); Ex. 56, Coker Dep. 196:16-197:7 (Bellator has outbid Zuffa for "big fighters" including Rory McDonald and Gegard Mousasi); *id.* 248:15-25 (Benson Henderson); *id.* 274:9-13 (Bellator picked up 100% of the free agent MMA athletes it tried to sign); Ex. 79, Campbell Decl. ¶¶ 4, 7-11 (free agents); Ex. 81 (UFC declining to match Bellator offer to Josh Koscheck); Ex. 82 (UFC opts not to match Josh Thomson's offer from Bellator); Ex. 52, J. Silva Dep. 193:21-23 (Quinton "Rampage" Jackson went to Bellator); Ex. 1, Fertitta Dep. 253:19-23 (same); Ex. 8, Epstein Dep. 183:8-13 (same); Ex. 83 (Phil Davis); Ex. 84 (Huerta).

23.     Many of the former UFC athletes were highly-ranked at the time they signed with their new promoters. Nero Decl. ¶ 124; Ex. 4, Topel I ¶ 221 (Ryan Bader and Phil Davis 3rd and 4th-ranked light heavy-weights); Ex. 85, Kingsbury Dep. 192:23-193:8 (Phil Davis left the UFC and is an "elite level fighter").

24.     Between 2011 and 2016, 70 MMA athletes competed for UFC and later competed for Bellator, while 72 competed for Bellator and later UFC. Exs. 86 & 87.

25.     No witness has testified that during the Class Period Zuffa prevented other MMA promoters from putting on live professional MMA bouts. Ex. 57, C. Silva Dep. 205:12-18 (UFC has not blocked WSOF from any inputs or done anything to impede WSOF's ability to compete); Ex. 77, Knapp Dep. 222:5-11 (UFC has not done anything to harm Invicta's ability to compete); Ex. 56, Coker Dep. 194:11-195:17 (describing Bellator events); *id.* 274:17-275:10 (describing

1   Bellator event with 2.1 million viewers); *id.* 280:14-17 ("Bellator is not a minor league"); *id.*

2   274:9-13 (Bellator picked up 100% of the free agent MMA athletes it tried to sign); Ex. 88, Hume

3   Decl. ¶ 4 (█████████████████████████████████████████████████████

4   ███"); Ex. 78, Aronson Dep. 78:17-79:24 (describing broadcast deal with CBS and inclusion on

5   UFC's Fight Pass to increase promotion of Titan's events).

6   26.   None of the Plaintiffs currently compete in bouts Zuffa promotes. CAC; Ex. 18, Le Dep.

7   22:10-17 (retired); Ex. 22, Vera Dep. 38:3-4; Ex. 89, Vazquez Dep. 172:6-174:17 (retired in

8   2013); Ex. 65, Quarry Dep. 62:3-13 (last fight in 2010); Ex. 90 (Fitch WSOF contract).

9   27.   During the Class Period, named Plaintiffs Fitch and Brandon Vera have entered into

10  exclusive contracts to compete for other MMA promotions.  Jon Fitch contracted with the World

11  Series of Fighting (now PFL) for a multi-bout exclusive promotional contract, and then in 2018,

12  he signed a promotional agreement to compete in Bellator bouts.[2] Ex. 90 (Fitch WSOF contract);

13  Ex. 60 (same).  Brandon Vera currently competes for One under a multi-bout exclusive contract.

14  Ex. 59 (Vera One contract).

15  28.   There is evidence that Zuffa and other MMA promoters compete for viewers with a

16  variety of sports entertainment programming.  Ex. 1, Fertitta Dep. 66:24-69:13 (UFC is not only

17  "competing with other promoters and leagues in mixed martial arts but also other sports, the NFL,

18  the NBA, Major League Baseball.  And certainly I always wanted to stay away from March

19  Madness.  Wanted to stay away from boxing, major boxing events, primarily a Floyd Mayweather

20  fight, Manny Pacquiao fight."); Ex. 8, Epstein Dep. 295:18-20 ("I mean, we're competing against

21  the NBA finals right now.  We're competing against March Madness at times, NFL, Super

22  Bowl"); Ex. 57, C. Silva Dep. 203:9-204:6 (WSOF competing for TV viewers "with everything

23  else that people could do from 8:00 to 10:00 at night. Anything. Live sport event, theater,

24  television, cable, broadband, pay services, Amazon, Netflix"); Ex. 77, Knapp Dep. 116:10-25

25  (Invicta event competed against March Madness); Ex. 91, Hand Decl. ¶ 4 (loss of closed circuit

26  sales distribution during Stanley Cup Playoff, New Years' Day college football and NCAA

27  _____

28  [2] "Jon Fitch signs with Bellator," https://www.youtube.com/watch?v=yGMocFO0rvw.

ZUFFA'S MOTION FOR SUMMARY JUDGMENT

March Madness); Ex. 10, Lawenda Decl. ¶ 5 ("From the standpoint of networks and advertisers, MMA is largely interchangeable" with other programming options like "major sports leagues, as well as extreme sports, poker, and adult animation such as The Simpsons and Family Guy.").

Venues, Sponsors, And Broadcasters

29.     During the Class Period, MMA promoters had access to venues. Ex. 4, Topel I ¶¶ 66 & Ex. 2 (examples between 2005-2016 of MMA promoters that have used venues in North America Zuffa booked); Ex. 57, Carlos Silva Dep. 176:16-25 (no trouble scheduling venues); Ex. 92 (chart showing from 2005-2015, 126 venues hosted Zuffa events, 76 only hosted one); Ex. 93 (recent Bellator events); Ex. 94 (recent PFL events).  Plaintiffs' experts did no analysis to suggest that suitable venues are not available to competing MMA promoters.  Ex. 16, Singer Dep. I 260:2-21.

30.     During the Class Period, MMA promoters had access to sponsors.  Ex. 4, Topel I ¶¶ 67; Ex. 56, Coker Dep. 278:3-18 (Bellator President describes its marquee sponsors, Miller Lite, Monster Energy, and Dave & Busters); Ex. 57, C. Silva Dep. 188:15-21 (WSOF/PFL sponsors include Alienware, Miller Lite, Kawasaki, Auto Shopper, Ticket Galaxy, Kiswe, Fight.TV, Avion Tequila); *id.* 112:25-113:10 (UFC makes it easier for WSOF to get sponsors because "The sport's bigger, more people know about MMA, more people want to play"); *id.* 190:7-9 (WSOF's sponsorship revenue has increased over time). Plaintiffs' experts did no analysis to suggest that suitable sponsors are not available to competing MMA promoters. Ex. 12, Singer Dep. II 552:2-12.

31.     During the Class Period, MMA promoters had access to broadcasters.  Ex. 4, Topel I ¶¶ 65, 70-73; Ex. 56, Coker Dep. 274:24-275:10 (describing Bellator's event that topped 2.1 million viewers on Spike TV); Ex. 67, Coker Decl. ¶ 4 (Bellator has "distribution in more than one hundred forty countries"); Ex. 57, C. Silva Dep. 180:13-17 (broadcast relationship with NBC Sports); Ex. 77, Knapp Dep. 62:21-23 (broadcast distribution deal with UFC Fight Pass); *id.* 110:2-18; Ex. 78, Aronson Dep. 78:17-79:24 (Titan events broadcast on CBS and Fight Pass). Plaintiffs' experts did no analysis to suggest that suitable broadcast outlets are not available to competing MMA promoters.  Ex. 12, Singer Dep. II 552:14-23.

Plaintiffs' Experts Opinions

32.     Plaintiffs' economist, Dr. Hal Singer, defines an output market as live MMA events in which participating athletes are in a relevant input market.  Ex. 70, Singer I ¶ 115.  According to Dr. Singer, MMA promoters are the sellers and their customers include viewers, cable networks, broadcast networks, and sponsors.  *Id.*  Dr. Singer admitted that he did not evaluate customer responses to a price increase for cable distributors, cable networks, or sponsors.  Ex. 12, Singer Dep. II 552:2-23, 544:3-15.

33.     Dr. Singer defines four input markets of "MMA Fighters":  a Zuffa only market, a Tracked Market, a Ranked Market, and a Headliner market.  Ex. 70, Singer I ¶¶ 95, 99.

34.     The FightMetric database, which measures the Tracked Market, does not include data from all major MMA promoters.  Ex. 95, Genauer Decl. ¶ 5.  ██████████████████████████
██████████████████████████████████████████████████  *Id.* ¶¶ 4-5.  ██████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████  *Id.* ¶ 8.

