# EXHIBIT 1

## Redacted Excerpts of Deposition of Lorenzo Fertitta

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,

Defendant.

Lead Case No. 2:15-cv-01045-RFB-(PAL)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF LORENZO J. FERTITTA

Las Vegas, Nevada

March 23, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 49608

30

**a member of the Nevada State Athletic Commission in 1996 or 1997 and were a member for approximately four years?**
A. Yes.
**Q. Okay. And so, do you recall how long you'd been off of the Nevada State Athletic Commission before you and your brother Frank purchased the UFC in January of 2001?**
A. I believe it was roughly six months.
**Q. And did you leave the Nevada State Athletic Commission in anticipation of your purchase of UFC?**
A. No.
**Q. And what did you and your brother pay for the UFC when you purchased it in January of 2001?**
A. The original purchase price at closing was $2 million.
**Q. And did you have a role at UFC -- at the UFC and then ultimately Zuffa that was something other than simply owner?**
A. I did not have an executive title or an executive role.
Being the what I would call the controlling shareholder along with my brother, we certainly weren't silent partners. We were involved in the business. But I would say not in a management,

31

day-to-day, executive day-to-day role.
**Q. Is there a time when you came to take on executive or day-to-day management duties at Zuffa?**
A. Yes.
**Q. Okay. When was that?**
A. That was approximately 2007 or 2008.
**Q. And did you have a title at Zuffa?**
A. Yes.
**Q. And what was that title?**
A. Chief executive -- chairman and chief executive officer.
**Q. That is chairman of the board?**
A. Yes.
**Q. And that was in 2007, you became chairman of the board, approximately?**
A. Yes. My testimony was 2007 or 2008.
**Q. Okay.**
A. I can't remember the exact month that I went over there, but it was around that time.
**Q. Okay, understanding that.**
**At the time that you became chairman of the board of Zuffa, who were the other board members?**
A. There were -- it was an LLC structure.
There was essentially me, my brother Frank, and I believe Dana White would have been a board

32

member as well.
**Q. Okay.**
A. And by that time, Dana would have been an equity partner in the LLC.
**Q. And did the composition of the board of directors of Zuffa change at some time thereafter?**
A. Yes.

33

**Q. Okay. And how much was Zuffa sold for?**
A. The total closing value in debt plus equity was 4,025,000,000.
**Q. 4,025,000,000?**
A. Yes.

A. That is a good clarification. I wasn't thinking in those terms.

**Q. Okay. Going forward, I want to be clear, so I don't have to be incorporating --**

MR. ISAACSON: Does that affect your last answer?

BY MR. DELL'ANGELO:

**Q. I think it was incorporated into the question, the prior answer.**

A. Yes. It would affect my last answer. I took the question as at any time, and that's why I reflected back to the very early years when UFC first started type of thing.

**Q. I see. So would you like to clarify?**

A. I'm sorry?

**Q. Is there anything you feel that you need to clarify?**

A. Yes. Yes. During the time that I was tenured at CEO of the company, I would say that -- relating back to your question, which I believe was -- if you could just repeat the question and we could start over, that would be fantastic.

**Q. Sure.**

**During the course of your tenure as CEO and chairman of Zuffa, did you come to the view -- did**

**you come to a view as to whether or not consumers distinguished mixed martial arts from the UFC?**

A. I believe that consumers, certainly educated consumers, understood the difference between UFC and mixed martial arts.

**Q. Okay. And did that view change at any time during the course of your tenure as CEO and chairman of Zuffa?**

A. No.

**Q. During the course of your tenure as CEO and chairman of Zuffa, did you ever come to believe that the UFC had transcended the sport of MMA to become the sport itself?**

A. Yes. I felt like that UFC was the most popular brand in the sport of mixed martial arts. And that at times, as I mentioned, no different than other industries where people say I'm going to get in the Jacuzzi where Jacuzzi is actually a brand name. You may not be getting into a Jacuzzi. Actually, that represents a hot tub.

