# EXHIBIT 12

# Redacted Excerpts from the Second Deposition of Dr. Hal J. Singer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

CUNG LE, NATHAN QUARRY, JON : CIVIL ACTION
FITCH, BRANDON VERA, LUIS   :
JAVIER VAZQUEZ, and KYLE    :
KLINGSBURY on behalf of     :
themselves an others        :
Similarly situated,         :
            Plaintiffs      : CASE NO.
                            : 2:15-cv-01045-RFB
        vs.                 : (PAL)
                            :
ZUFFA, LLC d/b/a ULTIMATE   :
FIGHTING CHAMPIONSHIP and   :
UFC,                        :
            Defendants      :

- - -

Tuesday, January 23, 2018
DAY 2

- - -

Continuation of videotaped deposition of HAL J. SINGER, Ph.D., taken pursuant to notice, was held at the offices of BERGER & MONTAGUE, P.C., 1622 Locust Street, Philadelphia, PA 19103, commencing at 10:19 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
866.624.6221
www.MagnaLS.com



Page 375

1  it's not -- it's certainly not necessary
2  to engender competitive outcomes so long
3  as the markets are more open, less
4  restrictive and rivals get a foothold and
5  are able to put forward compelling
6  matches for MMA audiences.
7       Q.   Are there -- at this point,
8  following your rebuttal report, is it
9  your opinion that there are many ways to
10 get to a lower foreclosure share that
11 would constitute an appropriate but-for
12 world?
13      A.   Well, remember, all that
14 needs to happen to get to a lower
15 foreclosure share is that Zuffa would
16 need to change the parameters of its
17 contracts with fighters in such a way as
18 to ensure that the cumulative duration of
19 the restrictions don't take you over some
20 level that a Court would deem
21 exclusionary.
22      That's all you need to get
23 the foreclosure share down.  We had
24 talked about whether 30 months -- 36

Page 376

1  months was too long and, you know, what
2  would be a -- what would be a duration
3  that would be acceptable to a Court.
4       That, to me, is really the
5  key element of what you need in a
6  contract to bring the foreclosure share
7  down to levels of zero, 20 or 30 percent.
8  After that, what we are doing here is we
9  are just filling in other aspects of the
10 but-for world that would complement or be
11 consistent with that -- with that
12 outcome.
13      Q.   All right.  So in your
14 opinion, does but-for world have to
15 include contracts that are -- exclusive
16 contracts that are no longer than one
17 year?
18      A.   Well, I think we went
19 through this in the first -- in the first
20 deposition.  But, again, I mean, my
21 answer is not going to change.  It's
22 going to be -- it's going to depend on
23 where -- where the Court would draw the
24 line as to what's considered to be an

Page 377

1  exclusionary arrangement.
2       Now, I have tried to inform
3  the Court based on what I think is the
4  average career span of a fighter and
5  that -- and that when we -- when we
6  figure out how to draw that line, we
7  ought to take into consideration how much
8  of a fighter's remaining career span is
9  left after they sign with Zuffa.
10      But depending on where that
11 line gets drawn, Zuffa could then
12 construct its contracts in such a way as
13 to comply with that -- with that line,
14 and with an important caveat:  So long as
15 30 percent, say, is tolerated, they
16 could -- they could carve off 30 percent
17 or, in fact, more if the market share is
18 not quite 100 percent.  They could carve
19 off a certain portion of their fighters
20 and subject them to potentially longer
21 contracts.
22      So there is not -- there is
23 not a -- there is not one way to get a
24 foreclosure share under 30, as we

Page 378

1  discussed.  There are a lot of ways to
2  get it down.  But these other parameters
3  that I am informing right now are things
4  that help fill in what the but-for world
5  would look like.  They are meant to
6  complement or be consistent with.  But
7  they're -- I think that while we have
8  been going in circles, these other
9  parameters, while important, aren't the
10 levers that are pushing foreclosure down
11 to 30, 20 or zero percent.
12      Q.   Okay.  One simple point I
13 had been wondering about based on the
14 support, you had told me before that
15 there is not one way to get foreclosure
16 share under 30; there are a lot of ways
17 to get it down.
18      That's still your opinion?
19      A.   Oh, sure.  I just gave
20 you -- I just gave you two ways to do it.
21 One could be across the board, every
22 single contract contains the same
23 provision.  That would get you down.
24 Another way to do it would be to do a

Page 383

1     Q.   And from that -- and from
2  that, your models -- your damages models
3  and your second impact model would
4  estimate -- would estimate damages impact
5  from that but-for world?
6           MR. CRAMER:  Objection to
7       form.
8           Go ahead.
9           THE WITNESS:  If you give me
10      a but-for foreclosure share, I can
11      tell you what the -- what the --
12      how much wages would go up by.
13 BY MR. ISAACSON:
14     Q.   All right.  Now, if the
15 Court were to rule that an exclusionary
16 contract is over two years and it's not
17 exclusionary, it's two years or less, if
18 you -- would an appropriate but-for world
19 then be contracts that were two years or
20 less, plus some other parameters, and
21 that would achieve a foreclosure share of
22 30 percent or less?
23          MR. CRAMER:  I am going to
24      object to the extent that this

