# EXHIBIT 16

## Redacted Excerpts of First Deposition of Dr. Hal J. Singer

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                         : Civil Action
                               : DOCKET NO.
CUNG LE, NATHAN QUARRY,        : 2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,       : (PAL)
LUIS JAVIER VAZQUEZ and        :
KYLE KINGSBURG, on behalf      : CLASS ACTION
of themselves and all          :
others similarly               :
situated,                      :
                               :
          Plaintiffs,          :
                               :
          v.                   :
                               :
ZUFFA, LLC, d/b/a              :
ULTIMATE FIGHTING              :
CHAMPIONSHIP and UFC,          :
                               :
          Defendants.          :

- - -

Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

*   *   *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 6

1          (Exhibit No. Singer-1,
2   Expert Report of Hal J. Singer,
3   Ph.D., No. Singer-2, Errata, and
4   No. Singer-3, Errata II, were
5   marked for identification.)
6          THE VIDEOGRAPHER:  We are
7   now on the record.
8          This begins videotape No. 1
9   in the deposition of Hal J. Singer
10  in the matter of Cung Le versus
11  Zuffa, LLC, in the US District
12  Court for the District of Nevada.
13         Today is Wednesday,
14  September 27th, 2017, and the time
15  is 9:24 AM.
16         This deposition is being
17  taken at 1622 Locust Street in
18  Philadelphia, PA 19103 at the
19  request of Boies, Schiller &
20  Flexner, LLP.
21         The videographer is Sol Tran
22  of Magna Legal Services, and the
23  court reporter is Connie Kent of
24  Magna Legal Services.

Page 7

1          Will counsel and all parties
2   present, please state their
3   appearances and whom they
4   represent.
5          MR. CRAMER:  Eric Cramer
6   from Berger & Montague for the
7   plaintiffs.
8          MR. DAVIS:  Joshua Davis on
9   behalf the Saveri Law Firm for
10  plaintiffs.
11         MR. SILVERMAN:  Dan
12  Silverman, Cohen Milstein Sellers
13  & Toll, on behalf of plaintiffs.
14         MR. SUTER:  Mark Suter,
15  Berger & Montague, on behalf of
16  the plaintiffs.
17         MR. ISAACSON:  Bill
18  Isaacson, Boies, Schiller &
19  Flexner for defendant Zuffa.
20         MR. WIDNELL:  Nicholas
21  Widnell, Boies, Schiller &
22  Flexner, for defendant Zuffa.
23         MR. NAKAMURA:  Brent
24  Nakamura, Boies, Schiller &

Page 8

1   Flexner also for defendant Zuffa.
2          MR. CRAMER:  And on the
3   phone is Augie --
4          THE WITNESS:  Augie Urschel.
5          MR. CRAMER:  Augie Urschel
6   from Economists, Inc.?
7          THE WITNESS:  Correct.
8          MR. CRAMER:  You can spell
9   his name for the court reporter.
10         THE WITNESS:  I don't know.
11  Maybe Augie can spell his last
12  name, Urschel.
13         MR. URSCHEL:  U-R-S-C-H-E-L.
14         THE WITNESS:  Thanks, Augie.
15         THE VIDEOGRAPHER:  All
16  right.  Will the court reporter
17  please swear in the witness.
18         HAL SINGER, having been
19  first duly sworn, was examined and
20  testified as follows:
21         - - -
22         E X A M I N A T I O N
23         - - -
24  BY MR. ISAACSON:

Page 9

1          Q.   So Dr. Singer, for ease of
2   reference, we're putting in front of you
3   Exhibits 1, 2 and 3.  Exhibit 1 is your
4   report, Exhibit 2 is your first errata
5   and Exhibit 3 is your second errata.  And
6   I'll be asking questions about those two
7   today, and if -- when you want to refer
8   to them, I wanted to make sure you had
9   them in front of you.
10         A.   Okay.
11         Q.   All right.  Now, I'm going
12  to ask you hopefully some detailed
13  questions about the various models that
14  you've -- that are included in your
15  report, but let me just ask you some high
16  level questions to make sure I understand
17  what models you have in -- in the report.
18         Now, for purposes of
19  damages, your first two damages models
20  are benchmark -- benchmarks against
21  Strikeforce and Bellator based on the
22  percentage of revenue paid to fighters;
23  is that correct?
24         A.   That is correct.



1      Q.   Okay.  And those -- those
2   models don't include any explanatory
3   variables, they're a simple comparison of
4   the percentage of revenues between firms?
5      A.   I wouldn't put it that way.
6   They are a comparison of fighter wage
7   shares across the two firms.
8      Q.   Right.
9      A.   You said revenues.
10      Q.   You're correct, I misspoke.
11   So thank you.
12          They are -- they don't
13   include any other explanatory variables,
14   they're just a comparison of the
15   percentage of revenue paid to fighters
16   between firms?
17      A.   Well, these -- these are
18   benchmarks and -- and I think by the
19   construction of a benchmark, as opposed
20   to, say, a regression model, which I've
21   also included, these particular damages
22   models don't control for variables --
23   other variables in the same way that a
24   regression model might.

1      Q.   Okay.  Then your next damage
2   model is a regression model, and that
3   shows the relationship -- attempts to
4   show the relationship between Zuffa's
5   foreclosure share and its own percentage
6   of revenue shared with fighters.
7          Do I have that right?
8      A.   Controlling for all other
9   things that could explain variations in
10   Zuffa's fighter wage share, yes.
11      Q.   Okay.  And that model
12   assumes that challenged conduct in this
13   case, as you've defined it in your
14   report, caused the foreclosure.
15      A.   No, I'm -- no, that's not
16   correct.
17      Q.   Okay.  Does it assume
18   that -- well, what caused the foreclosure
19   other than the challenged conduct?
20      MR. CRAMER:  Form.
21      THE WITNESS:  Can I have
22   that question back?
23          (Pertinent portion of the
24   record is read.)

1      MR. CRAMER:  Misstates the
2   testimony, foundation, form.
3      THE WITNESS:  I believe the
4   challenged conduct is the -- is
5   the cause of the foreclosure
6   share, that's correct.
7   BY MR. ISAACSON:
8      Q.   Okay.  And for foreclosure
9   in your regression, you used what -- what
10   you called the tracked fighters
11   foreclosure measure; is that right?
12      A.   Are you speaking of the
13   regression in the damages section?
14      Q.   Well, I think you've used it
15   for several different things, but your
16   foreclosure regression, and maybe if you
17   want to look at Table 6 of your report,
18   page 125.
19      A.   Sorry, the page?
20      Q.   125.
21      A.   Okay.
22      Q.   Now, Table 6 on page 125 is
23   the output of your foreclosure
24   regression, correct?

1      A.   It is the output of one
2   regression specification that appears in
3   a different section of the report,
4   correct.
5      Q.   Okay.  But it is an output
6   of your foreclosure regression, correct?
7      A.   I wouldn't put it -- I would
8   put it -- just to be -- just to clarify
9   what this is, it is the output of the
10   regression of one specification of the
11   regression that I ran in the
12   anticompetitive effects section of the
13   report.  I just want to make sure that we
14   don't conflate anticompetitive effects
15   with damages.
16      Q.   And I'm not trying to.  I
17   understand that this then gets used in
18   damages.  I'll take that next step.  But
19   let's give it a shorthand name?
20      A.   Okay.
21      Q.   Can we call it your
22   foreclosure regression or -- and this
23   would be one output because it's what --
24   the result of one specification, one



1    of the question then.
2           For each of your models, you
3    have a but-for world where the
4    foreclosure share for Zuffa is either
5    zero percent, 20 percent or 30 percent.
6           Do I have that right?
7       A.   I think you've got that
8    right.
9       Q.   Okay.  And that's regardless
10   for what foreclosure is specified in the
11   regression?
12      A.   I'm just -- I wish we could
13   use a different word than specified.
14      Q.   What word would you use?
15      A.   The regression doesn't get
16   to specify the foreclosure share, just as
17   the regression doesn't get to specify how
18   many punches a fighter threw, right, or
19   how many successful punches.
20      Q.   Tell me what word you want
21   me to use.
22      A.   So the regression takes the
23   data as the world presents it.  The
24   regression doesn't get to specify.

