# EXHIBIT 17

# Excerpts of Deposition of Plaintiff Jon Fitch

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch  ) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vasquez, )
and Kyle Kingsbury on behalf of    )
themselves and all others          )
similarly situated,                )
                                   )
          Plaintiffs,              )
                                   )
vs.                                )
                                   )
Zuffa, LLC, d/b/a Ultimate         )
Fighting Championship and UFC,     )
                                   )
                                   )
          Defendants.              )


VIDEO DEPOSITION OF JON FITCH

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:23 A.M.

and ending at 4:54 P.M. on Wednesday, February 15, 2017

Reported by:
Sarah Padilla, CCR NO. 929
Job No.  296624 Pages 1-257



```
                                                    Page 34
 1   BY MR. WIDNELL:
 2      Q   Okay.
 3      A   Well, no. I wouldn't say it made them
 4   elite. Because in Pride you kind of had to -- you
 5   had to win. You had to win to maintain elite
 6   status. If you just got beat up all the time, it
 7   wouldn't work so great. But UFC, they're the only
 8   ones that just getting that one fight for them
 9   changes things.
10      Q   So would you say Kimbo Slice is an elite
11   fighter?
12          MR. DELL'ANGELO: Object to the form to
13   the extent it calls for a legal conclusion.
14          THE WITNESS: Again, under my definitions
15   of an elite fighter, he was, because he built
16   himself up to a place of notoriety far exceeding
17   people who may have a higher skill set in fighting
18   than him. Kimbo, I believe his last fight before he
19   passed away is the most viewed fight ever, most
20   viewed MMA fight. I'm kind of guessing at this, but
21   I think his numbers, more people have watched that
22   fight than any other fight in the history of the
23   sport.
24          So I would have to say, yeah, that guy's
25   an elite-level fighter just because of that

                                                    Page 35
 1   notoriety. If you go down the street and ask
 2   different people a list of different fighters,
 3   chances are Kimbo is the name they're going to
 4   recognize.
 5   BY MR. WIDNELL:
 6      Q   So we're talking about Pride, how about
 7   K-1? If you fought in K-1 would that make you
 8   elite?
 9          MR. DELL'ANGELO: Objection to the form to
10   the extent it calls for a legal conclusion.
11          THE WITNESS: Again, going back to what I
12   said before, one of the ways to become elite is to
13   fight in the UFC. The other way is notoriety and
14   amateur and small regional performance. If you're
15   an awesome Olympic wrestler and you have some
16   notoriety, your first fight could be with a big
17   organization and you'd be elite. In order to
18   maintain elite status, you have to win, you have to
19   continue winning and you have to maintain your
20   notoriety. And that is usually done through
21   winning.
22   BY MR. WIDNELL:
23      Q   Yeah, that's a good point. I should have
24   asked before going on to K-1. So I think if I heard
25   you correctly, if you have a winning record in

                                                    Page 36
 1   Pride, does that make you elite?
 2          MR. DELL'ANGELO: Objection to the form to
 3   the extent it calls for a legal conclusion.
 4          THE WITNESS: No, that's not what I'm
 5   saying.
 6   BY MR. WIDNELL:
 7      Q   Okay.
 8      A   I'm saying that if you fought in Pride or
 9   another one of those organizations, you'd have to --
10   because they would be the critical lower-level shows
11   we're talking about, you would have to perform well
12   in that lower-level show.
13      Q   So what does performing well mean? That's
14   what I am trying to understand.
15      A   That's a difficult question. That's kind
16   of speculation because everyone has their own
17   opinion of what performing well is in this sport.
18   In my opinion, performing well is winning.
19      Q   So but I just asked if a winning record at
20   Pride was enough, and it sounded like you weren't --
21      A   It wasn't, but you had to have a winning
22   record. Because, like, my friend Phil Baroni might
23   not have had a winning record over there, but he may
24   win one, lose two, win one, lose two type of things
25   where he's still competitive. He's still

                                                    Page 37
 1   competitive with the other elites, which makes him
 2   elite.
 3      Q   I see. So is it fair to say that if you
 4   have a winning record for a certain number of fights
 5   at an organization -- at an organization like Pride,
 6   that you are an elite fighter?
 7          MR. DELL'ANGELO: Objection to the form to
 8   the extent it calls for a legal conclusion.
 9          THE WITNESS: Not necessarily. There's so
10   many factors that can go into it. But I find it
11   would be difficult to win a bunch of fights in one
12   of the top tier organizations and not be considered
13   elite. Because if you're winning a lot of fights in
14   Pride or another show with comparable eyeballs on
15   it, your notoriety is going to rise. You know,
16   people like winners. They're going to watch
17   winners. If you're a winner, people are going to
18   come back and watch you. So under that notoriety
19   balance that's going on there, yeah.
20      Q   Okay. So you just used a term that I
21   would really like to understand. You said "top tier
22   organizations." What do you mean by a top tier
23   organization?
24      A   Top tier, well, there's the UFC which
25   controls like 90 percent of the market, and then
```



