# EXHIBIT 56

## Redacted Excerpts of Deposition of Scott Coker

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
      Plaintiffs, )
)
         vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
      Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

SCOTT COKER

LOS ANGELES, CALIFORNIA

AUGUST 3, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 51251

|  | 98 |  | 100 |
|---|---|---|---|
| 1 | SCOTT COKER - HIGHLY CONFIDENTIAL | 1 | SCOTT COKER - HIGHLY CONFIDENTIAL |
| 2 | [redacted] | 2 | help us drive ratings on CBS and eventually drive |
| 3 |  | 3 | ratings on pay-per-view. |
| 4 |  | 4 | BY MR. DELL'ANGELO: |
| 5 |  | 5 | Q. So is it fair to say that you believe that |
| 6 |  | 6 | overall, attracting a fighter like Fedor would be, |
| 7 |  | 7 | you know, good for Strikeforce's business? |
| 8 |  | 8 | A. Yes. |
| 9 |  | 9 | Q. I think you testified a little earlier |
| 10 |  | 10 | today -- and I'm sorry, let me just withdraw that. |
| 11 |  | 11 | Is that generally true with other fighters |
| 12 |  | 12 | that have heat on them, as you described it, to use |
| 13 | Q. Do you think that that could be -- if there | 13 | that term? |
| 14 | was only one player that that could be -- hurt | 14 | A. Could you repeat the question one more |
| 15 | fighters? | 15 | time. |
| 16 | A. Yes. | 16 | Q. Sure. So I wanted to know if that was also |
| 17 | Q. Okay. And what other ways -- what ways | 17 | generally true with respect to Strikeforce's ability |
| 18 | would it hurt the fighters, in your opinion? | 18 | to attract other fighters that had heat on them, as |
| 19 | A. Well, the biggest way is think about if | 19 | you used that term? |
| 20 | there's only one place to have a job, and then, | 20 | A. Yes. It would have been a great statement |
| 21 | there's only a certain amount of slots available to | 21 | and a great recruiting tool. |
| 22 | have employment, the fighter purses naturally would | 22 | Q. So getting a fighter like Fedor, you |
| 23 | go down because now you're in control of the | 23 | believed, would have helped Strikeforce recruit or |
| 24 | marketplace. So now, you can dictate what an entry | 24 | attract other quality fighters? |
| 25 | fighter level would get and what a mid-tier fighter | 25 | A. Yes. |

|  | 99 |  | 101 |
|---|---|---|---|
| 1 | SCOTT COKER - HIGHLY CONFIDENTIAL | 1 | SCOTT COKER - HIGHLY CONFIDENTIAL |
| 2 | would get, what a top-tier fighter would get. And | 2 | Q. Is that something that you viewed as being |
| 3 | you kind of control the marketplace at that point. | 3 | important to Strikeforce? |
| 4 | Q. I think you testified that you wanted to | 4 | A. Yes. |
| 5 | pursue Fedor at this time? | 5 | Q. And why is that? |
| 6 | A. At this time, yes. | 6 | A. My goal was to build this company as big as |
| 7 | Q. So did you think that Fedor was an | 7 | we could, become a -- you know, a sizeable player in |
| 8 | important fighter for Strikeforce to try to get in | 8 | the mixed martial arts world. |
| 9 | its roster? | 9 | And I felt like we had a lot of pieces in |
| 10 | A. Yes. | 10 | place. We started -- we started recruiting top |
| 11 | Q. And why? | 11 | talent, that we were building from the ground up |
| 12 | A. Being undefeated for ten years, coming off | 12 | with, say, like Ty Woodley, Luke Rockhold, Daniel |
| 13 | of a big fight where he knocked out Andrei Arlovski. | 13 | Cormier, a lot of the stars that are currently stars |
| 14 | Had a lot of heat on him. | 14 | today for the UFC. |
| 15 | I mean, he's the man. Fedor is the | 15 | We started building our free agent |
| 16 | greatest of all time. And when you can have a | 16 | fighters. So we built the roster from the ground up |
| 17 | fighter like that come on to your roster, it's always | 17 | and we bought some of the fighters from the top down. |
| 18 | a good day. | 18 | And I think that Fedor would have been the icing on |
| 19 | Q. Did you believe that signing Fedor at | 19 | the cake for us, you know, to just show the industry |
| 20 | Strikeforce would help Strikeforce sell | 20 | that, hey, these are real players, you can count on |
| 21 | pay-per-views? | 21 | them, and they're going to be here for a long time. |
| 22 | MS. GRIGSBY: Objection, foundation. | 22 | Q. This email in Exhibit 7 is dated July 4, |
| 23 | THE WITNESS: I believed that he would help | 23 | 2009, correct? |
| 24 | drive ratings on Showtime, I believed that he would | 24 | A. Yes, that's correct. |
| 25 | put butts in seats. I would believe that he would | 25 | Q. Do you recall around that time frame, in |

26 (Pages 98 to 101)

## Page 102

SCOTT COKER - HIGHLY CONFIDENTIAL

2009, did Strikeforce acquire fighters from any other promotion?

A. Yes.

Q. And what promotion was that?

A. In 2009, we acquired Pro Elite.

Q. And what was Pro Elite?

A. Pro Elite was a struggling mixed martial arts fight company based out of Los Angeles. They -- well, at this time, we already had acquired them. This is prior to this.

Q. Right. So the email in Exhibit 7 is sometime later in 2009, Strikeforce had already acquired Pro Elite?

A. That is correct. And my thought, honestly, was in October of '10 -- I'm sorry -- October of '08 is when we acquired Pro Elite.

So that's my belief. So we acquired Pro Elite, which had the CBS, Showtime contracts. It had Nick Diaz' contract, Robbie Lawler's contract, it had Gina Carano's contract. So we acquired a lot of these great fighters at the end of '08.

Q. How did the acquisition -- well, let me withdraw that.

Did Pro Elite include any other MMA brands

## Page 103

SCOTT COKER - HIGHLY CONFIDENTIAL

that Strikeforce acquired?

A. No, because it was not a purchase of the entire company, it was just an asset purchase. So we plucked out certain things that we wanted and left a lot of things that we didn't want.

Q. How did Strikeforce's acquisition of Pro Elite impact Strikeforce's business?

A. When you have great fighters, great personalities, a great TV deal, then you can get great sponsorships, and you know, that's what helps you drive your business.

Q. Is it your view, then, that without things such as great fighters, you can't do those other things, like attract great sponsors, et cetera?

A. It makes it very difficult.

Q. How would you -- how would you characterize the -- I guess Strikeforce around the -- as an MMA promotion at the time of the Pro Elite acquisition? How would you characterize its trajectory in the MMA marketplace?

A. Clearly, No. 2 in the marketplace. I mean, UFC had a 20-year, you know, first in market advantage.

But I think we were gaining ground, gaining

## Page 104

SCOTT COKER - HIGHLY CONFIDENTIAL

momentum, income was pretty much -- those two years was pretty much like a hockey stick. In a down economic time, we were not impacted by the economy because we were still packing the stadium, we had great ratings, and we were putting butts in seats.

When I think about that time period for Strikeforce, I think that it was a great time for the company because we had just acquired all these great fighters, we already had great fighters. We were buying more fighters, we were starting to build more fighters. And we had a great TV deal, and you know, once you added Showtime and CBS, Strikeforce became really a regional brand to become a national brand.

Q. And was Strikeforce becoming a stronger competitor to the UFC at that time?

A. Yes.

Q. And was Strikeforce competing with the UFC for top talent at that time, that is, fighters?

A. The only fighter that I would think that we were both after that we really wanted was Fedor.

Q. In terms of -- in terms of top fighters?

A. Because we had just acquired all these great fighters, and we only had so many TV dates. So, you know, the house is pretty full, if you can

## Page 105

SCOTT COKER - HIGHLY CONFIDENTIAL

understand what I mean by that.

So we were looking for that one fighter that could make a big impact, and we wanted to get Fedor on our roster.

