# EXHIBIT 89

## Excerpts of Deposition of Javier Vazquez

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


Cung Le, Nathan Quarry, Jon Fitch,) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vazquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
            Defendants.           )




VIDEO DEPOSITION OF JAVIER VASQUEZ

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:15 A.M.

and ending at 3:46 P.M.on Wednesday, February 14, 2017




Reported by:
Sarah Padilla, CCR NO. 929
Job No. 296624 Pages 1-205



Page 82

1  BY MR. McSWEENEY:
2      Q   Do you recognize the name at No. 2,
3  Bibiano Fernandes?
4      A   I do.
5      Q   Do you know are you familiar with Bibiano
6  Fernandes as a professional MMA fighter?
7      A   I am, a little bit, little bit.  More so
8  with his jiujitsu.  A little bit.
9      Q   In October of 2010, would you regard this
10  as a roughly accurate ranking of Bibiano Fernandes
11  at the featherweight division?
12      MR. DELL'ANGELO:  Objection.  Vague.
13  Calls for speculation.
14  BY MR. McSWEENEY:
15      Q   In October of 2010, would you, in your
16  opinion, have regarded Bibiano Fernandes as an elite
17  MMA fighter?
18      MR. DELL'ANGELO:  Same objection.
19      THE WITNESS:  Again, I believe he was
20  fighting under different rules, so apples to
21  oranges.
22  BY MR. McSWEENEY:
23      Q   Do you know what promotion Bibiano -- do
24  you know whether Bibiano Fernandes was fighting for
25  a new promotion in October of 2010?

Page 83

1      A   I don't know.
2      Q   The next name --
3      A   I would just have to -- sorry.  I would
4  have to speculate.  I don't know Bibiano, his
5  career, what he's doing.  I don't know.
6      Q   The next name is, at No. 3, Marlon Sandro.
7      A   Uh-huh.
8      Q   Are you familiar with Marlon Sandro as a
9  professional MMA fighter?
10      A   Yes.
11      Q   In October of 2010, would you have viewed
12  Marlon Sandro as an elite MMA fighter?
13      A   Again, all these guys that you're
14  mentioning are fighting under different rules.
15      Q   Do you think Marlon Sandro was widely
16  regarded as an elite fighter in October of 2010?
17      MR. DELL'ANGELO:  Objection.  Vague and
18  calls for speculation.
19      THE WITNESS:  I don't know what other
20  people think.
21  BY MR. McSWEENEY:
22      Q   Do you think Jose Aldo was widely regarded
23  as an elite MMA fighter in your opinion in October
24  of 2010?
25      MR. DELL'ANGELO:  Objection.

Page 84

1      THE WITNESS:  I thought I answered that.
2      MR. DELL'ANGELO:  Form of the question.
3      THE WITNESS:  I thought I answered that
4  already.
5  BY MR. McSWEENEY:
6      Q   No, you answered your opinion.  I'm asking
7  now did you consider him to be widely regarded as an
8  elite fighter in October of 2010?
9      MR. DELL'ANGELO:  Object to the form of
10  the question.
11      THE WITNESS:  He could have been.
12  BY MR. McSWEENEY:
13      Q   Do you recall anyone saying in October of
14  2010 that Jose Aldo was not an elite professional
15  MMA fighter?
16      A   I don't know.  I don't know.  It's
17  possible somebody could have said that, but I don't
18  know.
19      Q   Do you recall anyone saying he was an
20  elite MMA fighter -- pardon me -- strike that.
21      Do you recall anyone saying Jose Aldo was
22  an elite MMA fighter in October of 2010?
23      MR. DELL'ANGELO:  Objection to the form.
24  It calls for a legal conclusion.
25

Page 85

1  BY MR. McSWEENEY:
2      Q   I'll remind you of the instruction that
3  I'm asking for your opinion and your recollection.
4  In 2010?
5      MR. DELL'ANGELO:  Just respectfully,
6  you're asking him if he recalls if somebody --
7      MR. McSWEENEY:  Describe Jose Aldo as an
8  elite MMA fighter in October 2010.  That's just a
9  mere recollection, not a legal conclusion.
10      MR. DELL'ANGELO:  Right, but based on
11  someone else's view based on his opinion?  That's
12  what's confusing me.  I'm sorry.
13      MR. McSWEENEY:  Well, that's not a legal
14  conclusion at any rate.
15  BY MR. McSWEENEY:
16      Q   So in October 2010 do you recall anyone
17  ever saying that Jose Aldo was an elite MMA fighter?
18      A   Do I recall it?  Sure.
19      Q   You do recall that?
20      A   People can say whatever they want to say.
21  They can say anybody's an elite MMA anything.  You
22  know what I mean?  They could.
23      Q   Do you have a specific recollection of
24  someone telling you --
25      A   No.



