Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER|MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

*Co-Lead Counsel for the Classes and*
*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Luis Javier*
*Vazquez, Brandon Vera, and Kyle Kingsbury*

*(Additional counsel appear on signature page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>          v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>                     Defendant. | Case No.: 2:15-cv-01045-RFB-PAL<br><br>**PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT** |

## GLOSSARY OF ABBREVIATIONS

For the convenience of the Court and efficiency, Plaintiffs' Opposition to Zuffa's Motion for Summary Judgment uses the following abbreviations:

| Expert Reports | Abbreviation | Exhibit |
|---|---|---|
| Expert Report of Hal J. Singer, Ph.D. (August 31, 2017) | SR1 | 1 |
| Rebuttal Expert Report of Hal J. Singer, Ph.D. (January 12, 2018) | SR2 | 2 |
| Supplemental Expert Report of Hal J. Singer, Ph.D. (April 3, 2018) | SR3 | 3 |
| Second Supplemental Reply Report of Hal J. Singer, Ph.D. (May 28, 2018) | SR4 | 4 |
| Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC* (August 30, 2017) | ZR1 | 5 |
| Expert Rebuttal Report of Andrew Zimbalist (December 26, 2017) | ZR2 | 6 |
| Expert Rebuttal Report of Professor Alan Manning (January 12, 2018) | MR1 | 7 |
| Expert Report of Guy A. Davis, CPA, CIRA, CDBV, CFE (August 31, 2017) | GDR1 | 8 |
| Expert Report of Professor Robert H. Topel (October 27, 2017) | TR1 | 9 |
| Depositions | Abbreviation | Exhibit |
| Deposition of Nathan Quarry (September 30, 2016) | Quarry Tr. | 11 |
| Rule 30(b)(6) Deposition of Kirk D. Hendrick on behalf of Zuffa, LLC (November 29-30, 2016) | Hendrick 30(b)(6) Tr. | 12, 13 |
| Rule 30(b)(6) Deposition of Ike Lawrence Epstein on behalf of Zuffa, LLC (December 2, 2016) | Epstein 30(b)(6) Tr. | 14 |
| Deposition of Denitza Batchvarova (January 25, 2017) | Batchvarova Tr. | 15 |
| Deposition of Kurt Otto (February 6, 2017) | Otto Tr. | 16 |

ii

| Depositions (continued) | Abbreviation | Exhibit |
|---|---|---|
| Deposition of Thomas J. Atencio (February 9-10, 2017) | Atencio Tr. | 17 |
| Deposition of Jon Fitch (February 15, 2017) | Fitch Tr. | 18 |
| Deposition of Brandon Vera (February 16, 2017) | Vera Tr. | 19 |
| Deposition of Kyle Kingsbury (February 17, 2017) | Kingsbury Tr. | 20 |
| Deposition of Jeremy Lappen (February 28, 2017) | Lappen Tr. | 21 |
| Deposition of Lorenzo J. Fertitta (March 23, 2017) | Fertitta Tr. | 22 |
| Deposition of Shannon Knapp (April 11, 2017) | Knapp Tr. | 23 |
| Deposition of Sean Shelby (April 12, 2017) | Shelby Tr. | 24 |
| Deposition of John Mulkey (April 19, 2017) | Mulkey Tr. | 25 |
| Deposition of Jeffrey Aronson (April 25, 2017) | Aronson Tr. | 26 |
| Rule 30(b)(6) Deposition of Drew Goldman on behalf of Deutsche Bank (April 28, 2017) | Deutsche Bank 30(b)(6) Tr. | 27 |
| Deposition of Ike Lawrence Epstein (May 25, 2017) | Epstein Tr. | 28 |
| Deposition of Joseph Silva (June 7, 2017) | J. Silva Tr. | 29 |
| Deposition of Scott Coker (August 3, 2017) | Coker Tr. | 30 |
| Deposition of Dana F. White (August 9-10, 2017) | White Tr. | 31, 32, 33 |
| Deposition of Hal J. Singer, Ph.D. (September 27, 2017) (excerpted) | Singer Tr. | 34, 141 |
| Deposition of Paul Oyer (November 29, 2017) (excerpted) | Oyer Tr. | 35 |
| Deposition of Robert Topel (December 5-6, 2017) | Topel Tr. | 36, 37 |
| Deposition of Roger D. Blair (December 8-9, 2017) | Blair Tr. | 38, 39 |

| Other Terms | Abbreviation | |
|---|---|---|
| Plaintiffs' Counterstatement of Facts | CSF | |
| Zuffa's "Statement of Undisputed Facts" | ZSUF | |
| Zuffa's Motion for Summary Judgment, ECF No. 573 | MSJ | |
| Exhibits to Zuffa's Motion for Summary Judgment, ECF Nos. 574-75 | Z.Ex. | |
| Zuffa's Motion to Exclude Testimony of Dr. Hal Singer, ECF No. 524 | SD | |
| Plaintiffs' Consolidated Brief in Opposition to Zuffa, LLC's Motion to Exclude the Testimony of Drs. Hal Singer and Andrew Zimbalist, ECF No. 534 | SZDO | |
| Reply in Support of Plaintiffs' Motion for Class Certification, ECF No. 554 | Class Reply | |
| Consolidated Amended Antitrust Class Action Complaint, ECF No. 208 | CAC | |
| Response to Plaintiffs' Requests for Admission | PRFA | |
| Revenues generated by a live MMA event | Event Revenues | |
| **Individuals** | **Abbreviation** | **Organization/Title** |
| Jeff Aronson | Aronson | **Titan FC:** Owner and Chief Executive Officer |
| Thomas Atencio | Atencio | **Affliction MMA** |
| Denitza Batchvarova | Batchvarova | **Zuffa, LLC:** Senior Vice President of Strategy |
| Dr. Roger D. Blair | Blair | **Zuffa, LLC:** Economist |

iv

| Individuals (continued) | Abbreviation | Organization/Title |
|---|---|---|
| Scott Coker | Coker | **Bellator:** President; **Strikeforce:** Founder, Former President and Chief Executive Officer |
| Guy A. Davis | Davis | Plaintiffs' Expert Accountant |
| Ike Lawrence Epstein | Epstein | **Zuffa, LLC:** Senior Vice President and General Counsel; 30(b)(6) designee for Promoter Acquisitions Topics |
| Lorenzo Fertitta | Fertitta | **Zuffa, LLC:** Founder, Former Owner and Chief Executive Officer |
| Jon Fitch | Fitch | Named Plaintiff |
| Drew Goldman | Goldman | **Deutsche Bank:** Rule 30(b)(6) designee |
| Kirk Hendrick | Hendrick | **Zuffa, LLC:** Executive Vice President and Chief Legal Officer; Rule 30(b)(6) designee for Fighter Contract Topics |
| Kyle Kingsbury | Kingsbury | Named Plaintiff |
| Shannon Knapp | Knapp | **Invicta Fighting Championship:** Founder and President |

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

| Individuals (continued) | Abbreviation | Organization/Title |
|---|---|---|
| Jeremy Lappen | Lappen | **ProElite (Parent Company of EliteXC):** President of Fight Operations; **World Fighting Alliance (WFA):** Former Chief Executive Officer |
| Dr. Alan Manning | Manning | Plaintiffs' Expert Economist |
| John Mulkey | Mulkey | **Zuffa, LLC:** Former Chief Financial Officer |
| Kurt Otto | Otto | **International Fight League (IFL):** Founder and President |
| Nathan Quarry | Quarry | Named Plaintiff |
| Sean Shelby | Shelby | **Zuffa, LLC:** Vice President of Talent Relations and Matchmaker for UFC |
| Joseph Silva | Silva | **Zuffa, LLC:** Former Executive Senior Vice President of Talent Relations and Matchmaker for UFC |
| Dr. Hal Singer | Singer | Plaintiffs' Expert Economist |
| Dr. Robert Topel | Topel | **Zuffa, LLC:** Economist |

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

| Individuals (continued) | Abbreviation | Organization/Title |
|---|---|---|
| Dana White | White | **Zuffa, LLC:** President |
| Brandon Vera | Vera | Named Plaintiff |
| Dr. Andrew Zimbalist | Zimbalist | Plaintiffs' Expert Economist |

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     COUNTERSTATEMENT OF FACTS ..................................................................3

        A.      MMA Promoters Require a Critical Mass of Marquee Fighters to Challenge
                Zuffa ...........................................................................................................3

                i.      Marquee Fighters Are the Principal Driver of MMA Promoter
                        Revenues. ........................................................................................3

                ii.     A Critical Mass of Top Fighters Is Necessary to Compete with Zuffa......4

        B.      Zuffa's Anticompetitive Scheme Was Designed to Lock in Current and Potential
                Top Fighters to Exclusive Contracts for the Most Valuable Parts of Their
                Careers ........................................................................................................6

                i.      Exclusive Fighter Contracts Restricted Fighter Mobility. ........................6

                ii.     Zuffa Leveraged its Market Power to Extend Exclusivity.........................7

                iii.    Zuffa's 2006-2011 Buyouts Shuttered Rivals and Locked in More
                        Fighters...........................................................................................9

        C.      Zuffa's Scheme Substantially Impaired Competition .........................................11

                i.      Zuffa's Scheme Succeeded in Locking up the Vast Majority of Top
                        Fighters..........................................................................................11

                ii.     Zuffa's Scheme Deprived Promoters of a Key Input: A Critical Mass of
                        Top Fighters. .................................................................................12

                iii.    Zuffa's Scheme Relegated Other Promoters to Feeder or Minor
                        Leagues. .......................................................................................12

                iv.     Zuffa Has Had No Direct Competition. ..................................................14

        D.      Zuffa's Scheme Caused Anticompetitive Effects ...............................................16

                i.      The Scheme Suppressed Fighter Compensation. ....................................16

                ii.     The Scheme Reduced the Quality of MMA Events.................................17

                iii.    The Scheme Suppressed Marketwide Output of MMA Events and
                        Inflated Prices. ...............................................................................17

        E.      Zuffa's Scheme Had No Procompetitive Effects ................................................18

III.    LEGAL STANDARD...........................................................................................18

IV.     ARGUMENT .......................................................................................................19

        A.      Plaintiffs Properly Define Input and Output Markets..........................................20

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

    i. Dr. Singer's Relevant Input Market Is Supported by Substantial Evidence. ...................................................................................20

    ii. Dr. Singer's Output Market Is Supported by Substantial Evidence. .......26

  B. Plaintiffs Have Shown Zuffa's Monopsony Power and its Anticompetitive Effects ...........................................................................................28

  C. Direct Evidence Establishes Zuffa's Monopsony Power.....................................29

    i. Zuffa Suppressed Fighters' Wages. ........................................29

    ii. Zuffa Restricted the Output of Fighter Services. ....................................31

    iii. Zuffa Excluded Rivals. ...................................................32

  D. Circumstantial Evidence Demonstrates Zuffa's Monopsony Power ..................32

  E. Zuffa Has Engaged in Exclusionary Anticompetitive Conduct..........................33

    i. Zuffa's Exclusive Contracts Substantially Foreclosed Competition. ......33

    ii. Zuffa's Acquisitions and Coercion Harmed Competition. .....................37

  F. Zuffa Has Not Shown Its Exclusive Contracts Had Procompetitive Effects ......39

  G. Zuffa Irrelevantly Addresses a Predatory Hiring Claim that Plaintiffs Do Not Assert ..............................................................................................41

  H. Zuffa's Monopoly Power Contributed to its Monopsony Power.......................41

  I. Direct Evidence Establishes Zuffa's Monopoly Power .....................................43

  J. Plaintiffs Support their Identity Class Claim with Admissible Evidence............45

  K. Plaintiffs Have Standing to Seek Injunctive Relief ...........................................45

V.  CONCLUSION...............................................................................................45

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

# TABLE OF AUTHORITIES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010)........................................................................................37

*Am. Ad. Mgmt. Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1990)......................................................................................30

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
   No. 04-cv-8967, 2005 WL 1515399 (S.D.N.Y. June 23, 2005) ........................................36

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*,
   108 F.3d 1147 (9th Cir. 1997)................................................................................1, 41

*Ass'n for Intercollegiate Athletics for Women v. NCAA*,
   558 F. Supp. 487 (D.D.C. 1983)..................................................................................23

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)....................................................................................38, 39

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991)....................................................................................19

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016)....................................................................................38

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)..................................................................................................44

*Brown v. City of Los Angeles*,
   521 F.3d 1238 (9th Cir. 2008)....................................................................................19

*Cal. Dental Assoc. v. FTC*,
   526 U.S. 756 (1999)..................................................................................................27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................................19

*Chicago Bd. of Trade v. United States*,
   246 U.S. 231 (1918)..................................................................................................44

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) ........................................................................45

*City of Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992)....................................................................................20

x

*Clarett v. NFL*,
  306 F. Supp. 2d 379 (S.D.N.Y. 2004)..................................................................23

*Costco Wholesale Corp. v. Maleng*,
  522 F.3d 874 (9th Cir. 2008)...........................................................................33

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016)............................................................36, 37

*Doe v. Arizona Hosp. & Healthcare Ass'n, ("Ariz. Nurses")*,
  No. 07-cv-1292, 2009 WL 1423378 (D. Ariz. Mar. 19, 2009)......................30, 31

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*,
  357 F.3d 1 (1st Cir. 2008)................................................................................37

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992).........................................................................................45

*Eisenberg v. Ins. Co. of N. Am.*,
  815 F.2d 1285 (9th Cir. 1987)...........................................................................19

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
  848 F.2d 976 (9th Cir. 1988).............................................................................37

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986).........................................................................................27

*FTC v. Motion Picture Adver. Serv. Co.*,
  344 U.S. 392 (1953).........................................................................................36

*FTC v. Staples*,
  970 F. Supp. 1066 (D.D.C. 1997).....................................................................25

*FTC v. Whole Foods Mkt., Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008)........................................................................25

*Gen. Bus. Sys. v. N. Am. Phillips Corp.*,
  699 F.2d 965 (9th Cir. 1983).............................................................................37

*Golden Boy Promotions LLC v. Haymon*,
  No. 15-cv-3378, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017)..................23, 24, 37

*Haagen-Dazs Co. v. Dble. Rainbow Gourmet Ice Creams., Inc.*,
  895 F.2d 1417 (9th Cir. 1990)...........................................................................39

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

*Heerwagen v. Clear Channel Commc'ns*,
   435 F.3d 219 (2d Cir. 2006) ...............................................................................28

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
   Nos. 00-cv-20905, 05-cv-334, 05-cv-2298, 06-cv-244, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ....24

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   903 F.2d 612 (9th Cir. 1990) ...............................................................................37

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1993) .......................................................................33, 40

*In re Apple iPod iTunes Antitrust Litig.*,
   796 F. Supp. 2d 1137 (N.D. Cal. 2011) ...............................................................45

*In re Beef Antitrust Litig.*,
   907 F.2d 510 (5th Cir. 1990) ...............................................................................32

*In re Dealer Management Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ...................................................................31

*In re Ebay Seller Antitrust Litig.*,
   No. 07-cv-1882, 2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ........................43, 45

*In re High-Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................... *passim*

*In re Lal*,
   No. 01-cv-1507, 2002 WL 449661 (N.D. Cal. Mar 15, 2002) ..............................19

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................................21

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*,
   No. 14-md-2541, 2018 WL 1524005 (N.D. Cal. Mar. 28, 2018) ..........................19

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig. ("Grant-In-Aid II")*,
   No. 14-md-2541, 2018 WL 4241981 (N.D. Cal. Sept. 3, 2018) ...........................22

*In re NCAA I-A Walk-on Football Players Litig.*,
   398 F. Supp. 2d 1144 (W.D. Wash. 2005) .....................................................23, 27

*Int'l Boxing Club of N.Y., Inc. v. U.S.*,
   358 U.S. 242 (1959) ...........................................................................22, 28, 36

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) ...............................................................................39

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000)................................................................................41

*Le v. Zuffa, LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016) ....................................................... *passim*

*Luria Bros. & Co. v. Federal Trade Commission*,
    389 F.2d 847 (3d Cir. 1968).................................................................................34

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015)..............................................................................30

*Masimo Corp. v. Tyco Health Care Grp. L.P.*,
    No. 02-cv-4770, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006).........................35

*Mazda v. Carfax, Inc.*,
    No. 13-cv-2680, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ...........................34

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988)...............................................................................20

*McNeil v. Nat'l Football League*,
    790 F. Supp. 871 (D. Minn. 1992) ............................................................23, 28, 42

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011)...............................................................................41

*Methodist Health Servs. Corp., v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017)...............................................................................37

*Midwest Radio Co. v. Forum Pub. Co.*,
    942 F.2d 1294 (8th Cir. 1991).............................................................................41

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984)..........................................................................................28, 44

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000).............................................................................19

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004)............................................................24, 25

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ....................................................................23

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015)................................................................... *passim*

xiii

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) ................................................................................................22

*Omega Envtl v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) .....................................................................................37

*Ostrofe v. H.S. Crocker Co., Inc.*,
   740 F.2d 739 (9th Cir. 1984) .......................................................................................31

*Paladin Assocs. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) .....................................................................................24

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
   351 F. Supp. 462 (E.D. Pa. 1972) ...............................................................................23

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   No. 12-cv-2102, 2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ....................................37

*Procaps S.A. v. Patheon Inc.*,
   141 F. Supp. 3d 1246 (S.D. Fla. 2015) .......................................................................44

*Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010) ....................................................................................39, 40

*Rebel Oil Co v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................... *passim*

*Rock v. NCAA*,
   No. 1:12-cv-1019, 2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) ...............................22

*Simpson v. Lear Astronics Corp.*,
   77 F.3d 1170 (9th Cir.1995) ........................................................................................19

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999) .........................................................................................27

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) ..................................................................................44

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) .......................................................................................24

*Sterling Merch, Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011) .......................................................................................38

*Tampa Electric Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ....................................................................................................37

xiv

*Taylor Pub. Co. v. Jostens, Inc.*,
   216 F.3d 465 (5th Cir. 2000)................................................................................41

*Telecor Communications, Inc. v. Sw. Bell Tele. Co.*,
   305 F.3d 1124 (10th Cir. 2002)............................................................................41

*Theme Promotions, Inc. v. News Am. Marketing*,
   546 F.3d 991 (9th Cir. 2008)................................................................................31

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   No. 99-cv-7654, 2003 WL 21397701 (C.D. Cal. 2003) ......................................37

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)..................................................................20, 24, 25

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*,
   No. 08-cv-513, 2009 WL 2596493 (D. Colo. Aug. 21, 2009)..............................41

*Twin City Sportservice v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982)....................................................................... *passim*

*United States v. Int'l Boxing Club of N.Y., Inc.*,
   171 F. Supp. 841 (S.D.N.Y. 1957)........................................................................36

*United States v. Int'l Boxing Club, Inc.*,
   150 F. Supp. 397 (S.D.N.Y. 1957)........................................................................36

*United States v. Syufy Enterprises*,
   903 F.2d 659 (9th Cir. 1990)............................................................................37, 38

*United States v. Boyce*,
   148 F. Supp. 2d 1069 (S.D. Cal. 2001) ................................................................19

*United States v. Dentsply*,
   399 F.3d 181 (3d Cir. 2005)........................................................................... *passim*

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
   914 F.2d 1256 (9th Cir. 1990)..............................................................................41

*Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)........................................................................................30, 31

*Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007)..............................................................................................38

*White v. NCAA*,
   No. 05-cv-999, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006)............................30

xv

*Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*,
    45 F. Supp. 2d 1164 (D. Kan. 1999) ................................................................................41

*Yeager's Fuel, Inc. v. Pa. Power & Light Co.*,
    953 F. Supp. 617 (E.D. Pa. 1997) ...................................................................................36

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .............................................................................................37

**Rules**

9th Cir. R. 36-3(c) .................................................................................................................39

Fed. R. Civ. P. 56 .................................................................................................................19

PLAINTIFFS' OPPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

## I.   INTRODUCTION

Although Zuffa has raised a scattershot set of issues in moving for summary judgment, the parties generally agree on the basic legal framework. Plaintiffs can establish their claim under Section 2 of the Sherman Act by showing that Zuffa: (i) had monopoly (or monopsony) power; (ii) acquired or maintained its monopoly (or monopsony) power through exclusionary conduct; and (iii) caused Plaintiffs antitrust injury. *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1161 (D. Nev. 2016) (quoting *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc*., 108 F.3d 1147, 1151 (9th Cir. 1997)); Zuffa's Motion for Summary Judgment, ECF No. 573 ("MSJ") 13.

