# Exhibit 5

Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC* (August 30, 2017)

PUBLIC COPY - REDACTED

# Expert Report of Andrew Zimbalist in Cung Le, et al. v. Zuffa, LLC

TABLE OF CONTENTS

I. Introduction and Assignment ........ 1

II. Qualifications ........ 5

III. Zuffa's Fighter Contracts ........ 6

IV. History of Restrictive Contracts in Other Sports ........ 18
- A. The Use of Reserve Clauses and Related Restrictions in Team Sports/Leagues ........ 18
  - i. Major League Baseball ........ 21
  - ii. National Football League ........ 26
  - iii. National Hockey League ........ 34
  - iv. National Basketball Association ........ 40
- B. Collective Bargaining and Modern Restricted Free Agency ........ 44
- C. The Effects of Intra-League Competition on Popularity and Profitability ........ 48
- D. The Conditions and Effects of Inter-League Competition ........ 53
- E. History of Restrictive Contracts in Boxing ........ 54

V. Estimation of Damages ........ 66
- A. Zuffa Benchmarks its Athlete Compensation to Other Sports ........ 67
- B. Evaluation of Potential Benchmarks for UFC Fighter Share of Revenue ........ 69
  - i. Boxing ........ 69
  - ii. Professional Team Sports: NFL, MLB, NBA, NHL ........ 72
  - iii. European Soccer ........ 77
- C. Damages Calculation and Results ........ 78
- D. My Selected Benchmarks Are, If Anything, Conservative ........ 82

VI. Conclusion ........ 91

## I. INTRODUCTION AND ASSIGNMENT

1. Zuffa LLC, doing business as Ultimate Fighting Championship ("Defendant," "Zuffa," or "UFC"), is a promoter of live professional mixed-martial-arts

PUBLIC COPY - REDACTED

("MMA") bouts. Plaintiffs are Professional MMA Fighters[1] who have fought for the UFC. Plaintiffs allege that Zuffa used anticompetitive conduct (the "challenged conduct") to establish, maintain, and enhance monopoly and monopsony power. The challenged conduct includes, among other things: (a) entering multi-fight exclusive contracts with a large share of the top Professional MMA Fighters, thereby keeping this allegedly necessary input from other MMA promotions; (b) acquiring multiple actual or potential rival MMA promotion companies; and (c) impairing other MMA promoters by using its alleged dominance to threaten sponsors, promoters, and fighters who worked with or considered working with the UFC's potential rivals.[2]

2. Plaintiffs have brought this case on behalf of two proposed classes of similarly situated Professional MMA Fighters: the "Bout Class" and the "Identity Class." The "Bout Class" includes: "All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States."[3]

3. The "Identity Class" includes: "Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or

---

[1] I use the term "Professional MMA Fighter" as defined in the Complaint to mean "a person who is compensated as a combatant in a Mixed Martial Arts bout." *Cung Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,* No. 15-cv-1045, Consolidated Amended Antitrust Class Action Complaint (Dec. 18, 2015) (hereinafter "CAC"). I sometimes use the term "fighter" synonymously.

[2] CAC ¶¶ 109-113, 116-118, 125-126, 128-134.

[3] CAC ¶ 39.

PUBLIC COPY - REDACTED

UFC Promotional Materials, during the Class Period in the United States."[4] Plaintiffs define the "Identity of a UFC Fighter" as "the name, sobriquet, voice, persona, signature, likeness and/or biographical information of a UFC Fighter." Plaintiffs have defined the "Class Period" as beginning December 16, 2010, and continuing until the challenged conduct ceases.[5] The challenged conduct, according to the CAC, began at least as early as December 2006.[6] The period of my damages analysis is from December 16, 2010 through December 31, 2016.

4. Counsel for Plaintiffs have asked me to determine:

a. whether the challenged conduct is anticompetitive in character and thus would have anticompetitive effects if engaged in by an entity with monopoly or monopsony power;

b. whether pro-competitive justifications that have been offered in defense of conduct similar to the challenged conduct that was historically engaged in by owners in other professional sports (i) have any validity, (ii) have any theoretical applicability to Mixed Martial Arts ("MMA"), and (iii) assuming arguendo that some would apply, whether any such alleged procompetitive benefits could be achieved with less restrictive alternatives; and

c. whether a class-wide method is capable of computing the aggregate amount members of the proposed "Bout Class" were undercompensated due to the challenged conduct, and if so, to calculate the total amount of undercompensation that members of the bout class suffered.

5. I first conclude that the challenged conduct is anticompetitive in character. To reach this conclusion, I first chart the history of athlete contracts and level of competition in a variety of professional sports including baseball, football, hockey, basketball, and

[4] *Id.* ¶ 47.

[5] *Id.*

[6] *Id.* ¶ 129.

PUBLIC COPY - REDACTED

boxing. Many of these sports have historically included clauses similar to those currently employed in UFC fighter contracts. Studying the changes in clauses in other sports similar to those Plaintiffs are challenging in this case illustrates the anticompetitive nature of the challenged conduct. In particular, the dramatic increases in athlete compensation that accompanied the expansion of free agency[7] in other sports, and the presence of competitive options in those sports, demonstrate the wage-suppressing effect of limitations on free agency that the challenged conduct imposed.

6. Next, I conclude that many of the pro-competitive justifications that have, over time, been offered in defense of similar conduct historically engaged in by owners in other professional sports are not valid and were not reasonably necessary for the success of such leagues or sports. These other sports and leagues have survived, and indeed have gone on to thrive, *after* the elimination or restriction of the use of contract terms similar to those challenged here. In addition, many of those procompetitive justifications, such as those relating to so-called competitive balance, have no direct relevance for an individual sport such as MMA. Finally, I conclude that even assuming some of these justifications could apply in MMA, the experience of these sports also shows that less restrictive contracting practices can accomplish similar aims. In fact, these other sports provide natural experiments that offer concrete empirical evidence of the beneficial competitive effects that result from lifting the restrictive conduct of the employer on both: (1) athlete compensation; and (2) the popularity and profitability of the sport as a whole.

---

[7] Free agency is generally understood to refer to the ability of players who have played out their existing contract to offer their services on the labor market to other employers in the industry. *See* Deposition of Joe Silva, June 7, 2017, (hereinafter "Silva Dep.") at 183:4-9.

PUBLIC COPY - REDACTED

7. I then provide a classwide method that computes the total aggregate amount that members of the bout class were undercompensated during the Class Period due to the challenged conduct. In particular, my method measures damages to the Plaintiff bout class in this case by comparing (a) the fighters' share of Zuffa revenue to (b) athletes' share of revenue in a variety of other professional sports. I use these other professional sports as a conservative yardstick to evaluate the likely level of fighter compensation in a but-for world, absent the challenged conduct, where Zuffa faces enhanced competitive conditions.

8. My opinion on damages assumes that Zuffa had market power in a relevant input market, and that the challenged conduct substantially foreclosed competition in that market such that but for the challenged conduct, Zuffa would have faced additional competition on par with those markets used as yardsticks. Because I am not opining on market power or level of foreclosure, determining the metes and bounds of the relevant markets is not necessary for my opinion. Although it is not relevant to my opinion, for convenience and as a short-hand, I sometimes refer to a potential relevant input market for professional MMA fighter services as the market for "top fighters." By this, I refer to the pool of professional MMA fighters that another live professional MMA promoter could use to compete effectively with Zuffa, and it includes, at a minimum, all Zuffa fighters.

## II. QUALIFICATIONS

9. I am the Robert A. Woods Professor of Economics and Chair of the Economics Department at Smith College in Northampton, Massachusetts. I received my B.A. in Economics from the University of Wisconsin-Madison in 1969 and my M.A. and Ph.D. in Economics from Harvard University in 1972 and 1974, respectively. I have served as a visiting professor at Doshisha University in Kyoto, Japan, the University of Geneva in

PUBLIC COPY - REDACTED

Geneva, Switzerland, and Hamburg University in Hamburg, Germany. I have studied and consulted extensively within the intercollegiate and professional sports industry for leagues, teams, players' associations, governments, citizen groups, and athletes for over twenty-five years. I have published twenty-six books and dozens of articles in the fields of sports economics, comparative economic systems and development economics. I am a founding member and serve on the editorial board of the *Journal of Sports Economics*. My detailed background and credentials are set forth in my curriculum vitae and biographical sketch, attached hereto as Exhibit A. For my work in this case, I am being compensated at my customary rate of $850 an hour.

## III. ZUFFA'S FIGHTER CONTRACTS

10.

(a)

(b) ;

(c)

[8] 30(b)(6) Deposition of Kirk Hendrick, Nov. 29, 2016, Exh. 2, (hereinafter "Hendrick Exh. 2") at 3, 17.

[9] *Id.* at 4, 18-20.

PUBLIC COPY - REDACTED



[redacted].

11. [redacted].

12. [redacted][11] [redacted].[12] [redacted].[13] [redacted].[14] [redacted]

---

10 [redacted]. [redacted].

11 [redacted] ([redacted]); [redacted]

12 Hendrick Exh. 2 at 7; Silva Dep. at 275:9-24, 276:8-18.

13 Silva Dep. at 412:7-413:22.

14 *Id.* at 410:15-21 (Silva would "[redacted]"); 421:6-17 ([redacted]).



.[15]

.[16]

[17]

[18]

13.

[15] *See id.* at 184:16-24.

[16] *See id.* at 184:25-185:11.

[17] ).

.

[18] Silva Dep. at 277:9-15.

PUBLIC COPY - REDACTED



.[19]

[20]

14.

[19]

[20]

[21]

[22]

PUBLIC COPY - REDACTED



.[23]

15.

.[24]

[25]

.[26]

23

24

[25] ZFL-1376378-79.

[26] *See* Silva Dep. at 463:23-464:8.

PUBLIC COPY - REDACTED



16.

[27] [28] [29]

17.

[27]

[28] Silva Dep. at 426:6-12.

[29] Silva Dep. at 433:13-434:16.

PUBLIC COPY - REDACTED



[30]

[31]

[32]

[33]

PUBLIC COPY - REDACTED



18. [redacted][34] [redacted]"[35] [redacted][36] [redacted]

19. [redacted][37] [redacted]

---

[redacted]

[34] [redacted]

[35] Silva Dep. at 25:2-4.

[36] Silva Dep. at 270:12-271:17.

[37] *See, e.g.*, ZFL-1404974 (According to Zuffa's Michael Mersch, [redacted]).



[38] [39] [40]

20. These practices, along with Zuffa's exclusive contracts and other exclusionary conduct provide a feedback loop deterring the movement of fighters to other promoters. This is because free agency only benefits fighters if enough competition exists for their services. I understand that Zuffa has reinforced its control over fighters by acquiring several competing promotions over the years and by engaging in the challenged conduct to weaken other MMA promoters. If there exist no significant rivals to Zuffa who can offer fighters equivalent compensation, matchmaking, and/or public notoriety, then fighters have even less incentive to endure the hardship of becoming a free agent. In particular, the ability of a promotion to offer matchups against other top quality fighters is a

[38]

[39]

[40] *Infra*, section IV. E.

PUBLIC COPY - REDACTED

key requirement for a promotion to attract promising talent.[41] Thus, Zuffa used its control over top-ranked and championship-contender professional fighters to limit the success of potential MMA promoter rivals.

21.

,"[42]

.[43]

---

[41] UFC's matchmaker, Joe Silva, understood well the importance of being able to fight top quality fighters in order to advance an MMA career. *See, e.g.*, Silva Dep. at 128:23-129:11 ("So if the majority of your opponents have losing records, they're probably not very good, so it doesn't tell me much about your ability… I would like your guy to have more experience and have experience against better people."); *id.* at 129:10-21 ("Beating guys with crappy records won't convince anyone [a fighter is] ready for the big leagues."); *id*. at 66:13-17 ("It never mattered, it didn't matter if it was Pride – if you're saying that Pride was one of the biggest in the world, I didn't care that he fought in Pride, I cared who [sic] he fought in Pride.").

[42] ZFL-2699678, Rows 1552-55.

[43] Deposition of Lorenzo Fertitta, March 23, 2017, (hereinafter "Fertitta Dep.") at 291-92.

PUBLIC COPY - REDACTED



22.

---

[44] ████████████████████████████████████

[45] The reserve clause originated in professional baseball in 1879 and was adopted by the other major team sports after they came into existence.  The reserve clause is discussed at greater length below.

[46] ████████████████████████████████████

16

PUBLIC COPY - REDACTED



[47]

.[48]

23.

.[49]

"[50]

.[51]

.[52]

[53]

24. Zuffa will likely argue that its restrictive contracts are necessary for the

---

[47] Silva Dep. at 59:14-24.

[48] Silva Dep. at 7:2-9:8; Hendrick 30(b)(6) Dep. at 35:11-36:16.

[49]

[50] DB-ZUFFA-00020303 at 04.

[51]

[52] Silva Dep. at 228:19-21 (Zuffa fighters only get paid when they fight).

[53] Silva Dep. at 186:18-187:21.

PUBLIC COPY - REDACTED

success of its business, and have purportedly improved both the popularity and the reach of MMA. Similar defenses of restrictive contracting in professional team sports were raised throughout the history of those sports as well. However, a review of that history indicates that similar tactics to those making up the challenged conduct here were progressively eliminated, limited, or otherwise regulated. The success of those sports, despite repeated interventions to enhance competition for talent, indicates that such restrictions are not reasonably necessary in order to promote success and popularity of a sport. On the contrary, the same history indicates that those goals can be accomplished without similar restrictions on competition among teams and leagues for talent.

## IV. HISTORY OF RESTRICTIVE CONTRACTS IN OTHER SPORTS

### A. The Use of Reserve Clauses and Related Restrictions in Team Sports/Leagues

25. There are many parallels between the restraints on competition in the UFC's labor market through the challenged conduct and the evolution of free agency in professional baseball, football, hockey, and basketball. Indeed, the parallels also extend to the entertainment industry outside of professional sports.[54] In professional team sports,

[54] For many years, Hollywood operated under the "studio system" under which studios employed actors under long-term exclusive contracts. The system was defended on the ground that it created an economic incentive for the studios to make the actor as famous as possible, since the studio would be guaranteed to reap the benefit of the actor's future fame, rather than losing the actor to a competing studio after the actor's fame, and therefore bargaining power, had increased. Rick Smith, "Here's Why Hollywood Should Kiss the Handshake Deal Goodbye," Note. 23 Loy. L.A. Ent. L. Rev. 503, 506-07 (2003). For actors under contract, the studios often maintained the actor's salary at the same level, even as their fame increased, thus pocketing the increased revenue driven by the actor's popularity. James Surowiecki, "Hollywood's Star System, At a Cubicle Near You," The New Yorker, May 28, 2001, available at http://www.newyorker.com/magazine/2001/05/28/hollywoods-star-system-at-a-cubicle-near-you. Under the studio system, a studio's contracts with actors contained a number of extension provisions with similar effects to the Retirement Clause and Champion's Clause in the standard

PUBLIC COPY - REDACTED

there are two potential sources of competition for athlete talent, intra-league and inter-league competition. Intra-league competition occurs among teams in the same league, to the extent it is not impaired by contractual restrictions. Inter-league competition occurs between competing leagues, to the extent competing leagues exist. Like inter-league competition, intra-league competition can operate as a source of competition in much the same way as competition could, in theory, arise between rival MMA promoters. Because of the potential existence of both types of competition, even when one does not exist, the other can lead to substantial competition for athletes' services.

26. Until the last decades of the twentieth century labor markets in professional sports initially functioned under the reserve system. Under that system, once an amateur athlete signed a professional contract to play for a specific team, that team owned the rights to that athlete for the entirety of his career, unless, of course, the team owner traded or sold the athlete to a new team. The reserve system essentially eliminated intra-league competition by using a variety of contractual methods to prevent athletes from ever becoming free agents.[55]

---

UFC contracts. *De Haviland v. Warner Bros. Pictures*, 153 P.2d 983, 985 (Cal. Dist. Ct. App. 1944). In the *De Haviland* case, the California courts concluded that the California Labor Code Section 2855 did not allow personal service contracts to extend beyond seven calendar years. *Id.* at 987. The court's opinion in *De Haviland* ended the studio system and essentially created "free agency" for actors in Hollywood. Under the modern system, studios renegotiate contracts for every new project. *See* Surowiecki. This has not stopped studios from investing millions of dollars promoting films, and thus increasing the fame and popularity of actors, even though the actor is likely to work with a competing studio on his or her next project. Jeffery B. Same, "Comment: Breaking the Chokehold: An Analysis of Potential Defenses Against Coercive Contracts in Mixed Martial Arts," 2012 Mich. St. L. Rev. 1057, 1079-80 (2012).

[55] James Quirk and Rodney Fort, *Pay Dirt: The Business of Professional Team Sports.* Princeton, N.J.: Princeton University Press (1992) (hereinafter "Quirk and Fort").

PUBLIC COPY - REDACTED

27. Under the reserve system, the compensation level for an athlete was set by the team, largely independent of the value produced by the athlete. As a result, until free agency was introduced in the professional leagues, the only historical source of competition for athlete talent, and thus of higher compensation for those athletes, arose during periods of inter-league competition, when a rival league emerged to challenge the dominance of one of the major leagues. In each of those cases, the dominant league knocked out its competition through purchase, merger or exclusionary business practices, including, in some cases, attempts to enforce the reserve clause to prevent athletes from going to a rival league.[56] By buying up rival leagues or driving them out of business, the established major leagues were able to end inter-league competition for athletes' services. Under the reserve system, without any inter- or intra-league competition for their services, athlete salaries and benefits languished at very low levels.

28. The free agency markets enjoyed by professional athletes today were created by a series of legal antitrust challenges and the formation of players' associations that have engaged in collective bargaining with the major sports leagues to end the reserve system. Those battles led to a successive set of rules in each league that reduced the restrictions that players faced in reaching the end of their exclusive contract terms and receiving competing bids from other teams. Many of the restrictions that the leagues imposed on free agency mirror the strategies used by the UFC to put obstacles in the path of fighters reaching the

[56] The history of rival leagues in professional team sports has been discussed by many authors. See, for instance, Harold Seymour, *Baseball: The Early Years.* New York: Oxford University Press, 1960; Stefan Szymanski and Andrew Zimbalist, *National Pastime: How Americans Play Baseball and the Rest of the World Plays Soccer*. Washington, D.C.: Brookings, 2006; and, Quirk and Fort, ch.8.

PUBLIC COPY - REDACTED

end of their contract terms and becoming free agents.

29.     The history of the development of free agency and dynamics of inter-league competition within the professional team sports reveals how restrictions on athlete mobility affect both athlete compensation and the popularity of team sports.  In each of the professional team sports, removal of restrictions on free agency led directly to higher compensation for athletes.  In addition, contrary to the claims of the leagues and club owners, the advent of free agency did not spell doom for the popularity of any sport, but instead, if anything, enhanced their respective popularity and success.

i.     **Major League Baseball**

30.     Since the formation of the National League (NL) in 1876, professional baseball has experienced several episodes of inter-league competition that put significant upward pressure on player salaries.  One of the more notable episodes occurred with the formation of the American Association (AA) in 1882.  During the period of competition between the NL and AA nominal average annual salaries in the NL rose from $1,375 in 1882 to $3,500 in 1891 (roughly the equivalent of $94,600 in 2017 dollars).  Then, in 1891, four of the AA teams were absorbed into the NL and another five AA franchises were dissolved.  Absent inter-league competition, average NL salaries fell steeply to $2,400 in 1892.

31.     Similar episodes occurred with the formation of the American League (AL) in 1901 until its accord with the NL in 1903 and with the Federal League in 1913 until its

PUBLIC COPY - REDACTED

dissolution and partial buy-out in 1915.[57]

32. Prior to 1976, Major League Baseball ("MLB") athlete contracts contained a reserve clause that permitted the clubs to automatically renew the individual player contracts for the next year in perpetuity if the team and the athlete could not agree to a contract.[58] For example, the 1969 contract of Curt Flood,[59] a player for the St. Louis Cardinals in MLB, included the following provision:

> On or before January 15 … of the year next following the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that year by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the March 1 next succeeding said January 15, the Player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said March 1, the Club ***shall have the right*** by written notice to the Player at said address ***to renew this contract for the period of one year on the same terms***, ***except that the amount payable to the Player shall be such as the Club shall fix in said notice***; provided, however, that said amount, if fixed by a Major League Club, shall be an amount payable ***at a rate not less than 80% of the rate stipulated for the preceding year***.[60]

33. This reserve clause granted the St. Louis Cardinals control over Curt Flood for as

---

[57] For more empirical detail on this period of inter-league competition in professional baseball, *see* Lawrence Kahn, "The Sports Business as a Labor Market Laboratory," *Journal of Economic Perspectives*, vol. 14, no. 3, Summer 2000, at 75-94 ("Kahn"). *See also*, Anthony C. Krautmann, Peter von Allmen & David Berri, "The Underpayment of Restricted Players in North American Sports Leagues," *International Journal of Sport Finance* (August 2009); Andrew Zimbalist, "Salaries and Performance: Beyond the Scully Model," in P. Summers (ed.), *Diamonds Are Forever*. Washington, D.C.: Brookings, 1992.

[58] The reserve system was introduced into baseball contracts in 1879. *See* Andrew Zimbalist, *Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime*. New York: Basic Books (1992) at 4-7. Also, *see*, *Flood v. Kuhn*, 407 U.S. 258, 259 n.1 (1972) (citing *Metropolitan Exhibition Co. v. Ewing*, 42 F. 198, 202-04 (S.D.N.Y. 1890)).

[59] Rule 3 of the Major League Rules provided that player contracts were required to be uniform such that the reserve clause in the Curt Flood contract was the same as for all players. *See Flood*, 407 U.S. at 259 n.1 (citing Major League Rules).

[60] Exhibit B, at paragraph 10(a) (image of the 1969 Curt Flood Contract) (emphasis added).

PUBLIC COPY - REDACTED

long as the Club desired.  Just as with the UFC's contracts, Curt Flood's contract also contained a clause stating that "while under contract, and prior to expiration of the Club's right to renew this contract, he *will not play baseball otherwise than for the club*…."[61]

34.    Moreover, the Curt Flood contract only permitted the player to terminate the contract if "the Club shall default in the payments to the Player … or shall fail to perform any other obligation agreed to be performed by the Club hereunder and if the Club shall fail to remedy such default within ten (10) days."[62] By contrast, the Club had the right to terminate the contract under a variety of circumstances including if the player "fail[s], in the opinion of Club's management, to exhibit sufficient skill or competitive ability to qualify or continue as a member of the Club's team."[63] The standard UFC contract is similarly asymmetrical, locking in the Fighter for a stated number of bouts or months (and including various tolling and other extension provisions), while allowing Zuffa to cut a fighter after one loss or two consecutive losses.[64]

35.    Following his forced trade to the Philadelphia Phillies in October 1969, Curt Flood asked to be made a free agent. The Commissioner of Baseball declined that request.[65]

---

[61] *Id.* at paragraph 5(a).

[62] *Id.* at paragraph 7(a)

[63] *Id.* at paragraph 7(b).

[64] 

[65] *See Flood*, 407 U.S. at 265.

PUBLIC COPY - REDACTED

Flood then challenged his MLB contract in federal court. The Supreme Court decided his case in 1972. Subsequent to a review of the Court's jurisprudence in prior cases concerning the "business of baseball" and the reserve clause, the Court held that baseball's reserve clause system enjoyed an exemption from the federal antitrust laws, although such exemption is "in a very distinct sense, an exception and an anomaly …. confined to baseball."[66] The Court specifically noted that "[o]ther professional sports operating interstate—football, boxing, basketball and, presumably, hockey and golf—are not so exempt."[67]

36. Despite the Supreme Court's endorsement of baseball's antitrust exemption, baseball players became the first professional athletes to achieve significant free agency, through strategies involving collective bargaining and arbitration rather than through the courts. In 1970, the MLB Players Association won the right to arbitrate player salary disputes in front of a neutral arbitrator instead of the MLB commissioner. In 1974, pitcher Jim "Catfish" Hunter became the first player to take advantage of arbitration to escape the reserve clause and become a free agent. The arbitrator declared Hunter's contract was void based on a technicality that arose from the Oakland Athletics' withholding part of his $100,000 salary connected to a pension contribution. After Hunter won free agency in arbitration, through a competitive bidding process he was able to secure a five-year contract with the New York Yankees for $3.35 million.[68] The 750% increase in his salary from 1974 to 1975 dramatically demonstrated to everyone in the baseball world the impact of free agency on athlete compensation.

---

[66] *Id.* at 282.

[67] *Id.* at 282-83.

[68] Paul Weiler, *Leveling the Playing Field: How the Law Can Make Sports Better for Fans* (2000) at 138.

PUBLIC COPY - REDACTED

37. Hunter's success led other baseball players to devise strategies to escape MLB's reserve clause. Shortly after the Hunter arbitration, Andy Messersmith of the Los Angeles Dodgers and Dave McNally of the Montreal Expos, neither of whom had signed his contract for the year after the reserve clause was first invoked, declared themselves to be free agents. The owners of the MLB Clubs disagreed, arguing that the reserve clause renewed the contracts in perpetuity. The Messersmith and McNally cases were submitted to arbitration before arbitrator Peter Seitz. On December 23, 1975, Seitz issued his ruling that Messersmith and McNally were free to bargain with other teams because MLB could not maintain a player's services indefinitely.[69]

38. Following the Messersmith and McNally arbitration decisions, more than half of MLB players chose to play out their contract options during the 1976 season.[70] Simultaneously, the players and MLB entered into negotiations over a new collective bargaining agreement ("CBA"), after their prior CBA expired at the end of 1975. By mid-summer 1976, the players were successful in reaching an agreement with MLB providing for substantially unrestricted free agency for veterans with six years of service in the major leagues, as well as the right to salary arbitration after two years of service.

39. Although this form of free agency was still restricted in many important ways,

[69] *See* Associated Press, "Arbitrator's Ruling Puts Baseball in Hot Corner," Chicago Tribune, Dec. 25, 1975, available at http://archives.chicagotribune.com/1975/12/25 /page/82/article/arbitrators-ruling-puts-baseball-in-hot-corner.

[70] Weiler at 140.

PUBLIC COPY - REDACTED

salary increases quickly ensued.[71] In 1976, the year before free agency hit in earnest, the average MLB player salary was $51,501. The following year, salaries jumped to approximately $76,000. Five years later, in 1981, with free agency in full swing, the average salary had risen 3.6 times to $185,651. The salary share in total baseball revenue increased as well: from 17.6 percent in 1974, to 20.5 percent in 1977 and to 41.1 percent in 1982.[72] By 1992, the average salary exceeded a million dollars. Today, it exceeds $4 million. As top salaries grew and raised average salaries, they also pushed the market upward for all players. Baseball players' minimum salary increased from $16,000 in 1975, to $30,000 in 1980, to $60,000 in 1985, $100,000 in 1990 and to $507,500 in 2015. Indeed, between 1990 and 2015 the minimum salary grew by over five times while the average salary grew by 3.56 times.[73]

ii. **National Football League**

40. Like MLB, the NFL imposed severe restrictions on player movement between teams that limited salary growth. Each team used standard player contracts which prohibited players from signing with another club without the consent of the club holding the player's contract. The contracts were enforced by agreement of the clubs to blacklist any player violating them and to "visit severe penalties on recalcitrant member clubs."[74]

41. However, unlike in professional baseball during the middle of the twentieth century, the existence of multiple leagues created competition for player talent. In the 1940s, for

---

[71] This is at least in part due to the fact that the salary levels set by those players who were allowed to become free agents started figuring into the arbitrator's calculations of the benchmark prevailing wage.

[72] Kahn at 81.

[73] This data comes from the Major League Baseball Players Association and is cited at www.latimes.com/sport/mlb/la-sp-mlb-salaries-chart-20160329-story.html.

[74] *See Radovich*, 352 U.S. at 449.

PUBLIC COPY - REDACTED

example, professional football players could contract with the NFL, the Pacific Coast League (which was affiliated with the NFL), the All-America Football Conference ("AAFC"), or the American Football League ("AFL").[75] Prior to the 1970 merger of the NFL and the AFL (then the last remaining competitor to the NFL), the leagues generally competed with each other for player talent, with some important limitations.[76]

42. In the 1950s, during the period of NFL-AAFC inter-league competition, the NFL owners realized that they would be unlikely to be able to enforce their reserve clause to block players from moving to a rival league. Instead, the NFL owners established a "blacklisting" policy meant to prevent players from attempting to leave in the first place by barring any player who left the league from being able to return.[77] The NFL enforced the blacklisting policy against Pete Radovich, who had moved from the Detroit Lions to the Los Angeles Dons in the newly

---

[75] In fact, four different top-level professional football organizations used the name "American Football League." The first AFL operated in 1926 and consisted of nine teams. The second AFL operated during 1936-1937 and consisted of eight teams. The third AFL operated during 1940-1941 and had six teams in 1940 and five teams in 1941. The fourth and final American Football League was founded in 1960 and operated until 1969 when it was merged with the NFL for the 1970 season.

[76] For example, as noted in the 1957 Supreme Court case *Radovich v. National Football League*, 352 U.S. 445, 448 (1957), the Pacific Coast League and the NFL did not compete over players who were already under contract in one or the other league.

[77] Zuffa is alleged to have similarly blacklisted fighters who worked with potential rivals. CAC ¶ 116. For example, in November, 2009 EA Sports announced the launch of an MMA video game featuring Strikeforce as its flagship promotion. Steve Sievert, "Strikeforce to be flagship promotion in upcoming 'EA Sports MMA' videogame," MMAJunkie.com, Nov. 06, 2009, available at https://web.archive.org/web/20091109023530/http://mmajunkie.com/news/16763/strikeforce-to-be-flagship-promotion-in-ea-sports-mma-videogame.mma. [REDACTED] ZUF-00335242. [REDACTED] ZUF-00335242.

PUBLIC COPY - REDACTED

created AAFC in order to be closer to his sick father.[78] Years later, after being blacklisted and prevented from returning to the NFL as a coach, Radovich responded with an antitrust lawsuit that resulted in the Supreme Court holding that baseball's antitrust exemption does not apply to professional football.[79] After the Supreme Court held that Radovich was entitled to prove his antitrust allegations against the NFL, the NFL eventually settled the case.

43. Despite such attempts to restrict inter-league competition, the existence of multiple leagues in football led to substantial increases in compensation for professional football players. Specifically, NFL salaries increased from an average of $10,000 in 1960 to $25,000 in 1967 due to inter-league competition between the NFL and the AFL, reflecting significantly higher compensation than that made by professional baseball players who were subject to the reserve clause and lacked the benefit of competition between leagues. Attempting to avoid this competition, the NFL and AFL merged in 1970, ending inter-league competition. The merger avoided antitrust review through a late-night amendment to an unrelated tax bill that made the merger immune from antitrust challenge.[80]

44. After the merger ended inter-league competition, the NFL's version of the reserve system also prevented intra-league competition through free agency, just as in MLB. Players who signed a contract with a particular club or who were drafted by the club (regardless of whether they signed a contract), were added to the club's "reserve list," which barred other NFL

[78] *See Radovich*, 352 U.S. at 449; Weiler at 150-151.

