# Exhibit 9

Expert Report of Professor Robert H. Topel (October 27, 2017) (excerpted)

PUBLIC COPY - REDACTED

Highly Confidential Under Protective Order

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CUNG LE, et al.,<br><br> Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP and UFC,<br><br> Defendants. | Case No. 2:15-cv-01045-RFB-PAL |

**Expert Report of Professor Robert H. Topel**

**October 27, 2017**

PUBLIC COPY - REDACTED

compensation. Standard and widely-accepted economic models of competitive labor markets explain the determination of workers' wages, measured in dollars per worker. Dr. Singer ignores these models. Instead, he asserts without foundation that an MMA athlete's compensation should be measured as a share of event revenues rather than as dollars paid. This metric is economically incorrect: there is no economic basis for Dr. Singer's assumption that a decline in the share of total event revenue paid to an MMA athlete is evidence of anticompetitive harm. In fact, procompetitive, market-expanding conduct by Zuffa would cause this share to decline in the absence of any harm to an MMA athlete, even if actual compensation of these athletes rose—which in fact it did.

[redacted]

28. **Opinion 8**: The economically correct measure of compensation is compensation—measured in dollars per athlete. Accepting *arguendo* the other flawed aspects of Dr. Singer's regression model, including his flawed measures of "foreclosure," I re-estimated his model using

10

### B.  EXCLUSIVITY AND MULTI-BOUT CONTRACTS ASSIST IN PROTECTING PROMOTERS' INVESTMENTS AND BUILDING A BUSINESS

85.  In the MMA marketplace, many aspects of the contracting structure between promoters and athletes are best understood as a solution to a ubiquitous free riding problem.

86.  Generally speaking, free riding can arise when two parties are engaged in a repeated economic relationship. The success of that relationship depends on one or both parties making investments that increase the value of collaboration. But in some cases, one party may be able to capture the investments of its partner by switching to another partner—the capital resulting from the investments are not specific to the original parties. This ability to free ride on the first partner's investments discourages that firm from making investments in the first place.[139] For example, an insurance company that sells through independent agents can increase demand for its products by advertising. However, once potential customers respond to the advertising by contacting the independent agent, the agent may have an incentive to steer customers to other insurers that do not spend as much on advertising, and therefore can offer more attractive pricing to the customer and to the agent.[140] To prevent such free riding, insurers that invest heavily in advertising may use exclusive agents rather than independent agents representing multiple insurers, and may restrict the ability of agents to take their client list with them if they leave to represent another insurer. Otherwise, the insurer would not generate as much return from its advertising and market development, and would have less incentive to promote its products.

87.  Both athletes and promoters make considerable investments that increase the value of the product offered to the public: athletes through their training, and promoters through promoting MMA events and athletes. However, there is an important difference between these investments. Investments in training borne by the athletes themselves are not subject to free riding because training is embodied in the individual athlete: when skilled athletes switch promoters, their embodied skills go with them to the new promoter. The original promoter cannot transfer those skills to a new athlete, so the athlete retains the ability to collect the returns on his own training investments. In contrast, a promoter's investments in an athlete increase the general

---

[139] See Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (2005) at Chapter 12, p. 414.

[140] Howard P. Marvel, "Exclusive Dealing," *The Journal of Law and Economics*, vol. 25 (April 1982).

PUBLIC COPY - REDACTED

==marketability and publicity of that athlete, which are embodied in the athlete's MMA reputation or identity.== If an athlete switches promoters, the investments made by the original promoter continue to make the athlete more marketable and valuable with the new promoter. Absent contractual restrictions or other means of compensating the original promoter, a competing promoter can free ride on the investments made by the original promoter by hiring the established athlete. With no limitations on switching among promoters, this free riding would reduce the investments made by promoters in MMA events, and decrease the value of MMA events to consumers, athletes, and promoters.



89. Other elements of the alleged Challenged Conduct can also be understood as either a consequence of or a response to the concern that competing MMA promoters will free ride on promotional investments. For example, Dr. Singer lists as a vertical restraint of trade a provision that restricts competing MMA promoters that contract with athletes that have left the UFC from using video clips of previous UFC fights to promote upcoming fights.[143] But this is simply a reflection of Zuffa exercising its intellectual property rights over copyrighted works. The

---

[141] SINGER REPORT at ¶ 21.

