# Exhibit 18

Deposition of Jon Fitch (February 15, 2017) (excerpted)

PUBLIC COPY - REDACTED

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch ) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vasquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
          Defendants.             )

VIDEO DEPOSITION OF JON FITCH

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:23 A.M.

and ending at 4:54 P.M. on Wednesday, February 15, 2017

Reported by:
Sarah Padilla, CCR NO. 929
Job No.  296624 Pages 1-257



**PUBLIC COPY – REDACTED**

Page 82

```
 1   BY MR. WIDNELL:
 2      Q   Okay.  So did anyone as Zinkin tell you
 3   about communications they had had with Zuffa that
 4   indicated that Zuffa was unhappy with something you
 5   had done?
 6      A   No.  Not that I can remember, but I'm not
 7   ruling it out.
 8      Q   So how in your mind were your punished by
 9   Zuffa?
10      A   I was fired for not wanting to sign a
11   contract for no money forever.
12      Q   That was the video game incident, isn't
13   it?
14      A   Yup.
15      Q   Okay.  Were there other instances where
16   you were punished by Zuffa?
17      A   Other than -- nothing that is like a
18   blatant measurable thing.  They used a number of
19   different tactics in order to create enough power to
20   reign over us and instill fear over us with minor
21   comments.  You know, trying to get us to perform for
22   them before the fights in their prefight speeches.
23   You know, there were threats there.  If you don't
24   fight a certain way, you're not going to be
25   rewarded.
```

Page 83

```
 1      Q   So can you give me an example of that?
 2      A   Before the fights, Dana would always pull
 3   all the fighters into a room without manager
 4   management or the corner, just fighters and him and
 5   his security.  And he would give a speech about how
 6   we're all in this together, and then somewhere in
 7   throughout that, there would be a minimal threat
 8   about leaving it all in the cage and, you know,
 9   putting on a show or whatever.  If you couldn't live
10   up to that, there would be -- you wouldn't get
11   the -- you wouldn't get the good stuff, which wasn't
12   necessarily a threat, but it's do it the way we want
13   you to do or you're not going to get anything.
14      Q   So what was the way that Zuffa wanted you
15   to do it?
16          MR. DELL'ANGELO:  Objection to the form.
17          THE WITNESS:  Whatever their opinion on
18   what sold their fights, they wanted, right, they
19   didn't care, well, I don't know how to -- I mean,
20   they wanted stand-up fights.  They wanted Muay Thai.
21   They wanted Muay Thai with small gloves.  Guys who
22   wrestled too much, guys who didn't fight their style
23   that they liked wouldn't be given certain
24   opportunities.  They wouldn't be allowed to progress
25   and fight the next toughest guy.
```

Page 84

```
 1   Demian Maia is in a position right now he
 2   should be fighting for title, but since they don't
 3   like his fighting style, he's being punished and not
 4   given a chance to fight for title.
 5          And that sends a clear message to every
 6   other single fighter in the world, that if you're a
 7   ground-based fight, you will not succeed on the same
 8   level in UFC, not because you're not good enough and
 9   you can't beat the guys at the top, but because they
10   just don't like that style.
11   BY MR. WIDNELL:
12      Q   Do you know why they don't like that
13   style?
14          MR. DELL'ANGELO:  Objection to the form.
15   You can answer if you know.
16          THE WITNESS:  They don't understand it.
17   They're not good at it.  I don't know.
18   BY MR. WIDNELL:
19      Q   So it's never been communicated to you why
20   they don't like the style that you are describing, a
21   ground -- what did you call it?
22      A   A ground-oriented-type fight.
23      Q   Okay.  And would that be more wrestling?
24      A   More wrestling, grappling based, dimension
25   based.
```

Page 85

```
 1      Q   Rather than standing up and --
 2      A   Rock'em Sock'em Robots.
 3      Q   So no one at Zuffa has ever explained to
 4   you why they have a preference for one style over
 5   another?
 6          MR. DELL'ANGELO:  Object to form.
 7   BY MR. WIDNELL:
 8      Q   Did anyone at Zuffa ever explain to you
 9   why they have a preference for one style over
10   another?
11      A   No.  They never -- I never had
12   conversations with somebody from Zuffa explaining to
13   me why I was not getting benefits because of my
14   style.  I never had that conversation.
15      Q   Has anyone at Zuffa ever made a public
16   statement that you recall that explains why they
17   prefer one style over another?
18      A   I think Dana has made statements.  He's
19   called things boring.  He doesn't like certain
20   things.  But I think that's his opinion.  And he
21   pushes his opinion a lot of times.
22      Q   So we're talking about the ways that you
23   had been punished.  We talked about the video game
24   incident.  And then I think you said that there were
25   subtle ways that you interpreted as threats.  Is
```



