# Exhibit 20

## Deposition of Kyle Kingsbury (February 17, 2017) (excerpted)

PUBLIC COPY - REDACTED

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon )
Fitch, Brandon Vera, Luis Javier)
Vazquez, and Kyle Kingsbury on )
behalf of themselves and all )
others similarly situated, )
                                    )
     Plaintiffs,                )
                                    )
  vs.                             ) Case No. 2:15-cv-
                                    ) 01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate )
Fighting Championship and UFC, )
                                    )
     Defendants.                )
                                    )

DEPOSITION OF KYLE KINGSBURY

Taken at the Offices of Boies, Schiller & Flexner
300 South 4th Street, Suite 800
Las Vegas, Nevada

On Friday, February 17, 2017
At 9:19 a.m.

Reported by:  Jane V. Efaw, CCR #601, RPR



PUBLIC COPY – REDACTED

mind, and they wanted to review the contracts with management and lawyers.

And at that time, Dana White fired all members of the American Kickboxing Academy, and he went on to post a video with several F bombs and foul language. I think he even said, "Who the fuck is Cain Velasquez anyways," a guy, my personal training partner and teammate who would go on to become heavyweight champ.

And I think Jon Fitch had to call Lorenzo to get his job back and really walk on eggshells in his conversation with Lorenzo because he realized that every fighter on that team would be hurt if they didn't get in line and do what they said and sign the contract as stated.

So from that point on, I understood that you either do as you're told or you walk. You really have no other choice.

Q. So I think you said that Dana White fired all members of the American Kickboxing Academy. Were you fired at that time?

A. I had already signed my contract for the Ultimate Fighter Season 8. And in that contract, there was the new likeness agreement. And so from my understanding talking to my management, I was in the

clear, but I was not sure had my teammates continued to press the issue and not fold to Dana White's pressure, that he might have fired me as well or at least punished me in different ways.

But the lesson was learned at that point that you don't talk back. You don't raise questions. And you don't try to change any wording that they give to you to sign in the contract.

Q. So you were not fired at that time; is that correct?

A. Not to my knowledge.

Q. Was Josh Koscheck fired at that time?

MR. DELL'ANGELO: Object to the form.

THE WITNESS: From what I understand, the fighters who fought in the UFC for American Kickboxing Academy were all let go, but it's possible that they had -- I don't know. It was just my understanding that the guys that were fighting in the UFC at that time at American Kickboxing Academy were all let go.

Q. But you don't know if Josh Koscheck was fired at that time?

MR. DELL'ANGELO: Object to the form.

THE WITNESS: I don't recall at this time.

///

BY MR. WIDNELL:

Q. Was Cain Velasquez fired at that time?

A. It would make sense that Cain was fired at that time with Dana specifically calling him out.

Q. But do you know if he actually was fired at that time?

A. I don't recall.

Q. But you had said that all of the members of the American Kickboxing Academy were fired at that time?

MR. DELL'ANGELO: Object to the form.

THE WITNESS: My answer was based on the fact that Dana had called out the members of American Kickboxing Academy saying that they would never fight in the UFC again and that they're pretty much all scumbags and don't deserve to fight.

BY MR. WIDNELL:

Q. Is there anyone you actually do know that was definitely fired at that time?

MR. DELL'ANGELO: Object to the form.

BY MR. WIDNELL:

Q. From American Kickboxing Academy.

A. I know for a fact Jon Fitch was let go, and that's why he had to call Lorenzo to get his job back.

Q. Do you know of anyone else who was fired at that time?

A. Not at this time, but it was understood that all of our jobs were in jeopardy.

Q. And that's because Dana White went online and said that you were all -- I think you used the term "scumbags"?

A. Yeah, and that's probably putting it lightly. But he specifically stated the members of the American Kickboxing Academy, and we fall under that umbrella.

Q. Is it fair to say that over the years management at UFC made numerous comments that you found offensive?

MR. DELL'ANGELO: Object to the form.

THE WITNESS: I didn't just find their comments offensive. A lot of times their comments carried weight in taking away of our notoriety and who we were. They weren't just belittling personal attacks. They would cause us to lose value. They would make us look like we weren't great fighters or that we should be lucky to fight in the UFC and lucky to fight for Dana.

BY MR. WIDNELL:

Q. And how did they do that?

PUBLIC COPY – REDACTED

A. Dana's done it in numerous ways by talking about fighters over the years. It's not just with American Kickboxing Academy. He's done it to several people. Tito Ortiz. The list really goes on and on. I can't recall any more at the moment.
Q. So other than talking bad about fighters, what else did he do?
A. What else did he do in the --
MR. DELL'ANGELO: Object to the form.
THE WITNESS: In threats?
BY MR. WIDNELL:
Q. I'm asking you what -- you said that it was more than just belittling fighters. So I would think talking bad about fighters is belittling fighters. Would you agree with that?
A. I would agree that talking bad about fighters is belittling them. But to answer your previous question, through threats and direct punishment, Dana really controlled how our careers went. And he could stick you on the undercard in your next fight against some unfavorable opponent. If you're on the undercard, you would make far less. If anything in sponsorship because you weren't on TV.
He might sit you on the bench for a while. That's happened to numerous fighters. And then give

you an unfair brutal opponent on an undercard. There were a number of different ways that Dana would use his power to our disadvantage.
Q. And what did he do specifically to you?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: I believe that Dana specifically, by attacking my team personally, had a direct impact on my view of the way the system worked and the way that Dana White handled the fighters. And from that point on, I understood to behave and not ruffle his feathers.
Joe Silva used similar tactics in his match making. And there were direct personal threats from Joe Silva.
BY MR. WIDNELL:
Q. And is it fair to say that you found that conduct offensive?
A. I found that conduct more than offensive. I found it detrimental to my career.
Q. So you mentioned that Mr. Quarry was the one who first contacted you, I think, about the lawsuit; is that correct?
A. Yes.
MR. DELL'ANGELO: Object to the form. Mischaracterizes the witness's testimony.

