# Exhibit 22

Deposition of Lorenzo J. Fertitta (March 23, 2017) (excerpted)

PUBLIC COPY - REDACTED

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon )
Fitch, on behalf of )
themselves and all others )
similarly situated, )
                                 )
               Plaintiffs,)
                                 )
    v.                             ) Lead Case No.
                                 ) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
                                 )
              Defendant. )
_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF LORENZO J. FERTITTA

Las Vegas, Nevada

March 23, 2017

9:09 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 49608

**PUBLIC COPY – REDACTED**

### Page 22

1  in those sanctioning organizations between the WBC,
2  the WBA, the IBF, the WBO. The list kind of goes on
3  and on. I can't name them all because I can't
4  remember.
5       Many of those organizations were also
6  located offshore. I believe the WBC was
7  headquartered in Mexico. I believe the WBC was
8  headquartered in, I want to say, Argentina or one of
9  the South American countries.
10      In addition to that, there had been widely
11 publicized, I would say, sting options that in fact
12 the FBI did with the IBF where there had been -- they
13 had been accused of accepting payment from promoters
14 to move their fighters into different rankings to get
15 title shots for some of their fighters.
16      So as you can see, boxing was kind of
17 wrought with problems and with corruption. And I
18 believe that's what the Ali Act's real main role was
19 was to try to rid the sport of corruption.
20   Q.  And one of the ways it did that was by
21 legislating a determination of who got a fight?
22   A.  No.
23   Q.  If I understood you, you said that that was
24 one of the issues with boxing at the time you believe
25 that led to the Ali Act?

### Page 23

1    A.  Yes. I believe that corruption overall was
2  one of the issues because there was fairly
3  well-documented cases where the accusations were that
4  promoters would pay, or bribe, I guess, would be a
5  stronger word, the sanctioning organizations to give
6  their fighter an advantage versus other fighters.
7    Q.  And as a result, an individual who received
8  a fight might not receive it on the basis of their
9  merit but on the basis of something else?
10   A.  Yes.
11   Q.  Okay. You also mentioned there was an
12 issue with titles. What was the issue with the
13 titles?
14   A.  No, I didn't say that there was an issue
15 with titles. I said that there was a lot of titles.
16   Q.  There were a lot of titles?
17   A.  Yes.
18   Q.  And was the fact that there was more than
19 one title problematic from your point of view?
20   A.  No. From my point of view as a
21 commissioner, it didn't really matter to me who the
22 sanctioning organization was or how many titles there
23 were.
24      In my personal opinion, I believe it
25 created confusion for the consumer. But that's just

### Page 24

1  a personal opinion.
2    Q.  Okay. You also mentioned rankings. I
3  think you said that there was an issue with respect
4  to, you tell me if I'm not characterizing this
5  correctly, but essentially the reliability of
6  rankings.
7       Is that accurate?
8    A.  Yes. I believe that there was a
9  credibility issue with the ranking systems of some of
10 the sanctioning organizations.
11   Q.  And was that because the rankings lacked
12 transparency?
13   A.  Yes. I believe that there was a
14 transparency issue.
15      But I also think that part of the issue was
16 that there -- that the sanctioning organizations --
17 yeah, I guess because of lack of transparency, yes.
18   Q.  Okay. All right.
19      Is it fair to say that you've started or
20 participated in the inception of a number of
21 different for-profit enterprises?
22   A.  Yes.
23   Q.  Okay. And in doing so, have you risked
24 capital in each of those various entities?
25   A.  Yes.

