# Exhibit 34

Deposition of Hal J. Singer, Ph.D. (September 27, 2017) (excerpted)

PUBLIC COPY - REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

| | | |
|---|---|---|
| IN RE: | : | Civil Action |
| | : | DOCKET NO. |
| CUNG LE, NATHAN QUARRY, | : | 2:15-cv-01045-RFB- |
| JON FITCH, BRANDON VERA, | : | (PAL) |
| LUIS JAVIER VAZQUEZ and | : | |
| KYLE KINGSBURG, on behalf | : | CLASS ACTION |
| of themselves and all | : | |
| others similarly | : | |
| situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZUFFA, LLC, d/b/a | : | |
| ULTIMATE FIGHTING | : | |
| CHAMPIONSHIP and UFC, | : | |
| | : | |
| Defendants. | : | |

- - -
Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

\* \* \*
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



PUBLIC COPY – REDACTED

Page 246

```
 1      arrangement.
 2          So by construction, if I --
 3      if I assume in a but-for world
 4      these restraints are removed, then
 5      the foreclosure falls.  I don't
 6      need an econometric proof of that.
 7      It -- it just follows from
 8      elementary logic.
 9  BY MR. ISAACSON:
10      Q.   Right.  Well, for example,
11  when we looked at Figure 3, you told me
12  things you thought were important, but
13  you didn't have any sort of mathematical
14  analysis to say, here's a clause that
15  relates to a specific foreclosure
16  percentage; is that right?
17      A.   That is correct.  I think --
18  I did not perform an inquiry as to the
19  causes or drivers historically of a
20  foreclosure share.  One could do that.
21  It sounds like there would be another
22  econometric exercise.  But the
23  foreclosure share, as I've measured it,
24  is what it is, and it's an explanatory
```

Page 247

```
 1  variable model.
 2      Q.   Okay.  Let's go to paragraph
 3  1 of your report.
 4      A.   Paragraph 1?
 5      Q.   Yes.  Page -- somehow that's
 6  page 4 and 5.
 7      A.   Got it.
 8      Q.   I'm sorry, paragraph 2.
 9      A.   Oh, paragraph 2.
10      Q.   You see in the middle
11  there's the definition of challenged
12  conduct?
13          "Plaintiffs allege that
14  these actions taken together, the
15  'challenged conduct.'"
16      A.   Yes.
17      Q.   Okay.  And the -- and in
18  paragraph 2 you list three things.
19          "1, Zuffa" -- Zuffa's
20  alleged to have, 1, eliminated potential
21  rival MMA promoters through horizontal
22  acquisitions; 2, deprived potential
23  rivals of key inputs, the fighters
24  themselves, by entering" -- "entering
```

Page 248

```
 1  into allegedly exclusionary contracts
 2  with the vast majority of top fighters,
 3  and 3, taken other steps to use its
 4  alleged dominance to impair potential
 5  rivals."
 6          And then you've also.
 7  Footnoting in footnote 2, the complaint.
 8  Though that's -- I'm not clear on whether
 9  that's not a footnote to the challenged
10  conduct.
11          MR. CRAMER:  No, that's a
12      footnote to the sentence at the
13      top of the page.
14          MR. ISAACSON:  Right.
15  BY MR. ISAACSON:
16      Q.   So is the challenged conduct
17  a subset of the allegations in the
18  complaint?
19          MR. CRAMER:  Objection to
20      form.  Foundation.
21          THE WITNESS:  I don't think
22      so.  I think that when I lay out
23      my understanding of the challenged
24      conduct, I try to -- I try to
```

Page 249

```
 1      trace the conduct that's being
 2      challenged in the complaint.
 3  BY MR. ISAACSON:
 4      Q.   Okay.  And I'm -- we're
 5  going to focus on taken other steps to
 6  use its alleged dominance to impair
 7  potential rivals, because perhaps you'll
 8  agree with me that that lacks
 9  specificity, but that's okay for an
10  introduction.
11      A.   Exactly.
12      Q.   Right, right, right.
13      A.   It's made very explicit
14  later on in the draft.
15      Q.   And then footnoting to
16  that --
17      A.   In the report, sorry.
18      Q.   -- at the end of that
19  sentence, it's to part VII A.  If I
20  wanted to understand the complete
21  challenged conduct, is that where I would
22  look to?
23      A.   I don't think so.  Let me
24  look at part 7A.  That could be a typo.
```



