# Exhibit 36

## Deposition of Robert Topel (December 5, 2017) (excerpted)

PUBLIC COPY - REDACTED

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON        )
FITCH, on behalf of                )
themselves and all others          )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
       vs.                         )  Case No.
                                   )  2:15-cv-01045-RFB-(PAL)
                                   )
ZUFFA, LLC, d/b/a Ultimate         )
Fighting Championship and          )
UFC,                               )
                                   )
            Defendant.             )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROBERT TOPEL

Washington, D.C.

December 5, 2017

9:34 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52568

PUBLIC COPY – REDACTED

**would result in lower compensation for workers in that market?**

A. What was the preface to that?

**Q. Higher levels of monopsony power in a labor --**

A. You say would I agree and then --

**Q. All things equal.**

A. All things equal. Sorry. We're talking -- forgive us, Tina.

MR. ISAACSON: Maybe repeat the question.

MR. CRAMER: Yes, I will.

BY MR. CRAMER:

**Q. Would you agree that all things equal higher levels of monopsony power in a labor market would result in lower compensation for workers in that market?**

A. If we're in a market where everybody is paid the same price, yes.

**Q. What do you mean by that, where everyone is same -- paid the same price?**

A. Well, the -- just as in the usual case of monopoly where we're talking about a single price seller, then a greater degree of market power on the output side will result in a higher price

because demand is more inelastic and every seller -- every unit has to trade for the same price. So if I want to expand at the margin -- sales at the margin I have to reduce price on every unit. And the issue here is that if I want to expand employment at the margin and I face rising supply price, then I have to pay every unit more.

**Q. When you say you face rising supply price, is that the same as a downward sloping supply curve -- I'm sorry -- upward sloping supply --**

A. Yeah, you don't want a downward sloping supply curve.

**Q. Upward sloping supply curve.**

A. Demand down, supply up.

**Q. Okay.**

A. Yeah. Yeah, upward sloping. The firm itself faces an upward sloping supply curve.

**Q. And when a firm faces an upward sloping supply curve, that firm by definition has monopsony power; is that correct?**

A. Has some degree of -- the term "monopsony power" is dangerous, as you know, the way the term monopoly power is dangerous. It has some market -- some power some influence over the price at which it transacts.

**Q. Monopsony power is measured in degrees. A firm can have a lot of monopsony power and a small amount of monopsony power, correct?**

A. I presume you're talking about different firms, but, yes, okay.

**Q. Or over time?**

A. Yeah.

**Q. Would you agree that the degree to which firms in a market pay workers less than their marginal revenue product depends on the elasticity of labor supply?**

A. To the firm.

**Q. To the firm.**

A. Yes.

**Q. So the answer is yes.**

**Is it fair to say that even though a firm with some degree of monopsony power pays its workers below the worker's marginal revenue product that the worker pay is nonetheless correlated with the marginal revenue product?**

A. You mean that you're moving up and down along an upward sloping supply curve?

**Q. Yes.**

A. So in something that increases -- with rising supply price something that increases

marginal revenue product would cause you to move out along the -- along the average factor cost curve; is that what you're saying?

**Q. Well, let me ask it this way. Is it fair to say that, all things equal, when marginal revenue product of a firm's workers rise, a firm with monopsony power will pay its workers more?**

A. Yeah. Over the -- over some period of time, yeah. There's contracts and things like that. Some simple shocks are not going to do it.

**Q. But over some period of time, all things equal, when a firm's marginal revenue of product of its workers rises, a firm with monopsony power will pay its workers more; is that fair?**

A. I think that's fair, yeah.

**Q. And similarly, all things equal, when the marginal revenue product of a firm falls over time a firm with monopsony power will pay its workers less; is that fair?**

A. Moving along an average factor cost curve which you've presumed to slope up. So that's fair.

**Q. And that condition that the supply curve is presumed to slope up is another way of saying that the firm has monopsony power; is that right?**

PUBLIC COPY – REDACTED

A. Well, we came -- we just came back to this term "monopsony power." There always -- you know, if this was a -- an antitrust case in the output market. The term is a little dangerous. There's -- there's some influence that the firm has over the price because supply slopes up.

**Q. And the textbook definition of monopsony power is a -- is -- is where there's an upper sloping supply curve, correct? I know you don't like the term, but --**

A. Yeah. If there's -- if -- I'm sorry, Tina. If you have some influence over -- the necessary condition for a firm with some monopsony power that's paying a single price is to -- or with some degree of market power in the input market is a ris- -- a rising supply price, rising average factor cost.

**Q. And so all things equal, when marginal revenue of product falls a firm facing an upper sloping supply curve will pay its workers less; is that fair?**

A. Over some period of time all other things equal and so on. So yes.

**Q. Would you turn to paragraph 311 of your report, please.**

A. This is the appendix?

**Q. It is the appendix, Appendix A.**

A. Yes.

**Q. The third -- third sentence of Appendix A says "In other words, Zuffa is better than its competitor at making its athletes more effective revenue generators"; do you see that?**

A. Yes.

**Q. What do you mean by that?**

A. Well, we have to read above. Let A be the relative quality of Zuffa athletes, which Zuffa can increase by incurring up cost according to the cost function C of A. So that when A is bigger Zuffa becomes -- that larger A makes those athletes more effective revenue generators.

**Q. What does it mean to say an athlete is a more effective revenue generator?**

A. That I've made some investments in the person's, in the context of this case, notoriety, reputation, the fighters he has fought against -- or he or she has fought against in the past, have done advertising, and so on that makes a unit of labor from this individual more productive.

**Q. So when Zuffa makes its fighters more effective revenue generators, they're able to**

**generate more revenues when they fight; is that fair?**

A. Yes. As you look down there to 313, A multiplies L, where this is -- L is the employment of factors by this firm called one, and larger A means each unit of L produces more units of labor service.

**Q. So what you're saying is that Zuffa is particularly good at causing the marginal revenue product of its fighters to increase over time, correct?**

A. Well, let's just be careful. I'm making an assumption above about A and the cost function C of A. So this is in the context of this model -- and I'm letting Zuffa be firm 1 here. So in the context of this model I'm not making a statement of fact about Zuffa. I'm saying if Zuffa is this firm and this is what Zuffa does, then that's the outcome.

**Q. Okay. So if what Zuffa does is makes it -- make its fighters more effective revenue generators, then what you were saying is that Zuffa in this example is causing the marginal revenue product of its fighters to increase, correct?**

A. Yes.

**Q. And is it your opinion that one of the things that Zuffa is particularly good at is causing its fighters to be more effective revenue generators?**

A. I think that's Zuffa's position and I think that's what the evidence tends to show, yes.

**Q. Is it your opinion?**

A. I just said yes.

**Q. Please turn to paragraph 56, please. It's on page 23. Here in the last sentence of paragraph 56 you say that "UFC sponsor Anheuser-Busch considers White to be an 'A-level athlete' for purposes of its premium marketing campaigns." Mr. White in this paragraph is Dana White; is that right?**

A. That's my understanding, yes.

**Q. Okay.**

**And this paragraph is talking about UFC's purchase in 2016 by a consortium of investors, correct?**

A. Yes.

**Q. And that consortium of investors is WME; is that right?**

A. That's my recollection. The initials

PUBLIC COPY – REDACTED

don't stick with me. So...

**Q. Well, is it fair to say that one of the things that the WME purchased when it bought Zuffa for $4 billion was athlete talent?**

A. You can't purchase athlete talent. What is it, the 15th amendment or something. You can only rent these people for a period of time. So --

**Q. I'm with you there.**

A. They -- they purchased a set of contractual rights and a business model and so on.

**Q. And one of the things that that was valuable to WME was that Zuffa had certain contractual rights with athlete talent, correct?**

A. Yes.

**Q. And one of the reasons why athlete talent is valuable is because the athletes are capable of generating revenues for the organization, correct?**

A. Correct.

**contributes to an athlete's human capital; do you agree with that?**

A. Yes.

**Q. What is human capital?**

A. Human capital is the intangible set of skills and attributes that end up being embodied in an individual after investments or it could just be because of innate talent.

**Q. And is fair to say that, all things equal, the -- the more human capital an athlete has the more revenues he's capable of generating when he fights?**

A. Well, I mean --

**Q. Roughly.**

A. Roughly. You're saying that -- there are different types of human capital. There's a whole vector of skills that goes into this and some are probably more productive at generating -- my human capital wouldn't do much good in the octagon.

**Q. Fair enough, though it might be interesting.**

A. I assure you it wouldn't be.

**Q. But with respect to MMA fighters the more human cap- -- capital an MMA fighter has all things equal the more revenues he's capable of generating when he -- when he fights, right?**

A. If we define human capital, and we can, I think, as the ability to generate revenues then

PUBLIC COPY – REDACTED

you've stated sort of a tautology there.

**Q. Okay.**

**Turn to paragraph 57 of your report, please.**

A. This comes to one of those -- I see the first sentence.

**Q. Yeah.**

A. There's probably a missing verb there, but go ahead.

**Q. I'm going to ask you about the second sentence where you write "These efforts by Zuffa and Zuffa's skill in providing consumers with an attractive MMA product grew the market for MMA to the benefit of athletes, consumers, and competing promoters"; do you see that?**

A. Yes, I do.

**Q. You opine here that Zuffa grew the market for MMA for the benefit of athletes, consumers, and committing -- competing promoters. Can you explain how --**

A. To, not for, but to. Sorry.

**Q. To the benefit, yes. Understood. Can you explain how Zuffa's efforts to grow the market for MMA benefited MMA athletes?**

A. Sure. Just take a simple example of the

television program they created back in, what was it, 2005 that generated interest in MMA among the public. That raised the demand for the services of people who can perform in the octagon, let's say, that benefited the athletes that fight for Zuffa and other athletes as well.

**Q. Did that promotional effort in creating the show increase the marginal revenue product of MMA fighters generally?**

A. You mean -- when you say generally, you mean like at other --

**Q. Yes.**

A. For other promoters and everything, yes.

**Q. So it increased the marginal revenue product of fighters at the UFC and increased the marginal revenue product of other professional MMA fighters, whether or not they fought at the UFC, correct?**

A. I would not expect it to be by similar amounts or by similar proportional amounts, but so long as it increased interest in the sport generally it would have some impact on attendance and willingness to pay for stuff associated with MMA events promoted by others. Now, if -- if aggregate supply was completely elastic, then it

wouldn't change in equilibrium marginal revenue product.

**Q. But aggregate supply of MMA fighters is not completely elastic, correct?**

A. Yeah. I don't know -- I don't know that that's true in the long run actually. I don't think we have any evidence that is true in the long run.

**Q. In the short run the -- that's not true, correct?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. In the short run as in, you know, almost all industries short-run supply is less elastic than long-run supply.

**Q. Did you do any empirical analysis of the long-run elasticity of supply of MMA fighters in this case?**

A. Are you asking whether I estimated the long-run elasticity of supply?

**Q. Did you?**

A. I didn't -- I didn't estimate the long-run elasticity of supply.

**Q. Did you do any other empirical analysis of the long-run elasticity of supply of MMA**

**fighters?**

A. Well, we know that there are more MMA fighters and more MMA events as demand has ground. So there's been entry from other sports and young people at the front end. So there's some evidence of, yes, longer -- longer run higher elasticity of supply.

**Q. Is one of the reasons why there has been entry by MMA athletes into the sport of MMA because the compensation of MMA athletes has gone up over time?**

A. That's one reason, but if supply was really highly elastic you'd get entry without -- you'd get transitory increases in compensation, but equilibrium compensation wouldn't change.

**Q. But you do agree that one of the things causing athletes to go into MMA instead of, say, football over time is that the compensation of MMA athletes has gone up, correct?**

A. I would say that the compensation of MMA athletes has gone up.

**Q. And that has --**

A. But whether in the long run that's going to raise MMA compensation in equilibrium remains to be seen because entry -- it's just like wheat

PUBLIC COPY – REDACTED

farmers. If the surgeon general came on and said eating wheat reduces heart disease and everybody starts eating wheat, then there's a transitory increase in the price of wheat as you move out along a short-run supply curve, but more people start producing wheat and if there's constant returns at the industry level, the price of wheat is going to return to what it was before.

