# Exhibit 38

Deposition of Roger D. Blair (December 8, 2017) (excerpted)

PUBLIC COPY

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
       Plaintiffs, )
)
       vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
       Defendant. )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROGER D. BLAIR, Ph.D.

Orlando, Florida

December 8, 2017

7:57 a.m.


Reported By:
Dawn A. Hillier, RMR, CRR, CLR
Job No. 52572

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

14

1  the NCAA cartel. I have another paper that's in
2  progress on rethinking baseball's antitrust exemption.
3       I have a chapter in the Oxford handbook on
4  sports economics regarding the -- you know, regarding,
5  again, baseball's antitrust exemption. And a paper in
6  the antitrust bulletin that was addressing the
7  inferences one might draw with respect to the treatment
8  that Barry Bonds got at the end of his career when his
9  contract ran out and he couldn't find anybody that
10 wanted to sign him.
11      There probably are some other things that I'm
12 not thinking of.
13   Q   It sounds like you've written pretty widely in
14 the economic analysis of sports or sports economics; is
15 that right?
16   A   Well, to some extent, yes.
17   Q   What, if anything, would you say defines
18 sports economics as a distinct field? Or distinguishes
19 the study of sports as an economist?
20   A   The economics is not different because we're
21 talking about sports. The institutions are -- you know,
22 may be different. There are -- when we're talking about
23 professional sports this spans all kinds of leagues and
24 organizations. So, you know, you could be talking about
25 the PGA Tour, which is an organization as opposed to the

15

1  National Football League, which is a -- which is a
2  league. You know, as I say, the economics aren't really
3  different. The institutions are somewhat different.
4  The -- there are some unique or idiosyncratic rules that
5  show up in collective bargaining agreements that, you
6  know, that come into play that make things -- they
7  affect the analysis, but they don't change the central
8  focus which should be in terms of -- in most cases, in
9  terms of microeconomics. To some extent, there are
10 issues that surface in terms of, like, stadium financing
11 that -- or franchise location that, you know, that give
12 rise to economic impact studies which are kind of a
13 macroeconomics thing, although, you know, they're not
14 economy wide, they're, you know, focused in or
15 centralized in, you know, certain locations.
16      You know, and there were other sorts of
17 regulations that come into play, like Title IX and...
18      But now, of course, we're getting into the
19 amateur sports. You know, so there's the NCAA, which
20 has, you know, got, you know, certain -- you know, sort
21 of unique features. But nonetheless, you know, the
22 tools of analysis are common to, you know, the economist
23 tool kit, so to speak.
24   Q   Are there any -- I think -- well, you
25 mentioned there are some idiosyncratic rules and CBAs,

16

1  but other than that, are there any other distinguishing
2  characteristics about the labor markets in sports as
3  compared to other industries?
4    A   Well, I mean, I don't know what you're
5  referring to or, you know, I mean, I'm assuming that
6  you've got something in mind.
7       But --
8    Q   Well let me -- let me clarify -- go ahead.
9    A   No. You go.
10   Q   All right. So, I guess what I'm getting at is
11 I guess some economists study industrial organizations
12 and study the way firms interact in a variety of
13 industries and don't necessarily separate out firms in
14 one industry from another. And I guess, is there
15 anything -- is there any reason -- is there any reason
16 why, looking at labor markets and sports, for example,
17 you might bring tools to bear that are different than a
18 standard -- than the standard methodologies of
19 industrial organizations?
20   A   Well, so, there are some things that are a
21 little -- I guess a little unusual. A lot of the
22 professional athletes are unionized. And the union
23 is -- what the union bargains for is a little strange in
24 this sense. That the unions don't appear to be at all
25 concerned with individual compensation. And, so,

17

1  they're sort of bargaining for a pot of money that the
2  athletes can then fight over. And, you know, I mean,
3  so, you have, you know, dollars associated with, you
4  know, a particular team. And then the athletes that are
5  going to be employed by that team essentially have to
6  try to get as much of that pool as they can,
7  individually, which is, you know -- I mean, usually what
8  you think of with unions, is that they're trying to
9  negotiate so that, you know, everybody's getting more or
10 less the same thing. And, so, you know, that would
11 be -- that would be a difference, or something that's
12 sort of idiosyncratic.
13      You know, at some level, you know, for some of
14 the -- some of the athletes are -- well, all athletes
15 have some uniqueness to their set of skills and
16 abilities. You know, some are bigger, some are faster,
17 some are stronger, some are more durable. You know,
18 some have a better feel for the game than others. And,
19 you know, there are some that, you know, that are kind
20 of superstars. And, you know, and given their skill set
21 and their abilities, they make a lot of money that --
22 and there are players that play other positions that are
23 less talented, or at least less uniquely talented. And,
24 you know, and they make less money. And, you know, so
25 there are differences like that.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

