# Exhibit 37

Deposition of Robert Topel (December 6, 2017) (excerpted)

**PUBLIC COPY - REDACTED**

267

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON    )
FITCH, on behalf of            )
themselves and all others      )
similarly situated,            )
                               )
            Plaintiffs,        )
                               )
        vs.                    )   Case No.
                               )   2:15-cv-01045-RFB-(PAL)
                               )
ZUFFA, LLC, d/b/a Ultimate     )
Fighting Championship and      )
UFC,                           )
                               )
            Defendant.         )
_____)


HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

ROBERT TOPEL, VOL. II

Washington, D.C.

December 6, 2017

8:39 a.m.




REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52570

PUBLIC COPY – REDACTED

292

1  So they'd have to be -- there would be competition
2  for this exclusive upfront, but information is not
3  fully played out yet on who's who.  So I doubt
4  that -- I doubt that fighters would want to sign
5  that contract.  So you -- you have a hypothetical
6  contract there.  Zuffa's not going to get any
7  fighters with that contract.
8      Q.  So in your view it's -- is it your view --
9  I'm just trying to understand.  Is your view that
10  it's anticompetitive because no one could sign it
11  or that it's anticompetitive for other reasons or
12  both?
13      A.  Well, you asked me --
14      MR. WIDNELL:  Objection, form.
15  BY THE WITNESS:
16      A.  Technically speaking, you asked me if it
17  was procompetitive, so like it was efficient,
18  right?
19      Q.  Yes.
20      A.  Well, it's not going to be an efficient
21  contract if fighters come along and say I'm not
22  signing that and they go somewhere else.  A
23  procompetitive contract is one that maximizes,
24  loosely speaking, the value of output, and there's
25  not going to be out -- well, Zuffa's not going to

293

1  participate in the output if they offer that
2  contract.  Somebody else would because they
3  wouldn't be offering that contract.
4      Q.  Assume for the question that fighters so
5  much wanted to fight for the UFC because the UFC
6  currently has most of the top fighters that they
7  were willing to make that deal going in.  Would it
8  then be procompetitive?
9      MR. WIDNELL:  Objection, form.
10  BY THE WITNESS:
11      A.  Well, you know, I don't know because now
12  you're telling me that other people can offer
13  similar contracts.  Other people can offer any
14  contract they want and implausibly Zuffa offers
15  this contract that says you're going to fight for
16  us forever and I don't know all the other forms of
17  the contract that you're talking about and
18  everybody lines up with Zuffa, then, I mean, one
19  could imagine that that has some value-producing --
20  you know, salubious value-producing consequence
21  that makes everybody want to go there, but I don't
22  know what it is.  So I've not had to consider that
23  in the context of this matter.
24      Q.  Would you agree that under that contract
25  Zuffa would have more incentive to invest in

294

1  promotion than it does under its existing
2  contracts?
3      A.  Well, under its existing contracts they
4  might lose people who move.  In that sense -- in
5  that sense only that would be one effect, but
6  you've also posited a world where everybody wants
7  to fight for Zuffa anyway.  So maybe they don't
8  have to promote so much because everybody wants
9  to -- wants to watch Zuffa anyway.
10      Q.  Turn to paragraph 95 and 96 -- or turn to
11  95 first, please.
12      A.  Okay.  We're back in my report, right?
13      Q.  We are.
14      A.  Yeah.
15      Q.  In paragraphs 95 and 96 you're talking
16  about --
17      A.  I'm sorry.  I'm on page 95.
18      Q.  Page 41.
19      A.  Yes.
20      Q.  There you're talking about co-promoted
21  matches.  What are copromoted matches?
22      A.  Where two promoters, say Bellator and
23  Zuffa, say let's have a match that mixes your guys
24  and our guys.
25      Q.  And you say there in the first sentence of

295

1  paragraph 95 towards the end that copromoted
2  matches are apparently nonexistent; do you see
3  that?
4      A.  I recall the sentence.  I'm looking for
5  the -- it's towards the end.
6      Q.  Of the first sentence.
7      A.  Oh, the first sentence?
8      Q.  I'm sorry.  The second sentence.
9      A.  Yes.
10      Q.  You understand that the UFC --
11      MR. WIDNELL:  Objection, misstates, but go
12  ahead.
13  BY MR. CRAMER:
14      Q.  The second sentence says "Copromoted
15  matches in which athletes from different MMA
16  promoters compete against one another are
17  apparently nonexistent."  Did I read that
18  correctly?
19      MR. WIDNELL:  I'm sorry.  I'm not --
20  you're in paragraph 95?
21      MR. CRAMER:  Yes, second sentence.
22      MR. WIDNELL:  I apologize.  Yes.  I see.
23  I was looking at a different sentence.  My
24  mistake.
25  BY THE WITNESS:

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

296

1      A. We're all on the same page.
2      Q. All right. I read that correctly?
3      A. Yes.
4      **Q. You understand that UFC refuses to**
5      **copromote with other MMA promoters, correct?**
6          MR. WIDNELL: Objection, form.
7      BY THE WITNESS:
8      A. Whether that's a binding policy or not I
9      don't know. I just know that they don't.
10     Q. Have you seen evidence in the record where
11     Dana White has said he will not copromote with
12     other promoters?
13     A. I don't recall that statement. I wouldn't
14     be surprised that it's made.
15     Q. Are you aware that other MMA promotions
16     haven't engaged in co-promotion?
17         MR. WIDNELL: Objection, form.
18     BY THE WITNESS:
19     A. Could you read -- I think you --
20     Q. I'll restate the question.
21     A. I think you said haven't when you probably
22     meant have.
23     Q. Thank you. Are you aware that other MMA
24     promotions have indeed engaged in co-promotion?
25         MR. WIDNELL: Objection, form.

297

1      BY THE WITNESS:
2      A. You said -- could you read -- I think
3      you --
4      Q. I'll restate the question.
5      A. I think you said haven't when you probably
6      meant have.
7      **Q. Thank you. Are you aware that other MMA**
8      **promotions have indeed engaged in procopromotion?**
9      **A. You know, I recall that there are a few**
10     **instances of copromotion and I can't remember what**
11     **they -- I can't remember the context or who did**
12     **it.**
13     Q. Are you aware that Pride used to do bouts
14     with fighters from different MMA promotions before
15     it was bought up by Zuffa?
16     A. I don't recall what Pride did.
17     Q. Are you aware that Strike Force before it
18     was bought by Zuffa used to allow some of its
19     fighters to go fight with other promotions?
20         MR. WIDNELL: Objection, form.
21     BY THE WITNESS:
22     A. That's a different thing.
23     Q. Are you aware of that?
24     A. Yeah.
25     Q. And you know that Zuffa recently engaged

298

1      in copromotion, correct?
2      A. With whom?
3      Q. Does Zuffa have market power in the boxing
4      promotion world?
5      A. Not that I'm aware of.
6      Q. And would you agree that if Zuffa engaged
7      in copromotion in boxing in a market in which it
8      does not have market power that that would be
9      efficient?
10     A. Well, you have to define copromotion
11     now.
12     Q. Promoting a bout with a fighter signed by
13     the UFC against a fighter that wasn't signed by the
14     UFC.
15     A. Are we -- are we talking about Conor
16     McGregor and his fight with -- what's his name?
17     Merryweather Lewis?
18     Q. Money Mayweather.
19     A. Yeah. Okay. All right. So that's what
20     we're talking about? Is that what we're talking
21     about, that's the question.
22     Q. Yes.
23     A. Okay.
24     Q. You're aware that Zuffa copromoted a
25     boxing match between its own fighter, Conor

299

1      McGregor, and Mayweather?
2          MR. WIDNELL: Objection, foundation.
3      BY THE WITNESS:
4      A. I'm not sure that it was copromotion in
5      the sense that we've been talking about here, but
6      I'm aware that Conor McGregor fought in that match
7      and it was okay with UFC for him to do it.
8      Q. The UFC promoted that match, correct?
9          MR. WIDNELL: Objection, foundation.
10     BY THE WITNESS:
11     A. When you say promoted, promote means that
12     they advertise the existence of the match going on
13     and that Conor McGregor is a UFC athlete and he's
14     fighting in this match or that they put the match
15     on?
16     Q. The former.
17     A. Yeah, I'm aware they did that.
18     Q. And you're aware that Mayweather is not
19     under contract with the UFC, correct?
20     A. Of course, yes.
21     Q. And you would agree -- strike that.
22     Have you done an analysis in your
23     report -- strike that.
24     Do you know whether the UFC intends to
25     copromote the match in the sense that it copromoted the match

9 (Pages 296 to 299)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



```
                                    300
1    between McGregor and Mayweather in boxing -- other
2    boxing matches in the future?
3        A.  It would depend on whether it's in the,
4    you know, management of UFC judges that it's in
5    their business interest and whether someone comes
6    along who's got the talents to compete at that
7    level and whether they want to risk it.
8        Q.  And you understand that the fight between
9    Mayweather and McGregor was profitable, correct?
10       A.  One assumes for the promoter of that
11   fight.
12       Q.  And for the fighters, correct?
13       A.  One assumes.
14       Q.  All right.  Back to Strike Force data.
15   You testified yesterday relating to the Chow test
16   and I have some follow-up questions.
17       A.  Okay.
18       Q.  You testified that when you ran your Chow
19   test that Zuffa and Strike Force data did not come
20   from the identical data-generating process,
21   correct?
22       A.  I recall saying something like that, yeah.
23       Q.  And you testified that your Chow test
24   could tell you if there was any reason to put these
25   guys, the Strike Force guys in your words, in the
```

```
                                    301
1    regression, correct?
2        A.  I don't know if -- I would never have
3    phrased it that way, but --
4        Q.  I'm quoting you.
5        A.  I don't remember saying it that way, but
6    go ahead.
```

```
                                    302
16       Q.  You've heard of the term "yardstick,"
17   right?
18       A.  Yeah.
```

```
                                    303
4        Q.  All right.  You believe that your Chow
5    test justifies the discarding of the Strike Force
6    data unless the data-generating process for Strike
7    Force is identical to the data-generating process
8    for Zuffa; is that right?
9        A.  The point I'm making is that this is a
10   different company and the Chow test demonstrates
11   that it was different.  Why you would put it in in
12   the first place escapes me.
13       Q.  All right.
14       A.  So having said -- this is a different
15   company, this is -- these athletes were not under
16   management of Zuffa, their compensation was not
17   determined by Zuffa, the contracts they signed were
18   not signed by anybody from Zuffa, and yet they're
19   being used for this.  And what the Chow test
20   demonstrated was, you know, not only shouldn't you
21   put them in there in the first place, but they
22   really are different.  That's what the Chow test is
23   demonstrating.
24       Q.  Strike Force was in the same market as
25   Zuffa, correct?
```

10 (Pages 300 to 303)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

340

1 now you've inserted firm.  So no.

2 **Q.  All right.  Firms in a market, if I change**
3 **the -- the -- all right.  I'll reask the question**
4 **this way.  A market can have an infinite number --**
5 **in order for a market to have a horizontal supply**
6 **curve there would need to be an infinite number of**
7 **equivalent workers at exactly the same wage; is**
8 **that right?**

9 A.  No.

10 **Q.  What was wrong with that?**

11 A.  Infinite.  Does the -- the supply curve

12 needs to be -- can be perfectly elastic over a

13 relevant range where demand in this market is

14 shifting and there will be no material effect on

15 prices.  I mean, there's not an infinite number of

16 workers anywhere.

17 **Q.  Okay.  So a firm would need to have a**
18 **substantial material number of equivalent**
19 **workers -- I mean, a market would need to have a**
20 **substantial number of equivalent workers at exactly**
21 **the same wage in order for there to be a horizontal**
22 **supply curve; is that right?**

23 A.  I said over the relevant range.

24 **Q.  Over the relevant --**

25 A.  So if we -- if we have -- there needs to

341

1 be enough to prevent the wage from rising when

2 demand shifts.

3 **Q.  All right.**

4 A.  And enough depends on the circumstances.

5 **Q.  Is it fair to say that when mobility of**
6 **workers is -- becomes restricted or is costly firms**
7 **in that market could obtain some monopsony power?**

8 A.  Your statement is so broad and vague

9 that -- you know, I'll come back to my taco stands.

10 And there's some costs of going to the next taco

11 stand so that people who live closest to my taco

12 stand prefer my taco stand to the taco stand that's

13 further away even though our tacos are in all other

14 respects identical.  That means that if I cut the

15 price of my tacos more people come to me.  If I

16 raise the price of my tacos fewer people come to

17 me.  That is not a completely horizontal demand

18 curve.  So in that sense -- and that's the sense in

19 which George is using it here in a lot of this

20 discussion -- one might say that there's a degree

21 of monopsony power if we define -- if we define

22 monopsony power to mean that if I cut my price I

23 sell more and if I raise my price I say monopsony

24 power in that case.  And you can do the same thing

25 on the other side of the market.  So, you know, my

342

1 firm's here and there's other firms and I'm going

2 to hire -- instead of trying to attract people to

3 my taco stand I'm going to hire people from along

4 the road between my firm and another firm and

5 they're all uniformly distributed.  I'm making up

6 this model.  And I'll get the same taco stand kind

7 of thing on the input side.  If I want to hire more

8 I have to reach further down the road and it's

9 costly to drive.  So I'll increase the marginal

10 price that I pay -- I'll have to increase the

11 marginal price that I pay.

12 **Q.  Okay.  So let's take your taco stand**
13 **example.  You have to taco stand A on one side of**
14 **the road and then a mile away you have taco stand**
15 **B.**

16 A.  Yeah.

17 **Q.  Now let's say somebody puts a toll on that**
18 **road and all of a sudden in order to get from taco**
19 **stand A to taco stand B it costs a hundred dollars**
20 **and before it used to cost zero dollars.  All**
21 **things equal, would that toll increase the mobility**
22 **costs of workers?**

23 MR. WIDNELL:  Objection, form.

24 BY THE WITNESS:

25 A.  So now I'm -- just -- just so I'm clear,

343

1 now I'm hiring workers for my taco stand?

2 **Q.  Yes.**

3 A.  So there's a toll that prevents people

4 from the other side of town getting to my taco

5 stand?

6 **Q.  Yes, and vice-versa.**

7 A.  Okay.  So yeah, there's fewer people that

8 I can hire from the other side of town.

9 **Q.  So now as compared to a world with the**
10 **hundred-dollar toll and the world without the**
11 **hundred-dollar toll, the two taco stands in the**
12 **world with the hundred-dollar toll have more**
13 **monopsony power than the world without the**
14 **hundred-dollar toll, correct?**

15 MR. WIDNELL:  Objection, form.

16 BY THE WITNESS:

17 A.  I think what you're trying to say is

18 that -- let's say here's A and B taco stands and

19 the middle of town is halfway in between, and then

20 I build a wall, okay, the Berlin Wall there so

21 people can't get across from -- from -- so people

22 between halfway and my taco stand and the

23 percentage -- there's nobody else in town -- can

24 only work for my taco stand.  They can't go work

25 for the other taco stand.

20 (Pages 340 to 343)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



344

1    Q. Correct.
2    A. Is that what we're saying?
3    Q. Yes.
4    A. Yeah. So these people have fewer options.
5  I got it.
6    Q. And when you compare the world with the
7  Berlin Wall in your example in the world without
8  the Berlin Wall, the firm with the Berlin Wall has
9  more monopsony power, correct?
10    A. The firm with the -- the firm -- I -- I
11  won't be competing as aggressively to get people
12  from across the place where the border is now. So,
13  you know, I don't know how things played out in the
14  output market. I mean, I understand what you're
15  trying to say and you're saying the same thing
16  here, and you're saying the same thing that I said.
17  There's a degree of monopsony power. You didn't
18  need the wall. I already said there's a degree of
19  what some people would call monopsony power there
20  by the fact that it is -- it is costly to move from
21  A to B.
22    Q. And --
23    A. So if it became more costly to move from A
24  to B, that degree of -- of control over price would
25  increase a little bit.

345

1    Q. So all things equal, the higher the
2  mobility costs in your example the higher the
3  monopsony power of the firms, correct?
4    MR. WIDNELL: Objection, form.
5  BY THE WITNESS:
6    A. Yeah. It depends on how we make the
7  mobility costs and things like that. It depends on
8  what we do with the mobility costs.
9    Q. We raise the costs. So go back to my toll
10  example. Assume that the Berlin Wall costs $100 to
11  get from one side to the other and now assume it
12  costs a thousand dollars to get from one side to
13  the other. As compared to the world where it costs
14  a hundred dollars to the world where it costs a
15  thousand dollars, the firms in the world where it
16  costs a thousand dollars would have a higher degree
17  of monopsony power than the -- all things equal,
18  than the firms in the world where it costs a
19  hundred dollars.
20    A. I think what you're trying to establish is
21  that the people on my side of the wall have fewer
22  places -- because there's only two places, have
23  fewer places at which they can work and that
24  affects the wage that I have to pay to get them to
25  work for me, and I agree with that.

346

1    Q. So all things equal, the higher the
2  mobility costs in the example the more monopsony
3  power the firms in that example have, all things
4  equal; is that right?
5    MR. WIDNELL: Objection, form.
6  BY THE WITNESS:
7    A. It was important that you said twice "in
8  that example." So I agree.
9    Q. And in that example we're talking about
10  taco stands, right? These aren't Taco Bell, right?
11  It could be a small firm that has some degree of
12  monopsony power; is that right?
13    A. Yes. Well, as the term -- as we're using
14  the term. It's just a dangerous term on both sides
15  of the market.
16    Q. Is it fair to say that one reason why
17  non-Zuffa firms employ some of the challenged
18  contractual provisions that we've talked about is
19  to restrain the mobility of the fighters that work
20  for them?
21    A. It's to do all the things we've discussed
22  before that -- you know, to see it that they get
23  the returns on their investments and that their
24  ability to manage a multi-bout career progression
25  is not interfered with.

347

1    Q. And one way in which they achieve those
2  ends is by restricting the mobility of the workers,
3  correct?
4    A. In the sense that I just used, yes.
5    Q. And so in that sense even these smaller
6  promotions can use these contracts to gain some
7  measure of monopsony power; is that right?
8    A. No.

21 (Pages 344 to 347)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



348

1          MR. CRAMER:  All right.  I'd like to mark
2    as the next exhibit a piece of the testimony from
3    Scott Coker in this case.  What exhibit?
4          THE REPORTER:  10.
5          (Topel Exhibit 10 was marked
6               as requested.)
7    BY MR. CRAMER:
8        Q.  What you've just been handed is
9    Exhibit 10.
10       A.  Yep.
11       Q.  It is a portion of the transcript of the
12   deposition of Scott Coker that was taken August
13   3rd, 2017 and it was taken in this case.
14       A.  This is the Bellator fellow?
15       Q.  And Strike Force.  He was at both.
16       A.  Okay.
17       Q.  Did you have an opportunity to review this
18   deposition transcript?
19       A.  Not in its entirety.
20       Q.  You read some of it?
21       A.  Some of it, yeah.  I believe so.
22       Q.  Turn to page 245 of the transcript which
23   is on the third -- it's the third page of the
24   exhibit.  Do you see that on the bottom right-hand
25   corner?

349

1        A.  You said 245, right?
2        Q.  Yes.
3        A.  245 is the bottom right of the second
4    page.
5        Q.  Yes.
6        A.  Okay.
7        Q.  After the title page.
8            All right.  I'm going to draw your
9    attention to the testimony beginning at line 3 on
10   page 245, and I'll read it into the record and then
11   we can discuss it.

350

351

2        Q.  All right.  You can put that aside.
3            Have you seen evidence that -- in the
4    record that certain MMA promotions other than
5    Zuffa, smaller MMA promotions have said that they
6    would abandon certain of the contractual provisions
7    if the UFC would?
8        A.  That sounds like something that might get
9    you in antitrust trouble anyway, but the -- I
10   haven't seen statements to that effect, but I'm
11   sure you'll show me.
12           MR. CRAMER:  Okay.  All right.  I'm going
13   to have the court reporter mark as the next exhibit
14   a series of e-mails.
15           (Topel Exhibit 11 was marked
16                as requested.)
17   BY MR. CRAMER:
18       Q.  The court reporter has marked as
19   Exhibit 11 a two-page document bearing the Bates
20   range ZFL-1904802 through 4803, and I'd like to
21   draw your attention to the e-mail at the bottom of
22   the page from Michael Chiappetta to Anthony Evans
23   at the UFC.
24       A.  Yes.
25       Q.  And then I'm particularly talking about

22  (Pages 348 to 351)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

352

1  the run -- one at 4:43 p.m. from Chiappetta who is
2  talking about a conversation he had with Bjorn
3  Rebney.  Bjorn Rebney was the head of Bellator at
4  the time and this is dated September 25th, 2012.
5  And I'd like to turn your attention to the next
6  page where Chiappetta, who is a reporter, is
7  reporting a conversation that Chiappetta had with
8  Rebney to the UFC.
9      A.  Can I -- can I just read the rest of
10  this.
11      Q.  Please do.
12          (Witness reviewing document.)
13  BY THE WITNESS:
14      A.  Remind me who Mike is because you've only
15  got a Gmail address.
16      Q.  Mike Chiappetta is an MMA reporter.
17  Anthony Evans is an executive at the UFC.
18      A.  So he's conveying some conversation that
19  he had with somebody at Bellator; is that what he's
20  doing?
21      Q.  Correct.  Chiappetta communicated with
22  Bjorn Rebney, who was the President of Bellator at
23  the time, and then he's communicating a
24  conversation that Chiappetta had with Rebney to the
25  UFC.  And on the second page of the e-mail --

353

1      A.  He says "Eventually"; is that sentence
2  you'd like me to read?
3      Q.  Yes.  Chiappetta says "Eventually he" --
4  referring to Rebney -- said "he would be willing to
5  do away with the section that allows them to
6  release a fighter and retain matching rights if
7  Zuffa would also do the same"; do you see -- do you
8  see that?
9      A.  I see that.
10      Q.  Do you know whether Zuffa eliminated the
11  right to match clause in response to Rebney's
12  challenge?
13          MR. WIDNELL:  Objection, form.
14  BY THE WITNESS:
15      A.  Well, you know, I don't know if there was
16  an actual challenge.  This is being relayed by a
17  reporter.  We know how sometimes that can get
18  muddled.  But I don't know if this is in -- this
19  sounds like it's in the context of a particular
20  transaction, but, you know, one wouldn't be
21  surprised if some competitor would say, hey, you've
22  invested a lot in all these folks, wouldn't you
23  like to get rid of this clause because then, you
24  know, it would give us greater access to the people
25  you've invested in.  That's the point of having

354

1  these clauses is to protect the investments that
2  have already occurred.
3          Now, on the first page here it says that
4  "The matching rights clause for fighters that have
5  been released, Bellator has it in their contracts
6  and Dana" -- I take it that's Dana White -- "said
7  last week that UFC has in their contracts too.
8  Although he said it's never been used."  So this
9  is -- it's an equilibrium where this contract
10  restriction has not been used.  It could be still
11  binding, but it hasn't been used.
12      Q.  Is it your opinion that the right to match
13  clause has never been, quote/unquote, used?
14      A.  I didn't offer that opinion.  I'm just
15  saying that that's what it says here.
16      Q.  Is it your opinion that if the UFC has
17  never during -- had never during a right to match
18  period matched a rival's bid that that would mean
19  the right to match clause had no effect in the
20  marketplace?
21      A.  That was the implication that I was trying
22  to convey at the end of my answer.  That doesn't
23  mean that it's not binding.  It doesn't mean that
24  it doesn't have an effect.  It's not -- it's not
25  put into the contracts for nothing.  It serves a

355

1  purpose.
2      Q.  So even if the right to match clause has
3  never been, quote/unquote, used, it's still having
4  an effect in the marketplace, correct?
5      A.  It could be having an effect in the
6  marketplace even if they've never had to invoke.
7      Q.  And why is that?

[redacted]

17      Q.  Sounds to me like that answer said the
18  right to match is not doing any work.  How is the
19  right to match doing any work, procompetitive work
20  or anticompetitive work, economic work if Zuffa
21  would just outbid any potential rival?  Why doesn't
22  Zuffa just get rid of the right to match, then, if
23  it knows it can just outbid any rival?
24      A.  Well, we go through this in my report.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**FILED UNDER SEAL**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

356

3  if it came down to, oh, why don't they just -- why
4  don't they just outbid, well, if Bellator makes its
5  best offer and it knows that Zuffa will match,
6  then, you know, the returns to making its best
7  offer aren't as high as otherwise. Now, take
8  that -- take away the right to match and you come
9  back to the example that I have in my report about
10  the holdup problem where you're more valuable to
11  Zuffa, the athlete knows it. So now you've got a
12  bilateral negotiation where there's no determinant
13  solution in economics except that it's going to be
14  somewhere in between and depends on the relative
15  intransigence of the two parties where you're going
16  to end up.
17       Q. So you just said --
18       A. Let me finish. So I said that the -- what
19  I've just described is the holdup problem that's in
20  my report that the right of first refusal is
21  designed to avoid.
22       Q. One of the things you said is that if
23  **Bellator makes its best bid during a UFC right to**
24  **match period the returns to Bellator to making that**

357

4  that says here's what this athlete is worth to us
5  and let us assume -- and that's the assumption of
6  my example -- that the athlete is worth more
7  because of past investments to Zuffa than to
8  Bellator. So in making this offer you're not
9  certain of what the value to Zuffa is, but it's
10  very likely to be higher. So I put all the -- I
11  put all the numbers into a contract, the athlete
12  takes the contract to Zuffa, and Zuffa says done,
13  we'll pay that, and that's our right of first
14  refusal. And so we can invoke that.
15       Q. So what effect, in your view, does that
16  have Bellator's incentives to make a bid?
17       A. Bellator may have -- well, relative to
18  what because I don't -- if -- if it's -- I think we
19  went over this yesterday. Suppose we canceled the
20  right -- in one guy's contract, everybody else's
21  contract stays the same. I know we did this --
22       Q. I think I can make it easier.
23       A. I know we did this yesterday.
24       Q. We did. I think I can just make it
25  easier. The right to -- **a fighter during the right**

358

1  **to match period or a fighter who has waited a year**
2  **and we're a day after the right to match period is**
3  **over, would Bellator's incentives to make a bid be**
4  **different once the right to match period expires**
5  **than during the right to match?**
6       A. They could be, though there's a question
7  of why Bellator make an offer in the right to match
8  period and they're gaining information about this
9  fighter from the fact that -- it's your
10  hypothetical. There's no contract between Zuffa
11  and the fighter a year after the end of his
12  contract. So you're -- Bellator's looking at that
13  at the end and saying, you know, winner's curse
14  might be operative here. So if we win what is it
15  that Zuffa knew about this fighter that we don't.
16       Q. Well, assume that Zuffa made a bid and the
17  fighter didn't accept it.
18       A. Okay.
19       Q. I'll withdraw it. I'm going to move on.
20       Would you agree with me that the conduct
21  engaged in by a firm without market power could
22  be -- could have anticompetitive effects when that
23  same conduct is engaged in by a firm with market
24  power?
25       A. That's conceivable.

359

1       Q. How is that conceivable?
2       A. Well, take the -- I mean, often in
3  contract disputes under section 2, like exclusive
4  dealing or loyalty discounts or something like
5  that, under certain prerestrictive conditions
6  things that have procompetitive effects can also
7  have anticompetitive effects if certain conditions
8  are satisfied.
9       Q. Well, is bundling -- product bundling one
10  of those examples? Product bundles has many
11  procompetitive effects and when engaged in by a
12  firm without market power in any of the markets in
13  which the products they're bundling --
14       MR. WIDNELL: Objection, form.
15  BY MR. CRAMER:
16       Q. I'll rephrase. Could bundling be one of
17  those examples where product bundling can be
18  anticompetitive when engaged in by a firm with
19  market power and procompetitive when engaged in by
20  a firm without market power?
21       A. Yes, that's -- I mean, that and a myriad
22  of other examples under section 2.
23       MR. WIDNELL: I just want to make clear,
24  you're asking for an economic opinion here, not a
25  legal opinion; is that right?

24 (Pages 356 to 359)

**PUBLIC COPY – REDACTED**



360

1          MR. CRAMER:  Yes.  I'm not asking for any
2    legal opinion.
3          MR. WIDNELL:  Okay.  I just want to
4    avoid --
5          THE WITNESS:  Yep, that's fine.
6          MR. WIDNELL:  -- making that objection
7    over and over.
8          THE REPORTER:  Guys.
9    BY MR. CRAMER:
10        **Q.  Turn to paragraph 43, please.  All right.**
11   **In paragraph 43 you quote a document.  I believe**
12   **it's the Deutsche -- one of the Deutsche Bank**
13   **documents and I'm just looking for that.  All**
14   **right.  Towards the middle of paragraph 43 you say**

362

1          MR. WIDNELL:  I just want to briefly note
2    an objection for completeness.
3          MR. CRAMER:  Okay.
4    BY MR. CRAMER:
5          **Q.  If there's something as you read through**
6    **this document that you think is missing, please let**
7    **me know.  Okay?**
8          A.  Okay.  Sorry.
9          MR. WIDNELL:  Just to be clear, it's not
10   in the document.  The document was an attachment to
11   an e-mail.
12         MR. CRAMER:  Oh, okay.  Fair enough.
13   BY MR. CRAMER:
14         **Q.  Fair to say in your report you don't cite**
15   **any e-mail that attaches this document, right?**
16         A.  Not that I'm aware of.
17         **Q.  Okay.**
18              **All right.  On page 16 under the heading**

361

6          **Q.  All right.  I'm going to show you the**
7    **document that Dr. Singer was quoting and have it**
8    **marked as Exhibit 12.**
9              (Topel Exhibit 12 was marked
10                  as requested.)
11   BY MR. CRAMER:
12         **Q.  And I'll note that you cite this document**
13   **in footnote 45.**
14         A.  Okay.
15         **Q.  It is entitled "UFC/Zuffa, LLC DBA**
16   **Ultimate Fighting Championship, Confidential**
17   **Information Memorandum."  It's dated October 2009**
18   **and it was put out by Deutsche Bank.  You've seen**
19   **this document before, correct?**
20         A.  Yes.
21         **Q.  And you recognize that Zuffa management**
22   **had input into this document, correct?**
23         A.  One would assume.
24         **Q.  All right.  Turn to page 16 internally to**
25   **the document.**

363

13         **Q.  And is it your view that -- strike that.**
14              **I believe you testified that it is your**
15   **opinion that Zuffa is the market leader among MMA**
16   **promoters; is that right?**
17         A.  Yes.
18         **Q.  And would you agree that that was the case**
19   **since 2001?**
20         A.  I don't recall the circumstances
21   completely in 2001.  The market was pretty small.
22   They might been the largest producer back then.
23         **Q.  And that remained the case from the date**
24   **of this document, October 2009, to the present,**
25   **correct?**

25  (Pages 360 to 363)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

372

1  **present a competitive threat to the UFC?**
2      A. They might have. I think all firms in
3  this market present a competitive threat to UFC.
4      **Q. So when Zuffa purchased Strike Force, for**
5  **example, it was eliminating, in your opinion, a**
6  **competitive threat; is that right?**
7      A. Well, no. The -- take Strike Force, for
8  example. You know, everybody in the -- if they
9  bought some small firm there's some competition
10  from that firm, that's all I'm saying. I mean, we
11  wouldn't want to say that these firms are in the
12  market and they don't compete with Zuffa. They
13  were competing for athletes, they were competing
14  for eyeballs, they were competing, and the question
15  is whether it was addressed by antitrust
16  authorities and the like is whether these
17  acquisitions materially affected competition in the
18  market. Evidently they found that they didn't.
19  So -- but these were -- these were firms operating
20  and there are always benefits and potential costs
21  of allowing acquisitions.
22      **Q. At the time that Strike Force was**
23  **purchased in 2010, did Strike Force, in your**
24  **opinion as an economist, present a significant**
25  **economic threat to the UFC?**

373

1      MR. WIDNELL: Objection, form.
2  BY THE WITNESS:
3      A. Not such a threat that the acquisition
4  would have -- would have materially affected
5  competition to the detriment of consumers and --
6  and fighters.
7      **Q. Did Pride at the time it was purchased**
8  **present a significant economic competitive threat**
9  **to Zuffa at the time it was purchased?**
10      A. And my answer's the same.
11      **Q. Would it be the same for all of the**
12  **entities?**
13      A. Yes.
14      **Q. Is it fair to say that even if we put the**
15  **promoters that Zuffa acquired aside --**
16      A. Let me finish -- let me say -- I should
17  have put the word "adversely" affect competition.
18      **Q. Is it fair to say, putting the promoters**
19  **that Zuffa acquired aside, that your report does**
20  **not identify a single MMA promotion other than**
21  **Zuffa that does business in the United States that**
22  **had substantial market share and was profitable?**
23      MR. WIDNELL: Objection, form.
24  BY THE WITNESS:
25      A. Are we -- are we saying that Bellator's

374

1  not profitable and doesn't do business in the
2  United States?
3      **Q. Is it your opinion that Bellator has**
4  **substantial market share and is profitable?**
5      A. It's -- it's got a substantial position in
6  the market and it seems to be surviving.
7      **Q. Is it your opinion that Bellator is**
8  **profitable currently?**
9      A. Well, it's an ongoing entity. So the
10  present discounted value of what those investors
11  think that this project is worth must be
12  positive.
13      **Q. Is it your opinion that the revenues that**
14  **Bellator brings in in any year exceed the costs of**
15  **running the organization in that year?**
16      A. I've not looked at the balance sheets of
17  Bellator, but given that they're still in business,
18  there must be some anticipation of positive cash
19  flow even if it's negative today.
20      **Q. So you're saying that it's your**
21  **understanding that there's an anticipation that**
22  **Bellator will one day be profitable, but you don't**
23  **understand that Bellator's profitable today; is**
24  **that right?**
25      MR. WIDNELL: Objection, form.

375

1  BY THE WITNESS:
2      A. Well, I'm not -- I'm not offering an
3  opinion of whether they have positive cash flow
4  today.
5      **Q. When in your --**
6      A. Just as Zuffa did not have positive cash
7  flow when it was a young and nascent participant in
8  this market.
9      **Q. When, in your opinion, did Bellator come**
10  **to have significant market share in the United**
11  **States?**
12      A. I don't recall the time series on
13  Bellator's market share. I recall that they have
14  television contracts. They're backed by Viacom and
15  so on.
16      **Q. Putting Bellator aside for the moment, can**
17  **you identify another MMA promotion that does**
18  **business in the United States that has significant**
19  **market share, in your opinion, and is profitable?**
20      A. Well, a lot of these must be profitable.
21  King of the Cage has been around putting on dozens
22  of events every year for many years. There's a
23  long list of promoters that are -- that are doing
24  this and -- you know, the market share you're
25  referring to is very limited in its scope because

28 (Pages 372 to 375)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

376

1    it only focuses on a certain identified group of
2    fighters, but on any given weekend there are
3    hundreds -- or any given month, let's say,
4    hundreds, maybe thousands of these events going on
5    across the country that have nothing to do with
6    Zuffa.
7         Q.  Is it your opinion that King of the Cage
8    has a -- earns a substantial share of the revenues
9    brought in by MMA events in the United States?
10        A.  That's not what I said.  I just said it's
11   out there, it's surviving, it must be making
12   money.
13        Q.  Do you know whether King of the Cage
14   copromotes events for other MMA promoters?
15        A.  They might.
16        THE REPORTER:  Can we take a break?
17        MR. CRAMER:  Yes.  Let's go off the
18   record.
19        THE VIDEOGRAPHER:  Going off the record at
20   11:19.
21        (A short break was had.)
22        THE VIDEOGRAPHER:  We're going back on the
23   record at 11:35.  This beginnings disk No. 3.
24   BY MR. CRAMER:
25        Q.  You testified about certain MMA promotions

377

1    like King of the Cage a moment ago; do you recall
2    that?
3         A.  Yes.
4         Q.  Are you aware that there's evidence that
5    Zuffa considered some of these MMA promotions,
6    quote/unquote, minor leagues?
7         A.  Yes.
8         Q.  What did it mean to be a minor league in
9    the MMA business?
10        A.  I don't think there's a formal definition.
11   I could only give you what, you know, somebody
12   might extend from baseball to -- because that's
13   where it -- the term is generally used, to some
14   other sport.
15        Q.  So what does it mean to you in baseball?
16        A.  That, you know, the Minor Leagues like AAA
17   or Pacific Coast Leagues or places where -- where
18   athletes play either because they like playing or
19   because they hope to make it to the Major Leagues.
20   You can have a career there, that it's in the
21   business, and the teams are viable.
22        Q.  And basketball has the G league; is that
23   right?  Used to be the D league.
24        A.  I don't know whether it's called the
25   G league.  The Continental Basketball Association

378

1    and other stuff.
2         Q.  Well, let's talk about the Minor Leagues
3    in baseball.  Is it fair to say that one purpose to
4    which NBA -- I'm sorry -- Major League Baseball
5    clubs use the Minor Leagues is to develop talent
6    that ultimately will make it to the Major Leagues
7    correct?
8         A.  Of course.
9         Q.  And is there a similar purpose in MMA for
10   Minor Leagues?
11        MR. WIDNELL:  Objection, form.
12        THE REPORTER:  I'm sorry.  I can't hear
13   you.
14        MR. WIDNELL:  Objection, form.  Can you
15   hear me?
16   BY THE WITNESS:
17        A.  First of all, I don't think there are any
18   Minor Leagues.  Maybe the better analogy is to
19   soccer where one can aspire to be premiere league
20   and might move up over time.  Whereas I don't think
21   the -- I've got to remember a team that's in the
22   Pacific.  The Albuquerque whatevers are not
23   aspiring to be a major league franchise.
24        (Topel Exhibit 13 was marked
25             as requested.)

379

1    BY MR. CRAMER:
2         Q.  All right.  I've had the court reporter
3    mark as Topel Exhibit 13 the next document.  I'm
4    going to put it in front of you.  This is a
5    document written by Zuffa's lawyers, Axinn Veltrop
6    Harkrider, LLP.  It's entitled "The FTC's
7    Investigation of Zuffa's Conduct Should be Closed."
8    It bears the Bates range ZFL-1212232 through 259,
9    and I'll note for the record that you cite this
10   document in paragraph 79, footnote 134.  You can
11   verify that.  Page 34.
12        (Witness reviewing document.)
13   BY THE WITNESS:
14        A.  Okay.
15        Q.  The document you're citing is in
16   paragraph -- footnote 134.
17        A.  Yes.
18        Q.  Okay.  So you recall this document?
19        A.  I recall elements of this document.  As I
20   look at the cover of it, I don't recall the
21   cover.
22        Q.  And it was written by Zuffa's lawyers
23   relating to the UFC's acquisition of Strike Force;
24   is that right?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



380

3   Q.  And do you know what the Federal Trade
4   Commission was doing investigating Zuffa after this
5   Strike Force acquisition?
6   A.  My recollection was it was looking to see
7   whether the acquisition had procompetitive effects
8   and whether contract terms also had procompetitive
9   or -- balancing procompetitive and any potential
10  anticompetitive effects.
11  Q.  So this document is from 2010; is that
12  right?  I'm sorry.  2011.
13  A.  It would have to be from around that date
14  I assume, but I don't see any date on this.  So...
15  Q.  It discusses on, for example, page 4 and 5
16  some documents from 2011.
17  A.  Unless they had a time machine, then
18  they --
19  Q.  So it had --
20  A.  I'll stipulate for the purpose of this
21  discussion that it's from sometime after November
22  of 2011.
23  Q.  Late 2011, early 2012; is that fair?
24  A.  Let's see where we can go with that.  If
25  it turns out to be false, I'm sure that the

381

1   gentleman to my left will have something to say
2   about it.
3   MR. WIDNELL:  Just for the record, you've
4   introduced a textbook that's dated 2018.
5   MR. CRAMER:  It's true, we have.  So there
6   was some time travel.
7   BY MR. CRAMER:
8   Q.  All right.  Please turn to page 10 of the
9   document.  There's a caption under the number 7
10  that says "Other strong potential competitors are"
11  --
12  THE REPORTER:  I'm sorry.  I'm having hard
13  time hearing.  Can you start over?
14  MR. CRAMER:  Yeah.
15  BY MR. CRAMER:

382

383

17  Q.  Andrew Dick works for the same
18  organization that you work for, correct?
19  A.  I believe he's a CRA employee.
20  Q.  What is a CRA employee?
21  A.  Charles River Associates.
22  Q.  And you're associated with CRA?
23  A.  Yeah.  I'm a senior consultant there.
24  We're not in the same office.  I don't interact
25  with Mr. Dick.

30  (Pages 380 to 383)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



388

1    Q. It was in early 2010, I believe March.
2    A. It doesn't matter for anything I've -- any
3  of my answers.
4    Q. Fair enough.
5    All right. In the next sentence you say
6  "Invicta has also succeeded by promoting only
7  women's MMA in five weight classes."
8    A. Yes.
9    Q. In your opinion, was Invicta a competitive
10  threat to the UFC?
11    MR. WIDNELL: Objection, form.
12  BY THE WITNESS:
13    A. My answer is the same. Invicta is another
14  firm in the business. So the totality of all the
15  firms in the market are substitutes for what UFC
16  offers. So if you look up there at the top,
17  Dr. Singer measures a market share, flawed and
18  overstated Zuffa's actual market share. This is
19  the point I was making before we took our break,
20  that -- that there's all kinds of firms recruiting
21  athletes and putting on events and they all aspire
22  to differentiate their product in just a little
23  way -- in some way just like the taco stand that we
24  talked about and they're competing. So I don't
25  have to think about a single firm as the

389

1  competitive constraint on what Zuffa does or on
2  what other firms do, what Bellator does. It's the
3  integral, if you will, the totality of it that
4  matters. As I said, there are thousands of events
5  going on across the country and across the world in
6  this sport.
7    Q. All right. I move to strike that as
8  nonresponsive.
9    You know that Invicta's president
10
11
12
13
14
15
16
17
18
19
20    Q. Do you know whether the UFC considers
21  Invicta a major league MMA promoter or a minor
22  league MMA promoter?
23    A. I don't recall. It doesn't matter to my
24  opinions.
25    MR. CRAMER: All right. I'd like to have

390

1  the court reporter mark the next document as -- oh,
2  this is not the one I want. I'm sorry. Excuse me.
3  All right. I'd like to have the court reporter
4  mark as Exhibit 14 the next document.
5    (Topel Exhibit 14 was marked
6    as requested.)
7  BY MR. CRAMER:
8    Q. All right. Exhibit 14 that the court
9  reporter just marked is a two-page series of
10  e-mails bearing the Bates range ZFL-12535916 and
11  917. And the cover e-mail is from Kirk Hendrick to
12  John Mulkey dated November 21, 2013. Have you seen
13  this document before?
14    A. I might have. I recognize names.
15    Q. Mr. Mulkey is the UFC's CFO; is that
16  right?
17    A. That's my recollection, yes.
18    Q. And Kirk Hendrick was one -- was the UFC's
19  general counsel at one time?
20    A. I don't remember that, but that could
21  be -- I'll accept that for the purpose of this
22  discussion.
23    Q. He was an executive at the UFC; is that
24  right?
25    A. That's my recollection.

391

1    Q. And he was there for a very long time,
2  correct?
3    A. I don't know how long he was there.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**



392

11    Q.  Is it fair to say that Zuffa purchased
12  Invicta's entire straw weight division?
13        THE REPORTER:  Straw?
14        MR. CRAMER:  Straw weight, S-T-R-A-W.
15  BY THE WITNESS:
16    A.  I believe that that's true.
17    Q.  Do you know one way or another whether
18  Zuffa believed that Invicta was in essence a
19  women's minor MMA league?
20        MR. WIDNELL:  Objection, form.
21  BY THE WITNESS:
22    A.  Beyond this I have no recollection of
23  whether they -- somebody there, everybody there, or
24  whether Invicta thought they were a women's minor
25  league.  I just don't know.

393

1    Q.  Okay.  You can put that aside.
2        Turn to paragraph 74 of your report,
3  please.  In paragraph 74 through 76 you identify
4  fighters who competed in UFC who then went on to
5  compete for other MMA promotions; is that right?
6    A.  Yes, I do.
7    Q.  Do you have any evidence that -- with
8  respect to any of the fighters that you discuss in
9  these paragraphs that Zuffa wanted to keep them?
10    A.  You mean do I have some e-mail that says
11  we want to keep this person?  No.  Only that
12  they've gone on to fight elsewhere and they've --
13  they've -- they've demonstrated some success.
14    Q.  All right.  So with respect to the
15  fighters you identify in paragraph 74, 75, and 76,
16  you don't know one way or another whether Zuffa cut
17  the fighters and then they went on to have success
18  at other promotions or whether Zuffa -- or whether
19  these fighters went to other promotions against the
20  will of Zuffa?
21        MR. WIDNELL:  Objection, form.
22  BY THE WITNESS:
23    A.  Against the will of Zuffa?
24    Q.  Do you know when -- I'll withdraw the
25  question.

394

1    A.  Okay.
2    Q.  Have you seen any evidence that any of the
3  fighters you discuss in paragraph 74, 75, or 76
4  that Zuffa wanted to keep any of them?
5    A.  I haven't -- I haven't examined the
6  details of any negotiations between the fighters or
7  their agents and Zuffa representatives.

22        MR. CRAMER:  I'd like to have the court
23  reporter mark as Exhibit 15 the next document.
24        (Topel Exhibit 15 was marked
25          as requested.)

395

1  BY MR. CRAMER:
7    A.  Yes.
8    Q.  And it bears the Bates No. Raine,
9  R-A-I-N-E, 0020633.
10    A.  Yes.
11    Q.  Are you aware of what Raine is?
12    A.  I don't recall anything about Raine.
13    Q.  Raine was a consultants that did some work
14  relating to the WME acquisition of Zuffa.  Does
15  that refresh your recollection?
16    A.  It doesn't refresh my recollection with
17  respect to a name, but I would not be surprised if
18  they -- they retained outside consultants for
19  purposes of doing things.

33  (Pages 392 to 395)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



**396**

16    Q.  Yeah.  And does that -- is that consistent
17 with your understanding of Zuffa's retention rate
18 with athletes?
19        MR. WIDNELL:  Objection, form.
20 BY THE WITNESS:
21    A.  I have no knowledge of any precise number
22 of Zuffa's retention rate.
23    Q.  Can you identify --
24    A.  I will tell you that I've heard phrases
25 like this a thousand times at -- where I work that

**397**

1 we've never let a faculty member go that we wanted
2 to keep, and often that means is he wanted to go so
3 we didn't want to keep him because, you know, he's
4 part of the specific capital here or he's not.  So
5 we're kind of proud of ourselves where I work and a
6 lot of the guys take it as, hey, if he didn't want
7 to be here we didn't want him to be here.  I've
8 heard these kinds of phrases a million times.  It
9 doesn't mean anything here in the context of, oh,
10 we made guys an offer to stay and they left.  I
11 don't know.
12    **Q.  Can you identify a single MMA fighter in**
13 **history that left the UFC that Zuffa wanted to**
14 **keep?**
15        MR. WIDNELL:  Objection, form.
16 BY THE WITNESS:
17    A.  Well, I can't because I don't know whether
18 they wanted to keep them.

**398**

12    **Q.  Someone in Zuffa wanted someone at WME who**
13 **was thinking of spending $4 billion for Zuffa to**
14 **know that Zuffa never lost a fighter that Zuffa**
15 **wanted to keep, right?**
16    A.  Yes.  And put that in the context of what
17 I just said.  If the guy doesn't want to be part
18 of -- I could see how management says the people
19 who don't want to be here are the ones that we
20 don't want to keep because we're working on the
21 value of the brand.  I'm not trying to argue with
22 you.  I'm just trying to see this -- interpret what
23 this thing says in context.
24    Q.  All right.  You can put that aside.
25        Turn to paragraph 103, please.  Actually,

**399**

1 you don't need to look at 103.  I'm going to ask it
2 separately from 103.  I don't think 103 helps for
3 you to understand the question.

34  (Pages 396 to 399)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



400

402

401

1   out in your report, before the last bout in his
2   contract and says I have a new contract for you,
3   it's got four more bouts, it will include higher
4   compensation, sign it.  In order for the fighter to
5   leave the UFC he'd have to turn that down,
6   correct?
7        MR. WIDNELL:  Objection, form.
8   BY THE WITNESS:
9        A.  Well, I don't know if he has to turn it
10  down or not.  The university puts a contract in
11  front of me and I say I'm not signing it yet.
12       Q.  Okay.
13       A.  You know, it's a -- I don't know what the
14  fuse is.  I don't know anything about this
15  negotiation so far except what you're telling me.
16       Q.  At minimum he would have to say I'm not
17  signing it yet, correct?
18       A.  Yeah.  He wouldn't sign it yet because you
19  have -- you've assumed that he was really hoping to
20  go somewhere else.

403

24       Q.  Well, let's say the UFC comes to this
25  fighter, as it frequently did I think you pointed

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



408

410

```
 7    A.  Can I see what you're reading?
 8    Q.  Sure.  We'll mark it as the next exhibit.
 9
10         (Topel Exhibit 16 was marked
11          as requested.)
12  BY MR. CRAMER:
13    Q.  What's been marked as Exhibit 16 is a
14  two-page series of e-mails bearing the Bates range
15  ZFL-1000978 through 979.  The top has an e-mail
16  from Lawrence Epstein to Michael Mersh CC'g Joe
17  Silva dated May 2nd, 2013.
18    A.  Let me just read the document.
19       I guess I -- should I be reading this in
20  reverse order?
21    Q.  Yes.
22    A.  Does it begin at the -- okay.
23    Q.  The first e-mail's at the bottom.
24    A.  Okay.
25    Q.  I'll walk you through it.  The first
```

409

411

```
 1  e-mail at the bottom from --
 2    A.  No.  Let me walk me through it.  So...
 3         (Witness reviewing document.)
 4  BY THE WITNESS:
 5    A.  So who's McGann?
 6    Q.  He is Congo Cheick's representative.
 7    A.  Okay.  Thank you.
 8         (Witness reviewing document.)
 9  BY THE WITNESS:
```

```
13    Q.  Have you seen documents in this case where
14  a fighter's representative said to Zuffa, look, you
15  don't intend to give us another contract, my guy
16  would like to go fight for another promotion, will
17  you release him from the right to match and Zuffa
18  said no?
19    A.  There might be a case like that.  There's
20  a lot of -- there's a lot of situations that I've
21  seen.
22    Q.  Have you seen a situation regarding a
23  fighter named Congo?
24    A.  Congo, that name rings a bell, but I can't
25  say that I recall the situation of Congo.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

Case 2:15-cv-01045-RFB-PAL   Document 509-36   Filed 09/24/18   Page 21 of 41

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



412

414

6   Q.  Okay.  You can put that aside.
7      Turn to paragraph --
8      MR. CRAMER:  Well, it's about 12:20.  Why
9   don't we go off the record.
10      THE VIDEOGRAPHER:  Going off the record at
11   12:22.
12         (Whereupon, at 12:22 p.m., the
13         deposition was recessed, to
14         reconvene at 1:00 p.m., this
15         same day.)
16
17
18
19
20
21
22
23
24
25

413

415

1
2
3
4
5
6
7
8
9
10
11
12   AFTERNOON SESSION
13         (1:13 p.m.)
14      THE VIDEOGRAPHER:  We are going back on
15   the record at 1:13.
16         ROBERT TOPEL,
17   the witness at the time of recess, having been
18   previously duly sworn, was further examined and
19   testified as follows:
20         EXAMINATION
21         (Resumed)
22   BY MR. CRAMER:
23      Q.  Now, we did touch on this a little
24   yesterday, but I just want to make sure the record
25   is clear.  Would you agree with me that as the

38  (Pages 412 to 415)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

416

1    marginal revenue product of MMA fighters rises,
2    event revenues rise, all things equal?
3         MR. WIDNELL: Objection, form.
4    BY THE WITNESS:
5         A. You're not saying the other way around.
6    Is it -- is it like something that causes marginal
7    revenue product to rise -- I mean, it doesn't have
8    to come through events. So -- I mean, we're
9    selling stuff, all kinds of things. The marginal
10   revenue product of a fighter is conceptually adding
11   a fighter to the group of other fighters and all
12   the other resources that the firm has and how much
13   revenue goes up. Whether that's realized in event
14   revenue I don't know and so -- an increase in the
15   revenues of the firm attributable to fighters would
16   cause the marginal revenue product of any given
17   fighter to be higher.
18        Q. So, all things equal, increase in event
19   revenues would cause the marginal revenue product
20   of any given fighter to rise; is that right?
21        A. No. I mean, revenues can increase
22   without for any given fighter his marginal revenue
23   product going up.
24        Q. The collective marginal -- the collective
25   marginal revenue product of MMA fighters generally,

417

1    is that a concept that makes sense to you? The
2    productivity of MMA fighters increases for some
3    reason.
4         MR. WIDNELL: Objection, form.
5    BY MR. CRAMER:
6         Q. Let's say --
7         A. I just need -- I just need to think what
8    could be meant by the collective --
9         Q. Let's say Zuffa over time invests
10   resources in promoting its fighters so that they
11   can bring in more event revenues over time.
12        A. Well, this is something we did talk about
13   in some detail yesterday, and some -- we even had a
14   picture that we worked on yesterday. Do you
15   remember that?
16        Q. I do, yes.
17        A. And there's a difference between the
18   marginal revenue product of a fighter at any given
19   level of fighters in equilibrium marginal revenue
20   product of a fighter. So if the marginal revenue
21   product of fighters in the industry went up but
22   supply's highly elastic, you could have no change
23   in the marginal revenue product of a fighter in
24   equilibrium because employment expands and so on.
25        Q. All right. Let's not talk about

418

1    equilibrium. Let's talk about the short term.
2         A. All you're saying -- when you say "short
3    term," you're still talking about equilibrium.
4    You're just telling me that you -- what you want to
5    assume now is that supply's kind of inelastic in
6    the marketplace.
7         Q. Over the short run.
8         A. Whatever run you want. Okay. Yeah.
9         Q. With that assumption, with supply
10   inelastic in the short run, is it fair to say that
11   as fighter marginal revenue product increases, all
12   things equal, you would expect event revenues to
13   increase?
14        A. Boy, now we're on -- if -- if -- I think I
15   understand what you're asking. If that's the
16   avenue through which marginal revenue product went
17   up, then, I mean, it could.
18        Q. Well, let's -- let's hold all revenue
19   streams constant other than revenue streams --
20   other than event revenue streams for this question.
21   So the only revenues that -- strike that. I'll
22   withdraw the question and move -- I'll withdraw
23   that last question and move on.
24        Would you agree that one determinant of
25   event revenues is fighter marginal revenue product?

419

1         A. One -- we keep framing this in terms of
2    marginal revenue product. One determinant of event
3    revenues is the popularity and therefore, let's
4    say, willingness to pay of customers to watch.
5         Q. Okay. So one determinant of event
6    revenues is the popularity and willingness of
7    customers to pay to see fighters fight; is that
8    right?
9         A. Sure.
10        Q. And is it also fair to say that --
11        A. Again, given the -- I don't want to call
12   it short run, but given the elasticity of supply of
13   events.
14        Q. Okay. And is it also fair to say that
15   fighter compensation is in part determined by the
16   willingness of people to spend money to watch
17   fighters fight?
18        A. It --
19        MR. WIDNELL: Objection, form.
20   BY THE WITNESS:
21        A. Sorry. It depends on how elastic the
22   supply of fighters is.
23        Q. And if we make the same assumption for
24   this question that there's an upward sloping supply
25   curve, would you agree with me that fighter

39 (Pages 416 to 419)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

420

1  compensation is, in part, determined by the

2  willingness of people to pay to see fighters fight?

3      A.  To the extent that we're talking about

4  things that change the demand for fighters and in

5  moving along a supply curve, then greater

6  willingness to pay downstream raises the demand for

7  fighters and compensation should rise to the

8  extent -- depending on the elasticity of supply of

9  fighters.

10     Q.  So it's fair to say that both fighter

11  compensation and event revenues are both, in part,

12  determined by the willingness of individuals to pay

13  to see fighters fight; is that right?

14     A.  Would you -- can you read that back?

15     Q.  I'll say it again.  That fighter

16  compensation and event revenues are both, in part,

17  determined by the willingness of people to pay to

18  watch fighters fight; is that fair?

19     A.  Yeah, subject to the conditions I gave.

20     Q.  Okay.

21         Turn to paragraph 200.  Now, in paragraph

22  200 you're criticizing Dr. Singer's damages

23  analysis in part, and in particular in the fourth

421

422

3      Q.  So, in your view, the challenged conduct

4  alters the amount of UFC's revenues and that would

5  in turn alter the total amount of dollars that

6  would be paid to UFC fighters in the but-for world,

7  right?

8      A.  You're connecting things from all over

9  the place now.

10     Q.  It's my job.

11     A.  I know, and I'm -- my job is to listen

12  carefully.

13     Q.  It is.

14     A.  Zuffa's producing a product and it's

15  putting on what they call shows, and these -- the

16  challenged conduct here or the restrictions enable

17  them to increase the valuable of those shows and

18  produce a more valuable product.  So when we talk

19  about holding revenues constant, you can't take --

20  you can't take one piece away and leave the other

21  piece intact.

22     Q.  So, in other words, when you're

23  determining damages you can't just assume that the

24  revenues would be what they were in the actual

25  world because the revenues, in your view, might be

423

1  less, right?

2      A.  Yeah.  If we took these things away from

3  the entire industry, the whole industry might be

4  less valuable.

5      Q.  So it's not appropriate, in your view, to

6  hold revenues constant because the challenged

7  conduct alters the amount of UFC's revenues, right?

8      A.  I'm trying to figure out where you're

9  going here, but that's a fact.  If you're

10  holding -- he's holding revenues constant.

11     Q.  Okay.  And, in your view, it's not

12  appropriate in evaluating the total possible

13  damages to fighters in this case to use the amount

14  of revenues that UFC actually brought in in the

15  actual world, right?

16         MR. WIDNELL:  Objection, form.

17  BY THE WITNESS:

18     A.  Yes.  Let me put it another way.  You

19  referred to the pie yesterday and changing the

20  contract restrictions doesn't mean -- just mean

21  that the same pie is divided up in a different way.

22     Q.  Okay.  So your view is that if the

23  but-for world we would expect the UFC to bring in

24  lower levels of revenues from their events, that

25  would likely lead to lower athlete compensation,

40  (Pages 420 to 423)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

424

1 right?
2    A. Depending on how everything else plays
3 out, yeah.
4    Q. I mean, you say in paragraph 200 -- we
5 looked at this before in the same paragraph on page

[REDACTED]

9    Q. Okay. So just so I understand, it's your
10 view that in computing damages in this case the
11 appropriate pool of total event revenues is the
12 amount of event revenues that the UFC would have
13 brought in in the but-for world, not the actual
14 world; am I right about that?
15    A. Well, I mean, I don't want you to sneak in
16 some sort of back-handed endorsement of the way
17 Dr. Singer's performing the whole exercise, that
18 it's based on some division of some share of
19 revenues because I think that's a major critical
20 mistake.
21    Q. All right. I'm not trying to sneak that
22 in.
23    A. Well, I just -- but I've got to be careful
24 here because you're getting me to endorse some
25 concept that's -- you know, endorsing some aspect

425

1 of a -- of a -- of an inappropriate procedure. But
2 the only point I'm making here is that the value
3 produced is going to be different in the but-for
4 world than in the world we're in, and -- because,
5 remember, my opinion is there aren't any damages.
6 So what it means to calculate those damages by the
7 procedures that Dr. Singer's using is kind of a --
8 let's just put it this way, a very vague concept.
9    Q. I understand you have your critiques of
10 Dr. Singer's analysis. I'm just trying to
11 understand the principles behind this particular
12 criticism, and as I understand it the particular
13 criticism is that to the extent Dr. Singer is
14 assuming that revenues are constant in the actual
15 world, that is not an appropriate assumption
16 because what he should be focused on in computing
17 damages are the revenues in the but-for world; is
18 that right?
19    A. Let's just say that you -- if I read back
20 your entire sentence there, it was kind of long,
21 and I just stopped with "because" -- I put a period
22 before the "because" and if you'll read back what
23 that says, I think I can agree with that
24 statement.
25    Q. Dr. Singer is assuming that revenues are

426

1 constant in the actual world that is not an
2 appropriate assumption?
3    A. Yes.
4    Q. Okay. And the reason why that's not
5 appropriate is because what an economist should do
6 in computing damages in an antitrust trust is take
7 into account all of the differences that would
8 occur in the but-for world, including the total
9 amount of revenues available to pay damages, right?
10    A. Well, you're assuming -- you're assuming
11 the appropriateness in that statement of
12 Dr. Singer's damage calculation that's based on a
13 share of revenues, and I'm -- so I'll just put it
14 in the context of his damage calculation, which is
15 just wrong, even within that context if you assumed
16 arguendo it was a way to calculate damages, you'd
17 still have to take into account that the world's
18 going to be different when those contract
19 restrictions are removed.
20    Q. Okay. Let's assume that we're talking
21 about an economist that didn't use share in his or
22 her damages analysis. They used wage level. So we
23 don't have the share problem that I think we're
24 getting hung up on. In that situation in
25 attempting to compute the effect of challenged

427

1 conduct on compensation one would need to assess
2 the total amount of revenues in the but-for world,
3 not the actual world; is that right?
4      MR. WIDNELL: Objection, form.
5 BY THE WITNESS:
6    A. Now I don't know -- where do revenues come
7 into this now? We just took it out of the
8 left-hand side. Maybe -- you know, if I wanted to
9 do a proper analysis I might have to compute the
10 market equilibrium in a world where revenues have
11 changed, but for the purposes of some -- if all
12 we're changing is the regression and saying we're
13 going to put compensation on the left-hand side or
14 the log of compensation on the left-hand side
15 rather than the share of revenues of -- the wage of
16 an athlete divided by event revenue, well, now
17 revenues aren't in the model, correct? They just
18 disappeared.
19    Q. Well, let's say that the regression
20 produced a percentage by which compensation was
21 reduced as between the actual world and the but-for
22 world. That's something that could happen with a
23 regression, right?
24      MR. WIDNELL: Objection, form.
25 BY THE WITNESS:

41 (Pages 424 to 427)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

428

1      A.  Let's suppose we had a case that -- let me
2  see if I can help you out or you can help me out or
3  we can help each other out.
4      Q.  Good.
5      A.  Suppose there's a regression of wages on
6  some all-agreed-upon conduct indicator.  Okay?  So
7  there's -- and there's a before and after.
8      Q.  Okay.
9      A.  And we say that wages were 2 percent lower
10 controlling for other stuff in the conduct period,
11 okay, and we're not doing anything about the --
12 forget critiques of whether the conduct -- and
13 suppose it was a really good controlled experiment
14 before and after.
15     Q.  Fair enough.
16     A.  Then there's a 2 percent impact of the
17 conduct, okay, which, as I just said, we're all
18 going to agree that this is right -- the right way
19 to measure the conduct.
20     Q.  Understood.
21     A.  Then one would need the stipulation along
22 with that that the practices in question didn't
23 have some offsetting impact that would have raised
24 pay because -- but we have a before and after
25 that's the conduct period.  So we've really taken

429

1  that into account.
2      Q.  So let's say in your example with the
3  well-specified regression showing a 2 percent
4  decrease in wages after when compared to before
5  that revenues were different in the after period
6  and the before period.  Would you multiply the 2
7  percent times the amount of revenues that you
8  thought would be existing in the but-for world or
9  the amount of revenues that would be existing in
10 the actual world?
11         MR. WIDNELL:  Objection, form.
12 BY THE WITNESS:
13     A.  Okay.  Well, see, you know, I didn't
14 succeed in getting us on the same page because you
15 just multiplied by revenues.  So revenues just came
16 sneaking in through the back door.  It was a
17 2 percent change in their pay, their compensation,
18 their salary.
19     Q.  Okay.  I understand.
20     A.  Revenues is gone.
21     Q.  All right.  Understood.  Okay.  So do you
22 multiply, then, by the total amount of compensation
23 paid to the workers in the actual world or the
24 total amount of compensation you believe would have
25 been paid to the workers in the but-for world?

430

1      A.  For the experiment we just did, you know,
2  we controlled for growth and other stuff and it was
3  just the -- I think if we understand each other,
4  it's a 2 percent reduction in wages.  So give them
5  2 percent of their wages.
6      Q.  Let's say that the conduct in question had
7  another effect -- strike that.  I get it.  I'll
8  move on.
9         Paragraph 108, please.  You state in
10 paragraph 108 on page 47 -- I think I have the
11 wrong paragraph here.  Oh, I mean paragraph 109.
12         You quote or paraphrase something from
13 Dr. Singer.  You say "As Dr. Singer notes, athletes
14 value the opportunity to develop their careers by
15 fighting against highly-ranked opponents and
16 audiences are drawn to fights among highly ranked
17 opponents"; do you see that?
18     A.  Yes.
19     Q.  Do you agree with Dr. Singer's
20 observation?
21     A.  That people want to fight highly ranked
22 opponents?
23     Q.  Yes.
24     A.  Well, they want to fight highly-ranked
25 opponents when they think they're ready to fight

431

1  highly-ranked opponents.
2      Q.  And are audiences drawn to fights among
3  highly-ranked opponents?
4      A.  I think -- I think ratings are higher.  I
5  think there was some evidence that ratings are
6  higher when highly-ranked people fight against each
7  other.
8      Q.  Do you agree that MMA fighters value the
9  ability to develop their careers by fighting
10 against highly-ranked opponents when they're ready
11 to fight them?
12     A.  Yeah.  I think that's why they sign up.
13 That's one of the reasons they sign up.
14     Q.  Is it fair to say that a fighter can't --
15 cannot advance in the rankings unless that
16 fighter's able to fight other fighters that are
17 ranked higher than them, right?
18         MR. WIDNELL:  Objection, form.
19 BY THE WITNESS:
20     A.  I don't think that's literally true, but
21 you don't have to fight somebody higher than you to
22 move up.
23     Q.  But in order to substantially move up in
24 the rankings, all things equal, it would be better
25 for you to fight higher ranked fighters, correct?

42 (Pages 428 to 431)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

432

1          MR. WIDNELL: Objection, form.
2    BY THE WITNESS:
3          A. Since I don't know exactly how the ratings
4    or the rankings happen, let's assume they're like
5    college football rankings, then you take into
6    account the types of opponents you've had and how
7    you did and somebody has a formula that tries to
8    take that into account. Same thing with golf
9    rankings and all sorts of things.
10         Q. All things equal, consumers will be
11   willing to pay more to see highly-ranked opponents
12   fight than lower-ranked opponents fight; is that
13   fair?
14         MR. WIDNELL: Objection, form.
15   BY THE WITNESS:
16         A. In every instance, no, but on average
17   probably yes.
18         Q. Higher ranked fighters, all things equal,
19   generate more revenues when they fight than
20   lower-ranked fighters, correct?
21         MR. WIDNELL: Objection, form.
22   BY THE WITNESS:
23         A. Not always, but on average that's probably
24   true.
25         Q. Turn to paragraph 96, please. In the

433

1    first sentence after the dash you state "There is a
2    natural tendency for a leading promoter to attract
3    a significant share of the top athletes"?
4          A. Yes.
5          Q. "This follows," you say, "from the
6    complimentarity of athlete talents in producing
7    high-quality bouts" --
8          A. That's the point we just made.
9          Q. -- "and the desire among athletes to fight
10   against the best"; do you see that?
11         A. Yes.
12         Q. And you agree with that?
13         A. Yes.
14         Q. Can you please explain the natural
15   tendency for a leading promoter to attract a
16   significant share of the top athletes. What does
17   that mean?
18         A. It means that athletes -- their talents
19   are complementary, that the good athletes want to
20   be in the places where the -- where the other good
21   athletes are so they can fight them. And then
22   it's -- it's kind of a feedback system that you
23   attract some of the good athletes, they fight well,
24   it makes it more attractive for the other good
25   athletes, and so on. So Zuffa kind of runs a

434

1    platform that has been successful in attracting the
2    top athletes and that complementarity plays a
3    role.
4          Q. How do you define "significant share" as
5    you use that term in this sentence?
6          A. All other things equal, a firm that is
7    attracting the top athletes will see its share
8    among the top athletes rise.
9          Q. And that's because fighters generally have
10   an interest in competing against the best fighters,
11   right?
12         A. Well, that's part of it, but the
13   complementarity is there's more energy created when
14   you put the good fighters against each other. So
15   the -- the customers like that too.
16         Q. And those are the fights that would likely
17   lead to career advancement and higher compensation
18   ultimately, correct?
19         MR. WIDNELL: Objection, form.
20   BY MR. CRAMER:
21         Q. The ones with higher energy.
22         A. Broadly speaking.
23         Q. Broadly speaking, yes?
24         A. Broadly speaking, if I -- if I'm
25   successful against higher-ranked people, I will

435

1    probably advance more and get paid more and so on,
2    as I understand the process.
3          Q. You can put that paragraph aside.
4          Would you agree with me that by
5    restricting fighter mobility used the challenged
6    contracts Zuffa's made it more difficult for other
7    MMA promotions to access UFC's top fighters, all
8    things equal?
9          A. No.
10         Q. Are you aware that Zuffa and banks working
11   with Zuffa have seen the challenged contracts and
12   describe the challenged contracts as barriers to
13   entry to rivals?
14         A. I think I know what you're -- to what you
15   are referring and I wouldn't characterize it that
16   way.
17         Q. All right. Would you take a look at what
18   has been marked as Exhibit 12. We marked it
19   earlier today. It was in the pile in front of you.
20         A. Exhibit --
21         Q. 12. It is the --
22         A. It's the Deutsche Bank?
23         Q. Correct.
24         A. What page do you want?
25         Q. I would like you to turn to page 7 of the

43 (Pages 432 to 435)

PUBLIC COPY – REDACTED

Case 2:15-cv-01045-RFB-BNW   Document 609-16   Filed 10/24/18   Page 27 of 41
Case 2:15-cv-01045-RFB-PAL   Document 568-35   Filed 09/21/18   Page 27 of 41
ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



44 (Pages 436 to 439)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



440

442

20    MR. CRAMER:  All right.  I'd like to show
21  you -- or have marked as Exhibit 17 the next
22  document.
23          (Topel Exhibit 17 was marked
24            as requested.)
25  BY MR. CRAMER:

441

443

1    Q.  Exhibit 17 is a two-page series of e-mails
2  bearing the Bates range WME-Zuffa-00013978 through
3  979.  The cover e-mail is from Brent Richard to
4  Al Pfitzenmaier and its subject is "Risks and
5  mitigants" and it's dated --
6    A.  I'm a little confused.  This one says it's
7  from Brent Richard to Brent Richard.  So...
8    Q.  -- and it's dated March 20, 2016.  There's
9  an e-mail at the bottom that he must have been
10  sending it to himself --
11    A.  That's my --
12    THE REPORTER:  One at a time, please.
13    THE WITNESS:  Sorry.
14  BY MR. CRAMER:
15    Q.  Do you know who Brent Richards is?
16    A.  It says here he's the global head of M&A
17  at WME and IMG.
18    Q.  Okay.  And you've seen this document
19  before, right?
20    A.  Yeah, I probably saw this.  I've seen
21  thousands of documents.
22    Q.  Well, you rely upon it in your footnote 46
23  and 407; is that right?
24    A.  Let's take a look at it, footnote 46 and
25  407.  What is this supporting -- okay.  Okay.  And

45 (Pages 440 to 443)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

444

1    then what's the other footnote?
2        **Q. 407.**
3        A. Okay.  Somewhere on there -- there it is.
4    Okay.  Same quote.  It appears twice.
5        **Q. Okay.**
6        A. Yes.
7        **Q. So you -- you believe this document is a**
8    **reliable source of information about Zuffa; is that**
9    **fair?**
10            MR. WIDNELL:  Objection, form.
11   BY THE WITNESS:
12       A. I believe that Dr. Singer quoted it in the
13   context that it was used by him.
14       **Q. And you quote from it too, right?**
15       A. Well, I'm quoting -- didn't he quote that?
16       **Q. I'm sure that he did, and you did as well.**
17       A. That's his -- that's his quote.  So I'm
18   quoting him.
19       **Q. All right.  Do you believe that this**
20   **document is a reliable source of information**
21   **regarding Zuffa's business practices?**
22       A. I think it's a reliable source of
23   information for that quote that was provided by
24   Dr. Singer.
25       **Q. Okay.**

445

1        A. What -- what part are you pointing to?
2    And then we can talk about it.

446

447

13       **Q. You can put that aside.**
14       A. Okay.
15       **Q. Turn to footnote 233 on page 72 of your**
16   **report.**
17       A. Footnote 233?
18       **Q. Yeah.  In the first sentence of footnote**
23       A. Hold on.  Let me read it in context.
24   Okay?
25            (Witness reviewing document.)



46 (Pages 444 to 447)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



448

1   BY THE WITNESS:
2      A.  Yes.

450

8      Q.  All right.  Would you agree with me that
9   not all fighters are exact substitutes for each
10  other?
11     A.  I'll agree with that.
12     Q.  Would you agree with me that some fighters
13  are more important to an MMA promotion than others?
14     MR. WIDNELL:  Objection, form.
15  BY THE WITNESS:
16     A.  Yes.
17     Q.  Some generate more revenues when they
18  fight than others; is that right?
19     A.  Yes.
20     Q.  And those that are capable of generating
21  more revenues when they fight, all things equal,
22  are more valuable to their promotion than other
23  fighters; is that right?
24     A.  The operative word there is generate, but
25  go ahead.

449

451

1      Q.  Is that right?
2      A.  It depends on how the particular fighter
3   is -- is evaluated by the organization, but on
4   average you'd rather have people who are capable of
5   generating more revenue.
6      Q.  Would it be fair to say that, all things
7   equal, the more a fighter is capable of generating
8   revenue, all things equal, the more important it is
9   for that promotion to ensure that that fighter
10  cannot freely leave the promotion to go to another
11  promotion?
12     MR. WIDNELL:  Objection, form.
13  BY THE WITNESS:
14     A.  That was a complicated question.  Could
15  you read it back, please.
16     Q.  Yeah.  Is it fair to say that, all things
17  equal, the more revenues a fighter is capable of
18  generating for a promotion the more important it is
19  for that promotion to ensure that that fighter does
20  not freely leave the promotion to go to another
21  promotion?
22     A.  Well, no --
23     MR. WIDNELL:  Same objection.
24  BY THE WITNESS:
25     A.  -- depends on what we're paying them.  I

47 (Pages 448 to 451)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



452

1 shouldn't have said we. I'm thinking about a
2 generic firm here. I've got somebody that's got a
3 high marginal product but I pay that person a lot.
4 You know, my incentive to retain that person
5 depends on how profitable that person is to me. So
6 if you change your question and say if this person
7 is really profitable to me would I rather not lose
8 them.
9     Q. Yes.
10     A. Yes.
11     Q. Turn to footnote 237, please, on page 74.
12 In the third sentence there -- you're talking about
13 a regression you did, and in the third sentence you
17     A. Let me read the footnote and stuff.
18     Q. Please do.
19     A. And actually -- okay. Here we go.
20         (Witness reviewing document.)
21 BY THE WITNESS:
22     A. Yes, now I've got to read 2 -- you want me
23 to read 237?

453

5     Q. And that's because, all things equal, it's
6 possible that an athlete's ranking would bear upon
7 its compensation?
8     A. Well, to put it more broadly, the -- when
9 we're comparing the compensation across time, we're
10 want to do as much as we can to hold constant the
11 composition of the fighters in different years.
12     Q. Would you agree that an athlete's
13 ranking -- that, all things equal, the higher an
14 athlete's rank the higher a compensation he will
15 make?
16         MR. WIDNELL: Objection, form.
17 BY THE WITNESS:
18     A. That should -- did you say on average
19 something?
20     Q. On average.
21     A. I wouldn't be surprised if that's true.
22     Q. Do you know whether or not Zuffa uses an
23 athlete's ranking in considering how much to pay a
24 fighter?
25     A. I haven't looked. If I have looked, I

454

1 don't remember any documents that say we're going
2 to -- we think -- we think of weighting or think
3 of ranking in the following way, but I guess I'd be
4 surprised if they weren't interested in that.
5     Q. Are you aware that state athletic
6 commissions use ranking in deciding whether or not
7 to approve fights that MMA promoters like Zuffa
8 propose to the commissions?
9     A. Let me just clarify. Are you -- first of
10 all, I'm not aware that they use ranking. Okay?
11     Q. Okay. Would that surprise you?
12     A. No.
13     Q. Why not?
14     A. I suppose it's because -- what immediately
15 came to mind, although this isn't part of my
16 opinion anywhere, I don't want to be thrown like me
17 in against some really accomplished guy, you know,
18 because I'm going to end up not feeling very good
19 at the end of it.
20     Q. And rankings would help determine whether
21 you, an unranked MMA fighter, and Conor McGregor
22 should be fighting against each other?
23         MR. WIDNELL: Objection, form.
24 BY THE WITNESS:
25     A. He could beat me with both hands tied

455

1 behind his back.
2     Q. And probably both legs tied behind his
3 back. All right.

48 (Pages 452 to 455)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

460

1  when you run this regression you're going to get
2  that.  Unless, as you say, they had some
3  mechanical -- another mechanical thing in there
4  that says every time our revenues go up by 10
5  percent we're going to increase compensation by 10
6  percent, okay, but we're doing a monopsony case
7  here where the allegation is that they reduce
8  compensation.  So even if they didn't reduce
9  compensation, even if they didn't change it, even
10 if they increased it by some smaller amount, a bump
11 on this side is going to cause a reduction on this
12 side.  It's kind of a teeter-totter.

22      **Q.  And if it did, then there would be no**
23 **negative correlation between this foreclosure**
24 **measure and athlete's share of revenue, right?**
25      MR. WIDNELL:  Objection, form.

461

1  BY THE WITNESS:
2      A.  Then you don't need a regression because
3  you just told me the share never changes.  So
4  you're just putting a constant on the left-hand
5  side.
6      **Q.  Assume for this question that Zuffa's**
7  **event revenues are increasing but at a slower rate**
8  **than event revenues at other MMA promotions.  Okay?**
9      A.  Okay.
10     **Q.  In that instance, all things equal,**
11 **Zuffa's foreclosure share would fall, right?**
12     MR. WIDNELL:  Objection, form.
13 BY THE WITNESS:
14     A.  So -- okay.  So you keep the athletes the
15 same, but event revenues rise faster for others?
16 Yeah, that can happen.
17     **Q.  So in order for Zuffa's foreclosure share**
18 **under the revenue-weighted measure to increase,**
19 **Zuffa must be earning a growing share of all MMA**
20 **event revenues, right?**
21     A.  Yeah.  I think that's the point we made in
22 our appendix.
23     **Q.  So rising Zuffa event revenues does not**
24 **automatically cause Zuffa's foreclosure shares to**
25 **mechanically increase, right?**

462

1      A.  I was making a point about the comparative
2  advantage and success of Zuffa.  So as Zuffa
3  becomes more successful relative to other firms --
4  I think I even phrased it this way -- its
5  revenue-weighted share is going to rise.
6      **Q.  But the mere fact that Zuffa's event**
7  **revenues are rising would not automatically cause**
8  **Zuffa's foreclosure shares to rise, right?**
9      A.  If everybody's event revenues rose at the
10 same rate, that would leave Zuffa's -- what he
11 calls -- the share that Mr. Singer calculates
12 would -- if I recall correctly, would not change.
13     **Q.  Turn to paragraph 227, please.  You say**
14 **there in the first sentence "The conceptual flaw in**
15 **Dr. Singer's use of revenue weighted input shares**
16 **is further illustrated by the following**
17 **implication.  Revenue weighted input shares imply**
18 **that firms with significant market power in the**
19 **output market also have a significant market**
20 **share -- or significant share of the input market."**
21 **Do you see that?**
22     A.  Yes.
23     **Q.  And then you say a little bit further on**
24 **on page 98 "This result is not supported by the**
25 **economic literature which recognizes that firms**

463

1  with significant market power and share in an
2  output market can operate in and have a small share
3  of a highly competitive input market"; do you see
4  that?
5      A.  Yes.
6      **Q.  It's fair to say you don't cite anything**
7  **for that proposition in this report, correct?**
8      A.  Well, it's just -- you don't have to have
9  market power and inputs -- a firm that has market
10 power and inputs -- excuse me.  A firm that has
11 market power and output doesn't -- for most of its
12 inputs doesn't have any market power.  I mean,
13 Microsoft buys pencils.  It doesn't have any
14 market -- if we stipulate that Microsoft has market
15 power in the output market for the operating
16 systems, it buys pencils competitively.
17     **Q.  Now, you're not saying that it's**
18 **impossible for a firm with monopoly power in the**
19 **output market to have monopsony power in an input**
20 **market, are you?**
21     A.  No.
22     **Q.  You're just saying that the former,**
23 **meaning monopoly power in the output market,**
24 **doesn't necessarily imply the latter, monopsony**
25 **power in the input market, right?**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

464

1       A.  Correct.
2       Q.  So assume for this question that there's
3   an MMA promotion that has a monopoly on the
4   promotion of professional MMA events.  It's the
5   only one.  You would agree that by definition this
6   is the only place an MMA fighter could get paid to
7   compete as an MMA fighter, right?
8       MR. WIDNELL:  Objection, form.
9   BY THE WITNESS:
10      A.  Yeah.  I don't -- I don't disagree with
11  that if they've got a monopoly.  It takes -- it
12  takes fighters in the output market to sell
13  services and it takes fighters in the input market
14  to get those services.
15      Q.  So it's fair to say that if you control
16  the output market in a professional sport, you
17  control the input market for the athletes that play
18  that sport as well, correct?
19      A.  No.  No.  The input market for that --
20  you've assumed that there are no good substitutes
21  for the athletes themselves, and -- you know, I
22  might be the -- let's pick a sport.  I might be the
23  monopolist on Major League Soccer in the United
24  States, but I can still be hiring soccer players
25  from everywhere and not have much market power over

465

1   the price I pay for soccer players.
2       Q.  Let's say you're the global monopolist for
3   soccer.  You control it all.  You control the
4   output market for the sport.  The only place that
5   professional soccer players have to play is you,
6   right?
7       A.  And if there's an inelastic supply of -- I
8   mean, what's going to happen in the input market is
9   that in that instance it depends on the elasticity
10  of supply of soccer players and then --
11      Q.  In other words, whether players would come
12  from some other sport or could go to another sport?
13      A.  Well, they could do all kinds of things.
14  There's some elasticity of supply of soccer
15  players.  We know that's true, it's not zero.  And
16  so the pricing and I've got two decisions to make,
17  how I operate in the input market and how I operate
18  in the output market, and it's going to depend in a
19  kind of a complicated way on the elasticity of
20  demand in the output market and the elasticity of
21  supply in the input market what ends up happening,
22  the prices I charge and pay in two markets.
23      THE VIDEOGRAPHER:  Five minutes on disk.
24      MR. CRAMER:  Let's take a break and go off
25  the record.

466

1       THE VIDEOGRAPHER:  Going off the record at
2   2:33.
3           (A short break was had.)
4       THE VIDEOGRAPHER:  We are going back on
5   the record at 2:35.  This begins disk No. 4.
6   BY MR. CRAMER:

467

51 (Pages 464 to 467)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



468

470

469

471

13    **Q.  All right.**
14        **Now, you say in paragraph 234 that when**
15    **you compare exhibits -- I'm sorry.  In 235 you say**
16    **at the bottom of page 100 "A comparison of Exhibit**
17    **28 to Exhibit 29 shows that much of the difference**
18    **between Dr. Singer's original shares and the**
19    **recalculated shares is due to Dr. Singer's use of**
20    **revenue weights"; do you see that?**
21    A.  Yep.
22        **Q.  And I'm trying to understand how you draw**
23    **that conclusion from a comparison between**
24    **Exhibits 28 and 29 given that the shares in both**
25    **Exhibit 28 and 29 are not revenue weighted?**

52 (Pages 468 to 471)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

472

1    A. His are revenue weighed, the green line.
2    Q. Oh, the green line is revenue weighted?
3    A. Yeah.
4    Q. Okay. And that's what you mean?
5    A. Yeah.
6    Q. Okay. And just so I understand, in this
7  analysis you treat a fighter ranked 1 as the same
8  value as a fighter ranked 15; is that right?
9    A. Yes.
10    Q. For example, you would treat Nunez the
11  same as you treat Rousey; is that right?
12    A. I don't know whether I did that with those
13  two particular fighters, but within a category that
14  would be true. So we didn't inverse weight
15  according to -- we didn't treat 15 as 1/15th of 1.
16    Q. Okay.
17    Turn to paragraph 229. So here you
18  talk -- you point out that Nunez was the champion
19  when she fought Rousey in December of 2016; is that
20  right?
21    A. Yes. That's my recollection.
22    Q. And at that time Rousey was ranked 5th; is
23  that right?
24    A. Yes.

473



21    Q. The main reason that the fight had over
22  1 million Pay-Per-View buys is Rousey, not Nunez,
23  right?
24    A. Sure.
25    Q. All right. You can put that aside.

474

1    Turn to paragraph 65, please. You say in
2  the second sentence on page 26 "In addition to the
3  athletes identified by Dr. Singer in his input
4  market definitions, MMA athletes have come from,
5  among other places, collegiate or Olympic
6  wrestling, boxing programs, martial arts,
7  academies, the military, and other professional
8  sports." Can you identify any top-ranked MMA
9  athletes that were also in the elite ranks of other
10  professional sports?
11    A. I haven't looked at the elite ranks of
12  other professional sports to see who moved over. I
13  know that an elite wrestler tried to move over and
14  got his butt kicked, but --
15    Q. That's correct.
16    A. Yep.
17    Q. Can you identify any top-ranked MMA
18  athlete that was in any rank of another
19  professional sport?
20    MR. WIDNELL: Objection, form.
21  BY MR. CRAMER:
22    Q. Not an elite necessarily. Just someone
23  who played professional football, for example.
24    MR. WIDNELL: Same objection.
25  BY THE WITNESS:

475

1    A. Some of these guys -- some of these guys
2  played other sports, if that's your question, but
3  the facts of their background are that a lot of
4  people came over from other sports and they fight
5  in other sports.
6    Q. Would you agree with me that if -- all
7  things equal, if MMA fighter compensation generally
8  rose relative to the compensation in other
9  professional sports, more potential athletes that
10  would otherwise have gone into these other sports
11  would choose MMA instead?
12    MR. WIDNELL: Objection, form.
13  BY THE WITNESS:
14    A. I think that's likely. That's part of the
15  reason the sport itself has grown.
16    Q. Would you agree that the better -- strike
17  that.
18    That therefore, all things equal, if you
19  increase the compensation to MMA fighters generally
20  you'd attract more qualified athletes?
21    A. I think that's what's happened.
22    Q. And, all things equal, increased fighter
23  compensation --
24    A. I don't know if the average would go up or
25  not. Depends on whether you pull in more

53  (Pages 472 to 475)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



**476**

1  high-ranked -- high-quality people or low-ranked
2  quality people, but the profession would become
3  more attractive relative to other professions.
4  **Q. And, all things equal, if you therefore**
5  **increase fighter compensation relative to other**
6  **sports, that would improve the quality of MMA for**
7  **consumers, right?**
8  MR. WIDNELL: Objection, form.
9  BY THE WITNESS:
10  A. There would be some effect there, yeah.

**477**

11  MR. CRAMER: For the court reporter there
12  have been two words, FightMetric,
13  F-I-G-H-T-M-E-T-R-I-C, and Fight Matrix, F-I-G-H-T,
14  M-A-T-R-I-X.
15  THE REPORTER: Thank you.
16  MR. CRAMER: You're welcome.
17  BY MR. CRAMER:
18  **Q. Can you identify a single MMA promoter**
19  **that you believe was excluded from the FightMetric**
20  **database that has or had a material share of the**
21  **MMA promotion business?**
22  A. I'm sorry.
23  MR. WIDNELL: Objection, form.
24  BY THE WITNESS:
25  A. I'm sorry. Could you say that again.

**478**

1  **Q. Yeah. Can you identify any MMA promoter**
2  **that was not in the FightMetric database that had**
3  **or has a material share of the MMA promotion**
4  **business?**
5  A. Well, if I don't have anybody in here,
6  we've talked about the identities before, but I
7  can't remember.
8  **Q. So sitting here today, you cannot identify**
9  **a single MMA promoter with a material share of the**
10  **MMA market that was not in the FightMetric**
11  **database; is that right?**
12  MR. WIDNELL: Objection, form.
13  BY THE WITNESS:
14  A. I don't recall the names of the promoters
15  that were not in there. I didn't keep track of
16  that.
23  **Q. And Mr. Genauer who created it sells the**
24  **data tracking MMA fighters and their records to MMA**
25  **promoters; is that right?**

**479**

1  A. That's my recollection.
2  **Q. Did you speak to Mr. Genauer --**
3  A. No.
4  **Q. -- in the course of your work?**
5  A. No.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123 1.800.642.1099

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



480

482

```
1      A.  You just handed it to me.
2      Q.  Well, you rely upon it in at least three
3   places in your report; isn't that right?
4      A.  I'm sure it came from attorneys for Zuffa.
5      Q.  You've seen it before, right?
6      A.  I've read a lot of documents.  This looks
7   familiar.
8      Q.  Turn to paragraph 6 on page 1 of the
```

481

483

```
10        MR. CRAMER:  I'd like to mark as the next
11   exhibit the declaration of Abraham Genauer,
12   Exhibit 18.
13            (Topel Exhibit 18 was marked
14              as requested.)
15   BY THE WITNESS:
16      A.  Is this Rommey's --
17        THE REPORTER:  Hold on, please.
18   BY THE WITNESS:
19      A.  I take it this is Rommey's formal name?
20      Q.  Well, this document was produced to the
21   Plaintiffs by Zuffa.  It's signed by Abraham
22   Genauer.  And it was executed October 26, 2017.
23      A.  Got it.
24      Q.  Do you know how this came into your
25   possession?
```

```
22      Q.  Do you know what fantasy sports gaming
23   Websites do with regard to MMA?
24      A.  I suppose they probably have fantasy bouts
25   and then people can participate.
```

55 (Pages 480 to 483)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

484

1     **Q. And it's fair to say that if --**
2     A. That's my recollection.

11     **Q. All right. You can put that aside.**
12     **Is it your opinion that MMA fighters could**
13 **easily substitute from professional mixed martial**
14 **arts to boxing?**
15     A. No.
16     **Q. Is it your opinion that MMA fighters could**
17 **easily substitute from MMA fighting to football?**
18     MR. WIDNELL: Objection, form.
19 BY THE WITNESS:
20     A. You mean to NFL football?
21     **Q. Yes.**
22     A. No.
23     **Q. Is it your opinion that MMA fighters could**
24 **easily substitute from MMA fighting to playing**
25 **tennis, professional tennis?**

485

1     MR. WIDNELL: Objection, form.
2 BY THE WITNESS:
3     A. No.
4     **Q. Other than Conor McGregor, can you**
5 **identify another MMA fighter who became a**
6 **successful professional boxer for more than one**
7 **fight?**
8     MR. WIDNELL: Objection, form.
9 BY THE WITNESS:
10     A. No. Are you counting him as successful?
11     **Q. You can determine that. Was he**
12 **successful, in your opinion?**
13     A. He made money. He lasted longer than I
14 would have thought.
15     **Q. Did you in your report do an analysis as**
16 **to whether there are other combat sports to which**
17 **professional MMA fighters could switch if their**
18 **compensation fell a small but significant agree?**
19     MR. WIDNELL: Objection, form.
20 BY THE WITNESS:
21     A. Whether -- whether there are other sports?
22     **Q. Yes.**
23     A. Well, they surely could switch to some
24 degree. The magnitude, I didn't calculate it.
25     **Q. Have you done an -- strike that.**

486

1     **Have you done any analysis of how much it**
2 **would cost to train to switch from professional MMA**
3 **fighting to another sport?**
4     MR. WIDNELL: Objection, form.
5 BY THE WITNESS:
6     A. I've done no financial analysis of such
7 switching.
8     **Q. Did you do any analysis of how much time**
9 **it would take for a professional MMA fighter to**
10 **switch from professional MMA to another sport?**
11     A. My understanding it takes various amounts
12 of time.
13     **Q. Would you agree that it takes a tremendous**
14 **amount of skill and training to be a top-level MMA**
15 **professional fighter?**
16     MR. WIDNELL: Objection, form.
17 BY THE WITNESS:
18     A. I think it takes a lot of skill to be a
19 top athlete in any category.
20     **Q. Is it fair to say that in order to be --**
21 **in order to be a top-level professional MMA fighter**
22 **one would need to be an extraordinary athlete; is**
23 **that fair?**
24     MR. WIDNELL: Objection, form.
25 BY THE WITNESS:

487

1     A. They are athletic. Whether they're as
2 athletic as some other field, I don't know.
3     **Q. Is it fair to say that in order to be a**
4 **top-level MMA fighter that athlete would need to be**
5 **knowledgeable about several martial arts**
6 **disciplines?**
7     MR. WIDNELL: Objection, form.
8 BY THE WITNESS:
9     A. I think they use several martial arts
10 disciplines. That's why it's called mixed martial
11 arts.
12     **Q. And in order to be a top-level MMA fighter**
13 **the athlete would need to be knowledgeable and**
14 **trained in more than one martial arts discipline,**
15 **correct?**
16     MR. WIDNELL: Same objection.
17 BY THE WITNESS:
18     A. I suppose one could be successful using a
19 limited set of skills, but you say more than one.
20 You're probably able to use more than one. That's
21 why it's called mixed martial arts.
22     **Q. Right. If a boxer tried to become a mixed**
23 **martial artist and all that professional boxer knew**
24 **was boxing, he would get his butt kicked, wouldn't**
25 **he?**

56 (Pages 484 to 487)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL



| | 488 |
|---|---|
| 1 | MR. WIDNELL:  Objection, form. |
| 2 | BY THE WITNESS: |
| 3 | A.  I don't know the answer to that. |
| 4 | **Q.  In order to be a professional MMA fighter** |
| 5 | **at the top level the athlete needs to be in** |
| 6 | **incredible shape; is that true?** |
| 7 | MR. WIDNELL:  Objection, form. |
| 8 | BY THE WITNESS: |
| 9 | A.  Incredible shape?  I mean, there's all |
| 10 | these adjectives flying around that -- it's rough |
| 11 | and tumble in that octagon and to last three rounds |
| 12 | to five rounds against somebody who's fighting you |
| 13 | in that weight takes stamina.  They have to be in |
| 14 | shape.  They have to be in better shape than I |
| 15 | am. |
| 16 | **Q.  In order to be a top-level MMA fighter the** |
| 17 | **athlete must be willing to risk serious injury or** |
| 18 | **death in the ring, correct?** |
| 19 | MR. WIDNELL:  Objection, form. |
| 20 | BY THE WITNESS: |
| 21 | A.  Well, I don't think -- what does it mean |
| 22 | to risk death?  I mean, people die in boxing.  I |
| 23 | don't know if anybody's ever died in mixed martial |
| 24 | arts.  I know it's regulated.  So it's not going to |
| 25 | be extraordinarily risky, but you can get hurt in |

| | 489 |
|---|---|
| 1 | there and there are fights that I've watched people |
| 2 | get hurt. |
| 3 | **Q.  And in order to be a top-level MMA fighter** |
| 4 | **you would need to be willing to risk serious injury** |
| 5 | **while fighting, correct?** |
| 6 | MR. WIDNELL:  Same objection. |
| 7 | BY THE WITNESS: |
| 8 | A.  That's true in any sport, but keep |
| 9 | going. |
| 10 | **Q.  You think it's more true in tennis that an** |
| 11 | **athlete will get seriously injured or mixed martial** |
| 12 | **arts, which one?** |
| 13 | A.  Probably in mixed martial arts. |
| 14 | **Q.  Turn to paragraph 304, please.  In** |
| 15 | **paragraph 304 you're talking about Zuffa's** |
| 16 | **acquisition of Pride, among other things, and in** |

| | 490 |
|---|---|
| 7 | **Q.  After Zuffa's acquisition of Pride it's** |
| 8 | **fair to say that Zuffa shut Pride down, correct?** |
| 9 | MR. WIDNELL:  Objection, form. |
| 10 | BY MR. CRAMER: |
| 11 | **Q.  It stopped running an MMA promotion under** |
| 12 | **the logo Pride, correct?** |
| 13 | MR. WIDNELL:  Objection, form. |
| 14 | BY THE WITNESS: |
| 15 | A.  Well, I don't know what it means to be -- |
| 16 | shut down would be to remove their assets from the |
| 17 | market and by the same -- in the same way that when |
| 18 | my consulting business was sold they kept the name |
| 19 | for a little while and then they folded us in under |
| 20 | the other brand name, but our assets and human |
| 21 | capital were still in the market. |

| | 491 |
|---|---|
| 23 | **Q.  Are you aware -- so the UFC bought Pride** |
| 24 | **in 2007; is that right?** |
| 25 | A.  I think that's the year, but I don't |

57 (Pages 488 to 491)

**PUBLIC COPY – REDACTED**

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

492

1    remember.
2        Q.  So if the UFC -- are you aware about
3    whether the UFC put on an event in Japan between
4    2007 and 2012?
5        A.  I don't recall.
6        Q.  Would it surprise you to learn that after
7    the acquisition of Pride in 2007, which you say was
8    an effort to enter into the Asian MMA market, that
9    Zuffa did not put on an MMA event in Asia until
10   February of 2012?
11       MR. WIDNELL:  Objection to form.
12   BY THE WITNESS:
13       A.  Doesn't surprise me because this
14   investment didn't turn out so well, especially when
15   the connection with management to the Yakuza became
16   evident.
17       Q.  You mean that Zuffa did not know before it
18   paid $47 million to the owners of Pride that Pride
19   had a relationship with organized crime in Japan?
20       MR. WIDNELL:  Objection, form.
21   BY THE WITNESS:
22       A.  I don't know whether they had knowledge of
23   it, but it didn't play out the way they had
24   anticipated.
25       Q.  Well, wasn't it notorious that Pride's

493

1    owners had a relationship with organized crime in
2    Japan?
3        MR. WIDNELL:  Objection, form.
4    BY THE WITNESS:
5        A.  Well, I say here "Nothing would prevent
6    him from using his local connections, including his
7    alleged connections to Japanese organized crime."
8    So somebody had some suspicions and how those
9    played out I don't know, but I know that management
10   had to be replaced.
11       Q.  Turn to paragraph 60, please.
12       A.  Yes.
13       Q.  The third sentence -- or the sentence
14   beginning "One of Zuffa's key business
15   initiatives"; do you see that?  Starts about midway
16   through the paragraph.
17       A.  Yes.
18       Q.  It says "One of Zuffa's key business
19   initiatives was an expansion of its events to
20   include international offerings and for developing
21   new markets for MMA outside the United States"; do
22   you see that?
23       A.  Yep, that was one of their initiatives.
24       Q.  What new markets?
25       A.  Well, they tried to run some stuff in

494

1    Asia.  My understanding is they've tried to run
2    things in Europe.  How successful they've been I
3    don't know.
4        Q.  Turn to paragraph 96, please.
5        A.  Yes.
6        Q.  In the last sentence on -- of paragraph 96
7    on page 42 that begins "In this regard"; do you see
8    that?
9        A.  Uh-huh.
10       Q.  You write "In this regard it is noteworthy
11   that in Asia, which is one of the other geographic
12   market for MMA identified by Dr. Singer, he cites
13   one championship's claim that it has a 90 percent
14   market share"; do you see that?
15       A.  Yes.
16       Q.  Why is that noteworthy?
17       A.  Well, one has a 90 percent market share,
18   it's not as if nobody can compete against --
19   against Zuffa and Zuffa's actually tried to compete
20   in that marketplace and hasn't been so
21   successful.
22       Q.  The 90 percent figure is of the Asian MMA
23   market; is that right?
24       A.  Yes.
25       Q.  All right.  You can put that aside.

495

1        MR. WIDNELL:  When you say put that aside,
2    you mean the report?
3        MR. CRAMER:  Oh, no.  I still have more
4    from the report.
5        THE WITNESS:  Darn.  I was putting it
6    aside.
7        MR. CRAMER:  Yeah.  Yeah.
8        MR. WIDNELL:  That was cruel.
9    BY MR. CRAMER:
10       Q.  Well, before I go back to the report --
11   turn to paragraph 201.  In the first two sentences
12   you say "In his regression assessing common impact
13   Dr. Singer only considers the impact of the
14   contractual restrictions in PAR contracts that he
15   claims extend the period of exclusivity when an
16   athlete is under contract to Zuffa.  Similarly,
17   when computing damages using his foreclosure
18   regression benchmark, Dr. Singer only estimates the
19   harm due to the alleged foreclosure provisions."
20       What do you mean by that?
21       A.  I mean you have a list of challenged
22   conduct and not all of it goes into the calculation
23   of his -- his foreclosure shares.  You know, you
24   have to put all of the alleged conduct in front of
25   me because it's late in the day.

58 (Pages 492 to 495)

PUBLIC COPY – REDACTED

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

496

1      Q. Well, you list some of them in the next
2  sentence.
3      A. Yeah.
4      Q. There's the horizontal acquisitions, the
5  counter programming; do you see that?
6      A. Yeah.
7      Q. And what you're saying is that the -- at
8  best the foreclosure analysis only considers the
9  impact from the challenged -- contractual
10  restrictions in the par contracts; is that right?
11      A. Yeah.
12      Q. All right. You can put that aside for a
13  minute.
14      Who's Joe Silva?
15      A. Isn't Joe Silva the --
16      Q. Well, I'll refresh your recollection.
17  Turn to paragraph 61.
18      A. Yeah. There are actually two people in
19  this case with the last name of Silva.
20      Q. That's true. There's a fighter. Turn to
21  paragraph --
22      A. What page?
23      Q. Paragraph 61, footnote 9 -- 94.
24      A. Paragraph 61, footnote 94.
25      Q. Right. In footnote 94 you cite the

497

1  deposition of Joe Silva, right?
2      A. Yes.
3      Q. Does it refresh your recollection that he
4  was the matchmaker for Zuffa?
5      A. Yes, it does.
6      Q. Does it sound right that he worked for
7  Zuffa from about 2001 to 2016?
8      A. That's familiar, but if you asked me to
9  verify that those are the dates, don't do that.
10      Q. Okay. Are you aware that he also
11  negotiated fighter contracts with some of the
12  fighters?
13      A. Yes.
14      Q. Are you aware that he worked for Zuffa
15  prior to the -- worked for the UFC prior to the
16  UFC's acquisition of Zuffa?
17      A. So he was carried over as an element of
18  management.
19      Q. Yes.
20      A. Yes.
21      MR. WIDNELL: I'm sorry. You mean prior
22  to Zuffa's acquisition of UFC?
23      MR. CRAMER: Yes.
24      THE WITNESS: Isn't that what he said?
25      MR. WIDNELL: He said UFC acquisition of

498

1  Zuffa.
2      THE REPORTER: One at a time, please.
3  BY MR. CRAMER:
4      Q. Let me ask the question again. Thank you.
5  Are you aware that Mr. Silva, Joe Silva worked for
6  the UFC prior to Zuffa's acquisition of the UFC?
7      A. I think I agreed to that.
8      Q. Okay. All right. And in paragraph 61 you
9  are citing Joe Silva as an authority about the
10  types of athletes necessary to run a successful MMA
11  promotion; is that fair?
12      MR. WIDNELL: Objection, form.
13  BY THE WITNESS:
14      A. It's more about a process of identifying
15  those athletes.
16      Q. And you believe he's a knowledgeable
17  resource on that topic?
18      A. He's a participant.
19      Q. And do you believe he's a reliable source
20  regarding the quality of MMA talent?
21      A. He's reliable for --
22      MR. WIDNELL: Objection, form.
23  BY THE WITNESS:
24      A. -- for the purposes that I used here.
25      Q. And one of the purposes for which you used

499

1  him here was what it takes to successfully run an
2  MMA promotion; is that right?
3      A. Yes.
4      Q. Turn to paragraph 76, please. In footnote
5  129 you'll see that you -- here again is the
6  deposition of Joe Silva, you cite him again; is
7  that right?
8      A. Yes.
9      Q. And you cite him here when discussing
10  Zuffa's competition for what you call,
11  quote/unquote, named fighters; is that right?
12      MR. WIDNELL: I'm sorry. What are you
13  referring to?
14  BY MR. CRAMER:
15      Q. The last sentence of paragraph 76 says
16  "Since Zuffa's inception it has been outbid for
17  what Joe Silva called 'named fighters' by other MMA
18  promotions"; do you see that?
19      A. Yes. Excuse me.
20      Q. And you cite Mr. Silva's deposition for
21  that proposition; is that right?
22      A. Yes.
23      Q. Would you agree that Mr. Silva's a
24  reliable source regarding MMA fighter talent
25  acquisition?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 502, New York, NY 10123  1.800.642.1099

PUBLIC COPY – REDACTED