WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER #3568
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC, d/b/a
Ultimate Fighting Championship and UFC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant. | Case No.: 2:15-cv-01045-RFB-(PAL)<br><br>**DEFENDANT ZUFFA, LLC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**HEARING REQUESTED**<br><br>**[REDACTED]** |

1

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    Plaintiffs' Claims Now Rest On A New Theory Of Liability And Must Be
Dismissed. ...................................................................................................... 2

II.   Plaintiffs' Claims Fail Because They Do Not Define Relevant Markets..................... 3

    A.   Plaintiffs' Input Markets for a Monopsony Claim Are Legally Insufficient. ...... 3

    B.   Plaintiffs' Evidence Does Not Define An Output Market For a Monopoly
Claim. .................................................................................................. 6

III.   Zuffa is Entitled to Summary Judgment on Plaintiffs' Monopsonization Claim.......... 7

    A.   The Undisputed Evidence Shows Competition. .................................................. 7

    B.   Plaintiffs Cannot Show A Genuine Issue of Fact Concerning Monopsony
Power. ................................................................................................ 10

        1.   Plaintiffs Cite No Relevant Direct Evidence Of Lower Compensation.... 10

        2.   The Undisputed Evidence Shows No Restriction In Output.................... 11

        3.   Plaintiffs Fail To Show A Genuine Issue Of Fact Concerning
Circumstantial Evidence Of Market Power. ............................... 11

    C.   Plaintiffs Fail To Rebut Evidence That Zuffa Did Not Engage In Exclusionary
Anticompetitive Conduct. ................................................................... 12

        1.   Plaintiffs' Allegations Fit Squarely Within a Predatory Hiring Claim..... 12

        2.   Plaintiffs Fail To Raise A Genuine Issue Of Material Fact That Zuffa's
Contracts Did Not Substantially Foreclose Competition ......................... 13

            a.   Plaintiffs Do Not Put Forward Evidence That Zuffa's Legitimate
Business Justifications Are Pretextual. ......................................... 15

        3.   Plaintiffs Have No Evidence Of Anticompetitive Acquisitions or
"Coercion" ................................................................................ 17

IV.   Zuffa Is Entitled To Summary Judgment On Plaintiffs' Monopolization Claim. ....... 19

V.   Plaintiffs Have No Evidence to Support Their Identity Class Claim.......................... 20

VI.   Plaintiffs Do Not Have Standing To Bring Claims For Injunctive Relief. ................. 20

VII.   Plaintiffs Do Not Raise Genuine Factual Disputes In The CSOF. .................... 20

    A.   The CSOF Relies on Improper or Inadmissible Evidence to Attempt to Create a
Genuine Issue of Material Fact. .......................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**

*A. H. Cox & Co. v. Star Mach. Co.*
  653 F.2d 1302 (9th Cir. 1981)..................................................................... 7

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*
  836 F.3d 1171 (9th Cir. 2016)..................................................................... 14

*Airweld, Inc. v. Airco, Inc.*
  742 F.2d 1184 (9th Cir. 1984)..................................................................... 22

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*
  592 F.3d 991 (9th Cir. 2010)................................................................. 16, 18

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*
  108 F.3d 1147 (9th Cir. 1997)..................................................................... 18

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*
  789 F. Supp. 2d 1201 (C.D. Cal. 2011) ............................................... 18, 19

*Barnes v. AT&T*
  270 F.R.D. 488 (N.D. Cal. 2010)................................................................ 20

*City of Vernon v. S. Cal. Edison Co.*
  955 F.2d 1361 (9th Cir. 1992)............................................................... 16, 26

*Doe v. Arizona Hosp. & Healthcare Ass'n*
  2009 WL 1423378 (D. Ariz. Mar. 19, 2009) ............................................. 10

*Fishman v. Wirtz*
  807 F.2d 520 (7th Cir. 1986)........................................................................ 7

*FTC v. Staples, Inc.*
  970 F. Supp. 1066 (D.D.C. 1997) ................................................................ 4

*FTC v. Sysco Corp.*
  113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................. 5

*FTC v. Whole Foods Market, Inc.*
  548 F.3d 1028 (D.D.C. 2008) ...................................................................... 4

*Gen. Bus. Sys. v. N. Am. Philips Corp.*
  699 F.2d 965 (9th Cir. 1983)...................................................................... 26

*Golden Boy Promotions LLC v. Haymon*
  2017 WL 460736 (C.D. Cal. Jan. 26, 2017) ............................................... 5

*Haro v. Sebelius*
  747 F.3d 1099 (9th Cir. 2014)...................................................................... 20

*Harris v. City of Fresno*
  625 F. Supp. 2d 983 (E.D. Cal. 2009)......................................................... 19

*Hecht v. Pro-Football, Inc.*
  570 F.2d 982 (D.C. Cir. 1977) ...................................................................... 7

*Heerwagen v. Clear Channel Commc'ns*
  435 F.3d 219 (2d Cir. 2006).......................................................................... 7

*Image Tech Serv. Inc. v. Eastman Kodak Co.*
  903 F.2d 612 (9th Cir. 1990)....................................................................... 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
  125 F.3d 1195 (9th Cir. 1997)............................................................... 15, 16

*In re Citric Acid Litig.,*
  191 F.3d 1090 (9th Cir. 1999)..................................................................... 22

*In re Ebay Seller Antitrust Litig.*
  2010 WL 760433 (N.D. Cal. Mar. 4, 2010)................................................ 22

*In re Live Concert Antitrust Litig.*
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................... 4, 9

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*
  311 F.R.D. 532 (N.D. Cal. 2015)................................................................. 20

*In re Online DVD Rental Antitrust Litig.*
  2011 WL 5883772 (N.D. Cal. Nov. 23, 2011)........................................... 10

*In re Optical Disk Drive Antitrust Litig.*
  2017 WL 6451711 (N.D. Cal. Dec. 18, 2017) ......................................... 9, 22

*Indep. Ink, Inc. v. Trident, Inc.*
  210 F. Supp. 2d 1155 (C.D. Cal. 2002) ........................................... 6, 12, 22

*It's My Party, Inc. v. Live Nation, Inc.*
  811 F.3d 676 (4th Cir. 2016)....................................................................... 18

*Kentucky Speedway, LLC v. NASCAR*
  588 F.3d 908 (6th Cir. 2009)..................................................................... 6, 7

*Lee v. NNAMHS*
  2009 WL 3052443 (D. Nev. Sept. 21, 2009) ............................................... 3

ii

*Mazda v. Carfax, Inc.*
  2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) .......................................................................... 14

*McNeil v. NFL*
  790 F. Supp. 871 (D. Minn. 1992) ......................................................................................... 19

*Missouri Hosp. v. C.R. Bard, Inc.*
  642 F.3d 608 (8th Cir. 2011) .................................................................................................... 3

*Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*
  2008 WL 11408997 (C.D. Cal. Oct. 10, 2008) ..................................................................... 11

*O'Bannon v. NCAA*
  802 F.3d 1049 (9th Cir. 2015) ......................................................................................... 16, 19

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*
  838 F.2d 360 (9th Cir. 1998) .................................................................................................. 16

*Ohio v. Am. Express Co.*
  138 S. Ct. 2274 (2018) ............................................................................................................ 27

*Olin Corp v. FTC*
  986 F.2d 1295 (9th Cir. 1993) .................................................................................................. 6

*Omega Envtl, Inc. v. Gilbarco, Inc.*
  127 F.3d 1157 (9th Cir. 1997) ....................................................................................... 9, 12, 13

*Pac. Coast Fed'n of Fishermen's Assocs. v. Murillo*
  2017 WL 3421910 (E.D. Cal. Aug. 9, 2017) ........................................................................... 3

*Pickern v. Pier 1 Imports (U.S.), Inc.*
  457 F.3d 963 (9th Cir. 2006) .................................................................................................... 3

*Rebel Oil Co. v. Atlantic Richfield Co.*
  51 F.3d 1421 (9th Cir. 1995) .......................................................................................... passim

*St. Alphonsus Med. Ctr-Nampa Inc. v. St. Luke's Health Sys., Ltd*
  778 F.3d 775 (9th Cir. 2015) ............................................................................................... 3, 19

*Taggart v. Rutledge*
  852 F.2d 1290 (9th Cir. 1988) ................................................................................................ 14

*Tampa Elec. Co. v. Nashville Coal Co.*
  365 U.S. 320 (1961) ................................................................................................................ 13

*Theme Promotions Inc. v. News Am. Marketing FSI*
  546 F.3d 991 (9th Cir. 2008) .................................................................................................... 5

*Thurman Indus. v. Pak'NPay Stores, Inc.*
  875 F.2d 1369 (9th Cir. 1989) ........................................................................................... 4, 22

ZUFFA'S MOT. FOR SUMMARY JUDGMENT REPLY

*U.S. v. Syufy Entrps.*
  903 F.2d 659 (9th Cir. 1990) ............................................................................................. 18, 20

*United States v. Oracle Corp.*
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................................................... 6

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*
  914 F.2d 1256 (9th Cir. 1990) ........................................................................................... 12, 16

*White v. NCAA*
  2006 WL 8066803 (C.D. Cal. Oct. 19, 2006) ........................................................................ 10

*William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*
  942 F.2d 1332 (9th Cir. 1991) ................................................................................................. 25

**RULES**

Fed. R. Civ. P. 56(c) ............................................................................................................... 21

Fed. R. Civ. P. 56(e)(2) .......................................................................................................... 21

**INTRODUCTION**

Unable to dispute the market realities of expanding competitors, increasing output, and rising compensation, Plaintiffs pursue a new antitrust theory and support it with a narrative that does not address Zuffa's Statement of Undisputed Facts ("SUF").  That narrative relies heavily on the public statements of UFC's President, Dana White, but strong statements praising your own business and demeaning your competitors are evidence of competition, not of an antitrust case.  And Plaintiffs cannot use their expert to manufacture factual disputes.  Plaintiffs never rebut with evidence critical facts that require Zuffa's motion for summary judgment to be granted.  Plaintiffs concede that during the Class Period, Zuffa has (1) increased output of Zuffa events, (2) paid athletes more, and (3) paid more than its competitors.  CSOF ¶¶ 28, 31.  Plaintiffs contend that such facts are "irrelevant," but relevance is a legal issue, which is why this case should be decided on summary judgment.

By contrast to the Complaint which survived dismissal based on a combined monopsony and monopoly claim, on summary judgment, Plaintiffs and their experts have failed to attempt to show antitrust injury or damages for a monopoly claim, or to attempt to perform the test for a market for such a claim.  Plaintiffs in opposing summary judgment can only pursue a monopsony claim that the Ninth Circuit has called "counterintuitive" and has questioned whether such a theory can make economic sense.  *U.S. v. Syufy Entrps.*, 903 F.2d 659, 663 (9th Cir. 1990).  Even for that claim, Plaintiffs have shifted their theory to one based on "marquee" fighters, a group that is not defined, was not disclosed in discovery, and which is neither the basis of the markets that have been defined nor the class for which certification is sought.  The undisputed facts show that Plaintiffs' remaining claim makes no economic sense:  Zuffa's competitors had and have access to talented MMA athletes, established venues, recognizable sponsors, and a wide variety of platforms and television stations to distribute their events.  Established competitors have grown, and new competitors have entered the market and expanded.  Nothing more is required in this Circuit to grant summary judgment.  *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (summary judgment granted where "competitors have expanded output in the recent past, or have the ability to expand output in the future").

**ARGUMENT**

Plaintiffs' Opposition presents a 16-page "Counterstatement of Facts" ("CSOF") that does not directly respond to Zuffa's SUF.  Plaintiffs' CSOF proffers "facts" using the "spaghetti approach" to summary judgment, where a party "has heaved the entire contents of a pot against the wall in hopes that something would stick."  *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).  This Court should "decline[] to sort through the noodles in search of" support for material disputes or Plaintiffs' claims.  *Id.*; *Assurance Co. of Am. v. Ironshore Specialty Ins. Co.*, 2016 WL 1169449, at *2 (D. Nev. Mar. 22, 2016) (denying summary judgment reconsideration motion where many exhibits bore "little to no relation to the propositions" they claim to support).  Other than sporadic references to factual disputes, Plaintiffs do not indicate which paragraphs of the SUF are disputed.  Where Plaintiffs fail to address Zuffa's SUF, the Court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(c), (e)(2).  *See infra* § VII.

I.      Plaintiffs' Claims Now Rest On A New Theory Of Liability And Must Be Dismissed.

Plaintiffs in their Opposition, for the first time, introduce the term "marquee," alleging that "Marquee Fighters are by far the most important input for MMA promoters" (CSOF ¶ 1) and that Zuffa violated the antitrust laws by preventing competitors from having a "critical mass" of these fighters.  Opp. 2, 32, 36.  The theory that a "critical mass" of "marquee" Fighters is a "critical input" does not appear in the Consolidated Amended Complaint ("CAC"), ECF No. 208.  And in Plaintiffs' interrogatory responses, Plaintiffs discuss "Elite Professional MMA Fighters" and make no mention of "marquee" fighters; the word "marquee" does not appear in *any* response, several of which specifically asked about "Elite Professional MMA Fighter" services.  Ex. 122, Pls.' First Am. Interrog. Resps. 4-12; Ex. 123, Pls.' Second Interrog. Resp. 7-9, 11-12.

As discussed in the Court's opinion on the motion to dismiss, Plaintiffs' CAC alleged a market for "Elite Professional MMA Fighter services," CAC ¶¶ 76-94, ECF No. 71 at 2-4, but Plaintiffs and their expert then denied the existence of a well-understood definition of who would constitute a group of elite MMA athletes. *E.g.*, Ex. 85, Kingsbury Tr. 210:6-8 ("I don't recall seeing a standard definition of an elite level fighter"); Ex. 70, Singer Rep. ¶¶ 99-114 (relevant

2

input market definitions do not include the word "elite"); Mot. 15, 20 & SUF ¶ 21.  Plaintiffs now

pivot to a new term, "marquee" fighters, to avoid the lack of evidence of a defined group of elite

fighters.[1]  But new allegations raised for the first time in opposition to summary judgment cannot

preclude the grant of summary judgment.[2]

II.     Plaintiffs' Claims Fail Because They Do Not Define Relevant Markets.

    A.     Plaintiffs' Input Markets for a Monopsony Claim Are Legally Insufficient.

        As Zuffa explained in its Motion, Plaintiffs propose four flawed market definitions in

place of a properly supported market. Mot. 18-19.  Each of Dr. Singer's proposed markets (none

of which is defined as "marquee" fighters) is flawed because, although he claims to use the Small

but Significant Non-transitory Decrease in Price ("SSNDP") test derived from the Merger

Guidelines, he never performs such an analysis.  *E.g.*, *Se. Missouri Hosp. v. C.R. Bard, Inc.*, 642

F.3d 608, 616 (8th Cir. 2011) (an expert's assertion that a SSNIP does not cause customers to

switch is insufficient to support a market where there is neither analytic nor anecdotal evidence to

support the claim).  The accepted market definition method required Dr. Singer to determine

where a price decrease would cause MMA athletes to switch promoters so as to determine the

relevant market of promoters.  *St. Alphonsus Med. Ctr-Nampa Inc. v. St. Luke's Health Sys., Ltd*,

778 F.3d 775, 784 (9th Cir. 2015) ("If enough consumers would respond to a SSNIP by

purchasing the product from outside the proposed geographic market, making the SSNIP

unprofitable, the proposed market definition is too narrow").  Dr. Singer did not attempt this and

admitted he did not evaluate a decrease in compensation at all.  Ex. 125, Singer Dep. 294:4-296:8.

There is no record evidence regarding how an athlete (whether labeled "marquee" or otherwise)

---

[1] Plaintiffs and their experts were not asked at deposition for the definition of "marquee" fighters
because Plaintiffs had not alleged the existence of such a group.

[2] *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (affirming summary
judgment where plaintiff gave "no notice of the specific factual allegations presented for the first
time in [Plaintiff's] opposition to summary judgment"); *Lee v. NNAMHS*, 2009 WL 3052443, at
*3 n.5 (D. Nev. Sept. 21, 2009) (inappropriate "for Plaintiff to assert new allegations outside the
scope of the complaint" in summary judgment opposition); *Pac. Coast Fed'n of Fishermen's
Assocs. v. Murillo*, 2017 WL 3421910, at *3–4 (E.D. Cal. Aug. 9, 2017) (summary judgment not
a "procedural second chance to flesh out inadequate pleadings") (citing cases).

would respond to a SSNDP.   This test was essential:  the undisputed evidence is that hundreds of athletes have left Zuffa to compete for other promoters.  SUF ¶ 22 (citing Blair Rep. ¶ 37, Fig. 1).

Rather than the accepted market definition method, Dr. Singer relies on industry lists of athletes and defines the market based on their promoters.  He claims that these lists are "industry recognized," but an expert opinion regarding industry recognition is insufficient as a matter of law to support market definition.  *In re Live Concert Antitrust Litig.,* 863 F. Supp. 2d 966, 993 (C.D. Cal. 2012).  There is also no evidence that Dr. Singer's lists are "industry recognized" to establish *markets or market shares*, as opposed to the ranking of athletes.

And even as a ranking of athletes, for the "Tracked" market, FightMetric's CEO explained that the FightMetric data does not capture a complete list of competitive MMA fighters.  Ex. 95, Genauer Decl. ¶¶ 5-12.  Dr. Singer also inexplicably excludes hundreds of promoters for athletes in his "Ranked" market, despite thousands of ranked athletes competing for them.  SUF ¶ 35; Exs. 124 & 131.  Dr. Singer compounds this problem by excluding promoters who sometimes put on bouts with ranked athletes.  Mot. 18.

Finally, for the "Headliner" market, Dr. Singer identifies the top 15 ranked athletes as a separate group (a group much smaller than the class), but does not adequately explain what distinguishes the top 15 ranked athletes as a relevant submarket.  *Thurman Indus. v. Pak'NPay Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) ("Without a showing of the role that industry and public perception, distinct customers, or specialized vendors play in motivating and shaping consumer decisions, the demarcation of a submarket from within the pool of producers and sellers who supply economic substitutes cannot be justified").  Plaintiffs offer no evidence, such as consumer surveys or a pricing analysis, sufficient to support the more narrow markets upheld in the cases they cite.[3]  Other of Plaintiffs' cases define markets by quality distinctions.  Opp. 22

---

[3] *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075-76 (D.D.C. 1997) (defining market of office superstores where evidence showed that prices were 13% higher "in markets where Staples faces no office superstore competition at all"); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1040 (D.D.C. 2008) ("the FTC provided direct evidence that . . . the opening of a new Whole Foods in the vicinity of a Wild Oats caused Wild Oats's prices to drop, while entry by non-PNOS stores had no such effect"); *see also Theme Promotions Inc. v. News Am. Marketing FSI*, 546 F.3d 991,

n.65.  But in all of those cases, clear and objective market evidence supported the distinctions–not merely the say-so of the expert–and it was clear who was in and out of the market.[4]  Additionally, the concept that a particular subset of suppliers is susceptible to a SSNDP is what is referred to as a price discrimination market[5] and Dr. Singer has expressly rejected that he is trying to define a price discrimination market.  Opp. Ex. 141, Singer Dep. II 542:11-18.

Plaintiffs claim that Dr. Singer "does perform a SSNDP test, analyzing the principal criterion Fighters use in evaluating promoters: the ability to offer suitable opponents," specifically "marquee" fighters.  Opp. 24, 37.  But Plaintiffs never define "marquee" and offer no support for their "sufficient marquee fighter" criterion for defining a market.  Substituting the vague term "marquee" (or similar terms such as "top" or "high ranking") for "elite" does not permit a market to be defined, and Dr. Singer did not define a market of such "marquee" fighters or even define the term in his report.  And real world examples refute the contention that athletes only sign with promoters who have some unidentified number of well-known athletes.  *E.g.*, Ex. 114 (Absolute Championship Berkut ("ACB") attracted 14 top-50 ranked athletes in two to three years despite starting with only four ranked athletes, each ranked 185 or lower).  During the Class Period, more than a hundred promoters excluded from the Ranked market each year had as many ranked athletes as promoters Dr. Singer included.  Exs. 131 & 132.

Even if the criterion of sufficient "marquee fighters" was accepted, that criterion would invalidate all of Dr. Singer's markets because it defines a Zuffa-only market.  Opp. 37 ("Top fighters would leave Zuffa only for a promotion that had amassed a 'deep lineup of marquee

---

1102 (9th Cir. 2008) (evidence that the price of coupon inserts rose from $4.00 per thousand to $7.00 per thousand without significant defection was sufficient to uphold jury verdict).

[4] Compare *Int'l Boxing Club of N.Y. v. United States*, 358 U.S. 242, 252 (1959) (in a conspiracy between promoters, venues, and broadcasters, upholding market of "championship" boxing matches where "detailed findings" of revenue, prices and demand showed a differentiation between "championship" and non-championship matches) with *Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736, at *11 (C.D. Cal. Jan. 26, 2017) (dismissing market of managers of "Championship-Caliber boxers" "in light of the fact that a non-Championship-Caliber Boxer can become a Championship-Caliber Boxer as the result of a single fight").

[5] *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 38 (D.D.C. 2015) (describing price discrimination markets under Merger Guidelines as targeting a "subset of customers for price increases").

fighters.'  The Scheme left no such promoter other than Zuffa"); Ex. 70, Singer Rep. ¶ 104 ("even the most prominent non-Zuffa promoters do not have access to a sufficiently deep pool of talented Fighters to provide competitive matchups").  But Plaintiffs' expert never defined or analyzed a Zuffa-only market, and such a market would clearly not be permitted. *E.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1119 (N.D. Cal. 2004) ("judicial rejection of markets narrowly defined to a single manufacturer's product has been even more pronounced than judicial skepticism about narrowly defined submarkets") (citing cases).  With a Zuffa-only market, all of Dr. Singer's other market definitions are invalid[6] and his calculations of impact and damages predicated on those market definitions are equally invalid.[7]

      B.    <u>Plaintiffs' Evidence Does Not Define An Output Market For a Monopoly Claim.</u>

      Dr. Singer has admitted that his defined output market includes "viewers, cable networks, broadcast networks, and sponsors" (Ex. 70, Singer Rep. ¶ 115), but that he did not test whether cable networks, broadcast networks and sponsors would switch to other sports and entertainment events in the face of a SSNIP. Mot. 19.  Plaintiffs therefore now take a new approach: claiming (without evidence or analysis) that these customers' demand is ultimately driven by viewers. Opp. 27.  This assertion fails as a matter of law as a method to define a market.  *Kentucky Speedway, LLC v. NASCAR*, 588 F.3d 908, 917 (6th Cir. 2009) (affirming summary judgment where plaintiff's expert (Dr. Zimbalist) defined a market of Sprint Cup races where "fans, television stations, corporations, and motorsports radio networks are consumers" but did not consider reasonable alternatives for all consumers).  And because Dr. Singer did not perform a SSNIP test, he has no basis to assert (or know) whether any purported customers in his market would turn to other sports and entertainment options if prices increased.[8]  Mot. 19.  A SSNIP test

---

[6] *Olin Corp v. FTC*, 986 F.2d 1295, 1299 (9th Cir. 1993) (relevant product market is "the smallest group of products" a hypothetical monopolist could profitably impose a SSNIP).

[7] Ex. 16, Singer Dep. 39:17-40:3 ("the market definition I choose and the weights that I apply generate a measure of foreclosure share" which is then included as an "input" in the regression).

[8] Opp. 28 n.81.  Documents which list the percentage of certain viewers of a handful of UFC events vis-à-vis other sports say nothing about whether enough MMA viewers would cross over to other sports/entertainment events in response to a SSNIP.  *Indep. Ink*, 210 F. Supp. 2d at 1170-72, 76 (internal business documents cannot define markets).

was crucial to justify Plaintiffs' narrow market because multiple appellate courts have held that professional sports compete with other sports and entertainment.  *E.g.*, *Kentucky Speedway*, 588 F.3d 908 ("'a family of four might patronize a Bengals or Reds game or some other sports event, instead of a Sprint Cup race' if the price of Sprint Cup race tickets were raised") (collecting cases).  There was no justification for skipping this test:  the people who know their businesses best, MMA and boxing promoters and network executives, all testified under oath that they competed in the output market with other sports and entertainment.  SUF ¶ 28.

Plaintiffs also improperly combine viewers of live MMA events with PPV viewers into one market, arguing that because "a handful of fans" could choose to watch either in person or on television, two markets are not required.  Opp. 27.  Plaintiffs are wrong, as courts have repeatedly held that there cannot be a national market for live attendance at an event.  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988-89 (D.C. Cir. 1977); *Fishman v. Wirtz*, 807 F.2d 520, 532 n.9 (7th Cir. 1986).

III.     Zuffa is Entitled to Summary Judgment on Plaintiffs' Monopsonization Claim.

A.     The Undisputed Evidence Shows Competition.

Plaintiffs do not dispute that Zuffa's competitors during the relevant time period have testified that they compete with Zuffa for athletes and that Zuffa has not blocked them "from any inputs necessary to put on successful MMA events" or "done anything to impede [their] ability to compete."  Ex. 57, C. Silva Dep. 205:12-18; SUF ¶¶ 22-25.  Plaintiffs claim that these promoters' sworn testimony are "boasts," CSOF ¶ 25, but never submitted evidence that this testimony is not true.  Plaintiffs cannot escape that Zuffa's competitors—the supposed targets of Zuffa's alleged conduct—state that Plaintiffs' theory is inconsistent with market facts.  In these circumstances, summary judgment must be granted.  *A. H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302, 1308 (9th Cir. 1981) (affirming summary judgment given competitors' testimony "that competition in the market remained vigorous").

Plaintiffs' reliance on testimony from Kurt Otto and Jeremy Lappen, CSOF ¶ 26 n.40, cannot create a disputed fact.  Both promoted MMA events before the Class Period and before Plaintiffs claim Zuffa had monopsony power, making their testimony irrelevant.  *Rebel Oil*, 51

7

F.3d at 1440.  And both testified only that they could not sign athletes under contract *with Zuffa*, not that they generally lacked access to athletes.  Lappen testified that he "signed many high-level fighters."  Pl. Ex. 21 at 137:22-139:23.  Otto testified he chose to sign former UFC champions as coaches because they "were the lifeblood of new talent coming up, so I got the coaches first, and then I got the great fighter," Pl. Ex. 16 at 105:24-106:4, and that even if Zuffa had athletes under contract, he could "find a new gym rat that has talent and build them up."  *Id.* at 247:14-16.

The facts Plaintiffs claim prove a lack of competition show the opposite—a continuously changing market with rapid entry and expansion.  Plaintiffs cite Bellator's current President Scott Coker's testimony that, before he took over, Bellator was a "dying brand," CSOF ¶ 26(a), but by 2018, Bellator, owned by Viacom, had grown substantially (including a television deal with Zuffa's former broadcast partner Spike TV (now Paramount Network)) and signed a distribution deal with DAZN for over a hundred million dollars.  SUF ¶ 18.  Plaintiffs cite a single 2011 document from an individual associated with ONE Championship offering to be a feeder organization to UFC, CSOF ¶ 26(b), but ONE has become the self-proclaimed largest MMA organization in the world.[9]  SUF ¶¶ 18, 25.  Plaintiffs cite evidence about WSOF in 2013 and 2014, but WSOF/PFL has since expanded its number of events, broadcasts events on NBC Sports, and is currently promoting a multi-million dollar MMA tournament.  SUF ¶¶ 18, 31; Ex. 133, C. Silva Dep. 60:14-61:1.  Plaintiffs largely ignore Zuffa's evidence about other new and growing competitors like ACB, but do acknowledge that it has expanded operations into North America.  CSOF ¶ 26 n.44.[10]  And Plaintiffs do not respond to other evidence of high-profile boxing promoter Oscar De La Hoya who has transitioned into MMA and will hold a PPV event between two former UFC champions later this year.  SUF ¶ 20.  Plaintiffs do not dispute that Zuffa's competitors have expanded over time.  CSOF ¶ 31.

---

[9] Plaintiffs cite one athlete who left ONE for Zuffa, CSOF ¶ 26(b), but ignore the ONE athletes Zuffa wanted but could not sign.  Pl. Ex. 24, Shelby Dep. 204:23-205:13; SUF ¶ 27; Ex. 127, Vera Dep. 182:7-24.

[10] ACB has also had rapid growth in ranked athletes coming to the promotion.  Ex. 114.

Plaintiffs try to discount the evidence of a healthy market for MMA athletes by claiming that any athlete who leaves the UFC is a "minor league Fighter" unwanted by Zuffa and irrelevant. Opp. 28. This statement is demonstrably false. SUF ¶¶ 22-23. Nor do Plaintiffs explain why it matters if Zuffa "no longer wants" an athlete, Opp. 28-29, or why highly-ranked athletes who leave the UFC (including as free agents) are "minor league." The relevant legal question is whether competing promoters have access to MMA athletes[11] and Plaintiffs do not and cannot rebut Zuffa's undisputed evidence that they do, both ranked and not. SUF ¶¶ 21-25.

Moreover, Plaintiffs focus exclusively on athletes who have previously competed in the UFC and do not rebut Zuffa's undisputed evidence that competing promoters have a large talent pool outside the UFC from which to sign athletes. SUF ¶ 21. Identifying up-and-coming talent is important for a successful MMA promotion. Mot. 32. Of the ten UFC champions of the "major" MMA weight classes, only two were "Headliners" when Zuffa signed them. Four of the ten champions were ranked lower than 100 at the time of signing. Ex. 126. Other household names, such as Conor McGregor, were nowhere near the top 15 when they initially signed with the UFC. Exs. 133 & 134 (McGregor was the 84th ranked lightweight at his first UFC bout on April 6, 2013). The evidence shows these up-and-coming superstars were available to any MMA promotion. Ex. 7, White Dep. 332:17-25.

Lastly, Plaintiffs argue that because their expert's regression analysis shows a relationship between wage share and foreclosure share, Zuffa's undisputed evidence showing actual competition in the market must be wrong. Opp. 28. This argument illustrates the abuse of econometric analysis in this case. Plaintiffs argue that if they have a regression model that shows damages, then there must be liability as well. This tautological reasoning has been rejected in other cases. *E.g., In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6451711, at *3 (N.D. Cal. Dec. 18, 2017) (granting summary judgment where the plaintiffs "jumble evidence of damages with evidence of causation" because "their burden remains to proffer evidence as to both of those elements separately"); *Live Concert*, 863 F. Supp. 2d at 975-76; Zuffa Singer *Daubert* Reply,

---

[11] *Omega Envtl, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997).

ECF No. 551 at 13-15 (explaining the fatal errors in Dr. Singer's circular reasoning).  In any event, "as the Ninth Circuit has recognized, expert testimony cannot substitute for market facts— and cannot defeat them, when the facts themselves render plaintiffs' theory of injury unreasonable." *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *15 (N.D. Cal. Nov. 23, 2011), *aff'd*, 779 F.3d 914 (9th Cir. 2015) (citing *Rebel Oil*, 51 F.3d at 1436).  Plaintiffs' expert cannot use mathematical equations to pretend that competition did not occur.

      B.      <u>Plaintiffs Cannot Show A Genuine Issue of Fact Concerning Monopsony Power.</u>

           1.       Plaintiffs Cite No Relevant Direct Evidence Of Lower Compensation.

Plaintiffs do not cite a single case accepting that an impact to wage share can show anticompetitive effect or antitrust injury.[12]  And certainly not where, as here, it is undisputed that actual compensation increased.  SUF ¶ 8, CSOF ¶ 28.[13]  Instead, Plaintiffs cite only to their own expert reports.[14]  Plaintiffs have failed to rebut Zuffa's explanations about why an impact on wage share is not equivalent to an impact on compensation.  Mot. 22, 24.  Under Plaintiffs' wage share theory, when Zuffa's successful promotions and productions increase revenue, a court may apply the antitrust laws to adjust the percentage of compensation shared with labor.  And while Plaintiffs deny that they are asking this Court to act as a central planner (Opp. 31), they cannot dispute that their approach would insert this Court into just that role by using antitrust laws to

---

[12] *White v. NCAA*, 2006 WL 8066803, at *5 (C.D. Cal. Oct. 19, 2006), cited at Opp. 30 n.86, did not use wage share to assess antitrust impact or harm.  In assessing class certification, the *White* court stated only that "[i]f substantiated," a comparison between the "labor" costs of professional leagues "may help show" the demand for college athletes. *Id.* at *4-5.  The case ultimately settled before the court could rule on the merits.  Plaintiffs also cite *Doe v. Arizona Hosp. & Healthcare Ass'n*, (Opp. 30) in which a court denied a motion to dismiss, but did not consider the merits of Plaintiffs' allegations.  2009 WL 1423378, at *7 (D. Ariz. Mar. 19, 2009).

[13] Plaintiffs' reliance on the "sponsorship tax" to show impact on compensation is irrelevant because Plaintiffs cite no evidence establishing that athletes' compensation decreased as a result.

[14] Plaintiffs mischaracterize Prof. Topel as "admitting" that exclusive contracts prevent a "transfer of wealth" to athletes.  Opp. 30.  This is untrue.  Prof. Topel stated that while the elimination of exclusive contracts would create a short-term "transfer of wealth," it is ultimately harmful to athletes because eliminating exclusive contracts would disincentivize a promoter from investing in athletes under contract and ultimately result in lower pay for athletes.  Pl. Ex. 36, Topel Dep. 76:4-77:3, 91:14-21, 92:16-20.  He likened it to "declaring a patent suddenly invalid and then anybody can make that formula, whereas they couldn't before.  That helps for a little while, but nobody's going to invest in the research and development again." *Id.* at 79:2-6.

establish the percentage of revenue a firm should share as compensation or wages.  No antitrust or other case has ever held, or permitted a verdict, that evidence of anticompetitive acts may be established by shares of revenues, whether tied to wages or prices.

        2.      The Undisputed Evidence Shows No Restriction In Output.

Plaintiffs rely entirely on their experts to assert that Zuffa restricted output by signing but not using athletes, what they term "shelving."  Opp. 31-32.  As discussed below, this is a predatory hiring claim and it fails under the requirements for such a claim.  Notably, Plaintiffs do not cite a single piece of admissible evidence showing Zuffa's practices caused a quantified reduction in output.  Opp. 31.  Plaintiffs argue that Zuffa should have expanded even more (Opp. 31), but their expert admitted he had no reliable method to measure or predict this hypothetical expansion.  Ex. 121, Singer II Dep. 605:1-:21, 611:7-612:2; Mot. 39.  The undisputed evidence shows that Zuffa increased the number of its events, bouts it promoted, number of athletes it signed, and compensation it paid those athletes, SUF ¶¶ 7-8, Ex. 70, Singer Rep. ¶¶ 206-208, Ex. 128, while new promoters emerged, accessed needed inputs, and expanded.  SUF ¶¶ 19-25.  The market reality is inconsistent with a firm exercising monopsony power.  Opp. 32.[15]

Plaintiffs' argument that marketwide output did not increase is irrelevant if Zuffa increased output.  *Rebel Oil*, 51 F.3d at 1434 (relevant question is whether "by restricting its own output, [defendant] can restrict market-wide output, and, hence, increase marketwide prices").[16]

        3.      Plaintiffs Fail To Show A Genuine Issue Of Fact Concerning Circumstantial Evidence Of Market Power.

Plaintiffs have not shown that Zuffa has restricted entry into any purported market.  This is fatal to Plaintiffs' claim.  Zuffa has offered admissible evidence regarding new market entrants (PFL, ONE, ACB), expanded output of existing competitors (Bellator), and future entry by well-established sports entertainment organizations (Golden Boy).  Mot. 25-26 (citing SUF ¶¶ 18-20).

---

[15] Plaintiffs falsely claim that Prof. Topel agreed with their characterization of a monopsonist's reduction in purchases, supply, and output; instead, they cite to a discussion of substitutability of MMA athletes to other professional sports.  Opp. 32 (citing Pl. Ex. 36, Topel Dep. 475:6-15).

[16] *See also Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*, 2008 WL 11408997, at *8 (C.D. Cal. Oct. 10, 2008) (rejecting plaintiff's contention that total market-wide output matters over defendant's output as contrary to Ninth Circuit precedent).

Where there is "undisputed evidence indicating that competitors have expanded output in the recent past, or have the ability to expand output in the future," summary judgment is appropriate. *Rebel Oil*, 51 F.3d at 1441; *Omega*, 127 F.3d at 1164 (successful entry or expansion by a competitor "precludes a finding that exclusive dealing is an entry barrier of any significance").

In response, Plaintiffs cite statements from bankers and executives about Zuffa's "dominance" and entry barriers, but as explained below, subjective opinions cannot defeat market facts. *Indep. Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155, 1170-72, 76 (C.D. Cal. 2002), *aff'd in relevant part*, 396 F.3d 1342 (Fed. Cir. 2005) (defendant's statements that it "has a dominant 'market position'" and other "non-economic, qualitative descriptions of market success are insufficient to establish that an antitrust defendant exercises market power"). Media statements and banker decks cannot rebut the undisputed facts showing competition between Zuffa and new and expanding competitors to sign athletes—objective evidence that belie subjective claims from years ago. SUF ¶¶ 18-25; *Omega*, 127 F.3d at 1164 (rejecting new entrant's label as "joke of the industry" where evidence showed entry and expansion from 6-8%).

C.   <u>Plaintiffs Fail To Rebut Evidence That Zuffa Did Not Engage In Exclusionary Anticompetitive Conduct.</u>

1.   Plaintiffs' Allegations Fit Squarely Within a Predatory Hiring Claim.

Plaintiffs' monopsony claim must be evaluated under the Ninth Circuit's standard for predatory hiring, defined as where "talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); *see* Mot. § II.C.1. Plaintiffs deny that they are making a predatory hiring claim, Opp. 41, by putting form over substance. Plaintiffs have argued that Zuffa acquired talent to deny it to competitors first in their CAC[17] and later in their expert

---

[17] *E.g.*, CAC ¶ 1 ("imposing extreme restrictions on UFC Fighters' ability to fight for would-be rivals"); ¶ 9 ("through its tight-fisted control over the supply of Elite Professional MMA Fighters" Zuffa could "block actual or potential rivals from accessing inputs . . . necessary to compete"); ¶ 73 ("Through, *e.g.*, exclusive contracts with MMA Fighters, the UFC has deprived potential and actual competitors of Elite Professional MMA Fighter services"); ¶ 134 (acquisitions meant "the UFC controlled virtually all Elite Professional MMA Fighters"); ¶ 155 ("As part of its effort to foreclose potential rival MMA promoters from accessing Elite

reports,[18] and now in opposing summary judgment—alleging "Zuffa's executives acknowledge the importance of blocking other promoters' access to top Fighters."  Opp. 5.[19]  Regardless of Plaintiffs' labels, it is undisputed that Zuffa competed for athletes by offering more money.  SUF ¶¶ 8-10.  Plaintiffs cannot have it both ways, alleging the elements of predatory hiring while claiming those allegations are immune from unfavorable Ninth Circuit precedent on predatory hiring.  When evaluated under the correct standard, Plaintiffs' claims must be dismissed. Plaintiffs have not shown that Zuffa's sole intent in signing athletes was to harm competition, nor that Zuffa failed to use the athletes it signed (or that Zuffa did not use "marquee" athletes).  Mot. 26-28.

> 2.  Plaintiffs Fail To Raise A Genuine Issue Of Material Fact That Zuffa's Contracts Did Not Substantially Foreclose Competition.

Plaintiffs must prove that the exclusive contracts they challenge caused substantial market foreclosure.  *Omega*, 127 F.3d at 1162 (no liability despite 38% market foreclosure).  Plaintiffs here calculate Zuffa's "foreclosure share" as "at least 50% during the Class Period."  Opp. 34. Plaintiffs and their expert use the term "foreclosure share," but do not actually examine the impact of an exclusive contract *on the market*.  *Cf. Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) ("a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence").  Plaintiffs' definition of "foreclosure share" assumes its own conclusion because it is a simple count of the number of 30-month or more contracts rather than foreclosure of a market.  Ex. 70, Singer Rep. ¶ 171; Singer *Daubert*, ECF No. 524 at

---

Professional MMA Fighters, the UFC has contracted with more Fighters than it needs for bouts").

[18] *E.g.*, Ex. 70, Singer Rep. ¶ 5 (identifying "Access to a broad stable of MMA Fighters" as a "critical input" and that "The Challenged Conduct ensured that Zuffa's would-be rivals lacked access to this critical input"); ¶¶ 145-46 ("Zuffa restricted the supply of Fighter services by consistently maintaining significantly more Fighters under contract than it could use").

[19] *Id.* 9 (UFC acquired WEC "because it wanted the lighter weight classes that the WEC had"); *id.* 10 (Zuffa targeted Strikeforce "to obtain Strikeforce's Fighters"); *id.* 12 ("locking up the 'vast majority of top fighters,' the Scheme blocked potential competitors"); *id.* 31 ("Zuffa did not pay 'shelved' Fighters and prevented other promoters from doing so"); *id.* 32 ("Using the Scheme to starve rivals of 'oxygen' in the form of top Fighters, Zuffa was able to force existing rivals out of business"); *id.* 44 ("Zuffa contract[ed] with more Fighters than it could use, 'shelving' them and leading a rival promoter to testify that Zuffa's fighters were 'collecting dust'").

20-23; Singer *Daubert* Reply, ECF No. 551 at 13-14.  And Dr. Singer does not base his definition of foreclosure share on economic evidence, and instead does so based on what he believes "would be a duration that would be acceptable to a Court."  Ex. 12, Singer Dep. II 376:2-7.

Even under a contract-based definition of foreclosure, Plaintiffs chose to not evaluate the number of actual Zuffa athletes under contract compared to the rest of Dr. Singer's market, likely because Zuffa only has a small percentage (no higher than 22%) of the Ranked market.  SUF ¶ 36.  Plaintiffs instead argue that looking at Zuffa's actual percentage of ranked athletes is improper because it treats all athletes as if they were the same.  Opp. 34.  Plaintiffs then make the same error by weighting each athlete by promoter revenue, regardless of rank or any other attribute.  Plaintiffs do this because Zuffa earns more revenues than other promoters, increasing the weighting of its athletes.  This creates the nonsensical outcome that a 183rd ranked athlete is weighted 17 times greater than a 3rd ranked athlete merely because the former competes for UFC and the latter Bellator.  Ex. 4, Topel. Rep. ¶ 221.  If top athletes are as important as Plaintiffs contend, Plaintiffs' revenue-weighting mechanism is irrelevant and incapable of proving anything other than who competes for Zuffa and who does not.[20]

Plaintiffs' Opposition claims to have shown substantial foreclosure in three ways, but none demonstrate that "the opportunities for other [promoters] to enter or remain in the market [are] significantly limited."  *Taggart v. Rutledge*, 852 F.2d 1290 (9th Cir. 1988).  *First*, Plaintiffs contend that record evidence shows that Zuffa and other market actors "recognized that one of Zuffa's greatest assets was its ability to use its Exclusive Contracts to foreclose competition."  Opp. 33.  But intent is not enough: "Rather, 'without some evidence of an adverse *impact* on competition' the fact that a supplier secures an exclusive deal 'in order to limit competition'" is irrelevant.  *Mazda v. Carfax, Inc.*, 2016 WL 7231941, at * 15 (S.D.N.Y. Dec. 9, 2016); *see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

---

[20] For the Headliner market, Plaintiffs weight using the inverse of an athlete's rank (*i.e.*, the 6th ranked athlete is worth twice as much to a promoter as the 12th ranked athlete) but no reasonable jury could rely on this assessment because Dr. Singer acknowledges that he merely guessed as to the appropriate weighting relationship.  Ex. 125, Singer Dep. I 142:23-143:21.

*Second*, Plaintiffs argue that Dr. Singer's regression provides evidence of substantial foreclosure to competition.  But Dr. Singer repeats his circular analysis in his regression because he admits that "foreclosure share" is an *input* based on his knowledge of what a court would accept, not an output of his regression.  Ex. 16, Singer Dep. I 39:1-9, 40:4-41:21.[21]

*Third*, Plaintiffs contend that Zuffa's 30-month contracts "last longer than the average Fighter's career and are effectively perpetual."  Opp. 33.  As an initial matter, no reasonable jury could rely on this assessment because Plaintiffs define a professional MMA athlete's "career" to be the length of time an athlete is at *Zuffa* (Opp. 35) and exclude all other professional MMA bouts, including for promoters in Plaintiffs' proposed markets.  If Zuffa athletes' careers are calculated to include all of their professional bouts, the median career length is 8.7 years, or 3 times the length Plaintiffs assert.  SUF ¶ 13.  Moreover, Plaintiffs' justification is nonsensical because even 24-month contracts would, according to Plaintiffs' calculation, last longer than an athlete's career but would lead to Zuffa having a 0% foreclosure share.  Ex. 16, Singer Dep. I 47:4-9.  Nor do Plaintiffs explain how an exclusive contract of any duration could substantially foreclose competition if an athlete's career is only 0.82 years.  If athletes' careers are really less than a year, competing for the contract of up-and-coming athletes would be of paramount importance.  Plaintiffs also cite no evidence in support of their assertion that the length of an athlete's Zuffa career is evidence of foreclosure, an assertion unanimously contradicted by the MMA promoters with whom Zuffa competes.  SUF ¶¶ 21-25.

      a.     Plaintiffs Do Not Put Forward Evidence That Zuffa's Legitimate Business Justifications Are Pretextual.

Once a defendant has put forth a legitimate business justification, the burden shifts to the plaintiff to show that the business justification is pretextual.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).[22]  Plaintiffs have failed to put forward a genuine

---

[21] Contrary to Plaintiffs' repeated assertion that Professor Topel "concedes" the effect of Dr. Singer's regression (Opp. 33), Professor Topel found Dr. Singer's regression "misleading, fatally flawed, and unreliable" including because "his measure of both 'foreclosure' and compensation are economically and econometrically incorrect."  Ex. 4, Topel Rep. ¶ 27.

[22] *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366 (9th Cir. 1992) (Plaintiffs "have the burden of proving that the defendant acted without a legitimate business justification").

issue of material fact to rebut that Zuffa's exclusive contracts serve the legitimate business purposes of (1) increasing output and (2) producing high-quality events.  Mot. 33.  The Ninth Circuit has repeatedly affirmed summary judgment to defendants where plaintiffs fail to meet that burden.  *City of Vernon*, 955 F.2d at 1366; *Universal Analytics*, 914 F.2d at 1259; *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 1000 (9th Cir. 2010).

Plaintiffs rely on an incorrect legal standard that applies to a Section 1 conspiracy case, where procompetitive justifications are irrelevant (*per se* case) or subject to a balancing test (rule of reason case).  Opp. 39 (citing *O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015)); CSOF ¶ 32.  "When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2."  *Image Tech.*, 125 F.3d at 1212; *Universal Analytics*, 914 F.2d at 1258 (antitrust defendant's conduct "is redeemed by a legitimate business purpose").

Plaintiffs argue that documents show Zuffa knew its contracts would deny competitors the "oxygen" needed to compete.  Opp. 40.  But conduct supported by legitimate business reasons, even where there is also evidence of an intent to hurt competitors, cannot establish a Section 2 violation.  *Universal Analytics*, 914 F.2d at 1258-59 (memo that said hiring an employee would "wound" a competitor "again" was insufficient evidence to support Section 2 violation where "the memo does not undermine MSC's legitimate business reasons for hiring much needed and competent computer programmers, or permit a jury to find that any of MSC's reasons for hiring the programmers was pretextual"); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368-69 (9th Cir. 1998) ("Where a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we must determine antitrust liability by asking whether there was a legitimate business justification").

Assuming for purposes of summary judgment that Zuffa's actions were based partially on a desire to restrict its competitors, Plaintiffs cite no evidence that Zuffa's conduct was not also based on the business justifications of increasing output and promoting quality events.  Plaintiffs do not dispute that, consistent with Zuffa's stated business purpose, Zuffa's overall output of events went up from 32 in 2010 to 41 in 2016 (SUF ¶ 7, CSOF ¶ 31), and Plaintiffs do not put

forward any evidence to rebut the multiple witnesses who testified that Zuffa's exclusive contracts were critical to this expansion. Mot. 33 & SUF ¶ 14. Plaintiffs' assertion that Zuffa cites "*no* evidence" in support of its justification (Opp. 39) is wrong.[23] And the type of alternatives analysis proposed by Plaintiffs' experts (CSOF ¶ 14) is legally irrelevant in a Section 2 case. *Image Tech Serv. Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990), *aff'd*, 504 U.S. 451 (1992) ("there is no least restrictive alternative requirement in the context of a Section 2 claim").

There can also be no dispute that Zuffa's contracts assisted it to put on high-quality events. It must be legitimate to contract with top talent in any industry through multi-year contracts—whether the talent is athletes, computer programmers, analysts, or innumerable other categories. Plaintiffs themselves argue that "a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of the need for "a steady supply of appropriately matched Headliners to occupy the Top of the Card" and "the need to replace Fighters that become unavailable due to injury." Ex. 70, Singer Rep. ¶ 158.[24] Plaintiffs thus agree that the evidence establishes that Zuffa's reason for exclusive contracts has merit. Mot. 33 & SUF ¶ 14.

   3. Plaintiffs Have No Evidence Of Anticompetitive Acquisitions or "Coercion."

Undisputed market facts show that Zuffa's acquisitions did not cause any lasting or substantial anticompetitive harm. During the relevant time period, there is no material dispute that: athlete compensation increased; athletes remained available in large numbers to other

---

[23] SUF ¶ 14; *e.g.* Acquisitions Dep. 177:15-178:5 (cited at SUF ¶ 14) ("you just can't run a business doing 42 or 43 events per year without having the athletes exclusive to you because you just can't produce that output of events not knowing the athletes are going to be there for you and not fighting for some other organization . . . I mean, you can have nonexclusive agreements, but you're only going to be doing a handful of events per year").

[24] Opp. 4 ("a 'deep roster of talented fighters' is 'essential' to stage live MMA events successfully"); *id.* at 4-5 ("Only by having access to a broad stable of top Fighters can a promoter develop new top Fighters"); CAC ¶ 58 ("successful promotion of a live Elite Professional MMA event requires Elite Professional MMA Fighters"); *id.* ¶ 109 ("Elite Professional MMA Fighter services . . . [are] needed to sustain a successful live Elite Professional MMA promotion").

promoters; and existing and new rival MMA promoters competed directly with Zuffa for highly-ranked and well-known athletes.  SUF ¶¶ 8, 18-25.  On these market facts, Zuffa's acquisitions did not and could not cause anticompetitive harm.  *Syufy*, 903 F.2d at 669 (finding no competitive impact where record "demonstrates that neither acquiring the screens of his competitors nor working hard at better serving the public gave Syufy deliverance from competition").  After each acquisition, Zuffa intended to and did use the contracts from the acquired promoter to compete more effectively.  § II.C.1, *supra*.  This is "vigorous competition on the merits of the type that the antitrust laws seek to promote."  *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1210 (C.D. Cal. 2011) (citing *Allied Orthopedic*, 592 F.3d at 998) (acquisition lawful and procompetitive where defendant "intended to use the assets and has done so to more effectively compete for . . . customers and to meet customer needs").

With respect to coercion, to constitute exclusionary conduct "coercion" must have a "significant and more-than-temporary harmful effect on competition."  *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*, 108 F.3d 1147, 1151 (9th Cir. 1997).  Plaintiffs offer the broad and self-serving speculative testimony of the named Plaintiffs of so-called "common knowledge" of Zuffa's coercion, and cite documents with sharp negotiating language, often internally, among Zuffa employees.  CSOF ¶¶ 11-12.  But Plaintiffs do not provide a single example of any athlete, much less a broad group of athletes, actually being subject to the coercive conduct they claim occurs.  Instead of coercion, Zuffa athletes who re-sign with Zuffa get paid *more compensation* under their new agreements.  Mot. 35; Ex. 4, Topel. Rep. ¶ 122 & Ex. 11 (Zuffa athletes paid ██████ in show money for the first bout under a new agreement).  Plaintiffs' narrative ignores that *athletes*, not Zuffa, often request to renegotiate their contracts for higher pay.  Ex. 132, Fertitta Dep. 165:23-166:14; Pls. Ex. 29, Silva Dep. 386:8-387:3; ECF No. 540 at 6 & n.18.  Competing vigorously to retain a contract, including the use of "strong competition" and "tough negotiation," is competitive conduct and "beneficial to competition."  *Arminak*, 789 F. Supp. 2d at 1211; *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016) (affirming summary judgment where speculation of possible coercion not substantiated).

IV.   Zuffa Is Entitled To Summary Judgment On Plaintiffs' Monopolization Claim.

Plaintiffs concede that they are not seeking damages for Zuffa's alleged monopolization. Opp. 20.  Without proof of the elements of such a claim of antitrust injury or damages, summary judgment must be granted. *Arminak*, 789 F. Supp. 2d at 1206-12 (granting summary judgment on abandoned monopoly allegations).  To the extent Plaintiffs' monopoly allegations are offered to "bolster" their monopsony claim,[25] Opp. 42, in the absence of proof of all the elements of monopolization:  (1) the claim for monopolization (and the combined monopoly and monopsony claim) must be dismissed; and (2) allegations of some elements of monopolization are legally deficient to support a monopsony claim.[26]  With respect to the acquisition of monopoly power, Plaintiffs have abandoned their claims regarding venues, sponsors, and broadcasters,[27] and now rely exclusively on the same allegations as the monopsony claim—Zuffa's acquisition of "marquee" fighters.  Opp. 42-43.  And Plaintiffs—who are seeking damages for allegedly low wages—have nowhere asserted or explained how they have been injured by Zuffa's monopoly.

The sole aspect of a monopoly claim Plaintiffs do address is monopoly power.[28] Plaintiffs' theory of supracompetitive pricing is premised on an increase in Zuffa's revenue split with PPV distributers, which allegedly resulted in a 24% increase in PPV revenue.  Opp. 43 n.115.  But an "increase in revenue could occur in a variety of ways not involving increased prices." *St. Alphonsus*, 778 F.3d at 787.  The relevant price is that paid by consumers, and Plaintiffs neither dispute that Zuffa made only one price increase after seven years of stagnant prices nor present evidence that Zuffa's price was above competitive levels.[29]  Mot. 38.

---

[25] Plaintiffs argue that "longstanding precedent in professional sports antitrust cases" shows that monopoly power can "bolster" claims of monopsony power, but cite only a single case discussing issues related to collateral estoppel and affirmative defenses.  Opp. 42 n.114 (citing *McNeil v. NFL*, 790 F. Supp. 871 (D. Minn. 1992)).

[26] *Harris v. City of Fresno*, 625 F. Supp. 2d 983, 1005 (E.D. Cal. 2009) (court may grant summary judgment on "additional . . . conduct" that "bolsters" the underlying claim).

[27] Dr. Singer admitted in his deposition that he did not conduct the necessary analysis to substantiate these allegations.  Ex. 12, Singer Dep. 551:7-552:23.

[28] Plaintiffs' reliance on *O'Bannon*, 802 F.3d at 1070, Opp. 29 n.84, to argue they can show either supracompetitive prices or restricted output is misplaced, as that case addressed the standard in the Section 1 price-fixing context, not for showing Section 2 monopoly power.

[29] Plaintiffs also discuss event ticket prices, but do not allege those prices were supracompetitive.

1    Plaintiffs do not contest that Zuffa expanded output, Opp. 44, instead arguing that Zuffa

2    restricted a certain type of output (PPV events) without explaining why this is relevant or

3    analyzing whether consumers view PPV and non-PPV events as interchangeable.  *U.S. v. Syufy*

4    *Entrps.*, 712 F. Supp. 1386, 1398–99 (N.D. Cal. 1989), *aff'd*, 903 F.2d 659 (9th Cir. 1990) ("the

5    Court must decide if consumers would choose to view motion pictures on home video, cable

6    television, pay-per-view television, or as sub-run motion pictures").  Plaintiffs' claim that market-

7    wide output decreased is irrelevant, Mot. 38, given that Zuffa's output expanded.

8    V.    <u>Plaintiffs Have No Evidence to Support Their Identity Class Claim.</u>

9    Plaintiffs' sole support for their identity class claim is Dr. Singer's inference that because

10   Zuffa allegedly suppressed bout pay, it must have suppressed identity pay, but as previously

11   stated in Zuffa's Class Certification Opposition (ECF No. 540), the identity rights are a

12   completely different set of rights granted under different contractual circumstances.

13   VI.    <u>Plaintiffs Do Not Have Standing To Bring Claims For Injunctive Relief.</u>

14   As Zuffa has explained in its class certification opposition, Plaintiffs as former UFC

15   athletes have no legal basis to seek injunctive relief.  To avoid this rule, Plaintiffs cite irrelevant

16   cases:  *Haro v. Sebelius*, 747 F.3d 1099 (9th Cir. 2014) (constitutional standing to challenge

17   government action); *Barnes v. AT&T*, 270 F.R.D. 488, 495 (N.D. Cal. 2010) (standing for former

18   employees because ERISA expressly permits it); and *In re NCAA Athletic Grant-In-Aid Cap*

19   *Antitrust Litig.*, 311 F.R.D. 532, 537 & n.6 (N.D. Cal. 2015) (no discussion of standing).  It is

20   entirely speculative whether third-party MMA promoters for whom Plaintiffs Vera and Fitch

21   compete would change their contracts or pay Plaintiffs more if this Court were to enjoin Zuffa.

22   VII.    <u>Plaintiffs Do Not Raise Genuine Factual Disputes In The CSOF.</u>

23   Based on the CSOF's lack of response, the Court should deem SUF ¶¶ 1-6, 10, 12, 17, 23-

24   27, 29-35, and 37-39 undisputed.[30]  Portions of other parts of Zuffa's SUF are also undisputed:[31]

25   _____

26   [30] In response to Zuffa's previous motion for partial summary judgment, Plaintiffs provided direct responses to the SUF.  ECF No. 365-1.

27   [31] For ease of reference, the below chart identifies paragraphs from the CSOF that indicate they are responsive to the SUF.  It is impossible to determine what other portions of the CSOF

28   Plaintiffs believe are responsive to the SUF.

| Unaddressed and Undisputed Facts | Relevant CSOF |
|---|---|
| Since 2001, the number of total UFC events steadily increased.  SUF ¶ 7. | ¶ 31 |
| Athlete compensation has increased since Zuffa acquired the UFC, including through the Class Period.  SUF ¶ 8. | ¶ 28 |
| Zuffa often pays athletes more than other MMA promoters.  SUF ¶ 9. | ¶ 28 |
| Between 2008 and 2015, Zuffa's residential PPV price was $45 or $55 (standard or high definition).  In 2015, Zuffa implemented one $5 increase.  Zuffa executives explained that this increase was meant to move prices closer to boxing PPV (priced around $70) and to keep pace with inflation.  SUF ¶ 11. | ¶ 31 |
| The term of the agreement is typically 20 months with the possibility of tolling for events such as injury, retirement, and refusal to compete.  Factoring in tolling and voluntary renegotiation of contracts, according to Plaintiffs' expert, an athlete's average career at Zuffa lasts 2 years and the median is 0.82 years.  For athletes who competed in at least one Zuffa bout, the total average career length in MMA overall is 8.7 years.  SUF ¶ 13. | ¶ 9 |
| At various points in time, Zuffa's Promotional Agreements have included an ███████████████████████████████████.  Such agreements also normally have ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████ SUF ¶ 15. | ¶ 8(c) |
| Other MMA promoters have ██████████████████████ ████████████████████████████████████████.  SUF ¶ 16. | ¶ 10[32] |
| Other MMA promotions compete with Zuffa to put on MMA events.  SUF ¶ 18. | ¶ 26[33] |
| During the Class Period, entrants to the MMA promotion business PFL, ONE, and ACB expanded output.  ONE increased its output from 1 event in 2011 to 16 in 2016; PFL increased its output from 1 event in 2012 to 8 in 2016; and ACB increased its output from 1 event in 2012 to 22 in 2016.  SUF ¶ 19. | ¶ 31 |
| New MMA promoters are continuing to emerge.  SUF ¶ 20. | ¶¶ 22-25 & n.41 |
| Promoters had access to talented athletes during the Class Period.  SUF ¶ 21. | ¶¶ 22-25[34] |
| MMA promoters have successfully outbid Zuffa and contracted with athletes during the period where Zuffa had a right to match a competitor's compensation. SUF ¶ 22. | ¶ 20 |
| In the Ranked market, from 2011 to 2016, Zuffa had only 18.1% of total available athletes under contract, and Zuffa never had over 22% of the total athletes in Dr. Singer's Ranked market in any year.  SUF ¶ 36. | ¶ 2 |

---

[32] Plaintiffs cannot dispute this fact by citing only to their expert report.  As discussed, *supra*, an expert opinion without support from record evidence cannot put a fact into dispute.  *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999).  And Dr. Singer provides *no* evidence of "UFC Out" clauses or similar exclusivity exceptions in Bellator's, ONE's, or Strikeforce's contracts.

[33] Plaintiffs have no admissible evidence to dispute this fact.  §§ III.A. & III.B.3 *supra*.

[34] Plaintiffs have no admissible evidence to dispute this fact.  §§ III.A, III.C.1, III(C)(2)(a) *supra*.

| Unaddressed and Undisputed Facts | Relevant CSOF |
|---|---|
| Dr. Singer's regressions find a negative relationship between: his input of (1) the number of 30 month multi-bout, exclusive contracts (Dr. Singer's "foreclosure share,") and his output of (2) the percentage of athlete compensation of total event revenues (the athletes' "wage share"). Wage share is the dependent variable in the regressions.  Dr. Singer did not look at whether Zuffa suppressed actual wages without controlling for revenues.  He has not run any models to establish injury or damages based on actual compensation as opposed to wage share.  His models when run with actual wages do not show an injury.  SUF ¶ 37. | ¶ 29 |

A.    The CSOF Relies on Improper or Inadmissible Evidence to Attempt to Create a Genuine Issue of Material Fact.

Plaintiffs' spaghetti pot of facts includes the following types of evidence that are inadmissible or insufficient to show an issue of material fact:

- **Expert reports:**  Plaintiffs improperly rely on their experts to support alleged facts without record evidence.  "An expert report cannot be used to prove the existence of facts set forth therein." *Citric Acid*, 191 F.3d at 1102; *In re Optical Disk Drive*, 2017 WL 6451711, at *3 (expert opinion and testimony cannot stand in the place of record evidence).  Documents not submitted as part of the record under Fed. R. Civ. P. 56(e) cannot be considered.  *Citric Acid*, 191 F.3d at 1101-02.

- **Pre-Class Period evidence:**  Evidence from *before the Class Period* cannot create a genuine issue of material fact as to whether Zuffa had market power *during the Class Period*.  *Rebel Oil*, 51 F.3d at 1440 ("To determine whether Rebel's claim of entry barriers is reasonable, we must consider those entries occurring *after* 1988, when the alleged barriers were in place and when ARCO allegedly obtained the power to charge supracompetitive prices"); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1193 (9th Cir. 1984) (rejecting evidence that preceded the timeframe the attempted monopolization occurred).

- **Puffery statements about competitors:**  Plaintiffs rely on statements that Dana White and Lorenzo Fertitta made to promote the UFC.  These statements are competitive puffery and have been deemed immaterial for summary judgment because such puffery "fails to exhibit more than aggressive behavior among intense competitors."  *Thurman*, 875 F.2d at 1379.

- **Opinion statements:**  Plaintiffs improperly rely on hearsay statements made in news articles, material drafted by third parties, and Zuffa internal discussions to prove elements of their antitrust claims.  *Indep. Ink*, 210 F. Supp. 2d at 1170-72, 76 (statements by defendant's executives and "marketing materials and investment reports" about the defendant's alleged dominance in the market do not establish market definition or market power) (citing cases); *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *4–5 (N.D. Cal. Mar. 4, 2010), *aff'd sub nom.* 433 F. App'x 504 (9th Cir. 2011) (statements by defendant's employees and consultant retained by defendant could not be used as evidence of market power).

22

| Pls.' CSOF | Zuffa's Response |
|---|---|
| ¶ 1[35] | This statement is immaterial because "marquee" fighters (or "top" or "highest level") is not a term defined in the Complaint or elsewhere, *see supra* § I, and because it is undisputed that MMA promoters had the ability to obtain talented MMA athletes during the Class Period.  SUF ¶¶ 21-24.  Plaintiffs have also not attempted to prove antitrust injury or damages for a class of "marquee" athletes. |
| ¶¶ 2-3, 5-6 | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 21-24, and that competitors had all of the inputs needed to compete.  SUF ¶ 25.  Plaintiffs' reference to Joe Silva's testimony is misleading and does not support Plaintiffs' proposition.  Pl. Ex. 29, Silva Tr. 332:4-333:16 ("popularity doesn't have anything necessarily to do with your accomplishments," and that it has more to do with "charisma").  Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes.  *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star.  So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| ¶¶ 4, 22 | Plaintiffs' statements are immaterial as undisputed evidence shows that new and existing promoters expanded during the Class Period.  SUF ¶¶ 18-20; § III.B.3 *supra*; Mot. 25-26.  Plaintiffs' citation to Professor Topel is incomplete and does not support Plaintiffs' assertion.  Pl. Ex. 37, Topel Dep. 437:4-11 (economists use the term "'barriers to entry' in -- in different ways. So to an economist a cost advantage, being better at something can be considered a barrier to entry.  It's not an anticompetitive barrier to entry"); *Syufy*, 903 F.2d at 668 (rejecting theory that "Syufy's effectiveness as a competitor creates a structural barrier to entry").  Record evidence does not support Plaintiffs' statement about the number of Zuffa athletes under contract.

Plaintiffs' CSOF ¶ 22 does not cite to record evidence to support that Zuffa locked up the "vast majority of fighters" and misquotes Prof. Topel's testimony.  Plaintiffs also misquote Kurt Otto's deposition testimony.  Otto testified that Zuffa's 2006 and 2007 acquisitions of WEC and WFA—both before the Class Period—limited his chances of getting a fighter *who was under contract with another promoter*, so he would have to "find a new gym rat that has talent and build them up from scratch."  Pl. Ex. 16, Otto Dep. 246:19-247:16.  Otto did not testify that he (or other promoters) was unable to compete with Zuffa.  It is undisputed MMA promoters had the ability to obtain talented MMA athletes during the Class Period.  SUF ¶¶ 21-24. |
| ¶ 7 | This allegation is immaterial as it does not establish an antitrust violation.  Mot. 28. |
| ¶ 8 | This statement is immaterial because undisputed evidence shows that promoters had the ability to sign talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters.  SUF ¶¶ 21-24.  Plaintiffs misquote Prof. Topel's testimony.  When asked whether "the challenged contracts are in effect restrictions on athlete mobility," he testified, "I don't know if I agree with |

---

[35] For ease of reference, Zuffa also includes a chart with the complete language of the CSOF and Zuffa's response.  Ex. 113.

23

| Pls.' CSOF | Zuffa's Response |
|---|---|
| | your phrase.  They are restrictions that protect the investments that Zuffa has made in athletes." Pl. Ex. 36, Topel Dep. 79:25-80:6.  Undisputed evidence shows that exclusive contracts enable Zuffa to have enough athletes available to compete in the dozens of UFC events Zuffa promotes each year and to maintain a high quality of events in the face of athlete injury or inability to compete. SUF ¶ 14.

Plaintiffs cite no record evidence that Zuffa's exclusivity clauses are longer for "the better" fighters.  The "Right to Match" clause ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 47 § 12.1; Ex. 55 § 12.2; Ex. 115, Mersch Dep. 325:17-326:7; Ex. 116, Epstein Dep. (5/26/2017) 91:10-92:10. |
| ¶ 9 | This assertion is unsupported; it is undisputed that a UFC athlete's professional career (*i.e.*, all paid bouts) is 8.7 years, roughly three times longer than Plaintiffs' calculation of Zuffa's contract term.  SUF ¶ 13; Ex. 49, Singer Reb. ¶ 64. |
| ¶ 10 | Plaintiffs' assertion that rival promoters' contracts contained "significant exceptions" is supported only by citations to their expert and is contradicted by undisputed market facts.  SUF ¶ 16 (undisputed that ▮▮▮▮▮▮▮, and pre-acquisition Strikeforce all had exclusive contracts with no significant exceptions); *see also* Ex. 56, Coker Dep. 180:20-181:3.  Plaintiffs' assertion that other promoters would have removed restrictive provisions if Zuffa did so is based on speculation and inadmissible hearsay. |
| ¶¶ 11-12 | CSOF ¶ 11 is inadmissible because it improperly relies on experts' opinions as undisputed facts.  The CSOF ¶¶ 11-12 arguments—and Mr. Vera's testimony about "common knowledge" that lacks foundation and is hearsay—regarding "coercion, threats, and aggressive" contractual enforcement and impediments to free agency are contradicted by the market facts and are immaterial for the reasons in section III.C.3.b *supra* and Zuffa's Motion (pp. 35-36).  The quote in CSOF ¶ 12(a) does not discuss preventing athletes from reaching free agency, instead it says Joe Silva could cut athletes who refuse appropriate matchups.  The quote in CSOF ¶ 12(b) from Jon Fitch does not show evidence of any withholding of money, whether tied to free agency or not.  CSOF ¶ 12(c) cites no evidence of athletes prevented from reaching free agency by coercion, and 12(d) cites no evidence of coercion and instead cites only negotiations to extend a contract.  The citations also do not show that the generalizations about Zuffa's alleged conduct are true.  *E.g.* Pl. Ex. 120 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  There is also no admissible evidence that Zuffa's contracts are "effectively perpetual."  Each contract has a defined term and specified provisions that allow for extensions in a few circumstances, ▮▮▮▮▮▮▮▮▮▮▮.  Ex. 47 § 4.1, 9.2.  It is undisputed that Zuffa offered to re-sign athletes for *more compensation* under new agreements.  Mot. 35-36; Ex. 130, Mersch Dep. 359:16-362:3. |
| ¶ 13 | This statement is not supported by any citation. |
| ¶¶ 14-18 | For the reasons in section III.C.3.a *supra* and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm: (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Pl. Ex. 14, Acquisitions Dep. 33:13-35:11); (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| Pls.' CSOF | Zuffa's Response |
|---|---|
| | (Ex. 129 at 83:20-84:18); and (3) ███████████████████████████ ███████████████████████  Mr. Mersch testified that "the general nature of my e-mail was to pass along that the relationship between Affliction and the UFC had apparently been repaired." Ex. 130, Mersch Dep. 445:21-446:14.  The record evidence shows that the Affliction acquisition was "looking good" because ███████ ██████████████████████████████  Pl. Ex. 62; Ex. 129, Acquisitions Dep. 150:15-151:19. Plaintiffs' statements about Pride are immaterial because Pride is outside Plaintiffs' geographic market, and ██████████████████████████████████████  CSOF ¶ 15.  There was no decrease in Zuffa's output and there was an increase in compensation.  SUF ¶ 8.  Each of these acquisitions are also immaterial because they occurred before the Class Period. Plaintiffs' evidence in CSOF ¶ 17 is immaterial because (1) it predates the Class Period and (2) refers to "███████████████████████████" for the UFC, with no decrease in output and only a positive effect on competition.  As to the Strikeforce acquisition, in 2012 the FTC concluded that "no further action is warranted" in connection with its investigation of that acquisition.  Ex. 117.  Undisputed evidence shows that ███████████████████████████  Pl. Ex. 14, Acquisitions Dep. 167:24-168:19.  Coker's deposition testimony cited in CSOF ¶¶ 17-18 contains inadmissible hearsay and is contradicted by the undisputed record evidence that compensation—including for former Strikeforce athletes—increased over time.  SUF ¶¶ 8-9.  All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions.  SUF ¶¶ 8, 18-25. |
| ¶ 19 | Plaintiffs' statement is inadmissible because it improperly relies on expert reports to prove facts.  It is also contradicted by the undisputed evidence that highly-ranked athletes left the UFC voluntarily for other promoters.  SUF ¶¶ 22-23.  The other cited material provides no support.  The cited exhibit and testimony discusses an athlete who "████████████████████████████████████████"  Nothing in that document indicates that Zuffa prevented the athlete from becoming a free agent at the end of his contract or even extended his contract because he refused to compete.  Plaintiffs' statement is also immaterial for the reasons discussed in sections III.A and III.C.2 and Zuffa's Motion (pp. 29-31). |
| ¶ 20 | *See* Reply at Zuffa SUF ¶ 21 *supra*.  Plaintiffs' record evidence from Raine is an inadmissible statement by a third party and cannot be considered on summary judgment as evidence of Zuffa's intent.  *See William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*, 942 F.2d 1332, 1337 n.7 (9th Cir. 1991).  Raine explained that Pl. Ex. 113 included questions from a potential investor "and the answers would have been composed by Raine."  Ex. 118, Neville Dep. 87:19-89:6.  Raine had no recollection of whether Zuffa had input into the document, *id.*, and there is no record evidence that Zuffa adopted any of the third party's statements.  In addition, this statement is inaccurate and immaterial.  *See* §§ III.A and III.B.3 *supra*.  It cannot be an antitrust violation to brag about the quality of your business. |

| Pls.' CSOF | Zuffa's Response |
|---|---|
| ¶ 21 | Plaintiffs' statement is inadmissible because it improperly relies on expert reports to prove facts. As set forth in the Motion (p. 29-31), section III.C.2 *supra*, and in Zuffa's *Daubert* Motion, Dr. Singer's foreclosure analysis is unreliable, flawed, and must be disregarded. ECF No. 524 at 2-3, 8, 20-22, 33-35; ECF No. 551 at 13-15 (explaining the fatal errors in Dr. Singer's circular reasoning). |
| ¶¶ 23, 24, 26 | Plaintiffs' statements are based on inadmissible evidence and expert supposition that contradict market facts. Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and have all inputs needed to compete. SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded. *See* § III.B.3 *supra*; SUF ¶¶ 18-25; *Rebel Oil*, 51 F.3d at 1441. Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion which are both incapable of creating a genuine issue of material fact. It is not illegal to brag about the quality of your business. Plaintiffs' claim that other promoters are "not on par with the UFC," Opp. ¶ 26 n.41, is irrelevant as the law does not require access to the best inputs, but only the ability to compete. *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983).

Plaintiffs' cited evidence is also inadmissible and misleading. Plaintiffs' citation to Ex. 112 omits parts of the document that show it relates to Zuffa's Brazilian operations, outside the alleged geographic market. Ex. 118, Neville Dep. 37:22-39:16; Ex. 119 (excerpt excluded from Pl. Ex. 112). Plaintiffs also misquote a portion of White's deposition and leave out Mr. White's testimony that One is "not a minor grassroots organization. They're a monster." Pl. Ex. 32, White Dep. 296:14-23. |
| ¶ 25 | Plaintiffs' statement is not supported by admissible evidence. Zuffa cites sworn testimony from MMA competitors during the Class Period about their ability to compete. SUF ¶¶ 21-22, 25. Plaintiffs improperly attempt to rebut these statements with pre-Class Period evidence and puffery and opinion which are incapable of creating a genuine issue of material fact. Plaintiffs' claim that such testimony is "not credible" is not a proper counterstatement of material facts. *City of Vernon*, 955 F.2d at 1369. |
| ¶ 27 | Plaintiffs improperly rely on their experts' opinions as facts, and those opinions are contradicted by undisputed market facts. Additionally, Plaintiffs misrepresent Dana White's statements regarding competition with other combat sports by selectively excluding sworn testimony that Zuffa does compete with other sports and entertainment. Pl. Ex. 33, White Dep. 543:17-18 ("we compete over certain things, venues and nights"); Pl. Ex. 32, 447:20-22; 452:13-453:20. Plaintiffs do not dispute the evidence of competition between MMA promoters and other sports. SUF ¶ 28. |
| ¶ 28 | Plaintiffs' statement improperly relies on their experts' opinions as facts. Plaintiffs also incorrectly state that Zuffa concedes that "absent the Scheme Fighter Wage Share would be substantially higher," citing TR1 ¶ 27. That cited paragraph sets forth Prof. Topel's opinion that Dr. Singer's regression evidence "is misleading, fatally flawed, and unreliable" including because "his measures of both 'foreclosure' and compensation are economically and econometrically incorrect." Plaintiffs agree that Zuffa pays <u>more</u> than other promoters, and attributes that higher pay to Zuffa's dominance, contrary to its case for monopsony power. |

| Pls.' CSOF | Zuffa's Response |
|---|---|
| ¶ 29 | Plaintiffs' statement is immaterial because workers who are paid a lower percentage of revenue but higher actual compensation have not suffered anticompetitive injury. Mot. 22-23; Zuffa *Daubert* Motion, ECF No. 522. |
| ¶ 30 | Plaintiffs' statement is based only on their experts' speculation that is not supported by any expert analysis or record evidence. Plaintiffs do not show suppressed wages; they purport to show suppressed wage share. Plaintiffs misquote Professor Blair's deposition contending that Professor Blair "conceded" certain effects would occur by "suppressing athlete compensation." Opp. ¶ 30 n.52. Professor Blair hypothesized about potential effects that could occur if athletes were paid "substantially below their marginal revenue product." Ex. 120, Blair Dep. 147:2-5. Plaintiffs have not attempted to calculate MRP in this case. Ex. 121, Singer Dep. II 433:13-434:1. |
| ¶ 31 | Plaintiffs do not dispute that Zuffa increased the number of its events. The remaining parts of Plaintiffs' assertion are immaterial because (1) in evaluating market power the relevant issue is whether "by restricting its own output, [a defendant] can restrict marketwide output, and, hence, increase marketwide prices" *Rebel Oil*, 51 F.3d at 1434, and it is undisputed that Zuffa's output went up; (2) undisputed evidence shows competitor entry and expansion during the Class Period (SUF ¶¶ 18-20); and (3) Plaintiffs cite no evidence that output fell due to the Scheme. Plaintiffs' expert acknowledges he did not run a regression to control for all other factors that might affect marketwide output, and is "simply taking a trend of output at the industry level and projecting it forward from 2010." Ex. 121, Singer Dep. II 604:5-10.<br><br>The remaining portion of the statement that Zuffa increased the price above competitive levels is not supported by record evidence because Plaintiffs have presented no evidence of competitive prices and costs in the market. Mot. § III.A.1. Nor did Dr. Singer perform a regression to control for things like demand and costs to evaluate the change in PPV price. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) ("Where output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand"). |
| ¶ 32 | This statement misstates Ninth Circuit law. See *supra* § III.C.2.a. Plaintiffs do not rebut that Zuffa's contracts allow it to increase output and put on high-quality events. SUF ¶ 14. Plaintiffs' expert admits that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of "the need for a steady supply of appropriately matched Headliners" and "the need to replace Fighters that become unavailable due to injury." Ex. 70, Singer Rep. ¶ 158. Evidence of certain types of restrictive contracts in other sports does not show that Zuffa's specific business justifications are pretextual. |

Dated:  November 2, 2018

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

By: /s/ William A. Isaacson
      William A. Isaacson
    *Attorneys for Defendant* Zuffa, LLC, d/b/a
    Ultimate Fighting Championship and UFC

William A. Isaacson (*Pro Hac Vice*)
Stacey K. Grigsby (*Pro Hac Vice*)
Nicholas A. Widnell (*Pro Hac Vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
Email:  wisaacson@bsfllp.com
       sgrigsby@bsfllp.com
       nwidnell@bsfllp.com

Donald J. Campbell #1216
J. Colby Williams #5549
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
Tel: (702) 382-5222
Fax: (702) 382-0540
Email: djc@campbellandwilliams.com
      jcw@campbellandwilliams.com

Richard J. Pocker #3568
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Tel: (702) 382 7300
Fax: (702) 382 2755
Email: rpocker@bsfllp.com

*Attorneys for Defendant* Zuffa, LLC, d/b/a Ultimate
Fighting Championship and UFC

1

## **CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that the foregoing **Zuffa's Reply In Support Of Motion**

3

**for Summary Judgment** was served on November 2, 2018 via the Court's CM/ECF electronic

4

filing system addressed to all parties on the e-service list.

5

6

7

/s/ Roderick Crawford

8

An employee of Boies Schiller Flexner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28