# EXHIBIT 113

## Chart of Plaintiffs' CSOF and Zuffa's Response

## (Redacted Public Version)

**Plaintiffs' Counterstatement of Facts and Zuffa's Response**

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| ¶ 1 | Marquee Fighters are by far the most important input for MMA promoters because Fighters draw the audience—and therefore television deals and sponsors. The UFC's longtime matchmaker Joe Silva testified that "it would devalue a promotion if the highest-level fighters in that organization are taken away" because "the highest-level fighters in an MMA promotion are a substantial component of the value of that organization." J. Silva Tr. 330:2-10.[1] | This statement is immaterial because "marquee" fighters (or "top" or "highest level") is not a term defined in the Complaint or elsewhere, and because it is undisputed that MMA promoters had the ability to obtain talented MMA athletes during the Class Period.  SUF ¶¶ 21-24.  Plaintiffs have also not attempted to prove antitrust injury or damages for a class of "marquee" athletes. |
| ¶ 2 | Contrary to Zuffa's claim that it is somehow relevant that Zuffa had a minority of "total available athletes under contract," ZSUF ¶36, Fighters are not fungible, *see* SR2 ¶¶23, 128-29, 140 & n.499; SR4 ¶48, and thus merely counting up Zuffa's raw share of "athletes under contract" with any MMA promotion is irrelevant. Rather, as Zuffa's economist admits, highly-ranked or better-known Fighters generate more Event Revenues. *See* Topel Tr. 432:10-24, 450:8-451:5 ("some fighters are more important to an MMA promotion than others;" "some fighters generate more revenues"); *id.* 36:7-17 ("household names" more valuable); *id.* 431:2-7. Executives of Zuffa and other aspiring promoters recognize this fact. Silva admitted, for instance, that "there is a group of fighters who, whether they're champions or not, . . . tend to separate themselves from the crowd as capable of being headliners;" and "an event will have difficulty succeeding without these top-level headline fighters." J. Silva Tr. 331:5-332:2. Relative to Fighters, the promoter's role is limited. | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 21-24, and that competitors had all of the inputs needed to compete.  SUF ¶ 25.  Plaintiffs' reference to Joe Silva's testimony is misleading and does not support Plaintiffs' proposition.  Pl. Ex. 29, Silva Tr. 332:4-333:16 ("popularity doesn't have anything necessarily to do with your accomplishments," and that it has more to do with "charisma").  Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes.  *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star.  So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| ¶ 3 | Because Fighters are not fungible and because the top Fighters drive revenues, as Zuffa has conceded, a ███████████ | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA |

---

[1] Plaintiffs' footnotes to the CSOF are omitted from this chart.

EXHIBIT 113 – Page 1

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | ████████ is ████████ to stage live MMA events successfully. Zuffa's economist also admitted, "To effectively compete with the UFC a competitor would need. . . a deep lineup of marquee fighters" and that "good matchmaking from a deep roster of talented fighters under contract is essential." Topel Tr. 440:12-441:10; *see also* SR1 ¶158. | athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 21-24, and that competitors had all of the inputs needed to compete. SUF ¶ 25. Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| ¶ 4 | Zuffa admits it has the "vast majority of top fighters" under multi-bout exclusive agreements—a barrier to entry and expansion for other promoters. And its economist conceded that "having the vast majority of top fighters. . . under your contracts, . . . that creates. . . a competitive advantage that, all other things the same, make—an entrant's going to have to overcome that in order to come in and compete head-to-head and have the same success as Zuffa." Topel Tr. 435:17-437:22. | Plaintiffs' statements are immaterial as undisputed evidence shows that new and existing promoters expanded during the Class Period. SUF ¶¶ 18-20; § III.B.3; Mot. 25-26. Plaintiffs' citation to Professor Topel is incomplete and does not support Plaintiffs' assertion. Pl. Ex. 37, Topel Dep. 437:4-11 (economists use the term "'barriers to entry' in -- in different ways. So to an economist a cost advantage, being better at something can be considered a barrier to entry. It's not an anticompetitive barrier to entry"); *Syufy*, 903 F.2d at 668 (rejecting theory that "Syufy's effectiveness as a competitor creates a structural barrier to entry"). Record evidence does not support Plaintiffs' statement about the number of Zuffa athletes under contract. It is undisputed MMA promoters had the ability to obtain talented MMA athletes during the Class Period. SUF ¶¶ 21-24. |
| ¶ 5 | Promoters need a deep roster of talented Fighters to compete with Zuffa because:<br>a. Given Zuffa's anticompetitive Scheme, a promoter must | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked |

EXHIBIT 113 – Page 2

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | supply multiple pairings of top Fighters to sustain consumer interest. SR1 ¶156. Not all top Fighters can be matched against each other because, *inter alia*, there are distinct weight classes, and repetitive pairings of the same top Fighters would have decreasing utility. *Id.*; *see also* Silva Tr. 130:18-131:16; Hendrick 30(b)(6) Tr. 217:17-218:10.<br>b. Only by having access to a broad stable of top Fighters can a promoter develop new top Fighters, as Fighters rise in the rankings only by defeating other top Fighters. SR1 ¶157. As Silva put it, "beating guys with crappy records won't convince anyone [a Fighter] is ready for the big leagues [*i.e.*, the UFC]." J. Silva Tr. 130:10-132:10; Ex.124 at -15.<br>c. In an environment in which Zuffa refuses, as part of the Scheme, to co-promote events with other MMA promoters, top Fighters and aspiring top Fighters require a promoter to have a critical mass of top Fighters. *E.g.*, Topel Tr. 431:8-13 ("the ability to develop their careers by fighting against highly-ranked opponents" is "one of the reasons they [Fighters] sign up"); *id.* 434:9-15 (Fighters "generally have an interest in competing against the best fighters" and customers "like that too" because putting "good fighters against each other" creates "more energy"); TR1 ¶96. Zuffa principal, Lorenzo Fertitta, made this clear: "[F]or any aspiring athlete that wants to become a fighter, we're at the top of the food chain … [T]heir goal is eventually to get to the UFC. So the talent pool is kind of coming to us so we kind of have the pick of the best fighters that are potentially out there." | athletes voluntarily left Zuffa for other promoters, SUF ¶¶ 21-24, and that competitors had all of the inputs needed to compete. SUF ¶ 25. Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes. *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star. So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| ¶ 6 | Zuffa concedes that by keeping top Fighters from other promoters the UFC will continue to be "the only viable alternative [for] a top tier fighter['s] career." SR1 ¶162. Zuffa's executives acknowledge the importance of blocking | These statements are immaterial because it is undisputed that promoters had the ability to obtain talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters, SUF ¶¶ |

EXHIBIT 113 – Page 3

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | other promoters' access to top Fighters to maintaining its dominance. In February 2014, for example, after Lorenzo Fertitta exercised a provision of Zuffa's Exclusive Contracts to prevent top Fighter Gilbert Melendez from defecting to Bellator, Fertitta wrote to Dana White: "We gotta keep taking these [expletive]'s oxygen til they tap out. We have sacrificed too much to let anyone get traction now." | 21-24, and that competitors had all of the inputs needed to compete.  SUF ¶ 25.  Undisputed record evidence shows that rankings alone do not translate into "talented" or "household name" athletes.  *E.g.* Pl. Ex. 30, Coker Dep. 90:7-18 ("low rank, to me, doesn't mean that you can't be a star.  So you can be ranked 3 or 4 in the world, but -- the flip side of that is you can be ranked 3 or 4 in the world, doesn't mean you are a star"), 90:20-91:5 (athletes like Plaintiff Cung Le were unranked, but "drew big TV ratings"). |
| ¶ 7 | Zuffa admits, ZSUF ¶12, all its Fighters are required to sign Exclusive Contracts. | This allegation is immaterial as it does not establish an antitrust violation. Mot. 28. |
| ¶ 8 | Zuffa also admits its Exclusive Contracts restrict Fighter mobility, preventing the best Fighters from moving to other promoters. *See, e.g.,* Topel Tr. 75:6-19, 80:7-16, 78:20-79:1 (admitting its Exclusive Contracts are "restrictions on athlete mobility"). Zuffa restricts Fighter mobility through specific contractual provisions, such as:<br>a. __The Exclusivity Clause__ prevents UFC Fighters from appearing for other promoters, Hendrick 30(b)(6) Tr. 382:11-385:23 & 376:25-377:13, and the better the Fighter, the longer the term.<br>b. __The Right to Match Clause__ gives Zuffa the right to match any offer made to a Fighter by another promoter for ▮▮▮▮ after the Exclusive Contract "term" and after any Exclusive Negotiation period. As a result, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ J. Silva Tr. 186:4-12. | This statement is immaterial because undisputed evidence shows that promoters had the ability to sign talented MMA athletes during the Class Period and that highly-ranked athletes voluntarily left Zuffa for other promoters. SUF ¶¶ 21-24. Plaintiffs misquote Prof. Topel's testimony.  When asked whether "the challenged contracts are in effect restrictions on athlete mobility," he testified, "I don't know if I agree with your phrase.  They are restrictions that protect the investments that Zuffa has made in athletes."  Pl. Ex. 36, Topel Dep. 79:25-80:6. Undisputed evidence shows that exclusive contracts enable Zuffa to have enough athletes available to compete in the dozens of UFC events Zuffa promotes each year and to maintain a high quality of events in the face of athlete injury or inability to compete.  SUF ¶ 14.<br><br>Plaintiffs cite no record evidence that Zuffa's exclusivity clauses are longer for "the better" fighters.  The "Right to Match" clause ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

EXHIBIT 113 – Page 4

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | c. **The Exclusive Negotiation Clause** gives Zuffa the exclusive right to negotiate with the Fighter after the "term," typically for 3 months.<br><br>d. **The Champions Clause** gives Zuffa the right to extend the contract of a Fighter who is the champion of any weight class at the end of the term ███████████. Ex.105 at -912; SR1 ¶69. | ██████████████████████████<br>██████████████████████████<br>██████████████████████████<br>██████████████████████████ Ex. 47 § 12.1; Ex. 55 § 12.2; Ex. 115, Mersch Dep. 325:17-326:7; Ex. 116, Epstein Dep. (5/26/2017) 91:10-92:10. |
| ¶ 9 | Contrary to Zuffa's contention about the average Fighter career length, ZSUF ¶13, the effective term of Zuffa's Exclusive Contracts was longer than the average Fighter career. | This assertion is unsupported; it is undisputed that a UFC athlete's professional career (*i.e.*, all paid bouts) is 8.7 years, roughly three times longer than Plaintiffs' calculation of Zuffa's contract term.  SUF ¶ 13; Ex. 49, Singer Reb. ¶ 64. |
| ¶ 10 | That certain other MMA promoters may also have exclusivity provisions, ZSUF ¶16, is disputed and irrelevant. It is disputed in that the other promoters' contracts contained significant exceptions to exclusivity, often allowing Fighters to compete in other organizations, including the UFC. SR1 ¶¶107, 135-36; SR2 ¶¶236-37. Further, the other promoters ████████████ ██████████████████████████ SR2 ¶¶190, 236-37. Indeed, evidence shows that other promoters would have been willing to co-promote MMA events, SR2 ¶¶221-24, and remove other restrictive provisions such as the Right to Match Clause, if Zuffa would. SR2 ¶¶190, 194, 236 & n.756; Ex.59 at -802-03. | Plaintiffs' assertion that rival promoters' contracts contained "significant exceptions" is supported only by citations to their expert and is contradicted by undisputed market facts.  SUF ¶ 16 (undisputed that ████████ and pre-acquisition Strikeforce all had exclusive contracts with no significant exceptions); *see also* Ex. 56, Coker Dep. 180:20-181:3.  Plaintiffs' assertion that other promoters would have removed restrictive provisions if Zuffa did so is based on speculation and inadmissible hearsay. |
| ¶ 11 | Zuffa used its market power and negotiating leverage—including through coercion, threats, and aggressive contractual enforcement—to make its Exclusive Contracts effectively perpetual. *See* SR1 ¶¶75-91; SR2 ¶¶58, 62-63, 67. For instance, Zuffa forced its Fighters to renegotiate before the end | CSOF ¶ 11 is inadmissible because it improperly relies on experts' opinions as undisputed facts.  The CSOF ¶¶ 11-12 arguments—and Mr. Vera's testimony about "common knowledge" that lacks foundation and is hearsay—regarding "coercion, threats, and aggressive" contractual |

EXHIBIT 113 – Page 5

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
|  | of the existing contract's term to prevent the Fighters from ever becoming free agents. Plaintiff Vera explained how this worked: "Every time a fighter. . . is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight." Vera Tr. 118:1-18. Zuffa President White conceded that "most guys never make it to the end of a UFC contract. They will get within three fights, and then we want to sit back down and start talking, right, to keep them." | enforcement and impediments to free agency are contradicted by the market facts and are immaterial for the reasons in section III.C.3.b and Zuffa's Motion (pp. 35-36).  There is also no admissible evidence that Zuffa's contracts are "effectively perpetual."  Each contract has a defined term and specified provisions that allow for extensions in a few circumstances, ▮▮▮▮▮▮▮.  Ex. 47 § 4.1, 9.2.  It is undisputed that Zuffa offered to re-sign athletes for *more compensation* under new agreements. Mot. 35-36; Ex. 130, Mersch Dep. 359:16-362:3. |
| ¶ 12 | Zuffa would do any of the following to prevent a Fighter from reaching free agency:<br>a. **Move Fighters to unfavorable placement on the fight card for an event** or impose unfavorable matchups. As White described in a 2013 interview: "I can tell you this man, If you f***ing call [UFC matchmaker] Joe Silva and turn down a fight, you might as well say f***ing rip up my contract. He's a mean little f***er. You don't call Joe Silva and tell him you don't want to f***ing fight anybody man. You might as well just take the fight because it's going to be worse. You might as well just do it." PRFA No. 20; *see also* White Tr. 354:6-355:21; Ex.43; Ex. 57.<br>b. **Control the timing of a bout** (*i.e.*, refuse to offer Fighters bouts) for Fighters on the last bout of their contract. That punishes them because they get paid only when they fight. SR1 ¶¶76-80. As Plaintiff Fitch testified, "If you don't get your bout agreement, you don't get paid, you don't get money, you can't feed your children."<br>c. **Delay a Fighter from competing for another promoter** through the Right to Match and Exclusive Negotiation clauses. | The CSOF ¶¶ 11-12 arguments regarding contractual enforcement and impediments to free agency are contradicted by the market facts and are immaterial for the reasons in section III.C.3.b and Zuffa's Motion (pp. 35-36).  The quote in CSOF ¶ 12(a) does not discuss preventing athletes from reaching free agency, instead it says Joe Silva could cut athletes who refuse appropriate matchups.  The quote in CSOF ¶ 12(b) from Jon Fitch does not show evidence of any withholding of money, whether tied to free agency or not.  CSOF ¶ 12(c) cites no evidence of athletes prevented from reaching free agency by coercion, and 12(d) cites no evidence of coercion and instead cites only negotiations to extend a contract.  The citations also do not show that the generalizations about Zuffa's alleged conduct are true.  *E.g.* Pl. Ex. 120 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). |

EXHIBIT 113 – Page 6

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | Those clauses prevent a Fighter reaching the end of a contract "term" from moving to another promoter for ███ ███—an excessively long period to sit out given that careers are short and Fighters get paid only when they compete. Zuffa uses this "compensation gap" to coerce more seasoned Fighters to sign new deals.  The Right to Match and Exclusive Negotiation Clauses, along with the Champions Clause, were effective threats, ensuring that Zuffa rarely needed to enforce them formally.<br><br>d. **Deprive Fighters of title opportunities**. Zuffa's control over title fights gave it leverage over contract length and pay ***because, due to the Scheme, the UFC offers the only titles that matter in MMA***. *E.g.*, Ex.50 at -76; Ex.121; Ex.79 at -65; SR1 ¶79; Fitch Tr. 222:3-23; Kingsbury Tr. 51:12-22, 96:17-19, 142:12-143:2. Zuffa also refused to offer bouts for championship titles unless the Fighters were locked-up long-term. *E.g.*, Ex.120 at -7332 (J. Silva to Bob Cook (manager) re Fighter: ████████████████████████ ████████████████████████████ Shelby Tr. 33:8-34:5; *see also id.* at 32:12-21. | |
| ¶ 13 | From 2006-2011, Zuffa enhanced its dominance by acquiring any potential competitor that could have posed a threat, and locked in those promoters' top Fighters to exclusive deals. | This statement is not supported by any citation. |
| ¶ 14 | In 2006, Zuffa acquired WEC, which featured top Fighters in lighter weight classes. Epstein 30(b)(6) Tr. 28:20-25, 33:14-20; SR1 ¶¶41-42. Zuffa ultimately merged WEC into the UFC. Also in 2006, Zuffa acquired World Fighting Alliance ("WFA") as a ████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████████ | For the reasons in section III.C.3.a and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm: (1) ████ ███████████████████████████████ ███████████ (Pl. Ex. 14, Acquisitions Dep. 33:13-35:11); (2) ███ ███████████████████████████████████ |

EXHIBIT 113 – Page 7

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | (Ex. 129 at 83:20-84:18).  There was no decrease in Zuffa's output and there was an increase in compensation.  SUF ¶ 8.  Each of these acquisitions are also immaterial because they occurred before the Class Period.<br><br>All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions.  SUF ¶¶ 8, 18-25. |
| ¶ 15 | In 2007, Zuffa acquired its then-most significant competitor, PRIDE Fighting Championship. At the time of the acquisition, PRIDE had 21 of the 28 top Fighters outside of the UFC. *See* Ex.111 at -140. Zuffa's PRIDE acquisition had a ███████████████████████████████████ ██████████ *Ex.*83 at -44. Lorenzo Fertitta stated that "this transaction advances Pride and the UFC way beyond and light years ahead of any other MMA organization." PRFA No. 4. Ultimately, Zuffa shut down PRIDE. White Tr. 167:13-18. After the acquisition, White bragged: "look at all the contracts we got from Pride and all the guys that came over[.]" *Id.* 313:6-10; *Id.* 167:24-168:13 ("Pride is dead, dummy. I killed them."). | For the reasons in section III.C.3.a and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  Plaintiffs' statements about Pride are immaterial because Pride is outside Plaintiffs' geographic market, and ████████████ ██████████████  CSOF ¶ 15.  There was no decrease in Zuffa's output and there was an increase in compensation.  SUF ¶ 8.  Each of these acquisitions are also immaterial because they occurred before the Class Period.<br><br>All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions.  SUF ¶¶ 8, 18-25. |
| ¶ 16 | In 2009, Zuffa acquired Affliction's Fighter contracts to shut down its promotion and move its Fighters to the UFC. *See* Ex.61 at -50-51; SR1 ¶¶44-46. On July 24, 2009, Zuffa's Mersch wrote: ██████████████████████████ | For the reasons in section III.C.3.a and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm. ███████████ ███████████████████████████████████ Mr. Mersch testified that "the general |

EXHIBIT 113 – Page 8

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | ." Ex.62. | nature of my e-mail was to pass along that the relationship between Affliction and the UFC had apparently been repaired." Ex. 130, Mersch Dep. 445:21-446:14.  The record evidence shows that the Affliction acquisition was "looking good" because ███████████████████████ ████████████████████████ Pl. Ex. 62; Ex. 129, Acquisitions Dep. 150:15-151:19.  There was no decrease in Zuffa's output and there was an increase in compensation.  SUF ¶ 8.  Each of these acquisitions are also immaterial because they occurred before the Class Period.  All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 8, 18-25. |
| ¶ 17 | In the wake of these acquisitions, Strikeforce began to amass a roster of top Fighters. Ex.67 at -19-20. Strikeforce's head, Scott Coker, testified, "In 2009 and '10, we [Strikeforce] had more top 10 rated heavyweights than the UFC did. So arguably we had a better heavyweight division than [UFC] did." Coker Tr. 105:23-25. After Zuffa acquired Affliction, Coker wrote: "[N]ow its ufc and strikeforce. [I]f we can[']t battle these guys it[']s over for the [MMA] industry. [UFC] will be the only one left. [W]e're the last chance otherwise fighters['] purses will go down if [UFC] is the only one. [W]e're luke skywalker and [UFC] is darth vader and the death star." Ex.68 at -04. By 2011, Strikeforce had emerged as the ████████████████ Ex.67 at -06; SR1 ¶47; Coker Tr. 103:17-24; Epstein 30(b)(6) Tr. | For the reasons in section III.C.3.a and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  Plaintiffs' evidence in CSOF ¶ 17 is immaterial because (1) it predates the Class Period and (2) refers to ████████████████ ██████ for the UFC, with no decrease in Zuffa's output and only a positive effect on competition.  As to the Strikeforce acquisition, in 2012 the FTC concluded that "no further action is warranted" in connection with its investigation of that acquisition. Ex. 117.  Undisputed evidence shows that ███████████████████████ ████████████████████████ Pl. Ex. 14, Acquisitions Dep. 167:24-168:19.  Coker's deposition testimony cited in CSOF ¶¶ 17-18 contains |

EXHIBIT 113 – Page 9

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | 170:4-7; J. Silva Tr. 173:4-10; *id.* at 316:15-18. ███████. In January 2011, Zuffa and Strikeforce had the vast majority of top-ranked Fighters in every weight class. | inadmissible hearsay and is contradicted by the undisputed record evidence that compensation—including for former Strikeforce athletes—increased over time. SUF ¶¶ 8-9.  All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions.  SUF ¶¶ 8, 18-25. |
| ¶ 18 | When Zuffa acquired Strikeforce in March 2011, Zuffa eliminated its only potential competition, SR1 ¶¶47-50, and in light of its Scheme, closed the door on the possibility of real competition going forward. Coker testified that after the acquisition, a "lot of people were disappointed … [b]ecause you now had managers call [Coker] and say: Now our [Fighters'] purses are going to go down. Now there's only one buyer [for MMA talent] and it's not going to be good for MMA as an industry." Coker Tr. 135:10-19. Managers later confirmed to Coker that Fighter purse offers decreased by about 20%. *Id.* 137:14-21. | For the reasons in section III.C.3.a and Mot. 34-35, Plaintiffs' statements are immaterial because there is no showing of anticompetitive harm.  As to the Strikeforce acquisition, in 2012 the FTC concluded that "no further action is warranted" in connection with its investigation of that acquisition. Ex. 117.  Undisputed evidence shows that ███████████████████████████████. Pl. Ex. 14, Acquisitions Dep. 167:24-168:19. Coker's deposition testimony cited in CSOF ¶¶ 17-18 contains inadmissible hearsay and is contradicted by the undisputed record evidence that compensation—including for former Strikeforce athletes—increased over time.  SUF ¶¶ 8-9. All of the acquisitions are also immaterial because undisputed market facts show that new competitors have entered the market and expanded after these acquisitions. SUF ¶¶ 8, 18-25. |
| ¶ 19 | Zuffa used its Exclusive Contracts and dominant market power to prevent top Fighters from becoming free agents, foreclosing other promoters' access to a sufficient stable of top Fighters. | Plaintiffs' statement is inadmissible because it improperly relies on expert reports to prove facts.  It is also contradicted by the undisputed evidence that highly-ranked athletes left the UFC voluntarily for other promoters.  SUF ¶¶ 22-23.  The other cited material provides no support.  The cited exhibit and testimony discusses an athlete who ███████████████ |

EXHIBIT 113 – Page 10

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | ██████████████████████ Nothing in that document indicates that Zuffa prevented the athlete from becoming a free agent at the end of his contract or even extended his contract because he refused to compete. Plaintiffs' statement is also immaterial for the reasons discussed in sections III.A and III.C.2 and Zuffa's Motion (pp. 29-31). |
| ¶ 20 | Zuffa's supposed evidence of Fighter mobility, ZSUF ¶¶21-25, merely reflects that the UFC is the "major league" of MMA and cuts Fighters who do not meet its standard. *See* SR1 ¶¶107, 136. As the Raine Group, who analyzed the market for Zuffa, explained, ███████████████████████ Ex.113 at -94. Zuffa's Silva echoed that understanding: "WSOF is where all of the fighters that we didn't want or got rid of went." J. Silva Tr. 177:7-178:21; Ex.127 at -818. Zuffa bragged in 2016 that ███████████████████████ Ex.115 at 14; *id.* ███████████████████████ Ex. 66. Zuffa's Scheme allowed it to lock in the vast majority of top Fighters. Silva bragged to White, "We Own MMA," listing the consensus rankings and showing that Zuffa controlled a high ratio of top-ranked Fighters in each weight class. *See* Ex.84; J. Silva Tr. 156:25-172:10 (discussing document). | *See* Reply at Zuffa SUF ¶ 21. Plaintiffs' record evidence from Raine is an inadmissible statement by a third party and cannot be considered on summary judgment as evidence of Zuffa's intent. *See William Inglis & Sons Baking Co. v. Cont'l Baking Co., Inc.*, 942 F.2d 1332, 1337 n.7 (9th Cir. 1991). Raine explained that Pl. Ex. 113 included questions from a potential investor "and the answers would have been composed by Raine." Ex. 118, Neville Dep. 87:19-89:6. Raine had no recollection of whether Zuffa had input into the document, *id.*, and there is no record evidence that Zuffa adopted any of the third party's statements. In addition, this statement is inaccurate and immaterial. *See* §§ III.A and III.B.3. It cannot be an antitrust violation to brag about the quality of your business. |
| ¶ 21 | Dr. Singer shows that Zuffa foreclosed a large and increasing share of Fighters, including Headliners (Fighters ranked in the top 15 of their weight class). SR1 ¶173 & Fig. 3; *see* SR1 ¶¶167-73; *id.* ¶¶306-09. By 2017, Zuffa had foreclosed ████████ of Fighters in the relevant markets and between 91-███ percent of Headliners. SR1 ¶¶128-29, 167-73 & Fig. 3. | Plaintiffs' statement is inadmissible because it improperly relies on expert reports to prove facts. As set forth in the Motion (p. 29-31), section III.C.2, and in Zuffa's *Daubert* Motion, Dr. Singer's foreclosure analysis is unreliable, flawed, and must be disregarded. ECF No. 524 at 2-3, 8, 20-22, 33-35; ECF No. 551 at 13-15 (explaining the fatal |

EXHIBIT 113 – Page 11

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | errors in Dr. Singer's circular reasoning). |
| ¶ 22 | By locking up the "vast majority of top fighters," the Scheme blocked potential competitors from entering or expanding. WME, which purchased Zuffa in 2016, observed: <br><br> ████████████████████████████ <br> ████████████████████████████ <br> ████████████████████ Ex.118 at -78; *see also* CSF ¶¶3-6. Dr. Topel conceded that Zuffa's control of the "vast majority of top fighters" through its contracts created a barrier to entry and that Zuffa's contracts deprived promoters of what they would need to challenge Zuffa's dominance. CSF ¶4. Because Zuffa had locked up the vast majority of top Fighters, other promoters were unable to compete with it. *E.g.*, Otto Tr. 246:19-247:19; *supra* ¶¶19-21 & n.36. | Plaintiffs' statements are immaterial as undisputed evidence shows that new and existing promoters expanded during the Class Period. SUF ¶¶ 18-20; § III.B.3; Mot. 25-26. Plaintiffs' citation to Professor Topel is incomplete and does not support Plaintiffs' assertion. Pl. Ex. 37, Topel Dep. 437:4-11 (economists use the term "'barriers to entry' in -- in different ways. So to an economist a cost advantage, being better at something can be considered a barrier to entry. It's not an anticompetitive barrier to entry"); *Syufy*, 903 F.2d at 668 (rejecting theory that "Syufy's effectiveness as a competitor creates a structural barrier to entry"). Record evidence does not support Plaintiffs' statement about the number of Zuffa athletes under contract. Plaintiffs' CSOF ¶ 22 does not cite to record evidence to support that Zuffa locked up the "vast majority of fighters" and misquotes Prof. Topel's testimony. Plaintiffs also misquote Kurt Otto's deposition testimony. Otto testified that Zuffa's 2006 and 2007 acquisitions of WEC and WFA—both before the Class Period—limited his chances of getting a fighter *who was under contract with another promoter*, so he would have to "find a new gym rat that has talent and build them up from scratch." Pl. Ex. 16, Otto Dep. 246:19-247:16. Otto did not testify that he (or other promoters) was unable to compete with Zuffa. It is undisputed MMA promoters had the ability to obtain talented MMA athletes during the Class Period. SUF ¶¶ 21-24. |
| ¶ 23 | Through the Scheme, Zuffa dominated MMA from at least 2007 to 2017. As Deutsche Bank observed, beginning in 2007: | Plaintiffs' statements are based on inadmissible evidence and expert supposition that contradict market facts. |

EXHIBIT 113 – Page 12

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | ██████████████████████ " Ex.102 at -304. As Zuffa conceded in 2009: "We are 'MMA'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." Ex.87 at -95. Moody's found in 2010 that the UFC is the "Largest global MMA Promoter" that "dwarfs any of its competitors." Ex.49 at -1183.  And as Zuffa recognized in 2010, (a) ████████████████████████ Ex.94 at -952, and (b) ████████████████████████████ Ex.85 at -805. Deutsche Bank echoed this in 2013, finding ████████████████ ██████████████ Ex.97 at -403. Zuffa's owners have ████████████████████ SR1 ¶137, Fig.2. White touted in 2010: "There is no competition. We're the NFL . . . There is no other guy." Ex.139. A Zuffa executive repeated that admission in 2010, stating that ███████████████ ████████████████████████████ Ex.93 at -41. | Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and have all inputs needed to compete.  SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded.  *See* § III.B.3; SUF ¶¶ 18-25; *Rebel Oil*, 51 F.3d at 1441.  Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion which are both incapable of creating a genuine issue of material fact. It is not illegal to brag about the quality of your business. |
| ¶ 24 | Given the █████████████ barriers to entry imposed by Zuffa's Scheme, Ex.118 at -78, the UFC has ██████████ ████████████████████ Ex.105 at -912. Instead, other promoters have positioned themselves as "feeder" or "minor leagues." As White conceded: "I don't look at those guys as competition at all. They're nowhere near the league that we're in. I need shows like this. They're the feeder leagues. All the guys who fight in those shows aspire to be in the UFC some day. They're creating all the UFC talent of tomorrow." White Tr. 194:21-195:5; Ex.136 at 1. | Plaintiffs' statements are based on inadmissible evidence and expert supposition that contradict market facts. Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and have all inputs needed to compete.  SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded.  *See* § III.B.3; SUF ¶¶ 18-25; *Rebel Oil*, 51 F.3d at 1441.  Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion which are |

EXHIBIT 113 – Page 13

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | both incapable of creating a genuine issue of material fact. It is not illegal to brag about the quality of your business. |
| ¶ 25 | Zuffa's citation to certain promoters' boasts that the UFC had not affected their ability to sign Fighters, ZSUF ¶¶21, 25, are not credible and are disputed. White has explained why they are not credible: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it. You're all feeder leagues to the UFC[.] I want them to exist and make money because those guys create the next talent that will end up in our organization someday." PRFA No. 24. Further, Zuffa's citations stand only for the undisputed proposition that Zuffa did not foreclose access to *all* Fighters. But that is irrelevant because the evidence shows that (a) all Fighters are not the same, CSF ¶¶1-2, (b) Zuffa locked up nearly all top Fighters and those with potential to be, CSF ¶¶4, 19-22, and (c) what is necessary to compete with the UFC is a critical mass of top Fighters, not low-ranked unknown Fighters or even a few top Fighters, CSF ¶¶3-6. In any event, Zuffa's cited statements do not contradict evidence showing that UFC is the "majors" and other promoters are not. As White testified, "Whether they like it or not, they're the farm league," White Tr. 192:25-193:14, and "I've said everybody was a feeder league to the UFC." *Id*. 242:13-16. *See also* Ex.89 at -195 ("All of the other shows out there act as minor leagues for the UFC. Guys get their experience and build their confidence in the other shows and if they are successful enough we bring them into the UFC."); CSF ¶24 & n.39. "Minor league" promoters may sign *some* athletes and make *some* profits, but they do not constrain Zuffa's market power. | Plaintiffs' statement is not supported by admissible evidence. Zuffa cites sworn testimony from MMA competitors during the Class Period about their ability to compete. SUF ¶¶ 21-22, 25. Plaintiffs improperly attempt to rebut these statements with pre-Class Period evidence and puffery and opinion, which are incapable of creating a genuine issue of material fact. Plaintiffs' claim that such testimony is "not credible" is not a proper counterstatement of material facts. *City of Vernon,* 955 F.2d at 1369. |
| ¶ 26 | Contrary to ZSUF ¶¶18-25, even the most prominent non-Zuffa promoters have been distant substitutes for the UFC. | Plaintiffs' statements are based on inadmissible evidence and expert supposition that contradict market facts. |

EXHIBIT 113 – Page 14

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | SR1 ¶¶104-07, 134-40. Similarly, market observers, including a consulting firm (the Raine Group) evaluating potential investors for Zuffa in 2016, viewed Zuffa as ██████. *Id.* ¶¶134-140; CSF ¶¶20, 22-24 & nn.37-39. The Raine Group put it succinctly in 2012: ████████ ███████████ Ex.112 at -065. As Lorenzo Fertitta admitted in 2012, "There never has been a comparable outlet [to the UFC]. . . . We've dominated this, this sport, alright? We've dominated the space." PRFA No. 17. None of the promoters Zuffa identifies, ZSUF ¶¶18, 21, has sufficient clout to check its dominance:<br><br>a. **Bellator** is not a direct competitor. In 2013, Deutsche Bank (with Zuffa's input and approval) represented to investors, ████ ██████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ Ex.97 at -439. Zuffa's then-CFO, John Mulkey, edited a draft of Moody's 2014 Credit Opinion to ████████████████████████. Ex.45 at -155; Mulkey Tr. 216:13-217:7; *id.* at 218:16-219:8. Coker, who was brought in to lead Bellator in June 2014, described the promotion as "a dying brand," because, among other reasons, Bellator lacked "star power . . . they didn't have very big names at Bellator." Coker Tr. 166:11-21. WME's diligence documents prior to acquiring the UFC in 2016 describe Bellator as a ████████████ Ex.118 at -78. Moreover, Zuffa's statement that Bellator "successfully outbid Zuffa" for Fighters (ZSUF ¶22; *see also id.* ¶¶23-24) is contradicted by the evidence showing that ████████████ ████████████████████████████████████ | Zuffa's competitors from the Class Period have universally testified that they competed with Zuffa and have all inputs needed to compete.  SUF ¶ 25. The undisputed evidence also shows these competitors have entered the market and expanded.  *See* § III.B.3; SUF ¶¶ 18-25; *Rebel Oil*, 51 F.3d at 1441.  Plaintiffs improperly attempt to rebut Zuffa's statements with pre-Class Period evidence, and statements of puffery or opinion which are both incapable of creating a genuine issue of material fact. It is not illegal to brag about the quality of your business.<br><br>Plaintiffs' claim that other promoters are "not on par with the UFC," Opp. ¶ 26 n.41, is irrelevant as the law does not require access to the best inputs, but only the ability to compete. *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983).<br><br>Plaintiffs' cited evidence is also inadmissible and misleading.  Plaintiffs' citation to Ex. 112 omits parts of the document that show it relates to Zuffa's Brazilian operations, outside the alleged geographic market.  Ex. 118, Neville Dep. 37:22-39:16; Ex. 119 (excerpt excluded from Pl. Ex. 112).  Plaintiffs also misquote a portion of White's deposition and leave out Mr. White's testimony that One is "not a minor grassroots organization.  They're a monster."  Pl. Ex. 32, White Dep. 296:14-23. |

EXHIBIT 113 – Page 15

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
|  | ██████████████ Ex.113 at -794; *see also* SR1 ¶134 (summarizing evidence UFC did not consider Bellator or other promoters on same level); J. Silva Tr. 191:12-205:14; White Tr. 299:8-307:17; 309:16-25; 315:6-316:3. In 2016, Bellator's revenues were ████ compared to just under ████ for Zuffa in North America alone. SR1 Tbl.3. <br> b. **OneFC**, *a promotion that operates exclusively in Asia*, began by telling Zuffa that it would be a UFC feeder league. Ex.54.[4] Dana White testified that OneFC was a feeder organization, White Tr. 296:7-9, and UFC matchmaker Sean Shelby has successfully obtained the release from OneFC to UFC of top OneFC Fighters. Shelby Tr. 203:9-23. <br> c. **Professional Fighters League** ("PFL"), the successor to World Series of Fighting ("WSOF"), does not directly compete with the UFC. PFL from its inception in 2012 through 2016 never achieved annual gross revenues of even ████ of the UFC's gross revenues. SR1 Tbl.3. Zuffa executives have conceded that WSOF does not have top Fighters and that it is a feeder league. J. Silva Tr. 177:7-178:21; Ex.127 at -818 ("WSOF is where all the fighters that we didn't want or got rid of went."); Shelby Tr. 164:11-13; White Tr. 289:17-290:6; *see also* SR1 ¶136 & nn.367-69 ████████████ |  |
| ¶ 27 | Contrary to ZSUF ¶28, the evidence is overwhelming that no other sport or entertainment competes with Zuffa. *See* SR1 ¶¶115-18. And Zuffa has admitted this with respect to boxing and wrestling. *See* White Tr. 543:13-14 ("We're not in competition with boxing."); *id.* 450:2-8 ("Is [the WWE] competition? No. I mean, there's people that watch WWE and there's people that watch UFC. . . . What we're doing is completely different from what they're doing."); *id.* 452:13- | Plaintiffs improperly rely on their experts' opinions as facts, and those opinions are contradicted by undisputed market facts.  Additionally, Plaintiffs misrepresent Dana White's statements regarding competition with other combat sports by selectively excluding sworn testimony that Zuffa does compete with other sports and entertainment.  Pl. Ex. 33, White Dep. 543:17-18 ("we compete over certain things, venues and nights"); Pl. Ex. |

EXHIBIT 113 – Page 16

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | 453:17 ("I've always said [the UFC and WWE are] two completely different markets."). | 32, 447:20-22; 452:13-453:20.  Plaintiffs do not dispute the evidence of competition between MMA promoters and other sports.  SUF ¶ 28. |
| ¶ 28 | That Zuffa's pay rose over time, ZSUF ¶8, or that Zuffa's dominance allowed it to pay more than other promotions, ZSUF ¶9, are irrelevant because Zuffa's Scheme reduced competition and suppressed Fighter compensation below levels that would have prevailed absent the Scheme. Dr. Singer's impact regression shows, for instance, that as there was an increase in the share of Fighters Zuffa locked up (the "Foreclosure Share"), Zuffa paid its Fighters a lower share of its Event Revenues ("Wage Share"), and thus that absent the Scheme Fighter Wage Share would be substantially higher. Zuffa concedes this effect. TR1 ¶27. Zuffa does not dispute that its annual Event Revenues grew substantially from 2007—▮▮▮▮▮—to 2016—▮▮▮▮▮. SR3 n.6 & Fig.A1. Zuffa concedes too that its Fighters played a substantial role in that ▮▮▮ of revenue. *See* Topel Tr. 27:18-25, 47:15-48:4, 241:4-16. It also concedes that as a firm's monopsony power grows, so does the gap between the amounts it pays its workers and the revenues the workers generate. And it even concedes that Zuffa's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TR1 ¶27 (emphasis in original). Zuffa's economist, Dr. Topel, admits the Exclusive Contracts prevent a "transfer of wealth" that would otherwise occur from Zuffa to its Fighters. | Plaintiffs' statement improperly relies on their experts' opinions as facts.  Plaintiffs also incorrectly state that Zuffa concedes that "absent the Scheme Fighter Wage Share would be substantially higher," citing TR1 ¶ 27. That cited paragraph sets forth Prof. Topel's opinion that Dr. Singer's regression evidence "is misleading, fatally flawed, and unreliable" including because "his measures of both 'foreclosure' and compensation are economically and econometrically incorrect."  Plaintiffs agree that Zuffa pays <u>more</u> than other promoters, and attributes that higher pay to Zuffa's dominance, contrary to its case for monopsony power. |
| ¶ 29 | Dr. Singer shows that, due to the Scheme, Zuffa paid Fighters a lower Wage Share ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ *See* SR1 Pt.III.D.1 & Pt.VI.A. Similarly, the major sports all have greater competition for athletes' services than Zuffa and so pay them about 50% or | Plaintiffs' statement is immaterial because workers who are paid a lower percentage of revenue but higher actual compensation have not suffered anticompetitive injury. Mot. 22-23; Zuffa *Daubert* Motion, ECF No. 522.Moreover, Plaintiffs admit that their wage share |

EXHIBIT 113 – Page 17

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | more of revenues. ZR1 ¶¶25-71. And two of the most prominent boxing promoters pay on average ▮▮▮ of their revenues to boxers. ZR2 ¶86. In contrast, Zuffa pays a paltry ▮▮▮ or so of its Event Revenues. Contrary to Zuffa's contention that Plaintiffs did not show it suppressed "actual wages," ZSUF ¶¶37, 8, the record demonstrates that Zuffa would have paid Fighters between $800 million and $1.6 billion more than it actually did absent the Scheme. | comparison between Zuffa and Bellator and Strikeforce is a simple comparison but does not "control for other variables in the same way that a regression model might." Ex. 16, Singer Dep. I 10:17-24.  Plaintiffs' assertion that Zuffa pays a lower wage share than other professional sports leagues is immaterial for the reasons discussed in Zuffa's *Daubert* motion.  ECF No. 522. |
| ¶ 30 | Zuffa's Scheme also reduced the quality of Live MMA Events by reducing Fighters' incentives to invest in their careers. Dr. Zimbalist found that "fighters have less incentive to prepare and train in the short run" because of their suppressed wages caused by the Scheme, and in "the long run, prospective MMA fighters have less incentive to develop the necessary skills to participate in the sport, lowering the supply and overall quality of participants." ZR2 n.47. | Plaintiffs' statement is based only on their experts' speculation that is not supported by any expert analysis or record evidence.  Plaintiffs do not show suppressed wages; they purport to show suppressed wage share. Plaintiffs misquote Professor Blair's deposition contending that Professor Blair "conceded" certain effects would occur by "suppressing athlete compensation." Opp. ¶ 30 n.52.  Professor Blair hypothesized about potential effects that could occur if athletes were paid "substantially below their marginal revenue product."  Ex. 120, Blair Dep. 147:2-5.  Plaintiffs have not attempted to calculate MRP in this case.  Ex. 121, Singer Dep. II 433:13-434:1. |
| ¶ 31 | Zuffa's claim that it and certain other promoters expanded their output over time, ZSUF ¶¶7, 19, is irrelevant because what matters is marketwide output, and the evidence shows that marketwide MMA output *fell* due to the Scheme. Dr. Singer determined that, due to the Scheme, Zuffa increased the price of PPVs above competitive levels while reducing marketwide output. | Plaintiffs do not dispute the material part of Zuffa's fact that it increased the number of its events.  The remaining portion of Plaintiffs' assertion is not material because (1) in evaluating market power the relevant issue is whether "by restricting its own output, [a defendant] can restrict marketwide output, and, hence, increase marketwide prices" *Rebel Oil*, 51 F.3d at 1434, and it is undisputed that Zuffa's output went up; (2) undisputed evidence shows existing competitors grew and new competitors entered the market and expanded during the Class Period |

EXHIBIT 113 – Page 18

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | | (SUF ¶¶ 18-20); and (3) Plaintiffs cite no evidence for their assertion that output fell due to the Scheme. Plaintiffs' expert acknowledges he did not run a regression to control for all other factors that might affect marketwide output, he is "simply taking a trend of output at the industry level and projecting it forward from 2010." Singer Dep. II 604:5-10. <br><br> The remaining portion of the statement that Zuffa increased the price above competitive levels is not supported by record evidence because Plaintiffs have presented no evidence of competitive prices and costs in the market.  Mot. § III.A.1.  Nor did Dr. Singer perform a regression to control for things like demand and costs to evaluate the change in PPV price.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) ("Where output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand"). |
| ¶ 32 | Zuffa provided no evidence that the Scheme had any procompetitive effects. *See* SR1 ¶¶257-90; SR2 ¶¶210-41; SR4 ¶10. Dr. Zimbalist showed MLB, the NBA, the NFL, the NHL, and boxing all once claimed their restrictive athlete contracts were essential to their success, but those excuses were all exposed as pretextual when their revenue, quality, and output *all improved* with expanded athlete mobility and free agency. *See* ZR1 ¶¶79-80, 83-84, 89-103; ZR2 ¶¶9, 90, 97, 99-114. Zuffa's suggestion that having its entire roster of Fighters locked into long term Exclusive Contracts is necessary to "have enough athletes available[,]" ZSUF ¶14, is pretextual and contradicted by the record, and any alleged benefits could | This statement misstates Ninth Circuit law.  See § III.C.2.a.  Plaintiffs do not rebut that Zuffa's contracts allow it to increase output and put on high-quality events.  SUF ¶ 14.  Plaintiffs' expert admits that "ongoing access to a deep pool of talented Fighters is a critical input to the ongoing success of an MMA promotion" because of "the need for a steady supply of appropriately matched Headliners" and "the need to replace Fighters that become unavailable due to injury."  Ex. 70, Singer Rep. ¶ 158. Evidence of certain types of restrictive contracts in other sports does not show that Zuffa's specific business justifications are pretextual. |

EXHIBIT 113 – Page 19

| Pls' CSOF | Plaintiffs' Counterstatement of Fact | Zuffa's Response |
|---|---|---|
| | be achieved by less restrictive means, including much shorter contracts (given that, *e.g.*, Zuffa admits booking events *only* ▮ ▮ *in advance*). | |

EXHIBIT 113 – Page 20