# EXHIBIT 118

# Excerpts of the Deposition of Colin Neville (Raine)

# (Redacted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON   )
FITCH, on behalf of           )
themselves and all others     )
similarly situated,           )
                              )
         Plaintiffs,          )
                              )
         vs.                  )  Case No.
                              )  2:15-cv-01045-RFB-(PAL)
                              )
ZUFFA, LLC, d/b/a Ultimate    )
Fighting Championship and     )
UFC,                          )
                              )
         Defendant.           )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

COLIN NEVILLE

New York, New York

August 8, 2017

1:38 p.m.

Reported by:
JUDITH CASTORE, CLR
Job No. 51358

```
                                    34
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2   separate research team that you relied
 3   on or anything like that?
 4      A   No.  I wish.
 5      Q   When you -- when you
 6   communicated with -- internally at
 7   Raine about Project Basquiat, how were
 8   those communications conducted?  What
 9   methods did you use?
10      A   Typically in-person meetings,
11   phone calls, and e-mails.
12      Q   Text messaging or no?
13      A   Not that I recall as related
14   to internal conversations.
15      Q   When you were -- you -- you
16   did mention text messaging in
17   communications with Zuffa; is that
18   right?
19      A   Yes.
20      Q   And who were those text
21   messages between specific individuals
22   at both Raine and Zuffa?
23      A   They would have been with
24   Nikisa Bardarian.
25      Q   And -- and who at Raine?
```

```
                                    35
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2      A   And myself.
 3      Q   Do you know whether anyone
 4   else at Raine used text messaging to
 5   communicate with individuals at Zuffa?
 6      A   I don't know.
 7      Q   Are you aware that plaintiffs
 8   in this case sent a request for -- it's
 9   called a subpoena, but sent a request
10   to Raine for certain documents that
11   Raine either prepared or had in its
12   possession concerning this
13   Project Basquiat?
14      A   Yes.
15      Q   And did you assist counsel in
16   collecting those materials?
17      A   I did not assist directly,
18   no.
19      Q   Did you assist indirectly or
20   --
21      A   We had a phone call with
22   counsel and --
23          MR. JAIME-BETTAN:  I just
24      want to jump in and make sure you
25      don't reveal anything that you
```

```
                                    36
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2   discussed with counsel that would
 3   be privileged.  We can talk about
 4   it offline if you need to clarify
 5   something.
 6      A   No, the phone call was purely
 7   to discuss that we had received this
 8   notice.
 9          MR. RADICE:  I'm going to
10      hand you Exhibit 2.
11          (Declaration of Business
12      Record Authenticity for the Raine
13      Group, LLC, was marked Raine
14      Exhibit 2, for identification, as
15      of this date.)
16      A   Thank you.
17      Q   I should have mentioned
18   before, if you need to take a break at
19   some point, just let me know.  I would
20   ask that you answer the question that's
21   pending, if there is a question
22   pending, but -- then go off the record.
23      A   Thank you.
24      Q   Are you familiar with this
25   document?
```

```
                                    37
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2      A   Yes.
 3      Q   And it's fair to say that
 4   this is a declaration that you executed
 5   on behalf of the Raine Group; is that
 6   right?
 7      A   That's right.
 8      Q   And this declaration pertains
 9   to certain documents produced by Raine
10   being authentic documents from Raine's
11   files; is that correct?
12      A   That's correct.
13      Q   We're going to talk about a
14   number of those documents, but I think
15   you could put that aside for right now.
16          This is signed by you; is
17   that right?
18      A   Yes.
19          MR. RADICE:  I'm going to
20      hand you a document marked
21      Raine 3.
22          (Document, Bates stamped
23      RAINE0000019 through 88, was
24      marked Raine Exhibit 3, for
25      identification, as of this date.)
```

**Page 38**

HIGHLY CONFIDENTIAL - NEVILLE

Q   I will ask you about a couple of specific pages about that, but let me -- let me know when you are ready to --
A   I'm ready.
Q   Are you familiar with this document?
A   Yes.
Q   And this document appears to be from early 2013. It says on this page 1, January 2013, right?
A   That's right.
Q   Okay. This concerns a different project, a project different from Project Basquiat that Raine was working on for Zuffa, right?
A   That's correct.
Q   And was that called Project Buffalo?
A   No.
Q   What was this project called?
A   This was called Project Brady.
Q   Project Brady. Okay.

**Page 39**

HIGHLY CONFIDENTIAL - NEVILLE

And did Zuffa always come up with the names for the projects?
A   It did.
Q   What -- what is this document? It says, Information memorandum on the front obviously, but could you tell me what that is in layman's terms?
A   Sure. This is a document used to market an opportunity to potential investors.
Q   And what was that opportunity?
A   It was to invest in the UFC's Brazilian business.
Q   And this is one of the -- this pertains to one of the deals you mentioned earlier that was not consummated; is that right?
A   That's right.
Q   Who prepared this document?
A   Raine prepared this document. And -- sorry. And Itau had input into preparing the document.

**Page 40**

HIGHLY CONFIDENTIAL - NEVILLE

(Clarification by the reporter.)
Q   Did Zuffa have input into this document?
A   Yes.
Q   If you had to put a percentage on Raine's input versus -- strike that.
If you had to, say, a portion percentage to each party who participated in creating this document, how would you do that?
MR. JAIME-BETTAN:  Objection. If you can.
Q   If you can.
A   I would say the majority of this was Raine's work product.
Q   And who else -- there was input from Zuffa additionally, right?
A   Yes.
Q   And who else?
A   Itau.
Sorry. My -- my Brazil --
Q   That's -- that's fine.

**Page 41**

HIGHLY CONFIDENTIAL - NEVILLE

A   -- pronunciation.
(Clarification by the reporter.)
Q   Can you describe who they are?
A   Sure. Itau, to my knowledge, is an investment bank primarily focused on Brazil and based in Brazil.
Q   So they're located in Brazil, right?
A   I believe -- they have an office in Brazil. I'm not sure where their headquarters are.
Q   Fair enough.
Did anybody else, to your knowledge, contribute to this document?
A   Not to my --
Q   When I say "anybody," I mean any other group.
A   Not to my knowledge, no.
Q   But most of the work product here is from Raine?
A   Correct.
Q   Who is this document

```
                                           86
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2       Q   -- is that right?
 3           MR. JAIME-BETTAN:  Calls for
 4   speculation.
 5       A   That is one interpretation of
 6   those bullets.  But I didn't prepare
 7   this nor have any context for the
 8   document.
 9       Q   Do you know of any examples
10   where the UFC made an offer to a
11   fighter but the fighter ended up
12   signing with another promoter?  And,
13   again, the time period I'm talking
14   about here is from the beginning of
15   your involvement in 2009 until 2014.
16           MR. JAIME-BETTAN:  I am going
17   to object.
18           I don't really think this is
19   within the scope of what I agreed
20   to with Ms. Lambert.  I will give
21   you a little leeway, but --
22           MR. RADICE:  I only have one
23   question on this.
24           MR. JAIME-BETTAN:  I am
25   sorry?
```

```
                                           87
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2           MR. RADICE:  I only have one
 3   question on this.
 4           THE WITNESS:  I'm sorry.
 5   Could you repeat the question?
 6           MR. RADICE:  Sure.  You can
 7   read it back.
 8           (Whereupon, the record was
 9   read.)
10       A   I don't recall individual
11   names of fighters.  But during that
12   time period, I do recall fighters
13   leaving the UFC to go to other
14   organizations broadly speaking in
15   conversations with the UFC.
16       Q   You can put that document to
17   the side.
18           I hand you Raine 7.
19           (Document, Bates stamped
20   RAINE0018791 through 18809, was
21   marked Raine Exhibit 7, for
22   identification, as of this date.)
23       A   Thank you.
24       Q   Do you know who prepared this
25   document?
```



```
                                           88
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2   [redacted]
23       Q   And who worked on this
24   document at Raine?
25       A   I believe myself, Garrett
```

```
                                           89
 1        HIGHLY CONFIDENTIAL - NEVILLE
 2   Gomes, Kenny Lee and Taylor Shim.
 3       Q   And did individuals at Zuffa
 4   have input into the substance of this
 5   document?
 6       A   I don't recall specifically.
 7       Q   Was this document included in
 8   the Project Basquiat data room?
 9       A   This likely would not have
10   been included in the data room.
11       Q   Okay.  Was this an internal
12   Raine document?
13   [redacted]
21       A   Correct.
22           MR. JAIME-BETTAN:  Can we go
23   off the record for just a second?
24   Sorry.  This may be something we
25   should talk about.
```

Page 90

```
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2           VIDEOGRAPHER:  The time is
 3   15:21.  We are off the record.
 4           (Whereupon, a brief recess
 5   was taken.)
 6           VIDEOGRAPHER:  The time is
 7   15:22.  We are on the record.
 8   [REDACTED]
15       A    Yes.
16       Q    Was this document updated, do
17   you know?
18       A    I believe it would have had
19   iterations before finalizing it, yes.
20       Q    I would like you to just step
21   back, and if you could, describe for me
22   the diligence process for
23   Project Basquiat specifically.
24       A    So, as to the extent of my
25   memory, we initially had approached
```

Page 91

```
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2   groups in China in the beginning of --
 3   sorry, excuse me, the end of 2016, in
 4   the beginning of 2017.  We --
 5       Q    Are those dates right?
 6       A    The end -- sorry.  The end
 7   of -- excuse me.  The end of 2015 and
 8   the beginning of 2016.
 9           We would have sent the teaser
10   to those Chinese groups and conducted
11   phone calls and given them access to a
12   limited set of information post the
13   signing of an NDA.
14           We then used the interest
15   from China strategically to -- to
16   generate interest from who we believed
17   were more likely U.S. parties.
18           At that time we would have
19   sent the teaser to the U.S. parties,
20   conducted those same phone calls, and
21   then asked for indications of interest
22   and provide them access to a data room.
23       Q    And by "U.S. parties," you
24   mean U.S. potential investors; is that
25   right?
```

Page 92

```
 1       HIGHLY CONFIDENTIAL - NEVILLE
 2       A    Correct.
 3       Q    But do you mean something
 4   else?
 5       A    No.  I mean potential buyers.
 6       Q    Were bidders given access to
 7   diligence questions and answers from
 8   other bidders?
 9       A    Can you repeat that?
10       Q    Were all bidders given access
11   to diligence questions and answers from
12   other bidders or potential bidders?
13       A    I don't recall, but I -- it's
14   not typical to provide answers that --
15   the questions that one group asked to
16   another group that hasn't asked those
17   same questions.
18   [REDACTED]
```

Page 93

```
 1   [REDACTED]
 3   is that your understanding?
 4           MR. JAIME-BETTAN:  Objection.
 5   Calls for speculation.
 6       A    It depends on the question.
 7   A lot of times people ask the same
 8   questions and we would leverage work
 9   done for other investors to answer
10   other questions from different
11   potential buyers.
12       Q    Fair enough.
13           What was the process for
14   responding to diligence requests?
15       A    I believe we offered --
16   initially we offered to answer one set
17   of questions.  It was very specific to
18   each buyer, to my recollection, and
19   then provided them access to the data
20   room.  We would -- again, depending
21   upon the buyer, we would usually set up
22   a phone call to address questions as
23   needed.
24       Q    Did individuals from Zuffa
25   participate in the process?
```



## Page 150

C E R T I F I C A T I O N

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

I, JUDITH CASTORE, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That COLIN NEVILLE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August, 2017.

- - - - - - - - - - -
JUDITH CASTORE

## Page 151

I N D E X

WITNESS                                    PAGE
COLIN NEVILLE
    Examination by:
        MR. RADICE          7
        MS. LYNCH         143

E X H I B I T S
(Retained by David Feldman Worldwide, Inc.)

RAINE                                      PAGE
Exhibit 1  Subpoena to Testify at a         10
           Deposition in a Civil Action to
           The Raine Group, LLC
Exhibit 2  Declaration of Business Record   36
           Authenticity for the Raine Group,
           LLC
Exhibit 3  Document, Bates stamped          38
           RAINE0000019 through 88
Exhibit 4  Document, Bates stamped          59
           RAINE0000575 through 595
Exhibit 5  Document, Bates stamped          67
           RAINE0004398 through 4430
Exhibit 6  Document, Bates stamped          68
           RAINE0018025 through 18033
Exhibit 7  Document, Bates stamped          87
           RAINE0018791 through 18809
Exhibit 8  Multi-page document, headed      99
           Project Basquiat, Diligence
           Requests, 7/10/2017
Exhibit 9  Multi-page document, headed     105
           Raine, FountainVest, as of
           06/15/2016
Exhibit 10 Document, Bates stamped         110
           RAINE0022430 through 22434
Exhibit 11 Document, Bates stamped         115
           RAINE0023834 through 23838
Exhibit 12 Document, Bates stamped         116
           RAINE0023839 through 23844
Exhibit 13 Document, Bates stamped         116
           RAINE0023845 through 23851
Exhibit 14 Document, Bates stamped         117
           RAINE0023852 through 23859

## Page 152

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

## Page 153

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

___ ___ CHANGE:_____
REASON:_____

_____     _____
WITNESS' SIGNATURE           DATE