# EXHIBIT 120

# Excerpts of the Deposition of Prof. Roger D. Blair

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
                                )
     Plaintiffs, )
                                )
     vs. )  Case No.
                                )  2:15-cv-01045-RFB-(PAL)
                                )
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
                                )
     Defendant. )
_____)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF ROGER D. BLAIR, Ph.D.

Orlando, Florida

December 8, 2017

7:57 a.m.

Reported By:
Dawn A. Hillier, RMR, CRR, CLR
Job No. 52572

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

146

constraint so they would have more people on the roster than they actually have in the absence of that constraint.

You know, you would say -- you know, you would infer the same sort of thing, that is that since it's a binding constraint, the teams would get additional value out of having more players on the roster. And, you know, assuming that they could find people to play, fill out that larger roster, which let's just assume that's possible, you would have the same sort of welfare loss. And that is that you have players that would contribute to the overall value and that are not being employed. And so there's a loss in value there. So, in that sense, you know, there would be a social welfare loss by that restriction.

You know, the fact that, say, Kris Bryant, you know, some budding star of the Chicago Cubs, you know, to the extent that they're paying him, let's say, $500,000 and his marginal revenue product is far above that, that does not create any social harm because he's still playing. It's just he's getting paid less so there's a distributional effect, but, you know, but there's not a welfare loss there.

147

BY MR. SILVERMAN:
Q   Is it possible that paying players substantially below their marginal revenue product could alter their incentives to invest, let's say, in their own training or their own professional development? Could that lead to a potential welfare loss?
MR. WIDNELL: Objection, form.
THE WITNESS: Okay. So, so, if you think back to -- of course, I'm a lot older than everybody else in the room. But when I was a kid, the -- you know, the players in Major League Baseball, in the off season -- now, I think this -- this was actually before I had a vivid -- any actual recollection, but there were stories about, you know, following the World Series. They would actually have major league stars barnstorming throughout the south playing exhibition games for extra money instead of training and, you know, and that kind of thing.

You know, they had people that were, I remember being a Dodgers fan, that Carl Furillo was, you know, one year he was a National League batting champion. And he worked in construction. He had a hard hat job in the off season. And so he wasn't working on his baseball skills. He was just

148

trying to earn a living, you know, as a construction worker. So, the quality of the play, you know, had to suffer. I mean, now, you know, again, you know, you'd have to -- you know, people would ask for some empirical evidence of this. But you would -- you would surmise that the play would have to suffer when you've got players that are working construction instead of what, instead of training, instead of lifting weights, stretching, perhaps, you know, taking a hundred swings in the batting cage every day during the off season, or whatever -- you know, whatever major league players are doing now to maintain and advance their skills during the off season.

Well, you know, a lot of players, back in the days when they didn't make much money, had to work at other jobs. And, you know, some of them sold insurance and, you know, things like that.
So --
BY MR. SILVERMAN:
Q   And could --
A   And in that case -- well, your question is what effect would this have. And, you know, I think the effect that it would have is that the quality of the play would be lower and that, you know, in turn, could

149

have an impact on fan demand for watching major league games and, you know, and then, you know, to that extent, the value of the product that's being offered, that is the competition of the field, you know, is lower and consumers are worse off as a result.
Q   And couldn't that -- isn't that also a form of allocative inefficiency if the marginal revenue product, let's say, of this athlete working in a construction job is less than the social value or the value -- or the revenue generated simply by the fan interest that they would generate if they had devoted that time and energy to training, let's say?
A   Yeah. You know, the problem -- the problem with the way you worded that, is that allocative inefficiency is -- sounds like it ought to be -- have a more popular meaning than it does to economists. You know, to an economist that allocative inefficiency is a term of art and it means what I described earlier, that is, that certain inputs in the case of, you know, where we're talking about inputs or in terms of output that, you know, things are either not being purchased or not being produced, when the value is higher than the cost.

And so there's a foregone value, and that's what the -- that's what the allocative inefficiency is related to. So, you know, we say that the monopolists,

38 (Pages 146 to 149)

ROGER D. BLAIR, Ph.D. - HIGHLY CONFIDENTIAL

### 234

```
 1
 2      STATE OF _____ )
 3                             ) :ss
 4      COUNTY OF _____ )
 5
 6
 7          I, ROGER D. BLAIR, Ph.D., the
 8      witness herein, having read the foregoing
 9      testimony of the pages of this deposition,
10      do hereby certify it to be a true and
11      correct transcript, subject to the
12      corrections, if any, shown on the attached
13      page.
14
15          _____
16              ROGER D. BLAIR, Ph.D.
17
18
19
20      Sworn and subscribed to before
21      me, this        day of
22                , 2017.
23
24      _____
25          Notary Public
```

### 235

```
 1             CERTIFICATE OF OATH
 2
 3      STATE OF FLORIDA  )
 4      COUNTY OF ORANGE  )
 5
 6      I, the undersigned authority, certify that ROGER D.
 7      BLAIR, Ph.D. personally appeared before me and was duly
 8      sworn.
 9          WITNESS my hand and official seal this 18th day of
10      December, 2017.
11
12
13      _____
        DAWN A. HILLIER, RMR, CRR, CLR
14      Notary Public - State of Florida
        My Commission No.:  FF 170625
15      Expires:  12-15-18
```

### 236

```
 1                  CERTIFICATE
 2
 3      STATE OF FLORIDA  )
 4      COUNTY OF ORANGE  )
 5          I, DAWN A. HILLIER, RMR, CRR, CLR certify that I
 6      was authorized to and did stenographically report the
 7      deposition of ROGER D. BLAIR, Ph.D.; that a review of
 8      the transcript was requested; and that the transcript is
 9      a true and complete record of my stenographic notes.
10
11          I further certify that I am not a relative,
12      employee, attorney, or counsel of any of the parties,
13      nor am I a relative or employee of any of the parties'
14      attorney or counsel connected with the action, nor am I
15      financially interested in the action.
16
17          DATED this 18th day of December, 2017.
18
19
20      _____
        DAWN A. HILLIER, RMR, CRR, CLR
```

### 237

```
 1             INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over carefully
 4      and make any necessary corrections. You should state
 5      the reason in the appropriate space on the errata
 6      sheet for any corrections that are made.
 7          After doing so, please sign the errata sheet
 8      and date it.
 9          You are signing same subject to the changes
10      you have noted on the errata sheet, which will be
11      attached to your deposition.
12          It is imperative that you return the original
13      errata sheet to the deposing attorney within thirty
14      (30) days of receipt of the deposition transcript by
15      you. If you fail to do so, the deposition transcript
16      may be deemed to be accurate and may be used in court.
```