# EXHIBIT 121

## Excerpts of the Second Deposition of Dr. Hal J. Singer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

CUNG LE, NATHAN QUARRY, JON : CIVIL ACTION
FITCH, BRANDON VERA, LUIS :
JAVIER VAZQUEZ, and KYLE :
KLINGSBURY on behalf of :
themselves an others :
Similarly situated, :
          Plaintiffs : CASE NO.
                       : 2:15-cv-01045-RFB
   vs. : (PAL)
                       :
ZUFFA, LLC d/b/a ULTIMATE :
FIGHTING CHAMPIONSHIP and :
UFC, :
          Defendants :

- - -

Tuesday, January 23, 2018
DAY 2

- - -

Continuation of videotaped deposition of HAL J. SINGER, Ph.D., taken pursuant to notice, was held at the offices of BERGER & MONTAGUE, P.C., 1622 Locust Street, Philadelphia, PA 19103, commencing at 10:19 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
866.624.6221
www.MagnaLS.com



Page 371

1  levels that I thought a Court
2  would deem at least not
3  anticompetitive based on my
4  understanding of precedent in the
5  similar cases.
6       So I think that that's where
7  the zero, 20 and 30 percent come
8  from, let's just be clear. It's
9  not -- it's not from anywhere
10 else. We are trying to find a
11 level of foreclosure that would be
12 deemed not anticompetitive by a
13 Court.
14      So the questions that you
15 asked me in the last five minutes
16 are -- seem like you are looking
17 for an alternative motivation for
18 how I got to zero, 20 and 30
19 percent. I am telling you what
20 got me to the zero, 20 and 30
21 percent, I was trying to come up
22 with levels that would basically
23 give Zuffa -- would shield Zuffa
24 from liability in exclusive

Page 372

1  dealing case.
2  BY MR. ISAACSON:
3       Q.   All right. So I am not here
4  to discuss your motivations about this.
5  I am just here to ask you questions.
6       And my next question is, is
7  there anything in your rebuttal report
8  where you analyze how a but-for world
9  that you have described would achieve a
10 foreclosure rate of 30 percent or lower?
11      A.   I don't think so, but the
12 question, again, has the -- has the
13 causality going in the wrong direction.
14      Q.   All right. And when you say
15 the causality is going in the wrong
16 direction, by that I am asking you how
17 the but-for world causes a lower
18 foreclosure share. Are you saying the
19 correct causality is how a lower
20 foreclosure share causes the but-for
21 world?
22      A.   It's closer. I would say
23 that if what we are trying to do is to --
24 first, we are trying to figure out what

Page 373

1  the wage effect was from Zuffa taking the
2  foreclosure share from the low digits,
3  low single digits up into the -- up into
4  the 90s, say, over the course of the
5  damages period, for the class period.
6  And I say, okay, let's roll it back,
7  let's see what the relationship was
8  between wage share and foreclosure share
9  and then just roll it back to levels that
10 would -- that would give Zuffa -- that
11 would shield Zuffa from antitrust
12 liability. Okay.
13      And then the next question
14 is, okay, what are -- what are other --
15 you know, you had asked me during the
16 first deposition, how does Zuffa get
17 there, what would they have to do to
18 their contracts to come into compliance
19 with or to ensure that foreclosure was no
20 higher than 30 percent. And we went
21 through all sorts of different ways that
22 they could restructure their contracts so
23 that it wouldn't -- so that foreclosure
24 levels wouldn't be above 30 percent.

Page 374

1       And Dr. Topel says, I want
2  to know more, not just what they'd have
3  to do to come into compliance, but tell
4  me what other elements would look like,
5  would there be -- would there be
6  co-promotion, would there be the
7  right-to-match clause, would there be
8  this and that and the other.
9       And so in this reply report,
10 I am trying to fill in a little more
11 granularity as to what a plausible
12 but-for world would look like that would
13 be consistent with foreclosure shares of
14 zero, 20 and 30 percent.
15      Q.   Now, when you say that the
16 but-for world you describe in paragraph
17 198 is a plausible but-for world, are
18 there other plausible but-for worlds in
19 your opinion that would be consistent
20 with foreclosure shares of 30 percent or
21 lower?
22      A.   Sure. Remember, in a
23 footnote I say that while co-promotion
24 would be likely based on these proxies,

MAGNA LEGAL SERVICES

### Page 375

1  it's not -- it's certainly not necessary
2  to engender competitive outcomes so long
3  as the markets are more open, less
4  restrictive and rivals get a foothold and
5  are able to put forward compelling
6  matches for MMA audiences.
7       Q.   Are there -- at this point,
8  following your rebuttal report, is it
9  your opinion that there are many ways to
10 get to a lower foreclosure share that
11 would constitute an appropriate but-for
12 world?
13      A.   Well, remember, all that
14 needs to happen to get to a lower
15 foreclosure share is that Zuffa would
16 need to change the parameters of its
17 contracts with fighters in such a way as
18 to ensure that the cumulative duration of
19 the restrictions don't take you over some
20 level that a Court would deem
21 exclusionary.
22           That's all you need to get
23 the foreclosure share down.  We had
24 talked about whether 30 months -- 36

### Page 376

1  months was too long and, you know, what
2  would be a -- what would be a duration
3  that would be acceptable to a Court.
4           That, to me, is really the
5  key element of what you need in a
6  contract to bring the foreclosure share
7  down to levels of zero, 20 or 30 percent.
8  After that, what we are doing here is we
9  are just filling in other aspects of the
10 but-for world that would complement or be
11 consistent with that -- with that
12 outcome.
13      Q.   All right.  So in your
14 opinion, does but-for world have to
15 include contracts that are -- exclusive
16 contracts that are no longer than one
17 year?
18      A.   Well, I think we went
19 through this in the first -- in the first
20 deposition.  But, again, I mean, my
21 answer is not going to change.  It's
22 going to be -- it's going to depend on
23 where -- where the Court would draw the
24 line as to what's considered to be an

### Page 377

1  exclusionary arrangement.
2           Now, I have tried to inform
3  the Court based on what I think is the
4  average career span of a fighter and
5  that -- and that when we -- when we
6  figure out how to draw that line, we
7  ought to take into consideration how much
8  of a fighter's remaining career span is
9  left after they sign with Zuffa.
10          But depending on where that
11 line gets drawn, Zuffa could then
12 construct its contracts in such a way as
13 to comply with that -- with that line,
14 and with an important caveat:  So long as
15 30 percent, say, is tolerated, they
16 could -- they could carve off 30 percent
17 or, in fact, more if the market share is
18 not quite 100 percent.  They could carve
19 off a certain portion of their fighters
20 and subject them to potentially longer
21 contracts.
22          So there is not -- there is
23 not a -- there is not one way to get a
24 foreclosure share under 30, as we

### Page 378

1  discussed.  There are a lot of ways to
2  get it down.  But these other parameters
3  that I am informing right now are things
4  that help fill in what the but-for world
5  would look like.  They are meant to
6  complement or be consistent with.  But
7  they're -- I think that while we have
8  been going in circles, these other
9  parameters, while important, aren't the
10 levers that are pushing foreclosure down
11 to 30, 20 or zero percent.
12      Q.   Okay.  One simple point I
13 had been wondering about based on the
14 support, you had told me before that
15 there is not one way to get foreclosure
16 share under 30; there are a lot of ways
17 to get it down.
18          That's still your opinion?
19      A.   Oh, sure.  I just gave
20 you -- I just gave you two ways to do it.
21 One could be across the board, every
22 single contract contains the same
23 provision.  That would get you down.
24 Another way to do it would be to do a



Page 379

1  carve-out for a certain set of contracts,
2  but you would have to make sure that
3  those contracts don't account for too
4  large of a share of a market.
5       There are lots of ways that
6  you could restructure the contract, and I
7  have -- of course, I have opinions as to
8  how it could be done to come into
9  compliance with, say, a 30 percent
10 foreclosure requirement.
11     Q.  All right.  And at this
12 point, following your rebuttal report,
13 you are still, depending on your analysis
14 about where the Court draws the line as
15 to what's an exclusionary arrangement.
16     Am I correct about that?
17     MR. CRAMER:  Objection to
18 form.
19     THE WITNESS:  I think that
20 that ultimately would fall to the
21 fact-finder.  I have tried to
22 inform the decision-making based
23 on my experience, my reading of
24 other cases, other economic

Page 380

1  articles and, of course, most
2  importantly, I go back to this,
3  the average career length of a
4  fighter.  I think that all those
5  things should inform what the line
6  should be.
7       I have tried to -- I have
8  tried to offer what I think would
9  be a fair number.  I have -- in
10 fact, in this report, I have
11 pointed to the duration in Zuffa's
12 contracts when it had less market
13 power than it does now as what I
14 think would be a reasonable proxy
15 for the duration of the contract.
16 BY MR. ISAACSON:
17     Q.  All right.  And just to make
18 sure I understand where you are now at
19 the end of your rebuttal report, if the
20 Court were to determine that contracts --
21 exclusive contracts of one year or more
22 were exclusionary, would that -- if --
23 would an appropriate but-for world
24 include one-year contracts or less, plus

Page 381

1  some other parameters or some other
2  possible parameters, as Zuffa said, and
3  that would result in a foreclosure share
4  of 30 percent or lower?
5       MR. CRAMER:  Objection to
6  form.
7       THE WITNESS:  Well, I think
8  we are close.  I think what I am
9  getting tripped up on is you said
10 one year or more would be
11 exclusionary.  And then, of
12 course, if you did it at one year,
13 you wouldn't be in compliance.
14 But how about can we try a
15 different hypothetical or did
16 you -- maybe you meant to do that.
17 BY MR. ISAACSON:
18     Q.  Well, no.  I was not trying
19 to put significance of 365 days versus
20 366.
21     But if the Court drew the
22 line at exclusionary contract of
23 something that's more than one year and
24 instead, that a one-year contract or less

Page 382

1  was not exclusionary --
2       A.  Got it.  Got it.  Sorry.
3  Then I didn't hear that the first time,
4  but I am with you now.
5       Q.  Okay.  With that assumption,
6  in your opinion, would an appropriate
7  but-for world be contracts that were one
8  year or less in duration, plus some other
9  potential parameters that you pointed to
10 in your report and that but-for world
11 result in foreclosure shares of 30
12 percent or less?
13     A.  Well, it's certainly getting
14 closer to what I think would be the
15 appropriate but-for world.  It seems like
16 we could -- we could restructure the
17 contracts by reducing the duration, such
18 that when I went back and calculated
19 foreclosure, it would no longer be in
20 excess of 30 percent, and I think that
21 getting the duration below what the
22 fact-finder deem exclusionary and in
23 violation of the antitrust laws is a
24 smart way to go about it.

Page 431

```
 1  saying is that the but-for wages and wage
 2  shares that I am estimating are closer to
 3  the fighters' marginal revenue product
 4  than what they are currently being paid.
 5      Q.  But in your opinion, are the
 6  but-for wages that you are estimating
 7  approximating the marginal revenue
 8  product of the fighters?
 9      A.  I am getting caught up on
10  the word "approximating."  Can we -- can
11  we agree on something that's a little
12  less strong?  How about we are -- we are
13  getting closer to in the but-for world.
14  The simulation is putting fighters at a
15  wage share and wage level that is closer
16  to their marginal revenue product.  I am
17  not -- I am not prepared to say that it
18  would -- it would approximate or be
19  exactly equal to 100 percent of the
20  but-for wages.
21      Q.  I need to follow up because
22  getting closer to could mean a little
23  closer to or very closer to.  So I could
24  stand in -- at the back of this room and
```

Page 432

```
 1  take one step forward and get closer to
 2  you but still be far away.
 3      A.  That's fair.
 4      Q.  The -- is the -- are the
 5  but-for wages -- but-for wages that you
 6  are estimating in your regression, are
 7  those close to or -- let me put it this
 8  way:  The but-for wages that you are
 9  estimating in your regression, how close
10  are they to the marginal revenue product
11  of the fighters in your opinion?
12      A.  I haven't estimated the
13  marginal revenue products, so to answer
14  that question, I would have to -- I would
15  have to engage in a -- in a different
16  exercise than what I did here.
17          But I -- what I -- what I
18  can tell you is that when we take the
19  foreclosure share down to 30 percent, we
20  are eviscerating a large part of Zuffa's
21  market power.  What I am -- what I am
22  hesitant -- what I am hesitating on and
23  what I am reluctant to say is that the 30
24  percent foreclosure completely
```

Page 433

```
 1  eviscerates Zuffa's market power to the
 2  point that Zuffa is forced to pay
 3  fighters equal to their marginal revenue
 4  product.  That's -- that's quite a
 5  statement.
 6          And I want to allow for the
 7  possibility that with 30 percent
 8  foreclosure share, Zuffa could still have
 9  some, not as much, but some buying power,
10  such that it could push wages below
11  marginal revenue product, just not to the
12  extent that it's doing today.
13      Q.  Now, you said you haven't
14  estimated the marginal revenue product of
15  the fighters.  If you could estimate
16  those, would that -- would you then use
17  that as the dependent -- a dependent
18  variable in your impact regression?
19      A.  No.  I intentionally did not
20  estimate the marginal revenue product
21  because it would be one unnecessary step
22  in the process, and I didn't want to
23  introduce an unnecessary step.  I did
24  what was needed to be done to simulate
```

Page 434

```
 1  but-for wage shares.
 2      Q.  In your opinion, does the
 3  individual marginal revenue product vary
 4  among fighters?
 5      A.  It could as a matter of
 6  theory, yes.
 7      Q.  Beyond theory, based on the
 8  investigation that you have done in this
 9  case, in your opinion, does it actually
10  vary amongst the fighters?
11      A.  Most likely, yes, based on
12  my investigation, I am thinking in
13  particular of a regression in which I
14  estimated the relationship between event
15  revenues and the rank of the highest
16  ranked fighter featured, and it seems to
17  me that so long as rank is capturing
18  productivity, it appears to be that if
19  you put on a fight with a high productive
20  fighter, all things equal, you are going
21  to generate higher event revenue.
22          So that tells me there is
23  going to be variation among the fighters
24  with respect to their ability, basically
```

Page 435

1  their revenue generation capabilities.
2      Q.  And assuming the status quo,
3  current Zuffa contracts and practices, is
4  there a relationship in your opinion
5  between fighters' marginal revenue
6  product and their individual
7  compensation?
8          MR. CRAMER:  Do you mean in
9      the current world?
10         MR. ISAACSON:  Yes.
11         THE WITNESS:  Yes, I think
12     in the current world, all things
13     equal, the more productive you
14     are, the higher you get paid.
15 BY MR. ISAACSON:
16     Q.  And I think you have said
17 this, but I will just confirm.  You do
18 think that what you would describe as a
19 competitive world, there would be a
20 relationship between marginal revenue --
21 individual marginal revenue product and
22 individual compensation?
23     A.  Well, there is always a
24 relationship, right?  There is a

Page 436

1  relationship in the actual world, there
2  is a relationship in the but-for world.
3  That's Labor Theory 101.  The -- what we
4  are trying to figure out is how the
5  challenged conduct affected or thwarted
6  that relationship.
7      Q.  Okay.  And you have said
8  that event revenue is a proxy for the
9  collective marginal revenue product of
10 the fighters of the event.
11         Is there a way of looking at
12 event revenue to use that as proxy for
13 individual fighter marginal revenue
14 product?
15     A.  Well, I think, again, the
16 way that I have constructed my impact
17 regressions, I have -- I have used the
18 individual compensation relative to the
19 event revenue as my dependent variable.
20 So in a sense, I am trying to decompose
21 event revenue that way.
22     Q.  All right.  And when you say
23 you use individual compensation relative
24 to event revenue, as I understand it, you

Page 437

1  are looking -- some fighters are paid
2  more, some are paid less, and you are
3  using their payments relative to one
4  another to see -- and comparing that to
5  event revenue?
6      A.  I wouldn't -- I wouldn't
7  quite put it that way.
8      Q.  Let me try to put it this
9  way:  The -- I am trying to get something
10 simple here.
11     A.  Okay.
12     Q.  You have someone who is
13 being paid a million dollars for a fight
14 and someone who is being paid $50,000 for
15 a fight.
16     A.  Got it.
17     Q.  You are assuming that the
18 person being paid $50,000 is making --
19 has a lower marginal revenue product than
20 the person being paid a million dollars?
21         MR. CRAMER:  Objection to
22     form.
23         THE WITNESS:  I am not
24     assuming anything.  Just to make

Page 438

1      your hypothetical concrete, let's
2      assume they both fought in the
3      same fight.
4          MR. ISAACSON:  Same event.
5          THE WITNESS:  Okay.  You
6      didn't say that, but I am trying
7      to --
8          MR. ISAACSON:  Right.
9          THE WITNESS:  Right.
10         Let's assume that they both
11     fought in the same event.  What my
12     model is trying to do, it's not
13     assuming anything.  It's letting
14     the data explain to us the
15     relationship between the fighters'
16     attributes and how much of the
17     event revenue that fighter was
18     able to take home as compensation.
19 BY MR. ISAACSON:
20     Q.  All right.  But for your
21 dependent variable, the -- you are
22 relying on the -- for your dependent
23 variable, the person earning $50,000
24 would be making less of a contribution



Page 603

```
 1  market, estimates the additional live
 2  events that would have taken place if you
 3  eliminated the challenged conduct?
 4       A.  Events that occur -- that
 5  are -- that are implicated or occur
 6  within that ranked definition.  With
 7  that -- with that caveat, yes, we are
 8  comparing -- we are just taking a trend
 9  of events that fall within a certain
10  market definition and comparing it to
11  what actually happened.  And no matter
12  what definition I use, it appears as if
13  there is a drop-off in industry events
14  despite the fact that Zuffa's event are
15  rising.
16       Q.  All right.  And so within
17  the rank -- now, absent the challenged
18  conduct -- we talked about absent the
19  challenged conduct to some -- for quite a
20  while for your regressions and impact
21  analysis.  I don't want to go back over
22  that.
23           Is your but-for world of the
24  absence of challenged conduct for
```

Page 604

```
 1  purposes of Figure 4B the same world
 2  where you have a foreclosure percentage
 3  of 30 percent or below?
 4       A.  I think it's the same
 5  but-for world, but I am not -- I am not
 6  using that same regression model as the
 7  tool or the mechanism that allows me to
 8  make this projection.  I am simply taking
 9  a trend of output at the industry level
10  and projecting it forward from 2010.
11       Q.  All right.  So in Figure 4B,
12  using the ranked definition, you are
13  estimating how many additional bouts
14  would have taken place from 2010 to 2016,
15  assuming that there was foreclosure of
16  30 percent or less?
17       A.  Well, that last part of the
18  question doesn't completely make sense to
19  me.  These are -- there is not a specific
20  but-for foreclosure share that's lurking
21  in the background.  I don't have to
22  specify but-for foreclosure share to
23  calculate an output factor to demonstrate
24  an output effect in this analysis.
```

Page 605

```
 1       Q.  All right.  Let me try it
 2  this way:  In Figure 4B, using the ranked
 3  definition, you are estimating how many
 4  additional bouts would have taken place
 5  from 2010 to 2016, assuming the same
 6  but-for world that would cause a
 7  foreclosure share of 30 percent or less?
 8       A.  So are you asking me what
 9  the implied reduction in output was in
10  the ranked market?
11       Q.  I am just trying to
12  understand your but-for world.
13       A.  Oh, the but-for world is --
14  the but-for world doesn't vary as we move
15  across my analyses.  I am -- I am just
16  telling you we don't -- this analysis
17  that we do here, as you may or may not
18  know, is -- does not depend on my
19  specifying a but-for foreclosure level.
20  This is a trend analysis.  This is a
21  before/after analysis.
22       Q.  I realize that.  But the --
23  your but-for world in Figure 4B is the
24  same but-for world that generates a
```

Page 606

```
 1  foreclosure percentage of 30 percent or
 2  less?
 3       A.  I think that's fair.
 4       Q.  Okay.  And using your trend
 5  analysis, if I am reading this right, in
 6  2016, for Zuffa events, which there were
 7  approximately a little less than 700 in
 8  the actual world, the -- in your
 9  estimation -- no, actually you are not
10  estimating the Zuffa event.
11           So let me -- the total event
12  account.  The total MMA event account --
13  actually, that's kind of confusing.
14           Why is the total MMA account
15  less than the Zuffa account?
16       A.  The Zuffa numbers are on
17  the -- are on the left-hand side.  If you
18  want to read --
19       Q.  I am looking at the blue
20  line and the green line.
21       A.  Mine don't have
22  color-coding, but --
23           MR. CRAMER:  Here.
24           THE WITNESS:  Okay.  If you
```

Page 607

```
 1        want to read off the Zuffa event
 2        count, you need to go to the axis
 3        on the left-hand side.
 4   BY MR. ISAACSON:
 5        Q.   Yes, I understand that.
 6   But -- oh, but the --
 7        A.   And if you want to read off
 8   the total or the non-Zuffa, you have to
 9   go get the relevant curve and then go to
10   the right axis, the second axis.
11        Q.   So -- all right.  So the
12   Zuffa count would be 40-some.  That's
13   right, because you are not going to have
14   hundreds of those.  And for the green --
15   for the total, you are going to have a
16   little over 600?
17        A.   Which part of the -- so I
18   am -- I am following the green.  Which
19   part of the green line -- oh, by 2016,
20   you're right --
21        Q.   2016.
22        A.   -- that in the actual world,
23   what this is telling us is that there
24   were somewhere between 600 and, say, 700
```

Page 608

```
 1   events that featured someone in the
 2   ranked definition, which is fairly broad.
 3   Remember, this is anybody in the top 650.
 4        Q.   Right.  So -- and in your
 5   estimation, in the same world it gets you
 6   a 30 percent foreclosure share or less,
 7   the amount of total MMA event in 2016
 8   would rise from -- some amount over 600
 9   to a little over 1,800?
10        A.   If you have -- if you
11   defined your market so broadly as to
12   include anyone in the ranked definition,
13   you have to recall, these are -- these
14   are going to be events that feature
15   fighters who are relatively obscure in
16   MMA.
17             I think there is a reason
18   why I didn't use the same kind of A/B
19   convention in this figure as I did for
20   4A, in part, because I think the ranked
21   definition is likely too broad to get a
22   reliable estimation of the output effect
23   here.  I think -- I think that I would
24   point you to more realistic market
```

Page 609

```
 1   definitions.
 2        Q.   Okay.  But am I right that
 3   for the ranked definition which you are
 4   projecting as an increase in bouts from
 5   over 600 to a little over 1,800?
 6        A.   What this graph shows is
 7   that had the trend from 2001 --
 8        Q.   I am sorry.  That was for
 9   2016.
10        A.   What this shows is that had
11   the trend in total events in this market
12   definition, the ranked definition,
13   persisted, the trend that went from 2001
14   to 2010, had it persisted, then by 2016,
15   total events would be somewhere on the
16   order of 1,800.
17        Q.   All right.  And based on
18   that, you reached the opinion that there
19   would be over 1,800 events in the ranked
20   definition in the year 2016 in the
21   absence of the challenged conduct?
22        A.   I don't think that that's
23   the opinion that I reached.  I think that
24   I am trying to be complete with respect
```

Page 610

```
 1   to every plausible market definition to
 2   show that output was restricted here.
 3        Q.   All right.  Now, let me see
 4   if I can understand -- do you have an
 5   opinion as to how many additional bouts
 6   there would be within the ranked
 7   definition in 2016 in the absence of the
 8   challenged conduct?
 9        A.   I don't think that I have
10   ever said that I am predicting that
11   exactly 1,800 events would have occurred.
12   I think that what I am saying is that had
13   the trend persisted, the trend from 2001
14   to 2010, then one would predict that by
15   2016, this industry would have grown to
16   something on the order of 1,800 events.
17        Q.   All right.  But based on
18   that trend, are you reaching any opinions
19   about how many events would have taken
20   place within the ranked definition in
21   2016 in the absence of the challenged
22   conduct?
23        A.   I think the opinion that I
24   am willing to make or take based on this
```



Page 611

1  chart in conjunction with all the other
2  charts that I have is that there was an
3  output effect and that revenue --
4  industry output fell no matter -- from
5  2010, no matter how you define the
6  relative input market.
7      Q.  All right.  But are you able
8  to quantify that output effect within the
9  ranked definition?
10     A.  One could quantify it if one
11 were truly interested in getting a
12 number, but I don't know -- I don't know
13 what the precise number gives you above
14 and beyond that inference that can be
15 drawn by saying that it fell with respect
16 to every way you define the market.
17     Q.  Have you quantified an
18 output effect within the ranked
19 definition of total events from the -- by
20 eliminating the challenged conduct?
21        MR. CRAMER:  Asked and
22     answered.
23        THE WITNESS:  I don't think
24     that I have -- I have quantified

Page 612

1     it.
2  BY MR. ISAACSON:
3      Q.  All right.  Let me go to the
4  tracked definition.
5      A.  Okay.
6      Q.  So here, for the number of
7  bouts, I just look at the left axis; is
8  that correct?
9      A.  Correct.
10     Q.  Okay.  And help me
11 understand the brackets that are the
12 A and B.
13     A.  Sure.
14     Q.  So there is the dotted line
15 that goes to the top of the B bracket.
16        Do you see that?
17     A.  Yes.
18     Q.  Okay.  The -- is that a
19 combination of the Zuffa event and
20 non-Zuffa events reflected in the blue
21 line and the red line?
22     A.  No.  The dotted red is the
23 legend that tells you it's the but-for
24 non-Zuffa event count.  So all we are

Page 613

1  doing is we first plot the non-Zuffa
2  event account, which is the red line,
3  right, through 2010, and then we -- and
4  then we fit a trend line from 2001 to
5  2010 and we extrapolate forward and we
6  say of that trend had persisted, then
7  non-Zuffa events would have continued
8  increasing and would have -- would have
9  reached a certain level by 2016.
10     Q.  All right.  So in Figure 4A,
11 the red dotted line is your trend line
12 for non-Zuffa events; is that correct?
13     A.  Fit -- yes.  But
14 importantly, fit from 2001 to 2010 only.
15     Q.  By "fit," meaning you are
16 projecting the trend for 2010 through
17 2016 by the trend prior to 2010?
18     A.  That's fairly close.  We fit
19 the trend with data from '01 to 2010, and
20 then we project forward through 2016.
21     Q.  All right.  And based on
22 that trend analysis -- well, first of
23 all, in 2016, there is -- for non-Zuffa
24 events, there is -- it looks like there

Page 614

1  is approximately 20 events?
2      A.  In the actual world, yes,
3  2016, it looks like there were about 20
4  non-Zuffa events that are in the tracked
5  definition.
6      Q.  All right.  And in the
7  but-for world, there is a little over 40
8  events?
9      A.  For non-Zuffa, correct.
10     Q.  For non-Zuffa?
11     A.  Correct.
12     Q.  So is it your opinion, based
13 on the trend analysis in Figure 4A, that
14 for the tracked definition, that in the
15 absence of the challenged conduct, the
16 number of non-Zuffa events would have at
17 least doubled in 2016?
18     A.  I think my opinion is that
19 there is evidence here of an output
20 effect, of output suppression.  That --
21 that's my opinion.  Whether I am able to
22 quantify that to any reasonable degree is
23 a related question, and, of course, my
24 best estimate, if you insist, would be

MAGNA LEGAL SERVICES

Page 647

```
 1       Q.   All right.
 2            MR. ISAACSON:  Thank you.  I
 3   don't have any more questions.
 4            MR. CRAMER:  Very good.
 5            THE VIDEOGRAPHER:  Okay.
 6   The time is 5:12 p.m.  This is the
 7   end of Dr. Hal Singer's
 8   deposition.  We are going off the
 9   record.
10              - - -
11        (The deposition concluded at
12   5:12 p.m.)
13              - - -
```

Page 648

```
 1              CERTIFICATE
 2
 3
 4        I HEREBY CERTIFY that the
 5   witness was duly sworn by me and that
 6   the deposition is a true record of
 7   the testimony given by the witness.
 8
 9
10
11
12   _____
13   Lori A. Zabielski
14   Registered Professional Reporter
15   CaseViewNet Reporter
16   Dated:  January 24, 2018
17
18
19
20
21
22        (The foregoing certification
     of this transcript does not apply to any
23   reproduction of the same by any means,
     unless under the direct control and/or
24   supervision of the certifying reporter.)
```

Page 649

```
 1          INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over
 4   carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8        After doing so, please sign the
 9   errata sheet and date it.
10   You are signing same subject to the
11   changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14        It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of
17   receipt of the deposition transcript by
18   you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
```

Page 650

```
 1            - - - - - -
 2             E R R A T A
 3            - - - - - -
 4   PAGE   LINE   CHANGE
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
```

