# EXHIBIT 125

# Excerpts of the First Deposition of Dr. Hal J. Singer (Redacted)

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEVADA

                        - - -

IN RE:                         :  Civil Action
                               :  DOCKET NO.
CUNG LE, NATHAN QUARRY,        :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,       :  (PAL)
LUIS JAVIER VAZQUEZ and        :
KYLE KINGSBURG, on behalf      :  CLASS ACTION
of themselves and all          :
others similarly               :
situated,                      :
                               :
        Plaintiffs,            :
                               :
        v.                     :
                               :
ZUFFA, LLC, d/b/a              :
ULTIMATE FIGHTING              :
CHAMPIONSHIP and UFC,          :
                               :
        Defendants.            :

                        - - -
          Wednesday, September 27, 2017
                        - - -
```

         Videotaped deposition of
   HAL J. SINGER, Ph.D., taken pursuant to
   notice, was held at the law offices of
   Berger & Montague, P.C., 1622 Locust
   Street, Philadelphia, Pennsylvania 19103,
   beginning at 9:24 AM, on the above date,
   before Constance S. Kent, a Certified
   Court Reporter, Registered Professional
   Reporter, Certified LiveNote Reporter, and
   Notary Public in and for the Commonwealth
   of Pennsylvania.
                * * *
           MAGNA LEGAL SERVICES
              (866) 624-6221
              www.MagnaLS.com



Page 138

```
 1   more a valuable fighter is going to -- a
 2   more highly ranked fighter is going to
 3   generate more attention, more sales with
 4   pay-per-view.
 5       Q.   And if the same fighter
 6   fought for Zuffa and Bellator in the same
 7   year and the Zuffa event generated more
 8   revenue, that fighter would receive a
 9   higher weight in the foreclosure share
10   calculation when he or she fights for
11   Zuffa rather than Bellator; is that
12   right?
13       A.   That would only be true
14   under the revenue weighting approach.
15   It's not true under the other -- under
16   the other approaches.
17       Q.   Right.  Under the revenue
18   weighting approach, if the same fighter
19   fights for Zuffa and Bellator in the same
20   year and the Zuffa events generate more
21   revenue, that same fighter would receive
22   a higher weight in the foreclosure share
23   calculation when he or she fights for
24   Zuffa; is that right?
```

Page 139

```
 1           MR. CRAMER:  Asked and
 2       answered.
 3           THE WITNESS:  I think I put
 4       it in a way that -- that I
 5       preferred.  I hear that as the
 6       same question.
 7   BY MR. ISAACSON:
 8       Q.   Well, you didn't actually --
 9   oh, okay.  You did say it was true under
10   the revenue weighting approach.  That's
11   right.  I'm sorry.  I only caught what
12   you said it was not true for.
13           The -- sometimes I ask the
14   same question if I'm trying to get the
15   answer.
16       A.   That's okay.
17       Q.   The -- now, you mentioned
18   the non-revenue weighting measures, and
19   one of those was where you weighted by
20   rank; is that right?
21       A.   To be precise, the inverse
22   of the rank, yes.
23       Q.   And inverse ranking means
24   you -- you were looking at ranked
```

Page 140

```
 1   fighters 1 through 15; is that correct?
 2       A.   Oh, not just in the
 3   headliner definition.  I've -- I've
 4   employed rank weighting in others as
 5   well.
 6       Q.   Okay.
 7       A.   When you -- when you start
 8   to combine fighters ranked 1 through 650
 9   within a given weight class, you have a
10   real issue of how valuable is it on a
11   relevant basis to lock up number 1 versus
12   number 650.  The notion being that 1 is
13   more valuable, and the question is how do
14   you -- how do you express that
15   mathematically.
16           So one approach to that, of
17   course, is to -- is to give more weight
18   to the higher ranked fighter.
19       Q.   And let me understand how
20   you did express the inverse ranking.  For
21   the inverse ranking, if you had the
22   number 1 fighter and the number 15
23   fighter in a weight class, the number 1
24   fighter would be weighted 15 times more
```

Page 141

```
 1   than the number 15 fighter?
 2       A.   I think that's fair.  I
 3   talked over you.  I'm sorry.  Yes, that's
 4   fair.
 5       Q.   And number 6 is weighted
 6   twice as much as number 12?
 7       A.   I think that's how the math
 8   works, yes.
 9       Q.   And did you do inverse
10   ranking for 1 through 650?
11       A.   I believe there is a
12   specification, it may not be in one of
13   the tables, but I think that we have done
14   inverse ranking under all of the market
15   definitions, including the ranked
16   definition.
17       Q.   And when you went to, say,
18   600, would the number 1 fighter be
19   weighted 600 times the number 600
20   fighter?
21       A.   Yes.
22       Q.   Okay.  And what's your basis
23   for using that inverse weighting, that 1
24   compared to 15 is 15 times as much, as
```



Page 142

1  opposed to number 1 is worth something
2  more than number 15.
3       A.   Right.  So the basis is the
4  record evidence in the case.  The record
5  evidence tells us that the purpose of
6  the -- of the exclusionary arrangements
7  is to tie up the most valuable fighter so
8  as to prevent rivals from getting a
9  foothold.
10          So that tells me
11 qualitatively that it's more valuable to
12 have 1 through 15 sewn up than, say, 75
13 through 90.
14          Now the question is, how can
15 I, as an economist, quantify that -- that
16 difference in valuation, and I've tried
17 revenue weighting, I've tried rank
18 weighting and inverse rank weighting and
19 I've tried unweighted.  And at the end of
20 the day, my -- my basic regression model
21 is not sensitive to how -- how one does
22 the weighting.
23       Q.   I'm just focusing now on
24 your inverse ranking analysis.  And I

Page 143

1  understand that you concluded the number
2  1 fighter, for example, is more valuable
3  than the number 10 ranked fighter, but
4  what's the basis for quantifying that as
5  the number 1 fighter is ten times more --
6  worth ten times more than the number 10
7  fighter?
8       A.   I think there is record
9  evidence suggesting that it would be
10 sufficient to lock up only the headliners
11 in order to -- to cripple or to slow the
12 advance of a rival promoter.
13          So what the record evidence
14 is telling me is that -- is that 1
15 through 15, for example, are more
16 valuable than 75 through 90.  The record
17 evidence doesn't necessarily tell me how
18 to give those fighters more weight.  So
19 what I decided to do for one
20 specification was to weight a fighter
21 based on his or her inverse rank.
22       Q.   All right.  So when you say
23 headliners, you mean number -- those
24 ranked 1 through 15, correct?

Page 144

1       A.   I've defined headliners very
2  precisely as 1 through 15.  I think the
3  term headliners can connote other --
4  other numbers.
5       Q.   And in the example that I've
6  given of the number 1 fighter and the
7  number 10 fighter, those would both be
8  headliners within your definition?
9       A.   Correct.
10      Q.   And the number 1 fighter
11 would be worth ten times as much as the
12 number 10 fighter, that's correct?
13      A.   Under the --
14      Q.   We're only talking about the
15 inverse rank weighting.
16      A.   Good.
17      Q.   I'm correct that under the
18 inverse rank weighting, the number 1
19 fighter would be weighted ten times as
20 much as the number 10 fighter; is that
21 right?
22      A.   Correct.
23      Q.   And there's nothing in the
24 record that would support that relative

Page 145

1  difference between the number 1 fighter
2  and the number 10 fighter?
3          MR. CRAMER:  Misstates the
4      testimony.
5  BY MR. ISAACSON:
6       Q.   Is that correct?
7       A.   That is not correct.
8       Q.   Okay.  What would you point
9  me to?
10      A.   I would point you to the
11 section where I describe the basis for
12 headliner submarket, and I think the
13 record is very clear on this that -- that
14 the headliners are more valuable in the
15 eyes of the -- of the MMA promoters.
16          The question is -- is how do
17 you express that higher value in a way
18 that a computer can understand it for the
19 purposes of performing a regression
20 analysis and that's where I come in as an
21 economist, that's where my value added
22 is, if you will.  Silva is not going to
23 tell me, go get the inverse -- go get the
24 rankings and use inverse in your

Page 290

```
 1  studied that and I imagine for someone
 2  who lives very far from the venue where
 3  the live event is staged, they would not
 4  be considered reasonably close
 5  substitutes.
 6       Q.   So for your input markets,
 7  what evidence did you take into account
 8  to assess customer's likely response to
 9  price increase in the SSNIP analysis?
10  And feel free to point me to the sections
11  of your report that --
12       A.   Did you mean to say -- I
13  think you just conflated the input
14  markets and customers.  Maybe we should
15  start over.
16       Q.   Yes, I said price increase
17  rather than wage decrease, but let me
18  just put it this way:  What evidence in
19  your report did you take into account to
20  assess the likely response to a SSNIP in
21  the input markets?
22       A.   Sure.  So there it's the
23  perspective of the fighters not the
24  customers.  So I was tripping up over
```

Page 291

```
 1  your --
 2       Q.   Yes.
 3       A.   -- injecting customers when
 4  we're talking about input markets.
 5       So I can take you to the
 6  relevant sections, and I will, but of
 7  course at high levels, I'm looking at
 8  record evidence of -- of what fighters
 9  and promoters thought about substitution
10  possibilities as you -- if you were to
11  move away from Zuffa to counteract a
12  hypothetical wage cut.
13       Q.   Okay.  So the first thing
14  you looked at was record evidence of
15  substitution.
16       A.   Or the perception of
17  substitution from the stakeholders, the
18  fighters, the promoters, and I'll just
19  point you, if you --
20       Q.   That's -- that's sufficient
21  for -- for item 1.
22            MR. CRAMER:  You asked him
23       to look at his report.
24            MR. ISAACSON:  I'm going
```

Page 292

```
 1       to --
 2            MR. CRAMER:  Okay.
 3            MR. ISAACSON:  I'm not going
 4       to ask him to recite all the
 5       documentary evidence.
 6  BY MR. ISAACSON:
 7       Q.   And I understand that
 8  there's documentary evidence that you're
 9  not reciting today.
10            Okay.  Other than the record
11  evidence of the -- about sub- --
12  perceptions of substitutability from the
13  stakeholders, what would be other parts
14  of your SSNIP analysis for the input
15  market?
16       A.   I would direct you to
17  Section 3A 1 for all of the evidence that
18  I used to inform the construction of the
19  relevant input market.
20       Q.   That would be the record
21  evidence that you were referring to?
22       A.   Well, record evidence is
23  fairly broad, right, because it
24  encompasses almost everything.  But I
```

Page 293

```
 1  will point -- to me the -- what helps to
 2  guide me to the findings that I made with
 3  respect to the input market was the fact
 4  that Zuffa was able to successfully
 5  suppress fighter wages, wages either
 6  measured by -- by wage share, regression
 7  or by knowledge of the fact that wage
 8  shares were [REDACTED]
 9  [REDACTED] yet Zuffa did
10  not suffer sufficient defection so as to
11  render that wage decrease unprofitable.
12            Now, that -- that tells you,
13  as a matter of economics, that a -- that
14  a reasonable starting place for defining
15  the contours of the relevant input market
16  is just the fighters under Zuffa's
17  control.  That was the -- the first thing
18  that occurred to me.
19            And once you -- once you
20  start there, you can start looking at
21  record evidence to determine whether
22  additional fighters from -- from rival
23  promotions ought to be included so that
24  you eventually get to the smallest set of
```



Page 294

```
 1  fighters such that a hypothetical
 2  monopsonist could profitably exercise
 3  monopsony power.
 4      Q.  All right.  And you said
 5  that Zuffa was able to successfully
 6  suppress fighter wages -- wage share.
 7  You were talking only about the share of
 8  revenues there, correct?
 9      A.  Correct.
10      Q.  Okay.  You didn't look at
11  whether Zuffa actually suppressed wages
12  and whether fighters moved to -- did not
13  move to other promoters after reduced
14  wages?
15          MR. CRAMER:  Compound,
16      objection to form.
17          THE WITNESS:  Actually, if
18      you take wage shares down from
19      ▇ percent to ▇ percent and you
20      hold an event revenues constant,
21      that's a decrease in the absolute
22      wage for the fighter.
23          So I don't -- I don't
24      automatically except that every
```

Page 295

```
 1      fighter was improved as they
 2      marched from a ▇ percent wage
 3      share at Zuffa to an ▇ percent
 4      wage share.
 5  BY MR. ISAACSON:
 6      Q.  All right.  But in your --
 7  in your hypothetical there you held
 8  revenues constant.  Did you look at, as
 9  part of your analysis of the input market
10  and defining that market, as to whether
11  Zuffa actually suppressed actual wages?
12          MR. CRAMER:  Objection to
13      form.
14  BY MR. ISAACSON:
15      Q.  As opposed to wage share?
16          MR. CRAMER:  Same objection.
17          THE WITNESS:  I'm focused on
18      wage share, of course, because
19      it's the right thing to look at
20      from an economic perspective.
21      We're trying to measure
22      exploitation, and the textbooks
23      tell you to do it as a share of
24      marginal revenue product.
```

Page 296

```
 1  BY MR. ISAACSON:
 2      Q.  So my actual question was --
 3  I understand you're focused on that, but
 4  my question is, did you look at whether
 5  Zuffa actually suppressed actual wages?
 6      A.  Without controlling for
 7  revenues, no.  Because it's incorrect to
 8  do so.
 9      Q.  So in performing your SSNIP
10  analysis for the input markets, is it
11  fair to say that you relied on the record
12  evidence about the issue of perceived
13  substitution from the stakeholders along
14  with your observations that when Zuffa
15  suppressed fighter wage shares, there
16  weren't significant defections?
17      A.  I think -- I think that
18  encompasses a lot.  I also think that
19  Zuffa in its ordinary course of business
20  made use of a FightMetrics (sic)
21  database.  I had -- the very first thing
22  I did when I -- when I got this case was
23  I started reading the economic literature
24  on the MMA industry, and almost every
```

Page 297

```
 1  article I read, the FightMetrics (sic)
 2  database formed the foundation of their
 3  empirical analysis.
 4          So I thought that that was a
 5  reasonable place to begin to posit what
 6  the smallest set of fighters that could
 7  be under the control of a hypothetical
 8  monopsony would be in order for it to
 9  exercise market power.
10      Q.  All right.  Why did you use
11  the smallest set of fighters not the
12  smallest amount of promoters?
13      A.  Well, because we're looking
14  at the input market.  The fighters form
15  the elements of the input market.  They
16  happen to belong to promoters, but
17  fighters are the elements or the
18  ingredients.
19          But I'm -- if I'm a
20  fighter -- just to make it clear, if I'm
21  a fighter and I'm thinking about
22  substituting, defecting from UFC and
23  going to a rival promotion, I don't care
24  what the name of the promotion is or
```



**Page 330**

1  restriction in the pay-per-view output of
2  marquee events between 2010 and 2015?
3      A.  Yes.  That's what a
4  pay-per-view event is.  I mean, you're
5  not going to sell a pay-per-view event
6  unless you have headliner fighters in it.
7      Q.  So you're characterizing all
8  of the pay-per-view events as marquee
9  events when you say marquee events?
10     A.  I think that you might be
11 able to find counterexamples, a handful
12 of counterexamples of a pay-per-view that
13 doesn't feature a headliner, but in
14 general it would be really hard to sell
15 it unless it featured a headliner.
16     Q.  Right.  And did the -- and
17 if Zuffa -- if a firm decided that it
18 wanted to move marquee events from
19 pay-per-view to broadcast, would you
20 consider that direct evidence of power to
21 restrict supply?
22         MR. CRAMER:  Incomplete
23 hypothetical, form.
24         THE WITNESS:  Well, you're

**Page 331**

1  asking me to assume something that
2  I understand to be an unprofitable
3  move.
4          But if -- if your experts
5  can show evidence that these
6  marquee events moved one-for-one
7  from pay-per-view to -- to
8  television, I'd be happy to
9  consider such evidence.  But I
10 don't have an opinion on it right
11 now.
12     Q.  Okay.
13         THE VIDEOGRAPHER:  Excuse
14 me, Counsel.  We're approaching
15 ten minutes left on the disk.
16         MR. ISAACSON:  I think I'm
17 done.
18         Give me one minute, but I
19 think I'm about done for the day.
20         Give us a minute.
21         MR. CRAMER:  Let's go off
22 the record.
23         THE VIDEOGRAPHER:  The time
24 is 4:28 PM.  We are going off the

**Page 332**

1  record.
2          (Recess.)
3          THE VIDEOGRAPHER:  The time
4  is 4:31 PM.  We have been on the
5  record for five hours and
6  36 minutes.
7          MR. CRAMER:  All right.  We
8  have no questions.
9          MR. ISAACSON:  Thanks.
10         MR. CRAMER:  Let's go off
11 the record.
12         THE VIDEOGRAPHER:  All
13 right.  The time is 4:31 PM.
14         This concludes the
15 deposition and this is the end of
16 Disk 3.
17         (Witness excused.)
18         (Deposition concluded at
19 approximately 4:31 PM.)

**Page 333**

2                 CERTIFICATE

5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

          It was requested before
8  completion of the deposition that the
   witness, HAL J. SINGER, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.

12         _Constance S. Kent_
            Constance S. Kent, CCR, RPR,
13          Certified Court Reporter
            Registered Professional Reporter
14          Certified LiveNote Reporter
            and Notary Public in and for the
15          Commonwealth of Pennsylvania
            Dated:  October 1, 2017

20         (The foregoing certification
21 of this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

