# EXHIBIT 129

# Excerpts of the 30(b)(6) Deposition of Ike Lawrence Epstein on Zuffa Acquisitions (12/2/16) (Redacted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON     )
FITCH, on behalf of             )
themselves and all others       )
similarly situated,             )
                                )
            Plaintiffs,         )
                                )
      vs.                       )  Case No.
                                )  2:15-cv-01045-RFB-(PAL)
                                )
ZUFFA, LLC, d/b/a Ultimate      )
Fighting Championship and       )
UFC,                            )
                                )
            Defendant.          )
_____)

CONFIDENTIAL

VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

BY IKE LAWRENCE EPSTEIN

December 2, 2016

LAS VEGAS, NEVADA

11:29 A.M.

Reported by:
Sarah Padilla, CCR NO. 929
Job No: 47777

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

```
                                          82
 1   [REDACTED]
```

```
                                          83
 1   [REDACTED]
 2      Q   Do you know who at Zuffa would know why
 3   the deal was structured the way it was structured?
 4      A   I don't.  Could be Kirk Hendrick, could be
 5   John Mulkey, but I don't know.
 6      Q   I would like to refer back to Exhibit 60,
 7   which we had been discussing earlier today.
 8      A   Okay.  Got it.
 9      Q   I'm going to direct your attention to the
10   second to last page of Exhibit 60.  There's a Bates
11   label at the bottom ZFL-1674073.  Are you with me?
12      A   I see it.
13          MS. GRIGSBY:  I'm just going to reiterate
14   my objection to this document.  It's unclear whether
15   this is a complete document, whether it's a draft,
16   and whether there was anything else that accompanied
17   it in terms of exhibits.
18          THE WITNESS:  I've got it in front of me.
19   BY MR. WEILER:
20      Q   I'm going to direct your attention here,
21   middle of the page, second sentence of the middle
22   paragraph, it says, [REDACTED]
```

```
                                          84
 1   [REDACTED]
```

```
                                          85
 1   [REDACTED]
 5          Is that sentence that I just read an
 6   accurate characterization?
 7          MS. GRIGSBY:  Objection.  Scope.  This
 8   looks like it relates to fighter contracts, not
 9   acquisitions.  And I'm going to renew my objection
10   about this document.  It looks to be an incomplete
11   document, just for the record.  If you notice,
12   there's myriad typos in this document.  It's unclear
13   who drafted it.
```

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

146

1  whether it was important to them, I don't -- I
2  assume so.
3      Q   Did Zuffa represent that it would make
4  good faith efforts to continue the Pride brand as
5  part of the Pride acquisition?
6      A   I believe we did.
7      Q   When Zuffa made that representation, did
8  it know that there were questions about Pride's
9  association with the Yakuza organization?
10     A   Well, I mean, the whole reason why Pride
11 was sold is because of the fact there were
12 allegations they were associated with the Yakuza.
13 So everybody was aware about those allegations.
14 Whether any of it was true, it was never proven as
15 far as I know one way or the other.  So of course
16 people were aware, because that's the only reason
17 they sold the business.
18     Q   Did Zuffa ever hold any events under the
19 Pride brand?
20     A   No.
21     Q   Were there any planned Pride events that
22 were canceled as a result of Zuffa's acquisition of
23 Pride?
24     A   You know, I think there certainly were
25 some discussions about doing an event in between the

147

1  closing and the time the business closed down.  Once
2  again, I didn't come on board until August of 2007,
3  so things were not in a good spot by then.  There
4  certainly was a discussion about doing events, as I
5  recall.
6      Q   So there were contemplated events under
7  the Pride brand Zuffa would undertake that did not
8  come to fruition?
9      A   They were contemplated events is my
10 recollection.  There was discussion about events in
11 Japan under the Pride name.
12     Q   Were there any Pride fighters who were cut
13 by Zuffa as a result of the Zuffa acquisition?
14     A   I don't recall fighters being cut, no.  I
15 mean, there may have been.  I mean, I know that when
16 we didn't put on events, fighters were saying, "Hey,
17 I want to fight.  I want to fight."  And ultimately
18 when we closed the down the business, we certainly
19 got them fights in the UFC.  There may have been
20 some fighters that we released, let them fight
21 elsewhere.  But I don't remember anyone being cut.
22     Q   When you said that there may have been
23 some fighters that were released, do you know how
24 many fighters were released?
25     A   I don't recall.

148

1       MR. WEILER:  I'd like to mark as an
2  exhibit, Exhibit 77.  Exhibit 77 bears the Bates
3  label ZUF-00375836 going through 5844.  While the
4  exhibit is being marked I will represent for the
5  record that this



149

19     Q   Are you familiar with an MMA or former MMA
20 promoter known as Affliction Entertainment Group?
21     A   Yes.
22     Q   What was Affliction?
23     A   Affliction was primarily a clothing brand,
24 sold T-shirts, jeans, jackets, all sorts of sort of
25 apparel.  And at some point they got into the MMA

38 (Pages 146 to 149)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

```
                                                              150
 1    promotion business.
 2        Q   Did Zuffa acquire Affliction?
 3        A   Yes.
 4        Q   How did Zuffa come to acquire Affliction?
 5        A   Well, just so we are clear, we acquired
 6    some assets from Affliction.  We didn't acquire the
 7    clothing brand or the manufacturing facilities and
 8    all that stuff.  [REDACTED]
 9
10
11
12
13    But we didn't acquire Affliction, the brand, the
14    apparel brand, obviously.
15    [REDACTED]
16
17
18
19
20    [REDACTED] They were doing an
21    event -- they'd done a couple events.  They were
22    doing an event that headlined with Josh Barnett and
23    Fedor Emelianenko.
24        Josh Barnett, who had tested positive for
25    performance enhancing drugs in the past was the
```

```
                                                              151
 1    subject of a prefight drug test by the California
 2    Athletic Commission.  When that drug test was
 3    returned and it was positive, they refused to issue
 4    Josh Barnett -- and this happened just days before
 5    the event -- a license to participate.  And as a
 6    result, Affliction canceled the event.
 7        Shortly thereafter, they contacted --
 8    their lawyer contacted me and said, you know, "We're
 9    looking to get out of this business.  Would you be
10    interested in acquiring the assets of the company?"
11    And we said we really weren't that interested in it.
12    And they said, "Well, would you just take over the
13    fighter liability and fighter contracts and we'll
14    give you the library?"  And so we decided to do it.
15    [REDACTED]
16
17
18
19
20        Q   I would like to mark as an exhibit,
21    Exhibit 78, a document that appears to be an article
22    published in Cage Potato MMA called "Affliction UFC
23    Truce Falls Apart, UFC Bans Another Brand."
24        A   All right.
25            MS. GRIGSBY:  Counsel, I just want to --
```

```
                                                              152
 1    is there a date on this besides the print date?
 2            MR. WEILER:  Yeah.  I will represent for
 3    the record that this is dated October 23rd, 2008.
 4    But I can't for the life of me tell you how I know
 5    that by looking at this exhibit.  For the record, a
 6    number of the comments starting at pages 2 and to
 7    page 7 of the document are dated October 23rd, 2008.
 8            (Exhibit 78 was marked.)
 9    BY MR. WEILER:
10        Q   Sir, I'd like to read you the passage from
11    this document, the first paragraph that says "MMA
12    Weekly reports that UFC and Affliction executives
13    met late last month to build a formal partnership
14    that would allow Affliction to return to the UFC as
15    a major clothing sponsor and work with the UFC to
16    create co-branded apparel.  In exchange, Affliction
17    would agree to cease operations as a fight promotion
18    and allow the UFC to buy out several of their
19    fighter contracts."  Do you see where it says that?
20        A   Yes.
21        Q   Did the UFC have negotiations with
22    Affliction in October 2008 regarding Affliction
23    ceasing its operations as a fight promotion and
24    becoming a sponsor of the UFC?
25        A   I don't remember the exact dates, but the
```

```
                                                              153
 1    problem that we have with Affliction is that they
 2    were essentially advertising an MMA brand within our
 3    organization.  So obviously, that didn't make any
 4    sense.  We weren't going to allow them to come into
 5    our UFC events and have branding that was associated
 6    with another promotion.  So we certainly had a
 7    discussion with them, "Listen, if you guys are in
 8    business of promoting MMA events, you're free to
 9    advertise anywhere in the planet you want.  But
10    you're not going to be part of our events.  If
11    you're not going to be in that business, then maybe
12    we can work on a deal where were we can work
13    together.  But we're not going to advertise a
14    competitive brand in our own product.  That makes no
15    sense.  And no business would ever do that."  Those
16    were the nature of the discussions.
17        Q   I see.  Who negotiated the -- strike that.
18            Who was the primary negotiator, if anyone,
19    at Zuffa regarding the Affliction negotiation?
20        A   You know, once again, with a small
21    management group, I think all of us were certainly
22    involved in it.  When I say "all of us," myself,
23    Kirk Hendrick, John Mulkey, Lorenzo Fertitta, and
24    Dana White.  I certainly had a role in negotiating
25    that deal because I had a relationship with the
```

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

238

```
 1
 2      STATE OF _____)
 3                            ) :ss
 4      COUNTY OF _____)
 5
 6
 7          I, IKE LAWRENCE EPSTEIN, the witness
 8      herein, having read the foregoing
 9      testimony of the pages of this deposition,
10      do hereby certify it to be a true and
11      correct transcript, subject to the
12      corrections, if any, shown on the attached
13      page.
14
15          _____
16            IKE LAWRENCE EPSTEIN
17
18
19
20      Sworn and subscribed to before me,
21      this _____ day of _____, 2016.
22
23      _____
24            Notary Public
25
```

239

```
 1      STATE OF NEVADA)
               ) Ss
 2      COUNTY OF CLARK)
 3
 4          I, Sarah Padilla, a duly commissioned and
 5      licensed court reporter, Clark County, State of Nevada,
 6      do hereby certify:  That I reported the taking of the
 7      deposition of the witness, IKE LAWRENCE EPSTEIN, commencing
 8      on Friday, December 2, 2016, at 11:39 A.M.; That prior to
 9      being examined, the witness was, by me, duly sworn to testify
10      to the truth; That thereafter I transcribed my shorthand notes
11      into typewriting and that the typewritten transcript of said
12      deposition is a complete, true, and accurate record of said
13      shorthand notes.  I further certify that I am not a relative
14      or employee of any attorney or counsel of any of the parties
15      nor a relative or employee of an attorney or counsel involved
16      in said action, nor a person financially interested in the
17      action; that a request [x] has [] has not been made to review
18      the transcript.
19          IN WITNESS WHEREOF, I have hereunto set my
20      hand in the County of Clark, State of Nevada, this 22nd
21      day of December.
22
23          _____
              SARAH PADILLA, CCR 929
24
25
```

240

```
 1              INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over carefully
 4      and make any necessary corrections. You should state
 5      the reason in the appropriate space on the errata
 6      sheet for any corrections that are made.
 7          After doing so, please sign the errata sheet
 8      and date it.
 9          You are signing same subject to the changes
10      you have noted on the errata sheet, which will be
11      attached to your deposition.
12          It is imperative that you return the original
13      errata sheet to the deposing attorney within thirty
14      (30) days of receipt of the deposition transcript by
15      you. If you fail to do so, the deposition transcript
16      may be deemed to be accurate and may be used in court.
17
```

241

```
 1                  E R R A T A
 2
 3
 4
 5          I wish to make the following changes,
 6      for the following reasons:
 7
 8      PAGE LINE
 9      ___ ___ CHANGE:_____
10      REASON:_____
11      ___ ___ CHANGE:_____
12      REASON:_____
13      ___ ___ CHANGE:_____
14      REASON:_____
15      ___ ___ CHANGE: _____
16      REASON:_____
17      ___ ___ CHANGE: _____
18      REASON:_____
19      ___ ___ CHANGE: _____
20      REASON:_____
21
22      _____  _____
23      WITNESS' SIGNATURE       DATE
24
25
```