# EXHIBIT 130

# Excerpts of the Deposition of Michael Mersch

# (Redacted)

```
                                                              333

              UNITED STATES DISTRICT COURT

                  DISTRICT OF NEVADA



 CUNG LE; NATHAN QUARRY, JON   )
 FITCH, on behalf of           )
 themselves and all others     )
 similarly situated,           )
                               )
            Plaintiffs,        )
                               )
            vs.                )  Case No.
                               )  2:15-cv-01045-RFB-(PAL)
                               )
 ZUFFA, LLC, d/b/a Ultimate    )
 Fighting Championship and     )
 UFC,                          )
                               )
            Defendant.         )
 _____)


              C O N F I D E N T I A L

              VIDEOTAPED DEPOSITION OF

                 MICHAEL P. MERSCH

  AFTERNOON AND EVENING SESSIONS (PAGES 333 to 496)

                  LAS VEGAS, NEVADA

                   JULY 14, 2017

                     4:43 p.m.



 Reported by:
 Jualitta Stewart, CCR No. 807, RPR
 Job No. 51253-B
```

MICHAEL P. MERSCH - CONFIDENTIAL

358

[redacted] Because, again, as we've seen from other documents and you've testified earlier it was Zuffa's practice to renegotiate with fighters that had wanted to continue having a contractual relationship with before the end of their contractual term; is that right?

A. The -- I think the language that I use there was almost because that would certainly be our hope that we would be able to come to and negotiate a mutually agreeable contract that the fighter was comfortable with, that we were comfortable with, and that was mutually beneficial. Obviously we can't guarantee that and, again, I have no independent recollection of the context or other things that were going on at this time, but that would be my guess as to what I -- what I meant by using that language.

359

Q. And that was especially true for top stars like Quinton Rampage Jackson, that Zuffa wanted to make sure that Zuffa had business certainty with regard to its top stars so it would attempt to renegotiate its top fighters' contracts before the end of their term, correct?

A. Again, I think that that is a term that may be applicable to -- first of all, I don't know how you would define, you know, what was a top star or, you know, that's a fairly amorphous term. But I think the term really applies to any fighter where a meeting of the minds could be had between the fighter and the company out of mutual desire to extend the terms or to supply out the terms of an existing deal with a more preferential deal.

Q. Zuffa wanted to ensure that the fighters that it wanted to maintain in its fold never got to the end of the terms of their contracts, correct?

A. Well, frankly, it wasn't -- it wasn't just Zuffa. Oftentimes the fighter himself would call and request that -- that they receive a new contract prior to the end of the term of an agreement because invariably -- well, maybe not invariably. Oftentimes, the new contract that they would receive would have enhanced and increased

360

levels of compensation which is, of course, was an appealing factor to any fighter.

But, you know, whether -- you know, there could be any number of factors that each fighter may have felt that worked to their benefit in giving them the position where they would come to Joe Silva or Dana or Lorenzo or myself or any number of people and say, you know, I believe now based on the body of work that I've delivered that, you know, we feel that it's appropriate to enter into a new contract. And oftentimes Zuffa was amenable to that as well because they felt that it was a mutually beneficial decision that benefitted both the company and the fighter.

Q. So what you're testifying to is that Zuffa, it was in Zuffa's interest to enhance the compensation of certain fighters in exchange for the fighters agreeing to another three or four fight deal, correct?

A. It was a negotiated point. Compensation, of course, is a negotiated point in virtually every contract that I'm aware of or monetary -- you know, the amount of money involved in any contract is, of course, an important point. But that would have been amongst any number of other, you know,

361

important provisions in the contract that may or may not have been renegotiated between the parties. Again, depending on what was important, depending on the -- all the various factors that could go into any individual negotiation with any individual fighter.

Q. So Zuffa comes to a fighter on the third -- between the third and fourth fights of a four-fight deal and says all right, you can fight your fourth fight at "X" dollars or you can sign this new deal, new four-fight deal at "X" plus "Y" dollars, the fighter then has an option to cancel the old contract and sign a new contract and make more money for that next fight; is that right?

A. There could be circumstances that go both ways where Zuffa may present an offer to the fighter or the fighter may come to Zuffa and present a proposal to the UFC that it hopes the UFC will take into consideration. And sometimes the parties were able to come to a meeting of the minds after independent evaluation and sometimes they weren't.

But the -- there was, you know, an ebb and flow that went both directions and oftentimes the driving force behind renegotiation or request for a sub -- a superseding agreement came from the

8 (Pages 358 to 361)

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                                    362
1    fighter's side and sometimes it came from the Zuffa
2    side.  It just depended on the context, it depended
3    on, you know, a variety of different factors.
4         MR. CRAMER:  All right.  I'd like to have
5    the court reporter mark as Mersch Exhibit 25 the
6    next document.
7         For the record, Mersch Exhibit 25 is a
8    series of e-mails with a Bates range ZFL 2496215
9    through 6216.  It's a July 2012 e-mail exchange
10   between Mr. Mersch, Tracy Long, and Joe Silva.
11        (Whereupon, Exhibit 25 was
12         marked for identification.)
13   BY MR. CRAMER:
14   Q.   Let me know when you've had a chance to
15   review it, and I have some questions about it.
16   A.   Okay.
```

```
                                                    363
8    Q.   Well, it was sent from your e-mail
9    address, correct?
10   A.   As I said, I don't have any independent
11   recollection, but I don't dispute that it occurred.
12   Q.   Okay.
13   A.   So.
```



25   ///

9 (Pages 362 to 365)

MICHAEL P. MERSCH - CONFIDENTIAL

442

1  it was expressed to me that anybody in the UFC's
2  executive team had any -- felt that the individuals
3  running the Affliction brand of MMA were a threat to
4  the UFC.  I don't recall that.  And, again, it was
5  ten years ago, apparently.  But as I sit here today,
6  I don't have any independent recollection that that
7  occurred.
8      Q.   Did you, at some point, gain the
9  understanding that either you or someone at Zuffa
10 viewed Affliction at this time as Zuffa's main
11 rival?
12     A.   I never gained that understanding.
13          MR. CRAMER:  All right.  I'd like to mark
14 as Mersch Exhibit 39 the next document.
15          (Whereupon, Exhibit 39 was
16           marked for identification.)
17          THE WITNESS:  To the best of my
18 recollection.  So.
19 BY MR. CRAMER:
20     Q.   Mersch Exhibit 39 is a one-page series of
21 e-mails bearing the Bates Number ZFL-2193553.  It's
22 a July 24 and 25, 2009 e-mail chain between
23 Mr. Mersch and Kevin Mulvey with a subject
24 "Affliction."
25          Let me know when you've completed

443

1  reviewing it.
2      A.   Okay.
3      Q.   So at the bottom of the chain, there's an
4  e-mail from you to Mr. Mulvey and Joe Ricca.
5      A.   Ricca.
6      Q.   Ricca.  Who is Mr. Mulvey?
7      A.   Mr. Mulvey and Mr. Ricca worked for a
8  government relations firm out of Boston,
9  Massachusetts called Dewey Square Group.
10     Q.   And they were doing business for Zuffa at
11 the time?
12     A.   At -- again, to the best of my
13 recollection timing-wise, I'm not a hundred percent
14 sure, but it wouldn't surprise me if during this
15 time -- and for many many years, I worked with
16 Mr. Mulvey and Mr. Ricca to bring MMA legalization
17 to the state of Massachusetts which prior to this
18 time only permitted boxing and did not permit the
19 promotion of live professional mixed martial arts
20 sporting events.
21     Q.   So Dewey Square was essentially a
22 lobbyist for Zuffa and the UFC at this time,
23 correct?
24     A.   Correct.
25     Q.   Okay.  And you were -- at the first

444

1  e-mail here, the subject is "Affliction," right?
2      A.   Yeah.
3      Q.   That's the subject?
4      A.   Yes.
5      Q.   And Affliction is the company we've just
6  been talking about that was exclusively an apparel
7  company but then at some point in late 2007 or two
8  thousand and -- or early 2008 became an MMA
9  promotion, correct?  That's Affliction, correct?
10     A.   I'm sorry, can you repeat that, I
11 apologize.
12     Q.   That's okay.
13          Affliction is the company that we've just
14 been talking about --
15     A.   Yes.
16     Q.   -- in the last document --
17     A.   Correct.
18     Q.   -- that in late 2007 went from being
19 exclusively an apparel company to an apparel company
20 plus an MMA promotion, right?
21     A.   Correct.
22     Q.   And you say to Mulvey and Ricca in July
23 of 2009, "Our main rival is done."
24          Do you see that?
25     A.   H'm-h'm.

445

1      Q.   And you --
2      A.   Yes.
3      Q.   You include a website news article from
4  Sherdog.com.  Sherdog.com is an MMA website; isn't
5  that right?
6      A.   Correct.
7      Q.   And there's a news item entitled,
8  "Affliction Clothing Back in UFC Fold."
9           Do you see that?
10     A.   Yes, sir.
11     Q.   And the Affliction clothing was back in
12 the UFC fold because Affliction had stopped the MMA
13 promotion business, correct?
14     A.   I would assume that that was one of the
15 factors, I don't recall all of the details
16 surrounding why -- what -- what negotiations took
17 place between either Dana, Lorenzo, and -- and --
18 and the people that ran Affliction.  But obviously
19 it appears that -- without reading the article, it
20 appears that at some point that that was agreed to.
21     Q.   And when you said "our main rival is
22 done," you were referring to Affliction as an MMA
23 promotion no longer being an MMA promotion, correct?
24     A.   I spoke with Mr. Mulvey and Mr. Ricca on
25 a fairly regular basis in the -- much of what I was

29 (Pages 442 to 445)

MICHAEL P. MERSCH - CONFIDENTIAL

446

1  doing there was keeping them abreast of current
2  events related to the company to make sure that they
3  understood, you know, the business interest of the
4  company that were going on and any major
5  developments that had happened.
6      And, again, I may have been referring to
7  that but, again, I certainly can appreciate what
8  context or other circumstances existed at that time
9  or what I may have been speaking with them about in
10 referring to them in that -- in that -- that regard.
11     But again, I think the general nature of
12 my e-mail was to pass along that the relationship
13 between Affliction and the UFC had apparently been
14 repaired.
15     Q.  Affliction didn't go out of business,
16 correct?
17     MR. WILLIAMS:  Objection to the form of
18 question.
19     THE WITNESS:  I have no knowledge -- not
20 to the best of my knowledge.
21 BY MR. CRAMER:
22     Q.  They continued to be an apparel company,
23 correct?
24     A.  To the best of my knowledge.
25     Q.  Right?  Now they were back in the UFC

447

1  fold, that's what the article reports, correct?
2      A.  As of the date of this e-mail, that would
3  be -- I would believe that would be accurate.
4      Q.  So when you're saying our main rival is
5  done, your mean -- you mean that Affliction was no
6  longer an MMA promotion, it's just a clothing
7  company, right?
8      A.  I think that I would have -- I would
9  characterize it as Affliction elected to stop
10 promoting the sport of mixed martial arts and they
11 negotiated whatever they may have negotiated with
12 either Dana White or Lorenza Fertitta to engender
13 themselves back into being a brand that they were
14 comfortable with sponsoring within the UFC
15 ecosphere.
16     Q.  And this -- you viewed this as great news
17 for the UFC, right?  That Mulvey says to you, Wow,
18 short-term, long-term ramifications."
19     And you say, "Any ramifications are good
20 for us.  We're going to get most of their fighters.
21 They only have 22 fighters."
22     Do you see that?
23     A.  I do.
24     Q.  So as a result of Dana and Lorenzo
25 negotiating with Affliction to have Affliction drop

448

1  their MMA promotion, looks like the UFC is now going
2  to be able to take all of Affliction's fighters,
3  right?
4      A.  Well, apparently, again, I don't have any
5  independent recollection regarding what was
6  happening at this particular time, but apparently
7  the inference that I would draw from reading this
8  e-mail would be that the UFC had entered into an
9  agreement to purchase some or all of the assets of
10 Affliction's MMA-related assets.
11     Q.  And then you say,

449

4      Q.  And you say a little bit further down,
5  "Things are looking good.  This was a big day for
6  the UFC."
7      Do you see that?
8      A.  I do see that.
9      Q.  And it was a big day for the UFC because
10 their main rival was out of the UFC promotion
11 business and the UFC could get most of their
12 fighters, correct?
13     A.  Honestly, I don't under -- I couldn't
14 possibly understand or tell you what my motivation
15 was for opining that that particular day which was
16 July 25th of 2009, eight years ago, why that was
17 big today or what my -- what -- you know,
18 conclusions or what, you know, information went into
19 my making that, you know, giving that opinion.
20     But, you know, certainly the fact that
21 the UFC was able to negotiate a, you know, an asset
22 purchase agreement for some of the assets of
23 Affliction's MMA business, apparently at that time I
24 thought that that was, in my opinion, good -- good
25 for the overall health of the company.  Because it

MICHAEL P. MERSCH - CONFIDENTIAL

490



491

```
3     MR. CRAMER:  All right.  That's all the
4  questions I have.  Thank you.
5     THE VIDEOGRAPHER:  Questions?
6     MR. CRAMER.  No questions.
7     THE VIDEOGRAPHER:  This concludes today's
8  deposition of Michael Mersch.  Total number of media
9  used is seven.
10    We are off the record at 8:27 p.m.
11    (Thereupon, the taking of the deposition
12          concluded at 8:27 p.m.)
```

492

```
2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____)

7     I, MICHAEL P. MERSCH, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.

15        _____
16           MICHAEL P. MERSCH

20 Sworn and subscribed to before
21 me, this     day of
22          , 2017.

24 _____
25        Notary Public
```

493

```
1        REPORTER'S DECLARATION
2  STATE OF NEVADA   )
                     ) ss
3  COUNTY OF CLARK   )

5     I, Jualitta Stewart, a duly commissioned
6  Notary Public, Clark County, State of Nevada, do
7  hereby certify:
8     That I reported the taking of the
9  deposition of the witness, MICHAEL P. MERSCH,
10 commencing on Friday, July 14, 2017, at the hour of
11 4:43 p.m.
12    That prior to being examined, the witness
13 was by me duly sworn to testify to the truth, the
14 whole truth, and nothing but the truth.
15    That I thereafter transcribed my said
16 shorthand notes into typewriting and that the
17 typewritten transcript of said deposition is a
18 complete, true, and accurate transcription of said
19 shorthand notes taken down at said time.
20    I further certify that I am not a
21 relative or employee of any party involved in said
22 action, nor a person financially interested in the
23 action.
24    IN WITNESS WHEREOF, I have hereunto set
25 my hand and affixed my official seal in my office in
```

41 (Pages 490 to 493)

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                        494
 1   the County of Clark, State of Nevada, this 1st day
 2   of August, 2017.
 3
 4
            JUALITTA STEWART, RPR, CCR No. 807
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                        495
 1             INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7       After doing so, please sign the errata sheet
 8   and date it.
 9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12       It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

```
                                        496
 1                  E R R A T A
 2
 3
 4
 5       I wish to make the following changes,
 6   for the following reasons:
 7
 8   PAGE LINE
 9   ___  ___ CHANGE:_____
10   REASON:_____
11   ___  ___ CHANGE:_____
12   REASON:_____
13   ___  ___ CHANGE:_____
14   REASON:_____
15   ___  ___ CHANGE: _____
16   REASON:_____
17   ___  ___ CHANGE: _____
18   REASON:_____
19   ___  ___ CHANGE: _____
20   REASON:_____
21
22   _____   _____
23     WITNESS' SIGNATURE          DATE
24
25
```

42 (Pages 494 to 496)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099