# EXHIBIT A

## Forbes.com article titled "UFC Lawsuit: Plaintiffs Oppose Summary Judgment, Make Final Pitch For Trial"

1,613 views | Sep 24, 2018, 08:15am

# UFC Lawsuit: Plaintiffs Oppose Summary Judgment, Make Final Pitch For Trial



**Paul Gift** Contributor
SportsMoney

---

The group of former fighters suing the UFC for alleged monopolization and monopsonization in the MMA industry submitted their final written arguments to the judge on Friday in an attempt to prevent the UFC from obtaining a summary judgment win and force the class-action antitrust lawsuit to trial, likely next year.





Jon Fitch and five other plaintiffs submitted their opposition to the UFC's motion for summary judgment in Las Vegas federal court on Friday. (AP Photo/Jeff Chiu)

In a heavily redacted opposition to the UFC's previously filed motion for summary judgment, the plaintiffs argued their case to Las Vegas federal court Judge Richard Boulware.

> *The record shows: (1) [UFC] had monopoly and monopsony power as the dominant MMA promoter—that is, [UFC] was the only promoter that could sell "major league" live MMA events broadcast in North America and the only promoter that could hire MMA fighters to compete in "major league" MMA events; (2) [UFC] willfully acquired and maintained monopoly and monopsony power through exclusionary conduct, including locking Fighters into long-term, exclusive contracts, coercing Fighters to enter and extend those Exclusive Contracts, and acquiring other MMA promoters that threatened the UFC's dominance; and (3) [UFC] used its monopsony power to suppress the compensation it paid its Fighters below competitive levels (and its monopoly power to decrease the supply and inflate the prices of MMA events ).*

In other words, we're finally getting to the meat-and-potatoes of this case: Did the UFC maintain and enhance its economic power and put rival MMA promoters at a significant competitive disadvantage through its use of long-term, exclusive fighter contracts?

The other (and much weaker) claims that the UFC prevented competing MMA promoters from accessing critical sponsors, television networks, and venue space – which I've affectionately referred to as "The Carlos Newton" – finally appear to have met their demise. Plaintiffs' focus throughout Friday's filing is the claim that the UFC deprived competitors "of a critical mass of marquee Fighters, rendering them 'minor leagues.'"

YOU MAY ALSO LIKE

If Judge Boulware determines that there are no genuine issues of material fact, then the UFC could walk away with an early win just as manager Al Haymon did last year in boxing's big antitrust case. According to the filing, plaintiffs believe at least two disputed issues are in play: (1) The UFC's alleged assumption that control of top-ranked fighters matters the same for a promoter's market power as control of fighters "competing at the margins of the sport" and (2) claims the UFC faces competition from other MMA promoters when it has allegedly admitted to being the "major league" of MMA.

The filing is chock full of financial details, deposition quotes, text messages and e-mails, virtually all of which were redacted, leaving readers with a small taste of many of the plaintiffs' arguments, but nowhere near a precise understanding. For example, in referencing the UFC's 2014 match of restricted free agent Gilbert Melendez's contract offer from Bellator, plaintiffs write, "[UFC's] executives acknowledge the importance of blocking other promoters' access to top Fighters to maintaining its dominance. In February 2014, for example, after Lorenzo Fertitta exercised a provision of [UFC's] Exclusive Contracts to prevent top Fighter Gilbert Melendez from defecting to Bellator, Fertitta wrote to Dana White: '*[Redacted]*'."

Plaintiffs repeatedly quote from depositions and documents that essentially describe an economic network effect that exits in many sports leagues (e.g., "Fighters 'generally have an interest in competing against the best fighters' and customers 'like that too' because putting 'good fighters against each other' creates

'more energy.'") and appear to argue that competing MMA promoters would need a critical mass of top fighters to overcome this network effect, at least in part because the UFC refuses to co-promote with other promotions.

Plaintiffs also home in on particular alleged UFC strategies such as renegotiating before the end of a fighter's contract "to prevent the Fighters from ever becoming free agents," unfavorable placement on fight cards and not giving title shots unless fighters were "locked-up long-term." The effect of these and other tactics, plaintiffs argue, is to make UFC exclusive contracts "effectively perpetual."

**Critical Mass**

An interesting portion of the filing was the plaintiffs' argument that the UFC's alleged scheme prevented competing MMA promoters from accessing a key input: A "critical mass" of top fighters. The actual sworn testimony of those other MMA promoters on this subject could be pivotal, an issue I've previously addressed.

In the publicly available and un-redacted portion of their depositions, it doesn't appear that any of the other MMA promoters testified to a meaningful foreclosure effect from the UFC's exclusive contracts. If anything, the testimony of former IFL co-founder Kurt Otto came the closest. He references not being able to "get" fighters who are "locked up in a contract" in his key quote. But he then immediately transitions into talent discovery, where fighters are presumably not locked up by any major promotions. "So I have to go all the way down to the gym level and go find a new gym rat that has talent and build them up and start from scratch. So, if you buy all the talent, your chances of finding Conor McGregor are slim to none; this one is out of town."

While not exactly a "new gym rat," Conor McGregor was notoriously (no pun intended) available for other MMA promoters to sign just 5 ½ years ago coming out of Cage Warriors in Europe.

Another issue for the plaintiffs is that other current or former promoters have been forceful in their testimony that the UFC has not hindered their ability to compete. To combat this potentially problematic testimony, plaintiffs note in their filing, "[UFC's] citation to certain promoters' boasts that the UFC had not affected their ability to sign Fighters, are not credible and are disputed."

Plaintiffs question the credibility of Jeff Aronson (Titan FC) and Shannon Knapp (Invicta FC) for having allegedly received "substantial revenue" from the UFC and cite a 2008 media quote from White about Elite XC as a "farm league" (a statement White did not disagree with in his deposition).

Yet two pages later in White's deposition, he responded, "Should I said I'm horrified and terrified of all this competition?" when asked about a media quote in which he referred to IFL, Bodog, and EliteXC as "feeder leagues."

White also testified that his job as a fight promoter is "to make you not take your wife out on Saturday night, not go to a movie, or whatever else you might want to do on Saturday night. My job is to make you stay home and watch the UFC," implicitly acknowledging potential competitive alternatives to the UFC in the output market.

Yet at other points in his deposition excerpt, White made statements upon which plaintiffs' attorneys were quick to pounce. "Yeah, no. We're – we're not in competition with boxing" was one such example.

**Expert Analyses**

When it comes to the alleged anticompetitive effects of the UFC's business strategies, plaintiffs hang their hat on an impact regression by expert witness Dr. Hal Singer which purportedly shows a negative correlation between the UFC's foreclosure share (percent of MMA fighters under exclusive UFC contracts) and its wage share (fighter compensation as a percentage of event revenues).

While this analysis has been highly disputed and subject to multiple rounds of expert witness reports, Judge Boulware could decide the reliability of Singer's work is an issue for trial or he could side with the UFC's arguments in its *Daubert* motion to exclude Singer's testimony and deal a crippling blow to the plaintiffs case.

At present, many portions of the filing are difficult to critique due to the many redactions. For example, while the UFC claims Singer didn't perform a SSNDP test as part of his relevant input market analysis, the plaintiffs claim he did. And while the UFC claims it only raised PPV prices by $5 between 2010 (really, 2008)

and 2015 (excluding the UFC 168 rematch of Chris Weidman vs. Anderson Silva which had a one-off higher price), plaintiffs appear to incorporate an increasing UFC revenue share from PPV distributors (effectively a lower price from its suppliers of distribution services) and reach an entirely different conclusion. They then cite redacted internal UFC documents and Deutsche Bank deposition testimony that say, well, something that may or may not have been interesting.

**Output Reduction**

The one area where redactions don't cause much of a problem are the plaintiffs' seemingly incredible claims of MMA output reduction due to the UFC's conduct. They note that the UFC restricted its PPV output by (what other filings appear to describe as) a decline from 15 PPV events in 2010 to 13 in 2015. But annual UFC PPVs took off in 2006 (from six in 2005 to 10 in 2006) and began to level off at 12-13 around 2008, with two higher years in 2010 and 2011 before the explosion of non-PPV shows with the FOX deal in 2012 and Fight Pass in 2014. Had 2009, 2008, 2007, 2006, 2005, etc. been the base year, UFC PPV output easily would've been flat or increasing.

To analyze the overall output of MMA events, Singer purportedly ran a regression on the number of live MMA events from 2001 to 2010 and extended the resulting trend line for 2011 on. UFC expert witness Robert Topel attacks this as assuming "that this growth would persist beyond 2010 is analogous to assuming children grow as much between their tenth and twentieth birthdays as between birth and their tenth birthdays" and yet he doesn't even mention the substantial difference in the number of states in which MMA was legalized and sanctioned over that same 10-year window (in broad terms it went from *very few* in 2001 to *a lot* in 2010). The UFC under Zuffa didn't even hold a domestic event outside of the five states of Nevada, New Jersey, Connecticut, Florida and Louisiana until 2006 when California finally legalized the sport of MMA. So if the purported statistical structure is true, this may well be a situation where an expert witness's number crunching is detached from an industry's reality.

As presently scheduled, the UFC will submit its final reply on November 2nd and then we wait for word on when Judge Boulware will hold a hearing. Outstanding issues on which he's yet to decide are the plaintiffs' motion for class certification

and the UFC's *Daubert* motions on three plaintiff expert witnesses (Hal Singer, Andrew Zimbalist and Guy Davis) and its summary judgment motions on Nate Quarry individually and for the entire case.

Should the class be certified and the plaintiffs survive the UFC's *Daubert* and summary judgment challenges, it will move to the trial phase, where hopefully the annoying redactions finally start to disappear.

*I am an associate professor of economics at Pepperdine Graziadio Business School, an ABC-certified referee and judge for the California Amateur Mixed Martial Arts Organization (CAMO) and a former provider of expert witness support in antitrust litigation. I previously covere...*

**MORE**

*Follow me on Twitter @MMAanalytics.*

3,064 views | Nov 19, 2018, 05:00am

# CFOs And The Innovation Trajectory: Insights From Oracle OpenWorld

**Margaret Harrist** Brand Contributor
**Oracle** BRANDVOICE



**Margaret Harrist** Brand Contributor

Follow

Margaret Harrist is director of content strategy and implementation at Oracle, where she focuses on digital disruption, enterprise resource planning, big data, supply chain, Internet of Things, and SaaS. Follow her at @mharrist.