—2:15-cv-01045-RFB-PAL—

1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                        )
5                   Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                        )
6         vs.                           )  Las Vegas, Nevada
                                        )  Friday, December 14, 2018
7  ZUFFA, LLC, d/b/a Ultimate           )  2:12 p.m.
   Fighting Championship and            )
8  UFC,                                 )  MOTIONS HEARING
                                        )
9                   Defendants.         )
   ──────────────────────────────────────

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:        See Next Page

20

21

    COURT REPORTER:      Patricia L. Ganci, RMR, CRR
22                       United States District Court
                         333 Las Vegas Boulevard South, Room 1334
23                       Las Vegas, Nevada  89101

24

    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

—2:15-cv-01045-RFB-PAL—

1  APPEARANCES:
   For the Plaintiffs:

2
            **DON SPRINGMEYER, ESQ.**
3           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
            3556 E. Russell Road, 2nd Floor
4           Las Vegas, Nevada 89120
            (702)341-5200

5
            **ERIC L. CRAMER, ESQ.**
6           **MICHAEL C. DELL'ANGELO, ESQ.**
            **PATRICK F. MADDEN, ESQ.**
7           BERGER & MONTAGUE, P.C.
            1818 Market Street, Suite 3600
8           Philadelphia, Pennsylvania 19103
            (215)875-3000

9
            **RICHARD A. KOFFMAN, ESQ.**
10          **DANIEL H. SILVERMAN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
12          (202)408-4600

13          **JOSHUA P. DAVIS, ESQ.**
            **JIAMIN CHEN, ESQ.**
14          THE JOSEPH SAVERI LAW FIRM, INC.
            555 Montgomery Street, Suite 1210
15          San Francisco, California 94111
            (415)500-6800

16
   For the Defendants:
17
            **J. COLBY WILLIAMS, ESQ.**
18          CAMPBELL & WILLIAMS
            700 South 7th Street
19          Las Vegas, Nevada 89101
            (702)382-5222

20
            **WILLIAM A. ISAACSON, ESQ.**
21          **STACEY K. GRIGSBY, ESQ.**
            **NICHOLAS A. WIDNELL, ESQ.**
22          BOIES, SCHILLER & FLEXNER, LLP
            1401 New York Avenue, NW
23          Washington, DC 20015
            (202)237-2727

24
   ALSO PRESENT:
25       Hunter Campbell, Esq., Zuffa
         Riche McKnight, Esq., Endeavor

—2:15-cv-01045-RFB-PAL—

1      LAS VEGAS, NEVADA; FRIDAY, DECEMBER 14, 2018; 2:12 P.M.

2                            --oOo--

3                   P R O C E E D I N G S

4      THE COURT:  Please be seated.

5      COURTROOM ADMINISTRATOR:  Now calling Le, et al.,

6  versus Zuffa, LLC, Case Number 2:15-cv-01045-RFB-PAL.  This is

7  the time for the hearing regarding Docket 518, motion to certify

8  class, and Docket 573, motion for summary judgment.

9          Starting with counsel for plaintiffs, please note your

10  appearance for the record.

11      MR. CRAMER:  Your Honor, Eric Cramer from Berger

12  Montague for the plaintiffs.  And I'd like to take the

13  opportunity, Your Honor, if you don't mind, to introduce you to

14  my clients; four of whom are here today.  We have Nate Quarry,

15  Jon Fitch, Kung Le, and Kyle Kingsbury.

16      THE COURT:  Good afternoon.

17      MR. CRAMER:  Thank you.

18      THE COURT:  And who else is with us at counsel table?

19      MR. DAVIS:  Good afternoon, Your Honor.  Josh Davis

20  from the University of San Francisco School of Law, and I'm here

21  on behalf of the Saveri Law Firm representing plaintiffs.

22      MS. CHEN:  Good afternoon, Your Honor.  Jiamie Chen

23  also from the Saveri Law Firm on behalf of the plaintiffs.

24      MR. DELL'ANGELO:  Good afternoon, Your Honor.  Michael

25  Dell'Angelo from Berger Montague on behalf of the plaintiffs.

─2:15-cv-01045-RFB-PAL─

1          MR. KOFFMAN:  Good afternoon, Your Honor.  Richard

2   Koffman from Cohen Milstein on behalf of plaintiffs.

3          MR. SILVERMAN:  Daniel Silverman, Cohen Milstein, on

4   behalf of plaintiffs.

5          MR. MADDEN:  Good afternoon, Your Honor.  Patrick

6   Madden from Berger Montague on behalf of the plaintiffs.

7          MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

8   Springmeyer, Wolf Rifkin, for the plaintiffs.

9          THE COURT:  Good afternoon.

10          For the defendants in this case?

11          MR. ISAACSON:  Bill Isaacson, Your Honor, from Boies

12   Schiller and Flexner for the defendant.

13          MS. GRIGSBY:  Good afternoon, Your Honor.  Stacey

14   Grigsby from Boies Schiller and Flexner for the defendant.

15          MR. MCKNIGHT:  Good afternoon, Your Honor.  Riche

16   McKnight from Endeavor for the defendant.

17          MR. WIDNELL:  Nicholas Widnell of Boies Schiller

18   Flexner for the defendant.

19          MR. CAMPBELL:  Hunter Campbell, Chief Legal Officer of

20   Zuffa.

21          MR. WILLIAMS:  Good afternoon, Your Honor.  Colby

22   Williams of Campbell and Williams on behalf Zuffa, LLC.

23          THE COURT:  Good afternoon.

24          Now, that we've gotten through all of that, I first

25   want to address, there was a fairly recently-filed motion to

─2:15-cv-01045-RFB-PAL─

1  seal by the defendants.  And who's going to be addressing that?

2           MS. GRIGSBY:  I am, Your Honor.

3           THE COURT:  So I will at least first say that I would

4  expect that the motion would have been filed much sooner than it

5  was filed.  And so I'm a little concerned about the timing of it

6  as it relates to when it was filed.  That being said, why don't

7  you come up to the podium and let's talk about the motion

8  itself.

9           And Ms. -- is it -- I'm sorry.  Is it Grigsby?

10          MS. GRIGSBY:  Yes, Your Honor.

11          THE COURT:  You can raise that.  There's a little

12  button there to help.  No, on the actual podium.  There you go.

13  So you don't have to bend over.  There you go.

14          So, Ms. Grigsby, here's my concern.  At some point some

15  of this material has to become public.  I don't know that it

16  gets to be protected.  So I'm trying to understand why I would

17  grant the motion to seal in the context of the proceedings.

18          Now, what I will tell you all now so you are aware of

19  this.  The Court intends to order an evidentiary hearing in

20  which all of the experts would be required to testify at a time

21  which I -- we have set.  And we'll see if it works with you.

22  And I have a list of the experts that I want to appear to

23  testify.

24          So, Ms. Grigsby, now that you have that new

25  information, why would I seal this proceeding in the context of

—2:15-cv-01045-RFB-PAL—

1   what the law tells me about the proceedings generally being

2   public?  Some of the arguments you make actually suggest that

3   there's actually no formula to protect, right, their individual

4   determinations about how people are paid.  So I'm not sure what

5   the proprietary interest would necessarily be.  And at some

6   point in terms of review of this Court's decision, which I fully

7   expect will happen in this case, it makes sense for the record

8   to be public.

9          Now, that's not to say that I would intend to unseal

10   what has been sealed.  It would simply be that in the context of

11   the discussion of the motions and the testimony of the experts

12   that going forward that there would be no sealing of that

13   information.  Why would I seal any of that information?

14          MS. GRIGSBY:  So, Your Honor, just to clarify, I think

15   there are two separate issues.  And the filing from or from last

16   night addresses the very specific issue of what sealing or what

17   should be discussed in the procedures for this particular

18   hearing.

19          So just to start out, let's talk about what everybody

20   agrees upon.  I don't think anybody here is actually suggesting

21   that we seal the courtroom for these proceedings.  What the

22   parties were negotiating was, if there are exhibits and

23   information that right now have conditionally been lodged under

24   seal, what -- what procedures we should take before we receive a

25   ruling from the Court in order to make sure that we are

1  preserving the potential confidentiality.

2          So, for example, if plaintiffs filed an exhibit and

3  later this Court, you know, grants the motion to seal, unless

4  there are parameters in place, then the plaintiffs could merely

5  read that information into the record, including the information

6  of individuals, of athletes, Zuffa's financial information,

7  their event-level information.  So really what we're looking for

8  is parameters.

9          So the --

10          THE COURT:  So let me tell you what I think are

11  appropriate parameters.  Individual information about individual

12  fighters would seem to me to be appropriate to be protected.

13  Zuffa's financial information at this point doesn't seem to me

14  warrants protection because at some point that's going to be a

15  part of at least what I'd have to consider, not all of the

16  financial information, but the discussions as it relates to

17  event revenue, percentages of event revenue, comparisons between

18  Zuffa and other promoters, the percentage of the revenues

19  compared to other professional sports.  I don't see why any of

20  that information should be sealed.

21          MS. GRIGSBY:  Well, just for an example, like when

22  we're talking about the comparison to other promoters, our

23  suggestion was to use relative terms like higher or lower for

24  these purposes.  And one of the reasons why is that third

25  parties have produced information.  And in fact Bellator,

1   another promoter, received assurances from the Court on June

2   1st, 2017, that their information would not be disclosed

3   publicly in hearings without notice to them first.  So --

4        THE COURT:  Well, I can give them notice, right.  I'm

5   going to have the hearing, and I can tell them there's going to

6   be a hearing in January.  And if a party whose information was

7   disclosed with that representation wants to object to protect

8   it, I will give them an opportunity to be able to do that.

9        MS. GRIGSBY:  Yes, Your Honor, and we fully agree, I

10  mean.  So the stage that this is coming to you is that Zuffa had

11  no intention of using and publicly displaying information or

12  reading into the record any materials that were lodged

13  conditionally under seal.  We consulted with plaintiffs pursuant

14  to paragraph 13 of the protective order to see how they planned

15  to proceed in this hearing.  During that meet-and-confer

16  process, we were informed that plaintiffs intended to display

17  things even if they had been "Marked Highly Confidential

18  Attorney's Eyes Only" under the protective order, and I asked

19  them if they were going to provide notice.  They said they were

20  making a judgment call on certain pieces of information.

21       So that filing relates to that particular issue, the

22  fact that we cannot reach an agreement on for the purpose of

23  just this hearing, not in January, what types of guideposts we

24  should have.  So our suggestion and I think everybody agrees

25  that we will hand up hard copies as opposed to using a display.

—2:15-cv-01045-RFB-PAL—

1  It doesn't even look like it's possible to display it into the

2  galley.

3          THE COURT:  Oh, it is.  I'm not going to lower the

4  screen that's big, but I'm not saying we'll do that at

5  this because -- you know.  And, of course, I wasn't trying to

6  elicit a response, but the fact is it's possible.  And I think

7  there has to be a determination of how we go about that.

8          What I'm saying, Ms. Grigsby, is that at some point I

9  don't think it's reasonable to expect that all of this

10  information would be kept from the public record.  And so it

11  seems to me the question is at this point if there are

12  representations about what was obtained -- if there are

13  representations made about obtained information, we give people

14  notice.  If there's particular information you want protected

15  for a hearing, then you all can make a request from me, but it

16  does seem to me certainly portions of the record are going to

17  necessarily need to be public and it's a question of what that

18  is.

19          So, if we move past your current motion because as I've

20  indicated to you what we're really going to be talking about

21  today is what the contours of the argument, the hearing, will be

22  that I'm going to set based upon the motions to certify and the

23  arguments that are made in the motion for summary judgment, but

24  the motion to certify has to come first.  So if you want to go

25  ahead and make a suggestion about that moving forward, we might

—2:15-cv-01045-RFB-PAL—

1    as well move into that, and then we can move back to what the

2    parameters of the hearing will be in terms of the substance.

3    But since you're up here, you might as well tell me what you

4    would suggest for the hearing.

5        MS. GRIGSBY:  Yeah, my suggestion would be to give the

6    parties an opportunity to meet and confer and consult

7    specifically about information that is designated right now in

8    the motion for summary judgment or the motion for class

9    certification on whether we can reach an agreement as to, you

10   know, whether we're going to object to it or not.  As I said, we

11   came prepared to use information that was not lodged

12   conditionally under seal.  It was just upon learning that that

13   was the plaintiffs' intent that we wanted to bring it to your

14   attention.

15       So I think that it makes sense for the parties to go

16   back.  As you could have noticed in the briefing for the motion

17   to seal, we withdrew 25 exhibits along with our motion for

18   summary judgment that were conditionally lodged under seal and

19   we unsealed them.  So I think that it would be possible for us

20   to reach an agreement on many, many things.

21       So I think there's that, but I also think secondarily

22   as you said, and just picking up, that at least third parties

23   who have produced under some kind of agreement with plaintiffs

24   or an assurance by the Court that their information will not be

25   disclosed publicly.  All of them should receive notice and have

—2:15-cv-01045-RFB-PAL—

1  a chance to object so that we can resolve those issues as well.

2      THE COURT:  Okay.  I will take that into consideration.

3  I appreciate that, Ms. Grigsby.  Thank you.

4      MS. GRIGSBY:  Thank you, Your Honor.

5      THE COURT:  Let's move -- and I know the plaintiffs

6  might want to respond, but I want to move to the issue of the

7  hearing and the motion to certify.  So who's going to be arguing

8  the motion to certify for the defendants in this case?

9      MR. ISAACSON:  Bill Isaacson for Zuffa.

10      THE COURT:  Don't stand all the way back there,

11  Mr. Isaacson.  Why don't you come all the way up to the podium.

12      So, Mr. Isaacson, I had initially denied the request

13  for an evidentiary hearing today --

14      MR. ISAACSON:  Yes, Your Honor.

15      THE COURT:  -- because I wanted to make sure that I had

16  gone through all of the material and reviewed the recent case

17  law, but also because I think that we need to understand what

18  the parameters of any hearing would be.  I do think that given

19  the Supreme Court law as it relates to the type of analysis

20  that's required and I think that at this point I'm convinced

21  that the Court may have to make certain factual determinations

22  about expert opinions because they are at different times

23  diametrically opposed with respect to identical at times data.

24      That seems to me something that has to be resolved.

25  And in going through the reports, it seems to me it would be

2:15-cv-01045-RFB-PAL

1  difficult for me to resolve that without having the experts

2  testify and hearing their testimony, observing them, to decide

3  whether or not it's appropriate to use wage share or a

4  percentage of event revenue as a legitimate economic model or

5  not and who said that and whether or not it's appropriate to

6  make these comparisons.

7          And so in reviewing that and in reviewing the case law,

8  it seems to me that I have to make those determinations to be

9  able to resolve the motion to certify because I have to tell you

10 it seems to me, quite honestly, it comes down to the fact

11 whether or not I accept Dr. Singer's expert opinions or

12 Dr. Topel or whoever's opinions.  That's essentially a central

13 aspect to not just the motion to certify, the case basically, I

14 mean.  And it's also true that some aspects to this are somewhat

15 unique in terms of the modeling, but it's also true that this is

16 the first time that I can see there's a case in an industry like

17 this and in this type of a trajectory that is something the

18 courts have considered post Tyson and Comcast which I think

19 changed the landscape for how courts look at these types of

20 things.

21          All that is to say that it seems to me that the

22 procedure that I think would be appropriate would be to have the

23 experts and only the experts with the exception of one

24 individual, which would be Mr. Silva, because I also think

25 Mr. Silva's testimony is potentially crucial at least to be able

—2:15-cv-01045-RFB-PAL—

1   to evaluate whether or not there was in fact internal pay

2   equity.  And if there was, that's I believe potentially a

3   separate basis.

4         So let me hear, Mr. Isaacson, your comment as it

5   relates to that proceeding and what you think should be the

6   contours or not of that in the context of this case.  By my

7   estimation that could take three or four days unfortunately in

8   part because of the complex nature of some of the modeling and

9   because you have different models for different aspects of the

10  common impact, right.

11        MR. ISAACSON:  Yes.

12        THE COURT:  So it's not as if it's one model that

13  covers all of these things, right.  You have different models.

14  You have different markets.  You have different sort of null

15  markets, if you will, that apply in the context of the

16  comparisons between the fighters and ranked fighters.  And so

17  why don't you tell me what your thoughts are as it relates to

18  that procedure in this case.

19        MR. ISAACSON:  Well, essentially we agree with you,

20  Your Honor, that for purposes of determining class certification

21  and the central issue which underlies the plaintiffs' case as to

22  how they're going to prove antitrust injury common throughout

23  the class that this relies on the work of Dr. Snyder and the

24  theory of both wage share and foreclosure share.  Foreclosure --

25  right now the regression is a relationship between foreclosure

2:15-cv-01045-RFB-PAL

1  share which is --

2          THE COURT:  I'm sorry.  Did you say Snyder?

3          MR. ISAACSON:  Yes, I did, but my mistake.

4          THE COURT:  It's Singer, right?

5          MR. ISAACSON:  Yes, Singer.  Yes, I was dealing --

6          THE COURT:  I was like, Okay --

7          MR. ISAACSON:  I was dealing with Dr. Snyder last week.

8          THE COURT:  No, that's okay.

9          MR. ISAACSON:  Right, right, right.

10         THE COURT:  I've spent a fair amount of time with this

11  record.  And so I was like how could I have missed this name?

12         MR. ISAACSON:  I've begun by misspeaking.

13         THE COURT:  Okay.

14         MR. ISAACSON:  So -- but the regression which relates

15  to a foreclosure share, which while it has the name foreclosure

16  is not an actual estimate of market share or a fact at commerce,

17  it's a count of the number of 30-month contracts.  So that's one

18  end of the formula.  And the other end of the formula is to

19  create a relationship to wage share.

20         And both of those we feel are -- lack a foundation to

21  create common impact, which gets to this issue of post Comcast,

22  particularly the need to show that all or virtually all class

23  members were injured, which is under Rule 23 an issue only for

24  the Court.  It's not something that goes to the jury.  You don't

25  have a verdict form about is there -- was there common impact.

1  It's part of the predominance inquiry under Rule 23.

2          So, I mean, I think Judge Koppe when she was talking

3  about these standards talked about you have to go look at these

4  experts and decide who's the most persuasive, which is in

5  essence what happens at any trial.  And that's what we're

6  talking about.  And so we agree with that.

7          We're perfectly happy to have pay equity be part of

8  this, and if you want to hear from Mr. Silva on equity, that

9  is --

10          THE COURT:  The reason why I say that, Mr. Isaacson, is

11  because it does seem to me that's a potentially separate basis.

12  I'm not saying it's established, but let's say if he were to

13  stand up and say, "Oh, you got me.  We had this internal formula

14  we used for each fighter's compensation."  I'm not saying he

15  says that.

16          MR. ISAACSON:  Right.

17          THE COURT:  But if something like that were to occur, I

18  think you would agree that that could be very significant in the

19  context of the motion to certify, including all of the evidence.

20          MR. ISAACSON:  So I would not -- would not agree with

21  that and I don't think -- and Dr. Singer would not agree with

22  that because -- and let me explain.  He -- they advance this as

23  relevant and probative and helpful, right, but that -- that pay

24  equity analysis, which is a separate regression that Dr. Singer

25  runs, does not reach a conclusion about any injury or impact.

1  It merely shows that -- it concludes that when -- basically a

2  rising -- a rising tide raises all boats, but it doesn't show

3  any actual common impact or amount of impact.

4          So while I would agree with -- agree with you that

5  it's --

6          THE COURT:  So you're saying it wouldn't be relevant to

7  deciding whether or not there's certain factors like ranking

8  that were uniformly considered or, you know, weight?  I mean, it

9  seems to me that at a minimum what a Zuffa witness, whoever it

10 would be, would be able to say, "This is a factor we considered

11 every single time."

12         Now, you could still make the argument that there are

13 individual determinations that go into a single factor.  I'm not

14 saying you couldn't make that argument.  But it seems to me that

15 it's hard to not consider relevant a Zuffa employee's, who's

16 been involved with compensation, testimony about whether or not

17 a factor was uniformly considered.  It doesn't mean that it

18 establishes --

19         MR. ISAACSON:  Right.

20         THE COURT:  -- common impact.  But it does mean that

21 there is an issue to be addressed as relates to separating out

22 the impact of the alleged antitrust injury versus common

23 factors.

24         MR. ISAACSON:  So I am not advancing the argument that

25 it's irrelevant.

1          THE COURT:  Okay.

2          MR. ISAACSON:  And so if you want -- I was merely

3    pointing out I think what you've understood.  It doesn't get you

4    there.

5          THE COURT:  No, I don't think it gets you there either,

6    but I'm just saying -- I'm just saying in the context of the

7    expert analysis it seems to me that that -- that information is

8    the information from one -- the only that I can see lay witness

9    potentially in terms of a party representative which would

10   impact my assessment of the experts' opinions.  That's what I'm

11   saying.

12         MR. ISAACSON:  Right.

13         THE COURT:  I'm not saying that I would look at whoever

14   the different employee is and say, "Ah, based upon my

15   credibility determination for you I find that the class is

16   certified."  I'm not going to say that.  But I do think that it

17   is given what the parties have submitted a relevant part of the

18   Court's overall assessment of these models.

19         MR. ISAACSON:  I'm not advancing or this is not a

20   motion in limine on this issue.  It's not a relevance argument.

21         THE COURT:  Okay.

22         MR. ISAACSON:  I'm simply saying if foreclosure share

23   doesn't survive or wage share doesn't survive, the pay equity

24   argument becomes -- it doesn't get you there.

25         Now, I will -- I'll have to say Mr. Silva has one thing

-2:15-cv-01045-RFB-PAL-

1  in common with the experts.  He is a third party.  He is an

2  ex-employee.  So we will have to ask him to do this and talk to

3  him about his schedule.

4          THE COURT:  Well, we could issue a subpoena, right.  I

5  could authorize that.

6          MR. ISAACSON:  Right.  He is --

7          THE COURT:  That could potentially address that.

8          MR. ISAACSON:  He doesn't live around here, but -- but

9  I think -- I think we will be able to talk to him cooperatively,

10 but I have the obligation to say he's not a current employee.

11         THE COURT:  No, that he's not in your control.  That's

12 fine.  And we can consider that in the context of the hearing

13 schedule because obviously this is not a jury trial.  This is

14 the Court's time.

15         MR. ISAACSON:  Right.

16         THE COURT:  And so we can work around that with

17 scheduling.

18         MR. ISAACSON:  Right.

19         THE COURT:  So what I had envisioned then would be

20 again the -- let me go through, and I'll get your feedback on

21 this, the witnesses that I have on my list.  Give me a second

22 here.

23         Is there anyone else other than the experts,

24 Mr. Isaacson, you think that the Court should hear from in

25 relation to this?  Because, as I said, I do think given what's

1  been advanced and given the nature of the expert modeling, but

2  also as I said thinking about Comcast and what I'm required and

3  can resolve, it seems really it's a standard related to the

4  Court deciding issues regarding expert opinions and what can and

5  cannot be sort of relied upon and accepted and me granting the

6  motion to certify or denying the motion to certify.

7        MR. ISAACSON:  Yes.  Yeah, we -- when we asked for a

8  hearing, we thought we'd proposed a hearing of experts.  So in

9  the absence -- in the absence of hearing something from the

10  plaintiffs about this that we need to respond to, I agree with

11  you.

12        THE COURT:  So here are the witnesses that I think

13  would need to be called or appear:  Dr. Hal Singer,

14  Dr. Zimbalist, Professor Allan Manning, Joseph Silva, Roger

15  Blair, Robert Topel, and Paul I think -- is it Oyer?  Over?

16        MR. ISAACSON:  Oyer, yes.  I will say to you that the

17  Blair/Zimbalist pairing has not been advanced to show common

18  injury.  I'm not going to suggest that they don't have some

19  potentially relevant things to say, but they have not been

20  advanced to try and support class certification on the issue of

21  common impact or injury.

22        THE COURT:  Well, I thought they'd been just advanced

23  to talk about what are appropriate comparisons with respect to

24  other sports and as it relates to the idea of a percentage of

25  the revenue and an event and whether or not that's appropriate.

—2:15-cv-01045-RFB-PAL—

1  Maybe I'm wrong, but that's --

2          MR. ISAACSON:  They do --

3          THE COURT:  I thought Dr. Zimbalist actually talked

4  explicitly about that.

5          MR. ISAACSON:  Yes, yes.  But only -- he was very

6  careful to limit that analysis to a damages calculation and has

7  no opinions on the issue of common impact.

8          THE COURT:  Well, I don't --

9          MR. ISAACSON:  Again -- and, again, I'm not telling you

10 that it's entirely irrelevant, so ...

11         THE COURT:  But I want to make sure, though, what

12 you're not going to then argue to me is, "Well, they don't have

13 -- even if you have common impact, they don't have a way of

14 assessing damages across the class that can actually identify

15 and address injury."  Because if that is the case, then I'm not

16 sure how damage is not going to be a part of it.  Because the

17 way that I read Comcast, that can also potentially --

18         MR. ISAACSON:  Yes.

19         THE COURT:  -- find in the context of whether or not

20 the plaintiffs can adequately come up with a formula that --

21         MR. ISAACSON:  Right.

22         THE COURT:  -- that can distinguish individual factors

23 from antitrust injury.  And so --

24         MR. ISAACSON:  I agree with you.

25         THE COURT:  -- how does that comparison not come into

—2:15-cv-01045-RFB-PAL—

1  play with respect to that?

2          MR. ISAACSON:  I agree with you with respect to that

3  issue on the damages.

4          THE COURT:  Because I understood that to be part of

5  your argument.

6          MR. ISAACSON:  Yes.  Right.

7          THE COURT:  I understand part of your argument to be in

8  addition to common injury they can determine damages

9  appropriately in a manner that's acceptable in terms of being

10  able to distinguish between, quote, unquote, procompetitive

11  revenue and antitrust injury-related revenue.

12          MR. ISAACSON:  Right.  And in some sense you could

13  segment the hearing between those groups of experts on injury

14  and damages --

15          THE COURT:  Okay.

16          MR. ISAACSON:  -- as it relates to class.

17          THE COURT:  Okay.

18          MR. ISAACSON:  And I think that would be an appropriate

19  way to structure it.

20          THE COURT:  Okay.  I mean, because I think in looking

21  at the modeling they seem to be related.

22          MR. ISAACSON:  Yes.

23          THE COURT:  And so it does seem to me that it's not

24  always clear that you can simply bifurcate it, but to go back to

25  the initial point, the reason why I put Dr. Zimbalist and

—2:15-cv-01045-RFB-PAL—

1  Professor Blair on the list is to deal with the issue of sort of

2  the appropriateness of some of these variables or terms because

3  I think that's very much a part of being able to determine what

4  the nature of the antitrust injury is or is not.

5          MR. ISAACSON:  All right.  Well, then we would very

6  much like -- appreciate the opportunity to give you that

7  information.

8          THE COURT:  Okay.  Because that's what you've

9  essentially presented in your submissions.

10          MR. ISAACSON:  Yes.

11          THE COURT:  Okay.

12          Is there anything else, Mr. Isaacson, that you think we

13  would need to work out in the context of this proceeding?

14  Because what I would anticipate is that we would have

15  essentially sort of like a prehearing conference to go over

16  issues that I anticipate are going to come up in this litigation

17  about what sort of exhibits can be used, what's the nature of

18  the inquiry.  I don't want this to be a full trial of this case.

19  On the other hand, I fully recognize that much of the case and

20  the argument revolves around these experts' opinions.

21          MR. ISAACSON:  Yes.

22          THE COURT:  And so in this case I think it's

23  unavoidable that you're going to have in the resolution of the

24  experts' opinions' reliability significant overlap with the

25  merits because that's the nature of this type of an antitrust

—2:15-cv-01045-RFB-PAL—

1   case it seems to me.

2           MR. ISAACSON:  I think at this point we would just be

3   looking to -- for your guidance as to your preference as whether

4   you want to go through the traditional format of the plaintiffs

5   put on their experts and then there's cross-examination and we

6   put on our experts.  It's also possible that -- we've mentioned

7   procedures where the experts are there at the same time so the

8   Court can address them both at the same time.  Sometimes that's

9   called hot tubbing.  And there's also the possibility you could

10  go back and forth between certain experts.

11          THE COURT:  So what I would expect is a back and forth.

12  There's certain things in the opinions and the submissions which

13  seem to me just to be essentially very different conclusions

14  even about similar data or similar variables.  And so I would

15  anticipate that I would be asking them, "Why given this set of

16  information you reached this conclusion," and then bring the

17  other expert up.  I mean, again, this would probably spend --

18  excuse me.  Probably most of the time would be spent with

19  Dr. Singer --

20          MR. ISAACSON:  Yes.

21          THE COURT:  -- and Professor Topel.

22          MR. ISAACSON:  And very little time with Dr. Snyder.

23          THE COURT:  So they would be the marquee experts,

24  right.  If we were going to have an event, they would be likely,

25  right, the marquee -- the main event.

1          MR. ISAACSON:  Right.

2          THE COURT:  And so I think that we would probably start

3   with them and then bring in, in exact opposite of actually a

4   bout, bring in the sort of undercard later, right.  But I think

5   that if we start with Dr. Singer and Professor Topel and then we

6   move on from there.  Because it does seem to me that, again, if

7   I don't accept some of the modeling from Dr. Singer, then this

8   case is basically over.

9          MR. ISAACSON:  Right.

10         THE COURT:  But if I do, there are other implications.

11  Because we haven't actually talked about and I've actually not

12  seen this come up since Comcast what are the implications of my

13  factual findings about expert opinion in a later proceeding.

14  Now, we don't have to discuss that, but that's something that I

15  think we should think about because if I make a determination,

16  for example, and I'm not saying that I would, that this is an

17  appropriate modeling, does that foreclose the defendants from

18  raising that at any point later on in this case?

19          I don't know that there has been a case that I've seen,

20  Mr. Isaacson, that has since Comcast gone through the level of

21  analysis I think Comcast suggests that has to then deal with the

22  issue of what are the implications of those findings as relates

23  to potentially sort of law or findings for the case.  Because

24  I -- that's a separate issue, but I wanted to highlight that for

25  you all --

2:15-cv-01045-RFB-PAL

1          MR. ISAACSON:  Right.

2          THE COURT:  -- because it's important for you all in

3   terms of preparation for the hearing to potentially be prepared

4   for that as an issue and for us to resolve it or not, I mean.

5   So if either side expects that if there are findings and the

6   case potentially proceeds that those findings could be binding

7   as relates to certain aspects of the case, we should resolve

8   that, I believe, ahead of time.

9          MR. ISAACSON:  Right.

10          THE COURT:  So that if you feel there is certain

11   information that needs to be presented at the hearing because of

12   the nature of how those findings would apply to the rest of the

13   case, then you need to let me know that.

14          MR. ISAACSON:  All right.  I think that raises a couple

15   of issues.  One is the Daubert motions are sort of set aside

16   without prejudice and are not live at this point.  And it would

17   make sense if they became live for purposes of this hearing

18   without any additional briefing, just that the previous -- just

19   the previous briefs, which would allow you to then decide, for

20   example, whether they've met the Daubert standard, but not the

21   Rule 23 standard or they didn't even make the Daubert standard

22   because that would have an effect on the question you're

23   raising.

24          And then, second, if you find that they don't meet the

25   Rule 23 standard for common impact, then the issue just becomes

—2:15-cv-01045-RFB-PAL—

1  then there's no class.

2      THE COURT:  There's no case really at that point.

3      MR. ISAACSON:  Well, there's -- there's technically

4  individual plaintiffs who have to decide whether to present

5  individual damages claims.

6      THE COURT:  Right, I mean, there's no class -- there's

7  no class case.

8      MR. ISAACSON:  Right, it's just about those

9  individuals.

10      THE COURT:  Right, right.

11      MR. ISAACSON:  And so the question would --

12      THE COURT:  I should clarify --

13      MR. ISAACSON:  If they try to use those models to

14  demonstrate those damages, then the issue that you're discussing

15  becomes a live one.

16      THE COURT:  Right.  I understand what you're saying.

17      But I meant in terms of there to be no case, there's no

18  class --

19      MR. ISAACSON:  Correct.

20      THE COURT:  -- action case that would proceed, but

21  there's still obviously the individual plaintiffs if I were to

22  decide that.  But, again, we're getting a little bit ahead of

23  ourselves.

24      MR. ISAACSON:  Yes.

25      THE COURT:  But I did want to again highlight the issue

1  of the implications of the finding if the case were to move

2  forward because I think then the parties should at least have an

3  eye towards that possibility.  And that way if they want to be

4  able to make a record that they think is appropriate, they can

5  do that at the hearing.

6         And I agree that we have -- we have to address the

7  issue of the Daubert motions, but it's not clear to me, because

8  I don't think it's been fully clarified, what the actual

9  standard is.  And I'm going to ask for briefing on this as it

10  relates to this type of an expert evidentiary hearing post

11  Comcast.  It seems to me that it's this amalgamation of a

12  Daubert standard, but also there are other class-specific issues

13  that would relate to expert testimony.

14         And so I'm not sure if the role is to essentially, as

15  you say, revive the Daubert motions, but I certainly thing we'd

16  have to -- and I'm going to ask the parties for briefing on

17  exactly what the standard is for this type of a hearing before

18  we have the hearing and alert the parties to what I believe is

19  the appropriate standard before we have the hearing.  Because

20  I'm again not sure that any hearing like this has been held,

21  again, as relates to antitrust post Comcast where we're going to

22  have these series of experts on this type of an issue.

23         But, again, I could be wrong, but I don't know that any

24  Circuit or the Supreme Court has actually laid out what the

25  standard is or burdens or anything like that.  And so I think

 1  we're going to have to have a little bit of a discussion about

 2  that before the hearing proceeds, but --

 3          MR. ISAACSON:  I think that --

 4          THE COURT:  -- those are the issues that I anticipate.

 5          MR. ISAACSON:  We're happy to do that, Your Honor.

 6          THE COURT:  Okay.  All right then.  Thank you,

 7  Mr. Isaacson.

 8          MR. ISAACSON:  Thank you, Your Honor.

 9          THE COURT:  Mr. -- who is this?  Mr. Cramer, are

10  you ...

11          MR. CRAMER:  Your Honor, if you don't mind, we're going

12  to tag-team, Mr. Davis and Mr. Cramer.  Mr. Davis will handle,

13  if you don't mind, some of the standard issues that were just

14  addressed.  And I'm going to talk more about the hearing itself,

15  if that's okay.

16          THE COURT:  Okay.  Well, we're not going to actually

17  argue the standard now.  I'm simply going to say that I'm going

18  to receive briefing on the standard and then we'll address it at

19  the time of the hearing.

20          MR. CRAMER:  That's fine.  That's fine.  I think he

21  just wanted to respond to some of the -- because I think -- I

22  think there have been Supreme Court cases post Comcast that have

23  addressed this issue, and he just wanted -- Mr. Davis wanted to

24  address that issue.

25          MR. DAVIS:  All I wanted to say so the concrete does

1  not begin to set is that Tyson Foods --

2         THE COURT:  I'm aware of how that --

3         MR. DAVIS:  -- obviously is post Comcast.  And I think

4  it's pretty clear relying on Amgen that the only issue is not

5  whether in fact plaintiffs prove common impact, but whether they

6  offer a method that's capable.  And if that -- and that that can

7  go to the jury.  And if it rises and falls together, as opposing

8  counsel said is true in regard to wage share and foreclosure

9  share, then it's up to the jury.  So there's no daylight at

10  least is our position.  And I know we're not arguing it now and

11  we don't need to come to resolution, but I just wanted to not

12  have it sort of sit.

13         In our opinion Tyson Foods is quite clear that in

14  circumstances like those opposing counsel described there is no

15  daylight between the Daubert standard and the Rule 23 standard.

16  If --

17         THE COURT:  Well, here's what I --

18         MR. DAVIS:  I just wanted to make sure that we

19  weren't --

20         THE COURT:  Well, I'm not saying there's daylight.

21         MR. DAVIS:  Yes.

22         THE COURT:  What I'm saying is that the Daubert

23  standard in the context of modeling that has to satisfy a Rule

24  23 standard is different by nature of what you would have to

25  prove as it relates to the nature of the class that you're

1  seeking to certify.  So it's not to say that Daubert doesn't

2  apply.  It's to say that if you're applying Daubert and in the

3  context of expert opinion trying to establish predominance in a

4  case and common impact, that's not simply are you relying upon

5  sort of accepted methodology like regression analysis, right.  I

6  certainly read Comcast and Tyson to say that there has to be

7  some further inquiry as it relates to the exact nature of the

8  inquiries that the Court has to go through for class

9  certification.

10           MR. DAVIS:  Right.

11           THE COURT:  And so I'm not saying --

12           MR. DAVIS:  Right.

13           THE COURT:  -- that it's a new standard.  What I'm

14  saying is because of the uniqueness of the inquiry --

15           MR. DAVIS:  Sure.

16           THE COURT:  -- regarding sort of predominance, right,

17  in particular that that does I think impact how one applies, in

18  this case myself, the Daubert standard.

19           MR. DAVIS:  Right.  And all I wanted to do is just

20  preserve --

21           THE COURT:  Right.  So I'm not --

22           MR. DAVIS:  -- and again not have this -- have the

23  cement begin to set on this is because our view is it's simpler

24  than that is for common issues -- if plaintiffs establish common

25  impact, they in antitrust cases virtually always win on

1   predominance and should.  We can explain, you know, at the

2   appropriate time why we think that's true here as well.  And

3   that in order to meet that standard, all that actually has to

4   happen is plaintiffs have to say, "Here's our method of proving

5   impact.  It is in fact common to the class."  And if accepted by

6   the jury that this is -- ultimately, that then it would

7   establish impact in a common way, widespread impact using a

8   common method.  And all the Court under Tyson Foods needs to do

9   then at that point is say, "Hey, that's a good enough method

10  that it is appropriate to take to the jury because it will rise

11  and fall together."

12          THE COURT:  Okay.  What did you understand me to be

13  saying that's different than that?

14          MR. DAVIS:  I'm not sure.  It may be the same to be

15  honest, Your Honor, and so --

16          THE COURT:  I'm trying to understand.

17          MR. DAVIS:  Yeah.

18          THE COURT:  I appreciate you're making your record.  I

19  don't know that I said anything --

20          MR. DAVIS:  I don't know about making a record.  I was

21  hoping to clarify, but perhaps I didn't.

22          THE COURT:  But to clarify, what did I say that would

23  suggest to you that somehow I thought that it was a higher

24  standard?  I'm not saying that.  I'm saying the combination of

25  the Daubert standards with a predominance inquiry results in a

—2:15-cv-01045-RFB-PAL—

1   unique type of inquiry as it relates to the hearing that I

2   anticipate.  I don't think that Daubert answers the types of

3   questions that need to be answered to decide whether or not a

4   particular model establishes common impact or not, but they're

5   related.

6            MR. DAVIS:  Okay.

7            THE COURT:  Okay?

8            MR. CRAMER:  All right.  Well ...

9            THE COURT:  All right.  I just wanted to make sure I

10   wasn't -- if there was some --

11            MR. DAVIS:  Thank you, Your Honor.

12            THE COURT:  -- confusion about that.

13            Sure.

14            MR. CRAMER:  Your Honor, I wanted to address the formal

15   issue of the hearing.  I think that I will agree with

16   Mr. Isaacson that the Zimbalist/Blair pairing while important

17   for establishing one method of damages -- Zimbalist does use

18   wage share and compares the wage share of the UFC to other

19   sports and Blair -- Blair opposes that method, but I do think

20   that the main action is really between Singer and Topel on the

21   common impact question.  And, thus, it might be -- it might be

22   wise to have that as a separate hearing.  And then if Your Honor

23   thinks "I didn't hear enough," maybe we need to bring more

24   experts in.  It might be wise to have the Singer/Topel pairing

25   at a hearing, maybe also bring in Oyer and Manning who are two

———2:15-cv-01045-RFB-PAL———

1  sides of the wage share question.

2          But I would say that it is -- it would take a long time

3  to have cross-examination and direct examination for six experts

4  and one lay witness.  And, perhaps, it would be better to focus

5  the hearing on Singer and Topel, and then if Your Honor finds

6  that you need more information, that this isn't enough for Your

7  Honor to establish common impact, then maybe we bring additional

8  experts in for another hearing.

9          THE COURT:  The problem with that, Mr. Cramer, is that

10  it takes -- it takes more time for me to do that than to just

11  have them all appear.

12          MR. CRAMER:  Okay.

13          THE COURT:  In part because of the scheduling of my

14  cases and the docket particularly in this district, right, than

15  bringing you back, you know, weeks later and me having to go

16  through the testimony, then make preliminary findings about

17  what's been satisfied, but where there are somehow lacunae in

18  the thing -- in the testimony, that to me takes longer.

19          What I would anticipate is that there are very specific

20  arguments that the defendants make about the inappropriateness

21  of the plaintiffs' modeling that come from the various experts.

22  And that's what I anticipate the testimony to focus on.

23          I don't anticipate this is going to be a full direct

24  and cross of these experts.  That is not the purpose of the

25  hearing.  Now, I will give more latitude as relates to

1  Dr. Singer and -- is it Topel?  Am I saying that wrong?

2  "Topal"?

3            MR. ISAACSON:  You were right the first time.

4            THE COURT:  Topel?

5            MR. ISAACSON:  "Topal."

6            THE COURT:  So Professor Topel.  I think that obviously

7  I'm going to give the parties latitude as it relates to those

8  experts laying out their views and cross-examining of them, but

9  I have a fairly good idea because the parties have been fairly

10  explicit about ways in which these experts disagree.  What's

11  likely to happen is I have a list of questions.  I'm going to

12  have even more questions by that time, which I'm just going to

13  ask them a series of questions about the regression models or

14  other models and then bring them up back and forth and have them

15  answer questions.

16            And so to that extent I think it will not take as much

17  time as you all probably anticipate that it will take.  And at

18  that point also I expect there's going to be minimal briefing

19  because it seems to me some of this is just me trying to

20  understand why are there it seems to me very different and

21  almost opposing views on what appear to be similar methods and

22  similar modeling and data and outcomes.  And so that's what I

23  anticipate in this case.

24            MR. CRAMER:  Okay.  Okay, Your Honor.

25            THE COURT:  But to go back to your initial comment,

1    certainly we can start with the two main experts.  And, perhaps,

2    there can be some lag time between when they would testify and

3    the other experts would testify such that we can all absorb

4    what's been said to focus the remaining experts' testimony.  I'm

5    fine with that since this is really about when I schedule it,

6    but I don't know that it makes sense for me to go through a full

7    transcript and make explicit written findings for Dr. Singer and

8    Professor Topel's testimony and then come back and do the

9    hearing again as relates to other experts.

10             MR. CRAMER:  Okay.  I understand, Your Honor.  Let me

11   suggest for at least the Singer/Topel pairing, I've done two of

12   these hearings recently in an antitrust context with experts.

13   They don't often happen in the Ninth Circuit, but on the East

14   Coast they happen a lot.  And I think the best way to do it is

15   to allow the plaintiffs' expert, Dr. Singer, to give a direct

16   exam to explain what he did and how he did it.  And then to have

17   cross-examination both by Your Honor, Your Honor can ask

18   questions whenever he would like, and cross-examination from

19   Zuffa.  And then to bring Dr. Singer back to allow him to

20   rebut -- I'm sorry.

21             So we finish with Dr. Singer, direct and cross.  And

22   then we bring up Dr. Topel and he gives a direct and there's

23   cross.  And then we allow Dr. Singer to come back for a short

24   rebuttal to respond to anything that Dr. Topel has said that may

25   require some response.  Your Honor may have further questions

1  after hearing from Dr. Topel.

2          So I think with respect to that pairing sort of a full

3  direct, cross, and then redirect -- I'm sorry.  Direct of Singer

4  then -- and cross of Singer and redirect of Singer, direct of

5  Topel, cross of Topel, redirect of Topel, and then bring Singer

6  back for a short rebuttal I think would be right.

7          With respect to the other experts, we may not need to

8  do that full back and forth because I think the real regression

9  modeling here is Dr. Singer's regression modeling and Topel's

10  response to that.  Dr. Zimbalist doesn't run a regression.

11          THE COURT:  Right.

12          MR. CRAMER:  Dr. Blair doesn't run a regression.

13  Professor Manning from London really talks about the wage share

14  issue.  Dr. Oyer talks about the wage share issue in a ...

15          THE COURT:  Well, here's why I think their information

16  -- maybe their testimony would be helpful.  If the question is

17  whether or not -- not just whether or not you properly conducted

18  the regression analysis, but also the viability, right, of the

19  particular variable or factor that you used, those witnesses are

20  directly relevant to that.

21          MR. CRAMER:  Oh, Your Honor, we --

22          THE COURT:  Some of the attack from the defendants on

23  the modeling relates to the appropriateness of particular

24  variables or interactions apart from how the actual regression

25  was done.  So, you know, there's some testimony that says,

2:15-cv-01045-RFB-PAL

1  "Well, okay, we're not saying that there were some errors in the

2  regression analysis itself in terms of statistical errors.

3  We're saying that this variable or factor doesn't capture

4  antitrust injury versus procompetitive" --

5          MR. CRAMER:  You're exactly right.

6          THE COURT:  I don't know how --

7          MR. CRAMER:  You're exactly right.

8          THE COURT:  -- I don't decide those issues in terms of

9  the credibility of the appropriateness of the factor in

10  conjunction with deciding whether or not the model's

11  appropriately applied.

12          MR. CRAMER:  Your Honor is exactly right on the wage

13  share question about whether wage share as a variable to be used

14  in a regression in a case like this is appropriate.  Dr. Manning

15  and Dr. Oyer are -- have relevant testimony, right.  Dr. Manning

16  both sides believe is authoritative.  He says yes.  Dr. Oyer

17  said no.  Right.  So they both have a different opposing view on

18  wage share.  So I agree that that pairing I think is more

19  directly relevant to the central issue than the pairing of Blair

20  and Zimbalist.  And so maybe --

21          THE COURT:  Well, I think that's true, but I also think

22  that defendants are not going to give up on any -- unless they

23  tell me now, any attacks on any of these variables, and some of

24  them involve some of the things that Dr. Blair said.  And so

25  unless -- until I hear from them saying that they're not going

1  to use any of Dr. Blair's comments or testimony, which I

2  don't -- I haven't heard them say yet, I think they should at

3  least be teed up to potentially testify.

4        And it may be as you both are saying that they're the

5  last grouping.  That's fine.  I'm happy to stagger the

6  respective witnesses, but it does seem to me that they need to

7  at least be available for testimony.

8        MR. CRAMER:  All right, Your Honor.  And let me just

9  address Mr. Silva.  I deposed him for I think it was 10 hours on

10 the record.  So we have a long transcript of that.  He is a

11 third party who lives in Virginia, I believe.

12       And there is other evidence that the plaintiffs have of

13 internal equity, this concept of internal equity.  Joe Silva is

14 an important witness and his documents are important to the

15 internal equity question.

16       THE COURT:  You think there's a more important witness

17 on internal equity than Mr. Silva?  In terms of you -- the

18 plaintiffs make reference to documentary and testimonial

19 evidence to establish internal equity.  It seems to me

20 Mr. Silva's name just keeps coming up in that section.

21       MR. CRAMER:  You're right.

22       THE COURT:  Right?  So --

23       MR. CRAMER:  You're right that Mr. Silva is an

24 important witness, but my -- if Your Honor wants Mr. Silva,

25 Mr. Silva will come here.  But if the third -- if Zuffa can

—2:15-cv-01045-RFB-PAL—

1    encourage him or Your Honor can encourage him to come here, he

2    will be here and we will talk to him.

3              THE COURT:  Right.

4              MR. CRAMER:  My point is simply that his testimony on

5    this subject is locked in.  And we'd be happy to redo it here,

6    but it may be one way to cut a corner.  If Your Honor is not

7    interested in cutting that particular corner, then we'll bring

8    and talk to Mr. Silva.

9              THE COURT:  I am not.  And again part of this,

10   Mr. Cramer, has to deal with again reading the combination of

11   these cases.  Again, as I look at Comcast and Tyson, they seem

12   to set a slightly different bar as it relates to how extensively

13   involved they want District Courts to be at the motion to

14   certify stage.  And what I wouldn't want to have happen is to

15   have a decision that I rendered either denying or granting the

16   motion somehow be reversed because there was just an area of the

17   testimony that we did not include in the hearing.  That's my

18   concern is this is a slightly moving target as it relates to the

19   evolving standard here because I do think it's evolving.  And I

20   certainly wouldn't want there to be aspects to any decision that

21   I rendered that were not explored adequately in the context of

22   providing the basis for my decision.

23             MR. CRAMER:  We understand, Your Honor.

24             I guess the only -- the last thing I would say about

25   the -- the hearing is with respect to the standard I guess what

—2:15-cv-01045-RFB-PAL—

 1  I would say is that I think it's pretty clear and I think Your

 2  Honor said this, but I just want to make sure that we're all on

 3  the same page, plaintiffs do not have to win, right.  We don't

 4  have to show we're right.

 5          THE COURT:  Well, I --

 6          MR. CRAMER:  We just have to show that our method is

 7  reliable.  So the question isn't whether Dr. Singer is right;

 8  it's whether his method is reliable enough under Daubert to go

 9  to the jury.

10          THE COURT:  No, I understand that, but what I'm saying

11  is I do think in the proceeding that I'm envisioning there would

12  be certain arguments that would be foreclosed by the defendants

13  if I were to find that the plaintiffs prevailed at this stage of

14  the hearing.

15          MR. CRAMER:  I think you're right.  I think you're

16  right.

17          THE COURT:  And the question is what are those, right.

18  What is -- because there is a mix here of methodological, right,

19  and what I like to call sort of substantive sort of relevant

20  modeling.  In other words, there is a question about whether you

21  are accurately interpreting the results versus whether or not

22  the variables that you've selected are appropriate to capture

23  what you say they're supposed to capture.

24          And I think the implications of my ruling on those

25  different types of factors carry over to the case if it proceeds

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1  in a class.  If it doesn't, obviously it doesn't matter.  What I

2  didn't want to have happen is for the parties not to consider

3  that in the context of the proceeding and if we're -- all of us

4  to be thinking about what those implications are.

5      It doesn't mean, Mr. Cramer, that I find that you have

6  to prove your case at this point in time, that you have to

7  prove, because I don't think that's the standard, that this is

8  the best model for doing this.  I don't think that that's

9  required.

10     I do think you have to demonstrate that it's an

11  adequate and reliable model, right, to argue to the jury that

12  it -- that it's not so flawed that in fact it cannot reasonably

13  argue that it purports to capture what it captures.  I think

14  that's what you would have to be able to demonstrate.

15     MR. CRAMER:  We agree with that.  We agree with that.

16     THE COURT:  Right.  But I don't think you have to prove

17  it, but I do think, though, ironically that some of the nature

18  of the determinations I make are dichotomous, right, in terms of

19  this particular variable percentage of event revenue is

20  appropriate or not.  That's not a -- I can't I think when I

21  have -- when hearing the testimony, I can't say, "Well, maybe."

22  You know, partly this variable I think that there are some

23  decisions that are dichotomous, and that may as a result of them

24  being dichotomous regarding variables that are acceptable or not

25  or whether or not a variable captures antitrust injury or not

1  that will have impact.

2          MR. CRAMER:  Fair enough, Your Honor.  Let me just

3  address one other thing.  A hearing with seven witnesses takes a

4  lot of time to prepare for.  It's also a logistical issue with

5  getting everybody on the same page, including Dr. Manning from

6  London.  And so January may be at least for the plaintiffs --

7          THE COURT:  Okay.

8          MR. CRAMER:  -- too soon for us.  Perhaps, what should

9  happen is the parties can meet and confer and --

10          THE COURT:  Well, if you want to meet and confer,

11  that's fine.  I wanted -- because, you know, the case is moving.

12  It's moving -- it's a big case.  So it's not going to move as

13  quick as other cases, but I wanted to give you the option of

14  trying to move this as expeditiously as possible.  At the same

15  point if you think logistically it's more efficient for all of

16  you to be able to coordinate your schedules along with these

17  witnesses, that's fine.  I'm not going to simply order a time

18  and require everyone to be there for that particular week.  And

19  so if you want to coordinate, try first to come up with a

20  schedule, that's fine.  I'm happy to do that.

21          What I would suggest is you come up with a schedule

22  that has pairings of the experts that's staggered, okay, that

23  starts with Dr. Singer and Dr. Topel and then it moves on from

24  there, right.  So that's what I would suggest that you would

25  have it set, I mean, for a particular week and then maybe we'd

2:15-cv-01045-RFB-PAL

1   have the next week -- because I don't want to set them too far

2   apart.  So I think, you know, one week and then one other

3   pairing the next week and then a third pairing the following

4   week would make the most sense.  That's easier for me to fit

5   into my schedule to find a day in a particular month, and it may

6   be easier for you all to do it that way as well.

7           I don't think it's going to take a day.  I think

8   Dr. Singer and Dr. Topel are going to take two, three days, but

9   just so we're clear.

10          MR. CRAMER:  Okay.

11          THE COURT:  I think they're going to take -- I think I

12  would expect that they will take a day and a half each.  So you

13  should allow for three days for that pairing, and then we'll

14  deal with the others.  I think the others would probably take a

15  day and a half combined at most, and we should allow for that.

16  And I think the last pairing, Dr. Zimbalist and ...

17          MR. CRAMER:  And Blair.

18          THE COURT:  And Blair is maybe a half day, I mean.

19  Well, we'll say a day because you all are traveling from all of

20  these different locations, a day anyway, but a half day to a

21  day.

22          MR. CRAMER:  Fair enough, Your Honor.

23          THE COURT:  Here's what I will tell you, though,

24  Mr. Cramer.  I have real questions about the identity class and

25  its viability in this case.  I would strongly encourage you to

2:15-cv-01045-RFB-PAL

1  the extent that you can highlight issues with that class you do

2  so at the hearing because at this point I'm not sure that I

3  think that that class is going to make it.  And I just wanted to

4  be honest with you because it seems to me that the focus of

5  Dr. Singer's results, and maybe I've missed something, has been

6  primarily on the bout class and many of the variables relate to

7  the bout class and sort of the event revenue.

8        So I think in relation to what -- to prepare for the

9  hearing I would certainly have Dr. Singer be prepared for that,

10  be prepared to talk about the issue of the interaction of

11  monopolization and sort of the monopsonistic conduct here and

12  whether or not there's any relation there and whether or not any

13  of his conduct is related to that.  Those are all fair

14  questions, but I wanted to really stress to you that I'm not

15  sure that I find that there's going to be enough at least from

16  what I've seen for the identity class to be certified.

17        And if you think there's somehow parts of Dr. Singer's

18  report that have not been sufficiently highlighted in your

19  briefs, I'm not saying you get to redo the report, but certainly

20  you can use the hearing to distinguish between evidence related

21  to the bout class and the identity class because I'm not sure

22  you can simply say, "Well, this evidence for the bout class

23  applies equally to the identity class," because I have to tell

24  you I'm not persuaded by that.  So I will allow you an

25  opportunity to be able to explore that a little bit more with

—2:15-cv-01045-RFB-PAL—

1   Dr. Singer.

2         And, Mr. Isaacson, I'm not sure if you're going to be

3   doing the cross, but I will allow the defendants some latitude

4   on that; because as it relates to the identity class, I have

5   some real concerns about whether or not the modeling captures

6   the alleged antitrust injury or whether or not there's

7   appropriate markets that are defined in that context.  You don't

8   have to respond to that, but --

9         MR. CRAMER:  We hope to address your questions at the

10  hearing, Your Honor.

11        THE COURT:  Okay.  But I wanted to highlight -- to

12  highlight that for you because I think that's something that

13  you're going to need to --

14        MR. CRAMER:  Let me ask right now while we're talking

15  about issues, are there other issues that Your Honor wants us to

16  -- other than obviously the ones you've pointed out, the wage

17  share and internal equity, are there other issues that Your

18  Honor would like us to focus on at this hearing in particular?

19        MR. CRAMER:  No, I think that the parties have

20  adequately identified through the back and forth the issues that

21  need to be identified in the context, particularly of Dr. Singer

22  and Professor Topel's expert testimony.  That there's obviously

23  questions about modeling for common impact and the impact across

24  the class as well as impact for each of the members of the

25  class.

1          I don't know and I will give some more thought to how

2   much guidance I want to provide as relates to that.  What I do

3   think we should do is set a hearing prior to the set of hearings

4   so that we can identify what -- clearly what the standards are,

5   what the parameters of the hearing or hearings are going to be.

6   And so you all, as you meet and confer, should come up with a

7   schedule for that hearing and included in that should be a

8   schedule for briefing.

9          And the issues that I do want to have briefed are the

10  appropriate standard for the Court to decide whether or not in

11  the context of a motion to certify the model can serve as a

12  sufficient basis for this Court to certify the class and what

13  specific findings the Court would have to make for the class to

14  be certified based upon this modeling.

15          And I say that for both sides, but I want to emphasize

16  this for you, Mr. Isaacson, which is what I don't want to have

17  happen is if there's an argument you're going to raise on a

18  particular issue of certification because then we're going to

19  argue certification after that that you -- that you then say,

20  "Well, they didn't present evidence on this particular factor,

21  but we didn't really ask about it at the hearing either."

22  You'll be foreclosed from presenting that type of an argument.

23  I'm not saying you would do that, but I have sometimes counsel

24  can get caught up in the hearing and not recognize that they

25  haven't asked certain types of questions.

1          Now, it's not to say that you are waiving arguments

2    that you've raised in your submissions and that if you don't ask

3    them again at the hearing you have to ask them.  But if there's

4    a particular argument that you feel is appropriate to raise and

5    I say this particularly in the context of there is this

6    procompetitive portion of this model that they simply did not

7    account for, right, and you've raised that.  I think that's

8    important for you to explore that with the witness and not

9    simply not question Dr. Singer about that and then say, "Well,

10   he didn't establish that."

11         That's the sort of thing that I think wouldn't be

12   helpful and I wouldn't look favorably upon.  I'm not saying you

13   would do that.  Because I do think one of the issues that,

14   again, if you look at the Supreme Court case in this case

15   there's a real issue about the modeling capturing in a reliable

16   way and adequate way antitrust injury.

17         That does remind me of one other point, though,

18   Mr. Cramer, which I did want to bring up with you which is I'm

19   not sure why the bout class wouldn't start over with the

20   takeover of Strikeforce.  I'm not sure why you picked 2010

21   versus I think the Strikeforce acquisition is 2011.

22         MR. CRAMER:  March 2011, I believe.

23         THE COURT:  Right, that -- Strikeforce is a fighter's

24   all-time exclusive contract.  It would seem to bolster your

25   argument.  I don't know why you wouldn't start the class --

—2:15-cv-01045-RFB-PAL—

1          MR. CRAMER:  We could have started there, Your Honor.

2    I believe that Strikeforce -- the takeover of Strikeforce is

3    part of the challenged conduct.  It's a significant part of the

4    challenged conduct, but it's only part of it and we believe that

5    conduct has been continuing.  And so the start date of the class

6    is four years prior to the day we filed, which was December

7    14th, I believe, to the day four years ago.

8          THE COURT:  December 14th.

9          MR. CRAMER:  December 14th, 2014, I believe is the day

10   that we filed.

11         THE COURT:  Right.  So the class is December 2010?

12         MR. CRAMER:  Right, it's four years.

13         THE COURT:  I was just trying to figure out that --

14   okay.  That helps me understand.

15         MR. CRAMER:  That's why.  It's the statute.  The

16   antitrust statute of limitations is four years, and so that's

17   the date we picked.  Obviously the takeover of Strikeforce

18   changed the industry in our view in a substantial way, and it is

19   very close to the beginning of the class period.

20         THE COURT:  Because one of the other things I also

21   would anticipate that would come out of this hearing is that I

22   would decide if I thought class were to be certified would have

23   to decide what the contours of what that class are or could be.

24   And for me one of the issues is the date and the other issue, as

25   I said, is the identity class which, again, I would encourage

—2:15-cv-01045-RFB-PAL—

1   plaintiffs to make their best arguments for.  But I do think

2   that that's something that's an issue that came up in the

3   context of my review of the case.

4          MR. CRAMER:  I had one issue.  Your Honor, the parties

5   submitted a stipulation regarding some supplemental expert

6   reports that were served upon each other, and that is before

7   Your Honor.  And I think one question I think the parties would

8   have before we begin the hearing is are those additional expert

9   reports going to be part of the record.

10         THE COURT:  Yes.

11         MR. CRAMER:  Okay.

12         THE COURT:  Just can you just identify for me -- again,

13  I want to make sure I'm having -- I'm considering the right

14  documents.  Because, again, what I don't want to have there --

15  there to occur is for there to be arguments about the parties

16  not having certain information available to them.  It's not to

17  say that whatever arguments that the parties have raised as to

18  the viability of the reports can't be raised for me at the

19  hearing, but I don't want to be getting into back and forth

20  about this supplemental report is a part of this process or not.

21         So I'll go back and look at them, but my recollection

22  of the submissions that I believe that you're talking about

23  would be that those reports would be reports and information

24  that could be included in the -- in the hearing.

25         MR. CRAMER:  Your Honor, on May 7th, 2018, Document

—2:15-cv-01045-RFB-PAL—

1   545.

2          THE COURT:  Is that the only document you're talking

3   about?

4          MR. CRAMER:  Yeah, the parties submitted a document

5   called Joint Motion to Supplement Expert Reports.  That's the

6   document I'm talking about.

7          THE COURT:  All right.  So, Mr. Isaacson, any objection

8   to me granting that?

9          MR. ISAACSON:  It's a joint motion.

10         THE COURT:  Well, you know, you'd be surprised how many

11  times lawyers actually change that their minds about joint

12  motions that they have filed.  So nothing surprises me.

13         MR. ISAACSON:  I haven't done that yet, but maybe that

14  -- I will not get my shot in the future.

15         THE COURT:  Okay.  So that joint motion will be

16  granted.

17         MR. CRAMER:  Thank you, Your Honor.

18         MR. DAVIS:  One logistical issue.  I do wonder if we --

19  just to make sure I understand, we have a hearing with witnesses

20  and then a prehearing date to sort of organize that.  And I

21  wonder if it wouldn't make sense to set that prehearing date

22  today, if that's at least possible, so that we can -- because

23  once everyone's disperses, you know, there will be a lot of

24  meeting and conferring.

25         THE COURT:  I'm happy to do that, I mean.

2:15-cv-01045-RFB-PAL

1        MR. CRAMER:  Let me just say that maybe it would be a

2  good idea if we met and conferred about that, to contradict my

3  colleague.

4        THE COURT:  Well, here's what I'll tell you.  I have

5  another -- I would like to get that done today.  I have another

6  hearing at 3:30.  I don't think it would be too much to ask for

7  you all after I finish that to come back if you need to or

8  simply to say, "We've agreed."  Because if you can't agree, then

9  I will set it and then sort of --

10        MR. CRAMER:  I'm sure we can come to an agreement on a

11  date.  We're not that obstructive.

12        THE COURT:  But here's what you also have to agree to

13  which I would want you to agree to also the briefing schedule as

14  it relates to briefing.  In my view this is simultaneous

15  briefing and simultaneous responses.  I don't want back -- so

16  you both would submit your version of the standard, then you

17  both would get one opportunity to respond to the other's

18  briefing regarding the standard, and then that's it.

19        MR. CRAMER:  Fair enough.

20        THE COURT:  And I don't think there's anything else

21  that we would need to address, but it seems to me the standard

22  would be the issue.  And in the course of the preparation for

23  that, I'll go through and see if there are other issues --

24  particular issues that I have regarding things that need to be

25  emphasized, like I had said to you, Mr. Cramer.  And there may

 1  be other issues, Mr. Isaacson, that I would want the defendants

 2  to focus on.

 3          MR. CRAMER:  One other question about the contours of

 4  the hearing.  The way I understood Your Honor to suggest we'd

 5  have this prehearing conference, we'd have the hearing with the

 6  experts and then a class certification argument at another time

 7  after that.

 8          THE COURT:  Yes.

 9          MR. CRAMER:  So Your Honor does not expect argument

10  during the hearing.  Is that correct?

11          THE COURT:  No.

12          MR. CRAMER:  That's correct.  Okay.

13          THE COURT:  No, I don't expect argument during the

14  hearing.  And I know that I'm saying that and that may not be

15  followed, but I would expect that you would point out after the

16  first day, our first event, that we might have a discussion

17  about what would be the contours of the remaining experts'

18  testimony so -- but what I would likely do is give you my

19  impressions of what I think is left to be done for those experts

20  so that you don't have to spend unnecessary time on those sorts

21  of issues.

22          MR. ISAACSON:  That makes sense.  If there's someone we

23  can confer with about if we're going to talk about a hearing

24  date when the Court's available.

25          THE COURT:  Well, sure.  I can give you some possible

1  dates.  If you give me a few minutes here, I can give you some

2  possible dates.

3          MR. ISAACSON:  And I apologize, Your Honor.  I turned

4  on my phone so that I can look at a calendar.

5          THE COURT:  Oh, that's all right.

6          So I'm thinking that it would be, just see if this is

7  generally fine, some time in February we would have the

8  prehearing conference or hearing, I should say, to the middle to

9  the latter part of February.  That would allow for the parties

10  to reasonably enjoy their holiday and then get back to work and

11  begin the new year regarding the standard.  So -- and, again, I

12  don't anticipate that the briefing regarding the standard would

13  actually take that long.  I think part of it is your best

14  impressions of what the four, five decisions that exist say and,

15  perhaps, you can suggest to me what other District Courts have

16  done.  Although, as you all know, that may be persuasive, but

17  certainly not binding.

18          What I will say is as it relates to the briefing, and

19  I'm saying this more to you, Mr. Cramer and Mr. Davis, is that

20  if I have some concern about sort of what the standard is, I'm

21  likely to apply what I think is the most strict standard.  So

22  you should give me the range.  And, you know, depending upon how

23  you view that, that may or may not benefit you depending upon --

24          MR. CRAMER:  If you grant the class.

25          THE COURT:  Exactly.  I knew that was coming, right.

—————2:15-cv-01045-RFB-PAL—————

1    Yes.  "If you grant the class and we don't pay, that helps us,"

2    right?

3              MR. DAVIS:  You can just tell us how you would rule

4    under each standard in advance.

5              THE COURT:  If only, right.

6              MR. ISAACSON:  Yeah, and we --

7              THE COURT:  But I do think that with the understanding

8    that it may not come down to a specific sentence, but this could

9    be the range of what the standards would apply in this case.

10   But I don't expect it to be more than 10 pages.

11             MR. CRAMER:  And does Your Honor expect those briefs to

12   be in before the mid-February conference?

13             THE COURT:  Yes.

14             MR. CRAMER:  Because at the mid-February conference

15   we're going to decide what the standard is, what the contours of

16   the testimony are.  If you all can also come to that conference

17   prepared to agree to certain stipulations, because the experts

18   actually do agree about certain things, not many, but there are

19   certain things that there's agreement about.  And so it does

20   seem to me that, for example, there should be an agreement about

21   what the nature of the alleged errors are that have been

22   identified.

23             So that you don't necessarily have to agree with it,

24   Mr. Cramer, but I would expect that the parties would be able to

25   say, "We agree that" --

2:15-cv-01045-RFB-PAL

1          MR. CRAMER:  What are the bones of contention.

2          THE COURT:  -- "these are the key tenets of the

3     opinion.  Here's the models that were used.  Here are the issues

4     that we have with the models."  And that focuses more on

5     defendant's arguments, but so that there's a clear list of what

6     you all agree to, what you don't agree to.  Obviously I know

7     your positions on that.  But in the briefing you all do, and I

8     think part of this is the nature of how the standard has

9     applied, skip around a little bit about what evidence relates to

10    common impact and the two-step process for the bout class versus

11    the identity class.  And some of that did overlap, but some of

12    it doesn't.

13         So it would be helpful for me for you all to come up

14    with at that hearing an agreed-upon sort of stipulated set of

15    facts as relates to the experts' opinion if you can, but also an

16    agreed-upon set of disputed issues.  So not quite a joint

17    pretrial order, but again I find in this circumstance it's more

18    helpful for us all to understand what it is that's disputed

19    specifically so that we don't have any concerns or issues about

20    people having been misled about what the other side was going to

21    be asking about.

22         MR. ISAACSON:  We appreciate that, Your Honor.  And the

23    briefing's going to be important to us because it's quite clear

24    there's going to be some disagreements because you're being told

25    that all you need to decide is whether or not the issue of

—2:15-cv-01045-RFB-PAL—

1  common impact can go to the jury.  And since the issue of common

2  impact doesn't go to the jury, we're going to have a different

3  view on that.

4          THE COURT:  You are.  Is 10 pages going to be enough

5  for you?

6          MR. ISAACSON:  Yes.

7          THE COURT:  Okay.  Good.  I like to hear that.  And so,

8  yes, again 10 pages for each brief.  So -- and I meant for both

9  the initial briefs and the responses.

10          MR. ISAACSON:  Thank you.

11          THE COURT:  Okay.  So why don't we then give you some

12  possibles for the hearing dates in this case.  Give me a second

13  and we'll -- or a few seconds and we'll work that out.  Anything

14  else while you all are up there together?

15          MR. ISAACSON:  I don't think so.

16          MR. CRAMER:  No, Your Honor.  Thank you.

17          THE COURT:  Wow.  Okay.  Thank you.  Give me a second

18  here.

19          (Court conferring with courtroom administrator.)

20          THE COURT:  So while I said I'd have a few dates, of

21  course I don't really have a few dates.  I think I have one.

22  February 1st to have the hearing or I would have to go to March

23  if you all -- because I have time in March I could do it because

24  February 1st is tight and I recognize that.  And it may be --

25  you may need to have more time to talk with your experts, but I

———2:15-cv-01045-RFB-PAL———

1  at least like to give the parties the option.  Again, we're not

2  doing the hearing on the 1st, but sometimes -- you may want to

3  confer with them.  But is that too tight a time frame?  Because,

4  otherwise, we do have to move it to March.  I don't know that I

5  have anything in February.

6          MR. CRAMER:  Your Honor, I left my calendar back in my

7  hotel room.  I am a dinosaur and use a paper calendar.  So if I

8  could confer with Mr. Isaacson later tonight, we can --

9          THE COURT:  Well, let's give you a March date, too,

10  then so that you have both and you don't have to come back.

11         MR. CRAMER:  Okay.

12         (Court conferring with courtroom administrator.)

13         THE COURT:  So March 8th is the other date.

14         MR. CRAMER:  Okay.  Your Honor, we will confer and get

15  back to your chambers.

16         MR. ISAACSON:  So in terms of meeting and conferring

17  about the actual dates when evidence is going to be take --

18  taken, does that mean we should be looking at -- based on what

19  you just said about February, does that mean we should be

20  looking at March or ...

21         THE COURT:  Well, if you do February 1st, then we can

22  look potentially at March dates, but what I would encourage you

23  to do is look at March, April, and May dates.

24         MR. ISAACSON:  I will say I have a five- to six-week

25  trial starting April 15th.  So this is it -- for me this is

—2:15-cv-01045-RFB-PAL—

1  going to have to be a before or after event, so ...

2          THE COURT:  Well, I'll leave that to the parties to

3  work out.

4          MR. CRAMER:  Okay.

5          THE COURT:  And we may be able to do, again, sort of

6  the main event, you know, Dr. Singer and Dr. Topel, first.  And

7  then if the parties are amenable to coming back after that, and

8  it may be that that works out the way that you had suggested,

9  Mr. Cramer, with respect to the way the case should proceed

10  regarding looking at those witnesses' testimony first.

11          MR. CRAMER:  Okay.

12          THE COURT:  So, the other thing that I intend to do is

13  deny the motions for summary judgment without prejudice so that

14  if you wanted to supplement them you can.  If you simply want

15  to, Mr. Isaacson, reinstate them, right, you can do that.  But

16  it may be that as a result of what happens at the hearing, for

17  each of you, you may want to supplement those.  And I don't want

18  to have a whole new set of motions.  Well, I wouldn't want --

19  I'm sorry.

20          I don't want to have supplements.  What I would

21  rather -- it's easier for me to do is not to piece together

22  supplements, but to actually have you -- even though it may be a

23  little more work for you, if you want to reconfigure your

24  argument, that you do that rather than send me a supplement that

25  sort of is referencing different pieces than what you've

—2:15-cv-01045-RFB-PAL—

1  previously submitted.

2          If you want to simply just reference what you have

3  previously filed, you can simply do that, but I would anticipate

4  that there might be some supplementing given what's happened in

5  this case overall.  It's hard for me to imagine that the parties

6  might not take an opportunity to be able to add to the record

7  from the hearing.

8          So I'm going to deny the motion for summary judgment

9  without prejudice to allow for a supplementing of the record as

10  it relates to that particular motion.  So you'll be able to file

11  the motion.  We can talk about and you all can talk about when

12  and how you'd set up a schedule for that, but I do think that

13  given what may or may not come in in this testimony that may --

14  and what potentially I decide about certain aspects, that may

15  change what you argue or don't argue in the motion for summary

16  judgment.  I don't want to have to piece together different

17  parts of supplements for that motion.

18          MR. ISAACSON:  Understood, Your Honor.

19          THE COURT:  Okay.

20          MR. CRAMER:  Thank you.

21          THE COURT:  All right.

22          Okay.  Have we resolved everything?

23          MR. CRAMER:  I think so, Your Honor.

24          THE COURT:  I mean for today.  I know we haven't

25  resolved everything.

—2:15-cv-01045-RFB-PAL—

1      MR. CRAMER:  Yes.

2      THE COURT:  So we don't then need for you all to meet

3  and confer about or stay in the courtroom or out in the court

4  about those dates.  What I will expect is you'll pick one of the

5  two of those dates because really those are the only dates that

6  I have.  And then what I would expect you to meet and confer

7  about as quickly as possible is the dates you think that

8  Dr. Singer and Dr. Topel can be available, right.  And given the

9  nature -- I mean, but they have to be together.  So their

10 testimony has to be joint.  They both have to be here --

11      MR. ISAACSON:  For all three days, yes.

12      THE COURT:  -- for all three days.

13      MR. CRAMER:  Yes.

14      THE COURT:  And prepared to go back and forth on the

15 witness stand, right, hot tubbing as you described.  So it's up

16 to you when those dates are, but let me know when they'll be.

17      MR. CRAMER:  Thank you, Your Honor.

18      THE COURT:  Okay?

19      MR. ISAACSON:  Thank you.

20      THE COURT:  All right.  Let me just check and see if

21 I'm missing anything.  Hold on.

22      (Court conferring with law clerk.)

23      THE COURT:  What I would like for you all to do, if you

24 wouldn't mind before you actually leave, is check to see if

25 there are any other stipulations or joint motions that I should

—2:15-cv-01045-RFB-PAL—

1   resolve now that you may think need to be resolved at this point

2   in time.

3           There is something we have to resolve which is what are

4   the defendants going to want to do about sealing of testimony

5   and records.  And, Ms. Grigsby, you started us off, but I think

6   there's going to need to be some proposed procedure as it

7   relates to what should or shouldn't be protected and how.  And

8   that can be as part of the same joint filing in terms of what

9   you all propose for a schedule.  But I do think what you should

10  do, the defendants should do, is propose a procedure and propose

11  areas of testimony that should be you think protected.  As I've

12  indicated to you, I don't think it would be appropriate to

13  protect all areas of this record, but it doesn't mean I intend

14  to unseal information.

15          So I would encourage you to propose some sort of either

16  staggered or other prioritized approach to what you think should

17  happen.  But what we'll do is that will be set on the same

18  schedule as the briefing schedule.  So I'll let you all come up

19  with that because what I would anticipate is that you all will

20  propose -- after you decide on the date propose a schedule for

21  me as it relates to the briefing.  Okay?

22          Any questions about that?

23          MR. CRAMER:  No, Your Honor.

24          THE COURT:  All right.

25          All right.  I'm just reluctant to release you without

—2:15-cv-01045-RFB-PAL—

1  getting more work done, but I think that we've done all that we

2  can do for today.  I appreciate you all coming and being

3  prepared.  I don't know if there's anything else that we need to

4  do in terms of the joint motions or preparation for the hearing.

5  I'm looking over my notes.

6          So we're adjourned in this case.  Thank you very much.

7          MR. CRAMER:  Thank you.

8          MR. DAVIS:  Thank you, Your Honor.

9          THE COURT:  I'm going to stay here for a few minutes.

10  Go ahead.

11          (Whereupon the proceedings concluded at 3:33 p.m.)

12                        --oOo--

13               COURT REPORTER'S CERTIFICATE

14

15      I, PATRICIA L. GANCI, Official Court Reporter, United

16  States District Court, District of Nevada, Las Vegas, Nevada,

17  certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled matter.

19

20  Date:  December 18, 2018.

21                              /s/ **Patricia L. Ganci**

22                              Patricia L. Ganci, RMR, CRR

23                              CCR #937

24

25