—2:15-cv-01045-RFB-PAL—

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5                  Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                       )
6          vs.                         )  Las Vegas, Nevada
                                       )  Friday, February 1, 2019
7  ZUFFA, LLC, d/b/a Ultimate          )  10:03 a.m.
   Fighting Championship and           )
8  UFC,                                )  PREHEARING CONFERENCE
                                       )
9                  Defendants.         )
   _____

10

11

12

13             REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:       See Next Page

20

21

    COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                      United States District Court
                        333 Las Vegas Boulevard South, Room 1334
23                      Las Vegas, Nevada  89101

24

    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
                        ─2:15-cv-01045-RFB-PAL─
```

 1 │ APPEARANCES:
   │ For the Plaintiffs:
 2 │
   │         **DON SPRINGMEYER, ESQ.**
 3 │         WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
   │         3556 E. Russell Road, 2nd Floor
 4 │         Las Vegas, Nevada 89120
   │         (702)341-5200
 5 │
   │         **ERIC L. CRAMER, ESQ.**
 6 │         **PATRICK F. MADDEN, ESQ.**
   │         BERGER & MONTAGUE, P.C.
 7 │         1818 Market Street, Suite 3600
   │         Philadelphia, Pennsylvania 19103
 8 │         (215)875-3000
   │
 9 │         **RICHARD A. KOFFMAN, ESQ.**
   │         **DANIEL H. SILVERMAN, ESQ.**
10 │         COHEN, MILSTEIN, SELLERS & TOLL, PLLC
   │         1100 New York Avenue, NW, Suite 500 West
11 │         Washington, DC 20005
   │         (202)408-4600
12 │
   │         **JOSEPH SAVERI, ESQ.**
13 │         **JOSHUA P. DAVIS, ESQ.**
   │         **JIAMIN CHEN, ESQ.**
14 │         THE JOSEPH SAVERI LAW FIRM, INC.
   │         555 Montgomery Street, Suite 1210
15 │         San Francisco, California 94111
   │         (415)500-6800
16 │
   │ For the Defendants:
17 │
   │         **J. COLBY WILLIAMS, ESQ.**
18 │         CAMPBELL & WILLIAMS
   │         700 South 7th Street
19 │         Las Vegas, Nevada 89101
   │         (702)382-5222
20 │
   │         **WILLIAM A. ISAACSON, ESQ.**
21 │         **STACEY K. GRIGSBY, ESQ.**
   │         BOIES, SCHILLER & FLEXNER, LLP
22 │         1401 New York Avenue, NW
   │         Washington, DC 20015
23 │         (202)237-2727
   │
24 │
   │
25 │

```
                    ─2:15-cv-01045-RFB-PAL─
```

 1  APPEARANCES CONTINUED:

 2        **BRENT K. NAKAMURA, ESQ.**
          BOIES, SCHILLER & FLEXNER, LLP
 3        1999 Harrison Street, Suite 900
          Oakland, California 94612
 4        (510)874-1000

 5  ALSO PRESENT:
          Hunter Campbell, Esq., Zuffa
 6        Riche McKnight, Esq., Zuffa

 7      LAS VEGAS, NEVADA; FRIDAY, FEBRUARY 1, 2019; 10:03 A.M.

 8                         --oOo--

 9                  P R O C E E D I N G S

10        COURTROOM ADMINISTRATOR:  Now calling Le, et al.,

11  versus Zuffa, LLC, Case Number 2:15-cv-01045-RFB-PAL.  This is

12  time for the prehearing conference.

13        Starting with counsel for plaintiffs, please note your

14  appearance for the record.

15        MR. CRAMER:  Good morning, Your Honor.  Eric Cramer

16  from Berger Montague.

17        MR. DAVIS:  Josh Davis on behalf of the Joseph Saveri

18  Law Firm representing plaintiffs.

19        MS. CHEN:  Jiamie Chen from the Joseph Saveri Law Firm

20  on behalf of plaintiffs.

21        MR. MADDEN:  Patrick Madden from Berger Montague on

22  behalf of plaintiffs.

23        MR. KOFFMAN:  Richard Koffman from Cohen Milstein

24  Sellers & Toll for plaintiffs.

25        MR. SILVERMAN:  Daniel Silverman, Cohen Milstein, on

—2:15-cv-01045-RFB-PAL—

1  behalf of the plaintiffs.

2          MR. SPRINGMEYER:  Good morning, Your Honor.  Don

3  Springmeyer, Wolf Rifkin, for the plaintiffs.

4          MR. SAVERI:  Good morning, Your Honor.  I'm Joseph

5  Saveri on behalf of plaintiffs.

6          MR. ISAACSON:  Good morning, Your Honor.  Bill

7  Isaacson, Boies Schiller & Flexner, for the defendant.

8          MS. GRIGSBY:  Good morning, Your Honor.  Stacey

9  Grigsby, Boies Schiller & Flexner, on behalf of the defendant.

10          MR. MCKNIGHT:  Good morning, Your Honor.  Riche

11  McKnight on behalf of Zuffa/UFC.

12          MR. CAMPBELL:  Good morning, Your Honor.  Hunter

13  Campbell on behalf of Zuffa.

14          MR. NAKAMURA:  Good morning, Your Honor.  Brent

15  Nakamura, Boies Schiller & Flexner, on behalf of Zuffa, LLC.

16          MR. WILLIAMS:  And good morning, Your Honor.  Colby

17  Williams, Campbell and Williams, on behalf of Zuffa.

18          THE COURT:  Okay.  Well, we are here for the prehearing

19  conference.  I did expect that this conference would be a little

20  closer to the actual hearing.  So I kept the date just because I

21  think it's important for us to just go over some housekeeping

22  matters, but as I look at the notice for availability, it looks

23  like we're not going to be doing anything until about August.

24          Do we have any further information about the dates or

25  were you all waiting to set those dates with me?  Because I have

1   ranges for the different -- I sort of hesitate to refer to them

2   as bouts per se, but, you know, we have these rounds.  We have

3   Singer/Topel, Manning/Oyer, and Zimbalist/Blair.  And so it does

4   seem to me we need to narrow those down.  I don't know if you

5   all are waiting for me or if you all are just waiting to hear

6   back from your experts.

7           So, Mr. Cramer, perhaps you could let me know.

8           MR. CRAMER:  We were waiting for Your Honor.  We

9   provided Your Honor with availability for all of the experts and

10  all of the lawyers.  And once we get feedback from Your Honor,

11  we'll work with the dates that you have available.

12          THE COURT:  Okay.  So I can set the dates within those

13  ranges.  Is that correct?

14          MR. CRAMER:  Yes, Your Honor.

15          THE COURT:  Mr. Isaacson?

16          MR. ISAACSON:  That's correct.

17          THE COURT:  Okay.  So that's helpful.  Now, I notice I

18  don't know if I saw a date for Mr. Silva's testimony.

19          MR. CRAMER:  Correct, Your Honor.

20          THE COURT:  Well, he's available, right.  So we could

21  do him earlier if we wanted to, right.  I assume that he

22  could -- he could be made available on behalf of defendants

23  whenever it was appropriate.

24          MR. ISAACSON:  He tells us he's in retirement and

25  generally available, so ...

1          THE COURT:  Well, I'm sorry to hear that.

2          MR. CRAMER:  Your Honor, it's plaintiffs' view that it

3    would probably be best if Mr. Silva came after the Singer/Topel

4    pairing at least because only then will it become clear exactly

5    where he fits in.

6          THE COURT:  Well, that makes sense.  I just -- since I

7    didn't see any reference to him in the letter, I wanted to make

8    sure that there was not any issue as it relates to his ability

9    to appear.  So he seems the most available of all of the

10   witnesses.  Is that right?

11         MR. CRAMER:  I think the idea is once everybody else is

12   scheduled, then we'll be able to fit Mr. Silva in.

13         THE COURT:  Okay.  I just wanted to be able to confirm

14   that.

15         So what we'll do is we'll look at our schedule, and

16   then we'll just issue an order that relates to the date.  And

17   then you all can work with that and, again, if there are any

18   issues with that, let me know.

19         Let's turn to -- it seems to me one of the things we

20   need to spend a little time with today is the exhibits and the

21   sealing or not of the exhibits and the date when exhibits are

22   going to be exchanged.  Assuming that I set the dates in the

23   time frames that the parties have submitted, what would be the

24   anticipated date for the exchange of exhibits for the hearing?

25         And I say that because it seems to me that some of the

—2:15-cv-01045-RFB-PAL—

1    rulings regarding sealing is going to be depending upon what the

2    nature of the exhibits are that are going to be presented.  And,

3    you know, I don't generally like to do an entire advisory

4    ruling.  I've given you all some sense of what I think will

5    likely not be sealed.  But do you all have an agreed-upon time

6    frame for the exchange?  Because then we could also set the time

7    frame by which third parties can file objections with the Court,

8    or at least if they want to make a special appearance, we can do

9    that.  Because what I would anticipate is you all would exchange

10   exhibits, you would come up with an agreement or not, and then

11   we'd have closer to the hearing an actual -- probably would

12   take, you know, who knows, but maybe a full day or so where we'd

13   go through and we'd just make the exhibits.

14         And then part of that is because I have to say,

15   Ms. Grigsby, I think this is probably your bailiwick as it

16   relates to the sealing, that it's hard for me to make

17   determinations about particularly trade secrets and sensitive

18   information without seeing what the exhibit is.

19         So, for example, it seems to me a general category

20   which I think I would probably seal would be anything related to

21   financial projections or financial future strategies.  So, you

22   know, if there were anything in these exhibits that suggested

23   expansion strategies for other areas or other countries, excuse

24   me, or other markets, that to me might be potentially something

25   that I would consider sort of sealing on a general basis, but

—2:15-cv-01045-RFB-PAL—

1  other than that, it seems to me that much of the arguments the

2  defendants make and plaintiffs make depends upon the nature of

3  the specific exhibit itself.

4       And I don't want to go through general arguments

5  without looking at the specific exhibits.  I mean, we'll talk

6  about a little bit that today and I'll let you all know what my

7  concerns are, but I first want to be able to work backwards.

8       Do we have a date for the exchange of exhibits,

9  Mr. Cramer?

10      MR. CRAMER:  I think, Your Honor, we were waiting for

11 Your Honor to set the date, but if it will be -- the hearing

12 will begin in August or September, I think if we came to some

13 agreement about something like 60 days in advance we would do

14 some kind of exchange and then reaction and then objection

15 period building up to the hearing, I think that would work, if

16 it would work for Zuffa.

17      MS. GRIGSBY:  Yes, Your Honor, that would work.

18      THE COURT:  Okay.  So we're looking basically --

19 today's February.  Let's just say -- so we don't necessarily

20 need to ruin everyone's summer.  Let's say we'll do it in May,

21 even though it's a little bit more than the 60 days, but part of

22 that I just have found that once you start scheduling things in

23 the summertime it can be much more difficult.

24      And we'll do the exhibit exchange -- let's say it will

25 be May 24th.  Any reason why we can't do it on that day?  So

─2:15-cv-01045-RFB-PAL─

1  what will happen is you will exchange exhibit lists on that day.

2  And then I'll give you until June 7th to -- between -- for that

3  next week you should meet and confer, and then if you can't

4  agree, which I expect you're not going to agree on everything,

5  you'll file whatever objections you have to the exhibits.  We'll

6  give you until June 14th.

7       Now, let me be clear about what the nature of the

8  objections are.  This is, as you all know, a hearing that I'm

9  setting related to the motion to certify, but it's -- we're

10  not -- because the standard is somewhat unclear, I want you all

11  to understand that obviously in this context the rules of

12  evidence are relaxed pursuant to the Court's needs.

13       So what I don't want are technical objections as

14  relates to exhibits, if there's not really an issue of

15  authenticity, if there's not really an issue that goes to the

16  Court to be able to rely upon the document.  So, for example,

17  403 arguments or 401 arguments, I will deal with those as the

18  exhibit comes in.

19       The objections that I think are appropriate are really

20  objections, one, as to an agreement about what should and

21  shouldn't be confidential and sealed, and the other is whether

22  or not there's something that either side views as so completely

23  unreliable that the Court really just should not consider it.

24  Now, from what I've seen of the submissions I don't know if

25  anything even falls into that category, but that's really what

—2:15-cv-01045-RFB-PAL—

1   I'm talking about in terms of the nature of the objections and

2   the identification of what's going to be in those filings on

3   June 14th.

4           Any questions about that, Mr. Cramer?

5           MR. CRAMER:  The one question I have, Your Honor,

6   relates to exhibits that might or might not be used on

7   cross-examination.  Given that we don't necessarily know what

8   the other side's -- exactly how they're going to testify on

9   direct, it may be the case that the parties would be able to

10  reserve the ability to introduce -- to use a document or a piece

11  of testimony or a transcript on cross-examination that has not

12  been exchanged.  I haven't had this conversation with the other

13  side, but it seems like it would be hard to plan every single

14  document that might need to be used --

15          THE COURT:  No, I think that's fine.  I mean, look, I

16  think that part of the purpose of this is really relates to the

17  issue of sealing documents.  You all are I'm sure well aware of

18  this record.  I don't think that either side will try to

19  introduce a document that had not previously been disclosed.

20  This is really just about the Court's attempt to try to address

21  the issues of confidentiality and sealing of documents.  So I

22  don't really see that as an issue, Mr. Cramer, so long as

23  parties are not trying to introduce a document that hasn't

24  previously been disclosed obviously.  Then that would be an

25  issue, but I don't hear you saying that.

—2:15-cv-01045-RFB-PAL—

1           Mr. Isaacson?

2           MR. ISAACSON:  Yeah.  One point is I don't think the

3    directs can be a surprise since we're -- we've disclosed reports

4    and everything has to come out of there.  So this is actually

5    from my perspective a hearing about condensing those materials

6    and letting the experts talk to you about what's in those

7    reports.

8           THE COURT:  Right.

9           MR. ISAACSON:  So I don't think that there's -- it

10   should not be a situation where someone says, "Oh, I didn't know

11   that was coming.  Here's an exhibit in light of that."

12           You know, having said that, if you want something

13   admitted into the record, I think it should be part of the

14   disclosures.  If you don't want to admit something, it doesn't

15   necessarily have to be part of the disclosure and that --

16           THE COURT:  I'm sorry.  When you say "the disclosures,"

17   you're talking about the exhibit disclosure?

18           MR. ISAACSON:  The exhibit disclosures, yes.

19           MR. CRAMER:  I think that's fair.  There may be a

20   textbook that a party would want to use on cross-examination

21   with the other expert to elicit or to get a reaction from the

22   witness that may not have been before --

23           THE COURT:  Well, that's the part I would expect that I

24   would -- that would be disclosed, too.

25           MR. CRAMER:  Oh, okay.  Yeah.

1    THE COURT:  If you're going to be relying upon any type

2  of scientific expert sort of articles, methodologies, that

3  should be disclosed not just to the other side, but so I can

4  prepare.

5    So, you know, if you present a textbook to me at the

6  hearing about regression modeling, I have some knowledge of

7  that, but I can't say that I'm going to be able to absorb it all

8  in that short period of time in the cross as it relates to the

9  particular expert.

10    And, again, let me be clear that the focus of this

11  regardless of what the standard is -- and in this case actually

12  I'm not sure the parties' standards are actually that far apart

13  because part of the focus here is on modeling.  And so whether

14  the standard is sort of -- can plausibly support it or whether

15  or not there's a more strict standard, the model from my

16  standpoint has to be reliable enough that a jury could rely upon

17  it to actually establish what needs to be established by the

18  plaintiffs.

19    And that actually doesn't necessarily, in looking at

20  either submissions, create as much daylight as you all I think

21  suggest between the standards because I do think that there has

22  to be sort of a measure of reliability and coverage that would

23  make it plausible, but also would go to the stricter standard

24  supported by the defendants in this case.

25    But, again, that is -- to go back to this issue, which

—2:15-cv-01045-RFB-PAL—

1    this is not meant to be a hearing where we're going to go over

2    the experts' entire testimony.  That is not what we're doing.

3            MR. ISAACSON:  Right.

4            THE COURT:  Right.  So the other thing that will happen

5    is when we do the report, we go through the exhibits, I will

6    give you all some indication of the types of issues that I

7    intend to focus on.  So, for example, the defendants have raised

8    this issue about the model conflating procompetitive versus

9    anticompetitive conduct, sort of.  Of course, looking at

10   Comcast, I'm going to ask about that.  The defendants should be

11   prepared for their expert to talk about what procompetitive

12   conduct, for example, could exist after a certain determination

13   if there's an assumption about a dominance in a particular

14   market.  That's a relevant question.

15           I don't know, again, what the experts will say about

16   that, but again those are the types of questions it seems to me

17   that we're going to get into.  So it may not actually take as

18   long as the parties have allotted because the reports are fairly

19   clear, and I think the areas of disagreement as relates to the

20   tax and the respective models are fairly specific.  And there

21   may be some discussion about, you know, how does one do modeling

22   in a relatively or new or emerging market as relates to this

23   particular market and what are appropriate assumptions in that

24   regard.

25           But, again, we'll go over those questions, but it seems

1   to me the first step is to get this issue of exhibits addressed

2   and sealing addressed because I expect you all may end up having

3   more arguments about what's going to be disclosed publicly

4   versus just the issue of the dispute between the parties

5   regarding the model.  So I wanted to set that time frame.

6        So with that, is there any issue with the dates that we

7   set so far as relates to the disclosure?

8        MR. ISAACSON:  No, Your Honor.  So just to clarify in

9   terms of these exhibits, I think what you're describing is what

10  I understood would happen.  So experts, for example, can rely on

11  articles and other things that are hearsay.  There's not a

12  hearsay objection to that being admitted.  It would be admitted

13  as hearsay and, you know, we might note that this is hearsay

14  being admitted for purposes of this hearing.  And then it's just

15  taken for that purpose.

16       And the same thing when you said about authenticity or,

17  you know, admissibility, you know, I think we can -- we should

18  be able to agree that, you know, even though we might have at a

19  jury trial an objection and a foundation needs to be laid, we

20  don't need to do that for this hearing.

21       THE COURT:  No.  I mean, what you need to point out to

22  me are exhibits that you think either lack sufficient

23  authenticity or themselves are so controversial in terms of what

24  they purport to represent that they shouldn't be even included

25  in the record.

———2:15-cv-01045-RFB-PAL———

1        MR. ISAACSON:  Right.

2        THE COURT:  Based upon a review of the record, I don't

3   know that anything like that exists in this record, but in an

4   abundance of caution I give you that as a category of something

5   that I would expect might be excluded.

6        So I generally expect that this is just going to be

7   about what is and isn't going to be sealed, what is and isn't a

8   trade secret, or isn't so sufficiently detailed that someone

9   couldn't glean from it which athlete is being sort of discussed

10  in a contract or a negotiation.  That's what I expect we're

11  going to be doing most of the time.

12        And then when I see the documents, Mr. Isaacson and

13  Ms. Grigsby, you'll be able to explain to me, because I have to

14  tell you I'm not quite clear about it now, what types of trade

15  secrets or sensitive commercial information is being protected.

16  It's difficult for me to do that given what's been submitted to

17  me without seeing the exhibits, and we'll just go through it

18  exhibit by exhibit.  And that may take time, but that seems to

19  me to be the only fair way to do it in this case.

20        So that's why I want to set that date as it relates to

21  exhibits.  That's the purpose of that particular date.  Okay?

22        MR. ISAACSON:  Fair enough, Your Honor.

23        THE COURT:  Any questions about that?

24        So then what we will is in conjunction with the dates

25  that we set for the hearing, we'll also set in the minute order

—2:15-cv-01045-RFB-PAL—

1  the date where we're going to go through all of those

2  objections.  Because, again, I don't believe that I'm in a

3  position now to rule generally on the motions to seal, but what

4  I may have you do is I may deny them without prejudice to you

5  refiling them once the exhibits are exchanged and go through and

6  give me a chart that says, "This is our objection to this and

7  that."  And this, Mr. Isaacson and Ms. Grigsby, that's going to

8  be part of what I'll need.  I'll need you to go through and say,

9  "Here are the exhibits.  Here's the basis for the objection."

10 You have four or five different categories you've identified in

11 your submission as to why the document should or shouldn't be

12 sealed.

13         So you'll have to just identify that for me so when we

14 go through that we can go through the categories of documents.

15 Does that make sense?

16         MS. GRIGSBY:  Yes, Your Honor, although I have one

17 clarifying question.

18         THE COURT:  Uh-hmm.

19         MS. GRIGSBY:  So when you say "deny the motions," the

20 pending motions now relate to the reply for the motion for class

21 certification, and then the remaining motions to seal actually

22 related to the motion for summary judgment.  So ...

23         THE COURT:  So let me be clear.

24         I'll go through the motions.  What I'm saying is the

25 request essentially to -- for me to decide now to seal documents

─2:15-cv-01045-RFB-PAL─

1  that would be presented at the hearing, I'm not going to approve

2  those now.  I'm not going to at this point, though, unseal

3  documents.  And so the extent that there are motions to seal

4  related to submissions, those will generally be granted.  If

5  they are for some reason not granted, just let me know that

6  that's an error.

7       So, generally, I'm going to keep everything sealed

8  until I decide what needs to be unsealed.  And so what I meant

9  when I was saying I'm denying it without prejudice, it's as to

10 your request as to the materials at the evidentiary hearing.

11 You have on behalf of defendants made requests for certain types

12 of material to be either presented in hard copy or redacted.

13 What I'm saying as relates to that request I'm denying that

14 without prejudice so that I can look at the chart and go through

15 that exhibit by exhibit or by categories of exhibits.

16       But as it relates to documents that are currently

17 sealed, they will remain sealed until I make a determination

18 about them being unsealed.

19       MS. GRIGSBY:  Yes, Your Honor.  Thank you.

20       THE COURT:  Okay?  All right.

21       MR. CRAMER:  Thank you, Your Honor.

22       THE COURT:  Sure.

23       All right.  So, let's see.  Ah.  I have one other

24 request for the parties.  I'm going to ask that you each submit

25 to me the names of three experts who you have not retained or

1  have not been retained by the defendants for the Court to

2  consider appointing as an independent expert in the evaluation

3  of the modeling in this case.  So I am contemplating appointing

4  separate court-appointed experts who would provide testimony in

5  court at the hearings, and of course you all would have to split

6  the cost of those experts.

7           I am not saying that I will do that, but I may be doing

8  that and I'm going to go and look at that as an issue.  I will

9  allow you all to comment on that now, but of course I have the

10 discretion to do it.  But you can tell me your positions with

11 respect to that.

12          MR. CRAMER:  Your Honor, I think what I would ask Your

13 Honor is if we would have the opportunity to weigh in by brief.

14 I've dealt with this issue in several different cases.  I found

15 that it often multiplies and complexifies the issues rather than

16 makes it more simple because you're multiplying the number of

17 experts and the number of opinions.  And often it does not I

18 think assist the Court.

19          But -- so that's -- in my experience that's in part

20 what happens.  There are a number of different rules governing

21 independent experts and what they are supposed to be doing and

22 not supposed to be doing, and there are two different sets of

23 rules and two different kinds of appointments.  And so I would

24 ask Your Honor if we would have the right or the ability to

25 weigh in in a short letter brief about -- on that issue, maybe

—2:15-cv-01045-RFB-PAL—

 1  simultaneous filings.

 2          THE COURT:  So let me be more specific.  You have all

 3  have raised methodological challenges -- well, more the

 4  defendants have than the plaintiffs have obviously, but there

 5  are methodological issues here.  One of them, for example,

 6  relates to if you are going to do modeling in a new market, how

 7  would you go about doing it.  I'm unpersuaded by the defendant's

 8  argument that you could -- and I'm not saying they're

 9  necessarily arguments, but it seems to me one of the arguments

10  is since this is essentially a market that's never been analyzed

11  before the model is inherently going to be flawed because you

12  don't have a comparable.  So in this case comparing it to the

13  NFL or to Major League Baseball, it is inappropriate, for

14  example.

15          I'm not necessarily persuaded by that, but I might, for

16  example, Mr. Cramer, seek expert advice from an independent

17  expert as to what you would do in terms of going about creating

18  such a model, what steps might you take to do that and what

19  methodologies might you use, right.  And so that's one example

20  of a question that I would ask an expert.  That's not -- I'm not

21  going to have them redo the analysis.  There are very specific

22  challenges here.

23          MR. CRAMER:  Right.

24          THE COURT:  One relates to assumptions about sort of

25  comparable markets, which is I think fundamental.  The other

—2:15-cv-01045-RFB-PAL—

1   relates to the ability to be able to capture procompetitive

2   versus anticompetitive, or whatever terms you want to use,

3   factors within the model to the extent that you can identify

4   common impact or injury that results just from antitrust conduct

5   versus legal conduct.  And so I may ask questions about that of

6   an expert.

7        I'm not going to ask them to completely devise their

8   own model, but I would ask them questions like that, where there

9   are foundational questions being asked about the methodologies

10  that seem to me it may be helpful to have an expert say, "If you

11  as a person who was qualified in this field were to engage in

12  this modeling, here are the things that you might consider as it

13  relates to these factors."

14       As I read Comcast, part of the issue really relates to

15  whether or not in the context of the modeling that's done it

16  seeks to appropriately capture, one, the plaintiffs' sort of

17  legal theory for damage, antitrust damage, and does so in a way

18  that doesn't unnecessarily conflate sort of legal conduct.  The

19  other issue in this case, as I said, relates to assumptions

20  about appropriate means to capture sort of common injury or

21  impact.

22       And so those are the types of questions, Mr. Cramer,

23  that I would expect potentially to ask this -- this expert or

24  other experts.  It's not to just give another commentary on

25  Dr. Singer's report.  It wouldn't necessarily be related to

—2:15-cv-01045-RFB-PAL—

1  that.  I'm not going to ask them to go through and do that, but

2  I might ask methodological questions because there are in this

3  case actually disagreements about methodology that go to the

4  heart of whether or not the models are themselves reliable or

5  not.  That's what I'm focussed on.

6          MR. CRAMER:  I understand.  I understand, Your Honor.

7  And in my experience it's very difficult to find a truly

8  independent expert because any -- many of the economists and

9  modelers who do this kind of work tend to be involved in cases

10 on one side or the other.  And those economists who don't tend

11 to do this kind of work are not necessarily experienced in, for

12 example, coming up with a model that attempts to compute damages

13 or impact on a class-wide basis.

14         So I -- all I'm advising is some caution there.  We

15 have -- we have found it very difficult to find truly

16 independent experts.  A lot of the economists who do this work

17 do it for one side or the other.

18         And so that bias is ingrained in many different people

19 from one side or the other.

20         THE COURT:  Well, here's what I would expect.  I would

21 expect both of you to be able to present experts who have

22 actually had to model the issues -- really the issues in this

23 case, and what I mean by that is exactly what's discussed

24 potentially in this case in Comcast.  And that is being able to

25 attempt to model in an emerging or new industry sort of

—2:15-cv-01045-RFB-PAL—

1  antitrust injury versus injury that may result from legal

2  conduct.

3          So I agree with you, Mr. Cramer, it would not be

4  helpful for simply for me to have an expert who has never found

5  it possible to be able to distinguish between the two.

6          MR. CRAMER:  Right.

7          THE COURT:  And it would be equally unhelpful to find

8  an expert who says that you can always do that, if that helps

9  the parties.  And if those are the names that I get, then likely

10  I won't be relying upon them.  I would hope in this universe of

11  experts there might be one or two individuals who could do this,

12  and perhaps I'm Diogenes with my lamp looking for an expert who

13  does not exist.

14          However, that being the case, I would still ask you,

15  right, to try; because I do think there is some very specific

16  pointed questions, and it may be that we can't come up with

17  them, but very specific pointed questions that it would be

18  helpful for me to have an expert discuss given the differences

19  between the parties.

20          So here's what I'm going to ask you to do and I'll give

21  you a month to do it and that is to identify three names,

22  provide the background as to why you think this person should be

23  considered to be a court-appointed expert, and information about

24  who -- how they previously represented defendants or plaintiffs

25  in antitrust cases and their experience, and their willingness

—2:15-cv-01045-RFB-PAL—

1  and availability to be able to testify in August.  Because if

2  they're not available to testify, it doesn't really matter,

3  right.

4        And so let's say no more than three names.  What I will

5  tell you will happen is after you submit the names to me, I will

6  contact them.  I'm not going to tell you what I'm going to ask

7  them specifically, but I'm telling you generally this is the

8  questions I'm going to ask about methodology.  I will certainly

9  let you all know, which I believe I'm obligated to do, that I've

10  had contact with them and that generally the contact is are they

11  able to do this, are they comfortable providing an expert

12  opinion in this area.  I'm not recording those conversations or

13  creating transcripts of them, but that's what I think that I am

14  obligated to do.

15        And then to the extent that I would actually engage an

16  expert in this case I would then tell you the instructions that

17  the expert has given, let you all --before the expert goes off

18  on producing or doing research, let you all comment on that, and

19  then proceed from there.

20        So before we even had the expert engaged, I would

21  certainly reach out to them to see whether or not they were in a

22  position or felt comfortable addressing the particular questions

23  at issue.  And, again, they are really the issues that I've

24  identified more or less and some that have come up in this case.

25  But that's what the Court anticipates it would do.  And it may

─────2:15-cv-01045-RFB-PAL─────

1   be after talking with them I find it not helpful, that they may

2   not be able to provide information.

3         Mr. Isaacson.

4         MR. ISAACSON:  So what level of communication do you

5   want us to have with those people before we submit the names?

6         THE COURT:  What you -- what you can do is tell this

7   person that the Court is contemplating appointing an independent

8   expert in this case.  That the Court wants to have their C.V.,

9   wants to understand how often they've testified for plaintiffs

10  versus defendants in these types of cases, what experience they

11  have in terms of developing models as it relates to antitrust

12  injury and capturing the nature of that injury, as well as

13  developing models in new and emerging markets regarding

14  antitrust, and that I will contact them and ask them about this

15  case.

16        They are certainly free to look at the public

17  documents.  So you're not to -- you don't have to tell them not

18  to look at the models.  They're certainly free to look at the

19  models, and you certainly can tell them that the Court

20  anticipates that they would be compensated at a rate

21  commensurate with their experience.

22        MR. ISAACSON:  So two things you've said in there are,

23  one is background in injury and the other is antitrust injury

24  and the other is antitrust and emerging markets.

25        THE COURT:  Right.

1          MR. ISAACSON:  Now, there are going to be people who

2    have no involvement in litigation who certainly have involvement

3    in studies on antitrust and emerging markets.  Mr. Cramer is

4    right that injury is a topic that comes up in litigation.

5          And so by definition you will -- you are going to be

6    confining the group of experts to people with background in

7    testifying in litigation on that topic.  I'm not aware of any

8    academic literature on this because it's a topic that comes up

9    for purposes of a court case.

10          THE COURT:  I would expect that.  And if it turns out

11    that we don't really have anyone who can be viewed as truly

12    independent from the standpoint of having worked on both sides

13    of the equation -- and it doesn't mean that having worked on

14    both sides of the equation means that they necessarily worked

15    for both plaintiffs and defendants, but it does mean that

16    oftentimes what happens in these types of cases, antitrust

17    cases, is that you will have experts who repeatedly say this

18    type of modeling just can't ever work.  And that's not helpful

19    to me, right.

20          What would be helpful is whether they're an expert who

21    usually works for defendants or an expert who usually works for

22    plaintiffs having had experience to have performed the work that

23    both Dr. Topel and Dr. Singer had to do.  That's what's helpful

24    to me.  If they haven't done something like that, then that's

25    not helpful.

————2:15-cv-01045-RFB-PAL————

1          And it may be that they don't exist, and if you feel

2    that you can't proffer someone, I'm not going to ask you to

3    present someone who doesn't exist from your standpoint, but it

4    would be helpful for me to be able to consider that.

5          MR. CRAMER:  Two questions.  One, do you want each side

6    to put forth three names or do you want the parties jointly to

7    put forth three names?

8          THE COURT:  Well, you know, I would love for you all to

9    agree upon three names, but that may just be not possible.  If

10   you all can actually jointly agree upon someone, of course I

11   would be happy to consider that person first in terms of the --

12   the individual I would consider.  I just am not necessarily

13   confident that that would happen.

14         So I'm going to just say three names each.  If you

15   jointly come up with a name or two --

16         MR. CRAMER:  May I suggest, Your Honor, that in order

17   to avoid the problem of one expert feeling like he came to this

18   assignment through one side or the other that the experts be

19   contacted jointly.  So that if they want to contact someone,

20   both sides are on the phone.  If we want to contact someone,

21   both sides are on the phone.  So the expert does not know who

22   was the initial sponsor of that expert.

23         THE COURT:  That seems appropriate.  Mr. Isaacson?

24         MR. ISAACSON:  I think that's fine with us.

25         THE COURT:  Okay.

1          MR. ISAACSON:  So in terms of your thinking about this,

2    Your Honor, so that this issue of common injury and modeling is

3    something that's come up since the Supreme Court decisions,

4    Wal-Mart, you know, there was a period of time in antitrust

5    cases where injury was not modelled.  There was a period of time

6    when it was just some economic analysis.  And so you are

7    talking -- you are talking about a very limited group of people

8    who have experience in this.

9          There is, and I think this is part of the arguments in

10   the papers, a wider group of academics who do regression

11   analysis who would look at regression analysis and say, "Yeah,

12   I've never done injury before, but I do -- I do outcomes.  And

13   this is -- this is an outcome.  And I would have opinions on

14   this," whether it's an opinion for them or for us.

15         And that -- that's the other way of going about this is

16   to -- is to widen that because I think undoubtedly both sides

17   have had experts who haven't done injury before who've said,

18   "But I do a lot of regression analysis and this is just another

19   type of way of looking at it."

20         So I'm not ...

21         THE COURT:  Well, here's my concern with that,

22   Mr. Isaacson.  If you ask someone who's done regression

23   analysis, they're always going to say, right, if you have some

24   familiarity with regression analysis, not all aspects of a model

25   are going to capture all the variability, right.

2:15-cv-01045-RFB-PAL

1        So what I don't want to have is someone who's going to

2   say, "Well, yeah, of course you're not going to be able to

3   completely separate these factors out because even with the

4   confidence interval there's still going to be some -- there's

5   still going to be some noise in these variables."  Again, that's

6   helpful, but the question is what can they say and to the extent

7   they're familiar with the nature of the inquiry that the Court

8   has to do that's helpful for me.

9        So my concern about doing that is that having some

10  knowledge of sort of antitrust sort of law and injury could help

11  the expert talk to me about how much of the model is not

12  necessarily flawed, but is I guess -- doesn't fairly capture a

13  sufficient amount of variability or as it relates to, for

14  example, the differences in the -- the wages or the salary that

15  it would be reliable.  And so my concern is is that if you

16  haven't had someone who's had to answer those types of questions

17  at some point, if you get an academic and start asking those

18  questions, there's going to be a lot of conditional statements

19  having not had to answer those types of questions.

20        And so I appreciate that, but I just think that it's

21  going to be hard if you have an expert who's never been asked

22  these types of questions in this context for them to be able to

23  give an answer that's going to be helpful.  And it may very well

24  be that we can't come up with someone, but, again, I think there

25  are significant issues here and I also think that I have a

─────2:15-cv-01045-RFB-PAL─────

1    concern of trying to set some standard that relates to what the

2    Supreme Court decided in Comcast.  There has to be some way for

3    the Court to say on some level there is a certain amount of

4    variability that's captured that's sufficient for the model to

5    be acceptable at this stage and potentially to be presented to a

6    jury.  And there's a certain amount of variability that's

7    insufficient.

8            Of course, the Supreme Court doesn't tell us.  And so

9    we're as District Courts left to try to figure that out and I

10   think experts can help with that.  And so that's what I'm

11   looking at, Mr. Isaacson.  I just I don't want to have an

12   academic come in and say to me, "Well, you know, of course

13   there's always going to be some noise in these variables and I

14   can't really tell you more other than give you confidence

15   intervals as it relates to how much I think the variability is

16   capturing, but there could always be variables that are

17   completely -- variables that are completely subsumed in other

18   variables.  And because I'm not familiar with this industry, I

19   can't tell you that."

20           And that's exactly what can happen because I've had it

21   happen in cases where their lack of familiarity with the

22   industry or with the type of litigation means that they'll make

23   a conditional statement that says, "This is true except I have

24   to accept the possibility as someone who's not familiar that

25   there may be variables in here that I'm not aware of that could

1  have a significant impact."

2      MR. CRAMER:  Your Honor, one thing I would ask, if you

3  would indulge this, is that the -- if Your Honor does retain an

4  independent expert, that that expert -- that the scope of that

5  expert's work be limited to the arguments between the -- the

6  methodologic arguments that Zuffa actually made attacking

7  Dr. Singer.  So that all of a sudden we don't have some -- often

8  what a new person wants to do is say, "Oh, I have my own clever

9  way of looking at this and I would have done it this way.  And

10  here are three other concerns or three other concerns with Topel

11  or three other concerns with Singer."  And all of a sudden now

12  we have a new person with a new set of ideas that is now coming

13  up with new arguments that no one has made before.

14      And so my hope or request is that the scope of this

15  expert's work is limited to the methodologic attacks that have

16  gone on between the parties to date.

17      THE COURT:  That's exactly what it would be.

18      MR. CRAMER:  Okay.  And adjudicating those.

19      THE COURT:  Right.

20      MR. CRAMER:  And not devising some new set of ...

21      THE COURT:  No, there are actually very discrete

22  questions about these models that the parties are fighting

23  about, right.  So I actually don't view the area of dispute,

24  Mr. Cramer, to be extensive.  It's focussed and significant, but

25  it is not 25 different questions about the models.

—2:15-cv-01045-RFB-PAL—

1          MR. CRAMER:  I agree, and my --

2          THE COURT:  Right.

3          MR. CRAMER:  The only reason why I raise it is so that

4    we don't have this new person saying, "Oh, and here's five other

5    questions about what Dr. Topel did or what Dr. Singer did

6    because I'm clever new expert been asked to weigh in on this.

7    Here's how I would have approached it.  And here -- and I know

8    that these were the arguments between Singer and Topel, these

9    three, but I'm going to engage in some different analysis."

10          THE COURT:  Right.  No.  Look, I have experience with

11    academics.  Having been an exiled academic myself at one point

12    in time, I understand that they can at times, you know, engage

13    in sort of an intellectual exercise that may not be relevant.

14    That's really not my purpose here.

15          MR. CRAMER:  Okay.

16          THE COURT:  The only reason why this is coming up is

17    because the experts in this case have made so fundamentally

18    opposing statements about basic modeling that it may be

19    necessary for me to find someone who says, if I think it's

20    appropriate, that this is -- does not make this model flawed in

21    a fundamental and inherent level.  Because that's some of what

22    the statements are in these -- it's not, well -- I mean, for

23    example, I don't know that I would necessarily ask the expert to

24    opine generally about assumptions made about comparable markets

25    or not.  I might ask them, "If you're in a new market, would you

—2:15-cv-01045-RFB-PAL—

1  try to find the most comparable market and would that be an

2  approach that would be accept?"  If they said yes, that would be

3  potentially the end of the inquiry.  I'm not -- wouldn't

4  necessarily ask them, "Would you use Major League Baseball

5  versus using the NHL?"  I'm not going to ask that type of

6  question.

7       The only issue would be if an expert got on the stand

8  for either side and made a statement about sort of general

9  principles of regression, for example, and those analysis about

10  the principles were -- and in this -- these reports sometimes

11  almost diametrically opposed, I would want to have some expert

12  be able to point me to what they viewed as potentially a way to

13  resolve that conflict.

14       And, again, that's why I want to be clear.  This would

15  be a very narrow and discrete area, and it really would be

16  about, again, fundamental principles about how these models

17  worked and what you would do to capture certain types of error.

18  It's not as I said going to be about, you know, is the -- is

19  Major League Baseball better than the National Football League

20  as a choice for a comparable market.  It might be would you use

21  a comparable market and how would you go about selecting the

22  market.  That's the type of questions, Mr. Cramer, that I'm

23  contemplating asking an expert because you have these

24  foundational disagreements between the experts.

25       MR. CRAMER:  Fair enough.  Will Your Honor be asking

—2:15-cv-01045-RFB-PAL—

1   this independent expert to submit a written report to the Court

2   that's shared with the parties in advance of the hearing so the

3   parties will have an understanding of the outlines of the

4   opinions of this independent expert before the hearing begins?

5           THE COURT:  Yes.

6           MR. ISAACSON:  And when you're talking about asking

7   questions of the expert, that would be in the context of the

8   hearing?

9           THE COURT:  Asking questions of which expert?

10          MR. ISAACSON:  You've talked about the questions you

11  would like to ask -- potentially ask the independent expert.

12  That would take place at the hearing?

13          THE COURT:  Yes.  I would identify for the expert when

14  I interviewed them the areas that I expect that they would get

15  questions about without saying, "Tell me preliminarily what your

16  answers are."  I wouldn't ask them that, but just so that they

17  would be prepared to answer the questions that the Court has.

18          And, again, we've been talking about I think the basic

19  questions that are at issue in this case.  As I've said before,

20  there are like four or five questions.  The only reason I think

21  an independent expert may be appropriate is because of this

22  fundamental disagreement about certain principles as relates to

23  the modeling and particularly between Dr. Topel and Dr. Singer.

24          MR. CRAMER:  Will the independent expert be given the

25  reports and all of the data and backup and all of the materials

—2:15-cv-01045-RFB-PAL—

1   necessary to rerun the regressions?

2           THE COURT:  Yes, but I wouldn't ask them to rerun the

3   regressions.  Right.  So I wouldn't ask that they be checking

4   the experts' work.

5           MR. CRAMER:  Okay.

6           THE COURT:  Right.  So -- and again --

7           MR. CRAMER:  So these questions are more at a higher

8   level --

9           THE COURT:  Yes.

10          MR. CRAMER:  -- than granular questions about precisely

11  what the experts did.

12          THE COURT:  Right, because, again, because there's been

13  this disagreement between the parties' experts about

14  foundational principles for these models, which again goes to

15  the core of the models, that's what I would expect the expert to

16  resolve; not whether or not it's appropriate, right, to start

17  the class period in December 2010 versus, you know, April 2009

18  versus January 2012.  That's not the type of question I would

19  anticipate asking the expert.  It's really to resolve

20  methodological questions that go to the heart of whether or not

21  the methodologies are flawed or not in a fundamental way; not,

22  you know, to go and check essentially the math or the

23  statistical modeling in terms of how it was performed.

24          Mr. Isaacson, any questions about that?

25          MR. ISAACSON:  No, Your Honor.

—2:15-cv-01045-RFB-PAL—

1        THE COURT:  And, again, it may very well be that in the

2   course of this that the Court makes the determination that it

3   simply wouldn't necessarily be helpful, but in an abundance of

4   caution I'm going to ask you to submit those -- each of you to

5   submit three names to me with the information I provided.

6        Okay.  Any other questions about that?

7        MR. CRAMER:  No.  Thank you, Your Honor.

8        THE COURT:  Okay.

9        Let's see.  What else is on our to-do list?  Is there

10  anything else that we need to do today?  I don't find that I

11  need to go through the and decide today the standard in this

12  case, and part of that actually depends upon the modeling

13  itself.  So it's -- as I've said, I'm not sure that the standard

14  is actually going to have a significant impact on my decision

15  depending upon what the Court decides is the reliability or not

16  of the models.  And so, again, I'm not going to decide that at

17  this juncture.  So I don't know if there's anything else we need

18  to do.

19        The main purpose for this hearing was to prepare for

20  the experts' hearing.  You all have outlined the time frames

21  which seem to generally be appropriate as relates to how much

22  time for the witnesses.  I think it will probably be less than

23  what you all have outlined, but we can talk about that at the

24  time.  So we have the time frames.  We have the dates.  We've

25  discussed the date for the disclosure of exhibits, and we'll set

─────2:15-cv-01045-RFB-PAL─────

1   a hearing for us to go over that and the possible appointment of

2   independent experts.

3           Anything else then?

4           MR. DAVIS:  Your Honor, so I was prepared to discuss

5   the standard today.  And I certainly understand given the

6   distance in time and what have you that may not be essential,

7   but I do just want to know, part of what you're talking about

8   was Comcast.  And without getting into great detail, I think we

9   have a very different view than defense counsel of what Comcast

10  requires.

11          THE COURT:  Oh, I know because I've read your

12  submission.  But I don't know that we need to go over the

13  submission, right.

14          MR. DAVIS:  Right.

15          THE COURT:  I mean, you've submitted it previously.

16  You submitted refined briefs that say similar things to what you

17  said previously --

18          MR. DAVIS:  Right.

19          THE COURT:  -- but in a more pointed way.  And so I

20  don't find that oral argument in this context is going to be

21  helpful, and part of the reason why that is is that the standard

22  may not matter in the context of what the Court finds as it

23  relates to the reliability of the modeling.

24          MR. DAVIS:  That all -- that all makes sense to me.

25  There is one procedural element and maybe there's no way to

──────2:15-cv-01045-RFB-PAL──────

1   address it, but I do just want to flag it, which is that

2   certainly if we were to have an academic, even an academic with

3   some relevant practical experience, they're not used to working

4   in the kind of doctrinal context.  And so when Comcast says, for

5   example -- and I won't go on, but when Comcast says, "We're

6   not -- we're just applying traditional class certification

7   principles here.  We're not to -- you know, we're not disturbing

8   this long-standing rule that reasonable estimates of damages are

9   fine.  We're not asking for accuracy, right," that's a legal

10  quirk.  You know, the standard is quite low for estimating

11  damages in antitrust cases once you prove violation and fact of

12  damage.

13          That is not going to mesh particularly well with a lot

14  of -- I'm actually a full-time academic and have spent a good

15  deal of my last 20 years watching the interplay between folks

16  with a more academic orientation, including economists,

17  interacting with legal standards.  And there is this potential

18  dissidence where what the expectation is -- you know, what the

19  Courts have always said in antitrust is you can't just guess,

20  but you got to be practical because, hey, the wrong-doer caused

21  -- once you've shown a violation in fact of damage, the

22  wrong-doer caused the uncertainty.

23          And that's -- that could just be tricky with having

24  this outside expert come in if they're sort of philosophizing

25  from a more academic perspective, what have you.  So that's the

—2:15-cv-01045-RFB-PAL—

1  concern.

2       THE COURT:  Well, first of all, I don't think it's

3  actually that tricky.  I think if you ask the expert a specific

4  question as it relates to the model, right, and confidence

5  intervals and what can and can't be captured and what you would

6  expect, you can give them the parameters of their answer, right.

7       MR. DAVIS:  Okay.

8       THE COURT:  Right.  So you're right.  What -- what

9  standard an expert might apply to the reliability of a model for

10 a peer-reviewed paper is not the standard that we're applying,

11 but that's not what we're going to ask.  But in my experience

12 you would want to have an expert who could say, "Well, put that

13 aside.  If I gave you this set of parameters as it relates to

14 capturing the variability of this particular wage or salary."

15 In my experience they're not necessarily going to be difficult

16 to understand it once you've given them that specific parameter,

17 right.

18       MR. DAVIS:  Yeah.

19       THE COURT:  I agree with you that if I just didn't give

20 them any instruction and then neither side asked them questions,

21 then, you know, we could be here for days listening to them talk

22 about it.  But that's not what we're talking about here, right.

23 And that's why, as I said, the issue as it relates to the

24 difference between the parties may not be that much of an issue

25 because I don't find that that's the standard that they have to

1   apply.  The standard that academics would apply for their own

2   modeling is not a standard that I've ever seen any court say is

3   the standard that you would apply.

4        Now, as I understand the standard, and this is why I'm

5   talking about the experts, is there is this issue in Comcast of

6   being able to at least attempting to capture or distinguish

7   between certain types of conduct.  Now, in that case I think

8   it's an extreme example because you have four theories.  Only

9   one of the theories goes forward, and so --

10       MR. DAVIS:  Right.

11       THE COURT:  -- I don't know that that -- that that

12  necessarily means that you have to be able to essentially

13  control for every possible minute influence on a particular

14  outcome in this case.

15       MR. DAVIS:  Right.

16       THE COURT:  For example, percentage of the revenue

17  that's paid to the fighters from the overall take for a fight.

18  That's not what I'm talking about.

19       MR. DAVIS:  All right.

20       THE COURT:  Right, but I do think if you had an expert

21  you could say, "If we set as our benchmark the fact that the

22  Court finds it to be acceptable 15, 20 percent, or 30 percent

23  essentially sort of unaccounted for variability, what would you

24  expect to see?"  Because at the end of the day what's going to

25  happen is we're going to come down to a number about the

—2:15-cv-01045-RFB-PAL—

1   variability and how much of the variability's being captured,

2   and you all are going to disagree about what the standard is

3   going to be, right.  You already do, right, more or less.

4           MR. DAVIS:  Right.

5           THE COURT:  Right.  But what the expert can speak to is

6   what would you do to try to capture the best of it, and if the

7   expert's -- if Dr. Singer has done that, then that's something

8   that I can take into consideration and whether or not it's

9   enough.  I mean, there's two separate questions here.  One is

10  whether or not the modeling captures enough of the impact of the

11  injury that it's -- it can -- the class can move forward and

12  potentially then the case can move onto a jury, if the Court

13  were to decide that, and what the threshold is for that.

14          And what Comcast doesn't tell us is what that is,

15  right, from a statistical standpoint because there are all

16  different ways to be able to make that determination, and they

17  don't give us -- they don't make any reference to any type of

18  statistical benchmarks that are going to be helpful.  And that's

19  why for me the expert could help with that, what sorts of things

20  would you look at, right, to be able to make the determinations

21  about a fundamentally flawed model in this area.  That is the

22  type of question that I would expect may come up.

23          MR. DAVIS:  Okay.  Thank you, Your Honor.  That's very

24  helpful.  And I do think that the one thing I don't want to get

25  away from is I don't think Comcast changed the law all that much

—2:15-cv-01045-RFB-PAL—

1  really.  It did address a very extreme circumstance and said

2  we're addressing a very extreme circumstance.  And I do think,

3  as you just articulated, certainly if something is fundamentally

4  flawed, if it's junk science, you know, at that level, of course

5  that -- you know, that's an issue.  But in-class certification

6  in particular and an antitrust damage in particular, the

7  standard has been very forgiving for some strong policy reasons,

8  but it's come from the Supreme Court whatever the reasons.  And

9  I -- what I would at least like an opportunity to address, if

10  necessary, I know we've laid this out twice now at length, but

11  is not to have that sort of ratcheted up.

12         THE COURT:  Well, but here's the issue.  And I'm sorry.

13  Remind me of your name again.

14         MR. DAVIS:  Josh Davis.

15         THE COURT:  Mr. Davis, here's the issue.  I don't know,

16  as I said to you earlier in this case, that there's a big

17  difference because if I were to find that the model's

18  fundamentally flawed even with the lower standard, it

19  wouldn't -- it wouldn't necessarily be acceptable, right.

20         MR. DAVIS:  I agree with that.

21         THE COURT:  Right.

22         MR. DAVIS:  Of course.

23         THE COURT:  So I'm not saying that -- that necessarily

24  Comcast changed the standard, but what it does do is it gives us

25  an example of a type of model that the Court finds to be

—2:15-cv-01045-RFB-PAL—

1  unacceptable.  And I think that model would still be

2  unacceptable under the standard that the plaintiffs have

3  actually presented.

4            MR. DAVIS:  Absolutely.

5            THE COURT:  So I'm not saying that somehow --

6            MR. DAVIS:  If there's four theories of liability and

7  only one can go forward --

8            THE COURT:  Right.

9            MR. DAVIS:  -- on a class cert basis -- on a class

10  basis and the damages model can't distinguish between them,

11  that's the extreme case where plaintiffs would agree obviously

12  that's rightly decided.

13            THE COURT:  Right.  So, again, without getting into the

14  full issue of the briefing --

15            MR. DAVIS:  Yes.

16            THE COURT:  -- that's why I had said I'm not sure that

17  the differences in the standard here are going to matter because

18  if there's a fundamental flaw as there was in Comcast, under

19  either standard it will not -- the case would not survive.

20  However, conversely, if the model wasn't fundamentally flawed

21  under either standard, the motion potentially could proceed.

22            So the issue as relates to the sort of fundamental or

23  not flaws in the modeling seem to me are central regardless of

24  the standard because I think that it could be outcome

25  determinative as relates to reliability of the model if I apply

—2:15-cv-01045-RFB-PAL—

1   the plaintiffs' or the defendant's proposed standards.  And

2   that's why, to me, this case really comes down to this modeling

3   and the Court understanding what the model captures and its

4   reliability and to the extent to which it's flawed or not or

5   whether or not it conflates conduct that it shouldn't conflate.

6          MR. DAVIS:  Thank you, Your Honor.

7          THE COURT:  Oh, sure.

8          Mr. Isaacson, did you have anything else you wanted to

9   add to that?

10         MR. ISAACSON:  Just I agree with Your Honor that if you

11  find that the model's fundamentally fraud, it's outcome

12  determinative, and the arguments about higher standards don't --

13  don't become an issue at that point.

14         When we present our evidence, we will be presenting

15  evidence not just on how the models are fundamentally flawed,

16  but under the higher standard if you take into account the

17  defendant's evidence.  And for example --

18         THE COURT:  Well, I don't know about that.  So let me

19  just be clear about that.  When you say the defendant's

20  evidence, I'm not sure what that means, right.  So maybe you

21  could help me.  Because let me give you an example,

22  Mr. Isaacson, of the question I'd like you to answer, for

23  example.  What is the legal sort of competitive conduct that

24  your client could engage in that you believe is captured in the

25  model?

2:15-cv-01045-RFB-PAL

1            And the reason why I ask you that is if the Court were

2   to make a determination, let's say, that as of whatever,

3   December 2011 or January 2012, all of the conduct that perhaps

4   previously might have assisted Zuffa from a strategic and

5   competitive standpoint by virtue of its dominance in the

6   relevant markets became essentially anticompetitive, what

7   procompetitive or what legal conduct could occur that you think

8   the model captures?

9            MR. ISAACSON:  Or doesn't or fails to capture.  The

10  procompetitive -- the procompetitive conduct that a model should

11  capture and does not as outlined in the expert reports and the

12  papers are all the efforts Zuffa does to promote, market, and

13  generate revenues for the events independent of the inputs of

14  the athletes who are doing the fights.

15           THE COURT:  So let me ask you a question.  If I were to

16  accept that, that would mean that you could never have a model

17  that worked in this circumstance.  Is that what you're telling

18  me?

19           MR. ISAACSON:  No, no.  Those --

20           THE COURT:  So what would be a way -- because I don't

21  see your expert actually saying this.  I'm just saying this

22  because I have to tell you now that to me is a concern.  What

23  would be a way to actually do that?  What would you do in a

24  circumstance where you're going to have -- you know, you have

25  marketing.  You have promotion.  All of that also benefits

—2:15-cv-01045-RFB-PAL—

1  Zuffa.  Are you saying that in a situation in which the revenues

2  are generally increasing for the overall industry and that in an

3  absolute way the wages are increasing that in that context it's

4  not ever going to be possible for there to be a model that would

5  distinguish between this legal conduct and this sort of illegal

6  conduct?

7       MR. ISAACSON:  No, that is not what we've said.  What

8  we've said is that there are variables that you can introduce in

9  order to do that; that the investments that are being made by

10  Zuffa which are, you know, for example, you know, present in the

11  financial statements of Zuffa.

12       THE COURT:  Right, but those investments would

13  necessarily be -- being made to promote its potentially sort of

14  dominant position, right.  How would -- how would you ever

15  distinguish that?  How would you say, "Well, this marketing only

16  goes to our procompetitive sort of lawful conduct.  Whereas,

17  this other marketing goes to or can be separated from our

18  promoting our own dominant position in the market"?  How would

19  that actually happen?

20       MR. ISAACSON:  I don't think there's such a thing as

21  marketing a dominant position.

22       THE COURT:  No, you're right because if you're

23  dominant, you're automatically, right, perpetuating your

24  dominant position, right?

25       MR. ISAACSON:  But in terms of -- I mean, if you

———— 2:15-cv-01045-RFB-PAL ————

1  just -- so it's perfectly legal to be a monopoly.  If you are a

2  monopoly, which we don't agree that we are, but if you just took

3  a standard monopoly and ...

4        THE COURT:  I'm sorry.  You said monopoly or monopsony?

5  Which one are you focussing on?

6        MR. ISAACSON:  You can use either one for purpose of

7  the example.

8        THE COURT:  Okay.  All right.

9        MR. ISAACSON:  The marketing, promotion, those are

10  procompetitive things being done by a monopoly.  And you can

11  analyze those, quantify them, look at them, and inject them into

12  a model.  For the same -- for Zuffa whether or not you accept

13  their allegation that we're a monopsony --

14        THE COURT:  And you're saying that those are things

15  that could be from a modeling standpoint --

16        MR. ISAACSON:  Yeah.

17        THE COURT:  -- separated from unlawful antitrust

18  conduct?

19        MR. ISAACSON:  The amount of money that Zuffa spends on

20  production costs -- so different from the NFL, which has the

21  network, you know, Zuffa runs the production.  The amount of

22  money that Zuffa spends on production is unquestionably

23  procompetitive activity.  I mean, I don't think any economist

24  will come in here and question that, including the plaintiffs'

25  economist.  Okay.  That promotes the business in a way that a

—2:15-cv-01045-RFB-PAL—

1  business is supposed to conduct itself.

2          And so if you're not sorting out that from what they

3  claim is the anticompetitive conduct, then you are not -- you

4  don't have a model that's distinguishing one from the other.

5          THE COURT:  And the question I have for you, and I just

6  want to go back because maybe you could help me see this, is it

7  possible to do that?

8          MR. ISAACSON:  Yes.

9          THE COURT:  Because -- really?  Because -- and maybe

10  you can help me.  Point me to where, because I want to go back

11  and look at this, your expert identifies and goes through and

12  says, "Here's where you could actually separate this out."

13  Because I want to go back and find it because, again, there's a

14  lot in the model.  So maybe you could identify that for me

15  because that's one of the areas that I'm going to look at as

16  relates to this because obviously that's one of your I think

17  main arguments in this case --

18          MR. ISAACSON:  Right.

19          THE COURT:  -- is that Dr. Singer's report from your

20  perspective doesn't do that.  But I wasn't real clear, and maybe

21  again I'll go over it again, about how you could ever

22  distinguish those types of effects, if you are in that allegedly

23  sort of dominant position promoting your dominant position how

24  you would be able to say, "Well, yes, this helps us in terms of

25  our position, but it also helps the industry."  And is there a

—2:15-cv-01045-RFB-PAL—

1  way to actually be able to do that?

2          Now, it may very well be that if you can't distinguish

3  the Court may still decide, "You know what, this is enough of an

4  input into this equation that it can't be properly modeled and,

5  therefore, there can't be antitrust injury.  And so, therefore,

6  in this context you can't do that."  I may reach that

7  conclusion, but I want to first understand from your perspective

8  how you think it could actually be done in a way that wasn't

9  done.  And if you could point again that out to me in the

10 record, I want to go back and look at that.

11         MR. ISAACSON:  So if this had been the December

12 hearing, I would have those citations in front of me.

13         THE COURT:  Okay.

14         MR. ISAACSON:  I'm happy to write you just a letter

15 that says, "Here's the parts of the report that I'm referring

16 to."

17         THE COURT:  Okay.  But you're saying it's in Dr. -- is

18 it Dr. Topel?  I don't know if he's the ...

19         MR. ISAACSON:  Yes.  There's been back and forth about

20 this between the --

21         THE COURT:  There has been, but again I don't know that

22 I fully saw the part that you're describing.  But, again,

23 there's a fair amount of --

24         MR. ISAACSON:  Right.

25         THE COURT:  -- a record in this case so --

———2:15-cv-01045-RFB-PAL———

1        MR. ISAACSON:  The related point I would make on this

2   in terms of what we would present in terms of evidence is on

3   this wage share point.  Our point on wage share and foreclosure

4   share is not just that they are fundamentally flawed, but if you

5   run the model the traditional way with actual wages, then there

6   is no finding of common impact.

7        THE COURT:  Yes, see -- okay.

8        MR. ISAACSON:  And so one of the reasons why we -- we

9   briefed the issue of the higher standard -- and, you know,

10  Wal-Mart says you can't ignore the defendant's evidence.

11       THE COURT:  Well, that's not what you're saying.  What

12  you're saying is, "We have a different model that we think

13  doesn't show" --

14       MR. ISAACSON:  And it's the traditional model that --

15  the way everybody has done it.

16       THE COURT:  Okay.  But that, Mr. Isaacson, goes back to

17  this issue about me having the expert to say whether or not this

18  is a legitimate approach to modeling.  And I don't know what

19  traditional model -- many models are traditional until they're

20  determined not to be traditional because there are better ways

21  of going about doing things.  So, to me, one of the things the

22  expert can do at the hearing when we have it is to explain to me

23  when you say traditional what that means because traditional has

24  to also mean reliable, appropriate, right, and that's why I say

25  I go back to this issue about the appropriateness of the model.

—2:15-cv-01045-RFB-PAL—

1          If -- from my standpoint, Mr. Isaacson, if there are

2    two different models and they're equally potentially useful and

3    helpful and the plaintiffs have used one and you're supporting

4    another one and they maybe reach different outcomes, I don't

5    know that you prevail in that instance.  I'm not saying that's

6    what you're saying, but --

7          MR. ISAACSON:  It is what I'm saying, and I think you

8    need to look at Ellis on that because Ellis had two different

9    models.  It had -- there was -- there was a plaintiff's -- a

10   defense economist who said that this -- the level -- the

11   statistics on discrimination only happened in two regions and a

12   plaintiff's economist who said it was more widespread than that.

13   And the District Court said, "There's nothing wrong with the

14   defense model.  It's admissible.  It's acceptable.  However,

15   there's a plaintiff's model also.  You can move forward."  And

16   Ellis said that was wrong.  You had to resolve that dispute.

17         THE COURT:  What do you mean resolve it?  So, in other

18   words, resolve the dispute in what way?  If they're both -- let

19   me ask you a question.

20         You're saying to me if both models are scientifically

21   valid, right, and they produce different outcomes it's up to me

22   to resolve how I weigh those two different models?

23         MR. ISAACSON:  Yes, and particularly in the facts of

24   this case because if you're looking at some new way of doing

25   this that's different from how everybody's been doing it -- and

─────2:15-cv-01045-RFB-PAL─────

1  we think this is a new way because you couldn't do it the old

2  way and have this case.  When you're going to have this new way

3  -- it's one thing to say, "All right.  We're doing this new way

4  -- you know, we've discovered a new way to figure out whether

5  this chemical causes cancer because none of the other

6  traditional methods tell us the answer."  Okay.  Here, the

7  traditional method tells you the answer.  There is no impact.

8  Right.

9       They have this new way that they found which if you

10  accept certain things does show the impact.  That's what's going

11  on here.  And so this is not just a matter of sort of saying,

12  "Okay.  I've got this gap of information and should I let this

13  new way of thinking here fill in that gap."  It's, "Should I

14  allow this new model to overturn the way all of the antitrust

15  wage models have been going for years."  And --

16       THE COURT:  So let me first say this.  Let me first say

17  this.

18       MR. ISAACSON:  And I do think you have to consider that

19  argument.

20       THE COURT:  Well, I'm not saying I shouldn't consider

21  it and we can talk about this, but I think that the standard is

22  different as it relates to me evaluating the outcome between two

23  scientifically valid models versus me looking at whether or not

24  the models are valid.  The first question is is the plaintiffs'

25  model even a scientifically way to approaching the question.  I

——2:15-cv-01045-RFB-PAL——

1  don't even get to defense evidence if that's not the case,

2  right.

3          Then the next question is as a legal matter do I have

4  to consider, Mr. Isaacson, that the defense has a model that

5  they think doesn't show impact.  You know, at this point, you

6  know, I'll go back and look at the law.  I'm not convinced that

7  I have to make that determination, but I also think again in

8  this case part of that's going to depend upon questions about

9  the model.  When you say new or not new, what that actually

10 means, right.

11         And so I'm not disagreeing with you that there could be

12 a sort of level of, for lack of a better word, sort of

13 abnormality about the modeling that while still valid is so

14 completely different than what you would expect that the Court

15 might find that it's not appropriate.  What I am saying is that

16 the reason why we're having this hearing is I'm not in a

17 position to evaluate when you say new what that actually means.

18 And I think that's the rigorous analysis that the Court actually

19 has to do.  That I have to have some way to be able to accept

20 that and go through this -- this analysis where I have

21 essentially two experts who disagree so fundamentally as the

22 experts do in this case.  I have to resolve that.

23         And I agree with you that I do have to resolve that

24 fundamental disagreement.  The question is at what level and

25 that's where the parties disagree, but I think I first have to

—2:15-cv-01045-RFB-PAL—

1  decide the scientific validity of the model, one.  Then the

2  question is if there's a different answer or if there are

3  different issues that are raised, at what level do I have to

4  decide that and at what level does the jury have to decide that.

5  And I think that is an answer that's better -- questions better

6  answered after I've heard the testimony to be able to figure out

7  at what order I find that there's going to be a difference.

8         I may find, for example, that one side or the other is

9  just simply not credible as it relates to what the answers are

10 that have been provided.  I'm not saying I would do that, but

11 that would resolve some of this issue.  I just don't know that

12 right now.

13        MR. DAVIS:  And Your Honor --

14        THE COURT:  Hold on just a second.

15        MR. ISAACSON:  I'm not trying to get you to decide

16 something today.  You're not deciding anything today.  And the

17 nature of my comments is to preview our arguments that we'll be

18 making at the hearing.  And when we present our evidence,

19 because of -- you know, I think because of the standards that

20 are set forth in Ellis, we will put on our evidence not just

21 that the model is flawed, fundamentally flawed, but also the

22 competing model that you need to weigh.  And we think we need to

23 make that record.  And we think that under the higher standards,

24 whether or not you ever get to the higher standards, that that

25 is -- that should be part of the presentation.

2:15-cv-01045-RFB-PAL

1          We don't think that that's tons of additional time.

2     And it's not a, you know, admission of a bunch of documents and

3     things.  It's just explaining what happens when you run this

4     model with actual wages and also explaining what happens when

5     you take into account things like production costs.

6          THE COURT:  Okay.

7          MR. DAVIS:  So, Your Honor, there -- I know we're not

8     resolving the standard today and we are certainly not resolving

9     the evidence, but there were some assertions made that I would

10    like an opportunity just to touch -- and I will be brief.  I

11    will be brief, but I would like to touch on a few of these

12    stories or a few of these issues that were raised.

13         Defense counsel said -- told the story of, "Well,

14    production costs went up and the like, promotion.  And there's

15    no way to control for that and, you know, we showed that it can

16    make a difference."  We welcome that inquiry.  And just to

17    preview that a bit, how that will look is Zuffa throughout a

18    series of expert reports vaguely said there's something there.

19    We call it the special sauce, but didn't identify how you

20    would -- one would capture it at all.

21         Dr. Singer in fact did try to capture that through

22    multiple variables that he discussed.  Finally, late in the day

23    in supplemental reports Dr. Topel said, "Oh, well, it might be

24    something like our spending."  Dr. Singer then immediately ran a

25    regression.  He had already captured that in certain variables,

—2:15-cv-01045-RFB-PAL—

1   change in, you know, year to year, changes in variables to

2   capture if there were an increase in expenditures.  But he

3   specifically then addressed the things that Dr. Topel finally

4   gave him.  "Oh, finally you've told us the story that you

5   want -- you haven't done the analysis, but you've told us where

6   to look."

7          He did that analysis.  And what you'll find and

8   certainly by the final report, Dr. Singer's, I apologize, fourth

9   report, but we were waiting for them to tell us where this

10  special sauce is hidden.  What you will see is Dr. Singer runs

11  -- Dr. Singer runs that analysis, controls for the very things

12  that Zuffa has identified, and finds that, in fact, wage share

13  should have been going up because the expend -- Zuffa's

14  contribution was decreasing over time or at most staying the

15  same.

16         THE COURT:  Well, the issue for me really is whether or

17  not there are some -- there may be some factors that are just

18  difficult to fully account for that because they overlap with

19  both sort of essentially improving or increasing sort of

20  exposure of the general public --

21         MR. DAVIS:  Right.

22         THE COURT:  -- to a particular industry with promotion

23  of a dominant antitrust position.  And what I'm saying is I

24  don't necessarily agree that if there's the potential for

25  overlap that the model has to capture that completely.

—2:15-cv-01045-RFB-PAL—

1          MR. DAVIS:  Right.

2          THE COURT:  Now, the question is how much of it has to

3   be captured and to what extent you can separate those things.

4   And for me that's part of the issue of the model --

5          MR. DAVIS:  Yes.

6          THE COURT:  -- that I have to look at and whether or

7   not there was an attempt to do that and whether or not

8   realistically how much of that can be captured.

9          MR. DAVIS:  Right.

10          THE COURT:  Because, to me, that's the fundamental

11   question that I have to ask the experts, which is to the extent

12   there's going to be expenditures that overlap, what do you do

13   about that?

14          MR. DAVIS:  Yes.

15          THE COURT:  I mean, because there are going to be some

16   expenditures like marketing where there's going to be some

17   overlap.  And you can look at how much that expenditure is as

18   one way to try to capture it.  You can look at other, sort of,

19   what would be sort of the normal returns.  I mean, there are

20   different ways you might want to look at that.

21          MR. DAVIS:  Right.

22          THE COURT:  But there's not going to be a way that's

23   going to completely capture that, and I don't know that that's

24   what could be expected.

25          MR. DAVIS:  Yes.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  And so I appreciate that.  And that's why I

2     was just asking Mr. Isaacson a little bit about that because I

3     wanted just to go back and before we had this hearing

4     familiarize myself with that.

5          So one of the things I am going to do is certainly when

6     we have the hearing about the exhibits we'll go over it in a

7     little more detail because I will in preparing the exhibits go

8     through again these expert reports, again, that are quite

9     voluminous.  And I most likely will give you very specific

10    questions that I expect that your experts will have to answer

11    that are relevant for me, which is not to say either side can't

12    make its record, but you all have made your record.  I mean, you

13    made the record, like, extensively.  I don't know that there's

14    any more of a record that you would need to make.  I mean, the

15    arguments you've raised with me today you've raised them

16    repeatedly.

17         And a lot of these hearings are about me explaining to

18    you what I understood from all of that and, you know, as a slow

19    plotting student what I'm requiring in terms of the knowledge

20    that is being sort of showered down upon me.  So, what I expect

21    is when we have the hearing about the exhibits you'll get a list

22    from me of both what I expect the experts will testify to and

23    what I would expect any independent expert to also produce a

24    report with respect to what they would testify to, because it

25    may very well be that I might ask the independent expert to

—2:15-cv-01045-RFB-PAL—

1  provide a report or testify after I have heard from Dr. Singer

2  and Dr. Topel.

3          So, for example, if I find one side or the other to be

4  not credible, well, I don't know that I would need an expert to

5  help me with that.  So, again, just so we're clear, to the

6  extent that I have the expert, the expert most likely would

7  appear and provide testimony in a report after the defendant's

8  and plaintiffs' experts had testified.

9          So, all right.  Anything else then that we need to

10  address, any sort of arguments that we're not going to have, but

11  we are sort of having anyway today?

12          MR. ISAACSON:  Just by way of citation, Your Honor, the

13  portion of Ellis that I was referring to about the two competing

14  experts who are Dr. Saad and Dr. Drogin is at pages 982 and 983

15  of the Ellis decision.

16          THE COURT:  Okay.  I will take a look at that.  And I

17  am sure, Mr. Isaacson, this will not be the last time that we

18  have this discussion.

19          MR. ISAACSON:  I'm sure, yes.

20          THE COURT:  But that's helpful again because for me, as

21  I'm sure you can hear, part of the question is trying to figure

22  out what threshold is set in these types of cases as relates to

23  the modeling.  That's just a question that's not very clearly

24  answered by the Supreme Court one way or another as relates to

25  what this sort of analysis is that I'm supposed to do other than

————2:15-cv-01045-RFB-PAL————

1   the fact that I know that I have to look at these models and

2   make certain determinations about their reliability and

3   validity.  So I do appreciate the parties' input as relates to

4   these modeling because I do think we are sailing in somewhat

5   uncharted territory, particularly as it relates to this modeling

6   and the antitrust area.

7          MR. DAVIS:  Your Honor, if I might, there are just

8   three quick points I would like to make.  I know this is not

9   going to -- not everything hangs in the balance, but opposing

10  counsel made a few arguments and I would like just --

11         THE COURT:  I thought you just did that, right.  He

12  just gave one citation.

13         MR. DAVIS:  He actually made --

14         THE COURT:  So if you want to give an opposing

15  citation --

16         MR. DAVIS:  -- other arguments that I would like to

17  address very quickly if I might.  The first one is --

18         THE COURT:  Okay.  So why don't we just save this

19  because I really -- we have, what, you have -- it's January.

20  We're not going to have the hearing until August.  Honestly, I

21  will have literally hundreds of cases between now and then.

22         MR. DAVIS:  I understand, yes.

23         THE COURT:  Right.  So whatever you tell me is probably

24  not going to necessarily -- particularly if it's of a technical

25  nature, right, I'm not going to recall it with the exactitude

─────2:15-cv-01045-RFB-PAL─────

1  you'd want me to at the time.  At the time --

2          MR. DAVIS:  Are you suggesting that you don't go to bed

3  every night and wake up every morning thinking about this case?

4          THE COURT:  I have to tell you honestly that that is

5  not the case.

6          MR. DAVIS:  I'm glad to hear that, Your Honor.

7          THE COURT:  And so -- but I do look at this material

8  and I will be looking at it more in depth as we get closer, but,

9  you know, I would not necessarily think it an efficient use of

10  your time or mine to engage further.

11          Again, part of this is to give you all just some sense

12  of what are the issues that I think that need to be addressed at

13  the hearing and will, as I said, address them as we get closer.

14          MR. DAVIS:  We appreciate it, Your Honor.  It is very

15  helpful to have that kind of guidance you've given us.

16          THE COURT:  Well, you'll have more specific guidance as

17  we get closer.

18          MR. DAVIS:  We appreciate it.  Thank you, Your Honor.

19          MR. CRAMER:  Thank you, Your Honor.

20          THE COURT:  All right.  Anything else that we need to

21  do today?

22          And so I will issue a minute order that will address

23  the issues of the motion to seal, but I expect that and

24  anticipated the motions to seal for now will be granted with the

25  understanding that I may decide to unseal things later.  And so

—2:15-cv-01045-RFB-PAL—

1  that will be my general order as to the motions to seal now, but

2  I may make a determination, as I said, later to unseal certain

3  documents.

4       We will then also include in the minute order the

5  schedule as relates to the disclosure of exhibits and objections

6  to the exhibits as well as the disclosure or provision of three

7  experts from either side to the Court.  And the hearing about

8  the exhibits and about the testimony will occur obviously before

9  the schedule is set by the Court as relates to the experts'

10 testimony.

11      MR. CRAMER:  Your Honor, when do you think you will let

12 us know when the -- the evidentiary hearing will begin?  Because

13 we need to tell our experts.

14      THE COURT:  Oh, we're going to go back and look at it.

15 Probably -- we have to look at -- well, here's what I will tell

16 you.  It will be after February 15th because we have to figure

17 out what's going to happen on February 15th as it relates to my

18 calendar, right.

19      MR. CRAMER:  Oh.  Okay.

20      THE COURT:  Right.  So this is a date that we have to

21 look at because I have to prioritize certain things versus other

22 things.  And I will tell you that I generally tend to prioritize

23 cases involving criminal matters and trials and to prioritize

24 issues involving civil rights violations before large antitrust

25 cases; not to say it's not significant in the context of your

─────2:15-cv-01045-RFB-PAL─────

1  clients' decision, but we have a fair number of cases in this

2  district that involve civil rights issues and other related

3  issues regarding criminal matters which will take priority.

4  And, as you all know, we are a very busy district.

5      So I already have schedules and trials all the way

6  through to the end of this -- almost to the end of this year.

7  So it's not a simple matter for me to make that determination.

8  And certainly if the Government's shut down, that places a

9  different type of burden on the Court as relates to the timing.

10     So what I expect is some time about two to three weeks

11  from now you will -- you will have that information.

12     MR. CRAMER:  Thank you, Your Honor.  Will Your Honor

13  also be setting the date for the hearing on which we will be

14  going over the experts --

15     THE COURT:  Yes.

16     MR. CRAMER:  -- and the evidence?

17     THE COURT:  Right, all of that will happen.  And so you

18  won't actually see a minute order in this case for two weeks, in

19  part, because I want to wait -- maybe except for the motions to

20  seal, but I want to wait until we understand what's going to

21  happen, to the extent that we do, on February 15th so that we

22  can figure out how we plan things accordingly because we have

23  different scheduling that occurs in the context of the

24  Government being shut down.  Okay?

25     MR. CRAMER:  Understood.  Thank you, Your Honor.

—2:15-cv-01045-RFB-PAL—

1        THE COURT:  Certainly.  All right then.  I appreciate

2   counsel today.  We are adjourned in this case.  I'm going to

3   stay on the bench for a few moments.  Thank you.

4        MR. CRAMER:  Thank you, Your Honor.

5        THE COURT:  It's all right.  I'm going to stay here for

6   a little bit and do some work.

7        (Whereupon the proceedings concluded at 11:22 a.m.)

8                          --oOo--

9             COURT REPORTER'S CERTIFICATE

10

11     I, PATRICIA L. GANCI, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter.

15

16   Date:  February 7, 2019.

17                          /s/ **Patricia L. Ganci**

18                          Patricia L. Ganci, RMR, CRR

19                          CCR #937

20

21

22

23

24

25