# EXHIBIT 6

**Defendants' Motion to Exclude Gene Deetz (Jan. 6, 2017), Case No. 15-cv-3378, Dkt. No. 322 (Jan. 6, 2017)**

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 2 of 34
Case 2:15-cv-03378-JFW-MRW Document 312 Filed 01/09/17 Page 1 of 34 Page ID
#:21880

**GREENBERG GLUSKER FIELDS**
**CLAMAN & MACHTINGER LLP**
Bertram Fields (SBN 024199)
BFields@ggfirm.com
Ricardo P. Cestero (SBN 203230)
RCestero@GreenbergGlusker.com
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590
Telephone: 310.553.3610
Fax: 310.553.0687

*Attorneys for Plaintiffs Golden Boy Promotions,*
*LLC, Golden Boy Promotions, Inc. and*
*Bernard Hopkins*

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
John B. Quinn (SBN 90378)
johnquinn@quinnemanuel.com
Michael E. Williams (SBN 108542)
michaelwilliams@quinnemanuel.com
Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000
Facsimile: 213.443.3100

*Attorneys for Defendants Haymon Boxing LLC,*
*Haymon Sports LLC, Haymon Boxing*
*Management, and Haymon Holdings LLC*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALAN HAYMON, *et al.*,<br><br>Defendants. | Case No. 2:15-cv-3378-JFW-MRW<br><br>**DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PROFFERED EXPERT, GENE DEETZ**<br><br>Hearing Date for Motions *in Limine*: February 10, 2017 at 9:00 a.m.<br>Judge: Hon. John F. Walter<br>Courtroom: 7A |

Case 2:15-cv-03378-JFW-MRW Document 126-4 Filed 01/09/17 Page 2 of 33 Page ID
#:21881

Pre-Trial Conference Date: January 20, 2017 at 9:00 a.m.

Filing Date: May 5, 2015
Trial Date: March 14, 2017

Case No. 2:15-cv-3378-JFW-MRW
TBA

07033-00002/8631114.14

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 4 of 34
Case 2:15-cv-03378-JFW-MRW Document 512 Filed 01/09/17 Page 3 of 34 Page ID
#:21882

## **IDENTIFICATION OF MATTERS IN DISPUTE**

Defendants Alan Haymon, Alan Haymon Development, Inc., Haymon Boxing LLC, Haymon Boxing Management, Haymon Holdings LLC, and Haymon Sports LLC (collectively, the "Haymon Defendants") hereby move the Court to exclude the opinions of Gene Deetz, which Plaintiffs Golden Boy Promotions, LLC and Golden Boy Promotions, Inc. (collectively, "GBP") plan to offer at trial. Mr. Deetz, a Certified Public Accountant, was retained by GBP to "review and analyze financial data and documents related to the above-referenced litigation and to provide [his] expert opinions regarding damages, if any, suffered by GBP as a result of Haymon's alleged anticompetitive practices in the boxing industry." Wolfson Decl., Ex. A (Expert Report of Gene Deetz, dated September 6, 2016 ("Deetz Rep.") at ¶ 14). However, Mr. Deetz's methodology is so fundamentally flawed that his opinions must be excluded in their entirety pursuant to the strictures of Fed. R. Evid. 702 and the *Daubert* standard.

In his Report, Mr. Deetz proposes a lost profits analysis that looks at GBP's overall "Income from Boxing Operations" for 2014—a metric he created for the purposes of this litigation—and then compares that number to the Income from Boxing Operations for 2015 and 2016, as well as his projections of what GBP should make in the future. Mr. Deetz concludes there was a drop in Income From Boxing Operations from 2014 to the present and, based on the parallel opinion of GBP's economist, Robert Kneuper, Ph.D. (discussed in Motion *in Limine* No. 2), Mr. Deetz further concludes that the drop is due to Defendants' alleged wrongful conduct and constitutes GBP's money damages. His damages estimates are the difference between what GBP actually made and what Mr. Deetz thinks they should have made in 2015 and beyond.

Mr. Deetz's opinions suffer from three fundamental flaws (among others) that render his testimony improper under Federal Rule of Evidence 702:

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE #_ TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

07033-00002/8631114.14

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 5 of 34
Case 2:15-cv-03378-JFW-MRW Document 812 Filed 01/08/20 Page 4 of 33 Page ID
#:21883

1    • Mr. Deetz fails to separately show how Golden Boy was harmed under
2      each of its liability theories. This task, called "disaggregation," is required
3      under both Supreme Court and Ninth Circuit precedent. A failure to
4      disaggregate requires exclusion, because the jury is otherwise left to
5      speculate as to the correct measure and amount of damages.

6    • Mr. Deetz's damages theory does not track Golden Boy's liability theories,
7      which means Golden Boy is seeking damages for supposed losses that
8      have nothing to do with this case. Specifically, Mr. Deetz estimates
9      damages based on GBP's profits for *all* of the boxers it promotes,
10     including so-called Championship-Caliber Boxers ("CCBs") *and* boxers
11     that do not have that designation, yet Golden Boy never made any
12     allegations of harm arising from the inability to attract non-CCBs, and has
13     offered no proof in support of a finding of liability premised on such a
14     theory. Plaintiffs have claimed that this inclusion reduces their overall
15     damages, but that is incorrect because non-CCBs' inclusion—and
16     misclassification, as noted in the next bullet point—creates a misleading
17     picture of GBP's overall finances and attempts to seek damages for losses
18     that are not reasonably linked to the allegations in this case.

19   • Mr. Deetz's methodology depends on the classification of boxers between
20     CCB and non-CCB, but he, a CPA with no expertise in economics and (by
21     his own admission) no ability to conduct the categorization analysis,
22     nevertheless sorted GBP's boxers into these categories himself. This
23     categorization is very important to Mr. Deetz's end conclusions because,
24     depending on how a boxer is classified (or misclassified), GBP's finances
25     tell very different tales.[1] That Mr. Deetz performed this analysis himself is

---
27   [1]  In Mr. Deetz's original report—before he amended it in response to
28   Defendants' rebuttal expert testimony—GBP's income from CCBs went *up* from

-4-    Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 6 of 34
Case 2:15-cv-03378-JFW-MRW Document 812 Filed 01/09/19 Page 5 of 30 Page ID
#:21884

1    inherently disqualifying.  And, tellingly, he also categorized **47** separate

2    boxers as CCBs that Dr. Kneuper, GBP's actual economic expert, did ***not***

3    classify as CCBs.  Given this disagreement with the economist that

4    actually manufactured the CCB definition, the damages methodology

5    facially violates GBP's own economic analysis and must therefore be

6    excluded as fundamentally untrustworthy.

7       Plaintiffs disagree with these assertions. First, Defendants' contention that

8  strict "disaggregation" is required is incorrect as a matter of law.  Notably, they have

9  failed to cite a single case which stands for that proposition, and none of the cases

10 they cite apply the supposed rule of disaggregation to exclude the testimony of a

11 damages witness in its entirety.  Simply put, the alleged requirement of

12 "disaggregation" is not, and by definition, cannot be, a basis to exclude Mr. Deetz's

13 testimony in its entirety.

14       Second, Defendants' argument that Mr. Deetz improperly includes all boxers

15 Golden Boy promotes in his calculation of lost profits fundamentally

16 misunderstands the nature of boxing promotion and the calculation performed by

17 Mr. Deetz.  According to Defendants, it is improper to include non-championship

18 caliber boxers in the lost profits calculation because Plaintiffs do not allege that

19 Defendants have engaged in any misconduct with respect to non-championship

20 caliber boxers.  What Defendants fail to recognize (or deliberately ignore and

21 _____

22 2014 to the present.  Its primary losses occurred with respect to non-CCBs.
   Wolfson Decl., Ex. A (Deetz Rep., Ex. 3).  Mr. Deetz subsequently supplemented
23 his report and re-categorized GBP's boxers differently (based on no new
   information) so as to paint a picture of declining CCB profits from 2014-2016 and
24 flattened non-CCB losses in the same period.  *See generally* Wolfson Decl., Ex. C
   (Supplement to Exhibit 3 of the Expert Report of Gene Deetz, Exhibit 3, dated
25 October 19, 2016 ("Revised Exhibit 3")).  Defendants note that the 2016 figures in
   Mr. Deetz's Exhibit 3 are only through June 2016.  For his damages calculations, he
26 multiplied the January-June 2016 numbers by two to get a full year profits estimate.
27 *See* Wolfson Decl., Ex. B (Deetz Dep. 62:16-23).

28

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 7 of 34
Case 2:15-cv-03378-JFW-MRW Document 812 Filed 01/09/20 Page 8 of 35 Page ID
#:21885

conceal from the Court) is that, because of the nature of boxing promotion, where the top level fighters carry the sport, non-championship caliber boxers fight in the same events and on the same fight cards as Championship Caliber Boxers. Boxing events are planned and driven by the Championship Caliber Boxers, but non-championship caliber boxers appear on the undercard. Therefore, in order to correctly calculate the lost profits from boxing operations, it is essential to allocate the proportionate share of revenues and expenses from those events to the non-championship caliber boxers who participate in the event. Moreover, Mr. Deetz's analysis separates out the profits and losses from each category of boxer and therefore provides all the necessary information to evaluate what profits result from Championship Caliber Boxers vs. non-championship caliber boxers. Finally, because non-championship caliber boxers are an expense item (*i.e.*, the revenue attributable to them is less than the costs attributable to them), failing to include them in the calculation would increase the lost profits calculation and result in higher damages. Accordingly, this is no basis to exclude Mr. Deetz's testimony.

Third, Mr. Deetz's application of the criteria created by Dr. Kneuper is entirely proper. Mr. Deetz is not offering an opinion outside his area of expertise. Indeed, he is not offering an opinion on the definition of Championship Caliber Boxers at all. He is simply applying the criteria developed by Dr. Kneuper to data he assembled for each of the years in question. Moreover, Defendants' contention that Mr. Deetz categorized 47 separate boxers as Championship Caliber Boxers that Dr. Kneuper did not is simply not true. This is a made-up statistic designed to try and discredit Mr. Deetz. But, even if it was true, it would only go to the weight of Mr. Deetz's opinions, not their admissibility.

## **DEFENDANTS' ARGUMENTS**

Mr. Deetz's damages opinions consist of a "before-and-after" analysis that compares a time period he assumes was unaffected by Defendants' alleged bad acts (2014)—*i.e.*, a "benchmark" year of profits—against a time period GBP alleges was

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 8 of 34
Case 2:15-cv-03378-JFW-MRW   Document 312   Filed 01/08/16   Page 7 of 8   Page ID
#:21886

affected by those acts (2015 and beyond), and then concludes damages are the difference between what GBP "should have" made in the latter time period, and what it actually made in those years.  *See* Wolfson Decl., Ex. B (Deposition of Gene Deetz ("Deetz Dep.") 326:6-9); *id.*, Ex. A (Deetz Rep. ¶¶ 22, 48-51).  Mr. Deetz also makes assumptions about GBP's profits in the future and makes conclusions about how and to what extent he believes future profits were lost due to Defendants' acts.  *See, e.g.,* Wolfson Decl., Ex. B (Deetz Dep. 18:10-24, 233:6-234:2; *id.*, Ex. A (Deetz Rep. ¶¶ 48-9).  Based on this approach, Mr. Deetz concludes that, if Defendants' bad acts (tying, exclusive television contracts, etc.) ceased before the end of this lawsuit, then GBP will have lost between $7-8.4 million.  *See* Wolfson Decl., Ex. A (Deetz Rep. ¶¶ 22, 54).  He also concludes that, if Defendants do not cease their acts and/or their acts created some sort of "permanent shift" in the industry, then GBP will allegedly lose $20 million, total, over time.  *Id.* at ¶¶ 22, 53.[2]  These opinions are flawed and warrant exclusion under Fed. R. Evid. 402 and 403 because they fail to disaggregate Golden Boy's alleged damages, they are based on theories of liability never alleged by Golden Boy, and because they exceed the scope of Mr. Deetz's expertise.

---

[2]  Notably, the acts that GBP complains about in this case **have** ceased. Defendants removed the alleged "tie-out" clause in their management and advisory contracts, as well as the exclusivity provisions in their television contracts, in the first half of 2016.  *See* Dkt. 147 (Alan Haymon's Motion for Summary Judgment) at 11 (noting that Defendants waived the exclusivity provisions in their management and advisory agreements in the first half of 2016) and Dkt. 158 (The Haymon Entities' Motion for Summary Judgment) at 8 n.4 (same for Defendants' television agreements).  Thus, given that neither Mr. Deetz nor GBP has provided any evidence that there has been a "permanent shift" in the industry, *see* Wolfson Decl., Ex. B (Deetz Dep. 302:10-304:10 and 314:10-315:19), this case is really just about $7-8.4 million.

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 9 of 34
Case 2:15-cv-03378-JFW-MRW   Document 812   Filed 01/09/20   Page 8 of 33   Page ID
#:21887

1   **I.      Mr. Deetz did not disaggregate his damages estimates by liability theory**

2          The first reason Mr. Deetz's opinions must be excluded is that he does not

3   offer separate damages estimates for each liability theory.

4          A.      Antitrust Plaintiffs Must Disaggregate Damages By Liability Theory In

5                  Order To Avoid Jury Speculation And Error

6          A plaintiff's damages methodology must be capable of "segregat[ing] the

7   losses, if any, caused by acts which were not antitrust violations from those that

8   were." *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1372 (9th Cir.

9   1992).  This is because proof of the *amount* of damage is distinct from causation,

10  and Plaintiffs must therefore prove in a reasonable manner the link between "the

11  injury suffered and the illegal practices of the defendants." *Id.* at 1371 (citing *MCI*

12  *Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)).  A

13  plaintiff's antitrust damages model must thus differentiate between the damages it

14  estimates for each liability theory the plaintiff alleges, a task that is called

15  "disaggregation." *Id.* at 1372-73 (affirming summary judgment for defendant

16  because plaintiff lacked evidence of damages due to their expert's failure to

17  disaggregate lost profits damages between different alleged antitrust liability

18  theories).[3]

19

20          [3]   Even if Plaintiffs were not required to disaggregate between their own liability

21  theories based on Defendants' conduct, Mr. Deetz did not even attempt to control

22  for additional or other reasons that GBP's profits might have dipped following 2014.

    For example, in 2014 (and before), GBP promoted Floyd Mayweather, the highest-

23  earning boxer in history.  In 2015, however, Mr. Mayweather instead chose GBP's

24  rival, Top Rank, to promote his fight with Manny Pacquiao, which ended up being

    the highest-grossing boxing bout in history, taking in revenue in excess of $500

25  million.  *See* Wolfson Decl., Ex. D (Expert Rebuttal Report of Michael P. Smith,

26  Ph.D, dated September 27, 2016 ("Smith Rep.) ¶ 25 n.33); *see also* Wolfson Decl.,

    Ex. B (Deetz Dep. 80:2-81:15).  Despite this lost opportunity, and that GBP does not

27  allege it occurred due to any wrongdoing by Defendants, Mr. Deetz concluded that

28  he properly included the $2.2 million in profits GBP obtained from promoting Mr.

1    "Disaggregation" is necessary, particularly in antitrust cases, because a jury

2    cannot award damages for lawful competitive behavior. *Litton Sys., Inc. v.*

3    *Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) (Where multiple

4    business practices of a defendant are challenged, "it is incumbent upon an antitrust

5    plaintiff to disaggregate its damage model except where it is impossible to do so.").

6    Thus, the jury must be able to sift through damages estimates for each liability

7    theory the plaintiff presents, or else be forced to engage in an impermissible

8    guessing game as to the correct damages number. *In re IBM Peripheral EDP*

9    *Devices Antitrust Litig.*, 481 F. Supp. 965, 1013–14 (N.D. Cal. 1979), *aff'd sub nom.*

10   *Transamerica Computer Co. v. IBM Corp.*, [1982–83 Trade Cases ¶ 65,218], 698

11   F.2d 1377 (9th Cir. 1983), *cert. denied,* 464 U.S. 955 (1983) (damage study found

12   unduly speculative where it failed to segregate damages according to various

13   challenged practices). *See also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708

14   F.2d 1081, 1163 (7th Cir. 1983) (vacating damages award as speculative because

15   "the jury was left with no way to adjust the amount of damages" in light of the

16   jury's findings on liability); *Image Tech.*, 125 F.3d at 1224 (similar).

17       Failure to disaggregate damages—including specifically with respect to lost

18   profits analyses such as the one Mr. Deetz presents here—requires exclusion. *Id.*

19   (excluding lost profits analysis on these grounds); *Magnetar Tech. Corp. v. Intamin,*

20   *Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015) (affirming summary judgment for lack

21   of damages evidence because of, *inter alia*, the plaintiffs' failure to "separate the

22   losses suffered as a result of [defendant's] conduct from the total losses suffered by

23   [plaintiff]," making it "impossible for a jury to estimate the lost profits attributable

24   to [defendant's] conduct"); *Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 695-

25

26

27   _____

     Mayweather in 2014 in his benchmark Income from Boxing Operations number. *Id.*

28   at 82:4-83:14.

DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 11 of 34
Case 2:15-cv-03045-RFB-BNW   Document 1226-10   Filed 07/09/19   Page 32 of 34   Page ID
#:21889

1    96 (5th Cir. 2003) (same, for lost profits report that was incapable of showing the

2    specific damages attributable to each of defendants' alleged bad acts).

3            Particularly instructive on this point is the Ninth Circuit's opinion in *City of*

4    *Vernon*, where the damages theory at issue was the "only possibly admissible

5    damage study…before the court."  955 F.2d at 1372.  Like GBP, the plaintiff in *City*

6    *of Vernon* "[did not] attempt or offer to make corrections" to its flawed analysis,

7    despite multiple discussions with the defendant.  *Id.*  This was problematic because

8    "[t]hat study failed to segregate the losses, if any, caused by acts which were not

9    antitrust violations from those that were."  *Id.*  Observing that the plaintiff's refusal

10   to segregate damages by liability "might well have been because [the plaintiff's]

11   deeply flawed study is the handmaiden of its equally flawed theory," the Ninth

12   Circuit excluded the evidence entirely.  *Id.*

13       B.    Mr. Deetz Does Not Disaggregate Damages At All, Despite Multiple

14             Opportunities To Do So

15           Contrary to this law, Mr. Deetz does not differentiate between GBP's

16   different liability theories and instead concludes that the damages he estimates are

17   due to all.  *See* Wolfson Decl., Ex. A (Deetz Rep. ¶¶ 53, 54); *see also id.*, Ex. B

18   (Deetz Dep. 106:5-110:12, 111:2-112:21, 113:9-115:19, 116:5-118:25).  In his own

19   words, Mr. Deetz simply accepted Dr. Kneuper's theories in full and estimated

20   damages based on the entirety of those theories without identifying specific events

21   or theories of harm for specific portions of the damages estimate.  *Id.* at 297:16-

22   298:10; *id.* at 341:10-345:2 ("We've talked about the fact that I don't identify a

23   specific event … and why I don't identify a specific event … And I disagree that

24   you don't [*sic.*] have to do that or should be able do that.") and 343:15-20 ("I

25   adopted [the] Kneuper [Report] in total, and I'd have to see all the facts and

26   circumstances in a different report by Dr. Kneuper, or some other instruction, that

27   gave me all the facts and circumstances to consider changing [my opinions]").

28

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 12 of 34
Case 2:15-cv-03378-JFW-MRW Document 1229 Filed 07/09/19 Page 32 of 33 Page ID
#:21890

For example, Mr. Deetz does not identify any specific boxers that GBP was unable to promote due to Defendants' alleged tie-outs. *See* Wolfson Decl., Ex. B (Deetz Dep. 103:11-104:1, 106:5-109:4, 338:16-23). Similarly, Mr. Deetz does not identify any specific bouts GBP was unable to promote due to Defendants' alleged tie-out or refusals to deal. *Id.* at 338:7-15, 338:25-339:7, 341:10-345:2 ("We've talked about the fact that I don't identify a specific event … and why I don't identify a specific event … And I disagree that you don't [*sic*] have to do that or should be able do that."). And Mr. Deetz does not identify which networks he believes would have signed deals with, or paid license fees to, GBP had Defendants not entered into their exclusive television contracts. *Id.* at 111:2-112:7 (testifying that he assumed the GBP's failure to renew its contract with Fox Deportes was attributable to Defendants' conduct, and that even if the real reason for the non-renewal was that GBP turned down the contract, his damages opinion would not change because Dr. Kneuper's opinion said otherwise), 296:4- 297:15 (testifying that his analysis did not distinguish between Fox entities and that he did not recall asking anyone at GBP whether Defendants' and GBP's relevant contracts were with the same Fox entities), 150:9-151:12 (admitting that his  damages analysis does not identify any harm specific to being excluded from particular networks).

This approach is fundamentally problematic because GBP's liability theories imply dramatically different effects from one another. For example, the harm GBP claims from its exclusive dealing liability theory is that Defendants' PBC series changed the dynamic such that GBP was unable to obtain license fees from basic television and "free" cable networks. Dkt. 218 (Plaintiffs' Opposition to the Haymon Entities' Motion for Summary Judgment) ("Opp. To Entities' MSJ"), at 11-12. But Mr. Deetz's analysis does not separately calculate the license fees GBP would have allegedly been able to obtain in the but-for world. *See generally* Wolfson Decl., Ex. A (Deetz Rep. ¶¶ 48-51, 53-54). Given that GBP claims it aired approximately two dozen shows per year on "free" television before 2015, and only

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 13 of 34
Case 2:15-cv-03378-JFW-MRW Document 123 Filed 09/16/19 Page 13 of 34 Page ID
#:21891

1   obtained approximately $40,000 in license fees, maximum, per show (which

2   annualizes to about $1.2 million),[4] this averages out to far, far less in "lost license

3   fees" than the $7-20 million Mr. Deetz estimates in total lost profits damages. Yet,

4   because Mr. Deetz does not break out those "lost license fees"—or, more

5   specifically, the total profits GBP obtained from license fees on "free" TV before

6   2015—from his broader conclusions, the jury will be left to simply guess those

7   numbers if it concludes that only the alleged exclusive dealing was actually illegal.

8   This is a classic disaggregation problem requiring exclusion.

9        As another example, the tying theory depends on harm stemming from GBP's

10   supposed inability to promote boxers that were in contract with Defendants. *See,*

11   *e.g.,* Wolfson Decl., Ex. F (Kneuper Rep.) ¶¶ 78-80 (describing Defendants' key,

12   alleged exclusionary practice as "locking up" the majority of championship-caliber

13   boxers via contractual provisions and "refusing (with few exceptions) to allow

14   Haymon-controlled Championship-Caliber boxers to participate in fights

15   represented by" key competing promoters including Golden Boy promotions). But

16   Mr. Deetz does not specify what amount of GBP's supposed lost profits stemmed

17   from its inability to promote such boxers, *see* Wolfson Decl., Ex. B (Deetz Dep.

18   312:18-320:25), which is important given that Mr. Deetz himself admitted GBP

19   makes vastly different amounts of money depending on the specific boxers it

20   promotes. *See*, *e.g.*, Wolfson Decl., Ex. B (Deetz Dep. 77:13-78:11 (testifying that

21   $2.2 million out of Golden Boy's $5.5 million 2014 operating income, or 40%, was

22   attributable to Floyd Mayweather),*See also* Wolfson Decl., Ex. C (Revised Exhibit 3

23   to the Deetz Rep. at 7) (over $4.4 million of Plaintiffs' 2015 net income out of

24   Golden Boy's $4.7 million 2015 net income from boxing operations, or almost 95%,

25

26       [4]  *See* Wolfson Decl., Ex. E (Deposition of Roberto Diaz ("Diaz Dep.") 220:1-13

27   (recalling that GBP received a license fee of "maybe about [$]40,000" per show on
    Fox Sports 1); *id.*, Ex. F (Expert Report of Robert Kneuper, Ph.D., dated September

28   6, 2016 ("Kneuper Rep.") ¶ 93, Table 5).

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 14 of 34
Case 2:15-cv-03378-JFW-MRW   Document 226   Filed 01/08/17   Page 13 of 34   Page ID
#:21892

1   was attributable to Canelo Alvarez); *id.* at 10 (in 2016, operating income attributable

2   to Canelo Alvarez was nearly $3 million and its total *net* income for the same year

3   was only $2.8 million).  If the jury concludes that Defendants are liable only for

4   tying, it will have no basis to calculate the damages specifically attributable to the

5   alleged tying, which is a separate act from the exclusive dealing.  *See Top Rank, Inc.*

6   *v. Haymon*, No. CV154961JFWMRWX, 2015 WL 9948936, at *5 (C.D. Cal. Oct.

7   16, 2015).

8          Given this failure to disaggregate, Mr. Deetz's damages opinions must be

9   excluded; otherwise, the jury will necessarily need to engage in a guessing game as

10  to Plaintiffs' damages for each liability theory without proof as to their actual

11  amount.  *See City of Vernon*, 955 F.2d at 1372-73 (holding that Plaintiff's damages

12  study was properly excluded when there was no information that would enable the

13  jury to reasonably estimate Plaintiff's injury without speculation).  Neither the

14  Supreme Court nor the Ninth Circuit permit such a result.  *See Comcast Corp.*, 133

15  S. Ct. at 1433; *City of Vernon*, 955 F.2d at 1372-73.

16  **II.    Mr. Deetz's analysis claims lost profits for both CCBs and non-CCBs,**

17  **even though GBP's case is only about CCBs**

18         As the Supreme Court recently made clear, "any model supporting a

19  plaintiff's damages case must be consistent with its liability case, particularly with

20  respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v.*

21  *Behrend*, 133 S. Ct. 1426, 1433 (2013) (citing *Image Technical Servs., Inc. v.*

22  *Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997)).  Although *Comcast* was

23  a case about class certification, the Ninth Circuit has been similarly clear for

24  decades that this requirement applies to all stages of antitrust cases. *Image Tech.*,

25  125 F.3d at 1224 (excluding damages opinion that did not match the plaintiff's

26  antitrust liability theory).

27         According to Mr. Deetz, his "Income from Boxing Operations" metric (which

28  is not a line item in GBP's financials) is an attempt at isolating just those profits

-13-

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 15 of 34
Case 2:15-cv-03378-JFW-MRW   Document 122   Filed 01/08/18   Page 15 of 35   Page ID
#:21893

1   GBP made from its promotional activities. *See* Wolfson Decl., Ex. B (Deetz Dep.

2   187:11-21). Mr. Deetz excludes corporate overhead from this metric, as well as

3   profits and losses he claims are not directly attributable to promotion itself. *Id.* at

4   186:18-190:24. Included in this metric, however, are *all* of GBP's promotion-

5   related profits and losses, including from boxers that Mr. Deetz claims are not

6   CCBs.

7          This inclusion is notable because, throughout his report, Mr. Deetz

8   acknowledges GBP only alleges it was foreclosed from promoting CCBs in the

9   Covered Period. *See* Wolfson Decl., Ex. A (Deetz Rep. ¶¶ 20, 35, 39, 40). GBP has

10  never claimed it was unable to attract non-CCBs to enter or maintain promotion

11  contracts with the company. *See generally* Dkt. 95 (SAC). More importantly, GBP

12  has not offered allegations or evidence regarding supposed relevant non-CCB

13  management or promotion market(s); how Defendants have or could ever obtain

14  market power in such markets; or how there has been or ever could be harm to

15  competition in any non-CCB markets due to Defendants' acts. *See generally*

16  Wolfson Decl., Ex. F (Kneuper Rep. ¶¶ 55-66 and 95-97). Indeed, GBP's liability

17  theories entirely hinge on the CCB definition; without it, the claims fall apart. Dkt.

18  147 (Alan Haymon's Motion for Summary Judgment) at 17-18. Mr. Deetz notes

19  GBP's allegations are that it was precluded from promoting CCBs, and that the

20  separate economic opinions on which he relies (*i.e.*, from Dr. Kneuper) focus solely

21  on market definition, market power, and supposed harm to competition in CCB-

22  related markets. *See* Wolfson Decl., Ex. A (Deetz Rep. ¶¶ 9, 13, 18, 34, 38, 48).

23  Mr. Deetz never identifies any allegations, proffered expert opinions, or lay

24  evidence regarding non-CCB-related market definition or market power. *See*

25  *generally id.* Nor does he—because he cannot, given the complete lack of

26  allegations or evidence on the point—identify any supposed harm to competition in

27  any alleged non-CCB market. *Id.*

28

-14-

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 16 of 34
Case 2:15-cv-03378-JFW-MRW Document 122-10 Filed 07/08/19 Page 13 of 36 Page ID
#:21894

1    Including non-CCB-related profits and losses in the damages analysis thus

2    requires Mr. Deetz to deviate from GBP's liability theories in multiple, important

3    ways.  For example, the evidence is that, before 2015, GBP received *de minimis*

4    license fees for its non-CCB-focused boxing series on Fox Sports 1, and that it never

5    stopped receiving substantial license fees for its CCB bouts.  Wolfson Decl., Ex. E

6    (Diaz Dep. 206:10-22 (testifying that top level fighters "who had outgrown Fox

7    Sports 1" moved onto fights televised on another network or premium channel),

8    208:3-24 (testifying that the Fights on Fox Sports 1 were more of a "developmental

9    level for … young fighters" to help them "obtain that stature of your bigger

10    network, your bigger license fee, your bigger exposure [*sic*.]"), 220:1-13 (recalling

11    that GBP received a license fee of "maybe about [$]40,000" per show on Fox Sports

12    1)); *id.*, Ex. G (Deposition of Eric Gomez ("Gomez Dep.") 253:13-22 (testifying

13    that GBP often received $400,000 to $500,000 for Showtime fights), 313:23-315:10

14    (testifying that Showtime fights are second to H.B.O. in terms of profitability)); *id.*,

15    Ex. H (Deposition of Julio Ramirez ("Ramirez Dep.") 107:20-108:13 (testifying that

16    he understands pay-per-view fights were historically and remain GBP's most

17    profitable bouts, both before and during the covered period)).  The allegations in this

18    case are that only CCB bouts were affected by the supposed anticompetitive acts;

19    nevertheless, Mr. Deetz assumes, by including non-CCBs in his analysis and income

20    metrics, that GBP has been harmed by making less—or, rather, losing more—than

21    before **on non-CCB bouts**.  *See generally* Wolfson Decl., Ex. A (Deetz Rep., Ex. 3).

22    Similarly, Mr. Deetz justified his inclusion of non-CCB-related profits and

23    losses in Income from Boxing Operations by arguing that GBP has been less able to

24    attract new talent to its roster due to Defendants' alleged acts.  Wolfson Decl., Ex.

25    (Deetz Dep. 66:11-69:3).  Nowhere is this liability theory mentioned in GBP's

26    operative complaint.  *See generally* Dkt. 95 ("SAC").  Nor does Dr. Kneuper (or any

27    other proposed Plaintiff expert) offer opinions about the definition of a non-CCB

28    market, Defendants' supposed power or likelihood of obtaining power in such a

-15-

1  market, or harm to competition in such a market.  *See generally* Wolfson Decl., Ex.

2  F (Kneuper Rep.).  Mr. Deetz's explanation for the non-CCB inclusion therefore has

3  no support in the liability theories actually articulated in the case.

4        Given this CCB focus, Mr. Deetz's damages methodology is incongruous

5  with the claims GBP hopes to prove at trial.  Mr. Deetz does not segregate out

6  GBP's lost profits from promoting CCB boxers; instead, he looks at GBP's total

7  finances—which include its activities with respect to non-CCBs—and then makes

8  assumptions and conclusions based on the combined CCB and non-CCB finances.

9  *See* Wolfson Decl., Ex. A (Deetz Rep., Exs. 3 and 5).  This presents damages

10  numbers divorced from GBP's liability theories because, as Mr. Deetz admits, they

11  assume (a) losses from decreased opportunities to promote CCBs, ***and*** (b) losses

12  from decreased opportunities to bring on non-CCBs.  *See* Wolfson Decl., Ex. B

13  (Deetz Dep. 19:18-20:5, 72:20-73:3, 322:18-324:10).  Furthermore, the non-CCB

14  damages numbers cannot be segregated out from the broader theory because they

15  form an inextricable part of Mr. Deetz's benchmark profits from 2014, against

16  which all future profits are compared.  *See* Wolfson Decl., Ex. B (Deetz Dep. 316:2-

17  11).

18        For these reasons, Mr. Deetz's damages methodology is fundamentally

19  flawed and must be excluded, because it does not track the liability theories in the

20  case.[5]  *See*, *e.g.*, *Prepaid Wireless Servs., Inc. v. Sw. Bell Wireless, Inc.*, 2002 WL

21

22     [5]  As discussed below, GBP's inclusion of non-CCB profits in the damages

23  estimate does not "lower" the overall damages number, as GBP claimed in its summary judgment opposition (and Defendants expect it will claim again here in

24  opposition to this motion *in limine*).  *See* Dkt. 217 (Opp. to Entities' MSJ) at 21.  In

25  order to avoid admitting that GBP's profits with respect to CCBs went up from 2014 through the present—and that its losses are entirely due to non-CCB-related

26  promotion activities—Mr. Deetz improperly categorized numerous different boxers

27  himself as CCBs and non-CCBs.  This foundation-less categorization is itself a basis to exclude Mr. Deetz's opinions, *see infra*, but also was a transparent attempt to

28  suggest GBP's CCB-related profits were extremely high in 2014 and then dropped

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 18 of 34
Case 2:15-cv-03345-vR-MRW Document 226-1 Filed 07/09/19 Page 23 of Page ID
#:21896

1   34367328, at *5 (S.D. Tex. July 23, 2002) (citing *Image Tech.*, 125 F.3d at 1224)

2   (excluding plaintiffs' damages expert's opinion because, *inter alia*, the expert's

3   opinion reflected a theory of liability no longer at issue and, even before that claim

4   was dismissed, the damages theory "did not segregate damages attributable to

5   Defendants' lawful versus unlawful conduct").

6   **III.   Mr. Deetz classified boxers himself (with great importance to his**

7           **conclusions) even though he is not qualified to do so**

8           Finally, Mr. Deetz's opinions should be excluded for the independent reason

9   that they purport to opine which boxers qualify as CCBs and which do not.  Mr.

10  Deetz is a CPA, not an economist.  At his deposition, he admitted he was

11  unqualified to opine on what does or does not make a boxer "Championship-

12  Caliber," and he further admitted that he performed no such substantive analysis.

13  *See* Wolfson Decl., Ex. B (Deetz Dep. 41:18-42:12; 44:2-9; 88:7-90:7).

14  Nevertheless, Mr. Deetz himself categorized boxers as either CCBs or non-CCBs

15  for the purpose of his damages analysis.  *Id.* at 322:18-323:5.

16          An expert must have the specific expertise to opine on issues requiring expert

17  knowledge.  *See Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 833 (C.D. Cal.

18  2010), *aff'd sub nom. Gable v. Nat'l Broad. Co.*, 438 F. App'x 587 (9th Cir. 2011)

19  ("[A] witness may offer an expert opinion only if he or she draws on some special

20  knowledge, skill, experience, training or education to formulate that opinion…

21  However, the opinion must be an expert opinion (that is, an *opinion informed by the*

22  *witness' expertise* ) rather than simply an opinion broached by a purported expert.")

23  (internal citations and quotations omitted).  Put differently, an expert in one area

24  may not provide expert testimony on issues outside of their expertise.  *See White v.*

25  *Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002) ("A layman, which is what

26  _____

27  precipitously in 2015 and 2016 due to Defendants' actions.  If one excludes non-
    CCBs from the analysis entirely, the financial data shows that GBP had stable CCB-

28  related profits from 2014 through the present.  *See infra*.

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 19 of 34
Case 2:15-cv-03378-JFW-MRW   Document 1122   Filed 07/09/19   Page 39 of 39   Page ID
#:21897

1  an expert witness is when testifying outside his area of expertise, ought not to be

2  anointed with ersatz authority as a court-approved expert witness for what is

3  essentially a lay opinion."); *see also Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL

4  5955666, at *2 (N.D. Cal. Nov. 6, 2013) ("Under Federal Rule of Evidence 702,

5  experts may not make expert conclusions about areas outside their expertise.").  Any

6  opinions that violate this basic requirement must be excluded.  *See Shalaby v.*

7  *Newell Rubbermain, Inc.*, 379 F. App'x 620, 622–23 (9th Cir. 2010) (affirming trial

8  court's exclusion of plaintiffs' expert because, *inter alia*, the expert sought to testify

9  as to matters outside the scope of her expertise); *In re Ford Tailgate Litig.*, 2015

10  WL 7571772, at *8 (N.D. Cal. Nov. 25, 2015), appeal dismissed (Feb. 16, 2016)

11  ("These topics are outside the scope of his expertise …Ford's motion to exclude

12  Locke's testimony *must* therefore be granted.") (emphasis added).

13       Mr. Deetz's categorization of boxers is important to his overall conclusions

14  because it affected the "trends" one observes in GBP's finances from Mr. Deetz's

15  "benchmark" year (2014), through the alleged liability period (2015-present).  In his

16  initial report, Mr. Deetz's categorization of boxers as CCB v. non-CCB showed that

17  GBP was never harmed by Defendant's alleged conduct.  Controlling for the loss of

18  Floyd Mayweather as a client from 2014 to 2015—who generated $2.2 million in

19  profits for GBP in 2014, but then chose Top Rank instead of GBP to promote his

20  famous 2015 fight against Manny Pacquiao—GBP's finances showed that it made

21  *more* money on CCBs each year from 2014 through the present, and that its losses

22  were entirely due to non-CCBs.  Wolfson Decl., Ex. A (Deetz Rep., Ex. 3); *see also*

23  *id.*, Ex. D (Smith Rep. ¶ 35 ("[A]ccepting Mr. Deetz's damages methodology and

24  assumptions, with corrections to focus on the promotion of championship caliber

25  boxers and to control for Mr. Mayweather's departure, Golden Boy has not been

26  damaged as a result of the alleged anticompetitive conduct.")).   Faced with this

27  observation in Defendants' rebuttal report, Mr. Deetz "revised" his categorizations

28  in a way to suddenly show very different numbers, ones that supposedly

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 20 of 34
Case 2:15-cv-03378-JFW-MRW Document 224 Filed 01/08/19 Page 20 of 34 Page ID
#:21898

1   demonstrated GBP experienced large losses with respect to CCBs from 2014 to

2   2015.  *See generally* Wolfson Decl., Ex. C (Revised Exhibit 3).

3        Besides being an improper supplement to his opening report, the larger

4   problem is that Mr. Deetz's independent determinations of which boxers are and are

5   not CCBs contradicts Dr. Kneuper's conclusions, or makes conclusions about

6   boxers Dr. Kneuper never addressed in his report.  Given that Mr. Deetz admitted he

7   does not have the expertise to determine which boxers are appropriately labeled

8   "Championship-Caliber," *see* Wolfson Decl., Ex. B (Deetz Dep. 46:10-21), he

9   insisted that he offered no such opinion and instead claimed that he relied only on

10  Dr. Kneuper's expertise.  *Id.* at 20:18-21:9, 27:19-28:11, 28:22-29:19, 39:18-40:14,

11  44:2-8.  Nevertheless, Mr. Deetz classified **47 separate boxers** as Championship-

12  Caliber that Dr. Kneuper did not, the majority of those in 2014, his benchmark year

13  (a critical point discussed further in Defendants' Motion *in Limine* No. 2).  *See*

14  Wolfson Decl., Ex. I (List Comparing Revised Ex. 3 and Exs. 3 and 4 of the

15  Kneuper Report).  *See also* Wolfson Decl., Ex. B (Deetz Dep. 32:13-33:22, 36:11-

16  37:3, 48:10-23, 123:9-127:1 (testifying that his damages analysis classified Alfredo

17  Angulo, Devon Alexander, Sakio Bika, Dierry Jean, Ezekiel Brook, Nihito

18  Arakawa, and Marco Periban as CCBs, but that none of these were considered

19  CCBs in Dr. Kneuper's report)).

20       Mr. Deetz sought to justify these differing classifications by testifying that he

21  considered a different time period than Dr. Kneuper (2014-2016 rather than 2015-

22  2016).  *Id.*  Even if Mr. Deetz had not already admitted he was unqualified to

23  determine who is a CCB, however, this justification ignored that none of these

24  boxers were included in Dr. Kneuper's list of 2015 CCBs, despite that many of them

25  participated in televised fights in 2015 and despite that, according to Dr. Kneuper,

26  the concept of a Championship-Caliber Boxer did not simply spring into being in

27  2015 (which means that there should have been CCBs in 2014, 2013, and so on).

28  *See, e.g., id.* at 32:13-33:22, 36:11-37:3, 48:10-23.  Dr. Kneuper's "objective"

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 21 of 34
Case 2:15-cv-03045-vR-MRW   Document 122-1   Filed 07/09/19   Page 21 of 33   Page ID
#:21899

1    criteria do not change from year to year.  At the very least, therefore, those boxers

2    Mr. Deetz classified as CCBs in 2014 who fought in a televised bout in 2015

3    presumably should have been included on Dr. Kneuper's 2015 list, yet none of them

4    were.  *See generally* Wolfson Decl., Ex. F (Kneuper Rep., Ex. 3).[6]

5         The divergence between Dr. Kneuper's and Mr. Deetz's classifications belies

6    Mr. Deetz's claims at deposition that he was simply applying Dr. Kneuper's

7    methodology to the categorization process.  *See* Wolfson Decl. Ex. B (Deetz Dep.)

8    at 20:18-21:9, 27:19-29:19, 44:2-8, 46:10-21.  Thus, on this basis alone, Mr. Deetz's

9    opinions must be excluded pursuant to FRE 702 because he himself admits he is

10   incapable of opining as to boxers' CCB status, and his opinions directly contradict

11   the only proffered expert arguably capable of making such an assessment.  *See In re*

12   *Ford Tailgate Litig.*, 2015 WL 7571772 at *8 (excluding expert testimony when the

13   expert sought to testify outside the scope of her expertise).

14        A final, critical point is that Mr. Deetz's categorization of 47 boxers as CCBs

15   in the 2014 profits (that Dr. Kneuper did not classify as CCBs even in 2015 or 2016)

16   has important effects on the damages estimates that demonstrate why his

17   unsubstantiated lay opinions must be excluded at trial.  As previously noted, Mr.

18   Deetz uses 2014 as a "benchmark" year against which to compare the profits GBP

19   made in 2015, 2016, and beyond.  His categorization—and re-categorization, after

20   receiving Defendant's rebuttal expert report—of these boxers artificially inflated

21   Golden Boy's "benchmark" CCB-related profits in 2014.  By inflating these

22   numbers, Mr. Deetz was then able to conclude that GBP's subsequent decline in

23   CCB-related profits in 2015 and 2016 was attributable to the alleged anticompetitive

---

24        [6]  Moreover, even with respect to 2015 and 2016—years expressly within the

25   scope of Dr. Kneuper's opinions—Mr. Deetz reached different conclusions

26   regarding which boxers were and were not CCBs.  For example, Mr. Deetz

     categorized Alfonzo Gomez and James Kirkland as CCBs even though Dr.

27   Kneuper's list of CCBs *for the same year* mentioned neither.  *See* Wolfson Decl.,

28   Ex. B (Deetz Dep. 127:2-137:17).

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 22 of 34
Case 2:15-cv-01045-RFB-BNW Document 812 Filed 07/09/19 Page 22 of 34 Page ID
#:21900

1  conduct in this case. This also was meant to permit him to dance around the fact

2  that GBP's decline in profits in 2015 and 2016 is due to ***non***-CCB-related activities.

3  *Supra* note 3 (GBP's damages theory fails to establish a reasonable "link" between

4  the damages it alleges and *any* of Defendants' alleged misconduct). The

5  categorizations between CCB and non-CCB are thus critical to Mr. Deetz's

6  methodology and he cannot be permitted to play with the categorizations to reach

7  the result he wants, particularly when he admits has no expertise to do so.

8  **IV.    CONCLUSION**

9         For the foregoing reasons, the Haymon Defendants request that the Court

10  exclude Mr. Deetz's testimony in its entirety because it is improper expert testimony

11  under Fed. R. Evid. 702 and the *Daubert* standard.

12                          **PLAINTIFFS' ARGUMENTS**

13         Plaintiffs' damages analysis relies on accepted accounting methodologies

14  applied by an expert with outstanding credentials. Notably, Defendants do not

15  contend either that Mr. Deetz's lost profits methodology is not an acceptable method

16  of calculating damages, or that Mr. Deetz is not qualified to render such an opinion.

17  Instead, Defendants attack certain specific components of Mr. Deetz's analysis,

18  none of which renders his opinion inadmissible. At most, Defendants' arguments go

19  to the weight of Mr. Deetz's opinions, not their admissibility.

20  **I.    "Disaggregation" Is Not a Basis to Exclude Mr. Deetz's Testimony.**

21         Defendants contend that Mr. Deetz's failure to "disaggregate" his damages

22  calculation renders it inadmissible. Defendants are wrong for three reasons. First,

23  Defendants have failed to cite a single case in which a plaintiff's damages expert

24  was excluded before trial on the basis that the expert did not disaggregate damages.

25  Second, there has been no determination that Plaintiffs' damages were caused by

26  Defendants' lawful conduct, as opposed to their unlawful conduct; therefore there is

27  nothing yet to disaggregate. Third, disaggregation is not required where, as here, it

28  would be impractical or impossible to do so.

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 23 of 34
Case 2:15-cv-03378-JFW-MRW Document 223 Filed 01/08/19 Page 22 of 33 Page ID
#:21901

A.   The Alleged Failure to Disaggregate Damages is Not a Basis to
     Exclude Expert Testimony in its Entirety.

The doctrine of strict disaggregation of damages has been rejected by all courts to consider it. *See MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1161 (7th Cir. 1983). Importantly, a plaintiff need not "disaggregate" damages caused by different types of unlawful conduct. *Id*. Disaggregation is only necessary where there has been a determination by the Court or the jury that some of the conduct causing damage to the plaintiff was lawful. *Image Tech. Services, Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1224 (9th Cir. 1997). Even then, disaggregation is not required where it would be impractical or impossible to do so. *See Bonjourno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 813 (3d Cir. 1984); *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003). For this reason, a failure to disaggregate damages is rarely, if ever, a basis to exclude an expert's testimony on a motion in limine. *In re High-Tech Employee Antitrust Litigation*, 2014 WL 1351040, *18, n. 38 (N.D. Cal. April 4, 2014) (Ninth Circuit cases that address disaggregation do not address the admissibility of an expert's testimony "under *Daubert* or otherwise").

Defendants cite a series of cases for the proposition that disaggregation of damages is required. Notably, not a single one arose in the context of a motion in limine to exclude evidence at trial.

In *City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1371-1373 (9th Cir. 1992), the issue of disaggregation was presented to the Court on an appeal from the trial court's ruling granting summary judgment in favor of the defendant. The *City of Vernon* Court determined that the trial court correctly granted summary judgment on all but one of the plaintiff's claims. *Id*. at 1373. The *City of Vernon* Court then went on to consider whether the plaintiff had raised a triable issue of fact regarding the recovery of damages for that claim. *Id*. at 1371. Having determined that only one of the plaintiff's claims could survive scrutiny, the

-22-

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 24 of 34
Case 2:15-cv-03045-RFB-BNW   Document 226-10   Filed 06/25/15   Page 23 of 34   Page ID
#:21902

1   *City of Vernon* Court ruled that the plaintiff's damages evidence was insufficient to

2   raise a triable issue of fact on the one remaining claim of wrongdoing.  *Id*. at 1373.

3   The question was not whether the study was admissible, but rather whether it was

4   sufficient to sustain the claim.  The Court ruled it was not sufficient.  *Id*.  Each of

5   *Magnetar Tech Corp. v. Intamin*, *Ltd*., 801 F.3d 1150 (9th Cir. 2015) and *Infusion*

6   *Res., Inc. v. Minimed, Inc.,* 351 F.3d 688 (5th Cir. 2003) were also summary

7   judgment cases.[7]

8       In each of *Litton Systems, Inc. v. Honeywell, Inc.*, 1996 WL 634213 (C.D.

9   Cal. July 24, 1996), *MCI Communications* and *Image Tech. Services*, the issue of

10  disaggregation was presented in connection with post-trial motions.  In each of those

11  cases, the defendant argued that, because the jury had determined that only some of

12  the defendant's conduct was wrongful, the evidence of aggregated damages was

13  insufficient to support a verdict on the remaining claims.  *Litton Systems*, 1996 WL

14  634213, at *3; *MCI*, 708 F.2d at 1174; *Image Tech*, 125 F.3d at 1224.  Indeed, in

15  *Image Tech*, the issue was whether a damages award based on a failed

16  monopolization claim could nevertheless survive.  *Id*.  Notably, the Court in each

17  case remanded the issue for a retrial on the issue of damages.  *Id*.

18      In *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 974

19  (N.D. Cal. 1979), the Court addressed the damages issue only in dicta in deciding

20  the case pursuant to stipulation after a hung jury.  Notably, before considering the

21  question of damages, the Court had already ruled that the plaintiff had failed to

22  prove liability on any theory.  *Id*. at 1010.  The Court simply went on to note that,

23

24

_____

25      [7]  Defendants' extensive reliance on cases involving the granting of summary
26  judgment for failure to prove damages demonstrates that this motion is nothing more
    than a disguised summary judgment motion.  Pursuant to the Court's Amended
27  Scheduling and Case Management Order (Dkt. 113), the Court should therefore not
    hear or resolve this motion.
28

-23-

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 25 of 34
Case 2:15-cv-01045-RFB-BNW Document 122 Filed 07/30/15 Page 23 of 32 Page ID
#:21903

1  even if some liability theory were to have survived, the evidence of damages was

2  insufficient to sustain a verdict. *Id*.

3        Accordingly, not a single case cited by Defendants applies the rules of

4  disaggregation in the context of a pretrial *Daubert* challenge to an expert report.

5  And, of course, this only makes sense. Because disaggregation only becomes

6  relevant if and when the Court or the jury determines that some form of lawful

7  conduct contributed to Plaintiffs' damages, the alleged failure to disaggregate

8  damages can only be evaluated once such a determination is made. Without

9  knowing what supposedly lawful conduct allegedly contributed to Plaintiff's

10 damages, there is no basis to disaggregate anything. That is a determination that

11 will be made, if at all, at trial. Only then will the parties and Court be able to

12 evaluate whether Mr. Deetz's damages model improperly includes damages

13 resulting from lawful conduct.

14        B.    There Has Been No Determination that Plaintiffs' Damages Were

15              Caused by Lawful Conduct.

16        Even under the cases cited by Defendants, disaggregation of damages is only

17 required where there has been a determination, either by the Court or a jury, that

18 certain of Defendants' actions were lawful and those lawful actions contributed to

19 Plaintiffs' harm. *See e.g., MCI*, 708 F.2d at 1161; *Image Tech Servs.*, 125 F.3d at

20 1224. Here, there has been no determination that Defendants engaged in lawful

21 conduct, nor has there been a determination that Plaintiffs' damages were caused, at

22 least in part, but such lawful conduct. Accordingly, Mr. Deetz's alleged failure to

23 disaggregate his damages model at this point cannot be a basis to exclude his

24 testimony.

25        C.    Disaggregation Is Not Required in this Case.

26        Even if the Court or the jury were to conclude that certain of Defendants'

27 actions were lawful, Plaintiffs are not required to disaggregate their damages where

28

-24-

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 26 of 34
Case 2:15-cv-03378-JFW-MRW Document 122 Filed 01/09/17 Page 25 of 33 Page ID
#:21904

1    it would be impossible or impractical to do so. *Bonjourno*, 752 F.2d at 813. That is

2    likely to be the case here.

3          The undisputed testimony is that a boxing promoter needs both boxers and

4    television outlets available to it in order to have a successful business. Sbardellati

5    Decl., Ex. 5, p. 19:18-20:5; Declaration of Gary Shaw filed in support of Plaintiffs'

6    Opposition to Motions for Summary Judgment, Dkt. 235 ("Shaw Decl."), ¶ 44;

7    Declaration of Elizabeth Sbardellati in support of Plaintiffs' Opposition to

8    Defendants' Motion in Limine No. 1 ("Sbardellati Decl."), Ex. 1, ¶¶ 34-35. Stated

9    in economic terms, these are the necessary inputs for the boxing business. *Id*., ¶ 36.

10         Plaintiffs allege that Defendants have engaged in unlawful activities that have

11   foreclosed Plaintiffs' ability to sign boxers and obtain available dates for television

12   broadcasts for their fights. Because both pieces are necessary for a successful

13   business, a determination that, for example, Defendants' conduct with respect to

14   boxers was lawful would not alter the conclusion that Defendants' unlawful conduct

15   with respect to television networks caused all of the damage to Plaintiffs as stated in

16   Mr. Deetz's report. Even if Plaintiffs could sign boxers, if they did not have any

17   available television networks to broadcast boxing events featuring those boxers,

18   Plaintiffs would still be precluded from successfully promoting those boxers. As a

19   result, the dramatic decline in the number of events and number of boxers promoted

20   by Golden Boy would remain. In this way, disaggregation of damages in this case is

21   neither practical nor possible.

22         *LePage's*, 324 F.3d at 166 is instructive. There, the Court considered a

23   Section 2 monopolization claim arising from exclusionary conduct and allegedly

24   unlawful bundling activities. *Id*. at 146-47. The Defendant argued that the award of

25   damages was improper because it did not disaggregate between lawful and unlawful

26   conduct. *Id*. at 166. The Court disagreed; holding that, because the defendants'

27   plan, taken as a whole, was found to violate Section 2, disaggregation of damages

28   was neither possible nor required. The same is true here. Plaintiffs contend that

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 27 of 34
Case 2:15-cv-03378-JFW-MRW   Document 229   Filed 07/08/19   Page 28 of 37   Page ID
#:21905

1    Defendants entire business model is anticompetitive and an attempt to monopolize

2    boxing promotion.  Plaintiffs are entitled to claim all of their lost profits that

3    resulted from the harm caused by those anticompetitive acts.

4    **II.    Mr. Deetz Properly Included Non-Championship Caliber Boxers in His**

5    **Lost Profits Calculation.**

6    r. Deetz employs a "before and after" or "but-for" model for calculating lost

7    profits caused by Defendants' conduct.  Sbardellati Decl., Ex. 5, p. 14:19-15:3.  This

8    is a generally recognized method for calculating lost profits damages.  Sbardellati

9    Decl., Ex. 4, ¶ 15.  In applying this method, the expert calculates profits before the

10   wrongful conduct began and compares those profits to the profits earned after the

11   defendant engaged in the wrongful conduct.  *Id.*, ¶ 17.

12   Although Defendants concede that Mr. Deetz's methodology is a well-

13   accepted method of calculating damages, Defendants contend that Mr. Deetz's

14   application of that methodology is fatally flawed because he includes non-

15   championship caliber boxers in his calculations.  Specifically, Defendants contend

16   that because Plaintiffs do not allege any unlawful conduct with respect to non-

17   championship caliber boxers, they cannot include those boxers in any damage

18   calculation.  As Mr. Deetz has explained, Defendants are wrong.

19   First, Defendants' argument ignores the reality of the boxing promotion

20   business that Championship Caliber Boxers drive revenue for the sport.  Shaw

21   Decl., ¶ 4; Kneuper Report, ¶¶ 20-23.  Championship Caliber Boxers are the fighters

22   that headline the event and fight on the televised portions of the card.  Shaw Decl., ¶

23   4.  However, each event also includes fights involving non-championship caliber

24   boxers.  *Id*.; Sbardellati Decl., Ex. 6, p. 63:1-24; Sbardellati Decl., Ex. 7, p. 255:8-

25   13.  These fighters participate in the undercards as a way of developing their careers

26   and hopefully one day becoming a Championship Caliber Boxer.  Sbardellati Decl.,

27   Ex. 6, p. 152:16-156:24; Shaw Decl., ¶¶ 4, 26.

28

-26-

1       Because of this business model, it is essential that any lost profits calculation

2  include the revenues and costs attributable to these developmental opportunities.

3  *See* Declaration of Gene Deetz in Support of Plaintiffs' Oppositions to Defendants'

4  Motions for Summary Judgment, Dkt. 237 ("Deetz Decl."), ¶¶ 19-20.  The revenues

5  and costs attributable to these non-championship caliber fighters are in the nature of

6  research and development expenses.  *Id.*, ¶ 20.  Failing to include these fighters in

7  the analysis would therefore improperly skew the lost profits analysis by eliminating

8  a significant cost center.  *Id.*

9       Second, Mr. Deetz's analysis actually confirms that Plaintiffs have been

10 harmed by the foreclosure of their ability to promote Championship Caliber Boxers.

11 Mr. Deetz's analysis demonstrates that the promotion of non-championship caliber

12 boxers is a money losing proposition.  Sbardellati Decl., Ex. 3 (Revised); Deetz

13 Decl., ¶¶ 19-20.  Indeed, Mr. Deetz's analysis reflects that in 2014, Golden Boy lost

14 $1,343,658 from the promotion of non-championship caliber boxers, in 2015, it lost

15 $1,207,285 from the promotion of non-championship caliber boxers, and through

16 June 2016, Golden Boy had lost $679,315 from the promotion of non-championship

17 caliber boxers.  Sbardellati Decl., Ex. 3 (Revised).

18      The fact that Plaintiffs consistently lose money from the promotion of non-

19 championship caliber boxers demonstrates that they are harmed by Defendants'

20 actions.  Without the ability to promote new Championship Caliber Boxers,

21 Plaintiffs are left with only the money-losing business of promoting non-

22 championship caliber boxers.  Accordingly, the inclusion of non-championship

23 caliber boxers in Mr. Deetz's analysis is fully consistent with Plaintiffs' theory of

24 damages.

25      Third, because promotion of non-championship caliber boxers is a money

26 losing proposition, failing to include these losses in any lost profits analysis would

27 actually result in higher damages for Plaintiffs.  In the promotion of Championship

28 Caliber Boxers, Plaintiffs necessarily incur the costs of promoting non-

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 29 of 34
Case 2:15-cv-03378-JFW-MRW   Document 122-10   Filed 06/15/19   Page 29 of 34   Page ID
#:21907

1    championship caliber boxers.  Deetz Decl., ¶¶ 19-20.  Those boxers are needed to

2    fill out the fight card and present a full event.  Shaw Decl., ¶ 4; Sbardellati Decl.,

3    Ex. 6, p. 63:1-24; Sbardellati Decl., Ex. 7, p. 255:8-13. Excluding the costs

4    attributable to the promotion of those non-championship caliber fights would result

5    in artificially higher profits from the promotion of Championship Caliber Boxers.

6    Deetz Decl., ¶ 20.  Accordingly, Mr. Deetz's analysis conservatively includes those

7    costs to arrive at the actual profits attributable to the boxing events involving

8    Championship Caliber Boxers.

9         Defendants suggest that Plaintiffs promoted boxing events which featured no

10   Championship Caliber Boxers.  *See*, pp. 12-15 above.  However, the evidence does

11   not support this assertion.  Contrary to Defendants' contentions, Plaintiffs' witnesses

12   have made clear that the main event fights broadcast on television networks such as

13   Fox Sports and Estrella TV do involve Championship Caliber Boxers.  Sbardellati

14   Decl., Ex. 6, p. 86:1-89:12;  Sbardellati Decl., Ex. 8, 221:22-222:5.  Although there

15   may be a larger percentage of non-championship caliber boxers involved in those

16   events, the main event will potentially involve Championship Caliber Boxers.  *Id*.

17        Moreover, even if there were occasional Golden Boy events that did not

18   feature any Championship Caliber Boxers, the testimony and Mr. Deetz's analysis

19   demonstrates that those events almost always lose money.  Sbardellati Decl., Ex. 8,

20   221:22-222:5; Sbardellati Decl., Ex. 7, 301:6-17; Sbardellati Decl., Ex. 3.

21   Therefore, yet again, including those events in Mr. Deetz's calculation of lost profits

22   only served to reduce Plaintiffs' overall damages.  Defendants cannot seriously

23   contend that including expense items which result in a ***lower*** damages calculation

24   justifies excluding Mr. Deetz's testimony in its entirety.

25   **III.    Mr. Deetz's Application of Dr. Kneuper's Criteria is Perfectly Proper.**

26        Defendants' final attack on Mr. Deetz's opinion takes aim at Mr. Deetz's

27   application of Dr. Kenuper's criteria for determining Championship Caliber Boxers.

28

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 30 of 34
Case 2:15-cv-03378-JFW-MRW   Document 122   Filed 01/09/17   Page 29 of 34   Page ID
#:21908

1  Defendants contend that, by applying Dr. Kneuper's criteria himself, Mr. Deetz is

2  offering an opinion beyond his expertise.  Defendants are wrong again.

3       Mr. Deetz does not offer an opinion as to what criteria distinguish

4  Championship Caliber Boxers from non-championship caliber boxers.  Rather, he

5  relies on Dr. Kneuper's opinion that the relevant criteria are: a ranking in the top 10

6  or a championship belt within the last two years, a television appearance in the last

7  two years and a US based manager or promoter.  Sbardellati Decl., Ex. 2, ¶ 38, n.

8  21.  Mr. Deetz then applies these criteria in a rote manner based on data compiled

9  from the same sources as Dr. Kneuper.  Sbardellati Decl., Ex. 5, p. 39:22-42:16.

10 There is nothing improper about this analysis.

11      Experts may rely on the opinions of other experts.  Fed. R. Evid. 703; *United*

12 *States ex rel. Jordan v. Northrop Grumman Corp*., 2003 WL 27366224, at *7 (C.D.

13 Cal. Jan. 6, 2003).  Indeed, it is customary for damages experts to rely on the

14 opinions rendered by liability experts in calculating damages.  *Id*. ("Grim is a

15 damages expert, not a liability expert.  She may therefore rely on assumptions about

16 liability made by the Government's liability experts in calculating damages….").

17 That is precisely what Mr. Deetz did here.  He relied on Dr. Kneuper's opinions and

18 then applied those opinions to his own analysis.  This is perfectly proper.

19      Defendants criticize Mr. Deetz's application of Dr. Kneuper's criteria on two

20 grounds.  First, Defendants criticize the fact that the original Exhibit 3 to Mr.

21 Deetz's report incorrectly categorized certain Championship Caliber Boxers as non-

22 championship caliber boxers.  *See* pp. 17-19, above.  However, Mr. Deetz explained

23 that this was the result of an inadvertent coding error in the classification of the

24 boxers and was corrected prior to his deposition.  Sbardellati Decl., Ex. 5, 26:19-

25 28:15.  Inadvertent errors such as this may go to the weight of Mr. Deetz's opinions,

26 but they do not render them inadmissible.  *See e.g., Micro Chem., Inc. v. Lextron,*

27 *Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (Court may not exclude expert testimony

28

-29

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 31 of 34
Case 2:15-cv-03378-JFW-MRW   Document 1122-10   Filed 07/08/19   Page 31 of 34   Page ID
#:21909

1  simply because of a dispute over the reliability of the expert's data or facts relevant
2  to the expert's analysis).

3       Second, and more fundamentally, Defendants contend that Mr. Deetz's
4  classification of boxers "contradicts Dr. Kneuper's conclusions." *See*, p. 17 above.
5  In making this argument, Defendants rely on the assertion that Mr. Deetz "classified
6  ***47 separate boxers*** as Championship-Caliber that Dr. Kneuper did not…." *Id*.  This
7  assertion is grossly misleading, if not downright false, and Defendants know it.

8       To begin with, included in the supposed list of 47 boxers about which
9  Defendants complain are two boxers who are, in fact, listed on Dr. Kneuper's lists.
10 Frankie Gomez appears on Dr. Kneuper's U.S. promoted list as Francisco Gomez,
11 and Michael Angelo Perez also appears on Dr. Kneuper's U.S. promoted list.
12 Sbardellati Decl., Ex. 1, Exh. 4.

13      Focusing only on the remaining 45 boxers, Defendants are comparing apples
14 to oranges.  As Mr. Deetz explained in deposition, his lists cover different time
15 periods than Dr. Kneuper's lists.  Specifically, Dr. Kneuper's lists are limited to
16 fighters classified as Championship Caliber at the time of Dr. Kneuper's report in
17 2016.  Sbardellati Decl., Ex. 1, ¶ 64.  Because Mr. Deetz was required to analyze
18 three years of Plaintiffs' boxing promotion activity, his application of Dr. Kneuper's
19 criteria looks at different time periods than that reflected in Dr. Kneuper's lists.
20 Sbardellati Decl., Ex. 5, p. 31:1-34:22.  Therefore, there is nothing unusual about the
21 fact that there would be fighters that Mr. Deetz classifies as Championship Caliber
22 that are not on Dr. Kneuper's lists.

23      Indeed, as Dr. Kneuper's report makes clear, boxers can move in and out of
24 the Championship Caliber classification.  Sbardellati Decl., Ex. 1, ¶ 61.  Most
25 notably, when a boxer retires, even if he was previously classified as Championship
26 Caliber, he will no longer be part of that market.  *Id.,* ¶ 61, n. 83.  This is true of
27 Floyd Mayweather – one of the 45 allegedly misclassified fighters.  By July 2016,
28 Floyd Mayweather had retired from boxing, so he logically is not included in Dr.

DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 32 of 34
Case 2:15-cv-03378-JFW-MRW Document 122 Filed 09/06/17 Page 32 of 34 Page ID
#:21910

1 Kneuper's lists, but is included in Mr. Deetz's list from 2014. Sbardellati Decl., Ex.

2 10, 43:8 (Mayweather is retired); Sbardellati Decl., Ex. 9, 293:2 (retired boxers are

3 excluded from his lists); Sbardellati Decl., Ex. 1, ¶ 61, n. 83. Similarly, a fighter

4 such as Bernard Hopkins, who had not retired as of July 2016, but had been inactive

5 for nearly two years, would not qualify as a Championship Caliber Boxer in July

6 2016 under Dr. Kneuper's criteria because he did not have any activity during the

7 relevant period. But, Mr. Hopkins certainly was a Championship Caliber Boxer in

8 2014 and was properly classified as such by Mr. Deetz. Sbardellati Decl., Ex. 3.

9 Other fighters may have been classified as Championship Caliber in 2014, only to

10 lose one or more fights and fall out of the Championship Caliber classification.

11        Therein lies the fallacy in Defendants' argument. The mere fact that certain

12 fighters are included as Championship Caliber Boxers in Mr. Deetz's analysis, but

13 are not included on Dr. Kneuper's lists says nothing about Mr. Deetz's analysis. It

14 simply reflects that Mr. Deetz's application of Dr. Kneuper's criteria for

15 Championship Caliber Boxers covers a wider time period than the lists attached to

16 Dr. Kneuper's report. Even if there were some merit to this argument, it merely

17 goes to the weight of Mr. Deetz's opinions, not their admissibility. Mr. Deetz

18 properly relied on Dr. Kneuper's opinions regarding liability and applied those

19 opinions in conducting his analysis. That is what is expected from a damages

20 witness. *United States ex rel. Jordan*, 2003 WL 27366224 at \*7. Accordingly,

21 there is no basis to exclude Mr. Deetz's opinions.

22 **IV.    CONCLUSION**

23        For the foregoing reasons, Defendants have offered no basis on which to

24 exclude Mr. Deetz's testimony and Plaintiffs respectfully request that the Court

25 deny the motion in its entirety.

26

27

28

Case 2:15-cv-01045-RFB-BNW   Document 664-10   Filed 06/15/19   Page 33 of 34
Case 2:15-cv-03378-JFW-MRW   Document 122   Filed 01/06/17   Page 32 of 33   Page ID
#:21911

1    DATED:  January 6, 2017           **QUINN EMANUEL URQUHART &**
2                                       **SULLIVAN LLP**

3                                       By:    /s/ Michael E. Williams
4                                               Michael E. Williams

5                                       Attorneys for Defendants
6                                       Haymon Boxing LLC, Haymon Sports
                                        LLC, Haymon Boxing Management, and
7                                       Haymon Holdings LLC

8    DATED:  January 6, 2017           **KINSELLA WEITZMAN ISER**
9                                       **KUMP & ALDISERT LLP**

10
11                                      By:    /s/ Jeremiah T. Reynolds
                                                Jeremiah T. Reynolds
12
13                                      Howard Weitzman (SBN 38723)
                                        hweitzman@kwikalaw.com
14                                      Jeremiah T. Reynolds (SBN 223554)
                                        jreynolds@kwikalaw.com
15                                      808 Wilshire Boulevard, 3rd Floor
16                                      Santa Monica, California 90401
                                        Telephone: 310.566.9800
17                                      Facsimile: 310.566.9850

18
19                                      Attorneys for Defendant
                                        Alan Haymon Development, Inc.
20
21
22
23
24
25
26
27
28

-32-                                    Case No. 2:15-cv-3378-JFW-MRW
─────────────────────────────────────
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.

Case 2:15-cv-01045-RFB-BNW Document 664-10 Filed 06/15/19 Page 34 of 34
Case 2:15-cv-03378-JFW-MRW Document 122 Filed 01/06/17 Page 33 of 34 Page ID
#:21912

| | | |
|---|---|---|
| 1 | DATED: January 6, 2017 | **KRAMER LEVIN NAFTALIS & FRANKEL LLP** |
| 2 | | |
| 3 | | By: ___/s/ Barry H. Berke___ |
| 4 | | Barry H. Berke |
| 5 | | Barry H. Berke (pro hac vice) |
| 6 | | bberke@kramerlevin.com Norman C. Simon (pro hac vice) |
| 7 | | nsimon@kramerlevin.com Marjorie H. Sheldon (pro hac vice) |
| 8 | | msheldon@kramerlevin.com |
| 9 | | 1177 Avenue of the Americas New York, New York 10036 |
| 10 | | Telephone: (212) 715-9100 |
| 11 | | Facsimile: (212) 715-8000 |
| 12 | | |
| 13 | | Attorney for Defendant Alan Haymon |
| 14 | DATED: January 6, 2017 | **GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP** |
| 15 | | |
| 16 | | By: ___/s/ Ricardo P. Cestero___ |
| 17 | | Ricardo P. Cestero |
| 18 | | Attorneys for Plaintiffs Golden Boy |
| 19 | | Promotions, LLC, Golden Boy Promotions, Inc. and Bernard Hopkins |
| 20 | | |
| 21 | | |
| 22 | Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other | |
| 23 | signatories listed, and on whose behalf the filing is submitted, concur in the filing's | |
| 24 | content and have authorized the filing. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT GENE DEETZ.