# Exhibit 2

Expert Report of Hal J. Singer, Ph.D. (August 31, 2017), with Zuffa's Proposed Redactions

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| IN RE: | ) | Case No.: 2:15-cv-01045-RFB-(PAL) |
| | ) | |
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, | ) | CLASS ACTION |
| Luis Javier Vazquez, and Kyle Kingsbury, | ) | |
| on behalf of themselves and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **EXPERT REPORT OF** |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship | ) | |
| and UFC, | ) | **HAL J. SINGER, PH.D.** |
| | ) | |
| Defendant. | ) | |

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Introduction and Assignment ........................................................................ 4

Summary of Conclusions .............................................................................. 8

Qualifications ............................................................................................... 11

I.    Industry Background ............................................................................. 13
    A.    The MMA Industry ................................................................. 13
    B.    Academic Literature on MMA ................................................ 19
    C.    Forms of Fighter Compensation Paid by Zuffa to Members of the Bout Class ... 21
        1.    Show and Win Purses ................................................... 21
        2.    Discretionary and Performance Pay ............................. 22
        3.    PPV Royalties .............................................................. 23
        4.    Letters of Agreement ................................................... 23
    D.    Forms of Fighter Compensation Paid by Zuffa to the Identity Class ................. 24

II.    Nature of the Challenged Conduct ....................................................... 27
    A.    Nature of the Horizontal Conduct .......................................... 28
        1.    Acquisitions of Potential Rivals .................................. 28
        2.    Counter-Programming and Litigation .......................... 35
        3.    Non-Compete Agreements With Other MMA Promoters ....................... 40
    B.    Nature of the Vertical Conduct .............................................. 41
        1.    Exclusive Fighter Contracts Prohibit Fighters from Working with MMA Promoters other than Zuffa for the Often Lengthy Duration of the Contracts ................... 42
        2.    Zuffa's Exclusive Contracts with Fighters Permit Zuffa to Extend the Duration of the Contracts .............. 43
        3.    Other Vertical Restraints ............................................. 46
    C.    Zuffa Exploited the Exclusionary Terms of the PARs to Make Exclusion Effectively Perpetual ............................................................... 48
        1.    Zuffa Exploited the Exclusionary Terms to Extend and Renew Fighter Contracts ............................... 48
        2.    Given Fighters' Short Career Durations, Zuffa's Exclusionary Provisions Were Effectively Perpetual for Fighters Who Zuffa Wished to Retain .... 59

III.    The Challenged Conduct Was Exclusionary and Harmed Competition ........................... 63
    A.    Indirect Evidence of Zuffa's Market Power ........................... 64
        1.    The Relevant Input Market .......................................... 66
        2.    The Relevant Output Market ....................................... 78
        3.    The Relevant Geographic Market ................................ 82
        4.    Zuffa's Dominant Share in The Relevant Input Market and Submarket .. 87
        5.    Zuffa's Dominant Share in The Relevant Output Market ....................... 89
        6.    Natural Barriers to Entry ............................................. 90
        7.    Artificial Barriers to Entry .......................................... 91
        8.    Market Participants and Observers Viewed Zuffa As Dominant ............. 91
        9.    All Indirect Evidence and Analysis of Zuffa's Market Power Is Common to the Classes .............................................. 98

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

B.     Direct Evidence of Zuffa's Market Power ........................................... 98
       1.     Direct Evidence of Power to Suppress Fighter Compensation Below
              Competitive Levels .................................................................. 98
       2.     Direct Evidence of Power to Restrict the Supply of Fighter Services. ..... 99
       3.     Direct Evidence of Power Over Pricing of Live MMA Events ............. 100
       4.     Direct Evidence of Power to Restrict the Supply of Live MMA Events 100
       4.     Direct Evidence of Power to Exclude Rivals........................................ 101
       5.     All Direct Evidence and Analysis of Zuffa's Market Power Is Common to
              the Classes .............................................................................. 101
C.     The Challenged Conduct Substantially Foreclosed Competition ..................... 102
       1.     The Challenged Conduct Blocked Rivals from Access to Key Inputs
              Necessary for a Successful MMA Promotion........................................ 103
       2.     The Challenged Conduct Foreclosed a Substantial Share of the Relevant
              Input Market and Submarket .................................................... 112
       3.     The Duration and Staggering of Zuffa's Contracts Prevented Meaningful
              Competition by Potential Rivals .............................................. 116
       4.     Zuffa Engaged in Coercive Contracting Behavior and Restricted Fighters'
              Ability to Terminate Contracts ............................................... 116
       5.     All Evidence and Analysis of Foreclosure Is Common to the Classes... 117
D.     The Challenged Conduct Generated Substantial Anticompetitive Effects ......... 117
       1.     Regression Models Show Bout Class Compensation Share Is Negatively
              Correlated with Zuffa's Foreclosure Share, Implying that Increased
              Foreclosure Share Causes Decreased Compensation Share ................... 118
       2.     Additional Evidence Shows That the Challenged Conduct Suppressed
              Fighter Compensation Below Competitive Levels ................................. 126
       3.     The Challenged Conduct Restricted the Supply of Fighter Services...... 131
       4.     The Challenged Conduct Inflated the Price of Live MMA Events ........ 133
       5.     The Challenged Conduct Restricted Output of Live MMA Events........ 135
       6.     All Evidence and Analysis of Anticompetitive Effects Is Common to the
              Classes .................................................................................... 140

IV.    Common Impact on the Bout Class .................................................... 140
A.     The Challenged Conduct Suppressed Bout Class Compensation...................... 141
B.     Common Evidence of a Compensation Structure Is Capable of Demonstrating That
       Compensation Suppression Was Broadly Experienced Across Bout Class Members
       .................................................................................................... 142
       1.     Documentary Evidence of a Compensation Structure ........................... 145
       2.     Econometric Evidence of a Compensation Structure ........................... 151
C.     Standard Econometric Methods Further Demonstrate Directly That the Vast
       Majority of Bout Class Members Received Lower Compensation Than They Would
       Have In the But-For World ............................................................... 154

V.     Common Impact on Identity Class ..................................................... 155
A.     The Challenged Conduct Suppressed Identity Class Compensation ................. 156
B.     Mechanisms Exist to Transmit Compensation Suppression Broadly Across Identity
       Class Members ............................................................................... 159

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

VI.     Aggregate Damages ................................................................................................. 161
        A.      Aggregate Damages Using Strikeforce and Bellator Benchmarks ................... 162
        B.      Aggregate Damages Using Zuffa Foreclosure Regression Benchmark ............ 163
        C.      Aggregate Damages Using Impact Regression Model Benchmark.................... 164
        D.      Aggregate Damages to the Identity Class ......................................................... 165

VIII.   Zuffa's Likely Efficiency Defenses Are Unavailing ...................................................... 167
        A.      Zuffa's Claim That the Challenged Conduct Increased Output......................... 168
                1.      Zuffa's Claim That Multi-Bout Contracts Increased Output ................. 168
                2.      Zuffa's Claim That Its Horizontal Acquisitions Increased Output......... 171
        B.      Zuffa's Claim That the Challenged Conduct Increased Fighter Compensation . 173
                1.      Zuffa's Claim That Increased Fighter Compensation Over Time Shows That
                        Fighter Compensation Is Competitive .................................................... 173
                2.      Zuffa's Claim That Increased Fighter Compensation After Horizontal
                        Acquisitions Shows That Fighter Compensation Is Competitive ........... 175
                3.      Zuffa's Claim That its Profit Data Show that MMA Fighter Compensation
                        Was Competitive.................................................................................... 176
        C.      Zuffa's Claim That The Challenged Conduct Incentivizes Investment in
                Promotional Platforms and Individual Athletes................................................. 179
        D.      The Experience of Other Professional Sports Leagues and the Sports Economics
                Literature Suggests That Elimination of the Challenged Conduct Would Benefit
                Fighters, Consumers, and the MMA Industry As a Whole................................. 181

Conclusion ........................................................................................................................ 184

Appendix 1: Curriculum Vitae............................................................................................ 185

Appendix 2: Methodology and Data.................................................................................... 203

Appendix 3: Materials Relied Upon .................................................................................... 210

### INTRODUCTION AND ASSIGNMENT

1.      Zuffa LLC, doing business as Ultimate Fighting Championship ("Defendant," "Zuffa," or "UFC"), is a promoter of live professional mixed-martial-arts ("MMA") bouts. Plaintiffs in this case are MMA fighters ("Fighters"), and include Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury.[1] Plaintiffs allege that Defendant implemented an anticompetitive scheme to acquire, maintain, and enhance its monopoly power in

---

1.      I interviewed named plaintiffs Cung Le, Nate Quarry, and Javier Vazquez on May 23, 2017. On June 2, 2017, I interviewed named plaintiffs Jon Fitch and Kyle Kingsbury.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

the market for promoting professional MMA bouts (the "Relevant Output Market"), and its monopsony power over the Fighters appearing in those bouts (the "Relevant Input Market").[2] I have measured the Relevant Input Market using two industry-accepted databases: (1) MMA Fighters who are tracked by FightMetrics (the "Tracked" Relevant Input Market); and (2) MMA Fighters who are ranked by FightMatrix (the "Ranked" Relevant Input Market). I also have defined a relevant input submarket consisting of all Fighters ranked one through fifteen in any of the major MMA weight classes (the "Relevant Input Submarket," or "Headliners"), using industry-accepted databases for ranking MMA Fighters.

2.      Plaintiffs allege that Zuffa's anticompetitive scheme has foreclosed potential rival MMA promoters and impaired their ability to compete with Zuffa in the promotion of professional live MMA Events ("Live MMA Events"). Specifically, Zuffa is alleged to have: (1) eliminated potential rival MMA promoters through horizontal acquisitions; (2) deprived potential rivals of key inputs (the Fighters themselves) by entering into allegedly exclusionary contracts with the vast majority of top Fighters; and, (3) taken other steps to use its alleged dominance to impair potential rivals.[3] Plaintiffs allege that these actions, taken together (the "Challenged Conduct"), have enabled Zuffa to harm competition in the Relevant Output and Input Markets,[4] thereby maintaining and enhancing Zuffa's monopoly and monopsony power, causing anticompetitive effects, and resulting in antitrust injury to Plaintiffs and members of the two classes defined below.[5]

---

2.   United States District Court District of Nevada, *Cung Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,* 2:15-cv-01045-RFB-(PAL), Consolidated and Amended Antitrust Class Action Complaint (Dec. 18, 2015) [hereafter, CAC].
3.   *Id.* ¶1; Part VII.A.
4.   *Id.* Part VII.B.
5.   *Id.* Parts VII.C-VII.D.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

3.      Plaintiffs have defined a "Bout Class" as:

> All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.[6]

Plaintiffs have defined the "Identity Class" as:

> Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials, during the Class Period in the United States.[7]

Plaintiffs define the "Identity of a UFC Fighter" as "the name, sobriquet [nickname], voice, persona, signature, likeness and/or biographical information of a UFC Fighter."[8] Plaintiffs have defined the "Class Period" as beginning December 16, 2010, and continuing until the Challenged Conduct ceases.[9] Plaintiffs claim that through the Challenged Conduct, Zuffa has injured members

---

6.   *Id.* ¶39. I have been instructed by Class Counsel to interpret the phrase "a bout fought in the United States," as used in the Bout Class definition, to mean any fight taking place within the United States or broadcast live (with or without a tape delay) into the United States. Given that all of the bouts in the data I am using to assess foreclosure, impact, and damages either took place within the United States or were broadcast live in the United States (albeit some with slight tape delay), I did not need to exclude any fighter from the Bout Class, nor did I need to remove data reflecting any potential non-qualifying bouts in assessing impact or damages. If, however, the class definition were interpreted to be limited only to those class members who fought in a bout that physically took place within the United States during the Class Period (regardless of whether or not it was broadcast live into the United States), 12.7 percent of the Bout Class members would be excluded (154 out of 1,214 Fighters). These 154 Fighters account for 1.5 percent of the aggregate Bout Class damages. Additionally, 33.1 percent of all Bout Class damages are associated with bouts fought outside the United States (but which were broadcast live into the United States).

7.   *Id.* ¶47. Consistent with the definition of the Bout Class, I limit my analysis to Fighters participating in one or more Zuffa Live MMA Events broadcast in the United States during the Class Period. This includes numbered UFC pay-per-view events (for example, "UFC 196: McGregor vs. Diaz,") as well as non-pay-per-view UFC events (for example, "FOX 7: Henderson vs. Melendez"). Events are considered live if broadcast either in real time or with a tape delay for events held in foreign time zones. (For example, UFC 138, held in the United Kingdom, was tape delayed for US audiences. *See* http://www.mmaweekly.com/ufc-138-tv-ratings-match-past-tape-delays). I do not include taped bouts from The Ultimate Fighter ("TUF"), Zuffa's reality-TV show; however, TUF finales, which are live, are included (for example, "TUF 21 Finale: Thompson vs. Ellenberger"). Finally, Live MMA Events by acquired promoters (such as Strikeforce), in which Fighters received compensation from Zuffa, are also included. *See* ZFL-2603701

8.   CAC ¶27.

9.   *Id.* I understand Plaintiffs claim that the Challenged Conduct is ongoing.

of the Bout and Identity Classes by compensating them for bouts and Identity rights, respectively, below levels that would have prevailed in the absence of the Challenged Conduct.[10]

4.        I have been asked by counsel for Plaintiffs to determine whether Zuffa possessed monopoly or monopsony power (or both), and, to the extent necessary or helpful to make such determinations, to define one or more relevant antitrust markets (along both product and geographic dimensions) for assessing the claims in this case. I have also been asked to assess whether the Challenged Conduct foreclosed competition and generated anticompetitive effects. I have also been asked to determine whether the Challenged Conduct: (1) caused members of each Class to be compensated below levels that would have prevailed in the absence of the Challenged Conduct; and (2) caused injury in the form of under-compensation that was widespread across members of each Class (that is, to assess whether the Challenged Conduct generated a "common impact" on each Class). Next, I have been asked to calculate the aggregate amount of undercompensation to members of each Class attributable to the Challenged Conduct. I was also asked to review and assess potential procompetitive justifications for the Challenged Conduct that Zuffa, or economists acting on its behalf, have asserted in other fora, including in proceedings before the Federal Trade Commission (FTC). Finally, for each prong of my analysis, I was asked to determine whether addressing it would involve methods and/or evidence common to Class Members (as opposed to evidence or methods that would vary from one Class Member to another).

---

10.  *Id.* ¶21. I estimate that, as of June 30, 2017, there are 1,214 Fighters in the Bout Class and at least as many Fighters in the Identity Class. As explained in Part V, *infra*, my analysis of the Identity Class focuses on two subgroups. The first of these subgroups consists of Fighters who received positive, nonzero compensation from Zuffa in exchange for use of their Identities during the Class Period. There are at least 826 Fighters in this first subgroup. The second subgroup consists of Fighters who executed a Promotional and Ancillary Rights Agreement with Zuffa during the Class Period. There are at least 791 Fighters in this subgroup. There is substantial overlap between these two subgroups. Approximately 64 percent of the members of the first subgroup are also members of the second subgroup, and approximately 67 percent of the members of the second subgroup are also members of the first subgroup.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

## SUMMARY OF CONCLUSIONS

5.     My conclusions in this report are based on the information available to me at this time. I reserve the right to supplement my opinions in the event that new evidence becomes available.

- Economists recognize that exclusionary conduct, such as the Challenged Conduct here, has the potential to harm competition. Whether the Challenged Conduct is actually anticompetitive here depends on: (1) whether Zuffa has enjoyed significant market power; and (2) whether the Challenged Conduct has allowed Zuffa to exercise its market power to foreclose or impair competition to a significant degree. I conclude that Zuffa enjoyed substantial market power, and exercised that power to substantially foreclose and harm competition.

- Zuffa has had significant monopoly and monopsony power at least since the beginning of, and extending throughout, the Class Period, and is widely recognized as the dominant promoter of professional Live MMA Events.

- At least since the beginning of, and extending throughout, the Class Period, Zuffa's Fighters have accounted for a large share in the Relevant Input Market (under both of my measurements) and Relevant Input Submarket, indicating Zuffa's monopsony (buying) power. Zuffa has also accounted for a large and dominant share in the Relevant Output Market at least since the beginning of, and extending throughout, the Class Period, indicating its monopoly (selling) power. Rival MMA promoters face substantial barriers to entry and expansion in the Relevant Output Market, due in part to the Challenged Conduct, including Zuffa's staggered, long-term exclusive contracts with Fighters. At least since the beginning of, and extending throughout, the Class Period, Zuffa has had no close competitors in the Relevant Output Market or in the Relevant Input Market or Submarket.

- In addition to this indirect evidence, there is ample direct evidence of Zuffa's significant monopoly and monopsony power. This includes direct evidence of suppressed Fighter compensation, pricing power over Live MMA Events, restricted demand for Fighter services, restricted supply of Live MMA Events, and the exclusion and impairment of potential rivals.

- The Challenged Conduct fits within the standard economic framework of Raising Rivals' Costs ("RRC").[11] Under the RRC framework, a dominant firm engages in

---

11. Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices and the Flawed Incremental Price-Cost Test*, 81(2) ANTITRUST L.J. 371-421, 376 (2017) ("The RRC foreclosure paradigm generally describes exclusionary conduct that totally or partially 'forecloses' competitors from access either to critical

exclusionary conduct that "totally or partially 'forecloses' competitors from access...to critical inputs."[12] As a consequence, firms that would otherwise provide competitive discipline are unable to do so, allowing the dominant firm to exercise market power, resulting in anticompetitive harm.[13]

- Access to a broad stable of MMA Fighters from the Relevant Input Market and Submarket is a critical input necessary to stage successful Live MMA Events in the Relevant Output Market. The Challenged Conduct ensured that Zuffa's would-be rivals lacked access to this critical input. Zuffa leveraged its staggered, exclusive contracts with Fighters to make its exclusionary provisions effectively perpetual for Fighters that Zuffa wished to retain.

- At least since the beginning of, and throughout, the Class Period, as a result of the Challenged Conduct, Zuffa foreclosed high shares of the Relevant Input Market (under both measurements) and Submarket, and MMA promoters were unable to compete effectively with Zuffa. Lacking access to a critical input (top MMA Fighters), the Challenged Conduct prevented non-Zuffa MMA promoters from staging successful Live MMA Events that could compete on the level of the UFC, and substantially constrained the ability of other MMA promoters from offering competitive compensation or promising career paths to top MMA Fighters.

- Zuffa's horizontal acquisitions and the exclusionary effects of the Challenged Conduct were mutually reinforcing. Zuffa's acquisitions eliminated would-be rivals to which Fighters might otherwise have switched, potentially defeating or at least mitigating Zuffa's attempts to exercise monopsony power. Zuffa subjected the rosters of Fighters from acquired MMA promoters to Zuffa's exclusionary contracts, making the acquired Fighters unavailable to non-Zuffa promotions, and enhancing Zuffa's foreclosure of the Relevant Input Market and Submarket. This further impaired any surviving MMA promoters from competing effectively with Zuffa, and further cemented Zuffa's status as the only MMA promotion capable of offering a promising career path to a Fighter seeking to challenge other top Fighters.

- Other components of the Challenged Conduct further reinforced these exclusionary effects. These include (1) counter-programming by Zuffa with the intent and effect of preventing other MMA promoters from achieving profitability; (2) agreements with other MMA promoters to impair potential rivals by shutting off access to Fighters; (3) contracts preventing other MMA promoters from using clips of Fighters' past fights to promote fights involving former UFC Fighters; (4) exclusive contracts with sponsors preventing sponsors from sponsoring non-Zuffa MMA

---

inputs or customers, with the effect of causing them to raise their prices or reduce their output, thereby allowing the excluding firm to profit by setting a supra-competitive output price, with the effect of harming consumers.").

12. *Id.*

13. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-10-

Promotions or Fighters, thus further locking-in Fighters to the UFC by threatening them with losing their third-party sponsorships (and corresponding sponsorship dollars) if they were to leave the UFC; and, (5) contracts requiring venues, sponsors, and broadcasters not do business with other MMA promoters as a condition for doing business with Zuffa.

- The Challenged Conduct has generated substantial anticompetitive effects in the Relevant Input Market and Submarket, and in the Relevant Output Market. These include suppressing compensation to UFC Fighters below competitive levels, restricting the supply of Fighter services in the Relevant Input Market and Submarket, and (relatedly) the supply of Live MMA Events in the Relevant Output Market, and inflating prices to MMA fans and consumers in the Relevant Output Market above competitive levels.

- Documentary and econometric evidence and analyses common to the Class as a whole demonstrates that: (1) Plaintiffs have suffered antitrust injury due to Zuffa's suppression of Fighter compensation below what it would have been in the absence of the Challenged Conduct; and (2) the antitrust injury resulting from the Challenged Conduct in the form of artificially suppressed compensation was universal or nearly so among members of both proposed Classes.

- ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████

- The evidence in the record includes efficiency defenses of the Challenged Conduct that have been proffered by Zuffa in past proceedings, and by economists on behalf of Zuffa. These efficiency defenses include the claims that the Challenged Conduct: (1) increased MMA output; (2) incentivized investments promoting Live MMA Events generally and individual Fighters specifically; and, (3) increased Fighter compensation. The record evidence I have reviewed to date does not support Zuffa's prior claims that any of the Challenged Conduct has had these purported positive effects. To the contrary, the available evidence from the record in this case, from my econometric analysis here, and from other professional sports and the sports economics literature indicates that elimination of the Challenged Conduct would benefit Fighters, consumers, and the MMA industry generally.

- All of my conclusions are based on data, methods, and evidence common to all members of each Class.

6.    The remainder of my report is organized as follows: In Part I, I briefly review the MMA industry's background and the related academic literature. In Part II, I review the horizontal and vertical aspects of the Challenged Conduct. In Part III, I show with evidence common to

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

members of both Classes that Zuffa possessed significant market power, and I demonstrate with classwide evidence that the Challenged Conduct substantially foreclosed competition and generated anticompetitive effects. In Parts IV and V, I show, using classwide evidence, that the harm flowing from the Challenged Conduct was widespread across members of both proposed Classes and thus can be said to have caused common impact across each Class. In Part VI, I calculate, using classwide evidence and methods, aggregate damages to members of each Class. In Part VII, I review efficiency defenses of the Challenged Conduct that Zuffa has put forth in prior proceedings, and I explain (based on classwide evidence and analyses) why these claims do not undermine my findings.

7.      The opinions expressed in this report reflect my review of evidence, data, testimony and other relevant materials to date. I reserve the right to supplement or amend my opinions should new materials or information become available.

**QUALIFICATIONS**

8.      I am a Principal at Economists Incorporated, a Senior Fellow at George Washington University's Institute for Public Policy, and I have served an Adjunct Professor at Georgetown University's McDonough School of Business (where I have taught Advanced Pricing to MBA candidates).

9.      Prior to joining Economists Incorporated, I was a Managing Partner at Navigant Economics, and before that, I was Chief Executive Officer of Empiris, a litigation and regulatory consulting firm (acquired by Navigant in 2010).

10.      I am the co-author of the e-book *The Need for Speed* (Brookings Press 2013), and the book *Broadband in Europe* (Springer Press 2005). My articles, several of which pertain to

exclusive dealing,[14] have appeared in dozens of legal and economic journals, as well as economic textbooks.

11.    I have testified before Congress on the interplay between antitrust and sector-specific regulation. My scholarship and testimony have been widely cited by courts and regulatory agencies. In agency reports and orders, my writings have been cited by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice. I served as an economic consultant to the Canadian Competition Bureau in a review of vertical merger in the television industry. My economic practice has been recognized by the American Antitrust Institute, and I have been a frequent speaker and author for ABA Antitrust Section events and publications, respectively.

12.    Although my experience spans several industries, I have considerable experience in sports. I served as a testifying expert in three program-carriage cases (adjudicated by an Administrative Law Judge pursuant to section 616 of the Cable Act) on behalf of independent cable sports networks: MASN (the network of the Baltimore Orioles and Washington Nationals), NFL Network, and Tennis Channel. I also served as an expert for the National Football League in the sports-blackout-rule proceeding at the Federal Communications Commission. I have served (and continue to serve) as a valuation expert for the Baltimore Orioles in their ongoing revenue-division dispute with the Washington Nationals, arbitrated by Major League Baseball.

13.    I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

---

14.  *See, e.g.,* Kevin Caves, Chris Holt & Hal Singer, *Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) Rev. Network Econ. (2013); Kevin Caves & Hal Singer, *Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) J. Competition L. & Econ. (2012); Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* Antitrust Source (2015).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

14.     My curriculum vitae is provided in Appendix 1. I have no financial stake in the outcome of this case. I am being compensated for my work in this case at the rate of $695 per hour. A list of the materials upon which I relied in forming my opinions for this report is provided in the Appendix.

## I.   INDUSTRY BACKGROUND

15.     In this section, I provide a brief summary of the MMA industry, the related academic literature, and the forms of compensation that Class Members receive from Zuffa.

## A.     The MMA Industry

16.     MMA is a term for the modern-day, full-contact competitive sport that mimics unarmed combat between two individual Fighters. MMA blends different combat styles, incorporating the most effective striking, wrestling, and disabling maneuvers from other stand-alone martial arts such as boxing, kickboxing, judo, and wrestling, into a single contest of physical supremacy. With its origins in the "no-holds-barred" scoreless competition of fighting until unconsciousness or submission, MMA has since evolved from a spectacle of "human cockfighting"[15] into a popular competitive sport with its own rules and scoring systems.[16]

17.     Similar in many ways to boxing, modern MMA fights (or "bouts") between competitors are timed rounds in which opponents attempt to disable their opponents. A bout can be won by either knocking out an opponent via striking the head, or by forcing the opponent to submit ("tap out") via a wrestling hold or lock that causes extreme pain. In the event neither Fighter has

---

15.  Robert J. Szczerba, *Mixed Martial Arts and the Evolution of John McCain*, FORBES, Apr. 3, 2014, *available at* http://www.forbes.com/sites/robertszczerba/2014/04/03/mixed-martial-arts-and-the-evolution-of-john-mccain/#27d42ac91a3b.

16.  Trevor Collier, Andrew L. Johnson & John Ruggiero, *Aggression in Mixed Martial Arts: An Analysis of the Likelihood of Winning a Decision, in* VIOLENCE AND AGGRESSION IN SPORTING CONTESTS: ECONOMICS, HISTORY AND POLICY SPORTS ECONOMICS, MANAGEMENT AND POLICY 4 (R. Todd Jewell, ed. Springer Science + Business Media 2011) [hereafter *Aggression in MMA*].

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

capitulated by the end of the last round, the winner is determined by a scoring system employed by judges.[17] Today, Fighters are divided into ten major weight classes.[18] The top Fighter of each division is awarded a championship belt. In a title fight, a challenger is matched against the defending champion.[19] In boxing, while independent sanctioning organizations declare champions, boxers can unify a title (becoming an undisputed champion) by simultaneously capturing championships at all major sanctioning organizations.[20] In contrast, championships in MMA are promoter specific: The UFC awards championship belts to Fighters within its own organization, and there are no independent sanctioning organizations that declare champions or regulate the rules as to who is declared a champion. To date, the UFC has never cross-promoted a Live MMA Event in conjunction with another MMA promotion.[21] However, there exist third-party ranking systems, often relied upon by MMA promotions and the MMA press, that rank all MMA Fighters (across different MMA promoters) relative to one another, both within weight classes and on an overall "pound-for-pound" basis.[22]

18.     State athletic commissions determine rules for Live MMA Events (weight divisions, fouls, equipment, etc.), and sanction each bout of a Live MMA Event individually.[23] Athletic

---

17. *See* UFC's "Ways to Win," *available at* http://www.ufc.com/discover/sport/ways-to-win.

18. *See, e.g.,* http://mmajunkie.com/rankings (showing the *USA Today/MMA Junkie* rakings for ten major weight classes, as well as men's pound-for pound rankings; *see also* UFC's "Weight Classes," *available at* http://www.ufc.com/discover/sport/weight-classes. *See also* http://bleacherreport.com/articles/2652376-bleacher-report-mma-rankings-for-july-2016

19. *See, e.g.,* Jake Martin, *25 Greatest UFC Title Fights of All Time*, Bleacher Report, Mar. 31, 2012, *available at* http://bleacherreport.com/articles/1123311-25-greatest-ufc-title-fights-of-all-time.

20. *Professional Boxing*, Encarta, June 5, 2008 (retrieved Nov. 14, 2008) ("If one fighter manages to capture the titles of all the major organizations at once, this is known as 'unifying' the title and the boxer is the 'undisputed' champion.").

21. According to Dana White, he "did a deal with Pride where they could use Chuck Liddell and Ricco Rodriguez [in 2003], and they were supposed to in return give me Wanderlei Silva and Sakuraba" but UFC "never co-promoted." Deposition of Dana White, Aug. 8, 2017, at 154:5-8.

22. *See, e.g.,* http://www.fightmatrix.com/mma-ranks/

23. *See, e.g.,* http://www.state.nj.us/lps/sacb/docs/martial.html; *see also* Deposition of Joseph Silva (June 7, 2017), at 91:9-17.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

commissions operate independently, sanctioning bouts under differing sets of criteria.[24] Generally, athletic commissions are primarily concerned with Fighter safety, considering factors such as matched Fighter's relative experience level and quality.[25] As of 2009, athletic commissions typically adopted the Unified Rules of Mixed Martial Arts when sanctioning events.[26]

19.    Live MMA Events are produced by promoters such as the UFC, which plan and execute MMA bouts for commercial entertainment. Live MMA Events are multi-hour productions consisting of a series of bouts between pre-matched Fighters. Unlike in boxing, which frequently pits two boxers from competing promoters against each other, all participants in a given Live MMA Event are typically affiliated with the same promoter.[27] This series of bouts (the "Fight Card") occurs sequentially from the bottom, with the most anticipated fight of the night generally occurring last (the "Top of the Card").

20.    MMA promoters rely on high-profile, highly-ranked Fighters at the Top of the Card to draw audiences to Live MMA Events.[28] A Live MMA Event that lacked these key inputs would

---

24.  Deposition of Joseph Silva at 86:12-19.
25.  *Id.* at 87:8-23, 107:4-19, 121:17-122:16.
26.  *See* http://www.abcboxing.com/committee-report-on-unified-rules-for-mma.
27.  Deposition of Joseph Silva at 215:11-216:18.
28.  Joe Silva, UFC's chief matchmaker, testified that "you would like people to buy tickets to it, to tune in on TV to watch it. And they're going to want to see the biggest stars that you have." Silva Dep. 102:23-103:3. *See also* ZUF-00085896-901 (2011 e-mail from Joe Silva to Dana White, Lorenzo Fertitta, and Sean Shelby, citing the USA TODAY/SB Nation Consensus MMA Rankings, showing that UFC Fighters account for the majority of the top twenty-five and top ten Fighters in each of seven weight classes; subject line reads "We Own MMA."); WME-ZUFFA-00001150 at *9 (WME-IMG presentation stating "6-8 bouts [per year] with big stars is 'normal' and the key to PPV [revenue];" charting the number of "Star Bouts" over time; noting that "If Ronda [Rousey], Jon [Jones], Conor [McGregor] stay healthy, 2016 line up is solid."). MMA promoters also recognize the value of star Fighters. *See* Deposition of Jeremy Lappen, President of ProElite (holding company of EliteXC), February 28, 2017, at 136:9-167:6 ("Q: Are fighters with notoriety like [Kimbo Slice] essential to building a successful MMA promotion? A: Yeah, the fighters are what draws…, it's hard to find a star. They have a certain X factor. That's what the business is about, I think."). *See also* Deposition of Shannon Knapp, President of Invicta Fighting Championships, April 11, 2017, at 124:10-12 ("Q: High Profile, she [Cristiane Justino, AKA Cyborg], was a well known fighter? A: Uh-huh, yeah. Q: Did her presence on a card affect the viewership? A. Yeah."); ZFL-0460809 at 10 (Lorenzo Fertitta states "[o]ur thinking when we bought Strikeforce was to give fans the fights they want…Obviously, Alistair [Overeem]'s one of the best heavyweights in the world, but he also has that 'it' factor – the tremendous look, he's huge.  It's a star factor.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

have difficulty drawing an audience, television distributors, and advertisers.[29] Fighting at the Top of the Card is the primary career objective for an MMA Fighter. Thus, the most successful Fighters accumulate enough wins with the goal of being matched against other prominent Fighters, and eventually a chance at winning a championship belt and obtaining a top ranking.[30] Of course, most Fighters do not become champions or fight at the Top of the Card. The median career length for an MMA Fighter is brief—approximately five bouts, spread over just 41 months.[31]

21.    Zuffa assumes responsibility for the costs of the event's production, including paying Fighters, whom it treats as independent contractors. In the UFC, Fighter pay is dependent on, among other things, a Fighter's performance, with Fighters typically receiving a predetermined "show" amount to participate in a bout, and a "win" payment if the Fighter is declared the victor. Show and win payments are typically the same amount; winning a bout typically doubles a Fighter's base pay.[32] UFC Fighters may also receive discretionary, performance-based bonuses; in limited cases, certain top-tier Fighters (such as defending champions) may also receive a share of the total revenues generated by the event, usually via a share of Pay-Per-View ("PPV") revenue.[33] MMA Fighters are generally tethered to Zuffa by contract for a time period (which, as discussed below, is often expanded by Zuffa by invoking certain contractual provisions designed to lock Fighters in as well as through other tactics) as well as for a specified number of bouts ("multi-bout contracts"); during this period (which can be indefinite in the case of retirement or extended

---

29.  *Id. See also* WME_ZUFFA_00031950-60 ("History tells us that for a pay-per-view to do big numbers, it needs marquee names… sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-views.").

30.  Deposition of Jon Fitch, February 15, 2017, at 112:7 – 112:9 ("Fighters fight for titles. The most coveted title is the UFC title.").

31.  *See* II.C.2, *infra*.

32.  *See* Part I.C, *infra*.

33.  *See* Part I.C, *infra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

injury), Fighters are unable to associate with other MMA promoters.[34] Despite these entanglements, as mentioned above, Zuffa still classifies its MMA Fighters as independent contractors rather than employees.[35] Zuffa pays Fighters no salary, offers none of the typical employee benefits (no pensions; no general health insurance; no life insurance; no disability benefits, etc.) and does not compensate Fighters for the costs that Fighters incur in the months (or years) of training leading up to a Live MMA Event. For instance, Zuffa does not pay for trainers, gym fees, managers, or equipment.[36] Zuffa pays Fighters for fighting only when they participate in bouts.[37]

22.     Zuffa earns revenue from four primary sources. *First*, Zuffa sells access to live events and taped content to a variety of media outlets, such as residential and commercial PPV, cable and broadcast television, video-on-demand ("VOD"), and the UFC Fight Pass online subscription service.[38] *Second*, Zuffa sells tickets for attendance at Live MMA Events. *Third*, Zuffa generates income from sponsorships, branding, and the advertising of products during its events. *Fourth*, Zuffa collects revenue from the sale of UFC-branded merchandise, such as video games, and collects royalties from products sold by licensees.[39]

23.     The UFC was purchased by Lorenzo and Frank Fertitta for $2 million in 2001, and was sold to William Morris Endeavor-International Management Group ("WME-IMG") in August

---

34. *See* Part II.B, *infra.*
35. *See* "DB-ZUFFA-00007015 - DB-ZUFFA-00007109.pdf" on Fighter classification. *See also* Hendrick 30(b)(6) V.I Tr. 264:8-10 (expressing Zuffa's position that fighters are independent contractors); Silva Dep. 186:18-20.
36. Silva Dep. at 186:18-187:21.
37. ███████████████████████████████████████████████████████████
█████████████████████████████████████ *See also* Silva Dep. at 228:19-21 (confirming that Zuffa fighters are compensated for fighting only when they participate in bouts).
38. ZUF-00401766 at 8.
39. *See* Zuffa's Consolidated P&L Statements from 2001 – November 2015: ZFL-1674096, ZFL-1053223, ZFL-1472224, ZFL-1381761, ZFL-1514712, ZFL-1514713, ZFL-1514769, ZFL-1514770, ZFL-1514804, ZFL-1514836, ZFL-1514837, ZFL-1514870, ZFL-1514900, ZFL-1514901, ZFL-1514933, ZFL-1514944, and ZFL-1514966.

2016 for approximately $4 billion.[40] Many of the key innovations that accompanied MMA's evolution from its "no holds barred" origins into mainstream acceptance were developed before Zuffa purchased the UFC: Record evidence indicates that key rules and regulations, the use of appropriate gloves, timed rounds, weight classes—even the use of the octagonal ring—predate Zuffa's acquisition of the UFC.[41]

24.     Prior to its sale to WME-IMG, Zuffa was privately owned and operated by a small group of individuals, initially consisting of Frank and Lorenzo Fertitta, who each held 45 percent equity in the venture, and Dana White, who owned the remaining 10 percent. Lorenzo Fertitta functioned as UFC's CEO with Dana White as President. Other Zuffa executives included Joe Silva, who served as chief matchmaker (until his retirement at the end of 2016), Kirk Hendrick, Zuffa's Chief Legal Officer, Ike Lawrence Epstein, Zuffa's Chief Operating Officer and John Mulkey, Zuffa's Chief Financial Officer.[42] According to Lorenzo Fertitta, Zuffa generated over $600 million in revenue in 2015.[43] As explained in Part III.A.5, Zuffa's market share in the Relevant Output Market has been approximately 90 percent by revenue since at least 2008. Zuffa's

---

40.  *See* Darren Rovell & Brett Okamoto, *Dana White on $4 billion UFC sale: 'Sport is going to the next level*, ESPN, July 11, 2016, *available at*: http://www.espn.com/mma/story/_/id/16970360/ufc-sold-unprecedented-4-billion-dana-white-confirms.

41.  Deposition of Joseph Silva, June 7, 2017 at 83:22-84:2 ("Q. What I'm trying to get at is the basic idea for the sport and the octagon and the early rule book, those were all in existence prior to Zuffa's purchase of the UFC; is that right? A. That's correct."); *id.* at 79:17-84:2 (Silva describes the iterative process he and others used in developing the rules and regulations in force between 1994 and 2001).

42.  *See* Hendrick 30(b)(6) Tr. at 15:3-13 (describing executive structure); Deposition of John Mulkey, April 19, 2017, at 11:22-12:6 (describing his role); Deposition of Ike Lawrence Epstein pursuant to Rule 30(b)(6) V.I, Dec. 2, 2016 at 10:10-21 (same); Silva Dep. at 15:3-5 (stating he retired at the end of 2016). *See also* ZUF-00096950; Deposition of Joseph Silva, June 7, 2017, at 76:22-84:2. *See also* ZFL-0000113 at 20; ZFL-0000136 at 24.

43.  Jesse Holland, *Lorenzo Fertitta: UFC will generate record-high $600 million revenue for 2015*, MMA MANIA, Dec. 28, 2015, *available at* http://www.mmamania.com/2015/12/28/10675158/lorenzo-fertitta-ufc-will-generate-record-high-600-million-revenue-2015-mma; *see also* ZFL-1514966 (showing revenues through November 2015 of $542 million).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

dominant position in the promotion of professional Live MMA Events is widely recognized around the world.[44]

## B.     Academic Literature on MMA

25.     In a book chapter published in 2011, economist Trevor Collier and his co-authors provide an overview of the MMA industry, and analyze the factors influencing the likelihood of a Fighter winning a bout by decision (as opposed to winning by knockout, TKO, or submission) in the UFC.[45] Using data on individual fights from FightMetric, the official statistics provider for the UFC,[46] the authors find that knockdowns and damage inflicted have the largest marginal effect of influencing judges' decisions.[47] The authors analyze only UFC bouts while ignoring other MMA promoters; they note that the UFC is "the largest and most successful organization within the industry."[48]

26.     In a 2014 working paper, economist Paul Gift models round-by-round scoring outcomes based on performance characteristics using FightMetric data, as well as non-performance characteristics, to test for certain behavioral biases among MMA judges.[49] The author analyzes "all UFC, WEC, and Strikeforce events promoted under the Zuffa banner"[50] between

---

44. *See* Part III.A.8, *infra. See also* ZUF-00162329-382 at 382 ("…the UFC holds the dominant market position within the sport and continues to do so even as a highly fragmented group of competitors have entered the market in an attempt to emulate UFC's success"). *See also* Matthew Miller, *Ultimate Cash Machine*, Forbes, Apr. 17, 2008, *available at* https://www.forbes.com/forbes/2008/0505/080 html.
45. *Aggression in MMA*, *supra*.
46. *See* http://www.fightmetric.com/.
47. *Aggression in MMA*, *supra*, at 97.
48. *Id.*
49. Paul Gift, "Performance Evaluation and Favoritism: Evidence from Mixed Martial Arts," Pepperdine University Working Paper (2014), *available at* http://www.fightmetric.com/company.
50. *Id.* at 7.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

September 28, 2001 and November 17, 2012 in Nevada and California.[51] His results provide evidence of bias towards heavy favorites and the Fighter who won the previous round.[52]

27.     In a 2012 master's thesis, Jeremiah Johnson correlates win/loss outcomes of MMA bouts using fight statistics from FightMetric.[53] The author's data set includes "every UFC event, as well as every event from other prominent promoters and events deemed to be significant."[54] Johnson finds that the count of knockdowns, takedowns, positional advances, and submission attempts are all positively and significantly correlated with a Fighter winning a bout, while a count of strikes landed is not.[55]

28.     In a 2015 article published in the *Journal of Business and Economics*, Richard McGowan and John Mahon estimate an econometric model analyzing the determinants of PPV buy rates for UFC events.[56] The authors' data set encompasses 105 UFC PPV events, beginning with UFC 57 in February 2006 and ending with UFC 170 in February 2014.[57] Based on their econometric analysis, the authors conclude as follows:

> The results of our study are not good news for the UFC as a company. The most important takeaway is that the identities of the fighters competing matter more than any title they would be competing for. Thus, when it comes to generating abnormally high PPV buy rates, the fighter has more drawing power than the brand. This conclusion could be used as an argument for fighters to get a larger percentage of the PPV revenue, since the fighters themselves, not the UFC titles, are what truly drive PPV buy rates.[58]

---

51. *Id.*

52. *Id.* at 1.

53. Jeremiah Douglas Johnson, *Predicting Outcomes Of Mixed Martial Arts Fights With Novel Fight Variables*, Thesis Submitted to the Graduate Faculty of the University of Georgia in Partial Fulfillment of the Requirements for the Degree Master Of Science (2012), *available at* https://getd.libs.uga.edu/pdfs/johnson_jeremiah_d_201208_ms.pdf

54. *Id.* at 6.

55. *Id.* at 23.

56. Richard McGowan and John Mahon, *Demand for the Ultimate Fighting Championship: An Econometric Analysis of PPV Buy Rates* 6(6) J. Bus. & Econ. 1032-1056 (2015) [hereafter "McGowan & Mahon"].

57. *Id.* at 1042.

58. *Id.* at 1047. *See also* 1046 ("For example, while Georges St. Pierre welterweight champion of the UFC, the welterweight title had a hugely positive coefficient. However, the coefficient's value was such not because of the importance of the welterweight belt, but because of the drawing power of St. Pierre. After the addition of the fighter ID control variables, only the heavyweight title still has a statistically significant positive coefficient in both Model 1

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-21-

**C.     Forms of Fighter Compensation Paid by Zuffa to Members of the Bout Class**

29.     In this section, I review the forms of compensation that Bout Class members receive from Zuffa. The terms of a Fighter's compensation are defined in a Promotional and Ancillary Rights Agreements ("PAR" Agreements) that Zuffa requires all of its Fighters to execute.[59] Each governs the Fighter's relationship with Zuffa from the moment of execution, during the defined "term" (subject to extension at Zuffa's election under certain conditions), over the course of multiple bouts, and with respect to some aspects of the relationship, in perpetuity.[60] Prior to any bout, a UFC Fighter also signs a "Bout Agreement,"[61] which affirms event-specific compensation details.

**1.     Show and Win Purses**

30.     A Fighter receives a "show" purse for his or her participation in a bout. An

---

and Model 2. The welterweight title's effect has been correctly reapportioned to Georges St. Pierre, and the women's title's effect has been reapportioned to Ronda Rousey.").

59.  Deposition of Joseph Silva, June 7, 2017, at 31:23-33:22.

60.  *See, e.g.,* DB-ZUFFA-00007015 - DB-ZUFFA-00007109 ("The Company enters into three, and in some cases four, separate types of agreements with its fighters...



61.  *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

additional "win" purse is also awarded if the Fighter is declared the winner of his or her bout. █

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.[62]

## 2.    Discretionary and Performance Pay

31.    Zuffa sometimes awards discretionary and performance pay following a fight deemed crowd-pleasing by Zuffa. These include bonuses for the "Fight of the Night," exceptional "Performance," the "KO [Knockout] of the Night," and the "Submission of the Night."[63] These payments are awarded based on a subjective evaluation of various factors. Sean Shelby, one of UFC's two "Talent Relations" employees[64] responsible for matching Fighters and lining up the card (or "matchmakers") explains that in awarding discretionary pay, "[t]here is a bit of a grey area, but simply, the more spectacular, higher level of difficulty, and the higher level of competition and stakes all factor in."[65] Because Zuffa is not contractually bound to make any such payments, Zuffa Fighters cannot be certain as to whether they will receive any such compensation at any point in their careers.[66]

---

62.  ZFL-0000003. *See also* Deposition of Lorenzo Fertitta, March 23, 2017 at 174:20-179:10; Deposition of Sean Shelby, April 12, 2017 at 208:9-209:17 (describing to the standard "show and win money" structure); Silva Dep. at 32:16-18 & 262:12-17 (same).

63.  ZFL-0000003. *See also* Fertitta Tr. 175:5-15.

64.  *See* ZUF-00096950.

65.  ZUF-00140700 ("Fight of The Night, KO of The Night, & Sub of The Night Bonuses are mostly based on the level of competition and difficulty of technique. If a prelim has a great fight but the main event is a great fight too, it will almost always go to the main event where more is on the line. If a guy gets a win with a guillotine but another wins by a flying triangle, it will go to the guy with the flying triangle. If a guy subs someone who has never been subbed before and has incredible submission defense, that counts as well. There is a bit of a grey area, but simply, the more spectacular, higher level of difficulty, and the higher level of competition and stakes all factor in. What can't get lost through is this is something that is merely extra. It's Zuffa going above and beyond and is not contractually obligated to do this.").

66.  *Id.*; *see also* Fertitta Tr. 180:19-22.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 3.        PPV Royalties

32.        A small number of top-tier Fighters receive compensation based on PPV purchases.[67] These Fighters typically receive a flat amount of money per PPV ticket sale, which may increase in discrete increments as the total number of tickets sold grows.[68] Record evidence indicates that Zuffa generally offered PPV royalties only to defending champions (as opposed to challengers), and sometimes to former champions.[69]

### 4.        Letters of Agreement

33.        A small number of top-tier Fighters negotiate individual Letters of Agreement ("LOA") with Zuffa prior to a Live MMA Event.[70] These are generally lump-sum payments to Fighters following a Live MMA Event, with the amount often contingent on the outcome of the fight.[71] Some LOAs specify bonuses based on a specific outcome (such as knockout),[72] and may

---

67.  *See* ZFL-0000003. *See also* Fertitta Tr. 186:14-187:11 & 188:19-190:6.
68.  For example, a Fighter may receive $1.00 for each PPV ticket sold between 200,000 and 400,000 tickets; $2.00 for each PPV ticket sold between 400,000 and 600,000 tickets; and $2.50 for each PPV ticket sold over 600,000 tickets. *See* ZFL-1833347.
69.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fertitta Tr. 186:22-187:11. *See also* ZFL-1005485 (an email on compensation negotiations for Holly Holm where Sean Shelby wrote that "a PPV component as a challenger is a dealbreaker," to which Dana White replies "For ppv bonus she must be defending [a championship]." At the time of UFC 183: SILVA vs DIAZ in January 2015, former UFC middleweight champion Anderson Silva had lost his middleweight title at UFC 162 in July 2013. His opponent, Nick Diaz, was not ranked in the UFC but was a former WEC and Strikeforce Welterweight champion. Even though neither Fighter was a defending champion, they both received PPV shares from the event, presumably because each was a former champion. *See* ZFL-0000003.xlsx (showing PPV and LOA compensation for both Diaz and Silva).
70.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
71.  *See, e.g.,* ZFL-0127082, an agreement with Brock Lesnar that specifies lump sums to be paid conditional on champion status ("For each and every Bout, in which Fighter participates where he is recognized as a UFC Champion, by ZUFFA, within thirty (30) days following the completion of each Bout, as contemplated in Section 7.1 (a) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the amount of Eight Hundred Twelve Thousand Five Hundred Dollars (US $812,500.00), less all permissible or required deductions and withholdings. Within sixty (60) days following the completion of each Bout, as contemplated in Section 7.1 (a) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the additional amount of Eight Hundred Twelve Thousand Five Hundred Dollars (US $812,500.00), less all permissible or required deductions and withholdings, for a total combined payment of One Million Six Hundred Twenty-Five Thousand Dollars (US $1,625,000.00).

also incorporate sponsorship or endorsement agreements or both.[73] The use of LOAs also allows

Zuffa to avoid reporting the total compensation paid to Fighters to state athletic commissions,

which keeps this information out of the public domain.[74]

**D.    Forms of Fighter Compensation Paid by Zuffa to the Identity Class**

34.    Payments to Fighters for the use of their identity rights fall into one of three broad

categories: (1) merchandizing royalties, (2) sponsorship payments, and (3) video game payments.

A PAR signed by a Fighter generally gives Zuffa the "exclusive worldwide right to use of the

Fighter's name, likeness, biography and other aspects of the Fighter's identity in connection with

promotion of the Bouts or the UFC brand."[75] These rights are "held by UFC in perpetuity and shall

---

For each and every Bout, in which Fighter participates where he is not recognized as a UFC Champion, by ZUFFA, within thirty (30) days following the completion of each Bout, as contemplated in Section 7.1 (c) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the amount of Three Hundred Seventy Five Thousand Dollars (US $375,000.00), less all permissible or required deductions and withholdings. Within sixty (60) days following the completion of each Bout, as contemplated in Section 7.1 (c) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the additional amount of Three Hundred Seventy Five Thousand Dollars (US $375,000.00), less all permissible or required deductions and withholdings for a total combined payment of Seven Hundred Fifty Thousand Dollars (US $750,000.00)."). *See also* ZFL-1833347.

72.    *See, e.g.,* ZFL-0393948, an agreement with Lyoto Machida that awards a stoppage bonus ("Further, Zuffa shall pay Fighter a Stoppage Bonus for such Bout in the amount of One Hundred Thousand Dollars (US $100,000), less all permissible or required deductions and withholding. For purposes of this Agreement, a Stoppage occurs if and only if Fighter is declared the winner of the Bout by Knock Out, Technical Knock Out or Submission by the applicable Athletic Commission.").

73. *See, e.g.,*



74.    *See, e.g.,* ZFL-2480590 (Mersch writes on July 10, 2014, "Normally we wouldn't want Overeem making that much out in the public so we'd have to do a separate LOA. But if they don't release it, we could leave it as is.").

75.    DB-ZUFFA-00007109. *See also* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, and ZFL-0086231. *See also* ZFL-1690436-444 (Fighter IP Guidelines for Consumer Products; provides Zuffa's interpretation of what Identity rights are included in the PARs, and the Identity rights for which Zuffa believes Fighters are owed royalties).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

survive even the death of the Fighter."[76] ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.[77]

35.     Members of the Identity Class may receive two forms of payments in exchange for the use of their Identity by sponsors. *First*, historically many sponsors have paid Fighters directly for services performed on behalf of that sponsor, including wearing their logo at UFC events.[78] In or around 2009, Zuffa began requiring that some of these sponsors separately pay Zuffa a brand affiliation fee or "sponsorship tax" for the right to sponsor Fighters at UFC events.[79] Over time, Zuffa expanded the categories of sponsors subject to the sponsorship tax.[80] In ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████.[81] Once Zuffa implemented the Athlete Outfitting Program, in an apparent attempt to make up for some of the Fighters' lost revenues from sponsors due to Zuffa's polices, it began

---

76.  DB-ZUFFA-00007019.

77.  *Id. See also* ZFL-0000650.

78.  Mossholder Dep. Ex. 36-A at 32 ("Most sponsors contract directly with athletes under contract with the UFC and determine the appropriate amount of compensation for that agreement without Zuffa's involvement.").

79.  The first record of a "sponsorship tax" occurs in an email conversation with an apparel sponsor dated 1/8/2009. *See* ZUF-00157206. Batchvarova Dep. at 26:9-27:4 ("At the time apparel companies … that were sponsoring athletes going into the octagon were paying an affiliation fee."); *see also* ZUF-00017896 and ZUF-00086103.

80.  *See, e.g.*, LESPLAINTIFFS-0032350 ("The only changes to in [sic] the sponsorship world pertain to tshirt/apparel companies… in short, any tshirt company wishing to sponsor UFC fighters must join the UFC approved sponsor program."); ZFL-1974115 ("NOTICE – For all Zuffa events going forward, only approved on-line retailers will be allowed to sponsor fighters. To that end, you must have a separately executed sponsorship agreement with Zuffa to be able to sponsor fighters for any events. This new policy will kick in beginning with UFC 116 on July 3, 2010.").

81.  *See* ████

███████████████████████████████████████████████████████

████████████████████████████████████

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

███████████████████████████████████████████████████████████████

█████████████.[82] *Second,* for certain sponsors willing to pay a premium to become an "official sponsor" of the UFC, Zuffa would negotiate with individual Fighters on that sponsor's behalf and would make payments to Fighters for services performed on behalf of a particular sponsor.[83] These services included wearing the sponsor's logo in the Octagon and making other appearances on behalf of the sponsor.[84]

36.       Some Fighters received compensation for their appearance in UFC-branded video games.[85] In September 2006[86] and June 2012,[87] respectively, Zuffa entered into agreements with two game publishers (THQ and Electronic Arts) to develop five video games featuring named Fighters from 2006 to the present. Of these, Zuffa provided specific payment data for three: UFC 2009 Undisputed, UFC 2010 Undisputed, and UFC Undisputed 3 (2012). Two more video games, EA Sports UFC and EA Sports UFC 2, were produced in 2014 and 2016, respectively.[88] Finally, beginning in June 2009,[89] Zuffa began selling trading cards containing Fighters' likenesses without

---

82.  Batchvarova Dep. at 32:5-34:20 ("[W]e came up with the methodology which is currently actually employed which is assigning by tenure, which is objective.").

83.  30(b)(6) Deposition of Michael Mossholder (December 1, 2016) at 143:19-146:121 ("Mossholder Dep."). *See also id.* Exhibit 36-A at 29 ("Some sponsors prefer to deal only with Zuffa and have them handle all payments, even to athletes."). This was the arrangement Zuffa had with certain large sponsors such as Anheuser Busch. The identity "assets" that Zuffa licensed on behalf of Fighters include "their individual IP, their ability to do appearances, production days, use of their individual social media, use of their individual digital, their fighter kits." *Id.* at 156:12-16.

84.  *Id.*

85.  ZFL-1023959.

86.  ZFL-0871571.

87.  ZFL-1394078.

88.  *See* ZFL-0000259 and the list of UFC branded video games, *available at* https://www.giantbomb.com/ufc/3025-248/games/

89.  ZFL-1825387 at row 123 of the Merchandise Licensing Tab. The Topps Trading Card Company Term is listed as "6/5/08 - 5/1/2011 extended to 5/1/16."

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

having merchandise rights agreements in place with each Fighter. It sought out separate merchandise agreements from such Fighters after the fact.[90]

37.  ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████.[91]

## II.  NATURE OF THE CHALLENGED CONDUCT

38.     In this section, I describe the Challenged Conduct. I begin by classifying the Challenged Conduct according to its "horizontal" and "vertical" aspects, based on whether the conduct involved other MMA promoters (horizontal) or whether the conduct involved MMA "inputs" such as Fighters (vertical). I then explain how the Challenged Conduct served to initiate, renew, and extend Fighter contracts, making Zuffa's exclusionary provisions effectively perpetual (or nearly so) for the vast majority of Fighters, especially in relation to Fighters' relatively short careers.

39.     Economists and antitrust practitioners recognize that horizontal *and* vertical conduct can have anticompetitive effects when undertaken by a firm with significant market power, and the effects of each form of conduct can and often do amplify the other. In Parts III.A and III.B, I demonstrate that Zuffa does possess significant monopoly and monopsony power in the Relevant Output and Input Markets, respectively. In Parts III.C and III.D, I demonstrate that the Challenged Conduct did, in fact, foreclose competition and generate anticompetitive effects.

---

90.     *See* ZFL-2536392 (August 13, 2012 email from Tracy Long notes: "Wow, that is a lot [of fighters missing merchandize rights agreements.] How did we let it get to so many? I didn't realize we did not have one for Cung Le.").
91.     *See* ZFL-2603704 (showing that 151 Fighters received sponsorship payments, 231 received video game payments, and 333 received merchandise royalties). For counts of total Fighters, *see* ZFL-0000003; ZFL-2603701.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-28-

## A.      Nature of the Horizontal Conduct

40.      Since buying the UFC in 2001, Zuffa has acquired five MMA promoters. Horizontal aspects of the Challenged Conduct include these horizontal acquisitions, as well as Zuffa's counter-programming of other Live MMA Events, and Zuffa's agreements, including non-compete agreements, with other MMA promoters. Economists and antitrust practitioners recognize that horizontal acquisitions can have anticompetitive effects whenever they lessen actual or potential competition with a rival or potential rival.[92] Non-compete agreements and collaboration with horizontal competitors can also be anticompetitive,[93] as can strategic efforts to harm competitors or potential competitors such as counter-programming.[94]

### 1.      Acquisitions of Potential Rivals

41.      In 2006, Zuffa purchased the World Fighting Alliance ("WFA")[95] and World Extreme Cagefighting ("WEC").[96] WFA was a Las Vegas-based MMA promoter that put on four

---

92. U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010) [hereafter *Merger Guidelines*] §1 ("[M]ergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise…A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives.").

93. *See, e.g.,* Department of Justice and Federal Trade Commission, Antitrust Guidelines for Collaborations Among Competitors (April 2000), §2.2, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf. Although non-compete agreements frequently consist of contracts between employers and employees, Zuffa's non-compete agreements are essentially horizontal agreements with potential competitors, as explained below.

94. *See* DENNIS CARLTON & JEFFREY PERLOFF, MODERN INDUSTRIAL ORGANIZATION (Pearson 2005 4th ed.) [hereafter MODERN IO] at 386-87. As Professors Carlton and Perloff explain, strategic efforts to harm competitors are more likely to be harmful when entry is difficult. This condition is satisfied here, given that Zuffa's staggered, multi-bout exclusive contracts constitute an artificial barrier to entry.

95. Deposition of Ike Lawrence Epstein pursuant to Rule 30(b)(6), Dec. 2, 2016 at 70:14-24 (discussing WFA acquisition); *see also UFC Acquires World Fighting Alliance, Inc.*, MMA JUNKIE, Dec. 11, 2016, *available at* http://mmajunkie.com/2006/12/ufc-acquires-world-fighting-alliance-inc.

96. Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA WEEKLY, Dec. 11, 2006, *available at* https://web.archive.org/web/20070929111019/http://www.mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Live MMA Events between 2001 and 2006.[97] Before its acquisition, WFA attracted headlining Fighters such as Quinton Jackson and Matt Lindland.[98] WEC was a California-based MMA promoter that produced 24 events between 2001 and 2006.[99] Zuffa announced its acquisitions of WFA and WEC on the same day in December 2006. The WFA acquisition was structured as an asset purchase in which Zuffa acquired select Fighter contracts, trademarks, and other intellectual properties;[100] these assets were immediately absorbed into the UFC and WFA ceased to exist. In contrast, Zuffa's purchase of WEC left WEC with its former leadership intact.[101]

42.     Zuffa reportedly intended WEC "to serve as a venue in which to groom up-and-coming talent" and as "a strategic maneuver to impede the chances of other MMA promotions (specifically the IFL or Pride) to secure a national TV deal in the United States."[102] █████

███████████████████████████████████████████████████████████

█████████████████████,"[103] █████████████████████████████

---

97.   Epstein 30(b)(6) Tr. 70:25-71:15. *See also* http://www.sherdog.com/organizations/World-Fighting-Alliance-68.

98.   Epstein 30(b)(6) Tr. 72:12-74:9. *See also* Josh Gross, *Lappen Sues WFA for Breach of Contract*, Sherdog, Dec. 7, 2006, *available at* http://www.sherdog.com/news/articles/Lappen-Sues-WFA-for-Breach-of-Contract-6308

99.   Epstein 30(b)(6) Tr. 26:19-27:3. *See also* http://www.sherdog.com/organizations/World-Extreme-Cagefighting-48.

100.  *UFC Acquires World Fighting Alliance, Inc.*, MMA Junkie, Dec. 11, 2016, *available at* http://mmajunkie.com/2006/12/ufc-acquires-world-fighting-alliance-inc.

101.  Epstein 30(b)(6) Tr. 24:12-13 (stating Zuffa's testimony that it acquired the WEC); Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA Weekly, Dec. 11, 2006, *available at* https://web.archive.org/web/20070929111019/http://www mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13.

102.  *Id. See also* "Exclusive: Dana White Announces UFC-WEC Merger," *available at* https://www.youtube.com/watch?v=zCIWWLnJSN4&feature=sub; ZFL-1240584 at -589 ("The primary purpose for Zuffa's acquisition of the small, regionally based WEC was to obtain a second brand, separate and distinct from the UFC, which could produce MMA events for non-PPV television distribution. The WEC would also serve as a second tier or 'minor league' feeder platform where younger, less experienced, lighter weight, and less well-known fighters could gain public awareness before developing to the point when they can move up to the UFC level of competition.").

103.  ZFL-1240584 at 590.



43.     Zuffa purchased Pride Fighting Championships ("Pride") in April 2007.[106] Pride was a Japan-based MMA promoter that produced 68 events between 1997 and 2007, two of which occurred in Las Vegas starting in October 2006.[107] Zuffa has written that, "Pride was widely…considered to be the second most recognized MMA brand worldwide when acquired."[108] In an email to Frank and Lorenzo Fertitta detailing the result of acquisition talks with Pride's owners, Thomas Paschall, outside counsel for Zuffa during the acquisition of Pride, noted "the strategic/preemptive nature of this acquisition (*i.e.*, to stop others from buying it) and your having seriously contemplated acquiring them only to shut down their business and utilize their Fighters in the UFC."[109] Within about six months of the acquisition, Zuffa fired Japanese staffers and closed down Pride's Tokyo offices.[110] When the Pride acquisition was underway, Zuffa paid $10 million to the CEO of Pride for a seven-year non-compete clause.[111]

---

104.  *Id.*

105.  *Id. See also* ZUF-00377706 (T. Louis Palazzo Non-Competition Agreement); ZUF-00377712 (Ross C. Goodman Non-Competition Agreement).

106.  Epstein 30(b)(6) Tr. 88:5-7 (stating on behalf of Zuffa that Zuffa acquired Pride); *id.* at 100:10-12 ("And the transaction didn't close until, I guess, May of 2007…"); *see also* "*Done deal: UFC owners purchase PRIDE FC*," MMA MANIA, Mar. 27, 2007, *available at* http://www.mmamania.com/2007/03/27/done-deal-ufc-owners-purchase-pride-fc. The actual agreement was consummated on April 18, 2007. *See* ZFL-1216165.

107.  *See* http://www.sherdog.com/organizations/Pride-Fighting-Championships-3

108   *See* Goldman 30(b)(6) Tr. 125:5-14 (discussing Zuffa's handwritten edits to a draft of the 2009 Deutsche Bank Confidential Information Memorandum).

109.  ZUF-00031544. *See also* Deposition of Drew Goldman pursuant to Rule 30(b)(6), April 28, 2017 at 73:17-74:1 (testifying on behalf of Deutsche Bank that, based on conversations with Zuffa and materials provided by Zuffa, Deutsche Bank's interpretation was that "Each acquisition [Pride, WEC and WFA] had unique offensive and defensive purposes at the time. However, both the WFA and Pride pending transactions resulted in Zuffa's roster of elite fighters expanding significantly.").

110.  Zach Arnold, *PRIDE office in Tokyo shut down, all workers fired*, FIGHT OPINION, Oct. 4, 2007, *available at* http://www.fightopinion.com/2007/10/04/pride-office-in-tokyo-shut-down-all-workers-fired/.

111.  ZFL-1676293 at 96.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

44.     Affliction Clothing was a U.S.-based MMA clothing label and was one of the primary clothing sponsors of Zuffa Fighters. Backed by prominent investors, AEG put on two successful Live MMA Events.[112] In early 2008, Zuffa terminated its sponsorship relationship with Affliction Clothing when Zuffa received information that Affliction was planning on entering the MMA promoter business under their new subsidiary, AEG.[113] In reaction to Affliction's decision to get into the business of MMA fight promotion, Zuffa barred Affliction from sponsoring any of its events or any of its Fighters.[114] This weakened Affliction, which ultimately decided to exit the MMA Promotion business.

45.     Zuffa purchased AEG's assets and Fighters on July 23, 2009. The purchase agreement stated that "AEG shall … cancel any and all future AEG Events or other Live MMA Events that AEG is involved in [and] cease … any and all MMA promotional businesses and endeavors by AEG…."[115] According to a final draft of a letter summarizing the agreement, the deal involved Affliction "exiting the MMA professional business,"[116] transferring Fighters under contract to Zuffa, and "creating some sort of promotional affiliation with the Ultimate Fighting Championship (UFC)."[117] Record evidence indicates that Zuffa saw Affliction as a competitive

---

112. ZFL-2463304 at 25.

113. Tim Ngo, *Affliction Banned From Sponsoring UFC Fighters*, 5TH ROUND, Jan. 25, 2008, *available at* http://www.5thround.com/356/report-affliction-banned-from-sponsoring-fighters-in-the-ufc/#more-356.

114. MMA Mania, "Report: Affliction MMA folds, will now be allowed to sponsor UFC and its fighters," (July 24, 2009), available at https://www.mmamania.com/2009/07/24/report-affliction-folds-will-now-sponsor-ufc ("Yahoo! Sports today issued a report that Affliction MMA will cease to exist, coming to terms with Ultimate Fighting Championship (UFC) under an agreement that will allow the clothing brand to once again sponsor the world's top promotion and the fighters under its umbrella. Affliction was 'banned' from doing so when it decided to begin promoting events last year.").

115. ZFL-2020850 at 50-51.

116. ZFL-2764805.

117. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

threat due to certain key Fighters affiliated with Affliction, and that Zuffa viewed the agreement to put Affliction out of the MMA business as "a big win."[118]

46.     After the acquisition agreement was finalized, UFC's Assistant General Counsel Michael Mersch wrote an email noting with reference to Affliction's demise that "[o]ur main rival is done."[119] Mersch also observed that acquiring Affliction's Fighter contracts would enhance the UFC's ability to put on attractive fights.[120] After the purchase, and once Affliction was no longer in the MMA promotion business, Zuffa reestablished a sponsorship affiliation with Affliction Clothing.[121]

47.     Zuffa purchased Strikeforce, the second largest MMA promoter at the time, in March 2011.[122] At the time of the purchase, Strikeforce was the "second most prominent and recognized … MMA organization in the world," and it had the most prominent women's MMA division.[123] Strikeforce produced 47 events across the United States before being acquired.[124] By 2009, "Strikeforce [had]… emerged as the world's second most prominent promotion, with sufficient size and assets to maintain and improve its position."[125] Its rise to prominence was cited

---

118. *See* ███████████████████████████████████████████████████████████████

119. ZFL-2193553.

120. *Id. See also* Deposition of Michael Mersch, July 14, 2017, at 447:4-450:8.

121. ZFL-2463304 at 25.

122. Strikeforce would continue to operate as a standalone promoter until January 2013, after which its Fighters and remaining assets were incorporated into UFC. *See* Nate Wilcox, *More Details Emerge on UFC Acquisition of Strikeforce*, BLOODY ELBOW, Mar. 13, 2011, *available at* http://www.bloodyelbow.com/2011/3/13/2047456/ufc-strikeforce-acquisition-more-details-emerge. *See also Strikeforce confirms Jan. 12 event is final Showtime broadcast*, MMA JUNKIE, Dec. 20, 2012, *available at* https://web.archive.org/web/20131102021751/http://www.mmajunkie.com/news/2012/12/strikeforce-confirms-jan-12-event-is-final-showtime-broadcast.

123. ZFL-2463304 at 9.

124. *See* http://www.sherdog.com/organizations/Strikeforce-716

125. ZFL-2463304 at 14.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

as the top story of 2009 by Sherdog.com, a popular Internet source of MMA news and information.[126]

48.     UFC matchmaker Joe Silva sent an email setting forth the January 27, 2011 consensus rankings of MMA Fighters in major weight classes, noting that the UFC "Own[ed] MMA."[127] Those consensus rankings, however, showed that Strikeforce had 3 of the top 10 (and 6 of the top 25) heavyweight Fighters; 5 of the top 25 (and a top 10) light heavyweight Fighter; 2 of the top 10 (and 4 of the top 25) middleweight Fighters; 2 of the top 10 welterweight Fighters; and 3 of the top 25 (including 1 top 3) lightweight Fighters.[128] No promotion other than the UFC had as many highly ranked Fighters in late January 2011, just two months prior to Zuffa's acquisition of Strikeforce.[129]

49.     In or around October 2010, Dana White called the Strikeforce owners to inform them that Lorenzo Fertitta wanted to acquire Strikeforce and, in November 2010, the Strikeforce owners met with representatives of the UFC concerning the potential acquisition of Strikeforce at the offices of WME.[130] At that meeting, Lorenzo Fertitta reportedly stated that he thought "Strikeforce is building a great brand, but [Zuffa felt] there should only be one brand, so [Zuffa]

---

126. *Id.* at 11. *See also* Coker Dep. at 38:6-12 (Strikeforce "got on [the UFC's] radar and I think they [Zuffa] wanted to control the market share."). In 2009, after Affliction exited the MMA promotion business and sold its assets to Zuffa, Mr. Coker (Strikeforce's founder) observed that "Affliction took the easy way out. [N]ow it's UFC and Strikeforce. If you can't battle these guys it's over for the MMA industry. UFC will be the only one left. We're the last chance. Otherwise, fighters' purses will go down if UFC is the only one – is the only one period. We're Luke Skywalker and UFC is Darth Vader and the Death Star." Coker Dep., Exh. 8; Coker Dep. at 95:10-20.
127. ZUF-00085896.
128. *Id.*
129. Coker Dep. at 121-10-23 ("I believe that the phone started ringing from Dana [White] because we had signed [prominent heavyweight] Fedor [Emelianenko] and we announced the heavyweight tournament. It was clear that although we were a very small company, much smaller than the UFC, but we were in the same business, that we had a better heavyweight division than they did, and I think that was one of the considerations on their part."). Coker also testified that the light heavyweight division has always been the "strongest in MMA" and "heavyweights, to me, would be just as important because everyone likes the heavyweights." *Id.* at 106:2-9.
130. Coker Dep. at 114:22-118:15.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

would like to buy [Strikeforce]."[131] For its part, Zuffa's internal correspondence in 2012 indicates that the UFC sought, by its Strikeforce acquisition, to eliminate it as a competitor. In a conference call, UFC CEO Lorenzo Fertitta stated that: "Lawrence and Pete Dropick, who run Strikeforce for us, went back to New York, had negotiated a separation agreement with Showtime to essentially shut Strikeforce down. We would then pull all of those Fighters into the UFC which is essentially what we want to do anyway."[132] According to Zuffa, acquiring Strikeforce's Fighter contracts was "definitely the most important" aspect of the deal.[133]

50.     According to Scott Coker, Strikeforce's founder, Lorenzo Fertitta stated that his plan was to "close [Strikeforce] down, and we would take all of the Fighters and bring them to the UFC."[134]  Coker testified that, after negotiations stalled, Dana White threatened that he would "come after [Strikeforce's] fighters, and he would make our life hard, and, you know, give us a bad time."[135] Coker testified that, had Strikeforce not been sold to Zuffa, Strikeforce "would have continued to become a stronger competitor to the UFC."[136]

51.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████,[137]

---

131.  *Id.* at 118:16-23.
132.  ZFL-1901788 at 94. Zuffa was interested in bringing in talent such as Ronda Rousey from Strikeforce into the UFC brand. *Id.*
133.  Epstein 30(b)(6), 12/2/2016 174:5-18; *see also* Silva Dep. at 316:9-22.
134.  Coker Dep. at 119:9-17.
135.  *Id.* at 128:9-14; Coker Dep., Exh. 8 (ZUF-00447778).
136.  Coker Dep. at 144:12-15
137.  ZFL-2530953 at 53.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

## 2.        Counter-Programming and Litigation

52.        Record evidence shows that the UFC engaged in counter-programming in attempts to suppress demand for events of other MMA promoters. According to one academic case study:

> The UFC had a simple strategy for limiting the growth of its competitors; it scheduled free counter-programming at the same time as their competitors with the intention of stealing revenues. And although this approach was not profitable in itself, it worked by preventing new competitors from both achieving profitable operations and recouping their investments in high-profile fighters.[138]

That Zuffa's counter-programming was "was not profitable in itself"[139] indicates that the economic motivation of Zuffa's counter-programming was to use its dominance to harm competition by impairing rivals in an anticompetitive manner, rather than to promote competition in the industry.

53.        The UFC's counter-programming appears to have been conceived in 2006 when the UFC sought to counterprogram the WFA's last event before they purchased the promotion. On June 15, 2006, Kirk Hendrick wrote to Lorenzo Fertitta, Dana White and Craig Borsari that Spike had agreed to air a taped compilation of UFC bouts on July 22, 2016 (the date of the WFA's last event).[140] Hendrick wrote: "Obviously, the idea would be: 'free UFC on Spike TV … versus whatever WFA charges for PPV.'"[141] A few years later, on November 24, 2008, Craig Borsari wrote that "Dana [White] wants to counter program Affliction['s pay-per-view event on] January 24 [2009]" with a re-run of a prior pay-per-view event on free television.[142] UFC President Dana White openly admitted to counter-programming in a May 2009 ESPN article, according to which, White had "thrown together the card [for Saturday's Fight Night 14] in five weeks in an attempt to

---

138.  Jesse Baker & Matthew Thomson, *The Ultimate Fighting Championships (UFC): The Evolution of a Sport*, in CASES IN MARKETING MANAGEMENT 115 (Kenneth E. Clow & Donald Baack, eds. 2012).

139.  *Id.*

140.  ZUF-00153787.

141.  *Id.*

142.  ZUF-00153903. Zuffa did, in fact, broadcast the re-play of the UFC 91 pay-per-view card, bringing in an average audience of 2.3 million viewers for the special. *See UFC 91 replay on Spike TV peaks with 3.3 million viewers*, MMAmania.com, Jan. 27, 2009, *available at* https://www.mmamania.com/2009/01/27/ufc-91-replay-on-spike-tv-peeks-with-33-million-viewers. Affliction did not have another event after its January 24, 2009 event.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-36-

choke out a dangerous upstart promoter, Affliction, which is staging its first event."[143] White clarified that "I'm doing this fight for one reason, to make Affliction spend money. If they're in business in January, I'll be horrified."[144]

54.



55.    UFC also noted that counter-programming was a part of its strategy in a presentation to potential sponsors.[148] In February 2009, Dana White forwarded a press announcement about Showtime's agreement with Strikeforce to other Zuffa executives, asking

143. Michael Woods, *UFC struggles to shake outlaw nature*, ESPN, May 12, 2009, *available at* http://www.espn.com/extra/mma/news/story?id=4157485. In a November 2008 email, Vice President of Operations Craig Borsari wrote to Lance Klein and Assistant General Counsel Kirk Hendrick that "Dana wants to counter program Affliction on January 24 and would like to run a UFC 91 special featuring fights from the PPV including Brock vs Randy. Can you talk to Kevin about licensing this program? I know its [sic] unlikely that they'll pay a big number for the show but it would be nice if we could at least get our production costs covered." ZUF-00153903.

144. *Id.*

145. ZFL-0827209.

146. *Id.*

147. Declaration of Scott Coker in Support of Nonparty Bellator Sport Worldwide, LLC's Motion to Quash or Modify Subpoenas, Feb. 22, 2017, ¶20 [hereafter, "Coker Declaration"]. *See also* Coker Dep. at 37:12-38:15 (confirming that Zuffa's counterprogramming of Strikeforce).

148. A September 2010 PowerPoint presentation to Sports Authority notes that "UFC Counter-Programming consists of re-run pay-per-view events and re-run bouts." *See* ZUF-00169647.

"are we going to counter program this on Spike?"[149] An August 14, 2009 email from Joe Silva to Dana White and Lorenzo Fertitta states: "I have stolen the following fights out from underneath Strikeforce in the last couple of days: Joey Villasenor[,] Riki Fukuda[,] Joey Villasenor[,] [sic] Phil Baroni[,] Dennis Hallman[.]"[150]

56.     Explosion Entertainment, which owned Strikeforce, wrote in its 2009 business plan that Strikeforce and other MMA promoters were increasingly "wary of UFC's predatory instincts and counter-programming clout."[151] It further noted that UFC's "arrogance has spawned business practices that can be viewed as anti-competitive and restraints of trade."[152] In a 2010 presentation discussing the future of the company, one of the potential options was to "Go Hard after the UFC" as opposed to becoming an MMA "minor league."[153] One element under the "con" section of plan was the threat of "UFC counter-programming (awake the sleeping giant)."[154] A March 3, 2010 email chain among Strikeforce executives expresses concern about UFC counter-programming Strikeforce's April 17, 2010 Nashville event, and even considers attempting to preemptively reserve event venues in the metropolitan area.[155] At the time, Andrew Ebel at Strikeforce noted internally that "I really feel that the potential of UFC holding an event in Nashville was and is

---

149.  ZFL-2005388.
150.  ZFL-2005616.
151.  ZUF-00421380 at 386.
152.  *Id.* at 387.
153.  ZUF00447547 at 570.
154.  ZUF00447547 at 562.

155.  This idea was later abandoned as impractical due to the high number of potential venues. *See* ZFL-2595178; *see also* ZFL-2586870, March 6, 2010 email from Andrew Ebel at Strikeforce ("UFC is playing dirty and may be trying to put on a live MMA event in a different venue in Nashville on the same night as ours. We need to get our media booked immediately so they don't come in and literally buy up all the available media in the marketplace. We need to move very quickly. This is very serious.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

really hindering our ticket sales to date."[156] UFC ultimately counter-programed the event by rebroadcasting UFC 110 on Spike at the same time as the Strikeforce event.[157]

57.     One UFC estimate indicated that UFC counter-programming could reduce Strikeforce's viewership by as much as 40 percent.[158] Zuffa created a PowerPoint presentation comparing viewership of Strikeforce live events with its counter-programmed recorded events in 2010.[159] In April 2010, Sam Raimist, a financial analyst for Zuffa, sent an email to Zuffa executives comparing ratings between Strikeforce and Zuffa events: "Overall UFC110 had a good showing as a replay going up against a live event. In comparison to other shows we have used to counter-program our competition, such as UFC107 and UFC100, UFC110's numbers are slightly down."[160]

58.     Zuffa also targeted other MMA promoters. Jeremy Lappen, once the president of fight operations at ProElite (which owned subsidiaries EliteXC, Cage Rage, and King of the Cage) testified that UFC at various times counter-programmed Live MMA Events.[161] ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

156.  *See* ZFL-2587231.
157.  *See* http://www.fightline.com/fl-news-2010-0417-487130-strikeforce- ("Although the UFC will not counter Strikeforce's second CBS primetime broadcast with a live show of their own tonight, MMA's monopoly will air November's "UFC 110: Nogueira vs. Velasquez" event on Spike TV to try and retain their stranglehold on the sport.").
158.  A May 2010 email from Sam Raimist notes: "Please find attached the ratings breakouts for Saturday's Strikeforce event on Showtime, and our counterprogramming, UFC Ultimate Fights." A follow-up email compares ratings for the counterprogrammed Strikeforce on Showtime event "to their last Showtime Event held in January," and notes that "Overall viewership from the January event to last Saturday's was down 40%. Strikeforce also saw significant drops in all of the demos," to which Zuffa's John Mulkey responds, "ouch[.]" ZFL-1677482 at 82-83.
159.  ZFL-2022954 at 55.
160.  ZUF-00339684.
161.  Deposition of Jeremy Lappen, Feb. 28, 2017, at 44 ("Q: Do you remember a specific time when another promotion counter programmed to one of your events? A: I don't remember the specific times, but I know that the UFC counter programmed our events. Q: Would you say that happened often while you were president of fight operations? A: I don't remember how often it happened. It happened more than once. But I don't remember how many times. Q: Did any other MMA promoters counter program Pro Elite events? A: Not that I remember.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ [162]

59.     Record evidence indicates that Zuffa also used the threat of litigation to impair would-be rivals. For example, IFL was an atypical MMA promoter in that matchups were team affairs, with each team member facing off in a one-on-one bout.[163] IFL held 22 events across the United States between 2006 and 2008.[164] It collapsed due to financial difficulties (in part, as discussed below, due to the Challenged Conduct) in 2008.[165]

60.     Before IFL had put on its first promotional Live MMA Event, Zuffa sued it, alleging that the fledgling company had illegally hired some of its former employees who took with them confidential trade secrets.[166] IFL co-founder Kurt Otto at the time stated that:

> Rather than having to do with "confidential" information or purported trade secrets, I believe that, to the contrary, as described below, this lawsuit has everything to do Zuffa's effort to stifle and stamp out perceived competition in the Mixed Martial Arts ("MMA") marketplace in a transparent attempt to put the IFL out of business before it ever gets off the ground.[167]

IFL counter-sued over allegations that UFC had threatened Fox Sports with a lawsuit if Fox were to sign a deal with IFL.[168] Both cases generated substantial legal expenses for IFL.[169]

---

162. ZFL-2483111 at 13.

163. Jonathan Snowden, *Disastrous debut costs IFL millions: The history of MMA on television, Part 2*, BLEACHER REPORT, Dec. 12, 2012, *available at* http://bleacherreport.com/articles/1442316-disastrous-debut-costs-ifl-millions-the-history-of-mma-on-television-part-2.

164. *See* http://www.sherdog.com/organizations/International-Fight-League-742.

165. IFL's assets were acquired by HDNet. *See* IFL SEC Form 10-K (2009), at 1 ("On November 17, 2008, IFLC sold substantially all of its assets to HDNet LLC…"). *See also* Tom Ngo, *IFL: Going, Going…Gone! UFC Here We Come?*, 5TH ROUND, July 25, 2008, *available at* https://web.archive.org/web/20091201045527/http://www.5thround.com/07252008/news/1293/ifl-going-goinggone/.

166. Jeffrey Thaler, *Breaking Down the Match-Up: UFC vs. IFL*, SHERDOG, Mar. 2, 2006, *available at* http://www.sherdog.com/news/articles/Breaking-Down-the-MatchUp-UFC-vs-IFL-4051.

167. Deposition of Kurt Otto, February 6, 2017, Exhibit 6, ¶ 4.

168. Thaler, *supra*.

169. Deposition of Kurt Otto, February 6, 2017, at 161.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

61.    The lawsuit also generated sworn statements from Patrick Miletich, a MMA trainer and former UFC champion, who testified that UFC's President Dana White threatened him and others that individuals doing business with IFL would forfeit future opportunities with the UFC. In two separate instances, White allegedly stated that "he was going to fucking crush these [the IFL] guys," and that "when the dust settles, anyone associated with the IFL would not be associated with the UFC."[170] Miletich further stated that White's statements represented:

> [A] threat to me and to my fighters who count on me to represent them and obtain opportunities for them to fight in the MMA industry. Because of the virtual monopoly that Zuffa has in the MMA industry, Mr. White clearly knew that cutting me and my fighters off from the UFC would have a devastating economic impact…
>
> Knowing Mr. White the way I do, I can honestly say that Zuffa's intent in bringing this litigation has nothing to do with protecting any confidential information. Rather, I believe this litigation is about one thing and one thing only—stamping out legitimate and, indeed, healthy, competition.[171]

### 3.    Non-Compete Agreements With Other MMA Promoters

62.    Record evidence indicates that Zuffa has entered into non-compete agreements with other MMA promotions or their principals. In November 2010, Zuffa entered into a settlement agreement with HDNet LLC and Mark Cuban resolving a dispute over distribution rights. The settlement agreement included a "NON-COMPETITION" clause stating that "HDNet and Mark Cuban would not engage in direct competition with Zuffa's line of business until November 9, 2014.[172]

63.    There is also evidence suggesting that Zuffa and other MMA promoters sometimes worked together to prevent Fighters from fighting bouts with other MMA promoters. During Zuffa's negotiations regarding the acquisition of MMA promoter, Pride, Pride's management

---

170. *Pat Miletich's Statement in UFC-IFL Case*, MMAWEEKLY, June 17, 2006, *available at* http://www.mmaweekly.com/pat-miletichs-statement-in-ufc-ifl-case.

171. *Id.*

172. ZFL-1225776 at 78.

offered to sign an exclusive contract with a well-known champion Fighter, Fedor Emelianenko, to "keep him away from Bodog [a rival promoter] so the contract is exclusive … depending on what you [Zuffa] want."[173] In a February 2013 email to UFC CEO Dana White titled "heads up," Shannon Knapp, the president of Invicta (another MMA promotion) wrote, "I wanted to let you know that we signed Zoila Frausta Gurgel (Bellator's 125lb champion) exclusively away from Bellator. We are not working with them or sharing talent with them. I always like to keep you in the loop so you know what is real."[174]

## B.  Nature of the Vertical Conduct

64.     Zuffa's long-term exclusive PARs with Fighters constitute the primary vertical component of the Challenged Conduct. My staff and I reviewed all Zuffa Fighter contracts produced by Zuffa; this includes a total of 2,136 valid PARs spanning 2001-2015.[175] As explained below, Zuffa's long-term exclusive PARs barred Fighters from fighting for any other MMA promoters for the duration of the PAR. In addition, Zuffa's PARs have long contained a variety of provisions permitting Zuffa to extend the duration of Fighter contracts unilaterally, which could and did extend contracts beyond the stated "term" for many additional months or years, or indefinitely. For example, when Fighters announce retirement or injury, their contracts are tolled until their next fight for Zuffa, which might never happen.

65.     Economists and antitrust practitioners recognize that vertical restraints such as these, when used by a dominant firm, can harm competition by blocking or impairing access to key inputs, thereby foreclosing firms that would otherwise provide competitive discipline to the

---

173. ZUF-00031544.
174. ZFL-1019758.
175. *See* Appendix, Table A1. Excludes two non-Zuffa contracts (from Invicta and EliteXC) that were also produced by Zuffa.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

dominant firm. By making it difficult or impossible for would-be rivals to acquire key inputs, such conduct restricts or eliminates the would-be rival's output, revenue, and ability to compete effectively.[176]

### 1. Exclusive Fighter Contracts Prohibit Fighters from Working with MMA Promoters other than Zuffa for the Often Lengthy Duration of the Contracts

66. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████ █████████████████████████████████████████

███████████████████████████████████████████████ ██ ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████.[179]

---

176. MODERN IO, *supra*, at 371-375; *see also id*. at 429-430; Salop, *supra*.

177. *See* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, ZFL-0086231. *See also* ZFL-1544038 at 58 (2012 Information Memorandum prepared by The Raine Group stating that "[a]ll fighters are signed exclusively to the UFC"). Prior to its acquisition by Zuffa, at least some Strikeforce contracts were "not exclusive and allow[ed] the fighters to have bouts elsewhere." *See* ZFL-1393175. *See also* 30(b)(6) Deposition of Kirk Hendrick, November 29, 2016, Exhibit 2, at 21-25 [hereafter *Zuffa Contract Summary*], at 3. The PAR did permit Fighters to compete in certain bouts, providing that the bout was not televised and that the Fighter obtained Zuffa's express written permission. Ex. 2 to Hendrick Dep. at Tabs 29-50 (demonstrating in Section 3.6 the lone exception to the contractual bout exclusivity provision). Because Zuffa could deny its permission, Zuffa could ensure a Fighter never defected to a rival that Zuffa perceived to threaten its market dominance.

178. ████████████████████████████████████████████
██ ██████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████

67.     Nearly all of Zuffa's PARs specify a term in both bouts and months, which covers the period when the Fighter is eligible to fight in a Zuffa promoted event.[180] The contracts are structured such that the PARs would enter their final phase at either the end of the final bout or the end of the final month of the contract, whichever comes first.[181] Zuffa precludes Fighters from fighting for other MMA promoters from the date their contracts were signed (even though the time period of the defined "term" does not begin until the first fight), which means that the PAR is also in effect during any time elapsing between the signing of a Fighter's contract and the Fighter's first bout—a period that, as I understand it, can sometimes extend for months.[182]

### 2.     Zuffa's Exclusive Contracts with Fighters Permit Zuffa to Extend the Duration of the Contracts

68.



180. *See, e.g.,*

181. *Id.*

183. *Zuffa Contract Summary* at 8. *See also* Appendix, Table A1.
184.



69.

185.

187. *Zuffa Contract Summary* at 4.
188. ZUF-00162329-382 at 361. *See also* DB-ZUFFA-00006389 at 392 (repeating same characterization in 2012).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



70.

71.

189. Goldman 30(b)(6) Tr. 72:17-24.

193. *See* Appendix, Table A1.

72. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ [197]

73. ███████████████████████████████████████████████

███████████████████████████████ ███████████████████████████

████████████████████████████████████ ███████████████████████

████████████████████████████████ ████████████

### 3.    Other Vertical Restraints

74. ███████████████████████████████████████████████

███████████████████████████████████████████ ███████████████████

───────────────────

[197]. ███████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████

198. *See* Appendix, Table A1.
199. *Zuffa Contract Summary* at 8. █████████████████████

200. ████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████ ████████████████████████████████

201. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER





202. Zuffa's PARs assert the "non-exclusive right to use a three minute clip of the recording of any prior bout, including any non-ZUFFA/UFC bout, in which Fighter was a participant to the extent that Fighter possesses the rights thereto or can reasonably obtain such rights solely for the purpose of publicizing the Bout…." *See, e.g.,* ZFL-0105053 at 61.

203. *See* Deposition of Michael Mersch, July 14, 2017 at 418:14-24 ("Q. So the fighter's sponsored by one of the UFC's exclusive sponsor and they decide to leave the UFC and go fight for Bellator. As a result of this policy, they couldn't take the sponsor with them if that sponsor wanted to stay with the UFC; is that right? A. Assuming that they had negotiated and agreed to . . . an exclusivity provision in a contract with Zuffa, I would assume and imagine that people who entered the contracts adhered to the terms of the contractors.").

204. In November, 2009 EA Sports announced the launch of an MMA video game featuring Strikeforce fighters. *See* https://web.archive.org/web/20091109023530/http://mmajunkie.com/news/16763/strikeforce-to-be-flagship-promotion-in-ea-sports-mma-videogame.mma UFC President Dana White responded by "ma[king] it clear that any fighter who signs over their likeness to the new project will be blacklisted from the UFC," and explained that "fighters who sign contracts to appear in EA Sports' upcoming MMA title 'will find themselves out of the UFC's good graces.' *See* ZUF-00335242.

205.

### C.   Zuffa Exploited the Exclusionary Terms of the PARs to Make Exclusion Effectively Perpetual

75.    Zuffa exploited the exclusionary terms of the agreements to renew and extend Fighter contracts, and to stagger them such that, to the extent any would ever expire, there would never be a critical mass of Fighters available to a potential rival at any one time. From the standpoint of Fighters' relatively short careers, this allowed Zuffa to make its exclusionary provisions effectively perpetual for those Fighters whom Zuffa wanted to keep. ████

████████████████████████████████████████████████

████████████████████ ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

#### 1.   Zuffa Exploited the Exclusionary Terms to Extend and Renew Fighter Contracts

76.    Zuffa exploited various forms of bargaining leverage made possible by the Fighter agreements and the other Challenged Conduct to restrict the quantity and quality of employment opportunities for its Fighters. This created powerful incentives for Fighters to renew their contracts before the prior contracts expired, on terms favorable to Zuffa. And Zuffa, in fact, made a practice of using its leverage to approach those of its Fighters it wanted to keep before the last fight of their contracts, so that Zuffa contracts rarely reached their end. Among other things, Zuffa could and did (1) impose (or credibly threaten to impose) delays between bouts, particularly before the final bout

---

206. CG-UFC-00000005 (Item 204). *See also* Deposition of Joseph Silva at 59:14-20 (discussing May 2007 Confidential Information Memorandum, DB-ZUFFA—00006712) ("Q. Then it says: 'Notably, only one marquee fighter has ever defected from UFC to a competing MMA organization, and that individual later returned to compete in the U.S.' As of the date of that statement, is that accurate to your knowledge? A. To my knowledge.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

of a Fighter's contract, during which Fighters—who get paid only when they fight—could not earn MMA income from any source; (2) pair (or credibly threaten to pair) Fighters against suboptimal opponents or on unfavorable positions on a Fight Card; (3) lock up the most valuable Fighters at the peak of their popularity by leveraging the presence of the champion's clause; and, (4) impose and enforce lengthy periods even after a Fighter had competed all of the bouts in his or her contract, during which the Fighter would not be allowed to negotiate freely or without restriction with other MMA promoters for the opportunity to fight for another MMA promoter.

77.    Zuffa exercised significant discretion over the timing of bouts in a Fighter's contract.[207] Record evidence indicates that Zuffa's ability to control the timing of a Fighter's matchups, the identity of opponents, and a Fighter's placement on the Fight Card conferred a negotiating advantage, particularly given that members of the Bout Class were compensated only when they fought.[208] The ability to force a Fighter to wait longer before the final bout (also the Fighter's next payday) incentivizes the Fighter to agree to Zuffa's terms for a new contract even if he or she preferred to fight for another MMA promotion or merely wanted to test his or her worth in "free agency."[209]

---

207.  Deposition of Denitza Batchvarova, Zuffa's Senior Vice President of Strategy, January 25, 2017, at 36:7-11 ("Q.  And just to make sure I understand what you are saying correctly, so the UFC has discretion on how to structure the card and wanted to maintain that discretion?  A.  Yes.  Yes.").

208.  Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 ("[T]hrough threats and direct punishment, Dana really controlled how our careers went.  And he could stick you on the undercard in your next fight against some unfavorable opponent.  If you're on the undercard, you would make far less.  If anything in sponsorship because you weren't on TV.  He might sit you on the bench for a while.  That's happened to numerous fighters.  And then give you an unfair brutal opponent on an undercard.  There were a number of different ways that Dana would use his power to our disadvantage."). *See also* Silva Dep. 405:12-19 ("Q. So everything's equal.  And the only thing you know now is that this guy's main card worthy and he has agreed to re-up, versus, it's the same situation, main card worthy where he's not agreed to re-up.  You'd more likely give the main card in a better position to the guy who has agreed to re-up as opposed to the one who hasn't; right? A.  Yes."); ZFL-2496215 (July 2012 e-mail exchange between Joe Silva, Michael Mersch and Tracy Long discussing the fact that it was Quinton Rampage Jackson's last fight on his contract, would not sign a new deal and that Zuffa used its discretion to not make Jackson's bout the main event).

209.  Deposition of Plaintiff John Fitch, February 15, 2017 at 105 ("Q: Okay.  And in this case, I think we've established that had you fought two fights [(of three)] and then renegotiated the contract? A: Correct."). *See also id.* at

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

78.   Record evidence indicates that Zuffa typically opened negotiations for a contract renewal before a Fighter's existing contract had expired.[210] For example, an August 2010 email from Nick Walton from MMAagents notes that "Traditionally, Joe Silva drops the fourth fight and gives a nominal raise as an incentive for re-signing for 4 more fights. This is even usually done when fight three was a loss...."[211] In ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ [215]

---

110 ("A: Yeah. I was just pointing out, this is one of the strategies they're using. You can see that fight was March 1, 2008. I hadn't fought since September, so money's running low, I need money, I need to fight. This agreement is sent to me in February; right? So -- oh, wait a minute, that's January. So that's two months before that fight. They're holding my bout agreement hostage. They're holding my next fight hostage until I sign this. They do that often. I think if you look at the other one, you'll probably see that too. Signed 4/6, yes. Signed 5/6, which is May, yeah, so I signed that in May. I fought in June. Q: So you're saying that at that time they were withholding a fight from you until you resigned? A: I'm saying they do that to everybody. We're going to hold your bout agreement until you sign your extension. We won't allow you to become a free agent."). *See also* Deposition of Plaintiff Brandon Vera, February 6, 2017 at 118 ("A: Every time a fighter has -- is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight. That's common knowledge across the board.").

210.  Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 ("[T]hrough threats and direct punishment, Dana really controlled how our careers went. And he could stick you on the undercard in your next fight against some unfavorable opponent. If you're on the undercard, you would make far less. If anything in sponsorship because you weren't on TV. He might sit you on the bench for a while. That's happened to numerous fighters. And then give you an unfair brutal opponent on an undercard. There were a number of different ways that Dana would use his power to our disadvantage.").

211.  ZFL-2647127.

212.  MARTIN0034081 at 81-82.

213.  Deposition of Joseph Silva at 322:12-16.

214.



79.    Zuffa had various means at its disposal to ensure that champions, or potential champions, were bound to Zuffa for long periods of time. If a Fighter wanted to contend for a title, Zuffa would first insist that the Fighter to sign a new, longer contract. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████████████████████████████████████
██████████████████████████████

Significantly, Zuffa did not need to invoke *formally* the champion's clause, or any other particular contractual provision in order to cause the Fighter to extend his or her contract. The presence of the contractual terms giving Zuffa the exclusive right to prevent the Fighter from leaving, combined with its contracting practices and market power, was sufficient to prevent the Fighter from leaving or testing his or her value in "free agency." (Even if Fighters could have done so, the viability of "free agency" was constrained by the Challenged Conduct, which created conditions under which other MMA promoters could not offer equivalent or viable competitive alternatives to Zuffa).[217] Record evidence emphasizes the importance of locking up Zuffa's best Fighters.[218] Joe

---

216. ZFL-1404974, at 976 (emphasis added).
217. *See* Parts III.C.1-2, *infra*.
218. *See* WME-ZUFFA-00001150 at *11 (Champions have on average 6.5 bouts remaining; Ranked 1-5 have 5.5 bouts remaining; Ranked 6-10 have 3.6 bouts remaining; Ranked 11-15 have 3.2 bouts remaining).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Silva testified that this strategy "could ensure that if [the Fighter] became champ [Zuffa would] have them locked up for a longer period of time."[219]

80.     If the Fighter refused to sign a new contract or tried to hold out for a better bargain, Zuffa had several tools at its disposal to put pressure on the Fighter, including, among other practices, delaying the final bout, offering an inappropriate or unfavorable match-up, and/or giving the last fight poor placement on the event's Fight Card. Delaying a Fighter's last fight was costly to Fighters, who receive compensation from Zuffa only when they fight.[220] Zuffa could also ensure that a Fighter refusing to sign a new contract made less money at his final bout.[221] Zuffa could, in addition, ensure that the Fighter was pitted against a mismatched or unfavorable opponent who could hinder the Fighter's career, thus putting the Fighter in the position of taking the fight and risk losing or being injured, or turning down the fight and triggering an extension of the Fighter's contract.[222] As Plaintiff Kingsbury made clear:

---

219. Silva Dep. at 456:21-25. *See also* Silva Dep. at 455:6-456:11; Silva Exh. 53 (discussing a Fighter (Thiago Alves) who was "on a 7 fight win streak and was the number one contender to fight the winner of GSP versus B.J. Penn," and offering Alves a "2 tier contract, with a higher path if he becomes champ. The good thing about those is it locks them in longer if they become champ").

220. Deposition of John Fitch, February 15, 2017 at 119 ("Q: And the reason why you would have to had sit out a year is because after you finished your fight --A: Because if I didn't sign up, if I didn't to do the re-up with the contract, I wouldn't have gotten a bout agreement. Q: Until? A: They would have exercised their time limit term to the full. Q: And the reason you know about that is because you heard about Huerta? A: Because they had done it to other people. Q: And you've heard about -- you gave one other example; is that correct? A: Huerta and Arlovski. Q: So you know two examples -- A: I know of two examples where the guys were brave enough to see it through. Most guys know if you don't sign the re-up, you don't get your bout agreement. If you don't get your bout agreement, you don't get paid, you don't get money, you can't feed your children.").

221. Silva Dep. at 385:15-21("Q. If a fighter refused to accept the new deal that you were offering them between the third and the fourth fight, he would face a situation where he was fighting that last fight at less compensation than he would have gotten had he accepted the new deal...? A. Yes, he chose to fight at less money.").

222. ███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████ y

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Joe Silva wanted me to fight [Glover Teixeira, a training partner of Chuck Liddell] on the undercard in Glover's first fight in the UFC. And that is exactly the kind of thing that hurts fighters. Nobody knew who he was. He was extremely talented. It was a lose-lose. If I beat him, I'm supposed to beat him. If I don't beat him, I just got my ass kicked by a guy that nobody knows.

I had another unknown opponent in his first fight in the UFC. I had to fly all the way to England for it. It was on the undercard, and it was against a guy who at the time was 11 and 0, no losses, and not a single opponent had made it out of the first round with him. So he was highly decorated and not known. Again, as stated, a lose-lose for me. And then I had received the damage that I did in that fight. And with my second orbital blowout on the same side, I was really concerned for my health fracturing the eyebrow as well and was just considering is it worth it? I can't get out of my contract. There's nowhere else to go at this point. Strikeforce didn't exist anymore. Pride didn't exist anymore. And I had no way of saying no.[223]

Fighters who chose to reject inferior matchups also faced the risk that Zuffa would retaliate by matching them against even less desirable opponents in the future. According to Dana White,

I can tell you this man, if you call Joe Silva and turn down a fight, you might as well say 'fucking rip up my contract.' He will… yeah. He's a mean little fucker. You don't call Joe Silva and tell him you don't want to fucking fight anybody man. You might as well just take the fight, 'cuz, 'cuz, it's gonna be worse, if you do [refuse the fight]. You might as well just do it, [just say] fuck it, alright? I'll fight him.[224]

    223. Deposition of Kyle Kingsbury, February 17, 2017, at 118. *See also* Deposition of John Fitch, February 15, 2017, at 87 ("A: So they took really tough amateur-type guys, but the crowd didn't know who they were. It's a lose-lose fight for somebody with notoriety. Because if you don't go in there -- if you go in there and completely beat the guy up, fine, you were supposed to. They didn't know who the other guy was. You go in there and you win, but you don't destroy the guy, oh, you suck now because you didn't destroy a guy with no name. Or you lose, you lose to a guy who has no name, and now your notoriety and your value drops immensely. They may even cut you because you lost. So that is one of the most subtle ways that they really put fear into people, is they control your destiny. They control who you fight, when you fight, and how much you fight for.").
    224. *UFC on Fuel TV 7 post-fight media scrum* (Feb. 2013), *available at* https://youtu.be/y0NTiITqn2w?t=12m9s *See also* Deposition of Nate Quarry, September 30, 2016, at 47:23-25 ("As Joe Silva said one time, 'If you don't like the first fight I offer you, you're sure as shit not going to like the second one.'"). *See also* ZFL-1421551 (In April 2010, Joe Silva wrote regarding negotiations with UFC fighter Nick Diaz, "I lowballed them on purpose the first offer knowing they would turn it down. How bout I come back with 29+29 32+32 35+35 38+38. If they turn it down I put him in a prelim against a really tough guy for his last fight."). *See also* Silva Dep. 405:12-19 ("So everything's equal. And the only thing you know now is that this guy's main card worthy and he has agreed to re-up, versus, it's the same situation, main card worthy where he's not agreed to re-up. You'd more likely give the main card in a better position to the guy who has agreed to re-up as opposed to the one who hasn't; right? A. Yes."); ZFL-2496215 (July 2012 e-mail exchange between Joe Silva, Michael Mersch and Tracy Long discussing that it was Quinton Rampage Jackson's

Zuffa could also retaliate by giving a Fighter inferior card placement; for example, a Fighter could be placed on the undercard instead of the Top of the Card.[225] If a Fighter lost even once, Zuffa could use (or threaten to use) the Cut Clause to cut Fighters in the middle of their contracts, allowing the Fighter to fight again only after agreeing to lower compensation.[226]

81.



last fight on his contract, would not sign a new deal and that Zuffa used its discretion to not make Jackson's bout the main event).

225. In April 2010, following UFC's regular practice, Joe Silva offered fighter Nick Diaz a new contract before Diaz's last fight. Silva explained, "If they [Diaz's team] turn it down I put him in a prelim against a really tough guy for his last fight." Silva Dep., Exh. 43 (ZFL-1421551). Silva testified that he would have matched Diaz against a tough guy regardless, but admitted that, all else equal, he would be more likely to give the main card to a fighter who has renewed their contract, as opposed to one who has not. *See* Silva Dep. at 401:2-19, 405:12-19.

226. *See, e.g.,* ZFL-2496264 (Fighter Hector Lombard was on "his 4th fight of an 8-fight Agreement." Under his original contract he was entitled to "205K to show and $75 to win" but Joe Silva explains, "He is no longer under that deal. In return for not being cut he is fighting a 1 fight deal for 100K.").

227.

228. *Id.* at 410:15-21 (Silva would "always just do it [issue the extension] for the time period in between fights."); *id*. at 421:6-17 (same). *See also* ZFL-2536288 (Fighter Matt Wiman writes: "Hey Tracy, I'm a little confused about my extension ... Can u explain it in simpler terms to me ... I was only injured for 2-3 months and the letter states an 8 month extension." Long responds: "Joe Silva gave me the time-frame. I believe it is based upon when you last fought and when you will fight. You last fought on October 1, 2011. You are now scheduled to fight on September 29, 2012." Wiman: "So all the months I'm training and waiting patiently are not counted? This is bc there's so many fighters and you all have to honor your contracts?"). *See also* ZFL-2494948 (Bryan Caraway receives a six month extension on top of four month extension. Caraway: "I was only hurt for 2 months?? Why is my contract being extended 6 months?" Long explains the math to Sean Shelby, based on time between fights). *See also* Deposition of Joseph Silva at 390:24-392:3.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



82.

83.

---

229. ZFL-2685237.
230. Deposition of Joseph Silva at 412:7-12 ("Q. So just so I'm clear, Zuffa finds out that a fighter is injured the day after a fight, it automatically issues an injury extension to that fighter even if that fighter hasn't been offered another fight; is that right? A. Correct."). *See also* Deposition of Joseph Silva at 408:24-413:7.
231. ZFL-0529761 at 62-63.
232. ZFL-2479576.
233.



84.

235

236. *See* Part II.B.2, *supra.*
237. Silva Dep. at 463:23-464:8.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

.[239]

85.    In the economic literature, contractual terms such as Zuffa's right to match clause are known as the "Right of First Refusal" ("ROFR").[240] Economists have shown that ROFRs, under certain conditions, can be beneficial to buyers (in this case, Zuffa), and harmful to both sellers (in this case, Fighters) and potentially competing buyers (in this case, other MMA promoters). Because "the seller places himself in a disadvantageous position by awarding the special buyer this right [of first refusal],"[241] economic analysis "offers prescriptive advice: considerable caution should be exercised prior to granting a right of first refusal."[242] Other economists have shown that ROFR can reduce the incentives for other buyers to compete with the favored buyer, which "reduces the marketability of the seller's asset."[243] As economist Michael

---

238.  *See* Parts III.C.1-2, *infra*. Indeed, as discussed further below the UFC engineered its contracts such that their possible expirations would be staggered, preventing other MMA promotions from being able to gain access to multiple top-flight Fighters at the same time. *See* Part III.C.3, *infra*.

239.  Deposition of John Fitch, February 15, 2017 at 121 ("Q: Okay, but outside of the re-up, if you really didn't want to sign the re-up, the contract would end after the duration of the contract, which in the case of Exhibit 51, I believe is 18 months, and then -- A: 18 months without making a dime. That would retire a fighter. We don't make that much money. You don't fight, you don't work for 18 months, you're not going to survive, you're not going to live. You don't get a choice."). *See also* ZFL-2642993 (January 2008 email from the agent for Andrei Arlovsky, a former UFC Heavyweight Champion, stating that "It is extremely damaging to Andrei's career to be shelved for such a long period of time [more than one year]").

240.  Sushil Bikhchandani, Steven Lippman & Reade Ryan, *On the Right of First Refusal* 5(1) ADVANCES IN THEORETICAL ECON. (2005).

241.  *Id.* at 2.

242.  *Id.*

243.  Marcel Kahan, Shmuel Leshem & Rangarajan Sundaram, *On First-Purchase Rights: Rights of First Refusal and Rights of First Offer*, 14 AMERICAN L. & ECON. REV. (2012). *See also* Leandro Arozamena & Federico Weinschelbaum, *A note on the suboptimality of right-of-first-refusal clauses*, 4(24) ECON. BULLETIN (2006) 1-5, at 1 ("We show that, under independent private values, no mechanism that includes an ROFR clause can maximize the

Leeds and his co-authors explain in *The Economics of Sports*, restricted free agency in professional sports confers an ROFR to a player's original team; as a consequence, "the expectation that the original team will match any offers may reduce the size or number of offers a restricted free agent receives."[244]

86. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ █ █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ █ █

████████████████████████████████████████████████████████

████████████████████████████

87. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

joint expected surplus of the seller and the right-holder. Adding such a clause to any given auction format, then, is jointly suboptimal for the two parties involved.").

244.  MICHAEL LEEDS, PETER VON ALLMEN & VICTOR MATHESON, THE ECONOMICS OF SPORTS (Routledge 5th ed. 2016) [hereinafter ECONOMICS OF SPORTS].

245.  *See* Part II.C.2, *infra* (documenting Fighters' short careers); *see also* Hendrick Dep. V.I ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career.").

246.  *See* ZFL-1872579. In a February 2014 text message discussion between White and Lorenzo Fertitta regarding re-signing Gilbert Melendez, Melendez's contract with Zuffa was ending and he had come to an agreement with Bellator. In response, Zuffa exercised the right to match clause to re-sign Melendez. *See* ZFL-1897652. Fertitta texts White: "We gotta keep taking these fuckers oxygen till they tap out. We have sacrificed too much to let anyone get traction now[.]" At his deposition, Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 291-92.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



### 2. Given Fighters' Short Career Durations, Zuffa's Exclusionary Provisions Were Effectively Perpetual for Fighters Who Zuffa Wished to Retain

88.    I define the cumulative duration of exclusivity as the sum of: (1) the contract term (including the lead-up time to a Fighter's first bout); (2) the option period (for those Fighters who had such a provision); (3) any exclusive negotiation period; and (4) the right to match period.[249] During (1), (2 if present), and (3), Fighters are directly prohibited from negotiating with or fighting for any other MMA promoter. For the duration of (4), Fighters remain unable to negotiate freely with other MMA promoters, because Zuffa can retain the Fighter simply by matching the terms of any competing offer, with the Fighter contractually obligated to accept Zuffa's matching terms without further negotiations. In other words, Zuffa maintained and exercised the unilateral and exclusive ability to block any Fighter under contract with it from fighting for another MMA

---

247.  Coker Declaration ¶15.
248.  ZUF-00162329-382  at  361.

                                                    *See also* Goldman 30(b)(6) Tr. 71:18-72:3 (Zuffa told Deutsche Bank as part of their efforts to sell Zuffa's debt that "the exclusivity clause that prevents fighters from moving to different MMA organizations while under contract and with negotiation and matching rights after the agreement expires is part of how the [Fighters'] contracts are designed to retain talent within [the UFC].").
249.  *See* Part II.B for details of these contractual terms.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Promotion for the entire period, stretching from (1) through and including (4).[250] Zuffa's ability to withhold Fighters from other MMA promoters factors prominently into my analysis of foreclosure and the anticompetitive effects of the Challenged Conduct.[251]

89. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ ██ ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████

---

250. *Silva Dep.* at 186:4-12 ("████████████████████████████████████
████████████████████████████████████████████████

251. *See* Parts III.C-D, *infra.*

252. Zuffa has produced contracts executed by Fighters between May 2001 and November 2015. I have no reason to believe that contracts executed after November 2015 differ materially from those executed beforehand.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



91.

253. *See* ZFL-1376378-79. *See also* ZFL-2642993 (January 2008 email from the agent for Andrei Arlovsky, a former UFC Heavyweight Champion, stating that "It is extremely damaging to Andrei's career to be shelved for such a long period of time [more than one year]"); ZFL-2632955 (agent stating that "MMA fighters [] career primes are generally short"). Zuffa's corporate designee concurred that sitting out for 12 months is not a reasonable option given Fighters' typically short career durations. Hendrick 30(b)(6) Dep. V.I ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career.").

254. *See* ZFL-1376378-79.

255. Calculated using data obtained from Sherdog.com.

256. WME-ZUFFA-00001150 at *11 (showing that champions have, on average, 6.5 bouts remaining in their contracts; Fighters ranked 1-5 have 5.5 bouts remaining on average; Fighters ranked 6-10 have 3.6 bouts remaining on average, and so on).

257. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### III. The Challenged Conduct Was Exclusionary and Harmed Competition

92.     Economists and antitrust scholars have identified criteria to determine whether conduct is exclusionary and harmful to competition, and these criteria can be informed by economic analysis. In this section, I lay out these criteria in detail, and I demonstrate that they are satisfied here.

93.     In Parts III.A and III.B, I demonstrate that Zuffa has significant monopoly and monopsony power, using well-accepted "indirect" and "direct" methods of proof. Indirect proof of market power involves defining relevant product (and geographic) markets, demonstrating that Zuffa has high market shares within the relevant markets, and showing that substantial barriers to entry exist. Direct proof is more straightforward, and simply requires evidence that Zuffa has in fact exercised monopoly and/or monopsony power. It bears emphasis that product market definition is a tool to *infer* pricing power—that is, the ability to raise prices above competitive levels, or to suppress compensation below competitive levels. Because here we have direct evidence that Zuffa exercised monopoly and monopsony power, indirect evidence is of secondary importance.[258]

---

258. *See, e.g.,* Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, in Paulo Buccirossi, ed., HANDBOOK OF ANTITRUST ECONOMICS (2007) [hereafter, "Baker & Bresnahan"], at 15 ("Historically, in the antitrust world, market power has most commonly been identified through inference from a high market share. But direct evidence has increasingly become important as an alternative, in part because academic economists have developed a number of econometric approaches for measuring market power."). Baker and Bresnahan also note that "quantitative methods of measuring market power through direct evidence have parallels involving the use of qualitative evidence." *Id. See also* Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 ANTITRUST L.J. 119, 126 (2004) ("Market definition is only a traditional means to the end of determining whether power over price exists. Power over price is what matters…if power can be shown directly, there is no need for market definition: the value of market definition is in cases where power cannot be shown directly and must be inferred from sufficiently high market share in a relevant market."). *See also* PHILLIP E. AREEDA, EINER ELHAUGE & HERBERT HOVENKAMP, 10 ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 267, 325–28, ¶ 1758b. (1996 & Supp. 2003); *see also* PHILLIP AREEDA, LOUIS KAPLOW & AARON EDLIN, ANTITRUST ANALYSIS: PROBLEMS, TEXT AND CASES ¶ 344 (6th ed. 2004).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

94.     In Part III.C, I lay out the criteria for demonstrating that the Challenged Conduct foreclosed competition to a substantial degree, and I show that these criteria are satisfied here. In Part III.D, I show that the Challenged Conduct generated anticompetitive effects.

## A.     Indirect Evidence of Zuffa's Market Power

95.     In general, a threshold requirement for demonstrating that the Challenged Conduct was exclusionary and harmful to competition is to show that the conduct at issue was undertaken by a firm with significant market power.[259] As explained below, for my indirect proof of monopsony power, I define a Relevant Input Market of MMA Fighters, which is measured in two ways using industry-accepted databases. I also define a Relevant Input Submarket of "Headliners," consisting of all Fighters ranked one through fifteen according to industry-accepted databases in any of the ten major MMA weight classes.[260]

96.



---

259.  *See, e.g.*, Salop, *supra*, at 374 (noting that "monopoly and dominant firm markets" are where potentially exclusionary conduct "raise[s] the greatest concerns," although this conduct "can allow non-dominant firms that lack market power to achieve that power, particularly where parallel exclusion by multiple firms can lead to anticompetitive coordination."). *See also* IIIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801, at 318 (2d ed. 2002); *see also* Einer Elhauge, *Defining Better Monopolization Standards*, 56 Stan. L.R. 253 (2003) [hereafter, "Elhauge"], at 257-261; 330-339.

260.  I consider the Relevant Input Submarket to be the top 15 Fighters in each class weight class. I choose 15, as opposed to 10, 25 or some other number, because (1) FightMatrix.com only lists the top 15 for their "pound-for-pound" fighter ranking (http://www.fightmatrix.com/historical-mma-rankings/generated-historical-rankings/?Issue=111&Division=-1), (2) UFC's internal fighter rankings display the top 15 fighters per weight class (http://www.ufc.com/rankings?fb_comment_id=6086517324953#f17c6b2f929913), and (3) the top 15 are displayed in USA Today/MMA Junkie's ranking system (http://mmajunkie.com/rankings). Relatedly, as explained by Leon Margules, President of Warriors Boxing Promotion, boxers ranked in the top fifteen by one of the major sanctioning organizations are mandatory challengers for the title, and thus by definition championship-caliber. Margules Dep. at 85:17-86:13 ("Only … if they are ranked in the top 15 will they qualify.").

261.  This includes all Fighters in the Relevant Input Submarket as well, which is a subset of the Relevant Input Market.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



62

97.     The DOJ's and FTC's *Horizontal Merger Guidelines* define a relevant antitrust (output) product market as a product or group of products such that a hypothetical monopolist that was the only present and future seller of those products could profitably impose a small but significant and non-transitory increase in price (the "SSNIP") over the competitive level.[263] The SSNIP is normally taken to be five percent.[264] If enough customers view some products outside a proposed product market as sufficiently interchangeable with products within the proposed market, the hypothetical monopolist could not profitably raise prices by the SSNIP. The forgone profits

---

262.  *See* HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY 82-83 (3d ed. 2005). There is no consensus as to precisely how high a firm's market share must be to convey monopoly power. If an industry has a competitive fringe that imposes some competitive discipline on the dominant firm, many economists consider market shares in the range of 30 to 50 percent to be too low to infer monopoly power. *See* MODERN IO at 644. In this case, the fringe of the market is not competitive, as a consequence of the Challenged Conduct.

263.  *Merger Guidelines* §4.1.1.

264.  *Id.* §4.1.2 ("The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value. However, what constitutes a "small but significant" increase in price, commensurate with a significant loss of competition caused by the merger, depends upon the nature of the industry and the merging firms' positions in it, and the Agencies may accordingly use a price increase that is larger or smaller than five percent.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

from the switching of consumers would exceed increased profits gained from the higher price paid by remaining customers.

98.     When it comes to input markets, market definition proceeds in an analogous fashion for the analysis of monopsony power. In this case, a relevant (input) market consists of a product or group of products such that a hypothetical monopsonist that was the only present and future buyer of those products could profitably impose a small but significant and non-transitory *decrease* in prices (or wages) below the competitive level. In the buying context, market definition turns on "the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist."[265] If sellers enjoy "numerous attractive outlets for their goods or services,"[266] then the hypothetical monopsonist would not be able to depress prices (or wages) significantly below competitive levels. Conversely, the exercise of monopsony power will be profitable when sellers have few competitive outlets to which to turn in response to a decrease in the price (or wage).[267]

### 1.     The Relevant Input Market

99.     Following the *Merger Guidelines*, I define the Relevant Input Market and Submarket based on the alternatives to which Fighters could reasonably substitute to counteract an exercise of monopsony power by Zuffa. As explained below, I provide two alternative metrics of the Relevant Input Market using two industry-accepted databases. The Relevant Input Submarket, a subset of the other markets, is also measured using industry-accepted databases:

---

265. *Id.* §12.

266. *Id.*

267. Given the nature of the Challenged Conduct—namely, foreclosure from a critical or must-have input—an alternative way to think about input market definition is from the perspective of potential rival MMA promoters: What is the narrowest set of Fighters that could be foreclosed via exclusionary agreements by a hypothetical monopsonist such that a potential rival MMA promoter would be materially impaired in its ability to compete effectively in the Relevant Output Market? Both frameworks lead to the same answer. *See, e.g.* Eric Cramer & Daniel Berger, *The Superiority of Direct Proof of Monopoly Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of Generic Drugs* 39 UNIVERSITY OF SAN FRANCISCO L. REV. (2004) at 112-113 ("[A] relevant product market is always defined in relation to the claims that give rise to the inquiry in the first place.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

1. Under the Tracked measure, all Fighters fighting for an MMA promoter included in the FightMetric database (which "tracks" Fighter performance) are included in the Relevant Input Market. A hypothetical monopsonist over all Tracked Fighters could profitably exercise monopsony power, because an MMA promoter without Tracked Fighters would not be able to offer competitive matchups to advance a Fighter's career.

2. Under the Ranked measure, the Relevant Input Market is expanded to include (1) all Fighters encompassed by the Tracked measure; and (2) any Fighter ranked in the FightMatrix ranking database. This includes Fighters ranked from 1 through 650 in any of the fourteen MMA weight classes in the FightMatrix database. The Ranked measure also includes ONE Championship, as explained below. A hypothetical monopsonist over all Ranked Fighters could profitably exercise monopsony power, because an MMA promoter without Ranked Fighters would be even less able to offer competitive matchups than an MMA promoter without Tracked Fighters.

3. Under the Headliner definition, the Relevant Input Submarket includes the top fifteen Fighters in any of the ten major MMA weight classes,[268] as ranked by FightMatrix. A hypothetical monopsonist over all Headliners could profitably exercise monopsony power, because non-Headliners are, by definition, lower-ranked Fighters that would typically provide sub-optimal matchups for Headliners.

100.    As explained below, athletes from combat-oriented sports outside of MMA such as boxing and wrestling are outside the Relevant Input Market, as are athletes from non-combat sports such as football or hockey. A market definition that encompassed Fighters from *all* MMA promoters would also be far too broad: The vast majority of these MMA promoters do not offer comparable competitive alternatives to which MMA Fighters could reasonably substitute to counteract an exercise of (buyer) market power by Zuffa. As explained below, the evidence indicates that even the most prominent non-Zuffa MMA promoters are at best distant substitutes to Zuffa from the perspective of Fighters.[269] Nevertheless, both my Tracked measure and my Ranked

---

268. *See* Part I.A, *supra* The Headliner definition omits the following minor weight classes: men's strawweight, women's featherweight, women's flyweight, and women's atomweight weight classes. However, these weight classes are included in the Ranked measure of the Relevant Input Market.

269. *See also* Part III.A.8, *infra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

measure conservatively include Fighters from non-Zuffa MMA promoters, based on two alternative industry-accepted databases.

101.    Combat-oriented sports outside of MMA, such as boxing, kickboxing, sumo wrestling, and professional wrestling, do not constitute sufficiently viable employment alternatives for MMA Fighters to defeat an exercise of monopsony power by a hypothetical monopsonist in the Relevant Input Market. The process of training to become an MMA Fighter is expensive and time-consuming. For this reason, Zuffa sometimes considered it superior to use lower-tier promoters to develop MMA talent instead of developing talent from scratch,[270] and even acquired other MMA promoters, in part, to gain access to their Fighters.[271] Training to become an MMA Fighter is specific to MMA, and is not seamlessly transferrable to another individual combat sport. As one Zuffa investor presentation explains: "For a fighter to be successful in the UFC, one must be a master of multiple martial arts disciplines and maintain peak physical condition."[272] A 2012 UFC management presentation states that "MMA is a Combination of Combat Sports,"[273] and that "Fighters must be well-versed in a variety of different fighting disciplines."[274]

102.    Accordingly, the generalized fighting skills required for MMA competition are not seamlessly transferable with the more specialized skills required in (say) boxing. Indeed, Zuffa initially explored, but subsequently abandoned, a business model of mixing and matching different

270. *See, e.g.,* ZFL-1897652 at 694 (November 2013 text message exchange between Lorenzo Fertitta and Sean Shelby, Lorenzo asked "Should we buy Invicta" and Shelby responded "tough question... It would have to keep operating though. If Invicta went away it hurts me a lot. There just isn't [sic] enough up-and-coming women yet.").
271. *See e.g.,* ZUF-00031544 (Correspondence from Thomas Paschall to the Fertittas, White and others indicating that the acquisition of Pride is a "strategic/preemptive" one and that Zuffa "seriously contemplated acquiring them only to shut their business down and utilize the fighters in the UFC.").
272.
273. ZFL-2547712, at 24.
274. *Id.* at 27.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

fighting styles (for example, pitting a judo-trained Fighter against a boxer).[275] The highly publicized boxing match, on August 26, 2017, between undefeated (and previously retired) 40-year-old boxing champion Floyd Mayweather and Conor McGregor, the UFC lightweight (MMA) champion, was the exception that proves the rule, representing an opportunity unavailable to the vast majority of Zuffa Fighters (or boxers). Further, that the two fighters were boxing, and not engaging in an MMA bout (which includes, but is not limited to, boxing) is a further indication that MMA is a distinct sport that requires highly specialized training to compete at the highest levels.[276]

103.    My conclusion that MMA is a distinct sport is even clearer for athletes in non-combat sports. For example, in response to a question regarding whether Zuffa would consider signing NFL player Greg Hardy to the UFC, Dana White stated: "It's tough man. We've tried some of these things, and they don't always work out. You've got to understand, a lot of these fighters have been training since they were kids, and this guy was training to play football and he became great at it. But fighting's a whole other ball game...."[277] Athletes who do attempt to transition from non-combat sports to MMA do not instantaneously compete at the level of UFC

---

275.  ZFL-1838367 at 95 ("In 2001, three fans of the sport saw past the spectacle of this multi-disciplined form of combat to the true potential of MMA as a real sport where no one discipline would dominate, but rather in which athletes would need to be cross-trained in all disciplines to be victorious in the Octagon.").

276.  *See, e.g.,* Jason Gay, *Mayweather and McGregor's Mindless Summer Fight*, WALL STREET JOURNAL, June 15, 2017, *available at* https://www.wsj.com/articles/mayweather-and-mcgregors-mindless-summer-fight-1497535595 According to an editor of *Bloody Elbow*, although mildly competitive through the first nine rounds, the fight was more a spectacle, as McGregor was never close to a win. *See, e.g.,* Mookie Alexander, *Six takeaways from Floyd Mayweather vs. Conor McGregor*, BLOODY ELBOW, Aug. 27, 2017 ("McGregor was never going to have the stamina to go the distance, and outside of the opening round counter uppercut and I believe a 9th round body shot (that looked like a low blow), Mayweather never seemed particularly fazed by his punches. Once Mayweather knew what he was getting from Conor after the first few rounds, he was willing to walk forward and land his own shots, and to me that was the obvious sign that McGregor was on borrowed time.").

277.  Zuffa's Response to Plaintiffs' Requests for Admission No. 37.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Fighters, but instead accumulate years of training and experience at smaller MMA promotions.[278] A 2012 UFC Management Presentation states unequivocally that "[a]ll UFC fighters have previous combat sports experience."[279]

104.   A market definition that encompassed Fighters from *all* MMA promoters would clearly be too broad: Although there are hundreds of non-Zuffa MMA promoters, they do not offer comparable competitive alternatives to which MMA Fighters could reasonably substitute to counteract an exercise of market power by Zuffa. As explained below, nearly all non-Zuffa promoters are small regional outfits that have none of the top Fighters in any weight class and do not even seek to compete with the UFC for talent. Indeed, even the most prominent non-Zuffa promoters do not have access to a sufficiently deep pool of talented Fighters to provide competitive matchups to advance a Zuffa Fighter's career, thus making non-Zuffa MMA promoters an inadequate substitute. Thus, even a (not so) hypothetical monopsonist controlling only Zuffa Fighters would be able to exercise significant monopsony power. Because the Relevant Input Market and Submarket encompass Fighters associated with non-Zuffa promoters, these market definitions are likely overly broad and thus conservative, as explained below.

105.   MMA promoters other than Zuffa are "highly fragmented"[280] and have not disrupted Zuffa's dominant position. In the words of one MMA promoter, non-Zuffa MMA

---

278.   For example, Wes Shivers played three games in the NFL for the Atlanta Falcons in 2000, but did not begin competing in MMA events until 2007. *See* http://www.sherdog.com/fighter/Wes-Shivers-49521; *see also* http://www.pro-football-reference.com/players/S/ShivWe20.htm. Shivers fought for small promotions with the exception of a single UFC exhibition bout (in 2009) and a single Strikeforce bout (in 2010). *See* http://www.sherdog.com/fighter/Wes-Shivers-49521. Similarly, Steve Bossé retired from the North American Hockey league to pursue a career in MMA in 2007, but did not make his debut in the UFC until 2015, after competing for years in minor promotions. *See* http://www.ufc.com/fighter/steve-Bosse?id; *see also* http://www.sherdog.com/fighter/Steve-Bosse-22732.

279.   ZFL-2547712, at 27 ("All UFC fighters have previous combat experience. Many of the fighters are collegiate and Olympic champions. Most have extensive experience in smaller organizations before fighting in UFC.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-71-

promoters are to Zuffa what "AAA baseball is to MLB." [281] Conversely, Zuffa is recognized by industry analysts as occupying "a premier 'major league' MMA platform."[282] Thus, Fighters at non-Zuffa promotions lack access to a "deep roster of talented fighters,"[283] which limits opportunities for career advancement outside of Zuffa (while simultaneously impairing would-be rivals).[284]

106.    In an internal presentation from 2010 (when Strikeforce was at the peak of its popularity), Zuffa equated Strikeforce to a "Double-A"[285] MLB team, and regional MMA promotions to "Farm Leagues."[286] In response to a question about whether the UFC planned to create a "minor league," Dana White replied, "All of the other shows out there act as minor leagues for the UFC. Guys get their experience and build their confidence in the other shows and if they are successful enough we bring them into the UFC."[287] As Lorenzo Fertitta noted in March 2014:

---

280. ZUF-000162329-382 (October 2009 Deutsche Bank Report, "$100,000,000 Incremental Term Loan": 356 ("...the UFC holds the dominant market position within the sport and continues to do so even as a highly fragmented group of competitors have entered the market in an attempt to emulate UFC's success").

281. The full quote is as follows: "'We believe the merger of Legacy Fighting Championship and Resurrection Fighting Alliance is an exciting and logical progression of the sport,' Legacy FC President Mick Maynard stated. 'As AAA baseball is to MLB, we will continue to develop the best prospects by providing a proving ground and a stage for the fighters to grow that is unrivaled in the sport.'" *See* http://mmajunkie.com/2016/09/legacy-fc-and-rfa-merge-to-create-new-legacy-fighting-alliance-promotion. *See also* ZFL-1500311 (In 2011, a concept document detailed the objective of establishing the Asia Fighting Championship to "serve as a development/feeder league to UFC[.]");

282. ZUF-000162329-382, October 2009 Deutsche Bank Report, at 361 ("the UFC's ability to attract the world's most talented MMA fighters gives it a premier 'major league' MMA platform.").

283. DB-ZUFFA-00006389 at 439.

284. *See* Part III.C.1, *infra*.

285. *See* ZFL-2022954 at 57.

286. *Id.*

287. *See* ZUF-00284193; *see also* Zuffa's Response to Plaintiffs' Request for Admission No. 24 (On April 8, 2013 at the Global Speaker Series at the Stanford Graduate School of Business in Stanford, California, Dana White stated: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it. You're all feeder leagues to the UFC, okay. I want them to exist and make money because those guys create the next talent that will end up in our organization someday.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

[w]e're lucky in the sense that for any aspiring athlete that wants to become a fighter, we're at the top of the food chain. They want to, their goal is eventually to get to the UFC. So the talent pool is kind of coming to us so we kind of have the pick of the best fighters that are potentially out there[.][288]

107.    Zuffa regularly signs the champions from other promotions—after they have been successfully groomed.[289] MMA promoters have included "Zuffa-out" clauses in their Fighter contracts, which release those Fighters from the contract if they are given an offer to fight for Zuffa.[290] The presence of Zuffa-out clauses indicates that these promoters have forfeited any chance at competing with Zuffa for talent, opting instead to serve as an input provider for Zuffa.[291] In a February 24, 2014 interview, Titan FC CEO Jeff Aronson explained his strategy as follows:

---

288.  Zuffa's Response to Plaintiffs' Request for Admission No. 33.

289.  For example, Zuffa signed Conor McGregor from a promotion called Cage Warriors when McGregor was a two-division champion for the promotion. *See* ZFL-2699678 (February 15, 2013 4:08:32 PM Text from Sean Shelby to Lorenzo Fertitta, page 26 of 177). *See also* Mersch V.I Tr. 93:1-6 (stating that Justin Gaethje, who was a World Series of Fighting Champion in his weight class, left the World Series of Fighting for the UFC); ZFL-12517218 (On June 22, 2014, Zuffa sought to retain the services of Invicta Champ Lauren Murphy and negotiated with Shannon Knapp to have her released to enable her to fight in UFC; she fought for the UFC on August 16, 2014); ZFL-2483396 (On December 6, 2013, UFC signed M-1 Fighter Mairbek Taisumov after negotiating his release from M-1; Mairbek competed in UFC on January 4, 2014 and remained active in UFC); ZFL-2483439 (Mairbek's release letter from M-1); ZFL-2483345 (Zuffa signed Jumabieke Tuerxun after he was released from Legend FC on December 9, 2013).

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████. In a November 2013 text message exchange between Lorenzo Fertitta and Sean Shelby, Lorenzo asked "Should we buy Invicta," and Shelby responds "tough question .... It would have to keep operating though. If Invicta went away it hurts me a lot. There just isn't [sic] enough up-and-coming women yet." Lorenzo responds, "What do think about just buying all of Shannon's 115lb roster?" Shelby replied, "She reportedly currently has about 8 of the top 10 in that class so if we are doing a division right now or TUF [Zuffa's "The Ultimate Fighter" reality show] right now then we would need it if we want the perceived best. So it would depend on when we intend to open up the division. If I put the word out now that we want to do something next year, women would start planning their exit now." *See* ZFL-1897652 at 694.

290. ███
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

291.   At his deposition, Joe Silva testified that "numerous promotions ask[ed] to be official feeder shows for the UFC. That is a benefit to them." Silva Dep. 143:7-9.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

> Everybody that has tried to challenge the UFC has wound up on their butt. Nobody has been able to do it. No one is going to take on Zuffa and win at this point. It's just not going to happen, and I have no aspirations to do that… I give every single fighter a 'Zuffa Out' clause… So yes, all of my guys have the ability to leave for the UFC, because every kid training in MMA has the dream of being a UFC champion. I want to be part of the facilitation of helping these guys get the fights they need.[292]

Similarly, in April 2011, Zuffa drafted an internal "cooperation framework" memo between the UFC and Legend FC, the purpose of which appears to have Legend FC serve as an MMA minor-league training ground for potential UFC Fighters, and to give UFC exclusivity over promising prospects developed within Legend.[293] Many MMA promoters have also sold or licensed their content to Zuffa's proprietary subscription streaming service ("Fight Pass"). A promoter who has entered into an agreement with Zuffa to license or sell their content to Zuffa is unlikely to compete aggressively against Zuffa for talent.[294]

108.    To be conservative, I define the Relevant Input Market to include certain Fighters from certain non-Zuffa promoters, based on data from industry-accepted tracking and ranking databases. The first of these databases is FightMetric, which tracks the round-level fighting

---

292. *See* ZFL-2531156. In April 2015, Titan FC and Zuffa began negotiating a more explicit partnership such as the one Zuffa entered into with Invicta, which would include Zuffa rights to Titan FC footage. *See* ZFL-2531156.

293. In exchange for support and training for Legend FC from the UFC, the UFC "gets sales rights to Legend content outside of Asia[,]" a "50/50 revenue split" and "UFC signoff on all Legend media deals to ensure complementary with UFC deals." In addition, "Legend shall work exclusively with UFC (no other promotions) on these initiatives" and "UFC has first rights to recruit any Legend fighters. Legend fighters may not fight in any other promotions outside of Legend (and their home countries) without UFC approval." ZFL-2554757 (email); ZFL-2554758 (draft cooperation framework).

294. *See* https://www.ufc.tv/category/fightlibrary. Indeed, Zuffa appears to have negotiated exclusive licenses to use the vast majority of the content it puts on Fight Pass, leaving promoters with few other options for broadcast revenue. *See* ZFL-1704928 (a May 2015 spreadsheet listing MMA Library licensing status). For example, Titan FC's exclusive license agreement with Zuffa pays Titan $75,000 per show put on Fight Pass; the payment increases only if Zuffa exercises an option to extend the contract after the third year. Aronson Dep. at 82:14-83:10. *See also* Aronson Ex. 13, 14 (Fight Pass License Agreement for Titan FC). This gave Titan FC a strong incentive not to compete directly against Zuffa for talent or do anything else that might jeopardize their "excellent relationship with the UFC." Aronson Dep. at 51:9-12; 92:8-93:16. Indeed, as Dana White explained the strategy in a January 2014 text to Lorenzo Fertitta: "Our deal should be just like our fight pass deals we should have locked up all the rights to all the famous fighters like Ali, Foreman, etc[.] We should start thinking about literally owning fighting/combat sports[.]" ZFL-2699678.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

statistics of Fighters associated with the "most prominent [MMA] organizations in the world,"[295] and is the "the official statistics provider to the UFC."[296] As noted above, FightMetric data have been used in prior academic work.[297] In addition, Joe Silva testified that FightMetric data were perceived in the industry as "very credible."[298] The second database used to measure the Relevant Input Market is FightMatrix (not to be confused with FightMetric), which is a global MMA Fighter ranking system that ranks MMA Fighters by weight class, including up to 650 Fighters per weight class.[299] FightMatrix is recognized by Zuffa itself as an authoritative source of MMA Fighter rankings.[300]

109.    Under the "Tracked" measure, all Fighters who fought for an MMA promoter included in the FightMetric database (which "tracks" Fighter performance) are (conservatively) included in the Relevant Input Market. In addition to the MMA promoters covered in the FightMetric data, I conservatively designate all Fighters associated with MMA promoters acquired by Zuffa in this measure of the input market.[301] As seen in Table 2, the Fighters covered under this measure of the Relevant Input Market include those affiliated with Affliction, Bellator, Dream, EliteXC, Pride, Strikeforce, UFC, World Extreme Cagefighting, and World Fighting Alliance. As

---

295.  E-mail from Remi Genauer, Director, FightMetric, to Economists Incorporated (Nov. 19, 2016, 19:48 ET).

296. FightMetric, About the Company, *available at* http://www.fightmetric.com/company. *See also* Trevor Collier, Andrew Johnson & John Ruggiero, *Aggression in Mixed Martial Arts: An Analysis of the Likelihood of Winning a Decision,* in 4 VIOLENCE AND AGGRESSION IN SPORTING CONTESTS, SPORTS ECONOMICS, MANAGEMENT AND POLICY SERIES, 97-109, 98 (Springer 2011).

297.  *See* Part I.B.

298.  Silva Dep. at 162:19-164:18.

299.  According to its website, the FightMatrix ratings system "takes an unbiased, objective look at all available professional MMA results from day 1 to the present." *See* http://www.fightmatrix.com/faq/.

300.  *See* Deposition of Javier Vasquez, February 14, 2017 at 67, Exhibits 42-44.

301.  Record evidence indicates that Zuffa's acquisitions targeted perceived rivals, or promoters viewed as potential rivals. *See* Part II.A (summarizing Zuffa's horizontal acquisitions). This definition is likely over-inclusive: A potential future rival is not the same as an actual rival. In addition, there is evidence that Zuffa sometimes acquired rivals to "to serve as a venue in which to groom up-and-coming talent"—that is, to serve a more complementary role. *See* Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA WEEKLY, Dec. 11, 2006.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

seen below, with the exception of Bellator, all of these promoters have gone out of business or been acquired by Zuffa.

TABLE 2: PROMOTERS ASSOCIATED WITH FIGHTERS IN THE RELEVANT INPUT MARKET
(MEASURED BY TRACKED FIGHTERS)

| Promoter Name | In FightMetric? | Owned/Acquired by Zuffa? | Final Year |
|---|---|---|---|
| World Extreme Cagefighting | X | X | 2006 |
| World Fighting Alliance | | X | 2006 |
| Pride Fighting Championships | X | X | 2007 |
| EliteXC[302] | X | | 2008 |
| Affliction | X | X | 2009 |
| Strikeforce | X | X | 2011 |
| Dream | X | | 2012 |
| Bellator | X | | N/A |
| UFC | X | X | N/A |

110. The second, "Ranked" measure expands the Relevant Input Market relative to the first measure: The Ranked measure includes (1) all Fighters encompassed by the "Tracked" measure; and (2) any Fighter ranked in the FightMatrix database. In addition, the Ranked measure also includes the Asian MMA promoter ONE Championship. ONE Championship has a large presence in Asia, and, according to Zuffa, is the only international MMA promoter that potentially competes with Zuffa for talent.[303] Including ONE Championship is conservative, given that ONE Championship has made only limited inroads outside of Asia.[304] According to FightMatrix, even

---

302. Although EliteXC was not directly acquired by Zuffa, its parent, Pro Elite, was acquired by Strikeforce shortly after EliteXC ceased promoting bouts. *See* Coker Tr. 23:4-8 ("We went out, we bought Pro Elite, and with buying Pro Elite came 40, 50 top fighters from around the world."). Thus, Zuffa ultimately realized the benefits of that acquisition when it acquired Strikeforce in 2011.

303. *See* Part III.A.3, *infra*.

304. For example, only a single Fighter from ONE Championship appears among the 165 slots delineating top-ranked MMA Fighters in the *USA Today/MMA Junkie* ratings. *See* http://mmajunkie.com/rankings (accessed April 18, 2017).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

an undefeated record in ONE Championship does not necessarily advance a Fighter's rank, due to a lack of high-quality opponents.[305]

111.   It bears emphasis that both the "Tracked and "Ranked" measures of the Relevant Input Market are quite conservative, given that even the most prominent non-Zuffa promoters are inferior substitutes from the perspective of Fighters. The list of MMA promoters associated with Fighters included in the Ranked measure includes the World Series of Fighting, M-1 Challenge, King of the Cage, and many others; the list of MMA promoters varies substantially over time: As of 2001, there were 83 MMA promoters. By 2009, there were 429. As of 2016, there were 213 MMA promoters associated with Fighters included in the Ranked measure.[306]

112.   Under the "Headliner" measure, the Relevant Input Submarket includes each of the top fifteen Fighters in any of the ten major MMA weight classes tracked in the *USA Today/MMA Junkie* rankings, according to the FightMatrix ranking database.[307] There are no close substitutes for Headliners. As explained in Part I.A, MMA promoters rely on top-ranked Fighters at the Top of the Card to draw audiences and viewers to Live MMA Events; for the same reason, fighting at the Top of the Card is the primary career objective for an MMA Fighter. This objective can be achieved only by defeating other highly-ranked Fighters.[308]

113.   Additional evidence confirms that Zuffa relies heavily on Headliners to fill the Top of the Card: In 129 of the 159 UFC PPV events from 2005 to May 2017, both of the Fighters at the

_____

305.  FightMatrix notes that "Fighters not in the UFC do not always have access to top competition. This can lead to a gradual decline in rankings," for example, "#33 Ben Askren has gone undefeated in One Championship, but his ranking points have fallen from 376, when he signed, all the way down to 169." Richard Mann, "Ranking Points for Highest Ranked Fighter by Promotion" *FightMatrix* (August 3, 2016).

306.  To clarify, not all Fighters affiliated with these promoters are included; only those that are ranked by FightMatrix are in the Relevant Input Market.

307.  The FightMatrix rankings are used instead of the *USA Today/MMA Junkie* rankings because the former are consistently available over time.

308.  Silva Dep. 129:10-21 ("Beating guys with crappy records won't convince anyone [a fighter is] ready for the big leagues."); Margules Dep. at 85:17-86:13 ("Only … if they are ranked in the top 15 will they qualify.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Top of the Card were Headliners. At least one of the Fighters at the Top of the Card was a Headliner in 158 of these 159 events.[309] Similarly, a *Sports Business Journal* analysis cited by UFC personnel concluded that:

> History tells us that for a pay-per-view to do big numbers, it needs marquee names: Chuck Liddell, Brock Lesnar, Rampage Jackson and Georges St-Pierre. Even if you don't know an arm bar from a rear naked choke, you've probably heard of those four, who from 2006 to today carried the highest pay-per-view averages of any main event fighter in MMA. During that span, those four fighters [] accounted for 17 of the 25 highest-selling pay-per-views. They held 11 of the top 14 slots, eight of the top 10, and six of the seven events that have exceeded a million…Exciting fights and a strong UFC brand can drive ratings and sell tickets, but *sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-view*s…"Stars matter when you look at buys, and that's not exclusive to the UFC," said Alex Kaplan, vice president of revenue and product marketing at DirecTV, who is responsible for pay-per-view at the company.[310]

The significance of Headliners to Zuffa is further confirmed by Joe Silva's use of consensus rankings in 2011—showing that UFC Fighters accounted for the majority of the top twenty-five and top ten Fighters in each of seven weight classes—to demonstrate the UFC's dominance to Zuffa management.[311]

114.    The Headliner measure of the Relevant Input Submarket is conservative because it includes Fighters associated with many non-Zuffa promoters. The list of MMA promoters associated with Fighters included in the Relevant Input Submarket includes Affliction, EliteXC, Gladiator Challenge, King of the Cage, Pancreas, and more than 250 others from 2001 to 2016. As of 2001, there were 47 MMA promoters associated with Fighters included in the Relevant Input Submarket. By 2009, there were 44. As of 2016, only six remained: UFC, Bellator, Invicta, M-1 Global, Titan Fighting Championship, and the World Series of Fighting.

---

309.  Over this time period, more than 80 percent of Zuffa's Event Revenue was derived from PPV events.
310.  WME_ZUFFA_00031950-60 (emphasis added).
311.  ZUF-00085896-901 (2011 e-mail from Joe Silva to Dana White, Lorenzo Fertitta, and Sean Shelby, showing that UFC Fighters account for the majority of the top twenty-five and top ten Fighters in each of seven weight classes; subject line reads "We Own MMA").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 2.    The Relevant Output Market

115.    I define the Relevant Output Market as Live MMA Events in which the participating Fighters are in either the Relevant Input Market (however measured) or the Relevant Input Submarket. In the Relevant Output Market, MMA Promoters are the sellers; their customers include viewers, cable networks, broadcast networks, and sponsors. As in other professional sports, the demand for Live MMA Events is ultimately driven by audience preferences. As explained below, record evidence indicates that Live MMA Events are a separate product market, and that audiences do not view other combat sports (such as boxing or professional wrestling) to be reasonably close substitutes. To the contrary—as Zuffa and third parties recognize—Live MMA Events are perceived as a separate category of sports entertainment, just as games produced by Major League Baseball are separate from those produced by the National Football League.[312] Finally, as explained below, Live MMA Events featuring Fighters not within either the Relevant Input Market or the Relevant Input Submarket are not reasonable substitutes for events in the Relevant Output Market, and are therefore excluded from the Relevant Output Market.

116.    Record evidence indicates that the degree of competition between boxing and MMA is limited, with low crossover between audiences.[313] Industry analysts have noted that

---

312. *See* Part III.A.8, *supra* (showing that WME-ING viewed the UFC as a league unto itself prior to acquiring Zuffa, and that Zuffa considers itself a separate league, comparable to MLB, NFL, etc.).

313. ███████████████████████████████████████████████████████████████████████ . *See also* ZFL-2477398: 3/5/2013: "[O]f the HHs that bought the latest Mayweather fight, only 9.4% purchased a UFC event in the UFC 154 – present window.  This indicates a much lower crossover among their subscribers than the latest Crop research shows. Of this group, only 2.3% purchased UFC 160." ZFL-2477398, at 2. *See also* ZFL-2528842: 5/10/2012, Caren Bell to UFC Executives - Analysis of a ratings disaster for a UFC event on FOX ("The show did 34% below what COPS was doing this season in the same time slot. . . . It was the lowest rating for a network TV MMA show in history"). On whether a PPV boxing event (Mayweather/Cotto) that night, or other sporting events, affected UFC's ratings: "The boxing is not an

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

boxing is a "very strategic sport that requires discipline and self-control in fighting style," whereas the coveted 18-to-34 male demographic (the primary MMA audience), are seeking more "knockout" moments and "raw" hand-to-hand combat.[314] Boxing is differentiated from MMA along several dimensions, including predictability[315] and weight-class gradations. For most UFC events, there is no near-term, marquee boxing event to which viewers could substitute, even if they were inclined to do so. Marshall Zelaznik, Zuffa's Chief Content Officer, testified that Zuffa's exclusive venue clauses were intended to "avoid confusion with other mixed martial arts promoters," but that "[w]e didn't believe that there would be confusion around a boxing event or wrestling or judo[.]"[316]

---

excuse, only because Manny Pacquiao fought Juan Manuel Marquez and did 1.41 million buys on PPV the same night as Cain Velasquez vs. Junior Dos Santos became, by far, the most-watched MMA fight ever in U.S. television, with the fight itself doing 9.5 million viewers between FOX and Fox Deportes." ZFL-2528842, at 2. "8% said they skipped it to watch the Mayweather fight." ZFL-2528842, at 3. "5% said they were watching sports other than boxing that night." ZFL-2528842, at 3.

314. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

316.   Deposition of Marshall Zelaznik, February 8, 2017 at 65:17-66:9 ("Q Would you say boxing is comparable to mixed martial arts?...THE WITNESS: In the sense that it's combat, it's similar. In the style of fighting they use, it's not similar. Q...Would you say that there was not a risk of confusion between mixed martial arts and boxing?...THE WITNESS: I think our concern about confusion was related to MMA. We didn't believe that there would be confusion around a boxing event or wrestling or judo[.]"). *See also* Mossholder Deposition (November 30, 2016), at 91:16-24 ("Q. Did Zuffa's ability to negotiate exclusivity language such as this in its contracts change at all over time? A. Standard language changed in the early days. Consumer confusion could include boxing, it could include WWE. As -- as the sport became more mainstream and understood as what the product is, there was less consumer confusion and so that language changed.") *Id.* at 95:13-23 ("A. Consumer confusion, again, as stated earlier; consumer confusion around boxing and WWE was -- in the infancy of the UFC was an issue. And as we have grown in -- in scale and brand awareness, it is less of an issue today. Q. So today Zuffa's not worried about consumer confusion between MMA and boxing or wrestling? A. It's less. We still have concerns, but it is less of a concern than it was, you know, a decade ago."). Mr. Mossholder served as Executive Vice President for Global Marking Partnership for Zuffa beginning in 2011.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

117.    Professional wrestling such as World Wrestling Entertainment ("WWE") differs qualitatively from MMA in that the former consists of staged events with preordained outcomes. Unlike MMA Fighters, professional wrestlers are "trained stunt performers,"[317] with a format that "eschews real competition for scripted plotlines."[318] MMA promoter contracts reflect a lack of competition with professional wrestling. For example, a 2007 agreement between Zuffa and the Endeavor Agency prohibits Endeavor from representing other MMA businesses, but explicitly allows Endeavor to "continue to represent World Wrestling Entertainment."[319] Similarly, a television license deal between WEC and Setanta Australia contains exclusivity language, but the language does not apply to WWE (or to boxing).[320] MMA has also exhibited much faster growth and greater profitability than professional wrestling, indicating that wrestling likely could not lure a sufficient number of MMA viewers/advertisers to defeat a price increase by a hypothetical monopoly provider of Live MMA Events.[321]

118.    Record evidence also indicates that customers view other, non-combat sports as complements to Live MMA Events, rather than economic substitutes. Part of a 2011 agreement between Zuffa and Fox included "intensive cross-promotion between UFC and FOX's

---

317. Andrew Brennan, *Professional Wrestlers Must Realize They Can't Enter The MMA Or The UFC; It's Not A Scripted Fight*, Forbes, Oct. 31, 2016.

318. Chris Smith, *UFC Vs. WWE: How Much More Is Real Fighting Worth?*, Forbes, July 12, 2016.

319. "Endeavor shall not represent any companies which own or control mixed martial arts businesses which directly compete with [Zuffa's promotions, Pride, WEC, and UFC]. By way of example only, businesses which Endeavor could not represent during the term would include K-1 or Elite XC, but Endeavor may continue to represent World Wrestling Entertainment." *See* ZFL-2613931 at 32 (Pride agreement); ZFL-2613939 at 40 (WEC Agreement), ZFL-2613946 at 47 (UFC Agreement).

320. *See* ZFL-2614687 at 88.

321. Chris Smith, *UFC vs. WWE: How Much More Is Real Fighting Worth?*, Forbes, July 12, 2016.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

programming, likely including NFL, NASCAR and MLB broadcasts."[322] Economic complements cannot constrain the pricing of each other, and thus are not part of the same product market.[323]

119.    Finally, Live MMA Events featuring Fighters outside the Relevant Input Market are not reasonable substitutes for Zuffa events. Non-Zuffa MMA promoters are poor substitutes to Zuffa from the perspective of Fighters.[324] The same holds true from the perspective of audiences: As explained in Part III.C.1 (below), non-Zuffa promotions lack access, among other things, to ██████████████████████████,"[325] which makes them inferior substitutes from the perspective of audiences. It bears emphasis that this definition of the Relevant Output Market is conservative, for the same reason that my definition of the Relevant Input Market is conservative: Events promoted by even the most prominent non-Zuffa promoters are distant substitutes for Zuffa.

---

322. DB-ZUFFA-00006389 at 392.
323. *See, e.g.,* Merger Guidelines §4.1.1 (showing that product markets are defined using substitutes, not complements).
324. *See* Parts III.A.1; III.A.8, *supra*.
325. DB-ZUFFA-00006389 at 392.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 3.      The Relevant Geographic Market

120.    According to basic principles of antitrust economics, the Relevant Geographic Market is defined using a SSNIP test directly analogous to that used in product market definition.[326] In the case of geographic markets, the SSNIP test asks whether a hypothetical monopolist within a given geographic region could profitably impose a small but significant and non-transitory increase in price above competitive levels—or, in the case of a monopsonist, a decrease in the price (or wage) below competitive levels.

121.    With respect to the Relevant Output Market, I define the relevant geographic market as encompassing Live MMA Events in the Relevant Output Market broadcast in North America. Viewer substitution outside of the North American market is limited by time-zone differences,[327] as well as by local or regional fan bases, which drive demand for Live MMA Events.[328] Victor Cui, CEO and owner of ONE Championship, an MMA promoter based on Singapore, stated in a 2016 interview that "UFC has got a 90-percent market share in the [United] [S]tates. We've got a 90-percent market share in Asia… [W]e've catered to our audience—the

---

326. *Merger Guidelines* §4.2.
327. ██████████████████████████████████████████████████████████████

See also ZFL-2235745 at 56. According to a survey done by Applied Analysis for Zuffa, out of all attendees at UFC 94, 71.8% were from the United States, and 27.5% were from Canada. The presentation notes that one of the Fighters in the event originated from Canada, which is assumed to have materially impacted the distribution of the origin of respondents. *Id. See also* ZFL-2554757; ZFL-2554758 (comments on an April 2011"cooperation framework" memo between the UFC and Legend FC state that "we should limit them to grow sport in China (that is all they should be focused on in my mind-don't want them branching out beyond that for now)…"). *See also* ZFL-2689504 (When Zuffa negotiated exclusivity provisions with local broadcasters abroad, Zuffa sometimes allowed an exemption for events "held and produced" in the local country. For example, in a 2007 negotiation with NTV-Plus, a Russian broadcaster, Zelaznik noted "I think this should be OK as the intent is to allow them to air Russian based promotions not US/UK based."). This suggests that Zuffa was not concerned about brand confusion between Russian promoters and U.S. promoters.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Asian MMA fans who have been pining for authentic Asian MMA action and on a world-stage[.]"[329] Conversely, Cui stated in another interview that Fighters in the mold of UFC superstar Conor McGregor were not suited to the Asian market.[330]

122.    Starting with a single event in 2011, ONE Championship has grown rapidly in Asia, and is scheduled to host 24 events in 2017.[331] Its website touts its "90% market share in Asia,"[332] "90% of the best world champions and fighters in Asia,"[333] and claims an "avid MMA fan base across top Asian markets" of approximately 563 million.[334] As ONE Chairman Chatri Sityodtong stated in an interview, "[w]e are focused on unearthing the greatest martial arts stars in each country, so every country has a world champion, one of the best martial artists in the world to root for that really links to their own history, heritage and their values...."[335] Sean Shelby, a matchmaker with the UFC, also stated that fight promotions in Asia could have "their own set of

---

329. James Edwards, *ONE Championship and UFC is the story of East and West in the MMA market*, INDEPENDENT, April 19, 2016 ("UFC has got a 90-percent market share in the [United] [S]tates. We've got a 90-percent market share in Asia...[W]e've catered to our audience - the Asian MMA fans who have been pining for authentic Asian MMA action and on a world-stage, to be showcased in front of potentially a billion viewers worldwide." When Cui referenced "the 1 billion viewers, he was speaking in part about the new TV deal they [ONE FC] announced last weekend with the largest TV broadcaster in the Philippines, ABS-CBN.").

330. *Nick Baldwin, CEO Victor Cui explains why Conor McGregor isn't suitable for ONE Championship*, BLOODY ELBOW, May 22, 2017, *available at* http://www.bloodyelbow.com/2017/5/22/15677574/ceo-victor-cui-explains-why-conor-mcgregor-isnt-suitable-for-one-championship-mma-ufc-news ("A big part of what drives the spirit of ONE Championship is really just the belief that martial arts makes the world a better place. Of course want it to be successful business, of course we want to continue to grow in a successful business enterprise. That philosophy of we're making the world a better place permeates throughout the entire organization. I think it's something our fans really appreciate in Asia."). According to ONE Championship chairman Chatri Sityodtong, McGregor's demeanor could be problematic for an Asian promoter. *Id*. ("Let's say we had a press conference in China and he [McGregor] threw a water bottle, I would go to jail. They'd put me in jail. I'm not kidding around.").

331. *See* Tony Mogan, *ONE Championship: Asia's MMA powerhouse plays up its differences to UFC in battle for supremacy*, INTERNATIONAL BUSINESS TIMES, Jan. 21, 2017 ("UFC's 4bn takeover symbolised the huge rise in MMA in 2016 but that growth has not spread to the East. In 2014, they held five events in the continent. In 2015 it shrunk to three. In 2016, it was just one. None are on the horizon for 2017. ONE, meanwhile hosted a single event in 2011 while in 2017 it will be 24.").

332. *See* https://onefc.com/about-one/.

333. *Id.*

334. *Id.*

335. *See* Mogan, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-84-

stars."[336] Similarly, Joe Silva testified that foreign Fighters must compete in the United States before they can achieve stardom here, and that there exist different fan bases in different geographies, with differentiated preferences.[337]

123.    A hypothetical monopolist imposing a SSNIP on Live MMA Events in the Relevant Output Market broadcast within North America would not be constrained by viewer substitution to Live MMA Events broadcast outside of North America. For example, although the price of a UFC PPV event broadcast in North America is in the range of $50 or more, ONE Championship has sold online access to its own PPV events in North America for $9.99, beginning at least as early as 2013,[338] and continuing into 2017.[339] That Zuffa can charge North American customers at least five times as much as One Championship indicates that the Relevant Geographic Market for Live MMA Events is not global.[340] ONE Championship has made only limited inroads outside Asia; it

---

336. Deposition of Sean Shelby, April 12, 2017, at 195:9-196:19. ("Q: In what way [is Pancrase different from promotions like RFA]? A: I would say it's a bit different in that, you know, it's a fight promotion based out of Japan rather than something out of, you know, this part of the world, North America. Q: So the difference between Pancrase and RFA is geographic? . . . . THE WITNESS: Yeah, no, I didn't – it would be a little bit different, because they could have their own set of stars over there that drive it, and so they might have a fighter that's worth something to them. I don't know, but in that area. And so again, when we talked about earlier, stars come in all different shapes and sizes, and over there they might have somebody that's a star to them. So it's a little bit different thing.").

337. Deposition of Joseph Silva at 52:12-20 ("Q. So in your opinion, American fans are all things equal more interested in fighters that are known to Americans?...THE WITNESS: I think that's wherever you're at. I think in Japan they're more interested in the fighters in Japan. You're interested in who you're familiar with until you become familiar with them."). See also Silva Dep. at 42:7-13 ("A. ...if you only fought in Japan, you were not a big name to anybody in the United States"); id. at 294:4-8 ("Q. I see. And success, say, in China or the Philippines wouldn't translate to U.S.; is that right? A. Correct or Korea or anywhere else it's all very specific. Q. So the business and the industry is very culture or country specific in your opinion? A. Yeah, it can be.").

338. Riley Kontek, 4 Reasons MMA Fans Should Pay Attention to One FC, BLEACHER REPORT, May 30, 2013 ("With UFC pay-per-views hovering around the $50 range, wouldn't it be nice to get a high-quality pay-per-view streaming live for something more affordable to the average Joe? Well, One FC will be running its pay-per-view this weekend for $9.99 from their website.").

339. See https://onefc.com/livestream/ ("Catch all the events live with ONE Championship's official livestream. Purchase the HD livestream now at only US$9.99 (service charges apply). Replays are available up till 14 days after the conclusion of the live event. ONE: KINGS OF DESTINY livestream starts at 8.30PM, Manila time [8:30AM EDT] (Main card)." (accessed April 19, 2017)).

340. ████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

accounts for just one out of 165 top-ranked MMA listings in the *USA Today/MMA Junkie* ratings.[341]

124.   With respect to the Relevant Input Market and Submarket, I define the relevant geographic market as North America. As explained above, although ONE Championship is outside of the Relevant Geographic Market, I conservatively include it in the Ranked measure of the Relevant Input Market.

125.   For the Relevant Input Market, the boundaries of the Relevant Geographic Market turn on the extent to which MMA Fighters would substitute towards MMA promoters in different geographies in the event of a small but significant and non-transitory decrease in Fighter compensation below competitive levels. A ████████████████████████████████████

██████████████████████████████████████████████████ ██████████████

████████████████████████████████████████████ ███ ███████████████

█████████████████████████████████████████████████████████████████

███ ██ ████████████████████████████████████████████████████████████

██████████████████████████████████

126.   The document states explicitly that the only exception is ONE Championship, which Zuffa identifies as the "only [international] league we consider a 'competitor' from that

---

██████████████████████████████████████████████████████████████████

341. *See* http://mmajunkie.com/rankings (accessed April 18, 2017).
342. ZFL-0885147-49 (In 2014, Zuffa drafted a document summarizing all of the "International MMA Leagues…we keep an eye out to scout for talent." The document notes that "[w]e consider the leagues listed below as the aggregators of talent in the country/region. There are smaller leagues below them, but any good talent ends up in the ones outlined below. Most of the leagues listed below have "UFC out" in their fighter contracts, meaning if UFC wants to sign any of their fighters, the fighter can break his or her existing contract without any penalties. The only league we consider a 'competitor' from that stand point (e.g. actively competing for talent with UFC in the region, and not allowing fighters to freely jump to UFC if offered a contract from us) is One FC in Asia.").
343. *Id.*
344. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

stand point (e.g. actively competing for talent with UFC in the region, and not allowing Fighters to freely jump to UFC if offered a contract from us)."[345] ONE Championship has "occasionally serv[ed] as a player for high-value free agents like former Bellator champion Ben Askren."[346] Yet Askren has seen his ranking slip, despite an undefeated record at ONE Championship, due to a lack of high-quality opponents.[347]

127.    ONE Championship also offered itself as a "feeder organization to UFC," indicating that ONE Championship did not see itself as a direct competitor to Zuffa.[348] Furthermore, a Zuffa Executive Vice President and managing Director of UFC in Asia was quoted in May 2013 as saying that he did not view ONE Championship as a competitor, but instead as a minor league helping to increase interest in the sport.[349] Thus, the extent to which Fighters perceive ONE Championship to be a competitive alternative purchaser of Fighter services is dubious. Nevertheless, although ONE Championship is outside of the Relevant Geographic

---

345.  *Id.*

346.  Shaun Al-Shatti, *ONE Championship's Victor Cui: 'We've gotten a lot of interest' since UFC-Reebok deal*, MMA FIGHTING, May 21, 2015.

347.  Richard Mann, *Ranking Points for Highest Ranked Fighter by Promotion,* FIGHTMATRIX. Aug. 3, 2016. *See also* Shaun Al-Shatti, *Where in the world has Ben Askren been? Well, it's complicated...* MMA FIGHTING (April 28, 2017) ("When Ben Askren signed with ONE Championship in late 2013, he was widely considered to be one of the most talented welterweight fighters in the world. He quickly did what many observers expected him to do, too, blitzing through back-to-back opponents to capture the ONE welterweight title with ease by mid-2014. But these days, nearly three years after he became ONE's welterweight king, Askren still has yet to defend his belt in any official capacity, and not for a lack of trying.").

348.  In 2011, Victor Cui of One League wrote that "I believe that ONE FC is well positioned to be a feeder organization to UFC and if you have an interest in any of our fighters, I would be more than willing to offer them to UFC and to support you in as many ways possible." *See* ZFL-1501599. Also, when Sean Shelby was trying to organize a UFC fight in Singapore in 2013, he wrote that although "it's not normally possible" to get One FC Fighters released from their contract he would "see if I can pull [Leandro] Issa out from his one FC fight" to fight for Zuffa in Singapore. ZFL-1886668; ZFl-1897060 at 158.

349.  Zuffa's Response to Plaintiffs' Request for Admission No. 256, 263. In addition, when Mark Fischer at UFC Asia noted in August 2012 that One FC "reportedly …[has] 'teams' of people running around Asia trying to lock up fighters to 3-year or 5-year contracts, to corner the market vs all comers (including us)" that revelation appeared to cause little concern among Zuffa executives. *See* ZFL-2552141 at 41-42 ("Anyway, if you guys don't see a problem with all this, then neither do I.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Market, as noted above, I conservatively include ONE Championship in my Ranked measure (the broadest measure of the Relevant Input Market).

### 4.    Zuffa's Dominant Share in The Relevant Input Market and Submarket

128.    To calculate Zuffa Fighters' share of the Relevant Input Market and Submarket (or Zuffa's share as a buyer), I divided the number of Zuffa's MMA Fighters by the total number of MMA Fighters in the Relevant Input Market and Submarket. Fighters in the Relevant Input Market were weighted by their associated promoters' PPV and gate revenues per Fighter, to reflect differences in the average quality of Fighters across different MMA promoters.[350] Using unweighted Fighter counts makes little economic sense, given that Fighters (even within the defined Relevant Input Market and Submarket) are not homogeneous, and instead vary in their ability to attract viewers—and hence their value to an MMA promoter. For the Relevant Input Submarket, I also calculate an alternative metric in which Fighters are ranked by the inverse of their rank according to FightMatrix.

129.    

---

350.  This approach is conservative because revenue data are available only for (relatively) large non-Zuffa MMA promotions such as Bellator and Strikeforce, so that Fighters from smaller promotions (which lack such data) receive the same weight as if they were affiliated with a larger promotion. Using public sources, I constructed a database of PPV revenue and gate revenue by promoter. Zuffa Fighters were weighted by the average revenue per Zuffa Fighter. Non-Zuffa Fighters were weighted by the average revenue per Fighter for non-Zuffa promoters. In the case of ONE Championship, I conservatively assigned Fighters a weight equal to 25 percent of Zuffa Fighters' weight, in light of evidence that ONE's valuation was reportedly "approaching" a valuation of $1B at approximately the same point in time that Zuffa sold for $4B. *See* Appendix 2 for details. *See also* James Goyder, *ONE Championship receives multimillion dollar investment from Singapore fund*, MMA MANIA, July 14, 2016 ("[T]he company is on course for a billion-dollar valuation…The UFC was sold for $4 billion to a group led by WME-IMG and ONE Championship is on course for an IPO in the next 12 to 18 months.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



351.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 5.   Zuffa's Dominant Share in The Relevant Output Market

130.   Zuffa's market share in the Relevant Output Market is the ratio of Zuffa's total revenue in the Relevant Output Market to the total revenues of all (Zuffa and non-Zuffa) MMA promoters in the Relevant Output Market. Although revenue data are not available for all non-Zuffa promoters in the Relevant Output Market, the available estimates of Zuffa's market share from industry analysts and press reports consistently indicate that Zuffa's market share has been approximately 90 percent by revenue since at least 2008.[352]

131.   ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ ██

████████████████████████████████████████████████

---

352. James Edwards, *ONE Championship and UFC is the story of East and West in the MMA market*, INDEPENDENT, April 19, 2016 ("UFC has got a 90-percent market share in the [United] [S]tates. We've got a 90-percent market share in Asia…."). *See also* ZFL-1241786 at 789 (July 2012 presentation by Brazilian Bank BTG Pactual estimating UFC has "more than 90% market share" and Elite XC, HD Net, Dream, Yamma, and StrikeForce account for 10%); ZUF-00401766-779 at 768 (April 2010 presentation by KO Associates asserts UFC: 90% market share by revenue"); ZUF-00421380-97 (August 2009 Strikeforce business plan cites Forbes Magazine for estimate that UFC "account[s] for 85-90% of industry revenues"); Matthew Miller, *Ultimate Cash Machine*, FORBES, April 17, 2008, *available at* https://www.forbes.com/forbes/2008/0505/080.html ("UFC is estimated to control 90% of the mixed martial arts industry."). *See also* ZUF-00157199 (internal UFC email from Randy Klein to Kirk Hendrick (January 7, 2009), citing market share estimate of 90 percent). *See also* ZIF-00401766-779 ("Mixed Martial Arts: UFC vs. Strikeforce" by KO Associates (April 28, 2010)) at 798 (showing market share estimate of 90 percent).

353. These figures are conservative because they are limited to Zuffa's event revenue for events in North America, and exclude all non-event-specific sponsorship revenue, which Zuffa does not disaggregate by geographic region. At the same time, the data reflect all revenue recorded for Strikeforce and Bellator, regardless of source.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



### 6.    Natural Barriers to Entry

132.    Natural barriers to entry are those that would-be entrants seeking to compete with Zuffa would face even in the absence of the Challenged Conduct. These include the "[s]ignificant fixed costs" that "are required to create content…."[355] These also would include costs associated with "proper infrastructure, substantial content to market upcoming fights, effective television distribution…and adequate resources to satisfy the costs of a UFC-level production."[356] In

---

354. *See* John Nash, *Why do boxers make more than MMA fighters?*, Bloody Elbow, Aug. 23, 2016.
355. DB-ZUFFA-00006389 at 96.
356.

addition, increasingly widespread regulation in the industry "acts as a barrier to entry for smaller MMA organizations as state-sanctioning rules mandate proper insurance and medical coverage for fighters, which can be prohibitively expensive[.]"[357]

### 7.    Artificial Barriers to Entry

133.    Artificial barriers to entry are those that for would-be entrants seeking to compete with Zuffa incur as a result of the Challenged Conduct As explained in Part III.C.1 below, the Challenged Conduct has denied rivals access to the Fighters necessary to compete effectively with the UFC. Accordingly, the Challenged Conduct is an artificial barrier to entry and expansion.

### 8.    Market Participants and Observers Viewed Zuffa As Dominant

134.    Zuffa's dominant position in the MMA industry is widely recognized by Zuffa and by third parties. A set of prepared Zuffa talking points tout "[u]nrivaled 360 degree ownership in the sports world. . . . No other organization of scale exists with similar ownership structure and control of content, brand, events and production[.]"[358] Zuffa considers Bellator (the largest non-Zuffa MMA promoter since Zuffa's 2011 acquisition of Strikeforce), to be only a "distant"[359] competitor, with "fighters that could no longer compete at the UFC level."[360] Joe Silva testified that the UFC did not view Bellator or its Fighters as on the same level as the UFC.[361] Zuffa also

---

████████████████████████████████

████████████████████████████████

358. ZFL-2529699, at 1 (6/28, 2015 talking points for Apollo include: "Unrivaled 360 degree ownership in the sports world. . . . No other organization of scale exists with similar ownership structure and control of content, brand, events and production; with full decision making authority and flexibility.").

359. In Moody's 2014 draft credit opinion, describing Bellator as "a competitor of UFC," UFC CFO John Mulkey inserted "distant": "a [distant] competitor of UFC." ZFL-1081154 at 55.

360. ████████████████████████████████

361. Silva testified that "if you gave [former two-time Bellator Lightweight Champion Eddie] Alvarez the shot and [UFC Lightweight Champion Benson] Henderson slipped on a banana peel and lost you will have given Bellator

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

regularly dismissed the significance of other MMA promoters generally.[362] Similarly, a 2012 Deutsche Bank Report dismissed the competitive significance of other MMA promoters generally and Bellator in particular:

> In recent years in MMA, promotions that have tried to position themselves as the UFC's primary competitor, such as Bellator, have always failed. Bellator's most recent event at UC Irvine's Bren Center attracted only 4,000 people…None of the Bellator fighters are household names.[363]

135.    Other promoters disavow any attempt to compete directly with Zuffa. In an investor prospectus dated September 2, 2016, Alliance MMA (formed through acquisitions of regional promoters) states that "[u]nder the Alliance MMA umbrella, we expect that our regional MMA promotions will identify and cultivate the next generation of UFC and other premier MMA promotion champions…."[364] The Alliance prospectus clarifies its status as a "developmental organization" that explicitly avoids even the appearance of direct competition with a "premier national promotion," (namely, the UFC):

> [I]t is our intention to serve as a developmental organization for the UFC and other premier national MMA promotions in the same fashion as college athletic programs serve as "feeders" to professional sports leagues] … [s]hould the UFC or another premier national MMA promotion view us as a threat they could use their significantly greater resources to frustrate our business and growth strategy and materially and adversely affect our business.[365]

---

the greatest Christmas present of all: Bellator's champ would jump from number ten to number one. Even just giving their former champion an immediate title shot puts Bellator on a level they don't deserve." Silva Dep. at 216:21-217:5; Silva Exh. 16. He further explained that would "benefit Bellator" because "every promotion wants to be able to claim to be number one, to claim that you have the best fighters. That gives some teeth to that claim." *Id.* at 220:8-12.

362.  In an interview with FanHouse in December 2009, Dana White said "Let me ask you a question … Do you think that there's any guy we can't get that we want? Other than Fedor [Emelianenko]?...But everyone else that we've wanted, we got." ZFL-2461790 at 90. Feb. 12, 2011 email from Joe Silva to Dana White, subject line, "We Own MMA", lists the MMA rankings from USA Today/SB Nation Consensus Rankings, which presents the top 25 Fighters in MMA for the seven major weight classes, and lists the ratio of top Fighters in each weight class controlled by Zuffa. ZUF-00085896. ZFL-2559292, 2010, Dana White news article quote noting that "other promotions…are not deep enough. There are not enough good fighters over there for them to challenge. There is here [the UFC], that's what makes it fun and interesting."

363.  DB-ZUFFA-00006389 at 439.

364.  http://www.nasdaq.com/markets/ipos/filing.ashx?filingid=11067618#V448288_424B1_HTM_A_003

365.  *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

136.   Even in the instances in which Fighters lack an explicit Zuffa-out clause, Zuffa has been able to recruit champions or other high-value Fighters from other MMA promotions. In March 2008, upon the request of Zuffa's Assistant General Counsel, Michael Mersch, Felix Martinez, the founder of Cage Fury Fighting Championship ("CFFC") consented to allowing Jim Miller to fight for the UFC and assigning his contract to the UFC even though Miller's contract prohibited him from fighting in any other promotion, unless approved by Martinez.[366] ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

366.  *See* ZFL-2188190 ("I do not give Jim Miller permission to fight in the International Fight League (IFL), but I do consent in letting him fight for the Ultimate Fighting Championships (UFC).").

367. ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

368.  *Two-division WSOF champ David Branch relinquishes titles, heads to free agency*, MMA JUNKIE, Feb. 6, 2017; *see also* Steve Juon, *Former WSOF dual-weight champion David Branch re-signs with UFC*, MMA MANIA, Feb. 15, 2017.

369.  Steve Juon, Justin Gaethje tests free agency, but WSOF still holds matching rights, MMA MANIA, Mar. 30, 2017; *see also* John Morgan, Justin Gaethje on new UFC deal: "Now I get a chance to prove I'm the best in the world." MMA JUNKIE, May 5, 2017; Mersch V.I Tr. 93:1-6 (stating that Justin Gaethje, who was a World Series of Fighting Champion in his weight class, left the World Series of Fighting for the UFC).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



137.

370. Fighters that can no longer compete in (or are simply "cut" from) the UFC often end up in other "minor league" promotions. For example, Jeff Aronson of Titan FC explained that "No one is going to take on Zuffa and win at this point. It's just not going to happen, and I have no aspirations to do that. I am very happy to do that carving my place and my niche giving young fighters the best platform in the word to shine on, and giving vets the opportunity to come and shine." *See also* Aronson Dep. at 31:10-32:4; ZFL-1112933 at 33 ("Bellator has old ex UFC fighters that are way past their prime."); Ethan Finkelstein, *WSOF New PPV Model to Award 50 Percent to Fighters*, Fansided, Sept. 23, 2014 ("Considering that World Series of Fighting's biggest names are currently former UFC contenders (notice how I did not say champions), the situation looks bleak for now.").
371. WME-ZUFFA-00001150 at *7.
372. *Id.*
373. *Id.*
374. *Id.*
375. *Id.*



In a June 2010 interview with *MMA Junkie*, Dana White remarks:

> There was a time when it was neck-and-neck. That time is over. There were times when we
> were in dogfights, but everybody needs to just concede and realize we're the [expletive]
> NFL. Period. End of story.[376]

In a May 2010 email string, Edward Muncey puts together bullet points "that reinforce[] why

*Yahoo! Sports* recognizes the UFC brand as the eminent entity in the sport of MMA." The first

major point read:

> Like the other major sports properties (e.g. NFL, MLB, NBA, NHL) in their respective
> categories, the UFC has no close 2nd place. As the NFL is the defining brand of Football,
> UFC is the defining brand of mixed martial arts.[377]

---

376.  John Morgan, *Dana White stands by 'pay for rankings' claim, says UFC is the NFL of MMA*, MMA JUNKIE,
June 14, 2010, *available at* http://mmajunkie.com/2010/06/dana-white-stands-by-pay-for-rankings-claim-says-ufc-is-
the-nfl-of-mixed-martial-arts.
377.  *See* ZUF-00395941.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

138.    In an interview with ESPN's "Outside the Lines" released by Zuffa on January 16, 2012, Lorenzo Fertitta stated "[t]here never has been a comparable outlet [to the UFC]. There never has been. When has there ever been a comparable outlet? We've dominated this, this sport, alright? We've dominated the space[.]"[378] Similarly, in March 2014, at The Leaders Sport Summit in London, England, Lorenzo Fertitta stated that

> [A]t the end of the day, we really have kind of become the gold standard in a sense. When you look at the top 10 in every division, we've got every fighter under our umbrella. All the fighters want to be with us because they want to fight the best competition. So from that standpoint, I think there is really—the competition isn't really relevant in that sense[.][379]

Third-party evaluators have also emphasized Zuffa's market dominance, and the profitability that comes with it. A 2009 Deutsche Bank report notes that "UFC holds the dominant market position within the sport and continues to do so even as a highly fragmented group of competitors have entered the market in an attempt to emulate UFC's success."[380] A 2012 Deutsche Bank report states that the 2007 PRIDE acquisition "solidified UFC's #1 position in the MMA market,"[381]

---

378.  Zuffa's Response to Plaintiffs' Request for Admission No. 17.
379.  Zuffa's Response to Plaintiffs' Request for Admission No. 32.
380.  ZUF-000162329-382 (October 2009 Deutsche Bank Report, "$100,000,000 Incremental Term Loan": 356 ("…the UFC holds the dominant market position within the sport and continues to do so even as a highly fragmented group of competitors have entered the market in an attempt to emulate UFC's success").
381.  A 2012 Deutsche Bank Credit Finance Report notes, "The UFC acquired PRIDE Fighting Championships in mid 2007, which was its number one competitor and formerly the second largest MMA association in the world, having a very strong presence in Japan. This acquisition solidified UFC's #1 position in the MMA market[.] The Company subsequently acquired World Extreme Cagefighting in October 2006, which it merged with the UFC in October 2010, and also purchased Strikeforce in March 2011[.] These acquisitions have further cemented the Company's dominant position in MMA, and along with the UFC's powerful brand name and full ownership[.]" DB-ZUFFA-00006389 at 98. The same report notes that "MMA in the United States is dominated by UFC. While there is no indication UFC's dominance will wane anytime soon, there are some who follow the industry that suggest that there may be some risks. The primary risk being the possibility of UFC fighters defecting to other promotion companies over pay disputes. The possibility of this occurring is remote as UFC has no match in the industry relative to overall management capabilities, promotion and public relations savvy. Furthermore, with the merger between sister promotion World Elite Cagefighting ("WEC") and UFC, as well as the acquisition of Strikeforce, the Company has virtually no competition left. Therefore it is strongly believed that UFC will maintain its domineering position for the foreseeable future." *Id.* at 6403. "Furthermore, with the acquisition of PRIDE Fighting Championships and its absorption into UFC, the acquisition of World Elite Cagefighting and its subsequent merger with UFC, as well as the purchase of rival promotion Strikeforce, the Company has established itself as the outright leader in the MMA market." *Id.* at 6439.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

while subsequent acquisitions "further cemented the Company's dominant position in MMA, and along with the UFC's powerful brand name[.]" [382] A 2010 announcement by Moody's upgrading Zuffa's rating outlook emphasized

> Zuffa's continued strong revenue and EBITDA growth trends worldwide…the increasing mainstream acceptance of the sport of mixed martial arts' (MMA) popularity and particularly so for industry leading UFC…[Zuffa's] premium MMA platform and UFC brand, sturdy credit metrics, strong free cash flow and superlative international revenue growth prospects.[383]

Such optimism implicitly discounts the prospect of some potential rival MMA promoter on the horizon.

139.



,,[386]

---

382. DB-ZUFFA-00006389 at 98.
383. Moody's Investors Service, "Announcement: Moody's Changed Zuffa LLC's (d/b/a Ultimate Fighting Championship or UFC) Rating Outlook to Positive from Stable," (December 1, 2010), *available at* https://www.moodys.com/research/Moodys-Changed-Zuffa-LLCs-dba-Ultimate-Fighting-Championship-or-UFC--PR_210184.
384.
385. *Id.* at 6439.
386. *Id. See also* ZFL-1544038 at 84 (December 2012 Information Memorandum prepared by The Raine Group and Itau BBA to market an equity investment in Zuffa Brazil, stating that UFC has a "Unique and Difficult to Replicate Business Model…no competitors on a domestic or global basis.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

140.    In summary, the combination of dominant market shares and barriers to entry allows me to conclude that Zuffa has significant monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market and Submarket.

### 9.    All Indirect Evidence and Analysis of Zuffa's Market Power Is Common to the Classes

141.    All of the indirect evidence of Zuffa's market power, and my analysis of it, is common to the Classes as a whole. If I were asked to analyze indirect evidence of market power for any single member of either Class, the evidence and analysis would be the same.

### B.    Direct Evidence of Zuffa's Market Power

142.    The direct evidence reviewed here demonstrates that Zuffa has monopoly power over Live MMA Events and monopsony power with respect to its Fighters. Direct evidence of monopsony power includes evidence of Zuffa's ability to profitably suppress Fighter compensation, and to restrict the supply of Fighter services. Direct evidence of Zuffa's monopoly power includes evidence of Zuffa's ability to profitably exercise its pricing power over Live MMA Events, and to restrict the supply of Live MMA Events. Finally, there is direct evidence of Zuffa's ability to exclude or impair rivals or potential rivals.

### 1.    Direct Evidence of Power to Suppress Fighter Compensation Below Competitive Levels

143.    The ability to suppress compensation below competitive levels constitutes direct evidence of Zuffa's substantial market power, and in particular, monopsony power. In Part III.D below, I use regression analysis to show that there is a negative relationship between Fighter compensation (measured as a share of event revenues) and the extent to which Zuffa's long-term exclusive contracts foreclosed its Fighters from rivals (a measure of Zuffa's market power). This analysis shows that, as the share of Fighters (key inputs to an MMA promotion) foreclosed by Zuffa increases, Zuffa is able to pay its Fighters a lower share of its event revenues. The result is

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

highly significant in both a statistical and an economic sense, and the result holds after controlling for a wide range of factors that may also influence Fighter compensation. Nothing in the record indicates that Zuffa suffered significant Fighter defections as a result of reducing the share of revenue paid to Fighters, suggesting that its exercise of monopsony power was profitable.

144.    Additional direct evidence of suppressed Fighter compensation includes: (1) evidence that Zuffa has reduced the share of revenue paid to Fighters over time; (2) evidence that Zuffa pays a significantly lower share of its revenues than Strikeforce (before the acquisition) or Bellator; and (3) a natural experiment in which Zuffa unilaterally restricted Fighter compensation by imposing a new sponsorship tax.[387] Again, nothing in the record indicates that Zuffa suffered significant Fighter defections, suggesting that these exercises of monopsony power were profitable.

### 2.    Direct Evidence of Power to Restrict the Supply of Fighter Services.

145.    The ability to restrict the supply of Fighter services below competitive levels constitutes additional direct evidence of monopsony power. Zuffa restricted the supply of Fighter services by consistently maintaining significantly more Fighters under contract than it could use, creating forced periods of inactivity during which Fighters were not paid and were not available to other MMA promoters to fight. In addition, Zuffa pursued a strategy of restricting the number of career paths available to Fighters.[388]

146.    If Zuffa lacked monopsony power, the excess Fighters on Zuffa's roster could have earned income from other promoters, rather than being bound to Zuffa during periods of forced inactivity (during which they did not get paid). Similarly, in the absence of monopsony power,

---

387.  *See* Part III.D.3, *infra.*
388.  *See* Part III.D.4, *infra.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Zuffa could not have restricted Fighter career paths, because Fighters would have defected to other MMA promoters.

### 3.   Direct Evidence of Power Over Pricing of Live MMA Events

147.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.[389]

### 4.   Direct Evidence of Power to Restrict the Supply of Live MMA Events

148.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ ██████████████████████████████████

████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

---

389.  *See* Part III.D.5, *infra*.
390.  *See* Figure 1, *supra*; Parts III.D.5-6, *infra*.
391.  Bellator put on a single PPV event in 2014. *See* https://www.bloodyelbow.com/2017/6/25/15870964/spike-executive-bellator-nyc-the-first-of-many-ppv-events-running-mma-news (stating that Bellator's debut PPV event was in 2014; Bellator hosted its second-ever PPV event in June 2017). In contrast, Zuffa put on 12 PPV events in 2014.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-101-

████████████████████████████████████████████████████

████████████████   ██   ███████████████████████████

████████████████████████████

### 4.     Direct Evidence of Power to Exclude Rivals

149.     Access to a broad stable of high-quality MMA Fighters is essential to stage successful MMA events in the Relevant Output Market. The Challenged Conduct blocked Zuffa's would-be rivals from access to this critical input, and also impaired rivals in other ways. In this way, the Challenged Conduct guaranteed that would-be rivals would not pose a significant competitive threat to Zuffa.[393] Some of these would-be rivals have been acquired by Zuffa, others have gone out of business, and others have been relegated to feeder leagues.[394] Both Zuffa and third parties recognize that the Challenged Conduct has been so successful in excluding rivals that Zuffa has no close competitors remaining in the market today.[395] The revenues and market shares of other MMA promoters are trivial in comparison to those of Zuffa.[396]

150.     In summary, the direct evidence reviewed above allows me to conclude that Zuffa possesses and has exercised monopoly and monopsony power.

### 5.     All Direct Evidence and Analysis of Zuffa's Market Power Is Common to the Classes

151.     All of the direct evidence of Zuffa's market power, and my analysis of it, is common to the Classes as a whole. If I were asked to analyze direct evidence of market power for any single member of either Class, the evidence and analysis would be the same.

---

392.  *See* Part III.D.6, *infra*.
393.  *See* Part III.C.1, *infra*.
394.  *See* Parts II.A.1; III.A.1; III.A.8, *supra*.
395.  *See* Parts III.A.1; III.A.4-5; III.A.8, *supra*.
396.  *See* Parts III.A.4-5, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

## C.    The Challenged Conduct Substantially Foreclosed Competition

152.    Given that Zuffa has substantial market power, the next question to consider is whether the Challenged Conduct allowed Zuffa to exercise its market power to significantly foreclose competition. I analyze four factors that inform this question. *First*, the conduct at issue must totally or partially prevent competitors from accessing critical inputs, thereby preventing rivals from competing effectively.[397] As explained below, in order to stage successful Live MMA Events in the Relevant Output Market, access to a broad stable of high-quality MMA Fighters is essential. But the Challenged Conduct ensured that Zuffa's would-be rivals lacked access to this critical input, and also impaired rivals in other ways. Thus, the Challenged Conduct guaranteed that would-be rivals would not pose a significant competitive threat to Zuffa (as Zuffa and third parties consistently recognized in internal documents and analyses).

153.    *Second*, if the resulting foreclosure represents a substantial share of the relevant markets at issue, that would be a further indication that such foreclosure would have adverse competitive effects. As explained below, the shares of the Relevant Input Market and the Relevant Input Submarket foreclosed by the Challenged Conduct are well in excess of the 20-30 percent thresholds that antitrust scholars have found are sufficient "to infer anticompetitive effects."[398]

154.    *Third*, I understand that some courts have considered whether the duration of the contracts at issue is sufficient to "prevent meaningful competition by rivals."[399] That is so here, given Zuffa's ability to make its exclusionary terms in most of its Fighter contracts effectively perpetual, given the ratio of the duration of the agreements to the average Fighter's MMA career,

---

397. *See, e.g.,* Salop, *supra*, at 376; *see also* Elhauge at 321-322.
398. *See* HERBERT HOVENKAMP, XI ANTITRUST LAW ¶1821, at 152, 160, 164-65 (1998). *See also* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory,* 123 HARV. L. REV. 469 (2009) ("it makes sense (when effects are not directly proven) to require the same 20-30% foreclosure share threshold that is required to infer anticompetitive effects from exclusive dealing").
399. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (3d Cir. 2012) [hereafter "*ZF Meritor v. Eaton*"].

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

and given that Zuffa's contract expirations were staggered, further ensuring that other MMA promoters could never have access to a critical mass of top-level Fighters at any given time sufficient to compete effectively with Zuffa.

155.   *Fourth*, I understand that courts may also consider evidence that the dominant firm engaged in coercive behavior, and (relatedly) evidence on the ability of customers to terminate the contracts.[400] These conditions are also satisfied, given (1) Zuffa's ability to exploit provisions in Fighter contracts to retain virtually any Fighter it desired; and (2) the fact that Zuffa's Fighter contracts contain one-way ratchets, giving Zuffa unilateral authority to bind Fighters to exclusive terms or to cut them.

### 1.   The Challenged Conduct Blocked Rivals from Access to Key Inputs Necessary for a Successful MMA Promotion

156.   As explained in Parts I.A and III.A.1, MMA promoters rely on Headliners at the Top of the Card to draw audiences and viewers to Live MMA Events. Of course, access to a single Headliner would be insufficient for even a single bout; MMA promoters need access to competitive pairings of Fighters. (In economic terms, Fighters are perfect complements in the MMA bout production function.) Nor would access to a single pair of Headliners be sufficient: To produce a stream of successful Live MMA Events over time, multiple pairings of Headliners are obviously necessary. Further, not all Headliners can be matched against each other. For example, a heavyweight Fighter cannot be matched against a lightweight.[401] Even two Headliners of the same

---

400.   *Id.*

401.   *See* Unified Rules and Other Important Regulations of Mixed Martial Arts at § 2, available at http://www.ufc.com/discover/sport/rules-and-regulations#2 ("In non-championship fights, there shall be allowed a 1 pound weigh allowance. In championship fights, the participants must weigh no more than that permitted for the relevant weight division."); Deposition of Joseph Silva at 130:18-25 ("I have to convince athletic commissions that this guy is reasonable. Especially at the heavyweight division, I have less guys, so … for him to come in, I have less of a choice who to match him up against…"). *See, also* Hendrick 30(b)(6) V.I Tr. at 217:17-218:10 (stating that Zuffa could not offer a strawweight a heavyweight fight because it is "not offering a legitimate fight").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

weight class may be a poor match if there is too much disparity in their relative rankings, or if they have fought each other too recently.[402] As one review of the existing literature observes,

> Superstars in the UFC don't always draw high numbers; they need a competitive opponent in order to garner the desired high buy rates. Anderson Silva, one of the UFC's more popular champions, drew only 300,000 buys in a squash match against Patrick Cote, but drew 725,000 buys facing a much more threatening Vitor Belfort.[403]

157.    Moreover, because Fighters become Headliners by defeating other Headliners, access to a stable of Headliners allows a promotion to create new Headliners. More generally, the list of Headliners is fluid over time, with Fighters' relative rankings shifting constantly with the outcome of bouts, Fighter inactivity, injuries, retirement, and so on.[404] Therefore, access to a sufficiently broad pool of top-level Fighters (who have the potential to become Headliners) is also important to create and sustain a profitable MMA promotion capable of competing with the UFC.

158.    ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

---

402. *See, e.g.*, Silva Dep. 95:18-24 ("Q. [H]ow would you describe or define the term 'contender'? A. That if you have rankings as we have for some while now, it's whoever the higher ranked fighters are who have not recently fought the person who is already champion, would be the highest available contenders."); *id.* at 94:25-95:13 ("Q. Now, is it fair to say that if you have a top-ranked fighter on your roster, you want to try to have that top-ranked fighter fight someone who is at least close to that fighter in rank? A. Yes, ideally. Q. And one of the reasons for that is to create a competitive match-up; is that right? A. Yes. Also to help create more consensus contenders. When people go, well, who should fight for the title next, well, if you go, these two high-ranked guys fought each other, and this was the victor, it would make sense for him to… get a title shot soon.").
403. McGowan & Mahon, *supra*, at 1036.
404. For example, the FightMatrix and USA Today/MMA Junkie rankings are generally updated weekly or biweekly.  *See*  http://mmajunkie.com/category/mma-rankings  (generally showing biweekly updates); *see also* http://www.fightmatrix.com/faq/ ("We usually update every Sunday or Monday.").



159.    As explained in Part II.C above, when Zuffa wanted to retain Fighters, Zuffa exploited provisions in its agreements with Fighters to make them effectively perpetual. This ensured that Zuffa's would-be rivals lacked access to this critical input, preventing them from competing effectively. Zuffa's staggered, long-term, and exclusive contracts with Fighters therefore constitute both a key artificial barrier to entry and a key component of the Challenged Conduct. Both Zuffa and third parties recognize that the Challenged Conduct had this effect.



---

405. DB-ZUFFA-00006389 at 439 (emphasis added). *See also* John Nash, "Why do boxers make more than MMA fighters?" *Bloody Elbow* (Aug. 23, 2016) ("[I]t is very hard to underestimate how much the UFC dominates the market of mixed martial arts…Somewhat understandable when one realizes that, according to the Fight Matrix rankings, every male fighter in the top three of their division and roughly 85% of all top 10 fighters in the ten divisions that the UFC promotes are under contract with the UFC."). Nash stated on Twitter in 2017 that "[m]y guess is that you'd need around 30% [of top Fighters] and a few #1s before you could threaten a serious run at the UFC." *See* https://twitter.com/heynottheface/status/884511218207084544; *see also* Silva Dep. 103:4-23 ("Q. And if you have a live MMA Event that doesn't have a top level, headlining match-up, that could hurt the ability of the event to attract an audience; is that fair? A. It is. … You may want a bigger fight for a card, but if people are injured or get married or whatever -- you have to work with what you have. Q. And you'd like to have -- as a matchmaker, you'd like to have . . . a complete stable of top-level fighters that are available to fight so you can create headlining events; correct? A. That would be ideal. Q. Okay. And you would not headline an MMA event at the UFC with two lesser-known or lower-ranked fighters if you could help it; correct? A. If you could help it.").

406. WME-ZUFFA-00013978.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



Similarly, a 2009 Deutsche Bank Report also described the Challenged Conduct as a key "barrier to entry," emphasizing that Zuffa had the "[v]ast majority of top fighters under multi-fight exclusive contracts."[408]

[black redaction bars]

,"[410]

160.   Text drafted by Zuffa for Deutsche Bank's 2013 debt-offering prospectus states that "All [UFC] athletes are under long term, exclusive contracts which provides a major competitive advantage for the UFC."[411] A 2010 announcement by Moody's upgrading Zuffa's rating outlook explicitly cited the "breadth of fighters under multi-year contracts which help serve as an effective barrier to entry,"[412] emphasizing Zuffa's "large contractually bound pool of fighters with superior opportunities for exposure and profit…."[413]

---

407.   *Id.*

408.   ZUF-000162329-382 (October 2009 Deutsche Bank Report, "$100,000,000 Incremental Term Loan"); *id.* at 347 ("Key investment considerations" "High barriers to entry," including "Vast majority of top fighters under multi-fight exclusive contracts").

[black redaction bars] *Id.* at 55.

410.   *Id.* at 55.

411.   ZFL-1055607 at 613.

412.   Moody's Investors Service, "Announcement: Moody's Changed Zuffa LLC's (d/b/a Ultimate Fighting Championship or UFC) Rating Outlook to Positive from Stable," (December 1, 2010), *available at* https://www.moodys.com/research/Moodys-Changed-Zuffa-LLCs-dba-Ultimate-Fighting-Championship-or-UFC--PR_210184 ("Moody's Investors Service changed Zuffa, LLC's (Ba3 Corporate Family Rating) rating outlook to positive from stable. 'The rating outlook change is prompted by Zuffa's continued strong revenue and EBITDA growth trends worldwide,' stated Neil Begley, a Senior Vice President at Moody's Investors Service. It is also based

161. 



Deutsche Bank's conclusion that, as a result of the Challenged Conduct, Zuffa has "no major competitors"[418] is consistently echoed by other industry participants as well as Zuffa itself (as explained in Part III.A.8 above). It is also consistent with the fact that the revenues and market shares of other MMA promoters are trivial in comparison to Zuffa's (as explained in Parts III.A.4-5 above). Zuffa's artificially created barriers to entry through the Challenged Conduct explain, at least in part, why well-capitalized enterprises (such as Mark Cuban's HD Net)[419] and media

upon improving credit metrics, and the increasing mainstream acceptance of the sport of mixed martial arts' (MMA) popularity and particularly so for industry leading UFC, in Moody's view. Zuffa's Ba3 CFR, Probability of Default Rating (PDR) and bank facility rating remain unchanged. Zuffa's Ba3 CFR reflects its premium MMA platform and UFC brand, sturdy credit metrics, strong free cash flow and superlative international revenue growth prospects. The rating considers the benefits from the growing popularity of UFC, and its scale, brand strength and breadth of fighters under multi-year contracts which help serve as an effective barrier to entry. The rating is also impacted by Zuffa's relative large scale in MMA, its first mover advantage of bringing structure to the sport, its large contractually bound pool of fighters with superior opportunities for exposure and profit….").

413. *Id.*
414. DB-ZUFFA-00057908, at 912.
415. *Id.*
416. *Id.*
417. *Id.* (emphasis added).
418. *Id.*
419. Josh Gross, Cuban sees bright future for MMA, ESPN, (September 13, 2007), *available at* http://www.espn.com/extra/mma/news/story?id=3017701.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-108-

conglomerates (such as Viacom, which purchased Bellator)[420] have failed to pose a successful challenge Zuffa's dominance.

162.



_____

420. Viacom buys Bellator, plans 2013 start on Spike, USA TODAY, (October 26, 2011), *available at* https://usatoday30.usatoday.com/sports/mma/post/2011-10-26/viacom-buys-bellator-plans-2013-start-on-spike/558003/1

421. *See* ZFL-1872579. In a February 2014 text message discussion between White and Lorenzo Fertitta regarding re-signing Gilbert Melendez, Melendez's contract with Zuffa was ending and he had come to an agreement with Bellator. In response, Zuffa exercised the right to match clause to re-sign Melendez. *See* ZFL-1897652. Fertitta texts White: "We gotta keep taking these fuckers oxygen till they tap out. We have sacrificed too much to let anyone get traction now[.]"At his deposition, Lorenzo Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 291-92.

422.

423. *See* ZFL-2536695 (Long to Silva: "Lorenzo wants Hector [Lombard] tied up in case he looks good at UFC 166.").

424. When Mark Bocek retired and requested that Zuffa release him from his contract in August 2014, Joe Silva wrote in a text message: "Bocek was sent a retirement letter but now he is asking for a complete release. He's coming off a win so I would not give it to him. He could end up fighting for Bellaforce[*sic*]." *See* ZFL-1897652 at 796. Bocek then asks Lorenzo Fertitta, "Im [sic] retired and have nothing to gain by being under UFC contract for life. Please release me permanently." *Id.* at 683. Lorenzo replies, "That's not really how it works Mark. Every fighter from Chuck Liddell, Mark Coleman, etc that retired in the middle of their contract are still under contract. You can do anything to make money you just can't fight anywhere else." *Id.* at 685. *See also* ZFL-1421024 – White letter to Rampage Jackson: "It appears that you have decided to 'retire' from MMA or other professional fighting competition. Assuming that is your intention, Zuffa, LLC is electing to suspend the Term of the Agreement for the period of such retirement. If you decide to come out of retirement again, I'll be ready to promote the remaining fights pursuant to your Agreement." *See also* ZFL-1702162 (In March 2008, Zelaznik sent a demand letter to Combat Fighting noting that "[i]t has come to our attention that you have listed Melvin Guillard, a fighter currently under contract with the [UFC], as a fighter participating in your fight Combat Fighting Championship event scheduled for May 17, 2008 in Newcastle, England," and demanding that they "explicitly state that Mr. Guillard will not be fighting" in the event). *See also* ZFL-2602496 (In February 2010, Fighter Akiyama asked for permission to compete in a Japanese MMA event called ASTRA in a judo match. Joe Silva responds, "He cannot do it."). *See also* ZFL-2615437; ZFL-12447128; ZFL-2135552; ZFL-2520643.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

███████████████████████████████████"[425] According to a 2010 email from the owner of Strikeforce, summarizing a meeting with Zuffa executives regarding the potential sale of Strikeforce, Dana White indicated that

> …he [White] would come guns a blazing now to steal our fighters. He said we were not close to being profitable because we didn't have enough fighters in our stable and that we would feel the pain of his full attention if we didn't sell.[426]

Zuffa's horizontal acquisitions and its Fighter contracts were mutually reinforcing. The acquisitions bolstered the exclusionary effects of Zuffa's Fighter contracts, placing more and more top Fighters under exclusive contracts, thereby making it still more difficult for surviving MMA promoters to compete effectively. Zuffa's horizontal acquisitions deprived would-be rivals of the acquired rosters. Once Zuffa acquires a roster of Fighters, those Fighters become subjected to its exclusionary contracts, and the remaining non-Zuffa promoters are foreclosed from this pool of talent. As Kurt Otto, President and founder of a now defunct MMA promotion called the IFL, testified:

> Q: Do you have an opinion about whether Zuffa's acquisition of Pride and WEC and WFA, in or about 2006 or 2007, made it more difficult or less difficult to compete with the UFC?
>
> A: Well, you tell me. If I need to go get fighters that are bigger names, they're not in the woods somewhere up, in a tree, hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter.[427]

163.    The acquired rosters included several highly ranked Fighters. As seen in Figure 1 of Part III.A.1, Zuffa's share of the Headliner Submarket has increased steadily in the wake of the Strikeforce acquisition, to more than 80 percent. According to FightMatrix, Zuffa has accounted for at least fourteen of the top fifteen pound-for-pound Fighters worldwide since late 2010.

---

425.  ZFL-2508355 at 60.
426.  ZUF-00447778.
427.  Deposition of Kurt Otto, February 6, 2017, at 246:19-247:12.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

164.     Zuffa's horizontal acquisitions also reinforced the effects of other aspects of the Challenged Conduct by eliminating would-be rivals to which Fighters might otherwise have switched, potentially defeating or at least mitigating Zuffa's attempts to exercise its market power. Because the horizontal acquisitions caused non-Zuffa promoters to lose access to the top (non-Zuffa) Fighters that generated the most revenue, non-Zuffa promoters were further precluded from offering competitive compensation and promising career paths to Fighters. As explained in Part III.A.1 above, even Zuffa's most prominent would-be rivals offer much more limited career opportunities than does Zuffa, in large part because Zuffa has all of the top Fighters locked up; there is nowhere else to go to fight against the best, and ascend the rankings. As Joe Silva testified, "[b]eating guys with crappy records won't convince anyone [a Fighter is] ready for the big leagues."[428]

> [I]f the majority of your opponents have losing records, they're probably not very good, so it doesn't tell me much about your ability… I would like your guy to have more experience and have experience against better people.[429]

As Fighter (and Plaintiff) Kyle Kingsbury testified regarding the lack of competitive alternatives during the Class Period, "there's nowhere else to go at this point. Strikeforce didn't exist anymore. Pride didn't exist anymore. And I had no way of saying no [to the UFC]."[430]



---

428.  Silva Dep. at 130:12-14.
429.  *Id.* at 128:23-129:11.
430.  *See* Deposition of Kyle Kingsbury, February 17, 2017, at 119. *See also* Part IV.B, *supra*.
431.  DB-ZUFFA-00006389 at 6397.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

165.   As explained in Part II.A.1 above, after the Strikeforce acquisition, Zuffa's share of the Relevant Input Market rose to over 90 percent under the Tracked measure, to over 80 percent under the Headliner definition, and to over 70 percent under the Ranked measure. The Herfindahl-Hirschman Index ("HHI") for the Relevant Input Market and Submarket therefore exceeds 8,100 under the Tracked measure,[432] exceeds 6,400 under the Headliner Submarket,[433] and exceeds 4,900 under the Ranked measure.[434] Each of these HHI values fall well above 2,500, the threshold for a market to be classified as "highly concentrated" according to the antitrust agencies' *Horizontal Merger Guidelines*.[435]

166.   The remaining components of the Challenged Conduct further reinforced its exclusionary effects on rivals. As explained in Part II.A.2 above, record evidence indicates that the intent and effect of Zuffa's counter-programming was to harm competition by impairing rivals: Although counter-programming "was not profitable in itself,"[436] it "worked by preventing new competitors from both achieving profitable operations and recouping their investments in high-profile fighters."[437] As explained in Part II.A.3 above, record evidence suggests that Zuffa worked with other MMA promoters to impair potential rivals by shutting off access to Fighters. As explained in Part II.B.3 above, Zuffa also (1) prevented other MMA promoters from using clips of Fighters' past fights to promote Fighters who had left the UFC;[438] (2) prevented Fighters from

---

432.  Equal to 0.9^2*(10,000).
433.  Equal to 0.8^2*(10,000).
434.  Equal to 0.7^2*(10,000).
435.  *Merger Guidelines*, §5.3.
436.  Jesse Baker & Matthew Thomson, *The Ultimate Fighting Championships (UFC): The Evolution of a Sport*, in CASES IN MARKETING MANAGEMENT 115 (Kenneth E. Clow & Donald Baack, eds. 2012).
437.  *Id.*
438.  Joe Silva admitted that "fighters often used their prior videos as a way to promote themselves" and that "it would be hurtful for [a] promotion not to be able to show past fights. We use – those past fights help to promote future fights… Because that's how you promote a fight.  You want to establish what this person has accomplished."

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

departing from the UFC without also losing their sponsorships; and (3) required venues, sponsors, and broadcasters not do business with other MMA promoters as a condition for doing business with Zuffa. All of this reinforced the exclusionary effects of the Challenged Conduct.

**2.      The Challenged Conduct Foreclosed a Substantial Share of the Relevant Input Market and Submarket**

167.    In this section, I present evidence demonstrating that Zuffa's exclusive contracts with Fighters substantially foreclosed competition. One of my foreclosure metrics is the share of Headliners foreclosed by the Challenged Conduct. Given that Headliners are a critical input for staging successful Live MMA Events, Zuffa's foreclosure of Headliners impairs rivals and enables Zuffa to exercise monopsony power over all Fighters in the Relevant Input Market. However, given the uncertainty in determining which Fighters will become Headliners in the future, it is logical that Zuffa would seek to foreclose a broad pool of top-level Fighters (who have the potential to become Headliners) to ensure continued dominance over time. Indeed, Zuffa's exclusive contracts apply to all of its Fighters, not just the top-ranked Fighters. Accordingly, I calculate Zuffa's foreclosure of the Relevant Input Market (measured both ways), as well as the Relevant Input Submarket.

168.    As explained below, a large and increasing share of the Relevant Input Market (between 68 percent and 98 percent during the Class Period) and the Relevant Input Submarket (between 50 and 91 percent during the Class Period) has been foreclosed by the Challenged

---

Therefore, from Zuffa's perspective it was "very important to be able to promote its fighters and its fights by using video of fighters' prior fights." Silva Dep. at 25:2-4; 270:12-271:17.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Conduct. These foreclosure shares are well in excess of the 20-30 percent thresholds that antitrust scholars have found are sufficient "to infer anticompetitive effects."[439]

169.    To measure Zuffa's overall foreclosure of the Relevant Input Market and Submarket, I calculated the ratio of MMA Fighters foreclosed by Zuffa's exclusionary Fighter contracts to the total number of MMA Fighters in the Relevant Input Market (under both measures) and Submarket. As in the market share calculations, Fighter counts are weighted by MMA promoters' average PPV and gate revenue per Fighter.

170.    ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

439.  *See* HERBERT HOVENKAMP, XI ANTITRUST LAW ¶1821, at 152, 160, 164-65 (1998). *See also* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory,* 123 HARV. L. REV. 469 (2009) ("it makes sense (when effects are not directly proven) to require the same 20-30% foreclosure share threshold that is required to infer anticompetitive effects from exclusive dealing").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

████████████████████████████████████████████████████████████

██████████████████████████████████ [440]

171.     Under the second foreclosure definition, I conservatively classify Zuffa Fighters as foreclosed if (1) the Fighter's contract contained a champion's clause (which all or virtually all did), and (2) the contract had a sufficiently long duration of exclusivity.[441] Specifically, Fighters were considered foreclosed if their contracts constrained them from fighting for and/or freely negotiating with other MMA promoters for a period of at least 30 months. This represents an economically significant share (the majority, or, in many cases, the entirety) of a Fighter's professional MMA career, as explained in Part II.C.2 above.

172.     The 30-month threshold is conservative given that antitrust scholars have found that exclusive contracts longer than twelve months in duration can have anticompetitive effects, depending on the industry.[442] The 30-month threshold is also conservative given that Zuffa routinely leveraged its bargaining power to induce Fighters to renew their contracts before the prior contract had expired, as explained in Part II.C. For example, a Fighter forced to commit to two sequential contracts of 20 months each is effectively foreclosed for 40 months, but would not be classified as foreclosed under this definition.

173.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ ,

---

440. *See* Part III.A.4, *supra*.

441. As explained in Part II.C above, the duration of exclusivity is calculated as the sum of (1) the Term (including the lead-up time to a Fighter's first bout); (2) the option period (if any); (3) the exclusive negotiation period; and, (4) the right to match period.

442. Areeda & Hovenkamp ¶ 1821d3.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

3.      **The Duration and Staggering of Zuffa's Contracts Prevented Meaningful Competition by Potential Rivals**

174.    As explained in Part II.C.2, the exclusive terms in Zuffa's contracts, combined with Zuffa's leveraging of the Challenged Conduct to renew and extend contracts, allowed Zuffa to prevent rivals from accessing Fighters for a period that was effectively perpetual, relative to Fighters' brief career lengths. Zuffa's top Fighters were bound by even longer-term contracts, and were (like all Fighters) subject to the champion's clause.[443]

175.    In addition, Zuffa's contracts were staggered, with different Fighters reaching the end of their contracts at different points in time. This further ensured that other MMA promoters would not have access to a sufficient stable of Fighters at any given time to compete effectively with Zuffa.[444] Indeed, on the few occasions when Zuffa has released Fighters to Bellator that, in Zuffa's view, might have allowed Bellator to stage a successful event, Zuffa has taken care to ensure that suitable opponents were not available to Bellator.[445]

4.      **Zuffa Engaged in Coercive Contracting Behavior and Restricted Fighters' Ability to Terminate Contracts**

176.    To an economist, coercion in the context of foreclosure can be thought of as the ability of a dominant firm to induce an economic agent to submit to exclusionary terms, by

---

443.  *See* Part II.C.2, *supra*; *see also* ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.

444.  WME_ZUFFA_00013978 ("practical barriers to entry are extremely high. UFC controls the best fighters, on staggered contracts").

445.  *See* Part II.C.1, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ensuring that the agent would be made worse off by refusing them.[446] This can be accomplished by exploiting a collective action problem, in which Fighters would be made individually worse off by refusing Zuffa's exclusionary terms, despite the fact that Fighters would be collectively better off if Fighters coordinated in their refusal.[447] By this standard, Zuffa clearly engaged in coercive behavior: As explained in Part II.C.1 above, Zuffa exploits its contract provisions to retain virtually any Fighter it desired, and Fighters agreed to Zuffa's terms because the Challenged Conduct left them no better alternative. Similarly, the Challenged Conduct clearly involved Fighters submitting to terms that asymmetrically restricted their ability to terminate their contracts: As explained in Part II.B.1 above, Zuffa's Fighter contracts contain one-way ratchets, giving Zuffa, but not Fighters, the discretion to continue to enforce exclusivity or to discontinue the contract if Zuffa had no further use for the Fighter. Moreover, Fighters were further restricted in their ability to terminate the exclusive terms governing them, given Zuffa's ability to leverage the Challenged Conduct to renew and extend contracts, explained in Part II.C.1 above.

### 5.    All Evidence and Analysis of Foreclosure Is Common to the Classes

177.   All of the evidence and analysis demonstrating that Zuffa foreclosed competition to a significant degree is common to the Classes. If I were asked to analyze foreclosure for any single member of either Class, the evidence and analysis would be the same.

### D.   The Challenged Conduct Generated Substantial Anticompetitive Effects

178.   Given that Zuffa had substantial market power and substantially foreclosed competition, anticompetitive effects would be expected and can be inferred. Nevertheless, in this section, I consider whether there is direct evidence that the Challenged Conduct generated

---

446.   *See, e.g.,* Ilya Segal & Michael Whinston, *Naked Exclusion: Comment* 90(1) Am. Econ. Rev. 296-309 (2000).

447.   *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

anticompetitive effects.[448] Evidence of anticompetitive effects includes regression analyses demonstrating that Fighter compensation as a share of event revenue declines as Zuffa's foreclosure share increases, after controlling for other factors that might influence Fighter compensation. Additional evidence of anticompetitive effects includes evidence that the Challenged Conduct restricted the supply of Fighter services in the Relevant Input Market and Submarket, and (relatedly) the supply of Live MMA Events in the Relevant Output Market, in addition to raising prices in the Relevant Output Market.

179.    I understand that some courts have found that the anticompetitive effects of the conduct at issue should be "considered in light of any procompetitive effects."[449] As explained in Part VII below, the purported procompetitive justifications that Zuffa has proffered for the Challenged Conduct in prior proceedings are unavailing. To the contrary, the experience of other professional sports leagues suggests that halting (and remediation) of the Challenged Conduct would benefit Fighters, consumers, and the industry as a whole.

**1.     Regression Models Show Bout Class Compensation Share Is Negatively Correlated with Zuffa's Foreclosure Share, Implying That Increased Foreclosure Share Causes Decreased Compensation Share**

180.    For the Bout Class, I estimated multivariate regression models in which the dependent variable to be explained is the share of event revenue received by a given Fighter at a given event, while the key independent variable of interest is Zuffa's foreclosure share. For any given bout in any given event, the total compensation each Fighter in the Bout Class receives can be decomposed into four categories; these are (1) show and win purses, (2)

---

448. Salop, *supra*, at 376; 383 ("In the RRC foreclosure paradigm, the ultimate antitrust concern is not the harm to the rivals, but rather the possible harm to consumers and competitive process from the resulting market power.").
449. *ZF Meritor v. Eaton* at 24.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement.[450] I define a Fighter's total event-level compensation ("Event Compensation") as the sum across these four categories.

181.    The dependent variable in my regression model ("Fighter Share") is equal to the share of Zuffa's event-specific revenue ("Event Revenue")[451] paid to a given Fighter that participated in a given event at a given point in time. Zuffa's Event Revenues include revenues from ticket sales, PPV and broadcasting fees, and other event-specific revenue streams. The regression data set includes Fighter Shares for both Zuffa Fighters, and for Strikeforce Fighters prior to Zuffa's acquisition of Strikeforce.[452]

182.    The regression model can be written as follows:

$$S_{ijt} = \beta_0 + \beta_i + \beta_1 D_{jt}^z FS_{jt} + \beta_2 Win_{ijt} + \beta_3 HasRank_{ijt} + \beta_4 Rank_{ijt} + \beta_5 LOA_{ijt} + \beta_6 PPV_{ijt} + \sum_k \lambda_k X_{ijt}^k + \varepsilon_{ijt} \quad (1.1)$$

Above, $S_{ijt}$ is the Fighter Share, equal to the ratio of each Fighter's Event Compensation to Event Revenue for Fighter $i$ participating in event $j$ at time $t$. The key variable of interest, $FS_t$, is the share of the Relevant Input Market or Submarket foreclosed by Zuffa as of time $t$. As explained in Part III.C above, $FS_{jt}$ is defined as the ratio of MMA Fighters foreclosed by Zuffa's exclusionary contracts to the total number of MMA Fighters in the Relevant Input Market or Submarket, with

---

450.  *See* Part I.B, *supra; see also* ZFL-0000003 (Zuffa Fighter compensation table).

451.  The Event Revenues used in my regression analysis were calculated using Zuffa's P&L statements, and include Ticket Sales/Site Fees PPV/Broadcast Sales/Fees (including "Web Buys" and "Other"), event-specific Merchandise, and event-specific Sponsorships.

452.  The Appendix describes the construction of the regression data set, which makes use of all available data from Zuffa at a sufficiently granular level to conduct my regression analysis, including the Strikeforce pre-acquisition data produced by Zuffa. As explained below, the Strikeforce pre-acquisition data provide a benchmark for the share of revenue that Fighters would receive in the but-for world.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Fighters weighted by PPV and gate revenues to reflect differences in the average quality of Fighters across different MMA promoters.[453]

183.     The variable $D_{jt}^z$ is set equal to one for all Zuffa events, and to zero for non-Zuffa events (that is, Strikeforce events prior to Zuffa's acquisition of Strikeforce). The coefficient $\beta_1$ therefore captures two effects: (1) the effect of Zuffa's increasing foreclosure share over time on Zuffa Fighter Shares, relative to those of Zuffa Fighters in time periods with lower foreclosure shares, after controlling for all other variables in the regression; and (2) the effect of Strikeforce Fighter Shares prior to the acquisition exceeding Zuffa Fighter Shares (after controlling for all other variables in the regression). Therefore, both the Strikeforce pre-acquisition Fighter Shares and Zuffa Fighter Shares during periods of (relatively) low foreclosure effectively serve as benchmarks for the Fighter Shares that Zuffa Fighters would have received in the but-for world. As explained below, my regression results show that $\beta_1$ is negative, and both statistically and economically significant. This result confirms that Zuffa's foreclosure of the Relevant Input Market and Submarket suppressed compensation for the Bout Class: But for the Challenged Conduct, Zuffa Fighter Shares would have been significantly higher.[454]

---

453. My regression results are robust to different weighting schemes, even if Fighters are unweighted. In particular, the regression shows a negative and statistically and economically significant relationship between Zuffa's foreclosure share and the Fighter Share of revenues if the foreclosure share is calculated in any of the following ways: (1) weighting Fighters by revenue per Fighter; (2) weighting Fighters by the inverse of the Fighter's rank; or (3) simply using an unweighted count of Fighters.

454. Using Strikeforce pre-acquisition Fighter Shares as a benchmark is consistent with elementary economics, which shows that competitive firms pay labor a share of revenue commensurate with labor's productivity, based on the marginal product of labor. *See, e.g.*, Roy Ruffin & Paul Gregory, Principles of Microeconomics 331-336 (Harper Collins 5th ed. 1993); *see also* Michael Katz & Harvey Rosen, Microeconomics 264-65, 276-77 (Irwin McGraw-Hill 3rd ed. 1998). In contrast, firms that wield monopsony power pay a smaller share of revenue of labor, by restricting both the amount of labor hired and the compensation paid to labor. *Id*. Therefore, although the Challenged Conduct, by reducing revenue opportunities for rival promoters, might have suppressed the *level* of compensation that Strikeforce (and other would-be rivals) could afford to pay to Fighters, the *share* of revenue paid to Fighters by Strikeforce remains an economically relevant benchmark for estimating but-for compensation.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

184.   The remaining variables in equation (1.1) above control for other factors that may influence Fighter-compensation shares. The term $\beta_i$ denotes Fighter-specific fixed effects, which control for all individual, Fighter-level attributes that remain constant over time. The variable $Win_{ijt}$ is an indicator equal to one if the Fighter won the bout (and thus received the win purse), and zero otherwise. The variable $HasRank_{ijt}$ is an indicator equal to one if FightMatrix records a ranking for Fighter $i$ at the time of event $j$, and zero otherwise. The variable $Rank_{ijt}$ is an integer corresponding to the Fighter's rank; it is set equal to zero for non-ranked Fighters. The variables $LOA_{ijt}$ and $PPV_{ijt}$ are indicators equal to one if the Fighter was entitled to additional compensation pursuant to a Letter of Agreement or an agreement to receive PPV royalties, and zero otherwise.

185.   ███████████ $X_{ijt}$ ███████████████████████████████



HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



186.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

187.  ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████[456]
██████████████████████████████.

---

[456]  This measure of economic harm is conservative because it measures only the exclusionary effects of Zuffa's Fighter contracts, and not the exclusionary effects of other aspects of the Challenged Conduct reviewed in Parts II.A and II.B above. As a result, this measure of economic harm is appropriate regardless of whether the other conduct is found to be anticompetitive. Put differently, even if the Challenged Conduct consisted solely of Zuffa's exclusionary contracts, my analysis of foreclosure analysis the resulting estimates of economic harm would remain the same.



**2.      Additional Evidence Shows That the Challenged Conduct Suppressed Fighter Compensation Below Competitive Levels**

188.    As explained below, additional evidence that the Challenged Conduct suppressed Fighter compensation below competitive levels includes: (1) evidence that Zuffa has reduced the share of revenue paid to Fighters over time (as the degree of foreclosure rose); (2) evidence that Zuffa pays a significantly lower share of its revenues than Strikeforce (before the acquisition) or Bellator; and (3) a natural experiment in which Zuffa unilaterally restricted compensation of its Fighters by imposing a new sponsorship tax. In the absence of the Challenged Conduct, Zuffa's ability to suppress Fighter compensation in these ways would have been at least partially counteracted by increased competitive pressure from other MMA promoters.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

189.     Zuffa's internal analyses indicate that Fighter compensation as a percentage of UFC event revenue has *decreased* over time, peaking at 25.8 percent in 2007, decreasing through 2013, and falling from 22.0 percent to 18.5 percent between 2010 and 2011, when Zuffa acquired Strikeforce and shut it down.[457] ███████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████      ███.[458] The presentation states that the risk of "Fighter Compensation Inflation"[459] was "the most asked question by financing sources, and is a critical cost that we must actively manage."[460] According to the document, Zuffa management intends to "contain" Fighter costs at no more than 20 percent of revenue.[461] Zuffa could not profitably control the share of revenue going to Fighters unless it wielded monopsony power. In 2007, Deutsche Bank marketing materials (prepared for Zuffa's lenders) indicated that "[t]he UFC believes that its dominant position in the MMA industry will allow them to contain fighter costs."[462] Thus Zuffa itself acknowledged it was able to suppress Fighter compensation as a result of its monopsony power. In a competitive labor market, Zuffa would not be to to do so.[463]

190.     Zuffa also pays Fighters a much smaller proportion of its revenue than did Strikeforce, a reasonable proxy for the competitive compensation share in the MMA industry.

---

457. ZFL-1484035 (all events); ZFL-1484036 (non-PPV events); ZFL-1484037 (PPV Events). Another internal Zuffa presentation estimates that Fighter compensation is 16% of total company revenue for all events occurring from 2006-2011. ZFL-1392468 at 69. One document indicates that 90 percent of Zuffa Fighters, including top tier Fighters, are "unhappy with compensation." *See* John Cholish: '90% Including Some Top Tier Fighters' Unhappy With UFC Pay, Full Contact Fighter (Friday, May 31, 2013), *available at* http://fcfighter.com/post/john-cholish-says-90-including-some-top-tier-fighters-unhappy-with-ufc-pay.
458. WME-ZUFFA-00001150 at *11.
459. *Id.*
460. *Id.*
461. *Id.*
462. DB-ZUFFA-00030406 at 07.
463. In a competitive labor market, compensation is set revenue paid to labor is determined by the productivity of labor, as opposed to the monopsony power of the firm that hires labor. *See, e.g.,* Roy Ruffin & Paul Gregory, Principles of Microeconomics 331-336 (Harper Collins 5th ed. 1993); *see also* Michael Katz & Harvey Rosen, Microeconomics 264-65, 276-77 (Irwin McGraw-Hill 3rd ed. 1998).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Prior to its acquisition by Zuffa, Strikeforce paid about 60 to 70 percent of its event revenue to Fighters.[464] Scott Coker, the former CEO of Strikeforce, explained that Strikeforce paid "minimum 68 percent of our gross income to our athletes pay structure… when we structured Strikeforce, we structured…[as] if there was a union."[465] ███████████████████████████

████████████████████     ███████████████████████████████

███████████████████████████████████████████████████████████

██████████.[466]

191.   Zuffa has also unilaterally and substantially reduced other forms of Fighter compensation profitably. Beginning in or about 2009, Zuffa began requiring that sponsors pay Zuffa a brand affiliation fee or "sponsorship tax" for the right to sponsor Fighters at UFC events.[467] Prior to that, UFC Fighters were free to encourage sponsors to pay them to advertise on their uniforms in the Octagon, and many did so, earning substantial revenues.[468] Zuffa extended the sponsorship tax to different categories of sponsors over time, increasingly diverting sponsorship revenue to Zuffa and away from Fighters.[469] To be approved to sponsor a Fighter

---

464. In 2010, the year before it was acquired by Zuffa, Strikeforce paid fighters 72.5 percent of total event revenues. In 2011, the year it was acquired, it averaged 63.7 percent of revenues paid to fighters. *See* ZFL-1472338.

465. "When I was in business with the Silicon Valley Sports & Entertainment Group and half the company was owned by the group that owns the San Jose Sharks [i.e. pre-acquisition by Zuffa], we kind of set up our pay structure based upon like a hockey union would do. We paid minimum 68 percent of our gross income to our athletes pay structure. If there was a union, I don't think that would take us off guard by any means because when we structured Strikeforce, we structured based around kind of like if there was a union." *See* http://www.mmafighting.com/2015/5/11/8581653/scott-coker-on-ufc-reebok-sponsorship-program-bellators-phones-been

466. *See* Part VI.A, *infra*.

467. Batchvarova Dep. at 26:9-27:4 ("At the time apparel companies … that were sponsoring athletes going into the octagon were paying an affiliation fee."); *see also* ZUF-00017896, ZUF-00086103, LESPLAINTIFFS-0032374 at 74.

468. *See* Part I.D, *supra*.

469. *See* ZFL-2193737 (Aug. 4, 2009 email from Mersch to Nate Quarry: "The only changes in the sponsorship world pertain to tshirt/apparel companies… in short, any tshirt company wishing to sponsor UFC fighters must join the UFC approved sponsor program."). *See also* ZFL-1974115 (Mersch writes: "NOTICE – For all Zuffa events going forward, only approved on-line retailers will be allowed to sponsor fighters. To that end, you must have a separately executed sponsorship agreement with Zuffa to be able to sponsor fighters for any events. This new policy will kick in

within a given category (such as apparel or supplements), sponsors were required to sign a "Brand Affiliation Agreement" or "League Affiliation Agreement" that required payment of the fee to Zuffa.[470] When small sponsors could not afford the sponsorship tax, Fighters were obliged (if they already had a sponsorship relationship), to give them up, and if not, to turn them down.[471] In addition to driving many small companies away from sponsoring their chosen Fighters, these sponsorship taxes also forced the sponsor to negotiate directly with Zuffa, bypassing the Fighter entirely.[472] One agent stated that other MMA promoters do not impose a sponsorship tax, and

---

beginning with UFC 116 on July 3, 2010."); ZFL-2152714 (Jun. 10, 2011 email from Mersch to Nate Quarry noting "Supplements – BSN is out as the 'official' sponsor of the UFC so the category is wide open but there will likely be another BSN type dominant player and then the rest will have to pay a fee to play in the space of probably between $50K-$500K depending on how much the primary wants to spend."). In October 2011, after the BSN contract ended, Zuffa signed an agreement with Muscle Pharm that required Zuffa to charge other supplement companies an annual sponsor tax that increased depending on the number of individual Fighters being sponsored: $15,000 for one Fighter; $25,000 for two Fighters; $50,000 for three to four Fighters; $100,000 for five to eight Fighters; and $200,000 for more than eight Fighters. *See* ZFL-1402629 at 29; ZFL-1402631 at 31 ("I have explained to you we are contractually required to abide by the schedule… We DO NOT have any discretion on this and cannot charge you less."). *See also* ZFL-2482323 at 25 (Showing that the amount paid by the sponsor to Zuffa for the right to sponsor Fighters depends on the number of Fighters sponsored).

470. *See, e.g.,* ZFL-2177960 (In June 2011, Kristin Gifford writes: "At this point we do not have an executed League Affiliation Agreement with Tokyo Five. Therefore, Tokyo Five will not be allowed to sponsor UFC or Strikeforce fighters until the Agreement is completed." At the time, the fee for apparel companies was $50,000 to sponsor UFC Fighters, $35,000 to sponsor Strikeforce Fighters, or $75,000 to sponsor both. *Id.*; *see also* ZFL-2177961; ZFL-2244949, at 50 (In February 2010 Mersch writes to Nate Quarry: "if And 1 (or any other sponsor) doesn't want to pay a fee or negotiate to pay to associate their brand name with the UFC brand, they're not going to be part of our events and not going to be allowed to sponsor anyone.").

471. *See* ZFL-2176645 (4/27/2011: Nate Marquardt's sponsor won't be able to afford sponsorship tax because they are only sponsoring the one fighter). *See also* ZFL-2205733 at 33 (7/11/2011: "Neither Jiu Jitsu Pro Gear nor Jacare's other sponsors will be able to afford the annual $35,000 sponsorship tax levied by Forza."); ZFL-2582134 (UFC sponsor Hooligans United writes to Strikeforce in 2009, "I was just finalizing a deal with a manager for a UFC fighter I was going to sponsor but was nixed at the last moment when they put in my paperwork. Apparently the UFC wants to control how many clothing companies advertise/sponsor their fighters shirts/shorts and do so by weeding out the smaller guys like myself and by charging the bigger g[u]ys ie Affliction huge fees (meanwhile that's less money for the actual fighters). I am just a (very) small company who was putting together some money to get a little exposure via the UFC route but as I said, they sq[u]ashed me!").

472. ████████████████████████████████████████████████████████████████████████. Mersch was also cavalier about the intended purpose of the sponsorship tax, stating in one email to a sponsor that the tax money was simply "money for Dana and Lorenzo." ZFL-1367079. Another: "Well tell them to stop being cheap and pay me some money." ZFL-1487968

indicated that his client lost 55 percent of his promised net sponsorship amounts as a result of Zuffa's sponsorship policies.[473]

192.    Record evidence indicates that Zuffa suffered no significant Fighter defections as a result of imposing the sponsorship tax.[474] In response to a January 2009 article concerning Zuffa's sponsorship tax, Strikeforce executives wrote that the "UFC will be able to impose this solely on the basis that they are perceived as the pinnacle MMA organization for the majority of fighters as of today."[475] Strikeforce declined to impose a sponsorship tax, reasoning that this tactic "could give [Strikeforce] a slight advantage in negotiations with fighters."[476] However, only one Fighter (Dan Henderson) actually defected to Strikeforce, and Henderson's contract was eventually transferred back to Zuffa when it acquired Strikeforce. Zuffa proceeded to apply its sponsorship tax to Fighters from the newly acquired company.[477] Accordingly, Zuffa's imposition of the sponsorship tax constitutes a natural experiment demonstrating Zuffa's ability to unilaterally and profitably restrict Fighter compensation, with other MMA promoters unable to provide competitive discipline in the labor market. In the absence of the Challenged Conduct, its ability to do so would have been curtailed.

---

473. *Id.* at 22-23 ("I know many promoters who do not ask for money and the fighters can get sponsors whoever [*sic*] they like…" The agent estimates that a Fighter that had previously netted $200,000 "ends up with 130k less and nets only 70K" because of Zuffa's restrictive policies.). *See also* ZFL-2486240 (Unmarked document from Batchvarova's custodial files stating "Original structure – we take over apparel + sponsorship … Look at reducing the numbers for the lower guys by 40%-50%.").

474. *See* ZFL-2244949. In response to concerns aired by Nate Quarry over new sponsorship policies, Michael Mersch wrote that: "I don't agree that the UFC [is] 'losing top fighters because of these policies.'"

475. ZUF-00418378.

476. *Id.*

477. *See* ZFL-1402822 at 23 (Agent for Alistair and Velnatijn complains on June 9, 2011 to Mersch that "What if they cant [*sic*] pay these sponsors, this was never an issue before you guys took over." Mersch responds "If they're not willing to pay for advertising like everyone else has to, that's their choice.") ██████████████████████████████████████████████████████████████ .

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 3. The Challenged Conduct Restricted the Supply of Fighter Services

193.    As explained below, Zuffa restricted the supply of Fighter services by consistently maintaining significantly more Fighters under contract than it could use, creating forced periods of inactivity during which Fighters were not paid and were not available to other MMA promoters to fight. In addition, Zuffa pursued a strategy of limiting the number of career paths available to Fighters. In the absence of the Challenged Conduct, Zuffa's ability to restrict the supply of Fighter services in these ways would have been at least partially counteracted by increased competitive pressure from other MMA promoters.

194.    Zuffa was consistently able to keep Fighters bound by the exclusionary provisions in its contracts—and thus unavailable to other MMA promoters—while simultaneously promoting an insufficient number of bouts given the number of Fighters on its roster. Record evidence indicates that Zuffa was able to suppress the number of events that Fighters would participate below what Fighters would otherwise prefer,[478] and that Zuffa consistently maintained significantly more Fighters under contract than it could use in bouts.[479] In his deposition, Joe Silva

---

478. ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

479.    *See, e.g.,* ZFL-2444687 (Joe Silva states in August 2011: "Have too many guys. Look how long it's taking me to get your other guys fights."); ZFL-1394508 (In December of 2012, Silva tells White, Fertitta and others that Zuffa has "way too many guys under contract right now"."); Zuffa's Response to Plaintiffs' Request for Admission No. 22 (On February 22, 2013, Dana White stated publicly that "We have 470-something guys under contract, okay? We have over 100 guys too many. We have over 100 guys too many on the roster right now[.]"); Dana White Deposition Ex.72 (Dana White states in February 2013 "There's over a 100 guys.   We're heavy."); TPS-0021184 (Joe Silva states in March 2013 "No space to bring in locals. Have to cut 100 guys."); ZUF-00325418 (Joe Silva states in January 2011 "I need to cut around 5 guys a show. If I cut 5 guys a show and don't sign anyone new for 10 shows I STILL have too many guys under contract."); Dana White Deposition Ex. 74 (Dana White states in October 2013 "I keep telling you guys our roster is too full. Guys have to get fights and it's like every time after a show when we cut a guy, and they're like "Fuck you Dana White, you're an idiot. This guy's the …" Shut the f -- k up and let us run our business. The roster is too full."); Kevin Iole, *In cutting Jake Shields, UFC takes a page out of NFL's playbook*, YAHOO SPORTS, Apr. 7,

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

testified that, from at least 2010 to 2015, he had "been complaining to managers and fighters and others" that Zuffa "had more fighters under contract than [Zuffa] had fights to give them."[480] Silva also testified that he kept Fighters under contract who he otherwise would have cut; his rationale was to keep these Fighters away from Bellator.[481] Kurt Otto, President and founder of a now defunct MMA promotion called the IFL, testified that it was his perception that Fighters at Zuffa were "collecting dust."[482] Record documents discuss the "shelving" of Fighters by Zuffa.[483]

195.    In the absence of the Challenged Conduct, the excess Fighters on Zuffa's roster could have earned income from other promoters, rather than being bound to Zuffa during periods of forced inactivity (during which they did not get paid). Put differently, Zuffa restricted the demand for Fighter services, by restricting their opportunities to earn income (given that Fighters are paid for bouts only when they fight).

196.    This evidence is corroborated by a case study of the UFC by Jesse Baker and Matthew Thomson, which notes that the UFC's strategy of "limiting the number of avenues that

---

2014, *available at* https://sports.yahoo.com/news/in-cutting-jake-shields--ufc-takes-a-page-out-of-nfl-s-playbook-203152661-mma.html (In April 2014, Dana White states "We have 500 guys under contract, which is a lot more than we really need...");

480. Deposition of Joseph Silva at 257:8-15. *See also* ZFL-2206472 (Joe Silva states in November 2010 "With the WEC merger I have too many guys right now so openings are sparse."); ZFL-2206527 (Joe Silva states in December 2010 "With the WEC merger have 70 fighters too many under contract. I have some guys who are going to be waiting 6 months for a fight."); ZFL-2206534 (Joe Silva states in December 2010 "With the WEC merger I have 70 more contracts than I can really handle so my life is going to be miserable for a while.").

481. *See* Silva Exh. 28 (explaining that Silva "would love to cut [fighter Rogerio Nogueira] but he would just end up fighting [former UFC champion] Rampage in Bellator." Silva testified that cutting Nogueira "would just be handing [Bellator] something easy … [a] [c]redible name." Silva Dep. at 304:24-306:12. Zuffa elected not to cut Nogueira *Id.* at 307:4-7. Silva also admitted that if Nogueira had been matched against Rampage, this would "improve Bellator's ability to put on a successful event." Silva Dep. at 307:19-308:2.

482. Deposition of Kurt Otto, February 6, 2017, 116:4-25.

483. ZFL-2642993 (January 2008 email from the agent for Andrei Arlovsky, a former UFC Heavyweight Champion, stating that "It is extremely damaging to Andrei's career to be shelved for such a long period of time [more than one year]"); *see also* ZFL-2699696 (text to Sean Shelby from Angela Hill (1301653003) on June 20, 2015 at 22:25, stating "Can you tell me if I'm going to be shelved again for 6 months? I'm really strapped for cash and need to figure something out if so.").

young fighters could take to pursue careers in the sport of MMA seemed counter-intuitive, especially while simultaneously attempting to grow the organization."[484] In the absence of the Challenged Conduct, Zuffa's ability to restrict Fighter career paths would have been curtailed, because these Fighters would have had more viable paths for pursuing their careers with other MMA promoters.

### 4.     The Challenged Conduct Inflated the Price of Live MMA Events

197.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████d.

198.     Zuffa's internal documents emphasize that the UFC has the "[t]op priced ticket in U.S. sports," with average PPV prices increasing from an average of $81 to more than $250 from 2001 to 2009.[485] Zuffa documents also indicate that UFC events were priced at a substantial premium relative to the NFL, NHL, WWE, and MLB.[486] A 2012 presentation by The Raine Group explains that "Fans Pay More for UFC,"[487] noting that "UFC events offer a premium consumer

---

484. Jesse Baker & Matthew Thomson, *The Ultimate Fighting Championships (UFC): The Evolution of a Sport*, in CASES IN MARKETING MANAGEMENT 114 (SAGE Publications, Kenneth E. Clow & Donald Baack, eds., 2011). *See also* ZFL-2499718 at 18 (November 2011 email from agent Leland Labarre on behalf of Josh Barnett to Sean Shelby and Michael Mersch at Zuffa indicating that Zuffa was able to suppress the number of events that Fighters would participate below what Fighters would otherwise prefer: "I am disappointed with the aggressiveness of your position. As you know, a fight every 4 months or so would be typical for MMA fighters, whose career primes are generally short. Conversely, a 4-fight deal with a 5-year exclusive term is unheard of. The interpretation you have provided is simply unreasonable.").

485. *See* ZFL-2508548, at 567. Another document states that PPV event ticked prices increased from $81 in 2001 to $299 in 2009. *See* ZFL-2279086 at 94.

486. *See* ZFL-2508548, at 567; *see also* ZFL-1243128, at 35.

487. *See* ZFL-1544038 at 62.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-134-

experience,"[488] and demonstrating that UFC's average ticket price for major international live-sporting events differs substantially from other sports including NFL, FIFA, and Formula 1.[489]

199.    One Zuffa document notes that "[p]rice increases for PPV transactions have also shown inelastic demand characteristics, even during the economic slowdown."[490] Zuffa's market research indicates that demand was insensitive to price hikes.[491] ██████████████

███████████████████████████████████████████████████████████[492]

200.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████.

201.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

488. *Id.*

489. *Id.*

490. October 2009 UFC Public Lender Presentation, ZFL-2279086 at 9; ZUF-00162329-382 at 43. At the deposition of Deutsche Bank's corporate designee, Drew Goldman, Deutsche Bank testified that Zuffa provided Deutsche Bank with data demonstrating that price increases for "pay per view buys and that regardless of economic conditions, that [Zuffa has] been able to continue to increase pricing." Goldman 30(b)(6) Tr. 119:9-121:6 (discussing October 2009 Confidential Information Memorandum, DB-ZUFFA-00056900, at -936). Zuffa was provided the opportunity to edit that statement and did not. See Goldman 30(b)(6) Tr. 132:8-24 (discussing handwritten edits to the October 2009 Confidential Information Memorandum, DB-ZUFFA-00043567, at 0572).

491. ZFL-2472830 at 1 ("Pay-Per-View Buys … Tracking to be the 2nd ranked event of all-time despite price increase. HD market share does not appear to be impacted by price."); ZFL-2530042 at 50 (June 2015 UFC Board Update Presentation: "$5 price increase in the U.S., which was introduced with the January 3rd UFC 182 event, does not appear to have negatively impacted buy rates."). *See also* ZFL-1063442 ("We are modeling $5 SRP increases in 2015 and 2018. The $5 increase in 2015 is long overdue as we haven't raised prices since 2006. We are not particularly concerned with price sensitivity as we experimented with a one-time price increase with UFC 168 and still generated the highest buys of 2013); ZFL-1084185 – 10/9/13 Mulkey says "our research shows the market will bear [a price increase]."); ZFL-1056382 (02/21/15 Markup of financial statement and factual commentary by CFO John Mulkey. "On January 3 (UFC 182: Jones vs. Cormier) we introduced a $5 price increase in the US which was met with little to no discernible pushback [and will remain]" (handwritten note)); ZFL-1073120 ("On January 3, [2015] UFC 182, Jones v. Cormier, we introduced a $5 price increase in the U.S. which was met with little to no discernable pushback.").

492. *See* RAINE0018791 at 802.

Strikeforce acquisition.[493]

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

202.   █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████

## 5.      The Challenged Conduct Restricted Output of Live MMA Events

203.   █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

493.  WME-ZUFFA-00001150 at *9 (In 2010, Zuffa averaged 514,000 residential PPV buys per event over 15 events, for a total of approximately 7.7 million residential PPV buys).

494.  *See* ZFL-2603702 (recording residential PPV revenue of $190.5 million in 2010).

495.  WME-ZUFFA-00001150 at *22 (reporting $196 million in residential PPV revenue for 2015).

496.  Equal to [6.4 million]/[7.7 million] − 1.

497.  Equal to [196 million]/[191 million] − 1.

498.  Let Zuffa's 2010 residential PPV price and quantity be denoted $P$ and $Q$, and denote Zuffa's 2010 residential PPV revenue as $P*Q = R$. In 2015, Zuffa's quantity is equal to $Q*(1 − 0.17)$, and its revenue is equal to $R*(1 + 0.026)$. Therefore, Zuffa's 2015 price is equal to $[R*(1.026)]/[Q*(0.83)] = [R/Q]*1.24 = [P]*1.24$.

499.  WME-ZUFFA-00001150 at *9.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-136-



204.     In addition, as explained below, the Challenged Conduct has restricted the output of Live MMA Events generally since 2010, a time period encompassing both a large increase in Zuffa's foreclosure of the Relevant Input Market and Submarket, and Zuffa's acquisition of Strikeforce.[501] This has caused industry output of Live MMA Events to fall (both in absolute terms and relative to prior trends) because the output of Live MMA Events by non-Zuffa promoters has fallen off sharply, with Zuffa's supply of Live MMA Events not increasing by enough to make up for the difference. This indicates that the Challenged Conduct suppressed the output of other MMA promoters. In the absence of the Challenged Conduct, Zuffa's ability to restrict industry output would have been at least partially counteracted by other MMA promoters, who would have been less constrained.

205.

---

500.  *See*    https://www.bloodyelbow.com/2017/6/25/15870964/spike-executive-bellator-nyc-the-first-of-many-ppv-events-running-mma-news  (stating that Bellator's debut PPV event was in 2014; Bellator hosted its second-ever PPV event in June 2017).

501.  *See* Figure 1, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

206. █████████████████████████████████████████

████████ ████████ ██ █ ████ ████ █ █ ████ ███ ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



207.



HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



**6.      All Evidence and Analysis of Anticompetitive Effects Is Common to the Classes**

208.    All of the evidence of anticompetitive effects I have discussed in this report, and my analyses of that evidence, are common to the Classes as a whole. If I were asked to analyze anticompetitive effects for any single member of either Class, the evidence and analysis would be the same.

**IV. COMMON IMPACT ON THE BOUT CLASS**

209.    In this section, I show that common impact can be demonstrated with respect to Bout Class Members using two separate, mutually reinforcing, methods. The first method is a standard, two-pronged, class-wide approach that has been accepted in prior antitrust litigation,

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

including in *High-Tech Employee* and in *Arizona Travel Nurses*.[502] Under this method, the first prong involves a determination as to whether classwide evidence is capable of showing that the Challenged Conduct had a generally suppressive effect on compensation Zuffa paid to members of the Bout Class. The second prong of the first method involves determining whether there is class-wide evidence of a mechanism that would transmit the artificially reduced compensation (found by the first prong) broadly across the Class.

210.     The second method—also successfully employed in antitrust class actions to demonstrate common impact—uses standard, class-wide econometric techniques to demonstrate that that the vast majority of Class Members received lower compensation than they would have in the but-for world. Under this second method, my econometric model compares the compensation actually received by each Class member to the amount that he or she would have received in the but-for world. Using this information, I then compute what proportion of Class members were artificially undercompensated due to the Challenged Conduct. This method, like the first, has been accepted in prior antitrust litigation.[503]

A.     **The Challenged Conduct Suppressed Bout Class Compensation**

211.     As explained above, the Challenged Conduct substantially foreclosed rivals from key inputs necessary to compete effectively, including most importantly access to the top-ranked

---

502. I was the plaintiffs' economic expert in *Arizona Travel Nurses*. I have also served as expert for plaintiffs in other classes that have been certified based in part on my proof of common impact, including most recently *In Re Lidoderm Antitrust Litigation*. The district court accepted my methodology for proving antitrust impact in *Johnson v. Arizona Hospital & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. 2009) at *8, 11. The same "two-step" methodology utilized in *Johnson* was accepted by the court in *In re High-Tech Employee Antitrust Litigation*, Case No. 11-CV-2509-LH, *Order Granting Plaintiffs' Supplemental Motion For Class Certification* (Oct. 24, 2013) at 53 ("Plaintiffs noted that Dr. Leamer's approach followed a roadmap widely accepted in antitrust class actions that uses evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class."). *See also, e.g.*, *Johnson*, 2009 WL 5031334 at *8, 11 (finding predominance where conduct was alleged to suppress bill rates for nurses generally and evidence was presented that bill rates were correlated with nurse pay rates); Caves & Singer, *supra*, at 5.

503. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Fighters. Because the Challenged Conduct impaired would-be rivals in their ability to compete, Zuffa exercised its market power over Fighters to a greater extent than it could have otherwise. In particular, the classwide regression analysis presented in Part III.D.1 above demonstrates that the Challenged Conduct reduced the share of Event Revenue Zuffa paid to the members of the Bout Class, thereby artificially reducing compensation to the Bout Class overall. The question for common impact is whether this effect was transmitted broadly across the Bout Class.

## B.    Common Evidence of a Compensation Structure Is Capable of Demonstrating That Compensation Suppression Was Broadly Experienced Across Bout Class Members

212.    As explained below, Zuffa's compensation practices differed as between the bottom 80 percent of Fighters, whose pay was largely predetermined by fixed schedules, and those of the top 20 percent, whose compensation was partially determined by similar formulaic aspects to the bottom 80 percent, but also included components such as Letters of Agreement and PPV agreements. My analysis shows that both groups would have seen higher Event Compensation[504] in the but-for world because Zuffa would have had to compete more aggressively against other MMA promoters to secure the services of all Fighters. In other words, but for the Challenged Conduct, more robust MMA rivals would have increased competition for all levels of Zuffa Fighters, not just some limited subset. Fighters in the bottom 80 percent would have enjoyed higher compensation through, at minimum, upward adjustments in Zuffa's standard compensation schedules. Fighters in the top 20 percent would also have benefitted from such adjustments to standard compensation schedules, and would also have benefitted further from increased bargaining leverage when determining the additional components of their compensation packages. As Scott Coker, former CEO of Strikeforce and current President of Bellator, explained in his

---

504.  As explained in Part III.D.1, Event Compensation includes compensation from (1) show and win purses, (2) discretionary/performance pay, (3) PPV royalties, and (4) letters of agreement.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

deposition, if Zuffa is the only viable alternative for Fighters (as he believed it would effectively be after Zuffa's acquisition of Strikeforce),[505] the effect is to depress compensation generally:

> [I]f there's only one place to have a job, and then, there's only a certain amount of slots available to have employment, the fighter purses naturally would go down because now you're in control of the marketplace. So now, *you can dictate what an entry [level] fighter would get and what a mid-tier fighter would get, what a top-tier fighter would get*. And you kind of control the marketplace at that point.[506]

This generalized suppression of compensation as the number and vitality of bidders for workers' services is reduced is just what is predicted by elementary economics, which shows that a monopsonist suppresses compensation to all of its labor inputs, just as a monopolist raises prices to all of its customers. Monopsony power is the mirror image of monopoly power;[507] the harm to competition from monopsony is directly analogous to the harm from monopoly.[508] A monopolist harms buyers by charging them a price above the competitive level; a monopsonist harms sellers by paying them a price below the competitive level.

213.    Another mechanism transmitting suppressed compensation across all or almost all members of the Bout Class consists of a formulaic compensation structure, driven by observable common factors such as such as weight class, Fighter rank, gender, placement on the card, win/loss record, and so on, combined with (and mediated by) Zuffa's implementation and enforcement of the economic concept of "internal equity," under which Zuffa ensured that similarly situated

---

505. As explained above, Coker likened Strikeforce to "Luke Skywalker" and the UFC to "Darth Vader and the Death Star." Coker Exh. 8; Coker Dep. at 95:10-20.

506. Coker Dep. at 97:18-99:3 (emphasis added).

507. U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010) [hereafter *Merger Guidelines*], §1; §12. *See also* MODERN IO at 107-110.

508. MODERN IO at 107-110; *see also* Merger Guidelines §1 ("Enhancement of market power by buyers, sometimes called 'monopsony power,' has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers"). *See also* §12. *See also Johnson v. Ariz. Hosp. & Healthcare Ass'n (AzHHA)*, No. CV 07-1292-PHXSRB, 2009 WL 5031334 (D. Ariz. July 14, 2009); *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (stating that monopoly and monopsony are "symmetrical distortions of competition") (quoted in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322 (2007).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Fighters received similar compensation, and that differences in compensation could be explained by known or knowable factors.

214.    Internal equity—also referred to by economists as wage compression—is the notion that laborers doing comparable work believe that they should receive similar compensation. As a forthcoming article in the *Quarterly Journal of Economics* notes, "a long tradition in economic thought—as well as in psychology, sociology, and organizational behavior—has advanced the notion that individuals also care about their pay relative to that of their co-workers."[509] Because employees value internal equity, employers respond by implementing uniform compensation structures that pay comparable compensation for comparable work. One textbook explains that "[p]ay structure refers to the array of pay rates for different work or skills within a single organization,"[510] and refers to examples of pay structures at companies such as Merrill Lynch and Lockheed Martin.[511] Payroll software companies offer advice to employers on achieving internal equity:

> Internal equity is the comparison of positions within your business to ensure fair pay. You must pay employees fairly compared to coworkers. Employees must also perceive that they are paid fairly compared to their coworkers. Otherwise, they might feel unvalued and leave. It is easy for employees to find out how much other employees earn via the Internet and word of mouth. If an employee works hard but is paid less than her coworkers who do not work as hard, she might become upset about her wages. When you adopt a straightforward and honest payment system, your employees will believe that they are being paid fairly and with equality. This boosts company morale and employee loyalty, bringing many benefits in the long run….

---

509. Emily Breza, Supreet Kaur & Yogita Shamdasani, *The Morale Effects Of Pay Inequality*, QUARTERLY J. ECON. (forthcoming 2017), *available at*: https://sites.google.com/view/ebreza/research. *See also* Caves & Singer, *supra*; GEORGE MILKOVICH, JERRY NEWMAN & BARRY GERHART, COMPENSATION 69 (10th ed. McGraw-Hill 2011) ("Internal alignment, also called *internal equity*, refers to the pay relationships among different jobs/skills/competencies within a single organization.") (emphasis in original).
510.  Milkovich, et al., *supra*, at 69.
511.  *Id.* at 69-73.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

> To create fair pay, you compare employees who do similar jobs for your company. You should consider the tasks your employees do. *If two employees perform similar tasks, they should earn similar wages.*[512]

215.    As explained below, there is substantial documentary evidence indicating that the compensation paid to Zuffa Fighters followed a formulaic compensation structure driven, in part, by considerations of internal equity. In addition, I provide econometric evidence indicating that approximately three-quarters of the variation in observed Fighter compensation (in absolute levels) is accounted for by observable common factors (as opposed to individualized factors). I also demonstrate empirically that individual Fighter compensation per event moves together with the per-event compensation paid to other Fighters, both within and across years. Put differently, the gains (or losses) in compensation are shared broadly across Class members.[513] This evidence demonstrates that Zuffa follows a compensation structure driven by considerations of internal equity, which implies that the compensation-suppressing effects of the Challenged Conduct were not confined to a subset of Class members, but instead were broadly shared across the Class.

### 1.    Documentary Evidence of a Compensation Structure

216.    Record evidence indicates that Zuffa's contracts specify formulaic schedules of show and win payments.[514] According to a 2010 UFC Due Diligence presentation, UFC compensation generally falls into different tiers, depending on the "ability and notoriety" of

---

512. Patriot Software, *Payroll Blog: Payroll Training, Tips, and News*, *available at*: https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/ (emphasis added). *See also* Stacey Carroll, "Does Your Company Have Internal Pay Equity?" *available at*: http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity

513.  A similar approach was used to demonstrate a compensation structure in *High-Tech Employee*. *See* Caves & Singer, *supra*, at 5.

514.  I review the forms of Fighter compensation paid by Zuffa, including show and win payments, in Part I.C above.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Fighters.[515] Fighters' show and win purses are nearly always identical to each other; the winner of a fight doubles his or her base pay.[516] A win in a prior bout typically entitles a Fighter to higher show and win purses in the next event, with the increase occurring in fixed increments, typically between $2,000 and $5,000. A loss in a prior bout typically does not lead to any guaranteed increase in the show and win purses payable in the next bout.[517] In his deposition, UFC's Joe Silva confirmed that "under our standard agreements a fighter only moves up in compensation if he wins. If a fighter does not win [and we] elect not to terminate the fighter his following bout stays at the same amount as previous fight."[518]

217.



Joe

---

515. ZFL-1382453 (noting that compensation "varies depending on ability and notoriety of Fighters. Generally Fighters are categorized into 3 tiers: a) Entry level - typically Fighters coming off The Ultimate Fighter Reality Show; b) Mid-tier level - emerging stars; c) Top-tier - proven stars who on certain occasions receive a portion of pay-per-view receipts").

516. *See, e.g.,* ZFL-0000003.xls (spreadsheet showing show and win purses).

517. *See, e.g.,* ZFL-0198252, 257 ("Fighter's Purse for the first Bout shall be Fifteen Thousand Dollars…If and only if Fighter is declared the winner of the first Bout, Fighter's purse for the second Bout shall be Seventeen Thousand Dollars….").

518. Silva Dep. at 341:11-20 ("Q. With respect to your question on how our compensation structure works, under our standard agreements a fighter only moves up in compensation if he wins. If a fighter does not win [and we] elect not to terminate the fighter his following bout stays at the same amount as previous fight? Do you see that? A. Yes. Q. That's accurate; right? A. Yes.").

519. *See, e.g.,* ZUF-00140700 ("Most any new fighter (not world ranked) at the lower weights will be coming into UFC at 6k+6k.").

520. *See* ZFL-0504268, 273-274 (contract signed 12/30/2008).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



521. Simpson's contract superseded another contract signed just months earlier with (Zuffa-owned) WEC, which was governed an identical show/win schedule (7/7, 9/9, 11/11, 13/13 15/15). *See* ZFL-0504287 at 292-294 (contract signed 9/4/2008).

522. Silva Dep. at 338:24-339:14 ("Q. Okay. And the way the contracts were structured, is it fair to say that they're structured so that if a fighter wins they move to the next level in the contract? A. That's correct. Q. If they lose they stay at same level? A. That is accurate. Q. So a contract can have 10 and 10 and 12 and 12 and if fighter wins 10 and 10 they move to the 12 and 12? A. Correct if they lose 10 and 10 they stay at 10 and 10 for the next fight. A. Yes. Correct.").

523. ZFL-0000003.xls (showing Quarry's win/loss record back to 2005).

524. ZFL-0003018, 022-024.



. Note: Strikeforce Challengers was an MMA series produced by Strikeforce and Showtime to highlight upcoming Fighters. *See, e.g.,* http://www.sherdog.com/news/news/Strikeforce-Challengers-20-Draws-143000-Viewers-on-Showtime-37424

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

219.    In his deposition, Mr. Shelby testified that when it comes to Fighter compensation, "you have to have some sort of uniformity."[528] As Mr. Shelby explained, that variation is also based on the relative ranking of Fighter's skills as compared to each other, "so you … have to have some sort of reason to have separation between the fighters."[529] He went on to explain that comparable Fighters are paid alike, stating that "[s]o if you see people in similar situations … in the first or second contract they're going to get compensated similarly…."[530]

220.    

221.

528. Deposition of Sean Shelby, January 25, 2017, at 241:22-242:1.
529. *Id.* at 242:4-242:5.
530. *Id.* at 242:17-242:19. In addition, Zuffa engaged Mercer, a human resources consulting firm, to study its pay structure for Fighters and make recommendations on a framework for Fighter pay. *See* ZFL-1007379 (Mercer statement of work); ZFL-0557588 (Recap and Current Status Review showing timeline of project).
531. ZFL-0895314.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



222. ██████████████████████████████████

223. ██████████████████████████████████

532. ZFL-0895314, 315.
533. *Id.*
534. ZFL-0895314, 316-317.
535. Deposition of Denitza Batchvarova, January 25, 2017, at 37:8-19.
536. *Id.* at 38:11-39:1.
537. *Id.* at 40:9-11, 66:8-18.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



224.

225.

538. Batchvarova Dep. at 67:3-14.

539. ZFL-1897652 at 748 (emphasis added).

540. ZFL-0819451 at 54.

541. *Id.* at 53.

542. ZFL-1005485 (3/13/14 email from Sen Shelby to Silva, Fertitta, and Dana, noting "I can talk money all day but a PPV component as a challenger is a deal breaker.").

543. *See, e.g.,* ZUF-00140642 (In May 2011, when an agent for one Fighter (Tiequan) sought to negotiate their contract, the negotiations centered around the contracts offered to other appropriate "benchmark" Fighters. Zuffa's Sean Shelby pointed to another Fighter (Jose Aldo) who was champion in the same weight class and made equal (or less) purses at the same stage in his career); ZUF-00140700 (listing comparable Fighters and their compensation); ZFL-0997899 (12/5/2013 email from Long to Fertitta and Hendrick, copy to Epstein, discussing "Fighter Comps" for Glover Teixeira. "Please let me know if you want me to pull any additional fighter's information for comparison.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

████████████████████████████████████  ██  ████████████████████████████████████

████████████████████████████  .",[545]

226.    Given Zuffa's formulaic compensation practices, it is unsurprising that a preliminary memorandum prepared for Zuffa by a law firm states that Fighter compensation levels move in tandem, regardless of where a Fighter falls in Zuffa's compensation structure.[546] As Chief UFC Matchmaker Joe Silva explained to one Fighter's manager: "As I said, I have a pay structure. I cannot mess it up for 1 fighter. I have to justify that to all the other managers… It's great if other people want to pay him more but that's not how my business model works."[547] This is, in effect, a textbook case of a manager seeking to apply the concept of internal equity to a workforce.[548]

### 2.    Econometric Evidence of a Compensation Structure

227.    To determine what proportion of the variation in Bout Class compensation (above and beyond the average) is attributable to common factors, I performed a regression analysis that explains total Fighter compensation (in levels, as opposed to share of event revenues) using some of the same explanatory variables from my regression analysis in Part III.D.1 above. However, I exclude from this regression Fighter-specific performance variables from the FightMetric database (such as average strikes landed, average takedown attempts, and so on). The regression analysis

---

544. Silva Dep. at 372:22-373:18 ("Q. Right. And so you wanted to make sure that you did your best to try to make sure that comparable fighters with comparable records are getting paid comparable amounts; is that fair? A. Yeah, that was my goal. Q. And one of the reasons why you did that is because you had to justify everyone's pay to everyone else, and if you …were doing this poorly or inefficiently, you'd constantly have fighters demanding more money, they'd say, hey, wait, you paid this guy this much and that guy that much, and you wouldn't be able to justify to them if -- if you hadn't been doing this well; is that right? A. It would just seem unfair to give somebody something that somebody else, equally deserving, didn't get. Q. And you attempted, at least in your mind, to be fair, to impose a sense of equity between the different fighters; correct? A. I did.").

545. *Id.*

546. ZFL-1472077, 123 ("wherever a fighter falls in UFC's compensation structure, he has experienced steady and substantial increases in compensation since 2005"). ████████████████████████████████████████████████

████████████████████████████████████████████████████████

547. ZUF-00296703-706.

548. Milkovich, et al., *supra*, at 69-73.

therefore relies upon common and objectively measurable factors only—such as weight class, rank, gender, placement on the card, year, country, and venue—to explain variation in observed Fighter compensation. The dependent variable is the natural log of a Fighter's Event Compensation. The *R*-squared obtained from this regression is approximately 78 percent. Accordingly, over three-quarters of the observed variation in Fighter Compensation—above and beyond what can be explained by the sample average—is explained by common factors. This provides further evidence of a compensation structure determined by factors common to the Class as a whole. Given that those factors would likely be the same in the but for world, the same factors that determine relative differences in compensation between Fighters would remain, and thus a general increase in compensation in the but for world would likely affect all Class members. A rise in some corresponds to a rise in all, just as a reduction in some would result in a reduction in all, because the compensation structure interconnects the compensation of all or almost all Zuffa Fighters.

228.    Next, I performed regressions to determine whether gains (or losses) in compensation are broadly shared across the Bout Class. Similar to analyses performed by the Plaintiffs' expert economist in *High-Tech Employee*, these regressions measure the extent to which an increase in the compensation paid to Fighters overall is statistically associated with an increase in compensation for individual Fighters.[549] Specifically, I estimated regressions in which the dependent variable was set equal to an individual Fighter's annual compensation per event, and the independent variable was set equal to either: (1) the average compensation per event paid to all other Fighters in *that* year; or (2) the average compensation per event paid to all other Fighters in

---

549. *See Order Granting Plaintiffs' Supplemental Motion for Class Certification*, *High-Tech Employee Antitrust Litig.*, No. 11-CV-02509 (N.D. Cal. Oct. 24, 2013), at 60-61. *See also* Caves & Singer, *supra*, at 5.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

the *prior* year.  Because the variables are measured annually, these regressions do not include the same set of control variables as the regressions reported in Part III.D.1 above (such as controls for Fighter performance within a bout, venue fixed effects, etc.). Instead, they include fixed effects by Fighter, which control for all individual-specific, time-invariant Fighter characteristics. The variable *Trend* is an annual time trend; this controls for secular trends over time that may be correlated with compensation.

229.



**C.    Standard Econometric Methods Further Demonstrate Directly That the Vast Majority of Bout Class Members Received Lower Compensation Than They Would Have In the But-For World**

230.    To provide further proof of classwide impact, I used standard econometric methods common to the Class as a whole to determine whether the vast majority of Bout Class Members received lower compensation than they would have in the absence of the Challenged Conduct. Specifically, I used the regression models from Part III.D.1 to predict the but-for compensation share for each Fighter in each event in the but-for world. I then compared the predicted but-for compensation share with the share of Event Revenue that the Fighter actually received in that event.

231.    █████████████████████████████████████████████████



232.    In summary, based on two independent methods, I conclude that all or almost all members of the Bout Class suffered antitrust injury as a result of the Challenged Conduct.[551]

## V. COMMON IMPACT ON IDENTITY CLASS

233.    In this section, I show that common impact can be demonstrated for two subgroups of the Identity Class. The first ("Identity Subgroup One") consists of those who received at least some sponsorship payments, video game payments, merchandise royalty payments, or athlete outfitting policy payments from Zuffa during the Class Period, according to Zuffa's records. The second ("Identity Subgroup Two") consists of all Fighters who executed a PAR during the Class Period, regardless of whether these Fighters received compensation for use of their Identity in the actual world according to the JD Edwards or Merchandise Royalty Accrual database.[552]

---

550. That a small percentage of a Fighters are not shown to have been undercompensated under this method does not imply that he or she was uninjured. As explained in the two-step method in Part IV.B, a generalized increase in compensation in the but-for world would have benefitted all or almost all Fighters.

551. Both methods of proving common impact to the Bout Class (the two-step method described in Part IV.B above, and the econometric method described here) reveal that all of the proposed representative plaintiffs for the Bout Class (namely, Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury) suffered impact in the form of artificially suppressed compensation due to the Challenged Conduct. *See* backup data.

552. My methods for proving common impact to the Identity Class reveal that the following proposed named plaintiffs for the Identity Class suffered impact in the form of artificially suppressed compensation due to the Challenged Conduct: Cung Le, Jon Fitch, Brandon Vera, Luis Javier Vazquez, Kyle Kingsbury, and Nate Quarry.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

234.   As explained below, I conclude that all or almost all of Identity Subgroup One suffered antitrust injury, based on the same, two-pronged method that was used to prove impact for the Bout Class. With respect to Identity Subgroup Two, I conclude that all or almost all of these Class members have suffered antitrust injury, because all or almost all of these Class members would have received at least nominal, one-time payment at the time that their PARs were executed as compensation for use of their Identity in the but-for world.

## A.    The Challenged Conduct Suppressed Identity Class Compensation

235.   As explained above, Zuffa has reduced the share of revenue paid to Fighters over time. Further, Zuffa pays a significantly lower share of its revenues to its Fighters than Strikeforce or Bellator pay to theirs. Moreover, Zuffa unilaterally restricted Fighter compensation by imposing a new sponsorship tax, appropriating sponsorship revenue that Fighters had previously received directly from sponsors.[553] In the but-for world, Zuffa's ability to restrict Fighter compensation in at least these three ways would have been curtailed, resulting in higher compensation for members of the Identity Class.

236.   Quantifying the effect of the Challenged Conduct on the Identity Class is complicated by the fact that I do not have access to records of payments made directly from sponsors to Fighters, which means that I cannot quantify the extent to which such payments declined as Zuffa began to appropriate more sponsorship revenue for itself. As a result, my analyses of harm to Identity Class members are conservative. The data available to me are limited to payments in which Zuffa was an intermediary between the sponsor and the Fighter. Specifically, Zuffa's JD Edwards ("JDE") database reflects various line-item payments that Zuffa made to Fighters, including sponsorship payments, video game payments, merchandise royalty payments,

---

553.   *See* Part III.D.2, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

and athlete outfitting policy payments ("JDE Identity Payments").[554] From the beginning of the Class Period until December 30, 2016 (the last date for which JDE data were produced by Zuffa), there are 820 Fighters who received at least some JDE Identity Payments, all of whom are members of Identity Subgroup One. I supplement the JDE Identify Payments data with the Merchandise Royalty Accrual data, which contains royalty accruals for Fighters with signed merchandising agreements with Zuffa. This brings the count of Fighters in Identity Subgroup One up to 826.[555]

237. ████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████ ██ ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

---

554. The JDE data also include unrelated payments such as reimbursements for travel expenses, as well as bout-related payments such as show and win purses. For purposes of my analysis here, I restrict the JDE data to sponsorship payments, video game payments, merchandise royalty payments, and athlete outfitting policy payments.

555. *See* Appendix 2.

556. *See* Part III.D.1, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

238. █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████ ██████████████████████████████

██████████ ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

239.    To estimate the amount of this nominal payment, I relied on a Zuffa document that includes a schedule of nominal, one-time, formulaic recommended payments in exchange for the use of their Identity in the UFC Electronic Arts video game series.[559] I understand that this document reflects payments that Zuffa offered to Fighters in exchange for Identity rights that Zuffa needed, but had neglected to acquire previously. According to the document, these payments were made according to a formulaic schedule by dividing Fighters into various tiers. The recommended payment ranges from $2,500 to $25,000 based on a Fighter's "rating," which included the following categories: "S, AAA, AA, A, B C, C-."[560]

240.    In the but-for world, all Fighters in Identity Subgroup Two would have received at least the minimum (lowest-tier) payment, which is $2,500.[561] This estimate is conservative because

557.   DB-ZUFFA-00007015 at DB-ZUFFA-00007028. *See also* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, and ZFL-0086231; ZFL-1690436-444 (Fighter IP Guidelines for Consumer Products; provides Zuffa's interpretation of what Identity rights are included in the PARs).
558.   DB-ZUFFA-00007015 at DB-ZUFFA-00007078.
559.   ZFL-1056348.
560.   *Id.*, tab 2 ("Fighter Bonus Recommendation").
561.   *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

it

## B. Mechanisms Exist to Transmit Compensation Suppression Broadly Across Identity Class Members

241.    Record evidence confirms the existence of uniform compensation structures transmitting compensation suppression broadly across the Identity Class. Zuffa's documents indicate that—to the extent that members of the Identity Class were compensated at all—payments were governed by formulaic structures. As discussed in Section I.D, Fighters received three different kinds of compensation from Zuffa for the use of their identity: (1) merchandise royalty payments; (2) payments for participation in official sponsorship programs; and (3) video game payments. These payments followed formulaic structures.

242.

---

562. *See* ZUF-00374356 ("Currently close to 100 fighters (past, current and rookies) as well as Octagon Girls, Cut Men and Announcers are signed to merchandise agreement. Few might have some exclusion but for the most part all have the same terms…. Any past, present and future fighter (Ultimate Fighter Show) that has or will have a following in the UFC/Pride/WEC will be offered a contract to participate in the merchandise program. Because we're signing many fighters, it's important that the basic terms within the schedules of each agreement stay the same. The only things that might be negotiated are the articles to which the fighter could or wants to participate in. This is because fighter might be bringing exclusive deals that would preclude him to participate in specific categories."). *See also* ZFL-2244834 (In January 2010, Mersch demands that Clay Guida sign Merchandise Agreement; "and that directive comes from Dana." Guida's agent replies: "We are glad to extend the relationship as well. Our counsel feels the merchandise agreement is a bit restrictive and has advised us against participating for the time being. If that changes, I will notify you immediately." Mersch replies: "That's not an option. We are willing to discuss the language but he needs to sign the Mersch agreement per Dana.").

563.



243.

---

564. ZFL-1049355. *See also* Batchvarova Dep. at 52:22-54:7 ("Q. Looking at the royalty on fighter IP sales, is it fair to say that every fighter for whom you had data either had a 20 percent royalty or a 30 percent royalty? … A. Yeah, if that is what you guys determined, then, yes, that is the data that I had. It seems like it, yes.").

565.

566. ZFL-0887100 (emphasis added). (11/25/2014 email from Batchvarova to Cook and several others stating, "After speaking with Lorenzo, Lawrence, Joe Silva and Sean Shelby, we have decided to move towards one pay scale for all weight classes. Below is the revised pay scale… Champion: $35,000; Ranked #1-#5: $17,500; Ranked #6-#10: $10,000; Ranked #11-#15: $5000; Non-ranked: $1,500").

567.

568. ZFL-1039853 at 58, 64; Batchvarova Dep. at 32:5-34:20 ("we came up with the methodology which is currently actually employed which is assigning by tenure, which is objective").

569. *Id.*

570. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



244.     In summary, the Challenged Conduct suppressed compensation for both Identity Subgroups, and there exist mechanisms to transmit this suppression broadly across Class Members. Accordingly, all or almost all members of Identity Subgroup One and Two suffered antitrust injury as a result of the Challenged Conduct.

## VI. AGGREGATE DAMAGES

245.

246.     It bears emphasis that, although Zuffa Fighters would earn higher compensation in the but-for world, not all Zuffa Fighters would necessarily be fighting for Zuffa in that newly competitive world. In the but-for world, other MMA promoters would have been able to attract more Fighters, would have earned higher revenue, and would have paid competitive compensation to those Fighters. Further, as shown in Part III.D.V above, output of Live MMA Events would

---

571.  ZFL-0979654.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

expend in a but-for world absent the Challenged Conduct, which could generate more revenue with which to compensate Fighters. Accordingly, for this and other reasons,[572] damages should not be constrained by the contemporaneous revenue and profit earned by Zuffa in the actual world.[573]

### A.   Aggregate Damages Using Strikeforce and Bellator Benchmarks



247. ██████████████████████████████████████

248. ██████████████████████████████████████

---

572. ███████████████████████████████████████
███████████████████

573. Moreover, as explained in Part VII, Zuffa's profits appear to have been understated by Zuffa's accounting practices.

574. Calculated from ZFL-1472337, and ZFL-1472338.

575. Calculated from SBPCL00002101.

576. Calculated from ZFL-1514837, ZFL-1514870, ZFL-1514900, ZFL-1514933, ZFL-1514944, and ZFL-2764799. Due to limitations in the Strikeforce and Bellator data, I conservatively compare the share of total revenue that Strikeforce and Bellator paid to their Fighters, respectively, to the share of Event Revenue that Zuffa paid to its Fighters.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



**B.      Aggregate Damages Using Zuffa Foreclosure Regression Benchmark**

249.     As an alternative to the Strikeforce and Bellator benchmarks, I calculate damages using a third benchmark that does not rely on any information from other MMA promoters. Instead, the third benchmark is based on the statistical relationship between Zuffa's foreclosure share and its own Fighter Shares over time. To quantify this relationship, I estimated a regression model similar to that presented in Part III.D.1, except that all data points for Strikeforce prior to its acquisition by Zuffa are discarded from the regression model. I conservatively used the Ranked measure of the Relevant Input Market to calculate damages.

250.



## C.  Aggregate Damages Using Impact Regression Model Benchmark

251.    My fourth measure of aggregate damages uses the impact regression model presented in Part III.D.1. By using the Strikeforce observations before Strikeforce was acquired by Zuffa, this method generates a larger coefficient on the foreclosure share relative to the regression model presented above. As before, I conservatively used the Ranked measure of the Relevant Input Market to calculate damages.

252.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-165-

**D.     Aggregate Damages to the Identity Class**

253.

254.

-166-



255.

256.



## VII.   ZUFFA'S LIKELY EFFICIENCY DEFENSES ARE UNAVAILING

257.    The record includes efficiency defenses of some or all of the Challenged Conduct that Zuffa, or economists acting on its behalf, have proffered in past proceedings. These efficiency defenses include the following claims: (1) that the Challenged Conduct has increased MMA output;[577] (2) that the Challenged Conduct incentivized investments promoting Live MMA Events generally and individual Fighters specifically;[578] and, (3) that the Challenged Conduct has increased Fighter compensation.[579] As explained below, the record evidence I have reviewed to date, and my own analyses, does not support Zuffa's prior claims that the Challenged Conduct has had any of these effects, and in fact, directly contradicts such claims.

258.    Zuffa's efficiency defenses, like the claims made by owners in other professional sports leagues in the past, amount to the claim that Zuffa must be permitted to exercise monopoly



577.

578.    *Id.*
579.    *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

and monopsony power for the good of the sport. But the evidence from other professional sports, and the extensive sports economics literature, indicate just the opposite: Elimination of the Challenged Conduct would likely benefit Fighters, consumers, and the MMA industry and sport generally.

**A.     Zuffa's Claim That the Challenged Conduct Increased Output**

259.    As explained in Part III.C, the Challenged Conduct restricted output in both the Relevant Input Market and the Relevant Output Market. In contrast, Zuffa has claimed that output has expanded as a result of its exclusive multi-bout contracts and its horizontal acquisitions. Neither claim is supported by the evidence.

**1.     Zuffa's Claim That Multi-Bout Contracts Increased Output**

260.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

261.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

580.   *Gaglio Letter* at 064.
581.   *Id.*
582.   *Id.* at 065.



583.  *See* Parts III.D.5 and III.B.2, *supra*.
584.  *See* Part II.C, *supra*.
585.  *Id.*
586.  *Gaglio Letter* at 064.
587.  *Id.* at 067.
588.  *See* Part III.B, *supra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



266.

---

589.   *See* Part III.C, *supra.*

590.   *Gaglio Letter, supra,* at 075.

591.   *Id.*

592.   *See* Part II.B, *supra.*

593.   *Gaglio Letter, supra,* at 076, n.27 (citing UFC Cut Fighters Analysis, 2008-2015, prepared by Dr. Blair's team).

594.   *Id.* at 074.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



### 2.   Zuffa's Claim That Its Horizontal Acquisitions Increased Output

267.   Professor Rodney Fort, one of Zuffa's experts from the FTC's first investigation of Zuffa's practices in 2011, claimed that Zuffa's horizontal acquisitions of MMA promoters has increased MMA output because "the number of Zuffa events has continued to increase following Zuffa's acquisition of WEC, WFA, Pride, and Affliction."[596] Dr. Andrew Dick, another of Zuffa's prior experts from the FTC's 2011 investigation, also pointed to increases in Zuffa's output over time as evidence of the acquisitions being procompetitive.[597]

268.   That Zuffa's *own* output may have increased over time fails to demonstrate the Challenged Conduct increased MMA *industry* output. Any firm that monopolizes an industry through horizontal acquisitions (and/or other anticompetitive conduct) may find that its own output

---

595.   *See* https://twitter.com/MMAGraphs/status/887735294845497348/photo/1

596.   *Declaration of Rodney D. Fort Submitted to the Federal Trade Commission on Behalf of Zuffa, LLC* (December 1, 2011), ZFL-1212308 [hereafter *Fort Report*] at 330; *see also* 355 (showing the annual number of UFC PPV events from 2001 - 2010).

597.   *See Declaration of Andrew R. Dick, Ph.D., Submitted to the Federal Trade Commission on Behalf of Zuffa, LLC* (December 1, 2011), ZFL-1212452 [hereafter *Dick Report*] at 472; *see also* 547-550 (identifying, from 2001 – 2010, the annual number of UFC PPV events, paid attendance at UFC PPV events, North American UFC PPV buys, and closed circuit locations for UFC PPV events).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

has increased. From an antitrust perspective, however, the relevant question is whether *industry* output is higher or lower than it would have been in the absence of Challenged Conduct. Professor Fort also claimed that Zuffa's horizontal acquisitions allow Zuffa to "stage higher quality fights by leveraging a larger stable of fighters."[598] Once again, this confuses conduct that is beneficial to Zuffa with conduct beneficial to the industry as a whole. Zuffa's ability to harm competition hinges on its ability to deny rivals access to the inputs necessary to stage high-quality fights, which leaves Zuffa as the only promoter capable of consistently staging high-quality fights.[599] In any case, my analysis shows that the Challenged Conduct restricted the supply of Live MMA Events in the Relevant Output Market: The decline is driven by a drop in non-Zuffa events, with Zuffa's supply of Live MMA Events not increasing by enough to make up for the difference.[600] For example, the supply of Fights featuring Headliners has declined significantly since the Strikeforce acquisition.[601]

269.    The claim that the Challenged Conduct is necessary to produce high-quality matchups also incorrectly assumes that two high-quality Fighters signed under different promoters cannot be matched against each other. But there is nothing that inherently prevents matchups between Fighters from different promoters. This is standard practice in boxing, and could occur in a more competitive MMA industry. In the current environment, Zuffa relies on the Challenged Conduct to maintain its dominant position, and thus Zuffa faces clear disincentives to avoid cross-promotional matchups, which might allow other MMA promoters to challenge its dominance. Tellingly, in a market in which Zuffa is not dominant (boxing), Zuffa revealed its willingness to

---

598.   *Fort Report, supra,* at 331.
599.   *See* Part III.B, *supra*.
600.   *See* Part III.D.4, *supra.*
601.   *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

pursue a matchup with another promoter (albeit a non-MMA promoter), having agreed to co-promote the Conor McGregor vs. Floyd Mayweather boxing match. In other words, in a competitive marketplace, where no promoter is dominant, it is in the interest of each promoter to stage the most competitive bouts, even if that means matching Fighters from different promoters. That is not true in MMA today due to the Challenged Conduct, but would be true in the absence of that conduct.

## B.    Zuffa's Claim That the Challenged Conduct Increased Fighter Compensation

270.    As explained in Part III.C, the Challenged Conduct afforded Zuffa the power to substantially suppress compensation paid to its Fighters. In contrast, Zuffa's experts have elsewhere claimed that Zuffa pays competitive compensation to Fighters. As explained below, these analyses do not support Zuffa's claim.

### 1.    Zuffa's Claim That Increased Fighter Compensation Over Time Shows That Fighter Compensation Is Competitive

271.    Dr. Dick has pointed to "steadily increased fighter compensation" over time as evidence that Fighter compensation is competitive.[602] Dr. Dick's analysis is based on changes in the levels of Fighter compensation between 2005 and 2010 for Zuffa Fighters at the 25th, 50th, and 75th percentiles.[603] For example, Dr. Dick's data show Zuffa's median Fighter compensation per event decreasing from approximately $10,000 in 2001 to $6,000 in 2005, then increasing to approximately $22,500 by 2010.[604] Similar patterns are observed for the 25th and 75th percentiles.[605]

---

602.   *Dick Report, supra* at 493-494.
603.   *Id.* at 568-570. Dr. Fort submitted identical analyses. *See* ZFL-1212308 at 348-350.
604.   *Id.* at 569. The increases over time are more modest when Dr. Dick deflates his data using compensation indices from other sports, or using a BLS index of compensation for employees in arts, design, entertainment, sports, and media occupations.
605.   *Id.* at 568, 570.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

272.    Dr. Dick's analysis fails to control for the fact that Zuffa's revenues—and Zuffa's revenues per Fighter—have increased very substantially over time. This means that Fighter productivity (or "marginal revenue product") has increased, which would predict under competitive circumstances an even greater increase in Fighter compensation. Over the time period studied by Dr. Dick (2001-2010), Zuffa's Event Revenue per Fighter per event has increased by more than a factor of ten.[606] Yet Dr. Dick's own data show that Fighter compensation has increased by significantly less than this over the same interval, by a factor of about two to three.[607] Thus, Dr. Dick's own data indicate that Fighter compensation has failed to keep pace with increases in Fighter productivity, indicating that Zuffa has been able to exercise monopsony power over its Fighters over time. Moreover, the relevant question is not whether Fighter compensation has grown in the absolute sense, but rather whether Fighter compensation would have been higher (or lower) in the absence of the Challenged Conduct.[608]

273.    My own regression does not suffer from these two flaws. *First*, my regression accounts for Zuffa's increasing revenues by measuring Fighter compensation as a percentage of revenue. *Second*, my regression controls for a host of other factors that may also influence Fighter compensation, unlike Dr. Dick's analysis, which allows me to identify (and isolate) the effect of the Challenged Conduct on Fighter compensation: My regression measures the effect of Zuffa's

---

606.   According to Zuffa's financial documents, Zuffa's Event Revenue per Fighter per event increased from $55,806 in 2001 to $599,207 in 2010.

607.   Dr. Dick's data show that Zuffa Fighter compensation at the 25th percentile increased from just over $4,000 in 2001 to just under $12,000 in 2010. Zuffa Fighter compensation at the 50th percentile increased from approximately $10,000 in 2001 to approximately $22,500 in 2010. Zuffa Fighter compensation at the 75th percentile increased from approximately $20,000 in 2001 to approximately $60,500 in 2010. *See* ZFL-1212452 at 568-570.

608.   Scott Coker, former CEO of Strikeforce, testified that Fighters received significantly lower offers after Strikeforce was acquired. Coker testified that, after the Strikeforce acquisition "[a] lot of people were disappointed ... [b]ecause you know, I had managers call me and say: Now our purses are going to go down. Now there's only one buyer and it's not going to be good for MMA as an industry." Coker Dep. 135:10-25. One year after the acquisition, mangers were telling Coker that "offers are about 20 percent less than when you guys [Strikeforce] were here." *Id.* 137:14-21.

foreclosure on Fighter compensation, all other things held constant, as opposed to simply tracking changes in compensation over time.[609] This distinction is important because the relevant comparison is not between Fighter compensation at arbitrary points in time, but rather between what Fighters earned in the actual world and what they would have earned in the absence of the Challenged Conduct, under more competitive conditions.

### 2. Zuffa's Claim That Increased Fighter Compensation After Horizontal Acquisitions Shows That Fighter Compensation Is Competitive

274. Dr. Dick compares compensation paid to Fighters for WEC, Pride, and Strikeforce before and after Zuffa acquired these promoters, and finds that the *level* of compensation increased for most Fighters.[610] Dr. Dick claims that this is evidence that Challenged Conduct was procompetitive.[611] Dr. Dick is wrong.

275. Dr. Dick's analysis fails to control for the fact that (due in part to the Challenged Conduct) non-Zuffa promoters earned revenues far below Zuffa's. As explained in Part III.D.1, the correct comparison is between the *share* of revenue that would-be rivals paid to their Fighters and the *share* of revenue received by Zuffa Fighters. The data show plainly that other MMA promoters paid a much higher share of their revenue to Fighters than did Zuffa, and my regression analysis yields the same result—after controlling for a host factors that may also influence Fighter compensation, unlike Dr. Dick's analysis.

---

609. *See* Part III.D.1, *supra*. Dr. Dick does present alternative analyses controlling for a small fraction of the control variables used in my own regression analysis. *See Dick Report, supra,* at 571-573 (showing compensation adjusted for the fighter's result in the current fight and his previous three fights, event type, indicators for knockout of the night, submission of the night, letter of agreement bonuses, and fighter fixed effects). In addition, none of Dr. Dick's analysis accounts for Zuffa's increasing revenue over time.

610. *Id.* at 495-500.

611. *Id.* at 501.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-176-

**3.     Zuffa's Claim That its Profit Data Show that MMA Fighter Compensation Was Competitive**

276.    In connection to the FTC's second investigation of Zuffa's practices in 2015, Dr. Blair attempts to demonstrate that Fighter compensation is substantial by reporting Fighter compensation as a proportion of Zuffa's profits, ranging from 38 percent to 70 percent between 2009 and 2014.[612] But Fighters' share of revenue—not profit—is the economically relevant metric. Elementary economics shows that, under competitive conditions, Fighters will earn a share of revenue commensurate with their productivity.[613] No such relationship holds for profit: If a firm's profit is $X$ percent of its revenue, and if the firm's labor costs come to $Y$ percent of its revenue, comparing $Y$ to $X$ does not yield insight into whether or not workers' compensation is competitive. Zuffa's profits depend on *all* of its revenue streams and *all* of its costs. Profits could therefore fluctuate for myriad reasons unrelated to the Challenged Conduct—even as foreclosure squeezes Fighters' revenue share.

277.    Further, accounting profits reflect multiple decisions by the Zuffa that are not directly related to Fighters, such as investment in other areas, management bonuses, substantial payouts to a handful of shareholders of the closely held private company, litigation costs, and other unrelated expenses. Zuffa's profits also appear to have been understated by Zuffa's accounting practices. Zuffa's purported "costs" include corporate jet expenses, bonuses, and management fees.[614] Such "costs" may actually reflect excess economic profit.[615] In addition, there is record

---

612.   Roger Blair, "Presentation of Observations Based on MMA Data," ZFL-1470673, at 80-81.
613.   *See, e.g.,* ROY RUFFIN & PAUL GREGORY, PRINCIPLES OF MICROECONOMICS (Harper Collins 5th ed. 1993), at 331-336.
614.   ███████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

evidence of an "historical lack of cost controls"[616] at Zuffa: A detailed review of Zuffa's cost structure by investment bank Goldman Sachs identified "actionable cost savings…representing approximately 25% of the UFC's addressable cost base,"[617] which were "expected to be recognized within 24 months."[618] Again, although Zuffa's accountants treated these items as costs, they may actually reflect excess economic profit. Thus, Dr. Blair's profit analysis would be rendered unreliable by Zuffa's accounting practices, even if it had a sound economic basis (which it does not).

278.    Similarly, Professor Fort has argued on Zuffa's behalf, based on data spanning 2006 to 2010, that "profits have not increased with Zuffa's acquisition of the assets of other promoters."[619] As noted above, Zuffa's profits may fluctuate for reasons unrelated to the Challenged Conduct, and are likely understated due to Zuffa's accounting practices. Even so, Zuffa's financial data do not show what Professor Fort claims. Zuffa's profits actually *increased* substantially over the timeframe analyzed by Dr. Fort: From 2006 to 2010, according to Zuffa's own financial statements, EBITDA increased from $77.1 million to $169.1 million, while Zuffa's net income increased from $76.0 million to $129.6 million.[620]

279.    Professor Fort's misleading claim is based on Zuffa's profit margins (measured as a *percentage* of revenue), as opposed to its absolute dollar profits. This ignores elementary

615.   Economic profit differs from accounting profit; the former is the difference between total revenue and total economic costs; the latter is the difference between total revenue and total accounting costs. *See, e.g.*, MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 199-202 (Irwin McGraw-Hill 3rd ed. 1998).

616.   *See* ZFL-2649918, at 965-966.

617.   *Id.* The projected savings fall into two categories: "(1) cost savings due to the historical lack of cost controls given the prior family-run, entrepreneurial nature of operations and (2) synergies due to the significant overlap in front and back-office functions across the UFC and WME IMG."

618.   *Id.* at 987.

619.   *Fort Report, supra*, at 325.

620.   *See* ZFL-1381761 and ZFL-1514836, Zuffa's consolidated profit and loss statements for 2006 and 2010. *See also* Appendix 2, which details all of Zuffa's financial documents used in my analyses.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

economics (and common sense), which teaches that firms seek to maximize dollar profit, not profit as a share of revenue.[621] A firm that earns $1 million of profit on $10 million in revenue has a profit margin of just 10 percent, yet that firm is obviously worth more than a firm that earns $10,000 of profit on $20,000 in revenue (earning a profit margin of 50 percent). According to Zuffa's financials, from 2006 to 2010, Zuffa's revenues increased from $181.5 million to $445.8 million, while its profit as a percentage of revenue remained roughly constant, resulting in a large increase in Zuffa's total profit.

280.    More generally, the notion of a purported lack of profitability is flatly contradicted by the facts. As explained above, UFC was purchased for $2 million in 2001 and sold for about $4 billion in 2016.[622] By any reasonable metric, this represents an extremely high return on investment. Contemporaneous financial analysis confirms that third parties considered Zuffa to be highly profitable: In 2010, Moody's increased Zuffa's rating outlook to "Positive" from "Stable," citing "Zuffa's continued strong revenue and EBITDA growth trends worldwide."[623] ██████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████  ██  ███████████████████████████

██████████████████████████  ██  ████████████████████████████████"[626]

---

621.  *See, e.g.,* MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 207-217 (Irwin McGraw-Hill 3rd ed. 1998).

622.  *See* Part I.A, *supra.*

623.  Moody's Investors Service, "Announcement: Moody's Changed Zuffa LLC's (d/b/a Ultimate Fighting Championship or UFC) Rating Outlook to Positive from Stable," (December 1, 2010), *available at* https://www.moodys.com/research/Moodys-Changed-Zuffa-LLCs-dba-Ultimate-Fighting-Championship-or-UFC--PR_210184 ("'The rating outlook change is prompted by Zuffa's continued strong revenue and EBITDA growth trends worldwide'").

624.  WME-ZUFFA-00001150 at *5.

625.  *Id.*

626.  *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

██████████████████████████████████████████████████████████████

████████████████

## C.    Zuffa's Claim That The Challenged Conduct Incentivizes Investment in Promotional Platforms and Individual Athletes

281.    As explained in Part III above, the Challenged Conduct suppressed competition, and allowed Zuffa to exercise monopsony power. As economists and antitrust authorities recognize, competition creates incentives for firms to invest, while the absence of competition can harm investment incentives.[627] In addition, as explained in Part VII.D below, evidence from professional sports leagues rejects the hypothesis that employers must wield monopsony power over athletes in order to incentivize investment decisions that ultimately benefit the industry as a whole. In contrast, Zuffa (parroting past arguments made by owners in other professional sports leagues) has claimed that elimination of the Challenged Conduct would remove incentives for competitive investment decisions. As explained below, these claims are unpersuasive.

282.    ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ ██ ██

███████████████████████████████████████████████████████████████

---

[627]    For example, when analyzing the potential for anticompetitive effects of a proposed merger, the antitrust agencies' *Horizontal Merger Guidelines* recognize that anticompetitive mergers may induce firms to reduce investment in capacity, or even to disinvest in pre-existing production capabilities. *Merger Guidelines*, *supra*, §6.3. The *Guidelines* also state that "[e]xplicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety, withdraw products or delay their introduction, or curtail research and development efforts after the merger, or explicit or implicit evidence that the ability to engage in such conduct motivated the merger, can be highly informative in evaluating the likely effects of a merger." *Id.* §2.2.1. *See also* Jonathan Baker, *Beyond Schumpeter vs. Arrow: How Antitrust Fosters Innovation*, 74 ANTITRUST L.J. 575-602, 577 (2007).

[628]    *Gaglio Letter, supra,* at 071.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER



283.     More fundamentally, in a competitive market for Fighter services, Zuffa (or any other MMA promoter) would secure the services of Fighters not by binding them to exclusive multi-bout contracts, but by offering competitive compensation, giving the Fighters clear economic incentives to commit to participating in future bouts, regardless of contract duration.[630] Even if a contract were to expire before the event, so long as the Fighter's pay was contingent on participating in the event, and so long as the compensation was competitive, the Fighter would have every incentive to show up for and compete vigorously at the event. Thus, in the but-for world, Zuffa's "Go To Market" event planning could be disrupted only if Zuffa offered below-market compensation, giving other MMA promoters an opportunity to offer Fighters alternative bouts with compensation more commensurate with their human capital. This is precisely how the competitive process is supposed to work. Moreover, if Zuffa offered to co-promote, it would not have had a similar claimed need to have a ready stable of available Fighters.

284.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████     ,"[631] This is pure conjecture, without any basis in evidence or economic theory. Television distributors are interested in Zuffa producing high-quality events that will attract viewers. The precise identities of Zuffa's roster of Fighters in (say) seven years (or whatever the

---

629.  *Id.*
630.  *See* Part III.D, *infra.*
631.  *Gaglio Letter, supra* at 073.

length of the typical television contract) cannot be known, and in any event, is less critical than Zuffa's offering generic, top-ranked Fighters who are competitive matched and effectively promoted. Again, in a competitive equilibrium, Zuffa could secure the services of top-ranked Fighters provided that it offers competitive compensation, and also through co-promotion.

285.    The duration of a television contract can easily exceed the average length of a Zuffa Fighter contract or a Fighter's career. For example, Zuffa's 2011 broadcast agreement with Fox spans seven years.[632] That Zuffa was able to negotiate such an agreement confirms that multi-year television distribution agreements do not require that Zuffa specify the identities of the Fighters to be featured in all future broadcasts over the life of the contract. Indeed, the Fox agreement calls for "high caliber" events without specifying the identities of all participants.[633]

**D.    The Experience of Other Professional Sports Leagues and the Sports Economics Literature Suggests That Elimination of the Challenged Conduct Would Benefit Fighters, Consumers, and the MMA Industry As a Whole**

286.    Although there is little question that the demand for professional Live MMA Events has expanded significantly in recent years, I have seen no persuasive evidence that the Challenged Conduct was necessary to facilitate this expansion, or that eliminating the Challenged Conduct would somehow impair the development of the industry. To the contrary, the experience of other professional sports leagues suggests that cessation of the Challenged Conduct would enhance competition and benefit the industry as a whole.

287.    Before free agency was introduced in other professional sports leagues, it was sometimes argued by sports leagues that it was necessary to exercise monopsony power over

---

632.   ZFL-1387999 (2011 Fox Agreement spanning January 1, 2012 through December 31, 2018).

633.   *Id.* ("At a minimum, the quality of (i) the Fight Card for UFC Live on FBC fights shall be of a high caliber that is commensurate with broadcast television sporting events, and (ii) the Fight Card for all other Live Fight Events (as defined below) shall be equal to or better than the average quality of the Fight Cards for UFC fights telecast on SpikeTV and Versus in 2011.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

athletes in order to ensure "competitive balance" (a commonly used measure of fan welfare).[634] The claim was that free agency would be harmful to fans and the industry overall, with talent flowing disproportionately to a small number of dominant teams. Yet the introduction of free agency to one professional sport after another has not had this effect.[635] As Stanford sports economist Roger Noll has observed:

> The [Leagues'] argument amounts to the claim that collusion by teams in sports leagues is justified because it is efficient and improves the welfare of consumers. This line of argument is rejected by virtually all economic studies of professional sports.…[T]he assignment of ownership of an asset (here, a player's human capital) will not affect the ultimate allocation of that asset in a competitive market… Thus, there is no basis for the claim that anticompetitive restrictions in the player market enhance efficiency....[636]

288.    Given that MMA is not a team sport, it unsurprising that Zuffa has not claimed that its conduct can be justified by concerns of competitive balance. Nevertheless, Zuffa's efficiency justifications, like those of professional sports leagues in the past, are premised on the notion that incentives to invest appropriately in Fighter services, and in promoting the bouts valued most highly by fans, are contingent on imposing restraints on athletes. Zuffa is wrong today for similar reasons that other sports leagues were wrong in the past: The reason that anticompetitive restraints on the market for athletes services cannot be justified in terms of economic efficiency is that, in a competitive market for athlete services, each athlete's "human capital" will flow to its highest-valued use.[637] In a competitive market, MMA promoters would compete for talent by assembling

---

634.   *See, e.g.,* Brad R. Humphreys, *Alternative Measures of Competitive Balance in Sports Leagues*, J. SPORTS ECON. 133-148 (2002).

635.   Roger Noll, *Buyer Power and Economic Policy*, 72 ANTITRUST L.J. 615-616 (2005).

636.   *Id.* Professor Fort himself reaches a similar conclusion in his sports economics textbook.  RODNEY D. FORT, SPORTS ECONOMICS 267 (Prentice Hall 3rd ed. 2011). *See also* JAMES QUIRK & RODNEY D. FORT, PAY DIRT: THE BUSINESS OF PROFESSIONAL TEAM SPORTS 240 (Princeton University Press 1992).

637.   *See* Noll, *supra*, at 616; *see also* Simon Rottenberg, *The Baseball Players' Labor Market*, 64(3) J. POL. ECON. 242-258 (1956); Quirk & Fort, *supra*; Mohamed El-Hodiri & James Quirk, *An Economic Model of a Professional Sports League*, 79 J. POL. ECON. 1302 (1971); Roger G. Noll, *Professional Basketball: Economic and Business Perspectives,* in THE BUSINESS OF PROFESSIONAL SPORTS 18 (Paul D. Staudohar & James A. Mangan eds.,

the highest compensation and benefits and the highest-valued matchups (including a willingness to co-promote). Fighters would offer their services to the MMA promoter that offers the most favorable compensation commensurate with their productivity (their marginal revenue product). This would derive from MMA promoters' deploying Fighters' human capital to its highest-valued use (that is, the matchups valued highest by fans).

289.    Far from harming the sport, the increased competition that would prevail in the but-for world would be expected to benefit the industry. Sports economists—including Professor Fort—recognize that fans are harmed when sports leagues exercise market power through coordinated behavior; "fans pay more for less in the presence of market power."[638] As Professor Fort concludes in an article appearing in *The Economics of Sports*,

> Almost all economists see the ultimate culprit [for rising ticket prices and other trends harmful to fans] as market power, which derives from the special legal treatment of leagues. The outcomes are exclusive franchise rights for teams, management of sports leagues as cartels, and a complete stifling of any competing leagues, precisely those indicated by the basic economic theory of market power.[639]

290.    Through the Challenged Conduct, Zuffa has achieved results analogous to cartelization of the MMA industry, without even the mitigating factor of having various teams within the UFC competitively bidding on athlete services as other sports leagues have. Another important distinction between Zuffa and certain other sports leagues is that Zuffa does not enjoy special immunity from antitrust enforcement. Fighters, fans, and the industry as a whole would be

---

1991); Daniel Sutter & Stephen Winkler, *NCAA Scholarship Limits and Competitive Balance in College Football*, 3 J. SPORTS ECON. 16 (2003).

638.   Fort, *supra*, at 409 ("From the fans' perspective, market power has the general tendency to reduce output and increase price…fans pay more for less in the presence of market power."). *See also* ZFL-1212308 at 11-12; *see also* MICHAEL LEEDS, & PETER VON ALLMEN, THE ECONOMICS OF SPORTS 111 (Boston Addison Wesley 2002); *see also* Roger Noll, *The Economics of Baseball Contraction* 4 J. SPORTS ECON. 383 (2003); *see also* JAMES QUIRK & RODNEY D. FORT, HARD BALL: THE ABUSE OF POWER IN PRO TEAM SPORTS 9 (Princeton University Press 1999).

639.   Rodney D. Fort, *Market Power in Pro Sports: Problems and Solutions*, *in* THE ECONOMICS OF SPORTS 8 (*ed*. WILLIAM S. KERN, W. E. Upjohn Institute for Employment Research 2000).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-184-

expected to benefit from removal of the Challenged Conduct and the introduction of increased competition through antitrust enforcement.

## CONCLUSION

291.    Since at least the beginning of the Class Period, Zuffa has possessed significant monopoly and monopsony power and, through the Challenged Conduct, has substantially foreclosed competition and generated significant anticompetitive effects. As a result, Zuffa has been able to compensate members of each Class below levels that would have prevailed in the absence of the Challenged Conduct, and this injury was widespread across the members of each Class. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████    The potential procompetitive justifications for the Challenged Conduct that Zuffa or economists acting on its behalf have asserted in prior proceedings are unavailing. The evidence from other professional sports, and the sports economics literature, as well as my own analysis, indicates that elimination of the Challenged Conduct would likely benefit Fighters, consumers, and the MMA industry generally. Finally, each prong of my analysis involves methods data, and evidence common to all Class Members. If I were asked to perform the same analysis for any single member of either Class, the evidence and analysis would be the same.

*     *     *

Hal J. Singer

Executed on August 31, 2017.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

## APPENDIX 1: CURRICULUM VITAE

**Office Address**

> Economists Incorporated
> 2121 K Street, NW
> Suite 1100
> Washington, DC 20037
> Phone:  (202) 747-3520
> singer.h@ei.com

**Education**

> Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
>
> B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Position**

> ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-present.
>
> GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016.
>
> GEORGE WASHINGTON UNIVERSITY, SCHOOL OF PUBLIC POLICY, GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington, D.C.: Senior Fellow 2016-present.

**Employment History**

> NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.
>
> EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.
>
> CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.
>
> LECG, INC., Washington, D.C.: Senior Economist, 1998-99.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

U.S.  SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.:  Staff Economist, 1997-98.

THE    JOHNS    HOPKINS    UNIVERSITY,    ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-98.


## Authored Books and Book Chapters

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co-authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).


## Journal Articles


HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?,* 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions,* 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks,* 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry,* 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?,* The ANTITRUST SOURCE (2012), co-authored with Andrew Card.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co-authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co-authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co- authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co-authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co-authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

## Expert Testimony Since 2012

*The Ohio State University v. New Par D/B/A Verizon Wireless*, Case No. 2:15-cv-2866 (S.D. Oh.).

*Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company*, Case No. 17-cv-318 (W.D. Wis.).

*Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al.*, Case No. 14CECG03039 MBS (Cal. Fresno).

*In re Lidoderm Antitrust Litigation*, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.).

*Maxon Hyundai Mazda et al. v. Carfax Inc.*, Case No. CV 2680 (AJN) (RLE) (S.D.N.Y.).

*Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice*, et al., Case No. 2014-cv-254012 (Ga. Super.).

*In re MyFord Touch Consumer Litigation*, Case No. 13-cv-3072-EMC (N.D. Cal.).

*Sun Life Assurance Company of Canada v. U.S. Bank National Association*, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan*, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.).

*In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries*, File No. EB-15-MD-005 (Federal Communications Commission).

*Omni Healthcare, et al. v. Health First Inc., et al.,* Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.).

*Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc.*, Case No. 12-cv-07065-JS (E.D. Pa.).

*Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp.*, Case No. 01-14-0001-6315 (Am. Arbitration Ass'n).

*Mark S. Wallach, et al. v. Eaton Corporation, et al.*, Case No. 10-260-SLR (D. Del.).

*STB Ex Parte No. 722 Railroad Revenue Adequacy* (Surface Transportation Board).

*In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 14-50 (Federal Communications Commission).

*Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology*, Case No.: 3:11-CV-1781 JCS (N.D. Cal.).

*Salud Services, Inc., et al. v. Caterpillar, Inc.*, Case No.: 1:12-cv-23927 (S.D. Fla.).

*Gnanh Nora Krouch v. Wal-Mart Stores, Inc.*, Case No. CV-12-2217 (N.D. Cal.).

*In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule*, MB Docket No. 12-3 (Federal Communications Commission).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*In the Matter of Review of Wholesale Services and Associated Policies*, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

*Crafting a Successful Incentive Auction: Stakeholders' Perspectives* (U.S. Senate, Committee on Commerce, Science, and Transportation).

*Altergy Systems v. Enersys Delaware, Inc.*, Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

*In re New York City Bus Tour Antitrust Litigation*, Master Case File No. 13-CV-07I1 (S.D. N.Y.).

*SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013)* (Copyright Board Canada).

*Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada* (S.D. Fla.).

*The Satellite Television Law: Repeal, Reauthorize, or Revise?* (U.S. House of Representatives, Committee on Energy and Commerce).

*Marchbanks Truck Service, et al. v. Comdata Network Inc., et al.*, Civil Action No. 07-1078-JKG (E.D. Pa.).

*Patricia Reiter v. Mutual Credit Corporation, et al.*, Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.).

*In re Photochromic Lens Antitrust Litigation*, MDL Docket No. 2173 (M.D. Fla.).

*In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P.* (Major League Baseball Revenue Sharing Definitions Committee).

*Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation*, No. 2:06-CV-3830 (DMC) (D.N.J.).

*Game Show Network, LLC v. Cablevision Systems Corp., File No.* CSR-8529-P (Federal Communications Commission).

*Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva*

*Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc.*, Case No. 2:06-cv-02768-MSG (E.D. Pa.).

*In Re Airline Baggage Fee Antitrust Litigation*, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

## White Papers

The Empirical Link Between Fibre-to-the-Premises Deployment and Employment: A Case Study in Canada (prepared for Bell Canada), co-authored with Kevin Caves and Anna Koyfman (Dec. 10, 2015).

Good Intentions Gone Wrong: The Yet- To- Be- Recognized Costs of the Department Of Labor's Proposed Fiduciary Rule (prepared for Capital Group), co-authored with Robert Litan (July 2015).

Bringing Sanity Back to the Spectrum Debate: A Response to CCA's White Paper (prepared for Mobile Future), co-authored with Allan Ingraham (June 26, 2015).

Unlocking Patents: Costs of Failure, Benefits of Success (prepared for Patent Utility) (Feb. 4, 2015).

The Consumer Benefits of Efficient Mobile Number Portability Administration (prepared for Neustar) (Mar. 8, 2013).

Economic Analysis of the Implications of Implementing EPA's Tier 3 Rules (prepared for Emissions Control Technology Association), co-authored with George Schink (June 14, 2012).

Are Google's Search Results Unfair or Deceptive Under Section 5 of the FTC Act? (prepared for Google), co- authored with Robert Litan (May 1, 2012).

Bundles in the Pharmaceutical Industry: A Case Study of Pediatric Vaccines (prepared for Novartis), co-authored with Kevin Caves (July 13, 2011).

Are U.S. Wireless Markets Effectively Competitive? A Critique of the FCC's 14th and 15th Annual Wireless Competition Reports (prepared for AT&T), co-authored with Gerald R. Faulhaber, Robert W. Hahn (July 11, 2011).

Do Group Purchasing Organizations Achieve the Best Prices for Member Hospitals? An Empirical Analysis of Aftermarket

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Transactions (prepared for Medical Device Manufacturers Association), co-authored with Robert Litan (Oct. 6, 2010).

The Economic Impact of Broadband Investment (prepared for Broadband for America), co-authored with Robert Crandall (Feb. 23, 2010).

Why the iPhone Won't Last Forever and What the Government Should Do to Promote Its Successor (prepared for Mobile Future), co-authored with Robert Hahn (Sept. 21, 2009).

The Economic Impact of Eliminating Preemption of State Consumer Protection Laws (prepared for the American Bankers' Association), co-authored with Joseph R. Mason (Aug. 21, 2009).

Economic Effects of Tax Incentives for Broadband Infrastructure Deployment (prepared for the Fiber to the Home Council), co-authored with Jeffrey Eisenach and Jeffrey West (Dec. 23, 2008).

The Effect of Brokered Deposits and Asset Growth on the Likelihood of Failure (prepared for Morgan Stanley, Citigroup, and UBS), co-authored with Joseph Mason and Jeffrey West (Dec. 17, 2008).

Estimating the Benefits and Costs of M2Z's Proposal: Reply to Wilkie's *Spectrum Auctions Are Not a Panacea* (prepared for CTIA), co-authored with Robert W. Hahn, Allan T. Ingraham and J. Gregory Sidak (July 23, 2008).

Irrational Expectations: Can a Regulator Credibly Commit to Removing an Unbundling Obligation? AEI-Brookings Related Publication No. 07-28, co-authored with Jeffrey Eisenach (Dec. 30, 2007)

Is Greater Price Transparency Needed in The Medical Device Industry? (prepared for Advanced Medical Technology Association), co-authored with Robert W. Hahn (Nov. 30, 2007).

Should the FCC Depart from More than a Decade of Market-Oriented Spectrum Policy? Reply to Skrzypacz and Wilson (prepared for CTIA), co-authored with Gerald Faulhaber and Robert W. Hahn (Jun. 18, 2007).

Improving Public Safety Communications: An Analysis of Alternative Approaches (prepared for the Consumer Electronics

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Association and the High Tech DTV Coalition), co-authored with Peter Cramton, Thomas S. Dombrowsky, Jr., Jeffrey A. Eisenach, and Allan Ingraham (Feb. 6, 2007).

The Budgetary Impact of Eliminating the GPOs' Safe Harbor Exemption from the Anti-Kickback Statute of the Social Security Act (prepared for the Medical Device Manufacturers Association) (Dec. 20, 2005).

Reply to "The Life Settlements Market: An Actuarial Perspective on Consumer Economic Value" (prepared for Coventry First), co-authored with Eric Stallard (Nov. 15, 2005).

The Competitive Effects of Telephone Entry into Video Markets (prepared for the Internet Innovation Alliance), co-authored with Robert W. Crandall and J. Gregory Sidak (Nov. 9, 2005).

How Do Consumers and the Auto Industry Respond to  Changes in Exhaust Emission and Fuel Economy Standards? A Critique of Burke, Abeles, and Chen (prepared for General Motors Corp.), co-authored with Robert W. Crandall and Allan T. Ingraham (Sept. 21, 2004).

Inter-City Competition for Retail Trade in North Texas: Can a TIF Generate Incremental Tax Receipts for the City of Dallas? (prepared for Harvest Partners), co-authored with Thomas G. Thibodeau and Allan T. Ingraham (July 16, 2004).

An Accurate Scorecard of the Telecommunications Act of 1996: Rejoinder to the Phoenix Center Study No. 7 (prepared for BellSouth), co-authored with Robert Crandall (Jan. 6, 2004).

Competition in Broadband Provision and Implications for Regulatory Policy (prepared for the Alcatel, British Telecom, Deutsche Telekom, Ericsson, France Telecom, Siemens, Telefónica de España, and Telecom Italia), co-authored with Dan Maldoom, Richard Marsden, and Gregory Sidak (Oct. 15, 2003).

The Effect of Ubiquitous Broadband Adoption on Investment, Jobs, and the U.S. Economy (prepared for Verizon), co-authored with Robert W. Crandall (Sept. 17, 2003).

The Deleterious Effect of Extending the Unbundling Regime on Telecommunications Investment (prepared for BellSouth), co-authored with Robert W. Crandall (July 10, 2003).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Letter Concerning Spectrum Auction 35 to the Honorable Michael K. Powell, Chairman, Federal Communications Commission, from Peter C. Cramton, Robert W. Crandall, Robert W. Hahn, Robert G. Harris, Jerry A. Hausman, Thomas W. Hazlett, Douglas G. Lichtman, Paul W. MacAvoy, Paul R. Milgrom, Richard Schmalensee, J. Gregory Sidak, Hal J. Singer, Vernon L. Smith, William Taylor, and David J. Teece (Aug. 16, 2002).

## Speaking Engagements

*Antitrust and Telecommunications,* ABA ANTITRUST IN THE AMERICAS, Mexico City, June 1, 2017.

*Fundamentals—Economics,* ABA SECTION OF ANTITRUST LAW SPRING MEETING, Washington, D.C., Mar. 29, 2017.

*DOL Rule Analysis and FSR's SIMPLE PTE Explained,* FINANCIAL SERVICES ROUNDTABLE, Washington, D.C., Aug. 6, 2015.

*New Principles for a Progressive Broadband Policy,* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Mar. 13, 2014.

*The Open Internet: Where Do We Go From Here?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C., Jan. 29, 2014.

*Does Platform Competition Render Common Carriage Irrelevant in an IP world?* PROGRESSIVE POLICY INSTITUTE, Washington, D.C. Nov. 20, 2013.

*The 41st Research Conference on Communication, Information and Internet Policy*, TELECOMMUNICATIONS POLICY RESEARCH CONFERENCE, George Mason University School of Law, Arlington, VA, September 27, 2013.

*The Broadband Technology Explosion: Rethinking Communications Policy for a Mobile Broadband World*, Pepperdine School of Public Policy, Menlo Park, CA June 20, 2013.

*Net Neutrality: Government Overreach or the Key to Innovation?*, NORTHWESTERN JOURNAL OF TECHNOLOGY AND INTELLECTUAL PROPERTY EIGHTH ANNUAL SYMPOSIUM, Chicago, IL, Mar. 8, 2013.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Internet Everywhere: Broadband as a Catalyst for the Digital Economy*, The Brookings Institution, Washington, D.C., Nov. 27, 2012.

*Can Broadband Power an Economic Recovery?*, Advanced Communications Law & Policy Institute at New York Law School, Washington, D.C., July 10, 2012.

*Using Regression in Antitrust Cases*, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL, Philadelphia, PA, Apr. 12, 2012.

*Mergers: The Road to Duopoly or Path to Competitive Panacea?* NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Los Angeles, CA, July 20, 2011.

*State of the Mobile Net*, CONGRESSIONAL INTERNET CAUCUS, Washington, D.C., May 27, 2011.

*Waves of Innovation: Spectrum Allocation in the Age of the Mobile Internet*, INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, Washington D.C., May 17, 2011.

*With or Without Merit, Class Certification Requires Commonality*, ABA SECTION OF ANTITRUST LAW 59TH ANNUAL SPRING MEETING, Washington, D.C., Mar. 30, 2011.

*4th Annual Future of Private Antitrust Enforcement Conference*, AMERICAN ANTITRUST INSTITUTE, Washington, D.C., Dec. 7, 2010.

*Jobs and Technology*, NEW DEMOCRATIC LEADERSHIP COUNCIL, Washington, D.C., Sept. 22, 2010.

*Regulation and Broadband*, ADVANCED COMMUNICATIONS LAW & POLICY INSTITUTE, NEW YORK LAW SCHOOL, New York, N.Y., July 14, 2010.

*13th Annual Symposium on Antitrust*, GEORGE MASON LAW REVIEW, Washington, D.C., Feb. 4, 2010.

*Broadband Infrastructure and Net Neutrality*, ADVISORY COMMITTEE TO THE CONGRESSIONAL INTERNET CAUCUS' STATE OF THE NET, Washington, D.C., Jan. 22, 2010.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*The Consequences of Net Neutrality Regulations*, AMERICAN CONSUMER INSTITUTE CENTER FOR CITIZEN RESEARCH, Washington, D.C., Nov. 19, 2009.

*Wireless Innovation Luncheon*, MOBILE FUTURE, Washington, D.C., Nov. 3, 2009.

*Second Life Settlements & Longevity Summit*, INSURANCE-LINKED SECURITIES & LIFE SETTLEMENTS, New York, N.Y., Sept. 30, 2009.

*Perspectives on Investment and a National Broadband Plan*, AMERICAN CONSUMER INSTITUTE, Washington, D.C., Sept. 4, 2009.

*Markets and Regulation: How Do We Best Serve Customers?*, Wireless U. Communications Policy Seminar, UNIVERSITY OF FLORIDA PUBLIC UTILITY RESEARCH CENTER, Tampa, FL, Nov. 13, 2008.

*The Price Of Medical Technology: Are We Getting What We Pay For?* HEALTH AFFAIRS BRIEFING, Washington, D.C., Nov. 10, 2008.

*Standard Setting and Patent Pools*, LAW SEMINARS INTERNATIONAL, Arlington, VA., Oct. 3, 2008.

*The Changing Structure of the Telecommunications Industry and the New Role of Regulation*, INTERNATIONAL TELECOMMUNICATIONS SOCIETY BIENNIAL CONFERENCE, Montreal, Canada, June 26, 2008.

*The Debate Over Network Management: An Economic Perspective*, AMERICAN ENTERPRISE INSTITUTE CENTER FOR REGULATORY AND MARKET STUDIES, Washington, D.C., Apr. 2, 2008.

*Merger Policy in High-Tech Industries*, GEORGE MASON UNIVERSITY SCHOOL OF LAW, Washington, D.C., Feb. 1, 2008.

*Telecommunications Symposium*, U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION, Washington, D.C., Nov. 29, 2007.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Wireless Practice Luncheon*, FEDERAL COMMUNICATIONS BAR ASSOCIATION, Washington, D.C., Nov. 29, 2007.

*Association for Computing Machinery's Net Neutrality Symposium*, GEORGE WASHINGTON UNIVERSITY, Washington, D.C., Nov. 12, 2007.

*Regulators' AdvanceComm Summit*, NEW YORK LAW SCHOOL, New York, N.Y., Oct. 14, 2007.

*Annual Conference*, CAPACITY USA 2007, New York, N.Y., Jun. 26, 2007.

*William Pitt Debating Union*, UNIVERSITY OF PITTSBURGH, SCHOOL OF ARTS & SCIENCES, Pittsburgh, PA., Feb. 23, 2007.

*Annual Conference*, WIRELESS COMMUNICATIONS ASSOCIATION INTERNATIONAL, Washington, D.C., June 27, 2006.

*Annual Conference*, MEDICAL DEVICE MANUFACTURERS ASSOCIATION, Washington, D.C., June 14, 2006.

*Annual Conference*, ASSOCIATION FOR ADVANCED LIFE UNDERWRITING, Washington, D.C., May 1, 2006.

*Entrepreneur Lecture Series*, LAFAYETTE COLLEGE, Easton, PA., Nov. 14, 2005.

## Editorials and Magazine Articles

*The Future of Net Neutrality: What Will the Court Decide,* FOREIGN AFFAIRS, Mar. 16, 2016, co-authored with Robert Litan.

*Obama's Big Ideas for Small Saves: 'Robo' Financial Advice,* WALL STREET JOURNAL, July 21, 2015, co-authored with Robert Litan.

*How the FCC Will Wreck the Internet,* WALL STREET JOURNAL, May 28, 2015

*The FCC's Incentive Auction: Getting Spectrum Right,* PROGRESSIVE POLICY INSTITUTE PAPER, Nov. 2013.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Clash of the Titans: How the Largest Commercial Websites Got That Way*, MILKEN INSTITUTE REVIEW, Second Quarter 2013, co-authored with Robert Hahn.

*Wireless Competition: An Update*, GEORGETOWN CENTER FOR BUSINESS AND PUBLIC POLICY ECONOMIC POLICY VIGNETTES, May 3, 2012, co-authored with Robert Hahn.

*Book Review of Tim Wu's The Master Switch*, MILKEN INSTITUTE REVIEW, January 2012.

*The AT&T/T-Mobile Deal: Should We Fear Wireless Consolidation?* FORBES, June 3, 2011.

*In FCC's Report on Wireless Competition, an Agenda?,* HARVARD BUSINESS REVIEW, Apr. 15, 2011, co-authored with Gerald Faulhaber.

*Will the Proposed Banking Settlement Have Unintended Consequences?* HARVARD BUSINESS REVIEW, Mar. 29, 2010, co- authored with Joseph R. Mason.

*Should Regulators Block AT&T's Acquisition of T-Mobile?*, HARVARD BUSINESS REVIEW, Mar. 22, 2010.

*The Black Hole in America's Retirement Savings*, FORBES, Dec. 21, 2010, co-authored with Robert Litan.

*Broken Compensation Structures and Health Care Costs*, HARVARD BUSINESS REVIEW, Oct. 6, 2010, co-authored with Robert Litan.

*Why Net Neutrality Is Bad for Business*, HARVARD BUSINESS REVIEW, Aug. 13, 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should (or Shouldn't) Do to Promote Its Successor*, MILKEN INSTITUTE REVIEW (First Quarter 2010), co-authored with Robert W. Hahn.

*Streamlining Consumer Financial Protection*, THE HILL, Oct. 13, 2009, co-authored with Joseph R. Mason.

*Foxes in the Henhouse: FCC Regulation through Merger Review*, MILKEN INSTITUTE REVIEW (First Quarter 2008), co-authored with J. Gregory Sidak.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

*Don't Drink the CAFE Kool-Aid*, WALL STREET JOURNAL, Sept. 6, 2007, at A17, co-authored with Robert W. Crandall.

*The Knee-Jerk Reaction: Misunderstanding the XM/Sirius Merger*, WASHINGTON TIMES, Aug. 24, 2007, at A19, co- authored with J. Gregory Sidak.

*Net Neutrality: A Radical Form of Non-Discrimination*, REGULATION, Summer 2007.

*Telecom Time Warp*, WALL STREET JOURNAL, July 11, 2007, at A15, co-authored with Robert W. Crandall.

*Earmarked Airwaves*, WASHINGTON POST, June 27, 2007, at A19, co-authored with Robert W. Hahn.

*Not Neutrality*, NATIONAL POST, Mar. 29, 2007, at FP19.

*Should ATM Fees Be Regulated?*, NATIONAL POST, Mar. 8, 2007, at FP17, co-authored with Robert W. Crandall.

*Life Support for ISPs*, REGULATION, Fall 2005, co-authored with Robert W. Crandall.

*No Two-Tier Telecommunications*, NATIONAL POST, Mar. 7, 2003, at FP15, co-authored with Robert W. Crandall.

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

## APPENDIX 2: METHODOLOGY AND DATA

292.    I relied on eight datasets to estimate the bout and identity class damages. Five of these datasets: (1) Zuffa bout compensation data; (2) Zuffa identity compensation data; (3) Zuffa contract data; (4) profit and loss data for Zuffa events; and (5) pre-acquisition Strikeforce event and compensation data—were derived from discovery documents. The other three datasets came from public sources: (6) the Fighter performance FightMetric data was purchased from the vendor directly; (7) Fighter rankings and the universe of Fighter-event matchups came from FightMatrix, and (8) the Sherdog website.

## A.    Datasets

### 1.    Zuffa's Bout Compensation Data

293.    Bates numbed documents ZFL-0000003, ZFL-2603701, and ZFL-2764800 are spreadsheets containing Fighter-event pairs for all Zuffa produced events from February 2001 (UFC 30) to July 2017 (UFC 214: CORMIER vs JONES). These spreadsheets, when combined, form the complete universe of all Zuffa Fighter-event pairs over that time period. In addition to event and matchup information, the data also detail the show, win, LOA, PPV, and discretionary bonus payments made to each Fighter in each event (for example, Fight of the Night, Submission of the Night, and Knockout of the Night). Not counting non-events and events with no FightMetric data (discussed below), this dataset contains 8,505 Fighter-event pairs spanning 415 events and 1,503 Fighters. The Fighter-event pairs form the basis for my regression dataset.

### 2.    Zuffa's Identity Compensation Data

294.    Zuffa produced ZFL-2679053 and ZFL-2764813 at Plaintiffs' request, which are line-item accounting databases used by Zuffa to track payments, including payments to fighters; it is internally referred to as the "JD Edwards Database." I analyzed the payment data and flagged all payments relating to the identity class (sponsorship payments, video-game payments, merchandise royalties, and athlete outfitting policy payments). I supplement this data with ZFL-0000650, a "Merchandise Royalty Accrual database," which tracks royalty revenues accrued to specific Fighters for the sale of merchandise. If total royalty accruals are greater than merchandise payments in the JD Edwards Database during the Class Period, I use royalty revenues accrued from the Merchandise Royalty Accrual database instead for that Fighter's Merchandise payments during the Class Period.

### 3.    Zuffa's Contract Data

295.    Zuffa produced 44,526 separate Bates-numbered documents containing 51,020 individual Fighter-related documents. These documents included Promotional and Ancillary Rights Agreements (PARs), Bout Agreements, Letters, Amendments, Ratifications, Merchandise Agreements, other miscellaneous contracts, and some non-contract documents. Many of these documents were unsigned drafts. My team of researchers reviewed all 51,020 documents in this production. They cataloged the type of the document, and, in the case of PARs, additionally catalogued the contents of these contracts. For each PAR, my team recorded the date, Fighter

name, promoter name, whether or not the document was signed by both parties, and various terms of the agreement. In addition to recording the term of the agreement in months and bouts, we also noted (where applicable) the terms of the Right to Match Period, the Exclusive Negotiation Period, the Champion's Clause, tolling periods, and any Option Periods. The researchers recorded how the language of the ancillary rights clauses, promotion clauses, exclusion clauses, Champion's clause, tolling clauses, right to match clauses, commercial identification clauses, and breach of suspension clauses changed over time. From this exercise, my team and I ultimately created a dataset containing the terms of all valid and complete PAR agreements signed by both Zuffa and the Fighter. This dataset contained 2,136 valid contracts in total, from May 2001 to November 2015.[640]

296.    I match this contract data to the Fighter-event observations from the Zuffa compensation data by the Fighter's name and the date of the observation. I assign an active PAR to a Fighter-event observation if the observation occurs during the active contract period of the PAR. This active contract period is determined by taking the PAR signing date as the beginning date, and assigning it an end date determined by (1) the contract's term length in months (including the lead-up time from signing to a Fighter's first bout, as determined by empirical observation); and (2) the option period (if any) specified in the contract.

297.    I make further allowances for early contract renewals and contract tolling. First, if a Fighter signs a new PAR while an old PAR is active, the new PAR takes precedence over the old. Second, as tolling data on contracts was not comprehensively available, I and my team take steps to match Fighter-event pairings that occur outside of any active contract. This happens in 123 observations before November 2015, the cut-off date for the contract data. If Fighter-event pairings occur with no matching PAR, and if that fight does not exceed the maximum number of bouts specified in the most recent contract, it is assumed that the PAR was extended via one of the PARs many tolling provisions. For 177 observations that occur after November 2015, we apply the Fighter's most recent contract to the observation.

298.    Overall, I and my team are able to match 78 percent of Zuffa's Fighter-event pairs from the compensation data to a PAR from 2001-2015, when the contract data ends, and 71 percent overall. (Contracts signed in 2015 may still be active in 2017, but no new contracts are observed, leading to a lower share of matched pairs.) I have no reason to believe the sample of contracts provided were biased in any material way with regards to their terms relative to the true contract population.

---

640.   I exclude two contracts from non-Zuffa promoters, one from Invicta and one from EliteXC, that Zuffa included in the document production.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-205-



### 4.       Zuffa's Event Profit and Loss Data

299.     Zuffa provided two event-level profit-and-loss documents from which I gather event-specific revenues, costs, and compensation paid to Fighters. ZFL-2764797 details the event-level revenues and costs for all numbered (Pay-Per-View) UFC event from 2006 to 2016. ZFL-2764798 details the same revenues and costs for all events from 2010 to 2016. This second document includes Strikeforce, WEC, and non-PPV events (such as the shows on FOX, FX, and FUEL). This means that there is a data gap from 2006 to 2010 of non-PPV Zuffa events. To address this gap, I supplement this data with event-specific profit and loss documents produced in discovery.[641] Each of these profit-and-loss statements reports the total direct and indirect costs and revenues generated from the event. The revenues are sorted into various categories, broadly classified as Ticket Sales or Site Fees; PPV, Broadcast Sales, and Fees (including "Web Buys" and "Other"); event-specific Merchandise; and event-specific Sponsorships.

### 5.       Pre-Acquisition Strikeforce Data

300.     Within the discovery documents, I identified a number of files that contained data on Strikeforce's operations before its acquisition by Zuffa. These assorted datasets, once cleaned and combined, provide a partially complete picture of Strikeforce's event revenues and Fighter compensation before its acquisition. These documents are SJS00084771, ZFL-2458186, and ZFL-1472338. These sources add complete 400 Fighter-event level observations to the regression dataset. I omit "Young Guns" Strikeforce events from my analysis, as these were amateur events with purses less than $1,000.

---

641.   EG: ZUF-00031995, ZUF-00034210, ZUF-00106849, ZUF-00106856, and ZUF-00106854.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### 6. FightMetric Fighter Performance Data

301.   To control for a Fighter's characteristics at the time of a fight, I procured detailed statistics on a Fighter's bout performance from FightMetric. This sports statistics firm, the "official statistics provider of the UFC,"[642] generates Fighter-bout level information such as the number of strikes attempted or landed, where they hit and the degree of power, the time spent in the various MMA positions (stalking, clinch, ground control), and other relevant metrics. These data are matched onto the bout compensation data by Fighter name and event.

302.   The FightMetric data contains fight data for a select number of MMA firms. These include Affliction, Bellator, EliteXC, Pride Fighting Championships, Strikeforce, World Extreme Cagefighting, and the UFC. FightMetric founder and director Rami Genauer explained over email FightMetric's selection criteria for promoters:

> It was basically an attempt to cover the…most prominent organizations in the world. That was UFC and PRIDE, then WEC, then Strikeforce. In recent years, it's become whoever the market is willing to pay for. That's meant covering Bellator at times, but not currently. There are also instances in the database of following a fighter's career, regardless of organization. That was more important in the early days of the company when the stars were what mattered. Now it's the UFC brand that matters the most.[643]

### 7. FightMatrix Data

303.   FightMatrix is an independent MMA ranking website that uses "a computerized rating system that attempts to capture un-biased "popular thought" and combine it with prediction-based analysis."[644] Zuffa personnel relied on FightMatrix statistics during depositions.[645] I pulled FightMatrix's historical rankings for all time periods and divisions, assembling a database showing all of the site's rankings in three-month intervals since 1990, ending in January 2017. FightMatrix tracks rankings by weight class, with different maximum ranks tracked. For example, the Men's Heavyweight division tracks Fighters up to the 250th best Fighter, whereas the Men's Welterweight division tracks Fighters up to the 650th best Fighter.[646]

### 8. Sherdog Data

304.   Sherdog.com is a major MMA news and fan site, cited by industry analysts as "the most popular source of MMA news and information."[647] In addition to its news services, Sherdog

---

642.   *See* http://www.fightmetric.com/company. Note that UFC displays the FightMetric statistics on their website, and a branded "Statistics Provided by FightMetric" logo appears on pages such as http://www.ufc.com/fighter/Ronda-Rousey

643.   E-mail from Remi Genauer, Director, FightMetric, to Augustus Urschel, Analyst, Economists Incorporated (November 19, 2016, 19:48 ET).

644.   See http://www.fightmatrix.com/faq/

645.   Deposition of Javier Vasquez, Feb. 14, 2017 at 67, Exhibits 42-44.

646.   *See* http://www.fightmatrix.com/historical-mma-rankings/generated-historical-rankings/?Issue=109&Division=4 and http://www.fightmatrix.com/historical-mma-rankings/generated-historical-rankings/?Issue=109&Division=1

647.   ZFL-2463304 at 14.

maintains a nearly complete record of every MMA fight from around the world, from UFC mega events in Las Vegas to eight-man untelevised garage fights in Bosnia and Herzegovina.[648] These records give the dates and locations of the fights, who fought in them, and the outcome of the individual bouts. I obtained the entire catalog of fights and events from Sherdog's public website and assembled a dataset of every MMA fight from around the world. The dataset contains 280,471 worldwide bouts of two Fighters from 36,864 unique Live MMA Events spanning from December 1991 to June 2017.

305.    In addition to event and bout data, the website assigns a unique Fighter ID to each MMA combatant in the known MMA universe. For example, the number "2383" in the URL www.sherdog.com/fighter/Nate-Quarry-2383 corresponds to Nate Quarry and no other Fighter, which can be tested by typing in http://www.sherdog.com/fighter/2383. Because names can vary across different datasets (and, in the case of some Zuffa data, within a dataset), I use this unique Fighter ID to link Fighters across the various datasets described here.

### B.    Foreclosure Share Methodology

306.    Zuffa's foreclosure share of the market is defined as the percentage of foreclosed Zuffa Fighters over the total population pool of the Relevant Input Market in a given month at time $t$, illustrated below. I calculate one measure of foreclosure under which all Fighters are considered foreclosed; in the alternative, I classify a Fighter as foreclosed only if the duration of exclusivity for their contract is 30 months or more. The foreclosure statistic can be written:

$$\left( \frac{Foreclosed\ Zuffa\ Fighter}{Relevant\ Input\ Market\ Fighter\ Pool} \right)_t$$

307.    Due to missing contracts for some Zuffa Fighters, I construct this statistic by multiplying Zuffa's internal foreclosure share by Zuffa's market share of the Relevant Input Market Fighter Pool at time $t$. For example, Zuffa may have 150 Fighters in a pool of 200 total Fighters in the Relevant Input Market at time $t$, but contract data is only available for 120 of those 150 Zuffa Fighters. In this case, I would take the internal foreclosure share of the Zuffa Fighters for which we have contract data. If 96 of those 120 Fighters were foreclosed, Zuffa would have an internal foreclosure share of 80 percent. I would then multiply that 80 percent by Zuffa's market share at time $t$, in this case 75 percent (equal to 150 Zuffa Fighters divided by 200 total Fighters in the Relevant Input Market Fighter Pool) for a total foreclosure share of 60 percent.

308.    The Relevant Input Market Fighter Pool consists of all Fighters in the Relevant Input Market at a Live MMA Event occurring at time $t$. I consider a Fighter to be in the Relevant Input Market Fighter Pool if he or she participated in a Live MMA Event within nine or twelve months before or after the Live MMA Event in question. This allows me to capture the pool of Fighters that were active around the time of a Live MMA Event, and thus potentially could have participated in it (even if they actually participated in some other Live MMA Event within the window). I consider a nine-month window as my baseline specification. By definition, Fighters not

---

648.   *See* http://www.sherdog.com/events  and  http://www.sherdog.com/organizations/Mix-Fight-Night-Bosnia-and-Herzegovina-11979

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

fighting in events during this window were inactive (did not fight in any Live MMA Event) for a period of 18 months surrounding the event in question. (My analysis of data from Sherdog reveals that the median career length for an MMA Fighter is brief—approximately five bouts, spread over just 41 months, which means that the typical length of time between bouts for a Fighter is about 8 months).

309.    In some specifications, Fighters are weighted by the average gate and PPV revenues per Fighter for their respective promoters. Using the MMA news source http://mmapayout.com, I construct a database of 254 Live MMA Events and their total revenues.[649] This includes event revenues for the promoters Affliction, Bellator, EliteXC, Pride, Strikeforce, UFC, WEC, and WSOF. I match these event revenues into the Sherdog data of all of the Fighter bouts that took place in that event. I then take the average revenue generated by each Fighter by dividing the total revenue by the number of Fighters. One average is calculated for Zuffa, and another for non-Zuffa promoters. Zuffa Fighters are then weighted by Zuffa's average revenue per Fighter, while non-Zuffa Fighters receive the average revenue per Fighter for non-Zuffa promoters. This approach is conservative because revenue data are available only for (relatively) large non-Zuffa MMA promotions such as Bellator and Strikeforce, so that Fighters from smaller promotions (which lack such data) receive the same weight as if they were affiliated with a larger promotion. In the case of ONE Championship, I conservatively assigned Fighters a weight equal to 25 percent of Zuffa Fighters' weight, in light of evidence that ONE's valuation was reportedly "approaching" a valuation of $1B at approximately the same point in time that Zuffa sold for $4B.[650]

### C.    Bout Class Regression Dataset Methodology

310.    Given the various datasets described above, I create a combined regression dataset at the Fighter-event observation level. Each observation is a Zuffa (or Strikeforce pre-acquisition) Fighter in a given event matchup. Each observation contains the Fighter's name, their opponent, the event and its details, the Fighter's compensation and bonuses (from the Compensation Data), the events revenues and costs (from Zuffa's Event Profit and Loss Data), the Fighter's performance in that event (from the FightMetric data), the market foreclosure shares in that month (see section B above), the PAR agreement terms a Fighter was subject to at the time of the event (from the Contract Data). Combined, these datasets provide the independent and dependent variables necessary to estimate the regression.

311.    With the exception of the contract, FightMatrix, and foreclosure share data, all of these datasets were merged in by Fighter IDs, a generated event ID, and the event date. Because the PAR agreements span multiple fights over time, I generate a timeframe over which each PAR agreement is active. This is the signing date plus the combined effective term. Because this is a theoretical date range, in the case of any overlapping agreements, I take the most recently signed

---

649.  I use http://mmapayout.com/blue-book/pay-per-view/ for PPV revenues and http://mmapayout.com/blue-book/live-gate-attendance/ for gate revenues. Note: Although Strikeforce and Bellator have both produced internal financial data, I used publicly available data to construct Fighter weights to ensure event-specific comparability across promoters.

650.  James Goyder, "ONE Championship receives multimillion dollar investment from Singapore fund," MMA Mania (July 14, 2016) ("[T]he company is on course for a billion-dollar valuation…The UFC was sold for $4 billion to a group led by WME-IMG and ONE Championship is on course for an IPO in the next 12 to 18 months.").

contract. The foreclosure share data and FightMatrix ranking data were merged in on matching months.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### APPENDIX 3: MATERIALS RELIED UPON

Deposition of Denitza Batchvarova (January 25, 2017)

Deposition of Ike Lawrence Epstein (December 12, 2016)

Deposition of Jon Fitch (February 15, 2017)

Deposition of Kirk Hendrick (November 30, 2016)

Deposition of Kyle Kingsbury (February 17, 2017)

Deposition of Jeremy Lappen (February 28, 2017)

Deposition of Michael Mersch (July 14, 2017)

Deposition of Michael Mossholder (December 1, 2016)

Deposition of Kurt Otto (February 6, 2017)

Deposition of Sean Shelby (April 12, 2017)

Deposition of Javier Vasquez (February 14, 2017)

Deposition of Brandon Vera (February 6, 2017)

Deposition of Marshall Zelaznik (February 8, 2017)

Deposition of Lorenzo Fertitta (March 23, 2017)

Deposition of Jeffrey Aronson (April 25, 2017)

Deposition of Dana White (August 9, 2017)

Deposition of Joseph Silva (June 7, 2017)

Deposition of Scott Coker (August 3, 2017)

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

LITERATURE

PHILLIP E. AREEDA, EINER ELHAUGE & HERBERT HOVENKAMP, 10 ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 267, 325–28, ¶ 1758b. (1996 & Supp. 2003)

PHILLIP AREEDA, LOUIS KAPLOW & AARON EDLIN, ANTITRUST ANALYSIS: PROBLEMS, TEXT AND CASES ¶ 344 (6th ed. 2004).

Leandro Arozamena & Federico Weinschelbaum, *A note on the suboptimality of right-of-first-refusal clauses,* 4(24) Economics Bulletin (2006) 1-5

Johnathan Baker, *Beyond Schumpeter vs. Arrow: How Antitrust Fosters Innovation*, 74 Antitrust L.J. 575-602, 577 (2007)

Jesse Baker & Matthew Thomson, *The Ultimate Fighting Championships (UFC): The Evolution of a Sport*, in Cases in Marketing Management 115 (Kenneth E. Clow & Donald Baack, eds. 2012)

Jonathan B. Baker & Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, in Paulo Buccirossi, ed., HANDBOOK OF ANTITRUST ECONOMICS (2007)

Sushil Bikhchandani, Steven Lippman, & Reade Ryan, *On the Right of First Refusal* 5(1) Advances in Theoretical Econ. (2005)

Emily Breza, Supreet Kaur, & Yogita Shamdasani, *The Morale Effects Of Pay Inequality*, QUARTERLY J. ECON. (forthcoming 2017)

DENNIS CARLTON & JEFFREY PERLOFF, MODERN INDUSTRIAL ORGANIZATION (Pearson 2005 4th ed.)

Kevin Caves, Chris Holt & Hal Singer, *Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, Rev. Network Econ. (2013)

Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* Antitrust Source (2015).

Kevin Caves & Hal Singer, *Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, J. Competition L. & Econ. (2012)

Trevor Collier, Andrew Johnson & John Ruggiero, *Aggression in Mixed Martial Arts: An Analysis of the Likelihood of Winning a Decision*, in 4 Violence and Aggression in Sporting Contests, Sports Economics, Management and Policy Series, 97-109, 98 (Springer 2011)

Eric Cramer & Daniel Berger, *The Superiority of Direct Proof of Monopoly Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of Generic Drugs* 39 UNIVERSITY OF SAN FRANCISCO L. REV. (2004)

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Aaron S. Edlin & Daniel L. Rubinfeld, *Exclusive or Efficient Pricing? The Big Deal Bundling of Academic Journals*, 72 Antitrust L.J. 119, 126 (2004)

Mohamed El-Hodiri & James Quirk, *An Economic Model of a Professional Sports League*, 79 J. POL. ECON. 1302 (1971)

Einer Elhauge, *Defining Better Monopolization Standards*, 56 Stan. L.R. 253 (2003)

RODNEY D. FORT, SPORTS ECONOMICS 267 (Prentice Hall 3rd ed. 2011)

Paul Gift, *Performance Evaluation and Favoritism: Evidence from Mixed Martial Arts*, Pepperdine University Working Paper (2014)

HERBERT HOVENKAMP, XI ANTITRUST LAW ¶1821, at 152, 160, 164-65 (1998)

HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY 82-83 (3d ed. 2005)

Brad R. Humphreys, *Alternative Measures of Competitive Balance in Sports Leagues*, J. Sports Econ. 133-148 (2002)

Jeremiah Douglas Johnson, *Predicting Outcomes Of Mixed Martial Arts Fights With Novel Fight Variables*, Thesis Submitted to the Graduate Faculty of the University of Georgia in Partial Fulfillment of the Requirements for the Degree Master Of Science (2012), available at https://getd.libs.uga.edu/pdfs/johnson_jeremiah_d_201208_ms.pdf

Marcel Kahan, Shmuel Leshem & Rangarajan Sundaram, *On First-Purchase Rights: Rights of First Refusal and Rights of First Offer*, 14 AMERICAN L. & ECON. REV. (2012).

MICHAEL KATZ & HARVEY ROSEN, MICROECONOMICS 264-65, 276-77 (Irwin McGraw-Hill 3rd ed. 1998)

MICHAEL LEEDS, PETER VON ALLMEN & VICTOR MATHESON, THE ECONOMICS OF SPORTS (Routledge 5th ed. 2016)

GEORGE MILKOVICH, JERRY NEWMAN, & BARRY GERHART, COMPENSATION 69 (10th ed. McGraw-Hill 2011)

Richard McGowan and John Mahon, *Demand for the Ultimate Fighting Championship: An Econometric Analysis of PPV Buy Rates* 6(6) Journal of Business and Economics 1032-1056 (2015)

Roger Noll, *Buyer Power and Economic Policy*, 72 ANTITRUST L.J. 615-616 (2005).

Roger Noll, *The Economics of Baseball Contraction*, 4 J. SPORTS ECON. 383 (2003)

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Roger G. Noll, *Professional Basketball: Economic and Business Perspectives*, in THE BUSINESS OF PROFESSIONAL SPORTS 18 (Paul D. Staudohar & James A. Mangan eds., 1991)

JAMES QUIRK & RODNEY D. FORT, HARD BALL: THE ABUSE OF POWER IN PRO TEAM SPORTS 9 (Princeton University Press 1999).

JAMES QUIRK & RODNEY D. FORT, PAY DIRT: THE BUSINESS OF PROFESSIONAL TEAM SPORTS 240 (Princeton University Press 1992).

ROY RUFFIN & PAUL GREGORY, PRINCIPLES OF MICROECONOMICS 331-336 (Harper Collins 5th ed. 1993)

Simon Rottenberg, *The Baseball Players' Labor Market*, 64(3) J. Pol. Econ. 242-258 (1956)

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices and the Flawed Incremental Price-Cost Test*, 81(2) ANTITRUST L.J. 371-421, 376 (2017)

Ilya Segal & Michael Whinston, *Naked Exclusion*: Comment 90(1) Am. Econ. Rev. 296-309 (2000)

Daniel Sutter & Stephen Winkler, *NCAA Scholarship Limits and Competitive Balance in College Football*, 3 J. SPORTS ECON. 16 (2003)

JEFFREY WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH 210-212 (Thompson 4th ed. 2009)


**TRIAL MATERIALS/BATES DOCUMENTS**

CG-UFC-00000005
DB-ZUFFA-00006389
DB-ZUFFA—00006712
DB-ZUFFA-00007015 - DB-ZUFFA-00007109
DB-ZUFFA-00007249
DB-ZUFFA-00007249 - DB-ZUFFA-00007289.pdf
DB-ZUFFA-00008846
DB-ZUFFA-00020303
DB-ZUFFA-00030406
DB-ZUFFA-00043567
DB-ZUFFA-00056900
DB-ZUFFA-00057908
MARTIN0034081
MARTIN0035084
MARTIN0044963
RAINE0000575
RAINE0018791

SBPCL00002101
TPS-0043214
WME-ZUFFA-00031950-60
ZFL-0000003
ZFL-0000113
ZFL-0000136
ZFL-0000259
ZFL-0000650
ZFL-0003018
ZFL-0050050
ZFL-0086231
ZFL-0105053
ZFL-0127082
ZFL-0132594
ZFL-0175016
ZFL-0198252
ZFL-0299212
ZFL-0393948
ZFL-0417369
ZFL-0460809
ZFL-0469293
ZFL-0469456
ZFL-0472320
ZFL-0486365
ZFL-0504268
ZFL-0504287
ZFL-0506593
ZFL-0529761
ZFL-0557588
ZFL-0802996
ZFL-0819451
ZFL-0827209
ZFL-0827347
ZFL-0871571
ZFL-0885147-49
ZFL-0887100
ZFL-0895314
ZFL-0940372
ZFL-0977248
ZFL-0979654
ZFL-0990908
ZFL-0997899
ZFL-1005485
ZFL-1007379
ZFL-1016893
ZFL-1019758

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZFL-1023959
ZFL-1039853
ZFL-1049355
ZFL-1053223
ZFL-1055607
ZFL-1056348
ZFL-1056382
ZFL-1063442
ZFL-1073120
ZFL-1081154
ZFL-1084185
ZFL-1096310
ZFL-1112933
ZFL-1216165
ZFL-1219068
ZFL-1224976
ZFL-1225565
ZFL-1225776
ZFL-1226920
ZFL-1229603
ZFL-1233191
ZFL-1240584
ZFL-1240584
ZFL-1241786
ZFL-1243128
ZFL-12439917
ZFL-12442377
ZFL-12447128
ZFL-12449538
ZFL-12517218
ZFL-1367079
ZFL-1376378-79
ZFL-1381761
ZFL-1382453
ZFL-1387999
ZFL-1392468
ZFL-1393175
ZFL-1394078
ZFL-1394508
ZFL-1402629
ZFL-1402631
ZFL-1402822
ZFL-1404974
ZFL-1421024
ZFL-1421551
ZFL-1470673

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZFL-1472063-76
ZFL-1472077
ZFL-1472224
ZFL-1472337
ZFL-1472338
ZFL-1484035
ZFL-1484036
ZFL-1484037
ZFL-1487968
ZFL-1499215
ZFL-1500311
ZFL-1501599
ZFL-1514712
ZFL-1514713
ZFL-1514769
ZFL-1514770
ZFL-1514804
ZFL-1514836
ZFL-1514837
ZFL-1514870
ZFL-1514900
ZFL-1514901
ZFL-1514933
ZFL-1514944
ZFL-1514966
ZFL-1544038
ZFL-1674096
ZFL-1676293
ZFL-1677482
ZFL-1690436-444
ZFL-1702118
ZFL-1702162
ZFL-1704928
ZFL-1825387
ZFL-1833347
ZFL-1835118
ZFL-1838367
ZFL-1872579
ZFL-1873428
ZFL-1886668
ZFL-1892287
ZFL-1892294
ZFL-1892308
ZFL-1892315
ZFl-1897060
ZFL-1897652

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZFL-1901788
ZFL-1908119
ZFL-1941439
ZFL-1974115
ZFL-1977394
ZFL-1978914
ZFL-2005388
ZFL-2005616
ZFL-2020850
ZFL-2022954
ZFL-2135552
ZFL-2149052
ZFL-2152714
ZFL-2176645
ZFL-2177960
ZFL-2177961
ZFL-2188190
ZFL-2193553
ZFL-2193737
ZFL-2203067
ZFL-2205733
ZFL-2206472
ZFL-2206527
ZFL-2206534
ZFL-2235745
ZFL-2244834
ZFL-2244949
ZFL-2251021
ZFL-2251267
ZFL-2251268
ZFL-2279086
ZFL-2444687
ZFL-2461790
ZFL-2463304
ZFL-2472830
ZFL-2477398
ZFL-2479576
ZFL-2480590
ZFL-2482323
ZFL-2483111
ZFL-2483345
ZFL-2483396
ZFL-2483439
ZFL-2486240
ZFL-2489547
ZFL-2491662

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZFL-2494934
ZFL-2494948
ZFL-2496215
ZFL-2496264
ZFL-2497585
ZFL-2499718
ZFL-2502942
ZFL-2508355
ZFL-2508548
ZFL-2520643
ZFL-2528642
ZFL-2528842
ZFL-2529699
ZFL-2530042
ZFL-2530953
ZFL-2531156
ZFL-2532557
ZFL-2534622
ZFL-2535654
ZFL-2536288
ZFL-2536392
ZFL-2536695
ZFL-2540458
ZFL-2544560
ZFL-2547712
ZFL-2552141
ZFL-2554757
ZFL-2554758
ZFL-2559292
ZFL-2582134
ZFL-2586870
ZFL-2587231
ZFL-2595178
ZFL-2602496
ZFL-2603701
ZFL-2603702
ZFL-2603704
ZFL-2613931
ZFL-2613939
ZFL-2613946
ZFL-2614046
ZFL-2614687
ZFL-2615437
ZFL-2618630
ZFL-2632955
ZFL-2642993

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZFL-2643298
ZFL-2647127
ZFL-2649918
ZFL-2685237
ZFL-2689504
ZFL-2699674
ZFL-2699678
ZFL-2699683
ZFL-2699687
ZFL-2699696
ZFL-2764799
ZFL-2764805
ZUF-00017896
ZUF-00031544
ZUF-00031995
ZUF-00034210
ZUF-00085896
ZUF-00086103
ZUF-00088096
ZUF-00088100
ZUF-00090606
ZUF-00096950
ZUF-00106610
ZUF-00106849
ZUF-00106854
ZUF-00106856
ZUF-00109551
ZUF-00122280
ZUF-00401766
ZUF-00140642
ZUF-00140700
ZUF-00153787
ZUF-00153903
ZUF-00157199
ZUF-00157206
ZUF-00162329
ZUF-00169647
ZUF-00284193
ZUF-00296703
ZUF-00325418
ZUF-00335242
ZUF-00339684
ZUF-00374356
ZUF-00377706
ZUF-00395941
ZUF-00401766-779

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

ZUF-00418378
ZUF-00421380-97
ZUF00447547
ZUF-00447778

*Declaration of Rodney D. Fort Submitted to the Federal Trade Commission on Behalf of Zuffa, LLC* (December 1, 2011), ZFL-1212308

*Declaration of Andrew R. Dick, Ph.D., Submitted to the Federal Trade Commission on Behalf of Zuffa, LLC,* (December 1, 2011), ZFL-1212452

United States District Court District of Nevada, *Cung Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,* 2:15-cv-01045-RFB-(PAL), Consolidated and Amended Antitrust Class Action Complaint (Dec. 18, 2015)

*Declaration of Scott Coker in Support of Nonparty Bellator Sport Worldwide, LLC's Motion to Quash or Modify Subpoenas,* Feb. 22, 2017, ¶20

*E-mail from Remi Genauer, Director, FightMetic, to Augustus Urschel, Analyst, Economics Incorporated* (November 19, 2016, 19:48 ET)

Goldman 30(b)(6)

*Order Granting Plaintiffs' Supplemental Motion for Class Certification*, High-Tech Employee Antitrust Litig., No. 11-CV-02509 (N.D. Cal. Oct. 24, 2013), at 60-61

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (3d Cir. 2012)

*Zuffa's Response to Plaintiffs' Requests for Admission* No. 37

**PUBLICLY AVAILABLE MATERIALS**

Shaun Al-Shatti, *ONE Championship's Victor Cui: 'We've gotten a lot of interest' since UFC-Reebok deal*, MMA Fighting, May 21, 2015.

Shaun Al-Shatti, *Where in the world has Ben Askren been? Well, it's complicated...* MMA FIGHTING (April 28, 2017)

Mookie Alexander, *Six takeaways from Floyd Mayweather vs. Conor McGregor*, Bloody Elbow, Aug. 27, 2017

Zach Arnold, *PRIDE office in Tokyo shut down, all workers fired*, FIGHT OPINION, Oct. 4, 2007, available at http://www.fightopinion.com/2007/10/04/pride-office-in-tokyo-shut-down-all-workers-fired/

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Nick Baldwin, *CEO Victor Cui explains why Conor McGregor isn't suitable for ONE Championship*, BLOODY ELBOW, May 22, 2017, available at http://www.bloodyelbow.com/2017/5/22/15677574/ceo-victor-cui-explains-why-conor-mcgregor-isnt-suitable-for-one-championship-mma-ufc-news

Andrew Brennan, *Professional Wrestlers Must Realize They Can't Enter The MMA Or The UFC; It's Not A Scripted Fight*, Forbes, Oct. 31, 2016

*John Cholish: '90% Including Some Top Tier Fighters' Unhappy With UFC Pay*, Full Contact Fighter (Friday, May 31, 2013), available at http://fcfighter.com/post/john-cholish-says-90-including-some-top-tier-fighters-unhappy-with-ufc-pay

Department of Justice and Federal Trade Commission, *Antitrust Guidelines for Collaborations Among Competitors* (April 2000), §2.2, available at https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

James Edwards, *ONE Championship and UFC is the story of East and West in the MMA market*, Independent, April 19, 2016

Ethan Finkelstein, *WSOF New PPV Model to Award 50 Percent to Fighters*, FANSIDED, Sept. 23, 2014

Jason Gay, *Mayweather and McGregor's Mindless Summer Fight*, Wall Street Journal, June 15, 2017

James Goyder, "ONE Championship receives multimillion dollar investment from Singapore fund," MMA Mania (July 14, 2016)

Josh Gross, *Cuban sees bright future for MMA*, ESPN, (September 13, 2007), available at http://www.espn.com/extra/mma/news/story?id=3017701

Josh Gross, *Lappen Sues WFA for Breach of Contract*, SHERDOG, Dec. 7, 2006, available at http://www.sherdog.com/news/articles/Lappen-Sues-WFA-for-Breach-of-Contract-6308

Jesse Holland, *Lorenzo Fertitta: UFC will generate record-high $600 million revenue for 2015*, MMA MANIA, Dec. 28, 2015, available at http://www.mmamania.com/2015/12/28/10675158/lorenzo-fertitta-ufc-will-generate-record-high-600-million-revenue-2015-mma

Kevin Iole, *In cutting Jake Shields, UFC takes a page out of NFL's playbook*, YAHOO SPORTS, Apr. 7, 2014, available at https://sports.yahoo.com/news/in-cutting-jake-shields--ufc-takes-a-page-out-of-nfl-s-playbook-203152661-mma.html

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Steve Juon, *Former WSOF dual-weight champion David Branch re-signs with UFC*, MMA Mania, Feb. 15, 2017

Steve Juon, *Justin Gaethje tests free agency, but WSOF still holds matching rights*, MMA MANIA, Mar. 30, 2017

Riley Kontek, *4 Reasons MMA Fans Should Pay Attention to One FC*, Bleacher Report, May 30, 2013

Richard Mann, "Ranking Points for Highest Ranked Fighter by Promotion" FightMatrix (August 3, 2016).

Matthew Miller, *Ultimate Cash Machine*, FORBES, April 17, 2008, available at https://www.forbes.com/forbes/2008/0505/080.html

*Strikeforce confirms Jan. 12 event is final Showtime broadcast*, MMA JUNKIE, Dec. 20, 2012, available at https://web.archive.org/web/20131102021751/http://www.mmajunkie.com/news/2012/12/strikeforce-confirms-jan-12-event-is-final-showtime-broadcast

*Two-division WSOF champ David Branch relinquishes titles, heads to free agency*, MMA JUNKIE, Feb. 6, 2017

*UFC Acquires World Fighting Alliance, Inc*., MMA JUNKIE, Dec. 11, 2016, available at http://mmajunkie.com/2006/12/ufc-acquires-world-fighting-alliance-inc

*UFC 91 replay on Spike TV peaks with 3.3 million viewers*, MMAmania.com, Jan. 27, 2009, available at https://www.mmamania.com/2009/01/27/ufc-91-replay-on-spike-tv-peeks-with-33-million-viewers

*Done deal: UFC owners purchase PRIDE FC*, MMA MANIA, Mar. 27, 2007, available at http://www.mmamania.com/2007/03/27/done-deal-ufc-owners-purchase-pride-fc

Tony Mogan, *ONE Championship: Asia's MMA powerhouse plays up its differences to UFC in battle for supremacy*, INTERNATIONAL BUSINESS TIMES, Jan. 21, 2017

*Pat Miletich's Statement in UFC-IFL Case*, MMAWEEKLY, June 17, 2006, available at http://www.mmaweekly.com/pat-miletichs-statement-in-ufc-ifl-case

Moody's Investors Service, "Announcement: Moody's Changed Zuffa LLC's (d/b/a Ultimate Fighting Championship or UFC) Rating Outlook to Positive from Stable," (December 1, 2010), available at https://www.moodys.com/research/Moodys-Changed-Zuffa-LLCs-dba-Ultimate-Fighting-Championship-or-UFC--PR_210184

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

John Morgan, *Dana White stands by 'pay for rankings' claim, says UFC is the NFL of MMA*, MMA JUNKIE, June 14, 2010, available at http://mmajunkie.com/2010/06/dana-white-stands-by-pay-for-rankings-claim-says-ufc-is-the-nfl-of-mixed-martial-arts

John Morgan, *Justin Gaethje on new UFC deal: "Now I get a chance to prove I'm the best in the world."* MMA Junkie, May 5, 2017

John Nash, *Why do boxers make more than MMA fighters?*, BLOODY ELBOW, Aug. 23, 2016

Tom Ngo, *IFL: Going, Going…Gone! UFC Here We Come?*, 5TH ROUND, July 25, 2008, available at https://web.archive.org/web/20091201045527/http://www.5thround.com/07252008/news/1293/ifl-going-goinggone/

Patriot Software, *Payroll Blog: Payroll Training, Tips, and News*, available at: https://www.patriotsoftware.com/payroll/training/blog/what-is-internal-equity/

Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA WEEKLY, Dec. 11, 2006, available at https://web.archive.org/web/20070929111019/http://www.mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13

Darren Rovell & Brett Okamoto, *Dana White on $4 billion UFC sale: 'Sport is going to the next level*, ESPN, July 11, 2016, available at: http://www.espn.com/mma/story/_/id/16970360/ufc-sold-unprecedented-4-billion-dana-white-confirms

Chris Smith, *UFC Vs. WWE: How Much More Is Real Fighting Worth?*, FORBES, July 12, 2016

Jonathan Snowden, *Disastrous debut costs IFL millions: The history of MMA on television, Part 2*, BLEACHER REPORT, Dec. 12, 2012, available at http://bleacherreport.com/articles/1442316-disastrous-debut-costs-ifl-millions-the-history-of-mma-on-television-part-2

Robert J. Szczerba, *Mixed Martial Arts and the Evolution of John McCain*, FORBES, Apr. 3, 2014, available at http://www.forbes.com/sites/robertszczerba/2014/04/03/mixed-martial-arts-and-the-evolution-of-john-mccain/#27d42ac91a3b

Jeffrey Thaler, *Breaking Down the Match-Up: UFC vs. IFL*, SHERDOG, Mar. 2, 2006, available at http://www.sherdog.com/news/articles/Breaking-Down-the-MatchUp-UFC-vs-IFL-4051

*UFC on Fuel TV 7 post-fight media scrum* (Feb. 2013), available at https://youtu.be/y0NTilTqn2w?t=12m9s

UFC's "Weight Classes," available at http://www.ufc.com/discover/sport/weight-classes

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Nate Wilcox, *More Details Emerge on UFC Acquisition of Strikeforce*, Bloody Elbow, Mar. 13, 2011, available at http://www.bloodyelbow.com/2011/3/13/2047456/ufc-strikeforce-acquisition-more-details-emerge

Michael Woods, *UFC struggles to shake outlaw nature*, ESPN, May 12, 2009, available at http://www.espn.com/extra/mma/news/story?id=4157485

http://www.abcboxing.com/committee-report-on-unified-rules-for-mma

http://bleacherreport.com/articles/2652376-bleacher-report-mma-rankings-for-july-2016

https://www.bloodyelbow.com/2017/6/25/15870964/spike-executive-bellator-nyc-the-first-of-many-ppv-events-running-mma-news

http://www.fightmatrix.com/faq/

http://www.fightmatrix.com/historical-mma-rankings/generated-historical-rankings/?Issue=109&Division=4

http://www.fightmatrix.com/mma-ranks/

http://www.mmafighting.com/2015/5/11/8581653/scott-coker-on-ufc-reebok-sponsorship-program-bellators-phones-been

http://mmajunkie.com/rankings

http://mmajunkie.com/2014/09/wanderlei-silva-lashes-out-at-ufc-in-video-announcing-retirement-from-mma

http://mmajunkie.com/2016/09/legacy-fc-and-rfa-merge-to-create-new-legacy-fighting-alliance-promotion

https://www.mmamania.com/2009/07/24/report-affliction-folds-will-now-sponsor-ufc

http://mmapayout.com/blue-book/live-gate-attendance/

http://www.mmaweekly.com/ufc-138-tv-ratings-match-past-tape-delays

https://onefc.com/livestream/

http://www.sherdog.com/events

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

http://www.sherdog.com/fighter/Steve-Bosse-22732

http://www.sherdog.com/fighter/Wes-Shivers-49521

http://www.sherdog.com/news/news/Strikeforce-Challengers-20-Draws-143000-Viewers-on-Showtime-37424

http://www.sherdog.com/organizations/Mix-Fight-Night-Bosnia-and-Herzegovina-11979

http://www.sherdog.com/organizations/World-Extreme-Cagefighting-48

https://twitter.com/heynottheface/status/884511218207084544

http://www.ufc.com/discover/sport/rules-and-regulations#2

http://www.ufc.com/discover/sport/ways-to-win

https://www.ufc.tv/category/fightlibrary

https://usatoday30.usatoday.com/sports/mma/post/2011-10-26/viacom-buys-bellator-plans-2013-start-on-spike/558003/1

https://web.archive.org/web/20091201045527/http://www.5thround.com/07252008/news/1293/ifl-going-goinggone/

https://web.archive.org/web/20091109023530/http://mmajunkie.com/news/16763/strikeforce-to-be-flagship-promotion-in-ea-sports-mma-videogame.mma

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

# UFC - Hal Singer Report - Errata

| # | P. | Location | Original | Change To / Addition | Reason |
|---|----|----------|----------|----------------------|--------|
| 1. | 6 | ¶ 3 n. 6 | If, however, the class definition were interpreted to be limited only to those class members who fought in a bout that physically took place within the United States during the Class Period (regardless of whether or not it was broadcast live into the United States), 12.7 percent of the Bout Class members would be excluded (154 out of 1,214 Fighters. These 154 Fighters account for 1.5 percent of the aggregate Bout Class damages. Additionally, 33.1 percent of all Bout Class damages are associated with bouts fought outside the United States (but which were broadcast live into the United States). | If, however, the class definition were interpreted to be limited only to those class members who fought in a bout that physically took place within the United States during the Class Period (regardless of whether or not it was broadcast live into the United States), 13.8 percent of the Bout Class members would be excluded (167 out of 1,214 Fighters). These 167 Fighters account for 3.0 percent of the aggregate Bout Class compensation. Under the damage model presented in Table 9 (Part IV. A), this corresponds to 3.0 percent of aggregate Bout Class Damages. Additionally, 33.1 percent of Bout Class compensation is associated with bouts fought outside the United States (but which were broadcast live into the United States). | Increase Validity |
| 2. | 6 | ¶ 3 n. 10 | I estimate that, as of June 30, 2017, there are 1,214 Fighters in the Bout Class and at least as many Fighters in the Identity Class. | I estimate that, as of June 30, 2017, there are 1,214 Fighters in the Bout Class and 1,085 in the Identity Class. | Inaccurate Numerical Figure |
| 3. | 16 | ¶ 20 n. 29 | *Id. See also* WME_ZUFFA_00031950-60 ("History tells us that for a pay-per-view to do big numbers, it needs marquee names… sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-views."). | WME_ZUFFA_00031950-60 ("History tells us that for a pay-per-view to do big numbers, it needs marquee names… sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-views."). | Unclear Citation |
| 4. | 26 | ¶ 35 n. 84 | *Id.* | *See* Mossholder Dep. Exhibit 36-A. | Unclear Citation |
| 5. | 29 | ¶ 42 n. 102 | *Id.* | Epstein 30(b)(6) Tr. 24:12-13 (stating Zuffa's testimony that it acquired the WEC); Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA Weekly, Dec. 11, 2006, *available at* https://web.archive.org/web/20070929111019/http://www.mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13 | Unclear Citation |
| 6. | 31 | ¶ 45 n. 117 | *Id.* | *See* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, ZFL-0086231. *See also* ZFL-1544038 at 58 (2012 Information Memorandum prepared by The Raine Group stating that "[a]ll fighters are signed exclusively to the UFC"). Prior to its acquisition by Zuffa, at least some Strikeforce contracts were "not exclusive and allow[ed] the fighters to have bouts elsewhere." *See* ZFL-1393175. *See also* 30(b)(6) Deposition of Kirk Hendrick, November 29, 2016, Exhibit 2, at 21-25 [hereafter *Zuffa Contract Summary*], at 3. The PAR did permit Fighters to compete in certain bouts, provided that the bout was not televised and that the Fighter obtained Zuffa's express written permission. Ex. 2 to Hendrick Dep. at Tabs 29-50 (demonstrating in Section 3.6 the lone exception to the contractual bout exclusivity provision). Because Zuffa could deny its permission, Zuffa could ensure a Fighter never defected to a rival that Zuffa perceived to threaten its market dominance. | Unclear Citation |

| 7. | 53-54 | ¶ 80 n. 224 | ZFL-2496215 (July 2012 e-mail exchange between Joe Silva, Michael Mersch and Tracy Long discussing that it was Quinton Rampage Jackson's last fight on his contract, would not sign a new deal and that Zuffa used its discretion to not make Jackson's bout the main event). | ZFL-2496215 (July 2012 e-mail exchange between Joe Silva, Michael Mersch and Tracy Long discussing that it was Quinton Rampage Jackson's last fight on his contract, that he would not sign a new deal, and that Zuffa used its discretion to not make Jackson's bout the main event). | Missing Words |
| 8. | 86 | ¶ 127 n. 348 | Also, when Sean Shelby was trying to organize a UFC fight in Singapore in 2013, he wrote that although "it's not normally possible" to get One FC Fighters released from their contract he would "see if I can pull [Leandro] Issa out from his one FC fight" to fight for Zuffa in Singapore. ZFL-1886668; ZFl-1897060 at 158. | Also, when Sean Shelby was trying to organize a UFC fight in Singapore in 2013, he wrote that although "it's not normally possible" to get One FC Fighters released from their contract he would "see if I can pull [Leandro] Issa out from his one [sic] FC fight" to fight for Zuffa in Singapore. ZFL-1886668; ZFl-1897060 at 158. | Increased Accuracy |
| 9. | 93 | ¶ 136 n. 367 | ██████████████████████████ | ██████████████████████████ | Typo |
| 10. | 124 | ¶ 187 n. 456 | Put differently, even if the Challenged Conduct consisted solely of Zuffa's exclusionary contracts, my analysis of foreclosure analysis the resulting estimates of economic harm would remain the same. | Put differently, even if the Challenged Conduct consisted solely of Zuffa's exclusionary contracts, my estimates of economic harm would remain the same. | Increased Accuracy |
| 11. | 127 | ¶ 189 n. 463 | In a competitive labor market, compensation is set revenue paid to labor is determined by the productivity of labor, as opposed to the monopsony power of the firm that hires labor. | In a competitive labor market, compensation paid to labor is determined by the productivity of labor, as opposed to the monopsony power of the firm that hires labor. | Increased Accuracy |
| 12. | 150 | ¶ 224 n. 542 | ZFL-1005485 (3/13/14 email from Sen Shelby to Silva, Fertitta, and Dana, noting "I can talk money all day but a PPV component as a challenger is a deal breaker."). | ZFL-1005485 (3/13/14 email from Sean Shelby to Silva, Fertitta, and White, noting "I can talk money all day but a PPV component as a challenger is a deal breaker."). | Increased Accuracy |
| 13. | 207 | ¶ 306 | $$\left( \frac{Foreclosed\ Zuffa\ Fighter}{Relevant\ Input\ Market\ Fighter\ Pool} \right)_t$$ | $$\left( \frac{Foreclosed\ Zuffa\ Fighters}{Relevant\ Input\ Market\ Fighter\ Pool} \right)_t$$ | Typo |
| 14. | 207 | ¶ 307 | For example, Zuffa may have 150 Fighters in a pool of 200 total Fighters in the Relevant Input Market at time *t*, but contract data is only available for 120 of those 150 Zuffa Fighters. In this case, I would take the internal foreclosure share of the Zuffa Fighters for which we have contract data. If 96 of those 120 Fighters were foreclosed, Zuffa would have an internal foreclosure share of 80 percent. I would then multiply that 80 percent by Zuffa's market share at time *t*, in this case 75 percent (equal to 150 Zuffa Fighters divided by 200 total Fighters in the Relevant Input Market Fighter Pool) for a total foreclosure share of 60 percent. | For example, Zuffa may have 15 Fighters in a pool of 20 total Fighters who fought in the Relevant Input Market at time *t*, but contract data is only available for 10 of those 15 Zuffa Fighters. In this case, I would take the internal foreclosure share of the Zuffa Fighters for which we have contract data. If 8 of those 10 Fighters were foreclosed, Zuffa would have an internal foreclosure share of 80 percent. I would then multiply that 80 percent by Zuffa's market share at time *t*, in this case 75 percent (equal to 15 Zuffa Fighters divided by 20 total Fighters in the Relevant Input Market Fighter Pool) for a total foreclosure share of 60 percent. | Increased Accuracy |
| 15. | 61 | ████ |  |  | Increased Validity |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | ███ | | | | |
| █ | █ | ███ | | | | Increased Validity |
| 17. | 205 | ███ | | | | Increase Validity |
| 18. | 204 | ¶ 295 | This dataset contained 2,136 valid contracts in total, from May 2001 to November 2015. | This dataset contained 2,135 valid contracts in total, from May 2001 to November 2015. | | Increase Validity |
| 19. | 41 | ¶ 64 | My staff and I reviewed all Zuffa Fighter contracts produced by Zuffa; this includes a total of 2,136 valid PARs spanning 2001-2015. | My staff and I reviewed all Zuffa Fighter contracts produced by Zuffa; this includes a total of 2,135 valid PARs spanning 2001-2015. | | Increase Validity |

## UFC - Hal Singer Report – Errata II

| # | P. | Location | Original | Change To / Addition | Reason |
|---|---|---|---|---|---|
| 20. | 14 | ¶ 17 n. 21 | According to Dana White, he "did a deal with Pride where they could use Chuck Liddell and Ricco Rodriguez [in 2003], and they were supposed to in return give me Wanderlei Silva and Sakuraba" but UFC "never co-promoted." Deposition of Dana White, Aug. 8, 2017, at 154:5-8. | According to Dana White, he "[did] a deal with Pride where they could use Chuck Liddell and Ricco Rodriguez [in 2003], and they were supposed to in return give me Wanderlei Silva and Sakuraba" but UFC "never co-promoted." Deposition of Dana White, Aug. 8, 2017, at 154:5-8. | Increased Accuracy |
| 21. | 15 | ¶ 18 n. 24 | Deposition of Joseph Silva at 86:12-19. | Deposition of Joseph Silva at 91:23-92:7. | Increased Accuracy |
| 22. | 15 | ¶ 18 n. 25 | Id. at 87:8-23, 107:4-19, 121:17-122:16. | Id. at 92:20-93:11, 114:14-115:6, 130:10-131:16. | Increased Accuracy |
| 23. | 15 | ¶ 18 n. 28 | See Deposition of Jeremy Lappen, President of ProElite (holding company of EliteXC), February 28, 2017, at 136:9-167:6 ("Q: Are fighters with notoriety like [Kimbo Slice] essential to building a successful MMA promotion? A: Yeah, the fighters are what draws…, it's hard to find a star. They have a certain X factor. That's what the business is about, I think."). See also Deposition of Shannon Knapp, President of Invicta Fighting Championships, April 11, 2017, at 124:10-12 ("Q: High Profile, she [Cristiane Justino, AKA Cyborg], was a well known fighter? A: Uh-huh, yeah. Q: Did her presence on a card affect the viewership? A. Yeah.") | See Deposition of Jeremy Lappen, President of ProElite (holding company of EliteXC), February 28, 2017, at 136:9-137:6 ("Q: Are fighters with notoriety like [Kimbo Slice] essential to building a successful MMA promotion? A: Yeah, the fighters are what draws…, it's hard to find a star. They have a certain X factor. That's what the business is about, I think."). See also Deposition of Shannon Knapp, President of Invicta Fighting Championships, April 11, 2017, at 124:8-12 ("Q: High Profile, she [Cristiane Justino, AKA Cyborg], was a well known fighter? A: Uh-huh, yeah. Q: Did her presence on a card affect the viewership? A. Yeah.") | Increased Accuracy |
| 24. | 16 | ¶ 20 n. 30 | Deposition of Jon Fitch, February 15, 2017, at 112:7 – 112:9 ("Fighters fight for titles. The most coveted title is the UFC title."). | Deposition of Jon Fitch, February 15, 2017, at 122:7-9 ("Fighters fight for titles. The most coveted title is the UFC title."). | Increased Accuracy |
| 25. | 17 | ¶ 21 n. 35 | See also Hendrick 30(b)(6) V.I Tr. 264:8-10 (expressing Zuffa's position that fighters are independent contractors); Silva Dep. 186:18-20. | See also Deposition of Kirk Hendrick 30(b)(6) V.I Tr. 264:8-10 (expressing Zuffa's position that fighters are independent contractors); Silva Dep. 186:18-20. | Increased Accuracy |
| 26. | 18 | ¶ 24 n. 42 | See also ZUF-00096950; Deposition of Joseph Silva, June 7, 2017, at 76:22-84:2. See also ZFL-0000113 at 20; ZFL-0000136 at 24. | See also ZUF-00096950; See also ZFL-0000113 at 20; ZFL-0000136 at 24. | Increased Accuracy |
| 27. | 22 | ¶ 30 n. 62 | See also Deposition of Lorenzo Fertitta, March 23, 2017 at 174:20-179:10 | See also Deposition of Lorenzo Fertitta, March 23, 2017 at 174:6-179:10 | Increased Accuracy |
| 28. | 22 | ¶ 31 n. 63 | See also Fertitta Tr. 175:5-15. | See also Fertitta Tr. 173:5-15. | Increased Accuracy |
| 29. | 22 | ¶ 31 n. 66 | see also Fertitta Tr. 180:19-22. | see also Fertitta Tr. 180:4-22. | Increased Accuracy |
| 30. | 23 | ¶ 32 n. 67 | See also Fertitta Tr. 186:14-187:11 & 188:19-190:6. | See also Fertitta Tr. 186:14-187:9 & 188:19-190:6. | Increased Accuracy |
| 31. | 23 | ¶ 32 n. 69 | ███████████████████ | ███████████████████ | Increased Accuracy |
| 32. | 26 | ¶ 35 n. 83 | 30(b)(6) Deposition of Michael Mossholder (December 1, 2016) at 143:19-146:121 ("Mossholder Dep."). | 30(b)(6) Deposition of Michael Mossholder (December 1, 2016) at 143:19-146:21 ("Mossholder Dep."). | Increased Accuracy |
| 33. | 26 | ¶ 35 n. 84 | Id. | Id at 143:19-146:21, 156:12-22 | Increased Accuracy |
| 34. | 30 | ¶ 43 n. 108 | See Goldman 30(b)(6) Tr. 125:5-14 | Deposition of Drew Goldman pursuant to 30(b)(6) Tr. 125:5-14 | Increased Accuracy |

| # | Pg | ¶/n | Original | Revised | Reason |
|---|---|---|---|---|---|
| 35. | 30 | ¶ 43 n. 109 | *See also* Deposition of Drew Goldman pursuant to Rule 30(b)(6), April 28, 2017 at 73:17-74:1 | *See also* Deposition of Drew Goldman pursuant to Rule 30(b)(6), April 28, 2017 at 73:8-74:2 | Increased Accuracy |
| 36. | 33 | ¶ 47 n. 126 | Id. at 11. See also Coker Dep. at 38:6-12 (Strikeforce "got on [the UFC's] radar and I think they [Zuffa] wanted to control the market share."). | Id. at 11. See also Coker Dep. at 38:6-12 (Strikeforce "got on [the UFC's] radar and I think that they [Zuffa] wanted to control the market share."). | Increased Accuracy |
| 37. | 33 | ¶ 48 n. 129 | Coker Dep. at 121-10-23 | Coker Dep. at 121:10-23 | Increased Accuracy |
| 38. | 33 | ¶ 49 n. 130 | Coker Dep. at 114:22-118:15 | Coker Dep. at 113:23-118:15 | Increased Accuracy |
| 39. | 38 | ¶ 58 n. 161 | Deposition of Jeremy Lappen, Feb. 28, 2017, at 44 | Deposition of Jeremy Lappen, Feb. 28, 2017, at 44:2-46:12 | Increased Accuracy |
| 40. | 39 | ¶ 60 n. 169 | Deposition of Kurt Otto, February 6, 2017, at 161. | Deposition of Kurt Otto, February 6, 2017, at 161:11-19. | Increased Accuracy |
| 41. | 42 | ¶ 66 n. 177 | *See also* 30(b)(6) Deposition of Kirk Hendrick, November 29, 2016, Exhibit 2, at 21-25 [hereafter *Zuffa Contract Summary*], at 3 | *See also* 30(b)(6) Deposition of Kirk Hendrick, November 29, 2016, Exhibit 2 [hereafter *Zuffa Contract Summary*], at 4 | Changed to PDF Page |
| 42. | 42 | ¶ 66 n. 179 | | | Changed to PDF Page |
| 43. | 44 | ¶ 68 n. 185 | | | Changed to PDF Page |
| 44. | 44 | ¶ 69 n. 187 | *Zuffa Contract Summary* at 4. | *Zuffa Contract Summary* at 5. | Changed to PDF Page |
| 45. | 45 | ¶ 70 n. 191 | | | Changed to PDF Page |
| 46. | 45 | ¶ 71 n. 194 | ████████████████ | ████████████████ | Changed to PDF Page |
| 47. | 45 | ¶ 71 n. 195 | | █████████ | Changed to PDF Page |
| 48. | 46 | ¶ 72 n. 197 | | █████████ | Changed to PDF Page |
| 49. | 46 | ¶ 73 n. 199 | *Zuffa Contract Summary* at 8 | *Zuffa Contract Summary* at 9 | Changed to PDF Page |
| 50. | 46 | ¶ 73 n. 200 | ███████ | | Changed to PDF Page |
| 51. | 46 | ¶ 74 n. 201 | ███████████████████ | ███████████████████ | Increased Accuracy |
| 52. | 47 | ¶ 74 n. 205 | ███████████ | █████ | Increased Accuracy |
| 53. | 48 | ¶ 76 n. 206 | See also Deposition of Joseph Silva at 59:14-20 (discussing May 2007 Confidential Information Memorandum, DB-ZUFFA—00006712) ("Q. Then it says: 'Notably, only one marquee fighter has ever defected from UFC to a competing MMA organization, and that individual later returned to compete in the U.S.' As of the date of that statement, is that accurate to your knowledge? A. To my knowledge."). | See also Deposition of Joseph Silva at 59:14-20 (discussing May 2007 Confidential Information Memorandum, DB-ZUFFA—00006712) ("Q. Then it says: 'Notably, only one marquee fighter has ever defected from UFC to a competing MMA organization, and that individual later returned to compete in the UFC.' As of the date of that statement, is that accurate to your knowledge? A. To my knowledge."). | Increased Accuracy |
| 54. | 49 | ¶ 77 n. 208 | Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 | Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18:16-19:3 | Increased Accuracy |
| 55. | 49-50 | ¶ 77 n. 209 | Deposition of Plaintiff John Fitch, February 15, 2017 at 105 ("Q: Okay. And in this case, I think we've established that had you fought two fights [(of three)] and then renegotiated the contract? A: Correct."). See also id. at 110 … See also Deposition of Plaintiff Brandon Vera, February 6, 2017 at 118 | Deposition of Plaintiff John Fitch, February 15, 2017 at 105:3-6 ("Q: Okay. And in this case, I think we've established that had you fought two fights [(of three)] and then renegotiated the contract? A: Correct."). *See also Id.* at 110:4-23 … See also Deposition of Plaintiff Brandon Vera, February 6, 2017 at 118:1-7 | Increased Accuracy |

| | | | | | |
|---|---|---|---|---|---|
| 56. | 50 | ¶ 78 n. 210 | Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 | Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18:16-19:3 | Increased Accuracy |
| 57. | 52 | ¶ 80 n. 220 | Deposition of John Fitch, February 15, 2017 at 119 | Deposition of John Fitch, February 15, 2017 at 119:15-120:11 | Increased Accuracy |
| 58. | 52-53 | ¶ 80 n. 222 | ███████████████████████ | ███████████████████████ | Increased Accuracy |
| 59. | 53 | ¶ 80 n. 223 | Deposition of Kyle Kingsbury, February 17, 2017, at 118. See also Deposition of John Fitch, February 15, 2017, at 87 | Deposition of Kyle Kingsbury, February 17, 2017, at 117:18-119:5. See also Deposition of John Fitch, February 15, 2017, at 86:25-87:15. | Increased Accuracy |
| 60. | 56 | ¶ 83 n. 235 | ███████████████████████ | ███████████████████████ | Increased Accuracy |
| 61. | 57 | ¶ 84 n. 239 | Deposition of John Fitch, February 15, 2017 at 121 | Deposition of John Fitch, February 15, 2017 at 121:2-11 | Increased Accuracy |
| 62. | 58 | ¶ 86 n. 245 | *see also* Hendrick Dep. V.I ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career."). | *see also* Hendrick Dep. V.I at 267:6-13 ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career."). | Increased Accuracy |
| 63. | 58 | ¶ 86 n. 246 | At his deposition, Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 291-92. | At his deposition, Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 289:22-290:14. | Increased Accuracy |
| 64. | 62 | ¶ 90 n. 253 | Hendrick 30(b)(6) Dep. V.I ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career."). | Hendrick 30(b)(6) Dep. V.I at 267:6-13 ("If [a fighter is] ready, willing, and able to fight and they want to fight, 12 months I would say is a time period that is significant for a fighter's career."). | Increased Accuracy |
| 65. | 64 | ¶ 95 n. 260 | Margules Dep. at 85:17-86:13 ("Only … if they are ranked in the top 15 will they qualify."). | Margules Dep. at 84:22-86:13 ("Only … if they are ranked in the top 15 will they qualify."). | Increased Accuracy |
| 66. | 74 | ¶ 108 n. 300 | *See* Deposition of Javier Vasquez, February 14, 2017 at 67, Exhibits 42-44. | *See* Deposition of Javier Vasquez, February 14, 2017 at 67:1-20, Exhibits 42-44. | Increased Accuracy |
| 67. | 76 | ¶ 112 n. 308 | Silva Dep. 129:10-21 ("Beating guys with crappy records won't convince anyone [a fighter is] ready for the big leagues."); Margules Dep. at 85:17-86:13 ("Only … if they are ranked in the top 15 will they qualify."). | Silva Dep. 130:10-21 ("Beating guys with crappy records won't convince anyone [a fighter is] ready for the big leagues."); Margules Dep. at 84:22-25 ("Only … if they are ranked in the top 15 will they qualify."). | Increased Accuracy |
| 68. | 84 | ¶ 122 n. 337 | Deposition of Joseph Silva at 52:12-20 … *See also* Silva Dep. at 42:7-13 ("A. …if you only fought in Japan, you were not a big name to anybody in the United States"); *id.* at 294:4-8 ("Q. I see. And success, say, in China or the Philippines wouldn't translate to U.S.; is that right? A. Correct or Korea or anywhere else it's all very specific. Q. So the business and the industry is very culture or country specific in your opinion? A. Yeah, it can be.") | Deposition of Joseph Silva at 52:12-22 … *See also* Silva Dep. at 42:7-13 ("A. …if you'd only fought in Japan, you were not a big name to anybody in the United States"); *id.* at 294:4-11 ("Q. I see. And success, say, in China or the Philippines wouldn't translate to U.S.; is that right? A. Correct or Korea or anywhere else it's all very specific. Q. So the business and the industry is very culture or country specific in your opinion? A. Yeah, it can be.") | Increased Accuracy |
| 69. | 105 | ¶ 158 n. 405 | *see also* Silva Dep. 103:4-23 ("Q. And if you have a live MMA Event that doesn't have a top level, headlining match-up, that could hurt the ability of the event to attract an audience; is that fair? | *see also* Silva Dep. 103:4-23 ("Q. And if you have an [live MMA] Event that doesn't have a top level, headlining match-up, that could hurt the ability of the event to attract an audience; is that fair? | Increased Accuracy |
| 70. | 108 | ¶ 162 n. 421 | At his deposition, Lorenzo Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 291-92. | At his deposition, Lorenzo Fertitta testified that the term "fuckers" referred to Bellator, while the "oxygen" referred to Fighters Gilbert Melendez and Eddie Alvarez, both of which Bellator was attempting to recruit. *See* Fertitta Tr. at 289:22-290:14. | Increased Accuracy |
| 71. | 110 | ¶ 164 n. 430 | *See* Deposition of Kyle Kingsbury, February 17, 2017, at 119. | *See* Deposition of Kyle Kingsbury, February 17, 2017, at 119:3-5. | Increased Accuracy |

| 72. | 111-112 | ¶ 166 n. 438 | Silva Dep. at 25:2-4; 270:12-271:17 | Silva Dep. at 25:2-5; 270:12-271:17 | Increased Accuracy |
|---|---|---|---|---|---|
| 73. | 132 | ¶ 194 n. 481 | Silva also admitted that if Nogueira had been matched against Rampage, this would "improve Bellator's ability to put on a successful event." Silva Dep. at 307:19-308:2. | Silva also admitted that if Nogueira had been matched against Rampage, this would "improve Bellator's ability to put on a successful event." Silva Dep.  at 307:11-308:2. | Increased Accuracy |
| 74. | 132 | ¶ 194 n. 482 | Deposition of Kurt Otto, February 6, 2017, 116:4-25. | Deposition of Kurt Otto, February 6, 2017, 116:4-24. | Increased Accuracy |
| 75. | 147 | ¶ 217 n. 522 | Silva Dep. at 338:24-339:14 ("Q. Okay. And the way the contracts were structured, is it fair to say that they're structured so that if a fighter wins they move to the next level in the contract? A. That's correct. Q. If they lose they stay at same level? A. That is accurate. Q. So a contract can have 10 and 10 and 12 and 12 and if fighter wins 10 and 10 they move to the 12 and 12? A. Correct if they lose 10 and 10 they stay at 10 and 10 for the next fight. A. Yes. Correct."). | Silva Dep. at 338:24-339:14 ("Q. Okay. And the way the contracts were structured, is it fair to say that they're structured so that if a fighter wins they move to the next level in the contract? A. That's correct. Q. But that if they lose they stay at same level? A. That is accurate. Q. So a contract can have 10 and 10 and 12 and 12 and if fighter wins 10 and 10 they move to the 12 and 12? A. Correct. Q All right. But if they lose 10 and 10 they stay at 10 and 10 for the next fight. A. Yes."). | Increased Accuracy |
| 76. | 210 | Materials Relied Upon | | Deposition of Nathan Quarry (September 30, 2016) Deposition of Shannon Knapp (April 11, 2017) Deposition of John Mulkey (April 19, 2017) Deposition of Drew Goldman (April 28, 2017) Deposition of Leon Margules (July 11, 2017) | Previously Omitted |
| 77. | 155 | Table 8 | | | Increased Validity |
| 78. | 154 | ¶ 231 | | | Increased Validity |