# EXHIBIT 10

## Excerpts from Robert Topel Deposition

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
)
       Plaintiffs, )
)
       vs. ) Case No.
) 2:15-cv-01045-RFB-(PAL)
)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
)
       Defendant. )
_____)

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF

ROBERT TOPEL, VOL. II

Washington, D.C.

December 6, 2017

8:39 a.m.

REPORTED BY:
Tina Alfaro, RPR, CRR, RMR
Job No. 52570

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

432

1  MR. WIDNELL: Objection, form.
2  BY THE WITNESS:
3     A. Since I don't know exactly how the ratings
4  or the rankings happen, let's assume they're like
5  college football rankings, then you take into
6  account the types of opponents you've had and how
7  you did and somebody has a formula that tries to
8  take that into account. Same thing with golf
9  rankings and all sorts of things.
10    Q. All things equal, consumers will be
11 willing to pay more to see highly-ranked opponents
12 fight than lower-ranked opponents fight; is that
13 fair?
14    MR. WIDNELL: Objection, form.
15 BY THE WITNESS:
16    A. In every instance, no, but on average
17 probably yes.
18    Q. Higher ranked fighters, all things equal,
19 generate more revenues when they fight than
20 lower-ranked fighters, correct?
21    MR. WIDNELL: Objection, form.
22 BY THE WITNESS:
23    A. Not always, but on average that's probably
24 true.
25    Q. Turn to paragraph 96, please. In the

433

1  first sentence after the dash you state "There is a
2  natural tendency for a leading promoter to attract
3  a significant share of the top athletes"?
4     A. Yes.
5     Q. "This follows," you say, "from the
6  complimentarity of athlete talents in producing
7  high-quality bouts" --
8     A. That's the point we just made.
9     Q. -- "and the desire among athletes to fight
10 against the best"; do you see that?
11    A. Yes.
12    Q. And you agree with that?
13    A. Yes.
14    Q. Can you please explain the natural
15 tendency for a leading promoter to attract a
16 significant share of the top athletes. What does
17 that mean?
18    A. It means that athletes -- their talents
19 are complementary, that the good athletes want to
20 be in the places where the -- where the other good
21 athletes are so they can fight them. And then
22 it's -- it's kind of a feedback system that you
23 attract some of the good athletes, they fight well,
24 it makes it more attractive for the other good
25 athletes, and so on. So Zuffa kind of runs a

434

1  platform that has been successful in attracting the
2  top athletes and that complementarity plays a
3  role.
4     Q. How do you define "significant share" as
5  you use that term in this sentence?
6     A. All other things equal, a firm that is
7  attracting the top athletes will see its share
8  among the top athletes rise.
9     Q. And that's because fighters generally have
10 an interest in competing against the best fighters,
11 right?
12    A. Well, that's part of it, but the
13 complementarity is there's more energy created when
14 you put the good fighters against each other. So
15 the -- the customers like that too.
16    Q. And those are the fights that would likely
17 lead to career advancement and higher compensation
18 ultimately, correct?
19    MR. WIDNELL: Objection, form.
20 BY MR. CRAMER:
21    Q. The ones with higher energy.
22    A. Broadly speaking.
23    Q. Broadly speaking, yes?
24    A. Broadly speaking, if I -- if I'm
25 successful against higher-ranked people, I will

435

1  probably advance more and get paid more and so on,
2  as I understand the process.
3     Q. You can put that paragraph aside.
4        Would you agree with me that by
5  restricting fighter mobility used the challenged
6  contracts Zuffa's made it more difficult for other
7  MMA promotions to access UFC's top fighters, all
8  things equal?
9     A. No.
10    Q. Are you aware that Zuffa and banks working
11 with Zuffa have seen the challenged contracts and
12 describe the challenged contracts as barriers to
13 entry to rivals?
14    A. I think I know what you're -- to what you
15 are referring and I wouldn't characterize it that
16 way.
17    Q. All right. Would you take a look at what
18 has been marked as Exhibit 12. We marked it
19 earlier today. It was in the pile in front of you.
20    A. Exhibit --
21    Q. 12. It is the --
22    A. It's the Deutsche Bank?
23    Q. Correct.
24    A. What page do you want?
25    Q. I would like you to turn to page 7 of the

43 (Pages 432 to 435)

ROBERT TOPEL, VOL. II - HIGHLY CONFIDENTIAL

**436**

1  Deutsche Bank document.
2     A. Yep.
3     Q. It's entitled "Key Investment
4  Considerations."
5     A. Yes.
6     Q. And then there's boxes of highlights and
7  I'd like you to look at the second highlight on the
8  left. Do you see what that says?
9     A. I see it.
10    Q. What does it say?
11    A. The left-hand box?
12    Q. Yes.
13    A. It says "High barriers to entry."
14    Q. And then if you look at the third bull- --
15 bullet to the right of the "High barriers to entry"
16 highlight, one of the rationales is "Vast majority
17 of top fighters under multi-fight exclusive
18 contracts"; do you see that?
19    A. Yes.
20    Q. So Deutsche Bank and Zuffa's executives
21 who put this document together for people who are
22 interested potentially in loaning money to Zuffa
23 wanted to convey that they saw the fact that Zuffa
24 had the vast majority of top fighters under
25 multi-fight exclusive contracts as a high barrier

**437**

1  to entry; is that right?
2        MR. WIDNELL: Objection, form.
3  BY THE WITNESS:
4     A. Well, let's just go over barriers to
5  entry. First of all, economists and others use the
6  term "barriers to entry" in -- in different ways.
7  So to an economist a cost advantage, being better
8  at something can be considered a barrier to entry.
9  It's not an anticompetitive barrier to entry, but
10 it's a barrier to entry because entrants are less
11 likely to be successful. So in exactly the way I
12 talked about a minute ago, because of this
13 complementarity we were talking about, having the
14 vast majority of top fighters, whether vast --
15 whatever vast means there, under -- under your
16 contracts, whether they be multi-fight contracts or
17 what, if people want to be there together, that
18 creates a -- an advantage, a competitive advantage
19 that, all other things the same, make -- an
20 entrant's going to have to overcome that in order
21 to come in and compete head-to-head and have the
22 same success as Zuffa. That's all it says.
23    Q. Well, it's doesn't --
24       THE REPORTER: Hang on one second.
25 BY MR. CRAMER:

**438**

1     Q. It's fair to say that it says more than --
2  it refers more to than -- strike that.
3        It refers more to than merely that Zuffa
4  has the vast majority of top fighters. It says
5  that Zuffa has the vast majority of top fighters
6  under multi-fight exclusive contracts, right?
7     A. Yes.
8     Q. What work is multi-fight exclusive
9  contracts doing in that bullet point?
10    A. Fist of all, I said that. So -- they have
11 -- that's because they have them under multi-fight
12 exclusive contracts and that makes it valuable
13 because I can be guaranteed that when I go to Fox
14 and I sell the television rights to be -- to be --
15 to UFC fights, I know who's going to be there in
16 the future because, you know, you're going to be
17 committing to a five-year, seven-year, ten-year, I
18 can't remember how long the Fox deal is, and they
19 can look at the stock they have now and say, yeah,
20 well, most of those guys -- not even most -- will
21 be here for three or four years. That's a valuable
22 thing when you're selling those rights and that's
23 what the -- that's what the audience here, which is
24 Fox, they're going to be interested in that.
25    Q. Well, the audience of this document are

**439**

1  people who are thinking of lending UFC up to a
2  hundred million dollars, right?
3     A. Well, yeah, but what's that got to do with
4  it?
5     Q. Well, one of the things that people who
6  might want to lend a company money would want to
7  know is whether that company is going to be able to
8  sustain its revenues into the future, correct?
9     A. I think we just said the same thing.
10    Q. Okay. And high barriers to entry don't
11 merely mean that Fox is willing to give me a
12 long-term contract. It also means that it would be
13 difficult for another MMA promoter to get access to
14 the top fighters that I have under multi-fight
15 exclusive contracts, right?
16       MR. WIDNELL: Objection, form.
17 BY THE WITNESS:
18    A. Well, first of all, not all at once they
19 couldn't get them. They can't just sign all of the
20 fighters on the same day.
21    Q. Correct.
22    A. But every year a substantial number of
23 fighters are coming off contract and they're open
24 to competition from others.
25    Q. The document doesn't say that, does it?

44 (Pages 436 to 439)

528

```
 1
 2      STATE OF _____)
 3                              ) :ss
 4      COUNTY OF _____)
 5
 6
 7         I, ROBERT TOPEL, the witness
 8      herein, having read the foregoing
 9      testimony of the pages of this deposition,
10      do hereby certify it to be a true and
11      correct transcript, subject to the
12      corrections, if any, shown on the attached
13      page.
14
15         _____
16              ROBERT TOPEL
17
18
19
20      Sworn and subscribed to before
21      me, this        day of
22             , 2017.
23
24      _____
25           Notary Public
```

530

```
 1              INSTRUCTIONS TO WITNESS
 2
 3         Please read your deposition over carefully
 4      and make any necessary corrections. You should state
 5      the reason in the appropriate space on the errata
 6      sheet for any corrections that are made.
 7         After doing so, please sign the errata sheet
 8      and date it.
 9         You are signing same subject to the changes
10      you have noted on the errata sheet, which will be
11      attached to your deposition.
12         It is imperative that you return the original
13      errata sheet to the deposing attorney within thirty
14      (30) days of receipt of the deposition transcript by
15      you. If you fail to do so, the deposition transcript
16      may be deemed to be accurate and may be used in court.
```

529

```
 1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
 2         I, TINA M. ALFARO, Registered Professional
 3      Reporter, Certified Realtime Reporter, and Notary
 4      Public, the officer before whom the foregoing
 5      deposition was taken, do hereby certify that the
 6      foregoing transcript is a true and correct record
 7      of the testimony given; that said testimony was
 8      taken by me stenographically and thereafter reduced
 9      to typewriting under my direction; that reading and
10      signing was requested; and that I am neither
11      counsel for, related to, nor employed by any of the
12      parties to this case and have no interest,
13      financial or otherwise, in its outcome.
14         IN WITNESS WHEREOF, I have hereunto set my
15      hand and affixed my notarial seal this 19th day of
16      December, 2017.
17
18      My Commission expires October 31, 2020.
19
20      _____
21      NOTARY PUBLIC IN AND FOR THE
22      DISTRICT OF COLUMBIA
```

531

```
 1                    E R R A T A
 2
 3
 4
 5         I wish to make the following changes,
 6      for the following reasons:
 7
 8      PAGE LINE
 9      ___ ___ CHANGE:_____
10      REASON:_____
11      ___ ___ CHANGE:_____
12      REASON:_____
13      ___ ___ CHANGE:_____
14      REASON:_____
15      ___ ___ CHANGE: _____
16      REASON:_____
17      ___ ___ CHANGE: _____
18      REASON:_____
19      ___ ___ CHANGE: _____
20      REASON:_____
21
22      _____   _____
23        WITNESS' SIGNATURE        DATE
```