

ERIC L. CRAMER / *CHAIRMAN*
p. 215.875.3009 m. 215.327.9583 | ecramer@bm.net

August 12, 2019

**VIA ECF**

Honorable Richard F. Boulware, II
Lloyd D. George Federal Courthouse
333 Las Vegas Blvd. South
Las Vegas, NV 89101

> Re:   Response to Zuffa's Submission: Notice of Citations Requested in February 1, 2019 Hearing in *Le, et al. v. Zuffa, LLC*, Case No. 2:15-cv-1045 (D. Nev.)

Dear Judge Boulware:

This submission addresses Zuffa's letter of August 7, 2019 to the Court (the "Letter"). Zuffa's Letter purports to respond *five months late* to an alleged request by the Court during the February 1, 2019 hearing. Letter at 1 (citing ECF No. 651, Hearing Tr. at 46:9-48:20). More specifically, Zuffa's Letter claims to provide "citations in the Zuffa expert reports to data on the procompetitive aspects of Zuffa's business that 'could be from a modeling standpoint' 'separated from unlawful antitrust conduct.'" Letter at 1. Zuffa's Letter is part of an unfortunate larger pattern: Zuffa keeps changing its position and submitting new arguments, often in the form of untimely and unauthorized submissions and expert sur-sur-rebuttals. The impetus Zuffa has to do so is understandable. Plaintiffs' experts—in particular, Drs. Singer and Zimbalist—have successfully debunked every criticism Zuffa has advanced. But desperation provides neither legitimate justification nor proper excuse. Zuffa should abide by the process this Court has set in place for adjudicating class certification, and Zuffa should cease its practice of unilaterally modifying that process in an attempt to gain unfair strategic advantage.

With apologies for adding to the information before the Court in advance of the upcoming class certification hearing, Plaintiffs feel compelled to respond briefly to correct the record on important aspects of Dr. Singer's modelling. By way of background, as the Court will recall, Dr. Singer measures the effect of Zuffa's foreclosure of the market for MMA Fighter Services on the share of the event revenues Zuffa paid its fighters ("wage share"). Due to the conduct Plaintiffs are challenging in this case, Zuffa has increased market foreclosure by locking up a growing and dominant share of the top MMA fighters that are necessary inputs into a "major league" MMA promotion. Dr. Singer finds that Zuffa's increasing foreclosure of the



August 12, 2019
Page 2 of 5

market has caused its Fighters' wage share to fall, substantially suppressing the pay of virtually all of its athletes.

More specifically, Dr. Singer used a sophisticated multiple regression model to isolate the causal role of foreclosure share from more than 1,500 additional factors that could also influence the wage share, and did so in an economically and statistically significant way. SR1 ¶¶180-187.[1] In other words, Dr. Singer controls for the possibility that factors other than the conduct Plaintiffs are challenging in this case contributed to the fall in wage share, and specifically isolates the causal role played by Zuffa's foreclosure of the market.

Dr. Singer's modelling yielded two outcomes critical to the class certification inquiry. First, he used common evidence to show that—in the but-for world, absent the conduct Plaintiffs are challenging in this case—Zuffa's fighters' collective wage share would have been approximately 50% or more rather than the approximately 20% or below Zuffa paid its athletes during much of the Class Period; second, he showed that—again, but for Zuffa's conduct—the pay of about 99% of UFC's fighters in the proposed Bout Class would have been substantially higher. SR1 ¶¶180-187; *id.* at ¶¶230-232, 249-252. In other words, Dr. Singer has found that the UFC is much like the four major U.S. major sports and boxing; in those sports, when owners were forced by lawsuits and collective bargaining to ease up on restrictive contracts, the ensuing competition caused owners to pay fighters approximately 50% or more of revenues, benefitting all or nearly all of the professional athletes in those sports.

Zuffa and its economist Dr. Topel claim, incorrectly, that Dr. Singer's findings are just computing the effects of "Zuffa's procompetitive investments," Letter at 1-2, and not its increasing foreclosure of the market (as measured by foreclosure share). In other words, Dr. Topel is suggesting that Dr. Singer's regression has not been able to isolate the effects of foreclosure share on wage share, despite the statistical significance of Dr. Singer's findings. Even though Dr. Topel produced a series of supplemental reports with new analyses, he has never been able to identify the specific "procompetitive investments" that were growing over time *more quickly than the contributions of the fighters*, as would be necessary to account for Zuffa retaining a *higher share* of its growing revenue pie over time in a competitive market. As Dr. Singer has shown, Zuffa's arguments in this regard are refuted by the facts of this case, basic economic principles, and Dr. Singer's rigorous statistical modelling. This is so for several reasons.

---

[1] Plaintiffs are using the citation format set out in Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification, ECF No. 554. For instance, SR1 is Dr. Singer's first report in this case, and TR1 is Dr. Topel's first report.



August 12, 2019
Page 3 of 5

*First*, and most importantly, for Zuffa's "procompetitive investments" to cause wage share to *fall*, Zuffa's non-Fighter inputs would have to contribute an *increasing* amount to Zuffa's event revenue growth, relative to the contributions of the Fighters. As a matter of economics, in a competitive market, if the contributions of the Fighters (collectively) relative to Zuffa's non-Fighter inputs stayed the same, wage share should remain the same as well. But it did not. So Zuffa has to explain *falling* wage share, that is, it has to explain why Zuffa's share of the growing revenue pie increased for procompetitive reasons. To do *that*, Zuffa would have to show that the contributions of its non-Fighter inputs were not only growing, but also somehow growing significantly *faster* than the contributions of the Fighters. SR3 ¶¶26-27. Despite serving an endless string of "supplemental" reports and unauthorized filings, Zuffa has not made that showing. Nor can it. The reason for that failure is simple: Zuffa's and Dr. Topel's position is at odds with the available evidence.

The evidence in the record shows, contrary to Dr. Topel's theory of the case, that Zuffa's non-Fighter related investments were generally flat during the Class Period, particularly in relation to its Event Revenues. Indeed, Zuffa's promotional expenditures actually fell(!), even as Event Revenues rose dramatically. SR4 ¶¶34-35; *id*. at Fig. 1. How can a factor like promotional expenditures that is *decreasing* both absolutely and as a share of overall costs play a *growing* role in generating Event Revenues over time? Dr. Topel never explains, because there is no plausible explanation. Further, as in other professional sports, the athletes are the major draw for MMA fans, and thus are a key driver of Zuffa's Event Revenues. SR3 ¶¶22-23; SR1 ¶¶20, 156-64. Thus, Dr. Topel's theory that the promoter's role has become more important over time relative to role of the Fighters is implausible. And lastly, Zuffa's non-Fighter inputs *enhance* the revenue-generating ability of its Fighters, and thus Zuffa's investments—absent the conduct Plaintiffs are challenging in this case—would result in it and its Fighters benefitting *proportionally* as Event Revenues rose. SR3 ¶23. It could hardly be otherwise. Fighters are the main inputs on display during Zuffa's events, and thus it is implausible for Zuffa to promote an event in a way that does not increase the revenue-generating ability of its Fighters. SR3 ¶27. Therefore, Dr. Topel's claim that Zuffa's allegedly increasing non-Fighter inputs could explain Fighters' declining wage share contradicts both the facts of this case and basic economic principles.

*Second*, Dr. Singer's impact regression uses standard methods to control for a wide range of factors that could affect the wage share paid to Fighters. Those factors include the possibility—contrary to the facts—that Zuffa's non-Fighter input contributions *increased* relative to those of its Fighters. Dr. Singer included a time trend variable, controlling for the possibility that the contribution of non-Fighter inputs to Event Revenue has somehow increased over time. *See* SR1 ¶185; *id*. at Table 6; SR3 ¶29. He also included year-to-year fixed effects variables, controlling for the possibility that contribution of non-Fighter inputs has somehow



August 12, 2019
Page 4 of 5

risen from year-to-year. *See* SR1 ¶185; *id.* at Table 6; SR3 ¶30. He also included fixed effects by promoter, controlling for the possibility that Zuffa has promotional acumen superior to other promoters. SR1 ¶185; *id.* at Table 6; SR3 ¶31. Next, he included thousands of Fighter-specific independent variables, collectively controlling for the possibility that Zuffa's promotional activities or acumen increased its effectiveness in generating event revenues relative to the Fighters. *See* SR1 ¶184; *id.* at Table 6; SR3 ¶32. Finally, in response to Dr. Topel's criticism, Dr. Singer included a variable for Zuffa's promotional spending in his regression model to see if that spending, and not foreclosure share, caused the declining wage share. *See* SR3 ¶33 & Table A2. Here, too, Dr. Singer continued to find that it was Zuffa's anticompetitive foreclosure of the market, and not anything procompetitive that Zuffa did, that was causing Zuffa's Fighters' collective and individual wage shares to fall. *Id.* Dr. Singer's careful inclusion of all of these variables ensured that the regression properly isolated the effects of increasing foreclosure share on wage share, and thus did not improperly attribute impact or damages to anything procompetitive that Zuffa may have done.

    *Third*, Zuffa's Letter repeats Dr. Topel's critiques of the data Dr. Singer used to measure promotional spending—data Dr. Singer drew from Zuffa's own annual audited financials.[2] Dr. Topel asserts that Dr. Singer instead should have used data drawn from Zuffa's event-level P&L statements. Letter at 2-3; TR4 ¶¶5-8. But Zuffa itself has admitted that its event-level P&Ls are "merely internal management tools" and are both unaudited and incomplete. *See* Letter from Marcy Norwood Lynch to Daniel Silverman (July 17, 2017). In using Zuffa's annual financial statements to construct his promotional spend variable, Dr. Singer simply followed Zuffa's guidance.[3] In any event, Zuffa's critique is moot, as Dr. Singer has shown that his results are preserved when he controls for *all* non-Fighter costs reported in Zuffa's event-level P&L

---

[2] Zuffa's Letter also observes that when Dr. Topel selectively pairs events that occurred within a few days of each other, he shows they generated substantially different event revenues. Letter at 2-3. From that, Dr. Topel claims incorrectly that Dr. Singer's promotional spend regression treats such events "exactly the same." *Id.* Dr. Singer has already explained why this critique is without merit: Dr. Singer's regression, in fact, includes variables such as fighter fixed effects that control for differences in the revenue generated at different events, including events that occurred within a few days of each other. SR4 ¶38. Moreover, even if Dr. Singer's impact regression did not control for *any* of the differences between these events, it would not make a material difference because Zuffa's foreclosure share is virtually identical for events that occur in close proximity to one another; as a result, the regressions could not attribute a lower wage share at one of these events to an increase in Zuffa's foreclosure share. SR4 ¶39.

[3] Zuffa's Letter also asserts incorrectly that Dr. Singer's impact regression "effectively disregards Zuffa's promotional spending in years other than 2008 to 2010 as irrelevant by design." Letter at 3. As Dr. Singer has explained, he does not, in fact, disregard promotional spending in any year. SR4 ¶23.



August 12, 2019
Page 5 of 5

statements, which include *all* of Zuffa's promotional expenditures that were recorded in the event-level P&Ls. SR4 ¶27.

*Fourth*, after multiple unsuccessful attempts to find a variable that would overturn Dr. Singer's regression results, in his fourth report in this case (TR4), Dr. Topel finally presented regressions purporting to overturn Dr. Singer's results. He did so by including a variable accounting for Zuffa's expenditures on *all* non-Fighter event costs, even including Zuffa's executives' lavish use of corporate jets (as if Dana White drinking Champagne in a private plane increased the number of ticket sales to Zuffa's events). SR4 ¶31. As Dr. Singer showed, Dr. Topel's results are driven by a simple data error, causing Dr. Topel to drop from his regression what he claimed were "missing" data points associated with pre-acquisition Strikeforce events. *See* SR4 ¶25; *id.* at ¶27. In fact, these data are *not* missing. When Dr. Singer corrects this single error—without making another change or running another regression—Dr. Topel's own regression confirms Zuffa's market foreclosure had an economically and statistically significant impact on reductions in Zuffa's Fighters' wage share. SR4 ¶27; *id*. at Appx. Table A1.[4]

*Finally*, in Dr. Topel's initial report, he presented a purely theoretical economic model speculating that Fighters' wage share could decline as a result of Zuffa increasing its promotional activities. TR1 ¶¶308-315; *see also* Letter at 1 (citing TR1 ¶310). As Dr. Singer has explained, Dr. Topel's theoretical exercise is fatally flawed, and relies on extreme and inapplicable assumptions, such as that *all fighters are perfectly interchangeable*. SR2 ¶¶139-143. That Dr. Topel was forced to rely on these extreme and unrealistic assumptions merely demonstrates how implausible it is that Zuffa's so-called "non-Fighter inputs" could possibly provide an alternative procompetitive explanation for its Fighters' falling wage share.

In sum, Zuffa's Letter is both procedurally improper and substantively meritless.

Respectfully Submitted,

Eric L. Cramer
*Co-Lead Counsel for the Classes*

---

[4] This result occurs whether Dr. Singer fixes Dr. Topel's error by adding the purportedly "missing" data back into the regression *or* by removing the incomplete data entirely. This single correction confirms Dr. Singer's results—and refutes Dr. Topel's—even if Dr. Singer does not make *any* additional modifications, and does not require him to run a "new" regression as Zuffa wrongly and belatedly asserts *for the first time 14 months after Plaintiffs served Dr. Singer's supplemental report*. Letter at 3.

1

**CERTIFICATE OF SERVICE**

2

3    The undersigned hereby certifies that the foregoing Response to Zuffa's August 7, 2019

4    Submission: Notice of Citations Requested in February 1, 2019 Hearing was served on August

5    12, 2019 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service

6    list.

7                                            */s/ Eric L. Cramer*
                                             Eric L. Cramer
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28