———2:15-cv-01045-RFB-PAL———

1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3

4   CUNG LE, et al.,                )
                                     )
5                   Plaintiffs,      )  Case No. 2:15-cv-01045-RFB-PAL
                                     )
6          vs.                       )  Las Vegas, Nevada
                                     )  Monday, August 26, 2019
7   ZUFFA, LLC, d/b/a Ultimate       )  9:43 a.m.
    Fighting Championship and        )
8   UFC,                             )  EVIDENTIARY HEARING, DAY ONE
                                     )
9                   Defendants.

10  ──────────────────────────────

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:        See Pages 2 and 3

20

21
    COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                      United States District Court
                        333 Las Vegas Boulevard South, Room 1334
23                      Las Vegas, Nevada  89101

24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

—2:15-cv-01045-RFB-PAL—

```
 1   APPEARANCES:
     For the Plaintiffs:
 2
             DON SPRINGMEYER, ESQ.
 3           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
             3556 E. Russell Road, 2nd Floor
 4           Las Vegas, Nevada 89120
             (702)341-5200
 5
             ERIC L. CRAMER, ESQ.
 6           PATRICK F. MADDEN, ESQ.
             MARK R. SUTER, ESQ.
 7           BERGER & MONTAGUE, P.C.
             1818 Market Street, Suite 3600
 8           Philadelphia, Pennsylvania 19103
             (215)875-3000
 9
10           DANIEL H. SILVERMAN, ESQ.
             COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11           1100 New York Avenue, NW, Suite 500 West
             Washington, DC 20005
12           (202)408-4600
13           JOSEPH SAVERI, ESQ.
             JOSHUA P. DAVIS, ESQ.
14           THE JOSEPH SAVERI LAW FIRM, INC.
             555 Montgomery Street, Suite 1210
15           San Francisco, California 94111
             (415)500-6800
16
     For the Defendants:
17
             SAMUEL MIRKOVICH, ESQ.
18           CAMPBELL & WILLIAMS
             700 South 7th Street
19           Las Vegas, Nevada 89101
             (702)382-5222
20
             WILLIAM A. ISAACSON, ESQ.
21           STACEY K. GRIGSBY, ESQ.
             NICHOLAS A. WIDNELL, ESQ.
22           BOIES, SCHILLER & FLEXNER, LLP
             1401 New York Avenue, NW
23           Washington, DC 20015
             (202)237-2727
24

25
```

```
                        ─2:15-cv-01045-RFB-PAL─
```

1  APPEARANCES CONTINUED:

2          **BRENT K. NAKAMURA, ESQ.**
          BOIES, SCHILLER & FLEXNER, LLP
3          1999 Harrison Street, Suite 900
          Oakland, California 94612
4          (510)874-1000

5  For Bellator Sport Worldwide, LLC:

6          **PHILIP M. KELLY, ESQ.**
          KENDALL BRILL & KELLY, LLP
7          10100 Santa Monica Boulevard Suite 1725
          Los Angeles, California 90067
8          (310) 556-2700

9
  ALSO PRESENT:
10
          Riche McKnight, Esq., Zuffa
11

12                      INDEX OF EXAMINATIONS

13  TESTIMONY OF HAL JASON SINGER, Ph.D.
    Direct Examination by Mr. Cramer...................54
14    Cross-Examination by Mr. Isaacson.................191

15

16      LAS VEGAS, NEVADA; MONDAY, AUGUST 26, 2019; 9:43 A.M.

17                          --oOo--

18                  P R O C E E D I N G S

19          THE COURT:  Please be seated.

20          COURTROOM ADMINISTRATOR:  Now calling Cung Le, et al,

21  versus Zuffa, LLC, Case Number 2:15-cv-01045-RFB-BNW.  This is

22  the time for the evidentiary hearing, Day 1.

23          Starting with counsel for plaintiff, please note your

24  appearance for the record.

25          MR. CRAMER:  Good morning, Your Honor.  Eric Cramer for

─2:15-cv-01045-RFB-PAL─

1   the plaintiffs.  And I'd also like to introduce Your Honor again

2   to two of the named plaintiffs who are here, Kyle Kingsbury and

3   Jon Fitch.

4            THE COURT:  Good morning.

5            MR. DAVIS:  Good morning, Your Honor.  Josh Davis for

6   the plaintiffs.

7            MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

8   on behalf of the plaintiffs.

9            MR. SUTER:  Good morning, Your Honor.  Mark Suter on

10  behalf of plaintiffs.

11           MR. MADDEN:  Good morning, Your Honor.  Patrick Madden

12  on behalf of plaintiffs.

13           MR. SILVERMAN:  Good morning, Your Honor.  Dan

14  Silverman.

15           MR. SPRINGMEYER:  Good morning, Your Honor.  Don

16  Springmeyer on behalf of the plaintiffs.

17           THE COURT:  Good morning.

18           MR. ISAACSON:  Good morning, Your Honor.  Bill Isaacson

19  for Zuffa.

20           MS. GRIGSBY:  Good morning, Your Honor.  Stacey Grigsby

21  on behalf of Zuffa.

22           MR. WIDNELL:  Good morning, Your Honor.  Nicholas

23  Widnell on behalf of Zuffa.

24           MR. MCKNIGHT:  Good morning, Your Honor.  Riche

25  McKnight on behalf of Zuffa.

———2:15-cv-01045-RFB-PAL———

1          MR. MIRKOVICH:  Good morning, Your Honor.  Samuel

2  Mirkovich, Campbell and Williams, on behalf of Zuffa.

3          THE COURT:  And do we have anyone on the telephone?

4          MR. KELLY:  Your Honor, good morning.  Phil Kelly on

5  behalf of Bellator Sport Worldwide, nonparty, but a motion

6  pending related to us today.

7          THE COURT:  Oh, so you want to appear on the motion as

8  it relates to the documents and sealings.  Is that what you're

9  here for, Mr. Kelly?

10          MR. KELLY:  That's correct, Your Honor.

11          THE COURT:  So I'll grant your admission to appear as

12  relates to that.

13          And I believe we have one other individual, Mr. --

14          MS. GRIFFITH:  Oh, Your Honor, Blakely Griffith, local

15  counsel for Bellator Sport, here with Mr. Kelly.

16          THE COURT:  Okay.

17          COURTROOM ADMINISTRATOR:  Hello, Counsel.  This is

18  Blanca Lenzi, courtroom administrator.  We are currently in the

19  hearing.  If you can announce your presence for the Court.

20          MS. JENKINS:  Good morning.  Brooke Jenkins and David

21  Marroso from, on behalf of Top Rank.

22          THE COURT:  Good morning.

23          So the first thing I want to do is deal with the issue

24  of the sealing and unsealing of documents in this case.  First,

25  it seems to me that the case involves a matter that would be

—2:15-cv-01045-RFB-PAL—

1  dispositive on the issue or dispositive on the case.  I can't

2  see the case proceeding if I don't grant the motion to certify.

3  Therefore, it does seem the compelling reasons standard would be

4  appropriate in this context.

5          So I'm not sure which of the counsel would like to

6  proceed, Mr. Isaacson or Ms. -- I'm sorry, is it Grigsby?  I

7  want to pronounce it right -- Grigsby.

8          I think you argued this last time to me.

9          MS. GRIGSBY:  Yes, Your Honor.

10         THE COURT:  I don't know if you have anything else to

11 add, but it would be my intention to completely unseal both

12 Dr. Singer and Dr. Topel's report and all of the underlying

13 information.  I don't know how I could write a decision as it

14 relates to the class certification that did not involve a

15 discussion of this matter in this case.  And it seems to me it

16 would be appropriate to do that, and I think that there are

17 compelling reasons as it relates to the information in there.

18         But there certainly is information I think that may --

19 and I haven't gone through all of the appendices as relates to

20 the individual fighters' information I think should be redacted,

21 and I don't think there's any disagreement about that.  But as

22 it relates to the revenue information, as it relates to other

23 information, it does seem to me that that is information that is

24 not protected in the context here.  It's information that's

25 directly relevant to the public inquiry here.  It's information,

1  from my review, that wouldn't cause any competitive harm as it

2  relates to the entities.

3       And I'll hear from the other third parties about what

4  they may want to potentially have excluded.  But part of the

5  issue in this case is it's undisputed, it seems to me, that

6  Zuffa exercised or UFC exercised the dominant market share.

7  It's hard for me to understand how there would be any harm to

8  these entities as relates to the information that is going to be

9  and will be released.  I also think that there's not sort of

10 evidentiary support for some type of, sort of, competitive harm.

11      And, in fact, the idea that these are trade secret

12 seems to me is exactly what Zuffa is arguing against.  They're

13 arguing that in fact that they don't have a formulaic approach

14 to compensation, that there's not a standard way in which they

15 approach compensation.  It's seems to me that it's hard for them

16 to argue consistently that this information is protected by a

17 trade secret or some other type of proprietary information.

18      Now, this doesn't apply to necessarily all of the

19 motions yet.  Because what I am going to do is, based upon what

20 my decision will be, I may or may not seal some of the related

21 information.  And so it does not mean that anything that's

22 necessarily mentioned in these reports would automatically be

23 unsealed.

24      And so to that, Mr. Kelly, I'll start with you as it

25 relates to Bellator.  And, again, it would be my -- be my

—2:15-cv-01045-RFB-PAL—

1  inclination to order that the information in the reports be

2  unsealed, because there's other information that was acquired --

3  that's attached, I believe, to the motions that may be more

4  detailed.

5      Again, I have not gone through and made an explicit

6  sort of comparison, Mr. Kelly, of the information that's

7  attached in some of the motions to the information that's in the

8  expert reports.  But it does seem to me that the information as

9  it relates to Bellator is much more limited.  And the reason why

10  I think it would be appropriate to unseal it is because it does

11  appear to present averages and not particular fighter

12  information as relates to compensation.  To the extent that

13  there would be information in the documents that would -- that

14  would pertain to particular negotiations, particular fighters,

15  that would seem to me the information that could, in fact, be

16  kept sealed or redacted.

17      But as it relates to overall averages with respect to

18  percentages of revenue that are paid to fighters over the class

19  period of time, Mr. Kelly, it's hard for me to see how there

20  would be any kind of competitive harm.  In fact, partly because

21  the information has already been released to the dominant the

22  player in the market, I'm not sure how there would be any

23  argument as relates to releasing publicly that information.  But

24  I'll give you at least an opportunity.

25      MR. KELLY:  Can I?

2:15-cv-01045-RFB-PAL

1          Your Honor, I appreciate the opportunity.  I just want
2   to address a couple of things.  And I think you're right that
3   there are two distinct categories here that are relevant.  One
4   is the high-level wage share category, and the other is the
5   high-level total revenue summary information.  And I believe
6   that those are the two categories I'm told by counsel for
7   plaintiffs that are included in Mr. -- Dr. Singer's report.
8          We actually discussed a compromise over the weekend
9   with counsel for plaintiffs that they would not publicly display
10  those two line items in Dr. Singer's report, which obviously
11  assists Bellator's view.
12         The second category, as you mentioned, is a two-page
13  very detailed, very granular, compilation of Bellator's -- all
14  financial information, from top to bottom, all different revenue
15  categories, all different expense categories.  That information,
16  I submit, should remain sealed.  I do think even under a
17  compelling interest standard, it satisfies the requirements both
18  as, you know, highly confidential financial information --
19         THE COURT:  And where is that attached?  Because,
20  again, there's so many exhibits, there's so many motions, I want
21  to make sure that I identify where that is.  So maybe you could
22  tell me or maybe plaintiffs' counsel can tell me.
23         MR. KELLY:  I have no idea, Your Honor.  Hopefully,
24  plaintiffs' counsel can tell us.
25         THE COURT:  Can someone at plaintiff's table tell me

—2:15-cv-01045-RFB-PAL—

1  where that detailed analysis for Bellator is attached so we can

2  figure that out.

3          MR. MADDEN:  So -- you don't mind.

4          Yes, that particular spreadsheet is now part of our

5  presentations.

6          THE COURT:  Okay.

7          MR. MADDEN:  And I do want to be clear about the

8  compromise that we offered Mr. Kelly, is that our witnesses

9  could still testify freely about the information.  It just

10  wouldn't be publicly displayed.

11          THE COURT:  Right.  Okay.  So I didn't see that in the

12  report.  Is that in Dr. Singer's -- attached to any of these

13  appendices anywhere?

14          MR. MADDEN:  No.  It's in the information relied upon,

15  but it is not an attachment to his report.

16          THE COURT:  And to me that's significant --

17          Thank you.

18          MR. MADDEN:  Okay.  Thanks.

19          THE COURT:  -- Mr. Kelly, because unless there's

20  information or averages that I'm using from third-party

21  information, that information would not need to be publicly

22  disclosed.  The reason why I think the information in Dr. Singer

23  and Dr. Topel's reports should be disclosed, because I'm going

24  to be relying upon that information to make my decision.  I

25  don't know how I could issue a public decision without

1   referencing particularly some of the numbers, because the

2   numbers are exactly what's at issue in this case.

3          I don't -- I don't see how the detailed financial

4   information of Bellator would, in fact, come into play.

5   However, to the extent that I reference information, I will say

6   to you, I am going to unseal that information.  However, it does

7   seem to me, in reviewing Dr. Singer and Dr. Topel's reports,

8   what you're looking at are comparisons that deal with sort of a

9   higher level averages and aggregates and revenues than the

10  specific financial details of Bellator.

11         So it was not my intention to unseal that detailed

12  level of information about Bellator.

13         MR. KELLY:  Very good.  I appreciate that, Your Honor.

14  Just from a practical standpoint, one thing that I've discussed

15  with plaintiffs' counsel is, during the hearing that's happening

16  over the next few days, they reserved the right to offer more

17  detailed information from that detailed spreadsheet, so below

18  the top-line financial, you know, the revenues or the wage

19  share.

20         And I understand that they need to do what they need to

21  do, but our concern is just from a practical standpoint as this

22  hearing progresses, what we need to do and how we can protect

23  Bellator's financial information in the event that an expert,

24  Dr. Singer, for example, says, "Oh, well, I need to refer to,

25  you know, these quarters and these specific revenue categories

─────2:15-cv-01045-RFB-PAL─────

 1    or these expense categories of Bellator."  I think that's

 2    highly, highly unlikely, from what I'm told, but I don't know.

 3              THE COURT:  So I'll make this both easy and difficult

 4    for you, unfortunately.  To the extent that it's relied upon and

 5    I think that it's relevant, that will be unsealed.  On the other

 6    hand, given my review of the reports, I think it's highly

 7    unlikely, Mr. Kelly, that that information at that granular

 8    level would be relevant to my inquiry at this point in time.

 9              However, if it gets to that point, I will tell you that

10    I'm going to unseal the information.  I don't intend to have any

11    information that I would rely upon be part of a sealed record in

12    a public decision in this case, and so I would unseal it.

13    However, as I've said, I don't anticipate that that detailed

14    information would become relevant.  And I'd be mindful of that,

15    if there was inquiry about that, to try to ensure that it was

16    necessary to the testimony at hand.

17              MR. KELLY:  Very good.  Thank you very much,

18    Your Honor.  I appreciate that.

19              THE COURT:  Sure.  Not at all.

20              And I'm sorry, Ms. Grigsby, we just sort of jumped over

21    to Bellator.  I don't know if you had any response to the

22    Court's order.  And, again, it would be limited to the

23    information in the reports.  There are other motions to seal

24    which I'm not going to address.

25              And let me be clear, as I've indicated, the parties'

—2:15-cv-01045-RFB-PAL—

1   dispute revolved around these reports.  I don't intend to issue

2   a decision that would be based upon any sealed information.

3   Much of the information in these reports is actually aggregate

4   information or in charts or summary form.  And a lot of the, I

5   think, opposition -- or I shouldn't say -- the motion practice

6   regarding sealing does relate to more detailed financial

7   information, which at this point is not clear to me that the

8   Court will rely upon with respect to the decision before me at

9   this point in time.

10          MS. GRIGSBY:  Your Honor, if I may just --

11          THE COURT:  Sure.

12          MS. GRIGSBY:  -- brief argument.

13          So, Your Honor, with respect to your ruling, we

14   understand that the vast majority of the report talks at a high

15   level.  And in fact, you know, as we've been meeting and

16   conferring with plaintiffs, there have been fewer and fewer

17   redactions.  But just looking through, for example, the

18   footnotes on Dr. Singer's report, there are actually references

19   to dollar figures, for example, the licensing fees, not in

20   aggregates, specifically, for one promoter.

21          And so while, you know, we understand your Court's

22   ruling in terms of things like, you know, yearly revenue wage

23   share, there just are a few discrete portions in the -- in these

24   reports that we would say actually qualify as kind of this --

25   the line-by-line sealed materials that this Court has not yet

―――2:15-cv-01045-RFB-PAL―――

1    ruled upon.

2         And we would ask at least for an opportunity, when it

3    gets into the specifics, to keep those materials under seal.

4    So, you know, right now I'm just looking specifically --

5         THE COURT:  That's fine.  So, Ms. Grigsby, let me spare

6    you and counsel time.

7         MS. GRIGSBY:  Okay.

8         THE COURT:  Again, to the extent that I don't find that

9    I need to rely upon information that may be detailed

10   information, I would be willing potentially to entertain a

11   request to seal that information.  Much of the argument in this

12   case revolves around regression analysis and sort of descriptive

13   statistics, which don't rely upon a single or particular figure

14   as relates to financial information.

15        MS. GRIGSBY:  Your Honor --

16        THE COURT:  And so based upon that, I can see where

17   there would be an opportunity to redact certain individual

18   pieces of information even in the reports.  However, at this

19   time it's difficult for me to make that detailed a determination

20   when I haven't drafted my report.

21        What I will say is, it's not my intention to

22   necessarily simply just completely order the report be unsealed

23   during the duration of the hearing, but I'm going to -- it's

24   going to be essentially or effectively unsealed based upon the

25   testimony.  So I'm not going to restrict the public in terms of

—2:15-cv-01045-RFB-PAL—

1    their ability to participate or be present when there's

2    questioning, and that questioning can involve any aspects of the

3    report.

4          And so I would entertain a request subsequent to this

5    to be able to redact certain information, but we don't need to

6    go into that level of detail at this point in time.

7          MS. GRIGSBY:  Yes, Your Honor.  So just so we have some

8    clarity.  So then, I guess, that would mean that now at least on

9    the docket then the reports are going to be in their current

10   form until we have an opportunity to determine what would fall

11   into that specific category that the Court has not yet ruled

12   upon.  Is that correct?

13         THE COURT:  Right.  But I would ask that you come up

14   with, at the end or the close of the testimony today, references

15   to the footnotes in Dr. Singer's report or other aspects to the

16   report.  Because I don't know that it makes sense to wait until

17   the very end.  And given what you're telling me, in my review of

18   the report, I don't know that there are that many instances

19   where there are footnotes that have that type of information in

20   it.  Again, I didn't go through all whatever hundreds of

21   footnotes are there, but what you're referencing seems to me to

22   be not sort of a frequent or common portion of the footnotes in

23   the report.  But, again, I haven't gone through all of them.

24   But I would like to be able to unseal them this week.

25         So -- in the next two or three days.  So I would ask

1  that if you are going to want something unsealed, that you

2  provide me with a list of it and you run it by plaintiffs'

3  counsel, because it will be unsealed within the next day or two.

4  So I'm not going to do it immediately, given your request, but I

5  am going to allow for questioning on all aspects of the report

6  through the testimony.

7        MS. GRIGSBY:  Your Honor, I have a second thing, which

8  is a follow-up question.  So to the extent, though, that

9  Dr. Singer intends to testify about the licensing fee that Zuffa

10  received, say, in 2016 from, you know, a certain other promoter

11  or something of that like, then if that material properly could

12  be confidential, because it's financial information and it kind

13  of reflects the business model, then I guess it's Zuffa's

14  position that we don't think that plaintiffs should elicit that

15  specific testimony.

16        THE COURT:  Oh, well, let me be clear, because I didn't

17  look at the particular footnote you're talking about.  If

18  Dr. Singer thinks it's relevant as it relates to coordination

19  with other MMA promoters, or he think it's relevant as relates

20  to any aspect of exclusionary conduct, right, or any type of

21  inclusive effect, then that will come in and that will be

22  available for testimony.

23        So, perhaps, you could direct me, Ms. Grigsby, so we

24  could be focused on in terms of the -- about which specific

25  footnote you're talking about to help me.

2:15-cv-01045-RFB-PAL

1           MS. GRIGSBY:  So I'm looking at, like, Footnote 294.

2    Specifically now --

3           THE COURT:  On which page?

4           MS. GRIGSBY:  Page 73.

5           THE COURT:  Okay.  Hold on.  Let me get there.

6           MS. GRIGSBY:  So there --

7           THE COURT:  Hold on just a moment.  Let me just look at

8    it.

9           MS. GRIGSBY:  Okay.

10          THE COURT:  Well, that's direct evidence of what he's

11   using as an example as it relates to incentives regarding

12   competition.  That -- if he is going to use that as an example,

13   that will be unsealed and will come in.

14          MS. GRIGSBY:  Well, our argument isn't that this

15   arrangement itself or even with this -- with the other promoter

16   is something that should be sealed.  It's more so the monetary

17   terms, which is not necessarily even relevant to his analysis.

18   But --

19          THE COURT:  I don't think there's a compelling reason

20   to seal that information, so I'm not going to seal it.

21          Is there any other footnote you want to identify for

22   me, Ms. Grigsby?

23          MS. GRIGSBY:  Your Honor, I think I would need to take

24   a little bit more time, and we will do that when we submit --

25          THE COURT:  Well, and to the extent that it comes up in

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1  testimony, something, you can certainly lodge an objection that

2  I will then -- we'll go through the same analysis and look at it

3  in the context.  But part of it also depends upon the analysis

4  that Dr. Singer intends to rely upon.  So if, for example, it

5  turns out he doesn't necessarily rely upon this information and

6  you want to subsequently request that it be sealed, I would

7  entertain that.  So part of it depends upon both what comes up

8  in direct and also what comes up in cross.

9        So the mere fact that I'm saying that I'm not going to

10 seal it now doesn't mean that I might not -- if it's not

11 substantive as it relates to my decision of the testimony might

12 not consider sealing it later based upon its relevance.  So even

13 though I'm saying to you now, if he relies upon it, I'm going to

14 allow for him to testify about it.  It doesn't mean you can't

15 subsequently make request about other information.

16       Do you understand?

17       MS. GRIGSBY:  Yes, Your Honor.

18       THE COURT:  So because, again, part of this is that it

19 depends upon what happens in the context of the testimony here

20 and also what the question is regarding both of the experts.

21 But it may very well be that some of the information can -- can

22 remain sealed, depending upon what my decision is and what the

23 testimony is.

24       MS. GRIGSBY:  Your Honor, our only concern is that as a

25 practical matter, if Dr. Singer chooses to say, Zuffa received X

1   amount for X, Y, and Z contract, a specific contract, not

2   necessarily generally about that net revenue or about total

3   revenue, annual revenue, then when Dr. Singer discloses that,

4   even if at some point the Court thinks that this is information

5   that is financial key to Zuffa's business strategy, we have a

6   courtroom where we have some outside observers.  So we wouldn't

7   necessarily have the opportunity to keep it from being

8   publicized widely, for example, tweeted.

9           THE COURT:  I understand that, but that I think is just

10  part of this public hearing process.  And so I'm not going to

11  restrict the testimony at this point in time.  Again, if

12  something comes up that we haven't discussed, I'd be willing to

13  entertain it at that time.

14          MS. GRIGSBY:  Thank you, Your Honor.

15          MR. MADDEN:  Your Honor, may I approach and ask a few

16  clarifying questions?

17          THE COURT:  Sure.

18          MR. MADDEN:  So we have prepared a slide deck that will

19  assist Dr. Singer to present his testimony.  We have provided

20  Zuffa with copies in advance.  So my question to you is based on

21  what you are telling the parties is whether we may display that

22  slide deck as unredacted or whether we have to remove materials

23  that have been deemed to be sealable, based on your rulings.

24          THE COURT:  So you don't have to -- you don't have to

25  unredact the information, but if Dr. Singer wants to testify

1    about what's redacted in the reports, he can.

2           MR. MADDEN:  Well, it's not that the -- the slides

3    themselves.  We have two versions of the slide deck in order to

4    prepare ourselves to proceed this morning.  We have one where

5    we've removed the content of the slides, to the extent Zuffa or

6    a third party has challenged the publication of the material on

7    the big screen, and then we have a version that's -- that would

8    allow the public to see what's on these slides.

9           THE COURT:  Well, I haven't seen the slides so I can't

10   tell you what they'll say.  So what we'll do is this.  We'll

11   just go through the slides.  They won't be publicized at first.

12   They will just be publicized to counsel, the same we do with the

13   jury.

14          MR. MADDEN:  Sure.

15          THE COURT:  And then if there's an objection or issues,

16   then we can address them as they come up.  But you can proceed

17   with the unredacted version of the slides, and then we'll -- and

18   then we'll address it as they come -- as they come up.  So --

19          MR. MADDEN:  Fair enough.

20          THE COURT:  -- I'm not going to be sort of make an

21   advisory ruling on a whole batch of slides that I haven't seen

22   yet.

23          MR. MADDEN:  I understand.  I appreciate that.  And we

24   will proceed that way.  Thanks.

25          THE COURT:  Okay.  Thank you.

—2:15-cv-01045-RFB-PAL—

1          Ms. Grigsby.

2          MS. GRIGSBY:  Your Honor, just to expedite the process.

3   We've reviewed the slides, and based on the parameters the Court

4   has just given, we would agree to display these slides.

5          THE COURT:  Okay.

6          MS. GRIGSBY:  We have no objection.

7          THE COURT:  Okay.  All right.  So ...

8          MR. KELLY:  Sorry, Your Honor.

9          THE COURT:  Hold on, Mr. Kelly.  Let me -- Mr. -- who's

10  on the phone?  I think it's Mr. Marroso and Ms. -- I'm sorry.

11         MR. MARROSO:  Ms. Jenkins is on the phone, Your Honor.

12  She's going to make the argument for Top Rank.

13         THE COURT:  Okay.  So -- and I don't know whether or

14  not in the -- if you all have seen the reports and have had

15  conversations with counsel about what from Top Rank would be

16  discussed today.

17         Ms. Jenkins.

18         MS. JENKINS:  Good morning, Your Honor.  Yes, we

19  have -- we have not seen the full expert reports in this matter,

20  but we received excerpts from one of plaintiffs' expert reports

21  with a list of AEO designated information provided by Top Rank

22  that this expert relied upon.

23         Top Rank is only concerned with one paragraph,

24  paragraph 85, in expert Dr. Andrew Zimbalist's report.  This one

25  paragraph contains Top Rank's fighter share revenue, what

—2:15-cv-01045-RFB-PAL—

1   percentage it pays its fighters of its revenue for years 2014 to

2   2016.

3          THE COURT:  Okay.  And, Ms. Jenkins, what is the

4   objection?  If this is aggregate information, again, I'm not

5   sure how that would overcome the standard here when it doesn't

6   appear to be related to particular fighters or fighter

7   arrangements or agreements or existing contracts.

8          As I understand it, the information with respect to Top

9   Rank would, again, be aggregate information.  So I'm not sure I

10  understand what the nature of the argument is as relates to

11  business modelling or practice.  One, because it seems fairly

12  clear to me that there's at least some general understanding of

13  the range of percentages that are paid with respect to the

14  revenue, but also it's going to be an aggregate figure.

15         MS. JENKINS:  Your Honor, Top Rank's general counsel,

16  back in 2017 when plaintiffs originally thought some of the

17  complex Top Rank's confidential information explained how this

18  information, if disclosed, could cause harm to Top Rank.

19  Mr. Harrison Whitman, GC for Top Rank, stated that if Top Rank's

20  competitors had access to this information, they could mimic Top

21  Rank's business strategy.  For example, our competitors could

22  attempt to poach boxers from Top Rank by --

23         THE COURT:  But Ms. Jenkins --

24         MS. JENKINS:  -- paid --

25         THE COURT:  Ms. Jenkins --

1          MS. JENKINS:  -- and that is why we hold this

2    information as confidential and do not disclose it.

3          THE COURT:  Well, I understand that.  But you

4    understand the standard that applies here as it relates to this

5    being a dispositive issue, and the Court may need to rely upon

6    that information.  And while there may be, as you understand,

7    arrangements in the context of discovery regarding production of

8    the parties, that's -- there's a different standard as relates

9    to this Court's decision about whether or not to unseal

10   information that it may intend to rely upon in a public opinion.

11         And, also, merely having a general counsel assert that

12   particular information is confidential and can be harmful is

13   certainly not sufficient to overcome the standard.  And I

14   don't -- and I'm not persuaded by the idea that somehow an

15   aggregate figure would allow a competitor to mimic Top Rank's

16   negotiation with respect to individual contracts.

17         That being said, it's not clear to me that this

18   information would necessarily come out in the context of the

19   evidentiary hearing.

20         I will simply say that, as I've said to Mr. Kelly from

21   Bellator, that if in the course of this hearing the Court finds

22   it necessary and important to rely upon that information, that

23   information will be unsealed.

24         Hello?

25         MS. JENKINS:  Thank you, Your Honor.  We accept your

—2:15-cv-01045-RFB-PAL—

1  proposal.

2           THE COURT:  All right.

3           Now, I believe that there was one other objection that

4  was lodged by -- there's so many initials for companies here.  I

5  don't want to misstate it.  Is it WAE or WEA?  Is that ...

6           MS. GRIGSBY:  Your Honor, it's WME.

7           THE COURT:  Thank you.  Sorry.

8           MS. GRIGSBY:  Yes, WME.

9           THE COURT:  And I'm sorry, Ms. Grigsby, are you also

10  representing WME?

11           MS. GRIGSBY:  For the purposes of this argument we are.

12  WME has acquired Zuffa, so ...

13           THE COURT:  Well, I know that --

14           MS. GRIGSBY:  Right.

15           THE COURT:  -- but I just want sure who was going to

16  appear in court on their behalf, given the objection.

17           I think in this context, Ms. Grigsby, my same ruling

18  would apply as relates to WME.  It's not clear to me that

19  there's a great deal of financial information.  There's some

20  reference in Dr. Singer's report to a change in business

21  practices without specifying necessarily detailed information

22  about what those may or may not be.  There is some information

23  in the report that would involve projections.

24           It's not clear to me, until I hear Dr. Singer or

25  Dr. Topel's testimony, how relevant or necessary that

2:15-cv-01045-RFB-PAL

1  information is unless it involves an understanding or an

2  assessment.  Because there is part of if where there's an

3  assessment of what the current market is as it relates to

4  competitors to Zuffa that I think is relevant.

5       But there's a whole separate part of the analysis for

6  the due diligence that involves, I think, a financial projection

7  about what could essentially be financially achieved.  I don't

8  know that any of that is necessarily based upon or relevant to

9  what the inquiry the Court has.

10      And so I would certainly allow you, to the extent that

11  comes up, to argue for a certain amount of information as

12  relates to financial projections regarding the acquisition to be

13  sealed.

14      MS. GRIGSBY:  Yes, Your Honor.  And now that I'm up, I

15  just had one other point of clarification.

16      THE COURT:  Sure.

17      MS. GRIGSBY:  Just as I'm looking through plaintiffs'

18  slides, so we were under the assumption that plaintiffs are

19  talking about the slides they handed to us today.  I have

20  noticed just -- it's not necessarily visible, but plaintiffs and

21  Zuffa have made an agreement that whenever something discusses

22  or a document or exhibit discusses an athlete, that we will not

23  specifically reference that athlete.

24      I'm assuming that we are still going to operate under

25  those parameters where there are, you know, third-party

—2:15-cv-01045-RFB-PAL—

1   information, so that we will not disclose that to the public.

2          THE COURT:  Well, there is except there's certain parts

3   of the reports that deal with headliners.  And there's certain

4   parts of the report where I think there are references to or

5   quotes from certain fighters, for example, accounting for a

6   certain percentage of the revenue as a way to indicate how

7   limiting the supply of fighters can be -- result in antitrust

8   injury.  And I think that's actually a quote from another

9   source, if you know what the portion of the report that I'm

10  talking about.

11         MS. GRIGSBY:  Yeah.

12         THE COURT:  If that's the case, then certainly I think

13  that can be used, but that's not, from what I understand,

14  talking about individual fighter negotiations.

15         MS. GRIGSBY:  I'm referencing individual fighter

16  negotiations --

17         THE COURT:  Okay.

18         MS. GRIGSBY:  -- where the language may be something

19  that plaintiffs are using to support their argument, but the

20  identity of the fighter is not really relevant or essential, in

21  our view, to Dr. Singer's opinion.  So it would really just be,

22  you know, keeping confidential the name of these athletes or

23  say -- you know, who are being negotiated on behalf of for

24  individual deals.

25         I think both parties before had discussed just not

———2:15-cv-01045-RFB-PAL———

1  necessarily referencing the athlete him or herself if we're

2  talking about that person's individual compensation information.

3         THE COURT:  And I think that would be appropriate.  I

4  don't know that there's going to be any such testimony here, but

5  if it comes up, we can address that as it comes up.

6         So I believe I have addressed all of the questions

7  relating to sealing.  And any other sort of housekeeping matters

8  we need to deal with?

9         Oh, Mr. Silva?

10        MS. GRIGSBY:  Yes, Your Honor.

11        Mr. Silva was my witness.  And as we thought we filed,

12  we needed to postpone his testimony.

13        THE COURT:  So why don't we do this.  Whoever is going

14  to talk about this issue, why don't you all come over to the

15  sidebar with me just for just a moment, please.

16        (Whereupon, the following sidebar conference was

17  reported, but not transcribed.)

18        THE COURT:  Okay.  So are there any other housekeeping

19  matters I need to deal with before we bring Dr. Singer on?

20        Mr. Cramer?

21        MR. CRAMER:  Your Honor, we filed a motion relating to

22  some 22 summary exhibits, or so-called summary exhibits that

23  Zuffa has put in the record.  And I think in order to cut it

24  short, I think what the -- and I was talking about this with

25  Mr. Isaacson before we came here.  I think what we would like to

1   understand from Your Honor is whether Rule 26 is going to be

2   enforced.  In other words, will the experts, when they take the

3   stand, be held to the opinions set out in their reports?

4          Because what we've seen from some of these new exhibits

5   is that they're really new expert analyses.  Zuffa hired a new

6   consultant, Dr. Lustig, to create a number of exhibits.  They

7   have new analyses.

8          THE COURT:  Right.  No, this -- let me be clear.

9   They'll be limited by the testimony that is identified in the

10  reports that are submitted for me with respect to the motion to

11  certify.  This is all about the motion to certify.  If we get to

12  a trial, we can talk about whether that happens.  But that's,

13  from my standpoint -- from my standpoint, seems to be some

14  period down the road.

15         For now, the testimony will be limited in the context

16  of the reports that the various experts authored.  Right.  So

17  they will not be able to go outside the confines of their

18  reports that they've offered, except to the extent they're

19  questioned about something that would lead to eliciting some

20  elaboration of information that they have provided.

21         So as it relates to the summary exhibits, I don't think

22  if they're based upon new information, that that would be

23  appropriate.  I also think, quite honestly, the parties should

24  limit their exhibits as relates to summary descriptive

25  information to what the experts themselves used as charts in

─────2:15-cv-01045-RFB-PAL─────

1   their reports.

2          So that's what I'm going to be looking to.  I'm not

3   going to be looking to new exhibits that are essentially trying

4   to summarize what's in the reports.  If you want to clarify

5   something about an expert's testimony, use their report to do

6   so.  But I don't think it's appropriate to have a summary report

7   of an expert's report unless it's a direct reference to what's

8   in the report itself.

9          MR. CRAMER:  Thank you, Your Honor.  That -- that is

10  helpful and instructive.

11         A separate question would be whether Zuffa would be

12  able to use these summary exhibits on cross-examination and then

13  say, Well, we've crossed -- we've crossed the -- with Dr. Singer

14  on it, so now Dr. Topel gets to testify about that.  We think

15  that that would be improper.

16         THE COURT:  Well, so part of it depends upon, again,

17  what the testimony is.

18         MR. CRAMER:  Okay.

19         THE COURT:  Summary exhibits that summarize testimony

20  are permissible.  Summary exhibits that essentially bring in new

21  testimony or offer new testimony would not be permissible.

22         Now, again, it's difficult for me to say what 's

23  summary or not because I haven't heard some of the testimony.

24  So I'm reluctant to sort of issue blanket rulings --

25         MR. CRAMER:  Fair enough.

1          THE COURT:  -- on information.  However, I do want to

2    offer you all guidance, which is I don't expect there to be

3    summary exhibits for testimony that's actually not in the

4    record.  So you can summarize something that's in the record

5    if -- if you think it may be helpful to me.  I may not think

6    it's helpful.  I may not admit it anyway.  So that's also

7    something to understand.

8          The purpose of this is to help me decide.  And so I'm

9    saying that to you so you all understand that at times I may cut

10   you off.  I'm not meaning to be abrupt or rude, but the fact of

11   the matter is that I have to make this decision based upon my

12   understanding of the information.  It's not essentially to

13   represent the entire argument for both sides.  I've read those

14   arguments multiple times, and so I don't need that necessarily.

15   So I may at certain points urge you to move on in different

16   directions.

17         But I don't think it would be appropriate to go beyond

18   the expert's own reports.  I mean, obviously, the rules of

19   evidence don't strictly apply in this type of a hearing, but I

20   try to adhere to them as closely as possible because they do

21   create certain level of reliability as it relates to

22   information.

23         MR. CRAMER:  Okay, Your Honor.  I appreciate that.

24         There's one fine distinction that Zuffa seems to be

25   making with some of these exhibits.  They say that while the

1   exhibits merely summarize backup data that's in one report or

2   another.  And it seems to me that if you're applying new

3   analysis and new reasoning and charting new information --

4   charting the information in a new way --

5           THE COURT:  Well, there's a difference between a

6   summary of backup information and statistical analysis.  So if

7   you're summarizing information, fine.  If you want to ask an

8   expert, Wasn't this part of what you considered, and if you did,

9   why did you consider this in relating to your modelling, that's

10  fine.  I don't want there to be offered by either side competing

11  modeling for what exists in the reports.  That is not the

12  purpose of this hearing.  I don't want someone to be rerunning

13  regression analysis unless it was already in the reports that

14  existed.

15          Now, if someone wants to take again descriptive

16  statistics and say aren't these part of the statistics,

17  that's -- from my standpoint, that's not redoing analysis,

18  right.  There's -- there are substantive distinctions between

19  descriptive statistics and the summary of descriptive statistics

20  and running sort of standardized sort of regression analyses

21  with respect to the different modelling that occurred in this

22  case.

23          So I have to see some of these -- how they're used in

24  relation to the testimony.  So I tend to allow lawyers some

25  latitude as it relates to how they want to use exhibits

 1  regarding cross-examination because I can ultimately decide

 2  whether or not I think it's helpful.  And you can make your

 3  objection, and I can rule on it based upon that.  We don't have

 4  a jury here so that allows for me to be able to hear the

 5  arguments and rule and move forward as it relates to exhibits

 6  and testimony.

 7          MR. CRAMER:  I understand.  Thank you, Your Honor.

 8          THE COURT:  Sure.

 9          Ms. Grigsby, yes.

10          MS. GRIGSBY:  If you're handling evidentiary

11  objections, Zuffa did have one outstanding objection.

12          THE COURT:  Sure.

13          MS. GRIGSBY:  Your Honor, we've resolved all of our

14  objections to plaintiffs' exhibits apart from one, which is

15  Plaintiff's Exhibit 481.  It is an expert report of Gene Deetz,

16  which is redacted and it was submitted in the Golden Boy v.

17  Harmon litigation.

18          THE COURT:  Right.

19          MS. GRIGSBY:  And our objection is basically based on

20  the parameters that this Court set earlier, which is to say you

21  were going to let most things in.  You know, it wasn't -- you

22  really didn't want the hearsay or relevance objections, but you

23  did say the other is whether there -- or not there's something

24  that either side views as so completely unreliable that the

25  Court really should not consider it.  And we -- we actually

1  believe that the Deetz report falls within that category.

2          Plaintiffs, through this litigation, actually

3  subpoenaed Golden Boy.

4          THE COURT:  Right.

5          MS. GRIGSBY:  They received records and data from

6  Golden Boy.  But instead of using that information, they are

7  using a redacted expert report, which you -- everybody

8  understands is hearsay in different litigation.

9          THE COURT:  Ms. Grigsby, let me stop you, and let me

10  ask them how they're going to use it to see whether or not I

11  even need to rule on this.

12          Ms. Grigsby, you can stay up or just, if you don't

13  mind, moving to the side.

14          MR. SILVERMAN:  Your Honor, we don't -- this exhibit is

15  the underlying data that's the basis of Dr. Zimbalist's

16  calculation of Golden Boy's wage share.  And, essentially, we

17  have two competing calculations here.  We have Dr. Zimbalist's

18  calculation relying on the data that was attached to this

19  report; and we have Dr. Blair's calculation, which is relying on

20  the data which Golden Boy produced in response to the subpoena.

21          We believe this is a battle of the experts about which

22  is more persuasive, and not a proper matter for Daubert or for

23  an evidentiary ruling in this hearing.  But we are planning to

24  present Dr. Zimbalist's results of that calculation in the

25  hearing.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Well, you haven't referenced the Deetz

2     report, and he's going to be relying upon that report or what --

3          MR. SILVERMAN:  So he's not -- no.  So, Your Honor,

4     Dr. Zimbalist is not relying upon the report or upon Dr. Deetz's

5     opinion that he -- that he reaches in that report.  What this

6     report is, is it's an expert report that was authored by

7     Dr. Deetz.  Dr. Deetz was hired by -- by Golden Boy in an

8     antitrust litigation that they brought against Haymon, and that

9     report was filed publicly on the docket and attached the data

10    that Dr. Deetz relied on from Golden Boy.  And that data

11    summarized Golden Boy's revenues and the -- their fighter

12    expenses.  And it attached detailed records of the -- of the

13    amounts that the fighters were paid and the revenues that the

14    events generated.  So Dr. Zimbalist relied on that data.

15         THE COURT:  So he's not relying upon the conclusions;

16    you're saying he's relying upon --

17         MR. SILVERMAN:  Just the data that was attached to the

18    report.

19         THE COURT:  Ms. Grigsby.

20         MS. GRIGSBY:  So Dr. Zimbalist said in his deposition

21    that he did not take any steps to independently verify this

22    data.  Obviously, an expert can rely on anything that an expert

23    would reasonably rely upon in their field.  But there is ample

24    case law, we briefed it in our Daubert, that this is just not

25    one of them.  If Dr. Zimbalist took no steps and also, on the

―2:15-cv-01045-RFB-PAL―

1   other hand, had access to the actual data produced by the third

2   party, it is inadmissible and, in fact, inappropriate for

3   Dr. Zimbalist to rely on that data.

4           And plaintiffs separately have offered this in as an

5   exhibit.  I mean, it sounds like they're saying that

6   Dr. Zimbalist isn't really going to testify on the Deetz report.

7   So it's unclear why this would even be an exhibit in this

8   hearing.

9           THE COURT:  Okay.  Well, what we'll do is I'll address

10  it when it comes up, depending upon how it's used.  It doesn't

11  seem to me that's necessarily going to be a significant part of

12  Dr. Zimbalist's testimony.  To the extent that I find it to be

13  something that he relies upon or uses, then I will consider,

14  Ms. Grigsby, the arguments about the reliability of the

15  information when evaluating the modelling that's being offered.

16  Okay?

17          MS. GRIGSBY:  Yes, Your Honor.

18          THE COURT:  So for now I'm not going to rule on that

19  particular objection until I hear the testimony.

20          MR. SILVERMAN:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          All right.  So -- oh, before we begin, I'm sorry, who's

23  going to be cross-examining Dr. Singer?

24          MR. ISAACSON:  That would be myself, Your Honor.

25          THE COURT:  Mr. Isaacson, why don't you come up to the

2:15-cv-01045-RFB-PAL

1   podium for a moment.

2        I would like for you to summarize what are the main

3   contentions you have about the modelling in this case as it

4   relates to Dr. Singer's report so, again, I can help to focus

5   this testimony.

6        MR. ISAACSON:  I would appreciate that.  Let me get my

7   binder.

8        THE COURT:  Oh, sure.

9        And I say that, Mr. Isaacson, because part of the issue

10  here is, I don't want us to spend time on necessarily factors

11  that Dr. Singer or Dr. Topel are allowed to choose as expert

12  statisticians.  They're really about sort of their judgment

13  necessarily, unless they go to the effectiveness of the

14  modelling.  And I say that because those are important

15  distinctions in this case, and I understand that you've made

16  arguments about sort of not inclusive of -- the modelling not

17  being inclusive of procompetitive effect.

18       I first want to ask you, what is it you specifically

19  understand as the procompetitive conduct, right, that Dr. Singer

20  and Dr. Topel should have and should be considering in the

21  context of the modelling in this case?

22       MR. ISAACSON:  So -- and Dr. Topel is going to begin on

23  this point, but the -- it would be everything that Zuffa does,

24  and this is the history of the Zuffa business, to build the

25  market, to build revenues, that would include --

 1          THE COURT:  Okay.  But what does that mean?  Because

 2   everything Zuffa does --

 3          MR. ISAACSON:  It includes building your brand,

 4   marketing.  It's the productions of the events, which are unique

 5   to Zuffa.

 6          THE COURT:  Okay.  Because I want to be specific.

 7   You're saying marketing and branding, right?

 8          MR. ISAACSON:  Yes.

 9          THE COURT:  Okay.  Of Zuffa or the industry?

10          MR. ISAACSON:  Of Zuffa.

11          THE COURT:  Okay.  Marketing and branding.

12          MR. ISAACSON:  That has a benefit to the industry,

13   probably, but we're focusing on Zuffa.

14          THE COURT:  Okay.  Marketing and branding.  The manner

15   of the presentation of the events?

16          MR. ISAACSON:  Yeah -- not -- so you understand that

17   unlike, for example, an NFL game where the NBC or Fox are

18   producing the game, Zuffa does the production --

19          THE COURT:  Right.

20          MR. ISAACSON:  -- not the television station.

21          So -- and so that's how the show is put on.  That

22   includes the bio -- the biographical and stories that are told.

23   It's the whole production of events.  So if you think about

24   the -- how the -- when you watch the Olympics, how that's

25   evolved from, you know, from the '60s when you have a certain

—2:15-cv-01045-RFB-PAL—

1   type of presentation to now how there's a -- they build stories

2   around athletes and tell those stories and have events.  All of

3   that is going on.  And you're going to hear some of that also,

4   you know, because that requires some knowledge of what these

5   things look like.

6           THE COURT:  Let me ask you a question.  Could the

7   television -- television networks have done it themselves under

8   the contracts they had with Zuffa?

9           MR. ISAACSON:  No.  Under the -- this is -- you would

10  have to redo the contracts.

11          THE COURT:  I'm sorry?

12          MR. ISAACSON:  You would have to redo the contracts.

13          THE COURT:  So, in other words, the television stations

14  weren't actually permitted, even if they had wanted to, by the

15  contracts, to do this.  This was something that Zuffa took on

16  itself.

17          MR. ISAACSON:  This was something the two parties

18  agreed to in their contracts.

19          THE COURT:  Okay.  No, that's fine.  Again, I want to

20  understand because part of this is about the choices.  Okay.

21  So --

22          MR. ISAACSON:  Right.

23          THE COURT:  -- so the other thing --

24          MR. ISAACSON:  And --

25          THE COURT:  -- is the manner of the production

1  including all of the background information, the biography of

2  the fighters, and sort of building the story around a particular

3  bout.

4          MR. ISAACSON:  Right.  And then -- and then you will

5  also hear about -- by the time the hearings conclude, we have to

6  get all the way through Mr. Silva, but how Zuffa goes ahead and

7  builds stars, builds athletes, makes them more prominent.

8          THE COURT:  Okay.  What does that mean?

9          MR. ISAACSON:  Well, if you take, for example, Conor

10 McGregor, who is identified as a relatively unknown fighter, and

11 then is marketed and built as a star, and becomes a star, that's

12 what that means.

13         THE COURT:  No, but you're saying "built as a star."  I

14 don't know what "built as a star" means.

15         MR. ISAACSON:  That means -- that means working with

16 the individual -- that means marketing the individual.  That

17 means matchmaking, making sure that you have appropriate matches

18 that build an audience.  It's -- it's the -- it's what Zuffa --

19 it's what Zuffa does for its business.

20         THE COURT:  Well, but it's not that, Mr. Isaacson,

21 because here's what I don't want to have happen.

22         MR. ISAACSON:  Right.

23         THE COURT:  I don't want to have these questions from

24 either side where someone's going to ask, Did your modelling

25 include procompetitive conduct?

1            MR. ISAACSON:  Right.

2            THE COURT:  That's a legal term, legal definition.

3     That doesn't tell me anything.  Right.  And so -- and so if

4     Dr. Singer or Dr. Topel, whoever says, Oh, I included

5     procompetitive effects or didn't, that's actually not helpful to

6     me either.  Because, obviously, the modelling is very specific

7     about -- and there are very -- there's various other aspects of

8     the conduct that are going to be important.  And so that's why

9     I'm asking and I'm going to be asking both sides to be clear

10    about when they specify when they talk about conduct,

11    particularly if there's going to be argument from both sides

12    about what conduct is not included in the modelling plan.

13           MR. ISAACSON:  And I don't think -- so in terms of

14    defining the dispute -- and one of the things we did try, in

15    light of your comments at the last hearing, Your Honor, we did

16    try to file something --

17           THE COURT:  Yeas, I read that.  Right.

18           MR. ISAACSON:  The -- I think what you are going to

19    hear is, it's not that Dr. Singer says Zuffa does nothing.  He

20    certainly thinks the fighters are -- you know, are really,

21    really important, but not that Zuffa doesn't do anything

22    procompetitively.  What he talks about is his model takes --

23    what matters for his model is whether those two things are

24    relatively proportional to one another.  And that's what you're

25    going to hear about.  And you will hear from both experts as to

1  whether that dispute validate -- whether he has a valid model

2  with that assumption or not.  All right?

3          THE COURT:  Well, okay --

4          MR. ISAACSON:  I don't think the argument -- the

5  argument is not going to be that Dana White is not a really

6  important marketer for Zuffa.  The argument is not going to be

7  that we don't do these productions and the productions are

8  valuable.  No one -- I don't think Dr. Singer will say he's

9  tried to measure that specifically.  If he does, that would be

10 news -- that would be -- that's not in his reports.

11         What he's saying is that because of -- and he's going

12 to talk about this notion of marginal revenue product, and I

13 don't want to put words in his mouth, but he talks about

14 proportionality.  As long as these things move proportionately,

15 then his model takes it into account.  And you're going to hear

16 that again with Dr. Manning and Dr. Oyer in the middle of

17 September.  That discussion continues with them.

18         And I'm not going to proceed into argument about this,

19 but I think that is the nature of the debate with respect to

20 that issue of modelling.

21         So what I -- to answer your initial question broadly, I

22 intend to talk to Dr. Singer about what is the challenged

23 conduct that he has assumed for his model, what is the

24 challenged conduct in that.  I intend to talk to him about the

25 foreclosure share concept.  I intend to actually -- see, this is

1  going to be the tricky part, and this is going to be for your

2  benefit, hopefully.  I'm going to actually try and get some

3  simplified expressions of the formulas he's using.  What's the

4  foreclosure share?  What's the fighter share?  So that -- and I

5  want something that's agreed.  This won't -- and I want

6  something that we can look at as we go forward.

7          And I want him then -- I also want to do that for

8  purposes of the regression.  Not a writing out a regression

9  formula because that -- that won't help any of us, but to

10 understand the basic things on either side of the regression and

11 see if we can get agreement on just what he did.  Because, like

12 you said a little while ago, it's the numbers that matter here.

13 And these formulas that generate the numbers I think will

14 illustrate --

15         THE COURT:  So you're not arguing -- I just want to be

16 clear.  You're not arguing -- I don't think that you're arguing

17 that he used nonstandard forms of regression analysis.

18         MR. ISAACSON:  I'm sorry, non --

19         THE COURT:  Standard forms or accepted forms of

20 regression analysis.

21         MR. ISAACSON:  No.  We're saying that both sides of the

22 regression are invalid.  The foreclosure share is not an

23 accepted concept, and the fighter share of -- or the

24 compensation share of revenue is not an accepted or meaningful

25 concept.

1          THE COURT:  And I just want to be clear.  Accepted by

2   whom?

3          MR. ISAACSON:  By economists or, we think, by courts.

4   And we don't think he's following relevant legal standards

5   for -- for either.  The --

6          THE COURT:  Okay.  Okay.  So again -- go ahead.  I'm

7   sorry.  Go ahead.

8          MR. ISAACSON:  So we will talk about, then, some of

9   the -- so that the Court understands it, we'll talk about,

10  then -- and this will be difficult, but trying to get some

11  agreement on what the variables are in his regression in a

12  way -- I have no background in economics, Your Honor, so I'm

13  speaking as a layperson.  And I hope to speak to you as a

14  layperson and to have these people talk to us as lay people.

15         THE COURT:  Okay.  That's helpful.  I do have some

16  background in regression analysis.  So I don't know that the

17  models are necessarily that difficult to understand from a

18  regression standpoint, but I do think it's appropriate for me to

19  be able to also explain them, to the extent that I'm writing my

20  opinions based upon them, in terms that everyone can understand.

21         But that's also why I just want to make clear about

22  there can be differences -- even in the context of regression

23  analysis, there are often common aspects of regression analysis

24  that would indicate the analysis itself is invalid.  I have not

25  heard, I just want to be clear, from you that the -- sort of the

1   various factors from a statistical standpoint that indicate a

2   regression analysis is not valid or that it is not capturing the

3   variability that it's intended to capture have been presented or

4   identified here.  Is that right?

5        MR. ISAACSON:  I think to be clear, I don't think I'm

6   going -- the point of our presentation is not to attack matters

7   of judgment, all right.

8        THE COURT:  Well, no, that's not what I'm asking you,

9   actually, because I want to be clear about this.  That's why I

10  partly want to do this, which is in the context of regression

11  analysis there are going to be certain indicators when you

12  validate the analysis that would show that the analysis itself

13  is not valid or that it's not within a particular confidence

14  interval or doesn't capture a certain degree of variability.

15  And that there will be certain tests that can be done or certain

16  indicators in the analysis which will show that the analysis

17  itself is invalid.

18       I want to just make sure, because I didn't understand

19  you to be arguing this, that you're not arguing that in the

20  analyses that are done by Dr. Singer or Dr. Topel that the

21  analyses themselves, from a regression or statistical

22  standpoint, are invalid in terms of the results that they

23  achieve.

24       MR. ISAACSON:  So we won't be -- that's a very broad

25  statement being made to a lawyer who's intending to attack this

———2:15-cv-01045-RFB-PAL———

1  regression.  I'm not going to be discussing confidence interval.

2  I'm not going to be questioning the statistical significance

3  findings.

4        THE COURT:  Okay.

5        MR. ISAACSON:  The -- I will be pointing to -- there

6  are variables where the results in -- and this is in the expert

7  reports, where the results indicate that that -- if you're

8  getting that result, there must be a problem with the

9  regression.  I don't know if that falls under the umbrella of

10 your broad question.  It might.

11       THE COURT:  It does.

12       MR. ISAACSON:  Okay.

13       THE COURT:  And so I wanted just to be clear about what

14 those are.  So there will be some arguments that you'll make

15 about the ratios and proportionality that you think are not

16 reflected in the actual results of regression.

17       MR. ISAACSON:  Right.  And we will --

18       THE COURT:  And you also make arguments about the

19 judgment used in terms of identifying the variables.  Because it

20 seems to me one of your arguments is -- relates to -- or a

21 couple of the arguments relate to how appropriate the various

22 variables are and the effects that are noticed to reach the

23 conclusions that Dr. Singer reaches.

24       MR. ISAACSON:  Right.  We -- we will be saying to you,

25 just like we would say in a products liability case if there was

1   some type of scientific diagnosis that had never been used

2   before, that they are plugging things into this regression that

3   no Court has accepted before.  And -- and that's what we are

4   going to be discussing.  That's both on the foreclosure share

5   side and on the fighter share side.

6         And there are subchapters to those stories, such as the

7   use of weighting, such as the Strikeforce data that comes in

8   that's used, and there is -- and you will see in Dr. Singer's

9   presentation that he will also be explaining how he defines his

10  markets.  Because when you're talking about foreclosure share

11  that's -- it's a share of something, and he's got to have a

12  market underlying that.  So you will be hearing from both sides

13  about market-share-type issues.

14        And then you'll hear a little bit about the identity

15  class and the -- we'll be spending most of the time on -- you

16  know, they are trying to show that all or virtually all class

17  members were injured.  They have a regression that does that.

18        They have a secondary analysis -- a second analysis

19  that indicates that there are -- there's a payment structure,

20  which includes another regression, at least another regression

21  that would indicate that effects would be spread.  But that -- I

22  think we will have agreement that that second analysis doesn't

23  actually try to show the effect; it just shows an effect would

24  be spread.  So we will be focusing on the analysis that shows --

25  that they shows an effect on all or virtually all class members.

2:15-cv-01045-RFB-PAL

1          And we will be attempting to show that it doesn't meet

2    the standard when you -- of rigor or persuasiveness, which we

3    think is what the relevant and also --

4          THE COURT:  Well, we have a new decision from the Ninth

5    Circuit which is, I think, quite helpful as it relates to the

6    standard.

7          MR. ISAACSON:  We agree with that, Your Honor.  And

8    we've made a filing on that last night.  I don't know if you've

9    had a chance to see it.

10          THE COURT:  I did.

11          MR. ISAACSON:  Okay.

12          THE COURT:  So I think that that helps -- I mean, well,

13    it's somewhat helpful.  So that's helpful for me, Mr. Isaacson,

14    because, again, I want to -- I've read the reports and I don't

15    want us to spend -- I want to understand where it is that -- and

16    again, I've read your briefing.  I want to understand where we

17    are today.  Because really what I want to focus on are the

18    aspects of the report -- the analysis that you find to be

19    problematic, and not necessarily going over and summarizing all

20    of it, the relevant input market, the relevant input submarket.

21    We don't -- I really don't want the parties to spend a lot of

22    time on that.  I've read that.  And so I really want to get to

23    the meat of what the disagreements are as it relates to the

24    modelling.

25          So I'm just saying that for all -- for everyone's

1  benefit.  It's certainly -- you -- and you can assume that I've

2  gone through this, because I have multiple times.  So we don't

3  have to spend lots of time on background information.  Right.

4         MR. ISAACSON:  Right.  I hope very much to get to the

5  meat of this.  I will say as, also, another person who has been

6  through this, that even when you've been through it, sometimes

7  there's a few things that don't jump out at you.  So sometimes I

8  will be doing some background to make sure we're all on the same

9  page.

10         THE COURT:  No, I'm not saying we shouldn't do

11  background.  What I'm saying is you don't have to explain to me

12  what MMA stands for.

13         MR. ISAACSON:  Yeah.

14         THE COURT:  Right?  Or --

15         MR. ISAACSON:  Okay.

16         THE COURT:  -- UFC or Zuffa.  No, I'm joking.  But I'm

17  just saying that --

18         MR. ISAACSON:  I'll take that section out of my

19  outline.  Yeah, yeah.

20         THE COURT:  So I think just to the extent that, for

21  example, if you hear me say, I understand that, move along, you

22  understand that I'm familiar with that area and we can move from

23  that.  And I assume -- because I assume -- I would expect the

24  testimony to go somewhat the same way that Dr. Singer's report

25  goes, which actually gives background.  And, basically, as you

 1  move through the report, it gets more and more detailed for

 2  certain aspects and gets to the common effects, basically, at

 3  the end.  I would expect that's what's going to happen here.

 4      But thank you, Mr. Isaacson.  That's helpful for me to

 5  clarify.

 6      MR. ISAACSON:  And sometimes when a Judge says move

 7  along, you feel like you're doing poorly.  This is a dialogue

 8  between us and the Court.  And so if something is not serving

 9  your purpose, then it will not be taken personally.  And if I

10  think I'm making a point, I will just talk to you about it and

11  say -- and then, so we're on the same page, and you say, No, I

12  100 percent completely understand that, then I'll move on.

13      THE COURT:  Okay.  Well, I think you've appeared in

14  front of me, Mr. Isaacson, to know that if I have a question, I

15  will certainly ask you.

16      MR. ISAACSON:  We look forward -- we look forward to

17  the questions.

18      THE COURT:  All right.

19      MR. ISAACSON:  We look forward to the questions.

20      THE COURT:  All right.  Thank you.  I appreciate that.

21      And go ahead, Mr. Cramer.  I don't expect you're going

22  to need to go through the same review.  So I'm going to ask you

23  the same question when Dr. Topel takes the stand that I asked

24  Mr. Isaacson.  The reports sort of speak for themselves.  I

25  expect, then, on the direct you're going to walk through the

—2:15-cv-01045-RFB-PAL—

1   report.  And the report even has some anticipation of the

2   arguments, even some of the arguments that Mr. Isaacson has

3   raised in the rebuttal report.

4          So I don't need to actually ask for your summary.  I

5   mean, if you'd like to give summary brief, you can.  But that's

6   not necessary.  It really is to focus on the critiques from both

7   sides of the modelling that's been offered because that's the

8   area that's going to be a little more fluid than what's been

9   presented as the appropriate modelling in the context of the

10  case.

11         MR. CRAMER:  Your Honor, we understand that and we

12  appreciate it.  And this is an area where Mr. Isaacson and I

13  agree.  That, in particular, I think explaining some of the

14  building blocks, even if it seems redundant, sometimes is

15  necessary.  And Mr. Isaacson went through his critiques, and

16  we're going to go through -- we're going to frame the issue,

17  right, is the conduct that we're talking about anticompetitive

18  or procompetitive.  That's the big dispute between Dr. Topel and

19  Dr. Singer.

20         And then the key question is whether Dr. Singer is able

21  to isolate the affect of the anticompetitive part of the

22  conduct, the foreclosure share, and show impact in damages from

23  the foreclosure of competition.  And that's the -- that's the

24  big dispute.  And that's what we're going to spend our time on.

25         But in order to get there, we have to -- foreclosure

—2:15-cv-01045-RFB-PAL—

1    share, as Mr. Isaacson said -- Isaacson said involves discussion

2    of what the market is.  And so we have to, a little bit, talk

3    about the market and the underlying theory of the market to talk

4    about foreclosure share, talk about wage share and why we use

5    that metric, and then talk about the model, explain how the

6    model works, how we take into account the variability of

7    compensation in the model, and show how we show how the effects

8    of the conduct are felt widely across the class, both with

9    regression itself and with a secondary analysis showing that

10   there's a structure where all of the pay of all of the fighters

11   moves together through time.

12          Dr. Topel and Dr. Singer agree on that point.  That the

13   fighter pay from the lowest rung to the highest rung has moved

14   together through time -- or at least moved in lockstep over the

15   course of the class period.  And our point there is that that

16   indicates that the fighter pay is connected.  The pay of the low

17   and the pay of the high are in some way related.  And so if

18   there's a general effect on compensation, as we say the

19   regression shows, that's going to have a widespread effect.

20          So that's what we're going to do for Your Honor today.

21          THE COURT:  Well, let's get going.

22          MR. CRAMER:  Let's do it.

23          THE COURT:  Thank you.

24          COURTROOM ADMINISTRATOR:  Please raise your right hand.

25          HAL JASON SINGER, Ph.D., having duly been sworn, was

-2:15-cv-01045-RFB-PAL-

1  examined and testified as follows:

2        MR. CRAMER:  Your Honor, if I may, I have copies of our

3  slide deck that I'd like to hand up to the Court.

4        THE COURT:  Well, you're not going to do it through

5  the ...

6        MR. CRAMER:  We are, but there's --

7        THE COURT:  No, no.  You know, I'm not a big paper

8  person.  So --

9        MR. CRAMER:  Okay.

10        THE COURT:  -- let's just use the monitors, please.

11        MR. CRAMER:  That's fine.  We'd like to enter it into

12  the record at the end so that you can -- you have a souvenir to

13  take home with you.

14        THE COURT:  Well, I mean, I don't know that I need to

15  enter sort of these type of exhibits.  I mean, I'll keep a copy

16  of them for reference purposes.  If I think I need to enter or

17  rely upon it, I will, but I'm going to rely upon the testimony

18  as the actual evidence that the Court will use.

19        MR. CRAMER:  Okay.  That's fair enough.

20        MR. ISAACSON:  Your Honor, since these are

21  demonstrative exhibits and they're not evidence, but we would

22  like them lodged on the record.  The parties can do at the end

23  of the day if you want.

24        THE COURT:  Yes, that's true.  I just want to be clear

25  about the fact that I don't view them to be separate and

—2:15-cv-01045-RFB-PAL—

1  substantive evidence of what they purport to represent.

2          COURTROOM ADMINISTRATOR:  Can I have you state and

3  spell your name for the record.

4          THE WITNESS:  Sure.  Hal Jason Singer, H-A-L,

5  J-A-S-O-N, Singer, S-I-N-G-E-R.

6          MR. CRAMER:  And we need the Court's system turned on

7  so we can put the slides on the screen.

8          (Court conferring.)

9          THE COURT:  So, again, Mr. Isaacson, Ms. Grigsby, so

10  there's no -- where's -- oh, you moved to the side of it.

11          There's no objection to any of these slides from the

12  deck that you've seen.  Is that correct?

13          MR. ISAACSON:  That -- not on confidentiality grounds,

14  and I don't think on any other grounds, though, I --

15          THE COURT:  Well, the relevance grounds is a separate

16  issue.

17          MR. ISAACSON:  I'm through at least the first 50 of

18  them.

19          THE COURT:  Okay.

20          MR. ISAACSON:  So if I have an objection, I'll talk

21  about it with counsel at the break.

22          THE COURT:  Go ahead.

23          MR. CRAMER:  Thank you, Your Honor.

24                          **DIRECT EXAMINATION**

25  BY MR. CRAMER:

---2:15-cv-01045-RFB-PAL---

1   Q.  Dr. Singer, good morning.  How are you -- how are you today?

2   A.  Good morning.  I'm doing well.

3   Q.  Great.

4        What's your educational background?

5   A.  I have a Bachelor of Science in Economics from Tulane

6   University, and a Master's and a Ph.D. in Economics from Johns

7   Hopkins University.

8   Q.  Since obtaining your Ph.D., have you taught economics?

9   A.  Yes, I have.  In the last five years I've been teaching

10  advanced pricing theory at the business school at Georgetown

11  University in Washington, D.C.

12  Q.  Have you published any articles in economic journals or law

13  reviews?

14  A.  Yes, I've published over 40 journals and law reviews and

15  economics journals.

16  Q.  Have you published any books or book chapters?

17  A.  I have published several --

18        THE COURT:  Mr. Cramer, we can go on from the

19  background for Dr. Singer.

20        MR. CRAMER:  Fair enough.

21        Your Honor, I wanted to show a slide of the various

22  cases that Dr. Singer testified in in which classes were

23  certified.  Is that --

24        THE COURT:  We don't need to do that.

25        MR. CRAMER:  -- unnecessary?

2:15-cv-01045-RFB-PAL

1          THE COURT:  Yes, that's not necessary.

2          MR. CRAMER:  Okay.

3          THE COURT:  Because you've already told me that anyway.

4          MR. CRAMER:  Fair enough.

5   BY MR. CRAMER:

6   *Q.*  Dr. Singer, when were you first retained to work on this

7   case?

8   *A.*  In 2014.

9   *Q.*  So you've been working on this case for five years.  How

10  many reports have you submitted in this case?

11  *A.*  I've submitted four reports:  my initial report, a rebuttal

12  report, a supplemental, and a supplemental reply.

13  *Q.*  Approximately how many hours have you and your staff spent

14  on this case?

15  *A.*  My staff and I have spent over 5,000 hours on this case.

16  *Q.*  Approximately how many depositions have you reviewed from

17  the record in this case?

18  *A.*  I personally reviewed roughly 20 depositions.  My staff has

19  reviewed many more than that.

20  *Q.*  And did you have access to the entire discovery record in

21  this case?

22  *A.*  Yes.

23  *Q.*  How did your staff determine which documents to look at?

24  *A.*  Well, for certain documents we were able to search what was

25  produced in discovery by search terms.  Like, for example, if I

 1  was interested in finding record evidence that spoke to entry

 2  barriers, we could search the discovery database for entry

 3  barriers.

 4        For other documents, like the fighter contracts, there

 5  were thousands of which, we had to review those manually.

 6  Q.  Let's talk about data.  Did you have access to data from

 7  both Zuffa and third parties?

 8  A.  Yes.

 9  Q.  What kind of data did you have access to?

10  A.  Well, from Zuffa we had very granular data on the

11  compensation of every fighter and every event.  And we also had

12  the event revenues.  We had what are called event P&Ls, which

13  told us profit and loss statements, which told us how much money

14  was generated, the sources of the revenue generation, how much

15  expenditures were incurred, and the sources of those

16  expenditures.

17        And then I think your question was two part.  Outside

18  of Zuffa, we were able to obtain a lot of data as well,

19  including from third-party vendors that track the industry.

20  We'll talk about FightMatrix and FightMetric.  Horrible,

21  horrible.  And Sure Dog.

22        But, yes, there were multiple sources of data that we

23  were -- we were able to glean from outside of the record as

24  well.

25  Q.  Did you also review -- I think you mentioned the fighter

—2:15-cv-01045-RFB-PAL—

1  contracts.  Did you review the fighter contracts in this case?

2  **A.**  That's right.  My -- it was the very --

3         THE COURT:  Mr. Cramer, you don't need to go through

4  that.  He obviously reviewed them.  I mean, you looked through

5  it.  His report goes through, essentially, all of the clauses

6  and the effect of the clauses.  There's a chart about the

7  clauses and exclusivity period.  So we don't need to go through

8  that.

9         MR. CRAMER:  I hear you.  All right.

10  BY MR. CRAMER:

11  *Q.*  So, Dr. Singer, and Your Honor, we're going to focus mainly

12  on plaintiffs' bout class.  We will have some discussion of the

13  identity class, but we're going to take a lead from Your Honor

14  and focus on the bout class.  Is that acceptable, Dr. Singer?

15  **A.**  Acceptable to me.

16  *Q.*  Okay.  I have a slide.  Is this the definition of the bout

17  class that you were working with in this case?

18  **A.**  That's right.  All persons who competed in one or more live

19  professional UFC-promoted MMA bouts that took place or were

20  broadcast in the United States from December 16, 2010, to

21  June 30, 2017.

22         THE COURT:  And, Dr. Singer, were you given that date,

23  the December 16, 2010, date?

24         THE WITNESS:  I was.

25         THE COURT:  Or was that a date that you picked?

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  I was given that date.

2           THE COURT:  Okay.

3    BY MR. CRAMER:

4    Q.  When was the Strikeforce buyout?

5           THE COURT:  Thank you.  That was going to my next

6    question.

7           It seems to me a lot of the effects of the report,

8    really, from your estimation, start to take off with the

9    purchase of Strikeforce.  I mean, particularly as it relates to

10   the issues regarding the supply of fighters and bringing

11   fighters over and being able to control the relevant input

12   markets and submarkets there.  It seems to me that the

13   Strikeforce purchase sort of was the culmination of a series of

14   purchases, but that was a significant purchase.  And we see

15   differences in effects after that.

16          Why wouldn't that be an appropriate date to sort of set

17   the more, let's say, robust findings, particularly as relates to

18   market share from the model?

19          THE WITNESS:  I think it's reasonable.  If you're

20   asking me -- this is typically a question beyond what I get

21   asked, but I think that the difference between December 2010 and

22   March of 2011, which is the date of the Strikeforce, I don't

23   think much happened in the interim that would change my opinions

24   in any way as to whether the conduct was anticompetitive.

25          THE COURT:  But you would agree that with -- with the

—2:15-cv-01045-RFB-PAL—

1  acquisition of Strikeforce that substantially impacted the --

2  the ability of Zuffa to control market shares as relates to, in

3  particular, the supply of fighters?

4          THE WITNESS:  It was a monumental event, no doubt.

5          THE COURT:  Okay.  Because I'm just saying, again, it

6  seems to me as relates to the effect that you describe that the

7  Strikeforce -- because it's close in time, but the Strikeforce

8  acquisition would be substantive.  Because I'm trying to figure

9  out what would be the appropriate dates.  I know you didn't

10  choose December 16, 2010.  So you're trying to be, I think,

11  probably somewhat careful about being critical of the choice of

12  the date, but it does seem to me that the Strikeforce date would

13  be a more natural choice for the effects that you describe.

14          Would you agree with that?

15          THE WITNESS:  It could be more natural.  I could --

16  yes, I could be persuaded.

17          THE COURT:  Okay.

18          Go ahead, Mr. Cramer.

19          MR. CRAMER:  Your Honor, just so you understand.  We

20  chose December 2010 because that was exactly four years before

21  we filed the complaint, and that's the statute of limitations --

22          THE COURT:  That's what I thought, too.

23          MR. CRAMER:  -- in antitrust cases.

24          THE COURT:  And, again, and that's a standard practice,

25  obviously, for lawyers.  But, again, it does seem to me, in

1  looking at the background material, that the Strikeforce

2  purchase was significant and huge, given what you described as

3  the exclusivity, and particularly regarding the fighters and the

4  number of fighters.

5           THE WITNESS:  Just one consideration, I think it's

6  worth mentioning, is that, of course, to the extent there were

7  underpayments to the fighters during those three or four

8  intervening months that are being taken away, and those

9  underpayments can be directly attributable to the challenged

10  conduct.

11           THE COURT:  Right.

12           THE WITNESS:  And trimming that off does have impact.

13  I mean, it does affect people who are potentially injured.

14           THE COURT:  No, certainly.

15           THE WITNESS:  Okay.

16           THE COURT:  I appreciate that.  Thank you.

17           Go ahead, Mr. Cramer.

18  BY MR. CRAMER:

19  *Q.*  Aside from this point that you just made, Dr. Singer, about

20  the fighters that may only have fought during the period between

21  December 2010 and March 2011, if we moved the beginning of the

22  class period to March 2011, would that materially change any of

23  your findings or opinions in this case?

24  *A.*  No.

25  *Q.*  Okay.  In broad terms, what do you understand the conduct

—2:15-cv-01045-RFB-PAL—

1  that plaintiffs are challenging in this case --

2  **A.**   Sure.

3  *Q.*   -- to be?

4  **A.**   In broad terms, the conduct that is being challenged --

5        THE COURT:  Okay.  We don't -- I don't need that.  I

6  mean, because I understand it in broad terms.  I understand it

7  in, actually, even more detailed terms.  I would rather focus on

8  getting the benefit of Dr. Singer's knowledge as relates to his

9  particular modelling.

10        So what would be helpful, Mr. Cramer, would be to start

11  with the -- just because I do think it's important to go through

12  what are the identifiable markets and build upon that in terms

13  of the industry.  Because I do think the background part of the

14  report, at least the initial report, talks about that.

15        Because I understand what the overall allegation is as

16  relates to the antitrust injury and how that's broken down, but

17  I think it's worthwhile to at least do some background as

18  relates to the industry and the markets and build up from there.

19        MR. CRAMER:  Your Honor, I appreciate -- I appreciate

20  that, and we will do that.

21        One of the things we do next is frame the dispute

22  between Dr. Singer and Dr. Topel, and the difference between

23  wage share and wage level.

24        THE COURT:  Okay.  Go ahead, if you --

25        MR. CRAMER:  I think that that is a fundamental issue,

1  and we're going to get right to that right now.

2  BY MR. CRAMER:

3  *Q.*  So, Dr. Singer, Dr. Topel, you know, says -- he disputes

4  pretty much all of your conclusions.  But are there any key

5  agreements between you and Dr. Topel in this case?

6  *A.*  There are.

7  *Q.*  And did you put those on a slide?

8  *A.*  I did.

9       The key agreement is that there are two phenomena

10  occurring at the same time, and I think the bone of contention

11  is whether they're related and whether there's an

12  anticompetitive story there or procompetitive story.

13       But we both agree that over the period of study inquiry

14  that the wage share, that is, the fraction of event revenues

15  that Zuffa's paying its fighters, is falling over time.  So to

16  give you an idea, in 2007 Zuffa thinks it was on the order of

17  about 26 percent, and then it falls into the -- into the 20s and

18  20s, and goes down into 18 and 19 percent at some point in the

19  class period, and hovers right around 20.

20       THE COURT:  Around 5 percent.

21       THE WITNESS:  Right?  Right.  And so 26 to 19 or 26 to

22  20 is a big decline in percentage point terms.  It's a big

23  decline in percent terms.  And I think we both agree that that's

24  happening in the background over the study period.

25       At the same time, we both agree that as the study

1  period unfolds, more and more fighters are being drawn into the

2  web and locked into these long-term exclusive contracts.  And

3  I'm going to refer to that as the foreclosure share.  I think in

4  the slide here, Dr. Topel refers to it in more colloquial terms,

5  but I think he's getting to the same thing, the share of MMA

6  fighters under contract rose while compensation as a share of

7  event revenue declined.

8  BY MR. CRAMER:

9  Q.  All right.  Thank you.

10        So you've explained this key agreement.  Do you and

11  Dr. Topel agree on the underlying economic explanation for why

12  wage share was falling as foreclosure share was rising?

13  A.  No, we do not.

14  Q.  Okay.  So have you prepared a slide summarizing the key

15  dispute between you and Dr. Topel on the merits of this case?

16  A.  Yes.

17  Q.  All right.  What does this slide depict?

18  A.  So the way that I view these two phenomena, this falling

19  wage share occurring with the rise in foreclosure, is that

20  there's a causal connection.  It's an anticompetitive story.

21  And there's a very straightforward story as to why that can be

22  happening.  As Zuffa is removing outside employment

23  opportunities for its fighters, either by taking away these

24  rival promotions via acquisition or via locking up the fighters

25  to long-term exclusive contracts, it is increasing their ability

1   to exploit the workers, to push down -- to create a wedge

2   between what they pay the workers on the one hand and what the

3   workers are contributing to revenues on the other.  That's the

4   exercise of monopsony.  That's the anticompetitive story.

5          Dr. Topel sees the conduct as being procompetitive.

6   And, in particular, the story that he seeks to tell in the

7   alternative is that -- is that wage share was falling because

8   Zuffa was making contributions to revenue that grew at a faster

9   clip than were the contributions being made by the fighters.

10  And his opinion --

11         THE COURT:  And how do you see that he actually defines

12  what that means in terms of how they can contributed to that?

13  I'm going to ask him that question.  I'm going to ask other

14  questions about it.  But what is your understanding of the

15  modelling that he used to try to capture that alleged -- I mean,

16  procompetitive is a legal term.  Right.  Essentially, what

17  you're talking about is sort of Zuffa's marginal sort of

18  contribution to sort of the increase in the revenue based upon

19  its own conduct --

20         THE WITNESS:  Right.

21         THE COURT:  -- apart from its, quote/unquote, exclusive

22  or other anticompetitive conduct.

23         THE WITNESS:  So for a very long time we were in the

24  dark as to what he was talking about, which is why I used the

25  phrase "special sauce."

1           THE COURT:  Right.

2           THE WITNESS:  So for, say, one, two, and report three,

3    we couldn't tell what he was talking about other than there was

4    something magical, like a black box.  We couldn't -- we couldn't

5    identify what it was, but Zuffa was bringing something special

6    to the table.

7           And by the time he got to report number 4, he finally

8    came around to identifying and committing to what he meant by

9    the special sauce, and it was the promotions, right.  It was

10   that they were -- they were producing quality promotions and

11   they were investing in promotions.  And so I said, Okay, let's

12   explicitly control for promotional expenditures as a new

13   variable on the right-hand side of regression.

14          MR. ISAACSON:  Your Honor -- Your Honor, he's now

15   discussing report 4 where he -- where he did a new regression

16   that was contrary to the parties' agreement to the Court.  So I

17   don't want him to go into the -- his -- the regression from

18   Singer's -- Dr. Singer's last report.

19          THE COURT:  Okay.  So, perhaps, maybe we could --

20          Just give me a moment, Dr. Singer.

21          When you're talking about the parties' agreement, I'm

22   not sure what it is, Mr. Isaacson, you're talking about as

23   relates to what I've ordered.  Because it doesn't -- quite

24   honestly, I'm not sure it matters what the parties agreed to if

25   it's something that I could legitimately consider.  Explain to

1    me why I wouldn't consider that.

2            Now, honestly, I don't know that he's gone into that

3    other than to say he didn't understand what it was until the

4    very end, but maybe you could give me some -- remind me of what

5    the issue is here.

6            MR. ISAACSON:  I don't think he's gotten into it yet,

7    but I didn't want --

8            THE COURT:  Okay.

9            MR. ISAACSON:  -- I didn't want him to.

10           There's -- in the last report, which we haven't had a

11   chance to respond to, there was a new regression from

12   Dr. Singer.  That's the simple point.

13           THE COURT:  Okay.

14           MR. CRAMER:  Your Honor, Mr. Isaacson is mistaken.  The

15   regression that Dr. Singer is turning -- talking about right now

16   in which he controlled for promotional spending, is in his third

17   report.

18           THE COURT:  That's what I thought, too.  So I'm

19   confused.

20           MR. CRAMER:  The regression analysis that Mr. Isaacson

21   is referring to, I think, is what -- what happened is in

22   response to the regression that Dr. Singer ran in which he

23   controlled for promotional expenditures, he put a variable in

24   the model.  Let's see what happens to promotional expenditures.

25   Let's put that variable in and see if it changes the result.  It

1    doesn't change the result.

2            In response, in -- in Dr. Topel's next report, because

3    they did not stop filing reports, they kept filing them,

4    Dr. Topel said, No, no, no, it's not promotion.  You have to put

5    in a variable that includes all non-fighter related Zuffa

6    expenses, from the money they spend on jets to everything else

7    they spend.  You have to put that variable in.

8            So in response, Dr. Singer said -- and so then

9    Dr. Topel ran that regression with this new variable in his next

10   report.  And all Dr. Singer did in response was not run a new

11   regression; he just pointed out that Dr. Topel screwed up.  That

12   Dr. Topel omitted data.  And all Dr. Singer said was if you take

13   out the omitted data, or you put in the complete data set, which

14   was available, that's not a new regression.  He just said

15   Dr. Topel screwed up.  And if you correct the error, then the

16   regression works still.

17           So what Dr. Singer's able to show with the regression

18   with promotion, you put promotion in, foreclosure share

19   raises --

20           MR. ISAACSON:  So this is our concern.  Because we

21   don't agree with that description, and I don't think you want to

22   air out those differences.

23           THE COURT:  What I want to figure out is to what extent

24   I should or shouldn't be considering it here.  So if there's --

25   and I don't recall ruling that I was excluding reports,

———2:15-cv-01045-RFB-PAL———

 1  Mr. Isaacson, so I'm a little confused about the fact that I

 2  wouldn't consider it.

 3          MR. ISAACSON:  This goes -- you have not ruled on this

 4  issue.  What there was was a joint motion to supplement expert

 5  reports, which is Document 545 on the docket --

 6          THE COURT:  Okay.  All right.

 7          MR. ISAACSON:  -- docket, in which the parties agreed

 8  on the guidelines for what was going to happen in the last

 9  reports.  And there's no question that he runs a new regression

10  with different data.  We disagree with the descriptions.  The

11  lawyers can argue this back and forth.

12          But there is a regression that we disagree with that we

13  have not had the opportunity to respond to.  Everything he's

14  saying we haven't had the opportunity to respond to.

15          And -- and the joint motion was intended to avoid

16  precisely this situation.

17          THE COURT:  This back and forth.

18          MR. ISAACSON:  Right.

19          MR. CRAMER:  Your Honor, the plaintiffs' --

20          MR. ISAACSON:  And that's paragraph 4.

21          THE COURT:  Hold on.  Let me just get to the -- the

22  joint motion is 5?

23          MR. ISAACSON:  Docket 545.

24          And I want to point out one other thing.  We are now to

25  the point of rebuttal.

1          The -- what's -- the groundwork that's being laid is

2     that Dr. Topel, in his third report, has said something in

3     response to the first reports, and now here's our response to

4     that.

5          And all of a sudden -- and this witness has the

6     opportunity to come back for rebuttal after Dr. Topel testifies.

7     So one of -- I don't know why we're doing this now.

8          THE COURT:  Because it's helpful to me to do it now.

9          MR. ISAACSON:  Well, okay.  All right.

10         But the --

11         THE COURT:  So if you want to do that with your

12    witnesses, Mr. Isaacson, your expert, and if you want to have

13    your expert comment on the last plaintiffs' report and prepare

14    Dr. Topel for that, you can do that.  Because even if I decided

15    the joint motion, I suspect there would still be further expert

16    supplements anyway, in my experience, in these cases.

17         But to the extent that you feel there is an appropriate

18    rebuttal to what Dr. Singer testifies to, I will give you broad

19    latitude through your expert to be able to ask Dr. Topel about

20    it.  If you want to provide even a supplement, so long as you

21    show it to the plaintiffs, I will let you do that.  If there is

22    something beyond what's been attached and you want to add

23    something since you haven't had the last word, I will consider

24    that as well.

25         So I don't want you to feel limited in that way, but,

 1  again, even -- even in deciding the motion, I think there's

 2  always going to be a back and forth.  And that's fine.  I don't

 3  have to decide this to the finality.  I mean, obviously --

 4          MR. ISAACSON:  Right.

 5          THE COURT:  -- I have to decide it up to a certain

 6  point.  But if you feel that somehow, Mr. Isaacson, you want to

 7  supplement the record, I will let you do that.

 8          MR. ISAACSON:  I just wanted -- depending on where they

 9  go with this, that actually will mean us sending over new

10  regression results, adjusting his last regression.  And --

11          THE COURT:  That's fine.

12          MR. ISAACSON:  Okay.

13          THE COURT:  Look, this is going to take a little bit of

14  time.  I mean, in part, this is the standard, which I think is

15  appropriate.  You have also said the Court has go through a

16  rigorous analysis.  That's what we're going to do.  And if that

17  means -- look, we're going to do this over the course of several

18  weeks.  If we have to bring people back, we'll bring people

19  back.  But I want to make sure everyone feels they have an

20  opportunity to be heard.  I will let you supplement to the

21  extent you think it's appropriate.  Both sides can.

22          MR. ISAACSON:  Okay.  Thank you, Your Honor.

23          THE COURT:  Of course.

24          MR. CRAMER:  Thank you, Your Honor.  And I take your

25  last comment to mean that if Zuffa supplements, that we get the

1  opportunity to respond.

2          THE COURT:  Yes.  At some point we have to cut it off,

3  but yes.

4          MR. CRAMER:  Plaintiffs -- we are -- we get the last

5  word; it's our motion.  So what kept happening here --

6          THE COURT:  Well, you get the last word until I say the

7  last word is heard.

8          MR. CRAMER:  Well, Your Honor, then gets the last word.

9          THE COURT:  But -- I'm joking.  But at some point we do

10  have to cut it off.  I do think that -- this is not a jury trial

11  or a bench trial.  The standard is not that I have to be

12  persuaded as to the credibility with respect to the modelling.

13  The standard is lower than that, from my standpoint, in terms of

14  looking at the Supreme Court's decision and the Ninth Circuit's

15  recent decision, but it does require some rigorous analysis as

16  relates to the foundational aspects to the modelling, which I

17  think the Court needs to address.

18          So with that, I'll let you continue.

19          MR. CRAMER:  Thank you, Your Honor.  And we agree with

20  your last statement.

21  BY MR. CRAMER:

22  Q.  All right.  Let's get back to this issue of special sauce.

23  I just want to make sure you've described -- you were in the

24  middle of sort of describing the special sauce, whether you can

25  complete your testimony on that point.

2:15-cv-01045-RFB-PAL

1   **A.**   Sure.  What we -- what we need to do to upset the findings

2   of my model, which is that there's a statistically significant

3   relationship between foreclosure share on the one hand and wage

4   share on the other, is to identify some variable that my model

5   omitted, that when brought into the regression, upsets that

6   relationship.  That's -- that's kind of the game.  That's the

7   ball game.

8          And Dr. Topel has had four or five reports to come up

9   with this variable that captures the magical special sauce that

10  Zuffa's contributing.  And he has yet to identify it.

11         And so as I --

12         THE COURT:  What's the most determinative variability

13  that his modelling captures?

14         THE WITNESS:  These additional variables -- I'm --

15  sitting here, I'm hard-pressed to remember if they add any

16  incremental explanatory part, but the key is they do not

17  upset -- they do not upset the statistically significant finding

18  between foreclosure share and wage share.

19         To me -- I mean, this follows right on high tech

20  antitrust litigation, but this is -- to me, this is the fight

21  that the econometricians are having is can you come up with one.

22  And he didn't here.

23         THE COURT:  Okay.  Thank you.  Go ahead.

24         MR. CRAMER:  All right.  Thank you, Your Honor.

25  BY MR. CRAMER:

————2:15-cv-01045-RFB-PAL————

1  Q.  Dr. Singer, have you prepared a slide explaining at a very

2  high level the basis for your opinion that Dr. Topel is wrong

3  and you are correct?

4  A.  I did.

5  Q.  All right.  What does this slide depict?

6  A.  What Dr. Topel's special sauce theory is missing, is that

7  when it comes to this particular application, this particular

8  industry, the MMA industry, and sports in general, but MMA in

9  particular, the athletes are the product.  Right.  And what that

10  means is that while there are other contributions to revenues, I

11  don't dispute that, the athletes are the main drivers of

12  these -- of these revenue gains.

13         THE COURT:  In other words, based upon your finding,

14  whether it's UFC, Zuffa, Strikeforce, Bellator, WFA, WAE,

15  whatever, ABC, it's less relevant than, you know, if it's Conor

16  McGregor or Rampage or whoever the person is, that people

17  actually pay to see either through Pay-Per-View or live event

18  ticketing?

19         THE WITNESS:  I just want to say back in my words, and

20  let's see if we're on the same page, hopefully.  It's the

21  fighters.  It's the identities of the fighters --

22         THE COURT:  Yes, it's the identity of the fighters that

23  drives --

24         THE WITNESS:  -- putting butts in the chair.

25         (Court reporter interruption.)

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  Oh, sorry.

2          THE COURT:  So the identity of the fighters -- in other

3     words, the fact that a particular fighter is known to be

4     associated with a particular UFC event, from your analysis, is

5     more significant than being associated with the UFC versus

6     Bellator or another promoter.

7          THE WITNESS:  Yes, Your Honor.  In fact, there's a

8     published paper that establishes that exact point.

9          THE COURT:  That's not your paper, though, right?  It's

10    someone else's.

11         THE WITNESS:  Someone else's.

12         THE COURT:  No, no.  But it's quoted in your report.

13         THE WITNESS:  Yes.

14         THE COURT:  It talks about --

15         THE WITNESS:  Man and -- yes, right.

16         THE COURT:  -- it talks about the percentage that

17    certain fighters capture the --

18         THE WITNESS:  Right.

19         THE COURT:  -- that drive the revenue.

20         THE WITNESS:  Right.

21         MR. CRAMER:  Your Honor, I put up on the screen

22    slide 68, which is -- I think, is the article Your Honor and

23    Dr. Singer are talking about.

24    BY MR. CRAMER:

25    Q.  Dr. Singer, would you like to explain what this article is

————2:15-cv-01045-RFB-PAL————

1   talking about?

2   *A.*   Sure.  So these -- these economists tested this hypothesis

3   explicitly.  Is it the fighters or is it the belts?  And just

4   the conclusion is fairly obvious where they came down.  The most

5   important take-away is that the identity of the fighters

6   competing matter more than any title.  The fighters themselves,

7   not the UFC titles, are what truly drive Pay-Per-View buy rates.

8           And, in fact, I supplemented this analysis with my own

9   original empiricism, and I found that knowing the rank of the

10  highest ranked fighter who was profiled in the event was very

11  helpful in predicting what the event revenues were.

12  *Q.*  All right.  Dr. Singer, we'll go in the special sauce in

13  even more detail later.  I just want to be clear.  Did you

14  assume that Zuffa's ability to pay a lower share of event

15  revenues to fighters over time was the result of Zuffa's

16  allegedly anticompetitive conduct?

17  *A.*  No, I did not assume that.  I posited a hypothesis, which is

18  that as Zuffa could ensnare more and more of these highly ranked

19  marquee fighters into this web of long-term exclusive contracts,

20  that it would give Zuffa the ability to push down the wage

21  share.

22          But I did in no way assume that conclusion.  I tested

23  it empirically and found that --

24          THE COURT:  How?

25          THE WITNESS:  -- to be the case.

———2:15-cv-01045-RFB-PAL———

1          THE COURT:  How did you test it?

2          THE WITNESS:  Through the regression analysis.  The

3   hypothesis that -- that we tested was could we explain variation

4   in wage share across events and across fighters with knowledge

5   of, at the time that the fight took place, how many fighters had

6   been sewn up or taken out of the market via Zuffa's exclusionary

7   long-term contracts.

8          We tested that and we tried to control for as many

9   other things that could be also explaining contributing to

10  variation in the dependent variable.

11         THE COURT:  But did you control for differences in

12  promoters?

13         THE WITNESS:  We did.  When --

14         THE COURT:  Well, I mean, because there's only a

15  certain period of time in which you could probably do that,

16  realistically, because after 2011 most of the headliners are

17  certainly under the UFC's umbrella.  But before that, I think

18  you have, and your report talks about, a fair number of the

19  headliners who were actually outside of the Zuffa camp.

20         Is there an analysis -- because I'm not sure that I saw

21  that part and maybe you can point it to me in the analysis that

22  talks about that particular difference that would address this,

23  quote/unquote, special sauce that you did?

24         THE WITNESS:  Sure, there's one iteration of the

25  regression that combines two databases.

—2:15-cv-01045-RFB-PAL—

 1          THE COURT:  Can you tell me where I can find that?  I

 2  just want to make sure we're talking about the same thing.

 3          THE WITNESS:  Sure.  It would be in my initial report.

 4  I think my first model in the report incorporated the

 5  Strikeforce compensation.

 6          THE COURT:  Right.

 7          THE WITNESS:  So I had -- I had --

 8          THE COURT:  Hold on just a second.

 9          THE WITNESS:  Oh, sorry.

10          THE COURT:  Can we find that?  Because I want to make

11  sure -- again -- and I'll just say this for all parties, because

12  it will be helpful to me, whenever you're referencing, because

13  there's so many reports and regression analyses, I always want

14  to make sure we're talking about the same analysis.  So whenever

15  that's referenced, Dr. Singer, Mr. Cramer, Mr. Isaacson, it's

16  always helpful for me that we reference the particular

17  regression analysis and the results.

18          So let's see if we can find that.  Because I think I

19  know what part of -- in your initial report I recall this, but I

20  just wanted to make sure.  And, of course, I'm sure you don't

21  have the page numbers memorized, and so let's see if we can't

22  find it.

23          Mr. Cramer, are you looking?

24          MR. CRAMER:  I am looking, Your Honor, for the

25  discussion of the Strikeforce version of the model, and ...

2:15-cv-01045-RFB-PAL

1            (Plaintiffs' counsel conferring.)

2            THE COURT:  Here we go.  I think the explanation starts

3  on page 121, but I'm not sure of the report.  And then we

4  have ...

5            MR. CRAMER:  In the rebuttal it goes into detail

6  about -- because Dr. Topel challenged the use of the Strikeforce

7  data in the model, and so the rebuttal has a detailed defense.

8            THE COURT:  Right.  But the results first appear in the

9  first report, I think.

10           MR. CRAMER:  That's correct.  That's correct.  And I

11  believe --

12           THE COURT:  I think it's 123, and then -- oh, here it

13  is.  So can you pull up the 125 -- page 125, I think, and 126, I

14  believe are the results.

15           Is there a way to --

16           At least from my notes, I think that's what we're

17  looking at.

18           MR. CRAMER:  Yeah, I mean, the discussion -- there's a

19  discussion in paragraph 181 on page 119 that --

20           THE COURT:  Yes, but I want him to look at -- I think

21  the results from the analyses are on the charts, 125 and 126.  I

22  just want to make sure I understand which term we're talking

23  about.

24           (Court conferring with courtroom administrator.)

25           MR. CRAMER:  Your Honor, may I approach the witness?

1           THE COURT:  Yes.

2           THE WITNESS:  I also don't feel I got a chance to

3   complete the answer, and I think it's going to help understand

4   this.

5           THE COURT:  Okay.

6           THE WITNESS:  Sure, sure.  But let me -- despite --

7           THE COURT:  So what we're going to do is --

8           Hold on just a second.

9           What we're going to do is, I'm also going -- we're

10  going to have you, Mr. Cramer, pull that out and put that on the

11  ELMO there, and then we can switch over so we can all be talking

12  about the same thing.

13          But go ahead.  While he's doing that, Dr. Singer, if

14  you want to finish your answer.

15          THE WITNESS:  So you asked was I able to control for

16  the identity of the promotion, and the answer is yes.  But I

17  only had to do that in the model that combined the Strikeforce

18  data with the Zuffa data.  So we only got detailed fighter

19  compensation and event revenue from two promotions, Strikeforce

20  before it was acquired and Zuffa over a very, very long time

21  period.

22          In this first model that I -- that I run, I combine the

23  Strikeforce data, right, so I have observations for every event.

24  I know how much the Strikeforce fighter got paid, down to every

25  component, and I also know what the event revenue was for

1   that -- for that Strikeforce event.  Right.  And I'm going to --

2   and I combine it with the Zuffa data, same type of data, right.

3   And I use a dummy variable that captures whether or not the data

4   that I'm looking at is coming from Strikeforce or Zuffa.

5        And I find that when you control for all things that

6   could possibly move the wage share around, that the foreclosure

7   share is highly statistically significant.

8        Now, let me -- let me just say I use another model that

9   does not rely at all on the Strikeforce database.  Right.  It

10  purely relies on the Zuffa data.  And what that means is I'm --

11  I basically have one arm tied behind my back in terms of what

12  can now contribute to explaining --

13        THE COURT:  Right.

14        THE WITNESS:  -- the foreclosure variable.  The only

15  source of variation that's left when you remove the Strikeforce

16  data is what we call time series variation, right, within Zuffa.

17  What we observe within Zuffa, going back again to, say, 2005

18  when the database begins, is we see that when Zuffa didn't have

19  as many fighters locked up under these long-term exclusive

20  contracts, they were paying their fighters a higher wage share.

21        So this second model, that we're in fact going to

22  present today, makes no use of the Strikeforce data, right.

23  And, therefore, there's only one potential contribution source

24  to explain the foreclosure variable.  It's this time series

25  variation within Zuffa.  And even that one, even that model

—2:15-cv-01045-RFB-PAL—

1   without any Strikeforce data, is able to show a statistical -- a

2   statistically significant relationship between the foreclosure

3   share and the wage share.

4          And, of course, when we bring the Strikeforce data back

5   in, we get the same result, but the coefficient is even larger

6   in this case because, of course, now we have two sources of

7   contribution.

8          THE COURT:  Which coefficient is larger?

9          THE WITNESS:  Oh, the foreclosure share coefficient is

10  larger.

11         And the reason is, Your Honor, is that we now have two

12  things that are contributing to that variable; not only this

13  time series variation of what's going on within Zuffa across

14  time, but also a cross-sectional variation.  Now, how

15  Strikeforce is paying its fighters compared to how Zuffa is

16  paying its fighters across different points in time.

17  BY MR. CRAMER:

18  *Q.*  Dr. Singer, when you said the coefficient on the foreclosure

19  share variable is higher in the Strikeforce model, what exactly

20  do you mean by that?

21  **A.**  Well, it's a bigger effect.  That means a -- for the same

22  size change in foreclosure share, you get a -- you get a larger

23  effect on the wage share.  And so it's no -- it's no surprise --

24         THE COURT:  It is a greater predictive effect on the

25  outcome.

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  Well, the predictive powers is high in

2    both models, but the magnitude of the effect is bigger when you

3    include the Strikeforce data.  I mean -- and, of course, because

4    my damages estimate turns on the size -- largely on the size of

5    that parameter, you get larger damages, of course, when you --

6    when you include the Strikeforce data.

7          THE COURT:  Okay.

8    BY MR. CRAMER:

9    *Q.*  Dr. Singer, on page 126 of your report, this lists -- this

10   is Table 6, and it lists or identifies the regression that

11   you've just described with the Strikeforce information.

12         I just want to draw your attention to the notes at the

13   bottom and you'll see, of the various fixed effects variables

14   that are being controlled for, one of them is promoter.  Is that

15   right?

16   *A.*  You want me to look at the notes under the table?

17   *Q.*  Correct.

18   *A.*  Okay.  Give me a second.

19         THE COURT:  Why don't we just look at the variable?

20   Where is the variable you're talking about?

21         THE WITNESS:  Because the fixed -- because the fixed

22   effects are suppressed in the tables, so they'll only show up by

23   name --

24         MR. CRAMER:  There are hundreds of fixed effects

25   variables, so you couldn't list them all.

1              THE COURT:  I thought he had said that he had listed in

2    the chart --

3              I thought you said you listed the promoter variable in

4    the chart that you have with the fighters share analysis.

5              THE WITNESS:  Right.  And so in the notes, it turns

6    out, we did -- we did control for it.  But the coefficient on

7    the promoter dummy is not listed in the table.

8              THE COURT:  Ah, that's what I was looking for.

9              THE WITNESS:  But we did.  If you look in the notes --

10             THE COURT:  No, I see that.  Okay.  So that's why I was

11   looking at the charts.  You were saying -- because I see, for

12   example, gender is listed and other things that are identified

13   in those, but the promoter variable isn't listed here.

14             THE WITNESS:  It's not listed, but if you were really

15   interested in the coefficient on it, we could generate that.

16   It's generated in the backup, of course.

17             THE COURT:  Okay.

18             THE WITNESS:  But the long --

19             THE COURT:  Well, I would actually be -- I mean,

20   because it's actually relevant to potentially the overall

21   analysis.

22             It would be helpful, Mr. Cramer --

23             MR. CRAMER:  Yeah.

24             THE COURT:  -- to see what the actual coefficient is,

25   because that actually matters, obviously.

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  Sure.

2           THE COURT:  Right.  So, I mean, the size of it in

3    comparison to the others and the statistical significance in

4    comparison to the others, obviously, is something that the Court

5    has to consider since that's basically -- at least what you're

6    saying is their whole argument, is that this variable actually

7    is -- captures, as you call it, the special or secret sauce with

8    respect to the sort of increase in the revenue.

9           THE WITNESS:  It's definitely related to the special

10   sauce.  Yes, that is true.  That's true.  But -- yes.  I'll

11   leave it at that.

12          THE COURT:  No, again, because I just want to be able

13   to then consider that in the overall context of the chart of

14   the -- of the different factors in the coefficients that are

15   there.  But we can -- we can do that later.

16          Why don't you go ahead, Mr. Cramer.

17          MR. CRAMER:  Just, Your Honor, this is Dr. Singer's

18   supplemental expert report, paragraph 31, and I just want to

19   put --

20          THE COURT:  Which?  Is that the first supplemental

21   report, the second, or third?

22          MR. CRAMER:  Correct.  The first supplemental report.

23          THE COURT:  Okay.

24          MR. CRAMER:  Yes, I don't have the exhibit number.

25          THE COURT:  That's all right.  Just identify the --

1  which supplemental report it is.  I think everyone understands

2  that.

3  BY MR. CRAMER:

4  *Q.*  This is page 23, paragraph 31, and you'll note it says:

5  Third, my analysis includes fixed effects by promoter.  This

6  controls for the possibility that Zuffa has a superior

7  promotional acumen and, therefore, captures a greater share of

8  event revenue than other promoters.

9  *A.*  And it also describes -- if I may, it also describes that

10  the coefficient's negative and explains the economic

11  interpretation of that coefficient.

12  *Q.*  And when you say the coefficient is negative, Dr. Singer,

13  please explain what that means.

14  *A.*  What it's telling you is that the wage share is

15  significantly lower at the UFC relative to other promoters in

16  the database.  That's not a surprise.  But the key thing,

17  though, is that we're feeding -- for this model, we're feeding

18  data from two different -- two different databases.  And we

19  certainly want to let the model know that when it comes from

20  database A, that it's coming from the database A, and when it's

21  coming from database B, we control for that.

22       But what's critical and probably the biggest takeaway

23  is that while I think it's appropriate to combine the two

24  databases, because economists like data, we -- you know, when I

25  get a database, it gets us excited, and so we want to make use

1  of it.  But what's really important is that even when you strip

2  out the Strikeforce data, there's valuable information that's

3  being lost when you do that.  Right.  Even when you strip it

4  out, the model, when run exclusively on the Zuffa database,

5  tells you the same thing.  That is, there is still a

6  statistically significant relationship between the foreclosure

7  share on the one hand and the wage share on the other.

8  Q.  All right.  And we're going to get back to some of that

9  later after we build some of these building blocks, but I think

10  that was helpful.

11        MR. CRAMER:  If we could put the slide deck back on the

12  screen, I would appreciate it.

13  BY MR. CRAMER:

14  Q.  All right.  Just one last question right now about the

15  special sauce theory.  And I believe you've testified about it,

16  but I just want to make sure it's clear.  Did you test

17  empirically Zuffa's procompetitive special sauce theory?

18  A.  Yes, I did.

19  Q.  And how did you do that?

20  A.  I did it two ways.  Initially -- I'd like to say, I already

21  had done it in the model.  We just saw that we had a -- we had a

22  Zuffa promotional dummy, but we also had time trends, which

23  could have captured greater contributions that Zuffa was making

24  over time.  We had year fixed effects.  We even, as we noted,

25  added a promotional variable to see if the knowledge of Zuffa's

1  promotion, how that -- how it grew over time could defeat or

2  undermine the relationship that we found between foreclosure

3  share and wage.  That didn't work.

4        And, finally, we went with Dr. Topel's suggestion of

5  basically throwing in the kitchen sink, all non-fighter event

6  revenues that -- event expenditures that Zuffa incurred.  We

7  used that as a potential control, and even when you include that

8  one.  And I should note, just -- when you look -- and I think

9  we're going to have a slide eventually of what Zuffa's

10 promotional levels are doing over time, and when you look at

11 their non-fighter expenditures, including promotional but

12 including everything else, including the jets, they're just not

13 rising.  They are rising, but they're not rising fast enough to

14 explain the explosion in event revenues.

15        THE COURT:  Right.

16        THE WITNESS:  Right.  So we kind of knew -- we kind of

17 knew going in that putting that in on the right-hand side likely

18 wasn't going to upset the results, and it didn't.

19        What Dr. Topel needs to identify and what he hasn't

20 done -- and this is what's so hard.  You have to find a variable

21 that's growing over time, right, that's capturing this

22 increasing contribution that Zuffa's making, but it also -- and

23 this is what makes it so hard.  You have to conceive of a

24 contribution that Zuffa makes that doesn't simultaneously

25 increase the revenue productivity of the fighters.  It's very

—2:15-cv-01045-RFB-PAL—

1   hard to conceive of that.

2        I want to be open-minded and allow it to happen, but

3   every time they make an investment to promote a fight, they are

4   indirectly boosting the productivity of the fighter itself.  And

5   so for them to come up with an explanation for why -- a

6   procompetitive story as to why wage share is falling, they have

7   to identify something that's making contributions.  It's

8   growing -- and it's growing at a faster rate over time than are

9   the contributions that the fighters are making to event

10  revenues.

11  BY MR. CRAMER:

12  Q.  And we're going to come back to that point, Dr. Singer.

13  Let's get some of the building blocks in here.

14  A.  Okay.

15  Q.  Before we do that, is there any analysis or evidence

16  relating to this central dispute between you and Dr. Topel that

17  varies by class member?

18  A.  Of the wage share?  Of the use of the wage share?

19  Q.  Yes.

20  A.  Oh, or --

21  Q.  No, no.

22  A.  Sorry.  Procompetitive versus anticompetitive?  I'm sorry.

23  No, there is nothing that's specific to any particular class

24  member.  It's all common.

25  Q.  Okay.  Did Zuffa's economists dispute your use of wage share

1 as the key lens of analysis in this case?

2 *A.*  That's probably an understatement.  Yes, they vehemently

3 opposed my use of the wage share.

4 *Q.*  Okay.  Is there something about the MMA industry that

5 suggests wage share and not wage level is the proper lens

6 through which the effect of the challenged conduct should be

7 assessed?

8 *A.*  Yes, and it's something we mentioned before.  It's that --

9 it's that in this industry, and in sports generally, but really,

10 it's really acute here, it's that the fighters are the product,

11 right.  And so we know that when the fighters marginal revenue

12 product goes up, when their productivity goes up, it's going to

13 be associated with an increase in event revenue.  There's going

14 to be some kind of a proportionality between their revenue

15 productivity and event revenues, given how important they are in

16 this industry.  Right.

17         We also know that, of course, as they're -- as their

18 marginal revenue product goes up, there's a strong economic

19 theoretical connection between what they should be paid, their

20 compensation, right.  If someone is more productive, economic

21 theory predicts, even by monopsonists, that the wage should go

22 up.  There's this tight interconnection between the fighters'

23 marginal revenue productivity, event revenues, and wage share,

24 right.

25         And we also know that revenues are exploding over the

───2:15-cv-01045-RFB-PAL───

1  study period, and the logical thing to do when faced with that

2  fact pattern, right, to control for all of these phenomena, is

3  to analyze the effect of the challenged conduct through the lens

4  of the wage share and not the wage level.

5  Q.  Dr. Singer, you used the term "marginal revenue product."

6  Can you please describe what that is.

7  A.  Sure.  As the name suggests, it's at the margin.  What is

8  the worker contributing in terms of revenue, right, with each --

9  with each incremental unit of effort that the worker employs.

10  Q.  All right.  We're going to have some examples of that.  But

11  before we do that, if you had just looked at wage levels in this

12  case and not wage share, as Dr. Topel says you should have, and

13  Dr. Oyer as well, and Dr. Blair, would you have missed some

14  important features of the MMA industry?

15  A.  Yes.  You would have missed the fact that event revenues are

16  exploding over the study period.  The event revenues in 2007, at

17  the time where I mentioned when wage share was at 26 percent,

18  was about $200 million; but by the end of the class period, it

19  had tripled.  It had gone over 600 million.

20        So to miss this phenomena, right, which is clearly

21  reflective of some increase in the productivity of the fighter,

22  who is the product, who is putting the butts in the chairs --

23  that's a technical economic term, right, you would -- you could

24  make an improper inference as to whether or not we're looking at

25  a competitive wage.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  Can you give us an example that might illustrate the

2  importance of using wage share as opposed to focusing solely on

3  wage level.

4  **A.**   Sure.  I'll use an example from the NBA, since that's

5  something that I care passionately about.  But we know that the

6  top level NBA players in the late 1980s were being paid around

7  $2 million a year, which sounds staggering today.  And we also

8  know that around that time that the industry or the league-wide

9  revenues were around a billion dollars.  Okay.  And it's no

10  surprise that, just like in MMA, and the NBA league revenues

11  have exploded.  It's up around 8 billion dollars a year now.  So

12  a 700 percent increase.  Right.

13       And so if you looked at what that top player was being

14  paid in the late '80s, let's say was being paid 2 million, and

15  you used an approach of Dr. Topel's, which suggested he thinks

16  that under competitive conditions a doubling of revenue is

17  associated with an 8 percent increase in wages, you would -- you

18  would come to a conclusion that the top athlete today in the

19  NBA, like LeBron James, should be paid $4 million a year.

20  Right.

21       But, clearly, that can't be a competitive wage when we

22  know that LeBron James is getting paid $35 million a year.  If

23  you paid LeBron James 4 million, the level of exploitation would

24  be massive.  And we can infer that if LeBron James is getting

25  paid $35 million a year, it must be the case that he's

1  contributing in excess of 35 million.  So paying him at

2  4 million would be -- would be grossly exploitative and

3  noncompetitive.  It would not a competitive wage.

4       And that's the problem with ignoring the explosion in

5  revenues that are going on in the background.

6  Q.  Dr. Singer, does economics have anything to say about

7  whether athletes or workers generally are receiving competitive

8  compensation?

9  A.  Yes.

10  Q.  And how -- what -- how does it frame that issue?

11  A.  The way that it frames it is by looking at the wedge between

12  what an athlete or a worker is getting paid, the wage, and the

13  marginal revenue product, what is being generated for the firm

14  at the margin.  Right.  The bigger that wedge is, the bigger the

15  exploitation and the bigger exercise of monopsony power.

16  Q.  If you observed a firm paying its workers significantly less

17  than the amount of revenues they're generating, their marginal

18  revenue product, what would that mean, as an economist?

19  A.  It would mean that the firm in question is exercising a

20  certain degree of monopsony power.

21  Q.  The last few statements you made about competitive wages,

22  MRP, monopsony power, is any of that controversial in the field

23  of economics?

24  A.  No.  This is the basic building blocks of labor economics.

25  Q.  Did you prepare some slides illustrating the concept of

—2:15-cv-01045-RFB-PAL—

1  marginal revenue product as used by economists?

2  *A.*  I did.

3  *Q.*  All right.  What is this slide depicting?

4  *A.*  This is from a book by Robert Smith titled Modern Labor

5  Economics.  If I could, I'd just read the passage because it's

6  good.  "If the presence of a tennis star increases attendance at

7  a tournament by 20,000 spectators, and the organizers net $25

8  from each additional fan, the marginal income produced by this

9  star is equal to her marginal product.  20,000 fans times the

10 marginal revenue of $25 per fan.  Thus, here the marginal

11 revenue product equals $500,000."

12 *Q.*  And what does that tell you?

13 *A.*  Well, in this example, the MRP of the athlete is 500,000.

14 So we now have a benchmark with which to compare her

15 compensation and make assessment as to whether or not her

16 employer is exercising monopsony power.

17 *Q.*  What does this next slide show?

18 *A.*  The next slide comes from a book by Rodney Fort titled

19 Sports Economics.  And he says, quote, In a competitive talent

20 market, we expect that players get paid pretty close to their

21 MRP.

22 *Q.*  And who's -- who's Rodney Fort?

23 *A.*  Rodney Fort was actually a UFC expert that was used in the

24 UFC's acquisition -- or Zuffa's acquisition of Strikeforce

25 before the Federal Trade Commission in 2010/2011.

2:15-cv-01045-RFB-PAL

1    *Q.*  What does this next slide show?

2    **A.**  The next slide comes from Roger Blair in a book titled

3    Sports Economics.  It says, quote, Whether athletes are

4    exploited in the sense that their MRP exceeds the wage that the

5    team pays them is an empirical question.  The evidence is that

6    athletes indeed have been exploited:  They have been paid less

7    than they were worth to the team, end quote.

8    *Q.*  And is this Roger Blair the same Roger Blair that we'll be

9    hearing from later in this proceeding?

10   **A.**  That's correct.

11   *Q.*  Okay.  And he is working for Zuffa in this case?

12   **A.**  Correct.

13   *Q.*  Okay.  How do you, in your analysis in this case, account

14   for fighter marginal revenue product in your work?

15   **A.**  Right.  So we don't get to directly observe what an

16   individual fighter's MRP is in this industry.  However, we do

17   get to observe the event revenues that are generated.

18            THE COURT:  Well, why not?

19            THE WITNESS:  Why don't we?

20            THE COURT:  Yes.

21            THE WITNESS:  The problem -- we get something close.

22   The problem is we don't get to see an individual fighter's --

23   perform by him or herself.  Right.

24            THE COURT:  So, in other words, because there's a

25   lineup, there's a ticket, basically.

———2:15-cv-01045-RFB-PAL———

1              THE WITNESS:  Exactly.

2              THE COURT:  So you have the top of the ticket and you

3    have other fighters.  You rarely have, as you -- even in major

4    boxing events, you're not going to have an event where there's

5    not going to be other fights at the same event.

6              THE WITNESS:  Right.

7              THE COURT:  Okay.

8              THE WITNESS:  But this experiment -- this experiment,

9    Your Honor, I mean, provides us a rich laboratory that isn't

10   available in many other industries, certainly, when you go

11   outside of sports in that.  What we have is we have different

12   combination of workers being put together over and over and over

13   again, and we get to see the events.

14             THE COURT:  Oh, I see.  Because you can control for the

15   individual fighters because you have them on different cards.

16             THE WITNESS:  That's right.  That's right.  And so what

17   I'm positing is that -- is that when we see a certain collection

18   together and there are events, it tells us something, it's not

19   equal to, but it tells us something about the collective

20   marginal revenue product of those fighters who are on display.

21             And the key assumption that I'm going to make is that

22   changes in the event revenues -- as you change that combination

23   of fighters, changes in event revenues are going to reflect

24   changes in the marginal revenue product of those fighters who

25   participated in that particular event.  I'm going to exploit

—2:15-cv-01045-RFB-PAL—

1  that -- that relationship.

2  BY MR. CRAMER:

3  Q.  So let's take an example.  Say Zuffa's event --

4          THE COURT:  I'm sorry, Mr. Cramer.

5          MR. CRAMER:  Oh, go ahead.

6          THE COURT:  So do you have a model that does that?

7          THE WITNESS:  Yes, that is my regression model.

8          THE COURT:  No, but in the regression model there's a

9  variable that accounts for the individualized marginal revenue

10  product for each of the -- based upon the fact they appear in

11  multiple events?

12          THE WITNESS:  We have -- yes, we have what are called

13  fighter fixed effects.  So whenever we're looking at a

14  particular event, we'll have a dummy, and if it's the Jon Fitch

15  variable -- if Jon Fitch's profile was presented in that fight,

16  the variable would turn onto one, and it will control every

17  time -- every time Jon Fitch shows up in the database in a

18  particular fight, right, that dummy will turn onto one.

19          THE COURT:  So in the context of that variable, you

20  created that variable, then, was able to predict, or not, what

21  the -- the fact that you weren't seeing the -- the increase in

22  the wage share as it relates to the marginal revenue product of

23  a particular fighter?

24          THE WITNESS:  What I'm trying to do is control for all

25  things that is knowable that could explain variation in both the

1  numerator by wage, or how much the fighter was paid, and the

2  denominator, how much event was generated.  Right.  And to make

3  that prediction, I want to condition on many things, but in

4  particular, who was on the card for that fight.

5       But at the end of the day, what I'm most interested in

6  is I want to control for everything possible that could be

7  moving the wage level and the event revenues, on the right-hand

8  side, and I want to focus my attention on foreclosure share.

9  That's -- at the end of the day, that is the anticompetitive

10  hypothesis to be tested.

11       Do we see all things equal as more and more fighters

12  get drawn into this long-term exclusive web and, therefore,

13  impair the ability of these rival promotions to compete

14  effectively, does that allow Zuffa to put downward pressure on

15  the wage share?  Right.  That's what I care about at the end of

16  the day.

17  BY MR. CRAMER:

18  *Q.*  And by including all of these variables, and very granular

19  variables, like turning on a variable when Jon Fitch fights,

20  you're able to -- are you able to isolate the effect of

21  foreclosure share on the compensation for each of the fighters?

22  *A.*  That's exactly what I'm doing.  Because I recognize that Jon

23  Fitch could be special.  And to the extent he's special, I want

24  to -- I want to accommodate that in the model.  I want to -- I

25  want to isolate and control for all possible things that could

1  be causing that left-hand side variable, the dependent variable,

2  the fighter's wage share.

3        Each observation -- an individual event generates

4  multiple observations in the database, right, because the

5  database is -- one observation is a fighter/event pair.  So in a

6  given event, I've got multiple observations.  Right.  And so,

7  yes, I want to control for that.  At the end of the day, what I

8  want to do is I want to isolate the effect of changes on

9  foreclosure share and changes on the fighter's wage share.

10 Q.  All right.  Let's go back to wage share more generally, just

11 briefly.  If an economist only focuses on -- in your earlier

12 example, on the 10 percent increase in wage level, without also

13 looking at the fact in your example that event revenues doubled

14 over that same period in the example, could the economists draw

15 an incorrect inference about the exercise of monopsony power by

16 the firm paying that worker?

17 A.  Absolutely.  That economist might mistakenly look back and

18 say, Oh, wage levels are going up in absolute terms.  That means

19 that there was no exercise of monopsony power here.  But that

20 would completely miss the forest.  Right.  What we want to know

21 is how are the fighters -- how are the athletes doing in

22 relation to the amount of revenues that are being generated over

23 time.

24 Q.  All right.  Do you have a slide with information suggesting

25 that Dr. Topel himself agrees that Zuffa's event revenues are

1   linked to the marginal revenue product of its fighters?

2   *A.*   I do, and this is key.

3           During his deposition, Dr. Topel was asked about this

4   critical linkage.  Because it is the building block in the wage

5   share approach.  And he says:  So -- the question is:  So when

6   Zuffa makes its fighters more effective revenue generators,

7   fighters are able to generate more revenues when they fight.  Is

8   that fair?

9           Yes.

10          Okay.  So if what Zuffa does is make its fighters more

11  effective revenue generators, then what you are saying is that

12  Zuffa, in this example, is causing the marginal revenue product

13  of its fighters to increase, correct?

14          Answer:  Yes.

15  *Q.*  So what does that tell you?

16  *A.*  What it's telling you is that we have another agreement

17  between the experts, which is good.  In this case, we both

18  recognize that an increase in the event revenue, even caused by

19  Zuffa, right, is reflective -- is reflective of an increase in

20  the marginal revenue product of the fighters who are showcased

21  in that particular event.

22          There's an agreement here between the experts, and it's

23  key because it's going to inform the right way that we should

24  model this phenomena.  Should we be looking -- studying the

25  effect of the conduct through the lens of the wage level or

2:15-cv-01045-RFB-PAL

 1   should we be studying it, instead, through the lens of the wage

 2   share?

 3           And what this is telling you is that -- is that

 4   increases in event revenues reflect, in part, increases in the

 5   marginal revenue product of the fighters on display.  And

 6   there's an agreement here between the experts on that.

 7   *Q.*  Let's continue this theme of agreement between you and

 8   Dr. Topel.  Does Dr. Topel also agree that changes in Zuffa's

 9   event revenues would lead to changes in the compensation of

10   Zuffa's fighters?

11   *A.*  He does.

12   *Q.*  And what does this excerpt from his deposition show?

13   *A.*  This is another really important exchange in his deposition.

14   He was asked:  Question:  The second-to-last sentence of

15   paragraph 200 at page 88 of your report says lower revenues

16   would likely lead to lower athlete compensation, right?

17           Answer:  Yes.

18           Why do you believe that?

19           Answer:  Because the revenues are part of the

20   willingness to pay for an athlete, and if -- look, if people

21   didn't want to come to fights, we couldn't pay the fighters.

22           That's pretty basic.  Right?

23   *Q.*  So what conclusions do you draw from that statement?

24   *A.*  The conclusion I draw here is that -- is that changes in

25   revenues also are predicted by economic theory and by record

1   evidence to affect the compensation of the employees.  Right.

2   Of the fighters.  And so this is key because now what we have is

3   this interconnected series of relations between the event

4   revenues going up on the one hand, being reflective of increases

5   of marginal revenue product, and also being connected, as a

6   matter of theory, to higher wages.

7            And it's this interconnectiveness that's going to

8   dictate a very particular way to analyze the problem, namely

9   through the wage share.

10  Q.  Is it your view --

11           THE COURT:  Hold on.  Excuse me, Mr. Cramer.

12           So -- but in your model to disaggregate the

13  contribution with respect to foreclosure share between Zuffa's

14  contribution and the marginal revenue product, that's why you

15  include the promoter variable and other effects, right?

16           THE WITNESS:  When you combine the data, yes, I do have

17  to control --

18           THE COURT:  Because you have to, at some point,

19  separate those things out.

20           THE WITNESS:  Correct.

21           THE COURT:  Otherwise, then the model can't disentangle

22  them, and that's a problem, correct?

23           THE WITNESS:  Correct.  Correct.

24           THE COURT:  So in other words, what you were talking

25  about earlier, you were saying that you agree with Dr. Topel

—2:15-cv-01045-RFB-PAL—

1  that in fact these things work together, but in controlling for

2  their relative contribution to the increase in revenue, one has

3  a much greater impact than the other.

4        THE WITNESS:  Correct.  Correct.

5        THE COURT:  Okay.

6  BY MR. CRAMER:

7  Q.  Is it your view, Dr. Singer, just so we're clear, that in a

8  competitive market, the fighters would get 100 percent of the

9  event revenues?

10 A.  That is not my view.

11 Q.  What wage share did your model find, approximately, that

12 fighters would receive in the but-for world absent the

13 challenged conduct?

14 A.  My model predicts that fighters would have received

15 something on the order of 50 percent wage share.  That is, half

16 of the event revenues would have -- would have gone to the

17 fighters.

18       THE COURT:  And also, not using -- because you use

19 another -- not model, but essentially formula, which is based

20 upon the preacquisition of, I think, Strikeforce and Bellator.

21 At some point you use percentages.

22       THE WITNESS:  I'm comforted by the fact that when I use

23 a benchmark approach -- so what we've been talking about so far,

24 Your Honor, is the regression approach.  The regression model

25 can simulate a world in which everything is identical, except

———2:15-cv-01045-RFB-PAL———

1    the foreclosure share goes down.  Right.

2              THE COURT:  Right.

3              THE WITNESS:  And that predicts something on the order

4    of 50 percent wage share.  I'm comforted by the fact that in the

5    same industry, the MMA industry, and what Dr. Topel said was a

6    reasonable benchmark, I'm comforted by the fact that my estimate

7    is bracketed by what Strikeforce paid its fighters and what

8    Bellator paid its fighters.  That gives me comfort that the

9    model is producing something useful.  It's also comforting, as

10   an aside, that this is where most professional athletes are paid

11   in terms of wage share.

12             THE COURT:  Within that range, actually.  I think it

13   was, like, 60-something percent --

14             THE WITNESS:  All signs are pointing, yes, are pointing

15   in the 50s, that's correct.

16             THE COURT:  Okay.  Well -- no, well, pointing to the

17   50s on the modelling, but in terms of what was paid by other MMA

18   promoters, it was actually higher --

19             THE WITNESS:  Well, there was one -- I'm sorry.  I

20   didn't mean to --

21             THE COURT:  But I'm saying there was some that were

22   above 50 and some that were below.

23             THE WITNESS:  Yeah, we had one that came in right below

24   50.

25             MR. CRAMER:  Bellator.

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  The Bellator.  And one then we had one

2   that came in in the 60s.

3          MR. CRAMER:  Strikeforce.

4          THE WITNESS:  Strikeforce, right.

5   BY MR. CRAMER:

6   Q.  All right.  So you identified what your model showed the

7   fighters would be paid absent the challenged conduct.  Can you

8   remind the Court approximately what the -- what wage share the

9   fighters have been paid with the challenged conduct in place

10  during the class period?

11  A.  During the class period we have a wage share between 19 and

12  20 percent.

13  Q.  All right.  So the differential's approximately

14  30 percentage points, that's what you found?

15  A.  Correct.

16  Q.  Okay.  Is wage share or labor share a common metric that

17  economists use to assess the competitiveness of worker pay?

18  A.  Yes.

19  Q.  Did you create a summary slide with some examples of

20  economists doing this?

21  A.  I did.

22  Q.  All right.  What does this show?

23  A.  So on this slide are two studies, Your Honor, and the first

24  comes from Simcha Barkai.  And what he is studying is in the

25  context of regression he's trying to see if concentration in the

—2:15-cv-01045-RFB-PAL—

1  industry under investigation is correlated in any way with how

2  much workers get to keep of the revenues that are thrown off,

3  what he calls the labor share, but what I'm calling the wage

4  share.  Those terms are interchangeable.  And what he finds --

5       THE COURT:  So when you talk about concentration, I

6  just want to be clear that I understand what it is you're

7  talking about in terms of concentration of what.

8       THE WITNESS:  Oh, how concentrated the industry is in

9  question.  So, for example, if it's monopolized, if there's two

10 firms, three firms, four firms.  Economists use this

11 construction call the HHI, Herfindahl-Hirschman Index, but there

12 are other ways to compute industry concentration, Your Honor.

13 You'll see things like what share of revenues are captured by

14 the top three firms in the industry, what share are captured by

15 top four firms.

16      HHI isn't the only standard, but it is a -- it is a one

17 way -- it's a nice summary statistic to find out how

18 concentrated an industry is.

19      And what Dr. Barkai found is that controlling for all

20 other aspects of an industry, knowledge that there's an increase

21 in the concentration is associated with a statistically

22 significant decrease in the wage share that are paid to the

23 workers in that industry.  Right.

24 BY MR. CRAMER:

25 Q.  What did Dr. Elsby find?

—2:15-cv-01045-RFB-PAL—

1  *A.*  Now, Dr. Elsby found something different, but the key here

2  is that he used the same lens.  That is, he's studying the

3  impact of different factors or forces on how well workers are

4  doing with the lens of the wage share.

5        So what he found was that when he controlled for all of

6  the things in his model, he found that offshoring, that is the

7  moving of jobs offshores to foreign countries, right, had a

8  statistically significant effect on pushing down the wage share

9  or the labor share in a given U.S. industry.

10 *Q.*  Is wage share, Dr. Singer, a common metric that sports

11 economists use to assess competitiveness of athlete pay?

12 *A.*  Yes.

13 *Q.*  Did you prepare a slide with some examples of economic

14 literature from -- of using wage share in the sports context?

15 *A.*  I did.

16 *Q.*  What does this show?

17 *A.*  Well, this first one is from Gerald Scully in an article

18 that was published in 2004.  And if I can just read it, it's,

19 quote, Is 50 percent or so as the player share the upper bound

20 in professional team sport?  One suspects that it is not.  If

21 all players were free agents, salary as a share of revenues

22 would rise substantially.

23 *Q.*  And what is this telling you?

24 *A.*  It's telling me a lot, but let's break it down.  What

25 it's -- first of all, it's using the lens of the wage share to

1   understand the effect of increases or decreases in free agency.

2   So if you give agency to the player, he or she has control

3   over -- over where they're going to work.

4        And what we're going to see in a series of study after

5   study is that changes in these restrictions -- now, these

6   studies are usually looking at the opposite direction, because

7   there's been a general lifting of restrictions.  Here, Your

8   Honor --

9        THE COURT:  You're saying there's been increase in free

10  agency effectively.

11       THE WITNESS:  Yes.  Right.  We've had an increase.

12  Here, Your Honor, the only twist is that we've had an increase

13  in the restrictions on labor mobility.  Zuffa has been inching

14  up the length of its long-term exclusive contracts over time.

15  We were at 12 months in 2003 and they pushed it into the 40

16  months now.  Okay.  And they've been -- and they've been

17  ensnaring more and more workers into their web.

18       But it's the shame general mechanism, the same

19  framework, is that we're trying to figure out how do changes in

20  restrictions on labor mobility affect worker compensation.

21  You'll see application after application after application that

22  economists in the sports industry use the wage share to get at

23  that.

24       And the only thing that I wanted to add if I could,

25  Eric, is that when he says if all players were free agents, now

1    of course not everyone is a free agent.  Rookies are not free

2    acts.  They have to wait a certainly amount of time before they

3    get to free agency.  Veterans enjoy free agency.  But what

4    economists have been able to do is exploit that change when

5    veterans were able to secure free agency and they observed what

6    happened to wage share.  And what he's saying is that if all

7    players were, right, if all players including rookies were free

8    agents, you would expect the wage share to go even higher than

9    50 percent.

10   BY MR. CRAMER:

11   *Q.*  Did you prepare another slide with Dr. Scully's work?

12   *A.*  I did.

13   *Q.*  And what does this show?

14   *A.*  So this is from the same study I believe, but he said:  Wage

15   share measures transitions from monopsonistic labor markets in

16   the past to veteran free agency now.

17          And then another quote, after free agency, Dr. Scully

18   found that wage share increased in Major League Baseball,

19   National Basketball Association, National Football League, and

20   the NHL.

21   *Q.*  What do you understand Dr. Scully to have meant by

22   monopsonistic labor markets in the past?

23   *A.*  Sure.  A monopsonistic labor market is the opposite of a

24   competitive labor market.  So it's one in which the employer is

25   able to create that wedge between what the worker is producing

1   on the one hand, the worker's marginal revenue product, and what

2   they get paid on the other hand.

3   Q.  Dr. Singer, was the transition from monopsonistic labor

4   markets in the past to veteran free agency now an inevitable

5   development in these four major sports?

6   A.  No, it wasn't.  To take Major League Baseball as one

7   example, the reserve clause was fought over, litigated, in labor

8   disputes for a period of 80 years until the famous Flood v. Kuhn

9   case.  Yes.  And so, no, it didn't -- it wasn't a gentle

10  transition.

11  Q.  And isn't this the 50 anniversary of the Flood v. Kuhn

12  victory?

13  A.  It was, it was.

14  Q.  In the UFC is there analogous mechanism in your view to the

15  reserve clause in baseball that affects fighters' ability to get

16  free agency?

17  A.  Yes, it's the long-term exclusive contracts that Zuffa

18  imposes on its fighters.

19  Q.  And we'll talk about those more in a bit.  Do you have

20  another slide with more examples of the use of wage share in

21  sports economic literature?

22  A.  Yes.

23          THE COURT:  I don't think we need to go through all of

24  them, Mr. Cramer.  You can move on from there.

25          MR. CRAMER:  Okay.  That's fine.

—2:15-cv-01045-RFB-PAL—

1   BY MR. CRAMER:

2   Q.  Why do you think it was useful for these economists to look

3   at wage share instead of or in addition to wage -- well, we'll

4   skip that.

5           Now, Dr. Topel says regarding your use of wage share,

6   he says it's different from this literature because he says this

7   literature analyzes the effect on the wage share of a, quote,

8   known change in monopsony power such as eliminating the reserve

9   clause in baseball.  That's quoting Dr. Topel.  Whereas, your

10  analysis, he says, is measuring the effect of the mere existence

11  of monopsony power.  Is that a fair critique that Dr. Topel

12  levels at you?

13  A.  No.

14  Q.  Why not?

15  A.  Because what I'm doing again is very analogous to what is

16  being done in each of these studies, which is in those cases in

17  these studies, the economist is looking at how a change in the

18  restriction on labor mobility -- it happens to be a relaxation

19  of those restrictions -- is affecting worker outcomes, athlete

20  outcomes, in the lens of the wage share.  I'm doing the same

21  thing, but the only -- the only difference -- I'm of course

22  looking at a change in restrictions, but my change is moving in

23  the wrong way for workers.  It's becoming more restrictive over

24  time.

25          But at the end of the day I'm looking at -- I'm looking

―2:15-cv-01045-RFB-PAL―

1  at a change in restrictions on labor market mobility -- on labor

2  mobility, on worker welfare through the lens of the wage share.

3  That is, changes in restrictions on changes in the wage share.

4  It's the same thing that's being done in countless studies.

5  Q.  All right.  So we're done with the studies, but I wanted to

6  ask you, Dr. Singer, did you find evidence in the record that

7  Zuffa itself or its current owner, WME, used wage share in its

8  internal analyses?

9  **A.**  Oh, yes.

10  Q.  Documents?

11       All right.  What is this -- we'll skip that.  What does

12  this show?

13  **A.**  So this, Your Honor, is a -- comes from an analysis that

14  WME, the eventual acquirer of Zuffa, prepared in studying the

15  prospect of buying Zuffa.  And you can see along the top -- I

16  want to highlight the motivation for the study.  They said

17  they've been asked by financing sources about fighter

18  compensation and how they plan to control fighter compensation.

19  And they say:  It's a critical cost that we have must actively

20  manage.  We believe our long-term 20 percent of revenue

21  assumption is reasonable.

22       And, Your Honor, if you look to the left side, I've

23  highlighted a section that says:  Historically fighters have

24  earned 16 to 19 percent of revenues.  And you see that -- if you

25  flash over to the bottom right, you can see what they're -- what

1   they're charting.  You see the 16, a 18, a 16, a 19.  And what's

2   really interesting is that they then make a projection from '16

3   forward because this document is created in '16.  So they have

4   no idea what the wage share is going to be.  But they're going

5   to project it at 20.  And they are confident that so long as

6   they can contain these costs at 20, they'll be able to squeeze

7   out the kind of profits that they're -- that they're hoping for

8   and that they're telling their prospective investors.

9   *Q.*  Did you find that not just WME, but also Zuffa used wage

10  share in internal documents?

11  **A.**  I did.

12  *Q.*  What does this show?

13  **A.**  So Zuffa itself uses the wage share when it thinks about

14  managing its business in the way -- in day-to-day operations.

15  Zuffa isn't thinking in terms of let's keep the wage level, some

16  number, at some fixed level.  They're thinking instead of how do

17  we manage this business with an eye towards keeping the wage

18  share at a manageable level.

19          So here Zuffa is performing an analysis in which

20  they're computing fighter compensation as a percentages of UFC

21  event revenues.  And you see, Your Honor, this is where I get

22  the 26 percent.  This is an internal estimate.  If you start at

23  2017, Your Honor, and you look up, you'll see the 25.85.  That's

24  the 26 percentish estimate for wage share.  And then you see

25  it's falling thereafter, falling, falling down, to 19 percent.

1   The long-term trend is downward by 2013.

2   *Q.*  Did Zuffa create a chart showing wage shares for

3   Pay-Per-View event revenues only?

4   *A.*  Yes.

5   *Q.*  And what does this show?

6   *A.*  So these are -- this is a subset of the data.  This is now

7   looking at how much is Zuffa paying its fighters for the

8   Pay-Per-View events, and you'll see a very similar pattern.  The

9   only difference that I wanted to point out is that by the -- by

10  the end of the period, when you get to the 17s, the 15s, and the

11  17s, and the 16s, you're actually at a lower -- you're actually

12  a lower share, wage share, than for all Zuffa events.  And this

13  isn't surprising.  It basically is telling us that the degree of

14  exploitation is higher for Pay-Per-View events than for

15  non-Pay-Per-View events.

16  *Q.*  Did you prepare a slide reminding the court of Dr. Topel's

17  opinion about the utility of using wage share as a measure of

18  compensation in this case?

19  *A.*  I did.

20  *Q.*  And what does he say?

21  *A.*  So Dr. Topel said in his first report, this is TR1, quote,

22  Worker's pay as a percentage of the employer's revenue is not a

23  measure of anything useful or informative, end quote.

24  *Q.*  Do you agree with that?

25  *A.*  No.

-2:15-cv-01045-RFB-PAL-

1    *Q.* Did Dr. Topel in his first report cite any of the documents

2    or studies that we just reviewed in reaching his conclusion that

3    wage share is not a measure of anything useful or informative?

4              THE COURT: Why don't we move on from --

5              THE WITNESS: No.

6              THE COURT: Because what I don't -- Mr. Cramer, I just

7    want to be careful about -- I don't want to spend most of

8    Dr. Singer's time on him summarizing Dr. Topel's testimony. If

9    you want to point out things that you think are an important

10   distinction, that's helpful. I'd rather have him discuss his

11   own modelling.

12             MR. CRAMER: Okay.

13             THE COURT: So I can understand that, so I can

14   understand that, rather than have him discuss his view of

15   Dr. Topel's modelling only to the extent there may be contrasts.

16   But I'd like to be able to get to his discussion about

17   foreclosure share and wage share and explaining just to make

18   sure that I understand how he arrived at the formulations for

19   those particular aspects of the model.

20   BY MR. CRAMER:

21   *Q.* All right. We're going to move to a new section just with

22   some background and then we're going to build up to the model.

23             THE COURT: What background? Because we have had a lot

24   of background.

25             MR. CRAMER: I'm going to ask him whether he thinks the

—2:15-cv-01045-RFB-PAL—

1  industry is nascent because Your Honor raised that issue and so

2  I wanted to --

3         THE COURT:  Why don't we get to the modelling.  We can

4  circle back to it being nascent or not.  I mean, I would rather,

5  again, get to the modeling because that's what we're here really

6  to discuss.  And to the extent that's relevant, we can come back

7  to that, but right now I'd rather get to that part of it.

8         MR. CRAMER:  Fair enough, Your Honor.

9         Let me ask you this, Your Honor.  There's some

10  background about how the industry works and that I think help

11  explain why the contracts are foreclosing of competition that I

12  think would be useful.

13         THE COURT:  Well, because I read that.

14         MR. CRAMER:  Okay.

15         THE COURT:  I mean, the report goes through all of the

16  clauses and why that -- why they have that sort of exclusive

17  effect and gives a chart about the length of the exclusivity

18  period.

19         I don't know that there's much dispute about that.  I

20  mean, they disagree about to the extent to which there's

21  exclusivity, but they don't really disagree about that.  They

22  disagree about foreclosure share and wage share.  So let's focus

23  on those aspects of the modelling because that's where I think

24  the rub is in the context of the disagreement between the

25  parties.

1          MR. CRAMER:  Fair enough.

2          THE COURT:  Unless I'm missing something, Mr. Isaacson.

3  Mr. Isaacson, you're not going to be disputing that those

4  particular clauses exist in the contracts.  And you may dispute

5  the impact of them as relates to the sort of overall sort of

6  procompetitive or anticompetitive effect, but you're not

7  disputing the clauses themselves and their existence in the

8  fighters contracts, right?

9          MR. ISAACSON:  The fighters contracts are the fighters

10  contracts, yes.

11          THE COURT:  Exactly.  Thank you.  So let's move on from

12  there.

13          MR. CRAMER:  Let me just say, Your Honor, just to be

14  clear, there is a big dispute about not what is in the fighters

15  contractors, but what effect they have in the marketplace, how

16  they foreclose petition, and some of that depends upon some of

17  this background information.

18          THE COURT:  Well, to the extent that Dr. Singer needs

19  to explain that in the context of a foreclosure share, that's

20  fine.

21          MR. CRAMER:  Okay.

22          THE COURT:  But you can assume that I understand that

23  there are multiple ways at least as alleged by the plaintiffs

24  that the contracts have an exclusive effect and an

25  anticompetitive effect, and that they lock fighters into these

―2:15-cv-01045-RFB-PAL―

1  contracts for periods that may extend their actual average

2  career.  So we can skip past that whole section, there are

3  several pages of the reports that talk about that, to, again,

4  the issues about sort of wage share, foreclosure share, and that

5  aspect of the modelling because that's the most from my

6  perspective hotly contested aspect to that.  Because that's

7  where Dr. Singer is trying to capture what in fact the

8  anticompetitive effect or antitrust injury is as it relates to

9  wages.

10         MR. CRAMER:  Let me just say that Zuffa does dispute --

11  they dispute that they're monopsonist and monopolist.  They

12  dispute that they're dominant contrary to all of the documents

13  that some of them we were going to take Your Honor through.

14  They dispute that the contracts were effectively perpetual.

15  They dispute -- they dispute -- they basically say that the

16  industry's very competitive when the evidence is that it isn't.

17  And so --

18         THE COURT:  Well, let me say this.  As it relates to

19  what I have to decide for certification, the thrust of their

20  arguments that I find to be one that I have to decide relates to

21  arguments about the modelling and the foreclosure share and the

22  wage share, right, as regarding the modelling.  I can draw my

23  own conclusions as to what the potential impact is or not of the

24  clauses themselves.  Certainly I can look at the percentage as

25  it relates to the relevant market share for the markets.  They

1  can make an argument about that.  I don't know that that's

2  honestly their best or most persuasive argument.

3          I think their argument really is as relates to the

4  extent to which Dr. Singer's modelling can capture and separate

5  out sort of the antitrust injury and its commonality as it

6  relates to the effect on the bout class.  That's where I see

7  this -- all of this to be focussed.  So I would like to focus us

8  on that.

9          MR. CRAMER:  There's -- I agree with that and we're

10  going to do that because that's -- Your Honor's the -- is the

11  sole audience for this.  And we want to be helpful.  There's

12  just one point I want to make before we get there.  It will take

13  a few minute -- five minutes.

14          THE COURT:  Okay.

15          MR. CRAMER:  Okay.

16  BY MR. CRAMER:

17  *Q.*  Did you see any evidence in the record as to what Zuffa's

18  economic motivation was for the challenged conduct, the

19  acquisitions, the exclusive contracts, and the coercion?

20  *A.*  I did.

21  *Q.*  And what was that?  And I'll take you to this slide here.

22  And please explain what's in the slide.

23  *A.*  Right.  So this is a text from Lorenzo Fertitta to Dana

24  White, and it's in 20 -- 2014.  And it relates to this issue of

25  foreclosure.  What is foreclosure?  We can talk about

—2:15-cv-01045-RFB-PAL—

1  foreclosure in like a high level economic sense, but what does

2  it mean here?  And what he said was, quote, We gotta keep taking

3  these f***ers oxygen until they tap out.  We have sacrificed too

4  much to let anyone get traction now.

5          And Mr. Fertitta was asked in his deposition to explain

6  what he meant.  And the question was:  And who are the f***ers

7  oxygen that you needed to keep taking, as you're referencing to

8  in that text?

9          Answer:  I believe it was referring to Bellator.

10  Q.  So what does that tell you as an economist about what Zuffa

11  was thinking in implementing the scheme plaintiffs are

12  challenging in this case?

13          THE COURT:  Mr. Cramer, I don't need this.

14          MR. CRAMER:  Okay.

15          THE COURT:  The statements, the e-mails, from Zuffa and

16  the UFC officials are very clear about what they were attempting

17  to do.  The question is whether or not that creates an antitrust

18  case or class.  So I don't think they're disputing that

19  Mr. Fertitta or Mr. White said what they said.  They said what

20  they said.  They're very clear about trying to dominate the

21  market.  That doesn't necessarily mean that what they did

22  actually creates a class.

23          So, I mean --

24          MR. CRAMER:  Yep.

25          THE COURT:  -- they said what they said.  But that

———2:15-cv-01045-RFB-PAL———

1    doesn't necessarily have a legal impact unless it's borne out by

2    other evidence in the record, which is what I'm going to look

3    at.  That's part of the record certainly, but I'm not going to

4    spend my time going through all of the different statements that

5    the various individuals made because I think there's also

6    additional information again that Dr. Singer and Dr. Topel can

7    elaborate regarding the questions before me.

8         MR. CRAMER:  Understood.  The only reason why we -- I

9    just focussed on this one, Your Honor, is because it

10   fundamentally explains what's going on here, which is that Zuffa

11   understood that the oxygen other promoters needed to compete was

12   fighters.  And what it needed to do was lock them up --

13        THE COURT:  I don't think there's any dispute about the

14   fact that they were trying to acquire --

15        MR. CRAMER:  Okay.

16        THE COURT:  -- as many fighters as possible as a way to

17   improve their -- their profitability and their market share.

18   Again, I don't think that they're disputing that they were

19   trying to increase their market share or the control of the

20   number of fighters.  I don't think that that's disputed at all.

21   I mean, the question is to what extent that creates a legal

22   case, right, before me.  So let's move on from there.

23        MR. CRAMER:  All right.  Let's talk about market power.

24   BY MR. CRAMER:

25   Q.  What does an economist mean by market power?

—2:15-cv-01045-RFB-PAL—

1   *A.*   So it depends if we're talking about a product market or an

2   input market, but for an output market or product market, market

3   power is monopoly power.   That is the ability to raise prices

4   over competitive levels.

5         If we're talking about input market, we're talking

6   about monopsony power.   That is, the power to push wages below

7   competitive levels, that is, below the MRPs.

8   BY MR. CRAMER:

9   *Q.*   And what does an economist mean by anticompetitive effects?

10  *A.*   Anticompetitive effects are the result of certain conduct

11  when practiced by a firm with market power that represent a

12  degradation of the competitive process.   If we're talking about

13  output markets, it typically manifests itself in the form of

14  higher prices or reduced output.   If we're talking about input

15  market, we're talking about suppressed wages or suppressed

16  employment.

17         THE COURT:   That doesn't affect profitability.

18         THE WITNESS:   Correct.

19  BY MR. CRAMER:

20  *Q.*   Which is the most relevant to class members in this case,

21  monopoly power or monopsony power?

22  *A.*   Monopsony power.

23  *Q.*   And why is that?

24  *A.*   Well, the workers are the ones who received the wages.   And

25  so they would be most concerned about whether or not they're

1   being paid a competitive wages.

2   Q.  And if UFC had monopsony power, what would that mean for UFC

3   fighters?  What would we see in the data?

4   A.  Well, what we would see is a wage level that wasn't

5   competitive; one in which the UFC was exercising monopsony

6   power, driving that wedge between the fighter's MRP and the

7   wage.

8   Q.  What methods can an economist in an antitrust case use to

9   determine that a firm has monopsony power?

10  A.  There are two methods by which an economist can establish

11  monopsony power.  There are direct methods and there are

12  indirect methods.  The direct methods are those -- are those

13  methods that speak directly to the firm's ability to push wages

14  down below competitive levels without incurring a loss.  Right.

15       And the indirect methods here would be defining a

16  relevant input market and demonstrating that the defendant had a

17  significant share of that input market, plus entry barriers.

18  The combination of those two would allow one to infer that the

19  defendant possesses the power to suppress wage wages.

20  Q.  How did you use the direct method here to show that Zuffa

21  had monopsony power?

22       THE COURT:  Hold on.  You don't need to go through

23  this.  He does it because he goes through and talks about the

24  market share and the different markets in his report, correct?

25       MR. CRAMER:  Correct, but --

—2:15-cv-01045-RFB-PAL—

1           THE COURT:  And partly, Dr. Singer, I want to get to --

2    I've read all of that.

3           THE WITNESS:  Right.

4           THE COURT:  Dr. Singer, I've read that part.  I've read

5    about how this actually created sort of indirect and direct

6    evidence and your views about that.  I really want to get to

7    aspects of explaining, again, your modelling based upon that.

8    So I want to move us to that part because that's the part that

9    will be most helpful to me.

10          THE WITNESS:  May I -- may I suggest something?

11          THE COURT:  Sure.

12          THE WITNESS:  That to measure the foreclosure share,

13   the foreclosure share has to be occurring within some relevant

14   input market.

15          THE COURT:  Right.

16          THE WITNESS:  And I think that the problem is that if

17   we jump to the foreclosure share without explaining how I got to

18   the relevant input market, we can, but it might -- it might not

19   set up the foreclosure share discussion.

20          THE COURT:  Oh, no.  I think it's okay to go through

21   what the definitions of the relevant input and output markets

22   are.  I mean, I think you do that in your report.  I think

23   that's okay, but I don't think we need to repeat sort of the

24   ranges of the market share over time with respect to relevant

25   input and output markets or the submarkets because I think I'd

1    rather focus on -- again, focusing -- going right into some of

2    the modelling.  But if you want to provide that level of

3    background you have just described, that's fine.

4              THE WITNESS:  Okay.

5    BY MR. CRAMER:

6    Q.  All right.  Well, let's talk about one of the main relevant

7    markets you used, the ranked market.  Can you define and

8    describe that for the Court, please?

9    A.  Right.  So the ranked market includes all fighters and their

10   associated promoters, so long as the fighter had a rank between

11   1 and 650 according to this FightMatrix database.  So what I'm

12   doing here, Your Honor, is I'm casting the net as wide as I

13   possibly can.  I believe that a hypothetical monopsonist would

14   only need to control the Zuffa platform in order to exercise

15   monopsony power.  I know that from the results of my regression.

16             But what I want to do to be as conservative as possible

17   is I want to bring in everyone that is conceivably within

18   this -- within this relevant market.  And the way that I'm going

19   to draw the contours of this market is I'm going to allow the

20   ranking of the fighter and his or her associated promoter to

21   define those contours.

22             So FightMatrix is the database that has a ranking of

23   every fighter in every weight class between 1 and 650 at all

24   points in time.  I'm going to impose one restriction that the

25   promotion had to have put on an event in North America because

—2:15-cv-01045-RFB-PAL—

1  that conforms with my geographic market definition.

2         But this net is cast as wide as possible to include

3  all -- all suppliers who are the fighters and the purchasers,

4  the promotions, in this ranked relevant input market.  And to

5  give you an idea of just how big it is, in a given year this net

6  draws in between 200 and 300 promotions.  This is well beyond

7  what any hypothetical monopsonist would need to control in order

8  to exercise market power, push down wage here.

9         What this is saying, what is this is positing, Your

10 Honor, is that a hypothetical monopsonist would need to control

11 all of these promotions, hundreds of promotions, and thousands

12 of their associated fighters in order to exercise monopsony

13 power.  That clearly is not the case, but I want to be -- I want

14 to be as conservative as possible when I draw the net.  And I

15 wanted to give you an idea about how big the net is at the end

16 of this exercise.

17        THE COURT:  Okay.  And this is the FightMatrix ranking?

18        THE WITNESS:  Correct.

19        THE COURT:  All right.

20 BY MR. CRAMER:

21 *Q.*  It's the ranked market.  And did you also define a

22 submarket?

23 *A.*  I did.  I defined a headliner submarket.  And the idea here,

24 Your Honor, is that if a hypothetical monopsonist only

25 controlled those fighters rank 1 through 15, that would be

—2:15-cv-01045-RFB-PAL—

1    sufficient in my mind in order to exercise monopsony power.  In

2    other words, the fighters who are within 1 through 15 are not

3    going to look -- if one -- if a hypothetical promotion had all

4    of them, those fighters would not be interested in substituting

5    to some inferior promotion --

6              THE COURT:  Right.

7              THE WITNESS:  -- that had, you know, fighters 300 to

8    355.

9              THE COURT:  Right.

10             THE WITNESS:  And, again, I'm going to impose the North

11   America event screen.  And for this submarket, just to give you

12   an idea about its magnitude, in 2010 there were 34 promoters.

13   By 2016 the set had with dwindled to six.  That was in part

14   because of the challenged conduct.  There just weren't as many

15   unique promotions that had -- featured a fighter who was a

16   headliner by the end of the class period.  They were either

17   acquired or went out of business, or Zuffa just took the

18   fighters from them.

19             Also associated with those 34 promotions there were

20   roughly 160 fighters.  The reason why you get again from 15 to

21   160 is that we do it by weight class.

22             MR. CRAMER:  All right.  Your Honor, I'd like to ask

23   Dr. Singer about how he measures market share because the

24   weighting of that measurement is contested by Dr. Topel.

25   Dr. Singer uses revenue weighting for both market share and

—2:15-cv-01045-RFB-PAL—

1   foreclosure share and also inverse ranked weighting.  And so I

2   think that's an important part of what's the debate about.

3            THE COURT:  Okay.

4            MR. CRAMER:  Okay.

5   BY MR. CRAMER:

6   *Q.*  All right.  In computing market share for the ranked input

7   market, the broader market first, did you weight all MMA

8   promoters equally?

9   **A.**  For the ranked market I did not.

10  *Q.*  So what did you do there?  What measures did you use to

11  weight the promoters?

12  **A.**  Well, I did it a few ways.  But the first way was to rank --

13  was to weight the value of the pool by the revenues of that

14  associated promoter.  And so, Your Honor, what I'm trying to do

15  is I have -- I have all of these different promotions and their

16  associated pool of fighters.  And I want to try to figure out

17  how important is -- is promoter's A pool relative to promoter's

18  B pool.  Right.  And I recognize that because we've cast the net

19  so wide, we've got fighters ranked 1 through 650 by weight

20  class, that not all fighters are equally valuable, right.

21            If I've locked up the highly ranked fighters, that

22  would be more -- a sign of more dominance than if I were to lock

23  up, you know, the lower ranked fighters.  And so the question is

24  how do I -- how do I -- given how big this net has been cast,

25  how do I weight the different -- the different pools of fighters

———2:15-cv-01045-RFB-PAL———

1   that are within a promotion?

2           And on my first approach, right, if what we're trying

3   to get at is the revenue-generation capability of a fighter

4   pool, I thought the most natural way would be the average

5   revenue per event of the associated promoter.  So that was the

6   first passthrough.

7   BY MR. CRAMER:

8   Q.  And what was your alternative weighting measure?

9   A.  My alternative weighting is to say, Okay, let's instead

10  weight each fighter within a given promoter's pool by the

11  ranking or in particular the inverse ranking.  So what that

12  would mean is that if I control the pool of fighters that are

13  really, really highly ranked, my pool would look bigger in terms

14  of my market share in this market.  And if you had a pool with

15  lowly ranked fighters or vice versa, you might have the better.

16          THE COURT:  Right.

17  BY MR. CRAMER:

18  Q.  In terms of the revenue weighting, is there anything unusual

19  as a matter of economics in computing a firm's share of a

20  relevant market using that kind of weighting?

21  A.  No.  In fact, the merger guidelines suggest that revenue

22  weighting is the default option.  To give you an idea, if we

23  were to try to figure out Apple's share of the cellular handset

24  market, one approach could do you treat every unit sold equally.

25  Right.  But what that would ignore is the fact that Apple can

————2:15-cv-01045-RFB-PAL————

 1  command $1,000 per phone right now.

 2          THE COURT:  Right.

 3          THE WITNESS:  And so if we use revenues instead, it's

 4  going to capture an important aspect of Apple's pricing power.

 5  Right.  At the end of the day this is an indirect approach to

 6  get at Zuffa's buying power.  And so if we're trying to get at

 7  Apple's --

 8          THE COURT:  It's also based upon the ability of it to

 9  control the value of the fighters' services.

10          THE WITNESS:  Correct, correct.

11          THE COURT:  So, in other words, you're just saying --

12  basically by weighting you're saying that not all fighters

13  services are created equal even in the context of the ranking.

14          THE WITNESS:  Correct.

15  BY MR. CRAMER:

16  Q.  All right.  Let's talk about foreclosure.

17          MR. CRAMER:  Before we jump into the numbers, I think

18  it's important for the Court to understand and for Dr. Singer,

19  if the Court will allow, Dr. Singer to explain why top level

20  fighters are important to a promotion.

21          THE COURT:  Well, I think he's already done that.  And

22  I think that was done by the report that was earlier identified.

23  He did it, but also the report references the other report.  I

24  think it was McGowan and Mahan, or I don't know how you

25  pronounce their names, that do a separate analysis.  So I'm

———2:15-cv-01045-RFB-PAL———

1  convinced of that, and that's also why he has the headliner

2  submarket.  So we don't need to have him explain that again.

3          MR. CRAMER:  Okay.  And another point we were going to

4  explain that we apparently don't need to, and that's great, we

5  can move on, is that it's not just one or two top level

6  fighters; but what's necessary, according to the record and the

7  economics, is the critical mass, right.  One person can't just

8  fight the other person every day.

9          THE COURT:  Well, no, it's a critical mass of both the

10  submarket and the overall market.

11          MR. CRAMER:  Yes.

12          THE COURT:  And that's why you have the submarket of

13  headliners in control of that because, right, you can't have,

14  you know, number one fighters fighting number 30 fighters all

15  the time.  If you don't have other fighters who are within that

16  same top 10, you know, then you might not have the same control

17  of the headliners submarket, which I believe was your point.

18          MR. CRAMER:  That is correct.

19          THE WITNESS:  That's better said.

20          THE COURT:  No, I wouldn't say that, but I have read

21  this material.

22  BY MR. CRAMER:

23  Q.  Okay.  That's -- all right.  Let's talk about foreclosure

24  share.

25          Do economists have a standard way of quantifying the

1  extent of market foreclosure in an exclusionary conduct case

2  like this?

3  *A.*  They do.

4  *Q.*  And what do they do?

5  *A.*  Well, they begin by defining a relevant market which I've

6  done as this input market.  And the next step is to figure out

7  what their market share is.  This is the building block, right.

8  And then figure out of those -- of those customers, or in this

9  case workers, who are locked into these long-term exclusive

10  contracts, which one of them are foreclosed in the sense that

11  their contracts contain or, I should say, potentially foreclose

12  in the sense that their contract contain terms that economists

13  associate with exclusive or exclusionary conduct.

14  *Q.*  How did you apply that methods here, if you did?

15  *A.*  Yes.  So what I did was remember the way my analysis began

16  back in 2014 was we had --

17        THE COURT:  So before you do that, let me just make

18  sure I understand because I want to make sure I'm understanding

19  when you talk about the context of the foreclosure share, first,

20  that's not a concept you created yourself.

21        THE WITNESS:  No, it's a very common concept in

22  economics.

23        THE COURT:  Second, in the context of foreclosure,

24  you're really talking about the inability of a particular

25  fighter to actually access the outside market.  And what I mean

1   by that is to be able to go beyond their particular promoter to

2   another promoter.  That they essentially don't have the ability

3   legally based upon the contract to move outside.  Because I want

4   to make sure I understand what it means that they are

5   foreclosed.

6          THE WITNESS:  There's a second meaning.  That meaning

7   is very important.  That meaning is very important, but there's

8   another perspective, which is from that of a rival or would be

9   rival promoter, right.  If a rival promoter can't get access to

10  this critical must-have input, then that rival promoter is going

11  to be impaired in its ability to compete in both the input

12  market and on the output market.

13         THE COURT:  Right, that creates barriers --

14         THE WITNESS:  That's a foreclosure --

15         (Court reporter interruption.)

16         THE WITNESS:  I'm sorry.

17         THE COURT:  So the first -- so are you saying, one, it

18  creates barriers to entry; it also creates the inability to

19  compete --

20         THE WITNESS:  Correct.

21         THE COURT:  -- generally if you're already in the

22  market?

23         THE WITNESS:  Correct.  And that is the notion of

24  foreclosure.  I'm foreclosing my rivals from getting access to a

25  must-have input.

—2:15-cv-01045-RFB-PAL—

1        THE COURT:  So my question about that is the

2  foreclosure share also meant to capture the inability to enter

3  the market.

4        THE WITNESS:  Yes, there's record evidence that

5  suggests that Zuffa and its investors understood that the

6  exclusionary contracts were serving as the key entry barrier for

7  rival MMA promotions.

8        THE COURT:  Okay.  Thank you.

9  BY MR. CRAMER:

10  Q.  And that evidence obviously is in Dr. Singer's report and --

11  and Deutsche Bank studies and bankers of Zuffa and internal

12  analysis where Zuffa saw that one of the key reasons why it was

13  valuable was because it had all of the top fighters locked up.

14        THE COURT:  Right.  So it acquired fighters and

15  required them to sign their contracts and closed down the staff

16  or whatever from that acquired entity.

17        MR. CRAMER:  And the reason why we showed you that

18  Bellator oxygen quote was because Zuffa recognized that the

19  fighters are the oxygen.  If we can keep oxygen from our

20  potential rivals, they're not going to be able to compete.

21        THE COURT:  Right, but the question is -- certainly

22  that's the intent.  The question is, Mr. Cramer, whether or not

23  they did it.  Right.  So what this case isn't about -- there's

24  no dispute, unless Mr. Isaacson tells me otherwise -- I don't

25  know that he really could given all of the quotes -- that they

—2:15-cv-01045-RFB-PAL—

1  weren't trying to do that.  The question is did they actually at

2  least sufficiently -- have you sufficiently alleged that they

3  did do it.

4          MR. CRAMER:  Yes.

5          THE COURT:  Right.  So that's why I'm saying the quotes

6  don't necessarily to me matter.  What matters is did they

7  actually affect when they potentially at least arguably were

8  intending to affect by that type of exclusion.  Mr. Isaacson.

9          MR. ISAACSON:  We agree that that's the relevant

10 question for this hearing.  Those quotes, as we proceed, are the

11 types of things that competitors say about one another.

12         THE COURT:  Right.

13         MR. ISAACSON:  And we don't think show intent.  I don't

14 think you're deciding that today.

15         THE COURT:  No, I'm not because as far as I am

16 concerned they don't really have any legal impact.  The legal

17 impact from my standpoint or the decision today is what actually

18 can be demonstrated by the modelling.  Did in fact -- whether

19 they intended or not to do that, did in fact or is there

20 sufficient evidence to allow the case to proceed in terms of

21 certification as it relates to the ability to foreclose in terms

22 of the wages, so ...

23         MR. CRAMER:  Fair enough, Your Honor.  I would just say

24 that some of the quotes from Zuffa's bankers, its investors, and

25 its owners are not just a statement of intent.  They are a

1    statement of this is what we've done and we've succeeded.  The

2    reason why we were able to sell -- be sold for $4 billion is

3    because we locked up the vast majority of top fighters, kept

4    them away from our competitors, potential competitors, who

5    couldn't compete with us, and made them all into the minor

6    leagues.  So these are not merely statements of intent.  This --

7              THE COURT:  I understand that.

8              MR. CRAMER:  They're statements of we succeeded, and

9    they did succeed fabulously.

10             THE COURT:  Again, that's not -- again, Mr. Cramer, I'm

11   not necessarily focussed on that because that's not really what

12   I have to decide right now as relates to this motion.  So --

13             MR. CRAMER:  Yes.

14             THE COURT:  -- let's move on from there.

15             MR. CRAMER:  Let's talk about your foreclosure share

16   calculation which I think is getting right to His Honor's issue

17   did Zuffa actually lock up the vast majority of fighters and

18   what effect did that have.

19   BY MR. CRAMER:

20   *Q.*  And so in computing foreclosure share, is that similar to

21   market share?

22   *A.*  It's very similar.  In fact, the market share -- my market

23   share measure is the building block of foreclosure share.

24   Here's how they relate.  If you assume, which is not the case,

25   that 100 percent of -- at all points in time that 100 percent of

1   all of Zuffa's fighters were locked into long-term exclusionary

2   contracts, then the foreclosure share is just equal to the

3   market share.  Right.  There's no adjustment necessary.

4         But what I need to get a foreclosure -- it's a subset.

5   It's typically a subset of the market share.  I need to go and

6   look at every fighter whom I've assigned to Zuffa to get their

7   market share.  And I need to pull out the ones -- whose

8   contracts do not contain these potentially exclusionary terms.

9   Right.

10        THE COURT:  Right.

11        THE WITNESS:  And the result is I get a foreclosure

12  share, which moves around of course over time with the market

13  share, but it's typically less than the market share because

14  it's typically the case, at least at the beginning of the class

15  period, that not all fighters fighting for Zuffa were subjected

16  to the offensive or the allegedly offensive or potentially

17  exclusive contracts.

18        What happened, Your Honor, over -- over the period of

19  study is that Zuffa ratcheted up the length of the contract so

20  that more and more fighters who were fighting for Zuffa had

21  their terms extending beyond this 30-month threshold that I use.

22        THE COURT:  Right.  And at the same time I think you

23  also argue that the average career length for the fighters was

24  decreasing or there was a period in which it was longer

25  potentially than the exclusivity period, but actually that

1   contracted over time as well.  Is that right?

2            THE WITNESS:  Well, the point that I'm making in slide,

3   Your Honor --

4            MR. CRAMER:  And that's right up on the screen.  Why

5   don't you describe it.  I think it would help.

6            THE WITNESS:  Sure, sure.  So these are my estimates of

7   the relevant career durations.

8            THE COURT:  Right.

9            THE WITNESS:  Right.  And what I want to do is come up

10  with a number that is associated with my relevant input markets.

11  And it's going to depend on which set of fighters I'm looking

12  at.  Right.  If I'm looking at the ranked market, I want to know

13  for everyone who shows up in my ranked market database at some

14  point in time, if I chart their careers up until the point that

15  they leave, I want to take a measure of how long they were

16  within the ranked market.  This is important and something that

17  distinguishes what I did with Dr. Topel is that I don't want to

18  count any time of that fighter when he was in the,

19  quote/unquote, minor leagues, when he was outside of the ranked

20  market.  And I don't want to count any time of course after he's

21  left the ranked market via retirement or injury.  I just want to

22  get a measure of the time he or she was in the ranked market.

23  And then I want to take an average across everybody in my

24  database, and that's what that first row captures.

25            That the -- and I'd like to focus -- we did the median

1   and the mean, but I would like to focus on the mean.  That 2.55

2   years is associated with about 30 months.  So on average across

3   all fighters in the ranked market the average career duration is

4   30 months.  And the reason why that's economically important is

5   that as Zuffa was --

6           THE COURT:  When you say "career duration," I want to

7   make sure I'm understanding this, is that -- that's the period

8   in which they were physically fit to fight and did at least

9   potentially have some fights.  I know there's a whole separate

10  argument about controlling the number of fights that fighters

11  had and suppressing their ability to actually fight as often as

12  they would like to be able to fight.

13          But when you talk about career, you're not simply just

14  talking about because I think you make a distinction in your

15  report about the extent to which a contract would potentially

16  extend beyond, say, someone's ability to fight, but covered

17  additional periods after they had retired and could no longer

18  fight.

19          THE WITNESS:  Right.

20          THE COURT:  Okay.

21          THE WITNESS:  That's true.  Yes.

22  BY MR. CRAMER:

23  *Q.*  Zuffa says that in measuring foreclosure share you simply

24  assumed all of Zuffa's fighters were foreclosed.  Is that true?

25  *A.*  It's not true, as I've just explained, that if I assume

1  that, then my market share measure would be equal to my

2  foreclosure share measure at all points in time.  And that's

3  clearly not the case.  It's always the subsets, at least towards

4  the beginning of the class period it is.

5  Q.  But what about those contracts that you did count as

6  contributing to foreclosure share?  Didn't you assume those were

7  exclusionary or anticompetitive?

8  A.  I didn't assume they were exclusionary.  I assumed they were

9  potentially exclusionary.  Right.  What I'm setting up is an

10  empirical test.  I'm identifying those contracts that have terms

11  that economists and antitrust scholars have recognized as being

12  potentially exclusionary.  And I want to see, if I come up with

13  a measure of the foreclosure share of the percentage of fighters

14  that Zuffa has subjected to these potentially exclusionary

15  terms, is that predictive in any way of changes in a fighter's

16  wage share --

17  Q.  And what are those -- you have a slide, Dr. Singer, of the

18  items you've looked at in determining whether a contract was

19  potentially exclusionary.  Are they up on the screen?

20  A.  They are.  So these are the three elements that the code

21  required -- statistical code that required in order to count a

22  contract as being potentially exclusionary at a given point in

23  time.  Right.  Number one is was it exclusive.  Number two is

24  did it include a champion's clause.  So the champion's clause is

25  that the contract would automatically renew upon the fighter

1  becoming the champion.  And number three is that the contract

2  length had to exceed 30 months.

3          If it had all of those three elements, I considered

4  that fighter to be potentially -- I consider the contract to be

5  potentially exclusionary, and I would count that fighter in the

6  numerator of my foreclosure share.  And just one thing that I

7  think is important, contract length.  There are three components

8  that are adding up to the total contract length.  It's just

9  important because sometimes the term gets confused with

10  counter ...

11          Term is just one of them.  Right.  So the term of the

12  contact again started off around 12 months in 2003 and we see

13  that thing get pulled up to I think 22 months by the end of the

14  of the class period.  Right.  The other -- the other components

15  that go into the contract length are the exclusive negotiation

16  period.  So there's a 90 day or three-month period in which,

17  even after the contract expires, Zuffa has exclusive rights to

18  that fighter over 90 days.  Right.

19          But it doesn't end there.  After a fighter waits out

20  that 90 days, when the fighter 's decided they want out, then

21  there's a right-to-match provision that lasts another year,

22  another 12 months on top of that.

23          So it's the -- it's the combination of those three

24  things that I sum up:  the term -- the term, the exclusive

25  negotiation period, and the right-to-match period that dictates

—2:15-cv-01045-RFB-PAL—

1  the length of the contract.  If you want out, how long you'd

2  have to wait before you get out.

3           THE COURT:  Right.

4  BY MR. CRAMER:

5  *Q.*  And let me just understand a little bit about that

6  right-to-match period.  If a fighter wants out and Zuffa doesn't

7  want to let that fighter out, what happens during that

8  right-to-match period?

9  *A.*  If --

10          THE COURT:  Well, I've read the contract, Mr. Cramer.

11          MR. CRAMER:  Okay.

12          THE COURT:  We don't need to go through that.

13  BY MR. CRAMER:

14  *Q.*  Okay.  Let's see -- did you prepare a slide with what the

15  foreclosure shares were, as you've just described, over time?

16  *A.*  I did.

17  *Q.*  All right.  And let's look at that.  What is this depicting?

18  *A.*  So the -- this slide is depicting how Zuffa's foreclosure

19  share changes over time.  And I do the foreclosure share

20  multiple ways.  The first way is for the ranked input market,

21  and in this case the pools of all promoters -- fighters, the

22  fighter pools, are weighted by the revenues.  And this shows

23  that the foreclosure share is around 30 percent --

24          THE COURT:  Okay.  So, Dr. Singer --

25          THE WITNESS:  Yes.

―2:15-cv-01045-RFB-PAL―

1          THE COURT:  -- can you -- I just want to make sure I

2    understand.  Tell me exactly what the foreclosure share is.

3          THE WITNESS:  Yeah.  What it is it's a measure of how

4    much of the market, of the input market, has been sewn up or

5    sewn off by Zuffa via primarily the exclusive contracts, how

6    much the market has been taken away from rival promoters.

7          THE COURT:  So the foreclosure share would be what

8    percentage of the market not only that they control, but that

9    they exclusively control.

10         THE WITNESS:  Exactly, exactly.  Because it's -- if

11   it's not exclusive, it's not counseled in the new --

12         THE COURT:  Okay.  And you gave the definition of what

13   that meant in terms of the sort of exclusivity and foreclosure

14   based upon those three sort of what were umbrella factors that

15   identified when someone would be placed into the foreclosure

16   share category.  Now, this was by fighter or does this include

17   also the weight for the fighter's services?

18         THE WITNESS:  Well, both, but it -- I think the easiest

19   way to think about it is is in stages.  First, we just want to

20   figure out who is the numerator.  Right.  The numerator would be

21   Zuffa fighters who are fighting pursuant to a contract that is

22   potentially exclusionary.

23         THE COURT:  Right.  I got that.

24         THE WITNESS:  And so we want to pull out those fighters

25   who are fighting pursuant to a contract that doesn't contain all

—2:15-cv-01045-RFB-PAL—

1 three of those terms.

2         THE COURT:  Got it.

3         THE WITNESS:  Then once we have the resulting pool of

4 fighters who are, we're going to apply the revenue weights.

5         THE COURT:  Okay.  So I just want to make sure.  So the

6 foreclosure share includes not just in terms of sort of the

7 market share, but includes -- the foreclosure share also

8 includes the revenue weights with respect to your valuation of

9 the respective value of the fighter's services.

10         THE WITNESS:  For one cut, yes, but what's critical is

11 that the revenue weights are not necessary to show high

12 foreclosure.  Right.  We're going to do this over and over again

13 for different weightings, different market shares --

14         THE COURT:  So hold on.  I'm sorry.  So when you say

15 for one cut, what you're saying is that you ran different

16 analyses with respect to foreclosure share.  Some that included

17 the revenue weights and some that were just included the

18 numerator based upon the number of fighters?

19         THE WITNESS:  Yeah, in the headliner submarket, Your

20 Honor, there is -- we do one specification with no weighting.

21         THE COURT:  But I'm saying, taking out the headliner

22 submarket, is there -- and I just want to make sure I'm

23 distinguishing in terms of my own the models that include the

24 larger input market that also is -- where there's analysis both

25 with the revenue weights and without the weights?

———2:15-cv-01045-RFB-PAL———

1        THE WITNESS:  When we go the largest one, right,

2   because we have the headliner, the tracked, which is the

3   little --

4        THE COURT:  Yes.

5        THE WITNESS:  And then the ranked.  When we go to the

6   largest one, 1 through 650, it is my opinion that you have to

7   apply some weight.  That is, it wouldn't make any sense to treat

8   a promotion --

9        THE COURT:  Right.

10       THE WITNESS:  -- fighters, you know, 620 through 630,

11   the same as some.  When you cast the net that wide, you have to

12   weight.  And I give it two different ways.  I do a weighting

13   with revenues, based on revenues.  And I do a weighting based on

14   the inverse of the fighter's rank.  And no matter how I do it

15   for the ranked market you're going to see numbers that are

16   vastly in excess of what --

17       THE COURT:  I'm sorry.  For the ranked market or for

18   the --

19       THE WITNESS:  For the ranked.  For the ranked market I

20   can also do ranked weighting.  Let me explain that because it's

21   -- if I could, because it's a little complicated.  Right.

22       In the ranked market we're going to include everybody

23   with a rank 1 through 650 and they had to have fought within the

24   18-month window that we're looking at.  Right.

25       And then the question is how do I weight them.  Right.

---2:15-cv-01045-RFB-PAL---

1   Because the pools could be different depending on where these

2   fighters are.  Under the revenue weighting approach I take the

3   average revenue per event that is generated by that promotion in

4   question.  If I -- alternatively, I can rank each fighter in

5   Zuffa's pool based on where that fighter is ranked and I'll do

6   it for all promotions.  Right.  And so it's -- it does sound

7   complicated.  It is a ranked market and I'm using ranked

8   weighting.

9          What I'm trying to show Your Honor at the end of the

10  day is that the revenue weighting is the best way to do it in my

11  opinion, but it's certainly not necessary.  Certainly to get the

12  regression results it's not necessary to show foreclosure that's

13  in excess of what economists and antitrust scholars consider to

14  create presumption of anticompetitive facts.

15         THE COURT:  Okay.  Thank you.

16  BY MR. CRAMER:

17  Q.  Dr. Topel says or Zuffa says at some point that instead of

18  using revenue weighting you should have used weighting by the

19  compensation of the fighters.  Are they right about that?

20  A.  Well, no, they are not right, for a few reasons.  Number

21  one, the whole theory of this case is about Zuffa's ability to

22  suppress compensation.  So it would be perverse to use a metric

23  compensation that would fall whenever Zuffa exercises monopsony

24  powers.  That was the first reason that --

25         THE COURT:  In other words, you want to have a variable

-2:15-cv-01045-RFB-PAL-

1  that would be independent of what are the alleged

2  anticompetitive conduct they're engaged in.

3          THE WITNESS:  Right.  We wouldn't want to reward Zuffa

4  for suppressing compensation and then have it look at if its

5  market share was actually lower.  That would be -- that would be

6  weird.

7          THE COURT:  Right.

8          THE WITNESS:  And, secondly, this is kind of an

9  academic matter is that we only had detailed compensation data,

10  again, for Zuffa and Strikeforce.  So just as a practical matter

11  the idea that we'd go out and do this for every promotion just

12  wasn't feasible in light of what I had.

13  BY MR. CRAMER:

14  *Q.*  As a matter of economics would it make -- aside from the

15  first point you made, would it make such difference to weight by

16  compensation versus weight by revenue?

17  *A.*  I don't think so.  And the reason is is that compensation of

18  course, as Dr. Topel has pointed out, is directly linked with

19  revenue.  And so the idea -- if we use compensation, I wouldn't

20  expect it to move the needle all that much.

21  *Q.*  Right.  So there seems to be an agreement here that there

22  should be some form of weighting.  Zuffa says compensation.  We

23  say revenue.  And is it your view that either one would show a

24  high foreclosure share?

25  *A.*  It is my view, but it's also my view is that neither one of

1  those two measures raise any kind of individualized issues.

2  It's either compensation for everybody in the class or it's

3  revenue for everyone in the class.

4  Q.  Dr. Singer, I'd like to ask you one question about this

5  slide.  There appears to be a large jump in or about 2010 to

6  2011 foreclosure share.  Foreclosure share appears to go from 30

7  percent to about 70 percent.  Zuffa controls about 70 percent of

8  the input market by 2011.  What accounts for that in your

9  economic opinion?

10  A.  The Strikeforce acquisition.

11  Q.  And why does it appear to happen before 2011 in your chart?

12  A.  Here's what happens.  I mentioned the 18-month window, Your

13  Honor.  And so at any point in time we're trying to determine

14  who's in the relevant market.  And so suppose we're looking at a

15  given point in time.  My model is going to look for all fighters

16  who fought in the previous nine months and all fighters who

17  fought in the subsequent nine months.  And if so, then I'm going

18  the consider those fighters, so long as they had a rank 1

19  through 650, right, they participated in an event that was in

20  North America, those fighters will be in the market.  And so the

21  reason why --

22          THE COURT:  The lag effect.

23          THE WITNESS:  There's a lag effect.  So this thing is a

24  leading indicator.  It's showing you what happening as the

25  Strikeforce acquisition kind of works it way through the

—2:15-cv-01045-RFB-PAL—

1  pipeline.

2         THE COURT:  They still had Strikeforce contracts at

3  least initially, too.  And then there's -- I thought that they

4  were then brought in under the Zuffa after the --

5         THE WITNESS:  When they made the acquisition, my

6  understanding is they were converted immediately to Zuffa --

7         THE COURT:  No, I meant within the look-back period.

8         THE WITNESS:  Well, but it's the looking-forward period

9  that's creating -- that's creating this upward trajectory before

10 the Strikeforce merger is consummated or acquisition is

11 consummated.  And we're just trying to explain why you see the

12 uptick a few months before the actual consummation in March.

13        THE COURT:  Oh, because it's looking forward and back.

14        THE WITNESS:  It's looking forward and backward.

15        MR. CRAMER:  And that uptake, just to be clear --

16        (Court reporter interruption.)

17        THE COURT:  Oh, yes.  I'm sorry.  We have been going

18 for a little while.  Why don't we take a 10, 15-minute break.

19 What we'll do is we'll come back -- actually, I mean, we're

20 actually close to the lunch hour.  We could just take a lunch

21 break at this point in time.

22        Why don't we just take a lunch break.  We'll come back

23 in an hour, and then we will finish up here.  Okay.

24        Anything else we need to do before we do that?

25        MR. CRAMER:  Thank you, Your Honor.

2:15-cv-01045-RFB-PAL

1          THE COURT:  All right.  Thanks.  We'll be in recess.

2 Thank you.

3          (Recess taken at 12:48 p.m.)

4          (Resumed at 1:58 p.m.)

5          THE COURT:  Please be seated.

6          Okay.  We're back on the record here.

7          Dr. Singer, you recognize you're still under oath?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  Mr. Cramer.

10          MR. CRAMER:  All right.  Thank you, Your Honor.  Good

11 afternoon.

12 BY MR. CRAMER:

13 *Q.*  So we were talking about slide 57 and Zuffa's foreclosure

14 share.  Dr. Singer, can you just summarize what this slide is

15 showing, just so we can get situated.

16 **A.**  The slide is showing how Zuffa's foreclosure share changed

17 over time, given a very particular market definition and

18 weighting metric.  So this is the ranked market definition using

19 revenue weights.  And what it basically shows is that at the

20 beginning of the class period, Zuffa's foreclosure share by this

21 measure is around 30 percent, and it shot up to around 70 at

22 the -- at the Strikeforce acquisition.  And it continued to

23 climb up until almost 90 percent and then fell back down into

24 the 80s and then back up into the direction of 90.

25 *Q.*  Did you also prepare a slide that included your foreclosure

─────2:15-cv-01045-RFB-PAL─────

1  share for the headliner submarket?

2  *A.*  I did.

3  *Q.*  What does this show?

4  *A.*  So this shows the same information, but this time for a

5  different input market, the headliner market.  And I'm, again,

6  using revenue weights.  It follows the same trajectory.  It's

7  lower.  It's -- it's around -- well, around 30 percent.  Let's

8  see.  Sorry.  Headliner is above.  I apologize for that.  The

9  headliner is the purple one that's right on top.  I'm sorry for

10 that.

11          THE COURT:  That's all right.

12          THE WITNESS:  So this one starts higher.  At the

13 beginning of the class period, it starts around 80 percent.  It

14 jumps up to 90, and then even approaches 100 percent.  And the

15 reason why the headliner is higher is because Zuffa has a more

16 dominant share among the headlining fighters.

17 BY MR. CRAMER:

18 *Q.*  Did you also prepare a slide that had the headliner

19 submarket without revenue weighting?

20 *A.*  I did.

21 *Q.*  What does this show?

22 *A.*  So now we've drawn on top of this graph a dashed purple

23 line, and as the -- as it notes at the bottom, Headliner

24 Unweighted.  You see it tends to follow a similar trajectory.

25 It's lower here.  And it's lower relative to the revenue

—2:15-cv-01045-RFB-PAL—

 1  weighted headliner.  But the important takeaway is that even

 2  without weighting, when we do the headliner submarket, Zuffa's

 3  foreclosure share can be shown to be at significantly high

 4  levels.

 5  *Q.*  So in summary --

 6           THE COURT:  So in the context of the literature, I

 7  understand that foreclosure share, in terms of being interpreted

 8  as being anticompetitive, to be somewhat at the 20 to 30 percent

 9  range.  Is that what you understand to be the standard?

10           THE WITNESS:  My understanding is that --

11           THE COURT:  I'm not talking about the legal cases.  I'm

12  talking about sort of the economic literature.

13           THE WITNESS:  The economic literature, and antitrust

14  scholarship generally, looks at a foreclosure share of around

15  30 percent, creating a presumption of anticompetitive effects.

16  But I don't mean to suggest that my proof of impact ends here.

17  This is just consistent with what the takeaways are from the

18  literature.  I'm going to go one step farther and, of course,

19  show that foreclosure share explains variation in wage share.

20  That's how --

21           THE COURT:  Why would --

22           THE WITNESS:  Sorry.

23           THE COURT:  Okay.  Why would there be such a difference

24  in the foreclosure share if it's unweighted versus if it's

25  weighted?  Would that be explained by having a few, but

1  significant number of fighters who were not under contract to

2  Zuffa but who are not essentially fighting?  I mean, because it

3  seems to me that there's such a huge difference between the

4  headliner unweighted and revenue weighted that, right, unless

5  I'm ...

6          THE WITNESS:  So you're comparing the two -- just to

7  make sure I understand --

8          THE COURT:  Yes.

9          THE WITNESS:  -- you're comparing the two headliners,

10  headliner and headliner --

11          THE COURT:  Yes.

12          THE WITNESS:  -- and revenue weighted and one is

13  unweighted.

14          THE COURT:  Yes.  And if you look at even sort of that

15  little -- sort of the two sort of periods there that are going

16  up, and around 2011 -- I'm not talking about 2007, but around

17  the 2011, that little column that goes up, there, obviously, are

18  substantial differences in the foreclosure share between the

19  headliner unweighted and the headliner revenue weighted.

20          THE WITNESS:  There are.  They're both well in excess

21  of 30 percent.  But, yes, I grant that there are differences.

22  And the differences are being driven, of course, by the revenue

23  weights.  That when you take away the revenue weights, the

24  headliner foreclosure share is falling, but is smaller.  But the

25  key, still, is that it's sufficiently high to create this

─2:15-cv-01045-RFB-PAL─

 1  presumption.  It's something that could happen.

 2          THE COURT:  So unweighted, it's essentially driven by

 3  the number of fighters?

 4          THE WITNESS:  The raw number, Your Honor, yes.

 5  Exactly.  It's just very simple.  The numerator is Zuffa

 6  fighters fighting pursuant to these potentially exclusionary

 7  contracts, and the denominator would be all fighters in the

 8  headliner market, but no weighting whatsoever.  Every fighter is

 9  treated the same.

10          MR. CRAMER:  May I ask a clarifying question,

11  Your Honor?

12          THE COURT:  Sure, just a moment.

13          But you also do see, then, a precipitous increase even

14  in the unweighted headliner --

15          THE WITNESS:  Oh, yes.

16          THE COURT:  -- foreclosure share.  And is that in part

17  because of the Strikeforce acquisition and the number of

18  headliners that are in that acquisition?

19          THE WITNESS:  Yes.  Even Strikeforce -- Zuffa dominated

20  the headliner submarket prior to the Strikeforce acquisition.

21  But even within certain weight classes you'd see something,

22  like, there was a document I'm remembering saying 8 of 10, 7 of

23  10, 9 of 10.

24          THE COURT:  Right.

25          THE WITNESS:  And then post, it went up to 10 of 10, 9

2:15-cv-01045-RFB-PAL

1   of 9, 10 of 10.  So there was a -- there were headliners inside

2   of the Strikeforce portfolio at the time of the acquisition that

3   were brought over to Zuffa that even cemented Zuffa's complete

4   and utter dominance.

5          THE COURT:  Right.  And even if another competitor had

6   some control over headliners, as far as I understand it, there

7   was no cross-promoter fights.  So you couldn't necessarily

8   leverage your lower number because you only have a smaller

9   number of fighters who can fight with each other in a particular

10  weight class, right?

11         THE WITNESS:  That's correct.  The hypothetical

12  suggests there were other headliners.  For the most part, there

13  weren't.  For the most part, Zuffa, post Strikeforce, took them

14  all.  I could take you weight class by weight class for, like,

15  top 10, and it's almost 9 for 10, 10 for 10, 9 for 10, 10 for

16  10.

17         But even assuming counterfactually that there were some

18  highly ranked fighters out there, you're absolutely right that

19  Zuffa's unwillingness to engage in cross-promotion made life

20  even more difficult for the rival promotions because they

21  weren't able to offer up attractive fighting opportunities for

22  their -- for their pool of fighters.

23         THE COURT:  So even if Zuffa had a lower unweighted

24  foreclosure share, because of the lack of cross-promotions, it

25  still would be able to dominate respective markets because it

—2:15-cv-01045-RFB-PAL—

1    would limit the ability of the other promoters to be able to put

2    on fights with other headliners who were equally matched in the

3    same weight class?

4              THE WITNESS:  I think I'm following, but just make sure

5    we -- you're asking me about a world without copromotion,

6    without --

7              THE COURT:  No, no, no.

8              THE WITNESS:  With copromotion.

9              THE COURT:  No, no.  I'm asking you for -- what I

10   understand is there was -- essentially wasn't copromotion in the

11   industry; that Zuffa and its competitors didn't essentially have

12   these cross-promoted fights, right?

13             THE WITNESS:  Zuffa was unwilling to engage in

14   copromotion.  Zuffa would not permit one of its own fighters to

15   go to a rival promotion.  In contrast, smaller promotions at

16   what are called Zuffa out-clauses, in which case they would

17   allow --

18             THE COURT:  Right.

19             THE WITNESS:  -- their fighters to fight.

20             THE COURT:  Those were people who were, essentially,

21   not going to be headliners -- headliners in the submarket,

22   right, because they're essentially fighting to get into the

23   below rankings of the headliner --

24             THE WITNESS:  Correct.

25             THE COURT:  -- submarket, correct?

2:15-cv-01045-RFB-PAL

1          THE WITNESS:  Zuffa had locked up the headliner market

2    post Strikeforce.

3          THE COURT:  So what I'm asking you is that in the

4    context of the unweighted headliner foreclosure share, even if

5    the percentage is lower, the impact of that percentage is still

6    substantial because of the fact there's no cross-promotions in

7    the fights.

8          THE WITNESS:  That's a very good point.  Yes, as a

9    matter of theory it would be substantial, but we're not going to

10   end the proof there.

11         THE COURT:  No, no, I understand that.

12         THE WITNESS:  We're going to go and we're going to test

13   it.  But you're right.  The instincts are right.  There could

14   be -- there could be -- there's a large potential for

15   anticompetitive facts.

16         THE COURT:  All right.  Thank you.

17         Go ahead, Mr. Cramer.

18   BY MR. CRAMER:

19   Q.  My clarifying question was:  To compare the unweighted

20   headliner to the weighted headliner, let me ask you a question.

21   Does the unweighted headliner, who will weight the person -- the

22   fighter ranked first in a weight class, the same as a fighter

23   ranked 15th in a weight class?

24   A.  Correct.

25   Q.  And a revenue weighted would probably rank those differently

———2:15-cv-01045-RFB-PAL———

1  because the higher the rank, the more revenues they're

2  generating?

3  *A.*  Correct.  And the more likely they're with Zuffa, that's

4  correct.  That's correct.

5  *Q.*  So this difference between the revenue weighted and the

6  unrevenue weighted may be generated by the fact that when you

7  revenue weight, you're accounting for the fact that higher

8  ranked fighters are generating more revenues?

9  *A.*  Correct.  That's correct.

10 *Q.*  And what's the purpose of that?  Why would you want to

11 account for that?

12        THE COURT:  Mr. Cramer, I actually understood it the

13 first time you did it.  You don't need to go through that.

14        MR. CRAMER:  Excellent.

15 BY MR. CRAMER:

16 *Q.*  All right.  At the risk of showing you something Dr. Topel

17 did, I just want to put this up for one minute.

18        Did Dr. Topel do his own analysis of foreclosure share,

19 Dr. Singer?

20 *A.*  Yes.

21 *Q.*  What is this?

22        THE COURT:  So, Mr. Cramer, are you going to call

23 Dr. Singer on rebuttal after Dr. Topel?

24        MR. CRAMER:  I do plan on doing that.

25        THE COURT:  So let's wait until we do that.

2:15-cv-01045-RFB-PAL

1          MR. CRAMER:  Okay.  Okay.

2          THE COURT:  For this part.

3          MR. CRAMER:  Yeah.  I just thought it was important to

4   show Dr. Topel also --

5          THE COURT:  I suspect you're going to ask him about it.

6          MR. CRAMER:  You might be right.

7          THE COURT:  And I suspect that Mr. Isaacson's going to

8   actually lead him through it, too.  So why don't we go ahead and

9   just move onto -- again, because what I want in this portion of

10  Dr. Singer's testimony to make sure he has had sufficient time

11  to just provide foundational information to make sure that I'm

12  clearly understanding all of the different aspects of the

13  foreclosure share formulation and how it was used, and other

14  information that was used in conjunction with the foreclosure

15  share percentages to establish the conclusions that he reached

16  with respect to anticompetitive impact of Zuffa's policies.

17          So that's what I'd like to focus on.

18          MR. CRAMER:  Thank you, Your Honor.  That's what we

19  will do.  One question, though.

20  BY MR. CRAMER:

21  *Q.*  Does the foreclosure share that you measure or the

22  foreclosure share that Dr. Topel measures vary from class member

23  to class member?

24  *A.*  Oh, no.  Foreclosure's a market-wide phenomena.  It's the

25  same for a class members.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  All right.  Let's talk about your impact regression in this

2  case.  Your Honor's happy to finally hear these words, I'm sure.

3          What's the main variable you're trying to explain, the

4  dependent variable in that regression?

5  *A.*  The dependent variable in the regression is the individual

6  fighter's wage share.  So what the fighter got paid divided by

7  the event revenues that were generated in that event that was

8  showcasing the fighter.

9  *Q.*  And what is the main independent variable here that you're

10 trying to use to potentially explain the changes in wage share?

11 *A.*  That would be the foreclosure share.

12 *Q.*  Okay.  Do you have a slide illustrating the formula of your

13 impact regression?

14 *A.*  I do.

15 *Q.*  All right.  So I got to find it.  Here it is.  All right.

16          Can you explain what this slide is depicting.

17 *A.*  All right.  So econometricians use the phrase left-hand side

18 variables and right-hand side variables.  To explain what we're

19 trying to predict goes on the left-hand side, and the right-hand

20 side variables, as the name suggests, that sit on the right-hand

21 side, are the things we're going to use to try to assist us in

22 making the prediction.

23          So I've been talking about wage share as being the key,

24 left-hand side variable, and I define how I -- how I -- I define

25 how I get the variable for each observation, divide the wage

1  level by the event revenue.  That's on the left-hand side.  And

2  I've been talking a lot about the foreclosure share today and

3  that being the key right-hand side independent variable.

4        What I haven't had a chance yet to talk about, and I'd

5  like to quickly, is just everything that went in on the

6  right-hand side that serves as a control variable.  So the

7  databases that I was able to obtain, including one called

8  FightMetric, not to be confused with matrix, tells me everything

9  that happened about that fighter's history going up into the

10  fight and also what happened during the fight itself.

11        It turns out that those -- those very granular data,

12  number of punches thrown, number of punches landed, takedown,

13  submissions, those sorts of things turn out to be predictive of

14  what the fighter got paid, and also predictive of the wage share

15  generally.

16        I'm also including things like the fighter's -- oh,

17  sorry.

18        THE COURT:  I just want to make sure.  So the wage

19  share that you have here, the wage level includes the various

20  amounts of the compensation.  So there was the different sort of

21  amounts a person gets for show, and other amounts that they

22  would get paid, but then there was also this sort of

23  discretionary amounts about -- that have to deal with top fight

24  or great takedown, things like that.

25        I assume all of that is captured in the wage level that

————2:15-cv-01045-RFB-PAL————

1    you use in the formula.

2          THE WITNESS:  Absolutely, including other categories,

3    whether the fighter got a piece of the Pay-Per-View action and

4    how big of a share he or she got.

5          THE COURT:  So you -- the wage share incorporates all

6    of that, and then you might use the controls to try to just

7    aggregate it.

8          THE WITNESS:  Try to explain variations.  We're trying

9    to predict it as well as we can.

10          THE COURT:  Right.

11          THE WITNESS:  And just finally, just to very quickly,

12    in addition to all the things that happened in the fight, we

13    know what the fighter's rank was, the weight class the fighter

14    was in.  We know something about the venue, the gender, whether

15    or not the fighter -- we control for Pay-Per-View, whether the

16    fighter participated in the Pay-Per-View pool.

17          And then these things called fighter fixed effects,

18    which is that we know that there might be something special

19    about the given fighter's identity.  We want to control for that

20    and make sure the regression knows that he's seeing the same

21    time fighter -- the regression model is seeing the same fighter

22    in the same five or six or ten different events.

23    BY MR. CRAMER:

24    Q.  And how do these control variables control for a variation

25    in your model?

—2:15-cv-01045-RFB-PAL—

1  **A.**  Well, they control for it because --

2         THE COURT:  You don't you don't need to --

3         MR. CRAMER:  Okay.

4         THE COURT:  -- go into that.  I mean, it's regression

5  analysis.  They can -- it's either statistically significant and

6  they show an effect or they don't, I assume.  Is that correct?

7         THE WITNESS:  That's very good.

8         THE COURT:  Okay.

9         MR. CRAMER:  Excellent.

10 BY MR. CRAMER:

11 *Q.*  Has Dr. Topel suggested that you left out important control

12 variables from this model?

13 **A.**  He does to a degree.  He does suggest later on in his

14 reports that there's a -- there's a key variable that I omitted

15 relating to what Zuffa is bringing to the table.  That's the

16 promotional variable, and then eventually the all non-fighter

17 event variable.

18         But the main -- I would say the main bone of contention

19 is not -- at least initially, was whether or not I had set up

20 the equation correctly to begin with.  That is, whether I had

21 used the wage share, whether that was the appropriate lens of

22 analysis.

23 *Q.*  And we're going to get to -- again, just to cover again the

24 promotion and all non-fighter event costs in a minute.  But

25 let's talk about the point you just made.

1              Dr. Topel specifies a regression model that attempts to

2    measure the effect of increasing foreclosure share, but instead

3    of using wage share as the variable of interest, he uses wage

4    level.  Do you agree with that?

5              THE COURT:  Wage level.

6              MR. CRAMER:  Wage level, right.

7              THE COURT:  And increases in wage level -- I mean, the

8    part of it is trying to account for that in the context of

9    increase -- right.

10             So go ahead, Dr. Singer.

11             THE WITNESS:  Let me just say back what I think you're

12   asking.  The major difference in modelling is that Dr. Topel

13   wants to study the effect of the conduct through the lens of the

14   wage level.

15             THE COURT:  The absolute level.

16             THE WITNESS:  The absolute level.  Right.

17             And in contrast, I want to study the effect of the

18   contrast through the lens of the wage share.  And I think I have

19   a slide that will show you that.

20             THE COURT:  That's all right.  I understand the

21   difference.

22   BY MR. CRAMER:

23   *Q.*  Does Dr. Topel ignore event revenues entirely?

24   *A.*  Initially he did.  But eventually he brought the event

25   revenues over to the right-hand side of the equation, and did

1   control for them, or at least he tried to.

2   Q.  Explain the difference between your regression formula and

3   Dr. Topel's regression formula as shown on the slides.

4   A.  So this slide captures what I was just trying to say, but --

5   and state it as a formula.  But if you just see what the event

6   revenue was entering in the denominator of my dependent

7   variable, and Dr. Topel has swung that around, taken it out of

8   the dependent variable, and added it on as a new explanatory

9   variable onto the model.

10          THE COURT:  Did he do an interaction variable between

11  foreclosure share and event revenue?

12          THE WITNESS:  He did not.

13          THE COURT:  Okay.

14  BY MR. CRAMER:

15  Q.  What if anything --

16  A.  That's exactly where I was going next.

17  Q.  Yeah, we have a question that goes right to this.

18          What, if anything, is Dr. Topel implicitly assuming by

19  putting a variable like event revenue on the right-hand side of

20  the equation as an independent variable, not an interaction

21  variable, but an independent variable?

22  A.  He's assuming that it is an exogenous variable.  That is to

23  say, he's assuming that it's not coming from the same place as

24  something that is simultaneously determining wage share.

25          Now, economists recognize this problem or this

1   potential problem is as being the endogeneity problem or the

2   simultaneity problem.  But in -- in broad strokes what it means

3   is he's -- he's not recognizing the distinct possibility, which

4   I think we showed at the very beginning of my slide

5   presentation, that there could be some unobserved factor that is

6   driving both the event revenue and the wage level.  And, of

7   course, that unobserved factor is the marginal revenue product

8   of the fighters, right.

9        He is bringing over a variable onto the right-hand side

10  that is being determined simultaneously with the wage level.

11  That is, increases in fighter revenue productivity is going to

12  lift by his own admission event revenues and wages.  And so this

13  is a -- this is a serious violation of these ordinary least

14  squares rules.

15       The other thing that I -- it's very important.  There's

16  another --

17       THE COURT:  So what is it that you would suggest that

18  his model should have done to account for the potential for that

19  relationship and that dependency, essentially, between those two

20  variables which are on opposite sides of that equation?

21       THE WITNESS:  Well, I think the most elegant solution,

22  Your Honor, is to just leave the regression as it was.  If you

23  keep event revenue on the left-hand side, then you eliminate the

24  endogeneity problem.  Now I'm trying to predict the wage

25  described as a fraction of the event -- the event revenues.

—2:15-cv-01045-RFB-PAL—

1           But if I could, there's something -- so endogeneity is

2    a fatal flaw, and it rules out doing it the way that Dr. Topel

3    did it.  But there's an even more fundamental flaw that doesn't

4    require as much complication in econometrics and I'd like to say

5    it if that's okay.

6    BY MR. CRAMER:

7    *Q.*  It's okay with me.

8    **A.**  Okay.  And that is when you put -- and it goes to your

9    interaction question, Your Honor.  When you put event revenues

10   on the right-hand side, what Dr. Topel is doing is he's

11   dismissing the plaintiffs' anticompetitive theory of harm.  The

12   anticompetitive theory of harm goes like this, that as more and

13   more fighters were foreclosed, were drawn into the net and

14   locked up and locked away from rival promotions, Zuffa was able

15   to alter the transmission mechanism that moved an extra dollar

16   of event revenue into the pocket of a fighter.  That's the

17   entire theory of the case.

18          The theory of the case is that -- is that they have --

19   they have altered the transmission mechanism.  But by putting it

20   over to the right-hand side, there's an independent variable.

21   He's presuming that increases in foreclosure share have no

22   effect on the mapping of event revenue into wage levels.

23          THE COURT:  In other words, he's not testing the

24   theory.

25          THE WITNESS:  Not only is he not testing.  He's

———2:15-cv-01045-RFB-PAL———

1  rejecting it out of the gate.

2  BY MR. CRAMER:

3  Q.  All right.  Thank you, Your Honor.

4        THE COURT:  So what would be -- hold on.  I want to go

5  back to this question.  Assuming that he wanted to test the

6  extent to which there was a relationship between event revenue

7  and foreclosure share, other than including potentially an

8  interaction variable in the equation, what would be other

9  statistical methods that you might think that he would want to

10  do that were not done as it relates to being able to actually

11  test your model, at least to the extent that there is a

12  relationship between event revenue and foreclosure share which

13  would suggest a potential for some type of ability to control

14  the wage level --

15        THE WITNESS:  Well, there's some obvious -- there's

16  some obvious things that we know just from a casually observing

17  the data, right, which is that a greater share of event revenue

18  was transmitted into wage levels in periods -- in the early part

19  of the study period when Zuffa's foreclosure share was low.  And

20  later on in the study period when Zuffa's foreclosure share was

21  high, that transmission was at a lower rate.

22        THE COURT:  Let me ask you this question.  Is there --

23  are there differences in between how you all measured

24  foreclosure share?

25        THE WITNESS:  No, but --

1          THE COURT:  Do he use your same definition --

2          THE WITNESS:  He uses the same -- this is his way of

3    trying to upset my results.  When he puts -- when he puts event

4    revenues on the right-hand side, he can undo the statistical

5    significance on the foreclosure share.  But what he gets at the

6    end -- I mention this -- I'm trying to think of the technical

7    term for absurd.  But he gets this relationship that implies a

8    100 percent increase in event revenue would only increase wages

9    by 8 percent.  He thinks -- he thinks that is consistent with

10   competitive labor market, a 100 percent increase going up by 8

11   percent.

12          And my reaction to that is that it's not competitive,

13   and the reason why you're getting such a small effect is that

14   you've set up the model incorrectly.

15          THE COURT:  Thank you.

16          Go ahead, Mr. Cramer.

17   BY MR. CRAMER:

18   *Q.*  All right.  Let's talk about the results of your impact

19   regression.  In summary what does it show?

20   **A.**  Well, it shows that there is a highly statistically

21   significant and economically significant relationship between

22   the foreclosure share and the wage share.  And, importantly,

23   that result is carried over when I change the market definition,

24   as I toggle between the headliner, the tracked, the ranked, when

25   I change the weighting schemes, when I bring in the Strikeforce

—2:15-cv-01045-RFB-PAL—

1  data.  So it's a very robust result that -- that continuously

2  finds this very tight relationship between foreclosure share and

3  the wage share.

4  *Q.*  So you ran versions of this model that included Strikeforce

5  data and it excluded Strikeforce data, correct?

6  *A.*  Correct.

7  *Q.*  And the one we're mainly presenting today is the one that

8  excluded Strikeforce?

9  *A.*  Correct, excluded.

10 *Q.*  Excluded, correct.

11        All right.  How do you use the results of your impact

12 regression to determine what UFC fighters wage share

13 collectively would have been absent the challenged conduct?

14 *A.*  Right.  So once the model is fit and I have the model

15 parameters, I can then simulate a world in which everything is

16 identical, except for the foreclosure share.  So if we want to

17 simulate that world, I want to pull back the exclusionary

18 contracts, right.  If I -- if I do that, Zuffa's foreclosure

19 share will fall to zero, if I take them all out.

20        And then I can go back and predict what each fighter

21 would have received in a but-for world where the challenged

22 conduct is removed.  Now, I do another simulation as well where

23 I tolerate a foreclosure share as high as 30 percent because my

24 understanding from the antitrust scholarship is that that could

25 be just at the level that's tolerable or acceptable by antitrust

—2:15-cv-01045-RFB-PAL—

1   scholars.

2   *Q.*   Is it -- so you -- did you assume or find a but-for world?

3   *A.*   I assumed a but-for world.

4   *Q.*   Right.  And is it standard for an economist to assume a

5   but-for world in which the challenged conduct is pulled out?

6   *A.*   In fact, that's what we do in all of my cases, whether it's

7   a price-fixing case or an exclusionary -- exclusive dealing

8   case.  What we're trying to do is model a world where everything

9   is the same.  It's the counterfactual.  We're trying to model a

10  world where everything is the same except for the challenged

11  conduct.

12  *Q.*   And did you prepare a slide that shows graphically how your

13  model toggles from the foreclosure share in the actual world to

14  the foreclosure share in the but-for world and how that affects

15  wage share?

16  *A.*   I did.

17  *Q.*   Okay.  Let's look at that slide.  What does this slide show?

18  *A.*   So this -- this slide shows you diagrammatically this

19  relationship that I'm finding between foreclosure share on the

20  one hand and the wage share on the other.  And what I can do is

21  I can move along a regression line where you can see that we

22  begin with a foreclosure share of around 80 percent, and that's

23  associated with the actual wage share of 19.5 percent.  And then

24  I can project a but-for world in which the foreclosure share,

25  say, is set to 30 percent, to be conservative.  And if I look

1  up, I can see what the associated wage share is, which is 47.3

2  percent.

3  *Q.*  And this red line effectively as you're graphing it is the

4  line that's predicted by your regression analysis?

5  *A.*  In the aggregate level, that's correct.

6  *Q.*  Okay.

7         All right.  So fighters don't get paid in wage share.

8  They get paid in dollars.  So was fighter pay in actual dollars

9  affected?

10  *A.*  Oh, yes.

11  *Q.*  All right.  And how do you know that?

12  *A.*  Well, to move --

13         THE COURT:  How can one not be affected by the other,

14  Mr. Cramer?  I don't understand.

15         MR. CRAMER:  It's math.

16         THE COURT:  They're getting paid in dollars.  Right.

17  So if their wage share is affected, that would be affecting the

18  dollar, unless I'm missing something.

19         MR. CRAMER:  No, you are right.

20         THE COURT:  I'm trying to make sure if there's some

21  other point you're trying to make about that.

22         MR. CRAMER:  No.  Zuffa has raised issues with this so

23  we want to spell it out.

24         THE COURT:  Okay.

25         MR. CRAMER:  But we can move on.

─2:15-cv-01045-RFB-PAL─

1           THE WITNESS:  Okay.

2           THE COURT:  Yes, I don't know that you need to explain

3  what the wages are paid in dollars if that's sort of --

4           THE WITNESS:  No, but I actually think -- there's a

5  slightly more -- let me -- just can I say it?

6           THE COURT:  Go ahead.

7           THE WITNESS:  Quickly what you're trying to get at,

8  which is that if you're trying to project the but-for world and

9  you know the event revenues from that particular event, you're

10  just multiplying those event revenues now by a higher wage

11  share.  And that's the translation into an actual wage.

12           THE COURT:  Right.  But that's based upon the

13  prediction of the particular rate and -- for the regression line

14  that was predicted by your model.  In other words, it doesn't

15  have to be straight necessarily.

16           THE WITNESS:  Uhm.

17           THE COURT:  I mean, that's the only question I had

18  which, I mean, that's all you had.  So obviously you have to --

19  in order to predict something else, you have to have other

20  information.  Is there anything in your analysis that would lead

21  you to believe that it wasn't a straight line?  Because that's

22  the only question I had about the but-for world is how do you

23  make those assumptions because oftentimes we don't always

24  observe perfectly straight lines in this context.

25           THE WITNESS:  That's fair.  I don't know if we've -- if

—2:15-cv-01045-RFB-PAL—

1   we've tried specifications.  I'd have to go back and see if

2   we've done log log specifications as opposed to just linear

3   specifications.  Sitting here I can't recall.

4          But I just wanted to clarify one thing is that we're

5   going to go event by event, and we're going to take that event

6   revenue and figure out what the fighters in that event would

7   have made --

8          THE COURT:  Right.

9          THE WITNESS:  -- based on their regression

10  coefficients.  And we're going to multiple it by the event

11  revenues, and we're going to have damages, the underpayment for

12  that one event.  And then we're going to sum up the

13  underpayments across all events in the database to come up with

14  an aggregate damages number.

15         THE COURT:  Right.  But that's what you have done?

16         THE WITNESS:  Yes.

17         THE COURT:  Right.

18  BY MR. CRAMER:

19  Q.  And we mentioned this earlier, but at the risk of reminding

20  the court here, how did you -- did you have any reality test

21  that you tested your but-for wage share of about 47.3 percent

22  against?

23  A.  Well, I would say that one good reality test is what were

24  other promoters in the MMA industry paying their fighters as a

25  share of event revenues.

—2:15-cv-01045-RFB-PAL—

1    *Q.*  And, here, we have a slide.  Can you describe what's on this

2    slide?

3    **A.**  All right.  So the 19.5 percent is the actual world.  The

4    but-for world is 47.3.  And as I said earlier, that is bound

5    from below by the Bellator wage share of 44.7 percent.

6            THE COURT:  And this was in 2010 or '11, these figures

7    would be -- because this is obviously before --

8            THE WITNESS:  This is --

9            THE COURT:  -- the preacquisition of Strikeforce,

10   right?

11           THE WITNESS:  For -- for Bellator and Zuffa these wage

12   shares are across the entirety of the class period.

13           THE COURT:  Okay.  All right.

14           THE WITNESS:  For Strikeforce, of course, we couldn't

15   do that because Strikeforce goes out of existence post.  So it's

16   for however long we had the data.

17           THE COURT:  Okay.  But there is a sort of a finite

18   period of time as relates to the Strikeforce which ends before

19   the end of the class period here.

20           THE WITNESS:  Correct.

21           THE COURT:  Because of the fact that it's acquired.

22           THE WITNESS:  Correct, it disappears.

23           THE COURT:  Right.

24   BY MR. CRAMER:

25   *Q.*  So go ahead, Dr. Singer.

2:15-cv-01045-RFB-PAL

1   *A.*  I still think it is a good benchmark, but --

2          THE COURT:  Well, I'm not saying that it isn't.  I'm

3   just saying that I just wanted to clarify the fact that the

4   different percentages apply to different sort of lengths of time

5   in terms of what the average is for that period of time as it

6   relates to the wage share, correct?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9   BY MR. CRAMER:

10  *Q.*  You raised this issue.  Why do you think that Strikeforce

11  and Bellator would make good benchmarks here?  Why would Zuffa,

12  absent the challenged conduct, you know, absent this

13  foreclosure, pay a wage share similar to what Bellator and

14  Strikeforce actually paid?

15  *A.*  So, now think about what the world would look like if Zuffa

16  refrained from the challenged conduct, if Zuffa refrained from

17  locking its fighters into these long-term exclusive contracts.

18  You know, more free agency.  You have more labor mobility.  So

19  now the fighters get to play one promotion off of the other.

20  And in that -- in that scenario fighters can credibly threaten

21  to leave Zuffa and go over to rival promotions.

22          At that point Zuffa would have to respond

23  competitively, right, via increasing its offers and, hence,

24  increasing the wage share.

25  *Q.*  All right.  Let's discuss some of the attacks that Zuffa and

—2:15-cv-01045-RFB-PAL—

1  Dr. Topel have directed at your impact regression.  In his

2  second report Dr. Topel claims that your analysis, quote,

3  requires the assumption that athletes are the only material

4  drivers of revenues.  Is that true?

5  *A.*  It's not true.  If -- if athletes were the only drivers of

6  revenue, then my but-for wage share would be 100 percent.  The

7  fact that the but-for wage share is 50 of course allows for

8  contributions by Zuffa.

9  *Q.*  But is it your view that the fighters are the primary or a

10 primary driver of revenues?

11 *A.*  It still is my view that fighters are the primary, yes,

12 drivers.

13 *Q.*  We looked at that study earlier today that I will not bring

14 back, but did that study -- did that study help you reach that

15 conclusion?

16 *A.*  Yes.

17 *Q.*  Okay.  Another argument Dr. Topel makes is that your

18 foreclosure share is really measuring some procompetitive

19 conduct by Zuffa.  Is Dr. Topel correct?

20 *A.*  No.  Remember how the foreclosure share is created and what

21 drives changes in foreclosure share.  First of all, foreclosure

22 share is capturing the share of fighters who are locked into a

23 long-term exclusive contract.  That is potentially

24 anticompetitive conduct.  There's nothing -- there's nothing

25 procompetitive about that.

1          If -- if those contracts were removed, the foreclosure

2    share would fall to zero, and if Zuffa went out and

3    procompetitively recruited based on business acumen or better --

4    better talents or whatever you could do to improve your

5    recruitment, the foreclosure share could be zero.  Right.  So

6    it's not -- it can't be confused with procompetitive conduct.

7          I wanted to say one more thing here, if that's okay.

8    You have to also just think about what's causing the foreclosure

9    share to move over time.  Why is it growing?  Is it growing

10   because of procompetitive?  Is it growing because of

11   anticompetitive?

12         There's two big things that are causing it to move.

13   The first is the Strikeforce acquisition, which in my opinion is

14   anticompetitive.  And the second thing that moves it around is

15   that the length of the contracts are growing over the class

16   period.

17         These are the things -- these are the anticompetitive

18   things that are driving movements in the foreclosure share.  And

19   it's those movements that have the prospect of explaining

20   movements in the wage share.  They're not procompetitive things

21   that are driving changes in the foreclosure share.

22   BY MR. CRAMER:

23   Q.  If Zuffa had done a great job promoting and done a great job

24   of recruiting and caused a lot of fighters to join them, but

25   didn't sign them up to long-term exclusive contracts that tied

—2:15-cv-01045-RFB-PAL—

1    them up and foreclosed them, what would the foreclosure share be

2    then?

3    *A.*   Zero.

4    *Q.*   And then your model would show no damages, right?

5    *A.*   My model would show no damages, correct.

6    *Q.*   All right.

7          Dr. Topel also claims that you fail to account for

8    Zuffa's procompetitive contributions to the growth of event

9    revenues in your regression analysis.  Is that right?

10   *A.*   No.  I allowed for things outside of Zuffa's foreclosure

11   share, outside of Zuffa's market power, and it could also

12   explain a depressing effect on the wage share.  And I originally

13   had things like time trends and your fixed effects and things

14   that I thought could be capturing changes, say, in the

15   popularity in the sport or changes in things that Zuffa was

16   adding over time that might explain the declines in wage share.

17   But we didn't stop there because --

18          THE COURT:  So I'm sorry.  What variables did you use

19   to test increases in the popularity of the sport?  I know you

20   said you controlled for the promoter -- particular promoter one

21   way or another.  Were there other variables in your analysis --

22   that you inserted into the analysis that deal with just

23   increased popularity of the sport?

24          THE WITNESS:  I think the time trend, Your Honor,

25   would -- could capture increased popularity.  We have year fixed

-2:15-cv-01045-RFB-PAL-

1    effects which could capture increased popularity.  We're

2    changing for the identity of the fire pools.  So as different

3    fighters come into the mix or different fighters are being

4    looked in the regression, a more popular fighter, a more highly

5    ranked fighter, could be explaining variations in wage share.

6    But we didn't stop there.  I just wanted to point out that we

7    also included the promotional spending variable.  That did not

8    upset the regression.  And then we included --

9            THE COURT:  When you say "did not upset the

10   regression" --

11           THE WITNESS:  Yes.

12           THE COURT:  -- you should just define what that means

13   so we're making sure we're on the same --

14           THE WITNESS:  Sure.

15           THE COURT:  Obviously I would assume that means that

16   the -- there's statistical significance to the foreclosure share

17   and its impact on which -- I wasn't sure if there was something

18   else you were talking about.

19           THE WITNESS:  I'm focussed like a laser on that

20   coefficient.  I want to --

21           THE COURT:  It's statistically significant and its

22   ratio as it compared to others?  So do you look at -- because I

23   know -- I mean, there are two issues.  One is the statistical

24   significance of it, how much variability is explained by that,

25   but also its relationship potentially of the coefficients to one

1   another.  And I don't know if you looked at that or not in terms

2   of the magnitude of their effect.

3           THE WITNESS:  I'm interested -- it's like they're all

4   my children.  I'm interested in all of them, but I want -- I

5   want to focus -- I want to focus your attention on the

6   foreclosure share.

7           If the foreclosure share remains to be statistically

8   significant and negative as we include more and more variables,

9   right, then we have greater confidence that we have controlled

10  for everything we need to.  So that's --

11          THE COURT:  But the model would also -- including the

12  size of the coefficient, would potentially determine how much it

13  impacted the wage share in comparison to other variables,

14  correct?

15          THE WITNESS:  Correct.  And we discussed earlier when

16  we included the Strikeforce data, remember?

17          THE COURT:  Right.

18          THE WITNESS:  The size of the coefficient grew because

19  now we have a second contribution, a variation, a second source

20  of variation, that we can exploit to inform the size of the

21  foreclosure share.

22          THE COURT:  So what I'm asking you is you're not

23  completely discounting the size of the impact even if it's

24  statistically significant?

25          THE WITNESS:  That's correct.  I'm not.  And of course

—2:15-cv-01045-RFB-PAL—

1   my damages are going to turn, in part, on how big that

2   coefficient is.

3            THE COURT:  Okay.  So I just want to make sure we're

4   not throwing the size of the coefficient out or putting it on

5   the side when you say disrupt the results.  You're saying there

6   is statistical significance to foreclosure share, and it also in

7   terms of its impact is maintaining a significant impact in the

8   context of its impact on the wage share as well.

9            THE WITNESS:  Correct.

10           THE COURT:  Okay.

11   BY MR. CRAMER:

12   Q.  The judge asked you, Dr. Singer, His Honor asked you about

13   how you control for the increased popularity of the sport.  Let

14   me ask you this question.  If the sport was -- if the sport of

15   MMA, the popularity was increased generally, what would that do

16   to the MRP, marginal revenue product, of the fighters?

17   A.  It would increase the MRP of the fighters.

18   Q.  And so if it increased the MRP of the fighters, what would

19   that say about -- would that help explain -- let me ask it this

20   way.

21           What would that say about what the competitive wage

22   level would be?

23   A.  Well, I think that that would not provide an explanation for

24   a falling wage share because if -- if what -- if what happened

25   over the time period is that the sport became more popular, as

1   you said, that would be consistent with an increase in the

2   marginal revenue product of the fighters.  And that -- at a

3   minimum the wage share should not drop.  In order to come up

4   with an explanation for the special sauce theory, you have to --

5   you have to conceive of something that is contributing more and

6   more to revenue at a faster rate than the contribution to

7   revenue of the fighters.

8              THE COURT:  In the model would that look like a

9   decreasing coefficient for the individual fighter's statistical

10  impact as well as a decreasing -- I'm trying to think of what

11  that would look like in terms of how the variables over time --

12  because we also have this time-released variable -- how they

13  would change as relates to the percentage of the predictive

14  value or ability to predict the wage share.  What would it look

15  like if that actually was happening?  If you saw that, what

16  would it look like?

17             THE WITNESS:  I think the way that it would look like

18  is that if you could come up with this special sauce variable,

19  what it would do is it would take away the explanatory power of

20  the foreclosure share.  I think the way that it manifests itself

21  is that it would soak away explanatory power of the foreclosure

22  share, and Dr. Topel has not been able to do that.

23             THE COURT:  Okay.

24  BY MR. CRAMER:

25  Q.  You mentioned this, but why would Zuffa's non-fighter

1   contributions to growth of event revenues have to go -- grow as

2   fast or faster than the fighter's contributions to event

3   revenues for Zuffa's theory to make sense?

4   **A.**  Because you have to explain a falling wage share, and the

5   only way that could happen is if something -- in a

6   procompetitive way.  And the only way you could do that is if

7   there was this other factor.

8           THE COURT:  An accompanying increase.

9           THE WITNESS:  Exactly.

10  BY MR. CRAMER:

11  *Q.*  And has Zuffa ever articulated what specific management

12  practices constitute these procompetitive activities that are

13  becoming more significant over time to revenue growth relative

14  to the fighter's contribution to revenue growth?

15  **A.**  No.

16  *Q.*  Is Zuffa's procompetitive special sauce theory that there's

17  this growing contribution to event revenues faster than the

18  contribution of the fighters going on consistent with your

19  understanding of the MMA industry?

20  **A.**  No, it is not.

21  *Q.*  Why not?

22          THE COURT:  That's actually a fairly long, complex

23  answer that he goes through in his report.  So, again, what I'd

24  like to do, Mr. Cramer, is it seems like you're moving almost

25  directly into rebuttal of Dr. Topel's report.  And I would like

—2:15-cv-01045-RFB-PAL—

1   to save that --

2          MR. CRAMER:  Okay.

3          THE COURT:  -- for actual rebuttal from Dr. Singer.  So

4   if you have nothing else, because I don't want this to eat up

5   the time, I'd like to turn this over to opposing counsel to

6   begin their cross-examination.

7          MR. CRAMER:  Your Honor, the one main thing we haven't

8   covered -- we've covered now the impact regression and how it

9   showed a falling wage share.  We haven't yet gotten to common

10  impact, how it was spread across the class, and a discussion of

11  how he used his regression and other analyses to explain common

12  impact.  I think that's important and --

13         THE COURT:  I think it's important, too.  But, again,

14  when we're going passed some of the time limits and I get

15  concerned.  I will tell counsel, too.  We have to end at

16  4 o'clock today for technology reasons related to us having to

17  shut our system down, and we're going to start a little bit

18  earlier tomorrow.  But why don't you get right to that,

19  Mr. Cramer, and I'll give you 20 minutes.  Then I'm going to

20  turn this over to opposing counsel.

21  BY MR. CRAMER:

22  *Q.*  Okay.  Dr. Singer, can describe your two main methods of

23  showing that the challenged conduct had a widespread effect

24  across the class?

25  *A.*  All right.  I used two methods.  The first method is that

——2:15-cv-01045-RFB-PAL——

1  I -- once I have a model that's fit to the data, I can go back

2  and make individual predictions for each fighter and then

3  compare what the fighter was paid per my model in the but-for

4  world to what the fighter was actually paid.  And if there was

5  an underpayment, I can determine that that fighter suffered

6  impact.

7          The second method, which I call the pay structure

8  method, begins with the same regression impact model, but then

9  looks for proof both in the record and my own original

10  empiricism, which suggests a pay structure binds the payment of

11  all of the fighters together through some knowable objective

12  factors.

13          THE COURT:  Like a pay scale.

14          THE WITNESS:  Like a pay scale.

15  BY MR. CRAMER:

16  *Q.*  All right.  Before we get to the pay scale, can you

17  describe -- so is your model capable, your regression model,

18  capable of showing impact to all or nearly all class members?

19  *A.*  Yes.

20  *Q.*  What does -- what is -- what are the results of your

21  regression model in terms of showing impact to all or nearly all

22  class members?  What does it show?

23  *A.*  So when I take -- when I take the model after it's fit and I

24  go and predict for each fighter what their but-for payments

25  would have been and compare it to their actual payments, I find

```
                    ─2:15-cv-01045-RFB-PAL─
```

1   that between 98.5 and 99.1 of class members suffered antitrust

2   injury.

3   *Q.*   And there are a handful of class members, 12, that did not

4   suffer injury at least according to that model?  Or your model

5   doesn't find suffered injury.  Does that undermine your model?

6   *A.*   It doesn't undermine my model, no.

7   *Q.*   Okay.  Did you devise this method of using a regression

8   analysis to show common impact across a class yourself or is

9   that a standard method?

10  *A.*   It's a standard method.  And I'm aware of cases in which

11  it's been used and accepted by courts.

12  *Q.*   Zuffa accuses you of using average foreclosure rates instead

13  of computing individual foreclosure shares for each fighter.

14  Does this criticism make sense in the context of your common

15  impact analysis?

16  *A.*   There's no such thing as an individual foreclosure share.

17  So I have a hard time following that one.

18  *Q.*   All right.  Let's talk now about your second method.  So

19  that's your first method.  It uses the regression to show common

20  impact.  Now, does the second stand on its own independent

21  method -- and you mentioned that it involves a pay structure.

22  By pay structure do you mean some kind of formal rigid salary

23  scale or something else?

24  *A.*   Something else.

25  *Q.*   And what do you mean?

—2:15-cv-01045-RFB-PAL—

1  *A.*  What I mean is that there are knowable objective factors

2  that explain differences in payments across employees of a firm

3  or in this case across something closer to an independent

4  contractors within a firm.

5        THE COURT:  Such as for a fighter, their ranking?

6        THE WITNESS:  Exactly.

7        THE COURT:  Or their weight class?

8        THE WITNESS:  Exactly.  So it suggests that comparably

9  -- comparable employees with comparable experience and

10  comparable tenure and comparable skills would be paid comparable

11  amounts.

12  BY MR. CRAMER:

13  *Q.*  Did you prepare a slide with some record evidence showing

14  that Zuffa believed they had some kind of basic formula for

15  compensation?

16        THE COURT:  So, Mr. Cramer, you don't need to have

17  Dr. Singer go through all the summary of the actual records

18  regarding Zuffa employees making references to pay scales and

19  pay structures.  If you want to go through his analysis as it

20  relates to analyzing the sort of common proportional movement of

21  the wages up or down, fine.  Let's do that.  But I don't need

22  Dr. Singer to review for me, you know, comments from the various

23  match makers at UFC about what their scale was and how they

24  tried to keep pay equity.  That's what Mr. Silva's testimony is

25  for.  And I know he does that already, Dr. Singer, in his actual

———2:15-cv-01045-RFB-PAL———

1  report anyway.  But I don't think that would be beneficial.  So

2  if you are talking about what's statistical work he does --

3          MR. CRAMER:  Okay.

4          THE COURT:  -- in relation to that, which he does do

5  separate from the pay scale, let's move to that.

6          MR. CRAMER:  Fair enough.

7  BY MR. CRAMER:

8  Q.  What empirical analyses did you do to confirm that there was

9  some -- at least an informal pay structure that bound the

10  salaries of the compensation of fighters together?

11  A.  I did two.  In the first approach I identified these

12  knowable objective factors such as Pay-Per-View, such as the

13  fighter's rank, the weight class, the gender.  And I was able to

14  show that these knowable objective factors were highly

15  predictive in what a fighter got paid.  That suggests again the

16  existence of a pay structure.

17          The second approach was at any point in time I

18  regressed what an individual fighter made on what all other

19  fighters were making at the same time.  And it turned out

20  knowing what everyone else was making did a very good job in

21  predicting what an individual fighter made as well.

22  Q.  All right.

23          Did Dr. Topel conduct an analysis in his reports, a

24  statistical analysis, that you believe confirm a price

25  structure?

1   **A.**   Yes.  Dr. Topel did perform a similar analysis looking at

2   movement in Zuffa fighter pay over time and found that there was

3   a connection across -- across fighters at a given point in time.

4   That is, they were all connected and moving upwards.

5   *Q.*   In every salary scale, in every fighting wage tier -- in

6   every ranking tier?

7   **A.**   In every ranking tier, that's correct.

8   *Q.*   So he found that wages in every ranking tier moved together

9   through time?

10   **A.**   Correct.

11   *Q.*   Okay.  Now, does Dr. Topel's opinion that fighter

12   compensation levels rose over time contradict your finding that

13   fighters were ultimately undercompensated?

14   **A.**   No.

15   *Q.*   Why not?

16   **A.**   Because it's conceivable that compensation was rising

17   slightly, but it wasn't rising enough to be commensurate with

18   the event revenues that were being generated by the fighters.

19         MR. CRAMER:  The last thing I would cover would be

20   damages, but those are mathematical computations flowing from

21   Dr. Singer's model.

22         THE COURT:  Well, I don't know -- I think he's actually

23   covered the damages based upon what he talks about as it relates

24   to the but-for world, and that regression line that we saw would

25   predict what the damages would be filing in the formula, unless

—2:15-cv-01045-RFB-PAL—

1  I'm missing something.

2          MR. CRAMER:  That's correct.

3  BY MR. CRAMER:

4  Q.  Maybe, Dr. Singer, could you just describe this slide so we

5  can --

6          THE COURT:  No, I understand.  I just wanted to make

7  sure that would be the basis, right, for the damages

8  calculation; in addition to you then I think also used what were

9  the percentages for the different actual MMA promoter

10  competitors in the market at different periods of time, right?

11          THE WITNESS:  That's correct.

12          THE COURT:  All right.

13          MR. CRAMER:  So, again, we have bout class damages.

14  They're 894 million under the model that we presented without

15  the Strikeforce data.  They're more with the Strikeforce data.

16  And then we also ran it if you started the class period at the

17  Strikeforce acquisition.

18          THE COURT:  Right.

19          MR. CRAMER:  They go down a slight amount.  And then

20  here would be the damages using the two benchmarks, Your Honor.

21          THE COURT:  Okay.

22          MR. CRAMER:  With that, Your Honor, unless you have

23  other questions for Dr. Singer, we will rest.

24          THE COURT:  Okay.  That's fine.

25          We're going to transition and transition with the

—2:15-cv-01045-RFB-PAL—

1    inputs.  Why don't we -- and I need to just take a very short,

2    five, 10-minute recess.  And then we'll come back and get

3    everyone set up and start with the cross.

4              (Recess taken at 2:47 p.m.)

5              (Resumed at 2:57 p.m.)

6              THE COURT:  Please be seated.  All right.  Go ahead,

7    Mr. Isaacson.

8              MR. ISAACSON:  Thank you, Your Honor.

9                          **CROSS-EXAMINATION**

10   BY MR. ISAACSON:

11   *Q.*  Good afternoon, Dr. Singer.

12   **A.**  Good afternoon.

13   *Q.*  So if I can ask you -- if we can pull up your slide 69,

14   which is your common impact -- common impact two methods.  And

15   you pretty much wrapped up with method B, the pay structure

16   part.  And now in method A and in method B, you begin with an

17   impact regression.  That's the regression that we were looking

18   at in Table 6, page 125 of your report.  Maybe you remember that

19   with all of the coefficients?

20   **A.**  I remember that, but if you might remember, that today's

21   presentation was based on a model without the Strikeforce data.

22   So to the extent that you're taking me to the model with the

23   Strikeforce data, that was not part of today's presentation.

24   *Q.*  Okay.  Well, let me understand that then.  If we could look

25   at slide 70.

1          This is what you just presented as your individual

2   impact.  That does include the preacquisition Strikeforce data,

3   right?

4   *A.*  I don't think so.  I think my entire model today was

5   premised on the model without -- the regression model without

6   the preacquisition Strikeforce data.

7   *Q.*  You think those numbers exclude the preacquisition

8   Strikeforce.  Is that --

9          THE COURT:  So why don't we do this, Mr. Isaacson,

10  because it would be helpful for me.  Let's use his actual

11  reports.

12         MR. ISAACSON:  That's what -- I'm about to go to that.

13         THE COURT:  That might be helpful.  That way I have it

14  in the record and --

15         MR. ISAACSON:  Sure.  Let's go to -- I'm about to go to

16  -- back to page 125.

17         THE COURT:  Of the original report?

18         MR. ISAACSON:  Of the original report.

19         THE COURT:  Okay.

20         MR. ISAACSON:  But let me just ask you about this.

21  BY MR. ISAACSON:

22  *Q.*  So going back to slide 69.  The impact regression, which

23  we'll come back to, the impact regression is what defines any --

24  generates an amount of impact on an individual fighter, correct?

25  *A.*  No.  The impact regression is used to establish a general --

2:15-cv-01045-RFB-PAL

1   a generalized effect across all fighters, but that's step one of

2   the two-part proof of common impact.

3   Q.  Right.  So pay structure does not generate an amount of

4   injury for a fighter?

5   A.  No, that is not the purpose of the pay structure.

6   Q.  Right.  The one that generates a dollar figure eventually is

7   the impact regression, and it's the one that generates 99

8   percent and it's the one that generates damages?

9   A.  I think what you're asking me is to describe method A as

10  opposed to method B.  It is true that under method B, the method

11  that uses the pay structure, I don't get to a number like 99

12  percent.  I get to a number of 100 percent.

13          THE COURT:  And when we're talking about pay structure,

14  let's make sure we're clear about when you mean pay structure

15  you're not talking about your reliance upon pay structures that

16  are in the record.  You're talking about a different type of pay

17  structure.  What do you mean by that?

18          THE WITNESS:  Oh.  Well, this is important, Your Honor,

19  that my pay structure is based on two types of evidence,

20  original quantitative analysis --

21          THE COURT:  Right.

22          THE WITNESS:  -- two types, in conjunction with

23  qualitative analysis from the record in which Zuffa employees,

24  among others, are explaining how the pay structure operated.

25          THE COURT:  And just again just so that I'm clear, how

—2:15-cv-01045-RFB-PAL—

1  does that pay structure determination work?

2          THE WITNESS:  Oh.  How does it work in practice at

3  Zuffa?

4          THE COURT:  No, no.  Well, I understood that part

5  because that's in the record.  But in terms of how it works in

6  terms of your inclusion in accounting for the common impact.

7          THE WITNESS:  All right.  So in the second proof or

8  what I call method B --

9          THE COURT:  Right.

10         THE WITNESS:  -- right, you need to marry up two pieces

11  to get across the finish line.  The first piece is from the

12  impact regression gives you a generalized wage effect.  That

13  shows you that across all members of the class there's a

14  generalized suppression of wages.  And then --

15         THE COURT:  Based upon?

16         THE WITNESS:  Based upon the impact regression model,

17  that regression model that we discussed today, the one of wage

18  share on foreclosure share.

19         THE COURT:  Right.  Okay.

20         THE WITNESS:  Regressed on everybody in the class.

21         THE COURT:  And controlling for the different variables

22  you control for.

23         THE WITNESS:  But that only gets you -- that only gets

24  you to a generalized the effect.  The coefficient on foreclosure

25  share tells you that something is happening in general, but it

1  doesn't necessarily speak to all or almost all members of the

2  class.

3       So from my second proof of common impact, method B, I

4  have to have something that bridges us from a generalized effect

5  to an effect that we know and are confident that touched all or

6  almost all, and that's what the existence of a pay structure is.

7  I'm following the proof as outlined by Professor Leamer in

8  high-tech antitrust litigation that was certified recently by a

9  court and in which this two-step method -- and I've used it

10  myself in other cases as well, where you establish a general

11  effect and then you marry that up with evidence of a pay

12  structure.  And the two combined let you know that all or almost

13  all members of the class were injured.

14       THE COURT:  Okay.  All right.  Thank you.

15  BY MR. ISAACSON:

16  *Q.*  And for each method, in order to show actual injury or

17  impact to any individual, you need the impact regression.

18  That's all I'm saying.

19  **A.**  Oh.  That's fair.  For method A and method B you definitely

20  need to begin with the impact regression model.

21  *Q.*  Okay.  So let's go to Table 6 of your opening report which

22  is page 125.  It's on the screen for you.

23       THE COURT:  It's also on the screen to your right.

24       THE WITNESS:  Okay.

25  BY MR. ISAACSON:

—2:15-cv-01045-RFB-PAL—

1   *Q.* And it covers a page and a half.  So let's just scroll it so

2   that -- we won't be able to show the whole thing at once, but

3   just so that everybody understands what it is.

4        All right.  We were sort of looking it at it on the

5   ELMO earlier.  It's the same one.  So if we go back up to the

6   top, all right, these dependent variables is the fighter share.

7   That's what you've told us.  Foreclosure share you've got for

8   tracked, ranked, and headliner.

9        Now, those numbers there, those are the coefficients

10  that result from the regression for -- from the foreclosure

11  share; those are not the actual foreclosure shares?

12       THE COURT:  Okay.  Hold on just a moment.  When you say

13  -- I just want to be clear.  It says fighter share here.  You're

14  talking about fighter wage share?

15       THE WITNESS:  Correct.  Yes.

16       THE COURT:  Make sure we're talking about the same

17  thing.

18       I'm sorry.  Go ahead, Mr. Isaacson.  I just wanted to

19  make sure.

20       MR. ISAACSON:  Okay.  That's why --

21  BY MR. ISAACSON:

22  *Q.* And the numbers next to the foreclosure share, the negative

23  3.3 percent.  I'm rounding there a little bit.

24  *A.* Yes.

25  *Q.* In the tracked market.  So that's the negative -- that's not

1  the amount of foreclosure share?

2  *A.*  No, that is the incremental effect of a small increase in

3  foreclosure share on the fighter wage share controlling for all

4  other variables that I controlled for in the model.

5  *Q.*  So you find a negative relationship there between

6  foreclosure share and the fighter share in each of those

7  markets, correct?

8  *A.*  Correct.

9  *Q.*  Okay.  Now, all of the other -- all of these coefficients

10  that are listed there, as explanatory variables, these are the

11  things you described as being on the right-hand side of the

12  regression; whereas, the fighter shares is on the left-hand

13  side?

14  *A.*  That's correct.

15  *Q.*  And for each of these what we're looking at are

16  coefficients.  Some are significant.  Some aren't.  Some are

17  positive.  Some are negative.  But what relationship the -- the

18  regression found between those variables and -- and the fighter

19  share?

20  *A.*  Correct.

21  *Q.*  So, for example, if we look at win flag, a couple of down

22  from foreclosure share, now that's whether you win a fight,

23  right?

24  *A.*  Correct.

25  *Q.*  And what you find there is it's not predictive of an effect

—2:15-cv-01045-RFB-PAL—

1   on fighter's wage share because the amount is very small and

2   it's not statistically significant.  Is that correct?

3   *A.*  Well, I grant you that it's small.

4   *Q.*  And just to be clear, when it's statistically significant

5   you put an asterisks by it depending on what the levels are?

6   *A.*  Correct.

7   *Q.*  So where we're looking at something that doesn't have

8   asterisks, it's not statistically significant?

9   *A.*  Oh.  That is correct.  I was -- I was looking at wins.  I'm

10  sorry.  Win flag, yes.

11  *Q.*  And for the same reason -- for the same thing the rank

12  there, where you rank, that did not show a statistically

13  significant relationship to -- to the fighter share, correct?

14  *A.*  In this -- in this particular iteration of the model -- you

15  know that I have many, of course, but if you're taking me to

16  Table 6, I agree with you that the ranked variable does not have

17  an asterisk next to it, indicating that it's not statistically

18  significant at conventional levels.  It still could be

19  important, but it doesn't have T-step large enough or a P-value

20  small enough that would fit under, say, 10 percent statistical

21  significance.

22  *Q.*  And moving down just a couple to PPV, that's Pay-Per-View,

23  right?

24  *A.*  Correct.

25  *Q.*  And so what the regression finds without statistical

---2:15-cv-01045-RFB-PAL---

1  significance, that if you're in a Pay-Per-View event, that

2  actually has a negative relationship to fighter share?

3  *A.*  Yeah.  We see from that first chart -- you remember,

4  Mr. Isaacson -- that showed the level of exploitation was even

5  higher for Pay-Per-View events.

6  *Q.*  Right.

7  *A.*  And so that's consistent with this finding as well.

8  *Q.*  All right.  So if we go to the next page.  All right.

9  There's a trend variable near the bottom right above constant.

10  You talked about the trend variables.  And that has a positive

11  relationship and statistically significant relationship to wage

12  share?

13  *A.*  Correct.  Yes, that's --

14  *Q.*  So there's a trend going on that's having a positive effect

15  on the -- on the fighter share?

16          THE COURT:  What does that -- what is the definition of

17  that variable?

18          THE WITNESS:  It's a time trend, Your Honor.

19          THE COURT:  Measured how?

20          THE WITNESS:  Oh.  So for the first year of the

21  database or the first month of the database, it would take on a

22  value of one.  And then it would go up by one in each successive

23  time increment.

24          THE COURT:  But the trend is measured in years?

25          THE WITNESS:  I believe the trend could be measured in

—2:15-cv-01045-RFB-PAL—

1  months.  It's either in months or years.  I just can't recall.

2  BY MR. ISAACSON:

3  Q.  It's less than -- it's not years.  I believe it is months.

4  And it's a linear trend, correct?

5  A.  Correct.

6  Q.  So it measured linear trends.  And what this would mean is

7  that holding all else constant that fighter share was

8  increasing, if you remove that trend?

9  A.  I don't know what you mean by remove the trend.  It shows

10  you that the coefficient on the time trend is time clicked

11  forward.

12  Q.  Right.

13  A.  That the wage share was predicted to go up, all things

14  equal.  This is key, all things equal.  In other words, if the

15  wage share had not been depressed as much as it was by the

16  foreclosure share, then what we should have seen was an upward

17  increasing trend in the wage share, but we didn't.

18  Q.  Right.  What you're saying is that there was a trend of

19  increasing fighter share that was going on, but in your opinion

20  it should have been a higher amount?

21  A.  That's not what I'm saying.

22  Q.  Okay.  Well, let me ask you to look at -- this is a portion

23  of Dr. Zimbalist's report.  This is a chart.  So this is --

24  Dr. Zimbalist is an expert for the plaintiff.  The report --

25  this is a Table 4-E.  It's from his errata.  So he did some

—2:15-cv-01045-RFB-PAL—

1 corrections on it.  It's JCCX 47.

2          MR. ISAACSON:  Can you pull that up for me.

3          I need Table 4.  It's JCCX 47, Table 4-E.  Yeah, here

4 we go.  All right.  So turn that.  Make it bigger.

5 BY MR. ISAACSON:

6 *Q.*  And you see this is Dr. Zimbalist's reporting fighter share

7 in event revenue.  And from 2010 to 2016 it's rising from 15.2

8 percent to 22.2 percent.  Overall during the class period

9 fighter share as expressed in event revenue was trending

10 upwards, correct?

11 *A.*  I'm not -- I Wouldn't accept that it was trending upwards,

12 no.

13 *Q.*  Okay.  Well, it wasn't --

14          THE COURT:  So let's talk about -- again, the same as

15 with Dr. Topel -- I mean, Dr. Topel, although Dr. Singer and

16 Dr. Topel are more directly in opposition.  I don't want to go

17 through him analyzing the Dr. Zimbalist report because there are

18 different foundations and different assumptions for the reports

19 that lead to different outcomes.  So I don't find that to be

20 significant, Mr. Isaacson.  So I'd move on from there.

21          MR. ISAACSON:  Okay.  Well, what I do believe this is

22 completely consistent with his trend variable, which is why I

23 was showing it to him.  The -- that there is a trend going on

24 that the trend variable is capturing of an increasing fighter

25 share.  And, whereas, it's been to described to you this morning

1  that there's a trend, absent the controls.  They are arguing

2  that it should have been higher.  I'm not trying to take that

3  out of the proposition.

4           THE COURT:  Right.

5           MR. ISAACSON:  But I'm trying to explain to you that

6  during the class period not only was fighter pay going up, but

7  also fighter share was going up and that has some importance in

8  this case.  All right.  In fact --

9           THE WITNESS:  Your Honor, may I respond?

10          THE COURT:  Okay.  So I'm sorry.  So your argument is,

11 Mr. Isaacson, that the statistically significant trend variable

12 from Dr. Singer's report would indicate that fighter share was

13 going up over time independent of foreclosure share?

14          MR. ISAACSON:  Right, and that variable is taking that

15 out.  And I'll spend some more time on this.

16          THE COURT:  Well, okay.  But let's let --

17          THE WITNESS:  May I respond to this?

18          THE COURT:  -- Dr. Singer respond to that.

19          MR. ISAACSON:  Well, can I show him something --

20          THE WITNESS:  Mr. Isaacson --

21          THE COURT:  No, no, no.  Let him respond to that first,

22 please.

23          THE WITNESS:  What Mr. Isaacson is missing is that my

24 regression database does not start in 2010.  My regression

25 database starts around 2003, 2004, 2005.  And there is a clear

—2:15-cv-01045-RFB-PAL—

1  and unmistakable decline in the wage share over the study period

2  in question by your own client's chart that I put up on the wall

3  at the very beginning.  Your client showed it at 26 percent in

4  2007, and we watched it step down into the 20s, then slightly

5  below 20, and then it flattened largely, I'll grant you that,

6  over the course of the class period.

7          THE COURT:  So what is that trend variable capturing as

8  it relates to positive impact of wage share over time?

9          THE WITNESS:  What the trend variable is capturing is

10  that I would say that controlling for all other things that are

11  occurring, including the depressing effect of the increasing

12  foreclosure that's growing over time, that what should have

13  happened is that -- is that the wage share was predicted to have

14  gone up over time, but that didn't happen.

15          THE COURT:  Well --

16          THE WITNESS:  That actually during the class period it

17  stayed flat over the class period.

18          THE COURT:  Okay.  So what you're saying is -- I want

19  to make sure I'm understanding.  Well, first, you had earlier

20  said that the time which would -- variable, which is the trend

21  variable here, would be some measure of an increase in the

22  popularity of the sport, right?

23          THE WITNESS:  It could capture that.  It could capture

24  anything that's trending over time.  It doesn't have to be

25  just --

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  So, in other words, it may capture hidden

2    variables that are correlated with time.

3          THE WITNESS:  Correct.

4          THE COURT:  Going forward in time.

5          THE WITNESS:  Correct.

6          THE COURT:  And as I take it one of your arguments

7    you're making is, one, is that it doesn't change the factor.

8    There's still a negative impact with respect to the depression

9    of the wage share by the foreclosure share notwithstanding the

10   existence of the significant time trend variable.

11         THE WITNESS:  Correct.  But I'm making a bigger point

12   which is that my regression was fit on a database that spanned

13   well before the class period.  I had observations from '5, '6,

14   and '7.  And it was from '7 -- '7 was really the peak of the

15   wage share.  So it's incorrect for Mr. Isaacson to suggest that

16   over -- over my study period, which predated that 2007 peak,

17   right -- he says that it was always rising over my study period.

18   That is incorrect.  It is a mischaracterization of what was

19   happening to the wage share over my study period.

20         THE COURT:  Right.  So let's focus on the same period

21   that we have here.  So from 2010 through 2016 is the wage share

22   increasing?

23         THE WITNESS:  I would describe it more if I -- if you

24   force me to choose between increasing or decreasing or flat, I

25   would go with flat.  Over the -- over the class period, it was

 1  largely flat.  It would bounce around, but it was staying around

 2  19.5 percent.

 3          THE COURT:  Okay.

 4          THE WITNESS:  The declining trend that is informing in

 5  part my model is the rapid decline that began in 2007 and went

 6  through, you know, 2010.

 7          THE COURT:  Okay.  Go ahead, Mr. Isaacson.

 8          MR. ISAACSON:  All right.  Can we look at ZCX302A, just

 9  the fighter share column.

10  BY MR. ISAACSON:

11  *Q.*  All right.  So this is the summary exhibit we disclosed to

12  the other side, and so I assume you've seen this?

13  **A.**  It's wrong, but I've seen it.  It's wrong, but I've seen it.

14  *Q.*  So let me ask -- so, first of all --

15          THE COURT:  So let's not -- again, I don't want to use

16  summary exhibits that he has not produced.  If you want to

17  reference findings from his report, then you should use --

18          MR. ISAACSON:  This is --

19          THE COURT:  -- charts in his report.

20          MR. ISAACSON:  This is drawn from his data.

21          THE COURT:  No, no.  No.  I want you to use his actual

22  charts.  I don't want you to use separately created summary

23  reports.  That is not helpful to me.  He's going to do exactly

24  what he's done here, which I would expect Dr. Topel to do the

25  same thing, which I didn't create it.  There may be different

———2:15-cv-01045-RFB-PAL———

 1   assumptions.  I don't know where this data comes from.

 2          And so if you want to attack and make the same -- I

 3   made the same instruction to Mr. Cramer -- use the particular

 4   report or charts that he has.

 5          MR. ISAACSON:  Okay.  Your Honor, but I will say, okay,

 6   he does know where this data came from and he does know whether

 7   this is accurate or not.  And --

 8          THE COURT:  Well, did he do these calculations?

 9          MR. ISAACSON:  No, because his --

10          THE COURT:  So then I don't want you to ask him about

11   calculations that he did not perform.  Dr. Topel can talk about

12   his own calculations.  Dr. Singer can talk about his

13   calculations, but I'm not in a position and I don't think it's

14   appropriate for me to try to evaluate other calculations that

15   were not performed by these individuals because I don't think

16   that that allows me to be able to suss them out.  If you want to

17   use his information or have him comment on another report like

18   you did with Dr. Zimbalist, I don't necessarily mind that, but I

19   don't want to get into this back and forth about --

20          MR. ISAACSON:  Okay.

21          THE COURT:  -- summary statistics that were not

22   produced by any of the experts.

23          MR. ISAACSON:  All right.  Can I -- just to -- I'm not

24   going to talk about the substance of this, but I think there's

25   one thing the Court would want to know.

———2:15-cv-01045-RFB-PAL———

1   BY MR. ISAACSON:

2   Q.  So the last chart had fighter share expressed -- the sort of

3   numbers you were thinking of:  15 percent, 18 percent, 20

4   percent.  And these -- these are all much lower.  Now, when

5   you're doing fighter share in your regression, you're doing the

6   individual fighter shares at the revenues, not the global group

7   of fighter?  So like when you talk about 20 percent fighter

8   share, you're talking about all of the fighters, but when you're

9   running your regression, you're running individual fighter

10  shares, which might be 1 percent or 2 percent?

11  A.  I am using the individual fighter share, but I am not using

12  this jerry-rigged data where each event --

13          THE COURT:  You don't have to comment about it.

14  Dr. Singer, let me stop you.  You don't need to comment on it.

15  If you want to clarify what your numbers are, then you can do

16  that, because that's part of the reason why I don't want to go

17  back to these other numbers is because we get into this back and

18  forth about these other numbers that are not in the report.

19          So why don't we move on from there.

20          MR. ISAACSON:  I just wanted you to understand the

21  difference between how his regression is doing it and these 15,

22  20 percent numbers we've been tossing around.

23          THE COURT:  I'm sorry.  Say that again.

24          MR. ISAACSON:  So when he's running his regression, I

25  think he disagreed with me, he's using individual fighter

—2:15-cv-01045-RFB-PAL—

 1  shares.  So their share at an event, which might be 1 percent,

 2  because it's one person, as opposed to the collective group.

 3          THE COURT:  I'm sorry.

 4          MR. ISAACSON:  So when --

 5          THE COURT:  So when you say he's using the individual

 6  versus the aggregate amount --

 7          MR. ISAACSON:  Yes.

 8          THE COURT:  -- perhaps, you can be more clear because

 9  I'm not sure I'm understanding what you're trying to point.  You

10  can ask him.

11          MR. ISAACSON:  Sure.  So let's pull up demonstrative 1,

12  the fighter share chart.

13  BY MR. ISAACSON:

14  *Q.*  All right.  I think you said this is -- in terms of how you

15  calculate fighter compensation share, it's individual

16  compensation over the amount of event revenue?

17  *A.*  I think that's fair.  In my regression model an individual

18  observation, as I testified earlier, was what -- what a

19  particular fighter was paid in a given event and divided by that

20  amount revenue.

21  *Q.*  So that's one person at one event?

22  *A.*  Correct.  The model is fit at the individual fighter event

23  pair level.

24  *Q.*  And the event revenue is a single event?

25  *A.*  For each observation it's a single event.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  Right.  So -- and then for foreclosure share, which would be

2  the next demonstrative --

3          MR. ISAACSON:  Let's see if we've got this right.

4  Should be number two.  Yes.  All right.

5  BY MR. ISAACSON:

6  *Q.*  So it's the number -- the numerator would be the number of

7  Zuffa fighters, I'll come back to plus or minus nine months,

8  with 30-month contracts, right?

9  *A.*  That's -- that's a shorthand.  You know that there's more to

10  it than that, but that certainly they had -- the duration of the

11  contract had to exceed 30 months.  But we also required there to

12  be a champion's clause.  We also required -- among other things,

13  but you're right.  30 months was critical.  That's correct.

14  *Q.*  Right.  And the -- now, the plus or minus nine months

15  means -- so if I took a month such as an event in October 2012,

16  you didn't actually track who had contracts in October 2012.

17  You looked at who was fighting around that month, and you went

18  nine months before and nine months after.

19  *A.*  I wouldn't put it that way.  I just didn't like the

20  beginning of it.  We did look at what the contract was at the

21  time they were in the relevant market.  And you couldn't be in

22  the relevant market for a certain period of time unless you

23  fought either nine months before that time or nine months after,

24  and if we're doing the ranked, which I assume you are, you

25  are -- you are actually a ranked fighter.  You had the rank at

—2:15-cv-01045-RFB-PAL—

1   that time of somewhere between 1 and 650.

2   Q.  Just sticking to plus or minus nine months.  So October

3   2012.  So if I fought within the nine-month period after that, I

4   would -- I would be in the numerator for the October 2012 event?

5   A.  Only if you were a Zuffa fighter and you fought pursuant to

6   a contract that contained those three provisions that I consider

7   to be potentially exclusionary.  And if --

8   Q.  And --

9   A.  Just a few more.  And if you were in the relevant market.

10  So if we're looking in the ranked, you'd have to have a rank at

11  the time, and your promoter would have had to put on an event in

12  North America.

13  Q.  Yes.  And so in terms of the plus or minus nine months, so

14  if we're -- for October 2012 -- for October 2012 -- for doing

15  the foreclosure share in October 2012, if I fought in January

16  2013, but didn't sign a contract until November 2013 -- November

17  2012 and I didn't have a contract in October 2012, I would still

18  be included in the numerator?

19          THE COURT:  Hold on.

20          THE WITNESS:  I couldn't follow that.

21          THE COURT:  I'm not sure I followed that.  And was

22  there anyone -- Zuffa fighters that were fighting without

23  contracts?

24          MR. ISAACSON:  No, but --

25          THE COURT:  So I don't know why we're doing a

—2:15-cv-01045-RFB-PAL—

1  hypothetical.

2        MR. ISAACSON:  You can fight nine months late

3  afterwards and not have a contract on the date.  So you can

4  fight nine months after October 2012 and not have a contract on

5  October 2012.

6        THE COURT:  But did that actually happen?

7        MR. ISAACSON:  Yes.  Sure.

8        THE COURT:  I mean, I'm not aware -- no.  When you say

9  sure, you're saying that there were -- there were fighters who

10  were fighting without contracts --

11        MR. ISAACSON:  No.

12        THE COURT:  -- during fights?

13        MR. ISAACSON:  No.  So I'll -- so because of the plus

14  nine months.

15        THE COURT:  Right.

16        MR. ISAACSON:  Right.  So I can -- I can sign a

17  contract three months afterwards, fight eight months

18  afterwards --

19        THE COURT:  Right.

20        MR. ISAACSON:  -- and be counted in the foreclosure

21  share for October 2012.

22        THE COURT:  Oh.  Right.

23        MR. ISAACSON:  Right.  And going backwards for nine

24  months, right, I can fight eight months beforehand, have my

25  contract lapse four months beforehand, and can counted in

—2:15-cv-01045-RFB-PAL—

1  October 2012.

2  BY MR. ISAACSON:

3  *Q.*  Do I have that right?

4  **A.**  I'm not sure I'm following.

5          THE COURT:  I'm not sure I'm following either.  And,

6  Mr. Isaacson, were there ever Zuffa fighters who fought without

7  contracts?

8          MR. ISAACSON:  That's not my point.

9          THE COURT:  But that's my question.

10         MR. ISAACSON:  No.  No.  Of course not.

11         THE COURT:  Okay.  So why would I consider that in

12  terms of your point if the fact is they were always under

13  contract one way or the another and the contract includes these

14  clauses?  I want to understand why it is you're saying this is

15  significant.

16         MR. ISAACSON:  Because the foreclosure share is not

17  using whether you were contracted on the date that there -- that

18  they're calculating the foreclosure share.

19         THE COURT:  Why does that matter if they were still

20  under contract and couldn't fight unless they fought pursuant to

21  the terms?

22         MR. ISAACSON:  Because the numbers don't match the real

23  world and --

24         THE COURT:  Yeah, but it wouldn't -- but it wouldn't

25  exclude their inclusion within the contract in the context of

----2:15-cv-01045-RFB-PAL----

1  their -- of the ability of the contract to control their

2  fighting results.

3          MR. ISAACSON:  But the regression -- right.  He's

4  also -- okay.  So the result is you actually count for, say,

5  October 2012 fighters who are contracted for other promoters

6  because of -- so if I fought eight months beforehand and I moved

7  four months later to Bellator, on October 2012 I'm counted as a

8  Zuffa fighter.

9          If -- likewise, if I'm fighting for Bellator on

10  October -- if I've contracted with Bellator on October 2012, I

11  leave Bellator, and I sign with Zuffa three months later, and I

12  fight six months -- you know, six months later, I'm being

13  counted as a Zuffa fighter in the foreclosure share.

14          THE COURT:  Okay.  And so do we have the numbers -- and

15  maybe this is what you're getting to.  I'll go back to the

16  reports -- of the number of fighters who actually fought, who

17  went from Zuffa to Bellator -- because, first of all, it's

18  mostly Bellator after 2011.  Do you have that number that you

19  think are overrepresented somewhere that I can look at to be

20  able to say that the foreclosure share isn't accurate, which is

21  -- foreclosure share isn't accurate, which is what I understand

22  you to be suggesting?

23          MR. ISAACSON:  I'm going to let Dr. -- I wanted to

24  establish the facts now, and we'll let Dr. Topel answer that

25  okay.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Okay.  So you're going to provide that

2     portion of it?

3          MR. ISAACSON:  Right.  Part of this -- what I'm trying

4     to achieve here is to get on the same page as to what's happened

5     as to how this regression works.

6          THE COURT:  Right.  And so I guess what you want to

7     point out is that the foreclosure share captures fighters who

8     may in fact in a given moment in time not actually be under

9     contract to Zuffa.  Is that right?

10         MR. ISAACSON:  That is one point that we will

11    eventually make.

12         THE COURT:  Okay.  And so in that sense you're saying

13    the foreclosure sale -- foreclosure share may be sort of

14    overestimating, right, the extent to which Zuffa had this

15    control because there are fighters who are included who

16    shouldn't be included.  Is that what you're saying?

17         MR. ISAACSON:  The way I would put it is it's not

18    actually trying to measure the relationship that it says it's

19    trying to measure.  That if foreclosure is not actually

20    foreclosure, then it's not measuring the relationship -- the

21    relationship he's captured -- he's capturing --

22         THE COURT:  But other than the time, what else are you

23    talking about?

24         MR. ISAACSON:  That's what --

25         THE COURT:  Okay.  But, no, when you're saying it

─2:15-cv-01045-RFB-PAL─

1    doesn't actually capture, right now you're focussed on time, are

2    you going to say there are other things as well?

3              MR. ISAACSON:  Yes.

4              THE COURT:  Okay.  I wasn't sure, in terms of what

5    you've done so far, there's something else I should be gleaning

6    besides, at least for now, if there may be fighters who are

7    captured who have actually moved onto a different promoter.

8              MR. ISAACSON:  There will be other things, and I will

9    do one thing at a time.

10              THE WITNESS:  Your Honor --

11              THE COURT:  Okay.  No.  That's fine.  I just want to

12    make sure I get each point in time.  And certainly I want to

13    make sure I understood that.

14              Dr. Singer.

15              THE WITNESS:  I just want to say that I've never seen a

16    sensitivity analysis of this kind to my foreclosure share.  I

17    would think that if it was really sensitive to these scenarios

18    that he's laying out, I would have seen an analysis by Dr. Topel

19    that says had it had -- had Dr. Singer done it this way, the

20    foreclosure share would drop precipitously.  But it sounds like

21    maybe this is a preview of some fresh and new analysis.

22              THE COURT:  We'll get to what it's -- I'm sure they're

23    going to -- they're not going to keep us in suspense too long,

24    hopefully.  We'll figure this out.

25              Go ahead, Mr. Isaacson.

—2:15-cv-01045-RFB-PAL—

1  BY MR. ISAACSON:

2  *Q.*  All right.  Now -- and the denominator -- the denominator

3  is, instead of being Zuffa fighter, it's all fighters?  Within

4  your markets.  When I say "all fighters," it's within whatever

5  market we're talking about?

6  *A.*  I think that's fair.

7  *Q.*  And you're weighting both the top -- the numerator and the

8  denominator.  You're weighting the Zuffa fighters by Zuffa

9  revenues, weighting the denominator for the non-Zuffa promoters

10  by their -- by their revenues?

11  *A.*  It's not exactly right, and of course that would only apply

12  to the revenue-weighted market definitions.

13  *Q.*  Right.  But the -- for calculating -- for doing your impact

14  regression, you used the weighting?

15  *A.*  Not for the presentation I did today.  And certainly -- no.

16  I'd answer no.  That's not the --

17  *Q.*  For the calculation of actual injury which is Table -- let's

18  go to Table 8 of your report.

19          THE COURT:  What page?  Is this the original report?

20          MR. ISAACSON:  It would be first report, page 155.

21  BY MR. ISAACSON:

22  *Q.*  There is -- I'm going to look at 155.  There is an errata

23  that changes the numbers slightly, but I don't think it's

24  material.  So for simplicity I'm just looking at page 155.

25  *A.*  Mr. Isaacson --

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Okay.  Hold on.  Let me him ask the

2    question, Dr. Singer.  I want to make sure I'm understanding the

3    question, too.

4    BY MR. ISAACSON:

5    Q.  All right.  The -- for purposes of this calculation, you

6    used -- this derives from the impact regression either with --

7    including the Strikeforce or excluding the Strikeforce?

8    A.  I'd have to go check because this is a key point.  I do it

9    every way.

10   Q.  Right, but you do -- you do this weighted, correct?

11          Table 8 is you use the weighted?

12   A.  I'm not sure I did because it doesn't say that I used the

13   weights.  This is for the headliner market definition.  You

14   recall that I do one iteration of headliner without any weights.

15   I do a headliner version with ranked weights.  I do a headliner

16   version with revenue weights.

17   Q.  So --

18   A.  My results, in terms of the share of the impacted signers,

19   are not sensitive to the weights.

20   Q.  Now, when you say they're not sensitive, you mean the

21   coefficients, the negative coefficients for the foreclosure

22   share?

23   A.  I was actually talking about the share of injured fighters.

24   That is, you're going to get into the high 90s based on any path

25   that you take.

—2:15-cv-01045-RFB-PAL—

1   *Q.* All right. Let's see if I can get us on the same page here.

2          MR. ISAACSON: Can we go to the demonstrative that's

3   for Dr. Singer, first report, Table 8.

4          THE COURT: Where is this in the report?

5          MR. ISAACSON: This -- this is like the -- my other

6   thing where I did foreclosure share. This is my attempt to see

7   if we can agree on what this means. This is not our -- this is

8   not intended to be argumentative.

9          THE COURT: Okay. Well, I mean, if he agrees. Again,

10  part of this, Mr. Isaacson, and the reason why I'm instant upon

11  this is when I go back to write my decision, it's helpful for me

12  to have these references. And so these things that are created

13  for the purpose of the testimony are not necessarily helpful

14  without providing the context. So for both doctors they give a

15  lot of context and they give footnotes and other things. When

16  I'm looking at a chart, I understand what the assumptions are

17  and what the factors are.

18         MR. ISAACSON: There's no assumptions here. When they

19  wrote out their formula for you in their slides, this is my

20  attempt to do the same thing. That's all that's going on here.

21  All right. There are no results here.

22         THE COURT: Okay.

23         MR. ISAACSON: Okay?

24  BY MR. ISAACSON:

25  *Q.* Now, when you're -- this is like when I showed you wage

—2:15-cv-01045-RFB-PAL—

1  share and foreclosure share.  I'm trying to find out if we got

2  this right, how you calculated it.

3          So when you're calculating individual injury, okay, the

4  individualized injury that went into Table 8, you're -- you're

5  doing a prediction of what they would actually -- what they

6  should have made and you're subtracting what they actually made?

7  *A.*  Correct.

8  *Q.*  And, now, the negative .33 here is the coefficient we looked

9  at in your table -- in your -- we looked at it for the tracked

10  market for the -- for the relationship between foreclosure share

11  and wage share.  There was a negative .33.  Do you remember

12  that?

13  *A.*  I seem to recall that coefficient, yes.

14  *Q.*  And whatever number here you used, this is just an example.

15  And so the .3 is -- is the 30 percent foreclosure share that you

16  assume in the but-for world.  You explained that in the but-for

17  world you're saying, well, some antitrust scholars and courts

18  have said 30 percent is okay.

19          THE COURT:  But that's not this number.

20          MR. ISAACSON:  That's .3 is --

21          THE COURT:  No, they're the same number, but you're

22  talking about different numbers, right.  This is based upon a

23  regression analysis --

24          MR. ISAACSON:  This is not regression.  This is math.

25  This is not the regression.

1          THE COURT:  Okay.  I'm confused then.  So I thought you

2     were saying this .033 came from the table on 125.

3          MR. ISAACSON:  Yeah, it's the result of the regression.

4          THE COURT:  Right.  Okay.  So that's the coefficient

5     for the foreclosure share.

6          MR. ISAACSON:  We're taking this coefficient, okay, and

7     he's running a new regression.  In order to get the predicted --

8     what the fighters would get in the predicted but-for world, and

9     you can correct this --

10          THE WITNESS:  I'm going to correct it because --

11          THE COURT:  So why don't we just ask him what the

12     actual formula is that he used because it's actually in his

13     report.  I don't --

14          MR. ISAACSON:  No, no, no.  It's not -- it's not in any

15     simple way.  I mean, there's pages and pages of things.

16          THE COURT:  Yes, but --

17          MR. ISAACSON:  Not in a way that you and I can

18     understand.

19          THE COURT:  Well, maybe we should try to figure that

20     out because what I'm saying to you is that I don't know that

21     this helps me; because if he's saying that that's not what he

22     used, what we're going to have -- Mr. Isaacson, the reason why

23     I'm saying use his reports, he's going to say that's not exactly

24     what I used.  And then where are we?

25          MR. ISAACSON:  I'm going to correct this to do what he

—2:15-cv-01045-RFB-PAL—

1    says he used.

2           THE COURT:  Okay.  All right.  Maybe it will help then.

3    Go ahead.

4           MR. ISAACSON:  I'm trying to be helpful, Your Honor.

5    BY MR. ISAACSON:

6    Q.  So for the prediction, you run your regression.  So going

7    back to Table 125 -- page 125.

8           So for the prediction you run this whole regression

9    again, this regression with all of these variables and all of

10   these coefficients, for each fighter with a different

11   foreclosure share.  Is that right?

12   A.  I don't rerun the regression, no.

13   Q.  Okay.  I'm using the wrong term saying rerun the regression.

14   You use the coefficients in this table to calculate a predicted

15   fighter wage?

16   A.  Correct.

17   Q.  Thank you.

18          And only --

19          THE COURT:  And how do you do that?

20   BY MR. ISAACSON:

21   Q.  You use a lower foreclosure share, right?

22          THE COURT:  Well, no, I want to actually know -- maybe

23   he can explain in basic terms.

24          THE WITNESS:  Sure.

25          THE COURT:  What do you do with the coefficients?  And

2:15-cv-01045-RFB-PAL

1    as it relates to going -- this predicted versus actual injury to

2    come up with what would be the suppressed wage share.  So how

3    did you do that?

4              THE WITNESS:  Correct.  So can we go back?  Because

5    this is wrong.  But can we go back to the prior page?  I take

6    these coefficients --

7              THE COURT:  Right.

8              THE WITNESS:  -- right.  And I know for a given fighter

9    event pair all of what these right-hand side variables were in

10   the actual world.  For a given observation in the database, I

11   know everything about that fighter that was used for the

12   prediction.

13             THE COURT:  So you do a summation?

14             THE WITNESS:  I do a simulation.  Simulation.

15             THE COURT:  Oh.

16             THE WITNESS:  Right.  A simulation of what that fighter

17   would have gotten in the but-for world.

18             THE COURT:  Right.

19             THE WITNESS:  Everything has kept constant except for

20   the foreclosure share.  So I have a prediction.  I have a

21   prediction of what that fighter would have made in the but-for

22   world.  And I compare -- at a given event, and I compare it to

23   what that fighter was paid in the actual world.  And for most of

24   the fighters, in fact the vast majority of fighters, you are

25   able to show an underpayment.  There is a small tail of a

—2:15-cv-01045-RFB-PAL—

1   distribution of fighters who were very, very well compensated in

2   the actual world --

3           THE COURT:  So in the simulation what goes into the

4   individual fighter pay characteristics that allows you to make

5   that calculation?

6           THE WITNESS:  Everything that was on the right-hand

7   side of the regression, Your Honor, everything, all of those

8   attributes.  We have a vector of attributes about the fighter

9   going into the fight and what he or she did at the fight:

10  punches thrown, takedowns, whether --

11          THE COURT:  So you try to account for all of those

12  variables in the actuals.  So, in other words, you say, okay,

13  there is impact on the wage share based upon punches thrown.  So

14  we're going to put that in as part of the actual.

15          THE WITNESS:  We know -- we know -- yes, we know

16  everything that actually happened.  We have -- just think of

17  this as an excel spreadsheet.  And we have all of the data for

18  each of the right-hand side variables for a given observation of

19  that data.  Right.

20          THE COURT:  Right.

21          THE WITNESS:  And now we can go ahead and predict using

22  these -- Mr. Isaacson likes this one a lot, but I don't.  Can we

23  go back to the one before?

24          THE COURT:  But it doesn't matter what we use --

25          THE WITNESS:  Well, those coefficients --

1          (Court reporter interruption.)

2          THE COURT:  It doesn't matter which diagram we use.  I

3   think what Mr. Isaacson trying to sort of get at and which I

4   certainly would want to also understand is what is it -- as best

5   you can explain in terms of those of us who don't look at the

6   somewhat complex formulas you have, what is it you did to be

7   able to capture what was the actual amount that would have been

8   the wage share and then what's the predicted change?  And it

9   seems we agree the prediction is based largely on the

10  coefficient of the foreclosure share.  Is it based upon anything

11  else?

12         THE WITNESS:  Everything.  It's based on everything on

13  the right-hand side.  It's based on all of the coefficients in

14  that prior slide that he keeps taking away.  It's based -- the

15  prediction is based on all of the coefficients; not just the

16  foreclosure share coefficient; on all of the coefficients.

17         THE COURT:  Okay.  So then do you -- do you take for --

18  in terms of the actual, is that based upon an actual event that

19  is a data point in the --

20         THE WITNESS:  Exactly.

21         THE COURT:  Oh, okay.

22         THE WITNESS:  Exactly.  And we know what the fighter

23  got paid in the actual world.  The trick is to try to estimate

24  what the fighter would have been paid --

25         THE COURT:  Got it.

—2:15-cv-01045-RFB-PAL—

1        THE WITNESS:  -- in A world where the foreclosure share

2   was zero or 30 percent.  And the model gives us a whole set of

3   parameters and say multiply these parameters by the actual

4   values on the right-hand side.  And now I can predict I need to

5   do one tweak, which is where the foreclosure share was 80

6   percent or 90 percent, we're going to change that down to, say,

7   30 percent or 0 percent.  Then we go to make the prediction, and

8   then we're going to compare the predicted wage to the actual

9   wage.  And if the prediction comes out higher, we can -- we can

10  infer that that fighter suffered impact in that event.

11        THE COURT:  Got it.

12        MR. ISAACSON:  So I actually think we got this line

13  correct based on what he said.

14        THE COURT:  So here's what I'm going to tell you, this

15  is not helpful to me at all because I actually don't --

16        MR. ISAACSON:  Can I --

17        THE COURT:  -- I don't think it captures -- what he's

18  describing is a very complex way of going about doing this in

19  terms of as it relates to each event and how it calculates the

20  factors.  This does not help me, Mr. Isaacson, at all.

21        MR. ISAACSON:  Can I just explain to you what we did

22  here, though?  The other coefficients is everything he said on

23  the right side.  That's what it means and --

24        THE COURT:  But, no, Mr. Isaacson, you're trying to

25  simplify things --

2:15-cv-01045-RFB-PAL

1           MR. ISAACSON:  The other thing is the tweak.

2           THE COURT:  But, Mr. Isaacson, you're trying to

3  simplify things that can't be simplified.  I do think the tweak

4  is something that he can describe, if you want to have him

5  describe that.  But the fact of the matter is these variables

6  are going to change based upon the fighters and the events.  And

7  so I understand that you want to focus on certain aspects of the

8  tweaks.  Let's talk about that.

9           But this is not I think an accurate simplification

10 based upon what Dr. Singer is describing to me of what happens.

11 Now that's not to say you can't make arguments about whether or

12 not that a tweak is an appropriate way to predict common injury,

13 which I take what part of your point is.  But let's focus on why

14 or why the tweak isn't appropriate.

15          MR. ISAACSON:  All right.

16          THE COURT:  Because this isn't helping me.

17          MR. ISAACSON:  Right.  All right.  Well, we got to the

18 point of learning from this that it's a tweak plus all of the

19 other coefficients, which is what I wanted the Court to know.

20          THE WITNESS:  But that slide is inaccurate because it

21 suggests --

22          MR. ISAACSON:  He doesn't want --

23          (Court reporter interruption.)

24          THE COURT:  So, Mr. Singer, you don't have to respond

25 if there's no question.

1        MR. ISAACSON:  Right.  The slide is inaccurate.

2        THE COURT:  I understand, but the slide's not admitted.

3   But here's the other thing.  It doesn't really matter -- this

4   goes for any of the lawyers.  The lawyers can't actually

5   testify, right, as much as they would like to, right.  That's

6   going to be you and Dr. Topel for both sides and the remaining

7   experts.

8        So if Mr. Isaacson or Mr. Cramer makes an argument

9   about what they think the data means, that's fine.  They're

10  entitled to do that.  That doesn't mean that I accept that.  And

11  if it's not in the question, you certainly don't need to respond

12  to it because, otherwise, we'll be here all day with that

13  because I don't think that's important at this point.

14        But, Mr. Isaacson, so I'm saying that in part because I

15  think what would be helpful is if you're trying to focus on how

16  you think the tweak as it relates to the coefficients is

17  improper or for some reason not valid, then let's talk about

18  that.

19        MR. ISAACSON:  Can I just -- he said something else,

20  though.  Because when he said he subtracted the actuals, I just

21  want to go over that.  Right.

22  BY MR. ISAACSON:

23  Q.  When you subtract the actuals, what -- you don't just go and

24  get the actual amount that was paid.  First you go through your

25  formula with all of the coefficients, keeping the original

—2:15-cv-01045-RFB-PAL—

1    foreclosure share, and then you compare that to the actuals, and

2    then -- and then make them equal, right?  You do -- you go

3    through the process of using the higher foreclosure share -- the

4    untweaked formula and see what compensation you got?

5    **A.**  It's not exactly how I'd put it, but maybe we're iterating

6    to the commonplace.  We're going to fit the model using the

7    actual data that we observe in the world, including these very,

8    very high foreclosure shares.  We get a set of parameters that

9    come out of the model.  Now we can go back and make predictions

10   on a fighter-by-fighter basis of each event as to what that

11   fighter would have been paid if we make one change.  That is,

12   when we go to make the prediction, we're going to set the actual

13   foreclosure -- we're going to show the value of the foreclosure

14   for that fighter not at what it was, but either zero or 30

15   percent.  It is a simulation.  And it will tell you what the

16   fighter would have been paid.  What I'm --

17          THE COURT:  Then when you did that, did you then sum

18   that sort of difference across all of the events for a

19   particular fighter?

20          THE WITNESS:  Well, we're doing it a fighter/event

21   pair.  So an observation in the database, Your Honor, is a

22   fighter/event pair.  It's a fighter who performed at a

23   particular event.

24          THE COURT:  Right.

25          THE WITNESS:  And so we're going to go fighter event,

—2:15-cv-01045-RFB-PAL—

1  fighter event, fighter event.  There's thousands of them.

2       THE COURT:  That's how you did the pairing.

3       THE WITNESS:  And for this proof of impact method A,

4  we're making predictions of what that fighter at that event

5  would have been paid, and we're comparing it to -- to what he or

6  she actually was paid.

7       And this is a very important point.  The other

8  coefficients that he has up on the screen, the other variables

9  in the model are not just canceling each other out.  The other

10 coefficients, the other variables, are playing a very important

11 part in the --

12       THE COURT:  That's what I understood from your

13 explanation.

14       THE WITNESS:  Okay.

15 BY MR. ISAACSON:

16 *Q.*  All right.  So -- and so when you do the actuals, I think

17 you just said this, you do the simulation and then -- so using

18 the actual foreclosure effect.  You say here's what my model

19 shows that they actually made.  And then your computer says,

20 well -- say you predicted 9,000.  The computer says, no, they

21 made 10,000.  And then you add in at the end a residual for that

22 $1,000 difference?

23 *A.*  No, that's not what I do.

24       THE COURT:  That's not what he just -- that's not what

25 he's describing what he's doing.  So --

1  BY MR. ISAACSON:

2  *Q.* So you're saying you actually used the -- you just went --

3  you went in and found out what each fighter paid and subtracted

4  that actual amount?

5  **A.** Let me try it again.  I have a prediction of what the

6  fighter would have been paid at a given event in a but-for world

7  where the foreclosure share was zero or 30, and I compare it to

8  what the fighter actually made.  If that difference shows an

9  underpayment, then I consider that fighter to have been injured.

10 Sometimes, very rarely for 12 of the fighters, that you cannot

11 show impact for a very, very small.  And it turns out the reason

12 why you can't is for this very, very small handful at the tail

13 of the distribution, they were paid so much in excess of what

14 every other fighter got, including those in the cohort, that the

15 regression can't understand why it is they did so well.  And it

16 appears as if they escaped injury, and this is important, only

17 under that model.  It is not my opinion that those 12 fighters

18 actually escaped injury.  I think they were injured.  Just using

19 this method A, you're always going to get a little bit of a

20 tail, right, that can't be shown to have suffered injury.

21 BY MR. ISAACSON:

22 *Q.* So -- but when you say I compared it to what the fighter

23 actually made, I just -- I want -- you just looked at what the

24 contract says they got paid?

25 **A.** No.

―2:15-cv-01045-RFB-PAL―

1  *Q.*  Right, that's what --

2          THE COURT:  No.  What I understood is that what Mr. --

3  Dr. Singer did was based upon the fighter/event pairing he came

4  up with a statistical model.  He then went back after he came up

5  with the model with the coefficients and then did a simulation

6  where he used the actual pairing event, and then he changed the

7  coefficient for -- for the foreclosure share.

8          MR. ISAACSON:  Okay.

9          THE COURT:  The 30 percent or zero.  Is that right?

10          THE WITNESS:  I left the coefficient the same.  I just

11  changed the value of the foreclosure share from 80 or 90,

12  whatever it was at the time I'm making the prediction in the

13  actual world, to zero or 30 percent.

14          THE COURT:  Right.

15          THE WITNESS:  But I left -- the coefficient came from

16  the first step.  That stays the same.  The coefficient tells you

17  what the relationship is between --

18          THE COURT:  Right.

19          THE WITNESS:  That stays.  That stays in the

20  simulation.

21          THE COURT:  I'm sorry.  You're right.  So you saying

22  that was for the variable.  Okay.

23  BY MR. ISAACSON:

24  *Q.*  It's a comparison of two simulations.  I think we got it.

25          THE COURT:  Okay.  Mr. Isaacson, here's what I'm

—2:15-cv-01045-RFB-PAL—

1  saying.  You repeating that doesn't tell me that that's what

2  your point is.

3         MR. ISAACSON:  I thought that's what he just said.

4         THE COURT:  No, no.  But, no, again that's actually not

5  what he's saying.  So part of it is I want to try to understand

6  your point, but what I understand is that Dr. Singer conducted

7  this statistical analysis and he used that then to do a

8  simulation.  But the simulation involved actual data that he --

9  that the simulation involves him changing the value as it

10  relates to the variable for the foreclosure share variable.

11  That's what I understood him to be saying.

12         So when you -- I don't understand him to be saying he's

13  doing two simulations.  He's not doing two simulations.  So I'm

14  not understanding -- when you're saying he's doing two

15  simulations, I don't understand what you mean by that.  Because,

16  as I understand it, both experts, at least in this pairing, used

17  actual data.  Is there something else that I'm missing,

18  Mr. Isaacson?

19         MR. ISAACSON:  I asked him -- so to subtract -- to my

20  mind, to subtract an actual, you just go get the actual and

21  subtract it, right.  The fighter made $100,000 at the event.

22  You subtract $100,000.

23         THE COURT:  Right.

24         MR. ISAACSON:  That's not my understanding of how

25  they -- they calculated the actual.

2:15-cv-01045-RFB-PAL

1      THE COURT:  Right, I think I just explained how he

2 calculated the actual.  And I guess what I'm trying to

3 understand is what is it that you are arguing that you think is

4 problematic about how that was actually done.

5      MR. ISAACSON:  Now that we've established that

6 foundation, I'm going to let Dr. Topel explain that because he

7 will do a better job of it than I could.

8      THE COURT:  Okay.  I wasn't sure if there was something

9 about the questioning, Mr. Isaacson, that I -- that I was

10 missing.  I assumed that Dr. Topel is going to get up here and

11 say things that are very different than Dr. Singer.  Otherwise,

12 we wouldn't have two opposing parties.

13      MR. ISAACSON:  But also part of this is to get -- one

14 part is to have him explain what he did.

15      THE COURT:  Right.  Okay.

16 BY MR. ISAACSON:

17 Q.  Now, the -- you mentioned what's in the foreclosure effect.

18 It's the 30-month contracts plus the champion clauses.  As I

19 think you've told before, the champion clauses are almost always

20 present.  It's really the 30-month contracts that are driving

21 those to regression?

22 A.  I think that it's fair to say that what's causing it to

23 change over time is the fact that Zuffa is inching up the

24 duration of the contracts.  That's correct.  You'll see

25 champions clauses early on in the class period.

2:15-cv-01045-RFB-PAL

1  Q.  Right.  There's one necessary element for a foreclosure

2  effect and that's the 30-month exclusive contracts?

3  A.  I wouldn't say there's one necessary.  We need -- we require

4  all three.

5  Q.  All right.  So at your -- I don't want to go into like

6  cross-examination impeachment excessively, but at your first

7  deposition I asked you and we can show -- you have your

8  depositions in front of you there if you want to look at it in

9  the binder, but I will show you on the screen.  First

10  deposition, 268, page -- line 11.  I asked you:  So there's one

11  necessary element for a foreclosure effect, and that's the 30

12  month or more exclusive contracts, correct?  Answer --

13  A.  Well, there is a different topic.

14  Q.  Answer:  Yes.

15  A.  It's a different topic.  Can I explain?

16       THE COURT:  Well, but here's what I think it will be

17  helpful.  Let me give this guidance to all counsel, which is

18  that I'm going to rely upon the explanations in the reports for

19  both sides.  So that's why I had said to Mr. Cramer,

20  Mr. Isaacson, sort of pulling out portions of Dr. Topel's

21  testimony also isn't helpful for me because the reports provide

22  the overall context.  I don't think it's helpful to pull out

23  just portions of the deposition, unless you can point to how

24  what's in the deposition is actually part of the model.

25       Because in the model and in the report he actually,

1   Dr. Singer, and so does Dr. Topel, explains what's in their --

2   his determination of the -- of this foreclosure variable.  And

3   it isn't just the 30 months.  It actually talks about other

4   factors.  Both of them talk about multiple factors.

5           And so I'm saying that to you because pulling this out

6   for me doesn't somehow contradict what is written in the actual

7   report, which is why I wanted to focus on that.

8           MR. ISAACSON:  So I believe I am focusing on the

9   foreclosure effect variable.  And I think he has said that the

10  only thing that matters for that foreclosure effect is the

11  30-month contracts.

12          THE COURT:  No, that's not what he says in the report.

13  The report goes through -- that's why I don't want to go back

14  and forth in the depositions.  The report for each of the -- for

15  each of the experts lays out the definitions for each of the

16  variables.  That's what I'm relying upon.

17          So for either side, if there are these moments in a

18  deposition where someone -- an expert says one thing or another,

19  that to me is less significant than, Mr. Isaacson, what the

20  actual reports show.  If you're saying that in fact -- and

21  Dr. Topel will say that in fact if you eliminate this time

22  period, that that completely eliminates the statistical

23  significance of the impact of the foreclosure share, fine.  Then

24  that's what you can do, but I don't -- I don't find it helpful

25  to pull out portions of deposition testimony that may or may not

----2:15-cv-01045-RFB-PAL----

1   be sort of explained in the reports themselves.

2          MR. ISAACSON:  So not everything is said in a report,

3   but I also think what I'm saying is completely consistent with

4   the report.  He listed and he said, I believe, that it's

5   30-month in champion clauses.  That's how he measured the

6   contract.

7   BY MR. ISAACSON:

8   Q.  Did I miss something?

9   A.  You missed one other element.  It was 30-month champion

10  clause and, perhaps, a right to match.  I'm just -- I'm getting

11  tired, but there's one other -- there's one other element.  I

12  had a slide earlier in the day that showed three elements of a

13  contract that are necessary for us to deem it to be potentially

14  exclusionary.

15  Q.  When you count the 30 months, you include the right to

16  match?

17  A.  Oh, correct.  I'm sorry.  I just am having a hard time

18  remembering what the third element was, but --

19  Q.  Right.

20         MR. ISAACSON:  I didn't think I was saying anything

21  controversial, Your Honor.

22         THE COURT:  Well, what I'm saying to you, Mr. Isaacson,

23  I'm not saying that you are.  What I'm saying is that it's

24  helpful for me because when I go back and look at the testimony,

25  I'm going to match it to the reports.  And to the extent that

1  you're saying that this is a major impact of the report, the

2  reports for both of the experts define the variables.  And so if

3  you want to say this is a significant or predictive aspect to

4  this particular variable, that's fine.  Then I think it's

5  helpful to point that out or ask him about that in the context

6  of the report.  If that's what you're trying to do here, that's

7  fine.

8         But I always want to make sure that whatever the

9  testimony is, it's matched up to aspects of the reports and the

10  sort -- and the models that are used so that I can go back and

11  tie it to that particular modelling.  Because obviously this is

12  very complex modelling, and I don't want to take statements out

13  of context from either expert as it relates to the modelling.

14  That's why I've tried to emphasize to both parties focusing on

15  the reports because I think since none of us are the

16  econometricians that these experts are that's the best way for

17  us to stay focussed.

18  BY MR. ISAACSON:

19  Q.  All right.  Well, let me try this.  Is it fair that in the

20  absence of the 30-month contracts you don't have an opinion

21  about whether any of the acquisitions that you've talked about

22  were anticompetitive?

23  A.  So now you're going into a different topic which relates to

24  the answer that was on the deposition screen.  That question

25  that was put to me was of the three pieces of the challenged

—2:15-cv-01045-RFB-PAL—

1  conduct:  the acquisitions, the long-term exclusive contracts

2  and I think exclusivity was the third element, Your Honor, and

3  the -- and the third would be the coercion.  I was asked in the

4  deposition which one of those three are necessary to drive

5  foreclosure.  And my answer was the 30-month plus exclusive

6  contracts.

7        But I think that the confusion was created when you

8  asked me whether those --

9  Q.  I didn't.

10       THE COURT:  Hold on.  Let him finish.

11       MR. ISAACSON:  I'm sorry.  I was asking a different

12  question, so ...

13       THE WITNESS:  Well, we were talk --

14       THE COURT:  Go ahead.  Finish.

15       THE WITNESS:  We were talking before, Your Honor, about

16  three elements of a contract that I needed to find before I

17  deemed it potentially exclusionary.

18       THE COURT:  Right.

19       THE WITNESS:  And then he showed something on -- that

20  was I think taken out of context.  It was in relation to a

21  different question which is, of the three elements of the

22  challenged conduct:  acquisitions, long-term exclusive

23  contracts, and coercion, which one of those do I consider to be

24  necessary to drive the model and gender and drive foreclosure.

25  And that one I will grant you the only one that's necessary of

—2:15-cv-01045-RFB-PAL—

1  those three are the long-term exclusive contracts.

2       THE COURT:  Okay.

3  BY MR. ISAACSON:

4  *Q.*  And you don't have an opinion if in the absence of the

5  30-month contracts whether the acquisitions are anticompetitive?

6  **A.**  I can tell you that if the -- if the anti -- if the

7  long-term exclusive contracts were to go away, if the judge were

8  to rule that those were procompetitive, right, then there would

9  be no damages.  I -- my model turns on those --

10      THE COURT:  The ability to lock up the fighters.

11      THE WITNESS:  The ability to -- if you take those away,

12  then there are no damages.  Alternatively, because they're

13  necessary, what goes on elsewhere is not that important.  The

14  other ones are not necessary.  So if you were to rule, for

15  example, that the acquisitions are procompetitive, right, then

16  they stick around.  In the but-for world they would have no

17  bearing on my model.  I would come to the exact same place --

18      THE COURT:  The acquisitions including the acquisition

19  of the fighters?  Then that would be different, right?

20      To emphasize your point, in other words, if I said,

21  well, the acquisitions are procompetitive and that includes the

22  acquisition of the additional fighters, that could potentially,

23  I'm not saying that it would, could potentially impact your

24  results?

25      THE WITNESS:  I'd have to think about that one.  Up

1    until now I've been thinking about three elements of the conduct

2    where the exclusive long-term contracts were a separate discrete

3    element from the acquisitions.

4         THE COURT:  Right.  Okay.

5    BY MR. ISAACSON:

6    Q.  So we talked about the time trend variable.  You also

7    mentioned a year fixed effect.  That was in the -- the footnotes

8    or whatever, the part of your -- of that table we were looking

9    at.  And those control for the possibility of things that have

10   changed from year to year?

11   A.  I think the way that I would put it is that if something

12   special happened in a given way that may have altered the wage

13   share, then the year fixed effects would capture it.

14   Q.  Right.  So the result of that is that when you're measuring

15   the relationship between foreclosure share and fighter share,

16   you're doing that within a year and not across years?

17   A.  (Pause.)

18        I wouldn't put it that way.  What's informing the

19   foreclosure variable in my model is time series variation at

20   Zuffa across time that relates how changes in the foreclosure

21   share across time affect -- affect wage share.

22   Q.  Right.  But your year effects variable, possibly in

23   combination with the trend variable, is taking out changes in

24   the foreclosure share across years; you're looking at the

25   relationship between foreclosure share and fighter share within

─────2:15-cv-01045-RFB-PAL─────

1  years?

2  *A.*  I wouldn't put it that way.

3  *Q.*  Okay.  Do you have an explanation, once you've wiped out the

4  year effects, what's left besides within the year?

5  *A.*  I haven't wiped out anything.  I'm just controlling for the

6  possibility that something happened in a given year that we

7  can't observe that may have explained a change in the wage

8  share.  I'm isolating the effect of changes in foreclosure share

9  on the wage share.

10  *Q.*  So once -- let me use your language.  Once you control for

11  year effects across years, what's left other than to look at

12  relationships within years?

13  *A.*  I just wouldn't put it that way.  I'm taking advantage of

14  time series variation across years to inform the foreclosure

15  share variable.

16  *Q.*  All right.  I'm giving you the opportunity to answer this.

17  Once you control for the effects across years, what else are you

18  looking at when you're looking at a relationship such as

19  foreclosure share to wage share, other than what that

20  relationship looks like within years?

21  *A.*  I just wouldn't put it that way.  We're not constraining

22  variations within years to --

23          THE COURT:  But the variable -- so the variable

24  isn't -- whatever the variable time span is, I don't know --

25  that's why I had asked the earlier question about is it matched

────────2:15-cv-01045-RFB-PAL────────

1  up with years.

2          MR. ISAACSON:  It's not.

3          THE COURT:  It's not.  So that's why I'm asking you --

4  I'm just curious about your question.  It would be whatever is

5  captured within that time frame that's impacting the wage share

6  is what's captured, as I understand it, by that time variable,

7  right?  And I'm not sure what -- what your point is because I

8  think that's what he said.

9          MR. ISAACSON:  So when you're looking at ...

10          So within a year, in terms of events, you have -- you

11  have different types of events.  You have very large events,

12  such as a Pay-Per-View event that's widely publicized.  You

13  might have a smaller event.  And if you look at just the

14  relationship between foreclosure share and wage share within a

15  year, you're doing comparisons of those types of events.

16          THE COURT:  Unless there's another variable that

17  controls for them in the model, right?

18          MR. ISAACSON:  I don't think he's suggesting -- there

19  is no wage --

20          THE COURT:  But they're listed.  So if they're listed

21  there, I would assume that they're also controlled for within

22  that same time period, wouldn't they be, Dr. Singer?

23          THE WITNESS:  I'm telling you that the foreclosure

24  share is being informed by the variation in the time series

25  across the entirety of the study period; not just within a given

1  year.

2           THE COURT:  But it would also exclude that particular

3  variable -- consideration of other variables that are also in

4  the model that you are controlling for.  So, in other words, you

5  have a -- unless there's some sort of interaction, you have a

6  Pay-Per-View --

7           THE WITNESS:  Exactly.  I'm sorry.  I'm not interacting

8  the years -- the year fixed effects with the foreclosure

9  effects, for example.  I don't know if that's where you're

10 going, but I didn't do that.

11 BY MR. ISAACSON:

12 Q.  No, I'm talking about if you just look -- if you just take a

13 year, as to what happened within a year, and you look at the

14 relationship between foreclosure share and wage share, you're

15 going to be looking at widely -- potentially looking at widely

16 different events with many different sizes of revenues?

17 **A.**  You could be looking at widely different -- I thought you

18 were going to say wage shares, but you could be looking at

19 widely different event revenues.  But the problem is that if you

20 limit it to one year, you're not going to get much variation in

21 the foreclosure share.  Foreclosure share doesn't vary that much

22 within a year.

23 Q.  All right.  The -- so let's look at your ... their slide 66.

24           THE COURT:  And, Mr. Isaacson, we have about five or so

25 more minutes and then we're going to have to wrap it up.  And,

1    again, we'll then talk about how we go forward with our

2    scheduling, because obviously we're running a little bit behind

3    as relates to the scheduling in terms of the testimony.

4          So we need to allow for a little bit more time given

5    how long it's taken so far.  So it's up to you, but I'll give

6    you time obviously to be able to come back and finish up.

7          MR. ISAACSON:  The one thing I know, Your Honor, is

8    it's up to you.  The --

9          THE COURT:  Well, I'm not sure that --

10         MR. ISAACSON:  I know --

11         THE COURT:  And I want to at least tell you this.  I

12   appreciate the challenges of trying to do cross-examination in

13   the context of an impact regression model for variables which

14   you yourself may not completely and fully understand in the

15   context of background in econometrics.  So I don't want you to

16   think that I'm asking for you to have a level of precision,

17   Mr. Isaacson, that you couldn't have in terms of training.  And

18   I appreciate the attempts to try to simplify it, but I do think

19   I want to over -- avoid oversimplification in a way that doesn't

20   represent the modelling for both -- for both experts.

21         That being said, what that means is that I want to be

22   able to give the lawyers, particularly the lawyers who are going

23   to be effectively crossing the experts, the ability to try to

24   come at these things in different ways.  And that's why I'm

25   saying to you I'll build in some latitude for you tomorrow.  And

—2:15-cv-01045-RFB-PAL—

1  we may have to talk about sort of our schedule and where we go

2  forward.  But I do appreciate the fact that it's a challenging

3  endeavor in this context.

4          MR. ISAACSON:  Let me just -- let me just see if I can

5  ask less than five minutes some -- a brief question that will

6  help me understand something for tomorrow.

7          THE COURT:  Okay.  Sure.

8  BY MR. ISAACSON:

9  *Q.*  So on slide 66, this was your -- your slide, it shows a 30

10  percent foreclosure share and then that ties to a 47.3 percent

11  but-for wage share?

12  *A.*  Correct.  It's a visual demonstration of what's going on in

13  a much more sophisticated way via the regression model.

14  *Q.*  Right.  And the -- if you look at --

15          MR. ISAACSON:  Now, can we show the slide 57.

16  BY MR. ISAACSON:

17  *Q.*  This is your slide 57 from your presentation.  And you can

18  see back in 2007 there's a foreclosure share of about 20

19  percent, and then for several -- it goes up to 30 percent, and

20  it bops around 30 percent for several years.  Do you see that?

21  *A.*  Yes.

22  *Q.*  So you would have predicted that during that period that

23  wage share would -- fighter share would rise to 47 percent?

24  *A.*  No.

25  *Q.*  In your but-for world?

2:15-cv-01045-RFB-PAL

1   *A.*   No.

2   *Q.*   Okay.  And why -- and so why is that?

3   *A.*   So think about what's happening.  In these years, which by

4   the way predate the class period, but I imagine we're just doing

5   this for an academic exercise.  So pick 2008, for example, which

6   is the year I'm not projecting damages for.  I would take the

7   actual compensation that occurred for a fighter, and then I

8   would go try to predict his or her but-for compensation setting

9   the foreclosure share, say, to 30.  But given the fact that it's

10  already almost at 30, I would suspect -- I never did this, but I

11  would suspect that had I tried to predict an impact in 2008 --

12          THE COURT:  You would have found nothing.

13          THE WITNESS:  Nothing or a much smaller portion of the

14  class would have been injured.

15          MR. ISAACSON:  Okay.  That will help me -- that will

16  help me going into tomorrow.

17          THE COURT:  Okay.  All right.  So you can step down,

18  Dr. Singer, but you will be back tomorrow.

19          So let's talk a little bit about, Mr. Isaacson and

20  Mr. Cramer, the scheduling because we're obviously taking a

21  little bit of time here to go through this.  But, Mr. Isaacson,

22  how much time do you expect you would have for Dr. Singer

23  tomorrow?

24          MR. ISAACSON:  I had -- so we have a 6.5 hour budget.

25  I had originally budgeted around 3, and I guess I've used

—2:15-cv-01045-RFB-PAL—

1   approximately one.  Somebody will tell me ...

2           MR. CRAMER:  Yeah.

3           THE COURT:  So maybe an hour and a half or so, Mr. --

4           MR. ISAACSON:  You know, my --

5           THE COURT:  -- Isaacson.

6           MR. ISAACSON:  Since this is a dialogue with the Court

7   and I don't know what he's going to say, I have no idea how

8   efficient I'm going to be.  I will try and get to the material

9   that the Court wants to hear about tomorrow.

10          THE COURT:  Well, I think part of the issue is it may

11  also be helpful -- and I actually don't know if Dr. Topel is

12  here.  I assume that --

13          MR. ISAACSON:  He is.

14          THE COURT:  -- he is.  It may also be helpful for me to

15  hear from them both, and then on rebuttal we may have a more

16  robust conversation about the differences.  Because I think

17  what's happening is and it's going to happen with Mr. Cramer

18  when Dr. Topel testifies is you all are going to point out

19  things that the experts are actually better at pointing out with

20  respect to each other models.  And then you'll come back and

21  circle back and I'll be able to look at that.

22          And so I can appreciate, Mr. Isaacson, you trying to

23  did that ahead of your expert, and that's challenging.  It may

24  be more useful to reserve a little bit more time or have a

25  little more time on rebuttal for both sides so that once there's

1  been at least some explanation, further explanation, of the

2  differences by the experts themselves, then I can ask some

3  questions.  You all can follow-up, and we can sort of move from

4  there.

5          MR. ISAACSON:  Quite -- quite sincerely, Your Honor,

6  I've been trying, I mean, not to impeach the man, but to lay the

7  foundation so that if Dr. Topel says Dr. Singer said something,

8  we're getting that right.

9          THE COURT:  Right.

10          MR. ISAACSON:  And ...

11          THE COURT:  Well, look, you're certainly free to and I

12  think you've done it in your briefings to argue that they have

13  mischaracterized each other's arguments.  And that's going to be

14  a part of what I have to disentangle, and that's okay.  They can

15  make those -- they can make those statements as long as they're

16  referencing portions of the report in the record as each of them

17  have done and will do, then I will be able to be to make that

18  type of determination.

19          So I don't know that, Mr. Isaacson, you need to spend

20  as much time sort of laying the foundation for how you are going

21  to be pointing out discrepancies.  The reports speak for

22  themselves.  And the respective experts can testify as to how

23  their reports and the modelling may or may not make assumptions

24  that are appropriate or may not take certain factors into

25  consideration.

 1          MR. ISAACSON:  I think I actually got through my

 2   foundational stuff today.

 3          THE COURT:  Okay.

 4          MR. ISAACSON:  And as you can tell, that's the hardest

 5   stuff.  And -- but I appreciated the opportunity for us to have

 6   these discussions of these individual variables because I

 7   thought they needed to be explained to the Court.

 8          THE COURT:  No, look, I think that they do need to be

 9   explained to the extent that there's any issues that I need to

10   consider regarding, for example, your arguments with respect to

11   what's not captured by the foreclosure share and the wage share.

12   Those are relevant conversations.

13          So then let's talk about sort of tomorrow.  So tomorrow

14   we have Dr. Singer for an hour and a half.  And then,

15   Mr. Cramer, how much do you have for follow-up?  And is

16   Dr. Singer then going to come on after Dr. Topel?

17          MR. CRAMER:  Yes, there's a rebuttal.

18          THE COURT:  Okay.  So I don't know how much time you

19   need then, Mr. Cramer, tomorrow to have Dr. Topel -- excuse

20   me -- Dr. Singer come back.  It would be better for us to let

21   Mr. Isaacson finish his cross.  Then Dr. Topel comes on.  You

22   all both do your respective questioning.  Then we can bring back

23   Dr. Singer because I don't know that it's going to be helpful

24   just to have you go through a rebuttal after Mr. Isaacson's

25   cross tomorrow of Dr. Singer without first having Dr. Topel

—2:15-cv-01045-RFB-PAL—

1  testify.

2        MR. CRAMER:  The only thing I would say, Your Honor, is

3  there's a couple of things that came up so far that I would want

4  Dr. Singer to clarify.  That might take five or 10 minutes, if I

5  can just get five.

6        THE COURT:  If they're that small, we can clarify them

7  even afterwards for the record.  I don't know that --

8        MR. CRAMER:  I think it would be helpful before

9  Dr. Topel testifies to have Dr. Singer explain one or two things

10  for five minutes.  So if Your Honor would indulge me, I would

11  ask for that.

12        THE COURT:  Well, let me think about that.  It depends

13  upon how we're going tomorrow.  So after -- so we have

14  Dr. Singer tomorrow for at most an hour and a half, hour and 45

15  minutes.  And then we have Dr. Topel after that which we should

16  finish then potentially tomorrow, at the latest Wednesday

17  morning, correct?

18        MR. CRAMER:  Oh, correct.

19        MR. ISAACSON:  Yeah.

20        THE COURT:  And then we have nothing else after that,

21  right?

22        MR. ISAACSON:  Until Friday.

23        THE COURT:  No, I mean, as relates to those two

24  witnesses.

25        MR. ISAACSON:  Yes.

─2:15-cv-01045-RFB-PAL─

1          THE COURT:  Well, I'm sorry.  Then you're going to

2   bring Dr. -- are you going to Dr. -- are you going to bring

3   Dr. Singer back on Wednesday morning for rebuttal?

4          MR. CRAMER:  If the rebuttal extends to Wednesday

5   morning, Dr. Singer will be back Wednesday morning.  And then we

6   have nothing on Thursday.

7          THE COURT:  Thursday.

8          MR. CRAMER:  And then on Friday we would have Professor

9   Zimbalist and Blair.

10          THE COURT:  Got it.  Okay.  So then actually I think

11   we're actually doing fairly well as it relates to the scheduling

12   that you all set forth.

13          MR. CRAMER:  I think so.

14          MR. ISAACSON:  Yeah, we'll finish on Wednesday.

15          THE COURT:  So is there anything else we need to then

16   do or clarify?  But we will get started tomorrow at 9 rather

17   than 9:30.  That will build in a little bit of extra time.

18          MR. CRAMER:  Excellent.

19          THE COURT:  All right.  Anything else we need to do

20   today then?  Okay.  All right.  We'll be adjourned.  I'm going

21   to stay on the bench for a few moments.

22          (Whereupon the proceedings concluded at 4:10 p.m.)

23

24

25

2:15-cv-01045-RFB-PAL

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  August 26, 2019.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

CCR #937