**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| IN RE: | ) | Case No.: 2:15-cv-01045-RFB-(PAL) |
| | ) | |
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, | ) | CLASS ACTION |
| Luis Javier Vazquez, and Kyle Kingsbury, | ) | |
| on behalf of themselves and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **EXPERT REPORT OF** |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship | ) | |
| and UFC, | ) | **HAL J. SINGER, PH.D.** |
| | ) | |
| Defendant. | ) | |

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Introduction and Assignment ................................................................................................ 4

Summary of Conclusions ...................................................................................................... 8

Qualifications ...................................................................................................................... 11

I.   Industry Background ................................................................................................... 13
     A.   The MMA Industry ........................................................................................... 13
     B.   Academic Literature on MMA .......................................................................... 19
     C.   Forms of Fighter Compensation Paid by Zuffa to Members of the Bout Class ... 21
          1.   Show and Win Purses .............................................................................. 21
          2.   Discretionary and Performance Pay ........................................................ 22
          3.   PPV Royalties .......................................................................................... 23
          4.   Letters of Agreement ............................................................................... 23
     D.   Forms of Fighter Compensation Paid by Zuffa to the Identity Class .................. 24

II.  Nature of the Challenged Conduct ............................................................................. 27
     A.   Nature of the Horizontal Conduct ..................................................................... 28
          1.   Acquisitions of Potential Rivals .............................................................. 28
          2.   Counter-Programming and Litigation ...................................................... 35
          3.   Non-Compete Agreements With Other MMA Promoters ........................ 40
     B.   Nature of the Vertical Conduct ......................................................................... 41
          1.   Exclusive Fighter Contracts Prohibit Fighters from Working with MMA
               Promoters other than Zuffa for the Often Lengthy Duration of the Contracts
               ................................................................................................................. 42
          2.   Zuffa's Exclusive Contracts with Fighters Permit Zuffa to Extend the
               Duration of the Contracts ........................................................................ 43
          3.   Other Vertical Restraints ......................................................................... 46
     C.   Zuffa Exploited the Exclusionary Terms of the PARs to Make Exclusion
          Effectively Perpetual ......................................................................................... 48
          1.   Zuffa Exploited the Exclusionary Terms to Extend and Renew Fighter
               Contracts ................................................................................................. 48
          2.   Given Fighters' Short Career Durations, Zuffa's Exclusionary Provisions
               Were Effectively Perpetual for Fighters Who Zuffa Wished to Retain .... 59

III. The Challenged Conduct Was Exclusionary and Harmed Competition .......................... 63
     A.   Indirect Evidence of Zuffa's Market Power ....................................................... 64
          1.   The Relevant Input Market ...................................................................... 66
          2.   The Relevant Output Market ................................................................... 78
          3.   The Relevant Geographic Market ............................................................ 82
          4.   Zuffa's Dominant Share in The Relevant Input Market and Submarket .. 87
          5.   Zuffa's Dominant Share in The Relevant Output Market ........................ 89
          6.   Natural Barriers to Entry ......................................................................... 90
          7.   Artificial Barriers to Entry ...................................................................... 91
          8.   Market Participants and Observers Viewed Zuffa As Dominant ............. 91
          9.   All Indirect Evidence and Analysis of Zuffa's Market Power Is Common to
               the Classes ............................................................................................... 98

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

B.   Direct Evidence of Zuffa's Market Power ............................................................. 98
   1.   Direct Evidence of Power to Suppress Fighter Compensation Below
        Competitive Levels ................................................................................... 98
   2.   Direct Evidence of Power to Restrict the Supply of Fighter Services ...... 99
   3.   Direct Evidence of Power Over Pricing of Live MMA Events .............. 100
   4.   Direct Evidence of Power to Restrict the Supply of Live MMA Events 100
   4.   Direct Evidence of Power to Exclude Rivals .......................................... 101
   5.   All Direct Evidence and Analysis of Zuffa's Market Power Is Common to
        the Classes ............................................................................................. 101
C.   The Challenged Conduct Substantially Foreclosed Competition ....................... 102
   1.   The Challenged Conduct Blocked Rivals from Access to Key Inputs
        Necessary for a Successful MMA Promotion ......................................... 103
   2.   The Challenged Conduct Foreclosed a Substantial Share of the Relevant
        Input Market and Submarket .................................................................. 112
   3.   The Duration and Staggering of Zuffa's Contracts Prevented Meaningful
        Competition by Potential Rivals ............................................................ 116
   4.   Zuffa Engaged in Coercive Contracting Behavior and Restricted Fighters'
        Ability to Terminate Contracts .............................................................. 116
   5.   All Evidence and Analysis of Foreclosure Is Common to the Classes ... 117
D.   The Challenged Conduct Generated Substantial Anticompetitive Effects ......... 117
   1.   Regression Models Show Bout Class Compensation Share Is Negatively
        Correlated with Zuffa's Foreclosure Share, Implying that Increased
        Foreclosure Share Causes Decreased Compensation Share ................... 118
   2.   Additional Evidence Shows That the Challenged Conduct Suppressed
        Fighter Compensation Below Competitive Levels ................................. 126
   3.   The Challenged Conduct Restricted the Supply of Fighter Services ...... 131
   4.   The Challenged Conduct Inflated the Price of Live MMA Events ........ 133
   5.   The Challenged Conduct Restricted Output of Live MMA Events ........ 135
   6.   All Evidence and Analysis of Anticompetitive Effects Is Common to the
        Classes ................................................................................................... 140

IV.   Common Impact on the Bout Class ................................................................................ 140
   A.   The Challenged Conduct Suppressed Bout Class Compensation ....................... 141
   B.   Common Evidence of a Compensation Structure Is Capable of Demonstrating That
        Compensation Suppression Was Broadly Experienced Across Bout Class Members
        ........................................................................................................................... 142
      1.   Documentary Evidence of a Compensation Structure ........................... 145
      2.   Econometric Evidence of a Compensation Structure ............................ 151
   C.   Standard Econometric Methods Further Demonstrate Directly That the Vast
        Majority of Bout Class Members Received Lower Compensation Than They Would
        Have In the But-For World ................................................................................ 154

V.   Common Impact on Identity Class ................................................................................. 155
   A.   The Challenged Conduct Suppressed Identity Class Compensation ................... 156
   B.   Mechanisms Exist to Transmit Compensation Suppression Broadly Across Identity
        Class Members .................................................................................................. 159

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

VI.    Aggregate Damages .................................................................................................... 161
       A.    Aggregate Damages Using Strikeforce and Bellator Benchmarks .................... 162
       B.    Aggregate Damages Using Zuffa Foreclosure Regression Benchmark ............. 163
       C.    Aggregate Damages Using Impact Regression Model Benchmark .................... 164
       D.    Aggregate Damages to the Identity Class ......................................................... 165

VIII.  Zuffa's Likely Efficiency Defenses Are Unavailing ..................................................... 167
       A.    Zuffa's Claim That the Challenged Conduct Increased Output .......................... 168
             1.    Zuffa's Claim That Multi-Bout Contracts Increased Output .................. 168
             2.    Zuffa's Claim That Its Horizontal Acquisitions Increased Output ......... 171
       B.    Zuffa's Claim That the Challenged Conduct Increased Fighter Compensation . 173
             1.    Zuffa's Claim That Increased Fighter Compensation Over Time Shows That
                   Fighter Compensation Is Competitive ..................................................... 173
             2.    Zuffa's Claim That Increased Fighter Compensation After Horizontal
                   Acquisitions Shows That Fighter Compensation Is Competitive ........... 175
             3.    Zuffa's Claim That its Profit Data Show that MMA Fighter Compensation
                   Was Competitive ..................................................................................... 176
       C.    Zuffa's Claim That The Challenged Conduct Incentivizes Investment in
             Promotional Platforms and Individual Athletes ................................................. 179
       D.    The Experience of Other Professional Sports Leagues and the Sports Economics
             Literature Suggests That Elimination of the Challenged Conduct Would Benefit
             Fighters, Consumers, and the MMA Industry As a Whole ................................. 181

Conclusion ............................................................................................................................ 184

Appendix 1: Curriculum Vitae .............................................................................................. 185

Appendix 2: Methodology and Data ...................................................................................... 203

Appendix 3: Materials Relied Upon ...................................................................................... 210

## INTRODUCTION AND ASSIGNMENT

1.      Zuffa LLC, doing business as Ultimate Fighting Championship ("Defendant,"
"Zuffa," or "UFC"), is a promoter of live professional mixed-martial-arts ("MMA") bouts.
Plaintiffs in this case are MMA fighters ("Fighters"), and include Cung Le, Nathan Quarry, Jon
Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury.[1] Plaintiffs allege that Defendant
implemented an anticompetitive scheme to acquire, maintain, and enhance its monopoly power in

---

1.   I interviewed named plaintiffs Cung Le, Nate Quarry, and Javier Vazquez on May 23, 2017. On June 2, 2017,
I interviewed named plaintiffs Jon Fitch and Kyle Kingsbury.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-5-

the market for promoting professional MMA bouts (the "Relevant Output Market"), and its monopsony power over the Fighters appearing in those bouts (the "Relevant Input Market").[2] I have measured the Relevant Input Market using two industry-accepted databases: (1) MMA Fighters who are tracked by FightMetrics (the "Tracked" Relevant Input Market); and (2) MMA Fighters who are ranked by FightMatrix (the "Ranked" Relevant Input Market). I also have defined a relevant input submarket consisting of all Fighters ranked one through fifteen in any of the major MMA weight classes (the "Relevant Input Submarket," or "Headliners"), using industry-accepted databases for ranking MMA Fighters.

2.      Plaintiffs allege that Zuffa's anticompetitive scheme has foreclosed potential rival MMA promoters and impaired their ability to compete with Zuffa in the promotion of professional live MMA Events ("Live MMA Events"). Specifically, Zuffa is alleged to have: (1) eliminated potential rival MMA promoters through horizontal acquisitions; (2) deprived potential rivals of key inputs (the Fighters themselves) by entering into allegedly exclusionary contracts with the vast majority of top Fighters; and, (3) taken other steps to use its alleged dominance to impair potential rivals.[3] Plaintiffs allege that these actions, taken together (the "Challenged Conduct"), have enabled Zuffa to harm competition in the Relevant Output and Input Markets,[4] thereby maintaining and enhancing Zuffa's monopoly and monopsony power, causing anticompetitive effects, and resulting in antitrust injury to Plaintiffs and members of the two classes defined below.[5]

---

2.   United States District Court District of Nevada, *Cung Le, et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC*, 2:15-cv-01045-RFB-(PAL), Consolidated and Amended Antitrust Class Action Complaint (Dec. 18, 2015) [hereafter, CAC].

3.   *Id.* ¶1; Part VII.A.

4.   *Id.* Part VII.B.

5.   *Id.* Parts VII.C-VII.D.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-6-

3.    Plaintiffs have defined a "Bout Class" as:

> All persons who competed in one or more live professional UFC-promoted MMA bouts taking place or broadcast in the United States during the Class Period. The Bout Class excludes all persons who are not residents or citizens of the United States unless the UFC paid such persons for competing in a bout fought in the United States.[6]

Plaintiffs have defined the "Identity Class" as:

> Each and every UFC Fighter whose Identity was expropriated or exploited by the UFC, including in UFC Licensed Merchandise and/or UFC Promotional Materials, during the Class Period in the United States.[7]

Plaintiffs define the "Identity of a UFC Fighter" as "the name, sobriquet [nickname], voice, persona, signature, likeness and/or biographical information of a UFC Fighter."[8] Plaintiffs have defined the "Class Period" as beginning December 16, 2010, and continuing until the Challenged Conduct ceases.[9] Plaintiffs claim that through the Challenged Conduct, Zuffa has injured members

---

6.    *Id.* ¶39. I have been instructed by Class Counsel to interpret the phrase "a bout fought in the United States," as used in the Bout Class definition, to mean any fight taking place within the United States or broadcast live (with or without a tape delay) into the United States. Given that all of the bouts in the data I am using to assess foreclosure, impact, and damages either took place within the United States or were broadcast live in the United States (albeit some with slight tape delay), I did not need to exclude any fighter from the Bout Class, nor did I need to remove data reflecting any potential non-qualifying bouts in assessing impact or damages. If, however, the class definition were interpreted to be limited only to those class members who fought in a bout that physically took place within the United States during the Class Period (regardless of whether or not it was broadcast live into the United States), 12.7 percent of the Bout Class members would be excluded (154 out of 1,214 Fighters). These 154 Fighters account for 1.5 percent of the aggregate Bout Class damages. Additionally, 33.1 percent of all Bout Class damages are associated with bouts fought outside the United States (but which were broadcast live into the United States).

7.    *Id.* ¶47. Consistent with the definition of the Bout Class, I limit my analysis to Fighters participating in one or more Zuffa Live MMA Events broadcast in the United States during the Class Period. This includes numbered UFC pay-per-view events (for example, "UFC 196: McGregor vs. Diaz,") as well as non-pay-per-view UFC events (for example, "FOX 7: Henderson vs. Melendez"). Events are considered live if broadcast either in real time or with a tape delay for events held in foreign time zones. (For example, UFC 138, held in the United Kingdom, was tape delayed for US audiences. *See* http://www.mmaweekly.com/ufc-138-tv-ratings-match-past-tape-delays). I do not include taped bouts from The Ultimate Fighter ("TUF"), Zuffa's reality-TV show; however, TUF finales, which are live, are included (for example, "TUF 21 Finale: Thompson vs. Ellenberger"). Finally, Live MMA Events by acquired promoters (such as Strikeforce), in which Fighters received compensation from Zuffa, are also included. *See* ZFL-2603701

8.    CAC ¶27.

9.    *Id.* I understand Plaintiffs claim that the Challenged Conduct is ongoing.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-7-

of the Bout and Identity Classes by compensating them for bouts and Identity rights, respectively, below levels that would have prevailed in the absence of the Challenged Conduct.[10]

4.      I have been asked by counsel for Plaintiffs to determine whether Zuffa possessed monopoly or monopsony power (or both), and, to the extent necessary or helpful to make such determinations, to define one or more relevant antitrust markets (along both product and geographic dimensions) for assessing the claims in this case. I have also been asked to assess whether the Challenged Conduct foreclosed competition and generated anticompetitive effects. I have also been asked to determine whether the Challenged Conduct: (1) caused members of each Class to be compensated below levels that would have prevailed in the absence of the Challenged Conduct; and (2) caused injury in the form of under-compensation that was widespread across members of each Class (that is, to assess whether the Challenged Conduct generated a "common impact" on each Class). Next, I have been asked to calculate the aggregate amount of undercompensation to members of each Class attributable to the Challenged Conduct. I was also asked to review and assess potential procompetitive justifications for the Challenged Conduct that Zuffa, or economists acting on its behalf, have asserted in other fora, including in proceedings before the Federal Trade Commission (FTC). Finally, for each prong of my analysis, I was asked to determine whether addressing it would involve methods and/or evidence common to Class Members (as opposed to evidence or methods that would vary from one Class Member to another).

---

10.  *Id.* ¶21. I estimate that, as of June 30, 2017, there are 1,214 Fighters in the Bout Class and at least as many Fighters in the Identity Class. As explained in Part V, *infra*, my analysis of the Identity Class focuses on two subgroups. The first of these subgroups consists of Fighters who received positive, nonzero compensation from Zuffa in exchange for use of their Identities during the Class Period. There are at least 826 Fighters in this first subgroup. The second subgroup consists of Fighters who executed a Promotional and Ancillary Rights Agreement with Zuffa during the Class Period. There are at least 791 Fighters in this subgroup. There is substantial overlap between these two subgroups. Approximately 64 percent of the members of the first subgroup are also members of the second subgroup, and approximately 67 percent of the members of the second subgroup are also members of the first subgroup.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### SUMMARY OF CONCLUSIONS

5.      My conclusions in this report are based on the information available to me at this time. I reserve the right to supplement my opinions in the event that new evidence becomes available.

- Economists recognize that exclusionary conduct, such as the Challenged Conduct here, has the potential to harm competition. Whether the Challenged Conduct is actually anticompetitive here depends on: (1) whether Zuffa has enjoyed significant market power; and (2) whether the Challenged Conduct has allowed Zuffa to exercise its market power to foreclose or impair competition to a significant degree. I conclude that Zuffa enjoyed substantial market power, and exercised that power to substantially foreclose and harm competition.

- Zuffa has had significant monopoly and monopsony power at least since the beginning of, and extending throughout, the Class Period, and is widely recognized as the dominant promoter of professional Live MMA Events.

- At least since the beginning of, and extending throughout, the Class Period, Zuffa's Fighters have accounted for a large share in the Relevant Input Market (under both of my measurements) and Relevant Input Submarket, indicating Zuffa's monopsony (buying) power. Zuffa has also accounted for a large and dominant share in the Relevant Output Market at least since the beginning of, and extending throughout, the Class Period, indicating its monopoly (selling) power. Rival MMA promoters face substantial barriers to entry and expansion in the Relevant Output Market, due in part to the Challenged Conduct, including Zuffa's staggered, long-term exclusive contracts with Fighters. At least since the beginning of, and extending throughout, the Class Period, Zuffa has had no close competitors in the Relevant Output Market or in the Relevant Input Market or Submarket.

- In addition to this indirect evidence, there is ample direct evidence of Zuffa's significant monopoly and monopsony power. This includes direct evidence of suppressed Fighter compensation, pricing power over Live MMA Events, restricted demand for Fighter services, restricted supply of Live MMA Events, and the exclusion and impairment of potential rivals.

- The Challenged Conduct fits within the standard economic framework of Raising Rivals' Costs ("RRC").[11] Under the RRC framework, a dominant firm engages in

---

11. Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices and the Flawed Incremental Price-Cost Test*, 81(2) ANTITRUST L.J. 371-421, 376 (2017) ("The RRC foreclosure paradigm generally describes exclusionary conduct that totally or partially 'forecloses' competitors from access either to critical

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

exclusionary conduct that "totally or partially 'forecloses' competitors from access...to critical inputs."[12] As a consequence, firms that would otherwise provide competitive discipline are unable to do so, allowing the dominant firm to exercise market power, resulting in anticompetitive harm.[13]

- Access to a broad stable of MMA Fighters from the Relevant Input Market and Submarket is a critical input necessary to stage successful Live MMA Events in the Relevant Output Market. The Challenged Conduct ensured that Zuffa's would-be rivals lacked access to this critical input. Zuffa leveraged its staggered, exclusive contracts with Fighters to make its exclusionary provisions effectively perpetual for Fighters that Zuffa wished to retain.

- At least since the beginning of, and throughout, the Class Period, as a result of the Challenged Conduct, Zuffa foreclosed high shares of the Relevant Input Market (under both measurements) and Submarket, and MMA promoters were unable to compete effectively with Zuffa. Lacking access to a critical input (top MMA Fighters), the Challenged Conduct prevented non-Zuffa MMA promoters from staging successful Live MMA Events that could compete on the level of the UFC, and substantially constrained the ability of other MMA promoters from offering competitive compensation or promising career paths to top MMA Fighters.

- Zuffa's horizontal acquisitions and the exclusionary effects of the Challenged Conduct were mutually reinforcing. Zuffa's acquisitions eliminated would-be rivals to which Fighters might otherwise have switched, potentially defeating or at least mitigating Zuffa's attempts to exercise monopsony power. Zuffa subjected the rosters of Fighters from acquired MMA promoters to Zuffa's exclusionary contracts, making the acquired Fighters unavailable to non-Zuffa promotions, and enhancing Zuffa's foreclosure of the Relevant Input Market and Submarket. This further impaired any surviving MMA promoters from competing effectively with Zuffa, and further cemented Zuffa's status as the only MMA promotion capable of offering a promising career path to a Fighter seeking to challenge other top Fighters.

- Other components of the Challenged Conduct further reinforced these exclusionary effects. These include (1) counter-programming by Zuffa with the intent and effect of preventing other MMA promoters from achieving profitability; (2) agreements with other MMA promoters to impair potential rivals by shutting off access to Fighters; (3) contracts preventing other MMA promoters from using clips of Fighters' past fights to promote fights involving former UFC Fighters; (4) exclusive contracts with sponsors preventing sponsors from sponsoring non-Zuffa MMA

---

inputs or customers, with the effect of causing them to raise their prices or reduce their output, thereby allowing the excluding firm to profit by setting a supra-competitive output price, with the effect of harming consumers.").

12. *Id.*

13. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-10-

Promotions or Fighters, thus further locking-in Fighters to the UFC by threatening them with losing their third-party sponsorships (and corresponding sponsorship dollars) if they were to leave the UFC; and, (5) contracts requiring venues, sponsors, and broadcasters not do business with other MMA promoters as a condition for doing business with Zuffa.

- The Challenged Conduct has generated substantial anticompetitive effects in the Relevant Input Market and Submarket, and in the Relevant Output Market. These include suppressing compensation to UFC Fighters below competitive levels, restricting the supply of Fighter services in the Relevant Input Market and Submarket, and (relatedly) the supply of Live MMA Events in the Relevant Output Market, and inflating prices to MMA fans and consumers in the Relevant Output Market above competitive levels.

- Documentary and econometric evidence and analyses common to the Class as a whole demonstrates that: (1) Plaintiffs have suffered antitrust injury due to Zuffa's suppression of Fighter compensation below what it would have been in the absence of the Challenged Conduct; and (2) the antitrust injury resulting from the Challenged Conduct in the form of artificially suppressed compensation was universal or nearly so among members of both proposed Classes.

- For the Class Period through June 30, 2017, aggregate damages to the Bout Class are alternatively estimated, depending upon factual underpinnings, at between $811 million and $1.6 billion. Aggregate damages to the Identity Class are estimated at $37.2 million.

- The evidence in the record includes efficiency defenses of the Challenged Conduct that have been proffered by Zuffa in past proceedings, and by economists on behalf of Zuffa. These efficiency defenses include the claims that the Challenged Conduct: (1) increased MMA output; (2) incentivized investments promoting Live MMA Events generally and individual Fighters specifically; and, (3) increased Fighter compensation. The record evidence I have reviewed to date does not support Zuffa's prior claims that any of the Challenged Conduct has had these purported positive effects. To the contrary, the available evidence from the record in this case, from my econometric analysis here, and from other professional sports and the sports economics literature indicates that elimination of the Challenged Conduct would benefit Fighters, consumers, and the MMA industry generally.

- All of my conclusions are based on data, methods, and evidence common to all members of each Class.

6.     The remainder of my report is organized as follows: In Part I, I briefly review the

MMA industry's background and the related academic literature. In Part II, I review the horizontal

and vertical aspects of the Challenged Conduct. In Part III, I show with evidence common to

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-11-

members of both Classes that Zuffa possessed significant market power, and I demonstrate with classwide evidence that the Challenged Conduct substantially foreclosed competition and generated anticompetitive effects. In Parts IV and V, I show, using classwide evidence, that the harm flowing from the Challenged Conduct was widespread across members of both proposed Classes and thus can be said to have caused common impact across each Class. In Part VI, I calculate, using classwide evidence and methods, aggregate damages to members of each Class. In Part VII, I review efficiency defenses of the Challenged Conduct that Zuffa has put forth in prior proceedings, and I explain (based on classwide evidence and analyses) why these claims do not undermine my findings.

7.      The opinions expressed in this report reflect my review of evidence, data, testimony and other relevant materials to date. I reserve the right to supplement or amend my opinions should new materials or information become available.

QUALIFICATIONS

8.      I am a Principal at Economists Incorporated, a Senior Fellow at George Washington University's Institute for Public Policy, and I have served an Adjunct Professor at Georgetown University's McDonough School of Business (where I have taught Advanced Pricing to MBA candidates).

9.      Prior to joining Economists Incorporated, I was a Managing Partner at Navigant Economics, and before that, I was Chief Executive Officer of Empiris, a litigation and regulatory consulting firm (acquired by Navigant in 2010).

10.      I am the co-author of the e-book *The Need for Speed* (Brookings Press 2013), and the book *Broadband in Europe* (Springer Press 2005). My articles, several of which pertain to

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-12-

exclusive dealing,[14] have appeared in dozens of legal and economic journals, as well as economic textbooks.

11.    I have testified before Congress on the interplay between antitrust and sector-specific regulation. My scholarship and testimony have been widely cited by courts and regulatory agencies. In agency reports and orders, my writings have been cited by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice. I served as an economic consultant to the Canadian Competition Bureau in a review of vertical merger in the television industry. My economic practice has been recognized by the American Antitrust Institute, and I have been a frequent speaker and author for ABA Antitrust Section events and publications, respectively.

12.    Although my experience spans several industries, I have considerable experience in sports. I served as a testifying expert in three program-carriage cases (adjudicated by an Administrative Law Judge pursuant to section 616 of the Cable Act) on behalf of independent cable sports networks: MASN (the network of the Baltimore Orioles and Washington Nationals), NFL Network, and Tennis Channel. I also served as an expert for the National Football League in the sports-blackout-rule proceeding at the Federal Communications Commission. I have served (and continue to serve) as a valuation expert for the Baltimore Orioles in their ongoing revenue-division dispute with the Washington Nationals, arbitrated by Major League Baseball.

13.    I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

---

14.  *See, e.g.*, Kevin Caves, Chris Holt & Hal Singer, *Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REV. NETWORK ECON. (2013); Kevin Caves & Hal Singer, *Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) J. COMPETITION L. & ECON. (2012); Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-13-

14.     My curriculum vitae is provided in Appendix 1. I have no financial stake in the outcome of this case. I am being compensated for my work in this case at the rate of $695 per hour. A list of the materials upon which I relied in forming my opinions for this report is provided in the Appendix.

## I.  INDUSTRY BACKGROUND

15.     In this section, I provide a brief summary of the MMA industry, the related academic literature, and the forms of compensation that Class Members receive from Zuffa.

### A.    The MMA Industry

16.     MMA is a term for the modern-day, full-contact competitive sport that mimics unarmed combat between two individual Fighters. MMA blends different combat styles, incorporating the most effective striking, wrestling, and disabling maneuvers from other stand-alone martial arts such as boxing, kickboxing, judo, and wrestling, into a single contest of physical supremacy. With its origins in the "no-holds-barred" scoreless competition of fighting until unconsciousness or submission, MMA has since evolved from a spectacle of "human cockfighting"[15] into a popular competitive sport with its own rules and scoring systems.[16]

17.     Similar in many ways to boxing, modern MMA fights (or "bouts") between competitors are timed rounds in which opponents attempt to disable their opponents. A bout can be won by either knocking out an opponent via striking the head, or by forcing the opponent to submit ("tap out") via a wrestling hold or lock that causes extreme pain. In the event neither Fighter has

---

15. Robert J. Szczerba, *Mixed Martial Arts and the Evolution of John McCain*, FORBES, Apr. 3, 2014, *available at*      http://www.forbes.com/sites/robertszczerba/2014/04/03/mixed-martial-arts-and-the-evolution-of-john-mccain/#27d42ac91a3b.

16. Trevor Collier, Andrew L. Johnson & John Ruggiero, *Aggression in Mixed Martial Arts: An Analysis of the Likelihood of Winning a Decision, in* VIOLENCE AND AGGRESSION IN SPORTING CONTESTS: ECONOMICS, HISTORY AND POLICY SPORTS ECONOMICS, MANAGEMENT AND POLICY 4 (R. Todd Jewell, ed. Springer Science + Business Media 2011) [hereafter *Aggression in MMA*].

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-14-

capitulated by the end of the last round, the winner is determined by a scoring system employed by judges.[17] Today, Fighters are divided into ten major weight classes.[18] The top Fighter of each division is awarded a championship belt. In a title fight, a challenger is matched against the defending champion.[19] In boxing, while independent sanctioning organizations declare champions, boxers can unify a title (becoming an undisputed champion) by simultaneously capturing championships at all major sanctioning organizations.[20] In contrast, championships in MMA are promoter specific: The UFC awards championship belts to Fighters within its own organization, and there are no independent sanctioning organizations that declare champions or regulate the rules as to who is declared a champion. To date, the UFC has never cross-promoted a Live MMA Event in conjunction with another MMA promotion.[21] However, there exist third-party ranking systems, often relied upon by MMA promotions and the MMA press, that rank all MMA Fighters (across different MMA promoters) relative to one another, both within weight classes and on an overall "pound-for-pound" basis.[22]

18.     State athletic commissions determine rules for Live MMA Events (weight divisions, fouls, equipment, etc.), and sanction each bout of a Live MMA Event individually.[23] Athletic

---

17. *See* UFC's "Ways to Win," *available at* http://www.ufc.com/discover/sport/ways-to-win.

18. *See, e.g.,* http://mmajunkie.com/rankings (showing the *USA Today/MMA Junkie* rakings for ten major weight classes, as well as men's pound-for pound rankings; *see also* UFC's "Weight Classes," *available at* http://www.ufc.com/discover/sport/weight-classes. *See also* http://bleacherreport.com/articles/2652376-bleacher-report-mma-rankings-for-july-2016

19. *See, e.g.,* Jake Martin, *25 Greatest UFC Title Fights of All Time*, BLEACHER REPORT, Mar. 31, 2012, *available at* http://bleacherreport.com/articles/1123311-25-greatest-ufc-title-fights-of-all-time.

20. *Professional Boxing*, ENCARTA, June 5, 2008 (retrieved Nov. 14, 2008) ("If one fighter manages to capture the titles of all the major organizations at once, this is known as 'unifying' the title and the boxer is the 'undisputed' champion.").

21. According to Dana White, he "did a deal with Pride where they could use Chuck Liddell and Ricco Rodriguez [in 2003], and they were supposed to in return give me Wanderlei Silva and Sakuraba" but UFC "never co-promoted." Deposition of Dana White, Aug. 8, 2017, at 154:5-8.

22. *See, e.g.,* http://www.fightmatrix.com/mma-ranks/

23. *See, e.g.,* http://www.state.nj.us/lps/sacb/docs/martial.html; *see also* Deposition of Joseph Silva (June 7, 2017), at 91:9-17.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-15-

commissions operate independently, sanctioning bouts under differing sets of criteria.[24] Generally, athletic commissions are primarily concerned with Fighter safety, considering factors such as matched Fighter's relative experience level and quality.[25] As of 2009, athletic commissions typically adopted the Unified Rules of Mixed Martial Arts when sanctioning events.[26]

19.    Live MMA Events are produced by promoters such as the UFC, which plan and execute MMA bouts for commercial entertainment. Live MMA Events are multi-hour productions consisting of a series of bouts between pre-matched Fighters. Unlike in boxing, which frequently pits two boxers from competing promoters against each other, all participants in a given Live MMA Event are typically affiliated with the same promoter.[27] This series of bouts (the "Fight Card") occurs sequentially from the bottom, with the most anticipated fight of the night generally occurring last (the "Top of the Card").

20.    MMA promoters rely on high-profile, highly-ranked Fighters at the Top of the Card to draw audiences to Live MMA Events.[28] A Live MMA Event that lacked these key inputs would

---

24. Deposition of Joseph Silva at 86:12-19.
25. *Id.* at 87:8-23, 107:4-19, 121:17-122:16.
26. *See* http://www.abcboxing.com/committee-report-on-unified-rules-for-mma.
27. Deposition of Joseph Silva at 215:11-216:18.
28. Joe Silva, UFC's chief matchmaker, testified that "you would like people to buy tickets to it, to tune in on TV to watch it. And they're going to want to see the biggest stars that you have." Silva Dep. 102:23-103:3. *See also* ZUF-00085896-901 (2011 e-mail from Joe Silva to Dana White, Lorenzo Fertitta, and Sean Shelby, citing the USA TODAY/SB Nation Consensus MMA Rankings, showing that UFC Fighters account for the majority of the top twenty-five and top ten Fighters in each of seven weight classes; subject line reads "We Own MMA."); WME-ZUFFA-00001150 at *9 (WME-IMG presentation stating "6-8 bouts [per year] with big stars is 'normal' and the key to PPV [revenue];" charting the number of "Star Bouts" over time; noting that "If Ronda [Rousey], Jon [Jones], Conor [McGregor] stay healthy, 2016 line up is solid."). MMA promoters also recognize the value of star Fighters. *See* Deposition of Jeremy Lappen, President of ProElite (holding company of EliteXC), February 28, 2017, at 136:9-167:6 ("Q: Are fighters with notoriety like [Kimbo Slice] essential to building a successful MMA promotion? A: Yeah, the fighters are what draws…, it's hard to find a star. They have a certain X factor. That's what the business is about, I think."). *See also* Deposition of Shannon Knapp, President of Invicta Fighting Championships, April 11, 2017, at 124:10-12 ("Q: High Profile, she [Cristiane Justino, AKA Cyborg], was a well known fighter? A: Uh-huh, yeah. Q: Did her presence on a card affect the viewership? A. Yeah."); ZFL-0460809 at 10 (Lorenzo Fertitta states "[o]ur thinking when we bought Strikeforce was to give fans the fights they want…Obviously, Alistair [Overeem]'s one of the best heavyweights in the world, but he also has that 'it' factor – the tremendous look, he's huge. It's a star factor.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-16-

have difficulty drawing an audience, television distributors, and advertisers.[29] Fighting at the Top of the Card is the primary career objective for an MMA Fighter. Thus, the most successful Fighters accumulate enough wins with the goal of being matched against other prominent Fighters, and eventually a chance at winning a championship belt and obtaining a top ranking.[30] Of course, most Fighters do not become champions or fight at the Top of the Card. The median career length for an MMA Fighter is brief—approximately five bouts, spread over just 41 months.[31]

21. Zuffa assumes responsibility for the costs of the event's production, including paying Fighters, whom it treats as independent contractors. In the UFC, Fighter pay is dependent on, among other things, a Fighter's performance, with Fighters typically receiving a predetermined "show" amount to participate in a bout, and a "win" payment if the Fighter is declared the victor. Show and win payments are typically the same amount; winning a bout typically doubles a Fighter's base pay.[32] UFC Fighters may also receive discretionary, performance-based bonuses; in limited cases, certain top-tier Fighters (such as defending champions) may also receive a share of the total revenues generated by the event, usually via a share of Pay-Per-View ("PPV") revenue.[33] MMA Fighters are generally tethered to Zuffa by contract for a time period (which, as discussed below, is often expanded by Zuffa by invoking certain contractual provisions designed to lock Fighters in as well as through other tactics) as well as for a specified number of bouts ("multi-bout contracts"); during this period (which can be indefinite in the case of retirement or extended

---

29. *Id. See also* WME_ZUFFA_00031950-60 ("History tells us that for a pay-per-view to do big numbers, it needs marquee names… sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-views.").

30. Deposition of Jon Fitch, February 15, 2017, at 112:7 – 112:9 ("Fighters fight for titles. The most coveted title is the UFC title.").

31. *See* II.C.2, *infra*.

32. *See* Part I.C, *infra*.

33. *See* Part I.C, *infra*.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-17-

injury), Fighters are unable to associate with other MMA promoters.[34] Despite these entanglements, as mentioned above, Zuffa still classifies its MMA Fighters as independent contractors rather than employees.[35] Zuffa pays Fighters no salary, offers none of the typical employee benefits (no pensions; no general health insurance; no life insurance; no disability benefits, etc.) and does not compensate Fighters for the costs that Fighters incur in the months (or years) of training leading up to a Live MMA Event. For instance, Zuffa does not pay for trainers, gym fees, managers, or equipment.[36] Zuffa pays Fighters for fighting only when they participate in bouts.[37]

22.    Zuffa earns revenue from four primary sources. *First*, Zuffa sells access to live events and taped content to a variety of media outlets, such as residential and commercial PPV, cable and broadcast television, video-on-demand ("VOD"), and the UFC Fight Pass online subscription service.[38] *Second*, Zuffa sells tickets for attendance at Live MMA Events. *Third*, Zuffa generates income from sponsorships, branding, and the advertising of products during its events. *Fourth*, Zuffa collects revenue from the sale of UFC-branded merchandise, such as video games, and collects royalties from products sold by licensees.[39]

23.    The UFC was purchased by Lorenzo and Frank Fertitta for $2 million in 2001, and was sold to William Morris Endeavor-International Management Group ("WME-IMG") in August

---

34. *See* Part II.B, *infra*.

35. *See* "DB-ZUFFA-00007015 - DB-ZUFFA-00007109.pdf" on Fighter classification. *See also* Hendrick 30(b)(6) V.I Tr. 264:8-10 (expressing Zuffa's position that fighters are independent contractors); Silva Dep. 186:18-20.

36. Silva Dep. at 186:18-187:21.

37. *See, e.g.,* DB-ZUFFA-00030406 ("Unlike many professional athlete organizations, the UFC's contracts with its fighters do not guarantee significant payments to the fighters."). *See also* Silva Dep. at 228:19-21 (confirming that Zuffa fighters are compensated for fighting only when they participate in bouts).

38. ZUF-00401766 at 8.

39. *See* Zuffa's Consolidated P&L Statements from 2001 – November 2015: ZFL-1674096, ZFL-1053223, ZFL-1472224, ZFL-1381761, ZFL-1514712, ZFL-1514713, ZFL-1514769, ZFL-1514770, ZFL-1514804, ZFL-1514836, ZFL-1514837, ZFL-1514870, ZFL-1514900, ZFL-1514901, ZFL-1514933, ZFL-1514944, and ZFL-1514966.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-18-

2016 for approximately $4 billion.[40] Many of the key innovations that accompanied MMA's evolution from its "no holds barred" origins into mainstream acceptance were developed before Zuffa purchased the UFC: Record evidence indicates that key rules and regulations, the use of appropriate gloves, timed rounds, weight classes—even the use of the octagonal ring—predate Zuffa's acquisition of the UFC.[41]

24.    Prior to its sale to WME-IMG, Zuffa was privately owned and operated by a small group of individuals, initially consisting of Frank and Lorenzo Fertitta, who each held 45 percent equity in the venture, and Dana White, who owned the remaining 10 percent. Lorenzo Fertitta functioned as UFC's CEO with Dana White as President. Other Zuffa executives included Joe Silva, who served as chief matchmaker (until his retirement at the end of 2016), Kirk Hendrick, Zuffa's Chief Legal Officer, Ike Lawrence Epstein, Zuffa's Chief Operating Officer and John Mulkey, Zuffa's Chief Financial Officer.[42] According to Lorenzo Fertitta, Zuffa generated over $600 million in revenue in 2015.[43] As explained in Part III.A.5, Zuffa's market share in the Relevant Output Market has been approximately 90 percent by revenue since at least 2008. Zuffa's

---

40. *See* Darren Rovell & Brett Okamoto, *Dana White on $4 billion UFC sale: 'Sport is going to the next level*, ESPN, July 11, 2016, *available at*: http://www.espn.com/mma/story/_/id/16970360/ufc-sold-unprecedented-4-billion-dana-white-confirms.

41. Deposition of Joseph Silva, June 7, 2017 at 83:22-84:2 ("Q. What I'm trying to get at is the basic idea for the sport and the octagon and the early rule book, those were all in existence prior to Zuffa's purchase of the UFC; is that right? A. That's correct."); *id.* at 79:17-84:2 (Silva describes the iterative process he and others used in developing the rules and regulations in force between 1994 and 2001).

42. *See* Hendrick 30(b)(6) Tr. at 15:3-13 (describing executive structure); Deposition of John Mulkey, April 19, 2017, at 11:22-12:6 (describing his role); Deposition of Ike Lawrence Epstein pursuant to Rule 30(b)(6) V.I, Dec. 2, 2016 at 10:10-21 (same); Silva Dep. at 15:3-5 (stating he retired at the end of 2016). *See also* ZUF-00096950; Deposition of Joseph Silva, June 7, 2017, at 76:22-84:2. *See also* ZFL-0000113 at 20; ZFL-0000136 at 24.

43. Jesse Holland, *Lorenzo Fertitta: UFC will generate record-high $600 million revenue for 2015*, MMA Mania, Dec. 28, 2015, *available at* http://www.mmamania.com/2015/12/28/10675158/lorenzo-fertitta-ufc-will-generate-record-high-600-million-revenue-2015-mma; *see also* ZFL-1514966 (showing revenues through November 2015 of $542 million).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-19-

dominant position in the promotion of professional Live MMA Events is widely recognized around the world.[44]

**B.      Academic Literature on MMA**

25.      In a book chapter published in 2011, economist Trevor Collier and his co-authors provide an overview of the MMA industry, and analyze the factors influencing the likelihood of a Fighter winning a bout by decision (as opposed to winning by knockout, TKO, or submission) in the UFC.[45] Using data on individual fights from FightMetric, the official statistics provider for the UFC,[46] the authors find that knockdowns and damage inflicted have the largest marginal effect of influencing judges' decisions.[47] The authors analyze only UFC bouts while ignoring other MMA promoters; they note that the UFC is "the largest and most successful organization within the industry."[48]

26.      In a 2014 working paper, economist Paul Gift models round-by-round scoring outcomes based on performance characteristics using FightMetric data, as well as non-performance characteristics, to test for certain behavioral biases among MMA judges.[49] The author analyzes "all UFC, WEC, and Strikeforce events promoted under the Zuffa banner"[50] between

_____

44. *See* Part III.A.8, *infra*. *See also* ZUF-00162329-382 at 382 ("...the UFC holds the dominant market position within the sport and continues to do so even as a highly fragmented group of competitors have entered the market in an attempt to emulate UFC's success"). *See also* Matthew Miller, *Ultimate Cash Machine*, FORBES, Apr. 17, 2008, *available at* https://www.Forbes.com/forbes/2008/0505/080.html.
45. *Aggression in MMA*, *supra*.
46. *See* http://www.fightmetric.com/.
47. *Aggression in MMA*, *supra*, at 97.
48. *Id.*
49. Paul Gift, "Performance Evaluation and Favoritism: Evidence from Mixed Martial Arts," Pepperdine University Working Paper (2014), *available at* http://www.fightmetric.com/company.
50. *Id.* at 7.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-20-

September 28, 2001 and November 17, 2012 in Nevada and California.[51] His results provide evidence of bias towards heavy favorites and the Fighter who won the previous round.[52]

     27.    In a 2012 master's thesis, Jeremiah Johnson correlates win/loss outcomes of MMA bouts using fight statistics from FightMetric.[53] The author's data set includes "every UFC event, as well as every event from other prominent promoters and events deemed to be significant."[54] Johnson finds that the count of knockdowns, takedowns, positional advances, and submission attempts are all positively and significantly correlated with a Fighter winning a bout, while a count of strikes landed is not.[55]

     28.    In a 2015 article published in the *Journal of Business and Economics*, Richard McGowan and John Mahon estimate an econometric model analyzing the determinants of PPV buy rates for UFC events.[56] The authors' data set encompasses 105 UFC PPV events, beginning with UFC 57 in February 2006 and ending with UFC 170 in February 2014.[57] Based on their econometric analysis, the authors conclude as follows:

> The results of our study are not good news for the UFC as a company. The most important takeaway is that the identities of the fighters competing matter more than any title they would be competing for. Thus, when it comes to generating abnormally high PPV buy rates, the fighter has more drawing power than the brand. This conclusion could be used as an argument for fighters to get a larger percentage of the PPV revenue, since the fighters themselves, not the UFC titles, are what truly drive PPV buy rates.[58]

---

51. *Id.*
52. *Id.* at 1.
53. Jeremiah Douglas Johnson, *Predicting Outcomes Of Mixed Martial Arts Fights With Novel Fight Variables*, Thesis Submitted to the Graduate Faculty of the University of Georgia in Partial Fulfillment of the Requirements for the Degree Master Of Science (2012), *available at* https://getd.libs.uga.edu/pdfs/johnson_jeremiah_d_201208_ms.pdf
54. *Id.* at 6.
55. *Id.* at 23.
56. Richard McGowan and John Mahon, *Demand for the Ultimate Fighting Championship: An Econometric Analysis of PPV Buy Rates* 6(6) J. Bus. & Econ. 1032-1056 (2015) [hereafter "McGowan & Mahon"].
57. *Id.* at 1042.
58. *Id.* at 1047. *See also* 1046 ("For example, while Georges St. Pierre welterweight champion of the UFC, the welterweight title had a hugely positive coefficient. However, the coefficient's value was such not because of the importance of the welterweight belt, but because of the drawing power of St. Pierre. After the addition of the fighter ID control variables, only the heavyweight title still has a statistically significant positive coefficient in both Model 1

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-21-

**C.    Forms of Fighter Compensation Paid by Zuffa to Members of the Bout Class**

29.    In this section, I review the forms of compensation that Bout Class members receive from Zuffa. The terms of a Fighter's compensation are defined in a Promotional and Ancillary Rights Agreements ("PAR" Agreements) that Zuffa requires all of its Fighters to execute.[59] Each governs the Fighter's relationship with Zuffa from the moment of execution, during the defined "term" (subject to extension at Zuffa's election under certain conditions), over the course of multiple bouts, and with respect to some aspects of the relationship, in perpetuity.[60] Prior to any bout, a UFC Fighter also signs a "Bout Agreement,"[61] which affirms event-specific compensation details.

**1.    Show and Win Purses**

30.    A Fighter receives a "show" purse for his or her participation in a bout. An

---

and Model 2. The welterweight title's effect has been correctly reapportioned to Georges St. Pierre, and the women's title's effect has been reapportioned to Ronda Rousey.").
    59.  Deposition of Joseph Silva, June 7, 2017, at 31:23-33:22.

    61.  *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-22-

additional "win" purse is also awarded if the Fighter is declared the winner of his or her bout. In over 94 percent of Zuffa's events, the "win" amount is simply the "show" amount again, meaning that Fighters generally double their base pay if they win their fight.[62]

### 2.    Discretionary and Performance Pay

31.    Zuffa sometimes awards discretionary and performance pay following a fight deemed crowd-pleasing by Zuffa. These include bonuses for the "Fight of the Night," exceptional "Performance," the "KO [Knockout] of the Night," and the "Submission of the Night."[63] These payments are awarded based on a subjective evaluation of various factors. Sean Shelby, one of UFC's two "Talent Relations" employees[64] responsible for matching Fighters and lining up the card (or "matchmakers") explains that in awarding discretionary pay, "[t]here is a bit of a grey area, but simply, the more spectacular, higher level of difficulty, and the higher level of competition and stakes all factor in."[65] Because Zuffa is not contractually bound to make any such payments, Zuffa Fighters cannot be certain as to whether they will receive any such compensation at any point in their careers.[66]

---

62. ZFL-0000003. *See also* Deposition of Lorenzo Fertitta, March 23, 2017 at 174:20-179:10; Deposition of Sean Shelby, April 12, 2017 at 208:9-209:17 (describing to the standard "show and win money" structure); Silva Dep. at 32:16-18 & 262:12-17 (same).

63. ZFL-0000003. *See also* Fertitta Tr. 175:5-15.

64. *See* ZUF-00096950.

65. ZUF-00140700 ("Fight of The Night, KO of The Night, & Sub of The Night Bonuses are mostly based on the level of competition and difficulty of technique. If a prelim has a great fight but the main event is a great fight too, it will almost always go to the main event where more is on the line. If a guy gets a win with a guillotine but another wins by a flying triangle, it will go to the guy with the flying triangle. If a guy subs someone who has never been subbed before and has incredible submission defense, that counts as well. There is a bit of a grey area, but simply, the more spectacular, higher level of difficulty, and the higher level of competition and stakes all factor in. What can't get lost through is this is something that is merely extra. It's Zuffa going above and beyond and is not contractually obligated to do this.").

66. *Id.*; *see also* Fertitta Tr. 180:19-22.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-23-

### 3.   PPV Royalties

32.   A  small  number  of  top-tier  Fighters  receive  compensation  based  on  PPV purchases.[67] These Fighters typically receive a flat amount of money per PPV ticket sale, which may increase in discrete increments as the total number of tickets sold grows.[68] Record evidence indicates that Zuffa generally offered PPV royalties only to defending champions (as opposed to challengers), and sometimes to former champions.[69]

### 4.   Letters of Agreement

33.   A  small  number  of  top-tier  Fighters  negotiate  individual  Letters  of  Agreement ("LOA") with Zuffa prior to a Live MMA Event.[70] These are generally lump-sum payments to Fighters following a Live MMA Event, with the amount often contingent on the outcome of the fight.[71] Some LOAs specify bonuses based on a specific outcome (such as knockout),[72] and may

---

67. *See* ZFL-0000003. *See also* Fertitta Tr. 186:14-187:11 & 188:19-190:6.

68. For example, a Fighter may receive $1.00 for each PPV ticket sold between 200,000 and 400,000 tickets; $2.00 for each PPV ticket sold between 400,000 and 600,000 tickets; and $2.50 for each PPV ticket sold over 600,000 tickets. *See* ZFL-1833347.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fertitta Tr. 186:22-187:11. *See also* ZFL-1005485 (an email on compensation negotiations for Holly Holm where Sean Shelby wrote that "a PPV component as a challenger is a dealbreaker," to which Dana White replies "For ppv bonus she must be defending [a championship]." At the time of UFC 183: SILVA vs DIAZ in January 2015, former UFC middleweight champion Anderson Silva had lost his middleweight title at UFC 162 in July 2013. His opponent, Nick Diaz, was not ranked in the UFC but was a former WEC and Strikeforce Welterweight champion. Even though neither Fighter was a defending champion, they both received PPV shares from the event, presumably because each was a former champion. *See* ZFL-0000003.xlsx (showing PPV and LOA compensation for both Diaz and Silva).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

71. *See, e.g.,* ZFL-0127082, an agreement with Brock Lesnar that specifies lump sums to be paid conditional on champion status ("For each and every Bout, in which Fighter participates where he is recognized as a UFC Champion, by ZUFFA, within thirty (30) days following the completion of each Bout, as contemplated in Section 7.1 (a) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the amount of Eight Hundred Twelve Thousand Five Hundred Dollars (US $812,500.00), less all permissible or required deductions and withholdings. Within sixty (60) days following the completion of each Bout, as contemplated in Section 7.1 (a) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the additional amount of Eight Hundred Twelve Thousand Five Hundred Dollars (US $812,500.00), less all permissible or required deductions and withholdings, for a total combined payment of One Million Six Hundred Twenty-Five Thousand Dollars (US $1,625,000.00).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-24-

also incorporate sponsorship or endorsement agreements or both.[73] The use of LOAs also allows

Zuffa to avoid reporting the total compensation paid to Fighters to state athletic commissions,

which keeps this information out of the public domain.[74]

**D.    Forms of Fighter Compensation Paid by Zuffa to the Identity Class**

34.    Payments to Fighters for the use of their identity rights fall into one of three broad

categories: (1) merchandizing royalties, (2) sponsorship payments, and (3) video game payments.

A PAR signed by a Fighter generally gives Zuffa the "exclusive worldwide right to use of the

Fighter's name, likeness, biography and other aspects of the Fighter's identity in connection with

promotion of the Bouts or the UFC brand."[75] These rights are "held by UFC in perpetuity and shall

---

For each and every Bout, in which Fighter participates where he is not recognized as a UFC Champion, by ZUFFA, within thirty (30) days following the completion of each Bout, as contemplated in Section 7.1 (c) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the amount of Three Hundred Seventy Five Thousand Dollars (US $375,000.00), less all permissible or required deductions and withholdings. Within sixty (60) days following the completion of each Bout, as contemplated in Section 7.1 (c) of the Promotional Agreement, Zuffa shall pay to DEATHCLUTCH, via bank wire or check, the additional amount of Three Hundred Seventy Five Thousand Dollars (US $375,000.00), less all permissible or required deductions and withholdings for a total combined payment of Seven Hundred Fifty Thousand Dollars (US $750,000.00)."). *See also* ZFL-1833347.

72. *See, e.g.,* ZFL-0393948, an agreement with Lyoto Machida that awards a stoppage bonus ("Further, Zuffa shall pay Fighter a Stoppage Bonus for such Bout in the amount of One Hundred Thousand Dollars (US $100,000), less all permissible or required deductions and withholding. For purposes of this Agreement, a Stoppage occurs if and only if Fighter is declared the winner of the Bout by Knock Out, Technical Knock Out or Submission by the applicable Athletic Commission.").

73. *See, e.g.,* ZFL-0299212, an agreement with Cung Le that awards a sponsorship bonus ("In consideration of the promotional and sponsorship activities to be performed by Cung Le ("Fighter"), in association with the November 10, 2012, UFC on Fuel bout ("the Macau Event"), and the grant of ancillary rights made pursuant to Section 3 of Fighter's Promotional and Ancillary Rights Agreement, fully executed on or about September 15, 2011 (the "Promotional Agreement"), this Letter of Agreement (the "Agreement") shall confirm the terms and conditions by and between Zuffa, LLC ("Zuffa"), and Fighter who is the sole and exclusive owner of the intellectual property rights of Fighter. Specifically, the following terms and conditions are hereby agreed to for valuable consideration: 1. Upon completion of the Macau Event, as contemplated in Section 7.1(c) of the Promotional Agreement, which is incorporated by reference, Zuffa shall pay to Fighter, via check, the additional amount of Four Hundred Thousand Dollars ($400,000.00), less all permissible or required deductions and withholdings. For the avoidance of doubt, there shall be no Win Bonus if Fighter is declared winner of the Bout.").

74. *See, e.g.,* ZFL-2480590 (Mersch writes on July 10, 2014, "Normally we wouldn't want Overeem making that much out in the public so we'd have to do a separate LOA. But if they don't release it, we could leave it as is.").

75. DB-ZUFFA-00007109. *See also* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, and ZFL-0086231. *See also* ZFL-1690436-444 (Fighter IP Guidelines for Consumer Products; provides Zuffa's interpretation of what Identity rights are included in the PARs, and the Identity rights for which Zuffa believes Fighters are owed royalties).

---

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-25-

survive even the death of the Fighter."[76] Fighters may also sign merchandising agreements, in which the Fighter grants Zuffa a non-exclusive and sub-licensable right to use intellectual property of the Fighter for the sale of UFC-branded merchandise in exchange for royalty payments of 10 to 15 percent of sales revenue, or 20 to 30 percent of license revenue.[77]

35.     Members of the Identity Class may receive two forms of payments in exchange for the use of their Identity by sponsors. *First*, historically many sponsors have paid Fighters directly for services performed on behalf of that sponsor, including wearing their logo at UFC events.[78] In or around 2009, Zuffa began requiring that some of these sponsors separately pay Zuffa a brand affiliation fee or "sponsorship tax" for the right to sponsor Fighters at UFC events.[79] Over time, Zuffa expanded the categories of sponsors subject to the sponsorship tax.[80] In 2015, Zuffa implemented a new "Athlete Outfitting Program," which required Fighters to wear Reebok "kits," thus limiting the outside sponsorship revenue athletes could obtain from sponsorships at UFC events.[81] Once Zuffa implemented the Athlete Outfitting Program, in an apparent attempt to make up for some of the Fighters' lost revenues from sponsors due to Zuffa's polices, it began

---

76. DB-ZUFFA-00007019.

77. *Id. See also* ZFL-0000650.

78. Mossholder Dep. Ex. 36-A at 32 ("Most sponsors contract directly with athletes under contract with the UFC and determine the appropriate amount of compensation for that agreement without Zuffa's involvement.").

79. The first record of a "sponsorship tax" occurs in an email conversation with an apparel sponsor dated 1/8/2009. *See* ZUF-00157206. Batchvarova Dep. at 26:9-27:4 ("At the time apparel companies … that were sponsoring athletes going into the octagon were paying an affiliation fee."); *see also* ZUF-00017896 and ZUF-00086103.

80. *See, e.g.,* LESPLAINTIFFS-0032350 ("The only changes to in [sic] the sponsorship world pertain to tshirt/apparel companies… in short, any tshirt company wishing to sponsor UFC fighters must join the UFC approved sponsor program."); ZFL-1974115 ("NOTICE – For all Zuffa events going forward, only approved on-line retailers will be allowed to sponsor fighters. To that end, you must have a separately executed sponsorship agreement with Zuffa to be able to sponsor fighters for any events. This new policy will kick in beginning with UFC 116 on July 3, 2010.").

81. *See* ZFL-0802996, which details the UFC's "Athlete Outfitting Policy." This policy book provides guidelines to all Fighters on wearing officially sponsored apparel and gear, and the compensation and fines associated with compliance. Reebok (apparel), Century (gloves), and Monster (headphones) are the three "approved brands" listed. Outside of Zuffa events including "Fight Week" Fighters could continue to make their own arrangements with sponsors. Batchvarova Dep. at 27:15-29:14.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-26-

compensating Fighters for complying with the Athlete Outfitting Policy through a formula based on tenure at Zuffa.[82] *Second,* for certain sponsors willing to pay a premium to become an "official sponsor" of the UFC, Zuffa would negotiate with individual Fighters on that sponsor's behalf and would make payments to Fighters for services performed on behalf of a particular sponsor.[83] These services included wearing the sponsor's logo in the Octagon and making other appearances on behalf of the sponsor.[84]

36.     Some Fighters received compensation for their appearance in UFC-branded video games.[85] In September 2006[86] and June 2012,[87] respectively, Zuffa entered into agreements with two game publishers (THQ and Electronic Arts) to develop five video games featuring named Fighters from 2006 to the present. Of these, Zuffa provided specific payment data for three: UFC 2009 Undisputed, UFC 2010 Undisputed, and UFC Undisputed 3 (2012). Two more video games, EA Sports UFC and EA Sports UFC 2, were produced in 2014 and 2016, respectively.[88] Finally, beginning in June 2009,[89] Zuffa began selling trading cards containing Fighters' likenesses without

---

82. Batchvarova Dep. at 32:5-34:20 ("[W]e came up with the methodology which is currently actually employed which is assigning by tenure, which is objective.").

83. 30(b)(6) Deposition of Michael Mossholder (December 1, 2016) at 143:19-146:121 ("Mossholder Dep."). *See also id.* Exhibit 36-A at 29 ("Some sponsors prefer to deal only with Zuffa and have them handle all payments, even to athletes."). This was the arrangement Zuffa had with certain large sponsors such as Anheuser Busch. The identity "assets" that Zuffa licensed on behalf of Fighters include "their individual IP, their ability to do appearances, production days, use of their individual social media, use of their individual digital, their fighter kits." *Id.* at 156:12-16.

84. *Id.*

85. ZFL-1023959.

86. ZFL-0871571.

87. ZFL-1394078.

88. *See* ZFL-0000259 and the list of UFC branded video games, *available at* https://www.giantbomb.com/ufc/3025-248/games/

89. ZFL-1825387 at row 123 of the Merchandise Licensing Tab. The Topps Trading Card Company Term is listed as "6/5/08 - 5/1/2011 extended to 5/1/16."

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-27-

having merchandise rights agreements in place with each Fighter. It sought out separate merchandise agreements from such Fighters after the fact.[90]

37.     Most Fighters did not receive any compensation from Zuffa for use of their Identities; between 2010 and 2015, fewer than 40 percent of Fighters received some form of Identity compensation from Zuffa.[91]

## II. NATURE OF THE CHALLENGED CONDUCT

38.     In this section, I describe the Challenged Conduct. I begin by classifying the Challenged Conduct according to its "horizontal" and "vertical" aspects, based on whether the conduct involved other MMA promoters (horizontal) or whether the conduct involved MMA "inputs" such as Fighters (vertical). I then explain how the Challenged Conduct served to initiate, renew, and extend Fighter contracts, making Zuffa's exclusionary provisions effectively perpetual (or nearly so) for the vast majority of Fighters, especially in relation to Fighters' relatively short careers.

39.     Economists and antitrust practitioners recognize that horizontal *and* vertical conduct can have anticompetitive effects when undertaken by a firm with significant market power, and the effects of each form of conduct can and often do amplify the other. In Parts III.A and III.B, I demonstrate that Zuffa does possess significant monopoly and monopsony power in the Relevant Output and Input Markets, respectively. In Parts III.C and III.D, I demonstrate that the Challenged Conduct did, in fact, foreclose competition and generate anticompetitive effects.

---

90.     *See* ZFL-2536392 (August 13, 2012 email from Tracy Long notes: "Wow, that is a lot [of fighters missing merchandize rights agreements.] How did we let it get to so many? I didn't realize we did not have one for Cung Le.").
91.     *See* ZFL-2603704 (showing that 151 Fighters received sponsorship payments, 231 received video game payments, and 333 received merchandise royalties). For counts of total Fighters, *see* ZFL-0000003; ZFL-2603701.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-28-

A.      **Nature of the Horizontal Conduct**

40.     Since buying the UFC in 2001, Zuffa has acquired five MMA promoters. Horizontal aspects of the Challenged Conduct include these horizontal acquisitions, as well as Zuffa's counter-programming of other Live MMA Events, and Zuffa's agreements, including non-compete agreements, with other MMA promoters. Economists and antitrust practitioners recognize that horizontal acquisitions can have anticompetitive effects whenever they lessen actual or potential competition with a rival or potential rival.[92] Non-compete agreements and collaboration with horizontal competitors can also be anticompetitive,[93] as can strategic efforts to harm competitors or potential competitors such as counter-programming.[94]

1.      **Acquisitions of Potential Rivals**

41.     In 2006, Zuffa purchased the World Fighting Alliance ("WFA")[95] and World Extreme Cagefighting ("WEC").[96] WFA was a Las Vegas-based MMA promoter that put on four

---

92. U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010) [hereafter *Merger Guidelines*] §1 ("[M]ergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise…A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives.").

93. *See, e.g.,* Department of Justice and Federal Trade Commission, Antitrust Guidelines for Collaborations Among Competitors (April 2000), §2.2, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf. Although non-compete agreements frequently consist of contracts between employers and employees, Zuffa's non-compete agreements are essentially horizontal agreements with potential competitors, as explained below.

94. *See* DENNIS CARLTON & JEFFREY PERLOFF, MODERN INDUSTRIAL ORGANIZATION (Pearson 2005 4th ed.) [hereafter MODERN IO] at 386-87. As Professors Carlton and Perloff explain, strategic efforts to harm competitors are more likely to be harmful when entry is difficult. This condition is satisfied here, given that Zuffa's staggered, multi-bout exclusive contracts constitute an artificial barrier to entry.

95. Deposition of Ike Lawrence Epstein pursuant to Rule 30(b)(6), Dec. 2, 2016 at 70:14-24 (discussing WFA acquisition); *see also UFC Acquires World Fighting Alliance, Inc.,* MMA JUNKIE, Dec. 11, 2016, *available at* http://mmajunkie.com/2006/12/ufc-acquires-world-fighting-alliance-inc.

96. Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA WEEKLY, Dec. 11, 2006, *available at* https://web.archive.org/web/20070929111019/http://www.mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13.

---

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-29-

Live MMA Events between 2001 and 2006.[97] Before its acquisition, WFA attracted headlining Fighters such as Quinton Jackson and Matt Lindland.[98] WEC was a California-based MMA promoter that produced 24 events between 2001 and 2006.[99] Zuffa announced its acquisitions of WFA and WEC on the same day in December 2006. The WFA acquisition was structured as an asset purchase in which Zuffa acquired select Fighter contracts, trademarks, and other intellectual properties;[100] these assets were immediately absorbed into the UFC and WFA ceased to exist. In contrast, Zuffa's purchase of WEC left WEC with its former leadership intact.[101]

42.    Zuffa reportedly intended WEC "to serve as a venue in which to groom up-and-coming talent" and as "a strategic maneuver to impede the chances of other MMA promotions (specifically the IFL or Pride) to secure a national TV deal in the United States."[102] Zuffa's internal documents confirm that Zuffa acquired the WFA in a "defensive strategy to eliminate a second tier competitive brand,"[103] and that "[t]he reason for the acquisition was to control the

---

97. Epstein 30(b)(6) Tr. 70:25-71:15. *See also* http://www.sherdog.com/organizations/World-Fighting-Alliance-68.

98. Epstein 30(b)(6) Tr. 72:12-74:9. *See also* Josh Gross, *Lappen Sues WFA for Breach of Contract*, SHERDOG, Dec. 7, 2006, *available at* http://www.sherdog.com/news/articles/Lappen-Sues-WFA-for-Breach-of-Contract-6308

99. Epstein 30(b)(6) Tr. 26:19-27:3. *See also* http://www.sherdog.com/organizations/World-Extreme-Cagefighting-48.

100. *UFC Acquires World Fighting Alliance, Inc.*, MMA JUNKIE, Dec. 11, 2016, *available at* http://mmajunkie.com/2006/12/ufc-acquires-world-fighting-alliance-inc.

101. Epstein 30(b)(6) Tr. 24:12-13 (stating Zuffa's testimony that it acquired the WEC); Ken Pishna & Ivan Trembow, *UFC Buying World Extreme Cagefighting*, MMA WEEKLY, Dec. 11, 2006, *available at* https://web.archive.org/web/20070929111019/http://www.mmaweekly.com/absolutenm/templates/dailynews.asp?articleid=3053&zoneid=13.

102. *Id. See also* "Exclusive: Dana White Announces UFC-WEC Merger," *available at* https://www.youtube.com/watch?v=zCIWWLnJSN4&feature=sub; ZFL-1240584 at -589 ("The primary purpose for Zuffa's acquisition of the small, regionally based WEC was to obtain a second brand, separate and distinct from the UFC, which could produce MMA events for non-PPV television distribution. The WEC would also serve as a second tier or 'minor league' feeder platform where younger, less experienced, lighter weight, and less well-known fighters could gain public awareness before developing to the point when they can move up to the UFC level of competition.").

103. ZFL-1240584 at 590.

---

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-30-

WFA and prevent it from competing with the WEC and UFC."[104] As a part of the acquisition, Zuffa also secured seven-year non-compete agreements with WFA's principal owners.[105]

43.    Zuffa purchased Pride Fighting Championships ("Pride") in April 2007.[106] Pride was a Japan-based MMA promoter that produced 68 events between 1997 and 2007, two of which occurred in Las Vegas starting in October 2006.[107] Zuffa has written that, "Pride was widely…considered to be the second most recognized MMA brand worldwide when acquired."[108] In an email to Frank and Lorenzo Fertitta detailing the result of acquisition talks with Pride's owners, Thomas Paschall, outside counsel for Zuffa during the acquisition of Pride, noted "the strategic/preemptive nature of this acquisition (*i.e.*, to stop others from buying it) and your having seriously contemplated acquiring them only to shut down their business and utilize their Fighters in the UFC."[109] Within about six months of the acquisition, Zuffa fired Japanese staffers and closed down Pride's Tokyo offices.[110] When the Pride acquisition was underway, Zuffa paid $10 million to the CEO of Pride for a seven-year non-compete clause.[111]

---

104.  *Id.*

105.  *Id. See also* ZUF-00377706 (T. Louis Palazzo Non-Competition Agreement); ZUF-00377712 (Ross C. Goodman Non-Competition Agreement).

106.  Epstein 30(b)(6) Tr. 88:5-7 (stating on behalf of Zuffa that Zuffa acquired Pride); *id.* at 100:10-12 ("And the transaction didn't close until, I guess, May of 2007…"); *see also* "*Done deal: UFC owners purchase PRIDE FC*," MMA Mania, Mar. 27, 2007, *available at* http://www.mmamania.com/2007/03/27/done-deal-ufc-owners-purchase-pride-fc. The actual agreement was consummated on April 18, 2007. *See* ZFL-1216165.

107.  *See* http://www.sherdog.com/organizations/Pride-Fighting-Championships-3

108.  *See* Goldman 30(b)(6) Tr. 125:5-14 (discussing Zuffa's handwritten edits to a draft of the 2009 Deutsche Bank Confidential Information Memorandum).

109.  ZUF-00031544. *See also* Deposition of Drew Goldman pursuant to Rule 30(b)(6), April 28, 2017 at 73:17-74:1 (testifying on behalf of Deutsche Bank that, based on conversations with Zuffa and materials provided by Zuffa, Deutsche Bank's interpretation was that "Each acquisition [Pride, WEC and WFA] had unique offensive and defensive purposes at the time. However, both the WFA and Pride pending transactions resulted in Zuffa's roster of elite fighters expanding significantly.").

110.  Zach Arnold, *PRIDE office in Tokyo shut down, all workers fired*, Fight Opinion, Oct. 4, 2007, *available at* http://www.fightopinion.com/2007/10/04/pride-office-in-tokyo-shut-down-all-workers-fired/.

111.  ZFL-1676293 at 96.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-31-

44.     Affliction Clothing was a U.S.-based MMA clothing label and was one of the primary clothing sponsors of Zuffa Fighters. Backed by prominent investors, AEG put on two successful Live MMA Events.[112] In early 2008, Zuffa terminated its sponsorship relationship with Affliction Clothing when Zuffa received information that Affliction was planning on entering the MMA promoter business under their new subsidiary, AEG.[113] In reaction to Affliction's decision to get into the business of MMA fight promotion, Zuffa barred Affliction from sponsoring any of its events or any of its Fighters.[114] This weakened Affliction, which ultimately decided to exit the MMA Promotion business.

45.     Zuffa purchased AEG's assets and Fighters on July 23, 2009. The purchase agreement stated that "AEG shall ... cancel any and all future AEG Events or other Live MMA Events that AEG is involved in [and] cease ... any and all MMA promotional businesses and endeavors by AEG...."[115] According to a final draft of a letter summarizing the agreement, the deal involved Affliction "exiting the MMA professional business,"[116] transferring Fighters under contract to Zuffa, and "creating some sort of promotional affiliation with the Ultimate Fighting Championship (UFC)."[117] Record evidence indicates that Zuffa saw Affliction as a competitive

---

112. ZFL-2463304 at 25.

113. Tim Ngo, *Affliction Banned From Sponsoring UFC Fighters*, 5TH ROUND, Jan. 25, 2008, *available at* http://www.5thround.com/356/report-affliction-banned-from-sponsoring-fighters-in-the-ufc/#more-356.

114. MMA Mania, "Report: Affliction MMA folds, will now be allowed to sponsor UFC and its fighters," (July 24, 2009), available at https://www.mmamania.com/2009/07/24/report-affliction-folds-will-now-sponsor-ufc ("Yahoo! Sports today issued a report that Affliction MMA will cease to exist, coming to terms with Ultimate Fighting Championship (UFC) under an agreement that will allow the clothing brand to once again sponsor the world's top promotion and the fighters under its umbrella. Affliction was 'banned' from doing so when it decided to begin promoting events last year.").

115. ZFL-2020850 at 50-51.

116. ZFL-2764805.

117. *Id.*

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-32-

threat due to certain key Fighters affiliated with Affliction, and that Zuffa viewed the agreement to put Affliction out of the MMA business as "a big win."[118]

46.  After the acquisition agreement was finalized, UFC's Assistant General Counsel Michael Mersch wrote an email noting with reference to Affliction's demise that "[o]ur main rival is done."[119] Mersch also observed that acquiring Affliction's Fighter contracts would enhance the UFC's ability to put on attractive fights.[120] After the purchase, and once Affliction was no longer in the MMA promotion business, Zuffa reestablished a sponsorship affiliation with Affliction Clothing.[121]

47.  Zuffa purchased Strikeforce, the second largest MMA promoter at the time, in March 2011.[122] At the time of the purchase, Strikeforce was the "second most prominent and recognized … MMA organization in the world," and it had the most prominent women's MMA division.[123] Strikeforce produced 47 events across the United States before being acquired.[124] By 2009, "Strikeforce [had]… emerged as the world's second most prominent promotion, with sufficient size and assets to maintain and improve its position."[125] Its rise to prominence was cited

---

118.  *See* DB-ZUFFA-00008846 at 847 (a Deutsche Bank employee who worked with Zuffa in connection with a financing in late 2009 reported on a conversation he had had with Zuffa CFO John Mulkey in July 2009 wherein Mulkey "explained one of the reasons that UFC management has been pre-occupied is due to negotiations with Affliction, which is the next biggest MMA competitor. Affliction is officially getting out of the business … and UFC will essentially takeover whichever fighter contracts it wants. Affliction will also pay UFC to become a sponsor going forward. [Mulkey t]hinks it is a really big win for the company.").

119.  ZFL-2193553.

120.  *Id. See also* Deposition of Michael Mersch, July 14, 2017, at 447:4-450:8.

121.  ZFL-2463304 at 25.

122.  Strikeforce would continue to operate as a standalone promoter until January 2013, after which its Fighters and remaining assets were incorporated into UFC. *See* Nate Wilcox, *More Details Emerge on UFC Acquisition of Strikeforce*, BLOODY ELBOW, Mar. 13, 2011, *available at* http://www.bloodyelbow.com/2011/3/13/2047456/ufc-strikeforce-acquisition-more-details-emerge. *See also Strikeforce confirms Jan. 12 event is final Showtime broadcast*, MMA JUNKIE, Dec. 20, 2012, *available at* https://web.archive.org/web/20131102021751/http://www.mmajunkie.com/news/2012/12/strikeforce-confirms-jan-12-event-is-final-showtime-broadcast.

123.  ZFL-2463304 at 9.

124.  *See* http://www.sherdog.com/organizations/Strikeforce-716

125.  ZFL-2463304 at 14.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-33-

as the top story of 2009 by Sherdog.com, a popular Internet source of MMA news and information.[126]

48.     UFC matchmaker Joe Silva sent an email setting forth the January 27, 2011 consensus rankings of MMA Fighters in major weight classes, noting that the UFC "Own[ed] MMA."[127] Those consensus rankings, however, showed that Strikeforce had 3 of the top 10 (and 6 of the top 25) heavyweight Fighters; 5 of the top 25 (and a top 10) light heavyweight Fighter; 2 of the top 10 (and 4 of the top 25) middleweight Fighters; 2 of the top 10 welterweight Fighters; and 3 of the top 25 (including 1 top 3) lightweight Fighters.[128] No promotion other than the UFC had as many highly ranked Fighters in late January 2011, just two months prior to Zuffa's acquisition of Strikeforce.[129]

49.     In or around October 2010, Dana White called the Strikeforce owners to inform them that Lorenzo Fertitta wanted to acquire Strikeforce and, in November 2010, the Strikeforce owners met with representatives of the UFC concerning the potential acquisition of Strikeforce at the offices of WME.[130] At that meeting, Lorenzo Fertitta reportedly stated that he thought "Strikeforce is building a great brand, but [Zuffa felt] there should only be one brand, so [Zuffa]

---

126. *Id.* at 11. *See also* Coker Dep. at 38:6-12 (Strikeforce "got on [the UFC's] radar and I think they [Zuffa] wanted to control the market share."). In 2009, after Affliction exited the MMA promotion business and sold its assets to Zuffa, Mr. Coker (Strikeforce's founder) observed that "Affliction took the easy way out. [N]ow it's UFC and Strikeforce. If you can't battle these guys it's over for the MMA industry. UFC will be the only one left. We're the last chance. Otherwise, fighters' purses will go down if UFC is the only one – is the only one period. We're Luke Skywalker and UFC is Darth Vader and the Death Star." Coker Dep., Exh. 8; Coker Dep. at 95:10-20.

127. ZUF-00085896.

128. *Id.*

129. Coker Dep. at 121-10-23 ("I believe that the phone started ringing from Dana [White] because we had signed [prominent heavyweight] Fedor [Emelianenko] and we announced the heavyweight tournament. It was clear that although we were a very small company, much smaller than the UFC, but we were in the same business, that we had a better heavyweight division than they did, and I think that was one of the considerations on their part."). Coker also testified that the light heavyweight division has always been the "strongest in MMA" and "heavyweights, to me, would be just as important because everyone likes the heavyweights." *Id.* at 106:2-9.

130. Coker Dep. at 114:22-118:15.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-34-

would like to buy [Strikeforce]."[131] For its part, Zuffa's internal correspondence in 2012 indicates that the UFC sought, by its Strikeforce acquisition, to eliminate it as a competitor. In a conference call, UFC CEO Lorenzo Fertitta stated that: "Lawrence and Pete Dropick, who run Strikeforce for us, went back to New York, had negotiated a separation agreement with Showtime to essentially shut Strikeforce down. We would then pull all of those Fighters into the UFC which is essentially what we want to do anyway."[132] According to Zuffa, acquiring Strikeforce's Fighter contracts was "definitely the most important" aspect of the deal.[133]

50.     According to Scott Coker, Strikeforce's founder, Lorenzo Fertitta stated that his plan was to "close [Strikeforce] down, and we would take all of the Fighters and bring them to the UFC."[134]   Coker testified that, after negotiations stalled, Dana White threatened that he would "come after [Strikeforce's] fighters, and he would make our life hard, and, you know, give us a bad time."[135] Coker testified that, had Strikeforce not been sold to Zuffa, Strikeforce "would have continued to become a stronger competitor to the UFC."[136]

51.     Record evidence indicates that the Zuffa continues to seek out potential rivals to acquire and shut down. A March 2015 email from Marshall Zelaznik, UFC's President of UK Operations, asks outside counsel to reach out to the University of MMA, an upscale amateur promotion based in Los Angeles, stating "Let's put on our to acquire list."[137]

---

131. *Id.* at 118:16-23.
132. ZFL-1901788 at 94. Zuffa was interested in bringing in talent such as Ronda Rousey from Strikeforce into the UFC brand. *Id.*
133. Epstein 30(b)(6), 12/2/2016 174:5-18; *see also* Silva Dep. at 316:9-22.
134. Coker Dep. at 119:9-17.
135. *Id.* at 128:9-14; Coker Dep., Exh. 8 (ZUF-00447778).
136. Coker Dep. at 144:12-15
137. ZFL-2530953 at 53.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

**2.      Counter-Programming and Litigation**

52.      Record evidence shows that the UFC engaged in counter-programming in attempts to suppress demand for events of other MMA promoters. According to one academic case study:

> The UFC had a simple strategy for limiting the growth of its competitors; it scheduled free counter-programming at the same time as their competitors with the intention of stealing revenues. And although this approach was not profitable in itself, it worked by preventing new competitors from both achieving profitable operations and recouping their investments in high-profile fighters.[138]

That Zuffa's counter-programming was "was not profitable in itself"[139] indicates that the economic motivation of Zuffa's counter-programming was to use its dominance to harm competition by impairing rivals in an anticompetitive manner, rather than to promote competition in the industry.

53.      The UFC's counter-programming appears to have been conceived in 2006 when the UFC sought to counterprogram the WFA's last event before they purchased the promotion. On June 15, 2006, Kirk Hendrick wrote to Lorenzo Fertitta, Dana White and Craig Borsari that Spike had agreed to air a taped compilation of UFC bouts on July 22, 2016 (the date of the WFA's last event).[140] Hendrick wrote: "Obviously, the idea would be: 'free UFC on Spike TV … versus whatever WFA charges for PPV.'"[141] A few years later, on November 24, 2008, Craig Borsari wrote that "Dana [White] wants to counter program Affliction['s pay-per-view event on] January 24 [2009]" with a re-run of a prior pay-per-view event on free television.[142] UFC President Dana White openly admitted to counter-programming in a May 2009 ESPN article, according to which, White had "thrown together the card [for Saturday's Fight Night 14] in five weeks in an attempt to

---

138.  Jesse Baker & Matthew Thomson, *The Ultimate Fighting Championships (UFC): The Evolution of a Sport*, in CASES IN MARKETING MANAGEMENT 115 (Kenneth E. Clow & Donald Baack, eds. 2012).

139.  *Id.*

140.  ZUF-00153787.

141.  *Id.*

142.  ZUF-00153903. Zuffa did, in fact, broadcast the re-play of the UFC 91 pay-per-view card, bringing in an average audience of 2.3 million viewers for the special. *See UFC 91 replay on Spike TV peaks with 3.3 million viewers*, MMAmania.com, Jan. 27, 2009, *available at* https://www.mmamania.com/2009/01/27/ufc-91-replay-on-spike-tv-peeks-with-33-million-viewers. Affliction did not have another event after its January 24, 2009 event.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-36-

choke out a dangerous upstart promoter, Affliction, which is staging its first event."[143] White

clarified that "I'm doing this fight for one reason, to make Affliction spend money. If they're in

business in January, I'll be horrified."[144]

54.    In May 2014, an internal UFC email string was circulated regarding a Live MMA

Event promoted by MMA promoter Bellator that was to take place at a venue fewer than ten miles

away from a UFC event on the same date. UFC Senior VP Peter Dropick wrote:

> Bellator just announced a Live MMA Event featuring Brennan Ward vs James Irvin at
> Mohegan Sun in CT on Sept 5th, the same night as our FS1 event at Foxwoods (10 miles
> down the road). It looks like Bellator goes on-sale June 6. I spoke to Felix at Foxwoods and
> they're still 110% committed. Any issues moving forward as planned? I think we should
> announce our event before their on-sale. We'll crush them at the gate.[145]

In response, UFC CFO John Mulkey replied: "Let's price it right and scare them out of town."[146]

Scott Coker, President of Bellator, filed a declaration stating that "UFC has frequently

counterprogrammed Bellator's events-for example by choosing venues or scheduling high profile

matches to draw audience away from Bellator's own key matches."[147]

55.    UFC also noted that counter-programming was a part of its strategy in a

presentation to potential sponsors.[148] In February 2009, Dana White forwarded a press

announcement about Showtime's agreement with Strikeforce to other Zuffa executives, asking

---

143. Michael Woods, *UFC struggles to shake outlaw nature*, ESPN, May 12, 2009, *available at* http://www.espn.com/extra/mma/news/story?id=4157485. In a November 2008 email, Vice President of Operations Craig Borsari wrote to Lance Klein and Assistant General Counsel Kirk Hendrick that "Dana wants to counter program Affliction on January 24 and would like to run a UFC 91 special featuring fights from the PPV including Brock vs Randy. Can you talk to Kevin about licensing this program? I know its [sic] unlikely that they'll pay a big number for the show but it would be nice if we could at least get our production costs covered." ZUF-00153903.

144. *Id.*

145. ZFL-0827209.

146. *Id.*

147. Declaration of Scott Coker in Support of Nonparty Bellator Sport Worldwide, LLC's Motion to Quash or Modify Subpoenas, Feb. 22, 2017, ¶20 [hereafter, "Coker Declaration"]. *See also* Coker Dep. at 37:12-38:15 (confirming that Zuffa's counterprogramming of Strikeforce).

148. A September 2010 PowerPoint presentation to Sports Authority notes that "UFC Counter-Programming consists of re-run pay-per-view events and re-run bouts." *See* ZUF-00169647.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-37-

"are we going to counter program this on Spike?"[149] An August 14, 2009 email from Joe Silva to

Dana White and Lorenzo Fertitta states: "I have stolen the following fights out from underneath

Strikeforce in the last couple of days: Joey Villasenor[,] Riki Fukuda[,] Joey Villasenor[,] [sic]

Phil Baroni[,] Dennis Hallman[.]"[150]

56.       Explosion Entertainment, which owned Strikeforce, wrote in its 2009 business plan

that Strikeforce and other MMA promoters were increasingly "wary of UFC's predatory instincts

and counter-programming clout."[151] It further noted that UFC's "arrogance has spawned business

practices that can be viewed as anti-competitive and restraints of trade."[152] In a 2010 presentation

discussing the future of the company, one of the potential options was to "Go Hard after the UFC"

as opposed to becoming an MMA "minor league."[153] One element under the "con" section of plan

was the threat of "UFC counter-programming (awake the sleeping giant)."[154] A March 3, 2010

email chain among Strikeforce executives expresses concern about UFC counter-programming

Strikeforce's April 17, 2010 Nashville event, and even considers attempting to preemptively

reserve event venues in the metropolitan area.[155] At the time, Andrew Ebel at Strikeforce noted

internally that "I really feel that the potential of UFC holding an event in Nashville was and is

---

149. ZFL-2005388.
150. ZFL-2005616.
151. ZUF-00421380 at 386.
152. Id. at 387.
153. ZUF00447547 at 570.
154. ZUF00447547 at 562.

155. This idea was later abandoned as impractical due to the high number of potential venues. See ZFL-2595178; see also ZFL-2586870, March 6, 2010 email from Andrew Ebel at Strikeforce ("UFC is playing dirty and may be trying to put on a live MMA event in a different venue in Nashville on the same night as ours. We need to get our media booked immediately so they don't come in and literally buy up all the available media in the marketplace. We need to move very quickly. This is very serious.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-38-

really hindering our ticket sales to date."[156] UFC ultimately counter-programed the event by rebroadcasting UFC 110 on Spike at the same time as the Strikeforce event.[157]

57.     One UFC estimate indicated that UFC counter-programming could reduce Strikeforce's viewership by as much as 40 percent.[158] Zuffa created a PowerPoint presentation comparing viewership of Strikeforce live events with its counter-programmed recorded events in 2010.[159] In April 2010, Sam Raimist, a financial analyst for Zuffa, sent an email to Zuffa executives comparing ratings between Strikeforce and Zuffa events: "Overall UFC110 had a good showing as a replay going up against a live event. In comparison to other shows we have used to counter-program our competition, such as UFC107 and UFC100, UFC110's numbers are slightly down."[160]

58.     Zuffa also targeted other MMA promoters. Jeremy Lappen, once the president of fight operations at ProElite (which owned subsidiaries EliteXC, Cage Rage, and King of the Cage) testified that UFC at various times counter-programmed Live MMA Events.[161] In 2014, CEO of Cage Warriors Graham Boylan complained to Garry Cook at the UFC about UFC counter-programming and suggested coming to a confidential agreement not to hold events in same area on

---

156.  *See* ZFL-2587231.

157.  *See* http://www.fightline.com/fl-news-2010-0417-487130-strikeforce- ("Although the UFC will not counter Strikeforce's second CBS primetime broadcast with a live show of their own tonight, MMA's monopoly will air November's "UFC 110: Nogueira vs. Velasquez" event on Spike TV to try and retain their stranglehold on the sport.").

158.  A May 2010 email from Sam Raimist notes: "Please find attached the ratings breakouts for Saturday's Strikeforce event on Showtime, and our counterprogramming, UFC Ultimate Fights." A follow-up email compares ratings for the counterprogrammed Strikeforce on Showtime event "to their last Showtime Event held in January," and notes that "Overall viewership from the January event to last Saturday's was down 40%. Strikeforce also saw significant drops in all of the demos," to which Zuffa's John Mulkey responds, "ouch[.]" ZFL-1677482 at 82-83.

159.  ZFL-2022954 at 55.

160.  ZUF-00339684.

161.  Deposition of Jeremy Lappen, Feb. 28, 2017, at 44 ("Q: Do you remember a specific time when another promotion counter programmed to one of your events? A: I don't remember the specific times, but I know that the UFC counter programmed our events. Q: Would you say that happened often while you were president of fight operations? A: I don't remember how often it happened. It happened more than once. But I don't remember how many times. Q: Did any other MMA promoters counter program Pro Elite events? A: Not that I remember.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-39-

same dates: "I'd like to reach out in confidence and ask if you want to work on not clashing?" Cook responds "We need to have a conversation about this when you get a chance."[162]

59.     Record evidence indicates that Zuffa also used the threat of litigation to impair would-be rivals. For example, IFL was an atypical MMA promoter in that matchups were team affairs, with each team member facing off in a one-on-one bout.[163] IFL held 22 events across the United States between 2006 and 2008.[164] It collapsed due to financial difficulties (in part, as discussed below, due to the Challenged Conduct) in 2008.[165]

60.     Before IFL had put on its first promotional Live MMA Event, Zuffa sued it, alleging that the fledgling company had illegally hired some of its former employees who took with them confidential trade secrets.[166] IFL co-founder Kurt Otto at the time stated that:

> Rather than having to do with "confidential" information or purported trade secrets, I believe that, to the contrary, as described below, this lawsuit has everything to do Zuffa's effort to stifle and stamp out perceived competition in the Mixed Martial Arts ("MMA") marketplace in a transparent attempt to put the IFL out of business before it ever gets off the ground.[167]

IFL counter-sued over allegations that UFC had threatened Fox Sports with a lawsuit if Fox were to sign a deal with IFL.[168] Both cases generated substantial legal expenses for IFL.[169]

---

162. ZFL-2483111 at 13.

163. Jonathan Snowden, *Disastrous debut costs IFL millions: The history of MMA on television, Part 2*, BLEACHER REPORT, Dec. 12, 2012, *available at* http://bleacherreport.com/articles/1442316-disastrous-debut-costs-ifl-millions-the-history-of-mma-on-television-part-2.

164. *See* http://www.sherdog.com/organizations/International-Fight-League-742.

165. IFL's assets were acquired by HDNet. *See* IFL SEC Form 10-K (2009), at 1 ("On November 17, 2008, IFLC sold substantially all of its assets to HDNet LLC…"). *See also* Tom Ngo, *IFL: Going, Going…Gone! UFC Here We Come?*, 5TH ROUND, July 25, 2008, *available at* https://web.archive.org/web/20091201045527/http://www.5thround.com/07252008/news/1293/ifl-going-goinggone/.

166. Jeffrey Thaler, *Breaking Down the Match-Up: UFC vs. IFL*, SHERDOG, Mar. 2, 2006, *available at* http://www.sherdog.com/news/articles/Breaking-Down-the-MatchUp-UFC-vs-IFL-4051.

167. Deposition of Kurt Otto, February 6, 2017, Exhibit 6, ¶ 4.

168. Thaler, *supra*.

169. Deposition of Kurt Otto, February 6, 2017, at 161.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-40-

61.    The lawsuit also generated sworn statements from Patrick Miletich, a MMA trainer and former UFC champion, who testified that UFC's President Dana White threatened him and others that individuals doing business with IFL would forfeit future opportunities with the UFC. In two separate instances, White allegedly stated that "he was going to fucking crush these [the IFL] guys," and that "when the dust settles, anyone associated with the IFL would not be associated with the UFC."[170] Miletich further stated that White's statements represented:

> [A] threat to me and to my fighters who count on me to represent them and obtain opportunities for them to fight in the MMA industry. Because of the virtual monopoly that Zuffa has in the MMA industry, Mr. White clearly knew that cutting me and my fighters off from the UFC would have a devastating economic impact...

> Knowing Mr. White the way I do, I can honestly say that Zuffa's intent in bringing this litigation has nothing to do with protecting any confidential information. Rather, I believe this litigation is about one thing and one thing only—stamping out legitimate and, indeed, healthy, competition.[171]

### 3.    Non-Compete Agreements With Other MMA Promoters

62.    Record evidence indicates that Zuffa has entered into non-compete agreements with other MMA promotions or their principals. In November 2010, Zuffa entered into a settlement agreement with HDNet LLC and Mark Cuban resolving a dispute over distribution rights. The settlement agreement included a "NON-COMPETITION" clause stating that "HDNet and Mark Cuban would not engage in direct competition with Zuffa's line of business until November 9, 2014.[172]

63.    There is also evidence suggesting that Zuffa and other MMA promoters sometimes worked together to prevent Fighters from fighting bouts with other MMA promoters. During Zuffa's negotiations regarding the acquisition of MMA promoter, Pride, Pride's management

170. *Pat Miletich's Statement in UFC-IFL Case*, MMAWEEKLY, June 17, 2006, *available at* http://www.mmaweekly.com/pat-mletichs-statement-in-ufc-ifl-case.
171. *Id.*
172. ZFL-1225776 at 78.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

offered to sign an exclusive contract with a well-known champion Fighter, Fedor Emelianenko, to "keep him away from Bodog [a rival promoter] so the contract is exclusive … depending on what you [Zuffa] want."[173] In a February 2013 email to UFC CEO Dana White titled "heads up," Shannon Knapp, the president of Invicta (another MMA promotion) wrote, "I wanted to let you know that we signed Zoila Frausta Gurgel (Bellator's 125lb champion) exclusively away from Bellator. We are not working with them or sharing talent with them. I always like to keep you in the loop so you know what is real."[174]

**B.    Nature of the Vertical Conduct**

64.    Zuffa's long-term exclusive PARs with Fighters constitute the primary vertical component of the Challenged Conduct. My staff and I reviewed all Zuffa Fighter contracts produced by Zuffa; this includes a total of 2,136 valid PARs spanning 2001-2015.[175] As explained below, Zuffa's long-term exclusive PARs barred Fighters from fighting for any other MMA promoters for the duration of the PAR. In addition, Zuffa's PARs have long contained a variety of provisions permitting Zuffa to extend the duration of Fighter contracts unilaterally, which could and did extend contracts beyond the stated "term" for many additional months or years, or indefinitely. For example, when Fighters announce retirement or injury, their contracts are tolled until their next fight for Zuffa, which might never happen.

65.    Economists and antitrust practitioners recognize that vertical restraints such as these, when used by a dominant firm, can harm competition by blocking or impairing access to key inputs, thereby foreclosing firms that would otherwise provide competitive discipline to the

---

173. ZUF-00031544.
174. ZFL-1019758.
175. *See* Appendix, Table A1. Excludes two non-Zuffa contracts (from Invicta and EliteXC) that were also produced by Zuffa.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-42-

dominant firm. By making it difficult or impossible for would-be rivals to acquire key inputs, such conduct restricts or eliminates the would-be rival's output, revenue, and ability to compete effectively.[176]

**1.   Exclusive Fighter Contracts Prohibit Fighters from Working with MMA Promoters other than Zuffa for the Often Lengthy Duration of the Contracts**

66.   While under a PAR, a Fighter is subject to an "exclusion clause" that requires the Fighter to fight exclusively for Zuffa, and prohibits the Fighter working with other MMA promoters.[177] Zuffa's PARs function as one-way ratchets, giving Zuffa unilateral authority to bind Fighters to exclusive terms or to cut Fighters that lose even a single bout (the "Cut Clause").[178] (In this sense, they differ qualitatively from contracts such as apartment leases or sports contracts in the NBA or MLB, which typically bind both parties to a specified term and/or amount). Virtually all of Zuffa's PARs also contain an ancillary clause granting Zuffa exclusive control over Fighters' Identity rights in perpetuity.[179]

---

176. MODERN IO, *supra*, at 371-375; *see also id.* at 429-430; Salop, *supra*.

177. *See* ZFL-0506593, ZFL-0175016, ZFL-0132594, ZFL-0469456, ZFL-0086231. *See also* ZFL-1544038 at 58 (2012 Information Memorandum prepared by The Raine Group stating that "[a]ll fighters are signed exclusively to the UFC"). Prior to its acquisition by Zuffa, at least some Strikeforce contracts were "not exclusive and allow[ed] the fighters to have bouts elsewhere." *See* ZFL-1393175. *See also* 30(b)(6) Deposition of Kirk Hendrick, November 29, 2016, Exhibit 2, at 21-25 [hereafter *Zuffa Contract Summary*], at 3. The PAR did permit Fighters to compete in certain bouts, providing that the bout was not televised and that the Fighter obtained Zuffa's express written permission. Ex. 2 to Hendrick Dep. at Tabs 29-50 (demonstrating in Section 3.6 the lone exception to the contractual bout exclusivity provision). Because Zuffa could deny its permission, Zuffa could ensure a Fighter never defected to a rival that Zuffa perceived to threaten its market dominance.

178. *Zuffa Contract Summary* at 140, 204, 844. *See also* DB-ZUFFA-00020303 at 04 ("the UFC reserves the right to terminate a fighter's contract after one or two consecutive losses").

179. *Zuffa Contract Summary* at 21-25. *See also* ZFL-1382453 at 80 ("Fighter grants unrestricted worldwide right [to] use, edit, disseminate, display and/or reproduce the name, likeness, sobriquet, voice, persona, signature and/or biography ("Identity") of the Fighter. Zuffa owns rights in perpetuity throughout the world. These rights include right to include likeness in any Zuffa-branded video games. This right is exclusive for most fighters.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-43-

67.  Nearly all of Zuffa's PARs specify a term in both bouts and months, which covers the period when the Fighter is eligible to fight in a Zuffa promoted event.[180] The contracts are structured such that the PARs would enter their final phase at either the end of the final bout or the end of the final month of the contract, whichever comes first.[181] Zuffa precludes Fighters from fighting for other MMA promoters from the date their contracts were signed (even though the time period of the defined "term" does not begin until the first fight), which means that the PAR is also in effect during any time elapsing between the signing of a Fighter's contract and the Fighter's first bout—a period that, as I understand it, can sometimes extend for months.[182]

### 2.  Zuffa's Exclusive Contracts with Fighters Permit Zuffa to Extend the Duration of the Contracts

68.  All PARs contain a right to match clause, which "grants Zuffa the right to match competing promoters' offer for limited period of time after the expiration of an athlete's agreement."[183] In approximately 95 percent of contracts I reviewed, the right to match period lasts for one year.[184] If another MMA promoter attempts to sign a Fighter during the right to match period, the Fighter must share the terms of that offer to Zuffa, and Zuffa can elect to retain the Fighter simply by matching the terms offered by the other MMA promoter. The potential rival

---

180.  *See, e.g.,* ZFL-0506593 §5.1: "The duration of Promotional Rights ("Term") shall commence on the Effective Date and end on the earlier of (i) Fifteen (15) months after the first bout promoted Zuffa involving Fighter under this Agreement; or (ii) the date on which Fighter has participated in at least three (3) Bouts promoted by ZUFFA under this Agreement ("Termination Date"), unless terminated sooner or extended further pursuant to the provisions of this Agreement."

181.  *Id.*

182.  *See, e.g.,* ZFL-0506593 §5.1 ("end on the earlier of (i) Fifteen (15) months *after the first* bout") (emphasis added). Compare to ZFL-0417369 §5.1 ("end on the earlier of (i) twenty eight (28) months after the Effective Date of this Agreement").

183.  *Zuffa Contract Summary* at 8. *See also* Appendix, Table A1.

184.  *See* Appendix, Table A1. *See also* Hendrick 30(b)(6) V.I Tr. 123:8-19 (confirming that "some version or another of the right to match has been in virtually all of Zuffa's contracts with its fighters … for the entire relevant time period").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-44-

cannot counter with a better offer, as the Fighter is contractually obligated to accept Zuffa's matching terms.[185]

69.    Virtually all (about 94 percent) of Zuffa's PARs contain a champion's clause.[186] If a Fighter becomes a title-holding champion at any point during the term the contract, the champion's clause automatically extends the Fighter's contract "for one year from the Termination Date or until the date on which the athlete has participated in three bouts promoted by Zuffa."[187] The champion's clause ensures that the most successful Fighters remain exclusive to Zuffa at a point in time that would otherwise translate into substantially increased marketability to competing MMA promoters and thus greater bargaining leverage for the Fighter. As a 2009 Deutsche Bank Report noted, "the UFC typically has the right to retain athletes who hold a championship title in any weight class at the expiration of their contract for one additional year, thereby ensuring that the Company continues to benefit from such a Fighter's potential popularity through additional promotions and events."[188] Deutsche Bank's designee testified that Zuffa told Deutsche Bank, when Deutsche Bank was preparing materials for potential buyers of Zuffa's debt, that the contractual provision that provided Zuffa "the ability to retain champions for an additional year

---

185. *Zuffa Contract Summary* at 66 ("Fighter shall not accept any offer…with any other promotional entity during the Matching Period without complying with this section. Prior to acceptance of any Offer made during the Matching Period, Fighter shall first deliver to ZUFFA a written notice of all material financial terms and conditions of the offer, including, but not limited to, the identity of the promotional entity making the offer. Such notice shall constitute an exclusive, irrevocable offer (the "ZUFFA Offer") to contract with Zuffa on the same financial terms and conditions.").

186. *See* Appendix, Table A1. *See also* Hendrick 30(b)(6) V.I Tr. 120:11-16 ("I would say a version or some variations to it has a championship clause in almost all of our promotional agreements.").

187. *Zuffa Contract Summary* at 4.

188. ZUF-00162329-382 at 361. *See also* DB-ZUFFA-00006389 at 392 (repeating same characterization in 2012).

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-45-

after their contract expires was part of how [the UFC's contracts with Fighters] were designed to retain talent with [the UFC]."[189]

70.    All of Zuffa's PARs also contain a retirement clause.[190] The retirement clause permits Zuffa to suspend a Fighter's contract indefinitely.[191] This prevents Fighters from coming out of retirement to fight for rival promoters, even many years after retirement.[192] If a Fighter declared that he or she was retired before fighting the requisite number of fights in his or her contract, he or she would still owe Zuffa those fights if and when he or she decided to come out of retirement.

71.    All of Zuffa's PARs contain a promotion clause.[193] The promotion clause grants Zuffa the "exclusive unrestricted worldwide right to promote any and all mixed martial arts contests during the Term."[194] The promotion clause also allows Zuffa to extend a Fighter's contract term in the event that the Fighter refuses an opponent.[195] Zuffa has sole control over the opponent to offer a Fighter.[196]

---

189. Goldman 30(b)(6) Tr. 72:17-24.

190. *See* Appendix, Table A1. *See also* Hendrick 30(b)(6) V.1 Tr. 121:12-24 ("There is a retirement provision in, to my knowledge, all of our agreements.").

191. *See Zuffa Contract Summary* at 9 ("The retirement clause allows Zuffa to extend, accelerate or fulfill its obligation to promote bouts if athletes retire before their agreements with Zuffa terminate This provision was designed to prevent an athlete from manipulating an agreement by retiring and then re-signing with another promoter The retirement clause has existed in Zuffa agreements since the time that Zuffa purchased the UFC.").

192. *See* ZFL-0486365 at 72 ("If at any time during the Term Fighter decides to retire from mixed martial arts or other professional fighting competition then ZUFFA may, at its election, (i) suspend the Term for the period of such retirement; (ii) declare that ZUFFA has satisfied its obligation to promote all future Bouts to be promoted by ZUFFA hereunder without any compensation due to Fighter therefor; or (iii) elect to provide Fighter with notice of an Acceleration.").

193. *See* Appendix, Table A1.

194. The promotion clause also requires athletes under contract with Zuffa to cooperate in the promotion of upcoming bouts. This includes pre-bout interviews, press conferences, weigh-ins, and appearances to sell merchandise. ZFL-1382453 at 80. *See also Zuffa Contract Summary* at 6, and at 47-59.

195. *See Zuffa Contract Summary* at 6 ("[i]n 2012 the promotion clause clarified that limited extension to the length of the agreement was possible in the event an athlete refuses an opponent"). *See also* Deposition of Joseph Silva at 125:20-126:22.

196. *See Zuffa Contract Summary* at 48.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-46-

72.     Zuffa's contracts also contained tolling provisions that "allow Zuffa to extend the Term of an agreement for the period of time that an athlete is unable or unwilling to compete in a UFC bout," to cover situations such as injuries or if a Fighter believes an opponent being offered is unacceptable or inappropriate, or if a Fighter simply wants out of his or her contract in order to fight for another MMA promoter.[197]

73.     Except for contracts signed during the years 2011-2014, nearly all Zuffa PARs include an exclusive-negotiation clause,[198] which requires Fighters to negotiate exclusively with Zuffa for renewal of their contracts for a period of 30 to 90 days.[199] Zuffa removed this clause halfway through 2011, but reinstated the clause in early 2014.[200]

### 3.     Other Vertical Restraints

74.     Zuffa's contracts with Fighters prevent other MMA promoters from using clips of Fighters' past fights to promote Fighters who had left the UFC.[201] In contrast, Zuffa itself

---

197.  *Zuffa Contract Summary* at 7; *see also* Hendrick 30(b)(6) V.I Tr. 197:12-198:8 (testifying on behalf of Zuffa that such a provision appears "in the majority of [Zuffa's contracts with fighters]...."); Silva Dep. at 275:9-24, 276:8-18 (confirming that Zuffa's contracts include provisions that toll the agreement for any period that a fighter is injured, retired, or otherwise unable or unwilling to appear in a bout).

198.  *See* Appendix, Table A1.

199.  *Zuffa Contract Summary* at 8. *See also* ZFL-1941439 (letter demanding a halt to negotiations within the exclusive negation period).

200.  *Zuffa Contract Summary* at 65. About ten percent of Zuffa contracts also contain an "option period" that allowed Zuffa to, in its sole discretion, renew the initial term (in bouts and months) of the contract at the end of a Fighter's contract a set number of times—effectively doubling or tripling a contract's effective length. *See, e.g.,* ZFL-0050050 at 6 ("Fighter hereby irrevocably grants Zuffa two (2) separate one year-option periods (each referred to herein as an "Option Period") to extend the duration of this Agreement including all of Fighter's obligations hereunder... ZUFFA shall have been deemed to have exercised any applicable Option Period unless ZUFFA notifies Fighter in writing of ZUFFA's intent not to exercise a certain Option Period by thirty (30) days prior to the commencement of the applicable Option Period... Zuffa shall provide Fighter with the opportunity to compete in at least three (3) Bouts during the Initial Period and during each Option Period that ZUFFA chooses to exercise..."). *See also* Appendix, Table A1.

201.  Silva Dep. at 59:5-13 (discussing May 2007 Confidential Information Memorandum, DB-ZUFFA—00006712) ("Q. Then it [the 2007 Confidential Information Memorandum] says: 'The UFC's complete control and ownership of its content also discourages competing organizations from soliciting UFC fighters by restricting ability market prior fights for promotional purposes?' Is that fair? Do you agree with that?...THE WITNESS: Yes."); Goldman 30(b)(6) Tr. 118:5-21 (discussing 2009 Confidential Information Memorandum as Deutsche Bank's designee) ("Q. Can you read the last sentence in that paragraph? A. The UFC's complete control and ownership of its

---

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-47-

preserved the right to use clips from its rivals in its standard Fighter contracts.[202] Zuffa also

entered into exclusive sponsorship contracts, pursuant to which Fighters could not leave the UFC

to fight for another MMA promoter without also losing their sponsorships.[203] Zuffa also warned

Fighters not to sign over their likeness to other MMA Promoters.[204] Zuffa also entered into

agreements with venues, sponsors, and broadcasters requiring that these entities not do business

with other MMA promoters as a condition for doing business with Zuffa.[205]

---

content also discourages competing organizations from soliciting UFC fighters by restricting their ability to market prior fights for promotional purposes. Q. Did Zuffa tell Deutsche Bank in 2009 that its complete control and ownership of its content discourages competing organizations from soliciting their fighters? A. Once again, the fact that UFC owns and has full control and ownership of their contents [sic] could have led us to the interpretation that, you know, other organizations couldn't solicit their fighters. So if [sic] could have been that they had that in discussions. It could have been that they just provided us with material and we made the … assumption. Q. So either Deutsche Bank or Zuffa made that conclusion? A. Correct. Q. And that's how it ended up in this document? A. Correct. Q. And Zuffa had the opportunity to edit it and did not? A. Correct.").

202. Zuffa's PARs assert the "non-exclusive right to use a three minute clip of the recording of any prior bout, including any non-ZUFFA/UFC bout, in which Fighter was a participant to the extent that Fighter possesses the rights thereto or can reasonably obtain such rights solely for the purpose of publicizing the Bout…." *See, e.g.,* ZFL-0105053 at 61.

203. *See* Deposition of Michael Mersch, July 14, 2017 at 418:14-24 ("Q. So the fighter's sponsored by one of the UFC's exclusive sponsor and they decide to leave the UFC and go fight for Bellator. As a result of this policy, they couldn't take the sponsor with them if that sponsor wanted to stay with the UFC; is that right? A. Assuming that they had negotiated and agreed to . . . an exclusivity provision in a contract with Zuffa, I would assume and imagine that people who entered the contracts adhered to the terms of the contractors.").

204. In November, 2009 EA Sports announced the launch of an MMA video game featuring Strikeforce fighters. *See* https://web.archive.org/web/20091109023530/http://mmajunkie.com/news/16763/strikeforce-to-be-flagship-promotion-in-ea-sports-mma-videogame.mma UFC President Dana White responded by "ma[king] it clear that any fighter who signs over their likeness to the new project will be blacklisted from the UFC," and explained that "fighters who sign contracts to appear in EA Sports' upcoming MMA title 'will find themselves out of the UFC's good graces." *See* ZUF-00335242.

205. Zuffa entered into agreements with sponsors requiring the sponsor "not to sponsor any other competitive mixed martial arts (MMA) leagues, promoters, fighters, and/or affiliated brands… during the Term without the express written consent of Zuffa." *See, e.g.* Epstein Exh. 32 (ZFL-1233191) at 192 (SAN Nutrition); Epstein. Exh. 35 (ZFL-2532557) at 559 (Body Plus). As Michael Mersch explained to one potential sponsor in August, 2010, "We are transitioning everyone to exclusivity with Zuffa promoted fighters only." Epstein Exh. 42 (ZFL-2149052), Epstein 30(b)(6) Dep. at 338:5-339:11. *See* ZFL-1835118, showing venue exclusion of all other MMA organizations as a condition for hosting a Zuffa event. *See also* ZUF-00090606, ZFL-2540458, and ZFL-1978914. *See* ZFL-2203067, showing sponsor exclusion of all other MMA organizations as a condition for sponsorship. *See also* ZFL-1224976, ZFL-1225565, ZFL-1226920, ZFL-1229603, ZFL-12439917, ZFL1219068, ZFL-2489547, ZFL-12449538, ZFL-2251021, ZFL-2251267, ZFL-2251268, ZFL-12442377, ZFL-2534622, and ZFL1219068. *See* ZFL-2614046, showing broadcaster exclusion of all other MMA organizations as a condition for airing UFC footage. *See also* ZFL-2502942, ZFL-1499215, ZFL-1702118 ZUF-00088096, ZUF-00088100, ZFL-1977394, and ZFL-2618630.

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-48-

C.     **Zuffa Exploited the Exclusionary Terms of the PARs to Make Exclusion Effectively Perpetual**

75.     Zuffa exploited the exclusionary terms of the agreements to renew and extend Fighter contracts, and to stagger them such that, to the extent any would ever expire, there would never be a critical mass of Fighters available to a potential rival at any one time. From the standpoint of Fighters' relatively short careers, this allowed Zuffa to make its exclusionary provisions effectively perpetual for those Fighters whom Zuffa wanted to keep. As Zuffa management stated categorically in a 2016 due diligence document, "…no athlete has left the UFC that the Company wanted to retain."[206] These practices—combined with Zuffa's market power, and other exclusionary practices discussed in Part III—ensured that MMA promoters could not compete effectively with Zuffa, and therefore could not significantly discipline Zuffa's market power or provide a robust competitive alternative to Fighters in their negotiations with Zuffa.

1.     **Zuffa Exploited the Exclusionary Terms to Extend and Renew Fighter Contracts**

76.     Zuffa exploited various forms of bargaining leverage made possible by the Fighter agreements and the other Challenged Conduct to restrict the quantity and quality of employment opportunities for its Fighters. This created powerful incentives for Fighters to renew their contracts before the prior contracts expired, on terms favorable to Zuffa. And Zuffa, in fact, made a practice of using its leverage to approach those of its Fighters it wanted to keep before the last fight of their contracts, so that Zuffa contracts rarely reached their end. Among other things, Zuffa could and did (1) impose (or credibly threaten to impose) delays between bouts, particularly before the final bout

---

206. CG-UFC-00000005 (Item 204). *See also* Deposition of Joseph Silva at 59:14-20 (discussing May 2007 Confidential Information Memorandum, DB-ZUFFA—00006712) ("Q. Then it says: 'Notably, only one marquee fighter has ever defected from UFC to a competing MMA organization, and that individual later returned to compete in the U.S.' As of the date of that statement, is that accurate to your knowledge? A. To my knowledge.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-49-

of a Fighter's contract, during which Fighters—who get paid only when they fight—could not earn MMA income from any source; (2) pair (or credibly threaten to pair) Fighters against suboptimal opponents or on unfavorable positions on a Fight Card; (3) lock up the most valuable Fighters at the peak of their popularity by leveraging the presence of the champion's clause; and, (4) impose and enforce lengthy periods even after a Fighter had competed all of the bouts in his or her contract, during which the Fighter would not be allowed to negotiate freely or without restriction with other MMA promoters for the opportunity to fight for another MMA promoter.

77.    Zuffa exercised significant discretion over the timing of bouts in a Fighter's contract.[207] Record evidence indicates that Zuffa's ability to control the timing of a Fighter's matchups, the identity of opponents, and a Fighter's placement on the Fight Card conferred a negotiating advantage, particularly given that members of the Bout Class were compensated only when they fought.[208] The ability to force a Fighter to wait longer before the final bout (also the Fighter's next payday) incentivizes the Fighter to agree to Zuffa's terms for a new contract even if he or she preferred to fight for another MMA promotion or merely wanted to test his or her worth in "free agency."[209]

---

207. Deposition of Denitza Batchvarova, Zuffa's Senior Vice President of Strategy, January 25, 2017, at 36:7-11 ("Q. And just to make sure I understand what you are saying correctly, so the UFC has discretion on how to structure the card and wanted to maintain that discretion? A. Yes. Yes.").

208. Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 ("[T]hrough threats and direct punishment, Dana really controlled how our careers went. And he could stick you on the undercard in your next fight against some unfavorable opponent. If you're on the undercard, you would make far less. If anything in sponsorship because you weren't on TV. He might sit you on the bench for a while. That's happened to numerous fighters. And then give you an unfair brutal opponent on an undercard. There were a number of different ways that Dana would use his power to our disadvantage."). *See also* Silva Dep. 405:12-19 ("Q. So everything's equal. And the only thing you know now is that this guy's main card worthy and he has agreed to re-up, versus, it's the same situation, main card worthy where he's not agreed to re-up. You'd more likely give the main card in a better position to the guy who has agreed to re-up as opposed to the one who hasn't; right? A. Yes."); ZFL-2496215 (July 2012 e-mail exchange between Joe Silva, Michael Mersch and Tracy Long discussing the fact that it was Quinton Rampage Jackson's last fight on his contract, would not sign a new deal and that Zuffa used its discretion to not make Jackson's bout the main event).

209. Deposition of Plaintiff John Fitch, February 15, 2017 at 105 ("Q: Okay. And in this case, I think we've established that had you fought two fights [(of three)] and then renegotiated the contract? A: Correct."). *See also id.* at

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

-50-

78.   Record evidence indicates that Zuffa typically opened negotiations for a contract renewal before a Fighter's existing contract had expired.[210] For example, an August 2010 email from Nick Walton from MMAagents notes that "Traditionally, Joe Silva drops the fourth fight and gives a nominal raise as an incentive for re-signing for 4 more fights. This is even usually done when fight three was a loss…."[211] In May 2014, Joe Silva forwarded an article to agent Martin in which Fighter C.B. Dollaway notes "Generally, the UFC negotiates with one fight left on your contract… So, after this fight, I'll be renegotiating."[212] Silva testified in his deposition that he would "very frequently"[213] present a new contract to a Fighter before the last fight in the Fighter's current contract.[214] Silva wrote in May 2015 "I always renegotiate before the last fight…."[215]

---

110 ("A: Yeah. I was just pointing out, this is one of the strategies they're using. You can see that fight was March 1, 2008. I hadn't fought since September, so money's running low, I need money, I need to fight. This agreement is sent to me in February; right? So -- oh, wait a minute, that's January. So that's two months before that fight. They're holding my bout agreement hostage. They're holding my next fight hostage until I sign this. They do that often. I think if you look at the other one, you'll probably see that too. Signed 4/6, yes. Signed 5/6, which is May, yeah, so I signed that in May. I fought in June. Q: So you're saying that at that time they were withholding a fight from you until you resigned? A: I'm saying they do that to everybody. We're going to hold your bout agreement until you sign your extension. We won't allow you to become a free agent."). *See also* Deposition of Plaintiff Brandon Vera, February 6, 2017 at 118 ("A: Every time a fighter has -- is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight. That's common knowledge across the board.").

210. Deposition of Plaintiff Kyle Kingsbury, February 17, 2017 at 18 ("[T]hrough threats and direct punishment, Dana really controlled how our careers went. And he could stick you on the undercard in your next fight against some unfavorable opponent. If you're on the undercard, you would make far less. If anything in sponsorship because you weren't on TV. He might sit you on the bench for a while. That's happened to numerous fighters. And then give you an unfair brutal opponent on an undercard. There were a number of different ways that Dana would use his power to our disadvantage.").

211. ZFL-2647127.

212. MARTIN0034081 at 81-82.

213. Deposition of Joseph Silva at 322:12-16.

214. *See also* ZFL-1873428 (Audie Attar, Mike Bisping's manager, texts Fertitta in August 2014 saying, "Joe Silva told me to reach out to you and Dana regarding Mike Bisping. He said Mike needs to sign an extension before he books his next fight, because he has 1 fight remaining on his current contract.").

215. ZFL-0977248. Internal Zuffa documents identify the advantages to Zuffa of signing a Fighter to a new contract before letting the prior contract expire. *See* ZFL-2643298 (Joe Silva writes: "it is always a bad position for us to be in counting on that new agreement while time is ticking away on the old one. If they decide not to sign it it [sic] we are in a bad position"). *See also* ZFL-2535654 (Chief Paralegal Tracy Long notifies Sean Shelby that Will Campuzano is on the last fight of his contract (this is information that Long routinely sends to Silva, Shelby, Mersch, Fertitta, Epstein). Shelby: "Wow. I thought I got him. Hang on. Let me get more fights out of him before you send off the bout.").

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER