—2:15-cv-01045-RFB-PAL—

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                )
                                   )
5              Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                   )
6        vs.                       )  Las Vegas, Nevada
                                   )  Wednesday, August 28, 2019
7  ZUFFA, LLC, d/b/a Ultimate      )  9:07 a.m.
   Fighting Championship and       )
8  UFC,                            )  EVIDENTIARY HEARING, DAY THREE
                                   )
9              Defendants.         )
   _____

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14        THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:      See Pages 2 and 3

20

21
    COURT REPORTER:    Patricia L. Ganci, RMR, CRR
22                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
23                     Las Vegas, Nevada  89101

24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

                    ─2:15-cv-01045-RFB-PAL─

 1  APPEARANCES:
    For the Plaintiffs:
 2
            **DON SPRINGMEYER, ESQ.**
 3          WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
            3556 E. Russell Road, 2nd Floor
 4          Las Vegas, Nevada 89120
            (702)341-5200
 5
            **ERIC L. CRAMER, ESQ.**
 6          **PATRICK F. MADDEN, ESQ.**
            **MARK R. SUTER, ESQ.**
 7          BERGER & MONTAGUE, P.C.
            1818 Market Street, Suite 3600
 8          Philadelphia, Pennsylvania 19103
            (215)875-3000
 9
10          **DANIEL H. SILVERMAN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
12          (202)408-4600

13          **JOSEPH SAVERI, ESQ.**
            **JOSHUA P. DAVIS, ESQ.**
14          THE JOSEPH SAVERI LAW FIRM, INC.
            555 Montgomery Street, Suite 1210
15          San Francisco, California 94111
            (415)500-6800
16
    For the Defendants:
17
            **SAMUEL MIRKOVICH, ESQ.**
18          CAMPBELL & WILLIAMS
            700 South 7th Street
19          Las Vegas, Nevada 89101
            (702)382-5222
20
            **WILLIAM A. ISAACSON, ESQ.**
21          **STACEY K. GRIGSBY, ESQ.**
            **NICHOLAS A. WIDNELL, ESQ.**
22          BOIES, SCHILLER & FLEXNER, LLP
            1401 New York Avenue, NW
23          Washington, DC 20015
            (202)237-2727
24

25

─────2:15-cv-01045-RFB-PAL─────

1 | APPEARANCES CONTINUED:

2 | **BRENT K. NAKAMURA, ESQ.**
BOIES, SCHILLER & FLEXNER, LLP
3 | 1999 Harrison Street, Suite 900
Oakland, California 94612
4 | (510)874-1000

5

6 | ALSO PRESENT:

7 | Riche McKnight, Esq., Zuffa

8
INDEX OF EXAMINATIONS
9
TESTIMONY OF ROBERT TOPEL, Ph.D.
10 | Cross-Examination by Mr. Cramer.......................15

11 | TESTIMONY OF HAL JASON SINGER, Ph.D.
Redirect Examination by Mr. Cramer...................102
12

13 | PLAINTIFFS' EXHIBITS
Number                                          Admitted
14 | 1                                                  61

15 | DEFENDANT'S EXHIBITS
Number                                          Marked
16 | 1                                                  72

17

18 | LAS VEGAS, NEVADA; WEDNESDAY, AUGUST 28, 2019; 9:07 A.M.

19 | --oOo--

20 | P R O C E E D I N G S

21 | THE COURT:  Please be seated.

22 | All right.  So we are back for another day of hearings

23 | here.  And we will continue with the cross-examination with

24 | Mr. Cramer.

25 | And, Dr. Topel, you recognize you're still under oath?

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  I do.

2          THE COURT:  Thank you.

3          MR. CRAMER:  Your Honor, I just have one preliminary

4   matter to bring up before we start the cross, if you don't mind.

5          THE COURT:  Uh-hmm.

6          MR. CRAMER:  Last night Zuffa was busy.  And they filed

7   with the Court the output of two brand new regressions and

8   sought leave to file still more brand new regressions.

9          THE COURT:  Well, I'm not saying I'm going to accept

10  those regressions, so that's a separate issue.

11         MR. CRAMER:  Okay.

12         THE COURT:  I'm going to ask Mr. Isaacson why I should

13  do that at this point in time because I don't know that they

14  should.

15         So, Mr. Isaacson, why don't you answer that question

16  for me.  Given the fact this hearing was planned well in

17  advance, I'm a little concerned about last-minute things that

18  could have easily been anticipated.  I don't really understand

19  why these regressions weren't previously filed.  And, so, I

20  don't know why I should accept them.

21         MR. ISAACSON:  So, we did this last night so that they

22  would have the opportunity to see them before the testimony

23  today because we didn't want that to be an issue.  And we

24  recognize that they were not put in the reports previously.

25  They were in direct response -- each one of them were the

—2:15-cv-01045-RFB-PAL—

1  subject of a colloquy with the Court, and what we suggested was

2  a two-page supplemental expert report with these.  They are

3  simple adjustments to current regressions so that if the Court

4  wants answers as to the data questions that were being

5  discussed, it would have those answers.

6          THE COURT:  Okay.

7          MR. ISAACSON:  The purpose of the two-page report is

8  not to have -- because it's two pages, is not to have any

9  additional expert argument or otherwise.  And in one of them,

10  you know, is a reply to -- and this -- we had this discussion at

11  the very beginning of Dr. Singer's direct when he was raising a

12  regression that we never -- was in his last report that we never

13  had a response -- never had a chance to respond to, and the

14  Court indicated that it would -- it was -- you know, it would be

15  interested in having us respond to things we hadn't had a chance

16  to respond to.

17          So, there's -- the large majority of our letter was

18  just giving you stuff in the report that you had asked about and

19  then these three sets of regressions that could be done in a

20  two-page report, and we've outlined what they are.  And I think

21  we gave notice as to what these are last night so they would

22  have the opportunity to have it.  I suggest the plaintiffs be

23  given a chance to respond, and then the Court can consider what

24  it wants to do.

25          THE COURT:  Well, I'm sorry.  And, so, just -- so, your

——2:15-cv-01045-RFB-PAL——

 1  view is that these regressions are a response to what particular

 2  inquiry?  I just want to make sure that --

 3          MR. ISAACSON:  All of that is outlined in the letter.

 4  So --

 5          THE COURT:  Well -- okay.  Well, let me just be -- let

 6  me go back and ask the specific question because -- hold on.

 7      (Pause.)

 8          THE COURT:  So it's just the one quote that -- one

 9  quote as it relates to the particular colloquy that I had.

10          MR. ISAACSON:  Right, with the -- with only one of the

11  three sets of regressions --

12          THE COURT:  Right.

13          MR. ISAACSON:  -- if I'm understanding what you're

14  saying.

15          THE COURT:  Right.  Those are sort of responses to

16  general areas of conversation that were discussed.

17          MR. ISAACSON:  Yes.

18          THE COURT:  Okay.  So what I will say right now is,

19  presumptively, I'm not going to accept them unless I think

20  they're directly -- they were referenced or included in the

21  reports.  If, however, I think that they're significant enough

22  that would warrant my consideration of them, then I would let

23  the plaintiffs respond, and we would unfortunately have to come

24  back.  At this point in time, I don't know that that would be

25  appropriate.

1         I think, in my review of these -- that's why I asked

2 you these questions -- these are things that could have easily

3 been anticipated and should have been anticipated as relates to

4 the questioning.  So, I'm not going to let Dr. Topel talk about

5 them, and I'm not going to include them at this point in time

6 because I don't think that they -- again, in my review of them

7 when you filed them and then just -- and hearing you talk about

8 them again today and looking again at the results, I don't see

9 how these were unanticipated areas of inquiry.

10         MR. ISAACSON:  So, to be clear, with only -- with

11 respect to only one set of those regressions, it's a response to

12 something they did in their last report to which we were not

13 permitted to respond to.

14         THE COURT:  So -- okay.  So, here's --

15         MR. ISAACSON:  That's what -- that's what we have as

16 Professor Topel's second proposed new regression.

17         THE COURT:  So, do you have the letter in front of you?

18         MR. ISAACSON:  Yes.

19         THE COURT:  So I just want to be clear about what it

20 is --

21         MR. ISAACSON:  At page --

22         THE COURT:  -- that we're talking about so we're not --

23 so, let's just go through it very quickly together.

24         So the first report, it talks about citations requested

25 by the court.

—2:15-cv-01045-RFB-PAL—

1           MR. ISAACSON:  Right.  Every -- the

2  relevant discussion --

3           THE COURT:  Hold on.  Hold on just a second.  And I

4  want to make sure I'm understanding what's new and what's not

5  new and what's a citation.

6           MR. ISAACSON:  So, what's new is page 3 of the letter.

7           THE COURT:  Right.  Okay.  So, that's what I thought.

8  I just wanted to make sure we're all on the same page.

9           So these other parts are just citations to the record?

10          MR. ISAACSON:  Correct.

11          THE COURT:  And you would agree with that, Mr. Cramer?

12  That the earlier part of the letter are just citations to the

13  record?

14          MR. CRAMER:  I think that's correct, Your Honor, though

15  I haven't -- this came in while I was preparing the rebuttal and

16  it came in, I think, at 10 o'clock last night.  I haven't had a

17  chance to study it.  I looked at --

18      (Court reporter admonishment.)

19          MR. CRAMER:  Oh, I apologize.

20          I haven't had a chance to study it.

21          THE COURT:  I'm not asking you to concede that you

22  agree that the citations are accurate --

23          MR. CRAMER:  Okay.

24          THE COURT:  -- but you agree that the letter is not

25  purporting to add new regressions in the first three pages?

2:15-cv-01045-RFB-PAL

1          MR. CRAMER:  I -- I --

2          MR. ISAACSON:  First two pages.

3          THE COURT:  First two pages, excuse me.

4          MR. CRAMER:  I believe that what the first two pages

5   are doing is providing citations to the record.  We don't know

6   if they're accurate or not.

7          THE COURT:  Okay.  That's fine.

8          MR. CRAMER:  That's correct, Your Honor.

9          THE COURT:  So, let me understand specifically,

10  Mr. Isaacson, the issue of the new regressions and why they were

11  provided now rather than earlier.  Because certainly you've had

12  Dr. Singer's last report before, and you could have asked me to

13  do this on the first day.  And, so, I'm just a little confused

14  about why I would accept them now.

15          And I say that in part because Dr. Topel has certainly

16  gone through and offered critiques along the lines, at least

17  what I understand, this is saying.  So -- and, quite honestly,

18  this doesn't actually some of the larger concerns that I have

19  about the differences in the model, but explain to me why this

20  wouldn't have been provided earlier.

21          MR. ISAACSON:  So, I'm only now speaking of the second

22  proposed new regression.

23          THE COURT:  Okay.  And that -- just so we're clear,

24  that would be?

25          MR. ISAACSON:  That would be the -- that would be a

1   response to the regression he put in his last report.

2          MR. CRAMER:  And, Your Honor, just so we're clear, that

3   last report that Mr. Isaacson is referring to was served in May

4   of 2018.  Okay?  And the first time --

5          THE COURT:  Okay.

6          MR. ISAACSON:  Let me -- let me -- let me --

7          THE COURT:  So we got the date, but let me let

8   Mr. Isaacson respond.

9          MR. ISAACSON:  And we have objected to that regression

10  being included in this hearing, and we did so -- and we did so

11  in response to their interrogatory -- to interrogatory responses

12  that included it, and when it was raised at the hearing, we

13  objected to it.  We thought it was improper for this -- and it

14  was inconsistent with, you remember, we were discussing the

15  joint motion that was submitted that said there would be no new

16  regressions in that last report.

17         THE COURT:  Right.

18         MR. ISAACSON:  So we made the objection and then we

19  had --

20         THE COURT:  Well, that's not my concern, Mr. Isaacson.

21         MR. ISAACSON:  Well, I'm just giving you the record of

22  what's happening.

23         THE COURT:  Before the hearing I should have been told

24  about this.  It shouldn't come in the midst of that.  I

25  appreciate that you objected.  But, now, in the midst -- in the

—2:15-cv-01045-RFB-PAL—

1  middle of Dr. Topel's testimony and after Dr. Singer's done

2  rebuttal -- I mean, has actually testified the first time, I'm

3  getting these regressions, notwithstanding that.  So what

4  happens is it delays, potentially, the hearing.

5          I'm not saying that there might not have been a reason

6  to do it.  What I'm saying is that the reason to do it existed

7  before the hearing started and doing it now delays the hearing.

8          And, so, my reason for rejecting it wouldn't be that

9  you wouldn't potentially have something to respond to; it would

10  be, one, this is late.  We have this hearing.  It should have

11  come before so that we would -- they would be able to respond.

12  I would be able to look at it.  We're in the middle, almost

13  towards the end of their testimony, and now getting this

14  hearing -- these regression offerings late.  I should have had

15  them previously.

16          And that's my question.  I don't know why they weren't

17  offered or given before, unless I'm -- they were attached to

18  something.

19          MR. ISAACSON:  Attached to something.  So, I...

20          The colloquy that we had, Your Honor, when we made the

21  objection, was that the prejudice -- if there was any prejudice

22  to us, it could be cured by giving us the opportunity to respond

23  to it.

24          THE COURT:  Right.  But he did respond to it.

25          MR. ISAACSON:  No.  No.  He has not.  He has not.

1          THE COURT:  Ah, I don't know -- perhaps you weren't

2     listening to my questions yesterday.

3          MR. ISAACSON:  No.  With this.

4          THE COURT:  But my questions were exactly around what

5     these new regressions are about, right?  So, I'm trying to

6     understand -- that's exactly what we spent time on yesterday,

7     which is part of the reason why I understand that these

8     regressions to be offered, but how did he not talk about what's

9     in the new regression?

10          MR. ISAACSON:  I should have been -- should be more

11     specific.

12          THE COURT:  Okay.

13          MR. ISAACSON:  He did not respond with the additional

14     regression material that's reflected here in the letter.

15          THE COURT:  Ah.

16          MR. ISAACSON:  Okay.

17          THE COURT:  So what you're saying is he responded, but

18     he didn't -- he wasn't able to offer new --

19          MR. ISAACSON:  Right.

20          THE COURT:  -- regressions.

21          MR. ISAACSON:  Correct.  And I would actually be

22     surprised if anybody needed to be called back about these.  I

23     think we've debated back and forth just as to how these things

24     would be done.

25          But if we're not permitted to supplement, I think our

1   original objection stands, and the Court should consider

2   whether -- in violation of the joint motion, what happened in

3   this -- that this -- whether what happened in this last report

4   should be considered.

5          THE COURT:  So, two things.  One is, it seems to me, in

6   looking at these regressions, these are similar to the criticism

7   that Dr. Topel raised about Dr. Singer's modelling.

8          Now, I haven't had a chance to go through them

9   extensively to review them, and I wasn't sure what you intended

10  to do with them because we're not even actually at redirect.  So

11  I'm not really sure what -- how they would get introduced

12  exactly at this point.

13         But, that being said, I don't know that they're going

14  to be necessarily helpful given the fact that Dr. Topel has

15  actually been fairly, I think, clear about what his concerns

16  were and what the issues are.

17         So, why don't we do this:  For now, we'll see how the

18  cross goes.  I'll look at these regressions again, because I

19  didn't have a chance to go through them, really, to be able to

20  sort of get a good sense of what I think they can add to the

21  conversation or not.  And I'm not sure what they add, honestly,

22  Mr. Isaacson, to what Dr. Topel's already said.

23         So, I'm not sure that they add -- and I will say, quite

24  honestly, if you have two statisticians who are running

25  regressions and they come up with different results, that, to

1  me, is not a basis to reject it at the motion for class

2  certification.  So there would have to be a reason, right, that

3  I would say that this -- even if that's true, we'd have to still

4  argue why it is, again, that I would not allow for the class to

5  be certified, if that was the issue.

6          So, that's the separate issue, which is that even,

7  let's say, that the regressions are run differently and

8  statisticians can run reactions and come up with different

9  results, that doesn't necessarily mean that I wouldn't certified

10  the class.  So, I think the question we'll have to ask is

11  whether or not, in the context of this procedure -- procedural

12  posture, whether or not even adding the regressions is

13  necessary.  But what I'm going to do is this.  We'll let

14  Dr. Topel finish his cross.  Then what I'll do is we'll take a

15  break.  I'll look at the regressions after that, and then I'll

16  figure out whether or not and how I'm going to address them.

17          But we'll see.  I understand your position,

18  Mr. Isaacson, that you think that they're responsive.  You

19  didn't have a chance to respond, and this is your attempt to do

20  that where the Court had indicated that you were going to have

21  some latitude to be able to respond.

22          So, what I want to do is figure out whether or not what

23  he said is actually going to be helpful as relates to this

24  elaboration, and then we'll see what we're going to do after

25  that.

2:15-cv-01045-RFB-PAL

1          MR. ISAACSON:  All right.  Thank you, Your Honor.

2          THE COURT:  Uh-hmm.

3          MR. CRAMER:  Thank you, Your Honor.

4          All right.  If you give me one moment --

5          THE COURT:  Sure.

6          MR. CRAMER:  -- I'm going to set up my papers here.

7          Thank you, Your Honor.

8

9          CROSS-EXAMINATION OF ROBERT TOPEL, Ph.D.

10  BY MR. CRAMER:

11  *Q.*  Dr. Topel, do you have the book entitled "Robert Topel

12  Hearing" in front of you?

13  **A.**  Yes.

14  *Q.*  Those were given to you by your counsel.  You may want to

15  refer to them at some points.

16  **A.**  Okay.

17  *Q.*  It has your reports and your deposition.  I don't know if

18  you'll need to.

19          Can I just check to see if the ELMO is working?

20          THE COURT:  One quick question.  Dr. Topel, you ran

21  these regressions late last night?

22          THE WITNESS:  Well, my staff did.

23          THE COURT:  Your staff did.

24          THE WITNESS:  Yeah.

25          THE COURT:  You're familiar with them?

1            THE WITNESS:  Yeah.

2            THE COURT:  Are they regressed on absolute wages or on

3    wage share?

4            THE WITNESS:  Those are on wage share.

5            THE COURT:  Okay.  I'm sorry, on Dr. Singer's wage

6    share?

7            THE WITNESS:  Yeah.

8            THE COURT:  Okay.  So they're not -- because the

9    earlier -- the other equation we had was on absolute --

10           THE WITNESS:  Different thing.

11           THE COURT:  -- context.

12           THE WITNESS:  Different thing.  We weren't doing that

13   last night.

14           THE COURT:  Okay.  So this is just -- this is just the

15   share -- this is your -- your company's regression on the wage

16   share and removing certain -- or adjusting certain variables in

17   the context of the new regression and that would be the weights.

18   Is that right?

19           THE WITNESS:  Well, you -- yeah, you -- you and I had a

20   long exchange about year fixed effects and how something that

21   doesn't vary within a year couldn't show up in the regression.

22   So, I demonstrated that for you by taking out the year effects

23   and putting the thing that has the advertising variable that's

24   constant within a year to show you what happened.

25           THE COURT:  Okay.

1        All right.  Thank you.

2        Go ahead, Mr. Cramer.

3        MR. CRAMER:  And, Your Honor, you understand that --

4  with those new regressions, I haven't had a chance to review,

5  but they're all entirely new.  I mean, Dr. Topel said he didn't

6  recall whether he had run them.

7        THE COURT:  Well, they're not -- there's no dispute

8  about them being new.

9        MR. CRAMER:  Okay.  Fair enough.

10       THE COURT:  So we can leave --

11       MR. CRAMER:  We can move on.

12       THE COURT:  Yeah, we go move on from there.

13  BY MR. CRAMER:

14  *Q.*  Good morning, Dr. Topel.  How are you?

15  **A.**  Good morning.

16  *Q.*  Good to see you again.

17       MR. CRAMER:  All right.  So, Your Honor, what I'm going

18  to try to do is be relatively brief.  I thought what I could to

19  be most helpful is try to elicit some of the things where I

20  think both sides have some agreements on, some foundational

21  agreements on, so then that we with bring Dr. Singer up to rebut

22  some of the specific points that Dr. Topel and Zuffa have made

23  in the course of the hearing.  So that's what I'm going to try

24  to do.  I hope I'm going to be helpful.

25  BY MR. CRAMER:

—2:15-cv-01045-RFB-PAL—

1  *Q.*  So, Dr. Topel, you agree that some fighters are more

2  important to an MMA promotion than other fighters, correct?

3  **A.**  Yes.

4  *Q.*  Okay.  And you would also agree that not all MMA fighters

5  are exact substitutes for each other.  Is that fair?

6  **A.**  Yes.

7  *Q.*  And you would also agree that some MMA fighters generate

8  more revenues when they fight than other MMA fighters.  Is that

9  fair?

10  **A.**  Yes.  I think you've asked the same question three times,

11  but go ahead.

12  *Q.*  Okay.  And those fighters capable of generating more

13  revenues when they fight, all things equal, are more valuable to

14  their promotion than other fighters.  Is that fair?

15  **A.**  Yes.

16  *Q.*  Okay.  And, generally speaking, audiences and consumers and

17  fans are drawn to fights featuring highly ranked opponents,

18  right?

19  **A.**  Yes.

20  *Q.*  And all things equal, fans and consumers are willing to pay

21  more to see highly ranked fighters compete against each other as

22  opposed to lower ranked fighters.  Is that fair?

23  **A.**  Yes.

24  *Q.*  So all things equal, higher ranked fighters, on average,

25  generate more revenues when they fight than lower ranked

—2:15-cv-01045-RFB-PAL—

1  fighters.  Is that fair?

2  *A.*  That's probably true on average, yes.

3  *Q.*  Okay.  Now, assume with me --

4  *A.*  I don't think we've done -- anybody here has done a study of

5  that, but it certainly makes sense.

6  *Q.*  Okay.  Now, assume with me for this question that when the

7  Strikeforce fighters you talked about yesterday moved from

8  Strikeforce to the UFC in 2011, when the UFC took over

9  Strikeforce, they, in general, and on average, began to fight

10  against a pool of higher ranked fighters.  Is that a fair

11  assumption?  Are you willing to stick with me?

12  *A.*  Well, I don't know if they did or not, but they moved.  And

13  why don't we assume that it could be true.

14  *Q.*  Okay.  So, if that is true, that when the Strikeforce

15  fighters moved from Strikeforce, they were generally fighting

16  against lower ranked fighters, to UFC they were generally

17  fighting, on average, against higher ranked fighters, would you

18  agree that the newly-arrived Strikeforce fighters in that

19  assumption would be expected to generate more revenues when they

20  fight because of the better pool of fighters they could now

21  compete against?  Is that fair?

22  *A.*  Well, you've described a situation where there's a

23  complementarity where -- and I think we even talk about this in

24  my report.  There's a complementarity between the qualities of

25  fighters, and part of what Zuffa's business model has been is to

 1  put the best people together.  So, another way of saying that is

 2  that in an efficient market these complements will -- what an

 3  efficient market does is it assigns resources, here fighters, to

 4  their most highly valued use.  And these fighters who were once

 5  at Strikeforce are more valuable now that they've moved over

 6  to -- over to Zuffa.  That's part of the business model.

 7  Q.  In other words -- thank you.  That's fair.

 8          Is another way of saying that that when you have a

 9  better pool of fighters fight against each other, there are a

10  network effects that improve their value?

11  A.  That could be.

12  Q.  Okay.  So, is it also fair to say, when these new

13  Strikeforce fighters are now fighting at the UFC and generating

14  more revenues, their marginal revenue product goes up?  Is that

15  right?

16  A.  That can be true, too.

17  Q.  So it's possible then that the new wages at the UFC, for

18  these Strikeforce fighters, after they moved to the UFC, could

19  be higher, but still below their marginal revenue product?  Is

20  that fair?

21  A.  Well, they could have been below marginal revenue product

22  when they left and when they came.  But, you know, if Zuffa had

23  monopsony power over these people, they don't -- they wouldn't

24  have to pay them more than they were getting at Strikeforce.

25  Q.  Okay.  That's not the question I asked, though.  The

 1   question I asked is, if the MRP, marginal revenue product, of

 2   the fighters when they moved from Strikeforce to the UFC goes

 3   up, and compensation also goes up, in order to know whether or

 4   not the wage is competitive at the UFC, you'd have to know

 5   whether the Strikeforce fighters are being paid above or below

 6   their marginal revenue product.  Is that fair?

 7   **A.**   No.  I'm sorry.

 8          THE COURT:  You'd have to know whether or not they're

 9   above or below the competitive wage what they should be getting,

10   right?

11          THE WITNESS:  Well, what -- the question we were

12   asking -- remember --

13          THE COURT:  No.  Here's the question.  The question is,

14   if they come over --

15          THE WITNESS:  Yeah.

16          THE COURT:  -- and they get paid more --

17          THE WITNESS:  Yeah.

18          THE COURT:  -- you wouldn't know whether or not that is

19   a based upon an exercise of monopsony power unless you knew what

20   the actual competitive wage was, correct?

21          THE WITNESS:  Correct.

22          Let me clarify.  When we made the transition from --

23   remember what plaintiffs are claiming, that the -- the

24   acquisition of Strikeforce increased the monopsony power of

25   Zuffa.  So we were looking -- we're looking at a world where

1  people moved from a place that had -- a situation where

2  monopsony power increased, but people moved over, yet their

3  wages went up.  And I'd make an even stronger comment about

4  that.

5          THE COURT:  Okay.  Mr. -- Dr. Topel, I don't want to

6  have the same discussion we had yesterday because we had this

7  fundamental disagreement, which I have to say, I found a little

8  concerning, where I kept asking you, right, and we had this back

9  and forth, right, you can have a situation where wages go up,

10 but there's still an exercise of monopsony power because the

11 wages don't go up to the competitive level.  That's true, right?

12         THE WITNESS:  That's true, and --

13         THE COURT:  Okay.

14         THE WITNESS:  -- and everything I'm saying is

15 consistent with that.

16         THE COURT:  Okay.  All right.

17         THE WITNESS:  Because we're talking about a

18 situation -- you could have wages below marginal revenue

19 product, whatever you want.

20         THE COURT:  Right.

21         THE WITNESS:  Okay?  But then you've got an increase in

22 the power to do that.  And wages didn't go down.  They didn't

23 stay the same.  They went up in the transition from these two

24 places.

25         Now, Dr. Singer's testified yesterday.  I was -- it

—2:15-cv-01045-RFB-PAL—

1  was --

2          THE COURT:  So, but are you assuming that if a company

3  has monopsony power it exercises in an absolute, right, sort of

4  zero tolerance way?  Because your argument would be that if I

5  had increased monopsony power, I would exercise at maximum,

6  which I don't have to necessarily do, right?  I mean, you're

7  correct that potentially if they had an increase in monopsony

8  power, they might not have had to pay individuals more, but the

9  fact they paid them more, even if it's a small amount more,

10  doesn't mean that they still weren't exercising monopsony power,

11  correct?

12          THE WITNESS:  That's what I'm saying, that the

13  degree -- monopsony power creates a wedge between marginal

14  revenue product and a person's compensation.

15          THE COURT:  Right.

16          THE WITNESS:  All right?  The degree of monopsony power

17  affects the size of that wedge.

18          THE COURT:  Right.

19          THE WITNESS:  Okay.  So, what we're seeing is people

20  coming over and there's no evidence that the wedge is getting

21  bigger, particularly for the people moving over.

22          THE COURT:  So where do you set the wedge?  Let's

23  assume for the moment that -- okay.  They're getting paid more.

24  But for you, where is that wedge?  Where is the amount that

25  tells you that they were actually -- what they should have been

1    paid based upon what was the competitive market?  Because you're

2    saying that the wedge should get either bigger, if there's an

3    exercise of monopsony power, but the question is, where is this

4    top line for you as it relates to the competitive wage?

5           In sort of your analysis, did you test to see what

6    would have been the competitive wage for these fighters, right,

7    if there were not monopsony power or if there were more

8    competitive promoters in the market?

9           THE WITNESS:  Well --

10          THE COURT:  What was the way that you independently

11   tested that?

12          THE WITNESS:  I'm going to -- I'm going to explain

13   it -- what we just did in the context of Dr. Singer's testimony

14   and because --

15          THE COURT:  But I actually asked you -- I actually

16   would like you to answer my question, which is --

17          THE WITNESS:  And I promise I'm going to answer your

18   question.

19          THE COURT:  Okay.  All right.

20          THE WITNESS:  Because remember what Dr. Singer said

21   yesterday, he tested whether foreclosure share had an impact on

22   compensation at Strikeforce, and he rejected the idea that it

23   did.  And so he acted as if they were not foreclosed and

24   Strikeforce is now a benchmark.

25          Now, there's two points there.  One is the econometric

1  point about the regressions we've been talking about.  And that

2  is, over at Strikeforce there's no mechanical relationship

3  between the revenue weights and the denominator of the wage

4  share.  So that's saying that -- that tells me that that bias

5  may be important in the Zuffa data, but now there's an economic

6  point, and this comes to what you just asked.

7          The economic point is if they -- if they're not

8  affected by the foreclosure of -- if Strikeforce is not affected

9  by the foreclosure of Zuffa, and that's what his tests said, and

10  he's using it as a benchmark, then it satisfies -- I'm not

11  saying I would go there, but this is the implication of

12  plaintiffs' theory -- they satisfy the benchmark place, the

13  place that's operating independently of --

14          THE COURT:  So you're saying that the Strikeforce

15  preacquisition would be the benchmark, but they were paying the

16  greater percentage of event revenue.  So if you were to use that

17  same benchmark, right, why wouldn't you use it for Zuffa?

18  Because -- right?  Preacquisition, Strikeforce is paying a

19  larger wage share than Zuffa.

20          THE WITNESS:  Your Honor --

21          THE COURT:  Well, okay, but please answer -- answer my

22  question.

23          THE WITNESS:  They're paying a larger wage share --

24          THE COURT:  So -- so --

25          THE WITNESS:  -- of lower wages.

2:15-cv-01045-RFB-PAL

1          THE COURT:  Okay.  But -- okay.  So, you're saying that
2     even if they're paying a larger wage share, they're paying lower
3     absolute wages.  And, so, therefore, they were essentially --
4     they are the model that you can use to show what the competitive
5     wage would be.
6          THE WITNESS:  I'm saying that's what the plaintiffs'
7     theory implies because they're saying that -- that Strikeforce
8     is not being affected by the foreclosure share.  Compensation of
9     Strikeforce is not being affected.
10          THE COURT:  Well --
11          THE WITNESS:  Now, let me finish.  Think -- think about
12     this wage share business.  Because now I've got somebody
13     fighting for Zuffa.  And, yeah, they've got a higher wage share
14     over at Strikeforce.  Now, that's because of the denominator,
15     revenue.  And, so, I -- somebody had -- wanted to make an offer
16     to somebody at Zuffa.  You say, we'll give you a percentage --
17     higher percentage of revenue.  I don't want a higher percentage
18     of revenue; I want a higher compensation.
19          So the metric is compensation, not what I'm going to
20     pay you as a share of my revenue.  My -- my wage share is
21     higher, but my wage is lower.  Guys don't want that.  They want
22     the wage.  And that's the point.
23          THE COURT:  So, I guess that I'm confused.  What would
24     you say is the proper benchmark for determining the appropriate
25     competitive wage for these fighters?

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  I'm saying that by this test --

2          THE COURT:  I'm not talking about the test.  I'm asking

3     you, based upon your own analysis and research, what -- where in

4     your research does it point to, what would be, and is, the

5     appropriate competitive wage measure?

6          THE WITNESS:  All I can tell you, Your Honor, is

7     there's no evidence that what we see is not the competitive

8     wage.  And -- and I can't point to -- other than taking the

9     benchmark that's offered by the plaintiffs and saying, okay,

10    let's use that.

11         THE COURT:  So you're saying that -- you don't

12    necessarily come up with that, but you didn't feel that was your

13    role; your role was to figure whether or not they had properly

14    set it, right?

15         THE WITNESS:  Who is "they" had properly set it?

16         THE COURT:  The plaintiffs' expert had properly set

17    the -- the appropriate measure for the competitive wage.  So

18    that's why you disagree with this idea about wage share and

19    foreclosure share, right?

20         THE WITNESS:  I think what people care about is their

21    compensation.

22         THE COURT:  Well, obviously.  No one's disputing that.

23    The question is what's the appropriate measure.  And if I

24    understand your testimony just now, what you're saying is that

25    if you even use the plaintiffs' model, that using sort of the

1   Strikeforce preacquisition of absolute compensation and wage

2   share ratio, that that would be the measure that could be used

3   based upon the model for the appropriate competitive wage.  And

4   if you look at that, there's no evidence that there was an

5   exercise of monopsony power when the fighters came over?

6            THE WITNESS:  I would say -- or before they left.  I

7   would say -- I would change one thing in what you said.  You

8   said "and the wage share."  I'm saying the compensation,

9   according to this, is a benchmark.  The level of compensation

10  that Strikeforce is being offered as a benchmark.  That's the

11  benchmark world.  It's separate from -- it's not affected by

12  the -- by this test.  It's not affected by the compensation by

13  the foreclosure share over at -- over at Zuffa.  So let's

14  compare.

15           THE COURT:  So you're saying the fact that -- that

16  Zuffa had a dominant position with respect to Strikeforce in the

17  market regarding the fighters wouldn't have impacted the

18  competitive ability of Strikeforce as relates to what wage they

19  could offer, so -- right?  Because what you're saying is that --

20           THE WITNESS:  That's --

21           THE COURT:  So they still -- they still would have, in

22  terms of what they're offering, they're still offering a

23  competitive wage unrelated to Zuffa's dominant position as

24  relates to fighter services?

25           THE WITNESS:  They're offering a competitive -- a

—2:15-cv-01045-RFB-PAL—

 1  competitive wage which, according to this test, their

 2  compensation was not affected by the -- by the fighters' share

 3  or -- excuse me -- the foreclosure share of Zuffa.

 4          THE COURT:  Okay.  Now I understand your argument.  I

 5  got it now.  Okay.  Thank you.

 6          Go ahead.

 7  BY MR. CRAMER:

 8  Q.  Let me just follow-up for one minute to take us -- take you

 9  back to, I think, part of the colloquy with His Honor and some

10  of the questions that I asked.

11          So you agreed with me that when fighters -- if we

12  assume that fighters' MRP goes up when they move from

13  Strikeforce to UFC, you would expect them to be paid more in a

14  competitive market, correct?

15  A.  In a competitive market.

16  Q.  Okay.  So let's -- let's say when the Strikeforce fighters

17  moved -- and you also, I think, testified that you --

18  A.  Hold on.  Hold on.  In a completely competitive market, if

19  Strikeforce is in that market, there wouldn't have ...

20          Wages are being set competitively.  You're saying

21  Strikeforce is out of that market.  I'm not, but --

22  Q.  I'm not sure I understand what you said, but let me move on.

23          So, I believe you testified that -- in response to His

24  Honor's question, that the way we determine a competitive wage

25  is we look at the wedge between the wage level and the marginal

─────2:15-cv-01045-RFB-PAL─────

 1  revenue product.  Is that right?

 2  *A.*  Well, if I knew the size of the wedge.

 3  *Q.*  Right.  Whatever that size is?

 4  *A.*  If there -- if there is a wedge.

 5  *Q.*  If is a wedge.

 6  *A.*  And there is a wedge.

 7  *Q.*  Okay.  So let's assume that when the Strikeforce fighters as

 8  a group moved from Strikeforce to the UFC their marginal revenue

 9  product doubled because of the network effects we talked about

10  earlier.  Okay?

11  *A.*  Okay.  Because of the combination of athletes that Zuffa

12  has -- has put together.

13  *Q.*  Right.  Has locked up into these exclusive contracts,

14  correct.

15  *A.*  Okay.  Which makes -- which makes productivity better when

16  you put people to Zuffa.

17  *Q.*  Right.  And Zuffa has locked them into these contracts, the

18  critical mass of them as we've argued.  All right.  So, let's

19  say --

20  *A.*  I'm not -- I'm not arguing -- agreeing with the last half,

21  but the first half is just fine.  Let's keep doing that.

22  *Q.*  Okay.  So, let's say their marginal revenue product doubles.

23  But you also see their compensation level go up, but it only

24  goes up 10 percent.  So, now, the wedge between wage level and

25  marginal revenue product has grown, right?

─2:15-cv-01045-RFB-PAL─

1  *A.*  On an individual basis -- you -- you've made the assumption.

2  I don't know.  So you're making up some number, and in a

3  competitive labor market everybody's compensation would have

4  been affect.

5  *Q.*  If you accept my --

6  *A.*  I mean, in a -- whether it's monopsonistic or competitive,

7  everybody's labor market would have -- compensation would have

8  been affected.

9  *Q.*  Dr. Topel, if you accept my assumption that wages did not

10  grow as fast as MRP, okay?  That was the assumption of the

11  question.  When the Strikeforce fighters moved from Strikeforce

12  to the UFC, that would mean that the UFC is exercising monopsony

13  power, correct?

14  *A.*  I didn't deny in this premise that they were -- they were

15  not exercising some degree of monopsony power.  I'm saying that

16  that degree of monopsony power increased according to your

17  theory.

18  *Q.*  Okay.  But the fact -- then the fact that the wages went

19  up -- wage level went up when Strikeforce fighters moved to the

20  UFC is not necessarily an indication that the UFC was paying a

21  competitive wage, right?

22  *A.*  They may not have been paying a competitively -- competitive

23  wage beforehand, afterhand, but they didn't have to raise the

24  wages of these people.  I mean, think about --

25          THE COURT:  Okay.  Okay.  But that's -- again, that's

—2:15-cv-01045-RFB-PAL—

1  not the question.  The question is even if -- but I think you've

2  already answered because I asked you the same question

3  yesterday, I think, which is -- and you've agreed with it, which

4  is that you can a situation in which the absolute wages go up,

5  but there's still an exercise of monopsony power because the

6  difference between what the increased wage is and what the

7  competitive wage is could still be substantial enough that there

8  would be an exercise of monopsony power.  You agreed with that.

9  You just said that you're not -- you don't agree that the

10  plaintiffs' model shows that, right?

11       THE WITNESS:  Doesn't show that, and it doesn't

12  indicate the effects of an increase in monopsony power.

13       THE COURT:  Right.  But I'm saying, you don't disagree

14  with the premise that you can have a situation in which wages

15  absolutely increase, but nonetheless, the increased wage can

16  still be a representation of monopsony power if it is not

17  increased to what would be the competitive wage.

18       THE WITNESS:  Wages could be rising, but they could be

19  rising at a level below the competitive level.

20       THE COURT:  Okay.  I'm -- I'm going to try to ask this

21  one more time, and maybe I'm not being clear.

22       Monopsony power can allow for a situation in which the

23  wage is increased absolutely, but they don't increase to the

24  competitive wage because of the exercise of monopsony power,

25  correct?

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  I agree with that.

2           THE COURT:  Okay.  That's all -- I think that's all.  I

3   understand that you have other explanations as to why they

4   may -- may or may not have increased in this circumstance, why a

5   company may be able to exercise monopsony power and keep the

6   wages flat.  So, I'm not saying that those aren't other

7   arguments that you've made.  I just wanted to clarify that you

8   do agree with that principle, which I think that you have

9   confirmed.

10          So why don't we go ahead, Mr. Cramer.

11          MR. CRAMER:  Yes.  Thank you, Your Honor.

12  BY MR. CRAMER:

13  Q.  His Honor raised this question of benchmarks.  And, so, I

14  wanted to show His Honor and Dr. Topel paragraph 287 from

15  Dr. Topel's report.

16          So this is paragraph 287, and it says, "There are three

17  natural candidates for a competitive benchmark:  The

18  compensation paid by other MMA promoters, which corresponds to

19  the Bellator benchmark used by Dr. Singer; the compensation paid

20  by Zuffa when it had a smaller share of the MMA market, which

21  corresponds to the lower foreclosure share used by Dr. Singer in

22  his regression benchmarks; and the compensation paid to

23  Strikeforce athletes who were then incorporated into UFC

24  following the 2011 acquisition, which corresponds to

25  Dr. Singer's Strikeforce benchmark."

2:15-cv-01045-RFB-PAL

1          Did you write that?

2   **A.**   I wrote that.

3   *Q.*   And your view is that these are natural competitive

4   benchmarks, but wage levels should be used, correct?

5   **A.**   Well, in the context of what Dr. -- Dr. Singer said that

6   Strikeforce was a benchmark.  So I'm saying let -- okay.  That's

7   a natural thing then.  Let's use Strikeforce.

8   *Q.*   Right.  So your view is let's use Strikeforce wage level,

9   and Dr. Singer's view is let's use these natural competitive

10  benchmarks, the ones you've identified, right here, agreeing

11  with Dr. Singer, but he says you should use wage share.  That's

12  the difference between the two of you, correct?

13  **A.**   He wants to use wage share, and the measure of whether wages

14  are being suppressed would be -- if those are the benchmarks and

15  that means I can look at them for a competitive outcome is,

16  what's happened to wages?

17  *Q.*   But you agree they're natural competitive benchmarks, right?

18  **A.**   No.  I said that Dr. Singer said they're natural benchmarks.

19  And, okay, naturally, I'm going to use them.  So he says so, I'm

20  going to look.  That's what it says.

21          THE COURT:  Well, no.  Are you saying -- because it

22  looks like it says there are three natural candidates for a

23  competitive benchmark.  That's your statement, right?

24          THE WITNESS:  I understand, but I'm doing this in the

25  context of the -- of what Dr. Singer's offered us up to this

—2:15-cv-01045-RFB-PAL—

 1  point, which is that it's a benchmark.  So I'm going to look.

 2          THE COURT:  Yes.  Do you disagree that they're natural

 3  benchmarks?

 4          THE WITNESS:  Yeah.

 5          THE COURT:  Well, what would be the natural benchmarks

 6  that you would offer or that you did offer in your reports?

 7          THE WITNESS:  The only thing I can do is take what he

 8  offered as a natural benchmark and say what happens.  If I

 9  had --

10          THE COURT:  Well -- so, if you wanted to offer your own

11  natural benchmark, what would it be?

12          THE WITNESS:  Okay.  You've asked me this before so

13  I'll try to give an example, and it will demonstrate to you

14  why --

15          THE COURT:  But I'm saying -- so, in other words, you

16  didn't do that in your report, but you're saying -- in this case

17  you're saying you just simply -- in this paragraph you simply

18  just accepted his benchmarks and that's why you made the

19  statement "there are three natural candidates for a competitive

20  benchmark"?  That's you accepting Dr. Singer's --

21          THE WITNESS:  That's -- that's -- I'm accepting it.  So

22  let me give you an example of --

23          THE COURT:  Because it doesn't actually say that,

24  right?  It doesn't say --

25          THE WITNESS:  Well, it's in the context.

1          THE COURT:  All right.  Okay.

2          THE WITNESS:  Okay.  Remember what you asked me

3   yesterday, because I said, if I could think of one, I would have

4   done it for you, one that I like.  I mean, suppose that we had

5   two MMA markets, one east of the Rockies, one west of the

6   Rockies, and there's no mobility between them.  And the one over

7   east of the Rockies is alleged to have -- since we're west of

8   the Rockies, I'll say the one west of the Rockies is alleged to

9   have some foreclosure going on, but it's not happening east of

10  the Rockies.  Well, then I could look at the level of

11  compensation -- the level of compensation -- over east of the

12  Rockies and say that's the competitive level, I'm going to

13  compare it to west of the Rockies.

14          THE COURT:  Okay.  But let me stop you for just a

15  second because I appreciate you're trying to come up with one,

16  but the question I have to deal with is this, right?  You said

17  you couldn't think of one, right?  And you're saying you don't

18  necessarily agree with them, but there has to be -- there has to

19  be some attempt to come up with that.  What's unreasonable about

20  using these?

21          If you can't come up with one on your own, because

22  obviously it's a challenge, why would it be unreasonable to use

23  these three?  They may not be perfect, but what else could you

24  use that would be available?  That's why I'm asking you that

25  because --

———2:15-cv-01045-RFB-PAL———

1           THE WITNESS:  Well --

2           THE COURT:  -- I have to find out, or I have to decide

3    whether or not they're unreasonable.  Is there anything

4    unreasonable about them in the absence of other alternatives?

5           THE WITNESS:  Well, if they're in the same market, they

6    should be affected by the same market forces include --

7    including foreclosure and the like.  But Dr. Singer's offering

8    them as a benchmark.  So he's saying, in effect -- I don't want

9    to put words in his mouth -- they are east of the Rockies.  And

10   Zuffa is over here west of the Rockies.  And, so, we're going to

11   compare east of the Rockies to west of the Rockies.  He wants

12   to -- he wants to use the wage share.  I've said there's no

13   competitive information about that wage share -- no market

14   information about that wage share that would tell you that this

15   is a monopsony outcome.  That's all I'm saying.

16          THE COURT:  Right.  But what I'm saying is that in the

17   context of the analysis that you all have done and I have to

18   decide, we can't just sort of throw up our arms and say, well,

19   we can't come up with something, so there can't be a reasonable

20   attempt to do it.

21          If you had to do this and you were -- and you,

22   yourself, had to do it, right, and weren't just simply saying

23   those aren't reasonable, what would you use?  Given what's here

24   and you had to do the analysis that Dr. Singer did, what would

25   you use?

1          THE WITNESS:  I would have said what I said here.  We

2   have no reliable evidence.

3          THE COURT:  Yes, but that's not the question.  The

4   question is, if you had to try to come up with the best

5   benchmarks available based upon what existed, what would you

6   use?

7          THE WITNESS:  We don't have best benchmarks.  That's

8   the nature of the problem that I face.

9          THE COURT:  Right.  But I understand that.  But as you

10  know, as an economist, this is not an uncommon problem.  Moving

11  into new markets, there are oftentimes situations in which you

12  have to use what you think are the best comparable or analogous

13  circumstances to help you predict certain information.

14          THE WITNESS:  Your Honor --

15          THE COURT:  And, so, part of the issue is, if you're

16  going to say to me, right, that these aren't reasonable methods,

17  the question is, what would be a reasonable alternative to what

18  was used?

19          THE WITNESS:  Your Honor, I've written lots of research

20  papers, many of which start out and don't go anywhere.  And why

21  don't they go anywhere?  Because we can't gather the evidence to

22  reflect conclusively on the problem being solved.  So I'm coming

23  to you and you're saying, well, what would you have done?  And I

24  start a project and say, look it, we can't get the evidence that

25  would distinguish between this and that, well, then, we can't.

—————2:15-cv-01045-RFB-PAL—————

1    And that -- and that's -- so I -- so you --

2          THE COURT:  So you're saying in this context, there

3    would be no way to actually come up with --

4          THE WITNESS:  Yes.  You asked me --

5          THE COURT:  -- an appropriate benchmark to assess the

6    competitive wage?

7          THE WITNESS:  You asked me yesterday, have you got a

8    competitive -- have you got a benchmark that you would recommend

9    and advocate.  I said no.  Because I haven't been able to -- I

10   told you, if I had thought of one, I would have told you.

11         THE COURT:  Right.

12         THE WITNESS:  Now, the best I could do is, I said,

13   look, plaintiffs are saying monopsony power increased upon these

14   acquisitions, or monopsony power increased over time.  So we

15   could compare -- we could compare the wage levels at Zuffa back

16   before their alleged foreclosure share went up, business

17   practices before -- that's a common way of doing it.  That's a

18   benchmark -- or we can look at what happened when this putative

19   monopsony power increased.  And that was my comparison of the

20   wages, either the levels if you want or the changes of people

21   at -- at Strikeforce.

22         THE COURT:  So one way then would be to look at what

23   happened to changes in wage levels and you could disagree about

24   the wage measure after people moved over?

25         THE WITNESS:  Yes, or you could look at the levels of

—————2:15-cv-01045-RFB-PAL—————

1    wages --

2              THE COURT:  Okay.

3              THE WITNESS:  -- at those places --

4              THE COURT:  Right.

5              THE WITNESS:  -- if that was a competitive benchmark.

6              THE COURT:  Right.  So -- but you're saying that might

7    be one mechanism for doing it?  And, again, I'm asking you this,

8    Dr. Topel, and I'm pushing you a little bit because, obviously,

9    I have to look at this and try to figure out, based upon the

10   information in this record, what is a reasonable approach and

11   whether or not the plaintiffs have taken that in the context of

12   the model.  And that's why I'm asking you that as an expert in

13   the field if you were required to do what Dr. Singer had to do,

14   which is to try to assess that, what you would have done.  And I

15   think what you said is you don't know that there would be an

16   easy way to do this given the absence of other exactly

17   comparable markets, right?

18             THE WITNESS:  Let me put this in the context of what my

19   assignment is -- was.  And that is two things.  I'll interpret

20   it as two things.  Have plaintiffs given a reliable method for

21   ascertaining the existence and effects of monopsony power?  No.

22             Do I have a reliable method in this market for

23   ascertaining the impact of monopsony -- of isolating any

24   monopsony power if it exists?  Don't have it.

25             THE COURT:  So you're saying, effectively, there would

—2:15-cv-01045-RFB-PAL—

1  be no way to actually ascertain whether or not there was an

2  exercise of monopsony power in this context?

3          THE WITNESS:  I've given you the ones that will --

4  within the context of plaintiffs' claims, that monopsony power

5  increased.  Well, that is inconsistent with their -- the

6  evidence is inconsistent with their theory.

7          I've talked about things -- business practices used by

8  smaller firms that have no alleged market power.  That's

9  consistent with the business practices we'd be -- we observed

10 not having anticompetitive impact or having procompetitive

11 reasons.  Those are the things I can offer you, but I can't

12 offer you, and I -- you know, I wish I could, but I can't offer

13 you some market somewhere that is unaffected by the alleged

14 practices that I can say, there it is.  That's the wage level

15 that ought to be paid.  We're just bringing it over here and

16 saying that's the harm.

17          THE COURT:  Okay.  I appreciate that.

18          THE WITNESS:  Okay.

19          THE COURT:  Thank you.

20          Go ahead, Mr. Cramer.

21 BY MR. CRAMER:

22 *Q.*  I was interested in your analogy about two MMA organizations

23 assuming two geographic markets, east of the Rockies and west of

24 the Rockies.  Is that what you brought up?

25 *A.*  Yes.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  Okay.  And you said you would compare the wage levels of the

2  two to see -- to check to see whether the wage being paid was

3  competitive.  Is that right?

4  *A.*  Yeah.

5  *Q.*  Okay.  So let's assume that the MMA outfit west of the

6  Rockies -- because L.A. is there and everybody likes

7  California -- they have all of the headliners, all of them, no

8  headliners on the east of the Rockies.  East of the Rockies they

9  have everybody -- no headliners at all.  Okay?  So you've got

10  the east of the Rockies, no headliners, minor leagues

11  effectively.

12  *A.*  Then it's not a benchmark.

13  *Q.*  Oh, it's not a benchmark.  Okay.  So, not a bench -- you

14  can't use then the wage level -- the wage level of an MMA

15  organization that has much lower ranked fighters to compare to

16  the -- to -- as a benchmark for the wage level --

17  *A.*  But we're looking -- we're looking --

18  *Q.*  Let me finish -- of an MMA promotion that has much higher

19  ranked fighters?  You can't do that for wage level, right?

20  *A.*  We're not looking at the -- I wasn't proposing -- my

21  assumption was these two places were the same so they had the

22  same distribution of fighters and everything, okay?  That's why

23  we looked at people who moved from Strikeforce to -- to --

24  *Q.*  Right.  So --

25  *A.*  -- UFC.

1  *Q.*  -- in comparing the two different organizations, you'd have

2  to control for a rank, for example, correct?

3  *A.*  You'd have to control for a lot of things in the world you

4  described.

5  *Q.*  You'd have to control for revenues, wouldn't you?

6         Let's say the west, because they had all of the top

7  fighters, they were bringing in a billion dollars a year, but

8  the east, they were bringing in a million dollar a year.  You'd

9  have to control for that in comparing the wage levels of the

10  two, correct?

11  *A.*  You might have to -- since I haven't done the study, you

12  might have to control for how much -- well, you know, how rich

13  people are and how much they're willing to pay.

14  *Q.*  Okay.  Let's turn to wage share.  You said in your report

15  that worker pay as a percentage of revenue is not a measure of

16  anything useful or informative.  Were those your words?

17  *A.*  Yes, and let me be careful about what we're talking about.

18  If I just take the pay of a worker and divide it by the revenue

19  of the -- the -- here, the show; in the restaurant business, the

20  restaurant; the wage of an individual worker divided by the

21  revenue of a firm is not a very useful benchmark.  Let me give

22  you an example.

23         In the restaurant business, Chick-fil-A.  Chick-fil-A

24  has average annual revenues of, I don't know, 4.5 million per

25  outlet.  Subway has average revenues per outlet of about

—2:15-cv-01045-RFB-PAL—

1  $500,000.  Dividing the wage, say, $20,000 a year of a

2  particular individual by the revenues of Chick-fil-A and then

3  comparing them to the -- the same $20,000 for the same type of

4  worker to the revenues over at Subway, which are, what is that,

5  a ninth of what they are at Chick-fil-A, that is not an

6  informative thing.

7  Q.  Right.  You can't use wage share when the worker -- you

8  can't draw a direct connection between the worker and the

9  revenues, right?

10  A.  Well, let me --

11       THE COURT:  You mean the worker's fungible.

12  BY MR. CRAMER:

13  Q.  The workers are fungible --

14  A.  Workers are fungible.

15  Q.  When -- for example, Chick-fil-A, the product isn't the

16  person, the fry cook.  The product -- bless you -- the product

17  isn't --

18  A.  You're focusing on something that I --

19       THE COURT:  Well, Mr. Cramer --

20       MR. CRAMER:  Okay.  I'll --

21       THE COURT:  I don't think you need to focus on this.

22       MR. CRAMER:  That's fine.

23       All right.  I just wanted to ask Dr. Topel about an

24  article that he wrote.  Let me put it up on the ELMO.

25  BY MR. CRAMER:

—2:15-cv-01045-RFB-PAL—

 1   *Q.*   This is an article entitled "The Economics of Team -- NFL

 2   Team Ownership" by Professors Kevin Murphy and Robert Topel.

 3            Is that Robert Topel you?

 4   **A.**   That one is me.

 5   *Q.*   And you wrote this paper with Professor Murphy?

 6   **A.**   Yes, we did.

 7   *Q.*   Okay.  All right.  I'd like to turn to page 1 of the

 8   article.  Page 1, the first sentence says:  "Our firm has been

 9   asked by the NFL Players Association, (NFLPA), to examine the

10   NFL owners' claim that they cannot continue to operate

11   economically under the current salary cap/free agency system."

12            Do you see that?

13   **A.**   Yes, I do.

14   *Q.*   And you and Professor Murphy did that evaluation for the NFL

15   Players Association?

16   **A.**   Yes, we did.

17   *Q.*   Okay.  All right.  This is page 2 of your article.  And the

18   fourth bullet down, which I've highlighted, says, quote, The

19   percentage of total revenues paid to players in the years

20   following the 2006 CBA extension is lower than the average

21   percentage paid to players since the NFL and the players entered

22   into the current salary cap/free agency system in 1993.  Recent

23   increases merely reverse a downward trend that began in 1999.

24            Do you see that?

25   **A.**   I see that.

2:15-cv-01045-RFB-PAL

1  *Q.*  So one of the points you're making here is that the NFL

2  player wage share, after 2006 -- after the 2006 CBA, is lower

3  than it was, on average, in the post 1993-period, correct?

4  *A.*  That's what the sentence says.  Are we connecting this to

5  my -- to the previous question?

6  *Q.*  I'm just asking what the sentence says.  You're tracking

7  wage share?

8  *A.*  I'm fine with reading it.

9  *Q.*  Okay.

10      (Court reporter admonishment.)

11          THE WITNESS:  We can both read.  It's --

12          THE COURT:  Are you -- oh, I'm sorry.  You're saying

13  you're fine with that?

14          THE WITNESS:  I am.

15          THE COURT:  You agree that that's what --

16          THE WITNESS:  That's what I said.

17          THE COURT:  Yes.

18          THE WITNESS:  That's what I said, and I'd stand by it.

19          THE COURT:  Right.  Okay.

20  BY MR. CRAMER:

21  *Q.*  Right.  And in short, you found -- you and Professor Murphy

22  found that NFL player wage share in the NFL went up from 1993 to

23  '99, began to fall in 1999, and then began to rise again in

24  2006.  Is that right?

25  *A.*  That's right.

—2:15-cv-01045-RFB-PAL—

1   *Q.* All right.  I'd like to show you figure 12 from this

2   article.

3          This is figure 12 from your article, right?

4   **A.** That's right.

5   *Q.* This figure is titled "National Football League Total Cash

6   Player Cost as a Percentage of Total Revenues, 1994 to 2007,"

7   right?

8   **A.** I can't read it from here, but I'll take your word to it.

9   *Q.* Okay.

10          THE COURT:  Actually, if you look on the screen right

11  there, Dr. Topel --

12          THE WITNESS:  Okay.  I got it.

13  BY MR. CRAMER:

14  *Q.* And in figure 12, you chart total player cost as a

15  percentage of total revenues, right?

16  **A.** That's right.

17  *Q.* So in this chart, you're comparing player wage shares over

18  time, right?

19  **A.** Yes, and I come back to my question, are we trying to

20  connect this --

21          THE COURT:  Well, hold on.  Let him -- let him do the

22  background.

23          THE WITNESS:  Okay.  He can -- I guess this is going to

24  play out to some ultimate question.  So, yes, you're -- that's

25  what we're doing.

—2:15-cv-01045-RFB-PAL—

1  BY MR. CRAMER:

2  Q.  Let me also ask you.  So, we see the wage share bouncing

3  around a lot -- the NFL player wage share bouncing around a lot

4  from 1994 to 2007.  It's fair to say that the NFL revenues were

5  going up during this period?

6  A.  I don't -- this is written God knows how long ago.  I don't

7  remember.

8  Q.  You don't know whether NFL revenues were going up from 1994

9  to 2000 --

10  A.  I suspect they were, but I don't remember.

11        THE COURT:  Well, I think they're -- it actually says

12  it in the previous slide that you put up.

13        MR. CRAMER:  Thank you, Your Honor.

14        THE COURT:  The paragraph above.

15        MR. CRAMER:  Yeah.

16  BY MR. CRAMER:

17  Q.  So if you just charted -- if you -- so -- so -- okay.  So

18  you just know -- you know the revenues were going up?

19  A.  Yeah.

20  Q.  Okay.

21  A.  I mean, one of the key points here was that -- putting aside

22  the share business, we can come back to this -- is that the

23  owners were moaning that they're not making any money.  And even

24  if they were losing money on a cash flow basis, they were buying

25  their franchises for 500 million and selling them for 1.5

 1  billion.  So it's like buying the Monet that you have a huge

 2  capital gain on and complaining about the insurance premium you

 3  had to pay every year to have it hanging on the wall.  You have

 4  to cap -- you have to count the capital gains on the asset when

 5  you're talking about the returns to ownership.

 6  Q.  Dr. Topel, you found, and Professor Murphy found, wage share

 7  useful and informative for your analysis in this paper, correct?

 8  **A.**  Yes.  Wage share -- I mean, the compensation share is part

 9  of the -- is part of the collective bargaining agreement.

10          And, you know, when I sold my company years ago now,

11  the -- the potential buyers all wanted to know what compensation

12  is a share of revenue.  That's not the same as the wage of a

13  worker divided by revenue.  But even then, is it informative

14  about monopsony power?  No.

15  Q.  Okay.  That's all I wanted to ask you about that.

16  **A.**  Okay.

17  Q.  Put it aside.

18  **A.**  I mean, as a matter of fact, I teach labor share of national

19  income in my class and how it can go up or down.

20  Q.  You teach wage share in your class?

21  **A.**  I teach labor share of national income in my class and how

22  increase -- and then one of the key points is an increase or

23  decrease in labor share doesn't mean that labor is better off or

24  worries off.

25  Q.  Okay.

—2:15-cv-01045-RFB-PAL—

1           THE COURT:  But it can mean that, though.  It's not as

2  if wage share is absolutely going to in every circumstance be

3  unrelated to the use of monopsony power, correct?

4           THE WITNESS:  Well, I wasn't even making a comment

5  about monopsony power.

6           THE COURT:  No.  But what I'm saying is that you're not

7  saying -- let me just clarify this.

8           I understand you to be saying that the wage share alone

9  doesn't necessarily reflect monopsony power in terms of the

10  differences, but you're not saying that wage share can't be

11  useful in some circumstances in talking about it, are you?

12           THE WITNESS:  If I could find a way to measure at the

13  aggregate level, say -- here's effect.  At the aggregate level,

14  in economy as a whole, the share of labor in national income --

15           THE COURT:  No.  But let -- but let's go back to the

16  for example.  Even in the NFL context of the article you wrote,

17  are you saying that the wage share as it relates to event --

18  sort of the revenues is not a useful -- at least one useful

19  metric to look at as it relates to monopsony power?

20           THE WITNESS:  Well, we weren't doing anything about

21  monopsony power.

22           THE COURT:  I'm not saying that.  I'm not saying.  But

23  I'm saying, are you saying that wage share can never be a useful

24  metric to look at in the context of monopsony power?  Or are you

25  saying in this case you don't think it reflects that, which is

──2:15-cv-01045-RFB-PAL──

1  two different things?

2          THE WITNESS:  You asked -- so you asked a very broad

3  question there.  So let's come back to the -- I think we talked

4  about this yesterday, but if we didn't -- if we did, forgive me.

5  If we didn't, here we go.

6          You talked about the reserve clause yesterday and how

7  the reserve clause in baseball was eliminated.  We knew that

8  that was a reduction in monopsony power.  Those guys -- the

9  owners used to own the contracts and then the -- the court came

10  along and, who was it, Lou Brock, I can't remember,

11  Andy Messersmith --

12          MR. CRAMER:  Curt Flood.

13          THE WITNESS:  Curt Flood.  Yeah.  Right.  Thank you.

14          You know, right.  We're probably about the same age and

15  we remember the same baseball player, you know, Bob Gibson,

16  but -- so the reserve clause went away.  That's a clear example

17  of where a transfer of wealth occurred.  And you would say,

18  well, you know, revenues of the teams were probably not affected

19  very much by this -- by this change immediately, so let's look

20  at their wage share.  And people have looked at the share of --

21  of the total take, if you will, in baseball when that went away.

22  That's a completely different experiment because now you've --

23  you know that this thing has gone away and both compensation

24  went up and the share of revenues went up.  I'm with you on

25  that.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  So, I guess -- no.  I guess what I was

2    saying is you had made this broad statement, which I think

3    probably is sort of unfair to sort of focus on, about how wage

4    share, I think, is never useful and can't tell you anything.

5    And I think what you meant by that is in the context of this

6    case, not in all cases, but in the context of this case --

7          THE WITNESS:  I meant --

8          THE COURT:  -- the wage share is not necessarily

9    indicative of monopsony power one way or the other.

10          THE WITNESS:  Yeah.  I meant two things.  I was

11    referring to the wage of an individual divided by the revenues

12    of the enterprise, and I was referring to what you're referring

13    to.

14          THE COURT:  Okay.  All right.  That's helpful.

15          Go ahead, Mr. Isaacson [sic].  Thank you, Dr. Topel.

16    BY MR. CRAMER:

17    Q.  I just noticed the sentence underneath the chart on figure

18    12 in your study.  You can look, Dr. Topel, at your screen.  It

19    says, "Considering the changes in the players' overall

20    percentage" -- meaning wage share over time -- "it appears that

21    the players' percentage did not keep pace with the growth in NFL

22    revenues after 2000."

23          Do you see that?

24    A.  Yes.

25    Q.  So you thought it was useful to compare whether the actual

1  wage level kept pace with rev growth and revenues, right?

2  *A.* Yes, because the -- the -- the owners were saying that it

3  more than kept pace.

4  *Q.* Okay.

5  *A.* They were losing money.

6  *Q.* Let's --

7  *A.* And let me draw the contrast here because I think you showed

8  us charts yesterday where the wage share was generally flat.

9  *Q.* Let's -- excuse me.

10       Let's talk about this issue that you just raised

11  regarding the reserve clause, but before we do that, I just want

12  to show you something from paragraph 200 in your report.

13  *A.* Uh-hmm.

14  *Q.* This sentence, the one that I've highlighted in paragraph

15  200 of your report reads, "In particular, the restrictions on

16  athlete mobility address potential market failures due to

17  transaction costs and the free-rider problem."

18       Do you see that?

19  *A.* Yes.

20  *Q.* And that's your opinion, right?

21  *A.* Yes.

22  *Q.* And the restrictions on athlete mobility in this sentence,

23  you're referring to the provisions in the UFC fighter contracts

24  that we've been discussing in this hearing, correct?

25  *A.* Yes.

2:15-cv-01045-RFB-PAL

1  Q.  Okay.  And so you would agree that those provisions restrict

2  athlete mobility, correct?

3  A.  All contracts restrict.

4  Q.  Okay.  All right.  Let's ...

5        I think you just mentioned you're aware of published

6  academic articles that use wage share to assess the compensation

7  of Major League Baseball players before and after the

8  elimination of the reserve clause in baseball, correct?

9  A.  I have some familiarity with that.

10  Q.  Okay.  I'd like to show you Tab -- I'm sorry.  It's not a

11  tab.  It's paragraph 201 of your second report.

12        So I've highlighted a section I want to draw your

13  attention to.  It says, "In his regression assessing common

14  impact" -- that's not what I wanted to show you.  I apologize.

15        Take two.  This is paragraph 22 from your second

16  report.  We'll get to the other one in a minute.

17        All right.  I've highlighted a sentence there in your

18  report.  It says, "This is because a known change in monopsony

19  power, such as eliminating the reserve clause in baseball, has

20  clear implications for compensation:  All else equal, a

21  reduction in monopsony power will increase wages."

22        Did you write that?

23  A.  Yes.

24  Q.  Okay.  Let me just ask you some quick clarifying questions

25  about that.

2:15-cv-01045-RFB-PAL

1              You would agree that the reserve clause was a provision

2  in Major League Baseball contracts that restricted the ability

3  of players to move from team to team, right?

4  *A.*   Not only restricted it, you could only move under the

5  reserve clause if the team itself sold your contract to somebody

6  else.

7  *Q.*  And you would agree that the elimination of the reserve

8  clause in baseball is an example of a -- what you called a known

9  change in monopsony power on the part of baseball teams,

10  correct?

11  *A.*   That's what I said.

12  *Q.*  And your opinion is that eliminating the reserve clause and

13  thereby enhancing the ability of athletes to sell their services

14  to competing teams reduced the monopsony power of Major League

15  Baseball teams, right?

16  *A.*   All else equal, yes.

17  *Q.*  And you would agree, would you not, the reduction of Major

18  League Baseball teams' monopsony power has implications for

19  athlete compensation, right?

20  *A.*   That's what the paragraph -- the sentence says.

21  *Q.*  And you would agree, all else equal, that when mobility of

22  athletes is enhanced, such as by the re- -- elimination of the

23  receive clause, all else equal, teams have less monopsony power,

24  correct?

25  *A.*   Yes.  When the -- when the property rights they had in their

—2:15-cv-01045-RFB-PAL—

1  baseball talents were transferred from the teams to them, that's

2  what happened.

3  Q.  And when sports outfits have less monopsony power, all else

4  equal, athletes get paid more, right?

5  A.  Yeah.  And the all else equal there is key.  So, if we go

6  back to the paragraph you had put up before, all else wasn't

7  equal, but keep going.

8  Q.  All right.  You would also agree with me that it would not

9  be procompetitive for Zuffa to require -- and I believe you told

10  me this at your deposition, but I just want to make sure it's

11  clear.  It would not be procompetitive for Zuffa to require, as

12  a condition of fighting for Zuffa, to execute contracts that

13  stipulate that that the fighter could never fight for another

14  promotion?  That's not procompetitive, you would agree?

15  A.  Well, I haven't examined it in detail, but I don't think

16  it's procompetitive.

17  Q.  And the reason for that, you gave me at your deposition, and

18  just tell me if you can confirm that today, is that it would

19  allow -- in that instance, Zuffa locked up fighters in

20  perpetuity -- that would allow Zuffa to capture all of the

21  returns on the fighters' investments and their own human

22  capital.  Isn't that right?

23  A.  Yeah, I mean -- I don't think they could even legally write

24  those contracts these days.

25  Q.  Right.  They'd be illegal.  You can't sign up anyone in

—2:15-cv-01045-RFB-PAL—

1  perpetuity, right?

2  *A.*   Right.  It's one of those amendments.

3  *Q.*   It's like slavery.  I think it's Thirteenth Amendment.

4  *A.*   I know it was 13, 14 or 15, but I can't remember.

5  *Q.*   Agreed.

6         All right.  Let's move to a different topic.  I'd like

7  to show you an excerpt from your opening report at pages 88 and

8  89, paragraph 201.  And the first sentence there you say, "In

9  his regression assessing common impact, Dr. Singer only

10  considers the impact of the contractual restrictions in PAR

11  contracts that he claims extend the period of exclusivity when

12  an athlete is under contract to Zuffa."

13         Do you see that?

14  *A.*   Yes.

15  *Q.*   And that's your opinion, right?

16  *A.*   You know, I can't -- I don't know the context.  I don't

17  remember everything yet, but let's keep going.  I wrote this as

18  an opinion.

19  *Q.*   Well, you wrote that in your report, right?

20  *A.*   Yes.  I'm just trying to remember what the context.

21  *Q.*   You were discussing the foreclosure impact regression and

22  you were observing that the impact and damages that flow from

23  that impact regression are picking up the foreclosure share.

24  *A.*   Yeah.  I think I see what I'm saying here.  Keep going.

25  *Q.*   But they're not directly picking up in any way the other

—2:15-cv-01045-RFB-PAL—

1  aspect of the challenged conduct.  That's what you were saying

2  here, correct?

3  *A.*  Yes.

4  *Q.*  Okay.  So just to be clear, Dr. Singer's impact regression

5  computes impact and damages flowing from the contractual

6  restrictions in the PAR contracts, that's your view, to the

7  extent it computes them at all?

8  *A.*  Well, they purport to do what's in the PAR contracts, but if

9  some part of the PAR contracts were found to be not

10 anticompetitive, I don't know how we would change -- what we

11 would do with his foreclosure share measure to take that part

12 out.

13 *Q.*  Right.  But if --

14 *A.*  Okay.  But it also doesn't take into account various other

15 accusations or allegations that plaintiffs had about, you know,

16 the product side of the market and other things.

17 *Q.*  Right.  So, let's say the Court were to decide that one of

18 the aspects of the conduct that plaintiffs are challenging, the

19 exclusionary restrictive contracts are anticompetitive, right,

20 then there would be no issue with Comcast, correct?

21       I withdraw the question.  I'll move onto the next --

22 *A.*  Are you sure you don't want me to answer that question?

23 *Q.*  Yeah, I'm sure I don't want you to answer it.  It's a legal

24 question.  I object to my own question.

25       All right.  Well, let me ask you about a document that

─────2:15-cv-01045-RFB-PAL─────

 1  you cited in your report.  This is a WME document you cited in

 2  your report.  It's called Project Basquiat.

 3              THE COURT:  Basquiat.

 4              MR. CRAMER:  Basquiat.  Thank you.

 5              THE WITNESS:  Your Honor, I wish we'd had you there --

 6  I wish you had been there at a deposition because we sat for a

 7  minute trying to figure out how to pronounce that.

 8  BY MR. CRAMER:

 9  Q.  We did, and we talked about this at his deposition.  It's

10  entitled "Final Posting Memo," and it's dated June 12th, 2016.

11              MR. ISAACSON:  What's the exhibit number?

12              MR. CRAMER:  The exhibit number is PCCX41.

13  BY MR. CRAMER:

14  Q.  All right.  Before I show you the page of that that I wanted

15  to ask you about, I just want to remind you, you cited this

16  document in your opening report.

17              Do you recall it?

18              THE COURT:  Okay.  So hold on a second, Mr. Cramer.

19              MR. CRAMER:  Yeah.

20              THE COURT:  Again, I have been assuming that the

21  documents you all are citing are attached to the experts

22  reports.  If they are not, then you need to make sure you

23  identify what the exhibit is, and if it needs to be admitted to

24  the hearing, then it needs to be admitted to the hearing.

25              MR. CRAMER:  Okay.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Let's try to be clear about that.  For the

2  most part, I think you all have been citing to things that are

3  in the reports, but I'm not sure this is, or if it's an exhibit

4  or where it is.  But let's just be clear where it is so that the

5  record is clear.

6          MR. CRAMER:  Okay.  This, Your Honor, is -- he cited it

7  in his report, paragraphs 56, footnotes 84 and 365.  And for the

8  record, it's JCCX51.  So it's in the joint exhibit binder, 51.

9          THE COURT:  So it's cited, but this -- the entire

10  exhibit is not --

11          MR. CRAMER:  Oh, I'm sorry, that's not it.  It's

12  PCCX41.  I apologize.

13          THE COURT:  But -- so, what you're about to show is

14  actually not in his report.  It's just from the -- from the

15  document that's cited itself.

16          MR. CRAMER:  Correct.

17          THE COURT:  Okay.

18          MR. CRAMER:  He cites the report twice.  He didn't

19  attach every single document he cited.

20          THE COURT:  Okay.  So then we'll need to admit this as

21  an exhibit.

22          MR. CRAMER:  Okay.  And it's in the joint appendix,

23  so ...

24          THE COURT:  Okay.  So, well, what -- what exhibit

25  number do you want to give this for the hearing?

—2:15-cv-01045-RFB-PAL—

1          MR. CRAMER:  I would like it to have PCCX41, the one

2    that it has been designated and -- yeah, it has been -- oh, this

3    is in plaintiffs.  It's not in the joint.  I'm sorry.  It's

4    PCCX41.

5          THE COURT:  So just give it a -- wait.  We don't do --

6    it's Plaintiff's Exhibit.  PCC, all of that, we don't need.

7          MR. CRAMER:  Okay.

8          THE COURT:  The Plaintiff's Exhibit number will be what

9    exactly?

10          MR. CRAMER:  Why don't we call it 1.

11          THE COURT:  Okay.

12          MR. CRAMER:  All right.

13          THE COURT:  I'm sorry.  Any objection, Mr. Isaacson?

14          MR. ISAACSON:  No objection.

15          THE COURT:  All right.  So we'll admit that.

16          MR. CRAMER:  That you.

17       (Plaintiff's Exhibit 1 is admitted.)

18    BY MR. CRAMER:

19    Q.  All right.  And I believe you testified, if you recall,

20    Dr. Topel, at your deposition, that you believed that WME, which

21    bought, Zuffa used this document in the course of evaluating

22    whether to purchase Zuffa.

23          Do you recall that?

24    A.  Vaguely.

25    Q.  I'm sorry?

1  *A.*  Vaguely.

2  *Q.*  Okay.  All right.  I just want to show you page 11 of the

3  document, and I want to -- I just want to draw your attention to

4  the chart on the lower left-hand side of that document entitled

5  "Bouts Remaining."

6          Do you see that?

7  *A.*  Yes.

8  *Q.*  Okay.  And that table has two columns:  One entitled

9  "Ranking" and one entitled "Average Remaining Bouts."

10          Do you see that?

11  *A.*  Yes.

12  *Q.*  And it's fair to say that if this chart is accurate, it

13  shows that the better a fighter is ranked, the more bouts

14  remaining on that fighter's UFC contract, on average, correct?

15  *A.*  Yes.  I agree with that.

16  *Q.*  And I believe you also agreed with me that either someone at

17  the UFC or WME, or both, thought it relevant to track this

18  statistic, correct?

19  *A.*  They put it in the document.

20  *Q.*  Okay.  And you would also agree with me, would you not, I

21  think as you did at your deposition, that one thing that WME

22  really wanted to know, or might want to know before it invested

23  $4 billion-plus in Zuffa, is that Zuffa had, at least its top

24  ranked fighters, under long-term exclusive contracts, correct?

25  *A.*  I don't know if I agreed to exactly that language, but

—2:15-cv-01045-RFB-PAL—

1  something like that would be valuable to WME.

2  *Q.*  And that's because, and I believe you said at your

3  deposition, that those fighters are the human capital that are

4  going to produce revenues for the UFC in the short-term at

5  least, right?

6  *A.*  If I -- I have some vague recollection.  I think I might

7  have even had some reference to Fox televising and they want to

8  know who they're getting.

9  *Q.*  Right.  And -- and you agree that champions are more

10  valuable than the guys ranked 11 to 15, right, to an

11  organization?

12  *A.*  Yes.

13  *Q.*  And you agree that fighters ranked 50 or worse are still

14  less valuable, correct?

15  *A.*  Well, they're not in this picture, but I ...

16  *Q.*  Okay.

17  *A.*  Take your word for it.

18  *Q.*  Okay.  Thank you.

19  *A.*  By the way, that -- that would be true in a competitive

20  market, too.

21      MR. ISAACSON:  Your Honor, there are other parts of

22  this document that WME has asked to be maintained as

23  confidential that weren't part of the examination.  And, so --

24      THE COURT:  So I'd ask the parties, Mr. Isaacson, then

25  to submit hopefully a jointly agreed upon based upon my

1  rulings --

2          MR. ISAACSON:  Yes.

3          THE COURT:  -- exhibits can be added to the record.

4          MR. ISAACSON:  Yes, that's what we would like to do.

5          THE COURT:  Okay.  That's fine.  I agree with that

6  approach, and would direct the parties to do that.

7          Go ahead, Mr. Cramer.

8          MR. CRAMER:  Thank you, Your Honor.

9          THE COURT:  Mr. Cramer, I'm going to give you about

10  10 -- 10 more minutes, 15 at most.  So --

11          MR. CRAMER:  Okay.

12          THE COURT:  -- you're going to have to move it along.

13          MR. CRAMER:  I -- okay.  I'm going to move it along.

14  BY MR. CRAMER:

15  *Q.*  I'm going to show you paragraph 171 of your report.  Before

16  I -- maybe I don't need to show this to you.

17          Do you recall that you describe in your report a

18  regression you ran that specified -- so that you could measure

19  changes in compensation separately for athletes with different

20  rankings?

21  *A.*  No.

22  *Q.*  All right.  This is paragraph 171 of your report, and it

23  says, "You modify the regression so you can measure changes in

24  compensation separately for athletes with different rankings."

25          Do you see that?

2:15-cv-01045-RFB-PAL

1   *A.*   Yeah.  Who -- whose compensation changes am I looking at

2   here?

3   *Q.*   Fighters.

4   *A.*   No, I understand, but only Zuffa fighters?

5   *Q.*   Yes.  No.  No.  This is all the fighters in the ranked

6   market.

7   *A.*   Can I see Exhibit 17?

8            THE COURT:  I'm sorry.  Is there a question here,

9   Mr. Cramer?  Because you could just cite this without

10  Dr. Topel --

11           MR. CRAMER:  Okay.

12           THE COURT:  -- testifying about it.

13           MR. CRAMER:  All right.  Let me just ask the question I

14  want to ask then.

15  BY MR. CRAMER:

16  *Q.*   You agree, would you, as you told me at your deposition,

17  that -- that Zuffa fighters -- that you found that Zuffa

18  fighters in all ranking categories:  1 to 15, 16 to 30, 31 to

19  50, 51 to 100, and 100 and worse, the compensation, on average,

20  in all of those tiers moved up during the course of the study

21  period, correct?

22  *A.*   I believe that's true.

23  *Q.*   They all --

24  *A.*   Should we look at Exhibit 17?

25  *Q.*   I think that -- that's fine.  They all -- they all moved in

2:15-cv-01045-RFB-PAL

1    the same -- you found, and it's in the record, that all of the

2    compensation in all of the fighter tiers moved -- moved in the

3    same direction during the class period, right?

4    A.   I have some recollection of that, yes.

5    Q.   Okay.  And in your opinion, as you told me in your

6    deposition, is that a -- the reason for that is that there was a

7    general increase in demand for fighter services that call --

8    that caused fighter pay in all of the different ranking

9    categories to move, correct?

10   A.   I -- I'm sure I said something like that.

11   Q.   Okay.  All right.  This is the last exhibit I want to show

12   you.

13          Does it all fit on this?  Is there a way that I can?

14       (Conferring with courtroom administrator.)

15          MR. CRAMER:  I am not technologically inclined.  Thank

16   you.

17          THE WITNESS:  That's perfect.

18       (Discussion held off the record.)

19   BY MR. CRAMER:

20   Q.   All right.  This is Exhibit 28 from your report, correct?

21   A.   Yes.

22   Q.   And this is your analysis of foreclosure share, or it's your

23   redone analysis of foreclosure share that you did in your

24   report, correct?

25   A.   It's a graph of shares.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  And it's foreclosure -- or it's shares of the ranked

2  relevant input market over time, correct?

3  *A.*  Yes.

4  *Q.*  Right, and it --

5  *A.*  And let me -- if we look at it across the bottom here, it's

6  Dr. Singer's revenue weighted, and then I think we're doing --

7  yeah, no revenue weights on the others.  So one's got revenue

8  weights, the other doesn't.

9  *Q.*  So you're comparing Dr. Singer -- the green line is

10  Dr. Singer's revenue weighted foreclosure share from his impact

11  regression, correct?

12  *A.*  Well, I can't remember if I was doing a comparison or if I

13  just put them all in the same graph, but keep going.

14  *Q.*  Well, the green -- you would agree with me that the green

15  line is Dr. Singer's revenue weighted foreclosure share line.

16  It says, "red Singer" --

17  *A.*  Yes.

18  *Q.*  Okay.

19  *A.*  Right.

20  *Q.*  And the darkest blue line is your measure of unweighted

21  fighters ranked 1 to 15, correct?

22  *A.*  Yes.

23  *Q.*  Okay.  And both of the lines, the green line and the

24  unweighted headliner line, start in or about 2005, close to the

25  same place.  Would you agree with me?

─2:15-cv-01045-RFB-PAL─

1  *A.*  Yeah.

2  *Q.*  And they end in or about 2017 in or about the same place,

3  correct?

4  *A.*  Yes.

5  *Q.*  So, mathematically, on average, they're moving up at the

6  same rate, correct?

7  *A.*  Yes, but Dr. Singer's regression has nothing to do with

8  that.

9  *Q.*  And if you look at the period for the headliner unweighted

10  between 2011 and 2012, here, there's about a 10 percent jump --

11  10 percentage point jump.  Isn't that right?

12  *A.*  Yeah.  There was a similar jump down before.  And, you know,

13  one thing that's interesting to note is that none of them --

14  none of those lines had -- and I'm just reading it off the graph

15  up there, I can see it from here -- none of those lines have

16  that surge in 2010.

17  *Q.*  Well, the Strikeforce acquisition was in March 2011,

18  correct?

19  *A.*  Well, but you don't see any surge in any -- within any of

20  these ranking categories associated with that.  What you do see

21  is a surge in the revenue weights that Dr. Singer uses to assign

22  to those people.  In fact, in the top ranked category there,

23  while the -- while his foreclosure share is skyrocketing to --

24  it's either going -- the top ranked category is either going

25  down or flat.

1  *Q.*  Would you agree with me that between 2010 and 2000- -- and

2  in the middle of 2014 they have grown the same amount, your

3  unweighted headliner and Dr. Singer's revenue weighted ranked

4  market?

5  **A.**  You've got to -- you got to go back.  Say that again.

6  *Q.*  That --

7          THE COURT:  So Mr. -- Mr. Cramer, the graphs speak for

8  themselves.

9          MR. CRAMER:  Okay.

10          THE COURT:  So we don't need to ask Dr. Topel to read

11  the graphs.  I can read the graphs.

12          MR. CRAMER:  Okay.

13  BY MR. CRAMER:

14  *Q.*  You would agree with me that -- that fighter rankings and

15  all of the categories moved up during the -- that the shares --

16          THE COURT:  Mr. Cramer --

17          MR. CRAMER:  Fair enough.

18          THE COURT:  I would agree with you because that's what

19  the graph says.

20          MR. CRAMER:  Excellent.

21          THE COURT:  Right?  He's not saying the graph is --

22          MR. CRAMER:  I don't need to have to point the obvious.

23  Your Honor wants me to move on.  I will complete my

24  cross-examination.  Thank you, Dr. Topel.  Thank you, Your

25  Honor.

—2:15-cv-01045-RFB-PAL—

1           THE COURT:  Okay.  Thank you, Doctor.

2           THE WITNESS:  May I step down?

3           THE COURT:  Yes, you may.

4           THE WITNESS:  Thank you.

5      (Witness excused.)

6           THE COURT:  Why don't we take a short recess and then

7      we'll bring Dr. Singer back over.  But before we do that,

8      Mr. Isaacson, and again, before we completely release Dr. Topel,

9      I'm not sure how we introduce these regressions without

10     Dr. Topel talking about them and explaining them in the context

11     of what was done.  And, so, the one thing, actually, as I think

12     about it, he may need to do that even for me to understand

13     whether or not I should admit them.

14           So, unless there's an objection to that, I can just ask

15     him -- I think he did it already -- just ask him to briefly

16     explain what was done.  And then I'll let you all argue about

17     whether or not it would appropriate for me to accept those

18     regressions.  Any opposition to that, just bringing him back

19     briefly for that purpose?

20           MR. ISAACSON:  Absolutely not, Your Honor.

21           THE COURT:  Okay.  Dr. Topel, I'm sorry.  I need you to

22     come back up here just for a few moments.

23           And do you have, Mr. Isaacson, a copy of the

24     regressions that you can give to Dr. Topel?

25           Hold on, Dr. Topel.  He needs to -- he needs to give

2:15-cv-01045-RFB-PAL

1  you a copy of -- of the new regressions.  And I'm just going to

2  ask you just to briefly explain them in terms of what -- what

3  was done.

4      (Defense counsel conferring with Dr. Topel.)

5      (Counsel conferring.)

6      (Witness retakes the stand.)

7          THE COURT:  Okay.  So, Dr. Topel, have you been

8  provided with the -- the new regressions?  Dr. Topel?

9          THE WITNESS:  Yes.  I'm sorry.

10          THE COURT:  Okay.  And, Mr. Isaacson, what I'm going to

11  ask you to do, just so we're all clear, is if you could put them

12  up on the -- the ELMO just when we're talking about them -- oh,

13  you don't have your own copy because I'm going to want --

14          MR. ISAACSON:  He has the only copy.

15          THE COURT:  He has the only copy.  Okay.  That's all

16  right.  Well, go ahead.  Dr. Topel, if you don't mind letting

17  him use that copy.  You'll be able to see it on the screen.

18          THE WITNESS:  Yeah, you do that.

19      (Counsel conferring.)

20          THE COURT:  That's all right.  It's going to be up on

21  the ELMO anyway.  So, that's fine.  Because what I'm going to do

22  is I'm still going -- I'm going to mark them as -- as court

23  exhibits, not to be admitted necessarily, but just so -- for

24  clarification as to what they are.  So let's start with

25  Defendant's Exhibit -- marked as Defendant's Exhibit 1.

1          You might have to -- there you go.  So this will be

2   marked as Defendant's Exhibit 1.

3       (Defendant's Exhibit 1 is marked.)

4          THE COURT:  And, Dr. Topel, can you describe to me what

5   it is that was run here?

6          MR. ISAACSON:  Just for, Your Honor, this corresponds

7   to the first regression on page 3 in the letter.

8          THE COURT:  Okay.  Thank you.

9          THE WITNESS:  Yes.  This is -- to preface this, when

10  Dr. Singer testified, up until now I had understood his position

11  to be that Strikeforce -- preacquisition Strikeforce had to

12  be -- had to be in.  And when he presented his model, it was

13  preacquisition Strikeforce is out, but he's using his

14  weighted --

15         THE COURT:  I'm sorry.  So preacquisition Strikeforce

16  bouts to be used in his impact regression.  Is that what

17  you're --

18         THE WITNESS:  They were in his impact regressions.

19  And, for example, as I understand it, the first several reports

20  in the body of the reports the -- any runs he had that did not

21  have preacquisition Strikeforce were not in the body of the

22  reports, but they are in the backup materials somewhere.

23         THE COURT:  Okay.  So what this regression is, is if

24  you remove the preacquisition Strikeforce bouts during the class

25  period, right, that's what this regression is?

1           THE WITNESS:  Uh, I think it's just removed the

2  preacquisition Strikeforce bouts based on, I assume, his finding

3  that their compensation was not affected by the --

4           THE COURT:  Well, okay.  Well, there could -- because

5  they're using multiple regressions, I'm trying to understand

6  what you did here.  So you used -- this chart is supposed to be

7  a regression on the dependent variable being wage share and all

8  that you did is remove the preacquisition Strikeforce bouts.  Is

9  that right?

10          THE WITNESS:  Yes.  In one of his submissions

11  Dr. Singer offered this with preacquisition Strikeforce --

12          THE COURT:  Well, okay.  Let's not talk about what he

13  did.

14          THE WITNESS:  Okay.

15          THE COURT:  I am only concerned about what you did.

16          THE WITNESS:  We took preacquisition Strikeforce out of

17  some regressions that Dr. Singer had submitted in a previous

18  report, and this is the result.

19          THE COURT:  Which regressions are you running again?

20  Because he ran a few different regressions.  So, I just want to

21  be clear.  So this -- this is his wage share regression, impact

22  regression, that he ran that was referenced I guess it was on --

23  there's a chart of it on page 125 I think of his report, and all

24  you did was take out the preacquisition Strikeforce bouts.

25          THE WITNESS:  I don't know if it's 125 of his report.

─2:15-cv-01045-RFB-PAL─

 1  The -- it's 10 regressions.

 2          MR. ISAACSON:  Your Honor, page 2 of the letter

 3  explains -- is part of the background of this regression, that

 4  these are called strata -- or strata regressions that have

 5  been -- that are parts of the report.

 6          THE COURT:  Which parts of the report?

 7          MR. ISAACSON:  So, on page 2 of the letter --

 8          THE COURT:  No, I understand that.

 9          MR. ISAACSON:  Okay.

10          THE COURT:  I'm saying --

11          MR. ISAACSON:  That's where --

12          THE COURT:  That's where the reference is --

13          MR. ISAACSON:  So what -- it was explained in the

14  letter with citations to the reports.

15          THE COURT:  Hold on.  Let me -- okay.  Let me go back

16  again and pull the letter up again.

17      (Pause.)

18          THE COURT:  Okay.

19          MR. ISAACSON:  This is the discussion of alternatives

20  to revenue weights.

21          THE COURT:  Right.

22          Did you run this regression, taking out the

23  pre-Strikeforce bouts for the regression that he ran on sort of

24  the impact -- not the stratified regression, from 125.  Did you

25  run that?

———2:15-cv-01045-RFB-PAL———

1            THE WITNESS:  125?

2            THE COURT:  So, I'll show you -- well, we don't have to

3    show you.  Because I'm not sure -- I'm not sure why this is

4    helpful, but we'll figure that out, because I'm not sure that in

5    the context of what I looked at this is something that would

6    be -- would necessarily be dispositive one way or the other.

7    But okay.  So this is in response to these stratified

8    regressions that were run.

9            MR. ISAACSON:  Right.  You had asked, Your Honor, if

10   Dr. Topel had done any alternative weighting, and he had done in

11   his reports an alternative weighting to revenue weighting.

12           THE COURT:  Right.

13           MR. ISAACSON:  And he had done these regressions where

14   he stratified the fighters into groups.  And -- so, page 2 just

15   describes the sequence that went back and forth between

16   Dr. Topel and Dr. Singer on this.  All -- everything on -- from

17   Dr. Topel and Dr. Singer, on page 2, is in the record and in the

18   reports.

19           THE COURT:  Got it.

20           MR. ISAACSON:  All right.  And the -- as it concludes

21   that all that happens is in the new -- Dr. Topel just takes the

22   last regression of Dr. Singer and makes the adjustment that's

23   reflected on page 3.

24           THE COURT:  Right.  Okay.  So, let me make sure I

25   understand this.  Dr. Topel, based upon these regression

—2:15-cv-01045-RFB-PAL—

1  findings, are you saying that for the -- for the -- for the

2  coefficients that are statistically significant, that they have

3  a positive impact on wage share?  Because that's what it looks

4  like they're saying, which is kind of hard for me to understand.

5          THE WITNESS:  Well, it's --

6          THE COURT:  You're saying that the increased wage share

7  had a positive -- increased foreclosure share had a positive

8  impact on the wage share?

9          THE WITNESS:  Let me be clear.  Dr. Singer ran these

10  regressions with preacquisition Strikeforce and --

11          THE COURT:  Okay.  No, no, no.  But I'm asking you to

12  tell me what these means, because if you look at these, right,

13  they look like they say, for wage share, as foreclosure share

14  increases, right, the wage share increases.

15          THE WITNESS:  It's his regression.

16          THE COURT:  No.  But you -- this is your regression,

17  right?

18          THE WITNESS:  I dropped preacquisition Strikeforce the

19  way he did for the model that he's used here in court.

20          THE COURT:  So you're saying your report, based upon

21  his regression, would find that as wage -- as foreclosure share

22  has a positive relationship to wage share, because that's an

23  interesting finding.

24          THE WITNESS:  Your Honor, remember what the -- the

25  fundamental opinion I offered is, that this approach is

1  misguided.  It's unreliable.  And when you drop the observations

2  from preacquisition Strikeforce, as Dr. Singer did --

3          THE COURT:  Yes, but your model's predicting.

4          THE WITNESS:  It's not predicting.  It's an

5  association.  I'm not saying there's causality here.

6          THE COURT:  But there's strong correlation.

7          THE WITNESS:  I said there was no causality in his

8  regression.

9          THE COURT:  Yeah, but --

10          THE WITNESS:  I'm saying you can't find a negative --

11          THE COURT:  Dr. Topel, the purpose of finding

12  coefficients to be statistically significant is exactly to argue

13  that there is some correlation or causation.  Otherwise, there

14  would be no point to them.

15          THE WITNESS:  Whoa.  Whoa.  Whoa.

16          THE COURT:  But -- so my point is, your regression is

17  saying that in these -- for example, for certain of these

18  classes, these stratified classes, there would be -- there would

19  be an increase.  Now, in some respects, it's not inconsistent

20  with what Dr. Singer said because for the 1 to 15, those are

21  actually people who actually were outliers in the model that he

22  used.  But for these other -- for these other ranked foreclosure

23  share fighters, it looks like there's a positive relationship,

24  at least for some of them.  So, I just want to be clear that's

25  what the model says.

1          THE WITNESS:  Remember what -- in your phrase you had a

2   very -- in your statement you had a very important conditioning

3   phrase.  You said "causation or correlation."  And one of the

4   most famous phrases in statistics is that correlation is not

5   causation.  And there's a correlation.  After he's removed all

6   of these other sources of variation, there's a correlation and

7   it turns out it's positive.  That's -- I can't do anything about

8   it.

9          THE COURT:  No, I'm not saying you can.  I'm just

10  saying that's -- that's what the model, based upon what -- the

11  regressions you ran, is saying, there's a positive correlation.

12         THE WITNESS:  The residual correlation between these

13  shares and the wage share after removing Strikeforce is a

14  negative.

15         THE COURT:  Okay.

16         THE WITNESS:  In some places it's positive.

17         THE COURT:  Well, on yours, it's all positive, though,

18  right?

19         THE WITNESS:  Well, no, I -- in some places it's even

20  got some statistical significance --

21         THE COURT:  Right.

22         THE WITNESS:  -- under the assumptions of calculating

23  significance.

24         THE COURT:  Okay.  All right.  Then let's move onto the

25  next one, Mr. Isaacson.

2:15-cv-01045-RFB-PAL

1          MR. ISAACSON:  That would be Exhibit 2.

2          This is the second regression discussed on page 3 of

3     the letter.

4          THE WITNESS:  Yeah.

5          THE COURT:  And what is this regression purporting to

6     do?

7          THE WITNESS:  You and I had an exchange yesterday about

8     if you have a variable that is constant within a year.  And I

9     said if you have year effects in the regression, you can't

10    estimate an effect of that variable because it's perfectly

11    colinear with the year effects.  And you seemed to want to see

12    what the effect of that variable could be.  And I said, well, I

13    can't show it to you because the computer won't take it.  But

14    the computer will take it if I take out the year effects.  So I

15    removed the year effects and put this thing that's constant

16    within a year, which is promotional expenses per event.  And

17    it -- it's --

18         THE COURT:  Did you run it -- what other variables did

19    you run it with?

20         THE WITNESS:  Everything -- nothing changed except I

21    took out the year effects and put this in.  And this is on

22    the -- also the -- the removing the Strikeforce data.

23         THE COURT:  Okay.

24         THE WITNESS:  All right?

25         THE COURT:  Uh-hmm.

─2:15-cv-01045-RFB-PAL─

1           THE WITNESS:  And you can see that the sign -- you were

2    wondering about the sign of that or the effect of that

3    promotional expenditure per event.  When that's put in there,

4    it's got a negative coefficient which is kind of what you'd

5    expect because that affects revenue that's in the denominator of

6    the left-hand side, but --

7           THE COURT:  But not substantially, though, right?  I

8    mean, you're talking about .003.

9           THE WITNESS:  Well, it's in millions and, so, you got

10   to multiply it out by the appropriate amount.

11          THE COURT:  No.  That's true, but I'm saying that's why

12   I would wanted to look at the other coefficients, too, to see

13   how it might affect.

14          THE WITNESS:  Yeah.  Yeah.  Yeah.  But the only point

15   is we put it in, there it is, and then the foreclosure share in

16   those regressions, and these are --

17          THE COURT:  It's not statistically significant.

18          THE WITNESS:  Yeah.

19          THE COURT:  Okay.  All right.  Then the last one.

20          Bless you.

21          This will be Defendant's Exhibit 3.

22          THE WITNESS:  Yeah, I got to look up my discussion

23   here.

24          THE COURT:  Okay.  This is a just different way of ...

25          THE WITNESS:  I can't ...

———2:15-cv-01045-RFB-PAL———

1              Yeah, these are just the unweighted foreclosure share

2    without preacquisition Strikeforce.

3              THE COURT:  Right.  Now, all of these are regressed on

4    wage share and not absolute wages.  Is that right?

5              THE WITNESS:  Wage share.

6              THE COURT:  Okay.

7              THE WITNESS:  And we had had stuff before saying that,

8    you know, if you drop Strikeforce and you don't have -- and

9    you -- and you don't weight, then you get these results.  And

10   this is just including the log -- the event costs or the net

11   event costs after fighter compensation in the regression.

12             THE COURT:  Okay.

13             THE WITNESS:  Okay?

14             THE COURT:  All right.  Thank you, Dr. Topel.

15             THE WITNESS:  Thank you.  Now can I step down?

16             THE COURT:  Now you can step down.

17             THE WITNESS:  Okay.

18       (Witness excused.)

19             THE COURT:  So what we're going to do is take a little

20   break right now and then we'll come back.  And I'm sure that the

21   parties will want to talk about their regressions.  I will think

22   about them, too.  We'll take about a 15-minute break, and then

23   we'll come back and talk about the regressions.  And we'll,

24   after that, have Dr. Singer come back on the witness stand.  So

25   we'll be in recess for a few -- 15 minutes or so.

─────2:15-cv-01045-RFB-PAL─────

 1      (Recess taken at 10:47 a.m.)

 2      (Resumed at 11:08 a.m.)

 3           THE COURT:  Please be seated.

 4           All right.  We're back on -- sorry.

 5           We're back on the record here in this case.  So,

 6  Mr. Isaacson, few questions for you.  And, again, I want to make

 7  sure as I'm understanding as relates to these new regressions.

 8           MR. ISAACSON:  I would like to make one correction for

 9  the record, though, an error we made.  I misnumbered the

10  exhibits.  So, his testimony is all right.  He doesn't have to

11  change any of his testimony.

12           THE COURT:  I'm sure Dr. Topel is happy to hear that.

13           MR. ISAACSON:  He did -- right.  But when he was

14  testifying about number 2, that was number 3 in the letter, and

15  vice versa.

16           THE COURT:  Okay.

17           MR. ISAACSON:  So -- and -- so, but he correctly

18  explained the regressions in front of him.

19           THE COURT:  Okay.

20           MR. ISAACSON:  I misstated the relationship to the

21  letter.

22           THE COURT:  Okay.  So you -- you were the problem is

23  what you're saying?

24           MR. ISAACSON:  Yes.  Yes.  100 percent.

25           THE COURT:  Okay.  So one of the questions I have for

1  you, Mr. Isaacson, and it's simple, which is that it's not

2  clear to me necessarily that a variable being statistically

3  significant or not knocks out the model at class certification.

4  And we should have a little bit of that conversation because the

5  standard is -- is certainly -- there is some disagreement about

6  what the standard is.

7       But is it your position that the fact that a variable

8  isn't potentially statistically significant as run by one of the

9  experts, that that's sufficient for me not to accept the

10  plaintiffs' model?

11       MR. ISAACSON:  That -- that sentence alone, no, we have

12  not stated that.  It depends --

13       THE COURT:  Okay.

14       MR. ISAACSON:  -- it depends on context and what we're

15  talking about.

16       THE COURT:  So, as I understand it, the purpose,

17  potentially, for the use of these regressions might be to -- and

18  I'm focusing on the new regressions in particular.  It doesn't

19  seem to me that they're fundamentally helpful in the context of

20  the standard that I have to apply, which relates to whether or

21  not I would find the modelling so flawed that the case couldn't

22  proceed, either from a persuasive or a reasonable juror

23  standard, whatever it is.

24       And, so, I wanted just to clarify with you what your

25  argument would be regarding the standard.  Because it seems to

1   me the use of these potential regressions really goes back to

2   some of the more foundational critiques that Dr. Topel raised,

3   which were in his testimony before the new regressions were run.

4   So it's not clear to me that they add anything substantively to

5   what he's already done and said.

6        He talked about, in his report there was that paragraph

7   you all referenced, about the issue of the fixed-year effects

8   and how they might impact or not the foreclosure share, which

9   is -- that -- I don't remember the exact paragraph number, but

10  about the rates.  So, he raises these critiques in his reports.

11  And, so, it's not clear to me that they add something

12  fundamentally new.  Maybe you can help me understand what they

13  add, because they're consistent with some of the critiques he's

14  raised.  He did them substantively previous to that.  They're

15  consistent with some of the foundational critiques he had of

16  Dr. Singer's modelling.  So I don't know what they add to my

17  analysis here.

18        MR. ISAACSON:  So, I would agree that the fundamentals

19  have been presented in the record and in the reports.  What

20  these add, which would be incremental as opposed to fundamental,

21  is, Your Honor, and I'll separate out the one that -- where we

22  never had the opportunity to respond.  But the ...

23        With regards to these regressions, what they add is

24  after Dr. Topel makes his fundamental critiques, sometimes the

25  Court asks, well, if you include that in the regression, what

—2:15-cv-01045-RFB-PAL—

1   happens.  These regressions confirm that when you -- not -- as

2   Dr. Topel is explaining, not that a good regression has now been

3   produced that shows no harm, but that once you apply this

4   critique, you get this meaningless result from the -- from the

5   regression.

6          THE COURT:  Right.  Well -- and, so, I appreciate that.

7          MR. ISAACSON:  It's incremental and answers that

8   question.  That's what they do.

9          THE COURT:  And I appreciate that because again,

10  Mr. Isaacson, I don't think the standard here is going to turn

11  on, or should turn on, different models that produce different

12  statistical significance for the variables because of the

13  different choices that can be made with respect to variables,

14  which are not about a flaw in the overall sort of process of how

15  the regression was run, but are about discretionary judgment

16  calls that the experts make.

17         MR. ISAACSON:  And I --

18         THE COURT:  And, so, to me, there can be, and I think

19  you all have tried to point out, some potential judgment that

20  may be so significant that they render the model flawed, and I'm

21  not saying one way or another whether or not I accept them, but

22  these new regressions don't seem to speak to that point.  And

23  I'm not inclined to -- to consider them not because I think that

24  they aren't consistent with the argument.  I think they are, but

25  they don't add enough that it would -- that would then warrant,

 1  which I think I might feel obligated to do, the plaintiffs being

 2  allowed to run sort of counter-regressions or talk about it.

 3       And that's why I wanted to ask you about it because

 4  it -- it seems to me that they're consistent with what are the

 5  critiques that have been made about the choice of the revenue

 6  weighting or not and how that might impact the modelling by

 7  Dr. Singer and also consistent with the critique that -- as it

 8  relates to the choice of which bouts to include, how that might

 9  impact, and particularly as relates to the fixed-year effects,

10  the foreclosure share -- foreclosure share's impact on the wage

11  share.  But those were things that were raised previously.

12       MR. ISAACSON:  So, these are not advanced to have a

13  debate about judgment calls.  These are just advanced to say, if

14  the question's asked, if you take into account this fundamental

15  critique and incorporate it into the regression, do the

16  plaintiffs still have a good result?  And the answer is no.

17       THE COURT:  Well, the answer's no for your expert, and

18  I suspect that the answer would be yes for their expert.

19       MR. ISAACSON:  Well --

20       THE COURT:  And the reason why I'm saying that to you

21  is that the going back and forth with statisticians about making

22  variables statistically significant, that could be an endless

23  process with people tinkering as to how to rework the variables.

24  And that's why I asked you about the fundamental standard

25  because I don't think, even if they both come up with different

—2:15-cv-01045-RFB-PAL—

1  results, that that means that the model is flawed.  It could be

2  flawed.  It could not be flawed.  But it wouldn't turn on both

3  of these experts running regressions where one finds a variable

4  to be statistically significant and another doesn't.  That, to

5  me, is not the standard, and I think you agree with that.

6        MR. ISAACSON:  I essentially agree with that.  It's a

7  -- but it's -- you know, it's a

8  what's-good-for-the-goose-is-good-for-the-gander issue, is that

9  this is -- work is done so that Dr. Singer can't get on the

10 stand and say, even when you take this into account, the

11 regressions all turn out wonderfully.

12        THE COURT:  Well, he can say that because he can say I

13 ran them differently.  I mean, and that's the issue for the

14 Court, right?  And the other issue is, to what extent -- and

15 I'll ask you this question -- under the standard you propose the

16 Court should be making credibility findings about the expert's

17 testimony.  Because in addition to the modelling, there has

18 certainly been challenges to the actual credibility of the

19 experts as it relates to their statements and what they mean,

20 for both -- you both have crossed these experts and challenged

21 them on some of their statements.

22        And what is your position about sort of whether or not

23 the Court, at this stage, should be making credibility

24 determinations with respect to the testimony?

25        MR. ISAACSON:  I think you had -- you look at the whole

—2:15-cv-01045-RFB-PAL—

 1  evidence.  So, you had -- as I said from the -- as we discussed
 2  I think at the beginning of this hearing, the standard is
 3  whether the plaintiffs are -- after a rigorous analysis, whether
 4  the plaintiffs are presenting a persuasive case and that takes
 5  into account the defense evidence.  So, I'm not aware of --
 6          THE COURT:  I mean -- I mean, from a personal
 7  credibility standpoint from witnesses.  So, in other words, is
 8  it the Court's role here just to evaluate the modelling and look
 9  at the testimony in the context of the explanation of that
10  modelling, or, as you know, in other types of evidentiary
11  settings, the Court makes -- can make broader credibility
12  determinations as it relates to experts or witnesses, or whoever
13  appears before the Court.  And I'm not sure if you're saying
14  that there's some distinction here between this evidentiary
15  hearing and other evidentiary hearings in the context of a class
16  certification or not.
17          MR. ISAACSON:  Well, I don't think anyone has called
18  Dr. Singer a liar or Dr. Topel a liar.  And --
19          THE COURT:  No.
20          MR. ISAACSON:  And, so, I don't think it's -- that's --
21  that's not what's going on here.
22          THE COURT:  No.  I don't think it's that.  But I do
23  think there have been arguments made by both sides about whether
24  or not the respective experts are taking certain liberties with
25  certain types of modelling principles and certain economic

———2:15-cv-01045-RFB-PAL———

1   principles.  And I think both of you have challenged whether or

2   not the variables are appropriately normed to economic

3   principles as it relates to monopsony in particular.

4         And, so, in that area, I do think that you have

5   challenged -- both of you, in different ways -- the credibility

6   of the experts to the extent that they may have emphasized

7   certain principles over others or certain types of approaches

8   over others in that context, and that's what I mean.

9         MR. ISAACSON:  I don't think of that as principally a

10  credibility issue.

11        THE COURT:  Okay.  That's fine.

12        MR. ISAACSON:  If a model is not geared to fundamental

13  economics, the model should be rejected.  And, you know, I would

14  guess, you know, secondarily someone could call that a

15  credibility issue, but the primary part of it is whether the

16  model is economically flawed or based on principles of economics

17  which are incorrect.

18        THE COURT:  Well, no, and I'm not saying that because I

19  -- I have to because they're econometricians, I have to rely

20  upon them, and have relied upon them, to elaborate what are the

21  relevant economic principles.  And so I have to start with that

22  because I don't start with any foundational or sort of

23  judicially-noticed economic policy, right?  I start with the

24  fact that they have to give me what they understand to be the

25  principles related to the exercise of monopsony power, how you

1  would capture that, what would be evidence of that, and I've

2  relied upon both of them -- or I will -- both of their

3  testimony, to come up with what the principles that are relevant

4  are in this context.

5         And while they've given, I think, fairly similar

6  definitions, there have been nuanced differences that I think

7  are still significant in the context of the modelling.  And, so,

8  that's why I wanted just to ask you a little bit about that

9  because that also goes back to the issue of these regressions,

10  honestly, because I don't think that I'm going to include them,

11  not because I think that they aren't responsive necessarily to

12  what the Court had asked, but because I think that they're --

13  they're essentially duplicative of what's already in front of me

14  in terms of the critiques that have been raised by the

15  defendants.  I don't see anything new in what's raised here as

16  it relates to the critique of the modelling by Dr. Singer.

17         And, so, I mean, we'll see what the rebuttal testimony

18  is, but at this point in time I am not inclined to accept them,

19  again, not on timeliness grounds for now, but on the -- on the

20  ground that at this point I think they are not even -- I mean,

21  potentially marginally helpful, but not necessarily helpful in

22  what's already been before me, so --

23         MR. ISAACSON:  All right.  Understood, Your Honor.

24         Then with respect to our objection to Dr. Singer's

25  regression in his last report, which we made in our -- when we

1  summarized this for the Court in the letter August 7th before

2  this hearing, which is Docket No. 705, we reiterated this -- we

3  gave a chronology -- the Court had asked for a chronology of how

4  this issue had been --

5        THE COURT:  Right.

6        MR. ISAACSON:  -- and we gave the chronology and

7  reiterated that we objected based on the joint motion to the new

8  regressions that were in his last report.  And the joint motion,

9  which was so ordered by the Court in Docket No. 628, the joint

10  motion is Docket 545, expressly says, in paragraph 5, that with

11  respect to Dr. Singer's last report, he will not include -- I

12  quote, will not include any new regressions.

13        And, so, the -- the new regressions there that we were

14  responding to which the Court doesn't find helpful for us to

15  respond to, we think should be precluded.  And you don't have to

16  decide that right now, but --

17        THE COURT:  Well, I want to -- I'm going to pull up

18  the -- again, the portions of the report that you think, if I'm

19  not accepting these regressions, shouldn't be included just so

20  that we're clear, and also Dr. Singer can be clear about what he

21  can and cannot testify about.

22        Let's go to the -- let me see if I can pull up ...

23        Just so we're clear, Mr. Isaacson, maybe you or your

24  team can point me to which exhibit.

25        MR. ISAACSON:  They're outlined -- they're detailed

—2:15-cv-01045-RFB-PAL—

 1   actually in the letter of August 7th.

 2            THE COURT:  I'm looking.

 3            MR. ISAACSON:  So -- so, this is Dr. Singer's fourth

 4   report, which is ECF 554 -- well, that's probably an attachment

 5   to a large brief, but it's a May 28th.  It's his fourth report

 6   or --

 7            THE COURT:  And I'm going to want to find that so

 8   that's why I'm saying --

 9            MR. ISAACSON:  Yeah.  Singer's Second Supplemental

10   Report.

11            THE COURT:  Do we have the --

12            MR. ISAACSON:  Exhibit 86 in this hearing.

13            THE COURT:  Hold on.

14            MR. ISAACSON:  Or ... maybe -- no.  Maybe that's not to

15   this hearing.

16            THE COURT:  Yeah.  No, no.  It's 5- -- Document 554,

17   Exhibit 3?

18            MR. ISAACSON:  Yes.

19            THE COURT:  Okay.

20            MR. ISAACSON:  And the --

21            THE COURT:  I think -- well, it doesn't -- this has

22   been filed under seal.  Sorry.

23            MR. ISAACSON:  And the three new regressions are Table

24   A1.

25            THE COURT:  Where is the sealed reply response?

2:15-cv-01045-RFB-PAL

1          Oh, here we go.

2          I'm sorry, the three new regressions are?

3          MR. ISAACSON:  Table A1 of that report.

4          THE COURT:  I'm just trying to pull up the sealed

5   document.  Because this was -- this was sealed then, this

6   portion of it?

7          MR. ISAACSON:  I suspect so.  I don't have that in

8   front of me, but ...

9          If you want the exhibit number, if that's more helpful

10  to pull up --

11         THE COURT:  That might be.

12         MR. ISAACSON:  It's JCCX 78.

13         THE COURT:  And in terms of the exhibits that were

14  submitted to the Court?

15         MR. ISAACSON:  Right.  So that's a joint exhibit.

16         THE COURT:  Right.  JCCX -- I'm sorry, what number?

17         MR. ISAACSON:  78.

18         THE COURT:  There we go.

19         And which table?

20         MR. ISAACSON:  A -- A1.

21     (Pause.)

22         THE COURT:  And, so, the idea of these regressions

23  would be in direct response to these particular regressions in

24  Table A1?

25         MR. ISAACSON:  Yes.  So, again, the joint motion, which

──2:15-cv-01045-RFB-PAL──

1  was so ordered by the Court, said that in his report, quote, he

2  will not include any new regressions.

3          THE COURT:  Right.

4          MR. ISAACSON:  Those are regressions.

5          THE COURT:  Mr. Cramer.

6          MR. CRAMER:  Your Honor, these are not new regressions.

7  What happened was, just to play out what -- how this happened,

8  Dr. Topel complained that if you control for promotional

9  spending -- that you had to control for promotional spending.

10 So Dr. Singer put in a variable to control for promotional

11 spending.  Dr. Topel responded and said, that's not good enough.

12 You have to control for all non-fighter event costs.  And he

13 runs a regression.

14         The report we're talking about is responding to

15 Dr. Topel's all-fighter -- all non-fighter event costs, right,

16 and all Dr. Singer is --

17         THE COURT:  She's saying you have to get in front of

18 the microphone.

19         MR. CRAMER:  Yeah.  All Dr. Singer is doing in that is

20 pointing out a simple error made by Dr. Topel, in his

21 regression, all --

22         THE COURT:  So let me ask you this question,

23 Mr. Cramer.

24         MR. CRAMER:  Yeah.

25         THE COURT:  I've asked Dr. Topel about his regressions.

———2:15-cv-01045-RFB-PAL———

1  They seem to try to run counter to these regressions.  And as I

2  said to Mr. Isaacson, the fact that he may have different

3  significance for these variables is not really going to, from my

4  standpoint, be dispositive of the issue before the Court.  And,

5  so, to the extent that I were to accept the regressions as

6  different regression analysis of these same variables, I could

7  accept them.  I don't know that they really -- that they -- they

8  move the needle at all.  I don't think they require, honestly,

9  any rebuttal regressions because -- and in looking at this chart

10  again, the chart is its own rebuttal to the regressions that he

11  ran.

12        So, I don't know that you would need to have Dr. Singer

13  rerun the regressions.  Dr. Singer's run regressions that show

14  statistical significance for the variables, including what he

15  thought Dr. Topel ran, and Dr. Topel's run different

16  regressions.  Not surprisingly, they have reached different

17  results.

18        So, let's assume for the moment, if I were to accept

19  these regressions, why would there be a need even to rerun

20  additional regressions?

21        MR. CRAMER:  We don't want to rerun additional

22  regressions.

23        THE COURT:  Okay.  So what I'm saying, even if I

24  accepted these regressions as some attempt as a counterpoint to

25  these, these regressions in this case will speak for themselves,

1    right.  So I don't know that I would need to look elsewhere.

2    They, in fact, in looking at them again now, match up fairly

3    directly as a rebuttal to what Dr. Topel ran, and you all could

4    argue to me why one would be more significant than the other.

5    But I don't -- now that I look at, again, this table, I mean, I

6    could accept the regressions.  I don't know that it changes

7    anything.  But in just a sense of fairness, I could accept them

8    and then look at the different models.

9         So, I'm saying that to you because I may just accept

10   them, but I don't know that, again, looking at the model, that

11   it changes anything.

12        MR. CRAMER:  Your Honor, we agree with you on the

13   standard.

14        THE COURT:  Okay.

15        MR. CRAMER:  Let me just say there are three different

16   things that my opponent wants to put in.  One responds to the

17   regression that you're looking at the table for, right?  They

18   say, this is a new -- this is semantic discussion about whether

19   that is a new regression or we're just pointing out that

20   Dr. Topel's regression, if you did make a simple error by

21   excluding partial data, it works, right?  We just say you

22   just -- all we did was take Dr. Topel's regression, the one he

23   ran, and said, if you didn't make this mistake, the whole model

24   works perfectly.  Right?  That's the only thing we did.  We

25   don't consider that a new regression.  All we were doing -- all

—2:15-cv-01045-RFB-PAL—

1  we were doing was just -- just rerunning Dr. -- just presenting

2  Dr. Topel's regression.

3          THE COURT:  Right.

4          MR. CRAMER:  The agreement was that we wouldn't run

5  some new regression with a new variable.  We did not do that.

6          THE COURT:  So you're talking about the stratified

7  regressions as being new?

8          MR. CRAMER:  All of the things that Mr. Isaacson wants

9  to put in now are new.  Right?  We -- this report was in May

10  2018.  The first we heard of any potential objection to the

11  table you're looking -- Your Honor's looking at, A1, was in July

12  of 2019 as we were heading towards this hearing.

13          THE COURT:  Right.  But my question to you is this,

14  Mr. Cramer.

15          MR. CRAMER:  Yeah.

16          THE COURT:  Assuming for the moment I accept that

17  they -- they run what they run.  My decision is not going to be

18  based upon a finding that they have improperly run regressions.

19  I don't think, honestly, there's been any support for the idea

20  that Dr. Topel or Dr. Singer improperly ran the regressions.

21  Right?  This is about the choice of the information that went

22  into the regressions and whether or not the choice of the

23  variables is reasonable.

24          And I'm saying that to you to say, I can accept these

25  regressions.  They're not going to change that part of the

---2:15-cv-01045-RFB-PAL---

 1  Court's inquiry.  They don't, from my standpoint, add anything

 2  along those lines because they're consistent with Dr. Topel's

 3  critiques.  And, so, to the extent that I would consider them, I

 4  would consider them as it relates to, I guess, a -- sort of a

 5  natural extension of an argument that the defendants have made,

 6  but as I've said, now a few times, finding statistical

 7  significance between -- or a difference of a finding of

 8  statistical significance between two experts is what I would

 9  expect, right?

10          MR. CRAMER:  Your --

11          THE COURT:  Honestly.  I'm not saying that's what you

12  pay experts to do, but that's what I would expect.  I wouldn't

13  expect that Dr. Topel would have come back and said, I

14  completely agree with Dr. Singer that all of these variables are

15  statistically significant because that would be the end of the

16  case for the defendants.

17          So, all of that is to say this:  Based upon this,

18  Mr. Cramer, I'm inclined to allow for the regressions to be

19  included just for completeness, but -- but to the extent that I

20  would think that they would have anything more than a -- again,

21  a marginal sort of impact, then I would let you come back and

22  run a regression.  But I don't think that they have anything

23  more than that.  I mean, just so the record is clear, I mean I

24  guess I could include them, but I don't know that I have

25  anything more.

 1            MR. CRAMER:  Your Honor, I appreciate that.  I just
 2    want to draw a distinction.  There are two groups of new things
 3    that Zuffa wants to put in.  One new thing responds to Table A1
 4    that Your Honor is looking at.  They say it's a new regression.
 5    We say it's the same old regression.  Right?  So that's one.
 6            The other set of regressions, two sets that they want
 7    to put in, are completely new.  They have no argument as to why
 8    they're new.  They respond to a regression in Dr. Singer's April
 9    2018 report to which Topel already had an opportunity to
10    respond in writing.
11            THE COURT:  So which regression are you talking about?
12            MR. CRAMER:  So -- Your Honor, let me grab the
13    exhibits.
14            So, Mr. Isaacson referred to Exhibits 1 and 3, though I
15    think they --
16            MR. ISAACSON:  And then I misnumbered them to make your
17    life more difficult.
18            MR. CRAMER:  So 2 and 3 were ...  Well, I'm just going
19    to take them in the order --
20            THE COURT:  We need the title of the regression.  That
21    may help.
22            MR. CRAMER:  Okay.  Table -- the first one is Table A3
23    in Dr. Singer's April 3rd, 2018, report with preacquisition
24    Strikeforce bouts removed.  This, Dr. Topel had a full and
25    complete opportunity to respond to in a report.  This argument

—2:15-cv-01045-RFB-PAL—

1   that Mr. Isaacson is making again doesn't refer to the

2   regression on Exhibit 1.  There is no explanation as to why, a

3   year and a half later, at the --

4          THE COURT:  Okay.

5          MR. CRAMER:  Okay.  So, that's the first one.  The --

6   just going -- the next one, Table A2 in Dr. Singer's April 3,

7   2018, report, again, if you look at the notes, Your Honor looks

8   at the notes at the bottom, it responds to Singer's April 3rd,

9   2018, report.  Again, Dr. Topel had a full and complete ability

10  to respond to that regression.  So whatever they shot over to us

11  last night, as this hearing with Dr. Singer and Topel is about

12  to end, not only have they already had an opportunity to

13  respond, they've had our stuff for a year and a half.

14         THE COURT:  So what I'm -- so --

15         MR. CRAMER:  So the only -- let me just finish.

16  Your Honor, the only one to which Mr. Isaacson's argument

17  applies is 3, and if Your Honor accepts that what -- Table A1 in

18  our last report is a new regression rather than essentially

19  rerunning the same or just pointing out the same regression,

20  then the only one that should come in is the one that responds

21  to the May 28, 2018, report because Zuffa says they never got an

22  opportunity to respond.

23         Now, of course, it's plaintiffs' motion.  The way this

24  works typically is plaintiffs get the last word.  But this -- if

25  Your Honor is going to, for fairness sake, admit a regression,

2:15-cv-01045-RFB-PAL

1  it would be this one.

2          THE COURT:  Okay.

3          MR. CRAMER:  Thank you.

4          THE COURT:  All right.  Mr. Isaacson, any final

5  comments?

6          MR. ISAACSON:  I compliment you.  Despite my

7  misnumbering of the exhibits, he's categorized them correctly

8  even though I don't agree with all of the arguments.

9          The Table A1 of the last report is a new regression.

10 It's explicitly against an order of the Court and, so, I think

11 it should be dis- -- disallowed.

12         THE COURT:  Okay.  So if I allow for the

13 counter-regression, Mr. Cramer's talking about the other two.

14         MR. ISAACSON:  You should either -- in the first

15 instance, you should disallow.  It in the second instance, if

16 you don't do that, you should permit both of them, yes.

17         THE COURT:  Okay.  So, all right.  Fine.  Let me hear

18 from Dr. -- so here's what I'm going to do.  I'll hear from

19 Dr. Singer on his rebuttal, and then I'll decide after that

20 whether or not it's something I need to consider.  And if I

21 don't need to consider it, then I'll just disallow it.

22         MR. CRAMER:  Thank you, Your Honor.  I appreciate it.

23         THE COURT:  All right.  So let's have Dr. Singer come

24 back on up.

25         All right.  Dr. Singer, you recognize that you're still

―2:15-cv-01045-RFB-PAL―

1  under oath?

2          THE WITNESS:  I do.

3          THE COURT:  Okay.

4

5          REDIRECT EXAMINATION OF HAL J. SINGER, Ph.D.

6  BY MR. CRAMER:

7  *Q.*  All right, Dr. Singer.  I'll let you get situated.

8  **A.**  I think I'm ready.

9  *Q.*  Very good.

10          MR. CRAMER:  All right, Your Honor.  What we're going

11  to try to do, consistent with Your Honor's wishes, is to address

12  some of the issues Your Honor raised at the end of the day

13  yesterday and then take on and respond to some of the main

14  points that Dr. Topel raised.  And, obviously, if Your Honor has

15  additional questions, we know you're not shy.  So, we expect to

16  hear from you as well.  But if we don't get to something that

17  Your Honor wanted to hear, we hope to be able to do that and

18  you'd ask us to do that.

19          All right.  Let me start.

20  BY MR. CRAMER:

21  *Q.*  There was a lot of discussion during this hearing so far

22  about whether your foreclosure share variable measures

23  anticompetitive conduct.  So the question is, in your economic

24  opinion, is your foreclosure share variable an appropriate

25  measure of the challenged anticompetitive conduct in this case,

1   Dr. Singer?

2   *A.*   It is.  The challenged conduct includes, at its core, these

3   exclusive fighter contracts that were long-term and locked out

4   fighters from rival or would be rival promotions.  And what my

5   foreclosure measure is aimed to do is to try to quantify what

6   share of the fighters, in some relevant antitrust input market,

7   were foreclosed from rivals.  This is the key -- this is the key

8   theory of the case.  The economic theory here is input

9   foreclosure or just simply foreclosure, that is, did Zuffa

10  foreclose rivals from some critical must-have input in such a

11  way as to impair the rival's ability to compete in both the

12  input market and in the output market.  And that's precisely

13  what my foreclosure measure is aimed to do.

14  *Q.*  Dr. Singer, have you, as economist, reached the opinion that

15  locking up more and more key fighters, this key input over time,

16  would be anticompetitive?

17  *A.*   Yes.  So, I just invoked the theories.  I won't spent too

18  much time.  There's a large economic theory that explains -- I'm

19  thinking of a seminal piece by Salop that explains how locking

20  out or foreclosing rivals from a key must-have input can be used

21  by a firm -- by a dominant firm to -- to impair rival efficiency

22  and to exercise monopoly or monopsony power.  That's well

23  established in theory.

24          As an empirical matter, I have set up a test that tries

25  to explain variations in fighter wage share over time by

—2:15-cv-01045-RFB-PAL—

1  controlling for all sorts of other factors, including some

2  procompetitive factors, that might -- might move this around,

3  might move the fighter weights around.  And I found a

4  statistically significant and negative relationship, time after

5  time, specifications after specification, that told me that this

6  was anticompetitive conduct.

7  *Q.*  Did you find anything in the record that made you

8  confident -- more confident about your conclusion in this

9  regard?

10  **A.**  In addition to theory, in addition to empirics, yes.  The

11  record evidence is pointing to the fact that it was this

12  strategy, that foreclosing rivals from -- from must-have inputs,

13  created an entry barrier that locked out would-be rivals and

14  prevented them from competing effectively.

15  *Q.*  And we're asking for the ELMO to be turned on because I'm

16  going to ask you about a piece of evidence that you cited in

17  your report and I'm going to ask you whether -- once it comes on

18  the screen, whether this is something that supports your

19  position -- your opinion in this case.  I apologize for not

20  having warned in advance.

21  **A.**  Okay.  I see it up there, but I don't see it on my -- okay.

22           THE COURT:  Wait.  Blanca, his -- oh, there we go.

23           So, Mr. Cramer, we've already been over this.

24           MR. CRAMER:  Okay.  Your Honor --

25           THE COURT:  So we don't need to --

—2:15-cv-01045-RFB-PAL—

 1            MR. CRAMER:  -- we'll move on.

 2            THE COURT:  -- go over that.

 3            MR. CRAMER:  Okay.

 4   BY MR. CRAMER:

 5   Q.  In an exclusive dealing case, Dr. Singer, is it standard to

 6   count up the share of contracts in the market subject to the

 7   exclusionary restraints in assessing the anticompetitive

 8   conduct?

 9   A.  Yes, not just exclusive dealing cases, bundling cases.  It's

10   very standard for an economist to try to estimate the

11   foreclosure share, and they do so by exactly this, counting up

12   the contracts that contained certain provisions and trying to

13   figure out what share of either buyers, potential buyers, what

14   share of distributors, in this case what share of fighters, were

15   foreclosed from rivals.

16   Q.  And --

17            THE COURT:  Do you reference -- do you reference

18   reports like that in your report?

19            THE WITNESS:  I do.  I reference reports and I --

20            THE COURT:  Can you tell me just which reports -- which

21   part of your reports indicate that, again, just so I can go back

22   and look at that?  Is it in your initial report?  Most likely.

23            THE WITNESS:  Most likely.  Yes.  Yes.

24            THE COURT:  All right.

25            MR. CRAMER:  I have his report here, Your Honor.  What

—2:15-cv-01045-RFB-PAL—

1    was the specific citation you were looking for?

2            THE COURT:  Well, he was -- Dr. Singer was indicating

3    that he had referenced in his report the fact that it was a

4    standard practice for economists to look at foreclosure share,

5    or some variation of the foreclosure share, or exclusivity, in

6    terms of assessing sort of market power, I assume.  And that's

7    what you were doing in this case, right?

8            THE WITNESS:  In this case, correct.  Correct, yes.

9            MR. CRAMER:  And we'll endeavor to provide those

10   citations, Your Honor.

11           THE COURT:  Okay.

12   BY MR. CRAMER:

13   Q.  All right.  Now, Dr. Topel, as you heard his testimony,

14   asserts that your foreclosure share variable might be picking up

15   procompetitive aspects of Zuffa's conduct.  And he has two

16   flavors of this argument, and I want to take them one at a time.

17           First, he says, that by including the revenue

18   weighting -- and we're going to talk more about revenue

19   weighting later, but by including the revenue weighting, the

20   additional dollars that Zuffa earns by being a good promoter

21   make its share of the foreclosed market larger.  Is Dr. Topel

22   right about this argument?  Is that -- are you being unfair to

23   Zuffa in some way?

24   A.  No, I'm not.  And just to be clear, remember what

25   drives increases in my foreclosure share, what even allows it to

1  be positive in the first place.  It has to be the case that

2  Zuffa's locking up fighters into long-term exclusive contracts.

3        Now, it's true that conditional on having those

4  contracts in place, that going out and doing procompetitive

5  things, like, I think you said, oh, increasing demand or driving

6  up revenues, right, could have an effect on increasing my

7  foreclosure share.  But this is the key, is that in the absence

8  of the restrictive long-term exclusive contracts that doing

9  those procompetitive things would not have increased the

10 foreclosure share.  That is to say, the only -- the only thing

11 that's moving the foreclosure share, the only necessary element

12 to the foreclosure share is the anticompetitive conduct.  So

13 there's -- there's no chance.

14       And I want to make one other point here on -- oh, of

15 course, I encourage Zuffa to go out and do wonderful things to

16 grow their revenue, right.

17       The revenue critiques that Dr. Topel lodged could only

18 speak to my revenue weighted foreclosure share, of course.

19 Right?  I have -- I have other foreclosure share metrics,

20 including unweighted foreclosure share and ranked weighted

21 foreclosure share.  So, certainly, for those two alternative

22 metrics of foreclosure share, anything that Zuffa is doing,

23 including procompetitively, to increase its revenue, has no

24 chance of increasing those measures of foreclosure share.

25 Q.  All right.  And --

—2:15-cv-01045-RFB-PAL—

1              THE COURT:  So -- so -- I'm sorry.  So their critiques

2    on the use of the revenue weighting, you say, simply don't apply

3    to those other regressions because they don't include revenue

4    weighting?

5              THE WITNESS:  Exactly, Your Honor.

6              MR. CRAMER:  And we're going to talk --

7              THE COURT:  And where are those regressions?  Are they

8    in your initial report or in the sup?

9              THE WITNESS:  Sure.  I'm remembering a Table 6 of my

10   initial report where I showed the regression results for

11   different market definitions and then different weightings and

12   then in the appendix and in the backup material.  We do it

13   every -- we do it every way.

14             THE COURT:  Okay.

15             THE WITNESS:  And it's very important to know that

16   while I think the revenue weighting, when we go to a very large

17   pool, is the right and best way to do it, I recognize that there

18   are alternatives.  And that's why I use a rank weighted method

19   as well.

20             THE COURT:  And even -- even under the unweighted

21   regression, the foreclosure sale -- foreclosure share is still

22   statistically significant negatively?

23             THE WITNESS:  For certain specifications, that is true.

24   That is true, Your Honor.

25             MR. CRAMER:  And we're going to go through those, but

1    Your Honor asked for a citation.  So, in his first report, in

2    footnote 453, he mentions that he runs the model.  It's robust

3    to all of these different weighting schemes.  And then in is

4    second report, in paragraph 148, he has a more explicit

5    explanation of what's going on.  So I'll put that up so you can

6    describe what this is talking about.

7              THE WITNESS:  Okay.

8    BY MR. CRAMER:

9    Q.  So, here you say, in your second report, in paragraph 148,

10   "In addition to being incorrect, Dr. Topel's claim that using

11   revenue weights introduces a mechanical negative correlation

12   into my impact regressions is irrelevant."  We're going to

13   respond to that, even though it's irrelevant, in a minute.  But

14   what I wanted to point out to His Honor is, it says, "As I

15   explained in my initial report, to demonstrate the robustness of

16   my impact regressions, I confirmed that my impact regressions

17   continue to find a negative and statistically significant -- and

18   economically significant relationship between Zuffa's

19   foreclosure share and the fighter share even when Zuffa's

20   foreclosure share is calculated using an unweighted count of

21   fighters.  Therefore" --

22             THE COURT:  And that's -- okay.  And, so, where is the

23   chart for that?  That -- you said -- well, it looks like there's

24   a footnote there.  I'm just saying, was there a chart that went

25   along with that?

—2:15-cv-01045-RFB-PAL—

1          MR. CRAMER:  I think that we chart the foreclosure

2    share using various different of these weightings, and the

3    output of these models were all turned over in the backup.  But

4    I don't think we have separate regression, because we ran this

5    10 or -- 10 different ways.  These are basically showing that

6    the model works.

7          THE COURT:  Right.  I'm just saying, was there a --

8    there was an associated chart with this particular sentence.

9          THE WITNESS:  I think Your Honor is asking, was there a

10   table that showed the --

11         THE COURT:  A table.  Excuse me.

12         THE WITNESS:  Yeah.

13         THE COURT:  A table, yes.  Excuse me.

14         THE WITNESS:  We had multiple tables, but I can't

15   recall if we had tables.  But if we didn't provide a table, we

16   provided the progression output for every specification that I

17   ran.

18         MR. CRAMER:  And if we did, I will point that out to

19   Your Honor.

20         THE COURT:  Okay.  All right.  Thank you.

21         MR. CRAMER:  Okay.

22   BY MR. CRAMER:

23   Q.  All right.  So before we get more down the road of revenue

24   weighting, another version of Dr. Topel's argument about your

25   foreclosure share picking up procompetitive effects is that your

—2:15-cv-01045-RFB-PAL—

1   foreclosure share variable is picking up Zuffa's recruiting of

2   new fighters.  They do a good job promoting, recruiting new

3   fighters, just by being a great promoter.  Doesn't -- does that

4   improperly increase foreclosure share, in your view?

5   *A.*  No, it does not, because, again, in the absence of the

6   long-term exclusive contracts, if Zuffa went out and pro- --

7   procompetitively recruited athletes by having a better venue or

8   just in their recruitment policies, and brought more athletes

9   over, that would not have contributed to increases in my

10  estimate of the foreclosure share.  The only -- the necessary

11  element for the foreclosure share to run is the exclusionary

12  contracts.

13  *Q.*  All right.  Let's talk more -- in more detail about the

14  revenue weighting.  And, first, and just for background, just

15  remind the Court and me why you felt you needed to apply

16  weighting in the ranked market in particular?

17  *A.*  The ranked market contains thousands of fighters.  And I

18  think there's an agreement among the experts that once you

19  expand the net, once you cast the net this wide, and you have

20  fighters that are ranked between 1 and 650 by weight category,

21  you need some sort of weighting methodology.  In fact, Dr. Topel

22  testified to that effect.

23          Now, I agree with him.  And what I -- I offered, too,

24  and what I thought the most appropriate one was, because we were

25  trying to figure out value in the creation of revenue

2:15-cv-01045-RFB-PAL

1  productivity, I thought -- I thought a weighting the fighters --

2  the pool of fighters, by their associated promoters' average

3  revenue per event was the best estimate.

4  Q.  All right.  Now, Dr. Topel criticizes this.  He says that

5  your method was improper because you weighted Conor McGregor the

6  same as the 6th -- the 100th ranked fighter at Zuffa, you know,

7  because -- just because they're both at Zuffa.

8         I'm going to ask you whether this critique makes sense,

9  and I'm going to note for the record that Dr. Singer responds to

10 this specific critique in his rebuttal report at paragraphs 133

11 and 134.

12        But, Dr. Singer, does this critique make sense?

13 **A.**  It doesn't, and it doesn't for several reasons.  Let me see

14 if I can kind of quickly tick through.

15        So, first, it's not appropriate to think about

16 weighting when I do the revenue weighting as it applies to each

17 individual fighter.  That's not what I'm trying to do.  I'm

18 trying to come up with a value of Zuffa's market share, not the

19 market share of a fighter.  I'm trying to come up with Zuffa's

20 market share.  And, so, I want to take the pool of Zuffa's

21 fighters and then I want to apply a weight to that pool that

22 captures why these fighters are more special, potentially, than

23 other fighters, have more value.  And then I apply the pool,

24 right?  And, so, yes, it's true that fighters with different

25 rankings within the Zuffa pool are going to all get hit with

—2:15-cv-01045-RFB-PAL—

1   this same average revenue per event.

2          The second -- the second point that I want to make, and

3   Your Honor mentioned this yesterday, is that due to these

4   network effects, it is true that when a fighter comes onto the

5   Zuffa -- to the Zuffa family, inside the Zuffa portfolio, that

6   fighter now gets to interact with the set of more valuable

7   fighters.  So it makes sense that we should think of the

8   collection of fighters, not an individual fighter who might be

9   down in the ranks as being somehow treated differently.  It's

10  the pool of the fighters and the value of what Zuffa's bringing

11  those network effects.

12         The third thing I want -- I want to mention is that I

13  like the revenue weighting, but -- but to the extent that

14  Dr. Topel is uncomfortable with the idea of treating

15  Conor McGregor the same as some other Zuffa fighter with a low

16  rank, I have an alternative rate -- weighting metric that does

17  that.  That is the ranked-based weighting.  In that case, I, of

18  course, go through and I treat each fighter according to the

19  inverse of their ranking.

20         So, the argument that he was offering yesterday --

21         THE COURT:  And in that -- and in that analysis, you

22  still have statistical significance --

23         THE WITNESS:  Absolutely.  Absolutely.

24         THE COURT:  -- regarding the foreclosure share and the

25  wage share?

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  Absolutely.

2          So, the last point I wanted to make, Eric, if it's

3    okay, is that -- is that what I heard Dr. Topel say was that he

4    thought compensation would be a better -- he acknowledged that

5    some weighting was necessary when the pool is this large, and he

6    thought compensation would be a good one.  It might be a good

7    one, but let me just say this.  My expectation is that because

8    compensation is going to be closely linked to -- to revenue,

9    that if we were to weight Zuffa's compensation -- Zuffa's pool

10   of fighters by compensation instead of average event revenue, I

11   believe that we would not move the needle in any material way.

12          And then, finally, of course, we don't have

13   compensation data for the -- for the non-Zuffa promoters except

14   Strikeforce.  So it's -- it's largely an academic exercise.

15   BY MR. CRAMER:

16   Q.  So Dr. Topel said that another problem with your revenue

17   weighting method is that you appear to apply substantially

18   higher weights to the same fighter when she moves from a major

19   league promotion -- I'm sorry -- from a minor league promotion,

20   like Bellator, to, you know, the majors, UFC.  Is that a problem

21   for your method?

22   A.  It's not a problem for the method.  Again, we should be

23   thinking of -- when we do the revenue weighting, we should be

24   thinking about the pool of -- of Zuffa fighters, how big is that

25   pool in relation -- how important is that pool in relation to

—2:15-cv-01045-RFB-PAL—

1   all of the fighters in the relevant input market.

2           So, I made this point, but it's worth mentioning it,

3   that the movement of one fighter from non-Zuffa to Zuffa is not

4   going to change the revenue weighting in any material sense.

5           I want to make another argument, which is that, again,

6   Your Honor recognized this yesterday, that there is something

7   special about the Zuffa pool.  Zuffa is providing greater career

8   advancement opportunities, and it's also providing fighters with

9   better matchups because they bring a higher -- a higher ranked

10  pool of fighters.  So, there is some economic intuition that,

11  yes, this fighter who's moving over from the minors into Zuffa

12  should be getting more weight.  And I want -- I want to make one

13  more point, if I could, and let's see if I can bring this up.

14          These fighters are not moving across promotions

15  randomly, right?  If we observe a fighter going from a minor to

16  going to Zuffa, that contains information, right?  Zuffa is

17  selecting fighters not randomly to pick off.  They're -- they're

18  bringing over fighters who likely have won their last five

19  fights and look like they're climbing up the ranks and we

20  potentially want to have that person in our pool.

21          So when we pick someone out, I think -- I think

22  Mr. Isaacson created this impression that we're just kind of --

23  kind of closing our eyes and we're kind of putting our hands in

24  the pool, and when out comes No. 365, why should that person get

25  more weight.  It's not a random selection.  That -- right?  We

—2:15-cv-01045-RFB-PAL—

1   were getting that person.  There's a reason why that person's

2   coming to Zuffa, and it makes sense that they should get more

3   weight.

4   *Q.*  Now, Dr. Topel has said that the -- the -- it's the revenue

5   weights that are the main driver of increasing foreclosure

6   share.  Is he right?

7   *A.*  He is not right.  If that were true, then when you went to

8   my other metrics of foreclosure, you shouldn't see any -- any

9   movement at all when, in fact, you do see a lift.

10  *Q.*  Now, Dr. Topel also claims that by including revenue weights

11  in your foreclosure share variable, your model introduces

12  endogeneity bias and mechanically causes wage share to go down

13  as revenues go up.  Is he right about that?

14  *A.*  He's not right, and I think this comes from a

15  misunderstanding as to how the revenue weights are constructed.

16  Let me be absolutely clear.  You know how we have event revenues

17  on the left-hand side on the defend- -- that's the denominator.

18          THE COURT:  Right.

19          THE WITNESS:  That is the event in question, right?  So

20  it's the fighter's pay in that event divided by the event

21  revenues.  I do not bring over the event revenues of that event,

22  as Dr. Topel intimated yesterday in his testimony.  I do not do

23  that.  If I did do that, that would be a -- clearly a violation.

24  That would be endogeneity.

25          Now, let me just explain again what the revenue weight

—2:15-cv-01045-RFB-PAL—

1   is.  The revenue weight is a very -- it's a -- it's ratio of

2   Zuffa's average revenue per all events that Zuffa puts on in the

3   given year, divided by the same -- the same factor in the

4   denominator, plus the average revenue per event across non-Zuffa

5   promoters across all of their events for the entire year.  So

6   it's just -- it's just a mistake to claim that I put the event

7   revenue of the event in question onto the right-hand side

8   variable in my revenue weighted models.  I do not.

9            THE COURT:  Okay.

10  BY MR. CRAMER:

11  *Q.*  But you didn't stand on that particular point.  You also

12  tested this, right?  So, to test whether revenue weighting is

13  resulting in increasing revenues over time, pushing down wage

14  share mechanically, did you run a version of your model that

15  holds the revenue weights constant throughout the class period?

16  ***A.***  I did.  So, the first reaction that I had to Dr. Topel was,

17  okay, let's assume that you're right, and that this whole thing

18  is being driven by increases in Zuffa's average revenue per

19  event relative to non-Zuffa over the course of the study period.

20  Right?  How could I eliminate that influence?  Right?

21            And what I did is I -- is I took the average of what

22  the Zuffa event revenue was across the entire class and I -- and

23  I locked it in place and I did the average of the non-Zuffa,

24  right?  So there was no way that Zuffa's increasing revenues

25  could contribute at all, right, to the -- to the changes in the

—2:15-cv-01045-RFB-PAL—

1  foreclosure share.

2          I reran the regression.  And I found, again, a

3  statistically significant and negative relationship between the

4  foreclosure share variable and the -- and the wage share.  So I

5  just -- I can't dispute strongly enough the notion that the

6  revenue weights are somehow the cause of the relationship that

7  I'm finding.

8          MR. CRAMER:  And, Your Honor, that regression that he's

9  discussing was discussed in his rebuttal report at paragraph

10  147.

11  BY MR. CRAMER:

12  Q.  All right.  So do the results of your regression analysis

13  here depend on revenue weighting?

14  A.  They do not.

15  Q.  Okay.  And I gave His Honor the cites for the various

16  different -- in the report at least, where the -- where -- in

17  his opening report and rebuttal report where he mentions these.

18          Does your regression continue to show a statistically

19  significant relationship between rising foreclosure share and

20  falling wage share using ranked weighting in the tracked market?

21  A.  Yes.

22  Q.  Does your regression continue to show the same statistically

23  significant relationship between rising foreclosure share and

24  falling wage share using ranked weighting in the ranked market?

25  A.  Yes.

—2:15-cv-01045-RFB-PAL—

1   *Q.*  Does your regression continue to show a statistically

2   significant relationship between rising foreclosure share and

3   falling wage share using ranked weighting in the headliner

4   market?

5   *A.*  Yes.

6   *Q.*  Does your regression continue to show this relationship with

7   no weighting at all in the tracked market?

8   *A.*  Yes.

9   *Q.*  Does your regression continue to show this relationship with

10  no weighting in the ranked market?

11  *A.*  Yes.

12  *Q.*  Okay.  Does your regression continue to show this

13  relationship with no weighting in the headliner market?

14  *A.*  Yes.

15  *Q.*  Okay.  So when Dr. Topel says your results are entirely

16  driven by using revenue weighting to mechanically cause wage

17  share to fall, is that accurate?

18  *A.*  It is not accurate.

19  *Q.*  All right.  Now, Mr. Isaacson claimed on cross-examination

20  that in performing your revenue weighting there were Bellator

21  events where revenue was listed, but you didn't count the

22  revenue.

23         Do you recall that discussion?

24  *A.*  I recall.

25  *Q.*  And he showed you ZCCX292, and I'm going to put that up on

─2:15-cv-01045-RFB-PAL─

 1    the ELMO.  But before I do that, did Dr. Topel --

 2              THE COURT:  I'm sorry.  And that exhibit is from?  We

 3    should admit that into the record.  What -- where is that from?

 4              MR. CRAMER:  I believe this is from the backup to

 5    Dr. Singer's report, page 9 of 10.

 6              MR. ISAACSON:  And it's also Singer Deposition Exhibit

 7    4.

 8              THE COURT:  So in terms of Dr. Singer's report, it's

 9    in -- it's attached to the backup of one of his reports?

10              MR. ISAACSON:  It -- it's a compilation of backup.  I

11    think we made it more readable, but, yes, it's directly from his

12    backup.

13              THE COURT:  Okay.

14              MR. CRAMER:  This is not going to be easy.

15              THE COURT:  We can zoom in.

16              MR. CRAMER:  We will do our best.  I will do some

17    zooming.

18    BY MR. CRAMER:

19    Q.  All right.  Let's look -- you were -- Dr. -- Mr. Isaacson

20    drew your attention to this Bellator event with Pay-Per-View

21    revenue you can see circled at 4.5 million?

22    A.  Yes, I see it.

23    Q.  Okay.  Well, actually, before I ask that, did Dr. Topel ever

24    make this attack, or any of Zuffa's experts, ever make this

25    attack in their reports?

—2:15-cv-01045-RFB-PAL—

1    *A.*   No.

2    *Q.*   Okay.  So this is all new at the hearing, correct?

3    *A.*   Brand new.

4    *Q.*   Okay.  Just please explain what's going on here.  What is

5    this depicting before we talk about our response to this?

6    *A.*   Well, it -- the database, or this backup, is showing you

7    every event that informed my revenue weighting metric.  And as

8    I -- as I testified, I needed -- I went out and got as much data

9    as I could possibly obtain.  And it shows you for each event --

10   whether it's Zuffa or non-Zuffa promoter -- it shows you a

11   revenue, including a breakdown between Pay-Per-View and gate.

12   And then the -- the one that is circled, I think that

13   Mr. Isaacson took me to yesterday, was Pay-Per-View revenue for

14   a Bellator event, Bellator 120, of $4.5 million.

15   *Q.*   Okay.  And did you apply a particular rule in deciding

16   whether or not to include the revenue in your weighting

17   analysis?

18   *A.*   I did.

19   *Q.*   What was that rule?

20   *A.*   My rule was that so long as the data were -- there were no

21   missing fields in the data, I included it in the average,

22   whether it was for the average of the Zuffa promotions per year

23   or the average of the non-Zuffa.  And the reason why I did that

24   is that I was worried about counting in the average data that

25   was understated.

—2:15-cv-01045-RFB-PAL—

1          So let's look at the Bellator one, Your Honor.  You'll

2   see that the gate revenue for Bellator 120 was missing in my

3   database.  See the blank under "Gate" --

4          THE COURT:  Right.

5          THE WITNESS:  -- "Bellator 120"?  And, so, what the

6   code -- the way the code was written to run was that if it -- if

7   it went through and saw that there was a missing for any field

8   in the data, it just wouldn't give any -- any import or any

9   weight to a missing observation --

10          THE COURT:  Is that --

11          THE WITNESS:  -- or partially missing observation.

12          THE COURT:  Is that a standard approach when running

13   analyses like this?

14          THE WITNESS:  Yeah -- well, yes.  And in particular,

15   what we're worried about, Your Honor, is that if -- we know that

16   revenues are a combination of gate and Pay-Per-View, right?  So

17   if I count observations that we know to be missing gate, it's

18   going to create the impression that that -- that that act --

19   that that revenue was too low and that's going to work into the

20   average.

21          THE COURT:  Well, in some respects, what it would do is

22   actually would have pulled down Bellator's weight more than it

23   might otherwise because you wouldn't have included the revenue

24   for the gate?

25          THE WITNESS:  Not necessarily.  Because imagine,

1    Your Honor, you have a bunch of observations that are complete.

2            THE COURT:  Right.

3            THE WITNESS:  With gate and Pay-Per-View.

4            THE COURT:  Right.

5            THE WITNESS:  And you're thinking about, should I

6    include this one on the margin with missing data, right?  To the

7    extent that it's smaller because of the missing data, it would

8    have the effect of pulling down --

9            THE COURT:  That's what I said.

10           THE WITNESS:  Oh, sorry about -- sorry about that.

11           THE COURT:  That's what I'm saying.

12           THE WITNESS:  We're on -- we're on the same page.

13           THE COURT:  No.  What I'm saying is, is that the

14   critique was that, in fact, these weights for these competitors

15   was lower than it should have been because you're missing data.

16   But by not including the missing data, you're saying, in fact,

17   you prevented it from being artificially lower than it might

18   otherwise have been because it would have been higher with the

19   total input from that event.

20           THE WITNESS:  That's one interpretation of the

21   critique, Your Honor.  I think I took it a different way, but I

22   might be getting sensitive --

23           THE COURT:  Well, no.  I -- I --

24           THE WITNESS:  -- in my old age.

25           THE COURT:  I can understand that, for both you and

1   Dr. Topel.  No.  I understood one of the issues of the critique

2   was that -- at least that's what I understood Mr. Isaacson to be

3   pointing this out, was that here you have what appears to be a

4   fairly large sort of Pay-Per-View revenue and somehow Bellator

5   is not getting credit for it.

6           THE WITNESS:  Absolutely.

7           THE COURT:  And that, therefore, led to this, in some

8   sense, added benefit in the context of regression for Zuffa

9   because their revenue is higher.  And I understood this critique

10  to be, well, Bellator's would have been higher had there not

11  been this flawed approach to inputting the data.  And what I

12  understand you to be saying, what -- this was an approach to

13  missing data, and that you did this to avoid actually having the

14  opposite effect of what they said.

15          THE WITNESS:  And importantly, Your Honor, this is key,

16  I applied the rule equally to non-Zuffa events and to Zuffa

17  events, right?  It's not as if I was -- I was picking on

18  non-Zuffa or in any way trying to engineer a result.  I wanted

19  to make sure that the data that made it into my model was good.

20  And, so, I think -- I think Mr. Cramer has pulled up an example

21  where you can see how the rule got applied equally.

22          MR. CRAMER:  UFC 180, 11/15/2014.

23          THE WITNESS:  So, again, Mr. Cramer, we're missing the

24  columns -- and I know that you didn't intend this, but I can't

25  remember whether the question mark corresponds to missing gate

───2:15-cv-01045-RFB-PAL───

1  or Pay-Per-View.  Could you --

2          THE COURT:  Well -- well, I understand your point.

3          THE WITNESS:  Right.

4          THE COURT:  Your point was that this was a -- this was

5  an approach that related to missing data that was applied

6  equally.

7          THE WITNESS:  Exactly.

8          THE COURT:  Okay.

9          THE WITNESS:  And just --

10          MR. CRAMER:  It's missing gate.

11          THE WITNESS:  Missing gate.  And, so, that UFC

12  observation, Your Honor, just didn't enter into the average

13  revenue per event calculation.

14          Now, I had never -- I'd never heard this critique until

15  yesterday.  My days are confusing and I got crossed across two

16  days.  So, it was either yesterday or the day before.  And, so,

17  what I -- what I asked my staff to do is just to rerun the

18  weights, this time including -- including everything, even the

19  missing data, and it has no effect.

20          THE COURT:  Okay.

21          THE WITNESS:  Okay?

22          THE COURT:  Thank you.

23  BY MR. CRAMER:

24  Q.  All right.  Now, Mr. Isaacson also pointed out on

25  cross-examination that in building your revenue weights, you

―2:15-cv-01045-RFB-PAL―

1   only included revenue that were event specific.  And, so, you

2   didn't include revenues from certain broadcast deals that

3   certain non-Zuffa promoters had.  Could this possibly have

4   affected your results?

5   **A.**   It could not have possibly affected it.  And before we get

6   to why, I just want to, again, stress that the rule -- I was

7   looking for event specific revenue.  So, a broadcast deal that

8   covered multiple events could not be allocated or attributed,

9   right.  So I'm looking at -- so that's the reason why broadcast

10  wasn't included, but importantly, I'm applying the rule equally

11  to Zuffa and non-Zuffa.  And, so, a lot of broadcast revenue in

12  the Zuffa events was also not counted, but there was no -- there

13  was no intent or even effect of somehow understating what the

14  other -- what the other non-Zuffa promotions looked like.

15        And this table, Your Honor, which appears in my first

16  report, shows you that there's just not enough non-Zuffa revenue

17  out there to matter.  Right?  And, so, what I've done here is

18  I've -- is I've calculated -- you'll see this Table 3 in Singer

19  Report 1.  I calculated, given the best data available, what I

20  thought was Zuffa's revenue shares in the output market.  And --

21  and I'm including in this all revenue, including broadcasting

22  revenue.  And what I find is that when you sum up the non-Zuffa

23  promotions and you divide it by the total revenues in the

24  marketplace in North America for each year, you get trivial

25  shares.

———2:15-cv-01045-RFB-PAL———

1          And what that means is that to the extent that I didn't

2   include any important sources of revenue, as Mr. Isaacson

3   asserted, right, bringing those revenues in would not cause

4   Zuffa's massive footprint to look any smaller than it did.

5          To give you an idea, if Zuffa's at 95 percent in the

6   output market, that's 95 divided by five times as big as

7   these -- as these other promoters.

8          THE COURT:  Right.

9   BY MR. CRAMER:

10  Q.  Did you do anything in this chart that would even make Zuffa

11  look smaller relative to the non-Zuffa promoters?

12  **A.**  I did.  I limited the Zuffa revenue to North America, and I

13  and I included all revenues for the -- for the minor league

14  rivals.

15  Q.  Didn't you also include only Zuffa event revenue and you

16  compared that to all revenue for the non-Zuffa promoters, right?

17  **A.**  That's true.

18  Q.  All right.  Now, Dr. Topel asserted that your regression had

19  three control variables that he deemed that had the,

20  quote/unquote, wrong signs.  All right.  He said -- and he said

21  that undermines your model.  And I'm putting up the Topel -- the

22  slide from the Topel direct examination, slide 17.

23          Trying to make it easier to read.

24          Do you recall this slide, Dr. Singer?

25  **A.**  I do.

————2:15-cv-01045-RFB-PAL————

1  *Q.*  Okay.  So, he highlights here the win flag -- and this is

2  the output from your regression in Table 6 in your first report,

3  right?

4  *A.*  Yes.

5  *Q.*  Okay.  And Dr. Topel highlights the win flag, the rank, and

6  the Pay-Per-View variables, correct?

7  *A.*  Yes.

8  *Q.*  Okay.  Now, he said -- was Dr. Topel correct that the win

9  flag had the wrong sign?

10  *A.*  No, he was not correct.  The win flag has a positive

11  coefficient on it, and that means that if you win the event, all

12  things equal, this specification is predicting that the

13  fighter's wage share would be higher.

14         THE COURT:  But it's not statistically significant at

15  that particular ...

16         THE WITNESS:  Correct, and we will -- we will address

17  that in one second.

18  BY MR. CRAMER:

19  *Q.*  Why don't you go ahead and address it.

20  *A.*  So, Your Honor, let's -- let's be very clear.  When you run

21  a unilateral regression -- a univariate regression, with just

22  win flag on the right-hand side, of course it's positive and

23  statistically significant.  What's happening here is what --

24  you're probably familiar with this concept of multicollinearity.

25  And, so, win flag turns out to be very highly correlated with

——2:15-cv-01045-RFB-PAL——

1  wins, which is another variable in the model.  Wins, recall, is

2  the number of wins the fighter had obtained at the time of the

3  fight.

4        THE COURT:  Right.

5        THE WITNESS:  And the win flag is if you won.  And, so,

6  I -- I -- in response to Dr. Topel's critique that I got the,

7  quote/unquote, wrong sign on the win flag, which I didn't, I

8  removed wins.  All the regression constant, I just removed

9  wins --

10     (Court reporter clarification.)

11        THE WITNESS:  I'm sorry.  I removed wins, W-i-n-s, from

12  the regression just to show that it's the multicollinearity

13  between wins and win flag that is sapping the explanatory power

14  and thence -- and, thus, removing the statistical significance

15  of one of them.  This is a very common -- a common occurrence in

16  econometrics, and it would -- there would be no reason to have

17  to lose faith in the overall regression.

18        Your Honor, remember, we have hundreds of controls and

19  thousands when you consider the fighter fixed effects.  And, so,

20  the notion that -- that we're not going to get the precise sign

21  as one might expect for each variable and statistical

22  significance for all of our controls is not as -- is not as

23  important as what -- what we're -- again, what I'm trying to

24  focus on, which is what is the relationship between foreclosure

25  and wage share, controlling for all other things.

—2:15-cv-01045-RFB-PAL—

1  BY MR. CRAMER:

2  *Q.*  Is it standard practice, as Dr. Topel was suggesting, to

3  discard a regression because the coefficient on a handful of

4  coefficient -- coefficient of control variables out of thousands

5  have the wrong sign?

6  *A.*  No, it's not standard, and particularly is wrong in the face

7  of multicollinearity when you've got hundreds or thousands of

8  right-hand side variables.

9  *Q.*  Did you run a test that you reported in your rebuttal

10  report, at paragraph 124, to see if these fixed effects

11  variables were collectively significant?

12  *A.*  Well, you said "fixed effects."

13  *Q.*  I'm sorry.

14  *A.*  I'm just going to -- sorry.  The control variables.

15  *Q.*  Control variables.

16  *A.*  The control variables.

17  *Q.*  I apologize.

18  *A.*  Right.  So, what I did, Your Honor, was that there was a

19  collection of control variables that -- that were not showing up

20  as being individually significant.  But I ran what's called an

21  F-test which was to determine if, collectively, they were

22  contributing significantly to explaining variation in wage share

23  over -- over the panel.  And the answer is they were, at -- at

24  the highest level of significance.

25  *Q.*  Does anything about Dr. Topel's, quote/unquote, wrong signs

1  argument undermine your regression in any way?

2  *A.*  No, they do not.

3  *Q.*  All right.  Dr. Topel argued, or opined, that because the

4  wage level of Strikeforce fighters increased when they moved to

5  Zuffa after Strikeforce was acquired, that shows Zuffa didn't

6  have monopsony power.  Is he right?

7  *A.*  He's -- he's not right.

8  *Q.*  Why not?

9          And I'm going to put up Dr. Topel's slide 8 from his

10  direct if that helps your answer.

11  *A.*  It helps at the margin, but I -- let me -- let me just take

12  a swing at it.  What I -- what Dr. Topel was -- he started off

13  his testimony as saying that he and his colleagues had figured

14  out that there's a nice way to test whether a firm has monopsony

15  power, and that is, when it absorbs new employees into the firm,

16  look to see what happened to the wages of those new employees.

17  If they stayed -- if they stay constant, you can infer that the

18  market -- that the labor market is competitive.

19          If, on the other hand, you see that the wages of the

20  newly hired workers goes up, that implies that the firm -- that

21  the buyer of those services is facing an upward sloping supply

22  curve and, therefore, one can infer that they've got monopsony

23  power.  Right?

24          And, so, I -- what -- what struck me from the -- from

25  the gallery was that then he -- then he said he has a natural

2:15-cv-01045-RFB-PAL

1  experiment to test whether or not Zuffa has monopsony power.

2  And he says, I look at what happened when Zuffa absorbed the

3  Strikeforce fighters.  And he was very excited about the fact

4  that those on -- and on an absolute level, those fighters went

5  up in wage.  And as I was sitting there saying, my, God, what

6  you just told us is that that would be evidence of monopsony

7  power.

8          The ... maybe I should --

9  *Q.*  Is there another reason that you have to reject the idea

10  that when Strikeforce fighters go to Zuffa, the mere fact that

11  they were paid more means that they were -- that they were being

12  paid a competitive wage?

13  *A.*  No.  And I'm -- for this other reason I want to -- I want to

14  go back to the intuition that Your Honor mentioned yesterday,

15  which is that these fighters are getting now merged up with a

16  higher pool of more highly ranked fighters.  And, so, it's

17  natural that their marginal revenue productivity is going to go

18  up and it's natural that their wages are going to go up in

19  absolute level.  And, so, to say from that that because the

20  wages went up, Dr. Topel concludes there must be no monopsony

21  here, is just -- just wrong.

22          I also just want to say one other thing that's kind of

23  obvious, to me anyway, is that if you're a large firm and you

24  hire another -- another -- you buy another firm and you bring

25  over their employees, and if you use a pay structure, it would

—2:15-cv-01045-RFB-PAL—

 1   be -- it would be natural that you'd move those new employees

 2   that are recently absorbed into the same pay structure as the

 3   one that exists at your firm.

 4         Can you imagine two employees speaking and knowing that

 5   because you were -- you came over from the acquired firm that

 6   you were going to be treated differently forever, right?  That

 7   probably wouldn't go down well.

 8         So, when I learned that Zuffa raised these wages to

 9   come into alignment, what I hear that is further support of the

10   pay structure.

11   Q.  And -- and is this why you used wage share instead of wage

12   level?

13   A.  Well, yes.  What wage -- what wage share does is it -- is it

14   controls for those differences in revenues that reflect

15   differences in marginal revenue productivity.  And the bottom

16   line here is that when those Strikeforce fighters came over, the

17   mere fact that they get mixed up with more valuable fighters,

18   right, is going to increase their marginal revenue productivity.

19   And that's what the wage share is trying to accommodate.

20   Q.  All right.  Let's move to another topic, your year fixed

21   effects and time trend.  We had a long discussion of that, or

22   Dr. Topel and His Honor and Mr. Isaacson had a long discussion

23   of that so I wanted you, Dr. Singer, to have a chance to respond

24   to it.

25         So, Dr. Topel asserted that because you included year

—2:15-cv-01045-RFB-PAL—

1   fixed effects in a time trend variable, your measurement of the

2   effect of foreclosure share on wage share was somehow invalid.

3   So, first of all, did Dr. Topel make this point in any of his

4   reports in this case, other than with respect to the promotion

5   spend variable?

6   **A.**   No.   This was a -- this was a new argument yesterday.

7   *Q.*   All right.   Is Dr. Topel's new argument about fixed effects

8   correct?

9   **A.**   It is not.

10  *Q.*   Why not?

11  **A.**   So, let's start with the year fixed effects and what -- what

12  Dr. Topel asserted yesterday was that by my including year fixed

13  effects in the regression, I was limiting any contribution of

14  variation in the foreclosure share that would inform that

15  foreclosure coefficient to movements of foreclosure share within

16  a given year, but that I wasn't -- I was no longer taking

17  advantage of -- of the movements in foreclosure share across the

18  study period.   And that's not correct.   The -- you have to

19  remember, I'm calculating foreclosure on a monthly basis.   Every

20  month it gets updated.

21       And the regression, it's very complicated, it uses

22  matrix algebra in its optimization routine, but what it's doing,

23  it's looking at average deviations in foreclosure share from the

24  year in a given month, say in 2010, and comparing those to

25  average deviations in a month from, say, 2015.   So it absolutely

2:15-cv-01045-RFB-PAL

1  is informed by variations in foreclosure share across years.

2          Now, I agree with him that it is also informed by

3  variations in foreclosure shares within years.  But I just want

4  to say this that it was -- it was -- it was -- it was unusual to

5  hear an econometrician saying that bringing in year fixed

6  effects was somehow not standard or somehow undermined the kind

7  of -- the kind of regression.  Year fixed effects, time -- a

8  time trend, Your Honor, whenever you're dealing with a panel of

9  data that goes over a long period of time -- in my case, it was

10 from the mid-otts [sic] till 2017, you have to control for the

11 fact that things could be changing over time.

12         And, so, I did it by including both a time trend and

13 year fixed effects.  And by doing so, you could say that it made

14 it harder to find an effect on the foreclosure share, and

15 despite those controls, I still found one.

16 Q.  Dr. Singer, you were shown --

17         THE COURT:  So, it wouldn't -- it wouldn't sort of

18 remove the foreclosure share trend because you controlled for

19 them.  And, so, his argument was, in part, that it sort of de-

20 -- I think they used the term --

21         THE WITNESS:  Detrending.

22         THE COURT:  -- "detrending" --

23         THE WITNESS:  Right.  He --

24         THE COURT:  -- the foreclosure share as it relates to

25 its sort of increase over time, but -- which I didn't really

—2:15-cv-01045-RFB-PAL—

1  understand it because it's based upon something completely

2  separate than foreclosure share is, which is the fighters and

3  the revenue.  So I'm not sure how they --

4          THE WITNESS:  I think what happened is this is all

5  coming and building up to a critique of my promotion variable in

6  which he thought didn't vary within a year, which is not true,

7  and we'll get to that in a bit.  So, he had laid out in his

8  report a foundation for -- for why my inclusion of year fixed

9  effects didn't give the promotion a variable an opportunity.

10 That was all -- that was in the papers.  We were ready for that

11 one.

12          What we weren't ready for, and what we heard for the

13 first time yesterday, was the idea that the year fixed effects

14 also does something to undermine the explanatory power of the --

15 of the foreclosure share.  That was a new one, and I just think

16 he's wrong.

17          THE COURT:  Okay.

18 BY MR. CRAMER:

19 Q.  Let's talk about the time trend.  Dr. Topel, like with the

20 year fixed effects variable, he claimed that including the

21 standard time trend variable, linear increases in foreclosure

22 share made no contribution to the foreclosure share coefficient.

23 Is he right?

24 A.  I don't know if I heard the question correctly, but let me

25 just say that -- that the increases that we see over time in

—2:15-cv-01045-RFB-PAL—

1  the -- in the foreclosure share do not proceed in a perfect

2  linear fashion.  They occur in a zigzag fashion, and there's

3  some -- in fact, by some of the measures of foreclosure share,

4  it will -- you'll see it accelerating, right?  And, of course,

5  those -- those increases that are occurring over time in a --

6  and not in a perfectly linear way, right, are contributing to

7  the estimate -- those sources of variation are contributing to

8  my estimate of the coefficient on foreclosure share.

9        So I disagree with his -- with his suggestion that --

10 just like his year fixed effects, that the inclusion of the time

11 trend was somehow zapping the ability of the foreclosure -- of

12 variation in the foreclosure share to make -- to make -- to

13 explain the foreclosure share estimate.  Of course it is.

14 *Q.*  Is use of a time trend variable standard?

15 **A.**  Absolutely.

16 *Q.*  And did including the time trend variable actually made it

17 -- make it harder for your regression to find a relationship

18 between foreclosure share and wage share?

19 **A.**  It's complicated.  You could say it makes it easier because

20 it's controlling for things that change, but, yes, it's also

21 making harder in that it's taking away certain sources of

22 variation in the foreclosure share from being able to contribute

23 by themselves.

24        THE COURT:  Such as?

25        THE WITNESS:  Well, such as those that are moving up in

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1    a perfect linear fashion.  Any linear trend -- any perfectly

2    linear trends in a foreclosure share, right, would be -- would

3    be --

4            THE COURT:  So, let's say --

5            THE WITNESS:  -- captured by the time trend variable.

6            THE COURT:  So the time trend variable might zap out

7    potentially extensions in the links of the lockup period, or

8    not, in the contract.  So, in other words, if they changed the

9    contract from year to year to increase the sort of,

10   quote/unquote, locked-up period, would the time-share fixed

11   effect variable pull on that?

12           THE WITNESS:  Well, you said time-share -- you said

13   time trend fixed effects, so those -- these are two

14   separate things.

15           THE COURT:  I know they're two separate --

16           THE WITNESS:  Let's deal with the time trend first.

17           THE COURT:  Right.

18           THE WITNESS:  All right?  And, so, what we need to be

19   focussed on is how is that time trend variable correlated with

20   the foreclosure share over time.

21           THE COURT:  Right.

22           THE WITNESS:  Right?  And, so, to the -- they are

23   correlated in part because you watch, the foreclosure share was

24   growing.

25           THE COURT:  Right.

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  But the key, Your Honor, is that it
2     wasn't growing in a perfectly linear fashion, right?  It would
3     zig up, zig down, and then -- and then in some cases it would go
4     very high, it would go high around, remember, the Strikeforce
5     acquisition.  So these nonlinear increases in the foreclosure
6     share, even in the presence of a time trend variable, are making
7     contributions to the foreclosure share coefficient.
8          THE COURT:  Okay.
9     BY MR. CRAMER:
10    Q.   All right.  Let's talk about the argument that Dr. Topel
11    actually had in his reply to your supplemental expert report at
12    paragraph 28.  He claims that your promotion spend variable had
13    no effect, just dropped out, for lack of sufficient variation.
14    Is he right?
15    A.   He's not right.
16    Q.   Why not?
17    A.   So, when I introduced the promotion expenditure variable, I
18    did that in the context of the model that included the
19    pre-Strikeforce acquisition, Strikeforce database, right?  And,
20    so, I pulled those databases together, and there were promotion
21    values for Zuffa and for Strikeforce in each year.  And, so, he
22    testified yesterday that there was no variation in the promotion
23    variable within a year, and he was wrong.  It does vary by year.
24          Now, what he did in his -- in his alternative
25    specification is he -- he eliminated the Strikeforce, which did

—2:15-cv-01045-RFB-PAL—

1  eliminate the variation in promotional expenditures within the

2  year, and then he claimed that the model had no more variation.

3  Well, yes, I agree with him, if you eliminate the variation, you

4  eliminate the variation.

5          THE COURT:  Because you're saying --

6          THE WITNESS:  If you turn up the temperature --

7          THE COURT:  Because you're saying the variation was

8  based upon the promoter, not based upon the --

9          THE WITNESS:  Let me see.

10          THE COURT:  -- the input from the promoter -- because

11  I --

12          THE WITNESS:  Wait.  Let me try --

13      (Court reporter admonishment.)

14          THE COURT:  So help me -- yeah.  So help me understand

15  whether -- if you're saying that he eliminated the variation by

16  removing Strikeforce, whether or not the promoter variable is

17  based upon the promoter or not, if that's what was the result of

18  the loss of the variation or if there's something else.

19          THE WITNESS:  That -- that's what he did to eliminate

20  the variation.  Your Honor, within a given year, there were only

21  two values for promotion.  One was the Zuffa promotion spend,

22  and the other one was the Strikeforce promotion spend.

23          So, had he -- had he left my model alone and just

24  included the pre-Strikeforce acquisition data with -- with

25  Strikeforce observations in it, right, this problem would go

1   away because then you'd have variation in the promotion variable

2   within a given year.  But what he did is he -- is he struck the

3   pre-Strikeforce acquisition thereby eliminating it and thereby

4   he's right.  He's right that when you eliminate variation in the

5   promotional spend, so that it's just one per year from Zuffa,

6   and you include a year fixed effects, of course there would be

7   no chance for the promotion variable to make any contribution.

8   But that's not what my model -- that's not how I tested

9   promotion.  I tested it with the pre-Strikeforce acquisition

10  data included.

11          THE COURT:  Because that's the only way to test

12  differences between Zuffa and another promoter?

13          THE WITNESS:  Well, I'm interested, Your Honor, in

14  testing the special sauce theory.  I want to make sure that I'm

15  controlling for everything in the regression that -- that Zuffa

16  could be doing that -- that might affect -- procompetitively

17  that might affect the wage share.  I want to get that in there.

18  And I also want to keep -- to the extent I can, I want to keep

19  that -- those year fixed effects in because they're

20  statistically significant.  They're important.  They're

21  important in explaining movements in the wage share over time.

22          So, I can't bring in a promotion variable that doesn't

23  vary by year in the presence of those year-fixed effects, but

24  that's not what I did.  I brought in a promotion variable that

25  does vary within a year.  There was a Strikeforce observation in

—2:15-cv-01045-RFB-PAL—

1   each and a Zuffa observation in each year.  And when you run it

2   that way, the model doesn't crash as Dr. Topel asserts.  You

3   have -- you have variation.  So, I'll leave it at that.

4   BY MR. CRAMER:

5   *Q.*  Dr. -- Mr. Isaacson used the following document, I'm going

6   to put it on the screen, it's JCCX70, Exhibit 4, Zuffa Event

7   Costs and Revenues in 2010.  And he used this document to

8   suggest that you didn't control for the non-fighter event costs

9   as listed in this chart.  Is he correct?

10  *A.*  No, he's not correct.

11  *Q.*  Why not?

12  *A.*  In the very last specification I ran when Dr. Topel said,

13  no, no, no, it's not promotion, it's the kitchen sink, it's all

14  of Zuffa's non-fighter expenditures at a given event, I used

15  that data.  And I tested whether the kitchen sink, when you

16  threw that in as a right-hand side variable, had any -- had

17  any -- could in any way upset the relationship on foreclosure.

18  And I want to make -- I want to make one other point, just --

19           THE COURT:  And, so, then what happened?

20           THE WITNESS:  Nothing happened.

21           THE COURT:  Okay.  All right.

22           THE WITNESS:  Right, if you did it properly.  Dr. Topel

23  went first, and what he did was he combined Zuffa with

24  Strikeforce data, but we notice that he -- he had carved out a

25  subset of the Strikeforce data when he brought the two databases

together. And all we did -- Mr. Isaacson calls this the new regression. It's not a new reaction. We just said, what happens if you don't throw those out? That's data. Why are you throwing out those data? We don't know why he threw them out. It could have been a coding error for all we know, but all he had to do was bring those back in and the effect on foreclosure was maintained. And if I could, I'd make one other point here.

While it's true that my promotion spend variable for Zuffa only shows up one time per year, my preferred way of doing it, and we can get it into why I do it that way. When I -- when I replicated Dr. Topel's model of the kitchen sink, that's event specific, so that's showing up multiple times a year. So any concern that he might have that -- that those effects have no chance to contribute because of the inclusion of the year fixed effects melts away.

THE COURT: Right.

THE WITNESS: Because now we have variation in this special sauce variable. Right? That occurs at a higher frequency --

THE COURT: Right.

THE WITNESS: -- than annually.

THE COURT: Okay.

THE WITNESS: Okay.

BY MR. CRAMER:

*Q.* Does the kitchen sink variable -- so you -- you said that

1   you took Dr. Topel's regression and you added in the missing

2   data, and it worked.  It showed this statistically significant

3   relationship that we've been talking about --

4   *A.*  Correct.

5   *Q.*  -- right?

6         What if you took all of the Strikeforce data out, you

7   didn't include incomplete data, what did -- what did that show?

8   *A.*  It would still work.  If you use Dr. Topel's all Zuffa

9   non-fighter event revenues, right, and you made that your

10   right-hand side data, and you just looked at Zuffa, just throw

11   out Strikeforce, my result on the foreclosure share is

12   preserved.  And what that means, Your Honor, is that you can

13   bring in the kitchen sink, right, that captures all of Zuffa's

14   expenditures on an event-level basis.  And so long as you either

15   bring in all of the Strikeforce data or throw it all away, the

16   results on the foreclosure share are preserved.  The only way

17   that he was able to upset it was bringing in the -- a subset of

18   the Strikeforce data and we -- we don't -- we don't have any

19   understanding as to why that subset was chosen.

20         THE COURT:  Okay.  Thank you.

21   BY MR. CRAMER:

22   *Q.*  All right.  Let's talk about this 18-month window that you

23   used in computing foreclosure share.  Mr. Isaacson asked you

24   about this window that looks nine months forward and nine months

25   backward.  Can you just explain to the Court and to me what you

─2:15-cv-01045-RFB-PAL─

1 did, Dr. Singer?

2 **A.**   Sure.

3        I wanted to -- I wanted to create a -- a moving average

4 or rolling average, if you will, of all of the active fighters

5 in the relevant market at a given point in time.  And I did that

6 because I didn't want the foreclosure share to be bouncing

7 around like wild.  I wanted it to be a steady trend.

8        And the question was how to -- how to identify who is

9 active in the market.  Now, as a starting place, I began with

10 the rank.  So if you had a -- if you had a rank at the time that

11 I went to go do the measure of the foreclosure share, or the

12 market share, because as I testified, they're starting from the

13 same place, I want to know if you fought -- if I'm looking in,

14 say, March of 2012, I want to know if you fought around that

15 time.  Because if you didn't fight around that time, you could

16 still have a rank, but you might not be active in the relevant

17 market.  Right?

18        And, so, what I did was I said, if I'm looking in March

19 of 2012, let's look in the Sure Dog database nine months forward

20 and nine months backwards.  And if I --

21        THE COURT:  So from the date of the fight?

22        THE WITNESS:  Well, it's -- it eventually gets attached

23 to a particular fight, that's correct, but I actually do it

24 every month.  I update the foreclosure share metric every month.

25        THE COURT:  No.  But I'm saying, the nine month forward

-2:15-cv-01045-RFB-PAL-

1   and the nine month back, is that focussed on the date of the

2   fight, the last fight?

3          THE WITNESS:  Eventually it will get -- these will get

4   merged up to a particular event, that's correct, and I'll be

5   looking at who's fighting in the event.  But I want to make sure

6   when I -- when I go to calculate Zuffa's share of all fighters

7   in the relevant input market, I want to make sure that I've --

8   that I've cast my net to include everybody who not only has a

9   rank, but who has also been active, right?  And the way that you

10  get in the numerator is if you fought at a Zuffa event pursuant

11  to a contract that contained the three elements that we think

12  are consistent with exclusionary conduct, or potentially

13  exclusionary.

14         THE COURT:  Okay.

15         THE WITNESS:  If I could just say one other thing that

16  motivates the window.  And there's nothing special about nine

17  months.  And we've tried it -- we've tried it different ways and

18  it doesn't affect, but I just want to say -- I just want to say

19  that.  Imagine if you drew a window that was three hours before

20  the event and three hours after the event, just for academic

21  purposes, right?  What would happen?  The only people -- the

22  only fighters in the relevant market would be the 20 fighters

23  who were featured --

24         THE COURT:  Right.

25         THE WITNESS:  -- on that day.  So -- and so that

—2:15-cv-01045-RFB-PAL—

1  intuitively made no sense to us.  What we wanted to make sure

2  was to draw the window wide enough so as to -- so as to get as

3  reasonable a view or vantage on who is in, who is in this

4  market, who's active at the time.

5        THE COURT:  Right.

6  BY MR. CRAMER:

7  Q.  I believe you just said this, but did your use of this

8  window bias your computation of foreclosure share in any way?

9  A.  Not in any way.  I've tried it with -- I've tried it with

10  different variations in the window size and that does not have

11  an effect.

12  Q.  And that's in your rebuttal report at paragraph 56 and 57.

13        All right.  Let me ask you a hypothetical.

14  A.  Okay.

15  Q.  Let's say a fighter competes for Bellator in a bout in

16  February.  He signs with Zuffa in March.  He doesn't compete in

17  April at all.  Does he count as foreclosed by Zuffa in April

18  even though he's locked up by Zuffa?

19  A.  According to my method, he would not be.  So I'm going to

20  assume that he fought for Bellator, I think you said, in

21  February.  He signed an exclusive -- he signed an agreement,

22  Mr. Cramer, that contains these three -- these three elements,

23  right?

24  Q.  Yes.

25  A.  Okay.  But he doesn't -- he doesn't fight in April, and

2:15-cv-01045-RFB-PAL

1    we're trying to come up with the measure in April.  How would

2    the code treat him?

3            Now, we know in our hearts that he is foreclosed, or

4    he's potentially foreclosed because he signed this agreement.

5    But because he hasn't fought yet for Zuffa he's going to be

6    treated as if he's not foreclosed by the way that I did it.  And

7    I think -- I think Mr. Isaacson -- we could come up with

8    hypotheticals until -- until the cows come home.  We could come

9    up with hypotheticals as to how it undercounts when a fighter is

10   actually foreclosed, but we don't treat him as being foreclosed.

11   And I think Mr. Isaacson -- I couldn't follow it, but I think he

12   was trying to come up with a hypothetical in which a fighter was

13   being treated as being foreclosed, but he wasn't really

14   foreclosed because of this timing issue.

15           And at the end of the day, Dr. Topel has never picked

16   up this -- this issue and measured what the effect is.  And I

17   haven't either, and I'm of the opinion that to the extent there

18   are any errors in one direction of overcounting, they're going

19   to be offset by errors in undercounting.  But let me tell you

20   this.  We will never have an error -- on a day of a fight we

21   will never -- someone who fought for Zuffa pursuant to a

22   contract, there's no way that we will misclassify that person on

23   that day.  If that person is fighting pursuant to an

24   exclusionary conduct, we will treat him as being foreclosed, and

25   if he's not, we won't.

————2:15-cv-01045-RFB-PAL————

1           THE COURT:  Okay.

2   BY MR. CRAMER:

3   *Q.*  Dr. Topel said that he has not come across articles using

4   wage share as a dependent variable in a regression, similar to

5   what you did.  Have you, in your research, found such articles?

6   *A.*  Yes, I have.

7   *Q.*  And those are listed -- we don't need to go through them

8   all -- in his rebuttal report at paragraph 104.

9           And you also came across multiple articles using wage

10  share in sports, right?

11  *A.*  Yes.  In fact, wage share was the common metric with which

12  sports economists assessed changes in restrictions on labor

13  market mobility on worker outcomes, or athlete outcomes.  This

14  is the lens of an analysis, and this is exactly what I'm doing

15  here.

16  *Q.*  All right.  You just mentioned restrictions on athlete

17  mobility.  I'd like to show you slide 12 from -- put it up.

18  This is from Dr. Topel's direct.  It's paragraph 200 from his

19  report.  And I'd just like to draw your attention to the

20  bracketed -- in my little blue bracket part of this where he

21  says, "In the absence of such restrictions" -- talking about

22  restrictions in contracts -- "promoters would not capture the

23  full value of their promotional investments and therefore would

24  do less promotion."

25           Do you see that?

─────2:15-cv-01045-RFB-PAL─────

1           In other words, he's implying here, as he does in his
2   reports, that the exclusive contracts are procompetitive because
3   they're output enhancing.  If we got rid of the contracts, he's
4   saying that output would fall.  Before I ask you whether this
5   makes sense, I want to show you a chart from your report.  And
6   this -- I'd like you to describe what this chart shows.
7   **A.**  All right.  And so, Your Honor, in my monopoly section,
8   which we haven't had much time to talk about because we decided
9   to focus my direct on the monopsony, there's a section entitled
10  "Direct Evidence of Monopoly Power."  And what I did was I
11  charted for a given relevant input market.  This is the ranked
12  market.  So now I'm looking at events.
13           MR. ISAACSON:  I apologize for interrupting.  This
14  is -- we can't find this at the page number matching to what you
15  previously gave us as the Singer deck.
16           MR. CRAMER:  The -- oh, this wasn't in -- this is --
17  this wasn't in the deck that we gave you.  This was for
18  rebuttal.
19           MR. ISAACSON:  Oh.  Okay.  This is a new -- do you have
20  copies --
21           THE COURT:  This is a rebuttal report?
22           MR. CRAMER:  This is in his first report, figure 4B.
23  It's actually a simplification of what's in his report at 4B.
24  4B had some other lines that we could talk about, but there's
25  only one line that we wanted to focus on, so -- but it's in his

—2:15-cv-01045-RFB-PAL—

1    first report, figure 4B.

2          THE WITNESS:  Right.  And so, Your Honor, what I --

3    what I did was I charted the number of events across all

4    promotions -- not just Zuffa, but non-Zuffa promotions -- that

5    featured a fighter who appeared in my ranked market between

6    2000 -- at least one fighter appeared in my ranked market

7    between 2001 and 2016.  And I went through event by event in

8    Sure Dog, and I -- and then I combined that with the ranking

9    data.  And I want to see how many events were being put on in

10   North America that featured a ranked fighter over -- over the

11   course of the study period.

12         And what I found was that while it was true that

13   Zuffa's events featuring these -- these highly ranked or --

14   sorry -- just ranked fighters was increasing over the study

15   period, no doubt, it wasn't increasing fast enough to offset the

16   decrease in non-Zuffa events that featured ranked fighters.  In

17   other words, as the foreclosure share grew over the study

18   period, what we saw was the diminution in output across the

19   entire market.  And this is the kind -- I offer this up as

20   direct evidence of Zuffa's monopoly power because what happens

21   in a monopolized market is that output is contracted as prices

22   rise, and that's what happened here.

23   *Q.*  What happened in other sports when restrictions like the

24   reserve clause in baseball were lifted to output?

25   *A.*  Right.  In other sports -- this is, again, restate

—2:15-cv-01045-RFB-PAL—

1   Dr. Topel's prediction of what would happen here.  Dr. Topel

2   says if you don't let Zuffa lock these fighters up into

3   long-term exclusive contracts that restrict labor mobility, that

4   Zuffa's going to stop investing in promotion, output's going to

5   fall, and other list of -- a parade of horribles are going to

6   happen.  Dogs and cats are going to be friends.

7           And, so, what I want to point out is that this

8   characterization is completely at odds with what has happened --

9   what the economic literature has shown to have happened in other

10  sports around the time that restrictions on labor mobility were

11  relaxed.  Now I went through in my report, study after study,

12  but the general flavor is that when restrictions were relaxed,

13  demand for the sport exploded, output increased, wages

14  increased.

15          And, so -- so, what he wants you to believe, Your

16  Honor, is that this sport would somehow be different, that this

17  parade of horribles is going to happen here if you remove what

18  the -- what is equivalent to the reserve clause.  If you remove

19  that reserve clause here, the sky is going to fall.  Never mind

20  the fact that in every other sport where something like the

21  reserve clause has been removed output has increased.

22          I just want to lay that -- that contradiction on the

23  board for you.

24          MR. CRAMER:  And this is a good preview for Friday

25  where we'll hear from Professor Zimbalist who elaborates on this

———2:15-cv-01045-RFB-PAL———

 1   issue.  He's a sports economist and obviously an expert in

 2   various different sports and what happened in those sports when

 3   restrictions on mobility were removed.

 4          I am almost done, Your Honor.

 5   BY MR. CRAMER:

 6   Q.  Two further questions.  Mr. Isaacson argued that there was

 7   no evidence that the challenged conduct had any effect on other

 8   promoter's ability to compete.  And when you were given an

 9   opportunity to respond, Dr. Singer, you pointed to record

10   evidence, there's Deutsche Bank documents, evidence from

11   Scott Coker who said he was impaired in his ability to compete

12   and --

13          THE COURT:  So is there a question there, Mr. Cramer?

14          MR. CRAMER:  Yes.  Yes.

15   BY MR. CRAMER:

16   Q.  One more -- well, Mr. Isaacson made an argument about this

17   so I --

18          THE COURT:  Well, I understand that.  You're --

19          MR. CRAMER:  Yeah.  Yeah.

20          THE COURT:  -- making an equally compelling argument as

21   an attorney back, but I just wanted to ask if there were

22   questions to Dr. Singer.

23          MR. CRAMER:  Yes.  There -- you are -- you are right.

24   There is a question.  One more.

25   BY MR. CRAMER:

—2:15-cv-01045-RFB-PAL—

1   *Q.*  What happened to the number of promoters with headline

2   fighters, fighters in the top, the ones that are generating the

3   majority of the value, when -- from 2010 to 2016?  And I'm going

4   to put on your slide 33 from your direct testimony.

5   **A.**  Okay.  So as you can see, Your Honor, remember, we have two

6   economic actors in the --

7          THE COURT:  Right.

8          THE WITNESS:  -- in the headliner input market.  You

9   have the buyers, which are the promotions, and the sellers,

10  which are the fighters themselves.  And -- and what I tracked

11  was the number of unique promoters by year.  And what you see is

12  a shrinkage.  It went from 34 unique promoters, in 2010, that

13  had at least one fighter in the top 15, down to only six by

14  2016.  Right?

15         And, so, what Mr. Isaacson is trying to suggest is

16  there was no rival impairment here, right, rivals are doing --

17  are doing wonderful.  Well, I don't doubt that rivals are --

18  some rivals are just getting by, but to the extent wonderful is

19  defined as showcasing headliners, rivals are being wiped out.

20         THE COURT:  Let me ask you this other question that

21  came up, which was this argument that somehow if you look at the

22  compensation for Strikeforce fighters and then for Bellator

23  fighters, that they were unaffected by the foreclosure share or

24  Zuffa's foreclosure share and, therefore, they represent actual

25  competitive compensation.

2:15-cv-01045-RFB-PAL

1    THE WITNESS:  Dr. Topel misstated my -- my test and my

2  conclusions, so let me -- let me try to clear up the confusion.

3    I told you that I -- I computed a regression of

4  Strikeforce wage share on Zuffa's foreclosure share.  He

5  suggested that the regression was Strikeforce's wage on Zuffa's

6  foreclosure share.  And I was -- I was squirming there, but I

7  now have the opportunity to tell you that is not the test that I

8  ran.  The test that I ran is that Strikeforce's wage share was

9  not dependent on Zuffa's foreclosure share.  That gave me

10  confidence to use Strikeforce's wage share as -- as -- as a

11  useful benchmark and also gave me confidence -- we had this

12  debate about -- about what to do with the foreclosure share when

13  you pool the data together, the Strikeforce observations and the

14  Zuffa observations.  But what's important --

15    THE COURT:  And you could only do that, though, for

16  Strikeforce; you couldn't do it for Bellator?

17    THE WITNESS:  I didn't have the kind of granular

18  competition data for Strikeforce --

19    MR. CRAMER:  For Bellator.

20    THE WITNESS:  I'm sorry.  For Bellator.

21    THE COURT:  For Bellator.  So remind me then, the wage

22  share for Strikeforce at the time was what percentage?

23    THE WITNESS:  I think this was in the 60s, 63 percent.

24    THE COURT:  Okay.  And was the compensation, the

25  absolute compensation, also different between --

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  Sure.

2          THE COURT:  -- Zuffa and Strikeforce?

3          And what was the differences in those numbers?  Do you

4    recall?

5          THE WITNESS:  I don't have them memorized, but I will

6    grant that the level of compensation was lower for Strikeforce

7    at the time than for -- than for Zuffa.  But, remember, if what

8    Strike- -- if what -- think about the theory of harm here.  If

9    what Zuffa was doing was impairing Strikeforce's ability to

10   compete effectively by depriving it of a must-have input, namely

11   highly ranked fighters, then that would have the effect of

12   depressing Strikeforce's revenues and through the wage share

13   that they elected, 63 percent, that would translate into a lower

14   wage.

15         THE COURT:  Right.

16         THE WITNESS:  Right.  And so that's why I'm not

17   comfortable using Strikeforce's wage as the -- as the

18   competitive benchmark because that wage was potentially

19   contaminated by the challenged conduct.  What I -- what I ruled

20   out was the possibility that Strikeforce's wage share was

21   contaminated by the challenged conduct, because I tested that

22   empirically.  And that gave me confidence that that is an

23   untainted competitive benchmark, in Dr. Topel's words, a natural

24   candidate for a benchmark.

25         THE COURT:  And why -- and why did -- so why would the

1   compensation be affected by the foreclosure share, but not the

2   wage share?

3           THE WITNESS:  Oh, I -- I -- I tried -- I'll try it --

4   maybe I'll try it a different way, but I think that what happens

5   is that we know that the wage share was set independent of the

6   conduct.  We know that empirically.  So -- so, I have confidence

7   in thinking that Strikeforce says to itself, in our business

8   model, we're going to give our fighters about 60 percent of the

9   event revenues.  All right?

10          And, now, what happens is, to the extent that the

11  conduct suppresses Strikeforce's event revenues, right, they

12  can't charge as much, they can't -- they can't sell as many

13  tickets, they can't put as many butts in chairs because they've

14  been deprived of this key must-have input, the high -- the

15  ranked fighters.  And, so, as a result, to the extent that the

16  conduct is pushing -- is holding down their revenues, it's also

17  holding down their wages.

18          We also talked, too, about that the pool is related

19  but -- and I'm repeating, but that pool of Strikeforce fighters

20  just wasn't as valuable, of course, given that it had lower --

21  lower ranked -- relatively lower ranked fighters than did Zuffa,

22  right?  And, so, when you take that same set of pool and you

23  move them into the -- into the Zuffa pool, you are combining it

24  with more highly ranked and, so, their MRPs go up --

25          THE COURT:  Right.

1          THE WITNESS:  -- because of this network effect.

2          THE COURT:  Got it.

3    BY MR. CRAMER:

4    *Q.*  One final question, Dr. Singer.  How does your model account

5    for increases in revenues in Mixed Martial Arts, at the UFC in

6    particular, due to the increasing popularity of the sport and

7    the increasing popularity of the fighters who compete in that

8    sport?

9    **A.**  It accounts for it by using the wage share as the dependent

10   variable.

11         THE COURT:  In what way?

12         THE WITNESS:  Because we know that the wage share is

13   controlling for changes in events that occur over time.  And

14   we -- we also know that those changes, for Dr. Topel's testimony

15   that was put on the board, are reflective of increases in the

16   marginal revenue product of the fighters themselves.  So you

17   have to control for -- for the event revenues somehow.  When

18   making a prediction of what the conduct did to fighters, you

19   must control for the event revenues.  And it is my opinion that

20   the traditional way to do it in the sports economics literature

21   is via the wage share.

22         THE COURT:  Okay.  Thank you.

23         MR. CRAMER:  That's all the questions I have,

24   Your Honor, unless you have anything else.

25         THE COURT:  No.  I don't have anything else.  Thank

—2:15-cv-01045-RFB-PAL—

1  you.

2         MR. CRAMER:  Thank you.

3         THE COURT:  Thank you, Dr. Singer.

4         MR. ISAACSON:  Your Honor, may I have a very short time

5  for clarifying questions, particularly --

6         THE COURT:  No.  No.  I didn't allow it for Mr. Cramer.

7  I'm not going to allow it for -- for Dr. Topel.  I'm not going

8  to allow it for Dr. Singer.  This is meant to be rebuttal

9  testimony.  I don't think there's anything else that we need to

10  do.

11         MR. ISAACSON:  Well, Your Honor, that chart, which was

12  shown for the first time, which, as counsel said, was not -- was

13  an excerpt of something from his report --

14         THE COURT:  Well, if you want to -- so here's what I

15  will tell you.  If you want to argue about whether or not that I

16  should consider the chart or not, that's fine.

17         MR. ISAACSON:  I think you should understand --

18         THE COURT:  But we don't need to have further questions

19  from Dr. Singer.  You can just talk about whether or not I

20  should include the chart or not.

21         MR. ISAACSON:  It's -- I -- I would like you to

22  understand what was left out.  I don't care if you consider it.

23  I would like you to understand what was left out.

24         THE COURT:  No.  I'm not going to allow that.  I didn't

25  allow it, again, for Mr. Cramer for Dr. Topel.  So, we'll end

2:15-cv-01045-RFB-PAL

1  with Dr. Singer there.  Thank you.

2          MR. CRAMER:  Thank you, Your Honor.

3          THE COURT:  All right.  We will take our lunch break

4  now and then we'll come back.  I don't know that we have

5  anything else except for housekeeping.  We have to work out some

6  issues, I think.  Is there anything else we need to do besides

7  some housekeeping issues today when we come back from lunch?

8          Mr. Cramer?  Mr. Isaacson?

9          MR. CRAMER:  No, Your Honor.  After lunch we have some

10 things we want to put into the record really answering your

11 questions.

12         THE COURT:  So one of the things I do want to make sure

13 you all talk about is, to extent that there were things that

14 were shown that are not attached to the reports, that those get

15 admitted as part of the record, Mr. Cramer, Mr. Isaacson.  And

16 then we'll go over the remainder of the schedule for this week

17 and then the -- the hearing schedules later.

18         So, is there anything else then?

19         MR. CRAMER:  That's all, Your Honor.

20         THE COURT:  Mr. Isaacson?

21         MR. ISAACSON:  No.  I agree.  Nothing else.

22         THE COURT:  Okay.  All right.  Thank you.  We'll be

23 adjourned.

24     (Recess taken at 12:51 p.m.)

25     (Resumed at 2:16 p.m.)

2:15-cv-01045-RFB-PAL

1          THE COURT:  Please be seated.

2          All right.  We're back on the record here.  I'm going

3   to talk a little bit about the schedule for Friday.  So, we have

4   the two experts for Friday coming.  And initially you guys had

5   said two and a half hours.  I don't know that we need that much

6   time.  So, tell me what you think you'll need to do with respect

7   to experts.  Mr. Cramer, I'll start with you.

8          MR. CRAMER:  I'm going to allow Mr. Silverman to

9   address this issue since he's handling Professor Zimbalist.

10          THE COURT:  Okay.

11          MR. SILVERMAN:  Good afternoon, Your Honor.

12          So, I actually wanted to ask you what you thought would

13   be helpful to hear from Mr. Zimbalist on so we could focus our

14   presentation.  We were planning originally in two and a half

15   hours to go through most of his opinions and summarize them, in

16   particular looking at his opinions on the development of free

17   agency in all of the league sports and his analysis of how

18   boxing has changed over time and how that affected both athlete

19   compensation in those sports and also output -- some of the

20   topics that we also talked about today and previewed.  We were

21   also hoping to go over his --

22          THE COURT:  Well, we don't need to summarize all of his

23   opinion.

24          MR. SILVERMAN:  Sure.

25          THE COURT:  The only thing that seems to me that might

 1  be potentially relevant would be the degree to which he thinks

 2  the different markets that he's looked at, apart from the MMA

 3  market, are analogous to the MMA market at different stages of

 4  their development.

 5          MR. SILVERMAN:  Okay.

 6          THE COURT:  I don't see that that takes that long.

 7          MR. SILVERMAN:  Sure.

 8          THE COURT:  But it seems to me one of the issue

 9  where -- I don't know if there was necessarily disagreement, but

10  there certainly was discussion with Dr. Singer and Dr. Topel

11  related to the reasonableness of using comparable professional

12  markets.  So it would be helpful to have Professor Zimbalist's

13  opinion about that.

14          MR. SILVERMAN:  Absolutely.

15          THE COURT:  Particularly as it relates to the issue of

16  restrictive clauses or free agency, whatever you want -- reserve

17  clause, however we describe it, essentially going from a

18  circumstance where there are more restrictive contracts to less

19  restrictive contracts.  I don't see how that is more than an

20  hour.

21          MR. SILVERMAN:  Sure.

22          THE COURT:  Is there anything else you think after

23  you've heard this testimony that would be helpful for me to

24  consider?  Because I don't know that there's anything else

25  besides that, honestly.

1          MR. SILVERMAN:  So the only other thing and this is

2     related is that -- that Professor Zimbalist responds to some of

3     the procompetitive efficiency defenses that have been offered by

4     Dr. Topel that were discussed a little bit today.  That kind of

5     overlaps because a lot of his responses to those efficiency

6     defenses refer to what happened in these other yardstick sports.

7          THE COURT:  So that seems like it would be part of the

8     same discussion, right.

9          MR. SILVERMAN:  Sure.  Yeah.

10          THE COURT:  So part of the discussion would be about to

11     what extent they're analogous.  There was one question I think

12     or issue that was raised by Dr. Topel as relates to unions or

13     not, but boxing's not unionized the way that, for example, the

14     other professions were.

15          MR. SILVERMAN:  Right.

16          THE COURT:  Professor Zimbalist will talk about that.

17     So talking about the extent to which they were restrictive

18     contracts, how that might have affected the number of events and

19     the competition, those would be things that Professor Zimbalist

20     could talk about.

21          MR. SILVERMAN:  Okay.

22          THE COURT:  But they're related to one another.

23          MR. SILVERMAN:  Yes.

24          THE COURT:  And it doesn't seem to me that it takes

25     more than an hour, hour and a half and 15 minutes to do that.

```
                      ─2:15-cv-01045-RFB-PAL─
```

1           MR. SILVERMAN:  I'm sure we can stick to that time

2    frame, yeah.

3           THE COURT:  So -- or at most an hour and a half

4    because, again, I think there's been a fair amount of testimony

5    already, and a lot of this -- the court's decision is going to

6    focus on the modelling and the purpose of the model.  And so

7    Professor Zimbalist offers I think a very unique, but very small

8    part of that which really relates to the reasonableness of the

9    comparisons and what happens in the context of procompetitive or

10   anticompetitive effect with respect to these restrictive

11   contracts and the removal of restrictive clauses.

12          MR. SILVERMAN:  That makes sense.  Absolutely.

13          THE COURT:  Okay.  So -- all right.  Thank you.

14          MR. SILVERMAN:  You're welcome.  Thank you, Your Honor.

15          THE COURT:  All right.  Mr. Isaacson, are you doing --

16          MR. ISAACSON:  I'm not doing --

17          THE COURT:  Professor --

18          MR. ISAACSON:  -- professor Blair, but my colleague who

19   is doing it isn't here.  So I will speak for him.  But if you

20   want an hour to an hour and a half, we will -- that's what we

21   will do.

22          THE COURT:  Okay.  All right.  So -- and Professor

23   Blair would talk about?

24          MR. ISAACSON:  Yes.

25          THE COURT:  What would he talk about?

 1          MR. ISAACSON:  So we will talk about the comparators as

 2  you said --

 3          THE COURT:  I just want to make sure he's going to talk

 4  about the same things that Professor Zimbalist will talk about.

 5  There's nothing different that you think he needs to talk about

 6  in this context.

 7          MR. ISAACSON:  His report -- I mean, the comparators

 8  are being used here with wage share.  So Professor Blair had

 9  something to say about that in his report, and so we would

10  include that because this isn't -- this -- you know, yardsticks

11  and wage share are a unique combination.  And so he would he

12  would address both.  But that's what's in his reports.

13          THE COURT:  Okay.  All right.  Thank you.

14          So looking at the schedule then here.

15          (Court conferring with court reporter.)

16          THE COURT:  All right.  So what we'll do is we'll take

17  Professor Zimbalist, and we'll start at 8:30 on Friday.

18  We'll ...

19          And we will go 8:30 to 9:45, and then we'll come back.

20  I have another engagement, and then we'll come back then at

21  11:30 and go until 3 or 3:30.  And so I'm going to allot the

22  time accordingly.  So that amounts about to two and a half hours

23  per side, but I'll give -- it's going to be two hours per side

24  per witness, so one hour, one hour, one hour, one hour.  So you

25  each will have one hour for each of the witnesses, so a total of

—2:15-cv-01045-RFB-PAL—

 1  four hours.

 2          Any questions about that?

 3          MR. CRAMER:  No, Your Honor.

 4          MR. ISAACSON:  I just alert to one issue with Professor

 5  Blair.  He has an eye condition, macular degeneration.  So if

 6  you're trying to show him documents, you have to read them to

 7  him.  So it goes a little slower.

 8          THE COURT:  Okay.  That's fine.  Are there a lot of

 9  documents you would expect that he'd have to read?

10          MR. ISAACSON:  No, but we're not in charge of the

11  cross-examination.

12          THE COURT:  Okay.  Who's doing the cross-examination?

13          And Friday, Mr. Silverman, right, you'll be seated

14  where Mr. Cramer is, right.  So you won't have to do this whole

15  circuit every time.

16          MR. SILVERMAN:  Yes, Your Honor.  That will be the

17  plan.

18          Yes.  So for his cross -- for Dr. Blair's

19  cross-examination, well, if he agrees with all of my questions,

20  then we won't need much -- that many documents at all.  But I

21  imagine that we may need to impeach with his deposition quite a

22  bit.  And I think the easiest way to do that, as I did at his

23  deposition with documents, was I read him the materials.  So my

24  plan is to -- to put the excerpts of his deposition up on the

25  screen and just read them aloud, if that will work.

1            THE COURT:  Okay.  That's fine.

2            MR. SILVERMAN:  But I think -- I think it may be a

3    little bit slower than normal, particularly if you -- if the

4    court and if Dr. Blair are going to want the full context for

5    deposition excerpts.

6            THE COURT:  Okay.  Well, we'll see how that goes then

7    in the context of his testimony.

8            MR. SILVERMAN:  Okay.

9            THE COURT:  But I appreciate that information.

10            MR. SILVERMAN:  Thank you.  You're welcome.

11            THE COURT:  All right then.  Is there anything else

12    that we need to address, Mr. Cramer?

13            MR. CRAMER:  Your Honor, just three short things.

14    We're going to prepare for Your Honor a list of exhibits to

15    admit.  We haven't done that yet.  We've been busy.

16            THE COURT:  So the "we" would that be both parties?

17    Right.  Because I don't know if the "we" means just this side of

18    the room or if the "we" means all sides.

19            MR. ISAACSON:  Yes.

20            MR. CRAMER:  Yeah, we'll work together to do that.  We

21    have the day off tomorrow.  So, perhaps, it will be -- I know

22    Zuffa has some already that we've already agreed to, but we'll

23    come up with a consolidated list.

24            And then the second thing I was going to say is Your

25    Honor has asked for just a packet of everything that was shown

-2:15-cv-01045-RFB-PAL-

1   to the Court either in a slide or on the ELMO.  I understand

2   that not all of that is an exhibit to admit.  Some of them are

3   just demonstratives, but Your Honor will get a package from us

4   of all of the things that we've shown to you.

5           THE COURT:  That's fine.

6           MR. CRAMER:  Some of will be exhibits.  Some of them

7   were, we understand, demonstratives.

8           And then the last point I just wanted to raise is just

9   on the ground rules here.  Last night we got three new

10  regressions.  We just want an understanding that the record is

11  closed at this point.  We're not going to get new regressions

12  from Dr. Blair, Dr. Topel, or Professor Oyer from Zuffa.  And I

13  just -- we just want to understand the ground rules.

14          THE COURT:  Well, I think you understand the ground

15  rules.  What you're asking me to do is direct them not to

16  produce them.  If you want to ask me to direct them not to

17  produce them, you should ask me to direct them not to produce

18  them.

19          MR. ISAACSON:  Everybody I have who can run a

20  regression is at the airport.

21          THE COURT:  Okay.

22          MR. ISAACSON:  So I am not -- you will get no new

23  regressions.

24          MR. CRAMER:  Well, I just mean between now and -- well,

25  Professor Manning and Professor Oyer are going to be testifying

2:15-cv-01045-RFB-PAL

1   in September.  And we --

2          THE COURT:  Well, no, I don't expect there would be any

3   new regressions between now and then.

4          MR. CRAMER:  Okay.  Thank you.

5          THE COURT:  And it's not even necessarily clear to me

6   that I'll need Professor Manning and Professor Oyer for further

7   testimony, honestly.  It depends upon what happens with the

8   professors tomorrow, and also the person who I do want to hear

9   from is Mr. Silva.  So that to me at this point may be more

10  significant.  I don't expect that there would be any further

11  regressions from these other professors.

12         MR. CRAMER:  Professor Manning would be happy to hear

13  that.  There's a British Airways strike and he's coming from

14  London.  We're having trouble arranging for his flights here.  I

15  think we've gotten something secured.  But as soon as Your Honor

16  makes that decision, we will let him know.

17         THE COURT:  Okay.

18         MR. CRAMER:  Thank you.

19         THE COURT:  Yes, because, I mean, I'll -- I'm likely to

20  make that decision after the hearing on Friday.  And that leads

21  me to another -- I'm sorry.  You had other issues, Mr. Cramer.

22         MR. CRAMER:  No, that was it.  Thank you, Your Honor.

23         THE COURT:  All right.

24         Mr. Isaacson.

25         MR. ISAACSON:  I was just going to say with respect to

2:15-cv-01045-RFB-PAL

1  Professor Manning as well our witness, Dr. Oyer, Professor

2  Manning actually sets fort specific criteria for when a wage

3  share should be used.  So I do think it's valuable to hear from

4  Dr. Oyer and Dr. Manning by the Court.  Because there are

5  specific criteria that their own expert is saying should be met.

6  I think the Court should be hearing that.

7          THE COURT:  Okay.  Well, the question is if -- why

8  would I necessarily -- if you want to make that argument, you've

9  made the argument to me in the briefs.  I can read the reports.

10  Is he going to say something different than what he's already

11  said?  I don't know.  And what I'm saying to you is that what I

12  feel I needed the most explanations for were the main models

13  that were at issue or the main models at issue in this case,

14  which is Dr. Singer's model.  And I don't know that there's more

15  information that I would need with respect to that that's going

16  to be anything other than some argument about what -- when it

17  should or shouldn't be used.

18          I think Dr. Topel talked about that as well.  So I

19  don't know that it wouldn't be redundant of what Dr. Topel

20  talked about.  He talked about when he thought it should or

21  shouldn't be used.  So I'm not sure what Professor Manning adds

22  to the discussion that's already been had with respect to

23  Dr. Singer and Dr. Topel, Mr. Isaacson, because they both talked

24  about it.

25          MR. ISAACSON:  Right.

2:15-cv-01045-RFB-PAL

1           THE COURT:  There are articles that they talked about
2    it and when it should be used.  And so I don't know why I would
3    hear more testimony about that if I've already had testimony
4    about that from experts from both sides.
5           MR. CRAMER:  And the criteria that he's talking about
6    are all laid out in the reports.  There's a discussion back and
7    forth.
8           MR. ISAACSON:  So what I was about to say, so as I've
9    understood this hearing so far it's been so -- principally so
10   the Court can ask questions about the major topics that we've
11   been advancing.  And what I'm saying is I think those gentlemen
12   have major topics.  And if the court doesn't have any questions
13   for them, that's one thing, but I just wanted to be clear I
14   don't think these are peripheral witnesses.  I think they are
15   important witnesses.
16           And -- and the hearing --
17           THE COURT:  They're important because -- so, in other
18   words, are they going to go over matter that Drs. Topel and
19   Dr. Singer went over?  Because I received certainly from these
20   two experts, I think, the respective parties' positions.
21   Dr. Topel was very explicit, right.  He thought that the wage
22   share shouldn't be used and why it shouldn't be used.  And so
23   the question is what do these experts add to the position of the
24   parties from the literature.  I'm not saying that they're not
25   going to talk about relevant topics, Mr. Isaacson.  But there

 1   was actually a fairly sort of robust and diverse conversation

 2   that was had as it relates to Dr. Topel and Dr. Singer about it.

 3          So, I don't know that I need more from these experts,

 4   and that's why I'm asking.  If they're simply going to repeat,

 5   for example, that we don't think that wage share should be used

 6   in this circumstance or we do think it should be used, unless

 7   they're saying something that's completely different than what

 8   is in their written material which I don't think they would be,

 9   I don't know why we would have them --

10          MR. ISAACSON:  Right.  I --

11          THE COURT:  -- in this case.  And that's why I was

12   saying that.

13          In the context of the regressions, it's helpful, for

14   example, to ask Drs. Topel and Dr. Singer how did you make this

15   decision about this variable, why did you run this regression.

16   And we're now moving to witness who have a very focussed aspect

17   to the case, and they're only relevant from my standpoint to

18   certain parts of the model.

19          So the question then becomes in terms of efficiency is

20   it efficient to have them, right, if they're simply going to be

21   reiterating the arguments that have already been made from both

22   experts in terms of the report.

23          MR. ISAACSON:  No, they wouldn't be merely reiterating

24   the arguments.  There are points being made by Dr. Oyer that

25   have not been made by Dr. Topel or where Dr. Oyer was the lead

————2:15-cv-01045-RFB-PAL————

1   witness.  Now, whether this is of use for you to hear is up to

2   you.  It is in the reports.  I mean, that -- I can't disagree

3   with that.  But some of it is theory -- some of it is

4   theoretical, but some of it is -- involves the actual model.

5   Dr. Oyer is the one -- as Dr. Topel says, Dr. Oyer's the one who

6   dealt with this win flag issue.  So things were said about that

7   where Dr. Oyer was the principal witness.

8           And it's in the reports, but I don't want to -- I don't

9   want to have this hearing not go forward and then we say in

10  future -- I don't know what we're going to be doing, but we

11  argue about this in the future and the Court hasn't had the

12  opportunity to address any questions it might have.

13          THE COURT:  Right.  Well, I appreciate that.

14          As I said, I haven't made a final decision about that.

15  That's why I asked you all for your input.  I'll go back and

16  look at the reports, but since you had said, Mr. Isaacson, I

17  don't expect any future witness are going to be running

18  regressions, that to me then suggests that part of this

19  testimony is going to be about potential sort of economic

20  standards and approaches, which I can read about.  I don't need

21  witnesses to tell me that.

22          And so the purpose of the evidentiary hearing was

23  really to address some of the questions about the variables, how

24  they were used, why certain regressions were run, what does it

25  mean that they were significant in this context or not,

1  explaining what the revenue weighting was as best they could to

2  a layperson.  I don't know that I hear from you that that type

3  of technical explanation is going to occur with these witnesses.

4         So it's not to say that I couldn't take from the

5  witness's information from their reports, but it is to say that

6  I'm not sure that a hearing's necessary if I can essentially

7  glean from the written material what they would say.

8         And it's not explaining technical aspects to it.  Now,

9  you've said that there's maybe a technical aspect to the win

10 flag.  I have to say I don't know that that's -- honestly that

11 that's persuasive one way or another, one particular variable

12 which I don't actually find to be that dispositive as it relates

13 to the overall model.  So it would have to be more than that in

14 order for me to find that they -- they were necessary in that

15 regard.

16        But I'm not making a final decision.  That's why I

17 wanted to ask you both about whether or not you thought they

18 would contribute, and if their contributions are going to be

19 largely based upon what they've stated, that's fine.

20        MR. ISAACSON:  And if I may, it's because -- you know,

21 one reason you may have that feeling is because you've only

22 heard from Dr. Singer about that and --

23        THE COURT:  No, I heard from Dr. Topel about it, too.

24        MR. ISAACSON:  No, he -- he touched on it, yes, but he

25 was not the principal witness on that.  His reports mention it,

—2:15-cv-01045-RFB-PAL—

1  but it's Dr. Oyer's reports that really going into that.  And so

2  when Dr. Singer says in rebuttal, you know, what he has to say

3  about that, it's Dr. Oyer who addresses that.

4        MR. CRAMER:  Here's the problem with that.  The reason

5  why I didn't object when Dr. Topel raised the win flag issue was

6  because Dr. Singer's here.  He can again his model.  Professor

7  Manning doesn't address the win flag issue.  Professor Manning

8  addresses wage share.  And that's it.

9        THE COURT:  So is there anything that you expect that

10  Professor Oyer's going to talk about that wasn't addressed by

11  Dr. Singer?  I thought Dr. Singer explained fairly clearly what

12  his position on the win flag issue was.

13        MR. CRAMER:  My only point is if we have Professor Oyer

14  spend 45 minutes discussing the win flag, Dr. Singer won't be

15  here.

16        THE COURT:  Trust me, he will not be spending that much

17  time talking about the win flag.  Okay.  So that's not what's

18  going to happen.  And, look, and I want to be fair because the

19  reality of it is, as I've explained, it's the plaintiffs' model

20  that has to survive scrutiny.  And so if there are issues that

21  are raised by the plaintiffs' model, I think it's fair to allow

22  them to be raised, Mr. Cramer.

23        So if Mr. Isaacson thinks that that's relevant, I'm not

24  saying that I agree with that, but I'm just saying that they can

25  make the argument.  The only question for me is whether or not

—2:15-cv-01045-RFB-PAL—

 1  it's an argument that I need that type of testimony regarding,

 2  and we'll see about that.  And I'll go back and look at the

 3  reports and see if there's something else that they can add.

 4      MR. ISAACSON:  I think generally when you read those

 5  reports you'll find them kind of technical.

 6      THE COURT:  I don't know we had some pretty technical

 7  conversations in the last few days.  So I don't know --

 8      MR. ISAACSON:  I --

 9      THE COURT:  -- if these are more technical than what

10  we've talked about.

11      MR. CRAMER:  I think Professor Manning's is pretty

12  straightforward.  So, I don't know that it's all that technical.

13  There's just a little bit of asymmetry because we'll have

14  Professor Manning talk about wage share and then Professor Oyer

15  will talk about and also win flag.  And we won't have anybody

16  talk about --

17      THE COURT:  I have full confidence, Mr. Cramer, that

18  you will be able to adequately address that.

19      MR. CRAMER:  Okay.  Thank you, Your Honor.

20      MR. DAVIS:  Your Honor, just by way of completeness,

21  there is one other issue that Dr. Manning addresses, I just want

22  to make sure the record is clear, which is the endogeneity issue

23  in Dr. Topel's regression.  That was covered today by Dr.

24  Singer.  So it's not a reason to have that second phase, but I

25  just want to be clear because I'll actually be -- if it occurs,

—2:15-cv-01045-RFB-PAL—

1    I would be the one doing the direct of Dr. Manning and the cross

2    of Dr. Oyer.

3              THE COURT:  Okay.  Okay.

4              MR. ISAACSON:  And with regards to this week, the --

5    Ms. Grigsby should address this.  There was the motion pending

6    with relation to the Golden Boy comparison.  And -- and then she

7    can also tell you about Mr. Silva's -- updates on Mr. Silva if

8    you want.

9              THE COURT:  Okay.  So ...

10             MR. ISAACSON:  And then I have one other matter --

11             THE COURT:  And so is the Golden Boy information going

12   to be part of the Friday testimony?

13             MR. SILVERMAN:  Sorry, Your Honor.  I'll try to fix

14   this on Friday.

15             So, Your Honor, Golden Boy is the basis for

16   Dr. Zimbalist's calculation of boxing's wage share.  We don't

17   think there's any big issue with that, but Zuffa has filed --

18             THE COURT:  So let me ask a question, Mr. Silverman.

19   So is the information as relates to being unsealed, is that part

20   of what he's going to talk about?  The sealed information, is

21   that part of the basis for his calculation?

22             MR. SILVERMAN:  Dr. Zimbalist -- the data that

23   Dr. Zimbalist relies on is not confidential, but the data that

24   Dr. Blair relies on I think is still marked confidential.

25             And so the dispute here is that Zuffa's filed a Daubert

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

─2:15-cv-01045-RFB-PAL─

 1   motion to exclude Dr. Zimbalist's opinion on boxing's wage share

 2   because they believe that the data that he's relied on is

 3   unreliable.  We don't think that's really an issue here.  So

 4   that's their argument to make, honestly.

 5           THE COURT:  Okay.

 6           MS. GRIGSBY:  Yeah, Your Honor.  Just so it's clear,

 7   this is not with -- with respect to Dr. Zimbalist, this is not

 8   an issue of confidentiality.  It's an issue -- a 702-type issue,

 9   Daubert, and also the evidence upon which he relies.  So,

10   specifically, he relies on Plaintiff's Exhibit 481 which is the

11   reported of Gene Deetz which was filed in redacted form in the

12   Golden Boy litigation.

13           As I previewed a little bit on Monday, Dr. Zimbalist

14   admitted in his deposition that he did absolutely nothing to

15   verify the figures that Golden Boy provided and that Gene Deetz

16   relied upon.  And, in fact, plaintiffs did subpoena Golden Boy

17   for their data, and instead of using the data they received from

18   Golden Boy, Zimbalist said that he relied upon this declaration.

19           The issue here really is just that there is a lot of

20   case law.  That that particular admission that Deetz -- that --

21   sorry -- that Zimbalist -- Dr. Zimbalist did absolutely nothing

22   to verify the accuracy of the information is not something that

23   an expert in the field can reasonably rely upon.

24           So that is our objection.  That is the subject of our

25   Daubert, but it's also our objection to him using that exhibit,

—2:15-cv-01045-RFB-PAL—

 1  to using the data at all.

 2          THE COURT:  So I haven't looked at this briefing before

 3  this afternoon.  So help me understand, Ms. Grigsby, is there

 4  any information that would indicate that this information is

 5  inaccurate in any way?

 6          MS. GRIGSBY:  Yes, and that would be the data that

 7  Golden Boy actually produced in this litigation.

 8          THE COURT:  So the data that Golden Boy actually

 9  produced in the litigation is different than the data that's in

10  the report?

11          MS. GRIGSBY:  Correct.

12          THE COURT:  And so the idea is that the data is

13  different in the context of being inaccurate or is it just more

14  or is it just different types of data?  So there's a difference

15  because people may provide more or less information or it's

16  different because what appears to be the same information is

17  reported differently.  That obviously would be a concern to me.

18          But, again, I haven't looked -- I didn't look before

19  coming out this afternoon at that particular motion.  So,

20  perhaps, you could just remind me what the nature of the

21  difference is.

22          MS. GRIGSBY:  Right.  Correct.  It appears to be the

23  latter for the same time period.  It is actually a different

24  percentage of wage share.  And Dr. Zimbalist does give reasons

25  why he is relying on the Deetz report.  However, he admits he

—2:15-cv-01045-RFB-PAL—

1  didn't take any steps to independently verify the data in the

2  Deetz report.  So basically he's saying, oh, this looks more

3  plausible to me, this redacted expert report in a different

4  case.  I did nothing to verify it.  And then, on the other hand,

5  plaintiffs obviously thought this information was relevant

6  because they subpoenaed Golden Boy to get it.  And he's saying

7  I'm just throwing it away because I don't think that it looks

8  right.

9         But, I mean, it's a threshold thing that an expert

10  needs to independent -- take some steps to independently verify,

11  whether that is some kind of other checks, before an expert can

12  actually rely upon that data in forming their opinions.  I mean,

13  experts can rely on hearsay.  Experts can rely on other experts,

14  but they must take steps.  They cannot just take something

15  without having any basis to independently verify that that

16  information is actually accurate.

17         And it appears that plaintiffs tried to do that by

18  subpoenaing Golden Boy, and when it didn't match up, they just

19  threw out what they got from the other promoter.

20         THE COURT:  Okay.  Mr. Silverman.

21         MR. SILVERMAN:  Thank you, Your Honor.  I have to admit

22  I wasn't prepared to argue this Daubert motion today, but I can

23  respond to some of this is Ms. Grigsby's points.

24         So there's two sets of data here.  One that was

25  submitted by Golden Boy and one that was attached to -- to

—2:15-cv-01045-RFB-PAL—

 1   Professor or Dr. Deetz's report.

 2        The -- both of them look pretty much the same, except

 3   that the data attached to Mr. Deetz's report has much more

 4   detailed, granular information of individual fighter

 5   compensation and event revenues attached to it.  Dr. Zimbalist

 6   did add up all of those individual numbers and made sure they

 7   added up to the total numbers.  At the end of the day he's just

 8   interested in the total annual revenue and annual fighter

 9   compensation.

10        THE COURT:  So you are saying he verified the

11   information he was going to use; he just didn't verify the other

12   information because he wasn't going to use it.

13        MR. SILVERMAN:  Right.  So what Ms. Grigsby is

14   referring to is that in his deposition they asked Dr. Zimbalist

15   what did you do to verify that this data was accurate.  And he

16   said, well, you know, he's taking the data as it is.  And then

17   in Dr. Blair's deposition Dr. Blair says we should use the data

18   that Golden Boy produced in response to a subpoena.  And when we

19   asked him did you verify that data, of course he said no, too.

20   Because when someone produces data, unless you do a 30(b)(6)

21   deposition of them -- which wasn't done for hardly any of the

22   data that anyone's relying on in this.  I don't think it was

23   done for any of the evidence that anyone is relying on in this

24   case, at least not that I'm aware of -- you have to take the

25   data as given.

1          Now, Dr. Zimbalist looked at both of those sets of

2   data, and he determined that the data that Golden Boy produced

3   in response to the subpoena was not complete.  So the wage share

4   is going to vary depending on if you have a subset of all of the

5   events for 2015 and 2016 or if you just look at some subset of

6   events.  With certain types of boxers, depending on their

7   ranking, you're going to get a -- you're not going to get

8   necessarily the same wage share.

9          And so one of the things we looked at -- one of the

10  things that Dr. Zimbalist looked at and he will -- he can

11  explain this to you himself on Friday if you're interested, is

12  that -- is that if you look at just the amount of fighter

13  compensation -- of boxer compensation listed in 2016 in the data

14  that Golden Boy produced, it's less than the amount that a

15  single boxer who Golden Boy promoted in 2016 received according

16  to both public records and the individual line items attached to

17  the Deetz data.  And, therefore, Dr. Zimbalist reasonably

18  decided that the data that was attached to the Deetz's report,

19  which again looks identical essentially, but with more detailed,

20  was more complete and accurate than the data that Golden Boy

21  produced in this case.

22         And I'd add one last thing, which is that the only

23  argument Zuffa really has here is that the data we should be

24  using is the data that Golden Boy produced in this case is just

25  that, that they produced it in this case.  But there's no reason

2:15-cv-01045-RFB-PAL

1  that a third party responding to a subpoena has to produce

2  complete and accurate data.  And, in fact, I think it's more

3  likely that they would produce complete and accurate data in a

4  case in which they are a party than in which they're a nonparty.

5          THE COURT:  So I want to make sure I am understanding,

6  Mr. Silverman.  As it relates to the wage calculation, you're

7  saying that he verified that information that was received from

8  Golden Boy in terms of the total -- total amounts was the same

9  for both sets of data?

10          MR. SILVERMAN:  He confirmed -- what he did is he

11  looked at the granular data that was -- so -- and the reason --

12  this is the reason we marked the -- marked this data as an

13  exhibit so that on Friday, if Your Honor was interested and if

14  Your Honor thought that this argument needed to be resolved in

15  order to resolve this motion, that you could see exactly what

16  this data looks like.  And I don't have that available right

17  now, but we will have it available on Friday if you want to see

18  it.

19          And -- and what you'll see is that we have a high-level

20  table that says annual fighter expenses and total revenues,

21  event revenues, and a few -- along with a few other line items

22  that aren't relevant to us.  And then behind that there's a list

23  of all of the fighter -- all of the events and the fighters and

24  their compensation and the revenue that was generated out of

25  that event.  And what Dr. Zimbalist did is he added up all of

—2:15-cv-01045-RFB-PAL—

1   the individual fighters and saw that that, in fact, added up to

2   the annual totals.

3          So that's one thing he did to verify.  The other thing

4   he did was compare the overall wage share numbers that are

5   calculated from -- from this data to other boxing promoters

6   whose data he received at some point during discovery and saw

7   that those numbers lined up much more closely with the -- with

8   the wage shares that were calculated from the data attached to

9   the Deetz report as opposed to the data that was produced in

10  Golden Boy.

11         THE COURT:  Well, and is his testimony focussed

12  primarily on Golden Boy or does it include other promoters, too?

13         MR. SILVERMAN:  So he only used the Golden Boy data to

14  calculate the boxing wage share, but he verified that number by

15  -- he did -- he did manage to find data from other boxing

16  promoters which he can use to -- to assess whether that number

17  is generally representative of the -- of the sport as a whole.

18         THE COURT:  Okay.

19         MS. GRIGSBY:  Your Honor, I --

20         THE COURT:  So, Ms. Grigsby, let me ask you this

21  question.  When you're saying that he didn't verify the

22  information, you're not disputing that this information was --

23  both sets of information were provided by Golden Boy, right?

24         MS. GRIGSBY:  So this is an --

25         THE COURT:  That's a yes-or-no question.

1          MS. GRIGSBY:  So we are not disputing that Golden Boy's

2     expert put forth this report.

3          THE COURT:  Right.  So you're not disputing that the

4     information came from Golden Boy in both sets of data, right?

5          MS. GRIGSBY:  We do not dispute that.

6          THE COURT:  Okay.  So the dispute that you're having is

7     you're saying that he should have been and when he received the

8     information -- and I want to be clear.  That's why I'm asking

9     that, Ms. Grigsby.  What is it that you're saying that should

10    have been done to verify information in the context of these two

11    sets of data if you're not disputing the fact that it was

12    provided by Golden Boy?

13         MS. GRIGSBY:  So plaintiffs have said that there is no

14    way that they could have actually verified it.  That is untrue.

15    They actually had a subpoena for deposition testimony to Golden

16    Boy, and they chose not to pursue that.  I think it's very

17    important to look at what the redacted Deetz report actually

18    looks like because plaintiffs are now representing that it is

19    something it is not.  So like, for example, if you look at --

20         THE COURT:  Okay.  So back up for a second.

21         MS. GRIGSBY:  Yes.

22         THE COURT:  Are you saying that it's unverified because

23    what they should have done after they produced it -- and I'm

24    saying "they," plaintiffs -- is they should have had a 30(b)(6)

25    deponent come in and say this is the data that we actually

—2:15-cv-01045-RFB-PAL—

1  produced?

2          MS. GRIGSBY:  No.  They had received data in this

3  litigation.  Their expert did not use that data.  If plaintiffs

4  believed there was an issue with the data and it did not

5  accurately reflect wage share as plaintiffs are trying to define

6  it, they should have pursued that deposition to determine why

7  there is some kind of a disconnect between what Dr. Deetz is

8  performing and how Dr. -- and what the actual data is that they

9  received from this promoter.

10          THE COURT:  So, in other words -- hold on just a

11  moment.  So, in other words, you're not -- you're not talking

12  about verification of the data from the standpoint it didn't

13  come from Golden Boy.  You're saying it did come from Golden

14  Boy.  You're not saying that somehow there's a distortion in

15  this production.  What you're saying is that to the extent that

16  there was a discrepancy between the data, that made the data

17  suspect and, therefore, they had an obligation to verify what

18  the discrepancy was before Dr. Zimbalist replied upon it.

19          MS. GRIGSBY:  So I think even using data is very

20  liberal.  So, for example, if you look at page 44 of Exhibit

21  481, which is the analysis of revenue expenses as an

22  event-by-event boxer-by-boxer basis, it is a black box.  It was

23  redacted.

24          THE COURT:  Okay.  But, Ms. Grigsby, I want you to try

25  to --

—2:15-cv-01045-RFB-PAL—

1          MR. SILVERMAN:  Can I respond?

2          THE COURT:  No, because I don't want to go back and

3   forth.

4          MS. GRIGSBY:  Sure.

5          THE COURT:  I want to make sure, Ms. Grigsby, is --

6   your argument seems to be that there were discrepancies or there

7   were omissions in the data that should have been verified, and

8   absent their verification, that creates ambiguity about the

9   validity of the data and where it comes from.  Is that right?

10          MS. GRIGSBY:  No, my argument is that an expert needs

11  to actually verify the information that that expert is using.

12  So that is --

13          THE COURT:  But the -- but the data came from Golden

14  Boy.  It was a subpoena.  They've produced it in response to the

15  subpoena.

16          MS. GRIGSBY:  No.

17          THE COURT:  So I don't understand.  If -- if the issue

18  is the data that's in the Deetz report, if I understand you

19  correctly, is it that you're saying that what -- what the expert

20  should have done was checked to see what information Dr. Deetz

21  actually used to run these regressions?  Because I'm not sure

22  when you say they didn't verify it what it is that they should

23  have actually done.

24          MS. GRIGSBY:  So, I'm sorry, I might not be precise.

25  So they got the Deetz report off of Pacer; not in response to

1  any subpoena.  So, yes, our argument is that if they were going

2  to use something that came off of Pacer, which is hearsay -- and

3  an expert report is not necessarily data.  It's not necessarily

4  evidence.  We don't know if the expert made, like, mathematical

5  errors.  We don't know what Gene Deetz did.  We do not know

6  whether this expert is actually even accurately reporting what

7  Golden Boy gave to him.

8           This is not raw data from Golden Boy.  This is

9  Dr. Deetz's interpretation of what he received from Golden Boy.

10          And, yes, in that circumstance an expert has an

11  obligation to do some kind of check to actually make sure that

12  Gene Deetz wasn't, like, leaving out rows from what he received

13  from Golden Boy.  We have no way of actually checking that.

14          And Dr. Zimbalist --

15          THE COURT:  So let me ask you a question.  So you're

16  saying that they could potentially, because you both have done

17  this, used publicly-available data, but you just couldn't use

18  it -- the expert couldn't use it to rely upon it to run his or

19  her own calculations?

20          Because both Dr. Topel and Dr. Singer actually relied

21  upon in their reports published reports about data that they

22  used to make arguments.  And so the idea that you can't use

23  public data to make an argument is one thing.  So I'm trying to

24  understand.  You can certainly do that.  If you're saying he

25  then ran a regression or did another analysis dazed upon that

—2:15-cv-01045-RFB-PAL—

1  data and he shouldn't do that, that's a separate argument.  But

2  you're not I don't think arguing that they can't or he can't

3  make an argument based upon what Golden Boy itself produced, are

4  you?

5      MS. GRIGSBY:  No, no, no.  Your Honor, the argument I'm

6  making is that you can use it -- say it was on Golden Boy's

7  website and it's publicly available.  Then we don't dispute that

8  if Golden Boy is putting out to the world that this is the

9  percentage that they're paying their boxers, that would be

10  valid.  We are not disputing that.  The difference is whether it

11  is valid for plaintiffs to go to NBC.com, pull things from a

12  website, and decide that -- with their expert without doing any

13  verification -- without having any checks and decide, okay, I'm

14  going to use that when I actually have data from the promoter

15  itself.

16      I mean, I think it's much more analogous to someone

17  going on a website, you know, ESPN, in order to get primary data

18  as opposed to going to NFL.com to get NFL data.

19      THE COURT:  So you're saying -- and I'll go back and

20  look at this -- that Dr. or Professor Zimbalist used this data

21  to run his own analyses, expert analyses, and the data wasn't

22  reliable because it was produced in this litigation and not --

23  excuse me -- verified as relates to that.

24      MS. GRIGSBY:  So when you say this data was produced in

25  this litigation, we're talking about presumably different data

—2:15-cv-01045-RFB-PAL—

1  because the percentages are different.  So Dr. Zimbalist took

2  somebody else's expert report and then decided based on someone

3  else's expert report that was filed in redacted form that he

4  would use that data.

5       What we're saying is plaintiffs have actually

6  subpoenaed -- they had all of the discovery mechanisms at their

7  disposal, and they used them.  They subpoenaed Golden Boy for

8  the data.  They actually noticed a deposition and chose not to

9  pursue it, and the reason is because the number would be lower

10  based on what they got.

11       So instead of using the discovery mechanisms at their

12  disposal, they had their expert rely on an expert report, which

13  is hearsay, in separate litigation and that expert testified

14  that he did nothing to verify the accuracy of that data.  We do

15  not know --

16       THE COURT:  So why don't we do this because we're going

17  to go back and forth, and I want to avoid that.  So what I want

18  to do is I'm going to go back and look at the motion again and

19  then have you all argue it and then decide how much I would

20  limit or not Dr. Zimbalist's testimony; because it may very well

21  be that the part of the report or his testimony that you find

22  objectionable is not a part that I really need.

23       So before we go down this path, I may in looking at the

24  report again and looking at the motion decide, you know what, I

25  don't know that I need that.  And in fact, you know, there's

—2:15-cv-01045-RFB-PAL—

1    certainly other -- well, I don't know that I'm going to need it.

2    So why don't we wait before we go down that path, but also that

3    way I can also take a look at the motions and the data again

4    because I think it will be helpful given, Ms. Grigsby, given the

5    specific arguments you're making for me to go back and review

6    that before.  And I'll do that and we'll do that at the

7    beginning of Dr. Zimbalist's testimony on Friday.

8         MS. GRIGSBY:  Yes, Your Honor.

9         THE COURT:  Thank you.

10         MR. SILVERMAN:  Thank you.

11         MS. GRIGSBY:  And one further issue on Mr. Silva since

12    you have noted that you do want to hear his testimony soon.  I

13    was just wondering if we could have a sidebar.

14         THE COURT:  Yes.  Of course.

15         MS. GRIGSBY:  Thank you, Your Honor.

16         (Whereupon sidebar conference was reported, but not

17    transcribed.)

18         THE COURT:  All right.  Is there anything else then

19    that we need to do, Mr. Isaacson?

20         MR. ISAACSON:  So you asked us, the two sides, last

21    night to exchange any questions we had about sources of what the

22    witness said in the expert reports, and both sides did that and

23    have responded to that.  There's on our side one issue as to

24    disclosure.  The -- we e-mailed them last night and there was

25    several questions, but there's only one question at issue.

2:15-cv-01045-RFB-PAL

1        Dr. Singer testified that his regressions are not

2   sensitive to weighting.  You remember he did that again today.

3   And we said please identify any backup materials you previously

4   provided of any impact regression in support of common impact

5   that's unweighted.

6        The response we got, which I can hand up to you, says:

7   In response to part B of Zuffa's request, which is what I just

8   read, plaintiff responds as follows.

9        (Counsel conferring.)

10       MR. ISAACSON:  The robustness checks are performed

11  using the data.do file, and then there's a long file name which

12  was produced as backup to SR1.  Included in the data set used by

13  the file are regenerated variables with the alternative

14  weighting methods.  To perform the robustness checks, the

15  variables in lines 119 through 135 which inform the foreclosure

16  share can be toggled for other weights.  For example, to switch

17  the model from revenue weights to unweighted in the tracked

18  market, change the variable, and then there's a long variable

19  name to another long variable name.  The code will output the

20  model results to the specified output folder in the code.

21       Now what's evident to the -- to that response is that

22  we would have to go do this check, toggle, check the variables,

23  and run the code.  And that this was not in his report.

24       MR. CRAMER:  Your Honor, we --

25       THE COURT:  Well, no, no.  I think what the report is

—2:15-cv-01045-RFB-PAL—

1   saying is that it runs it as part of the report.  So that the

2   software when they run the robustness check runs the analysis

3   and it does that.  That's what I understand that to be saying;

4   not that it -- the robustness test or a robustness check doesn't

5   necessarily have to include them providing a full table with all

6   of the coefficients for each of those checks.  There can be, as

7   I understood it from both Dr. Topel and Dr. Singer, a separate

8   robustness check that they can do in the software.  And that's

9   what that references.

10           MR. ISAACSON:  So I disagree, Your Honor, because

11  unless they have run it and disclosed it, we don't know that

12  they've run it.  So it would be similar -- I mean, we would not

13  stand --

14           THE COURT:  I'll disagree with that.  I will take a

15  look at that if you want to send that to me, but my -- my

16  finding as relates to the testimony is that the robustness

17  checks that were done as part of running the analysis -- that

18  when they run the regression, there are a series of other tests

19  that are run as it relates to the validity of the variables.

20  Hence, Dr. Topel saying when you run the regression at some

21  point it may kick out certain variables.

22           So that is also something that would run along with the

23  regression.  And so I understood both Dr. Topel and Dr. Singer

24  to be saying that when they run these regressions there -- there

25  are accompanying tests that are run to verify the validity of

—2:15-cv-01045-RFB-PAL—

1   the variables, and that that's what that represents.

2        So I don't think that that's anything different than

3   what's been provided.

4        MR. ISAACSON:  All right.  We would have no way of

5   knowing the tests that they've run if they haven't been

6   disclosed --

7        THE COURT:  Okay.  But --

8        MR. ISAACSON:  -- in the backup.

9        THE COURT:  Yes, you would because that's what I

10  understand that to mean in terms of what happened.  And even if

11  he referenced it, which he did, right, Dr. Topel would also know

12  what that means, right, and certainly could have run a test on

13  that data and didn't.

14       So I'm not going to require them to produce anything

15  more than what that is.  That's how I understand that.

16       MR. ISAACSON:  I'm not asking for more production.

17  What I'm saying is there was testimony that was given based

18  on -- believe me, I don't want more production --

19       THE COURT:  Yeah.

20       MR. ISAACSON:  -- on this.  That there was testimony

21  given on checks that were run and were not disclosed in the

22  backup data.

23       THE COURT:  Right.  So what I'm saying is I disagree

24  with that finding.  I find that what he's talking about is what

25  this is consistent with.  So I appreciate that, but I am going

—2:15-cv-01045-RFB-PAL—

1    to find something different.  Thank you.

2            MR. CRAMER:  Thank you, Your Honor.

3            THE COURT:  All right.  So I will see you all back

4    here -- let's try to be in here, for counsel at least, by 8 and

5    we'll start at 8:30.  And you're going to need to clear a little

6    space because I have another matter right now that's going to

7    come on.  We'll be adjourned.  I'll be back in just a few

8    minutes for the next case.

9            (Whereupon the proceedings concluded at 3:04 p.m.)

10                          --oOo--

11              COURT REPORTER'S CERTIFICATE

12

13        I, PATRICIA L. GANCI, Official Court Reporter, United

14   States District Court, District of Nevada, Las Vegas, Nevada,

15   certify that the foregoing is a correct transcript from the

16   record of proceedings in the above-entitled matter.

17

18   Date:  August 28, 2019.

19                              /s/ **Patricia L. Ganci**

20                              Patricia L. Ganci, RMR, CRR

21                              CCR #937

22

23

24

25