———2:15-cv-01045-RFB-PAL———

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5                  Plaintiffs,         )  Case No. 2:15-cv-01045-RFB-PAL
                                       )
6        vs.                           )  Las Vegas, Nevada
                                       )  Thursday, August 30, 2019
7  ZUFFA, LLC, d/b/a Ultimate          )  8:36 a.m.
   Fighting Championship and           )
8  UFC,                                )  EVIDENTIARY HEARING, DAY FOUR
                                       )
9                  Defendants.

10 _____

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19 APPEARANCES:        See Pages 2 and 3

20

21

   COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
23                     Las Vegas, Nevada  89101

24

   Proceedings reported by machine shorthand, transcript produced
25 by computer-aided transcription.

```
                    ─2:15-cv-01045-RFB-PAL─
```

 1  APPEARANCES:
    For the Plaintiffs:
 2
            **DON SPRINGMEYER, ESQ.**
 3          WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
            3556 E. Russell Road, 2nd Floor
 4          Las Vegas, Nevada 89120
            (702)341-5200
 5
            **ERIC L. CRAMER, ESQ.**
 6          **PATRICK F. MADDEN, ESQ.**
            **MARK R. SUTER, ESQ.**
 7          BERGER & MONTAGUE, P.C.
            1818 Market Street, Suite 3600
 8          Philadelphia, Pennsylvania 19103
            (215)875-3000
 9
10          **DANIEL H. SILVERMAN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
12          (202)408-4600
13          **JOSEPH SAVERI, ESQ.**
            **JOSHUA P. DAVIS, ESQ.**
14          THE JOSEPH SAVERI LAW FIRM, INC.
            555 Montgomery Street, Suite 1210
15          San Francisco, California 94111
            (415)500-6800
16
    For the Defendants:
17
            **J. COLBY WILLIAMS, ESQ.**
18          CAMPBELL & WILLIAMS
            700 South 7th Street
19          Las Vegas, Nevada 89101
            (702)382-5222
20
            **WILLIAM A. ISAACSON, ESQ.**
21          **STACEY K. GRIGSBY, ESQ.**
            **NICHOLAS A. WIDNELL, ESQ.**
22          **JOHN GERARDI, ESQ.**
            **ADAM SHAW, ESQ.**
23          **AMANDA STRICK, ESQ.**
            BOIES, SCHILLER & FLEXNER, LLP
24          1401 New York Avenue, NW
            Washington, DC 20015
25          (202)237-2727
```

—————————2:15-cv-01045-RFB-PAL—————————

1 | APPEARANCES CONTINUED:

2 |        **BRENT K. NAKAMURA, ESQ.**
       BOIES, SCHILLER & FLEXNER, LLP
3 |        1999 Harrison Street, Suite 900
       Oakland, California 94612
4 |        (510)874-1000

5 |

6 | ALSO PRESENT:

7 |     Riche McKnight, Esq., Zuffa

8 |                    INDEX OF EXAMINATIONS

9 |
TESTIMONY OF ANDREW ZIMBALIST, Ph.D.
10 |   Direct Examination by Mr. Silverman....................12
  Cross-Examination by Mr. Isaacson.....................52
11 |
TESTIMONY OF ROGER D. BLAIR, Ph.D.
12 |   Direct Examination by Mr. Widnell.....................94
  Cross-Examination by Mr. Silverman...................140

13 |

14 |     LAS VEGAS, NEVADA; THURSDAY, AUGUST 30, 2019; 8:36 A.M.

15 |                     --oOo--

16 |                P R O C E E D I N G S

17 |        THE COURT:  Please be seated.

18 |        So we are back on the record for day, what, four of the

19 | hearing.  I'll note the presence of counsel here.

20 |        And let's get right to the issue of the data and the

21 | testimony for today.  Ms. Grigsby, why don't you come up to the

22 | podium, please.

23 |        So I want to make sure I'm understanding the objections

24 | to Dr. Zimbalist's testimony.  It's to the use of the Golden Boy

25 | information.  Now, you have other arguments about the yardstick

—2:15-cv-01045-RFB-PAL—

1  method and the use of comparables, which I will tell you I find

2  it would be appropriate to reject based upon Dr. Topel's

3  testimony that you should be able to use comparables.  And

4  I'll -- I will allow you all to cross-examine, obviously,

5  Dr. Zimbalist about whether or not they're appropriate to use,

6  but I don't find that to be an appropriate basis to exclude his

7  testimony.

8          The question then comes down to Golden Boy.  And as I

9  understand it, your objection to the use of the Deetz

10  information.  Is that correct?

11          MS. GRIGSBY:  Correct.

12          THE COURT:  Now, his report is based upon other sources

13  besides the Deetz report, right?

14          MS. GRIGSBY:  Your Honor, it's based on the Deetz

15  report.

16          THE COURT:  He gives a report, it's not all based upon

17  Golden Boy information, right?

18          MS. GRIGSBY:  So, sorry.  His entire report, correct --

19          THE COURT:  Yes.

20          MS. GRIGSBY:  -- is based on more than just the Deetz

21  report.

22          THE COURT:  So there's testimony that he offers that's

23  unrelated to the Golden Boy information?

24          MS. GRIGSBY:  Correct.

25          THE COURT:  Okay.  And to that other testimony, you

———2:15-cv-01045-RFB-PAL———

1  have this other yardstick or sort of failed yardstick argument.

2  As it relates to the data, your objection is just to the Golden

3  Boy production of --

4          MS. GRIGSBY:  Correct.

5          THE COURT:  -- information.  Okay.

6          So what I'll do is I'll ask -- I'll will allow you to

7  ask some questions about that and then decide whether or not I'm

8  going to accept that testimony.  I assume they're going to offer

9  his testimony for other reasons, too.  But I've reviewed the

10 arguments about it.  And, Ms. Grigsby, what I'll do is let you

11 ask him some questions about it to elaborate a little bit

12 because I'm still not quite sure about how much he used it in

13 his calculations.  The report isn't actually as cleared about

14 that.  So if you want to explore that a little bit with him to

15 help me understand how much of its a reliance on the Deetz

16 information and how much he checked -- because you all gave some

17 conflicting information.

18         I don't know that I'm in a position until you ask him

19 some of those questions for me to be able to decide.  At that

20 point I might decide that it's not appropriate to use or rely

21 upon that portion of the report.  But given the conflict between

22 the parties, I think the easier way to go about this is for you

23 to go and explore some of the areas where you and --

24 Mr. Silverman, is that right?

25         MR. SILVERMAN:  Yes, Your Honor.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Disagreed about that.  Remember the other

2     day we had this disagreement about what was actually verified,

3     to the extent that I -- I couldn't really resolve that.  But

4     what I am going to do is I'll give you some latitude to question

5     him about the particular way that he did or didn't verify the

6     Golden Boy information and how much he relied upon the Deetz

7     report.

8          MS. GRIGSBY:  Yes, Your Honor.  And it will be my

9     colleague, Mr. Isaacson, doing that examination.  But we

10    understand that --

11         THE COURT:  Oh, you're not doing that.  Okay.  I

12    thought --

13         MS. GRIGSBY:  But we understand -- we understand the

14    parameters.

15         THE COURT:  Okay.  I thought you were going to be do

16    the cross.  You're not doing the cross-examination?

17         MS. GRIGSBY:  Correct.

18         THE COURT:  Oh, okay.  I guess it's just because, since

19    you've been doing all things sort of sealed, I assumed that you

20    were going to be doing part of that as well.

21         Okay.  So, I'm sorry, I should have called Mr. Isaacson

22    up here then to have that colloquy.  Okay.  But he's here, so

23    he's heard it.

24         Thank you, Ms. Grigsby.

25         MS. GRIGSBY:  Yes, Your Honor.

—2:15-cv-01045-RFB-PAL—

 1           THE COURT:  Any questions about that then,

 2   Mr. Isaacson?

 3           MR. ISAACSON:  No, Your Honor.

 4           THE COURT:  And, certainly, Mr. Isaacson, I don't want

 5   to -- by saying I'm rejecting the yardstick argument -- mean

 6   that you can't argue about the comparability of the different

 7   sports.  So it's not to say that you can't ask questions or

 8   cross about that, but it is to say that as a general matter I

 9   don't find that it's inappropriate to at least look at other

10   sports and then figure out how similar they are.

11           So it's not that you couldn't make an argument that

12   they're not similar enough, but it's -- it is, for me to reject

13   sort of the larger argument that it would never be appropriate

14   to compare MMA to other sports because they're not identical or

15   similar.

16           I sort of -- so I'm rejecting that general argument,

17   but it doesn't mean that you can't make arguments or cross

18   Dr. Zimbalist to the extent where you can say they're not close

19   enough comparables that would make sense to use these, or they

20   would be unreasonable to use these other sports comparisons.  So

21   just to clarify that.

22           Do you understand that?

23           MR. ISAACSON:  I understand, Your Honor.

24           THE COURT:  Okay.

25           All right.  So, are we ready then to go forward,

1  Mr. Silverman?

2          MR. SILVERMAN:  Yes, Your Honor.

3          THE COURT:  And so let -- also let me help the parties,

4  we do not need to go into, because I can read, the issue of the

5  history of sports and free agency.  That's a history that's

6  there.

7          Now, Dr. Zimbalist can talk about why he thinks it

8  would be appropriate to compare certain sports based upon that

9  history, but his report has a fairly lengthy section about

10 history.  I don't know how much of that you were all intending

11 to go into, but I don't know that that's particularly helpful

12 for me to have you just go through what he's written about.

13         So, Mr. Isaacson, were you going to spend a lot of time

14 on that?

15         MR. ISAACSON:  No, Your Honor.

16         THE COURT:  Okay.  I didn't think so.

17         And I assume, Mr. Isaacson, that part of your critique

18 was really going to be based upon the idea of using,

19 essentially, wage share or some type of event share revenue

20 measure and then trying to use that to compare that to UFC?

21         MR. ISAACSON:  Correct.

22         THE COURT:  Okay.

23         MR. ISAACSON:  That's a big part of it.

24         THE COURT:  Okay.  All right.

25         And, Mr. Silverman, I assume you're going to be

—2:15-cv-01045-RFB-PAL—

1  eliciting essentially the opposite; that the measures he used

2  were appropriate and are appropriate to come up with some --

3  some way to try to estimate damages in this case?

4          MR. SILVERMAN:  Yes, Your Honor.

5          One question to clarify what you just said.  We -- we

6  have -- Dr. Zimbalist is prepared not just to discuss the

7  history of the reserve system, which I'm sure he can skip.  But

8  I think we were hoping to go through some of that history just

9  to illustrate the analogs to Zuffa's contracts.  If you think

10 that would be helpful, but we're happy to skip that if Your

11 Honor --

12         THE COURT:  But that's outlined in his report, right?

13         I mean, what's he going to add --

14         MR. SILVERMAN:  That's right.

15         THE COURT:  -- that he doesn't say in the report?  I

16 mean, his report goes through a history of some of the

17 restricting -- restrictive clauses in boxing and, like, the

18 attempts to sort of regulate that, the Muhammad Ali Act.  All of

19 that is helpful.  I just don't need him to repeat that.

20         MR. SILVERMAN:  I understand, Your Honor.

21         THE COURT:  Right.  So if he wants to use information

22 to help him explain analogs because the analogs are what's going

23 to be attacked here, that's fine.  But I don't want to go

24 through and use our time just for him going through and doing a

25 history of that in terms of repeating what's already in his

2:15-cv-01045-RFB-PAL

1   report.

2           MR. SILVERMAN:  Yes, Your Honor.  Most of my

3   presentation -- well, essentially all of the presentation is --

4   is that he's prepared to talk about today is material that's in

5   his report.  So if you have -- I think we will focus on -- on

6   the benchmarks that he selected and why he selected those

7   benchmarks.

8           THE COURT:  Exactly.

9           MR. SILVERMAN:  If you have questions about anything

10  else, please feel free -- we welcome those questions.

11          The one other question I have is whether it would be

12  helpful for him to talk about how the effects of free agency in

13  the yardsticks and how that makes them good yardsticks.  That is

14  also contained in his report.

15          THE COURT:  I'm sorry?

16          MR. SILVERMAN:  The effects of free agency on wages,

17  output, and quality, essentially, in the sports that he looked

18  at.

19          THE COURT:  Well, I think maybe on wages.  I mean,

20  on -- and quality, I guess to the extent that there have been

21  arguments -- and I think Dr. Topel made some arguments about how

22  these contracts were procompetitive.

23          MR. SILVERMAN:  Exactly.

24          THE COURT:  And I assume that that's why you're

25  offering that.

————2:15-cv-01045-RFB-PAL————

1          MR. SILVERMAN:  Exactly, Your Honor.

2          THE COURT:  But I also think that's in his report.

3          So you can talk about that, but briefly.  So that makes

4   sense to me.

5          MR. SILVERMAN:  Okay.  That sounds good.

6          Would you -- and should we skip the summary of his

7   opinions and that stuff?

8          THE COURT:  You can skip that.

9          MR. SILVERMAN:  Okay.  One last question, just to

10   clarify.  Should -- Dr. Zimbalist has prepared some testimony

11   about his understanding of how Zuffa's contracts are analogous

12   to the reserve clause.

13          THE COURT:  You don't -- I don't need that.

14          MR. SILVERMAN:  Skip that.

15          Okay.  Thank you, Your Honor.

16          THE COURT:  So just so you all remember, remember you

17   get about an hour each for Dr. Zimbalist and then you get about

18   an hour each for Dr. Blair.

19          MR. SILVERMAN:  And, Your Honor --

20          THE COURT:  And our schedule today will be -- we'll go

21   from right now from 8:45 to about 9:50/10:00.  And then we'll

22   come back at 11:30 or maybe a little bit earlier and go to about

23   3:00.

24          MR. SILVERMAN:  Your Honor?

25          THE COURT:  Maybe earlier.

───2:15-cv-01045-RFB-PAL───

1        MR. SILVERMAN:  Would it be possible to reserve some of

2   the hour that we have for cross-examination with Dr. Blair and

3   use it with rebuttal with Dr. Zimbalist?

4        THE COURT:  I'm sorry, to do what?

5        MR. SILVERMAN:  To reserve some of our -- instead of

6   having a full hour to cross-examine Dr. Blair, to reserve some

7   of that time to do rebuttal with Dr. Zimbalist.

8        THE COURT:  Let's see what it is you think that you may

9   need to rebut first.  So why don't you go ahead and do your

10  presentation first.

11       MR. SILVERMAN:  Okay.  Thank you, Your Honor.

12       COURTROOM ADMINISTRATOR:  Dr. Zimbalist, please stand

13  and raise your hand.

14       THE WITNESS:  I'm sorry.

15       ANDREW ZIMBALIST, Ph.D., having duly been sworn, was

16  examined and testified as follows:

17       COURTROOM ADMINISTRATOR:  Thank you.

18       THE WITNESS:  Thank you.

19       COURTROOM ADMINISTRATOR:  Doctor, please and state and

20  spell your name for the record.

21       THE WITNESS:  Andrew Zimbalist.  A-N-D-R-E-W

22  Z-I-M-B-A-L-I-S-T.

23              DIRECT EXAMINATION OF ANDREW ZIMBALIST

24  BY MR. SILVERMAN:

25  Q.  Good morning, Dr. Zimbalist.

─2:15-cv-01045-RFB-PAL─

1  *A.*  Good morning.

2  *Q.*  Can you please explain what the phrase "free agency" refers

3  to in the league sports?

4  *A.*  "Free agency" refers to a situation where the individual

5  athlete has finished his contract obligations and is now free to

6  receive competitive bids on the open market.

7         MR. SILVERMAN:  Oh.  And can I please have the -- the

8  slides from over there brought up on the screen.  I'll be using

9  -- I'm not using them quite yet, but I will soon.

10  BY MR. SILVERMAN:

11  *Q.*  And what led to reduced restrictions on free agency in the

12  league sports?

13  *A.*  Well, it was a combination of litigation and collective

14  bargaining and in some cases rival leagues wore away eventually

15  the restrictions on free agency or the reserve clause in the

16  competitive team sports.

17  *Q.*  And what effect did the introduction of free agency have on

18  athlete compensation, wage share in the league sports?

19  *A.*  Athlete compensation and wage share rose dramatically

20  following the introduction of free agency in all of the sports.

21         THE COURT:  So, Dr. Zimbalist, are you talking about

22  both absolute -- absolute compensation and wage share?  Because

23  they're --

24         THE WITNESS:  They're different.

25         THE COURT:  They're different.

—2:15-cv-01045-RFB-PAL—

1          Or are you talking about compensation through the

2   measure of wage share?

3          THE WITNESS:  Both.

4          THE COURT:  Okay.  Thank you.

5   BY MR. SILVERMAN:

6   Q.  Have you prepared a slide to illustrate how wage share

7   increased after the introduction of free agency in professional

8   baseball?

9   A.  I have.  So what this slide shows is that just before free

10  agency was introduced, the compensation share in baseball was

11  17.6 percent.

12          In the year that it was introduced, 1977, not all

13  players were able to take advantage of it.  Nonetheless, the

14  compensation share jumped to practically three full percentage

15  points to 20.5 percent.

16          And five years later, when all of the players were able

17  to take advantage of the new collective bargaining agreement,

18  which allowed for free agency for a variety of players, the

19  share jumped to 41.1 percent.  So it more than doubled relative

20  to the pre-free agency days.

21  Q.  What is -- you mentioned "collective bargaining."  What does

22  collective bargaining have to do with free agency?

23  A.  In collective bargaining, the workers come together and they

24  meet with all of the owners or representatives of all of the

25  owners, so it's a bilateral monopoly situation.  And they

─2:15-cv-01045-RFB-PAL─

1  bargain over the conditions of the labor market, what will be

2  the conditions that will allow players to become free agents.

3        And, fundamentally, then what collective bargaining

4  does is it sets up permission for competitive labor markets to

5  exists.

6  Q.  Can you explain how free agency -- how the reserve system

7  came to an end in major league baseball and the role that

8  collective bargaining played in introducing free agency?

9        THE COURT:  He doesn't need to do that.

10        MR. SILVERMAN:  Okay.

11        THE COURT:  I'm familiar with that.

12  BY MR. SILVERMAN:

13  Q.  Zuffa has argued that one explanation for its lower wage

14  share is that it's a nascent sport that's still developing.

15        Is it possible that the reasons athlete wage share in

16  the major league sports increased over time is instead due to

17  these sports maturing rather than the relaxation of restrictions

18  on athlete mobility?

19  A.  Major League Baseball or the National League, part of Major

20  League Baseball, began in 1876.  100 years later in 1976 the

21  baseball players share languished below 20 percent.  It was not

22  until free agency was introduced that within years it more than

23  doubled.

24        So, I don't think it's at all reasonable to say that

25  the increase has to do with the maturation and the age of

1 baseball going forward.

2          One could make similar observations about the other

3 team sports.

4 *Q.* Do you think that mixed martial arts was a nascent industry

5 in 2011?

6 **A.** Well, mixed martial arts -- the broad category, as I

7 understand it, goes back quite a way.  It's identified in other

8 countries, particularly Brazil.

9          But in terms of the modern incarnation of it in the

10 United States, it goes back to 1993.  And so by the time the

11 class period in this case comes around, it's all -- it's already

12 roughly 18 or 20 years -- 20 years old.  So I don't think the

13 nascent industry argument makes a lot of sense.

14 *Q.* Let's turn to whether there are procompetitive

15 justifications for the terms in Zuffa's contracts that restrict

16 fighter mobility and how that relates to the league sports.

17          Did the leadership in the major team sports

18 historically claim that the reserve clause was necessary for the

19 success of the sport?

20 **A.** They did, indeed.  They often predicted the demise of the

21 sport without the reserve clause.

22 *Q.* What kind of things did they say?

23 **A.** So, we have in this slide here a statement from Paul

24 Richards, who was the GM of the Atlanta Braves.

25          In 1967 he said:  "This will be the end of baseball, as

1    we knew it."

2         We have statements from the president of the National

3    and the American League during the Curt Flood Challenge.  They

4    said:  "No intelligent person would continue to invest the large

5    capital required."

6         And it's not there, but it refers to the reserve,

7    unless the reserve clause remained in place.

8    Q.  And were those concerns justified?

9    A.  No, they were not.  What we know is that baseball and the

10   other team sports, indeed, went on to thrive after the

11   introduction of competitive labor markets.

12   Q.  Have you done any empirical -- well, let me step back a

13   second.

14        When you say that -- that those sports continued to

15   thrive, what happened in those sports after free agency arrived?

16   A.  Well --

17   Q.  And why did that lead to the sports thriving?

18   A.  I think a number of things happened.

19        On the ownership side, the owners now for the first

20   time had to face real labor markets and serious labor costs.

21   And what their response to that was to rationalize their

22   operation, to introduce modern business techniques, to

23   incorporate modern uses of finance, to use --

24        THE COURT:  So you're saying that the competitive labor

25   market actually also led to greater efficiencies in the business

─────2:15-cv-01045-RFB-PAL─────

 1  modelling?

 2          THE WITNESS:  Exactly.

 3          And not only efficiencies, but also more aggressive

 4  behavior towards the market and innovative behavior towards the

 5  market.  That's on the side of management.

 6          On the side of labor, what happened is now workers are

 7  getting paid, the players are getting paid much more substantial

 8  wages.  That encourages them to invest more in their own

 9  training.  It encourages the youth of America and of Latin

10  America and of Japan to look forward to the possibility of

11  baseball or the other team sports as being a viable career.

12          And they -- they more -- they do more self-training.

13  You've seen expansion, for instance, in youth sports.  You see

14  expansion in the involvement of youth sports.  You see youths

15  doing other things on their own to prepare themselves for the

16  possibility of that.  So the quality of baseball play also

17  increases.

18          At the same time, interestingly -- and I'm not sure

19  many people anticipated this, but at the same time what was

20  going on with free agency is all of a sudden the sport itself

21  became more dynamic.  Instead of having the same nine -- nine

22  players on the field for the Los Angeles Dodgers every year,

23  year after year, now you had a rotation of the players.  And

24  there was a whole other element of baseball, a whole other part

25  of the strategy which made it more interesting.

───2:15-cv-01045-RFB-PAL───

1          You have the development of the hot stove league.  All

2   of a sudden baseball fans are following baseball 12 months a

3   year instead of nine months a year.

4          All of a sudden leadership of the player development

5   organizations within teams, the general managers and the

6   sabermetricians and others have to strategize around this.  It

7   becomes a very engaging element that enhances the interest and

8   excitement around sports.

9   *Q.*  Have you done any empirical analysis studying how the

10  relaxation of restrictions on athlete mobility affected the

11  popularity of baseball?

12  **A.**  I have.

13  *Q.*  Have you prepared a slide summarizing how free agency

14  affected attendance?

15  **A.**  Yes, I have.

16  *Q.*  Can you explain this to the Court, please?

17  **A.**  Well, what this slide shows is that on -- until the

18  introduction of free agency in 1977, that baseball attendance

19  league-wide languished.  And then immediately after the

20  introduction, it jumped and then it continued to go up all the

21  way through 1990.

22  *Q.*  And how did free agency affect revenues in baseball?

23  **A.**  Same thing.  With the attendance going up, revenues went up

24  as well.

25  *Q.*  And what about operating profits, the actual profitability

—2:15-cv-01045-RFB-PAL—

1   of the sport?

2   *A.*   Likewise, in spite of the predictions of doom, profitability

3   went up because of -- as was observed, greater management

4   efficiencies, greater fan interest and popularity in the game.

5   *Q.*   Have you done any empirical analysis to study whether

6   restrictions on athlete mobility were good on balance for the

7   popularity of boxing?

8   *A.*   I have, yes.

9   *Q.*   What did you do?

10  *A.*   So, we have something of a natural experiment going back in

11  the 1950s.  In -- in 19 -- mid-1950s, there was an antitrust

12  case brought against two major boxing promoters who, at the

13  time, dominated the boxing industry.  And at the District Court

14  level in 1970 -- in 1957, there was an injunction issued that

15  proscribed the use of exclusive contracts for a period of five

16  years.  That -- that opened up the industry to more and more

17  promoters and to a degree -- for a while to a degree of

18  competition.

19          And what we see if we compare the gross boxing receipts

20  from the five years prior to the '57 injunction, to the five

21  years after the '57 injunction, that boxing revenue went up by

22  14 percent in nominal terms or 5.4 percent in real terms.  And

23  this, by the way, is a period of slow -- slow economic growth in

24  the United States.

25  *Q.*   Let's look at some of the procompetitive justifications that

—2:15-cv-01045-RFB-PAL—

 1  have been offered by Zuffa's experts in this case.

 2       Dr. Blair suggests that some of Zuffa's contractual

 3  provisions are similar to those in the major team sports.

 4       So, for example, Dr. Blair points out that the NFL has

 5  a franchise player rule that lets a team automatically renew a

 6  player's contract, like Zuffa's champion clause; he draws that

 7  analogy.

 8       Does that suggest to you that those clauses are

 9  procompetitive?

10  *A.*  No, it doesn't.

11  *Q.*  Why not?

12  *A.*  I fail to see the logic in it.  Well, first of all, as I

13  state in my report multiple times, the comparators or the

14  benchmark industries that I'm using are not perfectly

15  competitive.  They have a variety of restraints in them.

16  They're much, much more competitive than -- than MMA or the UFC,

17  but they're not completely -- they're not perfect competition.

18  They have restraints.

19       THE COURT:  So you're saying that the fact that you

20  identify other similar restraints in a sport doesn't mean that

21  that sport isn't still less restrictive than contracts that are

22  identified in this case?

23       THE WITNESS:  I'm not sure I follow that.

24       THE COURT:  So what I understand you to be saying is

25  that even though you may find other restrictive clauses in other

—2:15-cv-01045-RFB-PAL—

1   sports --

2           THE WITNESS:  Right.

3           THE COURT:  -- those other sports are still going to

4   have more procompetitive contracts than the contracts that are

5   here?

6           THE WITNESS:  In the case of my comparators, yes.

7           THE COURT:  Yes.

8           THE WITNESS:  Yes.

9           But going into the franchise player rule itself, which

10  exists, by the way, only in the NFL, doesn't exist in any of the

11  other can comparators.  This is a rule -- and it's little bit

12  more complicated than I'm going to state it because it has a

13  variety of nuances and dimensions.  But the rule basically says

14  that every team, each of the 32 teams in the NFL can designate

15  one franchise player.  And in order to do that, they have to

16  agree to pay that player at least the average salary of the top

17  five players at that position in the NFL; which is to say that a

18  market standard is being insisted upon for the -- for the

19  compensation of the franchise player.

20          So even though that franchise player maybe, with a

21  complete free agency, could have gotten more than the average of

22  the top five, nonetheless there's a benchmarking that's market

23  based about what the franchise player will be paid.

24  BY MR. SILVERMAN:

25  Q.  Would you agree with Dr. Blair that just because a

1  contractual restriction is used in the league sports that that

2  means it's procompetitive -- procompetitive as used by Zuffa?

3  What's the difference?

4  *A.*  Well, the -- there's a very important underlying antitrust

5  principle here, which is that behavior that appears to be

6  anticompetitive, if it's used by a firm with market power, can

7  have anticompetitive effects.  When anticompetitive -- when

8  there's behavior that could be anticompetitive, but it's used by

9  a firm without market power, then it doesn't have

10  anticompetitive effects.

11  *Q.*  And in the -- and in the league sports, what's the

12  significance of the fact that in the league sports you have

13  multiple teams competing for player contracts or for players?

14  *A.*  Well, primarily, there are two ways competition has been

15  generated in professional team sports.  One way it's been

16  generated historically -- and I won't go into the details, I

17  promise.

18       One way it's been generated historically is that there

19  have been rival leagues that have sprung in all of the team

20  sports.  And those rival leagues would create competition for

21  the players and push up the player share and push up player

22  salaries.

23       Another form of competition in the team sports is that

24  the teams become freed by the free agency rules to compete

25  against each other.  It's an intra-league competition.  But,

—2:15-cv-01045-RFB-PAL—

1  nonetheless, it's a robust competition.  Either 30 teams

2  competing against each other or 32 teams, in the case of the

3  NFL.

4  Q.  And does that kind of competition exist in MMA?

5  A.  No, it does not.

6  Q.  Why not?

7         THE COURT:  Mr. Silverman, I think I can figure that

8  one out.

9         MR. SILVERMAN:  Okay.  Thank you.

10  BY MR. SILVERMAN:

11  Q.  Were you able to quantify damages to the bout class as a

12  result of Zuffa's anticompetitive conduct?

13  A.  I was.

14  Q.  What methodology did you use to quantify damages to the bout

15  class?

16  A.  Yardstick methodology.

17  Q.  Is sometimes called a "benchmark" as well?

18  A.  Or benchmark methodology.

19  Q.  How does the benchmark or yardstick method work to calculate

20  damages in an antitrust case?

21  A.  You pick a group, either one firm as a comparator, as a

22  benchmark, or a group of firms as a benchmark, that are similar

23  to, substantially similar to, or reasonably similar to -- this

24  is various terms that are used in the literature, or as similar

25  as possible to.  There's a fairly wide set of writings about

2:15-cv-01045-RFB-PAL

1  exactly how you apply the standard.  But you apply the -- or you

2  pick the benchmarks that are either similar as possible or

3  substantially similar to or reasonably similar to the enterprise

4  under consideration.

5        But the comparators don't exhibit the same antitrust

6  violation that the -- the target company does.  So that enables

7  you to isolate the impact of the -- of the antitrust -- the

8  antitrust violation.

9  *Q.*  What benchmarks did you select for your analysis here?

10  *A.*  I selected the four major team sports in the United States:

11  The NFL, Major League Baseball, Major League -- NBA and NHL,

12  basketball and hockey, respectively, and boxing.

13  *Q.*  How were these benchmarks similar to MMA, such that they're

14  good benchmarks that are comparable?

15  *A.*  Well, I think the overriding feature of these other sport

16  industries -- and a substantial point that differentiates the

17  sports industry from the other industries in our economy is that

18  the athlete is the product.

19        The fans go to the arenas, they go to the stadiums,

20  they watch on television to watch the athletes.  When I buy a

21  jacket, when I buy a tie, the people who made the tie or the

22  jacket are anonymous to me.  And I don't buy the jacket or the

23  tie because I want to support or I want to watch particular

24  people make the jacket or the tie.  All of which is to say that

25  there's -- there's a production function.  There's a method of

—2:15-cv-01045-RFB-PAL—

1   production in the sports industry that is very, very labor

2   intensive or athlete intensive.  And that, of course, is true

3   across the -- the enterprises we're talking about in this case.

4           It's also the case that in MMA or UFC, they have the

5   same basic sources of revenue that they have in the professional

6   team sports and boxing, which is to say there's television or

7   media revenue, there's gate revenue, there's premium seat

8   revenue, there's sponsorship revenue, there's signage revenue,

9   and there's memorabilia revenue.  So you have the same revenue

10  sources.  And you have many of the same elements to different

11  degrees on the cost -- on the cost side.

12          So I think that that creates a basis for similarity

13  that allows for reasonable and meaningful comparisons.

14          And in those cases where one can identify differences

15  that might pollute or contaminate your effort to make reasonable

16  comparisons, one can control for them or consider them and to

17  see whether or not they would have such an impact.

18  BY MR. SILVERMAN:

19  *Q.*  How do these benchmarks differ from MMA such that they are a

20  good representation of the but-for world here?

21  **A.**  Well, in each of these cases from -- from boxing to the four

22  professional team sports, there is a very significant degree of

23  competition in their labor markets.  And so the impact of the

24  restraints that are imposed by Zuffa on the labor market in the

25  UFC are not present.

---2:15-cv-01045-RFB-PAL---

1  *Q.*  Approximately what share do you predict UFC -- what wage

2  share do you predict UFC fighters would have received in a more

3  competitive but-for world based on your analysis of these

4  yardsticks?

5  *A.*  Between 50 and 55 percent depending on the year.

6  *Q.*  How do -- how does the wage share paid by Strikeforce and

7  Bellator confirm the reliability of your yardsticks?

8  *A.*  Well, Bellator we have data for -- from 2010 through 2015,

9  and their wage share, if I remember correctly, is 48.5 percent.

10  And for Strikeforce we have data for 2010, '11, also I've seen

11  it for 2009, and their share is about 62 or 63 percent.

12        And these, of course, are -- and this is the same MMA

13  industry, these firms are in or were in.  And so it provides, I

14  think in some sense, a more pure and direct look at -- at

15  comparables by considering that they have this much, much higher

16  wage share than Zuffa.

17  *Q.*  Has Zuffa also benchmarked its compensation to the athlete

18  wage share in the same sports that you use as yardsticks?

19  *A.*  Yeah, in the -- in the record in this case --

20        THE COURT:  Sorry.  And I've read that part of the

21  report where it talks about where they do this for the

22  interview.

23        So, again, Mr. Silverman, that sort of stuff is not so

24  helpful for me because Dr. Zimbalist has identified that in

25  terms of the interviews and the other things.

—2:15-cv-01045-RFB-PAL—

1          So let's try to focus on the expertise as relates to

2   these measures.

3          MR. SILVERMAN:  Sure.

4   BY MR. SILVERMAN:

5   Q.  So some -- not to go into the presentations themselves, but

6   some of them identified other yardsticks that you didn't use or

7   potentially yardsticks that you didn't use as comparators, such

8   as NASCAR, PGA, PBR, Professional Bull Riding, Major League

9   Soccer, and the English Premiere League.  Why did you -- why

10  didn't you use those as yardsticks?

11  A.  Well, in brief, other than the English Premiere League, the

12  other sports that you mentioned don't have competitive labor

13  markets.  The English -- English Premiere League, the problem is

14  different and it has to do with a lack of clear enough data,

15  which I could go into, but I'll save it for now.

16  Q.  And did Dr. Blair agree with your assessment that major

17  league soccer does not have a competitive labor market for

18  athletes?

19  A.  He appeared to do that in his deposition, yes.

20          THE COURT:  Why don't we avoid Dr. Zimbalist's

21  commenting on what Dr. Blair said.  We can ask Dr. Blair when

22  Dr. Blair's --

23          MR. SILVERMAN:  Yes.  Yes, Your Honor.

24          (Pause.)

25          THE COURT:  Dr. Zimbalist, let me ask you this

—2:15-cv-01045-RFB-PAL—

1  question.  Why do you think that wage share, in relation to

2  wages as a percentage of revenue, is an appropriate measure to

3  compare the different comparators in the analysis?

4          THE WITNESS:  Okay.  This is a complicated question.

5  Actually, I'm going to start on -- on a simpler level, if I

6  could.

7          I think that what you find across sports is that they

8  have different level of popularity and different level of demand

9  for their product and, hence, there's different levels of

10  revenue.  And because you have different levels of revenue, if

11  you try to compare the sports based upon just the absolute wage

12  that's paid, it's very difficult.

13          You wouldn't expect the wage to be paid in a sport that

14  generated $10 million total revenue in a sport that generated

15  $100 million or $5 to $10 billion in revenue.

16          Or a different analogy might be if you take Clay

17  Bellinger from the Dodgers and he hits a home run in Dodger

18  stadium, that has a different marginal revenue product and,

19  hence -- brings about a different wage and if Clay Bellinger

20  hits the same home run in Tampa Bay --

21          (Court reporter clarification.)

22          THE COURT:  Okay.

23          THE WITNESS:  So I think that to adjust for the

24  different levels of popularity and the different levels of

25  revenue in the league, it's important to look at wage share.

2:15-cv-01045-RFB-PAL

 1          Now, if I wanted to look at wages only, the comparison

 2   I would want to look at is wages and the marginal revenue

 3   product and to see if there was a wedge there or some degree of

 4   monopsonistic exploitation.  The problem with just doing it that

 5   way is that the sports economics literature uniformly has thrown

 6   up its hands around the difficulty and all of the ambiguities in

 7   measuring marginal revenue product.

 8          So it doesn't -- again, here's something that I go into

 9   much more detail about, but it's sufficiently difficult to

10   measure marginal revenue product.  And there's sufficiently

11   enough ambiguity so that it wouldn't, in my view, be a reliable

12   and satisfying comparison to make between an ambiguous estimate

13   of marginal revenue product and the absolute wage.

14          THE COURT:  And is wage share an accepted method by

15   sports economists of looking at issues of competitiveness in the

16   labor market and procompetitive or anticompetitive behavior?

17          THE WITNESS:  Absolutely.  Absolutely.  It's all over

18   the literature.  And it's also, by the way, if economists didn't

19   do that, it would be their fault because it's all over the

20   leagues.

21          I mean, as you know, in three of the leagues that I'm

22   using, they have a salary cap which -- which stipulates a share

23   that the compensation will be a share of revenue.

24          In baseball they don't stipulate that.  There's no

25   salary cap, but it's always part of the collective bargaining

2:15-cv-01045-RFB-PAL

 1  discussions.

 2          THE COURT:  So in terms of even in any of the major

 3  league sports themselves, they use wage share as the accepted

 4  method for looking at the labor market and its competitiveness?

 5          THE WITNESS:  That's precisely right, Your Honor.

 6          THE COURT:  All right.  Thank you.

 7  BY MR. SILVERMAN:

 8  Q.  Which of the benchmarks sports you analyzed is most

 9  athletically similar to mixed martial arts?

10  A.  Probably boxing, much of my comparators.

11  Q.  How are boxing and mixed martial arts similar?

12  A.  Well, they're both -- they're both based upon

13  person-to-person combat.  They're both highly, highly dangerous

14  sports.  They both have relatively short player careers.

15  They're both organized around events or cards that has a main

16  event and has sometimes maybe two main events and then has an

17  undercard or preliminary events.  The fighters are fighting for

18  purses.  The ...

19          They're shown on Pay-Per-View or they're shown on other

20  media forms, over-the-top and traditional television.

21          So there are numerous, numerous ways in which these

22  sports deeply resemble each other.

23  Q.  What are some of the relevant differences between the market

24  structures of boxing today and MMA that makes boxing a good

25  yardstick?

——2:15-cv-01045-RFB-PAL——

1  *A.*  Well, there's competition in boxing as a result of -- of

2  legislation, primarily the 2000 Ali Act, as a result of the

3  mandatory challengers rules that are enforced by the four

4  sanctioning bodies, as a result of purse bid rules that are

5  mandated by the sanctioning bodies.  There's competition.

6        The sanctioning bodies are not tied to and they're

7  certainly not controlled by the promoters in boxing.  In boxing

8  there are well over a dozen promoters, a large number of

9  promoters who are major promoters who promote events on

10  Pay-Per-View and they compete against each other.

11        THE COURT:  So, Dr. Zimbalist, in the context of MMA,

12  is the -- I think is the Athletic Commission the only sanctioned

13  relevant body?

14        THE WITNESS:  The Athletic Commission, as I understand

15  it, is an oversight body.  It is a not a sanctioning body.  The

16  sanctioning body in the UFC is the UFC.

17        THE COURT:  Is the UFC.

18        So, in other words, there is no similar competing

19  sanctioning bodies in the MMA in the same way there are in other

20  sports?

21        THE WITNESS:  Well -- okay, to be precise -- I think

22  that that's fair, but to be precise at lower levels what might

23  want -- where one might call a minor league, there are other

24  sanctioning bodies and organizations.

25        But at a major league level, I think it's fair to say

—2:15-cv-01045-RFB-PAL—

1  that it's only the one sanctioning body.

2          THE COURT:  Okay.  And so the promoters essentially act

3  as their own sanctioning bodies?

4          THE WITNESS:  That's right.

5          THE COURT:  In terms of setting the weight classes and

6  the rules for the belts and all of that?

7          THE WITNESS:  Yes, but there's only one promoter.  The

8  promoter acts as the sanctioning body.  They're coterminous.

9          THE COURT:  And are you aware of any of these promoters

10  or sanctioning bodies issuing any regulations to restrict

11  anticompetitive bidding within those particular markets?

12          THE WITNESS:  So we're talking about UFC now?

13          THE COURT:  So there's UFC -- as far as your analysis,

14  does UFC do anything in terms of how it operates its business to

15  encourage some type of competitive wages, even internally?

16  Because obviously it's its own company, but are there any

17  efforts that you would see to try to mimic what's done by these

18  other sanctioning bodies to try to encourage labor market

19  competition?

20          THE WITNESS:  Not that I have seen, Your Honor.

21          THE COURT:  All right.

22  BY MR. SILVERMAN:

23  Q.  Dr. Zimbalist, can you explain a little more -- so, can you

24  explain a little more what copromotion is and POS and how that's

25  different in boxing than in MMA?

1   *A.*   Copromotion is when two promoters who have two different

2   fighters who want to fight against each other, either they want

3   to fight against each other, and if they're -- perhaps, the

4   sanctioning body is obligating them through a challenger rule to

5   fight against each other, they -- they decide to copromote.

6   They arrange for the fight together.  They arrange for the

7   promotion of the fight or the advertising for the fight.  They

8   make a deal with each other that they're going to get -- you

9   guys get 50 percent of the gate and we get 50 percent or

10  whatever that deal might be.  That's called promotion.

11        It means that there's -- that there's more

12  cross-fertilization and competition amongst the boxers.

13        "POS" stands for Provision Of Services.  That's a

14  similar type of arrangement, except that it's not coproduced.

15  One of the promoters leases the boxer of the other promoter and

16  signs a contract that says we'll -- we're going to take over the

17  promotion of this fight, but we're going to share revenue with

18  you in the following way.

19        The mandatory challenger rule -- did you ask me to

20  explain that as well?

21  BY MR. SILVERMAN:

22  *Q.*   Well, let me ask you -- let me ask you a more specific

23  question.  If I was a -- if I was the second ranked heavy-weight

24  boxer, let's say, according to one of the boxing sanctioning --

25  *A.*   If you were the first ranked, did you say?

────2:15-cv-01045-RFB-PAL────

1  Q.  The second.

2  **A.**  The second.

3  Q.  And let's say the first -- the heavy-weight champion was

4  under contract with a different promoter.  And if I wanted to --

5  if I, as the challenger, wanted to fight that heavy-weight

6  champion so I could become the champion or raise my public

7  profile, and the promoter who had the heavy-weight champion

8  under contract said you could only fight my boxer if you sign a

9  long-term contract with me, what would -- what would -- what

10  options would the challenger have in boxing that they wouldn't

11  have in MMA?

12  **A.**  Well, it's violation -- as you stated it, if I heard you

13  correctly, it's a violation of the Ali rule, the Ali Act.  That

14  would be coercive; that would be a coercive contract.

15          And so what rather happens is there's this mandatory

16  challenger rule that's enforced by the sanctioning bodies that

17  would obligate that fight to occur.  If the two promoters

18  involved with these two boxers couldn't come to an agreement,

19  then it would be thrown open to an outside bid.  There could be

20  a third party or multiple other parties who bid who would say:

21  Oh, well, if you let me promote this fight with these two

22  boxers, here's how much I'm willing to put on the line.

23          So that's another form in which competition is

24  generated in the boxing industry.

25  Q.  And how do those rules affect the ability of any one

—2:15-cv-01045-RFB-PAL—

1  promoter to dominate the market for the elite fighters in

2  boxing?

3  *A.*  Quite simply they can't.  Under the old rules, pre-Ali days,

4  what would happen is one promoter who had the top boxer --

5  Mr. King is known to have done this.  One promoter who has the

6  top boxer can say to the challenger or the most likely

7  challenger:  If you want to fight my guy, that's fine, but

8  here's the deal, if you win that fight you have to sign a

9  long-term contract with me.

10       And so you could parlay the fact that you had one --

11  one champion in your bucket, you can parlay that into a general

12  control over all of the major challengers in that weight class.

13  *Q.*  And that is -- is that essentially what the defendant in the

14  international boxing case was doing that you used as a natural

15  experiment in this slide we showed?

16  *A.*  Yes.

17  *Q.*  So, due to these differences that you've been describing

18  between the boxing market and the MMA market, how do these

19  differences in market structure affect boxers' wage share as

20  compared to mixed martial arts fighters' wage share?

21  *A.*  Well, the data that we have to start -- if I can, Your

22  Honor, and interrupt me if I'm saying something I'm not supposed

23  to say, but with the data that we have from Golden Boy for 2014,

24  2015, and the first half of 2016 has an average boxer share in

25  compensation at around 62 percent, I believe.

2:15-cv-01045-RFB-PAL

1           We also have data from Top Rank for three or four years

2    and that suggests even a higher -- I think there is a chart --

3    yes, there's a slide.  So the Top Ranked data shows fighter

4    shares in the upper 60s and going up to 80 percent in 2016.

5           We know from Mr. Margules' data provided in this case

6    that Warrior Boxing has fighter shares of 65.4 percent in '15

7    and '16.  And Lou DiBella who is also a boxing promoter and ran

8    the boxing program for ESPN for many years stated in his

9    deposition that 70 percent boxing share is completely common.

10          I did not use in my -- to be clear, I did not use in my

11   damages analysis these other ratios, these other shares.  These

12   are all well above the Golden Boy share that I did use of close

13   to 62 percent.

14   Q.  But you were able to get some data on wage share from boxing

15   promoters other than Golden Boy to corroborate your analysis?

16   A.  That's correct, as this slide shows.

17   Q.  And I'll go back -- I think we should go back to the Golden

18   Boy data, but I'd like to just cover a few things -- a few other

19   things first.

20          Once you selected your benchmarks, how did you

21   calculate damages?

22   A.  So, for each of the years in the class period, I took the

23   compensation share in each of my five comparator or benchmarks

24   sports and I averaged them.  And I compared that average with

25   the wage share in Zuffa in that year.  And the difference

2:15-cv-01045-RFB-PAL

1  between those two constitutes the damages.  So I took that --

2  the difference between those two and I multiplied it by the bout

3  revenue in Zuffa, and that would give me the damage for the

4  year.  And then I did that for each of the following six years

5  in the class period and I added it up, and that produced my $972

6  million damage figure.

7  *Q.*  In what way is your damage analysis conservative?

8  **A.**  It's conservative in two regards.  First of all, it's

9  conservative because my comparator sports are not perfectly

10 competitive in their labor markets.  They have a lot of

11 competition, but, as we discussed briefly, there are a variety

12 of constraints.

13       So, just for instance, in baseball you don't become a

14 free agent until you've been in -- the professional at the top

15 level in the major leagues for six years.  You don't get

16 arbitration rights until two-plus years.  So, when you have less

17 tenure than those levels, you don't have full free agency

18 rights.

19       So baseball's an interesting comparator -- same with

20 the other sports, by the way.  They're interesting comparators

21 because they do have competition in the labor market, but they

22 don't have full and open competition.  So the fact that I'm

23 comparing it to those sports isn't comparing it to a completely

24 open labor market.  So that's conservative on the one hand.

25       On the other hand, what I did in looking at the Zuffa

 1  fighter share, in order to be conservative, is I took one

 2  category that is listed in total fighter costs in the Zuffa

 3  financial statements, which is called "other fighter costs," and

 4  that category, as I looked into it, had several subcategories

 5  that clearly were not compensation to fighters.  In fact, most

 6  of them, in my view, were not compensation to fighters.  But

 7  there were a few that seemed to be compensation to fighters and

 8  there are one or two others that seemed in part to be

 9  compensation to fighters and in part not to be.

10        So I took that category, which in 2016, I think it was,

11  came to just about 3 percent of all compensation, so it was

12  significant.  I took that category that included things like

13  background checks on the boxers, visas for the boxers --

14  *Q.*  You mean for -- you mean for UFC fighters, right?

15  *A.*  I'm sorry, fighters.

16        Background checks for the fighters, background visas

17  for the fighters, coaches for the fighters -- in the ultimate

18  fighting, their coaches, their gloves that they wore, and a few

19  other things.

20        These are all clearly not compensation to the fighters,

21  but, nonetheless, they were part of this broad category of the

22  fighters costs.  And rather than trying to, which I wasn't able

23  to get enough information to do, to disaggregate it all and only

24  count part of it, I counted the whole thing.  And, again, that's

25  3 percent of -- of -- of total -- total compensation.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  So just --

2  *A.*  The numbers I'm using, they conceivably could be up to 2 or

3  3 percentage points too high, but again -- for the fighters in

4  Zuffa, that is.  But, again, I did that to present a

5  conservative estimate of what the Zuffa fighters were getting.

6          So both on -- both on the comparator side, which

7  produced somewhat lower shares than you'd would get in the fully

8  competitive labor market -- and that's also attested to by many

9  economists who have looked at this.  And on the Zuffa side, I

10  followed the methodology that would give me a higher share.

11  Both of those things are lowering -- lowering my damage

12  estimate.

13  *Q.*  So just to summarize and try to make sure I understand that.

14  So you're saying that on Table 4 -- well, in both Table 4-E and

15  5-E, fighter share and event revenue there, that's Zuffa's

16  fighter share, right?

17  *A.*  So I'm not sure which column you're pointing at.

18  *Q.*  I'm sorry.  The one, two -- the fourth column, including the

19  year.

20  *A.*  It says:  Fighter Share and Event Revenue.  That's Zuffa's

21  fighter share.

22  *Q.*  Zuffa's fighter share.

23          And so you're saying that those could be slightly

24  overstated.  Is that right?

25  *A.*  That they are probably somewhat overstated, yes.

1   *Q.*  Let's talk briefly about the Golden Boy data that you relied

2   on, since Zuffa has raised that's as a potential issue and

3   argued that it's not reliable.

4        Did you prepare a slide showing the Golden Boy data

5   that you relied on that you got from the Deetz report?

6   *A.*  Yes, I did.

7   *Q.*  And is this that data?

8   *A.*  Yes, it is.

9   *Q.*  Or this is -- this is your -- this is your summary of the

10  data, right?

11  *A.*  This is the summary of the data that was provided by

12  Mr. Deetz, but he also provided a breakdown of those categories

13  by fighter for each of the years.  And I -- I went over the

14  breakdown and confirmed that this summary was correct.

15  *Q.*  And how do you know that Mr. Deetz's data is complete and

16  accurate, the data that you relied on that was attached to his

17  report?

18  *A.*  Well, he testified to that in his report under oath.

19       He said his -- the data that he got from Golden Boy was

20  including all revenues and all expenses and that he was given

21  the QuickBooks version of all of the original data.

22  *Q.*  So, yeah, there's an appendix in his report where he

23  described the data he received from Golden Boy that he used

24  to -- to create that table that we just -- that we just looked

25  at.  Can you -- this essentially is a very similar table to the

—2:15-cv-01045-RFB-PAL—

 1  one in the back of his report, right?

 2  **A.**   That's correct.

 3  *Q.*   And -- so, yeah, can you describe again what data he

 4  received or that he said in his report that he received from

 5  Golden Boy to calculate the revenue -- Golden Boy's annual

 6  revenues and the amounts that they paid to their fighters?

 7  **A.**   The quotation reads:  "I received detailed QuickBooks

 8  spreadsheets representing all income and expenses recorded in

 9  QuickBooks for the 12-month periods ending December 31st, 2014,

10  and December 31st," 2012, "and for the six-month period ending

11  June 30th, 2016."

12  *Q.*  Did you do anything to independently verify Mr. Deetz's

13  calculation of the annual amounts paid to fighters and revenues?

14  **A.**  As I just referenced a moment ago, I looked at the detail

15  data that was disaggregated by fighter and added it up, and he

16  seemed to be representing the detail data accurately.

17  *Q.*  So just so the Court can see, this is a copy of the detail

18  data that you're referring to.  Is that right?

19  **A.**  It's for the year 2014, I believe.  I can't see it quite as

20  well on the left-hand side, but, yes, that's correct.

21          THE COURT:  And this is the detailed data that

22  Dr. Deetz had attached to his report?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.

25  BY MR. SILVERMAN:

—2:15-cv-01045-RFB-PAL—

1   *Q.*   Now -- yeah.  And this data, it's a little hard to see, but

2   it lists every -- it lists a bunch of fighters and the revenue

3   for that fighter and the fighter COGS.  Can you explain what

4   "COGS" is?

5   *A.*   Fighter COGS are fighter costs.

6   *Q.*   Okay.  So that's the amount that -- that Golden Boy paid to

7   those fighters?

8   *A.*   Yes.

9   *Q.*   Now, in his report, Dr. Blair relies on a different Golden

10   Boy data, which he argues is superior because it was produced in

11   this case.

12        Can you explain why you relied on the -- on the data

13   that was attached to Dr. Deetz's report rather than the data

14   that Dr. Blair relied on that was produced in response to a

15   subpoena by Golden Boy in this case?

16   *A.*   Yeah, there are a number of reasons why.

17        It starts with Dr. Deetz himself, who's been the

18   managing director of Navigant since 2008.  This is a firm that

19   Dr. Topel has worked with and belonged to, I believe.  It's very

20   well-known accounting firm.  Dr. Deetz is -- has been the

21   managing director for 11 years.

22        Neither Dr. Deetz nor Golden Boy would have had any

23   reason in this case to overstate fighter share in 2014.  This

24   was coming from a case that Golden Boy was bringing -- an

25   antitrust case, they were bringing against Haymon Enterprises,

—2:15-cv-01045-RFB-PAL—

1    another boxing -- another boxing promoter.

2              The work that Dr. Deetz was -- I shouldn't say

3    "doctor."  I'm not sure he's a doctor.  He's a Certified Public

4    Accountant.  What Mr. Deetz was asked to do was to look at the

5    damages because of lost profits, because of the alleged

6    antitrust behavior by Haymon.

7              In 2014 he produces a worker's share or a fighter share

8    that's higher than it is in 2015 and 2016.  In order to produce

9    larger damages, he would have to show that profits dropped more

10   in '15 and '16.  But by showing -- if he -- if there's any

11   manipulation of the data, either from Golden Boy to him or him

12   to the -- to the Court, what it would show is that profits went

13   down.  If, in other words, he made the player share seem higher,

14   player costs would be higher and/or revenues would be lower.

15   That would lower profitability in 2014, which could be

16   counterproductive for the purpose of his report from the point

17   of view of his client.

18             Now, there's also the data if you -- I don't know if we

19   have a slide for the data that you alluded to, the data that was

20   produced in this case.

21   Q.  That's this slide right here.

22   A.  Okay.  Okay.  I can't see it.

23   Q.  Oh, yeah.  So you can see?

24   A.  I can see it here.

25   Q.  Yeah.

2:15-cv-01045-RFB-PAL

1  *A.*  So if you -- when you examine this chart, which is what was

2  produced in this case, as I understand it at the last minute,

3  you see for the entirety, for the entire year of 2016, not the

4  first half, but the entire year that fighters were paid,

5  according to this chart, $7.8 million.

6          Now, if you go back to the Deetz report, you see for

7  the first half alone of 2016, there was one fighter, Saul

8  Álvarez who was paid $13.3 million.  That was his purse for a

9  fight in the first half of 2016.  He also fought in the second

10 half of 2016, according to the public record, made over $14

11 million in that.

12         But if one fighter, one fighter can make $13.3 million

13 in the first half of 2016, how could it be -- how could it be

14 the case that all fighters working for Golden Boy in the whole

15 year made over $7 million?

16         So what -- what that clearly suggests to me is that

17 there's an irreconcilable disparity here.  This data is not

18 consistent with other data.

19         And it -- it's simply is not accurate.

20 *Q.*  Are you aware --

21 *A.*  No, there's another -- there's another question here, which

22 is this -- if we're sort of trying to independently assess

23 what's going on with this data.  We know if we exclude the

24 Golden Boy data, but we go to the data from the other boxing

25 promoters that we just looked at, where the fighter shares were

—2:15-cv-01045-RFB-PAL—

1  up to 65, 70, 75 percent range, the fighter share that's implied

2  by this data is $7.8 million over $55.2 million.  So that's a

3  fighter -- I won't calculate exactly, but it's around 15

4  percent.  That also suggests that there's something very wrong

5  with this data, that it's incomplete at the very least.

6  Q.  And in terms of understanding exactly what data Golden Boy

7  produced in response to the subpoena in this case, so this is

8  actually all of the data that they produced for 2016, right?

9  A.  That's my understanding that there was no disaggregation.

10  Q.  So it's just one chart like this for 2015 and one chart like

11  that for 2016.  Was there anything else?

12  A.  For '15 and '16, which Golden Boy in their suit against

13  Haymon argued were unrepresentative years.  And there's no --

14  they provided no data at all for 2014.

15  Q.  And so there's nothing behind this to see how Golden Boy

16  calculated this or what individual fighters were paid or any

17  sort of -- you know, it's not really -- would you even call this

18  data, really?

19  A.  Well, as -- that I have seen, there's no explanation or

20  elucidation of what this means.

21  Q.  Are you aware of anything that -- anything that Zuffa or

22  Dr. Blair or his experts did to verify whether this data that

23  was produced by Golden Boy in response to this subpoena is

24  complete and accurate?

25  A.  Well, according to what Dr. Blair said in his deposition, he

2:15-cv-01045-RFB-PAL

 1  didn't do anything to verify it.

 2          MR. SILVERMAN:  I want to talk about a couple more of

 3  the claims that some of Zuffa experts have made, if they're

 4  helpful.  If they're not, please let me know and I will --

 5          THE COURT:  Well, what other claims and I'll tell you.

 6          MR. SILVERMAN:  Yeah.

 7  BY MR. SILVERMAN:

 8  Q.  So, Dr. Topel claims that because MMA promoters without

 9  monopoly power, such as Bellator, used contract provisions that

10  are similar to Zuffa's here, such provisions must serve

11  procompetitive purposes.

12          Do you agree with him about that?

13          And actually before you answer, could we --

14          THE COURT:  You don't need -- you don't need to ask him

15  about that.

16          MR. SILVERMAN:  Okay.  Could we please switch to the

17  rebuttal slides.

18          THE COURT:  So I guess one question I would ask you,

19  Dr. Zimbalist, related to this --

20          THE WITNESS:  Yeah.

21          THE COURT:  -- would be in terms of the reserve clause,

22  until there was litigation, were there any owners who were

23  opting not to use the reserve clause while the others were?

24          THE WITNESS:  No.

25          THE COURT:  And would there be any business reason to

1   do that?  Would that make business sense to not use the reserve

2   clause when others were?

3           THE WITNESS:  I'm sorry, can you --

4           THE COURT:  I'm saying would it make business sense --

5           THE WITNESS:  Yeah.

6           THE COURT:  -- to not use the reserve clause in your

7   own contracts when others were using them?

8           THE WITNESS:  When you say "others," you mean other

9   owners within the team sports league?

10          THE COURT:  Yeah.

11          THE WITNESS:  Not only would it not make sense, but the

12  league would kick you out.

13          THE COURT:  But let's say even in the context of

14  boxing, would it make sense at a time when they were having more

15  restrictive boxing contracts to not use them if others were

16  using them?  Would that make any business sense?

17          THE WITNESS:  I think the rule of thumb that's going to

18  be followed by the promoter is to follow those policies that

19  they're able to follow in order to survive.

20          So if there's a dominant firm that's following that,

21  you don't want to unilaterally disarm yourself.  You're going to

22  do whatever you can do that has been modeled by the dominant

23  firm.

24          THE COURT:  So it puts you at a competitive

25  disadvantage, in fact, to have less restrictive contracts if

 1  you're less dominant than Zuffa in this market?

 2          THE WITNESS:  That's precisely right.

 3  BY MR. SILVERMAN:

 4  Q.  Now, I believe you prepared a slide related to this.  Can

 5  you explain what this is, what this is about?

 6  A.  Yeah.  So this is, I think, a reformulation of what I was

 7  just talking to His Honor about, which it states -- from Areeda

 8  and Hovenkamp, it states:  "Behavior that is rational for a firm

 9  with little or no market power may nevertheless produce

10  substantial and unnecessary anticompetitive effects when wielded

11  by a firm with considerable market clout."

12  Q.  Now, Zuffa claimed that you testified in your deposition

13  that you wouldn't take the case if you only had one yardstick to

14  use as a comparator.  Is that a fair description of your

15  opinion?

16  A.  No.

17  Q.  Why not?

18  A.  Well, it's completely taken out of context what was being

19  asked of me at the time.

20          What was being asked of me at the time is if I -- I

21  were called upon to develop an analysis that distinguished the

22  impact of one restrictive act to another restrictive act, would

23  I -- would I take that if I had just one -- one data -- data

24  from one comparator.  And so that would be calling upon a

25  regression analysis, which I have not done.  It was not the

2:15-cv-01045-RFB-PAL

1    methodology I followed.  It's methodology that was followed by

2    Dr. Singer, but it's not my methodology.  And it would require

3    much, much more information.  So I was answering a very specific

4    question about -- isolating two different variables and their

5    independent effects.

6           Later on in the deposition I was asked the question

7    more generally, and I clarified that that's, in fact, was not --

8    was not what I had said, was not what I meant.

9    *Q.*  If you had used only boxing as a yardstick and eliminated

10   the team sports from your analysis, how would that have affected

11   your damages number?

12   **A.**  If I had used only boxing?

13   *Q.*  Only boxing.

14          THE COURT:  So, Mr. Silverman, I can see that it would

15   have increased the damages because the average revenue share was

16   higher.

17          MR. SILVERMAN:  Yep.

18   BY MR. SILVERMAN:

19   *Q.*  Is any single yardstick of the five you used essential to

20   your analysis?

21   **A.**  I don't believe so.

22          THE COURT:  But you would agree, Dr. Zimbalist, that

23   you thought that boxing was the most comparable analogous sports

24   market?

25          THE WITNESS:  I would agree to that, yes.

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

1           THE COURT:  All right.

2  BY MR. SILVERMAN:

3  *Q.*  And if any -- if the ultimate fact finder in this case

4  decided that any of your yardsticks were not sufficiently

5  comparable, could you use your model to calculate damages

6  excluding that yardstick?

7  *A.*  I could.

8           THE COURT:  How would you do that?

9           THE WITNESS:  I would take an average across four

10  yardsticks instead of five.

11           THE COURT:  Oh, I see.  Okay.

12           Mr. Silverman, I think you've covered just about every

13  area that you would need to.

14           MR. SILVERMAN:  Okay.  Thank you, Your Honor.

15           Sounds good.

16           If I do have any --

17           THE COURT:  We'll start again because -- we'll start up

18  with the cross right here, but -- I'm sorry, were you going to

19  say something else?  Excuse me, Mr. Silverman.

20           MR. SILVERMAN:  Well, I just -- I just wanted to

21  mention that depending on what comes up on Dr. Zimbalist's

22  cross, we may have some points that can -- that I would like to

23  use on rebuttal if there's time remaining.

24           THE COURT:  Certainly.  That's part of the reason why I

25  wanted to go ahead and start the cross now.

2:15-cv-01045-RFB-PAL

```
 1            MR. SILVERMAN:  Okay.  Thank you, Your Honor.

 2            THE COURT:  Uh-huh.

 3                 CROSS-EXAMINATION OF ANDREW ZIMBALIST

 4   BY MR. ISAACSON:

 5   Q.  Good morning, Your Honor.

 6            Good morning, Dr. Zimbalist.

 7   A.  Good morning, counsel.

 8   Q.  Now, I believe what you explained that what Mr. Deetz had

 9   was data from QuickBooks that was given to him by Golden Boy?

10   A.  He testified to that effect, yes.

11   Q.  All right.  And so the QuickBooks data is not something that

12   you have seen?

13   A.  That's correct.

14   Q.  All right.  And so the underlying data that went into the

15   Deetz report, you didn't take any steps to independently verify

16   that because you didn't have access to it?

17   A.  Except -- just to make sure we're talking about the same

18   thing -- there was a breakdown, a disaggregated breakdown

19   fighter by fighter.  That, I saw.  I did not see an independent

20   source.  I was not given access to the QuickBooks directly.  I

21   was not given access to their financial records room.

22            Is that what you mean?

23   Q.  Yes, yes, yes.  So I think we understand this, but there are

24   tables in the Deetz report that Mr. Deetz compiled and you

25   checked whether those added up?
```

—2:15-cv-01045-RFB-PAL—

1  **A.**  Yes.

2  **Q.**  But you don't know if the tables correctly compile the

3  information from the QuickBooks data?

4  **A.**  I did not see the QuickBooks data.

5  **Q.**  Right.  The -- and you've not spoken to Mr. Deetz, right?

6  **A.**  That's correct.

7  **Q.**  And -- and then I think you've established, but let's just,

8  for the record, be clear, that the -- the differences between

9  the numbers in the information produced by Golden Boy as opposed

10 to the tables of Dr. Deetz, if you look at the Golden Boy

11 documents, I think you said for 2016 the wage share would be

12 about 15 percent.  Actually, we calculated it as 14.1 percent?

13 **A.**  Okay.

14 **Q.**  But -- and for 2015, it would be about 29 percent.

15          Does that sound right?

16 **A.**  It does, yes.

17 **Q.**  Okay.  And you're not suggesting -- now -- and then you've

18 raised certain criticisms of what the -- of the data presented

19 by -- produced by Golden Boy in this litigation suggesting it's

20 incomplete.  Is it your -- and you -- and you made some

21 criticisms of Dr. Blair in this regard.

22          Is it your opinion that Dr. Blair should have verified

23 the accuracy of the Golden Boy data produced in this litigation

24 in order for it to be reliable?

25 **A.**  It's my opinion that if an expert presents data in any of

1   his or her reports that there should be some effort to -- to

2   verify its underlying reliability, yes.

3   Q.  That's something both you and Dr. Blair should have done?

4   **A.**  Well, I think I did it, frankly.  You didn't ask me what

5   else I did.  You asked me if I saw the QuickBooks.

6   Q.  Right.  Well, what you did to independently verify the

7   Golden Boy -- the Deetz data was you made sure his tables added

8   up?

9   **A.**  In part.  In part.  I also went to the public record and I

10  also saw that Saul Álvarez did indeed earn something like $13 or

11  $14 million in the first half and something like $14 million in

12  the second half.  And I looked at some of the other fighters who

13  were also earning million of dollars, and it led me to the

14  conclusion that there was either incompleteness or other sources

15  of inaccuracy in the summary table that was produced.

16  Q.  So I --

17          THE COURT:  So you're saying, Dr. Zimbalist, that even

18  in the publicly-available information, it contradicted the

19  information that was produced by Golden Boy in this case?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Substantially?

22          THE WITNESS:  Substantially.

23  BY MR. ISAACSON:

24  Q.  So, I understand your criticisms of the data produced by

25  Golden Boy in this case.  All right.  And you think that there's

-2:15-cv-01045-RFB-PAL-

1  an obligation of an expert to independently verify that

2  information as to both its completeness and its accuracy.  But

3  for the data in Dr. Deetz's report, you didn't have any public

4  information to fall back on to verify it, right?

5  **A.**  I think I just said otherwise.

6        THE COURT:  He described what he did use.  The $13

7  million, the $14 million, the other salaries that were publicly

8  available.  I think that's the extent of what he described that

9  he used.

10  BY MR. ISAACSON:

11  *Q.*  Right, but that was to critique what Golden Boy produced in

12  this case.  You're not able to look at the underlying data in

13  the Deetz report to see -- and compare that against any public

14  information?

15        THE COURT:  No.  He just said that he used that -- the

16  underlying data had tables -- this is what I, at least,

17  understood him as saying -- and he compared the

18  publicly-available salaries to what was listed to see if they

19  were similar.  And that was the extent of what he did, but that

20  was what he did.

21        Unless I misunderstood.  Is that what you said?

22        THE WITNESS:  No, I think that's right.  I think

23  there's another element to all of this.

24        THE COURT:  No, I understand that.  But I'm saying the

25  part that you said --

—2:15-cv-01045-RFB-PAL—

1              THE WITNESS:  You're right, Your Honor.

2              THE COURT:  The part you could do, which is limited,

3    but the part you did said was there was the discussion about $14

4    million salary, you compared that with what was in the chart,

5    and that seemed to be about the same numbers that were listed in

6    Dr. Deetz's table.  And you didn't have that for very many

7    fighters, but you did that on the limited public data that you

8    had?

9              THE WITNESS:  Yes.

10             THE COURT:  All right.

11   BY MR. ISAACSON:

12   Q.  Now, you -- then you referred to certain corroborating

13   information.  You mentioned Top Rank.

14             MR. ISAACSON:  Can we pull up PCCX40?

15   BY MR. ISAACSON:

16   Q.  Now, this is a declaration of David Lopez.  This is what

17   you're referring to when you're referring to Top Rank

18   information, correct?

19   A.  I'm almost certain that's where it came from, yeah.

20   Q.  Right.  So if we look at Paragraph 2, that's the information

21   you're referring to, right?

22   A.  I believe so, yes.

23   Q.  Okay.  And if we look at Paragraph 3 and so -- actually, let

24   me be clear.

25             MR. ISAACSON:  Can we go back to Paragraph 2?

1  BY MR. ISAACSON:

2  Q.  Okay.  It has Percentage Payments to Fighters.  Okay.

3        And so then let's see how "payment to fighters" is

4  defined.  "Includes the purse amount, separate payments to

5  fighter's promotional companies, if any, and amounts paid to

6  third parties as directed by fighters, if any."

7        Now, we don't know -- so, in boxing, as you described,

8  there's copromotion and then there's leasing of fighters and

9  payments that go from the promoter running the fight to the

10  other promoter and the other fighter?

11  A.  Yes.

12  Q.  And you don't know for Top Rank whether -- well, I mean, it

13  does.  It includes the separate payments to fighters'

14  promotional company.

15        You don't know how much money the fighter is actually

16  getting?

17  A.  Your Honor, all -- excuse me.

18  Q.  I appreciate it, but it's not necessary.

19  A.  I do respect you, Mr. Isaacson, so much.

20        No.  So here's the story.  What happens in all of these

21  fights is that the fighter will direct payments to be made

22  potentially to a promoter, potentially to a manager, potentially

23  to a cut man.  And all of those things are compensation that the

24  fighter earns, and then he is paying or she is paying his or her

25  accomplices their share of -- their agreed-upon share of the

─2:15-cv-01045-RFB-PAL─

1   value.

2          Something very similar to that is what goes on in UFC

3   compensation.  An UFC fighter is compensated a certain amount of

4   money, and then he or she has to turn around and pay manager and

5   pay trainers and pay for the gym.

6          And so at the end of the day we're not talking about

7   the amount of money that the fighter takes home and puts in his

8   or her bank.  We're talking about the amount of money that the

9   person who puts on the event is paying the fighter as a share of

10  the money that's generated by the event.

11         And this is something that -- this quote that you have

12  there is fine.  It's also testified to by Mr. Aaron in his

13  deposition in this case.

14  Q.  Yes.  So -- but to be clear, you spoke about all these

15  different things that are expenses of the fighter, et cetera.

16  But this also talks about separate payments to fighter's

17  promotional companies, the other promoters.

18         In terms of the split between the two promoters and the

19  fighter, even taking into account those other expenses you're

20  talking about, you don't know from the Top Rank money, from the

21  Top Rank data, how much goes to the fighter's share as opposed

22  to the two promoters' shares?

23  A.  So that's an interesting question.

24  Q.  Thank you.

25  A.  Yeah.

————2:15-cv-01045-RFB-PAL————

1              What, in fact, is happening is these copromotions or

2       the POS deals, which are payments to one side from the person

3       who actually produces the event, are payments that happen in

4       both directions.  At one point in time promoter A is the person

5       who's leasing somebody else's fighter.  At another point in time

6       promoter B is the person who's leasing somebody else's fighter.

7              And so at -- when -- when they're leasing the fighter,

8       they get paid a payment.  And what that payment does is it hikes

9       their revenue and it doesn't hike their fighter payments.  And

10      so what happens is the fighter's share would actually go down.

11             In any event, these POS deals go in both directions.

12      So it might alter the fighter's share in one case, it reverses

13      that alteration in another case.

14      Q.  All right.  But from the Top Rank data, you don't know what

15      percentage of the revenues go to the two promoters versus the

16      fighters?

17      A.  For any particular bout?

18      Q.  For anything.

19      A.  Well, what we have here if I can see the --

20      Q.  Well, I guess I said --

21             THE COURT:  Let him see the entire chart.

22             There you go.

23      BY MR. ISAACSON:

24      Q.  I said for purposes of the chart in Paragraph 2.

25      A.  Right.  So this is summarizing what happens over the course

———2:15-cv-01045-RFB-PAL———

 1  of these different years.

 2  Q.  Right.  And you don't know -- when it says "percentage

 3  payment to fighters," you don't know from this chart what actual

 4  percentage of money went to the two promoters as opposed to the

 5  fighters?

 6  A.  Well, again, there's a payment to the fighters, and the

 7  fighter directs some of that payment to be made to promoters and

 8  some of that payment to be made to managers.  So the entirety of

 9  the payment is made to the fighters.

10  Q.  Right.  But in terms of how much money goes to the two

11  promoters versus the two fighters, okay, you don't know what

12  the -- what those amounts are?

13  A.  Well, okay, so give me more details in your hypothetical

14  that we're getting --

15  Q.  This is not -- this is not a hypothetical.

16  A.  Well --

17  Q.  All right.  I'm asking you, all right, in terms of the share

18  that goes to the two promoters and the share that goes to the

19  fighters, you don't know from Table 2 what those shares are?

20  A.  What I'm saying is that Table 2 aggregates for each year a

21  variety of bouts.  And the greatest likelihood is that the

22  promoter is on one side of a POS in one bout, on the other side

23  on another bout.  So if there's a special payment to a promoter

24  that's not reflected also in the payment to the fighter, it will

25  be reversed the other time.

 1           THE COURT:  So let me ask you this question.  Maybe

 2    this is what you're both, I think, going back and forth about.

 3           When you said that there are copromotions of fights --

 4           THE WITNESS:  Yes.

 5           THE COURT:  When there's a payment to the promoter that

 6    the fighter's associated with, is there a separate payment apart

 7    from the payment that's made to the fighter; or is there simply

 8    a payment that's made to the fighter that would include the

 9    promoter's payment for allowing the fighter to be in a

10    copromoted fight?

11           THE WITNESS:  Well, okay.  I -- first of all, I think

12    that the -- the issue that Mr. Isaacson is raising applies to

13    POS and not copromotion.  But your -- with regard to your

14    question, my understanding that conceptually it doesn't matter

15    whether it's stipulated at the beginning that the pay -- that

16    there will be an independent payment to the promoter and an

17    independent payment to the fighter, or there will be a payment

18    to the fighter and then the fighter will make the independent

19    payment.  But my understanding is --

20           THE COURT:  But it matters for these percentages, which

21    is what Mr. Isaacson's point is, is that you're right in terms

22    of the overall business model, it seems to me, whether the

23    payments made to the fighter versus the payment being made to

24    the promotional company it may not matter.  But in terms of

25    using percentages in terms of wage share regarding revenue, then

—2:15-cv-01045-RFB-PAL—

1  it would matter because the understanding has at least been, I

2  think, been that these wage share measures were essentially

3  fighter compensation.

4         Now, that doesn't mean that the fighter isn't paying

5  out of that compensation other expenses they may have.  But in

6  this particular definition you've introduced, essentially, a

7  promotional company's payment, which is completely separate

8  than, for example, a fighter's payment to his or her manager or

9  gym fees.  This is a promoter's payment.  And so the question

10  is, can you disaggregate that from this number here?

11         THE WITNESS:  Your -- everything you said strikes me as

12  totally logical, but I think your premise is wrong.

13         I think that when there's a payment made to a promoter

14  because he has promoted a fight and he gets paid part of the

15  fighter's compensation that it's counted as fighter's

16  compensation, whether it's paid in one form or paid in the other

17  form.

18  BY MR. ISAACSON:

19  Q.  Except, sir, what this Paragraph 3 says is:  "Payments to

20  fighters includes separate payments to fighter's promotional

21  companies."

22         With respect to this data and how it was compiled, I

23  repeat, you don't know how much went to the two promoters versus

24  what went to the fighters on a percentage basis?

25  A.  Look, I think we can go around and around on this.  What we

2:15-cv-01045-RFB-PAL

 1  would need to do is to bring in an accountant from one of the

 2  companies to explain in detail exactly all of it.  If -- if --

 3          THE COURT:  So but -- but hold on, Dr. Zimbalist.

 4          THE WITNESS:  I think I can end the conversation.

 5          THE COURT:  No, no.  But here's what I'm saying.  So

 6  it's easy, right.  So you don't know, right.  And that's fine.

 7  You don't know -- you don't know what the separate percentage

 8  was for the promotion, right; because it's not your data, right?

 9          THE WITNESS:  That's correct.

10          THE COURT:  Okay.  I mean, that's all I think that he's

11  asking, right.

12          I understand why you would think that it wouldn't

13  necessarily be that big of a difference conceptually because in

14  a free agency or other places where a fighter might have, for

15  example, an agent, if they paid their agent out of their

16  compensation, you wouldn't necessarily say that that's not part

17  of the -- of the person's compensation.

18          But let's move on from there.  Because I think he was

19  just trying to clarify that point.  So let's move on from there

20  because I don't want us to spend a lot of time going back and

21  forth on that.

22  BY MR. ISAACSON:

23  Q.  All right.  If we can go to then JCCX57, which is the Golden

24  Boy -- it's the Deetz report --

25          THE COURT:  So you know what we need to do, actually, I

2:15-cv-01045-RFB-PAL

1  realize, Mr. --

2            MR. ISAACSON:  Oh, you need your break.

3            THE COURT:  Yeah.  We need to take a break here.  And

4  then we'll come back then at 11:30, and I'll give you about 25,

5  30 more minutes.  And then we will -- we will switch over to, I

6  believe, then Dr. Blair or Mr. Blair.  I can't --

7            MR. ISAACSON:  I was hoping to get closer to that hour

8  that I was promised.

9            THE COURT:  You've been on here -- I have been given a

10 clock.  You have been on here for about -- I'll do the

11 calculation, but close to 19 minutes.  So that would give you

12 maybe 30, 40 minutes.  But I'm not sure how much more you're

13 going to have.

14           So we'll see.

15           MR. ISAACSON:  I'm not going to have more than that.

16           THE COURT:  Okay.  Well, you may have less than that,

17 too.

18           Anyway ...

19           THE WITNESS:  Your Honor?  Your Honor?  Can I -- should

20 we take our lunch break now?  Is that --

21           THE COURT:  Yes, because when we come back, we're going

22 to go straight -- we're going to go from 11:30 to 3.  We're not

23 going to have a lunch break.  We may have short bathroom breaks,

24 but we're not going to have a lunch breaks.  So if you need to

25 get some energy, now's the time.

 1          MR. SAVERI:  Do we need to clear out this --

 2          THE COURT:  No, you do not.  We don't have any

 3  intervening events.

 4          MR. SAVERI:  Thank you.

 5          THE COURT:  Thank you.

 6          (Recess taken at 9:55 a.m.)

 7          (Resumed at 11:36 a.m.)

 8          THE COURT:  Please be seated.

 9          All right.  We're back on the record here.  Continuing

10  the cross-examination of Dr. Zimbalist.  You recognize you're

11  still under oath, sir.

12          THE WITNESS:  I do, thank you.

13          THE COURT:  Uh-huh.

14          Go ahead, Mr. Isaacson.

15          MR. ISAACSON:  Can we put up JCCX-57.

16  BY MR. ISAACSON:

17  *Q.*  This is the section of the Deetz report with the summary

18  data.  You looked at some of this with your counsel.  And

19  there's a column for fighter COGS, cost of goods sold, right?

20  You remember that?

21  *A.*  Yes.

22  *Q.*  And you don't know how Golden Boy calculates costs of goods

23  sold, right?

24  *A.*  I don't have a description of their detailed methodology.

25  *Q.*  All right.  And you don't know whether Golden Boy includes

—2:15-cv-01045-RFB-PAL—

1  the money that's paid to other promoters as part of costs of

2  goods sold?

3  *A.*  Well, I'd like to clarify something that I think has been

4  confusing in our discussion to now, which is that what is called

5  "promotional payments" includes payments to an independent

6  promoter such as Golden Boy, but also includes payments to the

7  fighter's promotional company that he or she owns.  So we don't

8  know when we can identify promotional payments whether those are

9  payments to an independent promoter, a bout promoter, or a

10 promoter that is, in fact, owned by an ownership company, an LLC

11 that's owned by the fighter in question.

12        So having said that, it's not clear from just the data

13 that's been presented here what -- what share of the fighter

14 COGS might be going to independent promoters and what share

15 might be going to promotional companies.

16 *Q.*  Thank you.

17        And I believe you told your counsel that fighter costs

18 to goods sold are the fighter costs and that's the amount that

19 Golden Boy pays to the boxer, but we don't actually know that,

20 do we?

21        THE COURT:  I think, Mr. Isaacson, isn't that the same

22 question you just --

23        MR. ISAACSON:  Okay.  I just want to make -- because he

24 said something slightly different before, but I'll move.

25        THE COURT:  No, I think you've made the point that

—2:15-cv-01045-RFB-PAL—

1  there are these costs that are built in.

2          MR. ISAACSON:  I will move on.

3          THE COURT:  Okay.

4  BY MR. ISAACSON:

5  *Q.*  Now, you also referred to a quote from a Mr. Lou DiBella

6  that a 70 percent share was common.  And you said he said that

7  in his deposition.  That's not correct, right, you were quoting

8  him actually from a television program?

9  ***A.***  I can't say at the moment, I thought it was his deposition.

10 *Q.*  All right.

11         MR. ISAACSON:  If we can look at his report at

12 Paragraph 112.

13 BY MR. ISAACSON:

14 *Q.*  And you see you quote, Mr. DiBella, and -- where he told

15 ESPN's Outside The Lines, right?

16 ***A.***  Okay.

17 *Q.*  All right.  Now, you don't know if Mr. DiBella, when he does

18 that split, includes the money that goes to the other promoters

19 or any of the other things you were just describing?

20 ***A.***  Well, once again, I think that perhaps it was my fault, but

21 I think there's some misconception about the only situation in

22 which this issue can arise is a POS.  It's not a copromotion

23 situation.

24         And in POS, what happens sometimes, arguably, is that

25 some of the money that goes to the independent promoter is

—2:15-cv-01045-RFB-PAL—

 1  included as a fighter share and, hence, it lifts it up.  But

 2  POSs go both ways, and we have testimony to that effect.

 3  Sometimes a promoter is on one side of the POS deal and

 4  sometimes he is on another side of the POS deal.  When he is on

 5  the other side of the POS deal, what happens is his revenue goes

 6  up without his fighter costs going up, and so that lowers the

 7  fighter share.

 8       And what I was arguing before is that I think in the

 9  aggregate we can expect pretty much a wash there.

10  Q.  So --

11  A.  If I'm wrong in that, I'm not sure that I am, but if I'm

12  mistaken in that and we were to say, okay, these shares that

13  we're looking at are 10 percent higher than they should be, and

14  so instead of -- instead of Top Rank being an average -- I don't

15  know what it was, somewhere in the low 70s.  Instead of it being

16  70 percent, it should be 10 percent below that, it should be 63

17  percent.  Then I think the point of corroboration that I was

18  making and use of these -- this other information still stands.

19       THE COURT:  And what percentage -- what percentage of

20  boxing matches involve a POS component?

21       THE WITNESS:  I don't know the answer to that.

22       THE COURT:  Okay.

23  BY MR. ISAACSON:

24  Q.  All right.  And the 10 percent number is just a number

25  you're pulling out by example, you don't have any evidence that

—2:15-cv-01045-RFB-PAL—

1  it's 10 percent?

2  *A.*  That's correct.

3  *Q.*  All right.  And you don't know how Mr. DiBella calculated

4  70/30, right?

5  *A.*  That's correct.

6  *Q.*  And in fact, Mr. DiBella at his deposition, when he was

7  asked whether 70/30 was common said no, right?

8  *A.*  That, I can't recall.

9  *Q.*  All right.  And you mentioned Saul Álvarez receiving $13

10  million in 2016, you don't how much of that went to the other

11  promoter and how much went to Mr. Álvarez, right?

12          THE COURT:  We don't know that there was another

13  promoter in there.  Because your question assumes that there was

14  one.  I'm just saying --

15          MR. ISAACSON:  I don't.  I honestly don't know.

16          THE COURT:  Okay.

17          MR. ISAACSON:  Maybe he knows.

18          THE COURT:  Okay.  Because --

19          THE WITNESS:  I think that His Honor's question is

20  appropriate.  Moreover, what's the case is that Saul Álvarez is

21  promoted by Golden Boy.  And he and his promotion company are

22  getting paid directly by Golden Boy.  That's in Golden Boy's

23  record.

24          It said that Golden Boy had an expense of $13.3 million

25  paid to their own boxer.  So this is not an issue where

—2:15-cv-01045-RFB-PAL—

1  copromotion is contaminating the information.

2          MR. ISAACSON:  Now, we can look to Paragraph 93 of his

3  first report -- of his rebuttal report.

4          THE COURT:  Whose?

5          MR. ISAACSON:  Dr. Zimbalist.

6          THE COURT:  Okay.

7  BY MR. ISAACSON:

8  Q.  And just so I can understand how you calculated damages

9  here, you say in the second sentence:  "My damages model is that

10  the entire set of exclusionary contract" -- sorry ...

11          "My damages model is that the entire set of

12  exclusionary contract clauses and anticompetitive practices work

13  together to foreclose meaningful competition in the MMA labor

14  market."

15          That's how -- that -- when you -- when you are

16  estimating damages, you are assuming that there's a set of

17  exclusionary contract clauses and anticompetitive practices as

18  defined by the plaintiffs that all work together to foreclose

19  competition, right?

20  A.  I think that's fair.

21  Q.  Right.  And, in fact, you say:  I don't believe it makes any

22  sense to isolate individual clauses or practices?

23  A.  In this -- in this case, that's correct.

24  Q.  Okay.

25          MR. ISAACSON:  And -- and just if we can look at Slide

1  2.  This is from -- this is an unused slide from the -- from the

2  Plaintiff's presentation with Dr. Zimbalist.  So this would have

3  been a slide he prepared.

4       And just in summary, I'm not going to go through this,

5  but here's your summary of the challenged conduct in this case.

6       THE COURT:  So, Mr. Isaacson, I'm not sure why any of

7  this line of questioning is relevant for the expertise of

8  Dr. Zimbalist.

9       I mean, if we're talking about the exclusionary aspect

10  of the contracts, that wasn't really what I understood him to be

11  offered for.  I didn't -- explicitly asked Mr. Silverman not to

12  go through the clauses.  So I don't think it's fair for you then

13  to go to the clauses because I asked him not to do that.  And I

14  don't really understand why we're doing it now.

15       MR. ISAACSON:  I'm not going to go through them.  What

16  I want to -- he's assumed certain challenged conduct.

17       THE COURT:  Right.

18       MR. ISAACSON:  He defined it.

19       THE COURT:  Right.

20       MR. ISAACSON:  Very simply, I think it's helpful to

21  have that in the record.  And that's my only question, is this

22  the -- this is challenge conduct that he assumed in this case

23  for purposes of damages.

24       THE COURT:  Okay.  I assumed that he assumed that

25  because I think he was fairly clear about that.  Okay.

2:15-cv-01045-RFB-PAL

1          THE WITNESS:  And the question, therefore, is?

2   BY MR. ISAACSON:

3   *Q.*  This is challenged conduct you assumed for purposes of

4   estimating damages, what's on your Slide 2?

5   **A.**  Yes.

6          THE COURT:  So, Dr. Zimbalist, you essentially assume

7   that there was restrictive labor market in the UFC, right?

8          THE WITNESS:  That's what I would like to emphasize

9   that I'm looking at to do my damages analysis the restrictions

10  on the labor market.

11         THE COURT:  Right.

12         THE WITNESS:  And the other challenged conduct that is

13  listed in the complaint is challenged conduct that might or

14  might not facilitate the -- the end result.

15         THE COURT:  Right.

16         THE WITNESS:  But as far as I'm concerned, the -- those

17  clauses and the actions following from the clauses that limit or

18  restrict fighter mobility is what's generating the damages.

19         THE COURT:  Right.  Thank you.

20  BY MR. ISAACSON:

21  *Q.*  Well, going back to Paragraph 93, I just -- given what you

22  just said.

23         THE COURT:  Okay.  Mr. Isaacson, I do not want to go

24  back and forth --

25         MR. ISAACSON:  Okay.

———2:15-cv-01045-RFB-PAL———

1          THE COURT:  -- at this level.  Because again --

2          MR. ISAACSON:  I'll move on.

3          THE COURT:  Right.  I just want him to talk about the

4    expert modelling, which is the critiques I think you had about

5    what the yardstick model -- yardstick methodology was.  That's

6    what I think is the most helpful area here.

7          MR. ISAACSON:  So some of the modelling has assumptions

8    and that was my point, not to go through it blow-by-blow.

9          THE COURT:  Okay.

10   BY MR. ISAACSON:

11   Q.  All right.  Your damages estimates are for the class as a

12   whole, they do not estimate individual injury, correct?

13   A.  Correct.

14   Q.  And to estimate damages, you assume Zuffa has both monopsony

15   and monopoly, correct?

16   A.  I certainly assume that they have monopsony power.  I

17   probably also assume they have monopoly power.

18   Q.  Okay.

19          THE COURT:  In what way?  Because it seems to me that

20   the model is based upon wage share.  I don't know that wage

21   share would necessarily --

22          THE DEFENDANT:  Well, certainly --

23          THE COURT:  Hold on.  Let me finish.

24          THE WITNESS:  Yes, sorry.

25          THE COURT:  I don't know that wage share necessarily,

2:15-cv-01045-RFB-PAL

1 at least as it has been described to me, would always

2 necessarily reflect monopoly power.  It seems it would have

3 reflected the ability of the -- allegedly the ability of the

4 promoter to be able to restrict payouts per event.

5         It doesn't have anything to do with how many events are

6 being produced and the relationship of those events to the

7 number of fighters that might be available.

8         So it seems to me your measure is just focussed on

9 assumption of monopsony power, right?

10        THE WITNESS:  I think that's accurate, Your Honor.

11 However, I think that the monopoly and the monopsony exist

12 hand-in-hand and support each other.

13        So that if a fighter were able to go through the

14 variety of impediments and restrictive clauses in the contract

15 and was waiting the 60- to 90-day exclusionary bargaining

16 agreement and then waiting another year during the right of

17 match, at the end of all of that, there's nobody to hire the

18 fighter.  And there's nobody there.

19        And so in that sense there's monopoly power in the

20 industry that reinforces the restrictive clauses in the

21 contract.

22        THE COURT:  Okay.

23 BY MR. ISAACSON:

24 Q.  All right.  Just touching on Major League Baseball.  In

25 1976, when you talked about having a free agency, my only

-2:15-cv-01045-RFB-PAL-

1  question about that is, how many years is the player under

2  contract before they hit unrestricted free agency?

3  *A.*  In baseball?

4  *Q.*  Yes.

5          THE COURT:  Are you talking about a specific year?

6          MR. ISAACSON:  Well, he started -- he said free

7  agency's advent was around 1976.  I don't want him to go

8  year-by-year --

9          THE COURT:  That's what I was trying to figure out.

10          MR. ISAACSON:  He can give me a general range of how

11  it's happened so we can do this in summary fashion.

12          THE WITNESS:  Okay.  I'll try to answer your question

13  as precisely as I can.  It's actually a contract, a CBA, a

14  Collective Bargaining Agreement, that was signed in the summer,

15  the mid summer of 1976 that established the labor market

16  institutions beginning in the year 1977.  And what was

17  established in that CBA is that after six years in the major

18  leagues, a player becomes an unrestricted free agent.

19          MR. ISAACSON:  Thank you.

20          THE COURT:  And do you know what it is now?

21          THE WITNESS:  It's the same.

22          THE COURT:  Six years?

23          THE WITNESS:  It's something that they're battling

24  over, but, yes, it is still the same.

25          THE COURT:  So that's why your reference to the fact

—2:15-cv-01045-RFB-PAL—

1   that Major League Baseball may have some still greater

2   restrictions on athlete mobility, where you're speaking is

3   particularly about this period of sort of being excluded from

4   free agency?

5         THE WITNESS:  Yes.  But it's important to qualify that

6   because after two-plus years it varies for different players.

7         The players who have had two-plus years of major league

8   experience become eligible for arbitration, salary arbitration.

9         And what we find in salary arbitration is that those

10  salaries come very close to mimicking a free agent's salary.

11        THE COURT:  Okay.  Interesting.  Okay.

12        MR. ISAACSON:  Can we look at Zimbalist -- actually,

13  there's Slide 32.

14  BY MR. ISAACSON:

15  *Q.*  This is a slide you didn't use that just recreates a

16  verbatim a section of your report.

17        In Table 4-E, in the third column, that's your

18  calculation of the fighter share and event revenue from 2010 to

19  2016.  Is that correct?

20  ***A.***  That's the -- that's the share of event revenue that I used

21  for purposes of calculating damages.  That's correct.

22  *Q.*  Okay.  The -- now, in terms of the yardstick standard that

23  you used, the standard that you used was you attempted to select

24  a group of comparators with as much similarity as possible with

25  the UFC?

—2:15-cv-01045-RFB-PAL—

1  *A.*  Yes.

2  *Q.*  Okay.

3      MR. ISAACSON:  And if we can look at Paragraph 53 of

4  his rebuttal report.  Where he says exactly that standard.

5  BY MR. ISAACSON:

6  *Q.*  You also say that standard is commonly used in real estate

7  appraisals.  There's no footnote to that, and we haven't found

8  any materials in your reports on that.

9      Have you cited anything in your reports that shows that

10 that standard of as much similarly as possible is common in real

11 estate appraisals?

12 *A.*  Have I cited anything?  No, I have not.

13 *Q.*  Okay.  And you also say it's also one of the three basic

14 methodologies, comparable sales employed to value companies, and

15 then you listed them.

16      Now is the "it" there the yardstick method or the -- or

17 is it the yardstick method using as much similarity as possible?

18 *A.*  It's -- the comparable sales method is in this case

19 analogous to the yardstick method.

20 *Q.*  Okay.

21      THE COURT:  So -- and excuse me, Mr. Isaacson.

22      So in sports economics, is it common when looking at

23 competitive labor markets or monopsony to use other markets to

24 try to assess how competitive or not a particular market is?

25      THE WITNESS:  Yes, it's done all of the time.

———2:15-cv-01045-RFB-PAL———

1          THE COURT:  And does your report identify other

2   articles that reference the use of comparators when assessing

3   the competitiveness of a labor market?

4          THE WITNESS:  I believe it does, yes.

5          THE COURT:  And so then I'd ask plaintiffs to be able

6   to just provide that as well.

7          MR. ISAACSON:  If we could look at Blair report page --

8   Paragraph 56.

9   BY MR. ISAACSON:

10  Q.  I'm just going to show you this for context and before I go

11  back to your report.  So the bottom of Paragraph 56.

12         THE COURT:  So, Mr. Isaacson, is it the defendant's

13  position that using comparators or benchmarks is not an

14  appropriate way to assess -- because if it's just about --

15         MR. ISAACSON:  We have never said that.

16         THE COURT:  Okay.  So then I'm not sure why this is

17  actually relevant.

18         MR. ISAACSON:  Because there is a standard that -- for

19  choosing yardsticks, and that's what we're talking about.

20         THE COURT:  Okay.  So if you want to get to that part

21  of where the standard is, because Dr. Zimbalist's report

22  actually references multiple citations to close as or comparable

23  as to different treatises.  And so if you're going to reference

24  a particular standard, then that would be helpful for me.

25  But --

─────2:15-cv-01045-RFB-PAL─────

1           MR. ISAACSON:  I --

2           THE COURT:  -- this isn't actually helpful because

3    you're taking pieces of both of Dr. Zimbalist and Dr. Blair's

4    reports, and I think the overall context of the report.  Because

5    they do, both of them, offer citations and treatises about

6    antitrust.  So I'm not sure if you're saying they should never

7    use it or if you're saying the proper way to use it in this

8    method.  And if you're going to say that, just point me to the

9    method, please.

10          MR. ISAACSON:  I have pointed out -- so that's what I

11   just did.  He said the method for establishing a yardstick is as

12   much similarity as possible.  That's how he defines the standard

13   for yardsticks in his field.

14          THE COURT:  Right.  What I'm saying is that his report

15   references multiple other aspects of what that actually means.

16   And so --

17          MR. ISAACSON:  I am --

18          THE COURT:  -- if you're going to point me to a

19   particular standard, then you should have give me the cite.

20   Because your jumping back and forth is not helpful.

21          MR. ISAACSON:  I'm going to get to subsets of it.  I'm

22   starting with the top standard, as much similarity as possible.

23   I want to tell -- explain the differences between the two

24   gentlemen on that standard, and then I'm moving to some

25   specifics.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Okay.

2          MR. ISAACSON:  Okay?

3          And the bottom of Paragraph 56 -- again, this is just

4   context so that we understand the next paragraph.

5   BY MR. ISAACSON:

6   Q.  So this is Dr. Blair.  He says:  "The standard as much as

7   possible in common is not a standard recognized in the field.

8   The recognized standard is that described by Professor

9   Hovenkamp, is similar to the plaintiff in all respects but for

10  the impact of the antitrust violations.  And similarly by

11  Dr. Rubinfeld as closely approximating the market in which the

12  violation occurred.  And, likewise, by Areeda and Hovenkamp as

13  comparable in all important respects."

14          Now, if we can go to your rebuttal report, Paragraph

15  55.  Right.  In terms of this discussion of standards, in terms

16  of what you -- what you have to say to Dr. Blair is:  "Although

17  I agree with the principle that the comparators should closely

18  approximate the market of the target company, but for the impact

19  of the alleged violation, the level of similarly for a yardstick

20  demanded by Dr. Blair in his report is impractical."

21          The standards that Dr. Blair was reciting you consider

22  to be impractical.

23  A.  Is that a question?

24  Q.  Yes.

25  A.  Well, first of all, the standards that Dr. Blair recites are

———2:15-cv-01045-RFB-PAL———

1  partial quotes from longer treatises by Mr. Hovenkamp, by

2  Mr. Rubinfeld and McClary, by the FTC Handbook on Antitrusts For

3  Telecoms.

4       And what you see in those discussions is reference to a

5  standard of comparable similarity, reasonable similarity,

6  sufficiently similar.

7       Professor Hovenkamp, in fact, has a 2011 article that's

8  called *A Primer on Antitrust Damage Estimates* that refers

9  specifically to the standard that I articulate.  And, by the

10 way, I think this is almost all a semantical question, but it's

11 a standard that I articulate which is as close as possible, as

12 close to similarity as possible.  It's exactly the same thing I

13 said.

14      Now, we can argue about whether sufficiently similar or

15 reasonably similar or reasonably comparable have more guts in

16 them, more teeth in them, than the other one.  But I think

17 really we're dealing with semantics.

18 *Q.*  Okay.  The Hovenkamp 2011 article that you just referred to,

19 is that referenced in your reports?

20 *A.*  I don't know if it is or it isn't.

21 *Q.*  Okay.  I asked you about this at the deposition.  It wasn't

22 something you referenced at the deposition.  You agree with

23 that?

24 *A.*  Counsel, you asked me stuff at my deposition as if I were

25 doing an entrance exam to a law school or to an economics

 1  program.  You asked me for citations when my basis for using the

 2  method that I used is 30 years of work in sports economics and

 3  assimilating the principles that I think are commonly used in my

 4  field, not by memorizing phrases.

 5  *Q.*  All right.  Let me move on.

 6      Now, you do agree that when you're comparing sports

 7  firms, other things being equal, one would expect a firm with

 8  higher overall revenue would have higher wage shares?

 9  **A.**  Do I expect?

10  *Q.*  So, other things being equal, a firm, including a sports

11  league, with higher overall revenue will have higher wage or

12  player shares?

13  **A.**  Are you asking me whether I think that in general?

14  *Q.*  Yes.

15  **A.**  No, not necessarily.

16  *Q.*  All right.

17      MR. ISAACSON:  Can we look at ZCX-179.

18      THE COURT:  Mr. Isaacson, I'm not sure what is the

19  point here exactly?

20      MR. ISAACSON:  Well, he is comparing football,

21  baseball, all sports with higher revenues, which -- where the

22  expectations is they will have higher wage shares.

23      THE COURT:  Right.

24      MR. ISAACSON:  To a lower revenue UFC.

25      THE COURT:  Oh, so the idea is that they shouldn't be

---

2:15-cv-01045-RFB-PAL

1  compared?  What I'm saying is --

2           MR. ISAACSON:  Yes.  Yes.

3           THE COURT:  I'm saying --

4           MR. ISAACSON:  Yes.

5           THE COURT:  I'm saying part of this is your argument

6  and I'm not saying you can't make the argument.  What I'm saying

7  is I'm not sure why --

8           MR. ISAACSON:  This is criteria for comparison.

9           THE COURT:  No, Mr. Isaacson, I get that.  Right.

10  That's not what I'm talking about.  What I'm talking about is

11  you don't need Dr. Zimbalist on the stand to say that.  You can

12  argue to me the comparators which you have are incorrect.  So --

13  and you've already pointed out why you think the methodology

14  isn't working.  So I'm not sure -- and I'm trying to let both

15  sides do -- things that you argue in your briefs, Mr. Isaacson,

16  as with Mr. Silverman, you don't need to argue them through the

17  witness because you've already argued them.

18           MR. ISAACSON:  Well, he --

19           THE COURT:  I mean, the witnesses are here to provide

20  expertise, but not to reiterate arguments that I've read from

21  both of you repeatedly.  So that's why I'm trying to limit this

22  to focusing on what the expertise is in the models, but not

23  different pieces of quotations from either side that are not

24  provided with context for the overall report.  That's not

25  helpful and it's not persuasive.

1          MR. ISAACSON:  Well, if -- I mean, the reason I am

2    presenting this is because he's written that this is correct.

3    And this is something not controlled for in his model.  Right.

4    He has said that when you compare -- and if I can -- I'll show

5    you right now.  It's what I was pulling up.

6          This is an article by Dr. Zimbalist.  All right.  And

7    if we can go to the -- this is 179.  All right.  Go to the

8    next -- that's the first thing he says in the article.  And the

9    second is -- all right.  The second:  "Other than things being

10   equal, one would expect that leagues with higher overall revenue

11   would have higher player shares."

12   BY MR. ISAACSON:

13   *Q.*  And if you were comparing two firms, you could -- on the

14   basis of wage share or player share, you could control for the

15   amount of revenues, right?

16   *A.*  If I were comparing two firms, I could control for the

17   amount of revenues that they had?

18   *Q.*  Yes.

19   *A.*  I'm not sure where you're going, but, yes, generally.

20   *Q.*  Okay.  And that's not something you did?

21   *A.*  Well, now you're referring to my report?

22   *Q.*  Yes.

23   *A.*  Well, I think you're taking a number of ideas and sentences

24   out of context, and so you're not representing my position.  I'd

25   be happy to articulate my position for you.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  But could you just first tell me whether you controlled for

2  the amount of revenues?

3  **A.**  In my report?

4  *Q.*  Yes.

5  **A.**  I didn't have any direct control for the amount of revenues,

6  because I don't believe that higher revenue sports compared

7  across different sports would distort -- in and of itself would

8  distort.

9        Indeed, you have one of your experts, Dr. Oyer, saying

10  as much.  In fact, Dr. Oyer explained a lower share on the basis

11  that they had higher revenues.

12        THE COURT:  So, Dr. Zimbalist, then maybe you can just

13  explain that paragraph and what the -- the context of the

14  paragraph that's on the screen.

15        THE WITNESS:  Yeah.  So this is -- I guess this is an

16  article -- it's really not an article, it's an op-ed in its

17  nature.  And I think it's from the Sports Business Journal

18  because it's replying to a Sports Business Journal article

19  written in 2008.

20        MR. ISAACSON:  Yes.

21        THE WITNESS:  And I'm probably referring to a piece in

22  the Sports Business Journal that compared baseball with another

23  field, maybe -- maybe with hockey or some other field.

24        What is true in some cases -- remember, I said all else

25  being equal in that quote.  What's true in some cases is that if

-2:15-cv-01045-RFB-PAL-

 1  you have a younger company with large startup costs at the

 2  beginning when they're smaller, they'll have lower wage share.

 3  When those startup costs become a smaller share of overall costs

 4  as revenue grows, then you would expect the wage share to

 5  increase.

 6          So this is about -- I don't remember the article I'm

 7  responding to, but I'm responding to a very specific situation

 8  and I'm stipulating all other things being equal.  I don't hold

 9  that to be a general proposition.

10          THE COURT:  So what you're saying is in that paragraph

11  you're trying to explain the fact that there may be

12  circumstances in which if you have lower revenue in a particular

13  league or industry you may have lower player wage share?

14          THE WITNESS:  I think that that's fair.

15          THE COURT:  And that may depend upon both the age of

16  the particular league, but also other costs associated with the

17  production of the particular sport?

18          THE WITNESS:  Yes, it might.

19          THE COURT:  Okay.

20  BY MR. ISAACSON:

21  Q.  All right.  And based on what you just said, it was your

22  opinion that it would be inappropriate to compare the wage share

23  in baseball to hockey because baseball has much higher revenue

24  than hockey?

25  A.  No, I said that might have been what I was responding to.

—2:15-cv-01045-RFB-PAL—

 1    But, you know, in this case there's a lot of record evidence.

 2    You have Bellator with a much lower salary base and a higher

 3    revenue share -- and a high comp share.  You have a Strikeforce

 4    with a low revenue base and a higher comp share.  You have all

 5    of the boxing promoters we've looked at with a substantially

 6    lower revenue base and a higher share.

 7         I don't think the proposition that you would expect

 8    higher wage shares from the league sports because they have

 9    higher revenues holds up.

10         And I have a long section in my first report with a

11    simple regression analysis that shows, in fact, there's an

12    inverse correlation between those two things.  That is, as

13    salaries -- as revenues go up, wage shares go down.

14    *Q.*  All right.  But in your opinion, would it be appropriate to

15    compare the wage shares of hockey and baseball to, for example,

16    estimate damages?

17    *A.*  To compare the wage share...

18    *Q.*  Wage share of hockey and baseball to estimate damages if --

19    in an antitrust case.

20    *A.*  Well, I -- my initial response to that is no, but it's

21    certainly, of course, something that I would want to think

22    about.  It's quite clear that -- that I'm looking at four

23    professional team sports and they all have pretty much the same

24    share.  They're all roughly 50 percent or higher.  And I think

25    that that's meaningful.

-2:15-cv-01045-RFB-PAL-

1          It's also meaningful that some of them provide a very

2  natural experiment for us here.  The natural experiment in

3  baseball is you don't have free agency in 1974.  In 1977, you

4  have it.  Wage shares double.  They jump up tremendously.  And

5  both times you have pretty much the same size of the industry.

6  You have collective bargaining before and after.

7          So there are natural experiments here that we can glean

8  a lot of information from.

9  Q.  All right.  The --

10          THE COURT:  Mr. Isaacson, you've got about five

11  minutes.

12          MR. ISAACSON:  All right.

13  BY MR. ISAACSON:

14  Q.  You said that on your direct you pointed to similarities

15  between the sports and MMA based on the athletes being the

16  product.  And then you also said they had substantially the same

17  or similar revenue generation models.

18          Do you remember similar revenue generation models?

19  A.  I think I said sources.

20  Q.  Sources.  All right.  Revenue generation sources.  And so

21  what percentage -- during the class period, what percentage of

22  Zuffa revenues was coming by Pay-Per-View and how does that

23  compare to the -- to the sports that you were -- that you're

24  using as comparators?

25  A.  It was much higher in Zuffa.

—2:15-cv-01045-RFB-PAL—

1   *Q.*  In fact, it's the predominant share of revenue for Zuffa?

2   **A.**  I would agree with that, yeah.

3   *Q.*  Now, if -- there's been -- if you were -- if you were to do

4   a study --

5        THE COURT:  I'm sorry, that's for boxing, too?

6        THE WITNESS:  Boxing has higher, but diminishing for

7   Pay-Per-View, yes.

8        THE COURT:  Okay.  So you're saying proportionally --

9   so Zuffa has, I guess, a larger source of its overall revenue

10  from Pay-Per-View than the other comparators that you used?

11       THE WITNESS:  That's true.

12       THE COURT:  Okay.

13  BY MR. ISAACSON:

14  *Q.*  And variability of revenue is relevant in deciding an

15  appropriate yardstick because an industry with risks will

16  require a higher rate of return?

17  **A.**  That's not exactly how I would say it, but generally that's

18  correct.

19  *Q.*  Okay.

20       THE COURT:  Let me ask you this question,

21  Dr. Zimbalist.  Are there higher costs associated with

22  Pay-Per-View revenue versus ticket revenue versus the other

23  revenue sources?

24       So, in other words, what would be the costs to a

25  particular owner or promoter for the different sources of

2:15-cv-01045-RFB-PAL

 1  revenue that you have identified, Pay-Per-View versus tickets

 2  versus memorabilia versus sponsorship?

 3          THE WITNESS:  I don't know if I can answer that

 4  question, Your Honor.  I haven't seen a breakdown of that.

 5          THE COURT:  Okay.

 6          THE WITNESS:  And it would certainly depend upon how

 7  the Pay-Per-View was being organized, whether it was being --

 8  production was being contracted out or not.  But I can't give

 9  you specific data for that.

10          THE COURT:  So in terms of the Pay-Per-View revenue, in

11  terms of assessing the costs, relative costs, for example, to

12  the UFC versus other sports, you'd have to take that into

13  consideration?

14          THE WITNESS:  I would, but it -- and it's a major point

15  that the defendants have made here, which is that they have

16  substantial television production costs.  It's also true in the

17  professional team sports and in boxing that there's

18  substantial -- substantial costs.

19          And I think it's also appropriate to put it in context,

20  because if you're looking at cost structure and saying, oh, it's

21  very heavy in Zuffa because they have Pay-Per-View production

22  costs, then we should also consider stadium costs or facility

23  costs.  Zuffa is paying $4 million a year in rental for all of

24  the different arenas they use for their 30 shows or 40 shows.

25  The New York Yankees spend $1.5 billion of their own money to

1   build Yankee Stadium and $100 million a year to operate Yankee

2   Stadium.  And all of the professional baseball teams spend $25

3   to $35 million a year maintaining their minor leagues, a cost

4   that Zuffa does not have, training costs that Zuffa does not.

5   So I think to isolate one particular costs is -- is

6   distortionary of the record.

7            THE COURT:  Thank you.

8   BY MR. ISAACSON:

9   *Q.*  All right.  And in terms of variability of revenue, you

10  observed higher variability of Zuffa's revenue with their

11  Pay-Per-View -- with their dependence on Pay-Per-View compared

12  to the four major league sports and boxing, right?

13  **A.**  If, again, I could provide some context to this answer.

14  Counsel is -- is associating variability of revenue with risk.

15  And when risk goes up -- and I think here in Las Vegas you know

16  it as well as anybody.  When risks goes up, you demand a higher

17  return in order to take the risk.  That's true.

18            The variability of the revenue, when other things being

19  equal, when it's more variable, there's generally more risk.

20            When the variability of revenue is at the top end and

21  what's variable is whether you're going to earn 15 percent sales

22  return, EBITDA, earnings before depreciation, interest, taxes --

23  so you know that.

24            So if you're earning a 15 to 35 percent EBITDA return,

25  that is EBITDA divided by your sales, and one year it's 15

1  percent and one year it's 25 percent, that's variability of

2  revenue.  But it's not variability of revenue that we associate

3  with risk-taking where you make a bet and you might win and you

4  might lose.  In other words, you might go underneath.

5         So I think, yes, Pay-Per-View has had variability.  It

6  probably has a little more variability from event to event.  But

7  boxing has tremendous variability in outcome from event to

8  event.

9         There's testimony in the record from Aaron and DiBella

10 and others that most boxing shows lose money.  So I don't think

11 the variability of revenue here is something that

12 distinguishes -- distinguishes Zuffa or would argue

13 appropriately for a higher rate of return in Zuffa or

14 alternatively for a lower compensation share.

15         THE COURT:  Okay.

16 BY MR. ISAACSON:

17 *Q.*  And, in your words, your five comparators, the four leagues

18 and boxing, have all been enormously successful and had staying

19 power for literally decades, right?

20 *A.*  That's correct.

21 *Q.*  Okay.  And that's not a characterization you would make

22 about Zuffa?

23 *A.*  Well, they haven't been around for literally decades.

24 *Q.*  All right.

25 *A.*  If they had been -- well, two decades, that's decades.

—2:15-cv-01045-RFB-PAL—

1   *Q.*  Right.  But they have not had enormous success over those --

2   you said Zuffa has been around for two decades, right?  And

3   you -- do you believe -- consider them to have had enormous

4   success throughout that period?

5   **A.**  I think they've had very good financial success, yes.

6            MR. ISAACSON:  Okay.  I think I'm out of time.

7            THE COURT:  You are.  Thank you, Mr. Isaacson.

8            MR. SILVERMAN:  Your Honor, can I just do a couple of

9   redirect questions?

10           THE COURT:  No.

11           Mr. Isaacson, who is going to be doing --

12           MR. ISAACSON:  I'm moving chairs.

13           MR. WIDNELL:  This is Nicholas Widnell.  I actually

14  haven't spoken before you before.  And Professor Blair will be

15  the witness.

16           If you don't mind, I would like to assist him up on to

17  the witness stand.

18           THE COURT:  Sure.

19           MR. WIDNELL:  Thank you.

20           THE COURT:  There is a step here and a step there, so

21  just be careful of that, Professor Blair.

22           MR. WIDNELL:  We actually practiced this.

23           THE COURT:  Well, that's why we have that sign there

24  because we've unfortunately had people...

25           THE WITNESS:  I came in and practiced, Your Honor, but

—2:15-cv-01045-RFB-PAL—

 1  that doesn't mean I'm not going to fall.

 2          THE COURT:  If you need more help, let me know.

 3          THE WITNESS:  Thank you.

 4          THE COURT:  And we'll try not to have you do it again.

 5          THE WITNESS:  Okay.

 6          THE COURT:  All right.  Professor, if you could just

 7  raise your right hand.

 8          ROGER D. BLAIR Ph.D., having duly been sworn, was

 9  examined and testified as follows:

10          THE COURT:  All right.  You can take your seat.

11          THE WITNESS:  Thank you.

12          COURTROOM ADMINISTRATOR:  Professor, please state and

13  spell your name for the record.

14          THE WITNESS:  Yes.  My name is Roger Blair.  And it's

15  R-O-G-E-R.  And my last name is B-L-A-I-R.

16          THE COURT:  I'm sorry.  And Mr. --

17          MR. WIDNELL:  Widnell.

18          THE COURT:  Widnell.  Okay.  Widnell.

19          Okay.  Thank you.

20                  DIRECT EXAMINATION OF ROGER BLAIR

21  BY MR. WIDNELL:

22  *Q.*  Professor Blair, is it fair to say that you're the

23  preeminent expert on monopsony?

24  *A.*  Well --

25          THE COURT:  So, Mr. Widnell, here's what I don't want

2:15-cv-01045-RFB-PAL

 1  us to do.  I have their C.V.s, so let's not go through the

 2  C.V.s.  I appreciate the fact these are respected experts.

 3  Otherwise, you all would not have paid so much for them to come

 4  to testify and provide reports.  So ...

 5          MR. WIDNELL:  I understand, Your Honor.

 6          THE COURT:  So let's move on from there.

 7          I don't think there's going to be any objection from

 8  the plaintiffs that Professor Blair is an expert in his field,

 9  is there, Mr. Silverman or Mr. Cramer?

10          MR. SILVERMAN:  No, Your Honor.

11          THE COURT:  Okay.  So ...

12          MR. WIDNELL:  I apologize.

13          THE COURT:  No, don't apologize.  I'm just saying --

14          MR. WIDNELL:  I have particular pride in his

15  credentials.

16          THE COURT:  Mr. Isaacson has been used to this, which

17  me unfortunately sort of ushering things along.

18          MR. WIDNELL:  I understand.

19  BY MR. WIDNELL:

20  *Q.*  Professor Blair --

21          MR. WIDNELL:  Can we turn to Slide 7?

22  BY MR. WIDNELL:

23  *Q.*  Professor Blair, you've criticized Dr. Zimbalist's use of

24  revenue share.  Could you explain why?

25  *A.*  Yes.  Revenue share is -- doesn't give you -- doesn't inform

—2:15-cv-01045-RFB-PAL—

1  you in any way about the existence or exploitation of monopsony.

2         THE COURT:  So why is it that people use it so -- at

3  least it has been cited in this various testimony, use it so

4  regularly as a way to at least try to estimate what would be

5  appropriate to pay athletes or players?

6         THE WITNESS:  Well, revenue share may make some sense,

7  and I kind of explained this in a different context with the

8  FTC.  Revenue share can make some sense if what's going on is

9  that the -- the employer and the employees are bargaining with

10  one another in, like, a collective bargaining.

11         And as Dr. Zimbalist pointed out, in these -- in these

12  settings, you have -- essentially you have what is known in

13  economics as bilateral monopoly.  So you have a monopoly

14  supplier of the input, which in most cases is the players union.

15         THE COURT:  Right.

16         THE WITNESS:  And you have the monopsony buyer, which

17  is the league-wide management committee or whatever they're

18  calling it.

19         Now, in those circumstances, it also makes sense for

20  the two parties to be bargaining over what we think of as the

21  surplus.  And -- but in professional sports, most of the

22  owner -- the companies are closely held and they don't want to

23  reveal what their -- what their actual profits are.

24         So instead of bargaining over a share of the profits,

25  they wind up bargaining over a share of the revenues.

1          THE COURT:  In that sense they have -- they're using

2    revenues as essentially a proxy for profits because they don't

3    want to reveal that about their own particular --

4          THE WITNESS:  Yes, that's correct.

5          THE COURT:  -- organization.

6          THE WITNESS:  And the -- you know, in that environment

7    then it makes some sense, you know, both theoretically and

8    practically, for them to be bargaining over, you know, this

9    split.  And, you know, there's -- but there's no unique correct

10   number on that split.  It's not necessarily going to be 50

11   percent.  I mean, there's some theoretical models that suggest

12   that, but, you know, you can get a split that's anywhere

13   between, you know, 2 percent for one and 98 percent for the

14   other or vice versa.

15         THE COURT:  So assume for the moment that the player --

16   the fighters here had their own union and they were

17   negotiating --

18         THE WITNESS:  Okay.

19         THE COURT:  -- with Zuffa.

20         THE WITNESS:  Okay.

21         THE COURT:  Would you expect that they would also use

22   revenue share as part of that negotiation?  Since the other

23   leagues do it that way.

24         THE WITNESS:  They -- they might, but, you know, they

25   could be -- they could bargain over -- see, it's hard -- well,

1  you know, it's hard to think about --

2        THE COURT:  I mean, what else would they use?  It seems

3  to me, at least from what I've seen, that wage share/revenue

4  share is a common way in which athletes or players, whether

5  they're organized or not, or boxers, use that at least in some

6  way to help them inform the negotiation.

7        Now, I'm not saying that necessarily means that it

8  reflects monopsony or not, but I'm trying to get at how it's

9  useful in the context of wage share.  Because it certainly

10  appears to be useful as part of a way that the parties negotiate

11  because they regularly use it.

12        So, would you expect that if the fighters here were to

13  form their own union that they would use revenue share as a way

14  to negotiate?  Or -- and -- and Zuffa because that seems to be

15  the way that -- that's a standard way to negotiate.

16        THE WITNESS:  Well, okay, this would be -- I think this

17  would be very complicated for one thing, because the fighters

18  are, you know, fighting, you know, two times a year, you know,

19  at the outside three times a year, which is very different from

20  the NFL where the teams are playing, you know, 16 games, plus

21  the preseason, then the postseason games and so on.  So they've

22  got -- you know, there's a -- it might make more sense to share

23  revenues, you know, on an aggregate basis.

24        Now, the individual players, of course, are negotiating

25  their own salaries and, you know, it has to conform to that pot

1  of money that's provided by the -- you know, in this -- under

2  the terms of the collective bargaining.

3         You know, with MMA you've got fighters who may or may

4  not, you know, fight, and there's also the issue of, you know,

5  if somebody's injured, are they going to get paid?  You know,

6  because they would like to be available -- like, you know,

7  football players would like to be available, but if they're

8  injured, they don't play, but they get paid anyway.  And it's

9  not clear exactly what we would do about that.

10         But, you know, the most fundamental thing, I believe,

11  about the difficulty of wage share is that the issue and the

12  central issue in this case, as I understand it, is some

13  impermissible exercise of monopsony power by -- by Zuffa.

14         And, you know, the -- you know, I illustrate in my --

15  in my report and I illustrate it to the Federal Trade Commission

16  that you can get very different wage shares or revenue shares in

17  perfectly competitive labor markets.

18         So if you can get two different wage shares and these

19  two markets are both competitive, so the difference between

20  those wage shares doesn't tell you anything.  It doesn't tell

21  you that the -- that in the market where the wage share is low

22  that those people have been damaged in some impermissible way.

23  Because by hypothesis, the two markets are competitive, and so

24  consequently we can't attribute any difference to the exercise

25  of monopsony.

—2:15-cv-01045-RFB-PAL—

1           THE COURT:  So are you saying that if there -- if I

2    were to assume that in fact there was monopsony power, that

3    wouldn't show up potentially in wage share?

4           If we knew there was monopsony power in a market and

5    there wasn't one -- in a comparable market there was no

6    monopsony power, are you saying that you could have a situation

7    where they'd have the same wage share?

8           THE WITNESS:  Well, it would translate -- the wage

9    share would -- could be a product of the actual wages paid.

10          But, you know, I understand what you're saying.  We've

11   got one market which is a perfect yardstick, right.  I mean,

12   everything's the same, but for the impermissible conduct.  And

13   then you've got the market in question where there is -- which

14   is, again, is the same, same, you know, everything -- all of the

15   economic aspects of the entity is the same except that there's

16   some impermissible or at least allegations of impermissible

17   conduct.

18          Now, if that is, in fact, monopsony and the two markets

19   otherwise would be completely identical, then you would get a

20   difference in the wages paid, the actual wages paid.  And then

21   you could do some calculation to see what happened in the wage

22   share.  But the wage share itself is not really informative.

23          THE COURT:  So what you're saying is that you could see

24   the effect of monopsony powering a wage share, but the wage

25   share in itself may not by itself be dispositive?

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  Yes, that's correct.

2           THE COURT:  Okay.

3           MR. WIDNELL:  Your Honor, in his -- in Professor

4    Blair's report he had a more detailed explanation of the point

5    he just discussed.  Do you -- do you want to just hear him walk

6    through that in the interim?

7           THE COURT:  Yes, let's go ahead.  Sure.

8           MR. WIDNELL:  Because it --

9    BY MR. WIDNELL:

10   Q.  So, Professor Blair, we actually have -- we -- this is a

11   table from -- it's basically Figure 3 from Roger Blair's report.

12   We've modified it only to just put colors on things and shade in

13   different parts to help have him explain it.  And it's -- part

14   of that is it's easier because he's memorized these colors so he

15   that can explain it.  He can't actually see the chart himself.

16          So, Professor Blair, we currently have the first

17   version that has the -- the lines in red, blue, and yellow for

18   Figure 3.  Do you -- can you just briefly explain what this

19   chart represents?

20   A.  Yes.  In that chart what I wanted to illustrate is that you

21   can -- in a competitive market, competitive labor market, you

22   can have two different revenue shares.  And those different

23   revenue shares can't possibly be due to monopsony or monopoly

24   because by hypothesis everything is competitive.

25          Okay.  So I -- the horizontal yellow line represents

———2:15-cv-01045-RFB-PAL———

1   the competitive wage rate in a competitive labor market.  And

2   what that indicates is that the employer or employers, in this

3   case, can hire as much as or as little labor as they want at the

4   prevailing competitive wage rate.

5        The two negatively sloped lines represent the demand

6   for labor by two different employers.  And the reason why I drew

7   them so that they would cross at the same point on that wage --

8   on that horizontal wage line was because I wanted to hold

9   constant the quantity of labor hired, which was $L_1$, and the --

10  the price per unit, which is the wage rate, which is $W_1$.  So $W_1$

11  times $L_1$ represents a total expenditure on labor.  And that's

12  that -- you know, on a different slide we've colored that in as

13  yellow box.

14       And then so I've got these two demands and they cross

15  at the same point, which means that they're both -- both

16  employers are paying the same wage per unit of labor and they're

17  hiring the same quantity of labor, which is $L_1$.

18       So I've got another slide where I kind of take this

19  apart.

20            MR. WIDNELL:  We've moved on.

21            THE WITNESS:  And you can see geometrically why the --

22            THE COURT:  So let me ask one question.

23            THE WITNESS:  Yes.

24            THE COURT:  These models seem to assume a decrease in

25  demand for labor, right?

1           THE WITNESS:  A negatively sloped demand for labor,

2   yes, that is correct.

3           THE COURT:  And is it your view there was a decrease in

4   demand for fighters over the class period?

5           THE WITNESS:  Okay.  So when we're talking about --

6           THE COURT:  And I know this is complicated by the fact

7   there's an allegation about monopsony, and there's also -- we

8   haven't even talked about the alleged monopoly side of this,

9   but ...

10          THE WITNESS:  Right.

11          THE COURT:  How dependent is this explanation on the

12  decreasing demand for labor?

13          THE WITNESS:  Okay.  When we say "decreasing demand,"

14  usually what that means is that the demand function is shifting

15  to the left so that at any given wage you want to hire fewer

16  people.

17          Now, here, what you're observing -- and I think what

18  you're asking me about is why is that -- why are the demands

19  negatively sloped?

20          THE COURT:  Yes.

21          THE WITNESS:  And the reason why they're negatively

22  sloped is that the -- what the marginal revenue product curve

23  shows you is the marginal value to the firm of hiring any

24  particular quantity of labor.

25          THE COURT:  Right.

1           THE WITNESS:  So at $L_1$ the marginal value to the firm is

2     equal to $W_1$ because they're --

3           THE COURT:  Right.

4           THE WITNESS:  -- that's the height.

5           Now, the reason why they have a negative slope is if we

6     assume that these two employers are in a competitive output

7     market, not the input market now, but the output market, then

8     what that means is they change output by a small amount.  The

9     market-determined price is not going to change because they're

10    too small.

11          So, you know, if you have one farmer selling -- you

12    know, planting twice as much acreage in corn, it's not going to

13    affect the corn -- the price of corn.

14          That's the idea.  Okay.  Now, so the marginal revenue

15    product is then equal to the price of the output times the

16    increase in the total output that the firm experiences from

17    hiring that additional labor.

18          So at $L_1$, if you hire just slightly more labor, you're

19    going to get approximately -- you're going to get more output

20    and if -- when you multiply that additional output by the price

21    of that output, that gives you the -- the marginal revenue

22    product, and it gives you an idea of what the marginal benefit

23    to the firm is of hiring that additional labor.

24          THE COURT:  Right.

25          THE WITNESS:  And then, of course, the wage rate is the

—2:15-cv-01045-RFB-PAL—

 1    cost of hiring the additional labor.

 2          THE COURT:  But in this case, Professor Blair, one of

 3    the things that will be slightly different about this,

 4    potentially, it seems to me is that the fighters are paid by

 5    bout; but they can have a period of time where they're not

 6    fighting, but they are locked into a contract such that they

 7    couldn't actually go out and seek payment from another promoter.

 8          Does this model or does this diagram account for that?

 9    Because it seems to me you could then have a situation in which

10    in the output market, even though you're not necessarily

11    increasing the output, you can have an increasing demand for

12    fighters as it relates to increasing the attractiveness of the

13    event, so you need a bigger roster.  But you're not paying them

14    necessarily more because the number of bouts is actually not

15    changing.

16          How would that impact the marginal revenue product and

17    the model -- the diagram that you have?

18          THE WITNESS:  Okay.  The -- I think I understand your

19    question.

20          So what you're saying is this sport -- this is -- I

21    wouldn't use this particular model.  I'd do a variation, which

22    I've got some place.  But -- so what you're suggesting is we

23    have a -- let's say we start at a point where the marginal

24    revenue product crosses that wage line, right.

25          THE COURT:  Right.

2:15-cv-01045-RFB-PAL

1          THE WITNESS:  All right.  Now the demand -- you know,

2     the product becomes more popular, the entertainment value

3     becomes more popular, more people want to watch it.  You know,

4     the -- you know, presumably you can, you know, perhaps get paid

5     more for it.

6          But in any event, the -- the demand for the output,

7     that is watching MMA, the audience value, that's -- let's say

8     that shifts to the right.

9          THE COURT:  Yes.

10          THE WITNESS:  Now, what that will do is it will make

11     this -- one of these demands shift to the right.  And what

12     happens then --

13          THE COURT:  So when you say "shift to the right," you

14     don't mean it becomes --

15          THE WITNESS:  The whole line shifts to the right.

16          THE COURT:  But you're not saying that it changes the

17     sign for the slope, you're not saying the line becomes

18     positively slope --

19          THE WITNESS:  No, no.

20          THE COURT:  You're just saying it moves it --

21          THE WITNESS:  Yes.

22          THE COURT:  -- by degree of units across sort of the

23     horizontal axis?

24          THE WITNESS:  Right.

25          THE COURT:  Okay.

2:15-cv-01045-RFB-PAL

1            THE WITNESS:  It moves it to the right.

2            THE COURT:  Okay.

3            THE WITNESS:  And then what happens is -- so if you

4    think about where the original intersection was, now you've got

5    this new higher demand.  If you look at that old employment

6    level, the MRP is above the wage rate now.

7            All right.  So what that does is that gives the

8    employer an incentive to expand employment.  So you will go

9    from, you know, from $L_1$ to some other value.  And as long as the

10   marginal revenue product that's above that wage, there continues

11   to be an incentive to expand employment and you eventually will

12   get to -- to the point on that horizontal wage line where the

13   new demand curve for labor crosses that.

14           And so you'll be back at -- again, as long as this

15   labor market is competitive, you're going to get back to the

16   same wage, but at a much higher employment level -- or higher

17   level.  Maybe much -- depending upon how much the demand shifts.

18           But what you're going to find is, although the wage

19   itself didn't go up, the total expenditure on labor went up

20   because you're hiring more people.

21           THE COURT:  But this assumes a competitive labor

22   market, correct?

23           THE WITNESS:  This -- this demonstration does.  And the

24   reason for that, Your Honor, is that my purpose in putting this

25   together was to illustrate the fact that differences in the wage

2:15-cv-01045-RFB-PAL

1  share do not inform us about anything about monopsony because

2  there -- by hypothesis there is no monopsony in this particular

3  model.

4          THE COURT:  Right.  But what would it look like if

5  there was a monopsony in this case?  Would you essentially see a

6  positively sloped line, but with a constant or a less positively

7  sloping wage line?

8          THE WITNESS:  Okay.  What -- what you would have if we

9  have some element of monopsony, okay, that comes from the fact

10  that the supply curve of labor has a positive slope.

11          When that has a positive slope -- and you just think

12  about it this way.  When the supply curve is positively slope --

13  let's suppose that you're hiring, you know, 100 people and

14  you're paying the wage that's on that supply line, right?

15          Now, let's suppose you want to hire one more person.

16  So you go up that supply curve to get to the next highest

17  person.  And what -- what happens in the market, unless you can

18  engage in some kind of real wage discrimination, what happens is

19  that wage rate that's necessary to get that extra person to --

20  to come into the labor force, that -- that wage goes up.

21          THE COURT:  But what I'm saying --

22          THE WITNESS:  But you to pay it -- excuse me.  But you

23  have to pay everybody else the same thing.

24          THE COURT:  But you're assuming no monopsony power.  If

25  I have monopsony power --

2:15-cv-01045-RFB-PAL

1          THE WITNESS:  No, I'm getting to the monopsony power

2    part of this.  Okay?

3          THE COURT:  All right.

4          THE WITNESS:  So what happens then with the positively

5    sloped supply is because when you hire one more person you don't

6    just incur increased costs equal to that wage, but you have to

7    pay everybody else an increased wage so that everybody's getting

8    paid the same amount.

9          Now, what that does then is there is what we refer to

10   as an marginal expenditure line, which is steeper than the

11   supply curve.  And where that crosses the demand is the

12   profit-maximizing level of employment.  Okay?

13         And then -- and you come down to the quantity axis and

14   that tells you what that quantity is.  Now, as the demand

15   shifts -- as you were asking me, if the demand shifts, the inner

16   section of that marginal expenditure line and the new demand is

17   going to be at a higher level of employment, and that

18   necessarily is going to mean that you're going to wind up paying

19   more to the -- to the workers.

20         THE COURT:  Right, but you're -- you're still assuming

21   a competitive market.  What I'm saying is that --

22         THE WITNESS:  No, I'm assuming -- here I'm assuming a

23   monopsonistic one.

24         THE COURT:  That's what I'm saying.  If I have

25   monopsony, why do I have to pay them any more at all?  If there

———2:15-cv-01045-RFB-PAL———

 1  was an increasing --

 2          THE WITNESS:  Okay.

 3          THE COURT:  In this case, here's what I'm assuming --

 4          THE WITNESS:  I --

 5          THE COURT:  I'm assuming there's an increasing demand

 6  for this case the events.

 7          THE WITNESS:  Right.

 8          THE COURT:  I'm assuming that part of the increased

 9  demand and popularity relates to having a higher rotation of

10  fighters.  So you need more fighters to be --

11          THE WITNESS:  Yes.

12          THE COURT:  -- able to rotate through.  But you have

13  monopsony power, allegedly.  Why would you have to pay the new

14  fighters any more than you've paid the old fighters if you can

15  control -- let's say you had complete and total control.  You

16  wouldn't have to pay them anything new, correct?  You could pay

17  them the same wage that you paid the other fighters and you

18  wouldn't even have to increase the wage because you have total

19  control over the input.

20          THE WITNESS:  Okay.  If the -- if the demand for the

21  bout, the fan demand increases, that's going to shift that

22  demand to the right.  And it also shifts the demand for all of

23  the inputs to the right.

24          Now, if you have monopsony, it is essential that the

25  supply curve have a positive slope.  If the supply curve does

—2:15-cv-01045-RFB-PAL—

1  not have -- has a -- is flat, then even if you're the only

2  employer, you can't depress the wage because what that supply

3  curve tells you is you could hire as much or as little as you

4  want at the prevailing wage, but you cannot pay less than that

5  because if you pay less than that no one will work for you.

6         THE COURT:  Right.  But there's no evidence here that

7  there was a decreasing supply curve, right?  There's no evidence

8  in this record that there was a decreasing supply of fighters.

9  And so my question to you is --

10        THE WITNESS:  No, but I'm talking about increase --

11        THE COURT:  No, but what --

12        THE WITNESS:  A positively sloped supply curve.

13        THE COURT:  What I'm trying to understand, Dr. -- or

14 Professor Blair is this.  If a company or an entity has

15 monopsony power, right, they don't have to pay, right?  Even if

16 there's an increased supply, an increased demand, right, the

17 definition of monopsony is that they don't have to pay what they

18 would otherwise have to pay if there's competition in the

19 market, correct?

20        THE WITNESS:  All right.  If -- if the -- if there is a

21 monopsonist, the monopsonist is, you know, by definition is the

22 only employer.  Now, the ...

23        Whatever the supply of fighters is, if -- if we start

24 from a position where the monopsonist has maximized profits, has

25 selected the appropriate number of fighters to maximize its

—2:15-cv-01045-RFB-PAL—

1  profits, now if the demand shifts to the right, the only way

2  that they can get more fighters is by increasing the amount that

3  they pay.

4            THE COURT:  Okay.

5            THE WITNESS:  Because the -- because you see the supply

6  curve, you know, has this positive slope.  And so if you're here

7  and you want to go to there, you got to bump up the amount that

8  you pay.

9            THE COURT:  Okay.

10            All right.  Thank you.

11  BY MR. WIDNELL:

12  *Q.*  And, Professor Blair, even if you observe monopsony power,

13  would that be evidence that the challenged conduct necessarily

14  was what caused monopsony power?

15  *A.*  Well, I don't know -- depends on what the challenged conduct

16  is, I suppose.

17            But, you know, when -- almost -- generally in the

18  economics literature and, you know, the empirical literature and

19  labor, you know, recently there's been a fair amount of work

20  done to estimate the supply elasticities.  And when that supply

21  elasticity is not infinite, that means that the labor supply is

22  not flat and it's positively sloped.  And whenever it's

23  positively sloped, there's some possibility of exercising

24  monopsony power.  And it's not like -- when we say "exercising

25  monopsony power," I don't want to -- I don't want to, you know,

—2:15-cv-01045-RFB-PAL—

1  misrepresent what that means.

2        What that means is that if you have any degree of

3  monopsony power, when you select the profit-maximizing quantity

4  of the inputs, including the labor input, you are going to be

5  operating where the marginal revenue product is going to be

6  higher than the wage rate.

7        So there will be some exercise of monopsony power at --

8  or at least, you know, the wage will be lower than it would be

9  under perfectly competitive conditions.  But, you know, it comes

10  from the supply curve having a positive slope.  And that can --

11  that can arise for any number of reasons unrelated to conduct by

12  the employer.

13  Q.  Can it be due to procompetitive reasons?

14  A.  I'm sorry?

15  Q.  Can some degree of monopsony power be attributable to

16  something that's actually procompetitive conduct?

17        For instance, if you are the one that creates a new

18  market and you're the first one to come to the market, is it

19  possible that your innovation creates some degree of monopsony

20  power?

21        THE COURT:  I just say how -- how convenient an example

22  that you're using.  Appropriate.

23        MR. WIDNELL:  You can pick your own example, Your

24  Honor.

25        THE COURT:  I mean, you can just ask him about this

—2:15-cv-01045-RFB-PAL—

1   case.  It's fine, Mr. Widnell.  I'm just saying you can ask him

2   about it because -- certainly it's appropriate to say, in this

3   case, is that a possibility?  Because that's true.  I mean, we

4   know the fact scenario.  So I'm just saying you don't have to

5   disguise it in a hypothetical.  It's okay.

6           MR. WIDNELL:  Fair enough.  But actually I do want

7   to -- just as more theoretical point.

8           THE COURT:  As an economic principle?

9           MR. WIDNELL:  Precisely.

10          THE COURT:  Okay.  That's fine.

11          THE WITNESS:  Well, sure.  Of course.  If they're --

12  you know, if you have developed a product or service that nobody

13  else, you know, is involved in, first of all, that gives you

14  monopoly in the output market.  But if there are unique inputs

15  that only you would be interested in hiring, then, of course,

16  you're going to have some monopsony power.

17          Now, again, it still depends on the supply side.  If

18  the supply is perfectly elastic, even though you're the only

19  employer, that -- or firm, you know, that doesn't mean -- you

20  still can't exercise any monopsony power in the sense that you

21  can depress the price in the marketplace.

22  BY MR. WIDNELL:

23  Q.  And just to be clear, another reason the supply curve could

24  be sloping upward could be that there's some level of market

25  power on the part of the seller as well, couldn't it?

2:15-cv-01045-RFB-PAL

1            (Pause.)

2            Or that there's product differentiation such that --

3    *A.*  Well, I mean, yes, there can always be, you know,

4    differences that -- that change the, you know, the supply

5    conditions.  Yeah, when you have -- if you had differentiation

6    in that input -- general input market, then, you know, you're

7    going to have, you know, differences in supply.  Well, that -- I

8    mean, if you think about athletes, for example, you know, the

9    absolute premiere athletes, like Mike Trout, for example, you

10   know, he's got, you know, a certain amount of market power,

11   right.  And because you have to deal with him, that's -- you

12   know, and he's different from other players in his position

13   because he's just better, you know, and that, you know, changes

14   things.

15   *Q.*  Okay.  We were talking about -- initially about the

16   appropriateness of using revenue share as a metric to assess

17   competitive effects.

18            One question that came up in that context was a

19   similarly to or the use of revenue share in collective

20   bargaining.  In your opinion, is collective bargaining more

21   competitive than a market without collective bargaining?

22   *A.*  Okay.  So -- so if we don't have any collective bargaining,

23   okay, then the market on the labor side is likely to be more

24   competitive than when you have unionization because, you know,

25   what the union does is it controls the supply and it can

—2:15-cv-01045-RFB-PAL—

1   withhold the supply.  I mean, that's -- you know, one of the

2   threats of a union is that they will go on strike and,

3   essentially, what they're doing is they're not -- unions are a

4   little different than when you're thinking about other kinds of

5   monopolies where you're selling, you know, these kinds of cups

6   or pencils or something.

7          But, you know, they have some control over the

8   availability of the labor supply, and, you know, that gives

9   them, you know, a certain amount of market power and sometimes

10  very substantial market power.

11  *Q.*  Thank you.

12         Also you referenced that you gave a presentation to the

13  FTC.  As you know, both of the experts have cited to a slide in

14  that presentation that included revenue share as evidence that

15  you actually rely on revenue share yourself in making or relied

16  on it yourself in making the presentation to the FTC.

17         Could you just briefly describe what that presentation

18  to the FTC was?

19  **A.**  Yes.

20         MR. WIDNELL:  Can we pull up --

21         THE WITNESS:  The FTC in the Seattle field office was

22  interested in the possibility that there was improper

23  monopsonistic conduct in MMA.  And they asked Zuffa to attend

24  the meeting and talk to them about that as part of their

25  investigation.

—2:15-cv-01045-RFB-PAL—

1          And I was asked to assist in that presentation.  And as

2     I recall, the FTC had a list of specific questions that they

3     wanted answers to.  And one of the questions or several of the

4     questions dealt with revenue shares.  And so to be responsive to

5     the FTC, I got some help from others, but, you know, we

6     basically assembled information about revenue shares and, you

7     know, in other sports because the FTC asked us to do that.  So

8     all I did was answer their question.

9          THE COURT:  So, Professor Blair, if you don't use

10    revenue or wage share, what would be an appropriate systemic

11    metric for assessing a monopsony or not or monopsony power in a

12    labor market?

13         THE WITNESS:  So I think that what you -- what you

14    really want to look at is the actual wages paid.

15         THE COURT:  But how would you look at it apart from the

16    influence of -- so if you're looking in a market where there is,

17    in fact, a monopsony --

18         THE WITNESS:  Okay.

19         THE COURT:  -- you obviously couldn't use those wages,

20    right, because those wages would already potentially be

21    depressed.

22         THE WITNESS:  Yes.

23         THE COURT:  So, would the only other way to do that

24    would be to look at either a comparable market or look at that

25    same market before or after the exercise of monopsony power?

```
                    -2:15-cv-01045-RFB-PAL-
```

1           THE WITNESS:  Okay.  Well, let me -- let me get at this

2   way.  I mean, I understand your question.

3           So what happens in a monopsonistic market is that the

4   wage paid is lower than it would -- would have been in the

5   absence of monopsony.  So there's a gap between the so-called

6   but-for wage and the actual wage.

7           So you would use the actual wage, but not -- you know,

8   not in the way that you might have thought that I was going to

9   try to do it.

10           So you'd use the actual wage.  And you have the actual

11   employment.  You know what those variables are because you could

12   get those from business records.  What you don't know is the

13   wage that would have prevailed --

14           THE COURT:  Right.

15           THE WITNESS:  -- in the absence of the market.  That's

16   what you have to estimate.

17           And one way of doing that is to use a yardstick, but

18   you have to do it appropriately.  Because if you don't, you're

19   going to get information and you're going to draw inferences

20   that are faulty and unreliable.

21           Or, another way to do it would be to look at before and

22   after data to try to -- and, of course, then you would have to

23   control for variables that change over --

24           THE COURT:  Right.

25           THE WITNESS:  -- the time that you're looking at -- at

—2:15-cv-01045-RFB-PAL—

1   the data.  And you'd have to try to infer what the but-for wage

2   would be, right, and compare that to the actual wage.

3            And, you know, the difference, of course, you know, you

4   would attribute to monopsony, provided that you've controlled

5   for the other things that are relevant.

6            THE COURT:  So in this circumstance, the market we're

7   talking about in this particular case, if you don't use wage

8   share, what would be, in your view, the appropriate systemic

9   metric -- where there's an allegation there's already a

10  depressed wage, what would be the appropriate metric to

11  determine the existence of monopsony power?  In other words,

12  what would be the appropriate method to determine whether or not

13  the actual wages were influenced by monopsony power?  What would

14  you do in this particular circumstance?

15           THE WITNESS:  Right.  So what you would try to do in

16  that circumstance would be that you will have the actual wages

17  which -- which we suspect are depressed, right.

18           THE COURT:  Right.

19           THE WITNESS:  And then what we want to see is, well,

20  can we get an estimate of what there would have been had there

21  been no monopsony to depress them.  Okay?

22           So, again, one way to do that would be to find a

23  suitable yardstick and compare that, you know, the wages that

24  are -- or I'm sorry.  Infer what the wages would have been in

25  the subject market based on what they actually were in the

—2:15-cv-01045-RFB-PAL—

 1  yardstick market.  That's one way.

 2         And then the other way would be to -- to try to use a

 3  before and after empirical approach to getting at what the wage

 4  would have been in the absence of the challenged conduct.  And

 5  the difference is the extent of that depression.  I mean, you're

 6  right.  I mean, the monopsony -- exercise of monopsony leads to

 7  a -- you know, a depression of wages.  And it does that because

 8  there's a restriction of employment.

 9         THE COURT:  So, in your view, are there any, what you

10  view to be, identical or nearly identical markets to the MMA

11  market here that you could use as a yardstick?

12         THE WITNESS:  Okay.  So, I'm not sure whether there are

13  or there aren't.  Okay.  You know, I -- you know, I wasn't asked

14  to actually determine that.  I was merely asked to -- to provide

15  testimony on whether I believed that the yardsticks that have

16  been selected were appropriate.

17         THE COURT:  Okay.

18         THE WITNESS:  So I don't -- I don't know the answer to

19  that.  You know ...

20         THE COURT:  What about boxing?  Let's talk about

21  boxing.  What about boxing?  Why wouldn't boxing be an

22  appropriate yardstick here?

23         THE WITNESS:  Yeah, I'm not -- you know, there are

24  differences across the sports.  And they look, you know, you

25  know, reasonably attractive, I guess, in the sense that, you

—2:15-cv-01045-RFB-PAL—

1  know, they're both combat sports and they're individual, not

2  team sports and that sort of thing.

3           THE COURT:  And they're not unionized.

4           THE WITNESS:  Yeah, and they're not unionized.

5           THE COURT:  Right.  So what I'm saying in the yardstick

6  method, I assume, that in the -- in this field there has to be

7  at least some understanding that you're not ever going to be

8  able to find an exactly identical market to make the comparison,

9  that there's always going to have to be some assessment of how

10  close the market is that you're using as a comparator, right?

11           THE WITNESS:  Yes.

12           THE COURT:  And so, in your view, what is -- how do you

13  assess close enough versus a line at which it crosses where it's

14  not close enough?  Because part of what I have to decide is is

15  this simply a subjective judgment that there may be broad

16  disagreement about even amongst recognized experts or whether or

17  not there's some very clear line that econometricians,

18  particularly in sports, use to say if you don't have this

19  particular measure or if you don't have this particular ratio,

20  then your comparator is not appropriate or reasonable.

21           Is there one set sort of formula or metric that's used

22  to assess a yardstick?

23           THE WITNESS:  Okay.  I -- you know, I mean, that's a --

24  obviously, that's a very troubling question for people that are

25  involved in antitrust economics, you know, either from, you

——2:15-cv-01045-RFB-PAL——

1  know, the legal side or the economics side.

2        The ... All right.  It is not formulaic.  There's a

3  variety of standards that have been expressed and to some extent

4  Dr. Zimbalist was asked about them, you know, earlier today.

5  And, you know -- and they come from Herb Hovenkamp's hornbook on

6  federal aid trust law and, you know, his treatise and Dan

7  Rubinfeld's chapter that he wrote on damages.  You know, kind of

8  the idea is -- I mean, this most central idea is that yardsticks

9  should be similar in all important respects.

10        Now, when you say something like as close as possible,

11  you know, the reason why that doesn't work is that's -- as you

12  know, I think they quoted something earlier out of my report.

13  That's most standard.

14        So let me just give you an example, supposing --

15        THE COURT:  So what would -- I mean, you're

16  acknowledging that they're never going to be identical.

17        THE WITNESS:  Right.

18        THE COURT:  And so you're also acknowledging that

19  they're going to have to be somewhat similar.  So that's why I'm

20  saying to you, if we just don't focus on the language, per se,

21  what words we use, it seems that you are saying that you're not

22  going to have identical markets; you're going to try to pick a

23  market that you think is reasonably close in all important

24  respects, but it's not ever going to be exactly identical,

25  correct?

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  That's very unlike -- well, there are

2    circumstances where it might be or at least really, really

3    close.  I mean, for example, if you had a ready mix concrete

4    dealer in, you know, Las Vegas and another one in Reno, you

5    know, they might be sufficiently far apart so that they're not

6    in competition with one another.  And something funny is going

7    on here and you look at the Reno performance and, you know,

8    they're -- there are cases where they are really, really close.

9           But -- but the problem is I don't think you can be too

10   loose with this.  I mean, the idea of as similar as possible --

11   the reason why I say that that's not standard is because you

12   imagine that the UNLV bookstore has got some complaint, and you

13   can't find another bookstore that's a good substitute -- a good

14   yardstick for them.  And the closest one you can find is Amazon.

15   Now, you can't use Amazon's performance in -- you know, to

16   represent what the performance of the UNLV bookstore.  And

17   that's just sort of an extreme example, of course.

18          But when you -- when you look at the major league

19   sports, there's almost nothing in common between the major

20   league sports and Zuffa.  It's not like --

21          THE COURT:  Well, let's talk about -- let's talk about

22   boxing.

23          THE WITNESS:  Okay.

24          THE COURT:  Because boxing seems to be very similar

25   only from what we talked about, which is you have single events.

—2:15-cv-01045-RFB-PAL—

1   You have single fighters.  You don't have teams.  You don't have

2   unions.  You have similar sources of revenue, it seems.

3          Why wouldn't boxing be an appropriate yardstick?

4          MR. WIDNELL:  Your Honor, could I just ask one

5   clarifying question?

6          THE COURT:  No, hold on a second.

7          MR. WIDNELL:  Okay.

8          THE WITNESS:  Okay.  So there are some -- you know,

9   there are some differences that might be -- that might be

10  significant.  You know, the audiences could be quite different.

11  The athletes could be quite different.

12         Now, you know, obviously, you know, in MMA there are

13  some people that, you know, may have started out as boxers and

14  then moved over.  You know there's some, you know, overlaps,

15  there isn't any doubt about that.

16         And as far as the audience is concerned, you know, some

17  people that like boxing, which, you know, is, you know, quite

18  different from MMA in many respects.  You know, some people are

19  going to be -- you know, there's going to be an overlap in those

20  audiences, but they might be, you know, substantially different.

21  You know, the -- you know, the fan familiarity -- I mean, boxing

22  has been around forever and, you know, and that's not true of

23  MMA.

24         You know, so there are -- you know, there are other

25  differences.  I haven't, you know, gone through it and tried to

—2:15-cv-01045-RFB-PAL—

1  calculate every one.

2        But, you know, the -- what was more important to me in

3  the context of evaluating Dr. Zimbalist's work was that he

4  didn't use boxing.  I mean, he used a handful of data from

5  Golden Boy, which, again, you know, I know you guys went through

6  this a lot already today.  But, you know, the data that are --

7  that were produced in this litigation, in this particular case,

8  have very different results than the results in -- that

9  Dr. Zimbalist used for boxing.  But he didn't use boxing anyway.

10  He averaged boxing together with four other major league team

11  sports.

12        And, you know, that -- you know, that kind of averaging

13  is completely inappropriate because it masks variability which

14  is important.  You know, you can't -- how are you going to

15  compare the quality of the management in his average with the

16  quality of the management and promotion efforts and so on in

17  Zuffa?

18        You can't do it.  Because, I mean, if you think about

19  the four major league team sports, they've got over 120

20  managers, right.  There's over 120 teams.  They're all

21  independently owned.  All of those people are different in terms

22  of the quality of their managerial talents and, you know, the

23  success of managing their teams.  So you can't compare that.

24  The sports are different.

25        The revenue -- the magnitude of the revenue is

1    enormously different.  You know, some -- there are teams in the
2    NFL that have revenues that are almost or around the same size
3    as the revenues that Zuffa experienced.  And then, you know, you
4    take one or two of those teams and, you know, there's still
5    another 120 teams that you have to incorporate.  And then you've
6    got this -- you know, some amount of boxing data from -- that
7    Dr. Zimbalist introduced from outside this case.
8              THE COURT:  That's helpful.  Thank you, Professor.
9    BY MR. WIDNELL:
10   Q.  So just one quick follow-up question on that and then I have
11   one other question and then I think I'm pretty much out of time,
12   but if you are prepared to --
13             THE COURT:  Well, no, if you have more information, I
14   think Dr. -- or I should say professor.  I don't know if you
15   prefer professor or doctor.
16             THE WITNESS:  I'm indifferent, actually, to tell you
17   the truth.
18             THE COURT:  Okay.  Has explained, I think, quite
19   effectively for me the issue of wage share and why that may or
20   may not be helpful, which I think is the main reason why the
21   defendants wanted to call him.  So I think his explanation of
22   the different models and the graphs he used was actually quite
23   helpful and informative to explain why, in his view, wage share
24   wouldn't be appropriate.
25             So I don't know if there's anything else you wanted to

—2:15-cv-01045-RFB-PAL—

1   add to that, but his testimony has been very helpful in terms of

2   informing me about that.

3          MR. WIDNELL:  So I think you may have gotten it from

4   the testimony.  If you didn't, I just wanted to ask another

5   question.

6          THE COURT:  Sure.  Go ahead.

7          MR. WIDNELL:  In his FTC presentation, he did use some

8   revenue share numbers because it was in response to a question.

9   But he prefaced it with basically the same presentation he just

10  gave you today.  I don't know if I need to go through that.  I

11  can show you that there's some charts --

12         THE COURT:  I think he's been very clear about his

13  opinion of what are the appropriate uses or not of revenue

14  share.

15         MR. WIDNELL:  Perfect.

16         THE COURT:  So I think he's been very clear and eloquent

17  about that.

18         MR. WIDNELL:  Okay.

19         THE COURT:  You asked if you thought that boxing would be

20  a good comparator.  And the question I just wanted to know is

21  were you asking whether boxing would be a good comparator using

22  wage share or whether boxing would be a good comparator using

23  actual wages?

24         THE COURT:  Well, I was actually asking him in the

25  context I believe -- and that's how I believe he answered the

————2:15-cv-01045-RFB-PAL————

 1  question in the context if you're trying to look at it both

 2  potentially as a competitive wages, but also in an analysis

 3  looking at monopsony, which would be very similar, obviously.

 4       MR. WIDNELL:  Yeah.

 5       THE COURT:  And that's what I assume he answered in that

 6  regard.

 7       MR. WIDNELL:  Okay.  So it wasn't the motion that it

 8  would be -- I just don't want you to be left with the impression

 9  that he was somehow saying it would be okay to use boxing with

10  wage share because I think --

11       THE COURT:  Well, I don't think that's what his testimony

12  is.  I don't think that's what his report said.

13       MR. WIDNELL:  Perfect.  Yes.

14       THE COURT:  I think he's been very clear about why that

15  shouldn't be the case.  I mean, not so much just here today, but

16  his report goes on quite extensively about that.  So I don't

17  think there's any ambiguity there, Mr. Widnell.

18  BY MR. WIDNELL:

19  Q.  So the -- at least one question I think it would be helpful,

20  perhaps, for you to hear is just there's been a lot of

21  discussion about whether Zuffa is like MLB under the reserve

22  clause.  And I wanted to just ask you, Professor Blair, based on

23  your analysis of Zuffa and the markets, your knowledge of sports

24  economics, do you believe that Zuffa currently today is like

25  athletes in Major League Baseball under the reserve clause?

—2:15-cv-01045-RFB-PAL—

1  *A.*  No.

2  *Q.*  And can you tell me why not?

3  *A.*  Yes.  So back in the day when Major League Baseball had a

4  reserve clause, essentially what that meant was that the

5  baseball player had a one-year contract, and the reserve clause

6  in that contract was at the end of that year the contract didn't

7  actually roll over.  They had to have a new contract.  But, you

8  know, the player had two options basically, could sign the

9  contract after negotiating with the team as best that he could

10 and -- or he could retire.  I mean, those were the only options

11 that he had.

12        And at the end of that second year, he had the same --

13 he was confronted with the same situation.  That is, that there

14 was a new contract and, you know, at some -- sometimes even

15 lower salary and -- but, again, the player had to think in the

16 back of his mind, do I want to play for this very low salary or

17 do I want to not play at all, because those are the only two

18 options that he had.

19        Now, that's not the case with MMA fighters that are

20 under contract with Zuffa.  You know, first of all, there are

21 lots of -- you know, first of all, the contracts are two-year

22 contracts.  They have an end date.  And, you know, and there's a

23 combination of end date and number of bouts.  But, you know

24 whether the -- they've -- all of the bouts have been fought or

25 whether the end date has been reached, you know, once you get to

 1  that point, you're a free agent.

 2          Now, there are, you know, provisions where Zuffa tries

 3  to retain the fighters that it finds most desirable.  And, you

 4  know, and sometimes they -- you know, they'll sign contracts

 5  extensions.  And when they sign contract extensions, what the

 6  fighter gets is more money and, you know, and they're under

 7  contract for more bouts.

 8          You know, so that's -- that's not at all like the

 9  reserve clause in baseball.

10  Q.  Would you say that that's very similar to some of the

11  provisions that you see in major league sports today?

12  **A.**  Well, sure.  I mean, we can see in the major league team

13  sports, you know, they've got, you know, various provisions.

14          Certainly contract extensions are commonplace among the

15  better players, especially.  You know, the team figures out,

16  okay, this guy is outperforming his contract.  We don't want him

17  to be mad and leave us as soon as he becomes a free agent.  So

18  what we're going to do is we recognize he's outperformed his

19  contract.  We renegotiate.  We extend his contract.  We give him

20  more money.  So he gets more money on the old contract, then

21  he's got, you know, an extension at higher wages.

22          And if he outperforms that contract, you know, they can

23  go through this same process again.

24          So, you know, that aspect of the Zuffa contracts is

25  very similar to what you see in other major league sports.

2:15-cv-01045-RFB-PAL

1  *Q.* And when you were preparing to your report, you wanted to

2  know whether or not there were, in fact, Zuffa athletes who went

3  to other promoters. Is that right?

4  **A.** Yes, that's correct.

5  *Q.* And we actually have figure 1 from your report up on the

6  screen. Can you just describe what that figure shows?

7  **A.** Yes. I mean, this shows the number of fighters that, you

8  know, fought for Zuffa and went elsewhere.

9          THE COURT: Do you know, Dr. -- or, Professor Blair,

10  how many fighters Zuffa had under contract total for these

11  years?

12          THE WITNESS: Okay. I mean, I -- I have seen that

13  information and I don't know off the top of my head --

14          THE COURT: That's fine.

15          THE WITNESS: -- what those numbers are, but I can

16  certainly find that for you.

17          THE COURT: I think it's in your report. I'm not sure.

18  Is that in your report?

19          THE WITNESS: I think so.

20          MR. WIDNELL: I actually don't know if it is, but we

21  can certainly make sure that we get you those numbers.

22          THE COURT: I think it's in one of the reports. I'm

23  not sure which report it is. But, okay. I just wanted to try

24  to get some context to the chart.

25  BY MR. WIDNELL:

─2:15-cv-01045-RFB-PAL─

1    *Q.*  And then you also just did -- I think you didn't describe it

2    as a rigorous market analysis, but at least an analysis of

3    roughly what kind of share fighters represented.

4            MR. WIDNELL:  Could we put up ...

5            THE WITNESS:  You know, let me just --

6            MR. WIDNELL:  Table 1 of the report.

7            THE WITNESS:  -- expand on that earlier answer.  You

8    know, not only are there, you know, there's evidence about

9    fighters that play -- bought out their contract, completed their

10   contract, and left.  But the ones -- some of the ones that

11   didn't leave, you know, got contract extensions and, you know,

12   and I don't know whether they're happy about it or not.  But I

13   think that generally speaking the contract extensions involved

14   increased payments.  So, I mean, they couldn't have been unhappy

15   about increased payments.

16           And -- and then, of course, there's some fighters that,

17   you know, completed their contracts and then decided they didn't

18   want to do this anymore.  I mean, after all, this is pretty

19   rough business that these guys are in.

20           And so, you know, it's not the case that people are

21   locked in forever, and it's not the case that there aren't

22   athletes that could be lured away to other promoters.  Because

23   some of them have.

24   BY MR. WIDNELL:

25   *Q.*  And just to be clear, your Table 1, which has the MMA

—2:15-cv-01045-RFB-PAL—

1    Herfindahl Index By Bouts and Events, 2011 to 2016, can you just

2    describe what that is?

3            And I'm not sure that we need to go into the Herfindahl

4    calculations.

5            THE COURT:  We -- I mean, we don't.  And if you -- but

6    if you think it's helpful for the conversation we've had

7    today -- I mean, I think you are switching slightly into a

8    different bit of an area as it relates to assessments about the

9    exclusivity or not of the contracts and --

10           MR. WIDNELL:  Well, it's relevant --

11           THE COURT:  -- the expert reports covered that.  And

12   that's, again, not something I necessarily need the experts to

13   be testifying about.

14           MR. WIDNELL:  It's only relevant in this sense that

15   unlike anything else I think that you've seen, Dr. Blair's

16   approach was looking at promoters that Zuffa fighters, former

17   Zuffa fighters, actually went to to compete at.

18           So it's a little bit different when you talk about

19   mobility and the ability for these contracts to restrict

20   employment, this gives you a sense of the options that were in

21   fact available to the other promoters.  So I think you've heard

22   Dr. Zimbalist say today there's nobody to hire them or something

23   to that effect.  This gives you a sense of how many promoters

24   there actually are out there who are available to hire.

25           THE COURT:  Well, part of the reason why, Mr. Widnell,

1  it's helpful for me to look at the reports is to figure out

2  what's the source is for this information.  So, excuse me.

3          I mean, depends upon what promoters you're talking

4  about.  Are they comparable promoters?  Where -- I mean, do

5  people have to come back?  Did they actually fight?

6          So what I'm saying to you is that all of that

7  information, I believe, from my review of Professor Blair's

8  report is there to provide the context.  And that's more helpful

9  for me than just looking at sort of other promoters because

10  other promoters really depends upon what promoters you're

11  talking about in terms of its impact.

12          So I'm not saying it's not helpful.  What I'm saying is

13  that part of the report is actually fairly clear to me.

14          MR. WIDNELL:  Okay.  I just wanted to make sure you

15  have the distinction that these were all promoters that hired

16  someone who left Zuffa.  So it's sometimes a fighter who was

17  fighting for Zuffa and then went to fight for another promoter.

18          So all of those are promoters who have hired someone

19  who was a Zuffa athlete, who would have been a member of the

20  class that we're talking about here.

21          THE COURT:  But so are you saying that these are --

22          MR. WIDNELL:  I --

23          THE COURT:  -- competitors to Zuffa in terms of being

24  in that sort of elite MMA market or are they just including all

25  promoters?  So there certainly was evidence from multiple

—2:15-cv-01045-RFB-PAL—

1   experts that there were other promoters who were not at the

2   level of Zuffa and who had these Zuffa out clauses.  So you

3   basically would fight until Zuffa wanted you to fight for them

4   and then they would invite you back in.

5          So I can't tell in this context, Mr. Widnell, that's

6   why I'm saying it's not helpful.  I want to be able to go back

7   and make sure that the chart you are showing to me has the

8   backup in it so that I understand the context of the statements.

9          MR. WIDNELL:  Okay.  I just wanted to give you the

10  opportunity to talk to Professor Blair for -- related to this.

11  And I would say that --

12         THE COURT:  That's what I'm saying, I don't need to

13  talk to him about that.  I think that part of his report is

14  actually fairly clear and it provides the backup.  And so, I

15  don't have that right here in front me as it relates to the

16  backup for that for this.  So I don't want to be asking him

17  questions without that information.  But I also don't think it's

18  necessary because those parts of his reports and Professor -- or

19  Dr. Zimbalist's reports are actually clear to me.  I don't need

20  their testimony on that.

21         MR. WIDNELL:  Okay.  So the question you just asked,

22  which is are these for the elite fighters, I -- the one point I

23  think that comes out of this is that there is a wide range of

24  fighters within Zuffa.

25         THE COURT:  No, oh, absolutely.

1        MR. WIDNELL:  And those fighters have different

2    options.  And that when you're trying to think about the

3    promotional market, the way they've done it, they've lumped all

4    of them together.  If they lumped them altogether, technically

5    any other promotion that can compete for some of them is --

6    should be in the market.

7        But if it's not, then I would hope that we -- that if

8    this becomes something where there's a focus on some sort of,

9    you know, cut-off of, you know, ranked fighters or something,

10   that there's an opportunity to then to look and see which of

11   those promoters hired those ranked fighters.

12       THE COURT:  So, Mr. Widnell, I'm not disagreeing with

13   that.  What I'm saying is that the testimony is not the best way

14   to do that --

15       MR. WIDNELL:  Okay.  That's fine.

16       THE COURT:  -- because --

17       MR. WIDNELL:  Yeah, I hear you.

18       THE COURT:  Dr. -- Professor Blair's report is much

19   more detailed on this than just this one chart.  That's what I'm

20   saying.

21       MR. WIDNELL:  Okay.  There's one last thing.

22       There's an e-mail that the plaintiffs had in their

23   presentation for Dr. Zimbalist that seems to purport -- to

24   suggest there's an e-mail from Professor Blair to Dr. Zimbalist

25   that I think maybe -- there may be some sort of inference

—————2:15-cv-01045-RFB-PAL—————

1  designed from that to try and show that -- that Professor Blair

2  was somehow communicating with Dr. Zimbalist about revenue

3  share.

4        I'd appreciate the chance just to clear that up with

5  Professor Blair, because I'm not trying -- we're going to have

6  an opportunity to kind of present --

7        THE COURT:  Well, let's see if they ask about it, and

8  then we can ask them to clear it up if they ask about it.

9        MR. WIDNELL:  My concern is that they've asked for

10  rebuttal time with Dr. Zimbalist, and we don't get to cross

11  Dr. Zimbalist under the system that we have today.  So my

12  concern is that they're not going to ask Professor Blair, but

13  then they'll ask Dr. Zimbalist and we won't have a chance to

14  present Dr. Blair's side.

15        THE COURT:  What I have done consistently --

16        MR. SILVERMAN:  Your Honor, we're not going to -- we

17  don't plan to ask about that.

18        THE COURT:  Okay.  I've tried to avoid the experts

19  commenting on the statements of the other experts because that's

20  not really helpful except to the extent they're commenting on

21  other models and then that maybe helpful.

22        MR. WIDNELL:  Okay.  One last thing.

23        We've talked about averaging.  I think that we probably

24  have covered it enough, but I want to make sure that if you have

25  any other questions, I'm not missing that with this opportunity.

2:15-cv-01045-RFB-PAL

1            THE COURT:  No.  Mr. Widnell, I'm sure you've observed.

2   If I have questions, I certainly will ask them.  So I don't have

3   any more questions.  Thank you.

4            MR. WIDNELL:  Thank you very much.

5            THE COURT:  Uh-huh.

6            Mr. Silverman?

7            MR. SILVERMAN:  Can we -- can we have a 10-minute break

8   just to prepare for cross?

9            THE COURT:  10-minute break, sure.

10           Professor Blair, you don't have to step down if you

11   don't want to or if you'd like to you can.

12           We can take a -- we can take a five, 10-minute recess.

13           Do you expect you'll have much, Mr. Silverman?  Because

14   I can't imagine that the cross should take that long.  I

15   actually think I asked a fair number of questions which address

16   both sides' issues in which lay out, I think the main issue

17   here, which is my understanding of why Professor Blair didn't

18   think it would be appropriate to use wage share, which is, I

19   think, one of the reasons why the defendants are offering him.

20   And I think he was very clear about that.

21           I'm not saying one way or another whether or not I sort

22   of accept that as dispositive, but I am saying I don't know that

23   there was much ambiguity in his testimony such that we need to

24   be spending a lot of time going back and forth.

25           So I'm not saying you can't cross, Mr. Silverman, but I

—2:15-cv-01045-RFB-PAL—

1  am saying that I would want to have you explain to me a little

2  bit about what would be the context of some of that if you

3  wanted to go more than, let's say, 30 minutes, because that

4  seems to me all that you would need.

5          MR. SILVERMAN:  Yeah, Your Honor.  I think 30 minutes

6  is sufficient.

7          THE COURT:  Okay.  So we'll take a five, 10-minute

8  recess.

9          Professor Blair, if you would like, you can remain

10  there.  You don't have to stand.  That's okay.

11          THE WITNESS:  I'm okay.

12          THE COURT:  All right.  I just wanted to make sure.

13          COURTROOM ADMINISTRATOR:  All rise.

14          (Recess taken at 1:15 p.m.)

15          (Resumed at 1:28 p.m.)

16          THE COURT:  Please be seated.

17          All right.  Mr. Silverman, you've got 30 minutes or

18  less.

19          MR. SILVERMAN:  Okay.  Thank you, Your Honor.

20          I'm sure we're all ready for the weekend.

21          THE COURT:  Well, it's not that.  And, I mean, I'm

22  serious.  I mean, I actually think Professor Blair has been very

23  clear.  His reports are pretty clear.  And certainly you have an

24  opportunity to cross, but -- and I understand his reasoning why

25  he thinks that wage share shouldn't be used in this context.  So

—2:15-cv-01045-RFB-PAL—

1   I just want to be clear about what I think the avenue is and you

2   should stick to that part of his testimony.

3           MR. SILVERMAN:  Thank you, Your Honor.

4           And I just -- I do want to just comment briefly on the

5   fact that did he testify a bit about the comparing -- Zuffa's

6   contracts to the reserve clause and the effects of Zuffa's

7   contracts.  I would just like to point out that we have a lot of

8   material about that.

9           THE COURT:  Yes, you don't need to go into that.

10          MR. SILVERMAN:  Okay.

11                    CROSS-EXAMINATION OF ROGER BLAIR

12  BY MR. SILVERMAN:

13  *Q.*  Nice to see you again, Dr. Blair.

14          You're not opining on Zuffa's market power in this

15  case, right?

16  *A.*  That's correct.

17  *Q.*  And you're not opining on the relevant markets in this case

18  either, right?

19  *A.*  That's correct.

20  *Q.*  Now, you've done an analysis that I think you -- that you

21  discussed very briefly during your direct, identifying a number

22  of promoters that have put on events that included fighters that

23  previously fought for the UFC, right?

24  *A.*  Yes, that's correct.

25  *Q.*  But other than that analysis, you haven't done any analysis

—2:15-cv-01045-RFB-PAL—

1  to evaluate the substitutability of the UFC with those other

2  promoters from the perspective of UFC fighters, right?

3  *A.*  You mean the way that the fighters view the employment

4  opportunities with Zuffa and with the other rival promoters?  Is

5  that what you're asking me?

6  *Q.*  Yes, the substitutability of those promoters from the

7  perspective of fighters.  You haven't done any analysis of that,

8  correct?

9  *A.*  Not, you know, in a formal, mathematical sense.  You know, I

10  observed that some of those promoters do have out clauses for

11  fighters who get offers from Zuffa.  And the reason for those

12  clauses is because the fighters view fighting for Zuffa to be

13  better than fighting for other promoters.

14       And my understanding is is Zuffa pays more than the

15  other promoters, and that goes a long way to explain why they

16  have a preference for Zuffa.

17  *Q.*  Dr. Blair --

18       MR. SILVERMAN:  Can you please pull up Tab 7 or can

19  we --

20       THE WITNESS:  I'm sorry, I didn't hear.

21       MR. SILVERMAN:  Sorry, I was speaking to someone else.

22       THE WITNESS:  Okay.

23  BY MR. SILVERMAN:

24  *Q.*  So if you recall in your deposition I asked you:  "Other

25  than that" -- by which I was referring to the analysis that we

1  just looked at -- "have you done any other analysis of the

2  substitutability" --

3          THE COURT:  So, Mr. Silverman, why don't we move on

4  from here.  I think that he's addressed this.

5          MR. SILVERMAN:  Okay.  Now if we -- actually, can we

6  switch back to the ELMO.

7  BY MR. SILVERMAN:

8  Q.  Now, I just put on -- up slide 9 of your presentation, which

9  I believe you discussed for a while.  And this is the slide with

10 the two different -- the two different graphs showing different

11 MRP lines with -- with a flat supply line, and it says:  "Two

12 perfectly competitive markets can have different revenue

13 shares."

14          Do you recall that slide?

15 A.  I do.

16 Q.  Now, for the -- for the markets represented in these slides,

17 the fact that the -- the fact that the SL line, the supply of

18 labor line, is just completely flat there, this type of graph

19 assumes that workers are perfectly fungible inputs, right?

20 A.  Yes, that's correct.

21 Q.  And that's not true in sports like MMA, right?

22 A.  That's correct.

23 Q.  And you talked a bit about collective bargaining in the

24 league sports earlier, right?

25 A.  Yes, that's correct.

1  *Q.*  And on your direct you testified that unions negotiating

2  with the leagues, that that's -- that's essentially a bilateral

3  monopoly, right?

4  **A.**  It's an approximation of that, yes.

5  *Q.*  And you'd agree, wouldn't you, that the outcome of a

6  bilateral monopoly to some extent -- to some extent resembles

7  the competitive outcome, right?

8  **A.**  So, it's interesting.  That's an interesting observation.

9        So if you compare monopoly with competition and

10  monopsony with competition, if you compare those outcomes to

11  bilateral monopoly, we have monopoly and monopsony in the same

12  market.  The output is going to be larger with bilateral

13  monopoly, and it will be -- it should be approximately equal --

14  I'm sorry -- approximately the same as the -- what you would

15  find a comparator on.

16        But what you don't know in a bilateral monopoly is what

17  the price is going to be.  The price is not unique as it is in

18  either a competitive market or a monopolized market or a

19  monopsonized market.

20        The price is indeterminate because the two sides are

21  interested in maximizing the total surplus from the -- you know,

22  from the business that's going on.  And having maximum -- so

23  they know that the -- that that competitive level of output will

24  maximize the total surplus.

25        And then the price or the wage, if it's a labor market,

1    you know, is going to serve as a way of splitting up that

2    surplus.  And that wage could be, you know, near the monopoly

3    level, it could be near the monopsony level, it could be

4    somewhere in between.  But it is determined by the bargaining

5    process and, therefore, it's -- it is indeterminate in -- as

6    that term is used in economic models.

7    Q.  But you --

8         THE COURT:  So, Professor Blair -- excuse me,

9    Mr. Silverman -- but wouldn't it be the case, for example, in

10   some of these sports that you would have a similar situation

11   that you might have with Zuffa where you'd have in a collective

12   bargaining situation, say the NFL, you're going to have

13   different athletes with different levels and different pay.  So

14   even in the context of negotiation, it's not as if they

15   negotiate a flat salary or wage for different individuals,

16   right.  They negotiate caps and they can negotiate the minimum

17   thresholds, but they're not negotiating individual salaries for

18   any -- for anyone.  Is that right?

19        THE WITNESS:  Yes, that's correct.

20        THE COURT:  But you're saying that the existence of the

21   bilateral monopoly still exerts a certain distortion on wages

22   that makes it not perfectly competitive?

23        THE WITNESS:  Okay.  So -- exactly.  So what would --

24   what you would expect to have happen is that the two sides --

25   and, again, you know, these teams -- you know, the owners don't

————2:15-cv-01045-RFB-PAL————

1  want to really reveal the profits, so it makes it complicated.

2  But ...

3       So they're bargaining over revenues, right.  I mean,

4  that's the issue is the revenues now.  So what they're trying to

5  do is get to a point where they maximize the size of the pot.

6       Now, the negotiation then is over a split, and that

7  split could be 50/50.  It could be 90/10 or 10/90 or sort of

8  anything that, you know, that makes some sense.

9       THE COURT:  So they're negotiating their split of the

10  overall pie and then within that split there's going to be

11  different pay for different players based on that.  So they'll

12  say we will look at what we consider to be the surplus and you,

13  owners of the NFL, you'll get 60 percent.  We, players, will get

14  40 percent or 50 percent.  And then once we get our 50 percent,

15  the distribution of that within the players is going to vary

16  based upon other factors.  Is that right?

17       THE WITNESS:  Yes, that's correct.  And in some -- for

18  some teams, you know, just a handful of players get almost all

19  of the money that's in that pot.

20       THE COURT:  Right.

21       THE WITNESS:  And then everybody else is getting -- I

22  mean, look, they're all getting paid pretty well, you know.

23       The league minimums are, you know, in the $500,000

24  range.  You know, they're different for different leagues.  So

25  it's not like they're not making any money.  But, you know,

—2:15-cv-01045-RFB-PAL—

1  compared to $20 million it's -- it's big difference, right.

2          But you're right, of course.  The -- you know, the

3  players on these teams are getting different pieces of the share

4  of the pie that goes to that team.

5          THE COURT:  Okay.  Thank you.

6  BY MR. SILVERMAN:

7  Q.  So, Dr. Blair, I believe you just said that -- just to

8  clarify.  When the unions in the league sports bargain

9  collectively with the leagues, they're bargaining over salary

10  caps, not actually salaries, right?

11  A.  Well, they're -- yeah, they're bargaining over the size of

12  the pie, right, how much money is available to the players,

13  right.  And, of course, what doesn't go to the players goes to

14  the owners.

15  Q.  But the teams in all of these four leagues don't necessarily

16  have to pay the salary cap, right?

17  A.  Well, yes, that's true.  They're -- there's some leeway.

18          Now, all of these leagues have revenue sharing to one

19  degree or another among the teams, not -- I'm not talking about

20  revenue sharing like we've been talking about in the context of

21  this case.  Talking about revenue sharing among the teams.

22          So, for example, the Yankees have a lot more revenue

23  than Kansas City.  And in the end, some of New York's money

24  winds up in Kansas City because of the revenue sharing that goes

25  on among the teams in Major League Baseball.

2:15-cv-01045-RFB-PAL

1          Now, the same thing is true in the other leagues.

2   There's some -- you know, to some extent, you know, that's --

3   it's recognition that even though the fan base is so huge in New

4   York City and the Yankees are generating a huge amount of money

5   that, you know, the rest of the league contributes to that.  And

6   that's the rationale for the revenue sharing.

7   *Q.*  So, Dr. Blair, you'd agree, though, that the actual salaries

8   that the players end up negotiating with their teams are

9   determined by market forces for free agents, right, in the

10  system we have now post-reserve system, right?

11  **A.**  Yeah, the -- the players -- so take football, for example.

12  The negotiations between the league and the union is over the

13  size of the salary cap.  And you have a -- you know, a certain

14  amount of money to -- that you are -- as a team you're permitted

15  to spend on the players.  And, of course, it's not as simple as

16  one might think.  They've got people whose sole job is to manage

17  the cap.  But ...

18          And -- and then the players on the team and their

19  agents negotiate with owner of that team over specific salaries,

20  not a share.  You know, they're not saying I want 10 percent or

21  5 percent or something.  They're saying I want $10 million.

22  And, you know, that's ultimately the -- you know, the players

23  that are hardest to come by and are more unique than others, you

24  know, they wind up with a larger than proportional amount of

25  that salary cap.

—2:15-cv-01045-RFB-PAL—

1  *Q.*  Now, you'd agree that from a theoretical perspective the

2  competitive wage is the marginal revenue product of the players,

3  right?

4  *A.*  Yes.

5  *Q.*  And --

6  *A.*  Yes.

7  *Q.*  In your textbook -- you wrote a textbook called *Sports*

8  *Economics*, right?

9  *A.*  I did.

10  *Q.*  Now, in that textbook on page 354 you're talking about

11  whether players are exploited in the sense that their MRP

12  exceeds the wage that the team pays them.  And I think you're

13  talking here about the league sports.

14        And you write:  "The evidence is that athletes indeed

15  have been exploited.  They have been paid less than they were

16  worth to the team.  Some athletes are still being exploited in

17  this sense even though salaries are extremely high for many of

18  them."

19        Do you recall that in your textbook?

20  *A.*  Not specifically, but it sounds familiar.  And I would

21  certainly agree with that.

22  *Q.*  So you'd agree that even -- in the league sports, even

23  though there's collective bargaining, as a whole the athletes

24  are still paid under the competitive wage, right?  They're still

25  being exploited in the sense that they're being paid less than

2:15-cv-01045-RFB-PAL

1  the competitive wage, right?

2  **A.**   Yeah, I believe that's true.  I mean, the exploitation -- in

3  this context, the term "monopsonistic exploitation," which dates

4  back to the '30s in Joan Robinson's book on The Economics of

5  Imperfect Competition, you know, that's a term of art in

6  economics.  And what it means is that there's a gap between the

7  marginal revenue product and the wage.

8  *Q.*   Now, if we turn to --

9          THE COURT:  Hold on just a moment, Mr. Silverman.

10         MR. SILVERMAN:  Say again?

11         THE COURT:  Hold on just a moment.

12         MR. SILVERMAN:  Sure.

13         THE COURT:  And, Professor Blair, given your expertise

14  in this area, what would you believe would be the best way to

15  try to approximate the marginal revenue product of, say, a

16  fighter or an MMA or a boxer in boxing?

17         THE WITNESS:  Well, I know a lot about some things, but

18  I, you know, sort of don't do much in the way of empirical work,

19  you know.

20         THE COURT:  Okay.

21         THE WITNESS:  I do some applied theory work and I do

22  policy work in terms of antitrust and other sort of public

23  policy issues.

24         THE COURT:  So from a theoretical -- from a theoretical

25  standpoint, would the marginal revenue product be the overall

————2:15-cv-01045-RFB-PAL————

1   revenue generated by an event controlling for whatever costs and

2   added value that the particular promoter brought to the

3   particular event?

4         THE WITNESS:  Okay.  So -- so, one way you could think

5   about this that might not generate nice, you know, figures like

6   the ones that I've put in my report and we've looked at on the

7   slides, would be if you -- if you compared -- let's say you had

8   an event, you know, where there were 10 bouts and you have

9   fighters of certain capabilities, certain rankings, and so on,

10  you know, some idea of their general popularity, something like

11  that.  And then you have a similar event in a similar location

12  and what you do is you substitute some -- you know, like Ronda

13  Rousey for Sally Jones.

14        And then you see that because Ronda Rousey's in the

15  lineup instead of Sally Jones, you find that the revenues, the

16  event revenues are substantially higher.  Well, that would

17  suggest that Ronda Rousey's marginal revenue product is

18  substantial and it's -- you know, you can measure it by that

19  increase in the -- in the event revenue.

20        THE COURT:  Okay.

21        THE WITNESS:  The problem is if you have -- say you had

22  an event with, you know, 10 bouts so you have 20 fighters.  And,

23  you know, now it's a lot more difficult to figure out, you know,

24  who's responsible for any bump in revenue because, you know,

25  it's not clear.

1          THE COURT:  If you could control for that and single

2    out that contribution, that would be potentially the marginal

3    revenue product if you could do that?

4          THE WITNESS:  Yes, that's correct.

5          THE COURT:  All right.

6    BY MR. SILVERMAN:

7    *Q.*  Dr. Blair, you discussed some alternative yardsticks in your

8    report.  I believe you discussed it very briefly on direct.  You

9    put a chart up that was -- let me see if I can find it.  Table 2

10   from your report, I believe.

11         Do you recall that table?

12   *A.*  Yes.

13   *Q.*  And in it you list --

14         MR. WIDNELL:  Your Honor, we haven't put that chart up

15   in this direct, I don't believe.

16         MR. SILVERMAN:  Oh, I thought I saw it.  Did you --

17         MR. WIDNELL:  I don't think --

18         THE COURT:  I don't believe you put this one up.

19         MR. SILVERMAN:  Okay.  We can skip it.

20         THE COURT:  They put up a different table, but not this

21   one.

22         MR. SILVERMAN:  Okay.  Let's skip that then.

23         MR. WIDNELL:  Table 1, perhaps.

24   BY MR. SILVERMAN:

25   *Q.*  Now, you also discussed an analysis you did of former UFC

———2:15-cv-01045-RFB-PAL———

1  athletes who fight for other promoters.

2          Do you recall that in your direct?

3  *A.*  Yes.

4  *Q.*  Now, when you -- let me put that chart up.

5          MR. SILVERMAN:  You can stay with the ELMO for a

6  second, Sarah.

7  BY MR. SILVERMAN:

8  *Q.*  Now, this chart just lists the number of former UFC athletes

9  who fought for another promoter in each of the years between

10  2011 and 2016, right?

11  *A.*  Yes.

12  *Q.*  And you haven't evaluated how valuable these fighters were

13  compared to those who remained at the UFC in terms of their

14  ability to draw fans, right?

15  *A.*  That's correct.

16          THE COURT:  Mr. Silverman, you can move on from this.

17  BY MR. SILVERMAN:

18  *Q.*  One other question not related to this -- this analysis

19  specifically, but in baseball, even under the reserve system,

20  players could drop to the minor leagues, right?

21  *A.*  They were -- you mean they got demoted?

22  *Q.*  They could be cut and go be demoted to the minor leagues,

23  right?

24  *A.*  Yes.

25  *Q.*  Okay.

———2:15-cv-01045-RFB-PAL———

1       Now, you would also agree that when an athlete is

2   negotiating with a monopsony or a powerful buyer, they may agree

3   to terms that are anticompetitive because that may still be

4   better than their outside option, right?

5   *A.*   Sure.  I mean, you may not like the -- you know, the

6   compensation that's offered, you might not like the terms of the

7   contract, but if that's the best that you can do, then, you

8   know, what that tells you is that, you know, that that's as good

9   an outcome as you can get in that particular industry.

10  *Q.*  Now, on your direct you briefly described an HHI index,

11  right, that you calculated?

12  *A.*   Yes.

13  *Q.*  And the HHI is a measure of concentration used by the merger

14  guidelines as a summary statistic to characterize how

15  concentrated an antitrust market is, right, or relevant

16  antitrust market?

17  *A.*   The agencies do use the HHI, but they're not the only ones.

18  You know, the HHI was -- is a measure of concentration that

19  industrial organization economists have used.  You know, I think

20  I remember, you know, reading an article by George Ziegler where

21  he pointed out that the HHI, which they didn't call it that

22  then.  They just called it -- just simply called it the

23  Herfindahl index at the time.

24       But, you know, he recommended that over the

25  concentration ratios and things that -- that industrial

—2:15-cv-01045-RFB-PAL—

1   organization economists had been using.

2   Q.  Now, in order for an HHI to be informative about the

3   concentration in a relevant market -- and I think you actually

4   write this explicitly in your report.  You write:  "Ordinarily,

5   in order to calculate an HHI, one must first define a relevant

6   market."  Right?

7   A.  Yes, that's correct.

8   Q.  But you haven't done that in this case, right?  You haven't

9   defined a relevant market?

10  A.  If you -- if you -- that's correct that I have not defined a

11  relevant market, but that wasn't the purpose of the HHI

12  calculation.  In that case, it was -- I didn't -- I didn't even

13  begin to think about all of the promoters that were out there.

14  There are hundreds of promoters.  And, you know, the ones -- so

15  we focused -- I decided to focus only on the ones that were --

16  that had hired former Zuffa athletes as providing alternative

17  employment opportunities.  So, you know, in that sense that was

18  the sense in which I was calculating that HHI.

19  Q.  Now, you're not -- so you said your -- the providers that

20  are providing alternative employment opportunities, but you

21  haven't evaluated -- other than doing an analysis showing that

22  former UFC fighters have fought at these promoters, you haven't

23  evaluated their substitutability from the perspective of

24  fighters.  We talked about that already, right?

25          THE COURT:  You did.

────2:15-cv-01045-RFB-PAL────

1          MR. SILVERMAN:  Okay.

2          THE COURT:  So, in other words, Dr. Blair, you didn't

3  actually do any sort of quantitative analysis as it relates to

4  the comparability of the offers or the previous or other

5  non-Zuffa employment that these fighters took, correct?

6          THE WITNESS:  Yes, that's correct.  I -- you know, I

7  know that some of these fighters probably fought out their

8  contracts, become free agents, and went elsewhere because they

9  were unhappy with Zuffa.  Some of them were let go by Zuffa

10  or -- before they ended a contract or at the end of the contract

11  Zuffa made no effort to resign them and then they went

12  elsewhere.

13          And I don't know the proportions that would fall into

14  those categories.  That's correct.

15          THE COURT:  Thank you.

16  BY MR. SILVERMAN:

17  *Q.*  In fact, you have no idea how many of those fighters were

18  cut by Zuffa and that's why they left, right?

19  **A.**  Yeah, I think I just said that.

20  *Q.*  Okay.

21          THE COURT:  Mr. Silverman, I think you're about done.

22          MR. SILVERMAN:  Can I do one last question?

23          THE COURT:  Sure.

24          MR. SILVERMAN:  Just one last question.  Okay.

25          MR. CRAMER:  Choose wisely.

—2:15-cv-01045-RFB-PAL—

1  BY MR. SILVERMAN:

2  *Q.*  I think earlier you talked about the standards that are --

3  that should be used for using a yardstick.

4        (Plaintiffs' counsel conferring.)

5  BY MR. SILVERMAN:

6  *Q.*  All right.  In your textbook you discuss the standard that

7  should be used for a yardstick, right?

8  *A.*  As I recall, yes.  But it's been some time since I actually

9  looked at it.

10  *Q.*  Well, let me read to you the standard that you said -- what

11  you said about doing a yardstick analysis.  You wrote:  "Of

12  course, the likelihood of being able to find a firm that is

13  identical to the plaintiff in all respects except for the impact

14  of the antitrust violation is quite small.  Therefore, the

15  courts have tended to impose a standard of reasonable

16  comparability as opposed to identicality, in accepting

17  yardstick-based damage estimates."

18        Do you recall writing that?

19  *A.*  Not specifically, no.

20  *Q.*  But that is in your textbook, right?

21  *A.*  I believe -- I believe you.  You're reading it.

22        MR. SILVERMAN:  Okay.  That's all my questions.

23  Thanks.  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        THE COURT:  Thank you, Professor.

1         MR. WIDNELL:  Your Honor, could we just have the next

2    sentence read from that passage?

3         THE COURT:  And if you want to cite it to me, that's

4    fine.  I mean, there's no question that's going to be related to

5    that.

6         MR. WIDNELL:  Okay.

7         THE COURT:  And I think all of what's in there has been

8    discussed from both parties.

9         MR. WIDNELL:  I just wanted to notice -- noted that it

10   continued into the next sentence in terms of what the standard

11   was.  That's all.

12        THE COURT:  Okay.  Thank you, Professor Blair.

13        THE WITNESS:  Thank you.

14        THE COURT:  You want to watch your step.

15        MR. SILVERMAN:  Thank you, Professor.

16        MR. WIDNELL:  Your Honor, do you mind if I approach to

17   assist Professor Blair?

18        THE COURT:  No.  Hold on.

19        Watch that right step right there.

20        THE COURT:  Thank you.

21        All right.  So, what else do we need to do today?  It

22   seems to me that we have finished with the witness testimony.

23        We will come back and we're going to work out, not

24   necessarily here, coordinating Mr. Silva's testimony.

25        Mr. Isaacson, Mr. Cramer, is there anything else that

———2:15-cv-01045-RFB-PAL———

1   we need to do from a housekeeping standpoint?

2          MR. ISAACSON:  We're cleaning up the exhibits together.

3          THE COURT:  Okay.

4          MR. ISAACSON:  We'll submit those.  We spent a long

5   time talking about the three additional regressions.  I'm not

6   sure you formally ruled on that.

7          THE COURT:  I haven't.  I'm going to go back and look

8   at the testimony.

9          MR. ISAACSON:  All right.  It's --

10          THE COURT:  I have to say that what I -- right now what

11   I'm inclined to say is the one regression, which appears to be

12   in direct opposition to the -- Dr. Singer regression, would be

13   appropriate and not consider the others.

14          MR. ISAACSON:  All right.

15          THE COURT:  Although, I have to say that, again, an

16   individual particular regression to me is not as significant as

17   the overall arguments and critiques that have been made about

18   the modelling generally.

19          And I didn't necessarily understand Zuffa's arguments,

20   Mr. Isaacson, to be sort of based entirely upon one or two

21   regressions.  So, for example, I understood part of the issue of

22   the impact of the new regressions would be the argument that the

23   foreclosure share wasn't an accurate measure and, perhaps,

24   wasn't always statistically significant.  And I think that there

25   was a fair amount of testimony from Dr. Topel about that, apart

-2:15-cv-01045-RFB-PAL-

 1  from the particular added regressions.

 2          So I don't know that apart from the regressions he ever

 3  said I think the model was appropriate or fine or an accurate

 4  measure.  I think he consistently said he didn't think

 5  foreclosure share was an appropriate way to measure

 6  anticompetitive conduct.

 7          And so to that extent, as I said, I'm not inclined to

 8  find that those additional regressions are going to be

 9  particularly helpful because I don't think that they add

10  anything to the critique.  I think that the critique was fairly

11  well laid out by you all as to why foreclosure share should not

12  be considered by the court as an adequate or reasonable measure.

13          So, at this point in time, as I said, I'm not inclined

14  to include them.  And if I think at some point it's necessary, I

15  will.  But at this point I'm not inclined to do that.

16          MR. ISAACSON:  I was not standing up to argue the

17  motion, just for point of view of housekeeping to indicate that

18  it's pending.

19          THE COURT:  I know.

20          Anything else then?  I mean, I know that we have some

21  sealing issues.  And what I would like to be able to,

22  Ms. Grigsby, is considering the testimony go back and -- because

23  we're going to come back here in a few weeks, right, less than a

24  few weeks, and talk about -- have testimony and talk.

25          And what I think we should do then is I want to try to

—2:15-cv-01045-RFB-PAL—

 1  have you all come in, potentially -- I'll look at my calendar --

 2  either the day -- a day before or stay a day after.  So we'll

 3  reach out to you.  And certainly we don't need everybody here,

 4  but certainly, Ms. Grigsby, your calendar and Mr. Cramer's

 5  calendar, since you all are the ones who are arguing, would be

 6  important.  But to do that potentially before the last set of

 7  experts, Mr. Manning and Mr. Oyer, testify.

 8          MR. CRAMER:  So, Your Honor, wants -- Your Honor

 9  does -- you were considering whether you wanted Professor

10  Manning and Professor Oyer, and I hear you now saying that

11  that's definitely going to be on.

12          THE COURT:  Well, here's what I think.  I'm going to

13  look at that.  I definitely want to hold that date for us all to

14  come here, because I think there are a number of issues that we

15  need to address.

16          What I will decide about is whether or not -- and I'll

17  look at that this week, within the next four or five days,

18  whether or not what I'm going to do is just ask you to do some

19  type of sort of summary argument at that point in time.  I don't

20  anticipate asking you all to submit anything else written.

21          MR. CRAMER:  We appreciate that.  There's been a lot of

22  paper.

23          THE COURT:  All that I would expect is if you wanted to

24  could back and do maybe a 10 or 15-minute presentation about

25  what you think the testimony has confirmed or not confirmed or

—2:15-cv-01045-RFB-PAL—

1   clarified, I mean, beyond what's in the reports.  I mean, the

2   reports are fairly extensive.  The testimony here was actually,

3   I think, wide ranging, but very helpful on particular points.

4   And so if you want to be able to do that, that's fine.

5        But we're not going to have another set, a round, of

6   briefs.  But I'll give you a date about whether -- when we're

7   going to do this closing sort of -- quote/unquote, closing

8   argument.

9        MR. CRAMER:  But do I hear you saying, Your Honor, that

10  we don't want to hear about wage share and endogeneity and win

11  flag from Professors Oyer and Manning?

12       THE COURT:  Well, what I'm going to ask you next is

13  what else are they -- I mean, are they going to say the same

14  things that these other experts have said?  Because if they are,

15  that's going to be an issue.

16       What I need to hear from you, though, Mr. Cramer, is to

17  what extent you're going to be --

18       MR. CRAMER:  Mr. Davis is handling the Oyer/Manning.

19       THE COURT:  To what extent the plaintiffs are relying

20  upon aspects of that for the modelling, and that's the part I

21  have to go back and make sure that I understand what Professor

22  Manning adds to the model, I mean, in terms of --

23       MR. DAVIS:  Sure.

24       THE COURT:  -- your antitrust conduct allegations as

25  well as the assessment of damages and the commonality of the

2:15-cv-01045-RFB-PAL

1    antitrust damage.

2            MR. DAVIS:  So, Your Honor, in just 30 seconds or less,

3    there are two main opinions that Professor Manning offers.  The

4    first one is that wage share can be used in general in the way

5    plaintiffs do and that it can be used in particular in this

6    case.  That's his main opinion.  And then -- and that's been

7    addressed a fair amount.

8            And the second major opinion he offers is a criticism

9    of the endogeneity bias that exists in Dr. Topel's wage level

10   regression or that he believes exists --

11           THE COURT:  Is that the same particular testimony that

12   Dr. Singer offered?

13           MR. DAVIS:  Yeah, there are differences in the nuance,

14   but they are much more similar than they are different.  The

15   same fundamental point is the one that he's making.

16           And then, as Mr. Isaacson pointed out, I think,

17   yesterday, the day before yesterday I believe, he does also set

18   forth three criteria that he believes are sufficient for using

19   wage share, but not necessary.  He has testified that he thinks

20   there could be other justifications for using wage share.  I

21   don't know how much that adds, if anything, frankly.

22           THE COURT:  Okay.  So, look, I think the testimony

23   about wage share might be potentially beneficial, not much.  As

24   in today, maybe a few clarifying questions that I might have

25   about that.  This is, I think, a significant aspect to the

—2:15-cv-01045-RFB-PAL—

1   dispute between the parties.  So it makes sense to maybe have

2   them for -- I don't remember what our schedule is, but, again, I

3   can't imagine having them both for more than three hours

4   combined.

5         And then we could, I guess, spent the rest of that day

6   doing sort of housekeeping work.  But I think if they're both

7   going to talk about wage share, we've had a fair amount of

8   discussion about that, I think it can't hurt to complete that

9   discussion as it relates to wage share.

10        MR. DAVIS:  Good.  And just because Professor Manning

11  is coming from London and so we would want -- I just want to be

12  clear and maybe -- it probably is my fault for not being clear,

13  so we definitely will have that day, but it may be a relatively

14  short session, it sounds like.  Is that fair?

15        THE COURT:  It is, but we have to do other work, too.

16        MR. DAVIS:  Yes, for sure.

17        THE COURT:  So the only question is how much more we

18  would do.

19        MR. Davis:  Okay.

20        THE COURT:  So given what -- the proffer you've made

21  about what Professor Manning might add, it seems to me it's

22  worthwhile to have Professor Manning and Professor Oyer -- if

23  defendants want to have them come talk about wage share, we've

24  had a fair discussion about that and some difference of opinion

25  that I think are important that I am going to have to sift

─2:15-cv-01045-RFB-PAL─

 1   through.  So it would be helpful for me to have that testimony.

 2          MR. DAVIS:  Good.  I would just add that Professor

 3   Manning and Professor Oyer do, as it turns out, disagree about

 4   wage share.

 5          THE COURT:  That's a shocking thing.

 6          MR. CRAMER:  Your Honor, there's one issue that I

 7   wanted to raise with respect to Mr. Silverman.

 8          MR. ISAACSON:  Can I ask a question before we leave

 9   that topic?

10          MR. CRAMER:  Of course.

11          MR. ISAACSON:  Just so I understand what's happening on

12   that day, did you say you also wanted argument on the motion

13   that day?

14          THE COURT:  Well, what I'm going to look at,

15   Mr. Isaacson, is the schedule and what other homework we have to

16   do.

17          It seems to me what may be -- let me just pull up the

18   calendar.

19          It seems to me the -- I don't anticipate that the --

20   look at the calendar -- that these professors are going to offer

21   such substantially different or unique testimony that you all

22   couldn't be prepared to offer some closing arguments, as it

23   were, as it relates to the testimony and their relation to the

24   motion to certify.  I'm just looking at the schedule here.

25          (Court conferring with courtroom administrator.)

```
                    ─2:15-cv-01045-RFB-PAL─
```

 1          THE COURT:  So I'm not sure if you all have blocked on

 2   your calendar both the 12th and the 13th, do you?

 3          MS. GRIGSBY:  Yes, Your Honor.

 4          THE COURT:  Okay.  Perfect.  That gives us enough time.

 5          So let's just say for now we'll finish the testimony.

 6   I think we had it scheduled for -- what day would the testimony

 7   scheduled for?

 8          MR. CRAMER:  September 12th.

 9          THE COURT:  So we'll do the testimony.  I'll give you

10   all a break to try to prepare your PowerPoints or whatever

11   presentation you like on the 13th.  We will come back and we'll

12   have a discussion.  And then we may spend some time that

13   afternoon, depending on how much time we need, to go through

14   sort of the sealing portion of that, Ms. Grigsby, in the

15   afternoon.  Either on the afternoon of the 12th, but I suspect

16   you may want to spend more time on other matters in preparation

17   with your team.  So we can probably do that in the afternoon

18   after the presentation.  I'll give you a half hour each.

19          MR. DAVIS:  Your Honor, so half hour each on the

20   argument?

21          THE COURT:  Right.  Yes, on the 13.

22          MR. DAVIS:  And I apologize.  My older daughter

23   actually has Bat Mitzvah the evening of -- on Friday night and

24   then that Saturday.  If we could do the argument in the morning,

25   just -- it sounded like what you're saying, but that would be

—2:15-cv-01045-RFB-PAL—

1   very helpful so that --

2          THE COURT:  No, it's a Friday.  I definitely don't like

3   to wait until 3 to do that type of argument.

4          MR. DAVIS:  Perfect.

5          THE COURT:  And you all have -- I mean, I have most of

6   the day set aside for you all.

7          MR. DAVIS:  Okay.

8          THE COURT:  And so, again, if -- let me be clear.  If

9   at any point in time if counsel need to come in and out, that's

10  fine.

11         MR. DAVIS:  Okay.  Right.

12         MR. CRAMER:  Mr. Davis was going to handle the class

13  argument, and if that's starts at 9 and ends at 11 or 12, I

14  think we would be fine.

15         THE COURT:  Okay.  Yeah, we're going to start at 9 or

16  8:30 on that day.  And, again, I'll give you a half hour each.

17         MR. DAVIS:  Yes.

18         THE COURT:  And, you know, if you -- I mean, I don't

19  think you need more than that, but I guess I could be convinced

20  of 45 minutes.  But I think that would be sufficient to finish

21  by -- we won't finish any later than I think 11:30.

22         MR. DAVIS:  Thank you very much.

23         THE COURT:  Does that work?

24         MR. DAVIS:  That's terrific.  I thank you.  My wife

25  thanks you, probably.

———2:15-cv-01045-RFB-PAL———

1        THE COURT:  No, we wouldn't want you to miss that

2   event, absolutely not.

3        MR. DAVIS:  Thank you.

4        THE COURT:  And if there's another complications that

5   relates to that, please let me know, Mr. Davis.  We'll adjust

6   the calendar accordingly.

7        MR. DAVIS:  I very much appreciate that, Your Honor.

8        THE COURT:  Of course.  It's an important event.

9        MR. CRAMER:  I was going to raise an issue with

10  Mr. Silva and just how Your Honor thinks that should proceed.

11  There are two potential ways, the plaintiffs could go first or

12  the Zuffa could go first.

13        I would propose that the plaintiffs go first so we can

14  lay out the points and issues that we've highlighted in our

15  papers and then Zuffa could respond, but whatever is most

16  helpful to Your Honor.

17        THE COURT:  Right.

18        MS. GRIGSBY:  Your Honor, as you can imagine,

19  plaintiffs and Zuffa do disagree in terms of the proposed order.

20        THE COURT:  Of course you do.  And it actually occurred

21  to me that, as I think about it, I don't know how much you all

22  are going to rely in terms of your closing on Mr. Silva.  We

23  wouldn't necessarily have his testimony on the 13th either.

24        I would just hate to have you all come back just to do

25  that and so I would want to use that day.  It seems to me that

—2:15-cv-01045-RFB-PAL—

1   Mr. Silva's testimony could potentially be significant in the

2   context of pay equity and pay structure, right.  I'm pretty sure

3   I've heard your arguments about that.

4        MR. CRAMER:  And, Your Honor, we have the deposition of

5   Mr. Silva and his documents.

6        THE COURT:  And what I am saying is that, what that

7   will -- what that testimony in part will, I think, really turn

8   on my sort of assessment of just his explanation of the

9   testimony.  And from that standpoint I don't think it would

10  change your arguments, honestly.  If you think that it will,

11  that's fine.  But it seems to me that we don't need to have the

12  closing arguments before -- or after Mr. Silva's testimony

13  because I just don't know how significant -- from my standpoint,

14  given what I've seen, a lot of this is going to revolve around

15  the modelling.

16       At this point in time the issue that would kick out the

17  class would really be whether or not there is an appropriate

18  model as relates to assessing the antitrust conduct and

19  assessing whether or not there was common injury and then

20  whether or not there can be a common damages assessment.

21       I don't know that Mr. Silva's testimony is going to be

22  that differential, such that it would change what the arguments

23  are that the parties will make, unless you argue from his

24  deposition.  And then we'll see if it's different than what he

25  testifies.

——2:15-cv-01045-RFB-PAL——

1          MR. CRAMER:  That's fair.

2          THE COURT:  Because of his condition, too, I wouldn't

3   want us to hold this all up.  I want to try to move forward with

4   that.  And I will still take his testimony, but I wouldn't want

5   to hold that process.

6          MS. GRIGSBY:  Your Honor, just one more housekeeping

7   matter.  And I was unclear whether the Court wants to deal with

8   this on the 13th or the 12th as opposed to now, which is, you

9   know, we are renewing our objection to Dr. Zimbalist and, in

10  particular, his reliance on the Deetz materials.  As has been

11  elicited during his testimony --

12         THE COURT:  So I'm going to stop you before you get

13  into argument.

14         MS. GRIGSBY:  Sorry.

15         THE COURT:  No, no, that's fine.  I appreciate that.  I

16  don't know that it's going to be necessary for us to go into

17  that.

18         As with the regressions, one of the things I'm going to

19  do is I need to absorb the different testimony that I've heard

20  about the different models.  We've had a fairly intense few days

21  as relates to econometrics.  And so I need a little time to

22  process that, Ms. Grigsby.

23         So I'm not in a position to say that I think that I am

24  or am not going to rely upon that information, but I would be in

25  that position, I think, when you all come back.

 1          MS. GRIGSBY:  Yes, Your Honor.

 2          THE COURT:  Mr. Isaacson, is there something else that

 3     you wanted to add?

 4          MR. ISAACSON:  Just, again, purely housekeeping.  It

 5     occurs to me that earlier today you had in front of you the

 6     Daubert motion which related to Dr. Zimbalist and you denied the

 7     motion.  And I think the docket reflects that the motions were

 8     filed and then denied without prejudice to be refiled later.  So

 9     they -- the motion you denied is not technically pending.  Maybe

10     you want us to refile the Daubert motion?

11          THE COURT:  Well, I wasn't sure if you were reasserting

12     your Daubert objection.  So that's why --

13          MR. ISAACSON:  Yes, we are.

14          THE COURT:  So there was no motion, but I assumed that

15     what Ms. Grigsby was doing, because I denied it as being

16     premature if I recall, was reasserting that.  And so, I was

17     reconsidering it.  If you don't want me to reconsider it, which

18     I think is not the case, Mr. Isaacson, that's what I was doing.

19          So, in that motion, there's a discussion generally

20     about a rejection of certain types of yardstick methods.  I am

21     rejecting that portion of it.  I am not rejecting the portion of

22     the argument, because I want to consider it, that relates to the

23     use of the Golden Boy information and whether or not that's

24     reliable.

25          But I understood Ms. Grigsby to essentially be

─2:15-cv-01045-RFB-PAL─

1  reasserting the objections that were identified in that Daubert

2  motion and I was considering them.

3          MR. ISAACSON:  Okay.  I think that makes -- my only

4  goal here is clarity of the record.

5          THE COURT:  Right.  No, no.

6          MR. ISAACSON:  I think that --

7          THE COURT:  I understood that I had rejected it.  But I

8  understood, at least that's what I thought, Ms. Grigsby was

9  actually reasserting the Daubert objection based upon the Golden

10  Boy information.  Is that right?

11          MS. GRIGSBY:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. ISAACSON:  And -- and the entirety of the motion, I

14  think.  So just, again, clarity -- and we also had a separate

15  Daubert motion, again, denied without prejudice for Dr. Singer.

16          We just want a clear record if those are being denied,

17  that that's what's happening, or whether we're refiling them or

18  -- because right now I think it's not -- it's not clear.

19          THE COURT:  Okay.  So what -- and I appreciate that.

20          What I will do, Mr. Isaacson, I'll go back and look at

21  the record and see to what extent I'm going to deny them or not.

22          I mean, quite honestly, I think the extent that those

23  Daubert objections are raised, they would be addressed by my

24  written opinion, in any event.  And so I wanted to give you some

25  sense about my rejection of certain arguments up front so you

—2:15-cv-01045-RFB-PAL—

1   can understand what to focus on.

2          And, so, I'll go back and look because what I'm going

3   to do now based upon this I'll go back and look at the list.  We

4   have a list of a fair number of motions and sealing motions in

5   particular.  That when you all come back, I want us to address

6   all of that so that the record is clear.  And if there other

7   issues like that, we can address that.

8          So, to that end, what may be appropriate is -- and I

9   can give you all a little bit of time to do that.  What you

10  may -- what we may want to do is just jointly file a letter, and

11  let's say we'll do it by the -- say we'll do it by September 9th

12  of what you think are the outstanding issues or motions that the

13  Court should address at that time.  That way we're all on the

14  same page, Mr. Isaacson, and we can address them.

15         They don't have to be jointly agreed to, but they

16  should -- at least one side should think this is an issue that

17  needs to be resolved.  Hopefully that's attached to a motion or

18  an argument that has been raised and not something new.  So it's

19  not really an intent to bring new objections, but to essentially

20  to make sure we have in one place all of the issues the Court

21  has to address as it relates to the motion.  Because I think

22  I've had sufficient testimony now to be able to decide most of

23  these motions, including the sealing motions, and the other

24  motions that have been raised.

25         And then I'll also identify to what extent I'm going to

―2:15-cv-01045-RFB-PAL―

 1  rule on the Daubert or other challenges or whether or not

 2  they're simply going to be incorporated as I expect into my

 3  decision as relates to the motion to certify.

 4       MR. ISAACSON:  Yeah, I guess -- yeah, I guess

 5  clerically we just need to figure out since they are not --

 6  there's no docket number pending with these live motions.

 7       THE COURT:  There isn't.  But here's what I understand.

 8  I understand that the defendants have raised alternative types

 9  of arguments to the expert testimony and modelling that's being

10  raised.  One at a Daubert level, but at other levels as well.

11  And so it doesn't, to me, make sense for me to address them

12  separately.  It makes sense for me to address them uniformly.

13       But it does make sense, I agree with you, Mr. Isaacson,

14  to make sure that whatever is outstanding gets addressed, and I

15  have a list of that because of the size of the docket, and that

16  we all know what that is, and we all agree as to what needs to

17  be resolved so I have that in front of me to make sure that

18  every -- every I gets crossed -- every I gets dotted and every T

19  gets crossed.

20       MR. ISAACSON:  Okay.  That's what we'll do.  On

21  September 9th, we'll give you a list of motions which have been

22  fully briefed from both sides, the Daubert motions that

23  basically need to be revived so you can -- you can rule on them

24  as you see fit.

25       THE COURT:  Okay.

1          MR. CRAMER:  Your Honor?

2          THE COURT:  Yes.

3          MR. CRAMER:  I want to get back to Mr. Silva for a

4 moment, just so the parties have clarity when we're planning for

5 his testimony.

6          Do you think it would be more helpful for Your Honor

7 for the plaintiffs to go first and lay out the points that we

8 are making and for Zuffa to follow-up or for Zuffa to go first?

9 They didn't cross.  They didn't spend much time examining

10 Mr. Silva.

11         THE COURT:  It's the plaintiffs' burden.  The

12 plaintiffs will go first, Zuffa will go second, and the

13 plaintiffs will then be able to go last.

14         MR. CRAMER:  Thank you.

15         THE COURT:  All right.  And then hopefully we'll get

16 dates, right, because that's the other reason why I don't want

17 to hold that up.  We can get -- we can get dates as the

18 possibility, because we have to check your schedules and then my

19 schedule in terms of taking the testimony in Richmond.

20         MS. GRIGSBY:  So, Your Honor, again, sorry,

21 procedurally, do you want us to submit dates to you after

22 September 16th or should we get dates from the Court?

23         THE COURT:  Just get in touch with my Deputy --

24         MS. GRIGSBY:  Okay.

25         THE COURT:  -- in terms of what dates you think -- when

─2:15-cv-01045-RFB-PAL─

1  you think Mr. Silva first will be available, when you all would

2  potentially be available, and then we'll sort of cross-check

3  that with my calendar.  I mean, likely what we're looking at is

4  a late sort of in the ... hold on.  I can get -- I can think

5  about some possibilities right now in terms of the week.

6          (Pause.)

7          THE COURT:  Look at September 23rd or September 25th.

8  Those will be the potential dates that I think we could possibly

9  do this.

10         MR. CRAMER:  Thank you, Your Honor.

11         THE COURT:  Okay?

12         All right.  Are we sure we're ready to end this

13 session?

14         MR. CRAMER:  We'd like to stay for the rest of the day.

15         THE COURT:  No more discussion of --

16         MR. CRAMER:  The next week.

17         THE COURT:  -- regressions and endogeneity and --

18         MR. CRAMER:  Your Honor, I just -- I just want to say

19 for the plaintiffs and I know for Zuffa, we really appreciate

20 the effort and intensity and care you've taken to really study

21 the papers.  It was very impressive and we appreciate it.

22         THE COURT:  Right.  Well, no, just thank the economics

23 professor I hired as a tutor for the past two weeks.  No, I'm

24 joking.  I didn't do that.

25         But no.  Yes, I appreciate the fact that you all put a

─────2:15-cv-01045-RFB-PAL─────

 1   lot of energy and effort into this case and into these briefings

 2   and I try to do the same.

 3         And to the extent -- I just want to say to the extent

 4   that I know sometimes you all were frustrated because I had

 5   these very direct questions, I was not intending to be abrupt or

 6   rude, but it was to try to focus you on what I think are the

 7   main issues.  As a former trial lawyer myself, I know how

 8   sometimes we can get carried away.  But to the extent that I did

 9   that, it really was to focus the issues.

10         But I do appreciate the preparation that counsel have

11   made in this case as well as the witnesses.  It was actually a

12   very helpful evidentiary hearing for me, and I expect it will be

13   more helpful in the days to come.

14         Then with that, is there anything else we need to do

15   before you all leave out of here early?

16         MR. CRAMER:  No, Your Honor.  Thank you.

17         MS. GRIGSBY:  No, Your Honor.  Thank you.

18         THE COURT:  And I have to apologize, obviously, this is

19   literally one of hottest days -- this week was one of the

20   hottest weeks in Las Vegas, possibly.  That was not to

21   discourage you from coming back or filing lawsuits in the

22   district, but I appreciate that as well.

23         So, anyway, you all have safe travels.  But I will see

24   you back here in a few weeks.

25         MR. CRAMER:  Thank you, Your Honor.

—2:15-cv-01045-RFB-PAL—

1        THE COURT:  I'm going to stay on the bench for a few

2  minutes.   Thanks.

3        (Whereupon the proceedings concluded at 2:21 p.m.)

4                        --oOo--

5             COURT REPORTER'S CERTIFICATE

6

7        I, PATRICIA L. GANCI, Official Court Reporter, United

8  States District Court, District of Nevada, Las Vegas, Nevada,

9  certify that the foregoing is a correct transcript from the

10  record of proceedings in the above-entitled matter.

11

12  Date:  August 30, 2019.

13                          /s/ **Patricia L. Ganci**

14                          Patricia L. Ganci, RMR, CRR

15                          CCR #937

16

17

18

19

20

21

22

23

24

25