Pls Ex. 8
(JCCX74 - Roger D. Blair, Sports
Economics (Cambridge University Press
2012))

Part 2

**6    MEASURING MONOPSONY POWER**

The essence of monopsony power in the labor market is the ability of a large employer to influence wages by restricting employment. Basically, the monopsonist recognizes that the supply curve is positively sloped and that it can move down along that supply curve to a lower wage by decreasing its employment. In this way, the monopsony wage deviates from the competitive wage. A measure of monopsony power should reflect this deviation. One way to do this is to adapt the Lerner Index of monopoly power to the case of monopsony.[12]

**6.1    Lerner Index of Monopsony Power**

Following Lerner, we want to measure the percentage deviation of the wage actually paid from the competitive wage at the quantity employed, which would equal the marginal revenue product ($MRP$). Put differently, the Lerner Index of monopsony measures the monopsonistic exploitation ($MRP - w$) relative to the wage ($w$). consequently, the Lerner Index ($\lambda$) would then be

$$\lambda = \frac{MRP - w}{w}.$$

To maximize profit, the monopsonist will restrict its employment to that quantity where the marginal revenue product is equal to the marginal factor cost:

$$MRP = MFC = w + L(\Delta w / \Delta L).$$

If we subtract $w$ from both sides, we have

$$MRP_L - w = L(\Delta w / \Delta L).$$

Now, divide both sides by $w$ to get the Lerner index:

$$\lambda = \frac{MRP_L - w}{w} = \frac{L}{w} \cdot \frac{\Delta w}{\Delta L}.$$

Because the elasticity of supply is $\varepsilon = (\Delta L / \Delta w)(w / L)$, we see that the Lerner Index is the reciprocal of the elasticity of supply of *labor:*

$$\lambda = \frac{1}{\varepsilon}.$$

Intuitively, this is an appealing result. Increases in the supply elasticity decrease monopsony power. This makes economic sense because the greater the quantity response of labor to changes in the wage, the less influence on wages the monopsonist will have. Put differently, the greater the elasticity of supply, the larger the reduction in employment will have to be to reduce the wage

[12] See Abba Lerner (1934), "The Concept of Monopoly and the Measurement of Monopoly Power," *Review of Economic Studies*, 1, 157–175. For an adaptation to monopsony, see Roger D. Blair and Jeffrey L. Harrison (1992), "Cooperative Buying, Monopsony Power, and Antitrust Policy," *Northwestern University Law Review*, 86, 331–366.

**Table 17.2.** The Influence of Supply and Elasticity on the Lerner Index

| $\varepsilon$ | 0.5 | 1.0 | 2.0 | 5.0 | $\infty$ |
|---|---|---|---|---|---|
| $\lambda$ | 2.0 | 1.0 | 0.5 | 0.2 | 0 |

by a given amount. The effect of $\varepsilon$ on $\lambda$ can be seen in several numerical examples, which are contained in Table 17.2.

Thus, when supply is inelastic ($\varepsilon = 0.5$), there is a 200 percent deviation from the competitive result. The more elastic the supply, however, the smaller the deviation. In the limit, when supply is perfectly elastic ($\varepsilon = \infty$), the buyer is essentially in a competitive market and the deviation is zero.[13]

## 7    MONOPSONISTIC EXPLOITATION: THEORY AND EMPIRICAL EVIDENCE

The term *monopsonistic exploitation* sounds pejorative, but it only refers to the fact that a profit-maximizing monopsonist will hire athletes to the point where $MRP = MFC$ rather than where $MRP = w$. Because $MRP = MFC = w + L\Delta w/\Delta L$, it follows that $MRP > w$ because $L\Delta w/\Delta L > 0$. This is *exploitation* in the sense that the player is paid less than his value to the club. The extent of this exploitation is determined by the supply elasticity. As we will see, the exploitation and the Lerner Index are closely related. Because profit maximization requires

$$MRP = w + L\Delta w/\Delta L,$$

the monopsonistic exploitation will be

$$MRP - w = L(\Delta w/\Delta L).$$

If we multiply the right-hand side by w/w, we have

$$MRP - w = w(L/w)\Delta w/\Delta L,$$

or

$$MRP - w = \frac{w}{\varepsilon}.$$

Thus, the smaller the elasticity of supply, the greater the exploitation.

Whether athletes are exploited in the sense that their $MRP$ exceeds the wage that the team pays them is an empirical question. The evidence is that athletes indeed have been exploited: they have been paid less than they were worth to the team. Some athletes are still being exploited in this sense even though salaries are extremely high for many of them.

## 7.1    Empirical Evidence

Gerald Scully produced the first – truly pioneering – work on this difficult subject.[14] His research provided valuable insights into the dramatic disparity

---

[13] Jonathan Jacobson and Gary Dorman (1991), "Joint Purchasing, Monopsony, and Antitrust," *Antitrust Bulletin*, 36, 1–90, make the point that if supply is flat (i.e., $\varepsilon = \infty$), there is no monopsony power because price cannot be depressed.

[14] Gerald W. Scully (1974), "Pay and Performance in Major League Baseball," *American Economic Review*, 64, 915–930.

between pay and performance in MLB before the advent of free agency. Scully started from the proposition that team revenues increase when the team's winning percentage rises. This makes sense because fans do not get too excited about their favorite team when it is constantly losing. Players contribute to their teams' winning percentages through their performance on the field. As a result, Scully proceeded by estimating the impact of player performance on a team's winning percentage, which is akin to the player's marginal product. He then estimated the effect of an improved winning percentage on the team's revenue, that is, the marginal revenue. In this way, he estimated the marginal revenue product of a player's performance.

Using data for the 1968 and 1969 seasons, Scully estimated marginal revenue products and compared them with the actual salaries paid. He found that the star players fared the worst. The stars received salaries that were about 15 percent of their $MRP$. Average players did somewhat better because they received salaries that were about 20 percent of their $MRP$. Interestingly, mediocre players actually were slightly overpaid. In sum, Scully concluded that monopsonistic exploitation was significant. It is important to recognize that Scully's estimates pertained to a period before free agency. During 1968 and 1969, the players were still subject to the reserve clause and therefore had no real options. They were at the mercy of their club. The empirical evidence suggests that mercy was in short supply before free agency.

Things changed when a labor arbitrator set baseball players free. With free agency, one should expect that those players who were free agents would be paid their market value – that is, their $MRP$, or something very close to it.[15] This is the approach taken by Krautmann, who assumed that free agents received salaries equal to their $MRP$s.[16] He then estimated a wage equation in which the salary received by a free agent was a function of performance using data on players eligible for free agency. Next, he used that equation to estimate what the wage of those players subject to reserve restrictions would have been had they been free agents. Using the estimated wage, Krautmann substituted a player's actual performance data to get an estimate of that player's wage had he been a free agent. Krautmann then compared the estimated salaries with the actual salaries paid to measure the extent of any monopsonistic exploitation that remained.

For the free agents, there was presumably no difference between their salary and their $MRP$ – that is, no exploitation. Veterans with at least three seasons in MLB, but less than six seasons, were not free agents, but they were protected to some extent by final offer arbitration.[17] When a player and his club cannot agree on a new contract, the player can file for arbitration and have a third party choose between the player's final demand and the club's final offer. The arbitrators look at pay and performance of other players to aid their decision. As a

---

[15] This inference depends on there being no collusion among the teams. Collusion, of course, could lead to exploitation of free agents.

[16] Anthony C. Krautmann (1999), "What's Wrong with Scully – Estimates of a Player's Marginal Revenue Product," *Economic Inquiry*, 37, 369–381.

[17] We examine final offer arbitration in more detail in Chapter 21.

result, the players should get pretty close to market value. Indeed, Krautmann estimated that these players received about 85 percent of their $MRP$. This, of course, is much better than the 15 to 20 percent of $MRP$ that players received before free agency. Final offer arbitration, therefore, introduced some market forces and improved those player's fortunes, even though it did not completely eliminate monopsonistic exploitation. For those players with less than three seasons in MLB, there was no market mechanism to protect them. As one would expect, the clubs were somewhat less than generous. Those players who were wholly restricted were paid about 27 percent of their $MRP$. This is somewhat better than Scully's estimate but a far cry from fair market value.

## 7.2  A Broader Look at Market Value

Performance measures are easy to find: home runs, batting average, rushing yards, receiving yards, points per game, and so on. For some players, however, their value to a team cannot be captured fully by these performance measures. Consider the case of Terrell Owens, who has been an on-field superstar in the NFL and an off-field negative influence during his career. Despite his unquestioned talent on the field, Terrell Owens was dumped first by the San Francisco 49ers and then by the Philadelphia Eagles for his disruptive attitude off the field. Nonetheless, the Dallas Cowboys signed a three-year deal with Owens. The contract included a $5 million signing bonus and salaries of $5 million for 2006, $8 million in 2007, and $7 million in 2008. At the end of 2006, Cowboys coach Bill Parcells retired. Although the Cowboys could have cut Owens at the end of 2006, they kept him.[18] The Owens example raises an interesting question: How much income has he lost due to the negative influence he brings to the locker room? It is hard to say specifically, but one way to gauge this is to compare his contract to those of other wide receivers after adjusting for performance differences.

For another example, consider the case of Randy Moss, who has always been a controversial athlete. He experienced legal problems while in high school, which led to the withdrawal of a scholarship offer at Florida State University. Moss was a star wide receiver at Marshall University and was drafted by the Minnesota Vikings. Despite complaints about his work ethic and focus during games, Moss was a superstar. After much on-field success and a few off-field problems, Moss moved on to the Oakland Raiders – the last refuge of troubled and troublesome players. Unfortunately, the Raiders had fallen on hard times on the field, and Moss's productivity waned. During the 2006 season, Moss caught only 42 passes for 553 yards, and he scored only three touchdowns. Moss was dissatisfied and complained constantly. He loafed at times and made it clear that he was unhappy and wanted to leave Oakland.

Moss was due to earn $9.25 million in 2007 and $11.25 million in 2008 with the Raiders. During the 2007 NFL draft, however, Moss was traded to the New England Patriots for a fourth-round draft choice.[19] Because of a combination

---

[18] Owens wore out his welcome in Dallas, moved on to the Buffalo Bills, and in 2010 landed in Cincinnati with the Bengals and Ochocinco – another controversial player.

[19] Judy Battista, "Patriots Accelerate an Overhaul by Trading for the Raiders' Moss," *New York Times*, April 30, 2007.

354     **Salary Determination: Competition and Monopsony**

of factors – his age (30), his recent lack of productivity, and the limited demand for a troublesome player – Moss agreed to play for the Patriots in 2007 for $3 million. Arguably, the price that Moss paid for his attitude was more than $6 million per year.[20]

In contrast to Moss and Owens, the Yankees valued Roger Clemens for more than mere numbers.[21] Starved for quality pitching, the Yankees signed Clemens to an extraordinary contract in 2007. The total value was $28,000,022, which was prorated over the portion of the season he played. Although Clemens had more wins than any living pitcher and more Cy Young Awards than any pitcher who ever lived, he was no longer the dominating power pitcher of earlier years. Nonetheless, Clemens improved the attitude and demeanor of the Yankees. Although some pitchers excuse losses due to poor run production, Clemens was not among them: "When you have guys scuffling at the plate, you're [still] supposed to get it done." When the Yankees needed it, Clemens volunteered to pitch in relief, which showed other players that a real professional athlete will do whatever will help the team win.[22]

Clemens also brought some good old-fashioned toughness to the Yankees. Some pitchers fail to protect their teammates, but Clemens was not among them. The Toronto Blue Jays were repeatedly throwing at Alex Rodriguez during 2007, so Clemens responded in kind. Even after a warning from the umpire, Clemens hit Alex Rios with a pitch and was ejected from the game, fined, and suspended for a game. Presumably, the message was not lost on the Blue Jays or on Clemens's Yankee teammates.

## 8   CONCLUDING REMARKS

In this chapter, we found that a player's worth to a team is his marginal revenue product. After setting out the competitive benchmark, we focused on monopsony in general and in the sports labor market. Empirical research shows that players can be underpaid – even while earning millions of dollars – when the clubs wield monopsony power.

### PROBLEMS AND QUESTIONS

1. A few years ago, the University of Hawaii (UH) increased the ticket prices to its home football games. At about the same time, the UH head football coach received a $400,000 per year raise in salary. UH officials quickly claimed that the salary increase had nothing to do with the increased ticket prices. Is this claim believable? Does it make sense from an economic perspective?

---

[20] In New England, Moss was a model citizen. His attitude was exemplary, and his performance was outstanding. He caught an NFL-record 23 touchdown passes in 2007. When he re-signed with the Patriots, he received a $12 million signing bonus as part of a three-year $27 million contract.

[21] Tyler Kepner, "Measured by More than Numbers," *New York Times*, July 2, 2007.

[22] This, of course, can be excessive. As we saw in Chapter 14, Clemens was implicated in MLB's steroid scandal.

2. When Michelle Wie was 13 years old, she was a golf prodigy from Honolulu. Not only did she drive the ball nearly 300 yards, but she was charismatic beyond her years. Her presence in a tournament sparked immediate interest. When she played in an Ladies Professional Golf Association event, the requests for media credentials doubled and the organizers actually ran out of daily tickets. How would you asses her *MRP* for these tournaments?

3. In 2000, Ken Griffey, Jr.'s *MRP* appeared to be some $18 million and his salary was only $11 million. Can you explain why Cincinnati was able to pay Griffey so much less than his *MRP*?

4. In 2002, Tiger Woods agreed to play in the New Zealand Open for the first time. The organizers offered to pay him a $2 million appearance fee. When the organizers dramatically increased ticket prices, fans and other professional golfers howled in protest. The organizers explained that "ticket prices are higher because of Tiger's presence, but not because of his appearance guarantee." Does this make sense from an economic perspective?

5. Suppose that the supply of NFL caliber punters (*P*) is given by

$$w_s = 100,000 + 3,000P,$$

where $w_s$ represents the wage and *P* is the number of punters. Given the supply, the marginal factor cost is $MFC = 100,000 + 6,000P$. The marginal revenue product of punters can be expressed as

$$MRP_P = 460,000 - 3,000P.$$

   a. What are the competitive wage and employment level?
   b. What are the wage and employment under monopsony?
   c. What is the extent of monopsonistic exploitation in this market?
   d. What is the social welfare loss of monopsony?
   e. Illustrate all of the above in a graph.

6. Scully found that the salaries paid in *MLB* before free agency were about 20 percent of a player's *MRP*. Suppose this is accurate. What was the elasticity of supply of those players?

7. Suppose that the labor supply is given by:

$$w_s = 25 + 5L,$$

where $w_s$ is the wage on the supply curve and *L* represents the units of labor. The marginal factor cost is then $MFC = 25 + 10L$. The demand (*MRP*) is given by

$$w_D = 100 - 5L,$$

where $w_D$ is the wage on the demand curve.

   a. Find the competitive wage and quantity.
   b. Find the wage and quantity under conditions of monopsony.
   c. Calculate the deadweight social welfare loss of monopsony.

356     **Salary Determination: Competition and Monopsony**

8. In the 1950s, MLB teams often paid big bonuses to sign amateur stars. The owners imposed a rule that such "bonus babies" could not be sent to a minor league team and had to be placed on the team's 25-man roster. Why would the owners deliberately hinder the development of these "bonus babies"?

9. Despite the talent, desire, and grit that it takes to be a world-class speed skater, a *New York Times* headline proclaimed "Speedskating's Olympic Rewards Fail to Pay the Bills." Why are world-class speed skaters broke?

10. Tiger Woods decided to end his self-imposed absence from the PGA Tour at the 2010 Masters Tournament. This caused a slight surge in ticket prices in the secondary market. What does this say about Tiger Woods's *MRP* for this particular tournament?

11. Some NCAA coaches have found that their schools have no tolerance for losing. Despite following the rules and graduating their players, coaches who fail to win fail to keep their jobs. Should they be surprised?

## RESEARCH QUESTIONS

1. The owner of the Los Angeles Clippers has a history of letting free agents go rather than paying them their market value. Keeping free agents can be very expensive. Elton Brand, for example, has been offered an $84.2 million multiyear contract. The Collective Bargaining Agreement permits a team to pay 25% of the contract value as a signing bonus. In this case, that would be about $21 million. In addition, a player can receive 70% of the first-year salary as an upfront payment. In Brand's case, this could be another $7 million. Thus, the Clippers would have to pay Brand as much as $28 million just to prevent his leaving. Find out which players have left the team for more money. How have the Clippers fared on the court with their strategy of letting free agents go elsewhere?

2. Review the facts in *Brown v. Pro Football Inc.*, 518 U.S. 231 (1996). Discuss the source of the owners' collective monopsony power and its exercise in this case.

3. In the 2006 season, the rookie minimum salary in the NFL was $260,000. How many rookies played for the minimum? Construct a schedule of salaries for all first-year players. If a player received a signing bonus, prorate the bonus over the life of his contract.

4. Examine how rookie salaries vary with place in the draft. Look at the salaries for the players chosen in the first three rounds.

## REFERENCES AND FURTHER READING

Baade, R. A., and V. A. Matheson. (2006). "Have Public Finance Principles Been Shut Out in Financing New Stadiums for the NFL?" *Public Finance and Management*, 6, 284–320.

## References and Further Reading

Kaplan, Daniel. "NFL Owners Give $300M for N.Y. Stadium." *Sports Business Journal,* Dec. 11, 2006.

Kaplan, Daniel. "Giants, Jets to borrow $650M each." *Sports Business Journal,* March 19, 2007.

Miller, P. (2007). "Private Financing and Sports Franchise Values: The Case of Major League Baseball." *Journal of Sports Economics,* 8, 449–467.

Noll, Roger G. (1974). *Government and the Sports Business* (chapter 9). Washington, DC: The Brookings Institution.

Noll, Roger G., and Andrew Zimbalist. (1997). *Sports, Jobs, and Taxes: The Economic Impact of Sports Teams and Stadiums.* Washington, DC: The Brookings Institution.

Owen, Jeffrey G. (2003). "The Stadium Game: Cities Versus Teams." *Journal of Sports Economics,* 4, 183–202.

Pickard, J. L., and I. C. Araujo. (1989). "Financing Toronto's SkyDome: A Unique Partnership of Public and Private Funding." *Government Finance Review* (December), 7–12.

Quirk, James, and Rodney Fort. (1992). *Pay Dirt: The Business of Professional Team Sports* (chapter 4). Princeton, NJ: Princeton University Press.

Quirk, James, and Rodney Fort (1999). *Hard Ball: The Abuse of Power in Pro Team Sports* (chapter 7). Princeton, NJ: Princeton University Press.

Quinn, Kevin G., Paul B. Bursik, Christopher P. Borick, and Lisa Raethz (2003). "Do New Digs Mean More Wins? The Relationship Between a New Venue and a Professional Sports Team's Competitive Success." *Journal of Sports Economics,* 4, 167–182.

Shubnell, L. D., J. E. Petersen, and C. B. Harris. (1985). "The Big Ticket: Financing a Professional Sports Facility." *Government Finance Review* (June): 7–11.

Szymanski, Stefan. (2009). *Playbooks and Checkbooks: An Introduction to the Economics of Modern Sports* (chapter 6). Princeton, NJ: Princeton University Press.

Zimbalist, Andrew. (2003). *May the Best Team Win* (chapter 6). Washington, DC: The Brookings Institution.

Zimbalist, Andrew. (2006). *The Bottom Line.* Philadelphia: Temple University Press, pp. 139–140.

Zimbalist, A., and J. G. Long. (2006). "Facility Finance: Measurement, Trends, and Analysis." *International Journal of Sport Finance,* 1, 201–211.

a result, it is in the collective interest of the NCAA's members to implement rules that curtail such expenditures. They have been somewhat successful in this effort.

---

**Box 18.2   *Should NCAA Athletes Be Paid?***

In a sense, NCAA athletes who receive a full grant-in-aid are being paid. Those who attend prestigious private schools, such as Duke, Northwestern, Notre Dame, and Vanderbilt, are being paid around $50,000 per year. The payment is considerably less at state-supported schools where tuition is substantially lower, but the fact remains that those athletes on scholarship are being paid.

Usually, when the issue of payment arises, the question is whether student-athletes should be paid something approaching their marginal revenue products. As elsewhere in the real world, this would lead to very uneven payments. NCAA champions in sports such as golf, lacrosse, soccer, swimming, and tennis would receive next to nothing. Star football and basketball players would earn substantial sums: hundreds of thousands of dollars.

To the extent that profits earned in revenue-generating sports such as football and men's basketball are paid to student-athletes in those sports, the non-revenue sports (in most cases, all the rest) will not be subsidized. This, however, is not the end of the world. There are many student-athletes participating at schools that provide no scholarships. This may not be such a bad thing.

---

**Box 18.3   *Monopsonistic Exploitation by the NCAA***

The NCAA puts strict limits on the compensation of student-athletes. No one – even the premier players – may receive more than a full-grant-in-aid, which is defined as tuition and fees, room and board, and books. Because the NCAA is a buying cartel, one should expect some monopsonistic exploitation, that is, a gap between an athlete's marginal revenue product and the monetary value of the grant-in-aid.

Brown estimated the marginal revenue product of premium college football players.[*] First, he estimated team quality, as measured by the number of players selected in the NFL draft, as a function of a team's recruiting efforts, market characteristics, and conference revenue-sharing policies. Second, team revenues were then estimated as a function of the number of players drafted by the NFL. Using data for the 1988–1989 season, Brown estimated that a premium college football player's marginal revenue product was $538,760. The difference between this and the monetary value of a full grant-in-aid is a measure of the monopsonistic exploitation of premium college football players.

[*] Robert W. Brown (1993), "An Estimate of the Rent Generated by a Premium College Football Player," *Economic Inquiry*, 31, 671–684.



378     **The National Collegiate Athletic Association as a Collusive Monopsony**

property rights in their own images. For most athletes, these property rights are not worth much, but, for the elite few – Tim Tebow, for example – these rights may be worth a good deal. Tim Tebow jerseys, Cam Newton coffee mugs, Sam Bradford posters, and Mark Ingram T-shirts sell for premium prices due to the image of the premier student-athlete. The NCAA extracts these benefits from the student-athlete by exercising its monopsony power.

To be eligible to participate, each student-athlete must sign Form 08–3a, which authorizes the NCAA, member schools, conferences, and organizing committees to use the player's name and picture. The student-athlete receives no compensation for these uses.

Another NCAA regulation permits the use of an athlete's likeness, picture, or name in school and conference promotions, but all money goes directly to the school or conference. If the athlete receives any compensation, he or she jeopardizes his or her eligibility.[25]

In *O'Bannon*, the complaint does not involve athletes who are still participating in NCAA athletics. Instead, *O'Bannon* challenges the NCAA's presumption that it can use the likenesses in perpetuity. This issue will be sorted out in the courts, or it will be settled. The point here, however, is that the NCAA secures these property rights because of its monopsony power. If an athlete refuses to surrender those rights, he or she cannot compete and will be denied a grant-in-aid.

### 7   CONCLUDING REMARKS

In this chapter, we have seen that the NCAA and its member schools behave like a buying cartel. In this regard, we analyzed collusive monopsony. We also debunked the notion that a monopsony passes on the lower prices that it pays in the form of lower prices that it charges. Specifically, we saw that the exercise of monopsony power causes the marginal cost curve to shift upward, which leads to less output. At the same time, the reduced payments lead to lower average costs at the optimal output, which results in profits for the monopsonists. After examining the unique characteristics of the NCAA cartel, we turned our attention to two antitrust challenges – one successful and one unsuccessful.

### PROBLEMS AND QUESTIONS

1. Is there a market for Division I basketball coaches that is separate from the markets for (a) high school coaches, (b) professional basketball coaches, and (c) Division II coaches? How would you go about defining the market (see Chapter 9)?

2. How would an NCAA restraint on the number of coaches affect the salaries of those coaches who remained employed?

---

[25] §12.5.1.1 Institutional, Charitable, Educational or Non-Profit Promotions.



# Players' Unions and Collective Bargaining



## INTRODUCTION

Workers in many occupations and industries have felt the need to band together in unions so that they could bargain collectively with management. In this way, the workers sought to level the playing field in negotiating wages, hours, benefits, and working conditions with large, powerful employers. Much the same has been true in professional sports: the players have formed unions to offset the collective monopsony power of the team owners.[1] These players' unions, however, are somewhat different from the traditional craft unions or industrial unions. We explore some of the differences here.

We begin this chapter by introducing the players' unions in the four major sports leagues. We then turn our attention to the economics of unions. Successful unions are labor cartels, which would ordinarily be illegal under the antitrust laws. There is, however, an explicit antitrust exemption for organized labor, which we outline briefly. When the union meets the league management negotiators, we have a market structure known as bilateral monopoly. We develop a simple model of bilateral monopoly and relate it to professional sports. We then examine minimum salaries in the major professional sports leagues, salary caps and luxury taxes, revenue sharing, and free agency. All of these issues are subject to collective bargaining and are largely protected from antitrust scrutiny.

## ORGANIZING THE PLAYERS' UNIONS IN THE MAJOR LEAGUES

No employer embraces the prospect of dealing with a union. When workers are not organized into a union, the employer largely has the upper hand in any labor–management negotiation. This is not to say that employers are immune to market forces, but whatever power exists is in management's hands as long as the workers are not organized. Consequently, management typically resists efforts at unionization. Things are no different in the major sports leagues.

---

[1] For some reason, the players' unions are generally referred to as players' associations rather than unions, but they are unions nonetheless.

432

All of them eventually became unionized, but the early going was pretty rough. In the balance of this section, we examine briefly the early organizational struggles of the four major players' unions.

### 2.1  Major League Baseball Players Association

From the inception of the reserve clause in the late 1880s, club owners had all the power in any labor–management negotiation. The players knew this and tried to organize to fight the reserve clause as far back as 1885 with the formation of the Brotherhood of Professional Baseball Players, which was the first union. This initial effort failed. In 1900, the players tried again and formed the Players' Protective Association, which also failed to defeat the reserve clause. The Fraternity of Professional Baseball Players of America, formed in 1912, and the American Baseball Guild, organized in 1946, were similarly unsuccessful. This, of course, resulted in continuing frustration for the players.

The modern Major League Players Association began in 1965 when the players organized under Marvin Miller's guidance. In 1968, Miller's effort resulted in the first Collective Bargaining Agreement (CBA) between MLB and the MLB Players Association (MLBPA). The gains for the players were small but significant. The league minimum salary rose from $6,000 to $10,000. This does not seem like much today, but it was an important first step. In 1970, the MLBPA negotiated the right to have a player's grievance heard by an independent arbitrator. This turned out to be extremely important in 1975 when Andy Messersmith and Dave McNally challenged the reserve clause. The independent arbitrator, Peter Seitz, ruled that the reserve clause could only provide the club with one added year of service. After that second year, the player would become a free agent. Free agency, of course, provides protection for the player – free market forces would determine compensation. As a result, clubs began to offer multiyear contracts at much higher salaries.

The MLBPA has been successful in many regards. The MLB minimum salary has increased over time. In 2006, the league minimum reached $380,000. In addition, average salaries have soared. In 2007, the average salary in MLB was $2.82 million. Players have health benefits, pension plans, generous travel per diems, and guaranteed contracts.

### 2.2  National Football League Players Association

Dissatisfied players began to organize the National Football League Players Association (NFLPA) in 1956. The players were concerned about several things: a league minimum salary of $5,000, a standard per diem for all players, and a requirement that the club had to provide equipment for the players. There was one more request that was extremely important to the players. They wanted a contract that required the club to pay injured players for the balance of the season. The NFLPA was met with passive resistance by the owners – no one would meet with them. The NFLPA got the owners' attention by threatening an antitrust suit. The NFLPA was prepared to charge the owners with collusive monopsony, which would be a violation of Section 1 of the Sherman Act. If successful, such a suit would expose the owners to treble damages.

434   **Players' Unions and Collective Bargaining**

The NFL recognized the NFLPA but essentially reneged on its agreements. For example, they agreed to the injury protection clause but did not put it in the standard player contract. They also agreed to pay the players an extra $50 for each preseason game, but then simply did not pay the players. Other demands for employee benefits, such as pension and health insurance, were basically ignored by the owners. Another threat of an antitrust suit in 1958 once again got the owners' attention, and the NFLPA made some progress.

The gains were slow and things were complicated by the merger between the NFL and the American Football League (AFL). Even after the NFL-AFL merger, the NFLPA and the AFLPA remained separate. Initially, the owners divided and conquered them. In 1970, however, the two unions joined forces. The new NFLPA applied for and received certification as a union by the National Labor Relations Board (NLRB). This was important because NLRB certification comes with some added legal protections for unions. The NFLPA continued to face many struggles but eventually achieved its most significant objectives: free agency; hospitalization, health and life insurance, and pension benefits; and (limited) injury protection.

### National Basketball Players Association

Bob Cousy, the great Boston Celtics guard, began organizing National Basketball Association (NBA) players into the National Basketball Players Association (NBPA) in 1954. For 10 years, the owners stalled the NBPA's efforts at gaining formal recognition. Finally, in 1964, the owners bowed to the players' collective threat to refuse to play in the first televised All-Star Game. The NBPA's early demands were fairly modest: a league minimum salary, health benefits, pension benefits, and a per diem for meals on travel days. Progress on these goals was slow because the owners were not inclined to share the wealth.

The players recognized that the reserve clause in their contracts was limiting the salaries that they could negotiate. Bound to one team, a player had only two choices: play or retire. In 1970, a group of NBA players filed a class action lawsuit alleging that the uniform adoption of the reserve clause by all clubs was an antitrust violation. Because of the glacial pace of antitrust litigation, a settlement was not reached until 1976. The clubs continued to limit free agency through various means, which frustrated the players. This frustration resulted in further litigation in 1987, but this time, a settlement was reached quickly. With the settlement of the lawsuit, the NBA players enjoyed true, unrestricted free agency. Now, when an individual player's contract expires, the player is completely free to sign with the highest bidder or any other team willing to hire him. As long as the clubs do not collude in the free-agent market, a player can negotiate a contract that will pay him something very close to his marginal revenue product.

As a result of collective bargaining and several lawsuits, the NBA players enjoy substantial salaries, substantial benefits, and free agency. There has been some labor strife over the years with strikes and lockouts threatened. On balance, however, the NBPA has done a good job for its members.

 **National Hockey League Players Association**

Players in the National Hockey League (NHL) are represented by the NHL Players Association (NHLPA), which was formed in 1967. The union was organized by player representatives from the six original NHL clubs: Montreal and Toronto in Canada and Boston, Chicago, Detroit, and New York in the United States. When the fledgling union met with management, it warned them that a refusal to recognize the union would result in an appeal to the Canadian Labour Relations Board. Such an appeal was unnecessary, however, as the owners agreed to recognize the NHLPA.

The NHLPA has had some internal problems but appears to be on relatively solid ground now. As with the other leagues, NHL players have the usual array of benefits. Their salaries are substantial as they are protected by market forces through free agency.

 **Executive Directors**

The executive directors of the major players' unions are well paid: Don Fehr (MLBPA) earned $1 million before he stepped down in 2010. Almost immediately, Fehr was hired by the NHLPA at a salary of $3 million. Billy Hunter (NBPA) earned $3.4 million, and Gene Upshaw (NFLPA) earned $3.7 million in 2008 before his death.

 **UNIONS AND ANTITRUST POLICY**

A players' union is a cartel. Instead of competing against one another on all terms of their employment as professional athletes, the players join together and agree to bargain collectively with management. The union acts on behalf of the players as a group. This player cartel can then behave somewhat like a monopoly supplier of athletic talent. Cartels and monopolizing behavior are usually illegal under the Sherman Act. Section 1 of the Sherman Act forbids collective action that restrains trade:

Every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is hereby declared to be illegal.

This, of course, would seem to apply to players' unions because they are combinations of independent athletes that restrain trade in the sense that the union members agree not to compete in the labor market with one another. This, of course, does not mean that they refrain from competing on the field or in the arena during games. It simply means that they will not agree to play under less favorable economic conditions than those that the union and management agree on. In the event that the union and management cannot agree on the terms of employment, the union may organize a strike. In that event, all of the union members agree to refuse to play. This looks like an obvious restraint of trade, which could be challenged as a violation of the Sherman Act.

In the early enforcement of the Sherman Act, which was passed in 1890, the courts found that unions did, in fact, violate Section 1 of the Sherman Act.

436    Players' Unions and Collective Bargaining

4 Unions and Coll

Congress, however, wanted union activity to be lawful and therefore exempted labor in 1914 when it passed the Clayton Act. In particular, Section 6 appeared to eliminate labor unions from antitrust scrutiny by definition:

The labor of a human being is not a commodity or an article of commerce. Nothing in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations ... nor shall such organizations ... be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Despite this plain language, the Supreme Court interpreted this exemption very narrowly. Frustrated by the Supreme Court's apparent determination to impede union activity, Congress passed the Norris-La Guardia Act in 1932. This act reasserted Congress' original intentions in the Clayton Act to immunize union activity from antitrust prosecution. This immunity is not absolute, however; it is limited to organizing activity and unilateral decisions of the union and its members.

In addition to the statutory labor exemption provided by the Norris-La Guardia Act, the courts have developed a nonstatutory labor exemption that permits unions to reach agreements with nonlabor entities. This exemption is limited to agreements between a union and a nonlabor entity that involve core labor market issues such as wages and working conditions. Other than through their effect on labor costs, these agreements should not influence competition in the output market.[2] In other words, a union cannot agree with one employer to reduce a rival employer's ability to compete in the output market. As a result of the labor exemption, players' unions are legal and can behave like a labor cartel.



**Figure 22.1.** Em
employment at $L_2$

## 4    UNIONS AND COLLECTIVE BARGAINING

Labor unions represent the collective interests of their members. As a general proposition, unions focus their attention primarily on (1) wages and salaries; (2) benefits such as vacation and sick leave, heath insurance, and pension plans; and (3) working conditions such as hours and safety. These issues are, of course, the concerns of professional athletes as well as of workers in other occupations. No matter how much a player loves his sport, playing is his or her job. Professional athletes cannot lose sight of that fact. There is ample evidence that the players are well aware of the need to protect their self-interest. Their unions help them achieve their personal economic goals.

of these labo
demand are e
at a wage of t
itive wage an
because selli
jersey that is
care.

*Profit M*
the supply
workers bec
financially,
not find a jc
($w_3$) who w
gruntled.

*Maxim*
ing the wag
select a wa
ers hired a
can see, th
ment will
somewha
ing. The v
more peo

### 4.1    Unions: Goals and Economic Consequences

A union is a monopoly supplier of labor, but its goals are unclear. Depending on the union's approach to supplying labor to employers, the wages and employment will vary. We can illustrate this in Figure 22.1. As usual, D represents the aggregate demand for a particular type of labor, and S represents the supply

---

[2] For a thorough examination of labor law and antitrust policy, see Phillip Areeda and Herbert Hovenkamp (2006), *Antitrust Law*, Vol. IB, 255–257, New York: Aspen Publishers.



nd therefore exempted
lar, Section 6 appeared
inition:

icle of commerce. Noth-
istence and operation of
: held or construed to be
nder the antitrust laws.

ted this exemption very
:termination to impede
a Act in 1932. This act
Act to immunize union.
ot absolute, however; it
ns of the union and its

vided by the Norris-La
y labor exemption that
:ities. This exemption is
· entity that involve core
ons. Other than through
t influence competition
gree with one employer
itput market. As a result
can behave like a labor

members. As a general
(1) wages and salaries;
insurance, and pension
:afety. These issues are,
l as of workers in other
ort, playing is his or her
There is ample evidence
heir self-interest. Their
ls.

unclear. Depending on
the wages and employ
usual, D represents the
; represents the supply

; Phillip Areeda and Herb
spen Publishers.

### 4 Unions and Collective Bargaining

437



**Figure 22.1.** Employment at $L_1$ maximizes profit, employment at $L_2$ maximizes the wage bill, and employment at $L_3$ is the competitive result.

of these labor services. The competitive solution is found where supply and demand are equal. In Figure 22.1, we can see that $L_3$ workers will be employed at a wage of $w_3$. Presumably, the workers want something more than a competitive wage and form a union to get it. It is unclear what the union's objective is because selling labor services is not the same as selling merchandise. A LeBron jersey that is not sold does not care, but a worker who goes unemployed does care.

*Profit Maximization.* If the union maximized profit, it would act as though the supply of workers was its marginal cost curve. It would then provide $L_1$ workers because $w_1$ exceeds $w_3$. Those workers who are employed do quite well financially, but there are many who would like to work at a wage of $w_1$ who will not find a job. In fact, there are workers willing to work for the competitive wage ($w_3$) who will be unemployed. No doubt these unemployed workers will be disgruntled.

*Maximizing the Wage Bill.* An alternative to profit maximization is maximizing the wage bill, which is the total expenditure on labor. That is, the union may select a wage of $w_2$ where marginal revenue equals zero. There will be $L_2$ workers hired at $w_2$, and the total expenditure on labor will be maximized. As we can see, the wage will be $w_2$ rather than $w_1$ with this strategy. However, employment will be $L_2$ rather than $L_1$. A union may be satisfied that this trade-off of somewhat higher employment for a somewhat lower wage is well worth making. The wage is still above the competitive level, and therefore, there are still more people who want to work at $w_2$ than there are jobs for them.



438    Players' Unions and Collective Bargaining

### Two Approaches to Excess Supply

When a union raises the wage above the competitive level, there will be excess supply. More people will want to work than will be able to find a job. Unions have to deal with this problem because disgruntled unemployed workers may disrupt the union's efforts.

*Craft Union Strategy.* Craft unions represent skilled workers such as carpenters, electricians, and plumbers. If the union's goal was to maximize the wage bill, it would recognize that it needed only $L_2$ members. The union would then limit the membership to $L_2$ and adjust that number over time as demand shifted. The union still faces a problem because there will be skilled workers who cannot get in the union. These nonunion workers may be able to compete with union workers for employment.

*Industrial Union Strategy.* The industrial union gathers together less skilled workers under the union umbrella. The union permits anyone to join. If it maximizes the wage bill, it will set a wage of $w_2$. At a wage of $w_2$, there will be excess supply. The union must deal with this excess supply because the unemployed members may take a nonunion job and compete with other union members. This, of course, would undermine the stability of the union. Industrial unions try to share the work by having shorter work weeks or rotating employment opportunities.

*Players' Union Strategy.* The players' unions employ a different strategy. The roster size for each team is determined through collective bargaining. Once the roster size, and therefore the total number of jobs, has been determined, it is entirely up to each club to decide who makes the team. The union has nothing to say about which players are retained and which players are cut. The clubs select the highest quality players from the available pool of talent according to their willingness to pay. Of course, mistakes are made, but few players of major league caliber fall through the cracks and go unemployed for very long.

The NFLPA, the NBPA, and the NHLPA bargain over the total wage bill. The results are expressed as salary caps, which limit the total payroll of each club. In MLB, there is no salary cap, but there is a luxury tax that is imposed on clubs that spend more than some threshold amount. The unions have little to do with the allocation of the salary dollars. Players bargain for salary dollars on their own (some with the help of an agent). Most of the other terms of employment – working conditions, pensions, contract terms – are subject to negotiations between the union and the league. The player's salary, however, is an individual matter between the club and the player.

## 5  BILATERAL MONOPOLY IN SPORTS

When the NFLPA sits down across the bargaining table from the NFL Management Committee, there is market power on both sides of the table. The union has something akin to monopoly power in the supply of major league quality football players. However, there is only one employer of such talent (the NFL) and, therefore, the NFL has an element of monopsony power. A market in which there is a single seller (the NFLPA) and a single buyer (the NFL) is called a



442    **Players' Unions and Collective Bargaining**

## 6    FREE AGENCY

For decades, professional athletes in the major sports leagues were bound to
one team through the reserve clause. The players were set free in a series of
decisions in arbitration and the courts. As a result, the clubs could not agree
among themselves to restrict free agency. Instead, they bargained with the
union to impose some restrictions on free agency. These restrictions vary some-
what from league to league.

### 6.1    Major League Baseball

If a player is selected in the MLB draft, he is initially bound to the club that
selected him for six years. The player can be traded to another club, which will
then have exclusive rights to that player's services. For the first three years in the
league, the player has only two choices: play for his club at whatever salary the
team dictates or retire. The club cannot pay him less than the MLB minimum,
which was $380,000 in 2006. After three years of service, the player is not free to
negotiate with another club but is protected to some extent by final offer arbi-
tration (see Chapter 21). After six years of MLB service, the player can become
a free agent if he is not already under contract. As a free agent, the player can
sign with any club that offers him a contract.

### 6.2    National Football League

There are several categories of free agency and one major exception in the NFL.
If a player has four or more years of service in the NFL and is not under con-
tract, he will be an *unrestricted free agent*.[4] He can then sign with any club that
wants to sign him. If the unrestricted free agent has not signed with another
club by June 1, his original club can offer him a contract that calls for a 10 per-
cent increase in salary over the previous year. If the player is still unsigned by
July 15, his original club has the exclusive right to sign him to a contract for the
following season.

Players with three years of service, but less than four, are *restricted free
agents*. Beginning on March 1, the restricted free agent has a 60-day window
during which he can try to generate interest from other clubs. If he gets an offer,
his original team can retain his services by matching the offer. If the original
club decides not to match the offer, the player can sign with the new club, and
his old team will get a draft choice as compensation.

Players with less than three years of service are *exclusive rights* players.
These players must sign with their original club. The club must offer a one-year
contract and must pay at least the league minimum. In 2010, the NFL rookie
minimum was $325,000, a player with one year of service had to be paid at
least $400,000, and a player with two years in the NFL had to be paid at least
$475,000.

[4] The four years of service limit only applies in years when a salary cap is in place. In years
without a salary cap, the player must have five years of service. Similar adjustments apply to
restricted free agents.

There is one major exception to these free-agency categories: the *franchise player*. Each NFL club can put the franchise tag on an otherwise free agent. The club must then pay the franchise player the average of the five highest salaries paid to players at his position. A club cannot designate more than one player as a franchise player in a single season. Once the franchise player signs, the club cannot use the designation on anyone else until the franchise player's contract runs out or the franchise player suffers a career-ending injury.

### 6.3  National Basketball Association

In the NBA, there are two classes of free agents: unrestricted and restricted. An unrestricted free agent is free to sign with any club without restriction.[5] For restricted free agents, the original club can exercise its right of first refusal. When another club signs an offer sheet, it offers a contract for two or more years to the restricted free agent. The original club can retain the player by matching the offer.

### 6.4  National Hockey League

Following the lockout in 2005, the new CBA provided two ways of becoming an unrestricted free agent. Irrespective of age, a player can become an unrestricted free agent after seven seasons in the NHL. Alternatively, if a player is 27 years old and has played four seasons in the NHL, he can become an unrestricted free agent.

## 7  SALARY CAPS AND LUXURY TAXES

A salary cap is a limit on the total player payroll. The NFL, NBA, and NHL all have salary caps of one sort or another; the precise definition varies across leagues. There is no salary cap in MLB, but there is a hefty "luxury tax" when a club's payroll exceeds the tax threshold. The idea is to limit the payroll cost to improve each club's financial stability and increase competitive balance. Salary caps can be *hard* or *soft*.

### 7.1  Hard Salary Caps

The NFL has a hard cap, which means that a club's payroll cannot exceed the cap for any reason. The NFL's hard cap went into effect in the 1993 CBA, which has been extended several times. The NFLPA and the NFL have agreed to split the *designated gross revenue*. The players receive 64 percent of the total estimate of the designated gross revenue. This sum is then divided evenly among the 32 NFL teams. This is the maximum amount that a team can spend on the player payroll.

There is some maneuvering around the salary cap in the NFL. The NFL salary cap does not actually include all salary expenditures paid to players

---

[5] The contract must include a salary at least equal to the NBA minimum, which varies on the basis of years of experience. In no event can the salary be lower than $473,604, which was the rookie minimum in 2010.



444    **Players' Unions and Collective Bargaining**

**Table 22.1.** Player's Share of National Hockey League (NHL) Revenue

| Revenue | Share |
|---------|-------|
| Less than $2.2 billion | 54% |
| $2.2–2.4 billion | 55% |
| $2.4–2.7 billion | 56% |
| Over $2.7 billion | 57% |

*Source:* NHL–NHL Players Association Collective Bargaining Agreement.

in a given season. The most significant exceptions involve bonuses. Signing bonuses and roster bonuses are allocated equally over the length of the player's contract, even though the player is paid the bonus in one lump sum at the beginning of the contract. For example, suppose a player signs a four-year contract for $3 million with a $1 million signing bonus. For salary cap purposes, $250,000 of the signing bonus will be allocated to each of the four years. However, limits have to be imposed because a gaping loophole would otherwise exist. Suppose that a team wanted to pay a player $33 million for three years. The contract could call for a $30 million signing bonus and salaries of $1 million per year. For salary cap purposes, the bonus would be allocated evenly – $10 million per year. A clever club, however, could sign the player to a 15-year contract. Now, the bonus would only count $2 million per year. At the end of the three years, the club can cut the player. Such a strategy cannot be tolerated because it would undermine the purpose of the cap. To avoid the pairing of minimum base salaries with multimillion-dollar signing bonuses, the NFL adopted a rule, known as the "Deion Sanders Rule," that requires the signing bonus to be allocated over the first three years of any player's contract. In addition, incentives that are deemed too "likely to be earned" by the NFL are counted against the cap. In the event that the "likely to be earned" incentives are not earned, they become cap credits for the next year. This is how some teams can be technically under the cap yet be spending over the cap. Another of the rare ways a team can get around the salary cap is through the "Cap Relief for Veterans" rule. This allows a club to sign players with more than four years of experience to one-year contracts and have it count for only $450,000 against the cap.

The NHL cap, which is a recent development, is hard. Following a 301-day lockout, the NHL and NHLPA reached agreement on a new CBA just before the start of the 2005–2006 season. For the first time, there was a salary cap in the NHL. The exact payrolls depend on how well the NHL is doing financially. The players' share of league-wide revenue depends on how much revenue is generated by the NHL. According to the CBA, the players' share increases as revenue increases from 54 percent to 57 percent, as shown in Table 22.1. The resulting sum is divided evenly among the 30 NHL teams. For example, if the NHL league-wide revenues were $2.5 billion, the total salary pool would be 56 percent or $1.4 billion. Each team would then face a salary cap of $46.67 million. This sum must cover all salaries, signing bonuses, and performance bonuses paid to all players.

Some teams located in financially weak markets may not be able to afford the salary cap limit on their own. The NHL and the NHLPA recognized this and included a provision for revenue sharing among the clubs. By transferring revenue from the financially stronger teams to those in need, each club should have enough money to cover the salary cap. The parties also recognized

the potential for opportunistic behavior on the part of some clubs. To mitigate such incentives, there are eligibility requirements for revenue sharing. To be a recipient, a club must be in the bottom half of the NHL in terms of league revenue. It must also be in a "small" market, which is defined as one with less than 2.5 million TV households.

In normal circumstances, a club is not allowed to exceed the salary cap. There is, however, an injury exception. If a player is injured severely enough to miss 24 days and 10 games, that player can be replaced on the roster with another player with a similar salary. This can put the club over the salary cap while the injured player is sidelined. Once the injured player returns, however, his replacement must be cut from the roster, and the club must meet the salary cap limitations.

### 7.2  Soft Salary Caps

The NBA has a *soft cap*, which means that there are plenty of exceptions so teams can sign the players that they want. The salary pool is determined by basketball-related income (BRI). Under the current CBA, which is a six-year deal signed in June 2005, the players received 49.5 percent of the BRI for the 2005–2006 season and 51 percent of BRI for the 2006–2007 season. The total pool is divided equally among all NBA clubs. Given the number of exceptions, the resulting salary cap hardly means anything.

The "Larry Bird Exception" pertains to teams that want to re-sign a veteran player who has played for that club for at least the three previous seasons. This player can be re-signed to a contract up to seven years long that calls for annual raises of up to 12.5 percent, even if doing so will put the club over the cap. There is also an "Early Bird Exception" for early qualifying veteran free agents who played the previous two seasons for the club that wants to re-sign the player. Even if the club is over the cap, it can re-sign such a player at a new salary up to 175 percent of his previous salary. This contract can also provide for annual raises of up to 12.5 percent. There is a Non-Bird Exception that pertains to veteran free agents who do not qualify for the Larry Bird or the Early Bird Exception. This could arise because the player had been traded or waived. These players can be re-signed at a salary up to 120 percent of the previous salary. Their contracts can call for annual increases of up to 10 percent.

There are other exceptions to the salary cap as well. One of the most common exceptions is the Mid-Level Exception, which allows a team to sign a player to a contract equal to the NBA average, even when the team will exceed the salary cap. This exception can be used on one player or split among players. Another exception is the Rookie Exception, which allows a team to sign rookies to contracts, even if they are over the cap. The $1 million exception is used to re-sign a free agent or another team's free agent. It is hard to see how the soft NBA salary cap imposes any limits on team payrolls given all of the exceptions.

### 7.3  Luxury Taxes

Alone among the four major sports leagues, MLB does not have a salary cap. Instead, it uses a *luxury tax* to keep payrolls down. The central purpose is to prevent wealthy teams from signing all the best players. In other words, the



446     Players' Unions and Collective Bargaining

**Table 22.2.** Rookie Minimum Salaries, 2010 Season

| League | Rookie Minimum |
|---|---|
| National Football League | $325,000 |
| Major League Baseball | $400,000 |
| National Basketball Association | $473,604 |
| National Hockey League | $500,000 |

luxury tax is supposed to improve competitive balance. Any club with a payroll that exceeds a predetermined tax threshold may be subject to the tax depending on that club's past history. The tax is levied on the difference between the actual payroll and the threshold. For example, suppose that the tax threshold is $150 million. If a club's payroll were, say, $170 million, the tax would apply to the difference of $20 million.

The luxury tax is designed to deal with chronic "overspending" by a club. As a result, occasional lapses are ignored. Under the terms of the CBA, the following assessments applied to clubs that exceeded the threshold:

First-time offenders were assessed no luxury tax.

Clubs that exceeded the threshold in 2006, but not in 2005, were assessed no luxury tax.

Clubs that exceeded the threshold in 2006, 2005, and 2003, but not in 2004, were assessed a 30 percent tax.

Clubs that exceeded the threshold in 2006 for either the third or fourth consecutive year were assessed a 40 percent luxury tax.

Thus, if a club's payroll exceeded the threshold by $20 million, a 40 percent luxury tax would increase the payroll cost from $170 million to $178 million. If the tax rate is 30 percent, then the cost increases to $176 million.

As a means of trying to equalize payrolls in MLB, the luxury tax is an abysmal failure. The only teams chronically over the threshold are the New York Yankees and the Boston Red Sox. Moreover, the range in player payrolls is enormous.

### 8  MINIMUM SALARIES

The players' unions were all concerned about minimum salaries for their members. Each of the major unions has been successful in negotiating a minimum salary. All of the major sports leagues now have minimum salaries for rookies. Interestingly, the minimum salaries seem to be inversely correlated with the popularity of the sport. The rookie minimum is lowest in the NFL and highest in the NHL. The figures for 2010 are displayed in Table 22.2.

Many rookies earn considerably more than the league minimum. Those players chosen early in the NFL draft, for example, usually earn much more than $1 million in the NFL. Jake Long was the number one overall pick in the

**Table 22.3.** Minimum Salary Schedules, 2010 Season

| Years | National Basketball Association | National Football League |
|-------|--------------------------------|--------------------------|
| 0 | $473,604 | $325,000 |
| 1 | $762,195 | $400,000 |
| 2 | $854,389 | $475,000 |
| 3 | $885,120 | $550,000 |
| 4 | $915,852 | $635,000 |
| 5 | $992,6809 | $635,000 |
| 6 | $1,069,509 | $635,000 |
| 7 | $1,146,337 | $760,000 |
| 8 | $1,223,166 | $760,000 |
| 9 | $1,229,255 | $760,000 |
| 10+ | $1,352,181 | $860,000 |

NFL's 2008 draft. He signed a five-year contract reportedly worth $57.75 million. Of this, $30 million was guaranteed. For Jake Long, the rookie minimum was, of course, irrelevant. However, it is not irrelevant for undrafted free agents, struggling for a spot on some team's roster.

In the NBA and the NFL, veterans must be paid minimum salaries based on their years in the league. It is interesting to note that the veteran minimum salaries are much higher in the NBA than in the NFL as shown in Table 22.3.

In individual sports – bowling, golf, tennis, track – athletes do not receive salaries. Prize money is awarded according to performance. Thus, there are no minimum salaries. A player could conceivably attempt to compete for an entire year and win no money at all. This, of course, is unlikely, but it is possible.

## 9   REVENUE SHARING

The major sports leagues all have some sort of revenue sharing. The idea is that all clubs contribute to the success of the league, but some clubs have better locations and therefore enjoy higher revenues. In a spirit of cooperation, the clubs agree to share revenues to some extent. The precise terms vary from one league to the next, but there is an effort in every league to redistribute the wealth. The players' unions care about this sharing of league revenue because it reduces the market value of a player.[6] A player's value to his club is his marginal revenue product, which is marginal revenue times marginal product. Revenue sharing acts like a tax on total revenue. Players contribute to total revenue by improving a club's winning percentage. An additional win increases total revenue by the marginal revenue, but with revenue sharing, the after-tax contribution is reduced from $MR$ to $(1 - t)MR$, where $t$ is the tax rate. As a result, a

---

[6]  We examined this in Chapter 6 when we discussed competitive balance.



448    **Players' Unions and Collective Bargaining**

player's market value is reduced from $MRP$ to $(1 - t)MRP$. Given the impact of revenue sharing, it is small wonder that the union wants to be involved in what might not look like their business.

Major League Baseball provides an excellent example, although it is a little complicated. MLB uses a combination of a Base Plan and a Central Fund Component supplemented by the Commissioner's Discretionary Fund. For the Base Plan, each club contributes 31 percent of its Net Local Revenue into a pool. The total amount collected is then shared equally. If a club gets back more than it put into the pool, then it is a net recipient. If it gets back less, it is a net contributor. MLB also has a Central Fund generated from other sources that provides net transfers to financially strapped clubs. These are designed to improve the financial position of those teams in weak markets to improve competitive balance. Finally, the commissioner has a Discretionary Fund that can be used to assist clubs that need a little extra help.

## 10   CONCLUDING REMARKS

Players' unions are concerned with protecting and promoting the economic interest of their members. Any aspect of league operations that affects the well-being of the players will spark the union's interest. As a result, things such as revenue sharing among the teams, which has an impact on a player's market value, will arouse the union and become a part of the CBA. Free-agency rules, salary caps, and luxury taxes are more obvious concerns for the union.

The players' unions in the NFL, the NBA, and the NHL all negotiate with their leagues over the total wage bill, that is, the total payroll. They do not negotiate individual salaries. Each player negotiates his own salary, which must come from the available salary pool. This is decidedly different from the case in other industries in which the union negotiates wages and salaries for its members.

## PROBLEMS AND QUESTIONS

1. "Revenue sharing among teams leads to lower salaries for players." True or false? Explain.

2. In a typical union, all members with the same tenure earn the same wage. This is not true in the NFL. Why not?

3. The MLBPA represents all major league baseball players. The St. Louis Cardinals have a monopoly on the provision of major league baseball in St. Louis. Explain why this is not a bilateral monopoly situation.

4. A strike or lockout is the result of a labor impasse. The clubs suffer because they earn no profit, and the players suffer because they earn no income. Is there any reason why the government should intervene to resolve the matter?

5. There have been efforts to unionize National Collegiate Athletic Association student-athletes, but they have all failed. Why?

# Author Index

Adams, W., 196
Alexander, D. L., 44, 115
Allen, W. D., 262
Andersen, T.N., 507
Araujo, I. C., 337, 359
Areeda, P., 436, 450
Ashman, T. D., 381, 430
Asinof, E., 234

Baade, R. A., 290, 303, 314, 316, 319, 336, 359
Bainbridge, M., 156
Balfour, A., 84
Balsdon, E., 240
Banaian, K., 430
Barger, E., 303
Baumann, R., 316, 319
Becker, G. S., 219, 240, 262, 507
Bellemore, F.A., 507
Bergmann, T. J., 450
Berri, D. J., 21, 45, 84, 85, 95, 116, 381, 404
Birren, G. F. E., 186, 196
Blair, R. D., 25, 26, 44, 48, 63, 102, 115, 128, 150, 152, 156, 175, 196, 353, 361, 366, 381, 439, 450
Bodvarsson, O. B., 430, 507
Bollinger, C. R., 174
Borick, C. P., 337, 359
Bradbury, J. C., 15, 64, 84, 196, 286, 303, 404
Brastow, R. T., 507
Brock, J. W., 196
Brook, S. L., 84, 381, 404
Brown, L. J., 190
Brown, R. W., 368, 381, 507
Burgess, P. L., 427, 430
Bursik, P. B., 337, 359

Cain, L. P., 84
Cameron, S., 186
Carlino, G., 319
Chang, Y. M., 84

Choi, J. P., 63,
Ciecka, J., 84
Clapp, C. M., 303
Coase, R. H., 152, 156
Coates, D., 95, 303, 319, 450
Cochran, J. J., 319
Conlin, M., 404, 507
Coulombe, S., 508
Coulson, N. E., 319
Crompton, J. L., 319
Crooker, J. R., 84
Curry, J., 240
Cymrot, D. J., 507

Dawson, P., 156, 304, 319
DeGennaro, R. P., 45
DePasquale, C., 25, 26, 44
Depken, C. A., II., 45, 84, 303, 507
DeSchriver, T. D., 136
Digler, A., 286
Dinardo, J. E., 286
Dixit, A., 391, 404
Dobson, S., 84
Dohrman, G., 466,
Dorman, G., 354
Drape, J., 240
Duggan, M., 235, 240
Duquette, G. H., 466
Durrance, C. P., 25, 26, 44
Dworkin, J. B., 450
Dye, R. F., 319

Easton, S. T., 450
Eber, N., 286
Eckard, E. W., 84, 381
El-Hodiri, M., 64
Emerson, P. M., 507

Fainaru-Wada, M., 282, 286
Falconieri, S., 156
Farmer, A., 404, 419, 427, 430

Fenn, A. J., 84, 85
Ferguson, D. G., 116
Fielding, L. W., 466
Findlay, D. W., 507
Fizel, J., 313, 430
Fleisher, A. A., III., 45, 361, 366, 381
Fong, L., 240
Ford, J. M., 507
Forrest, D., 156, 217
Fort, R. D., 15, 45, 64, 67, 68, 70, 73, 84, 85, 86,
   116, 197, 304, 319, 337, 359, 450, 507
Freitas, R. E., 196
Frick, B., 84, 286
Funk, J. P., 508

Gabriel, P. E., 507
Gandar, J. M., 157
Gerrard, B., 136
Gill, A., 507
Glazer, A., 231, 466
Goddard, J., 84
Goff, B. L., 45, 361, 366, 381
Goldfein, S., 196
Gouguet, J., 303
Gould, J., 420, 430
Greenberg, M. J., 303
Grenier, G., 508
Groothuis, P. A., 304, 450, 484,
   507
Gustafson, E., 84, 313, 430
Gwartney, J., 507

Haddock, D. D., 84,
Hadley, L., 84, 85, 313, 430
Hakes, J. K., 303
Hanssen, F. A., 507
Harris, C. B., 337, 359
Harrison, C. C., 363, 381
Harrison, J. L., 353, 361, 363, 381
Harrison, T., 450
Haugen, K. K., 286
Haupert, M., 45
Haworth, C., 507
Haynes, J. S., 128, 450
Heckelman, J. C., 240
Herndon, J., 186, 196
Hill, J. R., 450, 484, 507
Hinshaw, C. E., 157
Hirshleifer, D., 231, 240
Hirshleifer, J., 231, 240
Horowitz, I., 84, 15
Hotchkiss, J. L., 174
Hovenkamp, H., 175, 196, 436, 450
Hudson, I., 319
Humphreys, B. R., 70, 84, 95, 262, 303, 319,
   507
Hylton, K. N., 175, 196

Jenish, P. E., 116
Jewell, R. T., 507
Johnson, A. T., 404
Johnson, B. K., 304
Johnson, C., 507
Jones, G. A., 507
Jones, J. C. H, 116, 508

Kahane, L. H., 84
Kahn, L. M., 64, 361, 381, 417, 450, 508
Kanazawa, M. T, 508
Kaplan, D., 327, 336, 359
Kaserman, D. L., 48, 63, 102, 115, 150, 152,
   156, 175, 196, 366, 381, 439, 450
Kendall, T. D., 262
Kepner, T., 240
Kern, W., 44
Kesenne, S., 45, 64, 84, 116
Knowles, G., 45
Koning, R. H., 85
Krattenmaker, T. G., 181, 196
Krautmann, A. C., 21, 45, 84, 85, 95, 116, 355,
   430

La Croix, S. J., 507
Laband, D. N., 319
Lambrinos, J., 381, 430
Lande, R. H., 181, 196
Landes, W. M., 420, 430
Larsen, A., 85
Lavoie, M., 319, 508
Le Dressay, A., 116
Lee, Y. H., 64, 84, 85
Leeds, E. M., 127, 128, 136
Leeds, M. A., 127, 128, 136, 150, 156
Lehn, K., 174, 196
Lentz, B. F., 319
Leonard, W. M., II., 507
Leonard, J., 382
Lerner, A., 353
Lertwachara, K., 319
Levitt, S. D., 235, 240
Lewis, M., 508
Long, J. G., 337, 359
Longley, N., 508
Longo, A., 304, 319
Lopatka, J. E., 186, 191, 196

Maennig, W., 286
Marburger, D. R., 404, 427, 430, 431
Mason, D. S., 466
Matheson, V. A., 314, 316, 319, 336, 359
Maxcy, J., 64, 85, 417
McAfee, R. R., 384, 404
McAllister, S., 430
McCann, M. A., 484
McClain, D. L., 240
McCluskey, J. J., 262

## Author Index

Meehan, J. W., Jr., 45, 85
Meggyesy, D., 466
Miles, S. E., 507
Miller, L. K., 466
Miller, P. A., 45, 85, 336, 359, 431
Molitor, C. J., 484
Mondello, M. J., 85, 304
Morgenstern, O., 160, 174
Mulligan, J. G., 116

Nadeau, S., 508
Nash, J. E, Jr., 392, 404
Neale, W. C., 45
Nelson, R. A., 45, 85
Noll, R. G., 15, 64, 67, 95, 116, 156, 196, 290, 292, 304, 319, 337, 359, 450

Owen, J. G., 304, 337, 359

Palomino, F., 156
Parent, M. M., 136
Parkin, M., 15, 18, 45, 307, 466
Partridge, M. D., 507
Pauwels, W., 116
Pecorino, P., 404, 419, 427, 430
Pedace, R., 508
Peel, D. A., 45
Perloff, J. M., 132, 457, 466
Perri, T. J., 484
Petersen, J. E., 337, 359
Philips, L., 384, 404
Pickard, J. L., 337, 359
Pistolet, L., 127, 128, 136
Pitts, B. G., 466
Porter, P. K., 84, 116, 297, 304, 313
Preston, I., 240
Prinzinger, J., 382

Quinn, K. G., 337, 359
Quirk, J., 15, 45, 64, 67, 68, 70, 73, 84, 85, 197, 304, 319, 337, 359, 450

Raethz, L., 337, 359
Reid, C. E., 507
Richardson, T. V., 45, 85
Roberts, G. R., 197, 466
Robinson, J., 348
Rockerbie, D. W., 397, 450
Rodriguez, G., 319
Romano, R. E., 361, 381, 439, 450
Rosen, J. S., 484
Ross, S. F, 197
Rottenberg, S., 45, 70, 95
Ruseski, J. E., 262

Sakowics, J., 156
Salop, S. C., 181, 196
Sanders, S., 84, 95
Sanderson, A. R., 85, 290, 304

Sanghoo, B., 63
Sauer, R. D., 201
Sappington, D. E. M., 466
Schmalensee, R., 152
Schmidt, M. B., 45, 85, 381, 404
Schmitt, R. L., 507
Scoggins, J., 427, 430
Scoville, J., 450
Scully, G. W., 45, 64, 67, 73, 85, 354, 431, 508
Sherony, K., 45
Shmanske, S., 116, 496, 508
Shubnell, L. D., 337, 359
Siegfried, J. J., 157, 319
Simmons, R., 156, 217
Skeath, S., 391, 404
Slack, T., 136
Sloane, A. A., 450
Smith, D. R., 136, 507
Soebbing, B. P., 45
Sommers, P. M., 431
Spenner, E. L., 85
Spurr, S. J., 484
Stango, V., 404, 419, 427, 430
Stanton, T. J., 507
Steinberg, L., 466
Stewart, K. G., 116
Stigler, G. J., 230, 240, 348
Surdam, D. G., 85, 156, 404
Sutter, D., 86
Sykuta, M., 196
Szymanski, S., 15, 45, 64, 156, 157, 197, 240, 337, 359

Tainsky, S., 45, 286, 508
Thayer, M. A., 240
Thomas, C. R., 297, 304
Thomas, D. A., 45
Tollison, R. D., 45, 187, 197, 361, 366, 381
Tolone, W. L., 507
Tolsdorf, P., 286
Tygiel, J., 508

Utt, J., 86

Varian, H., 384, 404
Vicente-Mayoral, R., 84
von Allmen, P., 150, 156
von Neumann, J., 160, 174

Walsh, W. D., 508
Walton, H., 304, 319
Welki, A. M., 95
Whitehead, J. C., 304
Whitney, J. D., 86
Williams, L., 202, 206
Williamson, O., 152, 157
Willig, R., 152
Wilson, D. P., 45, 84

530   Author Index

Winfree, J. A., 45, 197, 262, 286, 484, 508
Winkler, S., 86
Wolfers, J., 217

Yates, A. J., 240
Yost, M., 64

Zimbalist, A. S., 15, 45, 86, 157, 197, 290, 292,
    304, 313, 319, 326, 337, 359, 382, 397, 450,
    508
Zirin, D., 15
Zlatoper, T. J., 95
Zuber, R. A., 157