Pls Ex. 15
(PCCX624 - Roger D. Blair & David Kaserman, Antitrust Economics (Oxford University Press, 2nd ed. 2009))



# ANTITRUST ECONOMICS

## SECOND EDITION

ROGER D. BLAIR

DAVID L. KASERMAN

**OXFORD**
UNIVERSITY PRESS

Oxford University Press, Inc., publishes works that further
Oxford University's objective of excellence
in research, scholarship, and education.

Oxford New York
Auckland Cape Town Dar es Salaam Hong Kong Karachi
Kuala Lumpur Madrid Melbourne Mexico City Nairobi
New Delhi Shanghai Taipei Toronto

With offices in
Argentina Austria Brazil Chile Czech Republic France Greece
Guatemala Hungary Italy Japan Poland Portugal Singapore
South Korea Switzerland Thailand Turkey Ukraine Vietnam

Copyright © 2009 by Oxford University Press

Published by Oxford University Press, Inc.
198 Madison Avenue, New York, New York 10016
www.oup.com

Oxford is a registered trademark of Oxford University Press

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

**Library of Congress Cataloging-in-Publication Data**
Blair, Roger D.

  Antitrust economics / Roger D. Blair, David L. Kaserman.—2d ed.
    p. cm
  Includes index.
  ISBN 978-0-19-513535-0 (cloth : alk. paper)
  1. Antitrust law—United States.
  2. Antitrust law—Economic aspects—United States.
  I. Kaserman, David L. II. Title.
  KF1649.B54 2008
  343.73′0721—dc22   2007029123

1 3 5 7 9 8 6 4 2
Printed in the United States of America
on acid-free paper

prevailed "but for" the antitrust violation. In both methodologies, estimates of the "but for" values must net out other influences that are not related to the antitrust violation.

### Problems with Before-and-After Models

Drawing reliable inferences from a before-and-after model is not without problems. Consider an overcharged plaintiff's claims for damages. In a before-and-after model of damages, the plaintiff uses the prices that it paid prior to the antitrust violation as the foundation for inferring what the prices would have been during the damage period but for the illegal activity. The fundamental problem is being sure that the preconspiracy prices provide a reliable foundation for inferring the prices during the damage period. For example, in Figure 5-4, we show the preconspiracy price pattern for a product during the 1989–2000 period. Assume that the evidence demonstrates that the conspiracy started in 2001, and observed prices rose dramatically thereafter. Based upon the prices during 1989–2000, one might estimate the prices for the 2001–2003 period as shown by the horizontal line, which is the preconspiracy average price. The difference between the prices actually charged and the estimated prices represents an estimate of the overcharge.

The theory behind these estimates is that the only thing that caused prices to rise was the conspiracy. Economic experts employed by the defendants, however, will investigate whether the price rise was due, at least in part, to normal market forces.[32] Although we have assumed that a conspiracy took place during 2001–2003, we cannot know with certainty what the prices would have been if the presumed conspiracy had not taken place. Thus, each side will present evidence based upon an analysis of past history and contemporaneous events. The conflict between the resulting estimates will be resolved by the jury's wisdom.

### Problems with Yardstick Models

Drawing reliable inferences from a yardstick model can pose a number of problems in practice. The major difficulty encountered in using a yardstick is finding a reliable one. The



Figure 5-4  Before-And-After Measure Of Damages.

central idea behind the yardstick approach is to identify a firm that is comparable in all important respects to the plaintiff except, of course, for the impact of the alleged antitrust violation. The economic performance of the yardstick firm is then used as an estimate of the performance that the plaintiff would have experienced "but for" the antitrust violation. The ideal yardstick is a clone or an identical twin of the plaintiff. Short of this, for the inferences drawn to be reliable rather than speculative, one must identify a firm that is truly comparable. Hovenkamp has described the yardstick method as follows: "Under the yardstick approach the plaintiff attempts to identify a firm similar to the plaintiff in all respects 'but for' the impact of the antitrust violation."[33] But the yardstick approach is demanding: "If the markets of the two firms are identical, and *if* the plaintiff's firm and the firm used for comparison stand in the same relative position in those markets, offer the same product mix, have comparable managements, and are comparable in all other respects, then the fact finder may infer that the two have comparable revenues or profits but for the violation."[34]

For the yardstick approach to provide reliable inferences, it is essential that the plaintiff and the yardstick operate in the same product market but in distinct geographic markets. In both *Farmington Dowel*[35] and *Admiral Theatre*,[36] the court explained that it was inappropriate to use a firm in the plaintiff's geographic market as a yardstick. The economic reason is plain: the financial performance of the yardstick is apt to be enhanced by the injury to the plaintiff if the firms compete in the same geographic market. As a result, the damage estimate will be biased upward if the yardstick is in the plaintiff's market.

Of course, the likelihood of being able to find a firm that is identical to the plaintiff in all respects except for the impact of the antitrust violation is quite small. Therefore, the courts have tended to impose a standard of reasonable comparability, as opposed to identicality, in accepting yardstick-based damage estimates. That is, the yardstick firm must be reasonably close to the plaintiff in all important respects; but it need not be identical. The two firms cannot differ markedly, however, for the inferences would be faulty.

### Contribution[37]

When two or more firms are found guilty of collusive behavior in violation of the antitrust laws, they share *joint and several liability*, which means that the firms as a group are collectively liable, but they are individually liable as well. In practical terms, this means that the plaintiff can demand full payment of all damages from one of the firms and ignore the rest. Suppose, for example, that a plaintiff lost his business as a result

---

[33] Hovenkamp, *The Indirect Purchaser Rule* (note 21), at 670.
[34] *Id*. In *Farmington Dowel Products v. Forster Manufacturing Co.*, 421 F.2d 61 (1st Cir. 1970), the plaintiff's yardstick damage evidence was rejected because (1) the plaintiff sold a single product whereas the yardstick's offerings were more diversified, (2) the plaintiff's sales organization paled in comparison to that of the yardstick, and (3) the yardstick was more amply capitalized than the plaintiff. The plaintiff and the purported yardstick were simply not sufficiently similar to support the inferred damages.
[35] *Farmington Dowel* (note 34).
[36] *Admiral Theatre Corp. v. Douglas Theatre Co.*, 437 F.Supp. 1268 (D. Neb. 1977).
[37] The issue of contribution in antitrust cases has received much academic attention in the past. For two excellent analyses, see Frank H. Easterbrook, William M. Landes, and Richard A. Posner, "Contribution Among Antitrust Defendants: A Legal and Economic Analysis," *Journal of Law and Economics* 23 (October 1980), pp. 331–370, and A. Mitchell Polinsky and Steven Shavell, "Contribution and Claim Reduction Among Antitrust Defendants: An Economic Analysis," *Stanford Law Review* 33 (February 1981), pp. 447–471.