```
                      2:15-cv-01045-RFB-PAL
```

 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF NEVADA

 3

 4  CUNG LE, et al.,              )
                                  )
 5                 Plaintiffs,    )  Case No. 2:15-cv-01045-RFB-PAL
                                  )
 6        vs.                     )  Las Vegas, Nevada
                                  )  Thursday, September 12, 2019
 7  ZUFFA, LLC, d/b/a Ultimate    )  9:06 a.m.
    Fighting Championship and     )
 8  UFC,                          )  EVIDENTIARY HEARING, DAY FIVE
                                  )
 9                 Defendants.    )
    _____

10

11

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:        See Pages 2 and 3

20

21

    COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                      United States District Court
                        333 Las Vegas Boulevard South, Room 1334
23                      Las Vegas, Nevada  89101

24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.
```

```
                          —2:15-cv-01045-RFB-PAL—
```

 1 | APPEARANCES:
   | For the Plaintiffs:
 2 |
   |         **DON SPRINGMEYER, ESQ.**
 3 |         WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
   |         3556 E. Russell Road, 2nd Floor
 4 |         Las Vegas, Nevada 89120
   |         (702)341-5200
 5 |
   |         **ERIC L. CRAMER, ESQ.**
 6 |         **PATRICK F. MADDEN, ESQ.**
   |         **MARK R. SUTER, ESQ.**
 7 |         BERGER & MONTAGUE, P.C.
   |         1818 Market Street, Suite 3600
 8 |         Philadelphia, Pennsylvania 19103
   |         (215)875-3000
 9 |
10 |         **DANIEL H. SILVERMAN, ESQ.**
   |         COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11 |         1100 New York Avenue, NW, Suite 500 West
   |         Washington, DC 20005
12 |         (202)408-4600
13 |         **JOSEPH SAVERI, ESQ.**
   |         **JOSHUA P. DAVIS, ESQ.**
14 |         THE JOSEPH SAVERI LAW FIRM, INC.
   |         555 Montgomery Street, Suite 1210
15 |         San Francisco, California 94111
   |         (415)500-6800
16 |
   | For the Defendants:
17 |
   |         **J. COLBY WILLIAMS, ESQ.**
18 |         CAMPBELL & WILLIAMS
   |         700 South 7th Street
19 |         Las Vegas, Nevada 89101
   |         (702)382-5222
20 |
   |         **WILLIAM A. ISAACSON, ESQ.**
21 |         **STACEY K. GRIGSBY, ESQ.**
   |         **NICHOLAS A. WIDNELL, ESQ.**
22 |         **JOHN GERARDI, ESQ.**
   |         **ADAM SHAW, ESQ.**
23 |         **SUSAN NERO, ESQ.**
   |         BOIES, SCHILLER & FLEXNER, LLP
24 |         1401 New York Avenue, NW
   |         Washington, DC 20015
25 |         (202)237-2727

—2:15-cv-01045-RFB-PAL—

1  APPEARANCES CONTINUED:

2           **BRENT K. NAKAMURA, ESQ.**
           BOIES, SCHILLER & FLEXNER, LLP
3           1999 Harrison Street, Suite 900
           Oakland, California 94612
4           (510)874-1000

5

6  ALSO PRESENT:

7        Riche McKnight, Esq., Zuffa

8                     INDEX OF EXAMINATIONS

9
TESTIMONY OF ALAN MANNING
10   Direct Examination by Mr. Davis.......................12
     Cross-Examination by Mr. Isaacson....................52
11
TESTIMONY OF PAUL BOYER
12   Direct Examination by Ms. Grigsby....................94
     Cross-Examination by Mr. Davis.......................140
13   Continued Cross-Examination by Mr. Davis.............

14

15     LAS VEGAS, NEVADA; THURSDAY, SEPTEMBER 12, 2019; 9:06 A.M.

16                         --oOo--

17                   P R O C E E D I N G S

18          THE COURT:  Please be seated.

19          COURTROOM ADMINISTRATOR:  Now calling Le, et al.,

20  versus Zuffa, Case Number 2:15-cv-01045-RFB-BNW.  This is the

21  time for Evidentiary Hearing, Day 5.

22          Counsel for plaintiffs, please note your appearance for

23  the record.

24          MR. DAVIS:  Joshua Davis for plaintiffs.

25          MR. CRAMER:  Eric Cramer, good morning, Your Honor, for

—2:15-cv-01045-RFB-PAL—

 1  plaintiffs.

 2          MR. SAVERI:  Joseph Saveri on behalf of the plaintiffs.

 3          MR. SUTER:  Mark Suter for plaintiffs.

 4          MR. MADDEN:  Patrick Madden for the plaintiffs.

 5          MR. SILVERMAN:  Dan Silverman for the plaintiffs.

 6          MR. SPRINGMEYER:  Good morning, Your Honor.  Don

 7  Springmeyer for plaintiffs.

 8          MR. ISAACSON:  Good morning, Your Honor.  Bill Isaacson

 9  for Zuffa.

10          MR. NAKAMURA:  Good morning, Your Honor.  Brent

11  Nakamura for Zuffa.

12          MS. GRIGSBY:  Good morning, Your Honor.  Stacey Grigsby

13  for Zuffa.

14          MR. WIDNELL:  Good morning, Your Honor.  Nicholas

15  Widnell for Zuffa.

16          MR. WILLIAMS:  Good morning, Your Honor.  Colby

17  Wilmington on behalf of Zuffa.

18          MS. NERO:  Good morning.  Susan Nero for Zuffa.

19          THE COURT:  Good morning.  Thank you all for coming in

20  a little bit earlier.  I have to adjust our schedule a little

21  bit today, and so what I'd like to do is proceed today in this

22  way.  We'll have testimony until about, oh, 10:20, 10:25, maybe

23  10:30.  We need to take a break until about -- for about two

24  hours or so, two and a half hours.  We'll come back between

25  12:45 and 1, and then go until about 4.  So that should give us

———2:15-cv-01045-RFB-PAL———

1    about three and a half or so hours with the witnesses.

2          And I wasn't sure about what the parties had worked out

3    regarding the testimony, whether or not Professor Manning,

4    Professor Oyer -- whether or not Professor Manning in particular

5    has to leave, Mr. Davis, early or not.  Because I actually would

6    like for Professor Manning to actually testify again after

7    Professor Oyer, after he hears Professor Oyer's testimony.

8          MR. DAVIS:  He does not have to leave, Your Honor.

9    He's available all day, and so we're very happy to do that.

10         THE COURT:  And so we'll do about -- I'm going to give

11   the parties about 45 minutes for the first round per witness, so

12   an hour and a half or so for Professor Manning, an hour and a

13   half for Professor Oyer, and then about a half hour at the end

14   for Professor Manning again.

15         Any questions about that schedule?

16         MR. DAVIS:  Your Honor, so the same amount -- my

17   apologies.  The same amount of time for direct and cross for

18   each?

19         THE COURT:  Yes, about 45 minutes each.  I don't know

20   that we'll need more than that.  I mean, I think actually it may

21   even be less than that.  In this case, really, it's focussed on,

22   as the parties know, the issue of the use of -- or wage share,

23   labor share, or whatever the terms that are different that are

24   used, and the exceptions of that in the literature, and the

25   examples of that in terms of literature, and why it would or

—2:15-cv-01045-RFB-PAL—

1   would it not be an appropriate measure and why -- or why it

2   would or would not be an appropriate measure in the context of

3   this case.  You know, and in this case, you know, Professor Oyer

4   and Professor Manning's reports are very specific as relates to

5   that.

6           So I don't even know that we'll need that much time for

7   each of the witnesses.  I've gone through their reports, and

8   their reports are very specific.  And I have some very specific

9   questions for them.  But I don't think we'll need that much

10  time.

11          MR. DAVIS:  Thank you, Your Honor.

12          THE COURT:  Okay.  Mr. Isaacson, any questions?

13          MR. ISAACSON:  No questions, Your Honor.

14          THE COURT:  Okay.  Wow.  We're off to a fabulous start

15  from both counsel.  All right.  Why don't we go ahead and get

16  started then.

17          Don't take your seat just yet.

18          THE WITNESS:  I need to be sworn.

19          ALAN MANNING, having duly been sworn, was examined and

20  testified as follows:

21          COURTROOM ADMINISTRATOR:  Thank you.  Sir, please state

22  and spell your name for the record.

23          THE WITNESS:  May name is Alan Manning, A-L-A-N, M-A

24  double N-I-N-G.

25          THE COURT:  Go ahead, Mr. Davis.

—2:15-cv-01045-RFB-PAL—

1          MR. DAVIS:  Thank you, Your Honor.

2          THE COURT:  You don't need to go through, for either

3  experts, their background or C.V., I mean, except to the extent

4  you want to ask them to talk about experience they may have in a

5  particular area of analysis regarding sort of antitrust cases

6  and anything similar to this.  But I've looked at their C.V.s.

7  you know, they're equally impressive.  I don't need to --

8          MR. DAVIS:  I was just going to start by asking whether

9  I should skip the qualifications.

10          THE COURT:  Yes.

11          MR. DAVIS:  And so what I will do is, with Your Honor's

12  permission, in order to stay true to what I understand

13  Your Honor's preferences to be, I will at certain moments sort

14  of proffer testimony that's possible.  And then I fully

15  anticipate Your Honor will say you don't need to hear it, and I

16  will move on.  So, qualifications, that was the first one.

17          Let me -- so since you raised the issue of experience,

18  let me just very briefly ask.

19                DIRECT EXAMINATION OF ALAN MANNING

20  BY MR. DAVIS:

21  *Q.*  Professor Manning, I believe you served as a witness in one

22  United States antitrust class action in the past.  Is that

23  right?

24  **A.**  Yes.

25  *Q.*  And what case was that?

———2:15-cv-01045-RFB-PAL———

1   *A.*   That was the High Tech Antitrust cold calling or no poaching

2   case.

3   *Q.*   And was the class certified in that case?

4   *A.*   It was.

5   *Q.*   Okay.  And that's the only time you served as an expert

6   witness in a U.S. antitrust class action other than this one.

7   Is that right?

8   *A.*   Yes.

9   *Q.*   Okay.  And we'll come back to that a bit -- a bit later.

10          All right.  Let's turn to --

11          MR. DAVIS:  If I may, Your Honor, just a very brief --

12   and it will be brief -- overview of Professor Manning's opinions

13   before we launch into the first substantive one?

14          THE COURT:  You don't need to do that.

15          MR. DAVIS:  Okay.  So --

16          THE COURT:  I reviewed -- I mean, I've reviewed the --

17   I mean, Professor Manning is very clear about when and when he

18   doesn't think that wage share would be appropriate, actually

19   outlines in his report exactly what are the conditions under

20   which he thinks it would be appropriate.

21          So --

22          MR. DAVIS:  Right.  So I'll turn to that -- I'd like to

23   turn to those criteria.  This is by the way of a proffer to

24   expedite once again.  Let me just say that I had prepared

25   questions which I think we don't need about a bunch of

—2:15-cv-01045-RFB-PAL—

1  definitions:  wage share, wage level, monopsony power, marginal

2  revenue product of labor --

3          THE COURT:  So what would be helpful would be for the

4  parties for both experts, I think, to focus on the issue of why

5  in this particular case, or why not sort of wage share/labor

6  share would be appropriate as opposed to sort of absolute levels

7  of compensation, why there are a fair number of studies that

8  talk about or use absolute level of compensation and relates to

9  sort of labor market analysis and competitive -- and

10  competitive -- the competitiveness of markets, and why in this

11  case that absolute level may or may not be appropriate and what

12  are the reasons why they make the choices that they do.

13          And I have some understanding of that, obviously, from

14  their expert opinions, but if we could flesh that out a little

15  bit, given what we've heard so far in the hearing over the

16  course of the past few days.

17          MR. DAVIS:  That would be perfect.  So let me turn to

18  that.

19          And as I do so, let me just point out that I'm -- I've

20  now made it a third of the way through my outline.  So --

21          THE COURT:  Oh, great.

22          MR. DAVIS:  -- remarkably efficient.

23  BY MR. DAVIS:

24  Q.  So let's turn to -- you prepared this slide on the criteria

25  for using wage share.  Is that correct, Professor Manning?

2:15-cv-01045-RFB-PAL

1  **A.**  Yes.

2  Q.  Okay.  And your first opinion is about when it is

3  appropriate to use wage share, correct?

4  **A.**  Yes.

5  Q.  Okay.  So why don't you talk me through the three criteria,

6  very briefly, that -- what do these three criteria show?

7  **A.**  Well, the first criterion is, you know, what is the question

8  that's trying to be asked here.  And the question is how to

9  actuate his actual compensation compared to what they would be

10  in a competitive market, and that strikes me as the essence of

11  the question we're trying to decide.

12  Q.  And when there is that sort of question, just to be clear,

13  use of wage share can be appropriate.  Is that correct?

14  **A.**  Yes.  That's my opinion.

15  Q.  Okay.  And let's talk about the second criterion.  What's

16  that?

17  **A.**  The second criterion is simply that you have to have a ...

18          (Interruption by the court reporter.)

19          THE WITNESS:  So the second criterion is, the data is

20  actually available in order to -- to compute the wage share.

21  And in this particular case, the data is very, very rich in that

22  regard.

23          THE COURT:  So I was curious when I read that in your

24  report, Professor Manning.  Is it simply the case that that type

25  of information is not commonly available in sort of labor market

—2:15-cv-01045-RFB-PAL—

1   analysis?  Because you talk a fair bit throughout your report

2   about how it's somewhat unique to have this sort of -- the

3   granular level of detail that you have in this case about

4   certain aspects -- certain aspects of sort of revenue and being

5   able to compute wage share.  Can you talk to me a little bit

6   about how that's not so common and how it's unique in this case.

7           THE WITNESS:  Yes.  I mean, I'll talk, perhaps, about

8   the different sorts of data that we often have.

9           THE COURT:  Okay.

10          THE WITNESS:  So, for example, often we would have a

11  household survey.  The household survey would ask you questions

12  about your age, your qual- -- education, your job, and so on.

13  It would ask you a question about how much you earn.  Most

14  people know, you know, how much they earn.  But it doesn't ask

15  questions about, well, what are the revenues of your employer?

16  I mean, most people wouldn't know the answer to that question.

17          THE COURT:  Right.

18          THE WITNESS:  And it wouldn't go further.  If they

19  asked the question, which is relevant in this case is, well,

20  what portion of the firm's revenue -- of your employer's

21  revenues are down to your activities, I mean, nobody would be

22  able to really answer that question.  So those kind of household

23  surveys, which are often the bread and butter of a lot of

24  research into labor market issues, just simply don't have

25  information on the firm-level revenues.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  What about other studies that deal with

2     sort of competitive wages and where they're trying to look at

3     what the competitive wage is where there is and is not monopsony

4     power?  In those types of analyses, do you see more industry or

5     firm-level data or is that still not common there?

6          So, for example, if I wanted to compare different tech

7     companies or hardware companies, is it possible to compare, for

8     example, Apple's production and the workers who are involved

9     with Apple's production with the workers who are involved with,

10    say for example, Dell?  Do you have that type of information for

11    industry comparisons when you're looking at competitive wages?

12    Is that common?

13         THE WITNESS:  Well, I think the answer is that it's

14    becoming more common.  So, for example, when I, you know, wrote

15    my book 15 years ago, it was quite uncommon to have lots of

16    those firm-level data sets, but it's becoming more common.  And

17    a lot of the very recent research looking at wage share, which

18    is a very rapidly growing area, is using that kind of data.  But

19    often that data would just be at the level of using something

20    that's really like the firm's accounts.  You would have total

21    revenues and you would have total compensation and total number

22    of employees, the sort of things that would appear in, you know,

23    financial statements of firms.

24         They wouldn't have what we have in this case, which is,

25    you know, a particular part of the firm's activities or an

---2:15-cv-01045-RFB-PAL---

1   event, the revenues associated with that, the workers --

2   particular workers involved in that, and how much they were paid

3   in relation to that.

4         So even though there is more firm-level data around,

5   it's still not as rich as the data that's available in this

6   particular case.

7         THE COURT:  So you're saying if you wanted to do that

8   type of comparison, say for example, with Dell and Apple, you'd

9   have to know which department that particular worker worked in,

10  what the revenues were for that particular department as related

11  to its contributions to the over -- or I shouldn't say its

12  revenue -- the contribution of the productivity of that

13  department to the overall sort of share of the product that's

14  being created, you'd have to have that level of data to be able

15  to do kind of the wage share analysis?

16        THE WITNESS:  Yes, you would have to move in that

17  direction, but it might be very hard because often people might

18  do a bit of work for this department, a bit of work for that

19  department, and so on.  I mean, I think what is unusual here,

20  you've got an event, it's a discrete event, and you've got a

21  measure of the revenue that is coming from that event.  You've

22  got a measure of the workers you know were involved in taking

23  part in that event, and the compensation they were paid.

24        So that's a feature of sort of, you know, this

25  particular case that I think is a bit different from the typical

———2:15-cv-01045-RFB-PAL———

1  data that we -- that we would be working with normally.

2          THE COURT:  Okay.  Thank you.

3          Go ahead, Mr. Davis.

4          MR. DAVIS:  Thank you, Your Honor.

5  BY MR. DAVIS:

6  *Q.* And I think you've anticipated a bit the third criterion

7  which I want to turn to because the two are closely related.

8  Let me ask first, is it your opinion that these three criteria

9  are necessary or sufficient to use wage share?

10  *A.* My opinion is that they're sufficient, but not necessary.

11  *Q.* But not -- and just if you could take a moment and explain

12  exactly what you mean by that.

13  *A.* I mean that if these three conditions are satisfied, I think

14  that the use of wage share is appropriate, but it doesn't mean

15  that there aren't other circumstances in which the use of wage

16  share would be appropriate.  But I just was confining myself to

17  saying, in this particular case, I think these conditions are

18  satisfied, and that's sufficient to justify the use of wage

19  share.

20          THE COURT:  Thank you.

21  BY MR. DAVIS:

22  *Q.* So let's turn to the third criterion in which I think you

23  were already discussing a bit.  What is the third criterion?

24  *A.* I mean, the third criterion is that you -- you -- there's a

25  tight link between the work of a particular group of workers, in

—2:15-cv-01045-RFB-PAL—

1  this case the fighters, and a particular revenue stream, in

2  particular the revenue stream for an event.  And, you know, that

3  condition is satisfied in this case.

4  *Q.*  Okay.  Could you just -- for background and so we're all on

5  the same page, can you give an example when the third criterion

6  is not satisfied?

7  **A.**  Yes, for example, in many situations when you buy a good or

8  a service, you're not very -- you're not at all interested in

9  who's providing that service or who's making that good.  In my

10  report I give the example of wait staff in a restaurant, you

11  know, who -- well, who was the software engineer who made my

12  iPhone?  I don't really know.  I don't really care, to be

13  honest.

14          THE COURT:  You can't charge more or less based upon

15  who actually made your iPhone.

16          THE WITNESS:  It's about, you know, the product is the

17  iPhone, and the quality of the product which it determines how

18  much, you know, you pay for it.  But, here, you know, the

19  product -- as I think has been said, the product in a way is the

20  fighters.  The people paying to watch this care a lot about the

21  identity of the fighters.

22          THE COURT:  And are you satisfied that that is actually

23  an established sort of statistically significant input as it

24  relates to the revenue?  So, in other words, in terms of if you

25  look at the studies and things that have looked at the impact of

———2:15-cv-01045-RFB-PAL———

1  the fighters on the revenues here, you're satisfied that there's

2  a clear correlation and potentially even causation between the

3  particular fighter and revenue, increase or decrease in revenue?

4           THE WITNESS:  Yes.  I mean, I think there's a lot of

5  evidence to that effect.  We know that sports that are more

6  popular that generate more revenue pay their athletes more than

7  sports that are less popular with -- with less revenue.

8           So I think -- I mean, it's also not just, you know, my

9  opinion as an economist.  If we think about suddenly if I was

10 put on one of these cards, I was the identity of the person on

11 it, I have an awful feeling it wouldn't generate a great deal of

12 revenue.

13          THE COURT:  So you're saying you couldn't generate the

14 revenues that maybe Conor McGregor could is what you're saying.

15          THE WITNESS:  I have my doubts.

16          THE COURT:  All right.

17          MR. DAVIS:  Good.

18          THE COURT:  Go ahead, Mr. Davis.

19          MR. DAVIS:  Thank you, Your Honor.

20 BY MR. DAVIS:

21 *Q.*  Does that analysis, the use of wage -- why use of wage share

22 is appropriate with MMA athletes, apply to the most famous

23 professional athletes generally and MMA athletes in particular?

24 *A.*  Yes, it does.

25 *Q.*  And does it also apply to the less famous athletes?

─2:15-cv-01045-RFB-PAL─

1    *A.*  Yes, I believe it does.  I mean, they make a smaller

2    contribution to the overall revenues of the event, but

3    nonetheless they make some contribution.

4    *Q.*  Now, can you -- you said that one reason people pay to watch

5    an event, an MMA event, is the identity of the fighters.  How

6    does that relate to use of wage share?  Can you just connect

7    those two for me?

8    *A.*  Yes, I think you can think of the fighters -- the identity

9    of the fighters as contributing to the revenues of the event.

10   So they're responsible for a share of the revenues from the

11   event.  And wage share is what it says, it's a share as well.

12   *Q.*  Okay.  And how does the notion of proportionality between

13   the fighters' contributions to an MMA event and the revenues

14   from that event figure in?

15   *A.*  Well, I -- if we think about a particular event and the

16   fighter -- the fighters participating in that event, and

17   suddenly twice as many people pay to watch that event, or

18   perhaps the same number of people but they pay twice as much to

19   watch it, so the revenues have doubled, then the contribution of

20   those individual fighters to that revenue has also doubled in

21   that situation.

22   *Q.*  Okay.  And I think you prepared a slide, this slide,

23   explaining why you believe there's a proportional relationship

24   between event revenues and compensation.  Now -- so why don't

25   we -- I think you've addressed to some extent the first point

——2:15-cv-01045-RFB-PAL——

1  about the creation of a percentage of revenues by the pro -- by

2  the professional athletes.  What about the second point?  What

3  is that second point?

4  **A.**  Well, the second point is that if you look at the literature

5  on sports economics, you see widespread use of the wage share to

6  summarize, for example, look at issues about how changes in, for

7  example --

8          MR. ISAACSON:  Your Honor, Your Honor, I object.

9  There's no discussions of the sports economics articles in his

10  report.

11          THE COURT:  Overruled.  I'll allow this testimony and

12  Dr. -- and Professor Oyer can talk about it as well.

13          Go ahead, Professor Manning.

14          THE WITNESS:  Okay.  So I think that, you know, in a

15  lot of those literature on sports economics, they're using the

16  wage share.  They're using the wage share for the same sort of

17  purpose as Dr. Singer is, for example, in this case, to try and

18  assess changes in the competitiveness of the market.  A good

19  example would be the reserve clause from the sort of 1970s and

20  so on.  So this is just very widespread, very commonplace in the

21  academic literature of sports economics.

22  BY MR. DAVIS:

23  *Q.*  And what is the third basis -- your third basis for

24  concluding that the compensation of MMA fighters is proportional

25  to MMA event revenues?

2:15-cv-01045-RFB-PAL

1  *A.*  Well, I think what the -- Dr. Singer's regression produces

2  very sensible results in the sense that --

3        MR. ISAACSON:  Your Honor, again, this is not in his

4  report.  In fact, his report, at paragraph 29, does not say that

5  Dr. Singer confirms proportionality.  He says he assumes

6  proportionality.

7        THE COURT:  So I've read the report.  He talks about,

8  Professor Manning does, proportionality in various ways.  I

9  think it's consistent with what the report says.  Overruled.

10  I'll allow it.

11        Go ahead, Professor.

12        THE WITNESS:  I think that the fact that Dr. Singer's

13  regression produces very sensible credible results in that if --

14  in the sense that as the foreclosure share, a measure of Zuffa's

15  market power increases, the wage share goes down, I think that

16  also lends support to the view that proportionality is -- is

17  appropriate.

18        THE COURT:  Okay.

19  BY MR. DAVIS:

20  *Q.*  And what is the fourth basis you have for concluding there's

21  a proportional relationship between event revenues and

22  compensation in MMA?

23  *A.*  Well, I think Dr. Blair, in his testimony a few weeks ago,

24  essentially endorsed proportionality and the use of wage share.

25        MR. DAVIS:  So if I might, Your Honor, we are going to

—2:15-cv-01045-RFB-PAL—

1  rely on just one interaction between Your Honor and Dr. Blair,

2  which we think was actually quite extraordinary and important to

3  this analysis.  I think it will benefit from having

4  Professor Manning explain it and, of course, address any

5  questions Your Honor might have.

6          THE COURT:  Okay.

7  BY MR. DAVIS:

8  Q.  So the first paragraph, we don't need to read it word for

9  word, but if it's easier, you can look it over on the screen

10 next to you.

11          If you could briefly summarize -- so just for context,

12 briefly, Your Honor had asked Dr. Blair how he would go about

13 measuring the marginal revenue product of MMA fighters or of

14 boxers, and Dr. Blair candidly acknowledged he's a theoretician

15 or applied theoretician, not an empiricist.  But -- and then

16 Your Honor asked:  "Well, but as a matter of theory how might

17 you do this?"  And this is Dr. Blair's response to that query.

18          So -- excuse me -- the first paragraph, Professor

19 Manning?

20 A.  Yes.  In the first paragraph he's essentially saying that

21 what you would likely -- like to be able to do to measure the

22 marginal revenue product of a particular athlete is to have two

23 similar events that differ only in the presence of one athlete

24 or another.

25 Q.  Thank you.  And then what does --

—2:15-cv-01045-RFB-PAL—

```
 1          MR. DAVIS:  Thank you very much.
 2  BY MR. DAVIS:
 3  Q.  And then what does he say, if you could summarize briefly,
 4  in the second paragraph?
 5  A.  And he says then that if you substitute one athlete -- the
 6  examples he gives, I think, is a more famous -- Ronda Rousey is
 7  the more famous athlete -- in an event for a less famous athlete
 8  and you found that the revenues went up, that would be a measure
 9  of the marginal revenue product of --
10          THE COURT:  Which is the commonly understood way to
11  measure the actual --
12          THE WITNESS:  Exactly.
13          THE COURT:  -- appropriate wage -- competitive wage in
14  a market.  Is that right?
15          THE WITNESS:  Yes.  Exactly.  That's the reason it's
16  important, because that's what we think the wage would be in a
17  competitive market, the marginal revenue product.
18          THE COURT:  All right.
19  BY MR. DAVIS:
20  Q.  And what does this say about use of wage share to assess
21  marginal revenue product in this case?
22  A.  Well --
23          THE COURT:  I think it speaks for itself, Mr. Davis.
24          MR. DAVIS:  Okay.  Thank you.
25          THE COURT:  You made your point.
```

2:15-cv-01045-RFB-PAL

1          MR. DAVIS:  Thank you.

2          And, Your Honor, if you'll forgive my presumption, also

3    no need to ask about how this relates to proportionality?

4          THE COURT:  Well, I think it's clear why it relates --

5    how it relates to proportionality.  So, yes, there's no need to

6    ask that.

7          MR. DAVIS:  Good.  Thank you very much, Your Honor.

8    BY MR. DAVIS:

9    Q.  And then if we could -- we'll turn -- the next two slides

10   are briefer in terms of text.  But the next two slides -- and

11   that's -- then that's it for this particular passage.

12         So in slide 5 that you prepared, could you please

13   summarize what it is that -- the problem that Dr. Blair raises

14   for operationalizing this approach?

15   A.  Well, there he's sort of saying that the problem is that

16   when we compare events, we're not normally just substituting one

17   fighter out for another, there's lots of different people

18   involved in different events, and that makes it a bit more

19   complicated.

20   Q.  Thank you.

21         And then the last slide on this, I believe the Court

22   suggests a solution -- a potential solution, and then Dr. Blair

23   responds to that solution.  If you could just summarize.

24         THE COURT:  Well, Mr. Davis --

25         MR. DAVIS:  Okay.  Don't -- please don't summarize --

—2:15-cv-01045-RFB-PAL—

```
 1            THE COURT:  Well, no, no.  It speaks for itself.
 2            MR. DAVIS:  It does speak for itself.
 3            THE COURT:  I appreciate that, so --
 4            MR. DAVIS:  Yes.  Thank you, Your Honor.
 5  BY MR. DAVIS:
 6  Q.  So let me just ask, based on this testimony, what
 7  significance, if any, does it have for Dr. Singer's wage share
 8  regression?
 9  A.  Well, a regression is a statistical method that is designed
10  explicitly to solve this problem, to isolate the impact of one
11  factor on the outcome, in this particular case the wage share,
12  while controlling for other factors, when there are lots
13  different factors varying all of the time.  So the regression --
14  a regression analysis is exactly the solution to this particular
15  problem.
16            THE COURT:  And so you're saying in this case wage
17  share can also be an appropriate measure because you have enough
18  information or other controlling factors that you can put them
19  in the regression analysis and control for their contributions
20  to marginal revenue product?
21            THE WITNESS:  Exactly.
22  BY MR. DAVIS:
23  Q.  All right.  So in a sense, what Dr. Singer did is exactly
24  what Dr. Blair was hypothesizing would be an appropriate way to
25  proceed.  Is that fair?
```

2:15-cv-01045-RFB-PAL

1  *A.*  I think that's fair.

2  *Q.*  Okay.  Let me ask you a hypothetical.  If Zuffa or WME had

3  internal documents that predicted a consistent wage share over

4  time, even while event revenues were increasing dramatically,

5  would that tell you anything about whether Zuffa or WME believed

6  fighter compensation and event revenues are proportional?

7          MR. ISAACSON:  Your Honor, I object.  He reviewed no

8  documents for his report and said he reviewed no documents.

9  This is just --

10          THE COURT:  I think he's asking a hypothetical

11  question.  I take it as a hypothetical, Mr. Isaacson.  I don't

12  take it as a -- necessarily a comment on this.  So overruled.

13  I'll allow it.

14          Go ahead.

15          THE WITNESS:  Yes, if one saw that when there was a

16  projection of an increase in revenue and associated with that

17  was an increase in compensation in the same proportion such that

18  the wage share remains constant, that to me is the definition of

19  proportionality.  It's not just to me.  That is the definition

20  of proportionality.  So that would suggest that those companies,

21  you know, used proportionality in their own internal analysis

22  and projections.

23  BY MR. DAVIS:

24  *Q.*  Thank you.

25          And would -- is proportionality, as you've described

─2:15-cv-01045-RFB-PAL─

1   it, more consistent with Dr. Singer's use of wage share or
2   Dr. Topel's argument that wage share should not be used?
3   *A.*  It's more consistent with Dr. Singer's use and not with
4   Dr. Topel's.
5   *Q.*  And could you just briefly explain why that is.
6   *A.*  Well, in Dr. Singer's regression, which has wage share on
7   the left-hand side, if there is a doubling in revenue, there's
8   going to be a doubling in compensation.  So the wage share
9   remains constant.  They're both going to increase in the same
10  proportion.
11        In contrast, Dr. Topel, he has some regressions in
12  which he doesn't have event revenues at all anywhere in the
13  model.  In that case he would have that an increase in revenues
14  has no effect on compensation whatsoever.  So there's not a
15  proportionality between the two.  And then he also has some
16  regressions in which he does include event revenue in a
17  different way to Dr. Singer, but in those he finds there's a
18  very small effect of event revenue on compensation.  So that,
19  for example, a doubling of event revenue is only leading to an
20  8 percent increase in -- in compensation.  And that, then,
21  implies there's no -- no proportionality.  The wage share would
22  be falling in that case.
23  *Q.*  And I'm just going to turn to a slide.  I think you prepared
24  a slide that very simply demonstrates the difference in -- as
25  event revenues double, the change in wage share that Dr. Singer

1   predicts versus the change in wage share that Dr. Topel's

2   regression predicts.  Could you please just describe what you've

3   put in this slide.

4   **A.**   Yes.  So in this hypothetical example we're starting with an

5   event that raises $10 million.  The wage share is assumed to be

6   20 percent, which is about what it is with the challenged

7   conduct.  So the initial compensation of the fighters would be

8   2 million.

9          Then we want to compare that -- then we want to compare

10   that with another event that has twice the revenue, 20 million.

11   The Singer regression would imply that the compensation of the

12   fighters would also double, 2 million to 4 million, and the wage

13   share would remain at 20 percent.

14          In contrast, the Topel regression would imply that the

15   compensation only goes from 2 to 2.16 million, and that implies

16   that the wage share would go from 20 percent to under

17   11 percent.

18          THE COURT:  And why is that significant to you,

19   Professor Manning?

20          THE WITNESS:  And that's significant because -- well,

21   if we go back, for example, to that hypothetical example we

22   talked a bit about, the companies a minute or so ago, if the

23   companies were themselves predicting that when we double

24   revenue, we double compensation, the wage share remains

25   constant, that would be consistent with Dr. Singer's regression,

-2:15-cv-01045-RFB-PAL-

1  but it would not be consistent with Dr. Topel's regression.

2        THE COURT:  Okay.

3  BY MR. DAVIS:

4  Q.  So what -- I'd like to now switch topics to -- we've gone

5  through the sort of first two of Professor Manning's opinions,

6  that wage share can be appropriate and that it is appropriate in

7  this case.  And then the last major opinion is about concerns

8  about the wage level regressions as they've been done in this

9  case.  So I'd like to turn to that, if I may.  And that relates

10  to the last comment that you made, Professor Manning.

11        You've -- the opinion -- what is your third opinion

12  about the uses -- the regressions in this case that use wage

13  level as a dependent variable?

14  A.  My opinion is that they're inappropriate and the results

15  from them are unreliable.

16  Q.  And why is that?

17  A.  Well, I think there are two reasons why one would think

18  that -- that they're not very plausible.  The first is that

19  there's really a very weak link, as we've just been discussing,

20  between the event revenues and compensation.  And we know, for

21  example, that sports that generate more revenue have much higher

22  compensation and so on, and that's just not what something like

23  the Topel regression would imply.  He has a very weak or no link

24  between revenues and compensation in his regressions.

25        So I think that when he saw that as his result, in some

—2:15-cv-01045-RFB-PAL—

 1  sense an alarm bell should have gone off in his mind that

 2  there's something not quite right here.  And then thinking

 3  about, well, what's not quite right, I think the technical

 4  problem there is with his regression is a problem that's known

 5  as endogeneity bias, and that causes the results of his

 6  regressions to be unreliable.

 7  Q.  So let's turn to a slightly more technical explanation of

 8  endogeneity bias and why you have concluded that it arises in

 9  this case.

10          MR. DAVIS:  Your Honor, I know you've already shown

11  great sophistication about regressions.  I won't -- with your

12  permission, I'll skip over describing portions of this

13  regression that -- that would no doubt be obvious to you.

14          I'll just note, so this is a simplified version of

15  Dr. Topel's regression.  The wage level is the dependent

16  variable.  We've noted some of the key independent variables,

17  foreclosure share, event revenues, and there's a bunch of others

18  and they all have a coefficient, and then there's the residual.

19  So that's just what we're looking at so that we can use that as

20  a point of departure for this discussion.

21  BY MR. DAVIS:

22  Q.  So, Professor Manning, what is endogeneity -- endogeneity

23  bias as it is relevant to this context, if you could describe it

24  sort of generally?

25  A.  I mean, endogeneity bias in general is that there's a

2:15-cv-01045-RFB-PAL

1  correlation between the residual in the regression and one of

2  the independent variables on the right-hand side.  In this

3  particular case, I think the problem is that there's a

4  correlation between the residual and the event revenue that

5  Dr. Topel includes on the right-hand side.  And that

6  contaminates the whole regression.  It makes the whole

7  regression unreliable.

8  *Q.*  And so when you say the whole regression is unreliable, I

9  think that's clear; but just to be overly clear, as lawyers tend

10 to be, that means that the coefficient next to foreclosure

11 share, too, would be unreliable.  Is that fair?

12 **A.**  That's exactly -- exactly right.

13        THE COURT:  Well, not just the coefficient.  You're

14 talking about statistical significance of the alleged

15 independent variables, too, right, or not?

16        THE WITNESS:  Yes.  I mean, the whole -- every aspect,

17 the regression coefficients, the associated standard errors, it

18 all is, you know, contaminated and unreliable.

19        THE COURT:  So it's not just going to bias one aspect

20 or one particular factor, it will bias the entire equation.

21        THE WITNESS:  Yes.  That's a very important principle,

22 when we teach endogeneity bias in econometrics, that the problem

23 is not just confined to the variable that's correlated with the

24 residual; it contaminates the whole regression.

25 BY MR. DAVIS:

2:15-cv-01045-RFB-PAL

1  *Q.*  Now, you said that event revenues correlate with the
2  residual in Dr. Topel's regression or that you believe that
3  there's that correlation.  Could you just spell out a little
4  bit, you know, in a slightly more detailed way why you believe
5  that's so.
6  *A.*  Yes.  So if we think about Dr. Topel's regression, on the
7  left-hand side we have wage level as his compensation of the
8  fighters.  This is mostly set before -- almost entirely,
9  actually, it's set before the actual event.  And it's reasonable
10  to think that the compensation is set based on the revenue that
11  is expected to be raised from the event.

12          But he doesn't have expected revenue.  What he actually
13  has is actual realized revenue.  And this is going to vary.  On
14  average this might be very close similar to expected revenue,
15  but it's never going to be exactly the same.  They're going to
16  be -- you don't know how many people are going to sign up for
17  Pay-Per-View on the night, for example.

18          And what this means is that there's a slippage between
19  the actual realized revenue and the expected revenue, and that
20  slippage goes into the residual.  And as a matter of
21  construction, because in that residual we now have a bit of the
22  actual realized revenue, that inevitably is going to be
23  correlated with the actual realized event revenue, which is one
24  of the variables he includes in his regression.
25  *Q.*  And I think you've already made clear what that means for

—2:15-cv-01045-RFB-PAL—

1   the reliability of Dr. Topel's regression.  And I think you

2   addressed this, but should Dr. Topel have recognized the danger

3   of endogeneity bias in this way?

4   **A.**  I mean, my opinion is that he should.  But when he had such

5   a weak link between event revenue and compensation, that should

6   have set off an alarm bell in his mind that something was wrong,

7   and then he should have thought about that.

8   *Q.*  Okay.

9           THE COURT:  Could there have been other things that he

10  could have done as it relates to his regression analysis that

11  would have demonstrated that?  So, in other words, if he thought

12  that was the case, could he have used other statistical methods

13  in the modelling to have addressed them that you think he could

14  have done that he didn't do?

15          THE WITNESS:  I mean --

16          THE COURT:  So if he wanted to find out if there was in

17  fact a relationship between event revenue and wage level, would

18  there be additional regression tests that he could have run, you

19  think he -- that he could have run, excuse me, that he didn't?

20          THE WITNESS:  I mean, I think one of the big problems

21  actually when you've got endogeneity bias is that you don't

22  actually have a test of it.  So --

23          THE COURT:  You don't have?  I'm sorry.

24          THE WITNESS:  You don't have a test of it within the

25  data.  You can't check.  So when a -- when you run a regression

—2:15-cv-01045-RFB-PAL—

1   model, it produces an estimated residual and it forces that

2   estimated residual to be uncorrelated with your independent

3   variables, event revenue in this case.

4          THE COURT:  Right.

5          THE WITNESS:  And that's by -- that's just a feature of

6   regression analysis.  So you can't test whether that estimated

7   residual is actually correlated.

8          Now, there are different methods that one can use to

9   try and overcome this endogeneity bias.  I mean, Dr. Topel

10  didn't pursue any of those.

11         THE COURT:  Such as?

12         THE WITNESS:  Well, there's a method called

13  instrumental variables.  I'm not quite sure if you want to get

14  into the details of that.  But another method that you could use

15  is essentially what Dr. Singer did, which was to take event

16  revenue over to the left-hand side of the regression and use the

17  wage share.  And then if there's a correlation of that, the

18  variable on the left-hand side with the residual, that does not

19  cause these problems of bias and unreliability in the

20  regression.

21         So I think one of the solutions is really the solution

22  that Dr. Singer used, which is to use a wage share regression.

23         THE COURT:  Okay.  Thank you.

24  BY MR. DAVIS:

25  Q.  And would another solution to this endogeneity problem be to

—2:15-cv-01045-RFB-PAL—

 1   simply eliminate event revenues from the regression entirely,

 2   take it out of the right side, but not place it on the left side

 3   either?

 4   *A.*   No, I think that would be wholly -- wholly inappropriate

 5   because we know -- I mean, I said earlier that we have sports

 6   that have more revenue, have higher compensation.  So we sort of

 7   know there's a link between revenue and compensation.  And if

 8   you just leave revenue out of the regression, you might not have

 9   an endogeneity bias, but you have a different sort of bias,

10   what's known as omitted variable bias.  You've left out the

11   variable that's highly relevant to this determination of

12   compensation.

13   *Q.*   Okay.  One more question, which is pretty technical in this

14   subject, and then we'll be done.

15          THE COURT:  You have about three or four minutes left,

16   Mr. Davis.

17          MR. DAVIS:  Three or four minutes left.  Okay.  I

18   think, then, this may be close to where we end.

19          THE COURT:  Okay.

20   BY MR. DAVIS:

21   *Q.*   So, this is a slide you created showing a simplified version

22   of Dr. Singer's regression.  And here we have wage share as the

23   dependent variable, not wage level.  And we no longer have event

24   revenue on the right-hand side as an independent variable.

25   Otherwise, they're very similar.

1          Now, one of the things that Zuffa has argued is that

2  because Dr. Singer, in some of his specifications of his

3  regression, uses revenue weighting on foreclosure share, that

4  his regression, at least those regressions, suffer from

5  endogeneity bias.  Now, is that a fair criticism?

6  **A.**  No.  I mean, I think there are three reasons why that's not

7  a fair criticism.  The first is that on the left-hand side here

8  he has event specific revenues.  And when he does the weighting,

9  he's never using event specific revenues.  He's using the annual

10  revenues of Zuffa as a whole and relative to other MMA promoters

11  in the market.

12          Secondly, when he sort of investigates whether this is

13  a problem, one of the things he does is he fixes the revenue

14  weights over time.  So now they're completely fixed.  So there

15  just cannot be a relationship with the event specific revenue on

16  the left-hand side.  He finds the results are very similar.

17          And, thirdly, he looks at other measures of the

18  foreclosure share that don't use revenue weights.  They used

19  ranked weights or unweighted.  And, again, he finds that the

20  results are very similar.

21          So I think all of that points to the conclusion that

22  this is not a serious problem.

23          MR. ISAACSON:  And for the record, Your Honor, I have

24  to object to all of that because none of that endorsement of

25  Dr. Singer's regression or analysis of it was in his reports.

1          THE COURT:  He does endorse Dr. Singer's reports.

2          MR. ISAACSON:  Not --

3          THE COURT:  Are you saying in this particular

4   explanation that he just provided?

5          MR. ISAACSON:  Yes, yes.

6          THE COURT:  Okay.  I'll go back and -- take that under

7   advisement.  I'll go back and look at that.  Thank you,

8   Mr. Isaacson.

9          MR. DAVIS:  I would also point out that this particular

10  criticism exists in none of Zuffa's expert reports.  This came

11  up for the first time at the hearing, this particular argument,

12  this general claim about endogeneity.  So we are responding in

13  kind only.

14         THE COURT:  Okay.

15         MR. DAVIS:  And I think with that, I will -- I'm

16  complete -- I've completed my direct examination of

17  Professor Manning.

18         Professor Manning, you should, I think, remain there.

19         THE WITNESS:  Yeah.  No, I just wanted to get myself

20  some water.

21         MR. DAVIS:  Thank you very much, Your Honor.

22         THE COURT:  Go ahead, Mr. Isaacson.

23         MR. ISAACSON:  Good morning, Your Honor.

24         Good morning, Professor.

25         Can we look at paragraph 6 of your report, footnote 7.

```
                        2:15-cv-01045-RFB-PAL
```

 1                  CROSS-EXAMINATION OF ALAN MANNING

 2   BY MR. ISAACSON:

 3   Q.  All right.  Now, you outlined the three criterion.  We won't

 4   go through those again.  With respect to the third criterion,

 5   your conclusion is that's satisfied if a firm's revenue, such as

 6   event revenue in MMA, is proportional to the marginal revenue

 7   product of a worker or group of workers, for example, the

 8   fighters or group of fighters in MMA.

 9          That's how that third criterion is satisfied.

10   A.  Can I just remind myself of what exactly I wrote in the

11   context in that paragraph?

12          I think what I would say about that is that I think

13   that's sufficient, as I said earlier in my testimony today, but

14   it's not a necessary condition.  So I thought it was satisfied

15   in this particular case, and so that supported it; but it's not

16   that if this wasn't satisfied you couldn't use wage share.

17   Q.  Okay.  And the -- and you concluded that -- if I can call

18   that proportionality, for shorthand.

19   A.  Okay.

20   Q.  You concluded that proportionality was plausible in this

21   case.  If we can look at paragraph 24 of your report, the last

22   sentence.

23   A.  Yes.

24   Q.  All right.  You conclude that the marginal revenue product

25   of an MMA fighter is plausibly proportional to event revenue,

─2:15-cv-01045-RFB-PAL─

1  correct?

2  *A.*   Correct.

3  *Q.*   And you cite your authorities for that in your report,

4  correct?

5  *A.*   I'm sorry.  I can't ...

6  *Q.*   Any authorities you had for that you laid out in your

7  report, correct?

8  *A.*   I would not say I laid out the totality of support for that.

9  That would be an extremely long list, because I think this is

10 very well attested.  I laid out enough that I thought made --

11 made the case.

12 *Q.*   So you certainly laid out the most important factors that

13 made the case?

14 *A.*   I laid out factors that I thought were sufficient to make

15 the case.

16 *Q.*   All right.

17 *A.*   I mean, I'm not saying that there aren't -- are not other

18 ones that one could have made.

19 *Q.*   All right.  And the -- and that's a conclusion -- this

20 plausibility conclusion is something that you state several

21 times in your report, right?  Paragraph 30.

22 *A.*   Let me have a look.

23         Yes, I used the word "plausibly" there.

24 *Q.*   Right.  And in fact, in your conclusion, you also say it's

25 reasonable.

1  *A.*  Yes.

2  *Q.*  All right.  Now, in this case, you believe that the

3  statement that fighter marginal revenue product is proportional

4  to event revenue.  That's a plausible and reasonable

5  hypothetical.

6  *A.*  I mean, I think it's well supported by the evidence.  I

7  mean, in my testimony earlier I went through the four pieces --

8  you know, distinct threads of evidence that I think supported

9  that proportionality.  I can -- I mean, if I can repeat them,

10 they would be firstly that thinking about the economic

11 principles, which is that, you know, if you double the amount of

12 people watching the event, you double the revenues, you double

13 the marginal product, that's proportionality.  There's a lot of

14 attestation, support for the use of this in the sports economic

15 literature.  That Dr. Blair's testimony, you know, really

16 essentially endorsed proportionality.  That the results of

17 Dr. Singer's regressions were very plausible.  That also lend

18 support to proportionality.  And when we talked about

19 hypothetical company documents, if there were such a document,

20 that would also support proportionality.

21      So I think there is a very large amount of evidence to

22 support that hypothesis of proportionality.

23 *Q.*  And so look -- so for under -- based on what you just said,

24 if event revenues double, then fighter MRP doubles, right?

25 *A.*  Yes.  I mean, on average that is going to -- going to be the

———2:15-cv-01045-RFB-PAL———

1  case.

2  *Q.*  So paragraph 27 of your report, you say just that.  Now when

3  you wrote that, you considered that to be a hypothetical, right?

4  *A.*  I -- I'm sorry.  I don't quite understand what you mean

5  by --

6  *Q.*  What I'm getting at here is that today you've said there's

7  evidence.

8  *A.*  Yeah.

9  *Q.*  But in your report you reach the conclusion that

10  proportionality was plausible, and you described it and you

11  considered it to be a hypothetical, a plausible hypothetical.

12  *A.*  No, I don't think that is fair at all.  I mean, I think that

13  the first of my, you know, bits of evidence that I said support

14  proportionality was a sort of hypothetical think about what

15  happens if twice as many people pay for an event.  That is a

16  hypothetical.

17       But when we went to the other pieces of evidence, when

18  we're talking about the use in the sports economic literature,

19  when we're talking about the sensible Dr. Singer regression,

20  when we're talking about, you know, the fact that perhaps

21  companies themselves assume proportionality, this is not just

22  hypotheticals.  These are actual pieces of evidence.

23  *Q.*  Well, when I asked you about this at your deposition -- let

24  me -- let me -- if we can go to your deposition.

25       And do you have your deposition there?

—2:15-cv-01045-RFB-PAL—

1   *A.*   I do, yes.

2   *Q.*   Page 93, line 14.  And I'm discussing proportionality in

3   paragraph 27 of your report that we were just looking at.  And I

4   ask you:  "Is that a hypothetical" -- referring you to paragraph

5   27.  "Is a hypothetical you're discussing.  Is that correct?"

6        And you say you haven't worked with the data in this

7   case.  "I mean, so it's hypothetical, but I think, you know,

8   it's a very plausible, reasonable hypothetical."

9        Okay.  Before today, what you -- when you've talked

10   about plausibility in the report, you were considering this to

11   be a plausible, reasonable hypothetical.

12   *A.*   No, I don't -- I don't think that's fair.  I mean, I think

13   if you look at my prior answer to that, I would say that there

14   I'm talking about -- and, perhaps, I can read it out.  Is the

15   first sentence in paragraph 27 is, you know, inviting them to

16   think about a hypothetical situation in which event revenue

17   doubles.

18        So that is what I just said a minute ago, that first

19   thinking about the economic principles behind proportionality.

20   That is a hypothetical, but the other elements that I talked

21   about to support proportionality, those are not hypotheticals.

22   *Q.*   Well, let's move -- I mean, you want the first -- the full

23   context there.  Let's move up earlier on the page.  I ask you:

24   "Do you have an opinion" -- at line 4:  "Do you have an opinion

25   as to whether the marginal revenue product of inputs to events

2:15-cv-01045-RFB-PAL

1  other than the athlete is proportional to event revenue" --

2  **A.**  Sorry.  I'm not entirely sure what page we're on now.

3  Q.  Oh, same page there, page 94.

4  **A.**  Oh, 94 now.  So we've gone over to -- because we were on 93

5  I thought.

6  Q.  Oh.  Oh.  I'm sorry.  You're right.

7          THE COURT:  I'm sorry, Mr. Isaacson.  Which -- you have

8  something on the screen.  I'm not sure if that's what you're

9  talking about.

10          MR. ISAACSON:  Right.  No, I mixed up my pages there.

11  That was my fault.

12          THE COURT:  That's all right.

13  BY MR. ISAACSON:

14  Q.  All right.  Well, let me move on.  I'll come back.

15          I do want to ask you, then.  And as of the time of your

16  report, you considered proportionality to be an assumption of

17  Dr. Singer, right?

18  **A.**  When he estimates a wage share regression, that is -- yes,

19  that is imposing proportionality on the data.  But, you know, if

20  we ask ourselves is that a plausible -- a reasonable thing to

21  do, the answer is yes for the four or five reasons that I've

22  given so far today.

23  Q.  All right.  I just -- I think we're getting on the same page

24  here.  All right.

25          His regression is imposing proportionality on the data,

1  correct?

2  **A.**   I mean, it is imposing proportionality, but it implies that

3  if revenue, for example, doubles, other things equal,

4  particularly the challenged conduct, compensation will double.

5  Q.  Right.  And you consider that a reasonable and plausible

6  thing to do.

7  **A.**   I consider it -- yes.  I mean, I'm not quite sure what the

8  words "reasonable" and "plausible" mean in a technical sense.  I

9  think it's the right thing to do in this case.  Let me just put

10  it that way.

11  Q.  And there was --

12         THE COURT:  Why is that?

13         THE WITNESS:  Well, that's the --

14         THE COURT:  The four factors you talked about.

15         THE WITNESS:  -- factors I talked about earlier today.

16  BY MR. ISAACSON:

17  Q.  But there was nothing in your report that shows that event

18  revenue is proportional to marginal revenue product, correct?

19  **A.**   I referred to, you know, for example, this hypothetical and

20  these other things, but I'm not doing empirical tests in my

21  report.  That's not been part of my opinion.

22         THE COURT:  How would you test for that?  If you were

23  going to test for it.

24         THE WITNESS:  Well, I think ideally what you would like

25  to do is to find -- if you could find, for example, a source of

1  variation in event revenue, expected event revenue, that didn't

2  suffer from the problem that I thought the measure used in this

3  case, and then you would look to see whether there's

4  proportionality in that case.

5       But I do think it's highly relevant that when you sort

6  of look across different sports with very different levels of

7  revenue, you see -- if they've got similar sort of degree of

8  competition, you see a similar level of the wage share, which

9  implies that the wage differences are in proportion to the

10  revenue differences.

11       THE COURT:  And isn't one of the challenges, at least

12  in this case it seems to me to be, that you don't have good data

13  on what a competitive absolute wage level would be for a

14  similarly situated fighter.  And is that part of the challenge I

15  think you talked about as relates to the data here, which is

16  that in another analyses you might actually have a wage level

17  where there's not alleged monopsonistic power, and then you

18  could use that potentially to do some analysis.

19       And isn't the challenge here that you don't seem to

20  have, or at least there's not an agreed-upon sort of competitive

21  wage level that can be used in the analysis here?

22       THE WITNESS:  Yes.  I mean, I think that's it --

23  exactly it.  We observe actual compensation, but we don't really

24  observe what compensation would have been in the absence of the

25  challenged conduct.  So I think what we're trying to do -- so

 1  what, for example, Dr. Singer is trying to do here is to take,

 2  you know, take -- construct a measure of how much monopsony

 3  power that Zuffa has, which is his foreclosure share.  And then

 4  see whether the wage -- when the foreclosure share is higher, so

 5  if Zuffa has more monopsony power, whether the wage share is

 6  lower.  And he confirms that that's the case.

 7        But, you know, the ranges of the foreclosure share

 8  observed in the data, I don't think one would want to -- I would

 9  want to say that any of them represent a perfectly competitive

10  market.  They're just different degrees of monopsony.

11        THE COURT:  Okay.  Thank you.

12  BY MR. ISAACSON:

13  Q.  All right.  And in order to show that event revenue is

14  proportional to marginal revenue product, you would need to do

15  empirical work with the data, correct?

16        THE COURT:  Well, but how would you -- I don't

17  understand how you would do that if you don't have the actual

18  wage -- which is my question to him, Mr. Isaacson, which is

19  how -- how could any of the experts do that in this case if they

20  don't have a competitive wage level in which to be able to

21  determine the accurate proportionality or not of the event

22  revenue to the wage level.  I'm not sure I'm understanding what

23  you're saying would be tested.

24        MR. ISAACSON:  I don't think that that is necessary for

25  proportionality.

―2:15-cv-01045-RFB-PAL―

1          THE COURT:  Okay.  So maybe I'm misunderstanding you,

2  then.

3          MR. ISAACSON:  Right.  I'm now just talking about the

4  proportionality of the contribution of the fighters to event

5  revenues.  And -- which is his -- which is what he says in

6  footnote 7, which does not -- doesn't go to competitive

7  wage/noncompetitive wage.

8          THE COURT:  So when you're talking about -- I'm sorry,

9  maybe I misunderstood you.

10          MR. ISAACSON:  So what he has said -- and so now we are

11  talking about whether that's been proven in this case.

12          THE COURT:  Whether what's been proven?  Because --

13          MR. ISAACSON:  Whether proportionality.

14          THE COURT:  Okay.  Proportionality of what to what?

15  Again, I just want to make sure we're talking about --

16          MR. ISAACSON:  Just -- footnote 7, so we just get it

17  exactly right.

18          Event revenue in MMA is proportional to the marginal

19  revenue product of a worker or group of workers in MMA.  That's

20  the proportionality that I'm talking about.

21          THE COURT:  Right.  And at least I understood

22  Professor Manning's testimony to be that -- that this

23  proportionality he believes is appropriate because of the nature

24  of the industry and what you see in other sports in relation to

25  the marginal revenue product of the workers in sports.

2:15-cv-01045-RFB-PAL

1        That's what I thought you were saying.  Is that right?

2        THE WITNESS:  Yes.  And I think there's more evidence

3 than that, actually, but that's certainly an important part of

4 it.

5        THE COURT:  So this -- that was one of the four reasons

6 why you thought this was appropriate.

7        MR. ISAACSON:  And I would like a test what he's

8 saying, was my question.

9        THE COURT:  Okay.  Okay.  We're on the same page.  I

10 just wanted to make sure we're talking about -- okay.  Go ahead.

11        MR. ISAACSON:  All right.

12 BY MR. ISAACSON:

13 *Q.*  In order to show that event revenue is proportional to

14 marginal revenue product, you would have to do empirical work

15 with the data, correct?

16 *A.*  No, I don't agree with that.  I mean, we've just given the

17 example in which looking at other sports which are judged to be

18 comparable in something, that's relevant information.  Looking

19 at an internal company document that projected increases in

20 revenue and increases in compensation in proportion, that would

21 be relevant to it.

22 *Q.*  Let me ask you --

23 *A.*  It's not just -- I mean, obviously, it adds something to it,

24 but it's not just this.

25 *Q.*  So if I can ask you to look at your deposition, page 84,

─2:15-cv-01045-RFB-PAL─

1  line 18.

2         So I ask you:  "Is there anything in your report that

3  shows that event revenue is proportional to marginal revenue

4  product?"

5         And you answer:  "I mean, I haven't worked with the

6  data, so, I mean, that would require working with the data."

7         And I want to ask you to look at page 90, line --

8         THE COURT:  So, I'm sorry, what did you mean by that,

9  then?

10        THE WITNESS:  Can I just take -- sorry -- take a moment

11 to understand a bit what the lead and then context was for that?

12        THE COURT:  Sure.

13        MR. ISAACSON:  And he gives the identical answer again.

14 I'd like him to see both, if that's possible, to save time.  If

15 we could look at page 90, line 24, through 91, line 13.

16 BY MR. ISAACSON:

17 Q.  "Have you done any work in this case -- have you done any

18 work reflected in your report that shows that in order for event

19 revenue to double, the marginal revenue product of athletes has

20 to double?"

21        You say:  "I mean, I haven't studied, you know, the

22 data, the particular situations, so I haven't got an opinion on

23 that."

24 *A.*  Well, I think that I would go back to saying that look --

25 working with the data in this case is part of it.  But I think

————2:15-cv-01045-RFB-PAL————

1  that, for example, the material in Dr. Zimbalist's report

2  looking at those other sports is highly relevant.  So to the

3  extent that I -- you know, I didn't -- I failed to list that

4  there, I think that I would say that I misspoke in that.

5  Q.  Well, you told me that you didn't have an opinion on this

6  issue in the absence of working for data -- absence of working

7  with the data, correct?

8  **A.**  No, I expressed the view in my report that I think that

9  proportionality is a reasonable assumption in this case.

10  Q.  Yes, a reasonable assumption.  Let me ask you to look at

11  your deposition at page 60, lines 10 through 18.

12         I ask you:  "And is it your opinion that the record in

13  this case -- I ask you about the record in this case -- makes it

14  possible to ascribe a measurable part of a firm's revenue to the

15  activities of a particular worker?"

16         Answer:  "I have -- I mean, I've not been asked to

17  express an opinion about that.  I've not given thought to that,

18  so I don't have an opinion on that."

19         Right.  Prior to today, you have not expressed any

20  opinions or done the work necessary to express any opinions

21  about whether that proportionality assumption has been met.

22  Aren't I right about that?

23  **A.**  No, I think you're wrong.  I mean, I think if I look at the

24  question that you're asking there, you're asking about whether

25  it's possible to ascribe a measure -- measurable -- sorry,

2:15-cv-01045-RFB-PAL

1   Your Honor -- whether it's possible to ascribe a measurable part
2   of a firm's revenue to the activities of a particular worker.
3   And I think in trying to answer that question I was saying -- I
4   was paying attention to that word "particular," in that case,
5   when we're often talking about the, you know, the collective of
6   the workers here.
7   Q.  All right.  I asked you the same question about groups.
8   Let's look at paragraph -- line -- page 62, line 22.
9   A.  Sorry, 62?
10  Q.  Beginning at line 22.
11  A.  Yeah.
12  Q.  I have this habit of saying right or all right before I ask
13  a question.
14          So as part of your report, you did not do any work to
15  allow you to conclude that a measurable part of a firm's revenue
16  can be attributed to any group of UFC fighters.  Is that
17  correct?
18  A.  I mean, I did not do --
19  Q.  Okay.  Let's just --
20          THE COURT:  Okay.  Let him -- let him explain the quote
21  so I can understand the context.
22          Go ahead, Professor Manning.
23          THE WITNESS:  Yeah.  So wait a minute.  Let me just
24  sort of --
25  BY MR. ISAACSON:

─2:15-cv-01045-RFB-PAL─

1   *Q.*  Please read through line 21 where you conclude you did

2   not -- where I asked you:  "You did not try to measure the

3   amount of that connection.  Is that correct?"

4        "I have not worked with the data in that case."

5        You also tell me you're repeating what you said

6   earlier --

7        THE COURT:  Hold on.  Hold on.  Mr. Isaacson, hold on a

8   second.  So let me just clarify something.

9        Professor Manning, were you asked to do any statistical

10  analysis in this case?

11       THE WITNESS:  No, I was not.

12       THE COURT:  And so, perhaps, you could help me

13  understand when you're saying you didn't work with the data,

14  what does that mean in the context of the answers to these

15  questions?

16       THE WITNESS:  I mean, what I would say is that if you

17  look at my answer above that, say at line 18, I'm referring

18  to -- I mean, Dr. Singer is the one who's done the work with the

19  particular --

20       MR. ISAACSON:  I apologize for interrupting.  What

21  page --

22       THE COURT:  Well, wait, Mr. --

23       MR. ISAACSON:  I just want to know what page he's on.

24       THE WITNESS:  The same page, 62.

25       MR. ISAACSON:  62.  Thank you.  I apologize for

—2:15-cv-01045-RFB-PAL—

1   interrupting.

2          THE COURT:  No, no, that's all right.  I'm trying to

3   track both of you, so it's hard for me to do that.  That's a

4   good clarification.

5          THE WITNESS:  Okay.  So, you know, there I say,

6   starting line 18, if -- sorry, let me read this out.

7          "If one takes Dr. Singer's approach, he's seeing how

8   variation in the foreclosure effect affects the worker's share,

9   all things being equal."

10          So what I'm doing is affirming the support -- affirming

11  my support for the work that Dr. Singer has done, but I myself

12  has not -- have not done that work in this particular case.

13  BY MR. ISAACSON:

14  Q.  And up until now -- up until today you -- because you had

15  not been able to work with any of the data, you had not

16  expressed an opinion about whether individual fighters or a

17  group of fighters ... whether you can -- whether you could tie

18  to an individual or group of fighters a measurable part of the

19  firm's revenues.

20          And I may not have said that great, but I think you

21  understand what I'm getting at.

22          THE COURT:  I'm sorry.  Was this produced before or

23  after his report?  I mean, was this -- was this deposition taken

24  before or after his --

25          MR. ISAACSON:  After his report.

—2:15-cv-01045-RFB-PAL—

 1          THE COURT:  Because I thought the report says that.  So

 2   are you talking other than the report?

 3          Because in his report he talks about how specifically

 4   he thinks that there's something unique about MMA and sports

 5   such that a particular fighter can actually have an impact on

 6   the event.  So I'm not sure if you're talking about something

 7   apart from what he puts in the report, Mr. Isaacson.

 8          MR. ISAACSON:  I'm talking about what's in his report.

 9   The deposition takes place after the report.  I'm going to get

10   to the only thing he cites to in his report to support what

11   you're talking about, Your Honor.

12          THE COURT:  Okay.  All right.  So --

13          MR. ISAACSON:  Okay.

14          THE COURT:  -- because I just remember that from the

15   report.  So you're going to get to that part --

16          MR. ISAACSON:  I think it's quite -- it's quite clear

17   that in his report he uses a plausibility standard or a

18   reasonability standard.

19          THE COURT:  Well, that's your view.  I have to decide

20   that, but okay.

21          MR. ISAACSON:  I understand that.  But since he wrote

22   it several times, I don't think I'm overstepping in saying that.

23   I spent time on his deposition with that, and he says doesn't

24   have an opinion about whether those things have been proven

25   because -- and he wasn't asked to have that opinion and to have

2:15-cv-01045-RFB-PAL

 1  that opinion he would have to -- he would have to look at the

 2  data and work with the data.

 3          THE COURT:  Okay.  So if you want to ask about that,

 4  that's fine.

 5          MR. ISAACSON:  Okay.  Well, let's go -- let's look at

 6  this proof.

 7          THE COURT:  Here's one thing I want to do.  When you

 8  say proof in the context of being an econometrician or

 9  statistician, what does that mean to you?  Because certainly in

10  the context of the law, it has a very different potential

11  meaning.  So what would you need to have as a finding in order

12  for you to be able to say something has been proven or clearly

13  demonstrated?

14          THE WITNESS:  Uhm.  I think if we're looking at a

15  regression analysis, one would be looking for, you know,

16  statistical significance of the coefficient on the variable of

17  interest.  In this case it's foreclosure share.

18          But I do think it's important that, you know, when I

19  use the word "reasonable" and "plausible" in expressing myself,

20  I'm not a lawyer.  And if those terms have a particular meaning,

21  I'm not aware of what those are.

22          THE COURT:  Well, that's why I'm asking you a question

23  about what -- what you meant, and that's what I think

24  Mr. Isaacson's questions are about, which are fair questions.

25  Which is, what do you mean when you say plausible?  Is that

 1  saying that you have some doubt about whether or not there's a

 2  connection or not?  Or is that simply your way of saying that

 3  you think that there's a strong relationship, but you're not

 4  going to say that it's absolute?

 5          So it's hard for us -- as lawyers, it has particular

 6  meaning, but you're not a lawyer.  So what does it mean to you

 7  when you use the word "plausible" and "reasonable" in this

 8  context?

 9          THE WITNESS:  I think it's -- in this particular case,

10  as a social scientist, I think I would be very reluctant to say

11  that any question is settled beyond, you know, any doubt

12  whatsoever.  So in that sense, I think that, you know, you have

13  to always be open.  You know, you're trying to use all the

14  information that you've got, and I've described different sorts

15  of information here that I was using, as best -- best you can.

16          In this case, I think it all adds up to a very strong

17  case.  I think there may be an element in here that when I use

18  the word "plausible" and "reasonable," there's a little bit of

19  British understatement in there.  We're sort or not -- we tend

20  not to sort of lay it on a little bit thick.  So I would just

21  ask, perhaps, to bear that in mind.

22          THE COURT:  Okay.  Go ahead, Mr. Isaacson.

23  BY MR. ISAACSON:

24  Q.  But stepping back from -- you know, I did spend time on this

25  question at the deposition.  At your deposition, you do agree

1    with me that you told me that you had no opinion about how much

2    revenue could be ascribed to fighters, either individually or a

3    group, and that in order to have that opinion, you would have to

4    work with the data.

5    A.   No, I mean I think that what I would say is that in this

6    case, for example, working out what the impact of the challenged

7    conduct is on the fighters, it's Dr. Singer who's help dealt

8    with that bit of the case.  That has not been part of my

9    assignment.  It has not been part of my opinion.

10   Q.   But with respect to that part of the case, Dr. Singer's

11   regression, as you agreed, imposes proportionality.  The -- with

12   respect to proving proportionality, whether there is a

13   relationship between the efforts of an individual fighter or a

14   group of fighters that's proportional to event revenue, whether

15   there's what you call that tight link, you did not have an

16   opinion about whether that was true or not at your deposition,

17   and you said you would -- in order to have that opinion, you

18   would have to work with the data.

19            I have that correct, don't I?

20   A.   No, I don't think that's fair at all.  For example, we've

21   been talking earlier about one of the elements that I've talked

22   about today, which is this hypothetical or thinking about if you

23   double revenue, what happens to the marginal revenue product,

24   and that the marginal revenue product would double.  And that,

25   you know, we've been talking about it earlier today, and that is

1  very clearly in the record in my deposition.

2  *Q.*  Yes.  It's a hypothetical.

3  **A.**  That part of it is.  As I mentioned the other bits, the

4  comparisons with other -- the use in other sports, you know,

5  parts of sports economics.

6  *Q.*  Well, the comparison to other sports in your report -- can

7  we look -- you do one comparison, right?  That's your

8  footnote 28.

9  **A.**  Let me have a look.  Sorry, what page is that on?

10  *Q.*  Let's see.  Paragraph 27, note 28.  So that would be

11  paragraph -- yes, page 6.

12  **A.**  No, I don't think that that's fair.  For example, one of

13  the -- if we looked at one of the materials that I relied on in

14  this -- excuse me while I just get this ...

15          THE COURT:  Sure, take your time.

16          THE WITNESS:  I think it's the last one.  Yes, it

17  should be.  I -- one of the pieces of the academic literature

18  that I relied on was this survey by William Boal and Michael

19  Ransom in 1997 called Monopsony in the Labor Market.  And that

20  summarizes a lot of literature from the sports economics.  And

21  in my report, when I refer to that article, I say -- I refer to

22  the fact that they are using many articles from sports

23  economics.  I mean, perhaps, it would take me a little bit of

24  time to find exactly the paragraph where I -- where I do that.

25  BY MR. ISAACSON:

───2:15-cv-01045-RFB-PAL───

 1  *Q.*  All right.  So you would agree with --

 2  ***A.***  I mean, I --

 3           (Court reporter clarification.)

 4  BY MR. ISAACSON:

 5  *Q.*  I'm sorry.  Are you finished?

 6  ***A.***  I'm sorry.  I'm saying I'm sure I can find that.  I can't

 7  put my finger on it right this minute.

 8  *Q.*  You're trying to find what?

 9  ***A.***  Where I refer to the Boal and Ransom paper and the fact that

10  it has extensive references to papers from sports economics in

11  the context of monopsony.

12  *Q.*  All right.  And the --

13           MR. DAVIS:  If I may, if you might look at paragraph 16

14  of your report on page 3.

15  BY MR. ISAACSON:

16  *Q.*  All right.  And you would agree with me with respect to just

17  that footnote separate from the Boal and Ransom piece, that all

18  you're pointing to there is a boxing event with Floyd -- with

19  Floyd Mayweather and Conor McGregor.

20  ***A.***  I mean, that footnote refers to that, but that is not -- it

21  is not my view that the only part of the sports economics

22  literature or what's happening in professional sports, that it's

23  only that fight that is relevant to this case.

24  *Q.*  All right.  And you would agree with me that article does

25  not demonstrate proportionality.

--2:15-cv-01045-RFB-PAL--

1  *A.*  I -- excuse me while I just sort of look at the -- remind

2  myself the context in which I was writing that footnote.

3      I mean, I think I'm making -- the point there is simply

4  that I'm saying the identity of the fighters matters --

5  *Q.*  Yes.

6  *A.*  -- to how much revenue it generates, and then there'll be a

7  link to the compensation of the workers.  It follows from that.

8  *Q.*  And do you not cite the Boal and Ransom survey in

9  paragraph 16 as showing proportionality, correct?

10  *A.*  I'm citing the Boal and Ransom paper partly because it's a

11  survey that summarizes a lot of papers on monopsony to that

12  date.  That's not part of -- for example, I didn't -- when I was

13  laying out my arguments earlier in my testimony about why

14  there's proportionality, I did not refer to Boal and Ransom.

15  *Q.*  Right.  You're not aware of Boal and Ransom supporting a

16  proportionality assumption, correct?

17  *A.*  Well, Boal and Ransom is a survey of what had been done on

18  monopsony, a lot of it in professional sports to that point.  So

19  it's more of a survey paper than expressing a particular

20  opinion.

21  *Q.*  All right.  If we could look at your slide 11.

22      All right.  And with regards to wage level, the WL, I

23  believe you said that that would be based -- the wage level for

24  an event would be based on expected revenues for the event.

25      THE COURT:  So, Mr. Isaacson, actually, this may be a

—2:15-cv-01045-RFB-PAL—

 1  good time, because I think you're going to go into a series of

 2  questions here --

 3           MR. ISAACSON:  Yes.

 4           THE COURT:  -- and I want to be able to make sure I get

 5  them all at once.  So why don't we take our break now.  We're

 6  going to come back at 12:45 to complete -- you have, I think,

 7  another 15 or 20 minutes or so that I can give you,

 8  Mr. Isaacson, then we'll go to Professor Oyer, and then we'll

 9  come back briefly to Professor Manning.  But we'll be in recess

10  until that time, and then you can continue right where you left

11  off.

12           MR. ISAACSON:  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           (Recess taken at 10:20 a.m.)

15           (Resumed at 1:28 p.m.)

16           THE COURT:  Please be seated.  All right.  We're back

17  on the record.  Sorry about the delay.  I was held up.

18           Professor Manning, you recognize that you're still

19  under oath?

20           THE WITNESS:  I do.

21           THE COURT:  All right.  Mr. Isaacson.

22           MR. ISAACSON:  Slide 11, Matt.

23           THE COURT:  Your equation?

24           MR. ISAACSON:  Matt, on the screen.

25           THE COURT:  Oh, no, it's warming up.

1          MR. ISAACSON:  I see.

2          COURTROOM ADMINISTRATOR:  Its warming up, I'm sorry.

3          MR. ISAACSON:  I see.

4          THE COURT:  It's not quite as fast as you are.

5          MR. ISAACSON:  Well, it's on the TV screen.

6          THE COURT:  Right.  Yes.  That takes a little longer to

7    warm up.

8          COURT ADMINISTRATOR:  Oh, that's me.

9          THE COURT:  If you want to go ahead and start

10   questioning, you can.

11         MR. ISAACSON:  As long as you both have it on your TV

12   screen.

13   BY MR. ISAACSON:

14   *Q.*  So the wage level, I think you said, the wages are based on

15   the expected revenues.

16   **A.**  I think it's reasonable to think that one of the influences

17   on the wage level is the revenues that are expected to be

18   generated by the event.  It's not the only factor.

19   *Q.*  Right.  It would be common for firms to take into account

20   expected revenues when setting wage levels.

21   **A.**  I'm only expressing an opinion about what would happen in

22   this particular case where we have fighters who are the key

23   workers in a particular event where we know that they're -- you

24   know, that they're responsible for this bit of revenue.

25   *Q.*  But you don't think other firms look at their revenues when

——2:15-cv-01045-RFB-PAL——

1  they decide what wage levels to set?

2  **A.**  They may do.  Some may do.  I haven't expressly looked at

3  lots of other firms in this particular case.  I haven't, you

4  know, expressed a view.  Some may, some may not.

5  *Q.*  Right.  And as part of your work as an economist, you

6  haven't looked at whether firms set wage levels based on

7  expected revenues.

8  **A.**  It's not the case that they -- firms in the models that I

9  would use would be setting wages to maximize their profits.  It

10  would be wrong to say that the expected revenues are the drivers

11  of wages.  It would be -- it might be the case that the expected

12  revenues ended up related to wages, but that is not the same as

13  saying that there was -- his influence in the choice of wage.

14  *Q.*  All right.  And what evidence is there in your report that

15  wage levels for Zuffa are more than -- are something more than

16  influenced by revenues, that there's something more going on?

17  What evidence is in your report about that?

18  **A.**  Well, I think in the -- in my report, I'm talking about the

19  case where we're talking about the hypothetical, thinking about

20  doubling revenue.  But as I've talked about earlier this

21  morning, there's a huge raft of other evidence that is relevant

22  to this.  It's what the sports economists are using in talking

23  about these internal company documents, which are assuming a

24  proportionality --

25          (Interruption by the court reporter.)

2:15-cv-01045-RFB-PAL

1          THE WITNESS:  I can't remember the exact next word that

2    came next, actually.

3    BY MR. ISAACSON:

4    Q.  And the only sports economist article referenced in your

5    report is the Boal and Ransom article that you mentioned in your

6    earlier testimony, right?

7    A.  The Boal and Ransom article is not a sports economics

8    article.  It's a survey of articles on monopsony at that point

9    of what's a considerable number in sports.  So that cites quite

10   a large number of sports economics articles, and I just referred

11   to that as a way of summarizing what is quite a large literature

12   without going through everyone individually.

13   Q.  Okay.  I'll come back to the Boal and Ransom.

14          But just to summarize, that because -- oh, I'm sorry.

15   The residual here, you say, will reflect in the regression or

16   will reflect the difference between the actual and the expected

17   revenues?

18   A.  I think it's very likely to, yes.

19   Q.  Right.  And so because fighters contribute to event

20   revenues, that as a result, if you include event revenues on the

21   right side of the regression, you have an endogeneity problem,

22   and if you don't, you have an omitted variable problem.  And,

23   therefore, you can't use actual compensation.  Is that right?

24   A.  Well, I think that this form of the regression is -- it

25   leads to unreliable conclusions.  I mean, I'm not sure I have

——2:15-cv-01045-RFB-PAL——

1  quite summarized that if you can't use compensation --

2  *Q.*  It would be unreliable -- so long as the fighters are

3  contributing to event revenues, it's going to be unreliable --

4  regression using actual compensation as the dependent variable

5  is going to be unreliable because you're either going to face an

6  endogeneity problem by incorporating the revenues or an omitted

7  variable problem by leaving them out.

8  ***A.***  In this particular example in this case, this labor market

9  we're studying compensation events, we're studying revenues and

10 events, yes.

11 *Q.*  Because the fighters contribute to event revenues.

12 ***A.***  Yes, I believe that they do.

13 *Q.*  The -- in High Tech workers, now -- which you've cited and

14 indicated you had done work on.  All right.  They're the model

15 that was offered to the Court to -- both for injury and damages

16 and to support the class, used actual compensation as the

17 dependent variable.  We agree on that, correct?

18 ***A.***  In the regression that Leamer ran in that -- that case was

19 one with log of compensation on the left-hand side, yes.

20 *Q.*  Right.  And on the right-hand side it used firm revenue.

21 ***A.***  It used, as I recall, one measure of firm revenue.  I think

22 it was global firm revenue per employee.  I'd have to actually

23 check whether that's the case.

24 *Q.*  I believe you're correct.  It was global firm -- it used

25 global firm revenue per employee.  So there were two classes in

—2:15-cv-01045-RFB-PAL—

 1  that case.  One was all salaried employees and one was a subset

 2  of technical workers.  You remember that?

 3  *A.*  I -- I don't remember exactly, I'm afraid, but I, you know,

 4  I think -- I'm prepared to believe you, if you're saying that

 5  that is the case.

 6  *Q.*  And that's Exhibit ZZX279, which we can put into the record,

 7  the -- which is the Leamer report.  I won't -- you're getting it

 8  right, so I'm not going to take you to the pages.

 9  *A.*  Okay.

10  *Q.*  So in that case, okay, Dr. Leamer had available firm revenue

11  and could have run the regression using compensation as a share

12  of revenue.  Could have done that both for -- for the salaried

13  employees and for the subset of technical employees.

14  *A.*  Well, it would be -- my view is that it would have been

15  inappropriate in this case -- in that case while it is

16  appropriate in this case.  And there are two reasons.

17          THE COURT:  And why -- go ahead.

18          THE WITNESS:  So the first reason is that in this

19  particular case, we think that the fighters, as I think has been

20  said, are the product.  People are interested in the identity of

21  the fighters.  As we talked about earlier in the case of the

22  products being produced by these high-tech firms, people are not

23  really interested in the specific identity of the software

24  engineers who produced it.  They're interested in the product

25  that comes out at the end.  So that's the first reason.

2:15-cv-01045-RFB-PAL

1          The second reason is that we -- you cannot, in that

2    data set, link the work of particular workers, say in either of

3    these classes, to a particular part of the revenue stream of

4    those companies.  This was global company revenue per employee.

5    I'm not even sure all of salaried work employees excludes

6    nonsalaried employees.  I must admit my recollection was that it

7    was just workers in the United States.  I mean, I stand ready to

8    be corrected on that.

9          But I then draw your attention to global, the point

10   being global revenue.  And so there's nothing in that case

11   that's like the equivalent.  We have an event, a discrete flow

12   of revenue for a particular piece of work, and we know exactly

13   which workers were associated with that.  There's nothing like

14   that.

15   BY MR. ISAACSON:

16   *Q.*  Am I incorrect, the percentage of revenues for fighter share

17   in this case uses the global revenues of Zuffa?

18   **A.**  The event revenues?  The specific event revenue?

19   *Q.*  Right.

20   **A.**  I mean, I -- to be quite honest, I can't recall exactly how

21   they do that.  But if it did, that is particularly fine.  The

22   point is the work -- the fighters are being done -- is being

23   done, and I think it's restricted to those events in North

24   America, actually, even if the rights are being sold globally.

25   *Q.*  Yes.

—2:15-cv-01045-RFB-PAL—

1  *A.*  So I think that isn't a fair analogy at all.

2  *Q.*  Is it your testimony that the technical workers of those

3  companies, such as Apple, Google, et cetera, do not contribute

4  significantly to their firm revenues by creating better products

5  and services, and that what you actually have to know is you

6  have to know their identities?

7  *A.*  No.  I mean, I believe they contribute to the firm.  I don't

8  think the firm would have employed them unless they were making

9  some contribution.  But I don't think their particular identity

10  is critical to the work that they're doing in that.  And that's

11  different from this case, very different.

12  *Q.*  You're saying you have -- in order for workers or

13  contractors to contribute significantly to the revenues of a

14  firm or an event or to do it proportionally, you have to know

15  their names?

16  *A.*  No, that is not what I am saying.

17         THE COURT:  Mr. Isaacson, that's not what he's saying.

18  What he's saying is that in the particular industry, at least in

19  his view, that the knowledge of who the particular fighter is

20  contributes to the value of the product versus a person not

21  buying an iPhone because they care about which particular

22  technician built that particular iPhone.  That's what I

23  understand the testimony to be.

24         Is that right, Professor Manning?

25         THE WITNESS:  That's exactly right.

————2:15-cv-01045-RFB-PAL————

1  BY MR. ISAACSON:

2  *Q.*  All right.  And ...

3          You're saying that in order for there to be

4  proportionality, that the consumer has to care about which

5  particular technician built a particular iPhone as opposed to

6  understanding whether those technicians made important and

7  serious contributions to the quality of that product?

8  **A.**  I'm sorry.  I think you're mixing up the point about

9  proportionality with a different point now.  I mean, the point

10  is about can you ascribe a particular revenue stream to a

11  particular group of workers whose identity was critical to that

12  revenue stream.  That is not about proportionality.

13  *Q.*  You are saying that in order to ascribe a particular revenue

14  stream to a particular group of workers, you need to know their

15  identity?

16  **A.**  No, that's not --

17  *Q.*  I'm sorry, the consumer needs to know their identity.

18  **A.**  No, that's not what I'm saying -- saying at all.  I mean, if

19  you imagine a hypothetical situation in which we manage to work

20  out this particular engineer and exactly the revenue that came

21  from the work that they did, we would expect there to be a link

22  between the compensation they are paid and the revenue they are

23  generating.  It's more a problem that we cannot -- the nature of

24  the data is that we are unable to do that.  And so we have to,

25  in a high-tech case, take a different approach to try and to

—2:15-cv-01045-RFB-PAL—

1  establish damages, for example.

2         THE COURT:  So you're saying you can't, in that

3  context, disaggregate the marginal revenue product of the group

4  of workers versus one particular worker?

5         THE WITNESS:  Yes, it's exactly that.  Software

6  engineers, you know, it's really quite unusual to have a piece

7  of work which is like an event.  You know exactly which workers

8  were part of generating that revenue.  You know exactly which

9  group of fighters were not part of that event.  That's really

10  quite an unusual sort of situation to have, but we have it in

11  this situation.

12         And I think it's very important to choose the

13  techniques that are appropriate to the data that you are having

14  in hand.  I mean, I think that's what being an expert --

15  expressing an expert opinion actually -- actually is.

16  BY MR. ISAACSON:

17  *Q.*  All right.  The Boal and Ransom article, which is PCCX685,

18  that article does not discuss wage share, correct?

19  ***A.***  I can't recall that exactly.  And I would have to -- I would

20  have to ...

21         MR. DAVIS:  Your Honor, may I approach the witness with

22  the article?

23         THE WITNESS:  Yeah, that would be very --

24         THE COURT:  Sure.

25         MR. ISAACSON:  I was about to hand him copies, but

——2:15-cv-01045-RFB-PAL——

1  sure.

2          And would Your Honor like a copy?  We're going to put

3  it on the screen.  Hand a copy to the Court?

4          THE COURT:  No, that's all right.  That's fine.  If you

5  just put it on the screen, that's fine.

6  BY MR. ISAACSON:

7  *Q.*  Okay.  Now, the section discussing -- with the survey that

8  you discussed, would be found at page 15, Section 5.1, Direct

9  Measurement of Wage and MRP.  Okay?  This continues for a couple

10  of pages.  Do you generally recall that this is the section of

11  the article that you were discussing?  You can see the

12  discussion of baseball occurs on the next page.

13  *A.*  I mean, what they are -- the paper is doing, then, is --

14  *Q.*  I have a very specific question.  Just is this the section

15  of the article that you were referring to?

16  *A.*  I'm afraid without reading the whole article -- I mean,

17  obviously, they do refer to sports there.  Without referring to

18  the whole article, I don't feel I can quite express an opinion

19  about this as the only place.

20  *Q.*  All right.  I haven't seen it elsewhere, so I'll plow

21  forward.

22          Now, the -- you are unaware -- this article -- and this

23  section is entitled Direct Measurement of Wage and MRP.  What

24  this section is discussing is literature where people like

25  Scully attempted to measure MRP and compared it to actual wages.

—2:15-cv-01045-RFB-PAL—

1  There's no -- it's not a discussion of what we've been calling

2  wage share, correct?

3  *A.*  Uhm.  Well, some of those papers -- I mean, again, I would

4  come back to this point that it depends a lot upon the, you

5  know, the date -- the appropriate technique depends a lot on the

6  data that you have available to you.  So let's just take a

7  particular example of that Scully 1974 paper.

8  *Q.*  I'm actually just trying to ask you a question about this

9  article and what it -- and is it discussing the comparison

10  between wages and MRP as opposed to between -- without any

11  discussion of wage share.

12          MR. DAVIS:  Your Honor, I would -- I would ask that

13  counsel allow the witness to finish answering the question.

14          THE COURT:  Well, I think, Mr. Isaacson, it might be

15  better to -- so you don't invite a long answer, to break the

16  question up.  Because I think what you're trying to do is ask

17  about whether or not the article, one, talks about wage share

18  and where it talks about it and then, two, what is it using as a

19  measurement as it relates to MRP.  So I think if you separate

20  those things out, that might make it easier.  Because I think

21  you're asking two things in that same question.

22  BY MR. ISAACSON:

23  *Q.*  All right.  The -- this section is talk -- 5.1 is talking

24  about comparing -- literature that compares wages and MRP,

25  correct?

2:15-cv-01045-RFB-PAL

1  *A.*  Yes.  It's discussing a methodology -- one methodology for

2  getting at monopsony power.

3  *Q.*  And at the top -- yes.  And at the top of page 16, it says

4  that wage -- or, rather, total compensation must be measured

5  accurately in levels.  Right.  It's talking about comparisons to

6  studies using actual wages, correct?

7  *A.*  I think that quote is being misinterpreted there, actually.

8  My -- can I give my understanding of what that means?

9  *Q.*  Well, I'll ask you about the Scully, then.

10         THE COURT:  Well, let him answer it.  Because if you

11  ask him about a quote, then he should be able to answer that.

12         So go ahead, Professor Manning.

13         THE WITNESS:  So the methodology -- so there are

14  different methodologies that have been used to try to assess the

15  extent of monopsony power.  They're discussing one here that

16  started with that Scully 1974 article.  And what he's saying

17  here -- and that attempted to directly estimate the marginal

18  revenue product, and to directly estimate -- and then have

19  measure of the wage, and then to compare the two.  And what

20  they're saying there is that the sort of wage data you should

21  have has to be the actual compensation; not an index.  A wage

22  index would be something that says in 2000 it was 100, in

23  2015 -- so it has to be the actual level.  That's the point

24  they're making there.

25         I mean, the analogy to what Singer is doing is, when

─2:15-cv-01045-RFB-PAL─

1  he's constructing the wage share, he is using actual total

2  compensation measured accurately in levels and not a wage index.

3  So what Dr. Singer is doing is exactly in line with what I think

4  the point is being made here.

5  BY MR. ISAACSON:

6  Q.  All right.  So moving back --

7          THE COURT:  Mr. Isaacson, about five minutes left.

8          MR. ISAACSON:  Yes, that's why I'm trying to get

9  briefer questions and answers here.

10  BY MR. ISAACSON:

11  Q.  So just moving down two paragraphs, it says:  "Almost all of

12  the studies examined professional baseball."  Right.  And

13  then -- so here we're discussing sports articles.  And then it

14  says in the next paragraph:  "The most influential paper on the

15  topic's by Scully 1974.  Almost everyone who has published on

16  the topic has adopted some version of his approach.  Scully

17  tests monopsony by estimating the MRP of individual players and

18  comparing it to pay."

19          Now, Scully actually used a regression with the log of

20  compensation as the dependent variable, correct?

21  A.  He had to -- he had a regression like that, yes.

22  Q.  All right.  Now, going onto --

23          THE COURT:  So how did he estimate the MRP?

24          THE WITNESS:  So he used this -- I mean, I -- so how he

25  did it there, he had data on, basically, it's revenue of

—2:15-cv-01045-RFB-PAL—

1  baseball teams in two seasons in the late 1960s.

2          THE COURT:  Right.

3          THE WITNESS:  He has total revenue.  I'm not quite sure

4  where that came from.  He regresses that on the number of wins,

5  and then he had a separate equation to regress the number of

6  wins on -- now, these are things I'm not going to understand

7  very well, like, runs batted in and, you know, those baseball

8  statistics.  Don't ask me please too many questions about that.

9          But I think what's very important again is -- I come

10  back to the point is that the nature of the data available, it

11  takes in large part the approach you take.  So when he goes to

12  his -- his revenue equation is for what I assume are all the

13  teams in Major League Baseball.  But when he comes to the wage

14  data, the source of that wage data is from newspaper articles

15  about what some workers actually earn.  And across the two

16  seasons, he only has, I think, something under 150 observations

17  on wages.  And there are many more than 150 players in baseball.

18          So he does not have the data available to him in order

19  to keep -- calculate the wage share at the level of the term --

20  at the level of the team.  And so of course he can't take this

21  approach.  He tries to find a different approach to try and do

22  the best he can with the data that he's got available.

23          So that's why I would say, yes, I understand why what

24  he's doing is he's not using the wage share, but again it comes

25  back to this point about what is the nature of the data, what is

—2:15-cv-01045-RFB-PAL—

1  the nature of the work that is being studied.

2  BY MR. ISAACSON:

3  Q.  All right.  And then on page 17, on the left-hand side,

4  moving down, there's:  "Scully's model is easy to criticize."

5  There's a paragraph discussing how the premise that spectators

6  are willing to pay only to see performance that contributes to

7  winning by the home team is tenuous.  And that paragraph

8  concludes:  "A direct measure of how individual performance

9  contributes to revenues is needed."

10         Is that conclusion that a direct measure of how

11  individual performance contributes to revenue is needed, is that

12  something you agree with?

13  A.  No, it is not.  And I think, actually, if one takes the --

14  this paper is written -- survey paper is written in 1997.  If,

15  for example, you look at the article written by Scully in 2004,

16  you see that, you know, the start of his -- that paper presents

17  sort of wage shares by major league sports in different years

18  and, you know, is not based on any individual performance data.

19         So, no, I think there is -- you know, people are taking

20  different approaches to try and to get to these problems

21  according to, you know, the data that they have available,

22  which, you know, is different in different circumstances.

23  Q.  And so the article notes that Scully's talking about

24  baseball, but at, again, on page 17, now on the right-hand

25  column, there's a discussion about the NFL and an article that

1  looks at the MRP of football players on the offensive side.  And

2  it explains at the end of that paragraph:  "They found the

3  offensive units of teams in the National Football League were

4  paid significantly more than MRP, even though football players

5  do not have free agencies.  They suggest that Scully's concept

6  of MRP is inappropriate."

7       And Scully's work was not holding up in other sports,

8  was it?

9  *A.*  I think that's a very broad conclusion to -- to draw.  I

10  mean, without going into the particular details of this study,

11  it's a slightly strange conclusion to draw that firms are going

12  to be paying workers more than their marginal revenue product,

13  because that would mean they're making losses on those -- on

14  those workers.

15  *Q.*  That's --

16  *A.*  I mean, there may well be something, if I read that paper in

17  detail, that I would actually say that the problem is not with

18  Scully, but with this particular paper.  But I'm -- I haven't

19  read that paper in detail and I can't comment on that.

20  *Q.*  And that's the point the authors were making, when you take

21  Scully and apply it to football, the results don't make any

22  sense.

23  *A.*  I mean, I think there's a whole literature that came out of

24  Scully 1974, very innovative paper and so on, but it's not the

25  final word on the topic.  It was the first word.  And then

—2:15-cv-01045-RFB-PAL—

1  there's a to and fro between academics as there is about what's

2  good about it, what's bad about it, and people expressing their

3  own view and so on.  I mean, that's just part of the sort of

4  academic give and -- you know, give and take that you get.

5  Q.  So this survey -- and, again, this is the only article that

6  you reference in your report.  That's why I'm spending time with

7  it.  It says then on the same page:  "Scully's" -- at the last

8  paragraph:  "Scully's econometrics specifications have also been

9  criticized.  Small changes in the model result in large

10  differences in estimated MRP."

11         Was that statement correct, that small changes in the

12  model result in large differences in the estimated MRP?

13  A.  I think it's fair to say that there was some papers out

14  there that claim that.  But one's also got to remember that this

15  survey article is now 20 years -- 20 years old.  There's quite a

16  lot of other articles written in sports economics about this

17  sort of being --

18  Q.  I'm not discussing those with you, sir, because they're not

19  in your report.

20         THE COURT:  Yes, but you've opened the door to asking

21  him about it.  So you cannot --

22         MR. ISAACSON:  No, I'm not --

23         THE COURT:  Mr. Isaacson, I actually get to decide

24  that.  If you ask him to place the articles in context, you

25  can't ask him to ignore what he knows in terms of expertise.  If

—2:15-cv-01045-RFB-PAL—

1  you want to ask him about that, that's fine, but you can't then

2  have him disregard what he's saying, which is -- you know, I

3  expect Professor Oyer will say the same thing about how the

4  literatures have changed or evolved.  So we don't want to be

5  stuck in time at the time of this particular article.  So if you

6  ask him about it and the significance of it, it's from 1974,

7  this Scully, and then later.  So he has to be allowed to be able

8  to respond, so --

9       MR. ISAACSON:  I respectfully disagree, Your Honor,

10  under the disclosure rules for expert reports.  Because when he

11  cites a -- when he cites an article in his report and I

12  cross-examine him about it, and then he responds, Well, there

13  are other articles that aren't in my report, I think he's gone

14  beyond the report and that's not --

15       THE COURT:  No, what you're doing is you're asking him

16  to comment on conclusions in a report and apply them to a modern

17  context.  If you ask him to do that and he's an expert, he can

18  then use his expertise.  I don't disagree with you that if he

19  wants to rely specifically on things in his report, then they

20  can't be beyond that.  But if you ask him a question about an

21  article and then ask him to opine based upon his expertise, then

22  he's allowed to use that expertise to answer.

23       So, he's going to be allowed to answer that.  So let's

24  move on from there.

25       MR. ISAACSON:  Okay.

─────2:15-cv-01045-RFB-PAL─────

1  BY MR. ISAACSON:

2  Q.  One last -- one last point here in the article.  On page 18,

3  in the second full paragraph, just with respect to what's

4  explained in this article, sir, this -- just with respect to

5  what's in this survey, it notes that there was an attempt to

6  apply these methods to nonunion coal towns, which are considered

7  to be monopsony towns.  And the results of those studies were

8  widely varying MRP estimates, which in some cases were sharply

9  less than actual wages.

10          When you -- when the methods were -- according to this

11  article, when the methods were applied to these coal towns that

12  were used by Scully for baseball, they didn't hold up.  Am I

13  reading that correctly?

14          THE COURT:  So, I'm sorry, Mr. Isaacson, so I

15  understand your question.  When you say "the method," which

16  method are you referring to?

17          MR. ISAACSON:  The strategy of directly comparing MRP

18  and wages.

19          THE COURT:  Okay.

20          THE WITNESS:  I mean, I think there's -- let me sort of

21  back up a little bit.  I mean, I think there would be widespread

22  agreement that if you could compare wages with marginal revenue

23  product, that would be informative about the extent of monopsony

24  power.  The problem is that you can't -- can never observe

25  marginal revenue product directly -- or never is a very strong

 1  word, but almost never.  And so people are trying to find a

 2  proxy, a way to estimate it.

 3          And, you know, there isn't a perfect method to it, and

 4  this academic literature is evolving with people saying, try

 5  this approach, try that approach, and this seems to work here,

 6  it doesn't seem to work there, perhaps labor -- baseball and

 7  Appalachian coal mining towns are rather different in some

 8  respect that isn't captured by this.  There are lots of reasons.

 9  I mean, this survey paper is trying for its readers to outline

10  what they think are the live issues at that point that, perhaps,

11  future researchers should be -- current researchers should be

12  aware of and, perhaps, future researchers should get involved in

13  trying to sort out.

14  BY MR. ISAACSON:

15  Q.  And just so I understand it --

16          THE COURT:  All right, Mr. Isaacson.

17          MR. ISAACSON:  It's my last question.

18          THE COURT:  All right.  I'll give you a little extra

19  time.  Yes, go ahead.  This is your last question.

20  BY MR. ISAACSON:

21  Q.  Just so I understand you, it's your view that you can almost

22  never observe marginal revenue product directly.

23  A.  I mean, I think it's commonly understood in the whole of

24  labor economics that marginal revenue product is very difficult

25  to observe.  I believe in his testimony, Dr. Topel gave a joke

 1  which was exactly about that where someone said, Well, we're

 2  going to sort out this problem by assuming we have observed the

 3  marginal revenue product.  But this is -- that problem of

 4  finding a proxy for it under -- is a problem that afflict the

 5  whole of labor economics, and it's not a problem that makes the

 6  whole of labor economics worthless as a field, in my opinion.

 7          THE COURT:  Thank you, Professor Manning.

 8          Okay.  So, Professor Oyer, is that going to be you,

 9  Mr. Isaacson?

10          MR. ISAACSON:  No.

11          THE COURT:  Okay.

12          MR. ISAACSON:  Ms. Grigsby.

13          THE COURT:  So if we have Professor Oyer come on up.

14          MS. GRIGSBY:  Your Honor, can we have a two-minute

15  break before Professor Oyer testifies?

16          THE COURT:  A two-minute break.  That's so specific.

17          MS. GRIGSBY:  Three?

18          THE COURT:  Yes, Ms. Grigsby.  Yes, that's fine.

19          (Recess taken at 1:57 p.m.)

20          (Resumed at 2:01 p.m.)

21          COURTROOM ADMINISTRATOR:  Please remain standing and

22  raise your right hand.

23          PAUL OYER, having duly been sworn, was examined and

24  testified as follows:

25          COURTROOM ADMINISTRATOR:  Thank you.  Sir, please state

—2:15-cv-01045-RFB-PAL—

 1  and spell your name for the record.

 2          THE WITNESS:  My name is Paul Oyer, P-A-U-L, last name

 3  is O-Y-E-R.

 4          COURTROOM ADMINISTRATOR:  Thank you.

 5          THE COURT:  Go ahead, Ms. Grigsby.

 6                  DIRECT EXAMINATION OF PAUL OYER

 7  BY MS. GRIGSBY:

 8  Q.  Good afternoon, Professor Oyer.

 9  A.  Good afternoon.

10  Q.  So you sat here during Professor Manning's testimony, right?

11  A.  Yes, I did.

12  Q.  And you heard Professor Manning testify about his three-part

13  test, which he believes makes it appropriate to use wage share

14  in this case.  Is that correct?

15  A.  Yes.

16  Q.  And as part of that three-part test --

17          MS. GRIGSBY:  Can we have slide 13.

18  BY MS. GRIGSBY:

19  Q.  -- he needs these three conditions to be met, with the last

20  being what we've been calling proportionality.  Is that right?

21  A.  Just to be fair to him, he would argue that these are -- he

22  doesn't need these to be met, but he would argue that if they're

23  met, his test holds.  And so, yes -- more or less, yes.

24  Q.  Well, he focused in this case on the three-part test,

25  correct?

—2:15-cv-01045-RFB-PAL—

1  *A.*  I agree.

2  *Q.*  And we know he didn't run any other tests to determine --

3  *A.*  Correct.

4  *Q.*  -- the use of wage share.  All right.

5       Now, here with respect to specifically to the third

6  part of the test, which is proportionality, has proportionality

7  been demonstrated here, in your opinion?

8  *A.*  No.  I found both the report, as well as Singer's reports,

9  as well as the discussion this morning, a little bit troubling

10 because of the -- Professor Manning is indicating that he --

11 that the three -- the third -- that these -- his three-part test

12 holds here.  And let's look at that footnote in particular, the

13 third criterion, we'll call -- we won't revisit this because

14 you've been through it all morning.  We'll just call this the

15 proportionality condition.

16      And throughout this entire exercise there's been

17 literally no evidence offered that that proportionality

18 assumption holds.

19      THE COURT:  So let me ask you a question because I

20 think it turns a little bit on this issue of whether or not

21 fighters contribute to event revenue.  Do you believe that the

22 studies and the analysis here show that a particular fighter's

23 individual marginal revenue product will contribute to a

24 particular event revenue level?

25      THE WITNESS:  So, yes, I -- of course I believe that.

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

—2:15-cv-01045-RFB-PAL—

1  However --

2        THE COURT:  Okay.

3        THE WITNESS:  -- the proportionality assumption is a

4  much -- the proportionality condition is a much stronger

5  statement than what you made.

6        THE COURT:  Okay.  So tell me -- so tell me about that.

7  Because if you were to -- and this is the part, I guess, that

8  we're going back and forth on.  If you were to assume in a

9  perfect market that a fighter was paid for their marginal

10  revenue product --

11        THE WITNESS:  Right.

12        THE COURT:  -- and the marginal revenue product was --

13  was related to the event revenue, why would that not be

14  sufficient to satisfy the proportionality factor?  Which I think

15  is the argument here, which is that if you have that

16  relationship, there is some correlation between event revenue

17  and marginal revenue product of the individual fighter.

18  Therefore, you have some basis for assuming that there's some

19  level of proportionality.  Why do you disagree with that?

20        THE WITNESS:  Okay.  So wait a minute.  I think

21  that's -- let me make a very important distinction based on your

22  question.

23        THE COURT:  Okay.

24        THE WITNESS:  Which is a good one.  Nobody is doubting

25  that there's some level of relationship between these, but

1   proportionality is a very strong statement.  It says that if

2   event revenue goes up by 20 percent, I expect fighter pay to go

3   up by 20 percent.  There's no reason to accept that on its face.

4   There's no reason to believe that would be true.

5           It's been stated by Professor Manning, both in his

6   report and here this morning, that it's plausible.  Now, I don't

7   know -- I know there's some legal side of plausible.

8           THE COURT:  Right.

9           THE WITNESS:  And I think Professor Manning and I are

10  both going to plead the "we mean this in the way we would talk

11  about it in a seminar type of world."

12          THE COURT:  Right.

13          THE WITNESS:  But plausible, you know, is -- I don't --

14  there's just no evidence to back it up.  He literally offered

15  you this morning no evidence to back it up.  The one piece of

16  evidence he offered was, he said:  The foreclosure share

17  estimates in Professor Singer's regressions were sensible to him

18  and, therefore, the proportionality assumption holds.  That's

19  just -- that's a leap with 17 steps in the middle, each of which

20  I would love to take issue with because none of them are true.

21          MS. GRIGSBY:  Can we turn to --

22          THE COURT:  Hold on just a moment, Ms. Grigsby.

23          So what I understand you to be distinguishing between,

24  Professor Oyer, is, on the one hand, you're not disagreeing that

25  there is a relationship to the marginal revenue product of a

—2:15-cv-01045-RFB-PAL—

1  particular fighter and event revenue and the fact that if a

2  particular fighter has a greater marginal revenue product, that

3  would increase, to some degree, the event revenue.  You're not

4  disagreeing with that as a -- in terms of how it applies in this

5  case?

6        THE WITNESS:  I would say they're certainly likely to

7  be related.  We're using cause and -- I want to be a little

8  less --

9        THE COURT:  They're correlated.

10       THE WITNESS:  -- about the relation -- which way that

11  relationship runs, but of course they're going to be related.

12       THE COURT:  And it seems to me what you're taking issue

13  with is the notion of, for lack of a better phrase, direct

14  proportionality, that that -- that if you have a very specific

15  proportional increase in event revenue, that is going to

16  directly be mirrored and -- or should be mirrored and -- in an

17  increase on either the wage share or wage compensation.  And

18  you're saying you disagree with that?

19       THE WITNESS:  I'm saying I see no evidence that that

20  holds.  I also -- can I add one thing from what you said?

21       THE COURT:  Sure.

22       THE WITNESS:  And that is, you sort of said we're

23  trying to draw distinction -- you suggested in that last remark

24  that there's some distinction between direct proportionality and

25  proportionality.  Everything we've been talking about is just

—2:15-cv-01045-RFB-PAL—

1  flat-out proportionality.  It's footnote 7 of Manning's report.

2  It's the one-for-one increase.  It's if my MRP increases by

3  20 percent event revenue -- or if event revenue increases by

4  20 percent, the MRP -- that's indicative that the MRP is also

5  20 percent higher.  That is a very, very strong assumption.

6        And if you were in an academic seminar and you said I

7  have a model, I'm going to, you know, run a regression, which

8  Dr. Singer does, which takes that as a given, and then the

9  evidence you offered for it was the evidence that Dr. Manning

10  offered this morning and in his report and that Dr. Singer --

11  you'd be laugh -- you'd literally be laughed out of the room.

12  There's no -- there's just nothing to back up this assumption

13  which is so fundamental to what they're doing.

14        Now, in fairness, he said it's a necessary condition,

15  not a sufficient one, but he did tell us he believes it holds.

16  And Singer is assuming it holds in the way he runs his

17  regressions, and there's just literally nothing to back that up.

18  BY MS. GRIGSBY:

19  Q.  So let's talk about what you said, which is that there's

20  nothing to back that up.

21        MS. GRIGSBY:  Can we go to slide 15.

22  BY MS. GRIGSBY:

23  Q.  So you heard Professor Manning say that Dr. Singer's

24  regression produces a credible and sensible result, right, and

25  that there is some known relationship between revenue and MRP.

1  He also said that.  And you just said you would agree that there

2  was probably some relationship between revenue and MRP, correct?

3          MR. DAVIS:  For the record, Your Honor, I do object

4  that this is a brand new analysis, not located anywhere in

5  Dr. Oyer's report.

6          THE COURT:  Overruled.  Let's see where it goes.  I

7  mean, if it's essentially an extrapolation of Professor Oyer's

8  report, which I think that it is, in his view, I don't know that

9  it's going to be prejudicial.  I'll allow it.

10          Go ahead, Ms. Grigsby.

11  BY MS. GRIGSBY:

12  *Q.*  So he said that -- and so you both agree that, you know,

13  revenue and MRP, there may be some relationship.  So let's look

14  at what Dr. Singer did.  Based on what Dr. Singer did, do you

15  have any basis to believe that Dr. Manning's -- Professor

16  Manning's assumption that athlete -- that wage share is somehow

17  proportional to what athlete's MRP is is a correct assumption?

18  *A.*  Right.  So let me point you to this example, and it is only

19  an example, but I will tell you that having seen the data, it's

20  not an outlier or some cherry-picked example.  This is a fairly

21  representative situation.

22          We have a fighter named John Howard.  I've never heard

23  of John Howard.  I don't know much about this, but I'm going to

24  assume -- I'm going to presume the following:  That is, that in

25  2015 during -- he had these two fights only a few months apart.

1   I'm going to guess that the marginal product of labor for him

2   was roughly equal in those two fights.  Again, that's a guess,

3   but it seems like I'm -- it seems like a very reasonable guess,

4   much more reasonable than some of the guesses that have been

5   made earlier today.

6           And so given that, let's take a look at what happened.

7   He's in two different fights.  How did his compensation vary

8   across those two fights?  Well, it's actually 50 percent

9   different.  And the entire reason for that is he won one fight

10  and lost the other.  We'll come back to that.  Hold that point

11  because it's very important.

12          But if we now look at -- so my guess is his marginal

13  product of labor is pretty -- there's -- an economist typically,

14  before Dr. Singer wrote his report, would have said, That's our

15  first guess as to his marginal product of labor.  If the labor

16  market is somewhat competitive, that's his compensation.

17          Now, the alternative way to approach this, apparently,

18  is to divide that by the event revenue.  Well, these are two

19  fights, same year, same guy.  I would guess -- I'd have to look

20  it up to be sure.  I would guess given that the event revenue is

21  much smaller in the first one that he was higher up in the card

22  in the first one and low down in the second one because the

23  event was a much bigger event with bigger names or something

24  like that.  Well, they both have Conor McGregor, so ...

25          But the point is, if you look at this, the MRP is

—2:15-cv-01045-RFB-PAL—

1  probably about the same in both of these fights.  His

2  compensation is about the same in both these fights except

3  because he won he gets more in one of them than the other.  His

4  fighter compensation share goes down by a factor of four.  The

5  event revenue is six times higher.

6       He's -- his marginal product of labor was not six times

7  higher in the second fight than it was in the first.  So the

8  proportionality assumption that's being thrown out suggests that

9  event revenue went up by six times, therefore, John Howard's

10 marginal product of labor was six times higher in the second

11 fight.

12       I mean, I'm not an expert on UFC, but that seems

13 ridiculous.

14       THE COURT:  So let me ask you a question, though.  Did

15 you do this type of analysis across the data?  Because one of

16 the concerns I have is, you're not saying you cherry-picked, but

17 this is out of thousands of data points.

18       THE WITNESS:  I mean, I'll give you one more.

19       THE COURT:  No, no, but my point is --

20       (Court reporter admonishment.)

21       THE COURT:  Did you do any systemic analysis that makes

22 this point as it relates to Dr. Singer's or Dr. Topel's

23 statistical analysis?

24       THE WITNESS:  So I did not.

25       THE COURT:  Okay.

———2:15-cv-01045-RFB-PAL———

1             THE WITNESS:  I --

2             THE COURT:  And I know that that wasn't what you were

3     asked to do.

4             THE WITNESS:  I did this in response to

5     Dr. Manning's -- don't forget that when I wrote my report, I had

6     not seen Dr. Manning's claims on proportionality.

7             THE COURT:  Right.

8             THE WITNESS:  So I asked for this analysis in response

9     to that.  And I have not done a formal analysis to show you

10    exactly -- I can show you one more example.  I have about 10

11    more that we -- that I've created that they are -- that suggest

12    this is a representative phenomena.  Event revenues just swing

13    all over the place.

14            THE COURT:  So, but what I'm saying to you is that how

15    do you know it's a representative phenomena if you didn't

16    actually do the statistical analysis yourself?  I mean, because

17    in some ways the same argument you're making regarding

18    Professor Manning could be made a little bit about you.  And I'm

19    trying to avoid with both you any -- trying to draw any

20    inferences based upon data analysis because neither one of you,

21    I think, were asked to specifically do that.  Although, you both

22    I think try to use examples to help me understand when wage

23    level compensation is important versus wage share.  So that's

24    why I ask you that.

25            THE WITNESS:  I don't think Dr. Manning showed you any

 1   examples that reflected at all on this.  So, the fact -- I would

 2   draw the distinction between this and anything he presented

 3   because at least I've given you a few data points, and I can

 4   give you one more if you'd like.

 5           But I will absolutely agree with you that this is -- I

 6   have not done a formal analysis.  I believe, based on the

 7   analysis I have done in the past, that this is representative of

 8   the data.

 9           THE COURT:  So when you -- what you --

10           THE WITNESS:  -- the data enough to tell you that I

11   can -- I -- that I believe this would prove representative of

12   the data.

13           THE COURT:  So what you want to understand is that

14   these data points illustrate the point you're making sort of

15   theoretically about -- or specifically about the model and the

16   assumptions?

17           THE WITNESS:  I'm -- I agree with that.  Can I take

18   issue with one thing you said?

19           THE COURT:  Yes.

20           THE WITNESS:  I'm not demonstrating anything

21   theoretically.

22           THE COURT:  Okay.

23           THE WITNESS:  Professor Manning gave you a very nice

24   theoretical discussion in his report of why Dr. Singer's

25   regression might be sensible.  You know, he gave you a

———2:15-cv-01045-RFB-PAL———

1  theoretical justification after the fact.  He's a theorist.  I'm

2  not.  I'm an empiricist.  This and everything else I've done is

3  going to be about the data.

4          THE COURT:  Okay.

5  BY MS. GRIGSBY:

6  *Q.*  So I just wanted to, then, talk about what you did do.  Did

7  you run any econometric analysis for this case?

8  *A.*  Yeah.  Would you mind giving me a slide that has my Table 1

9  and Dr. Singer's Table 6 in it?

10          MS. GRIGSBY:  8.

11          THE WITNESS:  I don't remember the number of that

12  slide.

13          MS. GRIGSBY:  Yeah, 8.

14          THE WITNESS:  So but while it's coming up, let me just

15  quickly explain, you may remember this from the reports so I'll

16  be very brief.  I just took Dr. Singer's baseline regression,

17  which you can see now in Table 6, and I reran the exact same

18  regression.  And all I did was change the dependent variable

19  from fighter share to log of compensation.  Why did I do that?

20  Because that's the first thing every labor economist does when

21  running a regression.  They put the log of compensation on the

22  left-hand side and they see what's going on.

23          THE COURT:  So one of the issues that comes up in this

24  case for me, Professor Oyer, is if there is true monopsony power

25  such that the actual wage level itself is still below what it

1   would be competitively, how does that not impact using, right,

2   right, the log of wages?  Because in that context, from what I

3   understand, is that you actually have other wages that are not

4   influenced by monopsony power that you can use.  And so one of

5   the challenges that I have to look at in this case is -- as

6   relates to using actual wage level is that appears to

7   potentially, at least as argued by the plaintiffs, to have been

8   influenced by the monopsony power.  So how can I take that into

9   consideration when looking at this analysis?

10           THE WITNESS:  Okay.  So can I give you two answers to

11   that -- to that question?

12           One is you can do what labor economists have done since

13   time and memorial to do that.  We can take some -- we can take

14   the log of compensation, and this includes in it, if foreclosure

15   share is specified correctly -- I am not going to advocate for

16   or against Dr. Singer's foreclosure share measure.  I'm going to

17   take it as given.  I didn't study that.  But let's just assume

18   that that's a measure of monopsony power.

19           THE COURT:  Right.

20           THE WITNESS:  So how would every economist before

21   Dr. Singer have analyzed that?  They would look at the wage and

22   they would look at these foreclosure shares.  And they'd say,

23   Okay, sure, I see that wage is going up -- I see that fighter

24   pay is going up, and I'm -- I have reason to believe monopsony

25   power is getting stronger at the same time.  So what do I do

2:15-cv-01045-RFB-PAL

1    about that?

2           Well, I ran a regression where I have the wage going up

3    as the left-hand side variable and I have this measure of

4    monopsony power.  And then I have a bunch of control variables,

5    such as Dr. Singer has or I had such as year effects, log of

6    revenue.  We'll come back to that.  You've heard a lot about

7    that.  We're not done with it, I'm afraid.

8           And so I would put in all of these controls.  And so as

9    a result, in my regression I have what economists would have

10   said until Dr. Singer wrote his report -- and, by the way, what

11   they will say in the future as well -- that the right way to do

12   this is I ran the wage regression and that gives me the but-for

13   world for what would the person's pay have been.

14          Can I --

15          THE COURT:  How do you know that if you don't know what

16   the actual wage would be?  So, in other words, if -- if I

17   know -- if I'm assuming that the wage that I'm using is

18   influenced by monopsony power, even if I can see that that wage

19   in and of itself varies with the foreclosure share, how would I

20   know what the wage would be, which is what I'm trying to figure

21   out, in the but-for world?  Because what you're saying to me is

22   you can figure that out without actually knowing what the

23   wage -- actual wage would be in a competitive market?

24          THE WITNESS:  Well, if I know -- what I do, then, is I

25   take the foreclosure share, set it equal to zero, back out.

—2:15-cv-01045-RFB-PAL—

1   That's my counterfactual wage that I would have in the

2   absence -- in the but-for world in the absence of competition.

3   It's literally what everybody's ever done before.

4         Can I have slide 6?  I said it was a two-part answer.

5   Do you mind?

6         THE COURT:  Okay.  Sure.  No, no, of course.

7         THE WITNESS:  Slide 5.  My mistake.

8         This is the textbook model of monopsony.  It comes from

9   a book written by Alan Manning, and it's laid out as the basic

10  model of monopsony.  And it gets to exactly your question.

11        So the wage in a monopsony world is the W there, and

12  the but-for wage that I want to know is, if I drew a line across

13  from the intersection of the supply in the MRP curve to the

14  wage, that would be the but-for wage in the absence.

15        THE COURT:  Right.

16        THE WITNESS:  And that's what I'm measuring.  But

17  why -- how do I do it?  I do it -- this graph clearly tells me.

18  What do I do?  I look at the wage where the log -- we usually

19  use the log of wage for reasons we could go into if you wanted.

20  But that's the way the textbook's written.  We just do it with

21  wage.  Wage share was something that was dreamed up by

22  Dr. Singer.  There's just no basis for it.

23        THE COURT:  So but why, then, and when I looked at some

24  of the information I had received, is there not some

25  consideration as relates to sports -- there's discussions about

2:15-cv-01045-RFB-PAL

1  sporting revenue, wage revenue.  I mean, this is a part of the

2  information that's been shared.  That there's negotiations

3  around that.  That there's even discussion by the team owners

4  that talk about event revenue and sort of in proportion of wages

5  to the revenue.

6       So why would I not, in the context of this particular

7  industry, look at that?  Because to me that's -- this is a

8  general model, but you're talking about, at least from what I've

9  heard from all witnesses, this is a somewhat unique industry.

10       THE WITNESS:  Well, I guess I would turn that question

11  around.  I have not heard one compelling argument why you would

12  do that.  And I'm going to tell you why you shouldn't.  But I

13  think the baseline question is:  Why don't I do what the

14  textbook tells me?  Why don't I do what's been done in every

15  wage regression of monopsony power ever before?  Literally.

16       And so -- and there are sports examples and there are

17  articles that discuss the wage share in those articles, but they

18  never -- they never run a regression the way Singer did, never.

19  Literally never.

20       THE COURT:  But --

21       THE WITNESS:  Scully is the closest, and he does it the

22  way I would do it, with a wage regression.

23       THE COURT:  So how do you deal with this issue,

24  Professor Oyer, of different individuals in the same market

25  having different marginal revenue product, right, that -- that

1  you can't say that Conor McGregor doesn't have a different

2  marginal revenue product from some other lower ranked fighter?

3  And so why is it that when there's this discussion about what

4  should be appropriate compensation for him, that there's not a

5  discussion of event revenue in the context of this conversation?

6  That's -- that's what I have to sort of think about in this

7  particular case.

8           THE WITNESS:  I'm sorry, I have three answers to your

9  questions this time.

10          THE COURT:  That's helpful.

11          THE WITNESS:  The first one is let's not talk about

12 Conor McGregor.  Conor McGregor is an outlier.  So do you want

13 to talk about Conor McGregor having -- that we can say that the

14 share of the revenue that night is directly related to Conor

15 McGregor?  Of course we can.  I know nothing about UFC except

16 that Conor McGregor is a big name in UFC.

17          THE COURT:  So --

18          THE WITNESS:  So, yes.

19          THE COURT:  -- so let's back this up.

20          THE WITNESS:  That we have --

21          THE COURT:  Hold on a second.  Hold on.  Hold on.  So

22 let's back up.  Because, then, I don't want to use that.

23          If we assume, whether or not it's Conor McGregor or

24 someone else, that the marginal revenue product of fighters is

25 different such that it -- that it can influence the event

2:15-cv-01045-RFB-PAL

1   revenue such that I can't -- I don't have a comparable

2   competitive wage for that same exact fighter, why would I use

3   this as opposed to the event -- or wage share?

4          THE WITNESS:  Can I go back to my slide with John

5   Wilson?  Is that his name?

6          THE COURT:  John Smith, I think.

7          MS. GRIGSBY:  Oh, oh, 15.

8          THE WITNESS:  15.

9          MS. GRIGSBY:  John Howard.

10         THE COURT:  John Howard.

11         THE WITNESS:  I'm sorry.  If John Howard is listening,

12  I apologize.

13         So I think the answer to your question is here.  So --

14  and what I would do is -- what I've done in my regression, my

15  wage regression, and also what Singer did in his regression, is

16  use dummy variables for every fighter.  So then we have -- let's

17  just say -- and it's not true in this case, but I'm going to

18  take this illustration and make it more hypothetical.  Let's

19  just say that in one of those the foreclosure share was 0 and in

20  the other it was .8 or something like that.

21         THE COURT:  Right.

22         THE WITNESS:  Then this difference in pay across John

23  Howard's two fights would tell me -- would exactly give me that

24  counterfactual that you're asking for, A.  And, B, again,

25  subject to the fair criticism that this is an example and not --

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

—2:15-cv-01045-RFB-PAL—

1  and -- that we already -- that I've already admitted to, just

2  look -- if you look at that, do you want to -- which of those do

3  you think is a more reasonable way to think about MRP?  And then

4  if one of them had high foreclosure and the other didn't, which

5  of those would you rather measure it with?  Event compensation

6  or fighter compensation share?  That's not a hard decision.

7  BY MS. GRIGSBY:

8  Q.  So just to put a pit in it, though, under -- using log

9  compensation, John Howard's compensation could go up, correct,

10  and you would still -- would you -- you could still find

11  significance, correct?

12  **A.**  Sure.  If -- if John Howard's compensation goes up and

13  foreclosure goes up, what you're going to find is, when you put

14  in, for example, the year effects or the arena effects or

15  something else, that's going to pull out the fact that John

16  Howard's pay is going up for reasons that have nothing to do

17  with it.

18        But putting event -- but, instead, dividing -- I mean,

19  instead looking at his fighter share, it's just -- it doesn't

20  make any sense on its face.  It's just not the right way to do

21  it.

22        THE COURT:  So from your understanding of this

23  literature, why do they use this?  Because I have been presented

24  with articles here that talk about, in the NFL and baseball,

25  looking at a sort of event or game revenue or in boxing, boxing

─2:15-cv-01045-RFB-PAL─

 1   revenue, and using that as a way to negotiate what would be a

 2   fair or appropriate wage.  It's not as if this is the first time

 3   in this case that an expert has ever come up with this idea --

 4   or at least I shouldn't say an expert, but people knowledgeable

 5   in these -- in this industry have ever come up with an idea that

 6   we should look at a percentage of the event revenue.  So why is

 7   that such a commonly used sort of metric?

 8            THE WITNESS:  Well, first of all, most of -- it's

 9   almost always used -- I won't say always because --

10            THE COURT:  Right.

11            THE WITNESS:  -- as Professor Manning said, you get in

12   trouble when you say always.  It's almost always used in the

13   context of team sports.  So I've not seen even just general

14   discussions of labor share in other individual sports.  I don't

15   think -- you know, when people analyze tennis and golf, they

16   don't talk about the golfer's share of the revenue.  That's just

17   not -- if you look at the articles, it's not talked about.

18            So that's one distinction.  And why is that a

19   distinction?  Because for reasons that just out of convenience,

20   that's something the collective bargaining agreements have

21   focused on.  Let's think about being partners and we're going to

22   share this revenue, and that's the way it's going to be done.

23   Now, that's asking them to be your partner and so forth.  You're

24   taking -- you're taking it out of a standard labor market

25   context.

—2:15-cv-01045-RFB-PAL—

1             The other thing to keep in mind is, while you have been

2    presented with these sports articles that talk about wage share,

3    you've not been presented with a single article that runs a

4    regression of an individual athlete's wage share.  And you

5    should also keep in mind that Dr. Manning wrote both a book and

6    a handbook chapter and -- about monopsony, never once mentioned

7    any of these sports articles.

8             So I -- the pretext of -- the base -- you've been

9    presented with these articles, but to a labor economist, they're

10   just not state of the art.  They're not something we do.

11   They're not something that has ever caught the attention of

12   Professor Manning or myself or others in this field.

13            THE COURT:  So how would you estimate the but-for wage

14   if you don't have the actual wage where event revenue is related

15   to a fighter compensation and where you believe that the actual

16   level of compensation is suppressed by monopsony power?

17            So how would you come up with -- if you're not using

18   wage share -- let's say you don't use that.  If I asked you to

19   say, Okay, Professor Oyer, I want you to come up independently

20   with a model for this based upon what information was available

21   and is available in this type of case, what would you do?

22            THE WITNESS:  Can I have my -- the table back.  Can we

23   just pivot back to the -- my regression --

24            MS. GRIGSBY:  8.

25            THE WITNESS:  -- next to --

————2:15-cv-01045-RFB-PAL————

1          MS. GRIGSBY:  Um-hmm.

2          THE WITNESS:  Foreclosure -- you need to be -- you need

3  to have ...

4          There might be other ways to do it in certain other

5  contexts.  The first thing I would want to do, and it applies in

6  this context, is find a proxy for monopsony power.

7          THE COURT:  Right.  Okay.  But I agree with you.  So if

8  you see that there's a monopsony -- let's say you find there's a

9  monopsony for -- I mean, a proxy, excuse me, for monopsony

10  power, which is foreclosure share.  That still doesn't give you,

11  though -- that tells you potentially the relationship, right,

12  but it doesn't tell you what the but-for wage would be.

13          So my question is, let's assume you establish it.  I

14  know you don't necessarily disagree with Dr. Singer's findings

15  regarding foreclosure share, but let's say for the moment that's

16  an appropriate proxy --

17          THE WITNESS:  We'll give you that.

18          THE COURT:  -- for monopsony power.  What would you do,

19  then, to estimate what would be the but-for wage if you know

20  there's a relationship?

21          THE WITNESS:  It's right here.  It is in this table on

22  the right.

23          THE COURT:  Okay.

24          THE WITNESS:  So I would take John Howard's pay that

25  night -- the log of his pay that night, and I would say -- let's

——2:15-cv-01045-RFB-PAL——

1    say he was paid $42,000 or whatever it is, and then I would undo

2    to the foreclosure share.  So I would say, let's take his

3    estimated pay in a world where foreclosure share is equal to

4    zero.  That is the but-for world.

5              THE COURT:  Yes, but isn't that assuming a direct

6    proportionality to foreclosure share and the wage?  Because --

7              THE WITNESS:  You're right.  He's --

8              THE COURT:  -- because you're assuming that the

9    foreclosure share of the monopsony power would be directly

10   proportional to the level of the wage, right?

11             THE WITNESS:  You're saying -- I mean, we're -- yes.

12   Dr. Singer's regression which, you know, as I said, I'm not

13   going to vouch for or against his choices of foreclosure share.

14             THE COURT:  Right.

15             THE WITNESS:  But one thing he's done is he's chosen to

16   specify it as a linear relationship.

17             THE COURT:  Right.

18             THE WITNESS:  And I bet he would say, and I would agree

19   with him, that that's a -- that's a naive beginning and we can

20   investigate the degree which we can relax that if we thought it

21   mattered, but as you see in the right-hand side regression I've

22   run, it doesn't matter anyway.

23             But if it did, you might want to say, well, let's think

24   about, sure, the difference between zero foreclosure and .3

25   might be very trivial; whereas, the difference between .7 and 1

1   might be huge.  Yes.  So this is assuming a linear foreclosure

2   share.  But that's -- that's irrelevant.  That's an important

3   point for estimating the -- for estimating the impact, if there

4   were any impact.  But it's not relevant to the choice of

5   left-hand side variable here at all --

6           THE COURT:  And --

7           THE WITNESS:  -- is what we're talking about.

8           THE COURT:  -- because it's not --

9           THE WITNESS:  Because he's -- I mean, he's not changing

10  his foreclosure share.  The linearity of the foreclosure share

11  assumption holds in what he's doing just as much as it does in

12  what I -- what I did.

13          THE COURT:  And why do you think you didn't find

14  foreclosure share here to be significant where he did?

15          Because even with -- even with -- even if you're doing

16  the log of compensation, if it's an accurate measure of

17  monopsony power, it should still -- should still have some

18  effect, right?

19          THE WITNESS:  Not if -- so, I'm not a -- I'm not an

20  antitrust labor economist, so I don't throw around terms like

21  procompetitive that --

22          THE COURT:  Right.

23          THE WITNESS:  -- effectively.  But pretend I do,

24  pretend I'm doing it well.  And, you know, there's probably --

25  as Zuffa is taking over and increasing its market share, Zuffa's

—2:15-cv-01045-RFB-PAL—

 1  the place everybody wants to be.  They're creating more value.

 2  They're capturing a lot of that value, sure, but the fighters

 3  are still better off because they're making more than they would

 4  have in the but-for world.  Or I shouldn't say more.  The

 5  coefficients are positive.  I'm not going to claim they're

 6  making more.

 7          THE COURT:  Right.

 8          THE WITNESS:  They're making -- there's no evidence

 9  they're making less.

10          THE COURT:  Right.

11          THE WITNESS:  That's all --

12          THE COURT:  Well, because your --

13          THE WITNESS:  -- that's my claim.

14          THE COURT:  Well, I'm saying because your model also

15  shows that essentially there's no -- either foreclosure is not

16  an accurate measure of monopsony power, or if it is, there's no

17  monopsony power because, right, it's not showing a statistically

18  significant effect on the log of compensation, right?

19          THE WITNESS:  Yeah, but we'd start from the assumption

20  that foreclosure share is capturing the market -- the monopsony

21  power.  If I start from that assumption, then we'll just assume

22  there's some monopsony power, but it's not having any

23  negative -- there's no evidence that it's having any negative

24  impact on pay.

25          You know, I'm not going to -- I'm not actually willing

———2:15-cv-01045-RFB-PAL———

1   to concede there is monopsony power, because I don't know about

2   the foreclosure share.

3            THE COURT:  Right.

4            THE WITNESS:  But if you just take that as the measure

5   and say, Yes, we think that's monopsony power, then I look at my

6   regression and I say, There's no evidence whatsoever that it's

7   lowering pay.  In the but-for world where foreclosure share is

8   zero, I have no reason to think that fighters in this regression

9   would have higher pay.

10           THE COURT:  Got it.  Thank you, Professor Oyer.

11           Ms. Grigsby.

12           THE WITNESS:  Can I -- can we -- well, we're going --

13  you go ahead.

14  BY MS. GRIGSBY:

15  *Q.*  I was just going to walk you through -- since we're already

16  on the results of your regression --

17  *A.*  Yeah.

18  *Q.*  -- I wanted to talk a little bit more about how the results

19  of your regression compare to Dr. Singer's results.

20  *A.*  Yes.

21  *Q.*  So you mentioned -- we've already gone through the fact that

22  you don't think labor share is the correct dependent variable.

23  But did you see other problems with Dr. Singer's regression?

24           MS. GRIGSBY:  Can I have slide 9, please.

25           THE WITNESS:  Yeah.  So am I -- is it one more slide

—2:15-cv-01045-RFB-PAL—

 1   where I've highlighted this?  I mean, it's hard for me to see,

 2   but I know the things here quite intimately.

 3   BY MS. GRIGSBY:

 4   *Q.*  And there's a monitor over there.

 5   **A.**  Oh, that's fine.  Yeah.

 6          So, Your Honor, you've run some regressions.  You

 7   understand the details of regressions.  So let me just -- so

 8   forget about the technical details for a second.  Let's think

 9   about how I as an economist would specify a model.

10          The first thing I would do is I would say in this case,

11   I want to know the relationship between foreclosure share and

12   pay.  And we're going to get to that.  We both do, eventually.

13   But before I throw in foreclosure share, I'd like to know did I

14   specify my model properly or not.  So what do I do?  I say,

15   Okay.  Well, what are some things where I know I have direct

16   evidence?  I know deep in my heart and nobody can change my mind

17   that there is a causal effect of this variable on pay.

18          THE COURT:  Right.

19          THE WITNESS:  And I'm going to look at my regression

20   and make sure that's there first.  So let me give you an example

21   outside of this one.  Every labor economist has run at some

22   point a regression of log pay on a bunch of stuff in the broader

23   context, and they always have education on the right-hand side.

24          I recently wrote a paper using some new data from

25   Norway where I was trying to figure out pay and making sure I

 1   had it right.  I didn't care about education, but the first

 2   thing I did was make sure that when I ran my pay regression -- I

 3   was looking at entrepreneurship and things that had nothing to

 4   do with college, but I wanted to make sure that that education

 5   variable had a big positive coefficient in my pay regression.

 6   Why?  Because I know there's a large causal effect of schooling

 7   on how much the person pays -- makes.

 8          Now, in the Zuffa context, I don't think education is

 9   in -- I don't have education data and I have no reason to have

10   that same bias about what education would do.  But there are

11   several variables where I know before I run the regression I

12   better get an effect of this or else I've done something wrong.

13   My variables are miss -- my regression's miss-specified.

14          And in the report I focus on win flag.  Here, I focus

15   on a few others.  What is win flag?  Win flag is an indicator

16   variable that equals one if the person won that night and equals

17   zero if the person lost that night.  By contract, 90-plus

18   percent, if I'm not mistaken, don't -- I can check that number,

19   but it's 90-odd percent of Zuffa fighters have a -- have a

20   contract similar to what you see on the screen now that says, if

21   you win, you will make as much as you did just for showing up.

22   That's -- and we saw that in my John Howard?

23   BY MS. GRIGSBY:

24   Q.  Yes.

25   A.  John Howard regressions already.  The only difference in his

———2:15-cv-01045-RFB-PAL———

1   pay was that he won one night and lost the other.

2          I don't have a sensible pay regression if winning

3   doesn't lead me to believe that pay goes up.  It just has to be

4   there or the regression's wrong.  There's a couple of other

5   examples highlighted on the previous slide.  So what do you see?

6          Go back.

7   *Q.*  Yep.

8   **A.**  So you see in my regression on the right-hand side, that

9   number is something like .3.  And if you undo the log effect, it

10  says that if I win, holding everything else equal, including the

11  fighter on that night.  Remember John Howard was -- I have the

12  fighter fixed effect for John Howard.  So if I hold everything

13  else equal and I look at the win flag, it says, everything else

14  equal, if I win, I get 40 percent more.

15         That's -- that's how the regression should work.  We

16  know that's how the world works.  That's how the regression

17  should work.

18         Dr. Singer, on the other hand, finds an estimated

19  coefficient near zero, standard errors that are very large, and

20  there's -- his regression tells you there's no reason to think

21  that if a fighter wins that night they'll make more money.  That

22  on its face -- I mean --

23         THE COURT:  But doesn't he have another factor that

24  also deals with the record?  And so, I'm just saying that

25  because I want to be fair to him and to you, right, and I don't

—2:15-cv-01045-RFB-PAL—

1    know if you had the same factor.  I think he had another factor

2    regarding the records.  Did you --

3              THE WITNESS:  We have exactly the same regressions.

4              THE COURT:  Okay.

5              THE WITNESS:  All I've done is changed the left-hand

6    side variable.

7              THE COURT:  Okay.

8              THE WITNESS:  Now, what he did -- what he explained in

9    his rebuttal report was something about multicollinearity.

10             I don't -- I don't want to be a jerk, but that was --

11   what he wrote there was, you know --

12             THE COURT:  Not credible, in your view.

13             THE WITNESS:  It's beyond not credible.

14             THE COURT:  Okay.

15             THE WITNESS:  It's -- it's -- it's a little -- it was

16   not right.  And the reason for that is he explains

17   multicollinearity breaks down the win -- he can't get his win

18   flag regression to work because of multicollinearity.

19             Your Honor, regressions are run because variables on

20   the right-hand side are collinear.  That is why we've run

21   regressions.  If he didn't have -- if things weren't collinear,

22   we wouldn't have run a regression.  We would have just looked at

23   how pay changed as -- the same time as foreclosure share

24   changed.

25             So the idea that win flag would be undone by these

———2:15-cv-01045-RFB-PAL———

1 other things is just simply ridiculous because these other

2 things are slightly correlated with it, but they don't change

3 the fact that the true causal effect on pay comes from winning

4 or as -- to use other examples, the dummy variable for

5 Pay-Per-View, which also shows up very dramatically in my

6 regression, we know you get more money if you get Pay-Per-View.

7 And in his regression it just doesn't show up.

8          THE COURT:  So I just want to go back to a point that

9 you made earlier, just so that I understand.  In terms of at

10 least this particular slide, this slide, even though it pulls

11 out particular variables, it's based upon you running the same

12 variables that he ran.  The only difference is you're not using

13 wage share, you're using log of compensation.

14          THE WITNESS:  I took his program and in the -- and the

15 part where it says regressed, blah, blah, blah.

16          THE COURT:  Right.

17          THE WITNESS:  I changed blah, blah, blah --

18          THE COURT:  To log.

19          THE WITNESS:  -- from what he had to log of

20 compensation that night.

21          THE COURT:  Okay.

22          THE WITNESS:  That is it.

23          THE COURT:  And so what you're saying, if I understand

24 you correctly is, that you have to start -- in any regression

25 you try to start with variables or factors that you know have

—2:15-cv-01045-RFB-PAL—

1   some influence on the left-hand side.  And you do that to help

2   you sort of, for lack of a better term, stay honest about the

3   validity of your model, right.  And so you start with that

4   assumption.

5          And so what you're saying is that one of the things

6   that should have led him and should lead me to question

7   Dr. Singer's model is that a factor or variable that you think

8   is understood industry-wide as being significant in terms of

9   compensation, whether it's wage share or log of compensation,

10  which is the win flag, is not statistically significant in his

11  regression.  Is that right?

12         THE WITNESS:  And I -- that was exactly right.  I

13  completely agree with everything you said.  I would just add if

14  you go down his list of regression coefficients, you can find

15  several cases where you would say that doesn't make sense.  If

16  you go down my list, you will not find a situation where you say

17  that doesn't make sense.

18         THE COURT:  So one of the questions I have for you,

19  Professor Oyer, which is -- goes back to this, and this happens,

20  as I'm sure you know, a lot with regression analysis is,

21  starting with certain fundamental assumptions, there can be

22  disagreements about the assumptions even as relates to, for

23  example, win flag.  So Dr. Singer might say, Well, I thought win

24  flag would matter, too, but the regression analysis doesn't lie

25  and there can be circumstances in which it doesn't actually

2:15-cv-01045-RFB-PAL

1  influence that.

2        How am I to distinguish between those two things?

3  Because that happens, as you know, frequently with regression

4  models where you have a foundational difference as relates to

5  assumptions.  The question is, is there anything in this

6  analysis that you can point me to, statistically speaking, that

7  would also tell you that there is an error here?

8        THE WITNESS:  Yeah.  So let's draw an important

9  distinction between a hypothesis and a known relationship.

10        THE COURT:  Okay.

11        THE WITNESS:  So often, sure, we'll have a hypothesis.

12  I think tenure on this job is going to lead to higher pay, would

13  be one in a wage regression.  I think the quality of the college

14  or law school you went to is going to be related to your pay.

15  And then I'll say, I'm sure I'm going to find that.  And then

16  you'd run the data, and if you don't find it you'd say, Huh,

17  maybe I was wrong.

18        But win flag is not one of those variables.

19        THE COURT:  And so --

20        THE WITNESS:  Win flag is the contract.  It's in the

21  contract.

22        THE COURT:  So you're saying because you know

23  automatically from the contract that in fact the compensation --

24  monopsony power or not -- is going to increase absolutely,

25  right, then the win flag should have some effect as it relates

─────2:15-cv-01045-RFB-PAL─────

 1  to the model.

 2          THE WITNESS:  And if it doesn't, you've specified your

 3  model incorrectly.

 4          THE COURT:  So let me ask this one question.  If the

 5  increase in the compensation is negligible compared to what the

 6  increase in compensation would be if it were truly a competitive

 7  market, would you see the results that he sees?

 8          So, in other words, the argument that they have made

 9  is, well, in a truly competitive market, if one of these

10  fighters is getting paid what they would otherwise be paid in

11  the but-for world, they'd be getting paid a much larger sum.

12          If that were the case -- and I'm not saying I find it,

13  but if that were the case, would you still see a statistically

14  significant impact on win flag or not?

15          THE WITNESS:  Oh, absolutely.

16          THE COURT:  Okay.

17          THE WITNESS:  If you don't have win flag having a

18  statistically significant effect, something's wrong with your

19  model.

20          THE COURT:  Okay.  Thank you.

21          Go ahead, Ms. Grigsby.

22  BY MS. GRIGSBY:

23  Q.  And I just wanted to address another thing that Dr. Singer

24  said, which is that if he ran an F test with the collective

25  significance of the win flag and certain other variables, that

1  they are collectively highly statistically significant.  To you,

2  is that a reasonable explanation for why these variables were

3  not significant in this regression?

4  **A.**  No.  So, the F test that he runs, again, in his response, I

5  just -- I think it's an amateurish response, is the only word I

6  can use.  He says let's run an F test and that will somehow come

7  to the -- be the savior that will come and save his win flag

8  result.  There is just no reason why you would run an F test.

9  What he does is he then says, Well, it's jointly significant

10 with all of these other things that may or may not be correlated

11 with win flag.  He doesn't test -- an F test is meant to test a

12 hypothesis.

13         I have a hypothesis.  I tested it.  It is that if I

14 win, I will get more money that night.  I tested that, and I now

15 know the answer to it.

16         His -- his F test is -- there's no underlying

17 hypothesis.  It's this bunch of stuff together, something

18 matters.  That's not the way to do it.

19         Now, he then cites to a couple of papers that run F

20 tests.  But what they've done in that paper -- in those papers,

21 which are not labor papers and not wage regressions and not in

22 any way related to what's going on here.  What they did in those

23 papers were, they took a bunch of closely related things that

24 are all trying to capture the same thing, but they weren't quite

25 sure mechanically how to specify that variable.  So they weren't

—2:15-cv-01045-RFB-PAL—

1  sure whether they should put in GDP or lag GDP or something like

2  that.  So they said, We don't have a prior on which of these

3  things matter, but we have a hypothesis that GDP over some

4  period of time matters.  And they put all of those into their

5  regression at the same time and tested the hypothesis, does GDP

6  matter.

7          Well, that's -- that's -- that's not what he's doing.

8  That's just not relevant to this -- that's not only not what

9  he's doing, it's not relevant to this case at all.

10  Q.  So now I want to move on a little bit to talking about some

11  of the criticisms of Dr. Topel's regression.  And

12  Professor Manning in particular mentioned the fact that

13  Dr. Topel's regression gives an unexpected result because you

14  only see an 8 percent increase if revenue doubles.

15          MS. GRIGSBY:  So right now can I pull up on the screen

16  Topel report, Exhibit 13, and Oyer Table 1.  So that's JCCX 51,

17  Exhibit 13, and JCCX 50.

18          THE WITNESS:  Don't I have a slide that gives us what

19  we want here?

20  BY MS. GRIGSBY:

21  Q.  Should be -- we're just going to blow it up.

22  A.  That's fine.  That's fine.

23          So these are --

24          MR. DAVIS:  I'll just note an objection for the record.

25  We did agree to share slides that we would be using on direct

2:15-cv-01045-RFB-PAL

1  beforehand.  If there's a slide, it would be helpful.  If not,

2  if there's not a slide --

3          MS. GRIGSBY:  We are not using a slide.  We're just

4  responding on the fly.  So we're responding to what

5  Professor Manning said this morning.

6          MR. DAVIS:  This is at odds with our agreement.

7          THE COURT:  I'm sorry.  It's at odds with?

8          MR. DAVIS:  We had an agreement that 45 minutes before

9  each direct examination we would provide the other side the

10 slides we'd use in direct examination.  And so we did so this

11 morning in anticipation of the direct examination today.  And my

12 understanding is that as this is part of this direct

13 examination, counsel is now not abiding by our agreement, but

14 rather introducing a new slide that we did not see as was

15 required according to our agreement.  And so I'm objecting to

16 the use of these materials on that basis.

17         MS. GRIGSBY:  Can I just respond briefly, which is,

18 these are actual exhibits.

19         THE COURT:  I understand that, but did you -- was there

20 an agreement to share information?

21         MS. GRIGSBY:  We did share slides, but this is -- this

22 is not a creation where we're altering what is in the exhibit at

23 all.  We're just pulling it up like we would deposition

24 testimony.  The only difference is that it's side-by-side.

25         MR. DAVIS:  We -- we did -- that is, many of the slides

—2:15-cv-01045-RFB-PAL—

1  consisted of exactly that.  We used hearing testimony and we

2  provided that in advance as a part of a slide.  I think --

3          THE COURT:  Well, let's see where it goes, Mr. Davis.

4  I'll allow Ms. Grigsby to use it.

5          Go ahead, Ms. Grigsby.

6  BY MS. GRIGSBY:

7  *Q.*  So Professor Manning testified that because Dr. Topel's

8  regression only shows an 8 percent increase in fighter

9  compensation when revenue doubles, that that was, in his words,

10  an alarm bell.  Do you agree with that?

11  **A.**  Yeah.  I was a little disturbed by that.  That was a false

12  alarm.  It was not an alarm bell.  8 percent increase in

13  revenue, I was a little --

14          THE COURT:  I'm sorry.  8 percent increase in?

15          THE WITNESS:  I'm sorry.  For -- 0.8 on this regression

16  on the left, which is Dr. Topel's regression, which is just my

17  regression only adding revenue as a control variable on the

18  right-hand side.  Okay.  That's all that's going on here in the

19  fourth, fifth, and sixth column of the left-hand side

20  regression.

21          THE COURT:  Uh-hmm.

22          THE WITNESS:  And you look at the revenue numbers, and

23  they're consistent with what Dr. Manning talked about this

24  morning.  They're 0.08, roughly, and that tells you that for a

25  one unit increase in log revenue, or doubling of revenue sort

—2:15-cv-01045-RFB-PAL—

1    of, you get an 8 percent increase in fighter compensation.

2           And Dr. Manning suggested that this was -- there was an

3    alarm bell because it was too small of a number.  I mean, I

4    just -- I find that very puzzling.  There's absolutely no reason

5    to think this number should be high at all.

6           THE COURT:  So why not?  If a boxer or a fighter goes

7    in and they increase revenue substantially, let's say

8    200 percent, why wouldn't you want to at least look at that?

9    And, again, part of this relates to how am I to know that.

10   You're saying that, Professor -- and I obviously don't doubt

11   that you mean that, but how do I know that that actually doesn't

12   make sense?  Is there something that I can look to that tells me

13   that?  Because part of the challenge here is that we don't have

14   a comparable market --

15          THE WITNESS:  Yep.

16          THE COURT:  -- that I can look at to say, Ah, here's

17   what the true competitive wage would be --

18          THE WITNESS:  I agree.

19          THE COURT:  -- for a fighter.  And so the challenge

20   that I face isn't that you all haven't raised potentially

21   significant criticisms, but as you know as an econometrician,

22   oftentimes you're in a situation where you're trying to model

23   something that there's not a perfect model for.  So how do I

24   know -- going back to this question, how do I know or how can I

25   gauge or evaluate you saying it shouldn't be alarm bells and

————2:15-cv-01045-RFB-PAL————

1  Professor Manning saying it does?

2       THE WITNESS:  So in this specific case, I'll try to

3  answer that.  And it's a judgment call, of course, but I think

4  that -- I think that at the end of the day -- again, it comes

5  back to that distinction from before about I have a hypothesis

6  versus I know the answer.  With revenue I don't know the answer

7  for sure.  I have a hypothesis that these numbers should go up.

8  However, I have no reason to think that revenue should go up

9  once I've controlled for all of the things we're controlling for

10 in our regression.

11      THE COURT:  You mean compensation should go up?

12      THE WITNESS:  That compensation should go up one --

13 thank you.  Thank you for correcting me.

14      When revenue goes up, compensation is going to go up

15 for, sure, on average.  I would expect that to be the case.  But

16 not necessarily for an individual fighter.

17      THE COURT:  Right.

18      THE WITNESS:  So John Wilson, I showed you before, had

19 very different pay -- had very similar payouts across two fights

20 because he was still John --

21      MS. GRIGSBY:  Howard.

22      THE COURT:  You mean Howard.

23      THE WITNESS:  So sorry.

24      THE COURT:  That's all right.  We've all said different

25 names, but we --

---

2:15-cv-01045-RFB-PAL

1            THE WITNESS:  I'm sorry about that.  I'm sorry to him.

2            So John Howard had pretty similar pay across the two

3    nights.  Revenues were dramatically different.  Why would we --

4    but -- so some of that may flow through to him, 8 percent if

5    there's a doubling, for example.  And that makes sense to me.

6            But keep in mind that all of these regressions have

7    fighter -- have dummy variables for every single fighter.  So

8    there's a dummy variable for John Wilson that's taking -- that's

9    noting that, sure, John Wilson's in this fight and revenue's

10   much higher, but he's still John Wilson.  And so I don't really

11   think he has to get paid that much just because this one fight

12   he's in, you know, has bigger names on the same ticket.  There's

13   no reason to think that that revenue increase is going to flow

14   to John Wilson, especially when I control for the fact that he

15   is still John Wilson.

16           These -- these regressions also -- also control for the

17   arena it's in.  So if I'm in a much bigger arena, revenues might

18   be bigger because there's more seats.  I don't know that that's

19   true, but I'm -- you know.  So they control for fixed effects

20   for each individual arena.  So, again, it's not that -- that

21   revenue -- that there's some number.  I'm not saying 8 percent

22   is exactly right or exactly wrong.  I'm just saying neither

23   Dr. Manning nor I have any reason to say this number should be

24   so-and-so.  It's not like win flag.  Win flag, we have a very

25   good reason to say that number has to be really high.

2:15-cv-01045-RFB-PAL

1          Here, we don't know.  We're running a regression.

2     We're controlling for a lot of other things that are related to

3     revenue and that's that.

4               THE COURT:  Okay.

5     BY MS. GRIGSBY:

6     Q.  So I just want to go back a little bit when you talked about

7     just generally as a matter of theory what your thoughts on labor

8     share.  Now, for -- from the standpoint of a labor economist,

9     why wouldn't you use wage share to determine whether there is

10    monopsony power?

11    A.  Right.  So this kind of -- let me relate that back to the

12    revenue point.  Because one of the criticisms that came up of

13    revenue this morning was that it's endogenous.  There was this

14    endogeneity problem that we talked about.  And, you know, that

15    might cause omitted variable bias or measurement error.

16          And truth be told, everything -- every regression has

17    some degree of measurement error and omitted variable bias.  So

18    whether we put revenue in or not doesn't affect my results

19    there.  And I don't think it's a big deal about whether

20    revenue's in there or not.

21          But literally, the worst way I can think of to solve

22    the problem, if revenue is in fact an -- if there is some sort

23    of problem with revenue that's either an endogeneity problem or

24    an omitted variable problem or anything else, literally the

25    worst way I can think of to solve that problem is to move it

2:15-cv-01045-RFB-PAL

1   over to the left-hand side of the regression.

2          THE COURT:  So let me ask you a question,

3   Professor Oyer.  What if, in fact, in the context of the

4   industry, the marginal revenue product is related to event

5   revenue.  Would it look like the model that Dr. Singer has?

6          Because part of this, again, is we have competing

7   models.  I don't have anything necessarily that tells me, in

8   terms of just like sort of art of error, that they're absolutely

9   invalid.  You all have made different assumptions about this.

10  If it actually is related to what the but-for wage would be, is

11  his model the appropriate way to go about doing it?

12         THE WITNESS:  No, I would say that's definitely not the

13  case.

14         THE COURT:  Okay.  So and tell me about why, even if

15  you thought that in this industry --

16         THE WITNESS:  Yeah.

17         THE COURT:  -- there was a relationship between the

18  but-for wage and particular event revenue, why wouldn't wage

19  share be an appropriate way to look at the -- why wouldn't that

20  be an appropriate measure?

21         THE WITNESS:  Revenue includes so many things that

22  go -- that have nothing to do with labor.  They include --

23         THE COURT:  I'm talking about event revenue, so --

24         THE WITNESS:  I know.  I know.  Even event -- even that

25  night's revenue includes all sorts of things that have nothing

—2:15-cv-01045-RFB-PAL—

 1  to do with labor:  the amount Zuffa spends on marketing, the

 2  size of the arena I mentioned before, all of these other things.

 3       So I've got all this in there, and these -- all of

 4  these things are driving revenue.  And it might be related to

 5  pay, and so we could have an argument about whether you control

 6  for it or not in the wage regression that I think makes sense.

 7  But taking this very noisy variable that, as the John Howard

 8  example shows you, kind of jumps around while despite the fact

 9  that the MRP is certainly not jumping around by a factor of six

10  within a few months of each other, why would I take this

11  incredibly noisy variable and just magnify any problem I have

12  with it by suddenly dividing my -- my dependent variable by it?

13  It's just not how you would solve -- it's -- you don't -- you're

14  magnifying the problem.  You're not fixing it.

15       THE COURT:  So let's assume that marginal revenue

16  product is one factor that contributes to event revenue.  And

17  let's say that I have seven factors.

18       THE WITNESS:  Yeah.

19       THE COURT:  If I have the other six factors on the

20  right side of my equation, would that not, then, if it -- if

21  marginal revenue product is being controlled for, would in that

22  case event revenue not be an appropriate measure as it relates

23  to marginal revenue product for the particular fighter?

24       THE WITNESS:  Gee, I really don't think so.  I mean, I

25  come back to the textbook model when the counterfactuals we run

1   there are just, how much does the person make in a competitive

2   world and how much do they make in a monopsonistic world.

3           THE COURT:  Yes, but we don't have that.  We

4   acknowledge the fact that in this industry this is not -- this

5   is not necessarily an ideal model, but my question to you is

6   this.  If you acknowledge, which I think that everyone has

7   acknowledged, that the marginal revenue product of a fighter has

8   some impact --

9           THE WITNESS:  Yeah.

10          THE COURT:  -- on the event revenue.

11          THE WITNESS:  Yep.

12          THE COURT:  If I say there are seven factors of it for

13  event revenue, six of which have nothing to do with the fighter,

14  if I control for those six -- and I'm not saying they have.

15          THE WITNESS:  Yeah.

16          THE COURT:  But if I have controlled for those six on

17  the right side of my equation, would that not be, then, a valid

18  way to try to measure how the marginal revenue product for the

19  fighter impacted the particular event?

20          THE WITNESS:  I just don't see how that solves any

21  problems.  We have wage share is -- we are -- we have a notion

22  that the economists have been using for decades, which is, we

23  run a wage regression, and that tells us something about but-for

24  worlds.  And they don't have to be foreclosure shares.  They can

25  be but-for I went to college, but-for I went to a better

—2:15-cv-01045-RFB-PAL—

1    college, whatever regressions we run.  And we have -- we have --

2    we have a toolbox for doing that.

3         And sometimes we make changes to that toolbox, but when

4    we do that, we expect the results to come out of them to be

5    sensible.

6         THE COURT:  Yes, but why isn't -- why isn't -- if there

7    is in fact a relationship, why isn't the model sensible?  That's

8    part of the question.  I think one of the things you pointed out

9    to me is you looked -- you thought, at least as relates to win

10   flag, one particular variable, that that variable should have a

11   particular statistical significance in the model and it doesn't.

12   So that should be one red flag as related to the model.

13        Can you point to others that you think exist?  Because

14   I think for me, that's helpful because that's potentially, at

15   least, an objective thing that I can look at.  Is there anything

16   else like that, Professor Oyer, that you can point to about

17   Dr. Singer's model?

18        THE WITNESS:  Yeah, I think the other -- a couple of

19   other things I would point to.  One is we're a starting from --

20   don't forget everything he does, as we started with, assumes

21   this proportionality.  We have -- we don't need that in my

22   world.  We need that in his world.  So why would I impose this

23   additional unjustifiable assumption?  I can't do it.  And, then,

24   the other thing I would point to is to go back to my John Howard

25   slide.

2:15-cv-01045-RFB-PAL

1           MS. GRIGSBY:  Oh, 15.

2           THE WITNESS:  Again, if we just look at that, we see

3  that event revenue went up by a factor of six.  And I just don't

4  see why that -- why we would think that that's indicative at all

5  of MRP.  There's just -- to act as though event revenue is

6  solving our problems for MRP in a world where event revenue

7  fluctuates so much and fighter individual pay doesn't?

8           You know, I'm frustrated as you are as -- I think

9  Professor Manning and I and you can all agree on the following:

10  We're all frustrated by the fact that the marginal revenue of

11  product -- the marginal revenue product is not something we can

12  measure.  And, therefore, we can't look cleanly and say, Yes,

13  this is monopsony, and no, that's not.

14          And I'm -- we've all been frustrated by that for many

15  decades.  And how do we -- do we have a solution to that

16  problem?  I hope we will some day.  But I can tell you for sure

17  measuring labor share is not the solution to the problem.

18  There's just nothing to back that up in anything Dr. Singer's

19  done or any of the testimony of Dr. Manning gave you today.

20          THE COURT:  Okay.  Thank you, Professor Oyer.

21          THE WITNESS:  Thank you.

22          THE COURT:  Ms. Grigsby.

23  BY MS. GRIGSBY:

24  Q.  Sure.  So let's just look at your slide 6 for a minute.  So

25  I just want you to walk through the example of why economists --

2:15-cv-01045-RFB-PAL

1  labor economists, such as yourself, use actual wages versus wage

2  share.

3  *A.*  Right.  So, this is just -- this is a simple example that

4  shows that there's just so much else going on in revenue besides

5  the product -- marginal product of labor.

6        So let's look at a programmer, and he or she might work

7  in four different jobs and one -- at one company they're paying

8  more, and maybe that's because they can use that person's skills

9  better and so they bid higher for their services and so forth.

10 But one is a hardware company.  One is a software company.

11 There's all sorts of other things that drive revenue besides

12 revenue share.

13       So if I were to look across -- and this is not -- this

14 is a hypothetical.  It's not a real example.  But, again, it

15 comes back to the fact that if I could -- if I could look at an

16 individual's -- would I -- is it just the case that if I could

17 look at the individual and look at their share of revenue

18 created, would that solve all of our problems?  No.  I mean,

19 it's just not -- we still have revenue share bouncing all over,

20 even though marginal product of labor might be the same in any

21 of these situations because the firm's cost structures are

22 different.  The firm's investments are different.

23 *Q.*  Now, Dr. Singer has explained that labor share is

24 appropriate or he's justified using labor share because as you

25 heard Professor Singer -- I mean, Dr. Singer and Professor

───2:15-cv-01045-RFB-PAL───

1  Manning say the athlete is the product.

2          Does that explanation change your conclusion here?

3  **A.**  Yeah, I -- that's an interesting distinction, but I don't

4  think in any way reflects on anything that's going on.

5          This idea that the athlete is the product somehow tells

6  us how we should specify the model, it just doesn't make any

7  sense.  If the athlete were truly the product in the absolute

8  sense, these guys would be entrepreneurs.  They'd start their

9  own businesses.  And we'd see -- you know, there are many

10  companies where people start their own business.  And, sure, we

11  look at their wage share because the whole company is theirs and

12  they own it.

13          But, in this context, the athletes aren't the product.

14  They're a part of the product.  They're no more the product than

15  an Apple engineer who designs an iPhone and who creates millions

16  of dollars of revenue for Apple.

17          THE COURT:  But how is that the case?  If you

18  acknowledge that in fact a particular fighter can influence

19  ticket sales and revenue, whereas the knowledge about the

20  particular Apple engineer doesn't do that, how is it that you

21  can then sort of treat them the same as it relates to the type

22  of influence their individuality will have on their salary, if

23  you acknowledge that there's a difference in terms of marginal

24  revenue product for each product that is created by the company?

25          THE WITNESS:  Look, there are valuable people at all

—2:15-cv-01045-RFB-PAL—

1  sorts of organizations.

2         THE COURT:  No, I understand that.  But what I'm saying

3  is that Professor Manning gave us an example, which I think is

4  potentially helpful, which says that no one buys an iPhone or

5  pays different amounts for different iPhones based upon which

6  iPhone designer or engineer designed it.  Whereas, people

7  potentially -- and I think this has been acknowledged -- will

8  buy a ticket or pay for Pay-Per-View for a fight based upon

9  which fighters are there.  How do you adjust for that in sort of

10 a standard, sort of, labor analysis?

11         THE WITNESS:  I mean, I reject the basic premise.

12 Because --

13         THE COURT:  So which part of about the premises do you

14 reject?

15         THE WITNESS:  The first part where Professor Manning

16 says they don't buy it based on which designer.  They don't know

17 the name of the designer, but the product is better if I have a

18 great designer who made a better product.  That person's

19 marginal product of labor at Apple was huge.  They designed a

20 better product that gives them an increase of 1 percent in

21 market share relative to Samsung.  That person is a rock star.

22 We don't know their name.  They are worth much more than John

23 Howard.  And they have a much bigger influence on people in the

24 marketplace than John Howard.

25         THE COURT:  Well, I'm not saying that there wouldn't be

—2:15-cv-01045-RFB-PAL—

1  a difference in terms of how a person might contribute to the

2  value of that.

3          THE WITNESS:  Yeah.

4          THE COURT:  But the question is, in terms of the

5  consumption of a particular product, whether or not familiarity

6  or knowledge of the particular, sort of, worker and the

7  acknowledgment that that actually has an impact in this area of

8  the industry, whether or not that's something that should be

9  taken into consideration when it relates to this.

10          THE WITNESS:  Again, I just don't see why that matters

11  at all.

12          THE COURT:  Okay.

13          THE WITNESS:  It's not a relevant consideration.

14          THE COURT:  Okay.

15  BY MS. GRIGSBY:

16  *Q.*  I guess my question to you would be, does that rock star

17  programmer drive revenue at Apple?

18  *A.*  Of course.  The rock star programmer, the rock star

19  professor, the rock star lawyer, all of these people drive --

20  drive revenue to the establishments for which they work.

21  *Q.*  Now, are you familiar with the Autor paper that both you and

22  Dr. Singer cite?

23  *A.*  Yes, I am familiar with the Autor, et al. paper.

24  *Q.*  Autor, et al. paper.

25          So, Dr. Singer has testified that the Autor, et al.

1  paper shows that economists used wage share or labor share to

2  determine, I guess, MRP.

3          Do you agree with that?

4  **A.**  So the Autor paper is an interesting new paper which comes

5  to some very interesting conclusion and does use the words

6  "labor share" from time to time.  But it has absolutely nothing

7  to do with the analysis being done in this paper -- I mean, I'm

8  sorry, in this case.  And there's a couple of reasons for that.

9  One is they're not running wage regressions.  They don't have

10  data on individual employees.  And so this labor share is at a

11  much more macro level.

12          There's a whole literature cited to by Singer in his

13  response that suggests that labor share is somehow studied in

14  this literature -- in economics.  It is studied.  It is studied

15  by macroeconomists and this one recent labor economists paper,

16  but it's not studied in the context of monopsony and it's not

17  studied in the context of an individual wage regression.

18          THE COURT:  And is part of that because you don't have

19  the data?  Do you have the data?

20          So, in other words, the other issue that Professor

21  Manning brought up, which is you don't have that granular level

22  data to be able to do that type of analysis, and so we use a lot

23  of compensation or compensation in part because we don't have a

24  better metric to do that.  How do you respond to that?

25          THE WITNESS:  Well, first of all, I'd like to point out

—2:15-cv-01045-RFB-PAL—

1   that Professor Manning has written a book, a handbook chapter,

2   and many other articles on monopsony.  Other people, Boal and

3   Ransom, wrote a review chapter about this.

4         All of them talked about wage regressions and studying

5   monopsony power.  Not once did Professor Manning or any other

6   economist ever write down or say out loud, Gee, I wish we had

7   the data to run a wage share regression analysis.  Instead --

8         THE COURT:  Okay.  But --

9         THE WITNESS:  Nobody ever asked for this.  Nobody ever

10  tried.

11        THE COURT:  But, Professor Oyer, that's not my

12  question.

13        THE WITNESS:  Okay.  Sorry.

14        THE COURT:  My question is, is it true that labor

15  economists typically don't have the information?  Because

16  whether they asked for it or not, they may be using what's

17  available to them.  And so one of the arguments that Professor

18  Manning said was we just don't have that data.  Because of the

19  way that the data comes to us, we couldn't, even if we wanted

20  to, measure the marginal revenue product for a particular Apple

21  engineer because we don't have that information.

22        THE WITNESS:  Yeah.

23        THE COURT:  Is that true?

24        THE WITNESS:  So I don't agree with this on two fronts.

25        THE COURT:  Okay.

1          THE WITNESS:  One is I don't disagree we want to do it

2     for all of the reasons we've already discussed.  So I won't

3     review those, but win flag, whatever, whatever you want --

4     whichever of my arguments I could reiterate, I wouldn't do it

5     even if I had it because it doesn't seem to be sensible, at

6     least not in this case.  I won't broaden it out to others.

7          The other thing is people have had it and not done it.

8     So we talked about the Scully paper.  Well, he had it.  He

9     didn't do it.  Professor Manning suggested that he couldn't do

10    it.  He had this regression of -- he had 150 -- and my memory of

11    the paper might be -- my memory of the paper could be wrong,

12    but, as I remember that paper, he had every ability to take the

13    wage of the employee and divide it by the team's revenue.  In

14    fact, he'd measured MRP by looking at the team's revenue.

15         So I don't think that Scully chose not to do it and

16    could -- and, you know, he could have.

17         All of these other papers in sports that have come

18    since could have, not one of them has ever done that.  The High

19    Tech workers case, I know there was this distinction, oh, you

20    can't do it because Apple -- whatever.  Why not?  Why would we

21    not -- why would we think that we can't take that High Tech

22    engineer and think about their share of the firm's revenue?  I

23    don't understand the distinction there.  Sure, they are a small

24    part of the overall firm, but so is John Howard.  So that's a

25    matter of degree; not of -- there's no conceptual difference.

─2:15-cv-01045-RFB-PAL─

1          We have that data.  We choose not to do it.  We don't

2     always have it.  He's right about that.  But it's not like we're

3     sitting around saying, Gee, I wish I could do that.  Oh, wow, we

4     need that data.  Nobody's saying that.

5          THE COURT:  So you're saying that that data's commonly

6     available at an industry level in terms of by -- within a

7     particular company by, I guess, unit and by whatever

8     measurements would be internally such that you could do that,

9     but economists, labor economists, don't do it?

10         THE WITNESS:  I would say it's -- you said at an

11    "industry level."  We often have it at the firm level.  We have

12    varying -- we have a wonderful set of new data sets available

13    through the Census Bureau and even better data available from

14    Scandinavian countries where people are running all sorts of new

15    regressions all the time.  But in there we know the company's

16    revenue.  Nobody's running -- nobody's running a labor share

17    regression.

18         THE COURT:  Thank you.

19    BY MS. GRIGSBY:

20    *Q.*  So I just want to move on for the last part to just talk a

21    little bit about Dr. Zimbalist and what he did in this case.

22         So Dr. Zimbalist also uses revenue share to compare UFC

23    or Zuffa to the big four sports and boxing.  Do you think that's

24    an appropriate comparison?

25    *A.*  No.  No.  I don't -- I don't think so.  So we already talked

———2:15-cv-01045-RFB-PAL———

1  about the comparison to the team sports, and I think that that

2  stands -- I think I'll just -- I won't reiterate, but basically

3  I just don't see why you would compare them to the team sports.

4  The cost structures are very different.  The maturity of the

5  sport is very different.

6          Boxing is a more natural comparison.  I would have to

7  agree that that would be the first place I would look.  As an

8  outsider they look pretty similar.  I don't watch either.  But

9  having said that, the nature of the sports are very different.

10          My understanding is that some of the same challenged

11  conduct goes on in boxing anyway, so it's not a natural place to

12  look.

13          But, also, in terms of they're just at very different

14  states of maturation of the sport.  So there's all sorts of

15  differences in supply and demand of boxers.  There may be all

16  sorts of different demands -- differences between supply and

17  demand of boxers that would make it not a relevant comparison.

18          It could be a relevant comparison, but I don't have --

19  I don't see -- we shouldn't start from the assumption that it is

20  because there's all sorts of things that could make it very

21  different.

22          THE COURT:  Well, part of the challenge here,

23  Professor, is I have to pick something, right?  I can't sort of

24  say -- throw my hands up and say nothing works in order to be

25  able to evaluate the reasonableness of it.  And so that's why I

—2:15-cv-01045-RFB-PAL—

1  think I have to sort of make some assessment.

2        My question to you is about boxing is if it were

3  established, and I'm not saying it has been, that in fact event

4  revenue was a metric used in relation to how a fighter was

5  compensated, would that then lend support to it being used in

6  MMA events?

7        THE WITNESS:  So wait a minute.  Are you saying that

8  suppose in boxing the person is literally paid a share of the

9  revenue brought in?  Well, that's very different than what's

10  happening here.

11        THE COURT:  No.  But my question is -- I'm not saying

12  it establishes it.  But if -- if in boxing or some other

13  industry the particular fighter or athlete's pay was directly

14  structured based upon event revenue --

15        THE WITNESS:  Right.

16        THE COURT:  -- would that lend support for it being

17  used in a similar industry?

18        THE WITNESS:  I am going to have to think about that.

19  I would say that confuses a different thing here, which is not

20  so much the level of pay, but the form of pay.  So we often

21  think about giving somebody equity in a company, giving somebody

22  benefits rather than pay.

23        Those are forms-of-pay questions, and once we start --

24  so it -- the issue you brought up there sounds like it's about

25  share -- revenue share, but it -- I think of that more as about

2:15-cv-01045-RFB-PAL

1    incentives or about the way in which I want to motivate the

2    person to work with me.

3           THE COURT:  Well, I didn't say it's different forms.

4    But my point is that if in fact it's built into a contract, it

5    would be no different than what your argument was, right,

6    regarding the doubling of the actual compensation?

7           THE WITNESS:  Oh, I see what you are saying.

8           THE COURT:  Right.  We would know that, in fact, it was

9    one of the metrics used.  And I'm not saying that that's been

10   established, but if that were to be established, would that lend

11   support to using wage share as a metric?

12          THE WITNESS:  Look, I would say there might be

13   conditions under which boxing would be a metric that -- a sport

14   that we would want to compare.  Whether we would use wage share,

15   I -- you know, I just -- I'd have to think.  I can't come --

16          THE COURT:  No, what I'm saying is if the contract

17   explicitly included that, right --

18          THE WITNESS:  If --

19          THE COURT:  -- as one of the ways that salary was or

20   compensation was calculated, as you were saying no different

21   than, for example, in for Zuffa there's a doubling of the

22   compensation, if that were established -- and, again, I'm not

23   saying that it is -- would that not provide a basis, at least

24   potentially, for the use of wage share at least in that

25   industry, say boxing?

─2:15-cv-01045-RFB-PAL─

1        THE WITNESS:  Maybe.  I'd have to -- again, we have to

2  think about the all things equal sort of thing.  So we just have

3  to make sure we're making an apples to oranges comparison.  And

4  is there a hypothetical world in which you can convince me that

5  the apple -- it's an apples to apples comparison?  Yes, that

6  hypothetical exists.  I'm not going to rule it out.

7        THE COURT:  Okay.

8        THE WITNESS:  I don't -- I haven't seen it.

9        THE COURT:  No, but what I'm saying is -- I'm just --

10  I'm trying to understand is you had said earlier that we know

11  that absolute compensation increases in these contracts, and so

12  that's a factor that should have significant influence in the

13  context of the modelling.

14        THE WITNESS:  Right.

15        THE COURT:  If we know, for example, in boxing that

16  event revenue and percentage of the event revenue is a form of

17  compensation, right, why wouldn't that then be an appropriate

18  measure to use as it relates to, like, boxer sort of competitive

19  wage?

20        THE WITNESS:  It might be.  It might be.

21        THE COURT:  Okay.

22  BY MS. GRIGSBY:

23  Q.  But to your knowledge, do boxers generally, besides the very

24  top boxers, get paid a percentage of revenue?

25  A.  I'm going to plead ignorance here.  I know nothing about how

———2:15-cv-01045-RFB-PAL———

1  boxers are paid.

2  *Q.* Have you reviewed anything in any of the expert opinions in

3  this case that boxers generally get paid a percentage of

4  revenue?

5  *A.* I may have, but I have long since forgotten the details of

6  them, to be honest.

7  *Q.* So I just want to move a little bit to the big four sports

8  because in the big four sports do you have any indication of

9  what type of labor market that is?

10  *A.* Yeah.  So the big four sports is a completely different

11  world.  It's collectively bargained.  It's mature.  It's -- we

12  have -- yeah, we have, sort of, issues with market power on both

13  sides.  So the nature of that business is just very different,

14  and I just don't think it's an easy way to make a comparison.

15        I wouldn't -- there's no reason to think that an X

16  percent share in Major League Baseball tells us anything about

17  the appropriate share in Zuffa.

18        THE COURT:  If you had to choose the most analogous

19  sport, what would it be?

20        THE WITNESS:  So the -- I threw out as a proposal X

21  Games.  And the reason -- the reason I like X Games is it has

22  two -- it's far from perfect.  It's far from perfect.

23        I don't watch any of these things so I don't know, but

24  it's -- but it has two things that to a naive observer like me

25  make it a good comparison.  One is it's at the early stages of

─2:15-cv-01045-RFB-PAL─

 1  its history, so the investments are being made by the central

 2  company or agency that's building the brand of the sport, UFC or

 3  the X Games people.  So that is a -- the other thing is it

 4  appeals to a similar sort of daring fan who -- or, you know,

 5  macho, daring fan.  I don't -- you know, so off the top of my

 6  head that seems like a reasonable place to start, but it's --

 7  I'm not advocating it as the perfect comparison by any means.

 8          THE COURT:  Okay.  Thank you.

 9          MS. GRIGSBY:  I have no further questions.  I pass the

10  witness.

11          THE COURT:  Thank you, Ms. Grigsby.

12          MR. DAVIS:  Would it be possible to set up the ELMO?

13          Thank you.

14                  CROSS-EXAMINATION OF PAUL OYER

15  BY MR. DAVIS:

16  *Q.*  Good afternoon, Professor Oyer.

17  **A.**  Good afternoon.

18  *Q.*  Nice to see you again.

19  **A.**  Same here.

20  *Q.*  So one of the things you said is that you have seen -- I

21  just want to make sure I have this right -- that you have seen

22  no evidence of proportionality in this case.  Is that right?

23  **A.**  I believe I -- yes, I will -- I would say I have not seen

24  any evidence of proportionality.

25  *Q.*  Okay.  Have you seen -- have you seen this document before?

—2:15-cv-01045-RFB-PAL—

1    **A.**   (Pause.)

2          MR. DAVIS:  And you can look on your screen.

3          (Fire alarm goes off.)

4          (Recess taken at 3:13 p.m.)

5          (Resumed at 4:05 p.m.)

6          MR. DAVIS:  Your Honor, I've been informed that I have

7    a hard stop at 4:30.  Is that right?

8          THE COURT:  Yes.

9          MR. DAVIS:  For today, for today.  Just for today.

10   Okay.  Thank you.

11         THE COURT:  Well, unless you think you can do it up to

12   4:45, I mean, because that's about how much time you'd have.  I

13   will give you that additional time.

14         MR. DAVIS:  I think if I -- if I have until 4:45, I can

15   get through my cross-examination.

16         THE COURT:  Okay.  Perfect.  I'm sure Professor Oyer

17   would appreciate that.

18         THE WITNESS:  I will be very happy.

19         THE COURT:  All right.  So we're back on the record,

20   and we're going to do our cross.

21         Mr. Davis?

22         MR. DAVIS:  Thank you, Your Honor.  If I might have

23   just a moment?

24         THE COURT:  Sure.

25         MR. DAVIS:  I grabbed everything because I was afraid I

—2:15-cv-01045-RFB-PAL—

1  would lose it.

2  BY MR. DAVIS:

3  *Q.*  Okay.  So --

4  *A.*  I'm sorry, I'm just making sure my phone is off.  I didn't

5  do that properly.

6          THE COURT:  That's okay.

7          THE WITNESS:  My mistake.  We're good.

8          MR. DAVIS:  That's okay.  I have a similar relationship

9  with technology.  I was half-convinced that I had pressed the

10  fire alarm button on the ELMO, and that was what precipitated

11  everything, so ...

12  BY MR. DAVIS:

13  *Q.*  Okay.  Let's take a look at -- this is -- I don't know if

14  you can see it on here, but that is your slide 15.

15          Does that look right to you?

16  *A.*  Yes.

17  *Q.*  Okay.  And in regard to your slide 15, this is the -- this

18  is John Howard a/k/a John Wilson a/k/a John Smith.  And he's one

19  your fighters that you identified.

20          Now, one of the things you said about these two events,

21  I think, is you drew the inference that he was probably higher

22  on the card at the first event, UFC Fight Night 59, than at UFC

23  189, if I recall your testimony correctly.  Is that right?

24  *A.*  I speculated that, yes.

25  *Q.*  You speculated that.  And what was the basis for your

—2:15-cv-01045-RFB-PAL—

1  speculating that?

2  *A.*  I -- I would just guess that that is the case given what we

3  know here.

4          THE COURT:  Is that based on the proximity in time?

5          THE WITNESS:  What?

6          THE COURT:  Was that based on the proximity --

7          THE WITNESS:  One is a much lower event revenue, and so

8  I'm guessing that he's lower on the card.  He's higher up on the

9  card in that event.

10         THE COURT:  In which event, just so we're clear?

11         THE WITNESS:  The top one.

12 BY MR. DAVIS:

13 *Q.*  Right.  So, in other words -- I just want to make sure I

14 understood your reasoning.  So, in other words, if John Howard

15 is in an event with a lot less revenue, the inference you would

16 draw is that he's probably higher on the card.  The other

17 prominent fighters are not.  And then when it's $30 million of

18 revenue, the reverse is probably true.  That's the inference you

19 did, in fact, draw?

20 *A.*  I'm sorry I drew it.  It's completely irrelevant to anything

21 we're discussing.

22 *Q.*  But it is an inference you did, in fact, draw?

23 *A.*  Again, I stated it.

24 *Q.*  You did state it.

25         Okay.  And so couple of things I want to ask you about

———2:15-cv-01045-RFB-PAL———

1   that.  The first one is, now, the wage share you calculated

2   here -- or I think it's called "fighter compensation share" --

3   let me start that over.

4          Fighter compensation share and wage share mean the same

5   thing in this context, right?

6   *A.*  Yes.

7   *Q.*  Okay.  So the wage share that you've calculated does not

8   control for the other fighters who appeared at the event, right?

9   *A.*  That's --

10          MS. GRIGSBY:  Objection.  Misstates his testimony.

11          THE COURT:  Overruled.  Go ahead.

12   BY MR. DAVIS:

13   *Q.*  I'm asking you the question.

14   *A.*  The event compensation number there, if you take the log of

15   it, it's the left-hand side variable in my equation.  If you

16   just take the fighter compensation share there, that's the

17   left-hand side variable in Dr. Singer's regression.

18   *Q.*  Oh, I see.  So you're using Dr. Singer's regression analysis

19   here to generate these particular wage shares?

20   *A.*  I'm -- yes.

21   *Q.*  Okay.

22   *A.*  I'm using his data.

23   *Q.*  Good.  I just wanted to make sure I understood what it was

24   you were doing.

25          All right.  Let's take a look at ...

2:15-cv-01045-RFB-PAL

1           And this is this is slide 8, correct?

2  **A.**  I can't read it, but ...

3  Q.  Okay.  I think you may be able to see --

4  **A.**  It's one of my slides.

5  Q.  Okay.  It's one of your slides and you have no reason to

6  believe it's not slide 8.  Fair enough.

7           And on the right-hand side is your regression using the

8  log of compensation.  Is that -- is that right?

9  **A.**  Yes.

10  Q.  Now, that regression does not control for event revenues.

11  Is that right?

12  **A.**  Yes.

13  Q.  Okay.  Just wanted to make sure of that as well.  Okay.

14           THE COURT:  And why not?  Why did you make that

15  particular choice, in your view?

16           THE WITNESS:  Well, because the simplest thing I

17  thought to do was just to take Dr. Singer's regression and run

18  what I considered the correct regression, which is a log wage

19  regression using the same explanatory variables.

20           THE COURT:  Okay.  So you don't know from your own

21  regression analysis whether or not event revenue would have had

22  a significant -- statistically significant impact in that

23  particular model that you ran because it wasn't in there?

24           THE WITNESS:  Well, I know it from Professor Topel's

25  report.

2:15-cv-01045-RFB-PAL

1          THE COURT:  But I'm saying from your own.

2          THE WITNESS:  I don't remember whether I ran that

3   regression or not.

4          THE COURT:  Okay.  All right.

5          THE WITNESS:  And it's irrelevant because it gives

6   exactly the same implications if you include event revenue as a

7   control variable.

8          THE COURT:  Why is that?  Whether or not it's

9   statistically significant or not is irrelevant; why?

10          THE WITNESS:  Oh, because -- well, all we care about --

11   all we care about in terms of drawing inferences regarding this

12   case is the foreclosure share coefficient.

13          So, you know, we care about win flag for all of the

14   reasons we discussed -- and apparently it's so exciting it set

15   off alarms.  But we care about win flag for various reasons.

16   But the only -- the only coefficient we really care about here

17   is foreclosure share.

18          And so the foreclosure share coefficients are -- are

19   economically and statistically insignificant in my regression

20   whether I include revenue as a control variable or not.

21          THE COURT:  Okay.

22          THE WITNESS:  So that's what I meant by it's irrelevant

23   whether we control for revenue because it doesn't affect the

24   inference you draw in foreclosure.

25          THE COURT:  Okay.

———2:15-cv-01045-RFB-PAL———

1 BY MR. DAVIS:

2 *Q.* Okay. Now, in your report, you opined that there's no

3 literature of which you were aware in the academic community

4 that accepts use of labor share as a proper basis for measuring

5 how monopsony power affects compensation, correct?

6 *A.* If you want me to verify that -- if you're reading from a

7 report, I will believe you.  I will believe you.

8 *Q.* Okay.

9        THE COURT:  Is that your view?

10       THE WITNESS:  That is my view.

11       THE COURT:  Okay.

12 BY MR. DAVIS:

13 *Q.* Okay.  That is your view.  Good.

14       But at deposition you admitted that you had never

15 written a publication that assessed the effect of monopsony

16 power on the compensation of professional athletes, correct?

17 *A.* If you want me to -- I won't take issue with the question.

18 I don't remember being asked that at the deposition.

19 *Q.* Have you ever written a publication that assessed the effect

20 of monopsony power on the compensation of professional athletes?

21 *A.* No, I have not.

22 *Q.* Okay.  And you didn't cite to any publications that used

23 wage level as a measure of the marginal revenue product of

24 professional athletes, correct?

25 *A.* Well, I -- did I not talk about Scully?

—2:15-cv-01045-RFB-PAL—

1  Q.  You did not.

2  A.  Okay.

3  Q.  And, in fact, in deposition you admitted that you had -- did

4  not cite to any such thing.

5  A.  Okay.  Then I did not.

6  Q.  And you didn't cite to any publication that rejects use of

7  wage share in assessing the affect of monopsony power on

8  compensation in sports, correct?

9  A.  There are -- there are no -- there are no papers that

10  suggest using it in the way Dr. Singer has used it so nobody has

11  rejected it.

12  Q.  You qualified your answer just then in a way that Dr. Singer

13  has used it.  I'm not qualifying it in that way.  I'm saying

14  generally that you actually have not identified any publication

15  that rejects use of wage share in assessing the effects of

16  monopsony power on compensation in sports however it's used.  Is

17  that fair?

18  A.  Did -- are you saying you asked me that -- are you asking if

19  you asked me that at the deposition or are you asking me now?

20  Q.  I'll ask you now.  Have you cited to any such publication?

21  A.  No.

22  Q.  Are you aware of any such publication?

23  A.  No, they don't exist.

24  Q.  They don't exist.  Okay.

25          So at your deposition do you recall that I put before

————2:15-cv-01045-RFB-PAL————

1  you the 2004 Scully article, *Player Salary Share and the*
2  *Distribution of Players Earnings*?
3  **A.**  Vaguely.
4  *Q.*  You do -- you recall that vaguely.
5          And I asked you to review that article at the
6  deposition.  Do you recall that?
7  **A.**  No.
8  *Q.*  Okay.  Do you recall whether you admitted that Professor
9  Scully appeared to use wage share in his analysis?
10  **A.**  I don't recall any discussion of Scully's paper from my
11  deposition.  That was a long time -- that was a very long time
12  ago.
13  *Q.*  Okay.  Why don't we look at the testimony.
14          So you -- and I believe you have a copy of your
15  deposition.  Is that correct?
16  **A.**  Do I?
17          THE COURT:  Let's hope so.
18          MR. DAVIS:  If not, we will happily provide you one.
19          THE WITNESS:  Yep, I do.
20  BY MR. DAVIS:
21  *Q.*  Very good.  So I'm looking at page 103 of your deposition
22  and starts at line 19.
23          And I asked the question:  "It fair to say that
24  Professor Scully is analyzing professional athlete compensation
25  using what we have called wage shares?"

—2:15-cv-01045-RFB-PAL—

1          And what was your response?  If you would read it out

2   loud.

3          THE COURT:  He doesn't need to read it out loud.  I can

4   read it.

5          MR. DAVIS:  Okay.  My apologies.

6          THE COURT:  If you want, Professor Oyer, you can read

7   it to refresh your recollection about what you said.  It's a

8   little hard to read these things because the way that the pages

9   work out.

10          THE WITNESS:  Yeah, I can see it in front of me.

11   BY MR. DAVIS:

12   Q.  Okay.  We'll cut to the chase.

13          On page 104, line 9 I say:  "Does he appearing to be

14   using wage shares in his analysis?"

15          And you say:  "I believe that's what he's doing."

16          Does that refresh your recollection at all?

17   A.  Not really.  But I believe you that he did that and that I

18   said that because ...

19   Q.  Okay.

20          THE COURT:  Do you have any reason to doubt that that's

21   true?

22          THE WITNESS:  Absolutely not.

23          THE COURT:  Okay.

24   BY MR. DAVIS:

25   Q.  Okay.  Very good.

—2:15-cv-01045-RFB-PAL—

1          And we went through a similar process, if you may

2    recall, with the -- or you may not recall, as it turns out, with

3    Professor Kahn and his article, *The Sports Business As A Labor*

4    *Market Laboratory.*

5    **A.**  Yes, I do.  I remember that one explicitly because, as I

6    remember, you tried to get me to focus on wage share, but that

7    article has for every discussion of wage share a similar

8    discussion of wage levels.

9    *Q.*  Okay.  And do you recall that I asked you whether he used

10   wage share in analyzing the effects of anticompetitive conduct

11   on player compensation?  Do you recall whether I asked that?

12   **A.**  Yes, I recall that one.

13   *Q.*  And do you recall that you answered that he did?

14   **A.**  I don't.  But I'll believe you that it's in here.

15          As I think back to it, I'm not sure that's how I would

16   have characterized, but this has been a while so --

17          THE COURT:  Why don't you show him the portion of his

18   deposition.

19          MR. DAVIS:  Why don't I do that.  That would be great.

20          THE WITNESS:  Just tell me where, I've got it right

21   here.

22          THE COURT:  He can grab some context.

23   BY MR. DAVIS:

24   *Q.*  Okay.  Page 109.  The question is:  "Are you aware that in

25   particular Professor Kahn is analyzing the effects of

2:15-cv-01045-RFB-PAL

1  anticompetitive conduct on player compensation using wage

2  shares?"

3        And your response was:  "Among other -- he is using

4  wage share among other means of -- among other methods and

5  measures, sure."

6        Does that refresh your recollection at all?

7  *A.*  Not really, but okay.  I'm sure I said that.

8  *Q.*  Okay.  Let's look at another example.  It would be John

9  Vrooman, *The Theory of the Perfect Game Competitive Balance in*

10 *Monopoly -- Monopoly Sports Leagues*.

11       Do you recall the testimony about Dr. Vrooman's article

12 at all?

13 *A.*  So I don't recall testimony about that article.

14       What I recall is in the deposition the attorney put a

15 litany of papers in front of me, and each one of them used the

16 term "wage share."  And I admitted that I had not cited to them.

17 And there are several reasons I hadn't cited to them.  One is

18 they're not incredible journals.  They're not something a labor

19 economist would read.  They weren't -- they're not papers that

20 would be submitted to the journals I read or to the journal I

21 edit.  So it's not a literature I know.  It's not a literature

22 to which Dr. Manning has cited.  It's not something that labor

23 economists read or do.

24       So they used the term "wage share."  They used that

25 term, and they sometimes show you what the wage share is.  Not

1    one these papers does anything close to what Dr. Singer did or

2    in any way other than using the term "wage share" is somehow

3    indicative that it's something we should do and, therefore, Dr.

4    Singer should do it.

5           It's just -- the term "share" is out there.  In the --

6    in my -- in my -- in my deposition there are places where I have

7    used the word "share" when writing articles that have nothing to

8    do with anything we're talking about today.  So, sure, shares,

9    wage shares, these terms are out there.  It's not relevant.

10   Q.  So I just want to be very clear about this.  Your claim is

11   that these articles don't actually use wage share, they just use

12   the term "wage share."  Is that your position?

13   A.  No, these articles -- sorry for cutting you off.  Sorry

14   about that.  Were you finished?

15   Q.  No, please.

16   A.  They use wage share.  They calculate wage share.  They

17   don't -- they do it at a league-wide level, if I remember

18   correctly.  And there's nothing that -- in any way has remotely

19   similar empirical validity.

20          There's nothing in those articles that gives empirical

21   validity to Dr. Singer's approach, which is for other reasons

22   having nothing to do with any of this invalid.

23   Q.  So, but they nonetheless do, in fact, use wage share.  And

24   you had originally said that you were unaware of any literature

25   that uses wage share to assess the affects on -- of monopsony

—2:15-cv-01045-RFB-PAL—

 1  power on the compensation of athletes.  That is what you had

 2  said, right?

 3  *A.*  Well, I was not aware of these papers until they were

 4  brought to my attention at deposition.  There is no reason I

 5  would have been.  And they have no bearing whatsoever on my

 6  opinion.

 7  *Q.*  Do you --

 8          THE COURT:  Hold on a second, Mr. Davis.

 9          Is part of that because you don't specialize in doing

10  work in the sports labor market?  Have you written any papers at

11  all in this particular area in the past 10 or 15 years

12  regarding, sort of, competitiveness in the labor market in the

13  sports field?

14          THE WITNESS:  No, I haven't.  I've written on -- and

15  sports never to do with competitiveness in the labor market.

16          THE COURT:  Okay.  And so this -- and, again, the

17  journal that you edit focuses on what types of market analysis?

18  Is it a particular industry or is it just that it doesn't

19  necessarily include the sports literature?

20          THE WITNESS:  So it's called the *Journal of Labor*

21  *Economics.*  It is the leading economics journal in the labor

22  economics field.  I'm an editor -- I'm the Editor-in-Chief.

23  Professor Manning used to be one of the editors of this journal.

24  Professor Topel also used to be one of the editors of this

25  journal.  It's the leading field journal in labor economics.  It

1  publishes sports papers.

2       I published -- I was the editor of one that we

3  published recently about NBA compensation.  So sports papers are

4  submitted to this journal all the time.

5       I don't know -- I have no idea whether any of these

6  papers were submitted that have been shown to us were submitted

7  to my journal.  They were -- they would not have been published

8  in it.

9       THE COURT:  Okay.  Thank you.

10      MR. DAVIS:  Thank you, Your Honor.

11 BY MR. DAVIS:

12 *Q.*  In terms of the dispute between wage share and wage level,

13 am I correct that it is your position that labor share is never

14 an appropriate benchmark for competitive pay?

15 **A.**  Again, I'm -- I'm not going to say "never," for exactly --

16 *Q.*  Right.

17 **A.**  Dr. Manning and I are both somewhat conservative.  Even

18 people from New Jersey can be understated, so I'm not going to

19 say "never" either.  But it is -- I have not seen a situation

20 where it would be appropriate to run the types of analyses Dr.

21 Singer used.

22 *Q.*  Okay.  And so that means --

23      THE COURT:  Excuse me, Mr. Davis.  I just want to

24 clarify this.

25      So, that is based in part upon your assumption that

──2:15-cv-01045-RFB-PAL──

1   there isn't a direct relationship between how fighters are

2   compensated and event revenue?  Because if there wasn't an

3   explicit term, then there would be no way you could say that

4   wage share wouldn't at least be some function of the

5   compensation, right?

6          THE WITNESS:  So, I think as I -- as I mentioned during

7   my earlier testimony, one thing that Dr. Manning and I and a lot

8   of labor economists would agree on is if we could ever measure

9   marginal revenue product we would be thrilled.

10         THE COURT:  Right.

11         THE WITNESS:  It would advance the literature and our

12  ability to spot monopsony in incredible ways.

13         I have no reason to think that -- I can't think of a

14  situation where we'd get closer to that gold standard than we

15  currently are by using labor share.

16         THE COURT:  But what I'm saying is, if you had a market

17  in which contracts were explicitly based on event revenue, would

18  that not then be a market in which wage share would be an

19  appropriate measure?  I'm not saying we have that here.

20         THE WITNESS:  Yeah, I understand.

21         THE COURT:  But what I'm trying to understand, sort of,

22  the theoretical argument you're making, and it seems to me that

23  it assumes -- because we don't have information -- that you

24  shouldn't use wage share unless there's some basis for

25  connecting the event revenue to the compensation.  And from --

————2:15-cv-01045-RFB-PAL————

1  and what I take from that is you saying you're not ruling it

2  out, but there's no information that would suggest that, in

3  fact, there is this connection.  And if there's no information

4  to suggest that there is this connection, that it wouldn't be

5  appropriate.

6          So then my sort of hypothetical to you is, if, in fact,

7  there was information that suggested event revenue was

8  explicitly tied to a fighter's compensation, would wage share in

9  that instance be an appropriate potential metric?

10          THE WITNESS:  Yeah, that's the I don't want to say

11  "never" because there could be a situation I'm not thinking of

12  where that would apply.  It doesn't apply here.  But there --

13  there could be such a situation.  I don't know.  I can't rule

14  that out for sure.

15          THE COURT:  Okay.

16  BY MR. DAVIS:

17  Q.  And it doesn't apply here to any of the fighters, is your

18  position?

19  A.  It does not apply to the fighters in a way that we can apply

20  using -- I'm only commenting on Dr. Singer's regression and

21  whether it applies there.

22          Do you want me to go back and think about whether it

23  applies to Conor McGregor or not?

24  Q.  No --

25  A.  I wasn't asked to do that.

———2:15-cv-01045-RFB-PAL———

1  Q.  Okay.  You were not asked to do that and you're not offering

2  an opinion on that issue?

3  A.  I'm offering an opinion that it's not relevant to the group

4  as a whole that we've been looking at, and there's no way it

5  makes sense to do the types of analyses Dr. Singer has done.

6  Q.  Okay.  Switch topics slightly.

7       In your expert report, you asserted that labor

8  economists start from the basic principle that in a competitive

9  labor market a firm will be willing to pay a worker up to the

10  marginal revenue product of that worker's labor.  Is that your

11  opinion?

12  A.  Yes.

13  Q.  Okay.  And I think you clarified at deposition -- and I take

14  this as a friendly amendment -- that they're always willing to

15  do that.  It's just in a competitive market they have to pay up

16  to the marginal revenue product of labor.  Is that -- is that

17  fair?

18  A.  That, I do remember.  Yes.

19  Q.  Okay.  Good.

20       And so, built into that principle, is that a firm would

21  not deliberately pay its workers more than their marginal

22  revenue product of labor.  Is that correct?

23  A.  I think that's right.

24  Q.  Okay.  And so even if we're looking at, for example, a

25  sports league with a union and the union confers some sort of

—2:15-cv-01045-RFB-PAL—

1    bargaining power on the athletes, we still would expect that the

2    amount of compensation that the athletes would receive would not

3    exceed their marginal revenue product of labor, that follows,

4    correct?

5    *A.*  Are you talking about the athletes as a group or

6    individually?

7    *Q.*  As a group.

8    *A.*  I would say that's right.

9    *Q.*  Okay.  And -- and those athletes -- and, therefore, at most

10   the compensation they would receive would be as a group their

11   marginal revenue product of labor?

12   *A.*  Yes.

13   *Q.*  All right.  Thank you.

14          Now, in your report -- oh, I think we covered this --

15   you modified Dr. Singer's regression, but you didn't include

16   event revenues as an independent variable in your version of the

17   regression.  Is that right?

18   *A.*  That's right.

19   *Q.*  Okay.

20          Now, at your deposition we discussed so-called nascent

21   sports.  Do you recall that at all?

22   *A.*  I don't.

23   *Q.*  Okay.  Maybe I can refresh your recollection.  Let me find

24   your ...

25          So I am looking at page 172.  172 of your deposition.

—2:15-cv-01045-RFB-PAL—

1   And starting on line 4 I asked you:  "Let's start with the

2   nascent business explanation."  We're talking about whether wage

3   shares -- wage share varies by different sport.  "Is it your

4   opinion that, all else equal, if the league is earlier in its

5   development, it would be expected to pay a lower share of its

6   revenue to its fighters than it would pay as it matures?"

7          And you said:  "Not necessarily."

8          I said:  "Not necessarily.  So it's possible that you

9   have it exactly backwards that nascent sports businesses pay a

10  higher share of revenue so that the major sports are a

11  conservative benchmark in this regard?"

12         You said:  "That's empirically not true, right.  So I

13  don't think that -- I don't think I have it exactly backwards

14  like as a general rule or something.  I don't think we know the

15  general rule.  I think we can't make a comparison about how

16  things get done in a nascent sport versus a non-nascent sport

17  for lack of a better way of saying it."

18         So it was your opinion, then, that there is no general

19  rule about whether nascent sports pay higher wage share or lower

20  wage share than more mature sports.  Is that fair?

21  *A.*  Yeah, I haven't studied it so I don't know.

22  *Q.*  Okay.  So you have no opinion on that?

23  *A.*  That's correct.  Well -- yeah.

24  *Q.*  Okay.  You earlier today stated that you thought labor

25  economists would agree with you about whether or not wage share

—2:15-cv-01045-RFB-PAL—

1  is appropriate to use in the way that Dr. Singer uses it.  Is

2  that correct?

3  *A.*  I don't remember saying that today.

4  *Q.*  You don't remember saying that -- you don't remember saying

5  that you were confident that labor economists would have a

6  similar view to yours rejecting that approach?

7  *A.*  What I think I said earlier today was -- and correct me if

8  I'm wrong, because I don't have the transcript.  If -- I believe

9  what I said was that if Dr. Singer submitted that paper to the

10  journal I edit, it would be rejected.

11  *Q.*  Yeah.  You -- I think you also said that -- you did say a

12  separate team, but that's okay.

13        Do you recall at your deposition that you also made

14  predictions about which labor economists would agree with you on

15  your position about wage share?

16  *A.*  I do.

17  *Q.*  You do.  Do you recall that you identified Professor Manning

18  as particularly authoritative on monopsony power?

19  *A.*  I do.

20  *Q.*  You do.  And that his work -- his book, *Monopsony in Motion*,

21  and his chapter on monopsony power and its effects in, I think,

22  the *Handbook of Economics -- Labor Economics* were particularly

23  authoritative.  Do you recall that as well?

24  *A.*  I think the book is excellent.  I mean, I've cited it

25  frequently because I think it makes our case very nicely for us.

———2:15-cv-01045-RFB-PAL———

1  *Q.*  Okay.  And Professor Manning, whom you -- you heard

2  Professor Manning testify earlier today as well?

3  **A.**  I did.

4  *Q.*  And Professor Manning, who you identified as particularly

5  authoritative and an expert and leader on monopsony power and

6  labor market, disagrees with you about wage share.  Is that fair

7  to say?

8          THE COURT:  I think it's fair to say.  Obviously

9  they're competing experts.

10  BY MR. DAVIS:

11  *Q.*  So it is at least conceivable that your prediction about

12  other labor economists might be mistaken as well.  That's my

13  last question on cross-examination.

14          THE COURT:  Well, I don't think that's really a

15  question, obviously.

16          MR. DAVIS:  I don't think it was either.  I think it's

17  rhetorical.

18          THE COURT:  I think it's a statement.

19          MR. DAVIS:  So I have no further questions on

20  cross-examination, Your Honor.

21          THE COURT:  So, Professor Oyer, I just have a couple

22  follow-up questions.  And it really goes to this issue of the

23  use of wage share or not and relates to two separate issues.

24  The first is, if you wanted to try to figure out how event

25  revenue contributed to marginal revenue product, how would you

—2:15-cv-01045-RFB-PAL—

 1  measure that?

 2          THE WITNESS:  If I wanted to figure out how event

 3  revenue --

 4          THE COURT:  In this industry, right.

 5          THE WITNESS:  If I wanted to figure out how event

 6  revenue contributed to marginal revenue product --

 7          THE COURT:  So I'm sorry.  So I'm sorry.  So I'm sorry,

 8  I should that that back.  The relationship between a particular

 9  fighter's revenue -- marginal revenue product -- the

10  relationship between that and event revenue, how would you

11  assess that?

12          In other words, if you really wanted to figure out if,

13  in fact, a particular fighter's marginal revenue product

14  impacted event revenue, all right, and if their -- how would you

15  first test that?

16          THE WITNESS:  So, I don't think there's an easy answer

17  to that.  So I would start by going back and doing some very

18  simple -- I'd start in Excel here.  I wouldn't get fancy.

19          So I don't know exactly how to do that, but I think our

20  first -- the first thing I would say -- and it comes back to

21  what -- one of the questions before is let's start with an

22  outlier and see how that works.  So I might try Conor

23  McGregor -- Conor McGregor, the only UFC fighter I've ever heard

24  of.

25          THE COURT:  Right.

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  So I keep saying him, but we could pick

2     another headliner and do the same thing.  And I might try to

3     look at how revenues are related, how that person's being in or

4     not in a fight is related.  But, boy, this is, off the cuff,

5     going to be a difficult thing.  I would -- I would start by

6     calling together -- what I would do, to be honest, I would try

7     to get a couple of other labor economists to sit down with me

8     and figure this out; possibly Alan; possibly others.

9          THE COURT:  But if you had to do it on your own, if you

10    had to do it on your own, right, what would you do?

11         THE WITNESS:  So I'd start by looking at some graphs.

12    I would do -- actually, I would do two graphs.  My new friend,

13    John Howard, and my -- and Colin -- Conor McGregor, and I would

14    look at the -- how -- I would just map -- I would just draw -- I

15    don't know if it would be a line graph.  I'm trying to think how

16    I would do this.  Probably just a scatter plot of bare revenue

17    for each of them, and they would be very different, of the

18    revenue in their fight versus how much -- how much they were

19    paid that night.  But, God, that doesn't even tell us anything.

20    I need -- I need -- I need more time.

21         MR. DAVIS:  Your Honor, I just for -- I actually do

22    have a couple more questions.  Whenever you're done, if I could

23    just have a few more minutes.  I apologize.  The fire alarm was

24    a little bit disruptive.

25         THE COURT:  No, that's all right.

1    Because, again, part of my task here, Professor Oyer,

2 is to figure out in a situation in which you don't have clear,

3 direct benchmarks -- a -- for example, a non allegedly sort of

4 challenge of monopsonistic market to do this, is it reasonable

5 to do what they did in the absence of having a perfect system?

6 And that's why I'm asking you, if had you to do this, why

7 wouldn't you -- why wouldn't you use some of these same measures

8 if you believed that there was a relationship between a

9 particular fighter's marginal revenue product and event revenue,

10 what would you do that would be different than what they did?

11    THE WITNESS:  I guess I -- I guess -- just because

12 there's a relationship, doesn't mean that's the focus.  There

13 could be a relationship between that.  There is a relationship

14 between the person's marginal revenue product of labor and many

15 things on the right-hand side of our regression.  But I don't

16 think revenue should be the focus of that -- of -- like, I don't

17 see it -- we're getting trapped because Singer said let's think

18 about share, and all of a sudden the focus is on the

19 relationship between marginal product of labor and revenue.

20    THE COURT:  But I'm saying that --

21    THE WITNESS:  That's not the baseline from which I'd

22 even start.

23    THE COURT:  So I'm saying that because in this record

24 there is, in fact, testimony of other witnesses who say that

25 they've looked at, for example, event revenue and fighter share.

2:15-cv-01045-RFB-PAL

 1  I mean, there are -- you haven't seen all of this or maybe you

 2  have.  There are actually different pieces of the record that at

 3  least suggest that that's something that people looked at.

 4        THE WITNESS:  Uh-huh.

 5        THE COURT:  And you're not disputing, I don't think,

 6  the fact that there is some relationship potentially between a

 7  fighter's marginal revenue product and event revenue, and it

 8  seems to me part of what you are talking about discussing and

 9  struggling with as relates to what they did is how they went

10  about trying to sort of quantify that relationship.  But the

11  question is, do you have a better way to do it?

12        THE WITNESS:  Yes, I do.  And it's Table 1 of my -- of

13  my report.  Because, there, we have in mind, again, the but

14  for -- the but-for regression.  That gives us -- if we -- again,

15  I'm going to rely on the foreclosure share.  That gives us what

16  would be the -- what would be -- in the absence of some

17  foreclosure share, what would be the pay of the fighters and --

18        THE COURT:  I'm sorry.  In that regression, did you

19  have event revenue?

20        THE WITNESS:  I did.  And so I can add it -- if I

21  really want to know about revenue, we can add it and we know the

22  relationship there.

23        THE COURT:  So what you would do is -- you were saying

24  you might do something which you think Dr. Topel did, which

25  would be you would do like an absolute level of compensation and

—2:15-cv-01045-RFB-PAL—

1   then you would put on the right side of the equation some

2   measure for event revenue?

3           THE WITNESS:  Uh-hmm.  Yes.  The other thing -- I mean,

4   the other thing I would do -- when I started this case, the

5   first thing you would do is you would look at just over time

6   draw some graphs about the relationship between fighter pay,

7   foreclosure share, revenue, and those sorts of things.

8           And what you find in all of those is that during the

9   period of contested -- what's the term here?

10          THE COURT:  Challenged conduct.

11          THE WITNESS:  Challenged conduct.  I'm sorry, I knew it

12  was two Cs.

13          THE COURT:  That's all right.

14          THE WITNESS:  During the period of challenged conduct,

15  pay -- even labor share, if I remember correctly, is going up or

16  it's not going down.

17          So, you know, I would have started with some simple

18  graphs.  I don't remember if any of those graphs included

19  revenue directly.

20          THE COURT:  Right.

21          THE WITNESS:  But I would start with that kind of

22  analysis.  Let's see how, as revenue went up, what happened with

23  pay.

24          THE COURT:  Right.

25          THE WITNESS:  I think if you do that, you're just not

2:15-cv-01045-RFB-PAL

1   going to see -- there's nothing that jumps out at you and says,

2   oh, my God, look.  They're being -- they're really taking

3   advantage of these guys starting at this point.  There's just

4   nothing in the data to suggest that.

5           THE COURT:  So what would you have to see to see that?

6   What would be the level?

7           So let's say, for example, at a particular -- because

8   it seems to me it's about degrees really.  It's not about

9   absolutes.  So if you say, for example, obviously if fighters

10  are getting pay $10 and the event revenue was $10 million, you

11  would, I think, agree that that obviously wouldn't be an

12  appropriate wage.  And even if the wage is going up from $5 or

13  whatever to $20, obviously the increase in the absolute wage

14  could potentially still not take into consideration the exercise

15  of monopsony power, right?

16          THE WITNESS:  I agree.

17          THE COURT:  So, again, part of the issue for me is,

18  okay, if you acknowledge that the increase in the absent

19  compensation is not necessarily in and of itself an -- an

20  indication of procompetitive conduct, what is the other measure

21  to figure out what would be then the difference between what the

22  absolute wage is and what the marginal revenue product is that

23  would bring it up to the competitive wage?  How would you model

24  that in that context?

25          THE WITNESS:  You're going to call me a broken record,

—2:15-cv-01045-RFB-PAL—

1    but I'm going to come back to Table 1 of my regression, with or

2    without revenue as an explanatory variable.

3              THE COURT:  Okay.

4              THE WITNESS:  That's the way we analyze these things.

5    And we'd have to --

6              THE COURT:  Yes, but what I'm saying your model doesn't

7    seem to take into consideration at least the potential argument

8    the absolute wage itself is so suppressed by monopsony power

9    that even the increase doesn't get you up to the marginal

10   revenue product, right?  Your model doesn't account for that,

11   does it?

12             THE WITNESS:  I think it does.

13             THE COURT:  But how?

14             THE WITNESS:  If we believe the foreclosure share

15   variable that Dr. Singer put together, it gives us the

16   counterfactual in a world where there's no monopsony power,

17   subject to the linearity assumption about foreclosure share --

18             THE COURT:  Right.

19             THE WITNESS:  -- and some other limits that -- but at a

20   first pass, none of that matters because in -- when you run the

21   regression the way I think you should, the variable isn't even

22   negative much less negative and statistically significant.  You

23   might say --

24             THE COURT:  I'm sorry.  When you say "the variable,"

25   you're talking about the foreclosure share?

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  The coefficient of the foreclosure share.

2          THE COURT:  Of the foreclosure share, right.

3          Okay.  Thank you, Professor.

4          MR. DAVIS:  Thank you, Your Honor.  Just a couple of

5   last questions and then --

6          THE COURT:  Okay.  Five minutes.

7          MR. DAVIS:  Five minutes it is.

8              CONTINUED CROSS-EXAMINATION OF PAUL OYER

9   BY MR. DAVIS:

10  *Q.*  Just before the fire alarm went off and causing -- I had put

11  this slide up.  You had said you had seen no evidence of

12  proportionality or you were aware of no evidence in this case of

13  proportionality.

14          You confirmed, I believe, that that was your position.

15  And I asked if you had seen this internal WME document assessing

16  the acquisition of Zuffa.  Have you -- had you seen this

17  document?

18  *A.*  For the record, I didn't pull the fire alarm to avoid

19  answering this question.

20  *Q.*  Fair enough.  Had you seen it?

21  *A.*  I saw -- when you put it up, I saw it this morning because I

22  got a copy, an advanced copy, of Dr. Manning's slides.

23  *Q.*  Okay.  But not before then?

24  *A.*  I don't recall having seen it.  I'm not going to tell you I

25  haven't.  I've seen a lot of stuff.

2:15-cv-01045-RFB-PAL

1  *Q.*  Sure.  Now, if you look at this it says -- this is an

2  internal analysis:  "We believe our long-term 20 percent of

3  revenue assumption is reasonable."

4       Do you see that?  It's the last line at the top where

5  WME is forecasting -- describing the forecast of event revenues

6  and of fighter compensation.

7  *A.*  I see it.

8  *Q.*  Okay.  And do you see that the estimate beginning in 2016

9  through 2020, their own internal estimate, has a wage share that

10  stays constant at 20 percent?

11  *A.*  I see it.

12  *Q.*  You do see that.  And so that -- their own internal document

13  was using, for business purposes, the very proportionality that

14  we are discussing.  Is that fair?

15  *A.*  No.  I wouldn't call this -- this doesn't tell you -- the

16  proportionality was about the -- the proportion -- no,

17  absolutely not.  I think you're completely misrepresenting how

18  this relates to the proportionality discussion.

19  *Q.*  They -- are you saying that they are not saying that you

20  have a consistent relationship between fighter compensation and

21  event revenue measured by wage share?

22  *A.*  The proportionality assumption is about the relationship

23  between the marginal product of labor and event revenue.

24  *Q.*  So that -- that is a different definition of

25  proportionality?

—2:15-cv-01045-RFB-PAL—

1  *A.*  Oh, it's the definition that Alan is using in his test.

2  *Q.*  That actually -- okay.

3  *A.*  Excuse me, Professor Manning.

4  *Q.*  That's Professor Manning.

5          So that -- please, what I would ask is, let's take

6  turns, if you don't mind.

7  *A.*  Fair enough.

8  *Q.*  And if I interrupt you, I apologize.  So please avoid.

9          So I just want to be clear.  So your testimony is

10  premised that on the -- on the proportionality with marginal

11  revenue product, not between fighter compensation and event

12  revenues?

13  *A.*  My -- that's correct.

14  *Q.*  Okay.

15  *A.*  Yes, that's correct, because that's what's written in

16  Dr. Manning's report.

17  *Q.*  And have you seen this document before?

18  *A.*  I do not remember having seen this document before.

19  *Q.*  Okay.  So this is --

20          THE COURT:  Well, let me ask this question.  Would it

21  matter to you, Professor Oyer, in terms of your analysis if you

22  were able to confirm that, in fact, Zuffa or UFC used wage share

23  as a way to set compensation?  Would that change some of your

24  opinions today?

25          THE WITNESS:  No.  So, let's be clear about a couple of

—2:15-cv-01045-RFB-PAL—

 1    things.

 2            THE COURT:  I'm saying so if they -- if they internally

 3    said we don't want to ever be in a situation -- and I'm not

 4    saying this is what happened -- where we compensate someone more

 5    than 20 percent of the event revenue, and they used that

 6    themselves as a way to try to set the compensation, you're

 7    saying that doesn't matter either?

 8            THE WITNESS:  No, that doesn't matter at all.  That's

 9    an internal -- how they budget and so forth.  That's between --

10    that doesn't tell us anything.

11            THE COURT:  But why wouldn't --

12            THE WITNESS:  I --

13            THE COURT:  Hold on.  But let me press you on that.

14            If they're using that themselves to determine

15    compensation, why then would wage share not matter if they,

16    themselves, are using that same metric?  Why should I disregard

17    their use of it when, in fact, that's part of how they view it

18    and part of how they make the decisions if that's established?

19            THE WITNESS:  So I think that's a fair question, but

20    there's a very straightforward answer.

21            Would you grant me that many companies out there do not

22    have monopsony power over their workers?

23            THE COURT:  Well, sure.

24            THE WITNESS:  Many companies budget their employee pay

25    as a share of revenue.  When they start doing their business

1 planning, it's an important factor.

2       Stanford University -- I don't know if they do -- if

3 they look at -- they certainly look at my pay and I don't --

4 it's a bad example, because I have no idea.  I'll -- whether

5 they plan it that way.

6       But many companies plan, oh, what's our -- what's our

7 HR spend going to be --

8       THE COURT:  Right.

9       THE WITNESS:  -- as a fraction of revenue.

10       THE COURT:  So you're saying that we shouldn't conflate

11 a company looking at essentially the cost of labor with a

12 compensation model based upon event revenue?

13       THE WITNESS:  Definitely not.  I mean, I might also add

14 that in this -- in what you have --

15       MR. DAVIS:  I would like to actually ask a question

16 about this before you testify about it, if I may.

17       THE WITNESS:  Well, no, on the last graph you showed me

18 that it's constant.  So I don't understand -- like, even if --

19 even if you took it as evidence -- like, even if you thought

20 they were imposing monopsony power, why is the wage share going

21 up and certainly not going down during the period where the --

22 where the -- where the conduct is going on.  But anyway --

23 BY MR. DAVIS:

24 Q.  No, let me answer this question since -- this is a reverse

25 role, but I'll just say, actually foreclosure share is very

—2:15-cv-01045-RFB-PAL—

 1  level at that period.  The significant increase in foreclosure

 2  share predates that.  The key inflexion point is the acquisition

 3  in March 2011 and all of this postdates that, but let me ask

 4  you --

 5          MS. GRIGSBY:  Can I just object that?

 6          THE COURT:  Okay.  Well, let's not have testimony.

 7  Let's ask your --

 8          MR. DAVIS:  I would like to do --

 9          (Court reporter admonishment.)

10  BY MR. DAVIS:

11  Q.  So, one of the things that you said earlier today is you

12  thought it would be extraordinary that if revenue were to double

13  that compensation would double as well.

14          Do you recall saying that?

15  **A.**  No, but it's possible I said that.

16  Q.  It's possible that you said that.

17          If you would look at this internal document by Zuffa

18  doing an internal analysis, if you look at 2015, this is actual,

19  the revenues were 113 million and the wage share was 19 percent.

20  And Zuffa internally forecasted that if there was a precise

21  doubling of revenues to 226 million, wage share would remain as

22  exactly 19 percent.  And so compensation would double precisely.

23          So this would be an example in this very case with this

24  very promoter that that extraordinarily unlikely thing would be

25  exactly what they predict.

─────2:15-cv-01045-RFB-PAL─────

1  **A.**  You honestly think --

2          MS. GRIGSBY:  Objection --

3          THE COURT:  You guys, we have to stop.  So, one,

4   overruled.  Go ahead.  And let Professor Oyer answer the

5   question.

6          THE WITNESS:  You honestly think the question you're

7   asking me is the important takeaway from this slide?

8          THE COURT:  Okay, but that's not the question.  So I

9   appreciate your comment, but we --

10          THE WITNESS:  We have wage share going up as challenged

11  conduct is taking place.  I don't understand why you -- why

12  you're presenting this as somehow useful to the case you're

13  trying to make.

14          Having said that, they kept wage share equal.  Yes,

15  they did.  I did not know they had done that.

16          MR. DAVIS:  No further questions, Your Honor.

17          THE COURT:  All right.  Thank you, Mr. Davis.

18          All right.  Thank you, Professor Oyer.  You are

19  excused.

20          THE WITNESS:  You are done with me?

21          THE COURT:  Yes, we are.  Thank you.

22          THE WITNESS:  Thank you.

23          THE COURT:  All right, counsel.  We have gone over the

24  time.  I do not have time to handle, sort of, the logistical

25  stuff here.  We will have to do this tomorrow.  What we'll do is

─2:15-cv-01045-RFB-PAL─

1  we'll start off -- I'd ask you to be here at 8:15 and we'll try

2  to get started that early, if not at least at 8:30.  And we'll

3  handle what we can logistically then, but I've given you some

4  extra time because of the fire alarm.  But I do need to step off

5  the bench at this point in time.

6       MR. DAVIS:  Your Honor, just as a housekeeping matter,

7  could I please read in the exhibit numbers of the two last

8  slides I used?

9       THE COURT:  Well, let's do that tomorrow.

10       MR. DAVIS:  Happy to do that tomorrow.

11       THE COURT:  Or you can submit for the record tomorrow

12  and see if they challenge that.

13       MR. DAVIS:  Okay.

14       THE COURT:  I don't think that's going to be an issue

15  to that.

16       MR. DAVIS:  I don't think it will be controversial.

17       THE COURT:  Okay.

18       MR. ISAACSON:  Just so we understand the order of

19  things tomorrow, we'll have -- is it rebuttal then argument and

20  then --

21       THE COURT:  Right.  So rebuttal and then argument.  We

22  can maybe do some housekeeping.  Then the argument will go

23  plaintiff, defendants, plaintiff.  And so you'll each have --

24  I'll give you 45 minutes to an hour.  For the plaintiffs, you

25  have to break that up.  So you can't -- that doesn't mean -- for

―――2:15-cv-01045-RFB-PAL―――

1  both the main argument and rebuttal.

2        MR. DAVIS:  And I -- probably you're just going to say

3  let's go home, but I will ask are there any issues that comes to

4  mind that would be particularly helpful for us to address.

5        THE COURT:  Oh, no, I think you, though, that all can

6  glean from my questions the things that I think are going to be

7  significant.  And I also try to elaborate on some of those as it

8  relates to plaintiff's argument in the minute order regarding

9  the briefing, so that should tell you something about the areas.

10  Because I expect us to cover a good portion of the arguments --

11  and, particularly from plaintiffs, what it is that you may or

12  may not be -- I wouldn't say giving up, but there's certain

13  areas of the motion that I think are stronger than others.  I

14  don't think I've been very bashful about which areas I think

15  are -- those are.

16        And so it's helpful to me to know if you're proceeding,

17  for example, on issues of monopoly, what it is that looks like,

18  because I'm not sure that that's been fully elaborated or

19  whether or not you're simply arguing monopsony to me or whether

20  or not you're arguing monopsony, but taking monopoly into

21  consideration because of the impact of the market share on the

22  monopsony, which complicates these things further.

23        So that's as best as I can do as a non-econometrician.

24        So, with that, I will see you all tomorrow at 8:15.

25        MR. DAVIS:  Thank you very much, Your Honor.

2:15-cv-01045-RFB-PAL

1      (Whereupon the proceedings concluded at 4:50 p.m.)

2                          --oOo--

3               COURT REPORTER'S CERTIFICATE

4

5      I, PATRICIA L. GANCI, Official Court Reporter, United

6  States District Court, District of Nevada, Las Vegas, Nevada,

7  certify that the foregoing is a correct transcript from the

8  record of proceedings in the above-entitled matter.

9

10 Date:  September 12, 2019.

11                              /s/ **Patricia L. Ganci**

12                              Patricia L. Ganci, RMR, CRR

13                              CCR #937

14

15

16

17

18

19

20

21

22

23

24

25