WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
JONATHAN M. SHAW (*Pro hac vice*)
(jshaw@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER (State Bar No. 3568)
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL (State Bar No. 1216)
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS (State Bar No. 5549)
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant* Zuffa, LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>                    Defendant. | Case No.: 2:15-cv-01045-RFB-BNW<br><br>**DEFENDANT ZUFFA, LLC'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

1

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

I. Rising Foreclosure Share And Falling Wage Share Occur In Perfectly Competitive Markets And With Legal Monopsony Conduct. ...................................................................................................1

II. Foreclosure Share Does Not Measure An Effect On Competitors. ........................................................................................2

III. Fighter Share Is Not A Valid Methodology For Evaluating Anticompetitive Impact Or Damages. ...........................................4

    A. Fighter Share of Revenue is Not Accepted to Measure Monopsony Power. ........................................................4

    B. Standard Methods Show No Common Injury or Damages. ............................................................................5

    C. Plaintiffs Cannot Justify the Use of Unknown Wage Share Regressions. ..................................................7

IV. Dr. Singer's Regression Does Not Identify A Meaningful Relationship. ......................................................................10

V. Dr. Singer's Regression Does Not Show Individual Impact To All Or Virtually All Of The Class .....................................11

VI. Plaintiffs' Yardstick Models Are Not Tied To The Challenged Conduct And Violate *Comcast* ...............................11

VII. Plaintiffs' Experts Fail To Apply Established Benchmark And Yardstick Analysis ..................................................12

VIII. Dr. Singer's Regression Relies On Pre-Acquisition Strikeforce Bouts And Weighting To Find Impact...........................14

    A. Pre-Acquisition Strikeforce Bouts are an Improper Benchmark .....................................................14

    B. Revenue Weighting.........................................................14

    C. Unweighted Foreclosure Shares ..................................15

CONCLUSION...........................................................................................................15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF ZUFFA, LLC'S SUPPL BRIEF IN OPP TO PLTFS' MTN FOR CLASS CERT

# TABLE OF AUTHORITIES

**Cases**

*Comcast v. Behrend,*
    569 U.S. 27 (2013) ............................................................................. 1, 2, 11, 12

*In re High-Tech Emp. Antitrust Litig.,*
    289 F.R.D. 555 (N.D. Cal. 2013) ............................................................ 12

*In re High-Tech Employee Antitrust Litig.*
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................... 5, 7

*In re Rail Freight Antitrust Litig.*
    2017 WL 5311533 (D.D.C. Nov. 13, 2017) ........................................ 11

*In re TMI Litigation*
    193 F.3d 614 (3d Cir. 1999) ................................................................. 8

*Mazda v. Carfax, Inc.*
    No. 13-CV-2680 (AJN), 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ............ 3

*McCabe v. Sec'y of Health and Human Services*
    2018 WL 3029175 (Fed. Cl. 2018) ....................................................... 8

*Omega Envtl. v. Gilbarco, Inc.*
    127 F.3d 1157 (9th Cir. 1997) .............................................................. 2

*Rebel Oil Co. v. Atl. Richfield Co.*
    51 F.3d 1421 (9th Cir. 1995) ................................................................ 4

*Spinelli v. NFL*
    96 F. Supp.3d 81 (S.D.N.Y. 2015) ....................................................... 3

**Other Authorities**

Daniel L. Rubinfeld
    *Research Handbook on the Economics of Antitrust Law* ................................. 13

Philip Areeda, Herbert Hovenkamp, Roger Blair, and Christine Durrance,
    *Antitrust Law: An Analysis of Antitrust Principles and Their*
    *Application* ........................................................................... 3, 13, 14

DEF ZUFFA, LLC'S SUPPL BRIEF IN OPP TO PLTFS' MTN FOR CLASS CERT

# GLOSSARY OF TERMS

| | |
|---|---|
| Expert Report of Roger D. Blair, Ph.D. (November 15, 2017) | BR1 |
| Expert Report of Elizabeth Kroger Davis (October 27, 2017) | EDR1 |
| Expert Rebuttal Report of Alan Manning, Ph.D (January 12, 2018) | MR1 |
| Expert Report of Paul Oyer, Ph.D (October 27, 2017) | OR1 |
| Expert Report of Hal J. Singer, Ph.D. (August 31, 2017) | SR1 |
| Rebuttal Expert Report of Hal J. Singer, Ph.D. (January 12, 2018) | SR2 |
| Expert Report of Robert H. Topel, Ph.D. (October 27, 2017) | TR1 |
| Sur-Rebuttal Expert Report of Robert H. Topel, Ph.D. (February 12, 2018) | TR2 |
| Reply Report of Robert H. Topel, Ph.D. to the Supplemental Report of Hal J. Singer, Ph.D. (May 7, 2018) | TR3 |
| Expert Report of Andrew Zimbalist, Ph.D (August 30, 2017) | ZR1 |

# INTRODUCTION

Plaintiffs seek to make this the first case where a regression between a share of revenues and a set of contracts is a measure of illegal monopsony conduct and is sufficient to certify a class.  Certifying a class based on this regression would change antitrust law and impose a standard on companies that compares not the compensation they pay, but the share of their revenues – making juries the new regulators of revenues that firms share with labor or contractors.  The regression also assumes that a "foreclosure share" of 30-month contracts is illegal exclusionary conduct.  These regressions as well as the yardsticks in this case then fail to distinguish legal from illegal conduct violating *Comcast v. Behrend*, 569 U.S. 27 (2013)  The evidentiary hearing, together with the previous class certification and *Daubert* briefing, illuminates other fatal deficiencies in Plaintiffs' attempt to meet their burden to certify a class.

## I. Rising Foreclosure Share And Falling Wage Share Occur In Perfectly Competitive Markets And With Legal Monopsony Conduct.

Dr. Singer's finding that an increase in Zuffa's foreclosure share coincided with a declining wage share is equally consistent with a competitive market.  Dr. Topel testified that, as a matter of standard economics, a regression measuring an effect on fighter share could not distinguish a competitive market from one with competitive restraints because a rise in revenue in either would decrease fighter share.  ECF No. 726 ("Aug. 27 Tr.") 105:6-19; *see also* TR1 ¶¶124-138 & App. A.  Prof. Blair confirmed that, in a perfectly competitive market, revenue increases resulting from procompetitive conduct would create a negative relationship with fighter share:  "you can get two very different wage shares or revenue shares in perfectly competitive labor markets . . . so the difference between those wage share doesn't tell you anything.  It doesn't tell you that in the market where the wage share is low that those people have been damaged in some impermissible way."  ECF No. 734 ("Aug. 30 Tr.") 99:10-25.

Prof. Blair also testified that a relationship to wage share could not distinguish the exercise of legal monopsony power from Challenged Conduct.  *Id.* 113:15-115:14.  Evidence supports that Zuffa – as a first-mover with owners that displayed acumen, ingenuity, commitment to quality, and made massive long-term investments – grew MMA from a fringe

spectacle to the fastest growing sport in the world and allowed the UFC to gain worldwide name recognition and brand loyalty.  TR1 ¶¶49-63.  Zuffa also grew by paying fighters more than competitors.  Ex. 2, Singer Dep. 192:3-17; TR1 ¶288.  Even if Plaintiffs disagree, the regressions offered do not prove whether an effect on wage share resulted from the legal exercise of monopsony power or the Challenged Conduct.  On rebuttal, Dr. Singer did not respond to any of this.  The inability of Plaintiffs' chosen methodology to discern lawful from unlawful conduct is fatal to their attempt to certify a class.  *Comcast*, 569 U.S. at 38.

The economic literature *Dr. Singer cites* confirms this inability.  An Autor article concluded that rising concentration and falling labor share is caused by the rise of "superstar firms" "with superior products or higher productivity,"  which increase sales "thereby enabling the most successful firms to control a larger market share."  Ex. 5 at 6 (cited at SR2 ¶104 n.370).  Similarly, Dr. Singer testified about a Barkai article, Aug. 26 Tr. 105:19-23, but left out that Barkai says rising concentration and falling labor share is "also consistent with a model of a dominant firm and competitive fringe . . . In such a model, *an increase in the productivity of the dominant firm also results in higher concentration driven by the growth of the dominant firm, higher markups driven by a decline in production costs of the dominant firm, and a decline in labor share."*  Ex. 6 at 28 (cited at SR2 ¶104 n.379).

## II.   Foreclosure Share Does Not Measure An Effect On Competitors.

Dr. Singer claims to analyze a "foreclosure share," but his input does not measure an effect on competition or competitors in the market as case law requires.  *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997) (requiring foreclosure of **competition** in a substantial share of the market).  His "foreclosure share" instead counts exclusive Zuffa contracts (weighted) that *could* extend to 30 months.  Singer I ¶170-73.

Dr. Singer does not analyze the effect of 30-month contracts on competitors and whether they were *actually* foreclosed from the ability to compete.[1]  His foreclosure share instead is "agnostic to the market share," Ex. 2, Singer Dep. 42:5-18, and to competition in the

---

[1] Zuffa's contract term is not actually 30 months, the average term is only 21 months during the Class Period.  SR1 Table 1.  According to Dr. Singer, on average, the length of time that an athlete was at Zuffa was only two years.  SR2 Table 1.

DEF ZUFFA, LLC'S SUPPL BRIEF IN OPP TO PLTFS' MTN FOR CLASS CERT

1  marketplace.  If Zuffa's competitors all exited the market, but its contracts fell to 18 or 28-

2  months in length, Zuffa's foreclosure share would be 0%.  *Id.* 44:16-45:12.  He does not even

3  have an opinion as to whether the Challenged Conduct is anticompetitive absent 30-month

4  exclusive contracts.  *Id.* 253:22-260:1; *see also* 271:2-17 (stating it would be a "fool's errand" to

5  decompose effects of the Challenged conduct from the 30-month contracts).  Singer's opinions

6  regarding "foreclosure share" have previously been rejected as unreasonable.  *Mazda v. Carfax,*

7  *Inc.*, 2016 WL 7231941, at *12 (S.D.N.Y. Dec. 9, 2016).

8       Dr. Singer's "foreclosure share" misinterprets the law.  Singer asserts that his economic

9  rationale is based on the "seminal" academic work of Steven Salop – a law review article.  ECF

10  No. 730 ("Aug. 28 Tr.") 103:14-23; SR1 ¶152 n.397.  But Salop interprets the case law as

11  requiring foreclosure by impact on competitors, "not by the simple fraction of input suppliers

12  that are affected."  Ex. 1, Salop article at 20.

13       Dr. Singer's regression is meaningful only if "foreclosure share" reflects established

14  exclusionary conduct.  Otherwise, the regression measures a relationship to legal contracts.  To

15  defend his measure of foreclosure, Singer explains he selected 30-month contracts based on (1)

16  "various case law that speaks to what constitutes a contract of sufficient duration to be

17  considered exclusionary," Ex. 2, Singer Dep. 152:6-9, and (2) his calculation of an MMA

18  athlete's career length.  *Id.* 152:10-17.  For his knowledge of case law, Singer cites to Areeda &

19  Hovenkamp ¶1821d3.  SR1 ¶172 n.442.  But *no* case cited in that section condemns contracts of

20  three years or shorter; rather the case law only condemns contracts exceeding five years.  Ex. 3 at

21  10 n.61; *see Spinelli v. NFL*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (contracts with "exclusivity

22  periods of no more than three years . . . do not foreclose competition and are not anticompetitive

23  as a matter of law").  Similarly, in *Carfax*, the court also held that no reasonable jury could find

24  that three to five year exclusive website contracts were anticompetitive or even "particularly

25  long-term."  2016 WL 7231941 at *14.

26       The same section of Areeda that Dr. Singer cites also contrasts locking up a small group

27  of dealers with having exclusive contracts with a very large network.  Ex. 3 at 11.  Here, Zuffa

28  has roughly 500 athletes under contract, whose contracts expire at various points throughout the

year.  ECF No. 208 ¶155; SR1 ¶175.  Even if Singer's assessment of 30-month contracts were valid, 1/30 become available for contracting every month, 40% every year.  The undisputed evidence shows that competitors had access to hundreds of former Zuffa athletes each year.  BR1 Figure 1.  The Ninth Circuit requires no more.  *Omega*, 127 F.3d at 1163 (rejecting claim that existing distributors are restricted by exclusive contracts because "Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of existing distributors. Antitrust laws require no more").

Dr. Singer's findings also show his "foreclosure share" is not measuring anticompetitive conduct.  His regressions show a relationship of fighter share to weighted foreclosure shares of 30 percent or less.  SR1 ¶186.  But his regression results hold even when unweighted foreclosure shares in the Ranked market are used.  SR1 ¶ 183 n.453; Aug. 28 Tr. 108:20-24.  These findings shows that his regressions are meaningless.  Zuffa's share of the Ranked market never exceeded 22% -- a threshold below any established basis for market power.  Ex. 4; *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995); Aug. 28 Tr. 108:20-24.

With regards to Dr. Singer's career length analysis, the length of a fighter career does not measure the required effect on competitors.  Singer testified that his career length estimate was "the period in which [athletes] were physically fit to fight and did at least potentially have some fights."  ECF No. 724 ("Aug. 26 Tr.") 138:6-21.  But Singer's "career length" consists of a career in one of his proposed market definitions, not a career as a professional MMA athlete. Aug. 27 Tr. 52:18-53:18.  The actual length of a Zuffa athlete's professional MMA career is 8.7 years, or roughly 1/3 the length of a Zuffa contract.  TR2 ¶40.  In contrast, NFL players undergo four years before reaching free agency, but the average NFL career only lasts 3.5 years; NBA first-round draft picks typically undergo eight years before reaching free agency, even though the average NBA career lasts only 4.8 years.  BR1 ¶36.

**III.  Fighter Share Is Not A Valid Methodology For Evaluating Anticompetitive Impact Or Damages.**

**A.  *Fighter Share of Revenue is Not Accepted to Measure Monopsony Power.***

Plaintiffs ask this Court to break entirely new ground.  No court has admitted a regression

showing impact to wage share as evidence of anticompetitive harm, and no antitrust agency has brought an action on that basis.  No published articles include a regression using compensation share *to measure the effect of a monopsony*.  *Compare* Topel, Aug. 27 Tr. 247:7-14 (zero regressions to measure the effect of monopsony), *with* Singer, Aug. 28 Tr. 149:3-6 (omitting "to measure the effect of a monopsony" from the question); Oyer ECF No. 741 ("Sept. 12 Tr.") 96:16-19 (articles "never run a regression the way Singer did, never").  The fighter share regression here is untested, unvalidated in economics, and not generally accepted in the field.

### B.  *Standard Methods Show No Common Injury or Damages.*

The standard method for analyzing Challenged Conduct or monopsony is to measure in a regression any effect on actual wages, not wage share, and no authority has even hinted that wage share should be used even where a regression using actual wages shows **no impact**.  Sept. 12 Tr. 93:12-96:19.  This was the approach in *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1207-08 (N.D. Cal. 2013).  Even the sports economics articles relied on by Drs. Singer and Manning recognized that actual wages, not wage share, was the relevant comparison.  Ex. 8, Kahn at 10 (cited at SR2 ¶97) ("The typical research design—similar to much work in this area in labor economics—is a regression in which log salary is the dependent variable").

This standard regression in *High-Tech* answers the question of the Court:  how can compensation "but for" a monopsony be determined?  As Prof. Oyer explained again, a regression with actual compensation permits, with appropriate control variables, a measure of actual compensation in a world with zero or low foreclosure share.  Sept. 12 Tr. 94:24-95:22; Aug. 27 Tr. 222:24-223:13.  The *High-Tech* regression also used the revenue variable that Plaintiffs argue would create endogeneity.  Ex. 17 at 72-73.  This is the method of regression analysis accepted by courts and labor economics.

The Court has asked whether it is possible to evaluate an impact on actual compensation given that actual compensation can rise even under monopsony conditions just not to the competitive level.  The Court *In High-Tech* evaluated the impact on workers compensation when wages were rising.  985 F. Supp. 2d at 1204-05, 1210.  As *High-Tech* demonstrates, the answer here is also a resounding yes.  Here, Zuffa's compensation at the start of the data period in 2005

1    was at or near the competitive level, Aug. 27, Tr. 221:6-18, because its foreclosure share was

2    less than 30%, SR1 Figure 3.  According to Plaintiffs' theory, when foreclosure share went up,

3    compensation should go down controlling for everything else.  Aug. 30 Tr. 117:9-21; Aug. 27

4    Tr. 225:10-17.[2]  But here, controlling for everything else, compensation did not go down below

5    the previously competitive level.  Profs. Topel and Oyer did their regression using Dr. Singer's

6    *exact regression,* but substituted actual compensation as the dependent variable for fighter share.

7    The results showed *no evidence* that Zuffa's increasing foreclosure share had an impact on

8    athletes' compensation.  TR1 Ex. 13, OR1 Table 1; Sept. 12 Tr. 92:16-22; 147:18-20; Aug. 27

9    Tr. 225:10-24.

10        Plaintiffs wrongly have stated these regressions show that a 100% increase in revenue

11    translates only into a 8% increase in compensation.  All the variables for the characteristics of

12    fighters and fighter fixed effects result in increased fighter compensation.  Sept. 12 Tr. 120:12-

13    122:3.  Fighter compensation has grown tremendously as revenues have increased.  TR1 ¶¶169-

14    71, Ex. 17-18.

15        The Strikeforce acquisition also provides insight into how compensation was affected.

16    "If Zuffa had monopsony power over these people, they wouldn't have to pay them more than

17    they were getting at Strikeforce."  Aug. 28, Tr. 20:17-24.  But the evidence shows Zuffa paid

18    them a lot more.  TR1 ¶¶184-86 & Ex. 22.  "If we had more market power and I just acquired all

19    of their contracts and if the story is they got no place to go, why do I pay them more?"  Aug. 27,

20    Tr. 136:20-22.

21        A comparison of the regression results shows that Dr. Singer's regression using fighter

22    share is misspecified.  His "WinFlag" variable accounts for whether an athlete wins a bout and,

23    as Singer explains, "In over 94 percent of Zuffa's events . . . Fighters generally double their base

24    pay if they win their fight."  SR1 ¶30.  This is a *known* result, not a hypothesis.  In a properly

25    specified regression, the WinFlag variable should have a positive and statistically significant

26

27    _____

      [2] Dr. Singer's regression analyzes the same concept looking at "the effect of Zuffa's increasing

28    foreclosure share over time on Zuffa's Fighter Shares, relative to those of Zuffa Fighters in time
      periods with lower foreclosure shares, after controlling for all other variables in the regression,"
      SR1 ¶ 183, but he evaluates the impact on athletes' wage share, not their actual compensation.

1  relationship with fighter share.  Sept. 12 Tr.111:23-112:17.  Dr. Singer's regression finds *no*

2  *relationship* between Fighter Share and the WinFlag variable, SR1 Table 6, which means that

3  "Dr. Singer would have to say that winning a bout has no effect on the fighter's pay."  OR1 ¶52.

4  The same nonsensical results appear for Dr. Singer's Rank and PPV variables, which

5  counterfactually show that having a higher rank or receiving a portion of PPV revenues has no

6  relationship to an athlete's fighter share.  TR1 ¶149; Aug. 27 Tr. 220:7-15.  These variables all

7  have the expected relationships when the proper dependent variable—actual compensation—is

8  used. TR1 Ex. 13, OR1 Table 1.

9        **C.  *Plaintiffs Cannot Justify the Use of Unknown Wage Share Regressions.***

10        Plaintiffs' experts claim that the standard approach accepted in the field of labor

11  economics is not appropriate here because, unlike the workers in *In re High-Tech*, the "fighter is

12  the product."  Aug. 27 Tr. 99:15-100:24; Sept. 12 Tr. 64:18-25.  This is a slogan, not proof of

13  anything measurable.  Plaintiffs also assert without proof that high-tech workers do not

14  contribute to revenues as much or more as fighters.  As Prof. Oyer explained, the argument

15  against other workers and their contributions makes no sense.  Sept. 12 Tr. 134:17-25.

16        A share of event revenues does not inherently reflect the athletes' measurable

17  contribution because revenues include contributions of (1) the MRP of Zuffa's investments and

18  promotional activities, including promotion of participating athletes, and (2) other firms, such as

19  venues, broadcasters, and sponsors who promote and contribute to the success of events.  TR2

20  ¶7.  Plaintiffs' experts cite nothing that supports the notion that, when a worker's impact on

21  revenue is sufficiently high, wage share, not wage levels, should be used.  Prof. Manning did no

22  work in his report to establish a measurable relationship between fighters and revenues.  Ex. 9,

23  Manning Dep. 62:22-63:21; 90:4-91:13.

24        Dr. Singer admitted he did not do a decomposition between the contribution between

25  Zuffa and the athletes, rather he relied "heavily" on an "academic" article for his conclusion.

26  Aug. 27, Tr. 95:6-13; Ex. 2, Singer Dep. 118:22-119:24.  The article on which Singer relied is by

27  McGowan and Mahon and appeared in a 2015 edition of *The Journal of Business and*

28  *Economics*.  Ex. 10.

1    Zuffa recently learned that this publication has fraudulently put itself forward as a

2    legitimate journal, and, until now, this scam has deceived the parties, their experts, and the

3    Court.  The "journal" deceives researchers concerning its origins by naming itself the *Journal of*

4    *Business and Economics*, a name close to a legitimate publication, the *Journal of Economics and*

5    *Business.*  It is not a legitimate academic journal, but the product of an academic vanity press, the

6    Academic Star Publishing Company.  At least three academic conferences have posted warnings

7    about Academic Star's "phishing scam" where it spams academic conference attendees seeking

8    submissions—then demands a $50 per page publishing fee.  Ex. 11.[3]  This pay-to-play journal

9    boasts no Impact Rank, no CiteScore, no Source Normalized Impact per Paper (SNIP), no

10   SCImago Journal Rank (SJR), nor any other standard metric of journal quality.  Its website

11   promises an incredible 3-4 week "peer review" process, lists only a New York address that turns

12   out to be a mailbox in an office services store, and has a FAQ section that begins each of its five

13   identical pages: "Core values: Guangzhou love Bosch help."  Ex. 12.[4]  The journal is not listed in

14   the catalog of any library outside Slovenia.[5]  An unvalidated reliance on such a fraudulent source

15   cannot stand.  *In re TMI Litig.*, 193 F.3d 614, 716 (3d Cir. 1999) (expert's reliance on other

16   expert reports flawed under *Daubert*); *see McCabe v. Sec'y of Health & Human Servs.,* 2018 WL

17   3029175 at *54 (Fed. Cl. 2018) (warning of rise of open access journals from "predatory

18   publishers" engaging in a "pay-to-play scheme").

19       Plaintiffs point to articles from sports economics, without regressions, that refer to the

20   share of league revenues that players receive in team sports, not individual sports like boxing.

21   Ex. 20, Vrooman, (no regression or attempt to estimate the effect of monopsony power).  In the

22   NFL, NBA, MLB and NHL, the player unions—in a bilateral monopoly situation (with a labor

23   antitrust exemption)—bargain for and receive a set percentage of revenues according to the

24   various CBAs.  Aug. 30 Tr. 96:6-18.  The articles cited by Prof. Manning discussed attempts to

25   measure MRP, not wage share.  *E.g.*, Ex. 24 Scully (1974) at 5; Sept. 12 Tr. 71:15-19; Ex. 19,

26

27   ───────────────
     [3] https://www.abainternational.org/media/jmerscam.aspx (visited 9/12/19)

28   [4] http://www.academicstar.us/journalsshow.asp?ArtID=371 (visited 9/12/19)
     [5] Ex. 13, https://www.worldcat.org/title/journal-of-business-and-econom-ics/oclc/911567023&referer=brief_results (visited 9/12/19)

Boal & Ransom at 15-18 (survey of articles comparing MRP to actual wages).  Moreover, those articles did not use wage share as a "test of the existence of monopsony"—as Plaintiffs attempt to do here—but rather evaluated *post hoc* the impact of removing known monopsonistic restraints.  Aug. 27, Tr. 248:3-249:5.  Nor did they analyze "wage share" when, as here, the same evidence showed no harm to actual compensation.  Ex. 7, Scully 2004 at 2 (describing simultaneous rise in baseball wage share and actual compensation).

Dr. Singer claims that his fighter share approach attempts to measure an athlete's compensation in relation to the athlete's marginal revenue product.  SR2 ¶8.  The problem with his approach is that MRP can "almost never" be measured—a proposition with which Dr. Singer and Prof. Manning agree.  *Id*; Sept. 12 Tr. 78:20-79:2.  Nonetheless, Dr. Singer says he may use wage share as a proxy for MRP.  SR2 ¶ 95.  The notion of wage share as a "proxy for MRP" is unproven, untested, unaccepted and not discussed in court decisions or labor economics.

Prof. Manning for Plaintiffs posited a new test for when compensation share may be used—a combination never published in any academic article or journal.  Ex. 9, Manning Dep. 33:13-39:19.  Prof. Manning opines that to meet this test, the contributions of fighters and Zuffa to revenue must be proportional.  MR1 ¶ 6 n.7.  Unless that condition is met, Plaintiffs' own evidence requires the class not be certified; no alternative conditions were offered. "Proportionality" has not been proven.  Instead, as Manning agreed, Dr. Singer assumed proportionality.  MR1 ¶ 29.  Plaintiffs argue that the regression proves proportionality, but Prof Manning testified that Dr. Singer ***imposed proportionality*** on the regression, Sept. 12 Tr. 41:18-19 – the regression is no more than proportionality in, proportionality out.

Prof. Manning admitted in his report that proportionality was a "plausible, reasonable hypothetical."  Ex. 9, Manning Dep. 93:21-94:2; 94:12-20; MR1 ¶24, 30.  He testified that he was being cautious and "British" when he used the term plausible, but over and over in his deposition, he confirmed that he did not have an opinion based on the record in this case that there was a proportional or measurable relationship between event revenues and fighter MRP. Ex. 9, Manning Dep. 24:20-25:7, 60:10-18, 62:22-63:21, 84:18-85:1, 90:24-91:13.  Nothing in his report or new testimony at the hearing demonstrated that a proportional or measurable

9

relationship, the evidence he points to only suggests that fighters do contribute to revenue in an unknown amount which is not the same as a proportional measurable contribution.

Nor could proportionality be proven, the MRP of the fighters "is not directly observable" and sports economists have "uniformly thrown up its hands around the difficulty and all of the ambiguities in measuring marginal revenue product."  Aug. 30 Tr. 30:4-7.

Plaintiffs' other argument is that one of Prof. Topel's robustness checks on his regression (which includes event revenue on the right-hand side of the equation) suffers from endogeneity bias because fighters contribute to Zuffa revenue.  Sept. 12 Tr. 63:2-10.  Plaintiffs present this as a Catch 22:  they also say that the regressions by Profs. Oyer and Topel that did not include a revenue variable suffered from omitted variable bias.  The result is to reject accepted and standard work in labor economics using actual compensation to measure monopsony, including Manning's textbook.  Labor contributes to revenue in countless industries and there is no evidence that fighters are unique from other businesses, including hi-tech workers in that regard.

## IV.    Dr. Singer's Regression Does Not Identify A Meaningful Relationship.

Dr. Singer admitted in response to the Court's question that promoter variables are necessary to disentangle Zuffa's contribution to MRP from the athletes' contribution.  Aug. 26, Tr. 101:12-102:4.  But Dr. Singer's promoter variable does nothing to disaggregate Zuffa's contributions from athletes.  The promoter variable is a "dummy" variable taking the value of 1 or 0 when an event is hosted by Zuffa or two promoters *before* the class period, Strikeforce and WEC.  Aug. 27 Tr. 11:13-12:4.  Dr. Singer does not include any variables for promoters *during* the class period, such as Bellator, Professional Fighters' League or One Championship.  *Id.* 12:5-13.  And Dr. Singer does not even include the promoter variable for any regression that excludes pre-acquisition Strikeforce.  *Id.* 4:20-24.

Dr. Singer also includes a time trend variable and a year fixed effects variable, the effect of which is to limit the source of variation of Dr. Singer's regression to non-linear changes in a given year.  Aug. 26, Tr. 240:6-13; Aug. 27 Tr. 159:17-160:8; Aug. 28, Tr. 137:16-138:5; TR3 ¶¶6, 28-31.  The remaining nonlinear source of variation within a year has no connection to an alleged anticompetitive conduct.  Within a year, a relationship to fighter share is random because

events vary widely in size, revenue and type (PPV or not).  TR3 Ex. 4 & 5.

These variables also mask that fighter share *was rising* during the class period.  Ex. 14, Zimbalist Errata 4-E (fighter share rose from 15.2% in 2010 to 22.2% in 2016).  Dr. Singer testified on direct examination that "over the period of study inquiry that wage share . . . is falling."  Aug. 26 Tr. 62:13-15.  After being confronted with evidence that his time trend variable masked fighter share rising over time, Dr. Singer reversed course and claimed that fighter share "stayed flat' during the class period.  *Id.* 203:7-204:2.  Dr. Singer did not address that Prof. Zimbalist, shows fighter share was rising during the class period.  Ex. 14 at 4-E.

## V.   Dr. Singer's Regression Does Not Show Individual Impact To All Or Virtually All Of The Class.

Dr. Singer's regression produces a single average foreclosure share coefficient based on all of the data in his dataset from 2005 to 2016.  SR1 Table 6.  He then applies this constant foreclosure share coefficient to each athlete in a mathematical formula guaranteed to find almost all were injured.  SR2 Tables 2-3.  Dr. Singer never attempts to determine if an individual athlete's compensation (or their fighter share) was less when Zuffa's foreclosure share was high than when foreclosure share was low.  TR1 ¶¶279-80.  This application of a constant average impermissibly masks differences among class members.  Class Cert Opp. at 27-28.

Moreover, Dr. Singer only calculates impact for part of the class.  There are 1,214 members of the class, ECF No. 518, Class Cert Mot. at 2; SR1 ¶3 n.6, but Dr. Singer's tables only report impact for between 1,046 to 1,052 athletes.  SR2 Tables 2 & 3.  Dr. Singer has no evidence of anticompetitive impact for up to 13% of the class, but "5% to 6% constitutes the outer limits of a de minimus number of uninjured class members."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2017 WL 5311533, at *87-88 (D.D.C. Nov. 13, 2017).

## VI.   Plaintiffs' Yardstick Models Are Not Tied To The Challenged Conduct And Violate *Comcast*

Under *Comcast,* where an expert's methodology cannot distinguish impact and damages caused by the theory of harm from that caused by other unchallenged conduct, class certification must be denied.  569 U.S. at 38; Class Cert Opp. 35-37.  Prof. Zimbalist violates *Comcast* because his model includes "the entire set of exclusionary contract clauses and anticompetitive

practices." August 30 Tr. 70:11-23; ZR1 at ¶1 n.2.  Among other things, Prof. Zimbalist

assumes that the Challenged Conduct includes monopolization, Aug. 30, Tr. 73:14-17, 74:11-12,

and the use of alleged dominance to "threaten sponsors."  *Id.* 70:11-23 & Zimbalist Slide 2.  Yet

Plaintiffs have abandoned their monopolization claim by failing to offer proof of the requisite

antitrust injury, or of monopoly control of venues, cable networks, sponsors or broadcasters, and

because Dr. Singer admits that he failed to perform the required SSNIP test for an output

market.  ECF No. 534 at 36-37; Singer Dep. Ex. 21, 551:7-553:8; Ex. 2, 288:15-290:5.  Plaintiffs

have made no effort to prove a case of monopolization of sponsors; rather, the record is replete

with evidence that other promoters have ready access to sponsors, TR1 ¶67, and Dr. Singer

acknowledged that he has no opinion on whether Zuffa's relationship with sponsors are

anticompetitive absent exclusive 30-month contracts. Ex. 2, Singer Dep. 259:19-260:1.  Dr.

Singer acknowledged that it is the "rapid decline" in fighter share before the Class Period —i.e.,

the period **before** Plaintiffs have alleged Zuffa had monopsony or monopoly power—that is

"informing part of my model."  Aug. 26 Tr. 205:4-6.  Under *Comcast*, this is fatal to Plaintiffs'

motion.

Similarly, the yardstick models Dr. Singer and Prof. Zimbalist advance do not isolate the

effect of any Challenged Conduct because they do not identify a but-for world to isolate the

effect of such conduct.  Rather, the comparators all use exclusive contracts. BR1 ¶¶77-

78.  Furthermore, because Plaintiffs' experts' yardsticks seek merely to estimate damages for the

class as a whole, SR1 ¶¶247-48; August 30, Tr. 73:11-13, they cannot be used to meet the

requirement that Plaintiffs show that all or virtually all class members were injured.  *In re High-*

*Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013).

**VII.    Plaintiffs' Experts Fail To Apply Established Benchmark And Yardstick Analysis**

Prof. Zimbalist describes the difference between his alleged yardstick analysis and the

established methodology as "semantical," but it is fundamental; his analysis fails to apply the

standards required.  Aug. 30 Tr. 81:7-13.  The established antitrust literature lays out standards

for a yardstick analysis that his does not meet: (a) that the comparator should be similar in all

important respects, and that any differences should be accounted for in the analysis and (b) the

comparator should be similar but-for the established conduct.[6]

That Prof. Zimbalist did not apply the required standard is unsurprising, given he was unfamiliar at the time of his report with the existence of any standards. Ex. 22, Zimbalist Dep. 149:22-150:2. And his analysis fails to apply any aspect of the recognized yardstick (similar in all important respects) standard to his analysis. Instead he used a circular standard: "as close as possible," Aug. 30 Tr. 81:11-12, which literally means anywhere from close to very far away. *Id.* 123:9-17. Prof. Zimbalist did not use a comparator that was the same in all important respects, but instead chose to average five inapposite comparators—the Big Four sports, and the boxing promoter Golden Boy—ignoring their major differences while introducing further error by impermissibly using an average. BR1 ¶¶60-68. Prof. Zimbalist admitted that it would not be appropriate to compare the wage share of hockey and baseball, but did not explain why a sport even more different, like MMA, is properly compared to them both. Aug. 30 Tr. 87:14-22.

At no point during expert discovery—or before the hearing—did Plaintiffs' experts advocate to use boxing as a stand-alone comparator. No expert here has done an analysis to confirm whether the athletes or audiences are comparable between the two sports. ZR1 ¶¶89-92; ZR2 ¶72 n. 129-132, Aug. 30, Tr. 124:16-125:11. And Plaintiffs allege in their Complaint that they are not. ECF No. 208, Cons. Am. Compl. ¶¶61-62.

Rather than analyzing "boxing," Prof. Zimbalist's average used selected data that he has never reviewed from a single promoter, Golden Boy—which is only one of dozens of boxing promoters—that he culled from a redacted expert report from another litigation. Aug. 30 Tr. 53:2-6. He was forced to acknowledge that he simply has no idea how much of the money he assumed that Golden Boy or other promoters paid to boxers actually went to other promoters. *Id.* 63:5-9; 66:12-15. Without knowing that information, he could not possibly calculate an accurate wage share for Golden Boy, much less for boxing as a sport.

---

[6] BR1 ¶¶50-52 (citing Philip Areeda, Herbert Hovenkamp, Roger Blair, and Christine Durrance, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*; Daniel L. Rubinfeld, *Research Handbook on the Economics of Antitrust Law*). These sources name many important comparisons that Zimbalist ignores; there are other important comparisons that Zimbalist has discussed which he also ignores. Ex. 25; Ex. 22, Zimbalist Dep. 204:23-207:10.

Dr. Singer does his own benchmark and compares the wage shares of Bellator and Strikeforce to Zuffa's wage share "across the entirety of the class period." Aug. 26 Tr. 174:11-12. But to have a reliable estimate of damages, a yardstick cannot be in the same geographic market. BR1 ¶¶71-74; Ex. 23, Areeda at 40. "The economic reason is plain: the financial performance of the yard-stick is apt to be enhanced by the injury to the plaintiff." Ex. 23 at 40.

## VIII. Dr. Singer's Regression Relies On Pre-Acquisition Strikeforce Bouts And Weighting To Find Impact.

### A. *Pre-Acquisition Strikeforce Bouts are an Improper Benchmark*

In some of Dr. Singer's regression specifications (i.e., SR1 Table 6), he includes pre-acquisition Strikeforce bouts in the regression data set as a benchmark. There is no reason to think that two businesses would pay the same share of revenue to various inputs. OR1 ¶40. The market is driven by wages—not wage share. No rational athlete would leave higher pay at Zuffa for lower pay but a higher fighter share at Strikeforce. It is undisputed that Zuffa paid more money than Strikeforce. TR1 ¶182; Ex. 2, Singer Dep. 192:3-17. Moreover, Strikeforce's share of revenue is not an appropriate benchmark because Strikeforce was losing money. EDR1 ¶¶71-74. In 2010, the year before Zuffa acquired Strikeforce, Strikeforce had an Event EBITDA of -5.1% and lost over $650,000. Ex. 15 (cited at EDR1 ¶72; SR1 ¶190 n.464).

### B. *Revenue Weighting*

In every specification of common impact in his report or shown during the evidentiary hearing, Dr. Singer weighted his foreclosure shares with downstream event revenue. SR1 Table 8, SR2 Tables 2 &3, Aug. 27 Tr. 11:10-12. The Merger Guidelines do not permit weighting an *input* market with downstream revenue. Horiz. Merger Guidelines §§ 5.2, 12. Rather, for an input market, the Merger Guidelines require a measurement of the purchases in the input market. *Id.* Even Prof. Zimbalist admits that weighting by compensation would be the appropriate metric for an input market. Ex. 16, Zimbalist 2nd Dep. 42:7-19.

Dr. Singer claims to weight athletes to "reflect differences in the average quality of Fighters" and their "value to an MMA promoter," but gives each athlete at a promoter *the exact same revenue weight*. Highly ranked athletes who leave Zuffa for other promoters are weighted

1   orders of magnitude lower because they compete for another promoter than low-ranked athletes

2   that Zuffa signs, who are immediately weighted as high as Zuffa's biggest stars like Conor

3   McGregor.  TR1 ¶¶220-23.  And each Zuffa athlete, receives weight up to 81x  higher than every

4   non-Zuffa athlete.  Aug. 27 Tr. 230:21-231:1.  This gives Zuffa a larger share of the input market

5   by virtue of its own ability to put on successful events in the output market.

6        To make matters worse, Dr. Singer uses only **eight events** to calculate the non-Zuffa

7   revenue weights that he applies to each non-Zuffa athlete for a period of seven years, Ex. 18;

8   Aug. 28 Tr. 121:6-7, even though his own analysis shows that non-Zuffa promoters put on

9   *thousands* of events during that same time period.  SR1 Figure 4b.

10       As an alternative to his revenue-weighting, Dr. Singer also weights athletes by the

11  inverse of their rank (i.e, the fifth ranked athlete is weighted three times more than the fifteenth

12  ranked athlete).  Dr. Singer initially conceded that he had no justification for his approach.  Ex.

13  2, Singer Dep. 143:16-21.  In his rebuttal report, he provided a new econometric analysis

14  showing that event revenues are positively related to the top-ranked athlete on the card.  SR2

15  ¶130.  But this unsurprising result (events with higher ranked athletes are also promoted more

16  heavily and put in larger venues with higher demand) says nothing about the value of the other

17  athletes on a card, let alone that they are properly weighted by the inverse of their rank.

18       Professor Topel set out an alternative approach to control for the various qualities of

19  athletes by using a stratification of athletes based on rank.  This regression showed no evidence

20  of impact on any strata of athlete.  TR1 ¶¶166-67 & Ex. 16; TR2 ¶¶29-31.

21  ### C.  *Unweighted Foreclosure Shares*

22       Dr. Singer's assertion that his model is not sensitive to weighting is true ***only*** if Dr.

23  Singer includes the pre-acquisition Strikeforce bouts in his regression.  No specification of Dr.

24  Singer's impact regression finds impact if pre-acquisition Strikeforce bouts are excluded and

25  unweighted shares are used.  TR1 Ex. 15 (columns 4-6); TR3 Ex. 1.

26  ### CONCLUSION

27       For the foregoing reasons and those set forth in the prior submissions and argument,

28  Plaintiffs' motion for class certification should be denied.

1

2     Dated: September 13, 2019

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

By: */s/ William A. Isaacson*
        William A. Isaacson

WILLIAM A. ISAACSON (*Pro hac vice*)
(wisaacson@bsfllp.com)
STACEY K. GRIGSBY (*Pro hac vice*)
(sgrigsby@bsfllp.com)
NICHOLAS A. WIDNELL (*Pro hac vice*)
(nwidnell@bsfllp.com)
JONATHAN M. SHAW (*Pro hac vice*)
(jshaw@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW, Washington, DC 20005
Telephone: (202) 237-2727; Fax: (202) 237-6131

RICHARD J. POCKER (State Bar No. 3568)
(rpocker@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800, Las Vegas, NV 89101
Telephone: (702) 382-7300; Fax: (702) 382-2755

DONALD J. CAMPBELL (State Bar No. 1216)
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS (State Bar No. 5549)
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
700 South 7th Street, Las Vegas, NV 89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant Zuffa, LLC*

DEF ZUFFA, LLC'S SUPPL BRIEF IN OPP TO PLTFS' MTN FOR CLASS CERT

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing DEFENDANT ZUFFA, LLC'S
SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION was served on September 13, 2019 via the Court's CM/ECF electronic filing
system addressed to all parties on the e-service list.


*/s/ Roderick Crawford*
RODERICK CRAWFORD

DEF ZUFFA, LLC'S SUPPL BRIEF IN OPP TO PLTFS' MTN FOR CLASS CERT