# EXHIBIT 2

Excerpts of Deposition of Hal Singer, Ph.D ("Singer 1st Dep.")
(September 27, 2017)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                          :  Civil Action
                                :  DOCKET NO.
CUNG LE, NATHAN QUARRY,         :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,        :  (PAL)
LUIS JAVIER VAZQUEZ and         :
KYLE KINGSBURG, on behalf       :  CLASS ACTION
of themselves and all           :
others similarly                :
situated,                       :
                                :
            Plaintiffs,         :
                                :
        v.                      :
                                :
ZUFFA, LLC, d/b/a               :
ULTIMATE FIGHTING               :
CHAMPIONSHIP and UFC,           :
                                :
            Defendants.         :

- - -

Wednesday, September 27, 2017
- - -

Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

*   *   *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



1           market definition and which

2           weighting method I use, right?

3           That -- that will generate a

4           foreclosure share that gets spit

5           out, I think, of a Microsoft Excel

6           file, and that foreclosure share

7           is going to be spit out alongside

8           each observation in the dataset.

9               The regression finds a

10          relationship between that

11          foreclosure share and the

12          fighters' wage share controlling

13          for all other things and then the

14          regression is done.

15              At that point, I -- I can

16          make use of the parameters that

17          come out of the regression to

18          project what a fighter's wage

19          share would be in a but-for world

20          in which the foreclosure share was

21          lower.

22              Sorry, I'm being -- I'm

23          being attacked here by a gnat.

24          And -- thank you.



Page 42

```
 1              And I use three different
 2         scenarios:  Zero percent,
 3         20 percent and 30 percent.
 4    BY MR. ISAACSON:
 5              Q.    Now, when you use a world in
 6    which there -- Zuffa has zero percent
 7    foreclosure, how does that translate into
 8    any -- a market share for Zuffa?
 9              A.    Oh, it could accommodate
10    many different market shares for Zuffa.
11    It is -- one way of putting it is almost
12    agnostic to the market share.  It
13    could -- it could accommodate many.
14              You can have -- just to be
15    clear, you can have a high market share
16    and zero foreclosure share if all of your
17    fighters are under, say, 12-month
18    contracts.
19              Q.    And do I understand
20    correctly that if all the Zuffa fighters
21    were under 12-month contracts, you would
22    expect the foreclosure share of Zuffa to
23    be zero or close to zero?
24                    MR. CRAMER:  Objection to
```



Page 43

1          form.

2                  THE WITNESS:  So I -- I deem

3          a fighter to be foreclosed, or to

4          be working or employed pursuant to

5          an exclusionary contract if, as

6          you know, the contract is

7          exclusive and if the duration

8          exceeds a certain number of

9          months.  I use 30 months I think

10         as my -- my baseline approach.

11                 And so if you -- if you

12         allow me to use that 30-month

13         baseline or cutoff as a measure

14         for whether a fighter is

15         foreclosed, and if your question

16         posits that every Zuffa fighter

17         under contract is -- is at

18         12 months, then by construction,

19         12 months is less than 30 months,

20         and therefore, under that

21         particular measure of foreclosure,

22         no fighter would be foreclosed.

23    BY MR. ISAACSON:

24         Q.    All right.  Is there any --



```
 1                    THE WITNESS:  Do I
 2           ordinarily do it?  I'm sorry, I'm
 3           just not following.
 4   BY MR. ISAACSON:
 5           Q.    How about in standard
 6   economics?
 7                    MR. CRAMER:  Same objection.
 8                    THE WITNESS:  I think that
 9           in standard economics you would
10           put the wage in the numerator and
11           you'd put the marginal revenue
12           product in the denominator.
13   BY MR. ISAACSON:
14           Q.    And the marginal revenue
15   product would be expressed as a dollar
16   value?
17           A.    Yes.
18           Q.    And do economists ordinarily
19   measure the productivity of the
20   additional output -- well, let me put it
21   differently.
22                    Do economists generally
23   measure the productivity created when a
24   firm adds a worker in dollar terms as
```



Page 118

```
 1      opposed to as a percentage of revenue?
 2                MR. CRAMER:  Objection to
 3           form, to generally.  For what
 4           purpose?
 5                THE WITNESS:  A firm could,
 6           if a firm bills -- if a law firm
 7           bills an associate out at $400 an
 8           hour, it could express what the --
 9           what the young lawyer's salary on
10           an hourly basis is as a -- under
11           an assumed utilization rate as a
12           percentage of that young lawyer's
13           bill rate.
14      BY MR. ISAACSON:
15           Q.    And are you aware of any
16      studies which express the marginal
17      revenue product of labor in terms of the
18      percentage of revenue of the firm?
19           A.    I'm not aware, but as you've
20      expressed it, that's not quite what I'm
21      doing either.
22           Q.    Now, in terms of -- did you
23      make any effort to measure the marginal
24      revenue product of labor of UFC fighters?
```



Page 119

1          A.      Yes.

2          Q.      Okay.  And what would you

3     point to me for that?

4          A.      What I did, which is I -- I

5     calculated the average revenue per event,

6     per fighter, and I'm using that as a

7     proxy for the marginal revenue product.

8          Q.      All right.  If the

9     average -- when you look at the average

10    revenue per event, per fighter, how do

11    you determine what part of that revenue

12    is the contribution of the fighter as

13    opposed to, for example, marketing,

14    promotions, production or the work of the

15    overall firm?

16         A.      So for my purposes, I don't

17    need to figure out that -- that

18    decomposition.  I will note, however,

19    that I cite a study in my literature

20    review section that suggests that the

21    fighter is responsible for, if not all,

22    the vast majority of -- of the

23    pay-per-view revenues that are captured

24    and not the brand.



Page 120

```
 1              Q.    Well, I didn't ask about the

 2    brand.

 3              The -- you would agree --

 4    you would agree with me that effective

 5    marketing and promotion could increase

 6    the average revenue per event, correct?

 7              A.    Yes.

 8              Q.    And you would agree with me

 9    that super- -- improving television

10    production can increase the average

11    revenue per event?

12              MR. CRAMER:  All things

13         equal?

14              MR. ISAACSON:  Yes.

15              THE WITNESS:  I'm not sure

16         what -- what you mean by improving

17         television production.

18    BY MR. ISAACSON:

19              Q.    A better production that

20    people enjoy more.

21              MR. CRAMER:  Objection to

22         form.

23              THE WITNESS:  And you're

24         asking me if I can conceive of
```



Page 142

```
1      opposed to number 1 is worth something
2      more than number 15.
3              A.    Right.  So the basis is the
4      record evidence in the case.  The record
5      evidence tells us that the purpose of
6      the -- of the exclusionary arrangements
7      is to tie up the most valuable fighter so
8      as to prevent rivals from getting a
9      foothold.
10              So that tells me
11     qualitatively that it's more valuable to
12     have 1 through 15 sewn up than, say, 75
13     through 90.
14              Now the question is, how can
15     I, as an economist, quantify that -- that
16     difference in valuation, and I've tried
17     revenue weighting, I've tried rank
18     weighting and inverse rank weighting and
19     I've tried unweighted.  And at the end of
20     the day, my -- my basic regression model
21     is not sensitive to how -- how one does
22     the weighting.
23              Q.    I'm just focusing now on
24     your inverse ranking analysis.  And I
```



Page 143

1    understand that you concluded the number

2    1 fighter, for example, is more valuable

3    than the number 10 ranked fighter, but

4    what's the basis for quantifying that as

5    the number 1 fighter is ten times more --

6    worth ten times more than the number 10

7    fighter?

8           A.    I think there is record

9    evidence suggesting that it would be

10   sufficient to lock up only the headliners

11   in order to -- to cripple or to slow the

12   advance of a rival promoter.

13               So what the record evidence

14   is telling me is that -- is that 1

15   through 15, for example, are more

16   valuable than 75 through 90.  The record

17   evidence doesn't necessarily tell me how

18   to give those fighters more weight.  So

19   what I decided to do for one

20   specification was to weight a fighter

21   based on his or her inverse rank.

22           Q.    All right.  So when you say

23   headliners, you mean number -- those

24   ranked 1 through 15, correct?



Page 144

1          A.     I've defined headliners very

2     precisely as 1 through 15.  I think the

3     term headliners can connote other --

4     other numbers.

5          Q.     And in the example that I've

6     given of the number 1 fighter and the

7     number 10 fighter, those would both be

8     headliners within your definition?

9          A.     Correct.

10         Q.     And the number 1 fighter

11    would be worth ten times as much as the

12    number 10 fighter, that's correct?

13         A.     Under the --

14         Q.     We're only talking about the

15    inverse rank weighting.

16         A.     Good.

17         Q.     I'm correct that under the

18    inverse rank weighting, the number 1

19    fighter would be weighted ten times as

20    much as the number 10 fighter; is that

21    right?

22         A.     Correct.

23         Q.     And there's nothing in the

24    record that would support that relative



Page 151

```
 1    revenues, variations in pay-per-view
 2    revenues can be explained by -- by who is
 3    being offered, the rank of the -- of the
 4    fighter that's being offered for that
 5    particular event.
 6              Q.    The -- you mentioned the
 7    subject before, but let me go over it.
 8                    Now, in calculating the
 9    foreclosure share, you used two
10    alternative definitions.  One was all
11    Zuffa fighters compared to total MMA
12    fighters weighted by revenue, and the
13    other was -- I'm sorry.  Actually, I
14    think I got that right.
15                    So in calculating
16    foreclosure share, you used two
17    alternative definitions.  One was all
18    Zuffa fighters compared to total MMA
19    fighters, and the other you only included
20    fighters whose contracts contained a
21    champions clause and had a 30-month or
22    longer period of exclusivity.
23                    Do I have that right?
24              A.    I think that's fair.
```



Page 152

```
1              Q.      Okay.  And how did you

2    decide that the 30-month threshold was

3    appropriate?

4              A.      Primarily two ways.  If you

5    go to my report, there might be others,

6    but the first was I'm familiar with --

7    with various case law that speaks to what

8    constitutes a contract of sufficient

9    duration to be considered exclusionary.

10              And second basis was that

11   I -- I looked at the average and medium

12   duration of a fighter and I -- I wanted

13   to make sure that -- that the number that

14   I went with as the cutoff represented a

15   sizable or significant or material share

16   of the -- from an economic perspective of

17   the fighter's average career span.

18              Q.      I should have asked you this

19   before.  When we were looking at Figure

20   1, market share and 2 -- and Figure 3,

21   which is foreclosure share, foreclosure

22   share is the result of your regression?

23              A.      No.

24              Q.      Is that right?
```



MAGNA
LEGAL SERVICES

Page 153

```
 1              A.    No.  So foreclosure share
 2      would be an input to the regression,
 3      right?  And so you can do one pass, which
 4      I did, which is to presume that all
 5      fighters working under -- under a Zuffa
 6      contract will foreclose.  That's one
 7      approach.  And in that case, foreclosure
 8      share just equals Zuffa's market share.
 9      And so whenever a fight or event pair
10      shows up in the regression database,
11      you'll see a measure of foreclosure
12      share, which is just equal to the market
13      share.
14              Under a second approach, you
15      can -- you can allow the foreclosure
16      share to deviate from the market share by
17      insisting that not only does the fighter
18      work for Zuffa, but the fighter also
19      fights pursuant to a contract that
20      contains a championship clause, is
21      exclusive and runs longer than -- equal
22      to or longer than 30 months.
23              Q.    All right.  So for some of
24      your models you used a foreclosure share
```



Page 191

```
 1    morning for purposes of damages.
 2            A.    Yes.
 3            Q.    I'm going to return to that
 4    topic.
 5                  In those benchmarks, you are
 6    using two competitors of -- of Zuffa
 7    comparing the percentage of their
 8    revenues paid to labor or paid to the
 9    fighters to that of Zuffa.  I think we've
10    established that, correct?
11            A.    Correct.
12            Q.    Okay.  Why in economic
13    theory would you use the percentage of
14    revenue paid to labor by a competitor as
15    a benchmark?
16            A.    Because this is a voluntary
17    transaction between a willing buyer and a
18    willing seller as to the appropriate wage
19    in the -- in the MMA industry.  And so I
20    think if we're looking for -- for
21    reasonable comparables that exist within
22    the same relevant market, this is the
23    logical place to start looking.
24            Q.    When you use the term
```



1    appropriate wage.

2         A.    Yes.

3         Q.    Are the Bellator -- is

4    Bellator paying the fighters higher

5    average wages than the UFC?

6         A.    I'd say it depends on which

7    fighter you're talking about, but --

8         Q.    I said average.

9         A.    Yeah, the weight -- sorry.

10        MR. CRAMER:   I was going to

11   say you mean today, Bellator?

12        MR. ISAACSON:   At any time.

13        THE WITNESS:   The -- the

14   levels of a Bellator or a

15   Strikeforce fighter on average

16   would tend to be below the levels

17   of the UFC fighters.

18   BY MR. ISAACSON:

19        Q.    So why, in economic theory,

20   would you use the percentage of revenues

21   that a competitor allocates to the labor

22   as a benchmark as opposed to the -- the

23   actual appropriate wage that they decided

24   to pay?



1          A.    Here's why:  The record

2     evidence tells us that Zuffa had its eye

3     on the wage share, not the absolute wage,

4     they had its eyes on the wage share.

5     They were committed to pushing the wage

6     share at or below 20 percent.  This is

7     how the industry works, this is how they

8     think.

9               Now, imagine a but-for world

10     in which you strip out the exclusionary

11     contracts and Strikeforce and Bellator

12     and others are able to evolve into

13     legitimate and viable contenders for this

14     market, what would likely happen is that

15     their output would expand, their revenues

16     would expand and now their 60 percent

17     offerings, or in the case of Bellator

18     their 48 percent offerings, would start

19     to draw fighters away from UFC and

20     towards those rivals.

21               And now the question is what

22     does Zuffa have to do in this -- in this

23     but-for world?  Is Zuffa able to stay on

24     its 18 percent share when were all of its



1     is part of your analysis of what makes a

2     contract 30 months or longer?

3              A.    No.  No, there are few --

4     the retirement clause and some other

5     tolling provisions were not counted in --

6     when I went to add up the durations.  In

7     that sense, my -- my method is

8     conservative.

9              Q.    All right.  The -- so the

10    retirement clause or another tolling

11    provisions of the contracts, in the

12    absence of contracts that were 30 months

13    or longer, you don't have an opinion

14    about whether they're anticompetitive,

15    correct?

16             A.    On a stand-alone basis, no.

17                   And you keep -- you keep

18    saying, just so the record is clear, in

19    the absence of 30 months.  Remember it's

20    exclusive plus duration.

21             Q.    Right.  Understood.

22             A.    Okay.

23             Q.    The -- the exclusive

24    negotiation clause, is that a provision



Page 259

1    that you have taken into account in

2    calculating the 30 months or more?

3           A.    Yes.

4           Q.    Am I correct that -- if my

5    colleague will allow me a compound

6    question to save time -- that items that

7    you have discussed include preventing the

8    use of fighter clips when you move to a

9    new promotion, moving sponsors with you

10   when you move to a new promotion, and

11   warning fighters not to sign over their

12   likenesses to other promoters, those

13   would -- you would not have an opinion

14   about whether those actions were

15   anticompetitive in the absence of

16   exclusive contracts that were 30 or more

17   months?

18          A.    I think that's fair.

19          Q.    Okay.   And do you have an

20   opinion about whether exclusivity

21   provisions with venues, sponsors or

22   broadcasters are anticompetitive in the

23   absence of exclusive contracts of 30 or

24   more months?



Page 260

1              A.      I don't have an opinion.

2              Q.      Okay.  Do you, together with

3      contracts, inclusive contracts that are

4      30 or more months, do the -- is it your

5      opinion that the exclusivity provisions

6      with venues increase the foreclosure

7      share of Zuffa?

8                  MR. CRAMER:  Objection to

9                  form.

10                 THE WITNESS:  I think that

11                 in conjunction with the primary

12                 restrictions on fighter mobility,

13                 the exclusives on the venues can

14                 be -- can be considered to be

15                 anticompetitive.

16                 Whether they contributed to

17                 higher foreclosure shares, I'd --

18                 I'd have think about it.  I

19                 imagine one might construct a

20                 story, but I'd have to -- I'd have

21                 to think about it some more.

22     BY MR. ISAACSON:

23             Q.      Okay.  Today you don't have

24     an opinion about whether exclusivity



Page 261

```
 1    provisions with venues, even taken
 2    together with exclusivity agreements with
 3    fighters of 30 or more months, would
 4    increase the foreclosure share --
 5    increase the foreclosure share?
 6            A.    Like I said, I can imagine
 7    how they could funnel more fighters into
 8    this net and therefore trigger the
 9    mechanism that's causing the rate
10    suppression in my -- in my models, but I
11    don't really have an opinion beyond that.
12            Q.    In general, we'll save time
13    if you tell me whether you have opinions
14    as opposed to what you imagine.
15            A.    Okay.
16            Q.    Or could imagine.  I don't
17    mean that as a criticism, I mean that as
18    constructive.
19                  MR. CRAMER:  Constructive
20            criticism.
21                  MR. ISAACSON:  No, not even
22            that.  A constructive way to get
23            through the day.
24                  MR. CRAMER:  Advice.
```



Page 270

```
 1    contract -- 30-month exclusive contracts,

 2    that would drop to near zero?

 3            A.    Correct.

 4            Q.    And --

 5            A.    And so now if you asked me

 6    that at point how to do an allocation

 7    among --

 8            Q.    No, I'm not --

 9            A.    -- counter-programming, da,

10    da, da, we'd be allocating a pot of zero.

11            Q.    Let me ask -- let me ask

12    questions here.  Okay?

13                  The -- in 2011, both those

14    numbers rise to about 90 percent.  Do you

15    see that?  The blue and purple lines?

16            A.    Yes.

17            Q.    Okay.  And without the

18    exclusive 30-year contracts, the

19    90 percent would drop to almost zero

20    percent?

21            A.    Correct.

22            Q.    Okay.  The rise from 2007 to

23    2011 from 40 -- 30 to 40 percent to

24    90 percent?
```



Page 271

```
 1        A.      Uh-huh, yes.
 2              Q.      Right?  Are you able to tell
 3    me how much of that was due to exclusive
 4    contracts of 30 or more months as opposed
 5    to those contracts in combination with
 6    other things such as counter-programming?
 7                    MR. CRAMER:
 8              Incomprehensible, form.
 9                    THE WITNESS:  I just don't
10              understand how you do a
11              decomposition like that when
12              there's only one necessary
13              element.  If the necessary element
14              goes, the foreclosure drops to
15              zero, and the notion of allocating
16              zero across the other elements is
17              a fool's errand.
18    BY MR. ISAACSON:
19              Q.      Right.  So if it's a
20    necessary element to 40 percent or
21    90 percent, does that tell you why it
22    rose from 40 to 90 percent?
23              A.      No.
24                    MR. CRAMER:  When it's a
```



Page 272

```
 1              good time to break, we've been
 2              going for about an hour.
 3                   MR. ISAACSON:  Sure.  Well,
 4              actually, let me -- unless you're
 5              dying.
 6                   MR. CRAMER:  No, no, go
 7              ahead.
 8    BY MR. ISAACSON:
 9         Q.    There are allegations in
10    this case of the use of identity rights
11    of the plaintiffs such as things on Fight
12    Pass or on posters or on television
13    episodes.  You're aware of those?
14         A.    Yes.
15         Q.    Okay.  Are those
16    anticompetitive acts, in your opinion,
17    that contribute to the foreclosure
18    effect?
19         A.    The way that I'd prefer to
20    put it is that when -- when done in
21    conjunction with what I consider to be
22    the one necessary element, they're
23    anticompetitive, they're exacerbating
24    things, and I don't have an opinion on
```



Page 287

```
 1            A.    I prefer direct evidence

 2     generally, and I think that I've -- I

 3     offer a slew of evidence that speaks to

 4     how you can prove directly that Zuffa

 5     exercises monopsony power.

 6            Q.    I understand that you

 7     offered direct and indirect evidence, but

 8     I need to ask about them one at a time

 9     and we can cover both.

10            A.    Okay.

11            Q.    So in terms of when you

12     define a market, can you describe to me a

13     situation where if you use revenue

14     weighting in the input market, where

15     the -- a monopoly firm would not

16     necessarily have a monopoly in the input

17     market?

18                  MR. CRAMER:  Incomplete

19            hypothetical, form.

20                  THE WITNESS:  I've never

21            given thought to that, and I'd

22            like to think about it and maybe

23            we'll come back.  But I don't

24            think I'm prepared to -- to
```



MAGNA
LEGAL SERVICES

1          construct a scenario about how

2          that could occur.

3     BY MR. ISAACSON:

4          Q.    All right.  The -- and then

5     you've described geographic market for

6     the output market also.  And is that also

7     North America?

8          A.    Yes.

9          Q.    All right.  The -- and in

10    terms of your SSNIP analysis -- all

11    right.  So did you do -- well, my

12    colleague wants to know so it seems like

13    a good question.

14          A.    I'm sure it is.

15          Q.    In the out -- in the output

16    market, what is being sold?  In the

17    output markets that you have defined.

18          A.    Sure.  I think that you

19    are -- the production or the product that

20    is being produced are -- is live MMA

21    events and the revenue associated with

22    those events can take the form of gate

23    revenue or pay-per-view.  That's from --

24    from the consumer side.  Of course,



Page 289

1      there's -- there's revenues from the
2      advertiser's side as well.
3                     But I hope that answers your
4      question.
5             Q.     All right.   And does
6      pay-per-view compete with broadcast?
7                     MR. CRAMER:   Objection to
8            form.
9                     THE WITNESS:   I did not
10           conduct that inquiry.
11     BY MR. ISAACSON:
12            Q.     Do you have an opinion one
13     way or another about that?
14            A.     No.
15            Q.     All right.   With respect to
16     the -- does -- do the live venue events
17     compete with pay-per-view events?
18            A.     I don't even understand the
19     question.   Many of the pay-per-view
20     events are live.
21            Q.     Meaning I watch it on
22     pay-per-view as opposed to go see it
23     live.
24            A.     I haven't -- I haven't



Page 290

 1    studied that and I imagine for someone
 2    who lives very far from the venue where
 3    the live event is staged, they would not
 4    be considered reasonably close
 5    substitutes.
 6         Q.    So for your input markets,
 7    what evidence did you take into account
 8    to assess customer's likely response to
 9    price increase in the SSNIP analysis?
10    And feel free to point me to the sections
11    of your report that --
12         A.    Did you mean to say -- I
13    think you just conflated the input
14    markets and customers.  Maybe we should
15    start over.
16         Q.    Yes, I said price increase
17    rather than wage decrease, but let me
18    just put it this way:  What evidence in
19    your report did you take into account to
20    assess the likely response to a SSNIP in
21    the input markets?
22         A.    Sure.  So there it's the
23    perspective of the fighters not the
24    customers.  So I was tripping up over



Page 291

```
 1     your --
 2            Q.    Yes.
 3            A.    -- injecting customers when
 4     we're talking about input markets.
 5                 So I can take you to the
 6     relevant sections, and I will, but of
 7     course at high levels, I'm looking at
 8     record evidence of -- of what fighters
 9     and promoters thought about substitution
10     possibilities as you -- if you were to
11     move away from Zuffa to counteract a
12     hypothetical wage cut.
13            Q.    Okay.  So the first thing
14     you looked at was record evidence of
15     substitution.
16            A.    Or the perception of
17     substitution from the stakeholders, the
18     fighters, the promoters, and I'll just
19     point you, if you --
20            Q.    That's -- that's sufficient
21     for -- for item 1.
22                 MR. CRAMER:  You asked him
23            to look at his report.
24                 MR. ISAACSON:  I'm going
```



Page 333

```
 1
 2                    CERTIFICATE
 3
 4
 5          I HEREBY CERTIFY that the
      witness was duly sworn by me and that the
 6    deposition is a true record of the
      testimony given by the witness.
 7
            It was requested before
 8    completion of the deposition that the
      witness, HAL J. SINGER, Ph.D., have the
 9    opportunity to read and sign the
      deposition transcript.
10
11
12    _____
      Constance S. Kent, CCR, RPR, CLR
13     Certified Court Reporter
       Registered Professional Reporter
14     Certified LiveNote Reporter
       and Notary Public in and for the
15    Commonwealth of Pennsylvania
      Dated:  October 1, 2017
16
17
18
19
20          (The foregoing certification
21    of this transcript does not apply to any
22    reproduction of the same by any means,
23    unless under the direct control and/or
24    supervision of the certifying reporter.)
```

