# EXHIBIT 3

PCCX604 - Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2017)

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume IIIA**
**Fourth Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application

 Wolters Kluwer


flow from uncontrolled behavior adjusted for its frequency; and (5) the relative gravity and frequency of the antisocial consequences of excessive or erroneous control of such behavior. Differences among commentators on the predatory pricing problem reflect differences in judgment on these several points.[47] Fortunately, several courts have realized the importance of administrability in defining predation.[48]

## ¶737.   Judicial Recognition of Long-Run Anticompetitive Pricing

**737a.   Introduction; above-cost prices lawful per se.**   Notwithstanding the criticisms offered in the previous Paragraph, some courts have stated their willingness to condemn prices above average total cost as "predatory." This Paragraph examines both those decisions and others that have rejected them. Since the assumption is that prices were above all relevant costs, the question is often posed as whether unlawful predation can be found by something other than a cost-based test.

Our examination is brief, because forceful dicta in the Supreme Court's *Brooke* decision rule out condemnation of prices that are not "below some measure of incremental cost." *Weyerhaeuser* then stated this as a rule of law, although in a case where the challenge was to predatory purchasing rather than predatory selling.[1]

---

47.   *See, e.g.,* Paul L. Joskow & Alan K. Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213 (1979).

48.   *Northeastern Tel. Co. v. AT&T,* 651 F.2d 76, 88 (2d Cir. 1981), *cert. denied,* 455 U.S. 943 (1982):

> Courts occasionally err in applying even the clearest legal rules. The more complicated the standard, the greater the chance for misapplication. Especially when the costs of a misjudgment are high and the prevalence of the conduct the law seeks to deter is low, simpler rules are preferable.

(Citing ¶711 in the first edition.) *See also Janich Bros. v. American Distilling Co.,* 570 F.2d 848, 857 n.9 (9th Cir. 1977), *cert. denied,* 439 U.S. 829 (1978) (considering long-run problems is "'intrinsically speculative and indeterminate' and, in considering the limitations of the judicial process, are properly disregarded in formulating a test for predatory pricing." *Citing* P. Areeda & D. Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv. L. Rev. 891 (1976); *Transamerica Computer Co. v. IBM,* 481 F. Supp. 965, 991 (N.D. Cal. 1979), *aff'd,* 698 F.2d 1377 (9th Cir.), *cert. denied,* 464 U.S. 955 (1983) ("all but impossible to distinguish between above cost limit pricing" and procompetitive reactions).

¶737.   n.1.   *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 223 (1993); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.,* 549 U.S. 312 (2007). On predatory purchasing as a §2 offense, see ¶747b.

158

firms to compete aggressively. Thus the decisions are wrong on policy grounds.

**737b. All courts recognize importance of cost-based evidence.** The decisions have not only accepted the central role of price-cost comparisons in identifying predatory pricing but have also given prominent place to marginal cost and its surrogate of average variable cost.[4] Even the Ninth Circuit, which has been the most receptive to non-cost factors, has made average variable cost the touchstone of presumptive legality for prices above it and of presumptive illegality for prices below it.[5]

Other courts have also made cost evidence central, but felt uncomfortable about making it determinative. A typical formulation was the Seventh Circuit's *Chillicothe* acknowledgment that while cost evidence was both "relevant and extremely useful," the court was also "willing to consider the presence of other factors" in identifying predation.[6] Nevertheless, as is typically the case when courts consider non-cost factors, those other factors were not potent enough to condemn a price that did not offend the cost standard.[7]

In its later *MCI* decision, the Seventh Circuit again expressed doubts about considering intent or other non-cost factors in a case where it had been found that the prices did not fall below its cost standard.[8] However, that court was not quite ready to adopt a rule of per se legality:

> We do not intend to imply that in *all* cases and in *all* circumstances we would only examine the price-cost relationship of a product or service. Our test merely suggests that a judge and jury may not *infer* predatory intent unless price is below long-run incremental cost. . . . [A] strong presumption of lawfulness must attach when price [exceeds such costs].[9]

---

4. For a more comprehensive cataloguing of the cases relying on cost data, see ¶¶740–742.

5. See ¶c.

6. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 432 (7th Cir. 1980).

7. After making the quoted statement, the court considered and rejected a number of non-cost factors. *Id.* at 432–34. *See also Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 824 (6th Cir. 1982) (refusing to be bound by any particular cost-based test, but looking also at other factors such as high entry barriers; ultimately finding no liability).

8. *MCI Commc'ns Co. v. AT&T*, 708 F.2d 1081 (7th Cir. 1982), *cert. denied*, 464 U.S. 891 (1983).

9. *Id.* at 1123 n.59. *See also Jays Foods, Inc. v. Frito-Lay, Inc.*, 614 F. Supp. 1073, 1078 (N.D. Ill. 1985) (relying on *MCI*, concluding that non-cost factors are "important adjuncts" to cost tests; stating willingness to condemn price between average variable and average total cost

160



¶737    **Monopolization: Particular Exclusionary Practices**

below a firm's "short-run, profit-maximizing" price can nevertheless be significantly above any measure of cost, including average total cost. The court was naturally concerned that where entry barriers are high, the exclusion of rivals, even by prices that are permanently low and above costs, might prejudice long-run consumer welfare by more than consumers would suffer from higher prices during the interval before effective competition might otherwise be established. This dictum has not yet been applied by any court, and our discussion in the previous Paragraph doubts its administrability.[13] As the Second Circuit recognized early on, attempting to deal with the long-run and strategic problem may cause more harm than good.[14]

**737c. Ninth Circuit decisions and rejection by other circuits.** In its important *Inglis* decision the Ninth Circuit elaborated on earlier reservations[15] and held first that prices above average variable cost are presumptively lawful; further, this presumption can be overcome only if the plaintiff proves that the challenged price did not maximize short-run profits but rather "that the anticipated benefits of defendant's price depended upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power."[16] Once again, the quoted exception would condemn any price, whether or not above cost, whose benefits depended on its tendency to eliminate competition.

---

*Distilling Co.*, 570 F.2d 848, 856–57 (9th Cir. 1977), *cert. denied*, 439 U.S. 829 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074 (1977). *See also William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027–28 (9th Cir. 1981), *cert. denied*, 459 U.S. 825 (1982); *California Computer Prods., Inc. v. IBM*, 613 F.2d 727, 743 (9th Cir. 1979) (approving directed verdict for defendant charging profitable price but asserting in dictum that limit pricing might possibly "be held an impermissible predatory practice"). *And see Caller-Times Publ'g Co. v. Triad Commc'ns, Inc.*, 791 S.W.2d 163 (Tex. Civ. App. 1990), *aff'd in part*, 826 S.W.2d 576 (Tex. 1992) (decided under state antitrust statute; following Areeda-Turner test as starting point but willing to consider evidence of subjective intent when price was above average variable cost but below average total cost; purporting to follow the Fifth Circuit Sherman Act rule).

13.  See ¶736b1.

14.  See ¶736d, referring to *Northeastern Tel. Co. v. AT&T*, 651 F.2d 76, 87–88 n.15 (2d Cir. 1981), *cert. denied*, 455 U.S. 943 (1982); *Janich*, 570 F.2d at 857 n.9.

15.  *See, e.g., Janich*, 570 F.2d at 848.

16.  *Inglis*, 668 F.2d 1014 at 1035. The court added that "[w]e emphasize a defendant's rational expectations to avoid penalizing innocent miscalculations that result in anticipated profits being turned into losses." A Sixth Circuit panel subsequently agreed with this standard, which it characterized as the modified Areeda-Turner rule. *D.E. Rogers Assocs., Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1436–37 (6th Cir. 1983), *cert. denied*, 467 U.S. 1242 (1984). However, the modified test was later held to govern only prices below average cost. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1056 (6th Cir.), *cert. denied*, 469 U.S. 1036 (1984).

162

in which monopolists can exploit their power without fear of scrutiny by the law."[22] Not only are "uncertainty and imprecision inherent in determining 'costs,'" but exclusive reliance on costs would exclude other important factors, "such as intent, market power, market structure, and long-run behavior."[23] Moreover, the court feared that a monopolist might reduce price temporarily to forestall entry and then restore prices when entry was no longer threatened. Finally, the court wished to reserve the possibility that a court might be able to identify and condemn limit pricing by which a monopolist might deter entry by pricing above its average costs but below the short-run profit-maximizing level.[24]

Although the court acknowledged that it "may be difficult in many or most instances to assess the long-run consequences of challenged pricing policies,"[25] plaintiffs should not be foreclosed from proving by clear and convincing evidence that a price above average total cost is nonetheless predatory:

> The test for determining the antitrust legality of prices that exceed average total cost should be consistent with . . . our view that cost-price relations should not be the exclusive method of proving predation. In addition, the test should be consistent with the economic analysis of Areeda and Turner. Their analysis indicates that prices above average total cost will rarely be predatory. Therefore, it is appropriate to impose on the plaintiff a greater burden of proving that prices above average total cost are predatory than the burden imposed by *Inglis* to prove that prices between average variable and average total cost are predatory. We therefore hold that if the challenged prices exceed average total cost, the plaintiff must prove by clear and convincing evidence — i.e., that it is highly probably true — that the defendant's pricing policy was predatory.[26]

The court provided few clues as to how this burden might be satisfied. It mentioned limit pricing (without indicating how it could be established), price rises after rivals left the market, market

---

22.   *Id.*, 698 F.2d at 1387.
23.   *Ibid.*
24.   *Id.* at 1387, citing *California Computer Prods., Inc. v. IBM*, 613 F.2d 727, 743 (9th Cir. 1979), and ¶714b in the first edition. The court also cited Frederic M. Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv. L. Rev. 869, 890 (1976), for the proposition that some price reductions employed for strategic purposes could impair long-run welfare.
25.   *Transamerica*, 698 F.2d at 1387.
26.   *Id.* at 1388–89.

164

responses. . . . Moreover, if the search for intent means a search for documents or statements specifically reciting the likelihood of anti-competitive consequences or of subsequent opportunities to inflate prices, the knowledgeable firm will simply refrain from overt description. If it is meant to refer to a set of objective economic conditions that allow the court to "infer" improper intent, then, using Occam's razor, we can slice "intent" away.

Thus, most courts now find their standard, not in intent, but in the relation of the suspect price to the firm's costs. And, despite the absence of any perfect touchstone, modern antitrust courts look to the relation of price to "avoidable" or "incremental" costs as a way of segregating price cuts that are "suspect" from those that are not. . . . When prices exceed incremental costs, one cannot argue that they must rise for the firm to stay in business. Nor will such prices have a tendency to exclude or eliminate equally efficient competitors. Moreover, a price cut that leaves prices above incremental costs was probably moving prices in the "right" direction — towards the competitive norm.[30]

The court was not obliged to choose between average costs and marginal costs because the challenged price exceeded both. It noted that even prices above average cost are unlawful in the Ninth Circuit if "clear and convincing" evidence shows that "the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power."[31] The court then rejected the Ninth Circuit test because price cuts to levels above total cost almost certainly move price in the right direction, because such a beneficial "bird in the hand" is preferable to the speculative "bird in the bush" of lower future prices, and because the test is vague.

Is it meant to include, for example, "limit pricing" — the common practice of firms in concentrated industries not to price "too high" for fear of attracting new competition? . . . Does the test mean to include every common instance of a firm (with market power) deciding not to raise its prices? If it means to include either of these sorts of circumstances, the rule risks making of the antitrust laws a powerful force for price increases. . . .

30. *Id.* at 232.
31. *Id.* at 233, quoting *Transamerica*, 698 F.2d at 1388, and *Inglis*, 668 F.2d at 1035.



¶737    Monopolization: Particular Exclusionary Practices

FTC complaint charging that DuPont (DP) had attempted to monopolize titanium dioxide pigment (TDP), which is used in the manufacture of paint and other products. DP came to enjoy a significant cost advantage around 1970, when higher raw materials costs and environmental regulation burdened its competitors. It was charged with (1) expanding its capacity by constructing a large-scale plant "prematurely" and with "exaggerated announcements" of its expansion intentions; and (2) exploiting its costs advantage by pricing its products high enough to finance its own expanded capacity but low enough to discourage rivals from expanding.[36] The Commission found that DP,

> with a 30% market share in 1972 and a substantial cost advantage over its rivals, sought to exploit this opportunity by embarking on a long-term expansion project to capture the demand growth anticipated over the following decade. In pursuing this objective, DP foresaw that this plan would significantly enhance its market share, possibly giving the firm a 65% share by 1985.[37]

Complaint counsel did not contend that DP overbuilt its capacity relative to anticipated demand; rather, they argued that it preempted competitive expansion through strategic announcement and start-up of a new plant. But there were legitimate business reasons for DP to provide advance notice of its expansion plans in order to obtain necessary permissions in the face of environmental objections. As the plant neared completion, demand failed to materialize in accordance with its reasonable expectations, but DP decided to complete it anyway, even if it had to lie dormant for a year. The FTC concluded that DP's announcement and start-up of

---

lemons and lemon juice, the FTC and the Sixth Circuit defined the market as lemon juice and a relevant "submarket" as reconstituted lemon juice. In that submarket, Borden held some 90 percent and was deemed a monopolist.

The Commission declined to define whether the appropriate floor was long- or short-run marginal cost. 92 F.T.C. at 799 n.29. (On the long-run test, see ¶741e.) Although no substantial sales were made at prices lower than average variable cost, the Commission prohibited Borden from selling ReaLemon "below its cost or at unreasonably low prices." *Id.* The Sixth Circuit interpreted this to order Borden not merely to charge more than its average cost, but also to avoid "sales made at or near average costs with the intent to restrain unreasonably competition from . . . others. . . ." 674 F.2d at 517. In short, even a sale at a profitable price could violate the Commission's order if accompanied by improper intent.

36.   96 F.T.C. at 707–08. DP was also charged with refusing to license its cost-saving technology to rivals. The FTC refused to impose any general duty to license rivals, which would tend to chill innovation, and there were no aggravating factors in this case such as unreasonable means to acquire know-how or collaboration with others to prevent access by rivals. On refusals to license, see ¶709.

37.   96 F.T.C. at 723.

of the would-be monopolist may enhance efficiency or product performance, albeit marginally, although the overall competitive effect is decidedly negative. In a similar vein, there are shortcomings in a test which relies exclusively on determining whether the conduct would have been rational for a smaller firm. On the one hand, it might be logical and necessary for a new or recent entrant to engage in below cost pricing as a means of achieving market penetration. On the other hand, size and efficiency may coalesce so that it is difficult, if not impossible, to ascertain precisely whether an effective marketing tactic owes its success to greater efficiency or the naked exercise of market power. Moreover, behavior that is rational for a firm with little or no market power may nevertheless produce substantial and unnecessary anticompetitive effects when wielded by a firm with considerable market clout.[40]

The *Titanium* decision is a good illustration of the dilemma that tribunals face in such cases. While the models are generally simple and elegant and presume reliable market predictions, the real world seldom offers such tidiness.[41] Looking *ex post*, as the tribunal inevitably must, it is usually impossible to proclaim that an earlier decision to build more capacity or keep prices low was anticompetitive in light of anticipated circumstances.

## ¶738.   Intent Evidence in Predation Cases

**738a.  Introduction; plausible uses of intent evidence.**  We have previously discussed evidence of intent as either a surrogate for or possible complement to structural evidence in predatory pricing cases.[1] *Brooke* holds that no matter what the defendant's anticompetitive intent, likelihood of recoupment must be established by objective evidence. We now examine the role of intent evidence in determining whether a particular *price* is predatory, concluding the following:

1.  When the price is above any relevant measure of cost, no amount of anticompetitive intent establishes unlawful predatory pricing.

---

40.  *Id.* at 738–39.
41.  On strategic creation of excess capacity as an entry deterrence strategy, see Jean Tirole, The Theory of Industrial Organization 255–56 (1992); Marvin B. Leiberman, *Excess Capacity as a Barrier to Entry: An Empirical Appraisal*, 35 J. Indus. Econ. 607 (1987).
  **¶738.**  n.1.  See ¶728, particularly ¶c.

The other side of this observation, of course, is that proven actual exclusion that is unexplained by some other competitively benign factor may be sufficient to show harm even on lower percentages.

   1821d3.   *Measuring contract duration for exclusion contracts, discounts, and rebates.*   As noted in ¶1802g, even a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short *and* there are no other impediments to switching. We suggest presumptively that periods

---

such equipment are four times as great as Dresser's. Already it is a major factor in the U.S. construction-equipment market; in some items it outsells Dresser. The nationwide practice of exclusive dealing has not kept Komatsu from becoming a major factor in the U.S. market, apparently in a short period of time. The reason is evident. Since dealership agreements in this industry are terminable by either party on short notice, Komatsu, to obtain its own exclusive dealer in some area, has only to offer a better deal to some other manufacturer's dealer in the area. It need not fear being sued for interference with contract; Roland would not be breaking its contract with Dresser if it gave Dresser the heave-ho, provided it gave 90 days' notice. Maybe if Roland had known that it would be cut off by Dresser as soon as it was, it would have demanded some guarantees from Komatsu to tide it over the period of transition when Komatsu was not yet as well established a name in central Illinois as Dresser (though Dresser itself was in a sense new to the market); and probably Komatsu would have given Roland these guarantees to get a foothold in the central Illinois market. The likeliest consequence of our dissolving the preliminary injunction would be to accelerate Komatsu's efforts to promote its brand through the Roland dealership.

*Ibid. See also Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399 (3d Cir. 2016) (claimed exclusive dealing that applied to only some 8 percent of relevant market insubstantial); *Taggart v. Rutledge*, 657 F. Supp. 1420 (D. Mont. 1987), *aff'd*, 852 F.2d 1290 (9th Cir. 1988) (even high foreclosure percentage does not establish illegality where competition is flourishing and new suppliers are not in fact foreclosed from entering the upstream market). *And see U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (possible foreclosure of 25 or 87 percent of physicians who opted to serve defendant's health care program exclusively, depending on market definition; but exclusivity provisions could be canceled on 30 days' notice; further, large number of uncommitted physicians were available notwithstanding high apparent foreclosure percentage); *Westman Comm'n Co. v. Hobart Int'l*, 796 F.2d 1216 (10th Cir. 1986), *cert. denied*, 486 U.S. 1005 (1988) (vigorous competition among resellers of restaurant supply equipment undermined plaintiff reseller's claim of unlawful exclusive dealing); *Ralph C. Wilson Indus. v. Chronicle Broad. Co.*, 794 F.2d 1359 (9th Cir. 1986) (exclusive television programming contracts simply created variety among television stations; not shown to keep stations out of the market); *Joyce Beverages of N.Y. v. Royal Crown Cola Co.*, 555 F. Supp. 271 (S.D.N.Y. 1983) (robust interbrand competition tends to make exclusive dealing competitively harmless); *Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245 (D.P.R. 2010), *aff'd*, 656 F.3d 112 (1st Cir. 2011) (dismissing complaint where most exclusive agreements were from one to two years in duration, although a few were for three years, but foreclosure shares were generally below 30 percent). *Cf. Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.*, 2009 WL 4061631, 2009-2 Trade Cas. ¶76,815 (D. Mass. Nov. 20, 2009) (dubious conclusion that contract enforcement activity should be counted as exacerbating factor in assessing anticompetitive potential of market-share discounts contracts; here, "sales representatives reviewed member-hospitals' purchasing activity to determine each member's compliance with market share commitments, and furthermore, required members to disclose their purchase records for review"; however, foreclosure on the basis of a market-share purchase contract is computed on the premise that the contract is being enforced according to its terms; on the other hand, lack of enforcement might indicate that a contract forecloses less than its terms suggest).

of less than one year be approved,[61] particularly where switching appears to face no substantial impediments, and even more particularly where dealers in the same distribution system and operating under the same contract provisions can be observed to be switching. We say "presumptively," however, because while short contract duration suggests cycling availability of buyers for upstream rivals, it does not guarantee such availability.

Short contract term and dealer ability to switch become more relevant as the number of individual dealers covered by the

61. *See, e.g., Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.,* 748 F.3d 160 (4th Cir.), *cert. denied,* 135 S. Ct. 437 (2014) (exclusive supply agreements with 21 out of some 1,000 potential customers was insufficient to constitute monopolization or attempt to monopolize by exclusive contracting; noting also that these exclusive agreements were of short duration; rejecting plaintiff's argument that these particular customers were "critical" to achievement of economies of scale; citing ¶806a); *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254 (3d Cir. 2012), *cert. denied,* 569 U.S. 958 (2013) (contracts of at least five years' duration tended to show exclusion; citing ¶1802g; also, while the contracts were terminable on short notice, termination would be very costly because there was no alternative supplier that could fulfill the buyers' needs); *Omega Envtl. v. Gilbarco,* 127 F.3d 1157, 1162–64 (9th Cir. 1997), *cert. denied,* 525 U.S. 812 (1998) (approving exclusive dealing where initial contract period was for one year and thereafter contract was terminable by either party on 60 days' notice); *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1326 (4th Cir. 1995) (approving one-year contracts); *Balaklaw v. Lovell,* 14 F.3d 793, 799 (2d Cir. 1994) (approving three-year exclusive anesthesiological services contract with six months' notice provision as preserving ample "opportunities for competition" — "such a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions); *U.S. Healthcare,* 986 F.2d at 596 (approving 30-day provision); *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,* 848 F.2d 976, 982 (9th Cir. 1988) (approving six-year exclusivity provision in lease); *Konik v. Champlain Valley Physicians Hosp. Med. Ctr.,* 733 F.2d 1007, 1014–15 (2d Cir.), *cert. denied,* 469 U.S. 884 (1984) (same; six-month notice period in anesthesiology contract); *Roland,* 749 F.2d at 395 (less than one year presumptively lawful); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 236–38 (1st Cir. 1983) (two-year limitation okay); *Pro Search Plus, LLC v. VFM Leonardo, Inc.,* 2013 WL 3936394, 2013-2 Trade Cas. ¶78,464 (C.D. Cal. July 30, 2013) (numerous contracts with relatively short termination periods and overall durations in two- to five-year range indicated that exclusive dealing was not anticompetitive; a later decision sustained an amended complaint, which also alleged that there were independent switching costs that made escaping from the contracts costly notwithstanding their short duration. *Pro Search Plus, LLC v. VFM Leonardo, Inc.,* 2013 WL 6229141, 2013-2 Trade Cas. ¶78,599 (C.D. Cal. Dec. 2, 2013)); *PNY Tech., Inc. v. SanDisk Corp.,* 2014 WL 2987322, 2014-2 Trade Cas. ¶78,834 (N.D. Cal. July 2, 2014) ("The prevailing rule in districts and circuits across the country is that where exclusive or semi-exclusive contracts are short in duration, easily terminable, incentive-based, and leave open alternative channels to competitors, they are not exclusionary," quoting *Church & Dwight Co. v. Mayer Labs., Inc.,* 868 F. Supp. 2d 876, 903 (N.D. Cal. 2012), *vacated in part on other grounds,* 2012 WL 1745592 (N.D. Cal. May 16, 2012); also quoting ¶1821); *Bepco, Inc. v. Allied Signal, Inc.,* 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (short termination clause requiring 30-day notice undermined claim of unlawful exclusive dealing; citing main text); *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 633 F. Supp. 386, 397 (D. Del. 1986) (180-day notice provision okay). Situations finding the duration excessive include *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1307–08 (9th Cir. 1982) (ten-year term invalid); *United States v. American Can Co.,* 87 F. Supp. 18, 29 (N.D. Cal. 1949) (five years too long); *Great Lakes Carbon Corp.,* 82 F.T.C. 1529, 1668–69 (1973) (output contract; 7 to 20 years excessive).

arrangement increases. To illustrate, if a manufacturer has only a single large dealer covering 60 percent of the market, luring that dealer away would require a large rival and, further, there would be only one dealer who could be enticed to switch. By contrast, if the manufacturer's system had 300 dealers within the relevant market, a single dealer could be lured away by a relatively small rival, and at any given time numerous dealers may be available for such switches. Indeed, in a large dealer network, even contracts with long terms need not be anticompetitive. For example, in a 300-dealer network where contracts average three years long with randomly distributed terminations, approximately 100 dealers should be free to renegotiate each year.

When the "exclusive deal" is accomplished by a price discount scheme rather than an absolute non-dealing contract, close examination of contract terms and effects is necessary to determine the true length of any exclusion. In many cases a rival could presumably steal a customer at any time simply by matching the discount. Discounts that are aggregated across a period of time, such as one year, should never be counted as a contract of more than one year's duration; however, there may be cases where the aggregation effectively requires a rival to price at below cost in order to both meet the defendant's price on current sales and match the discount that will be lost on past sales. For example, suppose a discount scheme offers a 5 percent discount in exchange for a high share of the customer's purchases, that the customer purchases once a month, and that the customer will not receive the discount unless it meets the purchase-share obligations over the entire year. During the first month of this contract a rival could bid away the sale by simply matching the price. During the second month, however, it would have to match the price on the current order *and* compensate the buyer for the lost discount on the previous month's order, and so on. By the third or fourth month the buyer may be locked in to the extent that no equally efficient rival could steal the sales at an above-cost price. Of course, once the rebate accrues the cycle starts over and rivals will be able to bid again. Such contracts come in a wide variety of types and must be examined closely to ensure that they really cause the exclusion that is claimed for them. Further, rivals are typically able to bid sales away not only by compensating for past discounts that have been forgone but also by offering better discounts in the future. Finally,

observations that rivals are actually taking sales notwithstanding the contract terms indicate that the terms are not exclusionary.[62]

In general, our suggested one-year presumption about contract duration should apply from the rival's or new entrant's perspective: the relevant question is whether during a one-year interval sufficient dealers are "freed up," looking at both contract terms and other impediments to switching, that the fact finder can conclude that there is a realistic opportunity for a new rival to enter the market or an existing rival to expand. In the case of aggregated discounts, the relevant question would be whether the competing for the sales by an equally efficient rival can occur at least once a year.[63]

To illustrate, suppose that a dominant upstream firm imposes exclusive dealing on 30 downstream dealers in the local resale market, and these dealers' sales account for 30 percent of the market. However, these dealers have two-year contracts on different cycles and there are no significant impediments to dealer switching. As a result, on average half of these dealers' contracts become available for bidding by a rival each year, indicating that true foreclosure is more like 15 percent rather than 30 percent.[64]

62. See ¶748e, which suggests a way of analyzing such contracts. Cf. Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 2009 WL 4061631, 2009-2 Trade Cas. ¶76,815 (D. Mass. Nov. 20, 2009) (suggesting that a contract with no termination provision but offering above-cost market-share discounts could be counted as being long if loss of the discount applied retroactively to purchases already made; of course, in that case the duration of the contract could not be counted as longer than the duration of the "reach back" period, which was not specified; for example, a contract that provided for retroactive loss of rebate over the calendar year if the purchaser should switch too many purchases would have a duration of one month if the switch occurred on February 1, or 11 months if it occurred on December 1; the plaintiff's claimed damages were for monopoly overcharges; in any event the court did not provide numbers from which one could compute whether the contract could exclude an equally efficient rival).

63. See Ticketmaster Corp. v. Tickets.com, Inc., 127 Fed. Appx. 346, 2005 WL 824095, 2005-1 Trade Cas. ¶74,745 (9th Cir. Apr. 11, 2005) (unpublished) (Ticketmaster's exclusive contracts of six years' average duration were not excessive because individual venues came up for rebidding frequently and the plaintiff was an active bidder for these renewals. In this case, on average, 16 percent of Ticketmaster's overall venues, and 26 percent of its top 150 venues, came up for renewal each year. "[A]ll customers might contract to buy exclusively from incumbents and yet allow effective entry if 20 percent of the contracts expire monthly (or even annually)," quoting Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1164 (9th Cir. 1997), cert. denied, 525 U.S. 812 (1998), which was in turn quoting an earlier version of ¶421f. The court also held that this conduct did not constitute exclusionary behavior under § 2 of the Sherman Act, apparently under the same test. See also Sterling Merch., Inc. v. Nestle, S.A., 724 F. Supp. 2d 245 (D.P.R. 2010), aff'd, 656 F.3d 112 (1st Cir. 2011) (contracts between ice cream distributor and Puerto Rico retailers that gave the former exclusive rights in retailer freezer display space for ice cream never exceeded 30.8 percent and averaged just under 27 percent over complaint period, dropping to under 20 percent the final year).

64. For this reason, the Eighth Circuit correctly concluded in Concord Boat that boat builders' immediate ability to switch undermined exclusion claims. By contrast, the Sixth

As ¶1802g3 notes, the contract term is not the only impediment to dealer switching; dealers who have made a significant co-investment in their supplier's specialized inputs may not be able to switch easily even when contract duration is short or the contract is an at-will contract. For example, many franchisees have made significant investments in their franchise, imposing switching costs as high as or higher than the costs of a contract breach. In that case, a short notice-of-termination provision hardly indicates that such franchisees can easily be induced to switch. At the other extreme, a convenience store selling unbranded gasoline through its own pumps could probably be induced to switch quite easily whenever its contract term permits.

1821d4.   *Existence of alternative distribution channels.*   In part, the question of distribution channels reduces to one of proper market definition. For example, if Levi's blue jeans are sold in both franchised Levi's brand stores and department stores, then the denominator for the fraction computing foreclosure should include both. Suppose that all Levi's brand stores, selling 1,000 pairs of jeans annually, are covered by exclusive-dealing contracts, but in addition jeans are sold through department stores. Levi's has no exclusive-dealing relationship with them; these stores sell an additional 2,000 pair of jeans annually. In that case, the percentage of the market foreclosed by exclusive dealing must be reckoned at one-third, or 33 percent.

But suppose that the area contains a significant number of department stores or clothing stores not currently selling any jeans at all, but it seems clear that they could easily do so in response to an alternative jean maker's offer. Adding a new brand of jeans requires nearly no investment in additional infrastructure or hardware and involves only the increases in variable costs associated with stocking and reselling any new product. Should these alternative stores be counted as "in the market" as well?

First, counting them as in the market poses one problem: because they are not currently selling jeans, they have no current market share. Of course, one could estimate their capacity for selling jeans, although such an estimate would necessarily be quite

Circuit concluded incorrectly in *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003), that the defendant's agreements with retailers to use its multibrand racks were exclusionary even though the agreements were apparently terminable at will. Although some of the rack replacements were done without any agreement with retailers, the court did not require the plaintiff to show how many were done by agreement and how many were not, and then permitted a damage award predicated on the assumption that all were unlawful.