# EXHIBIT 9

Excerpts of Deposition of Alan Manning ("Manning Dep.")
(February 8, 2018)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                     :  Civil Action
                           :  DOCKET NO.
CUNG LE, NATHAN QUARRY,     :  2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,    :  (PAL)
LUIS JAVIER VAZQUEZ and     :
KYLE KINGSBURG, on behalf   :  CLASS ACTION
of themselves and all       :
others similarly            :
situated,                   :
                           :
          Plaintiffs,       :
                           :
          v.                :
                           :
ZUFFA, LLC, d/b/a           :
ULTIMATE FIGHTING           :
CHAMPIONSHIP and UFC,       :
                           :
          Defendants.       :

- - -
Thursday, February 8, 2018
- - -

          Videotaped deposition of
     ALAN MANNING, taken pursuant to notice,
     was held at the law offices of Berger &
     Montague, P.C., 1622 Locust Street,
     Philadelphia, Pennsylvania 19103,
     beginning at 9:16 AM, on the above date,
     before Constance S. Kent, a Certified
     Court Reporter, Registered Professional
     Reporter, Certified LiveNote Reporter,
     and Notary Public in and for the
     Commonwealth of Pennsylvania.
               *  *  *
          MAGNA LEGAL SERVICES
            (866) 624-6221
            www.MagnaLS.com



1   particular worker or group of workers.

2            In your report, do you give

3   an opinion that, in this case, it is

4   possible to ascribe a measurable part of

5   a firm's revenue to the activities of a

6   particular worker or group of workers?

7        A.    I expressed the view that

8   the fighters who were involved in a

9   particular revenue play a role in

10  generating the revenue for that event.

11       Q.    Yes, but do you, in your

12  report, reach the conclusion that it's

13  actually possible to ascribe a measurable

14  part of a firm's revenue to the

15  activities of a particular worker or

16  group of workers?

17            MR. CRAMER:  Asked and

18       answered.

19            You may answer.

20            THE WITNESS:  I mean, I feel

21       that I -- you know, I answered

22       that in my previous --

23  BY MR. ISAACSON:

24       Q.    Well, what you told me in



Page 24

1    your previous answer was, I expressed the

2    view that fighters who are involved in a

3    particular revenue play a role in

4    generating revenue for that event, and

5    that doesn't tell me whether you are --

6    you state in your report that you can

7    ascribe a measurable part of a firm's

8    revenue to the activities of a particular

9    worker or group of workers.

10           What I want to know is, in

11   your report are you doing that, actually

12   reaching -- did you reach the opinion

13   that you can ascribe a measurable part of

14   a firm's revenue to the activities of a

15   particular worker or group of workers?

16        A.    I'm not sure that I

17   understand quite the distinction from the

18   previous one.  Do you mind expressing

19   that again -- asking that again?

20        Q.    I'm focusing on, for

21   example, ascribing a measurable part of a

22   firm's revenue, and you told me that

23   fighters play a role in generating a

24   revenue for an event, and playing a role



Page 25

1      doesn't tell me -- that may or may not be

2      ascribing a measurable part of a firm's

3      revenue to the event.

4           A.      Well, it's not my -- in my

5      opinion, I don't attempt to measure part

6      of the revenue that will be due to the

7      workers.

8           Q.      All right.  And in reaching

9      the opinion that fighters who are

10     involved in a particular event play a

11     role in generating the revenue for that

12     event, I would like you to ask -- ask you

13     to look at paragraph 24, where you say:

14               "The fighters are people

15     with media articles written about them,

16     and often Wikipedia pages.  It is

17     reasonable to conclude that the fighters

18     are the key workers in the event that the

19     customers are paying to watch and so play

20     an important role in generating revenue."

21               Is that the part of your

22     report -- well, that part of your report,

23     I think it's fair to say, says that the

24     fighters play a role in generating



1    revenue for an event.  Is there any other

2    part of your report that you would point

3    to me that would support that conclusion?

4                MR. CRAMER:  Objection to

5           form.  You're being unclear about

6           "that part of your report."  You

7           read a part of a sentence.

8                MR. ISAACSON:  The part I

9           read.  The part I read.

10               MR. CRAMER:  And not the

11          entire section that it's in?

12               MR. ISAACSON:  Yes.

13               MR. CRAMER:  Take your time

14          if you need to go through --

15               THE WITNESS:  Okay.  Do you

16          want me to go through every

17          paragraph and say --

18    BY MR. ISAACSON:

19          Q.    Whatever you do.

20          A.    Okay.  And could you just

21    read back the question?

22          Q.    Sure.  I'm focusing on --

23    you said that fighters are people with

24    media articles written about them and



```
 1    circumstances for when labor economists
 2    use wage share in analyzing compensation.
 3              What I'd like to know is,
 4    have you ever seen these three factors
 5    articulated before in anything in
 6    writing, a publication, an article, a
 7    textbook, et cetera?
 8              MR. CRAMER:  Asked and
 9         answered.
10              THE WITNESS:  I mean, I feel
11         I've answered that one.
12    BY MR. ISAACSON:
13         Q.   Well, you told me about how
14    you've seen them individually, but have
15    you ever -- can you point to me to any
16    publication or other -- anything in
17    writing where someone has said that it's
18    appropriate -- labor economists use wage
19    share in analyzing compensation when
20    three appropriate circumstances are met,
21    and then list these three circumstances?
22         A.   I -- in expressing my
23    opinion, I'm not simply copying out
24    conclusions that are -- it is not a
```



1    cut-and-paste job from someone else's

2    article.  It is using well-attested

3    techniques and measures from the existing

4    literature, but combining them in a way

5    that I think is wholly appropriate to

6    this particular case.  And that is what I

7    think of actually as trying to express an

8    expert opinion.

9           Q.    All right.  And I understand

10   you think that these are the appropriate

11   circumstances and you stated your reasons

12   for such, but I'd still like to know if

13   anybody -- of you've seen anybody write

14   out before that these are the three

15   appropriate circumstances for labor

16   economists to use wage share in analyzing

17   compensation?

18              MR. CRAMER:  Asked and

19          answered.

20              THE WITNESS:  I feel I've

21          answered it.  These are my own

22          words.  Did I cut and paste these

23          from someone else?  No.

24   BY MR. ISAACSON:



```
 1          Q.    All right.  And when you
 2   say -- I know you didn't cut and paste
 3   them, but have you seen any -- have you
 4   seen anybody list these three criteria,
 5   you know, in substance as the appropriate
 6   circumstance for when you -- labor
 7   economists would use wage share in
 8   analyzing compensation?
 9          A.    I mean, I -- in my report
10   here I'm trying to express an opinion on,
11   you know, the particular questions I was
12   asked to address, and obviously that
13   is -- in some sense it is -- you know, it
14   is a particular case.  So I am combining
15   well-attested, well-established ideas in
16   a way that is appropriate to that case,
17   and I think that is appropriate to
18   expressing an expert opinion.
19          Q.    Right.  And you've said to
20   me a couple times that you think these
21   three things are appropriate and I
22   understand that.  And you said to me
23   they're not a cut and paste,
24   word-for-word.
```



1              My question is:  Even if

2    they're not word-for-word, have you seen

3    any publication that lists these three

4    things, in sum and substance, as the

5    appropriate circumstance for a labor

6    economist to analyze wage -- to use wage

7    share in analyzing compensation?

8         A.    I mean, wage share is very,

9    you know, commonly used in the sport

10   economics literature, so I'm drawing --

11   drawing from that.

12              I think the statement of the

13   question, which is the first criterion is

14   really just a statement of the question

15   in this case as I understand it.  So I'm

16   not quite sure how I would take the

17   question in this case from some other

18   pre-existing -- pre-existing.

19              I mean, I think in cases

20   where one is trying to assess the impact

21   of anticompetitive practices, one is

22   trying to compare the actual compensation

23   in this case with compensation in the

24   but-for world.



1                 So I think that's completely

2    standard.

3         Q.    All right.  I still don't

4    know whether you're telling me anybody

5    has listed these three things before.

6         A.    I mean, I haven't seen -- I

7    mean, they're totally appropriate, and

8    you know, I'm combining well-attested

9    ideas, well-established ideas in a way

10   that's appropriate to that case, for that

11   combination -- because I'm not aware of

12   somebody who has written about this

13   particular case, that particular

14   combination which I chose to be

15   appropriate to this case and what I

16   think -- that is what I think I should be

17   doing when expressing an expert opinion,

18   I haven't got that.

19        Q.    All right.  So you've

20   reached the opinion that these three

21   factors are the appropriate circumstances

22   to consider in this particular case.

23                 Can you point me to

24   anything -- any literature where these



Page 38

1    three factors were considered appropriate

2    for some other -- for some other type of

3    facts or some other case?

4            A.    Well, I think that -- I

5    mean, let me take them in order.

6            Q.    I would like them in

7    combination.  Not individually, in

8    combination, all three?

9            A.    I think --

10               MR. CRAMER:  Form.

11               You may answer.

12               THE WITNESS:  I mean, what

13          I'm doing here is taking well-

14          established ideas individually and

15          drawing on ideas from established

16          work, well-established, and

17          combining them in a way that is

18          appropriate for this case.  I

19          think that is appropriate to what

20          one is asked to do as an expert.

21    BY MR. ISAACSON:

22            Q.    You've told me that several

23    times.

24            A.    Yeah.



Page 39

```
 1          Q.    You've got it on the

 2    record --

 3          A.    Yes.

 4          Q.    -- that you feel it is

 5    appropriate to combine these three

 6    circumstances in this -- for the facts of

 7    this case.

 8                And what I'm asking you now,

 9    have you run across, in any of your

10    research or writing or teaching, any

11    other specific facts or cases where

12    someone said the three circumstances that

13    you've identified are the appropriate way

14    to determine that wage share should be

15    used in analyzing compensation, all three

16    in combination?

17          A.    But there is no equivalent

18    to this case in -- you know, it's about

19    the particular case.

20          Q.    So looking at paragraph 10,

21    you discussed the question in this

22    litigation.

23                "In this litigation, the

24    question to be considered is different.
```



Page 59

1    wage share is appropriate in analyzing

2    compensation?  You make the proviso that

3    you might be able to go look, do an

4    analysis and find other factors, but as

5    of today, you would not have an opinion?

6          A.    I would have to think about

7    how one might seek to, you know, analyze

8    what data was available.  I have not, you

9    know, thought about that hypothetical

10   situation and so I don't have an opinion

11   on it.

12         Q.    All right.  And you

13   mentioned Dr. Zimbalist's comparison to

14   others -- between Zuffa and other sports.

15   Do you reach any opinions in your report

16   as to whether it was appropriate to

17   compare revenue -- labor share in one

18   sport to another sport?

19         A.    No, I was not asked for --

20   to express an opinion on that.  I have

21   not thought about that.

22         Q.    All right.  Now, in Item 3,

23   there's an or at the end.  It is possible

24   to ascribe a measurable part of a firm's



Page 60

1   revenue to the activities of a particular

2   worker or group of workers.  Does that

3   mean it's sufficient to meet either one,

4   do you need both?  I'm trying to

5   understand your -- because you mentioned

6   both, of a particular worker or group of

7   workers?

8           A.    Well, I think of it as an

9   or, so it's one of the two.

10          Q.    Right.  And is it your

11  opinion that the record in this case

12  makes it possible to ascribe a measurable

13  part of a firm's revenue to the

14  activities of a particular worker?

15          A.    I have -- I mean, I have not

16  been asked to express an opinion about

17  that.  I have not given thought to that,

18  so I don't have an opinion on that.

19          Q.    Okay.  Is it your opinion in

20  this case that it's possible to ascribe a

21  measurable part of a firm's revenue to

22  the activities of a particular group of

23  workers?

24          A.    I think that the event



Page 61

1    revenue is -- you know, the fighters in

2    that event are -- the revenue from that

3    event is connected to the activities of

4    the workers in that fight, yes.

5            Q.    And you reach that opinion

6    based on what you said in paragraph 24;

7    is that correct?

8            A.    I mean, not only that.

9    That's what I expressed, that's how I

10   summarized that view, but I would go back

11   to just simply saying that I think the

12   fighters are the key people here, that

13   that is who all eyes are on when there is

14   a fight going on.

15           Q.    But in terms of what you

16   have actually said in your report, your

17   reasons for concluding that it's possible

18   to ascribe a measurable part of a firm's

19   revenue to the activities of a particular

20   group of workers, what you've said in

21   your report about that can be found in

22   paragraph 24?

23           MR. CRAMER:   Objection to

24       form.



Page 62

```
1                THE WITNESS:  I mean, I
2           think that that is -- no, I don't
3           really accept that.  I think it is
4           more generally just saying that
5           the workers are the key people.
6  BY MR. ISAACSON:
7           Q.    All right.  Now, why does
8  what you say in paragraph 24 together
9  with workers being key people mean that a
10 measurable part of a firm's revenue is --
11 can be ascribed to a group -- to a group
12 of fighters in this case?  Where do you
13 get the measurable part?
14         A.    I mean, I think the -- I
15 mean, what I meant by measurable part
16 here is really that there are techniques
17 available in order to control for this.
18              So if one takes Dr. Singer's
19 approach, he's seeing how variation in
20 the foreclosure effect affects the worker
21 share.  All things being equal.
22         Q.    All right.  So as part of
23 your report, you did not do any work as
24 to whether -- do any work that would
```



Page 63

1   allow you to conclude that a measurable

2   part of a firm's revenue can be

3   attributed to any group of UFC fighters;

4   is that correct?

5              MR. CRAMER:   Asked and

6       answered, form.

7              THE WITNESS:   I mean, I

8       would simply, you know, repeat

9       what I said earlier that here is

10      some revenue coming from this

11      particular event, the fighters are

12      in that event, and so there is a

13      connection between the fighters in

14      that event and the revenue that

15      flows through that event.

16  BY MR. ISAACSON:

17      Q.    But you did not try to

18  measure the amount of that connection; is

19  that correct?

20      A.    I have not worked with the

21  data in this case.

22      Q.    All right.  And is all of

23  the event revenue for the Zuffa event

24  attributable to the fighters?



Page 64

```
 1              MR. CRAMER:  Objection to
 2         form.
 3              THE WITNESS:  No.  I mean,
 4         the claim is not the workers
 5         should have 100 percent of the
 6         event revenue, that they would
 7         have that in the but-for world.
 8         The claim is that they would have
 9         a higher share than they actually
10         had.
11    BY MR. ISAACSON:
12         Q.   All right.  And based on
13    your -- the work you've done in this
14    case, what is your understanding of what
15    factors contribute to event revenues?
16    You've named the role of athletes.  What
17    else would contribute?
18         A.   I mean, I haven't studied
19    that so I don't have an opinion on that.
20              MR. CRAMER:  We've been
21         going for almost an hour.  If this
22         is a good time to break, we can
23         break.
24              MR. ISAACSON:  Sure.
```



1    product.

2          A.    Yeah.

3          Q.    Why is that?

4          A.    I mean, I think it's

5    important to see that one -- that

6    statement in the context of that

7    paragraph of what that is about, and I've

8    given the reason why I think that this

9    is, because event revenue is partly just

10   determined on the night by how many

11   people, for example, sign up for

12   pay-per-view, whereas things like

13   compensation would be set in large part

14   before that.  That means that Dr. Topel's

15   regression is flawed.

16         Q.    The -- all right.  Now,

17   it -- when you say, "While event revenue

18   is plausibly proportional to marginal

19   revenue product for the reasons given

20   earlier," are the reasons given earlier

21   once more the statements in paragraph 24

22   about fighters are people with media

23   articles and often Wikipedia pages and --

24   as well as your statement that people



1    come to watch fighters?

2          A.    No, not just that.  I mean,

3    after paragraph 24, one goes to paragraph

4    25 that starts, "The reasoning that

5    supports this conclusion is the

6    following," and then I go through the

7    reasons for why that -- I mean, they're

8    also, you know, other pieces of evidence.

9    I mean, Dr. Topel's regression, flawed

10   though it is, does show that event

11   revenue -- that compensation is

12   significantly related to event revenue,

13   and I think that that is an indication of

14   really what I think is -- I think most

15   people would understand to be fairly

16   obvious, that the fighters are really

17   important people in these events.

18          Q.    All right.   So I want to

19   remove one word here just so I understand

20   it.  Is there anything in your report

21   that shows that event revenue is

22   proportional to marginal revenue product?

23          A.    I mean, I haven't worked

24   with the data so, I mean, that would



1    require working with the data.

2         Q.    All right.  And what is it

3    in paragraphs 25 and 26 that relates to

4    the issue of proportionality?  I

5    understand how you're explaining why

6    marginal revenue product will change with

7    the number of people watching and the

8    amount that they pay, but why would that

9    be proportional?

10         A.    Well, that I think is

11    explained in paragraph 27.  So if the

12    revenue for the fight is twice as large,

13    then the marginal revenue product is

14    twice as high, and that is a definition

15    of proportionality.

16         Q.    So what is it that allows

17    you to conclude that in paragraph 27,

18    that if a revenue for the fight is twice

19    as large then the marginal revenue

20    product -- actually, I have to breakdown

21    this sentence because I don't understand

22    this sentence.

23              So let's just break down

24    just the words and then we'll get into



Page 86

```
 1    the basis for the opinion.
 2         A.    Yup.
 3         Q.    If revenue for the fight is
 4    twice as large, then the MR -- marginal
 5    revenue product is twice as high.
 6         A.    Yup.
 7         Q.    I'm not getting the double
 8    twice there.
 9         A.    Well, I'm imagining if we
10    can talk about a hypothetical --
11         Q.    Right.
12         A.    -- situation, that, you
13    know, there's a certain amount of people
14    watching money -- watching this and
15    paying money to watch, whether it's in
16    person or the event, and then we double
17    the amount of the people who are paying,
18    then that would imply that the marginal
19    revenue product of the labor of the
20    fighters has -- has doubled.
21         Q.    All right.  So I'm -- maybe
22    I'm understanding this now.  So when you
23    say if revenue for the fight is twice as
24    large, then the marginal revenue product
```



1             THE WITNESS:  I feel I've

2        answered that.  I do feel I've

3        answered that.

4   BY MR. ISAACSON:

5        Q.   Well, what -- I'm going to

6   go over it.  I'm not even saying you

7   haven't answered it.

8        A.   Okay.  No, that's all right.

9        Q.   I swear to you I haven't

10  understood your answer, so I'm going to

11  over it until I understand it.

12            The -- are you saying that

13  if event revenues double, it is

14  necessarily true that the marginal

15  revenue product of the athletes had to

16  have doubled?

17       A.   Yes, I think that is what

18  it's saying.  I mean, it's saying it is

19  plausibly proportional -- sorry,

20  proportional means that a doubling leads

21  to a doubling.

22       Q.   Okay.  So am I correct that

23  what you're saying is if the revenues are

24  proportional to the marginal revenue



Page 90

1    product of labor, then you can conclude

2    that if event revenues double, then

3    marginal revenue product of labor has

4    doubled?

5              A.    I'm sorry, could you just

6    read that back?

7              Q.    Sure.

8              A.    I'm a bit confused.

9              Q.    So is what you're saying is

10   that if revenues are proportional to the

11   marginal revenue product of labor, then

12   you can conclude that if event revenues

13   double, then the marginal revenue product

14   of labor has doubled?

15                   MR. CRAMER:   Objection to

16        form.

17                   You may answer if you

18        understand.

19                   THE WITNESS:   I think the if

20        at the start I didn't really

21        agree, and I think I prefer my

22        previous answers to --

23   BY MR. ISAACSON:

24              Q.    Have you done any work in



Page 91

1    this case -- have you done any work

2    reflected in your report that shows

3    that -- that in order for event revenue

4    to double, the marginal revenue product

5    of athletes at the event has to double?

6                MR. CRAMER:  Objection to

7         form.

8         You may answer.

9                THE WITNESS:  I mean, I

10        haven't studied, you know, the

11        data, the particular situations,

12        so I haven't got an opinion on

13        that.

14   BY MR. ISAACSON:

15        Q.   All right.  Is -- the first

16   sentence in paragraph 27 is followed by

17   the sentence, "So the marginal revenue

18   product will be proportional to the event

19   revenue," are you -- is the first

20   sentence in paragraph 27 an example of

21   what happens when event revenue and

22   marginal revenue product are proportional

23   to one another?

24                MR. CRAMER:  Is that all it



Page 92

1          is or -- form.

2               You may answer if you

3          understand.

4               THE WITNESS:  Yeah, I'm

5          sorry, I'm not quite sure I'm

6          understanding.  Can you either

7          read it back or re-express it.

8    BY MR. ISAACSON:

9          Q.    All right.  So paragraph 27

10   concludes -- again this is my effort to

11   understand what you have written.

12         A.    Okay.

13         Q.    Paragraph 27 concludes:

14               "The marginal revenue" --

15   "So the marginal revenue product will be

16   proportional to the event revenue."

17               Is the first sentence in

18   that paragraph an example -- are you

19   presenting an example of what happens

20   when marginal revenue product is

21   proportional to event revenue?

22               MR. CRAMER:  Form.

23               You may answer.

24               THE WITNESS:  The first



Page 93

1          sentence in paragraph 27 is, you

2          know, inviting them to think about

3          a hypothetical situation in which

4          event revenue doubles, and to say

5          that, yes, then the marginal

6          revenue product of labor will

7          double as well.  So they're not --

8          they can vary independently in

9          that example.  So it's simply a

10         way of expressing proportionality,

11         although perhaps it seems not a

12         very clear way.

13    BY MR. ISAACSON:

14         Q.    And maybe it's helpful just

15    to state that the first sentence in

16    paragraph 27 is a hypothetical that

17    you're discussing; is that correct?

18              MR. CRAMER:  Objection to

19         form.

20              You may answer.

21              THE WITNESS:  I mean, I

22         haven't worked with the data in

23         this case.  I mean, so it's

24         hypothetical, but I think it's --



Page 94

1          you know, it's a very plausible,

2          reasonable hypothetical.

3     BY MR. ISAACSON:

4          Q.    And do you have an opinion

5     as to whether the marginal revenue

6     product of inputs to events other than

7     the athlete is proportional to event

8     revenue?

9          A.    I mean, I haven't worked

10    with the data in this case, so I haven't

11    got an opinion on that in this case.

12         Q.    And for your opinion in this

13    case in paragraph 5, that wage share is

14    an appropriate way to analyze the

15    compensation of MMA fighters in this

16    case, is one premise for that conclusion

17    that event revenue is plausibly

18    proportional to marginal revenue product?

19         A.    I mean, this is holding, you

20    know, other things equal, yes.

21         Q.    And if marginal revenue

22    product is not shown to be proportional

23    to event revenue in this case, am I

24    correct you would not be able to reach an



1    opinion, without at least further

2    analysis, of whether wage share is an

3    appropriate way to analyze the

4    compensation of MMA fighters in this

5    case?

6              MR. CRAMER:  Objection to

7         form.

8              You may answer.

9              THE WITNESS:  I mean, I

10        haven't considered the other case,

11        so that, I mean, I haven't got an

12        opinion.  I would have to -- have

13        to think about that.  But that

14        isn't the same as saying it would

15        not be possible.

16   BY MR. ISAACSON:

17        Q.   All right.  Would you agree

18   that if the marginal revenue product of

19   the inputs other than the athletes was

20   not proportional, then the -- to event

21   revenue, then the marginal revenue

22   product of the fighters would also not be

23   proportional?

24              MR. CRAMER:  Objection to



Page 166

```
 1
 2                    CERTIFICATE
 3

 4
 5          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
            It was requested before
 8   completion of the deposition that the
     witness, ALAN MANNING, have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
12   _____
     Constance S. Kent, CCR, RPR, CLR
13   Certified Court Reporter
     Registered Professional Reporter
14   Certified LiveNote Reporter
     and Notary Public in and for the
15   Commonwealth of Pennsylvania
     Dated:  February 9, 2018
16
17
18
19
20          (The foregoing certification
21   of this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)
```

