# EXHIBIT 22

Excerpts to Deposition of Andrew Zimbalist, Ph.D ("Zimbalist 1st Dep.")
(September 25, 2017)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


- - - - - - - - - - - - - - - - - - x

Cung Le, Nathan Quarry, John Fitch

Brandon Vera, Luis Javier Vazquez,

and Kyle Kingsbury on behalf of

themselves and all others

similarly situated,          Case No.

        Plaintiffs,    2:15-cv-01045-RFB(PAL)

    V.

Zuffa, LLC, d/b/a Ultimate,

Fighting Campionship and UFC,

        Defendants.

- - - - - - - - - - - - - - - - - - x

            HIGHLY CONFIDENTIAL

        VIDEOTAPED DEPOSITION OF

          ANDREW ZIMBALIST, Ph.D.

        Northampton, Massachusetts




Magna Legal Services    Reported By:

(866) 624-6221      MaryJo O'Connor, RMR/CSR

Www.MagnaLS.com      Job No:  345726



Page 2

1

2

3

4

5

6               Monday, September 25, 2017

7                     8:42 a.m.

8

9          VIDEOTAPED DEPOSITION of ANDREW

10   ZIMBALIST, Ph.D., held at Hotel

11   Northampton, 36 King Street, Northampton,

12   Massachusetts, pursuant to notice, before

13   MaryJo O'Connor, Registered Merit Reporter,

14   Certified Court Reporter, and Notary Public

15   in and for the Commonwealth of

16   Massachusetts.

17

18

19

20

21

22

23

24

25



Page 148

```
 1    you selected as a yardstick or benchmark      01:03:17
 2    for purposes of determining damages in an     01:03:20
 3    antitrust case the five sports comparisons    01:03:24
 4    that are in your report, correct?             01:03:29
 5         A.  Yes.                                  01:03:30
 6         Q.  Now, is there a literature in         01:03:31
 7    your field that set standards for how you     01:03:35
 8    go about selecting benchmarks or yardsticks   01:03:38
 9    in this circumstance?                         01:03:41
10         MR. CRAMER:  Objection to form.          01:03:43
11         A.  A literature that details the        01:03:46
12    best way to select yardsticks?                01:03:51
13         Q.  That sets standards for setting      01:03:53
14    yardsticks.                                    01:03:55
15         MR. CRAMER:  Objection to the            01:03:56
16         extent it calls for a legal              01:03:57
17         conclusion.  But you can answer, if      01:03:58
18         you understand the question.             01:04:00
19         A.  I'm not sure there is a broad        01:04:07
20    literature.  There are certain standards      01:04:08
21    where you try to take benchmarks that have    01:04:10
22    as much basic in common with the thing        01:04:13
23    you're comparing it to.                       01:04:19
24         Q.  All right.  If --                     01:04:21
25         A.  And it varies with one important     01:04:22
```



```
                                                    Page 149
 1    characteristic.                              01:04:25

 2         Q.  All right.  If I wanted to          01:04:28

 3    determine how an economist for purposes of   01:04:32

 4    estimating damages using a yardstick or      01:04:35

 5    benchmark in an antitrust case should go     01:04:38

 6    about selecting an appropriate yardstick or  01:04:45

 7    benchmark, where would I look?               01:04:48

 8         A.  You're asking me for the name of    01:04:51

 9    an article or articles or a book?  I can't   01:04:53

10    give that to you as I sit here.              01:04:56

11             You're talking about an antitrust   01:04:59

12    case rather than in general.  You look for   01:05:01

13    industries that have competition in the      01:05:04

14    area that you're trying to identify that     01:05:06

15    have -- at the same time have as much in     01:05:11

16    common with the enterprise or the industry   01:05:14

17    that you're comparing it to.                 01:05:16

18         Q.  All right.  Now, you say there      01:05:22

19    would have to be as much in common.  Is      01:05:30

20    there a field of study that I would look     01:05:34

21    to, a type of article, a type of study?      01:05:37

22             How do I go about determining       01:05:43

23    what are the standards for an economist in   01:05:45

24    choosing a yardstick or benchmark in a       01:05:47

25    situation such as this?                      01:05:51
```



Page 150

1        A.   I can't point you to any journal        01:05:51
2    article.                                          01:05:54
3        Q.   In picking a yardstick, would you        01:05:55
4    agree with the statement that you should          01:06:07
5    identify a firm or firms that are similar         01:06:09
6    to Zuffa in all respects except for the           01:06:14
7    impact of the alleged antitrust violation?        01:06:18
8        A.   I believe that, as I said a              01:06:22
9    moment ago, that you try to pick                  01:06:26
10   comparators that have as much in common           01:06:29
11   with the base enterprise or industry as           01:06:32
12   possible but vary in the important respect        01:06:34
13   that you're trying to identify.                   01:06:38
14       Q.   So what you have said is slightly        01:06:43
15   different than what I said, and I want to          01:06:45
16   explore that.                                     01:06:47
17           So you're using the phrase "as            01:06:48
18   much in common," and I'm using "similar in        01:06:51
19   all respects except for the impact of the         01:06:54
20   alleged antitrust violation," right?              01:06:56
21       A.   Okay.                                    01:06:58
22       Q.   Is it the appropriate standard           01:06:58
23   that you should identify a firm or firms          01:07:05
24   that are similar to Zuffa in all respects         01:07:07
25   except for the impact of the alleged             01:07:09



```
                                              Page 151
 1   antitrust violation?                     01:07:11
 2           MR. CRAMER:  Objection.  Asked   01:07:13
 3        and answered.  Also object to the   01:07:13
 4        extent it calls for a legal         01:07:16
 5        conclusion.  But asked and answered, 01:07:17
 6        and form.                           01:07:18
 7        A.  If you're asking me --          01:07:19
 8        Q.  My question is --               01:07:21
 9        A.  If you're asking me wouldn't it 01:07:22
10   be desirable to have everything exactly the 01:07:24
11   same except the level of competition, I  01:07:26
12   would say yes.                           01:07:28
13           We're doing the real world, not a 01:07:29
14   laboratory experiment here, and so you try 01:07:32
15   to find as much as possible in common    01:07:34
16   except for the variable that you're trying 01:07:36
17   to identify the impact of.  That's what I 01:07:38
18   believe.                                 01:07:40
19           Now, if you want to use just     01:07:40
20   boxing at the 62.2 percent, which is a low 01:07:43
21   percentage, because I didn't consider some 01:07:46
22   higher percentage information, if you want 01:07:49
23   to use just boxing, I'll come out with   01:07:52
24   larger.  And they're not identical in other 01:07:55
25   respects, but they're very similar.      01:07:58
```



Page 203

```
 1          Q.  And as I understand it,            01:57:43
 2   historically at some point movie actors       01:57:45
 3   were not free agents due to a studio system   01:57:49
 4   which employed long-term exclusive            01:57:53
 5   contracts?                                     01:57:54
 6          A.  Yes.                                01:57:55
 7          Q.  And the long-term exclusive        01:57:55
 8   contracts had a number of extension           01:57:57
 9   provisions?                                    01:57:58
10          A.  Yes.                                01:57:59
11          Q.  And the studio system eventually   01:57:59
12   ended; is that right?                          01:58:03
13          A.  Yes.                                01:58:04
14          Q.  And it ended when a court in       01:58:04
15   California held that personal service         01:58:08
16   contracts can't extend beyond seven           01:58:10
17   calendar years.                                01:58:12
18          A.  That's correct.                     01:58:13
19          Q.  And once the Court held that a     01:58:14
20   personal service contract could not extend    01:58:16
21   beyond seven calendar years, that ended the   01:58:18
22   studio system and essentially created free    01:58:21
23   agency.                                        01:58:26
24          MR. CRAMER:  Objection to form.         01:58:26
25          A.  That's largely correct.             01:58:27
```



```
                                              Page 204
 1          Q.  Well, that's exact -- well.      01:58:28
 2          And you say "Under the modern        01:58:33
 3  system, studios renegotiate contracts for    01:58:35
 4  every new project"; is that right?           01:58:38
 5          A.  Does it say that in the footnote? 01:58:40
 6          Q.  I believe --                      01:58:44
 7          A.  Can I look at the footnote?       01:58:44
 8          Q.  You have it right in front of     01:58:46
 9  you.                                          01:58:47
10          A.  Well, I need to know what page    01:58:48
11  we're looking at.                             01:58:51
12          Q.  Page 18.                          01:58:52
13          A.  (Document review.)  Okay.  It does 01:59:20
14  say that.  Yup.                               01:59:23
15          Q.  And are there any contracts in    01:59:24
16  this case that you've identified that         01:59:26
17  extend beyond seven calendar years?           01:59:28
18          MR. CRAMER:  Objection to form.       01:59:33
19          A.  In the contract itself you're     01:59:34
20  saying as opposed to the --                   01:59:36
21          Q.  Let's start with the contract     01:59:38
22  itself.                                       01:59:40
23          A.  Not that I know of.  The longest  01:59:40
24  one I think I saw was three or four years.    01:59:43
25          Q.  And based on the yardsticks       01:59:45
```



Page 205

1  you've applied, you would expect that          01:59:54

2  52 percent or more of revenues would go to      01:59:59

3  actors in a movie; is that right?               02:00:01

4       A.  Not necessarily.                       02:00:14

5       Q.  Why?                                   02:00:19

6       A.  Because I want to study more           02:00:20

7  about the cost structure of moviemaking.        02:00:22

8       Q.  What is it about the cost              02:00:27

9  structure that would cause you to say that      02:00:29

10  something less than 50 percent of revenues     02:00:31

11  should go to the movie actors?                 02:00:33

12       A.  I'm just saying that I would want     02:00:36

13  to study it.  I know a great deal about        02:00:38

14  professional sports, and I was comfortable     02:00:41

15  in making that comparison.  And before I'd     02:00:44

16  be making such a comparison with the movie     02:00:47

17  business, I'd want to study it.                02:00:49

18       Q.  What about the cost that you          02:00:51

19  would be looking at to determine why that      02:00:53

20  comparison would or would not be valid?        02:00:56

21           MR. CRAMER:  Asked and answered.      02:00:59

22       He said he wanted to study it.            02:01:00

23       Q.  That's what I'm saying.  He           02:01:02

24  hasn't answered.                               02:01:04

25           What is it you would be looking       02:01:05



Page 206

1    at?  What would you want to study to                02:01:06

2    determine whether it was an appropriate             02:01:07

3    comparison?                                          02:01:09

4         MR. CRAMER:  Same objection.  He               02:01:09

5      already answered.                                  02:01:10

6         A.  So there are capital costs for             02:01:11

7    the physical studios, there are                      02:01:16

8    transportation cost, there are insurance            02:01:19

9    costs, there are administrative costs.  I           02:01:21

10   would like to study those, the size of them         02:01:24

11   and how they vary before I would throw this         02:01:27

12   into the hopper as a comparator.                     02:01:30

13        Q.  What would you be looking at to            02:01:35

14   determine with respect to those costs to            02:01:37

15   determine whether the comparison was valid?         02:01:39

16        A.  I would want to look at the share          02:01:41

17   of those costs as a share of total revenue.         02:01:43

18        Q.  So would you be looking at                 02:01:48

19   whether the share of those costs was, for           02:01:50

20   example, higher than the share of similar           02:01:52

21   cost for Zuffa or less?  I'm trying to              02:01:56

22   understand what you're looking for.                  02:01:58

23        MR. CRAMER:  Asked and answered.               02:01:59

24      Objection.                                        02:02:00

25        A.  I would look at the relative               02:02:00



Page 207

| | | |
|---|---|---|
| 1 | shares relative to Zuffa, relative to the | 02:02:03 |
| 2 | other comparators. | 02:02:05 |
| 3 | Q.  Is there anything else you would | 02:02:07 |
| 4 | be looking at to determine whether it was | 02:02:17 |
| 5 | an appropriate comparison other than the | 02:02:19 |
| 6 | share of costs that were paid by the movie | 02:02:21 |
| 7 | studios? | 02:02:29 |
| 8 | A.  Yeah.  I'd want to look at risk. | 02:02:29 |
| 9 | I'd want to look at the variability of | 02:02:32 |
| 10 | revenue across projects. | 02:02:34 |
| 11 | Q.  Why would the variability of | 02:02:45 |
| 12 | revenue across projects be relevant to you | 02:02:48 |
| 13 | in comparing two firms as yardsticks? | 02:02:51 |
| 14 | A.  Because other things being equal, | 02:02:54 |
| 15 | you would expect two industries that were | 02:02:56 |
| 16 | otherwise identical where one of them had | 02:02:58 |
| 17 | more risk in it than the other, that in | 02:02:59 |
| 18 | order to attract capital, the industry that | 02:03:02 |
| 19 | had more risk would demand a higher rate of | 02:03:04 |
| 20 | return.  And a higher rate of return would | 02:03:07 |
| 21 | mean there was less money available to pay | 02:03:09 |
| 22 | labor in general. | 02:03:11 |
| 23 | Q.  And you said I want to look at | 02:03:13 |
| 24 | risk, I want to look at the variability of | 02:03:15 |
| 25 | revenue across projects.  And I asked you | 02:03:18 |



MAGNA
LEGAL SERVICES

Page 208

```
 1    about variability of revenue.  You just       02:03:20
 2    answered risk.                                02:03:20
 3             Are those interchangeable for        02:03:22
 4    purposes of this discussion?                  02:03:24
 5         A.  Risk and variability of revenue?     02:03:25
 6         Q.  Yes.                                 02:03:28
 7         A.  Interchangeable, no.  But very       02:03:28
 8    similar.  Overlapping.  Substantial           02:03:31
 9    overlapping.                                  02:03:34
10         Q.  So you would want to look at in      02:03:35
11    determining whether to compare the firms,     02:03:37
12    you would want to look at the overall risk    02:03:39
13    profile, and that would include the           02:03:41
14    variability of revenue across projects?       02:03:43
15         A.  Yes.                                 02:03:45
16         Q.  Are there any other factors that     02:03:46
17    you would want to investigate or study to     02:03:53
18    determine whether the comparison to the       02:03:55
19    movie industry was appropriate?               02:03:57
20         A.  Yeah.                                02:03:57
21         Q.  You've mentioned share of cost --    02:03:59
22         A.  There might be.  I can't think of    02:04:01
23    any as I sit here.                            02:04:02
24         Q.  You've got to let me finish the      02:04:03
25    question.                                     02:04:06
```



```
 1                C E R T I F I C A T E

 2

 3    COMMONWEALTH OF MASSACHUSETTS

 4    SUFFOLK, SS.

 5          I, MaryJo O'Connor, a Notary Public

 6    in and for the Commonwealth of

 7    Massachusetts, do hereby certify:

 8          That ANDREW ZIMBALIST, Ph.D., the

 9    witness whose testimony is hereinbefore set

10    forth, was duly sworn by me and that such

11    testimony is a true and accurate record of

12    my stenotype notes taken in the foregoing

13    matter to the best of my knowledge, skill

14    and ability.

15          IN WITNESS WHEREOF, I have hereunto

16    set my hand and Notarial Seal this 2nd day

17    of October 2017.

18

19

20                    MARYJO O'CONNOR, RMR/CSR

                              Notary Public

21

22

      My Commission expires:

23    September 28, 2018

24

25
```

