Eric L. Cramer (admitted *pro hac vice*)
Michael Dell'Angelo (admitted *pro hac vice*)
Patrick F. Madden (admitted *pro hac vice*)
Mark R. Suter (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000/Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

*Co-Lead Counsel for the Classes and*
*Attorneys for Individual and Representative Plaintiffs*
*Cung Le, Nathan Quarry, Jon Fitch, Luis Javier Vazquez,*
*Brandon Vera, and Kyle Kingsbury*

[Additional counsel listed on signature page]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, <br><br> Defendant. | Case No.: 2:15-cv-01045-RFB-BNW <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS CERTIFICATION** |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      THEORY OF THE CASE FOR CLASS CERTIFICATION ..................................................... 1

II.     CLASS CERTIFICATION STANDARD ................................................................................. 3

III.    CLASSWIDE PROOF OF VIOLATION, COMMON IMPACT, AND AGGREGATE
        DAMAGES .............................................................................................................................. 4

        A.      Common Proof of Violation ........................................................................................ 4

        B.      Common Proof of Widespread Impact Across the Class .............................................. 5

        C.      Classwide Proof of Aggregate Damages ...................................................................... 7

IV.     DR. SINGER'S IMPACT REGRESSION IS BOTH PLAUSIBLE AND ADMISSIBLE ....... 7

        A.      Drs. Singer's and Zimbalist's Use of Wage Share Is Appropriate .............................. 7

        B.      Foreclosure Share ........................................................................................................ 9

        C.      Zuffa's Additional Scattershot Attacks on Dr. Singer's Impact Regression All Fail .. 13

                (1)     Control variables without statistical significance............................................. 13

                (2)     Dr. Topel's new time trend and fixed effects critiques are without merit ....... 14

                (3)     Dr. Singer's use of Strikeforce data in his regression enhances its robustness 14

V.      DR. ZIMBALIST'S YARDSTICK DAMAGES ANALYSIS IS PLAUSIBLE AND
        RELIABLE ............................................................................................................................. 14

VI.     CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ...................... 5

*Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946) .......................... 3

*In re Cathode Ray Tube (CRT) Antitrust Litig*., 308 F.R.D. 606 (N.D. Cal. 2015) ........... 3

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................ 7

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ..................... 4, 5

*In re High-Tech Emp. Antitrust Litig*., 289 F.R.D. 555 (N.D. Cal. 2013) .............. 3

*In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............. 5

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*, 2009 WL 5031334
    (D. Ariz. July 14, 2009) ................................. 9

*Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016) ................... 2, 4, 5

*Masimo Corp v. Tyco Health Care Grp, L.P.*, 2004 WL 5907538
    (C.D. Cal. June 10, 2004) ................................. 10

*McNeil v. Nat'l Football League*, 790 F. Supp. 871 (D. Minn. 1992) .............. 2

*Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) ............ 5

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015) ............ 1, 2

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462 (E.D. Pa. 1972) ........ 4

*Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018) .............. 3, 4

*Seaman v. Duke Univ.*, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) .............. 5

*Senne v. Kansas City Royals Baseball Corp,* 2019 WL 3849564
    (9th Cir. Aug. 16, 2019) ................................. 3

*Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555 (1931) .............. 3, 7

*Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) .............. 5

*Twin City Sportservice., Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) ........... 9, 10

*Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ...................... 3, 5

*U.S. v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ....................... 1

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................................ 4, 5

*White v. Nat'l Collegiate Athletic Ass'n*, 2006 WL 8066803
    (C.D. Cal. Oct. 19, 2006) ........................................................................................................ 9

Case No.: 2:15-cv-01045 RFB-BNW

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

**I. Theory of the Case for Class Certification:** Plaintiffs seek class certification on the following antitrust theory: that Zuffa's Scheme—Acquisitions, Exclusive Contracts ("ECs"), and Coercion— maintained and enhanced its *monopsony* power in the relevant input market for MMA Fighter Services. By locking up the vast majority of top MMA Fighters in its ECs effectively in perpetuity, and buying up and shutting down any potential rivals who came close to challenging Zuffa's dominance, Zuffa eliminated or impaired competition for fighter services in the input market, reducing fighter pay below competitive levels. SR1 ¶¶1-2, 5, 38-192, 211-56; SR2 ¶12; SR3 ¶3; SR4 ¶¶4-5. The Scheme *also harmed* competition in the output market for promoting live MMA events because by shuttering rivals and locking-up a must-have input, Zuffa became the only place for fans to watch "major league" MMA. SR1 ¶148; SR1 ¶¶204-207. ***Importantly***, while there is abundant evidence that the Scheme involved an extension of monopoly power,[1] as well as monopsony power,[2] *nothing in Plaintiffs' case requires proof of monopoly power in any output market*.[3] Plaintiffs demonstrate that the Scheme impaired competition in the input market over the sale of Fighter services because, due to the Scheme, (a) fighter mobility was restricted and thus fighters had no real ability to become free agents, and (b) there were no reasonably equivalent MMA "major league" promoters to bid on Fighter services.[4] Notably, both factors—restricted fighter mobility *and* lack of viable alternate bidders for fighter services—are evidence and reflections *of monopsony power in the input market*, which is defined as

---

[1] As to monopoly power, the direct evidence includes Dr. Singer's showing that Zuffa's Scheme led to the reduction in the output of live MMA events, and artificial inflation of PPV prices. *See infra* nn.12 & 14. As for indirect proof, Dr. Singer showed that Zuffa's share of the output market for live MMA events was well over 90% during the relevant period. SR1 ¶¶115-19, 130-31 & Tbl.3; *id.* ¶¶142, 147-50, 197-207 & Figs. 4A-4C; SR2 ¶¶26-35, 44-52; HT 3-153:6-154:19.

[2] As to monopsony power, Dr. Singer showed with direct evidence—including his own impact regression as well as evidence from the mouths and records of Zuffa, its owner, and its executives—that Zuffa's scheme was intended to and did suppress fighter pay below competitive levels. SR1 ¶¶142-51, 156-66; ZR2 ¶¶34-52. And Dr. Singer showed that Zuffa had a large and growing share of the relevant input market (ranked & tracked) and submarket (Headliner). SR1 ¶¶95-131 & Fig. 1; SR2 ¶¶13-33.

[3] The Ninth Circuit held in a monopsony case regarding alleged restrictions on NCAA athlete pay, the plaintiffs did not also need to show monopoly power. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1070-71 (9th Cir. 2015) (suppression of athlete compensation is sufficient to demonstrate "an anticompetitive effect"). *U.S. v. Syufy Enters.*, 903 F.2d 659, 663-64 (9th Cir. 1990), does not help Zuffa. In *Syufy*, the court said that it made little sense that the defendant regional Vegas movie theater company would be able to wield market power against the major movie studios it bought from (monopsony power), but not the relatively less powerful moviegoers it sold to (monopoly power). *Id.* at 663. Here, Zuffa stands in a similar dominant position both to the Fighters and consumers.

[4] *See* HT 1-107:11-108:9, 110:15-111:4, 175:15-24; SR1 ¶¶68-73, 145-146, 156-176; SR2 ¶¶50-52.

"the group of [buyers] … who have the 'actual or potential ability' to deprive each other of significant levels of business."[5] The fewer viable MMA promotions that could compete for top MMA fighters, the more monopsony power Zuffa had. Proof of maintenance or enhancement of monopsony power alone suffices here to prove a Section 2 violation *and* impact and damages to the Fighters

It is also true *in this case* that a monopsonist in the market for the purchase and sale of MMA services will also necessarily be a monopolist in the market for the promotion of live MMA events and *vice versa*.[6] Longstanding precedent in professional sports antitrust cases establishes that monopoly power in an output market can *bolster* the claims of athletes of an antitrust violation in an input market—and *that* is the purpose of Plaintiffs' invocation of monopoly power in the output market.[7] Abundant classwide evidence here shows Zuffa's dominance in the MMA promotion market and is *further proof* of Zuffa's monopsony power. Dr. Singer explains that "the source of Zuffa's dominance in the Output Market—its unique access to a broad stable of high-quality MMA Fighters, which is essential to staging successful live MMA events—does imply that Zuffa also enjoys dominant shares in the Input Markets and Submarket. To illustrate, an MMA promoter that is a pure monopolist in the market for promoting MMA events is, by definition, a monopsonist in the market for Fighters seeking to be paid to appear in MMA events: If there is only a single dominant MMA promoter, then there is only one place for an MMA fighter to work." SR2 ¶137. Dr. Topel agreed. *See* Topel Dep. 464:2-14.[8] Finally, because the question of whether Zuffa monopolized as well as monopsonized is entirely

---

[5] *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1161, 1163 (D. Nev. 2016).

[6] But even if Zuffa were not a monopolist in the output market because, for instance and contrary to the record, MMA was reasonably interchangeable with boxing for fans in the output market, that would *not* mean that Zuffa had diminished monopsony power. Zuffa would still be the only place that top MMA Fighters could sell their services. SR1 ¶¶100-03, 115-18. By law and economic logic, a firm can have monopsony power without also having monopoly power, for example when the firm is the only *buyer* of an input, but competes with many downstream *sellers* of the output. *See O'Bannon v. NCAA*, 802 F.3d at 1070-71. It just happens to be the case in this market that Zuffa has both.

[7] *See McNeil v. NFL*, 790 F. Supp. 871, 895-96 (D. Minn. 1992) ("the existence of defendants' monopoly power is relevant for purposes of determining whether the challenged restraints are more anticompetitive because they have been imposed by a monopolist…;" "although defendants argue that monopolization of an output product market … is irrelevant to a determination of the legality of restraints in an input labor market … they nevertheless premise their entire rule of reason defense on the alleged necessity of implementing player restraints in the relevant input market in order to strengthen their ability to compete in the output market" (citations omitted)).

[8] This is the same point that Dr. Zimbalist made when he suggested that monopoly power "reinforces" monopsony power. HT 4-74:19-21. But, and to be clear, the Scheme's elimination and impairment of potential MMA rivals would enhance Zuffa's *monopsony power* even if—contrary to facts here—it did not also confer monopoly power because it limits the options for MMA fighters to sell their services.

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

common to the class, the Court need not decide that issue now. Indeed, the presence of this common question bolsters Plaintiffs' case the common issues would predominate at trial.

**II. Class Certification Standard.** The law requires plaintiffs' proof at class certification satisfy two criteria: (1) plausibility (or "reasonable judgment"), or at most, admissibility, and (2) commonality. As to (1), courts have applied two standards for gauging whether expert modeling constitutes appropriate evidence in support of predominance: (a) a more lenient "reasonable judgment" standard in the Ninth Circuit, *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-06 (9th Cir. 2018), or, alternatively, (b) a stricter "admissibility" standard. *Id.* at 1005. *Sali* rejected the admissibility requirement, including under *Daubert*, *id.* at 1004-06, and held that a trial court should determine whether plaintiffs' evidence constitutes "material sufficient to form a reasonable judgment." *Id.* at 1005. Consistent with *Sali*, trial courts in the Ninth Circuit have assessed whether expert evidence relies on "a plausible methodology."[9]

Zuffa has argued (at times) that the Court should weigh the parties' expert opinions and decide which experts are *more plausible* (or indeed decide whether class members have in fact been injured). These formulations cannot be squared with *Tyson v. Bouaphakeo*, 136 S. Ct. 1036 (2016), nor with the Ninth Circuit's recent decisions in *Sali* and *Senne v. Kansas City Royals*, 2019 WL 3849564 (9th Cir. 2019), nor with the district court's refusal to do so in *CRTs*. In fact, *Senne* held that "where the evidence is admissible—for expert evidence, using the *Daubert* standard—then the 'no reasonable juror' standard at the class certification stage applies." 2019 WL 3849564, at *20 (citing *Tyson*, 136 S. Ct. at 1049).[10] Zuffa's argument also cannot be squared with ***its own recent brief*** in which Zuffa interpreted *Sali* as holding that "evidence does not need to be in admissible form to be considered on a

---

[9] *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 629 (N.D. Cal. 2015).

[10] Zuffa argues that the rule expressed in *Senne* (and *Tyson* before it) must be confined to the wage and hour context. ECF No. 721 at 1. Not so. Although both *Senne* and *Tyson* base their holdings concerning the applicable standard at class certification on a rule established by the Supreme Court in the wage and hour context, namely *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 688 (1946) (*see Senne*, 2019 WL 3849564, at *15-16, 20; *Tyson*, 136 S. Ct. at 1048-49), the relevant part of *Mt. Clemens* applies the Supreme Court's longstanding antitrust principle of *Story Parchment v. Paterson Parchment*, 282 U.S. 555, 563 (1931), an *antitrust* case holding that because the wrongdoer created the uncertainty with respect to damages, "a just and reasonable inference," is all that is required. Further, when *Senne* states that "*Tyson* expressly cautioned that this rule should be … not assumed to apply outside of the wage and hour context," *Senne*, 2019 WL 3849564, at *22, n.27, the cited portion of the *Tyson* opinion merely states that the rule "will depend on … the underlying cause of action." *Tyson*, 136 S. Ct. at 1049. Because the rule in question derives from *Story Parchment*, it applies here.

motion for class certification," ECF No. 695 at 8, and that a court need only "'consider material to form a reasonable judgment,'" *id*. (quoting *Sali*, 909 F.3d at 1005), because the court "makes no findings of fact and announces no ultimate conclusions" at class certification. *Id*. (citation omitted). Zuffa has relied upon *Ellis v. Costco*, 657 F.3d 970 (9th Cir. 2011), for its assertion that a court must decide which expert is correct on the merits at the class stage, but *Ellis* (quoting *Wal-Mart v. Dukes*, 564 U.S. 338, 353 (2011)) requires only "significant proof" that common evidence "could" be used to attempt to prove widespread impact. *Ellis* explicitly rejected choosing between the experts. 657 F.3d at 983 & n.8. Common proof is class-wide evidence that, if reasonably believed by the jury, is capable of establishing the elements of Plaintiffs' claim, including common impact. *See infra* at 4-7.

### III. Classwide Proof of Violation, Common Impact, and Aggregate Damages

**A. Common Proof of Violation.** Plaintiffs have class-wide proof of: the Scheme itself; market power; substantial foreclosure of competition (including impairment and exclusion of potential rivals);[11] and anticompetitive effects (suppressed fighter pay;[12] reduced output;[13] reduced quality of MMA events;[14] higher prices for consumers),[15] and lack of procompetitive justifications.[16] Zuffa's argument that proof that the UFC coerced Fighters to re-sign contracts gives rise to individualized issues has no merit. Whether a particular Fighter was (or was not) coerced has no special significance to *that Fighter's claim*. Nor do Plaintiffs seek damages for discrete acts of coercion, but only for the *cumulative*, *classwide* effect of Zuffa's conduct (including coercion) on foreclosure of competition. HT 2-47:8-48:4, 49:16-50:7. The relevant issue for proving a violation, then, is the *overall effect* of Zuffa's Scheme. *Le*, 216 F. Supp. 3d at 1169 (scheme assessed "as a whole"). In short, proof of violation is entirely common. None of this proof varies by class member and, importantly, *this common proof of*

---

[11] *Phila. World Hockey Club v. Phila. Hockey*, 351 F. Supp. 462, 509 (E.D. Pa. 1972) ("One who builds the most modern steel mill cannot operate without an adequate supply of iron ore. The 50,000 amateur hockey players allegedly available to the WHA are not the 'iron ore' from which viable competition can be built. If the WHA is to compete effectively for attendance and television rights with commensurate payments, the WHA must have a 'show' which is equal or nearly equal to that of the NHL today.").
[12] SR1 ¶¶142-44, 178-92, 245-56 & Tbls.4-6, 9-12; SR2 ¶¶150-52, 167-86 & Tbls.2-3; ZR1 ¶¶104-40 & Tbls.4-6; Zimbalist Errata Tbls.4-E-6-E; ZR2 ¶¶83-93.
[13] SR1¶¶203-207, 268 & Figs. 4A-4C (reduced output); SR2 ¶¶44, 47-49; HT 3-149:16-152:23.
[14] ZR2 ¶¶90, 99 & n.47; ZR1 ¶¶79-80, 83-84; SR1 ¶¶286-90; SR2 ¶¶197-98, 211-212, 217, 234; HT 4-17:24-20:24.
[15] SR1 ¶¶147-48, 197-207; SR2 ¶¶44-49; *see also* SR4 ¶46; SR1 ¶199 & n.491.
[16] SR1 ¶¶257-90; SR2 ¶¶210-41; SR4 ¶10; ZR1 ¶¶79-80, 83-84, 89-103; ZR2 ¶¶9, 90, 97, 99-114.

*the violation and its market-wide effects* will predominate at trial and thus could satisfy predominance by itself.[17]

**B. Common Proof of Widespread Impact Across the Class.** Plaintiffs show widespread harm to the Bout Class through two independent classwide methods, each itself sufficient.[18] First, Dr. Singer used a standard impact regression model assessing compensation for each Class member and showing impact to approximately 99% of them. *See* SR1 ¶¶230-31 & Tbl.8; SR2 ¶¶150-52 & Tbls.2-3; HT 1-185:16-186:2; 192:22-193:12. Crucially, as to the first method, Zuffa admits that a certified class may contain 5-6% uninjured members.[19] Zuffa thus does not deny that Plaintiffs' showing of harm to approximately 99% of Class members, if plausible (or at most admissible), is enough. Second, Plaintiffs analyses show Zuffa maintained a pay structure, such that any general suppression of Fighter compensation it achieved through its Scheme would have had a widespread effect across the Class. SR1 ¶¶212-26; SR2 ¶¶153-66.[20] To make this showing, Dr. Singer proffered two analyses: (1) a regression showing that Fighter compensation was governed largely by common factors;[21] and (2) a "sharing analysis" showing that individual fighter pay closely tracked average fighter pay, SR1 ¶¶227-29 & Tbl.7; SR2 ¶¶158-64; HT 1-188:8-21. Dr. Singer additionally analyzed substantial evidence that Zuffa management imposed internal pay equity. *See* SR1 ¶¶212-26; SR2 ¶¶153-66. This evidence shows that if competition forced Zuffa to increase pay generally, "equity" would ensure a benefit to all Fighters. Courts routinely certify employee classes upon such showings.[22]

Zuffa's economists do not refute the evidence that compensation for Fighters at all levels moved together—*Dr. Topel's own analysis confirms Dr. Singer's results*. HT at 3-65:16-66:10; SR2

---

[17] *E.g.*, *Tyson*, 136 S. Ct. at 1045; *Amgen v. Conn. Ret.*, 568 U.S. 455, 459–60, 467–70 (2013).

[18] *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1192 (N.D. Cal. 2013); *Nitsch v. Dreamworks Animation*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016).

[19] ECF No. 540 at 24; *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136, 1138 (9th Cir. 2016) (impact is common unless the class includes "a great number of members who for some reason could not have been harmed") (quotation omitted); *High-Tech*, 985 F. Supp. 2d at 1192 ("widespread" harm suffices). By contrast, in the cases Zuffa cites, such as *Ellis*, the evidence showed that, at most, 25% of the class were affected by gender discrimination, 657 F.3d at 983, and in *Dukes*, 564 U.S. at 354, there was no evidence indicating whether impact was to 0.5% or 95% of the class.

[20] Courts have certified classes relying on a similar pay structure analysis. *See, e.g.*, *Nitsch*, 315 F.R.D. at 297–98; *High-Tech*, 985 F. Supp. 2d at 1206.

[21] *See* SR1 ¶¶230-31 & Tbl.8; SR2 ¶¶150-52 & Tbls.2-3.

[22] *See, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1214; *Seaman v. Duke*, 2018 WL 671239, at *4 (M.D.N.C. 2018) (finding common impact based on "internal equity structures"); *Nitsch*, 315 F.R.D. at 295 (same).

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

¶¶159-60. Zuffa's economists were silent as to Plaintiffs' pay structure evidence. Dr. Topel briefly made (contradictory) arguments challenging the use of Dr. Singer's impact regression to assess common impact. First, he wrongly suggested that Dr. Singer's method simply employed the same foreclosure share coefficient to compute the but-for wage share for each class member. HT 2-243:7-244:15; *see* HT 1-186:12-17. As the Court correctly observed, "that's not the way Dr. Singer did it." HT 2-244:17-18. If all Dr. Singer did was apply the same coefficient to every class member, then that method would have shown impact to everyone. HT 2-244:16-245:1, 245:15-20. Instead, Dr. Singer used his impact regression—incorporating hundreds of variables, including those unique to individual fighters—to compute the but-for wage share for each Fighter at each event. He then used his model to compare that predicted but-for wage share to that same fighter's actual wage share at that same event. In that way, his standard model is capable of determining impact for each fighter at each event. HT 1-169:11-19, 184:22-185:6, 227:23-229:6; SR1 ¶¶180-187, 227-229; SR2 ¶¶149-152, 158-164.[23]

Second, Dr. Topel argued that the model was flawed because it did not show impact for 14 out of 1,214 class members, observing that these 14 were prominent Fighters. HT 1-186:3-6.[24] But, as Dr. Singer explained, (a) his model shows impact to 99% of the Class, (b) under his second pay structure method, he has shown that fighter pay at all levels moved together, and thus that it is likely that all class members, including these 14, were injured, HT 1-186:18-189:18, 193:6-12; SR1 ¶226; SR2 ¶¶149-52, and (c) in any event, removing a handful of class members to which his model did not assign damages from the class would (logically) not reduce aggregate class damages, and would not otherwise undermine proof of common impact. SR2 ¶152; HT 1-143:5-145:14.

Zuffa's quibbles with Dr. Singer's common impact analyses aside, Zuffa's defenses to class certification depend almost exclusively on convincing the Court not to consider Drs. Singer's and Zimbalist's models in their entirety. Zuffa principally argues that (1) wage share is not an accepted mode of econometric analysis, (2) Dr. Singer's "Foreclosure Share" (FS) metric is improper (and,

---

[23] Courts regularly certify classes in antitrust cases relying on this same econometric common impact method. *See In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. 2017); *In re Air Cargo*, 2014 WL 7882100, *55 (E.D.N.Y. 2014); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221 (M.D. Pa. 2012).

[24] As Dr. Singer explained, because these handful of fighters earned relatively more than their peers, his model may have had trouble picking up injury to them, even if they were harmed. HT 1-230:2-20.

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

relatedly, his weighting methodology is flawed), (3) Dr. Singer's impact regression has additional flaws, and (4) Dr. Zimbalist's damages analysis is flawed. As discussed below, Zuffa is wrong across the board. Remarkably, and crucially for purposes of class certification, Zuffa's challenges to class certification almost exclusively involve issues *common to the Class*.

**C. Classwide Proof of Aggregate Damages.** Because Zuffa's antitrust violations create uncertainty, the standard for proving damages requires only "a just and reasonable inference," *Story Parchment*, 282 U.S. at 563, and "need not be exact." *Comcast v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs proffered three separate aggregate damages models. First, Dr. Singer's impact regression demonstrates aggregate damages to the Class ranging from $894M (no Strikeforce data), SR1 ¶¶249-50 & Tbl.10; SR2 ¶175, to $1.6B (Strikeforce data). SR1 ¶¶251-52 & Tbl.11; SR2 ¶174. Second, Dr. Singer employs a benchmark analysis using what Dr. Topel agreed were "natural competitive benchmarks," HT 3-33:16-34:2; TR1 ¶287, namely MMA promotions without market power. SR1 ¶¶247-48 & Tbl.9; SR2 ¶¶176-82. Third, Prof. Zimbalist uses benchmarks from the four major U.S. professional team sports plus boxing. HT 4-25:9-12; ZR1 ¶¶123-26 & Tbls.4-6, Errata at Tbls.4-E-6-E.

**IV. Dr. Singer's Impact Regression Is Both Plausible and Admissible.**

**A. Drs. Singer's (and Zimbalist's) Use of Wage Share Is Appropriate.** Plaintiffs do not need to show that wage share is superior to wage level—though we have in fact done so—*only* that wage share is a plausible or reliable method and that it is common. The evidence in the record—*including admissions from Zuffa's economists at the hearing*—establish that wage share is appropriate in this case, and there is no dispute that this issue presents a common question. Dr. Singer testified that wage share is frequently used in the sports economics literature, SR2 ¶¶88-102; HT 1-106:10-109:22, and in economics literature more generally, SR2 ¶¶103-07; HT 1-104:16-106:9, including as a dependent variable in regression analysis. *See* HT 1-104:16-106:9; HT 3-149:3-15; SR2 ¶¶103-07 & SR3 ¶7 (citing, *e.g.*, PX6 & PX16). Dr. Zimbalist testified that wage share is frequently used in sports economics. HT 4-30:14-20. Zuffa and WME used wage share in internal documents. HT 1-111:6-113:15; PX1; PX10. Dr. Topel used wage share in a report for the NFL Players' Association. HT 3-46:1-25, 49:6-8, 52:25-54:1; PX5. At the Hearing, Dr. Topel *admitted* that if a factfinder were to determine that Zuffa's fighter contracts were effectively perpetual and thus equivalent to baseball's

reserve clause,[25] that would mean that the contracts confer monopsony power on the UFC, and that their increasing use thus constitutes growing monopsony power. *See* HT 2-147:3-25; HT 3-55:1-56:5. And, in contrast to Dr. Oyer who took the extreme position that wage share is almost never used, Dr. Topel conceded that when it is known that an event changes monopsony power (such as adding or removing effectively perpetual athlete contracts), *using wage share is appropriate*. *See* HT 2-148; HT 3-51. Finally, Prof. Manning, whom Zuffa's experts deemed "particularly authoritative," Oyer Dep. 123:4-6; SR3 ¶8, testified that Dr. Singer appropriately used wage share here. HT 5-18:14-21, 19:12-17, 23:6-27:1, 64:10-65:14.

Notably, as Prof. Manning testified, *all* of the above referenced uses of wage share necessarily incorporate the inference that fighter MRP grows proportionally with increases in event revenues (holding monopsony power and other variables constant). HT 5-17:12-27:1. Thus, every use of wage share in the academic literature and by Dr. Topel himself *accepts and implies proportionality*. *Id*.; HT 18:2-21. That fighter MRP is proportional to event revenues is also amply supported by Dr. Manning and in the record more generally. Dr. Singer, for instance, referenced (a) WME's statement that its forecast of a "long-term 20% of revenue assumption is reasonable," HT 1-111:13-112:8 (discussing PX1), implying a proportional relationship between fighter pay (and thus growth in fighter MRP) and event revenues (holding Zuffa's monopsony power constant); and (b) *Dr. Topel admitted that fighter pay would move with event revenues*. HT 1-98:24-101:9; SR2 ¶108, n.402 (citing Topel Dep. at 202:21-203:3). Further, as Prof. Manning observed, Dr. Blair essentially admitted proportionality. HT 5-19:20-22:7. Dr. Blair suggested that one could measure MRP by evaluating the effect of a change in the identity of a fighter in a particular event on revenues generated at that event. HT 4-149:24-151:4. This concedes the key link between MRP and event revenues, the latter of which are driven by the names of the fighters on the card. HT 1-73:5-75:11. Thus, if wages do not rise proportionally with increasing event revenues (which reflect increases in MRP), that indicates the exercise of monopsony power. HT 1-189:11-18; SR1 ¶272; SR2 ¶¶8, 38, 74-75, 92-94, 103-109. And when Dr. Blair noted the confounding effect of other possible differences between events (other than merely a different fighter),

---

[25] The evidence is overwhelming, and at minimum plausible, that Zuffa's contracts are effectively perpetual for most fighters, lasting all or for the vast majority of their careers. SR1 ¶¶88-91 & Tbl.1; SR2 ¶¶64-66 & Tbl.1.

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

1    he testified that the solution would be to control for all variables potentially affecting wage share. HT

2    4-149-51. He thus effectively endorsed the basic structure of Dr. Singer's wage share regression, *which*

3    *does just that*! HT 5-24:25-25:22, 43:11-44:6. Finally, the court in *White v. NCAA*, 2006 WL 8066803,

4    at *5 & n.4 (C.D. Cal. 2006), relied on an analysis *comparing wage shares in different sports* to

5    certify a class of student athletes challenging as anticompetitive the NCAA's cap on financial aid.[26]

6    **B. Foreclosure Share.** Dr. Singer's main independent variable is Foreclosure Share (FS),

7    which measures the percentage of Fighters subject to Zuffa's Exclusive Contracts in his relevant

8    markets and submarkets. He showed that FS rose above 90% as a result of the Scheme, and that Zuffa

9    foreclosed between 91-99% of Headliners during the Class Period. HT 1-135:20-157:14, 1-176:17-

10   181:8, 3-110:23-111:12; SR1 ¶¶167-177, 306-308 & Fig.3; SR2 ¶¶53-66 & Tbl.1. Even without

11   applying any weighting, and treating all promoters' Fighter pools as equivalent, Zuffa had very high

12   FS. For instance, according to Dr. Topel's "stratified foreclosure share" approach, Zuffa locked up

13   more than 70 percent of the top Fighters during the Class Period, SR2 ¶¶59-60, 121-122; TR1 Ex. 28;

14   HT 3-66:20-68:12, 69:14-19; and Dr. Singer's impact regression shows that merely locking up

15   Headliners is sufficient to suppress wage share. *See* SR1 ¶¶186-87; *see also* SR2 ¶¶99, 156-65, 167.

16   **(1)** Dr. Singer's method of computing the share of a relevant market (here the relevant input

17   market and submarket) foreclosed by challenged exclusionary contracts is proper. *See, e.g.*, *Twin City*

18   *Sportserve. v. Charles O. Finley*, 676 F.2d 1291, 1303 (9th Cir. 1982) ("it was proper for the district

19   court to have aggregated [defendant's] contracts in the relevant market in order to assess the Sherman

20   Act violations resulting from these contracts"); *id*. at 1298 n.5 (finding 20-30% foreclosure sufficient to

21   harm competition); *see also* SR1 ¶153 n.398, ¶168 n.439, ¶172 n.442 (citing Areeda-Hovenkamp at

22   ¶1821); HT 1-130:23-131:13; HT 2-54:17-55:1; HT 3-105:5-106:10.[27]

23   **(2)** Dr. Singer's weighting Zuffa and non-Zuffa fighter pools in the FS analysis by the average

---

[26] As the *White* court observed: "[P]layer costs are less than 15.5 percent of revenues of NCAA member institutions. This percentage is extremely low… **In the NBA and NFL, player compensation is approximately 55-65 percent of total revenues. These percentages offer a reasonable comparison and estimate of player inputs in the production of sports entertainment**." (emphasis added). In *Johnson v. Arizona Hosp.*, 2009 WL 5031334 (D. Ariz. 2009), certified a class based on Dr. Singer's proposal to use wage share in a regression to measure impact and damages.

[27] *See also Masimo v. Tyco Health Care*, 2004 WL 5907538, *6, *10 (C.D. Cal. 2004) (considering effect of all contracts and conduct "in the aggregate" and holding that plaintiffs' assertion that the contracts covered between 40-70% of the market was sufficient (citing *Twin City*, 676 F.2d at 1304)).

9

revenue generated per fighter per event—as one of three of his weighting methods used in some of his regression specifications—is appropriate. First, Dr. Topel concedes that (i) better ranked fighters generate more revenues and are thus more valuable to a promotion, HT 3-18:4-19:2, and as a result (ii) *some* weighting method *is necessary*. HT 2-232:2-232:10; HT 3-43:1-13. Second, revenue weighting is standard in antitrust economics. *Twin City*, 676 F.2d 1291, n.5 ("The 24% [foreclosure share] figure represents the result of a 'weighted' calculation of Sportservice contracts by doubling the number of those held by Sportservice at major league baseball facilities . . . . pursuant to evidence submitted that major league baseball concession franchise revenues average twice that of other major league sports concessions."). Finally, nothing in Dr. Singer's analysis, including his impact regression, depends on revenue weighting. On the contrary, his model produces similar robust results without any weighting at all, and also with his rank-weighting method. *See* HT 1-143:5-145:14, 168:18-169:3; HT 3-118:12-119:18; HT 3-108:15-109:7; *see also* SR1 ¶182 n.453; SR2 ¶¶128, 129, 136, 148.

   **(a)** Dr. Topel argues that revenue weighting "mechanically" causes FS to rise and WS to fall. HT 2-238:22-25. That is false. First, as discussed below, Dr. Singer's revenue weights constitute a ratio of average Zuffa to non-Zuffa event revenues across *all* events in a given year, so there is no direct relationship between increasing event revenues in a *given* Zuffa event (the denominator of his wage share variable) and Dr. Singer's revenue weights. HT 2-55:12-56:13; HT 3-116:25-117:8; *see also* SR1 ¶¶168, 309 & n.350; SR2 ¶¶144-48. Second, if Dr. Singer's revenue weights were "mechanically" responsible for the relationship between rising FS and falling WS, then his model would not produce robust results with a different weighting method (*e.g.*, rank-based weighting) or with no weighting at all.[28] Moreover, to further test Dr. Topel's theory, Dr. Singer specified a version of his model holding the revenue weights constant throughout the relevant period (so that increasing revenues could not be a driver of increasing FS), and the model continued to produce robust results. HT 3-117:11-118:10; SR2 ¶147.[29]

---

[28] HT 1-143:5-145:14, 168:18-169:3; HT 3-108:15-109:7, 118:12-119:18; SR1 ¶182 n.453; SR2 ¶¶128-29, 136, 148 n.510.

[29] Dr. Topel offers a wage *level* regression which he claims controls for event revenues by putting event revenues on the right-hand side. This regression is flawed and its results are meaningless because it suffers from endogeneity bias. HT 1-164:17-166:5; HT 5-28:22-29:7; SR2 ¶¶115-119. Endogeneity bias occurs when a variable on the right-hand side of the regression is correlated with the residual, or error

(b) Dr. Topel asserts that Dr. Singer improperly gave all UFC fighters the same average weight, which was substantially more than the weights assigned to non-Zuffa fighters. *See* SR2 ¶¶133-137; HT 2-57:11-58:12. False. Dr. Singer did not weight individual fighters, but instead effectively weighted each promoter's fighter pool by its collective revenues relative to the pools of non-Zuffa promotions. This is appropriate given that Dr. Singer is measuring Zuffa's *market share and marketwide foreclosure.* HT 1-127:10-128:6, 142:18-143:4; HT 2-16:23-17:16, 57:11-58:12; HT 3-112:15-113:9, 114:16-116:3, 116:25-117:8; SR1 ¶¶168, 309 & n.350; SR2 ¶134. Further, it is entirely appropriate that when Fighters are called up to the UFC from the minors they become part of a pool that is weighted more heavily; when Fighters join the UFC, they gain the opportunity to fight against a dramatically superior pool of fighters, and thus generate more revenues. The new pool of fighters is better, so the MRP of a Fighter who joins the UFC increases. *See* HT 3-20:12-16, 29:11-15, 132:9-21, 157:18-24.[30]

---

term. HT 5-28:22-29:1. Here, Dr. Topel's regression suffers from endogeneity bias because there is an unobserved variable (in this case, fighter MRP) that is simultaneously determining both event revenue and the wage level. SR2 ¶118-119; HT 1-164:10-165:14. By introducing an explanatory variable that can only measure MRP with significant error, Dr. Topel introduces bias into all of his regression coefficients. SR2 ¶119; MR1 ¶30; HT 2-25:11-26:3; HT 5-29:13-24. As Dr. Topel admits with reference to endogeneity, "that messes up the whole shebang." HT 2-213:23-214:1. Further, as Dr. Singer explains, Dr. Topel's regression specification is effectively assuming away Plaintiffs' anticompetitive theory of harm by "presuming that increases in foreclosure share have no effect on the mapping of event revenue into wage levels." HT 1-166:1-167:1; HT 2-26:6-21; SR2 ¶117. In response, Dr. Topel suggests that the specifications of Dr. Singer's impact regressions that rely on revenue weighting also suffer from endogeneity bias. HT 2-204:4-205:11. Not so. Unlike Dr. Topel's regression, which includes *event* revenues on the right-hand side, Dr. Singer's revenue weights are based on a yearly average of the ratio of Zuffa's revenues to other promoters' revenues, not the revenues at some particular event. HT 2-55:12-56:13; HT 3-116:25-117:8; *see also* SR1 ¶¶168, 309 & n.350. As a result, *event* revenues do not appear on the right-hand side of Dr. Singer's revenue-weighted regressions and thus there is no endogeneity bias. Indeed, Dr. Singer tested this by running his regression with fixed revenue weights, and without revenue weights at all, confirming there is no bias. SR2 ¶147; HT 3-117:11-118:10.

[30] Zuffa's (and not its experts') belated challenge of some of the data that Dr. Singer used for his revenue weights is also without merit. Dr. Singer calculates revenue weights annually as the sum of the gate and PPV revenues for all events with complete gate and PPV data in a given year, divided by the number of fighters participating in those same events. HT 3-116:25-117:8; *see also* SR1 ¶¶168, 309 & n.350. The revenue weighting therefore reflects the aggregate value of Zuffa's pool of fighters, relative to the aggregate pool of non-Zuffa fighters. HT 1-127:10-128:6, 142:18-143:4; HT 2-16:23-17:16, 57:11-58:12; HT 3-112:15-113:9, 114:16-116:3. By restricting his revenue weights to events with complete gate and PPV data, Dr. Singer avoids including events whose revenue may be inaccurate. There is no bias because Dr. Singer applies this rule symmetrically to Zuffa events and to non-Zuffa events, HT 3-121:4-125:13. Further, Dr. Singer's regression results are not affected by this analysis given that (a) Dr. Singer confirmed that his results are robust to reversing the rule described above— *i.e.*, to including in his revenue weight calculations even those seven events for which only incomplete gate and PPV data are available, HT 3-125:14-19, and (b) Dr. Singer's regression results are robust to using rank-based weights, or no weights at all. HT 1-113:12-19, 117:11-119:18; SR1 ¶182 n.483; SR2 ¶¶128-29, 136, 148 & n.510.

**(3)** Dr. Topel's assertion that the FS variable is measuring procompetitive aspects of Zuffa's conduct is wrong. The variable only measures Fighters locked into Zuffa's exclusive contracts. If Zuffa had attracted Fighters without locking them into long-term exclusive deals, FS would be zero. HT 1-176:17-178:5. Moreover, the regression does not *assume* that increasing FS over time is anticompetitive; *it tests that proposition*. HT 1-75:12-76:10, 138:23-139:16; SR2 ¶¶3, 73, 75 n.274. If Zuffa's ECs were procompetitive, then they would not have suppressed Fighter wage share, but Dr. Singer's regression demonstrates that it did. HT 3-107:3-24. Dr. Topel also suggested for the first time in his second report that Zuffa's "special sauce" was its promotional spending, and asserted that the failure to control for such spending over time was a flaw in Dr. Singer's regression. TR2 ¶6; HT 1-162:11-17; HT 3-142:5-144:19. Dr. Singer explained that his regression had several variables designed to control for factors changing over time not otherwise included in the regression, such as the time trend and fixed effects variables, SR1 ¶¶185, 228; SR3 ¶¶29-30; SR4 ¶¶37-40; HT 1-178:7-181:9, 3-133:20-142:3, and observed that, in any event, it is unlikely that Zuffa could take steps that enhance revenues that do not also proportionately raise the MRP of its Fighters. In that case, no spending by Zuffa could explain *falling* wage share. As a result, Zuffa's search for the missing "special sauce" variable is doomed to failure. HT 3-142:12-144:19; SR3 ¶¶27-33; SR4 ¶14.

Further, to test Dr. Topel's new theory, Dr. Singer included a "promotional spend" variable in his regression for both UFC and Strikeforce. SR3 ¶¶27-33; HT 1-178:7-181:9; 3-133:20-142:3. It confirmed Dr. Singer's results. *Id*.[31] In Dr. Topel's fourth report, he finally suggested a variable that, he claimed, was a measure of Zuffa's "special sauce": all non-Fighter event costs. SR4 ¶15. This variable included spending on items wholly unrelated to event revenues (*e.g.*, Zuffa's spending on private jets), and is otherwise unsound. SR4 ¶¶27-35. Dr. Singer showed that Dr. Topel made an elementary data error in implementing his regression with that variable: when that error is corrected, Dr. Singer's regression, even when including Dr. Topel's new variable, still shows a statistically significant connection between rising FS and falling wage share. SR4 ¶27; HT 3-142:5-144:19.

---

[31] Dr. Topel claims that when he reruns the version of Dr. Singer's regression that included the promotional spending variable with the yearly fixed effects variables, the promotion spend variable dropped out of the regression for lack of sufficient variation. HT 3-139:10-15. Dr. Topel is incorrect. As Dr. Singer explains, Dr. Topel was only able to eliminate the intra-year variation in the promotional spending variable by improperly removing all of the Strikeforce data. HT 3-139:16-142:3; SR4 ¶23.

**C. Zuffa's Additional Scattershot Attacks on Dr. Singer's Impact Regression All Fail.**

**(1) Control variables without statistical significance.** Dr. Topel suggested that Dr. Singer's regressions were flawed because he identified a handful of control variables with coefficients that either had unexpected signs or were not statistically significant. Not so. As Dr. Singer explained, it is not unusual when a regression has hundreds of control variables for some of those control variables to be colinear, making their *individual* effects more difficult to disentangle. HT 3-128:20-130:8. However, because the effects of those control variables *can* be readily disentangled from the key variable of interest, namely foreclosure share, multicollinearity provides "no reason to … lose faith in the overall regression." *Id*. As Dr. Oyer conceded, "all we care about in terms of drawing inferences regarding this case is the foreclosure share coefficient." HT 5-143:24-144:1. Further, Dr. Singer ran (i) a statistical test showing that the "win flag" *is* statistically significant when the "prior wins" variable is dropped, SR2 ¶124; (ii) another version of his regression using the log of wage share, showing that win, rank, and PPV variables had the appropriate signs, and were statistically significant, SR2 ¶127 & Appx. Tbl. A3, and (iii) a univariate regression with only "win flag" (and also rank) on the right-hand side, in which the coefficient is positive and statistically significant. HT 3-128:20-23; SR2 ¶¶124-25. Drs. Oyer and Topel ignore these last three rebuttals.

**(2) Dr. Topel's new time trend and fixed effects critiques are without merit.** Dr. Topel offered an entirely new argument at the hearing, suggesting that Dr. Singer's inclusion of year fixed effects and a time trend variable in his impact regression undermined his results. HT 3-133:20-134:6; 136:12-16. Wrong. The inclusion of such variables is standard in econometrics when running a regression on a panel of data including an extended time series, HT 3-135:2-11; 137:14-15, and make it *harder* to find a link between foreclosure share and wage share, and yet despite including those controls, Dr. Singer still found a robust relationship. HT 3-135:12-15. Dr. Topel suggests that the inclusion of yearly fixed effects limits any contribution of variation in the foreclosure share that would inform the foreclosure coefficient to intra-year movements of foreclosure share. HT 3-134:11-18. He is wrong. Although Dr. Singer's impact regression is informed by ample intra-year variation (it measures foreclosure share on a monthly basis), it is also informed by variation in foreclosure share across years. HT 3-134:11-135:3. Similarly, while Dr. Singer's time trend variable controls for factors that change

linearly, foreclosure share "wasn't growing in a perfectly linear fashion… So these nonlinear increases in the foreclosure share, even in the presence of a time trend variable, are making contributions to [the] foreclosure share coefficient." HT 3-136:19-137:13, 139:1-7.

**(3) Dr. Singer's use of Strikeforce data in his regression enhances its robustness.** Dr. Topel's suggestion that Dr. Singer should not have included Strikeforce data in some specifications of his impact regression is without merit. First, Dr. Singer has explained that Strikeforce is a valid competitive benchmark given that it is in the same industry but did not have substantial market power, SR2 ¶78, and Zuffa has offered no persuasive reason to exclude it.[32] On the contrary, Dr. Topel himself agreed that pre-acquisition Strikeforce was a "natural benchmark" for the but for world. TR1 ¶287; SR2 ¶77; HT 3-33:16-34:2. In addition, Dr. Singer empirically tested whether Zuffa's foreclosure affected Strikeforce's wage *share* (not wage *level* as Dr. Topel suggested) and determined that it did not, so he could be confident that pre-acquisition Strikeforce wage shares represented a benchmark unpolluted by Zuffa's Scheme. HT 2-13:24-15:9; 3-154:20-155:14; SR1 ¶183 n.454.

**V. Dr. Zimbalist's Yardstick Analysis is Plausible and Reliable.** Dr. Zimbalist's yardsticks are reliable comparators.[33] Dr. Blair has written that "the courts have tended to impose a standard of reasonable comparability as opposed to identicality, in accepting yardstick-based damage estimates." HT at 4-156:14-17 (quoting PX16). Dr. Zimbalist testified that his yardsticks are similar to MMA because "there's a method of production in the sports industry that is very, very labor intensive or athlete intensive. And that, of course, is true across … the enterprises we're talking about in this case." HT at 4-25:13-26:17. Dr. Zimbalist also explained that (a) MMA has the same basic sources of revenue and many of the same costs as in his yardsticks, HT 4-26:4-11, (b) that by using wage share, his model was able to control for differences in revenues and popularity across the sports, HT 4-25:10-12, 28:25-

---

[32] Dr. Topel argues that the Strikeforce data should be discarded based on the results of a "Chow Test" but as Dr. Singer explains, Dr. Topel's use of the Chow test provides no econometric basis for discarding the Strikeforce pre-acquisition bouts from the regression. SR2 ¶¶80-85.

[33] Dr. Zimbalist testified that it is common in sports economics to "use other markets to try to assess how competitive or not a particular market is." HT 4-77-78. The Court asked whether Dr. Zimbalist's report identifies "articles that reference the use of comparators when assessing the competitive of a labor market." HT 4-77:22-78:6. It does. *See* ZR2 ¶78 n.144 (citing Twomey & Monks (2011)), which analyzes revenue shares as a means to infer the exercise of monopsony power by major league soccer ("MLS") in the United States, concluding that MLS does exercise monopsony power because MLS devotes "only about 25 percent of its revenues to player salaries, compared to 50 to 60 percent in most other U.S. professional sports and professional soccer leagues.").

29:25; ZR1 ¶¶105-06, and (c) that by averaging across five different sports he was minimizing the influence of any one sport on the overall analysis. ZR2 ¶70; HT 4-50:19-51:10. Dr. Blair also admitted that boxing is a "reasonably attractive" yardstick," HT at 4-120:20-121:4, and as to the major U.S. team sports, Dr. Blair testified that the actual salaries that the players end up negotiating with their teams are determined by market forces for free agents, HT at 4-147:7-11. Dr. Oyer conceded that boxing is a natural comparison, HT 5-136:6, and that team sports would not pay in excess of their collective MRP, HT 5-159:24-160:8, thus making them a reasonable competitive benchmark.[34]

Dr. Zimbalist's boxing yardstick (as part of his overall damages analysis) is also reliable. Dr. Zimbalist used Golden Boy data to calculate wage share in boxing, and bolstered his analysis using wage share data from other boxing promoters, such as Top Rank. ZR1 ¶¶110-13 & Tbl.2; Zimbalist Errata Tbl.2-E; ZR2 ¶¶83-88; HT 4-36:21-37:16, 41:1-47:1.[35] Dr. Zimbalist correctly sourced the Golden Boy data from an attachment to the Deetz report rather than the skeletal data Golden Boy produced in this case. He determined that the latter was inaccurate and incomplete because the total compensation listed for 2016 was less than Saul Alvarez's purses alone. HT at 4-42:3-16, 45:1-19.[36]

**VI. Conclusion**. In short, Zuffa's main challenges to class certification—whether wage share or wage level applies to all class members; whether FS is properly specified for all class members; whether Dr. Singer's impact regression is properly specified; whether Dr. Zimbalist's yardstick model is appropriate—are all common to the class. If Plaintiffs' method of proving common impact is deemed "significant proof," as it most certainly is, then the class should be certified.

---

[34] Drs. Zimbalist and Singer testified that free agency improved absolute wages, wage share, revenues, and profitability in other sports. HT 4-13:17-14:20; 17:14-20:4; HT 1-106:13-109:18.

[35] As to the Top Rank wage share, Zuffa's argument that some of Top Rank's payments actually went to other promoters is without merit. As Dr. Zimbalist explained, even if true, this does not bias his calculation because: (1) many of these payments are made as directed by the fighter to their manager, and are properly counted as compensation, as it is in the UFC, HT 4-57:20-58:13; (2) to the extent these payments go to "promotion" companies, those are often owned by the boxer themselves, HT 4-66:3-11; and (3) to the extent that these include payments to other promoters pursuant to a "provision-of-services" agreement, Dr. Zimbalist testified that would not bias his calculation of the wage share because Top Rank received revenue for "leasing" its own fighters (booked as revenue, not compensation) as often as it made payments for leasing other promoters fighters (booked as compensation, not revenue), resulting in no bias in either direction. HT 4-67:20-68:9.

[36] Dr. Zimbalist also independently verified the Deetz data by comparing the compensation listed in the Golden Boy data produced in this case to the public record reflecting Alvarez's purses, and determined that it "substantially" contradicted the information that was produced by Golden Boy in this case and on which Dr. Blair relied. HT at 4-54:6-56:10.

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

Dated: September 13, 2019

By: /s/ Eric L. Cramer
   Eric L. Cramer

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Jiamin Chen (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
jchen@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Daniel H. Silverman (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005
Telephone:     (202) 408-4600
Facsimile:     (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dsilverman@cohenmilstein.com

**Co-Lead Class Counsel**

**PLAINTIFFS' SUPPLEMENTAL CLASS CERTIFICATION BRIEF**

**Liaison Counsel for the Class**

Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Telephone:  (702) 341-5200
Facsimile:  (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone:      (602) 264-7101
Facsimile:      (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

William G. Caldes (*Pro Hac Vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Phone: (215) 496-0300/Fax: (215) 496-6611
bcaldes@srkattorneys.com

John D. Radice (*Pro Hac Vice*)
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502
jradice@radicelawfirm.com

Frederick S. Schwartz (*Pro Hac Vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Telephone:      (818) 986-2407
Facsimile:      (818) 995-4124
fred@fredschwartzlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September 2019 a true and correct copy of PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS CERTIFICATION was served via the District of Nevada's ECF system to all counsel of record who have enrolled in the ECF system.


By:
                                    */s/ Eric L. Cramer*