—2:15-cv-01045-RFB-PAL—

1                 UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3

4  CUNG LE, et al.,          )
                          )
5           Plaintiffs,   )  Case No. 2:15-cv-01045-RFB-PAL
                          )
6      vs.             )  Las Vegas, Nevada
                          )  Friday, September 13, 2019
7  ZUFFA, LLC, d/b/a Ultimate )  8:22 a.m.
  Fighting Championship and  )
8  UFC,               )  EVIDENTIARY HEARING, DAY SIX
                          )
9          Defendants.

10 _____

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14       THE HONORABLE RICHARD F. BOULWARE, II,
            UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:      See Pages 2 and 3

20

21

  COURT REPORTER:    Patricia L. Ganci, RMR, CRR
22                  United States District Court
                  333 Las Vegas Boulevard South, Room 1334
23                  Las Vegas, Nevada  89101

24

  Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

—2:15-cv-01045-RFB-PAL—

1  APPEARANCES:
   For the Plaintiffs:
2
        **DON SPRINGMEYER, ESQ.**
3       WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
        3556 E. Russell Road, 2nd Floor
4       Las Vegas, Nevada 89120
        (702)341-5200
5
        **ERIC L. CRAMER, ESQ.**
6       **PATRICK F. MADDEN, ESQ.**
        **MARK R. SUTER, ESQ.**
7       BERGER & MONTAGUE, P.C.
        1818 Market Street, Suite 3600
8       Philadelphia, Pennsylvania 19103
        (215)875-3000
9
10      **DANIEL H. SILVERMAN, ESQ.**
        COHEN, MILSTEIN, SELLERS & TOLL, PLLC
11      1100 New York Avenue, NW, Suite 500 West
        Washington, DC 20005
12      (202)408-4600
13      **JOSEPH SAVERI, ESQ.**
        **JOSHUA P. DAVIS, ESQ.**
14      THE JOSEPH SAVERI LAW FIRM, INC.
        555 Montgomery Street, Suite 1210
15      San Francisco, California 94111
        (415)500-6800
16
   For the Defendants:
17
        **J. COLBY WILLIAMS, ESQ.**
18      CAMPBELL & WILLIAMS
        700 South 7th Street
19      Las Vegas, Nevada 89101
        (702)382-5222
20
        **WILLIAM A. ISAACSON, ESQ.**
21      **STACEY K. GRIGSBY, ESQ.**
        **NICHOLAS A. WIDNELL, ESQ.**
22      **JOHN GERARDI, ESQ.**
        **ADAM SHAW, ESQ.**
23      **SUSAN NERO, ESQ.**
        BOIES, SCHILLER & FLEXNER, LLP
24      1401 New York Avenue, NW
        Washington, DC 20015
25      (202)237-2727

─────────2:15-cv-01045-RFB-PAL─────────

1  APPEARANCES CONTINUED:

2         **BRENT K. NAKAMURA, ESQ.**
          BOIES, SCHILLER & FLEXNER, LLP
3         1999 Harrison Street, Suite 900
          Oakland, California 94612
4         (510)874-1000

5

6  ALSO PRESENT:

7       Riche McKnight, Esq., Zuffa

8
                          INDEX OF EXAMINATIONS
9
   TESTIMONY OF ALAN MANNING
10   Redirect Examination by Mr. Davis.....................10

11
                          INDEX OF EXHIBITS
12 Exhibit No.                                    Admitted
   17                                               12
13 3                                                17

14

15     LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 13, 2019; 8:22 A.M.

16                         --oOo--

17              P R O C E E D I N G S

18          THE COURT:  Please be seated.

19          COURTROOM ADMINISTRATOR:  Now calling Cung Le, et al,

20 versus Zuffa LLC, Case Number 2:15-cv-01045-RFB-BNW.  This is

21 the time for Evidentiary Hearing, Day 6.

22          Counsel for -- starting with counsel for plaintiffs,

23 please note your appearance for the record.

24          MR. DAVIS:  Oh, sorry.  Joshua Davis for the

25 plaintiffs.

—2:15-cv-01045-RFB-PAL—

1           MR. CRAMER:  Eric Cramer for the plaintiffs.

2           MR. SAVERI:  Joseph Saveri on behalf of the plaintiffs.

3           MR. SUTER:  Mark Suter on behalf of plaintiffs.

4           MR. MADDEN:  Patrick Madden on behalf of plaintiffs.

5           MR. SILVERMAN:  Dan Silverman on behalf of plaintiffs.

6           MR. SPRINGMEYER:  Don Springmeyer for the plaintiffs.

7           MR. ISAACSON:  Good morning, Your Honor.  Bill Isaacson

8  for Zuffa.

9           MS. NERO:  Good morning, Your Honor.  Susan Nero for

10 Zuffa.

11          MS. GRIGSBY:  Good morning, Your Honor.  Stacey Grigsby

12 for Zuffa.

13          MR. WIDNELL:  Good morning, Your Honor.  Nicholas

14 Widnell for Zuffa.

15          MR. WILLIAMS:  Colby Williams on behalf of Zuffa.

16          MR. NAKAMURA:  Brent Nakamura on behalf of Zuffa.

17          THE COURT:  Good morning.  So we are back to have a

18 little more testimony from Professor Manning.  So if we could

19 have Professor Manning come back up to the stand.

20          And you recognize, Professor Manning, that you are

21 still under oath?

22          THE WITNESS:  I do.

23          THE COURT:  Go ahead and take your seat.

24          So before you begin, Mr. Davis, Professor Manning, I

25 want to give you an opportunity to be able to respond to some of

———2:15-cv-01045-RFB-PAL———

 1    Professor Oyer's testimony.  I understand that you heard some of

 2    it yesterday.  And some of it was actually, despite you all

 3    being colleagues, obviously, quite pointed as it relates to your

 4    arguments and opinions.  And so I want to give you a few moments

 5    to be able to respond.

 6            THE WITNESS:  I think much of it may be included in

 7    what we were going to --

 8            THE COURT:  What you were going to talk -- well --

 9    well, okay.  Well, I had a couple --

10            THE WITNESS:  Okay, we can --

11            THE COURT:  -- specific questions.  One of them just

12    has to do with this idea, one, that this data was available and

13    has been available in the industry, people just choose not to

14    use it, as it relates to wage share and the particular

15    industries like the high-tech industry.  You heard that

16    testimony yesterday?

17            THE WITNESS:  Yes.  Well, I think that is -- was not

18    correct.  Because although there is in some sense revenue data

19    available, the nature of that revenue data was not well suited

20    in that case to -- you know, to be -- take the same approach in

21    this case.  And in particular, for example, the revenue -- well,

22    there are several reasons.  I mean, one is it was kind of global

23    revenue.

24            THE COURT:  So you have firm-wide revenue, which isn't

25    really helpful in terms of doing a particular employee share --

—2:15-cv-01045-RFB-PAL—

1          THE WITNESS:  Yes.

2          THE COURT:  -- or marginal revenue product can't really

3   be worked out unless you have something more specific as it

4   relates to the actual product that they are specifically

5   producing.

6          THE WITNESS:  I think there's two issues why it's

7   different.  One is the nature of the work where we take this

8   argument that the identity of the fighters is really important

9   here.  And I do think that is -- is a valid point.

10          The second is the nature of the data.  So the nature of

11   the data here is that, you know, we have event revenues.  We

12   know exactly which fighters were involved in which events.  We

13   also know which fighters were not involved in which events.  So

14   we know, you know, who can't be contributing to event revenues

15   on a particular night.

16          In contrast, in the High Tech case what we have is

17   global revenue at the level of the company.  So this is -- you

18   know, because it's global revenue, it includes a part that's

19   revenue that's generated by workers who are outside the U.S. who

20   are not part of the class.  It includes workers within the U.S.

21   who were not part of the class.  And so I think that's a very

22   different nature of the data.

23          The event level revenue that we had here, we know which

24   workers were associated with that -- generating that revenue and

25   which were not, compared to this just one big number for global

─2:15-cv-01045-RFB-PAL─

1  revenue as a whole.

2        THE COURT:  Right.  The other question I have for you

3  is that Professor Oyer was, I think, somewhat tentative in his

4  answer to my question as relates to if we are aware of

5  potentially that wage shares as relates to event revenue is used

6  by particular promoters, would that, in your expert opinion, not

7  be a basis to use that in the regression model itself?

8        In other words, there was an argument that he made that

9  said we would never use wage share because it's not commonly

10  used and it's not something that the industry used.  And then I

11  had asked him about sort of known versus unknown variables and

12  how significant they are.  And he used -- initially talked about

13  compensation, how we know that compensation doubled because the

14  contract doubled the compensation if you won.  And so,

15  therefore, you would know in that context that that particular

16  variable and that issue was going to be part of the regression.

17        And so my question to you is, if we were aware -- and

18  I'm not saying it's been established, that in fact the promoters

19  used wage share as it relates to event revenue, would that not

20  be a basis to include that in the model?

21        THE WITNESS:  Yes.  I mean, I agree with that.  I mean,

22  Dr. Oyer actually went further in the regressions he presented.

23  He -- revenues played no role whatsoever, either on the

24  right-hand side or the left-hand side.  And I think that

25  that's -- you know, what we're trying to use revenues for is to

─2:15-cv-01045-RFB-PAL─

1  get this idea of the marginal revenue product.  Just sounds very

2  implausible that marginal revenue product has nothing to do with

3  actual revenues.  And when we saw those internal documents at

4  the end of yesterday, I think it's beyond all doubt, and that's

5  not British understatement, that in this case there is a link

6  between revenue and compensation.  So that you have to

7  incorporate revenue in some way in the model.

8         I mean, Dr. Topel incorporates it in some of his models

9  in a different way to Dr. Singer, but I think that those models

10 in which revenue plays no role in the determination of

11 compensation at all is just simply not -- you know, it's just

12 not a credible approach.

13        I mean, I think it is widespread in the academic

14 literature for working with the individual level data that we

15 discussed a little bit yesterday in these household surveys

16 where there wouldn't be questions about what is your firm's

17 revenue.  In those models, we try and proxy someone's marginal

18 revenue product by having their education, their age, their

19 occupation, and so on.

20        THE COURT:  But you don't -- in that models oftentimes

21 you don't have the type of granular data, at least that was you

22 said, as relates to their contribution to a particular product.

23        THE WITNESS:  I mean, exactly.  I mean, that's an

24 additional reason for why in this case you've got a link between

25 the workers and the particular product, a particular event here,

———2:15-cv-01045-RFB-PAL———

1 and there are certain workers that you know have got nothing to

2 do with that event because they're not taking part in it.

3        THE COURT:  And the other question I have for you is it

4 seems to me one of the issues here is also just about the choice

5 of variables versus the modelling itself.  So, in other words,

6 you've reviewed the reports in this case, and it seems much of

7 the argument based is -- or the critiques and the, sort of,

8 responses are based upon assumptions about what you would expect

9 to see based upon a choice of variables, but not necessarily any

10 clear identifiable errors from the regression modelling itself.

11        So, in other words, you're familiar with this type of

12 statistical modelling.  Do you see anything from any of the

13 modelling in terms of the critique from Professor Oyer that

14 would suggest that the models were run incorrectly as regression

15 models?

16        THE WITNESS:  No, I don't.  Don't see anything that --

17 I think they're properly run.  You know, there's -- you know,

18 there were issues raised about, you know, are the results

19 plausible, you know, there were issues raised around, for

20 example, the sign on the win flag in Dr. Singer's regression.  I

21 mean, I can address that in some detail if you would like or --

22        THE COURT:  What I'm saying is, and this is not

23 uncommon when people have competing regression models, they can

24 have arguments about whether or not their particular variable --

25        THE WITNESS:  Yeah.

─2:15-cv-01045-RFB-PAL─

1          THE COURT:  -- is properly constructed and captures

2   things.  But that oftentimes can devolve into a conceptual or

3   fundamental disagreement about how one should actually structure

4   the variable, but not necessarily about the model itself

5   actually being properly run to the extent that it's not invalid

6   as a regression model.

7          THE WITNESS:  No, I mean, I think the models are

8   properly run here.

9          THE COURT:  Okay.  All right.

10          Go ahead, Mr. Davis.

11          MR. DAVIS:  Thank you very much, Your Honor.

12              DIRECT EXAMINATION OF ALAN MANNING

13   BY MR. DAVIS:

14   *Q.*  Let me jump to, I think, a couple of exhibits that I meant

15   to, first of all, identify for the record and that we ended with

16   yesterday.  So, Professor Manning, I'm going to show you an

17   exhibit of an internal Zuffa document.  I just want to make

18   sure -- confirm that this is the one that you were referring to

19   a few moments ago.

20   **A.**  It is.

21   *Q.*  Let me just see if I can do this without setting off a fire

22   alarm.

23          MR. ISAACSON:  And, Your Honor, we repeat our objection

24   from yesterday that this -- his consideration of this document

25   was not in his reports.

1            THE COURT:  I'm sorry.  I didn't hear that last part,

2    Mr. Isaacson.

3            MR. ISAACSON:  This was -- his -- he did not consider

4    this document in his reports.  We made this objection yesterday.

5            THE COURT:  Okay.  Overruled.  I'll allow it.

6            Go ahead.

7            MR. DAVIS:  And this is -- just for identification

8    purposes, I understand this to be Plaintiff's Exhibit 1,

9    page 12.  And do you want to see it or ...

10            MR. ISAACSON:  If you're going to spend time with it,

11    sure.

12            MR. DAVIS:  I just want to do it for identification

13    purposes.

14            MR. ISAACSON:  Then that's fine.

15            MR. DAVIS:  Okay.

16    BY MR. DAVIS:

17    Q.  And then the other document to which you refer, I believe is

18    this one.  This is the internal Zuffa document that I discussed

19    with Dr. Oyer yesterday.  Is this the document to which you were

20    also referring?

21    A.  It is.

22    Q.  Okay.  And that's a new plaintiff's exhibit.  That's

23    Plaintiff's Exhibit 17, and it's found on page 60.

24            MR. ISAACSON:  And we reiterate our objection to this

25    document on the same grounds.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Okay.  Overruled.  I'll allow it.

2          (Plaintiff's Exhibit 17 is admitted.)

3    BY MR. DAVIS:

4    *Q.*  And did you have any -- I think you talked a bit about the

5    significant of these documents.  Did you have anything further

6    you wanted to say about the significance of these documents as

7    they relate to proportionality as we've been discussing it

8    during this hearing?

9    ***A.***  Well, they support proportionality.  I mean, we have here

10   projections of increases in revenue.  And when revenues are

11   projected to increase, we have compensation projected to

12   increase in the same proportion leading to a constant wage

13   share.

14   *Q.*  Okay.  And this was the event that Dr. Oyer yesterday

15   described as extraordinary if it would happen, and it appears

16   that that's exactly what Zuffa and WME predicted would happen,

17   yes?

18          THE COURT:  And I just want to understand,

19   Professor Manning.  And your argument is that the -- because we

20   have that whole back and forth about what exactly the

21   proportionality was that you were talking about.  So I want you

22   just to sort of explain it again just so there's no confusion in

23   the record.  Because I think --

24          THE WITNESS:  Yeah.

25          THE COURT:  -- I'm not sure Professor Oyer was talking

2:15-cv-01045-RFB-PAL

 1  about the same type of proportionality --

 2          THE WITNESS:  Yeah.

 3          THE COURT:  -- you were talking about.  So I'd like you

 4  just to go over that again to make sure that I have it clear as

 5  to what it is -- when you say proportionality, what that means.

 6          THE WITNESS:  Yes.  Okay.  So I think there are three

 7  key concepts here.  There's the compensation, there's the

 8  revenue, and behind the scenes is this idea of the marginal

 9  revenue of product.

10          THE COURT:  Right.

11          THE WITNESS:  So the sort of economic principles say

12  there should be a proportionality between wages and the marginal

13  revenue of product holding monopsony power constant.  And then

14  we have -- then there are sort of reasons to believe that

15  marginal revenue product is proportional to revenues.  And I

16  talked about things like that thought experiment, if you double

17  revenues, you're doubling someone's marginal revenue product,

18  the testimony of Dr. Blair, and so on.

19          So then we have the proportionality between wages and

20  marginal revenue product, between marginal revenue product and

21  revenues, and then we sort of put that together in a line.  And

22  we don't observe marginal revenue product, but we end up with a

23  proportionality between compensation and revenue itself.  And

24  that is what is in this document.

25          THE COURT:  So, and that proportionality would be to --

────2:15-cv-01045-RFB-PAL────

1 it's a one-for-one proportionality?

2          THE WITNESS:  Well, it's in proportion.  So it

3 doesn't -- it means that if you double revenues, you double

4 compensation.

5          THE COURT:  Right.

6          THE WITNESS:  It doesn't mean that if revenues go up by

7 100 million, compensation go up by 100 million.

8          THE COURT:  Right.  It's a proportional increase in

9 terms of what the ratio --

10          THE WITNESS:  Exactly.  Exactly.

11          THE COURT:  Okay.

12          MR. DAVIS:  Thank you, Your Honor.

13 BY MR. DAVIS:

14 Q.  And there's been discussion of the expense -- the extent of

15 sports literature that uses wage share to assess the effects of

16 monopsony power on compensation.  Does that literature

17 incorporate the inference of proportionality that you just

18 described?

19          MR. ISAACSON:  I repeat the objection, Your Honor.

20          THE COURT:  Okay.  Overruled.

21          Go ahead.

22          THE WITNESS:  Well, it does.  I mean, a good example of

23 that would be the Scully article from 2004.  He's discussing

24 what the impact of changes to the degree of competition in the

25 big four sports are, like getting rid of the reserve clause.

─────────2:15-cv-01045-RFB-PAL─────────

1  And in order to do that, what he's doing is he's presenting data

2  on how the wage share changed over time.  And I think his data

3  has just been put up on that slide there.

4         So there it's very clear that it's -- you know, the

5  title of the table is Player Compensation as a Share of Revenue.

6  And if one looks at the text surrounding that, one will see he's

7  then inviting the reason to say, Well, look, there was this sort

8  of change to the contract structure in this period.  Look what

9  happened to the wage share before and afterwards.

10         THE COURT:  And thank you, Professor Manning.

11         And, Mr. Davis, I want to make sure, is this article in

12  the material that's been submitted to me?

13         MR. DAVIS:  It's on the slide -- yes, it's on the

14  slide.

15         THE COURT:  No, I mean, in terms of material that's

16  already been -- is in the record.

17         MR. DAVIS:  Its JCCX56.

18         THE COURT:  Okay.  That -- okay.  That doesn't

19  necessarily tell me where it is in the record in terms of where

20  it was filed.  Has it been filed in connection with any of the

21  documents?

22         MR. DAVIS:  It has, and somebody who's far more

23  competent than me is going to tell you exactly where.

24         THE COURT:  Okay.  Just take a moment because I just

25  want to be able to note that for the record.

———2:15-cv-01045-RFB-PAL———

```
1              MR. DAVIS:  Sure.

2              THE COURT:  It's helpful.

3         We can come back to it.

4              MR. DAVIS:  Yeah, he'll be working -- he is -- Mark is

5    an extraordinarily reliable young man, so he will be working

6    furiously.

7              THE COURT:  That's fine.

8              MR. DAVIS:  Okay.  Good.

9         And, Mark, do feel free to interrupt as soon as you

10   find what you're looking for.  All right.  So let's go to it --

11             MR. SUTER:  It's Plaintiff's Exhibit 3.

12             MR. DAVIS:  Plaintiff's Exhibit 3.

13             THE COURT:  Plaintiff's Exhibit 3 to?

14             MR. DAVIS:  To this hearing.

15             THE COURT:  To this hearing.  Was it previously

16   attached to anything?

17             MR. CRAMER:  It was cited in Dr. Singer's rebuttal

18   report.

19             THE COURT:  Cited in Dr. Singer's rebuttal report.

20   Thank you.

21             MR. DAVIS:  Thank you.

22             THE COURT:  I think part of that was your -- was

23   related to the nature of your objection.  Is that right,

24   Mr. Isaacson?

25             MR. ISAACSON:  Yes, Your Honor.  This has not been --
```

—2:15-cv-01045-RFB-PAL—

 1   none of this has been disclosed in Professor Manning's reports.

 2        MR. DAVIS:  He was asked about it at his deposition.

 3        THE COURT:  So I just want to understand the objection.

 4   I'm overruling the objection because I think, one,

 5   Professor Oyer's testimony invited this based upon what he said

 6   and the criticisms he raised, but I'm going to accept it for the

 7   limited purpose for which Professor Manning's using it, not

 8   necessarily anything broader than what is his use of that

 9   material.  But I do think that Professor Oyer, and actually

10   Dr. Topel, actually invited this as it relates to their comments

11   regarding the non-use ever of wage share or player share in the

12   academic literature.  So I will allow it.

13        (Plaintiff's Exhibit 3 is admitted.)

14        (Plaintiff's counsel conferring.)

15   BY MR. DAVIS:

16   *Q.*  Okay.  Let's go through some additional criticisms we heard

17   predominantly yesterday of -- of wage share, and I would just

18   like your responses to them.  So, first of all, one criticism is

19   that Zuffa claims that use of wage share is not appropriate

20   because you can't measure the marginal revenue of product of

21   labor perfectly.  Is Zuffa right about that?

22   *A.*  No, they're not right.  I mean, I think there's been common

23   agreement amongst the experts that it is not possible to measure

24   exactly --

25        THE COURT:  Right.

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  -- the marginal revenue product.  And the

2   whole field of labor economics would disappear in a puff of

3   smoke if that was a fatal problem.

4           THE COURT:  That was Dr. Topel's joke, I believe.

5           MR. DAVIS:  That was -- yes.  Yes, exactly.

6           THE WITNESS:  Yeah.

7   BY MR. DAVIS:

8   *Q.*  Let's turn to *Monopsony In Motion*.  In your book, *Monopsony*

9   *In Motion*, you did not discuss examples that used wage share as

10  opposed to wage level.  Does that suggest that your endorsement

11  of wage share in this case is not consistent with your prior

12  published work?

13  *A.*  It does not.

14  *Q.*  And I believe you prepared a slide suggesting some reasons

15  why that's so.  If you could just explain them.

16  *A.*  Yes.  Well, the first reason is something we discussed

17  yesterday, which is that the data I was using in that book were

18  data sets that simply didn't contain information on revenue so

19  one couldn't not compute a wage share even if one wanted to.

20          The second reason is -- was that in writing that book,

21  my purpose was to argue that monopsony was much more persuasive

22  throughout labor markets than was commonly believed.  So at that

23  time it was commonly accepted that there were often degrees of

24  monopsony in professional sports, but it was argued that there

25  was very little in other parts of the labor market.

1          THE COURT:  Got it.

2          THE WITNESS:  And I wanted to focus on those other

3   parts of the labor market, so I made a deliberate decision not

4   to focus on professional sports.

5          And I think the third reason is that in that book what

6   I was arguing was that the idea of monopsony had the potential

7   to explain a very wide range of labor market phenomena.  So it

8   was not simply narrowly focussed on comparing actual

9   compensation to competitive competition, which is the question

10  that's before us in this case.

11          THE COURT:  Okay.

12  BY MR. DAVIS:

13  Q.  All right.  And in your book, *Monopsony In Motion*, you have

14  some figures and formulas -- formula I guess, one in which --

15  one in particular that Dr. Oyer showed yesterday.

16          Okay.  And I ... this is a well-thumbed copy, so I

17  apologize for the slight interlineation.

18          Is that the diagram that Dr. Oyer showed, to the best

19  of your recollection?

20  **A.**  Yes.

21  Q.  And is that diagram in any way inconsistent with use of wage

22  share and the way it's been done by plaintiffs in this case?

23  **A.**  It is not.  I mean, I would draw your attention to the fact

24  that on that diagram on the vertical axis we mark the wage, but

25  there's also this thing which, in the jargon, we would call wide

———2:15-cv-01045-RFB-PAL———

1   prime M, the higher line, and that is the marginal revenue

2   product of labor.  And both of those are marked because the

3   extent of monopsony power is essentially the wage as a share of

4   the marginal revenue product of labor.  So it's the gap between

5   the wage and the marginal revenue product, between those two

6   horizontal lines, which is a measure of monopsony power.

7            MR. DAVIS:  And just for the record, I note this is --

8   we were looking at page 31 of the book, *Monopsony In Motion,* and

9   I'm now going to turn to page 30, just the opposite page.

10  BY MR. DAVIS:

11  *Q.*  And there's a figure 2.3 on the -- toward the bottom of that

12  page that hopefully you can read.  What, if anything, does this

13  tell you about use of wage share and the way it's been done by

14  plaintiffs' experts in this case?

15  *A.*  I would say that's equation 2.3, but I guess that's a

16  detail.

17            Well, I apologize -- apologies for the algebra that's

18  in this.  Obviously, it's designed for an academic audience.

19  But basically what that equation 2.3 says is the relationship

20  between the degree of monopsony power, which in the algebraic

21  formulation is this epsilon, and the -- and the wage is a share

22  of the marginal revenue product.  The wage being denoted by W

23  and the marginal revenue product being denoted by Y prime.  So

24  this equation is a relationship between the degree of monopsony

25  power and the wage as a share of the marginal revenue product.

—2:15-cv-01045-RFB-PAL—

1  And the word "share" there is really important.

2  *Q.*  And is this equation standard in labor economics?

3  **A.**  I mean, that is the most standard equation for representing

4  the idea of monopsony.  This was right at the start of the book,

5  I mean, page 30.  I'm sort of -- sort of explaining in very

6  simple terms what the model of monopsony implies.

7  *Q.*  Okay.  And then --

8         THE COURT:  And then -- I'm sorry.  And this model

9  describes monopsony in the context of the -- when you say "the

10 share of the wage," the share of the wage as relates to the

11 marginal revenue product, explain that again to me.  Because I

12 want -- I want to be able to determine the difference between

13 wage share in the context of this case and sort of share of the

14 wage in terms of how you're using it here, because they're not

15 the same.  And so maybe you can just elaborate on that just so

16 I'm clear and the record's clear.

17        THE WITNESS:  Yes.  Well, here this is the wage as a

18 share of the marginal revenue product, this mythical thing --

19        THE COURT:  Right.

20        THE WITNESS:  -- that we're all seeking.  But, perhaps,

21 it would be helpful, I don't know, for me to explain how one

22 would go from that equation to what we see in this particular

23 case.

24        THE COURT:  Well, it seems to me one of the things

25 you're suggesting is that some of the proxies that are

─────2:15-cv-01045-RFB-PAL─────

1 attempting to be used for marginal revenue product here, which

2 are some of the controls in Dr. Singer's model, are simply a way

3 to try to capture this share, right, to be able to quantify it,

4 right, which is what his model's attempting to do is to capture

5 the share of the wage and distinguish it -- well, the -- is to

6 pull out marginal revenue product from the wage and then look at

7 the marginal revenue product as -- in this case as a -- as a

8 share of the -- of the wage or as a share of the event revenue.

9        So, is it your view that this model serves as a basis

10 for using wage share in the model in this case?

11        THE WITNESS:  Yes.  Now, perhaps, I'll try and explain

12 how I see it.  So this is -- the wage is a share of the marginal

13 revenue product.  And I think everyone agrees that if we

14 actually observe the marginal revenue product, we'd just compare

15 compensation to it, everything would be very simple, very clean.

16        But we don't.  And so we have to come up with proxies

17 for the marginal revenue product.  And that's where the

18 disagreements start -- or one sort of part of disagreement

19 start.  So we have different approaches.  We have Dr. Oyer who

20 when he proposes a compensation regression in which revenue

21 plays no part, he's essentially saying the marginal revenue

22 product is totally unconnected to revenues.  And for the reasons

23 I outlined a few minutes ago, I think that's just not a credible

24 position at all.

25        Then we have Dr. Topel's approach, which is slightly

1  different.  He says, well, we're going to put revenue on the

2  right-hand side of a regression, where we've got compensation on

3  the left-hand side.  And that leads to a very small measured

4  effect of revenue on compensation, which is doubling leads to an

5  8 percent increase that we talked about before.

6          My view is that suffers from endogeneity bias.  And I

7  think one of the reasons, also, to worry about it is the results

8  are very implausible, because that doubling of revenue leading

9  to only an 8 percent increase in -- in compensation is

10  completely inconsistent with -- with those internal documents we

11  saw a few minutes ago.  It's totally inconsistent with the fact

12  that if we compare sports with similar degrees of competition

13  that, you know, some are much more popular than others, we see

14  that they have different levels of compensation in proportion.

15  Dr. Topel's model doesn't predict that.

16          Dr. Topel's model is inconsistent with the fact that if

17  we take a given sport and think of revenue increasing over time,

18  as has been the case for MMA but also for other sports, his

19  prediction is that as revenue increases over time, the wages

20  would not increase in proportion, and so the wage share would be

21  falling.  That's inconsistent with all the data.  So all of

22  those things say to me that Dr. Topel's approach is not a

23  persuasive one.

24          And then we have Dr. Singer's approach, which is based

25  on proportionality between the marginal revenue product and

—2:15-cv-01045-RFB-PAL—

1    revenues.  And that is -- does not have all those

2    inconsistencies that I talked about.  It's consistent with the

3    internal documents comparing sports to a moment in time,

4    comparing sports over time.  In addition, if we have this sort

5    of thought experiment, let's imagine twice as many people are

6    watching, that implies proportionality.  It's consistent with

7    the use in the --

8         THE COURT:  Well, that proportionality comes back to

9    this equation, though.

10        THE WITNESS:  Well, this is the proportionality between

11    the marginal revenue product and the wages -- and the revenues.

12    So that's how you operationalize this.

13        THE COURT:  But that's what I'm saying.

14        THE WITNESS:  Yes.

15        THE COURT:  The idea of proportionality is based upon

16    the fact that you're going to have this --

17        THE WITNESS:  Yes.

18        THE COURT:  -- this constant ratio, which is that it --

19    that you should have -- well, not ratio, but if you have this

20    monopsony power and you can actually measure the marginal

21    revenue product with the wage, you may actually come up with a

22    proportion that would be a constant, potentially.

23        THE WITNESS:  If -- if the degree of monopsony power is

24    constant and other relevant things are, that would be the case,

25    yes.

2:15-cv-01045-RFB-PAL

1             THE COURT:  Okay.  All right.  Thank you.

2             MR. DAVIS:  Your Honor, I was going to ask briefly

3   about the -- why the High Tech cold call case is different.

4   That may have been covered enough.

5             THE COURT:  It was.

6             MR. DAVIS:  Okay.  Thank you.

7   BY MR. DAVIS:

8   *Q.*  One of the criticisms that Dr. Oyer made was that wage share

9   is used in macroeconomics, but not in microeconomics.  Is that a

10  fair criticism?

11  *A.*  No, I don't believe that's a fair criticism.

12  *Q.*  Why not?

13  *A.*  Well, the wage share at the level of the economy as a whole,

14  so we have total compensation, the economy as a whole, total

15  revenue, and so on.  That can just be written as the average of

16  the wage share in the individual companies that go to make up

17  the economy.  And so it simply cannot be legitimate to say you

18  can look at it at the macrolevel, the level of the whole

19  economy, and yet not at the lower level, at the level of the

20  individual firm, or as in this case we go even lower to

21  different events within a firm.

22  *Q.*  Okay.  Another criticism that Dr. Oyer or Zuffa has leveled

23  is that wage share hasn't been used in a regression.  Is that a

24  legitimate criticism?

25  *A.*  Uhm.  No, I don't think it is.

—2:15-cv-01045-RFB-PAL—

1    *Q.*  And why not?

2    **A.**  Uhm.  Well, I think that a regression is a method that's

3    designed to isolate the effect of one factor when other factors

4    are, you know, possibly also, you know, affecting the variable

5    you're interested in in studying.

6         I mean, maybe a good example of that would be, say, to

7    go back to that Scully 2004 article, that Table 1 that we showed

8    a few minutes ago.  So in that article, Scully uses wage share.

9    That's very clear.  He doesn't do a regression on the wage

10   share.

11        THE COURT:  But isn't it fair to say, Dr. --

12   Professor Manning, that whenever someone's doing a regression

13   analysis in terms of the variable definition, they're not always

14   going to be exactly the same anyway.  So, in other words,

15   arguing that the defined variable is different, wouldn't that

16   actually apply to many regressions because the variables are

17   almost always going to be defined differently and, in fact, what

18   makes an article potentially publishable is coming up with a new

19   variable that has explanatory power?

20        THE WITNESS:  Yes.  No, I mean, I agree with that.  And

21   I think that's why, for example, it's one of the things that

22   Dr. Singer does, is he runs a very wide variety of regressions,

23   coming up with similar results.  And that, to me, adds

24   considerable weight to it.  I mean, if someone just cherry-picks

25   one regression, goes on a fishing expedition, finds the exact

-2:15-cv-01045-RFB-PAL-

1  combination and definition of variables that gives them the

2  result they want, they put that in front of you, that's much

3  less persuasive than if someone does a very wide range of, you

4  know, experimentation, if you like, you know, how we define the

5  foreclosure variables, what foreclosure variable, how we -- what

6  other variables we put in there, what is the sample we look at,

7  all of the kind of things that Dr. Singer says -- does.

8       THE COURT:  And I guess my question is, is that, at

9  least from what has been explained here in sort of how

10  regression analysis works, the relevant issue isn't whether or

11  not you come up with a new variable.  The question is whether or

12  not it's valid and statistically valid and it works out based

13  upon the analysis.  Is that right?

14       THE WITNESS:  Yeah, exactly.  I mean, I think, you

15  know, the foreclosure in this particular case, if we focus in on

16  the foreclosure share, we would expect that's a good measure of

17  the degree of monopsony power.  And the fact that Dr. Singer

18  finds that it does indeed suppress compensation is -- I think,

19  adds weight to supporting his conclusion.

20       THE COURT:  So it may seem to me that some of the

21  fundamental questions about these variables is whether or not,

22  in the first instance -- not in terms of how they're run in the

23  models, but in the first instance whether or not they make

24  sense.  Because it seems to me part of what you all are arguing

25  about --

—2:15-cv-01045-RFB-PAL—

1           THE WITNESS:  Yeah.

2           THE COURT:  -- isn't about the models in terms of how

3  they're run necessarily, but whether or not the choice of the

4  variables and the definition of the variables --

5           THE WITNESS:  Yeah.

6           THE COURT:  -- makes sense in a given industry.

7           THE WITNESS:  Yeah, there is disagreement about that,

8  but I think there's also some disagreement about whether the --

9  the specification makes sense.  So I've said earlier that I

10 think omitting revenue completely from a compensation equation,

11 as Dr. Oyer seemed to propose, that makes no sense.

12          Dr. Topel's approach to including it, I've said that,

13 in some situations, might make sense, but in this situation it

14 doesn't because of the endogeneity bias and the results are very

15 implausible.

16          THE COURT:  But I guess my question is, it seems to me

17 in terms of evaluating the choice of the specification, that

18 doesn't seem to be as much about the models in terms of the

19 outcomes of the results themselves as about whether or not you

20 agree with the underlying assumptions of the specifications to

21 begin with.  So one of your criticisms of Dr. Topel's model is

22 that it essentially just doesn't actually test for what you

23 expected it would test for as it relates to event revenue; that

24 if you move it over to the right side of the equation, that

25 creates a problem because you're making an assumption about its

—2:15-cv-01045-RFB-PAL—

1    potential impact or effect on compensation or wage share that

2    isn't plausible in this industry, right?

3            THE WITNESS:  Yeah.  I mean, I think the -- it's an

4    additional problem.  Dr. Topel's regression is, you know, he

5    doesn't find any effect from the foreclosure share on

6    compensation and, yet, you know, we would expect from that kind

7    of, you know, greater control over the market to have an effect

8    on compensation.

9            THE COURT:  Okay.  Thank you.

10   BY MR. DAVIS:

11   *Q.*  Professor Manning, you've talked about omitted variable bias

12   and endogeneity bias as it applies to the wage level

13   regressions.  I won't revisit all of that.  I do want to just

14   put a fine point on one issue.

15           Is it your opinion that the wage level regression that

16   Dr. Oyer did in his Table 1 where he omitted event revenues as a

17   variable at all is unreliable as a result of omitted variable

18   bias?

19   *A.*  I mean, that is my opinion that leaving revenue out of

20   the -- having -- assuming that revenue has no impact on

21   compensation is both implausible and totally inconsistent with,

22   in particular, those internal documents.  I mean, that's not the

23   only piece of evidence supporting --

24           THE COURT:  Yeah.

25           THE WITNESS:  -- the implausibility of it, but it's

—2:15-cv-01045-RFB-PAL—

1  incredibly -- it speaks very directly to that point.

2  BY MR. DAVIS:

3  Q.  All right.  Let me ask you briefly --

4        THE COURT:  I'm going to give you about five more

5  minutes, Mr. Davis.

6        MR. DAVIS:  I will move quickly.  Thank you,

7  Your Honor.

8  BY MR. DAVIS:

9  Q.  Let me ask you briefly about the poor beleaguered John

10  Howard, who often goes by other names.  Dr. Oyer testified

11  yesterday -- we had a discussion yesterday about what this

12  fighter share compensation meant on the right column.  And I

13  just want to be clear, because I think there was some confusion

14  in the testimony.

15        Now, is that -- that right column, is that a fighter

16  compensation share that is produced by Dr. Singer's regression

17  or is that just the raw data that was used in the regression?

18  A.  I mean, my understanding that that is just the raw data.

19  Q.  And so those percentages, they wouldn't, then, control for

20  any other variables in trying to compare John Howard's

21  compensation measured as wage share in one event as opposed to

22  the other?

23  A.  No.  I mean, using a regression to attempt to isolate the

24  effect of one variable while controlling for others is really

25  important.  And simply looking at the raw data doesn't really --

—2:15-cv-01045-RFB-PAL—

1  you know, that isn't an appropriate method.

2  *Q.*  So is there any meaningful inferences that can be drawn from

3  an example like that?

4  **A.**  I don't think so.

5  *Q.*  Okay.

6         And that -- the first slide I showed was slide 15 from

7  the direct examination of Dr. Oyer.  And this slide is slide 9

8  from the direct examination of Dr. Oyer.  And this is -- this

9  has the discussion of win flag and other variables.  And there

10  was a discussion yesterday about multicollinearity and whether

11  multicollinearity can explain why the coefficient next to some

12  of these variables, like win flag, wouldn't -- wouldn't be what

13  one would necessarily expect.

14         What is your view on whether multicollinearity provides

15  an adequate explanation of these coefficients?

16  **A.**  I mean, my view is that multicollinearity does provide an

17  explanation.  And in some of his reports Dr. Singer has, you

18  know, addressed that particular point.

19  *Q.*  Okay.  And when you say in his reports he's addressed that

20  particular point, do any come to mind, please?

21         THE COURT:  He testified about it.  He testified about

22  this very issue, right?

23         MR. DAVIS:  Okay.

24         THE COURT:  And he was crossed about it, and he talked

25  about how one particular win or loss may not be as significant

────2:15-cv-01045-RFB-PAL────

1  in the context of the person's overall record and their

2  reputation.  He controlled for that, which is, I think, the

3  response that plaintiffs have given, and I don't necessarily

4  need Professor Manning to tell me that.  That's what -- that is

5  what it means in terms of the multicollinearity, that there are

6  other aspects to it.  So you can move on from there.

7        MR. DAVIS:  Fair enough.  Let me just ask one question

8  that was not addressed directly.  It's relatively narrow on

9  this.

10 BY MR. DAVIS:

11 *Q.*  Does it matter that most fighter contracts increase

12 compensation automatically for wins in regard to this

13 multicollinearity response?

14 **A.**  No, it does not.  Because in a regression you're controlling

15 for a lot of other factors, for example, you know, how they

16 performed during the fight.  Whereas, the contract, you know, is

17 just about whether you've got a win.  So Dr. Singer shows that

18 if you just have the win flag in there, you get something that

19 is lined with the contractual form -- form of the contract.

20 *Q.*  Okay.  Talking about the sports literature, Dr. Oyer sort of

21 rejected entirely -- hadn't been aware of it, but rejected it

22 entirely.  But Dr. Topel took a somewhat different approach.

23 And he says that -- and I want to try to get this right, that

24 literature is fine and use of wage share is fine if we're

25 looking -- or measuring the effect of a known change in

1  monopsony power, but not if we're using wage share to assess the

2  existence of monopsony power.

3          Does that distinction make any sense?

4          MR. ISAACSON:  We object to using this witness to

5  respond to Dr. Topel and his reports.

6          THE COURT:  I think this -- sustained.

7          If you just want to ask a question, just ask the

8  question rather than sort of summarizing the testimony.

9          MR. DAVIS:  Thank you.  Strike that question.

10  BY MR. DAVIS:

11  Q.  Would it be fair to say that the sports literature using

12  wage share -- that extensive sports literature using wage share

13  is limited to assessing the effects of known changes of

14  monopsony power -- in monopsony power on compensation and can't

15  be used to assess the existence of monopsony power and its

16  effect on compensation?

17          THE COURT:  Hold on a second, Professor.

18          MR. ISAACSON:  We object that this was not disclosed.

19  And while he's removed Dr. Topel's name from the question, it's

20  the same question.

21          THE COURT:  Well, and again, Mr. Isaacson, my

22  argument -- my response is the same, which is that

23  Professor Oyer made some very broad statements yesterday about

24  the sports literature, just saying you can never use this, this

25  would never be appropriate.  And I think he definitely opened

2:15-cv-01045-RFB-PAL

 1  the door to these types of comments.  So I'm going to allow

 2  them, and I'm going to overrule the objection.

 3          MR. ISAACSON:  I'll just say for the record,

 4  Professor Oyer and Dr. Topel -- Professor Topel, this was a

 5  rebuttal witness.  He had the chance to respond to their sports

 6  points in his rebuttal report and chose not to.

 7          THE COURT:  I appreciate it, but we're having an

 8  evidentiary hearing and I'm going to ask you all about what the

 9  nature of it is.  But part of this is -- Mr. Isaacson, I

10  appreciate your point.  Part of this is, this is a somewhat new

11  aspect procedurally because of this rigorous analysis that has

12  been suggested by the Court and which you also -- and defendants

13  have encouraged.  And so I have tried to keep the testimony

14  close to the reports.  But there have been some fairly broad

15  statements made by the experts, so I think it's fair to allow

16  both sides to be able to address.  And since it's the

17  plaintiffs' burden, I'm going to let them be able to have the

18  last word on that.

19          Go ahead, Mr. Davis.

20  MR. DAVIS:

21  Q.  Right.  So the question was, and that's -- there's an

22  extensive sport literature that uses wage share to assess the

23  effect of monopsony power on professional athlete compensation.

24  And one potential characterization is that that literature is

25  used only to assess the effects of a known change in monopsony

─2:15-cv-01045-RFB-PAL─

1    power, but not to assess the existence of monopsony power.

2           Is that a coherent distinction, to your mind?

3    **A.**  No, I don't think it is.  I mean, I don't think it's an

4    accurate description of the sports literature.  So, for example,

5    if one takes getting rid of the reserve clause, there were lots

6    of people at the time, I think this is in Dr. Zimbalist's

7    report, who actually argued that was procompetitive.  He

8    disputed that that has -- had got anything to do with

9    monopsony -- monopsony power.

10          And so until you actually look at the data and look at

11   the effects on the wage share, you know, you wouldn't know that

12   that is actually was -- was reducing monopsony power in that

13   market.

14          THE COURT:  And Dr. -- or Professor Manning, in your

15   opinion, it seems to me one of the challenges in looking at

16   monopsony power is it's difficult to perfectly capture its

17   effect on the wage unless you have two identical markets where

18   one has monopsony power and one doesn't, and you have

19   essentially identical workers with identical characteristics.

20   Is it fair to say that that almost never occurs to the extent

21   that you're always on some levels going to be trying to estimate

22   how the monopsony power's exercised in terms of the degree it

23   would suppress the competitive wage because you're not going to

24   have that ideal comparison?

25          THE WITNESS:  Yeah.  I mean, you're never going to have

1  that ideal comparison.  I mean, it's not just about assessing

2  monopsony power.  If you want to assess the impact of any

3  Government policy --

4          THE COURT:  Right.

5          THE WITNESS:  -- or anything, you're almost always

6  faced with a similar issue.

7          THE COURT:  So in terms of econometrics, it's not

8  uncommon to try to be estimating or using sort of comparables

9  that are not exactly comparable to capture certain effects

10  because you're not going to have these ideal comparable markets.

11          THE WITNESS:  Yeah, exactly.  You're trying to do the

12  best -- the best you can to build a plausible -- you know,

13  strong case -- a stronger case as you can.

14          THE COURT:  Okay.  Thank you.

15          Go ahead, Mr. Davis.

16  BY MR. DAVIS:

17  Q.  Just two last questions about use of language.  You used the

18  terms "reasonable" and "plausible" on the stand --

19          THE COURT:  Mr. Davis, we don't need to go over this.

20          MR. DAVIS:  I don't need -- okay.

21  BY MR. DAVIS:

22  Q.  And, then, are you finding or assuming proportionality?

23  A.  Well, I'm saying that there's a lot of evidence to support

24  proportionality.  I mean, that comes from -- I mean, I've listed

25  it, I think, numerous times.  I mean, I can list it again.  I

1  think it explains the internal documents.  It explains the

2  comparisons of sports, the increases in revenues over time

3  within sports, from the sort of hypothetical sport --

4  hypothetical thought experiment, from the use in sports

5  economics, Dr. Blair's testimony, the fact that Dr. Singer's

6  regressions produce very sensible -- sensible results.  So I

7  think really there's an abundance of evidence supporting that.

8           THE COURT:  Thank you.

9           Thank you, Professor Manning.  You may step down.

10          THE WITNESS:  Thank you.

11          MR. DAVIS:  Thank you, Your Honor.

12          Thank you, Professor Manning.

13          THE COURT:  All right.  Are we ready to go into our

14 final arguments here, Mr. Davis?

15          MR. DAVIS:  Yes.  If I could just have a moment to

16 exchange my documents.

17          THE COURT:  Take a moment.  Sure.

18          Mr. Isaacson, do you need more time -- are you going to

19 be doing it, Mr. Isaacson?

20          MR. ISAACSON:  Yes, Your Honor.  And I think I have a

21 little time because they go first, so ...

22          THE COURT:  Okay.  If you need a few minutes, just let

23 me know.

24          MR. ISAACSON:  Okay.

25          THE COURT:  How much time are you taking for this first

1  portion of your presentation?  How much time are you taking for

2  rebuttal?

3          MR. DAVIS:  So am I correct that I have an hour

4  overall?

5          THE COURT:  You do.

6          MR. DAVIS:  I would like to take 30 minutes for each,

7  if that's appropriate.

8          THE COURT:  Okay.  That's fine.

9          MR. DAVIS:  Okay.

10          So, Your Honor, there are a couple of things going on,

11  and I want to just try to frame them a little bit and then get

12  more into the meat of the arguments.  I do -- I think the

13  framing is important because the plaintiffs' antitrust case

14  really broad-brush has three separate parts, and there's a

15  somewhat different standard at class certification as relates to

16  each of the -- of those parts.  It's actually I think a pretty

17  significant difference.  So I want to walk through that and then

18  situate some of the arguments within that framework.

19          And those three parts are, first of all, to establish

20  liability plaintiffs have to establish that there was an

21  antitrust violation.  It's part of the liability case.  And

22  that, among other sources of evidence, plaintiffs rely on

23  Drs. Singer, Zimbalist, and Manning.

24          The second part relates to common impact, and that is

25  also part of the liability case.  There has to be impact or fact

—2:15-cv-01045-RFB-PAL—

1  of damage in order for there to be liability.  And, there,

2  importantly we rely -- plaintiffs rely on Dr. Singer's expert

3  analysis and to some extent Dr. Manning in terms of shoring up

4  the reliance on wage share primarily and critiquing a tax based

5  on wage level, but not on Dr. Zimbalist.  And that's going to

6  matter a great deal because of the different class

7  certifications -- the different standards of class certification

8  that applies to these different pieces.

9       And then the final piece is damages.  That's post

10  liability.  Once you have an antitrust violation in fact of

11  damage, you have -- you have to calculate damages.  And

12  antitrust case law is well established that one can do so on an

13  aggregate basis.  And there -- and I'll come back to this in a

14  minute -- the standard is particularly forgiving.  The notion

15  being, and this dates back at least to the Supreme Court's

16  Eastman Kodak decision of 1927, that once we've established

17  liability, we have a known violator of the antitrust laws; and

18  any uncertainty that results is the fault of that defendant;

19  and, therefore, anything that's better than a guess and a

20  reasonable estimate suffices.  And the standard has in the

21  90-plus years not been upset.  In fact, in Comcast in 2013 the

22  Supreme Court reaffirmed that an estimate suffices for damages.

23       So, and that is where Dr. Singer -- he figures as well,

24  but Dr. Zimbalist reappears; but not in the common impact stage,

25  which matters a great deal in the battle over the yardsticks.

1   And I say that in part because there are a couple of -- there's

2   some themes that have come out of this hearing, I think.   I

3   think the hearing has been tremendously distilling and

4   productive.

5          And one is that you can't beat nothing -- you can't

6   beat something with nothing.  And when it comes to damages,

7   that's Supreme Court law.  There's tremendous skepticism baked

8   into the damages stage that you can't beat something with

9   nothing unless you're really desperate.  And so -- and that's

10  important.

11         So let's go back to the very first step, and I want to

12  have -- in part, because it addresses the question or the issue

13  that I understood Your Honor to have raised about the role of

14  monopoly power in this analysis because that's where monopoly

15  power figures, and it's the only place that monopoly power

16  figures in the analysis.

17         So the first question is is there an antitrust

18  violation.  And from a class certification standard, what's

19  interesting here is I think, in part, because the expert reports

20  addressed both class certification and the merits at the same

21  time.  Almost -- the vast majority of Zuffa's critiques of

22  plaintiffs' evidence has pertained to the antitrust violation.

23  And Courts say over and over again that is by its nature an

24  issue that is common to the class.

25             It's not actually a class certification issue.  It's

—2:15-cv-01045-RFB-PAL—

1  common to the class, and if it's common, that tends to mean that

2  common issues predominate.  And, therefore, class certification

3  tends to be appropriate.  Now, we're happy to engage in these

4  debates, but it's -- the debates are very oddly situated in that

5  sense for a class certification hearing.

6      THE COURT:  So, in other words, are you saying that in

7  other -- if it's accepted that these contracts existed commonly

8  throughout the class, whether or not they had an anticompetitive

9  or procompetitive effect is not for me to decide at this point?

10      MR. DAVIS:  That's right.  At this point -- and the

11  Courts -- you know, High Tech -- Court after Court says this.

12  And the citation is, look, when we're talking about the

13  existence of a violation, there may be anticompetitive effects,

14  there may be procompetitive effects, there may be debates about

15  those things.  That is a market-wide analysis.  That is a rise

16  or fall as a class as a whole.

17      In Amgen the Supreme Court say, hey, materiality is an

18  issue -- this is a securities litigation context -- but because

19  materiality is an issue that all class members will win or lose

20  on at the same time, we -- the trial court should not address

21  whether, in fact, a misrepresentation was material.  Don't

22  address it because it necessarily is an issue on which the class

23  members rise or fall together.

24      THE COURT:  There has to be some level -- I mean, I

25  don't want to use the word "plausibility" because we've been

 1  using it back and forth.

 2          MR. DAVIS:  Right.

 3          THE COURT:  But I do think at this point at this stage,

 4  Mr. Davis, I do have to assess to what extent the assertions of

 5  the, sort of, anticompetitive effect are appropriate and

 6  reasonable.  And there are a lot of cases that talk about not

 7  deciding merits, but at least peeking at them slightly to figure

 8  out whether or not the arguments led the class sort of past some

 9  threshold.

10          Now, what's --

11          MR. DAVIS:  Those --

12          THE COURT:  -- unclear is exactly what -- what that

13  threshold exactly is, but from what I see of the literature, it

14  seems to me that it has to be something -- this isn't quite the

15  sort of reasonable jury analysis exactly, but it has to be

16  something that I would find, if proven, would essentially

17  establish, you know, an antitrust claim.  And that, to me, is --

18          MR. DAVIS:  Right.

19          THE COURT:  And that has to be plausible enough for it

20  to be proven.  I don't know that the standard has to be more

21  than that.  So if you want to comment a little bit on that, you

22  can because --

23          MR. DAVIS:  I do, yes.

24          THE COURT:  -- we've actually in this hearing gone

25  fairly deep into the merits of the actual modelling, which I'm

─2:15-cv-01045-RFB-PAL─

1  not even sure is relevant.  And I'll ask Mr. Isaacson the same

2  question.

3          MR. DAVIS:  Yes.

4          THE COURT:  But that's why I had asked these questions

5  about were the models run incorrectly.

6          MR. DAVIS:  Sure.  Absolutely.

7          THE COURT:  I mean, we can argue about how a variable

8  is defined in a regression.  It's not clear to me that the

9  definition or specificity of a variable in a regression is at

10  the class certification stage a basis for me to knock out a

11  class if, all other things being equal, the variable would apply

12  to all of the class members if you're arguing about whether or

13  not that's appropriately specified.

14          And, Mr. Isaacson, I'm going to ask you that same

15  question because I think that's something for me to decide here

16  as a threshold matter.

17          Because I don't know the law is as clear as it could be

18  in understanding what this rigorous analysis means in the

19  context, Mr. Davis, of that.  I have allowed this to go into

20  that level of detail, in part, so that if there has to be some

21  record one way or the other either to deny the motion or the

22  grant the motion, the Court can address all of that --

23          MR. DAVIS:  Yes.

24          THE COURT:  -- in the context of whatever opinion it

25  writes.

—2:15-cv-01045-RFB-PAL—

1          And so -- but I do want you to comment a little bit on

2    that.  And, Mr. Isaacson, again, I'm going to ask you the same

3    question which is, now that we've had some information here

4    about it, which of these criticisms actually are criticisms

5    going to class certification and which are the criticisms going

6    to the merits which should not be criticisms of the models that

7    I should address in the first instance on the motion to certify

8    the class?

9          MR. DAVIS:  That's very helpful, Your Honor.  Thank

10   you, and let me say a few things in response.

11          First of all, on the plausibility test, we have two

12   positions.  One, we are unconcerned about meeting the

13   plausibility standard on the existence of an antitrust

14   violation.  You have put us through our paces.  You know, you

15   said in anticipation of this that we would -- at least for

16   purposes of the hearing we would be put potentially to a higher

17   standard -- the higher end of the standard.  And I think the

18   query has been rigorous, well-informed, and searching, and we

19   are grateful for the opportunity to be able to put forward our

20   case.

21          Having said that, I do think it's important to

22   distinguish, when it comes to the antitrust violation, the

23   existence of the antitrust violation, that is not where the

24   plausibility language appears.  That's not where the significant

25   proof language appears.  That is what Courts have generally said

 1   is on the existence of the antitrust violation Rule 23 does not

 2   require any -- that kind of inquiry at all.  Again, we feel very

 3   comfortable so --

 4           THE COURT:  It requires what kind of inquiry from your

 5   perspective?

 6           MR. DAVIS:  Recognition that these issues are common to

 7   the class.  And Supreme Court's opinion in Amgen is a perfect

 8   example.  The Court did not say plaintiffs have to show

 9   materiality is plausible.  The Court said that is a common

10   issue.  The class members' claims will rise or fall together

11   and, therefore, that need not be resolved at all at class

12   certification.  We are just choosing a mechanism, a procedural

13   mechanism, for how to resolve this case.  This is not summary

14   judgment.

15           And, so, I think there's not even a plausibility

16   standard in that context.  And I mention that in part because a

17   couple of things I want to just situate there, and then I want

18   to get to the meat of common impact, which is where plausibility

19   absolutely does arise.

20           But a couple of things fit there that I think that

21   Zuffa has made arguments that are in the wrong bucket.  And one

22   of them is about coercion, and at times Zuffa has said, oh, this

23   is an individualized issue so it causes problems for class

24   certification.  And it doesn't, and the real reason it doesn't

25   is coercion is only relevant to the extent, from the plaintiffs'

1  case, that it speaks to the existence of an antitrust violation

2  and contributes to the overall foreclosure share, which is by

3  its nature a class-wide inquiry.

4       There isn't foreclosure share that varies by class

5  member.  There's one foreclosure share.  Zuffa has it.  It's

6  taken a wrong path on that as well.

7       So that by its nature is a common issue, so is this

8  issue of monopoly power.  Now, one of the issues that the Court

9  wanted if I understood correctly, and I apologize if I'm not

10 correct, is what's the relationship between monopsony power,

11 monopoly power, and the theory of the plaintiffs' case.  So I

12 want to try to -- we've tried to address that in the briefing,

13 but I do want to speak --

14       THE COURT:  Because you could have a completely

15 separate antitrust claim based just on the monopoly -- exercise

16 of monopoly power, which I wasn't clear about from the beginning

17 of your pleadings, but I don't think that's in theory at this

18 point.  What I understand the theory to be is the monopoly --

19 the monopoly power influences the exercise of monopsony power.

20 So I need to consider, sort of, the market share position of

21 Zuffa as it relates to this output market, but only in the

22 context of the exercise of monopsony power as it relates to the

23 antitrust violation.

24       MR. DAVIS:  And I would even scale that back one step.

25 We would say our claim is based on monopsony power.  All we need

─2:15-cv-01045-RFB-PAL─

1   to show is monopsony power.  The Ninth Circuit's recent decision

2   in O'Bannon, which we cite in our briefs, says you just need

3   monopsony power.  You don't also need monopoly power.

4           THE COURT:  No, I think that's true.

5           MR. DAVIS:  Right.  And so -- so that's true, right.

6   And I didn't think we were disagreeing here.

7           And, however, it is also true that in this market Zuffa

8   has not only monopsony power, but monopoly power.  Those two are

9   closely related.  They aren't in every market, but they happen

10  to be in this market.

11          And in terms of noting the anticompetitive effects of

12  Zuffa's behavior and, therefore, whether it violates the

13  antitrust law, we have this additional argument that's not

14  necessary, but we have this evidence showing that, in fact, if

15  you look at the market as a whole, output went down, for

16  example.  There's other evidence, but that's a good example.

17          And that is, an output market is direct evidence of

18  monopoly power.  And it has a relevant anticompetitive effect,

19  and it certainly is at least a response to potential

20  procompetitive effects that are, first of all, not necessary,

21  but relevant.  And so we'd want to put on that evidence, and

22  that's where monopoly power fits in.

23          And then, second, it's only in this violation stage.

24  So it is automatically common to the entire class; either that,

25  along with other considerations, causes the judge at summary

───2:15-cv-01045-RFB-PAL───

1  judgment or the jury at trial to say, yes, there's an

2  anticompetitive violation or not.  And then all class members

3  win on lose on that issue together.  And that's the role it

4  plays.

5        We're seeking no damages based on monopoly.  We're

6  arguing for no impact based on monopoly.  It has nothing to do

7  with that.  It's cabin.  It's relevant.  It's not necessary,

8  it's limited, and it only is related to the violation.

9        THE COURT:  Okay.

10        MR. DAVIS:  Then we get to the common impact analysis.

11        THE COURT:  Well, and here's what I will tell you,

12  Mr. Davis.  I just can't see -- well, I can't say that.  It's

13  highly unlikely that I would certify the identity class in this

14  case.  I think I've been pretty clear about foreshadowing that.

15        MR. DAVIS:  You have.

16        THE COURT:  That's why I asked these questions.  I'm

17  saying that to you because I would not really spend any time, if

18  were you, of your precious time arguing the identity class to

19  me.

20        MR. DAVIS:  I will spend -- the entirety of my argument

21  today on that issue has concluded with this sentence.  Let's

22  talk about the bout class then.

23        THE COURT:  Okay.

24        MR. DAVIS:  So limited to the bout class, what's -- so,

25  ordinarily, in an antitrust case -- and, you know, a lot of the

────2:15-cv-01045-RFB-PAL────

1  lawyers here, we have this niche practice.  My full-time job is

2  a professor.  I just study private antitrust cases.  We focus on

3  this obsessively, and nobody else really cares or knows -- tends

4  to know that much about it.

5       But it is true that in antitrust class actions

6  overwhelmingly in the vast majority of cases whether to certify

7  a class turns on the predominance issue, not always, but almost

8  always and in particular on this concept of common impact, and

9  in this way specifically.  When plaintiffs provide appropriate

10 evidence of common impact, it is almost impossible to find a

11 case that doesn't certify -- a Court that doesn't certify that

12 class in an antitrust case.

13      So what is common impact?  Common impact means that

14 plaintiffs are able to use common evidence to provide a

15 plausible method or significant proof of widespread impact

16 across the class members.

17      Now, I want to talk briefly -- so one of the questions

18 is, well, what does that inquiry involve, right.  How far does

19 the Court have to go on that?  And a couple of things I do want

20 to say.  So, one is that the Courts are really consistent

21 about -- they don't always use exactly the same language.  We

22 cited cases.  Many say plausible, some realistic, some adequate.

23      Opposing counsel often has been citing to Ellis and

24 Dukes, which are actually commonality cases, not predominance

25 cases, but actually the language they use, they reject the

2:15-cv-01045-RFB-PAL

1    position that opposing counsel has asserted.  I've been chomping

2    at the bit for months to get to talk about Ellis and Dukes

3    because what they actually say is significant proof.  Quoting --

4    Ellis quoting Dukes says on page 983 of that Ninth Circuit

5    opinion:  All we need is significant proof.

6         Ellis did not say that the Court should choose between

7    experts.  In fact, in footnote 8 on page 193, what Ellis said in

8    that very opinion was:  Here's why we don't have to choose

9    between the experts.

10        What had happened in that case, it was a gender

11   discrimination case against Costco, very closely parallel in

12   some ways to the Wal-Mart case that was Dukes in the Ninth

13   Circuit, is in the Dukes case plaintiffs had done only one step

14   of a two -- of the two-step analysis we did here, right.  So our

15   two-step analysis establishing common impact is we have this

16   multivariate regression analysis that shows that compensation

17   went down generally.

18        That is an aggregate approach, but then you need a

19   second step.  Going down generally is not enough for common

20   impact.  How do you know it's widespread?  And so we used two

21   techniques.  Dr. Singer did -- called it by different names, but

22   an individual prediction where he broke down class member by

23   class member, taking into account all of those variables.  You

24   remember opposing counsel tried to attack Dr. Singer.  It became

25   clear he didn't really understand how the -- exactly that

—2:15-cv-01045-RFB-PAL—

1   regression worked.

2          But it ends up on an individual-by-individual

3   bout-by-bout basis assessing common impact.  And Dr. Singer, as

4   he is want to do, ran this a whole bunch of different ways just

5   to make sure no matter what you criticize it works.  And he

6   always came up with about 98, 99 percent of the class were

7   impacted.

8          Okay.  So that's one form that that second stage can

9   play.  The other one is impact plus the pay structure.  And that

10  is, hey, if fighter -- or if the relevant worker's compensation

11  moves largely together, not in a rigid way, but largely

12  together, then if you see a shock to the system like general

13  pace of suppression, that's going to be widespread across the

14  class.

15         And that's exactly what Dr. Singer showed through a

16  common factors regression and a sharing analysis.  I can talk

17  more about that if the Court's interested, but here's the key

18  point.  In both Dukes and Ellis, that second stage, it was not

19  clear it had been done at all.  In Dukes, it was pretty clear it

20  hadn't been done.  And so the Supreme Court said, okay, you may

21  have shown this sort of -- this systemic-level gender

22  discrimination, but you haven't shown if it applied to .5 --

23  this is the language of the Supreme Court paraphrased slightly

24  because my memory is not that good.  But you haven't shown

25  whether that affected .5 percent of the decisions at issue or 95

1   percent of the decisions at issue.  They didn't have the step

2   two, and the Court just said you got to have step two or we

3   don't know this is really common.  That's exactly what

4   Dr. Singer did.

5          But all you need is significant proof.  We're not

6   deciding common impact now.  We're deciding whether you have

7   significant proof, which I would say is -- you know, if I'm in

8   law professor mode, I've had a nice conversation --

9          (Court reporter interruption.)

10          MR. DAVIS:  I would have a nice conversation about the

11   potential differences between plausibility and significant

12   proof, but I think as a practical matter, they are essentially

13   the same.  And so Ellis is perfectly in line and Dukes is in

14   line with the framework that we are putting forward.

15          There was another issue in Ellis as well, which is not

16   only had the trial court not -- it indicated at times that it

17   wasn't going to look at the evidence at all.  And the Ninth

18   Circuit said, oh, no, that's not right on common impact.  On

19   common impact you do actually have to look at the evidence for

20   significant proof.

21          But the defendants in addition had come forward and

22   said, you know, we think this is all wrong, but if you're right

23   at all, there are only two of eight regions, so roughly speaking

24   25 percent of the class, that's impacted.  And that's too low

25   for widespread impact.

—2:15-cv-01045-RFB-PAL—

1          Zuffa at times has conceded 94 percent is sufficient

2     for common impact.  That's fair enough.  We're at 98, 99

3     percent.  For this case that's all academic.

4          And what's crucial is that is precisely the showing

5     that Zuffa has not made here.  Zuffa's arguments would take us

6     to 0 percent impact or they would leave us essentially at 98, 99

7     percent impact.  There's one brand new argument they made in the

8     brief they filed just last night that they made for the very

9     first time, which I'm happy to address, but that's the first

10    time when they tried to get that number down.

11         And so -- and that -- what's really bizarre about that

12    is they -- and there's a whole class cert brief.  They have two

13    paragraphs, this latest brief, on common impact, and that's

14    where all of the action is.  And I can give you case after case

15    where there is common impact measuring these wages and they all

16    certify the class.  Give you half a dozen that use it -- off the

17    top of my head that uses Dr. Singer's first methodology; another

18    few that use his second methodology; is actually in our brief

19    many more; but that's where the action ordinarily is.

20         And so whether it's the plausibility standard or the

21    significant proof standard, we feel like we more than satisfy

22    that.  And this, Your Honor, you have said multiple times, and I

23    think, here, I'm just I think singing to the choirs.  You don't

24    need to choose between the experts.  The issue is not -- we

25    think wage share is right, and wage level as done by defendants

2:15-cv-01045-RFB-PAL

1    is a mess.  They'd either have endogeneity bias or they have

2    omitted variable bias when they use wage level.  They've shown

3    no comparable issue with wage share.  We would say we clearly

4    win.  Again, they're trying to beat something with nothing.

5           Putting that aside, the real inquiry is is wage share

6    in our approach plausible.  If it is, it is clearly common to

7    the class, other than the couple of arguments that Zuffa made;

8    neither of which is persuasive.  And, therefore, there's common

9    impact, and the class should be certified.

10          Now, one issue which I think may not be live.  I'm not

11   sure if it is live.  Zuffa has vacillated throughout this

12   litigation about essentially adopting plaintiffs' standards or

13   this other standard.  No, plaintiffs have to prove common impact

14   at the class certification stage, even though Court after Court

15   says, no, that's not right.

16          In their standard briefs, they have articulated it both

17   ways.  Sometimes they said capable of and sometimes they've

18   said, no, no, you have to prove it.  In their hearsay brief,

19   their hearsay reply brief, they actually seemed to just fully

20   endorse the plaintiffs' position.  They specifically said, hey,

21   don't worry -- don't admit any evidence.  We don't need to

22   address this hearsay issue and actually admit evidence because,

23   and they quoted this Howell decision from the Southern District

24   of California which adopts the standard plaintiffs have been

25   advocating throughout.  And they said, look, the Court makes no

—2:15-cv-01045-RFB-PAL—

1  findings of fact and announces no ultimate conclusions on

2  plaintiffs' claim at the class certification stage.

3          THE COURT:  But let me ask you about that.

4          MR. DAVIS:  Yeah.

5          THE COURT:  Because it seems to me that one of the

6  things you all both are asking me to do -- well, you're not -- I

7  think you're asking me to do it in plaintiffs' favor if I have

8  to do it, but not that I'm required to do it, is make certain

9  findings of fact; but, also, make certain credibility

10 determinations based upon the experts' testimony.

11         And, Mr. Isaacson, I'm going to ask you this same

12 question, which is, to what extent are these credibility

13 findings in addition to plausibility findings?

14         Because that to me is a significant -- I mean, they're

15 related, but they're not exactly the same.

16         MR. DAVIS:  Right.

17         THE COURT:  And it does seem to me that part of this

18 idea of rigorous analysis implies not necessarily the same type

19 of credibility finding that you would have as a fact finder, but

20 it's sort of -- it does I think sort of shade a little bit into

21 this idea about plausibility or my determination of plausibility

22 or reasonableness based upon my assessment of the experts'

23 testimony.

24         And, obviously, I'm not going into full fact-finder

25 mode because we don't have someone presenting facts here.  What

───2:15-cv-01045-RFB-PAL───

1    we have is the experts presenting essentially a discussion about

2    theories of the case in terms of the modelling, but maybe you

3    can talk just a little bit about that, Mr. Davis.

4           MR. DAVIS:  Absolutely.

5           THE COURT:  Because I think that's a significant thing

6    that I have to decide, which is am I saying I find one witness

7    more credible than the other or am I simply saying, as what

8    plaintiffs are asking me to say, which is Dr. Topel or Professor

9    Oyer have reasonable criticisms that can be raised in front of

10   the jury, but they haven't raised a criticism that reaches to

11   essentially the fundamental plausibility of the -- of the

12   plaintiffs' theory such that at this point I wouldn't certify

13   the class.

14          MR. DAVIS:  Thank you, Your Honor.

15          I would say absolutely the latter.  I think that the

16   law is all clear.  Again, I can quote Zuffa's own brief on

17   hearsay where they said all you need to do is consider materials

18   sufficient to form a reasonable judgment.  And, so, that you

19   just need to form a reasonable judgment, Your Honor.

20          All Your Honor would need to say is, well, this is

21   plausible or there's significant proof.  Plaintiffs have shown

22   that there's a way to go forward which, if believed by a jury,

23   which is plausible or significant proof and, if believed by a

24   jury, would use common evidence to show widespread impact on the

25   class.

—2:15-cv-01045-RFB-PAL—

1        I do not believe -- Your Honor, you mentioned earlier

2   that the Courts have not been perfectly clear about this, and

3   that is true.  I live in the Bay -- San Francisco Bay area, and

4   I've done these events with judges.  And as we talk about it,

5   there's this -- on issues that we get this granular, do I

6   have -- can I take into account the credibility of the witness?

7   There isn't as clear law as we would like.

8        The notion of having hearings at class certification is

9   relatively new.  This process over the last 20 years has gotten

10  more and more rigid.  It used to be 20 years ago plaintiffs

11  could just say, hey, I can do a regression.  I didn't, but I can

12  do a regression.  There's a thing called a regression.  And the

13  Courts say, oh, a regression.  That's fancy.  Class certified.

14        THE COURT:  Right.

15        MR. DAVIS:  There's this progression that unfortunately

16  has become ever more expensive and ever more protracted, but now

17  that we have these hearings, what I would say is you are

18  certainly -- if we're going to have live hearings with

19  witnesses, you are in no way prohibited from making assessments

20  of the credibility of the witnesses, all toward the limited kind

21  of determination, which is not a true finding of fact, that

22  plaintiffs have put forward a plausible methodology or a

23  significant proof or not.

24        If plaintiffs cross that threshold based on

25  credibility, internal documents, and High Tech cold call, Judge

—2:15-cv-01045-RFB-PAL—

1   Koppe was very moved by the fact, which is true here as well,

2   that plaintiffs' theory matches all of the internal documents

3   and defendant's theory disavowed all of the internal documents.

4   And she said, I'm not having that.  You know, you're saying no

5   wage share, but the documents show that Zuffa and WME used wage

6   share.  Their experts used wage share.  You know what, we've got

7   wage share here as plausible.

8         That's the kind of determination that needs to be made,

9   and it absolutely can be made, in part, on the credibility of

10  the witnesses, would be my submission.

11        I don't think there's any very crisp, clear governing

12  law except that I've never seen a case say if you have a hearing

13  with live witnesses somehow the Court can't take into account

14  credibility.  It can.  That's -- that is -- there's no reason to

15  think there's an exception for that.  It's just that the

16  standard is significantly different than if, say, this were a

17  bench trial.

18        THE COURT:  Well, no, I think that's true.  I think it

19  comes up, credibility, in part because you have competing

20  models.

21        MR. DAVIS:  Yes.

22        THE COURT:  And so that -- that creates at least a

23  question in my mind as to how I resolve that procedurally in

24  terms of the standard.

25        MR. DAVIS:  Right.

1          THE COURT:  And from my perspective -- and again,

2  Mr. Isaacson, I'm going to ask you a similar question, which is

3  I don't know that I need to accept Dr. Topel's model, but I can

4  accept it as a critique of the plaintiffs' theory as it relates

5  to whether or not the theory's plausible, which is to me what

6  would be appropriate.  That you can look at Dr. Topel's model

7  and say, Based upon this it's clear that their approach isn't

8  even plausible because what he developed in terms of his

9  modelling demonstrates the implausibility of Dr. Singer's

10  modelling.  As opposed to, I have two competing models which

11  offer different ways of explaining this.

12          MR. DAVIS:  Yes.

13          THE COURT:  But if the jury's potentially convinced by

14  plaintiffs' approach, then there can be a finding.  That's a --

15  those are two different ways of approaching --

16          MR. DAVIS:  Right.

17          THE COURT:  -- this.

18          MR. DAVIS:  I would concede that if -- that if Dr. --

19  putting aside the fact that Dr. Topel's model is unsalvageable

20  because of the endogeneity bias problem -- and I do think that's

21  relevant, right.  I think that if you're going to be doing that

22  weighing would say, Okay.  Wait a second.  We've got some pretty

23  powerful critiques of that model.

24          But I think, ultimately, the answer is plaintiffs do

25  have to meet that plausibility standard and -- and the Court

—2:15-cv-01045-RFB-PAL—

1   does not need to say I reject the wage level analysis, but the

2   Court does need to say notwithstanding the critiques that the

3   model -- plaintiffs' models are plausible.

4           THE COURT:  Right.

5           MR. DAVIS:  And then I --

6           THE COURT:  So, in other words, the critiques don't

7   render it implausible.

8           MR. DAVIS:  The critiques don't render it implausible.

9   Therefore, they can go forward on the class basis.

10          THE COURT:  Got it.

11          MR. DAVIS:  If they're persuasive, they establish

12  common impact.  That's as far as I need to go on this.

13          And I would -- there was another issue which I believed

14  Your Honor raised I just wanted to make sure I did address.  And

15  that is, you asked, well -- one of the things you've been saying

16  I think absolutely correctly is these critiques, there's

17  something funny about the kind of critique that's going on here.

18  And I think Your Honor is exactly right.

19          In these class certification proceedings, there are

20  often fundamental attacks on the regression.  Is it specified at

21  all properly?  Is it run at all properly?  I think it's cropped

22  up a little bit.  Dr. Singer pointed out that Dr. Topel

23  inadvertently was omitting data, and Dr. Topel never really

24  ended up denying that exactly.  So that would be -- that's a

25  whoops, right.  Oh, I meant to include the data.  I only

—2:15-cv-01045-RFB-PAL—

1   included some of it.  That's a really serious problem.

2         There's been no critique equivalent to that of any of,

3   in my opinion, certainly of Dr. Singer's regression, which is

4   actually all we need since it covers all of the bases.  But the

5   Supreme Court in Bazemore said -- the Supreme Court in Bazemore

6   said that in terms of admissibility, which would be the highest

7   standard that would apply here, right.  Sali in the Ninth

8   Circuit says, no, there's this lower standard of material

9   sufficient to form a reasonable judgment is all that's

10  necessary.

11        But even under the higher admissibility standard, when

12  you're battling over which variables to use, wage level versus

13  wage share, you know, event revenue's in, event revenue's out,

14  have you specified foreclosure share the right way, it seems to

15  make a difference in this endless battle over promotional spend,

16  and all non-Zuffa non-fighter expenditures, that is not to be

17  resolved at this stage.  That's not to be resolved on

18  admissibility.  That is ultimately an issue for a jury to hear

19  these different battles and to take a position on them.

20        The last thing I'll say, and then I'll reserve.

21        THE COURT:  You have about two, three minutes left

22  here.

23        MR. DAVIS:  Perfect.  So let me just say a couple of

24  things, and then I'll reserve the rest of my time for rebuttal.

25        I do want to talk briefly about the damages stage.  So,

1    as I mentioned before, there's this very long line of history

2    that -- of cases dating back over 90 years from Eastman Kodak in

3    1927 through at least Comcast in 2013, and that's just in the

4    Supreme Court.  There's consistent law in the Ninth Circuit as

5    well saying that, when you get to the damages stage, it is

6    particularly inappropriate to say the defendant gets to beat

7    something with nothing, to just shoot down the models and say,

8    no, I want a perfect world, I want a perfect world, I want a

9    perfect world.

10          And we have -- plaintiffs have offered multiple ways of

11   calculating damages.  They -- the primary one is Dr. Singer's

12   regression or I should say these multiple regressions which work

13   with all sorts of variables.  And there's a range, but they work

14   and we could go forward on any of them.

15          And then there's Dr. Singer's yardsticks, Bellator and

16   Strikeforce, which are largely confirming.  Bellator's a little

17   bit below 50 percent.  Strikeforce, a little above 60 percent in

18   terms of wage share.  There's Dr. Zimbalist, the major U.S.

19   sports and boxing.  That's all plus 50 percent.

20          But, you know, this battle over the standard at -- in

21   economics for a yardstick is in some ways misplaced because what

22   governs is the legal standard.  And the legal standard is really

23   clear in the line of cases that I just mentioned from the

24   Supreme Court.  I mean, there is -- this case is replete with

25   issues of what's economics, what's law, and how do we marry the

———2:15-cv-01045-RFB-PAL———

1   two of them.

2           But the law is very clear that if it's not a guess, if

3   it's some kind of reasonable -- reasonable estimate to try to

4   make sense of the damage the defendants have done once we've

5   concluded that there's a violation, and by the time we get to

6   damages that's what we've concluded, then we are going to have a

7   very forgiving standard.  Because the uncertainty in antitrust

8   we know was created by the defendant's own wrongdoing.  This is

9   forcing the plaintiffs to create a but-for world, and we are

10  very reluctant to say that the -- an antitrust violator can

11  retain its ill-gotten gains because of the uncertainty that it

12  has created.

13          And the language is really much more flowery than I

14  said and much more beautiful.  It's partly because these are old

15  cases, but they're very clear, right.  They use all sorts of

16  fancy terms for saying bad guy.  And they say bad guys don't at

17  the damages stage -- now you've shown that they're a bad guy,

18  bad guys don't get to keep the money unless there's a really,

19  really serious problem.  None of which comes close to the kinds

20  of critiques that have been levelled against Dr. Zimbalist or

21  Dr. Singer.

22          So, with that, I'm going to reserve my time for

23  rebuttal.

24          THE COURT:  Thank you, Mr. Davis.

25          MR. DAVIS:  Thank you, Your Honor.

─2:15-cv-01045-RFB-PAL─

1        MR. ISAACSON:  To assist me, Your Honor, we've put

2   things I'll be saying onto slides.

3        THE COURT:  Sure.

4        MR. ISAACSON:  They'll be on the screen, but I'd like

5   to hand up copies as well.

6        THE COURT:  Okay.

7        So I would, Mr. Isaacson, like for you to start with

8   this discussion of the standards so I can at least --

9        MR. ISAACSON:  Sure.

10       THE COURT:  -- be clear about what your position is.

11  If you want to also just get some water, because I know you're

12  going to be up here a little bit longer, you can do that if

13  you'd like.  It's up to you.  I'm not saying you have to, but

14  you can certainly bring it up.

15       And talk to me a little bit about the different

16  standards, but also talk to me again about this issue regarding

17  findings that I would or wouldn't make at this stage, what that

18  looks like from your perspective, and -- and how the Court

19  should elaborate that in relation to its opinion.

20       MR. ISAACSON:  So, sure, Your Honor.  So at the outset,

21  I would like to correct one thing that was said.  It was said

22  the common impact is part of the liability case.  Common impact

23  is part of the Rule 23 case.

24       When you try a class action case to a jury, there are

25  no common impact jury verdict forms, instructions.  That is a

1  requirement for predominance under Rule 23.  It's entirely up to

2  the Court.  This is not an issue that overlaps with the jury.

3        And when you have an issue that doesn't overlap with

4  the jury, and when you look at Ellis, Ellis says, and I quote,

5  The District Court was to resolve any factual disputes necessary

6  to determine whether there was a common pattern or practice that

7  could affect the class as a whole.

8        Ellis considered two experts, a plaintiff expert and a

9  defense expert.  The District Court certified saying what the

10  plaintiff experts had to say seemed plausible and admissible.

11        And the -- Ellis said:  "Instead of examining the

12  merits to decide this issue, it appears the District Court

13  merely concluded that because plaintiff and Costco's evidence

14  was admissible, a finding of commonality was appropriate."

15        This issue is in your hands.  So you will have to make,

16  however you do this, necessary findings of fact and conclusions

17  of law to resolve -- to decide this issue of commonality on the

18  merits.

19        THE COURT:  So in your definition of commonality --

20  because I think there's also this common impact that gets

21  conflated between these two factors, Mr. Isaacson.  Tell me

22  commonality versus common impact, if you're -- if you're putting

23  them together, because --

24        MR. ISAACSON:  And, you know, I'm using -- I'm using

25  commonality over in the predominance provision.

1          THE COURT:  Okay.

2          MR. ISAACSON:  Okay.  So I am talking about the

3  predominance of commonality.

4          THE COURT:  Okay.

5          MR. ISAACSON:  All right.  And the -- and the -- and

6  one element of that predominance is whether there is common

7  impact.  The cases say if you don't have common impact, then you

8  have individualized -- individualized injury, and then we're

9  having a trial with each class member about whether they were

10  individually injured.

11          That's different from aggregate damages.  Because you

12  can have, for example, all of these comparisons to Strikeforce,

13  Bellator, Major League Baseball, boxing, using as yardsticks

14  don't assess the individualized injury; they do an average.  And

15  that average may be true for the group, but it doesn't tell you

16  that all or virtually all were injured.

17          THE COURT:  Right.

18          MR. ISAACSON:  The only thing that attempts to do that

19  is Dr. Singer's impact regression.

20          The -- and so it's up to you to decide, under -- to

21  resolve those disputes and decide after a rigorous analysis

22  whether you are persuaded by that.  You asked the question,

23  Well, where does Dr. Topel's analysis fit into that?  Where it

24  fits in is, yes, it is a critique.  And that may be sufficient

25  to reject what Dr. Singer is doing.  But it is also in this

2:15-cv-01045-RFB-PAL

1  context where the critique is the standard way of doing this and

2  the way it's always done in a regression, and let me just say, a

3  regression to assess monopsony effects.

4  There's a game that's been played where the -- I asked

5  the witnesses are there any regressions using wage share to

6  assess the effect of monopsony.  And then plaintiffs ask are

7  there any regressions with wage share, leaving out the monopsony

8  part.  Right.

9  The entire history of any case law on this and labor

10 economics where there's a regression, is the dependent variable

11 is the actual wages or the log of compensation.  That is not a

12 disagreement about variables.  That's not like what -- where

13 we're saying, oh, we always disagree about regressions and which

14 variables should we in -- in it.  The dependent variable's the

15 variable of interest.  It's what you are testing.  It is

16 fundamental.

17 If you are not testing something meaningful, then you

18 are not exact -- you are not presenting an antitrust case.  And,

19 frankly, I think that one of the things that we are putting on

20 your plate is, because this has never been done before, this

21 will be a shock to antitrust enforcement to suggest that we are

22 now going to go forward in antitrust cases and that all our --

23 our antitrust authorities, which have been ignoring anything

24 like this, should be looking at not at actual wages of

25 monopsony; they should be looking at wage share, even --

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Well, Mr. Isaacson, why wouldn't I accept

2  potentially the argument that it's unique.  I mean, the argument

3  here wasn't that it would be -- it should be made in all

4  markets.  The argument that was made -- and we're getting

5  somewhat into the merits of the argument, but, I mean, since you

6  started this -- I was going to go to this, which is,

7  Professor Manning offered very explicit reasons why he thought

8  it would be appropriate.  And the other -- and

9  Professor Zimbalist and Dr. Singer did, too, but

10  Professor Manning, I think, spent a fair amount of time,

11  particularly as an individual who has a fair amount of knowledge

12  in this area, explaining why it would be reasonable and why,

13  from my perspective, it doesn't necessarily mean that every

14  antitrust case would follow this.  Because not every antitrust

15  case would have the same circumstances, and so to what extent

16  should I take that into consideration.

17          So you don't have to answer that now, just put that on

18  your list of questions and answers, I'm saying, because I do

19  want to finish this conversation first, though, Mr. Isaacson,

20  about the standards.

21          MR. ISAACSON:  I will say one thing briefly about that

22  without going into the details of Professor Manning, which I

23  will discuss later.  It's not unique.  It's not remotely unique.

24  All right.  A regression to test the effect of a monopsony or,

25  more appropriately, any allegations of illegal conduct by

—2:15-cv-01045-RFB-PAL—

 1  monopsony, okay, using wages is the conventional method for

 2  seeing whether something happened.

 3       That's what happened in High Tech Workers.  In High

 4  Tech Workers, it had revenue in the regression.  It was testing

 5  a situation where -- this won't be a big surprise to you -- High

 6  Tech Workers did -- were experiencing rising wages.  And the

 7  argument was, well, but due to the collusion -- it was a

 8  monopsony collusion case -- that they should have been higher.

 9  Okay.  A regression tests that.  And it tests it here because

10  foreclosure share in Dr. Singer's work was once down at 30

11  percent and lower.

12       So you can test, using actual wages, what the effect of

13  rising foreclosure share -- we don't think foreclosure share is

14  a meaningful concept, but you can test that using a regression

15  on actual wages, which is what Professor Oyer and Topel

16  explained and did.

17       THE COURT:  So you're saying at 30 percent foreclosure

18  share there's still a competitive wage.

19       MR. ISAACSON:  That's what they said.

20       THE COURT:  Well, okay, they -- when you say --

21       MR. ISAACSON:  And you can test -- you could also test

22  it at 0 percent.

23       THE COURT:  I'm sorry.  When you say "they," are you

24  talking about Dr. Singer or are you talking about Dr. Topel?

25       MR. ISAACSON:  Plaintiffs.

———2:15-cv-01045-RFB-PAL———

1        THE COURT:  So you're saying Dr. Singer said that at

2   30 percent that would be -- that would be a competitive wage

3   there such that you could compare the absolute wage at that

4   level to a later wage to determine monopsony power.  Because I

5   don't recall that exactly, but I want to make sure I'm

6   understanding your argument.

7        MR. ISAACSON:  Yeah, he said -- and that's why in his

8   but-for world he has a 30 percent foreclosure share.  And he

9   said -- he points to case law for this.  He's getting the case

10  law wrong.  The case law is about attempt at monopolization, not

11  monopolization.

12        But you don't have to get hung up on the 30 percent

13  number.  You can test it at 20 percent, 10 percent, and 0

14  percent.  You can test the effect of rising foreclosure share.

15  You can see -- and that's what he was doing with -- said he was

16  doing with wage share.  Right.

17        All of his but-for worlds can be tested with actual

18  wages.  And that's what the literature does, and that's what

19  High Tech Workers does.  It's not unique.  Right.  We are saying

20  that the method that plaintiffs in monopsony cases have brought

21  forward, that antitrust agencies would bring forward, that labor

22  economists would bring forward, is this conventional method.

23  And the only explanation we get is that fighters are the

24  product, not a measurable product, but that they are the

25  product.

—2:15-cv-01045-RFB-PAL—

1           As if computer -- as if there aren't stars at Apple,

2      that there aren't designers, that there aren't movie stars.  I

3      mean, you can say in any number of industries that labor --

4      labor has an MRP.

5           THE COURT:  So let me ask you a question about that

6      going a little bit back -- a response in looking at the

7      standard.

8           If I were to find that that critique was credible and

9      find that those witnesses raised a credible argument that this

10     was not an appropriate way to do that, your argument would be

11     that I could make that credibility and factual determination

12     because the plaintiffs' expert said something different, right,

13     and that that would be sufficient to deny a class certification.

14     Is that right?

15          MR. ISAACSON:  I don't consider it a credibility issue.

16          THE COURT:  Well --

17          MR. ISAACSON:  I don't like that --

18          THE COURT:  -- because the plaintiffs' expert didn't --

19     just said something different.  So, Mr. Isaacson, I can't sort

20     of deny what the record is.  They don't agree with that.

21     Professor Manning, you heard his testimony.  He literally just

22     said that it's not inconsistent, that -- I mean, you're not

23     disputing him being an expert.  He wrote a book, a book that

24     people have referenced as relates to monopsony power.  And he

25     talked about how in this case there are -- there were legitimate

─2:15-cv-01045-RFB-PAL─

1   principles and labor analysis that should be taken into

2   consideration.

3           And so I don't know that I can simply say there was no,

4   sort of, opposing view as it relates to that, because I think

5   there was.  And that's why I'm asking you this question, the

6   same question I asked Mr. Davis, which is, we do have some

7   differences of opinion as to whether or not, from a labor

8   economics standpoint, the modelling is appropriate.

9           MR. ISAACSON:  Right.  I don't think -- yes, there are

10  opposing views.  We are in litigation.  And that's not how you

11  resolve this.  Okay.

12          And I'll talk about some of the undisputed things, but

13  in terms of the very -- what I'm trying to say in the simplest

14  possible terms, is that a regression can use wages.  It does use

15  wages.  It's in his book, the standard -- the standard method.

16  Okay.

17          THE COURT:  Mr. Isaacson, that's actually not quite my

18  question.

19          MR. ISAACSON:  But I'm saying since -- now you're

20  making a choice.  Should I do something new?

21          THE COURT:  No.  No.  Let's step back for a moment.

22  And it relates to the standard and the findings, right.

23          Do I have to, in order to rule for the defendants, find

24  the testimony provided by the plaintiffs' experts not to be

25  credible?  Because Professor Manning, Professor Zimbalist,

1  Dr. Singer explicitly said that, sort of, principles of

2  modelling the econometricians use support this model.  And you

3  don't disagree with that.

4        And so -- and your experts say something, obviously,

5  different than that.  And my question to you is, at this stage,

6  do I have to make a credibility finding about the validity of

7  the modelling proposed by the experts?  Is that what you're

8  requiring me to do, if I find, which I think it's pretty clear,

9  that there are disputes between the experts about the validity

10 of the modelling and labor economics?

11       MR. ISAACSON:  Ellis says you have to resolve the

12 expert disputes on the commonality issue.  Right.  That --

13       THE COURT:  Okay.  And that means?  I'm talking about

14 credibility.  So I'm not talking about commonality.

15       MR. ISAACSON:  That's one tool in your toolbox, yes.

16 All right.  But the -- you have to do what a Court does to

17 resolve factual disputes between experts.

18       THE COURT:  And that -- and I say that because

19 traditionally, Mr. Isaacson, the way I do that, as you know, is

20 I make a credibility determination.  If I have competing

21 testimony, whether it's experts or other individuals, at an

22 evidentiary hearing, the Court has to make some obviously

23 reasoned choice based upon that, but part of that is credibility

24 in this case.  And that's why I'm pushing both you and Mr. Davis

25 about that because the experts in this case did have fairly

———2:15-cv-01045-RFB-PAL———

1   strong opinions about the modelling.  And I wouldn't say they're

2   completely unequivocal, but they were different and they were

3   very clear about what their position was.

4           MR. ISAACSON:  Right.

5           THE COURT:  And it seems to me it's hard for me to

6   decide this without at least venturing somewhat into the area of

7   making certain credibility findings because you're essentially

8   asking me to find, look, this is not sound from a labor

9   economics standpoint, notwithstanding the arguments that are

10   raised by -- or the positions that are raised by Professor

11   Manning, Professor Zimbalist, or Dr. Singer, who you don't

12   dispute are experts, and you're not saying they're not qualified

13   to issue an expert opinion.

14           You're saying that in terms of this particular type of

15   model you don't believe that, sort of, the labor and, sort of,

16   economic or whatever the term would be principles support the

17   use of it in this context, right?

18           MR. ISAACSON:  That was -- that was a lot for me to say

19   right to, but the --

20           THE COURT:  Okay, but the -- I'll go back.

21           MR. ISAACSON:  The way I -- the way I would phrase it

22   is that in -- once you're facing opposing points of view from

23   experts, you are subjecting the plaintiffs' expert to a rigorous

24   review.  And you can say, I -- you know, it doesn't -- you know,

25   if you found -- I mean, if you -- you don't have to find someone

─2:15-cv-01045-RFB-PAL─

1   incredible to say, okay, for -- under the case law where I'm

2   required to do a rigorous review and where under Daubert I'm

3   supposed to have, you know, established methodologies.  And

4   you're telling me you've got an opinion that we should be doing

5   something that we haven't done before, right.  You -- your case

6   is not persuasive that we should -- we should do that.  Right.

7   That's the way -- that's the way I -- and I think I'm talking --

8           THE COURT:  Okay.

9           MR. ISAACSON:  -- in the terms of Ellis when I use

10   those words.

11           THE COURT:  Well, I say that, Mr. Isaacson, because it

12   does seem to me that there has to be some limits as to the

13   extent of fact finding at this stage.  I mean, I don't think you

14   necessarily disagree with Mr. Davis with the broader point that

15   I'm not engaged in the type of fact finding or merits analysis

16   that I would be at the summary judgment or other stage.

17           MR. ISAACSON:  Right.  And we've not, you know, for

18   example, argued, you know, that disputed issues about fact about

19   whether there's monopsony power are decided at this stage.

20           THE COURT:  Okay.

21           MR. ISAACSON:  The Rule 23 issue is being decided --

22   about predominance is being decided at this stage.

23           THE COURT:  Okay.  All right.

24           MR. ISAACSON:  So if I can --

25           THE COURT:  Go ahead.

—2:15-cv-01045-RFB-PAL—

1          MR. ISAACSON:  I've touched some on the -- already on

2    the regression, but before we get to that, let's talk a little

3    bit about Comcast, which is on slide 6.  All right.

4          And we just set forth the requirements of Comcast,

5    which the Court is aware of.  You have to tie -- link the theory

6    of liability to the theory.  And on page 7 -- so an important

7    thing that's happened in these reports and in this hearing is

8    Professor Topel and Professor Blair put up charts and explained

9    to you that in a competitive market that if you had rising event

10   revenue, that you would have declining wage share.

11         And so the same result that you would see from a

12   regression of whether -- you get the same result in a

13   competitive market.  And Professor Blair also explained that

14   you're going to get the same result if you have legal monopsony

15   conduct, that a monopsony is just being successful.  It's making

16   better -- it's making better products.  It's paying people more,

17   right.

18         And so when you have a regression between foreclosure

19   share and compensation share, it's not distinguishing between

20   competitive conduct and noncompetitive conduct, legal conduct

21   and illegal conduct.  And what was remarkable about Dr. Singer's

22   rebuttal -- I mean, that's how Dr. Topel started was -- there

23   was no response to that.  There's been no explanation as to why

24   that is not true.

25         And it's absolutely fatal because if you have

1   procompetitive acts or neutral acts, legal -- acts that are not

2   illegal, that increase revenue, then Zuffa's going to add

3   fighters.  The share of fighters will increase.  Compensation

4   will stay the same and -- or proportionally less in revenues and

5   then fighter share will decrease.  That's also --

6          THE COURT:  Mr. Isaacson, let me ask you this question

7   in relation to that.  If I were to find that the foreclosure

8   share was in fact a good measure of monopsony power, would that

9   change your argument at all?

10          MR. ISAACSON:  No, because it's not distinguishing.

11   All right.  You can't -- you can't -- when you're doing that

12   measurement, you can't tell whether you are measuring illegal or

13   legal conduct, competitive or noncompetitive conduct, because

14   you get the same results either way.

15          THE COURT:  Okay.  When you say "you get the same

16   results," are you talking about the same results in Dr. Singer's

17   model or the same results in Dr. Topel's model?  I just want to

18   make sure that we're talking about the same thing.

19          MR. ISAACSON:  I know -- oh, it's Dr. Singer's model

20   because this is specific to wage share.

21          THE COURT:  Okay.  All right.  I just wanted -- I

22   wasn't sure.

23          MR. ISAACSON:  Right, right, right.

24          THE COURT:  So you're saying that -- and I know that

25   part of the argument they had and that's why I want you to

—2:15-cv-01045-RFB-PAL—

1  respond to their argument, too, is that it's the combination of

2  the foreclosure share and the market share.  That it's not

3  dependent solely on foreclosure share.  That if I accept that

4  that exact -- that that creates this monopsony power, that

5  that's sufficient at this stage for them to proceed.  Can you

6  talk about that?

7          MR. ISAACSON:  Right.  With respect to this argument --

8  I'll speak later about foreclosure share and why I don't think

9  it meets that test.  But it -- with -- what we are explaining

10  here is that when you're measuring the effect of foreclosure

11  share on -- on wage share, right, if you measure the effect of

12  legal conduct on wage share, you get the same result.  And you

13  can't -- so when you get -- when you get that foreclosure share

14  relationship, that's not telling you that there's something

15  noncompetitive or illegal going on.

16          THE COURT:  And it goes back to my question.  Doesn't

17  that require me to find that the measure of foreclosure share

18  itself doesn't capture exclusive anticompetitive conduct?

19  Because if it does, why doesn't it answer that question,

20  Mr. Isaacson?

21          MR. ISAACSON:  Because, Your Honor, if you have a

22  regression where you're measuring the relationship between

23  something illegal and wage share, and you have a regression

24  between something legal and wage share, and they're both going

25  to have the same results, then it doesn't matter that you made a

2:15-cv-01045-RFB-PAL

1    determination that something was illegal.  The regression itself

2    is not -- is not sorting out the difference between the conduct.

3              THE COURT:  I don't disagree with that, but when you

4    say legal and it's measuring that, that legal means that I would

5    have to find that the foreclosure share variable captures that.

6              What is legal about his -- what's the variable that

7    reflects legal conduct that gives the same outcome?  Because if

8    I -- if I accept that the foreclosure share captures exclusive

9    conduct that may be in terms of its impact illegal, how is it

10   capturing also legal conduct?  Maybe you can help me understand

11   that.

12             MR. ISAACSON:  Because there are things, and everybody

13   agrees, that can increase revenues that are legal conduct.

14             THE COURT:  Yes.

15             MR. ISAACSON:  Okay?  And so if you have -- if you're

16   trying to see if there's a relationship to wage share, if you're

17   getting the same relationship, whether it's legal or illegal,

18   all right, then you've not isolated the effect of the illegal

19   conduct.

20             THE COURT:  Okay.  So let me ask this question.  If

21   those other sides of the equation relate to legal conduct and

22   they're being controlled for, how are you not isolating the

23   effect if foreclosure share only captures illegal conduct?

24             MR. ISAACSON:  Because when you run -- because it's not

25   a matter of controlling for it.  Because -- because when you run

2:15-cv-01045-RFB-PAL

1 the regression, okay, with the -- with the legal conduct, okay,

2 with whatever controls, if you -- you get the same result.  You

3 can't --

4 THE COURT:  Okay.  Based upon --

5 MR. ISAACSON:  -- you can't have a regression that -- I

6 don't care how many controls you have -- that says that there's

7 an effect from illegal conduct if you do the same regression and

8 find the same effect from legal conduct.

9 THE COURT:  No, but maybe I'm -- maybe we're talking

10 past each other.  The whole point of the regression, I

11 understood, was that in fact it does have controls for legal

12 conduct, and the foreclosure share itself is meant to capture

13 illegal conduct.  That's why you have these controls.

14 So, of course, in order to address this very issue

15 about distinguishing procompetitive from anticompetitive

16 conduct, you have to have a proxy for what captures the

17 anticompetitive conduct and put it in with a regression model

18 that has procompetitive models and show that the anticompetitive

19 proxy still has a statistical significance, which is why I had

20 asked you do I have to assume that the foreclosure share

21 variable includes legal conduct to be able to prove the

22 argument.  Because, otherwise, that's what the whole point of

23 the controls are in the regression model.

24 MR. ISAACSON:  No, Your Honor.  And you do not to have

25 assume that.  Because if you run -- because they're running the

─2:15-cv-01045-RFB-PAL─

1  regression with foreclosure share --

2        THE COURT:  Right.

3        MR. ISAACSON:  -- as an input.

4        THE COURT:  Right.

5        MR. ISAACSON:  If you do an input with legal conduct

6  and get the same result, then foreclosure share, okay, is not

7  teaching you anything.  It's not a meaningful relationship, even

8  with all of those controls.

9        THE COURT:  Why not?  If it's still statistically

10  significant, Mr. Isaacson, what it tells you is that

11  anticompetitive measure -- and I'm not saying I accept it as

12  that because you're going to talk about that later, but for this

13  conversation we're talking about it being an appropriate proxy.

14        If, in fact, it is statistically significant such that

15  there is an impact of this variable of anticompetitive conduct

16  on the wage share, and we're not dealing with whether or not

17  wage share is an appropriate measure right now, but if we assume

18  that it is, why does that not establish that, in fact, there is

19  an influence of anticompetitive conduct on the competitive wage?

20        MR. ISAACSON:  Because if you run a test with both

21  illegal and legal conduct and they both reduce wage share, even

22  with controls --

23        THE COURT:  And they both?  I'm sorry.  I didn't hear

24  that line.

25        MR. ISAACSON:  And they both reduce wage share, even

1   with controls, then you're not testing the effect of the illegal

2   conduct, and that's Comcast.  All right.  And the --

3            THE COURT:  Okay.

4            MR. ISAACSON:  And the articles -- on slide 9 we point

5   out that the articles being cited by plaintiffs say that legal

6   monopsony conduct would reduce wage share.  Okay.  They say

7   that.

8            We've cited -- we gave you our citation letter that

9   explains our evidence about, you know, what are procompetitive

10  investments.  It doesn't matter whether we -- you don't have to

11  resolve that.  The point is that it exists, and since they've

12  got something that they say is important, we got something we

13  say is important.  Does the regression allow you to test that?

14  And under basic economics, which Dr. Singer chose not to respond

15  to, you can't do it.

16           Now, the other thing that fails to follow Comcast are

17  the benchmark damages, and that's on slide 11.  Okay.  Now,

18  Dr. Zimbalist at paragraph 93 of his second report basically

19  amounts to a confession of I'm not following Comcast, because

20  his model includes the entire set of exclusionary contract

21  clauses and anticompetitive practices.  There's no sorting out

22  of anything, and that's --

23           THE COURT:  I'm sorry.  Can you explain that to me a

24  little bit more when you say that?

25           MR. ISAACSON:  Sure.  Because if you're going to

2:15-cv-01045-RFB-PAL

1   compare a yardstick with no controls -- remember they don't

2   impose any controls between these two.  It's just a simple

3   comparison.  All right.  He just assumes that --

4        THE COURT:  But which -- which benchmark in particular

5   are you -- because he used --

6        MR. ISAACSON:  All of them.

7        THE COURT:  So are you talking about not just the

8   Golden Boy; you're talking about also the other sports analysis?

9        MR. ISAACSON:  Right, though, he only uses a

10  combination of them.  He doesn't ever do them individually.

11       THE COURT:  No, but his chart sort of tries to break

12  them down.  I want to make sure I'm understanding, when you're

13  talking about the aggregate -- him combining all of the entire

14  set of exclusionary contract clauses and anticompetitive

15  practices, are you talking about for all of those different

16  sports or are you just talking about just for that Golden Boy,

17  sort of, information?  I just wanted to be clear what you're

18  talking about.

19       MR. ISAACSON:  This assumes all of the data's correct,

20  you know, that there are appropriate yardsticks, any of the

21  yardsticks that have been used in this case.  So it's the

22  sports, the boxing, them in combination.  It's also Bellator and

23  Strikeforce because you're assuming all of the challenged

24  conduct.

25       And Dr. Zimbalist even says that the challenged conduct

————2:15-cv-01045-RFB-PAL————

1  includes threats to sponsors.  All right.  Now, these aren't --

2  and then he went onto say, of course, that he was assuming

3  monopsony power.  He said that in this hearing.  He said it in

4  his deposition point-blank.  All right.  The -- I'm sorry.  He

5  was assuming monopoly power.

6      The -- now, there's no monopoly case that's been pled

7  or proven.  There's like a half a case at best.  They say, well,

8  we showed some reductions in output.  They admitted they are not

9  showing an antitrust injury from monopoly.  Their output markets

10  don't use a sniff test.  We have a debate about whether they use

11  that test for input markets.  Dr. Singer agrees he didn't use it

12  for any output market.  There's no liability evidence.

13      Now, this market would be one of venues, cable

14  networks, broadcast networks, and sponsors, right.  They chose

15  not to put in proof because it would have been impossible.  We

16  know there's lots of venues.  We know there's lot of sponsors.

17  We know there's lots of television stations.

18      They've not proven a case of monopolization.  And even

19  when they talk about these output things, they talk about it as

20  one big national market as if all of these individual venues

21  could be one market, which is plainly not allowed by the case

22  law.

23      Now, in the absence of a monopoly case where the

24  yardsticks assume that a sufficient monopoly case has been

25  proven, you have fallen short of Comcast because you have not

———2:15-cv-01045-RFB-PAL———

1   tied the damages models to the theory of liability.  That's not

2   an issue about, well, we have liberal proof of damages in the

3   last stage.  This is purely a Comcast issue.  That the theory is

4   not tied to the -- to the yardstick models.

5          All right.  Now, returning to fighter share and more

6   specifically -- now, there's this issue of -- I've already

7   explained how High Tech Workers is a conventional model, would

8   be used here, it's been used by the Courts, and it's a

9   regression consistent with accepted economics.  I mean, there's

10  some remarkable things being said.  Well, the problem is -- is

11  data availability because it's only global firm revenue.

12         Well, first of all, there's no reason why you can't

13  test this wage share theory at a firm level, but there's also

14  product level revenue information, if you're trying to argue

15  that, you know, High Tech Workers or some other group of workers

16  increase the value of a product.  This is not remarkable

17  information.  And these whole assertions about data availability

18  are not something you see in the literature, in the courts.  No

19  one's mentioning this as a problem.  This is a construct for

20  this case as if you can't do it with actual wages, when you can.

21         He actually said that the workers were not part of the

22  class.  In High Tech Workers there were two classes.  One was

23  all salaried employees.  He said, well, it was the U.S. versus

24  global revenues.  Well, guess what?  You can find the U.S.

25  revenues within the global revenues.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  So I'm going to ask you a question that I

2    asked Professor Oyer which he didn't really answer, which maybe

3    you can help me with, which is, if I were to find there's

4    sufficient or plausible evidence that, in fact, wage share was

5    used within the industry, why would I not then find it an

6    appropriate measure?

7          Because I asked him that, Mr. Isaacson, a couple times,

8    and he did not actually give me I think a full answer to that.

9    And so, perhaps, you can help me understand that.  Because the

10   fact that it hasn't been used doesn't necessarily mean that it

11   couldn't be used if in fact it's being used within the industry.

12   And he acknowledged that if something is used in the industry,

13   potentially that might be the case, but that was as close as he

14   got.  So maybe you can help me understand that.

15         And I'm not saying that they've established it.  What

16   I'm saying is that if they come forward and say you have enough

17   here to find that it was plausibly used, and they're going to

18   look at that chart and they're going to talk about what that

19   chart actually means as relates to the projections but -- and

20   other sort of record evidence.  But if I were to find that, in

21   fact, it was used, how does that impact my assessment of whether

22   or not wage share is an appropriate measure?

23         MR. ISAACSON:  Used -- you have to ask the question

24   used for what.  And --

25         THE COURT:  So let me specify what I mean by that.

1           MR. ISAACSON:  Oh.

2           THE COURT:  If I were to find that in the record Zuffa

3    itself looked at event revenues and used percentages --

4           MR. ISAACSON:  Right.

5           THE COURT:  -- to try to determine how much to pay or

6    not pay fighters, would that be enough from your perspective for

7    me to find that wage share is an appropriate measure in this

8    case?

9           MR. ISAACSON:  No, because you are -- and you are --

10   you are trying to decide whether it's an appropriate measure to

11   determine the effect of monopsony.  All right.  That is

12   completely different from assessing what -- a business saying

13   how much am I paying for my labor, how much am I paying for my

14   manufacturing costs.  And that's what Professor Oyer told you

15   and what Dr. Topel told you is that you have businesses, and

16   businesses break down, like, how much -- what percentage am I

17   paying to this, what percentage am I paying to that.  That is

18   not an evaluation of monopsony power.

19           And --

20           THE COURT:  You will have one more witness who is going

21   to talk a little bit more about this because I think that's one

22   reason why Mr. Silva I think is relevant as relates to pay

23   structure potentially, which is one of the questions I want to

24   ask him.

25           But they -- all of these witnesses at least acknowledge

 1  on some level that they weren't, sort of, intimately familiar

 2  with, at least before this case, and regularly familiar with how

 3  businesses operated within this industry.  So, in other words,

 4  they weren't themselves former, sort of, executives or corporate

 5  officers in this industry.  And so there was a certain I think

 6  amount of reliance on some record evidence and some sort of

 7  industry articles in relation to that.

 8          And that's why again I want to ask you that question

 9  because it does seem to me part of the challenge here for me is

10  figuring out to what extent wage share would be appropriate if

11  the industry is unique, which is what has been offered here, in

12  relation to the use of event revenue.  So if I were to find

13  that, in fact, it was used, would that be enough for me to find

14  it appropriate at this stage of the litigation?

15          MR. ISAACSON:  As I just said, no, because it's not

16  being used to measure monopsony power.  That's not what firms do

17  internally.  All it's being used for is to estimate their costs,

18  which is not a measure of monopsony power.

19          And ...

20          THE COURT:  But if they could hold it constant, even

21  with increase in revenue, even if the revenue itself was

22  dictated in part by the contribution of a fighter, why wouldn't

23  that be evidence of monopsony power plausibly?

24          MR. ISAACSON:  That's not what -- so no -- there's no

25  assertion that at Zuffa or anybody else has been analyzing

—2:15-cv-01045-RFB-PAL—

1    monopsony power internally.  There's no regressions or --

2          THE COURT:  No, no.

3          MR. ISAACSON:  -- or correlations or anything like

4    that.  So --

5          THE COURT:  I think the record evidence that they want

6    to put forward is to say that they looked at these numbers --

7    and I'm not saying that it's established, but part of it is me

8    trying to figure out what to look at.

9          MR. ISAACSON:  You can go ahead for this purpose and

10   say it's established.

11         THE COURT:  Right.

12         MR. ISAACSON:  It doesn't establish -- it's not a

13   measure of monopsony power.  It's not an analysis of monopsony

14   power.  It's completely irrelevant.  And no -- you know, and

15   no -- there would be no economic basis for saying, oh,

16   because -- you know, because I looked at, you know, you know,

17   what percentage of my business has been going to either labor or

18   manufacturing costs that I'm now going to incorporate that into

19   a monopsony analysis.

20         THE COURT:  Okay.

21         MR. ISAACSON:  Okay.

22         The -- you know, the other thing that's said, well, is

23   it's 8 -- this 8 percent alarm bell.  The 8 percent is the

24   result of the foreclosure share coefficient.  All of the other

25   coefficients result in fighter pay, when -- your ranking, when

—2:15-cv-01045-RFB-PAL—

1  you have a winning strike, et cetera, when -- and the evidence

2  is that fighter pay has gone up remarkably as revenues have gone

3  up.  So the 8 percent number is -- is not a meaningful number to

4  say that somehow that event revenues are going up and fighters

5  are not getting paid.  They're getting paid because of the other

6  coefficients in the regression.

7        All right.  Now, again -- and then what's said is, and

8  this was sort of remarkable, that as long as fighters are

9  contributing to -- to revenues, then you either -- then if you

10  put -- you either need to put a revenue variable in and the

11  regression fails or you leave the revenue variable out and you

12  have an omitted variable.

13        And, you know, that means High Tech Worker's regression

14  was wrong because it had the revenue variable.

15        THE COURT:  No, but what here -- what I want you to

16  respond to specifically is this idea, which isn't on its face

17  unreasonable, Mr. Isaacson, that people don't buy an iPhone

18  based upon which designer builds it versus people going to a

19  fight based upon who the fighters are.  That's not an

20  unreasonable argument.  And, in fact, all of the experts

21  acknowledged some level of the influence of the individual

22  fighter's name and who they are influencing ticket sales.

23        So I don't think that's disputed.  And it doesn't seem

24  to me that I've seen evidence that somehow in any of these

25  cases, including In re: High Tech, where there's this similar

—2:15-cv-01045-RFB-PAL—

1  agreement amongst sort of labor economists.  And that's what I'm

2  looking at specifically regarding that particular issue.

3         MR. ISAACSON:  So two things.  Okay.  One is there is

4  not a stitch of evidence or record in this case to support those

5  assertions.  All right.  And the --

6         THE COURT:  Okay.  I'm sorry.  When you say "those

7  assertions," maybe --

8         MR. ISAACSON:  The assertions that over at Apple that

9  or other firms that if you don't know the faces or names of the

10  people, that labor is not contributing significantly or

11  otherwise.

12         THE COURT:  Okay.  But that's not -- that's not the

13  question.

14         MR. ISAACSON:  But that is the question.

15         THE COURT:  No, no, no.  The question is whether or not

16  the -- there's something unique about the identity of the

17  fighter in terms of the final product; not in terms of the

18  contribution.  And that's an important distinction.

19         So, in other words, I'm not saying that there are going

20  to be employees at a firm who may or may not contribute more or

21  less in terms of the marginal revenue product to a particular

22  product.  What I'm saying is that in this industry as alleged

23  there's not going to be a change of the price of the particular

24  iPhone, right, because a particular individual was involved in

25  making the product.  Whereas, the assertion here is that, in

———2:15-cv-01045-RFB-PAL———

1  fact, the price of the product and its attractiveness will vary

2  based upon the individual worker or fighter's contribution to

3  the event.

4       Why isn't that a reasonable argument?

5       MR. ISAACSON:  So the first part of what you said is

6  incorrect because the better designer, even if you don't know

7  who they are, does result in a higher price for the product

8  because they create a better product.

9       The second part of what you said about how -- the fact

10  that I made -- know a fighter's identity and like them, all

11  right, that is a -- that is a way in which fighters can increase

12  event revenues.  That's just a function -- that's just a method

13  for increasing event revenues.

14       THE COURT:  Yes, but that's part of the marginal

15  revenue product, right?

16       MR. ISAACSON:  Yes, but the point -- but your -- the --

17  but the unidentified workers -- and, frankly, there are a lot of

18  identified star designers and programmers, but set that aside, I

19  think they would be laughing at us over in Silicon Valley at

20  what -- at this discussion.

21       The -- the unidentified workers have functions by which

22  they increase revenue.  Fighters have functions by which they

23  have increased revenue.  One of the functions of a fighter may

24  be some -- they've gained some fame, like Conor McGregor, and

25  that increases revenue.  Functions for the programmer is they --

1  you know, you just assume this for this hypothetical that they

2  are anonymously designing a great product that results in a

3  higher price.  Okay.

4         It doesn't matter that difference.  So it's an identity

5  versus a nonidentity doesn't matter because the regression is

6  supposed to be testing, all right, whether labor is

7  contributing -- you know, it doesn't -- you don't have a

8  regression that's unique to people with identities.  And it

9  doesn't make sense.

10         THE COURT:  Well, so let me ask you a question.  Is

11  there -- you're saying that there's actually labor data that

12  would allow you to test for whether or not when a particular,

13  let's say, engineer came onto Apple and added particular

14  features that you would be able to isolate their contribution to

15  a particular iPhone and the different generations of that

16  iPhone, and that just isn't done in that case.  Because that's

17  sort of what you're saying which is, yes, they have this

18  marginal revenue product.  That can vary based upon their

19  ability to contribute to the features of the phone in the

20  example that we're using.

21         MR. ISAACSON:  You could --

22         THE COURT:  And that they have that data.  They just

23  don't use it.

24         MR. ISAACSON:  They have that -- so they -- they did

25  use that data in High Tech Workers.  They used the firm-wide

—2:15-cv-01045-RFB-PAL—

1  revenue because they considered that the relevant data.  But you

2  can also do it product by product.  If you had a group that was

3  contributing to a product, just like you have fighters

4  contributing to an event -- if you have -- if you have labor who

5  are contributing to a product, you can do the same analysis.

6      THE COURT:  No, but you'd have to know for each

7  different iteration of the phone on which they'd worked, right,

8  what their contribution was in order to be able to do that.  You

9  couldn't just do it for one product for all of the -- all of the

10  different engineers across, right.

11      I mean, what they're arguing to me is that you don't

12  have that type of data for a phone because if it were the phone

13  you could say iPhone 6, iPhone 7, iPhone 8, we have 12 different

14  engineers and we try to figure out the different costs based

15  upon the features related to the advances in the phone.

16      MR. ISAACSON:  I don't understand -- so if you're just

17  assuming that a designer has contributed only to the iPhone 6,

18  yeah, there's data on the iPhone 6 sales.  I mean, I don't

19  understand this position and --

20      THE COURT:  Okay.  Well, I appreciate that.  Let's move

21  on because we're going to -- we're going to -- I don't want you

22  to lose your time just on this particular issue.

23      MR. ISAACSON:  All right.  The proportionality

24  question, so -- and Dr. Manning just defined it, and he said

25  proportionality -- there's two types of proportionality.  Wages

—2:15-cv-01045-RFB-PAL—

 1  are proportional to marginal revenue product and marginal

 2  revenue product is proportional to revenues.  All right.

 3          That's not the same thing as saying we're paying 20

 4  percent, and so if revenues double, that we're paying 20

 5  percent, our numbers go up.  There's a specific proportionality

 6  that he's talking about, and he says there's no doubt there is a

 7  link.  That's not proportionality.

 8          Okay.  All of the evidence that they are submitting is

 9  that the fighters have some -- you know, and when they quote our

10  experts is fighters contribute to MRP.  Okay.  That doesn't mean

11  it's proportional or measurable or known.  Doesn't establish how

12  much, how significant, what it is.  Right.

13          And proportionality was assumed by Dr. Singer,

14  Dr. Manning told us that.  He says it in his report.  And he

15  backed away from the fact that he only said it was plausible,

16  but at his deposition, and we went through this, he said over

17  and over again I have no opinion on this.

18          THE COURT:  So let me ask you a question, Mr. Isaacson.

19  Is this not a question where I'm getting into sort of a more

20  merits-based inquiry?  How is this part of the overall

21  plausibility inquiry that I have to look at?

22          Because I don't necessarily disagree with you that

23  there could be critiques for proportionality, but there could be

24  critiques for various aspects of the models even that the

25  different experts use.  Why should I decide this at this level

———2:15-cv-01045-RFB-PAL———

1   as it relates to the class certification?

2          MR. ISAACSON:  Because in resolving whether the

3   evidence is persuasive or has been -- survives a rigorous review

4   and in resolving the disputes between the experts, Dr. Manning

5   has said -- he said there could be other ways of doing it, but

6   it didn't explain what those would be.  Said the only way that's

7   been put forward in this case would -- would require

8   proportionality.  He's agreed it's an assumption.  Okay.

9          It's not proven.  He says -- when they say, well, we

10  have evidence, and he said today again we have significant

11  evidence.  Right.  And each piece of the significant evidence

12  simply says that fighters contribute to event revenues or

13  contribute to MRP without defining it.

14         All right.  That is a complete and utter absence of

15  proof of a predicate for a model where plaintiffs have the

16  burden -- which the plaintiffs have the burden on, and it

17  doesn't -- and it doesn't survive rigorous review, and it's not

18  persuasive.

19         THE COURT:  Okay.

20         MR. ISAACSON:  All right.

21         And I think it was an important concession by Dr. -- or

22  by Professor Manning that Dr. Singer is imposing proportionality

23  on the data in his regression.

24         THE COURT:  You mean assuming it?  Assuming that it

25  exists?

1          MR. ISAACSON:  Yes, but he -- and by imposing it that

2    means the regression doesn't prove proportionality.  Because

3    once you impose it on it, of course you get a proportional

4    result.

5          The -- we've -- you know, we've also noted in our

6    papers something we discovered only -- only this week.  That,

7    you know, the principal thing that Dr. Singer relies on is this

8    Mahon paper, McGowan and Mahon, which turns out to be from a

9    completely fraudulent journal.

10          THE COURT:  So I want to ask you about that because, I

11    mean, that's -- first of all, I don't even know how I even

12    resolve that.  I mean, I'm not saying it's not a legitimate

13    criticism.  I don't know that I can even look at that at this

14    point.  I didn't hear evidence on it.  I don't know how I can

15    make that finding.

16          And so part of it is, Mr. Isaacson, I have no way to

17    evaluate that.  I'm not saying that it's not true that this

18    was -- this alleged sort of not scam, but there is this --

19          MR. ISAACSON:  It is a scam.

20          THE COURT:  -- presentation of what should not be

21    legitimate article.  I don't know that it was ever something

22    that was brought to me before that.  And so part of the

23    challenge I have is, okay, maybe that's true.  Why am I

24    considering it now?  There was no opportunity really to address

25    this previously.  And so help me with that.

1            MR. ISAACSON:  The reason there was no opportunity to

2    address it previously is because this journal has been

3    committing a fraud upon everybody here.  All right.  And which

4    is no one's responsibility.  And both parties, their experts,

5    and it's now been discovered, and to not -- and to accept

6    fraudulent evidence --

7            THE COURT:  But I have -- I can't find it fraudulent.

8    Just because you say it's fraudulent --

9            MR. ISAACSON:  We've submitted --

10           THE COURT:  Right.  I understand that.  But,

11   Mr. Isaacson, here's the problem, right.  You're submitting

12   something for me to find factually, and I'm not saying you

13   shouldn't do it.  But if I'm going to -- if I want me to accept

14   that, one issue is they should be able to respond to that.

15           MR. ISAACSON:  Absolutely.

16           THE COURT:  But the other is at this point, quite

17   honestly, for the years that this litigation has been going on I

18   have no idea why all of a sudden and how old this article is,

19   why is it this is just now being brought to my attention?

20   Because, quite honestly, it should have been brought to my

21   attention now.  It's late to bring it to my attention.  I've had

22   this hearing set for, as you know, months and now all of a

23   sudden I'm hearing this now.

24           And so it's not just the fact that I don't have a basis

25   to resolve it, but the defendants should have brought this to my

—2:15-cv-01045-RFB-PAL—

1   attention years ago, right?

2        MR. ISAACSON:  As should have the plaintiffs, right.

3   We've been tricked because of the name of this journal, and the

4   trick has been successful up until now.  And I just -- with all

5   respect, I don't think it's ever too late to submit a fraud upon

6   the Court and upon the parties.

7        And that's what -- that's what this is.  And they're

8   welcome to respond to this, but I think it's plain what it is.

9        And I don't think they have anything to apologize

10  for -- apologize for.  They've been tricked.  We've been

11  tricked.  The --

12       THE COURT:  So you're saying -- so you're saying that,

13  absent this article, there's no proof in the record that an

14  individual fighter's -- an individual fighter can have an

15  individual effect upon event revenue in a particular bout.

16       MR. ISAACSON:  I am not saying that.  I'm saying that

17  Dr. Singer said this was the thing he thought was the most

18  important proof and the thing he leaned most heavily on.

19       THE COURT:  So let's assume for the moment that he

20  doesn't lean on the article, but he leans on the underlying

21  principle which is that, in fact, fighters do have a significant

22  impact on event revenues.  Does that change anything?

23       Let's assume I take the article out, that I were to

24  find that in fact and the industry has acknowledged that a

25  fighter has impact on event revenue.  How does this change that?

2:15-cv-01045-RFB-PAL

 1          MR. ISAACSON:  Then what's left are general statements

 2   that fighters contribute to event revenues with no data or

 3   analysis to show that -- to measure it, show how significant it

 4   is, to -- you know, to give it any -- to put any meat on those

 5   bones.  That's what you're left with.

 6          THE COURT:  Okay.

 7          MR. ISAACSON:  And that's why Dr. Singer was leaning,

 8   in his words, heavily upon this.

 9          The -- so maybe I'll move to foreclosure share?

10          THE COURT:  Sure.

11          MR. ISAACSON:  So foreclosure share --

12          THE COURT:  And let me help you with sort of where I'm

13   focusing, Mr. Isaacson --

14          MR. ISAACSON:  Sure.

15          THE COURT:  -- which is at this stage I don't know

16   that -- I don't have to determine the robustness of the

17   variable, but I do think I have to determine whether or not the

18   variable's properly defined to capture actual anticompetitive

19   conduct.  Because I think if -- in the precedence of Comcast, if

20   I think that foreclosure share itself is too heavily biassed by

21   procompetitive conduct, I don't know that it's an effective

22   proxy, and that might go to the issue of certification.  Would

23   you agree with that?

24          MR. ISAACSON:  I would go farther, though, Your Honor.

25          THE COURT:  Okay.

2:15-cv-01045-RFB-PAL

1          MR. ISAACSON:  Okay.  It is not just a Comcast issue.

2   It is that foreclosure is, for Dr. Singer, a legal construct.

3   It is a legal determination.  The -- he said that in his

4   deposition.  He said that -- he quotes a law review, the Salop

5   Law Review, for providing the standards here.  And he says, it's

6   my knowledge of the cases, and he cites Areeda.  And the

7   Areeda -- and he says -- and he cites Areeda as supporting that

8   30 months would be an appropriate measure of foreclosure.

9          And we can just read Areeda.  That section of Areeda

10  has, you know, big string cites.  And there's a section of

11  string cites where the Courts say, you know, we're not going

12  to say these contracts are okay and -- and a group of contracts

13  where they're not.  And there's no cases condemning a

14  three-year -- a three-year contract much less a 30-month

15  contract.  They're all five, seven, and higher, right.

16         And so what they are doing is there is a built-in legal

17  assumption here, something purely for the Court, that says --

18  and he said in his deposition -- okay.  We talked about 30

19  months.  36 months was too long.  What would be a duration that

20  would be acceptable to a Court?  That to me is really the key

21  element.

22         At paragraph 172 of his opening reports he says -- he

23  cites antitrust scholars.  That's Areeda who are antitrust legal

24  scholars, right.  He is taking away from the Court the

25  definition of foreclosure.  He is assuming that 30 months works.

—2:15-cv-01045-RFB-PAL—

1  All right.

2          And he doesn't have -- there are no cases that say 30

3  months or three-year contracts constitute, you know, prohibited

4  exclusive contracts or foreclosure.

5          THE COURT:  And so does this go to the issue,

6  Mr. Isaacson, that I think you're saying that I should decide

7  about the extent of an MMA's fighter career?  Because it seems

8  to me you all have these different arguments about the length of

9  the career, and I'm not going to get into numbers.  But let's

10  just say for example, Mr. Isaacson, I was to find that the

11  length of the career was 1.5 years, I'm not saying that it is,

12  or one and a half years.  Then obviously a 30-month contract

13  would be potentially significant in the context of that

14  fighter's career or not, but if it were seven years, it may not

15  be.

16          Is this the type of situation where you think the Court

17  has to resolve certain findings in order for me to find that the

18  plaintiffs can sort of -- can have me certify this class?

19          MR. ISAACSON:  In part, yes.  In part, no.

20          THE COURT:  Okay.

21          MR. ISAACSON:  The "in part, no" is because under the

22  relevant legal standards, which is when they quote this law

23  journal by Salop, all right, that actually says that the

24  substantiality of input foreclosure, that's what we're talking

25  about here, is demonstrated most accurately by the resulting

—2:15-cv-01045-RFB-PAL—

1  impact on the competitor's costs and output; not by the simple

2  fraction of input suppliers that are affected.

3         All right.  They have not -- the -- in stopping at

4  their analysis of the fighter career, they don't move forward

5  and do what Salop says.  And it says what happened to your

6  rival's costs, what happened to their output, what happened to

7  their expansion.

8         THE COURT:  But what about some of the other record

9  evidence that they attached?  They do attach some record

10  evidence that talks about from these other competitors what they

11  viewed as the impact of both these contracts and Zuffa's

12  strategies on their ability to attract fighters and their

13  ability to be able to put on competitive bouts.  And this goes

14  to some of the other, sort of, vertical/horizontal conduct,

15  because we focus a lot on the modelling, but they have presented

16  at least some other evidence in the context of the motion to

17  certify.  How should I consider that?

18         MR. ISAACSON:  So if you go ahead and assume they're

19  being denied some input that they want, that still doesn't

20  answer the question about whether that raised their costs,

21  constrained their output, or their ability to expand.  You have

22  to analyze the competitors, what happened to their businesses.

23         THE COURT:  So I'm saying, if a competitor says at the

24  time that this was happening we essentially felt foreclosed and

25  we didn't -- we didn't have enough money to compete, we couldn't

—2:15-cv-01045-RFB-PAL—

 1  obtain the fighters, is that enough?

 2      MR. ISAACSON:  If -- not if their business has doubled.

 3  That's the thing is you have to analyze what happened to them.

 4  This is -- this is a -- there are empirical facts where you look

 5  at what happened to the competitors.

 6      THE COURT:  No, but -- and, again, so this partly goes

 7  back to this issue, Mr. Isaacson, where I'm trying to figure out

 8  how far into the facts I have to find things.  And you're saying

 9  to me I would have to assess the record evidence to see, in

10  fact, if there was empirical evidence to support the statements

11  of competitor's officers.  Because I don't think you're

12  disputing that, in fact, there's some statements in here where

13  you have competitors who say Zuffa controlled and dominated the

14  market, we were excluded, we didn't have the cost.  You're not

15  saying that.  What you're saying is that I have to evaluate the

16  validity of that statement, right?

17      MR. ISAACSON:  I actually do dispute that, but, you

18  know -- you know, because all of the current competitors

19  disagree with this.  And they quote -- they quote somebody from,

20  you know -- they quote Mr. Coker when he was with Strikeforce.

21  That's not what he says with Bellator.  But set that aside.

22  Okay.

23      The cases that we quote in the Ninth Circuit and Salop

24  say, okay, that the analysis -- and he says this.  Singer says,

25  I did two -- I had two reasons for foreclosure.  Okay.  One is

—2:15-cv-01045-RFB-PAL—

1   the law, and two are the fighter careers.  Okay.  That's not an

2   assessment of the effect on competitors.  Right.  That simply

3   doesn't happen.  You're not weighing this evidence, right.

4          That the empirical analysis did not happen.  So that's

5   why -- that's -- now, but if you do get to the fighter career --

6          THE COURT:  What would that analysis look like from

7   your perspective that they should have presented that they

8   didn't?

9          MR. ISAACSON:  You analyze -- and this is common

10  analysis in antitrust.  This is what the antitrust division

11  would be doing if they had -- if they had any interest in a case

12  like this.  They would be going -- they would be looking at what

13  happens to rivals' costs, what happened -- you know, what has

14  happened to their growth, their output, are they continuing --

15  are they getting big media deals, are they getting -- are they

16  able to put on their shows.  Okay.  That's the things they would

17  be looking at, the empirical -- the way you evaluate a business.

18         THE COURT:  Well, how do I look at the increase in

19  market share for Zuffa in that context?

20         MR. ISAACSON:  Increase in market --

21         THE COURT:  Because clearly there is an exponential

22  increase in the control of the input market and output market,

23  too, but let's talk about the input market by Zuffa at the same

24  point in time.  Can I take that into consideration in that?

25         MR. ISAACSON:  I mean, it could be relevant, but if the

2:15-cv-01045-RFB-PAL

1   rivals are entering and growing, the fact that Zuffa's growing

2   also doesn't answer the question.  I'm not going to tell you

3   it's absolutely irrelevant, but it wouldn't answer the question.

4          THE COURT:  Okay.

5          MR. ISAACSON:  I mean, no one would stop there and say

6   that's enough.

7          THE COURT:  Okay.

8          MR. ISAACSON:  Now, the other half of your question is

9   then, yes, if you think the career length thing is -- is

10  relevant, then, yes, you should resolve it because it's

11  fairly -- it's fairly easy to resolve.  I don't think it's --

12  it's a factual dispute.

13         Dr. Singer calculates a career length by limiting their

14  careers to what's within his market.  He said that.  So if they

15  have fights within his market definition -- he says the career.

16  He initially answered your question incorrectly.  You said, Is

17  it the period in which athletes were physically fit to fight and

18  did at least potentially have some fights?  You asked him that.

19  He said yes.  That's wrong.  Right.

20         So fights outside of this market, when you count those,

21  and you add up -- so for a Zuffa fighter, who had a Zuffa fight,

22  and you count all of their fights, Dr. Topel measured it, then

23  your career's 8.7 years.

24         THE COURT:  Now, is that --

25         MR. ISAACSON:  That's not a dispute.

───2:15-cv-01045-RFB-PAL───

1        THE COURT:  Is that in the elite market?  Because there

2  was this distinction that they made between sort of elite or

3  sort of the higher level MMA bouts and these what they called

4  the minor leagues or feeder bouts.  And is it your view that I

5  shouldn't distinguish between those different types of bouts in

6  the context of that?  And is that 8.7 years putting those

7  together?

8        MR. ISAACSON:  It is -- yes, it's putting those

9  together.  Okay.  I think the term "elite" has fallen apart in

10 this case.  Every plaintiff has said I don't know what that

11 means.  And there's no definition of it.

12        But you asked the correct question here when you asked

13 him is it the period in which athletes were physically fit to

14 fight and did at least potentially have some fights.  That's

15 their career.

16        And so anybody who fought for Zuffa within that

17 definition had 8.7 years.  The experts give, you know, different

18 definitions of what should be the career, but no one's

19 disagreeing about the math of the calculation.  All right.

20 Which means that these people have the ability and if -- you

21 know, and if you're saying, well, they went to a different --

22 you know, a minor league, all right, that's not relevant to --

23 if they're not succeeding, okay, that's not relevant to the

24 length of their career or -- you know, because if you have a

25 30-month contract for an unsuccessful fighter and they go onto a

—2:15-cv-01045-RFB-PAL—

1    minor league, okay, that's not a constraint.

2           The other -- the other thing that Areeda points out,

3    right, in an exclusivity case for foreclosure that's unheard of

4    here is that there's a difference between exclusivity -- if

5    you've got five dealers in a market and you lock up all five

6    with exclusive contracts, or four or five, that's one thing.

7    When you have 500 contracts of -- of 30 months in duration,

8    right, then there's contracts available every month.  40 percent

9    of them come available for new contracts in any year.  Okay.

10          The Areeda treatise that they are -- that Dr. Singer

11   quotes, the exact thing, has this whole section on the case law

12   that says when you have this network of -- of -- and with all of

13   these contracts, well, then you have continued availability.

14   That's not an exclusivity case.  And it is fundamental that

15   Dr. Singer is trying to impose on this Court a legal assumption.

16          And, you know, I don't -- I think we all know that

17   that's not what experts are supposed to do.

18          THE COURT:  All right.  You've got a few minutes left,

19   Mr. Isaacson.

20          MR. ISAACSON:  Okay.  I will touch on the -- I'll just

21   touch on the -- oh, the yardsticks.

22          The other thing I want to say about the yardsticks is,

23   in addition to not meeting Comcast, all right, Your Honor asked

24   the question are we contesting whether yardsticks can be used.

25   Yardsticks can be used if they're appropriate.  Okay.  Like any

─2:15-cv-01045-RFB-PAL─

1   other thing, you have standards in the field.  The standards are

2   defined in Areeda and also in other authorities from -- from

3   Dr. Rubinfeld -- from Professor Rubinfeld.

4          And the standard is in the most -- they have to be

5   similar in the most important respects, and they define things

6   like -- that aren't considered here such as the revenues, the

7   profits, the product mix, other comparisons.

8          Now, Dr. Zimbalist at his deposition said he was

9   unaware of any standards in his field for a yardstick.  He then

10  came up with the standard of as close as possible.  As close as

11  possible literally means I could be standing right next to you

12  or I could be -- I could be in California, right.  It doesn't

13  tell you anything.  It's not a standard in the field.  So you

14  literally have yardstick comparisons that are being offered not

15  under any acceptable standard.

16         And then when you do the comparisons, Dr. Zimbalist

17  even said, and perhaps you'll remember this, he had written that

18  higher revenue should lead to higher wage share.  And he's

19  comparing it to all of these higher revenue sports to Zuffa and

20  didn't take that into account or control for it which is what

21  you're supposed to do.

22         The -- the -- he also said that he -- it wouldn't be

23  appropriate to compare the wage shares of hockey and baseball.

24  Well, if you can't compare hockey and baseball, you can't

25  compare Zuffa to these other sports.  The revenues are

—2:15-cv-01045-RFB-PAL—

1  different.  The histories are different.  And the comparisons

2  also fall apart because you're supposed to compare to a but-for

3  world, a world without the exclusive contracts.  And guess what

4  these sports have?  Exclusive contracts.

5        And you don't get to free agency in the NBA, the NFL,

6  Major League Baseball for a lot longer than 30 months.  Okay.

7        Zuffa has the -- the shortest exclusivity contracts.

8  And I'm saying 30 months kindly because the actual average is

9  like 21 months.  They're just tacking on this exclusive

10 negotiation period at the end of this.  Maybe I'll end with

11 boxing because Your Honor asked a lot of questions about that.

12       The boxing was never offered as a stand-alone

13 comparator.  It's only part of a mix by Dr. Zimbalist with all

14 of these other sports.  Boxing, the only data in that average is

15 Golden Boy, right.  We know that the Golden Boy data does not

16 sort out the money that went to the fighter or the two

17 promoters.  We learned that.

18       We also learned that -- even though he pointed to other

19 boxing sources that he didn't include in his average, we also

20 learned that we don't know what fighters are getting versus the

21 two promoters getting because of the uniqueness of boxing.

22       So, boxing was not offered as a stand alone.  And,

23 again, boxing -- I understand people are fighting in both

24 sports.  Okay.  That's not a comparison of marketing revenues,

25 profits, variability of revenues, all of these different

—2:15-cv-01045-RFB-PAL—

1  business things.  It's only a measure of the fact that these are

2  combat sports.

3         And if I'm out of time?

4         THE COURT:  I believe you are.

5         MR. ISAACSON:  Can I say one more sentence to correct

6  something that I thought was remarkable.

7         There are sections of our -- of our pleadings that

8  haven't been discussed at these hearings because they aren't

9  tied to the economists.  And they're in our motions, and they

10  are in our presentation.  Counsel touched on one of them,

11  coercion.  He said coercion is a common issue.

12         Coercion is always individualized.  That's what all of

13  the cases say because you have to decide fighter by fighter what

14  happened to coerce them and were they coerced.  There's no such

15  thing as coercion of a class of -- of over a thousand people.

16         THE COURT:  Okay.  Thank you.

17         Why don't we take a five-minute recess.  Let people

18  take a little break, and we'll come back in five minutes.  I'm

19  going to stay on the bench for a few moments.  We'll be

20  adjourned.

21         MR. CRAMER:  Thank you, Your Honor.

22         (Recess taken at 10:45 a.m.)

23         (Resumed at 10:52 a.m.)

24         THE COURT:  Please be seated.  All right.  We're back

25  on the record.

────────2:15-cv-01045-RFB-PAL────────

1            Mr. Davis.

2            MR. DAVIS:  Good morning again, Your Honor.

3            So I'm in a little bit of an awkward position because

4    there were various issues on which Your Honor pressed opposing

5    counsel, and I will try to touch a bit on anything.  If there's

6    any -- are there any particular issues of concern?

7            In those colloquies, I don't know what to say other

8    than Your Honor was right and that -- and so -- but,

9    nonetheless, I feel like -- so I'm happy to just move through.

10            THE COURT:  So the fact that I pushed doesn't mean that

11    I'm going to resolve things in your favor.

12            MR. DAVIS:  That is my difficulty.

13            THE COURT:  So you should understand if you don't at

14    this point -- I ask certainly of both sides, but it doesn't mean

15    I'm going to resolve it one way or another.  You shouldn't take

16    that as indicative of me --

17            MR. DAVIS:  Right.

18            THE COURT:  -- finding one thing or the other.

19            I think in this case one of the issues that I think is

20    presented by this phrase "rigorous analysis" raises real issues

21    about to what extent I'm supposed to be making factual findings

22    regarding issues like exclusivity of the contracts --

23            MR. DAVIS:  Right.

24            THE COURT:  -- and what the impact is of market share

25    or not.  And, so, Mr. Isaacson's argued that I have to find the

—2:15-cv-01045-RFB-PAL—

1  information to be persuasive.

2      So the only thing I would ask you to do is if you think

3  there are -- to the extent that I find that to be a relevant

4  standard, I'm not saying that it is, as relates to sort of the

5  persuasiveness or not of foreclosure share as a measure of

6  anticompetitive conduct, you should address that.

7      MR. DAVIS:  Yes.

8      THE COURT:  Because it does seem to me that if I don't

9  find that to be a reasonable proxy that can actually distinguish

10 between procompetitive and anticompetitive conduct, then that's

11 a problem.

12      Now, I disagree with Mr. Isaacson to the extent that

13 you can't have in the same equation variables that control for

14 procompetitive versus anticompetitive conduct, but I don't

15 necessarily disagree that I have to at least look at the extent

16 to which foreclosure share is an appropriate proxy for capturing

17 primarily anticompetitive conduct.

18      MR. DAVIS:  Very good, Your Honor.  Why don't I start

19 there then, and I can address other issues as I have time.

20      THE COURT:  And that goes into this issue about the

21 fighters' careers and the eight years versus the three and a

22 half years.

23      MR. DAVIS:  Yes.

24      THE COURT:  Because there are substantial differences

25 in the numbers regarding the career length --

─────2:15-cv-01045-RFB-PAL─────

1          MR. DAVIS:  That's right.

2          THE COURT:  -- that I think are relevant to my

3    determination of whether or not foreclosure share is an

4    appropriate measure of exclusivity.

5          MR. DAVIS:  That's right.  That's two and a half years,

6    just to be clear.  It matches almost perfectly the 30 months.

7    Let me say a few things about that.

8          On the foreclosure share issue to start with, first of

9    all, this is not a novel methodology.  Counting up the contracts

10   and -- and then looking at the market as a whole and revenue

11   weighting, even, that all comes out of the Ninth Circuit's

12   decision in -- from 1982 which has since been followed in Twin

13   Cities Sports Service.  So that basic framework is consistent.

14         Now, in terms of foreclosure share, this is not -- this

15   is another instance of Zuffa, and I think it's a difficult --

16   difficulty they have in this position -- in their current

17   position, they're fighting all the real evidence in the record

18   that predates this litigation.

19         And so I'll only give you a couple of examples, but

20   it's not as if as opposing counsel indicated that we made up

21   this foreclosure share notion and that these contracts don't

22   actually cause any difficulty.  There is document after

23   document -- let me ... are we on?

24         There is document after document in the record.

25         THE COURT:  Was this -- are you talking about the

—2:15-cv-01045-RFB-PAL—

1   Deutsche Bank report?

2        MR. DAVIS:  Yes.  Yes.  So this, for example -- there's

3   got to be at least a dozen.  This is a Deutsche Bank evaluating

4   Zuffa, and what it says is:  High barriers to entry.  Vast

5   majority of tight fighters -- the top fighters under multi-fight

6   exclusive contracts.

7        This is an economic evaluation of why Zuffa is worth

8   something.  Why?  Because they've got these long-term exclusive

9   contracts that create high barriers to entry.  And the response

10  is there's no evidence in the record of foreclosure of rivals.

11  This is evidence -- that's exactly what this is evidence of, and

12  it's having such a profound economic impact that it makes all of

13  the difference in the world.

14        And I'll give you just one more example because I

15  don't -- there's a lot to cover, but this is Moody's Investor

16  Services.  Zuffa controls a breadth of fighters under multi-year

17  contracts which help to serve as an effective barrier to entry.

18        So we've just invented apparently these exclusive

19  contracts that are incredibly powerful in the marketplace, but

20  it's the things that Moody's, the real pros, internally

21  evaluating sufficient's value, this is what they're focusing on.

22        Another point is if you look at these -- at these cases

23  what they consistently hold from the Supreme Court down is it's

24  not the nominal length of the contract that matters.  What

25  matters is the practical effect.  Well, high barriers to entry,

1    that answers the problem, but even beyond that, this is an

2    e-mail from general counsel, Michael Mersch, to a fighter's

3    manager in 2011.

4           And what does he say about the length of the contract?

5    "The extension term only comes into play should Mark complete

6    all fights and be the champion.  I can tell you in my five years

7    with the UFC that has never happened because we don't let that

8    happen.  Before someone fights for an UFC championship, we would

9    likely have them locked in a longer term deal.  Additionally, if

10   a fighter is successful under a four fight deal, we typically

11   negotiate a new agreement after the third fight.  So he will

12   never see the end of his contract."

13          Now, Zuffa has this after-the-fact contrived

14   explanation for this.  Oh, no.  It's all very innocuous.  It's

15   more money.  Just so happens that that's not what they said

16   internally.  What they said is we use our leverage to make sure

17   these things are in effect perpetual.  So perpetually certainly

18   meets any standard one would want for a long enough contract.

19   And so I don't think this is a contrived foreclosure share

20   analysis at all.

21          A couple of other points.  Dr. Singer did not assume --

22   he was very clear about this, he did not assume his measure of

23   foreclosure share.  He hypothesized it and then ran a regression

24   that tested it, and the regression came up with extraordinarily

25   robust results.

--2:15-cv-01045-RFB-PAL--

1        Now, as Your Honor you know well because you're very

2   familiar with statistical analysis, a statistical analysis like

3   that is a little bit like trying one of the keys in a key chain

4   when you're trying to open the front door.  You're not assuming

5   it's the right key.  You're testing if it's the right key.  And

6   if the door opens, it's the right key or it's a heck of a

7   coincidence.

8        THE COURT:  Right.

9        MR. DAVIS:  Dr. Singer didn't just say, hey, this

10  foreclosure share -- if this was a poor measure of foreclosure

11  share, he wouldn't get in specification after specification

12  these extraordinarily statistically and economically significant

13  robust results that suggest he's got just the right measure of

14  foreclosure share.

15        Now, Zuffa even -- sorry.  Opposing counsel then at one

16  point conceded, well, you know, if there was some indication

17  that rivals -- maybe you'd have the right foreclosure share if

18  there was some indication that rivals actually are being

19  foreclosed, but, hey, there's no evidence in the record.  And I

20  would say that's true except for the record in the -- the

21  evidence in the record that shows exactly that.

22        And I'll take another slide.  This is JCCX 49.  And

23  this -- this shows the supply of MMA events projected, as it was

24  progressing linearly, to grow.  And this is what actually

25  happened.  What happened was we see this, in fact, significant

———2:15-cv-01045-RFB-PAL———

1   decline in the output of MMA events because, why?  Zuffa is

2   foreclosing rivals.  It's breaking them down.  It's robbing them

3   of their F'ing oxygen, in the language of Zuffa's own executive,

4   and that it's acquiring them once they're gutted or relegating

5   them to minor league status.  And what we see is a very

6   significant drop.

7          Now, Zuffa says, oh, but we had more events.  Yes, you

8   had more events.  There were fewer total and your market share

9   went through the roof.  That's a sign of monopsony power.  It's

10  a sign of monopoly power, which we don't need, but is relevant

11  to the violation.  But absolutely that's confirmation that

12  foreclosure is exactly what is going on.

13         So those are some of my main responses to that.  And

14  the way that Zuffa -- as I said, one of their big problems here

15  is their whole case is premised on fighting the documents.  All

16  of the prelitigation evidence lines up with our theory time

17  after time.  There's a trove of it.  So much so that we're

18  beside ourselves at hearings.  Can we put this?  Can we put

19  this?  They don't have anything comparable to that.

20         Let me talk about the length of the career, though,

21  even if we're comparing here.  So Dr. Singer actually measured

22  the length of the career in either of two ways, how long are you

23  in the UFC if you make it to the UFC or if we want to look at

24  all of the promoters, even the minor league ones, how long are

25  you in one of them if you make it to one of them, and comes up

───2:15-cv-01045-RFB-PAL───

1  with very comparable results.

2         Now, I think personally the right approach is if you

3  make it to the UFC, which as a practical matter given these

4  anticompetitive practices, that's the major leagues, how long

5  are you in the UFC?  That's your 2.5 years.  Eliminating people

6  who only fought once.  It's a conservative measure.  It's higher

7  than the actual average.  He felt it would have been too extreme

8  to include all of those.  It would have dropped the average very

9  significantly.

10         So what does Zuffa do?  A card game.  They say -- they

11  say if you ever fought in the UFC, you're a pro.  How long did

12  you fight in any of -- in any MMA, even if it's street corner

13  promotion or minor leagues or what have you.  Then you come up

14  with this number of almost nine years.  That is meaningless,

15  right.  That is a cherry-picking approach.  Why?

16         Let's think about that.  If you said someone's a pro

17  basketball player, would you say I'm going to take all of the

18  NBA pro athletes, the guys who had a cup of coffee and the guys

19  who made it for a bunch of years, and I'm going to measure their

20  career by all of the time they played basketball, minor leagues,

21  G leagues, Russia, Spain, college.  That's exactly what they're

22  doing.  And they're saying, oh, that's the relevant measure.

23         And, you know, all that opposing counsel said is you

24  can't look at minor league.  That's not -- that doesn't make

25  sense.  Why doesn't it makes sense?  Of course it makes sense.

─2:15-cv-01045-RFB-PAL─

1  Minor league is different.  And Dr. Singer even tested it by

2  using -- by being consistent, apples to apples.

3          If you're in the minor league, how long are you there?

4  Then the result's the same.  You only get this nonsense

5  nine-year career by saying any who's -- anyone who's been in the

6  UFC at all their whole career lasts as long as they fought

7  anywhere.  And that, that, Your Honor, I would respectfully

8  submit can't be the right test.

9          So that's on foreclosure share.  Let me jump to a few

10  other things if I may in the time I have.  One is almost -- oh.

11  Foreclosure share and procompetitive effects, let me talk about

12  that.  I don't think I have to talk very long about this.  I do

13  want to mention it.  This was one of those -- this was

14  definitely a spot where I thought, you're right.  You pressed

15  both sides very hard, and that's the judicial thing to do, and

16  we appreciate that.

17          THE COURT:  Why don't you address it with the argument

18  as relates to the length of time --

19          MR. DAVIS:  Right.

20          THE COURT:  -- of the career?  I mean, I can look at

21  the contract terms themselves and draw my own conclusion.  I

22  don't need the lawyers --

23          MR. DAVIS:  Right.

24          THE COURT:  -- to do that.

25          MR. DAVIS:  Right.  No.  What I meant on this was the

—2:15-cv-01045-RFB-PAL—

1    Comcast -- what was initially framed as a Comcast argument.

2    Does Dr. Singer's foreclosure share separate out the

3    anticompetitive effects from the procompetitive effects?  And,

4    you know, I don't want to presume, but frankly there was no good

5    answer to what Your Honor was saying, which is Your Honor said,

6    wait a second.  As Dr. -- opposing counsel said, hey, Dr. Singer

7    never responded to this.  He did respond to it.  He responded in

8    just the way Your Honor was pressing opposing counsel.  And what

9    he said was foreclosure share only measures the long-term

10   exclusive contracts.  It's not measuring any of those alleged

11   procompetitive effects, and then I control for those other

12   procompetitive effects.

13         THE COURT:  That's why they're in the equation.

14         MR. DAVIS:  That's why they're in the equation.  And,

15   frankly -- and then opposing counsel simply said, well, if you

16   run the regression with procompetitive effects, it wouldn't be

17   different.  That regression's never been run.  Nothing's been

18   substituted for foreclosure share.  Of course it would produce

19   different results.

20         I think it was just a misunderstanding, frankly, the

21   nature of the regression and how it works.  So I won't say much

22   more on that unless it would be helpful.

23         We started a couple -- one big picture point.  Almost

24   every argument, if not every argument, that opposing argument

25   made was common to the class.  This is extraordinary.  As I

1    said, time after time I argue class certification, so do lots of

2    other folks, the battle's overcome in impact.  And that battle

3    often is, hey, we've rerun it.  We've knocked you down to 90

4    percent, 80 percent, 25 percent in Ellis.  So you have to

5    choose.

6            THE COURT:  So, in other words, there's no argument

7    here that there are different types of contracts, that there

8    were different periods?

9            MR. DAVIS:  Not -- there's no -- the only -- there's a

10   brand new argument that we got in the brief.  I don't want to

11   give it the time of day since opposing counsel didn't raise it.

12   It's a bad argument, but it's a brand new argument.  I mean, I'm

13   happy to address it if it's --

14           THE COURT:  Which argument are you talking about so

15   I --

16           MR. DAVIS:  Opposing counsel for the very first time

17   with no evidentiary -- with no basis from the experts said, hey,

18   there's -- the regression only includes about 1,050 fighters --

19           (Court reporter interruption.)

20           MR. DAVIS:  There's 1,050 fighters in the regression.

21   There's almost 1,200 fighters in the class.  Although we've done

22   regressions during this hearing that are brand new, we've never

23   put in anything on this particular argument before.  We'd like

24   to raise it now that if you count all of those missing fighters

25   as unimpacted, an inference that would be bizarre to draw, now

—2:15-cv-01045-RFB-PAL—

1  you're below 90 percent.  It's the first time they've made any

2  argument along those lines.

3      We obviously haven't responded to it because it's brand

4  new.  The reason it's nonsense is I can cite you case after case

5  where, in fact, virtually every case the data is more

6  incomplete.  And of course you use the data you do have where

7  not all -- we didn't have data for all fighters, especially the

8  ones who are most briefly in the UFC.  And so you don't have

9  complete data.  You draw an inference.

10      Dr. Singer's impact regression shows impact to every

11  single fighter who was in the UFC relatively briefly and just is

12  unable to show impact for about a dozen of the longest-standing

13  fighters, which means that these fighters would be impacted at

14  least at 99 percent if you were to draw any sort of reasonable

15  inference.  But, again, it's a brand new argument in a brief

16  that we got this morning for the first time.

17      Zuffa --

18      THE COURT:  Do you want to address briefly the issue

19  about the article?

20      MR. DAVIS:  So the article -- first of all, nothing

21  that opposing counsel said said the article's unreliable.  It

22  said the journal in which it appeared was unreliable.  And

23  opposing counsel said it was a fraud and -- but the fraud is the

24  journal.  We don't know that the article -- authors of the

25  article were duped or the folks who evaluated it were duped.

1          And, you know, I will say -- so Mr. Isaacson said, oh,
2  it's a fraud.  We just found out.  We don't know when they found
3  out about this.  I wish this weren't a pattern, but I do have to
4  say, Your Honor, every time we make an argument, Zuffa feels as
5  if it should be getting the last word.  They've done new
6  regressions during this hearing.  They've presented new evidence
7  and new arguments in the briefs they submitted this morning
8  which we took to be only summaries of what had already been
9  done.

10          This is not some anomaly.  This is a pattern and
11  practice where if things don't seem to be going well, let's come
12  up with yet a new argument at the last minute and hope that
13  suddenly changes everything.

14          And so I would say, Your Honor, it is way too late.
15  There is no basis, appropriate basis, for you to evaluate this
16  point.  We don't really need it anyway, but just on principle
17  that -- Your Honor should not be taking -- I respectfully submit
18  -- we respectfully submit, Your Honor should not be taking into
19  account this or the brief that we'll get on Monday on this
20  hearing or the one we'll get a week from Monday or the
21  regression that will come a week after that.

22          At some point when there's a clear order in place about
23  how these things should proceed, they should stop.  And this is
24  well past that time, and it's not the first time we've been well
25  past that time.

1        Now, opposing counsel started off by proposing a

2   standard that exists nowhere in the case law and in fact would

3   violate I think the Rules Enabling Act.  He said common impact

4   is not an element of plaintiffs' claim.  Common impact isn't an

5   element, but impact absolutely is.  Fact of damage impact is.

6        So the showing plaintiffs have to make at class

7   certification is that they can prove impact with common

8   evidence, which means common evidence of a widespread effect.

9   He, opposing counsel, made this argument, which is a fascinating

10  innovation for those of us who live this life, but has no basis.

11  And he said, well, common impact is not something the jury's

12  going to have to decide.  So now it's a new thing that exists

13  only in antitrust class actions.  It's something that plaintiffs

14  have to prove that they wouldn't have to prove in individual

15  litigation so the judge has to decide that on the merits.

16        Well, the Court has been -- the Supreme Court has been

17  very clear, you don't create a new requirement because you're in

18  a class action.  That would violate the Rules Enabling Act.

19  That's procedure-altering substantive doctrine.

20        Second, what you will find in case after case after

21  case favorable to plaintiffs and unfavorable is that they say

22  the thing that the Court is to do is to ask what will the jury

23  actually be asked and can that be proven or attempted to be

24  proven on a predominantly common basis.  That's the query.

25  That's how you frame this query.  How is the litigation going to

2:15-cv-01045-RFB-PAL

1  proceed?  How is trial ultimately going to proceed?

2          Now, if common impact is not something the jury's going

3  to be asked, then it is not something that has to be proven at

4  class certification.  That would be a complete artifice that has

5  nothing -- that bears no relationship to ordinary litigation as

6  it would otherwise proceed.

7          So he's -- again, not seeing this argument ever, he's

8  made it before in this case, we've seen it before in this case,

9  but in other litigation, that's just not how class certification

10  doctrine proceeds.  It's the -- it's some sort of alternative

11  universe.  It's a reverse universe where we're doing the exact

12  opposite of the way one ordinarily frames the standard.

13          Another point that was made -- and I am not going to

14  get to all of them unfortunately.  I do hope if there are any

15  concerns that you have, please raise them, but was that

16  plaintiffs say, oh, wage share is used to test -- to assess the

17  effects of monopsony power a lot throughout the whole sports

18  literature.  However, says opposing counsel, not in a

19  regression.  But as Professor Manning and Dr. Singer have

20  testified, that just makes our analysis more rigorous.

21          Professor Scully did what Dr. Singer did in a close

22  approximation.  He just did it much less rigorously.  It's not a

23  criticism of Professor Scully.  We just have access to data that

24  is extraordinary.  It is -- unless you're in litigation, you

25  can't get Zuffa to turn over all of these details about all of

—2:15-cv-01045-RFB-PAL—

1    these fighters to run this amazingly rigorous regression.

2    That's the only -- that's why we get to do it.  But that's not a

3    reason to criticize what we have done.  That's a reason to think

4    it's particularly rigorous and careful.  And so the idea that

5    that somehow make it novel is baseless.

6              And, in general, one of the main points opposing

7    counsel of Zuffa has made is, hey, this has never been done

8    before, Your Honor.  Oh, it's a crisis, chicken little, never

9    been done.  So, first, there's two points I'd say about that.

10   One, it's untrue.  And, two, it's irrelevant.

11             So the first point about being untrue, it is untrue

12   that it is -- it is true that it has never been done, perhaps,

13   as rigorously as this, but it is not true that it hasn't been

14   done.  If you're talking about monopsony antitrust cases, we

15   have it in the briefs.  I can cite to you eight of them.  If

16   you're talking about Section 2 cases, monopsony antitrust cases

17   that were certified, I could cite you eight of them that I have

18   written down.  If you're talking about --

19             THE COURT:  Certified in terms of?

20             MR. DAVIS:  Class certification.

21             THE COURT:  No, but on -- in regard to what issue in

22   particular?  I just want to make sure.

23             MR. DAVIS:  In regard to monopsony antitrust cases

24   certified that the monopsony claims could go forward on a class

25   basis.

———2:15-cv-01045-RFB-PAL———

1          THE COURT:  Okay.

2          MR. DAVIS:  And we cite to eight cases that do that.

3   We cite to multiple Section 2 cases that were certified for

4   class treatment.  Allen versus Dairy Farmers is one.

5   Southeastern Milk is another.  We cite to worker antitrust

6   cases.

7          THE COURT:  No, I understand that.  I just wasn't

8   sure --

9          MR. DAVIS:  Sure.

10          THE COURT:  -- when you said that generally.

11          MR. DAVIS:  I apologize for not being clear.

12          And we cite to multiple cases that use wage share and

13   that were certified.  One of them, Arizona versus Johnson, was

14   in 2009.  It's true that wage share wasn't used in an actual

15   regression.  It was in a proposed regression because, as I

16   mentioned earlier, the standards keep going up, but now we've

17   done the regression.  We've done the full merits analysis.  That

18   just makes our analysis more rigorous.

19          And in White versus NCAA, again, less rigorous, not

20   with regression, but wage share was used in a case that was part

21   of certification.  So it's not true this has not been -- this

22   exact thing, particularly this incredibly rigorous thing, sure,

23   that has not been done in precisely the same way.  But that's

24   just because the science is advancing and the standards keep

25   going up.  And what we do as plaintiffs just keeps improving,

—2:15-cv-01045-RFB-PAL—

1   but it's also irrelevant.  There's no non-novelty requirement of

2   Rule 23.  Rule 23(z) doesn't say, hey, if this is novel, the

3   judge can't do it.  Actually, it says the opposite.  Shady

4   Grove, the Supreme Court said, if Rule 23 is satisfied, this is

5   not permissive.  It's required that the class is certified.

6              THE COURT:  All right.  Two minutes, Mr. Davis.

7              MR. DAVIS:  Two minutes.  All right.

8        So much to choose from, so much with which I disagree.

9              THE COURT:  Well, why don't you choose from things that

10   you haven't said.

11             MR. DAVIS:  Right.

12             THE COURT:  Because I think most of it you've actually

13   already said.

14             MR. DAVIS:  Right.

15        Let me unfortunately squander just a few moments

16   looking at my notes.  Maybe I'll talk briefly about -- about

17   Comcast?  I don't know if that's at all a significant concern,

18   but one point we already addressed that foreclosure share

19   clearly does distinguish between the procompetitive and the

20   anticompetitive.  That's what the regression does.  There wasn't

21   really a response to that.  I think what was missed was that

22   Dr. Singer had a response.

23             And then in terms of the benchmark, I do want to come

24   to that -- well, first of all, Comcast is a much -- Comcast, it

25   almost never succeeds.  I don't know why defendants always seem

2:15-cv-01045-RFB-PAL

1  to raise it at class certification.  I think it's sort of the

2  last refuge of the folks who are otherwise at wits' end.

3  Comcast just -- Comcast is a very limited case.  There were four

4  theories on which the plaintiffs proceeded at class

5  certification.  Only one of them the Court determined was

6  appropriate to go forward on a class basis.  The other three,

7  the Court determined you can't go forward on a class basis.  And

8  the expert in that case, a very good expert, Jim McClave said,

9  you know what, I can't disaggregate the damages from the four

10  theories.

11         All the Supreme Court said is, wait a second.  If you

12  can't disaggregate the damages from the four theories and then

13  your theory doesn't match your damages, you can't -- that's not

14  an appropriate -- as gentle as we are on damages, and the Court

15  reaffirmed in 2013 in Comcast very forgiving standard, just an

16  estimate, this goes too far.

17         And the Court noted if all four theories were in and

18  you can't disaggregate, that really might not be a problem, but

19  with three gone and one alive, that's a real issue.

20         So ever since then defendants have been running with it

21  thinking that things have changed.  It almost never works.  The

22  Ninth Circuit in Leyva in the very same year right away said

23  this just stands for the proposition that your theory of

24  liability has to match your damages measure.

25         That -- none of that is a successful critique on

---
—2:15-cv-01045-RFB-PAL—

1  Dr. Zimbalist.  Dr. Zimbalist's benchmarks, all he's doing is

2  he's recognizing that hey -- he said collectively he may have

3  been imprecise at moments.  This is the conduct that plaintiffs

4  are proving is anticompetitive.  And here's these benchmarks and

5  they're the best I can do, right.  It's not perfect, but we're

6  trying to do as well as we can.  And that should give us a

7  reasonable estimate of what the wage share would be in a

8  competitive market.

9       Comcast has nothing to say about that.  That is just a

10  reasonable estimate.  It goes back to the old -- the other line

11  of cases that Comcast reaffirmed that said a reasonable estimate

12  is appropriate.  And I do want to maybe land on one point.

13       THE COURT:  You're over your time.  So this will be

14  your last 30 seconds.

15       MR. DAVIS:  This will be my last 30 seconds.

16       So we offer major sports and boxing as appropriate

17  benchmarks.  So they all point in the same place, 50 percent

18  plus, and they all confirm Dr. Singer's regression.  So Zuffa

19  says, oh, no, those are -- those sports are too well established

20  and too big.

21       So we offer Bellator and Strikeforce as reasonable

22  benchmarks.  Dr. Singer does.  They're smaller and they're newer

23  than Strikeforce -- than the UFC.  And then Zuffa says, oh, no,

24  those are too new and too small.  Those have to be different.

25       And at some point one has to say, when they say they

2:15-cv-01045-RFB-PAL

 1   can't come up with any yardstick and the law says you really

 2   don't go there unless there's absolutely no alternative, we

 3   think that both Dr. Singer and Dr. Zimbalist have come up with

 4   perfectly reasonable alternatives under the appropriate legal

 5   standard.

 6          And with that, thank you very much for your time, Your

 7   Honor.  And as Eric said last time we were here, we really do

 8   appreciate how much work and effort and engagement this has

 9   been.  It has been very trying on us in a good way.  We were put

10   to our paces, and we appreciate that.

11          So thank you, Your Honor.

12          THE COURT:  Thank you.

13          All right.  I think that we are done for today, and

14   then we will regroup in Virginia in a few weeks.  Is that

15   correct?

16          MS. GRIGSBY:  Yes, Your Honor.

17          MR. CRAMER:  September 23rd?

18          THE COURT:  Yes.  And so you do need to be in touch

19   with my deputy about certain arrangements that need to be made

20   in relation to court reporting.  Logistically, there may be some

21   challenges.  So you all are going to have to make some

22   arrangements.  Their court has a slightly different approach and

23   they have court reporters who I think are tied up.  And so the

24   parties will need to make some arrangements to be able to have

25   Live Note court reporting if they want it, which I assume that

—2:15-cv-01045-RFB-PAL—

1   you will.

2           And at that point in time I would anticipate also the

3   Court will have all of its rulings regarding the various

4   outstanding motions that were submitted in the letter.  And

5   we'll go over those together in relation to the motion to see if

6   there's any question about that.  Okay?

7           MR. CRAMER:  And, Your Honor, what time were we

8   starting on September 23rd?

9           THE COURT:  Well, let's see what we have in terms of

10  the court's availability there, but I would say 9 or 9:30.  And

11  we'll block out the whole day until 4:30 or so, but it's likely

12  it will be less than that.  But I'm just saying, because we

13  can't be aware of the logistics right now, the courtroom and

14  who's available and how it will be operated, just block that

15  time out and ask Mr. Silva to be available during that time.  I

16  don't expect the testimony will take the entire day, but it will

17  take a few hours at least.

18          MR. CRAMER:  Your Honor had said you wanted, and just

19  to confirm, an hour for each side on Mr. Silva with plaintiffs

20  going first, then Zuffa, then plaintiffs having some --

21          THE COURT:  Yes.

22          MR. CRAMER:  -- recross.

23          THE COURT:  So I think given what I've heard so far it

24  probably will be about two and a half hours, one hour for each

25  side and then a half hour rebuttal for the plaintiffs.  Just a

——2:15-cv-01045-RFB-PAL——

1   moment.

2           (Court conferring with courtroom administrator.)

3           THE COURT:  All right.  Is there anything else?

4           MR. CRAMER:  I had just one clarification.  Is Your

5   Honor expecting to hear argument on any of the outstanding

6   issues that you just discussed?

7           THE COURT:  The only things I might ask the parties to

8   do is maybe for five or 10 minutes at the end summarize how they

9   think the testimony would be relevant to my overall decision, of

10  Mr. Silva.  You don't need to be redoing the entire argument,

11  but what I would expect is for you all to say why do you think

12  this is helpful or not for your respective positions.  I'll give

13  you some time to do that, 10 minutes.  I don't think you need

14  more than that.

15          MR. CRAMER:  That's fair.  I was referring to Your

16  Honor's discussion of some of the other pending motions.  You

17  said you were going to give your decisions.  And I was just

18  asking whether Your Honor wanted some feedback or argument

19  relating to those other disputes.

20          THE COURT:  Well, we'll have some discussion about that

21  because some of it relates to how logistically to accomplish

22  sealing versus unsealing certain types of these orders.  And so

23  even though I have a good idea of how I want to resolve it, you

24  all know better where these things are in the record.  And so we

25  have to figure out what it looks like when I seal -- keep

2:15-cv-01045-RFB-PAL

1  certain things sealed and certain things unsealed.  And so what

2  I would expect is the parties would come in with some list to

3  help me understand where different things are sealed or

4  unsealed.

5          So, for example, there are certain things that I've

6  unsealed regarding the reports and things like that that I

7  expect you all to be able to identify for me so that I can

8  include them in the record.  And then if -- in knowing which of

9  those documents that they are involved with, Mr. -- Ms. Grigsby,

10 because that's going to be helpful for me.  That's the sort of

11 thing that I expect, just to be able to clarify that.

12         MR. CRAMER:  Okay.

13         MS. GRIGSBY:  Yes, Your Honor.

14         MR. CRAMER:  We can do that.

15         MR. SPRINGMEYER:  Your Honor, will the courtroom be

16 open here on the 23rd should any of us choose to --

17         THE COURT:  No, the courtroom here will not be open.

18         MR. SPRINGMEYER:  Okay.

19         THE COURT:  So if you want to participate, you're going

20 to have to go to Virginia, or we can inquire about whether or

21 not you can call in to listen.  I'm not sure whether or not they

22 have that capability in the courtroom we will have, but you

23 should assume that you won't be able to do that because I just

24 don't know what the functionality is of the courtroom where we

25 will be having testimony.  Okay?

```
                         ─2:15-cv-01045-RFB-PAL─
```

1              MR. CRAMER:  Thank you, Your Honor.

2              THE COURT:  All right.  And I don't think we have any

3    other outstanding issues that we have to address.  I'm going to

4    stay on the bench for a few moments.  I appreciate all of you

5    and all of your time and your commitment to help educate me over

6    these past few days.

7              So we'll be adjourned.  I'm going to stay on the bench

8    for a few moments.  Thank you.

9              MR. DAVIS:  Thank you, Your Honor.

10             MR. ISAACSON:  Thank you, Your Honor.

11             (Whereupon the proceedings concluded at 11:23 a.m.)

12                            --oOo--

13                   COURT REPORTER'S CERTIFICATE

14

15        I, PATRICIA L. GANCI, Official Court Reporter, United

16   States District Court, District of Nevada, Las Vegas, Nevada,

17   certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20   Date:  September 13, 2019.

21                                 /s/ **Patricia L. Ganci**

22                                 Patricia L. Ganci, RMR, CRR

23                                 CCR #937

24

25