Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

*Co-Lead Counsel for the Classes and
Attorneys for Individual and Representative Plaintiffs
Cung Le, Nathan Quarry, Jon Fitch, Luis Javier
Vazquez, Brandon Vera, and Kyle Kingsbury*

*(Additional counsel appear on signature page)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| Cung Le, Nathan Quarry, and Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant. | Case No.: 2:15-cv-01045-RFB-(BNW)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT ZUFFA, LLC'S MOTION FOR RECONSIDERATION (ECF NO. 748)** |

I. **INTRODUCTION**

At the last day of the evidentiary hearing relating to class certification ("Evidentiary Hearing" or "Hearing"), Zuffa sought to elicit testimony from Joseph Silva, its long-time former matchmaker, relating to the economic concept of "wage share." Plaintiffs objected on two grounds: (1) Mr. Silva is a lay witness who is not competent to testify about use of wage share as a lens for analyzing monopsony power, and (2) any testimony from Mr. Silva on this issue would be entirely new given that neither Zuffa nor the Plaintiffs had ever before elicited or even attempted to elicit testimony from any lay witness, including Mr. Silva, on this topic. The Court sustained Plaintiffs' objection, and then, when Zuffa's counsel persisted in asking wage share-related questions despite the Court's ruling on the objection, the Court struck the testimony. Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-103:25-106:11.

Zuffa's request that the Court reconsider its decision not to allow, and to strike, testimony relating to wage share from Mr. Silva (Zuffa's "Motion") should be denied for at least five reasons. First, Zuffa does not even attempt to, and cannot, meet the relevant standard for reconsideration, which in this context (absent new law or evidence, which Zuffa has not invoked) requires demonstrating clear error or manifest injustice. Second, Zuffa's attempt to expand the record, belatedly, with entirely new evidence purporting to relate to wage share from a lay witness is improper. Zuffa had multiple opportunities to present such evidence from its witnesses, including Mr. Silva, during the briefing on class certification or in its expert reports, but it failed to do so. It neither asked Mr. Silva questions on this topic at his 10-hour deposition, nor submitted a declaration from Mr. Silva with its class opposition briefing, nor did it give Dr. Topel access to Mr. Silva to include such information in any of Dr. Topel's five reports. In fact, Zuffa's first effort to elicit testimony from any lay witness relating to wage share was when it attempted to question Mr. Silva about it at the Evidentiary Hearing, and then again in the first and only declaration it submitted from Mr. Silva (attached to its Motion), sixteen months after the close of briefing on class certification. That untimely declaration should be stricken from the record along with Mr. Silva's improper testimony on the topic.

Third, contrary to Zuffa's Motion (at 1-2), Zuffa's wage share questions have nothing to do with the Court's rationale for having Mr. Silva testify at the Hearing. As the Court stated when it set the

Hearing, the purpose of Mr. Silva's appearance was to evaluate Plaintiffs' and Dr. Singer's reliance on Mr. Silva to demonstrate that Zuffa had maintained internal equity in compensating its fighters. Dr. Singer cited economic principles and literature and Plaintiffs cited cases showing that a firm's adoption and maintenance of pay equity among its workers has the effect of creating an informal pay structure, which causes any generalized effects on compensation to be broadly experienced across a class. As the Court stated, Mr. Silva's testimony was "potentially crucial at least to be able to evaluate whether or not there was in fact internal pay equity. And if there was, that's I believe potentially a separate basis" for certifying the class. Ex. B (Dec. 14, 2018 Hrg. Tr.) at 12:21-13:3. Zuffa's proposed wage share-related questions are far afield from the Court's rationale for having Mr. Silva testify.

Fourth, the core of the sought testimony is inaccurate in that it contradicts other testimony from Mr. Silva himself as well as Zuffa's own data and documents. In Mr. Silva's untimely declaration, he says that he supposedly had "never heard of the concept of paying athletes a share of revenues until [he] learned about this lawsuit," ECF No. 748-3, at ¶8, and "no [MMA] athlete ever asked [him] for a contract wherein the athlete would earn a certain percentage of the event revenue as payment." *Id*. at ¶9. But Mr. Silva's internal documents and his deposition and Hearing testimony reveal that some Fighters—indeed some of the highest paid Zuffa Fighters—requested and were paid a percentage of pay-per-view ("PPV") revenues, *i.e.*, percentages of the highest-revenue events that Zuffa holds. *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-85:25-86:13. Relatedly, he also testified that Zuffa implemented certain bonuses after events to help align Fighter pay with actual revenue-generating performances. *See, e.g.*, *id.* 7-122:11-20. Accordingly, to the extent that Mr. Silva meant to imply in his new proffered testimony that Zuffa did not pay some fighters based on revenues generated at certain events, *that would be false*.

Fifth, even if the testimony were accurate, it would be irrelevant to any issue at stake at class certification. The sought wage share testimony, even if true, would be fully consistent with the existence of internal equity and a pay structure, and thus with a proper showing of common impact. Zuffa could maintain internal equity—paying similar fighters similarly—whether or not it used wage share in setting their compensation. Moreover, as an economic matter, the question of whether wage share is an

appropriate metric to analyze the claims in the case is unrelated to whether the UFC agreed to pay Fighters based on a share of revenues. Zuffa's labor economist, Prof. Oyer, admitted at deposition that the method by which workers are paid (level or share) is not informative about whether wage level or wage share is an appropriate analytical tool for economically evaluating worker pay. *See* Ex. C (Oyer Tr.) at 91:2-9 (testifying that merely because certain salespeople are paid based on commissions, *i.e.*, paid a share of the revenues they generate, does not necessarily mean that wage share is the appropriate lens to evaluate their compensation). Further, courts and the academic literature use wage share as an analytical tool even for workers who are not paid based on a percentage of revenues. *See, e.g.*, *White v. NCAA*, 2006 WL 8066803, at *5 & n.4 (C.D. Cal. Oct. 19, 2006) (certifying class of NCAA athletes and endorsing the plaintiffs' expert's use of wage share to assess the impact and damages of the alleged anticompetitive conduct on college athletes even though the athletes were compensated with scholarships and not based on a percentage of revenues). Prof. Topel himself conceded that academics studying the effects of eliminating the reserve clause in Major League Baseball appropriately used wage share to evaluate athlete pay, *see, e.g.*, Ex. D (Aug. 27, 2019 Hrg. Tr.) at 2-248:3-23, even though individual baseball players are paid in wage levels, not wage share. Moreover, Zuffa and WME have used wage share as a relevant metric in evaluating Fighter pay even though many Fighters are paid in levels, not share. *See, e.g.*, Plaintiffs' Hearing Exs. 1[1] and 10.[2]

Finally, Zuffa's motion and its multiple repeated efforts to elicit the disallowed wage share testimony more generally continues Zuffa's pattern of belatedly attempting to introduce new evidence and arguments. Zuffa, for example: (1) submitted five reports from Dr. Topel despite being originally allowed only one, (2) tried to present entirely new expert materials by a new and previously undisclosed expert during this Hearing, misrepresenting those materials as "summary exhibits," (3) attempted to submit brand new regression analyses in the middle of the Hearing, and (4) presented

---

[1] Plaintiffs' Hearing Ex. 1 is the 2016 WME presentation titled "Project Basquiat Final Posting Memo," submitted to the Court as PCCX41 and excerpts were attached to Plaintiffs' Motion for Class Certification, ECF 518-43. Page 12 of Plaintiffs' Hearing Ex. 1 includes a chart showing WME used wage share to track past Fighter compensation and to project future Fighter compensation as event revenues increased.

[2] Plaintiffs' Hearing Ex. 10 is the 2013 internal Zuffa email with attachments charting Zuffa's wage share over time.

entirely new arguments with new evidence in the summary brief it filed on September 12, 2019. As Plaintiffs highlighted during closing arguments, "This is not some anomaly. This is a pattern and practice where if things don't seem to be going well, let's come up with yet a new argument at the last minute and hope that suddenly changes everything. And so I would say, Your Honor, it is way too late." Ex. E (Sept. 13, 2019 Hrg. Tr.) at 6-124:10-14. Zuffa's latest salvo in this pattern is the sought "wage share" testimony from Mr. Silva. It is late, wrong, and irrelevant. In short, Zuffa's motion for reconsideration should be denied and its brand-new Silva declaration should be stricken.

## II. BACKGROUND AND DISCUSSION OF MR. SILVA'S TESTIMONY

Plaintiffs, through one of their economic experts, Dr. Hal Singer, proffered two standard independent methods of demonstrating that the challenged conduct (the "Scheme") suppressed Fighter pay broadly across the proposed Class, *i.e.*, demonstrated common impact. First, Dr. Singer specified a regression model—his impact regression—showing that the collective wage share of Bout Class Fighters was much lower in the actual world (approximately 20%) as compared to what it would have been in the "but-for" world absent the Scheme (more than 50%). Importantly, Dr. Singer's impact regression had such granular data that Dr. Singer was able to use his model to assess, for each fighter in each bout, whether pay was suppressed by the Scheme. The model showed that 99% of the Fighters suffered impact. *See, e.g.*, Ex. F (Aug. 26, 2019 Hrg. Tr.) at 1-185:20-186:2; Expert Report of Hal J. Singer (Aug. 31, 2017) ("SR1") ¶¶210, 230-32; Rebuttal Expert Report of Hal J. Singer (Jan. 12, 2018) ("SR2") ¶¶150-52.[3]

As this Court is aware, Dr. Singer also implemented a second proof of common impact. For that second method, he started with the first step of the impact regression (as well as his other analyses showing that the Scheme depressed fighter pay, *see, e.g.*, SR1 ¶¶188-92). SR1 ¶¶209, 211, 213-29; Ex. F (Aug. 26, 2019 Hrg. Tr.) at 1-184:22-185:12, 1-186:18-187:11, 1-188:8-21; Ex. G (Aug. 28, 2019 Hrg. Tr.) at 3-132:22-133:10. He then separately determined, with other classwide evidence and analyses, that Zuffa's pay practices maintained and imposed a pay structure. *Id.* The pay structure arose

---

[3] SR1 was provided to the Court as JCCX49 and is on the docket at ECF No. 518-3. SR2 was provided to the Court as JCCX71 and is on the docket at ECF No. 518-4.

because Zuffa sought to justify relative differences in the pay of its fighters based on a handful of objective, common factors—*i.e.*, it adhered to and maintained internal pay equity. *Id.* As a matter of economics, when a pay structure exists, any generalized pay effects—such as suppression due to an anticompetitive scheme—would be expected to have widespread effects across a Class. *Id.*

It is this latter, second, independent proof of common impact to which the testimony of Joseph Silva is relevant. As the Court itself observed in stating the rationale for having Mr. Silva testify, "Mr. Silva's testimony is potentially crucial at least to be able to evaluate whether or not there was in fact internal pay equity. And if there was, that's I believe potentially a separate basis" for certifying the class. Ex. B (Dec. 14, 2018 Hrg. Tr.) at 12:21-13:3. Consistent with the Court's rationale, Plaintiffs elicited testimony from Mr. Silva at the Hearing demonstrating that Zuffa had adhered to and maintained internal pay equity in compensating its Fighters. Specifically, Mr. Silva testified, among other things, that:

- Zuffa paid its Fighters in a structured fashion, including, *e.g.*, a set payment to appear at the fight ("to show"), a set payment if the Fighter won ("to win"), bonuses based on the Fighter's performance at an event, and, in some cases, Fighters were paid a percentage of Pay-Per-View revenues. *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-121:2-122:20, 7-85:25-86:13.

- The amounts and form of compensation for all UFC Fighters reflected two primary common and objective factors, namely, the Fighters' expected "popularity" and "performance." *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-54:23-55:24, 7-41:23-42:1; *see also id.* 7-57:10-22 (discussing PCCX255: "Q. …You tell him, 'Everybody has it tough. I have to do what is fair for everyone. You make what you make based on performance and popularity.' … by 'performance and popularity' you meant … that fighters are paid on your view and the UFC's view as to the expected fan interest and the fighter's expected performance when they fight, correct? A. Right"); *id.* 7-58:2-7 ("Q. … [I]f a fighter is expected by you or the UFC to generate more fan interest, you are willing to pay him more relative to a fighter that you believe is expected to generate less fan interest, correct? A. Yes."); *id.* 7-42:2-50:21, 7-59:24-60:8, 7-60:12-19.

- Each of the small handful of UFC executives who determined the pay of UFC Fighters "attempted to be fair and slot the fighters in terms of [the executives'] view of [the fighters'] popularity and performance." Ex. A (Sept. 23, 2019 Hrg. Tr) at. 7-118:2-14; *see also, e.g.*, *id.* 7-61:14-62:16, 7-60:12-61:11.

- Mr. Silva imposed and enforced what he called "a pay structure," requiring him to justify his decisions to all other Fighters. Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-53:2-8 (discussing PCCX391: "Q. … You say: 'As I said, I have a pay structure. I cannot mess it up for one fighter. I have to justify that to all the other managers.' You wrote that, correct? A. Correct."); *see also id.* at 7-53:17-54:22 (discussing PCCX338: "Q. … [O]n page 2 you write … 'As I said, I have 200 fighters under contract, and our purses are public. I have to justify to all my other fighters what I pay out. There are people under contract to me now that are not making as much as I offered Ricardo [Almeida], and they are better known to our fans and have more

UFC fights than he does.' Do you recall writing that? A. Yes. Q. So you're trying to justify the pay … to this fighter by saying, hey there are some other people who may even be better than you that are getting less? A. Correct. Q. So you're trying to convince the fighter that you're treating him fairly, is that right? A. Yes. Whenever I've dealt with fighters, I have tried to be able to justify my offer.").[4]

- Mr. Silva and the other UFC executives who negotiated Fighter pay dealt with discrete sets of Fighters and attempted to be consistent in their application of the common objective pay factors to the Fighters with whom each dealt. *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-93:2-15, 7-95:2-101:8, 7-120:19-121:1.

In other words, Zuffa adhered to and maintained "internal equity" amongst its fighters. SR1 ¶¶209-29. Firms that maintain internal equity, like Zuffa, naturally and inevitably impose a pay structure because each worker is compensated based on the value he or she adds relative to the value added by other workers. *Id*. When such principles are in effect, multiple courts have found common impact and certified classes. *See, e.g., High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167, 1213-14 (N.D. Cal. 2013) (finding common impact, and certifying worker class, where six defendant firms "adhered to principles of internal equity [meaning] similarly situated and similarly performing employees were paid similarly"); *see also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 293 (N.D. Cal. 2016); *Seaman v. Duke Univ.*, 2018 WL 671238, at *4 (M.D.N.C. Feb. 1, 2018).[5]

---

[4] Mr. Silva's deposition testimony further elaborated on these concepts. For instance, at deposition, he testified as follows:

> Q. … [S]o you wanted to make sure that you did your best to try to make sure that comparable fighters with comparable records are getting paid comparable amounts; is that fair?
>
> A. Yeah, that was my goal.
>
> Q. And one of the reasons why you did that is because you had to justify everyone's pay to everyone else, and … if you were doing this poorly or inefficiently, you'd constantly have fighters demanding more money…; is that right?
>
> A. It would just seem unfair to give somebody something that somebody else, equally deserving didn't get.
>
> Q. And you attempted, at least in your mind, to be fair, to impose a sense of equity between the different fighters; correct?
>
> A. I did.

Ex. H (Silva. Tr.) at 372:22-373:18.

[5] Notably, this case is far more straightforward than these three prior cases for showing common impact. None of these other cases had the type of granular regression analysis capable of showing harm on a per-worker basis. The plaintiffs in each of these cases had only generalized regression analyses showing overall pay suppression at the company level. Further, in those cases, there were literally

At firms that maintain internal pay equity, the compensation of workers at different levels is inextricably tied together, and thus moves together for all workers in response to common forces. *See, e.g.*, SR1 ¶¶213-14; Ex. F (Aug. 26, 2019 Hrg. Tr.) at 1-184:22-185:12, 1-186:18-187:11, 1-188:8-21; Ex. G (Aug. 28, 2019 Hrg. Tr.) at 3-132:22-133:10. Mr. Silva's testimony and documents explain *why* Dr. Singer and Dr. Topel both found that Fighter pay at all ranking levels moved together through time. *See, e.g.*, Ex. G (Aug. 28, 2019 Hrg. Tr.) at 3-65:16-66:10 ("Q. You agree … that you found that Zuffa fighters in all ranking categories: 1 to 15, 16 to 30, 31 to 50, 51 to 100 and 100 and worse, the compensation, on average, in all of those tiers moved up during the course of the study period, correct? A. I believe that's true… Q. Okay. And in your opinion …, the reason for that is that there was a general increase in demand for fighter services that … caused fighter pay in all of the different ranking categories to move, correct? A. I – I'm sure I said something like that."); *see also* SR1 ¶¶228-29 & Table 7 (describing regression assessing degree to which gains and losses in compensation for individual fighters were statistically associated with gains and losses to fighters overall); *id.* ¶227 (describing regression showing that 78% of variation in fighter compensation is explained by common, objectively measurable variables). Internal equity and a pay structure ensure that any factor broadly affecting compensation, such as increased demand for worker services (per Dr. Topel), or a Scheme that enhances a firm's monopsony power (per Plaintiffs and Dr. Singer), would be expected to have widespread effects across the firm's workers. In short, Mr. Silva's testimony bolstered Dr. Singer's second proof of common impact, and thus Plaintiffs' case for class certification.

### III. ZUFFA DOES NOT MEET THE STANDARD FOR RECONSIDERATION

Nowhere in Zuffa's Motion does it set forth the applicable legal standard. And for good reason: Zuffa articulates no basis whatsoever that could meet that standard. "Reconsideration is an extraordinary remedy, to be used sparingly." *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*, 245 F.R.D. 470, 472 (D. Nev. 2007); *see also Bartech Sys. Int'l, Inc. v. Mobile Simple Solutions, Inc.*, 2018

---

hundreds of different job titles, salary ranges, and job functions across multiple different firms. The problem for the plaintiffs there was showing that changes in the pay at one job (say, software engineer) would affect the pay at all of the others (*e.g.*, multiple types of hardware engineers, multiple types of software engineers on different products, and graphic designers). Here, there is one firm and only one job title: MMA Fighter, making proof of common impact much simpler.

WL 1785869, at *1 (D. Nev. Apr. 13, 2018) ("Motions for reconsideration are disfavored."). Local Rule 59-1(a) provides that reconsideration may be appropriate if: (1) there is newly discovered evidence that was not available when the original motion was filed, (2) the court committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change of law. *See also S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1100 (9th Cir. 2010) (same); *United States v. Gibson*, 2017 WL 379413 (D. Nev. Jan. 25, 2017) (same).

The party seeking reconsideration bears the burden of establishing appropriate grounds for that relief, *Bartech*, 2018 WL 1785869, at *1, but Zuffa has not attempted to do so. To meet this burden, the party must set forth a "valid reason" why the court should reconsider and set "forth facts or law of a strongly convincing nature to persuade the court to reverse its prior decision." *ESCO Corp. v. Cashman Equipment Co.*, 158 F. Supp. 3d 1051, 1076 (D. Nev. 2016). "A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court has already ruled." *McCart-Pollak v. Etkin*, 2017 WL 8682118, at *1 (D. Nev. Dec. 28, 2017) (quoting *In re AgriBioTech, Inc.*, 319 B.R. 207, 209 (D. Nev. 2004)); *see also ESCO*, 158 F. Supp. 3d at 1076 (same).

Zuffa provides no newly discovered evidence, nor does it cite any case law (much less an intervening change in law), and Zuffa does not argue that the Court committed a "clear error" or that the Court's decision was manifestly unjust. Instead, Zuffa argues only that the Court previously asked for the testimony Zuffa seeks to add to the record. That is both inaccurate and insufficient to meet the applicable reconsideration standard. As set forth above, the Court's stated rationale for Mr. Silva's testimony was to evaluate Plaintiffs' and Dr. Singer's reliance on his deposition testimony and documents in which Mr. Silva stated that he adhered to and maintained internal equity and enforced a pay structure. Neither Zuffa nor Plaintiffs had ever before sought to elicit testimony from Mr. Silva on the economic topic of wage share. Further, even if the Court had requested such testimony from Mr. Silva, the Court's decision to exclude it at the Hearing does not constitute a "clear error," nor is it manifestly unjust—and Zuffa does not demonstrate otherwise. Zuffa's motion should be denied and Mr. Silva's untimely declaration should be stricken.

## IV. ARGUMENT

### A. The Disallowed "Wage Share" Testimony Is Entirely New and Too Late

The disallowed testimony should not be permitted because it is entirely new. Before Zuffa raised the issue at the Evidentiary Hearing, neither party had ever before sought to elicit such testimony from Mr. Silva (or any other lay witness). Zuffa did not ask Mr. Silva such questions at his 10-hour deposition. Zuffa did not submit a declaration from Mr. Silva in its class opposition papers. Zuffa did not make Mr. Silva available to Dr. Topel in drafting his reports. And Plaintiffs did not ask Mr. Silva about such issues during its questioning of Mr. Silva at the Hearing, and thus Zuffa's attempt to elicit such testimony was also beyond the scope (in addition to be entirely new). Zuffa even conceded at the Hearing that testimony from Mr. Silva concerning wage share was new. Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-103:25-105:8 ("THE COURT: … Ms. Grigsby, did he ever previously testify about wage share? MS. GRIGSBY: He did not[.]"). Accordingly, when Zuffa attempted to ask Mr. Silva about wage share, Plaintiffs immediately objected. And the Court sustained the objection. *Id.* Finally, Zuffa's contention that Mr. Silva, as a fact witness, is not limited to his deposition testimony, Motion at 2, is irrelevant. This is not the trial. The context is a Hearing on a fully briefed motion. It would be unfair and prejudicial to permit Zuffa to introduce new material during the class certification Hearing when it had a full and fair opportunity to present its case in briefing that closed more than a year ago and through the testimony of three of its economists at the Hearing.[6]

### B. The Court Requested Testimony on Pay Structure and Internal Equity, Not Wage Share

As set forth above, the Court stated that the purpose of Mr. Silva's appearance at the Hearing was to testify concerning whether Zuffa adhered to and maintained internal pay equity, and thus imposed a pay structure. *See* Ex. B (Dec. 14, 2018 Hrg. Tr.) at 12:21-13:3, 16:8-17; Ex. F (Aug. 26, 2019 Hrg. Tr.) at 1-187:16-25; Ex. E (Sept. 13, 2019 Hrg. Tr.) at 6-87:20-24. Zuffa's citation to a colloquy between Zuffa's counsel and the Court, Motion at 1, does not help them. The full colloquy

---

[6] That prejudice would be compounded by the fact that the Court excluded the testimony during the Hearing. Admitting it now through Mr. Silva's proffered declaration would prevent Plaintiffs from cross-examining Mr. Silva on this testimony. Indeed, the prejudice stemming from the lack of cross-examination is readily apparent given that, as set forth below, Mr. Silva's proffered declaration contradicts his Hearing testimony, the evidentiary record in this case, and his deposition testimony.

makes clear that the Court sought to hear from Mr. Silva concerning pay structure, not wage share. Ex. E (Sept. 13, 2019 Hrg. Tr.) at 6-86:1-87:24. Zuffa never presented the Court with any reason to believe that Mr. Silva had relevant knowledge about whether wage share is an appropriate economic lens through which to evaluate Zuffa's Scheme—and as set forth below, he does not have such relevant knowledge. The Court stated that Mr. Silva would testify about pay structure and internal equity, and the Court thus correctly limited Mr. Silva's testimony consistent with its rationale.

### C. The Disallowed Testimony Is Misleading and Wrong

In Mr. Silva's newly proffered declaration, he attests that he had "never heard of the concept of paying athletes a share of revenues until [he] learned about this lawsuit," ECF No. 748-3, at ¶8, and "no [MMA] athlete ever asked [him] for a contract wherein the athlete would earn a certain percentage of the event revenue as payment." *Id*. at ¶9. This proposed testimony contradicts other portions of Mr. Silva's testimony (and the substantial documentary evidence and data). Specifically, Mr. Silva testified that Zuffa paid certain of its Fighters a percentage of Pay-Per-View ("PPV") revenues. *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-85:25-86:13 ("Q. And you also mentioned that some athletes negotiated shares of Pay-Per-View revenues; is that correct? A. Correct. Some fighters would get a piece of the Pay-Per-View."). In a PPV event, the highest revenue events the UFC holds, the largest component of the event revenue is the PPV purchase revenues. Thus, Mr. Silva is aware that the UFC has in fact paid some of its most prominent Fighters a share of event revenues. Similarly, Silva is aware of Fighters requesting PPV revenue shares. For example, Silva testified at his deposition that "some" fighters "frequently asked for [PPV] cuts in compensation negotiations." Ex. H (Silva Tr.) at 436:9-17. Relatedly, he also testified that Zuffa implemented certain bonuses after events in order to align better Fighter pay with actual revenue-generating performances. *See, e.g.*, Ex. A (Sept. 23, 2019 Hrg. Tr.) at 7-122:11-20. That Zuffa sought to align the pay of its Fighters relative to each other not merely with expectations regarding popularity and performance, but also with actual popularity (as measured in fan interest and revenues generated) and performance is exactly what a firm seeking to maintain internal equity would do. *See, e.g.*, *id*. Mr. Silva's proffered declaration is thus, at best, misleading given that he was certain that Zuffa's most prominent Fighters both request and receive PPV event revenue

percentages as compensation.[7]

### D. The Disallowed Testimony Is Irrelevant Legally and Economically

Even if Mr. Silva's disallowed testimony were neither new nor false and misleading, it should still be disallowed because it is irrelevant. The appropriateness of wage share as a metric to evaluate the claims in this case is an economic question that Mr. Silva is not qualified to answer (and no one has argued Mr. Silva possesses relevant economic expertise). Further, Zuffa's apparent purpose in seeking to elicit wage share-related testimony from Mr. Silva is to attempt to show that Zuffa did not pay individual Fighters based on shares of revenue. Whether Zuffa pays some of its Fighters based on a share of revenues that they generate—which Zuffa, in fact, *does*—is not actually relevant to the underlying question of whether wage share is an appropriate metric to evaluate Plaintiffs' claims. Zuffa's own economist, Dr. Oyer, conceded that how a worker is paid—in level or share—does not determine whether worker compensation is properly analyzed by level or share. *See* Ex. C (Oyer Tr.) at 91:2-9 (testifying that merely because certain salespeople are paid based on commissions, *i.e.*, paid a share of the revenues they generate, does not necessarily mean that wage share is the appropriate lens to evaluate their compensation). The case law implicitly endorses the same view. For example, *White v. NCAA* approved plaintiffs' expert's use of wage share to assess the impact and damages of the alleged anticompetitive conduct on a class of college athletes even though the athletes were compensated with scholarships and not based on a percentage of revenues. *See* 2006 WL 8066803, at *5 & n.4 (C.D. Cal. Oct. 19, 2006).

The academic literature also analyzes the wage shares of professional and collegiate athletes even though their wages are not set as a percentage of revenue. *See, e.g.*, SR2 ¶6 n.5 (collecting

---

[7] An alternative ground for striking Mr. Silva's new declaration is that it is a "sham affidavit." *See, e.g.*, *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("This sham affidavit rule prevents a party who has been examined at length on deposition' from 'rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'"). The Court should not permit a sham affidavit to defeat class certification when it could not be used to create an issue of fact at summary judgment.

articles); *id.* at ¶¶88-100.[8] For example, in a 2013 study, Prof. James Monks analyzed the NCAA's monopsony power over athletes using the "share of revenue returned directly to the" athletes even though those athletes are compensated through scholarships and other payments that are not based on shares of revenues.[9] Profs. Monks and Twomey published a paper in 2011, which analyzed revenue shares as a means to infer the exercise of monopsony power by Major League Soccer ("MLS"), even though MLS players' compensation is set in dollars, not wage share.[10] Even where players' associations bargain for a salary cap that is set as a percentage of revenues, *e.g.*, the NFL and NBA, players in those leagues are nevertheless compensated on an individual basis in dollars, not shares of revenues; and the academic literature nevertheless uses wage share as a lens of analysis to assess the presence of or changes in monopsony power over time.[11] Zuffa and WME have also used wage share as a relevant metric in evaluating Fighter pay even though many Fighters are paid in levels not share. *See, e.g.*, Plaintiffs' Hearing Exs. 1[12] and 10.[13] Thus, the case law, academic articles and even Zuffa's economists agree that the disallowed testimony is irrelevant to whether wage share is an appropriate

---

[8] Moreover, even non-sports economists have used wage share to study concentration in labor markets wherein employee compensation is denominated in dollars, not shares of revenue. *See, e.g.*, SR2 ¶107 (discussing Simcha Barkai, *Declining Labor and Capital Shares*, Univ. of Chicago New Working Paper Series No. 2 (Nov. 2016) (concluding that "an increase in [market] concentration is associated . . . with a decline in the labor share."), which was provided to the Court as PCCX644, admitted to the Evidentiary Hearing Record as Plaintiffs' Ex. 16, and filed as an attachment to Plaintiffs' *Daubert* briefing at ECF No. 534-31).

[9] *See* SR2 ¶99 (discussing James Monks, *Revenue Shares and Monopolistic Behavior in Intercollegiate Athletics*, Cornell Higher Education Research Inst. Working Paper 155 (Sept. 2013), at 3, which was provided to the Court as PCCX506, and attached to Plaintiffs' *Daubert* briefing at ECF No. 534-29).

[10] *See* SR2 ¶98 (discussing Twomey & Monks, *Monopsony and Salary Suppression: The Case of Major League Soccer in the United States*, 56(1) THE AMERICAN ECONOMIST 20-28 (2011), which was provided to the Court as JCCX61, and attached to Plaintiffs' *Daubert* briefing at ECF No. 534-28).

[11] *See* SR2 ¶98 (discussing John Vrooman, *The Economic Structure of the NFL* in THE ECONOMICS OF THE NATIONAL FOOTBALL LEAGUE: THE STATE OF THE ART, 7 SPORTS ECONOMICS, MANAGEMENT AND POLICY 22-25, 29 (K.G. Quinn ed. Springer 2012), which was provided to the Court as PCCX530); *see also id.* ¶101 (discussing Topel & Murphy, *The Economics of NFL Team Ownership*, Chicago Partners (2009), which was provided to the Court as JCCX63, and attached to Plaintiffs' Daubert briefing at ECF No. 534-32).

[12] Plaintiffs' Hearing Ex. 1 is the 2016 WME presentation titled "Project Basquiat Final Posting Memo," submitted to the Court as PCCX41 and excerpts were attached to Plaintiffs' Motion for Class Certification, ECF 518-43. Page 12 of Plaintiffs' Hearing Ex. 1 includes a chart showing WME used wage share to track past Fighter compensation and to project future Fighter compensation in the future as event revenues increased.

[13] Plaintiffs' Hearing Ex. 10 is the 2013 internal Zuffa email with attachments charting Zuffa's wage share over time.

lens through which to evaluate Plaintiffs' claims.

Mr. Silva's disallowed wage share testimony is not relevant to the question of whether Zuffa maintained internal pay equity and thus had a pay structure—*i.e.*, the purpose of his testimony on Plaintiffs' Motion for Class Certification. Nor is it relevant to the appropriateness of Plaintiffs' experts' use of wage share in this case. These points constitute additional reasons that the disallowed testimony was correctly excluded.

## V. CONCLUSION

Pursuant to the Court's request, Mr. Silva's testimony establishes that Zuffa maintained and enforced internal pay equity—and thereby confirms Dr. Singer's second, independent method for proving common impact. As set forth above, Mr. Silva testified that: (1) Zuffa used common forms of compensation for Fighters, (2) Zuffa determined the amounts of such compensation to Fighters based on common, objective, factors such as "popularity" and "performance," (3) the small number of Zuffa executives responsible for making these compensation decisions consistently applied these factors across all of the Fighters for whom they were responsible, and (4) the executives attempted to apply these factors fairly such that similar Fighters were paid similar amounts. These are precisely the points for which Plaintiffs cited Mr. Silva's testimony in their briefing on Plaintiffs' Motion for Class Certification. *See, e.g.*, Pls. Mot. for Class Certification, ECF No. 518, at 4, 26-28; Reply in Support of Pls. Mot. for Class Certification, ECF No. 554, at 14-15; SR1 ¶¶216-17, 219, 224-26. Consistent with the case law, this testimony demonstrates common impact because any generalized effect on pay—such as by the Scheme here—would be broadly shared across the Class through Zuffa's internal pay structure.

Zuffa's effort to distract from the effect of this testimony by attempting to introduce testimony on wage share from Mr. Silva should not be permitted because: (1) no party has previously elicited testimony from Mr. Silva on this issue and thus any such testimony would be entirely new and inappropriate on a fully briefed motion, (2) the Court never requested Mr. Silva testify concerning wage share, (3) Mr. Silva's disallowed testimony is incorrect, and (4) Mr. Silva is not competent to testify to the appropriateness of using wage share as an economically appropriate metric, nor is his disallowed

testimony relevant to that question. The Court correctly decided this issue at the Hearing in sustaining Plaintiffs' objection. Zuffa has provided no basis for reconsideration under Local Rule 59-1(a), and therefore its motion should be denied.

Dated: October 4, 2019

By: /s/ Eric L. Cramer
    Eric L. Cramer

Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
Mark R. Suter (*Pro Hac Vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000/Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
msuter@bm.net

Joseph R. Saveri (*Pro Hac Vice*)
Joshua P. Davis (*Pro Hac Vice*)
Kevin E. Rayhill (*Pro Hac Vice*)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Phone: (415) 500-6800/Fax: (415) 395-9940
jsaveri@saverilawfirm.com
jdavis@saverilawfirm.com
jchen@saverilawfirm.com
krayhill@saverilawfirm.com

Benjamin D. Brown (*Pro Hac Vice*)
Richard A. Koffman (*Pro Hac Vice*)
Daniel H. Silverman (*Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005
Phone: (202) 408-4600/Fax: (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dsilverman@cohenmilstein.com

**Co-Lead Class Counsel**

**Liaison Counsel for the Class**

Don Springmeyer (Nevada Bar No. 1021)
Bradley S. Schrager (Nevada Bar No. 10217)
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
Phone: (702) 341-5200/Fax (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com

**Additional Counsel for the Classes**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON & FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Phone: (602) 264-7101/Fax: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

William G. Caldes (*Pro Hac Vice*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Phone: (215) 496-0300/Fax: (215) 496-6611
bcaldes@srkattorneys.com

John D. Radice (*Pro Hac Vice*)
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Phone: (646) 245-8502/Fax: (609) 358-0745
jradice@radicelawfirm.com

Frederick S. Schwartz (*Pro Hac Vice*)
LAW OFFICE OF FREDERICK S. SCHWARTZ
15303 Ventura Boulevard, #1040
Sherman Oaks, CA 91403
Phone: (818) 986-2407/Fax: (818) 995-4124
fred@fredschwartzlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October, 2019 a true and correct copy of PLAINTIFFS' OPPOSITION TO DEFENDANT ZUFFA, LLC'S MOTION FOR RECONSIDERATION (ECF NO. 748) and supporting papers was served via the Court's CM/ECF system on all parties or persons requiring notice.

/s/ *Eric L. Cramer*
Eric L. Cramer