Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

---

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01045-RFB-BNW |
| Plaintiffs, | |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendant. | |

---

TRANSCRIPT OF HEARING BEFORE

THE HONORABLE RICHARD FRANKLIN BOULWARE, II

September 23, 2019

9:33 a.m. - 12:13 p.m.

Richmond, Virginia



Page 38

```
 1   Q    And after the acquisition of Strikeforce,
 2   the UFC obtained some or all of these fighters that
 3   I just mentioned, correct?
 4   A    Correct.
 5   Q    Let's look at the next division.  And here
 6   we have light heavyweights consensus rankings
 7   during this period, and we can see the top 25; is
 8   that right?
 9   A    Yes.
10   Q    And Strikeforce had 10, 11, 13, and 14 and
11   19.  And after the Strikeforce acquisition, I
12   believe the UFC acquired all but Dan Henderson; is
13   that right?
14   A    I believe so.
15   Q    And eventually UFC got Dan Henderson; is
16   that right?
17   A    Yes.
18   Q    Okay.
19   A    Which Dan Henderson fought for UFC before
20   that.
21   Q    Right.  Okay.
22        And in this e-mail, as you explained to me
23   at your deposition, you were showing your managers,
24   your bosses, Dana White and Lorenzo, how successful
25   you and Sean Shelby had been at signing the top MMA
```

Page 39

```
 1   talent and the majority of the top fighters in all
 2   of the divisions you identified, right?
 3   A    Correct.
 4   Q    And just to summarize this, you would agree
 5   with me that after the Strikeforce acquisition, the
 6   UFC's share of the top 25 fighters in all of these
 7   weight classes listed went up, higher than it was
 8   in February of 2011, correct?
 9   A    Correct.
10   Q    All right.  You can put that document aside.
11   All right.  Let me turn back to where I was and ask
12   you about -- oh, put up the minimum document.
13        His Honor had a question about the number of
14   fighters being paid at the lower level.  I just
15   want to draw your attention to this aspect of the
16   document.
17        The assumptions of the document was that
18   under Tier 1, which is the first tier of percentage
19   of bouts at show, pay tiers, Tier 1 has less than
20   17,000.  So am I correct that this --
21           MS. GRIGSBY:  Well, I'm just going to
22      object, because he hasn't laid a foundation
23      with this witness that he's knowledgeable.  I
24      mean, the witness just testified he didn't
25      know.  There's no --
```

Page 40

```
 1           THE COURT:  Overruled.  I'll allow it.
 2      He seems to be fairly knowledgeable in this
 3      area.
 4        So, Mr. Silva, you understand what
 5   these tiers were, right?
 6           THE WITNESS:  Correct.  I did not
 7      create this document, but --
 8           THE COURT:  But you understood what the
 9      tiers were that were referenced in the
10      document, I assume?
11           THE WITNESS:  Yes.
12           THE COURT:  Okay.  And what are they?
13           THE WITNESS:  Well, what you saw them
14      at is the minimum if -- amount that we pay the
15      smallest contract.
16           THE COURT:  So Tier 1 would be the
17      minimum amount?
18           THE WITNESS:  Correct.
19           THE COURT:  And Tier 2 would be what?
20           THE WITNESS:  It's anything over that,
21      as it progresses up.  But I don't understand
22      how they got to anything above that because it
23      could vary then greatly depending on how well
24      you did.
25           THE COURT:  Well, I'm sorry.  Are you
```

Page 41

```
 1      saying you didn't -- when they created the
 2      document, you didn't understand what these
 3      tiers were?
 4           THE WITNESS:  Correct.  I disagreed in
 5      general with a lot Danny's projections.  I did
 6      not understand how they got to them.
 7           THE COURT:  Well, it looks like they're
 8      showing actual difference --
 9           THE WITNESS:  Right.  But after a first
10      contract is over --
11           THE COURT:  Right.
12           THE WITNESS:  -- you might negotiate,
13      as has happened after the second fight of a
14      fighter's contract, and that throws that off.
15      Or you might let them fight their contract
16      out, and that would affect where it goes.
17        I think they're trying to come up with
18      an average, where they're trying to figure it
19      out.  But there was no lockstep way of, if
20      this is what the first contract was, this is
21      what the second contract is.
22   BY MR. CRAMER:
23   Q    ==Right.  You're saying that pay of UFC
24   fighters reflected their popularity and performance
25   as they went forward, correct?==
```



11 (Pages 38 to 41)

```
                                              Page 42
 1    A    Correct.  And it could vary greatly.
 2    Q    Right.  But you tried to pay fighters in
 3  accord with what you believed they were bringing to
 4  the table in terms of their performance, how you
 5  expected them to perform, and how popular they were
 6  with the fans, correct?
 7    A    Well, there's a lot more things that go into
 8  it.
 9            THE COURT:  Well, what else would go
10  into -- I mean, other than looking at their
11  popularity, their rank, and their ability to
12  draw fans, what else would you look at besides
13  that?
14            THE WITNESS:  Well, a huge thing that
15  would affect me is -- which was out of my
16  control, but they would bring to me, is they
17  would go, hey, two months from now we're going
18  to do a show in Poland.  And I don't have any
19  Polish fighters.  There was nobody in Poland
20  who particularly interested me, but I'd have
21  to go out now and go find some.  And is it
22  going to now put a new premium on Polish
23  fighters.  This isn't I can take it or leave
24  it.  It's like I have to find Polish fighters,
25  and whatever it cost me to get those fighters,
```

```
                                              Page 43
 1  I now have to do because they've told me we're
 2  doing a show in Poland.
 3            THE COURT:  Well, I understand that.
 4  But my understanding is that most of the
 5  fighters for the UFC at this time were in the
 6  United States; is that right?
 7            THE WITNESS:  No.  We did a lot of
 8  international shows.
 9            THE COURT:  When you say "a lot,"
10  Mr. Silva, you have to be very specific.
11            THE WITNESS:  Right.  But even if they
12  said -- if they said we're going to do one
13  show --
14            THE COURT:  Let me help you.  So what
15  percentage of the fights the UFC put on around
16  this time, 2011, were in the United States?
17            THE WITNESS:  I don't know
18  percentage-wise, but I can --
19            THE COURT:  Well, was it more than
20  half?
21            THE WITNESS:  Yeah, I'd say more than
22  half.  But if they told me we had one show in
23  Korea --
24            THE COURT:  Well, I understand that.
25  So I appreciate what you're talking about, but
```

```
                                              Page 44
 1  that's not necessarily the question I'm
 2  asking.  I'm trying to figure out the
 3  percentages here.  And there may have been --
 4            THE WITNESS:  Right.
 5            THE COURT:  -- shows here.  So would
 6  you say that three-fourths of the fights for
 7  the UFC were in the United States?
 8            THE WITNESS:  Probably.
 9            THE COURT:  Okay.  And so I'm not
10  saying you didn't have some fights, I'm trying
11  just to get some sense of the numbers.
12            THE WITNESS:  Right.
13            THE COURT:  And so -- because in the
14  last few slides, it looked like UFC had
15  control over most of the fighters at this time
16  in certain weight classes, and so that's why
17  when you say you had to go outside to get
18  fighters for certain international fights, I
19  want to just get a sense of how often that
20  happened.
21            THE WITNESS:  Quite often, because if
22  he had told me we were going to have one show
23  in Korea, they're not only going to fight in
24  Korea, they will fight in those other shows
25  that are in the United States.  I owe them
```

```
                                              Page 45
 1  more than one fight when we do multi-fight
 2  deals.
 3            But simply knowing -- if they tell me,
 4  hey, this year we're going to do a show in
 5  Korea, a show in Japan, multiple shows in
 6  Brazil, shows in Europe, I have to get talent
 7  for all of those.  And then I will have to get
 8  them fights, three fights a year, average.
 9            So they'll fight besides just in Korea
10  or Japan or wherever they're from.  I
11  definitely have to have them for that one
12  show.  But to get their other fights, they
13  will then fight in other shows that I have.
14            THE COURT:  So going back to the issue
15  of them and how you would assign or pay the
16  fighters, other than these international
17  fights where you may have to find someone for
18  that local area, other than the rank and the
19  popularity of the fight, what else would you
20  look at?
21            THE WITNESS:  Well, just like it
22  wouldn't have to be a country too.  It could
23  be a city.  If we were going to a big city and
24  they're like, do you have anybody local,
25  somebody for PR that would be good for us for
```



Page 46

1  that city. And I'd have to try and find that
2  person and pay what it would take to get him.
3      If you had somebody -- say there's a
4  local promotion and this guy is the local
5  hero, like it would be good to pick him up for
6  this show because we're doing it in this show,
7  then we'll get local PR and sell local
8  tickets.
9      THE COURT: Right. I understand that.
10 But I'm saying it seems to me, at least from
11 what I've heard about the business, there are
12 a fair number of fighters who are known
13 nationally, that if you didn't -- because of
14 their popularity, you wouldn't have to find a
15 particular heavyweight or other fighter who is
16 just on a particular city, I'm saying in Las
17 Vegas or New York, because they were known
18 nationally.
19     And so other than the idea of
20 potentially scouting local talent, what else
21 did you look at to determine a contract for a
22 fighter?
23     THE WITNESS: Well, his level of
24 competition. So we had some -- what kind of
25 swelled the ranks, as I said, were these

Page 47

1  last-second replacement fights, which we had a
2  huge number of.
3      This sport is very physically
4  demanding. So in my entire career, I've done
5  maybe one card where somebody didn't drop out
6  injured. And I've had cards where more than
7  half the scheduled fighters dropped out
8  injured. So when that happens, I still owe
9  their opponent a fight. So I would prefer to
10 take somebody who is already under contract
11 and have them step in and fight, but those
12 fighters are like, why am I going to take that
13 risk, I didn't have a full training camp to
14 prepare for this, I already have a UFC
15 contract, I'm good.
16     So I have to usually get somebody from
17 outside who is looking to get their first shot
18 with the UFC. So those type of fighters quite
19 often would be more that entry level. It's
20 like this is not really somebody I wanted to
21 sign, but I'm kind of being forced to to get
22 this other guy his fight.
23     THE COURT: So that's why it says
24 66 percent of people in that first tier were
25 --

Page 48

1      THE WITNESS: I think that has a lot to
2  do with it. If you did not have the amount of
3  injuries that we have, I think those numbers
4  would be vastly different.
5      THE COURT: But then it looks like, if
6  you look at these numbers, 83 percent of these
7  fighters are in Tier 1 or Tier 2, right? Less
8  than 30,000; is that right?
9      THE WITNESS: Correct.
10     THE COURT: And is part of that due to
11 what you're talking about, which is obtaining
12 these individual fighters?
13     THE WITNESS: Yeah, I would say -- just
14 say on average if we had to sign three guys as
15 injury replacements per show, and we do 44
16 shows a year, that's a lot of fighters being
17 added.
18     THE COURT: And it looks like many of
19 them, kind of the majority of them, would come
20 in under the standard first contract, minimum
21 contract?
22     THE WITNESS: Right. As I said, they
23 are guys who I not necessarily -- like, this
24 isn't a guy I really want; it's like, this is
25 a guy I need because I owe this other guy a

Page 49

1  fight.
2      THE COURT: So in order to fill sort of
3  gaps or holes in the ticket that would arise,
4  you would bring in these fighters and sign
5  them to these contracts?
6      THE WITNESS: Yes, sir.
7      THE COURT: All right. And then you're
8  not finding them any more fights after the one
9  fight you acquired them for; is that right?
10     THE WITNESS: No. I did give them a
11 standard contract. And it was my practice, I
12 knew you were coming in short notice, so it's
13 not the best circumstances, and it's a jump up
14 in competition for you. So it was very rare
15 that if you lost that fight that I would cut
16 you. I was usually going to give you another
17 opportunity.
18     THE COURT: Okay. Thank you.
19 BY MR. CRAMER:
20  Q   I want to go back to your statement that
21 you -- when the UFC was putting on a show in
22 Poland, you would look for a fighter popular in
23 Poland, or if the UFC was putting on a show in
24 Buffalo, you would look for a fighter popular in
25 Buffalo.

Page 50

1    I asked you whether the UFC looked to pay
2 fighters based on their popularity and their
3 performance. So the latter of three, popular in
4 Poland or Buffalo, or Poland in popularity, you're
5 looking for fighters who can generate interest with
6 the audience, correct?
7  A   Yes.
8  Q   Yes.
9    And when the UFC put on shows in Poland or
10 Buffalo, those were typically broadcast into
11 North America, correct?
12  A   Well, it would depend on -- like, where on
13 the card they're at, though.
14  Q   But the show itself would be broadcast --
15 the main part of the show would be broadcast into
16 North America?
17  A   The main part, yes.
18  Q   Or be on Pay-Per-View?
19  A   Yes.
20  Q   Or both?
21  A   Correct.
22  Q   Okay. All right. Let me take you to
23 Exhibit PCCX-391, it's a series of e-mails between
24 you and Bas Boon between May 19, 2009, and
25 January 29, 2011.

Page 51

1    Before I ask you about the document in
2 particular, Boon is a fighter representative; is
3 that right?
4  A   Yes, sir.
5  Q   And in this series of e-mails, Boon was
6 trying to get you to sign one of his fighters to
7 the UFC, John Einemo; is that right?
8  A   Einemo.
9  Q   Einemo, E-I-N-E-M-O. Is that right?
10  A   Yes, sir.
11  Q   Okay. So turn to page 3 of this document,
12 please.
13    THE COURT: Now, have all of these
14   exhibits been admitted? I want to make sure,
15   because I know one of the things we have to
16   make sure we do is confirm what's on the
17   record as to whether it's been admitted or
18   whether it needs to be admitted into the
19   record here, Mr. Cramer.
20    MR. CRAMER: Well, these have all been
21   submitted. This is PCCX-391.
22    THE COURT: Okay. And have I actually
23   formally admitted all of those documents? I'm
24   not sure that I have. We can make sure that
25   we do that at the close of the proceeding

Page 52

1 today.
2    MR. CRAMER: Okay. Very good. Thank
3 you, Your Honor.
4    THE COURT: For both sides' documents,
5 so whatever was offered previously.
6    Go ahead, Mr. Cramer.
7    MR. CRAMER: Thank you, Your Honor.
8 BY MR. CRAMER:
9  Q   On page 3, there's this e-mail dated May 19,
10 2009, where you discuss a potential offer to
11 Einemo, and it was a four-fight contract, and you
12 offered compensation starting at 15 and 15, and you
13 proposed to increase that 2 and 2 for each win; is
14 that right?
15  A   Yes.
16  Q   And it was a four-fight deal; is that right?
17  A   Yes.
18  Q   All right. Now let's go to page 2. At the
19 bottom -- yeah, it carries over to page 3. Also on
20 May 19, 2009, Boon sends you an e-mail in which he
21 tries to negotiate higher compensation.
22    And towards the bottom of page 2, you
23 responded to Boon's efforts to get more money for
24 his client, writing, quote -- where is the bottom
25 of page 2? On the top of page 2. I'm sorry.

Page 53

1 There you go.
2    Top of page 2, Wednesday, May 20th, 2009,
3 you responded to Boon's efforts to get his client
4 more money. You say: "As I said, I have a pay
5 structure. I cannot mess it up for one fighter. I
6 have to justify that to all the other managers."
7    You wrote that, correct?
8  A   Correct.
9  Q   All right. You can put that document aside.
10    And I'd like to show you another document
11 with a similar theme. It's PCCX-338, and it's an
12 e-mail dated October 10, 2007, in which you were
13 writing to someone named Ali Almeida --
14  A   Almeida.
15  Q   -- Almeida, A-L-M-E-I-D-A, regarding a
16 fighter named Ricardo Almeida.
17    And on page 2 you write -- page 2. And in
18 the box there on October 10th you write to
19 Mr. Almeida: "As I said, I have 200 fighters under
20 contract, and our purses are public. I have to
21 justify to all my other fighters what I pay out.
22 There are people under contract to me now that are
23 not making as much as I offered Ricardo, and they
24 are better known to our fans and have more UFC
25 fights than he does."



Page 54

1  Q  Do you recall writing that?
2  A  Yes.
3  Q  Okay. So one of the tools you used to
4  negotiate with fighters was to try and place your
5  offer that you're giving to the fighter in the
6  context of what you believed were comparable
7  fighters or even better fighters getting a similar
8  or lesser deal; is that right?
9  A  Well, as it says here, I'm offering Ricardo
10 more money than people who are now in the UFC,
11 so --
12 Q  Right. So you're trying to justify the
13 pay --
14 A  Correct.
15 Q  -- to this fighter by saying, hey, there are
16 some other people who may even be better than you
17 that are getting less?
18 A  Correct.
19 Q  So you're trying to convince the fighter
20 that you're treating him fairly; is that right?
21 A  Yes. Whenever I've dealt with fighters, I
22 have tried to be able to justify my offer.
23 Q  And one of the tools you used to negotiate
24 with fighters was to place the offer in the context
25 of these fighters, and you did that to try to,

Page 55

1  again, align the pay with expected performance and
2  popularity of the fighter, correct?
3  A  Well, the potential.
4  Q  Right. Expected performance. Their
5  potential popularity --
6  A  Unexpected is the possibility, because quite
7  a few do not.
8  Q  Right. You don't know.
9  A  (Nods head up and down.)
10 Q  But what you're trying to do is align the
11 pay of what you expect their performance and
12 popularity to be?
13 A  Well, then I could -- when somebody else
14 came to me and said, why did you give this to this
15 guy, then I could verbalize, here are part of the
16 reasons why, we're in Brazil and he's Brazilian,
17 he's got this following, he's a Brazilian Jiu-Jitsu
18 world champion, and that's something that factored
19 into it. So I'd have to list all of the reasons
20 why so that the dealers know you're just pulling
21 numbers out arbitrarily.
22 Q  Right. You're trying to justify the pay
23 based on objective facts, correct?
24 A  Correct.
25 Q  Correct?

Page 56

1  A  Correct.
2  Q  All right. Now I'd like to turn to a
3  document PCCX-255, and it's a series of e-mails
4  between you and Sven Bean regarding a fighter known
5  as Bang, B-A-N-G. And the top e-mail here is dated
6  December 9, 2010.
7    Do you recall this series of e-mails?
8  A  Yes, sir.
9  Q  Does Bang refer to Duane "Bang" Ludwig?
10 A  Yes.
11 Q  Okay. And I'd like to show you the first
12 e-mail in the chain on page 3.
13 A  Yes.
14 Q  It's from you to Mr. Bean, who is
15 representing Mr. Bang, or Bang, and you offer him a
16 new four-fight deal before Bang's last fight in his
17 prior contract.
18    And you say: "He is on his last fight at 14
19 and 14. I'll drop that and give him a new deal at
20 16, 16; 18, 18; 20, 20; and 22, 22."
21    Do you see that?
22 A  Yes.
23 Q  Okay. And that was the offer, correct?
24 A  Yes.
25 Q  And turn to Mr. Bean's response in the

Page 57

1  middle of page 2. On December 8th, he asked for
2  2,000 more to win and show. Okay.
3    "Can I please ask that if we go ahead and
4  sign four more fights, we'd be able to start at 18,
5  18?"
6    So he wants a little bit more than you
7  offered.
8    And I'd like to show you your response,
9  which is on the top of page 2.
10   You tell him: "Everybody has it tough. I
11 have to do what is fair for everyone. You make
12 what you make based on performance and popularity."
13   Do you see that?
14 A  Yes.
15 Q  And those were your words, correct?
16 A  Correct.
17 Q  And by "performance and popularity," you
18 meant what we've been just talking about, that
19 fighters are paid on your view and the UFC's view
20 as to the expected fan interest and the fighter's
21 expected performance when they fight, correct?
22 A  Right. Because the manager is trying to
23 make an appeal to personal issues that he's having,
24 and I'm letting him know I can't take personal
25 issues into account, I'm basing it on your

```
                                              Page 58
 1   performance and your popularity.
 2       Q    Right.  And in other words, if a fighter is
 3   expected by you or the UFC to generate more fan
 4   interest, you are willing to pay him more relative
 5   to a fighter that you believe is expected to
 6   generate less fan interest, correct?
 7       A    Correct.
 8       Q    Turn to page 1.  And this is your last
 9   e-mail to Mr. Bean, at the top of the document.
10   And you're pretty firm here.
11          You say to him: "I'm not trying to be a
12   dick, but no, everyone knows what everyone makes.
13   Our purses are public.  I have to justify
14   everyone's pay to everyone else."
15          Do you see that?
16       A    Yes.
17       Q    And you said that, right?
18       A    Correct.
19       Q    And I'd like to show you -- I asked you
20   about this at your deposition, and I'd like to show
21   you your testimony about it at your deposition.
22       A    Yes.
23       Q    This is at 372 to 373 of your deposition.
24          I asked you: "And so you wanted to make
25   sure that you did your best to try to make sure
```

```
                                              Page 59
 1   that comparable fighters with comparable" --
 2          THE COURT:  So, Mr. Cramer, you don't
 3      need to read the deposition.  If you want to
 4      ask him the question, then you can ask him the
 5      question.  If he doesn't answer it the way he
 6      answered in the deposition, then you can just
 7      then read in the deposition.
 8          MR. CRAMER:  Okay.  Fine.  I'm going to
 9      ask the same question.
10   BY MR. CRAMER:
11       Q    So with this back and forth that we just
12   looked at, you wanted to make sure that you did
13   your best to make sure that comparable fighters
14   with comparable records are getting paid comparable
15   amounts; is that fair?
16       A    Right, but it's not just on records.
17          THE COURT:  Okay.  But you wanted to
18      have a -- Mr. Silva, you wanted to have a
19      comparable pay scale for fighters.  You
20      wouldn't just have arbitrary numbers, right?
21          THE WITNESS:  Correct.  That I would
22      have different factors that I could verbalize
23      and say, yes, this is why.
24          THE COURT:  Right.  You want to be able
25      to explain it.  But those factors would be
```

```
                                              Page 60
 1   applied equally across the fighters.  So in
 2   other words, you would look at the popularity
 3   and performance of the fighters the same; you
 4   wouldn't favor one fighter or another in terms
 5   of that evaluation, correct?
 6          THE WITNESS:  Correct.  But instead, it
 7      would just weigh differently for different
 8      fighters.
 9          THE COURT:  Right.
10          THE WITNESS:  That problem does not
11   apply to everyone.
12          THE COURT:  No, I understand that.
13      What I'm saying is that in terms of that
14      assessment --
15          THE WITNESS:  Yes.
16          THE COURT:  -- on performance and
17   popularity, you would try to apply that evenly
18   across the fighters, right?
19          THE WITNESS:  Yes.
20          THE COURT:  Right?
21          THE WITNESS:  Yes.
22          THE COURT:  Okay.
23   BY MR. CRAMER:
24       Q    And I asked you on page 373, and I'll ask it
25   to you right now in the context of this back and
```

```
                                              Page 61
 1   forth: "You attempted, at least in your mind, to
 2   be fair, to impose a sense of equity between the
 3   different fighters, correct?"
 4          Is that right?  That's what you were trying
 5   to do, be fair to the fighters?
 6       A    Could you define "equity" for me?
 7       Q    Treating fighters based on the objective
 8   factors that you were talking about.
 9          THE COURT:  I think, Mr. Cramer, he
10      just answered that question.  That was the
11      question, I think, that I asked him.
12          MR. CRAMER:  Okay.  Thank you.
13   BY MR. CRAMER:
14       Q    Let me just clarify.  One way you conveyed
15   to managers and fighters that you were negotiating
16   with that you were dealing with them fairly was to
17   tell them honestly where their compensation fit
18   relative to other fighters at their level; is that
19   right?
20       A    Yes.
21       Q    Okay.  And do you recall telling me that
22   fighters or their managers wanted to be treated
23   unfairly in their favor?
24       A    Yes.  I mean, a manager is doing his job;
25   he's doing everything in his power to get the most
```



Page 62

1  that he can for his client.
2  Q   Right. And the way you dealt with a manager
3  in that situation was to try to compare his or her
4  fighter to other fighters that you believed were
5  similar or better, and explain that the fighter
6  with whom you were negotiating is being treated the
7  same or better as compared to the other fighter; is
8  that fair?
9  A   That's fair.
10 Q   And you believed that if you were to raise a
11 fighter's pay above what a comparable or better
12 fighter was being paid, either by accident or in
13 response to a manager's inquiry, that could
14 potentially cause you problems across the board
15 with other fighters and managers; is that right?
16 A   Correct.
17 Q   Thank you.
18     And you told me at your deposition you
19 wanted to be able to tell fighters that they were
20 being treated fairly relative to other fighters
21 with similar skills and records and popularity,
22 correct?
23 A   Right. And there's other factors too. As
24 long as I could explain it, one thing is that you
25 have certain fighters who -- as I said, people are

Page 63

1  very hesitant to take last-notice fights because
2  it's a big risk, you haven't had a full training
3  camp to prepare, but there are some fighters who
4  have repeatedly done that. So their manager might
5  come back and remind me -- because you're dealing
6  with so many fighters, you might forget. So I go,
7  hey, here is a new deal, I'll offer it. And the
8  manager, if he's a good manager, he'll come to you
9  and go, you know, this guy stepped up for you,
10 three times he fought for you short notice, maybe
11 he didn't win every time, but he's always been
12 there for you. Don't you think that's worth more
13 money?
14     And I'd look at him and go, yeah, you're
15 right, he did, he did me a solid, let's give him
16 more money. But if somebody then asks about that,
17 then they go, wait, you're saying, you know,
18 because I won this many fights, I'm getting this,
19 why does that guy get that? And I can then say,
20 this guy stepped up three times late notice; he had
21 a reason outside of why I would pay him more than
22 somebody else with a similar record or a similar
23 popularity.
24 Q   Fair enough. All right. Let me change
25 topics a little bit.

Page 64

1      In order to fight within the UFC, Zuffa
2  requires fighters to sign what Zuffa called the
3  exclusive for both Promotional and Ancillary Rights
4  Agreement, correct?
5  A   Correct.
6  Q   Okay. And at the time of your deposition,
7  you were not aware of any fighter that Zuffa had
8  allowed to compete in the UFC without signing one
9  of those exclusive contracts; is that right?
10 A   Correct.
11 Q   And you're not aware of any fighter fighting
12 in the UFC today that did not sign one of UFC's
13 exclusive contracts?
14 A   I'm not aware.
15 Q   Okay. And it's fair to say that in your
16 negotiations with fighters, you understood that
17 this exclusive fighter agreement had certain
18 standard provisions that Zuffa expected its
19 fighters to sign and agree to, correct?
20 A   Correct.
21 Q   And it's fair to say that the end of a term
22 of a standard UFC fighter's contract, the contract
23 typically provided a 90-day exclusive negotiation
24 period; is that right?
25 A   Correct.

Page 65

1  Q   And during that period, Zuffa was the only
2  promotion that could bid on the services of that
3  fighter, correct?
4  A   Correct.
5  Q   Okay. And following the exclusive
6  negotiation period, Zuffa's standard contracts
7  typically also had a right to match any offer that
8  the fighter got from another promoter, correct?
9  A   Correct.
10 Q   And that right-to-match period typically
11 lasted for one year; is that correct?
12 A   Correct. But we would have to -- if
13 somebody had an offer, we would have to deal with
14 it immediately.
15 Q   Right. So if somebody got an offer, you
16 would have to deal with it, and you decided whether
17 to respond. But if Zuffa did respond, then the
18 negotiation was over, correct?
19 A   Correct.
20 Q   Okay. Between the 90-day exclusive
21 negotiation period and the one-year right-to-match
22 period, Zuffa had the ability to retain any fighter
23 it wanted to keep after the term of the exclusive
24 agreement for up to 15 months, provided Zuffa was
25 willing to match an offer from another promotion,

Page 82

```
 1  bonuses for fighters?  In other words, it
 2  wouldn't be one fighter get $30,000 for that
 3  same fight versus another fighter get $50,000,
 4  right?
 5        THE WITNESS:  It could be the first
 6  fight of the night or the main event.  It
 7  would be the same.
 8        THE COURT:  But I mean in terms of for
 9  the different fighters, fighters themselves,
10  you wouldn't have different bonus amounts --
11        THE WITNESS:  No.
12        THE COURT:  -- for different fighters
13  for those types of bonuses, right?
14        THE WITNESS:  It was the same for
15  everyone.
16        THE COURT:  Okay.  And were fighters
17  allowed to negotiate the bonuses, those types
18  of bonuses?
19        THE WITNESS:  No.  There was a -- it
20  did evolve.  There was a time where a bonus
21  amount was different from show to show based
22  on how big the show was.  But that caused a
23  problem, which I solved, where it was just
24  like, well, your people, maybe they're not the
25  highest ranked guy, but they're very exciting,
```

Page 83

```
 1  and they get bonuses, and he doesn't want to
 2  go out and fight on this small show, because
 3  lesser bonuses, and he's a bonus machine.  So
 4  to avoid people wanting to skip shows because
 5  the bonuses are different, it's like let's
 6  just make them all standard for all the shows.
 7        THE COURT:  And about when did you do
 8  that?
 9        THE WITNESS:  I'm so bad with time
10  frames.
11        THE COURT:  Before or after
12  Strikeforce?
13        THE WITNESS:  Probably after, that it
14  became more uniform.
15        THE COURT:  Right after that?
16        THE WITNESS:  Not right after, but --
17        THE COURT:  But around that --
18        THE WITNESS:  I think it came about
19  simply because we were starting to notice that
20  this trend was happening with certain fighters
21  avoiding certain shows.
22        THE COURT:  I see.
23        THE WITNESS:  And it was based on the
24  bonuses.  Like Joe Lauzon, he never fought for
25  a title, he was always an exciting guy, you
```

Page 84

```
 1  could have him on an exciting fight.  But
 2  there would be certain shows, like, hey, Joe,
 3  I want you on the show, he's like, yeah, I'd
 4  rather wait for the Pay-Per-View.  I was
 5  like -- you know, at first you're like, but
 6  why, this is a good spot for you and it shows
 7  you off.  He's like, hey, man, I'm all about
 8  the bonuses, you have that -- you're only
 9  offering $30,000 for a show this size, and I'd
10  rather wait to Pay-Per-View where it's
11  $60,000.
12        THE COURT:  Because the bonus for the
13  one event could be substantially higher, it
14  could in fact be more than they might get paid
15  for their -- whatever the win amount is,
16  right?
17        THE WITNESS:  Correct.  And multiple
18  times it even happened where you got two
19  bonuses, the person got the fight of the
20  night, so they got 50,000 for that, and they
21  got performance of the night because it was
22  the best fight and they had a spectacular
23  knockout in it, so they got an extra $100,000
24  for that fight.
25        THE COURT:  Okay.  Thank you for
```

Page 85

```
 1  explaining that.
 2  BY MS. GRIGSBY:
 3  Q    But just to touch upon it, there's more in
 4  this spreadsheet than just bonuses; is that right?
 5  A    Correct.
 6  Q    So did some fighters negotiate, say, for
 7  example, signing bonuses?
 8  A    Yes.
 9  Q    Did UFC have different negotiations
10  regarding incidentals for fighters?
11  A    Yes, for some.
12  Q    Can you just give an example of what the
13  difference might be in those negotiations?
14  A    Well, standard, we would fly the fighter and
15  the cornerman to the show, they would share a
16  hotel, they would both get per diem.  And there
17  would be certain fighters when they achieved a
18  higher stature, that they're like, look, I really
19  need two cornermen, and they need their own hotel
20  room.
21        You did have to be pickier about that simply
22  because we were only allotted so many hotel rooms
23  by the casino, but there would be some where there
24  would be some wiggle room for that.
25  Q    And you also mentioned Pay-Per-View, that
```



Page 86

1  some athletes negotiated shares of Pay-Per-View
2  revenues; is that correct?
3     A    Correct.  Some fighters would get a piece of
4  the Pay-Per-View.
5     Q    So can you describe generally how did that
6  work to negotiate a piece of the Pay-Per-View?
7     A    So if you've got -- if a fighter is to the
8  stature of where that was a possibility, generally
9  I would refer them to Dana or Lorenzo.  But if they
10 granted them that, say they were the champion, when
11 they defended their title, they would get a
12 percentage of Pay-Per-View over a certain base
13 level.
14    Q    And when you negotiated Pay-Per-Views, did
15 athletes ever ask you about Zuffa's actual or
16 expected revenue for an event?
17    A    No.
18    Q    All right.  So then I just want to go back
19 to -- you mentioned that there was a minimum pay.
20 And plaintiff showed you JCCX-8.  Do you recall
21 that?
22    A    Yes.
23    Q    Now, did you create that slide dec, JCCX-8?
24    A    I did not.
25    Q    And do you know --

Page 87

1          THE COURT:  So Ms. Grigsby --
2          MS. GRIGSBY:  Sure.
3          THE COURT:  -- just so we're clear, do
4  you mind putting that up on the screen?
5          MS. GRIGSBY:  Oh, sure.  I'm sorry.
6  Would you put up --
7          THE COURT:  Is that the Moving the
8  Minimums?
9          MS. GRIGSBY:  Correct.  Yeah.
10         THE COURT:  Okay.  I just wanted to
11 make sure you're referencing and I'm
12 referencing --
13         MS. GRIGSBY:  Yes.
14         THE WITNESS:  -- we're talking about
15 the same --
16         MS. GRIGSBY:  Yes.
17         THE COURT:  So it's Moving the Minimums
18 sheet that had the different scales as well as
19 that tier column.  Is that the one you're
20 talking about?
21         MS. GRIGSBY:  Correct.
22         THE COURT:  And, Mr. Silva, that's what
23 you understand to be the document?
24         THE WITNESS:  Yes.
25         THE COURT:  That's fine.  We don't need

Page 88

1  to show it now.  I just wanted -- you to
2  identify it for the record.
3  BY MS. GRIGSBY:
4     Q    So for JCCX-8, did you create any of these
5  slides?
6     A    No.
7     Q    And do you know -- let's turn to the
8  assumptions.  When it talks about greater than or
9  equal to -- for Tier 2, greater than or equal to
10 17K, less than 30K, do you know where those numbers
11 are coming from?
12    A    I don't.
13    Q    Okay.
14         THE COURT:  And I'm sorry, who was the
15 person who prepared this document?
16         THE WITNESS:  Denitza Batchvarova.
17         THE COURT:  And what was her role?
18         THE WITNESS:  She would do, like,
19 financial projections and stuff for Zuffa.
20         THE COURT:  So she would have access to
21 all the contracts and information in the
22 contracts?
23         THE WITNESS:  Correct.
24         THE COURT:  Okay.  So she would have
25 known this information about what all the

Page 89

1  fighters were being paid, because she would
2  have access to it as a financial person inside
3  of Zuffa; is that correct?
4          THE WITNESS:  But she's trying to make
5  projections on --
6          THE COURT:  Okay.  But first answer
7  that question.  She would have had access to
8  all the fighter contracts and their amounts?
9          THE WITNESS:  Yes.
10         THE COURT:  Okay.  So she could create
11 a chart based upon that information, correct?
12         THE WITNESS:  The information we had at
13 the time, yes.
14         THE COURT:  Okay.  I understand you're
15 saying that you don't -- you may or may not
16 have agreed with how it was put together, but
17 she had access to that information, to include
18 all of the contracts for all of the fighters
19 for UFC at the time?
20         THE WITNESS:  Yes.
21         THE COURT:  Okay.  Thank you.
22 Go ahead.
23 BY MS. GRIGSBY:
24    Q    But do you know how she put together this
25 information?  Do you actually know that she



Page 90

1  consulted with all these contracts?
2  A    I don't know.
3  Q    Okay. So let's talk a little bit about the
4  minimum compensation, just to be clear.
5       You mentioned that untested fighters or new
6  fighters, some of them received $10,000 as a start
7  for their first contract.
8       Would those same fighters receive a second
9  amount for their second contract with the UFC?
10 A    If they --
11 Q    Like a second starting point. Sorry.
12      So talking about not the first contract, but
13 the second contract.
14 A    There was no set second contract.
15 Q    So there was no minimum for the second
16 contract with the UFC; is that right?
17 A    No.
18 Q    Okay.
19 A    The only minimum at that point was the 10
20 and 10 that was established.
21 Q    And would you say athletes generally signing
22 their second contracts with the UFC received
23 similar amounts for show and win payments?
24 A    I'm sorry, repeat that.
25 Q    Would you say that athletes signing their

Page 91

1  second contracts with the UFC would always receive
2  similar amounts for their show and win payments in
3  their second?
4  A    No.
5  Q    Why not?
6  A    Because it would depend -- well, if you
7  fought three fights, it would depend on what you
8  did in those three fights. It's very different if
9  you won all three fights, if you lost all three
10 fights, if you had a mix in between, if you won
11 those fights in an exciting fashion, the level of
12 competition that you were fighting in those three
13 fights would affect your next deal.
14 Q    Okay. And were there instances where
15 fighters had, say, for example, losses, who might
16 receive more on those second contracts than
17 fighters who might have had a slightly better
18 record?
19 A    Yes.
20 Q    Can you give some examples?
21 A    Off the top of my head, I'm not sure. There
22 are so many that -- to remember, had they that
23 early on in their career, if they lost and come up.
24 But we certainly had more popular people. There's
25 examples like Sage Northcutt, who was signed to a

Page 92

1  multiplied deal, and way before his deal was up
2  received a huge jump in pay simply because Dana
3  just saw a lot of potential in him.
4  Q    Okay. So I want to go back to the PCCX-391,
5  which is -- can we put 391 up, please. And
6  that's -- I'll just take minute, but it's the
7  e-mail exchange between Bas Boon about John --
8  A    Olav Einemo.
9  Q    Einemo.
10      Now, just to be clear, plaintiffs have asked
11 you a number of questions. But when you said, "I
12 have a pay structure, I cannot mess it up for one
13 fighter," did that mean to you that Zuffa had a pay
14 structure?
15 A    No, Zuffa did not have a pay structure.
16 Q    Why do you say that?
17 A    Well, because my opinion of what somebody
18 was worth was not the same as what Dana thought
19 they were worth or Lorenzo thought they were worth
20 or Sean thought they were worth. There's no, like,
21 written or set structure or anything.
22      Me saying "structure," I'm just talking
23 about my logical framework of how I justified; that
24 if Dana came to me and said, why are you paying
25 this guy this, that I could then go, I'm paying him

Page 93

1  this because of this, this and this.
2       THE COURT: Well, you try to be
3  consistent, right, Mr. Silva?
4       THE WITNESS: Correct. I try to have a
5  consistent logic. Now, those numbers would
6  change depending on the circumstances.
7       THE COURT: Well, right. They would
8  change based upon each fighter, obviously.
9  But in terms of what you considered the early
10 stage, you looked at their performance and
11 their popularity as two of the main factors
12 you considered, you didn't change
13 consideration of those two main factors across
14 the fighters, right?
15      THE WITNESS: Right. But there are
16 also other things. Like I said, if somebody
17 had fought multiple late-notice fights. As
18 long as they had some sort of thing that I
19 could verbalize it --
20      THE COURT: Well, I understand that. I
21 understand that. What I'm saying is there
22 would be a case that -- some of the fighters
23 you would consider performance but not their
24 popularity, and for other fighters you would
25 just consider popularity. You wouldn't --

Page 94

1  THE WITNESS: Well, it would weigh
2  differently. And that was a hard thing, where
3  this is more of an art than a science.
4  THE COURT: Mr. Silva, you have to try
5  to listen to my question.
6  You considered performance and
7  popularity for all of the fighters when you
8  assessed them, right?
9  THE WITNESS: Yes.
10  THE COURT: Okay. And you try to do
11  that analysis the same for the fighter; it
12  doesn't mean that it resulted in the same
13  contract, I'm not saying that meant that you
14  paid them all the same. What I'm saying is
15  that you tried to use those factors equally
16  across the fighters; you didn't try to weigh
17  them differently just based upon who the
18  fighter was.
19  And I understand that the factor itself
20  might have come out differently in terms of
21  your analysis based on the fighter's
22  performance, but it's not as if, for example,
23  some fighters you would say, I'm not even
24  going to consider their performance at all,
25  for example. You would never do that, right?

Page 95

1  THE WITNESS: Correct.
2  THE COURT: Okay. That's what I'm
3  saying. I just want to get a sense of the
4  application of the fact that you tried to use
5  the same factors so you could be consistent,
6  and then you could justify, as you said, why
7  you paid, for example, different fighters
8  different amounts; is that right?
9  THE WITNESS: Correct.
10  THE COURT: Okay. All right. That's
11  helpful. Thank you. Go ahead, Ms. Grigsby.
12  BY MS. GRIGSBY:
13  Q   Just to be clear, though, how many different
14  people negotiated contracts besides yourself with
15  athletes?
16  A   There was me, Sean Shelby, Dana, Lorenzo.
17  Sometimes they might hand one off to one of the
18  lawyers, but generally they would, like, give them
19  the terms, they'd just kind of be in between. But
20  we were the four main people, me, Sean, Dana and
21  Lorenzo.
22  Q   And when you talk about you, Sean, Dana,
23  Lorenzo, which is four people, did you always agree
24  on how much a fighter was worth or how much would
25  be offered to a fighter?

Page 96

1  A   No. We differed greatly oftentimes.
2  Q   And did you have any -- you mentioned you
3  didn't have any guidance. But did you have any
4  framework that told you, all four of you, how much
5  you should be offering a particular fighter based
6  on performance or popularity?
7  A   No.
8  Q   And you mentioned there were times that you
9  disagreed; is that correct?
10  A   Correct.
11  Q   Did you ever receive even like an e-mail
12  that said this is the structure that we're going to
13  use going forward to negotiate with athletes to
14  determine how much to offer that athlete?
15  A   No.
16  Q   And if there was such a policy, would you
17  have known about it in the course of your job as
18  vice president of talent and relations?
19  A   I would think so, because I was signing so
20  many contracts, I would have to know.
21  Q   And when you talked about using objective
22  factors, if you didn't agree, would those factors
23  be the same for everybody who was negotiating
24  contracts?
25  A   No.

Page 97

1  THE COURT: Well, Mr. Silva, my
2  understanding from your earlier testimony was
3  that you negotiated most of the contracts, and
4  the high-level contracts were left to
5  Mr. White and Mr. Fertitta, but most of the
6  contracts -- most of the lower fights, I take
7  it, were left to you as one of the main people
8  doing the negotiations; is that right?
9  THE WITNESS: No. I mean, Sean Shelby
10  did probably 40 percent. Between me and Sean,
11  the ones that Dana and Lorenzo did do, we
12  probably split 60/40.
13  THE COURT: I see. So they would
14  negotiate -- Mr. White and Fertitta, they
15  would negotiate some of the top fighters; is
16  that correct?
17  THE WITNESS: Right.
18  THE COURT: In terms of the fighters
19  below that, it was then you and Mr. Shelby,
20  and you said as related to that split between
21  you and Mr. Shelby, it was about you doing
22  60 percent, Mr. Shelby about 40 percent?
23  THE WITNESS: That seems about right.
24  THE COURT: Okay.
25



25 (Pages 94 to 97)

Page 98

1  BY MS. GRIGSBY:
2  Q    And did you --
3           THE COURT:  And hold on just a second,
4  Ms. Grigsby.
5           MS. GRIGSBY:  Okay.
6           THE COURT:  So did you and Mr. Shelby
7  have vastly different ways of evaluating
8  fighters, so if one fighter came to you with
9  essentially the same types of popularity and
10 performance, they'd get one number, and they'd
11 get a different number from Mr. Shelby?
12          THE WITNESS:  It didn't happen.  It
13 would go because of -- I didn't want to create
14 confusion, I'd seen how they work in other
15 promotions, so we tried to not do what I call
16 crossing the streams.
17          THE COURT:  Right.  But --
18          THE WITNESS:  I left Sean's guys to
19 Sean.  But if he gave them a deal, like, they
20 didn't like, they would try to come to me, and
21 I'd be like, no, that's not -- you're Sean's
22 guy, not my guy, I'm not dealing with that.
23          THE COURT:  Well, and was Mr. Shelby,
24 as far as you know, considering other factors
25 besides performance and popularity?

Page 99

1           THE WITNESS:  No.  But our opinion of
2  what those are, what he might find to be
3  exciting or interesting or not, but I did,
4  that would happen all the time.  When we had
5  to determine the of-the-night bonuses, we'd
6  fight like cats and dogs about that.
7           THE COURT:  I understand that.  But
8  it's your understanding that Mr. Shelby was
9  also looking at performance and popularity
10 when he determined what to pay fighters,
11 wasn't he?
12          THE WITNESS:  There's also, like,
13 potential.  That's a big part of what you
14 would pay --
15          THE COURT:  Mr. Silva, again, try to
16 listen to my question.
17          Did you understand that Mr. Shelby was
18 also using popularity and performance as
19 measures to determine what to pay fighters?
20          THE WITNESS:  Yes, I understood the
21 question, and I'm trying to explain --
22          THE COURT:  It's a yes-or-no question.
23          So did he also use those factors or did
24 he not?
25          THE WITNESS:  Those are part of the

Page 100

1  ones that he used, yes.
2           THE COURT:  Because I want to
3  understand.  It's not as if, for example, if
4  I'm saying this -- otherwise you'd have, it
5  seems to me, some sort of competition that
6  you -- one fighter could come to you and get a
7  10, 10, or a 15, 15 contract, and go to him
8  and get a 22 and 22 or whatever the number
9  would be contract?
10          THE WITNESS:  He could not.
11          THE COURT:  Okay.  So there would be
12 some sense of at least consistency as it
13 relates to the application?  It's not as if
14 you had vastly different ways in which the
15 same type of fighter would be given a
16 contract, is it?
17          THE WITNESS:  They could not, because
18 we didn't deal with the same fighters.
19          THE COURT:  Okay.  So help me
20 understand.  So in other words, you're saying
21 that once a fighter had a contract negotiated
22 with you, then typically you would be the one
23 to renegotiate that fighter's contract?
24          THE WITNESS:  Yes.  Sean had his weight
25 classes.  He did 145, 135, 125 pound men's and

Page 101

1  the women's divisions.  I did not touch those
2  classes, never ever.
3           THE COURT:  Right.  Okay.  So you had
4  your own sort of categories that you looked
5  at?
6           THE WITNESS:  Yes.
7           THE COURT:  Okay.  Now I get it.  Okay.
8  Thank you.
9           Go ahead, Ms. Grigsby.
10 BY MS. GRIGSBY:
11  Q    And you were mentioning something about
12 potential.  Would you say potential is the same
13 thing as performance and popularity?
14  A    No, because it's unknown.  You know how
15 popular someone is.  You know what they've done.
16 It's a whole different thing, you trying to guess
17 what they might do in the future.  That's a whole
18 different thing.  And that's where our opinions can
19 vary greatly.
20  Q    Did your opinion vary from Sean, Lorenzo
21 Fertitta and Dana White about who had potential in
22 terms of athletes?
23  A    Yes.
24  Q    So I want to look at Plaintiffs'
25 Exhibit 365, if we could put that up.



Page 102

1  And this is the e-mail from February 12th,
2  2011, and the subject is "We own MMA." Correct?
3       So I just have a few questions, which is --
4  so here it's talking about the rankings. It's for
5  USA Today, SB Nation Consensus MMA Rankings.
6       What type of ranking is that in terms of MMA
7  athletes?
8   A   What they would do is they would check a
9  bunch of other websites' rankings and then try to
10 come up with -- get an average using all these
11 other rankings that were done.
12  Q   When you were looking at rankings -- or when
13 you looked at rankings, did you always refer to the
14 SB Nation Consensus MMA Rankings to determine an
15 athlete's ranking?
16  A   Not always.
17  Q   Where else would you look?
18  A   There was a bunch of different -- you know,
19 Sherdog would do rankings, or FightMetric. There
20 was a bunch of different rankings. So you kind of
21 checked them all out to see what they're doing, if
22 you agreed with them, disagreed with them.
23  Q   And did rankings stay consistent, like, you
24 know, from, say, one month to the next?
25  A   No.

Page 103

1   Q   How often would they change?
2   A   They would change constantly. Even the UFC
3  rankings changed depending on who in the pool was
4  voting.
5   Q   So the number of people who are ranked here,
6  would those necessarily have the same rankings in,
7  say, 6 or 12 months?
8   A   No.
9   Q   Just one other thing I wanted to point out.
10 So you were looking at the heavyweight rankings,
11 and it ranks them 1 through 23. And you mentioned
12 a couple of times, but who was the top Strikeforce
13 heavyweight on this consensus ranking?
14  A   Fedor Emelianenko was in Strikeforce.
15  Q   And did Fedor Emelianenko ever sign with the
16 UFC?
17  A   He did not.
18  Q   Did you try to sign Fedor?
19  A   We did.
20  Q   And you were never successful -- how long
21 did you try to sign Fedor?
22  A   For quite a while. He was considered by
23 many to be the top heavyweight for a long time, so
24 we definitely tried to get him.
25  Q   So I want to talk to you just a little bit

Page 104

1  about wage share. Are you familiar with the
2  concept of paying athletes a percentage of a
3  company's revenue?
4       MR. CRAMER: Your Honor, may I object?
5  There's -- first of all, Mr. Silva never put
6  in a declaration in this case. So the only
7  thing we have in the record from Mr. Silva are
8  his documents and the deposition. There are
9  no questions in the deposition about wage
10 share. There's nothing in the documents about
11 wage share. So now we're going to have this
12 lay witness testify apparently about an
13 economic concept that seems inappropriate and
14 brand new and --
15      THE COURT: Okay. Ms. Grigsby, did he
16 ever previously testify about wage share?
17      MS. GRIGSBY: He did not, but that's
18 the point. He is going to testify --
19      THE COURT: So we're not going to allow
20 him to testify about it now.
21      MS. GRIGSBY: So I just -- really, my
22 only question there is if he's even familiar
23 with it.
24      THE COURT: Here's what I'm saying. I
25 really don't think it's fair to go down this

Page 105

1  avenue if there hasn't been testimony.
2       MS. GRIGSBY: Sure.
3       THE COURT: Because what's going to
4  happen is we're going to end up -- there's
5  essentially a free-for-all for testimony as it
6  relates to things that he hasn't previously
7  testified about.
8       So I'm going to sustain the objection.
9  We'll move on.
10 BY MS. GRIGSBY:
11  Q   So when you were negotiating contracts with
12 athletes, did you know Zuffa's event revenues?
13  A   I did not.
14  Q   Were you ever told that you had a budget for
15 negotiating with fighters?
16  A   I was not.
17  Q   Were you ever told that you were spending
18 too much for compensation on fighters?
19  A   I was not.
20  Q   Now, plaintiffs have suggested that Zuffa
21 tried to maintain a certain set of its revenues as
22 compensation --
23      MR. CRAMER: Your Honor --
24      THE COURT: You're asking the question
25 in a different way, and so I just want to warn

Page 106

1  you.  All right.  I gave you a little latitude
2  on the first few questions.  Please, if I
3  sustain an objection, don't try to ask the
4  question in a different way, because that's
5  exactly what we're doing.  So I sustained it.
6  Move on from this area.
7          MS. GRIGSBY:  Okay.  I'll move on.
8          THE COURT:  And I'm going to strike
9  from the record all of his answers as it
10 relates to revenues in this case that were
11 just asked and answered.  Go ahead.
12 BY MS. GRIGSBY:
13 Q   Well, just one question is:  Did any athlete
14 ever ask to be paid based on revenue from an event?
15         THE COURT:  Sustained.
16 BY MS. GRIGSBY:
17 Q   Now, plaintiffs have asked you a little bit
18 about the right to match, Zuffa's right to match
19 athletes who brought offers.  You recall that
20 testimony, correct?
21 A   Correct.
22 Q   And there you said that many of the
23 athletes, there was only a certain percent where
24 Zuffa chose not to match it; is that right?
25 A   Correct.

Page 107

1  Q   Now, can you list some of the athletes that
2  Zuffa did want to retain that you were unable to
3  retain and match?
4  A   I mean, just off the top of my head, guys
5  like Ryan Bader, Rory MacDonald --
6          MR. CRAMER:  Your Honor, I'm going to
7     object here too.  This is brand new.  I've
8     actually asked him in his deposition, and he
9     said --
10         THE COURT:  Overruled.  I asked him
11    about this, and he gave percentages.
12         MR. CRAMER:  Okay.
13         THE COURT:  He can go ahead and do
14    that.  Go ahead.
15         THE WITNESS:  So we had fighters like
16    Rory MacDonald, Ryan Bader, Lyoto Machida,
17    Gegard Mousasi.  There's a lot of fighters who
18    we made offers to keep, and they got better
19    offers and outbid us.
20         THE COURT:  Okay.
21 BY MS. GRIGSBY:
22 Q   And some of these fighters, where did they
23 end up competing?
24 A   Those went to Bellator.  But guys -- like,
25 Brandon Vera went to One FC.

Page 108

1  Q   And did Zuffa try to retain Brandon Vera?
2  A   We made an offer to keep him.  He was an
3  attractive athlete, he could fight heavyweight or
4  light heavyweight.
5  Q   And so another thing that plaintiffs -- or
6  Mr. Cramer asked you about was the fact that you
7  often renegotiated contracts on the third fight.
8          So why did you renegotiate contracts on the
9  third or -- the third or the fourth -- third fight
10 of a four-fight deal?
11 A   Well, I would prefer that the fighters would
12 stay in their contract so that I could immediately
13 turn them around into other shows.
14         The longer that you had negotiations outside
15 of contract, that was going to take longer before I
16 could put them in a show.  I couldn't advertise a
17 fighter as being on a show if he was not actually
18 contracted to me.
19 Q   And in terms of renegotiating after the
20 third fight, was it always you initiating that
21 negotiation?
22 A   No.  Quite often fighters would want to do a
23 new deal because they know that I would offer them
24 more money to do a new deal.
25 Q   So can we pull up ZCCX-14?  And I'm looking

Page 109

1  at page 2 of 9.
2          So here, I'll just read it.  It's to you
3  from --
4          THE COURT:  Okay.  Why don't you just
5     ask it, just like I told Mr. Cramer.
6          MS. GRIGSBY:  Sure.
7  BY MS. GRIGSBY:
8  Q   Well, here it's about Tim Means.  And it
9  says at the bottom:  "I'd like to talk to you about
10 a new contract for Tim Means.  He's three in on his
11 current four-fight deal.  Hit me back at your
12 convenience."
13         Is this an example of some -- a manager
14 trying to renegotiate before the fourth fight?
15 A   Yes.
16 Q   Okay.  So can you look at the next page of
17 the exhibit.  This is for a different fighter, and
18 I don't want to do violence to his name, but Daniel
19 Omielanczuk.
20 A   Omielanczuk.
21 Q   Yeah.
22         At the bottom it says -- it's from his
23 manager.  And it says:  "How are you doing?  Daniel
24 did a job in UFC Fight Night 72.  We are happy to
25 see his aggressive style and finish his night in 48

Page 118

```
 1   Q    Fair enough.
 2        And you, with the fighters that you were
 3   negotiating with, attempted to be fair and slot the
 4   fighters in in terms of your view of their
 5   popularity and performance, right?
 6   A    Correct.
 7   Q    And Mr. Shelby tried to do the same, right?
 8   A    Correct.
 9   Q    And Mr. White tried to do the same with the
10   people he was negotiating with, right?
11   A    Correct.
12   Q    And Mr. Fertitta, to the extent he was
13   involved at all, he also tried to be fair, correct?
14   A    Correct.
15   Q    All right.  Let's talk about --
16        THE COURT:  Excuse me just for a
17   second.
18        So, Mr. Silva, are you saying there was
19   no communication with each other about what
20   would be appropriate levels of compensation to
21   offer?  So you would never get e-mails from
22   Mr. Shelby or Mr. White or Mr. Fertitta
23   saying, I'm thinking of offering this fighter
24   this amount, what do you think?
25        Did that ever happen?
```

Page 119

```
 1        THE WITNESS:  Not that I recall.
 2   Especially with Dana and Lorenzo, there was
 3   contracts that I did not know about until I
 4   saw after I stopped working for UFC.
 5        THE COURT:  Okay.  So other than those
 6   two -- they're doing about 10 percent of the
 7   deals.
 8        Other than the deals they're doing,
 9   with you and Mr. Shelby, you're saying you
10   never communicated about compensation levels.
11   So in other words, you never said or he never
12   said to you, I'm thinking of offering this
13   fighter this amount, do you think that's fair
14   or appropriate, what would you do?  That never
15   happened?
16        THE WITNESS:  I don't think so, because
17   it was a little bit of apples and oranges.  We
18   did very different weight classes, so to judge
19   a brand new women's weight class versus my
20   much more established -- I had the oldest,
21   largest weight classes.  His weight classes
22   were such a different thing, he wanted a
23   different talent pool.
24        You know, my job is that -- I kind of
25   showed I knew what I was doing.  So he and
```

Page 120

```
 1   Lorenzo would mostly leave me alone.  And then
 2   when Sean came in and was doing his weight
 3   classes, I wanted to do the same thing for
 4   him.  Like, I think you're a smart guy, you
 5   know what you're doing, go do your thing.
 6        THE COURT:  So essentially what you're
 7   saying is you both keep -- stay in your lane
 8   as it relates to your weight classes and what
 9   was being offered, because that was your
10   expertise, and you didn't really spend a lot
11   of time looking at fighters in his weight
12   class, and he didn't spend a lot of time
13   looking at fighters in your weight class as
14   far as you know?
15        THE WITNESS:  Correct.
16        THE COURT:  Okay.  Thank you.  That
17   helps.
18   BY MR. CRAMER:
19   Q    And Mr. Shelby was experienced with his
20   weight classes, and attempted to be consistent in
21   his classes, right?
22   A    Sure.
23   Q    And you were experienced in your weight
24   classes, and attempted to be consistent in your
25   weight classes, correct?
```

Page 121

```
 1   A    Correct.
 2   Q    Okay.  Let's talk about some of the
 3   different forms of payment that Ms. Grigsby asked
 4   you about.  She asked you about the
 5   fight-of-the-night bonus.  There were some other
 6   kinds of bonuses, like the knockout-of-the-night
 7   bonus, right?
 8   A    Right.
 9   Q    There was also a Pay-Per-View payment,
10   correct?
11   A    Correct.
12   Q    Now, is it fair to say that -- and you said
13   that one of the issues with the show and the win
14   payment was the fact those were set in advance of
15   the fight?
16   A    (Nods head up and down.)
17   Q    These -- the fight of the night, knockout of
18   the night, Pay-Per-View, those happened after the
19   fight, correct?
20   A    Correct.
21   Q    And the goal of those types of payment are
22   really to try to align the actual fact of the
23   performance and popularity with the compensation,
24   right?
25   A    Well, the popularity had nothing to do about
```

```
                                                Page 122                                               Page 124
 1   it.                                                        1   shown to you at your deposition, it was
 2   Q    Well, the Pay-Per-View?                               2   Exhibit 50 at your deposition.  I'm just
 3   A    No.                                                   3   showing you because it actually -- put up the
 4   Q    Well, the fighter draws a lot of                      4   first page of the document.
 5   Pay-Per-View --                                            5        MS. GRIGSBY:  So I'm going to object
 6   A    Oh, you're talking about the Pay-Per-View             6   too because there is no foundation, just like
 7   bonus?                                                     7   that Joe Silva has testified about --
 8   Q    Yeah.                                                 8        THE COURT:  Okay.  I agree with you,
 9   A    I thought you were saying of-the-night                9   Ms. Grigsby.  Sustained.
10   bonuses, sorry.                                           10        So, Mr. Cramer, if you want to
11   Q    Let's talk about the fight of the night and          11   establish a little bit of foundation as to
12   the knockout of the night.                                12   whether or not this witness knows this
13   A    Okay.                                                13   document.
14   Q    Those are attempting to align the actual             14        MR. CRAMER:  Okay.  This is PCCX-88.
15   fact of the performance with the pay?                     15   And please take that down.  Please take that
16   A    Correct.                                             16   down.
17   Q    And the Pay-Per-View is, in part, attempting         17        Mr. Silva just testified about the
18   to align the actual fact of the popularity with the       18   amount -- the dollar amount of
19   pay, correct?                                             19   fight-of-the-night bonuses, and this document
20   A    Correct.                                             20   contains actual figures on --
21   Q    Okay.  Do you know the direction in terms of         21        THE WITNESS:  No, it doesn't.
22   the average fight-of-the-night bonus per fighter          22        THE COURT:  Well, the question is --
23   from, like, 2007 forward, whether that went down          23        MR. CRAMER:  Okay.
24   substantially?                                            24        THE COURT:  Hold on, Mr. Silva.
25   A    For the of-the-night bonuses?                        25        It's not whether or not he was

                                                Page 123                                               Page 125
 1   Q    Yes.                                                  1   involved.  The question is whether or not he
 2   A    No.  There was a time, as I said, I'm not             2   is aware of this particular document --
 3   sure exactly when it started, but that the                 3        MR. CRAMER:  Okay.
 4   of-the-night bonuses were different depending on           4   BY MR. CRAMER:
 5   the show.  And then there was a time where they did       5    Q   Are you aware of this document?
 6   away with that because fighters would want to avoid        6        THE COURT:  -- and what the figures
 7   the smaller shows, they could fight for a bigger           7   are.
 8   bonus, so then they made it standard for every show        8        MR. CRAMER:  Fair enough, Your Honor.
 9   that it would be $50,000.                                  9   BY MR. CRAMER:
10   Q    All right.  I'd like to show you a document         10    Q   Are you aware of this document?  Have you
11   from 2015 that actually covers this issue.  It's         11   seen it before?
12   formatted similar to the minimum fight --                12    A   I am aware of the document.
13   A    Uh-huh.                                             13    Q   Okay.  You'd seen it during the course of
14   Q    -- payment document.                                14   your work at the UFC?
15        So please put the first page of the document       15    A   Right.  Now, there was other bonuses, too,
16   up.                                                      16   that were not discussed that were not fight of the
17        MR. CRAMER:  And, Mr. Madden, can you              17   night, and that's what I believe this chart
18   identify the document?                                   18   references, that for a long period of time what
19        MR. MADDEN:  He's working on it.  I can            19   would happen is after a show would end, the next
20   give you the Bates number.                               20   day, for Monday, I would summarize the card to
21        MR. CRAMER:  What's it called?  Do you             21   Dana, Lorenzo, Sean, and I'd say, here's what
22   have it?                                                 22   happened in every fight, and here's money that's
23        MR. MADDEN:  It's on your screen.                   23   not knockout of the night or fight of the night,
24        MR. CRAMER:  Oh, it's on my screen.                24   here's extra bonuses that I think these guys are
25   Fighter Bonus Payment, February 2015.  It was            25   worth.  And I would make suggestions, this guy
```