1

2:15-cv-01045-RFB-PAL

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3

 4  CUNG LE, et al.,              )
                                  )
 5            Plaintiffs,         ) Case No. 2:15-cv-01045-RFB-PAL
                                  )
 6       vs.                      ) Las Vegas, Nevada
                                  ) Monday, August 26, 2019
 7  ZUFFA, LLC, d/b/a Ultimate    ) 9:43 a.m.
    Fighting Championship and     )
 8  UFC,                          ) EVIDENTIARY HEARING, DAY ONE
                                  )
 9            Defendants.
    _____
10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14        THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE
15

16

17

18

19  APPEARANCES:      See Pages 2 and 3

20

21
    COURT REPORTER:   Patricia L. Ganci, RMR, CRR
22                    United States District Court
                      333 Las Vegas Boulevard South, Room 1334
23                    Las Vegas, Nevada  89101

24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.
```

Case 2:15-cv-01045-RFB-BNW Document 751-8 Filed 10/04/19 Page 2 of 6
Case 2:15-cv-01045-RFB-BNW Document 724 Filed 08/27/19 Page 184 of 252

184

2:15-cv-01045-RFB-PAL

1 to save that --

2       MR. CRAMER: Okay.

3       THE COURT: -- for actual rebuttal from Dr. Singer. So
4 if you have nothing else, because I don't want this to eat up
5 the time, I'd like to turn this over to opposing counsel to
6 begin their cross-examination.

7       MR. CRAMER: Your Honor, the one main thing we haven't
8 covered -- we've covered now the impact regression and how it
9 showed a falling wage share. We haven't yet gotten to common
10 impact, how it was spread across the class, and a discussion of
11 how he used his regression and other analyses to explain common
12 impact. I think that's important and --

13       THE COURT: I think it's important, too. But, again,
14 when we're going passed some of the time limits and I get
15 concerned. I will tell counsel, too. We have to end at
16 4 o'clock today for technology reasons related to us having to
17 shut our system down, and we're going to start a little bit
18 earlier tomorrow. But why don't you get right to that,
19 Mr. Cramer, and I'll give you 20 minutes. Then I'm going to
20 turn this over to opposing counsel.

21 BY MR. CRAMER:

22 Q. Okay. Dr. Singer, can describe your two main methods of
23 showing that the challenged conduct had a widespread effect
24 across the class?
25 A. All right. I used two methods. The first method is that

Case 2:15-cv-01045-RFB-BNW   Document 751-8   Filed 10/04/19   Page 3 of 6
Case 2:15-cv-01045-RFB-BNW   Document 724   Filed 08/27/19   Page 185 of 252

185

2:15-cv-01045-RFB-PAL

```
 1   I -- once I have a model that's fit to the data, I can go back
 2   and make individual predictions for each fighter and then
 3   compare what the fighter was paid per my model in the but-for
 4   world to what the fighter was actually paid.  And if there was
 5   an underpayment, I can determine that that fighter suffered
 6   impact.
 7            The second method, which I call the pay structure
 8   method, begins with the same regression impact model, but then
 9   looks for proof both in the record and my own original
10   empiricism, which suggests a pay structure binds the payment of
11   all of the fighters together through some knowable objective
12   factors.
13            THE COURT:  Like a pay scale.
14            THE WITNESS:  Like a pay scale.
15   BY MR. CRAMER:
16   Q.  All right.  Before we get to the pay scale, can you
17   describe -- so is your model capable, your regression model,
18   capable of showing impact to all or nearly all class members?
19   A.  Yes.
20   Q.  What does -- what is -- what are the results of your
21   regression model in terms of showing impact to all or nearly all
22   class members?  What does it show?
23   A.  So when I take -- when I take the model after it's fit and I
24   go and predict for each fighter what their but-for payments
25   would have been and compare it to their actual payments, I find
```

Case 2:15-cv-01045-RFB-BNW   Document 751-8   Filed 10/04/19   Page 4 of 6
Case 2:15-cv-01045-RFB-BNW   Document 724   Filed 08/27/19   Page 186 of 252

186

2:15-cv-01045-RFB-PAL

1  that between 98.5 and 99.1 of class members suffered antitrust
2  injury.
3  Q.  And there are a handful of class members, 12, that did not
4  suffer injury at least according to that model?  Or your model
5  doesn't find suffered injury.  Does that undermine your model?
6  A.  It doesn't undermine my model, no.
7  Q.  Okay.  Did you devise this method of using a regression
8  analysis to show common impact across a class yourself or is
9  that a standard method?
10 A.  It's a standard method.  And I'm aware of cases in which
11 it's been used and accepted by courts.
12 Q.  Zuffa accuses you of using average foreclosure rates instead
13 of computing individual foreclosure shares for each fighter.
14 Does this criticism make sense in the context of your common
15 impact analysis?
16 A.  There's no such thing as an individual foreclosure share.
17 So I have a hard time following that one.
18 Q.  All right.  Let's talk now about your second method.  So
19 that's your first method.  It uses the regression to show common
20 impact.  Now, does the second stand on its own independent
21 method -- and you mentioned that it involves a pay structure.
22 By pay structure do you mean some kind of formal rigid salary
23 scale or something else?
24 A.  Something else.
25 Q.  And what do you mean?

Case 2:15-cv-01045-RFB-BNW   Document 751-8   Filed 10/04/19   Page 5 of 6
Case 2:15-cv-01045-RFB-BNW   Document 724   Filed 08/27/19   Page 187 of 252

187

2:15-cv-01045-RFB-PAL

```
 1   A.   What I mean is that there are knowable objective factors
 2   that explain differences in payments across employees of a firm
 3   or in this case across something closer to an independent
 4   contractors within a firm.
 5             THE COURT:  Such as for a fighter, their ranking?
 6             THE WITNESS:  Exactly.
 7             THE COURT:  Or their weight class?
 8             THE WITNESS:  Exactly.  So it suggests that comparably
 9   -- comparable employees with comparable experience and
10   comparable tenure and comparable skills would be paid comparable
11   amounts.
12   BY MR. CRAMER:
13   Q.   Did you prepare a slide with some record evidence showing
14   that Zuffa believed they had some kind of basic formula for
15   compensation?
16             THE COURT:  So, Mr. Cramer, you don't need to have
17   Dr. Singer go through all the summary of the actual records
18   regarding Zuffa employees making references to pay scales and
19   pay structures.  If you want to go through his analysis as it
20   relates to analyzing the sort of common proportional movement of
21   the wages up or down, fine.  Let's do that.  But I don't need
22   Dr. Singer to review for me, you know, comments from the various
23   match makers at UFC about what their scale was and how they
24   tried to keep pay equity.  That's what Mr. Silva's testimony is
25   for.  And I know he does that already, Dr. Singer, in his actual
```

Case 2:15-cv-01045-RFB-BNW Document 751-8 Filed 10/04/19 Page 6 of 6
Case 2:15-cv-01045-RFB-BNW Document 724 Filed 08/27/19 Page 188 of 252

188

2:15-cv-01045-RFB-PAL

1  report anyway.  But I don't think that would be beneficial.  So
2  if you are talking about what's statistical work he does --
3          MR. CRAMER:  Okay.
4          THE COURT:  -- in relation to that, which he does do
5  separate from the pay scale, let's move to that.
6          MR. CRAMER:  Fair enough.
7  BY MR. CRAMER:
8  Q.  What empirical analyses did you do to confirm that there was
9  some -- at least an informal pay structure that bound the
10 salaries of the compensation of fighters together?
11 A.  I did two.  In the first approach I identified these
12 knowable objective factors such as Pay-Per-View, such as the
13 fighter's rank, the weight class, the gender.  And I was able to
14 show that these knowable objective factors were highly
15 predictive in what a fighter got paid.  That suggests again the
16 existence of a pay structure.
17         The second approach was at any point in time I
18 regressed what an individual fighter made on what all other
19 fighters were making at the same time.  And it turned out
20 knowing what everyone else was making did a very good job in
21 predicting what an individual fighter made as well.
22 Q.  All right.
23         Did Dr. Topel conduct an analysis in his reports, a
24 statistical analysis, that you believe confirm a price
25 structure?