1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

```
CUNG LE; NATHAN QUARRY, JON    )
FITCH, on behalf of            )
themselves and all others      )
similarly situated,            )
                               )
        Plaintiffs,            )
                               )
        vs.                    )  Case No.
                               )  2:15-cv-01045-RFB-(PAL)
                               )
ZUFFA, LLC, d/b/a Ultimate     )
Fighting Championship and      )
UFC,                           )
                               )
        Defendant.             )
_____)
```

VIDEOTAPE DEPOSITION OF JOSEPH SILVA

Richmond, Virginia

June 7, 2017

8:11 a.m.

Reported by:
KIMBERLY L. RIBARIC, RPR, CCR
JOB NO. 50374

370

1  SILVA
2  correct, I would not want to hurt my credibility by
3  acting like what they have in black and white is not
4  true.
5      Q.  So if you -- if they brought to you like
6  what you have described as an outlier, where some
7  fighter may have diverted from what you thought they
8  should have gotten based on their background and
9  their skill level, you'd -- you'd certainly --
10 sometimes you would hear it from the fighters or
11 their representatives about that outlier; right?
12     A.  Yes.
13     Q.  And if, by creating that outlier, that
14 sometimes causes other fight -- you have to then
15 raise the compensation then of some other fighters
16 because you made that one mistake; is that right?
17     A.  Well -- well, you'd have to -- one, I don't
18 know I'd say it was a mistake.  And it's -- it's a
19 matter of opinion.  And that I did deals, Sean did
20 deals, Dana did deals, Lorenzo did deals, and
21 everybody's judgment is different.  So you have to
22 weigh those in.  So that's all people who are getting
23 deals in the UFC.
24      But a manager's job is to negotiate the best
25 deal that they can.  And my job is to try to

371

1  SILVA
2  negotiate a deal that I thought was fair.
3      Q.  So if -- if, for example, Shelby had been --
4  had been systematically kind of paying fighters a bit
5  more than you did or Dana was systematically paying
6  comparable fighters a little bit more than you did,
7  you then might feel pressure then to kind of pay
8  fighters more because you would be hearing from reps
9  about comparables from Dana or Shelby; is that right?
10     A.  I'm sure it would be brought up.
11     Q.  So if -- if there are some -- if one of the
12 three of you are kind of raising the level per
13 equivalent fighter, that's going to put pressure on
14 that third person to kind of raise as well?
15     A.  I don't think it's pressure in that me and
16 Sean did the vast majority of deals, and me and Sean
17 were in constant communication every day and knew
18 what each other were doing.  So it's not like I was
19 going, Sean, what are you doing here?  We knew.  But
20 we would still, on our own, choose to, let's move
21 people up, we feel like it's time to do it.
22      So Dana and Lorenzo did do deals, but they
23 did, like I said, maybe 10, 15 percent of deals.
24     Q.  Yeah, if you turn to the first page of this
25 document, Bean says: "Can you meet me in the middle?

372

1  SILVA
2  You said 16, I asked for 18.  Could you agree to 17?"
3      He says that towards the bottom.
4      A.  Uh-huh.
5      Q.  And then you say on December 9, 2010: "Not
6  trying to be a dick but no.  Everyone knows what
7  everyone makes.  Our purses are public.  I have to
8  justify everyone's pay to everyone else."
9      Do you see that?
10     A.  Yes.
11     Q.  What did you mean by that, "I have to
12 justify everyone's pay to everyone else"?
13     A.  I feel it was important in my job to
14 actually engage with people and not just dictate to
15 them.  So if somebody was going to say, what about
16 this guy, I would have to engage that and not go, too
17 bad.
18     Q.  Right.
19     A.  I'd have to go, okay, you've got a point,
20 let's try and figure this out.  So, yeah, I'm just
21 making him aware of that.
22     Q.  Right.  And so you wanted to make sure that
23 you did your best to try to make sure that comparable
24 fighters with comparable records are getting paid
25 comparable amounts; is that fair?

373

1  SILVA
2      MR. ISAACSON:  Objection.  Form.
3      A.  Yeah, that was my goal.
4      Q.  And one of the reasons why you did that is
5  because you had to justify everyone's pay to everyone
6  else, and if you -- if you were doing this poorly or
7  inefficiently, you'd constantly have fighters
8  demanding more money, they'd say, hey, wait, you paid
9  this guy this much and that guy that much, and you
10 wouldn't be able to justify to them if -- if you
11 hadn't been doing this well; is that right?
12     A.  It would just seem unfair to give somebody
13 something that somebody else, equally deserving,
14 didn't get.
15     Q.  And you attempted, at least in your mind, to
16 be fair, to impose a sense of equity between the
17 different fighters; correct?
18     A.  I did.
19     Q.  All right.  You can put that document aside.
20     MR. CRAMER:  Like to mark the next
21 document as Silva Exhibit 38.
22     (Silva Deposition Exhibit 38 marked for
23 identification.)
24     Q.  Silva 38 is a series of e-mails bearing the
25 Bates range ZFL-2641095 through 1099.  The one at the

94 (Pages 370 to 373)

## Page 434

SILVA

Q. Okay. Certain fighters received a share of Pay-Per-View revenues when they defend -- when they -- I'm sorry.

Certain fighters received a share of Pay-Per-View revenues; correct?

A. Correct.

Q. Who was offered at Zuffa a share of Pay-Per-View revenues?

A. That would be up to Dana and Lorenzo who they're willing to give a share of Pay-Per-View revenues to.

Q. Is it fair to say that only champions defending their title were given a share of Pay-Per-View revenues at the UFC?

A. No.

Q. There were others?

A. There were others. I think if you would become a -- a big attraction even without a title, you could still be worthy of Pay-Per-View, but it was rarer.

Q. It was rare.

Most of the times that fighters were offered a share of the Pay-Per-View revenues, they were defending a title; correct?

## Page 435

SILVA

A. I'd say most, yes.

MR. CRAMER: I'd like to mark as Silva Exhibit 48 the next document.

(Silva Deposition Exhibit 48 marked for identification.)

Q. This is an e-mail from Shelby to White and Mr. Silva -- I'm sorry. It's just an e-mail from Fertitta, Lorenzo Fertitta, to Shelby, cc'd to White and Silva --

A. Uh-huh.

Q. -- dated Thursday, March 13, 2014. The subject is Holly Holm, and it bears the Bates number ZFL-1005485.

At the top Mr. Fertitta says: "We can get something done. For ppv bonus she must be defending."

PPV bonus refers to Pay-Per-View bonus?

A. Yes.

Q. And was Mr. Fertitta correct that in order for Holly Holm to get a Pay-Per-View bonus, she had to be defending a title?

A. He was saying that he was not willing to give her Pay-Per-View if she's not a champion defending her title.

## Page 436

SILVA

Q. And was that -- that's just for her or that was -- that was not a general policy?

A. I think most of them were that way, is that you needed to be a -- a champion defending your belt to get it. Not -- there were some exceptions, but for the majority.

Q. Okay. You can put that aside.

==Is it fair to say that fighters frequently asked for Pay-Per-View cuts in compensation negotiations?==

==A. Some do. There's actually quite a few fighters who did not care about that because they felt that they were not marketable enough that it was not enticing to them because they weren't really convinced they were going to sell a bunch of Pay-Per-Views.==

If you were somebody who -- who had a demonstrable popularity, then you feel, it's like this is going to be a windfall for me, I will sell a bunch of Pay-Per-Views. Not everybody felt they would. Some kind of saw themselves as more workmanlike, it's like, look, I put in my time and I work hard and this and that, I'm not a fan favorite, who cares.

## Page 437

SILVA

Q. Okay. So I think I asked you briefly about this, but Zuffa also paid other kinds of discretionary bonuses?

A. Correct.

Q. In addition to win and show; correct?

A. Correct.

Q. Okay. And by "discretionary," the -- these other bonuses that I'm going to ask you about, other than win and show, and potentially Pay-Per-View, they were not contractually required to pay structured or discretionary bonuses; correct?

A. Correct.

Q. All right. How were the -- how were these structured or discretionary bonuses determined?

A. And you're not talking about like the end-of-the-night bonuses, you're talking about just like up and down -- because we had -- for every show you had, like, say $50,000 bonus for performances of the night, for fight of the night, that both would get it, so that was standard on every show.

Q. So every --

A. So that was one kind of bonus.

Q. So one kind of bonus is a fight-of-the-night bonus?