Geoffrey M. Klineberg, Esq. (*Pro Hac Vice Motion Pending*)
District of Columbia Bar No. 444503
Joshua D. Branson, Esq. (*Pro Hac Vice Motion Pending*)
District of Columbia Bar No. 981623
KELLOGG HANSEN TODD FIGEL &
    FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W. Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
jbranson@kellogghansen.com
*Attorneys for Sparacino PLLC*

Brian D. Shapiro, Esq. (proposed local counsel)
Nevada Bar No. 5772
LAW OFFICE OF BRIAN D. SHAPIRO, LLC
510 S. 8th Street
Las Vegas, NV 89101
Tel:  (702) 386-8600
brian@brianshapirolaw.com
*Attorney for Sparacino PLLC*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>　　　　　　　Defendant. | **Case No. 2:15-cv-01045-RFB-BNW**<br><br><br>**DECLARATION OF RYAN R. SPARACINO** |

**DECLARATION OF RYAN R. SPARACINO**

I, RYAN R. SPARACINO, declare as follows:

1. I am the founder and Managing Partner of the law firm of Sparacino PLLC ("Sparacino" or "Firm"), and my Firm is counsel for certain former professional mixed martial arts ("MMA") fighters who may have claims as absent members of a potential "Bout Class" in *Le v. Zuffa*, should a class be certified. I have personal knowledge of the facts set forth in this declaration and if necessary, could testify competently thereto. I make this declaration in support of Sparacino's Opposition to Interim Class Counsel's Emergency Motion and to transmit to the Court a true and correct copy of the attached documents.

**I.    Our Decision to Pursue this Litigation**

2. I am the founder and Managing Partner of Sparacino and have been practicing law since 2004. Prior to starting Sparacino, I, among other things, worked at two prominent global law firms for about a decade (Winston & Strawn LLP and Pillsbury LLP), and I also served as the head of the D.C. office of an elite global investigations company, Nardello & Co. LLC.

3. The two other Sparacino lawyers working on this matter are Eli Kay-Oliphant and Stacy Taylor. Mr. Kay-Oliphant has been practicing law since 2005. Prior to joining Sparacino, Mr. Kay-Oliphant was a partner at the elite national litigation firm Massey & Gail LLP, and previously worked at global law firms Latham & Watkins LLP and O'Melveny & Myers LLP. Mr. Kay-Oliphant clerked for the Honorable W. Eugene Davis of the United States Court of Appeals for the Fifth Circuit. Ms. Taylor has been practicing law since 2001. Prior to joining Sparacino, Ms. Taylor served as a soldier and lawyer in the United States Army for twenty years.

4. Sparacino is a Washington, D.C.-based law firm, and its practicing attorneys are all licensed to practice in D.C. Sparacino represents plaintiffs and defendants in civil and criminal matters, with a particular emphasis on matters involving substantial investigations and large groups of plaintiffs who have suffered injury from a common scheme.

5. In its mass-tort cases, Sparacino typically partners with nationally prominent litigation firms under an arrangement in which Sparacino is responsible for the investigation- and

client-facing aspects of a matter, while the litigation partner firm takes the lead in court and on all litigation-facing aspects of the matter.

6. I have never been sanctioned or disciplined by any court or bar, federal or state. To my knowledge, no Sparacino lawyer has ever been sanctioned or disciplined by any court or bar, federal or state.

7. I am a passionate life-long MMA fan, having first begun to closely follow the sport in the late 1990s, and I have continued to follow it ever since. I feel passionately about helping MMA athletes vindicate their legal rights.

8. I followed *Le v. Zuffa* since it was filed and, upon learning of the Court's statements regarding potentially certifying a class, began investigating UFC's conduct to determine if, in partnership with an antitrust specialist firm, Sparacino could provide valuable counsel to fighters considering opting out of the class.

9. After this investigation, Sparacino determined that putative class members could benefit from information and careful evaluation of whether it would be in each of their best interests either to participate as a class member—depending both on the definition of the class as well as their particular claim—or to opt out and file their own case.

10. Sparacino communicated with several prominent national antitrust specialist firms before ultimately reaching an agreement to jointly represent potential opt-out clients with Scott+Scott Attorneys at Law LLP ("Scott+Scott"), a national leader in antitrust litigation.

**II.    Sparacino's Communications with Putative Class Members**

11. Sparacino identified potential clients by researching publicly available data concerning UFC bout history. On March 16, 2021, Sparacino sent its "First Mailer" via Federal Express to 223 potential clients identified through this process. Attached as Exhibit A is an example of the cover letter to this First Mailer. This example reflects the mailer that Sparacino sent to potential clients residing in California. Our intention was that the mailer comply with Rule 23 as well as the relevant rules concerning attorney solicitations. Further, even though Sparacino is governed by the D.C. Rules of Professional Conduct, we prepared a separate mailer on a state-by-state basis, out of an abundance of caution, to comply with each state's ethics rules.

12. We believe that there are approximately 1,200 former professional MMA athletes who may have a potential opt-out claim that they may wish to pursue against UFC. Of that broader set, 223 were sent the First Mailer by Sparacino. Sparacino has not yet actively contacted any of the other approximately 1,000 additional potentially eligible putative class members who may wish to receive counsel concerning whether to opt out, should a class be certified.

13. I have significant prior experience as an informal in-house ethics and privilege point person at prior firms. I personally reviewed the relevant states' Rules of Professional Conduct. And after preparing a template for communications to go out to putative class members, I conducted an independent re-review to ensure such communications were not misleading. I also established a process designed to ensure that we placed attorney-advertising language on every envelope sent to prospective clients. I further personally verified that attorney-advertising language appeared on the brochure and the caption of every mailer we sent.

14. Only after that review did Sparacino seek and receive Scott+Scott's review and approval for the form of the First Mailers, which Scott+Scott provided after its own lawyers also independently reviewed the First Mailers. Finally, Sparacino then further reviewed *Le v. Zuffa* docket documents to attempt to determine in good faith any individuals who were represented and excluded from the recipient list those individuals Sparacino identified.

15. Sparacino intended to refrain from sending communications to any person who was individually represented, but Sparacino inadvertently, and without knowledge that they were represented, sent mailers to four individuals who had been named plaintiffs in prior cases to *Le v. Zuffa*: (1) Dennis Hallman, in Washington State; (2) Darren Uyenoyama, in California; (3) Gabe Ruediger, in California; and (4) Mac Danzig, in Oregon. Our inadvertent mistake in mailing these four fighters was the result of our reviewing the *Le v. Zuffa* docket (which we successfully used to exclude all named plaintiffs in *Le*) while inadvertently failing to account for parties in related cases whom, for reasons unknown to us, were not included as parties in the Class Action once it was consolidated in *Le*.

16. The First Mailer presented to the recipient as one document, bound together by a clip. The First Mailer included business cards for two Sparacino attorneys, a cover letter, and a

fourteen-page brochure. As mentioned above, an example of the cover letter template is attached as Exhibit A. The brochure (which was functionally identical in every version of the mailer) is attached as Exhibit B.

17. The First Mailer also included a brief overview of the potential claims against UFC, biographies for the lawyers and non-lawyer professionals from Sparacino and Scott+Scott who would work on the matter, and a lengthy disclaimer incorporating language that Sparacino believed to be required by every state to which Sparacino sent the mailers.

18. The First Mailer did ***not*** (a) ask any potential client to grant opt-out authority to Sparacino, (b) urge any action other than to reach out to Sparacino to discuss the potential client's legal options, (c) provide a deadline by which potential clients would have to act or suggest that time was of the essence, or (d) include any agreement, authorization, or other form for the recipient to sign.

19. Sparacino has not communicated about this matter with—and has not sent any mailers to—residents of Nevada. Sparacino intends to contact Nevada residents only if it is permitted to do so by the Court.

20. Out of an abundance of caution, I mailed a copy of the First Mailer to the Nevada Bar, via Federal Express, within fifteen days of sending the mailer.

### III. Interim Class Counsel Voiced Concerns About Our Mailers

21. On March 23, 2021, Sparacino attended a conference call with Scott+Scott and Interim Class Counsel (the "March 23 Conference Call"). Mr. Kay-Oliphant and I participated in the March 23 Conference Call on behalf of Sparacino.

22. During the March 23 Conference Call, an attorney from Berger Montague, on behalf of Interim Class Counsel, asserted the mailer was misleading because it did not (a) state that the *Le v. Zuffa* Court had appointed Interim Class Counsel, (b) name the law firms that the Court had so appointed, (c) disclose that Interim Class Counsel had been working on the *Le v. Zuffa* case since before it was filed in 2014, and (d) explain that the Court previously indicated its intention to certify the Bout Class and, if it does so, that the recipient of the mailer is part of that

class, the recipient's interests are currently represented by Interim Class Counsel, and the recipient need not need take any action to benefit from any recovery in *Le v. Zuffa*.

23. During the March 23 Conference Call, Berger Montague, on behalf of Interim Class Counsel, also asserted that it was improper for Sparacino to have contacted represented parties. Berger Montague added that Sparacino had sent a mailer to at least one person directly represented by Interim Class Counsel. And Berger Montague also stated that they believe they represent every putative member of the class, even though the class has not been certified and the opt-out date has not been set (much less expired).

24. During the March 23 Conference Call, I stated that Sparacino takes ethics issues very seriously, we did not believe that we had done anything wrong, but we would promptly review Berger Montague's allegations. I also stated that Sparacino and Scott+Scott currently represent clients who are former professional MMA fighters and have retained us to provide counsel regarding whether to opt out of *Le v. Zuffa*, should a class be certified.

25. During the March 23 Conference Call, David Scott, of Scott+Scott, stated that Scott+Scott agreed with Sparacino about the need to take ethics concerns seriously, and Scott+Scott also believed that Sparacino and Scott+Scott had not done anything wrong but Scott+Scott, like Sparacino, would promptly review Berger Montague's allegations.

26. On March 24, 2021, Berger Montague, on behalf of Interim Class Counsel, emailed Sparacino and Scott+Scott to provide additional detail regarding Interim Class Counsel's assertions and allegations. The email purported to provide authorities and further detailed, in relevant part, that Interim Class Counsel also believed the mailers were unethical because they communicated a gratuitous sense of urgency and would lead a reasonable person to believe that they needed to take action. A copy of the email is attached as Exhibit C.

**IV.    Sparacino Addresses Interim Class Counsel's Concerns by Sending the Second Mailer**

27. Sparacino disagreed with Interim Class Counsel's allegations that the mailers were misleading. To be clear, Sparacino does not believe Interim Class Counsel's allegations are meritorious or that it committed any ethics violations.

28. In an abundance of caution, however, and to alleviate Interim Class Counsel's concerns, on March 24, 2021, Sparacino sent a follow-up letter (the "Second Mailer") to every person that had received the First Mailer, other than those whom Sparacino had identified as potentially represented (including the individuals discussed *supra*) and a few people for whom the First Mailer had been returned due to an incorrect address. Attached as Exhibit D is the California template used for the Second Mailer. Once again, the California template is substantively identical to the versions sent to potential clients in other states.

29. All told, Sparacino sent 216 Second Mailers to a subset of the 223 people who received the First Mailer. As of the date of this submission, Sparacino has not sent communications to the approximately 1,000 other members of the putative Bout Class in *Le v. Zuffa*.

30. As the Second Mailer states, Sparacino will not contact again any of the 216 recipients of the Second Mailer unless the recipient initiates contact with Sparacino. Even though this language was not ethically necessary, I included it in the Second Mailer out of an attempt to de-escalate the situation with Interim Class Counsel.

31. Based on standard Federal Express delivery times, the Second Mailers arrived on March 25 and March 26, 2021, with most of the 216 recipients receiving them no later than late morning March 26, 2021.

## V. Interim Class Counsel Threatens Scott+Scott and Scott+Scott Withdraws

32. Sparacino, Scott+Scott, and Interim Class Counsel were scheduled to continue the meet-and-confer process for late afternoon/early evening March 25, 2021. According to what Scott+Scott told Sparacino, at some time before that scheduled conference call, Interim Class Counsel threatened Scott+Scott to take adverse action directly against Scott+Scott if they did not withdraw from this matter.

33. After being threatened by Berger Montague, Scott+Scott requested that the meet-and-confer call scheduled for March 25 be delayed.

34. At around 2:00 PM ET on March 26, 2021, Scott+Scott informed Sparacino that they intended to withdraw. That day, Scott+Scott partners, including Mr. Scott, told Mr. Kay-

1. Oliphant and me that Scott+Scott withdrew from its then-existing co-representation of professional MMA fighters with Sparacino because of the reputational and business risk related to Interim Class Counsel's threats against Scott+Scott. During the same discussion with Sparacino, Scott+Scott reiterated that they believed neither Scott+Scott nor Sparacino had done anything wrong, and Scott+Scott continued to believe that Berger Montague's allegations were without merit.

35. Interim Class Counsel then filed the instant Motion without seeking to meet and confer further (indeed, without communicating in any way) with Sparacino.

36. Unless affirmatively asked to do so by an MMA fighter, Sparacino will not send mailers to any additional putative members of a potential Bout Class (i.e., the approximately 1,000 professional MMA athletes whom Sparacino has not yet contacted) until the Court resolves Interim Class Counsel's Emergency Motion. While that Motion remains pending, Sparacino will not communicate with any such absent class members unless they reach out to Sparacino directly. Nor will Sparacino re-contact any of the individuals to whom we have already sent a mailer, unless they initiate contact with us directly.

## VI. Sparacino's Client Relationships and Engagement Letters

37. As of the date of this Declaration, Sparacino represents 11 former professional MMA athletes ("Clients"), with 17 other former MMA athletes having requested an engagement letter for review ("Contemplating Potential Clients").

38. Those Clients and Contemplating Potential Clients chose to hire, or are considering hiring, Sparacino to help them understand their opt-out rights and how best to pursue their claims, either as part of the presumptive class in *Le* or otherwise.

39. Sparacino has not sought permission to opt out on behalf of its clients—indeed, it would be premature to do so considering that no class has been certified and no opt-out date has been set.

40. Each Client or Contemplating Potential Client has executed an engagement letter, or is currently in receipt of an engagement letter (the "Engagement Letter"), with Sparacino that provides, in relevant part, as follows:

**Scope of Engagement.** We have agreed that our engagement is limited to performance of services in analyzing your potential ability to "opt-out" of the current class action against Zuffa, LLC, which does business as the Ultimate Fighting Championship or UFC ("UFC" or "Defendant"), relating to your ability to bring claims against UFC based upon UFC's alleged violations of the Sherman Act. You understand that our engagement is limited to counseling you regarding the suitability of bringing an "opt-out" claim. In the unlikely event that the Firm is unable to identify enough potential "opt-out" clients to make the approach viable in the Firm's discretion, the Firm may withdraw from the representation and/or recommend that you decline to "opt-out" of the current class action lawsuit against UFC, *Le v. Zuffa*. In this letter, we refer to our provision of legal services to you as described in this paragraph as the "UFC Case."

\*\*\*

**45-Day Special Withdrawal Period After Class Certification Order.** We expect the Court in *Le v. Zuffa* to enter an order under Rule 23 of the Federal Rules of Civil Procedure that certifies the "Bout Class" in *Le v. Zuffa*, and that you will be eligible, as a member of the Bout Class. We want you to be confident in your choice of counsel and your decision to retain us to provide you counsel concerning potentially opting out in *Le v. Zuffa*. To that end, we have agreed that you may terminate our representation of you in the UFC Case for any reason, or no reason at all, by notifying us within forty-five (45) days of the entry of any class certification order by the Court in Le, which we will promptly disclose to you.

Should you choose to terminate our services within this 45-day period, even if you do so to remain in the class action as a class member in *Le v. Zuffa* or hire other counsel to pursue your opt-out case, we agree that you will owe us nothing and that the Firm will fully release you from this Agreement, other than with respect to the provisions in this Agreement concerning "Confidentiality," "Non-Disclosure," and "Aggregate Representation and Conflicts," which we believe are necessary to protect the legal strategy of the remaining clients whom the Firm represents in the UFC Case.

For the avoidance of all doubt, you can also terminate us at any time, for any reason; if you do so within 45 days of the entry of the class certification order under Rule 23, we will forego any claim to any share of your recovery. If you terminate us after 45 days of the entry of the class certification order under Rule 23, we will follow the terms outlined below in "Termination of Representation."

\*\*\*

**Notice Regarding Limited Nature of Representation in UFC Case.** As we have also explained in the Scope of Engagement section, you understand that we are representing you under this engagement letter for the narrow purpose of reviewing your potential claims under the Sherman Act, counseling you regarding whether to "opt out" of the current antitrust class action against UFC (*Le v. Zuffa*), and handling any of the immediate work thereafter (e.g., receiving a settlement offers from UFC, if any). We have disclosed to you that we are currently in discussions with several prominent national law firms that have expressed an interest in working on this matter and have relevant antitrust expertise, and we believe – but cannot promise – that we will partner with a law firm to handle this matter. You further understand that, because the decision of whether to "opt out" depends on the joinder of enough "opt out" plaintiffs so that the

economics are viable for all the "opt out" plaintiffs, and on our ability to finalize a co-counsel relationship with a new firm after Scott+Scott's withdrawal from your matter, in the unlikely event that the Firm is unable to represent a sufficient number of "opt out" plaintiffs to make the matter economically viable, or we are unable to find a partner firm to complement our work for you and provide antitrust expertise, the Firm may elect to withdraw as your counsel in the UFC Case. In such circumstances, we will do so within a reasonable time prior to any opt-out deadline if such deadline is announced, and we will counsel you to remain in the class action *(Le v. Zuffa)* rather than opting out. If we withdraw in such circumstances, you will owe us nothing and we will not have any claim to any recovery you receive as a class member in *Le v. Zuffa* or any fees owed to any class counsel in *Le v. Zuffa*. While the Firm does not believe it is likely that we will have to withdraw like this, we cannot completely rule out the risk.

41. As reflected in the 45-day period quoted above, Sparacino intends to provide Clients with a 45-day window once they have the information necessary to make an informed decision regarding whether to remain in the class in *Le v. Zuffa* or to opt out and chart their own legal course as part of a group of "opt-out" plaintiffs.  To ensure there is no doubt as to our intention for each Client to make a fully informed choice, however, Sparacino intends to modify every Engagement Letter to extend the Client's 45-day risk-free termination period to the end of any court-ordered opt-out period, after the issuance of a court-approved class notice, so that any client can elect to either remain a member of the class, or hire alternative opt-out counsel (i.e., not Sparacino) if they wish to opt out but not use Sparacino.

42. Sparacino is currently in discussions with several elite antitrust litigation firms that have expressed interest in partnering with Sparacino to counsel fighters considering opting out of the class action in *Le v. Zuffa*.  Our intention is to reach a co-counsel deal with a prominent national law firm with antitrust and class action expertise comparable to Scott+Scott's.

43. Sparacino's counsel to its client about whether to opt out will depend heavily on Sparacino's antitrust litigation partner firm, that is:  (i) Sparacino's antitrust partner firm will be the lead on the antitrust merits and class action/opt-out risk; and (ii) if Sparacino does not partner with a high-caliber antitrust firm, Sparacino will counsel clients to remain in the class (or choose other opt-out counsel if one should appear in a separate matter), and if that occurs Sparacino will not seek any attorneys' fees or costs from Clients or Interim Class Counsel.

1    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 13, 2021

_____
Ryan R. Sparacino

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of April 2021 a true and correct copy of **DECLARATION OF RYAN R. SPARACINO** was served via the District Court of Nevada's ECF system to all counsel of record who have enrolled in this ECF system.

/s/ *Brian D. Shapiro, Esq.*
Brian D. Shapiro, Esq.