# EXHIBIT B

No. 22-____

I N  T HE

# United States Court of Appeals
# for the Ninth Circuit

---

I N RE  G OOGLE  P LAY  S TORE  A NTITRUST  L ITIGATION

---

Petition for Review of Order Granting Class Certification from the
United States District Court for the Northern District of California
No. 21-md-2981; No. 20-cv-5761
District Judge James Donato

---

## PETITION FOR PERMISSION TO APPEAL AN ORDER GRANTING CLASS CERTIFICATION PURSUANT TO RULE 23(f)

---

Katherine B. Wellington
H OGAN  L OVELLS  US LLP
125 High St., Suite 2010
Boston, MA 02110

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Danielle Desaulniers Stempel
H OGAN  L OVELLS  US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

December 9, 2022

*Counsel for Defendants-Petitioners*

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: 415-512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: 415-512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Petitioners*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendants-Petitioners state as follows:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Commerce Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Ireland Limited is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Asia Pacific Pte. Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.,

a publicly traded company; no publicly traded company owns more than 10% of

Alphabet Inc.'s stock.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF THE ISSUES FOR REVIEW ......................................................1

INTRODUCTION ..........................................................................1

STATEMENT OF THE CASE.................................................................4

    A.    Google Play .....................................................................4

    B.    This Litigation .................................................................5

    C.    The Certification Decision ........................................................7

REASONS FOR GRANTING THE PETITION .......................................................8

I.    THE COURT SHOULD GRANT REVIEW TO ADDRESS THE RIGOROUS ANALYSIS REQUIRED TO DETERMINE WHEN THE PRESENCE OF UNINJURED CLASS MEMBERS PREVENTS CLASS CERTIFICATION ...................................................9

II.    THE COURT SHOULD GRANT REVIEW TO ADDRESS WHETHER AN ANTITRUST INJURY MODEL THAT DOES NOT ACCOUNT FOR INDEPENDENT VARIABLES AFFECTING WHETHER A PLAINTIFF IS UNINJURED CAN SUPPORT CLASS CERTIFICATION ...................................................14

III.    THIS COURT SHOULD GRANT REVIEW TO CLARIFY THAT INDIVIDUALIZED DAMAGES ISSUES CAN PRECLUDE CLASS CERTIFICATION .................................................20

CONCLUSION ..........................................................................23

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ........................................................................ 13

*Bess v. Ocwen Loan Servicing LLC*,
334 F.R.D. 432 (W.D. Wash. 2020) ................................................. 22

*Bowerman v. Field Asset Servs., Inc.*,
39 F.4th 652 (9th Cir. 2022) ........................................................ 21, 23

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) .............................................................. 8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................. 21

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) ....................................................... 18, 19

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................................ 19

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................... 13

*In re Apple iPhone Antitrust Litig.*,
2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ............................. *passim*

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ............................................................... 11

*In re Digit. Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ........................................................ 13

*In re Flash Memory Antitrust Litig.*,
2010 WL 2332081 (N.D. Cal. June 9, 2010) .................................... 13

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Lithium Ion Batteries Antitrust Litig.*,
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ...............................15, 18

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014)........................................................15

*In re Pre-Filled Propane Tank Antitrust Litig.*,
2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ....................................13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019)...........................................................11

*Leyva v. Medline Industries Inc.*,
716 F.3d 510 (9th Cir. 2013) .......................................................21, 22

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*,
2022 WL 4596597 (C.D. Cal. Aug. 4, 2022) .....................................22

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ..............................................................12

*Microsoft Corp. v. Baker*,
137 S. Ct. 1702 (2017)..........................................................................8

*Ngethpharat v. State Farm Mut. Ins. Co.*,
339 F.R.D. 154 (W.D. Wash. 2021) ...................................................21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ......................................*passim*

*Roman v. Jan-Pro Franchising Int'l, Inc.*,
342 F.R.D. 274 (N.D. Cal. 2022).........................................................21

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
2010 WL 3855552 (E.D. Pa. Sept. 30, 2010)....................................11

*Solis v. Am. Airlines, Inc.*,
2022 WL 4359556 (C.D. Cal. Sept. 13, 2022) .............................21, 22

**TABLE OF AUTHORITIES—Continued**

Page(s)

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021).....................................................................6, 16

*Viernes v. DNF Assocs., LLC*,
   582 F. Supp. 3d 738 (D. Haw. 2022)...............................................21

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ............................................20, 21, 22

**RULES:**

Fed. R. Civ. P. 23(b)(3)...........................................................................21

Committee Note on Rule 23(f) .................................................................8

## STATEMENT OF THE ISSUES FOR REVIEW

1.    Must a district court conduct a rigorous analysis of the extent to which the proposed class contains uninjured class members before it can certify the class?

2.    Can a district court certify a class based on an injury model that does not account for variables that yield individualized differences among class members?

3.    Must a district court actually analyze whether individualized issues with respect to damages calculations predominate?

## INTRODUCTION

In this antitrust class action, the District Court certified a class of 21 million consumers who seek $4.7 billion in damages related to purchases of apps and app-related content in the Google Play store. The price for those purchases was set by app developers, who pay Google a service fee equal to a percentage of the price. Plaintiffs' theory of injury is that with more competition, Google would have charged developers lower service fees, and developers would have responded by lowering their product's prices. The main issue at class certification was whether plaintiffs had a model that could show Article III injury on a classwide basis. This Court has repeatedly recognized that whether this fundamental prerequisite of class certification has been satisfied warrants review under Rule 23(f), particularly when

plaintiffs seek billions in damages.  *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 661 (9th Cir. 2022) (en banc); Pet. at 1-3, *In re Juul Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 22-80062 (9th Cir. July 12, 2022) (granted Oct. 24, 2022).

Consumer injury here means that at least one developer from whom an individual made a purchase would have lowered prices in response to a lower service fee, such that the consumer would have paid less for his or her purchases. Real-world data shows this almost never happens:  When Google actually lowered service fees, developers lowered prices for about 2% of products.  Indeed, developers—who also sued Google—offered evidence that only 8% of developers would have lowered prices, with 92% keeping the difference for themselves. Therefore, for the *vast majority of 21 million consumers in the class,* a lower service fee for developers would not have resulted in a lower price, which means the vast majority of the class is uninjured.

The District Court nevertheless certified the class, relying on plaintiffs' expert, Dr. Hal Singer.  Dr. Singer did not analyze pass-through using real-world data and ignored that nearly all developers strategically price their apps to end in $.99, which they would not alter if they saved a few cents on service fees. Advancing a model never before used to show classwide injury, he predicted the exact opposite of what the data show: that every single developer would have

2

passed on cost savings from a lower service fee to consumers. Skipping over *whether* any savings would be passed on, the model instead calculates *how much* savings would be passed on based on an app's share of transactions in the Play store category in which the developer listed the app.[1] This simplistic model depends on all apps in each category being substitutes, which Dr. Singer agreed was inaccurate. Different apps have different competitors, which is just one of the reasons not all developers would have reduced prices if service fees had been lower.

The District Court's certification order raises three open questions meriting review, and the court manifestly erred in addressing each one. *First*, the District Court failed to conduct the rigorous analysis into injury and standing that Rule 23 requires. The court acknowledged that there are individualized issues with respect to injury, but did not analyze what they were or whether they prevented class certification. It faulted *Google's* evidence of uninjured class members, rather than analyzing whether *plaintiffs' model* met their burden to show classwide impact. *Second*, the court relied on an injury model that does not account for individualized differences between class members that affect whether they suffered any injury. *Third*, the court concluded that individualized issues with respect to damages can

---

[1] Put concretely, for an app with a 10% share of its category, Dr. Singer's model says it will pass through 90% of any service fee reduction to consumers.

never prevent class certification.  This Court should grant the petition to give
much-needed guidance on these key questions and reverse the District Court's
erroneous rulings.

### STATEMENT OF THE CASE

**A.      Google Play**

Google Play is a store where developers offer apps, and consumers
download them.  There are over four million apps on Play, offering services from
fitness to gaming to music.  Roughly 90% of apps are completely free but may
display ads.  *See* ECF 325-5 at 174.[2]  For the remaining 10%, developers make
money in different ways, including by selling the apps or digital goods in the apps.
*See* Add. 8.

Apps and in-app content purchases on Play are subject to a percentage-based
service fee on developers' revenue from consumer purchases.  *See* ECF 325-1 at
473.  Different developers pay different percentages.  *See id.*  These fees enable
Google to support billions of users; protect against malware; offer tools to
developers; and enable users to manage purchases, subscriptions, and parental
controls.  *See* ECF 325-5 at 277-279.  Google requires developers to use Play's

---

[2] Unless otherwise specified, ECF references are to the multidistrict litigation
docket, No. 3:21-md-02981-JD (N.D. Cal.).

billing system, which protects consumer security and allows for efficient fee collection.  *Id.* at 277.

Most apps are free, and users of those apps thus spend no money on Play.  *See* ECF 325-1 at 601-602.  Even for apps offering purchases, many consumers spend very little money, and do so in only one app.  *See* ECF 325-5 at 174-175 (roughly 39% made purchases from just one app).  Developers—not Google—set app prices based on many idiosyncratic factors.  ECF 325-1 at 502.  Nearly all developers use focal point pricing, setting prices to end in 99 cents.  *Id.* at 505.  Approximately 97% of U.S. consumers' transactions had retail prices ending in 99 cents.  *Id.*

Evidence confirms that when Google changes its service fees, the vast majority of developers do not reduce prices.  *Id.* at 514-515.  Google reduced service fees for some developers between 2018 and 2021, and those developers did not lower prices for at least 87% of paid apps and 98% of in-app purchases and subscriptions.  *Id.* at 515.

## B.    This Litigation

A putative consumer class, putative developer class, two individual developers, and 39 States sued Google, alleging anticompetitive conduct.  The cases were consolidated into a multi-district litigation.  *See* ECF 1.  The putative developer class reached a proposed settlement that the District Court has

preliminarily approved.  *See* Order, *In re Google Play Developer Antitrust Litig.*, No. 20-cv-05792 (N.D. Cal. Dec. 1, 2022), ECF 233.  Consumer plaintiffs ("plaintiffs") ultimately sought to certify a class of consumers in 17 states and territories.  *See* Add. 3-4.  Although plaintiffs are consumers, they allege that as a result of anticompetitive conduct, Google's *developer* service fee is too high.  Their claims thus depend on a "pass-through" theory:  They are injured *only if* developers would have passed the benefit of lower service fees through to consumers via lower prices.  Add. 3, 16-17.

The putative class includes more than 21 million consumers, who made purchases involving 272,500 apps.  *See* Add. 12; ECF 272-13.  To demonstrate each consumer suffered an injury—and thus has Article III standing—plaintiffs must show that each of those 21 million consumers paid a higher price because of the alleged anticompetitive conduct.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021).  This requires showing that at least one developer from whom each consumer bought a product would have lowered its price if Google's service fee were lower.  *See* ECF 325-1 at 502.  Unless a developer would have reduced the price it set for consumers, consumers buying products from that developer were uninjured by the amount of the service fee Google charged the developer.

To carry their burden, plaintiffs hired Dr. Singer, who opined that all developers would have lowered their prices had Google lowered its service fees. *See* ECF 325-1 at 140. Rather than utilize real-world data, he borrowed a model from a different economic context that involves just *one* variable: market share. *See* Add. 17-18. This model assumes that developers always pass on cost savings in proportion to "market share," without accounting for any other factors affecting prices.

## C.     The Certification Decision

The District Court certified plaintiffs' proposed class. Add. 27.[3] The court acknowledged the class presented "individualized questions on impact and damages." Add. 26. Yet the court did not identify what those questions were. Instead, the District Court concluded—without substantive analysis, and while flipping the burden at class certification—that *Google* "has not shown" that the potential for a large number of uninjured class members "is a concern." Add. 21. As for Google's real-world data demonstrating that only a very small number of developers reduced prices in response to service-fee decreases, the court stated that "Dr. Singer raised several serious questions about" some of this data, but declined

---

[3] The District Court certified federal antitrust and parallel state claims based on the same reasoning. App. 24-25. The arguments Google raises in this petition therefore apply to all claims.

to engage with or resolve any of those questions, and did not address developers' data showing the same result. *See id.*

The court accepted Dr. Singer's model despite its failure to account for key variables that affect whether a consumer was injured or suffered damages. Add. 18-20. The court never analyzed whether it would be necessary to account for these variables to determine injury or damages at trial. The court instead stated that it did not *matter* if Google was right that individualized damages issues might dominate trial, because the court believed "it is well-established circuit law that damages calculations alone cannot defeat certification." Add. 23 (quotation marks omitted).

## REASONS FOR GRANTING THE PETITION

Rule 23(f) grants this Court discretion "to grant or deny review 'on the basis of *any* consideration.' " *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709-10 (2017) (quoting Committee Note on Rule 23(f)). Review is particularly appropriate where certification turns on unsettled legal questions and where "the district court's decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 958 (9th Cir. 2005) (per curiam). Both are true here. This Court should grant the petition and reverse.

## I.     THE COURT SHOULD GRANT REVIEW TO ADDRESS THE RIGOROUS ANALYSIS REQUIRED TO DETERMINE WHEN THE PRESENCE OF UNINJURED CLASS MEMBERS PREVENTS CLASS CERTIFICATION.

In *Olean*, this Court held that Rule 23 requires courts to perform a "rigorous analysis" to determine "whether individualized inquiries into" antitrust injury and Article III standing "would predominate over common questions." *Olean*, 31 F.4th at 668-669 & n.12. The Court should grant the petition to explain what this rigorous analysis entails—and reject the District Court's approach.

Google presented significant evidence that the putative class contains uninjured members. A consumer is injured *only if* a developer would have charged the consumer less money absent the allegedly anticompetitive conduct that plaintiffs say artificially inflated Google's service fee. But evidence shows most consumers were not injured because most developers *would not* have charged consumers less money. When Google reduced its service fees, developers reduced prices on only between 1% and 13% of paid apps, and less than 2% of subscriptions and in-app purchases. *See* ECF 325-1 at 516. Analyzing the same question with different data, the developer class plaintiffs' expert found that only 8% of apps pass through lower costs to consumers. *See id.* at 553-555. And multiple developers testified that they did not lower prices when Google reduced service fees. *See* ECF 272-4 at 256; ECF 272-5 at 212-214; ECF 272-6 at 306-307. All of this indicates that *the vast majority of consumers* in the class are

9

uninjured: They would not have paid less if Google had charged developers reduced fees.

Other record evidence supports that conclusion. Nearly all apps use focal point pricing, which is "a well-established concept in economics." ECF 325-5 at 238. As the district court concluded in *In re Apple iPhone Antitrust Litigation*, "overwhelming evidence suggests that developers would choose to price their apps at focal points ending in 99 cents." 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022). Here, for *97% of U.S. consumers' retail transactions*, developers chose prices ending in 99 cents. ECF 325-1 at 505. If Google had reduced its service fee to 15%, a developer is unlikely to lower its price by pennies or even a quarter, especially when doing so would not be a focal point price. Thus, if Google had lowered its service fee to 15%—roughly what Dr. Singer claims should have happened—a developer charging $1.99 would have continued charging $1.99 rather than reducing its price all the way to $0.99. Because nearly all transactions employ focal point pricing, *id.* at 505-506, 563, this fact too indicates that *a substantial number of consumers in the class* are uninjured.

Given the significant evidence of uninjured class members, the District Court should have conducted a rigorous analysis to determine the extent to which uninjured plaintiffs are present in the class, and whether those uninjured class members prevented certification. It did not do so. Instead, it concluded that

10

"*Google* has not shown" that the class "would be so overinclusive that substantial numbers of uninjured people would populate it." Add. 21 (emphasis added). And, although the court purported to identify "serious questions" about *some* of Google's evidence, it conducted no analysis to answer those questions. *Id.* That gets the Rule 23 analysis wrong: It is *plaintiffs'* burden to show the Rule's requirements have been met, not Google's burden to disprove them. *Olean*, 31 F.4th at 664.

Other courts routinely conduct the basic inquiry the District Court omitted. For example, in an antitrust class action alleging that a generic drug should have entered the market earlier, the court considered whether putative class members were uninjured because they would have paid the same amount even if the generic had entered the market. *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51-54 (1st Cir. 2018); *see also Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *24-25 (E.D. Pa. Sept. 30, 2010). In an action alleging that shipping prices should have been lower, the court considered whether putative class members were uninjured because they would have paid the same amount even if overall prices had been lower. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-624 (D.C. Cir. 2019). And in an action challenging a hospital merger, the court considered whether putative class members were uninjured because they were "protected … from price

increases." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825-826 (7th Cir. 2012). Indeed, in a closely analogous litigation involving Apple's app store, the court considered whether focal point pricing created an individualized issue as to injury that prevented class certification—and found it did. *See Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8, *16.

The District Court performed no such analysis here. The court acknowledged that there were "individualized questions on impact." Add. 26. But the District Court *did not identify those issues*, let alone consider whether they affected whether putative class members were uninjured.

The court's attempts to explain away its failure to conduct this analysis fall flat. Its suggestion that "[t]his is not unlike a price-fixing case, where the price-fixing affects all market participants, creating an inference of class-wide impact," Add. 21-22 (quotation marks omitted), makes no sense. The prices charged to consumers are set by developers, not Google. The Court did not analyze whether a great number of the 21 million class members would be uninjured due to focal point pricing or individual developers' decisions to "pocket the extra money" rather than lowering their prices. Add. 20. And because the Court did not analyze who was uninjured, it did not analyze whether the presence of uninjured plaintiffs prevented class certification. Instead, the District Court simply asserted that "predominance does not demand perfection"—without explaining how a trial could

be conducted with 21 million plaintiffs, where evidence shows that injury depends on each developers' pricing preferences. *Id.*

The District Court also claimed that because the consumers are direct purchasers under *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019), "there is no barrier to certification" on the basis of "pass-through." Add. 16-17. But that is wrong. Regardless of who collects payment, plaintiffs' proof of Article III injury still depends on whether *developers* would have passed through a lower service fee by reducing prices for app-related purchases. As many courts have concluded, determining whether increased costs would be passed through is a difficult inquiry that cannot be brushed aside, like the District Court did here. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *11 (N.D. Cal. June 9, 2010); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *12 (W.D. Mo. Nov. 9, 2021); *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017).[4]

This Court should grant the petition to clarify the rigorous analysis of uninjured class members required by *Olean* and to correct the District Court's

---

[4] The only individualized question the District Court considered was consumers' security preferences. Add. 23. The court held that because each consumer's security preference is "conditional"—i.e., dependent on the facts and circumstances—it cannot prevent class certification. *Id.* That gets the analysis backwards. Determining individual security preferences for each of 21 million

manifestly erroneous analysis. The burden of showing that a "great number" class members are not uninjured rests on plaintiffs, not Google. *Olean*, 31 F.4th at 669 (quotation marks omitted).[5] To determine whether individualized injury issues predominate, a district court must identify what those individual issues are and determine whether they affect putative class members. The District Court departed from the rigorous analysis upheld in *Olean* and from the carefully reasoned decisions of other courts.

## II. THE COURT SHOULD GRANT REVIEW TO ADDRESS WHETHER AN ANTITRUST INJURY MODEL THAT DOES NOT ACCOUNT FOR INDEPENDENT VARIABLES AFFECTING WHETHER A PLAINTIFF IS UNINJURED CAN SUPPORT CLASS CERTIFICATION.

The District Court's acceptance of Plaintiffs' novel injury model also merits review. In this Circuit, plaintiffs may show common injury using a regression model featuring "appropriate independent or explanatory variables" to "test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's [allegedly unlawful] behavior." *Olean*, 31 F.4th at 671, 683 (cleaned up). The *Olean* model, for example, accounted for "independent or explanatory

---

plaintiffs, and the costs each plaintiff would have incurred to keep their data and devices secure, is an individualized issue that should have prevented certification.

[5] As the *Olean* dissent explains, this Court's "great number" standard "creates a split with other circuits" holding that a class can contain (at most) a "*de minimis*" number of uninjured members. *Olean*, 31 F.4th at 692 (Lee, J., dissenting)).

variables" "that could affect the price ..., including product characteristics, input costs, customer type, and variables related to consumer preference and demand." *Id.* at 671. Here, the District Court certified the class based on an injury model that admittedly *did not* test or isolate relevant independent variables—most importantly, competitive conditions and focal point pricing—affecting whether a consumer was injured. This Court should grant review to address this significant legal issue and provide needed guidance to the district courts, which are divided on this question.

*Olean* left open the question here: whether an injury model that *does not* control for independent explanatory variables can support class certification. An independent explanatory variable (such as focal point pricing) is a reason why a plaintiff is *not* injured, regardless of whether the anticompetitive conduct occurred. Other district courts in this Circuit have refused to certify classes involving models that do not control for such variables. *See, e.g.*, *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 ("Having failed to use or address the issue, the model does not provide a reliable method for determining but-for pricing in the presence of focal pricing."); *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3-5 (N.D. Cal. Mar. 5, 2018) (similar); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324-325 (N.D. Cal. 2014) (similar).

The District Court here took the opposite tack.  Dr. Singer's model fails to account for multiple independent variables—including competitive conditions and focal point pricing—let alone account for them using the kind of rigorous regression analysis this Court approved in *Olean*.  Dr. Singer admitted that his model accounts for only one factor: "the implied pass-through rate" given an app's market share in its category.  ECF 325-5 at 241.  These shortcomings mean that Dr. Singer's model *cannot be used at trial* to show injury to individual class members who are seeking damages, as *TransUnion* requires.  *See* 141 S. Ct. at 2207-08.

Dr. Singer's model relies on a basic assumption:  If Google changes its service fees, a developer will *always change its prices in perfect proportion* to the app's market share of its category—regardless of any other individualized factors that might affect a developer's pricing decisions.  Dr. Singer uses a "one minus share" formula that works as follows:  Developers list their app in one of 35 broad categories in the Play store, such as gaming or health.  *See* Add. 10 & n.5.  Dr. Singer calculates each app's share of that overall category.  He then subtracts the app's share from 100%, and assumes that the app will pass on to consumers that percentage of cost savings from a lower service fee.  *See* ECF 325-5 at 234-235.  Thus, for a gaming app with 10% of the category share, Dr. Singer assumes it will pass on to consumers 90% of any savings from a lower service fee.

16

Dr. Singer assumes every app will act this way. But for that to be true, every app in each of the 35 broad categories must be in perfect competition. *See* ECF 325-1 at 559-560; ECF 302 at 116 (Dr. Singer agreeing that, in this type of model, "all of the goods in the market … have to be substitutes in proportion to their shares of that market"). Dr. Singer agrees that is not accurate. *See* ECF 302 at 117 ("I don't think that every one is a good substitute necessarily."). The inaccuracy in this assumption is obvious. Even though the children's game Thomas the Tank Engine and the adult game Doom are in the same "games" category, they are clearly not competitors, are not marketed to the same consumers, and are not perfect substitutes such that if the price of one increased, consumers would switch to the other in proportion to the app's share of the category. *See id.* at 90. And Dr. Singer admits his model does not "determine which apps in each category are complements and which are substitutes." ECF 325-5 at 230.

The District Court tried to excuse this flaw by pointing out that Google created the 35 categories from which developers choose. Add. 19. But Google established these categories to make it easier for users to find apps, much as a bookstore might locate both horror and romance novels under "fiction." That does not mean all apps within a category are substitutes or that the category has anything to do with whether a service fee is actually passed through to users.

Dr. Singer's model also does not account for focal point pricing. If Google decreased its service fee to 15%, an app developer is unlikely to drop its price by a handful of cents to an amount that is not a focal point. *See* ECF 325-1 at 506. This conclusion is common sense, reflects economic reality, and is consistent with the evidence. *See supra* p. 10; ECF 325-1 at 506; *see, e.g.*, *Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *4. Dr. Singer admitted that focal point pricing is "an important consideration" in developers' pricing decisions. ECF 325-5 at 239. And he admitted that his model does not account for it at all. *Id.* at 240-241.

Dr. Singer's "one minus share" model is so simple, it has never been used by anyone—including Dr. Singer—to calculate pass-through. *See* ECF 302 at 51. Google's expert, Dr. Burtis, testified that she had "never seen" this methodology used in this manner. *Id.* There is a reason for this: It doesn't work. Because the model fails to isolate and control for independent variables, it cannot possibly determine whether an individual developer would have charged less—and thus whether an individual consumer would have paid less—absent the anticompetitive conduct.

The District Court concluded that Dr. Singer's model survived *Daubert*, even though *Daubert*'s purpose is to screen out models, like this one, that have no proven track record for a given purpose. *See Cooper v. Brown*, 510 F.3d 870, 880

(9th Cir. 2007). That was error, but even if the District Court correctly allowed Dr. Singer's model under *Daubert*, the court manifestly erred by "confus[ing] the *Daubert* standard … with the 'rigorous analysis' standard" required under Rule 23. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The District Court *agreed* that "individualized issues" are present here; those issues include focal point pricing and the fact that some developers "might pocket the extra money … rather than lowering prices for consumers." Add. 20. Yet the District Court deemed it irrelevant for Rule 23 purposes that Dr. Singer's model did not even attempt to control for these concerns. *Id.*

The District Court forgave the errors in the model because it believed Dr. Singer had offered "empirical analyses" supporting the model's use here, namely "tests using real-world data to confirm the accuracy of his predictions." Add. 21. But that is wrong. Dr. Singer admitted that he did not conduct any analysis of real-world data to test the effect of lower service fees on the prices that consumers paid. ECF 325-5 at 228. All Dr. Singer did was confirm the unremarkable proposition that increasing prices will tend to reduce market share. *See id.* at 231-232; ECF 318 at 22. That is entirely irrelevant to the issue here: whether the percentage of Google's service fee that an app developer "passes through" to a consumer is directly related to an app's market share in the broad Play store categories.

Even more remarkably, the District Court purported to accept Dr. Singer's theory because an expert in the *Apple iPhone Antitrust Litigation* "also modeled demand and supply conditions on a category-by-category basis." Add. 19. This leaves out a critical detail: The *Apple iPhone* district court held that model was *not* sufficient to support class certification precisely because it failed to account for variables like focal point pricing. *See* 2022 WL 1284104, at *8, *16. These two courts' conflicting analyses in analogous cases underscores the need for this Court's guidance. At a minimum, the District Court's reliance on Dr. Singer's model is manifestly erroneous because it cannot possibly demonstrate Article III standing for any given class member at trial, much less all 21 million.

## III. THIS COURT SHOULD GRANT REVIEW TO CLARIFY THAT INDIVIDUALIZED DAMAGES ISSUES CAN PRECLUDE CLASS CERTIFICATION.

The District Court acknowledged that "individualized questions on … damages" are present, Add. 26, but declined to evaluate them or explain how they could possibly be addressed in a 21-million-plaintiff trial—repeating the same error as its analysis of Article III standing. The court concluded that it need not engage on these individualized questions based on its reading of circuit precedent as creating a bright-line rule that "damage calculations alone cannot defeat [class] certification." Add. 23 (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594

F.3d 1087, 1094 (9th Cir. 2010), and citing as support *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

Earlier this year, however, this Court recognized that "excessive difficulty" in calculating damages defeats class certification. *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022). That aligns with Rule 23's text, which requires consideration of whether common issues "predominate over *any* questions affecting only individual members," without excepting damages, Fed. R. Civ. P. 23(b)(3) (emphasis added), and the Supreme Court's holding that predominance is not satisfied when "[q]uestions of individual damage calculations will inevitably overwhelm" common questions. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

Whether and when individualized damage calculations defeat class certification is a recurring and hotly debated question. Some courts have reached the same conclusion as the District Court did below. *See, e.g.*, *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 301 (N.D. Cal. 2022); *Viernes v. DNF Assocs., LLC*, 582 F. Supp. 3d 738, 760 (D. Haw. 2022); *Ngethpharat v. State Farm Mut. Ins. Co.*, 339 F.R.D. 154, 169 (W.D. Wash. 2021). Other district courts in this Circuit have denied certification precisely because plaintiffs have failed to show a workable solution for calculating individualized damages. *See, e.g.*, *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *17; *Solis v. Am. Airlines, Inc.*, 2022

WL 4359556, at *6 (C.D. Cal. Sept. 13, 2022); *LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597, at *1 (C.D. Cal. Aug. 4, 2022); *Bess v. Ocwen Loan Servicing LLC*, 334 F.R.D. 432, 440 (W.D. Wash. 2020). Several of those courts held that individualized issues are alone sufficient to prevent certification, even when other common issues exist. *See, e.g.*, *Solis*, 2022 WL 4359556, at *6; *LSIMC*, 2022 WL 4596597, at *6, 11; *Bess*, 334 F.R.D. at 440.

The confusion surrounding this issue warrants clarification. In *Yokoyama*, this Court described the amount of damages as "invariably an individual question" and said that the need for "damage calculations alone cannot defeat certification." 594 F.3d at 1094 (quotation marks omitted); *accord Leyva*, 716 F.3d at 513. In context, however, it is clear this Court was not adopting a bright-line rule. Instead, the Court was observing that the mere "*presence* of individualized damages cannot, by itself, defeat class certification." *Leyva*, 716 F.3d at 514 (emphasis added). In other words, a court need not reject class certification merely because the damages calculation involves some element of individualized analysis. *Leyva* even expressly recognizes that an inability to "feasibly and efficiently" calculate individualized damages may thwart certification. *Id.*

The many individualized injury and damages issues in this case make it an ideal vehicle for this Court to clarify its precedent on this important issue. The *21 million* class members here made different purchases from over 270,000 different

apps and assert that $4.7 billion in damages is at issue. Plaintiffs will need to demonstrate the amount of money each individual consumer would have saved in a hypothetical world of lower service fees charged by Google to developers—taking into account all the individualized issues the District Court said could be postponed until trial, including focal point pricing, competition, and developers' idiosyncratic preferences (like whether to pocket any cost savings). *See* Add. 18-20. That is certainly an "excessively difficult" damages calculation, and it should preclude certification. *Bowerman*, 39 F.4th at 663.

## CONCLUSION

For the foregoing reasons, the petition should be granted.

Respectfully submitted,

December 9, 2022

/s/ Neal Kumar Katyal

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110
Telephone: (617) 702-7745
Facsimile: (617) 371-1037
katherine.wellington@hoganlovells.com

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Danielle Desaulniers Stempel
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: 415-512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: 415-512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Petitioners*

## CERTIFICATE OF COMPLIANCE

1.      This petition complies with the type-volume limitations of Federal

Rule of Appellate Procedure 5(c)(1) and 9th Circuit Rules 5-2(b) and 32-3 because

it contains 5,196 words, excluding the parts of the brief exempted by Federal Rules

of Appellate Procedure 5(b)(1)(E) and 32(f).

2.      This petition complies with the typeface requirements of Federal Rule

of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it has been prepared in a proportionally

spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-

point font.


/s/ Neal Kumar Katyal
Neal Kumar Katyal

# ADDENDUM

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Google Play Store Antitrust Litigation | Case No. 21-md-02981-JD |

**ORDER RE CONSUMER PLAINTIFFS'
CLASS CERTIFICATION MOTION
AND DEFENDANTS' MOTION TO
EXCLUDE EXPERT TESTIMONY**

Re: Dkt. Nos. 280, 282
(Case No. 20-cv-05761-JD)

This action by consumer plaintiffs is one of several antitrust cases about the Google Play Store. These cases have been consolidated into a multidistrict litigation (MDL) for centralized proceedings before this Court. Dkt. No. 1.[1] The named plaintiffs allege, on behalf of themselves and multiple putative classes of consumers, that defendant Google illegally monopolized the Android app distribution market with anticompetitive practices in the Google Play Store.

Google's motion to exclude the testimony of plaintiffs' economics expert is denied. The consumers' motion for class certification is granted in main part, subject to some adjustments of the named plaintiffs. Dkt. Nos. 251, 252.

**BACKGROUND**

The consumer case is itself a consolidated action. Before it was made a part of the MDL, the Court consolidated a number of related consumer cases under the caption, *In re Google Play*

---

[1] Unless otherwise noted, all docket number references are to our district's ECF docket for the multidistrict litigation case, No. 21-md-02981-JD. For present purposes, the Court will cite to the redacted versions of filings pending resolution of a mountain of sealing requests in a separate order.

*Consumer Antitrust Litigation*. *Consumer* Dkt. No. 78.[2]  The Court appointed on an interim basis co-lead class counsel, liaison counsel, and a steering committee to manage the consumer side of the litigation. *Consumer* Dkt. No. 128.

The operative complaint for the consumers is the consolidated second amended class action complaint.  Dkt. No. 172 (SAC).  The named plaintiffs are six consumers in the states of California, Massachusetts, New York, Washington, Wisconsin, and Georgia, all of whom purchased mobile apps through the Google Play Store or paid for in-app digital content for one of those apps. *Id.* ¶¶ 23-29; *Consumer* Dkt. No. 259.  The defendants are Google, LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp. (together, Google).  SAC ¶¶ 32-36.

The thrust of the SAC is that Google has unlawfully acquired and maintained a monopoly in the Android app distribution market through anticompetitive practices in the Google Play Store.  The Google Play Store is said to be the "dominant" distribution channel for mobile apps to Android device users. *Id.* ¶ 51.  The Play Store features "over three million apps, including all the most popular Android apps," compared to "just 700,000 apps offered by Aptoide, the Android app store with the next largest listing." *Id.* ¶ 82.  According to the SAC, "Google's market power results in enormous profits," and "[i]n 2020 alone, the Google Play Store generated revenues of $38 billion, accounting for over 20 percent of the company's total revenue in that year of $182 billion." *Id.* ¶ 86.

Plaintiffs allege that "Google has willfully and unlawfully maintained its monopoly in the Android Application Distribution Market through a series of related anticompetitive acts designed to foreclose alternative and competing Android app distribution channels." *Id.* ¶ 111.  The anticompetitive acts include requiring OEMs to preinstall and prominently place the Google Play Store on the Android devices they manufacture; requiring mobile network operators, in return for a share of Google's revenues, to preload the Google Play Store in a prominent position on all Android mobile devices that they distribute; and prohibiting developers who sell their apps

---

[2] References to the "*Consumer* docket" are to the ECF docket for Case No. 20-cv-05761-JD.

United States District Court
Northern District of California

1    through the Google Play Store from providing any apps that would allow consumers to download

2    a competing app distribution store.  *Id.* ¶¶ 112-54.

3        Plaintiffs say that Google's monopoly power allowed it to charge a "supra-competitive

4    commission of up to 30% on the price of apps purchased through the Google Play Store and in-

5    app purchases processed through Google Play Billing," the use of which is mandated by Google

6    for all apps that are distributed through the Play Store.  *Id.* ¶ 84.  Plaintiffs purchased Android

7    apps and made in-app purchases "directly from Google," and so were harmed by paying

8    artificially inflated prices for the apps.  *Id.* ¶¶ 208-11.

9        The SAC identifies three product markets -- "(1) the Licensable Mobile Operating System

10   Market; (2) the Android Application Distribution Market; and (3) the In-App Aftermarket," SAC

11   ¶ 41 -- but alleges claims only with respect to the latter two.  These claims are six counts against

12   Google under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, for unlawful

13   monopolization, unreasonable restraints of trade, and unlawful tie-in in the Android Application

14   Distribution Market and In-App Aftermarket, *id.* ¶¶ 221-79; four counts under the California

15   Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., for unreasonable restraints of trade and

16   unlawful tie-in in the same two markets, *id.* ¶¶ 282-328; and one count under the California Unfair

17   Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., for unlawful, unfair, and

18   fraudulent business practices, *id.* ¶¶ 329-62.  The requested relief consists of "treble damages for

19   injuries caused by defendants' violations of the federal antitrust laws and California's Cartwright

20   Act," restitution under the UCL, and a conduct injunction.  *Id.* at 74.

21       Plaintiffs' motion for class certification, Dkt. No. 251, proposes classes that are somewhat

22   different from those in the SAC.  The SAC named a nationwide class or, in the alternative, a

23   "repealer-state class."  SAC ¶¶ 213, 220, 280-81.[3]  The motion asks for certification of a smaller

24

25   ───────────────
     [3] The SAC says that the "repealer-state class" consists of individuals in "those states whose laws
26   permit indirect purchaser standing and provide for antitrust recovery to indirect purchasers."  SAC
     ¶ 213.  Plaintiffs have abandoned the "'repealer states' class" because "Google has consistently
27   included a choice-of-law provision in its user agreements designating California law as controlling
     in litigation brought by users," and so "California law governs the state law claims of all class
28   members, regardless of where they reside and regardless of whether a particular state has
     'repealed' *Illinois Brick*."  Dkt. No. 251 at 3.

group, mainly because plaintiffs have entered into a Joint Prosecution Agreement with the Attorneys General of the 38 states and the District of Columbia, who are plaintiffs in *State of Utah et al. v. Google*, No. 21-cv-05227-JD, which is another constituent case in this MDL. Plaintiffs advised the Court that, "[t]o pursue consumers' claims against Google most effectively and efficiently, plaintiffs' counsel and the thirty-nine Attorneys General asserting *parens patriae* claims" have "agreed in the Joint Prosecution Agreement that class certification would be sought" in the consumers' case "only for consumers in states, districts and territories that have not asserted a *parens patriae* claim" in the States case. Dkt. No. 251 at 3. In effect, plaintiffs and the Attorneys General agreed that plaintiffs would not pursue certification on behalf of state residents represented in the Attorneys General case.

Plaintiffs propose certification of two classes for the Sherman Act, Cartwright Act, and UCL claims:

> Rule 23(b)(3) Multistate Damages Class:
>
> All persons in the following U.S. states and territories:
>
>> Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Pennsylvania, South Carolina, Wisconsin, Wyoming, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands
>
> who paid for an app through the Google Play Store or paid for in-app digital content (including subscriptions or ad-free versions of apps) through Google Play Billing on or after August 16, 2016, to the present.
>
> Rule 23(b)(2) Multistate Injunctive Relief Class:
>
> All persons in the following U.S. states and territories:
>
>> Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Pennsylvania, South Carolina, Wisconsin, Wyoming, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands
>
> who currently own a mobile phone or tablet with an authorized and preinstalled version of Google's Android OS capable of accessing the Google Play Store.

Dkt. No. 251 at i.[4]

---

[4] Plaintiffs filed a "corrected proposed order" that again changed the class definitions slightly, Dkt. No. 304, which will be discussed later.

Google opposes certification.  Dkt. No. 273.  It has also asked to exclude the testimony of plaintiffs' expert for certification, Dr. Hal J. Singer.  Dkt. No. 252.

To aid the *Daubert* and class certification analysis, the Court held a concurrent expert proceeding, known informally as an "expert hot tub."  The hot tub featured Dr. Singer and Google's expert, Dr. Michelle M. Burtis, in a debate about the economic factors germane to the question of certification.  Dkt. No. 299.  The Court moderated the debate pursuant to a joint submission by the experts identifying their top areas of disagreement, which was prepared at the Court's direction.  Dkt. Nos. 191, 284.  The Court has used the hot tub procedure in other cases, and has found it to be an invaluable tool for vetting *Daubert* issues and determining questions of class certification, among other uses.  *See In re Capacitors Antitrust Litigation*, No. 17-md-02801-JD, 2020 WL 870927 (N.D. Cal. Feb. 21, 2020); *In re Capacitors Antitrust Litigation*, No. 17-md-02801-JD, 2021 WL 5407452 (N.D. Cal. Nov. 18, 2021).  The Court also heard argument by counsel on the class certification and *Daubert* motions.  Dkt. No. 317.

For the pending motions, the Court will take up the *Daubert* challenge to Dr. Singer first.  Because this challenge is made in the class certification context, reference to Rule 23 is required.  The full Rule 23 determination will be made in an ensuing section.

## DISCUSSION

## I.   LEGAL STANDARDS

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Put more plainly, expert opinions are admissible when they are relevant, supported by the evidence, based on sound methodologies, and useful to the jury on topics that ordinary people would not necessarily understand without help.  The Rule 702 inquiry is "a flexible one," with no "definitive checklist or test."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993).

5

The Court's task is to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quotations and citation omitted).

To determine admissibility under Rule 702, the Court may consider factors such as "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quotations and citation omitted). The Court may "also consider whether experts are testifying 'about matters growing naturally' out of their own independent research, or if 'they have developed their opinions expressly for purposes of testifying.'" *Id.* These factors are "illustrative, and they are not all applicable in each case," and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Id.* (quotations and citation omitted); *see also Primiano*, 598 F.3d at 564 ("the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case'") (citation omitted).

"Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotations and citation omitted). The Court "is 'a gatekeeper, not a fact finder.'" *Id.* (quoting *Primiano*, 598 F.3d at 568). The Court will "exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999)). Any objections short of that are fodder for cross-examination and not exclusion.

Dr. Singer's opinions were proffered in aid of plaintiffs' request to certify a class, and so the *Daubert* issues must be evaluated in light of Rule 23. The overall goal of Rule 23 is "to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v.*

United States District Court
Northern District of California

*Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (cleaned up). "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted).

To come within the exception, plaintiffs bear the burden of proving by a preponderance of the evidence that the proposed classes satisfy all four requirements of Rule 23(a) and at least one of the subsections of Rule 23(b). *Id.*; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc), *cert. denied*, ___ S. Ct. ___, 2022 WL 16909174 (Nov. 14, 2022). The Court's analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," though the merits questions are to be considered only to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted). The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). The decision of whether to certify a class is entrusted to the sound discretion of the district court. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

The analysis of expert testimony for class certification has some specific elements. "When considering class certification under Rule 23, district courts are not only at liberty to, but must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'" *Ellis*, 657 F.3d at 980 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351-52 (2011)). The Court may not certify a class just because the expert evidence is admissible. *Id.* at 982. The Court must directly answer the Rule 23 question of "whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims." *Olean*, 31 F.4th at 667. To do that, the Court will decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives) and resolve[] disputes raised by the parties." *Id.* at 683 (emphasis omitted). While this is a rigorous inquiry, the

1    "district court's findings at the certification stage 'do not bind the fact-finder on the merits.'" *Id*.

2    at 667 n.10 (citation omitted).

3    **II.       THE MOTION TO EXCLUDE**

4            Google does not suggest that Dr. Singer is unqualified to be an expert witness on

5    economics, and for good reason.  Dr. Singer is a managing director at Econ One, an economic

6    consulting firm, and is an adjunct professor at the McDonough School of Business at Georgetown

7    University, where he teaches MBA candidates.  Dkt. No. 254-4 (Singer Report).  He received a

8    Ph.D. in economics from the Johns Hopkins University in 1999, has been involved with antitrust

9    issues as an economist throughout his career, and has published articles in antitrust journals and

10   presented at antitrust events.  Dr. Singer has testified about competition issues before the United

11   States Congress on multiple occasions.  *Id*.  He is qualified as an expert in economics, and Google

12   does not contend otherwise.

13           Google's main *Daubert* objection is to Dr. Singer's "pass-through formula."  Dkt. No. 252

14   at 6-13.  The formula is an essential element of his opinions about Google's overcharges in app

15   sales, and the artificially inflated prices consumers paid as a consequence.  These opinions are

16   rather complex, and they start with Dr. Singer's description of the relevant product market.

17           Dr. Singer proposes two relevant markets:  an Android App Distribution Market, which is

18   "the market for the sale and distribution of Apps for Android mobile devices," and an In-App

19   Aftermarket, "the ancillary aftermarket for services in support of consummating purchases of In-

20   App Content."  Singer Report ¶ 2.  Dr. Singer posits, without objection by Google, that the

21   Android App Distribution Market is a two-sided market in that it "matches buyers (in this case

22   consumers) and sellers (in this case app developers).  Two-sided platforms benefit from 'indirect

23   network effects,' meaning that each additional buyer makes the platform more appealing to

24   sellers." *Id*. ¶ 51.  The In-App Aftermarket is "one-sided:  It is a simple transaction between a

25   buyer (the developer) and a seller of services, including payment processing, record keeping, and

26   unlocking of content, needed to consummate a purchase of In-App Content."  *Id*. ¶ 27.

27           Dr. Singer says that Google charges a "take rate generally of 30 percent" in these two

28   markets, *id*. ¶ 29, meaning that Google "takes 30 percent of all revenues on the original sale and

United States District Court
Northern District of California

downloading of Apps from the Play Store and the sale of digital content within Apps," *id.* ¶ 1.

Dr. Singer assessed "the competitive effects of the various restrictions Google enforces

(collectively, the 'Challenged Conduct'), to extract these 'take rates,' and, in particular, . . .

assess[ed] whether, as a result of the Challenged Conduct, consumers have overpaid for the initial

downloads of Apps through the Play Store and for purchases of In-App Content." *Id.*

It was important for Dr. Singer to figure out whether Google's "take rate" would have been

lower absent the challenged conduct, and if so, whether that would have translated into lower

prices for consumers. For Play Store transactions, Google typically collects the full payment

amount directly from consumers and then shares that revenue with developers according to

Google's revenue-sharing agreement with each developer. The prices consumers pay for apps and

in-app content are set independently by the developers in their sole discretion. *See* Singer Report

¶¶ 19, 21, 27, 57, 135, 137, 175, 227.

In the hot tub debate, Dr. Singer said that he used for the two-sided Android App

Distribution Market the Rochet-Tirole model of pricing to estimate a "but-for take rate" that

Google would have imposed on Play Store transactions "in a but-for world absent the challenged

conduct." Dkt. No. 302 (Hot Tub Tr.) at 9:24-10:3. To estimate the "but-for take rate" for the

one-sided In-App Aftermarket, he utilized the Landes-Posner model, developed by economist

William Landes and Judge Richard Posner. *Id.* at 40:8-41:14. Dr. Singer's "pass-through" rate

was an input into both of these models. *See id.* at 9:19, 41:21-22.

The "pass-through" rate is a critical element of Dr. Singer's overcharge analysis, and is the

main point of contention in the *Daubert* dispute. In Dr. Singer's conception, "Google sets a take

rate or commission imposed directly on developers," and the "pass-through rate" is the "portion of

the supracompetitive cost imposed on developers through the take rate [that] is passed through to

consumers." Singer Report ¶ 180. Dr. Singer stated at the hot tub that "92.4 percent of the

transactions in the database were all at that headline 30 percent rate," Hot Tub Tr. at 60:1-4; in this

case, there was also no "before and after" period for the challenged conduct. A traditional

regression analysis was therefore not possible. *Id.* 62:21-63:7; Singer Report ¶ 168. This is why

Dr. Singer "looked for an economic model of consumer demand that would allow [him] to make

9

1    predictions of how an app developer would change its price in response to a change in the take

2    rate, given the nature of the demand that that app developer faced." Hot Tub Tr. at 60:12-16. He

3    found that "the logit model captures the demand faced by app developers." *Id*. at 60:18-19. Logit

4    models are often used in merger cases to "map a change in the merging parties' costs that come

5    about from merger synergies into a change in price." *Id*. at 61:18-20.

6        Dr. Singer applied the logit model here, through a series of calculations, to conclude that

7    the pass-through rate for each app is one minus an app's share in the app's chosen Play Store

8    category. *Id*. at 76:5-7, 97:21-99:7; Singer Report ¶¶ 235-240. The Play Store is divided into

9    more than 34 categories under headings such as "dating," "entertainment," "games," and "sports,"

10   and developers self-select one of these categories to market their apps to consumers in the Play

11   Store.[5] Dkt. No. 254-6 (Singer Reply Report) ¶¶ 75-76 & Table 2.

12       Dr. Singer opined that a category-share-dependent pass-through formula makes intuitive

13   sense because each developer is "competing against everyone within the category." Hot Tub Tr.

14   at 78:6. He concluded that "the logit model makes a very specific prediction about the

15   relationship between an app's share within its category and its price; and in particular, the

16   prediction is that as the app's price goes up, it should lose share within the category, reflecting the

17   fact that all of these apps within the category are substitutes in some way." *Id*. at 81:21-82:1.

18   Dr. Singer tested the fit between the logit demand model and the transactional data available to

19   him, and he "found a very tight fit" for every category. *Id*. at 82:2-3. He noted that these

20   categories are "meaningful arena[s] of competition . . . which one can use for estimating shares for

21   the logit model." *Id*. 117:17-21.

22       Google has not suggested that this overall approach is "junk science" destined for the scrap

23   heap under *Daubert*. At the expert hot tub, Google's expert, Dr. Michelle Burtis, forthrightly

24   acknowledged that the Rochet-Tirole model "is used in [the] economic literature," and "is used in

25   the way that Dr. Singer is using it here." Hot Tub Tr. at 16:2-7. With respect to the Landes-

26

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] Dr. Singer stated at the hot tub that there were 35 categories until Google removed the
     "transportation" category in 2016. Hot Tub Tr. at 82:14-16.

     10

United States District Court
Northern District of California

Posner model, Dr. Burtis stated, "Economists use these kinds of equations. I certainly wouldn't say that this is, you know, junk science in that regard." *Id*. at 44:19-24.

Dr. Burtis's critique focused on Dr. Singer's "methodology for the pass-through rates," mainly because she thought it was "not standard" and had "never seen it before." *Id*. at 51:5-11. As *Daubert* objections, these comments do not go far. Rule 702 does not forbid new methodologies and analyses. It is true that "well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." *Daubert*, 509 U.S. at 592 n.11. But general acceptance of a method is no guarantee of reliability, and is not a touchstone of admissibility under Rule 702. *See id*. ("Nor, on the other hand, does the presence of *Daubert*'s general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."). The "gatekeeping inquiry must be tied to the facts of a particular case," and so it is not necessarily "surprising" for expert opinions to be based on methods that are new and not been the subject of peer review. *Kumho Tire*, 526 U.S. at 150-51 (cleaned up).

Dr. Singer addressed the "novelty" point by explaining why he could not use the more traditional approach of a regression analysis. *See id*. at 60:1-4, 62:21-63:7; Singer Report ¶ 168. He applied a version of the logit model, which has been used in the merger context, after running tests to confirm that the model fit the data here. Dr. Burtis made much of the fact that the original version of the model utilized a "per unit" cost rather than an "ad valorem" cost (*i.e.*, a "percentage of the price" cost, as is the case here), but did not say why this might be a fatal flaw or "junk science." *See*, *e.g.*, Hot Tub Tr. at 56:15-57:23. At the hot tub, Dr. Burtis stopped short of saying that Dr. Singer should have used a regression analysis, and did not identify any other model he might have used. She also did not say that it was categorically wrong for Dr. Singer to apply the logit model here, and instead simply criticized the inputs he selected. *See id*. at 90:25-91:3 ("if he wanted to use the logit model -- it was his choice. He wanted to use it. So if you're going to use it, do it right. Figure out the groupings of products that are truly substitutes for one another."). That again is the stuff of cross-examination and not exclusion.

United States District Court
Northern District of California

11

Overall, Google has not demonstrated that unreliability or invalidity warrant exclusion of Dr. Singer's opinions. Its heart may not have been in that. Google's arguments were directed far more to opposing certification than to disqualifying Dr. Singer. Every substantive point made by Dr. Burtis at the hot tub, and by Google in its *Daubert* motion (including, for example, Dr. Singer's failure to account for developers' marginal costs and for focal point pricing), was presented mainly to say that plaintiffs cannot establish commonality and predominance for Rule 23 purposes. *Compare* Hot Tub. Tr. & Dkt. No. 252 *with* Dkt. No. 273. That is a wholly different question from admissibility. Exclusion of Dr. Singer's opinions under Rule 702 is denied.

## III.     THE RULE 23(B)(3) CLASS

Plaintiffs propose certification under Rule 23(b)(2) and (3). Dkt. No. 251. The (b)(3) proposal got the most discussion in the parties' briefs, and the Court will start with that.

Under Rule 23(b)(3), a class is appropriate when "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each of the four requirements of Rule 23(a) -- sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation -- must also be met.

### A.     Numerosity (23(a)(1))

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no dispute between the parties that there are more than 21 million putative class members. Dkt. No. 273 at 4; Dkt. No. 289 at 13. The numerosity requirement is satisfied.

### B.     Commonality (23(a)(2)) and Predominance (23(b)(3))

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

1     *Alcantar*, 800 F.3d at 1052 (cleaned up). What matters is the "capacity of a class-wide proceeding

2     to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350

3     (quotations omitted, emphasis in original). This does not require total uniformity across a class.

4     "The existence of shared legal issues with divergent factual predicates is sufficient, as is a

5     common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v.*

6     *Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564

7     U.S. 338. The commonality standard imposed by Rule 23(a)(2) is, however, "rigorous." *Leyva v.*

8     *Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

9        Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common

10    questions of law or fact predominate over the individual ones. This inquiry focuses on "whether

11    the common, aggregation-enabling, issues in the case are more prevalent or important than the

12    non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577

13    U.S. 442, 453 (2016) (cleaned up). Each element of a claim need not be susceptible to classwide

14    proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the

15    litigation are given more weight in the predominance analysis over individualized questions which

16    are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*,

17    835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the

18    central issues in the action are common to the class and can be said to predominate, . . . even

19    though other important matters will have to be tried separately, such as damages or some

20    affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453

21    (internal quotations omitted). "Rule 23(b)(3)'s predominance criterion is even more demanding

22    than Rule 23(a)." *Comcast*, 569 U.S. at 34.

23        The "requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a)" and

24    "courts must consider cases examining both subsections in performing a Rule 23(b)(3) analysis."

25    *Olean*, 31 F.4th at 664. The Court finds it appropriate to assess commonality and predominance in

26    tandem, with a careful eye toward ensuring that the specific requirements of each are fully

27    satisfied. *See*, *e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

28

United States District Court
Northern District of California

13

United States District Court
Northern District of California

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). For cases like this one brought under the Sherman Act, 15 U.S.C. § 15, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., "[t]he elements of a claim for such antitrust action[s] are (i) the existence of an antitrust violation, (ii) 'antitrust injury' or 'impact' flowing from that violation," and "(iii) measurable damages." *Olean*, 31 F.4th at 665-66 (citations omitted).[6] "[T]o prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666. The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

### 1. Sherman Act Claims

Overall, plaintiffs have established commonality and predominance for the Sherman Act antitrust claims. The parties vigorously engaged with each other on this issue, and Google raised a host of objections that are resolved in the ensuing discussion. In the end, the record establishes that plaintiffs satisfied their burden of proof on these elements.

### a. Antitrust Violation

Plaintiffs' main claim is for an unlawful monopoly under Section 2 of the Sherman Act, 15 U.S.C. § 2. To establish Google's liability for that claim, plaintiffs will need to show: "(a) [Google's] possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (internal quotations omitted). For the Section 1 claim of restraint of trade, plaintiffs will need to show a contract, combination, or conspiracy that unreasonably restrains interstate commerce. 15 U.S.C. § 1.

---

[6] Plaintiffs' UCL claim is derivative of the Sherman Act and Cartwright Act claims. *See* SAC ¶¶ 329-62.

14

1    "A threshold step in any antitrust case is to accurately define the relevant market, which

2    refers to 'the area of effective competition.'"  *Qualcomm*, 969 F.3d at 992 (quotations and

3    citations omitted).  Plaintiffs' class certification motion uses Dr. Singer's Android App

4    Distribution Market and the In-App Aftermarket as the two relevant product markets.  Dkt.

5    No. 251 at 4.  Dr. Burtis accepted these market definitions for class certification purposes.  *Id.*

6    Consequently, there is no dispute about the relevant markets for certification purposes.

7            Plaintiffs have detailed the common evidence that the class members will present at trial to

8    prove Google's anticompetitive conduct.  Google does not disagree that common evidence is

9    available to prove Google's alleged antitrust violations in the relevant markets.  The Court's

10   independent analysis confirms this is so.  The question of liability will be answered by common

11   evidence about Google's conduct with respect to all consumers in the relevant markets, such as

12   Google's agreements with mobile carriers, OEMs, and developers.  *See* Dkt. No. 251 at 4-10.

13   There will be no need to make individualized inquires for any specific plaintiff, and Google does

14   not suggest otherwise.  Dkt. No. 273.  Common questions predominate for the antitrust violation

15   element of plaintiffs' claims.

16                          **b.      Antitrust Injury or Impact**

17           "'Antitrust injury' is 'injury of the type the antitrust laws were intended to prevent and that

18   flows from that which makes defendants' acts unlawful."  *Olean*, 31 F.4th at 666 (quoting

19   *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  For class certification

20   purposes, plaintiffs "must establish, predominantly with generalized evidence, that all (or nearly

21   all) members of the class suffered damage as a result of defendants' alleged anti-competitive

22   conduct."  *In re Packaged Seafood Products Antitrust Litig.*, 332 F.R.D. 308, 320 (S.D. Cal. 2019)

23   (quotations and citation omitted), *aff'd*, *Olean*, 31 F.4th 651.  Plaintiffs rely on Dr. Singer's

24   analysis as their common method of proving antitrust impact.

25           This is the certification element most hotly contested by Google.  Google's main

26   contention is that plaintiffs have "no common proof of pass-through."  Dkt. No. 273 at 9-16.  In

27   Google's view, this alone bars certification of a (b)(3) class.

28

United States District Court
Northern District of California

To start the discussion, the "pass-through" concept needs clarification. In the antitrust context, pass-through typically refers to the passing on of overcharges through distribution networks to downstream purchasers. The classic example is found in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which involved a traditional, vertical supply chain in which a defendant accused of anticompetitive conduct (Illinois Brick) sold concrete blocks to masonry contractors, who in turn sold to general contractors, who then sold to plaintiff the State of Illinois, the ultimate consumer of the blocks. The plaintiff did not buy directly from Illinois Brick, which was alleged to have engaged in a conspiracy to fix the price of the concrete blocks. In that context, the Supreme Court determined that the plaintiff, as an indirect purchaser, could not pursue an antitrust claim against the defendant based on a pass-though of the anticompetitive overcharge through the distribution chain to the ultimate consumer. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). This was based mainly on concerns about multiple recoveries for the same anticompetitive injury, and the uncertainties inherent in determining what portion of an overcharge was passed on. *See id*. at 1524.

For obvious reasons, Google analogizes the Play Store to this traditional supply chain situation. *See* Dkt. No. 273 at 9-10 ("[p]roof of pass-through" is "complex" because "it 'must account for the actions of innocent intermediaries who allegedly passed on the overcharge.'"). The problem for Google is that this theory has been definitively held not to apply to online app markets that do not operate as traditional, vertical supply chains.

As discussed in the background section, the parties agree that the developers set the prices for their apps and content, but Google collects the payment from the consumers, and keeps a cut of it before paying the remainder to the developers. This is the same system used in the Apple App Store, which sells apps to Apple users just as the Play Store sells them to Android users, and the Supreme Court had no trouble concluding that the traditional pass-through concept was inapposite. "There is no intermediary in the distribution chain between Apple and the consumer. The iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust violator. The iPhone owners pay the alleged overcharge directly to Apple." *Apple*, 139 S. Ct. at 1521. "The

United States District Court
Northern District of California

1    absence of an intermediary is dispositive" of the device owners' status as direct purchasers, and

2    "[t]he overcharge has not been passed on by anyone to anyone."  *Id*. at 1521, 1525.

3          So too, here.  The consumer plaintiffs paid the alleged overcharge directly to Google.

4    Consequently, there is no barrier to certification on this score.

5          To be sure, plaintiffs were not always crystal clear when talking about pass-through.  They

6    have embraced *Apple* with a bear hug, starting with the complaint, which alleges that "[f]or every

7    in-app purchase, just as for an initial app purchase, consumers pay Google, not the app developer.

8    Google then taxes the transaction at the exorbitant rate of up to 30%, remitting the remainder to

9    the developer, who is responsible for setting the purchase price to the consumer."  SAC ¶ 18; *see*

10   *also id*. ¶ 220 (plaintiffs are "direct purchasers under *Apple v. Pepper*").  They emphasized in their

11   class certification motion that they "paid Google directly for these purchases, and, accordingly, are

12   direct purchasers who may sue Google under federal antitrust laws."  Dkt. No. 251 at 1 (citing

13   *Apple*, 139 S. Ct. at 1520).

14         Even so, Dr. Singer said in his report that a "portion of the supracompetitive cost imposed

15   on developers through the take rate is passed through to consumers."  Singer Report ¶ 180.  He

16   claimed that he "take[s] no position on whether proof of pass-through is necessary under the law."

17   *Id*. ¶ 222.  But as previously indicated, his overall opinions are based on a formula that calculates

18   "pass-through rates."  *Id*. ¶¶ 222-40.

19         The record amply demonstrates that there is no substantive confusion here.  Dr. Singer and

20   plaintiffs plainly understand the Play Store consumers to be direct purchasers.  It would have been

21   more precise under *Apple* to talk in terms of the share of the overcharge borne by the consumers.

22   But the direct consumer payment of an overcharge is, in fact, what plaintiffs and their expert focus

23   on.

24         The pass-through formula is suitable as an element of classwide proof of antitrust impact

25   and injury.  The formula was an input for both the Rochet-Tirole model (which Dr. Singer used for

26   the Android App Distribution Market) and the Landes-Posner model (used for the In-App

27   Aftermarket).  It was derived from a logit model, which captured the demand curve faced by the

28   developers who sell apps and content in the Google Play Store.  Dr. Singer determined that the

United States District Court
Northern District of California

United States District Court
Northern District of California

pass-through formula may ultimately be expressed as "one minus the share" an app has in its self-selected Play Store category. Dr. Singer calculated the pass-through rate for each category, then calculated that the average pass-through rate across all categories was 89.9%, meaning that consumers across the board paid an estimated 89.9% of Google's commission on Play Store transactions. Singer Report at 112 (Table 8). Using this rate in the Rochet-Tirole model, Dr. Singer "estimate[d] that in the but-for world, platform competition results in a competitive take rate of 23.4 percent, down from its observed value of 30.1 percent in the actual world." *Id.* ¶ 193. "This difference results in an average overcharge to consumers of $0.30 per paid App download," with "aggregate damages of $18.76 million." *Id.* Using the 89.9% average pass-through rate in the Landes-Posner model for the In-App Aftermarket, Dr. Singer concluded that, for in-app content, "Google's take rate would fall to 14.8 percent in th[e] competitive but-for world" from a "take rate in the actual world of 29.2 percent." *Id.* ¶¶ 218, 220. This would result in an average $1.34 consumer savings per transaction and an aggregate damage figure of $4.71 billion, by Dr. Singer's calculations. *Id.* at 98 (Table 5).

Google fires a blunderbuss of objections at the pass-through formula, none of which hit the mark. To start, Google says that Dr. Singer ignored developers' marginal costs, Dkt. No. 273 at 10-11, but that is not a fair characterization of his analysis. Dr. Singer stated that "Google's requirement that developers pay a percentage of their revenue to Google is mathematically equivalent to an increase in developers' marginal cost," Singer Report ¶ 225, and his analyses are focused on modeling what is likely to happen when there is a change to that significant, common component of developers' marginal cost. *See*, *e.g.*, Singer Reply Report ¶ 72 ("When marginal cost falls -- due, in this case, to a substantial and permanent reduction in the take rate -- developers will find that their prior prices are no longer profit-maximizing. Standard economics prescribes that developers will therefore decrease their prices until marginal revenue once again equals marginal cost."); Hot Tub Tr. at 101:18-23 ("What we can observe is what the change in the marginal cost would be in a but-for world. . . . And a logit model gives us a way to map that change in the marginal cost into a change in prices.").

18

United States District Court
Northern District of California

1    Google says that if a developer's marginal cost is zero, there is no pass-through, and so by

2    failing to account for marginal costs, Dr. Singer failed to account for these hypothetical developers

3    who would have had no pass-through because they had no marginal costs.  Dkt. No. 273 at 10-11.

4    At the hot tub, however, Dr. Burtis acknowledged that while replication costs (*e.g.*, the cost to

5    "make" an additional, say, digital sword) may be zero, it is highly unlikely that any developer's

6    marginal costs would actually be zero, because developers necessarily have costs that exist outside

7    of the digital world, such as the cost of digital storage, a computer to code on, or an engineer's

8    time.  *See* Hot Tub Tr. at 94:2-95:3.

9    Google also attacks Dr. Singer's use of the logit model for the pass-through analysis,

10   namely the derivation of the "one minus the share" formula, which is heavily dependent on the

11   Play Store category self-selected by each app developer.  Google says that this is wrong because

12   the categories are broadly defined, and so apps within a category are not necessarily substitutes for

13   each other, or subject to the same competitive forces.  The "Games" category, for example, hosts

14   educational games for kids and wargames for adults, which typically would not be interchangeable

15   or competing products.  *See* Dkt. No. 273 at 12-13.

16   Why this might be fatal to certification is entirely unclear.  Google made the point mainly

17   as an observation, rather than a well-formulated analysis, and its persuasive value is negligible.

18   As the Court observed at the hot tub, the 35 categories are what Google gives to developers, and

19   "Dr. Singer can only work with what Google actually does."  Hot Tub Tr. at 89:11-19.

20   Interestingly, Apple's App Store offers very similar categories as the Google Play Store.  *See*

21   Singer Reply Report at 31 (Table 2).  It is worth noting that, in a similar antitrust action

22   challenging Apple's App Store practices (indeed, in the underlying district court case that gave

23   rise to the *Apple v. Pepper* decision by the Supreme Court), the consumer plaintiffs' expert, who

24   won a Nobel Prize in economics, also modeled demand and supply conditions on a category-by-

25   category basis.  *See* Expert Report of Dr. Daniel L. McFadden, *In re Apple iPhone Antitrust*

26   *Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.), Dkt. No. 443-14 ¶ 211 (model modified to

27   reflect demand and supply conditions that are specific to each app category; observing that

28

consumers who purchased apps in the Games category may have a different degree of price sensitivity from those who purchased apps in the Music category).

Overall, Dr. Singer's use of the Google Play Store categories is reasonable in light of the evidence, and his approach to those categories does not make his analyses incapable of showing classwide impact. *See Olean*, 31 F.4th at 676. Google may cross-examine Dr. Singer about its objections at trial, but they are not a reason to deny class certification.

Google offers a grab bag of "other idiosyncratic factors" that Dr. Singer is said not to have accounted for. Dkt. No. 273 at 13. These include, for example, the possibility that even if Google's take rate were lower, a developer might pocket the extra money or give it away, rather than lowering prices for consumers. Google also suggests that some developers might have other marginal costs that are exceptionally large, thereby changing the analysis, or that they may not reduce their prices to the full extent predicted by Dr. Singer because they engage in "focal point pricing," *i.e.*, ending their prices in $.99. *Id.* at 11-12.

The thrust of these observations is that Dr. Singer's methods may not totally eliminate the possibility of some individualized issues for class members. They do not need to. Rule 23 does not demand that all of the world's complexities be smoothed away. To obtain certification, the plaintiffs' burden is to show that the "common, aggregation-enabling, issues in the case are more prevalent or important than" those individual issues. *Olean*, 31 F.4th at 664 (quoting *Tyson Foods*, 577 U.S. at 453); *see also In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 557-58 (9th Cir. 2019) (en banc) ("even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'") (cleaned up). Put more simply, predominance does not demand perfection, and Google has not demonstrated that Dr. Singer's analysis falls short on this score. Moreover, Dr. Singer stated that his method can be customized to fit particular situations. His same methodology can be run "at an app-by-app level as well," although for obvious space and time constraint reasons, he did not do that in his report. Hot Tub Tr. at 86:10-15 ("We could allow for these percentage overcharges to vary by app. But what I've offered is a reliable and common

methodology that could apply to ever member of the class."). The salient point is that the same methodology can be used by every class member to establish antitrust impact.

Google contrasts Dr. Singer's pass-through analysis with Dr. Burtis's conclusion that, "when Google reduced service fees for many transactions in 2018, 2021, and 2022, developers in the data set only reduced prices for about 2% of products subject to the service fee reductions." Dkt. No. 273 at 9. This observation is again of minimal value. At the hot tub, Dr. Singer raised several serious questions about Dr. Burtis's analysis, such as whether she misinterpreted product SKUs in the transactional database by missing the fact that some SKUs were different listings for the same product. *See* Hot Tub Tr. at 64:3-75:10. Consequently, the Court cannot say that Dr. Burtis's 2% conclusion is enough to deny certification at this time.

Google's suggestion that Dr. Singer did not do any empirical analyses is wholly unfounded. The record, namely his report and hot tub testimony, amply establish that his opinions were solidly grounded in the transactional data and other evidence in the case. *See id.* at 9:18; Singer Report. He also ran multiple tests using that real-world data to confirm the accuracy of his predictions about such things as "the relationship between an app's share within its category and its price." Hot Tub Tr. at 81:18-20.

Google says that Dr. Singer's methods cannot identify "uninjured" class members. Dkt. No. 273 at 9. In effect, Google demands that each class member individually prove an injury before certification may be granted. The law provides otherwise. *See Olean*, 31 F.4th at 668-69 ("a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones."). It is true that a class may not be certified when it would be so overinclusive that substantial numbers of uninjured people would populate it. *See id.* at 669. Google has not shown this is a concern here. In addition, plaintiffs' case is that Google's monopolistic practices inflated the "headline rate" that was used as the basis for all developers' negotiations with Google, which affected all of the prices set by the developers and paid by consumers to Google. This is not unlike a price-fixing case, where the "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are

individually negotiated." *Id.* at 671 (quoting *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1254 (10th Cir. 2014)). "Setting the certification bar at the extreme height defendants propose would almost certainly kill off most antitrust class actions well before an adjudication of the merits of the case." *In re Capacitors Antitrust Litigation (No. III)*, Case No. 17-md-02801-JD, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018).

To be clear, the Court is not deciding the question of certification here on the basis of price fixing cases. What matters is that a defendant's common practices are often a good basis for establishing classwide proof of liability and injury. For the same reason, the fact that Google's service fee rates have in fact differed at the margins across developers is not fatal to certification. Plaintiffs may still argue, using Dr. Singer's analysis, that everyone was injured because the headline rate, which was the starting point for all negotiations, was affected.

Google says that Dr. Singer's alternative Play Points model is not common proof of impact. Dkt. No. 273 at 18-19. Google's Play Points program is a consumer reward program, akin to airline frequent flyer miles and the like. For this model, Dr. Singer used the Rochet-Tirole model, but he held the "but-for take rate . . . fixed at its observed average value of 29.3 percent." Singer Report ¶ 251. For this part of his analysis, he used the Rochet-Tirole model for both the Android App Distribution Market and the In-App Aftermarket. He concluded that, "[a]ccording to this model, the Play Points program would be expanded to be worth an average of $0.77 per transaction, or approximately 8.7 percent of consumer spend (in the competitive but-for world). Because the expanded Play Points program is a direct subsidy to consumers, there is no need to estimate a pass-through model to establish antitrust impact." *Id.* ¶ 253.

Dr. Singer's analysis stumbles a bit on this point. It is hard to square the Play Points model with plaintiffs' injury claims. The SAC focuses heavily on the overcharge that consumers paid because of Google's monopolistic practices. *See*, *e.g.*, SAC ¶ 18 ("As a result, consumers pay more for applications and in-app purchases than they would in a competitive market. For every in-app purchase, just as for an initial app purchase, consumers pay Google . . . . Google then taxes the transaction at the exorbitant rate of up to 30%"). The SAC never mentions fewer Play Points as another injury, which gives pause about the applicability of the Play Points model.

*See Comcast*, 569 U.S. at 35 ("at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation'") (citations omitted). For present purposes, the Court concludes that Dr. Singer's main overcharge models satisfy the commonality and predominance requirements of certification. The Court has not relied on the Play Points model for certification, and leaves for another day the question of whether it might be presented to a jury.

As a closing point, Google says that class members may be worse off in plaintiffs' but-for world because Google may have to change its current practices to stay competitive by cutting back on services it currently offers for free. In Google's view, "in a world without existing Android security standards, security-conscious consumers would be worse off because they would face costs to keep their data and devices secure." Dkt. No. 273 at 20. Concerns like these are far too speculative and conditional to be a serious barrier to certification. As is the case for all of Google's attacks on Dr. Singer, it may argue the point at trial, *see Olean*, 31 F.4th at 682 n.31, but it does not erode plaintiffs' showing of common evidence to prove antitrust impact.

### c. Damages

Google's damages objections are readily dispatched. Google says that plaintiffs lack a common method of calculating class-wide damages "for the same reasons they lack common proof of impact." Dkt. No. 273 at 21-22. Plaintiffs have prevailed on that issue, and Google's damages attacks are overruled on the same grounds. The Court adds that it is well-established circuit law that "damage calculations alone cannot defeat certification," *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010), and "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva*, 716 F.3d at 514. Dr. Singer has stated how his common methodology can be used to drill down further and make calculations at an app-by-app level. This is enough for now.

### 2. Cartwright Act and UCL Claims

Google did not separately challenge plaintiffs' Rule 23 showing for the Cartwright Act and UCL claims brought under California law. Plaintiffs also did not separately discuss their claims in

United States District Court
Northern District of California

1    the class certification briefing. Even so, the Court has independently examined the state law

2    claims to determine the propriety of certification under Rule 23.

3         To start, plaintiffs say that the proposed multi-state class may bring claims under

4    California law because "Google has consistently included a choice-of-law provision in its user

5    agreements designating California law as controlling in litigation brought by users." Dkt. No. 251

6    at 3. Google does not disagree with this. *See* Dkt. No. 273. In effect, both sides agree that the

7    California statutes should be applied beyond the state's borders.

8         Although the parties did not brief the question in any detail, the Court will provisionally

9    apply California state law to the multi-state class. "Subject to constitutional limitations and the

10   forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the

11   substantive law of a single state to the entire class." *In re Hyundai*, 926 F.3d at 561 (citing, among

12   other cases, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985)). For the Cartwright Act

13   specifically, "the perpetration of anticompetitive activities within California 'creat[es] state

14   interests' in applying California law to that conduct." *AT & T Mobility LLC v. AU Optronics

15   Corp.*, 707 F.3d 1106, 1112 (9th Cir. 2013) (citation omitted). The UCL also applies to claims by

16   the multi-state class for anticompetitive conduct by Google that occurred within California. *See

17   Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 224-25 (1999).

18        Consequently, the Court will apply California law to the multi-state class, as the parties

19   propose. This application is provisional in the sense that, as in *In re Hyundai*, "no party argued

20   that California's choice-of-law rules should not apply to this class . . . arising from an MDL in a

21   California court," but an objector or other interested person may do so later in the case. *In re

22   Hyundai*, 926 F.3d at 561. If so, further discussion of the issue may be warranted. *Id.*; *see also

23   Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019) ("of course, if future decisions or

24   circumstances lead to the conclusion that extraterritoriality must be evaluated on an individual

25   basis, the district court can decertify the class.").

26        With the choice of law decided for now, the Court has no trouble concluding that plaintiffs

27   have demonstrated commonality and predominance for the Cartwright Act and UCL claims. This

28

United States District Court
Northern District of California

1  conclusion flows readily from the discussion of these elements with respect to the Sherman Act

2  claims.

3  　　　**C.　　Typicality and Adequacy (23(a)(3), (4))**

4  　　　Google has made a rather rare challenge to the adequacy of class counsel.  Dkt. No. 273 at

5  22-23.  The challenge is made because the Joint Prosecution Agreement divvied up the

6  representation of the various states between the consumer plaintiffs and the State Attorneys

7  General.  Google says that class counsel "continue to have a financial interest in the claims of

8  consumers they no longer seek to represent," and so the JPA "creates improper incentives and dual

9  loyalties that conflict with counsel's duty to the proposed class."  *Id.*

10  　　　Why this might be so is not clear.  Even assuming some continued "loyalty" to former

11  class members would arise, which is hardly a self-evident proposition, the nature of the ostensible

12  conflict with counsel's duty to the classes is not explained.  If anything, the government and

13  private actors are marching arm-in-arm toward a common victory over Google.  Their claims are

14  just about the same, the evidence will be the same, and all indications in the record are that their

15  interests are well-aligned.  The possibility that "under the JPA, counsel's ability to keep earning

16  fees depends on the absence of a settlement providing a recovery for the proposed class," *id.*, may

17  be true, but it is irrelevant.  Under the lodestar approach to awarding class counsel's fees, counsel

18  will always be able to ask for a higher lodestar the longer a case is litigated prior to settlement.

19  This alone does not make class counsel inadequate under Rule 23(a).  In addition, the Court has

20  broad discretion over fee awards, and ample authority to investigate and respond to any concerns.

21  　　　For the four named plaintiffs who no longer reside in a state within the adjusted class

22  definition, plaintiffs have a problem.  A class representative must be a member of the class.  *See*

23  *Dukes*, 564 U.S. at 348.  For that reason, the Court declines plaintiffs' "proposed corrected order,"

24  Dkt. No. 304, which attempts to make these plaintiffs a part of the class by expressly naming

25  them, and terminates the parties' related filings.  Dkt. Nos. 306, 311.  Plaintiffs Mary Carr

26  (Washington resident), Daniel Egerter (California resident), Zack Palmer (Massachusetts resident),

27  and Serina Moglia (New York resident) are not included in the proposed (b)(3) class as it is

28  currently defined, and they are consequently not adequate representatives under Rule 23(a)(4).

United States District Court
Northern District of California

By all appearances, interim class counsel have been litigating this case diligently and competently. The Court finds them to be adequate and will confirm their appointment. Plaintiffs Matthew Atkinson and Alex Iwamoto are typical and adequate, and will be appointed class representatives.

### D.    Superiority of Class Adjudication (23)(b)(3))

The last remaining factor for class certification is superiority under Rule 23(b)(3). Google does not contest this factor. "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615.

As discussed, there is a substantial body of common evidence that could be presented by the proposed class on the elements of their antitrust and consumer protection claims. Class members' individual damages are likely to be very small, and certainly not large enough to make it worth their while to bring individual lawsuits in the absence of this class action. Although some attention will need to be given to fine-tune how the individualized questions on impact and damages can be managed at trial, a class action is superior to individual proceedings in this consolidated action.

## IV.    THE RULE 23(B)(2) CLASS

Plaintiffs have also asked for certification of an injunctive relief class under Rule 23(b)(2). For this proposed class, Google says that certification cannot be granted because the proposed injunction is insufficiently described and supported, and plaintiffs have not shown that their request for injunctive relief predominates over the monetary relief they are seeking. Dkt. No. 273 at 23-25.

"Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (quoting *Zinser*, 253 F.3d at 1195). That is not the case with consumer plaintiffs' requests for relief here -- the primary relief they seek is without a doubt monetary. Consequently, certification of a (b)(2) class is denied. There is the

United States District Court
Northern District of California

possibility of an injunction ancillary to an award of damages, which may be considered later in the case as warranted by developments.

## CONCLUSION

The following class is certified under FRCP Rule 23(b)(3):

All persons in the following U.S. states and territories:

Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Pennsylvania, South Carolina, Wisconsin, Wyoming, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands

who paid for an app through the Google Play Store or paid for in-app digital content (including subscriptions or ad-free versions of apps) through Google Play Billing on or after August 16, 2016, to the present.

Plaintiffs Matthew Atkinson and Alex Iwamoto are appointed named representatives, and interim class counsel, *see Consumer* Dkt. No. 78, are confirmed as class counsel under Rule 23(g).

The parties are directed to jointly file by January 20, 2023, a proposed plan to give notice to the certified class and an opportunity to opt out.

Certification under Rule 23(b)(2) is denied, as is the requested exclusion of Dr. Singer's testimony under Federal Rule of Evidence 702.

**IT IS SO ORDERED.**

Dated: November 28, 2022

_____
JAMES DONATO
United States District Judge

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 22-

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Petition for Permission to Appeal an Order Granting Class Certification Pursuant to Rule 23(f)

**Signature** | /s/ Neal Kumar Katyal | **Date** | 12/9/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*