35.     Dr. Singer does not include in his Ranked market unranked athletes who compete for promoters with a ranked athlete.  Ex. 70, Singer I ¶ 111 n.306.  Nor does he include events from promoters who sometimes featured ranked athletes and sometimes did not.  Ex. 96 (ranked market promoters' events with ranked and unranked athletes).  Between 2011 and mid-2017, 2,122 athletes were ranked while competing for one of 861 different foreign promoters and later a promoter in Dr. Singer's Ranked market or vice versa.  Exs. 97 & 98 (summaries of promoter switches and foreign promoters).

36.     In the Ranked market, from 2011 to 2016, Zuffa had only 18.1% of total available athletes under contract, and Zuffa never had over 22% of the total athletes in Dr. Singer's Ranked market in any year.  Ex. 99 (Zuffa's share of all ranked athletes 2011-2016).

37.     Dr. Singer's regressions find a negative relationship between:  his input of (1) the number of 30 month multi-bout, exclusive contracts—which Dr. Singer calls "foreclosure share," Ex. 70, Singer I ¶ 306; and his output of (2) the percentage of athlete compensation of total event

revenues (the athletes' "wage share").  *Id.* § III.D.1, Table 6, ¶ 306; Ex. 16, Singer Dep. I 39:1-3, 43:2-10.  Wage share is the dependent variable in the regressions.  Ex. 16, Singer Dep. I 105:4-10.  Dr. Singer did not look at whether Zuffa suppressed actual wages without controlling for revenues.  *Id.* 296:2-8.  He has not run any models to establish injury or damages based on actual compensation as opposed to wage share.  *Id.* 98:19-100:10.  His models when run with actual wages do not show an injury.  Ex. 4, Topel I ¶¶ 141, 146-49.

38.     Dr. Singer never ran a regression to evaluate the impact of the so-called "sponsorship tax" on overall athlete compensation.  Ex. 16, Singer Dep. I 311:22-312:6.

39.     Dr. Singer's comparison of Zuffa's wage share to that of Strikeforce and Bellator is a comparison of athlete wage shares across firms.  Ex. 16, Singer Dep. I 9:18-10:7.  This does not control for other variables in the same way that a regression model might.  *Id.* 10:12-24.

### LEGAL STANDARD

Summary judgment is appropriate when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To establish either monopolization or monopsonization[3] under Section 2 of the Sherman Act, a plaintiff must prove three elements—that the defendant (i) possessed monopoly power in the relevant markets; (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury.  *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).  "Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009).

---

[3] "Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.,* 549 U.S. 312, 320 (2007).

For the first element, a plaintiff must define a relevant product and geographic market. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) ("*Amex*"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). A plaintiff must then show monopoly power either directly through evidence of "restricted output and supracompetitive prices," *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008), or indirectly through an analysis of market share, barriers to entry, and other factors. *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 n.2 (9th Cir. 1996).

For the second element, the "test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition. The Sherman Act is not directed 'against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'" *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 557 (9th Cir. 2018) (citation omitted). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407. "When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).

To prove causal antitrust injury, a plaintiff must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad. Mgmt. Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1990). A plaintiff must also establish "in a reasonable manner the link between the injury suffered and the illegal practices of the defendant." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015). The injury cannot be caused by legal conduct or market forces, "as it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

**ARGUMENT**

Zuffa previously filed *Daubert* motions seeking to exclude testimony from Plaintiffs' two economists, Dr. Singer and Dr. Andrew Zimbalist, as well as its accountant Guy Davis. ECF Nos. 522, 524, 517. To the extent the Court grants those motions, Plaintiffs will be left with no evidence of market definition, causation, or damages. Without evidence of these essential elements of Plaintiffs' claims, summary judgment must be granted. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) ("because no damages had been properly shown, there was an independent reason to grant summary judgment on various claims . . . Indeed, the deficiencies in that study undermine Vernon's whole case"); *accord McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988).

Even apart from *Daubert*, Zuffa is entitled to summary judgment on Plaintiffs' monopolization and monopsonization claims. Plaintiffs' Complaint—premised on a claim of monopsonization of MMA athletes combined with monopolization of the market for the promotion of elite professional MMA events—alleges that together this power has made Zuffa the only purchaser of "Elite MMA Fighter services," which allowed Zuffa to maintain and exert monopsony power. CAC ¶¶ 5, 108. The record evidence has established that competing MMA promoters have access to the inputs needed to compete, SUF ¶¶ 21-31, which undermines the foundation of Plaintiffs' monopsony claim—that Zuffa is the only purchaser of athletes' services because it is the only promoter who can access the necessary inputs to compete. CAC ¶¶ 5, 108. By the time of class certification and their expert reports, Plaintiffs accordingly redefined their alleged "Scheme" and omitted any monopoly claims. No longer defined by the operative Complaint, Plaintiffs' claims instead are free floating allegations strung through their class certification briefing and their opposition to *Daubert*. Without a monopolization, or combined monopolization and monopsonization claim, Plaintiffs' monopsonization claim becomes implausible. As this Court noted in its ruling on the motion to dismiss, the Ninth Circuit has explained that "While it is theoretically possible to have a middleman who is a monopolist upstream but not downstream, this is a somewhat counterintuitive scenario." *Le*, 216 F. Supp. 3d at 1163 (*quoting Syufy*, 903 F.2d at 663). In *Syufy*, the Ninth Circuit asked the question, why, if a

15

company had market power, would it take advantage of that power in one market where there was a monopsony and not in the market where there was a monopoly. *Id.* That is now the question in this case. "The answers to these questions are significant because, like all antitrust cases, this one must make economic sense." *Id.* Summary judgment is required here because Plaintiffs' claims make no economic sense and instead are antithetical to principles of free competition.

I.    Plaintiffs Have Not Defined A Legally Sufficient Input Or Output Market Because They Attempt To Define The Market By The Athletes In The Market, And Not The MMA Promoters Which Compete.

Vertical restraints like the challenged conduct between Zuffa and athletes "often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *Amex*, 138 S. Ct. at 2285 n.7. "[W]ithout a properly-defined market, it is impossible to accurately determine Defendants' market share." *Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736, at *12 (C.D. Cal. Jan. 26, 2017). As a result, summary judgment is appropriate where plaintiffs fail to proffer sufficient evidence to permit a reasonable jury to adopt plaintiffs' proposed market definition. *Rebel Oil*, 51 F.3d at 1435; *Golden Boy*, 2017 WL 460736, at *10; *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012). Plaintiffs have not met their burden of proving an input market of buyers (where Zuffa competes with other promoters to acquire athletes' services) or an output market of sellers (where Zuffa competes to offer sports entertainment to viewers).

A properly defined market must include all reasonable substitutes from a consumer's (or athlete's) perspective. *Rebel Oil*, 51 F.3d at 1435. Here, the product market of buyers or sellers is the available MMA *promoters*. Ex. 12, Singer Dep. II 531:15-24 (promoters are "buyers in that market"). The accepted test for market definition is whether "a significant number" of customers (or athletes in the input market) would turn to other sellers (or buyers/MMA promoters in the input market) "in the event of a small but significant non-transitory increase [or decrease in the input market] in price [SSNIP, or SSNDP] by a hypothetical monopolist." *Golden Boy*, 2017 WL 460736, at *11; *St. Alphonsus Med. Ctr-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015); Ex. 100, U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger

Guidelines (2010), at 9.  Plaintiffs and their economist Dr. Hal Singer have not sought to define a market of sellers in the output market or buyers in the input market and instead have improperly tried to define the market by identifying athletes who should be included in the market.  *E.g. Live Concert*, 863 F. Supp. 2d at 987 (rejecting market definition where expert "never meaningfully considered any narrower definition of the market, nor did he ever 'expand that definition until all reasonable substitutes [were] included'").  The Court has no obligation "to accept uncritically" market definitions "that coincidently fit plaintiff's precise circumstances." *Golden Boy*, 2017 WL 460736, at *10 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016)).  Dr. Singer's market definition is tautological—his postulated market (promoters who feature his select groups of athletes) is the same as his final market definition.

In their Complaint that survived the motion to dismiss, Plaintiffs initially sought to define the relevant markets as MMA promoters who featured "elite" fighters.  *Le*, 216 F. Supp. 3d at 1165-67; CAC ¶¶ 55-58.  Plaintiffs represented to the Court that "the distinction between the "Elite' designation' and non-Elite fighters . . . . is well understood in the industry." *Le v. Zuffa*, Case No. 5:14-cv-05484-EJD, ECF. No. 71 at 5 (N.D. Cal. Apr. 10, 2015).  Discovery has since revealed that even Plaintiffs cannot agree what constitutes an "elite" fighter.  Ex. 65, Quarry Dep. 272:19-24; Ex. 89, Vazquez Dep. 85:16-86:18; Ex. 17, Fitch Dep. 36:8-37:19; Ex. 22, Vera Dep. 228:25-229:4; Ex. 85, Kingsbury Dep. 210:5-8.

Plaintiffs' expert Dr. Singer never uses the term "elite" to define the relevant input or output markets, and Plaintiffs have also abandoned this part of their Complaint.  Ex. 70, Singer I ¶¶ 1, 115.  Singer instead identifies four hypothetical markets, each of which identifies a group of athletes that takes the place of Plaintiffs' "elite fighter" concept.  Those four groups are: (1) "Zuffa Only" fighters, (2) "Tracked" fighters—athletes who the company FightMetric tracks, (3) "Ranked" fighters—athletes who the company FightMatrix.com ranks who competed in an event in North America or for the promoter One, and (4) "Headliner" fighters—a "submarket" of the Ranked market that includes only the top fifteen FightMatrix ranked fighters by division.  *Id.* ¶¶ 99, 104.

1    A.    Plaintiffs' Evidence Does Not Define An Input Market.

2         Dr. Singer assumes that only promoters that currently feature athletes in one of these

3    groups are in his input markets.  Ex 70, Singer I ¶ 99.  He does not identify or assess promoters

4    that do not currently feature his athletes and whether they compete with promoters within the

5    defined markets.  Ex. 16, Singer Dep. I 54:7-14.  Here, literally hundreds of promoters switch

6    from events with FightMatrix ranked athletes to ones without.  Of the 793 promoters who hosted

7    an MMA event with at least one ranked athlete in North America during the Class Period, 441 of

8    these promoters (55%) also promoted events without any ranked athletes.  Ex. 96.  This non-

9    approach to market definition would be the same if Dr. Singer defined a market of office software

10   without assessing who sold such software or who sold reasonable substitutes for such software.

11   Dr. Singer has not even attempted to define a market using the accepted SSNIP test because he

12   has not defined buying promoters to whom a price decrease by a monopsonist would cause a shift

13   in business.  *Live Concert*, 863 F. Supp. 2d at 987; *Golden Boy*, 2017 WL 460736, at *11.  The

14   court in *Golden Boy* specifically rejected this approach to market definition, concluding that it

15   offered "no explanation why managers of non-Championship-Caliber Boxers would not be in the

16   same economic market . . . particularly in light of the fact that a non-Championship-Caliber

17   Boxer can become a Championship-Caliber Boxer as the result of a single fight."  *Golden Boy*,

18   2017 WL 460736, at *11.

19        While Dr. Singer said he analyzed the relevant input market using SSNIP methodology,

20   he never articulated what he did to assess the available rival promoters or how athletes would

21   respond to a price decrease.  Ex. 12, Singer Dep. II 529:23-530:17, 534:14-535:13.  The SSNIP

22   methodology requires an analysis of the qualifications of each firm that is excluded from the

23   market, *Golden Boy*, 2017 WL 460736, at *11 (product market for "Championship-Caliber

24   Boxers" is not sustainable where expert fails "to analyze the qualifications or backgrounds of the

25   current managers in the market"), but Dr. Singer merely uses the ranking data combined with his

26   own subjective analysis to include or exclude athletes rather than promoters.

27        Moreover, the flaws with his selection criteria include:

28

- *Zuffa Only Market.* Dr. Singer concluded that one relevant market includes only Zuffa athletes based on his belief that he can rely on regression results he agrees with to define a market. Singer-Zimbalist Daubert Opp., ECF No. 534 at 45 n.81. A regression showing impact in a relevant market is only valid if the outcome is not predetermined and the market has been correctly defined. The undisputed record refutes a Zuffa-only market because UFC faces competition from promoters for athletes and because athletes elect to go to rival promoters. SUF ¶¶ 21-27.

- *Tracked Market.* The FightMetric database does not include data from all major MMA promoters. SUF ¶ 34. ███████████████████████████████████████ *Id.*; Ex. 95, Genauer Decl. ¶¶ 8-9. ███████████████████████ *Id.* ¶¶ 4-5.

- *Ranked And Headliner Markets.* Dr. Singer selectively excludes from the Ranked and Headliner markets all athletes with foreign promoters except those competing for One (where Plaintiff Brandon Vera fought during the Class Period). Ex. 70, Singer I ¶ 110. However, of the 6,009 ranked athletes in Singer's Ranked market between 2011 and mid-2017, *2,122* were ranked while competing for one of 861 different foreign promoters and later a promoter in Singer's Ranked market or vice versa. SUF ¶ 35.

B.      Plaintiffs' Evidence Does Not Define An Output Market.

Plaintiffs have abandoned their monopolization claim, but that claim should be dismissed separately for a similar failure to attempt a proper market definition. Dr. Singer defines his output market using the same athletes he identifies in the input markets, Ex. 70, Singer I ¶ 115, but he defines the customers in the output market to include "viewers, cable networks, broadcast networks, and sponsors," *id.* In his deposition, Dr. Singer admitted that he never assessed the extent to which some customers in his proposed market would react to a price increase. SUF ¶ 32. Any proper market definition requires considering the reasonable substitutes. *Paladin Assocs, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003). Here, the record includes testimony from MMA promoters and a broadcast executive that MMA events compete with a broad spectrum of sports entertainment, SUF ¶ 28, which Dr. Singer does not analyze.

Dr. Singer also combines viewing events at a live venue with viewing events on PPV or broadcast television, while concluding the geographic market is North America. Ex. 70, Singer I ¶¶ 115, 121. But it is erroneous to assert a national geographic market for events requiring attendance at a local venue. *E.g. Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006) ("a higher price in Boston will not lead Boston purchasers to buy tickets for the same

19

concert held in New York"); Ex. 16, Singer Dep. I 289:15-290:5 (confirming he has not evaluated the substitutability between Live MMA attendance and PPV events but "I imagine for someone who lives very far from the venue where the live event is staged, they would not be considered reasonably close substitutes").

II.      Zuffa is Entitled to Summary Judgment on Plaintiffs' Monopsonization Claim.

        A.      Undisputed Competition Shows That The UFC Lacks Monopsony Power.

        Plaintiffs' case proceeds on the theory that Zuffa is the dominant purchaser of elite MMA athlete services, which allowed Zuffa to maintain and exert monopsony power. CAC ¶ 108.  The record evidence establishing that competing MMA promoters have access to the inputs needed to compete, SUF ¶¶ 21-31, refutes Plaintiffs' monopsony claim that Zuffa is a monopsony purchaser of athletes' services.  CAC ¶ 10.

        Zuffa has many significant competitors during the Class Period, none of whom believe they are "fringe" MMA promoters or the "minor league," and who all deny that Zuffa impaired their ability to compete.  SUF ¶¶ 21-25.  Bellator is owned by Viacom and televised on Paramount Network (previously known as Spike TV).  SUF ¶¶ 18, 31.  Bellator recently signed a nine-figure deal with streaming service DAZN to produce 22 annual events.  SUF ¶ 18.  Its President Scott Coker testified that "Bellator is not in a minor league."  SUF ¶ 25.  PFL has an exclusive distribution partnership with NBC Sports.  SUF ¶ 31.  PFL President Carlos Silva likewise testified that PFL has continued to compete with Zuffa unimpeded, testifying that Zuffa has not "blocked the World Series of Fighting from any inputs necessary to put on successful MMA events."  SUF ¶ 25.  One Championship is "Asia's largest global sports media property" and broadcasts to 1.7 billion potential viewers across 138 countries.  Ex. 71, "About One."  Matt Hume, Vice-President of Operations and Competition for One Championship's parent company, stated that "██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████"  SUF ¶ 25; Ex. 88, Hume Decl. ¶ 4.

1    Zuffa's competitors have access to numerous professional MMA athletes, including those

2    who previously competed for UFC.  SUF ¶¶ 21-27.  As Zuffa's own competitors have explained,

3    they compete vigorously with UFC to sign MMA athletes and have not been prevented access to

4    those athletes.  *Id.*; Ex. 56, Coker Dep. 270:12-19 ("there's not going to be a free agent fighter

5    that Bellator can't afford or have access to"); Ex. 57, C. Silva Dep. 112:21-24 (UFC does not

6    make it difficult for WSOF/PFL to attract talent); Ex. 77, Knapp Dep. 220:4-16; Ex. 88, Hume

7    Decl. ¶ 4.  Also, a substantial number of athletes move among promoters, including from the UFC

8    to another promoter or from another promoter to the UFC.  Between 2011 and 2016, 70 MMA

9    athletes competed for UFC who later competed for Bellator, while 72 competed for Bellator and

10   later the UFC.  SUF ¶ 24.

11          B.    Plaintiffs Lack Evidence Of Monopsony Power

12    A plaintiff can provide "direct evidence of the injurious exercise of market power" if it

13   puts forward "evidence of restricted output and supracompetitive prices."  *Rebel Oil*, 51 F.3d at

14   1434; *see also Amex*, 138 S. Ct. at 2288 ("Market power is the ability to raise price profitably by

15   *restricting output*." (citing Areeda & Hovenkamp § 5.01)); *In re Beef Antitrust Litig.*, 907 F.2d

16   510, 516 (5th Cir.).  Plaintiffs have failed to provide evidence of monopsony power, either

17   through direct or circumstantial evidence.

18                1.    There Is No Direct Evidence Of Lower Compensation.

19                      a.    Impact To Wage Share Is Not Evidence Of A Price Decrease.

20    Plaintiffs contend that Dr. Singer's regression constitutes direct evidence of Zuffa's

21   monopsony power.  According to Plaintiffs, Dr. Singer's regression shows that "as the share of

22   Fighters (key inputs to an MMA promotion) foreclosed by Zuffa increases with 30 month or more

23   contracts, Zuffa is able to pay Fighters a lower share of its event revenues" (i.e., "wage share").

24   Ex. 70, Singer I ¶ 143.  Even accepting that Dr. Singer's regression could prove impact to wage

25   share from foreclosure of a market (it does not), a plaintiff using direct evidence must show an

26   impact on compensation.  *Rebel Oil*, 51 F.3d at 1434; *Le*, 216 F. Supp.3d at 1168 (Plaintiffs

27   allege Zuffa's monopsony power "artificially suppressed compensation").

28

An impact to wage share is not equivalent to an impact on compensation because wage share can decline even as athlete compensation rises or stays the same.  If an athlete is paid $100,000 at two events, one event which grosses $500,000 and one which grosses $1,000,000, the athlete receives the same compensation for both events but wage share declines from 20% to 10% based on the larger event revenue.  Wage share may be high, and actual wages low, when a promotion fails and earns minimal revenue.  Wage share also *will* decline for successful events if, with everything else the same, Zuffa engages in procompetitive efforts to enhance its event revenues, such as increasing the amount or effectiveness of promotion, improving the quality of its event production and television broadcast, making other brand investments, and countless other activities that businesses regularly engage in to increase revenues.

Plaintiffs have not evaluated the effect of the challenged conduct on actual compensation levels.  SUF ¶ 37.  Undisputed evidence shows that actual compensation paid to Zuffa athletes rose during the Class Period.  SUF ¶ 8.  In addition, when a competitor is able to charge similarly high prices to those charged by an alleged monopolist, allegations that the alleged monopolist's prices are artificially high are insufficient to prove supracompetitive prices.  *Dominick v. Collectors Universe, Inc.*, 2012 WL 6618616, at *4 (C.D. Cal. Dec. 18, 2012).  Record evidence shows that on average Zuffa's compensation is higher than that of its competitors.  SUF ¶ 9.

The Supreme Court has warned courts about adopting an approach that "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill suited."  *Trinko*, 540 U.S. at 408.  Precedent cautions prudence "to avoid constructions of § 2 which might chill competition, rather than foster it."  *Am. Prof'l,* 108 F.3d at 1151 (citation omitted).  Different firms in a market have no reason to allocate *the percentage* of its revenues in similar ways when the firms are of a different size or have different management opinions, different business models, or different strategic goals.  Minimum or absolute shares of revenue that must be allocated to one specific group of labor (Plaintiffs' wage share ignores the non-athletes who work for Zuffa), or other costs, put the courts in the unprecedented position of regulating the operation of U.S. businesses.  *Syufy*, 903 F.2d at 663-64

("It is a simple but important truth, therefore, that our antitrust laws are designed to protect the integrity of the market system . . . . competition, not government intervention, is the touchstone of a healthy, vigorous economy").  An antitrust rule based on wage or cost share would strip a business of the power to make independent decisions about how to invest in inputs for the service. Making wage share a measure of anticompetitive conduct or injury would have the practical effect of stifling companies' innovation and investments for fear of incurring treble damages liability based on a lower than average wage share.

Plaintiffs ask this Court to ignore the actual compensation paid to athletes and instead to find that athletes have been injured if Zuffa does not pay a designated (and constant) percentage of event revenue to athletes at every event (in essence, the "fair" wage share).  ECF No. 518 at 14 ("███████████████████████████████████████████████████████").  This wage share theory invites this Court to cast aside binding precedent and step into the role of central planner, relying on a brand new theory of antitrust liability that no Court has previously endorsed.  The Court should decline this invitation.

For this reason, Plaintiffs are also unable to show antitrust injury, which requires a plaintiff to "prove that his loss flows from an anticompetitive aspect or effect of defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not harm competition." *Rebel Oil*, 51 F.3d at 1433 (citing *Atlantic Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 334 (1990)).  Here, Plaintiffs cannot show that a reduction in wage share was the result of any exertion of monopsony power as opposed to procompetitive revenue-generating or efficiency-enhancing investments.

b.  Zuffa's Purportedly Lower Wage Share Than Strikeforce Or Bellator Is Not Evidence Of Monopsony Power.

To further illustrate the flaws with the wage share theory, Plaintiffs argue that Zuffa's purported payment of a smaller share of its revenue to athletes than Strikeforce and Bellator is direct evidence of Zuffa's monopsony power.  Ex. 70, Singer I ¶ 190.  It is not.

Plaintiffs assert that Strikeforce paid about ███ of its event revenue to athletes, while Bellator pays approximately ███  *Id.*  Plaintiffs conclude without any further analysis that "the

23

Challenged Conduct suppressed Fighter compensation below competitive levels." *Id.* ¶ 188.  Dr. Singer acknowledged that his assessment is a simple comparison between wage shares, but does not "control for other variables in the same way that a regression model might."  Ex. 16, Singer Dep. I 10:17-24.  Controlling for other factors is critical because a high wage share is as consistent with a failing promotion as an appropriate level of compensation.  Ex. 101 (█████████████████████████████████████████).

### c. The So-Called "Sponsorship Tax" Does Not Constitute Direct Evidence Of Harm To Compensation.

Plaintiffs purport to offer a "natural experiment" of Zuffa's ability to profitably restrict athlete compensation through the imposition of a so-called "sponsorship tax"—a program that required certain categories of sponsors to pay a brand-affiliation fee to appear in UFC events as athletes' sponsor.  Ex. 70, Singer I ¶¶ 191-92.  But Plaintiffs' "experiment" is faulty.  Plaintiffs' experts never isolate the impact of the brand-affiliation fee on total athlete compensation given the many other factors that influence athlete compensation, including rising compensation throughout the Class Period for participation in UFC bouts.  SUF ¶¶ 8, 39.  Even if Zuffa's implementation of the brand-affiliation fee reduced athletes' *sponsorship* compensation, Plaintiffs still have not demonstrated that a change to sponsorship compensation impacted athletes' overall compensation, much less reduced their compensation below a competitive level.

### 2. Plaintiffs Have Not Shown a Restriction in Output for Athlete Services.

Direct evidence of market power in this monopsony case, in addition to a reduction in athlete compensation, requires proof of a restriction on output.  *Rebel Oil*, 51 F.3d at 1434.  Instructively, the Fifth Circuit has explained that if a defendant "had monopsony power, it would take illegal advantage of that situation by reducing its purchases of fed cattle in order to reduce its costs and make a higher profit on each head of cattle processed."  *In re Beef*, 907 F.2d at 516.  That court upheld the district court's grant of summary judgment because the plaintiff did not show that defendant "ever significantly reduced its purchases of fed cattle or its output of processed beef."  *Id.*  Plaintiffs claim here is similarly deficient.  Plaintiffs offer no evidence that

1  Zuffa has reduced its purchases of athlete services.  Rather Plaintiffs claim that Zuffa maintains

2  an excess supply of athletes.  *Infra* II.C.1.

3              3.       Plaintiffs Have Not Shown Circumstantial Evidence Of Market Power.

4      "To demonstrate market power circumstantially, a plaintiff must:  (1) define the relevant

5  market, (2) show that the defendant owns a dominant share of that market, and (3) show that there

6  are significant barriers to entry and show that existing competitors lack the capacity to increase

7  their output in the short run." *Rebel Oil*, 51 F.3d at 1434.  As discussed above, Plaintiffs cannot

8  meet the threshold requirement of proving a relevant antitrust market.  *See* Section I.[4]

9      Plaintiffs also cannot show the last requirement, that the market has high barriers to entry.

10 "A § 2 plaintiff, establishing monopoly power by circumstantial evidence, must establish more

11 than just market share.  Even a 100% monopolist may not exploit its monopoly power in a market

12 without entry barriers." *Image Tech*, 125 F.3d 1195, 1208.  "To justify a finding that a defendant

13 has the power to control prices, entry barriers must be significant—they must be capable of

14 constraining the normal operation of the market to the extent that the problem is unlikely to be

15 self-correcting." *Rebel Oil*, 51 F.3d at 1439.  Where competitors can enter the market and expand

16 output, there are no barriers to entry.  *Id.* at 1441 ("evidence of past output expansion may be

17 used as a surrogate.  If there is undisputed evidence indicating that competitors have expanded

18 output in the recent past, or have the ability to expand output in the future, summary disposition

19 may be appropriate"; *Syufy*, 903 F.2d at 664 ("A high market share, though it may ordinarily raise

20 an inference of monopoly power, will not do so in a market with low entry barriers").

21     During the Class Period, new MMA promoters entered the market and the existing

22 promoters expanded.  PFL, One Championship, and Absolute Championship Berkut all entered

23 the market during the Class Period and expanded output.  SUF ¶ 19-20; Ex. 4, Topel I Ex. 23.

24 The UFC's largest domestic competitor, Bellator, expanded its output from 10 events in 2009 to

---

[4] As explained in Zuffa's *Daubert* motion, Dr. Singer's calculation of Zuffa's share of the input market (athlete services) is illogical and weights athletes in the market by event revenue rather than counting the number of athletes Zuffa has under contract.  ECF No. 524; Ex. 70, Singer I ¶ 128.  As a result, the same athlete could represent a different share of the input market when that athlete switches from Bellator to, for example, Zuffa.

averaging over 20 during the Class Period.  Ex. 4, Topel I Ex. 23.  Moreover, other sports entertainment organizations have entered MMA, including transitioning from other combat sports like boxing promoter Golden Boy Promotions.  SUF ¶ 20.

        C.      <u>Zuffa Did Not Engage In Exclusionary Anticompetitive Conduct</u>.

The second required element to prove monopsonization is whether the defendant "willfully acquired or maintained" such monopsony power by "engaging in predatory or anticompetitive conduct designed to destroy competition." *The Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990).  Whether the challenged conduct is viewed collectively or individually, Plaintiffs have not presented a genuine issue of material fact that would allow a reasonable jury to find they made such a showing.

        1.      Zuffa Was Not Engaged In Predatory Hiring.

Plaintiffs contend that "Zuffa has restricted the supply of Fighter services by consistently maintaining significantly more Fighters under contract than it could use," Ex. 70, Singer I ¶ 145, and as a result, other MMA promoters "do not have access to the Elite Professional MMA Fighters necessary to sustain and grow a profitable rival promotion company."  CAC ¶ 109.

This type of antitrust claim is called predatory hiring.  "Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990).  To prove a predatory hiring claim, a plaintiff must demonstrate either (1) the hiring "harm[ed] the competition without helping the monopolist or (2) a "clear nonuse in fact." *Universal Analytics*, 914 F.2d at 1258; *Am. Prof'l.*, 108 F.3d at 1153.[5]  Courts are "rightly

---

[5] *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 480 (5th Cir. 2000) (affirming judgment as a matter of law where "Jostens hired [talent] precisely because it believed they would increase its business"); *Midwest Radio Co. v. Forum Pub. Co.*, 942 F.2d 1294, 1297–98 (8th Cir. 1991) (affirming summary judgment where talent hired away from competitor were used); *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1196 (D. Kan. 1999) (granting summary judgment on antitrust claims where "authority clearly indicates that claims of predatory hiring should be restricted to cases in which the plaintiff can demonstrate either nonuse of the employee or a proven intent to hire *for the sole purpose of denying the employee to the plaintiff*" and plaintiff failed to provide any evidence of either).

cautious in imposing antitrust liability for a firm's hiring practices" and "have examined more closely claims of anticompetitive hiring than other forms of anticompetitive conduct." *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493, at *12 (D. Colo. Aug. 21, 2009) (citation omitted).

Plaintiffs' predatory hiring claim does not meet either prong of the *Universal Analytics* test.  First, there is no evidence that Zuffa's sole intent in hiring hundreds of athletes over the putative Class Period was to keep them away from competitors.  Plaintiffs can only identify two athletes—Gilbert Melendez and Antonio Rogerio Nogueira—with whom Zuffa allegedly contracted for the purpose of preventing those athletes from signing with a competitor.  Ex. 70, Singer I ¶¶ 162 n.421, 194 n.481.  Zuffa's then CEO Lorenzo Fertitta testified ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Ex. 1, Fertitta Dep. 290:6-8.  Noguiera went on to compete in four UFC events.[6]  Even if Plaintiffs' allegations about these two athletes were accurate (they are not), these isolated examples fall well short of showing the "continued pattern" of predatory hiring necessary to sustain their monopsony claim.  *Am. Prof'l*, 108 F.3d at 1153.

It is implausible that Zuffa signed athletes solely to keep them away from competitors and not to help put on UFC events.  Plaintiffs even admit that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion."  Ex. 70, Singer I ¶ 158.  Zuffa witnesses have testified to the same.  SUF ¶ 14.  Zuffa—like any other MMA promotion—has every incentive to scout and sign talented athletes to drive the success of their business.  Because MMA athletes are important to Zuffa's business, it is neither predatory hiring nor an antitrust violation to sign them.  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 855–57 (7th Cir. 2011) (affirming summary judgment where given the competitive importance of physician groups, "It is not troubling, then, that the Hospital made an extraordinary effort to retain these physicians").

---

[6]  Ex. 102, Antonio Rogerio Nogueira Sherdog profile.

ZUFFA'S MOTION FOR SUMMARY JUDGMENT

Furthermore, Plaintiffs have not alleged, much less proven with evidence, that Zuffa signed athletes who did not compete in UFC events.  It is undisputed that Zuffa increased the number of its events during the putative Class Period.  SUF ¶ 7.  Plaintiffs' only allegation related to supposed nonuse is that Zuffa caused "forced periods of inactivity," also known as "benching."  Plaintiffs have identified three athletes who Zuffa allegedly "benched," only one of which occurred during the putative Class Period:  Andrei Arlovski in 2008, Roger Huerta (likely in 2009), and ███████ in 2015.  Ex. 70, Singer I ¶ 164 n.483; Ex. 17, Fitch Dep. 110:25-111:10.  As for the allegation related to ███ Zuffa matchmaker Sean Shelby told her to "Plan on getting back in within 4 months," Ex. 103, which she did.  Ex. 104 (███████████████████).

In any event, the allegations are irrelevant.  At most, Plaintiffs argue that some UFC athletes faced a delay before they were used.  Ex. 105 at 33.  This is insufficient to show "clear nonuse in fact."  *Universal Analytics*, 914 F.2d at 1258.  And, even if these claims were to be believed, they do not show the "continued pattern" of nonuse necessary to sustain Plaintiffs' claim.  *Am. Prof'l*, 108 F.3d at 1153.

### 2.      Zuffa's Contracts Did Not Substantially Foreclose Competitors.

The Ninth Circuit has held that there are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of inter-brand competition."  *Omega Envtl v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  "It is widely recognized that in many circumstances [exclusive dealing contracts] may be highly efficient – to assure supply, price stability, outlets, investments, best efforts or the like—and pose no competitive threat at all."  *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2008) (citing Hovenkamp ¶¶ 1810-1814b).  For this reason, "only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected'" violate the antitrust laws.  *Omega*, 127 F. 3d at 1162;  *accord Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (monopolization claim requires proof that party did "foreclose competition in a substantial share of the line of commerce affected").

a. Plaintiffs Assume But Do Not Prove That Zuffa's Exclusive
Contracts Foreclose A Substantial Share Of Competition.

Plaintiffs have hinged the success of their Section 2 claim on whether Zuffa's exclusive

alleged 30-month contracts[7] substantially foreclose competitors from the market.  Ex. 70, Singer I

¶ 171; Ex. 16, Singer Dep. I 269:1-14 ("there's only one necessary condition [to a foreclosure

effect] which are this 30-month exclusive provision, if you take them out, the foreclosure goes

away"); 165:16-166:4 ("the challenged conduct that's driving the foreclosure if you think about

how it's being triggered are the restrictions in the fighter contracts, those are doing the heavy

lifting here, and that's the exclusive provision plus the other provisions that cause the contract's

duration to exceed 30 months").  If Zuffa's contracts do not substantially foreclose competition,

their antitrust claim fails because Plaintiffs' assessment of foreclosure of the market, impact, and

damages all *assume* Zuffa's exclusive 30-months contracts are illegal.

Plaintiffs' expert identifies a "foreclosure share" (not a market share) as an input to his

models defined as the percentage of contracts with 30-month or more exclusivity.  SUF ¶ 37.

Because this is a high share of the contracts, he concludes the contracts must be exclusionary.

Ex. 70, Singer I ¶ 153.  But Plaintiffs' experts have performed no analysis of the extent to which

the contracts actually foreclose competition.  At a minimum, this requires an assessment of

whether other promoters can compete for the contracts at the time they are signed.  However,

even if there were evidence that the Zuffa's contracts do foreclose competition, Plaintiffs have not

shown whether that foreclosure is substantial.

Because "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from

some portion of the market, namely the portion consisting of what was bought," *Barry Wright*

*Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir.1983) (J. Breyer), a foreclosure analysis

cannot merely assume that exclusive agreements foreclose competition.  *E.g., Mazda v. Carfax,*

---

[7] For the sake of argument, Zuffa accepts Plaintiffs' characterization of its contracts as 30-months
in length; however, the actual term of Zuffa's contract is shorter.  Plaintiffs' 30-month calculation
incorrectly assumes an athlete is foreclosed for the entire ▮▮▮▮▮ right to match period.  Ex. 70,
Singer I ¶ 88.  Athletes can and do contract with other promoters during the right-to-match
period.  SUF ¶ 22. Plaintiffs have presented *no* evidence of a single athlete who waited the entire
▮▮▮▮▮ right to match period before signing with a competing promoter.

29

1   *Inc.*, 2016 WL 7231941 at *12-13 (S.D.N.Y. 2016) (granting summary judgment in part because

2   plaintiffs' expert—Dr. Singer—assumed that agreement foreclosed competition without

3   performing any economic analysis).  Yet that is precisely what Plaintiffs' expert has done here by

4   defining an athlete as "foreclosed" if the terms of an athlete's contract extends an athlete's

5   contract to 30 months or more (regardless of whether the athlete is actually foreclosed from

6   competitors for that length of time).  Ex. 70, Singer I ¶ 172 n.441.

7          Plaintiffs do not even evaluate how a contract of a shorter duration would impact

8   competition in the marketplace.  Instead, Dr. Singer assumes that Zuffa's foreclosure of the

9   market would be *0%* if its contracts were less than 30 months.  Ex. 16, Singer Dep. I 47:4-9 ("If

10  the legal standard were 30 months and . . . if Zuffa's contracts were all 12-month contracts, then

11  the foreclosure share by my measure would be zero percent."); Ex. 12, Singer Dep. II 385:11-17.

12         Rather than evaluate the impact of the duration of the contract *on the market*, Plaintiffs

13  have set their definition of foreclosure based on (1) what they believe a "court will find

14  exclusionary" and (2) the duration of an exclusive contract that a court would find to be

15  exclusionary.  Ex. 12, Singer Dep. II 376:2-7 ("what would be a duration that would be

16  acceptable to a Court.  That to me is really the key element of what you need in a contract to

17  bring the foreclosure share to levels of zero, 20 or 30 percent").  Dr. Singer concedes that

18  foreclosure is an "input" he assumes in his analysis *based on his knowledge of the law*, rather than

19  the *output* of an assessment of the impact of foreclosure on the market.  Ex. 16, Singer Dep. I

20  39:1-9; 40:4-41:21.

21         Contrary to Dr. Singer's assertion that 30-month exclusive contracts are unlawful, courts

22  have routinely held that exclusive contracts even up to six years are not anticompetitive so long as

23  there is sufficient opportunity to compete for each contract at the time it is signed.  *Ferguson v.*

24  *Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 982 (9th Cir. 1988) (affirming

25  summary judgment with competition for contract at six-year intervals); *Golden Boy*, 2017 WL

26  460736, at *14; *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21397701, at *4 (C.D. Cal.

27  Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005) (granting summary judgment because

28

competitors "have the opportunity to compete for the contract" after it expires); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (affirming summary judgment because "most of the contracts expire every year or two," giving competitors "a shot at obtaining the next contract").

There is no evidence that promoters are unable to compete for athletes at the time Zuffa signs an initial contract with them.  And promoters *do* compete with Zuffa for athlete services and have access to talented MMA athletes.  SUF ¶¶ 21-23; Section II.B *supra*.  Despite other options available to them, athletes, including Plaintiffs, have routinely explained numerous reasons why they chose to sign with Zuffa, including the high compensation, superior exposure, extensive promotion, and Zuffa's professionalism.  SUF ¶ 10 (athletes' reasons they compete for the UFC); *Omega Envtl.*, 127 F.3d at 1164 ("We agree with the unremarkable proposition that a competitor with a proven product and strong reputation is likely to enjoy success in the marketplace, but reject the notion that this is anticompetitive.  It is the essence of competition.").

Courts are justifiably wary of condemning such conduct as anticompetitive. *Weyerhaeuser*, 549 U.S. at 323-25 (the use of high bid prices to compete for inputs is "essential to competition and innovation on the buy side of the market" and potentially beneficial to consumers).

        b.   **Plaintiffs Have Failed To Quantify The Extent To Which Competition Is Foreclosed.**

Plaintiffs rely on Dr. Singer's "foreclosure share" as proof of substantial foreclosure, but no reasonable jury could conclude that Dr. Singer's foreclosure share represents a reasonable estimate of the percentage of overall MMA athletes affected by the contract.  Even accepting Dr. Singer's Ranked market, which as described above is flawed, the percentage of Ranked Zuffa athletes under contract represents only 18.1% of the total available ranked athletes from 2011 to 2016, and that number was never higher than 22% of the ranked athletes.  SUF ¶ 36.

Dr. Singer has no compelling justification for disregarding undiscovered, unranked athletes as compared to athletes that Zuffa has discovered.  Before an MMA athlete signs with a promoter, any MMA promotion may bid for the athlete's services.  As Dana White explained,

1  "Four years ago, Conor McGregor was available to everybody.  Bellator, One FC, UFC,

2  everybody out there . . . I saw him, I liked his personality, and I turned him into a star."  Ex. 7,

3  White Dep. 332:17-25.  The same is true for every other athlete available on the market.  Part of

4  the success of an MMA promoter is to identify and develop up-and-coming talent.  Ex. 56, Coker

5  Dep. 101:10-11 (Strikeforce recruited top talent "that we were building from the ground up"); Ex.

6  57, C. Silva Dep. 171:13-24 ("World Series of Fighting also grows and creates fighters"); Ex. 52,

7  J. Silva Dep. 41:24-42:16 ("███████████████████████████████████████████

8  ███████████████████████████████████████████████████"); Ex. 77, Knapp

9  Dep. 51:13-52:1 ("I'm looking for talent").

10      Dr. Singer justifies his finding that the contracts are exclusionary by calculating that the

11  median career duration for an athlete at Zuffa is 0.82 years and the average is 2.00 years.  Ex. 49,

12  Singer II ¶ 64 & Table 1.  This is the duration of a career *at Zuffa*, not an athlete's MMA career.[8]

13  *Id.*; Ex. 12, Singer Dep. II 463:18-464:3.  This analysis highlights additional flaws with Dr.

14  Singer's analysis.  First, according to Dr. Singer, the average Zuffa athlete is under contract to

15  Zuffa for less time than meets his definition of exclusionary.  Second, if athletes' careers are of

16  such short duration, Dr. Singer's failure to give any weight to up-and-coming talent is even more

17  inexplicable.

18      The record has many examples of successful Zuffa fighters who have had careers that

19  extend long after leaving Zuffa.  When athletes' contracts with Zuffa expire, other MMA

20  promotions have bid for and contracted with those free agent athletes.  SUF ¶ 21-23; *E.g.*

21  *TicketMaster*, 2003 WL 21397701 at *4.  Bellator's President, for example, testified that "there's

22  not going to be a free agent fighter on the planet that [Bellator] can't afford and have access to"

23  and confirmed that Bellator "picked up a hundred percent of the free agent MMA fighters that it

24  went after in 2017."  SUF ¶ 21-23.  This included "big fighters" like Rory MacDonald, Gegard

25  Mousasi and former UFC champion Benson Henderson, who all signed with Bellator after their

26

27  _____

[8] The average MMA career length of athletes who have competed in at least one Zuffa bout is 8.7
28  years.  SUF ¶ 13; Ex. 50, Topel II ¶¶ 39-40.

UFC contracts ended.  *Id.*  Every year between 2011 and 2016, more than 230 former UFC athletes competed for other promotions.  *Id.*; Ex. 80, Blair Rep. ¶ 37, Figure 1.

Plaintiffs argue that the inability to access *more* talented athletes prevents competition. Ex. 70, Singer I ¶ 175.  This assertion is incorrect as a matter of law:  the antitrust laws protect competition; they do not promise competitors the tools to compete with the highest and best means.  *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983).

      c.  Zuffa's Has Legitimate Business Justifications For Its Exclusive Contracts.

"When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."  *Image Tech.*, 125 F.3d at 1212.  Here, exclusive contracts are widely used by other MMA promoters and have always been used by Zuffa.  SUF ¶¶ 14-16.  Zuffa's witnesses have testified that exclusive contracts are necessary for their business to maintain its high output and quality of events.  SUF ¶ 14.  "███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████"  Ex. 48, Contracts Dep 97:25-98:9.  Zuffa's Chief Operating Officer described a related concern: "we have a television broadcast deal with Fox broadcasting that requires us to deliver a certain number of events.  In order for us to get that deal, we have to tell them we're able to staff these fights up with events.  It's impossible to deliver on a contract, and no television network would ever contract with you if you didn't have these arrangements with your athletes to deliver them for bouts."  Ex. 8, Epstein Dep. 103:6-105:7.  This is not a hypothetical concern.  Record evidence shows that in 2013 and 2014, for example, nearly all of Zuffa's events had injured athletes that needed to be replaced.  Ex. 106.  Courts have previously accepted the expansion of output and adherence to high quality as a legitimate business justification.  *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (prevention of free riding and distributors wholly committed to marketing Haagen-Dazs legitimate justifications); *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614

1    F.3d 57, 82 (3d Cir. 2010) (exclusive dealing contract with tire supplier had legitimate business

2    justifications such as "more exciting races" and increased "car counts").

3                    3.       Plaintiffs Have Not Adduced Evidence That The Remaining Challenged
                              Conduct Is Anticompetitive.

4

5           The two remaining aspects of Plaintiffs' challenged conduct—Zuffa's acquisitions of

6    certain MMA promoters and alleged "coercion" of athletes to re-sign their contracts—are not

7    sufficient to defeat a summary judgment motion because neither had a "significant and enduring

8    impact" on competition. *Am. Prof'l*, 108 F.3d at 1152. Plaintiffs have also failed to show they

9    suffered any antitrust injury as a result of the challenged conduct. *Cal. Comp.*, 613 F.2d at 746

10   ("There can be no synergistic result such as [plaintiff] claims from a number of acts none of

11   which show causal antitrust injury").

12                   a.     Plaintiffs Have Presented No Evidence Of Anticompetitive Effects
                           From Zuffa's Acquisitions Of MMA Promoters.

13          The "mere fact that a merger eliminates competition between the firms concerned has

14   never been a sufficient basis for illegality." 4 Phillip E. Areeda *et al.*, Antitrust Law ¶ 901a

15   (2009). Given these procompetitive efficiencies, Section 7 of the Clayton Act sets out a clear

16   standard for the ways in which a plaintiff can challenge a horizontal merger and what a plaintiff

17   must prove if they choose to do so. "To prove an unlawful merger claim under § 7 of the Clayton

18   Act, a plaintiff must show that the effect of the challenged acquisition 'may be substantially to

19   lessen competition, or tend to create a monopoly.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d

20   1011, 1021 (9th Cir. 2016) (quoting 15 U.S.C. § 18). Plaintiffs do not bring a Section 7 claim,

21   nor do they present any evidence to show that any of Zuffa's acquisitions were anticompetitive.

22          In *Syufy*, the Ninth Circuit affirmed a judgment following a bench trial that a movie

23   theater operator had not monopolized the Las Vegas movie theater market even though Syufy had

24   acquired three other theaters in the market that left Syufy temporarily controlling "100% of the

25   first-run film market in Las Vegas." *Syufy*, 903 F.2d at 665. Contrary to the government's theory

26   that such acquisitions constituted anticompetitive conduct, the Court explained "in a competitive

27   market, buying out competitors is not merely permissible, it contributes to market stability and

28

promotes the efficient allocation of resources." *Id.* at 673. "As is often the case when a vigorous competitor enters the market, more complacent theatre operators were eliminated, but there was no credible evidence that Syufy did anything improper to drive them out." *Id.* at 672.

The record evidence further makes clear that, after Zuffa's acquisitions, competitors entered the market and expanded. SUF ¶¶ 18-20; *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011) (affirming summary judgment challenging exclusive contracts and acquisitions where there was actual entry in the market).

b. Plaintiffs Have Not Presented Evidence Of Anticompetitive "Coercion."

Plaintiffs have also made allegations of "coercion" of athletes, but have not presented a genuine issue of material fact that any alleged "coercion" could have had a "significant and more-than-temporary harmful effect on *competition*" to constitute exclusionary conduct. *Am. Prof'l*, 108 F.3d at 1151. Plaintiffs do not even define coercion, but complain of mean tweets or insulting language. Ex. 105 at 34 ("Zuffa would attack the character of athletes attempting to leave the UFC, by having Dana White criticize the Fighter in the media"); *id.* at 35 (matchmaker allegedly said "If you don't like the first opponent I offer you, you sure as hell will not like the second"). According to Dr. Singer, Zuffa engages in coercion by offering to re-sign athletes before the last bout on their current contracts and paying them *more compensation* under new agreements. Ex. 70, Singer I ¶¶ 77-78. Attempting to re-sign athletes to exclusive contracts by offering more money is fully consistent with the procompetitive behavior that exclusive dealing arrangements can foster in a market. *Weyerhaeuser*, 549 U.S. at 325; *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (exclusive dealing arrangements "may actually encourage, rather than discourage, competition because the incumbent and other [competitors] have a strong incentive continually to improve the [quality] and prices they offer in order to secure the exclusive positions").

No allegation of "coercion," whether analyzed separately or collectively, raises any triable issue of fact. *Race Tires*, 614 F.3d at 79 (affirming summary judgment where "neither the lengthy duration of the Hoosier contracts nor their renewal terms represent real evidence of

35

coercion or interference" and actual terms of form contract "appear to be completely consistent with what one would actually expect to find in an exclusive supply arrangement"); *It's My Party,* 88 F. Supp. 3d at 495 (granting summary judgment where "individual instances of alleged unlawful behavior" were not "not facial evidence of coercion" as to "permit a reasonable inference of coercion") (citation omitted).

III.   <u>Zuffa Is Entitled To Summary Judgment On Plaintiffs' Monopolization Claim</u>.

Because Plaintiffs no longer allege injury based on a monopoly claim, *Daubert* Opp. ECF No. 534 at 36-37, as well as their claim of a scheme of combined monopoly and monopsony, it is not relevant to their theory of injury and should be dismissed. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (claims that do not "cause[] respondents to suffer a cognizable injury" must be dismissed on summary judgment); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (affirming summary judgment where no causal antitrust injury).

Evidence confirms that Zuffa could not or did not restrict other promoters' access to any of the purported requirements for a successful MMA promotion and that Plaintiffs expert has done no analysis of whether Zuffa restricted access to venues (SUF ¶ 29), sponsors (SUF ¶ 30), or broadcasters (SUF ¶ 31):

*Venues*:  Zuffa's competitors have access to hundreds of venues for events across the country and around the world, including venues UFC has used.[9] SUF ¶ 29.  There are hundreds of suitable venues across the country and around the world, as evidenced by the number of different venues secured by Bellator, PFL, and others.  SUF ¶ 29.  As just one example, UFC hosted an

_____

[9] Zuffa and venues have legitimate business reasons to include short-term "clearance windows" (normally ▓▓▓▓▓) that limit the venue from hosting other MMA events, ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 107, Venues Dep. 24:25-25:16; 32:3-10.  *Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1400 (9th Cir. 1987) (affirming summary judgment regarding clearances windows for movies); *Ticketmaster*, 2003 WL 21397701, at *5 (C.D. Cal. Mar. 7, 2003) (granting summary judgment where venues, not just defendant, sought exclusive contracts).

1   event at Madison Square Garden in November 2016,[10] WSOF hosted an event there just six weeks

2   later,[11] and Bellator hosted an event there six months later.[12]  Courts have previously rejected

3   claims that suitable venues could be "locked-up" when so many alternatives exist.  *Golden Boy*,

4   2017 WL 460736, at \*16 (granting summary judgment where boxing events "there are numerous

5   alternative venues in most major metropolitan areas of the United States"); *see also Aerotec Int'l,*

6   *Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016) (affirming summary judgment

7   because "reasonable access to the essential facility exists—even if not in a way that is conducive

8   to [plaintiff]'s existing business model") (citation omitted).

9        *Sponsors*:  Zuffa's competitors have access to sponsors.  SUF ¶ 30.  Zuffa generally

10  contracts with a single sponsor in certain product categories (apparel, beverage company, etc.).[13]

11  Ex. 112, Sponsors Dep. I 21:20-22:2, 73:4-9, 106:3-106:21.  Zuffa's competitors are free to (and

12  do) contract with any other company in those categories, as well as sponsors in any category in

13  which UFC does not have an exclusive sponsor, and to compete for Zuffa's exclusive sponsor

14  partners at the end of the exclusive contract.  Testimony confirms that competitors have their

15  choice of marquee sponsors.  SUF ¶ 30

16       *Broadcasters*:  Given the many television channels, streaming options, and online forms

17  of distribution which could and do broadcast MMA bouts, competitors have access to a multitude

18  of broadcasting options.  SUF ¶ 31; *Golden Boy*, 2017 WL 460736, at \*15 (granting summary

19  judgment regarding exclusive broadcast agreements where "there were both existing and potential

20  alternative channels of distribution available to Golden Boy"); *Omega Envtl.*, 127 F.3d at 1163.

21       As discussed above in Sections I.B and II.B.3, circumstantial evidence does not support a

22  claim that UFC has monopoly power in an output market through proof of high market share in a

23

24  [10] Ex. 108 (UFC press release).

25  [11] Ex. 109 (PFL event recap).

26  [12] Ex. 110 (Bellator event recap).

[13]

27  Ex. 111, Sponsors Dep. II 264:5-265:4.

28  Ex. 112, Sponsors Dep. I 21:22-22:5, 72:22-73:12.

ZUFFA'S MOTION FOR SUMMARY JUDGMENT

relevant market characterized by high barriers to entry and the inability of existing competitors to expand. *Rebel Oil*, 51 F.3d at 1434.

A.   Plaintiffs Lack Direct Evidence Of Zuffa's Alleged Monopoly Power.

1.   No Supracompetitive Prices.

A mere allegation of a price increase cannot prove market power. Rather, "market power is the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984); *Rebel Oil*, 51 F.3d at 1434 ("Without market power to increase prices above competitive levels, and sustain them for an extended period, a predator's actions do not threaten consumer welfare").

Plaintiffs allege one increase in PPV prices signifies Zuffa's supracompetitive pricing, Ex. 70, Singer I ¶ 147, but present no evidence related to ticket prices at the event. From 2008 to 2015, the PPV price of UFC events remained unchanged. SUF ¶ 11. In 2015, Zuffa implemented a $5 increase in PPV price to $50 ████████████████████████ *Id.* Plaintiffs make no attempt to offer evidence of competitive prices and costs that is required to demonstrate that Zuffa's $5 price increase is supracompetitive. *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504 (9th Cir. 2011) (granting summary judgment where "Evidence that eBay has raised prices over a period of years . . . proves nothing with respect to whether the prices are supracompetitive").

2.   No Reduction In Output.

A restriction in output requires a showing that "by restricting [a defendant's] own output, it can restrict marketwide output and, hence increase marketwide prices." *Rebel Oil*, 51 F.3d at 1434. Zuffa has not restricted its own output during the Class Period. SUF ¶ 7. Instead, Zuffa's total number of live MMA events increased from 32 in 2010 to 41 in 2016. *Id.*

Plaintiffs argue that Zuffa reduced output when the number of PPV events went from 15 events in 2010 to 13 events in 2015. Ex. 70, Singer I ¶ 201. But Plaintiffs have defined a market for live MMA bouts, not PPV events, CAC ¶ 55, and Zuffa's output must be viewed in relation to the alleged market. Regardless, Plaintiffs have presented no evidence—*e.g.*, a consumer survey

1   or otherwise—that Zuffa would have (or even could have) expanded output even more absent the

2   challenged conduct. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233

3   (1993) (granting judgment as a matter of law where output "expanded at a rapid rate" following

4   the alleged predation and where there was no record evidence output "would have been greater"

5   without the defendant's entry).  Plaintiffs' economists never attempt to show that Zuffa's

6   actions—as opposed to market forces like changes in supply or demand—led to a change in

7   overall output in the market.

8   IV.   <u>Plaintiffs Have Failed To Support Their Identity Class Claim With Admissible Evidence.</u>

9        Plaintiffs have abandoned their initial theory of liability that the "Identity Class" was

10  purportedly harmed as a result of granting certain perpetual rights to Zuffa.  CAC ¶ 92.  Plaintiffs

11  now make a half-hearted attempt to continue pursuing their identity rights claim as a tag-along

12  theory to their Bout Class claim, but have failed to present any evidence showing that members of

13  the Identity Class were harmed as a result of the challenged conduct.

14       Plaintiffs have not proven that the so-called "Identity Rights" Agreements are

15  anticompetitive.  When an athlete competes in a UFC bout, the UFC owns the intellectual

16  property associated with that broadcast.  SUF ¶ 17.  Zuffa's agreement restrains athletes from

17  using UFC trademarks, programs, and intellectual property which is legal, competitive activity to

18  protect that property.  *In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1145 (N.D.

19  Cal. 2011) (refusal to license intellectual property does not violate Section 2).  Under the contract,

20  athletes are free to, and do, sell or license their identity rights to other purchasers of their

21  identities despite their limited identity rights to Zuffa.  SUF ¶ 17.  Even without the athletes'

22  grant of rights, no other MMA promoter would be entitled to use to Zuffa's copyrighted works,

23  like its event broadcasts, without permission.

24       Further, none of Plaintiffs experts did any separate economic modeling for the Identity

25  Class to show that the challenged conduct caused that class any injury.  Ex. 16, Singer Dep. I

26  218:4-7.  Instead, Plaintiffs argue that Dr. Singer's regression that purports to calculate effects for

27  the Bout Class can be applied to the Identity Class as well.  Ex. 70, Singer I ¶ 237.  Even

28

accepting Dr. Singer's regression as capable of showing impact to the Bout Class (it cannot), no reasonable jury could find that this regression shows harm to the Identity Class.  Dr. Singer's regression purports to show that as Zuffa's share of athletes under exclusive 30-month contracts increases, the share of event revenue to athletes decrease.  This has nothing to do with the use, grant, or payment for identity rights.  Plaintiffs here have failed to show how Zuffa's actions have reduced competition for athletes' identity rights.

Plaintiffs' expert contends without any economic analysis that in a but-for world athletes would have received ██████ for the grant of their identity rights.  This assertion merely assumes but does not prove that all Identity Class members were harmed by the challenged conduct.

Pursuant to this Court's Order, Zuffa incorporates by reference its motion for partial summary judgment that the statute of limitations bars many of the Identity Class claims and requests a ruling on that motion along with this summary judgment motion. ECF Nos. 347, 388.

V.      <u>Plaintiffs Do Not Have Standing To Bring Claims For Injunctive Relief</u>

For the reasons stated in Zuffa's class certification opposition, Plaintiffs lack standing to pursue injunctive relief; therefore, these claims must be dismissed.  ECF No. 540 at 40.

**CONCLUSION**

For the foregoing reasons, Zuffa respectfully requests that the Court grant summary judgment in its favor.

1

2    Dated:  July 30, 2018                      Respectfully Submitted,

3                                              BOIES SCHILLER FLEXNER LLP

4

5                                              By: /s/ William A. Isaacson

6                                                  William A. Isaacson
                                               *Attorneys for Defendant* Zuffa, LLC, d/b/a
7                                              Ultimate Fighting Championship and UFC

8                                              William A. Isaacson (*Pro Hac Vice*)
                                               Stacey K. Grigsby (*Pro Hac Vice*)
9                                              Nicholas A. Widnell (*Pro Hac Vice*)
                                               BOIES SCHILLER FLEXNER LLP
10                                             1401 New York Ave., NW
                                               Washington, DC 20005
11                                             Tel: (202) 237-2727
                                               Fax: (202) 237-6131
12                                             Email: wisaacson@bsfllp.com
                                                      sgrigsby@bsfllp.com
13                                                    nwidnell@bsfllp.com
14
                                               Donald J. Campbell #1216
15                                             J. Colby Williams #5549
                                               CAMPBELL & WILLIAMS
16                                             700 South 7th Street
                                               Las Vegas, Nevada 89101
17                                             Tel: (702) 382-5222
                                               Fax: (702) 382-0540
18                                             Email: djc@campbellandwilliams.com
                                                      jcw@campbellandwilliams.com
19

20
                                               Richard J. Pocker #3568
21                                             BOIES, SCHILLER & FLEXNER LLP
                                               300 South Fourth Street, Suite 800
22                                             Las Vegas, NV 89101
                                               Tel: (702) 382 7300
23                                             Fax: (702) 382 2755
                                               Email: rpocker@bsfllp.com
24

25                                             *Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
26                                             Fighting Championship and UFC

27

28
                                       41

1

2 <u>**CERTIFICATE OF SERVICE**</u>

3       The undersigned hereby certifies that the foregoing **Zuffa's Motion for Summary**

4 **Judgment** was served on July 30, 2018 via the Court's CM/ECF electronic filing system

5 addressed to all parties on the e-service list.

6

7

8                               /s/ Roderick Crawford

9                               An employee of Boies Schiller Flexner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZUFFA'S MOTION FOR SUMMARY JUDGMENT