As I said, many times people say hand me a Kleenex versus saying hand me a tissue. Many times, people say give me a Coke versus just being a soda.

So I believe that UFC was the most identified brand in the sport of mixed martial arts.

**Q. And during the course of your tenure as CEO and chairman of Zuffa, did you come to the view that the real competitors of UFC were what else -- the other things were happening in sports entertainment rather than other MMA organizations?**

A. Yes.

MR. ISAACSON: Objection to form.

THE WITNESS: Yes.

BY MR. DELL'ANGELO:

**Q. Okay. And why is that?**

A. The way I approached the business and thought about the business was that, at the end of the day, mixed martial arts, one of our events, UFC, is a form of entertainment and sports. Sports entertainment, clearly. Which means, when you think about our core demographic, young males, 18 to 34, was the demographic we primarily targeted, we had to think about what else was consuming their time for that entertainment time, that period.

So we actually spent a lot of time talking about it internally, doing analysis, thinking about it. It affected where we would put an event. It affected what date we would put an event on because we felt like not only were we competing with other promoters and leagues in mixed martial arts but also

other sports, the NFL, the NBA, Major League Baseball.

And certainly I always wanted to stay away from March Madness. Wanted to stay away from boxing, major boxing events, primarily a Floyd Mayweather fight, Manny Pacquiao fight.

In addition to that, we would do some analysis looking at what theatrical releases were coming out, you know. Probably not a great idea to hold a big pay-per-view or pay-per-view or do an event on the same night that maybe Avatar or X Men or some other movie that clearly was targeting our core demographic was going to be released.

**Q. Okay. And during the course of your tenure as chairman and CEO of Zuffa, did there come a time when, you know, the top 10 fighter in every MMA division was under the UFC's umbrella?**

MR. ISAACSON: Objection to form.

THE WITNESS: I don't know.

BY MR. DELL'ANGELO:

**Q. I'd like to show you a video clip.**

A. Um-hmm.

THE REPORTER: You don't need me to record that, right?

MR. DELL'ANGELO: No. We're going to

**Q. Versus some other MMA promotion?**

A. Maybe they would have had the same feeling with another one. I can just tell you the experience that I had in speaking to athletes.

**Q. Okay. And by 2014, do you agree that Zuffa strove to make sure that the events that it produced were headlined by fighters who were ranked in the top 10 in mixed martial arts?**

A. Yes, but it depends on what events you're referring to because there were a number of events in the UFC. We had a number of events which typically are on pay-per-view or a few times were on broadcast, on Fox broadcast.

We had fight nights that were predominantly on cable. That would be Fox Sports 1 and Fox Sports 2.

And then, we had some fights we did, as I mentioned Fight Pass, which was a digital over-the-top platform.

It wasn't so much about fighters being as much in the top 10, but when you're talking about the numbered events, typically, those are headlined by the more popular or more accomplished fighters. So by default, they would probably be in someone's top 10 because there's, you know, different rankings

out there at any given time.

**Q. Throughout of your testimony today, I believe --**

A. Yes.

**Q. -- you've referred to the UFC a number of times as a brand.**

**Is that a fair statement?**

A. Yes.

**Q. And in your view, by 2010, what did that brand represent?**

A. In my view, the UFC represented best in class in combat sports, it represented best in class in sports in general. It was finally a recognizable brand.

You've got to understand, when we bought the UFC in 2001, it was probably the most tarnished brand in sports. I mean, it's hard to get worse than Senator John McCain calling us human cockfighting and then living with that for a number of years as the moniker that when people hear the word UFC, the first thing that comes to mind is human cockfighting.

So through the work and the capital we invested and the business strategies that we put in place, yes, by 2010, I believe that the brand UFC represented something that was a positive.

**Q. And did that brand by at least 2010 also indicate to consumers that the UFC's fighters were the best in the world?**

A. That's what we -- yes. That's what we set up to accomplish from a branding standpoint.

Whether or not they were, I don't know. But in the eyes of the consumer, the idea was that if a fighter was in the UFC, it meant that they were one of the best fighters in the world.

**Q. And so, fair to say that from a consumer's perspective, even if the consumer didn't necessarily know the fighter by name, the fighter -- or, excuse me -- the consumer would know that when it was watching a UFC event, it was seeing the best fighters, you know, out there at the time?**

MR. ISAACSON: Objection, calls for hearsay and mind reading.

THE WITNESS: Yes. From the standpoint of our branding and our marketing, the idea was that when the consumer saw that there was a UFC fight, they would think they were -- or, assume that they were watching the best.

It's no different than if you go to -- if you go to Tiffany's and buy a diamond, in the consumer's mind, for whatever reason, it's better

than the same exact diamond that maybe you buy down the street. It's the same product, but because it's in the little turquoise box, there's perceived value in that brand. Brands have value, and we believe that we created consumer value in the UFC brand.

BY MR. DELL'ANGELO:

**Q. Regardless of the value of the brand, there's differentiation in the product that different brands sell, isn't there?**

A. Yes.

MR. ISAACSON: Objection to form.

THE WITNESS: Yes.

BY MR. DELL'ANGELO:

**Q. Okay.**

A. Some brands do a better job than others.

**Q. Right. But are you familiar with the jeweler Van Cleef & Arpels?**

A. Yes.

**Q. And are you familiar with a jeweler Zales, for example?**

A. Yes.

**Q. Do you think that they are selling comparable products or products of equal value?**

MR. ISAACSON: Objection.

THE WITNESS: I would say that Van Cleef &

going to be aired on Fox Sports 1.

So we looked at the card. Obviously, the main event of the main card was the biggest fight of the night. But we would pepper in fights all throughout the entire night. Also, as a way to get fans to show up to the venues early because they were fights that mattered. It was part of our business strategy.

**Q. When the UFC would put on a pay-per-view event, were all the fights on the card televised?**

A. In the early days, no. And then, at some period, when we were on Spike TV, prior to our Fox contract, we actually learned from Affliction. They came up with a great idea. They did their first pay-per-view. It was a smashing success for them. And they broadcast their prelims on cable TV.

We were like, that's a really good idea. And pretty much from there on out, I think we started broadcasting our prelims on Spike.

And then, once again continued do that as a strategy with Fox.

And then, when technology developed to the point where you could do live streaming, we added Fight Pass -- or actually, I just reminded myself, we first started broadcasting the first two or three

fights on Facebook. We were actually the first sports organization to broadcast and stream a live event on Facebook in a way to get broad distribution and eyeballs.

So over time, it evolved into that, yes.

**Q. And despite Affliction's great idea, they're no longer in business either, right?**

A. They are not in business, no.

**Q. Have you ever sought to calculate what percentage of Zuffa's revenue is paid to fighters as fighter compensation?**

A. Yes.

**Q. And have you made that calculation for every year that the company is in business?**

A. Yes, I'm pretty confident we have.

**Q. And is it fair to say that's probably a relatively easy calculation to make if you have financials or the income statements?**

A. Yes.

**Q. Okay. So do you know what the percentage of revenue, of Zuffa's revenue that was paid to fighters as fighter compensation in 2009?**

A. I don't specifically -- no, I don't specifically know the amount paid in 2009.

**Q. Okay.**

A. I have a general percentage of what percentage that's paid to fighters over time.

**Q. Okay. And what is that?**

A. So when looking at UFC fighter pay, a lot of times, people want to try to compare us to other sports' percentage, but there are some issues there.

And one of the things I've always felt strongly about and believe is you've got to put apples for apples when you're starting to compare percentages. You can get -- you can get false information if you don't otherwise do that.

UFC is very different from other sports entities and sports leagues. And what I mean by that is that we bear all the cost of production and marketing for an event compared to, say, other leagues which, typically what they do is they take a license from a network, and they essentially hand that network the responsibility of broadcasting that event, promoting that event, marketing that event.

[redacted]

[redacted]

**Q. And can you explain what that means?**

A. Sure. Sure.

So if you're another sports league and a network pays you a hundred dollars because that network is going to bear the expense of all the production and marketing -- and by the way, they're also going to sell ads and generate revenue on that end, that revenue and that expense doesn't sit on the income statement or balance sheet of that company.

So they get the license fees, and they don't have the same expenses associated with the event that we would because we're actually incurring all those costs.

[redacted]

[redacted]

Q. Have you from time to time compared the percentage of revenue paid by Zuffa to fighters to the percentage of revenue paid to athletes in other sports?
A. Yes.
Q. Do you recall doing so publicly?
A. Yes.
Q. What do you recall about that?
A. I recall -- first of all, I will say that I did a lot of interviews. Like I mentioned before, a lot of interviews.
But I remember doing a specific interview with ESPN where the subject matter of their interview was specifically fighter compensation and fighter payment. That's why I recall that specifically.
Q. Right. And what do you recall saying, if anything, about the percentage of revenue that Zuffa paid to fighters compared to the percentage of revenue paid by other sports --

A. Sure.
Q. -- that --
A. Sure. My recollection of that is that I said that we felt like we compared favorably to other sports.
I know a lot of other sports throw out these terms like, you know, we pay 50 percent to our athletes.
And what I tried to explain to the reporter who was asking me questions was something similar to what we talked about, that it's very hard to compare the UFC with those other established leagues because the business models are different from that standpoint, we have to bear more overall costs for the event.
Unfortunately, what I failed to point out was that it really is completely unfair for anybody to be comparing UFC's financials to that of the NFL or Major League Baseball or the NBA. It's really not a comparison, and really, a more comparable sports league would have been something more like Major League Soccer, which had about the same -- been around for almost the same period of time, whereas, you know, I think baseball has been around for over a hundred years and the NFL has been around for a very

long time and basketball since the '40s or '50s.
Q. Do you recall comparing internally with your colleagues at Zuffa the percentage of revenue paid to fighters versus the percentage of revenue paid to players in the NFL?
A. Yes. I'm sure we talked about that.
Q. [redacted]

242

would --

**Q. Sure.**

A. -- be great.

**Q. Did Zuffa ever seek to prevent the development of mixed martial arts brands that might compete with Zuffa or mixed martial arts related brands that Zuffa anticipated that it might develop?**

A. No.

243

244

245

**Q. Does that same concept explain why fighters are not permitted to have over sponsors?**

A. At one time -- there's really two -- two reasons.

Actually, yes, that is a reason. We actually -- "we" meaning UFC -- had a relationship with an online poker business called Ultimate Poker.

So it was standard practice that if the UFC had a category -- it didn't prevent fighters from having other competitors in that category as sponsors, they just couldn't wear it within our broadcast.

**Q. To the extent that a fighter had such a sponsorship, that is, with a separate beer brand, for example, am I correct that the UFC also precluded the fighter from associating himself in any way with the UFC as it related to the sponsorship?**

A. So if a fighter had a sponsorship relationship with a competing brand, your example, to Bud Light, they absolutely could have that relationship, and they could use their likeness or whatever they wanted; they just could not use the UFC along with it because we own the UFC license.

**Q. Right. So the fact that an individual athlete like a UFC fighter had participated in the UFC, he or she couldn't use that background to facilitate his sponsorship relationship and revenue, right?**

A. I don't know that that is the case.

He certainly couldn't -- he or she, I should say, certainly couldn't use the UFC logo, the UFC trademarks. The fact that he or she was a UFC fighter is history. I mean, yes, I mean, it is what it is.

But it's similar to other sports. I get a kick every time I see Shaquille O'Neal doing Icy Hot commercials, and I never see him wearing a Miami Heat jersey or an Orlando Magic jersey or a Los Angeles Lakers jersey. It's standard practice when professional athletes do sponsorships outside of something that their team or their league has some type of relationship with that they're not allowed to use the marks of the team or the league, et cetera.

**Q. Is that true in individual sports as well?**

A. I don't know.

**Q. Has Zuffa ever used threats to intimidate a fighter?**

A. No, not in my opinion.

**Q. Has it ever used a threat to scare a fighter?**

A. No.

**Q. Has it ever used a threat to gain leverage in a negotiation with a fighter?**

A. No. We've taken some hard negotiating positions for sure. I wouldn't call them threats, though.

**Q. Has Zuffa ever used a threat to negatively impact a fighter's value to a potential competitor?**

A. Not that I'm aware of.

**Q. Do you recall ever receiving complaints from fighters or their managers that the UFC or members of the UFC had spoken with fighters in a threatening manner?**

A. I'm sure that I had some conversation --

MR. ISAACSON: Objection to form.

THE WITNESS: I'm sure that I've had some conversations with fighters and managers maybe that weren't happy with negotiations, maybe because they weren't going the way they wanted them to, maybe because -- maybe because, from a stylistic standpoint, they weren't happy with that.

But when you use the word "threat," I would say no, not a threat.

**Q. Okay.**

A. Can I take you up on that bathroom break for a second?

**Q. Absolutely.**

A. I spoke a little bit too soon.

How long has it been?

MR. ISAACSON: We've been going for a little over two hours.

THE WITNESS: Two hours?

THE VIDEOGRAPHER: We're going off the record at approximately 4:09 p.m.

(There was a recess taken.)

(Exhibit 26 was marked for identification by the reporter.)

THE VIDEOGRAPHER: We're going back on the record. The time is approximately 4:26 p.m.

BY MR. DELL'ANGELO:

**Q. Mr. Fertitta, you have before you a one-page email that's been marked as Exhibit 26.**

**Have you had an opportunity to take a look at it?**

A. Yes.

286

experienced fighters.

That was just my way of trying to explain to the media and to people who asked how fighters are compensated, not necessarily any matrix or anything like that.

[redacted]t.

As a standard tool for management, we had what we'll call minimums. And what that would mean was that most fighters when they first come in in their first fight in the UFC -- once again, not all but most fighters would sign for what we would call a minimum amount, which I believe is 10,000 to show, 10,000 to win, it could be 12,000 to show, 12,000 to win. I don't know where it is right now.

**Q. Could you look at Exhibit 24, page 33 of 178.**

[redacted]

287

[redacted]

288

[redacted]

**Q. Let me show you what I'm marking as the next exhibit, 29, I believe.**

**(Exhibit 29 was marked for identification by the reporter.)**

**BY MR. DELL'ANGELO:**

**Q. Do you have Exhibit 29 before you?**

A. I do.

**Q. Do you recognize the document?**

A. I do.

[redacted]

289

[redacted]

290

[redacted]

291

[redacted]

292

[redacted]

Q. All right. I think -- why don't we take a break. We're coming to a close on our record time.

THE VIDEOGRAPHER: We're going off the record at approximately 5:26 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We're going back on the record. The time is approximately 5:37 p.m.

MR. DELL'ANGELO: So we'll note for the record that in light of counsel's objections about the introduction of publicly available documents that were not produced in discovery, the fact that the

293

Mercer issue has not been resolved and that we have not received a privilege log, we're not going to close the deposition, but we don't have any further questions subject to those issues.

MR. ISAACSON: I will note that the objection to which you referred to, I did not -- I did not stop you from asking any of your questions on the basis of that objection in all of your questions. You had the ability to ask all of your questions.

Are you done?

MR. DELL'ANGELO: Yes.

MR. ISAACSON: Okay.

THE VIDEOGRAPHER: No further questions from anyone?

MR. ISAACSON: I'm going to just ask a few questions while we're here.

EXAMINATION

BY MR. ISAACSON:

**Q. Do you have Exhibit 29 -- actually, Exhibit 27, sir?**

A. Yes.

**Q. Exhibit 27 was an article that you were shown with comments about Dana White and Quinton "Rampage" Jackson, and you were asked to look at the**

**last paragraph of the article.**

**And the second-to-last paragraph says:**

**"Jackson," referring to Rampage Jackson, "mad that White had been critical of him for taking the role said that he wasn't coming back."**

**Q. All right. Let me see if I can work backwards through your pile to Exhibit 21.**

**Do you have Exhibit 21?**

A. I'm sure I have it somewhere here. What does it look like?

**Q. It says, "LexisNexis" in the upper left.**

A. There we go.

**Q. All right. Exhibit 21 is a news article dated September 29th, 2008. So we're talking about the year 2008.**

**And that's where you were shown on page 3**

**of this article a quote that was towards the bottom:**

**"UFC doesn't seem to worry much about the other companies in the MMA field, and" you, sir, "pull no punches about the competition. 'No one's ever successful except us, he said, there is no No. 2'."**

**There's what you were saying in 2008, right?**

A. Yes.

**Q. And on page 2 at the top, there's another quote from you in the third paragraph.**

**Was this also something you said in 2008?**

**"People associate the sport with UFC; we've had a very strong brand. No one else has been successful with this except us. There is a long list of tombstones."**

**Is that something else you said in 2008?**

A. Yes.

**Q. And then, the article says, "UFC almost ended up in the same graveyard," and it talks about your history.**

**Is that something that you agree with?**

A. Yes.

**Q. Would you explain why.**

A. As I mentioned previously in my testimony, when we started the UFC, there really wasn't much to it except for an idea. We essentially bought some trademarks, some IP. We assumed some fighter contracts and a couple of other commercial contracts with some satellite providers. I think there was a DVD distribution deal in place. It was a very small business, and it was losing money.

From the time period of 2001 to roughly about the beginning of or sometime in 2005, in order to continue to operate the UFC, me and my brother had to continue to fund operations through our own capital.

And there was a point in time, probably around 2004, where I actually made a conscious decision to either shut down the UFC and cease operations, or I thought maybe there was a possibility that we could sell the UFC and get some value, certainly not anywhere near what we had invested but some value to help recoup some of our investment.

And I had Dana go out into the marketplace and talk to a few people in the market that he thought would be interested.

Ultimately, I had a change of heart and decided that I wasn't ready to quit. That, at that time in my career, I hadn't really had any big business failures.

So it was very personal from my standpoint, and really kind of made the decision that we were going to try to figure out how to make this business work one way or the other.

And we were very close to shutting down, but we ended up deciding to take one more risk.

And back then at that time, media companies wouldn't -- would barely take a meeting with us, let alone pay us money for our product. So --

**Q. Thank you.**

A. -- we decided to move forward.

**Q. All right. Let me ask you two more things.**

**Exhibit 24, which is the large exhibit of text messages, do you have that?**

A. Yes.

**Q. A few minutes ago, you were asked about page 75.**

A. Yes.



STATE OF ______________ )
) :ss
COUNTY OF _____________)

I, LORENZO J. FERTITTA, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
LORENZO J. FERTITTA

Sworn and subscribed to before me, this day of , 2017.

______________________
Notary Public

CERTIFICATE OF REPORTER

I, Cynthia K. DuRivage, a Certified Shorthand Reporter of the State of Nevada, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

Reading and signing by the witness was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: April 6th, 2017

______________________
CYNTHIA K. DuRIVAGE
CCR No. 451

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE
___ ___ CHANGE:______________________
REASON:______________________
___ ___ CHANGE:______________________
REASON:______________________
___ ___ CHANGE:______________________
REASON:______________________
___ ___ CHANGE: ______________________
REASON:______________________
___ ___ CHANGE: ______________________
REASON:______________________
___ ___ CHANGE: ______________________
REASON:______________________

______________________ __________
WITNESS' SIGNATURE DATE