Page 384

1       calls for a legal conclusion.
2           But go ahead and answer, if
3       you understand the question.
4           THE WITNESS:  Let me -- it
5       was a two-parter and let me take
6       the second part, which is probably
7       easier.  And that is, would it --
8       would it get you to a foreclosure
9       share below 30 percent?  And I
10      think that by the construction of
11      your hypothetical, it would, if I
12      understood it correctly.  You are
13      saying the Court deems anything in
14      excess of 24 months --
15          MR. ISAACSON:  Right.
16          THE WITNESS:  -- to be
17      exclusionary -- let me finish --
18      and you asked me to posit a world
19      in which the contracts were
20      exactly 24 months.
21 BY MR. ISAACSON:
22     Q.   My intent is this question
23 two is the same as the last question.  If
24 the Court has ruled that above two years

Page 385

1  is exclusionary and in the first
2  question, that they ruled that above one
3  year was exclusionary.  Everything else
4  -- everything else is the same.
5           MR. CRAMER:  Same objection.
6  BY MR. ISAACSON:
7      Q.   You would still -- if Zuffa
8  moved its contracts down to two years or
9  less, that would achieve foreclosure
10 shares of 30 percent or less?
11     A.   I think that if we draw the
12 line, if one were to draw the line at 25
13 months and if -- and if all of the
14 contracts came in at 24 months, then it's
15 almost tautological.  If that's how we
16 define foreclosure, then the foreclosure
17 would come in at less than 30 percent.
18     Q.   And in that situation, you
19 would reach the same conclusion as to the
20 amount of damages and your second impact
21 analysis -- second impact model would
22 remain the same?
23          MR. CRAMER:  Objection to
24      form, incomplete hypothetical,

Page 386

1       calls for a legal conclusion.
2           THE WITNESS:  I want to
3       think about it a little more, but
4       sitting here, it's not -- it's not
5       obvious how I would change my
6       impact model or damages model
7       based on that hypothetical.  I
8       probably would want to think about
9       it a little more.
10          But my -- what's giving me
11      some reservation is that -- I
12      wouldn't draw the line at 24.  I
13      think the 24 represents too much
14      of a fighter's life span or career
15      span.
16          And so that -- while it
17      would be a significant improvement
18      over where things are today, it's
19      conceivable that a movement
20      from 36, roughly where we are
21      today, to 24, would it engender
22      different competitive effects than
23      a movement from 36 to 12?  I mean,
24      certainly at 12, the market is

Page 455

```
 1   of the top-tier labor economics journals?
 2          MR. CRAMER:  Misstates the
 3       testimony.
 4          THE WITNESS:  Beyond the
 5       ones that I just gave you?  I
 6       don't know if I could -- if I
 7       could give you others.
 8   BY MR. ISAACSON:
 9       Q.  Well, which ones have you
10   named by name?
11       A.  I think I gave you
12   the Journal of Labor Economics.  I think
13   I gave you Review of Labor Statistics, I
14   believe is one.  I am going by memory
15   here.  I think I have seen some specialty
16   journals as well.
17          I certainly cite articles,
18   but I don't -- I don't -- in various
19   labor journals.  But I would refer you to
20   the rankings instead of going by my
21   memory of labor journals.
22       Q.  Okay.  And you mentioned the
23   subfield of sports.  Are there leading
24   journals in that field that you could
```

Page 456

```
 1   name?
 2       A.  I don't know if I could name
 3   them.  I certainly cited articles from
 4   them, but I would refer you to the same
 5   rankings.
 6          THE VIDEOGRAPHER:  Excuse
 7       me, Counsel.  We are approaching
 8       ten minutes left on the disc.
 9          MR. ISAACSON:  Okay.
10          - - -
11          (Off the record at this
12       time.)
13          - - -
14          MR. ISAACSON:  Why don't we
15       just change the tape.
16          THE VIDEOGRAPHER:  The time
17       is 12:22 p.m.  This is the end of
18       Disc 1.  We are off the record.
19          - - -
20          (Off the record at this
21       time.)
22          - - -
23          THE VIDEOGRAPHER:  The time
24       is 12:31 p.m.  This is the start
```

Page 457

```
 1   of Disc 2.  We are on the record.
 2   BY MR. ISAACSON:
 3       Q.  You talked before about how
 4   individual marginal revenue product
 5   varies between fighters, and I think we
 6   agree that fighter compensation agrees
 7   between various fighters.
 8          Does current fighter
 9   compensation vary between fighters in the
10   same way that the individual marginal
11   revenue product varies between the
12   fighters?
13          MR. CRAMER:  Objection to
14       form.
15          THE WITNESS:  You used the
16       word "same" and that's what I am
17       tripping up on.  There is
18       certainly a relationship between a
19       fighter's MRP and his or her
20       compensation.
21   BY MR. ISAACSON:
22       Q.  Would you describe that
23   relationship as significant, substantial
24   or minimal or --
```

Page 458

```
 1       A.  Again, I am going to go back
 2   to just basic labor theory, that in a
 3   competitive market, the fighter's
 4   compensation would be equal to his or her
 5   MRP, in a perfectly competitive -- let me
 6   stipulate or let me add that caveat.  In
 7   a monopsonized labor market, there is a
 8   wedge between the MRP and the
 9   compensation.
10          And there is certainly a
11   relationship under both extremes, of the
12   monopsonized market and the perfectly
13   competitive market.  And part of the
14   theory of the case is, as you know, that
15   the conduct here upset that normal
16   transmission mechanism, that is, it upset
17   what would have otherwise -- what gains
18   to fighter productivity that would have
19   otherwise been passed along in the form
20   of higher wages didn't occur, in my view,
21   as they -- as they would have in a world
22   absent the restrictions on fighter
23   mobility.
24       Q.  All right.  I understand you
```

MAGNA LEGAL SERVICES

Page 459

```
 1   to be saying that in the current world,
 2   that gains in individual marginal revenue
 3   product won't translate into individual
 4   compensation in the same way as they
 5   would in a competitive world.  Then the
 6   competitive world, more of the marginal
 7   revenue product, would translate into
 8   compensation.
 9       A.   More of the gains.
10       Q.   More of the gains.
11       A.   Yes.
12       Q.   Is there -- however -- with
13   the understanding that there is not the
14   same quantitative amount of translation,
15   is the -- is there still some sort of
16   linear relationship between the rate they
17   are going up?
18       A.   Again, it depends on whether
19   we are dealing with an open and free
20   labor market or a -- or a labor market
21   that is subject to a monopsony.
22            What we have observed here
23   is that fighter compensation, although it
24   was rising, did not -- did not keep up
```

Page 460

```
 1   with the rate of growth in event
 2   revenues, and I am positing that in a
 3   more competitive environment indeed
 4   showing, based on my econometric model,
 5   that the rate of increase in compensation
 6   would have been higher and more in line
 7   with the rate of increase in event
 8   revenue.
 9       Q.   Now, you talked before about
10   your estimates of median career length,
11   and I believe in your rebuttal report,
12   it's approximately 41 months or five
13   bouts, fights.
14       A.   I think that I spent more
15   time estimating the duration and months
16   than in bouts.  I think that -- I think
17   that the relevant -- the relevant figure
18   here for what we are fighting about is
19   the duration as measured in months.
20       Q.   All right.  And to do
21   that -- to do that analysis, you used
22   data obtained from sherdog.com; is that
23   right?
24       A.   I believe so, yes.
```

Page 461

```
 1       Q.   And to do that calculation,
 2   you calculated a career length using
 3   fights for only those promoters in the
 4   tracked market; is that correct?
 5       A.   Are you speaking about in my
 6   rebuttal report?
 7       Q.   As of today, where do you
 8   stand on this issue?
 9       A.   I think the best estimates
10   as of today is what's in my rebuttal
11   report.  I think I have tried to -- I
12   have tried to cut it every which way
13   that's -- what I consider to be
14   ████████████████████████████████████
15   ████████████████████████████████████
16   ████████████████████████████████████
17   ████████████████████████████████████
18   ████████████████████████████████████
19       Q.   All right.  And for your
20   estimates, you relied on data from
21   sherdog.com?
22       A.   I think that is the
23   beginning of it.  I think I need more
24   than just Sherdog, but I think that that
```

Page 462

```
 1   is the starting point of my analysis.
 2       Q.   And then you calculated
 3   career length using fights that appeared
 4   in FightMetric?
 5       A.   It sounds right, but I think
 6   I just feel more comfortable -- given how
 7   detailed the analysis was, I would
 8   probably feel more comfortable going
 9   there and telling you exactly what we
10   did.
11       Q.   All right.  You have got
12   your rebuttal report in of front of you,
13   if you want to look at it.
14       A.   Okay.  Let me see.  If you
15   have the chart handy, that might get us
16   there faster.  If not, I will try to find
17   it.
18       Q.   It might be on page 53.  You
19   have got median and mean duration to
20   Table 1 there.
21       A.   Right.  But I think -- I
22   think I now -- I now see what was
23   tripping me up.  You had imposed a
24   requirement, the added requirement that
```

Page 463

```
 1   we only measure their career span while
 2   they are within the relevant input
 3   market, and that's only the case for the
 4   second and third rows, you see.  I think
 5   you --
 6       Q.  You -- I see.  All right.
 7       A.  And the third market is yet
 8   a different -- I mean, those are
 9   different -- those are different market
10   definitions.  And I think you asked me
11   for one in particular.
12       Q.  All right.  So when you say
13   that your best estimate of the career of
14   a fighter is found in your rebuttal
15   report, would that be Table 1 on page 53
16   of your report?
17       A.  Correct.
18       Q.  And there, you look at four
19   different things.  One is limited to when
20   Zuffa fighters are fighting in Zuffa
21   bouts; is that right?
22       A.  Correct.
23       Q.  So that would exclude Zuffa
24   fighters who fought for other promoters
```

Page 464

```
 1   either before or after their career at
 2   Zuffa?
 3       A.  Correct.
 4       Q.  And then you use the
 5   relevant input market tracked measure.
 6   That is based on FightMetric data,
 7   correct?
 8       A.  Correct.
 9       Q.  And that would be -- and you
10   would only be calculating fights that
11   were for the promoters in that market, in
12   that -- in FightMetric?
13       A.  Correct.  When they go
14   outside of the relevant input market as
15   defined by the tracked measure, then they
16   would no longer be considered to be
17   active in their career.
18       Q.  All right.  And you would --
19   and then for the third way you would look
20   at it, you would look for the ranked
21   measure, which is -- which would include
22   only the promoters in FightMetric?
23       A.  Well, my ranked measure
24   members starts with a set of all fighters
```

Page 465

```
 1   in FightMetric and then expands it
 2   to also include those that are in Fight
 3   Matrix I think plus another promotion as
 4   well.
 5       Q.  I think they are totally
 6   over overlapping, but let me -- let me --
 7       A.  Oh, it's true that the way
 8   it's constructed, the tracked measure of
 9   the market definition sits perfectly
10   inside of the ranked measure, right.
11       Q.  All right.  So the ranked
12   measure includes all the promoters who
13   are either in Fight Matrix or
14   FightMetric?
15       A.  The fighters associated with
16   promoters, correct, yes.
17       Q.  So if you had fights outside
18   of those promoters, those would not be
19   counted as part of your career?
20       A.  Again, I just want to be
21   careful that as we moved to the ranked
22   measure, the -- it's the fighter that is
23   driving the analysis, not his or her
24   associated promoter, right?  It doesn't
```

Page 466

```
 1   begin with a set of promoters.  It
 2   happens to generate a set of promoters as
 3   a byproduct.  But here, fighters are
 4   going to be included regardless of who
 5   their associated promoter is so long as
 6   they have a rank higher than 650.
 7       Q.  Right.  But I'm not talking
 8   about market definition now.  I am just
 9   talking about how you calculate the
10   median career of a fighter.
11       A.  Sure.
12       Q.  If they -- if they had
13   fights outside of the promoters who are
14   counted in FightMetric or Fight Matrix,
15   those would not be counted as part of the
16   fighter's career?
17       A.  I wouldn't -- I wouldn't put
18   it that way.  I would feel more
19   comfortable saying something like that
20   with respect to the FightMetric measure,
21   which is the tracked measure, because
22   that is driven by the identity of the
23   promoter.
24           The identity of the promoter
```

Page 527

```
 1      some help.  So promoters inside of
 2      my relevant market or outside of
 3      my relevant market?
 4   BY MR. ISAACSON:
 5      Q.   Yes, promoters inside your
 6   relevant market.
 7      A.   Remember -- the question
 8   doesn't make any sense because it's a
 9   hypothetical monopsonist pushing the
10   wages down, so it is the only -- it's the
11   only buyer in the relevant market.
12      Q.   In each of the relevant
13   markets that you defined, did you assume
14   that Zuffa was the only relevant buyer?
15      A.   No.
16      Q.   In the -- for example, in
17   the tracked market, did you test whether
18   if you reduced the individual pay of
19   Zuffa fighters, Bellator would step in
20   and pay the -- pay the amount they were
21   being paid and the fighter would move to
22   Bellator?
23      A.   I don't think the question
24   makes sense given that Bellator wasn't
```

Page 528

```
 1   included in the -- in the tracked market
 2   or at least -- sorry -- or at least
 3   Bellator's fighters.  Remember, we are
 4   contemplating a hypothetical monopsonist
 5   who controlled all of the fighters in the
 6   tracked market, including Bellator's
 7   fighters.  Would that be a sufficient
 8   number of fighters such that you could
 9   push wages below competitive levels.
10      Q.   All right.  Bellator is a
11   promoter in the tracked market, right?
12      A.   Correct.
13      Q.   So is Affliction, correct?
14      A.   Anyone who was tracked by
15   FightMetric.
16      Q.   Okay.  So was WEC and
17   EliteXC?
18      A.   I can't tell you by memory
19   if those were or were not.
20      Q.   And did you -- I am just
21   trying to understand by the end of your
22   reply report what SSNIP analysis you have
23   done.
24           Did you do any actual
```

Page 529

```
 1   testing to experiment to say what would
 2   happen if Zuffa lowered what it's paying
 3   its fighters, whether those fighters
 4   would move to another promoters, such as
 5   Bellator, World Series of Fighting?
 6           MR. CRAMER:  Asked and
 7      answered.
            [redacted]
19   BY MR. ISAACSON:
20      Q.   Other -- so you looked at
21   record evidence.
22      A.   Yes.
23      Q.   Other than looking at the
24   record evidence, did you do any testing
```

Page 530

```
 1   to determine whether fighters in any of
 2   your -- in any of your markets you were
 3   defining would move to another promoter,
 4   such as Bellator or World Series of
 5   Fighting, if their individual pay
 6   declined?
 7           MR. CRAMER:  Objection to
 8      form.
 9           THE WITNESS:  When you think
10      about it, once you get into the
11      tracked, and particularly once you
12      get into the ranked, the market is
13      drawn so broadly that it subsumes
14      all of these rival promoters.  So
15      the question just doesn't make
16      sense as posed.  They are all in
17      the relevant market.
18   BY MR. ISAACSON:
19      Q.   Well, are you saying that
20   all -- all the rival promoters are in the
21   tracked market or in the ranked market or
22   in both?
23      A.   No, that's not what I am
24   saying.  I'm saying that your question
```

Page 531

1  pertained to Bellator, I think, and
2  Bellator is inside of the tracked.  And
3  so it doesn't make sense to ask whether a
4  fighter in this hypothetical market would
5  substitute to Bellator.  It's already in
6  there.  We are asking if you control all
7  of those fighters, in addition to Zuffa's
8  fighters, in addition to whoever else is
9  inside of the tracked market, would that
10 be enough to permit you to exercise
11 monopsony power.
12        So I could help you along,
13 but asking if they would substitute to
14 Bellator isn't -- is nonsensical.
15       Q.   Well, you agree with me that
16 for the tracked market, Bellator,
17 EliteXC, WEC and other promoters are
18 participants in that market?
19       A.   I don't like to put it that
20 way, no.
21       Q.   All right.  Do you agree
22 that they are customers for the fighters?
23       A.   They are buyers in that --
24 in that market, yes.

Page 532

1        Q.   Okay.  So in the tracked
2  market, did you test whether fighters in
3  that market would move to another buyer
4  in that market such as Bellator if their
5  individual pay declined other than
6  looking at record evidence?
7        A.   Again, no, and that's not
8  the relevant experiment to perform.
9        Q.   Okay.  And in the tracked
10 market, did you test whether fighters in
11 that market would move to another buyer
12 in that market such as World Series of
13 Fighting if their individual pay declined
14 other than looking at record evidence?
15       A.   World Series of Fighting, I
16 just can't recall if that's a promoter
17 that was tracked by FightMetric.  You
18 might -- you might be able to help me
19 out, and then I could give you an answer.
20       Q.   World Series of Fighting is
21 included in the -- is included in Fight
22 Matrix in your tracked -- in your
23 tracked --
24       A.   Did you mean to say Fight --

Page 533

1  FightMetric?
2        Q.   Ranked market.
3        A.   Oh, ranked market.
4        Q.   Yes.
5        A.   So have you identified -- I
6  think it would help me.  You have
7  identified a promoter now for the first
8  time in the series of questions that sits
9  outside of the tracked but inside of the
10 ranked.
11       Q.   Yes.
12       A.   Got it.
13       Q.   And maybe it will help if I
14 repeat the question --
15       A.   Okay.
16       Q.   -- if anybody ever reads
17 this.
18       A.   Okay.
19       Q.   The -- in the -- in the
20 ranked market, did you test whether
21 fighters in that market would move to
22 another buyer in the market such as World
23 Series of Fighting if their individual
24 pay declined other than what you have

Page 534

1  said, you looked at revenue evidence?
2        A.   I would say no.  They are --
3  they are already in the ranked market and
4  so we are not looking at substitution
5  within the ranked market.  That's not the
6  relevant inquiry.
7        Q.   Okay.  And -- all right.
8  Now, for each of those markets, let's go
9  to promoters that are outside the market.
10 Okay.
11       So for the tracked market,
12 did you look at -- did you test whether
13 fighters in that -- let me start over.
14       In the tracked market, other
15 than looking at record evidence, did you
16 test whether fighters in that market
17 would move to another buyer outside the
18 market such as World Series of Fighting
19 if their individual pay declined?
20       A.   I think that it was largely
21 informed through record evidence and
22 through other inferences that I made,
23 such as the profitability of Zuffa's
24 weight suppression with a much smaller

Page 535

1   set of fighters. I think that there was
2   not a separate empirical analysis of
3   defection of fighters from -- the
4   promoters included -- in tracked, for
5   example, into the promoters included in
6   ranked but not in tracked.
7        Q.   And your answer would be the
8   same for ranked that -- in terms of the
9   type of analysis you used?
10       A.   Yes.
11       Q.   And your answer would be the
12  same for the headliner submarket?
13       A.   Correct.
14            MR. CRAMER: Whenever it's a
15       good time for a break, we have
16       been going for over an hour.
17            MR. ISAACSON: I think I may
18       be almost finished with something
19       here.
20            MR. CRAMER: Sure.
21  BY MR. ISAACSON:
22       Q.   Did you consider any
23  narrower definitions to the market, by
24  which I mean did you consider a smaller

Page 536

1   market of buyers than your tracked
2   market?
3        A.   Sure, the headliner market.
4   The headliner submarket, as I like to
5   call it.
6        Q.   Was the headliner submarket
7   the smallest market you considered?
8        A.   That is the smallest market
9   I considered.
10            MR. ISAACSON: All right.
11       Why don't we take a break.
12            THE VIDEOGRAPHER: The time
13       is 2:33 p.m. We are going off the
14       record.
15            - - -
16       (Off the record at this
17       time.)
18            - - -
19            THE VIDEOGRAPHER: The time
20       is 2:51 p.m. We are back on the
21       record. This is the start of
22       Disc 3.
23  BY MR. ISAACSON:
24       Q.   Before the break, we were

Page 537

1   talking about the markets you defined.
2   With respect to the tracked market, did
3   you include all of the fighters that
4   fought for all of the buyers in that
5   market?
6        A.   It's conceivable that there
7   are some fighters who were out listed in
8   FightMetric but are affiliated with a
9   promoters who is. It's conceivable. But
10  I think I am more comfortable saying that
11  we let the FightMetric data dictate who
12  was in the market. It's just whoever
13  they tracked.
14       Q.   Okay. And the reason that
15  you didn't include all of the fighters
16  for all of the promoters in the tracked
17  market is because you let the FightMetric
18  data dictate who was in the market?
19       A.   Not really. I think that we
20  are -- we are getting confused again
21  about -- about the market definition
22  exercise and the way that I measured and
23  identified fighters in the market.
24            I used various techniques,

Page 538

1   indirect and direct, of the SSNIP test to
2   try to inform the contours. And I got to
3   an MMA fighter relevant input market, and
4   then I went out and found two databases,
5   one by FightMetric, another by Fight
6   Matrix, that would allow me to inform or
7   populate who the fighters were in that
8   market after we have defined it using the
9   SSNIP test.
10            So I -- I am just hesitating
11  on the way that you put the question.
12  It's not as if the database dictated who
13  was in the market. We defined a market
14  as MMA -- professional MMA fighters, and
15  then we went out looking for databases
16  that would allow us to populate that
17  market with actual fighters.
18       Q.   Did you use the SSNIP test
19  to populate who were the buyers in the
20  market you defined?
21       A.   No.
22       Q.   Why -- why didn't you
23  include all of the fighters who fought
24  for buyers in the tracked market in your

MAGNA LEGAL SERVICES

Page 543

1  A. Yes.
2  Q. Now, your output markets are
3  the live MMA events in which the
4  participating fighters are either in the
5  relevant input market or the relevant
6  input submarket?
7  A. Yes.
8  Q. Okay. And the consumers of
9  the output market include viewers, cable
10 networks, broadcast networks and
11 sponsors; is that fair?
12 A. Well, certainly, viewers and
13 consumers.
14     Can I hear -- can I hear --
15 Q. Viewers, cable networks,
16 broadcast networks, sponsors.
17 A. I feel more comfortable
18 saying that viewers are the -- are the
19 primary consumers in the output market,
20 not the -- not the cable distributors.
21 That's just an intermediary between the
22 viewer and the -- and the producer of the
23 event.
24 Q. So I am not -- I wasn't

Page 544

1  trying to assess anybody as primary or
2  secondary.
3      Rather, consumers -- do the
4  consumers in your output market include
5  viewers, cable networks, broadcast
6  networks and sponsors?
7      MR. CRAMER: Asked and
8      answered.
9      THE WITNESS: I don't recall
10     looking at substitution by
11     sponsors or substitution by cable
12     distributors. I think that the
13     right lens is that of the
14     consumer's perspective, ultimately
15     the viewer.
16 BY MR. ISAACSON:
17 Q. All right. Well, let me use
18 a -- maybe it's my word choice.
19     Are the customers in your
20 relevant output market viewers, cable
21 networks, broadcast networks and
22 sponsors?
23     MR. CRAMER: Objection to
24     form.

Page 545

1      THE WITNESS: And let's just
2      focus on cable networks. Are
3      you -- I took your first question
4      to mean cable distributors. Are
5      you -- are you intentionally
6      making a distinction between cable
7      networks and cable distributors
8      now?
9  BY MR. ISAACSON:
10 Q. No. I am not even sure what
11 you mean by a cable distributors.
12 A. Oh, a cable distributor
13 would be like Comcast, and a cable
14 network would be like a station or a
15 network that appears on the cable system.
16 Q. I mean -- well, let's --
17 let's do both.
18 A. Okay.
19 Q. So -- so Comcast is under
20 your definition a cable station?
21 A. No. Comcast is a
22 distributor.
23 Q. A distributor. Okay.
24 A. Comcast happens to be

Page 546

1  vertically integrated into certain
2  networks as well. But...
3  Q. All right. Okay. So are
4  the customers in your relevant output
5  market viewers, cable stations, cable
6  networks, broadcast networks and
7  sponsors?
8      MR. CRAMER: Form.
9      THE WITNESS: I think that
10     I -- the most natural customer to
11     think of in the output market,
12     which is the consumption of the
13     event, is the viewer. I think
14     that we could -- we could talk
15     about the way that sponsors -- the
16     role that sponsors play in this
17     market and the role that cable
18     networks play, but I -- they are
19     not -- they are not symmetrically
20     aligned with the viewers. And I
21     think that if -- I am trying to
22     recall the methods that I used to
23     define the contours, and I think
24     it was largely from the

Page 547

```
 1      perspective of viewers.
 2   BY MR. ISAACSON:
 3      Q.  So for your relevant output
 4   market, are sponsors customers in that
 5   market?
 6          MR. CRAMER:  Asked and
 7      answered.
 8          THE WITNESS:  I just don't
 9      like using -- I don't like using
10      the word "customer."
11   BY MR. ISAACSON:
12      Q.  Okay.  Are -- in your output
13   market, are sponsors buyers in that
14   market?
15          MR. CRAMER:  Asked and
16      answered.
17          THE WITNESS:  Sponsors are
18      buying advertising slots that are
19      associated with the event itself,
20      but I think the consumption of the
21      event is most properly understood
22      from the lens of the viewer, the
23      consumer.
24
```

Page 548

```
 1   BY MR. ISAACSON:
 2      Q.  So does that mean sponsors
 3   are not buyers in your relevant output
 4   market?
 5          MR. CRAMER:  Asked and
 6      answered.
 7          THE WITNESS:  They buy
 8      advertising slots that are sold
 9      alongside the event itself, but I
10      am -- I am considering the event
11      as the -- as what's being
12      produced.
13   BY MR. ISAACSON:
14      Q.  Okay.  In your relevant
15   output market, are broadcast networks --
16   I guess you don't like using the term
17   "customers" for broadcast networks; is
18   that --
19      A.  They are certainly not
20   the -- not the ultimate customer.  They
21   are an intermediary that gets them
22   between the ultimate customer and the
23   producer.  And only for a small sliver of
24   events.
```

Page 549

```
 1          I think the action, the
 2   television action at least, is occurring
 3   on the pay-per-view side, not on the
 4   non-pay-per-view viewing side.
 5      Q.  As you define your relevant
 6   output market, are broadcast networks
 7   customers or buyers?
 8      A.  I think the broadcast
 9   networks are buying the rights to
10   distribute the events to the ultimate
11   consumer, which is the viewer.  So I
12   still like to think about the consumer or
13   the buyer in the output market, the
14   event, the production of the event as the
15   consumer, the viewer, ultimately.
16      Q.  And so I just need to go
17   over this again because I understand you
18   think the consumer -- you think about the
19   consumer as the -- I guess as the -- as
20   the buyer ultimately, but I am trying to
21   figure out who you are excluding.  I
22   understand you have got the consumers in
23   there.
24          Are broadcast networks
```

Page 550

```
 1   customers or buyers in your -- in the
 2   relevant output market you have defined?
 3          MR. CRAMER:  Asked and
 4      answered.
 5          THE WITNESS:  I think they
 6      are an intermediate -- an
 7      intermediary that stands between
 8      the customers and the producers of
 9      the events, and only for a small
10      sliver of what I consider the
11      valuable television that's being
12      produced here.
13   BY MR. ISAACSON:
14      Q.  So does that mean they are
15   or are not customers or buyers in your
16   relevant output market?
17      A.  I think -- sorry.
18          MR. CRAMER:  I was going to
19      say, same objection.
20          Go ahead.  You may answer.
21          THE WITNESS:  I would -- I
22      would say it depends on how you
23      want to -- what question are you
24      trying to answer?
```



Case 2:15-cv-01045-RFB-BNW   Document 574-13   Filed 07/30/18   Page 13 of 15

Page 551

```
 1   BY MR. ISAACSON:
 2       Q.   I am talking about the
 3   questions you are answering that you are
 4   defining in your market.  I am talking
 5   about your relevant output market.
 6       A.   Sure.
 7       Q.   Are the buyer -- are the
 8   broadcast networks buyers or customers in
 9   that market?
10          MR. CRAMER:  Same objection.
11          THE WITNESS:  I think
12      that -- I would have to go back to
13      my initial report, but if I am
14      remembering correctly, I was
15      looking at to where viewers would
16      go in response to a SSNIP in the
17      output market, not where cable
18      distributors would go, not where
19      cable networks would go.  I was
20      looking at where viewers would go.
21      That's my memory, sitting here
22      today, as to -- as to how I
23      performed the SSNIP in the output
24      market.
```

Page 552

```
 1   BY MR. ISAACSON:
 2       Q.   So at the -- by the end of
 3   your reply report, you have not done a
 4   SSNIP analysis for your output market for
 5   sponsors; is that correct?
 6          MR. CRAMER:  Objection to
 7      form.
 8          THE WITNESS:  I would have
 9      to go back and look at my initial
10      report, but I -- my -- sitting
11      here, I don't -- I don't recall
12      doing that.
13   BY MR. ISAACSON:
14       Q.   Okay.  And at the end of
15   your reports, for your -- for the
16   relevant output market you have defined,
17   you haven't done a SSNIP analysis for
18   broadcast networks; is that correct?
19       A.   I think the same answer.
20   It's possible I had record evidence that
21   spoke to the views of broadcasters, but
22   I -- sitting here, that's not what I
23   recall.
24       Q.   Okay.  For your relevant
```

Page 553

```
 1   output market as you define it, you
 2   didn't do a SSNIP analysis for cable
 3   stations or cable networks?
 4       A.   I don't recall doing a
 5   SSNIP, but I would have to go back and
 6   refer to my -- from that perspective, but
 7   I would have to go back and refer to my
 8   initial report.
 9       Q.   Okay.  And do you -- are you
10   able to say today whether cable stations
11   or cable networks are customers in the
12   relevant output market that you defined?
13       A.   I think that with the caveat
14   that we are studying the non-pay-per-view
15   events, which, of course, are not the
16   important or salient or marketable or
17   valuable component of the content that's
18   being created, I think that you could say
19   that the cable networks can serve as a
20   proxy for the preferences of the ultimate
21   consumers, but I think that I conducted
22   my relevant output market analysis from
23   the perspective of the ultimate consumers
24   or customers, namely, the viewers.
```

Page 554

```
 1       Q.   Are the consumers the only
 2   relative -- relevant customers in the
 3   output market you have defined?
 4       A.   Can I have it back?
 5          - - -
 6          (The reporter read from the
 7      record as requested.)
 8          - - -
 9   BY MR. ISAACSON:
10       Q.   And by "consumers," I mean
11   individuals who attend or watch events,
12   such as myself.
13       A.   I am going to have it back.
14   I am sorry.
15       Q.   Sure.  I don't blame you.
16          - - -
17          (The reporter read from the
18      record as requested.)
19          - - -
20   BY MR. ISAACSON:
21       Q.   And by "consumers," I mean
22   individuals who attend events or watch
23   them.
24       A.   I don't know what it means
```



55 (Pages 551 to 554)

Page 647

```
 1      Q.   All right.
 2           MR. ISAACSON:  Thank you.  I
 3   don't have any more questions.
 4           MR. CRAMER:  Very good.
 5           THE VIDEOGRAPHER:  Okay.
 6   The time is 5:12 p.m.  This is the
 7   end of Dr. Hal Singer's
 8   deposition.  We are going off the
 9   record.
10           - - -
11           (The deposition concluded at
12   5:12 p.m.)
13           - - -
```

Page 648

```
 1              CERTIFICATE
 2
 3
 4      I HEREBY CERTIFY that the
 5   witness was duly sworn by me and that
 6   the deposition is a true record of
 7   the testimony given by the witness.
 8
 9
10
11
12   _____
13   Lori A. Zabielski
14   Registered Professional Reporter
15   CaseViewNet Reporter
16   Dated:  January 24, 2018
17
18
19
20
21
22        (The foregoing certification
     of this transcript does not apply to any
23   reproduction of the same by any means,
     unless under the direct control and/or
24   supervision of the certifying reporter.)
```

Page 649

```
 1         INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over
 4   carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8       After doing so, please sign the
 9   errata sheet and date it.
10   You are signing same subject to the
11   changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14       It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of
17   receipt of the deposition transcript by
18   you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
```

Page 650

```
 1           - - - - - -
 2            E R R A T A
 3           - - - - - -
 4   PAGE   LINE   CHANGE
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
```



```
                                              Page 651
 1          ACKNOWLEDGEMENT OF DEPONENT
 2       I, _____, do
 3    hereby certify that I have read the
 4    foregoing pages,  338-652 PGS, and that
 5    the same is a correct transcription of
 6    the answers given by me to the questions
 7    therein propounded, except for the
 8    correction or changes in form or
 9    substance, if any, noted in the attached
10    Errata Sheet.
11
12    _____
      HAL J. SINGER, Ph.D.        DATE
13
14
15
16
17    Subscribed and sworn
18    to before me this
19    _____ day of _____, 20_____.
20    My commission expires:
21    _____.
22
23    _____
      Notary Public
24
```

```
                                              Page 652
 1          LAWYER'S NOTES
 2    PAGE  LINE
 3    _____ _____ _____
 4    _____ _____ _____
 5    _____ _____ _____
 6    _____ _____ _____
 7    _____ _____ _____
 8    _____ _____ _____
 9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
```