1       Q.   Foreclosure is an output of
2    the regression?
3       A.   No, it's an input.  It's an
4    input.
5       Q.   Okay.  So --
6       A.   But the regression doesn't
7    get to -- doesn't get to pick what
8    foreclosure is or specify it.  Maybe I'm
9    misinterpreting what you mean by--
10      Q.   I'm just trying to find a
11   word that you're comfortable with.
12      A.   The regression takes the
13   data as the world presents it and looks
14   for relationships between those data.
15      Q.   Right.
16      A.   All right?  So it doesn't
17   specify.  The -- maybe what would be
18   helpful is that the market definition --
19   the market definition that I choose and
20   the weights that I apply generate a
21   measure of foreclosure share.
22      Q.   Okay.
23      A.   Right?  And then I'm going
24   to apply a regression analysis.  But the

1    regression doesn't get to specify, the
2    regression takes the foreclosure share as
3    an input.
4       Q.   So regardless of the measure
5    of foreclosure share that's generated by
6    any specific model, the world -- you are
7    going to assume for purposes of
8    estimating impact or damages that the
9    actual foreclosure share of Zuffa will be
10   zero, 20 percent or 30 percent depending
11   on the model?
12           MR. CRAMER:  Objection to
13   form.
14   BY MR. ISAACSON:
15      Q.   That's correct?
16           MR. CRAMER:  Objection to
17   form.
18           THE WITNESS:  It was close.
19   You said the model to start the
20   question, and just again to be --
21   to be specific, the regression --
22   the regression doesn't get to pick
23   the foreclosure share.  The
24   foreclosure share flows from which

1    market definition and which
2    weighting method I use, right?
3    That -- that will generate a
4    foreclosure share that gets spit
5    out, I think, of a Microsoft Excel
6    file, and that foreclosure share
7    is going to be spit out alongside
8    each observation in the dataset.
9           The regression finds a
10   relationship between that
11   foreclosure share and the
12   fighters' wage share controlling
13   for all other things and then the
14   regression is done.
15           At that point, I -- I can
16   make use of the parameters that
17   come out of the regression to
18   project what a fighter's wage
19   share would be in a but-for world
20   in which the foreclosure share was
21   lower.
22           Sorry, I'm being -- I'm
23   being attacked here by a gnat.
24   And -- thank you.



1       And I use three different
2    scenarios: Zero percent,
3       20 percent and 30 percent.
4  BY MR. ISAACSON:
5       Q.   Now, when you use a world in
6  which there -- Zuffa has zero percent
7  foreclosure, how does that translate into
8  any -- a market share for Zuffa?
9       A.   Oh, it could accommodate
10  many different market shares for Zuffa.
11  It is -- one way of putting it is almost
12  agnostic to the market share.  It
13  could -- it could accommodate many.
14       You can have -- just to be
15  clear, you can have a high market share
16  and zero foreclosure share if all of your
17  fighters are under, say, 12-month
18  contracts.
19       Q.   And do I understand
20  correctly that if all the Zuffa fighters
21  were under 12-month contracts, you would
22  expect the foreclosure share of Zuffa to
23  be zero or close to zero?
24       MR. CRAMER:  Objection to

1       form.
2       THE WITNESS:  So I -- I deem
3    a fighter to be foreclosed, or to
4    be working or employed pursuant to
5    an exclusionary contract if, as
6    you know, the contract is
7    exclusive and if the duration
8    exceeds a certain number of
9    months.  I use 30 months I think
10    as my -- my baseline approach.
11       And so if you -- if you
12    allow me to use that 30-month
13    baseline or cutoff as a measure
14    for whether a fighter is
15    foreclosed, and if your question
16    posits that every Zuffa fighter
17    under contract is -- is at
18    12 months, then by construction,
19    12 months is less than 30 months,
20    and therefore, under that
21    particular measure of foreclosure,
22    no fighter would be foreclosed.
23  BY MR. ISAACSON:
24       Q.   All right.  Is there any --

1  is there any measure of foreclosure where
2  a 12-month contract, in your opinion,
3  would not result in the zero or near zero
4  foreclosure?
5       MR. CRAMER:  Objection to
6    form.
7       THE WITNESS:  Let me hear it
8    back.  But I don't think I
9    understood it, but let me just
10    hear it.
11  BY MR. ISAACSON:
12       Q.   Well, because you just told
13  me about how your 30-month baseline, and
14  you confined your answer to that
15  particular measure of foreclosure.
16       And I'm asking you, is there
17  any measure of foreclosure where a
18  12-month contract for all Zuffa fighters
19  would not result in zero or near zero
20  foreclosure?
21       MR. CRAMER:  Objection to
22    form.
23       THE WITNESS:  Well,
24    certainly not if you use 30 months

1       as the cutoff, but if -- if the
2    court, for example, were to deem
3    that 12 months with an
4    exclusion -- with an exclusive
5    arrangement were exclusionary,
6    then contracts with 12 months
7    would be exclusionary.  It's
8    tautological.  It depends on where
9    you draw the cutoff and what --
10    what conditions you require for --
11    for one to conclude that a
12    contract was exclusionary.
13  BY MR. ISAACSON:
14       Q.   All right.  So I'm not
15  asking you any questions about what
16  courts rule, I'm asking you questions
17  that come out of your models.
18       Is there any measure of
19  foreclosure in any of your models where a
20  12-month contract for all Zuffa fighters
21  would not result in zero or near zero
22  foreclosure?
23       MR. CRAMER:  Objection to
24    form.  Asked and answered.



1          THE WITNESS:  I'd have to
2     think about it some more, but I
3     think I -- I think I gave you -- I
4     think I gave you what the answer
5     was, which is that it depends
6     on -- on how you draw the -- the
7     line.
8   BY MR. ISAACSON:
9     Q.   All right.  And how would
10  you define zero percent foreclosure?  You
11  said some of your models assume zero
12  percent foreclosure.  How do you define
13  zero percent foreclosure?
14    A.   So no model assumes it.
15  Just to be clear, I'm projecting but-for
16  worlds in which the foreclosure share is
17  zero, 20 or 30 percent.  But I'm
18  interpreting the question as how could
19  Zuffa get to zero percent foreclosure?
20    Q.   Right.  How would you define
21  Zuffa with zero percent foreclosure?
22    A.   It can get -- you could get
23  to zero percent foreclosure in myriad
24  ways.  So I'm not -- I'm not specifying

1   exactly how you get there.  I can give
2   you examples, I think we just did, in
3   which the legal standard is 30 percent --
4   30 months -- sorry.  If the legal
5   standard were 30 months and if counter-
6   factually all of -- well, and if Zuffa's
7   contracts all were 12-month contracts,
8   then the foreclosure share by my measure
9   would be zero percent.
10         But that's just one way.
11  There are -- there are many -- there are
12  many ways to get your foreclosure share
13  down.  You can -- you can divest --
14  divest fighters and send -- send fighters
15  to a -- to an independent organization
16  thereby decreasing your market share and
17  thereby decreasing your foreclosure
18  share.
19         There's -- there are many
20  ways to get to -- to a lower foreclosure
21  share.
22    Q.   All right.  So can you give
23  me some other examples of ways that Zuffa
24  could get to zero percent foreclosure

1   share?
2          MR. CRAMER:  I'm going to
3     object to the extent it calls for
4     a legal conclusion.
5          But you can answer.
6          And asked and answered.
7          THE WITNESS:  I think I've
8     covered -- I've covered the basis.
9     I think that the most -- the most
10    obvious way to construct it is by
11    coming up with a baseline in terms
12    of number of months in which an
13    exclusive contract is deemed
14    exclusionary and positing a world
15    in which Zuffa's contracts come
16    under that -- that cutoff.  They
17    could be 15 months long, they
18    could be 17 months long.
19  BY MR. ISAACSON:
20    Q.   All right.  And that cutoff
21  that needs to be posited, is that a legal
22  cutoff or is that a matter of economics?
23         MR. CRAMER:  Objection to
24    form.

1          THE WITNESS:  I think it is
2     ultimately a legal decision, but
3     it can be informed through
4     economics.  I hope economics can
5     inform the law at times.
6   BY MR. ISAACSON:
7     Q.   All right.  You mentioned
8   reducing the baseline number of months
9   for the exclusive contracts, and you
10  mentioned divesting fighters to -- to an
11  independent organization from Zuffa.
12         Are there any other examples
13  that you can think of as to how Zuffa
14  could reach zero or near zero
15  foreclosure?
16    A.   Sure.  I can keep on coming
17  up with examples.
18         One example would be that
19  there's no exclusivity provision in the
20  contracts.
21    Q.   All right.  That's one.  Are
22  there any other examples?
23         MR. CRAMER:  Asked and
24    answered, form.



1      THE WITNESS:  I can't think
2  of others.
3  BY MR. ISAACSON:
4      Q.   All right.  Now, you do
5  define markets in your report at a high
6  level.  Let me see if I've got what
7  you've got.
8          For input markets, you've
9  defined a tracked market by referring to
10 data from FightMetric -- FightMetrics
11 (sic) right?
12     A.   I certainly use FightMetrics
13 (sic), but I prefer to say that I have --
14 I have a relevant input market and a
15 relevant input submarket, and I use two
16 different standard industry databases to
17 identify the fighters in the relevant
18 input market.
19     Q.   Right.
20     A.   One is FightMetric, the
21 other one is Fight Matrix.  I'm very
22 upset about those names, but that's --
23     Q.   Right, they're not helpful
24 to us.

1      A.   They're not helpful.
2      Q.   But we'll live with them.
3          But -- so you have two
4  relevant input markets:  A tracked market
5  which -- for which you draw data from
6  FightMetric, and a ranked market which
7  draws from data from Fight Matrix,
8  together with the data from FightMetric.
9          Do I have that right?
10     A.   Again, I would prefer to say
11 there's one relevant input market that
12 we're -- that we're trying to measure and
13 I have two different ways of measuring
14 it.  One relies on a database from
15 FightMetrics (sic), which I refer to as
16 the tracked method.  That's -- that's
17 really the beginning, because as you
18 probably are aware, there's a few
19 additions that I tack on to -- to even
20 that measure.
21          And then as we move from the
22 tracked measure to the ranked measure,
23 I -- I include everybody who made it into
24 the tracked and I add on additional

1  fighters who were ranked, but not
2  tracked, as well as one other MMA
3  organization.
4      Q.   So those are two -- do I
5  understand it right, those are two
6  different relevant input markets that
7  you -- that you have defined?
8      A.   This -- this could be a
9  matter of semantics, but I prefer to say
10 there's one relevant input market and
11 these are two different ways to measure
12 it.
13     Q.   What is the one relevant
14 input market?
15     A.   It's -- I think I've defined
16 it in the report.
17     Q.   Feel free to point me in the
18 report.
19     A.   Okay.
20     Q.   If it helps you, the
21 relevant input market discussion is on
22 page 66.
23     A.   Well, if we're going to call
24 it anything by shorthand, I would prefer

1  to use the term relevant input market.  I
2  think that the language in the report
3  explains what I'm trying to get at, which
4  is a set of fighters with MMA fighter
5  services that would be used by an MMA
6  promotion organization to stage live
7  events.
8      Q.   You told me you preferred to
9  say there's one relevant input market and
10 there's two different ways to measure it.
11         What is the one relevant
12 input market?
13         MR. CRAMER:  Asked and
14 answered.
15         THE WITNESS:  These are --
16 these are MMA fighters who are
17 used as input to the production of
18 live MMA events.
19         And to clarify it, I said
20 two.  Of course there's a --
21 there's a third -- a submarket.  I
22 don't know if --
23 BY MR. ISAACSON:
24     Q.   Yeah, we'll get to the



1 submarket.
2     A.   Okay.
3     Q.   The -- all right.  And the
4 submarket is the -- you used the
5 headliner definition; is that right?
6     A.   Correct.
7     Q.   And am I correct that in
8 your opinion, there would be no broader
9 market than the markets you have defined
10 using the tracked measure or the ranked
11 measure?
12     A.   Correct, there's no broader
13 market.  Already I think that the ranked
14 market is -- is potentially overly broad.
15     Q.   And when you -- when you say
16 there's no broader market, that would
17 mean there's no reasonable substitutes
18 outside those markets if, for example,
19 fighter pay where to go up?
20     A.   That's not quite what I
21 mean.
22     Q.   Well, let me ask you this.
23 Then let me just ask you this question:
24 In your opinion, are there no reasonable

1 out -- substitutes outside the tracked
2 market and the ranked market if fighter
3 pay rises?
4         MR. CRAMER:  From what level
5 to what level?
6         MR. ISAACSON:  It goes up.
7         MR. CRAMER:  Okay.
8         THE WITNESS:  So I do
9 allow -- before I answer the
10 question, I just want to make sure
11 you understand how I get to the
12 market.  It's not entirely driven
13 by reasonable substitutes.  I'm
14 asking -- I'm trying to employ the
15 SSNIP test from the merger
16 guidelines, and I'm looking for
17 the smallest set of fighters such
18 that a hypothetical monopsonist
19 could exercise market power.
20         And that -- that is the
21 question that -- that drives the
22 analysis.
23 BY MR. ISAACSON:
24     Q.   And I'll ask you about your

1 SSNIP analysis, which is S-S-N-I-P.
2         But just returning to my
3 question, in your opinion, are there no
4 reasonable substitutes outside the
5 tracked market and the ranked market if
6 fighter pay goes up?
7     A.   So that -- you haven't
8 posited the correct question for market
9 definition.  It's not if fighter pay goes
10 up.  It's -- the question is if -- if
11 Zuffa were to control a certain set of
12 fighters, could -- could Zuffa exercise
13 market power in the form of pushing wages
14 down?  You keep saying if prices go up.
15 That's not the -- that's not market --
16     Q.   I appreciate you telling me
17 I'm not asking the correct questions --
18     A.   Well, I mean --
19     Q.   But let's stick with --
20 let's stick with answering my questions.
21     A.   Okay.  Well, okay, but if
22 you ask me a question that makes no sense
23 as a matter of economics, I can't give
24 you an answer.

1     Q.   In your opinion -- in your
2 opinion, are there no reasonable
3 substitutes for the fighters outside the
4 tracked market and outside the ranked
5 market?
6     A.   I would put the caveat that
7 if a hypothetical monopsonist controlled
8 all of the fighters in either of those
9 two markets, it would be able to
10 successfully exercise a wage suppression
11 below competitive levels without having
12 to fear that a sufficient number of
13 fighters inside of its net would -- would
14 substitute to something outside of the
15 net.
16         And that's a long way of
17 answering your question, but I think
18 doing so more precisely as to what is
19 considered reasonable.
20         If you -- if you have, say,
21 all of the ranked fighters, and you're
22 looking at it from the perspective of a
23 given ranked fighter, let's suppose a
24 highly ranked fighter, he or she will not



Page 70

1  offered alternative methodologies, they
2  all point to numbers that create a range,
3  and I think that -- that any one of them
4  would be a reasonable estimate of
5  damages.
6      Q.  And within that range, every
7  number within that range you consider to
8  be reasonable, correct?
9          MR. CRAMER:  Objection to
10      form.  Misstates the testimony.
11         THE WITNESS:  No, because
12      I -- I don't want to pick some
13      number that's -- that's -- that
14      just is randomly chosen between
15      two of my estimates.
16  BY MR. ISAACSON:
17      Q.  All right.  That's fair.
18         So every -- you've -- you've
19  estimated a range of damages.  Every
20  number within that range that you've
21  estimated, you would consider a
22  reasonable award of damages in this case?
23         MR. CRAMER:  Form.
24         THE WITNESS:  Every number

Page 71

1      associated with one of my damages
2      methodologies represents a
3      reasonable estimate of aggregate
4      damages.
5  BY MR. ISAACSON:
6      Q.  All right.  And amongst the
7  numbers associated with one of your
8  damages methodologies, you do not have an
9  opinion as to which one is more or less
10  appropriate as an award of damages; is
11  that correct?
12         MR. CRAMER:  I'm going to
13      object to the extent it calls for
14      a legal conclusion.
15         THE WITNESS:  I don't think,
16      at least sitting here today, I'm
17      prepared to speak to which is more
18      or less appropriate.  They can be
19      evaluated on other dimensions such
20      as more or less conservative.  But
21      more or less appropriate, I'm --
22      I'm not even sure I understand
23      what that means.
24  BY MR. ISAACSON:

Page 72

1      Q.  Okay.  You mentioned the --
2  you mentioned the FightMetric database
3  which is used in connection with your
4  tracked input market as well as your
5  ranked input market.  FightMetrics (sic)
6  is a service that promotions pay to --
7  pay FightMetric for; is that right?
8      A.  I think that a promotion can
9  subscribe and purchase the FightMetrics
10  (sic) data.  I know, for example, that
11  Zuffa uses it in its day-to-day business
12  operations.
13      Q.  Is it the case if you do not
14  subscribe, if you don't pay, that you're
15  not on FightMetric?
16      A.  That is not my
17  understanding.
18         MR. ISAACSON:  Can we mark
19      this as Exhibit 4?
20         (Exhibit No. Singer-4, Excel
21      spreadsheet, Weight Data for
22      Foreclosure Shares, was marked for
23      identification.)
24  BY MR. ISAACSON:

Page 73

1      Q.  Exhibit 4 is a backup file
2  we were provided.  It's titled Weight
3  Data for Foreclosure Shares.  We've
4  printed out a tab called Combined Event
5  Tab.  We've not altered the content, but
6  in order to have the columns fit on one
7  page, we rotated the first row to make
8  the column names vertical, and we also
9  added page numbers and shrunk the columns
10  to fit the content.
11         MR. CRAMER:  Which did you
12      add?
13         MR. ISAACSON:  We did add no
14      content.  We -- we did some things
15      to make it fit on the page.
16         MR. CRAMER:  You said you
17      added combined --
18         THE WITNESS:  No, I think he
19      said he rotated the titles, the
20      headers of the columns so that it
21      would fit.
22         MR. CRAMER:  Thank you.
23  BY MR. ISAACSON:
24      Q.  Now, as I understand this,



19  (Pages 70 to 73)

Page 74

```
1    this would be pay-per-view revenue data
2    that you relied on when you did your
3    foreclosure regression?
4        A.   It depends on which
5    weighting technique I used, right?  I've
6    done three different weighting
7    techniques:  The revenue weighted, the
8    ranked weighted and unweighted.
9        Q.   Okay.  So this would be the
10   data that you used when you weighted by
11   revenue; is that correct?
12       A.   I believe so.
```



Page 76

Page 75

Page 77

```
1    entries, but a lot of entries where it's
2    blank.  And am I correct that where you
3    did not have actual data for the gate,
4    you used some sort of average?
5        A.   Well, I wouldn't put it that
6    way.
7        Q.   Okay.  How would you put it?
8        A.   I would say that I computed
9    an average across a year for a given --
10   for a given promoter, and if there was a
11   blank in the field, the blank, by
12   construction, could not inform the
13   average.
14       Q.   I just asked you if you used
15   an average, but okay.
16           You did use -- where the
17   field was blank for gate, you used an
18   average across a year for the given
19   promoter?
20       A.   I believe that's the rule.
21   I'd want to go back and check that, but I
22   believe that we calculated an average
23   revenue per event, per fighter across the
24   promotion within a given year for
```

(from Page 76, lines 23-24)
```
23       Q.   The -- now, looking down the
24   column called Gate.  You have some
```

MAGNA
LEGAL SERVICES



**Page 94**

14  Q.   All right.  Now, you have
15  estimated damages and foreclosure effect
16  relying on the relationship to the
17  percentage of revenue paid to fighters,
18  correct?
19      MR. CRAMER:  Form.
20      THE WITNESS:  Can I hear
21  that back?  I'm sorry.
22  BY MR. ISAACSON:
23  Q.   You've estimated damages in
24  a foreclosure effect relying on a

**Page 95**

1  relationship to the percentage of revenue
2  paid to fighters, what you called the
3  fighters' share?
4  A.   I think that I've offered --
5  I've offered, under one of my approaches
6  to damages, a regression-based approach
7  that relates foreclosure share to fighter
8  wage share.
9  Q.   I'm talking about something
10  slightly different.
11  A.   Okay.
12  Q.   Okay.  And we'll come to the
13  fighter wage share.  But in terms of
14  the -- go back to 125.
15  A.   Okay.
16  Q.   Table 6, which is an example
17  of the output of your regression that
18  we've been calling the foreclosure
19  regression, expresses that as there's an
20  increase in foreclosure share, there's a
21  decrease in fighter share, and the
22  fighter's share is the share of revenue
23  that goes to fighters.
24  A.   Or what I like to call -- or

**Page 96**

1  what I like to call the fighter wage
2  share, a fighter/event share, fighter
3  revenue share is fine.
4  Q.   Fighter share as you've
5  written it here.
6  A.   Okay.
7  Q.   And when you estimate
8  damages using the Bellator and
9  Strikeforce benchmarks, you look at the
10  percentage of revenues paid to fighters
11  between -- and compare them amongst
12  firms, correct?
13  A.   With one modification, which
14  is when I do those Strikeforce and
15  Bellator benchmarks, I'm using aggregate
16  fighter shares.  In comparison when I --
17  when I perform the regression, I'm using
18  the wage share of a particular fighter.
19  Q.   All right.  And then when
20  you estimate damages using your
21  regression models, you also look at
22  fighter shares, what's the effect --
23  what's the -- damages are expressed as
24  the reduced share of revenue paid to

**Page 97**

1  fighters?
2  A.   I'm sorry, when I'm doing
3  damages?
4  Q.   Yes.  When you're doing
5  damages, you're saying that the share
6  paid to fighters is lower than it
7  otherwise would be with -- if you had a
8  lower foreclosure?
9  A.   I think that's fair.
10  Q.   Okay.
11  A.   I also -- I just wanted to
12  clear up something as I -- you asked me a
13  few minutes ago about the number of
14  observations and I may have injected some
15  uncertainty because my brain was seizing
16  up as to whether or not it changes across
17  the different specifications, and as
18  I'm -- as I'm recalling now, you do, in
19  fact, have the same number of
20  observations across tracked, ranked and
21  headliner.  The only thing that's
22  changing here is how I define the
23  foreclosure share, but it's the same
24  regression dataset.

1    Q.   You have not done any impact
2  models or damages models where you --
3  where you use as an input the actual
4  amount of fighter pay as opposed to the
5  fighter share?
6    A.   I don't think that's true.
7  I have -- in my impact section, I've run
8  a model on levels, not related to
9  foreclosure share, but levels of fighters
10  compared to what other fighter were being
11  paid.
12    But if you're asking have
13  I -- have I run a model that relates
14  foreclosure share to the levels, I have
15  not done that.
16    Q.   All right.  I think I
17  understand you, but let me get it
18  straight.
19    You have not run any models
20  that establish the -- that establish the
21  fact of injury or the amount of damages
22  that rely on the actual salaries that
23  are -- not salaries, the actual
24  compensation paid to fighters as opposed

1  to the fighters' share?
2    MR. CRAMER:  Objection to
3    form.
4    THE WITNESS:  No, I'm going
5    to -- I'm going to say no to that
6    one.  I thought I just clarified.
7  BY MR. ISAACSON:
8    Q.   Just say no and I'll ask you
9  a follow-up question.
10    A.   Fine.  No.
11    Q.   The -- when you look at
12  actual fighter pay, that's when you
13  were -- when you used actual fighter pay
14  as opposed to fighter share, that's when
15  you performed regressions to determine
16  whether gains or losses in a compensation
17  were broadly shared across the bout
18  class, correct?
19    A.   Correct, as part of an
20  impact model.
21    Q.   Right.  And does that model
22  generate an amount of impact or amount of
23  damages?
24    A.   No, that model was to

1  establish the fact of common impact.
2    Q.   And the results showed that
3  individual fighter compensation per event
4  moves together with per event
5  compensation paid to other fighters; is
6  that correct?
7    A.   Yes.
8    Q.   Okay.  And while it
9  establishes that the compensation moves
10  together, the output of that model does
11  not actually demonstrate injury to any
12  specific fighter; is that correct?
13    MR. CRAMER:  Objection to
14    form.
15    THE WITNESS:  I would say
16    the output of that model in
17    conjunction with other steps in
18    that two-part proof show impact to
19    all fighters.
20  BY MR. ISAACSON:

Page 102

1
2
3     A.   This analysis must be
4  understood in conjunction with other
5  analyses in the section, the totality of
6  which establishes common impact.
7     Q.   I agree with that.  What I'm
8  saying is this -- this model by itself
9  would not show any injury to any specific
10  fighter, it would have -- it would have
11  to be considered in conjunction with
12  other analysis that you've done?
13     A.   I think that's fair.  I
14  would not -- I would not offer this model
15  by itself as proof of common impact.  I
16  would offer it, as I did, in conjunction
17  with other models in the section, and
18  record evidence, of course.
19     Q.   Right.  So the models that
20  actually conclude by themselves that
21  there was damage or impact to individual
22  fighters are all expressed in terms of
23  fighters' share and don't rely on data
24  but actual fighter pay; is that correct?

Page 103

1        MR. CRAMER:  Objection to
2  form.
3        THE WITNESS:  No, that's not
4  correct.
5  BY MR. ISAACSON:
6     Q.   The models that show actual
7  impact or damages by themselves all are
8  expressed in terms of the fighters' share
9  of revenue, correct?
10     A.   I wouldn't put it that way
11  either.
12     Q.   Okay.  For each of those
13  models you were looking at what the
14  fighter share of revenue actually was
15  compared to what it would be in the
16  but-for world using the models that
17  you've relied on, correct?
18     A.   For certain models, the
19  left-hand side variable of the regression
20  was expressed in terms of fighter share
21  as opposed to absolute level.
22        But I want to make clear for
23  the record that the numerator is the
24  fighters' pay.  So when you say the

Page 104

1  models aren't taking into consideration
2  the fighters' pay, I have to -- I have
3  to -- I have to reject that.
4     Q.   All right.  So there is a
5  variable in each of your impact models
6  and damages models that actually estimate
7  a dollar effect on fighters that relies
8  on the fighters' share as opposed to the
9  absolute level of compensation of the
10  fighter.  Do I have that right?  What you
11  call the variable on the left-hand side.
12     A.   Yeah, the dependent variable
13  in certain models is expressed in terms
14  of fighter's share, and to figure out
15  what the effect is on a fighter's
16  absolute pay, it's a ministerial change
17  to convert from an actual fighter share
18  to a but-for fighter's share, and then
19  knowing what the event revenue was to
20  convert to a but-for fighter pay.
21        So I think that -- I think
22  that to say that it's -- it's not making
23  use of actual fighter pay just misses
24  what's -- what's going on.

Page 105

1     Q.   All right.  So on page 155,
2  Table 8.
3     A.   Okay.
4     Q.   Which reports on a
5  regression you did for impact.  The
6  dependent variable there was the
7  fighter's share of revenue rather than
8  the absolute level of compensation, am I
9  correct?
10     A.   Correct.
11     Q.   Okay.  And the same would be
12  true for each of the regressions in your
13  damages models; is that correct?
14     A.   I believe that's fair, that
15  the dependent variable in those models
16  was fighter share of revenues.
17     Q.   I'm going to take a big
18  chance here and ask if you can explain
19  for our audience what you mean by a
20  dependent variable.
21     A.   Sure.  So the dependent
22  variable is the variable that we are
23  trying to understand and explain what --
24  what drives it to -- to move around.  And

MAGNA
LEGAL SERVICES

1  so we -- you'll also hear the expression
2  the left-hand side variable, but -- but
3  it's -- it's the variable of interest.
4  We are -- we are trying to -- to
5  understand the world through -- through
6  that variable and to explain what causes
7  it to vary.
8      Q.   All right.  So I'd like -- I
9  think variable of interest is a phrase
10  you use in your report, and I guess it's
11  also comfortable calling it a dependent
12  variable for a layperson, the variable
13  we're trying to explain.  Both of those
14  would be acceptable?
15      A.   Sure.
16      Q.   Okay.  The --
17          THE VIDEOGRAPHER:  We're ten
18      minutes left on this tape,
19      Counsel.
20          MR. ISAACSON:  All right.
21      We'll go about five more minutes
22      and take a break.
23  BY MR. ISAACSON:
24      Q.   Have you done damages

1  analysis before where you had used the
2  percentage of -- the percentage of
3  revenue as opposed to the absolute level
4  of compensation as the variable of
5  interest?
6      A.   It's possible.  Sitting here
7  I'm thinking of another -- of another
8  wage case that I did, which was -- which
9  I refer to as Arizona Travel Nurses, and
10  it's possible that we -- when we did our
11  modeling there, we expressed -- in fact,
12  it's kind of coming back to me.  I think
13  we were interested in a nurse's payment
14  relative to her bill rate.  So -- so yes,
15  I believe I've -- I've done something
16  like that before.
17      Q.   You say something like that,
18  have you done -- have you used as the
19  variable of interest before the share of
20  total revenue that goes to the labor
21  force, whether that labor force is an
22  employee or -- or contractors?
23      A.   I think so.
24      Q.   Okay.  And you think you did

1  that in Arizona Travel Nurses?
2      A.   Yeah, it's an old case, but
3  I -- some -- some faint memories are
4  coming back, and I -- I believe that
5  to -- to establish similar things, common
6  impact there, we were -- we were looking
7  at the bill rate as the denominator,
8  that's how much the hospital was -- was
9  charging for the -- for the nurse, and
10  the numerator was the wage that went to
11  the -- to the nurse, and so it's an
12  analogous construction of a dependent
13  variable.
14      Q.   Any other cases that you --
15  where you've estimated damages using the
16  variable of interest or the dependent
17  variable as the share to labor?
18      A.   I'm not sure.  I'm not sure
19  how many other wage suppression cases
20  I've done besides -- besides these two.
21  I'd have to -- I'd have to go back and
22  think about it.
23      Q.   Okay.
24          MR. ISAACSON:  All right.

1      Why don't we take a break?
2          MR. CRAMER:  Sure.
3          THE VIDEOGRAPHER:  The time
4      is 11:26 AM.  We are going off the
5      record, and this is the end of
6      Disk 1.
7          (Recess.)
8          THE VIDEOGRAPHER:  The time
9      is 11:40 AM.  This is the start of
10      Disk 2, and we are now on the
11      record.
12  BY MR. ISAACSON:
13      Q.   So I want to continue our
14  discussion of the percentage of revenue
15  paid to labor as the variable of
16  interest.
17          Is there economic literature
18  that you're familiar with that discusses
19  the percentage of revenue that's paid to
20  labor in a competitive industry as
21  opposed to an industry that's less
22  competitive?
23      A.   Is there economic
24  literature?



Page 162

```
 1    combination of multiple factors, the most
 2    likely being that the duration of the
 3    contracts back in that period were not
 4    sufficiently long so as to turn on any
 5    particular fighter as being foreclosed.
 6              You also have times of lower
 7    market share.  So a lot of things are
 8    contributing to -- to why Zuffa's
 9    foreclosure share would be that small way
10    back in 2005.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 163

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 164

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 165

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

MAGNA ❯
LEGAL SERVICES



Page 190

1    what you're asking me to assume is
2    to assume there are no artificial
3    restrictions.  I -- I don't know.
4    I'm trying -- when you say stand
5    alone, you need to give me more
6    context.
7  BY MR. ISAACSON:
8    Q.    That would be fine.  Go
9  ahead and assume there are no artificial
10 barriers to entry, there would remain the
11 natural barriers to entry that you've
12 identified, do you consider those to be
13 high barriers to entry?
14   A.    I consider them to be
15 economically significant in the sense
16 that it might be hard for you or I to
17 enter tomorrow in a timely and seamless
18 way.  But I think that a person like Mark
19 Cuban with access to capital and
20 experience in television and having his
21 own TV channel, there -- could likely
22 overcome the natural barriers.
23   Q.    The Strikeforce and Bellator
24 benchmarks, we talked about those this

Page 191

1  morning for purposes of damages.
2    A.    Yes.
3    Q.    I'm going to return to that
4  topic.
5        In those benchmarks, you are
6  using two competitors of -- of Zuffa
7  comparing the percentage of their
8  revenues paid to labor or paid to the
9  fighters to that of Zuffa.  I think we've
10 established that, correct?
11   A.    Correct.
12   Q.    Okay.  Why in economic
13 theory would you use the percentage of
14 revenue paid to labor by a competitor as
15 a benchmark?
16   A.    Because this is a voluntary
17 transaction between a willing buyer and a
18 willing seller as to the appropriate wage
19 in the -- in the MMA industry.  And so I
20 think if we're looking for -- for
21 reasonable comparables that exist within
22 the same relevant market, this is the
23 logical place to start looking.
24   Q.    When you use the term

Page 192

1  appropriate wage.
2    A.    Yes.
3    Q.    Are the Bellator -- is
4  Bellator paying the fighters higher
5  average wages than the UFC?
6    A.    I'd say it depends on which
7  fighter you're talking about, but --
8    Q.    I said average.
9    A.    Yeah, the weight -- sorry.
10       MR. CRAMER:  I was going to
11 say you mean today, Bellator?
12       MR. ISAACSON:  At any time.
13       THE WITNESS:  The -- the
14 levels of a Bellator or a
15 Strikeforce fighter on average
16 would tend to be below the levels
17 of the UFC fighters.
18 BY MR. ISAACSON:
19   Q.    So why, in economic theory,
20 would you use the percentage of revenues
21 that a competitor allocates to the labor
22 as a benchmark as opposed to the -- the
23 actual appropriate wage that they decided
24 to pay?

Page 193

Page 214

1    Q.   Right.  And I understand you
2  know what you're trying to do.
3    A.   Oh, but I --
4    Q.   I'm trying --
5    A.   I'm trying to do it pursuant
6  to the standard.  The standard says find
7  a competitive benchmark.
8    Q.   Right.  And what -- in
9  determining what is a competitive
10  benchmark, are there any standards that
11  you're able to tell us today for doing
12  that, again for determining
13  anticompetitive effect or damages in an
14  antitrust case?
15    A.   Yes, and the standard, I'm
16  going to say it again, is you're looking
17  for a similarly situated firm that is
18  operating free from the challenged
19  conduct.  That's what you're trying to do
20  and that's what I did.
21    Q.   Right.  And in determining
22  what a similarly situated, are there any
23  standards for that?
24    A.   I don't think that there are

Page 215

1  a set of ironclad standards that -- that
2  are going to apply in every instance.  I
3  think that there are some broad standards
4  and I think that when you get to the
5  application, the economist has to use
6  some judgment in making a determination
7  as to what constitutes a good benchmark.
8    Q.   All right.  And when you say
9  you think -- I understand you're going to
10  use your judgment.  But when you say, I
11  think there's some broad standards,
12  right, is there a description of those
13  broad standards or a list of those broad
14  standards that you looked at before you
15  did your report?
16    MR. CRAMER:  Asked and
17  answered.
18    THE WITNESS:  I'm familiar
19  with the literature but I did not
20  go back and consult one person's
21  article in an ABA journal that
22  would tell me what he or she
23  thought would be the standards.
24  BY MR. ISAACSON:

Page 216

1    Q.   And is there any description
2  of those broad standards in your field
3  that you would consider authoritative?
4    MR. CRAMER:  Asked and
5  answered.
6    THE WITNESS:  I'd want to
7  see the article.  I would want to
8  see the article before I
9  considered it authoritative.
10  BY MR. ISAACSON:
11    Q.   But -- meaning today you
12  can't point to anything authoritative in
13  your field that would establish the broad
14  standards for determining whether two
15  firms are similarly situated in doing the
16  benchmark analysis?
17    MR. CRAMER:  Asked and
18  answered.
19    THE WITNESS:  Can I hear it
20  again?  I'm sorry.
21  BY MR. ISAACSON:
22    Q.   Today you can't point to
23  anything authoritative in your field that
24  would establish the broad standards for

Page 217

1  determining whether two firms are
2  similarly situated in doing the benchmark
3  analysis?
4    MR. CRAMER:  Asked and
5  answered.
6    THE WITNESS:  I can't think
7  of a particular article, no.
8    THE VIDEOGRAPHER:  Counsel,
9  we have nine minutes left to the
10  end of this disk.
11    MR. ISAACSON:  Let's see if
12  I can do something in five
13  minutes.
14  BY MR. ISAACSON:
15    Q.   Paragraph 253.  I think we
16  agree when we've been talking about your
17  damages estimates today, they've been
18  about the bout class.  So let's talk
19  about your damages to the identity class,
20  or at least get a start on that.
21    Did you do any common impact
22  analysis for the identity class?
23    A.   Sure, I have a section
24  titled Common Impact For the Identity



Page 218

1    Class where I demonstrate what I consider
2    to be a rigid pricing structure when it
3    comes to identity payments.
4        Q.   Okay.  And did you do any
5    separate economic modeling such as you
6    did for the bout class?
7        A.   No, I did not.
8        Q.   The -- and you have two
9    methods of estimating damages for the
10   identity class as I understand it.  One
11   is that you take the percentage increase
12   in revenue that would be paid as the
13   fighter share, the increased percentage.
14   So for example, if the fighter share went
15   from 50 to 75 percent, that would be a 25
16   increase in fighter share, and then you
17   apply that percentage increase to the
18   identity payments actually made to
19   fighters?
20       A.   Close.  As stated in
21   percentage terms, and I give the -- I
22   give the sample in paragraph 253 where I
23   put the but-for share --
24       Q.   Yes.

Page 219

1        A.   Over the -- right, over the
2    actual share, and then I multiply that by
3    the payments that were made, correct.  I
4    mean, so long as that's what you're
5    saying, we're on the same page.
6        Q.   I think we're saying the
7    same thing.
8        A.   Okay.
9        Q.   But you're applying the
10   percentage increase in the fighter share
11   to the absolute payments for the identity
12   payments?
13       A.   Yes.



Page 220

13       MR. ISAACSON:  Okay.  All
14   right.  Why don't we take a break?
15       THE VIDEOGRAPHER:  The time
16   is 2:10 PM.  This is the end of
17   Disk 2.  We are off the record.
18       (Recess.)
19       THE VIDEOGRAPHER:  The time
20   is 4:26 PM (sic).  This is the
21   start of Disk No. 3 and we are now
22   on the record.
23   BY MR. ISAACSON:
24       Q.   You can look at --

Page 221

1        MR. CRAMER:  The time is
2    what?
3        THE VIDEOGRAPHER:  2:26 PM.
4    I'm sorry.
5        MR. CRAMER:  Okay.
6    BY MR. ISAACSON:
7        Q.   If you could look at page
8    154 of your report, Table 7, which
9    displays the results of your first
10   analysis of common -- econometric
11   analysis of common impact.  We've looked
12   at this before.
13       A.   Yes.
14       Q.   And it says bout class
15   compensation structure.  And in paragraph
16   228 when you're discussing this, in the
17   first sentence -- I've actually said this
18   sentence several times, I think:
19       "I performed regressions to
20   determine whether gains or losses in
21   compensation are broadly shared across
22   the bout class."
23       A.   Yes.
24       Q.   Was -- did you use for the

MAGNA
LEGAL SERVICES



Page 258

Page 260

Page 259

Page 261

```
12        Q.   In general, we'll save time
13   if you tell me whether you have opinions
14   as opposed to what you imagine.
15        A.   Okay.
16        Q.   Or could imagine.  I don't
17   mean that as a criticism, I mean that as
18   constructive.
19            MR. CRAMER:  Constructive
20   criticism.
21            MR. ISAACSON:  No, not even
22   that.  A constructive way to get
23   through the day.
24            MR. CRAMER:  Advice.
```

Page 266

1      Q.   So any conduct, such as
2  counter-programming that increases
3  Zuffa's market share would increase the
4  foreclosure share and increase damages?
5          MR. CRAMER:  Objection to
6      form.
7          THE WITNESS:  It's a little
8      more complicated than that because
9      again you have to -- you have to
10     assume that the -- the contracts
11     that they're coming into are
12     exclusionary.
13         But if you grant me that,
14     then increases in Zuffa's market
15     share by, say, making life so
16     miserable for a rival that they
17     end up folding and losing all
18     their fighters to Zuffa, yes, is
19     going to increase foreclosure
20     share.
21  BY MR. ISAACSON:
22     Q.   Looking at Figure 3, which
23  is page 115?
24     A.   115?

Page 267

1      Q.   Yes.
2      A.   Okay.

Page 268

Page 269



Page 270

Page 272

BY MR. ISAACSON:
        Q.    There are allegations in
this case of the use of identity rights
of the plaintiffs such as things on Fight
Pass or on posters or on television
episodes.  You're aware of those?
        A.    Yes.
        Q.    Okay.  Are those
anticompetitive acts, in your opinion,
that contribute to the foreclosure
effect?
        A.    The way that I'd prefer to
put it is that when -- when done in
conjunction with what I consider to be
the one necessary element, they're
anticompetitive, they're exacerbating
things, and I don't have an opinion on

Page 271

Page 273

whether or not they would be
anticompetitive on a stand-alone basis.
        Q.    Okay.  And would the use of
those identity rights in clips, poster,
television series, are those more the
result of the alleged anticompetitive
acts in this case, or are they actually
something that would tend to foreclose
competition?
        MR. CRAMER:  Objection,
    vague.
        THE WITNESS:  I think that
    telling a fighter that he or she
    can't take her identity rights
    with her to -- her clips, for
    example, to the --
BY MR. ISAACSON:
        Q.    Talking about something
different here.  I'm not talking about
taking clips with you.  I apologize for
interrupting.
        I'm talking about just using
clips on Fight Pass, using an image in a
poster.  I'm not talking about



Page 286

1      with respect to, say, a finding of
2    monopsony power in the input
3    market.
4  BY MR. ISAACSON:
5      Q.   Well, you do have findings
6  of monopsony power that do rely on
7  revenue weighting, right?
8      A.   I think that under the --
9  under the indirect approach and under
10  only one pass through the indirect
11  approach, I weight fighters by -- by
12  revenues to make an inference about
13  Zuffa's high shares in that relevant
14  input market.
15      Q.   Right.
16      A.   But as you know, that's only
17  one of many, many approaches that allow
18  me to get to the conclusion of monopsony
19  power.
20      Q.   Okay.
21      A.   I actually prefer --
22      Q.   So let's return --
23      A.   Can I finish?
24      Q.   I thought you were.

Page 287

1      A.   I prefer direct evidence
2  generally, and I think that I've -- I
3  offer a slew of evidence that speaks to
4  how you can prove directly that Zuffa
5  exercises monopsony power.
6      Q.   I understand that you
7  offered direct and indirect evidence, but
8  I need to ask about them one at a time
9  and we can cover both.
10      A.   Okay.
11      Q.   So in terms of when you
12  define a market, can you describe to me a
13  situation where if you use revenue
14  weighting in the input market, where
15  the -- a monopoly firm would not
16  necessarily have a monopoly in the input
17  market?
18      MR. CRAMER:  Incomplete
19    hypothetical, form.
20      THE WITNESS:  I've never
21    given thought to that, and I'd
22    like to think about it and maybe
23    we'll come back.  But I don't
24    think I'm prepared to -- to

Page 288

1      construct a scenario about how
2    that could occur.
3  BY MR. ISAACSON:
4      Q.   All right.  The -- and then
5  you've described geographic market for
6  the output market also.  And is that also
7  North America?
8      A.   Yes.
9      Q.   All right.  The -- and in
10  terms of your SSNIP analysis -- all
11  right.  So did you do -- well, my
12  colleague wants to know so it seems like
13  a good question.
14      A.   I'm sure it is.
15      Q.   In the out -- in the output
16  market, what is being sold?  In the
17  output markets that you have defined.
18      A.   Sure.  I think that you
19  are -- the production or the product that
20  is being produced are -- is live MMA
21  events and the revenue associated with
22  those events can take the form of gate
23  revenue or pay-per-view.  That's from --
24  from the consumer side.  Of course,

Page 289

1  there's -- there's revenues from the
2  advertiser's side as well.
3      But I hope that answers your
4  question.
5      Q.   All right.  And does
6  pay-per-view compete with broadcast?
7      MR. CRAMER:  Objection to
8    form.
9      THE WITNESS:  I did not
10    conduct that inquiry.
11  BY MR. ISAACSON:
12      Q.   Do you have an opinion one
13  way or another about that?
14      A.   No.
15      Q.   All right.  With respect to
16  the -- does -- do the live venue events
17  compete with pay-per-view events?
18      A.   I don't even understand the
19  question.  Many of the pay-per-view
20  events are live.
21      Q.   Meaning I watch it on
22  pay-per-view as opposed to go see it
23  live.
24      A.   I haven't -- I haven't



1  studied that and I imagine for someone
2  who lives very far from the venue where
3  the live event is staged, they would not
4  be considered reasonably close
5  substitutes.
6      Q.  So for your input markets,
7  what evidence did you take into account
8  to assess customer's likely response to
9  price increase in the SSNIP analysis?
10  And feel free to point me to the sections
11  of your report that --
12      A.  Did you mean to say -- I
13  think you just conflated the input
14  markets and customers.  Maybe we should
15  start over.
16      Q.  Yes, I said price increase
17  rather than wage decrease, but let me
18  just put it this way:  What evidence in
19  your report did you take into account to
20  assess the likely response to a SSNIP in
21  the input markets?
22      A.  Sure.  So there it's the
23  perspective of the fighters not the
24  customers.  So I was tripping up over

1  your --
2      Q.  Yes.
3      A.  -- injecting customers when
4  we're talking about input markets.
5          So I can take you to the
6  relevant sections, and I will, but of
7  course at high levels, I'm looking at
8  record evidence of -- of what fighters
9  and promoters thought about substitution
10  possibilities as you -- if you were to
11  move away from Zuffa to counteract a
12  hypothetical wage cut.
13      Q.  Okay.  So the first thing
14  you looked at was record evidence of
15  substitution.
16      A.  Or the perception of
17  substitution from the stakeholders, the
18  fighters, the promoters, and I'll just
19  point you, if you --
20      Q.  That's -- that's sufficient
21  for -- for item 1.
22          MR. CRAMER:  You asked him
23      to look at his report.
24          MR. ISAACSON:  I'm going

1      to --
2          MR. CRAMER:  Okay.
3          MR. ISAACSON:  I'm not going
4      to ask him to recite all the
5      documentary evidence.
6  BY MR. ISAACSON:
7      Q.  And I understand that
8  there's documentary evidence that you're
9  not reciting today.
10          Okay.  Other than the record
11  evidence of the -- about sub- --
12  perceptions of substitutability from the
13  stakeholders, what would be other parts
14  of your SSNIP analysis for the input
15  market?
16      A.  I would direct you to
17  Section 3A 1 for all of the evidence that
18  I used to inform the construction of the
19  relevant input market.
20      Q.  That would be the record
21  evidence that you were referring to?
22      A.  Well, record evidence is
23  fairly broad, right, because it
24  encompasses almost everything.  But I

1  will point -- to me the -- what helps to
2  guide me to the findings that I made with
3  respect to the input market was the fact
4  that Zuffa was able to successfully
5  suppress fighter wages, wages either
6  measured by -- by wage share, regression
7  or by knowledge of the fact that wage
8  shares were falling over time from
9  26 percent to 18 percent, yet Zuffa did
10  not suffer sufficient defection so as to
11  render that wage decrease unprofitable.
12          Now, that -- that tells you,
13  as a matter of economics, that a -- that
14  a reasonable starting place for defining
15  the contours of the relevant input market
16  is just the fighters under Zuffa's
17  control.  That was the -- the first thing
18  that occurred to me.
19          And once you -- once you
20  start there, you can start looking at
21  record evidence to determine whether
22  additional fighters from -- from rival
23  promotions ought to be included so that
24  you eventually get to the smallest set of

MAGNA
LEGAL SERVICES

Page 294

1    fighters such that a hypothetical
2    monopsonist could profitably exercise
3    monopsony power.
4        Q.   All right.  And you said
5    that Zuffa was able to successfully
6    suppress fighter wages -- wage share.
7    You were talking only about the share of
8    revenues there, correct?
9        A.   Correct.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 295

1
2
3
4
5    BY MR. ISAACSON:
6        Q.   All right.  But in your --
7    in your hypothetical there you held
8    revenues constant.  Did you look at, as
9    part of your analysis of the input market
10   and defining that market, as to whether
11   Zuffa actually suppressed actual wages?
12       MR. CRAMER:  Objection to
13   form.
14   BY MR. ISAACSON:
15       Q.   As opposed to wage share?
16       MR. CRAMER:  Same objection.
17       THE WITNESS:  I'm focused on
18   wage share, of course, because
19   it's the right thing to look at
20   from an economic perspective.
21   We're trying to measure
22   exploitation, and the textbooks
23   tell you to do it as a share of
24   marginal revenue product.

Page 296

1    BY MR. ISAACSON:
2        Q.   So my actual question was --
3    I understand you're focused on that, but
4    my question is, did you look at whether
5    Zuffa actually suppressed actual wages?
6        A.   Without controlling for
7    revenues, no.  Because it's incorrect to
8    do so.
9        Q.   So in performing your SSNIP
10   analysis for the input markets, is it
11   fair to say that you relied on the record
12   evidence about the issue of perceived
13   substitution from the stakeholders along
14   with your observations that when Zuffa
15   suppressed fighter wage shares, there
16   weren't significant defections?
17       A.   I think -- I think that
18   encompasses a lot.  I also think that
19   Zuffa in its ordinary course of business
20   made use of a FightMetrics (sic)
21   database.  I had -- the very first thing
22   I did when I -- when I got this case was
23   I started reading the economic literature
24   on the MMA industry, and almost every

Page 297

1    article I read, the FightMetrics (sic)
2    database formed the foundation of their
3    empirical analysis.
4        So I thought that that was a
5    reasonable place to begin to posit what
6    the smallest set of fighters that could
7    be under the control of a hypothetical
8    monopsony would be in order for it to
9    exercise market power.
10       Q.   All right.  Why did you use
11   the smallest set of fighters not the
12   smallest amount of promoters?
13       A.   Well, because we're looking
14   at the input market.  The fighters form
15   the elements of the input market.  They
16   happen to belong to promoters, but
17   fighters are the elements or the
18   ingredients.
19       But I'm -- if I'm a
20   fighter -- just to make it clear, if I'm
21   a fighter and I'm thinking about
22   substituting, defecting from UFC and
23   going to a rival promotion, I don't care
24   what the name of the promotion is or

MAGNA
LEGAL SERVICES

Page 310

1      321, that we came to outside of
2      the record evidence --
3  BY MR. ISAACSON:
4      Q.   Okay.
5      A.   -- that speak to, for
6  example, whether wrestling would be
7  perceived as a -- as a reasonable
8  substitute from the perceptive of
9  consumers to a live MMA event.  I think
10 that those Forbes articles and the record
11 evidence and knowledge that Zuffa was
12 able to profitably impose a price
13 increase on pay-per-view, all guided me
14 in reaching the final conclusion as to
15 the relevant output market.
16     Q.   I'm going to have you repeat
17 that because that was at the end of a
18 very long answer about what you were
19 going to look at.  Or I'll repeat it to
20 you.
21          In doing your SSNIP analysis
22 for the output markets, you relied on
23 Forbes articles and record evidence that
24 caused you to conclude that Zuffa would

Page 311

1  be able to profitably impose -- along
2  with knowledge that Zuffa was profitably
3  impose a price increase on pay-per-view
4  to reach your conclusions as to the
5  relevant output market?
6      A.   That's fair.
7      Q.   And your direct evidence is
8  discussed on page 98 -- beginning on page
9  98.
10     A.   Uh-huh.
11     Q.   All right.  The first item
12 of direct evidence is the power to
13 suppress fighter competition below
14 competitive levels.
15          And you list several items.
16 Each of those relate to reduced fighter
17 share; that is, the share of revenues
18 other than your reference to its
19 sponsorship tax.
20          Do I understand that right?
21     A.   Yes.
22     Q.   Okay.  The -- and how
23 significant was the sponsorship tax?
24          MR. CRAMER:  Objection to

Page 312

1  form.
2  BY MR. ISAACSON:
3      Q.   Can you quantify that tax
4  for me?
5      A.   I'm not sure I'm able to
6  that quantify the sponsorship tax.
7      Q.   Okay.  The second type of
8  direct evidence you talk about is the
9  direct -- is the evidence to restrict the
10 supply of fighter services, and you talk
11 about Zuffa consistently maintains
12 significantly more fighters under
13 contract than it could use.
14          Now, when you say
15 consistently, what years are you
16 referring to?
17     A.   The class period.
18     Q.   And so it's your opinion
19 that consistently throughout the class
20 period, that Zuffa maintained
21 significantly more fighters under
22 contract than it could use?
23     A.   Yes.
24     Q.   And when you say "than it

Page 313

1  could use," do you mean that it was
2  unable to give those fighters -- give
3  fights to those fighters?
4          MR. CRAMER:  Objection to
5  form.
6          THE WITNESS:  It was unable
7  to give fights to fighters in a
8  timely fashion.
9  BY MR. ISAACSON:
10     Q.   All right.  And when you say
11 a timely fashion, do -- were they able to
12 give the fights to the fighters within
13 the time period of the contract?
14         MR. CRAMER:  Objection to
15 form.
16         THE WITNESS:  I'm -- I'm
17 hesitating because I'm aware of
18 record evidence suggesting that
19 Zuffa on occasion would toll the
20 clock either for real or imagined
21 injury or --
22 BY MR. ISAACSON:
23     Q.   All right.  But I'm -- I'm
24 talking about a fighter who is ready,

MAGNA
LEGAL SERVICES

Page 330

7  Q.  So you're characterizing all
8  of the pay-per-view events as marquee
9  events when you say marquee events?
10  A.  I think that you might be
11  able to find counterexamples, a handful
12  of counterexamples of a pay-per-view that
13  doesn't feature a headliner, but in
14  general it would be really hard to sell
15  it unless it featured a headliner.
16  Q.  Right.  And did the -- and
17  if Zuffa -- if a firm decided that it
18  wanted to move marquee events from
19  pay-per-view to broadcast, would you
20  consider that direct evidence of power to
21  restrict supply?
22  MR. CRAMER:  Incomplete
23  hypothetical, form.
24  THE WITNESS:  Well, you're

Page 331

1  asking me to assume something that
2  I understand to be an unprofitable
3  move.
4  But if -- if your experts
5  can show evidence that these
6  marquee events moved one-for-one
7  from pay-per-view to -- to
8  television, I'd be happy to
9  consider such evidence.  But I
10  don't have an opinion on it right
11  now.
12  Q.  Okay.
13  THE VIDEOGRAPHER:  Excuse
14  me, Counsel.  We're approaching
15  ten minutes left on the disk.
16  MR. ISAACSON:  I think I'm
17  done.
18  Give me one minute, but I
19  think I'm about done for the day.
20  Give us a minute.
21  MR. CRAMER:  Let's go off
22  the record.
23  THE VIDEOGRAPHER:  The time
24  is 4:28 PM.  We are going off the

Page 332

1  record.
2  (Recess.)
3  THE VIDEOGRAPHER:  The time
4  is 4:31 PM.  We have been on the
5  record for five hours and
6  36 minutes.
7  MR. CRAMER:  All right.  We
8  have no questions.
9  MR. ISAACSON:  Thanks.
10  MR. CRAMER:  Let's go off
11  the record.
12  THE VIDEOGRAPHER:  All
13  right.  The time is 4:31 PM.
14  This concludes the
15  deposition and this is the end of
16  Disk 3.
17  (Witness excused.)
18  (Deposition concluded at
19  approximately 4:31 PM.)

Page 333

2  CERTIFICATE
5  I HEREBY CERTIFY that the
6  witness was duly sworn by me and that the
   deposition is a true record of the
   testimony given by the witness.
7
8  It was requested before
   completion of the deposition that the
9  witness, HAL J. SINGER, Ph.D., have the
   opportunity to read and sign the
   deposition transcript.
12  Constance Kent
   Constance S. Kent, CCR, RPR,
13  Certified Court Reporter
   Registered Professional Reporter
14  Certified LiveNote Reporter
   and Notary Public in and for the
15  Commonwealth of Pennsylvania
   Dated:  October 1, 2017
20  (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)



Page 334

```
 1          INSTRUCTIONS TO WITNESS
 2
 3             Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8             After doing so, please sign
 9   the errata sheet and date it.
10             You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14             It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 336

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages,  1 - 337, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   HAL J. SINGER, Ph.D.         DATE
17
18
19
20   Subscribed and sworn
     to before me this
21   _____ day of _____, 20____.
22   My commission expires:_____
23
     _____
24   Notary Public
```

Page 335

```
 1           - - - - -
             E R R A T A
 2           - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 337

```
 1           LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