Page 38

1  everybody else controls small-time percentages.  So
2  you have like Pride, Strike Force, whoever
3  underneath the top UFC.  And the reason is, with the
4  contracts, they control the contracts and they keep
5  the better fighters to themselves, which allows --
6  which doesn't allow growth in the smaller shows.
7      Q   Okay.  So you said that UFC controls
8  90 percent of the market.  What's your basis for
9  saying that?
10     A   Well, I'm not an economist, but the things
11 that I've read online point to them numerically
12 controlling a large 90-percentile portion of the
13 market.
14     Q   And what --
15     A   Again, I'm not an expert.  I'm not an
16 economist.  So I don't really know what I'm talking
17 about with that.  That's just stuff I've read.  I
18 could do a Google search for you.
19     Q   Can you give me JUST an example of what
20 you've read online that -- is it trade press
21 articles?
22     A   I have just -- just there have been things
23 mentioning how much the companies are making per
24 year, what's the profit ratio per year.  Nobody's
25 anywhere near what UFC is bringing in.

Page 39

1      Q   Okay.  So you recall seeing reporting on
2  what the different organizations were making in
3  terms of revenue -- is that?
4      A   Yeah.  There have been some reports on the
5  revenue.
6      Q   Okay.  And do you recall any specific
7  place where you saw this?
8      A   Not specifically, no.
9      Q   Okay.  Thank you.  Can you give me an
10 example of other top tier organizations?  I think
11 you mentioned Pride.  I think you mentioned Strike
12 Force.  Are there others that you would describe as
13 being a top tier organization?
14         MR. DELL'ANGELO:  Objection
15 mischaracterizes the witness's testimony.
16 BY MR. WIDNELL:
17     Q   Okay.  I apologize, actually.  Maybe I
18 misheard that.  I think you just said something.
19 You referenced Pride and Strike Force in connection
20 with top tier organizations.  Would you consider
21 Pride to have been a top tier organization at the
22 time it existed?
23     A   The -- I believe that Pride was a
24 competitor.  They were actually competing with the
25 UFC at the time of acquisition.

Page 40

1      Q   What do you mean by "competitor"?
2      A   That they had a lot of the big names
3  signed.  They had people watching the show, people
4  talking about them, people arguing about which
5  fighters are better, you know, UFC's or Pride's
6  champ.  And then UFC got rid of them by buying them
7  off, all of their champs, bought all of their top
8  guys up.  That's one reason why they bought them
9  because they were top tier.  They couldn't allow
10 another top tier organization to hang around, cut
11 into their profits.
12     Q   So it sounds to me like you're saying that
13 Pride was competing with UFC for fighters.  Is that
14 fair to say?
15     A   Yes.  Yeah.  Fighters, MMA fighters,
16 athletes compete for belts and titles.  Promoters,
17 event hosts they compete for the athletes so, yes.
18     Q   Okay.  So athletes that would consider
19 going to UFC to fight for UFC would have thought of
20 Pride as being a reasonable substitute; is that
21 accurate?
22         MR. DELL'ANGELO:  Objection.  Calls for
23 speculation, and to the extent it seeks a legal
24 conclusion.
25         THE WITNESS:  I, yeah.  It would have to

Page 41

1  be speculation on my part, but I can go from my
2  experience.  I signed with UFC in 2005.  And it was
3  not an option for me because in 2005 I do not
4  believe Bushido was around, and Pride did not have
5  my weight class.  I would have had to have tried to
6  put on, like, 30-pounds to fight over there.  And
7  I -- I didn't want to do that.  But my only option
8  was the UFC.  I had nowhere else to go.
9  BY MR. WIDNELL:
10     Q   Okay.  But would you say -- I mean, you
11 said that Pride competed for fighters.  Would you
12 say that they were fighters that would consider
13 going to UFC and also going to Pride?
14         MR. DELL'ANGELO:  Objection.  Calls for
15 speculation.
16         THE WITNESS:  Again, it would have to be
17 speculation, but if you were a 205-pounder to heavy
18 weigh, there was reason to give pause to decide
19 which organization to go to.
20 BY MR. WIDNELL:
21     Q   Okay.  And is that because your
22 understanding is that Pride offered a comparable
23 opportunity for fighters to UFC?
24         MR. DELL'ANGELO:  Objection.  Leading.
25 You can answer.



Page 106

```
 1  BY MR. WIDNELL:
 2     Q   So the actual duration of the contract
 3  would have been -- it would have started at the time
 4  of your first fight --
 5     A   Uh-huh.
 6     Q   -- and it would have ended at the point
 7  that you renegotiated the contract; is that right?
 8     A   Yes.
 9     Q   Okay.  And it looks like that time period
10  was less than a year.  Does that sound right to you?
11     A   Yeah, it seems correct.
12     Q   Okay.  And just by way of example, so your
13  next contract was a four-fight contract, and it
14  looks like you renegotiated it after the third
15  fight?
16         MR. DELL'ANGELO:  Objection to form.
17  Foundation.
18  BY MR. WIDNELL:
19     Q   Assuming that is the case, would that
20  contract have been approximately a year-long
21  contract in terms of actual duration?
22         MR. DELL'ANGELO:  Same question -- same
23  objections.
24         THE WITNESS:  Yeah.  I don't really
25  understand what you're getting at.
```

Page 107

```
 1  BY MR. WIDNELL:
 2     Q   I'm just trying to figure out the length
 3  of time that the contract was in operation.
 4     A   Well, it's different because, you know, I
 5  fought in one, so they needed to secure me before I
 6  fought my next fight and would be out of contract.
 7  And they wouldn't have wanted to let me go coming
 8  off a couple wins and then letting my contract
 9  expire.  So they wouldn't -- I wouldn't see why they
10  would try to extend that time period as long as you
11  can.
12     Q   I'm sorry.  I'm not sure I understand what
13  you mean?
14     A   Yeah.  I'm kind of confused with your
15  question, though.  I don't really get what you're
16  asking.
17     Q   So the only question I'm trying to ask is
18  how long is the contract in operation.  And it
19  sounds like it starts at your first fight and it
20  ends when your contract is renegotiated.  Does that
21  sound right to you?
22         MR. DELL'ANGELO:  Objection.  Calls for a
23  legal conclusion.  You can answer if you know.
24         THE WITNESS:  I would say more that, once
25  your contract is initiated, they don't let it really
```

Page 108

```
 1  get to an end.  It's not allowed to end.  You're
 2  automatically forced to re-sign a new contract.  So
 3  it's a new contract, so technically the other one's
 4  over, but it's not really, because they're just
 5  extending a similar position.  There's not any real
 6  negotiation taking place.  A $2,000 bump is not a
 7  negotiation.
 8  BY MR. WIDNELL:
 9     Q   So they have the ability to force you to
10  sign the contract, but they're still giving you a
11  $2,000 bump; is that correct?
12         MR. DELL'ANGELO:  Objection to the form.
13  Mischaracterizes the witness's testimony.
14         THE WITNESS:  They're giving you no real
15  option other than to sign the contract.  And the
16  little pay bump is the least that they will give you
17  in order to kind of legitimize what they're doing.
18  Because if guys won and didn't get pay bumps,
19  there'd be less incentive to even be a fighter, an
20  MMA fighter.
21  BY MR. WIDNELL:
22     Q   Okay.  So let's --
23         MR. McSWEENEY:  Exhibit 51.
24         MR. WIDNELL:  Okay.  Perfect.
25         (A discussion was held off the record.)
```

Page 109

```
 1  BY MR. WIDNELL:
 2     Q   Let me refer you now to Exhibit 51.  So
 3  Exhibit 51, I think I had already read this in, but
 4  it's ZFL0414103.  It's the exclusive and promotional
 5  and ancillary rights agreement.  If you look at the
 6  last page, there's a signature on that agreement
 7  that looks like your signature that's dated
 8  January 2nd, 2008.  Does this document look familiar
 9  to you?
10     A   Yeah, I believe -- I believe so.
11     Q   I think part of my confusion in terms of
12  how I handed this to you was that on the bottom of
13  the first page, it says "Fighter 2007."
14     A   Uh-huh.
15     Q   But it looks like you signed this in 2008?
16     A   Yeah.  You can see that the fight was --
17  before was the March 1, 2008, which you can see,
18  that's one of the other strategies they use to force
19  you to sign the agreements.  I hadn't fought since
20  October.
21     Q   I think there's an intervening contract
22  that I -- which I thought was the contract that I
23  was handing you, but I think we're going to have to
24  clear that up.  I think there's effectively a
25  contract that covers your three fights Luigi, Roan,
```



Page 110

1  and Diego. And that this one is now going to be
2  covering the fight that you have with Chris Wilson
3  as your first fight?
4      A   Yeah. I was just pointing out, this is
5  one of the strategies they're using. You can see
6  that fight was March 1, 2008. I hadn't fought since
7  September, so money's running low, I need money, I
8  need to fight. This agreement is sent to me in
9  February; right? So -- oh, wait a minute, that's
10 January. So that's two months before that fight.
11 They're holding my bout agreement hostage. They're
12 holding my next fight hostage until I sign this.
13 They do that often. I think if you look at the
14 other one, you'll probably see that too. Signed
15 4/6, yes. Signed 5/6, which is May, yeah, so I
16 signed that in May. I fought in June.
17     Q   So you're saying that at that time they
18 were withholding a fight from you until you
19 resigned?
20     A   I'm saying they do that to everybody.
21 We're going to hold your bout agreement until you
22 sign your extension. We won't allow you to become a
23 free agent.
24     Q   Okay.
25     A   Can we go back to the example with

Page 111

1  Arlovski. Roger Huerta is coming to my mind now
2  too. I think the same thing happened.
3      Q   I'm sorry who was?
4      A   Roger Huerta.
5      Q   Was an example of?
6      A   Like Arlovski, wanted to fight out his
7  contract and they benched him, iced him.
8      Q   Okay. So that's another example of
9  someone that you believe was benched?
10     A   Yes.
11     Q   Okay. And you don't remember when Huerta
12 was benched?
13     A   I don't know the dates.
14     Q   How did you find out about Huerta?
15     A   It was very -- it was a public thing. It
16 was covered in the press.
17     Q   Okay. So we don't have the earlier
18 contract, but let me do this going forward now and
19 let's see if you believe the same thing happened for
20 the next one I had mentioned. You might say it did.
21 So can I get tab 53. I'm going to be handing you
22 what is marked as Exhibit 54.
23         (Exhibit 54 was marked.)
24         (Discussion held.)
25         MR. MAYSEY: Did I get yours, counsel?

Page 112

1          MR. McSWEENEY: You got mine.
2  BY MR. WIDNELL:
3      Q   Exhibit 53 is a document with the initial
4  Bates number ZFL0414089.
5          MR. DELL'ANGELO: Is that 54 or 53?
6          MR. WIDNELL: I'm sorry. Exhibit 54. I'm
7  sorry. My apologies.
8          MR. DELL'ANGELO: Note for the record,
9  counsel, on final page of 54 ZFL0414106, the
10 witness's Social Security Number and passport number
11 appear.
12 BY MR. WIDNELL:
13     Q   And on that last page, is that your
14 signature?
15     A   I believe that is my manager. Or, I'm
16 sorry, I believe that is my signature. I misspoke.
17     Q   Okay. And does this agreement look
18 familiar to you?
19     A   I believe so. Yes.
20     Q   All right. So let's go back to Exhibit 51
21 really quickly. If you look at the term of Exhibit
22 51, which would be page 4, 5.1. Is that a
23 four-bout, 18-month contract?
24         MR. DELL'ANGELO: Objection. Calls for a
25 legal conclusion.

Page 113

1          THE WITNESS: I believe that is correct.
2  BY MR. WIDNELL:
3      Q   Okay. And then the compensation under the
4  contract for the four fights, can you tell me what
5  that --
6          MR. DELL'ANGELO: Objection. Calls for a
7  legal conclusion.
8          THE WITNESS: So on which one?
9  BY MR. WIDNELL:
10     Q   For the Exhibit 51 that we were talking
11 about?
12     A   Which is on page? Page 4 is the term.
13 What are you talking about?
14     Q   The compensation starts on the next page.
15     A   Yeah, I see it here now. Yup. I see it.
16     Q   Okay. So for the first bout, it is 30/30;
17 is that correct?
18     A   Correct.
19     Q   And when I say 30, 30, just to be clear, I
20 mean it's 30,000 to show and 30,000 to win?
21     A   Yeah. That is show and win.
22     Q   That's your understanding?
23     A   Yes.
24     Q   And the next fight after that is 34/34?
25     A   Correct.

MAGNA LEGAL SERVICES

Page 142

```
 1    Q   Now, I guess I hear what you're saying.
 2  I'm not saying that you're not a very accomplished
 3  fighter.  I think your record stands for itself.
 4  But I was asking if, for the last few fights in the
 5  UFC if you've been winning.  It looks like you were
 6  not?
 7    A   A draw and then a couple losses to guys
 8  who are title contenders or champions.  I mean, that
 9  doesn't really take you off.  That drops my ranking
10  from top five into the top ten.  I'm still top ten.
11    Q   So are rankings really important in
12  assessing the quality of the fighter?
13    A   Well --
14        MR. DELL'ANGELO:  Objection
15  mischaracterizes the witness's testimony.
16        THE WITNESS:  That's not exactly what I
17  said.  Rankings are interesting to say the least.
18  Because when you have a monopolistic environment,
19  that company, UFC, they heavily influence ranking
20  especially since they started ranking their own
21  guys, they dictate who's ranked what.  Rankings can
22  be really important, and they're needed to make it a
23  merit sport, yet we don't have legitimate rankings
24  because the organization that should be doing the
25  rankings, would be independent third party
```

Page 143

```
 1  sanctioning bodies.  But they do not exist in mixed
 2  martial arts, because UFC set things up so they that
 3  they were the sanctioning body.
 4    Q   Okay.  So UFC's rankings aren't reliable
 5  from your perspective; is that correct?
 6    A   In the sense that they can put anybody
 7  ranked anywhere at any time how it benefits their
 8  business, rather than legitimately ranking fighters
 9  who are better than each other.  It's collusion,
10  it's conflict of interest, that they have.
11    Q   And are there any other third party
12  entities that have rankings that you think are
13  reliable?
14    A   In boxing.  In boxing they have
15  sanctioning bodies.  And I think the boxing rankings
16  are very reliable since the Muhammad Ali Act was
17  introduced.  And they have definitive third party
18  ranking systems, yes.  But we don't have that.
19    Q   Okay, so there are no rankings that are
20  done by third parties outside of the UFC --
21    A   That far --
22    Q   For MMA -- please let me finish -- for MMA
23  fighters that are reliable, in your opinion, is
24  that?
25    A   In my opinion, rankings cannot be fully
```

Page 144

```
 1  reliable unless they are done by an independent
 2  third-party sanctioning body.
 3    Q   Okay.  So are there any rankings that are
 4  partially reliable?
 5    A   That's a good question.
 6        MR. DELL'ANGELO:  Objection to the form.
 7        THE WITNESS:  I would say that some
 8  independent entities can possibly have reliable
 9  rankings, yet they are usually media-related
10  companies, and those media-related companies are
11  heavily influenced by the power of the UFC.  If you
12  do rankings or articles that the UFC does not
13  particularly like, they will revoke your press
14  passes and you will not be allowed to cover events
15  in person.  You will not have access to the
16  athletes.  I have gotten e-mails before from the UFC
17  saying, "Do not talk to these people in the media."
18  And it's for those reasons.  They didn't like them
19  and they didn't like what they were reporting on
20  their company.
21    Q   So which media representatives were you
22  told not to talk to?
23    A   I do not remember at the time.  But I do
24  remember -- I do remember being told on at least
25  one, maybe two, occasions that there were people
```

Page 145

```
 1  that we should not talk to that were in the media.
 2    Q   And when you were told that, did they
 3  explain why you should not talk that to them?
 4    A   I do not remember.
 5    Q   Okay.
 6    A   I cannot remember the reason they gave.
 7  But there were talks about it from other people on
 8  the Internet, other fighters about what it was
 9  about.  And I think they were just not happy with
10  some of the critical writing.  I think Sherdog lost
11  their press pass at least once, maybe more times,
12  because of things that they had written that the UFC
13  didn't like.
14    Q   So because of your understanding that
15  Sherdog lost its press pass, would you say that
16  Sherdog rankings aren't reliable?
17    A   I will say that the only rankings that I
18  truly find reliable are the rankings that come from
19  third party independent sanctioning bodies that do
20  not exist in MMA.
21    Q   Okay.  So just going back to your last few
22  fights in the UFC before you were cut, do you recall
23  at that time what the reason -- whether any reason
24  was given for why you were cut?
25    A   After the Demian Maia loss?
```



37 (Pages 142 to 145)

MAGNA LEGAL SERVICES

Page 146

```
 1     Q    Yeah.
 2     A    The only reason that I was given was that
 3  the public statements that Dana White made, that I
 4  was overpaid and that I was on the downside of my
 5  career, even though I lost to contending champions
 6  and ex-champions.
 7     Q    So when he said you were on the downside
 8  of your career, do you recall if he said anything
 9  more specifically?
10     A    I do not recall him saying anything more
11  specific about that.
12     Q    Okay.  And you said that when you left, I
13  think -- and correct me if I mischaracterize your
14  testimony -- I think you said when you left, you got
15  paid a lot less money by WSOF; is that correct?
16     A    Yes.  My -- by being cut by the UFC, my
17  notoriety dropped, and I was forced into basically
18  the minor leagues.  And I took a severe loss on the
19  -- you know, I was making 66 and 66 for the Maia
20  fight, I think is what it was.  And I got plopped
21  into somewhere around 30/30, so it was about a 50,
22  60 percent drop in pay just because I was forced out
23  of the UFC.
24     Q    Did you look at any other options, or was
25  WSOF the only option that you were -- that you had?
```

Page 147

```
 1         MR. DELL'ANGELO:  Object to the form.
 2         THE WITNESS:  At that period of time, the
 3  only other viable organization may have been
 4  Bellator, but their setup wasn't something worth
 5  considering at the time.  They were heavy into the
 6  tournaments, so to speak, and it wasn't really
 7  something that we wanted to go to.  If Scott Coker
 8  would have been president of Bellator when I was
 9  released, that would have been somewhere I could
10  have considered.
11  BY MR. WIDNELL:
12     Q    Why were you not interested into going
13  into a tournament style organization?
14     A    Because tournaments, generally, in my
15  opinion, are used to build fighters.  You have an
16  unknown fighter who hadn't had a lot of exposure, a
17  lot of notoriety, you let him fight in a tournament,
18  and people get to see that fight over and over
19  again, usually in a quicker succession than guys who
20  do one-fight-type fights.  So the level of notoriety
21  I had, I should have been fighting for titles, not
22  fighting in tournaments.
23     Q    Would you describe a tournament as more of
24  a meritocracy than the system at UFC?
25     A    Yes, I would agree that a tournament style
```

Page 148

```
 1  is more of a meritocracy system.
 2     Q    But in this case you weren't interested in
 3  going to a system that was more of a meritocracy?
 4     A    Because the pay would have been a lot
 5  lower and, yeah, the weighing in on merit versus
 6  money, and then, of course -- it's not -- it's still
 7  not really a true merit, because it's one
 8  organization in a sport.
 9         If the entire sport was run via tournament
10  style, then, yeah.  If everybody in the sport had to
11  face everybody else through a tournament, yes, that
12  would be great.  But in a single organization where
13  you're stuck with that one organization and not
14  allowed to cross promote, you're not fighting people
15  from other organizations, then, no, I would not
16  think that is a true meritocracy.
17     Q    You said that was the system at Bellator
18  then.  Has the system changed since?
19     A    Yes.  Scott Coker got rid of the
20  tournament system.  Sometimes he does do a
21  tournament-type thing.  But that, again, he's still
22  building guys.
23     Q    Okay.  I think you said the money was a
24  lot less at Bellator than at WSOF?
25     A    Uh-huh.
```

Page 149

```
 1     Q    What was your recollection about what the
 2  money would have been at Bellator?
 3     A    We didn't talk money, so I don't know.
 4  But we have guys who were fighting -- I don't want
 5  to say that we had, I mean my management was
 6  managing other people who were fighting in Bellator.
 7  And it wasn't -- it wasn't a viable choice.  Looking
 8  at what those guys were getting paid in that
 9  organization, it wasn't something we were looking
10  at.
11     Q    And what were you paid at WSOF?
12     A    I don't have it right here in front of me.
13  It might have been close to 30 and 30, along those
14  lines, maybe even 25 and 25.  But I think it was
15  around that 30 to 30.
16     Q    And what were you getting paid at UFC
17  before you left, do you recall?
18     A    When I was cut from UFC, I think it was 66
19  and 66.
20     Q    Okay.  Were there any other options out
21  there that you have gone to?
22         MR. DELL'ANGELO:  Object to the form.
23         THE WITNESS:  Again, at that point in
24  time, UFC had already bought up all the legitimate
25  competition and there really wasn't anywhere for me
```

Page 254

1  promote, and you could fight for those belts from
2  those independent sanctioned bodies.
3      Q   Is it your understanding that all
4  promoters right now basically require you to fight
5  fighters within their promotion?
6          MR. DELL'ANGELO:  Objection to the form.
7  Vague.
8          THE WITNESS:  To my understanding, most of
9  the time guys are going to be restricted to fighting
10 for one organization.  Scott Coker does do some
11 things where he actually co-promotes a little bit.
12 But it's -- it's very, very minimal.
13 BY MR. WIDNELL:
14     Q   Does WSOF co-promote at all?
15     A   I do not believe that they do.  But I
16 think I remember -- I think when Ali was the match
17 maker/vice president, he did extend an offer to
18 Bellator to fight champions.  But it's very, very
19 unlikely.  It doesn't happen often, and, yeah, that
20 was more of a publicity stunt.  He was trying to
21 prove his organization was better than Bellator, so
22 he was trying to get fights between champions set
23 up.  Boxing, they co-promote all the time.  And I
24 think that would be a much better scenario for us.
25     Q   Why do you think smaller promoters don't

Page 255

1  co-promote?
2          MR. DELL'ANGELO:  Objection to the form.
3  Calls for speculation.
4          THE WITNESS:  In my opinion, the smaller
5  promotions generally are happy being number two to
6  big dog, UFC.  And they are mostly fighting against
7  each other for the up-and-coming guys and acting as
8  feeder systems to the UFC rather than competitors
9  of.
10         MR. WIDNELL:  Okay.  I have no further
11 questions.
12         MR. DELL'ANGELO:  Okay.  We will read and
13 sign.
14         THE VIDEOGRAPHER:  We are now off the
15 record.  The time is 4:54 P.M.

---

                    CERTIFICATE OF WITNESS
PAGE  LINE  CHANGE         REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____
                    * * * * *
        I, Jon Fitch, witness herein, do hereby
certify and declare under penalty of perjury the within and
foregoing transcription to be my deposition in said action;
that I have read, corrected and do hereby affix my signature
to said deposition.
_____  _____
Jon Fitch
Witness                            Date

STATE OF NEVADA)
               ) ss
COUNTY OF CLARK)

        I, Sarah Padilla, a duly commissioned and
licensed court reporter, Clark County, State of Nevada,
do hereby certify:  That I reported the taking of the
deposition of the witness, Jon Fitch, commencing on
Wednesday, February 15, 2017, at 9:23 A.M.; That prior to
being examined, the witness was, by me, duly sworn to
testify to the truth; That thereafter I transcribed my
shorthand notes into typewriting and that the typewritten
transcript of said deposition is a complete, true, and
accurate record of said shorthand notes.  I further certify
that I am not a relative or employee of any attorney or
counsel of any of the parties nor a relative or employee of
an attorney or counsel involved in said action, nor a person
financially interested in the action; that a request
[x] has [] has not been made to review the transcript.
        IN WITNESS WHEREOF, I have hereunto set my
hand in the County of Clark, State of Nevada, this __
day of _____.

                       _____
                       SARAH PADILLA, CCR 929



65 (Pages 254 to 257)