Q. At that time, how would you characterize Strikeforce's heavyweight division?

A. The thought behind getting Fedor, honestly, was to put together I mean arguably the greatest heavyweight tournament ever in the history of MMA, especially North America.

And we already had Alistair Overeem, we had Fabricio Werdum, we had Josh Barnett. We had Brett Rogers. We had Big Foot Silva, and we had Andrei Arlovski.

And I wanted to put Fedor on a roster so I could put him in this tournament because I knew that this was a tournament that was going to be a significant difference maker in our sport.

Q. How did you think that Strikeforce's heavyweight division compared to the UFC's heavyweight division in 2009?

A. Yeah. In 2009 and '10, we had more top 10 rated heavyweights than the UFC did. So arguably, we had a better heavyweight division than they did.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

170

SCOTT COKER - HIGHLY CONFIDENTIAL

1  golf.
2  Q.  You weren't a student of the MMA promotion
3  industry or business, right?
4  A.  No.
5  Q.  So about three months later, you become
6  involved in Bellator, correct?  So June of 2014,
7  about three months after you kind of emerged from
8  your --
9  A.  Yes.
10 Q.  -- your hiatus, if you will?  Okay.
11        And so, from the time of March 2014 to the
12 time of June 2014, did you study or research Bellator
13 to try to understand it more and why it may have
14 lacked star power?
15 A.  No.  The mindset really wasn't to, you
16 know, like to study anything, really.  It was stop
17 and smell the roses, unwind a little bit, just relax.
18 Go on vacation, travel, you know, travel all over the
19 world for a year-and-a-half, and then, play a lot of
20 golf and just relax.
21 Q.  Right.  Yes, I appreciate that.  All I was
22 really trying to understand is up to June of 2014 how
23 dialed in you really were to Bellator's business and
24 why, you know --

171

SCOTT COKER - HIGHLY CONFIDENTIAL

1  A.  I had no idea.  Honestly, it was Kevin Kay
2  requesting a meeting, and I didn't even know who
3  Kevin Kay was, to be honest with you.  So I said,
4  okay, I'll go meet him.  But really, I'm going to go
5  open another company.  I remember telling some
6  friends:  I'm not in the business of building other
7  people's businesses, I'm go to build my own business
8  again and I'm going to go back and do this.
9         And I sat down with Kevin Kay, and he's
10 telling me what he's doing, telling me what he wants
11 to do, wants to make a move in the top position.
12        Originally, I thought he wanted me to work
13 with Bjorn Rebney.  I said, well, this is not -- you
14 know, by committee, this is -- something that has to
15 be very, you know -- somebody has to make the
16 decision.  I don't want to argue with somebody else.
17        And I said, Kevin, I go, your brand has
18 really been dented.  And you know, I'm coming up off
19 a very, very -- you know, time in my life where
20 Strikeforce was great, I want to create something
21 else great.
22        I remember telling Kevin this.  I said,
23 your ship is kind of like the Titanic.  You know?  Do
24 I want to jump on the Titanic as you guys are

172

SCOTT COKER - HIGHLY CONFIDENTIAL

1  tilting?  I go:  I don't know.  I go -- I had to
2  think about that.
3         And I said something to him, and I wanted
4  to see how he'd react.  And what I said was, I said:
5  Kevin, you don't only have a black eye in the
6  business, you have an orbital fracture, and I'm not a
7  surgeon.  I don't even know if I can help you.
8         He said:  Well, hey, think about it.  I
9  said:  Well, I'll think about it.
10        And I didn't call him back for a month
11 because I wasn't looking for a job, I didn't want to
12 be employed by anybody.
13        But he kept calling me and talking.  And
14 the more I talked to him, I started feeling good
15 about his vision.
16        And so, finally, after much -- you know,
17 thinking about it for two-and-a-half months, I said:
18 You know what, F it.  Let's go for it.  I'm going to
19 go and try my best and try to help build Bellator.
20 And then, they made the move to remove Bjorn, and I
21 came in two days later.  And that was March of '14,
22 yeah, March of '14.
23 Q.  In your estimation, as you just sort of
24 articulated, was Bellator's lack of star power part

173

SCOTT COKER - HIGHLY CONFIDENTIAL

1  of what made it like the Titanic in the MMA industry?
2  A.  I think it comes from leadership at the
3  top, and it was that tournament format.  To me, the
4  tournament format, my belief is this -- and I worked
5  for K-1 for eight years, which was the greatest
6  tournament format, you know, entity ever, that and
7  Pride.
8         And you should do tournaments when you have
9  eight stars because then, everybody can identify with
10 these eight fighters, just like we did for the
11 heavyweight tournament.
12        These were tournament formats that were
13 happening every week in a different city in a little
14 town that, you know, a lot of people didn't hear
15 about.  You know, I didn't even know what some of
16 these cities were.  And a 1500, 1800-seat stadium.
17 It just looked very small, very dark, very dingy, and
18 the product was just subpar.  And this is before, you
19 know, Viacom came in and took it over.
20        So that's what I was referring to.  Kevin
21 was like, you know.  And he goes:  Well, have you
22 watched our product lately?  I says:  No, not really.
23 And I really hadn't even watched one episode to that
24 point.  He goes:  Well, check it out.

44 (Pages 170 to 173)

```
                                              174
 1           SCOTT COKER - HIGHLY CONFIDENTIAL
 2           And I said:  You know, Kevin, the
 3   tournament format doesn't work.  I'm telling you,
 4   you've got to have eight stars.  And then, your
 5   overlapping of tournaments were -- you know, because
 6   this is what I was hearing from the managers and the
 7   fighters and even some of my friends that are hard
 8   core MMA fans can't keep up with which tournament is
 9   fighting today and which one is next week and who,
10   what weight class.  They just get confused because
11   there's so many tournaments going on at the same
12   time.
13       Q.  Right.
14       A.  So I told Kevin, I said:  We have to change
15   the format.  We have to go back to star fights, you
16   know, star versus star, and we have to --
17           MR. KELLY:  Slow down a little bit.
18           THE WITNESS:  I'm getting excited, you
19   know.
20           But I just told Kevin that we have to
21   change the format, and he was agreeable.  He said:
22   Look, if we give you the reigns, we're going to give
23   you the reigns, and you go do it.
24           And I said:  All right, let's go do this.
25
```

```
                                              175
 1           SCOTT COKER - HIGHLY CONFIDENTIAL
 2   BY MR. DELL'ANGELO:
 3       Q.  Before June of 2014, did Bellator have a --
 4   you mentioned Viacom.  Did Bellator have a
 5   relationship with Viacom?
 6       A.  Before 2014?
 7       Q.  June of 2014, yeah.
 8       A.  That was coming out of -- yes, they did.
 9       Q.  And did Bellator's pre-June 2014
10   relationship with Viacom mean that Bellator had, you
11   know, access to capital to pay fighters that, you
12   know, had an upstart promotion might not otherwise
13   have?
14           MS. GRIGSBY:  Objection to form.
15           MR. KELLY:  Objection, foundation, calls
16   for speculation.
17           THE WITNESS:  Yeah, I would have to
18   speculate at this point.
19   BY MR. DELL'ANGELO:
20       Q.  Are you familiar with Dana White's
21   statements about, you know, the importance of
22   Bellator's relationship with Viacom as it relates to
23   Bellator's access to what he has characterized as
24   $5 billion in cash?  Have you heard those statements?
25       A.  No.
```

```
                                              176
 1           SCOTT COKER - HIGHLY CONFIDENTIAL
 2       Q.  In your experience as an MMA promoter, was
 3   having access to, you know, cash alone as an MMA
 4   promoter sufficient to attract top talent?
 5       A.  Is cash enough?
 6       Q.  In and of itself.
 7       A.  That's -- that's a very tricky question,
 8   and I'll tell you why.  Because if I went to a
 9   fighter and I was trying to recruit a fighter and
10   let's say UFC was coming in and we're making the same
11   offer, right, they would have familiarity with both
12   of us.  But let's say, you know, somebody else came
13   in and was willing to pay even more money.
14           A lot of times, a fighter will take what
15   they're familiar with, and it might be less money.
16           So I don't think money is the only, you
17   know, consideration because there has to be a comfort
18   level for them to trust you and want to fight for
19   you.
20       Q.  And do the fighters also need to know that
21   they will have the opportunity to be matched against
22   fighters of, you know, comparable quality?
23           MS. GRIGSBY:  Objection to form,
24   foundation.
25
```

```
                                              177
 1           SCOTT COKER - HIGHLY CONFIDENTIAL
 2   BY MR. DELL'ANGELO:
 3       Q.  In your experience.
 4       A.  I mean, I've never had a fighter that I've
 5   offered a contract to say, well, I want to fight this
 6   guy and then I want to do this and that.  They want
 7   to know their deal, and then, they'll go deal with
 8   the division is my experience.
 9       Q.  I guess thinking about it differently,
10   let's take Fedor as an example since we talked about
11   him.
12           In your experience, would a fighter like
13   Fedor, would it be beneficial to his career to join a
14   promotion that only had unknown, untested fighters?
15           MS. GRIGSBY:  Objection, calls for
16   speculation.
17           THE WITNESS:  My opinion is that he
18   would -- he would take that into consideration, yes.
19   BY MR. DELL'ANGELO:
20       Q.  Do you know if he was ever presented with
21   that kind of opportunity?
22       A.  I will say this, he did fight in Russia
23   many times for small organizations that he felt that
24   he wanted to fight in Russia.  So he fought for these
25   companies and they paid him, and he fought several
```

```
                                      178                                         180
          SCOTT COKER - HIGHLY CONFIDENTIAL             SCOTT COKER - HIGHLY CONFIDENTIAL
 1                                               1
 2   times there that were not big, big, you know,    2     Q.  Okay.  So what is your understanding of
 3   worldwide companies.                              3   what it is?
 4       Q.  So let's get back to sort of Bellator     4     A.  My understanding is when another league,
 5   post -- let's get back to Bellator post June 2014. 5   like, say, for instance Rizin or KSW wants to
 6   Or get to it, as the case may be.                 6   co-promote, then it becomes a co-promotion between
 7            Does Bellator have a policy regarding its 7  Bellator and Rizin or Bellator and, you know, KSW or
 8   fighters' ability to sign sponsorship deals with  8   One FC.  That's what I think of as a co-pro.
 9   Bellator sponsors?                                9     Q.  Does Bellator have a policy regarding
10       MS. GRIGSBY:  Objection, form.              10    co-promotion as you think of it?
11       THE WITNESS:  Yes, it has a policy, yes.    11      A.  No.
12   BY MR. DELL'ANGELO:                             12      Q.  So it doesn't prohibit co-promotion, right?
13       Q.  Does that policy include a sponsorship tax 13   A.  No.
14   like the one that you testified about at the UFC? 14    Q.  Does Bellator have a policy with respect to
15       MS. GRIGSBY:  Objection, form.              15   whether or not a fighter under contract with Bellator
16       THE WITNESS:  No.                           16   can fight for other promotions?  Other MMA
17   BY MR. DELL'ANGELO:                             17   promotions, that is.
18       Q.  And does Bellator have a policy that    18     A.  Repeat that one more time just to make sure
19   governs its fighters' ability to sign with sponsors 19  I understand.
20   that are not Bellator sponsors?                 20      Q.  Yes.  Does Bellator have a policy regarding
21       A.  Yes.                                    21   whether or not fighters under contract with Bellator
22       Q.  And what is that policy?                22   may fight for other MMA promotions?
23       A.  I'll just explain the policy.           23      A.  Yes.
24       Q.  Sure.                                   24      Q.  And what is that policy?
25       A.  The basic policy is simple.  You can't have 25  A.  Under the contract, it's an exclusive

                                      179                                         181
          SCOTT COKER - HIGHLY CONFIDENTIAL             SCOTT COKER - HIGHLY CONFIDENTIAL
 1                                               1
 2   a competing sponsor on a fighter that competes     2   contract with the fight company.  So they are not
 3   against your league, you know, league sponsors.    3   allowed to compete.
 4       So we have like Dave & Busters, our           4     Q.  And do you know when that policy came into
 5   fighters can't go get Buffalo Wild Wings, let's say, 5  being?
 6   kind of the same area.  Or if he has Bud Light and 6      MS. GRIGSBY:  Objection, foundation.
 7   ours is Miller, then there's a conflict.  So they  7      THE WITNESS:  I don't.  And I will say
 8   can't do that.                                     8   this.  If we have a fighter that wants to fight in
 9       Other than that, they're free to go as long   9   Japan, then we'll send him.  If we have a fighter
10   as it falls under the rules and the regulations of 10  that wants to fight in another league, we'll send
11   Viacom Media Company.                            11   them.  We send fighters to Vienna sometimes.
12       Q.  Otherwise, they're not -- aside from those 12     I do believe, and again, I'm not a hundred
13   limitations, Bellator doesn't restrict its fighters' 13 percent, but my belief is that we do have in some
14   right to have sponsors when they're fighting for  14   fighters' contracts that they actually are allowed to
15   Bellator?                                        15   compete in a fight league in another country if we're
16       A.  Other than that, there's no other        16   not -- if it doesn't hurt our business in the sense
17   restrictions.                                    17   that we have certain obligations to these athletes,
18       Q.  And does Bellator have a policy regarding 18   they have to fight two or three times a year.  And we
19   co-promotion for its fighters?                   19   want to make sure that we're able to make that happen
20       A.  Can you explain that?                    20   for the athlete.  Otherwise, you know, we could be in
21       Q.  Sure.  Are you familiar with the term    21   breach of the deal.
22   "co-promotion" as it relates to the promotion of MMA 22    So that's kind of in a nutshell what that
23   bouts?                                           23   agreement is.
24       A.  It could mean -- it could mean several   24   BY MR. DELL'ANGELO:
25   things.                                          25     Q.  Right.  So for example, you might not agree
```

```
                                                        182
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2     to let a Bellator fighter fight another promotion if
 3     it would prohibit you from -- prohibit Bellator --
 4         A.  Booking him.
 5         Q.  -- from booking him for a fight that you
 6     owe him contractually?
 7         A.  That's correct.  If it doesn't interfere
 8     with our business.
 9         Q.  Sure.
10         A.  If we have plans to fight a fighter and he
11     says, look, I want to fight in Russia against
12     so-and-so, I've had this conversation many times even
13     recently as a month ago with our -- one of our big
14     stars in London, with MVP Michael Page.  And he says:
15     I want to box.  And I said:  Go ahead.  Go box.  As
16     long as it doesn't interfere with your MMA schedule
17     and our obligation to fulfill our agreement with you,
18     then box away and enjoy yourself.
19         Q.  In the MMA promotion business, are you
20     familiar with the term "exclusivity" or "exclusivity
21     provision"?
22         A.  Of course.
23         Q.  What do you understand that mean?
24         A.  I mean, obviously, it's exclusive which
25     means that they're restricted, they can't do it.  But
```

```
                                                        183
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2     to me, there's the agreement, and then, there's the
 3     spirit of the agreement.  And to me, the spirit of
 4     the agreement always has to be an open door, back and
 5     forth.
 6         Q.  When Bellator was being operated by --
 7     well, does there come a time after you became
 8     involved with Bellator that the company changed its
 9     contracts?
10         A.  Yes.
11         Q.  Okay.  And did those changes to its
12     contracts include changes to the exclusivity
13     provision?
14         A.  To my knowledge, yes.
15         Q.  And how did they change?
16         A.  Again, if we have a fighter that wants to
17     fight elsewhere and wants to put it in the contract,
18     then we might have done it for one or two people that
19     we said, okay, we'll let you go ahead and do it.
20             For the most part, I think these agreements
21     still have exclusivity provisions, but if they came
22     and talked to us like King Mo did, two years ago, he
23     wanted to fight in the Rizin tournament, so we let
24     him go to Japan and fight.  It was not a co-pro.  We
25     had no financial stake in the fight or what happened
```

```
                                                        184
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2     to King Mo.
 3             And then, last year, he wanted to go again,
 4     so, we said okay.  You know, we weren't booking him
 5     at the time.  Go ahead and go fight your heart out.
 6         Q.  Right.  So are you aware that Bellator
 7     produced some documents to the plaintiffs in this
 8     litigation?
 9         A.  I believe so.
10         Q.  And have you had the opportunity to look at
11     any of those documents?
12         A.  I glanced at them, yes.
13         Q.  So I want to show you a couple of documents
14     I got that were produced by the plaintiffs in
15     litigation.  I'm going to hand you two at the same
16     time.
17             The first I'm marking as Coker Exhibit 11.
18     The Bates stamp begins SBPCL00003784.
19             And then, the second exhibit I'm going to
20     hand you is Exhibit 12, which begins SBPCL00002713.
21             (Exhibits 11 and 12 were marked for
22             identification by the reporter.)
23     BY MR. DELL'ANGELO:
24         Q.  You're welcome to take as much time as you
25     want to look at them, Mr. Coker, but I'm really at
```

```
                                                        185
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2     the moment just interested if you could take a quick
 3     look and identify them so we can just cover a few
 4     questions.
 5         A.  Um-hmm.
 6         Q.  Let's start with Exhibit 11.  Do you
 7     recognize Exhibit 11?
 8             MR. KELLY:  Are you asking him if he
 9     recognizes the form?  Because it is redacted.
10             MR. DELL'ANGELO:  That's a fair question.
11     So I'll withdraw the question.
12     BY MR. DELL'ANGELO:
13         Q.  So Mr. Coker, do you recognize the form of
14     the document of Exhibit 11?
15         A.  It looks like a standard contract.
16         Q.  Of Bellator?
17         A.  Yes.
18         Q.  Would you turn to page 40 of the document.
19     The Bates is 3823.
20             Do you see a name and a signature there?
21         A.  Is it here?
22             MR. KELLY:  Keep going.
23     BY MR. DELL'ANGELO:
24         Q.  I think you've got it.
25             Do you see a name and a signature there?
```

```
                                              190
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2   for itself.  It's either in there or it's not in
 3   there.
 4   BY MR. DELL'ANGELO:
 5       Q.  Why don't I read it and you can just
 6   answer.  So 6, "Grant Of Ancillary Rights" says:
 7            "Subject to the terms and
 8            conditions set forth below, fighter
 9            hereby grants to promoter the
10            following, unrestricted, irrevocable
11            worldwide rights in perpetuity,
12            ancillary rights."
13            Do you see?
14       A.  Um-hmm.
15       Q.  Would you agree that that doesn't contain
16   the term "exclusive," right?
17       A.  Correct.
18       Q.  And then, if you go down to A, it begins:
19            "The exclusive right during the
20            term to stage all bouts, sell
21            tickets, admission," et cetera.
22            Do you see that?
23       A.  Yes.
24       Q.  Is that an example of an exclusivity
25   provision of the type that you testified about a
```

```
                                              191
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2   little bit earlier?
 3            MR. KELLY:  Object to the extent it calls
 4   for a legal conclusion.  The document speaks for
 5   itself.
 6            THE WITNESS:  I mean, look, I'm not a
 7   lawyer.
 8   BY MR. DELL'ANGELO:
 9       Q.  Sure.  I understand.
10       A.  But to me, this looks like an exclusive
11   provision.
12       Q.  Okay.  But then, I would also like you to
13   just take a moment to look at the following
14   paragraphs of this contract that you signed on behalf
15   of Bellator, B, C, D, E, F, G, H.
16            Do you see any of those that include an
17   exclusivity provision?
18            MS. GRIGSBY:  I'm going to object again --
19            MR. KELLY:  The document speaks for itself.
20            Take your time and --
21            THE WITNESS:  Are you asking me to read
22   through this thing now?
23   BY MR. DELL'ANGELO:
24       Q.  I just wanted to know -- I mean, look, you
25   signed the document, right, on behalf of Bellator.
```

```
                                              192
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2   I'm just trying to see if you're aware if it has an
 3   exclusivity provision in anything other than 6A --
 4       A.  I'll be honest with you --
 5       Q.  -- in paragraph A --
 6       A.  Here is the process.
 7       Q.  Yes.
 8       A.  So I go and make a deal --
 9            THE REPORTER:  You all talked right at the
10   same time.  Sorry.
11            THE WITNESS:  So as president of the
12   company, I go, I make the deal with the athlete, and
13   then, I turn it over to our legal team and they
14   finish up with the fighter's legal time, and they
15   make the document and they execute it.  That's really
16   the process.
17            But I'm happy, you know, to read through
18   this if you'll give me a minute here.
19            MR. KELLY:  Just so the question is in
20   mind, you're asking whether B through H --
21            MR. DELL'ANGELO:  Yeah.  They just contain
22   the same type of exclusivity provision that's in A.
23   By my reading, they don't, but I think you all seem
24   to be comfortable that the document speaks for
25   itself.
```

```
                                              193
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2            MS. GRIGSBY:  Yeah, I'm going to object,
 3   he's not a lawyer, and in terms of the term
 4   "exclusivity provision," I don't see that anywhere in
 5   the document.
 6            MR. DELL'ANGELO:  I'm going to object to
 7   the use of speaking objections.  We've spoken about
 8   that, Stacy.
 9            MS. GRIGSBY:  I don't think we have.
10            MR. DELL'ANGELO:  We have.  We wrote you a
11   letter, didn't we?
12            MS. GRIGSBY:  It wasn't to me.
13            MR. DELL'ANGELO:  Okay.  So it was to your
14   counsel.  You know what we mean, so please don't
15   persist because you know they're improper.
16   BY MR. DELL'ANGELO:
17       Q.  So --
18       A.  So --
19       Q.  As you've used the term, do you see an
20   exclusivity provision in any portion of paragraph 6
21   of Exhibit 12 other than part A?
22       A.  Does not appear to be.
23       Q.  Okay.  Thank you.
24            Has Bellator ever attempted to contract
25   with a fighter who was under contract with the UFC?
```

194

SCOTT COKER - HIGHLY CONFIDENTIAL
A. No.
Q. Why not?
A. Because if they fight for the UFC, they have a contract with the UFC which would not allow them to come fight for us.
So the process has been that we would wait until the fights are completely done, we go into a matching rights period, and then, we'll talk to them when they are free and clear to talk.
Q. At Bellator, are you familiar with the term "tent-pole event"?
A. Yes.
Q. What is a tent-pole event as it relates to Bellator?
A. We do six stadium shows. When you say stadium, the size of, let's say, Staple Center or Anaheim or the Forum here, Madison Square Garden, and it's six big events with all big fighters.
Q. Can you just explain what a tent-pole event is, like what that means?
A. I would -- yeah. I would base tent-pole on the scale of the venue, the quality of the fighters, and traditionally, we do them on a Saturday night instead of a Friday night. It's a three-hour show

195

SCOTT COKER - HIGHLY CONFIDENTIAL
instead of a two-hour show.
But it's sizeable matchups to attract sizeable viewers.
Q. Do tent-pole events, as that term is used at Bellator, does that encompass fighters that are -- what types of fighters does it include?
A. We would bring all of our top talent.
Q. And does the term "Legend bouts," is that something that Bellator promotes as well?
A. From time to time, yes.
Q. Okay. And as Bellator promotes Legend bouts, what are Legend bouts?
A. I would consider a fight like the one we just had at Madison Square Garden. We had Chael Sonnen fighting Wanderlei Silva. Like a Legends matchup.
Q. Just going back to something I asked you a moment ago about Bellator, I think you testified that Bellator doesn't attempt to contract with fighters who are under contract with the UFC, correct?
A. Yes.
Q. Okay. In the MMA promotion business, are you familiar with something called matching period?
A. Yes.

196

SCOTT COKER - HIGHLY CONFIDENTIAL
Q. Okay. What is a matching period?
A. My understanding is that some contracts, not all contracts, have a matching period. So we always ask the fighter: Are you in a matching period, or can you go straight to a -- I'm sorry.
Repeat that one more time.
Q. My question really just was what is a matching period, as you understand --
A. Okay. I was thinking more of the exclusive negotiation period.
So a matching period is a certain amount of time that is in a contract between a fighter and a promoter that allows them to match another offer from another league.
Q. Okay. And during the course of your tenure at Bellator, has Bellator ever made an offer to a UFC fighter who is coming off of a matching period?
A. Who is --
MS. GRIGSBY: Objection to form.
THE WITNESS: Who is in a matching period?
BY MR. DELL'ANGELO:
Q. Who is in a matching period.
A. Yes, we have.
Q. Okay. Can you give me an example?

197

SCOTT COKER - HIGHLY CONFIDENTIAL
A. Roy McDonald.
Q. Okay.
A. And Gegard Mousasi.
Q. Any others that you can think of?
A. Those are the two big -- the big fighters that come to my mind.
(Exhibit 13 was marked for identification by the reporter.)
BY MR. DELL'ANGELO:
Q. Mr. Coker, I'm marking as Exhibit 13 an exhibit that I'm handing to your counsel. For the record, Exhibit 13 is a declaration of Scott Coker In Support Of Non-Party Bellator Sport Worldwide, LLC's Motion To Quash Or Modify Subpoenas.
Do you recognize Exhibit 13?
A. No.
Q. All right. Would you turn to the last page of Exhibit 13.
Is that your signature?
A. It appears to be.
Q. Just take a moment and take a look at Exhibit 13, and tell me if this refreshes your recollection.
MS. GRIGSBY: Objection. Counsel, is this

50 (Pages 194 to 197)

198

SCOTT COKER - HIGHLY CONFIDENTIAL
1  the state in which it was filed with the
2  highlighting?
3      MR. DELL'ANGELO:  Pardon?
4      MS. GRIGSBY:  Was this filed with
5  highlighting --
6      THE REPORTER:  I can't hear you.
7      MS. GRIGSBY:  Sorry.  Was this -- does
8  everybody -- does everybody else's document have
9  highlighting, or is it just mine?
10     MR. KELLY:  Yes.
11     MR. DELL'ANGELO:  It should not.
12     THE WITNESS:  This one does.
13     MR. RAYHILL:  Yes.  Let's pull those back.
14 Is there a place where I can make copies?
15     MR. DELL'ANGELO:  Why don't we go off the
16 record.  Thanks.
17     THE VIDEOGRAPHER:  Going off the record.
18 The time is 2:19 p.m.
19     (There was a recess taken.)
20     THE VIDEOGRAPHER:  Going back on the
21 record.  The time is 2:31 p.m.
22 BY MR. DELL'ANGELO:
23     Q.  So Mr. Coker, you have before you a
24 refreshed copy of Exhibit 13 entitled the

199

SCOTT COKER - HIGHLY CONFIDENTIAL
1  "Declaration Of Scott Coker in Support of Non-Party
2  Bellator Sport Worldwide LLC's Motion to Quash Or
3  Modify Subpoenas."
4      Would you first turn to the last page of
5  the document and tell if that's your signature?
6      A.  Yes.
7      Q.  Okay.  And what is the date on the
8  document?
9      A.  February of '17.
10     Q.  February of 2017?
11     A.  2017, yes.
12     Q.  You've had a moment to take a look at the
13 document.  Could you tell me if you recognize it?
14     A.  I do.
15     Q.  And it's a declaration that you executed in
16 February of 2017 -- or, January, sorry -- yes,
17 February of 2017?
18     A.  Yes.
19     Q.  Do you have any reason to believe that the
20 statements in here are inaccurate or incomplete in
21 any way?
22     A.  No.
23     Q.  Would you turn, please, to page 7 of 8 of
24 the document, if you're looking in the upper

200

SCOTT COKER - HIGHLY CONFIDENTIAL
1  right-hand corner there.
2      I want to direct your attention -- do you
3  see paragraph 21?
4      A.  This is 7?
5      MR. KELLY:  He's counting on the --
6      THE WITNESS:  Oh, I see.
7  BY MR. DELL'ANGELO:
8      Q.  In the upper right-hand corner.
9      MR. KELLY:  Yes.
10 BY MR. DELL'ANGELO:
11     Q.  Because the numbers are a little --
12     A.  You're looking at No. 7?
13     Q.  I'm looking at page 7 of 8 if you're
14 looking at the upper right-hand corner.
15     A.  Yeah.
16     Q.  If you could go down to line 13, if you're
17 looking in the left-hand axis there, each line is
18 numbered.
19     A.  Um-hmm.
20     Q.  And there's a sentence that begins at the
21 end of line 13 that says:
22         "As it is now, UFC has frequently
23         counterprogrammed Bellator's events,
24         for example, by choosing venues for

201

SCOTT COKER - HIGHLY CONFIDENTIAL
1          scheduling high profile matches to
2          draw audience away from Bellator's
3          own key matches.  Such practices
4          could become lethal if UFC were
5          unilaterally armed with Bellator's
6          event information."
7      A.  Um-hmm.
8      Q.  Could you just tell us what you meant by
9  UFC counterprogramming Bellator's events?
10     A.  Yes.  So we had a fight in January that we
11 considered one of our big tent pole fights, and it
12 was Tito Ortiz fighting Chael Sonnen.
13     And the calendar on the athletic commission
14 cleared, it's like we felt it was a good date and no
15 competition that day.
16     And so, we go and we announce this fight,
17 and we go on sale.  And then -- and this is all
18 public information from the internet.
19     Then Dana comes out and says, oh, we're
20 going to go on the same day.  We're going to go right
21 down the street from you in Anaheim, and we're going
22 to book the biggest fight card in the history of UFC.
23     So, you know, we say, okay, then now we'll
24 have to just do a better job, go out and sell some

51 (Pages 198 to 201)

246

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2    matching rights clause, in there if you thought it
3    was detrimental to the fighters?
4        A.  I mean, we treat our fighters extremely
5    well, but this is also a business side where I
6    have -- it's my job to protect the company.  And if
7    one company out there that's industry leader is doing
8    it and you're not doing it, then it's not creating a
9    fair playing field.
10       Q.  Now, besides Strikeforce, do other MMA
11   promoters have a right-to-match clause?
12           MR. DELL'ANGELO:  Objection to form.
13           THE WITNESS:  I'm not sure.
14   BY MS. GRIGSBY:
15       Q.  Well, does Bellator have a right-to-match
16   clause in some of its contracts?
17       A.  I believe we do.
18       Q.  And has Bellator had a right-to-match
19   clause in its contracts since you've been president?
20           MR. DELL'ANGELO:  Objection to form.
21           THE WITNESS:  I believe so.
22   BY MS. GRIGSBY:
23       Q.  Has Bellator exercised the right-to-match
24   clause since you've been president?
25       A.  I can only -- I mean, maybe a couple times.

247

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2        Q.  Do you remember examples of when Bellator
3    exercised the right-to-match clause when you were
4    president?
5        A.  I cannot.
6        Q.  If Bellator exercises the right-to-match
7    clause, then that means that the fighter would
8    generally stay with Bellator; isn't that right?
9            MR. DELL'ANGELO:  Objection to form.
10           THE WITNESS:  Yes.
11   BY MS. GRIGSBY:
12       Q.  But the right-to-match clause doesn't
13   prevent a different promoter from making an offer to
14   a fighter during the matching period, does it?
15           MR. KELLY:  Objection to the extent it
16   calls for a legal conclusion.
17           THE WITNESS:  Can you repeat that one more
18   time.
19   BY MS. GRIGSBY:
20       Q.  So the right-to-match clause, if you have a
21   fighter in Bellator, does not prevent a different MMA
22   promoter from making an offer to a fighter during the
23   matching period, does it?
24           MR. KELLY:  Same objection.
25           MR. DELL'ANGELO:  Objection to form.

248

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2            THE WITNESS:  They can -- they can
3    negotiate with other leagues at that time.
4    BY MS. GRIGSBY:
5        Q.  And by the same token, the right-to-match
6    clause in, say, a UFC fighter's contract does not
7    prevent Bellator from making an offer to the fighter
8    during the matching period, does it?
9            MR. DELL'ANGELO:  Objection to form.
10           MR. KELLY:  Same objection.
11           THE WITNESS:  If a fighter is in a matching
12   period there in the UFC, they're also able to take
13   offers from multiple organizations.
14   BY MS. GRIGSBY:
15       Q.  In fact, you've made offers to free agents
16   from the UFC during the matching period as president
17   of Bellator, haven't you?
18       A.  Yes.
19       Q.  So one example would be Rory McDonald which
20   you mentioned earlier; is that right?
21       A.  Yes.
22       Q.  And you've also been able to sign as
23   president of Bellator Benson Henderson after his UFC
24   contract expired; is that right?
25       A.  Yes.

249

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2        Q.  And generally, do you think that matching
3    helps drive up the offers for a fighter?
4            MR. DELL'ANGELO:  Objection to form.
5            THE WITNESS:  Yes.
6    BY MS. GRIGSBY:
7        Q.  And matching also, the right to match also
8    helps fighters see what their value is.
9            Wouldn't you agree?
10           MR. DELL'ANGELO:  Objection to form.
11           THE WITNESS:  Yes.
12           (Exhibit 24 was marked for
13           identification by the reporter.)
14   BY MS. GRIGSBY:
15       Q.  I'm handing you what has been marked Coker
16   Exhibit 24.  Exhibit 24 is Bates-stamped ZFL-2456113.
17           Do you recognize this document?
18       A.  Yes.
19       Q.  What is it?
20       A.  It was myself -- well, it was actually from
21   Jim Goddard and myself talking about Tito Ortiz.
22   Like I said, 2009, Tito either was a free agent or he
23   was going through his matching period.
24           Tito's manager or law firm, his name is
25   Ofir, he called me up and said that Tito was looking

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

250

SCOTT COKER - HIGHLY CONFIDENTIAL

to make a move away from UFC, are you interested? So we started talking. And then, I was talking to Jim Goddard about, you know, the opportunity, and that's what this email is.

Q. Now, in the middle of the page, Jim Goddard writes to you, in an email dated March 16, 2009:

[redacted]

251

[redacted]

A. We were looking to do partnership deals with the athletes at that point. So instead of the traditional model where you're the athlete, maybe you make a million dollars a fight and you make, you know, some money on top of that, when it has been like a $3 or $4 per pay-per-view buy, that was the traditional model.

So what I talked to Tito about was, why don't you and I go in partnership with this deal. And so, you become a partner, and it's a one-off or two-off or three-off event or however many fights you want to do.

But basically, the partner would be the fighter with you, and Strikeforce would put up the money, we would have done a pay-per-view fight with Tito versus somebody, and then, we would have split revenues equally like a partner.

Q. So at this time, in March of 2009, you thought that Strikeforce could offer Tito Ortiz something that the UFC could not match; is that

252

SCOTT COKER - HIGHLY CONFIDENTIAL

right?

A. I think we would offer them something different than they would traditionally offer.

Q. And at this time in March 2009, you thought that the UFC would not match it for Tito Ortiz; is that right?

A. That's correct.

Q. Now, you testified a little bit that you understood that UFC engaged in counterprogramming. Do you remember that?

A. Yes.

Q. And you also testified that after Strikeforce bought Pro Elite, you thought that there was more counterprogramming; is that right?

A. Yes.

Q. Now, after Strikeforce brought Pro Elite, do you know if UFC put on more events than it had in prior years?

A. I'm not sure.

Q. Did Strikeforce ever engage in counterprogramming of UFC?

A. Well, we have done fights on the same date because that was the only date available, but it wasn't targeted fights like we're going after

253

SCOTT COKER - HIGHLY CONFIDENTIAL

anybody. That's the difference, I think.

Q. So would it be your testimony that Strikeforce didn't intend to put on fights on the same date, but it in fact did put on fights on the same date as the UFC?

A. Yes.

(Exhibit 25 was marked for identification by the reporter.)

BY MS. GRIGSBY:

Q. So I apologize, this is not stapled, but this is Exhibit 25. This is one copy. Two copies. Now, do you recognize this document?

A. I don't recognize it, but I'm sure that it was me sending it.

Q. So this is ZFL-2396988.

A. Okay.

Q. And for the record, you are laughing.

A. Okay.

Q. I want to start with Mr. Spira's email which is in the middle of the first page, sent on March 5th, 2010 at 1:26 a.m., and it says:

[redacted]

64 (Pages 250 to 253)

|  | 266 |  | 268 |
|---|---|---|---|
|  | SCOTT COKER - HIGHLY CONFIDENTIAL |  | SCOTT COKER - HIGHLY CONFIDENTIAL |

```
                            266
 1      SCOTT COKER - HIGHLY CONFIDENTIAL
 2      combat event aside from the event
 3      set forth herein."
 4      Let me just back up.  Do you recognize this
 5  document?
 6      A.  No.
 7      Q.  So on the last page, or the page that ends
 8  with 234.
 9      A.  My signature.
10      Q.  So that's your signature.  So you were the
11  signatory for this contract; is that right, on behalf
12  of Bellator?
13      A.  Yes.  I mean, we do have my signature stamp
14  on some of these documents, you know, that they're
15  authorized -- our legal team is authorized to sign it
16  on behalf of myself.
17      Q.  So you don't remember entering into this
18  contract; is that right?
19      A.  I can tell you, I've never read any venue
20  document probably ever in the history of my combat
21  sports promoting business.
22      Q.  Well, would it surprise you if venue
23  contracts have a provision, such as this one, where
24  it is exclusive and it cannot host other combat
25  sports during a certain window?
```

```
                            267
 1      SCOTT COKER - HIGHLY CONFIDENTIAL
 2          MR. DELL'ANGELO:  Objection to form.
 3          THE WITNESS:  You know, I'm just not sure.
 4  BY MS. GRIGSBY:
 5      Q.  We'll put that one to the side.
 6          (Exhibit 28 was marked for
 7          identification by the reporter.)
 8  BY MS. GRIGSBY:
 9      Q.  And I'm going to hand you what has been
10  marked as Exhibit 28, and you might have similar
11  answers, but we'll see.
12      A.  I'll try my best.
13      Q.  So Exhibit 28 has been Bates-stamped
14  SBPCL00000324 with the ending Bates stamp of
15  SBPCL00000341.
16          Just turning to the last page.
17      A.  Yes.
18      Q.  Is that your signature on the last page?
19      A.  Yes.
20      Q.  Do you recognize this document?
21      A.  No.
22      Q.  Do you recall entering into a site
23  agreement with the Chickasaw Nation at all, between
24  Bellator and the Chickasaw Nation?
25      A.  Yes.  I believe this document is in
```

```
                            268
 1      SCOTT COKER - HIGHLY CONFIDENTIAL
 2  reference to our Thackerville, Oklahoma event.  And
 3  we go there, I think two or three times a year.  And
 4  I think it came up for renewal in '16, and this looks
 5  like the extension.
 6          But again, the process would be, you know,
 7  our venue staff member talking to the casino and the
 8  host venue, and then, basically, I would green light
 9  the terms and the conditions that they're proposing
10  or make changes.  And then, it just goes to legal,
11  and that's how it operates.
12      Q.  Well, looking at SBPCL00000332, which is
13  under heading 3, subparagraph Q, it says:
14          "Exclusivity.  Nation understands
15          and agrees that during the term, it
16          shall not host any other MMA events
17          aside from the event set forth
18          herein."
19          Is this the type of term that you would
20  approve?
21      A.  I didn't even know that was in the
22  agreement.
23      Q.  Now, would you say that Bellator is a
24  national promotion of MMA bouts events?
25      A.  Yes.
```

```
                            269
 1      SCOTT COKER - HIGHLY CONFIDENTIAL
 2          (Exhibit 29 was marked for
 3          identification by the reporter.)
 4  BY MS. GRIGSBY:
 5      Q.  I'm handing you what has been marked as
 6  Exhibit 29.
 7          Now, this is an article from SB Nation,
 8  which is "Spike TV president:  Bellator MMA on an
 9  even footing with the UFC."  MMA fighting is the
10  category.  It's by Mark Raimondi, dated February 8th,
11  2015.
12          Now, I just want to direct your attention
13  to the last page.  On the last page, you're quoted as
14  saying:
15          "There's not going to be a fighter
16          on the planet.  We can't afford and
17          have access to."
18          Do you see that?
19      A.  Yes, I see it.
20      Q.  Did you make that statement?
21      A.  Yes.
22      Q.  And do you believe it's true that there's
23  not going to be a fighter on the planet that Bellator
24  can't afford and have access to?
25          MR. DELL'ANGELO:  Objection to form.
```

```
                                               270
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2         THE WITNESS:  Let me just explain the
 3   steps.
 4         So basically, it's -- access to, meaning if
 5   they're a free agent, obviously, we have to -- we
 6   can't just go steal fighters.  So that's maybe a
 7   misstep on my part.
 8         But I believe that we will be able to
 9   afford the fighters that are getting the top dollar
10   out there.
11   BY MS. GRIGSBY:
12      Q.  So with that correction, which is there's
13   not going to be a free agent fighter on the planet
14   that we can't afford and have access to, would you
15   say it's true that there's not going to be a free
16   agent fighter that Bellator can't afford or have
17   access to?
18         MR. DELL'ANGELO:  Objection to form.
19         THE WITNESS:  I believe it's true.
20         (Exhibit 30 was marked for
21         identification by the reporter.)
22   BY MS. GRIGSBY:
23      Q.  I'm handing you what has been marked as
24   Exhibit 32 --
25         THE REPORTER:  Exhibit what?
```

```
                                               271
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2         MS. GRIGSBY:  32.  Oh, sorry.  30.
 3   Exhibit 30.
 4   BY MS. GRIGSBY:
 5      Q.  Exhibit 30 is another article from
 6   SB Nation called "AJ McKee re-ups for multiple years.
 7   Will remain in Bellator MMA for foreseeable future."
 8         Now, I just want to direct your attention
 9   to the second page where the article starts.  The
10   last paragraph at the bottom.  The beginning of the
11   sentence reads:
12            "We have many of the best
13            featherweights in the world fighting
14            for Bellator, and AJ has left no
15            doubt in my mind that he belongs in
16            that group."
17         Did you make that statement?
18      A.  Yes.
19      Q.  And do you believe it to be true?
20      A.  Yes.
21      Q.  So you believe that Bellator has some of
22   the best featherweight fighters in the world, is that
23   right, fighting for Bellator?
24         MR. DELL'ANGELO:  Sorry.  I'm going to just
25   object to the form.  Vague and ambiguous as to time.
```

```
                                               272
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2   BY MS. GRIGSBY:
 3      Q.  So this article is dated December 21st,
 4   2015.
 5         So as of December 2015, do you believe that
 6   Bellator has or had some of the best featherweight
 7   fighters fighting for Bellator in the world?
 8      A.  Yes.
 9      Q.  You can put that to the side.
10         (Exhibit 31 was marked for
11         identification by the reporter.)
12   BY MS. GRIGSBY:
13      Q.  So I'm handing you what has been marked as
14   Exhibit 31, which is an article, again, from
15   SB Nation, which reads, "Scott Coker:  Bellator did
16   talk to Alistair Overeem's reps, but 'we chose' not
17   to make an offer."  It's dated February 16th, 2016.
18         Now, I just want to direct your attention
19   to the third page in this article.  In the third
20   paragraph up from the bottom, which starts as --
21   through to the last one in the article.  The third
22   paragraph up from the bottom.  It starts with, "And
23   same thing with Sterling."
24         Now, the last sentence in this box says:
25            "There are other free agents that
```

```
                                               273
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2            are on the market that we're going
 3            after.  There's a lot of fighters
 4            out there right now."
 5      A.  Um-hmm.
 6      Q.  Did you make that statement in 2016?
 7      A.  Yes.
 8      Q.  And do you believe it to be true, that in
 9   February 2016, there were a lot of fighters out there
10   on the market that Bellator could go after?
11      A.  Yes.
12      Q.  You can put that to the side.
13         (Exhibit 32 was marked for
14         identification by the reporter.)
15   BY MS. GRIGSBY:
16      Q.  I'm handing you what has been marked as
17   Exhibit 32.
18         Exhibit 32 is an L.A. Times article
19   entitled "Bellator goes after free agents as it digs
20   in as alternative to UFC," dated January 21st, 2017,
21   by Lance Pugmire.
22         Now, in the article, in the third paragraph
23   of the second page, there's a quote from you that
24   says:
25            "We picked up a hundred percent of
```

## Page 274

```
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2      the guys we went after last year.
 3      It's a commitment by Spike TV and
 4      Viacom."
 5          Do you see that?
 6      A.  Yes.
 7      Q.  Did you make that statement?
 8      A.  Yes.
 9      Q.  And is it true that in last year, meaning
10   that as of January 2017, Bellator picked up a hundred
11   percent of the free agent MMA fighters that it went
12   after?
13      A.  Yes.
14          (Exhibit 33 was marked for
15           identification by the reporter.)
16   BY MS. GRIGSBY:
17      Q.  I'm handing you what has been marked as
18   Exhibit 33.
19          Now, since you've been president of
20   Bellator, have you followed the ratings that
21   Bellator's events have gotten either on free TV or on
22   pay-per-view?
23      A.  Yes.
24      Q.  Now, this article is another SB Nation
25   Bloody Elbow article entitled "Kimbo versus Shamrock
```

## Page 275

```
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2   Bellator MMA (main event) averages 2.1 million
 3   viewers on Spike," dated June 22nd, 2015.
 4          Now, is it true that in June of 2015,
 5   Bellator's Kimbo Slice/Shamrock event topped
 6   2.1 million viewers on Spike?
 7      A.  Yes.
 8      Q.  And in your view, is that a sizeable
 9   audience, 2.1 million viewers, for an MMA event?
10      A.  Yes.
11          MR. DELL'ANGELO:  Objection to the form.
12          THE WITNESS:  Sorry.
13          (Exhibit 34 was marked for
14           identification by the reporter.)
15   BY MS. GRIGSBY:
16      Q.  So let's look at -- this is Exhibit 34.
17          Exhibit 34 is another production from Shark
18   Entertainment.  The first email is really a long
19   forward, but it's from David I. Schwarz at Spike TV,
20   subject:  Spike press June 22nd, 2015, Bellator 138,
21   and then, it looks like there's a forward from Scott
22   Coker at Bellator on the same date, and finally, from
23   Christian Printup to you, Scott Coker, with a cc to a
24   number of individuals on June 22nd, 2015.  Oh,
25   Christian Printup.
```

## Page 276

```
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2      Do you recognize this document?
 3      A.  It looks like a document that traditionally
 4   comes to us, including myself from after an event,
 5   from the press guys at Spike TV, David Schwarz.
 6      Q.  Now, on the second page, do you see the
 7   quote:
 8          "Bellator produced an entertaining
 9          night of fights that certainly
10          brought with it more headlines and
11          media attention than its main
12          competitor, the UFC," by SB Nations.
13          Do you see that?
14      A.  Yes.
15      Q.  And that is referring to -- all these
16   quotes are referring to the Shamrock/Kimbo Slice
17   fight; is that correct?
18      A.  Yes.
19      Q.  And do you agree with SB Nation that
20   Bellator produced an entertaining night of fights
21   that brought with it more headlines and media
22   attention than its main competitor, the UFC, for the
23   Shamrock/Slice fight?
24      A.  I believe for that event, we did.
25   ///
```

## Page 277

```
 1         SCOTT COKER - HIGHLY CONFIDENTIAL
 2          (Exhibit 35 was marked for
 3           identification by the reporter.)
 4   BY MS. GRIGSBY:
 5      Q.  I'm showing you what has been marked as
 6   Exhibit 35, which is an SB Nation article, dated
 7   November 10, 2015 with a headline "Bellator slightly
 8   tops UFC in total viewers over the weekend."
 9          Now, do you remember the event discussed in
10   this article, which is Bellator St. Louis event in
11   November of 2015?
12      A.  Yes.
13      Q.  And do you agree that the St. Louis event
14   got better ratings than the UFC by drawing 814,000
15   viewers?
16      A.  Yes.
17      Q.  So during your time there, there have been
18   a number of times where Bellator's ratings have
19   either met or exceeded that of the UFC event during
20   the same time period; is that right?
21      A.  Yes.
22      Q.  And just to be clear, so during your time
23   at Bellator, there are a number of times when
24   Bellator's ratings have been the same or exceeded the
25   UFC?  I was just clarifying the question.
```

|  | 278 |  | 280 |
|---|---|---|---|
| 1 | SCOTT COKER - HIGHLY CONFIDENTIAL | 1 | SCOTT COKER - HIGHLY CONFIDENTIAL |
| 2 | A. Yes. | 2 | Daniel Cormiers. They're going to |
| 3 | Q. Now, earlier, you also testified that | 3 | be the next stars of the MMA." |
| 4 | Bellator has some main sponsors since you've been | 4 | In December of 2014, did you say that? |
| 5 | president there; is that right? | 5 | A. I believe so. |
| 6 | A. Yes. | 6 | Q. And do you believe that labeling a league |
| 7 | Q. And so, one of the core sponsors, you said, | 7 | as either a minor league or an up and coming can be |
| 8 | was Miller Lite; is that correct? | 8 | misleading? |
| 9 | A. Yes. | 9 | A. Yes. |
| 10 | Q. And one of the sponsors is also -- is it | 10 | Q. Would you agree, at least as of December of |
| 11 | Monster Energy as well? | 11 | 2014, that things in the MMA industry change very |
| 12 | A. Yes. | 12 | quickly? |
| 13 | Q. And Dave & Busters, you also mentioned as a | 13 | A. Yes. |
| 14 | sponsor of Bellator; is that right? | 14 | Q. And you said in the fourth paragraph of the |
| 15 | A. Yes. | 15 | second page that you don't think Bellator is a minor |
| 16 | Q. And those are marquee sponsors, aren't | 16 | league, do you? |
| 17 | they? | 17 | A. Bellator is not in a minor league. |
| 18 | A. Yes. | 18 | Q. And when you referred earlier to a |
| 19 | MS. GRIGSBY: Do you mind if I just take | 19 | two-player market or a single-player market, you |
| 20 | five minutes? | 20 | would consider Bellator a player, wouldn't you? |
| 21 | MR. DELL'ANGELO: Sure. | 21 | A. Yes. |
| 22 | MS. GRIGSBY: I don't think I've got much | 22 | MR. DELL'ANGELO: Objection to form. |
| 23 | longer. | 23 | MS. GRIGSBY: So I actually think that's |
| 24 | MR. DELL'ANGELO: Okay. | 24 | all I have for you. |
| 25 | THE VIDEOGRAPHER: Going off the record. | 25 | THE WITNESS: Okay. Thank you. |
|  | 279 |  | 281 |
| 1 | SCOTT COKER - HIGHLY CONFIDENTIAL | 1 | SCOTT COKER - HIGHLY CONFIDENTIAL |
| 2 | The time is 4:41 p.m. | 2 | MS. GRIGSBY: Thank you very much. |
| 3 | (There was a recess taken.) | 3 | MR. DELL'ANGELO: I actually just have a |
| 4 | THE VIDEOGRAPHER: Going back on the | 4 | few follow-up questions. We don't need to go off a |
| 5 | record. The time is 4:51 p.m. | 5 | break. We can just jump right in. I'll be quick. |
| 6 | (Exhibit 36 was marked for | 6 | THE WITNESS: Okay. |
| 7 | identification by the reporter.) | 7 |  |
| 8 | BY MS. GRIGSBY: | 8 | FURTHER EXAMINATION |
| 9 | Q. I'm handing you what has been marked as | 9 | BY MR. DELL'ANGELO: |
| 10 | Exhibit 36. | 10 | Q. Hello again, Mr. Coker. I just have a few |
| 11 | So Exhibit 36 is another SB Nation article, | 11 | follow-up questions, and I'll try to be quick. I |
| 12 | dated December 25th, 2014, entitled "Scott Coker on | 12 | know it's been a long day. |
| 13 | UFC antitrust lawsuit." Bellator is not a, quote, | 13 | Ms. Grigsby asked you some questions about |
| 14 | "minor league," unquote. | 14 | extending fighter contracts. |
| 15 | Do you recall giving an interview with MMA | 15 | Do you recall those questions? |
| 16 | Fighting about the antitrust lawsuit that was filed | 16 | A. Yes. |
| 17 | in December of 2014? | 17 | Q. Okay. I'd just like to ask you a few |
| 18 | A. I believe so. | 18 | follow-up questions about that. |
| 19 | Q. Well, on the third page, above the bullet | 19 | To the extent -- to the extent that you |
| 20 | Bellator 131, the paragraph above says: | 20 | have worked for an MMA promotion, either Strikeforce |
| 21 | "Labeling a league based on the | 21 | or Bellator, and you've ever extended a fighter's |
| 22 | past can be misleading because the | 22 | contract because of an injury -- let me withdraw |
| 23 | fighters that are here today | 23 | that. |
| 24 | fighting for us are going to be the | 24 | To the extent that you've extended a |
| 25 | next Luke Rockholds and the next | 25 | fighter's contract on the basis of an injury, have |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

```
                                    298
 1
 2      STATE OF _____ )
 3                              ) :ss
 4      COUNTY OF _____ )
 5
 6
 7          I, SCOTT COKER, the witness
 8   herein, having read the foregoing
 9   testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15          _____
16              SCOTT COKER
17
18
19
20   Sworn and subscribed to before
21   me, this        day of
22            , 2017.
23
24   _____
25        Notary Public
```

```
                                    299
 1
 2          CERTIFICATE OF REPORTER
 3       I, Cynthia K. DuRivage, a Certified
 4   Shorthand Reporter of the State of Nevada, do hereby
 5   certify:
 6       That the foregoing proceedings were taken
 7   before me at the time and place herein set forth;
 8   that any witnesses in the foregoing proceedings,
 9   prior to testifying, were duly sworn; that a record
10   of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; that the foregoing transcript is a true
13   record of the testimony given.
14       I further certify I am neither financially
15   interested in the action nor a relative or employee
16   of any attorney or party to this action.
17       Reading and signing by the witness was
18   requested.
19       IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21   Dated:  August 16, 2017
22
23
              _____
24              CYNTHIA K. DuRIVAGE
                 CCR No. 451
25
```

```
                                    300
 1        INSTRUCTIONS TO WITNESS
 2
 3     Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7     After doing so, please sign the errata sheet
 8   and date it.
 9     You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12     It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
```

```
                                E R R A T A
 1
 2
 3
 4
 5     I wish to make the following changes,
 6   for the following reasons:
 7
 8   PAGE LINE
 9   ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____    _____
23    WITNESS' SIGNATURE        DATE
```