Page 86

1    Q   -- or saying?
2    A   No.
3    Q   So you don't recall?
4    A   No, like we don't sit around and be like,
5    Yep, this guy's elite, this guy's elite, this guy's
6    elite.  It's not something that's generally -- we
7    don't generally do that.
8    Q   Right.  So the term "elite" was not widely
9    used by fighters to describe one another?
10       MR. DELL'ANGELO:  Objection.  Misstates
11   the witness's testimony.
12       THE WITNESS:  No.  What I said was we
13   don't sit around.  The word elite is the word elite.
14   We don't sit around saying this guy's elite, this
15   guy's elite.  We would just say this guy's good,
16   this guy's tough, this guy's this, this guy's that,
17   you know.  We're not sitting there, you know, being
18   specific with the word elite.
19   BY MR. McSWEENEY:
20   Q   Court reporter will be handing you what's
21   been marked as Exhibit 44.  You're going to have to
22   share this one.
23       (Exhibit 44 was marked.)
24   BY MR. McSWEENEY:
25   Q   Once again -- okay.

Page 87

1        Once again, this is a printout from -- of
2    Fight Matrix rankings.  So if you turn to the second
3    page at the top, you'll see it's from 7/3/2011 for
4    the featherweight division.
5        Previously, with respect to the rankings
6    from October 2010, you testified that one of the
7    factors weighing against the possibility that Jose
8    Aldo was an elite fighter was that, because he
9    didn't speak the language, he didn't yet have a
10   following.  Do you recall that testimony?
11   A   I do.
12   Q   Do you know whether by 7/3/2011 Jose Aldo
13   had developed a following?
14   A   I would be completely speculating.  I
15   would have no clue.  I have no clue.
16   Q   In July of 2011, would you have regarded
17   Jose Aldo as the best featherweight MMA fighter in
18   the world?
19       MR. DELL'ANGELO:  Objection.  Calls for
20   speculation.
21       THE WITNESS:  I would definitely consider
22   him very good, tough.
23   BY MR. McSWEENEY:
24   Q   In your opinion, would you have considered
25   him in July of 2011 to be an elite MMA fighter?

Page 88

1        MR. DELL'ANGELO:  Objection.  Calls for
2    speculation.
3        THE WITNESS:  Again, I feel that it's
4    possible, yes.
5    BY MR. McSWEENEY:
6    Q   Do you see No. 4, Pat Curran?
7    A   Uh-huh.
8    Q   And do you recall earlier in the day
9    discussing the fight, UFC 46, that you were
10   scheduled to fight against Matt Serra?
11   A   Uh-huh.
12   Q   Do you recall that?  Do you recall who was
13   the replacement fighter for you?
14   A   Jeff Curran.
15   Q   Do you know whether Jeff and Pat Curran
16   are related in any way?
17   A   I believe they're -- they might be
18   cousins.
19   Q   Cousins.  All right.
20   A   They might be cousins.  They might be.
21   I'm not --
22   Q   Fair enough.
23   A   Sure.
24   Q   Do you -- are you familiar with Pat Curran
25   was a professional MMA fighter?

Page 89

1    A   Yes.
2    Q   In July of 2011 did you view Pat Curran as
3    an elite professional MMA fighter?
4        MR. DELL'ANGELO:  Object to the form to
5    the extent it calls for a legal conclusion and
6    speculation.
7        THE WITNESS:  He -- he was fighting in a
8    different organization.  I'm not sure of the rules,
9    say, if it was consistent with the unified rules.
10   Sometimes shows add and subtract rules.  Not really
11   add, but usually they will subtract, different
12   shows.
13   BY MR. McSWEENEY:
14   Q   Okay.  In determining who in your opinion
15   is an elite fighter, the rules that they fight under
16   play a role?
17   A   I believe that being able to win or lose
18   will generally dictate where you are for the most
19   part, for the most part.  And I do, I think that you
20   have to fight apple with apples and oranges with
21   oranges.  The second you start altering the rules
22   the results can be altered and maybe somebody that's
23   having success may or may not have success or vice
24   versa.
25   Q   Is the only reason that Pat Curran in your



Page 170

1   because I'm too busy doing what I'm doing.
2   MR. McSWEENEY:  Why don't we just do a,
3   like a five-minute break and with some luck then we
4   should be able to wrap it up after that.
5   THE WITNESS:  Okay.
6   THE VIDEOGRAPHER:  We are now going off
7   the record.  The time is approximately 2:47 P.M.
8   (A short recess was taken.)
9   THE VIDEOGRAPHER:  We are now back on the
10  record.  The time is approximately 2:57 P.M.
11  BY MR. McSWEENEY:
12  Q   Mr. Vazquez, do you recall earlier today
13  we were discussing the circumstances surrounding
14  your decision to retire from professional MMA
15  fighting?
16  A   Yes, sir.
17  Q   And two of the reasons you gave were, one,
18  the mandatory requirement that you attend the
19  fighter summit that you no longer felt should be a
20  requirement or that you did not want to attend, and,
21  two, that you were not getting paid sufficiently to
22  make it worth your while to continue professional
23  fighting.  Do you recall that?
24  A   Yes, sir.
25  Q   Were there other reasons why you decided

Page 171

1   to retire from professional MMA fighting beyond
2   those two that you've already mentioned?
3   MR. DELL'ANGELO:  Objection.  Asked and
4   answered.
5   THE WITNESS:  I'm still answering?
6   BY MR. McSWEENEY:
7   Q   Yeah.
8   A   Part of it was just I had enough, man.  I
9   fought for 13 years.  I competed, you know, even
10  though it wasn't fighting similar type of, you know,
11  grappling, wrestling, jiujitsu for whatever, 20
12  years.  So wear and tear also.
13  Q   The court reporter is going to hand you
14  what's been marked -- or what will be marked as
15  No. 47, Exhibit No. 47.
16  (Exhibit 47 was marked.)
17  BY MR. McSWEENEY:
18  Q   This is, Exhibit 47 is a printout of an
19  article on Sherdog.com titled With Fights Still Left
20  on UFC Contract, Javier Showtime Vazquez Officially
21  Announces Retirement.  Are you familiar with this
22  document?
23  A   I believe so.  I'm just trying to get
24  through it here.  See exactly the first several
25  pages.

Page 172

1   Q   In particular, I'll direct your
2   attention -- take your time to review the whole
3   thing.  But there's a document with -- on -- or
4   rather page, on the bottom right corner it says 716.
5   A   Got it.
6   Q   And do you see that there appears to be a
7   tile, an article title that says With Fights Still
8   Left on UFC Contract, Javier Showtime Vazquez
9   Officially Announces Retirement?
10  A   Yes, sir.
11  Q   And the date of this article is January
12  13, 2013, correct?
13  A   Yes.
14  Q   If you turn to pages to a page that has
15  916 on the bottom right corner.
16  MR. DELL'ANGELO:  Go ahead and read it.
17  MR. McSWEENEY:  Yeah.  Take a moment to
18  read that.
19  MR. DELL'ANGELO:  Actually, just for the
20  record, it looks like it begins on 816.
21  MR. McSWEENEY:  Yes.
22  BY MR. McSWEENEY:
23  Q   Let me know when you have had a chance to
24  review it?
25  A   Uh-huh.

Page 173

1   Q   Okay.
2   A   More or less, yeah.
3   Q   Okay.
4   A   I got the gist of it.
5   Q   Sure.  Directing your attention
6   specifically to the page with 916 in the bottom
7   right-hand corner?
8   A   Uh-huh.
9   Q   You will see the third paragraph from the
10  top reads ""When I got back to the locker room after
11  the Stevenson fight, I just knew I had nothing left.
12  I had nothing left to prove.  I knew my knee and my
13  body had definitely had enough,' Vazquez said, 'I
14  didn't want to do it.  I just didn't want to do it
15  anymore.  The fear of stepping into the cage is just
16  the fear I didn't want to experience anymore.'"
17  Do you see that?
18  A   Yes, sir.
19  Q   Is it true that upon returning to the
20  locker room after your final fight with Joe
21  Stevenson you had decided that you would no longer
22  be a professional MMA fighter?
23  A   For the record, I felt like that many
24  times after fights.  So there is a decompression
25  period after fights.  That's why they tell you don't

MAGNA
LEGAL SERVICES

Page 174

1    retire after fights.  That's why they tell you don't
2    retire after fights.  So, yes, I did say that.  Yes,
3    I did feel that.  I think the biggest difference
4    between this time and other times where I've said it
5    was a statement I made in there, I just didn't want
6    to do it anymore.  It just got to the point -- you
7    know, and I thought about it.  That's why I didn't
8    come without the retirement until a little bit
9    later.  Because, of course you say things like that
10   in the heat of the moment.  You get back, then you
11   decompress for a few days and you think about it,
12   and you go, okay, do I really want to do it?  So,
13   yes, during that time frame, that's what I thought.
14   I had a broken hand, it was a tough camp, body was
15   banged up, so, yes that's always -- you know, not
16   always, but that was a lot of times, I don't want to
17   do it anymore.
18       Q    Right.
19       A    Fight 15 minutes.  You just went through a
20   three- or four-month camp.  And it takes a minute
21   for everything to settle, and sometimes you feel
22   differently.  It just so happened in this particular
23   instance I didn't feel differently.  So I waited
24   some time to really give myself the opportunity to
25   potentially change my mind.  But that was my initial

Page 175

1    reaction.  But I was always open to the possibility
2    depending on opponent, depending on maybe possibly
3    renegotiating the terms where we're doing it for
4    more money.
5            But, you know, I knew how tight the
6    contracts were and how not flexible they were with
7    those contracts.  Unless they absolutely need you to
8    do something, it really wasn't feasible.  So, yes, I
9    did say that.  Yes, I do stand by that.  But also
10   have -- I also want to say that I -- have you ever
11   fought?  Have you ever been in a fight like that in
12   front of 10,000 people, somebody that's trained to
13   kill you for four months?  Have you ever had that
14   kind of experience?  Have you ever had that kind of
15   fear?  We're all afraid.  I don't care who it is --
16   Mr. Fitch, Mr. Kingsbury, any of us.  Any fighter,
17   when you look back and the gate's closed and the
18   fight is on and the cameras are rolling, and
19   everybody in the arena is looking at you, it's
20   scary.  Even though we deal with it, and we put that
21   aside and we stick to our game plan and we fight
22   smart and we try not to get hurt, it's scary.
23           There is tremendous amount of stress and
24   lead-up and buildup to that fight.  It's not me and
25   you, Mr. Moore, let's go fight outside.  That's one

Page 176

1    type of scenario, you feel that -- (descriptive
2    sound) -- adrenaline rush that moment when I throw
3    you, you know.  But over a prolonged period of time,
4    that buildup wears on you and you have to be very
5    mentally tough.  It's very emotionally draining.
6    The second that you get an opponent -- it was for me
7    anyways, instant diet change, instant training
8    change, instant mentality change -- instant.  That
9    is the way it was for me.
10           The second I got a bout agreement, I saw a
11   name on that contract, everything flips.  It has to.
12   You have to mentally prepare yourself for that.  And
13   I don't think people understand that.  People
14   understand, oh, you just show up and fight.
15   Sometimes you have shitty fights.  You have bad
16   fights sometimes.  Bad performances for whatever
17   reason; bad weight cut, over train, whatever.  That
18   fear of being in there, that fear of preparation
19   that, that anxiety that you have the week of, the
20   month of.  It's something that when you do it 21
21   times, you don't want it anymore.  And could I put
22   that fear aside today and do it?  If I had to.  My
23   family relied on me to do it.  And said --
24       Q    Take your time.
25       A    If I had to, I would, but you got to pay

Page 177

1    me.  I'll fight anybody.  I don't care who it is.
2    Do I want to?  No, but if my family needs me to, I
3    will.  So I wasn't willing to go through that
4    anymore for what I was getting paid.  That's it.
5        Q    You can take your time.
6        A    If you pay me, I'll fight anybody,
7    anybody, anybody.  If you're not willing to pay me,
8    I've already done enough damage to myself.  It's a
9    tough enough sports as it is.  There's no benefit to
10   doing this if you don't cash out like get the big
11   fights.  That's why we are where we are.  We're all
12   broken; mentally, physically, psychologically.
13   We're all broken, all of us.  And I had -- myself
14   and some of the other plaintiffs the other night
15   just had a discussion.  We just sat around and
16   talked, no cameras, no nothing.  And you start --
17   these are guys, they're from everywhere.  Some of us
18   trained together, some of us didn't.  We're from
19   everywhere.  And when I walked away from the
20   conversation that I had with these guys -- nobody
21   else knows.
22       Q    Well, the question was whether the
23   statement in the article was true?
24       A    At that time, yes.
25       Q    I appreciate your -- the difficulty of

MAGNA
LEGAL SERVICES

Page 202

1  My memory's a little bit foggy.  So we got here
2  yesterday.  Yesterday was Sunday; right?  Or
3  yesterday was Monday?  No, yesterday was Monday.
4      Q    Yesterday was Monday.  It's a little foggy
5  was well?
6      A    Yeah.  I don't know.  Yesterday we got
7  here and we went to go eat.  I don't know what to
8  tell you.  We got here and went to go eat.
9  Honestly, I don't remember what we talked about at
10  that time.  I'm not even kidding.
11     Q    Why don't we take a short break.  We'll
12  review where we are, and that should probably be
13  close to the end.
14         THE VIDEOGRAPHER:  We are now going off
15  the record.  The time is approximately 3:39 P.M.
16         (A short recess was taken.)
17         THE VIDEOGRAPHER:  We are back on the
18  record.  The time is approximately 3:45 P.M.
19  BY MR. McSWEENEY:
20     Q    Mr. Vazquez, are you aware of something
21  called MMAAA?
22     A    Yes.
23     Q    And can you tell me what your
24  understanding of what the MMAAA is?
25     A    I have no clue, to be honest with you.  I

Page 203

1  don't know what they're doing.  They're supposed to
2  be another fighter organization, not organization,
3  like an association.  I have no clue what the heck
4  they're doing.
5      Q    So I take it you have no involvement in
6  the MMAAA?
7      A    No.
8      Q    Do you have any understanding of how their
9  aims may differ from the MMAFA?
10     A    No.
11         MR. McSWEENEY:  No further questions.
12         MR. DELL'ANGELO:  Okay.  Thank you.  We'll
13  read and sign.
14         MR. McSWEENEY:  Okay.
15         MR. DELL'ANGELO:  I guess just, while
16  we're here, pursuant to the protective order, we're
17  going to claw back lead Plaintiffs 0175299.  Is that
18  exhibit that I think you inadvertently handed out as
19  45 or 48 or whatever it was?  We'll get you a letter
20  on that.
21         MR. McSWEENEY:  We'll look forward to it.
22         THE VIDEOGRAPHER:  This concludes the
23  video deposition of Javier Vazquez.  We are now
24  going off the record.  The time is 3:46 P.M.
25         (TIME NOTED: 3:46 P.M.)

1              CERTIFICATE OF WITNESS
2  PAGE  LINE  CHANGE            REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20              * * * * *
21     I, Javier Vazquez, witness herein, do hereby
   certify and declare under penalty of perjury the within
22 and foregoing transcription to be my deposition in said
   action; that I have read, corrected and do hereby affix
23 my signature to said deposition.
24 _____ _____
   Javier Vazquez
25 Witness                     Date

1  STATE OF NEVADA
                 ) ss
2  COUNTY OF CLARK
3
4      I, Sarah Padilla, a duly commissioned and
5  licensed court reporter, Clark County, State of Nevada,
6  do hereby certify:  That I reported the taking of the
7  deposition of the witness, Javier Vazquez, commencing on
8  Tuesday, February 14, 2017, at 9:15 A.M.; That prior to
9  being examined, the witness was, by me, duly sworn to
10 testify to the truth; That thereafter I transcribed my
11 shorthand notes into typewriting and that the typewritten
12 transcript of said deposition is a complete, true, and
13 accurate record of said shorthand notes.  I further certify
14 that I am not a relative or employee of any attorney or
15 counsel of any of the parties nor a relative or employee of
16 an attorney or counsel involved in said action, nor a person
17 financially interested in the action; that a request
18 [x] has [] has not been made to review the transcript.
19     IN WITNESS WHEREOF, I have hereunto set my
20 hand in the County of Clark, State of Nevada, this __
21 day of _____.
22
23
                _____
                SARAH PADILLA, CCR 929
24
25