Extensive evidence satisfies each of the three elements. The record shows: (1) Zuffa had monopoly and monopsony power as the dominant MMA promoter—that is, Zuffa was the only promoter that could sell "major league" live MMA events broadcast in North America and the only promoter that could hire MMA fighters ("Fighters") to compete in "major league" MMA events; (2) Zuffa willfully acquired and maintained monopoly and monopsony power through exclusionary conduct, including locking Fighters into long-term, exclusive contracts (the "Exclusive Contracts"), coercing Fighters to enter and extend those Exclusive Contracts, and acquiring other MMA promoters that threatened the UFC's dominance (together, the "Scheme"); and (3) Zuffa used its monopsony power to suppress the compensation it paid its Fighters below competitive levels (and its monopoly power to decrease the supply and inflate the prices of MMA events ).

Critically, Zuffa's arguments throughout its motion rely on two assumptions that are demonstrably wrong—or, at the least, give rise to genuine issues of material fact. First, Zuffa pretends that all Fighters are equivalent—that retaining the champion in a weight class matters no more for the market power of a promoter than a Fighter competing at the margins of the sport. So, for example, Zuffa claims that it controlled only a modest share of the market for Fighter services, based solely on the raw number of Fighters it had under contract, if one counts the *top 650* ranked Fighters in each weight class as if they all were equivalent. But that is untenable. The evidence shows the top-ranked Fighter matters far more for market power than the tenth-ranked Fighter, and far, far more than the hundredth-ranked Fighter. Taking that reality into account, Zuffa's exclusive control over top Fighters and its ability to deprive potential competitors of a critical mass of those top Fighters gave it market

1

power. Zuffa's own economist conceded, "████████████████████████████████ ████████████████████████████" Topel Tr. 440:12-441:10, and Zuffa itself admitted that ██ ████████████████████████████████████████████████████████████████████ ████████████████████████████. SR1 ¶¶159-60 (quoting Zuffa documents).

Second, Zuffa asserts it faces competition because other promoters host MMA events. But that conflicts with Zuffa's admissions that it is *the* "major league" of MMA. As Dana White, Zuffa's President, stated, "████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████" SR1 ¶106 (quoting Ex.89). Or, as he put it more bluntly, "████████ ████████████████████████" SR1 ¶137. Ample evidence confirms Zuffa's Scheme deprived its potential competitors of a critical mass of marquee Fighters, rendering them "minor leagues." In MMA, athletes obtain fame by competing against ranked opponents, ascending the rankings, and vying for titles. By acquiring all potential competitors and signing virtually all top Fighters to Exclusive Contracts, Zuffa left the top Fighters and aspiring top Fighters with nowhere else to go. Lorenzo Fertitta, Zuffa's former CEO, explained, "When you look at the top 10 in every division, we've got every fighter under our umbrella. All the fighters want to be with us because they want to fight the best competition. So from that standpoint . . . the competition isn't really relevant." PRFA No. 32.

Zuffa's motion also relies on another dubious claim: that it is solely responsible for the growth of MMA. Evidence shows that this claim is more myth than reality. *Infra* n.55. But its crucial weakness is its lack of legal relevance. Successful companies are no more exempt from antitrust law than they are from the laws governing minimum wage or race or sex discrimination.[1] The relevant issues instead are whether Zuffa (a) used anticompetitive exclusionary practices to acquire *or maintain* its dominant market position, and (b) whether it would have paid Fighters more than it did absent the Scheme. The overwhelming evidence shows it did abuse its market power. It also shows that without the Scheme, Fighters would not have received the ██% or less of Event Revenues—which Zuffa paid them—but rather about 50% or more of revenues, just as athletes do in the NBA, NFL, MLB, and NHL. Those

---

[1] *United States v. Dentsply*, 399 F.3d 181, 196 (3d Cir. 2005) ("While we may assume that [defendant] won its preeminent position by fair competition, that fact does not permit maintenance of its monopoly by unfair practices.").

leagues may well have contributed to the popularity of their respective sports. But after each eliminated the kind of conduct the UFC now uses to limit athlete mobility, competition for athletes' services increased. So did athlete pay, the popularity of each sport, and revenues. If Zuffa stops violating federal antitrust law, the evidence shows its Fighters, the sport of MMA, and the public will all benefit.

## II. COUNTERSTATEMENT OF FACTS

### A. MMA Promoters Require a Critical Mass of Marquee Fighters to Challenge Zuffa

#### i. Marquee Fighters Are the Principal Driver of MMA Promoter Revenues.

1.      Marquee Fighters are by far the most important input for MMA promoters because Fighters draw the audience—and therefore television deals and sponsors.[2] The UFC's longtime matchmaker Joe Silva testified that "it would devalue a promotion if the highest-level fighters in that organization are taken away" because "the highest-level fighters in an MMA promotion are a substantial component of the value of that organization." J. Silva Tr. 330:2-10.[3]

2.      Contrary to Zuffa's claim that it is somehow relevant that Zuffa had a minority of "total available athletes under contract," ZSUF ¶36, Fighters are not fungible, *see* SR2 ¶¶23, 128-29, 140 & n.499; SR4 ¶48, and thus merely counting up Zuffa's raw share of "athletes under contract" with any MMA promotion is irrelevant. Rather, as Zuffa's economist admits, highly-ranked or better-known Fighters generate more Event Revenues. *See* Topel Tr. 432:10-24, 450:8-451:5 ("some fighters are more important to an MMA promotion than others;" "some fighters generate more revenues"); *id.* 36:7-17 ("household names" more valuable); *id.* 431:2-7. Executives of Zuffa and other aspiring promoters recognize this fact. Silva admitted, for instance, that "there is a group of fighters who, whether they're champions or not, . . . tend to separate themselves from the crowd as capable of being headliners;" and

---

[2] SR1 ¶¶20, 113; SR2 ¶132; J. Silva Tr. 102:23-103:3 (Promoters "seek to populate the main events with the biggest draws as fighters"); Lappen Tr. 136:4-13; *id.* 142:17-18; Coker Tr. 88:13-89:3; *id.* 103:9-12.

[3] Kurt Otto, who ran a promotion that had aspirations of competing with the UFC, testified that the ability to retain and recruit well-known fighters is "the epitome of the sport" because "they put butts in the seat . . . . It's the gasoline to the engine. Without that, you have zero." Otto Tr. 102:24-103:23. Zuffa's internal documents, third party market analyses, and the testimony of Zuffa's own economist all confirm the central importance of marquee Fighters. SR1 ¶¶20, 156-164; Topel Tr. 242:7-243:1 ("people like to watch quality fighters" and "the higher quality fighter the more revenues an event is likely to generate" (discussing Ex.116)); *id.* 241:4-16; *id.* 418:24-419:9; Ex.119 at -52 ("████████████████████████████████████████████████"). Economists recognize that sport revenues rise with the quality of the athletes. SR2 ¶¶89-102; SR3 ¶¶22-23; MR1 ¶¶6, 24-28, 31.

"an event will have difficulty succeeding without these top-level headline fighters." J. Silva Tr. 331:5-332:2.[4] Relative to Fighters, the promoter's role is limited.[5]

ii.   **A Critical Mass of Top Fighters Is Necessary to Compete with Zuffa.**

3.    Because Fighters are not fungible and because the top Fighters drive revenues, as Zuffa has conceded, a "███████████████████" is "███████" to stage live MMA events successfully.[6] Zuffa's economist also admitted, "█████████████████████████████████████████ ██████████████" and that "████████████████████████████████████████ ████████████████" Topel Tr. 440:12-441:10; *see also* SR1 ¶158.

4.    Zuffa admits it has the "█████████████████████" under multi-bout exclusive agreements—a barrier to entry and expansion for other promoters. And its economist conceded that "██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████" Topel Tr. 435:17-437:22.[7]

5.    Promoters need a deep roster of talented Fighters to compete with Zuffa because:

a.    Given Zuffa's anticompetitive Scheme, a promoter must supply multiple pairings of top Fighters to sustain consumer interest. SR1 ¶156. Not all top Fighters can be matched against each other because, *inter alia*, there are distinct weight classes, and repetitive pairings of the same top Fighters would have decreasing utility. *Id.*; *see also* Silva Tr. 130:18-131:16; Hendrick 30(b)(6) Tr. 217:17-218:10.

b.    Only by having access to a broad stable of top Fighters can a promoter develop new top

---

[4] *See also* Coker Tr. 96:25-97:5 (█████████████████████████████████████████████████ ███████████████████); *id.* 89:4-7; Atencio Tr. 54:22-55:3 ("top of the card" fighters are more valuable); *cf.* SR1 ¶20; SR2 ¶132; Blair Tr. 18:7-14 ("fans are more willing to watch . . . superstars").
[5] SR1 ¶28; SR3 ¶¶22-23, 26-27, 33; SR4 ¶¶14, 16-17, 25, 40; TR1 ¶87; Topel Tr. 23:16-24:3, 24:20-25:9, 36:24-37:13, 54:3-15, 55:12-56:4. Coker: "I believe the fighter is the key. They are number one in this industry. And not everybody might believe that. They might believe that … it's the league, but I've always felt that fighters were number one. And from there you have something to work with and something to build." Coker Tr. 88:13-24; *id.* 88:25-89:7.
[6] Ex.97 at -439; Ex.100 at -738 (same); *see also* Deutsche Bank 30(b)(6) Tr. 61:23-63:13 (████████████████████████).
[7] *See also, e.g.*, SR1 ¶¶159-60; Ex.88 at -347; Ex.45 at -154; Ex.44 at -613; Ex.92 at -384 (admitting ████████████); Ex.97 at -439; Ex.100 at -738 (same).

Fighters, as Fighters rise in the rankings only by defeating other top Fighters. SR1 ¶157. As Silva put it,

"███████████████████████████████████████████████████

███████" J. Silva Tr. 130:10-132:10; Ex.124 at -15.[8]

      c.  In an environment in which Zuffa refuses, as part of the Scheme, to co-promote events

with other MMA promoters,[9] top Fighters and aspiring top Fighters require a promoter to have a

critical mass of top Fighters. *E.g.*, Topel Tr. 431:8-13 ("the ability to develop their careers by fighting

against highly-ranked opponents" is "one of the reasons they [Fighters] sign up"); *id.* 434:9-15

(Fighters "generally have an interest in competing against the best fighters" and customers "like that

too" because putting "good fighters against each other" creates "more energy"); TR1 ¶96. Zuffa

principal, Lorenzo Fertitta, made this clear: "[F]or any aspiring athlete that wants to become a fighter,

we're at the top of the food chain … [T]heir goal is eventually to get to the UFC. So the talent pool is

kind of coming to us so we kind of have the pick of the best fighters that are potentially out there."[10]

      6.  Zuffa concedes that by keeping top Fighters from other promoters the UFC will continue

to be "████████████████████████████████████." SR1 ¶162. Zuffa's executives

acknowledge the importance of blocking other promoters' access to top Fighters to maintaining its

dominance.[11] In February 2014, for example, after Lorenzo Fertitta exercised a provision of Zuffa's

Exclusive Contracts to prevent top Fighter Gilbert Melendez from defecting to Bellator, Fertitta wrote

to Dana White: "████████████████████████████████████████████████

████████████████████"[12]

---

[8] PRFA No. 5 (Fedor Emelianenko, who was not with the UFC, could not be considered the best because "he's not going to fight anybody"); J. Silva Tr. 128:23:129:11 ("I would like your guy to have more experience and have experience against better people.").
[9] *See* White Tr. 154:5-8 (███████████████████████████████████████████████████
████████████████); J. Silva Tr. 216:19-217:5 (admitting that reason for no co-promotion is due to concerns of allowing other promoters to gain traction); Ex.128 at -702; Topel Tr. 296:4-9 (same); SR1 ¶17; *see also* SR2 ¶¶221-26 (noting that non-Zuffa promoters routinely co-promote); Topel Tr. 297:7-12 (admitting that non-Zuffa promoters engage in co-promotion).
[10] PRFA 33; PRFA 32 (Fertitta: "All the fighters want to be with us because they want to fight the best competition."); Shelby Tr. 164:11-13 ("████████████████████████████████████████
████████████"); SR1 ¶¶20, 100, 104-05, 112, 119, 152, 156-64; SR2 ¶¶12, 21, 29-30, 54-55, 66. *See, e.g.*, SR1 ¶162 (quoting Ex.55, Ex.72, Ex.76); *id.* n.424 (quoting Ex.58); J. Silva Tr. 315:23-317:8; Ex.131 at -82.
[12] Ex.134 Rows 1499-1502. *See also* Fertitta Tr. 290:20-292:14. In another example, Joe Silva ████████████████████████████████████████████████████████████████
████████████████████████████" J. Silva Tr. 304:18-306:12; Ex.130 at -03. Silva

**B. Zuffa's Anticompetitive Scheme Was Designed to Lock in Current and Potential Top Fighters to Exclusive Contracts for the Most Valuable Parts of Their Careers**

**i.    Exclusive Fighter Contracts Restricted Fighter Mobility.**

7.    Zuffa admits, ZSUF ¶12, all its Fighters are required to sign Exclusive Contracts.[13]

8.    Zuffa also admits its Exclusive Contracts restrict Fighter mobility, preventing the best Fighters from moving to other promoters. *See, e.g.,* Topel Tr. 75:6-19, 80:7-16, 78:20-79:1 (admitting its Exclusive Contracts are "restrictions on athlete mobility").[14] Zuffa restricts Fighter mobility through specific contractual provisions, such as:

a.    **The Exclusivity Clause** prevents UFC Fighters from appearing for other promoters, Hendrick 30(b)(6) Tr. 382:11-385:23 & 376:25-377:13, and the better the Fighter, the longer the term.[15]

b.    **The Right to Match Clause** gives Zuffa the right to match any offer made to a Fighter by another promoter for ▓▓▓▓▓▓ after the Exclusive Contract "term" and after any Exclusive Negotiation period.[16] As a result, "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" J. Silva Tr. 186:4-12.

c.    **The Exclusive Negotiation Clause** gives Zuffa the exclusive right to negotiate with the Fighter after the "term," typically for 3 months.[18]

admitted that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" *Id.* 307:23-308:2.
   SR1 ¶¶21, 29; Hendrick 30(b)(6) Tr. 68:19-69:1; Ex.122 at 2; J. Silva Tr. 259:8-20 ("in order to fight a bout for the UFC, the fighter is required to sign what Zuffa called the exclusive promotional and ancillary rights agreement").
[14] *See also* Hendrick 30(b)(6) Tr. 366:14-19, 376:15-18 (UFC Exclusive Contracts are ▓▓▓▓▓▓▓▓▓); Ex.105 at -912; Ex.97 at -392; Ex.100 at -751; J. Silva Tr. 57:8-59:20 (agreeing with Deutsche Bank statements).
[15] *See also* Deutsche Bank 30(b)(6) Tr. 71:18-72:3 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; Ex.102 at -304 & Mulkey Tr. 92:10-93:1; Ex.97 at -392; Ex.100 at -751; Ex.86 at -447; J. Silva Tr. 280:7-282:10; Ex.129.
[16] *See* SR1 ¶¶68, 73, 84-88; ZR1 ¶¶10, 12, 77; Ex.100 at -751 (May 2007 CIM: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"); Ex.104 at -933 (October 2009 CIM: same); Ex.97 at -392 (same in 2013); *id.* at -408 (same); Deutsche Bank 30(b)(6) Tr. 71:18-72:3 ▓▓▓▓▓▓▓▓▓▓▓; J. Silva Tr. 184:16-185:16; *id.* 458:7-459:16 (same).
[17] *See also* White Tr. 389:18-390:10 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"); Hendrick 30(b)(6) Tr. 261:3-262:22 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); ZSUF ¶15; Topel Tr. 404:10-22, 406:9-407:8, 409:5-7▓.
[18] *See* SR1 ¶¶73, 84; ZR1 ¶¶12, 77; Ex.100 at -751 (May 2007 CIM: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"); Ex.104 at -933 (October 2009 CIM: same); Ex.97 at -392 (2013 Leveraged Finance Credit Report: same); *id.* at -408 (same); Deutsche Bank 30(b)(6) Tr. 71:18-72:3; J. Silva Tr. 184:16-185:16 (confirming same); *id.* 458:7-459:16 (same); *id.* 186:4-12. *See also* White Tr. 391:5-20 (same); Hendrick 30(b)(6) Tr. 261:3-262:22 (same); ZSUF ¶15.

d. **The Champions Clause** gives Zuffa the right to extend the contract of a Fighter who is the champion of any weight class at the end of the term ████████████████. Ex.105 at -912; SR1 ¶69.[19]

9.    Contrary to Zuffa's contention about the average Fighter career length, ZSUF ¶13, the effective term of Zuffa's Exclusive Contracts was longer than the average Fighter career.[20]

10.    That certain other MMA promoters may also have exclusivity provisions, ZSUF ¶16, is disputed and irrelevant. It is disputed in that the other promoters' contracts contained significant exceptions to exclusivity, often allowing Fighters to compete in other organizations, including the UFC. SR1 ¶¶107, 135-36; SR2 ¶¶236-37. Further, the other promoters "████████████ ████████████████████████████████████████████████████████████████" SR2 ¶¶190, 236-37. Indeed, evidence shows that other promoters would have been willing to co-promote MMA events, SR2 ¶¶221-24, and ████████████████████████████████████ ██████████. SR2 ¶¶190, 194, 236 & n.756; Ex.59 at -802-03.[21]

ii.    **Zuffa Leveraged its Market Power to Extend Exclusivity.**

11.    Zuffa used its market power and negotiating leverage—including through coercion,

---

[19] *See also* Hendrick 30(b)(6) Tr. 240:19-241:8; Ex.122 at 4 (████████████████████████ █████████████████████████████); Deutsche Bank 30(b)(6) Tr. 72:4-24 (testifying that ████████ ████████████); J. Silva Tr. 58:20-59:4; *id.* 274:14-275:3; ████████████████████████████ ██████████ Ex.122 at 7 (" ██████████████████████████████████████████████████"); Epstein Tr. 210:5-10; J. Silva Tr. 126:14-18; *id.* 275:9-276:18; *id.* 408:12-15; *id.* 410:3-7; *id.* 412:7-12; *id.* 412:25-413:22; *id.* 421:6-17; *id.* 426:6-12; *id.* 432:13-433:16; *id.* 467:11-468:3; *id.* 469:7-470:22; *see also* Ex. 90 at -69; Ex. 133; J. Silva Tr. 419:9-20; SR1 ¶162, n.424; *cf.* ZSUF ¶13.

[20] *Compare* SR1 ¶89 & Tbl.1 (██████████████████████████████████████████████), *with* SR 2 ¶64 & Tbl.1 (average Zuffa Fighter career with Zuffa is 24 months with a median of 0.82 years; average in the Input Market (defined below) only 0.38 to 1.33 years (4.56 months to 15.96 months) with median of 1.8 to 2.55 years (21.6 months to 30.6 months)); *see also* SR3 ¶45; SR1 ¶¶99-100, 104-107, 108-111, 127; SR2 ¶24, 64-66. Zuffa's contention that the average career for athletes who competed in at least one Zuffa bout is 8.7 years, ZSUF ¶13, mischaracterizes those athletes' careers because the 8.7 figure includes "the portion of a Fighter's career spent in the minor leagues (which is comparable to including a professional athlete's time playing in high school and college when calculating the length of his or her professional career)," SR3 ¶45; *see also id.* (Topel's calculation includes "bouts in extremely minor promotions that do not have a single athlete ranked between 1 and 650 in *any* weight class").

[21] Further, restrictive provisions that may not be anticompetitive when engaged in by a non-dominant firm are competitively destructive when implemented by a firm, like the UFC, with monopoly power. SR2 ¶¶238-39, 190.

threats, and aggressive contractual enforcement—to make its Exclusive Contracts effectively perpetual. *See* SR1 ¶¶75-91; SR2 ¶¶58, 62-63, 67. For instance, Zuffa forced its Fighters to renegotiate before the end of the existing contract's term to prevent the Fighters from ever becoming free agents. Plaintiff Vera explained how this worked: "Every time a fighter. . . is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight." Vera Tr. 118:1-18. Zuffa President White conceded that "most guys never make it to the end of a UFC contract. They will get within three fights, and then we want to sit back down and start talking, right, to keep them."[22]

12.    Zuffa would do any of the following to prevent a Fighter from reaching free agency:

a. **Move Fighters to unfavorable placement on the fight card for an event**[23] or impose unfavorable matchups.[24] As White described in a 2013 interview: "I can tell you this man, If you f***ing call [UFC matchmaker] Joe Silva and turn down a fight, you might as well say f***ing rip up my contract. He's a mean little f***er. You don't call Joe Silva and tell him you don't want to f***ing fight anybody man. You might as well just take the fight because it's going to be worse. You might as well just do it." PRFA No. 20; *see also* White Tr. 354:6-355:21; Ex.43; Ex. 57.

b. **Control the timing of a bout** (*i.e.*, refuse to offer Fighters bouts) for Fighters on the last bout of their contract. That punishes them because they get paid only when they fight. SR1 ¶¶76-80. As Plaintiff Fitch testified, "If you don't get your bout agreement, you don't get paid, you don't get money, you can't feed your children."[25]

c. **Delay a Fighter from competing for another promoter** through the Right to Match and Exclusive Negotiation clauses. Those clauses prevent a Fighter reaching the end of a contract "term" from moving to another promoter for ▮▮▮▮▮▮▮▮▮▮—an excessively long period to sit out given that careers are short and Fighters get paid only when they compete. Zuffa uses this "compensation gap" to coerce more seasoned Fighters to sign new deals.[26]

---

[22] White Tr. 347:12-14; *see also* Ex.50 at -976 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); White Tr. 390:20-24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ J. Silva Tr. 384:9-23 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex.132; J. Silva Tr. 383:9-15; Ex.52 at -186.
*See* SR1 ¶¶76-80; ZR1 ¶16; Batchvarova Tr. 36:7-11; Kingsbury Tr. 18:16-19:3; Ex.51; J. Silva Tr. 401:2-19, 405:12-19; Ex.71 at -15.
[24] *See* SR1 ¶77; Quarry Tr. 47:23-25; Ex.51; J. Silva Tr. 401:2-19; Ex.58 at -748; Kingsbury Tr. 116:1-119:24; Fitch Tr. 86:21-87:15; Ex.43; J. Silva Tr. 404:23-405:19, 426:6-12, 432:13-433:16, 126:14-18.
[25] Fitch Tr. 119:6-120:11; *id.* 110:4-23. *See also* Vera Tr. 118:1-18; SR2 ¶61 & n.231; Hendrick 30(b)(6) Tr. 265:5-267:13; Ex.123; J. Silva Tr. 228:19-21, 464:3-8; Ex.75; Ex.56.
[26] *E.g.*, Fitch Tr. 119:6-23 ("[I]f I didn't sign up, if I didn't re-up with the contract, I wouldn't have

Case No.: 2:15-cv-01045-RFB-(PAL)

The Right to Match and Exclusive Negotiation Clauses, along with the Champions Clause, were effective threats, ensuring that Zuffa rarely needed to enforce them formally.[27]

d. **Deprive Fighters of title opportunities**. Zuffa's control over title fights gave it leverage over contract length and pay *because, due to the Scheme, the UFC offers the only titles that matter in MMA. E.g.*, Ex.50 at -76; Ex.121; Ex.79 at -65; SR1 ¶79; Fitch Tr. 222:3-23; Kingsbury Tr. 51:12-22, 96:17-19, 142:12-143:2. Zuffa also refused to offer bouts for championship titles unless the Fighters were locked-up long-term. *E.g.*, Ex.120 at -7332 (J. Silva to Bob Cook (manager) re Fighter: ███████████████████████ ███████████████████████████ ); Shelby Tr. 33:8-34:5; *see also id.* at 32:12-21.

### iii. Zuffa's 2006-2011 Buyouts Shuttered Rivals and Locked in More Fighters.

13.     From 2006-2011, Zuffa enhanced its dominance by acquiring any potential competitor that could have posed a threat, and locked in those promoters' top Fighters to exclusive deals.

14.     In 2006, Zuffa acquired WEC, which featured top Fighters in lighter weight classes. Epstein 30(b)(6) Tr. 28:20-25, 33:14-20; SR1 ¶¶41-42. Zuffa ultimately merged WEC into the UFC.[28]

Also in 2006, Zuffa acquired World Fighting Alliance ("WFA") as a "████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████."[29]

15.     In 2007, Zuffa acquired its then-most significant competitor, PRIDE Fighting Championship.[30] ██████████████████████████████████████████████████

---

gotten a bout agreement. Q: Until? A: They would have exercised their time limit term to the full."); *see also* J. Silva Tr. 184:16-185:16 (agreeing that "during that 15-month period, if there's a fighter that Zuffa wants to keep, it has the option of keeping him as long as Zuffa matches any offer during that right-to-match period"); *id.* at 186:4-187:21 ███████████████████████████████████████████ ██████████████████████████ ; White Tr. 390:25-393:11; Hendrick 30(b)(6) Tr. 261:3-262:22 (same); *id.* 263:25-264:7 (admitting: ███████████████████████████████████ ███████████████████████████████████ "); Topel Tr. 114:17-116:1, 355:2-356:7, 357:25-358:6 (admitting ████████████████████████ ; SR1 ¶¶68, 84-87. ██████ *See* SR1 ¶79 (███████████████████████████████████████ "); Topel Tr. 355:2-6 ("Q. So, even if the right to match clause has never been, quote/unquote, used, it's still having an effect in the marketplace, correct? A. It could be having an effect in the marketplace even if they've never had to invoke."); *see also* Topel Tr. 355:12-356:6 (████████████████████████████████████████████████); *id.* 357:25-358:6 (same); *id.* 114:17-115:9 (same).
[28] *See* White Tr. 141:3-12 ("The UFC merged the WEC into the UFC because it wanted the lighter weight classes that the WEC had.").
[29] Ex.47 at -590. ███████████████████████████████████████████████. Ex.65 at 12; *see also* White Tr. 142:22-143:3, 313:11-13; Fertitta Tr. 81:18-82:5; SR1 ¶¶41-42.
[30] SR1 ¶43; Ex.99 at -636; Deutsche Bank 30(b)(6) Tr. 125:5-14; Epstein 30(b)(6) Tr. 113:16-18; White Tr. 152:14-21.

Case No.: 2:15-cv-01045-RFB-(PAL)

1    ██████. *See* Ex.111 at -140. Zuffa's PRIDE acquisition had a "████████████

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████" Ex.83 at -44. Lorenzo Fertitta stated that "this

4    transaction advances Pride and the UFC way beyond and light years ahead of any other MMA

5    organization." PRFA No. 4. Ultimately, Zuffa shut down PRIDE. White Tr. 167:13-18. After the

6    acquisition, White bragged: "look at all the contracts we got from Pride and all the guys that came

7    over[.]" *Id.* 313:6-10; *Id.* 167:24-168:13 ("Pride is dead, dummy. I killed them.").

8         16.   In 2009, ████████████████████████████████████████████

9    ████████████████. *See* Ex.61 at -50-51; SR1 ¶¶44-46. On July 24, 2009, Zuffa's Mersch

10   wrote: "████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████"

12   Ex.62.

13        17.   In the wake of these acquisitions, Strikeforce began to amass a roster of top Fighters.

14   Ex.67 at -19-20. Strikeforce's head, Scott Coker, testified, "In 2009 and '10, we [Strikeforce] had more

15   top 10 rated heavyweights than the UFC did. So arguably we had a better heavyweight division than

16   [UFC] did." Coker Tr. 105:23-25. After Zuffa acquired Affliction, Coker wrote: ████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████" Ex.68 at -04. By 2011,

20   Strikeforce had emerged as the "████████████████████████████████████████

21   ████" Ex.67 at -06; SR1 ¶47; Coker Tr. 103:17-24; Epstein 30(b)(6) Tr. 170:4-7; J. Silva Tr. 173:4-

22   10; *id.* at 316:15-18. ████████████████████████████████████████[31] In

23   January 2011, ████████████████████████████████████████████████

24   ██.[32]

25        18.   When Zuffa acquired Strikeforce in March 2011, ████████████████████

26

27   ───────────────
     [31] White Tr. 214:4-220:20; Epstein 30(b)(6) Tr. 170:22-171:14; J. Silva Tr. 316:9-14; *id.* 173:22-25.
28   [32] *See* White Tr. 228:12-233:20; J. Silva Tr. 156:25-172:10; Ex.126. Fertitta told Coker that he thought
     "Strikeforce [was] building a great brand, but we feel there should only be one brand, so we would like
     to buy your company." Coker Tr. 118:10-23.

██████, SR1 ¶¶47-50, and in light of its Scheme, closed the door on the possibility of real competition going forward. Coker testified that after the acquisition, a "lot of people were disappointed … [b]ecause you now had managers call [Coker] and say: Now our [Fighters'] purses are going to go down. Now there's only one buyer [for MMA talent] and it's not going to be good for MMA as an industry." Coker Tr. 135:10-19. Managers later confirmed to Coker that Fighter purse offers decreased by about 20%. *Id.* 137:14-21.

### C. Zuffa's Scheme Substantially Impaired Competition

#### i.   Zuffa's Scheme Succeeded in Locking up the Vast Majority of Top Fighters.

19.   Zuffa used its Exclusive Contracts and dominant market power to prevent top Fighters from becoming free agents, foreclosing other promoters' access to a sufficient stable of top Fighters.[33]

20.   Zuffa's supposed evidence of Fighter mobility, ZSUF ¶¶21-25, merely reflects that the UFC is the "major league" of MMA and cuts Fighters who do not meet its standard. *See* SR1 ¶¶107, 136. As the Raine Group, who analyzed the market for Zuffa, explained, "████████ ████████████████████████████████████████████." Ex.113 at -94. Zuffa's Silva echoed that understanding: "████████████████████████████████████████████████." J. Silva Tr. 177:7-178:21; Ex.127 at -818.[34] Zuffa bragged in 2016 that "████████████ ████████████████████████" Ex.115 at 14; *id.* (████████████████████████ ████████████████████████████); Ex. 66.[35] Zuffa's Scheme allowed it to lock in the vast majority of top Fighters. Silva bragged to White, "████████████," listing the consensus

---

[33] SR1 ¶¶159-66; SR2 ¶¶21, 42, 50-55, 65-67, 69-71; Ex.40; J. Silva Tr. 304:18-308:2.
[34] Zuffa's examples of Fighters leaving the UFC, ZSUF ¶¶22-24 & Z.Exs. at 86-87, are athletes Zuffa cut or did not pursue. *E.g.*, Ex.77 ████████████████████████████); White Tr. 309:16-25 (Bellator Fighters Tito Ortiz and Quinton Rampage Jackson were "has-beens"). Zuffa offers no evidence that it wanted to retain any of the Fighters it cites, ZSUF ¶¶22-24 & Z.Exs.86-87, because it did not.
[35] *See also* Topel Tr. 395:20-396:15, 398:12-16 (discussing Ex.115); Ex.100 at -751 (May 2007 CIM: ████████████████████████████████); J. Silva Tr. 59:14-20 (discussing Ex.100); Ex.95 at -25; Ex.101 at -085; Ex.102 at -304 (May 2007 FAQ: "████████████████████████ ████████"); SR2 ¶61 (quoting White saying "████████████████████ ████," and citing documentary evidence that "████████████████ ████████████"). This fact was well recognized throughout the industry. *E.g.*, Otto Tr. 427:22-428:4 ("If UFC had a fighter under contract and desired to keep that fighter under contract, it was generally understood in the MMA industry that Zuffa had the power to keep them.").

Case No.: 2:15-cv-01045-RFB-(PAL)

rankings and showing that Zuffa controlled a high ratio of top-ranked Fighters in each weight class. *See* Ex.84; J. Silva Tr. 156:25-172:10 (discussing document).[36]

21. Dr. Singer shows that Zuffa foreclosed a large and increasing share of Fighters, including Headliners (Fighters ranked in the top 15 of their weight class). SR1 ¶173 & Fig. 3; *see* SR1 ¶¶167-73; *id.* ¶¶306-09. By 2017, Zuffa had foreclosed ███████████ of Fighters in the relevant markets and between ████ percent of Headliners. SR1 ¶¶128-29, 167-73 & Fig. 3.

**ii.  Zuffa's Scheme Deprived Promoters of a Key Input: A Critical Mass of Top Fighters.**

22. By locking up the "███████████," the Scheme blocked potential competitors from entering or expanding. WME, which purchased Zuffa in 2016, observed: "███ ██████████████████████████████████████████████ ██████████████████████" Ex.118 at -78; *see also* CSF ¶¶3-6. Dr. Topel conceded that Zuffa's control of the "███████████" through its contracts created a barrier to entry and that Zuffa's contracts deprived promoters of what they would need to challenge Zuffa's dominance. CSF ¶4. Because Zuffa had locked up the vast majority of top Fighters, other promoters were unable to compete with it. *E.g.*, Otto Tr. 246:19-247:19; *supra* ¶¶19-21 & n.36.

**iii.  Zuffa's Scheme Relegated Other Promoters to Feeder or Minor Leagues.**

23. Through the Scheme, Zuffa dominated MMA from at least 2007 to 2017. As Deutsche Bank observed, beginning in 2007: "████████████████████████████████ ████████████████" Ex.102 at -304. As Zuffa conceded in 2009: "████████ ██████████████████████████████" Ex.87 at -95. Moody's

---

[36] PRFA No. 32 (L. Fertitta: "When you look at the top 10 in every division, we've got every fighter under our umbrella. All the fighters want to be with us because they want to fight the best competition. So from that standpoint . . . the competition isn't really relevant."); Ex.60 (Shelby: "████████ █████████"). Otto, who ran another MMA promoter, testified: "If I need to go get fighters that are bigger names, they're not in the woods somewhere up in a tree hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter." Otto Tr. 246:19-247:19. Otto testified further about the effect of Zuffa's control of top Fighters: "the talent pool was slim to none.… It's like, … you gobble up organizations and you coincidentally get the contracts with that deal, and those guys are under contract, and even though they don't exercise their rights to fight them, they're still under contract, and they're locked up. So, you know, the talent pool was not there[.]" *Id.* 371:12-372:13. Lappen, with ProElite (parent company of EliteXC), testified that Zuffa's Exclusive Contracts affected EliteXC's ability to sign top Fighters. *See* Lappen Tr. 137:22-138:8.

Case No.: 2:15-cv-01045-RFB-(PAL)

found in 2010 that the UFC is the "████████████████████" that "████████

████████████" Ex.49 at -1183.[37] And as Zuffa recognized in 2010, (a) ████████████

████████████" Ex.94 at -952, and (b) "████████████████████████████████

████████████████████████████████████" Ex.85 at -805. Deutsche Bank echoed this in 2013,

finding "█████████████████████████████████████████████

████████████." Ex.97 at -403.[38] Zuffa's owners have ████████████████████████

████. SR1 ¶137, Fig.2. White touted in 2010: "There is no competition. We're the NFL . . . There is

no other guy." Ex.139. A Zuffa executive repeated that admission in 2010, stating that "████████

████████████████████████████████████████████████████████████

████████" Ex.93 at -41.

24.     Given the "████████████" barriers to entry imposed by Zuffa's Scheme, Ex.118 at -78,

the UFC has "████████████████████████████████." Ex.105 at -912. Instead, other

promoters have positioned themselves as "feeder" or "minor leagues." As White conceded: "I don't

look at those guys as competition at all. They're nowhere near the league that we're in. I need shows

like this. They're the feeder leagues. All the guys who fight in those shows aspire to be in the UFC

some day. They're creating all the UFC talent of tomorrow." White Tr. 194:21-195:5; Ex.136 at 1.[39]

25.     Zuffa's citation to certain promoters' boasts that the UFC had not affected their ability

---

[37] *See also* Ex.106 at -05 (Moody's 2008); Ex.92 at -84-85 (Moody's 2009); Ex.107 at -39-40 (Moody's 2011); Ex.108 at -58-59 (Moody's 2013); Ex.82 at -87-88 (Moody's 2014); Ex.109 at -74-75 (Moody's 2015); Ex.110 at -82-83 (Moody's 2016).
[38] *See also* SR1 ¶¶130-31; Ex.100 at -738 (Deutsche Bank ("DB") 2007); Ex.104 at -928 (DB 2009); Ex.98 at -534 (DB 2011); Ex.48 at -311 (Goldman Sachs 2012); Ex.96 at -276 (DB 2013).
[39] *See also* Topel Tr. 376:25-377:19 (admitting that Zuffa considered other promotions to be "minor leagues" and comparing "minor league" promotions to AAA in MLB "where athletes play either because they like playing or because they hope to make it to the major leagues"); Ex.54 (██████████████████████████); Shelby Tr. 180:14-182:24 (████████████████████████████████████); Ex.41 & Ex.42 at -52 (████████████████████████████████████); Aronson Tr. 33:10-34:9 & Ex.121 at 3 (Titan FC "give[s] every single fighter a UFC Out clause [*i.e.*, a clause permitting the Fighter to leave for the UFC if the UFC wants the Fighter] … [A]ll my guys have the ability to leave for the UFC, because every kid training in MMA has the dream of being a UFC champion."); Knapp Tr. 220:22-221:13 (Invicta "can't ask [its] athletes to fight hard for [Invicta] if [she's] not willing to fight hard for them and give them the opportunities they're looking for. And I assure you, every one of them wants to be in the UFC[.]"); Ex.81 at -916 (████████████████████████████████████); Atencio Tr. 75:22-76:11 (Non-Zuffa promoters were minor leagues or "steppingstones" for MMA athletes to get to the "top" (referring to the UFC)); J. Silva Tr. 141:17-144:4; *id.* 143:5-9 ("████████████████████████████████████ ████████); Ex.125 at -198.

to sign Fighters, ZSUF ¶¶21, 25, are not credible and are disputed.[40] White has explained why they are not credible: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it. You're all feeder leagues to the UFC[.] I want them to exist and make money because those guys create the next talent that will end up in our organization someday." PRFA No. 24. Further, Zuffa's citations stand only for the undisputed proposition that Zuffa did not foreclose access to *all* Fighters. But that is irrelevant because the evidence shows that (a) all Fighters are not the same, CSF ¶¶1-2, (b) Zuffa locked up nearly all top Fighters and those with potential to be, CSF ¶¶4, 19-22, and (c) what is necessary to compete with the UFC is a critical mass of top Fighters, not low-ranked unknown Fighters or even a few top Fighters, CSF ¶¶3-6. In any event, Zuffa's cited statements do not contradict evidence showing that UFC is the "majors" and other promoters are not. As White testified, "Whether they like it or not, they're the farm league," White Tr. 192:25-193:14, and "I've said everybody was a feeder league to the UFC." *Id.* 242:13-16. *See also* Ex.89 at -195 ("███████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████"); CSF ¶24 & n.39. "Minor league" promoters may sign *some* athletes and make *some* profits, but they do not constrain Zuffa's market power.

### iv.   Zuffa Has Had No Direct Competition.

26.   Contrary to ZSUF ¶¶18-25, even the most prominent non-Zuffa promoters have been distant substitutes for the UFC. SR1 ¶¶104-07, 134-40.[41] Similarly, market observers, including a consulting firm (the Raine Group) evaluating potential investors for Zuffa in 2016, viewed Zuffa as ██████████ *Id.* ¶¶134-140; CSF ¶¶20, 22-24 & nn.37-39. The Raine Group put it succinctly in 2012: ███ ████████████████████████████████████████." Ex.112 at -065.[42] As Lorenzo Fertitta admitted in 2012, "There never has been a comparable outlet [to the UFC]. . . . We've dominated this,

---

[40] The testimony of Lappen (EliteXC) and Otto (IFL) contradicts Zuffa's cited evidence, *supra* n.36. In addition, both Aronson and Knapp receive substantial revenue from Zuffa, bringing their credibility into question. Aronson Tr. 82:14-83:10, 92:8-93:16; Knapp Tr. 130:6-13, 63:24-64:13.
[41] Similarly, Zuffa's contention that "New MMA promoters are continuing to emerge," ZSUF ¶20, is overstated and irrelevant because, to the extent there have been new promoters, they have all been feeder leagues, not on par with the UFC. *See* CSF ¶¶22-25.
[42] *See also* Ex.114 (Item 2.3 line 91) ("███████████████████████████████ ██████████").

this sport, alright? We've dominated the space." PRFA No. 17. None of the promoters Zuffa identifies, ZSUF ¶¶18, 21, has sufficient clout to check its dominance:

a. **Bellator** is not a direct competitor. In 2013, Deutsche Bank (with Zuffa's input and approval) represented to investors, █████████████████████████████████████████████ ████████████████████████████████████. Ex.97 at -439. Zuffa's then-CFO, John Mulkey, edited a draft of Moody's 2014 Credit Opinion to ███████████████████████████. Ex.45 at -155; Mulkey Tr. 216:13-217:7; *id.* at 218:16-219:8. Coker, who was brought in to lead Bellator in June 2014, described the promotion as "a dying brand," because, among other reasons, Bellator lacked "star power . . . they didn't have very big names at Bellator." Coker Tr. 166:11-21. WME's diligence documents prior to acquiring the UFC in 2016 describe Bellator as a ██████ Ex.118 at -78. Moreover, Zuffa's statement that Bellator "successfully outbid Zuffa" for Fighters (ZSUF ¶22; *see also id.* ¶¶23-24) is contradicted by the evidence showing that ████████████████████████████████████████████████████████████ ████████████. Ex.113 at -794; *see also* SR1 ¶134 (summarizing evidence ████████████████████████████████). J. Silva Tr. 191:12-205:14; White Tr. 299:8-307:17; 309:16-25; 315:6-316:3. In 2016, Bellator's revenues were $████ compared to just under $████ for Zuffa in North America alone. SR1 Tbl.3.

b. **OneFC**, *a promotion that operates exclusively in Asia*, began by telling Zuffa that it ████ █████████. Ex.54.[43] Dana White testified that OneFC was a feeder organization, White Tr. 296:7-9, and UFC matchmaker Sean Shelby has successfully obtained the release from OneFC to UFC of top OneFC Fighters. Shelby Tr. 203:9-23.

c. **Professional Fighters League** ("PFL"), the successor to World Series of Fighting ("WSOF"), does not directly compete with the UFC. PFL from its inception in 2012 through 2016 never achieved annual gross revenues of even ████ of the UFC's gross revenues. SR1 Tbl.3. Zuffa executives have conceded that WSOF does not have top Fighters and that it is a feeder league. J. Silva Tr. 177:7-178:21; Ex.127 at -818 ("██████████████████████████████████████████ ████████████████"); Shelby Tr. 164:11-13; White Tr. 289:17-290:6; *see also* SR1 ¶136 & nn.367-69 (██████████████████████████████████████).[44]

27.     Contrary to ZSUF ¶28, the evidence is overwhelming that no other sport or entertainment competes with Zuffa. *See* SR1 ¶¶115-18. And Zuffa has admitted this with respect to boxing and wrestling. *See* White Tr. 543:13-14 ("We're not in competition with boxing."); *id.* 450:2-8 ("Is [the WWE] competition? No. I mean, there's people that watch WWE and there's people that watch UFC. . . . What we're doing is completely different from what they're doing."); *id.* 452:13-453:17 ("I've always said [the UFC and WWE are] two completely different markets.").

---

[43] Zuffa offers no admissible evidence supporting OneFC's supposed valuation. ZSUF ¶18.
[44] Zuffa also cites Russian promoter Absolute Championship Berkut (ACB) that has signed a handful of former UFC Fighters. ZSUF ¶18. But ACB has promoted only one, untelevised event in the US, a second untelevised event in North America, with nothing upcoming. Zuffa does not dispute that ACB has "virtually no presence in the Relevant Geographic Market, and is hardly established in the marketplace." SR2 ¶32. Further, the day before Zuffa filed its MSJ, ACB confirmed the cancellation of three events due to "organizational and financial problems." Ex.141.

**D. Zuffa's Scheme Caused Anticompetitive Effects**

    **i.    The Scheme Suppressed Fighter Compensation.**

    28.    That Zuffa's pay rose over time, ZSUF ¶8, or that Zuffa's dominance allowed it to pay more than other promotions, ZSUF ¶9, are irrelevant because Zuffa's Scheme reduced competition and suppressed Fighter compensation below levels that would have prevailed absent the Scheme. Dr. Singer's impact regression shows, for instance, that as there was an increase in the share of Fighters Zuffa locked up (the "Foreclosure Share"), Zuffa paid its Fighters a lower share of its Event Revenues ("Wage Share"), and thus that absent the Scheme Fighter Wage Share would be substantially higher.[45] Zuffa concedes this effect. TR1 ¶27. Zuffa does not dispute that its annual Event Revenues grew substantially from 2007—███████—to 2016—███████. SR3 n.6 & Fig.A1. Zuffa concedes too that its Fighters played a substantial role in that ███ of revenue. See Topel Tr. 27:18-25, 47:15-48:4, 241:4-16.[46] It also concedes that as a firm's monopsony power grows, so does the gap between the amounts it pays its workers and the revenues the workers generate.[47] And it even concedes that Zuffa's "████████████████████████████████████████████ ████." TR1 ¶27 (emphasis in original).[48] Zuffa's economist, Dr. Topel, admits the Exclusive Contracts prevent a "transfer of wealth" that would otherwise occur from Zuffa to its Fighters.[49]

    29.    Dr. Singer shows that, due to the Scheme, Zuffa paid Fighters a lower Wage Share ████ ███████████████████████████████ See SR1 Pt.III.D.1 & Pt.VI.A. Similarly, the major sports all have greater competition for athletes' services than Zuffa and so pay them about 50%

---

[45] See SR1 ¶¶171, 180-87 & Tbls. 4-6; SR2 ¶¶3, 36, 40, 68, 72-87, 138, 144-48; SR3 ¶¶3, 12, 37, 40, 44, 46, 49; SR4 ¶7; Ex.69 at -08; Coker Tr. 97:18-99:3; ZR2 ¶19; Blair Tr. 157:8-158:19.
[46] Dr. Singer demonstrates empirically that Event Revenues increase in proportion to Fighter rank. SR2 ¶¶130-31 ███████████████████████████████); id. ¶¶111-13, 118, 120, 128; SR3 ¶¶20-33; MR1 ¶¶24-27.
[47] Topel Tr. 46:4-10 ("Q. So if the market's competitive, the athlete will get paid equal to his marginal revenue product; and if there's monopsony power in the market, the athlete will get paid below [it], correct? A. Yeah. All athletes, not just Zuffa.").
[48] See also Topel Tr. 50:6-51:2. Zuffa also created a chart ██████████████████████████████ ████████████████████████████ Ex.53 at -35; Topel Tr. 250:11-251:7, 252:1-16. Event Revenues increase as Fighter talent increases, and thus Fighters are responsible for a significant and proportional share of Event Revenues. See SR2 ¶¶111-13, 118, 120, 128; SR3 ¶¶22-23, 26, 28; SR4 ¶¶14, 16-17, 19, 38; MR1 ¶¶24-27.
[49] See Topel Tr. 76:4-77:3, 78:20-79:1, 83:19-84:8, 84:11-85:5, 86:1-11, 124:1-13, 136:11-137:1, 140:19-22, 344:6-346:8.

---

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT

**Public Version (Redacted)**

or more of revenues. ZR1 ¶¶25-71. And two of the most prominent boxing promoters pay on average

███ of their revenues to boxers. ZR2 ¶86. In contrast, Zuffa pays a paltry ███ or so of its Event

Revenues.[50] Contrary to Zuffa's contention that Plaintiffs did not show it suppressed "actual wages,"

ZSUF ¶¶37, 8, the record demonstrates that Zuffa would have paid Fighters between █████████

██████████ more than it actually did absent the Scheme.[51]

### ii.    The Scheme Reduced the Quality of MMA Events.

30.    Zuffa's Scheme also reduced the quality of Live MMA Events by reducing Fighters'

incentives to invest in their careers. Dr. Zimbalist found that "fighters have less incentive to prepare

and train in the short run" because of their suppressed wages caused by the Scheme, and in "the long

run, prospective MMA fighters have less incentive to develop the necessary skills to participate in the

sport, lowering the supply and overall quality of participants." ZR2 n.47.[52]

### iii.    The Scheme Suppressed Marketwide Output of MMA Events and Inflated Prices.

31.    Zuffa's claim that it and certain other promoters expanded their output over time, ZSUF

¶¶7, 19, is irrelevant because what matters is marketwide output, and the evidence shows that

marketwide MMA output *fell* due to the Scheme.[53] Dr. Singer determined that, due to the Scheme,

---

[50] SR1 ¶¶189, 252 & Tbl.10; ZR1 n.242 & Tbls. 4-5; Ex.53 at -35; Ex.116 at *11; Ex.78 at *10; Ex.117 Line 14; Ex.63 at -69.
[51] *See* SR1 ¶¶245-56 & Tbls. 9-12; SR2 ¶¶171-86; ZR1 ¶¶123-26 & Tbls. 4-6; ZR2 VI.
[52] *See also* ZR2 ¶90 ("higher compensation would incentivize athletes to invest more in their own preparation and training, yielding higher quality fighters and contests, and increasing industry revenues [as observed] in U.S. professional team sports following the advent of free agency"); *id.* ¶99; *see also* ZR1 ¶¶79-80 (other sports saw increased investment from owners and increased quality of sporting events as athletes used increased compensation to devote more time to training and fitness and exerted themselves more in competition); *id.* ¶¶83-84 (same). SR1 ¶¶286-90; SR2 ¶¶197-98, 211-12, 217, 234. Zuffa's economist Dr. Blair conceded that by suppressing athlete compensation "the quality of play would be lower and that. . . in turn, could have an impact on fan demand for watching major league games and. . . to that extent, the value of the product that's being offered, that is the competition o[n] the field. . . is lower and consumers are worse off as a result." ZR2 ¶100 (quoting Blair Tr. 148:24-149:5). Dr. Topel likewise acknowledges, all else equal, an increase in Fighter compensation relative to other sports would improve MMA quality. Topel Tr. 476:4-10; *see also id.* 154:22-25, 155:17-24.
[53] *See* SR1¶¶203-207, 268 & Figs. 4A-4C (measuring reduced output of promoters in the Input Market); SR2 ¶¶44, 47-49. Further, Zuffa had too few bouts for its Fighters such that, absent its Exclusive Contracts, the Fighters would have competed for other promoters at additional events. *E.g.*, SR1 ¶¶193-96, nn.478-83; SR2 ¶¶42-43, n.153; J. Silva Tr. 225:5-228:25; *id.* 238:4-21, 240:16-243:22, 248:11-14, 249:16-250:19, 257:8-15; White Tr. 343:20-24, 341:7-12, 340:9-12; Shelby Tr. 119:7-14, 128:1-17; Ex.91 (Silva: ████████████████████████████████████ ").

Zuffa increased the price of PPVs above competitive levels while reducing marketwide output.[54]

**E. Zuffa's Scheme Had No Procompetitive Effects**

32.     Zuffa provided no evidence that the Scheme had any procompetitive effects. *See* SR1 ¶¶257-90; SR2 ¶¶210-41; SR4 ¶10.[55] Dr. Zimbalist showed MLB, the NBA, the NFL, the NHL, and boxing all once claimed their restrictive athlete contracts were essential to their success, but those excuses were all exposed as pretextual when their revenue, quality, and output *all improved* with expanded athlete mobility and free agency. *See* ZR1 ¶¶79-80, 83-84, 89-103; ZR2 ¶¶9, 90, 97, 99-114. Zuffa's suggestion that having its entire roster of Fighters locked into long term Exclusive Contracts is necessary to "have enough athletes available[,]" ZSUF ¶14, is pretextual and contradicted by the record, and any alleged benefits could be achieved by less restrictive means, including much shorter contracts (given that, *e.g.*, Zuffa admits booking events *only* ▮▮▮▮▮ *in advance*).[56]

**III.     LEGAL STANDARD**

---

[54] *See* SR1 ¶¶147-48, 197-207; SR2 ¶¶44-49; *see also* SR4 ¶46 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Further, in connection with its debt offerings, Zuffa bragged, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex.103 at -690; *see also* Ex.104 at -936 (same); SR1 ¶199 & n.491 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Zuffa asserts that the reason for the increase was to move prices closer to boxing and keep pace with inflation. ZSUF ¶11. Neither excuse refutes Dr. Singer's point that higher prices for MMA Events demonstrate Zuffa's market power because the ability to raise price profitably without losing sales—regardless of the reason—is market power. SR1 ¶¶142, 147.

[55] Zuffa's claims to have developed the sport of MMA, ZSUF ¶¶3-6, are immaterial. SR2 ¶¶228, 232. They are also disputed. *See* SR2 ¶229 (discussing the "Zuffa myth"). Zuffa executives have admitted, for instance, that "the basic idea for the sport and the octagon and the early rule book, those were all in existence prior to Zuffa's purchase of the UFC." Silva Tr. 83:22-84:2. Features of MMA that pre-dated Zuffa's purchase of the UFC include: "sport's first rule book," *id.* 79:17-81:2, the "octagon" cage still used today, *id.* 81:3-16, and the pay-per-view business model. *Id.* 82:3-9. *See also* Fertitta Tr. 28:6-29:3 (prior UFC owners "were wildly successful" and "actually profitable"). And Zuffa's claim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* GDR1 ¶18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *see also id.* ¶¶22(2)-(3), 27-30, 32-33 & Tbls. 2, 7, 9; ZR1 ¶35 & Tbl. 7; White Tr. 561:17-563:19; Ex.137 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Shelby Tr. 78:14-22; SR1 ¶¶257-290; SR2 ¶¶188-98, 210-41. Further, in a more competitive environment, if Zuffa lacked Fighters to fill an Event card, it could have obtained them from a feeder promoter or free agency, or could have co-promoted events. SR2 ¶¶221-26, nn.725-730; Shelby Tr. at 212:23-213:8. Other promoters were willing to co-promote if Zuffa was. SR2 ¶¶221-26; Topel Tr. 297:7-12. Similarly, Zuffa could have imposed much shorter terms and had sufficient Fighters available for its cards ▮▮▮▮▮ in advance. *See* SR2 ¶¶188-97. Moreover, Zuffa has neither quantified any procompetitive effects, Topel Tr. 148:25-149:6, 150:1-12, 153:18-25; Blair Tr. 245:14-19; SR2 ¶¶210, 212, 215-21, 232, nor shown that they outweigh the demonstrated anticompetitive effects. SR2 ¶¶215, 218, 241.

18

Case No.: 2:15-cv-01045-RFB-(PAL)

Summary judgment is proper when no genuine issue of material fact remains and, viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 (9th Cir. 2008); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). The court regards as true the nonmoving party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289.

A moving party that does *not* bear the burden of persuasion at trial nevertheless has an *initial* burden of production and persuasion to show that there is no material factual dispute. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party must satisfy its initial production in its opening brief, as a new argument cannot be raised for the first time in a reply brief. *See Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1176 & n.4 (9th Cir.1995) (issues not raised in opening brief may not properly be raised in reply); *In re Lal*, 2002 WL 449661, *3 (N.D. Cal. Mar 15, 2002) (same); *United States v. Boyce*, 148 F. Supp. 2d 1069, 1085 (S.D. Cal. 2001) (same).

The moving party may discharge its burden of production in either of two ways: (1) "produce evidence negating an essential element of the nonmoving party's case," or (2) "show that the nonmoving party does not have enough evidence of an essential element of its claim . . . to carry its ultimate burden of persuasion at trial." *Id.* 1106. To discharge the initial burden by negating an essential element of the non-moving party's claim, the moving party must produce affirmative evidence of such negation. *Nissan*, 210 F.3d at 1105; *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, 2018 WL 1524005, at *4 (N.D. Cal. Mar. 28, 2018). If the moving party carries its initial burden, then the burden shifts to the non-moving party to raise a genuine issue of material fact. *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Nissan*, 210 F.3d at 1105; *Grant-in-Aid*, 2018 WL 1524005, at *4. On the other hand, if the moving party does *not* carry its initial burden, the non-moving party— even one with the ultimate burden of persuasion at trial—is under no obligation to offer any evidence in support of its opposition. *Nissan*, 210 F.3d at 1105, 1107; *Grant-in-Aid*, 2018 WL 1524005, *4.

## IV.    ARGUMENT

Zuffa begins its argument by relying on its *Daubert* motions, claiming Plaintiffs' experts should be excluded, supposedly leaving Plaintiffs with no evidence of market definition, causation, or

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

damages. MSJ 15. But Plaintiffs have explained why Zuffa's *Daubert* motions all should fail. *See generally* SZDO. Dr. Singer's and Zimbalist's opinions should be deemed reliable and admissible on those issues, and their testimony alone defeats summary judgment. Further, even without them, there is sufficient evidence—including admissions from Zuffa and its economists—to deny Zuffa's motion.[57]

Zuffa also asserts incorrectly that Plaintiffs no longer claim that it has monopoly power. MSJ 15-16. Zuffa knows this is untrue, as it spends many pages *addressing Plaintiffs' evidence of its monopoly power*. MSJ 19-20, 36-39. This is just another effort by Zuffa to sidestep the overwhelming evidence that its anticompetitive conduct allowed it to become the dominant *seller* of MMA events— giving it *monopoly* power—and also allowed it also to become the dominant *buyer* of MMA Fighter services—giving it *monopsony* power. *See* SR2 ¶137. While it is true that Plaintiffs seek *damages* based only on Zuffa's monopsony power—in the form of suppressed wages—Plaintiffs continue also to show Zuffa's *monopoly* power. *See, e.g.,* SZDO 36-37.

**A. Plaintiffs Properly Define Input and Output Markets**

Plaintiffs show Zuffa's market power in two ways: (i) circumstantial evidence: Zuffa had a dominant share of relevant markets, giving it power to cause anticompetitive harm, and (ii) direct evidence: Zuffa in fact caused anticompetitive harm, including suppressing Fighter compensation. Both are sufficient by themselves to establish market power. *Rebel Oil Co v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434-35 (9th Cir. 1995). Zuffa argues Plaintiffs have not properly defined the relevant input market ("Input Market")—for purchases of Fighter services—or output market ("Output Market")—for the sale of MMA events. MSJ 16-20. Zuffa is wrong as to both.

**i. Dr. Singer's Relevant Input Market Is Supported by Substantial Evidence.**

In a monopsony case, a relevant market is "the group of [buyers] … who have the 'actual or potential ability' to deprive each other of significant levels of business." *Le*, 216 F. Supp. 3d at 1161, 1163; *Todd v. Exxon Corp.*, 275 F.3d 191, 203-05 (2d Cir. 2001). "The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved."

---

[57] *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992), and *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (MSJ 15), thus do not support Zuffa's motion.

Case No.: 2:15-cv-01045-RFB-(PAL)

*Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982).[58] Dr. Singer conservatively defines the Input Market using two broad definitions: Tracked and Ranked.[59] The "Tracked" definition includes all nine MMA promoters that hire Fighters tracked by an industry accepted database that Joe Silva found "very credible."[60] Dr. Singer alternatively uses an even broader "Ranked" definition, which includes (1) all promoters in the Tracked definition, (2) all promoters with any Fighter ranked in a separate database (called "FightMatrix"), which ranks Fighters up to 650 in each weight class across promoters, and (3) an additional promoter, One FC, that operates in Asia. SR1 ¶110.[61] Further, Dr. Singer defines the Headliner submarket, comprising promoters with the top 15 Fighters in the 10 major weight classes tracked in the USA Today/MMA Junkie rankings. *Id.* ¶112.[62] As this Court has already ruled: "To find whether the Plaintiffs defined a relevant market within a sport . . . , the Court must take into consideration how athletes in their respective fields are ranked with regards to one another." *Le*, 216 F. Supp. 3d 1166. That is what Dr. Singer's market definitions do.[63]

---

[58] *See also Rebel Oil*, 51 F. 3d at 1435 ("the court may not weigh evidence or judge witness credibility"); *Le*, 216 F. Supp. 3d at 1165.

[59] Contrary to Zuffa's assertion, MSJ 17, Dr. Singer begins with the market for "Elite Professional MMA Fighter services." CAC ¶¶76-94; *see also* SR1 ¶¶105-14, 134-40. He finds substantial evidence—including admissions of Zuffa's top executives, internal documents, reports by investors and analysts, and financial data—that no promoter is interchangeable with Zuffa from a Fighter's perspective. *See, e.g.*, SR1 ¶¶131, 134-40 & nn.352, 358-86; SR2 ¶¶16-24, 26; CSF ¶¶3-6, 19-26. Dr. Singer observes that "even the most prominent non-Zuffa promoters do not have access to a sufficiently deep pool of talented Fighters to provide competitive matchups to advance a Zuffa Fighter's career, thus making non-Zuffa MMA promoters an inadequate substitute." SR1 ¶104. Dr. Singer testified that his impact regressions show the market likely included "just the fighters under Zuffa's control" because Zuffa needed to control no other Fighters to lower pay by a small but significant amount without defections. Singer Tr. 292:7-294:3. Zuffa complains that Dr. Singer defines a Zuffa-only Input Market. *See* MSJ 19 (citing SZDO 45 n.81). That would have, in fact, been proper. But, to be conservative, Dr. Singer defines the Input Market more broadly.

[60] J. Silva Tr. 162:19-163:4. The "Tracked" definition includes nine Promoters whose Fighters were tracked by "FightMetric." SR1 ¶109; Singer Tr. 296:17-297:9 (economic literature on the MMA industry frequently uses FightMetric data).

[61] Zuffa's citation to *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012), MSJ 18, is unhelpful because in that case, unlike here, the expert "never meaningfully considered any narrower definition of the market, nor did he ever expand that definition until all reasonable substitutes [were included]." *Id.* Dr. Singer performed an SSNDP test and then considered both broader and narrower markets, finding that regardless whether Zuffa's Scheme is analyzed in the context of an Input Market that is conservatively broad (Ranked) or appropriately narrow (submarket of Headliners), Zuffa exercises considerable monopsony power. *See infra* at 24 (discussing SSNDP test).

[62] *Le*, 216 F. Supp. 3d at 1161 ("although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket").

[63] Dr. Singer uses his impact regressions to confirm the correctness of his Input Market. A relevant market is the smallest grouping of buyers that, if unified by a monopsonist, would permit a buyer to reduce compensation below competitive levels. *Rebel Oil* at 1434; *Le*, 216 F. Supp. 3d at 1161, 1163.

First, contrary to MSJ 16-17, Plaintiffs define the Input Market based on *promoters* that buy MMA Fighter services. The proper way to identify the relevant promoters, however, is *by the athletes they retain*, just as Plaintiffs do. Again, not all MMA promoters are equivalent largely because not all Fighters are. Only promoters who retain a core number of marquee Fighters compete with Zuffa to buy Fighter services and to sell MMA events. Dr. Singer defines the Input Market "by determining the extent to which *promoters* other than Zuffa do or do not offer 'comparable competitive alternatives to which MMA Fighters could reasonably substitute to counteract an exercise of (buyer) market power by Zuffa.'" SR3 ¶49 (quoting SR1 ¶100) (emphasis added). Thus, although Dr. Singer "distinguish[es] between promoters by their most important feature: the talent and quality of their respective rosters of Fighters[,]. . . the markets are defined to include *promoters*." *Id.* (emphasis added).[64]

Courts have long recognized "relevant market definition[s] based on a quality distinction of one league over another" based on distinctions *in the quality of the athletes*. *Rock v. NCAA*, 2013 WL 4479815, at *13 (S.D. Ind. Aug. 16, 2013). This Court previously held, for instance, that "the Supreme Court has recognized distinctions in different levels of athletic competitions to constitute a relevant market for the purpose of the Sherman Act: 'championship boxing is the "cream" of the boxing business, and. . . is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes.'" *Le*, 216 F. Supp. 3d at 1166 (quoting *Int'l Boxing Club of N.Y., Inc. v. U.S.*, 358 U.S. 242 (1959)) (alterations in original).[65]

---

Dr. Singer shows that by controlling dominant shares of each of his markets, Zuffa was able to suppress pay below competitive levels. SR2 ¶¶36-40; SR1 ¶¶180-87; Singer Tr. 292:7-294:3. If promoters outside of Dr. Singer's Input Market were viable alternatives, then Zuffa would not have been able to suppress compensation, confirming his markets are correct. Zuffa's citation to *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285, n.7 (2018), MSJ 16, is inapposite because Plaintiffs in fact define relevant markets. Moreover, neither Zuffa nor any of its experts have ever claimed that the Supreme Court's "multi-sided market" analysis applies here, and it would be too late to do it on reply (and improper without expert testimony). Regardless, that analysis does not apply here. *See Grant-In-Aid II*, 2018 WL 4241981, at *4-5 (N.D. Cal. Sept. 3, 2018) (sports not a two-sided platform).

[64] *See also* SR1 ¶99 (defining the Input Market based on "the alternatives to which Fighters could reasonably substitute," *i.e.*, promoters); *id.* ¶¶100, 104-05 & SR2 ¶16 (rejecting an Input Market definition of "all MMA promoters"); SR1 ¶111 (Input Market definition is conservative because "the most prominent non-Zuffa promoters are inferior substitutes"); *id.* ¶125; SR2 ¶24 & n.67.

[65] *See also Int'l Boxing*, 358 U.S. at 250-52. Courts have done so, as Dr. Singer does here, "particularly where that distinction results in increased revenue and opportunities for the participants," including, *e.g.*, a distinct market for "championship" boxing contests, *id.*, distinct markets for different levels of collegiate athletics, *Rock*, 2013 WL 4479815, at *13 (distinguishing Division I football from Division II and Division III), and distinct markets for major league and minor league professional sports,

Case No.: 2:15-cv-01045-RFB-(PAL)

Zuffa oddly complains about Plaintiffs' expansion of the market definition beyond promoters who hire "elite" Fighters. MSJ 17-18. Zuffa's analysis is exactly backwards. What Plaintiffs show is that even if, to be conservative, one defines the market overly broadly—to include promoters that hire MMA Fighters who cannot compete with Zuffa's—Zuffa *still* has a dominant market position. CSF ¶¶21, 23-24, 26; SR2 ¶17; SR3 ¶49. Zuffa's market power persists with a narrower market definition, limited to the top 15 Fighters per weight class—the "Headliner" submarket. *E.g.*, CSF ¶21.

In challenging Plaintiffs' market definition, Zuffa offers an irrelevant analysis—with no basis in expert testimony—that promoters holding events with at least one Fighter satisfying Dr. Singer's criteria often held events with no Fighters satisfying those criteria. MSJ 18. It is hard to imagine what Zuffa thinks this proves. Using the Ranked approach, Zuffa's analysis would mean that some promoters hold some events with only one Fighter ranked 650 or better in a weight class and hold other events with no Fighters ranked 650 or better. Hundreds of promoters, Zuffa notes, fit this category. *But none of those promoters competes with Zuffa*. CSF ¶¶23-26. Having a single Fighter in the top 650 at

---

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462, 471-74 (E.D. Pa. 1972). *See also O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 966-68 (N.D. Cal. 2014) (top division college football and basketball are separate markets from lower divisions); *In re NCAA I-A Walk-on Football Players Litig.*, 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) (denying NCAA's motion to dismiss where top recruits are "necessary 'inputs' to the production of Division I-A football"); *Ass'n for Intercollegiate Athletics for Women v. NCAA*, 558 F. Supp. 487, 497 (D.D.C. 1983) ("NAIA is not a realistic option" to Division I men's intercollegiate athletics); *Clarett v. NFL*, 306 F. Supp. 2d 379, 383-84, 403 (S.D.N.Y. 2004) (NFL is separate market from other professional leagues, such as arena football), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); *McNeil v. Nat'l Football League*, 790 F. Supp. 871, 891-93 (D. Minn. 1992) (relevant market deemed "major league professional football"); *Cf. Twin City*, 676 F.2d at 1299 ("In defining a relevant market for Sherman Act purposes, the court must consider distinction in degree as well as kind.").

Zuffa's reliance on *Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017), is misplaced. MSJ 18. *Golden Boy* concerned whether *managers* of top boxers and lower-ranked boxers were interchangeable, not whether the fighters themselves were interchangeable. 2017 WL 460736 at *1. And the *Golden Boy* plaintiff offered "no explanation why managers of non-Championship-Caliber Boxers would not be in the same economic market. . . particularly in light of the fact that a non-Championship-Caliber Boxer can become a Championship Caliber Boxer as the result of a single fight." 2017 WL 460736, at *11. Here, conversely, Dr. Singer analyzes why promoters in his Input Market are not in the same economic market as other promoters based on the identity of *Fighters* on their roster, namely because a promoter's roster of Fighters (and thus potential opponents) is the critical attribute Fighters consider in determining whether a promoter is a reasonable substitute for Zuffa. CSF ¶5(c). That promoters at the fringe of the Input Market, *i.e.*, those with rosters of only the lowest-ranked Fighters who qualify for the definition, may enter or exit the Input Market with some degree of frequency due to the changing rankings at the very bottom of this broad definition does not make Dr. Singer's definition legally (or factually) deficient because the market is already so broadly defined as to make such changes at the outer limits economically insignificant. SR2 ¶17.

only some events hardly shows otherwise. And given Zuffa's many admissions that not a single other MMA promoter qualifies as "major league," *id.* & *supra* n.39, it is not credible that hundreds do. Dr. Singer's approach finds confirmation in common sense. Top sports leagues do not compete with leagues that hire only marginal talent. *See* CSF ¶¶23-27. Yet Zuffa has to take the absurd contrary position—that promoters without any Fighters in the top 650 in a weight class somehow compete with Zuffa—to challenge Plaintiffs' market definition.

Zuffa also accuses Dr. Singer of failing to apply the so-called "SSNIP" test. MSJ 18-19. As Zuffa admits elsewhere, the correct test is actually "SSNDP" (a small but significant non-transitory decrease in price (or compensation)).[66] In other words, the relevant market should include only those promoters to which Fighters would switch if Zuffa were to decrease their compensation meaningfully (by a small but significant amount) for a meaningful period of time (non-transitory).[67] But Dr. Singer *does* perform a SSNDP test, analyzing the principal criterion Fighters use in evaluating promoters: the ability to offer suitable opponents. SR3 ¶49; SR1 ¶¶99-119; *see also* CSF ¶5 (Top Fighters or those striving to be so require a promoter with a critical mass of top Fighters). Zuffa even concedes that Fighters evaluate promoters by the Fighters on their rosters. Topel Tr. 433:14-21 ("the good athletes want to be in the places . . . where the other good athletes are so they can fight them"); *see also* PRFA No. 33. To define the outer bounds of the Input Market, as part of the SSNDP test, Dr. Singer undertakes the standard process, starting with the narrowest market and expanding until all (conceivably) reasonable substitutes are included. SR1 ¶¶99-119.[68]

Finally, Zuffa quibbles about the outer bounds of the Input Market.[69] As to the Ranked Market,

---

[66] Zuffa *concedes* that the appropriate way to define an input market is to identify those promoters to which Fighters would turn to prevent a Promoter from imposing a "SSNDP." *See* MSJ 16 (citing *Golden Boy*, 2017 WL 460736, at *11; *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)).

[67] To identify the group of MMA talent buyers in the Input Market, Dr. Singer analyzes which promoters are reasonably interchangeable with Zuffa such that Fighters would switch if Zuffa's athlete pay falls below competitive levels. *See Rebel Oil*, 51 F. 3d at 1435 ("If [sellers; here Fighters] view the [buyers; here promoters] as substitutes, the [buyers] are part of the same market."); *Todd*, 275 F.3d at 202 ("This market is comprised of buyers who are seen by sellers as being reasonably good substitutes."); *see also Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) (relevant market includes products or services "that have reasonable interchangeability for the purposes for which they are produced" (citation omitted)); SR1 ¶¶98-99; SR2 ¶13; SR3 ¶49.

[68] *See also Hynix Semiconductor Inc. v. Rambus, Inc.*, 2008 WL 73689, at *3 (N.D. Cal. Jan. 5, 2008).

[69] Courts routinely adopt market definitions that require judgment at their outer limits. "That the outer

---

PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

the outer limit is appropriate, in part, because Zuffa Fighters (and all aspiring and top Fighters) do not

consider events featuring Fighters without sufficient skill or experience to rank in the top 650 of a

weight class to be reasonable substitutes for the UFC. CSF ¶5; SR2 ¶17; SR3 ¶49.[70] Zuffa has not

identified any promoters not in the Ranked Market that aspiring top Fighters would consider

appropriate substitutes for Zuffa. As to the Tracked Market, the outer limit is appropriate, in part,

because ██████████████████████████████████████████████████████████

██████████████████████████████.[71] Zuffa argues that the Tracked Market

████████████████████████████████████████████████████████████████████

MSJ 19. However, the Tracked Market includes nine promoters and the evidence supports excluding

████████████████████████████████████████████████████████████

██████████████████████, CSF ¶26(c); ██████████ ██████

████████████████████████ CSF ¶26(b),

████████████████████████████████ CSF ¶26(a). In any event, all three promotions are

---

edge of a market's boundaries [is] disputed does not mean the market is legally flawed." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*, 311 F. Supp. 2d 1048, 1090 (D. Colo. 2004) ("rock" music may be distinct market); *see also FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038-39 (D.C. Cir. 2008) (recognizing market for "premium natural and organic supermarkets"); *FTC v. Staples*, 970 F. Supp. 1066, 1074-75, 1082-83 (D.D.C. 1997) (recognizing distinct submarket of office superstores). Notably, many of the promoters Dr. Singer includes in the Input Market were described by Zuffa's own executives as "minor leagues." SR1 ¶¶105-09, 111.
[70] Zuffa also argues that Dr. Singer's Ranked definition "selectively excludes" athletes competing for Promoters outside the relevant geographic market. MSJ 19. Zuffa submits no expert analyses in support of this assertion, instead citing only a list of Fighters who at one time competed in the relevant geographic market but at other times competed outside the market. *See id.* (citing ZSUF¶35 & Z.Exs. 96-98). The record contradicts Zuffa's unsupported contention that such promoters are in the relevant geographic market. *See, e.g., infra* n.72. In any event, even where "the availability of employment [outside the Input Market] places some constraints on the ability of the [monopsonist] to limit salary increases," a market definition may be appropriate because even a monopsonist "is subject to limitations on how far it can [decrease price.]" *Todd*, 275 F.3d at 204.
[71] Zuffa argues that the FightMetric database "████████████████████████████████████████ MSJ 19. This point does not help Zuffa. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ " SR2 ¶17; *see also* Topel Tr. 483:11-19 (admitting ████████████████████████████████████████████████████████████████ :
*See also* SR1 ¶¶124-27 (defining the relevant geographic market); Topel Tr. 494:10-24 (Asia is separate market); J. Silva Tr. 52:12-22, 42:7-13, 294:4-8 (same); Shelby Tr. 196:3-19 (same).

Case No.: 2:15-cv-01045-RFB-(PAL)

in fact conservatively *included in the Ranked definition*.

Zuffa argues that it has "never had over 22% of the total athletes in Dr. Singer's Ranked market in any year," relying solely on a lawyer-created "summary chart." ZSUF ¶36 & Z.Ex.99. This non-expert analysis of market share erroneously treats Fighters as fungible in measuring market share. But the value of a Fighter to a promoter correlates with Fighter rank. *See* CSF ¶¶2-3, 28 & n.46. Assessing promoters' share of the Input Market is not simply an exercise in comparing the raw number of Fighters each has. Zuffa in fact has *conceded* that promoters *should be weighted* according to the relative collective compensation of their respective group of Fighters. SD 34; SZDO 48-49. And *that* is essentially what Dr. Singer does.[73] Based on these appropriately weighted shares, Dr. Singer calculates Zuffa's market share in the Input Markets over time to be significant and increasing. Between 2005 and June 2017, Zuffa's shares were ███ % (Tracked), ████ % (Ranked), and ████ % (Headliners). CSF ¶21. These dominant shares demonstrate monopsony power. *See infra* Sec.IV.C-D; *see also Le*, 216 F. Supp. 3d at 1161. Zuffa has elsewhere *admitted* its dominance of the Input Market.[74]

**ii.    Dr. Singer's Output Market Is Supported by Substantial Evidence.**

Zuffa claims Plaintiffs no longer argue it has monopolized the Output Market, MSJ 15-16, 19, and then, inconsistently, argues that Plaintiffs have not defined the Output Market properly. It is mistaken on both counts. While Plaintiffs need not demonstrate monopoly power at all in this monopsony case, *infra* 41-44 (discussing monopoly power) & nn.113-14 (citing cases showing monopoly power unnecessary in monopsony case), Plaintiffs do so here. Dr. Singer defines the Output Market as sellers of live MMA events broadcast on television in North America featuring Fighters in the Input Market or submarket. SR1 Pt.III.A.2.[75] He analyzes whether consumers viewed other promoters as substitutes for the UFC, concluding only those promoters whose live MMA events are broadcast on television in North America and feature Fighters in the Input Market could be deemed

---

[73] While Dr. Singer does not have Fighter compensation data for each promotion, he does have Event Revenue data. Because Fighter compensation is roughly proportional to Event Revenues, *supra* n.46, Dr. Singer weights promoters based on the revenues their Fighters generate. SR1 ¶128.

[74] *E.g.*, Topel Tr. 435:17-437:22, 440:12-441:10 (admitting Zuffa's control of the "█████████ ████████"); Ex.88 at -382; PRFA No. 32 (Fertitta bragging that they have every top-10 Fighter); *see also* CSF ¶¶19-26 (discussing Zuffa's control of top Fighters and dominance over other promoters).

[75] Dr. Singer's Output Market is conservative given his finding that non-Zuffa promoters are "inferior substitutes from the perspective of audiences." SR1 ¶119; *see also* CSF ¶¶1-6, 22-26.

Case No.: 2:15-cv-01045-RFB-(PAL)

adequate substitutes by viewing audiences. *See supra* n.67 (relevant markets defined based on "reasonable interchangeability"). Zuffa has a dominant share of the Output Market, *see, e.g.*, SR1¶¶134-140; CSF ¶¶19-26, and therefore monopoly power.

Zuffa raises three meritless challenges.[76] First, Zuffa complains that Dr. Singer defines the customers in the Output Market to include "viewers, cable networks, broadcast networks, and sponsors," but assesses the substitutability of promoters only from the perspective of viewers. MSJ 19. But Dr. Singer's focus on viewers is appropriate because the point of the Output Market is to determine whether Zuffa had the market power to harm *consumer* (*i.e.*, viewer) welfare. *In re NCAA I-A Walk-on*, 398 F. Supp. 2d at 1151 ("the test for harm to competition is whether consumer welfare has been harmed" (citing *Rebel Oil*, 51 F.3d at 1433)). The Scheme harmed consumers by reducing output of MMA events to end-customers, CSF ¶31 & n.53, and increasing prices to end-customers, CSF ¶31 & n.54), and by diminishing the quality of MMA, CSF ¶30 & n.52—all cognizable anticompetitive effects.[77] A firm capable of causing those anticompetitive effects has monopoly power.[78] Further, demand by networks and sponsors ultimately depends on the demand by viewers, supporting Dr. Singer's approach.[79] Dr. Singer thus appropriately defines the bounds of "reasonable interchangeability" from the perspective of consumers, *i.e.*, MMA fans. SR1 ¶¶115-119.

Second, Zuffa's *lawyers* argue without economist support that Dr. Singer's Output Market is "erroneous" because it "combines viewing events at a live venue with viewing events on PPV or broadcast television, while concluding the geographic market is North America." MSJ 19. But the customers in the relevant geographic output market are viewers generally. That a handful of fans who live near the venue could attend in person or watch on television does not require two separate

---

[76] Zuffa also argues that Plaintiffs "have not sought to define a market of sellers in the output market . . . and instead have improperly tried to define the market by identifying athletes who should be included in the market." MSJ 17. That argument is similar to Zuffa's concerning the Input Market and fails for the same reasons. *See supra* 20-26; *see also* SR1 ¶119; *cf.* SR1 Figs.4A-C (analyzing supply of live MMA events in Output Market in terms of promoters).

[77] *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("reduction of output" is an anticompetitive effect); *Cal. Dental Assoc. v. FTC*, 526 U.S. 756, 777 (1999) ("artificially raising prices" is an anticompetitive effect); *Le*, 216 F. Supp. 3d at 1169 (suppressed output sufficient).

[78] *See Ind. Fed'n of Dentists*, 476 U.S. at 460 (market power is a "surrogate" for anticompetitive effects); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999) (monopoly power is "having sufficient economic muscle" to cause anticompetitive effects).

[79] *See, e.g.*, Singer Tr. 548:14-549:15; *id.* 543:17-23; *id.* 555:1-9; *id.* 555:10-20.

geographic markets. *See, e.g.*, *McNeil*, 790 F. Supp. at 891; *Int'l Boxing*, 358 U.S. at 250-51.[80]

Third, Zuffa asserts that it competes not only with other promoters, but also "with a broad spectrum of sports entertainment." MSJ 19. *But see NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 111-12 (1984) (rejecting the NCAA's contention that it competes with other programming as inconsistent with *Int'l Boxing*). Dr. Singer analyzes such alleged competition and concludes that no other sport or entertainment content competes with Zuffa. *See* CSF ¶27. Moreover, Zuffa admits that there is little crossover between the audience of MMA and other sports and entertainment.[81]

### B. Plaintiffs Have Shown Zuffa's Monopsony Power and its Anticompetitive Effects

As discussed *supra* Sec.IV.A.i (Zuffa has dominant shares of the Input Market and Submarket), and further below, Zuffa's Scheme afforded it substantial market power in the Input Market, enabling Zuffa to restrict Fighter mobility and suppress Fighter compensation. CSF ¶¶4-12, 19-31. That is sufficient to show monopsony power. *See supra* at 20. Zuffa argues that it has "many significant competitors" who do not believe they are "fringe" or "minor league" promoters. MSJ 20. But, again, the evidence—including Zuffa's own admissions—contradicts Zuffa's assertion. CSF ¶¶23-26; *see also* Sec.IV.A.i *supra*. Zuffa contends that "competitors have access to numerous [Fighters], including those who previously competed for the UFC." ZSUF ¶¶21-27; MSJ 21. But that is irrelevant because: (a) Zuffa admits that it has never lost a Fighter it wanted to keep, CSF ¶20 & n.35, and thus all Zuffa has shown is that when it cuts Fighters they end up in the minor leagues; (b) Zuffa admits that it has the "███████████████████," CSF ¶¶4, 19-22; and (c) other MMA promoters have access only to "minor league" Fighters. CSF ¶¶22-26. "The proper inquiry is not whether [the available unforeclosed inputs] enable a competitor to 'survive' but rather whether [such inputs] 'pose[] a real threat' to defendant's monopoly." *Dentsply*, 399 F.3d at 193 (quotation omitted). Indeed, if Zuffa were losing Fighters who are highly-ranked or generate significant revenues, its Foreclosure Share would have fallen. But Dr. Singer shows the opposite.[82] That other promoters have access to Fighters that Zuffa no

---

[80] Zuffa relies on *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006), a case that considered the relevant geographic market only for live attendance tickets for rock concerts. By contrast, UFC events feature both live attendances and television broadcast audiences.

[81] *See*, Ex.73 (██████████████████████████████████); CSF ¶27. *See also* Ex.46; Ex.70 at -99; Ex.74 at -42-44. Third-party analyses concur. *E.g.*, Ex.97 at -438.

[82] CSF ¶21; *see also* SR2 ¶51; *Dentsply*, 399 F.3d at 194 (failure of rivals to penetrate the market

longer wants is consistent with its substantial monopsony power. CSF ¶¶20-21.[83]

## C. Direct Evidence Establishes Zuffa's Monopsony Power

In addition to circumstantial evidence of monopsony power, *see infra* Sec.IV.D, which is sufficient *by itself,* Plaintiffs *also* provide direct evidence: that Zuffa *could* suppress compensation, restrict the purchase of MMA Fighter services, or exclude rivals because it did all three.[84] That direct evidence confirms Zuffa's monopsony power.

### i.    Zuffa Suppressed Fighters' Wages.

#### a.    Plaintiffs' Econometric Use of Wage Share Is Proper.

The standard form of direct evidence of monopsony power is that a monopsonist suppressed compensation below competitive levels. *O'Bannon*, 802 F.3d at 1070-71; *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012). Plaintiffs show that if Zuffa had not engaged in the Scheme, its Fighters would have received much higher pay. Plaintiffs measure how much compensation Zuffa's Fighters would have received in a more competitive market by using Wage Share. CSF ¶¶28-29. Wage Share measures compensation as a percentage of revenue. It is a standard measure of the effect of monopsony power on the compensation of professional athletes. SR2 ¶¶88-109; SR3 ¶¶6-16; ZR2 ¶¶45-49; MR1 ¶¶5, 9-23, 31; SZDO at 10-25. Plaintiffs discuss the validity of using Wage Share in this context at length in the SZDO and Class Reply and incorporate that here. Dr. Singer conducts regression analyses to show that as Zuffa's conduct foreclosed competition by signing more and more top Fighters to Exclusive Contracts, the Wage Share Zuffa paid its Fighters decreased. CSF ¶¶28-29. In other words, in a freer market—one in which Zuffa did not have such a lock on available talent—the Fighters' Wage Share would have been substantially higher.[85] Using Wage Share

---

substantially demonstrates market power).

[83] Zuffa's evidence of "substantial" mobility based on its reference to 70 Fighters who switched over a 6 year period, ZSUF ¶24 & ZExs. 86-87, MSJ 21, does not account for why those 70 Fighters left the UFC (*e.g.*, whether the UFC cut them) or the relative value of those Fighters. *See* CSF ¶¶19-21. Zuffa also references 72 Fighters who left Bellator for the UFC. ZSUF ¶24, MSJ 21, which merely confirms Bellator's status as a minor (or feeder) league. *See also* CSF ¶¶23-26.

[84] *See Rebel Oil*, 51 F.3d at 1434; *O'Bannon v. NCAA*, 802 F.3d 1049, 1070-71 (9th Cir. 2015) (suppression of athlete compensation is sufficient by itself to demonstrate "an anticompetitive effect;" purported requirement that plaintiffs must "show a decrease in output" is "simply incorrect").

[85] SR1 ¶¶190, 247-48 & Tbl. 9; SR2 ¶¶72-87, 176-82; ZR1 ¶¶104-39 & Tbls. 2-6; ZR2 ¶¶28-93; SR1 ¶¶190, 247-48 & Tbl. 9; SR2 ¶¶77-85, 176.

Case No.: 2:15-cv-01045-RFB-(PAL)

in this way, Drs. Singer and Zimbalist show Zuffa Fighters would have received more money if not for its Scheme. CSF ¶¶28-29.[86]

b.  **Impact on Wage Share Shows Impact on Wages.**

Zuffa claims Plaintiffs have failed to show its conduct decreased compensation. MSJ 2-3, 21-23. Not so. Drs. Singer and Zimbalist use Wage Share as a way to assess the effects of Zuffa's conduct on Fighter *compensation*. Their ultimate conclusions are that if Zuffa had not engaged in the Scheme, Zuffa's Fighters would have received hundreds of millions dollars of additional *money*. CSF ¶29.

Zuffa asserts that, in theory, Event Revenues *could* go up purely because of Zuffa's efforts, so Fighter Wage Share *could* decrease while Fighter compensation does not. MSJ 22. But Zuffa cites *no evidence* it was responsible for a greater proportion of Event Revenues as Fighter Wage Share declined. In contrast, Dr. Singer controls for any shift in Zuffa's relative contribution to Event Revenues over time. He demonstrates Zuffa's *anticompetitive conduct* decreased Fighter Wage Share, not some speculative improving effort by Zuffa. SR2 ¶¶5, 40, 74; SR3 ¶29; SR4 ¶¶34-40.[87] Zuffa also asserts that Fighter pay increased. MSJ 1-2, 4, 22. But that is irrelevant. What matters is whether Zuffa's Fighters would have received *more* compensation in a *more* competitive market. *High-Tech*, 856 F. Supp. 2d at 1123; *Doe v. Arizona Hosp. & Healthcare Ass'n ("Ariz. Nurses")*, 2009 WL 1423378, at *3-4 (D. Ariz. Mar. 19, 2009). Drs. Singer and Zimbalist show Fighters would have. CSF ¶¶28-29.[88] Plaintiffs thus establish the Scheme caused them antitrust injury.[89]

Zuffa, citing *Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S.

---

[86] Courts have also endorsed using Wage Share to assess the competitiveness of athlete compensation. *See White v. NCAA*, 2006 WL 8066803, at *5 & n.4 (C.D. Cal. Oct. 19, 2006) (comparing player expenditures as percent of revenue in the NCAA with that of professional athletes).
[87] Dr. Singer, in fact, evaluated empirically Zuffa's speculation that its supposedly increased promotional or other event-related spending could have caused Zuffa's ███████ of Event Revenues between 2007 and 2016, and found that "████████████████████████████████████████████ ████████████████████." SR4 ¶34. He also ran a regression testing whether changes in Zuffa's promotional spending had any effect on his analysis of the link between increasing foreclosure share and falling Wage Share, and he found that it did not. SR3 ¶33; *see also* SR4 ¶¶ 21-33.
[88] Zuffa contends it paid Fighters more than other promoters. MSJ 5, 22. That too addresses the wrong issue. Zuffa's market power allowed it to become and remain the only "major league" for MMA. CSF ¶¶19-26. That it may have paid Fighters more than "minor league" promoters is irrelevant.
[89] So the standard set out in Zuffa's cited cases, MSJ 14, is satisfied. *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015); *Am. Ad. Mgmt. Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1990).

398, 407-08 (2004), claims Plaintiffs ask this Court to act as a "central planner" in setting the Wage Share Zuffa must pay athletes. MSJ 23. Untrue. Plaintiffs ask the Court to stop Zuffa from engaging in its Scheme so that a freer market can set Fighter pay. That is consistent with established precedent.[90]

### c.    Zuffa's "Sponsorship Tax" Confirms It Suppressed Wages.

Dr. Singer finds further direct evidence of Zuffa's monopsony power in a "natural experiment" involving a "sponsorship tax." SR1 ¶¶191-92. One form of direct evidence of monopsony power is if Zuffa could decrease pay without losing a significant number of Fighters. *Id*. Beginning around 2009, Zuffa did just that. It imposed a "sponsorship tax," requiring sponsors to pay Zuffa—not just Fighters—for the right to appear on Fighters' uniforms. *Id*. Zuffa's gain naturally was the Fighters' loss, decreasing Fighter pay from sponsors and deterring some sponsors entirely. *Id*. Yet Zuffa experienced no significant number of defections. *Id*. Zuffa speculates some its Fighters might have experienced some offsetting gains in compensation, MSJ 24, but it offers no evidence that occurred.

### ii.    Zuffa Restricted the Output of Fighter Services.

Dr. Singer shows Zuffa decreased the output of Fighter services by "shelving" Fighters— locking them up in Exclusive Contracts and providing them insufficient bouts. SR1 ¶¶145-46, 193-96. Zuffa pays Fighters only when they compete. *Id*. ¶195. So Zuffa did not pay "shelved" Fighters and prevented other promoters from doing so. *Id*. ¶¶195-196. Even Joe Silva, Zuffa's long-time matchmaker, complained Zuffa had more Fighters under contract than fights to give them. *Id*. ¶194 (citing, *e.g*., J. Silva Tr. 257:8-15). The result was that Zuffa offered fewer pay-per-view events and fewer live MMA events occurred than would have in a competitive market. *Id*. ¶¶148, 202-08. Zuffa ignores this evidence, noting Plaintiffs' claim that "Zuffa maintains an excess supply of athletes." MSJ 25. But, again, Zuffa "shelved" Fighters, locking them up, denying them bouts and restricting supply and output, SR1 ¶¶145-46, 193-96; SR2 ¶42-43, confirming its monopsony power. *Theme Promotions, Inc. v. News Am. Marketing*, 546 F.3d 991, 1001 (9th Cir. 2008); *Rebel Oil*, 51 F.3d at 1134; *High-*

---

[90] *High-Tech*, 856 F. Supp. 2d at 1123 (quoting *Ariz. Nurses*, 2009 WL 1423378, at *4); *see also id*. (citing *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 42-43 (9th Cir. 1984)) ("The Ninth Circuit has held that, where … an employee is the direct and intended object of an employer's anticompetitive conduct, that employee has standing to sue for antitrust injury."). *Trinko*'s "central planning" discussion concerned "enforced sharing" of Verizon's network with competitors, *see* 540 U.S. at 408, and did not "abrogate long-standing jurisprudence" relating to exclusive-dealing and monopolization claims. *See In re Dealer Management Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 956 (N.D. Ill. 2018).

31

*Tech*, 856 F. Supp. 23 at 1122-23. Courts recognize when monopsonists suppress the prices they pay, they often reduce purchases, supply, and output, *In re Beef Antitrust Litig.*, 907 F.2d 510, 516 (5th Cir. 1990), and Dr. Topel admits the same relationship. Topel Tr. 475:6-15.

### iii.   Zuffa Excluded Rivals.

Evidence also establishes Zuffa excluded rivals, depriving them of a critical mass of marquee Fighters so that only Zuffa could hold "major league" events and had no actual competitors for Fighters' services. CSF ¶¶19-26, nn.36, 39. Using the Scheme to starve rivals of ████████" in the form of top Fighters, Zuffa was able to force existing rivals out of business and prevent any potential rivals from gaining "███████." CSF ¶6. And, then, after wounding its potential rivals, it bought them out and shut them down. CSF ¶¶13-18. As Coker wrote before Zuffa acquired Strikeforce in 2011, "████ ███████████████████████████████████████████████████████████" CSF ¶17.

## D.  Circumstantial Evidence Demonstrates Zuffa's Monopsony Power

In addition to direct evidence of Zuffa's monopsony power, Plaintiffs also provide circumstantial evidence—which is by itself sufficient. *Rebel Oil*, 51 F.3d at 1434. Direct evidence shows Zuffa *could* suppress wages or restrict supply by demonstrating Zuffa *did* suppress wages and restrict supply. *Id.* On the other hand, circumstantial evidence relies on market conditions to show that Zuffa had monopsony power in the relevant markets. *See supra* Sec.IV.A. Plaintiffs have defined proper antitrust markets and showed Zuffa's dominant shares of those markets. *Id.* That is enough.

Zuffa claims, incorrectly, that Plaintiffs have failed to show high barriers to entry. MSJ 25. In fact, extensive evidence—including admissions from Zuffa's own executives and bankers—shows that "███████████████████████████████████████████████████████████████ ████████████████" CSF ¶¶3-6, 22 & n.7. Further, on those occasions when potential competitors even began to threaten Zuffa's dominant position, it bought them out. CSF ¶¶13-18. So only Zuffa holds "major league" MMA events. CSF ¶¶19-26. In response, Zuffa identifies various foreign and "minor league" promoters as supposed evidence of market entry and expansion. MSJ 25-26. These arguments miss the point. First, these entities are outside of the relevant market. *Supra* 20-27; CSF ¶26 & n.44. More importantly, Zuffa offers no evidence that "minor league" promoters can mitigate its market power. New entrants in foreign markets or the expansion of "minor league" MMA events cannot

prevent Zuffa from suppressing Fighter compensation or restricting the supply of Fighter services at "major league" MMA events, just as an increase in the number of basketball games in a European league or G League would not affect the compensation of NBA players or the supply of their services in NBA games.[91]

## E.  Zuffa Has Engaged in Exclusionary Anticompetitive Conduct

Zuffa also denies that it "willfully acquired or maintained" its monopsony power through its Scheme. However, the evidence shows various forms of cognizable anticompetitive conduct, including Exclusive Contracts, acquisitions of potential rivals, and coercion. The law requires that the Scheme and its effects be evaluated *as a whole*.[92] But even looking at it piecemeal—as Zuffa improperly does—each element is anticompetitive.

### i.     Zuffa's Exclusive Contracts Substantially Foreclosed Competition.

Zuffa does not contest that Plaintiffs can establish that Zuffa engaged in exclusionary anticompetitive conduct if they show Zuffa's Exclusive Contracts foreclosed a substantial share of the relevant market. Zuffa asserts, however, that Plaintiffs assume rather than prove substantial foreclosure. MSJ 29-30.[93] Not true. First, as discussed above, extensive evidence shows that Zuffa, its economic advisors, and other market actors all recognized that one of Zuffa's greatest assets was its ability to use its Exclusive Contracts to foreclose competition, creating a powerful barrier to entry. *See supra* Sec.II.B-C. Second, Dr. Singer demonstrated that Zuffa's Exclusive Contracts, which last longer than 30 months (typically far longer, CSF ¶¶8-12), foreclose competition because, by various measures, they last longer than the average Fighter's career, CSF ¶9 & n.20, and are effectively perpetual. CSF ¶¶11-12. Third, Dr. Singer's regression analyses show that as Zuffa's Foreclosure Share increased, its Wage Share decreased as a result. CSF ¶28. Zuffa concedes this effect. *Id.* Dr. Singer's analyses demonstrate

---

[91] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1993) (MSJ 25), does not help Zuffa because the evidence shows high barriers to entry.

The equitable relief Plaintiffs seek would lower these artificial barriers to entry. If, for example, Zuffa's contracts were limited to a single year and ended at the same time, or if Zuffa were forced to co-promote events and prevented from acquiring potential rivals, other promoters could potentially compete for Fighters' services at "major league" MMA events. *See, e.g.*, SR2 ¶¶187-98; CSF ¶32.

[92] *Le*, 216 F. Supp. at 1168 (quoting *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008) ("[I]n the antitrust context, the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'").

[93] Zuffa made the same argument in its *Daubert* motion, Plaintiffs pointed to extensive evidence that contradicted Zuffa's position; Zuffa ignores that evidence here. SZDO 25-29; Class Reply 9-12.

that Foreclosure Share—as he defines it—explains variations in Zuffa's Wage Share. SR1 ¶186; SR2 ¶36. Zuffa's foreclosure and monopsony power enabled it to suppress compensation. CSF ¶¶28-29. Zuffa offers no credible alternative explanation for the success of Dr. Singer's analyses. SZDO 25-26.

Zuffa contends Dr. Singer fails to quantify Zuffa's Foreclosure Share accurately, MSJ 31-33, relying on Zuffa's familiar false premises: (1) all MMA *Fighters* are equivalent: and (2) all MMA *promoters* are equivalent. ZSUF ¶¶18-28. As to the first point, Zuffa notes it had on average under contract only about 18% of *all* Fighters in the "Ranked" market and never more than 22%. That analysis is flawed because, as discussed above (at 26), it is wildly over-inclusive of Fighters and because it fails to weight Fighters based on their value in the market. CSF ¶¶1-2. The term "Ranked" includes the top 650 Fighters in *each weight class*. SR1 ¶99. Zuffa's analysis thus treats the 650th flyweight Fighter equally to the best heavyweight Fighter in the world. Dr. Singer avoids this error in two ways. First, he relies on the most appropriate market—the "Headliner" submarket, including the top 15 Fighters per weight class—as well as the second-most appropriate market—the "Tracked" market, intermediate between Ranked and Headliner—and analyzes the Ranked market only to show that even a very broad market definition confirms Zuffa's market power. *Id*. Second, Dr. Singer appropriately does not weigh all athletes equally. He weights Fighters based on their rank (for the Headliner submarket) and, alternatively, based on the revenues generated by the promoter for which they fought (Headliner, Tracked, and Ranked). *Id*. ¶¶128-29; SR2 ¶59, 128-37, 144-48. Dr. Singer's empirical analyses show that Fighter compensation is largely determined by rank, and thus that rank is key in assessing the value of Fighters. *See supra* n.46; CSF ¶¶2-3, 28. As a matter of economics, a Foreclosure Share of 20-40% is considered sufficient to infer anticompetitive effects. SR1 ¶168.[94] Dr. Singer finds, for *all* of his market definitions, that Zuffa's Foreclosure Share was always at least ██% during the Class Period and generally much higher—as high as ██%. CSF ¶21.[95]

Zuffa also errs by treating all promoters as equivalent. That is wrong for similar reasons: a

---

[94] *See also Twin City*, 676 F.2d at 1298 (24 percent unlawful); *Luria Bros. & Co. v. Federal Trade Commission*, 389 F.2d 847, 864-65 (3d Cir. 1968) (condemning over 30 percent as unlawful); *Mazda v. Carfax, Inc.*, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) (same).

[95] Zuffa's efforts to argue to the contrary by treating all Fighters as equal is untenable. Indeed, Zuffa itself admitted in its *Daubert* motion that Fighters should be "weighted," and not all treated as the same. *See* SZDO 48-49; CSF ¶¶1-2.

promoter is only as good as the group of Fighters it has under contract. CSF ¶¶1-6. Just as in *Dentsply*:

"The reality in this case is that the firm that ties up the key [Fighters] rules the market." 399 F.3d at

190. Extensive evidence shows Zuffa's Scheme enabled it to lock up the vast majority of top-level

Fighters, and thus become and remain *the* "major league" of MMA. Zuffa itself compared Strikeforce

at its peak in popularity to a "Double-A" MLB team and regional MMA promotions to "Farm

Leagues." SR1 ¶106 & nn.285-86; CSF ¶¶23-25. So Dr. Singer is correct to measure the average

professional career in terms of tenure in the UFC, the only "major league" MMA promoter. *See supra*

33 & n.20.[96] Zuffa denies reality by defining MMA career length to include every bout by a UFC

Fighter, including bouts in promotions that Zuffa itself described as "minor league." *See id*.[97] Zuffa

similarly claims in its brief that Fighters who leave the UFC for Bellator continue their "major league"

careers. MSJ 32-33. But as Zuffa has admitted, "██████████████████████████████████

████████████████████████" CSF ¶¶20, 26.[98]

      Zuffa also argues that its Exclusive Contracts are too short to harm competition. MSJ 30. But

the evidence is that they are *not* short-term and, in any event, *do* harm competition. First, Zuffa

concedes for the purposes of this motion that its Exclusive Contracts have terms of *at least* thirty

months,[99] which is longer than the average Fighter's career. CSF ¶9 & n.20. Zuffa cites a handful of

---

[96] Dr. Singer's analysis of the average length of Fighter careers is also conservative given that Zuffa has admitted that ██████████████████████████████████████ SR2 ¶65. Dr. Singer explains that ██████████████████████████████████" *Id.*

[97] Zuffa identifies two purported "flaws" in Dr. Singer's Foreclosure Share analysis. MSJ 32. Zuffa notes that the average time a Fighter is under contract with Zuffa—median of 0.8 years and mean of 2 years—is less than the 30 month contract that Dr. Singer treats as adding to Foreclosure Share under one of his models. But that is not a flaw. That Zuffa often cut Fighters and relegated them to the minors—likely when they were not free to leave on their own—in no way undermines Dr. Singer's model. Nor do Fighters' short careers make it a problem—as Zuffa asserts but does not explain—that Dr. Singer does not include time Fighters spend in the "minor leagues." To the contrary, given that most Fighters who make the UFC do so only very briefly confirms how little of an impact they are likely to have on the UFC's monopsony power and compensation.

[98] The UFC admitted it was able to hire all or virtually all of the Fighters it wanted. Dana White explained, "██████████████████████████████████████████████████" Exs.66 -90.

[99] Zuffa argues that the term is less than 30 months because Fighters can sign with another promoter during the right to match period. MSJ n.7. Zuffa is wrong because Zuffa had the contractual ability to keep any fighter it wished. That fighters left for other promoters during the right to match period means that Zuffa *did not want that Fighter*. *See* CSF ¶20. The "relevant inquiry" is whether the fighters "could get out the[ir] agreements on short notice," not whether the UFC could terminate the fighter. *Masimo Corp. v. Tyco Health Care Grp. L.P.*, 2006 WL 1236666, at *7 (C.D. Cal. Mar. 22, 2006).

Case No.: 2:15-cv-01045-RFB-(PAL)

inapposite cases finding that contracts longer than 30 months were not anticompetitive, MSJ 30-31, but courts have noted that the length of an exclusive agreement "is not dispositive of whether it violates" the Sherman Act, even if the contract "is terminable at will." *Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, 2005 WL 1515399, at *6 (S.D.N.Y. June 23, 2005). Courts have condemned exclusive dealing with relatively short durations, especially where, as here, those contracts foreclose a large portion of the market, or there are, as here, other impediments to switching or evidence of anticompetitive effects.[100] Thus, "the relevant question is whether [when the term is up], . . . looking at both contract terms *and other impediments to switching*, that the fact finder can conclude that there is a realistic opportunity for a new rival to enter the market or an existing rival to expand." Antitrust Law ¶1821 (emphasis added); *see also Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 658-60, 663 (E.D. Pa. 1997) (difficulty of terminating a contract can make *de facto* length much longer).

In practice, Zuffa exploited its monopsony power through coercion, threats, and aggressive enforcement to make its contracts effectively perpetual. CSF ¶¶11-12. Due to the Scheme, Zuffa has admitted that ████████████████████████████████████ CSF ¶20. In contrast to the cases cited by Zuffa, MSJ 30-31, here Plaintiffs have shown that Zuffa has market power and that its contracts substantially foreclosed competition by ensuring that no rival could obtain a critical mass of top Fighters. CSF ¶¶6-12. Zuffa accomplished this, among other ways, by locking up the vast majority of top Fighters, including provisions that gave it the power to extend contracts perpetually, ensuring that contract end dates were "██████" and that the most valuable Fighters were locked up for the longest terms.[101] Finally, because the Scheme relegated all of Zuffa's rivals to the "minors,"

---

[100] *See, e.g.*, *U.S. v. Int'l Boxing Club, Inc.*, 150 F. Supp. 397, 400, 412, 417-418 (S.D.N.Y. 1957) (condemning scheme that involved signing 4 championship-contender boxers to two-year exclusive contracts, with options to renew for additional two-year terms; and requiring contenders for a title to sign a champion's clause requiring three to five years of exclusivity for title bouts); *U.S. v. Int'l Boxing Club of N.Y., Inc.*, 171 F. Supp. 841, 842 (S.D.N.Y. 1957), *aff'd by Int'l Boxing*, 358 U.S. 242 (1959) (implementing 5-year moratorium on *all* exclusive fighter contracts of any duration); *FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 393-96 (1953) (condemning exclusive contract terms longer than 1 year); *Dentsply*, 399 F.3d at 184, 185, 191, 193 (exclusivity policy imposed by manufacturer on its dealers violated Section 2 "despite the lack of long term contracts" and being "essentially terminable at will" because the large market share "held by [defendant] and its conduct excluding competing manufacturers … realistically make the arrangements as effective as [long term] contracts[,]" it was "designed expressly to exclude its rivals[,]" and "[i]t helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to [defendant's] market share").
[101] CSF ¶22; *see, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 31-32 (S.D.N.Y. 2016) (denying

Case No.: 2:15-cv-01045-RFB-(PAL)

Fighters lacked the practical ability to switch, even when their contract came up for renegotiation.[102]

Top fighters would leave Zuffa only for a promotion that had amassed a "███████████

████" CSF ¶¶3-5. The Scheme left no such promoter other than Zuffa, CSF ¶¶19-26, and so none

had "sufficient opportunity to compete for each contract at the time it is signed."[103]

### ii.    Zuffa's Acquisitions and Coercion Harmed Competition.

#### a.    Zuffa's Acquisitions Eliminated Potential Rivals.

Zuffa does not deny that it acquired other MMA promoters, including the ones that posed the

largest potential competitive threats. But it cites *U.S. v. Syufy Enterprises*, 903 F.2d 659 (9th Cir.

1990), arguing its acquisitions caused no anticompetitive harm. MSJ 34-35. That argument fails for two

reasons. First, it treats the acquisitions in a vacuum rather than appropriately as part of Zuffa's Scheme.

The acquisitions compounded the effects of the other aspects of the Scheme, eliminating rivals—and

thus leaving Fighters no choice but to stick with the UFC—and depriving other promoter of a critical

mass of top Fighters. CSF ¶¶13-18. Second, in *Syufy*, the defendant acquired several movie theatres,

giving it a dominant share of the Las Vegas theatre market. *Id.* at 664-65. However, there was no

---

summary judgment where plaintiff offered "evidence that [defendant] intentionally staggered the end
dates of key contracts to prevent competitors from acquiring a 'critical mass' of retail distribution").
[102] *See Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *6 (C.D. Cal. Dec. 2,
2013) ("monopoly makes dealing with [defendant] an economic necessity and makes the cost of
switching prohibitive").
[103] MSJ 30; *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("[I]f the defendant
occupies a dominant position in the market, its exclusive dealing arrangements invariably have the
power to exclude rivals." (citing *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)).
Zuffa's use of its Scheme to achieve market dominance distinguishes this case from the ones it cites.
MJ 28-31: *Omega Envtl v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (no substantial
foreclosure); *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir.
2008) (same); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th
Cir. 2010) (no exclusion of competitors); *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
848 F.2d 976, 982 (9th Cir. 1988) (no evidence that a *single* six-year exclusive lease agreement
foreclosed competition or otherwise harmed competition); *Golden Boy*, 2017 WL 460736, at *12, 14
(very low barriers to entry in relevant market, no market power, and no evidence as to the prevalence of
5-year agreements in the relevant market); *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL
21397701, at *4 (C.D. Cal. 2003) (defendant lacked power to exclude competitors and did not impair
rival's ability to compete for contracts); *Methodist Health Servs. Corp., v. OSF Healthcare Sys.*, 859
F.3d 408, 410-11 (7th Cir. 2017) ("no evidence that [the] exclusive contracts have a significant
exclusionary effect" or "could have caused prices to rise").
      Zuffa claims that *Gen. Bus. Sys. v. N. Am. Phillips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983), in
effect reverses exclusive dealing doctrine, giving Zuffa immunity for locking up the top MMA
Fighters. MSJ 33. In fact, the cited page held that the plaintiff there failed to define a market and
establish market power. *See Image Tech. Servs., Inc. v. Eastman Kodak*, 903 F.2d 612, 617-18 (9th Cir.
1990) (*Philips* found plaintiff had "not presented facts from which [market power] could be inferred").

1   evidence of barriers to entry or anticompetitive harm. *Id*. at 661. Here, in contrast, Plaintiffs show both.

2   *See supra* Secs.II.A, II.C, II.D, IV.B-E, IV.H-I. So *Syufy* supports Plaintiffs.[104] Zuffa also relies on

3   supposed entry into the market and expansion by competitors, although it does not explain the

4   significance of those alleged facts. MSJ 35. Whatever Zuffa's point, it fails because it too rests on the

5   false premise that all promoters and events are the same. Again, the expansion of "minor league" MMA

6   events does not diminish Zuffa's market power.[105]

7                    **b.      Zuffa's Coercion Supported the Exclusive Contracts.**

8           Plaintiffs have extensive evidence that Zuffa used its monopsony power to coerce Fighters into

9   signing new, long-term Exclusive Contracts before their current contracts ended, allowing Zuffa in

10  effect to control Fighters for as long as it wanted. CSF ¶¶11-12. The tools Zuffa used include

11  threatening or imposing delays between bouts, forcing Fighters to fight undesirable opponents,

12  depriving Fighters of title opportunities, or placing them on undesirable positions on a card, in addition

13  to using various contractual provisions to prevent Fighters from participating in events and getting paid.

14  *Id*. Even Zuffa's own matchmaker, Joe Silva, admitted ███████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ███████████████████. CSF ¶12. Zuffa ignores this, pretending that Plaintiffs complain only about

17  "mean tweets or insulting language," MSJ 35, or that Zuffa used additional pay as a way to encourage

18  Fighters to re-sign. Zuffa's failure to respond to Plaintiffs' actual evidence of Zuffa's coercive use of

19  market power is tantamount to an admission it cannot do so.[106] Together with the other conduct, the

---

[104] Zuffa also may be implying that Plaintiffs have not shown anticompetitive harm specifically from the acquisitions, although it is unclear on this point. MSJ 34-35. Regardless, Zuffa's acquisitions forced Fighters into its anticompetitive, exclusionary contracts, so Plaintiffs have shown the acquisitions were anticompetitive and they contributed to its overall anticompetitive scheme. Singer Tr. 251:10-254:9; CSF ¶¶13-18. Plaintiffs here do not bring a Section 7 claim and rely on Zuffa's acquisitions only as part of its larger Scheme, so *Boardman v. Pac. Seafood Grp*., 822 F.3d 1011, 1021 (9th Cir. 2016) (MSJ 34), is inapposite.

[105] *Sterling Merch, Inc. v. Nestle, S.A*., 656 F.3d 112 (1st Cir. 2011) (MSJ 35), does not support Zuffa's position because, among other reasons, the plaintiff there failed to show a reduction in output or an increase in prices, impairment of competition, or monopoly power. *Id*. at 122-24. Plaintiffs here have extensive favorable evidence on all of those issues. *See supra* II.A, II.C-D, IV.B-D, IV.H-I.

[106] Zuffa cites various irrelevant cases. *Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312 (2007) (MSJ 2, 13, 31, 35), involved allegations of predatory bidding—a claim about a defendant paying *high* prices to lead to anticompetitive result. Here, in contrast, Zuffa pays anticompetitive *low* prices to Fighters (and charges inflated prices to its buyers), conduct much more suspect under antitrust law. *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994), involved a dispute over

coercion enhanced the anticompetitive effects of the Scheme.

**F. Zuffa Has Not Shown Its Exclusive Contracts Had Procompetitive Effects**

Because Plaintiffs have shown the Scheme caused anticompetitive effects, the burden shifts to Zuffa to establish "procompetitive justifications" for the Scheme. *O'Bannon*, 802 F.3d at 1072. It fails to do so. Zuffa suggests it retains more athletes than it needs under its Exclusive Contracts to guard against injuries. MSJ 33-34. Doing so, it claims *without citing any supporting evidence*, has increased MMA output and quality. *Id.* The first problem with that argument is that it confirms that Zuffa's Exclusive Contracts restrain competition. Zuffa denies its Exclusive Contracts reduce purchases of Fighter services. MSJ 24-25. But its position is self-contradictory. If its contracts lock up extra Fighters in case of injury, fewer Fighters are available to other MMA promoters. *See supra* Sec.IV.C.ii. Alternatively, if the Fighters would not participate in MMA bouts anyway, Zuffa has no need to lock them up. Zuffa cannot have it both ways. In any event, Dr. Topel admitted Zuffa's Exclusive Contracts are "restrictions on athlete mobility," and prevent a "transfer of wealth" to Fighters. CSF ¶¶8, 28. The second problem with Zuffa's position is that it is pretextual: evidence shows the real reason Zuffa locked up top Fighters was to deprive potential rivals of a critical mass of top Fighters, the "████████" they needed to compete. CSF ¶6; *see also id.* ¶32. The third problem is its lack of evidence. Zuffa cites some evidence for the obvious proposition that Fighters get injured (although evidence shows events can go forward anyway, SR2 ¶42). But Zuffa cites *no* evidence that locking up Fighters and preventing them from fighting—except if there is an injury—increases output or quality, as Zuffa asserts. MSJ 33-34.[107] In contrast, there is extensive evidence that the opposite is true: Zuffa's Exclusive Contracts and

---

which group of doctors would have an exclusive contract, not a challenge to exclusive dealing generally, and involved no evidence that there was substantial market foreclosure resulting in wage suppression, price inflation, or decreased output. *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010), is inapposite because there the defendant, unlike Zuffa here, established procompetitive benefits from its conduct, *id.* at 80-83, the plaintiff there had the opportunity to participate in a competitive market (as in *Balaklaw*, the plaintiff competed for the exclusive contract), *id.* at 83-84, whereas the Fighters here have been deprived of competition for their services, and Plaintiffs here, unlike the plaintiff there, have shown coercion, which supports a Section 2 claim. *Id.* at 77-79. Similarly, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), is inapplicable because, unlike here, there plaintiffs failed to define a proper market, in part because the claims implicated only live attendance at concerts, not as here purchases of broadcasts of events nationally, *id.* 681-82, and the plaintiff brought tying claims without evidence of tying. *Id.* 683-87.

[107] Zuffa cites *Haagen-Dazs Co. v. Dble. Rainbow Gourmet Ice Creams., Inc.* 895 F.2d 1417 (9th Cir. 1990) (not for publication/citation, 9th Cir. R. 36-3(c)) and *Race Tires*, 614 at 82, arguing "the

---

39

other anticompetitive behavior *decreased* the output of MMA events. CSF ¶31 & n.53. That makes sense. The record is replete with evidence that the true purpose of Zuffa's Exclusive Contracts is to prevent rivals from gaining "███████," creating artificial barriers to entry that Zuffa itself acknowledged. CSF ¶¶3-6, 19-26.[108] The evidence shows Zuffa "pursued a deliberate strategy of restricting the number of career paths available to Fighters," SR2 ¶43; SR1 ¶196, evidence that Zuffa ignores.[109] And, indeed, Drs. Singer and Zimbalist show that Zuffa's resulting monopsony power allowed it to decrease the purchase of Fighter services and suppress Fighter compensation. CSF ¶¶28-29, 31; *see also supra* 31-32; SR2 ¶42. Zuffa's monopoly power similarly enabled it to decrease the sale of MMA events and inflate prices to consumers. CSF ¶31 & nn.53-54. That conduct is textbook for a monopsonist. SR2 ¶42 & n.149. Zuffa's conduct thus *decreased* output of pay-per-view MMA events between 2010 and 2015 and *decreased* industry output of live MMA events by restricting the output of other promoters. SR1 ¶¶148, 203-208; SR2 ¶268; CSF ¶31 & n.53. Moreover, the history of other professional sports leagues shows increased competition for athlete services improves athletic performance.[110]

---

[108] expansion of output and adherence to high quality" are business justifications, MSJ 33-34, but Zuffa has shown neither, rendering those cases and *Image Tech.*, 125 F.3d at 1212 (MSJ 33), inapposite.

[108] Indeed, Zuffa offers no explanation for how the right to match and champion's clause are necessary to ensure fighters are available to replace injured athletes, which demonstrates the pretextual nature of this purported business justification. *See Dentsply*, 399 F.3d at 196-97 (purported business justifications can be rejected if they are "inconsistent with [the defendant's] announced reason for the exclusionary policies, its conduct enforcing the policy, [and] its rival suppliers' actions").

[109] Zuffa also claims that Exclusive Contracts are widely used by other MMA promoters. ZSUF ¶16. This is both disputed and misleading, as the evidence shows both that other promoters were willing to co-promote or relax exclusivity, and also that other promoters ███████████████████████████████████████████ ██████████████████████████████████. CSF ¶10. And, even if it were true, it would not mean the Scheme was procompetitive. *Twin City*, 676 F.2d at 1305 ("an industry-wide practice would not justify what has clearly been shown to be unjustifiably anticompetitive").

[110] SR1 ¶¶286-290; ZR1 ¶¶79-80, 83-84; ZR2 ¶¶90, 99-102; CSF ¶33 & n.50. Finally, Zuffa ignores that Plaintiffs have offered substantially less restrictive alternative to Zuffa's Exclusive Contracts, which would still achieve Zuffa's purported procompetitive aims. *See O'Bannon*, 802 F.3d at 1074. Contracts that are limited to twelve months, and do not have a right to match, exclusive negotiation rights, or a champion's clause, and involve no coercion to re-sign could provide Zuffa with equivalent protection against injuries, but without the anticompetitive effects. CSF ¶32 & n.56. Shorter contracts would allow competition over Fighter compensation, SR1 ¶264, increasing pay and improving MMA output and quality. SR1 ¶¶286-290; ZR1 ¶¶79-80, 83-84; ZR2 ¶¶90, 99-102. Similarly, if Zuffa were to co-promote events—so Zuffa Fighters could have bouts with, say, Bellator Fighters—Zuffa could address its concern about injured athletes *and* allow competition for Fighter services that would drive up Fighter compensation closer to competitive levels, increase the output of MMA events, and let the market ensure the highest quality bouts occur. CSF ¶5 & n.9; *id.* ¶¶28-32; SR2 ¶¶196-97, 221-26.

**G.  Zuffa Irrelevantly Addresses a Predatory Hiring Claim that Plaintiffs Do Not Assert**

Zuffa pretends Plaintiffs are pursuing a predatory hiring claim. MSJ 26-28. They are not. Predatory hiring looks like active competition—aggressive efforts to hire that increase worker mobility and may initially increase compensation—but that can eventually cause anticompetitive effects. Courts are skeptical of predatory hiring claims—just as they are of predatory pricing claims. Unlike the aggressive poaching of rivals' workers in predatory hiring, Zuffa has severely *limited* rivals' ability to poach its Fighters and thus Fighter mobility.[111] And unlike in Zuffa's predatory hiring cases where there is no showing of market power or harm to competition, Zuffa's Scheme here had demonstrable anticompetitive effects: foreclosing substantial competition, suppressing pay and inflating prices.[112]

**H.  Zuffa's Monopoly Power Contributed to its Monopsony Power**

Zuffa asserts that Plaintiffs have "abandoned their monopolization theory." MSJ 2, 36. That is untrue. *See supra* 20, 26-27. Further, while monopsony power alone suffices for a Section 2 claim,[113] longstanding precedent in professional sports antitrust cases establishes that monopoly power in an

---

[111] So the predatory hiring cases Zuffa cites are inapposite. *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (typical predatory hiring case with apparent competition over hiring); *Harcourt Brace*, 108 F.3d at 1153 (same); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 480 (5th Cir. 2000) (same); *Midwest Radio Co. v. Forum Pub. Co.*, 942 F.2d 1294, 1297-98 (8th Cir. 1991) (same). *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493 (D. Colo. Aug. 21, 2009), is similarly irrelevant because plaintiffs there, unlike here, failed to define a market to show sufficient market power to suppress wages. *Id.* at *21-*27.
[112] *See Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1201 (D. Kan. 1999) (noting noncompetition agreements "are strongly disfavored by the law"); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 853-55 (7th Cir. 2011) (noting exclusive dealing contracts were anticompetitive and violating them was procompetitive).
Zuffa's pretext for addressing predatory hiring is that Dr. Singer shows that "Zuffa has restricted the supply of Fighter services by consistently maintaining significantly more Fighters under contract than it could use." SR1 ¶145 (MSJ 26). But the relevance of that point is that the restriction of Fighter services is direct evidence of Zuffa's monopsony power, as discussed above. *See supra* Sec.IV.C.ii. Zuffa acknowledges this point, for it attempts (unsuccessfully) to challenge Plaintiffs' reliance on the restriction of Fighter services for this purpose. MSJ 24-25 (II.b.ii). Plaintiffs have provided extensive evidence that Zuffa restricted Fighter services. Indeed, even Zuffa admits Plaintiffs have identified at least five specific Fighters it "shelved." MSJ 27-28. It also acknowledges Plaintiffs' evidence of "delays" in making bouts available to Fighters, that is, of shelving. MSJ 28. That creates a genuine issue of material fact about whether Zuffa restricted Fighter services and, hence, whether it had monopsony power. *Rebel Oil*, 51 F.3d at 1434; *High-Tech*, 856 F. Supp. 3d at 1122-23. To avoid this conclusion, Zuffa claims predatory hiring must be "examined more closely . . . than other forms of anticompetitive conduct." MSJ 27 (quotation marks and citation omitted). But Plaintiffs bring no such claim, so any heightened standard does not apply.
[113] *E.g., Telecor Communications, Inc. v. Sw. Bell Tele. Co.,* 305 F.3d 1124, 1134 (10th Cir. 2002) (recognizing monopsony plaintiff does not have to prove end-user impact); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-88 (9th Cir. 2000) (same); *O'Bannon*, 802 F.3d at 1070-71.

41

Case No.: 2:15-cv-01045-RFB-(PAL)

output market *bolsters* the claims of athletes in an input market.[114] Abundant evidence shows Zuffa's dominance in the MMA promotion market cemented its monopsony power and ability to suppress compensation. Dr. Singer explains that "the source of Zuffa's dominance in the Output Market—its unique access to a broad stable of high-quality MMA Fighters, which is essential to staging successful live MMA events—*does* imply that Zuffa also enjoys dominant shares in the Input Markets and Submarket. To illustrate, an MMA promoter that is a pure monopolist in the market for promoting MMA events is, by definition, a monopsonist in the market for Fighters seeking to be paid to appear in MMA events: If there is only a single dominant MMA promoter, then there is only one place for an MMA fighter to work." SR2 ¶137. Zuffa's economist agreed. *See* Topel Tr. 464:2-14.

Furthermore, as Dr. Singer explains, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████. SR2 ¶109. That reduced the competitive pressure on Zuffa to

increase Fighter compensation, buttressing its monopsony power. *See* SR1 ¶¶180-187; SR4 ¶5. ████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. CSF ¶6. Scott Coker,

the former Strikeforce CEO, testified that by acquiring Strikeforce, Zuffa would become the only viable alternative for fighters: "[I]f there's only one place to have a job, and then, there's only a certain amount of slots available to have employment, the fighter purses naturally would go down because now you're in control of the marketplace." Coker Tr. 97:18-99:3. Plaintiff Kingsbury testified that "there's nowhere else to go at this point. Strikeforce didn't exist anymore. Pride didn't exist anymore. And I had no way of saying no" to the UFC. Kingsbury Tr. 119:3-5. Zuffa claims it "could not or did not restrict other promoters' access to any of the purported requirements for a successful MMA promotion," MSJ 36, and then discusses venues, sponsors, and broadcasters. *Id*. 36-38. That argument

---

[114] *See, e.g., McNeil*, 790 F. Supp. at 895-96 ("the existence of defendants' monopoly power is relevant for purposes of determining whether the challenged restraints are more anticompetitive because they have been imposed by a monopolist…"; "although defendants argue that monopolization of an output product market … is irrelevant to a determination of the legality of restraints in an input labor market … they nevertheless premise their entire rule of reason defense on the alleged necessity of implementing player restraints in the relevant input market in order to strengthen their ability to compete in the output market" (citations omitted)); *see also id.* at 896 (noting plaintiffs would have opportunity to prove at trial that because defendants have monopoly power in the output market, they have monopsony power in the input market).

ignores one of Plaintiffs' central points: that Zuffa deprived other promoters of a critical mass of marquee Fighters—a *necessity* to be a successful "major league" promoter. *See* CSF ¶¶3-6, 19-26.

## I.   Direct Evidence Establishes Zuffa's Monopoly Power

As noted above, *supra* at 20, monopoly power can be demonstrated with direct evidence, such as inflated prices or restricted output, *Rebel Oil*, 51 F.3d at 1434; *Le*, 216 F. Supp. 3d at 1161, in addition to Plaintiffs' indirect evidence, *see supra* 26-28, 41-43, CSF ¶¶22-26—which is also sufficient by itself. The record indicates Zuffa profitably raised the price of its live MMA events above competitive levels. Between 2010 and 2015—during the period when it acquired Strikeforce and Zuffa's foreclosure of the relevant markets increased significantly—it increased its pay-per-view prices by ███. SR1 ¶147.[115] Zuffa documents show the UFC has ███████████████████████████████" and that ██████████████████████████████████████████. SR1 ¶198; CSF ¶31 & n.54. Zuffa argues that price increases are not sufficient to demonstrate market power. MSJ 38. However, during this same period of time, Zuffa's documents reveal ████████████████ ███████████████████████████████████████. *See, e.g.*, SR1 ¶199. That *is* monopoly power. *See* AREEDA & HOVENKAMP, ¶501.[116] At the same time, Zuffa's price increases cannot reflect competitive conditions—such as increasing costs or demand—because ████████████ ███████████████████████████████. SR2 ¶46.[117] In addition, Deutsche Bank testified that Zuffa provided it with data demonstrating that "████████████████████████████████ ███████████████████████" Deutsche Bank 30(b)(6) Tr. 119:9-120:6 (emphasis added).

---

[115] Zuffa claims that it only increased its PPV prices by $5, MSJ 38, but that figure ignores the increasing percentage of PPV revenues that Zuffa was able to obtain from PPV distributors. SR2 ¶45. The ███████ figure is the same price hike expressed as a percentage of *Zuffa's average revenue per residential PPV customer*—that is, only the portion of the retail price that accrues to Zuffa. The ███████ figure is what is relevant for determining whether Zuffa could profitably exercise monopoly power. Zuffa's profitability is determined by its own revenues—not those of PPV distributors. From Zuffa's perspective, PPV distributors are its direct customers. SR2 ¶¶44-45.

[116] One 2009 UFC public presentation to lenders notes, "████████████████████████████████ ██████████████████████████" Ex.64 at -91. Zuffa conducted its own market research surrounding its price increases, which indicated it "██████████████████████████████████████" because price increases "█████████████████████" and were "██████████████████████████" SR1 ¶199, n.491. Thus, unlike in *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504 (9th Cir. 2011), MSJ 38, the price increases here were accompanied by output reductions. *See infra* section IV.I.ii; SR2 ¶46.

Such price increases that cannot be explained by competitive conditions establish monopoly power. *See Bd. of Regents*, 468 U.S. at 109 n.38.

Further, while Zuffa was increasing its PPV prices by ▮%, it restricted its PPV output by ▮%. SR1 ¶¶148, 201-02; CSF ¶31 & nn.53-54. Its supply of PPV events ███████████████████ ████████████████████████████████████████████████████████. SR1 ¶203 (citing Ex.116 at *9). Zuffa was essentially the only MMA promoter with PPV events during this time. (Bellator had a single PPV event in 2014.) So the industry supply of PPV events decreased. *Id.* Zuffa argues *its* output of live MMA events—including non-PPV events—increased during the Class Period. MSJ 38. However, the relevant effect on competition is *marketwide*.[118] Zuffa appears to acknowledge this, arguing that "plaintiffs' economists never attempt to show that Zuffa's actions . . . led to a change in *overall* output in the market." MSJ 39 (emphasis added). But Zuffa is wrong: Dr. Singer shows that as Zuffa's foreclosure of the Input Market increased, output of live MMA events by non-Zuffa promoters decreased, resulting in a *net decrease* in output. *Supra* n.53. That is confirmed by Zuffa contracting with more Fighters than it could use, "shelving" them and leading a rival promoter to testify that Zuffa's fighters were "collecting dust."[119] Zuffa's *intent* to suppress marketwide output is confirmed by its plans to acquire other MMA promoters just to shut them down.[120] *See, e.g.*, *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("knowledge of intent may help the court to interpret facts and to predict consequences"). After Zuffa acquired WEC, Pride, and Strikeforce, it closed them and the UFC absorbed their Fighters.[121] Zuffa also ignores Plaintiffs' direct evidence of Zuffa's monopoly

---

[118] *See, e.g.*, *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1278 (S.D. Fla. 2015) ("Plaintiff must measure the magnitude of the actual adverse effects 'by their impact on the market rather than by their impact on competitors' and show that they are felt 'marketwide'" (quoting *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071, 1074-75 & n.5 (11th Cir. 2004)).

[119] Otto Tr. 116:4-24; *see also* SR1 ¶194, n.483. *See supra* Sec.IV.C.ii. The evidence that the Scheme decreased marketwide output was lacking in *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (MSJ 39).

[120] In an email to Frank and Lorenzo Fertitta detailing the result of acquisition talks with Pride's owners, Thomas Paschall, outside counsel for Zuffa during the acquisition of Pride, noted ███████████████████████████████████████████████████████████ ██▮" Ex.83. Similarly, Zuffa's acquisition of the assets and fighters of Affliction involved Affliction ▮" Ex.80. And according to Scott Coker, Strikeforce's former CEO, Fertitta stated that his plan was to "close [Strikeforce] down, and we would take all of the Fighters and bring them to the UFC." Coker Dep. 119:9-17. *See also* CSF ¶¶13-18 & n.32.

[121] *See* SR1 ¶43 n.109, 110; *id.* ¶49 n.132; White Tr. 167:13-18 (testifying Pride was shut down without

---

power—that it excluded competitors.[122]

**J.   Plaintiffs Support their Identity Class Claim with Admissible Evidence**

Zuffa claims restraining Plaintiffs from using UFC intellectual property is not anticompetitive. MSJ 39. But Zuffa's intellectual property is not the issue (and *In re Apple iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1145 (N.D. Cal. 2011) is irrelevant). MSJ 39. The same challenged conduct that injured the Bout Class also injured the Identity Class: Zuffa's use of monopsony power to suppress the compensation of the Identity Class. SR1 ¶¶235-40. Dr. Singer draws the appropriate inference that Zuffa's Scheme diminished the amount it paid Fighters proportionally across different revenue streams: ancillary revenues associated with identity rights and revenues directly from promoting live MMA bouts. SR1 ¶253; *see also Le*, 216 F. Supp. at 1169 (holding Plaintiffs' identity rights claims state an antitrust violation). Zuffa offers no reason that Zuffa's unlawful exercise of monopsony power would have suppressed bout pay to a different degree than identity pay. Thus, Dr. Singer's application of his foreclosure regression to measure the amount of damages to the identity class is appropriate.[123]

**K.   Plaintiffs Have Standing to Seek Injunctive Relief**

Plaintiffs incorporate by reference their explanation of their standing to pursue injunctive relief from their reply brief supporting class certification. Class Reply 25.

**V.   CONCLUSION.**

For the foregoing reasons, Zuffa's summary judgment motion should be denied.

---

ever putting on an event); Ex.135 ("Pride is dead dummy! I killed 'em."). This evidence of inflated prices and restricted output distinguishes *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *5 (MSJ 38), which lacked evidence of either.

[122] *See supra* Secs.II.B & C, IV.C.iii; SR1 ¶149. "[E]vidence of the ability to exclude some competitors from the market, even in the absence of market-wide restricted output or supracompetitive prices, could suffice to demonstrate market power in certain instances[.]" *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 900 (N.D. Cal. 2012) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464-65 (1992)).

[123] Zuffa additionally argues that Dr. Singer "assumes" all Identity Class members were harmed by the Scheme based on his analysis that, without the Scheme, Fighters would have received at least ▮▮▮ for the grant of their identity rights. MSJ 40. That argument confuses impact and damages. The ▮▮▮ figure is Dr. Singer's estimate of the *amount* of damages. Dr. Singer's proof of *impact* derives from all Fighters, in the actual world, signing away Identity rights without *any* compensation as a result of the Scheme. That suffices to show impact. *See* Class Reply 24. Finally, Zuffa asserts that the statute of limitations bars many of the Identity Class claims. Plaintiffs incorporate by reference their responsive arguments from their opposition to Zuffa's motion for partial summary judgment. *See* ECF No. 365.

Dated: September 21, 2018                    Respectfully Submitted,

By: /s/ Eric L. Cramer
        Eric L. Cramer

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER|MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000/Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Jiamin Chen (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Phone: (415) 500-6800/Fax: (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
jchen@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Daniel H. Silverman (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005
Phone: (202) 408-4600/Fax: (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dsilverman@cohenmilstein.com

**Co-Lead Counsel for the Classes**

Case No.: 2:15-cv-01045-RFB-(PAL)

**Liaison Counsel for the Classes:**

Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Phone: (702) 341-5200/Fax (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Phone: (602) 264-7101/Fax: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

Frederick S. Schwartz (*Pro Hac Vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Phone: (818) 986-2407/Fax: (818) 995-4124
fred@fredschwartzlaw.com

William G. Caldes (*Pro Hac Vice*)
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street – Suite 2500
Philadelphia, PA 19103
Phone: (215) 496-0300/Fax: (215) 496-6611
wcaldes@srkw-law.com

John D. Radice (*Pro Hac Vice*)
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502
jradice@radicelawfirm.com

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on this 21st day of September, 2018 a true and correct copy of
PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT and
supporting papers was served via email on all parties or persons requiring notice.

3

4

5

                            _____/s/ *Eric L. Cramer*_____
                               Eric L. Cramer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 2:15-cv-01045-RFB-(PAL)

PLAINTIFFS' OPPOSITION TO ZUFFA'S MOTION FOR SUMMARY JUDGMENT
**Public Version (Redacted)**