[79] *Radovich*, 352 U.S. at 452.

[80] Weiler at 151. In exchange for introducing this amendment to the tax bill, Senator Russell Long and representative Hale Boggs got an NFL franchise for Louisiana, the New Orleans Saints. *Id.*

PUBLIC COPY - REDACTED

clubs from negotiating with the player.[81] NFL players who were on a club's "reserve list" could only play for that NFL club. If the player sat out and refused to play, he remained on the "reserve list."[82] Under the standard player contract, the player was bound to his club for a period of at least two years.[83] In addition, the standard NFL player contract contained a provision known as the "Option Rule," which gave the employing club a unilateral option to renew the contract for a further term of one year at a reduced rate of compensation.[84] The purpose of this rule was to coerce players to sign a new contract on the owner's terms under peril of having to serve another year at reduced compensation.[85] The player could only become a free agent after playing out the option year at reduced compensation.[86] The NFL also had a so-called "tampering" rule, which required that during the time a player was under contract with one club, including the option year, all other clubs were prohibited from negotiating with or making offers

---

81 *Kapp v. Nat'l Football League*, 390 F. Supp. 73, 76 (N.D. Cal. 1974).

82 

83 *Mackey v. Nat'l Football League*, 407 F. Supp. 1000, 1005 (D. Minn. 1975), *aff'd in part*, 543 F.2d 606 (1976) (discussing R.C. Owens becoming a free agent after playing out his option year).

84 *Kapp*, 390 F. Supp. at 77.

85 *Id.*

86 *See Mackey*, 407 F. Supp. at 1003.

PUBLIC COPY - REDACTED

to the player.[87]

45. The Rozelle Rule was unilaterally adopted by the NFL clubs in 1963 as an amendment to the NFL's Constitution and By-Laws.[88] The Rozelle Rule essentially provided that a player could become a free agent if he waited until his contract expired and played through the option year, but any other team who wanted to sign that player *also* needed to compensate the player's former club.[89] If the two clubs were unable to conclude mutually satisfactory arrangements, the Commissioner would award compensation in the form of one or more players and/or draft picks.[90] Since the Commissioner's decision on appropriate compensation was open-ended, it was sufficient to deter virtually all player movement between clubs.

46. The Rozelle Rule was challenged in *Mackey v. National Football League* in 1975. In that case the Eighth Circuit observed that, although a player "theoretically gains his freedom and may bargain with any club" after he plays out his option year, "[s]uch freedom appears to be illusory."[91] Among other reasons, the court noted the substantial deterrent effect for becoming a free agent created by forcing a player to endure the hardship of playing through the option year knowing that "he probably will have no choice but to return to the defendant club to which he

[87] *Id.* at 1005-6. This rule is somewhat similar in effect to the UFC's ban on negotiating with rivals while under contract and then during the exclusive negotiation period. These provisions restrict the time an athlete has to negotiate for offers from a new employer, thus increasing the risk to a player that if they try to play out their contract and become a free agent, they could end up with no offer at all.

[88] *Id.*

[89] *Mackey v. NFL*, 543 F.2d 606, 609 n.1 (8th Cir. 1976).

[90] *Id.*

[91] *Mackey*, 407 F. Supp. at 1006.

PUBLIC COPY - REDACTED

has already announced his intention to leave."[92]

47. The *Mackey* court concluded that, under such circumstances, the NFL's rules operated similarly to professional baseball's reserve clause, even though, in three isolated instances, a player had signed with a new team without compensation having been determined in advance.[93] The court concluded that the Rozelle Rule *in conjunction with* the rest of the NFL's reserve system – including the standard exclusive player contract, the option clause, and the tampering rule – was designed to "impose severe hardships on a player prior to his ever becoming a free agent and act to discourage and deter players from playing out the option and achieving that status."[94] Ultimately, the court found that the NFL's reserve system substantially restricted players' freedom of movement, reduced their bargaining power in contract negotiations, and resulted in lower salaries paid by each club than if competitive bidding were allowed to prevail.[95]

48. The NFL offered a number of justifications for the Rozelle Rule, including that it was purportedly necessary to protect the clubs' investment in scouting expenses and player development costs.[96] However, the court rejected this justification, finding that the expenses

[92] *Id.* at 1006-07. Note that similar obstacles exist to UFC fighters successfully becoming free agents, in particular the risk of foregoing any compensation for over a year, as well as the ability of Zuffa to deny them advantageous matchups and card placement if they attempt to fight out their contract. *See supra* Section III.

[93] *Id.* at 1006.

[94] *Id.* at 1005. Note the substantial parallels between the NFL's methods to prevent free agency and those used by the UFC.

[95] *Id.* at 1007.

[96]

PUBLIC COPY - REDACTED

incurred by the clubs in player development are similar to those incurred by other businesses, and that there is no right to compensation for this type of investment.[97]

49.     Although the NFLPA won a judicial battle in *Mackey* against the NFL's reserve system, that victory did not lead to free agency in the NFL.  After a failed strike in the summer of 1974 and incurring huge legal expenses in its attempt to secure full free agency via litigation, union leaders settled the *Mackey* case and entered into a new five-year collective bargaining agreement with the NFL that bartered compensation improvements for players in exchange for a new version of the Rozelle Rule.[98]  During the next ten-year period under which the compromise was in place, only one "free" agent who was subject to draft pick compensation actually shifted to a new team.[99]  As a result of these restrictions on free agency in the NFL, average player salaries increased from $55,000 in 1977 to $90,000 in 1982, while during the same period of time as free agency flourished in baseball average salaries in MLB increased from $52,000 in $241,000, even though during that period the NFL's popularity was rising faster than MLB's under any financial metric.[100]



[97] *Mackey*, 543 F.2d at 621.

[98] Weiler at 154. Under the new version of the rule, compensation was limited to draft picks.

[99] *Id.*

[100] *Id.* at 155. It bears mention that there was a period of less than two years when the NFL faced competition over players during 1974 and 1975 from the startup World Football League (WFL). The WFL was poorly organized and underfunded, yet it did compete over players with the NFL and probably had some impact on the modest NFL salary growth during the 1970s.

PUBLIC COPY - REDACTED

50.     Following another NFL players' strike of seven weeks during 1982, the United States Football League (USFL) was born, with Donald Trump as owner of the New Jersey Generals.  Initially a number of prominent NFL players jumped to the USFL and vigorous salary competition ensued.  While real average NFL salaries increased at an annual rate of 4 percent between 1977 and 1982, and at 5 percent per year between 1985 and 1989, during the three years of competition with the USFL average salaries grew at a 20 percent annual clip.[101]  However, the NFL had locked up broadcasting contracts at the three major national networks, which shut the USFL out of meaningful television revenue. Following a successful antitrust challenge on liability, but a monetary award of only $3 (after trebling), the USFL folded.

51.     It was not until after another major legal battle that free agency came to the NFL in earnest.  In 1989, the NFL owners unilaterally implemented "Plan B free agency."[102]  Plan B free agency stipulated that each team could reserve 37 of the 45 players on its active rosters. That is, only the 8 least productive players on each team gained free agency rights, while the 37 most productive players did not. In *McNeil,* the NFL's reserve system (Plan B free agency) was deemed to be an illegal restraint of trade by a jury trial in 1992, which found that Plan B had a "harmful effect on competition in the relevant market for the services of professional football players[,]" that it was "more restrictive than necessary to achieve the objective of establishing or maintaining competitive balance in the NFL[,]" and that the players had suffered economic injury as a result.  Following the resolution of *McNeil*, several other players brought a class action seeking to prevent the NFL from imposing any restrictions on the movement of players

---

[101] *See* Kahn at 80.

[102] *McNeil v. NFL*, No. 4-90-476, 1992 WL 315292, at *1 (D. Minn. Sept. 10, 1992).

PUBLIC COPY - REDACTED

whose contracts expired on February 1, 1993.[103] In February 1993, the NFL and a class of players entered into a settlement agreement which expanded unrestricted free agency to veteran players with more than five years of experience,[104] with a few remaining exceptions.[105] The settlement also implemented a salary cap based on an agreed upon share of the NFL's "Designated Gross Revenues" ("DGR"), ranging from 62%-67%.[106]

52. As a result of the arrival of unrestricted free agency for veteran players, average salaries increased from approximately $490,000 in 1992 to $650,000 in 1993, high enough to trigger the salary cap.[107] By 1999, with the salary cap still in place, average player salaries had reached approximately $1.1 million.[108] Further, as in baseball, the salary dynamic ensuing from free agency increased salaries across the board: average salaries were pulled up by the stars' salaries and minimum salaries followed the upward trend in parallel. Thus, the minimum salary in the NFL rose from $50,000 in 1985 to $325,000 in 2010 and to $435,000 in 2015. That is, the minimum salary increased 8.7 fold over this period or at a healthy compound annual rate of 7.5 percent.[109]

iii. **National Hockey League**

---

[103] *White v. NFL*, 822 F. Supp. 1389, 1395 (D. Minn. 1993).

[104] *Id.* at 1412.

[105] *See id.* at 1412-13; *infra*, section IV. B.

[106] *Id.* at 1413.

[107] Weiler at 110.

[108] *Id.*

[109] Note that minimum salaries in the NFL and NBA vary according to a player's years of service. They are lowest for rookies and highest for the longest standing veterans. I report the rookie minimums here, because are the lowest permissible level for salaries. But a similar trend exists across the salary spectrum.

PUBLIC COPY - REDACTED

53. The history of the reserve clause in the National Hockey League ("NHL") is also relevant to an analysis of the effects of the challenged conduct because reform came in the context of a challenge by a competitor to the NHL, the World Hockey Association ("WHA") and NHL players who wanted to play in the WHA. The NHL attempted to use the reserve clause to prevent the players from playing in the WHA. In turn, the players and WHA challenged the NHL's use of the reserve clause as an anticompetitive scheme designed to willfully maintain its monopoly over major league professional hockey.

54. Prior to the formation of the WHA in 1971, the NHL was the only major league professional hockey association in North America.[110] There were, however, three other professional hockey leagues at that time, the American Hockey League ("AHL"), the Western Hockey League ("WHL"), and the Central Hockey League ("CHL"),[111] which were considered inferior to the NHL.[112] At the time, the best players played in the NHL notwithstanding the existence of these other leagues.[113] The NHL invested in these minor leagues, however, due to the important role those leagues played in developing talent for the NHL.

55. NHL players were required to sign a uniform Standard Player's Contract. The Standard Player's Contract included a reserve clause from at least 1952.[114] The contract used during the 1971-72 playing season contained the following provision:

---

[110] *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc*., 351 F. Supp. 462, 474 (E.D. Pa. 1972).

[111] The CHL teams were owned by the NHL. *Id.*

[112] *Id.*

[113] *Id.* There were two other leagues, the International Hockey League and the Eastern Hockey League, but they were viewed as "amateur" or "semi-professional" leagues at best. *Id.*

[114] *Philadelphia World Hockey Club*, 351 F. Supp. at 475.

PUBLIC COPY - REDACTED

> The Club agrees that it will on or before September 1st … next following the season covered by this contract tender to the Players personally or by mail … a contract upon the same terms as this contract save as to salary.
>
> The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement.[115]

56. In addition to the reserve clauses featured in all NHL player contracts as of 1972, the NHL By-Laws established various "lists" which related to the right of NHL teams to control the services of professional players.[116] These "lists" included a "Voluntary Retired List," a "Protected List" and an "Inactive List."[117] Similar to the NFL, the By-Laws of the NHL also forbid "tampering" with any player controlled by another club, where tampering was defined to include negotiating with, offering employment, or discussing employment.[118]

57. When the WHA began attempting to sign NHL players to play in the WHA, the NHL invoked the reserve clause in an effort to block players from leaving the NHL for the WHA. Over 20 major and minor lawsuits between the WHA and NHL ensued.[119] The conduct that the WHA complained of, similar to the challenged conduct here, was the NHL's contracts

---

[115] *Id.* at 474 (citing NHL By-Laws § 2.2(a); Exhibit D-1, Campbell Affidavit, Ex. D-4). Any player's Standard Player's Contract entered subsequent to March 29, 1972 (after the entry of the WHA to the market for professional player services), would contain a similar clause that added reference to an arbitration agreement for determining player salaries when the parties could not agree. *Id.* at 475.

[116] *Id.* at 476.

[117] *Id.*

[118] *Id.* at 477.

[119] Steven A. Riess, *Sports in America from Colonial Times to the Twenty-First Century* (2011) at 962. *See also Philadelphia World Hockey Club*, 351 F. Supp. at 488 (describing "at least 11 legal actions" to enforce the NHL reserve clause as of November 1972).

PUBLIC COPY - REDACTED

and its enforcement strategies. These strategies allowed the NHL to control the supply of players who were capable and available for play in any potential new league where the level of internal competition might have fairly approached the level then existing in the NHL.[120]

58. Among those lawsuits was the case *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc*. The case was a consolidated action concerning the WHA and NHL and also involved various hockey teams and John McKenzie, an NHL player seeking to play in the WHA.[121] The WHA sought a preliminary injunction against the enforcement of the NHL's reserve clause to prevent NHL players from signing with WHA teams. A federal court granted the injunction in 1972. A primary basis for the granting of the injunction in favor of the WHA was the finding that the "total effect of the NHL's conduct will be to destroy the economic viability of the new league [the WHA] and to return to the NHL their monopoly over major league hockey."[122] In doing so, the court also recognized that "[i]f the WHA should be driven out of business, the public and players would lose the benefit of competition which has already raised players' salaries and made hockey available to new audiences."[123]

59. The NHL owners responded to the injunction by unilaterally modifying the reserve clause rules in November 1973 to adopt a version of the one-year option similar to the Rozelle Rule used by the NFL. As in the NFL, if a player played out the option year, he would be able to move to another team. However, if he switched to another NHL team rather than leaving for the WHA, the new team would have to compensate the old team with a combination

---

[120] *Philadelphia World Hockey Club*, 351 F. Supp. at 509.

[121] *Id.* at 462.

[122] *Id.* at 496.

[123] *Id.*

PUBLIC COPY - REDACTED

of current player contracts, draft choices, and/or cash.[124] If the teams could not agree on the compensation themselves, it would be chosen from their "last best offer" submitted to an NHL arbitrator.[125] In February 1974, the district court approved a settlement in the ongoing lawsuit between the WHA and NHL[126] that included monetary damages, inter-league play and the NHL modifying its standard contract to free players to move to a rival league. The two leagues eventually agreed to recognize each other's contracts and, beginning in 1974, 67 exhibitions games were played between teams in the two leagues.[127] The NHLPA agreed to the new reserve system because the continued existence of inter-league competition from the WHA was sufficient to keep salaries rising, with the caveat that the agreement was terminable if the NHL ever merged with the WHA.

60. As noted by the *Philadelphia World Hockey* court, player salaries increased dramatically after the WHA entered the market.[128] The average former NHL player who joined the WHA saw salaries increase from $31,000 in 1971-72 to $53,000 in 1972-73.[129] For many players, the increase was even more pronounced. Derek Sanderson's salary went from $50,000 per season in the NHL to $300,000 in the WHA.[130] Gerry Cheevers's salary rose from $47,500 in the NHL to $200,000 in the WHA.[131] In other cases, players received significant counter offers

---

[124] *McCourt v. Cal. Sports, Inc.*, 460 F. Supp. 904, 906 (E.D. Mich. 1978).

[125] *Id.*

[126] *Id.* at 910.

[127] *Id.*

[128] *Philadelphia World Hockey*, 351 F. Supp. at 488.

[129] *See* Riess, *supra,* at 962.

[130] *Id.*

[131] *Id.*

PUBLIC COPY - REDACTED

to stay in the NHL. John McKenzie made $48,000 in 1971-72 and, to keep him from leaving for the WHA the following season, McKenzie's NHL team offered him $100,000.[132]  With NHL players leaving or threatening to leave for the WHA, the average NHL salary rose from $24,000 in 1971-72 to $40,000 in 1972-73.[133]

61.     By 1979, however, the WHA and NHL agreed to the functional equivalent of a merger after several years of discussions between the two leagues concerning cost controls and the manner of reestablishing a monopoly in the industry.[134]  Although the merger triggered the NHLPA's right to renegotiate its agreement, the players ultimately agreed to a heavily restricted version of free agency that severely limited intra-league competition for talent.  While average NHL salaries had reached approximately $96,000 in the 1977-78 season, significantly higher than the $76,000 achieved in baseball after a full year of free agency, in the years after the merger, players' salaries leveled off.[135]  By the early 1990s, hockey nominal salaries averaged just slightly over $200,000, while free agency had driven baseball's average salaries over $1 million.[136]  Moreover, in real 1977 dollars, the $200,000 salary in 1991 was worth only $90,000.  So, after adjusting for intervening inflation, the average NHL salary actual fell during this period of reduced competition after the merger.

62.     In 1992, through collective bargaining, the NHLPA negotiated a moderate form of unrestricted free agency for players 31 or older and/or those with 10 years of service who

---

[132] *Id.*

[133] *Id.* Further, minor league players saw their wages rise with the entry of the WHA into the player services market. Players who joined the WHL doubled their wages. *Id.*

[134] *Id.*

[135] Weiler at 156.

[136] *Id.*

PUBLIC COPY - REDACTED

were earning less than the league average.[137] In combination with salary arbitration, even this restricted form of free agency drove average NHL salaries to $900,000 in 1995-96, and to $1.5 million in 2005-06.[138] As with MLB and the NFL, the advent of free agency in the NHL brought increases not only to top and average salaries, but also commensurate growth in the minimum salary. The NHL's minimum salary grew from $125,000 during the 1995-96 season to $450,000 during 2005-06. Thus, reduced restrictions on free agency led to higher compensation for athletes across the board.

iv. **National Basketball Association**

63. From 1949 to 1959, the National Basketball Association ("NBA") was the only professional basketball league in the United States.[139] Like the other three major sports leagues, the NBA used a reserve clause up until the mid-1970s.[140] Until 1967, the reserve clause essentially restricted all competition for NBA player talent. However, in 1967, a competing league was created, the American Basketball Association ("ABA"). By the early 1970s, bidding wars between the NBA and the ABA had caused average salaries to increase from approximately $20,000 in 1967 to approximately $90,000 in 1972.[141] In 1972, NBA

---

[137] *Id.*

[138] *Id.*; "Average Salary for EPL, NBA, MLB, NFL, NHL, MLS, WNBA, AFL etc…" BigSoccer.com, Apr. 14, 2006, available at http://www.bigsoccer.com/threads/average-salary-for-epl-nba-mlb-nfl-nhl-mls-wnba-afl-etc.339337/; Kevin Yam, "Salary of a Hockey Player," The Physics Factbook, 2005, available at https://hypertextbook.com/facts/2005/KevinYam.shtml.

[139] *See* Thane Rosenbaum, "Antitrust Implications of Professional Sports Leagues Revisited: Emerging Trends in the Modern Era," 41 U. Miami L. Rev. 729, n.180 (1987).

[140] *See* Richard E. Bartok, "NFL Free Agency Restrictions Under Antitrust Attack," 41 Duke L.J. 503, 515 n.66 (1991) (citing James B. Dworkin, *Owners versus Players: Baseball and Collective Bargaining*. Boston, Mass: Auburn House (1981) at 233.

[141] Weiler at 152.

PUBLIC COPY - REDACTED

players were the highest compensated in any of the team sports and the salary share in revenue had grown from 30 percent in 1967 to 66 percent in 1972.[142]

64. From the outset, the owners of the teams in the ABA sought to merge with the NBA. When word of merger discussions leaked out to the players, they responded in 1970 with an antitrust class action against both leagues in the name of National Basketball Players' Association president, Oscar Robertson.[143] In *Robertson v. National Basketball Association*, 389 F. Supp. 867 (S.D.N.Y. 1975), the players alleged that the NBA monopolized major league professional basketball by: (1) controlling the terms upon which major league basketball was played in the United States; (2) allocating and dividing the market for professional player talent; and (3) enforcing its monopoly through boycotts, blacklists and concerted refusals to deal.[144]

65. At that time, the Uniform Contract that all players were required to sign included exclusionary provisions such as:

a. A provision requiring that the player shall play basketball for his club or its assignees exclusively until "sold" or "traded;"

b. A provision that the club has the absolute right to sell, exchange, assign or transfer the Uniform Contract on the same terms to another club;

c. A provision stating that if the player refuses to play, the club may either terminate the Uniform Contract or seek an injunction to prevent the player from playing basketball for anyone else; and

d. A reserve clause which provides that if the player refuses to sign the Uniform Contract for the next playing season, the club can

[142] Kahn, op cit., at 79.

[143] *Robertson v. National Basketball Assn.*, 389 F. Supp. 867, 873 (S.D.N.Y. 1975).

[144] *Robertson*, 389 F. Supp. at 873-74.

PUBLIC COPY - REDACTED

unilaterally renew and extend the contract on the same terms and conditions including salary.[145]

66. The plaintiff players alleged that the NBA used those provisions not only to prevent player movement and negotiation between teams in the NBA, but also to prevent players from leaving for the ABA.[146] The *Robertson* court reviewed the decisions in the recent hockey cases (including *Philadelphia World Hockey* decision) and expressed substantial skepticism as to whether the reserve rule, the proposed merger between the NBA and the ABA, and other allegedly exclusionary conduct of the NBA could survive scrutiny under the antitrust laws.[147] In the face of this judicial opposition, and finding themselves unlikely to get a special exemption from Congress to immunize their league merger, the NBA owners entered into a ten-year settlement with the players. The settlement introduced free agency in two stages, in exchange for allowing the NBA and ABA merger to go forward in 1976 and reestablishing the NBA's monopoly over the sport.

67. From 1976 to 1980, the perpetual reserve rule was replaced with a compensation scheme similar to the NFL's Rozelle Rule.[148] Under this scheme, the NBA commissioner determined compensation to be paid to the club that lost the free agent, which could consist of cash, draft picks, or players already in the NBA if the teams were unable to settle the matter among themselves.[149] From 1981 to 1986, the NBA was to abolish its

---

[145] *Id.* at 874. If the player is "traded" or "sold" under the Uniform Contract, the reserve clause can be invoked by the new team. *Id.*

[146] *Id.*

[147] *See id.* at 893-896.

[148] Bartok at 503, n.66.

[149] *Id.*

PUBLIC COPY - REDACTED

compensation scheme for free agency and replace it with a right of first refusal.[150]

68.   During this period where free agency was introduced to basketball, average salaries rose from $143,000 in the 1977-78 season to $246,000 in the 1982-83 season, while average hockey salaries (which continued to have highly limited competition for athletes) did not even keep pace with inflation during that same period.[151]

69.   In 1983, the NBA and the players' union reaffirmed the right of first refusal and added a mandatory salary floor and cap.[152]

70.   In 1988, the new collective bargaining agreement maintained this free agency structure, except that it eliminated the right of first refusal for "veteran" players who play out their second contract.[153] With some modifications, the basic structure of NBA free agency has largely survived in similar form since that 1983 deal.

71.   The salary increases that resulted from free agency in the NBA were also spread broadly across all NBA players, including the lowest compensated. With the introduction of the salary cap for the 1984-85 season and the concomitant lifting of player compensation for the signing of free agents, the average salary in the NBA began to skyrocket, reaching $3 million during the 1998-99 season and eventually $6.25 million during the 2016-17 season.  Mimicking the pattern in the other leagues, the NBA minimum salary increased from $37,500 in 1979-80, to $65,000 in 1984-85, $150,000 in 1994-95,

---

[150] *Id.*

[151] Weiler at 156-57 (noting hockey salaries increased from $96,000 to $112,000 during the same period).

[152] *Id.*

[153] *Id.* Veterans were initially defined to include players who had five years of NBA service. Starting in 1993 the threshold was reduced to four years of service.

PUBLIC COPY - REDACTED

$385,000 in 2004-05, and $543,400 in 2016-17.

## B. Collective Bargaining and Modern Restricted Free Agency

72. As the above history illustrates, in addition to judicial intervention, collective bargaining played an important role in the eventual elimination of the reserve system—a system with competitive restraints on "free agency" akin to what Zuffa has perpetuated with the UFC through the challenged conduct—in each of the team sports. However, in the process of negotiating these reforms through collective bargaining, the players and team owners have agreed to implement or maintain a variety of restrictions on free agency preventing the existence of a fully competitive labor market. One such restriction is the right of first refusal, which limits the ability of a player to move to another team by giving their first team a right to match competing offers during a specified period of time.[154]

73. In the NBA, for instance, when the players won the right to free agency as part of the settlement in *Robertson v. NBA* in 1976, the owners were successful in implementing both compensation for players lost to free agency and the right of first refusal.[155] While compensation for players lost to free agency ended in 1981, the right of first refusal persists today for the category of restricted free agents. The right of first refusal deters salary growth because the owners realize that the chances of bidding for a restricted

[154] Another example is that NFL teams today can designate a "franchise player," enabling them to keep one key player as long as they pay that player at the average (or above) of the top five players at his position in the league. There are also transition players for which the team owner has a right of first refusal. Of course, each of these restrictions was collectively bargained with the NFLPA and, hence, is protected under the non-statutory labor exemption from the antitrust laws.

[155] Bartok at 515.

PUBLIC COPY - REDACTED

free agent leading to actually signing that free agent are low.[156] However, one of the principal impacts of bidding is to raise player salary. If owner A bids for owner B's player, then owner B is likely to return the favor and bid for a player from owner A's team. The net effect of this bidding is not to reallocate talent across the teams, but to raise the players' salaries. Consequently, owners tend to shy away from bidding for restricted free agents.

74. Another important restriction on the players' market imposed by the sports leagues in some form is a team salary cap. In each of the leagues except MLB, collective bargaining has resulted in an agreement to superimpose a salary cap on top of free agency, calculated as a percentage of defined league revenues. These salary caps were negotiated by the players' unions in the context of robust intra-league competition among teams, and provide players with close to 50 percent of league-wide revenue including very strong health and retirement benefits.

75. While it is not clear that these restrictions would survive antitrust review if they were imposed unilaterally by the team owners, players in the major U.S. team sports bargain away the right to unrestricted free agency in exchange for preserving the basic process that allows teams to compete against each other for player services or for other benefits, such as increased pensions or better health care.[157] The leagues have attempted to justify such limits on free and open competition on the grounds that they are necessary in order for a *league* of competing teams to function. The nature of a league is that the teams

---

[156] Note however, that player's compensation in the NBA is still much higher than that in the UFC, as described in Section V. C *infra*.

[157] Because of the non-statutory labor exemption to the antitrust laws, many of these restrictions are immune from antitrust review since they were bargained for collectively.

PUBLIC COPY - REDACTED

create a *joint* product as a result of teams competing against each other on the field. If the teams cannot maintain competitive balance, the appeal of the joint product may suffer.

76. Team owners' justifications for the reserve clause based on maintaining competitive balance are unsubstantiated. However, even if the evidence supported such a competitive balance justification for more limited restrictions on free agency in the league sports, such a justification could not apply to MMA, because there is no equivalent joint product. On the contrary, because Zuffa refused even to co-promote events with other MMA promotions, there cannot be a competitive balance justification for imposing restrictions on free agency.[158]

77. [redacted].[159] [redacted]

[158] Deposition of Dana White, Aug. 9, 2017 (hereinafter "White Dep.") at 154:5-8 [redacted]"). For instance, the UFC has refused to co-promote fights with Bellator. According to Joe Silva, "it's a risk for both sides." Silva Dep. at 215:11-216:18.

[159] [redacted]

PUBLIC COPY - REDACTED



78. In addition, Zuffa's right to match is just one of several lines of defense that prevent fighters from moving to other promoters. As I outline elsewhere, *see* Section III. (above), Zuffa made it a practice to prevent fighters from even getting to the right-to-match period by incentivizing and pressuring fighters to sign new contracts before their last fights

[160] *See, e.g.*, ZFL-0506593.

[161] *Id.*

[162] Collective Bargaining Agreement between the National Basketball Association and the National Basketball Players Association, Jan. 19, 2017, available at http://3c90sm37lsaecdwtr32v9qof.wpengine.netdna-cdn.com/wp-content/uploads/2016/02/2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf.

PUBLIC COPY - REDACTED

and by using a variety of tolling provisions and other conduct (*e.g.*, exclusive sponsorships causing fighters to lose sponsors if they move to another promotion). These provisions and practices, combined with the Champion's Clause, gave fighters – and especially title challengers – overriding incentives to re-sign long-term before the championship bout because if they won, their contract would be automatically renewed anyway.

**C. The Effects of Intra-League Competition on Popularity and Profitability**

79. Prior to free agency, owners in each of the major team sports argued in the courts, before Congress, and to the media, that the introduction of free agency would sound the death knell to their sport. They claimed that competitive balance among the teams would be destroyed as rich clubs would be able to accumulate all the best players and that profits were either non-existent or exiguous, so the players were not being exploited under the reserve clause system. If salaries went any higher, they claimed, the teams and leagues would go bankrupt. At a press conference in 1967, Paul Richards, the general manager of the Atlanta Braves, referring to the advent of collective bargaining (and the resulting threat to the reserve system) in baseball declared: "This will be end of baseball, as we knew it."[163] The owners said similar things so many times over the airwaves that it practically became conventional wisdom. In 1970, an editorial on a New York City radio station typified this viewpoint: "Professional sports is facing a challenge that threatens its existence.… Under the existing system, a baseball player must perform for the club that owns him if he plays at all … professional sports cannot work without it [the reserve system] or something like it.…

[163] Quoted in Charles Korr, *The End of Baseball as We Knew It*. Urban, Ill: University of Illinois Press, (2002) at 1.

PUBLIC COPY - REDACTED

Any player not in favor of the ground rules has no business entering the game."[164] And during Curt Flood's challenge to baseball's reserve clause, Joe Cronin and Chub Feeney, the presidents of the American and National Leagues respectively, asserted that baseball without the reserve clause was an impossibility: "No intelligent person would continue to invest the large capital required … mutually advantageous trades would become impossible if the players' consents were required …[and] the wealthier clubs could sign an unbeatable team of all-stars, totally destroying league competition."[165]

80. Post-1976 experience in each of the leagues has shown the owners' apocalyptic views to be wrong. As salaries rose, and rose rapidly, owners began to treat their clubs as true businesses, engaging in advertising, marketing, planning, improved community relations, facility upgrades, strategic pricing policies, rationalized scouting and player evaluation, and so on. Rising salaries also motivated players to devote more time to rigorous fitness and training, as well as to exert themselves more fully in competition. The more dynamic players' market, with players switching teams more readily, created a larger terrain for strategic decision-making for teams' front offices and engendered greater intrigue for the general public. The game became more interesting to the fans. The result was rapidly growing revenue, more profitability, escalating franchise values, and, in most cases, more competitive balance.

---

[164] *Id*. at 4-5.

[165] *Id.* at 90. Two team owners, Francis Dale of the Cincinnati Reds and John McHale of the former Montreal Expos, testified at the Flood trial that they would not have invested in Major League Baseball had it not been for the reserve clause and antitrust exemption. *See*, for one, "Owners Say Reserve Clause Reason They Invested in Baseball," *Chicago Tribune*, June 4, 1970 available at http://archives.chicagotribune.com/1970/06/04/page/98/article/owners-say-reserve-clause-reason-they-invested-in-baseball.

PUBLIC COPY - REDACTED

81. Consider first the evidence on competitive balance. Although there are many possible metrics to track competitive balance, the one most commonly used is the so-called Noll-Scully index. This index is given by the standard deviation of team win percentages within a league during a particular year divided by the idealized standard deviation of win percentages if the league were perfectly balanced, *i.e.*, each team had the identical level of player talent. Because leagues that play more games (*e.g.*, baseball with 162 regular season games versus football with 16) will be less subject to random fluctuation in win percentages and, hence, have a lower standard deviation, other things equal, it is necessary to adjust for the effect of randomness in outcomes when comparing competitive balance across leagues or within a league over time, as the league grows in size. **Error! Reference source not found.Error! Reference source not found.** below depicts the evolution of the Noll-Scully index in various leagues over time. The lower the index, the more balance there is across the teams.

PUBLIC COPY - REDACTED

**Table 1: Evolution of Competitive Balance**

| Decade | MLB | NBA | NFL | NHL |
|---|---|---|---|---|
| 1960-1969 | 2.10 | 2.90 | 1.68 | 2.00 |
| 1970-1979 | 1.90 | 2.39 | 1.62 | 2.64 |
| 1980-1989 | 1.72 | 2.72 | 1.52 | 2.02 |
| 1990-1999 | 1.74 | 3.08 | 1.51 | 1.83 |
| 2000-2015 | 1.82 | 2.75 | 1.56 | 1.68 |

82. Free agency came to MLB in the late 1970s, to the NBA substantially in the early-1980s, to the NFL and the NHL in the early 1990s. MLB's index dropped steadily from the 1960s to the 1970s to the 1980s, as free agency was introduced. Other factors have since intervened to stabilize the index. The NBA index has gone back and forth with no apparent effect of free agency on competitive balance. Keep in mind that the NBA was the first league to introduce a salary cap (in 1983-84) and that two or three dominant players can have an enormous impact on a basketball game's outcome. In any event, there is no clear evidence that free agency and competitive labor markets have hurt the NBA's competitive balance. The index for the NFL has remained low and stable throughout the period and, again, there is no evidence that more open labor markets have hurt balance in the league. The NHL's free agency was introduced in steps, with most advances coming in the 1990s, a decade when competitive balance increased, as it continued to do in the 21st century. Any team owner predictions of competitive balance perdition from free agency have not come to pass.

PUBLIC COPY - REDACTED

83. Similarly, the advent of more open labor markets has not had a deleterious effect on team or league revenues or profits. On the contrary, revenue, profits and franchise values have all skyrocketed since the advent of free agency in each sport. Free agency did bring higher player costs, but it also brought increased urgency to identify and implement the most efficient and successful management practices. Equally important, increased player mobility sparked more intrigue and interest from the public, as offseason hot stove leagues generated speculation and intense discussion among fans. Seasonal sports leagues increasingly began to garner media attention the year round. Viewed statically, higher costs would lead to diminished profitability or loss. Viewed dynamically, revenue growth outpaced cost increases and industry performance metrics in each of the team sports improved.

84. Of course, over time many things changed in the sports industry, and all of the growth cannot be attributed to the competitive pressures brought about by more open labor markets. Yet, the performance improvements in each of the sports were noticeable soon after the introduction of free agency. Consider the early changes in baseball. Total baseball attendance stagnated from 1970 at 28.8 million to 29.8 million in 1975, the year before the arbitrator's decision in Messersmith and McNally, but then jumped to 38.7 million in 1977, the year free agency took hold, and continued to grow handsomely, reaching 55.2 million in 1989.[166] Meanwhile, team revenues went through the roof, rising from $5.7 million in 1970, to $9.0 million in 1977, $20.1 million in 1983 and $47.7 million

[166] Official Baseball Guide, various years.

PUBLIC COPY - REDACTED

in 1989.[167] Reported operating profits grew from $3.6 million in 1976, to $6.1 million in 1977, $10.4 million in 1978 and to $214.5 million in 1989.[168] All this, after dozens of proclamations over the decades that free agency would kill the sport.

**D. The Conditions and Effects of Inter-League Competition**

85. As demonstrated above, whenever there have been two elite leagues in each of the established sports, the resulting inter-league competition has led to increases in athlete compensation despite the existence of an intra-league reserve system. Moreover, competition between leagues has been good for fans as well as for players. Indeed, charting the history of the major sports indicates that competition between leagues has led to expanded output. For example, the risk created by the potential creation of the Continental Baseball League in the 1950s led to the first expansion of the number of baseball franchises in MLB in the twentieth century.[169] Similarly, the threat created by the AFL in the 1960s led the NFL to expand into Dallas and Minneapolis-St. Paul. Over the years, more than half of the NFL's 32 franchises were added as a result of competition from rival football leagues and subsequent mergers that ended that competition.[170]

86. For a rival league to succeed, among other things, it must be able to pay enough to attract star talent. In order to afford that compensation, it must be able to attract networks, advertisers, merchandizers and fans. But this creates a catch-22, because a rival league cannot attract networks, advertisers, merchandizers and fans if it does not have any

---

[167] Zimbalist, *Baseball and Billions* at 58.

[168] *Id*. at 64-65.

[169] Weiler at 325.

[170] *Id.* at 326.

PUBLIC COPY - REDACTED

star players.[171]

87. In contrast, the brief experiences of the major league team sports with inter-league competition indicates that it had a positive effect on both the players and the fans, leading to higher compensation, new franchises, and expanded output.

88. In order to compare the effects of Zuffa's conduct to the demonstrated effects of the reserve system in the team sports, it is essential to consider the structural difference between the competition that exists within a league and the competitive landscape faced by Zuffa, which has no intra-league competition for fighters. The above history indicates that in the absence of vigorous inter-league competition for athletes, the opportunity for robust *intra-league* competition always existed, limited only by contractual restraints such as the reserve system. That is, whenever a player was allowed to become a true free agent in one of the professional sports leagues, there was a robust market available to bid on that player's services and reveal the player's true incremental value to the team that needed that player the most. In contrast, in order for Zuffa's challenged conduct to suppress fighter compensation, it needed only to prevent potential rival MMA promoters from gaining a "foothold," leaving little incentive for fighters to endure the hardship of reaching free agency in the first place.[172]

### E. History of Restrictive Contracts in Boxing

---

[171] In MMA, over the course of the last two decades, several potential rivals began to put pressure on the UFC. The UFC responded either by buying them out or by ratcheting up the restrictive terms in their fighter contracts and/or intensifying the enforcement of these contracts, so as to prevent these potential rivals from gaining access to top Professional MMA fighters.

[172] *See supra* Section III.

PUBLIC COPY - REDACTED

89. Boxing as a sport is athletically more similar to MMA than the sports previously discussed, and the business of boxing also operates more similarly. Boxing events are organized by promoters who set up professional boxing contests pitting two individuals against each other in hand-to-hand combat, governed by a set of rules established by state athletic commissions. As with Professional MMA Fighters, typical boxers' careers are relatively short, and they face enormous risks each time they enter the ring.[173] [REDACTED].[174] Promoters are also responsible for arranging the details required to put on the event, dealing with the venues, sponsors, and television networks. Boxers are often represented by managers who act as an agent or representative of the boxer, and who negotiate with promoters on behalf of the boxer.[175] [REDACTED].[176] As with MMA, [REDACTED].[177] In boxing there are seventeen different weight classes.[178] However, as discussed further below, unlike in boxing, titles in MMA are promotion specific.

---

[173] *Golden Boy Promotions LLC v. Haymon*, No. 15-cv-3378-JFW (MRWx), 2017 U.S. Dist. LEXIS 29782, at *6 (C.D. Cal. Jan. 26, 2017).

[174] Deposition of Leon Margules, July 11, 2017 (hereinafter "Margules Dep.") at 105:16-21.

[175] 15 U.S.C.S. § 6301.

[176] Margules Dep. at 82:21-24.

[177] *Id.* at 83:7-11.

[178] For example, Section 3 of the WBO regulations lays out the seventeen different weight categories. "Regulations of World Championship Contests," World Boxing Organization, Aug. 28, 2013, available at http://www.wboboxing.com/regulations/.

PUBLIC COPY - REDACTED

90. .[179] .[180] .[181] Also as with MMA, Leon Margules, the President of Warriors Boxing, a boxing promoter, testified that " ."[182]

91. Despite these athletic and business similarities, the current market structure of boxing is quite dissimilar from MMA. Unlike MMA, boxing today has multiple prominent promoters who compete with each other to sign the best boxers, including title-holding championship boxers and contenders for titles, and who can promote PPV matches that attract large audiences. .[183]

[179] Margules Dep. at 90:3-9.

[180] *Id.* at 91:8-22.

[181] *Id.* at 105:4-15 ( ").

[182] *Id.* at 19:3-7. Margules also testified that *Id.* at 19:11-17.

[183] *Id.* at 23:9-23.

PUBLIC COPY - REDACTED



[redacted].[184] [redacted].[185] [redacted].[186] As one court observed "[u]nlike other sports, such as football, baseball, and golf, boxing has not naturally evolved towards having a single entity controlling most or all of the professionally televised events in the sport."[187]

92. [redacted].[188] [redacted].[189] Each sanctioning body has its own titles for each weight class, ranks the top boxers in each weight class,[190] and establishes rules governing the awarding, maintaining, and contesting of championship titles. For example, the sanctioning bodies

---

[184] *Id.* at 16:11-18; 21:20-22:19.

[185] *Id.* at 102:16-104:10. This is the case even though [redacted]" *Id.* at 114:13-21.

[186] *Id.* at 100:6-10.

[187] *Golden Boy Promotions*, 2017 U.S. Dist. LEXIS 29782, at *37.

[188] Margules Dep. at 99:6-14 ([redacted].).

[189] *Id.* at 95:11-19.

[190] *See* "Boxing Rankings," Fightnews.com, available at http://www.fightnews.com/rankings-2; Margules Dep. at 95:20-25.

PUBLIC COPY - REDACTED

have established rules requiring the champion to defend their title periodically to avoid being stripped of it.[191]

93. Because of the rules created by sanctioning bodies, promoters who have contracts with different boxers often co-promote fights with each other. For example, [REDACTED] .”[192] Mandatory challengers are supposed to be assured of having a bout against the champion of their division within a specific period of time, regardless of whether the champion and mandatory challenger share the same promotion company.[193] [REDACTED] .[194] Such co-promotion or POS agreements increase competition for championship-caliber boxer talent,[195] and mean that a successful boxer who is able to become a mandatory

---

[191] Section 5 of the WBO Regulations of World Championship Contests (hereinafter "WBO Regulations") requires that "Each WBO World Champion except in the Heavyweight Division shall defend his title at intervals not greater than nine (9) months counting from the date of the acquisition thereof or from the last compulsory defense, as the case may be, in a twelve (12) round fight, against the Mandatory Challenger, as determined by the Championship Committee according to these Regulations, unless an exception is made pursuant to these Regulations." http://www.wboboxing.com/regulations/.

[192] Margules Dep. at 84:22-85:16.

[193] Muhammad Ali Boxing Reform Act, Report of the Committee on Commerce, Science, and Transportation, U.S. Senate, 106th Cong. 1st Sess. (Jun. 21, 1999) (hereinafter "Senate Report") at 9; WBO Regulations § 6.

[194] Margules Dep. at 85:17-86:13.

[195] As Margules explained [REDACTED] . *Id.* [REDACTED]

PUBLIC COPY - REDACTED

challenger can be guaranteed a chance to fight for the title without having to sign with the promoter of the current champion. In contrast, in the UFC if a fighter wants a shot at fighting the current champion of a weight class, or even a shot at fighting any top-ranked fighter at all, that fighter needs to sign an exclusive deal with UFC, and then it would be up to the UFC to decide unilaterally whether, and when, to give that fighter that opportunity.[196]

94. For championship belt fights co-promoted under a given sanctioning body, promoters and managers usually negotiate how much each side will receive from the fight. However, when the two sides cannot agree, the sanctioning organization often mandates a "purse bid" which allows any registered promoter to submit a bid for how much they are willing to pay the boxers.[197] [REDACTED][198]

95. A recent purse bid for a fight between heavyweight champion Wladimir Klitschko and secondary titlist Alexander Povetkin indicates how the competition generated by this bidding process can dramatically increase boxer compensation. After representatives for each boxer reached an impasse in negotiations over a fight scheduled to take place in August 2013, the WBA ordered a purse bid. Klitschko's promoter, K2 Promotions, bid $7.13 million, and Povetkin's promoter, Sauerland Event, bid $6,014,444. However, the contest was won by a third Russian promoter, Vladimir Hryunov who bid $23,333,330,

---

[196] [REDACTED]

[197] WBO Regulations § 11; Margules Dep. at 86:14-87:11.

[198] Margules Dep. at 87:20-88:8.

PUBLIC COPY - REDACTED

dramatically increasing the amount of the purse to be split between Klitschko and Povetkin.[199] As a matter of normal market behavior, I would expect such increases in compensation for the most highly compensated boxers to lead to increased compensation for other boxers as well.[200]

96. Because independent sanctioning bodies, rather than promoters, decide who has a right to be a contender for a championship bout, boxing promoters have less leverage than Zuffa has to coerce athletes into signing long-term exclusionary contracts in exchange for a shot at a title fight. This reduced structural leverage, in combination with a less concentrated market for boxing promotion, leads to more competition for boxer talent than exists in MMA, where the UFC also effectively acts as the sanctioning organization by awarding its own belts.

97. However, as with the team sports described above, boxing promoters had a long history of using exclusive, long-term promotional contracts,[201] which practices have over time been eliminated or reduced. Just like the club owners in the team sports used the reserve clause to control athletes, historically, boxing promoters "have utilized contracts with vague or unspecified terms regarding how long the contract will be in effect, thereby

[199] Dan Rafael, "Klitschko camp 'surprised' by $23m purse bid," ESPN UK, Apr. 25, 2013, available at http://en.espn.co.uk/boxing/sport/story/204099.html.

[200] *See* Margules Dep. at 121:2-11 ("[REDACTED]).

[201] Senate Report at 8.

PUBLIC COPY - REDACTED

permitting the promoter to control the boxer for virtually the boxer's entire productive career."[202]

98. For example, in the 1950s the U.S. Department of Justice brought an anti-trust suit, *United States v. Int'l Boxing Club of NY, Inc.,* against two boxing promoters, James Norris and Arthur Wirtz, who had implemented a conspiracy to monopolize top-level prize fighting in 1949. Their scheme enabled them to gain almost complete control over the promotion of championship boxing matches, by among other strategies: (1) acquiring rival promoters; (2) signing the four championship-contender boxers to two-year exclusive contracts, with options to renew for additional two-year terms; and (3) requiring contenders for a title, as a condition of being afforded an opportunity to engage in a championship contest, to enter into "contingent" exclusive contracts pursuant to which the contender, if he won the contest and thereby became champion, was required to engage in title bouts exclusively under the promotion of defendants for a period of from three to five years.[203] In 1949, even when Norris and Wirtz implemented their plan to monopolize championship boxing, their contracts with the four title contenders guaranteed compensation to the fighters of not less than 25% of gate receipts and broadcast licensing revenue.[204]

---

[202] Senate Report at 8.

[203] *United States v. Int'l Boxing Club, Inc.*, 150 F. Supp. 397, 400, 412, 417-418 (S.D.N.Y. 1957). There are parallels between these exclusionary provisions and Zuffa's fighter contracts, in particular, the "champion's clause." The goal of each is to ensure that the most valuable fighters cannot become free agents and fight for rival promoters when they are at their peak level of productivity. These similarities are not surprising given that Zuffa's witness explained that provisions of Zuffa's contracts were based on those that were used in boxing. Kirk Hendrick Rule 30(b)(6) Tr. (hereinafter "Hendrick Tr."), V.I. at 72-73.

[204] *Int'l Boxing Club, Inc.*, 150 F. Supp. at 412.

PUBLIC COPY - REDACTED

99.     After determining in 1955 that boxing was not exempt from the nation's antitrust laws, the courts in 1957 issued a final judgment in favor of the government, compelling a breakup of the Norris and Wirtz company and requiring a five-year moratorium on exclusive fighter contracts for both champion and non-champion boxers.[205] The fact that boxing's popularity continued to increase during that five-year period indicates that such exclusive contracts were not necessary for the industry's success.[206] In 1956, just before the courts enjoined exclusive contracting practices, gross boxing receipts as measured by the Bureau of the Census were $4.4 million.[207]  By 1960, gross receipts had increased to $5.9 million, and by 1963, they had increased to $7.8 million.  In order to demonstrate this increase was not the result of random variation in a given year, I can compare the average gross receipts for the five-year period before and after the moratorium went into effect.  The average annual gross receipts during the five years from 1952-1956 (inclusive) before the moratorium went into effect was $4.6 million per year.  The average annual gross receipts

---

[205] See *United States v. Int'l Boxing Club of N.Y., Inc.*, 171 F. Supp. 841, 842 (S.D.N.Y. 1957) ("4.  The defendants, and each of them, are restrained and enjoined from entering into, directly or indirectly, any contract, agreement, or understanding, which provides, in terms or in effect, that a boxer shall not engage in a professional boxing contest for any person other than the defendants, or any of them.  Provided, however, that nothing in this Section Four (4) shall be construed to prevent the defendants, or any of them, from entering into a contract with a professional boxer providing for the promotion of a single professional boxing contest."); *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242 (1959).

[206] Indeed, the use of such contracts had waned even before the Supreme Court issued its opinion in 1959. *Int'l Boxing Club of N.Y.*, 358 U.S. at 254 ("At the time of the final decree [in 1957] the Joe Louis agreements had elapsed; the exclusive-contract practice had been at least temporarily abandoned….").

[207] Bureau of the Census. "Participation in Selected Recreational Activities: 1896 to 1970", Bicentennial Edition: Historical Statistics of the United States, Colonial Times to 1970, Part 1, U.S. Department of Commerce, available at https://www.census.gov/history/pdf/1914-1948baseballattendance.pdf.

PUBLIC COPY - REDACTED

during the five years from 1957-1961 (inclusive) after the moratorium went into effect was $5.3 million per year, representing a 14% increase. The annual gross receipts as reported by the Bureau of the Census are shown in Figure 1, below.[208]

**Figure 1: Boxing Gross Receipts (Millions)**

Source: https://www.census.gov/history/pdf/1914-1948baseballattendance.pdf.

100. In the decades after the moratorium on exclusive contracts expired, corrupt and exclusionary practices once again came to permeate the boxing industry. One famous example is illustrated by Don King, who dominated boxing promotion for many decades. King signed an exclusive contract with boxer James "Buster" Douglas, which provided that the exclusive term would be automatically extended in the event the boxer was recognized

[208] Part of the 1957 District Court decision was stayed, but the section forbidding exclusive contracts for five years was implemented. It is also noteworthy that the growth in the industry after 1957 occurred despite the ongoing corruption and dubious practices within boxing as well as the frequent Congressional hearings on the troubles in the industry. *See, e.g.*, Edmund Edmonds & William Manz, "Congress and Boxing: A Legislative History 1960-2003," William S. Hein & Co., Inc., Buffalo, New York, (2005).

PUBLIC COPY - REDACTED

as world champion, "to cover the entire period Douglas is world champion and a period of two years following" loss of the title.[209] It also once again became common practice in the boxing industry for a promoter who had successful boxers under contract to require that any challenger who sought to fight one of these boxers to sign a long-term agreement with the promoter similar to the contracts at issue in *International Boxing Club*.[210] Such contracts are often referred to as "conditional option contracts."[211]

101. There have been several attempts by state regulators to curb the some of these abuses. For example, for a period of time covering at least the 1990s, the Nevada State Athletic Commission had implemented a rule forbidding exclusive boxing contracts.[212] However, the ease with which boxing promoters could evade state regulation by relocating boxing matches to states without such regulation led to repeated calls for uniform federal regulation. Despite numerous attempts, such regulation of exclusionary boxing contracts did not succeed on the federal level until the Muhammad Ali Boxing Reform Act (the "Ali Act") was enacted in 2000.

---

[209] Douglas went on to defeat the defending heavyweight champion Mike Tyson in 1990, leading to litigation over his contract. *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 748 (S.D.N.Y. 1990).

[210] Senator John McCain and Ken Nahigian, "Symposium Sports and the Law: A Fighting Chance for Professional Boxing," 15 Stan. L. & Pol'y Rev. 7, 20 (2004).

[211] *Id*.

[212] *Don King Prods., Inc.*, 742 F. Supp. at 748, 759 (referencing Section 467.112(3) of the Nevada State Athletic Commission's Rules and Regulations); Statement of Patrick English, Hearing Before the Committee on Commerce, Science, and Transportation, U.S. Senate, 105th Cong. 2nd Sess. (Mar. 24, 1998) (*Business Practices in the Processional Boxing Industry*) at 23 ("Nevada's regulations would appear to state that multibout contracts are forbidden").

PUBLIC COPY - REDACTED

102. Among other things, the Ali Act is aimed at protecting boxers from "coercive" contract provisions, which are defined to include "a contract provision that grants any rights between a boxer and a promoter … if the boxer is required to grant such rights … as a condition precedent to the boxer's participation in a professional boxing match against another boxer who is under contract to the promoter."[213] Under the Ali Act, such coercive provisions "shall be considered to be in restraint of trade, contrary to public policy, and unenforceable against any boxer" to the extent it is "for a period greater than 12 months."[214]

103. While commentators suggest that the Ali Act has led to limited reforms in actual industry practice due to weak enforcement mechanisms,[215] the presence of multiple top-level promoters and the mandatory challenger and purse bid rules have allowed champion-caliber boxers to participate in the top level of competition in the sport without being coerced into exclusive contracts, and to experience real free agency in the market for their services.[216] The result is that boxers commonly have received 60% or more of the

---

[213] Muhammad Ali Boxing Reform Act, 2000 Enacted H.R. 1832, 106 Enacted H.R. 1832, 114 Stat. 321, § 10(a)(1)(B).

[214] *Id.*

[215] McCain and Nahigian at 22 ("Overall, federal, state, and tribal enforcement of the PBSA and the Ali Act remain woefully inadequate.").

[216] For example, the testimony of Patrick C. English, Counsel for boxing promoter, Main Events explains: "it is the major ratings organizations which have promulgated the most important single rule in boxing. That rule, uniform among the three major organizations, is the rule which requires that a champion engage in mandatory bouts against the leading available contenders at defined periods. It is this rule which can prevent champions (and their promoters) from avoiding worthy contenders in favor of fighting a series of "bums." It is this rule, along with a corollary 'purse bid' rule, which allows worthy contenders the opportunity to fight for the title without signing away future rights. I represented Evander Holyfield in court when he successfully enforced his right, as mandatory contender, to fight James 'Buster' Douglas which resulted in his first reign as undisputed champion. I represented Pernell Whitaker in litigation where he enforced his right to fight for his first title as the leading contender. I represented Lennox Lewis

PUBLIC COPY - REDACTED

revenue generated by their fights in recent years.[217]   At the same time, according to Nielsen, between 2010 and 2015 the amount of televised boxing output has expanded significantly, from 30,379 minutes of programming to 70,470 minutes of programming.[218]

## V.  ESTIMATION OF DAMAGES

104.    One way to assess the damages caused by the challenged conduct is to identify a benchmark for what fighter compensation would have been in a but-for world where the challenged conduct did not exist.   In this section, I evaluate the appropriateness of a variety of other sports as competitive benchmarks and calculate damages to the Bout class in the aggregate by using the selected sports as benchmarks of the level of fighter compensation that would have prevailed in the but-for world.

105.    My basic methodology is as follows.  For each sport that I use as a benchmark, I apply the athlete compensation share of revenue to the reported Zuffa bout revenues to arrive at what Zuffa's fighters would have been paid if they received the same share as the athletes in these other sports where more competitive labor markets prevail.  I then take the mean of these but-for compensation levels from the different sports and compare it to the total event-related fighter compensation paid out to Zuffa's athletes.  The difference is the basis for my estimate of the total amount members of the bout class were underpaid due to the challenged conduct.

---

when he enforced his right to fight for the title as the mandatory contender. All managed, through the mandatory process, not only to gain titles but to avoid entering into contracts resulting in unwanted promotional ties." *Business Practices in the Professional Boxing Industry*, S. Hrg. 105-712, Mar, 24, 1998 (105th Cong.) at 30.

[217] *See infra*, Section V. B.i.

[218] DB-ZUFFA-0007187 at 216.

PUBLIC COPY - REDACTED

106. The reason I compare the player compensation share rather than the actual pay levels is to control for the state of the industry and differences between the popularity and thus demand for each benchmark as compared to MMA. Obviously, if the popularity of a benchmark sport is much higher than MMA, one would expect the athletes to be better compensated for that reason, apart from any differences in the competitiveness in the labor market of the benchmark. However, because demand for a sport is reflected in the revenue generated, one would expect the ratio of athlete compensation to revenue to reflect instead the competitive characteristics of the sport, controlling for any differences in demand or popularity. As such, the proper comparison, which controls for the varying amounts of revenue earned by, *e.g.*, boxing matches as compared to MMA matches, is the share of revenue that is paid to the fighters. Indeed, Zuffa itself regularly used fighter compensation as a percent of event revenue as a financial metric.[219]

**A. Zuffa Benchmarks its Athlete Compensation to Other Sports.**

107. 

.[220]

[219] *See* ZFL-2277058 at 69 .

[220] ZFL-1425511 at 16-17; ZFL-1070290 at 327.

PUBLIC COPY - REDACTED



[221]

[222]

108.

,,[223]

[224]

.[225]

[221] ZFL-1081154 at 54.

[222] ZUF-00113209 at 11.

[223] ZFL-0557588 at 91.

[224]

[225]

PUBLIC COPY - REDACTED



.[226] .[227]

## B. Evaluation of Potential Benchmarks for UFC Fighter Share of Revenue

109. In this section I evaluate a number of competitive benchmarks to determine what characteristics make the player compensation share of revenues in those sports an aggressive or conservative estimate of but-for fighter compensation share in the UFC. I evaluate MLB, the NFL, the NBA, the NHL, Premier European Soccer Leagues, and Boxing as benchmarks.

### i. Boxing

110. The similarity of the MMA industry to the boxing industry suggests that the labor market in boxing would be a reasonable benchmark.[228] As discussed above, unlike MMA, boxing has multiple major promoters who compete with each other to sign the best prize fighters.[229] It also has a separation of promoters from sanctioning bodies, which

---

[226] ZFL-2700585, passim.

[227] WME_Zuffa_00005368.

[228] 

[229] *See supra* section IV. E.

PUBLIC COPY - REDACTED

bodies impose rules such as fights for mandatory challenges and purse bids to create competition for the right to promote championship matches. These circumstances are clearly more competitive than those in MMA, where I understand that Plaintiffs allege that the UFC is the dominant promoter of Professional MMA events, and where the UFC also effectively acts as the sanctioning organization by awarding its own belts. Further, the Ali Act, which applies to boxing but not to MMA, forbids many of the challenged contracting practices used by Zuffa. Other than having a more competitive market, boxing is otherwise structurally similar to MMA.

111. In connection with boxing promoter Golden Boy's lawsuit against Al Haymon, data on Golden Boy's total revenue and fighter expenses for 2014, 2015, and the first half of 2016 was released publicly. It is shown in Table 2. I use these numbers to calculate boxers' share of revenue for 2014, 2015 and the first half of 2016. For prior years, I assume that the boxer share of revenue was the average of these two and a half years for which data is available, which comes to 62.2% on average.

PUBLIC COPY - REDACTED

**Table 2**

**Golden Boy Revenues and Expenses**
**(Deetz Report, 2014 – June 30, 2016)**

| Period | Total Revenue | Fighter Expenses | Other Expenses | Income from Boxing Operations | Fighter Share of Revenue |
|---|---|---|---|---|---|
| 2014 | $140,448,787 | $89,344,118 | $42,274,826 | $8,829,843 | 63.6% |
| 2015 | $46,323,840 | $28,864,172 | $12,768,480 | $4,691,187 | 62.3% |
| 2016 (1st Half) | $32,604,518 | $18,206,224 | $11,597,665 | $28,000,629 | 55.8% |
| Total | $219,377,145 | $136,414,514 | $66,640,971 | $41,521,659 | 62.2% |

112.

[230] Jesse Holland, "Bob Arum fires back at Dana White: 'UFC fighters get paid nothing'," MMA Mania, Sept. 23, 2011, available at http://www.mmamania.com/2011/9/23/2444228/bob-arum-fires-back-at-dana-white-ufc-fighters-get-paid-nothing.

PUBLIC COPY - REDACTED



113. Using boxing as a benchmark for the fighter share of revenue is also likely to be conservative because a boxing promoter is more likely to cover a boxer's auxiliary costs, such as training, than is Zuffa and, thus, one would expect the athlete's share in event revenue to be lower than in the UFC if the labor markets in top-level boxing and UFC were commensurately competitive.[233]

ii. **Professional Team Sports: NFL, MLB, NBA, NHL**

114. U.S. professional team sports have had competition among the teams for players since the introduction of free agency, and, hence, despite the existence of various labor market restraints discussed above, they provide a reasonable benchmark for athlete compensation under circumstances of more open competition. Indeed, to the extent that competition among teams for talent is constrained by restrictions on free agency (covered by

[231] John Barr and Josh Gross, "UFC fighters say low pay simply brutal," ESPN, Jan. 15, 2012, available at http://www.espn.com/espn/otl/story/_/page/UFCpay/ufc-fighters-say-low-pay-most-painful-hit-all.

[232] Margules Dep. Exh. 3 (WAR-000009).

[233] As discussed above, I am assuming that Plaintiffs will show that but for the challenged conduct, Zuffa would face additional competition for fighter talent on par with the levels of structural competition present in my respective selected benchmarks. Given my discussion above, and my understanding of the MMA industry (as well as the competitive environments of other sports) and Zuffa's practices in particular, I believe this assumption to be reasonable.

PUBLIC COPY - REDACTED

the non-statutory labor exemption since they are collectively bargained), that makes these sports conservative as benchmarks.[234] Of course, the MLB, NHL, NFL and NBA have been around for several decades and are more developed than UFC, with much higher annual revenues. Thus, I am not comparing the absolute salaries of professional athletes in the U.S. team sports with those of fighters in the UFC. Comparing the *share* of revenue that is paid out in the team sports with that in the UFC removes the problem that may have been associated with using absolute salaries.

115. For each of the four leagues, I collected data on the player share of revenue from the collective bargaining agreements in each sport, publicly available sources, and conversations with league and union executives.[235]

116. Zuffa executives have acknowledged in the past the appropriateness of comparing the share of revenues going to athletes in the UFC with professional team sports. When asked what percentage of UFC's revenue goes to its fighters during a 2012 interview on ESPN's *Outside the Lines,* Zuffa LLC's CEO and co-owner Lorenzo Fertitta stated: "not far off what the other sports leagues pay as a percentage of revenue."[236] When reminded

[234] For example, as discussed above, the player share of revenue in the NFL, NHL and NBA all reflect the existence of built-in competitive restraints in the form of salary caps, luxury taxes, revenue sharing and debt rules. Were these markets subject to open and unconstrained competition, the player shares would be higher and, thus, the estimated damages would be higher.

[235] The Statistics Portal, available at statista.com; data from NBA and NHL players' associations; http://stats.nhlnumbers.com/teams?year=; *Forbes* annual sport valuation issues; Spotrac.com; Rodney Fort's Sports Economics, available at https://sites.google.com/site/rodswebpages/codes.

[236] Barr and Gross, "UFC fighters say low pay simply brutal". Echoing Fertitta's boast, during a 2016 interview Dana White was asked about the money-making opportunities for UFC fighters. He replied: "The opportunities today – are just like playing in the NFL, or playing in the NBA or

PUBLIC COPY - REDACTED

that the player share in the NBA, NFL, NHL and MLB is around 50 percent, Fertitta replied: "[It's] in that neighborhood, yeah."[237] As is clear from the analysis below, Fertitta's comment is simply wrong.[238]

117. [239]

118. However, the fact that revenue varies between these leagues and the UFC does not undermine the validity of the comparison. First, as I explain above, by comparing athlete compensation as a *share* of league revenue, I am controlling for the fact that different

Major League Baseball.... Trust me when I tell you, these guys are making a lot of money. We are on par with other sports leagues out there." Anton Tabuena, "White defends UFC pay: Fighters make a lot of money, we're on par with other sports," Bloody Elbow, June 23, 2016, available at https://www.bloodyelbow.com/2016/6/23/12011036/white-defends-ufc-pay-fighters-make-a-lot-of-money-were-on-par-with.

[237] Barr and Gross.

[238] 

[239] Fertitta Dep. at 199-200.

PUBLIC COPY - REDACTED

leagues generate different revenues at different levels of maturity and popularity. Second, an evaluation of the relationship between league revenue and player share proves that there is no basis for the claim that leagues with less revenue pay a lower *share* of that revenue to their athletes.

**Table 3**

**NFL and MLB Player Shares in Revenue**[240]

| Year | NFL Revenues (billions $) | NFL Player Share | MLB Revenues (billions $) | MLB Player Share |
|---|---|---|---|---|
| 1993-94 | 1.745 | 68.5% | 1.209 | 62.7% |
| 1996-97 | 2.235 | 61.4% | 2.067 | 58.7% |
| 1999-00 | 3.423 | 59.6% | 3.329 | 56.5% |
| 2002-03 | 4.944 | 56.1% | 3.728 | 63.1% |
| 2005-06 | 6.160 | 55.1% | 5.206 | 50.6% |

119. Table 3 shows both the league revenues and player share for the NFL and MLB over a variety of years. Table 3 indicates that, if anything, there is an inverse relationship between league revenue and player compensation share of revenue. As NFL revenues grew between 1993-94 and 2005-06, the player share decreased steadily from 68.5 percent to 55.1 percent, and this trend has continued with NFL revenues around $14 billion and the player share around 47 percent in 2016-17. The correlation coefficient between NFL revenues and player share over the interval in Table 3 is a statistically robust -.901, showing an *inverse* relationship. The pattern in baseball is very similar with a correlation coefficient of -.706, although the major league players' share has steadied over the last decade as revenues have grown. While details for these years are not publicly available for

[240] John Vrooman, "The Economic Structure of the NFL," in K.G. Quinn (ed.), *The Economics of the National Football League,* Springer (2012) at 23. Andrew Zimbalist, "Reflections on Salary Shares and Salary Caps," Journal of Sports Economics 11:1 (February 2010), at 22-24.

PUBLIC COPY - REDACTED

the NBA, NBA player share in 2000-01 was 65 percent of Basketball Related Income, while it was approximately 51 percent in 2015-16. The pattern in all three leagues is exactly the opposite of that claimed by Mr. Fertitta. What this analysis indicates, in conjunction with the discussion above about the history of competition in professional team sports, is that the major determinant of how much of the revenue pie goes to athletes versus owners is not the absolute size of the sport, but rather the amount of competition among owners over the athletes' services. The more that owners are able to limit competition—through contractual restrictions on free agency or by eliminating competition from competing leagues—the more athlete compensation can be suppressed.

120.

[241]

[241] ZFL-0186162; Sean Shelby Deposition, Apr. 12, 2017, (hereinafter "Shelby Dep.") at 130:20-24 ( ).

PUBLIC COPY - REDACTED

[redacted]

iii. **European Soccer**

121. European soccer provides a useful benchmark because in addition to competition among teams for talent, there is also competition between *leagues* as well. The league structure of European soccer is different than the closed team sports leagues in the United States. Each country has a hierarchy of leagues and teams can be promoted to higher leagues or demoted to lower leagues, depending on the performance in the final league standings. In part because of this strict punishment/reward system, competition for players tends to be strong among teams in a given league, but also among teams in leagues across all of Europe. More recently, the European soccer leagues have introduced "Financial Fair Play" rules which penalize teams that run consecutive financial deficits and this has blunted the competition over players somewhat. Nonetheless, competitive labor markets, albeit restrained, continue to exist. The problem with using the European soccer leagues as a damages benchmark is that the availability data on salary share of players presents some ambiguities that are discussed below. Accordingly, the data on player share in the European soccer leagues is presented as corroborative evidence rather than to calculate damages.

122. [redacted]

PUBLIC COPY - REDACTED



### C. Damages Calculation and Results

123. Below, I calculate annual damages to the bout class by comparing UFC athlete share of event-based revenue to the average athlete share of revenue in the selected benchmarks discussed above: the NFL, MLB, NBA, NHL, and boxing. For those leagues whose competitive seasons run between two calendar years, the year identified is the fiscal year. Hence, the 2014-15 NBA season corresponds to fiscal year 2015 and is represented as 2015. My source for Zuffa's revenues and fighter compensation are Zuffa's annual financial statements.[242]

242 

PUBLIC COPY - REDACTED

124. Note that the shares in the NFL, NHL and NBA are shares of "defined revenue." Each league defines revenue a little differently in their collective bargaining agreements. The differences relate to the treatment of related party transactions and the partial deduction of expenses for certain activities, such as stadium construction or revenue generated by events other than the games themselves. MLB shares are based on total league-wide revenue.[243] I consider bout or event compensation to be comprised of the following payments in Zuffa's annual income statements: fighter purse, fighter bonus, fighter LOA, fighter sponsorship-event, fighter compensation, athlete outfitting compensation, and other fighter costs-event.

125. Bout class damages are based on Table 4 and Table 5. Table 4 contains Zuffa's *event-based* revenue, and calculates fighter share of that revenue based on fighters' event-based compensation.[244] Table 5 calculates the but-for amount that bout class members would have been paid if they had received the same share of Zuffa's event-based revenue as the share received by athletes in my selected benchmarks, and finally the mean calculated by averaging the compensation share across all of the benchmarks.

126.

[243] Note that some academic studies have estimated player shares of revenue in MLB, the NFL, the NBA and the NHL to be considerably higher than the shares I am using in the report. *See*, for instance, John Twomey and James Monks, "Monopsony and Salary Suppression: The Case of Major League Soccer in the United States," *American Economist* 56, no. 1 (Spring 2011) where the estimated player shares are reported as between 52 percent and 59 percent.

[244] Event-based revenue includes gate sales, live or taped television, pay-per-view, video-on-demand, UFC Fight Pass, and sponsorship and advertising revenue.

PUBLIC COPY - REDACTED

PUBLIC COPY - REDACTED



PUBLIC COPY - REDACTED



### D. My Selected Benchmarks Are, If Anything, Conservative

127.

[245] July 17, 2017 letter from counsel at Boies, Schiller & Flexner to Daniel Silverman.

PUBLIC COPY - REDACTED

128. Similarly, I include "athlete outfitting compensation" as bout-related pay even though it is arguable that some or all of it is really licensing or identity compensation. In this treatment, I am also being conservative.

129. I anticipate that one objection Zuffa will make to my benchmark analysis is to claim that comparing their athlete compensation share of revenues to other sports is comparing "apples to oranges" since Zuffa maintains that because they do their own television production, their non-player costs are exceptionally high.[246] This objection is unfounded.

130. 

.[247]

.[248]

[246] For example, in an interview with ESPN's *Outside the Lines*, Lorenzo Fertitta claimed "[w]hat you have to understand is that our model is different. We are everything. We're the promoter. We're the television producer. We're responsible for all the costs that go into the production, and you're talking millions and millions of dollars." Barr and Gross.

[247] ZFL-1472337; ZFL-1472338.

[248] SBPCL00002101.

PUBLIC COPY - REDACTED

131. [redacted][249] [redacted].[250] [redacted][1] [redacted].

132. Furthermore, to the extent Zuffa claims that such production costs are not incurred by the owners in the sports I have selected as benchmarks, such a claim is inaccurate. For example, team owners in the MLB, the NBA and NHL often own their own regional sports networks (RSNs) and, therefore, also cover their television production costs.

---

249 [redacted]

250 [redacted]

251 ZFL-1514944.

PUBLIC COPY - REDACTED

These RSNs contribute a significant portion of team revenues.[252]  Consider, for instance, a team like the Boston Red Sox.  It is in a television market covering all of New England, including almost 5 million households.  With household cable penetration of around 80%, there are close to 4 million homes that subscribe to NESN (the team's RSN)[253] and cable distributors pass on a monthly fee of roughly $5.  This sum produces approximately $20 million monthly or $240 million yearly.  On top of this, NESN also earns tens of millions of dollars from advertising sales.  In its most recent valuation of MLB teams (March 23, 2016), *Forbes* estimates that the Red Sox total revenue is $398 million.[254]  If we posit conservatively that 50 percent of NESN's revenue is attributable to the Red Sox (with the rest to the Bruins and shoulder programming) and the network earns $40 million in ad sales, then the Red Sox revenue from NESN is $140 million, or roughly 35% of team revenue.  The Red Sox payroll in 2016 was $204 million or 51.3% of its estimated revenue.[255]  NESN's revenues are part of MLB's total revenues.

---

[252] For the NBA, *see* Collective Bargaining Agreement, January 19, 2017, Article VII (a)(ii), at 127.  For MLB, *see* Basic Agreement, 2012-2016, Article XXIV (A), at 119-120. For the NHL, see Collective Bargaining Agreement Between National Hockey Association and National Hockey Association Players' Association, Sept.16, 2012-Sept.15, 2022, Article 50.1 (a), at 223-228.  Although it only applies to very modest revenue from pre-season games, for the NFL see NFL Collective Bargaining Agreement, Aug. 4, 2011, Article 12 (Section 1)(a), at 61-66.

[253] The Boston Red Sox is owned by a partnership called Fenway Sports Group.  The Fenway Sports Group also owns 80 percent of NESN.

[254] "Forbes Releases 19th Annual MLB Team Valuations," Forbes, March 23, 2016, available at https://www.forbes.com/sites/forbespr/2016/03/23/forbes-releases-19th-annual-mlb-team-valuations/#7c7b904720af.

[255] This payroll represents the team's 40-man roster and excludes minor league player contracts.  The latter would add several million dollars to the payroll.

PUBLIC COPY - REDACTED

133. Even if it were correct that Zuffa incurred higher production costs than my benchmark sports leagues,[256] those would likely be counterbalanced by other expenses that are incurred by my benchmark sports leagues but *not* by Zuffa.

134. [redacted].[257] [redacted].[258]

135. [redacted]

[256] [redacted]

[257] [redacted].

[258] As estimated by *Forbes*.

PUBLIC COPY - REDACTED



**Table 7**

136.

[259]

[260] Where Zuffa's audited financial statements have restated net income, the restated numbers are listed below. In addition, these numbers reflect net income attributable to Zuffa, where applicable.

PUBLIC COPY - REDACTED





.[261] t,[262] [263]

261

262 "Movies and Entertainment Industry Profitability Rations", available at http://csimarket.com/Industry/industry_Profitability_Ratios.php?ind=917&hist=4.

263 CSIMarket does not have estimates for this sector before 2015. In general, as the economy has gradually strengthened each year since 2008, one would expect margins during 2010-2014, if anything, to be below the average in 2015 and 2016.

PUBLIC COPY - REDACTED

**Table 8:** 

137. ██████████████



---

264 These are calculated from Zuffa's audited financial statements covering 2010-2015 (ZFL-0000031, ZFL-0000221, ZFL-0000136, RAINE-0016846) supplemented by Zuffa's Consolidated P&L Statements, supra n. 242.



89

PUBLIC COPY - REDACTED

138.

,,[266]

[267]

139.

[266] ZFL-1516424 at 56.

[267] *Id.* at 70.

PUBLIC COPY - REDACTED

██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

## VI.  CONCLUSION

140.   I conclude as follows:

a.   Zuffa's challenged conduct is anticompetitive in character and, thereby, would have anticompetitive effects if engaged in by an entity with monopoly or monopsony power;

b.   The pro-competitive justifications that have been offered in defense of conduct similar to the challenged conduct that was historically engaged in by owners in other professional sports (i) are invalid, (ii) do not have any theoretical applicability to MMA, and (iii) MMA could exist as a successful sport with less restrictive conduct in its labor market; and

c.   ████████████████████████████

███████████████████████████████

████████████████████████████████

██████████████████████████████

███████████

91

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Andrew Zimbalist

Northampton, Ma.

August 30, 2017

PUBLIC COPY - REDACTED

**EXHIBIT A**

PUBLIC COPY - REDACTED

August 2017

# CURRICULUM VITAE

**ANDREW ZIMBALIST**
65 Ward Ave.
Northampton, MA 01060
(413) 586-7636

Office: Department of Economics
Smith College
Northampton, MA 01063
(413) 585-3622, 585-3503
FAX (413) 585-3389/3339
Email: azimbali@smith.edu

## Current Status:

Robert A. Woods Professor, Department of Economics, Smith College
Five College Graduate Faculty

## Education:

B.A., University of Wisconsin, 1969
M.A., in Economics, Harvard University, 1971
Ph.D., in Economics, Harvard University, 1974

## Fellowships, Grants, Awards and Positions:

National Science Foundation Traineeship, 9/69-8/72
Doherty Latin American Fellowship, 9/72-8/73
Harvard Institute for International Development Research Grant, 6/73-9/74
Research Fellow, Department of Economics, Harvard University l/79-7/79
Picker Fellowship in International Studies, 6/82-7/83
Visiting Scholar, Doshisha University, Kyoto, Japan, l/85-5/85.
Picker Fellowship in International Studies, 6/85-9/86.
Chair, Department of Economics, Smith College, 1982-1987
Writer and Director, Household International Grant on markets and the world economy, 1989-1993
MacArthur Foundation Grant for the study of reform of socialist management, 1990
Ford Foundation Grant for research and academic exchange, 1990-91
Director, LASA Cuba Task Force study group on transition and reform, 1990-91
MacArthur Foundation Grant for research and academic exchange, 1992-96
Chair, LASA Task Force on Scholarly Relations with Cuba, 1993-94
Member, The Atlantic Council of the United States, Working Group on Cuba, 1994-95
*Baseball and Billions* selected as one of the 8 best business books of 1992 by *Business Week*, as the best sports book of 1992 by the *Sporting News*, as the

PUBLIC COPY - REDACTED

best business book of 1992 by *USA Today Baseball Weekly*, and selected as
  Breakthrough Book in *Lingua Franca*
*Sports, Jobs and Taxes* selected as Breakthrough Book in *Lingua Franca*
Selected as the sports journalist of the year in 1998 by the *Village Voice*
*Unpaid Professionals* selected as a Breakthrough Book in *Lingua Franca*
Danziger Fellowship, Smith College, 1999-2002
Listed in *Who's Who in America*
Listed in *Who's Who in American Educators*
Chair, Smith College Committee on Athletics and NCAA Faculty Rep, 1998-present
Bi-weekly commentator on the business of sports on NPR's Marketplace, 2002-2005
Visiting Professor, University of Geneva, 2003
*May the Best Team Win* given "Silver Award" by *ForeWord Magazine* in their
  Book of the Year Award in Business and Economics
*National Pastime: How Americans Play Baseball and the Rest of the World Plays
  Soccer* awarded prize for "Outstanding Academic Title" by *Choice*, the
  major review journal of the American Library Association
National Advisory Council, Campaign for Alcohol-Free Sports TV,  2006-09
Advisory Board, Israeli Baseball League, 2006-07
National Policy Advisory Board, Women's Sports Foundation
Advisory Board, Pennsylvania State Institute for Sports Law, Policy and Research
Selected as one of America's Top 100 Most Influential Sport Educators (Institute for
  International Sport)
Visiting Professor, University of Geneva, Geneva Switzerland, 2003
Visiting Professor, American Studies Program, Doshisha University, Kyoto, Japan,
  June 2007.
Selected as one of top 100 sports educators by the Institute for International Sport,
  October 2007.
Advisory Council, The Drake Group, 2009-  .
Westlaw Round Table Group, expert
Visiting Professor, University of Hamburg, Hamburg, Germany, 2011
Advisory Board, Sports Leadership and Management Program, UMASS-Boston,
  2015-
Consultant to the Commissioner's Office, Major League Baseball, 2006-16.
*Circus Maximus* selected as one of the Best Books of 2015 by *The Economist*
Co-editor Palgrave Macmillan Pivot Book Series on Sports Economics, 2016-

## Other Activities (partial listing)

Member, Editorial Board of journal **Journal of Sports Economics**, 1999 - present.
Member, Editorial Board of journal **Base Ball**, 2006 – present
Member, Editorial Board of journal **Journal of Issues in Intercollegiate Sport**,
  2007 – 2013
Member, Editorial Board of journal, **International Journal of Management and
  Marketing**, 2013 - 2015
Member, Editorial Board, **Sports Technology**, 2007 - 2010
Academic Affiliate, Analysis Group/Economics, 1999-present
Member, Advisory Board, The Drake Group, 2009-present

**PUBLIC COPY - REDACTED**

Series Editor of Latin American Economic Development Book Series, Westview Press, 1987-1994.

Member, Editorial Board of journal *Comparative Economic Studies*, Association for Comparative Economic Studies, 1987-1990.

Member, Advisory Board, U. Mass Boston, Sport Management Program. 2014-present

Member, Editorial Board of journal *Latin American Perspectives*, 1988-1998.

Member, Advisory Board, Western Massachusetts Civil Liberties Union, 1988-1994.

Member, Board of Directors, Network on East-West-South Research Cooperation on Technology Transfer, 1988-1994.

Member, Cable Advisory Board, Northampton, Ma., 1990-1994.

Member, Washington Office on Latin America Op-ed Writers' Network, 1995-1998.

Chair, Cable Advisory Board, Northampton, Ma., 1993-1994.

Member, Advisory Board, EcoConsult, 1992-1996.

Development Consultant, SRI project on non-traditional export promotion in Central America and the Caribbean basin, 1987-1988.

Development/Management Consultant, United Nations' Development  Project, assessment of management training programs and needs in Cuban economy, 1990- 1993.

Project consultant, Ford Foundation, 1990

Project consultant, MacArthur Foundation, 1992

Consultant to Major League Baseball, Office of the Commissioner, 2005-06, 2010-present

Faculty Board, College Sports Research Institute, University of North Carolina, 2008-present

Consultant, for Attorney Robert Pearl in litigation brought by Mrs. Billy Martin, involving  estimation of managerial contribution to revenue of baseball franchises, 1992.

Consultant, for Weil, Gotshal & Manges, in litigation brought by NFL Players' Association, involving an analysis of the effect of free agency on league competitive balance, 1992.

Consultant, for Williams & Youle, in arbitration case for compensation for territorial rights to the Denver Zephyrs of the American Association from the Colorado Rockies. (testimony)

Consultant, for Cunningham Law Group, in litigation against Major League Baseball for tortious interference in effort to procure a franchise for Tampa Bay.

Consultant, for Grippo & Elden, in litigation brought by WGN and the Chicago Bulls against the National Basketball Association over league rules restricting the number of superstation broadcasts.

Consultant, for Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al. (testimony)

Consultant, for Campbell, Maack & Sessions, in arbitration case for territorial compensation rights regarding Salt Lake City Buzz and Trappers. (testimony)

PUBLIC COPY - REDACTED

Consultant, for Wendell, Chritton & Parks, in arbitration case for territorial
  compensation to Fort Lauderdale Yankees from Florida Marlins. (testimony)

Consultant, for ABRY Communications in litigation between KSMO-TV and the
  Kansas City Royals. (testimony)

Consultant, for the Major League Baseball Players' Association concerning
  analysis and design of revenue sharing system for Major League Baseball.

Consultant, for Atlantic Council of the United States, project on U.S./Cuba
  relations.

Consultant, for IRELA (Instituto de Relaciones Europeo-Latino-americans),
  Madrid, of the European Parliament.

Co-founder of the United Baseball League, with Rep. Robert Mrazek, Rep. John
  Bryant and Richard Moss.

Consultant, for Attorney Robert Bell in litigation between Marianne Stanley and
  USC.

Consultant, for ING Bank

Consultant, for Holderbank

Consultant, for Coca-Cola

Consultant, for Euromoney

Consultant, for Mayor's Office, Portland, Oregon

Consultant, for Krendl, Horowitz & Krendl in litigation between Steven Ehrhardt
  and the Colorado Rockies Baseball Team. (testimony)

Consultant, for Brown, Hart, Reed & Kaplan in Burt v. Hampshire College.
  (testimony)

Consultant, for Wolff Companies

Consultant, for Connecticut Senate Democrats

Consultant, for Husch & Eppenberger, in St. Louis CVC Authority v. NFL
  (testimony)

Consultant, for Rose, Sundstrom & Bentley, in W. Poe v. Hillsborough County &
  City of  Tampa. (testimony)

Consultant, for U.S. House Judiciary Committee in drafting bill for partially lifting
  baseball's antitrust exemption as it applies to labor relations

Consultant, for IRS in franchise asset evaluations

Consultant, for Davis, Scott, Weber & Edwards in Miami sports facility case

Consultant, for Los Angeles Mayor's Office in arena financing matter

Consultant, for Cincinnati *Business Courier*, in stadium lease evaluation

Contributing columnist, *Sports Business Journal*

Consultant, for Analysis Group/Economics in U.S. Department of Justice
  case against a Major League Baseball franchise. (testimony)

Consultant, for ENIC in European soccer case

Consultant, for National Basketball Players' Association in collective bargaining

Consultant, for Rabinowitz, Boudin et al. in copyright case

Consultant, for National Hockey Players' Association in franchise analysis

Consultant, expert on behalf of Fraser class in antitrust litigation against Major
  League Soccer (testimony)

Consultant, for Leboeuf, Lamb, Greene & MacRae in baseball franchise valuation
  case

Consultant, for  Kohrman, Jackson & Krantz in NFL/consumer protection case.

**PUBLIC COPY - REDACTED**

(testimony)

Consultant, for Greenbaum, Doll & McDonald in sports antitrust case

Consultant, for Menard, Murphy and Walsh in sports facility/eminent domain case

Consultant, for Levin, Fishbein, Sedran & Berman in NFL antitrust case

Consultant, for Wisconsin Governor's office in stadium matter

Consultant, for Sills, Cummis, et al. in tax case involving the New Jersey Nets

Consultant, U.S. Department of Justice, in tax case involving several baseball teams. (testimony)

Consultant, for Shughart, Thomson & Kilroy in NFL franchise valuation case

Lecturer, Aspen Institute Congressional Program on Cuba

Consultant, for Boies, Schiller & Flexner in NFL ownership/franchise valuation case. (testimony)

Consultant, Ways and Means Committee, Boston City Council

Consultant, for Henry Klein in NFL/consumer rights case

Consultant, for Thorsnes, Bartolotta & McGuire in sports broadcasting antitrust case

Consultant, for Schulman & Kaufman, in sports licensing case

Consultant, for Blecher & Collins in sports licensing case

Consultant, "The Power of Ideas" Program, American Public Television

Consultant, for Modern Continental in stadium construction plan

Consultant, for Boies, Schiller & Flexner in Broadcasting case (testimony)

Consultant, for National Cable Telecommunications Association, Board of Directors

Consultant, Minneapolis Metropolitan Sports Facilities Corporation against MLB's contraction efforts

Consultant, to the Shubert Organization in economic development matter

Consultant, to the IRS in NFL franchise valuation case

Consultant, to Boyle, Morrisey et al. in damages case

Consultant, to the Antitrust Division of the U.S. Justice Department

Consultant, to First Watch Investment Advisors, LLC

Consultant, to McLaughlin, Gouldborne & Cohen in minor league baseball facilities matter

Consultant, to Furnier & Thomas in a sports stadium matter

Consultant, to NCAA in financial analysis of intercollegiate athletics

Consultant, to Brascher Law in sports damages case

Consultant, to Marcus Katz in sports league matter

Consultant, to McKinsey&Company in college sports matter

Consultant, to Bruce Ratner/Forest City in development matter

Consultant, to Wisconsin State Legislature in team and stadium matter

Consultant, to Dewey Ballantine in intercollegiate sports antitrust case

Consultant, to new team boxing league

Consultant to Boies, Schiller and Flexner in NFL ownership matter

Consultant to WUSA, relaunch effort

Consultant to McDonald & Hayden in NHL financial matter

Consultant to District of Columbia's Controller's Office in stadium matter

Consultant to Waite, Schneider, Bayless and Chesley in stadium matter

Consultant to San Francisco Giants in stadium matter (testimony)

Consultant to City of Anaheim in stadium matter (testimony)

PUBLIC COPY - REDACTED

Consultant to Waite, Schneider, Bayless and Chesley in NASCAR antitrust matter (testimony)

Consultant to Jackson County, Mo. in stadium negotiations with the Chiefs and Royals

Consultant to Rainey Kaiser, in stadium matter in Jackson, Tennessee (testimony)

Consultant to Magna Entertainment in horse racing matter

Consultant to Harrah's in sports development matter

Consultant to ML in sports franchise purchase matter

Consultant to NJSEA in stadium matter

Consultant  to the San Francisco Board of Supervisors in assessing the economic impact of an Olympics bid

Consultant to various MLB teams

Consultant to MLB in collective bargaining, 2005-06, and 2010-11

Consultant to Citigroup clients on franchise purchase

Consultant to Weil, Gotshal & Manges in matter involving NBA team

Consultant to Geraghty, O'Laughlin & Kenney in matter involving professional basketball player

Consultant to Melick, Porter & Shea in matter involving professional golf

Consultant to New Jersey Sports and Exhibition Authority in arena matter

Member, National Advisory Council, Campaign for Alcohol-Free Sports TV, Center for Science in the Public Interest

Member, Advisory Board, Museum of the City of New York, exhibit on baseball in New York, 1947-1957

Member, Board of Advisers, Israeli Baseball League, 2006-07

Member, Board of Directors, Vintage Baseball Federation, 2007-present

Member, Advisory Board, Penn State Institute for Sports Law, Policy and Research, 2007-present

Member, Advisory Board, Professional Athlete Education Initiative, 2008-present

Member, National Expert Advisory Panel, Women's Sports Foundation

Member, Antitrust Public Policy Group, Women's Sports Foundation

Consultant to Michael Best Law Group in minor league baseball matter

Consultant to Northwoods League in franchise valuation matter

Consultant, Knight Commission Committee on financial reform in college sports

Member, Advisory Board, Lake Placid Sports Summit

Consultant to city of Seattle in sports facility matter (testimony)

Consultant to Barnes & Thornburg in tennis antitrust matter (testimony)

Consultant to Jones Day in antitrust matter in NHL (testimony)

Consultant to Ken Burns/Florentine Films on baseball documentary

Consultant to Flaherty, Sensabaugh & Bonasso in a college head coach liquidated damages case

Consultant to the National Football Players Association for a study on comparative retirement benefits

Consultant to Squire, Sanders & Dempsey in a franchise relocation matter

Consultant to Dewey LeBoeuf in a franchise relocation matter

Consultant for valuation purposes in sale of interest in MLB team

Consultant to MLB's Commissioner's Office on economic issues, 2005 - present

Consultant to Northlands in an arena and economic development matter

PUBLIC COPY - REDACTED

Consultant to U.S. Department of Justice in college sports antitrust matter
Consultant to Heenan Blaikie and the city of Ottawa in a sports/stadium matter
Consultant to Hausfeld, LLP in NFL mediation of labor relations dispute
Consultant to Schiff Hardin LLP in publicity rights cases involving Michael Jordan
    (testimony)
Consultant to Jackson Kelly LLP in college sports realignment mediation
Consultant to McDonald Sanders LLP in college sports realignment matter
Consultant to Boyle, Shaughnessy & Campo in an NHL matter
Consultant to Ater Wynne LLP in franchise valuation matter
Consultant to Meerkats, regarding Australian Rules Football, management strategy
Consultant to Bredhoff & Kaiser, regarding NLRB matter in college football
Consultant to Nagel Rice in NFL matter
Consultant to US Track & Field Athletes in compensation matter
Consultant to Speaker of the House, Rhode Island in stadium matter
Consultant to Morrison & Foerster in a stadium matter
Consultant for the Atlantic 10 Athletic Conference, 2016
Consultant for Cohen Milstein in anti-trust matter
Consultant for Dunlavey & Associates in stadium analysis

Referee for Social Science Research Council of Canada, National Science
    Foundation, Spencer Foundation, American Economic Review, World
    Development, Journal of Economic Behavior and Organization, Latin American
    Research Review, Southern Economic Journal, Regional Science and Urban
    Economics, Problems of Post-Communism, Industrial and Labor Relations
    Review, Journal of Inter-American Studies and World Affairs,  Latin American
    Politics and Society, Cuban Studies, Social Science Quarterly, Journal of
    Comparative Economics, Studies in Comparative International Development,
    Journal of Industrial Economics, National Science Foundation, Fullbright, Latin
    American Perspectives, Journal of Sports Economics, Eastern Economics Journal,
    Southern Economic Journal, Quarterly Review of Economics and Finance,
    Journal of Sport History, Economic Inquiry, Regional Studies, Journal of
    Business, B.E. Journals in Economic Analysis and Policy, Journal of Planning,
    Education and Research, Growth and Change, Journal of Public Economics,
    Urban Affairs Review, Journal of Issues in Intercollegiate Athletics, Sociological
    Forum, International Journal of Sport Finance, Public Budgeting and Finance,
    State and Local Government Review, Thompson/South-Western publishing,
    Urban Affairs Review, International Journal of Sport Policy and Practice, and
    various university presses and other journals.  He has also served as an outside
    reviewer in numerous university tenure and promotion cases.

## Testimony before Political Bodies:

House Ways and Means Committee on the economic effects of U.S. policy toward
    Cuba in March 1994
U.S. Senate Judiciary Committee in December 1992 in hearings on baseball's

PUBLIC COPY - REDACTED

antitrust exemption

N.Y. State Senate on public policy toward minor league baseball in February 1993

U.S. House Judiciary Committee in its consideration of the Bunnings/Synar bill to limit MLB's anti-trust exemption in September 1994

U.S. Senate Judiciary Committee in January 1996 at hearings on the future of professional sports leagues

U.S. House Judiciary Committee in February 1996 at hearings on antitrust implications of professional sports franchise relocation

New York State Senate on the economic impact of sports franchises and stadiums on cities in April 1996

U.S. House Commerce Committee in May 1996 at hearings on the "Fan Freedom and Community Protection Act of 1996"

Connecticut State Legislature in December 1998 on the proposal to bring the New England Patriots to Hartford (written only)

U.S. Senate Judiciary Committee in June 1999 at hearings on sports antitrust policy and stadium financing

Springfield City Council in July 1999 on public subsidies for the construction of a minor league stadium

Philadelphia City Council in June 2000 on pubic subsidies for stadium construction.

U.S. Senate Judiciary Committee in November 2000 on competitive balance in Major League Baseball (written only)

Ways and Means Committee, Boston City Council, December 11, 2000 (written only)

U.S. Department of Education Commission of Gender Equity in College Athletics, November 20, 2002

Yonkers, New York, City Council, December 2002

San Francisco City Council, March 2005

Boston Finance Commitee, February 2015

Massachusetts State Senate, May 2015

## Publications:

## Books:

***Economic Democracy:  Workers' Participation in Chilean Industry, 1970-73,*** Academic  Press, February 1978.  Updated, student paperback edition, Fall 1981. Revised spanish   language edition, ***Democracia Económica***, Fondo de Cultura Económica, Mexico, 1984.  (with Juan Espinosa).

***Case Studies on the Labor Process*** (editor).  Monthly Review Press, December 1979 (paperback edition, April 1981).

PUBLIC COPY - REDACTED

***Comparative Economic Systems:  An Assessment of Knowledge, Theory and Method***   (editor).  In series on history of economic thought edited by Warren Samuels, Kluwer- Nijhoff, November 1983.

***Comparing Economic Systems:  A Political Economic Approach***, Academic Press, July 1984.  Second printing, December 1985.  Second edition, Harcourt, Brace and Javonovitch, Fall 1988 (with H. Sherman and S. Brown).

***Cuba's Socialist Economy Toward the 1990s*** (editor).  Special issue of ***World Development***, vol. 15, no. 1, January 1987. Pergamon Press.  Book version with new introductory essay,  (paper and hardback editions)  October 1987, Lynne Rienner Publishers.

***Cuban Political Economy:  Controversies in Cubanology*** (editor).  Westview Press, January 1988.

***The Cuban Economy: Measurement and Analysis of Socialist Performance***. Johns Hopkins University Press, October 1989. (with Claes Brundenius).

***Panama at the Crossroads: Economic Development and Political Change in the Twentieth Century.*** University of California Press, Summer 1991. (with John Weeks).

***Cuba in Transition: Crisis and Transformation*** (joint editor). Westview Press, Spring 1992.

***Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime.*** Basic Books, Fall 1992.   (Japanese edition published in July 1993 by Dobunshoin, Tokyo.) Updated paperback edition with new preface and postscript, March 1994.  Audio cassette, High Sport Productions, 1994.

***Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums.*** (jointly written and edited with Roger Noll, Stanford University).  Brookings Institution, October 1997 (hard and soft back editions).

***Unpaid Professionals: Commercialism and Conflict in Big-Time College Sports***. Princeton University Press, September 1999 (hardback).  Expanded and updated paperback edition, February 2001.

***The Economics of Sport I & II*** (editor). Two volumes. Edward Elgar's series on *The International Library of Critical Writings in Economics*, edited by Mark Blaug, September 2001.

***Symposium on Competitive Balance in Professional Sports*** (editor). Special Issue of the *Journal of Sports Economics*, May 2002.

PUBLIC COPY - REDACTED

***May the Best Team Win: Baseball Economics and Public Policy***.  Washington, D.C.: Brookings Institution Press, March 2003. Expanded and updated paperback edition, April 2004.  Japanese Edition (Baseball Magazine), October 2006.

***National Pastime: How Americans Play Baseball and the Rest of the World Plays Soccer.***  Washington, D.C.: Brookings Institution Press, April 2005, (with Stefan Szymanski).  Japanese Edition (Diamond, Inc.), 2006.  Korean Edition (Editor Publishing), 2006.  Expanded paperback edition, June 2006.  Chinese Edition, China Times Publishing, April 2008.

***In the Best Interests of Baseball? The Revolutionary Reign of Bud Selig.***  New York: Wiley, March 2006.  Paperback edition, June 2007.  Updated, expanded edition, published as ***In the Best Interests of Baseball? Governing the National Pastime***. University of Nebraska Press, March 2013.

***The Bottom Line: Observations and Arguments on the Sports Business*** (editor and author. Temple University Press, September 2006.

***Equal Play: Title IX and Social Change*** (joint editor and author). Philadelphia: Temple University Press, Fall 2007. (with Nancy Hogshead-Makar).

***Circling the Bases: Essays on the Challenges and Prospects of the Sports Industry***.  Temple University Press, December 2010.  Released as audio book by Redbook Audiobooks in October 2013.

***International Handbook on the Economics of Mega Sporting Events***. Edited and written with Wolfgang Maennig, April 2012.

***Home Team***. Delabarre Publishing LLC, May 2012. e-book. (with Shelley Rotner and Barbara Riccio).

***The Sabermetric Revolution: Assessing the Growth of Analytics on Baseball.*** University of Pennsylvania Press. Philadelphia, Pa., February 2014. (with Ben Baumer). Updated, new paperback edition, February 2015. Korean edition June 2015.

***Circus Maximus: The Economic Gamble Behind Hosting the Olympics and the World Cup***. Brookings Institution Press, January 2015.  Paperback edition (expanded and updated), February 2016.  Japanese, Spanish and Chinese editions 2016.

***Unwinding Madness: What Went Wrong with College Sports and How to Fix It.*** Brookings Institution Press, February 2017.  (with Donna Lopiano and Gerry Gurney)

***No Boston Olympics: How and Why Smart Cities Are Passing on the Torch .*** UPNE, May 2017.  (with Chris Dempsey)

PUBLIC COPY - REDACTED

***Rio 2016: Olympic Myths, Hard Realities***. Brookings Institution Press, forthcoming, August 2017. Edited and written.

## Professional Articles:

"Income Distribution in the United States," in ***The Review of Radical Political Economics***, Summer, 1971. Reprinted in Edwards, Reich and Weisskopf, ***The Capitalist System***, Prentice-Hall, 1972; MacEwan and Weisskopf, ***Perspectives on the Economic Problem***, Prentice-Hall, 1972; Carson, Ingles and McLaud, ***Government in the American Economy***, Heath, 1973; Mermelstein, ***Economics: Mainstream Readings and Radical Critiques*** (second edition), Random House, 1973. (with F. Ackerman, H, Birnbaum and J. Wetzler)

"Sweezy on Chile," ***Monthly Review***, March 1972, and a response in May 1972 issue; also in Sweezy and Magdoff, Sweezy and Magdoff (eds.), Revolution and Counter-Revolution in Chile. (with B. Stallings).

"La Expansión de la Educación Primaria y el Desarrollo Capitalista: el Caso de Chile," ***Revista del Centro de Estudios Educativos***, (Mexico, D.F.), no. 2, 1973.

"Workers' Participation in Chilean Industry Under Allende," ***Science for the People***, Oct./Nov. 1973 and ***Monthly Review***, (March 1974).

"Showdown in Chile," ***Monthly Review***, October 1974, and in Sweezy and Magdoff (eds.), ***Revolution and Counter-Revolution in Chile***. (with B. Stallings).

"The Dynamic of Worker Participation: An Interpretive Essay on the Chilean and Other Experiences," ***Administration and Society***, (May 1975); also in Garson and Smith (eds.), ***Organizational Democracy***, Sage, 1976.

"The Political Economy of the ***Unidad Popular**," **Latin American Perspectives***, (Spring 1975). (with Barbara Stallings).

"The Limits of Work Humanization," ***Review of Radical Political Economics***, (Summer 1975).

"Worker Participation in Cuba," ***Challenge: The Magazine of Economics Affairs***, (Nov-Dec. 1975).

"Workers' Control in Allende's Chile," Institute for Workers' Control, Pamphlet No. 47 (England); also, revised version in ***Comparative Urban Studies***, (Spring 1976). (with James Petras).

"Class and Income Distribution in the United States," in Althauser and Snyder (eds.), ***Selected Contemporary Social Problems***, 1975. (with Frank Ackerman).

"Worker Management of Chilean Industry, 1970-1973: An Empirical Investigation," ***Journal of Economic Issues***, (June 1976).

"La disparité des salaries et des profits," ***Le Monde Diplomatique***, (July 1976).

"Capitalism and Inequality in the United States," in Edwards, et. al., ***The Capitalist System***, (2nd edition), Prentice-Hall, 1978. Revised for 3rd edition, 1984. (with F. Ackerman).

"The Prospects for U.S.-Cuba Trade," ***Challenge: The Magazine of Economic Affairs***, (January/February 1978).

"The Economics of Workers' Management: The Chilean Experience," ***Economic Analysis and Workers' Management***, vol. 12, nos. 3-4, (1978). (with J. Espinosa).

"Introduction: Case Studies on the Labor Process," in ***Case Studies on the Labor Process***, edited by Andrew Zimbalist, Monthly Review Press, 1979.

"Technology and the Labor Process in the Printing Industry," ***Ibid***.

"Economic Democracy: Solution or New Challenge," ***Journal of Social Economics***, Vol. 38, No. 3 (Dec. 1980).

"On the Role of Management in Socialist Development," ***World Development***, Vol. 9, Nos. 9/L0 (Fall 1981). Reprinted in Wilber and Jamison (eds.), Socialist Models of Development, Pergamon, 1982.

"Response to de Vylder," ***Economic and Industrial Democracy***, Vol. 3 (1982).

"Soviet Aid, U.S. Blockade and the Cuban Economy,*" **Comparative Economic Studies** (formerly **ACES Bulletin***), Vol. 24, No. 4 (Winter 1982).

"Introduction: Reflections on the State of the Art of Comparative Economics," in ***Comparative Economic Systems: An Assessment of Knowledge, Theory and Method***, edited by A. Zimbalist, Kluwer-Nijhoff, 1983.

"Incentives and Elicitation Schemes: A Critique and An Extension," in ***Comparative Economic Systems: An Assessment of Knowledge, Theory and Method***, edited by A. Zimbalist, Kluwer-Nijhoff, 1983. (with S. Koont).

"Cuban Economic Planning: Organization and Performance," in Halebsky and Kirk (eds.), ***Cuba: Twenty-Five Years of Revolution***, Praeger, 1985.

"Recent Studies on Cuban Economic Growth: A Review," ***Comparative Economic Studies***, Vol. 27, no. 1 (spring 1985). (with C. Brundenius).

"Japan-U.S. Trade:  Reason and Fury," Part 1, *Japan Economic Journal* (April 30, 1985).

"Japan-U.S. Trade:  Reason and Fury," Part 2, *Japan Economic Journal* (May 7, 1985).

"Cuban Economic Growth One More Time:  A Response to `Imbroglios'," *Comparative Economic Studies* (Fall 1985). (with C. Brundenius).

"Cuban Growth:  A Final Word," *Comparative Economic Studies* (Winter 1985). (with C. Brundenius).

"An Annotated Bibliography of Economics and Business," in *Sources of Information in the Social Sciences*, American Library Association, 1986. (with B. Hoselitz and R. Kaufman).

"Patterns of Cuban Development:  The First Twenty-Five Years," *World Development*, vol 15, no. 1 (January 1987). (with  S.Eckstein).

"Cuban Industrial Growth, 1965-1985," *World Development*, vol. 15, no. 1 (January 1987).  Translated and reprinted, "El Crecimiento Industrial de Cuba, 1965-85," *Temas de Economía Mundial*, no. 20 (1987) and in *Empresas Públicas: Problemas y Desarrollo*, vol. 2, nos. 6-7 (1988).

"Introduction:  Cuba's Socialist Economy Toward the 1990s," *World Development*, vol. 15, no. 1 (January 1987).  Revised and expanded as introductory essay in Zimbalist (ed.), *Cuba's Socialist Economy Toward the 1990s*, L. Rienner Publishers, 1987.

"The Economics of Socialism" in J. Eatwell et. al. (eds.), *The New Palgrave:  A Dictionary of Economic Thought and Doctrine*. London:  The Macmillan Press Ltd., 1987. (with D. Milenkovitch).

"Analyzing Cuban Planning:  A Response to Roca," *Cuban Studies/Estudios Cubanos*, vol. 17, 1987.

"Cuban Political Economy and Cubanology:  An Overview," in Zimbalist (ed.), *Cuban Political Economy*, op. cit.

"Interpreting Cuban Planning:  Between a Rock and a Hard Place," *Ibid*.

"Cubanology and Cuban Economic Performance,"  *Ibid*. (with C. Brundenius).

"Cuban Planning: A Rejoinder to Roca," *Cuban Studies/Estudios Cubanos*, vol. 18, 1988.

PUBLIC COPY - REDACTED

"Cuba's Statistical and Price Systems:  Interpretation and Reliability," ***Latin American Perspectives****,* vol. 14, no. 1, 1988.  Revised spanish version in ***El Trimestre Económico****,* vol. 57, no. 227, 1990.

"Incentives and Planning in Cuba," ***Latin American Research Review****,* vol. 24, no. 1 (January 1989).

"Cuba's External Economy: Reflections on Export Dependence, Soviet Aid and Foreign Debt," ***Comparative Economic Studies****,* vol. 30, no. 2, 1988.

"Quinquennial Growth Rates in the CMEA: A Note on Eurocentrism," ***Comparative Economic Studies****,* vol. 30, no. 3, 1988.

"Using Physical Indicators to Estimate GDP Per Capita in Cuba: An Estimate and a Critique," ***Journal of Comparative Economics****,* March 1989.

"What Is Comparative Economic Systems, Normatively Speaking," ***Comparative Economic Studies****,* vol. 31, no. 3, Fall 1989.

"Problems and Prospects of Export Diversification:  The Case of Costa Rica," in E. Paus (ed.) ***Struggle Against Dependence:  Non-traditional Export Promotion in Central America and the Caribbean****.*  Westview Press, 1988.

"Problems and Prospects of Export Diversification: The Case of Panama," in ***Ibid****.*

"Development Strategy and the Growth of Non-traditional Exports in Socialist Cuba," in ***Ibid****.*

"La Economía Cubana Al Comienzo del Cuarto Decenio," ***El Trimestre Económico****,* vol. 56, no. 224 (Octubre-Diciembre 1989).

"The Failure of U.S. Intervention in Panama: Humiliated in Its Backyard," ***Third World Quarterly****,* vol 11, no. 1, January 1989 (with John Weeks).

"Cuba's Socialist Economy After Three Decades," ***Multinational Monitor*** (April 1989).

"Cuba's Economic Diversification: Progress and Shortcomings," in S. Halebsky and J. Kirk (eds.) ***Transformation and Struggle: Cuba Faces the 1990s****,* Praeger Publishers, January 1990.

"Reform in Cuba," in I. Kim (ed.) ***Reform in Communist Systems:  Comparative Perspectives****.*    Washington D.C.: Washington Institute, 1991 (with Wayne Smith).

"El Desarrollo Económico de Cuba en Perspectiva Comparada*,"* ***Cuadernos de Nuestra América****,* vol. 4, no. 4 (December 1989) (with Claes Brundenius).

PUBLIC COPY - REDACTED

"Desarrollo Económico y Crisis en Panamá desde 1970," *Temas de Economía Mundial*, 1992.

"Cuba in the Age of Perestroika: A Review Essay," *Latin American Perspectives*, 1992.

"Perspectives on Cuban Development and Prospects for the 1990s," in A. Hennessy and G. Lambie (eds.), *Cuba and Western Europe: Breaking the Blockade*. London: MacMillan, 1994.

"The Organization and Performance of Cuban Agriculture," in Twomey & Helwege (eds.) *Modernization and Stagnation: Latin  American Agriculture in the 1990s*. New York: Greenwood Press, 1991. (with Claes Brundenius)

"Does the Cuban Economy Work?" *NACLA Report on the Americas*, October 1990.

"Whither the Cuban Economy," in Kirk et. al. (eds.) *Cuba Faces the 1990s*. Boulder: Westview Press, 1992.

"Industrial Management Reform in Cuba," in Ian Jeffries (ed.) *Industrial Reform in Socialist Countries*. England: E. Elgar Publishers, 1992.

"Cuba, 1990," in E. Gamarra and J. Malloy (ed.) *Latin America and Caribbean Contemporary Record*. 1992.

"Salaries and Performance in Major League Baseball," in P. Sommers (ed*.) Diamonds Are Forever: The Business of Baseball*. Washington, D.C.: Brookings Institution, 1992.

"Recent Trends in Latin American Economic Development," in *Proceedings of Symposium on Latin American Studies in theUnited States and the Soviet Union*. Moscow: Institute of Latin America, Academy of Sciences, October 1991.

"Teetering on the Brink: Cuba's Post-CMEA Economic and Political  Crisis," *Journal of Latin American Studies*, vol. 24, no. 2, (May, 1992).

"The Cost of the U.S. Embargo and Its Extraterritorial Application  to the Cuban Economy," in    M. Krinsky et. al. (eds.). *United States Economic Measures Against Cuba*. New York: Aletheia Press, 1993.

"U.S. Subsidiary Trade with Cuba: Competing Tendencies," *Business Tips on Cuba*, vol. 1, no. 2 (November 1992).

"Cuba," in *Economist Intelligence Unit World Outlook*, 1993. London: EIU, 1993.

PUBLIC COPY - REDACTED

"Baseball's Economic Dilemmas and Public Policy," Katherine Asher Engel Lecture, Smith College, November 17, 1992.

"Quarterly Situation Report: Cuba, 1st Quarter - 4th Quarter, 1993," ***Economist Intelligence*** Unit. London: EIU, 1993.

"Institutions of the Service Economy in Panama: Free Zone and Banking Center," in R. Roberts (ed.) ***International Financial Centres***. London: Edward Elgar Pubs., 1994.

"Public Policy Toward Minor League Baseball**,"** ***Oversight Hearings: The Well-Being of Minor League Baseball in New York State***. Trancript of Hearing Before the Committee on Tourism, Recreation and Sports Development, New York State Senate, February 9, 1993: New York, Roy Allen & Associates, 1993.

"Baseball's Economics and the Antitrust Exemption," ***Baseball's Antitrust Immunity***. Written Testimony. Hearing before the Subcommittee on Antitrust, Monopolies and Business Rights of the Committee on the Judiciary. U.S. Senate, 102nd Congress, December 10, 1992. Washington D.C.: USGPO, 1993.

"Hanging on in Havana," ***Foreign Policy***, No. 92, Fall 1993.

"Cuba," in ***Economist Intelligence Unit World Outlook, 1994***. London: EIU, 1994.

"Quarterly Situation Report: Cuba, 1st Quarter, 1994," ***Economist Intelligence Unit***. London: EIU, 1994.

"Baseball Economics and Antitrust Immunity," ***Seton Hall Journal of Sport Law***, vol. 4, no. 1 (1994).

"Cuba: Reforming the Economic System from Within," in J. Pérez-López (ed.), ***Cuba at a Crossroads***. Gainesville: University of Florida Press, 1994.

"El Impacto del Embargo de Estados Unidos para Cuba y Terceros Paises," in W. Grabendorff (ed.), ***Cuba: Apertura Económica y Relaciones con Europa***. Madrid: IRELA, 1994.

"Cuba: compás de espera en La Habana," ***Estudios Internacionales***, XXVII, 107/108, 1994.

"Baseball's Antitrust Exemption," ***The Antitrust Bulletin***, vol. 39, no. 2 (summer 1994).

"La organización y el desempeño de la agricultura cubana," in Twomey & Helweg (eds.) ***Modernización y estancamiento: La agricultura latinoamericana en los***

PUBLIC COPY - REDACTED

***años noventa***. Mexico: Fondo de la Cultura Económica, 1994 (translated and updated version, with Claes Brundenius)

Written Testimony for the House Judiciary Committee's Consideration of the Synar/Bunning Bill on Baseball's Antitrust Exemption. September 1994.

"Waiting for Change: Adjustment and Reform in Cuba," ***World Development***, May 1995. (with Manuel Pastor)

"Facing the Future: External Shocks, Economic Crisis, and the Dynamics of Transition in Cuba," ***NACLA Report on the Americas***, Fall 1995. (with Manuel Pastor)

"Are Professional Team Sports Striking Out?" ***World Book Year Book***,(yearly supplement to the ***World Book Encyclopedia***), 1996.

"Cuba, Castro, Clinton and Canosa," in A. Ritter & J. Kirk (eds**.), *Cuba in the International System: Normalization and Integration***. London: MacMillan, 1996.

Chapter on comparative economic systems in economics textbook published in Russia. (With Tom Weisskopf and Robert McIntyre)

"The Economics of Major U.S. Professional Sports Leagues," in A. Wise, ***International Sport Law and Business***. Cambridge: Kluwer, 1997.

"Professional Sports Franchise Relocations," written testimony before the U.S. Senate, Committee on the Judiciary, January 23, 1996, published in ***Hearing on the Future of Professional Team Sports***. Washington, D.C.: USGPO, 1966. Modified version also presented to hearings of the House Judiciary Committee, February 6, 1.

"The Economic Impact of Sports Teams on Cities," ***Tennessee's Business***, vol. 7, nos. 1-2, 1996.

"Baseball in the 21st Century," in D. Marburger (ed*.) **Stee-rike Four! What's Wrong with the National Pastime***, Greenwood Press, 1996.

"The Cuban Economy in the Era of Helms-Burton," in ***Cuba ante Helms-Burton***, IRELA, Madrid, Spain, 1996.

"Public Policy and the Economic Impact of Sports Teams and Facilities on Metropolitan Area Development," written testimony before the U.S. House of Representatives, Committee on Commerce, Subcommittee on Commerce on Commerce, Trade and Hazardous Materials, on H.R. 2740, ***Hearings on the Fan Freedom and Community Protection Act of 1995***, Serial No. 104-104, May 16, 1996. Washington, D.C.: U.S. Government Printing Office, 1996.

PUBLIC COPY - REDACTED

"Has Cuba Turned the Corner?" *Cuban Studies*, vol. 27, 1997. (with Manuel Pastor)

"Gender Equity and the Economics of College Sports," *JAI's Advances in the Economics of Sports*, edited by W. Hendricks, 1997.

"Sports, Jobs and Taxes: Are New Stadiums Worth the Costs?" *Brookings Review*, Summer 1997. (with Roger Noll)

"Build the Stadium: Create the Jobs," *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew Zimbalist,  Brookings Institution, October 1997. (with Roger Noll)

"The Economic Impact of Sports Teams and Facilities," *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew  Zimbalist , Brookings Institution, October 1997. (with Roger Noll)

"Sports, Jobs and Taxes: The Real Connection," *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums* edited by Roger Noll and Andrew Zimbalist , Brookings Institution, October 1997. (with Roger Noll)

"The Economics of Stadiums, Teams and Cities," *Policy Studies Review*, Vol 15, No. 1, Spring 1998.

"El enigma economico de Cuba," in D. Dirmoser and J. Estay, *Economia y reforma economica en Cuba*. Mexico City: Nueva Sociedad, 1998.

"College Sports: The Bottom Line," *College Football: Nonprofit – Yes or No*. American Bar Association, 1999.

"A Miami Fish Story," *The New York Times Magazine*, October 18, 1998. Reproduced in Peter Donnelly (ed.) *Taking Sports Seriously*.  Toronto: Thompson, 2000.

"The Economics of Sports Facilities and Their Communities," *Journal of Economic Perspectives*, Spring 2000, vol. 14, no. 3. (with John Siegfried).

"The Y2K Problem in Professional Sports," in W. Kern (ed.), *Current Issues in Sports Economics*, Upjohn Institute, 2000.

"Whither the Cuban Economy," in S. Kaufman and D. Rothkopf (eds.), *Cuba: Preparing for the Future*, America's Society, 2000.

"The Economics of Stadiums, Teams, and Cities," in Wibur Rich (ed.) *The Economics of Politics and Sports Facilities*. Westport, Conn.: Quorum Books, 2000.

PUBLIC COPY - REDACTED

"The Cuban Economy at the Millenium," in Dick Clark (ed.) *U.S. Policy Toward Cuba*. Washington, D.C.: The Aspen Institute, 2000.

"The State of Competition in Major League Baseball," *Hearing before the Subcmte. On Antitrust, Business Rights, and Competition of the Senate Committee on the Judiciary*, 106th Cong., 2000.

"Postscript," chapter in paperback edition of *Unpaid Professionals*, forthcoming, February 2001.

"Competitive Balance and Labor Relations in Major League Baseball," *Milken Institute Review*, Volume 3, Number 1, (February, 2001).

"Escalating Ticket Prices in Professional Sports," *2001 Americana Annual/ Encyclopedia Year Book*.  Grolier, 2001.

"Foreword," to the second edition of *Fair Ball: A Fan's Case for Baseball* by Bob Costas. Broadway Books, 2001.

"Introduction," in A.Zimbalist (ed.) *The Economics of Sport*. London: Edward Elgar, summer 2001.

"The Peculiar Economics of Baseball,"  in *Baseball As America.* Washington, D.C.: National Geographic & National Baseball Hall of Fame, March 2002.

 "Competitive Balance in Sports Leagues: An Introduction," *The Journal of Sports Economics*, vol. 3, no. 2 (May 2002).

"Testing Causality Between Team Performance and Payroll: The Cases of Major League Baseball and English Soccer," *The Journal of Sports Economics*, vol. 3, no. 2 (May 2002).  Reprinted in Bill Gerrard (ed.) *The Economics of Association Football*.  London: Edward Elgar, 2006. (with Stephen Hall & Stefan Szymanski) and in *Recent Developments in the Economics of Sport,* edited by Wladimir Andreff, London: Edward Elgar, 2011.

"A Note on the Local Impact of Sports Expenditures," *The Journal of Sports Economics*, vol. 3, no. 4 (December 2002), with John Siegfried.

"The Cuban Economy Toward the 21st Century: Performance and Prospects," in Max Azicri and Elsie Deal (ed.), *Cuban Socialism in a New Century: Adversity, Survival and Renewal.*  Gainesville: University Press of Florida, 2004.

"Competitive Balance Conundrums: Reply to Fort and Maxcy," *The Journal of Sports Economics*, May 2003, vol. 4, no. 2.

PUBLIC COPY - REDACTED

"Sports and Economics," ***U.S. Society & Values: Sports in America.*** (Journal of the U.S. Department of State), December 2003, vol. 8, no. 2.

"May the Best Team Win: Making Baseball Competitive," ***The Brookings Review***, Fall 2004.

"Labor Relations in Major League Baseball," ***The Journal of Sports Economics***, Winter 2004.

"Sport as Business," ***Oxford Review of Economic Policy***, Winter 2004, vol. 19, no. 4.

"Cable Television and Monopoly Power in Sports Programming," ***Milken Institute Review***, vol. 5, no. 4, Winter 2004.

"The Practical Significance of Baseball's Antitrust Exemption," ***Entertainment and Sports Lawyer***, Vol. 22, No. 1, Spring 2004.

"Reforming Intercollegiate Athletics," in Bruce Svare (ed.) ***Sports Reform in America***, forthcoming.

"Whither Baseball Economics," ***Nine: A Journal of Baseball History and Culture***, Vol 13 Number 1, September 2004.

"What to Do About Title IX," ***Gender Issues***, vol. 21., no. 2, Spring 2003. Reprinted in R. Simon (ed.) ***Sporting Equality: Title IX Thirty Years Later***. New Brunswick: Transaction Books, 2005.

"Unionism in Team Sports," in ***Berkshire Encyclopedia of World Sport***, 2005.

"Organizational Models in  Professional Team Sports Leagues," in S. Szymanski & W. Andreff (eds.),  ***Handbook of Sports Economics***, Edward Elgar, 2006.

"The Economics of Sport," in S. Durlaf et al., ***The New Palgrave***, Macmillan, 2005. (with Stefan Szymanski)

"Preface" for second edition of ***National Pastime***, June 2006. (with Stefan Szymanski)

"'Compensating differentials and the social benefits of the NFL' – A Comment," ***Journal of Urban Economics***, Vol. 60, No. 1 (July 2006): 124-131.  (with Dennis Coates and Brad Humphreys)

"Economic Perspectives on Market Power in the Telecasting of US Team Sports," in C. Jeanrenaud and S. Kesenne (eds.), ***The Economics of Sport and the Media***, Edward Elgar Pubs., 2006.

PUBLIC COPY - REDACTED

"Facility Finance: Measurement, Trends, and Analysis," *International Journal of Sport Finance,* vol. 1, no. 4, November 2006.   To be reprinted in B. Humphreys and D. Howard (eds.)  *The Business of Sport.*  Praeger, 2008.  (with Judith Grant Long).  Reprinted also in *Recent Developments in the Economics of Sport,* edited by Wladimir Andreff, Edward Elgar, Fall 2011.

"The Economic Impact of Sports Facilities, Teams and Mega-Events" *Australian Economic Review*, December 2006.  (with John Siegfried)

"A Wink and a Smile: Getting a Leg Up on the Competition through Real Estate during the Glory Years," in J. Thorn (ed.), *Baseball in New York, 1947-57*, Harper Collins, 2007.

"Unionism in U.S. Sports," *Scribner's Dictionary of American History*, 2008.

"Governance of Sports Leagues: Experiences and Lessons," in P. Rodriguez et al. (eds.) *Governance and Competition in Professional Sports Leagues*, Universidad de Oviedo, 2008.

"What to Do About Title IX," *Legal Issues in College Sports*, November 2007.

"The Financing and Economic Impact of the Olympic Games,"  in B. Humphreys and D. Howard (eds.)  *The Business of Sport.*  Praeger, 2008.  (with Brad Humphreys)

"New Balance: Salary Caps, Revenue Sharing and Luxury Taxes in Professional Sports Leagues," *The Milken Institute Review*, vol. 10, no. 4, 2008.

"Marvin Miller's Contribution to Major League Baseball," *Induction Ceremony Commenorative Journal (National Jewish Sports Hall of Fame and Museum).* April 2009.

"Gender Equity in Intercollegiate Athletics: Economic Considerations and Possible Solutions," forthcoming in *Sports Economics,* edited by Leo Kahane and Stephen Shamske, Oxford University Press.

"Performance Enhancing Drugs and Antidoping Policy in Major League Baseball: Experience, Incentives and Challenges," Rodriguez, P.; Kesenne, S; García, J. (eds.) *Threats to Sports and Sports Participation*. Universidad de Oviedo Press. Oviedo, Spain, May 2008.

"Reflections on Title IX," *Smith Alumnae Quarterly*, June 2009.

"Assessing the Antitrust Case Against the Bowl Championship Series," *Global Competition Policy*, May 2009.

"Anitrust, the BCS and Public Policy," *Antitrust Bulletin*, Winter 2009.

PUBLIC COPY - REDACTED

"Baseball's Economic Development," in L. Cassuto (ed.) Oxford's ***Baseball Companion***, 2010.

"Is It Worth It? Hosting the Olympic Games and other Mega Sporting Events is an Honor Many Countries Aspire to – But Why?" ***Finance & Development***, March 2010. Reprinted in ***Current Economics***, March 2010.

"Dollar Dilemmas During the Downturn: A Financial Crossroads for College Sports," ***Journal of Intercollegiate Sport***, June 2010.

"Be Careful What You Wish For Revisited: A Response to Jeff Orleans," ***Journal of Intercollegiate Sport***, June 2010.

"CEOs with Headsets: Why College Coaches Make Too Much and What to Do About It," ***Harvard Business Review***, September 2010.  Reproduced in audio book of best HBR pieces in 2010.

"The Economic Impact of the Olympic Games," ***The New Palgrave***, March 2011.

"An Economic Lesson from the Sports Industry," ***Harvard College Economics Review***, March 2011.

"Ongoing Debates in U.S. Sports Law: An Economist's Perspective," in ***Tagungsband***, edited by Karl_Heinz Schneider and Song Luzeng, conference volume from German Sports University, forthcoming, fall 2011.

"Brazil's Long To-Do List," ***America's Quarterly***, Summer 2011.

"Sport League Design: Incentives and Performance in Major League Baseball," ***Sport and Economy*** (Conference Volume of the International Hamburg Symposium, 2011). Hamburg: Meyer & Meyer Verlag, 2012.

"Reflections on 'The Wealth-Power-Inequality-Gender Connection," to appear in ***Capitalism on Trial***, edited by Robert Pollin, 2013.

"Des relations du travail dans les ligues sportives aux Etats-Unis," ***Jurisport***, April, 2012.

"Introduction: the economics of mega sporting events,"  in Maennig and Zimbalist, ***International Handbook on the Economics of Mega Sporting Events.***  London: Edward Elgar, 2012.

"What is a mega sporting event?"  in Maennig and Zimbalist, ***International Handbook on the Economics of Mega Sporting Events.***  London: Edward Elgar, 2012.

PUBLIC COPY - REDACTED

"Future challenges: maximizing the benefits and minimizing the costs," in Maennig and Zimbalist, ***International Handbook on the Economics of Mega Sporting Events.*** London: Edward Elgar, 2012.

"Inequality in Intercollegiate Athletics: Origins, Trends and Policies," ***Journal of Intercollegiate Sport.*** 2013.

"Epilogue: In the Best Interests of Baseball," ***In the Best Interests of Baseball? Governing the National Pastime.*** University of Nebraska Press, 2013.

"Thoughts on Amateurism, the O'Bannon Case and NCAA Reform," at thedrakegroup.org, March 2013 (with Allen Sack).

"Sports Facilities and Economic Development," ***Government Finance Review***, Winter 2013.

"Taxation of College Sports: Policies and Controversies," in Eddie Comeaux (ed.), ***Introduction to Intercollegiate Athletics in American Higher Education.*** Johns Hopkins University Press, 2014.

"Quantifying Inefficiencies in the Baseball Players' Market," ***Eastern Economic Journal***, Spring 2014. (with Ben Baumer.)

"The Economy of the National Hockey League," in Lewis Kurlantzick (ed.), ***Legal Issues in Professional Hockey***, Academica Press, forthcoming, 2016.

"The Illusory Economic Gains from Hosting the Olympics and World Cup," ***World Economic Journal***, March 2015.

"Corruption and the Bidding Process for the Olympics and World Cup" in Transparency International's ***Global Corruption Report***, Transparency International, Routledge, 2016.

“El Futuro de Peleteros Cubanos en el Béisbol de las Grandes Ligas," ***Temas***, Febrero 2016.

“The Japanese Experience with the IOC and FIFA,” introductory chapter for Japanese edition of ***Circus Maximus***, March 2016.

“Pay for Play: Unionization and the Business of the NCAA,” ***Journal of Business and Securities Law,*** Vol. 16 (2016).

“Fixing Intercollegiate Athletics and a Constrained, Conditional Antitrust Exemption,” ***Managerial and Decision Economics***, (June 2016).

“The Organization and Economics of Sports Mega-Events,” ***Intereconomics: Review of European Economic Policy***, Vol. 51 (May/June 2016).

"Reforming College Sports: The Case for a Limited and Conditional Antitrust Exemption," ***The Antitrust Bulletin***,  March 2017.

"Introduction: Rio 2016," in ***Rio 2016: Olympic Myths, Hard Realities***, edited By Andrew Zimbalist, Brookings Institution Press, September 2016.

"The Economic Legacy of Rio 2016," in ***Rio 2016: Olympic Myths, Hard Realities***, edited By Andrew Zimbalist, Brookings Institution Press, September 2016.

"Boston Passes on the Olympic Torch," ***CATO Journal***, Fall 2017, forthcoming.


## Journalistic Articles:

"Allende's Chile:  A Post-Mortem," ***Boston Real Paper***, (September 26, 1973).

"Worker Control Over Technology: Labor Issues for the Eighties," ***The Nation***, Vol. 229, No. 16 (November 17, 1979).

"Impressions of Cuba:  The Olympics,  The Economy and Politics," ***Cubatimes***, (Sept./Oct. 1984). (with A. MacEwan).

"Twisting Statistics on Cuban Health," ***Cubatimes***, (Jan./Feb. 1985).

"Cuban Labor Markets Reconsidered," ***Cuba Business***, vol. 2, no. 2 (April 1988).

"Sugar Dependence: Has Cuba's Diversification Strategy Worked?" ***Cuba Business***, vol. 2, no. 4 (August 1988).

"Non-traditional Exports," ***Cuba Business***, vol. 2, no. 5 (October 1988).

"Sugar Diversification," ***Cuba Business***, vol. 2, no. 5 (December 1988).

"The Impact of the U.S. Blockade on the Cuban Economy," ***Cuba Update***, April 1990.

"Has the U.S. Blockade Helped Cuba?" ***Cuba Business***, vol. 3, no. 3 (June 1989).

"Cuban-Soviet Relations: The Gorbachev Visit and After," ***Cuba  Business***, vol. 3, no. 4 (August 1989).

"In Search of Efficiency," ***Cuba Business***, vol. 5, nos. 2&3 (April & June, 1991).

"Take Me Out to the Cleaners," ***New York Times***, op-ed piece, 14 July 1992.

PUBLIC COPY - REDACTED

"Baseball's Antitrust Exemption," ***Legal Times***, vol. xv, no. 27 November 1992. Reprinted in The Connecticut Law Tribune, vol. 18, no. 47 (November 1992).

"Impact of the Blockade," ***Cuba Business***, vol. 6, no. 6 (November/December 1992).

"Give Castro a Carrot," ***The New York Times***, op-ed piece, February 17, 1994.

"Field of Schemes: The Case for a Baseball Strike," ***The New Republic***, August 15, 1994.

"Is Baseball Whiffing in the Cash Column?" ***Newsday***, op-ed piece, August 14, 1994.

"Batter Up, Already," ***The New York Times***, February 14, 1995.

"Not Suitable for Families," essay published in ***U.S. News & World Report***, January 20, 1997.

"Fewer Families Own Sports Teams: It's Okay" op-ed published in ***USAToday***, May 21, 1997.

"Municipalities in the '90s Don't Seem to Know When to Say When," ***Sports Business Journal***, Vol. 1, No. 6, June 1-7, 1998.

"So You Want to Own a Big-League Ball Team?" ***Sports Business Journal***, Vol. 1, No. 7, June 8-14, 1998.

"Capital Needs, Political Realities Fuel New Interest in Sports Offerings," ***Sports Business Journal***, Vol. 1, No. 10, June 29-July 5, 1998.

"Team Profitability and Labor Peace," ***New York Times***, op-ed, July 5, 1998.

"This Bud's for a Salary Cap," ***Sports Business Journal***, Vol. 1, No. 14, July 27 - August 2, 1998.

"Dollar Signs Tell the Story Behind NBA Lockout," ***Sports Business Journal***, Vol. 1, No. 16, August 16, 1998.

"A Scary Thought: Jones May Be Right About Browns," ***Sports Business Journal***, Vol. 1, No. 20, September 7-13, 1998.

"Without Subsidies, Few Athletic Programs Are Turning a Profit," ***Sports Business Journal***, Vol. 1, No. 20, September 7-13, 1998.

"What's BOB Really Worth to Phoenix?" ***Sports Business Journal***, Vol. 1, No. 20, September 7-13, 1998.

PUBLIC COPY - REDACTED

"Taking Stock in the Indians," ***Sports Business Journal***, Vol. 1, No. 26, October 19-26, 1998.

"Fair is Fair, Even If You're a Superstar" ***Newsday***, op-ed, November 3, 1998.

"Let the Market Rule the Basketball Court," ***The Wall Street Journal***, op-ed, November 10, 1998.

"NBA Lockout: Which Side Is Dropping the Ball?" ***The New York Times***, op-ed, November 29, 1998.

"Football Stadium Folly," ***The New York Times***, op-ed, December 5, 1998.

"The Patriots Deal: Giving Everything and Getting Nothing," ***The Hartford Courant***, op-ed, December 13, 1998.

"Stadium for Patriots in Hartford Will Fail as Economic Development, Just Like Others," ***Journal Inquirer***, op-ed, December 14, 1998.

"Thanks to Kraft and Governor, Connecticut Gains a Team and Loses Its Shirt," ***Sports Business Journal***, op-ed, December 21-27, 1998.

"If Competitive Balance Spoils the Show, Congress Waits in the Wings," ***Sports Business Journal***, January 11-17, 1999.

"Has Milstein Lost His Mind? Not Hardly," ***Sports Business Journal***, January 25-31, 1999.

"The NBA Lockout: A Post-Mortem," ***Sports Business Journal***, February 15-21, 1999.

"When Teams Move, Protecting Both Fans and Owners Is Tricky," ***Sports Business Journal***, February 22-28, 1999.

"Hail Mary Economics," ***The Dismal Scientist*** (economics magazine on the web, www.dismal.com), March 18, 1999.

"Selig, Players Both Err Early Regarding Competitive Balance," ***Sports Business Journal***, March 22-28, 1999.

"Baseball Si, Embargo No," ***Sports Business Journal***, April 5-11, 1999.

"Spreading the Wealth While Also Spreading the Sacrifice," ***Sports Business Journal***, April 19-25, 1999.

PUBLIC COPY - REDACTED

27

"Four Reasons the Patriots Returned, and Loyalty Isn't One of Them," ***Sports Business Journal,*** May 16-23, 1999.

"There's No Accounting for College Sports," ***University Business***, vol. 2, no. 5 (June 1999).

"If the Redskins Are Worth $800 Million …," ***Texas Monthly***, September 1999.

"Flawed Specter Bill Still a Worthy Start for Stadium Finance Reform," ***Sports Business Journal***, June 14-20, 1999.

"Arguments Against Making Freshmen Ineligible Fail Examination," ***Sports Business Journal***, July 12-18, 1999.

 "Thinly Spread Talent Creates Challenge to Records But Also to Baseball," ***Sports Business Journal***, August 9-15, 1999.

"NCAA Needs a Real Game Plan to Emerge from Dark Season," ***Sports Business Journal***, September 6-12, 1999.

"Deep Contradictions at the NCAA," ***NewsSmith***, Fall 1999.

"College Sports Crisis," ***The Washington Times***, October 1, 1999.

"Despite Questions, Minor League Basketball Is the Answer," ***Sports Business Journal***, October 4-10, 1999.

"The NFL's New Math," ***The Wall Street Journal***, October 13, 1999.

"College Athletics System Practically Guarantees Academic Fraud," ***Sports Business Journal***, November 1-7, 1999.

"Baseball Needs Millennial Remedies After Its Comeback Stumbles," ***Sports Business Journal***, November 29 – December 5, 1999.

"CBS' Big NCAA Deal Is No Cure for What's Ailing College Sports," ***Sports Business Journal***, December 27, 1999 – January 2, 2000.

"Irish 'Win One for the Gipper', Get Off With Mild Rebuke," ***Sports Business Journal***, January 10-16, 2000.

"Don't Cry for Woody," ***Sports Business Journal***, January 24-30, 2000.

"Jordan Effect Won't Rescue NBA," ***Wall Street Journal***, January 24, 2000.

"The Commissioner's New Clothes," ***Sports Business Journal***, February 21-27, 2000.

PUBLIC COPY - REDACTED

"Backlash Against Title IX: an End Rund Around Female Athletes," ***Chronicle of Higher Education***, March 3, 2000. Reprinted in Lynn Messina (ed.) ***Sports in America***. New York: H.W. Wilson, 2001.

"Overinflated," ***Brill's Content***, April 2000.

"NCAA's Definition of 'Amateur' Evolves, But Hypocrisy Remains," ***Sports Business Journal***, March 20-26, 2000.

"MLB, Players Should Get to the Point," ***Sports Business Journal***, April 17-23, 2000.

"Reforms Offer Bigger Payoff Than Salaries," ***Sports Business Journal***, May 15-21, 2000.

"Fair's Fair for New Fenway – But Is It?" ***Sports Business Journal***, June 12-18, 2000.

"Economics 100: Higher Ticket Prices Not Caused By Payroll," ***Sports Business Journal***, July 10-16, 2000.

"Blue Ribbon in Review: Good News and Bad," ***Sports Business Journal***, August 7-13, 2000.

"Rob Manfred, What Planet Are You On?" ***Sports Business Journal***, August 28 – September 3, 2000.

"Academics Get No Boost from Boosters," ***Sports Business Journal***, September 4 – September 10, 2000.

"XFL Is No Match for NFL's Firepower," ***Sports Business Journal***, October 2 – 8, 2000.

"NCAA's New Financial Report: Good News?" ***Sports Business Journal***, November 6-12, 2000.

"Yes, It's About Money," ***New York Times***, December 13, 2000.

"MLB Imbalance Shows Up in the Numbers," ***Sports Business Journal***, December 18-24, 2000.

"Let Those Interested in Basketball Go to the Pros," ***Sports Business Journal,*** January 22-28, 2001.

PUBLIC COPY - REDACTED

"NBA Players Doing Just Fine at the Pay Window, Thank You," ***Sports Business Journal***, January 29-February 4, 2001.

"NFL's Revenue Structure Saps Will to Win," ***Sports Business Journal***, February 26 – March 4, 2001.

"History – and Leading Economic Indicators – Best Guides to Future," ***Sports Business Journal***, March 12-18, 2001.

"The Price of Athletic Success," www.sportsjones.com, March 2001.

"Selig Wrong to Get That Shrinking Feeling," ***Sports Business Journal***, April 2-8, 2001.

"Share of Ball Park: $16 a Year," op-ed, ***Miami Herald***, April 30, 2001.

"MLB's Balance Debate Deserts Middle Ground," ***Sports Business Journal***, May 7-13, 2001.

"A New Ballpark: The Catch," ***St. Louis Post-Dispatch***, May 6, 2001.

"Twins Shouldn't Be Exhibit A for Contraction," ***Sports Business Journal***, June 11-17, 2001.

"Cards Offer Is in the Ballpark," ***St. Louis Post-Dispatch***, June 20, 2001.

"Does Baseball's Antitrust Exemption Still Matter? More Than You Think," ***Sports Business Journal***, July 9-15, 2001.

"Knight Report Yields Little New, Much Worthy," ***Sports Business Journal***, July 16-22, 2001.

"Teams Riding High, Despite NFL Protest," ***Sports Business Journal***, August 20-26, 2001.

"Should College Athletes Be Paid?" ***American Teacher***, September 2001.

"Boston Bidders, Here's How to Figure Out What Sox Are Worth," ***Sports Business Journal***, September 10-16, 2001.

"Sports and Their Fans – Kudos," ***Sports Business Journal***, October 1-7, 2001.

"New Economic System for NHL Has Both Promise, Problems," ***Sports Business Journal***, October 29 – November 4, 2001.

"Why 'Yer Out' Is A Bad Call for Baseball," ***Business Week***, November 12, 2001.

PUBLIC COPY - REDACTED

"Baseball's Addition Through Subtraction Just Doesn't Add Up," *Sports Business Journal*, November 19-25, 2001.

"Contraction Might Not Fly, But Talk Will Help Hold Salaries Down," *Sports Business Journal*, December 3-9, 2001.

"MLB By the Numbers: But Who's Buying?" *Sports Business Journal*, December 24-30, 2001.

"New York City Can Do Better," *New York Post*, January 17, 2002.

"Baseball and D.C., for All the Wrong Reasons," *The Washington Post Outlook*, January 27, 2002.

"Zimbalist to Manfred: You Made Point for Me," *Sports Business Journal*, February 11-17, 2002.

"Baseball by the Numbers," *New York Times Sunday Magazine*, March 31, 2002.

"That's Not the Sky Falling on TV Rights Landscape, Just a Little Rain," *Sports Business Journal*, April 1-7, 2002.

"All Right All You Lawyers, Play Ball!," *Business Week*, April 15, 2002.

"The Exemption Is As Bad Today As When It Began," *Sports Business Journal*, April 29 - May 5, 2002.

"Making the (Up)grade Is Tougher Than It Looks," *Sports Business Journal*, May 27 – June 2, 2002.

"Los Angeles and the NFL: Here We Go Again," *Sports Business Journal*, June 24-30, 2002.

"MLS May Not Reap Benefits It  Expects From World Cup Fever," *Sports Business Journal*, July 22-28, 2002.

"Middle Ground Not Yet Lost for Baseball Bargainers," *Sports Business Journal*, July 29-August 4, 2002.

"Another Bowl Game Not What NCAA Needs," *Sports Business Journal*,  July 29-August 4, 2002.

"The Mets Are Worth More Than $391 Million," *Sports Business Journal*, August 19-25, 2002.

"Numbers, Facts Don't Back Title IX Critics," *Sports Business Journal*, September 16-22, 2002.

PUBLIC COPY - REDACTED

"Beantown's New Brain Trust Touches All the Fan Bases," ***Sports Business Journal***, October 14-20, 2002.

"Labor Relations Heating Up in the NBA," ***Sports Business Journal***, November 11-17, 2002.

"Live from New York City: Inflation, Traffic – and the Olympics!" ***Wall Street Journal***, November 14, 2002.

"Time to End the Big Colleges' Scam," ***Sports Business Journal***, December 9-15, 2002.

"MLB's Salary Restraints Working – For Some," ***Sports Business Journal***, January 6-12, 2003.

"Stadium Renovations: The Real Economic Story," ***Kansas City Star***, January 29, 2003.

"The NFL's Report Card," ***Sports Business Journal***, February 3-9, 2003.

"MLB's New CBA Already At Work," ***Sports Business Journal***, March 3-9, 2003.

"Boom Is Over? Don't Believe Everything You Read," ***Sports Business Journal***, March 31-April 5, 2003.

"Flawed Financial Analysis of NHL Skates on Thin Ice," ***Sports Business Journal***, April 28-May 4, 2003.

"Gloom and Doom in MLB Stats – or Maybe Not," ***Sports Business Journal***, May 26 – June 1, 2003.

"Concentration of Media Ownership Carries Big Price," ***Sports Business Journal***, June 23 – June 29, 2003.

"A's New Management Model a Work in Progress," ***Sports Business Journal***, July 21 – July 27, 2003.

"Trading on Baseball's Competitive Integrity," ***Sports Business Journal***, August 18-24, 2003.

"Imperfect, Prejudicial BCS System Ripe for Reform," ***Sports Business Journal***, September 15-21, 2003.

"The Gold in Baseball's Diamond," ***The New York Times***, op-ed, September 30, 2003.

PUBLIC COPY - REDACTED

"What Went Wrong With WUSA?" *Sports Business Journal*,  October 13-19, 2003.

"Money Game: Baseball's Short-Lived Rally," *Forbes*, November 10, 2003.

"NHL Labor Relations: Sorting Through the Rhetoric," *Sports Business Journal*,
    November 10 –16, 2003.

"NHL Labor Relations: Crafting a New Agreement," *Sports Business Journal*,
    November 17 - 23, 2003.

"A Fan's Delight Pays Off for Stadium Owner, Too," *Sports Business Journal*,
    December 8 - 14, 2003.

"Baseball Makes a Mess in Milwaukee," *The New York Times*, op-ed, December
    21, 2003.

"Clarett Has a Compelling Case for NFL Eligibility," *Sports Business Journal*,
    January 12-18, 2004.

"Jeremy Bloom Can Guide NCAA to Logical Reform," *Sports Business Journal*,
    February 9-15, 2004.

"A-Rod Should Boost Yanks' 2004 Revenues by $20M," *New York Sun*, February
    20, 2004.

"Break Up the Yankees?" *Sports Business Journal*, April 5-11, 2004.

"MLB's Debt Rule Reveals More Smoke and Mirrors," *Sports Business Journal*,
    May 3-9, 2004.

"Bush Panders for Votes While Hurting Cubans," *Newsday*, May 20, 2004.

"The Bush Economy: Living on Borrowed Time," *Newsday*, June 21, 2004.

"MLB's Internet Arm Gets a Leg Up," *Sports Business Journal*, June 28-July 4,
    2004.

"MLB Still Has Work to Do," *Sports Business Journal*, July 26-August 1, 2004.

"Enough Already: Put Baseball Back in DC," *Sports Business Journal*, September
    13-September 19, 2004.

"Tweaking the NFL Juggernaut," *Sports Business Journal*, October 4-10, 2004.

"Solving the NHL's Stalemate, *Sports Business Journal*, October 18-24, 2004.

"Games People Play," *New York Times*, November 14, 2004.

PUBLIC COPY - REDACTED

"Straight Talk on Stadiums," *Sports Business Journal*, November 15-21, 2004.

"No Easy Answers for MLB's Steroid Scandal," *Sports Business Journal*, December 13-19, 2004.

"$53 Million for Pedro? How Do You Figure?" *New York Times*, December 19, 2004.

"Hockey Owners Give Their Sport a Slap Shot," *Newsday*, January 5, 2005.

"Union Proposal Shows Way Out of NHL Hockey Mess," *Sports Business Journal*, January 10-16, 2005.

"NFL, Krafts Make the Super Bowl Math Add Up," *Sports Business Journal*, February 14-20, 2005.

"Single-Entity Ownership Too Simple to Solve NHL's Complex Problems, *Sports Business Journal*, March 14-20, 2005.

"In Steroids Hearings, Congress Has Its Eye on the Wrong Ball," *Sports Business Journal*, April 4-10, 2005.

"Curb Coaches' Salaries and Preserve Title IX Gains," *Sports Business Journal*, May 2-8, 2005.

"British Soccer Fans, Kicked Again," *Washington Post*, May 22, 2005. (with Stefan Szymanski)

"More Benevolence in Stadium Games," *Sports Business Journal*,  May 30 – June 5, 2005.

"Does a Stadium Help the Economy," *Washington Examiner*, May 26, 2005.

"New York Facility Triad Is Good News," *Sports Business Journal*, June 27 – July 3, 2005.

"Economic Impact of the Olympic Games Rarely Adds Up to Much Gold," *Sports Business Journal*, August 1-7, 2005.

"With Steroids, Settle In for the Long Haul," *Sports Business Journal*, August 29-September 3, 2005.

"McClatchy's Pirates Demonstrate the Art of Doing Less with More," *Sports Business Journal*, September 19 - 25, 2005.

"Its Owners Divided, the NFL Reaches a Revenue-Sharing Crossroads," *Sports Business*

PUBLIC COPY - REDACTED

*Journal*, October 24-30, 2005.

"How Much Is Theo Worth?" ***Boston Globe***, Novemeber 2, 2005.

"Monopoly's Money: Nascar's Real Reason for Breaking Up Big Teams Is to Protect Its Cartel," ***New York Times,*** November 6, 2005.

"How to Confront MLB's Shrinking TV Audience," ***Sports Business Journal***, November 28 – December 3, 2005.

"The NHL's Wage Conspiracy Won't Survive Legal Scrutiny," ***Sports Business Journal***, December 19-25, 2005.

"Solution to Salary Inflation Among College Coaches Is Clear, But Unlikely," ***Sports Business Journal***, January 16 – 23, 2006.

"Fair Ball," ***New York Times***, January 22, 2006.

"Financing a New Yankee Stadium: The Devil Is In The Details," ***Baseball Prospectus***, January 30, 2006.

"Myth and Reality: The Economic Impact of the Super Bowl," ***Sports Business Journal***, February 20 – 26, 2006.

"Over and Out," ***Baseball Prospectus***, February 22, 2006.

"Baseball Can Learn from Hockey," ***Sports Business Journal***, March 27 – April 2, 2006.

"Fans, critics should keep expectations of steroid investigation realistic," ***Sports Business Journal***, April 24 – April 30, 2006.

"Administration's stealth tactics could undermine progress of Title IX," ***Sports Business Journal***, May 15 – May 21, 2006.

"Professional Soccer in U.S. Prepared for Take Off," ***Sports Business Journal***, June 19 – June 25, 2006.

"Unsettling issues will test strength of MLB's first-half success stories," ***Sports Business Journal***, July 24 – July 30, 2006.

"It's Time to Enforce Title IX Again," ***Sports Business Journal***, August 21 – August 27, 2006.

"A New Trend in Facility Financing," ***Sports Business Journal***, September 18 – September 24, 2006.

PUBLIC COPY - REDACTED

"Clutch Play" ***Boston Globe***, October 8, 2006.

"The Cardinals' Owners Deserve Our Praise," ***Sports Business Journal***, October 16 – October 22, 2006.

"The Cardinals Deliver Winning Teams, And More," ***St. Louis Post Dispatch***, October 30, 2006.

"MLB's New CBA Augurs Well for Future Growth," ***Sports Business Journal***, November 6 – November 12, 2006.

"Congress Is Right to Investigate the NCAA's Tax Privileges," ***Sports Business Journal***, December 18 – 24, 2006.

"College Athletics Turns Pro," ***New York Times***, January 7, 2007.

"Baseball's Posting Paradox," ***Sports Business Journal***, January 15 – January 21, 2007.

"Player Disability Insurance Challenges Sports Leagues," ***Sports Business Journal***, February 19- 25, 2007

"A Dose of Capitalism Wouldn't Hurt the NFL," ***Sports Business Journal***, March 19-25, 2007.

"Value of Student-Athlete is Often Forgotten Amid Catastrophic Injury," ***Sports Business Journal***, April 24-30, 2007.

"Prejudiced NBA Referees? Think Again," ***Sports Business Journal***, May 21-27, 2007.

"College Sports May Be Fun, But They Are Not Money Makers," ***Sports Business Journal***, June 18-24, 2007.

"An Exchange of Strategies Could Benefit MLB, Japanese Leagues Alike," ***Sports Business Journal***, July 16-23, 2007.

"New GAO Report Belies Critics of Title IX," ***Sports Business Journal,*** August 20-26, 2007.

"Why the PGA's Fedex Cup Faced Trouble from the Start," ***Sports Business Journal***, September 17-23. 2006.

"Baseball's Fortunes Are Soaring in More Ways Than One," ***Sports Business Journal***, October 15, 2007.

PUBLIC COPY - REDACTED

"Boras is Playing Poker with his Clients' Money (and Reputation)," ***Sports Business Journal***, November 19-25, 2007.

"Rays' Owners Offer Worthy Stadium Plan for St. Petersburg," ***Sports Business Journal***, December 17-23, 2007.

"More Financial Challenges in Store for College Athletics -- There's a Reasonable Remedy," ***Sports Business Journal***, January 21-27, 2008.

"Webster Decision Could Have Huge Impact on Soccer Salaries, Finances," ***Sports Business Journal***, February 18-24, 2008.

"Salary Shares in Sports Leagues – There's More Than Meets the Eye," ***Sports Business Journal***, March 11-17, 2008.

"The Cuban Embargo: Enough Already," ***Flyp***, March 27- April 10, 2008.  (Reprinted at ***Tikkun.com***, March-April, 2008.)

"Blowing Smoke at the Steroid Problem," ***Sports Business Journal***, April 22-28, 2008.

"Day of Reckoning is Coming for College Sports," ***Sports Business Journal***, May 19-25, 2008.

"Zell Is Barking Up the Wrong Tree with Sale of Cubs," ***Sports Business Journal***, June 16-22, 2008.

"New Yankee Stadium Shaping Up to Offer Fans Top-Notch Baseball Experience," ***Sports Business Journal***, July 21-27, 2008.

"Baseball's Peculiar Offseason, 2008-09," ***Sports Business Journal***, November 24-30, 2008.

"Women's Sports," ***Tikkun***, January/February 2009.

http://freakonomics.blogs.nytimes.com/2009/01/09/questions-for-sports-economist-andrew-zimbalist/

"March Madness It is, Economically," ***Wall St. Journal***, March 10, 2009.

"Financing College Sports: It's Time for a Change," ***MindingtheCampus.com***, March 12, 2009.

"Short of Paying Players: Fix the Rules,"  ***New York Times,*** March 3, 2009, at http://roomfordebate.blogs.nytimes.com/2009/03/18/march-money-madness/

"Baseball Amid a Financial Meltdown," ***San Diego Union-Tribune***, April 9, 2009.

PUBLIC COPY - REDACTED

"A Conversation: The Sports Recession," *The New Yorker Online*, August 5, 2009.

"Do Olympic Hosts Ever Win? Not a Rosy Picuture," *New York Times*, October 2,
2009, at http://roomfordebate.blogs.nytimes.com/2009/10/02/do-olympic-host-cities-ever-win/

"The Yankees Didn't Buy the World Series," *Wall Street Journal*, November 16, 2009.

"A Baseball Ritual We Could Do Without," *Sports Business Journal*, December 7 – 13, 2009.

"Growing Pains at the Olympics," *New York Times*, February 23,
2010, at http://roomfordebate.blogs.nytimes.com/2010/02/23/growing-pains-at-the-olympics/.

"Time to Move On in Texas," *Sports Business Journal*, June 7 – 13, 2010.

"Why's the American League Better?  It's the Payrolls, Stupid," *Forbes Sports Money,* June 1,
2010, at http://blogs.forbes.com/sportsmoney/2010/06/whys-the-american-league-better-its-the-payrolls-stupid.

"Where's Instant Replay?" *Forbes Sports Money,* June 3, 2010, at
http://blogs.forbes.com/sportsmoney/2010/06/where-is-instant-replay/.

"The Economics of the Jeter Contract," **mlb.com**, December 1, 2010.

"Whither the NFL?" *Sports Business Journal*, January 31-February 6, 2011.

"Success Isn't Just a Happy Coincidence," *Boston Globe*, June 26, 2011.

"Realigning Baseball and Tweaking the Postseason," *www.Freakonomics.com*,
August 1-8, 2011.

"NCAA: Self-Interested Paternalism, But Not Colonialism," *The Atlantic* (at
theatlantic.com), September 19, 2011.

"College Athletes Should Not Be Paid," *The Atlantic* (at
theatlantic.com), September 21, 2011.

"MLB Is Headed in the Right Direction with New Cap and Tax Plan," *Sports
Business Journal*, December 5-12, 2011.

"Basketaball's New CBA: Winners and Losers," *Forbes* (at forbes.com), December 5,
2011.

"Olympics Madness," *New York Times*, Room for Debate (at nytimes.com), April 2,
2012.

PUBLIC COPY - REDACTED

"Three Reasons Why Hosting the Olympics Is a Loser's Game," ***Atlantic.com***. July 23, 2012.

"Francona's Petty Payback to Sox Owners," ***Boston Globe***, January 29, 2013.

"Should College Athletes Be Paid? No, but ...," ***US News and World Report***, April 2, 2013.

"Bidding Wars and Olympic Madness," ***Huffingtonpost.com***, June 11, 2013.

"A Biogenesis Field Day for MLB Critics," ***Huffingtonpost.com***, August 2, 2013.

"Whither Brazil's World Cup," ***Latin American Advisor*** (Inter-American Dialogue), November 4, 2013.

"A-Rod's PR Gambit," ***Huffingtonpost.com***, December 16, 2013.

"Proof That College Athletics Need to be Reformed," ***New York Times***, Room for Debate, March 29, 2014.

"The Clippers Are Worth Nowhere Near What Ballmer Is Paying," ***Time***, May 30, 2014.

"IOC and FIFA: Monopoly Power Makes Pricey Games," ***Boston Globe***, June 8, 2014.

"The Big Five Power Grab: the Real Threat to College Sports," ***Chronicle of Higher Education***, June 19, 2014 (co-author).

"Get Ready for a Massive World Cup Hangover, Brazil," ***Time***, June 27, 2014.

"Brazil's World Cup: Who Gains and Who Loses?" ***The Diplomatist (***India). Vol. 2, no. 7, July 2014.

"Non-Profit Status is Basically Irrelevant," ***New York Times***, Room for Debate, September 4, 2014.

"Hosting the 2024 Olympics Would Be a Misuse of Public Money, Land and Resources," ***Boston Globe***, October 13, 2014.

"Chasing Glory: Why Hosting the Olympics Rarely Pays Off," ***The Conversation***, October 24, 2014.

"A-Rod May Get His Millions But His Future Remains Murky," ***The Conversation***, November 19, 2014.

"Breaking Down Giancarlo Stanton's $325 Million Deal: Could the First Billion Dollar Contract Happen Sooner Than We Think?" ***The Conversation***,

November 21, 2014.

"Coaches' Salaries and Higher Education," *Huffington Post*, January 2, 2015.

"Reforming College Sports," *Chronicle of Higher Education*, January 12, 2015.

"Boston Would Be Lucky to Lose the Olympic Competition," *Wall St. Journal*, January 10, 2015.

"Boston Olympic Bid's Heavy Cost," *Daily Beast*, January 12, 2015.

"Time for a Presidential Panel to Investigate College Sports," *Chronicle of Higher Education*, January 13, 2015.

"A Look at Olympics Budget Points to Overruns," *Boston Globe*, January 24, 2015.

"Shameful Qatar Has Sold FIFA a Dummy," *Sunday Times*, March 8, 2015.

"Olympics Numbers Don't Add Up," *Boston Globe*, March 23, 2015.

"Paying College Athletes: Take Two," *Huffington Post*, March 28, 2015.

"Boston 2024's New Mantra: American Exceptionalism," *Boston Globe*, April 17, 2015.

"A Fiscal Faustian Bargain: Analyzing the Economics of a Boston Olympics," *Harvard Magazine*, forthcoming, July/August 2015.

"Women's World Cup Doesn't Need Sepp Blatter," *Los Angeles Times*, June 22, 2015.

"Boston 2024: Beware Backdoor Funding," *Boston Globe*, June 23, 2015.

"Move Over, Men's Sports," *Huffington Post*, July 6, 2015.

"The NCAA's Women Problem," *New York Times*, op-ed, March 26, 2016.

"Olympic Pulse," *Washington Post*, op-ed, May 1, 2016.

"The Summer Olympics Should Always Be in Los Angeles – Forever," *Time*, July 14, 2016.

"An Economic Myth of Olympic Proportions," *Project Syndicate*, August 8, 2016.

"The Olympic Accounting Muddle," *Huffington Post*, August 9, 2016.

"Debating the Olympics," *Prospect Magazine*, August 17, 2016.

PUBLIC COPY - REDACTED

"Antitrust Exemption May Aid College Sports' Untenable Situation," ***Sports Business Journal***, November 28 – December 4, 2016.

"Economic Impact of Sports Tourism," ***Sports Destination Management***, November/December, 2016.

"Those March Madness Basketball Teams Aren't As Profitable As You Think," www.markewatch.com, March 16, 2017.

"Glory for Women, Money for Men in NCAA Basketball Tournament," ***Hartford Courant***, March 30, 2017.

"The Inside Story of No Boston Olympics," ***Commonwealth Magazine***, April 25, 2017. (with Chris Dempsey)

"Beware of the Two-fer," ***Sports Business International***, September 2017.

## Book Reviews:

***Conversations with Allende***, by R. Debray, ***University Review***, February 1972.

***Generating Inequality*** by Lester Thurow, ***Review of Radical Political Economics***, Fall 1978.

"The Management of Factories in China: A Review of Two Books by Stephen Andors," ***Challenge***, Sept/Oct 1978.

***Nigerian Capitalism***, by S. Schatz, in ***Social Science Quarterly***, Dec. 1979.

***Critical Perspectives on Imperialism and Social Class in the Third World***, by James Petras, ***Monthly Review***, Vol. 31, No. 1 (May l980).

***In the Name of Efficiency: Management Theory and Shopfloor Practice in Data-Processing Work***, by Joan Greenbaum, ***Monthly Review***, Vol. 3l, No.5 (October 1980).

***The Cruel Dilemmas of Development: 20th Century Brazil***, by Silvia Ann Hewlett, ***Eastern Economic Journal***, Fall 1981.

***Workers' Control Under Plan and Market***, by E. Comisso, ***Insurgent Sociologist***, Vol. 11, No. 3 (Fall 1982).

***In Defense of the Mixed Economy***, by Andrew Shonfield, ***Journal of Economic Literature***, Vol. 23, No. 2, (June 1985):625-626.

PUBLIC COPY - REDACTED

"Cuban Economic Performance: A Review of ***Revolutionary Cuba: Economic Growth with Equity***," ***Monthly Review*** (Nov. 1985).

***A Theory of Economic Systems***, by Manuel Gottlieb, ***Journalof Comparative Economics***, Vol. 10, No. 2 (June 1986):188-190.

***Rural Development in the Caribbean***, by P. I. Gomes, ***Comparative Economic Studies***, vol 28, no. 2 (Summer 1986): 119-123.

***Technological Change, Collective Bargaining, and Industrial Efficiency***, by Paul Willman, ***Journal of Economic Literature***, vol. 26 (June 1988): 56-57.

***Power and Poverty: Development and Development Projects in the Third World***, edited by D. Attwood et. al., ***Economic Development and Cultural Change***, vol. 38, no. 1 (Oct. 1989).

Review essay: "Recent Scholarship on Cuban Development: A review of J. Dominguez's ***To Make a World Safe for Revolution*** and J. Perez-Lopez's ***Measuring Cuban Economic Performance," Economic Development and Cultural Change*** (January 1991).

***Paying the Costs of Austerity in Latin America***, edited by H. Handelman and W. Baer, ***Inter-American Review of Bibliography*** (winter 1990).

***Poverty Theory and Policy: A Study of Panama***, by Gian Singh Sahota, ***Journal of Latin American Studies***, vol. 24 (February 1992).

***Conditions Not of Their Choosing: The Guaymí Indians and Mining Multinationals in Panama***, by Chris N. Gjording, ***Journal of Latin American Studies,*** vol. 25 (May 1992).

***Cuba: The Revolution in Peril***, by Janette Habel, ***Journal of Latin American Studies***, vol. 25 (May 1992).

Review essay, "Baseball and Society in the Caribbean: a Review of ***The Tropic of Baseball*** and ***Trading with the Enemy***," ***New West Indian Guide***, vol. 68, nos. 1-2 (1994).

***Pay Dirt: The Business of Professional Team Sports***, by James Quirk & Rodney Fort, ***Journal of Economic Literature***, vol. 32, no. 1 (March 1994).

Review essay, "Cuba and the U.S.: During and After the Cold War," a Review of ***Cuba on the Brink*** and ***The Cuban Revolution***, ***Book World: The Washington Post***, January 23, 1994.

PUBLIC COPY - REDACTED

***Hardball: A Season in the Projects***, by Daniel Coyle, ***Book World: The Washington Post***, March 21, 1994.

***Lords of the Realm: The Real History of Baseball***, by John Helyar, ***Book World: The Washington Post***, May 29, 1994.

***Cuba in Transition***, by the Association for the Study of the Cuban Economy, ***The Economics of Transition***, vol. 3, no. 3 (1995).

***Back to the Future: Cuba Under Castro***, by Susan Eckstein, ***Economic Development and Cultural Change***, October 1996 (vol. 45, no. 1).

***Cuba's Second Economy: From Behind the Scenes to Center Stage***, by Jorge Pérez-López, ***Cuban Studies***, forthcoming.

***A Good Walk Spoiled: Days and Nights on the PGA Tour*** by John Feinstein, and ***My Usual Game: Adventures in Golf*** by David Owen, ***The Washington Post Book World***, July 27, 1995.

***Making the Majors: The Transformation of Team Sports in America*** by Eric M. Leifer, ***Journal of Economic Literature***, March 1997.

***Mad as Hell: How Sports Got Away from the Fans and How We Get It Back*** by Mike Lupica, ***The Washington Post Book World,*** December 17, 1996.

***A March to Madness: The View from the Floor in the Atlantic Coast Conference*** by John Feinstein, ***The Washington Post Book World***, January 18, 1998.

***Cuba: Restructuring the Economy*** by Julio Carranza, Luis Gutierrez and Pedro Monreal, ***Journal of Interamerican Studies and World Affairs***, Summer 1998.

***Legal Bases: Baseball and the Law*** by Roger Abrams, ***The Washington Post Book World***, June 18, 1998.

***Anatomy of a Failed Embargo: US Sanctions Against Cuba*** by Donna R. Kaplowitz, ***The International History Review***, June 1999.

***Onward to Victory: The Crises that Shaped College Sports*** by Murray Sperber, ***The Washington Post Book World***, October 25, 1998.

***The Agent*** by George Higgins, ***The Washington Post Book World***,  January 26, 1999.

***Castro's Curveball*** by Tim Wendell, ***The Washington Post Book World***, March 14, 1999.

PUBLIC COPY - REDACTED

***Glory for Sale: Fans, Dollars and the New NFL*** by Jon Morgan, ***Lingua Franca***, Breakthrough Books, February 2000.

***Hard Ball: The Abuse of Power in Pro Team Sports*** by James Quirk and Rodney Fort, ***Journal of Economic Literature***, June 2000.

***Sole Influence: Basketball, Corporate Greed, and the Corruption of America's Youth*** by Dan Wetzel and Don Yaeger, ***Washington Post Book World***, April 11, 2000.

***Beer and Circus: How Big-Time College Sports Is Crippling Undergraduate Education*** by Murray Sperber, ***University Business***, September 2000.

***Leveling the Playing Field: How the Law Can Make Sports Better for Fans*** by Paul Weiler, ***Washington Post Book World***, August 21, 2000.

***Market, Socialist and Mixed Economies: Comparative Policy and Performance in Chile, Cuba and Costa Rica*** by Carmelo Mesa-Lago, ***Cuban Studies***, vol. 32, 2001.

***The End of Baseball As We Knew It: The Players Union, 1960-81*** by Charles Korr, ***Business History Review***, Spring 2003.

***Development Prospects in Cuba: An Agenda in the Making*** edited by Pedro Monreal, ***Journal of Latin American Studies***, vol. 35, 2003.

***Moneyball: The Art of Winning an Unfair Game*** by Michael Lewis, ***The American Prospect***, October 2003.

***Reclaiming the Game: College Sports and Educational Values*** by William Bowen and Sarah Levin, ***The Journal of University and College Law***, May 2004.

***Branch Rickey in Pittsburgh: Baseball's Trailblazing General Manager for the Pirates, 1950-1955*** by Andrew O'Toole, ***Ohio Valley History***, vol. 4, no. 4, Winter 2004.

***Juicing the Game: Drugs, Power and the Fight for the Soul of Major League Baseball*** by Howard Bryant, *Baseball Perspectives: MLB.COM*, August 2005.

***Wages of Wins*** by David Berri et al., ***Journal of Sports Economics***, April 2007.

***Rumors of Baseball's Demise: How the Balance of Competition Swung and the Critics Missed***, by Robert Cull. ***Journal of Economic Literature***, June 2007.

***Labor and Capital in 19th Century Baseball***, by Robert Gelzheiser. ***Baseball: A Journal of the Early Game***, Fall 2007.

PUBLIC COPY - REDACTED

Review Essay of **Vince Gennaro,** *Diamond Dollars: The Economics of Winning in Baseball.* **Hingham, Ma.:** Maple Street Press, 2007 and **J.C. Bradbury,** *The Baseball Economist: The Real Game Exposed.* New York: Dutton, 2007. *Journal of Economic Literature* (December 2007: 1061-1066).

*The Arrival of the American League: Ban Johnson and the 1901 Challenge to National League Monopoly,* by Warren Wilber. *Baseball: A Journal of the Early Game*, vol. II, no. 2 (Fall 2008).

*Bowled Over: Big-Time College Football from the Sixties to the BCS Era*, by Michael Oriard. *Review of Politics*, vol. 72, no. 3 (2010).

*Sport and Public Policy: Social, Political and Economic Perspectives*, edited by Charles Santo and Gerard Mildner. *Journal of Sports Economics*, vol. 12, no. 5 (October 2011).

*The Baseball Trust: A History of Baseball's Antitrust Exemption*, by Stuart Banner. *Wall Street Journal,* March 30, 2013.

*Baseball on Trial: The Origin of Baseball's Antitrust Exemption*, by Nathaniel Grow. *Journal of Economic Literature*, December, 2014.

## Reports:

"Costa Rica," in SRI International, *Nontraditional Export Expansion the Central American Region.* Prepared for the Bureau for Latin America and the Caribbean.  March 1986.

''Panama," in Ibid.

"An Assessment of Cuba's Management Needs and Training Program." Prepared for the Management Development Program of the United Nations' Development Program, Dec. 1990.  (with Marc Lindenberg).

"An Assessment of SUTCER's Stage One Management Training Implementation and Proposal for Stage Two."  Prepared for the UNDP, January 1992. (with Marc Lindenberg).

"Estimating Managerial Marginal Revenue Product and Income Potential in Major League Baseball," prepared for Attorney Robert J. Pearl, May 1992.

PUBLIC COPY - REDACTED

"Baseball Economics and the Antitrust Exemption," Testimony before the Antitrust Subcommittee of the Committee on the Judiciary, United States Senate, December 10, 1992.

"An Evaluation of Phase Two of Cuba's Management Development Program," prepared for the UNDP, January 1993.

"Public Policy Toward Minor League Baseball," Testimony before before the Committe on Tourism, Recreation and Sports Development, New York State Senate, Oversight Hearings, February 9, 1993.

"Opportunity Cost Approach to Estimating 'Just and Reasonable Compensation' for Denver Territorial Rights," prepared for  Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al., March 5, 1993.

"Critique of the Doctrine of Single Entity As It Applies to the National Basketball Association," report prepared for Grippo & Elden in WGN v. NBA, May 1993.

"Profitability of NBA Franchises," report prepared for Grippo & Elden in WGN v. NBA, May 1993.

"Appropriate Fee Payments for Superstation Broadcasts," report prepared in WGN v. NBA, June 1993.

"Estimating the Value of the Territory of Salt Lake City to the Salt Lake City Trappers and the Pioneer League," report prepared for Campbell, Maack & Sessions in Salt Lake City Buzz/Pacific Coast League v. Salt Lake City Trappers/Pioneer League, February 1994.

"Cash Flow Multiple and Comparable Sales Approach to Estimating Compensation for Denver Territorial Rights," prepared for Williams, Youle & Koenigs, Attorneys at Law, for arbitration case of The Denver Zephyrs Baseball Club v. Colorado Baseball Management, et al., April 1994.

Documents on the design and structure of the United Baseball League, including league prospectus and plan for cities.  July through November 1994.

"An Approach to Estimating Territorial Compensation for Ft. Lauderdale to the Florida State League," prepared for Wendell, Chritton & Parks in arbitration case of the Florida Marlins v. NY Yankees and Florida State League, May 1994.

"A Draft Plan for Revenue Sharing With and Without a Salary Cap for Major League Baseball," prepared for the Major League Baseball Players' Association, May 1994.

PUBLIC COPY - REDACTED

"Fact and Value of Damages to KSMO TV-62 from The Baseball Network," prepared for ABRY Communications in litigation against the Kansas City Royals, September 1994.

Issue Brief on the Cuban Economy, Trade and the Embargo for the Atlantic Council of the United States, October 1994.

"Report on Territorial Compensation due the Florida State League of the National Association in the Taking of Ft. Lauderdale by the Florida Marlins," prepared for Wendell, Chritton & Parks in arbitration case of the Florida Marlin v. NY Yankees and Florida State League, December 1994.

"Memorandum on the value of the Colorado Rockies' franchise," prepared for Jay Horowitz in Erhardt v. Colorado Rockies, January 1996.

"Memorandum on damages in Burt v. Hampshire College," prepared for attorney David Kaplan, March 1996.

"Memorandum on the economic impact of the Tampa Bay Buccaneers on the Tampa MSA,"prepared for Bentley, Rose & Sundstrom, January 1997.

"Report on damages suffered by the St. Louis CVC as a result of restrictive practices by the NFL," prepared for Husch & Eppenberger, February 1997.

"Expert Rebuttal Report in CVC v. NFL," Husch & Eppenberger,  June 1997.

"Second Rebuttal Report in CVC v. NFL," Husch & Eppenberger, September 1997.

"Affidavit on Antitrust Implication of Facility Non-compete Clause," Davis, Scott, Weber & Edwards, September 1997.

"Memorandum on Los Angeles Arena Financing," Mayor's Office, Los Angeles, September 1997.

"Report on Cincinnati Bengals/Hamilton County Lease for New Stadium," Cincinnati *Business Courier*, November 1997.

"Evaluation of Team Report on the FMV of Assets Acquired by the XXX Limited Partnership on October 4, 1993," with GML Associates for the Internal Revenue Service,  January 1998.

"Appraisal of the FMV of Major and Minor League Contracts Acquired by [a major league baseball team]," with GML Associates for the Internal Revenue Service, September 1998.

PUBLIC COPY - REDACTED

"Memorandum on Luxury Taxes and Player Markets," for the National Basketball Players' Association, October 1998.

"Report on the Purchasing Power Parity of the Spanish Peseta in Various Years," for Rabinowitz, Boudin et. al., October 1998.

"Economic Development in Hartford and the New England Patriots," written testimony before the Connecticut State Legislature, December 9. 1998.

"Expert Report on the Value of the Kansas City Royals," for U.S. Department of Justice, February 1999.

"Declaration," on bankruptcy and franchise stability in Major League Baseball for U.S. Department of Justice, April 1999.

"Expert Report on Monetary Damages Resulting from Restraints on Competition in the Labor Market for Players Implemented by Major League Soccer, L.L.C. and Its Member Teams," for Weil, Gotshal & Manges, June 1999.

"The Cuban Economy at the Millennium," report presented to the Aspen Institute Congressional Symposium, Cayman Islands, April 2000.

"Expert Report on Monetary Damages Resulting from the Violation of the Right of First Refusal Offered to Purchasers of Cleveland Browns' Season Tickets Prior to the 1995 NFL Season," report presented to Kohrman, Jackson & Krantz, April 2000.

"Expert Report on Franchise Valuation of the Washington Redskins on January 1, 2000 and Damages Suffered by WSV," report presented to Boies, Schiller & Flexner, June 2000.

"Affidavit in Rebuttal to Defendants' Motion," in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.

"Supplemental Expert Report on Liability," in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.  (with Roger Noll)

"Supplemental Expert Report on Monetary Damages" in MLS monopsony case, for Weil, Gotshal & Manges, August 2000.

"Financial Integrity and College Athletic Reform," testimony before the Knight Commission on College Athletic Reform, Willard Hotel, Washington, D.C., October 18, 2000.

"Competitive Balance in Baseball," written testimony before the U.S. Senate Judiciary Committee Hearings, November 21, 2000.

PUBLIC COPY - REDACTED

"Economic Impact of a New Fenway Park," written testimony to Ways and Means Committee, Boston City Council, December 11, 2000.

"Affidavit on the Intrinsic Value of Season's Tickets," report to Henry Klein in NFL/consumer rights case, January 2001.

"Damages Report," in PCC v. NBC, March 11, 2002.

"Written Testimony" and "Oral Testimony" before the U.S. Department of Education's Commission on Gender Equity in College Athletics, November 20, 2002.

"Expert Report on the Economic Impact of a Proposed Minor League Ballpark and Retail Project in Yonkers, New York," December 17, 2002.

"Report on NBA Team Financials," for National Basketball Players Association, April 20, 2003.

"Pro Formas for AAFL," for Marcus Katz.

"Report on the Commercialization of College Basketball and March Madness," for Dewey Ballantine in antitrust suit against the NCAA, March 2004.

"Report on the Fiscal Impact on the Treasuries of New York City and New York State from the Atlantic Yards Project in Brooklyn," for the Forest City/Ratner Company, April 2004.

"Report on the NBA's Combined Financial Statement for 2002-03," April 2004.

"Report for New Team Boxing League on Its Organizational Structure and Incentives," May 2004.

"Rebuttal Report" in Minogue et al. v. Modell for Boies, Schiller and Flexner, June 2004.

"Supplementary Report on the Fiscal Impact of the Atlantic Yards Project," July 2004.

"Report on NHL finances and labor market," September 2004.

"Updated Report on the Atlantic Yards Project," January 2005.

"Updated Report II on the Atlantic Yards Project," June 2005.

"Liability Declaration in Hamilton County v. NFL," May 2005.

"Comparison of May 2004 and June 2005 FCRC Reports," June 2005.

PUBLIC COPY - REDACTED

"Report on Damages from the Angels' 2005 Name Change," November 2005.

"Updated Report III on the Atlantic Yards Project," May 2006.

"Report on revenue sharing modeling exercise for Major League Baseball," July 2006.

"Updated Report IV on the Atlantic Yards Project," November 2006.

"Affidavit on Financials in Kentucky Speedway v. NASCAR," November 2006.

"Report on Prospective Fiscal Damages to Portland from Trail Blazer Relocation," November 2006.

"Liability Report in Kentucky Speedway v. NASCAR," March 2007.

"Report on Damages" in golfer injury case, April 2007.

"Supplemental Liability Report in Kentucky Speedway v. NASCAR," July 2007.

"Declaration on Defendants' Motion in Kentucky Speedway v. NASCAR," August 2007.

"Notes on Minor League Stadium Operations," for the Vintage Base Ball Federation, October 2007.

"Preliminary Opinion of Value for the Eau Claire Express, NWL," for Michael Best Ltd., October 2007.

"Liability Report in DTB v. ATP Tour et al.," for Barnes & Thornburg, January 2008.

"Response to Walker in DTB v. ATP Tour et al.," for Barnes & Thornburg, February 2008.

"Report on the Value of Seattle SuperSonics to the City," for city of Seattle, May 2008.

"A Comparison of Retirement and Other Benefits for Players Among the Four Major U.S. Professional Team Sports," for the National Football Players Association, February 2009.

"Declaration on League Rules, Franchise Relocation and Antitrust" for Squire, Sanders & Dempsey L.L.P., June 2009.

PUBLIC COPY - REDACTED

"Second Declaration on the Viability of Hamilton, Ontario as a Host City for an NHL
    team and an Appropriate Relocation for the Phoenix Coyotes," for Dewey LeBoeuf,
    September 2009.

"Third Declaration in Response to NHL Experts," for Dewey LeBoeuf, September 2009.

Joint-author, Amicus Brief to the U.S. Supreme Court in, AMERICAN
NEEDLE, INC., *Petitioner*, v. NATIONAL FOOTBALL LEAGUE, ET AL,
*Respondents*. September 2009.

"Updated Report V on Atlantic Yards Project," for FCRC, October 2009.

"Valuation Report on the Pittsburgh Pirates," for minority team owner, October
2009.

"Model projecting market value for MLB teams," for MLB Commissioner's
Office, July 2010.

"Report on the Feasibility of a New Downtown Arena for the Edmonton Oilers,"
for Northlands, September 2010.

"Report on Constraints on the Lack of Success of the Ottawa Lynx," for the city
of Ottawa, February 2011.

"Second Report on the Feasbility of a New Downtwon Arena for the Edmonton
Oilers," for Northlands, March 2011.

"Report on Salary Shares and Definition of Revenue Base in the NFL," for
Hausfeld, LLP in NFL work stoppage mediation, April 2011.

"Declaration on Economic Approach to Valuing Publicity Rights," for Schiff
Hardin, LLP in publicity rights case involving Michael Jordan, December 2011.

"Affidavit on Estimating Damages in WVU Exit from Big East," for
KellyJackson, in intercollegiate athletics conference realignment case, February
2012.

Joint-author, "Comment of Sports Economists on the FCC's Sports Blackout
Rules," Before the Federal Communications Commission, February 14, 2012.

Report on the Liquidated Damages Clause in the TCU Decision
Not to Enter the Big East Conference, May 10, 2012.

Report on Prospective NHL Earnings of an Injured Player, in mediation matter
for Boyle, Shaughnessy & Campo, November 2012.

Rebuttal Report in Jordan v. Safeway, November 2013.

PUBLIC COPY - REDACTED

Report on the Financial Status and Policy Choices of the Eastern Michigan University Football Program, for the faculty union, December 2013.

Joint-author, "Response of Sports Economists on Declaration of Hal J. Singer," Before the Federal Communications Commission, March 25, 2014.

Joint-author, "Switching Play: Towards a New, Elite Pan-Caribbean Football League," report for Concacaf/Fifa, September 2014.

Joint-author, "Freshmen Ineligibility in Intercollegiate Athletics," report for The Drake Group, March 2015.

Joint-author, "Student Fee and Institutional Subsidy Allocations to Fund Intercollegiate Athletics," report for The Drake Group, March 2015.

Joint-author, "Compensation of College Athletes Including Revenues from Commercial Use of Their Names, Likenesses and Images," report for The Drake Group, March 2015.

Joint-author, "Establishment of a Presidential Commission on Intercollegiate Athletic Reform," report for The Drake Group, March 2015.

Joint-author, "Fixing the Dysfunctional NCAA Enforcement System," report for The Drake Group, April 2015.

Joint-author, "Academic Integrity in Collegiate Sport," report for The Drake Group, April 2015.

Report on Valuing Publicity Rights in Jordan vs. Jewel, April 2015.

Report to USATF Athletes Association on Compensation Issues, April 2015.

Joint-author, Amicus Brief in Support of Tom Brady's Petitition for Panel Rehearing and Rehearing En Banc, May 31, 2016.

Co-author White Paper on Intercollegiate Athletic Governance, Atlantic 10, December 2016.

PUBLIC COPY - REDACTED

**EXHIBIT B**

PUBLIC COPY - REDACTED

# National League of Professional Baseball Clubs

**Parties** Between ST. LOUIS NATIONAL BASEBALL CLUB, INC. herein called the Club, and CURTIS CHARLES FLOOD of 4466 West Pine, St. Louis, Missouri, herein called the Player.

**Recital** The Club is a member of the National League of Professional Baseball Clubs, a voluntary association of twelve member Clubs which has subscribed to the Major League Rules with the American League of Professional Baseball Clubs and its constituent Clubs and to the Professional Baseball Rules with that League and the National Association of Baseball Leagues. The purpose of these rules is to insure the public wholesome and high-class professional baseball by defining the relations between Club and Player, between Club and Club, between League and League, and by vesting in a designated Commissioner broad powers of control and discipline, and of decision in case of disputes.

**Agreement** In consideration of the facts above recited and of the promises of each to the other, the parties agree as follows:

**Employment** 1. The Club hereby employs the Player to render, and the Player agrees to render, skilled services as a baseball player during the year 1969 including the Club's training season, the Club's exhibition games, the Club's playing season, and the World Series (or any other official series in which the Club may participate and in any receipts of which the player may be entitled to share).

**Payment** 2. For performance of the Player's services and promises hereunder the Club will pay the Player the sum of $90,000, in semi-monthly installments after the commencement of the playing season covered by this contract. Payment shall be made on the day the amount becomes due, regardless of whether the Club is "home" or "abroad".

If a monthly rate of payment is stipulated above, it shall begin with the commencement of the Club's playing season (or such subsequent date as the Player's services may commence) and end with the termination of the Club's scheduled playing season and shall be payable in semi-monthly installments as above provided.

Nothing herein shall interfere with the right of the Club and the Player by special covenant herein to mutually agree upon a method of payment whereby part of the Player's salary for the above year can be deferred to subsequent years.

If the Player is in the service of the Club for part of the playing season only, he shall receive such proportion of the sum above mentioned, as the number of days of his actual employment in the Club's playing season bears to the number of days in said season.

Notwithstanding the rate of payment stipulated above, the minimum rate of payment to the Player for each day of service on a Major League Club shall be at the rate of $10,000 per year; except, if a Player physically joins a Major League Club on or after September 1, he shall be paid during September at the rate of $8,500 per year for each day of service until he has accumulated a total of 60 days of Major League service, after which he shall be paid at the rate of $10,000 per year for each day of service with such Major League Club.

Payment to the Player at the rate stipulated above shall be continued throughout any period in which a Player is required to attend a regularly scheduled military encampment of the Reserve of the Armed Forces or of the National Guard during the Club's playing season.

**Loyalty** 3. (a) The Player agrees to perform his services hereunder diligently and faithfully, to keep himself in first-class physical condition and to obey the Club's training rules, and pledges himself to the American public and to the Club to conform to high standards of personal conduct, fair play and good sportsmanship.

**Baseball Promotion** (b) In addition to his services in connection with the actual playing of baseball, the Player agrees to cooperate with the Club and participate in any and all promotional activities of the Club and its League, which, in the opinion of the Club, will promote the welfare of the Club or professional baseball, and to observe and comply with all requirements of the Club respecting conduct and service of its team and its players, at all times whether on or off the field.

**Pictures and Public Appearances** (c) The Player agrees that his picture may be taken for still photographs, motion pictures or television at such times as the Club may designate and agrees that all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires. The Player further agrees that during the playing season he will not make public appearances, participate in radio or television programs or permit his picture to be taken or write or sponsor newspaper or magazine articles or sponsor commercial products without the written consent of the Club, which shall not be withheld except in the reasonable interests of the Club or professional baseball.

**Player Representations**

**Ability** 4. (a) The Player represents and agrees that he has exceptional and unique skill and ability as a baseball player; that his services to be rendered hereunder are of a special, unusual and extraordinary character which gives them peculiar value which cannot be reasonably or adequately compensated for in damages at law, and that the Player's breach of this contract will cause the Club great and irreparable injury and damage. The Player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this contract by the Player, including, among others, the right to enjoin the Player from playing baseball for any other person or organization during the term of this contract.

**Condition** (b) The Player represents that he has no physical or mental defects known to him, which would prevent or impair performance of his services.

**Interest in Club** (c) The Player represents that he does not, directly or indirectly, own stock or have any financial interest in the ownership or earnings of any Major League Club, except as hereinafter expressly set forth, and covenants that he will not hereafter, while connected with any Major League Club, acquire or hold any such stock or interest except in accordance with Major League Rule 20(e).

**Service** 5. (a) The Player agrees that, while under contract, and prior to expiration of the Club's right to renew this contract, he will not play baseball otherwise than for the Club, except that the Player may participate in post-season games under the conditions prescribed in the Major League Rules. Major League Rule 18(b) is set forth on page 4 hereof.

**Other Sports** (b) The Player and the Club recognize and agree that the Player's participation in other sports may impair or destroy his ability and skill as a baseball player. Accordingly the Player agrees that he will not engage in professional boxing or wrestling; and that, except with the written consent of the Club, he will not engage in any game or exhibition of football, basketball, hockey or other athletic sport.

PUBLIC COPY - REDACTED

**No Salary Reduction**

(b) The amount stated in paragraph 2 hereof which is payable to the Player for the period stated in paragraph 1 hereof shall not be diminished by any such assignment, except for failure to report as provided in the next sub-paragraph (c).

**Reporting**

(c) The Player shall report to the assignee Club promptly (as provided in the Regulations) upon receipt of written notice from the Club of the assignment of this contract. If the Player fails so to report, he shall not be entitled to any payment for the period from the date he receives written notice of assignment until he reports to the assignee Club.

**Obligations of Assignor and Assignee Clubs**

(d) Upon and after such assignment, all rights and obligations of the assignor Club hereunder shall become the rights and obligations of the assignee Club; provided, however, that

(1) The assignee Club shall be liable to the Player for payments accruing only from the date of assignment and shall not be liable (but the assignor Club shall remain liable) for payments accrued prior to that date.

(2) If at any time the assignee is a Major League Club, it shall be liable to pay the Player at the full rate stipulated in paragraph 2 hereof for the remainder of the period stated in paragraph 1 hereof and all prior assignors and assignees shall be relieved of liability for any payment for such period.

(3) Unless the assignor and assignee Clubs agree otherwise, if the assignee Club is a National Association Club, the assignee Club shall be liable only to pay the Player at the rate usually paid by said assignee Club to other players of similar skill and ability in its classification and the assignor Club shall be liable to pay the difference for the remainder of the period stated in paragraph 1 hereof between an amount computed at the rate stipulated in paragraph 2 hereof and the amount so payable by the assignee Club.

**Moving Expense**

(e) If this contract is assigned by a Major League Club to another Major League Club during the playing season, the assignor Club shall pay the Player, for all moving and other expenses resulting from such assignment, the sum of $300 if the contract is assigned between Clubs in the same zone; the sum of $600 if the contract is assigned between a Club in the Eastern Zone and a Club in the Central Zone; the sum of $900 if the contract is assigned between a Club in the Central Zone and a Club in the Western Zone; and the sum of $1,200 if the contract is assigned between a Club in the Eastern Zone and a Club in the Western Zone. The Eastern Zone shall include the Philadelphia, New York and Pittsburgh Clubs in the National League and the Baltimore, Boston, New York and Washington Clubs in the American League; the Central Zone shall include the Chicago, Cincinnati, Atlanta, St. Louis and Houston Clubs in the National League and the Chicago, Cleveland, Detroit and Minnesota Clubs in the American League; the Western Zone shall include the Los Angeles and San Francisco Clubs in the National League and the California and Oakland Clubs in the American League.

If, during the Major League playing season, a Player is required to report to a Major League Club from a National Association Club, or to a National Association Club from a Major League Club, such Major League Club shall pay the reasonable and actual moving expenses of the Player and his immediate family resulting therefrom and shall reimburse the Player for up to one month's rental payments for living quarters in the city from which the Player is transferred for which he is legally obligated after the date of the transfer and for which he is not otherwise reimbursed; except the foregoing shall not apply if the Player is required to report on or after September 1.

**"Club"**

(f) All references in other paragraphs of this contract to "the Club" shall be deemed to mean and include any assignee of this contract.

**Termination**

**By Player**

7. (a) The Player may terminate this contract, upon written notice to the Club, if the Club shall default in the payments to the Player provided for in paragraph 2 hereof or shall fail to perform any other obligation agreed to be performed by the Club hereunder and if the Club shall fail to remedy such default within ten (10) days after the receipt by the Club of written notice of such default. The Player may also terminate this contract as provided in sub-paragraph (f) (4) of this paragraph 7.

**By Club**

(b) The Club may terminate this contract upon written notice to the Player (but only after requesting and obtaining waivers of this contract from all other Major League Clubs) if the Player shall at any time:

(1) fail, refuse or neglect to conform his personal conduct to the standards of good citizenship and good sportsmanship or to keep himself in first-class physical condition or to obey the Club's training rules; or

(2) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to qualify or continue as a member of the Club's team; or

(3) fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract.

(c) If this contract is terminated by the Club by reason of the Player's failure to render his services hereunder due to disability resulting directly from injury sustained in the course and within the scope of his employment hereunder and written notice of such injury is given by the Player as provided in the Regulations on page 4 hereof, the Player shall be entitled to receive his full salary for the season in which the injury was sustained, less all workmen's compensation payment paid or payable by reason of said injury.

(d) If this contract is terminated by the Club during the training season, payment by the Club of the Player's board, lodging, and expense allowance during the training season to the date of termination and of the reasonable traveling expenses of the Player, including first-class jet air fare and meals en route to his home city, and the expert training and coaching provided by the Club to the Player during the training season shall be full payment to the Player.

(e) If this contract is terminated by the Club during the playing season, then, except in the case provided for in sub-paragraph (c) of this paragraph 7, the Player shall be entitled to receive as full payment hereunder such portion of the amount stipulated in paragraph 2 hereof as the number of days of his actual employment in the Club's playing season bears to the total number of days in said season, provided, however, that if this contract is terminated under sub-paragraph (b) (2) of this paragraph 7 for failure to exhibit sufficient skill or competitive ability, the Player shall be entitled to an additional amount equal to thirty (30) days payment at the rate stipulated in paragraph 2 hereof and the reasonable traveling expenses of the Player including first-class jet air fare and meals en route to his home city.

**Procedure**

(f) If the Club proposes to terminate this contract in accordance with sub-paragraph (b) of this paragraph 7, the procedure shall be as follows:

(1) The Club shall request waivers from all other Major League Clubs. Such waiver request must state that it is for the purpose of terminating this contract and it may not be withdrawn.

(2) Upon receipt of the waiver request, any other Major League Club may claim assignment of this contract at a waiver price of $1.00, the priority of claims to be determined in accordance with the Major League Rules.

(3) If this contract is so claimed, the Club shall, promptly and before any assignment, notify the Player that it had requested waivers for the purpose of terminating this contract and that the contract had been claimed.

(4) Within 5 days after receipt of notice of such claim, the Player shall be entitled, by written notice to the Club, to terminate this contract on the date of his notice of termination. If the Player fails so to notify the Club, this contract shall be assigned to the claiming Club.

(5) If the contract is not claimed, the Club shall promptly deliver written notice of termination to the Player at the expiration of the waiver period.

(g) Upon any termination of this contract by the Player, all obligations of both parties hereunder shall cease on the date of termination, except the obligation of the Club to pay the Player's compensation to said date.

PUBLIC COPY - REDACTED

[illegible] comply with all provisions of the Major League Agreement, the Major League Rules, the Rules or Regulations of the League of which the Club is a member, and the Professional Baseball Rules [illegible] provisions of this contract or the provisions of any agreement between the Major League Clubs and the Major League Baseball Players Association, provided that the Club, together with the other Clubs of the American and National Leagues and the National Association, reserves the right to modify, supplement or repeal any provision of said Agreement, Rules and/or Regulations in a manner not inconsistent with this contract or the provisions of any then existing agreement between the Major League Clubs and the Major League Baseball Players Association. A copy of the Major League Agreement, the Major League Rules, the Rules or Regulations of the League of which the Club is a member, and the Professional Baseball Rules, as in effect on the date of this Contract has been delivered to the Player prior to execution of this Contract.

**Disputes**

(b) All disputes between the Player and the Club which are covered by the Grievance Procedure as set forth in the Agreement between the twenty Clubs and the Major League baseball players, as represented by the Major League Baseball Players Association, dated February 19, 1968, shall be resolved in accordance with such Grievance Procedure, which is incorporated herein by reference.

**Publication**

(c) The Club, the League President and the Commissioner, or any of them, may make public the findings, decision and record of any inquiry, investigation or hearing held or conducted, including in such record all evidence or information, given, received or obtained in connection therewith.

**Renewal**

10. (a) On or before January 15 (or if a Sunday, then the next preceding business day) of the year next following the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that year by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the March 1 next succeeding said January 15, the Player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said March 1, the Club shall have the right by written notice to the Player at said address to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice; provided, however, that said amount, if fixed by a Major League Club, shall be an amount payable at a rate not less than 80% of the rate stipulated for the preceding year.

(b) The Club's right to renew this contract, as provided in sub-paragraph (a) of this paragraph 10, and the promise of the Player not to play otherwise than with the Club have been taken into consideration in determining the amount payable under paragraph 2 hereof.

11. This contract is subject to federal or state legislation, regulations, executive or other official orders or other governmental action, now or hereafter in effect respecting military, naval, air or other governmental service, which may directly or indirectly affect the Player, Club or the League and subject also to the right of the Commissioner to suspend the operation of this contract during any national emergency.

**Commissioner**

12. The term "Commissioner" wherever used in this contract shall be deemed to mean the Commissioner designated under the Major League Agreement, or in the case of a vacancy in the office of Commissioner, the Executive Council or such other body or person or persons as shall be designated in the Major League Agreement to exercise the powers and duties of the Commissioner during such vacancy.

**Supplemental Agreements**

The Club and the Player covenant that this contract fully sets forth all understandings and agreements between them, and agree that no other understandings or agreements, whether heretofore or hereafter made, shall be valid, recognizable, or of any effect whatsoever, unless expressly set forth in a new or supplemental contract executed by the Player and the Club (acting by its president, or such other officer as shall have been thereunto duly authorized by the president or Board of Directors, as evidenced by a certificate filed of record with the League President and Commissioner) and complying with the Major League Rules and the Professional Baseball Rules.

**Special Covenants**

**Approval**

This contract or any supplement hereto shall not be valid or effective unless and until approved by the League President.

Signed in duplicate this 3RD day of MARCH, A.D. 1969

Curtis C. Flood (Player)

4466 West Pine
St. Louis, Missouri
(Home address of Player)

Social Security No. 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

ST. LOUIS NATIONAL BASEBALL CLUB, INC. (Club)

By [signature] (Authorized Signature)

Gen. Mgr.

Approved ____________ 196__

[signature]

President, National League of Professional Baseball Clubs

PUBLIC COPY - REDACTED

1. The Club's playing season for each year covered by this contract and all renewals hereof shall be as fixed by the National League of Professional Baseball Clubs, or if this contract shall be assigned to a Club in another league, then by the League of which such assignee is a member.

2. The Player, when requested by the Club, must submit to a complete physical examination at the expense of the Club, and if necessary to treatment by a regular physician or dentist in good standing. Upon refusal of the Player to submit to a complete medical or dental examination the Club may consider such refusal a violation of this regulation and may take such action as it deems advisable under Regulation 5 of this contract. Disability directly resulting from injury sustained in the course and within the scope of his employment under this contract shall not impair the right of the Player to receive his full salary for the period of such disability or for the season in which the injury was sustained (whichever period is shorter), together with the reasonable medical and hospital expenses incurred by reason of the injury and during the term of this contract, less all workmen's compensation payments paid or payable by reason of said injury; but only upon the express prerequisite conditions that (a) written notice of such injury, including the time, place, cause and nature of the injury, is served upon and received by the Club within twenty days of the sustaining of said injury and (b) the Club shall have the right to designate the doctors and hospitals furnishing such medical and hospital services. Any other disability may be ground for suspending or terminating this contract at the discretion of the Club.

3. The Club will furnish the Player with two complete uniforms, exclusive of shoes, which uniforms will be surrendered by the Player to the Club at the end of the season or upon termination of this contract.

4. The Club will pay all proper and necessary traveling expenses of the Player while "abroad", or traveling with the Club in other cities, including board, and first-class air and hotel accommodations, if practicable.

During the championship season, the allowance for meals and tips shall be $15 per day for each date a Club is on the road and for each traveling day. No deductions will be made for meals served on an airplane. If, when a Club departs from the home city, departure is scheduled prior to 12:00 Noon, the Player will receive $15 for that date; if departure is after 12:00 Noon, the Player will receive $7.50 for that date. Returning to the home city, if arrival is later than 6:00 p.m. the Player will receive $15; if arrival is prior to 6:00 p.m., the Player will receive $7.50. The Club may require the Player to sign checks for meals at a hotel in lieu of the cash meal allowance.

During the training season, the Player will receive an allowance of $40 per week, payable in advance, to cover training camp expenses. If the Player has his family in camp and is granted consent to live away from the Club's headquarters, he shall receive a meal money allowance of $12 per day, without deduction for lunch or sandwiches served at the ball park, and a room allowance equal to what the Club actually saves on hotel expenses by reason of the Player not staying at the Club hotel. Where the Club owns its own facilities (such as Los Angeles or Houston) where there is no saving, the Club will allow $2 per day per room, in addition to the $12 allowance for meals.

The Club will also pay the first-class jet air fare of the Player to his home at the end of the season, provided, however, that if the Club finishes its season "abroad" and appropriate transportation is not provided back to the Club's home city, the Player shall be paid an amount equal to the first-class jet air fare back to the Club's home city plus the first-class jet air fare from the Club's home city to the Player's home, provided the Player elects to return home via the Club's home city.

5. For violation by the Player of any regulation or other provision of this contract, the Club may impose a reasonable fine and deduct the amount thereof from the Player's salary or may suspend the Player without salary for a period not exceeding thirty days, or both. Written notice of the fine or suspension or both and the reason therefore shall in every case be given to the Player.

6. In order to enable the Player to fit himself for his duties under this contract, the Club may require the Player to report for practice at such places as the Club may designate and to participate in such exhibition contests as may be arranged by the Club, for a period beginning not earlier than March 1, without any other compensation than that herein elsewhere provided. The Club will pay the necessary traveling expenses, including the first-class jet air fare and meals en route of the Player from his home city to the training place of the Club, whether he be ordered to go there directly or by way of the home city of the Club. In the event of the failure of the Player to report for practice or to participate in the exhibition games, as required and provided for, he shall be required to get into playing condition to the satisfaction of the Club's team manager, and at the Player's own expense, before his salary shall commence.

7. In case of assignment of this contract the Player shall report promptly to the assignee club within 72 hours from the date he receives written notice from the Club of such assignment, if the Player is then not more than 1600 miles by most direct available railroad route from the assignee Club, plus an additional 24 hours for each additional 800 miles.

Post-Season Exhibition Games. Major League Rule 18(b) provides:

Exhibition Games. (b) No player shall participate in any exhibition game played during the period between the close of the Major League championship season and the following training season; except that a Player, with the written consent of the Commissioner, may participate in exhibition games which are played within thirty days after the close of the Major League championship season and which are approved by the Commissioner. Player conduct, on and off the field, in connection with such post-season exhibition games shall be subject to the discipline of the Commissioner. The Commissioner shall not approve more than three Players of any one Club on the same team. No Player shall participate in any exhibition game with or against any team which, during the current season or within one year, has had any ineligible player or which is or has been during the current season or within one year, managed and controlled by an ineligible player under an assumed name or who otherwise has violated, or attempted to violate, any exhibition game contract; or with or against any team which, during said season or within one year, has played against teams containing such ineligible players, or so managed or controlled. Any player violating this rule shall be fined not less than fifty dollars ($50) nor more than five hundred dollars ($500), except that in no event shall such fine be less than the consideration received by such player for participating in such game.

Revised 10/1/68

PUBLIC COPY - REDACTED

**EXHIBIT C**

PUBLIC COPY - REDACTED

## Materials Relied Upon

***News Articles***

Associated Press. "Arbitrator's ruling puts baseball in hot corner," Chicago Tribune, Dec. 25, 1975, available at http://archives.chicagotribune.com/1975/12/25/page/82/article/arbitrators-ruling-puts-baseball-in-hot-corner.

Barr, John and Josh Gross. "UFC fighters say low pay simply brutal," ESPN, Jan. 15, 2012, available at http://www.espn.com/espn/otl/story/_/page/UFCpay/ufc-fighters-say-low-pay-most-painful-hit-all.

"Forbes Releases 19th Annual MLB Team Valuations," Forbes, March 23, 2016, available at https://www.forbes.com/sites/forbespr/2016/03/23/forbes-releases-19th-annual-mlb-team-valuations/#c132d9620af0.

Holland, Jesse. "Bob Arum fires back at Dana White: 'UFC fighters get paid nothing'," MMA Mania, Sept. 23, 2011, available at http://www.mmamania.com/2011/9/23/2444228/bob-arum-fires-back-at-dana-white-ufc-fighters-get-paid-nothing.

Looney, Douglas S. "The Start of a Chain Reaction?," Sports Illustrated, Feb. 16, 1976, available at https://www.si.com/vault/1976/02/16/558545/the-start-of-a-chain-reaction.

"Owners Say Reserve Clause Reason They Invested in Baseball," Chicago Tribune, June 4, 1970, available at http://archives.chicagotribune.com/1970/06/04/page/98/article/owners-say-reserve-clause-reason-they-invested-in-baseball.

Rafael, Dan. "Klitschko camp 'surprised' by $23m purse bid," ESPN UK, Apr. 25, 2013, available at http://en.espn.co.uk/boxing/sport/story/204099.html.

Shaikin, Bill. "A look at how Major League Baseball salaries have grown more than 20,000% the last 50 years," Los Angeles Times, March 28, 2016, available at www.latimes.com/sport/mlb/la-sp-mlb-salaries-chart-20160329-story.html.

Sievert, Steve. "Strikeforce to be flagship promotion in upcoming 'EA Sports MMA' videogame," MMAJunkie.com, Nov. 06, 2009, available at https://web.archive.org/web/20091109023530/http://mmajunkie.com/news/16763/strikeforce-to-be-flagship-promotion-in-ea-sports-mma-videogame.mma.

Surowiecki, James. "Hollywood's Star System, At a Cubicle Near You," The New Yorker, May 28, 2001, available at http://www.newyorker.com/magazine/2001/05/28/hollywoods-star-system-at-a-cubicle-near-you.

Tabuena, Anton. "White defends UFC pay: Fighters make a lot of money, we're on par with other sports," Bloody Elbow, June 23, 2016, available at

PUBLIC COPY - REDACTED

https://www.bloodyelbow.com/2016/6/23/12011036/white-defends-ufc-pay-fighters-make-a-lot-of-money-were-on-par-with.

***Academic Literature***

Bartok, Richard E. "NFL Free Agency Restrictions Under Antitrust Attack", Note .41 Duke L.J. 503 (1991).

Kahn, Lawrence M. "The Sports Business as a Labor Market Laboratory." *The Journal of Economic Perspectives*, vol. 14, no.3, 75-94 (2000).

Krautmann, Anthony C., Peter Von Allmen, and David Berri. "The Underpayment of Restricted Players in North American Sports Leagues." *International Journal of Sport Finance*, vol.4, 161-175 (2009).

McCain, John and Ken Nahigian. "Symposium Sports and the Law: A Fighting Chance for Professional Boxing", 15 Stan. L. & Pol'y Rev. 7 (2004).

Rosenbaum, Thane N. "The Antitrust Implications of Professional Sports Leagues Revisited: Emerging Trends in the Modern Era", 41 U. Miami L. Rev. 729 (1987).

Same, Jeffery B. "Comment: Breaking the Chokehold: An Analysis of Potential Defenses Against Coercive Contracts in Mixed Martial Arts", 2012 Mich. St. L. Rev. 1057 (2012).

Seymour, Harold. *Baseball: The Early Years.* New York: Oxford University Press, 1960.

Smith, Rick. "Here's Why Hollywood Should Kiss the Handshake Deal Goodbye", Note. 23 Loy. L.A. Ent. L. Rev. 503 (2003).

Twomey, John and James Monks, "Monopsony and Salary Suppression: The Case of Major League Soccer in the United States," *American Economist* 56, no. 1 (Spring 2011): 20-28.

Vrooman, John. "The Economic Structure of the NFL," in K.G. Quinn (ed.) T*he Economics of the National Football League*. Springer, 2012.

***Cases***

*De Haviland v. Warner Bros. Pictures, Inc*, 67 Cal.App.2d 225 (1944)

*Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741 (S.D.N.Y. 1990)

*Flood v. Kuhn*, 407 U.S. 258 (1972)

PUBLIC COPY - REDACTED

*Golden Boy Promotions LLC v. Haymon*, No. 15-cv-3378-JFW(MRWx), 2017 U.S. Dist. Lexis 29782 (C.D. Cal. Jan. 26, 2017)

*International Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959)

*Kapp v. National Football League*, 390 F. Supp. 73 (N.D. Cal. 1974)

*Mackey v. National Football League*, 407 F.Supp. 1000 (D. Minn. 1975)

*Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976)

*McCourt v. California Sports, Inc.*, 460 F.Supp. 904 (E.D. Mich. 1978)

*McNeil v. National Football League*, No. 4-90-476, 1992 WL 315292 (D. Minn. 1992)

*Metropolitan Exhibition Co. v. Ewing*, 42 F. 198 (S.D.N.Y. 1890)

*Philadelphia World Hockey Club v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462 (E.D. Penn. 1972)

*Radovich v. National Football League*, 352 U.S. 445 (1957)

*Robertson v. National Basketball Ass'n*, 389 F.Supp. 867 (S.D.N.Y 1975)

*United States v. Int'l Boxing Club of New York, Inc.*, 150 F.Supp. 397 (S.D.N.Y 1957)

*United States v. Int'l Boxing Club of New York, Inc.*, 171 F.Supp.841 (S.D.N.Y. 1957)

*White v. National Football League*, 822 F.Supp. 1389 (D. Minn. 1993)

***Depositions***

Deposition of Kirk Hendrick, November 29, 2016.

Deposition of Lorenzo Fertitta, March 23, 2017.

Deposition of Drew Goldman, April 28, 2017.

Deposition of Joe Silva, June 7, 2017.

Deposition of Leon Margules, July 11, 2017.

Deposition of Michael P. Mersch, July 14, 2017.

Deposition of Ike Lawrence Epstein, July 21, 2017.

**PUBLIC COPY - REDACTED**

Deposition of Dana White, August 9, 2017.

Hendrick 30b6 Exhibit 2 - Zuffa 30(b)(6) Deposition Topic A – Fighter Contracts.

***Legislative Materials***

H. R. Rep. No. 106-449 (1999).

15 U.S.C.S § 6301.

S. Rep. No. 105-371 (1998).

Statement of Patrick English, Hearing Before the Committee on Commerce, Science, and Transportation, U.S. Senate, 105th Cong. 2nd Sess., Business Practices in the Professional Boxing Industry (March 24, 1998).

Muhammad Ali Boxing Reform Act, 114 Stat. 321, § 10(a)(1)(B) (2000).

Nevada State Athletic Commission's Rules and Regulations, Section 467.112(3).

***Online Resources***

"Average Salary for EPL, NBA, MLB, NFL, NHL, MLS, WNBA, AFL etc…" BigSoccer.com, Apr. 14, 2006, available at http://www.bigsoccer.com/threads/average-salary-for-epl-nba-mlb-nfl-nhl-mls-wnba-afl-etc.339337/.

"Boxing Rankings," Fightnews.com, available at http://fightnews.com/rankings-2.

Rodney Fort's Sports Economics", available at https://sites.google.com/site/rodswebpages/codes.

***Pleadings and Legal Correspondence***

Letter from counsel at Boies, Schiller, Flexner to Daniel Silverman, dated July 17, 2017.

Consolidated Amended Class Action Complaint, ECF No. 208, filed Dec. 18, 2015.

***Third Party Materials***

Bureau of the Census. "Participation in Selected Recreational Activities: 1896 to 1970", Bicentennial Edition: Historical Statistics of the United States, Colonial Times to 1970, Part 1, U.S. Department of Commerce.

Collective Bargaining Agreement between National Football League and the National Football League Players Association, Aug. 4, 2011.

PUBLIC COPY - REDACTED

Collective Bargaining Agreement between National Hockey League and National Hockey League Players' Association, Sept. 16, 2012-Sept. 15, 2022.

Collective Bargaining Agreement between the National Basketball Association and the National Basketball Players Association, Jan. 19, 2017, Article VII (a)(ii).

Contract between St. Louis National Baseball Club, Inc. and Curtis Charles Flood, National League of Professional Baseball Clubs, March 3, 1969.

MLB Basic Agreement, 2012-2016.

"Regulations of World Championship Contests," World Boxing Organization, Aug. 28, 2013.

***<u>Websites</u>***

Movies and Entertainment Industry Profitability Rations", available at http://csimarket.com/Industry/industry_Profitability_Ratios.php?ind=917&hist=4

The Statistics Portal, statista.com

Sportrac.com

"Team Comparison -17/18", NHL Numbers, available at http://nhlnumbers.com/teams?year.

Yam, Kevin. "Salary of a Hockey Player," The Physics Factbook, 2005, available at https://hypertextbook.com/facts/2005/KevinYam.shtml.

PUBLIC COPY - REDACTED

***Bates Stamped Materials***

| | | |
|---|---|---|
| CG-UFC-00000003 | DB-ZUFFA-00006712 | DB-ZUFFA-00007187 |
| DB-ZUFFA-00007290 | DB-ZUFFA-00020303 | DB-ZUFFA-00024253 |
| DB-ZUFFA-00030406 | DB-ZUFFA-00056900 | DB-ZUFFA-00006712 |
| RAINE-0016846 | RAINE-0018791 | SBPCL00002101 |
| WAR-000009 (Margules Deposition Exhibit 3) | WME_ZUFFA_00001150 | WME_ZUFFA_00005368 |
| ZFL-0000007 | ZFL-0000031 | ZFL-0000064 |
| ZFL-0000113 | ZFL-0000169 | ZFL-0000221 |
| ZFL-0000136 | ZFL-0186162 | ZFL-0411039 (Lappen Deposition Exhibit 203) |
| ZFL-0506593 | ZFL-0557588 | ZFL-0940065 |
| ZFL-0994806 | ZFL-1014148 | ZFL-1014149 |
| ZFL-1021391 | ZFL-1053223 | ZFL-1070290 |
| ZFL-1081154 | ZFL -1233191 (Epstein Deposition Exhibit 32) | ZFL-1376378 |
| ZFL-1381761 | ZFL-1382452 | ZFL-1404974 |
| ZFL-14121551 (Silva Deposition Exhibit 43) | ZFL-1425511 | ZFL-1472224 |
| ZFL-1472337 | ZFL-1472338 | ZFL-1514712 |
| ZFL-1514713 | ZFL-1514748 | ZFL-1514769 |
| ZFL-1514770 | ZFL-1514804 | ZFL-1514836 |
| ZFL-1514837 | ZFL-1514870 | ZFL-1514900 |
| ZFL-1514901 | ZFL-1514933 | ZFL-1514944 |
| ZFL-1514966 | ZFL-1516424 | ZFL-1516456 |
| ZFL-1674096 | ZFL-2149052 (Epstein Deposition Exhibit 42) | ZFL-2198339 (Epstein Deposition Exhibit 34) |
| ZFL-2277058 | ZFL-2496264 | ZFL-2532557 (Epstein Deposition Exhibit 35) |
| ZFL-2603702 | ZFL-2632955 | ZFL-2642993 |
| ZFL-2699678 | ZFL-2700585 | ZFL-2764798 |
| ZFL-2764797 | ZFL-2764799 | ZFL-2764800 |
| ZUF-00113209 | ZUF-00335242 | |

PUBLIC COPY - REDACTED

***<u>Other Materials</u>***

Dworkin, James B. *Owners versus Players: Baseball and Collective Bargaining*. Boston, Mass: Auburn House, 1981.

Edmund Edmonds & William Manz, "Congress and Boxing: A Legislative History 1960-2003," William S. Hein & Co., Inc., Buffalo, New York, 2005.

Korr, Charles. *The End of Baseball as We Knew It.* Urban, Ill: University of Illinois Press, 2002.

Quirk, James & Rodney Fort. *Pay Dirt: The Business of Professional Team Sports.* Princeton, N.J.: Princeton University Press, 1992.

Riess, Steven A. *Sports in America from Colonial Times to the Twenty-First Century* (2011).

Szymanski, Stefan and Andrew Zimbalist. *National Pastime: How Americans Play Baseball and the Rest of the World Plays Soccer*, Washington, D.C.: Brookings, 2006.

Zimbalist, Andrew. "Salaries and Performance: Beyond the Scully Model," in P. Summers (ed.) *Diamonds Are Forever*. Washington, D.C.: Brookings, 1992.

Zimbalist, Andrew. *Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime*. New York: Basic Books, 1992.

Zimbalist, Andrew. "Reflections on Salary Shares and Salary Caps," Journal of Sports Economics 11:1 (February 2010)

PUBLIC COPY - REDACTED