[142] SINGER REPORT at ¶ 71; SINGER REPORT at n. 60.

[143] SINGER REPORT at ¶ 74.

PUBLIC COPY - REDACTED

95. Inherent to this solution to the transaction cost issue is that the marketplace will rely on matches between athletes contracted to the same promoter. Co-promoted matches, in which athletes from different MMA promoters compete against one another, are apparently non-existent.[155] There are also significant risks for the promoter whose job it is to sell the public on the idea that its athletes are the best. The promoter for the losing athlete in a cross-promoted event not only has lost that one bout but may also have diminished its ability to promote future events featuring its athletes because of the loss in the reputation and brand it had tried to create.[156] When discussing whether there can be procompetitive benefits to Zuffa's contracting practices, Dr. Singer suggests that a more competitive MMA industry could have matchups between athletes from different promoters.[157] Yet he provides no evidence of such cross-promotions between any promoters in the market, either currently or historically. The absence of cross-promotion, even among Zuffa's competitors, is strong evidence that cross-promotion is an inferior business model in MMA—it has failed the market test. The market reality is one of intra-promoter matches only.

96. Given this market outcome in which intra-promoter bouts are the universal business practice—not only by Zuffa, but also by competing promoters—there is a natural tendency for a leading promoter to attract a significant share of the top athletes. This follows from the complementarity of athlete talents in producing high-quality bouts, and the desire among athletes to fight against the best, statements which appear repeatedly in Dr. Singer's report.[158] Thus, the fact that Zuffa is larger than its rivals, has a larger share of top athletes, and is more successful at attracting audience share and revenue is not indicative of anticompetitive conduct, but rather follows naturally from the solution to the transaction cost problem that has been adopted by all competitors in the marketplace; such an outcome is procompetitive. The market structure induces aggressive competition between promoters to stage appealing events featuring matches among

---

[155] When discussing the possibility of cross-promoted fights, the only example that Dr. Singer cites is a boxing match between an MMA athlete and a boxer. (SINGER REPORT at ¶ 269.)

[156] Deposition of Scott Coker, (August 3, 2017) [hereinafter COKER TR.] at 84-87.

[157] SINGER REPORT at ¶ 269; see also SINGER REPORT at ¶¶ 283-4.

[158] SINGER REPORT at ¶¶ 20, 106, 136, 138, 164.

PUBLIC COPY - REDACTED

their own contracted athletes. The most successful promoter will tend to attract the most talented athletes and produce the highest-valued events, at least until being supplanted by another promoter with a superior product or business acumen. In this regard, it is noteworthy that in Asia, which is the only other geographic market for MMA identified by Dr. Singer, he cites ONE Championship's claim that it has a 90 percent market share.[159]

97.  Moreover, when viewed from the perspective of the marketplace implementing an efficient solution to a transaction cost problem, the horizontal acquisitions that are an element of the alleged Challenged Conduct discussed by Dr. Singer are in fact procompetitive. When competing promoters each have highly ranked athletes, but transaction costs deter promoters from arranging cross-promoted matches, horizontal acquisitions enable top athletes to compete against each other—the complementary inputs (highly talented athletes) are brought within a single firm, which the evidence indicates is necessary for them to fight each other. This result benefits customers, who want to see (and are willing to pay to see) matches between top athletes. As discussed below, it also benefits athletes, for whom compensation increased following these acquisitions. In Section IX, I show that Zuffa's horizontal acquisitions did not increase its market power.

### D. OTHER PROCOMPETITIVE BENEFITS OF ZUFFA'S CONTRACT PROVISIONS

#### 1. Tolling Provisions



99.  Dr. Singer states that in the case of injury, unwillingness to compete, or retirement, Zuffa's agreements permitted them to extend contracts beyond the stated term for "many

---

[159] "About ONE," available at https://onefc.com/about-one/ cited in SINGER REPORT at ¶ 122.

PUBLIC COPY - REDACTED