PUBLIC COPY – REDACTED

```
                                                Page 86
 1    that accurate, that description?
 2       A   Threats, fear, intimidation type of
 3    things.
 4       Q   So can you give me an example of that kind
 5    of threat?
 6           MR. DELL'ANGELO:  Objection.  Asked and
 7    answered.
 8           THE WITNESS:  Yeah, I've answered that.
 9    BY MR. WIDNELL:
10       Q   So we talked about how Dana would get the
11    fighters together before an event and say that he
12    preferred a certain style over another.  Was that
13    the only example -- is that the only kind of threat
14    that he made?
15       A   I mean, no.  There is just little things,
16    things he makes in public statements, the fights he
17    gives to certain people, the place on the -- your
18    place in the pay-per-view lineup, whether you fight
19    on the pay per view or you fight on the TV card,
20    whether you get sent overseas, the opponents you get
21    matched up against.  One of the ways they punished
22    me a lot of the times is they found me the toughest
23    guy they could find that nobody had ever heard of
24    before.
25           So they took really tough amateur-type
```

```
                                                Page 87
 1    guys, but the crowd didn't know who they were.  It's
 2    a lose-lose fight for somebody with notoriety.
 3    Because if you don't go in there -- if you go in
 4    there and completely beat the guy up, fine, you were
 5    supposed to.  They didn't know who the other guy
 6    was.  You go in there and you win, but you don't
 7    destroy the guy, oh, you suck now because you didn't
 8    destroy a guy with no name.  Or you lose, you lose
 9    to a guy who has no name, and now your notoriety and
10    your value drops immensely.  They may even cut you
11    because you lost.
12           So that is one of the most subtle ways
13    that they really put fear into people, is they
14    control your destiny.  They control who you fight,
15    when you fight, and how much you fight for.
16       Q   So which guys in your fight history fit
17    that category of really tough guys that nobody knew
18    about?
19           MR. DELL'ANGELO:  At the UFC?
20    BY MR. WIDNELL:
21       Q   At the UFC.  Well, I assume it's at the
22    UFC since --
23           MR. DELL'ANGELO:  Just want to be clear.
24           THE WITNESS:  Well, my first fight, Brock
25    Larson, I hadn't done anything to irritate them yet.
```

```
                                                Page 88
 1    BY MR. WIDNELL:
 2       Q   Did you have notoriety at that point?
 3       A   I did, enough to almost make it onto the
 4    Ultimate Fighting television show.  I had enough
 5    notoriety.
 6       Q   So let me just ask a quick question about
 7    that.  Would you say if you made it onto the
 8    Ultimate Fighting show, that that makes you an elite
 9    fighter?
10           MR. DELL'ANGELO:  Objection to form to the
11    extent that it calls for a legal conclusion.
12           THE WITNESS:  Man, I don't like it.  It's
13    an opinion, I don't like it.  But in a sense, like I
14    said, if you get that rubber stamp, it doesn't
15    necessarily make you elite to be on the show.  But
16    if you win the show and you fight for the UFC, like
17    I said that rubber stamp, I'm a UFC veteran.
18    BY MR. WIDNELL:
19       Q   Yeah.  That's the distinction I'm trying
20    to get at.
21       A   Yeah.
22       Q   So if you fight for the UFC --
23       A   So being on the show, maybe not.
24       Q   Maybe not?
25       A   Yeah.
```

```
                                                Page 89
 1       Q   Okay.
 2       A   If you fight on the show and you lose and
 3    you don't get the contract, maybe not.  But that
 4    show may give you the ability to raise your
 5    notoriety, you fight at a smaller show and your
 6    notoriety gains some more, and then you get the --
 7    then you get the call.
 8       Q   Okay.  And in your case, the fact that you
 9    were being considered for the show meant that you
10    had the kind of notoriety that made you an elite
11    fight; is that correct?
12       A   Yeah.  Especially since it was the first
13    show.  It's different, though.  It's different now.
14    That first show, if you look at the level of
15    experience and competition to all the guys who were
16    on that show, they had all been around a long time.
17    You know, there were no newbies on that show.
18    Everybody there had ten fights or so.
19       Q   So is it fair to say that in that first
20    show they were all elite fighters?
21       A   It's a little different.  The first maybe
22    two or three, I can't remember, and they even had a
23    come-back show, and those were old guys that had
24    fought in the UFC before.  But, yeah, it's a sliding
25    scale.  Because now it's less experienced guys
```



23 (Pages 86 to 89)

PUBLIC COPY – REDACTED

Page 90

1  getting in on the show.  So I wouldn't say
2  necessarily.  In fact, a lot of those guys who were
3  invited on that show, were invited on that show
4  because they may have been considered elite already
5  because they had notoriety.  The UFC, people had
6  seen them fight, they'd seen videos, heard their
7  name, things like that.
8      Q   So your first fight with Brock Larson was
9  a tough fight, was that to punish you?
10     A   Not necessarily.  But I -- I was set up to
11 lose that fight.  He was undefeated.  They were
12 going to try to start building him, right?  Because
13 it was the 185-pound division was a weak division.
14 They didn't have a lot of guys, a lot of talent.
15 They needed star power.
16         So they had this undefeated guy from
17 Minnesota.  They wanted to make him the Matt Hughes
18 of the weight class.  I was brought in to lose.
19 Now, I hadn't had any real experience with Zuffa at
20 the time, so they didn't really have any reason to
21 punish me.  But Zuffa and my management company were
22 already bitter rivals.  They already hated each
23 other.  DeWayne was no longer allowed in on
24 negotiations because him and Dana would just fight.
25         So there's possible -- possibility that he

Page 91

1  was trying to punish my management by setting me up
2  against this tough fight to lose.  But I took it
3  anyways because I knew I was better than the guy and
4  I just needed to get my foot in the door.  As soon
5  as I had my foot in the door, I was straight.
6      Q   How'd you know it wasn't a case of they
7  were trying to punish Brock Larsen by matching him
8  with you?
9          MR. DELL'ANGELO:  Object to form.
10         THE WITNESS:  Of course I have to
11 speculate at this stuff, but he had an undefeated
12 record.  He was more marketable at that point.  He
13 had a large local following in Minnesota where he
14 was fighting.  So just on paper, it looks likely
15 that that was the situation.  Plus, I can't remember
16 fully, but he might have already been signed to a
17 multi-fight deal.
18 BY MR. WIDNELL:
19     Q   And if you are signed to the a multi-fight
20 deal, they don't have an incentive to --
21     A   They want to keep you.  They have a reason
22 they want to keep you around.  They don't want you
23 going somewhere else.
24     Q   So that's actually one way that a
25 multi-fight deal might be a good thing.  It shows

Page 92

1  that they're making an investment in you?
2          MR. DELL'ANGELO:  Objection to the form.
3          THE WITNESS:  Yeah, I wouldn't say it's a
4  good thing.  Just they want to make sure no one has
5  access to you.
6  BY MR. WIDNELL:
7      Q   And why do they want to make sure nobody
8  else has access to you?
9      A   Because your notoriety could bring
10 notoriety to a rival competition.
11     Q   Okay.
12     A   If I have notoriety and I go to a promoter
13 who no one knows about, I'd bring all those fans
14 with me.  That's why they do it.
15     Q   Is there any other reason why they would
16 have want to have a multi-fight contract?
17         MR. DELL'ANGELO:  Objection to the form.
18 Calls for speculation.
19         THE WITNESS:  To my understanding, I mean,
20 it makes a lot of sense why the UFC would want a
21 multi-fight contract, they keep all the talent, you
22 can't go nowhere else, no one else can compete.  Of
23 course it's beneficial for the UFC contracts for the
24 UFC to have multi-fight contracts.
25

Page 93

1  BY MR. WIDNELL:
2      Q   And it sounds like it's your opinion that
3  if you have a multi-fight contract, they're going to
4  try and give that fighter better fights; is that
5  correct?
6          MR. DELL'ANGELO:  Objection to form
7  mischaracterizes the witness's testimony.
8          THE WITNESS:  Yeah.  No, I'm not saying
9  that at all.
10 BY MR. WIDNELL:
11     Q   Okay.  I thought I'd heard that based on
12 the description of why they were matching you with
13 Brock Larsen.  But that's not the case?
14     A   No, that's not the case.  I was just
15 guessing, straight up guessing that he might have
16 had a multi-fight contract.  The situations we were
17 looking at, I was brought in short notice to fight,
18 so I didn't have as much time to prepare.  I didn't
19 have zero against, you know, he was like 16 and 0,
20 when you have an 0 you're highly marketable.  He
21 already had a large following in Minnesota where he
22 was fighting.
23         I didn't have much of a following because
24 I jumped from show to show to show.  His coach was
25 my coach, his jiujitsu coach at the time, David



PUBLIC COPY – REDACTED

Page 114

```
 1    Q   If you win; is that correct?
 2    A   Yes, only if you win.
 5    A   Uh-huh.
 8    A   Correct.
 9    Q   Okay.  And based on the date of your
10  signature of that contract, can you tell me which
11  fights would have been covered?
12        MR. DELL'ANGELO:  Objection to the form.
13  Calls for a legal conclusion.
14        THE WITNESS:  I can't be a hundred percent
15  sure what the date on this one is.  That would be
16  either Chris Wilson GSP, Gono, Paulo Thiago, I
17  believe.
18  BY MR. WIDNELL:
19    Q   If you had fought all four fights on the
20  contract?
21    A   Yes, I fought all four on that.
22    Q   Ah, so now let's go to Exhibit 54 --
23    A   Correct.
24    Q   -- and see when that was signed.  So can
25  you tell from when that was signed whether you
```

Page 115

```
 1  fought all four fights under the contract that's
 2  Exhibit 51?
 3    A   I don't believe I did.  Looks like I was
 4  forced to re-sign before the Paulo Thiago fight, the
 5  UFC 100.
 6    Q   Okay.
 7    A   That is July 11, 2009.
 8    Q   Okay.  And for Exhibit 54, for that
 9  contract, can you tell me what your compensation for
10  the first fight was?
                                            Now,
13  let's go back to Exhibit 51.  We talked about the
14  compensation.  Can you look at your fight history
15  and tell me what compensation you actually would
16  have gotten based on your wins and losses?
17    A   For which fight?
18    Q   So let me ask it this way.  So Chris
19  Wilson was the first fight on that contract, I think
20  we've established; is that correct?
21    A   Yes.
24    A   Uh-huh.
```

Page 116

```
 3    A   No, because we started a new agreement.
 4    Q   Isn't this the new agreement?
 5    A   Huh-uh.
 6    Q   I thought that this was the agreement that
 7  covered Chris Wilson.
 8    A   What do you mean?
 9    Q   I thought that this was the agreement that
10  covered Chris Wilson, Exhibit 51?
11    A   No.  I'm sorry.  I don't understand what
12  you are asking.
13        MR. MAYSEY:  Can we go off record for a
14  second?
15        MR. DELL'ANGELO:  No, don't go off the
16  record.  Let him finish his answer.
17        THE WITNESS:  Yeah, I don't understand
18  what you're saying.
                                              but I
21  did not finish the agreement.
22        MR. WIDNELL:  Okay, so.
23        MR. DELL'ANGELO:  Can you excuse me,
24  counsel, before you proceed.
25        MR. WIDNELL:  Yeah, did you want to go off
```

Page 117

```
 1  the record?
 2        MR. DELL'ANGELO:  We don't have to go off
 3  the record.  I think there's a lack of clarity about
 4  one of the exhibits that I think Mr. Masey has.  And
 5  I just ask you let him clarify with you.
 6        MR. WIDNELL:  Sure.
 7        MR. MAYSEY:  So Exhibit 54, can you read
 8  off the Bates label.
 9        MR. WIDNELL:  ZFL0414089.
10        MR. DELL'ANGELO:  I think Mr. Masey got
11  two of 53 but not one of 54.
12        MR. MAYSEY:  I got two of 53.
13        MR. DELL'ANGELO:  Ah.  Which is leading to
14  a little bit of confusion.
15        MR. McSWEENEY:  Ah, I see.  My apologies.
16  Is that all we need to cover?
17        MR. DELL'ANGELO:  Yes, thank you for your
18  indulgence.
19  BY MR. WIDNELL:
20    Q   So I just want to go back to Exhibit 51.
21  And I'm just trying to figure out what you would
22  have gotten paid for -- right now, just what you
23  would have gotten paid for the Chris Wilson fight.
24  Which Chris Wilson was the first fight under the
25  contract in Exhibit 51; is that correct?
```

Page 118

```
 1    A   Yeah.
         [redacted]
         ?
11    A   Yup.
12    Q   And you won that fight; right?
13    A   Yes.
14    Q   And so for the next fight, which was your
15   fight with GSP?
16    A   Uh-huh.
         [redacted]
21    A   Yes.
22    Q   And then because you didn't win your next
23   fight, you would have been paid 34/34 also; is that
24   right?
25    A   Yes.
```

Page 119

```
 1    Q   Okay.  And you won that next fight?
 2    A   Yes.
         [redacted]
 5    A   I believe so.
         [redacted]
 9    A   Because if I would not have signed, I
10   would not have gotten another fight for a year,
11   which at that time I hadn't made enough money to sit
12   out a year.  I probably would have had to retire.
13   And there was no other place for me to go to make --
14   to make any money, so in that sense, yeah.
15    Q   And the reason why you would have to had
16   sit out a year is because after you finished your
17   fight --
18    A   Because if I didn't sign up, if I didn't
19   to do the re-up with the contract, I wouldn't have
20   gotten a bout agreement.
21    Q   Until?
22    A   They would have exercised their time limit
23   term to the full.
24    Q   And the reason you know about that is
25   because you heard about Huerta?
```

Page 120

```
 1    A   Because they had done it to other people.
 2    Q   And you've heard about -- you gave one
 3   other example; is that correct?
 4    A   Huerta and Arlovski.
 5    Q   So you know two examples --
 6    A   I know of two examples where the guys were
 7   brave enough to see it through.  Most guys know if
 8   you don't sign the re-up, you don't get your bout
 9   agreement.  If you don't get your bout agreement,
10   you don't get paid, you don't get money, you can't
11   feed your children.
12    Q   You don't get your bout agreement,
13   according to you.  And --
14    A   According to most, yeah.
15    Q   Okay.
16    A   According to management, according to
17   other fighters, according to the media, news media.
18    Q   As you understand it?
19    A   As I understand it, yes.
20    Q   And I'm not trying to dispute your
21   understanding.  But the contract ends after some
22   duration of time; correct?
23    A   It's supposed to end.  But they just keep
24   stacking up on top of it.
25    Q   So how do they stack up on top of it?
```

Page 121

```
 1    [redacted]
         you're not going to survive, you're not
11   going to live.  You don't get a choice.
12    Q   So you had fought a number of contracts --
13   a number of the fights prior to the point where you
14   were being considered for renegotiation; right?
15        MR. DELL'ANGELO:  Objection to the form.
16   BY MR. WIDNELL:
17    Q   So let me put it this way.  The contract
18   started with -- or the time started running from the
19   first fight of the contract, which was with Chris
20   Wilson; is that correct?
21    A   Yes.  I mean, I guess one of the things
22   that I guess I need to be clear about is, because of
23   the UFC's monopolistic position in the market and
24   their dominance, their belt is the only belt.  So
25   there is no reason to go anywhere else.  You're not
```

**PUBLIC COPY – REDACTED**

Page 122

1  going to make money, you're not going to achieve,
2  you're not going to be anything unless you fight for
3  their belt.
4      So that's another reason you're kind of
5  forced to re-up these contracts.  There's nowhere --
6  that's why I say, there's nowhere else to go because
7  you're a fighter.  Fighters fight for titles.  The
8  most coveted title is the UFC title.  You have
9  nowhere else to go.
10     Q   And I understand that UFC maybe the most
11 attractive choice, and the next best choice may seem
12 to be a very bad choice.  But what I'm trying to
13 understand is how they're forcing you to re-sign a
14 new contract.  And I just want to make sure I
15 understand the mechanics of that.
19     A   Uh-huh.
20     Q   And at the point that you started
21 renegotiating, it was after your third fight, which
22 was on January 31 of 2009.

Page 123

1      MR. DELL'ANGELO:  Objection to the form.
2  Mischaracterizes the witness's testimony.
3      THE WITNESS:  Yeah.
4      MR. WIDNELL:  I'm trying to characterize
5  the contract, actually.
6      MR. DELL'ANGELO:  Well, actually, one of
7  the things you did was you said there was a
8  negotiation, and I don't think the witness testified
9  there was a negotiation, so it mischaracterizes the
10 witness's testimony.
11     I appreciate what you're trying to do, and
12 I think clarification would be helpful, but you
13 didn't achieve it with that.
14     MR. WIDNELL:  I understand what you're
15 saying about negotiation.
16 BY MR. WIDNELL:
17     Q   So there was a point where you re-signed a
18 contract sometime after January 31 of 2009.
19     A   Uh-huh.
20     Q   Right?  And at that point, the contract
21 that you were under had started in March 1st of
22 2008?
23     A   Uh-huh.

Page 124

1      A   Uh-huh.
2      Q   And then I understand there is a period of
3  exclusive negotiation?
4      A   Uh-huh.
5      Q   But then the way this gets to another year
6  of waiting --
7      A   And matching, yeah.
8      Q   -- is the matching part?
9      A   Uh-huh.
10     Q   Is that right?
11     A   Yeah.
12     Q   Because the matching period is another
13 year after that?
16                         Then I would
17 have been given a contract to fight the last fight.
18 And then I have to sit and wait two months until I
19 can start taking offers from other people.  And then
20 they have the right to match.  You're talking about
21 two years of not fighting almost.  That's going to
22 retire a guy.  You can't -- there's no choice.
23     That's why I say forced.  Because you're
24 in a position where -- and it's not a negotiation,
25 he's right, there's no negotiation.  Here is what

Page 125

1  we're offering; take it or leave it.  If you leave
2  it, you're quitting, you are retiring, you're not
3  going to survive in the sport anymore.  There's
4  nowhere else to go.
5      Q   Okay.  So I understand that that's your
6  characterization of what happened.  But I just want
7  to be clear.  The way that you may get this to be
8  two years that you're going to have to sit around is
9  because the right to match is a year, and you don't
10 believe that other promotors would get you an offer
11 during that time period; is that correct?
12     MR. DELL'ANGELO:  Objection.
13 Mischaracterizes the witness's testimony.
14     THE WITNESS:  No.  What I'm saying is
15 there is ample studies that show that matching
16 periods freezes markets.
17 BY MR. WIDNELL:
18     Q   What do you mean by freeze market?
19     A   They keep potential bidders from bidding.
20 It freezes them because they don't want to -- they
21 don't want to deal with the turmoil and struggle on
22 bidding on this guy and losing it.  They'd rather
23 not do it at all.
24     Q   So your position is that other bidders
25 won't bid during the matching period; is that

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED

Page 218

1       THE WITNESS:  I mean, it's similar, like I
2 said.  I'll say it again, three-year-old with a
3 baseball bat and 900-pound gorilla with a baseball
4 bat.  I mean, it's the same type of contracts.  I
5 mean, these guys, these smaller shows copy the UFC.
6 There was a big hoopla a while ago about Ken Pavia
7 supplying Bellator with UFC contracts back in the
8 day.  I mean, these organizations copied UFC's
9 contracts.  I mean, they're all the same contracts.
10 But the idea of a three-year-old with a bat versus a
11 900-pound gorilla with a bat, these guys don't have
12 the power to inflict damage with what they're doing;
13 the UFC does.
14 BY MR. WIDNELL:



23       MR. DELL'ANGELO:  Sorry to interrupt you,
24 Counsel, but the witness doesn't have the exhibit
25 and we need to get him oriented.

Page 219

1       MR. WIDNELL:  Sorry.  It's Exhibit 51,
2 page 5.
3       MR. DELL'ANGELO:  Just flip it over to
4 make sure it's the right -- because they're the
5 same.
6       THE WITNESS:  What page on 51?
7 BY MR. WIDNELL:



Page 220

1       MR. DELL'ANGELO:  Object to the form to
2 the extent it calls for a legal conclusion.
3       THE WITNESS:  As long as that fighter
4 wants to continue fighting and continues to win, he
5 will remain under contract with them.  If he loses
6 or chooses to sit out for one year, it appears, and
7 sit out the matching period, you're talk about a
8 champion who could potentially be on the bench for
9 one year to two years.  I mean, what does that do to
10 someone's value?  How is he going to fight for any
11 money two years after he's fought?
12       Like, yeah.  He would go from a very
13 lucrative position to not having much notoriety at
14 all in that situation.  So you -- you don't really
15 have the option of not continuing to fight for them
16 forever.  The only way out is if they cut you, if
17 they don't like you and they want to get rid of you.
18   Q  Now, I believe you said that all the
19 fighters talk about what happens in the UFC.  How
20 many times have you heard of a fighter talk about
21 this clause being invoked?
22   A  Randy Couture was one.  Chuck Liddell is
23 another.  I mean, there's been a number over the
24 years.  I can't remember them off the top of my
25 head, but I know they were a few guys, because

Page 221

1 champions want to fight the other champions who are
2 out there.  And they can't do that currently like
3 this, you know.  They're stuck.
4   Q  So your understanding is, Randy Couture,
5 Chuck Liddell, and at least some other fighters have
6 not been able to leave the UFC because UFC used this
7 provision?
8       MR. DELL'ANGELO:  Objection to form.
9 BY MR. WIDNELL:
10   Q  Is that correct?
11       MR. DELL'ANGELO:  Object to the form.
12 Mischaracterizes the witness's testimony.
13       THE WITNESS:  No, it's not what I'm
14 saying.  I'm saying that the UFC uses multiple
15 tools, including these contracts, to get people to
16 sign and be obedient, even if it's not in their best
17 interest.
18 BY MR. WIDNELL:
19   Q  Okay.  I understand that.  I've heard you
20 say that.  But what I'm really trying to ask about
21 is what instances are you aware of where this
22 provision, specifically, was invoked to keep a
23 champion from leaving the UFC?
24   A  I answered that.  That one instance that I
25 do know for sure was Randy Couture.  And it was



Page 222

```
 1  discussed, a lot of people at the time wanted Chuck
 2  to go and fight the Pride champion, unify the belts,
 3  and it never happened.  But it's also the fact that
 4  there's nowhere else to go.  The UFC has monopolized
 5  the market and made their belt the only belt worth
 6  having, right?  Because they are the promoter and
 7  the sanctioning body.  They control the belt that
 8  everybody wants.  Everybody needs that belt.  You're
 9  not going to make as much money doing anything else
10  other than holding that belt.  So yes, these
11  contracts never end because you have nowhere else to
12  go.  They use multiple tentacles to make these
13  things happen.
14      Q   And you said that every fighter is
15  affected by the champion clause, how were you
16  affected by it?
17      A   Well, I was a contracted UFC fighter, and
18  the job and life goal and purpose for every fighter
19  is to win the highest coveted belt, the most
20  proclaimed, the most looked-up-to belt, and that's
21  the UFC belt.  So everyone who is fighting for that
22  belt is affected by the provisions of that belt
23  throughout the sport, throughout the company.
24      Q   And how were you affected specifically?
25          MR. DELL'ANGELO:  Objection to the form.
```

Page 223

```
 1  Asked and answered.
 2          THE WITNESS:  Yeah.  I believe I answered
 3  that.
 4  BY MR. WIDNELL:
 5      Q   So what you said is, I'm saying that I
 6  have no problem -- you said, well, I was a
 7  contracted UFC fighter and the job and life goal and
 8  purpose of every fighter is to win the highest
 9  coveted belt, the most proclaimed --
10      A   Title.
11      Q   Title.
12      A   Trophy, award.
13      Q   So is the only way that you are affected
14  by the championship clause that the championship is
15  what you wanted to attain?
16          MR. DELL'ANGELO:  Objection to the form.
17  Mischaracterizes the testimony.  Calls for a legal
18  conclusion.
19          THE WITNESS:  No.
20  BY MR. WIDNELL:
21      Q   So how were you affected?
22      A   I was affected the way that everyone was
23  affected.  We're all fighting for the same belt.  So
24  any terms and conditions around that belt affect
25  everyone who is competing for it.  We're not there
```

Page 224

```
 1  competing for money.  We're there competing for
 2  titles.  We want the belt.
 3      Q   Okay.  But you were never a champion;
 4  correct?
 5      A   Not in the UFC, no.
 9          MR. DELL'ANGELO:  Objection to the form.
10          THE WITNESS:  It was in my contract,
11  though, so it affected me.  If it wasn't going to
12  affect me, why would they put it in any contract.
13  BY MR. WIDNELL:
14      Q   So it affected your legal rights is what
15  you're saying; is that correct?
16      A   Yes.
17      Q   Okay.  Now, at WSOF you are a champion;
18  right?
19      A   Yes.
20      Q   And the champion's clause does apply to
21  you; is that correct?
22      A   Correct.
23      Q   Does that prevent you from being able to
24  leave WSOF?
25      A   Correct.  But, again, we're going with the
```

Page 225

```
 1  three-year-old and a baseball bat versus a 900-pound
 2  gorilla and a baseball bat.  I'm getting screwed in
 3  each situation, but I'm not getting screwed as bad
 4  with the little guy.  It doesn't hurt so bad when my
 5  little son hits me.
 6      Q   So how long do you have to stay with WSOF
 7  because of your champion clause?
 8          MR. DELL'ANGELO:  Objection to the form to
 9  the extent it calls for a legal conclusion.
10          THE WITNESS:  Yeah, I'm not a hundred
11  percent sure.  I have a promotional rights agreement
12  also.  When that runs out, the provisions of the
13  title stuff will kick in, but it's the same -- same
14  thing.  I mean, that provision is there, they all
15  use it because the top dog is using it.  If they
16  didn't use it, the UFC would just pluck their
17  champions, all the other champions every time.
18  Every time someone won a belt, somebody would buy
19  them up.
20  BY MR. WIDNELL:
21      Q   Because the UFC would pay more for the
22  champion than the organization's paying itself?
23      A   Yeah.  Not much, but they would just pay
24  enough to keep that guy to put that other company
25  out of business, because now they can't have a named
```

PUBLIC COPY – REDACTED

Page 226

```
 1  fighter.  If they built the guy up, they could steal
 2  him away.
 5      A   Yup.
 6      Q   What are you getting paid now?
13      Q   Okay.  So you're locked in into your next
14  fight.  What will you be paid?
21          MR. DELL'ANGELO:  Objection to the form.
22  Calls for speculation.
23          THE WITNESS:  It's impossible to know what
24  I could possibly be paid.  You know, we don't have a
25  free unhindered market.  So I wouldn't be able to
```

Page 227

```
 1  figure out what my real worth is.
 2  BY MR. WIDNELL:
 3      Q   Do champions at UFC get a percentage of
 4  pay per view?
 5          MR. DELL'ANGELO:  Objection to the form.
 6  Foundation.
 7          THE WITNESS:  UFC champions need to defend
 8  their belt in order to get a piece of the pay per
 9  view.  But, I mean, that all depends on
10  negotiations, if they're able to get very much.  I
11  mean, I can't recall the negotiation.  It's pretty
12  standard with a lot of those guys, what they're
13  getting.
14  BY MR. WIDNELL:
16  With the UFC you would be locked in at a higher rate
17  most likely; is that correct?
18          MR. DELL'ANGELO:  Object to the form.
19  Mischaracterizes the witness's testimony.
20          THE WITNESS:  I could guess.  I would have
21  to -- I would have to guess by looking at what I was
22  getting paid when I got cut.  And I would have to
23  guess by what my contemporaries are getting paid
24  also to figure that out.  But chances are I would be
25  making considerably more money.  But the funny thing
```

Page 228

```
 1  is though that's probably a much smaller percentage
 2  of the proceeds the companies are making that I
 3  would get paid.  I bet you I'm making a much bigger
 4  percentage of what World Series of Fighting is
 5  making for their shows versus what I made of what
 6  the UFC is making.  World Series ending up doing
 7  gates of billions of dollars is not happening.  They
 8  give most of their tickets away at the gate.
 9  BY MR. WIDNELL:
10      Q   So when you said that WSOF's champion
11  clause has much less of an effect on you, it's
12  because you are making much -- a much larger
13  percentage of their overall revenue, even though
14  you're getting paid a lot less money.  Is that what
15  you meant by WSOF's champion clause affected you?
16      A   No, that's not what I mean.
17          MR. DELL'ANGELO:  Objection to the form.
18  Mischaracterizes the witness's testimony.
19          THE WITNESS:  No, that's not what I mean.
20  What's that question again?  That wasn't what I
21  meant.
22  BY MR. WIDNELL:
23      Q   When you said that the champion clause as
24  used by -- or the champion clause as used by the
25  WSOF had less of an effect on you.  But it sounds
```

Page 229

```
 1  like you're locked into a contract with a lower
 2  compensation.
 3      A   Well, the thing with that is, I haven't --
 4  we've seen guys go from World Series to UFC.  I
 5  don't know if there was any champions yet.  It's a
 6  new organization.  But we have situations where guys
 7  like Justin Gaethje is a champ, and he may be
 8  allowed to leave.  A lot of these guys are content
 9  with being number two.  So they're willing to
10  release some of the champions.  I don't know.
11          Yeah, that's kind of the way it is.  The
12  UFC got rid of me because they were paying me too
13  much.  They didn't like me.  And I had nowhere else
14  to go so, yeah, I'm stuck.  I had to go there.  I
15  don't like that contract, but there's no other
16  options.  It's retire or do that.
17      Q   So you've talked about how the UFC didn't
18  like you.  I think you said it's because of stances
19  you took like the video game stances.  Is that what
20  you think is the reason for why UFC doesn't like
21  you?
22      A   That is one reason.  The other reason is
23  because I am a more grappling-based fighter, and
24  they want stand-up fights because they want more
25  knockouts.
```



**PUBLIC COPY – REDACTED**