THE WITNESS: I believe that Nate was the first person I spoke with about the lawsuit.
BY MR. WIDNELL:
Q. Did he give you any reason why he was reaching out to you personally?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: Nate was a personal friend of mine that I had met on a goodwill tour for the military. And we had spent some time overseas. And we had quite a bit of downtime on our tour for the troops, and we had discussed quite a bit of the way the UFC had handled him personally and the way the UFC had handled me personally and various other fighters.
So when we spoke about the lawsuit, it was already understood what was going on and some of the things that we needed to change moving forward to make it a legitimate sport.
BY MR. WIDNELL:
Q. Are there any other reasons you can think of for why he reached out to you?
MR. DELL'ANGELO: Object to the form. Calls for speculation.
THE WITNESS: I don't recall at this time if there were any other.

(Whereupon Defendant's Exhibit 78 was marked for identification.)
BY MR. WIDNELL:
Q. I'm handing you a document marked Exhibit 78. Does that document look familiar to you?
A. It does look familiar.
Q. I should say that the Bates number for that document is LE Plaintiffs-0049960. My understanding is that this is a Facebook message from Nathan Quarry to you. Does that look correct to you?
A. That looks correct.
Q. Can you read the line that starts with "Pierced told me"?
A. "Pierced told me you are down to join the lawsuit. Is that true? We could really use more people in San Jose, as the UFC is trying to move the venue to Vegas where they own the courts."
Q. What is your understanding of what Mr. Quarry meant by that?
A. My understanding -- first of all, that's a typo. "Pierced" is really Mike Pierce. He was also on the tour for the troops with Nate and I and was also part of the conversations about the mishandling and mistreatment by the UFC. He's a personal friend of both of ours.

PUBLIC COPY – REDACTED

I think what Nate is alluding to with "The UFC is trying to move the venue to Vegas where they own the courts" is that any fighter previously, due to our contracts, if they wanted to dispute anything with the UFC, they would need to go to court in Las Vegas. And in his personal opinion, "where they own the courts," I believe that's because no fighter had previously been victorious, to my recollection.
BY MR. WIDNELL:
Q. Do you agree with that assessment? That UFC owns the courts in Las Vegas?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: I don't agree with that statement. That the UFC owns the courts in Las Vegas. I do agree with the fact that it has been very hard for fighters to win a lawsuit against the UFC in Las Vegas.
BY MR. WIDNELL:
Q. Why is that?
A. I'm not sure at the moment. It's just if you look at the track record and we remember guys like Randy Couture getting tied up in court for years and then going back with their tail in between their legs to fight again for the UFC after burning the clock on the precious window that they have to fight.

(Whereupon Defendant's Exhibit 79 was marked for identification.)
BY MR. WIDNELL:
Q. I'm handing you a document that's marked Exhibit 79. The Bates number on this document is LE Plaintiffs-0049959. And it appears to be a Facebook message from you to Mr. Quarry. Does that look correct to you?
A. That looks correct to me.
Q. Would this be your response to Mr. Quarry's message?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: This was a response to, I believe, one of Nate Quarry's posts online, on Facebook.
BY MR. WIDNELL:
Q. Do you recall which post it was?
A. I believe he was talking about the potential for a lawsuit and the mistreatment of fighters.
Q. So if you go back to Exhibit 78. It's the exhibit I handed you before handing you this one.
A. Uh-huh.
Q. What is the time stamp on that message, the date and time stamp?
A. On 78 is January 30th, 2015, 5:01 p.m.

Q. Okay. Now go back to Exhibit 79. What's the date and time stamp of that message?
A. January 30th, 2015, 5:12 p.m.
Q. So is it accurate to say that you sent the message in Exhibit 79 11 minutes after Mr. Quarry sent you the message in Exhibit 78?
A. That is correct.
Q. But you're saying that there was something else that you were responding to and not the message in Exhibit 78; is that correct?
A. I believe that this is a response to Nate personally on his page after a post he made on Facebook.
Q. And it wasn't a response to the message in Exhibit 78?
MR. DELL'ANGELO: Object to the form. Asked and answered.
THE WITNESS: I think we're -- there's perhaps a misconception that Mike Pierce was the first person I talked to. I'm not sure if that's the --
BY MR. WIDNELL:
Q. Well, it looked to me, looking at this, as if Exhibit 79 was a response to Exhibit 78, but I think you're saying that it wasn't?

A. What I'm saying is that I had spoken with Nate and Mike and several fighters extensively over the years. And that the realization that the possibility we could have a lawsuit that would be class action and work and the ability to have a chance to win and change the way things are done is what sparked my interest to join the lawsuit. And my contact with Nate is in response to his post about the potential for a lawsuit.
Q. But it's nonresponsive to this specific message that's Exhibit 78; is that correct?
MR. DELL'ANGELO: Objection. Asked and answered.
THE WITNESS: Exhibit 78 is confirming my interest in joining the lawsuit. Pierce told me, "You're down to join the lawsuit." I had spoken about this already with Nate and Mike Pierce and different fighters and was willing to join the lawsuit.
BY MR. WIDNELL:
Q. So this is actually a response to some separate post that, I guess, we don't have on Nate's Facebook page. Is that accurate?
A. To my understanding, that is accurate.
Q. Okay. And you responded by saying, "I would

PUBLIC COPY – REDACTED



to my final fight in King of the Cage and was just waiting to finish my contract with them. I'm not sure at which point.

Q. But it was sometime before your final fight with King of the Cage?

A. I believe so.

Q. Did you decide to hire a new manager at that point?

A. I decided to hire a new manager after I suffered my first loss against Tony Lopez, which is my final fight in King of the Cage.

Q. And who was that manager?

A. The manager was Crazy Bob Cook and DeWayne Zinkin from Zinkin Entertainment.

Q. And how did you meet them?

A. I grew up in San Jose, California, and around that area and was familiar with American Kickboxing Academy and the level of fighters that they had.

When I was 17, a friend of mine and I decided to go train at American Kickboxing Academy briefly. We played football and wrestled together, but we didn't do a spring sport.

So to stay in shape and to learn new things that would be applicable to football and wrestling,

we decided to take mixed martial arts with Frank Shamrock and Crazy Bob Cook at American Kickboxing Academy.

Q. Was your friend in -- did he also become an MMA fighter?

A. Yes. His name was Daniel Puder. And he fought for Strikeforce. And he ended up becoming a pro wrestler. He won the million-dollar Tough Enough for WWE.

Q. So when did you join AKA as an MMA fighter?

A. I joined AKA as an MMA fighter after my loss with Tony Lopez. I moved back to California, which is where I'm from. My family's there. And started training at American Kickboxing Academy.

Q. And it's that same time period that you also retained Bob Cook and DeWayne Zinkin?

A. That is correct.

Q. And did one of them handle most of your matters?

A. Crazy Bob Cook was the -- between the two of them, the person that I spoke with the most. DeWayne Zinkin had his offices in Fresno, California, which is a few hours away. And Bob trained and managed the guys and was at American Kickboxing Academy regularly.

Q. So after your last fight in King of the Cage, did King of the Cage try and exercise its option for another year?

MR. DELL'ANGELO: Object to the form to the extent it calls for a legal conclusion.

THE WITNESS: I believe that King of the Cage tried to exercise the option for a second year because my manager at that time, I had a phone call with him and let him know that I would not be re-signing with them and that I was going to move to California to train at AKA and have a new management company represent me.

Obviously, that didn't sit well with him. And I believe they called Bob Cook at some point threatening that they still had me under contract and that they wouldn't allow me to work with someone else.

And if I recall correctly, DeWayne Zinkin had his lawyers look at their contract, and they determined that they did not have that right and that there was a conflict with having my manager who got me this contract be an employee of King of the Cage.

BY MR. WIDNELL:

Q. Was there any litigation related to that?

A. They had threatened to take us to court and

have litigation, and that never came to fruition.

Q. Was there ever any other litigation between either King of the Cage and you or between you and your prior manager?

MR. DELL'ANGELO: Objection. Compound.

THE WITNESS: No, not to my knowledge, there was no litigation.

BY MR. WIDNELL:

Q. If you go back to Exhibit 81 and look at the second page, Item 7. Could you read that?

A. "If Kyle should become injured and cannot compete in scheduled fights, King of the Cage will have the option to extend the term of the contract so that Kyle may fulfill his time commitment."

Q. What's your understanding of what that term meant?

A. This term, I believe, is King of the Cage's ability to extend my contract during an injury.

Q. Did that provision ever come into play?

A. That provision --

MR. DELL'ANGELO: Object to form to the extent it calls for a legal conclusion.

BY MR. WIDNELL:

Q. Let me ask it slightly differently. Maybe it's easier. Were you ever injured during your time

PUBLIC COPY – REDACTED



fighting for King of the Cage?
A. I was not injured during my time fighting for King of the Cage.
Q. So if I'm reading this correctly, it looks like the next thing that happened was that you ended up becoming a contestant on the Ultimate Fighter; is that correct?
A. That is correct.
Q. Can you tell me how that came to pass?
A. After training at American Kickboxing Academy, I had fought as a heavyweight in all my previous matches. And a couple of my teammates, Bobby Southworth, who had fought as a heavyweight prior and was the current light heavyweight for Strikeforce, they mentioned that they think I should try to drop the weight. Instead of trying to gain weight, I should try to lean out as much as I can and be a bigger fighter at the 205 weight class. And I took that into consideration but still liked not having to cut weight.
But it was when Bob Cook mentioned to me there was an opportunity to be on the Ultimate Fighter Season 8, which had split between lightweights 155 class and light heavyweights 205 class.

And then if I was able to drop my weight that I could potentially be on that show. And that that could get my foot in the door for fighting at the highest level in the UFC.
Q. So you agreed to apply; is that right?
A. Yeah. Bob Cook and I sent in a video to them. They had already -- Bob had a history working with the UFC. Obviously, they already had fighters on our team that were in the UFC. But they also had fighters that had gone through the Ultimate Fighter as a pathway to make it into the UFC.
Q. You say "as a pathway to make it into the UFC." Were you focused at that point on trying to become a UFC fighter?
A. I think the goal of every fighter is to fight at the highest level and to become champion one day. And if you're trying to fight, it doesn't matter if you're the champion, you know, big fish in a small pond. You could be the best of a small community. But really to test yourself and to know that you're the best in the world, that takes becoming champion of the UFC.
Q. At the time, did you think it was competitive to get a spot on the Ultimate Fighter?
MR. DELL'ANGELO: Objection to the form.

BY MR. WIDNELL:
Q. Let me ask this a little differently. Did you feel like you had to compete with a lot of other people to get that spot on the Ultimate Fighter?
A. In my opinion, the Ultimate Fighter by Season 8 time was wildly successful in that a lot of people watched the show. You had to have certain credentials. You had to have displayed yourself in a manner that showed that you had real talent or at least the possibility of growing into that talent.
And so they had to see something in you in order to bring you on that show. And it was hard -- it was quite competitive to get on the show.
Q. So you'd say there were a lot of other fighters who wanted to have the spot that you got; is that accurate?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: I think that's a fair statement.
BY MR. WIDNELL:
Q. Now, Mr. Fitch in his deposition -- I can't recall if this was in the morning and you would have heard it or not. But at some point during his deposition, he said that he thought that at the time that he applied, the people who made it onto the

Ultimate Fighter were all elite fighters.
But I think he said that later seasons that may not have been the case. Do you agree with that statement?
MR. DELL'ANGELO: Object to the form to the extent it calls for a legal conclusion and mischaracterizes the prior witness' testimony. You can answer.
THE WITNESS: I think if I understand that question correctly, Jon was stating that on the Ultimate Fighter Season 1, because it was the first one, there was a wealth of talent on that season and that a lot of the fighters who fought on Ultimate Fighter Season 1 eventually went on to have careers in the UFC.
That wasn't the case for every Ultimate Fighter. There's been various seasons where only a couple guys or women were kept after the show had ended as opposed to the majority of them from Ultimate Fighter Season 1.
On the Ultimate Fighter Season 8, we were really a standout at that point because quite a few of the fighters were kept from Ultimate Fighter Season 8, which hadn't been the case in between Season 1 and Season 8.

PUBLIC COPY – REDACTED

BY MR. WIDNELL:
Q. So would you say that all of the contestants for Season 8 were elite fighters?
MR. DELL'ANGELO: Object to the form to the extent it calls for a legal conclusion.
THE WITNESS: I'm not saying that at all. In fact, one of the ways that they would orchestrate the show is they would bring on some really talented fighters, and they would bring on some guys who had bare minimal experience, sometimes with no fights or a 1-and-0 record or a 1-and-1 record.
And it is my understanding that they wanted that dynamic for the people who made it into the house so that they would still have exciting fights, meaning "exciting" they would still see big knockouts and things like that as opposed to every fight going to a decision.
So when you compete at the highest level, it's not always guaranteed that you'll have a knockout or an exciting fight for the fans. I think Jon Fitch has demonstrated that throughout his career and was punished for it, winning a lot by decision and not fighting the way the UFC would have wanted him to. Dana White specifically.
So Ultimate Fighter Season 8 did have quite

a wide-ranging gap of fighters who were extremely talented and had great records and fighters that had minimal experience.
BY MR. WIDNELL:
Q. Were you an elite fighter at the point that you were participating in Season 8?
MR. DELL'ANGELO: Objection to the form. Calls for a legal conclusion.
THE WITNESS: I believed in myself and my chances of winning the Ultimate Fighter Season 8. I did not believe I was an elite fighter until I've made it into the UFC.
BY MR. WIDNELL:
Q. Would you say that only the contestants on the Ultimate Fighter who ultimately made it into the UFC were elite fighters?
MR. DELL'ANGELO: Objection to the form to the extent it calls for a legal conclusion.
THE WITNESS: I would say that if you've made it into the UFC, you could consider yourself an elite-level fighter, in my opinion.
BY MR. WIDNELL:
Q. Okay. But what I'm really trying to figure out is if you're selected for the Ultimate Fighter, does that also mean you're an elite fighter? And it

sound like some are and some aren't.
If you were going to try and identify or come up with an easy explanation for which are the most likely elite fighters of the season, how would you do that?
MR. DELL'ANGELO: Objection to the form to the extent it calls for a legal conclusion and speculation.
THE WITNESS: In my opinion, I think the guys who were kept under contract -- or were given a contract to fight in the UFC after the Ultimate Fighter 8 had finished defined them as elite. They had made it to the highest level if they were fighting against the best guys, and they had made it to the highest level of the sport.
BY MR. WIDNELL:
Q. So if you got a contract at the end, that really is the best indicator that you actually are an elite fighter among the members of the Ultimate Fighter season; is that accurate?
MR. DELL'ANGELO: Objection to the form to the extent it calls for a legal conclusion.
THE WITNESS: In my opinion, I believe there are a number of factors that would go into making somebody an elite fighter. But probably the most

important, in my opinion, would be to fight in the UFC.
BY MR. WIDNELL:
Q. Can you be an elite fighter if you don't fight in the UFC?
MR. DELL'ANGELO: Objection to the form to the extent it calls for a legal conclusion.
THE WITNESS: I think there have been some cases in the past where there were elite-level fighters who did not fight in the UFC.
BY MR. WIDNELL:
Q. Okay. Thanks. Could you just tell me how it comes to pass that if you are a contestant on the Ultimate Fighter, whether or not you ultimately become a fighter in the UFC? Do you know how that process works?
MR. DELL'ANGELO: Object to the form. Foundation. Calls for speculation.
THE WITNESS: I don't know for sure what the criteria is to make it into the UFC or why they pick the certain people that they do.
But in my opinion, you would have to have some form of notoriety. You would have to be somebody who's marketable and likable or at least have the potential for that.

PUBLIC COPY – REDACTED



Page 90

Page 92

Page 91

Page 93

(Whereupon Defendant's Exhibit 86
was marked for identification.)

BY MR. WIDNELL:

Q. I've just handed you what's marked Exhibit 86.

MR. DELL'ANGELO: Excuse me, Counsel. Do you have copies for us?

MR. WIDNELL: Yes, sorry.

BY MR. WIDNELL:

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED

Page 94

A. Yes. I fought October 24th, 2009, against Razak Al-Hassan.
Q. And when you fought against Razak Al-Hassan, is that the fight that you were describing where you felt that you had to fight?
A. Yes.

Page 95

Q. Okay. And you were concerned about fighting Razak Al-Hassan because you were injured at the time; is that correct?
A. That is correct. I had separated my rib.
Q. Were you told that you had to fight Razak Al-Hassan?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: What I had seen with other fighters and seeing the way they were treated, you didn't argue with the guy that was put in front of you. You didn't try to pick your opponents or say you didn't like to fight somebody. You said yes when they asked, and you fought on the date.
Dana White has said many times, including in front of the media, that all guys fight hurt. Everyone comes to the fight with injuries. You better show up on fight day. It doesn't matter if you're hurt. Everybody's hurt.
And not wanting to be cut from the UFC and not have a job, I felt obligated to fight hurt.
BY MR. WIDNELL:
Q. At that time if you had been cut from the

Page 96

UFC, would you have had other options for places you could have fought?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: To my understanding, in October 2009 Strikeforce was another organization that was still running. Is that correct?
BY MR. WIDNELL:
Q. I can't answer questions. I'm sorry. This is an instance where I need to ask you questions. You can answer to the best of your ability, but I can't answer your questions.
A. I believe Strikeforce was still around at that time, in 2009. And they were a rising company not on the level of the UFC, but were heading in that direction. So there would have been that possibility.
But that would have eliminated any chances of becoming UFC champion and winning at the highest level among the best fighters in the world.
Q. So in your opinion, was Strikeforce not at the same level as the UFC?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: I believe when Strikeforce was acquired by the UFC, they were becoming close to that level, and they had certain fighters that were

Page 97

definitely on par with UFC-level fighters. A lot of the Strikeforce fighters that came over to the UFC after the purchase and acquisition ended up doing very well. Tyron Woodley is the current welterweight champion of the world. He was from Strikeforce. My teammate Luke Rockhold became the middleweight champion in the UFC. He was a champion in Strikeforce.
So there was a number of talented fighters there. And it was a good organization on the rise, but it was not on the level of the UFC at that time.
BY MR. WIDNELL:
Q. As of October of 2009?
A. That is correct.
Q. Is that because Strikeforce didn't have the same caliber of fighters that the UFC had?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: Strikeforce had some fighters that were of UFC caliber. The UFC was able to keep a lot of their fighters through exclusive contracts and keep them for longer periods of time and by different clauses in the contracts, the ability to match for 60 to 90 days -- exclusive negotiation for 60 to 90 days and the ability to match for up to one year in the champions clause. It was very hard for fighters to

PUBLIC COPY – REDACTED



Page 98

```
 1  get out of their contract unless they were no longer
 2  wanted and the UFC could cut them.
 3  BY MR. WIDNELL:
 4      Q.  I think you said, though, that at the time
 5  that the UFC acquired Strikeforce, at that time
 6  Strikeforce was competitive to the UFC; is that
 7  accurate?
 8      A.  What I said was that Strikeforce was on the
 9  rise as a competitor, but they were still not on the
10  level of the UFC.  In that they had fighters that
11  were -- some of the fighters were on the level of UFC
12  fighters.  And that was proven after the acquisition
13  and acquiring of those fighters and seeing their
14  success in the UFC.
15      Q.  So are you saying that at the time the UFC
16  acquired Strikeforce, you still would not have
17  regarded Strikeforce as being a reasonable
18  alternative to the UFC as a place to fight?
19          MR. DELL'ANGELO:  Objection to the form.
20          THE WITNESS:  It might have been a
21  reasonable alternative, but there was no way of
22  getting out of the contract to go over to
23  Strikeforce.
24          UFC did a very good job of making sure that
25  fighters stayed with them if they were worthwhile and
```

Page 99

```
 1  had notoriety.  And it was very hard, if not
 2  impossible, to shop around and try to get to other
 3  competitors.
 4  BY MR. WIDNELL:
 5      Q.  Okay.  Going back to the fight with Razak
 6  Al-Hassan, though, I think you said that you had
 7  fought him because if you were cut, there would have
 8  been no other place for you to fight; is that
 9  accurate?
10      A.  On the level of the UFC, that is a correct
11  statement.
12      Q.  Okay.  If you had been cut at the time or
13  just before UFC acquired Strikeforce, would you have
14  regarded Strikeforce as a reasonable option?
15          MR. DELL'ANGELO:  Objection to the form.
16          THE WITNESS:  I think that at the time
17  Strikeforce was acquired, a lot of my teammates that
18  were fighting with Strikeforce spoke very favorably
19  about the way they were treated in respect to -- or
20  in comparison to the way that we were treated in the
21  UFC.
22          I don't know.  It never happened.  I never
23  had that option to leave, and I would be speculating
24  or guessing.
25  ///
```

Page 100

```
 1  BY MR. WIDNELL:
```
[remainder of page redacted]

Page 101

[page redacted]



**PUBLIC COPY – REDACTED**

Page 114

I had. I didn't want them to say, Screw you. You're on your own. You're just retired, or you talked bad about us and, no, we're not going to take care of you anymore, in that respect concerning my medical bills.

At this point in my career, I was pretty upset by the matchmaking, being forced to take certain fights, and I wasn't happy. But I didn't want to speak badly about the UFC at that time because I was still under contract and because I wanted them to take care of my medical bills.

Q. And were they taking care of your medical bills?

A. They took care of my medical bills for the fights. And they had injury insurance, which I paid a $1500 deductible to have my shoulder healed.

Q. And I think you also talked about the orbital bone fracture. Was that covered by --

A. That was covered by Zuffa. That happened in a fight, yes. They covered everything that happened in fights.

Q. But you did say, "I'm leaning toward not doing it again"; is that right?

A. I was leaning towards not doing it again, but I wanted to leave the door open in case I got that itch again. And, again, I restate here, "I

Page 115

could wake up a month or two from now and be as hungry as I've ever been and think I shouldn't have opened my mouth a month ago," referring to speaking the truth about what was going on in the UFC with buyouts, exclusive contracts and threats exclusive contracts that had been made to me among other fighters. And that would pretty much be the end of my career if I had done so. So I said there's no finite decision.

Q. So at this time, had you made comments about those concerns publicly?

A. I had not made public -- not to my knowledge at that time had I made any public statements in terms of my dissatisfaction with the UFC. I had seen firsthand with teammates Jon Fitch and Josh Koscheck what that had done to their careers, and I did not want to go that route if I was going to continue to fight for them.

Q. Okay. Were you under the impression that UFC was punishing you at that time?

A. Yes. In fact, there were articles written that -- one article stated, "I don't know what Kingsbury has done to piss off Joe Silva, but it is clear and obvious." Or "Kingsbury gets thrown to the wolves. What did he do to piss Jon Silva off?"

Page 116

Q. And how is it clear and obvious that you were being punished?

A. Well, if you go through my fight history, you can see right before my four-fight losing streak, I was on a four-fight winning streak with two fight of the nights and a 21-second knockout.

A lot of that competition was not well known. And after I received my first orbital blowout in the fight of the night victory against Fabio Maldonado, I spoke with my coaches and management. And we realized that the competition in the UFC at the highest level is so tough that you can be hurt and have to take time off for who knows how long. And that it was a detriment to fight people that were that good but not well known.

So we had asked Joe Silva after the Fabio Maldonado fight. I remember specifically walking on eggshells in the statement. And I said, "I'm very grateful with the matchups that you have given me in the past. And I'm happy fighting the guys you put in front of me. But I would like to fight a bigger named opponent in my next fight because the level of competition is so high that if I lose to an unnamed guy, it would hurt me. As opposed to if I was to fight a big name opponent, at least people would know

Page 117

who that person is if I was to lose. And you could lose any fight. It could happen on any day. So I just wanted to fight named opponents.

And in the very next fight they put me against Stephan Bonnar. Not an opponent I would have wanted. But because we had asked for a named opponent, I took the fight anyways.

At that time I was a blue belt in Jiu-Jitsu. Stephan Bonnar was a black belt. So there was a huge discrepancy and one of his weaknesses. And the fight went his direction because of that.

I wasn't too upset at that point. It's really the fights that came after that that really made me believe that I was being punished. Glover Teixeira I knew very well. I had trained with his coaches and teammates, Chuck Liddell and Coach John Hackleman down at The Pit.

Glover Teixeira was a close friend and training partner of Chuck Liddell's. Over the years they said he could be champ. He was one of the best in the world. And Joe Silva wanted me to fight him on the undercard in Glover's first fight in the UFC.

And that is exactly the kind of thing that hurts fighters. Nobody knew who he was. He was extremely talented. It was a lose-lose. If I beat

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED

Page 118

him, I'm supposed to beat him. If I don't beat him, I just got my ass kicked by a guy that nobody knows.

On top of that, being put on the undercard, there was a great deal less in sponsorship money because I wasn't guaranteed to be on TV.

They also rushed me to the cage in that fight without playing my entrance music. It was the only fight they did this. Yet they allowed Glover to walk out with his entrance music. They said it was a TV time thing.

Yet they didn't account for the 30 seconds it would take for me to walk to the cage. So UFC personnel was screaming at me to run to the cage in an effort to rattle me.

After that fight against Jimi Manuwa, I had another unknown opponent in his first fight in the UFC. I had to fly all the way to England for it. It was on the undercard, and it was against a guy who at the time was 11 and 0, no losses, and not a single opponent had made it out of the first round with him. So he was highly decorated and not known. Again, as stated, a lose-lose for me.

And then I had received the damage that I did in that fight. And with my second orbital blowout on the same side, I was really concerned for

Page 119

my high health fracturing the eyebrow as well and was just considering is it worth it? I can't get out of my contract. There's nowhere else to go at this point. Strikeforce didn't exist anymore. Pride didn't exist anymore. And I had no way of saying no.

When I got the fight with Glover Teixeira, that was the only time that I had asked to not fight a certain fighter because I knew how good he was and I knew that he was an unknown.

And I spoke to Joe Silva face-to-face in Tokyo, Japan, at one of the events. He had overheard me complaining to one of the fans about my next opponent. He said, "Kyle, what's the problem?"

And I said, "Joe, I'm glad you're here. The problem is that nobody knows who Glover is, and he could easily be the UFC champ. He could be the champion of our division. I know how good he is. I've trained with his coaches. The coaches know me well. They know my style. And I would be happy taking on anyone else."

And then he said to me the usual tag line, "You've got to take the fight with Glover. If you don't like this fight, you're not going to like the next one."

And I said, "I would take on Jon Jones or

Page 120

Shogun Rua, legends of the sport, before I'd want to take on Glover Teixeira because at least people knew who they were. And he told me, "You've got to take the fight anyways."

Q. Who do you think should have fought Glover Teixeira?

A. It would be speculation on my part to say who should have fought Glover Teixeira. But if it's an entry level fight in the UFC, he should have fought somebody else that maybe had one fight in the UFC.

Yeah, in my opinion, he should have fought somebody else that was new to the UFC. Because even when they offered him to fight Shogun Rua after beating me, Shogun turned down that fight. And as a former champion, he had a little bit more power than I did.

And Dana White went on to barbecue Shogun Rua saying that he was a pussy for not wanting to take the fight and that he was going to take the fight anyways, belittling Shogun and taking away from his notoriety.

Q. If you turn to the second page of Exhibit 88. Do you see the sentence, "'They haven't cut me, and I'm very grateful for that,' he said.

Page 121

'If I decide to stick around, it will be in the UFC'"?

A. Yes, I see that statement.

Q. Did you say that?

A. I did say that statement.

Q. Okay. If you'd turn to the third page. Do you see the sentence that says, "I made the decision to go to MMA for as long as it may last and go back after to being a fireman again"?

A. Yeah, I see that statement.

Q. Did you make that statement?

A. I did make that statement.

Q. What did you mean by that?

A. When I first got the contract to fight in King of the Cage, I was living in Arizona. And I had a friend who was a firefighter/paramedic for Phoenix Fire. He was putting me through the process to become a firefighter in Arizona. I thought of that as a great career.

And basically at the time, I had passed my first interview with Phoenix Fire and was waiting to do -- I was prepping for my second interview to get in. And we got the contract to fight in King of the Cage. And my friend told me, "Hey, fighting doesn't last long. Fire fighting will always be here. You

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

should fight. See how far you can take it. And when you're done, you can always come back to fire fighting."

Q. At this point in time, how much money had you made in the last year from fights?

A. In the last year from Jimi Manuwa, Glover Teixeira and Stephan Bonnar?

Q. The date of this article is November 2012. So going back a year from that.

A. So November 2011 I fought Bonnar. 12 grand for Bonnar plus a $3,000 bonus. 12 grand for Glover Teixeira. And I think I got 12 grand with a $12,000 bonus to Jimi Manuwa since they stopped the fight for doctor stoppage. $51,000 in my estimate.

Q. How much would you have made as a fireman at that point?

MR. DELL'ANGELO: Objection. Calls for speculation.

THE WITNESS: I'm not sure what the firefighters make in Phoenix. I know firefighters in California make six figures a year. In Sunnyvale, the town that I live currently, they start at $120,000 a year with full medical and dental for their entire family, retirement benefits. And they are able to go to other fire departments, which we

are not able to go to other fighting organizations.

BY MR. WIDNELL:

Q. It says in the next paragraph, "I've got some soul searching to do to see where I'm at mentally, emotionally and spiritually. I've got to digest the whole situation, the career, to see if it's something I want to continue to do. Thankfully I've got a six-month medical suspension to figure it out. It's not something I have to decide right off the bat." Did you make that statement?

A. I made that statement.

Q. Were you thankful at the time that you had gotten that six-month suspension?

A. Yeah. My face was fractured. I needed that. I couldn't fight within that six-month period. In fact, it took me longer to heal from that because as I had stated earlier, it's not an injury that you can continue to train on. So I needed to train after that eye had healed.

And I did want time to decide if weighing out all the things that the UFC has done, weighing out the fact that there were no other options to go to, and the fact that I would likely be fighting for them forever, is it worth it or not?

So I had a tough decision to make, and I

needed time to make that decision along with the healing process.

Q. And ultimately weighing the decision between becoming a fireman and going back to fight, did you go back to fight?

A. I did go back to fight. I fought Patrick Cummins in my final fight in the UFC.

Q. And is it fair to say that you probably earned less money going back to fight than you would if you had gone to be a fireman?

MR. DELL'ANGELO: Objection to the form.

THE WITNESS: It depends on where I was working as a firefighter. But I was making less money, in my opinion, than fire fighting places I would have wanted to.

BY MR. WIDNELL:

Q. Okay. And if you look a little bit further down, it says -- this is another quote. I believe it's attributed to you. "People don't get into the sport to become a millionaire. You get into the UFC because you're trying to beat someone's ass. I'm 4-4 in the UFC. It was never my goal to be a .500 firefighter. Whatever I end up choosing, if I do end up wanting to fight again, there will be a period of time of working to improve before I can come back."

Did you say that?

A. Well, I did say that.

Q. Do you agree with that statement today?

A. I do agree with that statement. It is clear that when you get into fighting, it's because you love fighting. And the reason may be to beat someone's ass. It may be to -- you know, my reason changed over time. When I first got into fighting, it's because I genuinely wanted to hurt and fight. I genuinely wanted to hurt other people.

As I grew as a person and established a meditation practice and reading and understanding things differently spiritually and emotionally, I no longer had that itch to hurt somebody. But I wanted to test myself at the highest level. And I wanted to push myself and put myself in a position to really test myself.

Q. Do you think that that's something that you're unique in terms of how you felt about fighting? Do you thing others were really just doing it for the money?

MR. DELL'ANGELO: Objection to form. Calls for speculation.

THE WITNESS: In my opinion, nobody gets into fighting just for the money. There are plenty

PUBLIC COPY – REDACTED



A. I didn't feel that there was any other option to fight at an elite level. And as I stated here in my email -- we can leave the answer at that.
Q. So I think that you also said that at some point before Zuffa acquired Strikeforce, Strikeforce actually was potentially a promotion you would have considered going to; is that right?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: I stated that around the time of Strikeforce's acquisition, that they had become an organization that would be worth considering. There was nothing to consider, though, due to the nature of our contracts.
BY MR. WIDNELL:
Q. But you were concerned about being cut, and you made the decision to fight injured in 2009 because you didn't feel that Strikeforce was an option at that time; is that right?
A. Strikeforce was not an option to fight at an elite level at that time.
Q. So what changed between 2009 and when UFC acquired Strikeforce that made it potentially an option?
A. In my opinion, Strikeforce had continued to improve their show. They had a lot of fighters that

had come up the ranks. And it appeared that they could do well at the UFC level.
And then, of course, they went on after the acquisition and the fighters were acquired to do well at the UFC level. And as I stated earlier, Tyron Woodley, a Strikeforce fighter, is now the current welterweight champ. Luke Rockhold, a Strikeforce champion, had become the middleweight champion of the UFC.
So I think that's a fair assessment at that point. That they, at the time of acquisition, had become a fairly competition organization. I think that's why the UFC wanted to acquire them and to acquire their fighters.
Q. But in 2009 they weren't?
MR. DELL'ANGELO: Objection to form.
THE WITNESS: As I stated earlier, they were on the rise, but they were not an elite organization and not a viable option if I wanted to fight the best in the world.
BY MR. WIDNELL:
Q. When did you find out about the pay disparity compared to organizations like the NFL?
A. I believe I was on a tour for the troops in 2010 or 2011. And Sean O'Hara of the NFL -- I think

he played for the New York Giants -- was there. We were in Baghdad in Iraq in Saddam's palace. And he was talking about the steps they had taken to make their NFL Players Association a strong organization to get what was fair in the NFL.
And we had spoken about what they had gone through in 2007. That they had fought for 55 percent of the revenue. And I remember laughing at the fact that it was estimated we were being paid under 15 percent and to hear these guys were battling for 55 percent, and the judges awarded that to them.
Q. Do you know why the judges awarded that to them?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: I'm not entirely sure of the logistics of their case. I don't know exactly what happened. I followed it loosely but not closely.
BY MR. WIDNELL:
Q. Did you learn about any other professional leagues that had similar pay disparities, such as the UFC?
A. Over time the closest to our sport is the other combat sport, boxing. And I had been made aware online that boxers can receive up to 80 percent of a purse of the total revenue on any given card.

And that seemed even more disheartening by the fact that they were paid that much more and we were paid that much less.
And they had the ability to fight people. They had an independent ranking system, that the promoters were not the matchmakers. And the ranking system, they didn't run the ranking system and the matchmaking at the same time, which is something that we were dealing with in the UFC.
The UFC controlled our careers entirely. They picked who we fought, when we fought. They could chose if we were on the undercard and didn't make sponsorship money. They chose to give us bonuses or not give us bonuses based on a number of things.
They had stated that, you know, you'll get your bonus if you fight exciting and you give a good show for the fans. And that was not always the case. When I fought Ricardo Romero, I had a 21-second knockout. It was a huge pay-per-view card. And I believe I got a $3,000 bonus for that.
Did they have to give me the bonus? No. But $3,000 on top of what I was making was a drop in the ocean. It doesn't cover much, if anything.
Q. Do you get basically the same level of pay

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED

as other fighters in the UFC?
MR. DELL'ANGELO: Objection to form.
THE WITNESS: Pay varies greatly among fighters in the UFC. There are some fighters, like Conor McGregor, who make a great deal more money than other fighters.
But I think the general language in our contracts is similar, and the way that they control the fighters is quite similar. And our options outside of the UFC are similar for every fighter
BY MR. WIDNELL:
Q. I'm sorry. You said your options are similar for every fighter outside of the UFC; is that correct?
A. Yeah. That is referring to the fact that as Pride became a viable competitor, they were purchased along with their fighters. As Strikeforce became a viable competitor, they were purchased along with their fighters.
And there aren't any options outside of the UFC that are on par with the UFC, if any. And I believe at this current time in mixed martial arts, companies like the World Series of Fighting and Bellator are not on the same level as the UFC.
And if you want to fight the best fight and

consider yourself an elite level fighter, there's only one place to do that, and that's within the UFC.
Q. When you said the options are the same, does that mean the compensation is the same for all fighters who leave the UFC?
A. No, I didn't say that, and that's not even what I said among the UFC. I said there are vast differences in what people would be paid in the UFC. And I mentioned Conor McGregor getting significantly more money than other people. I have no problem with that. Conor McGregor is still underpaid. And if it was a free and open market, we'd be paid significantly more.
Q. So you'd say that when fighters leave the UFC, they get very different compensation potentially too, or would you say that it's very similar?
MR. DELL'ANGELO: Object to the form.
THE WITNESS: I don't know what happens when fighters leave the UFC, and I have not fought outside of the UFC after --
MR. DELL'ANGELO: Object to the form.
THE WITNESS: No, that is not what I'm saying.
BY MR. WIDNELL:
Q. I apologize. I did not mean to ask that

question to suggest that that's what you were saying. I was asking the question: If a fighter leaves the UFC, does the fighter -- do different fighters get different levels of compensation?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: What I said was just as in the UFC fighters are paid differently. When fighters leave the UFC, they can be paid differently.
But that wasn't my point. My point was that our options for leaving the UFC are the same and that our options are quite limited by the fact that the UFC has acquired the viable competition.
BY MR. WIDNELL:
Q. Do you know any fighters who have left the UFC who are still competing in Adam May events?
A. I do.
Q. Is it your understanding that they are not well compensated?
MR. DELL'ANGELO: Objection to form.
THE WITNESS: I wouldn't know if fighters who have gone on to fight in other organizations are well compensated because the definition of "well compensated" is not simply a dollar amount. It is, in my personal opinion, what would be a percentage of the total revenue. That would be compensated fairly.

So if somebody leaves the UFC and was making 50 grand to show and 50 grand to win and they leave and they get $10,000 and $10,000 in another organization, that really depends upon the level of total revenue within that organization.
BY MR. WIDNELL:
Q. So if the revenue of that organization is significantly lower, it could be very good compensation. Is that what you're saying?
MR. DELL'ANGELO: Objection to form.
THE WITNESS: I would be speculating because I don't know the numbers of other organizations. And I don't know what fighters, even the ones that I do know that fight outside the UFC, I do not know what they're making.
BY MR. WIDNELL:
Q. Do you think organizations ever offer more money to fighters leaving the UFC than the UFC offers them?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: As stated previously, I don't know what other fighters are making. But because of the fact that the UFC is the big dog, they have the most revenue, and the fact that they control the contracts, I don't imagine that any other

PUBLIC COPY – REDACTED



Page 146

organization would pay them substantially more than what the UFC is paying them currently.
It doesn't make sense if they don't have the same fan base. It doesn't make sense. And it doesn't make sense with our contracts either. Because there's no true free agency, it limits our ability and has a chilling effect on our ability to make more money leaving the UFC.
Another organization isn't going to try to get into a bidding war with the UFC knowing that if the UFC truly wants them, they can just purchase them at any price.
And with the fact that they have an exclusive negotiating period for 60 to 90 days and the fact that they have a right to match for an additional year, it doesn't make sense for other organizations to try to buy someone out just because they've had their last bout in their contract.
BY MR. WIDNELL:
Q. So just to be clear. You'd say that based on your understanding of UFC's practices and its contractual practices, it would not make sense for another organization to offer more money than UFC is paying for a UFC fighter; is that correct?
MR. DELL'ANGELO: Objection to form. Calls

Page 147

for speculation. And compound.
THE WITNESS: In my opinion, other organizations simply aren't in a position to do so. I'm sure there are instances where a fighter might have been paid more to fight in a different organization outside of the UFC. But I would think that to be rare.
And the fact is we don't see bidding wars over fighters. And I've mentioned the contracts and exclusivity. So I believe I've answered the rest of that question.
BY MR. WIDNELL:
Q. You said that fighters in the UFC are paid different amounts of money; is that correct?
A. That is correct.
Q. They receive different compensation; is that correct?
A. That is correct.
Q. What level of compensation did you receive compared to other fighters?
MR. DELL'ANGELO: Objection to form and calls for speculation.
BY MR. WIDNELL:
Q. Actually, that's a good point. I don't want you to speculate. Did you talk to your team members

Page 148

on AKA about what kind of compensation they received?
A. I had spoken -- I don't remember specific details. I know that the fighters who have been fighting longer were paid more. My Ultimate Fighter contract was considered standard, base-level pay at the time.
Q. If you had just gone straight into the UFC instead of going into the Ultimate Fighter, would you have been paid more?
A. I have no idea. I have no idea.
Q. Did Mr. Fitch enter the UFC by going straight to fighting events instead of going through the Ultimate Fighter?
MR. DELL'ANGELO: Objection to form.
THE WITNESS: Mr. Fitch did go to the UFC first instead of being on the Ultimate Fighter Season 1. And if I remember correctly, he was paid less in his first fight in the UFC. But he wasn't locked into a three-fight deal with the potential for a six-fight deal, with the potential for a nine-fight deal. And he was also -- he entered into the UFC at a different time period than I did. So entry level pay in my year would be different from entry level pay in his year.
///

Page 149

BY MR. WIDNELL:
Q. Was the entry level pay in your year higher or lower than the entry level of pay in his year?
MR. DELL'ANGELO: Objection to the form.
THE WITNESS: I would be guessing on what entry level pay is. As I stated, I wasn't sure. I was informed that when I made it to the UFC, that this was the stock entry level pay that they were willing to give to new fighters.
And that was slightly higher, if my estimation is correct. $8,000 and $8,000 versus $5,000 and $5,000 in Jon Fitch's instance.
BY MR. WIDNELL:
Q. Did Mr. Fitch ever show you what kind of pay he was getting as he progressed through the UFC?
A. I never reviewed any of Jon's contracts. I think if I was aware of the exact dollar amounts, it was like maybe because I saw them on an MMA site posting of what everyone had made, along with what the UFC had made in ticket sales and revenue.
Q. You talked about the point in time when Mr. Fitch was caught over the video game incident. Do you recall that?
A. I do recall.
Q. Do you recall Mr. White saying how much

PUBLIC COPY – REDACTED