### Page 25

1    Q.  Okay. And is it fair to say that when most
2  new businesses start, someone is risking capital?
3    A.  Yes.
4    Q.  And when you started new businesses, have
5  you also given up opportunity costs, that is, the
6  opportunity to do something else?
7    A.  No.
8    Q.  No? So the theory that time is finite, and
9  you only have so much time to devote to one issue or
10 one business or enterprise versus another?
11   A.  No, because I think it depends on what your
12 level of involvement is.
13      I mean, you can start a business just being
14 an investor, kind of a silent partner.
15   Q.  Okay.
16   A.  You can also start a business and be very
17 involved and be more of what I would call a hands-on
18 entrepreneur.
19   Q.  Okay. And the various businesses that you
20 have -- well, let me withdraw that.
21      The various for-profit enterprises that you
22 have been involved with and that you have started, is
23 it fair to say, have been very successful
24 financially?
25   A.  Yes, some of them have. Some of them

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

26

1   haven't.
2       Q.  Right.  And collectively, the success of
3   those various for-profit enterprises have enabled you
4   to become a billionaire, correct?
5       A.  Yes.
6       Q.  The fact that you're, say, one of the
7   thousand or so richest people on earth; is that
8   correct?
9       A.  Yes.  According to certain magazines, that
10  is the case.
11      Q.  Around the time your tenure as a Nevada
12  State Athletic Commissioner was coming to an end, you
13  became involved in the sport of mixed martial arts;
14  is that correct?
15      A.  No.
16      Q.  Okay.  Did there come a time when you
17  purchased an entity called UFC?
18      A.  Yes.
19      Q.  And what was the UFC?
20      A.  The UFC was a organization, a business,
21  that was started in 1993, I believe November of 1993.
22  It was originally conceived by the Gracie family in
23  Brazil.
24          Their interest was they had migrated from
25  Brazil to California, and they had -- excuse me.

27

1   They had developed a form and a style of fighting
2   called Brazilian jujitsu.
3           At the time, going back to the early '90s,
4   ground fighting, which Brazilian jujitsu is, that
5   technique was not very well-known by what I would
6   call the western culture or at least in America.
7           Historically, martial arts were what I
8   would call the traditional martial arts that included
9   stand-up fighting like Karate, Taekwondo, Judo,
10  things of that nature.
11          Their interest was to prove, at least in
12  their belief, that jujitsu was the dominant martial
13  art.
14          And in order to do that, they felt like
15  that they wanted to create a challenge that would pit
16  fighters from different disciplines, and they decided
17  to put in one of their family members, Royce Gracie,
18  into this tournament.
19          They partnered with some individuals that
20  had a background in, I guess you would call it
21  entertainment promotion, and they conceived this idea
22  called the Ultimate Fighting Championship.
23          They rented an arena in Denver, Colorado.
24  My understanding is that they went to Colorado
25  specifically because it was one of the few states

28

1   that did not have an athletic commission, which of
2   course is the regulatory body that would oversee
3   combat, unarmed combat in any given state.
4           So they essentially went in.  Nobody could
5   tell them not to do it.  The arena agreed to it.
6           They were able to secure a pay-per-view
7   distribution with the help of a gentleman by the name
8   of Bob Meyrowitz who was in the business of
9   distributing pay-per-views.
10          At the time, distributing pay-per-view was
11  very complicated because, you know, in todays world
12  you have maybe a handful of pay-per-view companies
13  between the satellite and cable companies with all
14  the consolidation.
15          Back then my understanding was there was
16  literally hundreds, if not a thousand, different
17  cable companies each sitting around the
18  United States.  So you needed someone to aggregate
19  all of it for you, and that's what Bob's company did.
20          They put the event on, and from what I'm
21  told, they never even really intended to start a
22  business.  The idea was to put on an event.  There
23  was never an intention to do UFC 2 or 3 or 4 or, for
24  that matter, 208.
25          They were wildly successful.  They were

29

1   actually profitable.
2           And because of that, they decided to do
3   UFC 2.  Obviously UFC 3, UFC 4, et cetera.
4       Q.  And at some point, you participated with
5   others in the purchase of that business?
6       A.  I purchased the UFC along with my brother
7   Frank in January of 2001.
8       Q.  Did anyone -- that's Frank Fertitta,
9   correct?
10      A.  Yes.
11      Q.  Okay.  Did anyone other than you and your
12  brother Frank Fertitta participate in the purchase of
13  the UFC in January of 2001?
14      A.  At the creation and outset of the entity
15  that purchased the assets of the UFC, which is called
16  Zuffa, it was an LLC structure, the only shareholders
17  were myself and my brother Frank.  We were 50/50
18  partners.
19      Q.  So I want to understand the timing.  This
20  is January of 2001.
21          At the time that you purchased Zuffa with
22  your brother Frank, were you still a member of the
23  Nevada State Athletic Commission?
24      A.  No.
25      Q.  And I believe you testified that you became

LORENZO J. FERTITTA - CONFIDENTIAL

30

1  a member of the Nevada State Athletic Commission in
2  1996 or 1997 and were a member for approximately four
3  years?
4      A.  Yes.
5      Q.  Okay.  And so, do you recall how long you'd
6  been off of the Nevada State Athletic Commission
7  before you and your brother Frank purchased the UFC
8  in January of 2001?
9      A.  I believe it was roughly six months.
10     Q.  And did you leave the Nevada State Athletic
11 Commission in anticipation of your purchase of UFC?
12     A.  No.
13     Q.  And what did you and your brother pay for
14 the UFC when you purchased it in January of 2001?
15     A.  The original purchase price at closing was
16 $2 million.
17     Q.  And did you have a role at UFC -- at the
18 UFC and then ultimately Zuffa that was something
19 other than simply owner?
20     A.  I did not have an executive title or an
21 executive role.
22         Being the what I would call the controlling
23 shareholder along with my brother, we certainly
24 weren't silent partners.  We were involved in the
25 business.  But I would say not in a management,

31

1  day-to-day, executive day-to-day role.
2      Q.  Is there a time when you came to take on
3  executive or day-to-day management duties at Zuffa?
4      A.  Yes.
5      Q.  Okay.  When was that?
6      A.  That was approximately 2007 or 2008.
7      Q.  And did you have a title at Zuffa?
8      A.  Yes.
9      Q.  And what was that title?
10     A.  Chief executive -- chairman and chief
11 executive officer.
12     Q.  That is chairman of the board?
13     A.  Yes.
14     Q.  And that was in 2007, you became chairman
15 of the board, approximately?
16     A.  Yes.  My testimony was 2007 or 2008.
17     Q.  Okay.
18     A.  I can't remember the exact month that I
19 went over there, but it was around that time.
20     Q.  Okay, understanding that.
21         At the time that you became chairman of the
22 board of Zuffa, who were the other board members?
23     A.  There were -- it was an LLC structure.
24         There was essentially me, my brother Frank,
25 and I believe Dana White would have been a board

32

1  member as well.
2      Q.  Okay.
3      A.  And by that time, Dana would have been an
4  equity partner in the LLC.
5      Q.  And did the composition of the board of
6  directors of Zuffa change at some time thereafter?
7      A.  Yes.
8      Q.  And how did it change?



33

9 (Pages 30 to 33)

**PUBLIC COPY – REDACTED**

LORENZO J. FERTITTA - CONFIDENTIAL

|     | 74 |
|-----|----|
| 1 | THE WITNESS:  Yes. |
| 2 | BY MR. DELL'ANGELO: |
| 3 | Q.  And let's begin with WEC. |
| 4 | Did Zuffa consider WEC to be a competitor |
| 5 | at the time that it acquired it? |
| 6 | A.  The way that we looked at WEC was a little |
| 7 | bit different from this standpoint.  WEC was a |
| 8 | regional promotion that was producing events that |
| 9 | primarily highlighted fighters in the lower weight |
| 10 | classes that the UFC -- that we at the time did not |
| 11 | have. |
| 12 | So that particular acquisition, we didn't |
| 13 | look at it as a competitive promotion inasmuch as we |
| 14 | looked at it as a strategic acquisition because it |
| 15 | was going to be additive and allow our company to |
| 16 | increase the output that we would generate. |
| 17 | Q.  That is because it enabled the UFC to |
| 18 | acquire fighters in lower weight classes that at the |
| 19 | time of the acquisition that they didn't have? |
| 20 | A.  No. |
| 21 | Q.  Okay.  Then why is it then? |
| 22 | A.  When we originally purchased the WEC, we |
| 23 | decided that we were going to continue to operate the |
| 24 | WEC as a separate division maintaining the WEC brand. |
| 25 | We had an infrastructure, albeit not huge, |

Page 75

1  but we had full-time employees dedicating their time
2  solely to the promotion, marketing, operations of the
3  WEC.
4      Q.  So let me ask again in a slightly different
5  way.
6      Did Zuffa's acquisition of the WEC enable
7  it to acquire fighters in lower weight classes that
8  Zuffa, LLC didn't promote fights for under any of its
9  brands?
10     A.  Yes.
11     Q.  Okay.  And at the time of the WEC
12 acquisition by Zuffa, LLC, what, if any, competitors
13 existed in the weight classes that existed within the
14 WEC?
15     A.  Can you give me a time frame reference.
16     Q.  I'm talking about at the time of the
17 acquisition, the time that Zuffa acquired WEC.
18     A.  Right.  There were a number of promotions
19 around the world that promoted fights within the
20 lower weight classes.
21     Q.  How about in North America?
22     A.  I believe that there were, yes.
23     Q.  Okay.  And which of those did -- at the
24 time of Zuffa's acquisition of the WEC, did you
25 believe were competitors for the weight classes that

Page 76

1  the WEC promoted fights in North America?
2      A.  My recollection is that at that time, King
3  of the Cage, which was a well-run organization who
4  had distribution deals, I believe it was operated by,
5  maybe owned by Terry Treblecock.
6      And forgive me because we're talking about
7  a large time period, so we're talking about a big
8  span.
9      Possibly K-1 would have promoted files in
10 North America.
11     There was a number of promoters that
12 promoted fights in that weight class -- in those
13 weight classes.
14     Q.  That you could --
15     A.  And I know that because some of the
16 fighters that were in the WEC had fought for various
17 organizations.  So the obvious conclusion there is
18 that there had to have been multiple other fight
19 promotions that promoted fights within those weight
20 classes.

Page 77



11     So at that time, promotions like Shuto had
12 a very, very strong presence in the lower weight
13 classes.
14     Pancrase, very strong presence in the lower
15 weight classes.
16     Primarily because if you think about, you
17 know, even when you look at some of the Asian
18 countries in the Olympics, they tend to dominate and
19 do better in the lower weight categories and such.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

LORENZO J. FERTITTA - CONFIDENTIAL



```
                                                        78                                                              80
                                                             6   because I believe that they wanted to get those
                                                             7   liabilities off of their books, meaning that they had
                                                             8   contracted with fighters that they owed fights to,
                                                             9   and they were not able to deliver on those
                                                            10   contractual terms.
                                                            11           Therefore, they approached us, and we
                                                            12   acquired those two companies so that we could
```

LORENZO J. FERTITTA - CONFIDENTIAL



22 (Pages 82 to 85)

**PUBLIC COPY – REDACTED**

286

10    that.
11        As a standard tool for management, we had
12    what we'll call minimums. And what that would mean
13    was that most fighters when they first come in in
14    their first fight in the UFC -- once again, not all
15    but most fighters would sign for what we would call a
16    minimum amount, which I believe is 10,000 to show,
17    10,000 to win, it could be 12,000 to show, 12,000 to
18    win. I don't know where it is right now.
19    **Q. Could you look at Exhibit 24, page 33 of**

287

288

289

**PUBLIC COPY – REDACTED**

LORENZO J. FERTITTA - CONFIDENTIAL

```
                                                        290
[redacted lines 1-14]
15    Bellator made him a significant offer that ended up
16    being very much to his advantage.
17        Q.  But he, nevertheless, ended up contracting
18    with UFC, correct?
19        A.  Yes.
20        Q.  Would you look at page 75 of Exhibit 24,
21    please.  That's at ZFL-1897726.
22        A.  Yes.
23        Q.  And if you go down to about the middle of
24    the page, in the first-hand column in the from,
25    there's a text from Dana White to your 6097 number,
```

```
                                                        291
1     that's February 25, 2014 at 7:00 and 4 seconds p.m.
2         Do you see that?
3         A.  I do.
4         Q.  And as you read across, it seems to refer
5     to negotiations that you had with a Melendez and
6     another dude.
7         Do you have an understanding of what
8     Mr. White is referring to there?
9         A.  Yes.
10        Q.  What is he referring to?
11        A.  He's referring to -- I believe he's
12    referring to Eddie Alvarez who was a Bellator
13    fighter.
14        Q.  He would be the other dude?
15        A.  Eddie, I'm assuming, was the other dude
16    because he had done the same thing but in Bellator
17    where he had decided to fight out the last contract
18    in Bellator and test the free agency market.
19        Q.  And Mr. White's text continues through the
20    next line.  Do you see that?
21        A.  Yes.
22        Q.  I'll read the two texts for you.  It says:
23            "Bro, you know I love you to
24             fuckin' death as it is, but what you
25             pulled off this week with Melendez
```

```
                                                        292
1             and 'other dude' is fuckin' badass.
2             Fuckin' cut throat nasty business
3             like you see in the movies.  Good
4             shit, homie.  Congrats."
5         And what's your response there?  Would you
6     read that, please.
[redacted lines 7-14]
15        Q.  All right.  I think -- why don't we take a
16    break.  We're coming to a close on our record time.
17        THE VIDEOGRAPHER:  We're going off the
18    record at approximately 5:26 p.m.
19        (A recess was taken.)
20        THE VIDEOGRAPHER:  We're going back on the
21    record.  The time is approximately 5:37 p.m.
22        MR. DELL'ANGELO:  So we'll note for the
23    record that in light of counsel's objections about
24    the introduction of publicly available documents that
25    were not produced in discovery, the fact that the
```

```
                                                        293
1     Mercer issue has not been resolved and that we have
2     not received a privilege log, we're not going to
3     close the deposition, but we don't have any further
4     questions subject to those issues.
5         MR. ISAACSON:  I will note that the
6     objection to which you referred to, I did not -- I
7     did not stop you from asking any of your questions on
8     the basis of that objection in all of your questions.
9     You had the ability to ask all of your questions.
10        Are you done?
11        MR. DELL'ANGELO:  Yes.
12        MR. ISAACSON:  Okay.
13        THE VIDEOGRAPHER:  No further questions
14    from anyone?
15        MR. ISAACSON:  I'm going to just ask a few
16    questions while we're here.
17
18                EXAMINATION
19    BY MR. ISAACSON:
20        Q.  Do you have Exhibit 29 -- actually,
21    Exhibit 27, sir?
22        A.  Yes.
23        Q.  Exhibit 27 was an article that you were
24    shown with comments about Dana White and Quinton
25    "Rampage" Jackson, and you were asked to look at the
```

74 (Pages 290 to 293)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

LORENZO J. FERTITTA - CONFIDENTIAL



294

295

16   No one else has been successful with
17   this except us.  There is a long
18   list of tombstones."
19        Is that something else you said in 2008?
20   A.   Yes.
21        Q.   And then, the article says, "UFC almost
22   ended up in the same graveyard," and it talks about

296

297

18   text messages, do you have that?
19   A.   Yes.
20        Q.   A few minutes ago, you were asked about
21   page 75.
22   A.   Yes.
23        Q.   And you indicated that the text message was
24   talking about Bellator.
25        Do you remember that?

75 (Pages 294 to 297)

**PUBLIC COPY – REDACTED**