Page 250

1  Q. It even gets confusing, your
2  Table of Contents doesn't have a 7A.
3  A. Right. So let me --
4  MR. CRAMER: I think it
5  means 2.
6  THE WITNESS: Yeah.
7  MR. ISAACSON: 2A?
8  THE WITNESS: Yeah.
9  MR. CRAMER: There's a
10 section of the report called --
11 under Roman II called Nature of
12 the Challenged Conduct.
13 MR. ISAACSON: That would
14 make more sense, yes.
15 THE WITNESS: You want to
16 strike the V there.
17 BY MR. ISAACSON:
18 Q. All right. So II A is the
19 horizontal conduct?
20 A. Yes.
21 Q. And so is that the item 3 in
22 your paragraph 2, the other -- the other
23 conduct, is it the horizontal conduct?
24 A. No.

Page 251

1  Q. Okay. Would it be
2  everything in No. II that's -- would
3  your -- would the -- Roman numeral II,
4  would that section capture the challenged
5  conduct?
6  A. Roman II captures the
7  challenged conduct.
8  Q. Okay. Maybe I just got us
9  another errata.
10 The -- now, the esti- --
11 your challenged conduct includes
12 horizontal conduct and vertical conduct.
13 As I understand it, from what you've said
14 today, that you are not estimating injury
15 or damages from the horizontal conduct;
16 is that right?
17 A. I think I'm not -- I'm not
18 estimating any -- any impact or damages
19 that flow entirely through the
20 horizontal. What -- what's important and
21 what drives the damages and the impact in
22 my models are the vertical restraints.
23 They're doing the -- that is the
24 mechanism of harm that I'm capturing,

Page 252

1  that I'm measuring.
2  Q. All right. The -- you are
3  measuring an increase in foreclosure due
4  to the acquisition of rivals by Zuffa; is
5  that right?
6  MR. CRAMER: Asked and
7  answered, form.
8  THE WITNESS: Conditional on
9  Zuffa using exclusive contracts of
10 a sufficient duration, then yes,
11 bringing on more fighters and
12 funneling them through that
13 mechanism is causing foreclosure
14 to go up.
15 In contrast, if Zuffa were
16 not using exclusive contracts of a
17 sufficient duration and made a
18 horizontal acquisition, then by my
19 regression model, at least, there
20 would be no increase in
21 foreclosure share and there would
22 be no anticompetitive effects.
23 In other words, the vertical
24 restrictions on fighter mobility

Page 253

1  are doing -- is the only necessary
2  condition, it is doing all the --
3  all the lifting, if you will,
4  according to my model.
5  BY MR. ISAACSON:

[remainder of page 253 redacted]

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 254

```
10   BY MR. ISAACSON:
11       Q.   Fine.  You discuss
12   counter-programming in your report.  I
13   can refer you to that, but if you're
14   general familiar with the topic.
15       A.   Yes.
16       Q.   All right.  You are -- am I
17   correct that you are not attributing any
18   increase in foreclosure percentage to
19   counter-programming or would you know?
20       A.   I'll give you the same
21   answer I just gave you for the
22   acquisitions.  If you strip away the
23   restrictions on the fighter mobility, the
24   exclusive long-term contracts, then the
```

Page 255

```
1    presence of the counter-programming would
2    not engender higher foreclosure shares
3    according to my model, would not generate
4    the wage effects that -- that my model is
5    showing.
```

Page 256

Page 257

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES



Page 258

Page 259

Page 260

Page 261

```
12        Q.   In general, we'll save time
13   if you tell me whether you have opinions
14   as opposed to what you imagine.
15        A.   Okay.
16        Q.   Or could imagine.  I don't
17   mean that as a criticism, I mean that as
18   constructive.
19             MR. CRAMER:  Constructive
20   criticism.
21             MR. ISAACSON:  No, not even
22   that.  A constructive way to get
23   through the day.
24             MR. CRAMER:  Advice.
```

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 286

1   with respect to, say, a finding of
2   monopsony power in the input
3   market.
4   BY MR. ISAACSON:
5       Q.   Well, you do have findings
6   of monopsony power that do rely on
7   revenue weighting, right?
8       A.   I think that under the --
9   under the indirect approach and under
10  only one pass through the indirect
11  approach, I weight fighters by -- by
12  revenues to make an inference about
13  Zuffa's high shares in that relevant
14  input market.
15      Q.   Right.
16      A.   But as you know, that's only
17  one of many, many approaches that allow
18  me to get to the conclusion of monopsony
19  power.
20      Q.   Okay.
21      A.   I actually prefer --
22      Q.   So let's return --
23      A.   Can I finish?
24      Q.   I thought you were.

Page 287

1       A.   I prefer direct evidence
2   generally, and I think that I've -- I
3   offer a slew of evidence that speaks to
4   how you can prove directly that Zuffa
5   exercises monopsony power.
6       Q.   I understand that you
7   offered direct and indirect evidence, but
8   I need to ask about them one at a time
9   and we can cover both.
10      A.   Okay.
11      Q.   So in terms of when you
12  define a market, can you describe to me a
13  situation where if you use revenue
14  weighting in the input market, where
15  the -- a monopoly firm would not
16  necessarily have a monopoly in the input
17  market?
18          MR. CRAMER:  Incomplete
19      hypothetical, form.
20          THE WITNESS:  I've never
21      given thought to that, and I'd
22      like to think about it and maybe
23      we'll come back.  But I don't
24      think I'm prepared to -- to

Page 288

1       construct a scenario about how
2       that could occur.
3   BY MR. ISAACSON:
4       Q.   All right.  The -- and then
5   you've described geographic market for
6   the output market also.  And is that also
7   North America?
8       A.   Yes.
9       Q.   All right.  The -- and in
10  terms of your SSNIP analysis -- all
11  right.  So did you do -- well, my
12  colleague wants to know so it seems like
13  a good question.
14      A.   I'm sure it is.
15      Q.   In the out -- in the output
16  market, what is being sold?  In the
17  output markets that you have defined.
18      A.   Sure.  I think that you
19  are -- the production or the product that
20  is being produced are -- is live MMA
21  events and the revenue associated with
22  those events can take the form of gate
23  revenue or pay-per-view.  That's from --
24  from the consumer side.  Of course,

Page 289

1   there's -- there's revenues from the
2   advertiser's side as well.
3           But I hope that answers your
4   question.
5       Q.   All right.  And does
6   pay-per-view compete with broadcast?
7           MR. CRAMER:  Objection to
8       form.
9           THE WITNESS:  I did not
10      conduct that inquiry.
11  BY MR. ISAACSON:
12      Q.   Do you have an opinion one
13  way or another about that?
14      A.   No.
15      Q.   All right.  With respect to
16  the -- does -- do the live venue events
17  compete with pay-per-view events?
18      A.   I don't even understand the
19  question.  Many of the pay-per-view
20  events are live.
21      Q.   Meaning I watch it on
22  pay-per-view as opposed to go see it
23  live.
24      A.   I haven't -- I haven't



PUBLIC COPY – REDACTED

Page 290

```
 1  studied that and I imagine for someone
 2  who lives very far from the venue where
 3  the live event is staged, they would not
 4  be considered reasonably close
 5  substitutes.
 6       Q.   So for your input markets,
 7  what evidence did you take into account
 8  to assess customer's likely response to
 9  price increase in the SSNIP analysis?
10  And feel free to point me to the sections
11  of your report that --
12       A.   Did you mean to say -- I
13  think you just conflated the input
14  markets and customers.  Maybe we should
15  start over.
16       Q.   Yes, I said price increase
17  rather than wage decrease, but let me
18  just put it this way:  What evidence in
19  your report did you take into account to
20  assess the likely response to a SSNIP in
21  the input markets?
22       A.   Sure.  So there it's the
23  perspective of the fighters not the
24  customers.  So I was tripping up over
```

Page 291

```
 1  your --
 2       Q.   Yes.
 3       A.   -- injecting customers when
 4  we're talking about input markets.
 5          So I can take you to the
 6  relevant sections, and I will, but of
 7  course at high levels, I'm looking at
 8  record evidence of -- of what fighters
 9  and promoters thought about substitution
10  possibilities as you -- if you were to
11  move away from Zuffa to counteract a
12  hypothetical wage cut.
13       Q.   Okay.  So the first thing
14  you looked at was record evidence of
15  substitution.
16       A.   Or the perception of
17  substitution from the stakeholders, the
18  fighters, the promoters, and I'll just
19  point you, if you --
20       Q.   That's -- that's sufficient
21  for -- for item 1.
22          MR. CRAMER:  You asked him
23     to look at his report.
24          MR. ISAACSON:  I'm going
```

Page 292

```
 1     to --
 2          MR. CRAMER:  Okay.
 3          MR. ISAACSON:  I'm not going
 4     to ask him to recite all the
 5     documentary evidence.
 6  BY MR. ISAACSON:
 7       Q.   And I understand that
 8  there's documentary evidence that you're
 9  not reciting today.
10          Okay.  Other than the record
11  evidence of the -- about sub- --
12  perceptions of substitutability from the
13  stakeholders, what would be other parts
14  of your SSNIP analysis for the input
15  market?
16       A.   I would direct you to
17  Section 3A 1 for all of the evidence that
18  I used to inform the construction of the
19  relevant input market.
20       Q.   That would be the record
21  evidence that you were referring to?
22       A.   Well, record evidence is
23  fairly broad, right, because it
24  encompasses almost everything.  But I
```

Page 293

```
 1  will point -- to me the -- what helps to
 2  guide me to the findings that I made with
 3  respect to the input market was the fact
 4  that Zuffa was able to successfully
 5  suppress fighter wages, wages either
 6  measured by -- by wage share, regression
 7  or by knowledge of the fact that wage
 8  shares were falling over time from
 9  26 percent to 18 percent, yet Zuffa did
10  not suffer sufficient defection so as to
11  render that wage decrease unprofitable.
12          Now, that -- that tells you,
13  as a matter of economics, that a -- that
14  a reasonable starting place for defining
15  the contours of the relevant input market
16  is just the fighters under Zuffa's
17  control.  That was the -- the first thing
18  that occurred to me.
19          And once you -- once you
20  start there, you can start looking at
21  record evidence to determine whether
22  additional fighters from -- from rival
23  promotions ought to be included so that
24  you eventually get to the smallest set of
```

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 294

1  fighters such that a hypothetical
2  monopsonist could profitably exercise
3  monopsony power.
4      Q.  All right.  And you said
5  that Zuffa was able to successfully
6  suppress fighter wages -- wage share.
7  You were talking only about the share of
8  revenues there, correct?
9      A.  Correct.

Page 295

5  BY MR. ISAACSON:
6      Q.  All right.  But in your --
7  in your hypothetical there you held
8  revenues constant.  Did you look at, as
9  part of your analysis of the input market
10 and defining that market, as to whether
11 Zuffa actually suppressed actual wages?
12     MR. CRAMER:  Objection to
13     form.
14 BY MR. ISAACSON:
15     Q.  As opposed to wage share?
16     MR. CRAMER:  Same objection.
17     THE WITNESS:  I'm focused on
18     wage share, of course, because
19     it's the right thing to look at
20     from an economic perspective.
21     We're trying to measure
22     exploitation, and the textbooks
23     tell you to do it as a share of
24     marginal revenue product.

Page 296

1  BY MR. ISAACSON:
2      Q.  So my actual question was --
3  I understand you're focused on that, but
4  my question is, did you look at whether
5  Zuffa actually suppressed actual wages?
6      A.  Without controlling for
7  revenues, no.  Because it's incorrect to
8  do so.
9      Q.  So in performing your SSNIP
10 analysis for the input markets, is it
11 fair to say that you relied on the record
12 evidence about the issue of perceived
13 substitution from the stakeholders along
14 with your observations that when Zuffa
15 suppressed fighter wage shares, there
16 weren't significant defections?
17     A.  I think -- I think that
18 encompasses a lot.  I also think that
19 Zuffa in its ordinary course of business
20 made use of a FightMetrics (sic)
21 database.  I had -- the very first thing
22 I did when I -- when I got this case was
23 I started reading the economic literature
24 on the MMA industry, and almost every

Page 297

1  article I read, the FightMetrics (sic)
2  database formed the foundation of their
3  empirical analysis.
4          So I thought that that was a
5  reasonable place to begin to posit what
6  the smallest set of fighters that could
7  be under the control of a hypothetical
8  monopsony would be in order for it to
9  exercise market power.
10     Q.  All right.  Why did you use
11 the smallest set of fighters not the
12 smallest amount of promoters?
13     A.  Well, because we're looking
14 at the input market.  The fighters form
15 the elements of the input market.  They
16 happen to belong to promoters, but
17 fighters are the elements or the
18 ingredients.
19         But I'm -- if I'm a
20 fighter -- just to make it clear, if I'm
21 a fighter and I'm thinking about
22 substituting, defecting from UFC and
23 going to a rival promotion, I don't care
24 what the name of the promotion is or

PUBLIC COPY – REDACTED

MAGNA LEGAL SERVICES

Page 298

```
 1  who's running it or who the chief
 2  matchmaker is, I want to make sure that
 3  I'm going to be put inside of a pool
 4  of -- of fighters such that I have a
 5  prospect of elevating through the ranks.
 6  It's the fighters that determine what a
 7  reasonable substitute is when fighters
 8  are considering defecting.
 9       Q.  Now, you're not suggesting
10  that Zuffa used the Fight Matrix data to
11  define a market, are you?
12       A.  Well, you just toggled from
13  FightMetrics (sic) to Fight Matrix.
14       Q.  I'm sorry, FightMetrics
15  (sic).  Sorry.  I was bound to do that
16  today.
17           But you're not suggesting
18  that Zuffa used FightMetrics (sic) data
19  to define a market?
20       A.  I'm suggesting that firms
21  are not -- are not employed -- firms are
22  not in the businesses of defining
23  relevant product markets as the normal
24  course of business, right?  They're doing
```

Page 299

```
 1  something else.  Defining markets is the
 2  task of an antitrust economist.
 3       Q.  All right.
 4       A.  But I do think it's
 5  important that Zuffa uses and relies on
 6  the FightMetrics (sic) database in its
 7  ordinary course of business.
 8       Q.  All right.  And is that part
 9  of -- do you consider that -- that
10  observation that Zuffa relies on the
11  FightMetrics (sic) database to be part of
12  your SSNIP analysis?
13       A.  I think it undergirds the
14  conclusion that -- that this is the
15  relevant set of fighters that would need
16  to be under the control of a hypothetical
17  monopsonist so that the wage decrease
18  below competitive levels would not be
19  rendered unprofitable.
20       Q.  Right.  So does your SSNIP
21  analysis for the input markets consist of
22  anything other than the things that
23  you've listed so far:  The record
24  evidence of substitution -- of
```

Page 300

```
 1  perceptions of substitutability from
 2  stakeholders, your observations about how
 3  Zuffa suppressed fighter wage shares
 4  without defections or significant
 5  defections, and Zuffa's reliance on the
 6  FightMetrics (sic) database?
 7           MR. CRAMER:  Would you like
 8      him to look at his report, is that
 9      what you're asking?
10           MR. ISAACSON:  He can look
11      at his report in answering the
12      questions.  I've allowed him to do
13      that for every question.
14           MR. CRAMER:  Okay, good.
15           THE WITNESS:  By looking at
16      it, it refreshes my memory that in
17      paragraph 101, for example, I'm
18      looking at evidence, again from
19      the perspective of what I call
20      stakeholders, or mostly fighters,
21      as to whether or not some -- some
22      sport outside of MMA would
23      constitute a reasonable substitute
24      to defect to in response to a wage
```

Page 301

```
 1      decrease.
 2           And we can go through
 3      paragraph-by-paragraph.  I don't
 4      know if that's how you want me to
 5      use the time --
 6  BY MR. ISAACSON:
 7       Q.  I thought -- I thought that
 8  as encompassed within the record evidence
 9  of perceptions of substitute billing.
10       A.  Right.  But why -- I mean, I
11  wouldn't say why we go by my memory of
12  what I used, we have the report and we
13  can go paragraph-by-paragraph and I
14  can --
15       Q.  Your report is long, I'm
16  trying to see if I can get a summary of
17  your conclusions with you having access
18  to your report.
19           MR. CRAMER:  So he wants you
20      to take your time and make sure
21      that you've adequately summarized
22      your conclusions and the evidence
23      upon which they're based.
24           THE WITNESS:  Okay.
```

MAGNA LEGAL SERVICES

PUBLIC COPY – REDACTED