**Q. Are MMA athletes like wheat farmers?**

A. No. They perform different functions than wheat farmers.

**Q. Are MMA athletes commodities?**

A. Well, it's not --

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. -- it's not that they're commodities, no. That's not the right term. The -- the question is, you know, what's the abundance of the talents that they have relative to the demand for them.

**Q. Turn to paragraph 63 of your report, please. The last sentence of that paragraph on page 26 says "Zuffa's success at identifying MMA athletes early on in their careers and promoting them successfully into household names has been a Cornerstone of its long-term value and success"; do**

**you see that?**

A. Yes, I do.

**Q. So in your opinion what has made Zuffa a long-term value and success is that Zuffa has been able to both identify MMA athletes early in their careers and promote them successfully into household names; is that right?**

A. That's part of what Zuffa does.

**Q. And that's one of the things that has made Zuffa a long-term value and success, correct?**

A. I think we referred to two things there. Identify them and then promote them successfully. Identify their talent --

**Q. Okay.**

A. -- so their -- their potential to be promoted, and then promoting them.

**Q. If all MMA athletes are the same, why would it be important to identify talent?**

A. But I didn't say they were all the same. You know, you could have an industry where different athletes have different amounts of talent and then the more talented ones will earn more, but the supply of more talented guys is highly elastic and the supply of less talented guys is highly elastic. It's like if you doubled the demand for

lawyers in the long run. You're still going to have good lawyers and not-so-good lawyers and the good lawyers will make more than the not-so-good lawyers, but the whole distribution of earnings doesn't necessarily have to change in the long run.

**Q. How does promoting fighters into household names allow Zuffa to have long-term value and success?**

A. Because that's the type of thing that, as I understand it, in this marketplace people are willing to pay for.

**Q. A key advantage of having fighters who are household names is that more people know about those fighters and want to pay to watch them, right?**

A. I think that's a fair statement.

**Q. So due to the UFC's promotional efforts, in your view, the UFC fighters can attract a wider audience when they fight; is that right?**

A. To the extent that those -- for the fighters that are successful subjects of such investment, that is true.

**Q. What you're saying is that one of the ways in which Zuffa has become successful is by boosting**

**the ability of its fighters to generate revenues when they fight, correct?**

A. Yeah. The point of investing is to generate revenues.

**Q. And the investments you're talking about here have boosted the ability of their product, the fighters, to generate revenues when they fight, correct?**

A. Well, the fighters, the other inputs used by Zuffa all go into the act of generating revenues. And so they've made a number of successful investments and those tend to generate revenues.

**Q. And one of those successful investments, in your view, is the investments they make in identifying and promoting fighters which has become successful by boosting the ability of those fighters to generate revenues when they fight, correct?**

A. As I alluded to a minute ago I don't want to convey the impression that it's every fighter, but they make some successful investments and those fighters generate revenues.

**Q. Would you agree that a fighter who's a household name because of Zuffa's investments and**

PUBLIC COPY – REDACTED

**promoting that fighter all things equal would generate more revenues for the UFC when he fights than a fighter who is not a household name?**

A. Well, you know, you could -- one can become a household name for a lot of reasons. If we assume that what you mean by a household name is that he or she is well known and that people value that notoriety, then yes.

**Q. Turn to paragraph 258 of your report, please. At the bottom of page 111 you say "Further, MMA athletes benefit from the greater exposure they receive on television broadcasts"; do you see that?**

A. Yes, I do.

**Q. Explain the reasoning here. How do MMA athletes benefit from the greater exposure they receive on television broadcasts?**

A. Because that increases their -- the knowledge of the public about that athlete, it increases the interest of the public so that that benefits the -- the athlete both in terms of any revenues they might collect from that and future television broadcasts either for one promoter or for another.

**Q. The more well known an athlete is, all**

**things equal, the more revenues that athlete will generate when he or she fights, right?**

A. This comes back to what I said. It depends on whether that notoriety is positive or negative, but if -- if by def- -- we're back to a tautology. If what you say is that positive notoriety creates greater public interest and people are willing to pay for that, then that benefits the fighter.

**Q. And it benefits the fighter because if a fighter generates more revenues when he or she fights, that fighters' compensation will be higher, all things equal, correct?**

A. It depends on -- it depends on market conditions, but to the extent that -- as it does in this market, that increases the market's willingness to pay for that individual, then that benefits the fighter.

**Q. You, in fact, found in this case that there's a statistically significant relationship between event revenues and fighter compensation, correct?**

A. Yes.

**Q. As event revenues go up, all things equal, fighter compensation goes up, correct?**

A. Well, we have to be careful. To the extent that -- highly compensated fighters generate more revenue than -- which way the causation goes there is -- is not crystal clear, right? I've got a good fighter -- I'm a good fighter, I'm already well known, I'm prominent, then I'm going to generate more revenue, but it is also the case simply from the structure of compensation that I think certain fighters get paid more and then it increases the demand for you in the future.

**Q. Would you agree that the average WNBA game generates less revenue than the average NBA game?**

A. I believe that's true. And if you're representing it to be true, I'll stipulate that it is.

**Q. And that's because there's a larger pool of potential people willing to pay to see the NBA events than WNBA events, correct?**

A. I think that -- I think that's a fair statement.

**Q. And the people that are -- the larger pool of people that are willing to see --**

A. Or it could be the same pool of people who are willing to pay more.

**Q. Okay. Well --**

A. Yeah.

**Q. -- either -- either it's the same pool of people willing to pay more or there's a larger pool of people that want to see NBA versus WNBA, correct?**

A. I think that's a fair statement.

**Q. And it's also fair to say that you would expect NBA players on average to generate more revenues when they play than WNBA players, correct?**

A. You said on average. I think you said on average.

**Q. Yes.**

A. So it's not true for every athlete. I believe that's -- I think I see where you're going. I think it's right.

**Q. And it would be reasonable to conclude that the average marginal revenue product of an NBA player is greater than the average marginal revenue product of a WNBA player, correct?**

A. I congratulate you for getting average and marginal in the same sentence, but the marginal revenue product of a typical NBA player properly defined is probably bigger than the average marginal revenue product of a typical WNBA player.

PUBLIC COPY – REDACTED

**Q. And in computing or determining the marginal revenue product of either an NBA player or a WNBA player, does it matter to you how the NBA came to have a larger market than the WNBA?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. For the -- could you read the beginning of the sentence?
**Q. Yes. In computing the marginal revenue product or in determining the marginal revenue product of an NBA player versus a WNBA player, does it matter to you as an economist how it was that the WNBA [sic] came to have a larger market than the WNBA does?**
A. I mean, for simply the purpose of you're assuming that he could compute this.
MR. ISAACSON: You said WNBA having a larger market than WNBA, which I don't think you want.
MR. CRAMER: Correct. I'll stand corrected. I'll ask it again.
BY MR. CRAMER:
**Q. For the simple purpose of just determining the marginal revenue product of an NBA player and a WNBA player, does it matter to you how the NBA came**

**to have a larger market than the WNBA?**
MR. ISAACSON: Objection to form.
MR. CRAMER: You can answer.
A. Well, it can, but you've asked it in the sense of if you were simply -- assuming I could do this computation because marginal revenue product is a concept, it's not something that I've -- you've just got a spreadsheet, you can press a button and get it. In certain context it would matter, depends on what you're analyzing, and in certain context it wouldn't. But if all you wanted to know is what's the marginal revenue product of Lebron James if -- when he's added to the roster of -- I'll change teams -- Oklahoma City, then as opposed to -- and I can't remember the names of any WNBA athletes and maybe that's your point -- when I move one of those players from one franchise to another what's the marginal revenue product, conceptually I don't need to know what caused it. But then it has different -- what caused it has different implications for the form of contracts and all sorts of things.
**Q. It's fair to say that in this case you made no effort to compute the marginal revenue product of any MMA fighters, correct?**

A. If what you're asking is did I compute the addition to revenues that would come from adding a marginal fighter to the stock of fighters holding constant everything else about the organization, no, no one's done that in this case.
**Q. Is it fair to say that the marginal revenue product of MMA fighters as a whole is roughly equivalent to the degree to which they contribute to MMA event revenues?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. I don't know what you mean by "as a whole."
**Q. Is it fair to say that the marginal revenue product of MMA athletes or a MMA fighter, put it that way --**
A. Let's do a MMA fighter.
**Q. Okay. All right. Is it fair to say that the marginal revenue product of a MMA fighter is roughly equivalent to the degree to which he or she contributes to event revenues?**
A. Well, I mean --
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. -- there's all sorts of revenue sources.

The way I described it a minute ago -- and I'm going to prefer my definition to yours -- is that the marginal revenue product of an individual is the addition to the organization's revenues from all sources when that individual is added to the labor force of the organization holding constant everything else that the organization does to generate revenue.
**Q. And you made no effort in this case to compute again the marginal revenue product of any MMA athlete, correct?**
MR. ISAACSON: Asked and answered.
BY THE WITNESS:
A. I don't think anybody in this case has -- has done that. The marginal revenue product is a concept.
**Q. Have you made an effort to estimate in any way the marginal revenue product of MMA fighters in your work in this case?**
A. As a -- as a measure of what they add to revenues, no one's done that, but to the extent -- if the market was competitive, then the marginal revenue product would be equal to what they get paid.
**Q. So --**

PUBLIC COPY – REDACTED

A. It comes back to a sentence you asked me about -- about 45 minutes ago. So I'm just restating the obvious.

**Q. So if the market's competitive, the athlete will get paid equal to his marginal revenue product; and if there's monopsony power in the market, the athlete will get paid below his marginal revenue product, correct?**

A. Yeah. All athletes, not just Zuffa athletes.

**Q. And are you assuming for your work in this case that the MMA market is competitive?**

A. I don't know whether it's perfectly competitive, but it's -- it's highly competitive.

**Q. Is that an assumption of yours or a finding of yours?**

A. It's a finding because other people are competing for athletes and Zuffa has to compete for athletes.

MR. CRAMER: The court reporter would like us to take a break and she's in charge.

THE VIDEOGRAPHER: Going off the record at 10:31.

(A short break was had.)

THE VIDEOGRAPHER: We are going back on

the record at 10:43. This begins disk No. 2.

BY MR. CRAMER:

**Q. The court reporter has told me that we have a tendency to talk over each other. So let's really both do our best to try and stop doing that. I will try to do my part.**

**All right. Turn to paragraph 32, please. The bottom of page 12, the last sentence begins "Overall attendance at MMA events immediately**

**Q. Okay. And you would agree that the growth in viewership has increased the amount of revenue that Zuffa generates from the average UFC event, correct?**

A. Yes.

**Q. And this growth in revenues has also**

**increased the amount of revenues generated by UFC fighters at each Zuffa event, right?**

A. It -- it increased the revenue that generated by fighters.

MR. ISAACSON: Object to form.

BY THE WITNESS:

A. It's too vague.

**Q. Okay. I will -- I will restate the question. The growth in revenues that flowed in part from the growth in viewership during this period also was a reflection of the increased marginal revenue product of UFC fighters, correct?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. I think I understand what you're saying. I'm going to agree with it, but I'm not quite sure what you're saying, but go ahead.

**Q. Okay. I don't want -- I don't want you not to be sure. I don't think Mr. Isaacson wants you not to be sure either. So let me ask it a different way. Is it fair to say that the increased fighter marginal revenue product would be correlated with the growth in UFC event revenues over this period?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Well, not necessarily. It depends on what -- to what the increase in event revenues is attributable.

**Q. Is it your opinion that fighter marginal revenue product at the UFC did not increase from 2009 to 2016?**

A. No, that's not what I said.

**Q. So you do --**

A. But the mere fact -- sorry if we talked over each other, but I think I'm completing a thought. The mere fact that more people watched doesn't mean that the marginal revenue product of any particular input has -- has increased.

**Q. If we assume for purposes of this question that the marginal revenue product of fighters has indeed increased from 2009 -- strike that.**

**Turn to paragraph 126, please. At the beginning of paragraph 126 you say "To state the obvious, an athlete's pay as a share of event revenue can easily decline even if pay measured as it should be in dollars per athlete is increasing. This is especially likely if Zuffa's promotional investments drive greater interest in its MMA**

PUBLIC COPY – REDACTED

**events so that Zuffa's revenues at each event increased because the greater attendance -- because of great attendance or viewership"; do you see that?**

A. Yes.

**Q. So would you agree that in general the share of UFC event revenues going to fighters did, in fact, decline over time, say, from 2009 to 2016 even as fighter compensation measured in dollars per fight increased?**

A. I'm not sure it declined in every year, but I think that -- I think the evidence is that fighter compensation increased at a different rate, a slightly lower rate -- or somewhat lower rate than the increase in revenues so that the ratio would be lower.

**Q. So what is happening over time, in your view, is that the UFC event revenue pie is increasing while the UFC's share of event revenues relative to the fighter's collective share is increasing; is that fair?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Well, I don't know that. You're defining a pie. The ratio of fighter compensation to total

event revenue in which they fight was on average lower as those revenues increased.

**Q. Okay. That's fair. In other words, the UFC as a business is keeping a larger share of event revenues for itself over time as event revenues increase; is that fair?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. No.

**Q. In other words, the UFC is paying -- I'll strike that.**

**And, in your view, the fact that UFC fighter compensation is growing slower than UFC's event revenues can be explained because Zuffa's promotional investments drive greater interests in MMA events?**

A. That would happen if the last part of your sentence is true.

**Q. So one explanation, in your view -- one possible explanation, in your view, for the fact that growth in event revenues is outstripping growth in fighter compensation is that Zuffa's promotional investments drive greater interest in MMA events; is that right?**

A. That could make it happen, yes.

**Q. Is it your opinion that Zuffa's promotional investments drive greater interest in MMA events that that explanation is what's causing fighter compensation to grow more slowly than event revenues?**

A. Well, that combined with the market structure, yes.

**Q. And what is that opinion -- putting the market structure part aside for the moment, what is that opinion based upon?**

A. Well, I look at the -- these sort of poster child for Zuffa investment is the ultimate fighter television program that generated so much interest and that grew interest in the -- in the event, but advertising, choosing the right com- -- finding the right athletes, choosing the right combinations of athletes to compete against each other, designing the sequence of fights that a fighter's going to be in, those are all activities that Zuffa engages in to -- as part of its business model.

**Q. Which one of those activities you just described would enhance event revenues without also enhancing fighter marginal revenue product, if any?**

A. Well, any one of them actually could do

that because the definition of marginal revenue product is what this individual added to the stock adds to my revenues holding everything else constant. And so the television program could have increased the event revenues without for any particular fighter changing that fighter's marginal revenue product, because the marginal revenue product does not identify the particular event. I mean, the firm's making a calculation of how much it's going to sell and at what prices over time and what all other investments it's going to make. And so marginal revenue product is far removed from simply the event revenue which a fight -- fighter is fighting.

**Q. Where in your report, if anywhere, do you provide an analysis of those portions of Zuffa's investments that do not contribute to fighter marginal revenue product?**

A. Are you -- I'm confused as to what you're asking. Are you saying that certain inputs to the process of producing Zuffa's product are complementary with -- with the talents of athletes so that if I advertise that raises the productivity of an athlete, it's sort of what in technical jargon it would be Q complements or something?

PUBLIC COPY – REDACTED

They're all com- -- they can all be complementary if that's what you're asking, but I don't know.

**Q. So all of the investments that you have discussed that have generated additional revenues for Zuffa over time, event revenues for Zuffa over time could well be complements to fighter talent, correct?**

A. Any of the inputs used could be complements to fighter talent.

**Q. And if those inputs used are complements to fighter talent, then adding those inputs would increase the marginal revenue product of the fighter, all things equal, correct?**

A. Well, holding constant all the other things that happen, it can shift marginal product. Whether in equilibrium it changes marginal revenue product at the quantity that's actually employed is another question.

**Q. You do not in your report evaluate whether any of the inputs that Zuffa has invested in over time are complements to fighter talent or are not complements to fighter talent, correct?**

A. Well, since the event revenues that are being generated are higher and some of that's attributable to the investments that Zuffa has

made, that shifted the demand for talent and even in a perfectly competitive labor market that would raise compensation. So in that sense we've -- we've analyzed that complementarity.

**Q. So to the extent you've analyzed the complementarity --**

A. And let me -- I'm sorry to speak over you, but let me just finish the thought. You know, with rising supply price at the industry label in a perfectly competitive labor market it would increase compensation.

**Q. To the extent you've analyzed in your report whether Zuffa's inputs to the growth in event revenues over time are or are not complements to athlete talent, you have shown that the inputs are indeed complements to athlete talent, correct?**

A. Complements in the sense of producing -- you've got to define the units of output by which then you're multiplying by marginal revenue to get marginal revenue product, and the -- it can be raising marginal revenue product by raising the marginal revenue product -- marginal revenue product, or it can be making them as I did in that example you showed them in the appendix -- you showed in the appendix making each individual. So

that appendix example was a complementarity [sic] between the investments made by Zuffa and the effective amount of entertainment that's being provided by a Zuffa athlete.

**Q. The example from the appendix was one in which Zuffa's investments made its fighters better at generating revenue when they fight, correct?**

A. Yes.

**Q. So that's an example of Zuffa's investments enhancing the marginal revenue product of its fighters, correct?**

A. Yes. Enhancing the product of its fighters.

**Q. Do you have any examples of Zuffa's investments that add to event revenues without enhancing the revenue-generating power of their fighters in your report?**

**Well, let's be careful about what I just said. In the appendix what happens is that the number of units of entertainment or interest generated by an athlete is increased by the investments that Zuffa makes. Whereas in that example the price per unit of interest was given and the -- the point of that example was even if there was no market power downstream in the output**

**market or upstream in the input market, you'd get the kind of pattern that we're talking about. So that's What I mean by Q complementarity, those inputs raise the productivity of -- of an athlete. It didn't necessarily change marginal revenue. You're dancing around one with a -- a related concept which is that the investments increase the market's willingness to pay for the athlete for any given amount of talent that the athlete has. Zuffa's doing many complicated things that affect both of those.**

**Q. Where in your report do you evaluate that latter concept?**

MR. ISAACSON: Objection to form.

MR. CRAMER: By "latter concept" I mean investments that increase the willingness to pay for the athlete given the talent and revenue generating power of that athlete.

A. Well, I provide examples. The television show did that, increased willingness to pay for what those athletes bring to the party. Now, you can view that as -- it's -- it's -- we're getting down into the nuances of the models, that you can view that as increase in the amount of entertainment that they provide and entertainment

PUBLIC COPY – REDACTED

has a -- units of entertainment have a fixed price, or you can say it increases the price per unit of entertainment to -- it's -- I mean, you could model it either way or you could re-think about it either way.

**Q. Did you model it one way or the other?**

A. Well, in the back I did it for the purposes of that example as it increased the number of units of entertainment. You know, in the report, you know, I think it would be easier to think about it in terms of -- of -- like the television show is increasing people's willingness to pay to see athletes with a given amount of talent.

**Q. Let's switch topics slightly. Is it fair to say that if all you knew about a firm was that worker compensation increased over time that you could not determine as an economist that the firm was or was not exercising monopsony power?**

A. You would need to know more.

**Q. What more would you need to know?**

A. I can't infer that -- a firm with monopsony power, I mean, you view -- I think you've alluded to this in questions over an hour ago. If demand increase can move out along the average

factor cost curve and end up paying a higher price.

**Q. So one thing you would need to know is whether or not demand had increased over time where you saw worker compensation going up; is that fair?**

A. No. That wouldn't provide the evidence of monopsony power.

**Q. What would you need to know in order to know -- if you saw a firm whose worker compensation was increasing over time, what would you need to know in order to determine that that firm was exercising monopsony power?**

A. You'd need to know relative to some but-for world that compensation would have been even higher. So you'd need some kind of controlled experiment about how a firm in similar circumstances employed people and paid people or maybe in some market in identifiably similar circumstances where arguably the existence of that market power you refer to did not exist or existed at some lower level.

**Q. Assume for this question that the market is perfectly competitive. Over some period of time you then determine that the marginal revenue product of that firm's workers in a hypothetical**

**labor market go up -- goes up about 50 percent, but the wages only go up about 10 percent. Could you conclude from that that monopoly power -- monopsony the power is being exercised over that period?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. No.

**Q. What more would you need to know?**

A. Well, the outcome that you've described is consistent with a competitive labor market. I think you started by saying assume a perfectly competitive labor market and then you switched in the middle to the exercise of monopsony power, which is --

**Q. Fair enough.**

A. -- a total contradiction. So we can't -- but the facts you describe are consistent with the operation of a competitive labor market.

**Q. So let me reask the question. Assume the market is perfectly competitive at time T. Then over some period of time you determine that the marginal revenue product of the firm's workers goes up about 50 percent and you also determine that the wages only go up about 10 percent. Could you based on those facts determine that monopsony power is**

**being exercised?**

A. Absolutely not.

**Q. Why not?**

A. Well, your premise was that the market was perfectly competitive. In fact, this is -- this is what the example in the appendix does. The marginal revenue product of some firm increases. Let's define perfectly competitive here as, you know, perfectly elastic supply at the industry level. Then wages aren't going to change. The revenues of the firm that got this technological advance that raised its demand for labor are going to be higher. So the wage I pay each person didn't change and revenues went up. That would happen in perfect competition.

**Q. Right. So in the example you just gave the increased revenues resulted from some technological advance?**

A. Some investments, some -- something that raised the marginal revenue product of labor in this firm. They hired Dana White, hey, and he's a like a tech -- he's a walking, talking technological advance. I don't know. So he makes demand for the output of this firm or the productivity of the fighters, whatever, goes up.

PUBLIC COPY – REDACTED

is. I haven't studied it.
**Q. So your opinion is is that Zuffa has some degree of monopsony power but that degree is small; is that fair?**
A. If they have a degree of monopsony power, there's been no evidence to indicate what it is or that they've -- the evidence does not indicate that they've exercised monopsony power in this market. Whether they have some monopsony power or not is -- is another question. If they tried to hire a whole bunch more athletes would they have to pay a higher wage? Maybe.
MR. CRAMER: I'm marking as Topel Exhibit 3 the next document. Oh, excuse me.
THE WITNESS: Same guys.
MR. CRAMER: Oh, yes, same guys.
(Topel Exhibit 3 marked as requested.)
BY MR. CRAMER:
**Q. So what you've been handed is Topel Exhibit 3. It's a different chapter from the Ehrenberg and Smith textbook that you cite in footnote 205; is that right?**
A. Is this the same footnote? Sorry. I don't need to turn --

**Q. Yes.**
A. Okay. Go ahead.
**Q. And this is chapter 5 of the Ehrenberg text "Modern Labor Economics" and the chapter's entitled "Frictions in the Labor Market"; do you see that?**
A. Yes.
**Q. Okay. Please turn to -- before I ask you to turn -- I'm sorry. Turn to page 131. All right. I'd like you to look at the second full paragraph, first sentence on page 131 beginning with "Thus"; do you see that? It says --**
A. Oh, we're above the monopsonistic page. Okay.
**Q. Correct.**
A. "Thus the higher worker's mobility."
**Q. Yes.**
A. Okay.
**Q. I'll read it to you. It says "Thus, the higher worker's mobility costs are the steeper the labor supply curve facing a firm will tend to be. Conversely as mobility costs fall other things equal, the labor supply curve to firms will flatten and become more elastic"; do you see that?**
A. Yes.

**Q. Do you agree with that?**
A. Well, it depends on a lot of things that go on above that paragraph. I think I know what they have in mind. So if there are --
**Q. Well -- go ahead.**
A. If there are -- just the mere existence of mobility costs doesn't do it because -- I mean, if there were constant mobility costs then -- then there's kind of a wedge between here and there, so to speak, but if what they mean is rising mobility costs so that the more people I try to hire from elsewhere the marginal person has to incur greater mobility costs to get from there to me, me as hiring somebody, then that, at least in the short run, can -- would be sort of the -- the level of compensation that I have to pay at the margin to attract people.
**Q. So am I right that decreasing worker mobility, making worker mobility more difficult all things equal makes the labor supply curve steeper?**
A. Decreasing labor mobility.
MR. ISAACSON: Objection to form.
BY MR. CRAMER:
**Q. Doing something to make it more difficult for one worker to move from one firm to another,**

**raising the costs of a worker moving from one firm to another, that's what I mean.**
A. Then it just raises the cost of a worker --
MR. ISAACSON: Objection to form.
THE WITNESS: Tina's getting frustrated because we're all talking at once. So let's let her catch up. Are you caught up? Okay.
BY THE WITNESS:
A. This sentence here refers to mobility costs and it could be the mobility costs of going from A to B or from B to A; and if it's from B to A and I'm A, then I have to compensate people at the margin for that mobility cost to get them to come work for me. So I have to pay a higher wage than if that wasn't there. And if we're talking about going from B to A, then I can pay less than what the other guys pay because the worker has to take into account the mobility costs of going from A to B.
**Q. So if firm A raises the costs somehow of moving from firm A to firm B, firm A can pay the worker less than if he hadn't raised the cost of mobility, right?**
MR. ISAACSON: Objection to form.

PUBLIC COPY – REDACTED

BY THE WITNESS:

A. Can pay the worker less than firm B. That's not what we see in this case, but that's true.

**Q. By "this case" you mean the Zuffa case?**

A. Yes.

**Q. Okay. Let's still talk about the -- about the hypothetical. It's fair to say that, all things equal, if a firm is able to make it more difficult and expensive for its workers to move from its firm to another firm, the lower it is able to pay its workers; is that right?**

A. No.

**Q. Why is that wrong?**

A. Well, the -- I mean, we're -- you're sneaking up on the rules and -- and contract stuff, and to the extent that those rules make investments more valuable and allow the firm in question to collect on the returns on its investment, those rules can and generally will increase the amount that workers pay. I mean, if there were zero mobility costs ex post and no restrictions on going, then I -- I as firm A, I'm not investing in these people because it raises their general productivity. It's like I don't want to train -- I

don't want to train -- incur the cost of training plumbers for my firm because I make them into good plumbers and they go work somewhere else for the marginal product that I generated.

**Q. All right. Well, I -- I'll move on.**

**Turn to paragraph 200 and in particular I'd like to focus your attention on a part of paragraph 200 that is on page 88. The second sentence -- or the first full sentence on the page says "In particular the restrictions on athlete mobility address potential market failures due to transaction costs and the free rider problem"; do you see that?**

A. Yes, I do.

**Q. And by "restrictions on athlete mobility" in this sentence you're referring to the contractual provisions that Plaintiffs are challenging in this case, correct?**

A. Generally speaking, yes.

**Q. How is it that the -- strike that.**

**Turn to paragraph 68, please. In paragraph 68 you opine in the first sentence "It may be true that eliminating the challenged contract provisions could promote entry by competing promoters, at least temporarily, because**

**new entrants could expropriate existing Zuffa investments in athletes"; do you see that?**

A. Yes, I do.

**Q. Could you explain the mechanism by which eliminating challenged contractual provisions could promote entry by competing promoters?**

A. Sure. Zuffa has invested in its athletes, in their personas, in matching them with the right opponents, and so on, things we've discussed elsewhere. Those are costly investments by Zuffa. The challenged contract provisions partially protect the returns on those investments. So it makes it worthwhile for Zuffa to makes those investments in the first place.

Now, after the investments are made if suddenly you change the rules and say, oh no, all of these restrictions on, you know, right of first refusal, champion's clause, the whole thing are out the window and now you've got these athletes that Zuffa made valuable, raised their productivity. If they can just leave because somebody else -- this is the plumber example I just gave you -- then they can go somewhere else. So there would be a transfer of wealth from Zuffa to the athletes, but in equilibrium it's not going to last long because

now that everybody can just up and leave nobody's going to invest. That's what the paragraph is saying.

**Q. Okay. So you're postulating a change from the current world to a world where none of the challenged contractual provisions exist, is that right, in this paragraph?**

A. Yes. And it's -- it's not just a change of two hypotheticals like what if it had been this way forever on one planet and the other way forever on the other planet. It's in the middle of the existence of this you say no, all the contracts you wrote are out the window.

**Q. Okay. And in that instance with the challenge provisions out of the way, other MMA promoters could immediately retain Zuffa's athletes, right, if they wanted to?**

A. Well, they could as long as they're willing to pay up to the value that's been created by Zuffa. Some of that value's going to be Zuffa specific, but not all of it.

**Q. So, in your view, because Zuffa has invested in promoting these athletes they as a group are more valuable, all things equal, to a rival promoter than unranked fighters sitting in an**

PUBLIC COPY – REDACTED

**MMA gym somewhere; is that right?**
A. I think what you said is right, yeah.
**Q. And what it means to be more valuable in this context is that these fighters are capable of bringing in more revenues when they fight, correct?**
A. Yeah. The identification process and so on raises their interest, the public's interest in these particular fighters. Some of that return, as I said, was Zuffa specific, some of it's totally general like the plumbers.
**Q. And in this instance where you had the challenged provisions and then they're gone, a new or another MMA promotion could, in your words, expropriate existing Zuffa investments in its athletes; is that right?**
A. Yes. So Zuffa would have lost money on its investments that it made in the past. It wouldn't have -- it would not have gotten the returns on its investments.
**Q. So, in your view, at least in the short run, eliminating the challenged contractual provisions will enhance the mobility of the fighters; is that fair?**
A. I don't know if you would call it enhance the mobility. More of them will move because

there's more subject to outside bidding. This is kind of like expropriating a -- you know, declaring a patent suddenly invalid and then anybody can make that formula, whereas they couldn't before. That helps for a little while, but nobody's going to invest in the research and development again.
**Q. So the athletes here are like a patent and with respect to a patent, say a pharmaceutical patent, once the patent expires or ends, the price tends to drop dramatically, correct?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. The generics -- now we're into patents. The generics tend to sell for less than the previous price of the brand name. As an aside, whether the brand name drug actually sells for a lower price is another more complicated question.
**Q. Bill and I have been through that together a long, long time ago.**
A. Okay.
**Q. All right. I'm going to move back to Zuffa. It's fair to say that in the short run -- strike that. Well, let me -- let me ask this question again.**
**I think you said that the challenged**

**contracts are in effect restrictions on athlete mobility in paragraph 200, right? We worked through it.**
A. I don't know if I agree with your phrase. They are restrictions that protect the investments that Zuffa has made in athletes.
**Q. Turn to paragraph 200, please.**
A. Okay.
**Q. The second sentence or the first full sentence on page 88 says "In particular the restrictions on athlete mobility address potential market failures" --**
A. Okay. I'm referring to those challenged business practices. So in that sense they are restrictions on mobility that say you can't just up and leave.
**Q. And in your opinion, enhancing fighter mobility by removing restrictions from the contract -- that the contracts create in the short run at least would in your view facilitate rival entry; is that right?**
A. It might facilitate rival entry depending on fixed costs and things like that and what they foresee about this market because they can't -- well, it does get complicated. Forgive

me. If we say that Zuffa can't use these and other people can, then rival entry will occur.
**Q. So there are two options, either Zuffa would pay its fighters more or the rivals will come in and expropriate the value that Zuffa has created by investing in its fighters; is that fair?**
A. No. You're -- you're -- I said a little while ago that when you get rid of these restrictions Zuffa's not going to be able to invest in fighters and the interest in fights and things like that the way they did before because they can't capture their returns. So the -- the question I offer -- I just asked is what are you assuming about the entry. Do they come in under the same rules as Zuffa?
**Q. Oh, I see.**
A. Okay. Or are they allowed to do things that Zuffa did from the beginning and now we turn around and say Zuffa, you can't do that anymore but everybody else can and that's -- that's my question.
**Q. Okay. In paragraph 68 -- and I believe you referred to that in your answer earlier -- you say in the sentence beginning with "Suppose"; do you see that? I'd like you to look at that. It's**

PUBLIC COPY – REDACTED

**the third sentence of paragraph 68; do you see that?**
A. I'm not there yet.
**Q. "Suppose" is on the right-hand margin.**
A. Oh, here we are. Okay. Second sentence.
**Q. Yeah.**
A. Third sentence.
**Q. Third sentence. It says "Suppose Zuffa's contract provisions are found to be anticompetitive, then a potential competitor could recruit and contract with the existing stock of developed Zuffa athletes enjoying the fruits of Zuffa's past investments in developing those athletes. This would create a transfer of wealth to the stock of existing Zuffa athletes." Do you see that?**
A. Yes. That's what I said a few minutes ago.
**Q. You did. And I just want to understand what you mean here. What you're talking about when you talk about a transfer of wealth is from Zuffa to its fighters; is that fair?**
A. Zuffa would be worse off by having lost the returns on its investments.

**Q. And what you mean by "lost the returns on its investments" is that in this situation, at least in the short run, Zuffa would pay its fighters more, correct?**
A. Well, I don't necessarily mean that at all. I mean that those athletes would go -- we've defined this now as a reduction in mobility costs. Some of these guys go somewhere else because somebody else pays for the productivity that Zuffa produced with its investments. It's the plumbers problem again. And, you know, whether Zuffa stays in business after this I don't even know because the premise of much of this is that these competitors -- I think we had it in this paragraph -- these competitors get to use rules that are now prohibited for Zuffa. So Zuffa's definitely at a competitive disadvantage in that world.
**Q. Okay. But I just want to understand what you mean by transfer of wealth. Presumably the Zuffa fighters who now are free of the contractual restrictions would move if they could get paid more, right, and that's what you mean by the transfer --**
A. Move -- the -- the amount that someone is

willing to pay -- I can leave immediately because we've assumed away these contractual restrictions and somebody's bid the value of what Zuffa created for my services, at least the value of what Zuffa has created to that firm for my services. So to the extent that I go I will be paid more ex post than I would have been paid, and so that is a transfer of wealth from one party to another. You've expropriated the investments that Zuffa made.
**Q. It's a transfer of wealth, in your view, from Zuffa to the fighters because in this instance Zuffa would either have to pay the fighters more or someone else would pay the fighters more, right?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. I think I see where you're going with it and yes.
**Q. So at least in the short run enhancing fighter mobility by removing the challenged contracts would lead to higher UFC fighter compensation, right?**
A. For people who have already been invested in, but Zuffa's not going to invest again.
**Q. So for the existing stock of Zuffa**

**athletes eliminating the challenged contracts, at least in the short run, would enhance fighter mobility and lead to higher fighter compensation, correct?**
A. It could do that.
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. As I said, it depends on what we're assuming about what other firms can do. I mean, if we had a world where nobody could do this, then the other firms probably aren't going to want to hire them either because in equilibrium this business model's not going to work.
**Q. But the transfer of wealth occurs -- presumably the transfer of wealth only occurs if someone is willing to pay the fighters more, correct?**
A. You have to have some market structure in place where someone is willing to pay more, but if the more is just a -- a -- the more relies on the fact that, hey, we get to hire these guys that we didn't have to invest in, great, and then we can write multi-contract -- multi-fight contracts with them and everything else. So it could be Bellator, terrific, they invested and we get to get him.

PUBLIC COPY – REDACTED

**Q. Is it fair to say in the short run if we eliminate the challenged contractual provisions, one immediate effect is that fighters get paid closer to the amount of event revenues that they generate for the promotion; is that fair?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. They'll get paid more than they would have because they're getting some of the returns on the investment that were previously shared with -- with the investing firm.

**Q. So in your view, the challenged contractual provisions are what is allowing Zuffa to pay the fighters below the marginal revenue product of those fighters, correct?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. No. I mean, it's -- in the long run -- when you think about investments you have to think about the costs and the returns. So anybody who's making investments in -- any firm that's paying for some of the investments in human capital has to get, you know, at least a competitive return on those investments. So it's not a one-period thing. It's a multi-period thing. There's a kind of

before and -- period 1 and period 2 and the firm invests and it gets the returns. So even under competition if you turned around to firms and said, look, you don't get the returns, that would be a transfer of wealth to -- in the second period to the people who are invested in in the first period. So getting more of your marginal revenue product you're thinking about it like at a single point in time whereas the relevant thing is it's dynamic. It's -- it's how many periods are you going to be here and what I do -- what I do with you when you're young and a novice and unknown and how do I get the returns on what I just did for you to make you more productive.

**Q. Okay. I understand you're making a dynamic long-run argument. I'm just trying to understand how it works in the short run for the existing stock of Zuffa athletes. And for the existing stock of Zuffa athletes in the short run what is allowing Zuffa to pay fighters below their marginal revenue product are the challenged contractual restrictions, correct?**

MR. ISAACSON: Objection to form, asked and answered.

BY THE WITNESS:

A. They're getting a return. So their marginal revenue product over the -- I can't answer this outside of the context of two periods because I have to take the costs into account. Now, if what you're trying to say -- let me just phrase it so we're on the same page. Come back to my example of the plumbers. For the marginal plumber in two periods the return -- the investment cost is going to be equal to -- what I pay has to be compensated by a wedge between what his productivity would be somewhere else and what I have to pay him in the second period. Okay. So I might have some restriction on whether he can leave right away and all that. And now you tell me that restriction's gone. So, yeah, somebody else will pay up to what that guy's worth in the second period, but that doesn't mean his marginal revenue product doesn't take into account what I paid for him in the first period, but -- but that's in the past now and it's gone and we let him go, he's gone. I'll never make that investment again, but he's gone and he'll get paid more, and that's the sense in which there's a transfer of wealth relative to the outcome that we had when we had a contract that protected the investments.

**Q. Turn to paragraph 113, please.**

MR. CRAMER: Do you need a break?

THE REPORTER: After this.

MR. CRAMER: We'll take a break after this.

BY MR. CRAMER:

**Q. Towards the end of that paragraph, paragraph 113, you have a sentence that begins "As explained above, if athletes"; do you see that?**

A. Yes.

**Q. This says "As explained above, if athletes can freely switch to competing promoters that pay 'competitive compensation' given the athlete's human capital, human capital that was largely developed by an initial promoter, then there is little incentive for the initial promoter to make the investments that contribute to that human capital in the first place"; do you see that?**

A. Yes.

**Q. So here you're positing a world without the challenged contracts, right? In other words, if athletes can freely switch; is that right?**

A. I think that's a fair statement, yeah.

**Q. And in this world you are opining that -- strike that.**

PUBLIC COPY – REDACTED

**And the premise of your argument is that if all of a sudden athlete mobility were enhanced, then other promoters would be willing to pay UFC -- UFC fighters up to the value of their human capital; is that right?**

A. Well, I'm -- I'm positing that -- you can interpret this in two ways. One, you had me in paragraph something, 68 or something.

**Q. 68.**

A. And we're talking about removing the contract restrictions and having a but-for world where either everybody else can use those contract restrictions or nobody else can and the outcomes in those two worlds are different. Here we can -- if I say -- if athletes can freely switch, then these investments are not going to occur. I'm sort of comparing two but-for worlds. How would this industry operate absent the contract restrictions, and the -- to the extent that it takes the business acumen of the promoter and so on to develop those personas and value, there would be a lot less of that development. And it says there's little incentive for the initial promoter to make the investments that contribute to human capital in the first place. So we'd have an -- we'd have an

equilibrium with less investment in that type of human capital.

**Q. All right. I understand your dynamic argument. I'm asking about now the short run and the premise of your point that if athletes can freely switch to competing promoters, competitive comp- -- those promoters would pay athletes compensation given the athlete's human capital is that these competing promoters would be willing to pay more than the UFC would given the athlete's human capital, right?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. No, that's not what I'm saying here. You're addressing a different problem. Let's just be explicit about what I'm saying here. If athletes can freely switch -- and I'm making a statement about the market and if athletes can freely switch in this market, then initial promoters wouldn't be making the investments in human capital in the first place.

**Q. I understand that.**

A. Okay. And so, I mean, read the next sentence. "Reducing promotional investments would make athletes as well as the promoter -- I could

have said promoters -- and consumers worse off."

**Q. Right, but --**

A. So is this statement about two different market -- the equilibrium under two different market structures either these kinds of restrictions are allowed or they're not allowed, and I'm talking about well, if they're not allowed the world's going to be a lot different than it is.

**Q. What did you mean when you said "If athletes can freely switch to competing promoters that pay competitive compensation given the athlete's human capital"?**

MR. ISAACSON: Asked and answered.

BY THE WITNESS:

A. It means that if there's free mobility I can switch to anybody who will pay "competitive compensation," but, you know, that -- in the equilibrium that level of compensation, that value is going to be lower.

**Q. I'm asking not -- not at the long-run equilibrium, but in the short run.**

A. But that's not what this sentence is about.

**Q. I know, but the sentence is premised on**

**the notion -- and tell me if I'm wrong -- that if you enhanced athlete's mobility in the short run competing promoters would pay a higher amount of the athlete's human capital than the UFC would be willing to pay, correct?**

A. Well, that's not what this sentence is about. I mean, we -- we can talk about -- if you want to talk about that problem I'm happy to talk about it, but that's not what this sentence is about. This is about what would the industry look like in a world where you can't do this.

**Q. Right. I understand that. You're making a dynamic long-term argument, but it seems to me that your dynamic long-term argument is premised on something happening in the short run.**

A. No. Let me explain. I've got two worlds --

MR. ISAACSON: I'm going to object to form.

BY THE WITNESS:

A. Okay. I have two worlds. World -- east of the Rockies we can have -- and there's -- and nobody goes from one side to the other. East of the Rockies I'm going to have one set of rules and the industry develops the way it develops, and the

PUBLIC COPY – REDACTED



MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. I got -- I'm sorry. Your sentence went on a long time and it had a lot of hypotheticals in it and I lost the train.

PUBLIC COPY – REDACTED

114

116

A. My answer's the same.
**Q. All right. Turn to paragraph --**
A. Let's be -- let's be careful. I mean, that's an equilibrium -- again, that's an equilibrium and the reason they have the restricted free agency period is because there's specific value that has been invested in by the franchise. And so the equilibrium is that with the existence of restricted free agency there is a period where -- let us presume all the premises of -- that you've talked about are true where offers are less likely to arrive, but that's within the context of restricted free agency. If you didn't have restricted free agency, period, then players and franchises would all be less valuable. So that's -- that's a completely different market than what this is. So you can't -- this is always true in economics. You have to figure out what's the equilibrium and you can't take a contract that exists and say, okay, in this part of the contract this many offers arrive, in that part of the contract that many offers arrive, and then say, well, the net -- then the second part is just like what the world would be if there's no contract. That's not the way it works. You've got to say if

115

**Q. Are you familiar with restricted free agency in basketball?**
A. Yeah, somewhat.
**Q. And are you aware that athletes during the restricted free agency period tend to get less bids than when athletes are no longer during the restricted free agency period?**
A. I've not studied that, but it doesn't surprise me.
**Q. And is it also fair to say that athletes during a restricted free agency period as compared to athletes after the restricted free agency period is over tend to get paid less during -- get lower bids during the restricted free agency period than after the restricted free agency period, all things equal?**

117

we took away the contract people would invest less, basketball players would be less popular, basketball would be less popular. It's the whole thing and that's why the contract's there.
**Q. Turn to paragraph 101 -- 101, please.**
A. Yes.

PUBLIC COPY – REDACTED

118

**Q. So here you're positing an athlete that is worth $100,000 to Bellator; is that right?**
A. After investments have been made, yes.
**Q. After Zuffa's investments have been made?**
A. Yes.
**Q. Okay. And that is because Bellator presumably believes it can earn at least a hundred thousand dollars in additional event revenues when that athlete fights, correct?**
A. I don't know if it's event revenues. He's worth a hundred thousand dollars to Bellator.
**Q. Because Bellator believes he is going to generate at least a hundred thousand dollars in earnings, correct, for Bellator?**
A. Not his -- for Bellator, yeah. It could come from selling bobblehead dolls. I don't care what it comes from.

119

**Q. Okay. Is what you're saying that the athlete's marginal revenue product at Bellator is at least a hundred thousand dollars; is that the same concept?**
A. Well, if what we're talking about is that everybody at -- you know, all the other things at Bellator are held constant and we add this person, then willingness to pay by Bellator is a hundred thousand dollars.
**Q. Okay. And in this example the fighter's revenue generating power is greater at Zuffa than at Bellator?**
A. In this example, that's correct.
**Q. Why? What explains that?**
A. Because I've been fighting Zuffa athletes and, you know, whatever rivalries have been built up, Zuffa has a fan base the way lots of branded firms have a customer base that has some differential loyalty to them. They're a -- they're a differentiated product and they -- they found a target audience that values what UFC does. So all the firms are not just generics in this market. So I've made these investments and I would design the investments so that they increase the value to me, but some of that's -- some of that human capital is

120

portable and that's the hundred thousand dollars to Bellator.
**Q. Is it fair to say that this athlete's marginal revenue product at Zuffa in your example is at least $150,000?**
A. Well, you know, with all the other stuff that's going on at Zuffa -- look, willingness to pay by Zuffa is $150,000.
**Q. And so Zuffa must think that the athlete's marginal revenue product is at least $150,000, correct?**
A. I'm saying that's the -- that's the upper limit. So if -- I'm not sure how you're using marginal -- willingness to pay is the largest amount that Zuffa would pay to have this athlete.
**Q. Okay.**
A. And that's $150,000.
**Q. Now, you say that the right to match allows Zuffa to avoid being, as you say, held up by the fighter who will force Zuffa to pay more; is that right?**
A. Are you just reading what I -- what I said?
**Q. I'm paraphrasing.**
A. Okay. Well, let's read. "The athlete has

121

an incentive to overstate the value of the other unmeasured aspects of the Bellator offer" -- that's one of the tactics he could use -- "forcing Zuffa to pay more and thus capturing some of the returns on Zuffa's investment."
**Q. Well, the holdup, in your view is the fighter demanding Zuffa to pay him more than a hundred thousand dollars; is that right?**
A. Yeah, because the $150,000 is the amount that helps to cover the investments that Zuffa previously made in the fighter.

PUBLIC COPY – REDACTED

**Q. Let's just say for this particular fighter.**



A. Okay. So this guy -- the Melendez question we talked about a few minutes ago. I'm giving this person a unique ticket that says the rules don't apply to you.

**Q. Let's -- here's the hypothetical, assume that Melendez does not have a right to match in his contract, he negotiated it away.**

A. Somebody forgot.

**Q. Somebody forgot.**

A. Somebody forgot. Okay. But that's important.

**Q. Okay.**

A. That's actually really important because if somebody forgot, then they're going to invest in this dude and -- like they've got it and then they're going to realize ex post he's going to come in and say ha ha, you invested in me but there's no restriction on what I can do because you forgot to check the box and he brings in some lawyer that said -- and -- and Zuffa says we give up. Yeah, we can collect the returns on Zuffa's investment then, but that's a very specific thing, they forgot to check the box, because if you negotiate it away, then Zuffa knows what's going to happen and they're going to invest less.



**Q. Okay. So in the situation where Zuffa forgot and didn't know that the right to match was not in the contract of this fighter, you would agree that Zuffa would make those investments thinking that the fighter was subject to a right to match and then as a result of not having the right to match that fighter would be able to be paid more than in a world where that fighter had a right to match, correct?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. He can then expropriate Zuffa's investments, that's true. So -- I mean, I don't know why this is an interesting problem, but maybe we'll figure it out later.

MR. ISAACSON: Do you want to take a break at this point?

MR. CRAMER: One minute.

BY MR. CRAMER:

**Q. Is it your opinion that any -- strike that.**

**Have you seen any fighters that were able to negotiate away the right to match in their contracts?**

A. You know, I don't recall. I might have.



I've seen lots of stuff.

**Q. It's fair to say that the vast majority of Zuffa's contracts have the right to match provision in it, correct?**

A. Yes. I think we have a table to that effect.

MR. CRAMER: Okay. All right. We can go off the record.

THE VIDEOGRAPHER: Going off the record at 12:52.

(Whereupon, at 12:52 p.m., the deposition was recessed, to reconvene at 1:30 p.m., this same day.)





PUBLIC COPY – REDACTED

AFTERNOON SESSION
(1:41 p.m.)
THE VIDEOGRAPHER: We are going back on the record at 1:41. This begins disk No. 4.
ROBERT TOPEL,
the witness at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION
(Resumed)
BY MR. CRAMER:
**Q. Please turn to paragraph 87 of your report, page 36. You say there at the beginning of the paragraph "Both athletes and promoters make considerable investments that increase the value of the product offered to the public, athletes through their training and promoters through promoting MMA events and athletes." Do you see that?**
A. Yes.
**Q. Okay. And then you go on to say that "Investments and training are borne" -- I'm sorry. "Investments and training borne by the athletes are not subject to free riding because training is embodied in the individual athlete"; do you see that?**

A. Yes.
**Q. And the point you're making there is that athletes can take the skills they created through their training investments to other promoters?**
A. Yes. And the skills they develop are general in that sense.
**Q. So it's your understanding that the UFC does not, as a general matter, invest in fighter training or pay for fighter training or development?**
A. I'm not saying that. It says "Investments in training borne by the athletes themselves are not subject to free riding because the training's embodied in the individual athlete."
**Q. All right. Well, let me just ask you that. Is it -- is it or is it not your understanding that UFC does not as a general matter invest in fighter training?**
A. I don't recall if they pay for like gym time or something like that. I don't think they do, but it's not really material to my opinions.
**Q. So you don't know one way or another whether the UFC pays athletes for time they spend in gyms; is that fair?**
A. I don't recall. If I knew at some point,

I've forgotten.
**Q. You're aware that UFC athletes aren't paid salaries, correct?**
A. Yes.
**Q. So it's your understanding that if an athlete goes to a gym he could submit that for reimbursement to the UFC?**
A. I didn't say that.
**Q. So how in your understanding is an athlete paid for going to a gym to train?**
A. I didn't say that either.
**Q. Okay. So you just don't know one way or another?**
A. I said if I knew at some point whether there was anybody who got any reimbursement for training time or paying for the coach or anything like that, I don't recall it.
**Q. All right. I'm not asking you about whether any person ever at the UFC was paid for training. My question is do you know one way or another whether the UFC in general pays its fighters for training expenses?**
A. I don't recall it.
**Q. Do you have an understanding one way or another about whether the UFC pays for fighter's**

**trainers?**
A. I don't recall.
**Q. Do you know one way or another whether the UFC pays for a fighter's sparring partners?**
A. I don't recall.
**Q. Do you know one way or another whether the UFC pays for a UFC's business manager -- I'm sorry -- a UFC's fighter's business manager?**
A. I have no recollection.
**Q. Do you know one way or another whether the UFC pays for a fighter's meals while they're training?**
A. Well, see, you dropped in the "while they're training." I think there's -- there are certain things that are paid for around the time of an event, I know that. I don't recall seeing in a contract anything about paying for meals while they're training.
**Q. So you're aware that in UFC fighter contracts the UFC agrees to pay for certain things around an event; is that right?**
A. Yes.
**Q. Have you ever seen a UFC fighter contract in which the UFC agreed to pay for training expenses that were not around an event?**

PUBLIC COPY – REDACTED

A. I haven't seen it in a contract, but I'm not in a position to say it never happened.

**Q. It might happen, but you don't know one way or another; is that your opinion?**

A. That's correct.

**Q. Do you know one way or another whether the UFC pays for a fighter's travel when they're training, not around an event?**

A. I've never seen such an expense in a contract. If I have, I don't remember.

**Q. Do you know one way or another whether the UFC pays for a fighter's general medical care separate and apart from anything that might happen in a bout?**

A. That's different. I recall something about medical care. I can't remember what it is. Injuries in a bout might be taken care of. I can't remember.

**Q. Do you know one way or another whether the UFC provides fighters who are fighters for the UFC general medical insurance?**

A. I'm trying to remember and I don't as I sit here.

MR. ISAACSON: Objection to form.

BY MR. CRAMER:

**Q. You're aware that UFC fighters are independent contractors, correct?**

A. Yes.

**Q. And are you familiar -- strike that.**

**Have you in your work in this case computed or quantified anywhere the amount of money that the UFC has paid fighters for training?**

A. No. I think you know that. Yeah.

**Q. So in paragraph 87 you referred to "Returns on a fighter's training investments"?**

A. Yes.

**Q. You would agree that all things equal, the more training a fighter does the better an athlete that fighter will be?**

A. If the training is rational, yeah. That would be the point of training.

**Q. And, all things equal, the more rational training fighters do generally the better MMA product they will be, correct?**

A. Yes.

**Q. And, all things equal, the better MMA product the more demand there will be for it, correct?**

A. Yes.

**Q. So, all things equal, if more money is**

**spent on MMA training in a rational way the sport will benefit generally, right?**

A. Are you saying that there's spill-overs from my training onto other people?

**Q. Correct. Yes.**

A. Then there would be too little training because I don't get all the returns to my training. That could be true. There could be an externality.

**Q. And putting aside the externality issue, all things equal, the more money that fighters spend on rational training for MMA, the more consumers of the sport will benefit, correct?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. You think you're saying -- you said there's no externality and I think you said there is an externality but -- now, but that -- the more people train the more -- I think what you're trying to get at is that the more people train the more people are willing to pay to watch them battle it out in the octagon. Is that what you're trying to say?

**Q. Well, put it this way. The more people train the higher quality fights there will be, all**

**things equal; is that right?**

A. Well, that could be true. I don't know the answer because it could be a war of attrition where, you know, you train -- given my level of training you train harder than me and given your level of training I choose how to -- how hard to train and we don't really get anywhere. I mean, it could be that kind of world where the training itself is even excessive, I guess, but I think I see where you're going. If these guys are investing in their own general human capital it's going to raise their value not only to Zuffa, but to anyone else in the -- in this business.

**Q. Right. What do you mean "in this business"?**

A. In the MMA business.

**Q. So if they spend money investing in their human capital by training to be a better MMA fighter, those skills are going to be -- are going to help them in the MMA business; is that right?**

A. I think that's why they train.

**Q. Are you familiar with the reserve clause in baseball?**

A. Generally speaking, yes.

**Q. Fair to say that that clause was once part**

PUBLIC COPY – REDACTED

**of Major League Baseball player contracts, right? You're generally familiar with that?**
A. Yes.
**Q. And the clause in general stated something to the effect of that the rights of the player were retained by the team even after the contract expired; is that fair?**
A. The rights to the player playing baseball?
**Q. Yes, playing baseball.**
A. Okay. There might have been geographic restrictions and things like that. I can't remember, but yes, in playing Major League Baseball.
**Q. It was a strict limitation on the athlete's mobility in baseball, right?**
A. In Major League Baseball.
**Q. In Major League Baseball.**
**Would you agree that the reserve clause was a means by which the major --**
A. Hold -- hold -- hold on. You said mobility.
**Q. Yes.**
A. It might not have affected mobility at all. It was a matter of who does the competing to move the resource from team A to team B.

**Q. Explain that.**
A. Prior to -- and -- and prior to the elimination of the reserve clause the rights in -- over a long period of time to the baseball-playing services of the baseball player resided with the original contracting team that signed the kid. And so just like in -- think back to Babe Ruth who was on the Red Sox. He was on the Red Sox under the reserve clause and the Yankees -- he was more valuable as a Yankee than as a Red Sox. So the Yankees bought his contract from -- from the Red Sox and he played out his career there until he went to the Dodgers and other places at the end of his career. So the competition for the resource was still there and -- but who owned the rights was changed.
**Q. Okay.**
A. So that mobility -- I think the evidence is mobility didn't change much at all -- much, if at all. It's just the competition was taking place between different parties for the same valuable resource and the resource generally ended up where it was most valuable. Hence, Babe Ruth to the Yankees.
**Q. So, in your view, the reserve clause was**

**efficient?**
A. I didn't say it was efficient. I just -- I don't know how you got so out of that. I just said that they transferred the property rights, the ownership rights over the resource or over the services and the -- the allocation of the resource may not have changed and I think a lot of people claim that it didn't change, but there was a transfer of wealth over to -- from one side of the market to the other.
**Q. So the allocation as between which team a player would play on did not change, but by transfer of wealth you mean that instead of the player getting paid more the teams kept more of the player's human capital, correct?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. They kept more of the -- the returns on the general human capital that they had.
**Q. The teams kept more or the players kept more?**
A. Prior to the elimination of the reserve clause.
**Q. The teams kept more of the general human capital that the players had?**

A. The returns.
**Q. The returns.**
A. They didn't keep the human capital. They couldn't hold onto it or eat it or anything like that.
**Q. They made more money from it, correct?**
A. Then that gets complicated too because they had to buy the franchises and -- they got a competitive rate of return. There was a loss, let's put it that way. When the reserve clause was eliminated there was a loss to the team owners who had bought teams based on the premise that this is what the rules were.
**Q. Is your view that the reserve clause increased the incentive of baseball teams to invest in their players as between a world without the reserve clause?**
A. Well, I've never thought about it. I've never studied that in that context. In some sense, yeah, that's definitely going to be true because -- to the extent there was specific capital that only raised their value in one place, then other teams were not going to be willing to pay for that to the -- so no, no. In that case the -- I'd have to think it through because if it was purely specific

PUBLIC COPY – REDACTED

capital it would -- there's the holdup problem like we would -- like we encountered in here that we talked about a while ago that the -- the players might be more able to collect some of the specific capital investment. So maybe there was less human capital investment after the end of the reserve clause. I haven't studied it.

**Q. Oh, after the end of the reserve clause you believe -- well, strike that.**

**Do you believe that Major League Baseball used the reserve clause as a means to prevent free riding.**

MR. ISAACSON: Objection to form, calls for speculation.

BY THE WITNESS:

A. I haven't studied the reserve clause. I don't know the answer to your question. I don't know what you mean by "prevent free riding." There was probably -- given the structure of the reserve clause there was less free riding than there otherwise would have been.

**Q. Why?**

A. Because the team owners got the returns on anything specific they did. I don't know how much specific they did and I haven't studied the

performance of baseball teams before and after.

**Q. Well, it's fair to say that since the team owners controlled the rights to a player, the team owners could be sure that they could obtain the returns on any specific investments they make in that player or more sure than without the reserve clause, correct?**

A. I guess you'd say -- I think the end of your premise was more sure than without the reserve clause. I remember Drysdale and Koufax held out for a hundred thousand dollars back in 1967. They held out together. It was bargaining, you know, bargaining over their specific value to the Dodgers.

**Q. Right, but you would agree that a player has more bargaining power when he has the ability to sell his human capital to another team than when his only choices are play for the Dodgers or don't play at all, correct?**

A. Bargaining power over -- look, over just his salary?

**Q. Yeah.**

A. Well, if somebody else is going to pay for him and if the reserve clause -- and they've got total free agency, let us say, which they don't but

let us say, then the resource in question, all other things the same, is going to capture -- I mean, you saw higher salaries in baseball after the end of the reserve clause.

**Q. Why?**

MR. ISAACSON: Sorry.

BY THE WITNESS:

A. Because the person being paid for the -- for the resource was different than it was before.

**Q. I don't under --**

A. Doesn't mean people are paying less for the resource. So, I mean, look at it. The efficiency of that market could have gone down, it could have gone up. I don't know, I haven't studied it, but it went up because it was a transfer of property rights to the baseball players.

**Q. Baseball player compensation went up because property rights were transferred from the team to the players, correct?**

A. That's what the reserve clause did.

**Q. Is it your view that the reserve clause was procompetitive?**

A. No.

**Q. Is it your view that the reserve clause was -- why wasn't it procompetitive?**

A. Because it was permanent, and so it existed -- I mean, you're asking me things about the institutional features of Major League Baseball that, you know, I'm not a lawyer. So they had an antitrust exemption and all sorts of other things that went back in time, but the contracts were in effect for the entire -- the obligation was for the -- for the baseball players' entire baseball -- at least Major League Baseball career. We don't see that in this case.

**Q. So there's something about the permanence of the restriction on mobility that will lead you to believe that it's procompetitive or not procompetitive?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Whether it's procompetitive or not I'm not offering an opinion on because I haven't studied Major League Baseball, as I said, but there's a major difference between the contracts here and the contracts there and that is that the contracts here one becomes a free agent at the end of one's contract.

PUBLIC COPY – REDACTED

**Q. And by becoming a free agent -- well, so is it your view that the contracts that the UFC has are more procompetitive than the reserve clause because the term is shorter?**

MR. ISAACSON: Objection, misstates the testimony.

BY THE WITNESS:

A. Like I said, I haven't determined how noncompetitive they are. I'm telling you that there's a major difference in the contracts -- when I say "they are," I meant the baseball contracts. There's a major difference in the contracts in that here the contracts have many of the current elements of Major League Baseball, so that right of first refusal and all that other jazz during the period, but they got rid of the reserve clause and that had consequences for the earnings of baseball players, but there's no -- nothing here that's similar to the reserve clause. That's my point.

**Q. Would you agree that the baseball teams continued to invest in promoting players after the reserve clause was eliminated?**

A. You mean is there a positive amount?

**Q. Yeah.**

A. I don't know. I assume so.

**Q. Would it be -- do you know one way or another whether baseball teams' investment in baseball players went up or down after the elimination of the reserve clause?**

A. Now, that's impossibly complicated because the technology of marketing sports in general changed throughout the 1970s after the baseball -- after reserve clauses was eliminated. You know, baseball teams started televising, they started televising globally, the value of franchises changed so dramatically. 900 other things changed. So whether they invested more in terms of total dollars I don't know.

**Q. Okay. So hold everything else equal. What hypothesis would you have about the effect on investment in promotion of baseball players with the elimination of the reserve clause have had?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Repeat your question.

**Q. Yeah. So I'm just trying to understand your -- what your economic hypothesis would be, what would your opinion be if you had to come up with a hypothesis about whether the elimination of the reserve clause increased or decreased the**

**investments in promotion of baseball players. All things equal, what would you say?**

MR. ISAACSON: Objection to form, compound, calls for speculation.

BY THE WITNESS:

A. Well, first of all, they were investing in baseball players and -- in the sense of the Minor Leagues and things like that that they could collect the returns on. Some of that investment may have been reduced. I haven't studied it. I don't -- I don't know. I also don't know how much investment in developing personas and stuff like that went on in -- in Major League -- by teams. So how much of the value of Nellie Fox was specific to the White Sox. I don't know, but to the extent that there was investment in -- the situation was different because, you know, the American League was a league of teams. And so a lot of the investment inured to the league in a sense. And I don't know how -- I don't know how they changed their behavior. I haven't studied how much promotion they did. I don't know if they came up with a TV show about baseball players that piqued the interest of fans in a particular -- in a particular organization. I just don't know. I

haven't studied it.

**Q. Is it your opinion that absent the -- in a world without the challenged contracts that Zuffa would not have produced the Ultimate Fighter television show?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Well, no. All I know is that it increased the value of -- you know, I can't say for certain that there would have been no TV show, but the returns to that TV show would certainly have been reduced. So the incentive to produce that TV show would have been lessened.

**Q. But you don't have an opinion one way or the other about whether that TV show would have been produced in a word absent the challenged contracts, correct?**

A. Could it have existed; is that your point?

**Q. Yes.**

A. Well, I think they would have done a calculation that says our return on this TV show is materially lower. So whether a TV show or a TV show with the same amount of resources devoted to it would have been -- would have been produced, it wouldn't have been the same amount of resources

PUBLIC COPY – REDACTED

because they would calculate that we're less likely get those returns.
**Q. Did you, yourself in this case do that computation?**
A. I just did it as we sat here.
**Q. But you don't in your report have any computation about the expected returns of the Ultimate Fighter in a world absent the challenged contracts, correct?**
A. Well, it's a general principle of economics that if you -- if a firm invests in something on which it can't collect the returns or on which everybody else gets to collect the returns it's less likely to occur. So, you know, we farmers don't advertise, that sort of thing.
**Q. Why don't we farmers advertise?**
A. Because if I advertise -- if I spend a lot of money advertising the benefits of eating wheat, the benefits inure to all the other wheat farmers and only a very small portion to me. So producing the Ultimate Fighter was -- you know, had a combination of specific value to -- to UFC, but it also had an effect on the value -- value of other promoters.
**Q. So there -- there are two different**

**effects that investment of the Ultimate Fighter had. One was to enhance the value of the UFC brand and one was to enhance the value of the fighters who could then walk without the challenged contracts; is that fair?**
A. I don't know what you -- what fighters? It enhanced the market for all fighters. It doesn't have particularly --
**Q. I understand.**
A. It might have had a different impact on Zuffa fighters than for Strike Force fighters or something, but it was a -- to the extent that -- you pointed to two effects, you said it affected MMA and it affected Zuffa. And the MMA part -- or it affected Zuffa fighters and MMA fighters in general and the MMA part in general helped the Zuffa fighters and it helped the whoever fighters.
**Q. And your opinion --**
A. And the promoters.
**Q. Right. And your opinion is that in a world without the challenged contracts in order to determine whether Zuffa would have invested in the ultimate fighter television show they would have had to do some kind of computation about the**

**returns to that investment resulting from the part of the investment that enhanced the value of the UFC brand versus the -- versus the part of that investment would enhance MMA generally; is that fair?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. Whether they did a formal calculation of here's what the spill-over effect is I don't know. I'm telling you a general principle that when you can't collect the returns on your investment you're less likely to do it.
**Q. It's fair to say that in this case you did not do any such spill-over computation, correct?**
A. Well, what we see is that -- I mean, you can look at the charts, that after the Ultimate Fighter revenues per event went way up. And so -- for Zuffa events. So some of that was decidedly specific, in my opinion.
**Q. And that means that it's possible that in the but-for world absent the challenged contracts Zuffa might have made some investments in the Ultimate Fighter, correct?**
A. Well, some, yeah.
**Q. And you haven't computed the amount of**

**diminished investments in the Ultimate Fighter that Zuffa would have done absent the challenged contracts, correct?**
A. Beyond saying the returns are affected in the way I indicated and that it's likely to be less, no.
**Q. You do not quantify the total amount of dollars that the UFC spends on promoting fighters anywhere in your report, correct?**
A. No, I don't think I do.
**Q. And you don't quantify the total amount of dollars that the UFC spends per fighter in any particular year on promotions, correct, in your report?**
A. No, not in my report.
**Q. And you don't, in fact, quantify the amount that the UFC spends on promoting any fighter at all in your report, correct?**
A. Well, it would be difficult to do so. So in the extent -- to the extent that promoting means matching and all those other things, I don't know how I would match that to any particular fighter. So they're making strategic decisions with regard to the assets with whom they have contracts and those are costly things to do.

PUBLIC COPY – REDACTED

**Q. You don't in your report quantify the total amount of promotional investment in athletes that you believe would be lost if the challenged contractual provisions were eliminated, do you?**
A. You mean do I have a dollar amount on it?
**Q. Correct.**
A. We didn't put a dollar amount, no.
**Q. You don't quantify in your report the total amount of promotion dollars that the UFC invested in its brand during the class period, do you?**
A. Not in my report, no.
**Q. And you don't quantify the total amount of promotion dollars that the UFC invested in promoting its fighters separate and apart from promoting its brand in your report, correct?**
A. I'm confused by your question. Are you asking whether I have a number?
**Q. Correct.**
A. For the amount of promotional resources devoted to augmenting the -- the reputations of fighters as -- as Zuffa fighters?
**Q. During the class period.**
A. I don't have that number.
**Q. And you don't quantify the total amount of**

**investments in fighters that would have been foregone in the but-for world, correct, a number?**
A. What's the but-for world?
**Q. Absent the challenged contracts and challenged conduct.**
A. Okay. We're going in circles again. So is the but-for -- you need to define the but-for world. And is it that Zuffa can't do this and every- -- these things and everybody else can or that nobody can do this? And I think the only thing you're arguing here is that the but-for world is that only Zuffa can't do it; is that correct?
**Q. I'm asking about your report. What did you assume about the but-for world in your report? Which of those two scenarios did you assume?**
A. I assumed that either one of them could be the but-for world that you're talking about because it's not my job to determine what the but-for world is. What is it that -- you've brought this case and I understand your arguments. What is it that you see as the but-for world? Is it that these contracts, call them contract restrictions, the challenged conduct, are they challenged conduct for Zuffa so that only -- so that if these things are found to have had the impact that you claim that

Zuffa can't do it but Bellator can and everybody else can, or is it that in general you want to have a rule for the entire MMA market that nobody can have these kinds of contract restrictions, that nobody can write contracts like this? And that's -- that's important. That's the point I've been making before lunch too, that's important.
**Q. I understand you think it's important. And I'm trying to understand what assumption you made about the but-for world in your report. Which one of those did you assume, if either?**
MR. ISAACSON: Objection, asked and answered.
MR. CRAMER: I don't think I got an answer.
MR. ISAACSON: Yeah, you did.
BY THE WITNESS:
A. I've given you my answer with regard to both of those worlds which seem to be the two that you might specify as the way -- you have a view, I think, of how the industry ought to be organized that's different than the way it's organized, and I can't give you a completely specific answer to that question without knowing what that view is. So if you tell me that in the but-for world all other MMA

promoters get to use these contract restrictions, that's one but-for world. Or you might say in the but-for world no MMA promoters get to use these contract restrictions. The -- the implications for the industry, for Zuffa, for Bellator, for fighters are all different in those two but-for worlds.
**Q. And it's fair to say that you didn't quantify the amount of promotion dollars that would have been foregone in either of those but-for worlds in your report, correct?**
A. I've given you the analysis that says if you can't collect the returns, you're not going to invest. So the -- there would have been more promotional dollars in a world -- by Bellator in a world where Bellator got to use those contracts and Zuffa didn't than in a world where nobody gets to use the contracts.
**Q. Can you show me a table in your report where you quantify the amount of additional promotional dollars that -- I'm sorry -- the amount of promotional dollars that would be lost in either of those two but-for worlds? Is there a table in your report where I can find that?**
A. No. That's not part of my analysis or part of my opinions.

PUBLIC COPY – REDACTED

**Q. Did you evaluate whether in the but-for world, in either of the two but-for worlds if MMA promoters reduce the amount they spent on promoting fighters that fighters or their management would spend more on promoting themselves?**

A. So did I analyze substitution; is that what you're talking about?

**Q. Yes. Did you?**

A. Well, the -- the promotional activities of -- you'll have to explain what you mean by promoting themselves. So would an individual fighter and his manager hire an advertising agency or -- or something like that or develop their own TV show; is that what you have in mind?

**Q. Are you aware that individual MMA fighters do spend money on promoting themselves through social media and otherwise?**

**I understand that, but how much they spend -- you know, I've not studied how much they've spent, but are you asking me whether there would be their own TV shows and things like that? They would not invest in things that were specific to the value of a particular promoter. They would invest in things that just had to do with their persona generally and to the extent that promoters**

**have a comparative advantage in developing those things, because, after all, the individual fighters don't control with whom they fight, they don't control the sequencing of the -- they don't internalize all those things, which is why they have multi-bout contracts with the promoters. So that how much would occur depends on who has a comparative advantage in producing that type of capital, in making those investments, and the evidence in this market is that promoters -- I'm not just saying Zuffa, I'm saying promoters have a comparative advantage in making those types of investments.**

**Q. And --**

A. And that's why the contracts look like what they do.

**Q. And you would agree that the fighters have a comparative advantage in promoting their own image to the public, correct?**

A. You know, you can't even say that. It's that if they promoted their own image to the public, they would -- they are way less likely to invest in aspects of that image that inure to Bellator or to Pride or something like that. Pride's out of business. One. So who's got the

comparative advantage of -- in investing is determined by the way the market works, and the evidence is, as I said a minute ago, that the nature of these contracts that are used by all the major promoters is that the comparative advantage in investing resides disproportionately on the promoter's side because of all the things they do to promote interest in matches and athletes.

**Q. What I hear you saying is that a fighter doesn't have an interest in promoting a promoter -- or advertising a promoter. My question is whether a fighter has more of an interest in promoting and advertising himself in his own image than a promoter would have in investing in a fighter's image, all things equal?**

A. Forgive me for putting it this way, asked and answered. I -- I --

**Q. I don't think I got an answer.**

A. Well, you did.

**Q. Okay. It's fair to say that it's also not part of your analysis to compute the total amount of output of MMA events that might have flown from any foregone promotional dollars, right? Let me ask -- let me -- strike that. Let me ask it another way.**

**Do you in your report in any place compute the reduced revenues to MMA events that would have occurred in either of the but-for worlds that you**

PUBLIC COPY – REDACTED

**discussed a moment ago?**
A. Well, I mean, I couldn't because you never told me what the but-for world is.
**Q. And if you couldn't, you didn't, right? You did not compute the lost output --**
A. Well, if you don't tell me what the but-for world is, then -- then I don't know what the but-for world is, do I?
**Q. So it's fair to say that in doing your report you didn't know what the but-for world was, correct?**
A. I only know that Dr. Singer specifies a but-for world where his misbegotten foreclosure share would have been 30 percent rather than what it is, but behind that he never says what the but-for world would be. He never explains how that share would come to be what it is and which parts of the contract restrictions would lead to it being 30 percent rather than what it is. So, you know, one of the weaknesses of Dr. Singer's report is he never says -- he gives all this opinion about what competition would do, but he doesn't tell us what competition would look like.
**Q. You don't compute in your report the amount of revenues from MMA events that would be**

**lost in either of the but-for worlds that you believe might be relevant in this case, correct?**
A. Well, I don't know if those are the only two --
MR. ISAACSON: Objection, asked and answered.
BY THE WITNESS:
A. -- but-for worlds.
THE REPORTER: I'm sorry.
THE WITNESS: I'm sorry. We spoke --
MR. ISAACSON: Objection, asked and answered.
BY MR. CRAMER:
**Q. Let me ask it this way. You don't compute the amount of MMA revenues that would be lost in any possible but-for world in your report in this case, correct?**
A. As I said, without knowing what you think the but-for world should be, it's impossible for me to understand or for anybody to understand the market structure and the market -- the way this market would -- would play out. I can give you directions of magnitudes, I can say what incentives would look like if there was -- if there were no contracts whatsoever, but, you know, you can think

of the myriad ways that Dr. Singer's foreclosure share, as he calls it, could have gotten from what it is to 30 percent and the different ways that could happen have implications. So there's -- and I don't know how many different ones there are. So I just don't know what the market -- I need some guidance from the Plaintiffs to say this is what we think the world's going to look like and you just haven't said. You just haven't said it's not that.
**Q. And it's fair to say that given that you didn't compute the amount of loss revenues in any potential but-for world, you didn't compute the amount of what you believe would be lost compensation to MMA fighters in the but-for world; am I correct about that?**
MR. ISAACSON: Objection to form.
BY THE WITNESS:
A. I don't even know if it's going to be lost compensation in some but-for world. There's no evidence that -- in this record that the earnings of MMA fighters have been adversely affected in any way by the challenged conduct.
**Q. My question is you have said that in the but-for world that directionally MMA revenues would**

**be lower, correct?**
A. Directionally? Which but-for world? I mean, if you said, look it, the but-for world is one where the only thing we're going to do is, I don't know, make the right of first refusal two and a half months -- excuse me -- the exclusive negotiation period two and a half months instead of three months, that's one thing. If you're going to say I'm going to get rid of them all for Zuffa, that's another thing. If I'm going to get rid of them all for everybody, that's another thing. Am I going to take different combinations of the contract restrictions and say they're okay, but those aren't okay, you've got to tell me. So directionally if you got rid of some of these the returns on investment by promoters are lower. That's what I can tell you and that's what -- and that's what the promoters have in mind that, you know, we want to invest in these things, we've got to make sure that we get our returns.
**Q. All right. I understand, you've made the point repeatedly that you don't understand what Plaintiffs are saying the but-for world would have looked like. I'm just asking whether in your report you quantified certain things. So would you**

PUBLIC COPY – REDACTED

**Q. Yes.**

A. Depends on what I relied on it for. So you said footnote 34? That's the Singer report.

**Q. Footnote 84.**

A. Oh. I have to remember what I relied on here. 84.

**Q. You relied on page 14 of the document.**

A. Hold on. Okay. Where's 84? Okay. So footnote 84 merely refers to the fact that Mr. White was thought to be part of the talent they acquired in the sale of the company. And I haven't looked at this in ages. I assume that statement is in there somewhere. What was the other one?

**Q. Footnote 365 on page 108.**

A. I've got to look at what we said that refers to.

(Witness reviewing document.)

BY THE WITNESS:

A. Okay. That refers to residential buys.

**Q. So you rely in your report in two occasions on information that's in this memo, correct?**

A. Yes.

**Q. Do you know who prepared this memo?**

A. Was this Deutsche Bank? I can't remember.

**Q. Do you know whether WME used this document in the course of their evaluating whether to purchase Zuffa?**

A. I believe they did, but I don't recall the specifics.

PUBLIC COPY – REDACTED

238

240

Q. Okay.

Is there a logical connection between the degree to which Zuffa has its top fighters signed to long-term deals and Zuffa's ability to maintain its fighter wage share at or below current levels?

A. Not that I know of.

239

241

PUBLIC COPY – REDACTED

**Q. Well, why would revenue from live events experience volatility with fight card quality?**
A. I assume that if quality is volatile then revenues from the events could be volatile.
**Q. Why?**
A. Because people like to watch quality fighters.
**Q. All things equal, the higher quality fighter the more revenues an event is likely to generate for Zuffa, correct?**

A. That sounds right.
**Q. All right. You can put that document aside.**
MR. CRAMER: I'd like to mark as the next document Topel Exhibit --
THE REPORTER: 7.
MR. CRAMER: -- 7. Thank you.
(Topel Exhibit 7 was marked as requested.)
BY MR. CRAMER:
**Q. Topel Exhibit 7 is a document entitled "UFC Company Overview." It bears the Bates range ZFL-2677898 through 7967, and I will represent to you that you listed this document on your materials relied upon.**
A. Okay.
**Q. Do you recall sitting here today what in this document you relied upon?**
A. No.
MR. ISAACSON: He'd have to go through it page by page to answer that.
BY MR. CRAMER:
**Q. All right. You don't need to do that. That's fine. If you can't -- if you don't remember just looking at it, that's fine.**

**You recall seeing this document.**
A. You know, I recall seeing a lot of documents and I recall documents like this. I'm looking at a page here with check marks and X's and things and I recall seeing something like that. And I recall some of these photos. Whether this is the exact document I'm recalling, I can't -- I can't say.

**Q. But it believed it to be accurate and you relied upon it in this case, correct?**
A. It's in my -- the list of things relied upon and I would have to look through the whole thing and search through my memory to find out how we relied upon it.
**Q. Turn to the last paragraph on this page.**
A. Okay.

PUBLIC COPY – REDACTED

MR. ISAACSON: You want him to go through each page of this and --

MR. CRAMER: Just on this page do you see --

BY THE WITNESS:

A. On this page?

**Q. Yes.**

A. Why would you? All right. I just -- I'm -- I'm mystified by your question. I'm sorry.

**Q. Okay. It's fair to say that you don't mention this document's -- this -- strike that. Withdraw the question. You can put it aside.**

MR. CRAMER: I'm going to mark the next document as Topel Exhibit 8.

(Topel Exhibit 8 was marked as requested.)

BY MR. CRAMER:

**Q. Exhibit 8 bears the Bates range ZFL-1484034 through 4037, and the first page of the document is an E -- a series of e-mails between John Mulkey and Steven Tecci and they're all in August of 2013 and then there's some attachments. Have you seen this document before?**

A. I've seen charts like this. I don't remember if it was this document. I'm sure if I cited it you're about to tell me.

**Q. As far as I know, you didn't cite it.**

A. Okay. I mean, you see a lot of charts in a case like this. I could have seen this.

**Q. Do you know who John Mulkey is?**

A. I don't recall.

**Q. Does it jog your recollection if I tell you that Mr. Mulkey is the -- or was the CFO of Zuffa?**

A. How about if I just take your word for it?

**Q. Okay.**

**Turn to the first page, the first attachment, page 1484035, and look to the bottom of the page.**

A. Yes.

PUBLIC COPY – REDACTED

250

252

251

253

Q. I'd like to talk for my last 20 minutes of the day about the Strike Force preacquisition bout data. Do you recall issues surrounding that data in your report?

A. Yes, I do.

Q. Okay. You say in your report that when you removed the Strike Force preacquisition bout data from Dr. Singer's foreclosure regression the negative correlation between foreclosure and compensation share disappears in two of Dr. Singer's three measures of foreclosure; do you recall that?

A. Yes.

Q. And it's your opinion that it's appropriate to remove that data because of certain statistical tests that you ran; is that right?

A. Yes.

Q. And the statistical tests that you ran are called the Chow test; is that right?

A. It's an F test.

Q. A Chow test is a version of an F test; is that right?

A. Yes.

PUBLIC COPY – REDACTED

**Q. Okay. Turn to paragraph 155, please. Okay. The Chow test, in your view, determines whether factors that contribute to the differences in UFC and Strike Force athletes' compensation have been controlled for; is that right?**

A. Where are you reading?

**Q. Am I right that the null hypothesis does not mean that all regression coefficients are different as between Zuffa and Strike Force,**

**correct?**

A. Yeah. That was the point I was making.

**Q. The null hypothesis would be rejected even if only one out of the 63 coefficients was different between Strike Force bouts and UFC bouts, correct?**

A. No. No. It would -- the F test tests whether all -- you can reject the hypothesis that they're all simultaneously zero. It could be that some of them are significant or nonzero, some of them are zero. It's just the nature of a hypothesis test that --

**Q. But the hypothesis is whether all of the 63 regression coefficients between the Strike Force preacquisition bouts were identical to the coefficients on the Zuffa bouts, right?**

A. Yeah. We're testing whether the structures of the two models are identical.

**Q. But the hypothesis is whether all of them, all of the coefficients as between the Zuffa data and the Strike Force data are the same, right?**

A. As I said, we're testing the joint hypothesis whether all the Strike Force -- they're included in the model as interactions between Strike Force and the regressor in the question and

we're testing the joint hypothesis that they're all zero. So does Strike Force have a material impact -- does accounting for differences in the structure of the model at Strike Force -- between Strike Force and Zuffa have a material impact on the fit of the regression, and the answer was yes.

**Q. Let me ask it this way. Your running of the Chow test allowed for no differences at all in the way in which fighter compensation is determined between the Strike Force data and the Zuffa bout data; is that right?**

MR. ISAACSON: Objection to form.

BY THE WITNESS:

A. Differences at all? It tested what I just said. I don't think I can say yes to your question. We tested whether the effects -- the difference in the effects of these variables at Strike Force were jointly significant, and the answer was yes.

**Q. All right. Turn to paragraph 155. You cite the ABA section of antitrust law, second edition, 2010 at 1 -- page 179 in footnote 221; am I right?**

A. Yes.

**Q. And you cite that for the appropriate statistical response to finding that there are different coefficients for different sets of data on the explanatory variables, right?**

A. Yes.

**Q. And that's your basis for excluding the Strike Force data, right?**

A. We tested whether they came from the -- they were generated by the same model, and the answer was no.

THE VIDEOGRAPHER: Five minutes on disk.

MR. CRAMER: Okay.

BY MR. CRAMER:

**Q. The ABA manual that you relied upon -- look at the last sentence of footnote 221 which is quoting from the ABA manual. It's on page 68. It says "If the regression model fails a Chow test 'the appropriate model needs to adequately control for such differences'"; do you see that?**

A. I do.

**Q. Did you try and run a model that allowed the coefficients to vary as a means of controlling for the differences between the Strike Force data and the UFC data?**

A. Well, by definition when you put in the

PUBLIC COPY – REDACTED