18

1  Q  I think you mentioned the uniqueness of a set
2  of skills and abilities that certain players have.  And
3  that in professional sports, tell me if I'm accurately
4  characterizing what you said, that in professional
5  sports, there are superstars as well; is that right?
6      A  Yes.
7  Q  Is it fair to say that the unique set of
8  skills that athletes have or their fame plays an
9  important role in the revenues generated by sports
10 organizations?
11     A  Yeah, sure.  I mean, because -- I mean,
12 because of fan appeal and, you know, the fans are more
13 willing to pay to watch some of these so-called
14 superstars.
15     Q  Exactly.
16     A  Yeah.  Sure.
17     Q  Does that characteristic of the product that's
18 being created in that -- in professional sports, does
19 that one characteristic that distinguishes it from other
20 industries where the customers of the product don't
21 really know or care who the workers are that made it,
22 necessarily?
23         MR. WIDNELL: Objection, form.
24         THE WITNESS: You mean, like when -- if I buy
25 a Toyota, I don't really have any idea who

19

1  assembled the parts and who designed it and that
2  kind of thing?
3  BY MR. SILVERMAN:
4      Q  Exactly.
5      A  And so I'm not willing to pay a premium for
6  that Toyota because some, you know, revered designer,
7  you know, sort of designed how --
8      Q  Right.
9      A  -- the car looked.
10        Okay.  So, that's -- you know, lots of
11 products that we buy are like that; right?  You know,
12 some of them -- some of the products, however, are
13 endorsed by movie stars or sports stars or, you know,
14 people that have certain appeal to consumers.  But I
15 guess your question is, you know, am I particularly
16 interested in going to watch the Orlando Magic play
17 because they're playing against the Cleveland Cavaliers
18 and I want to watch LeBron James play.
19     Q  For example.
20     A  Is that --
21     Q  Yeah.  Well, that's part of my question.  But,
22 yeah, can you answer that question?
23     A  Yeah.  Sure.  I mean, yeah.  Of course.  I
24 mean, you know, people --
25     Q  Yeah.

20

1      A  Yeah.  I mean, sure.  People want to, you
2  know, may well want to see somebody like LeBron James
3  play, even though he's playing for the visiting team.
4  Sure.
5      Q  So, given that sports has this characteristic,
6  which I won't call unique, but different then, let's
7  say, the Toyotas, for example, in that the ultimate
8  consumer is the fans may care about the identity of
9  the -- or the performance of the individual workers
10 producing the product, does that give rise to any unique
11 issues in studying sports as a field, as opposed to
12 other -- I'm sorry, sports as an industry as opposed to
13 other industries?
14         MR. WIDNELL: Objection, form.
15         THE WITNESS: Well, I mean, that's a specific
16 feature of the demand on the part of the fan base
17 or consumers, you know, that can influence how many
18 people are willing to buy tickets to watch.  And
19 how much they're willing to pay for those tickets.
20 But, you know, the determination of those issues
21 depends on, you know, a host of factors in addition
22 to whether some famous superstar is there or not.
23 You know, has to do with promotion and has to do
24 with how well the team is doing, or teams, and how
25 close the game might be and therefore how exciting

21

1  it might be to watch.  And there's a whole host of
2  things that are, you know, specific things that,
3  you know, one might want to think about when
4  analyzing questions in sports.
5  BY MR. SILVERMAN:
6      Q  Changing gears for a sec.  Have you testified
7  in court before as an expert witness?
8      A  I have, yes.
9      Q  How many times?
10     A  My best estimate is about 25 times.
11     Q  About how many of those cases were antitrust
12 cases?
13     A  Assuming that 25 is a good estimate, I would
14 say probably something in the order of the high teens.
15 Maybe as much as 20, but...
16        That's about as good as I can do.
17     Q  And have you testified on both the plaintiff's
18 side and defense side in antitrust cases?
19     A  I have, yes.
20     Q  How many times have you had your deposition
21 taken?  That might be a tough one.  If you can estimate.
22     A  Probably -- probably about 60 times.
23     Q  And how many times have you been retained by
24 Boies Schiller, Zuffa's attorneys in this matter?
25     A  In any matter?

6 (Pages 18 to 21)

**PUBLIC COPY**

**Page 22**

1  Q   In any matter, yeah.
2  A   All right.  So, I'm hesitating because I guess
3  the answer's twice, although the retentions were kind of
4  simultaneous.
5  Q   What were the two matters?
6  A   Well, there was, you know, a preliminary, I
7  guess, investigation by the Seattle field office of the
8  FTC that dealt with matters that were, you know, pretty
9  much the same thing as the matters in this case.  And
10 then there was this case.
11 Q   Have you been retained -- other than those two
12 matters, have you been retained as an expert witness in
13 any other cases involving the MMA industry?
14 A   No.
15 Q   Or combat sports?
16 A   No.
17 Q   Have you ever -- before working on this case,
18 have you ever studied combat sports?
19 A   Not in depth.  But, you know, in teaching a
20 sports economics class, I made the mistake of sending
21 out a questionnaire to the class asking them, in the
22 beginning, what they might be interested in my making
23 sure that I covered.  And a couple of them pointed that
24 they were interested in MMA.  And so I had to go find
25 out something about it so that I could, you know,

**Page 23**

1  conduct a sensible class.
2      But beyond that, I would say no.
3  Q   What did you -- what did you research for the
4  purposes of your class on MMA?
5  A   I don't recall at this point.
6  Q   Have you retained -- other than the two --
7  this case and the other one you mentioned, have you ever
8  been retained as an expert witness in any other cases
9  involving other professional sports organizations?
10 A   Okay.  So there was a matter involving the PGA
11 Tour that I did some work on a while ago.  And then
12 there was -- well, this didn't deal with organizations.
13 But I mean, I worked on an RPM case that involved
14 Callaway Golf.
15 Q   By RPM, you mean resale price maintenance
16 or...
17 A   Yes.
18     And then there was another matter for Callaway
19 that dealt with a dispute with the -- I forget the name
20 of the organization, but it's the actors' guild, you
21 know, the union.
22 Q   SAG?  Is that the Screen Actors Guild?
23 A   Yeah.  Yeah.
24     Other than that, I don't -- I don't
25 remember -- well, there's something -- there was

**Page 24**

1  something that I worked on for Acushnet which is the
2  title that makes Titleist golf balls.
3      I don't remember any other cases.
4  Q   Okay.  What was the PGA Tour case about?
5  A   Well, this was some time ago.  But it had to
6  do with -- you know, there was some dispute about
7  eligibility requirements for the players.  So, as you
8  might imagine, when they put on an event -- I think this
9  was for the -- I think this was actually for the senior
10 tour events.
11     You know, there's only so many players they
12 can have in the field.  And they had eligibility
13 requirements.  And somebody was objecting to the
14 eligibility requirements, I guess.  I think that
15 that's -- as best I can remember, that was the issue.
16 Q   And who were you retained by in that case?
17 A   Well, it was -- I was retained by a lawyer
18 representing the PGA Tour, or the senior tour, or
19 whichever it was.
20 Q   And was the tour the defendant in that case?
21 A   Yes.
22 Q   Were the claims -- were there antitrust claims
23 involved, if you recall?
24 A   Well, you know, I don't recall specifically.
25 But there were probably some antitrust claims, you know,

**Page 25**

1  regarding the eligibility requirements.
2  Q   What was the basic opinion you offered in that
3  case, if you recall?
4  A   I don't remember.
5  Q   Has any portion of your testimony ever been
6  excluded by a court?
7  A   There was one case where I think that the
8  district court objected to the way that I defined a
9  relevant market for -- well, it was a relevant market
10 for the case, but it was, you know, driven by the -- you
11 know, a specific hospital in a, you know, fairly
12 isolated area.  And, you know, I think that there was
13 some question about that that became moot because the
14 case that was on appeal was settled.  I can't think of
15 anything beyond that.
16 Q   Do you remember the name of that case?
17 A   Not specifically, no.
18 Q   Was it M&M Medical Services -- some medical
19 supplies and services versus Pleasant Valley Hospital?
20 Does that sound familiar?
21 A   Okay.  So, I know there were some -- these
22 were -- there were a couple of durable medical equipment
23 cases that I worked on.  And, you know, and one of them
24 was the case that I'm referring to.  But I don't
25 remember whether it was M&M specifically or not.

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

|  | 114 |  | 116 |
|---|---|---|---|
| 1 | But, you know, one of the things that we're | 1 | I'm sorry, how long does it take to get from that |
| 2 | implicitly assuming is that all units of the input | 2 | equilibrium one to equilibrium two.  And we don't |
| 3 | are homogenous so that, you know, whoever, you | 3 | really -- we don't really have much to say, |
| 4 | know, you know, widgits are the same thing and | 4 | theoretically, about any kind of variations that |
| 5 | they're identical.  And now, it may be that in | 5 | may exist during that transition period. |
| 6 | order to get more of them, you have to up the | 6 | Now, one would expect, once you get into |
| 7 | price.  But that doesn't mean that they somehow | 7 | equilibrium, again, that the terms would be, if not |
| 8 | become different then.  They'll still provide, you | 8 | identical, they would be the value of the total |
| 9 | know, the quality and, you know, in every dimension | 9 | compensation -- bundle of compensation would have |
| 10 | is the same. | 10 | to be valued pretty much the same by the |
| 11 | The other thing is that, you know, that model | 11 | individual -- if we're talking about labor, the |
| 12 | is a kind of, you know, spot market model in the | 12 | individual workers, if they're -- if they have |
| 13 | sense that, you know, we're talking about, you | 13 | identical skills so that this model is really |
| 14 | know, I'm going to buy, you know, rolls of copper | 14 | appropriate, then, you know, it may well be that, |
| 15 | wire because, you know, for, you know, an | 15 | you know, I'm -- I'm more risk averse than you are. |
| 16 | electrical contracting company.  And in looking at | 16 | So when I am trying to land a job, I want some |
| 17 | that, you know, I'm going to -- you know, the issue | 17 | protection. |
| 18 | is, I'm going to buy five rolls instead of four | 18 | Now, you can't get protection for nothing.  So |
| 19 | and, you know, what does that do and, you know, | 19 | the value of this set of terms, you know, I may get |
| 20 | and, you know, but the transaction's taking place, | 20 | less in retirement benefits.  I may get less in, |
| 21 | bang, all at once.  You know, now, that's not true | 21 | you know, perhaps vacation time.  I may get less in |
| 22 | in, you know, what you're talking about because | 22 | terms of, you know, monthly salary or something. |
| 23 | you're talking about, you know, contracts that | 23 | But in exchange for that, I get some protection |
| 24 | have, you know, some inter-temporal dimension to | 24 | against, you know, being unemployed or, you know, |
| 25 | them.  And -- now, and then when we start to talk | 25 | losing benefits if I get injured or something like |
|  | 115 |  | 117 |
| 1 | about some of these terms, you know, one would | 1 | that. |
| 2 | expect -- maybe -- maybe not -- maybe not | 2 | You know, on the other hand, somebody that is |
| 3 | initially, but you would expect the terms to wind | 3 | less risk averse doesn't value those protections as |
| 4 | up being roughly the same, you know, in a market, | 4 | much as I do and, you know, and doesn't want them, |
| 5 | you know, just through adjustments over time as you | 5 | and, you know, may take a different set of terms |
| 6 | move to an equilibrium.  You know, again, now, you | 6 | that might involve, you know, higher salary or, you |
| 7 | know, I don't think that we've -- we emphasized | 7 | know, some higher monetary benefit and, you know, |
| 8 | this enough when we teach economics, that most of | 8 | as trade-off against absorbing more of the risk. |
| 9 | the models that we talk about are equilibrium | 9 | So it's hard to -- it's hard to say exactly |
| 10 | models.  So I can tell you that, you know, we start | 10 | what's going to happen in that regard. |
| 11 | from competition, and now you say to me, okay, so, | 11 | MR. SILVERMAN:  Yeah.  Why don't we take a |
| 12 | for example, in one of the things that we were | 12 | break.  We have to change the tape. |
| 13 | looking at before, you know, we started out with | 13 | THE VIDEOGRAPHER:  This is the end of media |
| 14 | competition and there was a whole bunch of mergers | 14 | unit number two to be continued on media unit |
| 15 | and that created a dominant firm. | 15 | number three.  12:18 p.m., off the record. |
| 16 | And then we want to say, okay.  So, now, let's | 16 | (A luncheon recess is had from 12:18 p.m. to |
| 17 | compare what happens with this dominant firm in a | 17 | 1:14 p.m.) |
| 18 | fringe to what we started with.  Well, what we | 18 | THE VIDEOGRAPHER:  Here begins media unit |
| 19 | never tell you about is how you get from that | 19 | number three in the continued deposition of |
| 20 | competitive equilibrium to the new dominant firm | 20 | Roger D. Blair.  We're going back on the record at |
| 21 | equilibrium.  And in between -- I mean, first of | 21 | 1:14 p.m. |
| 22 | all, as economists -- now, some labor economists | 22 | BY MR. SILVERMAN: |
| 23 | may actually look at this and try to estimate this | 23 | **Q   Welcome back.  I would like to turn your** |
| 24 | adjustment process.  But by and large, you know, we | 24 | **attention back to the -- your textbook, "Sports** |
| 25 | don't really focus on how long does it get to -- | 25 | **Economics," that we were looking at before.  And on page** |

30 (Pages 114 to 117)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

118

1  343 of that book, you write in a section called Demand
2  for Athletic Talent, [as read]: We begin our analysis
3  of the sports labor market by assuming that it is
4  competitively structured. For the most part, however,
5  sports labor markets are not competitive. Nonetheless,
6  the competitive model provides a useful benchmark for
7  comparison with the actual results. In addition, it
8  introduces a way of measuring a player's value to his
9  club. Athletes are employees of their respective clubs
10 which are business firms that produce athletic
11 competition that is sold to the fans. We begin our
12 analysis with the principles that drive the employment
13 decisions of profit maximizing firms. In general, labor
14 is an input in the production process. No one demands
15 labor services for their own sake. Instead, labor is
16 demanded because it can be used to produce something
17 that the employer can sell. Consequently, the demand
18 for labor is a derived demand. It is derived from the
19 demand for the output that the labor is used to produce.
20 In the sports business, players, coaches, and managers
21 are employed by their clubs to produce athletic
22 competition which is what the clubs sell to the fans.
23 The demand for athletic talent is derived from the fans'
24 demand for watching the games that the athletes play.
25      So, can you explain for me -- well, let me

119

1  start by asking, do you agree that labor is a derived
2  demand?
3       MR. WIDNELL: Objection, form.
4       THE WITNESS: I think you misspoke slightly.
5  BY MR. SILVERMAN:
6    Q  Sorry. Yeah.
7       Do you mean that -- scratch that. Let me ask
8  the question again.
9       Do you agree that the demand for labor is a
10 derived demand, it is derived from the demand for the
11 output that the labor is used to produce?
12   A  Yes.
13   Q  Okay. What is the output that the UFC
14 produces using the athlete's labor in MMA?
15   A  It provides -- what it's supplying are, you
16 know, events that consist of a number of bouts, MMA
17 fights.
18   Q  Do you agree that with this quote that I just
19 read, that the demand for athletic talent is derived
20 from the fans' demand for watching the games that the
21 athletes play?
22   A  Yeah. That's the same question.
23   Q  Yeah. Essentially.
24      Just specific to sports and fans, I guess.
25   A  Yes.

120

1    Q  Okay. Is the demand for fighter talent in MMA
2  derived from the fans' demand for watching MMA events
3  featuring those fighters?
4       MR. WIDNELL: Objection, form.
5       THE WITNESS: Well, it may not be those
6  fighters, but the demand for MMA talent is -- you
7  know, is a derived demand from -- it's derived from
8  the demand by fans for watching MMA bouts.
9  BY MR. SILVERMAN:
10   Q  Given that MMA is an individual sport which
11 pits certain fighters against other fighters, is it
12 possible that fans have very different levels of demand
13 for bouts featuring certain fighters rather than others?
14      MR. WIDNELL: Objection, form.
15      THE WITNESS: Sure.
16 BY MR. SILVERMAN:
17   Q  Have you analyzed how much fan demand is
18 affected by the particular fighters who appear in an MMA
19 event?
20   A  Not specifically, no.
21   Q  I think we covered this, but in a competitive
22 market, an employer pays their employees the marginal
23 revenue product of their labor; is that right?
24   A  Yeah. In a competitive market, the firm is
25 going to expand employment to the point where the

121

1  marginal revenue product is equal to the wage that is,
2  you know, comes from the demand and supply in the market
3  as a whole.
4    Q  And so then the wage that that firm pays will
5  equal that margin revenue product; is that right?
6    A  Yes. And assuming that the -- that we're in a
7  profit maximizing equilibrium, that is that the firm has
8  been successful in actually maximizing profit. And when
9  that's the case, the marginal revenue product will be
10 equal to their wage.
11   Q  And we discussed how a monopsonist pays
12 something less than the marginal revenue product of
13 labor; right?
14   A  Yes.
15   Q  And that leads to a transfer of surplus from
16 the worker to the monopsonist; right?
17   A  Relative to the competitive solution, yes,
18 that's correct.
19   Q  At page 345 of your textbook, you write [as
20 read]: A professional team's focus on marginal revenue
21 product is illustrated by the Cincinnati Reds'
22 assessment of Ken Griffey, Jr.'s presence in 2000. The
23 team expected to gain 20 million in new revenues due to
24 his presence in the line-up. Attendance rose by some
25 500,000 fans during the 2000 season which translated

31 (Pages 118 to 121)

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

122

1  into 16 million in additional gate receipts and
2  concession revenues.  Merchandise sales rose another
3  1.9 million.  Arguably, Griffey's marginal revenue
4  product, or MRP was nearly 18 million which was less
5  than the Reds had hoped for, but more than Griffey was
6  paid, which was 7 million.
7       Does this paragraph illustrate the sort of
8  analysis that an economist would engage in to try to
9  estimate an athlete's marginal revenue product?
10      MR. WIDNELL:  Objection, form.
11      THE WITNESS:  I don't know if you would do
12 that on -- I don't know if you could do that on a
13 very broad basis.  What I was trying to do --
14 that's an illustration.  And, you know, what it
15 indicates, of course, is that Griffey didn't do a
16 good job bargaining for, you know, for his salary
17 because he wound up getting substantially less than
18 what one might think was the -- his marginal
19 revenue product.
20      Now, as an illustration of -- you know, that
21 general idea of looking at marginal revenue
22 products, it got those -- there's a source for, you
23 know, where I got the information in order to write
24 up that.  You know, if you were looking at, you
25 know, marginal revenue products, you know, more

123

1  generally, you might want to -- to see whether that
2  increase in attendance of 500,000 was motivated by
3  something else.  I mean, you know, Griffey may not
4  have been the only player that was attracting fan
5  attention.  You know, it could have been that the
6  ball club had invested in, you know, other
7  promotional activities that led to increased
8  attendance, at least in part.  I mean, I wouldn't
9  say that Griffey had nothing to do with it, but,
10 you know.
11      And, so, if you were looking at this in, you
12 know, a broader context, than just to provide an
13 illustration for students, you know, you would
14 probably want to look at some other things as well.
15 BY MR. SILVERMAN:
16   Q   So I understand, you're saying it can be --
17 you know, this is just an illustration and it's not
18 obvious to that you can attribute, you know, 500,000
19 fans, specifically, to Griffey, for example.  But is
20 the -- is the method of analysis correct in the sense
21 that to measure the marginal revenue product of an
22 athlete, one acceptable way to approach that problem
23 would be to try to measure the additional -- the number
24 of additional fans that that athlete brings to their
25 employer, essentially?

124

1       MR. WIDNELL:  Objection, form.
2       THE WITNESS:  Well, that's certainly one of
3  the -- you know, one of the benefits; right?  I
4  mean, presumably, with Ken Griffey, Jr., you were
5  getting, you know, one of the best baseball players
6  that ever lived.  And, you know, that would do a
7  couple of things to -- in terms of benefits for the
8  team.  I mean, number one, just because, you know,
9  he was a remarkable player and people would be
10 interested in watching him play.  You know, that
11 would have a positive effect.  But in addition to
12 that, you know, because of his talent, they should
13 have won -- all else being equal, they should have
14 won more games --
15 BY MR. SILVERMAN:
16   Q   Um-hum.
17   A   -- as a result.  And that usually makes the
18 fans happier and, you know, and might well lead to some
19 additional attendance as well.  But, you know -- but,
20 again, what you would want to be sure is that you're
21 taking into account other sources of those changes.  If
22 you're just looking at the change in attendance from one
23 year to the next, it's 500,000 fans.  And you say, well,
24 we added Griffey.  Well, if you attribute all of that
25 increase to Ken Griffey, Jr., that might be a mistake

125

1  because, you know, we'd have to take into account what
2  else happened.  I mean, there may well have been, you
3  know, a change in economic conditions that led to, you
4  know, fans spending more money on going to baseball
5  games.  It could have been, you know, any number of
6  things, as I mentioned before.
7  BY MR. SILVERMAN:
8    Q   Is this -- it sounds like you're -- it sounds
9  like you're pointing out a correlation causation issue
10 with this example; is that right?
11   A   Not entirely.  I mean, to some extent, it is a
12 distinction between correlation and causation.  But
13 it's -- you know, I would feel comfortable -- you know,
14 if everything else was constant, which is, you know,
15 sort of hard to, you know, find situations like that
16 empirically.  But if everything else was constant and,
17 you know, the only real difference that you can see is
18 that Ken Griffey, Jr., is now playing right field or
19 wherever he was playing, instead of somebody else, then,
20 you know, I wouldn't feel uncomfortable attributing
21 causation to the increase in attendance being due to Ken
22 Griffey, Jr.  It's just that if you're going to try to
23 do that, you still have to control for all the other
24 things that actually aren't constant.  Because, you
25 know, in -- you know, real empirical settings, you know,

32 (Pages 122 to 125)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

Page 150

you know, there's allocative inefficiency associated with the monopolist, because the monopolist does not -- does not put in enough resources to produce the welfare maximizing quantity of output that it -- because it restricts output.

And on the purchase side for buying inputs or hiring inputs, as the case may be, that the decision is to -- is allocatively inefficient because too few resources are being purchased or hired in the sense that their value exceeds their social cost. So that's what -- so allocative inefficiency has a technical meaning. And you're asking me a question that relates to what happens to perhaps shifts in the demand functions. And that's a different matter.

Q  Let me step back a beat and just ask you, is it your opinion that the reserve system was anticompetitive on balance, which is related to what we're talking about?

A  You mean historically?

Q  Historically. The historic reserve system.

A  Is anticompetitive?

Q  Um-hum.

A  Is that the question?

Q  Yeah.

A  Sure.

Page 151

Q  And why?

A  Because the reserve system, you know, was in agreement among the major league teams to use a standard player contract that had the evergreen provision, or provisions whenever a collection of terms in the contract is what we commonly refer to as the reserve clause, which, you know, may have been more than a clause. But constituted that reserve system so that, you know, once a player was signed to a contract, that the -- you know, the club had property rights in that contract and, you know, no one else could gain access to that unless they sold it or traded it.

And, you know, so the agreement among all the teams to respect that provision in the contract for all the other teams meant that they were agreeing, you know, not to compete for the services of any player that was under contract to a different team.

Q  What is -- how would you define -- as a scholar of antitrust economics, how would you define what it means for a practice to be anticompetitive?

A  Well, a practice -- I mean, ordinarily, we think of a practice as being anticompetitive if it's -- if we're talking about the output market, at least the higher prices, lower quantities, lower quality.

And, you know, similarly, on the buying side,

Page 152

if it leads to, you know, lower prices paid and lower quantities purchased, you know, we think of those -- that conduct as being anticompetitive. You know, it's you know, conduct or practices that prevent competition between alternative producers or alternative employers, you know, we think of as being anticompetitive.

Q  And we discussed how the reserve clause gave teams monopsony power over the players and we discussed how that led to suppressed salaries. Did it also lead to lower output?

A  I don't think it led to lower output in the sense that, you know, the teams -- the leagues had, you know, at that time, a -- you know, a schedule of 154 games. And, you know, it's hard to say whether it led to a reduction in outputs in the National League. It was in place back in the 1800s, you know, so...

But by the same token, it's hard to imagine that you get many more games into a season anyway since you only have basically six months to play, which is 180 days. And if you got 154 games, back in those days, the travel was by train and bus and stuff. I mean, it's just, you know, it's hard to imagine that they could have played many more games than that anyway, but, you know.

In principle, maybe there was some, you know,

Page 153

marginal reduction in the number of games. You know, I can't -- I can't say, but...

Q  So, when you say that the reserve clause was anticompetitive, then, are you referring mostly to its effect on players' salaries on that input price?

A  Well, it's that and the -- I mean, just on its face, when you describe, you know, what that reserve system involved, you know, it did limit the competition between teams for a particular player's services. Right? So, if you and I want to hire the same player, and he's under contract to me, then you have to buy that contract from me either for cash, or you could trade somebody else's contract for that contract.

But, you can't simply go to the player and say, hey, why don't you -- next season, why don't you play for me, because there's an agreement that you and I are not going to compete in that way.

Q  Does any agreement -- I'm sorry. Does any practice that limits the competition between teams for a particular player's services anticompetitive?

MR. WIDNELL: Objection, form.

MR. SILVERMAN: Strike that. Let me rephrase that.

BY MR. SILVERMAN:

Q  Is any practice that limits the competition

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

154

1  between teams for a particular player's services
2  anticompetitive?
3      MR. WIDNELL:  Same objection.
4      THE WITNESS:  So, you know, my initial
5  instinct is to say -- is to -- is to agree that
6  that would be the case.  But, you know, I would
7  have to think about, you know, what is -- you know,
8  what's involved in, you know, in specific, you
9  know, cases.  Because when you say "any," that
10 means -- that means if I agree to that, that means
11 that there is no agreement that limits competition
12 that could be either competitively neutral or
13 actually pro competitive.  And, you know, to say
14 that safely, you have to be able to think about all
15 of the -- every conceivable, you know, possible
16 agreement.  And I just, you know, I'm just not in a
17 position to do that right now.
18 BY MR. SILVERMAN:
19     Q  Sure.  Would you agree that that -- an
20 agreement that -- that limits the competition between
21 teams for a particular player's services has an obvious
22 anticompetitive implication or effect?
23     MR. WIDNELL:  Objection, form.
24     THE WITNESS:  Well --
25 BY MR. SILVERMAN:

155

1     Q  Which then might be counterbalanced by some
2  other justification.
3     A  Okay.  Well, so --
4     MR. WIDNELL:  Objection, form, compound.
5     THE WITNESS:  So, all right.  So, so, if you
6  think about -- if you think about, you know, most
7  of the contracts in the professional league sports
8  are multi-year contracts, and suppose that the
9  players are free agents, and, you know, or a
10 player's a free agent, and he signs a four-year
11 contract with, you know, with my team, so, that
12 agreement, you know, limits competition for that
13 player's services for the term of the contract.
14 You know, and I wouldn't think of that as being
15 anticompetitive.  You know, I think of that as
16 being, you know, that's what happens with
17 multi-year contracts.  I mean, it's not -- it's not
18 really a question of competition.  Because if the
19 player was a free agent, you know, and you had
20 another team, you know, you could have -- you could
21 have competed with me to sign that player the
22 four-year contract, or you could have offered three
23 years at more money, or five years at, you know,
24 maybe a little less money per year, but with that
25 additional year, you know, guaranteed, you know...

156

1  I mean, you know, this -- you know, sometimes
2  it's -- sometimes things that look like they're
3  either exclusionary or, you know, anticompetitive
4  in some other way, are not really anticompetitive.
5  It's just that the locus of competition is
6  different.  And that difference, you know, has to
7  be taken into account in order to figure out
8  whether there's -- you know, whether on balance the
9  agreement's anticompetitive.
10    So, for example, you know, in, you know, some
11 franchise contracts, you know, for just not
12 baseball, but -- or sports franchise, but just
13 general franchise contracts, there may be time
14 provisions that -- that require that the -- that
15 the franchisee has to buy certain inputs from the
16 franchiser.  And so it looks like that provision is
17 tied to the franchise license.  And you might say,
18 well, that's anticompetitive because other -- you
19 know, the franchisees can't buy from other sources.
20    But what you have to recognize is that the
21 locus of competition shifted.  The locus of
22 competition is to become the franchiser's supplier.
23    So the rival suppliers of that input, you
24 know, are going to negotiate -- or not negotiate,
25 but they're going to essentially bid and compete

157

1  for becoming the supplier to the franchise system.
2  But they're doing that at the franchiser level,
3  rather at the franchisee level.  It's not that the
4  competition disappears, it's just that it happens
5  at a different place.  You know, that's what I mean
6  about sort of looking for the locus of competition.
7  BY MR. SILVERMAN:
8      Q  Let's go back to an athlete, I think I've
9  heard what you're describing as called competition for
10 the contract, for example.
11     But, in order to have competition for the
12 contract, if you're an athlete, in order to have
13 competition for the contract that allows you to capture
14 something close to your marginal revenue product, there
15 has to be -- you have to have an alternative to that
16 agreement -- right? -- provided by alternative buyers in
17 the market?
18     MR. WIDNELL:  Objection, form.
19     THE WITNESS:  Yeah.  So -- so, for example,
20 you know, if the Dodgers want Mike Trout, then Mike
21 Trout, you know, he's a free agent, he's got some
22 leverage in bargaining with the Angels because he
23 can go across the street, so to speak, and sign up
24 with the Dodgers if they're offering him a better
25 deal.

40 (Pages 154 to 157)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

|  | 158 |
|---|---|
| 1 | Now, if the Dodgers don't exist, and the only |
| 2 | employment opportunity that Mike Trout has is to |
| 3 | either sign with the Angels, you know, after some |
| 4 | negotiation, or essentially retire, then he's got |
| 5 | fewer options. And that's going to influence the |
| 6 | extent to which he's going to get compensated. |
| 7 | BY MR. SILVERMAN: |
| 8 | Q   So is it fair to say that the robustness of |
| 9 | the competition at the outset when the contract is being |
| 10 | negotiated, is a key factor in whether the athlete can |
| 11 | obtain something close to their marginal revenue product |
| 12 | as a result of that contract? |
| 13 | MR. WIDNELL: Objection, form. |
| 14 | THE WITNESS: Yeah. I'm not so sure what you |
| 15 | mean by robustness of the competition. I mean, you |
| 16 | know, basically what I said was that, you know, if |
| 17 | there's -- if there's no alternative to playing for |
| 18 | the Angels, then Mike Trout is, you know, going to |
| 19 | have to negotiate with the Angels. |
| 20 | Now, you know, it's not all -- you know, the |
| 21 | bargaining isn't all on the side of the Angels |
| 22 | because, you know, they get benefit out of having |
| 23 | him on the team. They get tremendous benefit |
| 24 | because he's popular with the fans and he's a great |
| 25 | player. You know, he contributes to wins, even |

|  | 159 |
|---|---|
| 1 | though they haven't been winning much lately. But, |
| 2 | you know, he contributes a lot to whatever wins |
| 3 | they do have. |
| 4 | And, you know, he puts on a good show. The |
| 5 | fans like to watch him play. And, so, for -- he -- |
| 6 | if they pushed him far enough so that he decided |
| 7 | he'd be better off to just walk away from baseball, |
| 8 | then, you know, they would be, you know, adversely |
| 9 | affected. That is "they," being the Angels. |
| 10 | So there's going to be some negotiations. |
| 11 | It's not like they're going to drive his -- you |
| 12 | know, his compensation down to, you know, some |
| 13 | level approaching nothing. |
| 14 | But, obviously, if he's got the ability to go |
| 15 | and negotiate with other baseball teams who are |
| 16 | looking for essentially the same thing that the |
| 17 | Angels are in terms of fan appeal and performance |
| 18 | and helping to win games and, you know, and that |
| 19 | sort of thing, you know, he's in a better |
| 20 | bargaining position. |
| 21 | BY MR. SILVERMAN: |
| 22 | Q   If we turn to page 354 of your textbook, you |
| 23 | refer to the difference between a worker's marginal |
| 24 | revenue product and the wage that they're paid as |
| 25 | monopsonistic exploitation. Can you explain what that |

|  | 160 |
|---|---|
| 1 | means? |
| 2 | A   Yes. I think that -- I think that Joan |
| 3 | Robinson coined that term in her book, "The Economics of |
| 4 | Imperfect Competition" which was published in the 1930s. |
| 5 | And she looked -- she had a chapter on monopsony in that |
| 6 | book. And she talked about the difference between -- I |
| 7 | forget exactly, you know, what terms she used. I don't |
| 8 | mean a monopsonistic exploitation. I know what that |
| 9 | term is. But whether she called it marginal |
| 10 | expenditure, marginal revenue products, marginal factor |
| 11 | costs. I mean, I don't know exactly what terms she was |
| 12 | using but, you know, to put in the terms that we use, |
| 13 | you know, we've been using today, she was talking about |
| 14 | the fact that the profit maxima -- profit maximization |
| 15 | by a monopsonist is going to lead the monopsonist to |
| 16 | hire labor, say, up to the point where that marginal |
| 17 | expenditure on labor is equal to marginal revenue |
| 18 | product, or the value of the marginal product, depending |
| 19 | upon the market structure and the output market. |
| 20 | And, you know, that determine -- that equality |
| 21 | determines the quantity that will be employed. At that |
| 22 | quantity, the height of the supply curve determines the |
| 23 | wage that will be paid. And the difference between the |
| 24 | two, the marginal revenue product, which is the marginal |
| 25 | benefit or the marginal value of the labor at that |

|  | 161 |
|---|---|
| 1 | particular quantity, is above the -- what the laborer's |
| 2 | actually being paid. |
| 3 | And she referred to that difference as |
| 4 | monopsonistic exploitation. |
| 5 | Q   You go on to write that whether athletes are |
| 6 | exploited in the sense that their marginal revenue |
| 7 | product exceeds the ways that the team pays them is an |
| 8 | empirical question. |
| 9 | And you then go on to say [as read]: The |
| 10 | evidence is that athletes indeed have been exploited. |
| 11 | They have been paid less than they were worth to the |
| 12 | team. Some athletes are still being exploited in this |
| 13 | sense, even though salaries are extremely high for many |
| 14 | of them. |
| 15 | Do you agree with that? |
| 16 | A   Yes. |
| 17 | Q   And then on the next page, you write [as |
| 18 | read]: For the free agents, there was presumably no |
| 19 | difference between their salary and their MRP. That is |
| 20 | no exploitation. Veterans with at least three seasons |
| 21 | in Major League Baseball, but less than six seasons were |
| 22 | not free agents, but they were protected to some extent |
| 23 | by final offer arbitration. |
| 24 | When a player and his club cannot agree on a |
| 25 | new contract, the player can file for arbitration and |

41 (Pages 158 to 161)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY**