WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006
Tel: (202) 223-7300
Fax: (202) 223-7420

DONALD J. CAMPBELL #1216
(djc@campbellandwilliams.com)
J. COLBY WILLIAMS #5549
(jcw@campbellandwilliams.com)
CAMPBELL & WILLIAMS
710 South 7th Street,
Las Vegas, NV  89101
Telephone: (702) 382-5222; Fax: (702) 382-0540

*Attorneys for Defendant Zuffa, LLC, d/b/a*
*Ultimate Fighting Championship and UFC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC,<br><br>Defendant. | Case No.: 2:15-cv-01045-RFB-(BNW)<br><br>**DEFENDANT ZUFFA, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>**HEARING REQUESTED** |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

CONCISE STATEMENT OF UNDISPUTED FACTS ....................................................3

    History of Zuffa and the UFC ..................................................................................3

    Growth of the UFC in Events and Compensation ..................................................4

    Zuffa and MMA Contracts.......................................................................................5

    MMA Competition....................................................................................................7

    Venues, Sponsors, and Broadcasters .....................................................................12

LEGAL STANDARD......................................................................................................13

ARGUMENT ...................................................................................................................15

I.      Zuffa Is Entitled to Summary Judgment Because Undisputed Facts Show that Zuffa Lacks Monopsony Power..............................................................................15

    A.     There Is No Direct Evidence of Durable Monopsony Power ................................16

          1.    Output Has Increased...................................................................................16

          2.    Athlete Compensation Has Increased. .......................................................18

    B.     The Absence of Barriers to Entry and Expansion Demonstrates that Zuffa Lacks Monopsony Power........................................................................................19

          1.    Undisputed Evidence During the Class Period Shows Low Barriers to Entry....................................................................................................19

          2.    Recent Growth in the Industry Confirms that Barriers to Entry Are Low and Competition Was Robust During the Class Period....................20

II.    Zuffa Did Not Engage in Exclusionary Anticompetitive Conduct....................................22

    A.     Zuffa's Exclusive Contracts Are Procompetitive and Did Not Deprive Competing Promoters of a Substantial Share of the Market for Fighters..............22

          1.    Zuffa's Contracts Do Not Foreclose a Substantial Share of the Market........................................................................................................22

               a.     The Undisputed Evidence Shows Only Minor Foreclosure. .........23

               b.     Dr. Singer Does Not Prove Substantial Foreclosure......................25

           2.    Zuffa Has Legitimate Business Justifications for its Contracts................27

B.    The Challenged Conduct Is Not Anticompetitive....................................................31

    1.    Hiring the Best Athletes Is Competition.......................................................31

    2.    Extending Contracts for More Money Is Competition. ............................32

    3.    Plaintiffs Have Not Presented Evidence of Anticompetitive Effects from Zuffa's Acquisitions of MMA Promoters. .......................................35

    4.    Aggressive Competition with Rivals Is Not Unlawful. ............................36

    5.    Plaintiffs' Monopsony Broth Arguments Based on Conduct that Is Not Anticompetitive Fail. ...........................................................................36

III.    Zuffa Is Entitled to Summary Judgment on Plaintiffs' Monopolization and Monopsonization Claims. .....................................................................................37

IV.    Plaintiffs Have Not Shown Article III Standing Because They Have Not Shown Antitrust Impact to Every Class Member. .........................................................39

CONCLUSION....................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States* v. *$133,420.00 in U.S. Currency*,
  672 F.3d 629 (9th Cir. 2012) ................................................................................39

*A. H. Cox & Co.* v. *Star Mach. Co.*,
  653 F.2d 1302 (9th Cir. 1981) ..............................................................................25

*Arminak & Assocs., Inc.* v. *Saint-Gobain Calmar, Inc.*,
  789 F. Supp. 2d 1201 (C.D. Cal. 2011) ................................................................38

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
  495 U.S. 328 (1990) ........................................................................................34, 35

*Balaklaw* v. *Lovell*,
  14 F.3d 793 (2d Cir. 1994) ...................................................................................33

*In re Beef Indus. Antitrust Litig*,
  907 F.2d 510 (5th Cir. 1990) ..........................................................................16, 18

*Cascade Health Sols.* v. *PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ................................................................................34

*City of Anaheim* v. *S. California Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ..............................................................................37

*CoStar Grp., Inc.* v. *Com. Real Est. Exch. Inc*,
  2023 WL 2468742 (C.D. Cal. Feb. 23, 2023) ......................................................17

*Crowder* v. *LinkedIn Corp.*,
  2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ........................................................37

*Distance Learning Co.* v. *Maynard*,
  2020 WL 2995529 (N.D. Cal. June 4, 2020) ........................................................17

*Dreamstime.com, LLC* v. *Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ...............................................................................37

*E. Food Servs., Inc.* v. *Pontifical Cath. Univ. Servs. Ass'n, Inc.*,
  357 F.3d 1 (1st Cir. 2004) .....................................................................................22

*Eastman* v. *Quest Diagnostics Inc.*,
  724 F. App'x 556 (9th Cir. 2018) .....................................................................15, 36

*Epicenter Recognition, Inc.* v. *Jostens*, *Inc.*,
  81 F. App'x 910 (9th Cir. 2003) ...........................................................................20

*Ferguson* v. *Greater Pocatello Chamber of Com., Inc.*,
848 F.2d 976 (9th Cir. 1988) ...................................................................................26

*Forsyth* v. *Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .................................................................................16

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......................................................20

*Haagen-Dazs Co.* v. *Double Rainbow Gourmet Ice Creams, Inc.*,
895 F.2d 1417 (9th Cir. 1990) .................................................................................28

*Image Tech. Servs., Inc.* v. *Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ....................................................................22, 27, 28

*Imaging Ctr., Inc.* v. *W. Maryland Health Sys., Inc.*,
158 F. App'x 413 (4th Cir. 2005) ...........................................................................28

*Indep. Ent. Grp., Inc.* v. *Nat'l Basketball Ass'n*,
853 F. Supp. 333 (C.D. Cal. 1994) ...................................................................28, 31

*Jefferson Parish Hospital District No. 2* v. *Hyde*,
466 U.S. 2 (1984)....................................................................................................23

*Kottle* v. *Nw. Kidney Centers*,
146 F.3d 1056 (9th Cir. 1998) .................................................................................37

*Le* v. *Zuffa, LLC*,
216 F. Supp. 3d 1154 (D. Nev. 2016) .....................................................................38

*Lujan* v. *Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................................40

*Magnetar Techs. Corp.* v. *Intamin, Ltd.*,
801 F.3d 1150 (9th Cir. 2015) .................................................................................38

*Malheur Forest Fairness Coal.* v. *Iron Triangle, LLC*,
2023 WL 6811871 (D. Or. Oct. 13, 2023)..............................................................34

*Masimo Corp.* v. *Tyco Health Care Grp., L.P.*,
2004 WL 5907538 (C.D. Cal. June 10, 2004) ........................................................37

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................38

*New York* v. *Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023).................................................................................36

*Methodist Health Servs. Corp.* v. *OSF Healthcare Sys.*,
2016 WL 5817176 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017) ......................................................................................................................23

*Movie 1 & 2* v. *United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) ................................................................................32

*O.S.C. Corp.* v. *Apple Computer, Inc.*,
   792 F.2d 1464 (9th Cir. 1986) ..............................................................................28

*Oahu Gas Serv., Inc.* v. *Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ................................................................................15

*Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................................................................................20

*Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) ................................................................................29

*Omega Env't, Inc.* v. *Gilbarco, Inc.*,
   127 F.3d 1167 (9th Cir. 1997) ........................................................................ *passim*

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009).............................................................................................14

*FTC* v. *Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..........................................................................14, 15

*Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010).....................................................................................29

*Rebel Oil Co.* v. *Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .........................................................16, 19, 22, 37

*Spinelli* v. *Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015).........................................................................26

*Sterling Merch., Inc.* v. *Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011).................................................................................36

*Stop & Shop Supermarket Co.* v. *Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004)...................................................................................23

*United States* v. *Syufy Enterprises*,
   903 F.2d 659 (9th Cir. 1990) ...........................................................22, 36, 38, 39

*Ticketmaster Corp.* v. *Tickets.com Inc.*,
   127 F. App'x 346 (9th Cir. 2005) .....................................................24, 25, 26

*TransUnion LLC* v. *Ramirez*,
   141 S. Ct. 2190 (2021)..........................................................................................39

*Universal Analytics, Inc.* v. *MacNeal-Schwendler Corp.*,
   914 F.2d 1256 (9th Cir. 1990) .........................................................27, 31, 32

v

*United States* v. *Various Slot Machines on Guam*,
   658 F.2d 697 (9th Cir. 1981) .................................................................18

*Verizon Communications Inc.,* v. *Law Offices of Curtis V. Trinko LLP*,
   540 U.S. 398 (2004).............................................................................15

*W. Parcel Exp.* v. *United Parcel Serv. of Am., Inc.*,
   190 F.3d 974 (9th Cir. 1999) ............................................................2, 20

*Weyerhaeuser Co.* v. *Ross–Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007)..........................................................14, 33, 34, 35

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) .................................................................18

**Statutes**

Fed. R. Civ. P. 56(a) ............................................................................14

Sherman Act..............................................................................14, 27, 36

**Other Authorities**

*John Fitch signs with Bellator*, MMA FIGHTING (Mar. 1, 2018),
   https://www.mmafighting.com/2018/3/1/17066990/jon-fitch-signs-with-
   bellator ...............................................................................................25

"Jon Fitch signs with Bellator,"
   https://www.youtube.com/watch?v=yGMocFO0rvw...............................13

Philip Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
   Principles and Their Application § 575 (5th ed. 2023)............................16

Phillip E. Areeda *et al.*, Antitrust Law ¶ 901a (2009) ...................................36

Phillip E. Areeda *et al.*, Antitrust Law ¶ 1821d3 (2009) ................................25

Defendant Zuffa, LLC ("Zuffa") submits this motion for summary judgment and supporting memorandum of points and authorities and seeks judgment in its favor as to all of Plaintiffs' claims on the grounds described below.

## INTRODUCTION

When Zuffa purchased the Ultimate Fighting Championship ("UFC") for $2 million in 2001, the market for professional Mixed Martial Arts ("MMA") was effectively non-existent. Losing money, banned from holding events in 36 states, and blacklisted from television outlets, the UFC was the "most tarnished brand in sports." But where others saw a failing business offering a niche product, Zuffa saw possibility. In the decades since, Zuffa has built UFC from nothing into a multi-billion dollar professional sport with massive global viewership that benefits its athletes, its shareholders, and the regions in which it operates. Zuffa has been the rising tide that lifts all boats, creating an entire industry into which numerous competitors have entered and thrived. By working tirelessly to legitimize and expand MMA, Zuffa has given countless fighters the opportunity to earn a living from this sport, and as the UFC has grown, Zuffa has consistently increased both the number of events that it promotes as well as the amount of money paid to athletes who compete in MMA bouts, remaining the industry leader in compensation. Zuffa's stewardship of the UFC—risk-taking, innovation, and hard work—illustrates the very best aspects of competition. And increasing the number of bouts Zuffa promotes (i.e., increasing output) and the actual pay it provides fighters is the opposite of what one would expect if Zuffa was a monopsonist.

Plaintiffs bring this antitrust class action on behalf of a "Bout Class" comprising athletes who competed in a UFC bout during the Class Period from December 16, 2010, to June 30, 2017, originally alleging that Zuffa monopolized the market for the promotion of "Elite Professional MMA bouts" and monopsonized the market for "Elite Professional MMA Fighter services" during that time. Plaintiffs have since dropped their monopolization theory, alleging a "Scheme" that now makes no mention of Zuffa's alleged monopolization of the market for promotion of live Elite Professional MMA Fighter bouts. Pls. Mot. for Class Certification, ECF No. 518; *see also Daubert* Opp., ECF No. 534 at 36-37 (Plaintiffs admitting "monopoly power is not relevant to their theory

of injury"). The Court has acknowledged that Plaintiffs "abandoned their theory . . . that liability flows from Defendant's monopoly power in the output market" and are now solely advancing claims related to Zuffa's alleged "monopsony power in the input market." *Le* v. *Zuffa*, LLC, No. 2:15-cv-01045-RFB-BNW (D. Nev.), Order re Class Certification, ECF No. 839, at 20 n.20. The Court should grant Zuffa summary judgment on Plaintiffs' abandoned monopolization claim.

Zuffa is also entitled to summary judgment on Plaintiffs' monopsonization claim. First, Plaintiffs have failed to demonstrate any evidence of monopsony power. Rather than reducing consumption of fighter services and suppressing compensation—both of which Plaintiffs must prove to support their monopsonization claim—the undisputed evidence shows Zuffa *increased* output during the Class Period, a trend that continues to the present.

Second, undisputed evidence shows that there were low barriers to entry and robust competition in the relevant market, as competitors routinely entered the MMA market, successfully competed with Zuffa for athletes, and expanded their output of MMA bouts during the Class Period—another trend that continues to this day. Where there are no "unnatural market barriers" and competitors have the ability to expand output, there is no monopsony power, and summary judgment is appropriate. *W. Parcel Exp.* v. *United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 977 (9th Cir. 1999).

Third, Zuffa's conduct is procompetitive and did not deprive competing promoters of a substantial share of the market for MMA fighters. Zuffa's exclusive contracts were motivated by legitimate business justifications, and are standard in the industry. Moreover, competitors had access to top athletes throughout the Class Period, and every MMA promoter who testified in this case has said so. Plaintiffs can point to no testimony or document that shows that Zuffa's competitors have insufficient access to top athletes to compete. Plaintiffs have failed to show that Zuffa's individual actions were anticompetitive, and, as a matter of law, they cannot be considered anticompetitive in the aggregate.

Zuffa respectfully requests summary judgment in its favor on all of Plaintiffs' claims.

## CONCISE STATEMENT OF UNDISPUTED FACTS

1.     MMA is an interdisciplinary sport that combines attributes of boxing, wrestling, karate, Muay Thai, Brazilian jiu jitsu, judo, and other sports.  CAC ¶ 59.

2.     Zuffa puts on live MMA events in which athletes compete in bouts for a ticketed audience. CAC ¶ 30.  Zuffa broadcasts these events on pay-per-view ("PPV"), network and cable television, and through its streaming service, Fight Pass.  Ex. 2 at -095; Ex. 3 at -205.

<u>History of Zuffa and the UFC</u>

3.     In 2001, two businessmen and siblings, Frank and Lorenzo Fertitta, purchased the MMA promotion, the Ultimate Fighting Championship ("UFC"), for $2 million through their company, Zuffa.  Ex. 1, Fertitta Dep. 30:13-16.  When Zuffa bought the UFC "there really wasn't much to it except for an idea." *Id.* 296:1-297:15.  The UFC was "losing money" and "probably the most tarnished brand in sports." *Id.* 147:9-25, 295:21-297:15.

4.     At the urging of Senator John McCain—who infamously labeled MMA "human cockfighting"—and others, 36 states banned MMA events.  Ex. 1, Fertitta Dep. 147:9-25; Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I, ¶ 49; Ex. 5 at -983.  By 1999, many PPV outlets refused to air MMA events, and PPV subscribers dropped.  Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I ¶ 49.

5.     To rehabilitate the UFC brand and grow the sport of MMA, Zuffa invested considerable time and tens of millions of dollars in the UFC.  Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I ¶ 50; Ex. 6 at -440; Ex. 8, Epstein Dep. 460:19-461:6.   Zuffa enlisted attorneys and regulatory consultants, Ex. 4, Topel I ¶ 51; Ex. 8, Epstein Dep. 15:16-20:6, and appeared before regulators in nearly every state.  Ex. 8, Epstein Dep. 17:1-18:1.  Zuffa's effort to move MMA into the mainstream took years—in the early 2000s, "MMA, you know, was still a very niche market.  It was something that, you know, not a lot of people knew about or people had misconceptions about it." Ex. 9, Acquisitions Dep. 34:10-35:11.

6.     In 2005, Zuffa agreed to pay $10 million to produce *The Ultimate Fighter*, a reality show contest in which multiple athletes competed for a contract with the UFC.  Ex. 8, Epstein Dep. 200:8-202:11; Ex. 1, Fertitta Dep. 197:24-198:17; Ex. 10, Lawenda Decl. ¶ 3 ("Zuffa ultimately agreed to provide Spike with the show, all-expenses-paid").  When Spike "first began airing The

Ultimate Fighter, most of the advertisers at Spike blacklisted the show." Ex. 10, Lawenda Decl. ¶ 4. The show, however, debuted to successful ratings, and, for the first time, Zuffa's owners could secure a television contract. Ex. 1, Fertitta Dep. 200:8-202:11. The Fertittas personally invested millions before they realized any profit from operating the UFC. Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I ¶ 50; Ex. 6 at -440; Ex. 8, Epstein Dep. 460:19-461:6.

<u>Growth of the UFC in Events and Compensation</u>

7.     Since 2001, the number of UFC events steadily increased. In 2002, Zuffa promoted just 7 UFC events. Ex. 11. That number increased to 18 events in 2006, 32 events in 2010, 41 events in 2016, and 42 events in 2022. *Id.*; Ex. 8, Epstein Dep. 98:11-99:4; Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I ¶ 93.

8.     Athlete compensation has increased since Zuffa acquired the UFC, including through the Class Period. Ex. 12, Singer Dep. II 459:12-460:8 (Plaintiffs' expert acknowledging that fighter compensation was rising); Ex. 13, Vera Decl. ¶ 3 ("Since joining the UFC, my compensation has increased substantially"); Ex. 14, Mersch Dep. 476:10-477:11 ("compensation in the UFC paid to fighters continued to go up and up over the course of time"); Ex. 15, Batchvarova Dep. 64:15-65:23 ("athlete compensation is one of those items for us where it continues to grow. It is not going down. It is only going up. It is purposely going up, right."); *id.* 75:6-76:25 ("fighter compensation is going up, it has since the beginning of the company"); Ex. 113, Epstein Decl. ¶ 4; Ex. 4, Topel I ¶¶ 169-71 & Ex. 17-18 ("athletes at all levels of rankings enjoyed increases in compensation over the class period").

9.     Zuffa often paid athletes more to compete in MMA bouts than other MMA promoters. Ex. 16, Singer Dep. I 192:8-17 ("the levels of a Bellator or a Strikeforce fighter on average would tend to be below the levels of the UFC fighters"); Ex. 17, Fitch Dep. 146:12-23 (WSOF paid Plaintiff Fitch 50-60% less than UFC previously paid him); Ex. 18, Le Dep. 102:11-16 (Plaintiff Le confirming that Zuffa paid him more than under his Strikeforce contract). More recently, Zuffa has released UFC champions and other high-profile fighters from their contracts to allow them to negotiate with Zuffa's MMA competitors for higher compensation than Zuffa was willing to offer. Ex. 79, Campbell Decl. ¶¶ 3-4, 7-16, 18-20 (Corey Anderson, Lyoto Machida, Fabricio Werdum,

Francis Ngannou, Shane Burgos, Anthony Pettis, Demetrious Johnson, Eddie Alvarez, and Sage Northcutt, among others, have left UFC for several other MMA promotions since 2017).

10.    Some UFC athletes have chosen to compete for UFC because of its high compensation and skill as a promoter.  Ex. 19, Serra Decl. ¶ 5 ("There are several reasons why I believe the UFC is the best MMA organization to fight in," including providing "the best compensation and incentives"); Ex. 20, Alves Decl. ¶ 3 ("My life changed when I started fighting in the UFC.  I now live a comfortable life where I can provide for my family"); Ex. 21, Reinhardt Dec. ¶ 3 ("Everything is better with the UFC than other promotions . . . Not only did my compensation increase, my popularity, my fan base, my recognition, and everything else has increased as well"); Ex. 22, Vera Dep. 233:10-17, 234:21-235:4 (Recognizing Zuffa's promotional ability and well-run organization); Ex. 23, Edwards Decl. ¶ 5 ("the potential for fighters to earn bonuses" and "the visibility of the fighters is beyond comparison"); Ex. 24, Belfort Decl. ¶ 6 (UFC "has expended the most resources in promoting me and the events I fought in"); Ex. 25, Lauzon Decl. ¶ 8 ("I could fight in many other promotions, but choose the UFC because I trust how they handle their business and I know how I will be treated"); Exs. 26-45.  During the Class Period, Zuffa fighters that re-signed with UFC were paid 21.2% *more* in show money for the first bout under their new agreement. Ex. 4, Topel I ¶ 122.

Zuffa and MMA Contracts

11.    Zuffa enters into Promotional and Ancillary Rights Agreements ("Promotional Agreements") with athletes for the exclusive right to secure, promote, arrange, and present any and all of their MMA bouts during the term of the agreement. *E.g.*, Ex. 47 § 1; Ex. 48, Contracts Dep. 95:22-96:20.

12.    The term of the agreement is typically 20 months with the possibility of tolling for events such as injury, retirement, and refusal to compete.  Ex. 47 §§ 4.1, 9.1-9.3.  An athlete's average career at Zuffa lasts two years and the median is 0.82 years.  Ex. 49, Singer II ¶ 64 & Table 1.  By contrast, for athletes who competed in at least one Zuffa bout, the total average career length in MMA overall is 8.7 years.  Ex. 50, Topel II ¶¶ 39-40.

13.     Multi-bout exclusive contracts enable Zuffa to have enough athletes available to compete in the numerous UFC events Zuffa promotes each year.   As Zuffa's corporate representative explained, "In order to run the business, we have to have a certain number of athletes available to us in order to put on all the events we're putting on in a given year. . . . That's part of how we're able to run the company."  Ex. 48, Contracts Dep. 153:5-12; *see also id*. 97:23-98:10; 243:24-244:13.  Other Zuffa witnesses similarly testified to the importance of exclusive contracts to Zuffa's operations.  Ex. 51, Shelby Dep. 119:15-120:18 (given the nature of the sport, as much as "10 to 40 percent" of Zuffa's athletes may be injured, on a leave of absence, or otherwise unavailable at any given time); Ex. 9, Acquisitions Dep. 177:14-178:5; Ex. 8, Epstein Dep. 98:5-99:17; 103:6-105:7; Ex. 14, Mersch Dep. 104:19-25; Ex. 52, J. Silva Dep. 247:10-248:10, 120:20-121:20; *see also* Ex. 106 (in 2013 and 2014, nearly all of Zuffa's events had injured athletes that needed to be replaced).  Zuffa has had similar exclusivity provisions in its Promotional Agreements since it first purchased the UFC.  Ex. 53 § 2(a).  Without a sufficiently deep roster of athletes signed to long-term contracts, "the ecosystem would crash."  Ex. 8, Epstein Dep. 104:1-105:7; *id.* 98:5-99:3 ("If the fighters were not exclusive to us, we could never put on 40 plus events per year, and our output would significantly decrease."); Ex. 9, Acquisitions Dep. 177:14-178:5 ("you just can't run a business doing 42 or 43 events per year without having the athletes exclusive to you"); Ex. 48, Contracts Dep. 97:17-98:10.  In a world without exclusive, multi-bout contracts, there "would be many, many less fights because no network is going to agree to sign a long-term deal" without some assurance the events can be staffed.  Ex. 8, Epstein Dep. 104:1-105:7; Ex. 113, Epstein Decl. ¶ 5.  Dr. Singer does not accuse Zuffa of below-cost or even unprofitable payments to fighters.  Ex. 70, Singer I ¶ 147.

14.     At various points in time, Zuffa's Promotional Agreements have included an exclusive negotiation period of 60 or 90 days.  Ex. 54 § 13.1; Ex. 55 § 12.1.  The Promotional Agreements also normally have a right to match clause, which provides Zuffa the right to match a competing promoter's offer for a short period of time after the expiration of the agreement.  Ex. 47 §12.1; Ex. 55 §12.2; Ex. 79, Campbell Decl. ¶ 5.  During the matching period, athletes can receive offers from other promoters.  *Id.* Zuffa then has 15 business days to match or beat the competitor's offer.

*Id.* Zuffa staggers the expiration dates of its agreements with athletes, which means there is a "constant supply of athletes coming available," "whom may reach free agency only weeks apart." Ex. 4, Topel I, ¶ 118.

15.     Other MMA promoters have exclusivity provisions in their promotional agreements with athletes.  Ex. 113, Epstein Decl. ¶ 5; Ex. 4, Topel I Ex. 5 (100% of sample of Bellator agreements include exclusivity provision); Ex. 56, Coker Dep. 180:20-181:3; Ex. 57, C. Silva Dep. 196:3-12; Ex. 58 (lists Strikeforce exclusive contracts); Ex. 59 (ONE Championship 6-bout, 36-month contract with provisions allowing for extensions beyond initial term); Ex. 60 (WSOF 3-bout 16-month contract with provisions allowing for extensions beyond initial term); Ex. 61 (Bellator 6-bout 24-month contract with provisions allowing for extensions beyond initial term).  Exclusive, multi-bout contracts ensure promoters "see a return on investment," have a sufficient "roster" to "fill in" when "a fighter gets injured," and "encourage the fighters to keep up their performance." Ex. 57, C. Silva Dep. 196:25-197:14; *see also* Ex. 4, Topel I ¶¶ 87, 113;  Ex. 113, Epstein Decl. ¶ 5.

16.     Many athletes who compete in UFC events complete the terms of their contracts with Zuffa and become free agents.  *E.g.*, Ex. 79, Campbell Decl. ¶ 5.

17.     During free agency, athletes may negotiate new contracts with one or more MMA promoters or with other sports teams or sports promoters.  *E.g.*, Ex. 79, Campbell Decl. ¶¶ 5-6. Zuffa has been unable or unwilling to match the offers provided by competing promoters for many of its free agent athletes, including during the alleged class period in this litigation and after. *Id.* ¶¶ 4-20.

<u>MMA Competition</u>

18.     Other MMA promotions compete with Zuffa to put on MMA events and Zuffa's competition has continued to grow and expand their operations.  Ex. 113, Epstein Decl. ¶¶ 4-15. These competitors include:

- <u>Bellator MMA ("Bellator")</u>, a promotion founded in 2008 and currently owned by Viacom, which according to its President Scott Coker during the Class Period  had "steadfastly grown its market, signing numerous new athletes from the United States and abroad, commanding record attendance, and continuing to expand its television audience, with distribution in more than one hundred forty countries."

Ex. 67, Coker Decl. ¶ 4; Ex. 56, Coker Dep. 172:24-173:20.  Bellator expanded its output of MMA events from 10 events in 2009 to averaging over 20 events during the alleged Class Period.  Ex. 113, Epstein Decl. ¶ 6;  Ex. 4, Topel I at Ex. 23.  In June 2018, Bellator announced a five-year, nine-figure deal to broadcast Bellator bouts on DAZN, the self-described "world's largest dedicated live sports streaming services," covering the U.S. and other geographies served by the streaming service.  Ex. 68, Topel Supp. ¶ 2;  Ex. 113, Epstein Decl. ¶ 6.  Since Bellator 206, this includes all events aired by Paramount Network as well as seven exclusive cards per year.  *Id*. ¶ 6.  Bellator's deal with DAZN was signed to "double Bellator's revenue and make the organization profitable."  *Id*.  In September, 2020, Bellator announced that its bouts would move to CBS Sports Network, with preliminary bouts to stream on YouTube and CBSSports.com.  *Id.*  On February 9, 2021, Bellator announced that Bellator events would begin airing exclusively on Showtime in April 2021.  Bellator now has a dedicated channel on Pluto TV. *Id.* Bellator has also received widespread media and commercial recognition for the quality of its fights.  *Id.*

- Professional Fighters League ("PFL"), which entered the market in 2018 as the successor to MMA promotion World Series of Fighting (WSOF), which was established in 2012.[1]  Ex. 113, Epstein Decl. ¶ 8.  PFL purchased WSOF's fighting operations in and event infrastructure in 2018 and currently describes itself as "the #1 fastest growing sports league and the #2 MMA company worldwide."  *Id*.  PFL's viewership has increased substantially since its founding.  *Id*. ¶ 10.  PFL puts on an MMA tournament with six weight class champions, each earning a $1 million prize, with $10 million in total compensation.  *Id*. ¶ 9.  PFL debuted its inaugural season in June 2018 at Hulu Theater at Madison Square Garden in New York City.  In January 2018, PFL reached a multi-platform distribution deal for the inaugural 2018 season with NBC Sports Group and Facebook.  *Id*.  Within the United States, NBC Sports Group established a live Thursday night PFL franchise, presenting seven regular-season live events in prime time exclusively on NBCSN beginning June 7, 2018, through the end of August 2018.  *Id*.  Events televised by NBCSN also streamed on NBCSports.com and the NBC Sports app.  *Id*.  Beginning in February 2019, the PFL's events were broadcast by ESPN in the United States.  *Id*. PFL events and playoff matches air on ESPN+ and ESPN2, with the Championship Event on New Year's Eve airing exclusively on ESPN2 and ESPN Deportes.  *Id*. PFL was bought by Ted Leonsis and a group of investors and influencers such as Tony Robbins and Kevin Hart to invest money and to promote the league.  *Id.* ¶ 8. Since 2018, PFL has received hundreds of millions of dollars in investments from major investors, such as the Public Investment Fund of the Kingdom of Saudi Arabia, SRJ, Ares, Knighthead, Luxor Capital, Waverley Capital, Elysian Park Ventures, and numerous NBA, MLB, NHL, and MLS team owners.  *Id*.  In May 2022, Alex Rodriguez became a partial owner of PFL after contributing to a $30 million funding round.  *Id*. ¶ 9.  PFL is reported as having approximately $500 million in funding, and currently holds sponsorships from major brands, such as GEICO, Draft Kings, Bose, Bud Light, Celsius, and others.  *Id*. ¶ 10.  According to

---

[1] When deposed in this case, Carlos Silva, the PFL League President from 2018-2019, was then-WSOF President of Business Operations.  Ex. 57, C. Silva Dep.

8

news reports, PFL is engaged in discussions with Bellator regarding merging. *Id*. ¶ 7.

- <u>One Championship ("ONE")</u>, founded in 2011 and the self-described "world's largest martial arts organization" has continued to grow and expand its operations in the years since the Class Period. Ex. 113, Epstein Decl. ¶ 11. During the Class Period, ONE possessed "a roster of blue-chip Fortune 500 sponsors, including Disney, Marvel, LG, Sony, Facebook, Haier, Kawasaki, L'Oreal, Casio, Bayer, and more." Ex. 71, "About One." Since 2017, ONE has rapidly expanded its global and U.S. audience, ranking in the top five in viewership and engagement among all global sports properties, reportedly ahead of the UFC in terms of digital viewership, digital fan engagement and cumulative global reach in broadcast television as of June 2021. Ex. 113, Epstein Decl. ¶ 11. By June 2022, ONE had grown its average number of viewers per event from 40,000 viewers in 2016 to 50 million viewers in 2022. *Id*. In May 2023, ONE hosted its first event in the U.S. that aired on Amazon Prime Video and announced plans to host many additional events in the U.S. in 2024. *Id*. Overall, eight ONE events have aired on Amazon Prime Video in 2023. In September 2023, ONE signed an expansive broadcasting partnership deal with DirectTV that would allow ONE bouts to be broadcast across the United States in bars and restaurants via DirectTV for Business. *Id*. On September 29, 2023, ONE Fight Night 14 debuted as ONE's first DirectTV event airing live in the U.S. market. *Id*. ONE has garnered hundreds of millions of dollars in investments from major investors such as Sequoia Capital, Guggenheim Investments, and the Qatar Investment Authority, and has been valued at approximately $1.4 billion as of June 2022. *Id*. ¶ 12. ONE is considering an initial public offering in the near future. *Id*.

- <u>Absolute Championship Berkut ("ACB")</u>, a promotion established in 2014 that during the Class Period prided itself as "the world's fastest growing MMA promotion." Ex. 72, ACB Facebook post. Absolute Championship Berkut held 27 events in 2017, Ex. 73 (list of ACB events), and signed many former UFC athletes, including Thiago Silva, Pat Healy, Nam Phan, and Efrain Escudero. Ex. 74, Sherdog profiles.

19.    During the Class Period, entrants to the MMA promotion business PFL, ONE, and ACB expanded output. ONE increased its output from one event its first year in 2011 to 16 events in 2016; PFL increased its output from one event its first year in 2012 to eight events in 2016; and ACB increased its output from one event its first year in 2012 to 22 events in 2016. Ex. 75 (annual events by promoter); Ex. 4, Topel I ¶ 192 & Ex. 23. Collectively, these promoters, along with Bellator, have increased the number of MMA events from 22 events in 2010 to 68 events in 2016. Ex. 75; Ex. 4, Topel I ¶ 192 & Ex. 23.

20.    New MMA promoters are continuing to emerge. Ex. 113, Epstein Decl. ¶¶ 5, 8-15. For example, in April 2023, Invicta Fighting Championships ("Invicta") was acquired by Anthem Sports & Entertainment. *Id*. ¶ 13. Invicta events were broadcast live on the Anthem-owned

9

networks AXS TV and Fight Network in the United States and Canada, respectively, as well as on IFC's YouTube channel. *Id.* Combate America is another competitor that has continued to grow, having performed multiple rounds of capital raises and becoming recognized as real players in the U.S. MMA market. *Id.* ¶ 14. Other competitors have also entered the MMA marketplace or grown since the Class Period, including, but not limited to, Legacy Fighting Alliance, Bare Knuckle Fighting Championships, Titan Fighting Championships, Xtreme Fighting Championships, and Golden Boy Promotions. *Id.* ¶ 15. UFC competes with these entities for investors, broadcasting deals, sponsorships, and fighters. *Id.*

21.     MMA promoters have been able to access talented MMA athletes during the Class Period—both from the pool of former UFC fighters, and by growing its own up-and-coming talent. Ex. 57, C. Silva Dep. 204:23-25 (affirming WSOF can sign MMA athletes from "a large talent pool"); Ex. 77, Knapp Dep. 226:9-12 (Invicta has been able to contract with elite MMA athletes); *id.* 220:17-20 (President of Invicta, when asked if UFC prevents her from signing athletes: "Heck no"); Ex. 78, Aronson Dep. 26:3-28:8 (Aronson started MMA promotion because there were so many "incredibly talented" prospects); *id.* 52:23-25 (Titan FC athletes "were of the top level in the world and there was no promotion I wouldn't put my guys up against"); *id.* 40:22-23; Ex. 56, Coker Dep. 273:8-11 (affirming that Bellator could go after a lot of fighters on the market); *id.* 272:5-8 (Bellator has some of the best featherweight athletes in the world); Ex. 79, Campbell Decl. ¶¶ 5-13, 15-20 (discussing free agents). From 2011 to 2016, more than 230 former UFC athletes competed for other promotions. Ex. 80, Blair Rep. ¶ 37, Fig. 1. In 2016, as many as 309 former UFC athletes fought for other MMA promotions. *Id.* Zuffa had only an average of 18.1% of the athletes in Plaintiffs' Ranked Market under contract in any given year, and never had more than 22% under contract in a single year. Ex. 99. 182 of the athletes who left UFC to fight for another promotion later *came back* to fight for UFC again. Ex. 80, Blair Rep. ¶ 37 n.61.

22.     MMA promoters have successfully outbid Zuffa and contracted with athletes during the period where Zuffa had a right to match a competitor's compensation. Ex. 79, Campbell Decl. ¶¶ 6-11 (Lyoto Machida leaving UFC for higher compensation at Bellator), ¶¶ 13-15 (Fabricio Werdum, Francis Ngannou, Shane Burgos, and Anthony Pettis leaving UFC for PFL), ¶¶ 18-20

(Demetrious Johnson, Eddie Alvarez, and Sage Northcutt leaving UFC for ONE); Ex. 8, Epstein Dep. 182:2-14 (Ryan Bader and Rory McDonald); Ex. 56, Coker Dep. 196:16-197:7 (Bellator has outbid Zuffa for "big fighters," including Rory McDonald and Gegard Mousasi); *id.* 248:15-25 (Benson Henderson); *id.* 274:9-13 (Bellator picked up 100% of the free agent MMA athletes it tried to sign); Ex. 79, Campbell Decl. ¶¶ 5-13, 15-20 (free agents); Ex. 81 (UFC declining to match Bellator offer to Josh Koscheck); Ex. 82 (UFC opts not to match Josh Thomson's offer from Bellator); Ex. 52, J. Silva Dep. 193:21-23 (Quinton "Rampage" Jackson went to Bellator); Ex. 1, Fertitta Dep. 250:14-253:25 (same);   Ex. 8, Epstein Dep. 182:15-183:17 (same); Ex. 83 (Phil Davis); Ex. 84 (Huerta).

23.  Many of the former UFC athletes were highly-ranked at the time they signed with their new promoters.  Ex. 79, Campbell Decl. ¶¶ 3, 7-11, 13-16; Ex. 4, Topel I ¶ 221 (Ryan Bader and Phil Davis 3rd and 4th-ranked light heavy-weights); Ex. 85, Kingsbury Dep. 192:23-193:8 (Phil Davis left the UFC and is an "elite level fighter").

24.     Numerous former UFC fighters have been recruited by Zuffa's competitors, both during and since the Class Period.  Ex. 79, Campbell Decl. ¶¶ 3-20.  These include UFC champions and box-office draws that were in the prime of their careers.  *Id*. ¶¶ 6-11 (Bellator signing Lyoto Machida and Corey Anderson); ¶¶ 13-17 (PFL signing Fabricio Werdum, Francis Ngannou, Shane Burgos, and Anthony Pettis); ¶¶ 18-20 (ONE signing Demetrious Johnson, Eddie Alvarez and Sage Northcutt).   Between 2011 and 2016, 70 MMA athletes competed for UFC and later competed for Bellator, while 72 competed for Bellator and later UFC.  Exs. 86 & 87.  Since 2017, Bellator has recruited and signed numerous former UFC athletes, including Corey Anderson, Lyoto Machida, Cristiane "Cyborg" Justino Venâncio, Yoel Romero, Shinsho Anzai, Chris Avila, Ryan Bader, Galore Bofando, Liz Carmouche, Oliver Enkamp, Quinton "Rampage" Jackson, Brett Johns, Timothy Johnson, Myles Jury, Jeremy Kennedy, Rustam Khabilov, Valerie Létourneau, Michael McDonald, Jordan Mein, Curtis Millender, Frank Mir, Albert Morales, James Mulheron, Khalid Murtazaliev, Roy Nelson, Sergio Pettis, Devin Powell, Justin Scoggins, Sam Sicilia, Erick Silva, Leslie Smith, Jon Tuck, Jim Wallhead, Charlie Ward, Eric Wisely, and others.  Ex. 79, Campbell Decl. ¶¶ 3-12.  PFL has also attracted elite fighters to join its MMA operation since

2017.  *Id.*  ¶¶ 13-17.  In 2021, former UFC heavyweight champion Fabricio Werdum signed with PFL after 13 years with UFC because—although Zuffa negotiated to renew his contract—Werdum preferred PFL's specific fighting format and salary.  *Id.* ¶ 12.  Similarly, former UFC Heavyweight Champion Francis Ngannou, who PFL signed in May 2023, indicated in the press that PFL offered him more compensation than any other competitor MMA promotion, including UFC.  *Id.* ¶ 14.

25.     No witness has testified that during the Class Period Zuffa prevented other MMA promoters from putting on live professional MMA bouts.  Ex. 57, C. Silva Dep. 205:12-18 (UFC has not blocked WSOF from any inputs or done anything to impede WSOF's ability to compete); Ex. 77, Knapp Dep. 222:5-11 (UFC has not done anything to harm Invicta's ability to compete); Ex. 56, Coker Dep. 194:11-195:17 (describing Bellator events); *id.* 274:17-275:10 (describing Bellator event with 2.1 million viewers); *id.* 280:14-17 ("Bellator is not a minor league"); *id.* 274:9-13 (Bellator picked up 100% of the free agent MMA athletes it tried to sign); Ex. 88, Hume Decl. ¶ 4 (One competes with UFC for athletes and is "not a minor league or feeder league for the UFC."); Ex. 78, Aronson Dep. 78:17-79:24 (describing broadcast deal with CBS and inclusion on UFC's Fight Pass to increase promotion of Titan's events).

26.     None of the Plaintiffs currently compete in bouts Zuffa promotes.  CAC; Ex. 18, Le Dep. 22:10-17 (retired); Ex. 22, Vera Dep. 38:3-4; Ex. 89, Vazquez Dep. 172:6-174:17 (retired in 2013); Ex. 65, Quarry Dep. 62:3-13 (last fight in 2010); Ex. 90 (Fitch WSOF contract).

27.     During the Class Period, named Plaintiffs Fitch and Brandon Vera entered into exclusive contracts to compete for other MMA promotions.  Jon Fitch contracted with the World Series of Fighting (now PFL) for a multi-bout exclusive promotional contract, and then in 2018, he signed a promotional agreement to compete in Bellator bouts.[2]  Ex. 90 (Fitch WSOF contract); Ex. 60 (same).  Brandon Vera currently competes for One under a multi-bout exclusive contract.  Ex. 59 (Vera One contract).

<u>Venues, Sponsors, and Broadcasters</u>

28.     During the Class Period, MMA promoters had access to venues. Ex. 113, Epstein Decl. ¶ 5;  Ex. 4, Topel I ¶¶ 66 & Ex. 2 (examples between 2005-2016 of MMA promoters that have used

---

[2] "Jon Fitch signs with Bellator," https://www.youtube.com/watch?v=yGMocFO0rvw.

venues in North America Zuffa booked); Ex. 57, Carlos Silva Dep. 176:16-25 (no trouble scheduling venues); Ex. 92 (chart showing from 2005-2015, 126 venues hosted Zuffa events, 76 only hosted one); Ex. 93 (Bellator events); Ex. 94 (PFL events).  Plaintiffs' experts did no analysis to suggest that suitable venues are not available to competing MMA promoters.  Ex. 16, Singer Dep. I 260:2-21.

29.     During the Class Period, MMA promoters had access to sponsors.  Ex. 113, Epstein Decl ¶ 5; Ex. 4, Topel I ¶ 67; Ex. 56, Coker Dep. 278:3-18 (Bellator President describes its marquee sponsors, Miller Lite, Monster Energy, and Dave & Busters); Ex. 57, C. Silva Dep. 188:15-21 (WSOF/PFL sponsors include Alienware, Miller Lite, Kawasaki, Auto Shopper, Ticket Galaxy, Kiswe, Fight.TV, and Avion Tequila); *id.* 112:25-113:10 (UFC makes it easier for WSOF to get sponsors because "The sport's bigger, more people know about MMA, more people want to play"); *id.* 190:7-9 (WSOF's sponsorship revenue has increased over time).  Plaintiffs' experts did no analysis to suggest that suitable sponsors are not available to competing MMA promoters.  Ex. 12, Singer Dep. II 552:2-23.

30.     During the Class Period, MMA promoters had access to broadcasters.  Ex. 113, Epstein Decl. ¶ 5; Ex. 4, Topel I ¶¶ 65, 70-73; Ex. 56, Coker Dep. 274:24-275:10 (describing Bellator's event that topped 2.1 million viewers on Spike TV); Ex. 67, Coker Decl. ¶ 4 (Bellator has "distribution in more than one hundred forty countries"); Ex. 57, C. Silva Dep. 180:13-17 (broadcast relationship with NBC Sports); Ex. 77, Knapp Dep. 62:16-23 (broadcast distribution deal with UFC Fight Pass); *id.* 110:2-18; Ex. 78, Aronson Dep. 78:17-79:24 (Titan events broadcast on CBS and Fight Pass).  Plaintiffs' experts did no analysis to suggest that suitable broadcast outlets are not available to competing MMA promoters.  Ex. 12, Singer Dep. II 552:14-23.

**LEGAL STANDARD**

Summary judgment is appropriate when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).[3]  To establish monopsonization[4] under Section 2 of the Sherman Act, a plaintiff must prove three elements—that the defendant (i) possessed monopoly power in the relevant markets; (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury.  *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). "Simply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009); *accord Qualcomm Inc.*, 969 F.3d at 990.

The "test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition.  The Sherman Act is not directed 'against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'" *Eastman* v. *Quest Diagnostics Inc.*, 724 F. App'x 556, 557 (9th Cir. 2018). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Communications Inc.,* v. *Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407 (2004).  "A monopolist's act must have an anticompetitive effect"—that is, it "must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *Qualcomm Inc.*, 969 F.3d at 990.

Further, even a monopolist's exclusionary conduct "cannot create antitrust liability if there was a legitimate business justification" for its actions. *Oahu Gas Serv., Inc.* v. *Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988).

---

[3] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

[4] "Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co.* v. *Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007).

**ARGUMENT**

By the time of class certification and their expert reports, Plaintiffs had redefined their alleged "Scheme" and omitted any monopoly claims, which the Court confirmed in its order certifying the Bout Class. Without a monopolization, or a combined monopolization and monopsonization claim, Plaintiffs' monopsonization claim becomes economically implausible and unsupported by the undisputed evidence. Undisputed facts show that Zuffa does not have alleged monopsony power and there are no resulting anticompetitive effects on competition (which must be shown), such as reduced fighter wages and reduced output during the relevant period. Those undisputed facts demonstrate that output and fighter pay increased during the class period where both would have decreased if there was monopsony power. SUF ¶¶ 7-10.

The undisputed facts also show the absence of exclusionary effects on Zuffa competitors: the record evidence establishes that competing MMA promoters have access to the inputs needed to compete, SUF ¶¶ 18-30. Even if Plaintiffs could prove otherwise—and they cannot—their monopsonization claims would fail because those claims rely on alleged conduct, including agreements to pay fighters more and so-called "predatory" hiring, that is lawful and procompetitive. Plaintiffs have no evidence, expert or otherwise, that isolates the alleged anticompetitive harm or antitrust damages resulting solely from unlawful, as opposed to lawful, conduct.

## I.  Zuffa Is Entitled to Summary Judgment Because Undisputed Facts Show that Zuffa Lacks Monopsony Power.

Summary judgment is warranted because, based on undisputed facts, Zuffa is not a monopsonist. A firm possesses monopsony power when it can "reduce its purchases" of labor "in order to reduce its costs." *In re Beef Indus. Antitrust Litig*, 907 F.2d 510, 516 (5th Cir. 1990); *see also Rebel Oil Co.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power exists when "by restricting its own output, a firm can restrict marketwide output and, hence, increase marketwide prices"). It is undisputed that Zuffa has spent nearly two decades *increasing* its consumption of MMA athlete services while simultaneously increasing both the number of events it promotes and also MMA athlete compensation—conduct that is inconsistent with the

notion that it is wielding monopsony power.  SUF ¶¶ 5-10; *In re Beef Indus.*, 907 F.2d at 516 (affirming grant of summary judgment where plaintiffs failed to show that defendant "significantly reduced its purchases of fed cattle or its output of processed beef").

In addition, voluminous, undisputed evidence of competitors' entry and expansion, SUF ¶¶ 18-27, firmly refute the notion that there were "significant barriers to entry" in the market, or that "existing competitors lacked the capacity to increase their output." *Rebel Oil*, 51 F.3d at 1434. The reality is that Zuffa was a first-mover that worked to legitimize MMA as a sport.  It expended significant resources to develop the MMA product, and, like all pioneering firms, it reaped the early rewards of those investments, while laying the foundation for thriving competition in the future.

A.      There Is No Direct Evidence of Durable Monopsony Power

To establish monopsony power requires Plaintiffs to show *both* reduced output *and* suppressed compensation because both are the necessary results of such power.  *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th Cir. 1997) ("plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits. With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power"); *CoStar Grp., Inc.* v. *Com. Real Est. Exch. Inc*, 2023 WL 2468742, at *5 (C.D. Cal. Feb. 23, 2023) (granting motion to dismiss for failure to plausibly allege market power where plaintiff alleged facts showing increased prices but did "not make any allegations regarding restricted output"); *see also* Philip Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 575 (5th ed. 2023) ("The monopsonist, like the monopolist, 'exercises' its power by reducing output, in this case in the market in which it purchases").

1.      Output Has Increased.

The evidentiary record clearly shows an *increase* in output.  SUF ¶ 7.  It is undisputed that Zuffa increased the number of events it promoted, bouts it promoted, number of athletes it signed, and compensation it paid to athletes.  *Id*. ¶¶ 7-8; Ex. 70, Singer I ¶¶ 206-208.  UFC went from promoting seven events in 2002, to 18 events in 2006, to 32 events in 2010, to 41 events in 2016,

16

to 42 in 2022—which requires correspondingly greater purchases of athlete services.  SUF ¶ 7; Ex. 113, Epstein Decl. ¶ 3; Ex. 4, Topel I ¶ 93.  At the same time, new promoters emerged, accessed needed inputs, and expanded themselves.  SUF ¶¶ 18-30.  Even Dr. Singer's analysis concluded that Zuffa expanded throughout the relevant period.  Ex. 70, Singer I ¶¶ 138-39, Fig. 4A, 4B.  This evidence is inconsistent with a firm restricting output in order to drive down wages.  *Distance Learning Co.* v. *Maynard*, 2020 WL 2995529, at *6 (N.D. Cal. June 4, 2020) (to establish monopsony power through direct evidence, a plaintiff must show that the alleged monopsonist can restrict "marketwide output" by "restricting its *own* output") (quoting *Rebel Oil*, 51 F.3d at 1434).

Plaintiffs' argument that Zuffa restricted output relies on the theory that Zuffa could have expanded output *even further* than it did.  There is no evidence in the record to support that contention.  Dr. Singer admitted he had no method based on his foreclosure shares to measure or predict a hypothetical expansion in a world without Plaintiffs' Challenged Conduct.  Ex. 12, Singer Dep. II 605:1-21, 609:17-610:2.  Dr. Singer merely provided an opinion that Zuffa's output could have been expanded if the growth trends before 2010 had been the same after 2010, even though his analysis showed that his foreclosure share was growing faster before 2010 than after.  *Id.* 621:6-16.  Dr. Singer argued that foreclosure before 2010 made reliance on this trend conservative, which made no sense because the higher the foreclosure in his trend analysis, the higher the output. *Id.* 611:7-612:2, 621:17-622:11.  Dr. Singer admitted that he was unaware of any analysis showing a relationship between the foreclosure he alleged and output declines.  *Id.* 624:1-11 ("I haven't performed any analyses that would illuminate that point"). The "conclusory opinion" of an expert is insufficient to establish a genuine dispute of material fact where it is unsupported by direct evidence.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994); *see also United States* v. *Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) (to survive summary judgment, "an expert must back up his opinion with specific facts").  Dr. Singer also conceded that he was not aware of a single instance in which an athlete was not offered the contracted number of bouts within the term of the athlete's contract.  Ex. 16, Singer I Dep. 315:22-316:17, 317:14-318:7.  In other words, Zuffa fulfilled its contractual obligations to place its athletes in the agreed-upon bouts and increased the number of events that it promoted.  Plaintiffs present no evidence

1  that this level of output is somehow *below* the competitive level.  *In re Beef Indus.*, 907 F.2d at

2  516.

3          2.      Athlete Compensation Has Increased.

4        Plaintiffs' evidence of a decrease in athlete compensation is likewise non-existent, based

5  on the record submitted at class certification.  Uncontested evidence shows that compensation paid

6  to Zuffa athletes substantially increased during the Class Period.  SUF ¶¶ 8-10.  As Zuffa

7  succeeded in expanding MMA, it correspondingly increased compensation paid to athletes.  *Id.*

8  From 2005 to 2016, Zuffa's per-bout compensation grew at an average annual rate of 18%.  Ex.

9  14, Mersch Dep. 476:10-477:11; Ex. 15, Batchvarova Dep. 64:15-65:23; Ex. 4, Topel I ¶ 58.  Over

10  the five-year period from 2011 to 2016 alone, Zuffa's top athletes saw their compensation increase

11  by an average of 21%, and its lower-ranked athletes saw increases of approximately 50%.  Ex. 4,

12  Topel I ¶¶ 44, 58, 169-171, 180-91.  Moreover, Zuffa paid higher compensation to its athletes than

13  its competitors.  SUF ¶ 9.

14        Plaintiffs instead rely on so-called "wage share" as a proxy to show an effect on fighter

15  pay.  Dr. Singer acknowledges that this is merely a proxy for the appropriate way to calculate a

16  competitive wage by calculating an athlete's marginal revenue product ("MRP")—*i.e.* the increase

17  in revenue that can be *attributed* to that athlete's additional labor.  Ex. 16, Singer Dep. I 115:21-

18  116:3; Ex. 49, Singer II ¶¶ 8, 36, 38.  But he claims that MRP is "not directly observable," and

19  then posits that "the next best type of evidence of Zuffa's monopsony power is to examine a

20  Fighter's compensation as a share of Event Revenue (the wage share)."  Ex. 49, Singer II ¶ 8.

21        Plaintiffs' theory is that, throughout the Class Period, the wage share was too low compared

22  to the competitive level.  Plaintiffs offer no way of discerning what that competitive level *is*, and

23  so there is no way of knowing whether wages are at, above, or below that level.  "Wage share"

24  just side-steps the key inquiry at the heart of a monopsony case: how much *should* the wage be in

25  a competitive market?  And Dr. Singer conceded that a promoter can "add value by increasing the

26  quality of the production."  Ex. 16, Singer Dep. I. 120:8-121:10.  The wage share analysis is

27

28

incapable of showing whether wages are below the competitive level and does not constitute direct evidence of monopsony power.  Ex. 49, Topel II ¶ 8.[5]

B.    The Absence of Barriers to Entry and Expansion Demonstrates that Zuffa Lacks Monopsony Power.

"To justify a finding that a defendant has" monopsony power "entry barriers must be . . . capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Rebel Oil*, 51 F.3d at 1439.  Similarly, where competitors have "expanded output in the recent past, or have the ability to expand output in the future," the defendant lacks monopsony power, and summary judgment is appropriate.  *Id.* at 144; *Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1167, 1164 (9th Cir. 1997) (successful entry or expansion by a competitor "precludes a finding that exclusive dealing is an entry barrier of any significance").

1.    Undisputed Evidence During the Class Period Shows Low Barriers to Entry.

Plaintiffs cannot meet their burden of showing that the market has high barriers to entry, because competitors have routinely entered the market and expanded output during the Class Period—and after.  Bellator—one of the UFC's largest competitors—expanded its output from 10 events in 2009 to averaging over 20 during the Class Period.    SUF ¶ 18.  Other promoters like PFL, ONE Championship, and Absolute Championship Berkut all entered the market during the Class Period and expanded output.  *Id.* ¶¶ 18-20.  And boxing promoter Golden Boy Promotions

---

[5]  This Court previously accepted Plaintiffs' use of wage share for purposes of certifying the Bout Class.  But the inquiry at the class certification stage is whether a model is *capable* of proving a claim on a class-wide basis—*i.e.*, whether use of the methodology would give rise to individualized issues that would overwhelm common ones.  *Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022).  At the summary judgment stage, the court must establish whether the model is sufficiently valid on the merits to create a question of fact.  That is a different standard, which is why courts routinely re-examine models at the summary judgment stage, including in the case of Dr. Singer, even when they had previously deemed them adequate for purposes of class certification.  *E.g.*, *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *7-9  (N.D. Cal. Aug. 28, 2023).

began promoting MMA events during the Class Period by transitioning from other combat sports. *Id*. ¶ 20.

Moreover, Zuffa's competitors have had access to all of the resources they need to succeed. And they have only become more formidable competitors since the Class Period.  Plaintiffs cannot dispute that Zuffa's competitors compete with Zuffa for athletes and have frequently outbid them, including during the contractual matching period.  SUF ¶¶ 22-24.  And that is in addition to growing their own up-and-coming talent. *Id.* ¶¶ 21-25.  Similarly, other promoters have had ample access to venues, name-brand sponsors, and broadcasters.  *Id*.  ¶¶ 18, 28-30.  Neither Zuffa nor any extrinsic factor has kept them "from any inputs necessary to put on successful MMA events" or "done anything to impede their ability to compete." Ex. 57,  C. Silva Dep. 205:12-18; SUF ¶¶ 21-25; 28-30.

In similar circumstances, the Ninth Circuit has held that there is no genuine dispute of material fact regarding monopoly power where the undisputed record shows both (1) expansion of output in the relevant market, and (2) the entry and growth of significant competitors.  *W. Parcel Exp.*, 190 F.3d at 976-77.  Both of these requirements are met here, *supra* SUF ¶¶ 15-25, and Plaintiffs thus cannot make the requisite showing that Zuffa had "the ability to exclude competition." *W. Parcel Exp.*, 190 F.3d at 977; *see also Epicenter Recognition, Inc.* v. *Jostens, Inc.*, 81 F. App'x 910, 912 (9th Cir. 2003) (defendant lacked market power, despite its "dominant market share" where "existing competitors could easily and quickly expand production and pick up the slack" if the defendant "should attempt to increase prices or decrease quality").

2. <u>Recent Growth in the Industry Confirms that Barriers to Entry Are Low and Competition Was Robust During the Class Period.</u>

The low barriers to entry in the market are confirmed by events after the Class Period. Many of Zuffa's most significant competitors have expanded during the past six years and, in doing so, have assembled even greater resources in the form of athletes, sponsors, and means of distribution.  The PFL, for example, has expanded substantially since 2018 and proclaims itself "the #1 fastest growing sports league and the #2 MMA company worldwide."  SUF ¶ 18.  PFL's viewership has also increased substantially since its founding.  *Id*.  Moreover, it has increasingly

20

drawn athletes away from UFC, *id.* ¶¶ 21-25, directly rebutting Plaintiffs' theory that "elite" MMA athletes would not be willing to leave UFC for competitors.  UFC Heavyweight Champion Francis Ngannou, for example, signed to fight with PFL earlier this year.  *Id.* ¶ 24.  Investors, including the Public Investment Fund of the Kingdom of Saudi Arabia, SRJ, Ares, Knighthead, Luxor Capital, Waverley Capital, Elysian Park Ventures, and "numerous NBA, MLB, NHL, and MLS team owners," have poured money into PFL.  *Id.* ¶ 18.  And PFL also holds sponsorships from major brands like GEICO, Draft Kings, Bose, Bud Light, and Celsius.  *Id.*

Bellator has also grown since the close of discovery.  Bellator began to host its Grand Prix tournament series in 2018 and now has a dedicated channel on Pluto TV.  *Id.* ¶ 18.  With this series, it quickly expanded to having up to 27 events in the years following the Class Period.  Bellator has increasingly been lauded for the quality of its fights.  *Id.*  The further entry and growth of competitors immediately following the Class Period confirms that barriers to entry were low during the Class Period.  Competitors have continued to expand their presence in the market, attracting athletes and confirming that Zuffa does not possess monopsony power.  These competitors are well-funded and have television distribution agreements that confirm that they have the ability to provide real competition to Zuffa.

As also discussed in Zuffa's motion to reopen discovery, this post-class-period evidence confirms that Zuffa lacks monopsony power.  The fact that competitors were able to enter the market, expand, and compete with Zuffa for MMA athletes shows that Zuffa lacked the ability to restrict its own output to suppress wages.  *Rebel Oil*, 51 F.3d at 1439, 1441 (courts "must consider" events that occurred since "the alleged barriers were in place" because "plaintiff must show that new rivals are barred from entering the market" and liability for monopolization may not exist "if there is undisputed evidence indicating that competitors have expanded output in the recent past, or have the ability to expand output in the future."); *United States* v. *Syufy Enterprises*, 903 F.2d 659, 665 (9th Cir. 1990) (firm lacked monopsony power where the "market was more competitive when this case came to trial than before" the conduct at issue); *see also* Mot. to Reopen Discovery.

## II.     Zuffa Did Not Engage in Exclusionary Anticompetitive Conduct.

### A.     Zuffa's Exclusive Contracts Are Procompetitive and Did Not Deprive Competing Promoters of a Substantial Share of the Market for Fighters.

The bar for finding an exclusive-dealing arrangement anticompetitive is high.  There are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition." *Omega*, 127 F.3d at 1162.  Exclusive contracts "may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all." *E. Food Servs., Inc.* v. *Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004).  Accordingly, "exclusive dealing contracts are not disfavored by the antitrust laws." *Id.* at 8.  Instead, such contracts are unlawful *only* when they (1) "foreclose competition in a substantial share" of the market and (2) lack any legitimate business justification. *Omega*, 127 F.3d at 1162; *Image Tech. Servs., Inc.* v. *Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).  Plaintiffs can make neither showing.

### 1.     Zuffa's Contracts Do Not Foreclose a Substantial Share of the Market.

Because "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought," the key question is whether the contracts "foreclose competition in a *substantial share* of the line of commerce affected." *Omega*, 127 F.3d at 1162 (quoting *Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.)); s*ee also Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J. concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a *significant* fraction of buyers or sellers are frozen out of a market by the exclusive deal.").  Although there is no set percentage that constitutes a "substantial share" of the market, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *Stop & Shop Supermarket Co.* v. *Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004); *see also Methodist Health Servs. Corp.* v. *OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) ("Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim"), *aff'd*, 859 F.3d 408 (7th Cir. 2017); *Omega*, 127 F.3d at 1162-65 (no anticompetitive injury where contracts foreclosed 38% of the market).

Plaintiffs do not come anywhere close to showing substantial foreclosure.  The undisputed evidence shows that a significant number of fighters were available to contract each year, and Dr. Singer's analysis does not prove otherwise.

a.      <u>The Undisputed Evidence Shows Only Minor Foreclosure.</u>

Several key and undisputed pieces of evidence show that Zuffa's contracts resulted in only minor foreclosure of the market for fighters.

*First*, nearly 80% of Plaintiffs' Ranked Market was available to contract with Zuffa's competitors each year during the Class Period.  Said otherwise, Zuffa had only an average of 18.1% of the athletes in Plaintiffs' Ranked Market under contract in any given year, and never had more than 22% under contract in a single year.  SUF ¶ 21; Ex. 99.  That is significantly lower than the percentage courts typically require to support an exclusive dealing claim.

Plaintiffs dispute these calculations, but the only way they reach a higher percentage of foreclosure in the Ranked Market is by weighting the fighters by the revenue generated by their promoters.  Ex. 70, Singer I ¶¶ 128-29; Ex. 49, Singer II ¶¶ 59, 128-37, 144-48.  Thus, a fighter is worth more if his promoter earned more when he appeared in a bout.  But "it makes no economic sense to adjust for athletes' quality by weighting them by their promoters' revenue."  Ex. 4, Topel I ¶ 162.  Doing so produces nonsensical results, such as the conclusion that the 183rd-ranked athlete in 2017 was worth *17 times more* than the 3rd-ranked athlete, merely because the former competed for UFC and the latter for Bellator.  *Id.* ¶¶ 162, 221.  This effect is especially apparent in fighters who moved between promoters.  For example, Dr. Singer's model finds that the weight of a single fighter on Zuffa's foreclosure share increased by "a factor of nearly 14 in just five months" as a result of joining Zuffa, even though his ranking remained the same.  *Id.* ¶ 222.  By contrast, another fighter's weight *decreased* by 94% in just one month after leaving Zuffa, even though his rank actually *increased* dramatically (from 235 to 71) during the same time period.  *Id.* at ¶ 223.

Ultimately, it should come as no surprise that by weighting Zuffa's athletes substantially more, Dr. Singer is able to "show" significant foreclosure.  A leading firm can always be deemed to have tied up a "substantial share" of a market if foreclosure share is calculated based on revenues

23

of the firm.  That is circular analysis.  Weighting by the revenues of an alleged monopoly, which is legal, proves nothing about the effect of alleged exclusionary conduct.[6]

*Second*, even if a substantial share of fighters were under contract, Zuffa's agreements still do not *foreclose* a substantial share of the market because their expiration dates are staggered.  SUF ¶ 14.  As a result, there is always a "constant supply of athletes coming available," "whom may reach free agency only weeks apart."  Ex. 4, Topel I ¶ 118.  The Ninth Circuit has previously held that exclusive contracts "allow effective entry if 20 percent of the contracts expire monthly (or even annually)."  *Omega*, 127 F.3d at 1164; *see also Ticketmaster Corp.* v. *Tickets.com Inc.*, 2003 WL 21397701 at *2, 4, *aff'd*, 127 F. App'x 346, 348 (9th Cir. 2005) (same where 16% of Ticketmaster contracts came up for renewal in any given year; contracts had six-year average duration).[7]  Given that Zuffa's contracts constantly expire throughout the year, Plaintiffs cannot plausibly claim that competing promoters are substantially foreclosed.

*Third*, real-world evidence shows that athletes can and frequently do move between promotions when their contracts terminate.  From 2011 to 2016, at least 230 former UFC athletes competed for other promotions *every year*.  SUF ¶ 21.  In 2016, as many as 309 former UFC athletes did so.  *Id*.  While Plaintiffs downplay this evidence by casting former UFC athletes as retirees who left the "major league" to play out the rest of their careers in the "minor leagues," the undisputed evidence shows that 182 of the athletes who left UFC to fight for another promotion later *came back* to fight for UFC again.  *Id*.  The experiences of the Named Plaintiffs also reflect the reality that fighters can and do fight in many promotions over the course of their career.  During the Class Period, Plaintiff Jon Fitch signed an exclusive, multi-bout contract with the World Series

---

[6] In addition to revenue-weighting, Dr. Singer weights one of his three markets (the Headliner market) by the inverse of an athlete's rank, meaning that the 6th ranked athlete is worth twice as much as the 12th ranked athlete.  Ex. 70, Singer I ¶¶ 1, 95, 128; Ex. 16, Singer Dep. I 140:19-141:8.  But Dr. Singer provides no rationale for adopting this particular weighting system.  Ex. 16, Singer Dep. I 142:23-143:21 ("The record evidence doesn't necessarily tell me how to give those fighters more weight.").

[7] A section of the treatise cited by Dr. Singer, Ex. 70, Singer I ¶ 172, explains that "in a larger dealer network, even contracts with long terms need not be anticompetitive.  For example, in a 300-dealer network where contracts average three years long with randomly distributed terminations approximately 100 dealers should be free to renegotiate each year."  Phillip E. Areeda *et al.*, Antitrust Law ¶ 1821d3 (2009).

of Fighting (WSOF), now the Professional Fighters League (PFL), after competing for the UFC. *Id*. ¶ 27.[8]  Similarly, Plaintiff Brandon Vera left the UFC to compete for One Championship. *Id*. And this trend has only continued in recent years. *Id*. ¶¶ 21-25; Ex. 79, Campbell Decl. ¶¶ 3-20.

*Finally*, Zuffa's competitors do not agree they are foreclosed.  Ordinarily, antitrust cases challenging a defendant's exclusive contracts are brought by the defendant's competitors.  *See, e.g.*, *Omega Env't*, 127 F.3d at 1157-61; *Ticketmaster*, 127 F. App'x at 347.  That is not the case here.  On the contrary, Zuffa's competitors use nearly identical contractual arrangements, SUF ¶ 15 and they strenuously object that Zuffa has done nothing to "block" them "from any inputs necessary to put on successful MMA events."  SUF ¶ 21.  The Ninth Circuit has recognized that "uncontradicted testimony" from competitors "that competition in the market remained vigorous" despite the challenged conduct is an important fact supporting summary judgment.  *A. H. Cox & Co.* v. *Star Mach. Co.*, 653 F.2d 1302, 1308 (9th Cir. 1981).  Especially in the context of an exclusive dealing claim where the question is whether *competitors* had access to the relevant input (here, fighters), the fact that all of Zuffa's competitors believed that they did is striking.

### b.   Dr. Singer Does Not Prove Substantial Foreclosure.

As against all of the above, Plaintiffs have only Dr. Singer's conclusion that Zuffa's exclusive, 30-month[9] contracts substantially foreclose competition.  But Dr. Singer never actually assesses whether 30-month contracts foreclose competition.  Dr. Singer admits that his conclusion that 30-month contracts are unacceptable is not drawn from any empirical assessment of their effect on the market but rather is based entirely on his *legal* conclusion as to "what would be a duration that would be acceptable to a Court."  Ex. 12, Singer Dep. II 375:7-376:3; Ex. 16, Singer Dep. I 46:20-47:9 ("If the legal standard were 30 months and . . . if Zuffa's contracts were all 12-month contracts, then the foreclosure share by my measure would be zero percent");

---

[8] After the Class Period ended, Fitch signed with yet another promoter, Bellator.  Ariel Helwani, *John Fitch signs with Bellator*, MMA FIGHTING (Mar. 1, 2018), https://www.mmafighting.com/2018/3/1/17066990/jon-fitch-signs-with-bellator.

[9] While Zuffa accepts Plaintiffs' 30-month characterization for the sake of argument for this motion, that calculation incorrectly assumes an athlete is foreclosed for the entire 12-month right to match period.  Ex. 70, Singer I ¶ 88.  But athletes can and do contract with other promoters during that period.  SUF ¶¶ 22-24.  Plaintiffs have not cited a single athlete who waited the entire 12-month right to match period before signing with a competing promoter.

1   *id.* 152:1-17 ("I'm familiar with – with various case law that speaks to what constitutes a contract

2   of sufficient duration to be considered exclusionary").

3        *First*, not only is Dr. Singer not competent to provide a legal conclusion but his conclusion

4   that 30-month contracts would be deemed unlawful is wrong.  Courts have repeatedly found

5   contracts more than twice the length of Zuffa's to be lawful.  *E.g., Ticketmaster Corp.* v.

6   *Tickets.com Inc.*, 127 F. App'x 346, 347 (9th Cir. 2005) (six-year contracts lawful); *Ferguson* v.

7   *Greater Pocatello Chamber of Com., Inc.*, 848 F.2d 976, 982 (9th Cir. 1988) (six-year exclusive

8   lease lawful); *see also Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015)

9   (three-year agreements "do not foreclose competition and are not anticompetitive as a matter of

10   law").

11        *Second*, Plaintiffs have previously tried to justify Dr. Singer's "conclusion" that 30-month

12   contracts substantially foreclose competition by reference to the length of a typical fighter's career,

13   but that argument is unavailing.  Dr. Singer asserts that the median career length for an athlete at

14   Zuffa is 0.82 years.  Ex. 49, Singer II ¶ 64 & Table 1.  Dr. Singer also calculates that the "typical

15   length of time between bouts for an MMA Fighter is about 8 months," Ex. 70, Singer I ¶ 308.

16   These different calculations do not mean that a typical fighter career is one fight.  Instead, Dr.

17   Singer's first calculation of a median career length does not include the time an athlete spends

18   fighting for another promoter either before or after Zuffa.  Ex. 4, Topel I ¶ 116.  Taking account

19   of that time, the median career length for fighters who participated in at least one UFC bout is

20   dramatically higher—8.7 years.  SUF ¶ 12.  Zuffa's contracts cover no more than 30% of that

21   period.  Ex. 4, Topel I ¶ 116 (a 26-month UFC contract "would span no more than one-third of an

22   athlete's career for 75 percent of UFC athletes, and no more than one-quarter of their careers for

23   half of UFC athletes").

24        Dr. Singer's claim that a fighter's career lasts less than a year also makes no sense, because

25   he concedes that 12-month exclusive contracts *would* be acceptable.  Ex. 16, Singer Dep. I

26   46:20-47:9; Ex. 49, Singer II ¶ 198 (describing Plaintiffs' but-for world as including contracts "of

27   one year or less"); *see Omega*, 127 F.3d at 1163 (collecting cases reflecting overwhelming

28   consensus that exclusive contracts of a year or less are not anticompetitive).

Dr. Singer's foreclosure analysis is also inconsistent with his assessment of the length of a fighter's career in another important respect.  In order to show that Zuffa has "locked up" a sufficient percent of the market, Dr. Singer dismisses the relevance of novice talent, preferring instead to focus on "headliners" (i.e., the top 15 athletes in each weight class).  Ex. 70, Singer I ¶ 99.  Plaintiffs cannot have it both ways.  Either athletes' careers are so short that identifying future (not current) stars is all that matters, or athletes' careers are sufficiently long that Zuffa's contracts do not tie them up for a sufficiently lengthy portion of their career.  Whatever the case, the upshot is clear: Zuffa's contracts do not "lock up" all the talent such that other competitors cannot access it.

2.    <u>Zuffa Has Legitimate Business Justifications for its Contracts.</u>

Summary judgment also is required because Zuffa's contracts are supported by legitimate and procompetitive business justifications.  "When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."  *Image Tech.*, 125 F.3d at 1212.  As the Ninth Circuit has explained, the "key" to determining whether a defendant's conduct is supported by a "legitimate business justification" is to ask whether the conduct furthers a procompetitive purpose or instead represents "an attempt 'to exclude rivals on some basis other than efficiency.'"  *Universal Analytics, Inc.* v. *MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990).  To "rebut a defendant's asserted business justification," the plaintiff must show "either that the justification does not legitimately promote competition or that the justification is pretextual."  *Image Tech.*, 125 F.3d at 1212.  Summary judgment is warranted where defendants assert legitimate justifications and plaintiffs fail to rebut them.  *See Universal Analytics*, 914 F.2d at 1259 (affirming summary judgment where plaintiff failed to show that defendants' "legitimate business reasons for hiring much needed and competent computer programmers" were pretextual, despite internal memorandum stating that one goal of the hiring was to "wound" a competitor); *Imaging Ctr., Inc.* v. *W. Maryland Health Sys., Inc.*, 158 F. App'x 413, 420-22 (4th Cir. 2005) (affirming summary judgment where defendants' exclusive contracts covered 80% of the relevant market because plaintiff failed to rebut the procompetitive justifications for such contracts).

Zuffa has shown at least two pro-competitive justifications for its exclusive, multi-bout contracts, which Plaintiffs have failed to rebut.  The contracts promote investment in athletes by reducing free-riding, and they enable promoters to expand output by ensuring they have a sufficiently deep roster of athletes to staff each event.  Given these procompetitive justifications, it is no wonder such contracts are the "industry norm."  Ex. 57, C. Silva Dep. 196:19-198:1.

*First*, exclusive, multi-bout contracts are necessary to address free-riding concerns.  The prevention of free-riding is a well-recognized, legitimate business justification, which the Ninth Circuit has repeatedly relied on in affirming summary judgment to defendants.  *E.g.*, *Häagen-Dazs Co.* v. *Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, *5 (9th Cir. 1990) ("preventing free-riding" is a "legitimate and lawful" purpose); *O.S.C. Corp.* v. *Apple Computer, Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986) (same); *Indep. Ent. Grp., Inc.* v. *Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994) ("Exclusive employment agreements lawfully prevent such free-riding").  This Court should do the same here.

The MMA industry is premised around the construction and maintenance of fighters' brands.  SUF ¶¶ 1-10.  Fans are not just looking for a competitive fight between people they do not know; they are looking for familiar faces whose stories they can connect to.  *Id.*  Promoters thus substantially invest in building up a cult following around their athletes—teasing rivalries between particular fighters, crafting captivating narratives for up-and-comers, and hyping matches against defending champions.  *Id.* ¶ 10.  Zuffa, in particular, is highly adept at such promotion, and its athletes have long emphasized the importance of the resources that Zuffa allocates toward building up their careers in explaining their decision to sign with Zuffa.  *Id*; Exs. 19-45.

There would be little incentive for Zuffa or other promoters to make such investments if fighters could immediately switch to a competitor as soon as they began to see some success.  SUF ¶¶ 11-17.  Fear that a competitor would capture the benefits associated with a promoter's investment would reduce such investments, making both fighters and consumers worse off overall.  *Id.*; Ex. 113, Epstein Decl. ¶¶ 4-5.  Exclusive, multi-bout contracts provide the solution: they ensure promoters "see a return on investment," encouraging them to keep it up.  SUF ¶ 15.

As to the free-riding concern, Plaintiffs do not dispute that some exclusivity is needed.  Ex. 70, Singer I ¶ 264.  Instead, Plaintiffs argue that "shorter contracts" of "12 months" in length could adequately address promoters' free-riding concern.  *Id*.  But Plaintiffs have not substantiated that claim with any evidence.  Nor could they, given Dr. Singer's calculation of a typical time between bouts of about 8 months, Ex. 70, Singer I ¶ 308, meaning that a 12-month contract would cover only a single fight.  And one fight is hardly sufficient to induce promoter investment, as Plaintiffs essentially admit.  *Id*. ¶ 264.

*Second*, exclusive-dealing arrangements are also essential to growing output, because they ensure promoters will have a sufficient pool of athletes from which to staff events.  Ex. 113, Epstein Decl. ¶ 5.  Like preventing free-riding, increasing the quantity and quality of events is a well-recognized, legitimate business justification.  *E.g.*, *Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*, 614 F.3d 57, 82 (3d Cir. 2010) (exclusive dealing arrangement justified in part because it increased "car counts" in races and "made for a more successful show"); *Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*, 797 F.2d 370, 378 (7th Cir. 1986) ("The monopolist cannot be faulted for wanting to sell *more* output unless he is engaged in some predatory or exclusionary scheme.").

To deliver on their contractual promises to broadcasters, promoters like Zuffa must maintain a sufficiently deep roster of athletes to staff each live event.  SUF ¶¶ 13-15, 25, 27.  Given the nature of the sport, as much as "10 to 40 percent" of Zuffa's athletes may be injured, on a leave of absence, or otherwise unavailable at any given time.  *Id*. ¶ 14; *see also* Ex. 106 (in 2013 and 2014, nearly all of Zuffa's events had injured athletes that needed to be replaced).  In light of these constraints, having a large pool of available fighters is key to growing output, including through long-term broadcast deals that promise a certain number of events per year.

Dr. Singer admits as much, as do Zuffa's competitors.  Dr. Singer describes "access to a broad stable of high-quality MMA fighters" as "essential," precisely because fighters often "become unavailable due to injury, retirement, and so on."  Ex. 70, Singer I ¶¶ 152, 158.  Competitors likewise recognize that a key benefit to "exclusive, multibout contracts" is having a sufficient "roster" to "fill in" when "a fighter gets injured."  SUF ¶ 15.

Without a sufficiently deep roster of athletes signed to long-term contracts, Zuffa would not be able to staff each event, and "the ecosystem would crash" and Zuffa's "output would significantly decrease."   SUF ¶ 13; Ex. 8, Epstein Dep. 104:1-105:7; 98:11-99:3; Ex. 9, Acquisitions Dep. 177:10-178:5.  In a world without exclusive, multi-bout contracts, there "would be many, many less fights because no network is going to agree to sign a long-term deal" without some assurance the events can be staffed.  SUF ¶ 13; Ex. 8, Epstein Dep. 104:1-105:7.

Plaintiffs likewise cannot seriously dispute that exclusive, multi-bout contracts help promoters increase their output by providing a dependable supply of athletes from which to staff events.  Zuffa's overall event output *rose* during the Class Period, from 32 events in 2010 to 41 in 2016. SUF ¶ 7.  That output growth is a direct result of Zuffa's ability to consistently staff exciting match-ups.  And while Plaintiffs have previously suggested that promoters could also address staffing concerns through co-promotion (i.e., pairing a UFC fighter against a Bellator fighter), *see* ECF No. 596 at 40 n.110, co-promotion reduces competition among promoters while not preventing free-riding.  On the contrary, it may encourage free-riding by allowing other promoters to benefit from their competitors' investments by sharing in the revenues associated with events featuring their competitors' athletes.

Plaintiffs' alternative is one that essentially amounts to a single-bout contract on an event-by-event basis or a one-year contract, achieving the same result.  Ex. 70, Singer I ¶ 264.  But court-mandated single-bout contracts would be disastrous for the industry.  Without multi-bout contracts, promoters could never even guarantee a single re-match of a popular fight between rivals or well-paired athletes.  Nor could promoters guarantee that their champion would stay to defend their belt—even once.  And without a defending champion, up-and-coming fighters could never be guaranteed a chance to prove their mettle against the reigning victor.  That is why Zuffa's competitors, Bellator and One Championship,  and former competitor WSOF, all employ exclusive contracts of a similar, if not longer, duration than Zuffa's.  SUF ¶ 15.[10]  If these contracts did not have the value Zuffa ascribed to them, Zuffa's competitors would compete for athletes by offering

---

[10] Beyond exclusivity, other provisions of Zuffa's contracts are also industry standard.  *E.g.*, Ex. 113, Epstein Decl. ¶¶ 4-5;  Ex. 4, Topel I ex. 4 & 5 (showing that Bellator's contracts contained all the same challenged provisions as Zuffa's).

1  non-exclusive contracts or contracts of a shorter duration as Dr. Singer urges.  But Plaintiffs
2  present zero evidence of other competitors doing so—precisely because these terms are essential
3  to protect promoters' investments.

4  Finally, to the extent Plaintiffs may argue that Zuffa's contracting decisions were motivated
5  in part by an intent to exclude competitors, such an argument would not suffice to rebut Zuffa's
6  legitimate business justifications unless Plaintiffs could show that those justifications were entirely
7  pretextual.  *See Indep. Ent. Grp., Inc.* v. *Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal.
8  1994) ("The intent to exclude competitors through lawful means cannot be predatory as a matter
9  of law."); *cf. Universal Analytics*, 914 F.2d at 1259 (making same point regarding predatory hiring
10  claim).  It is entirely legal to hire the best talent, for example, to improve a business and to do so
11  with the intent to deny such talent to competitors.  Because Plaintiffs have not even tried to show
12  that Zuffa's sole intent was to exclude competitors or destroy competition, they cannot rebut
13  Zuffa's legitimate business justifications and thus their claim must fail.

14  B.  The Challenged Conduct Is Not Anticompetitive.

15  Plaintiffs' "Challenged Conduct" in this case includes allegations that Zuffa hired more
16  fighters than it needed, engaged in coercive contracting practices, improperly acquired smaller
17  promoters, and competed aggressively with rivals.  Ex. 70, Singer I ¶¶ 40-63, 74, 145.  Such
18  conduct as a matter of law does not suffice to show that Zuffa "engaged in predatory or
19  anticompetitive conduct designed to destroy competition." *Movie 1 & 2* v. *United Artists*
20  *Commc'ns, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990).

21  1.  Hiring the Best Athletes Is Competition.

22  Plaintiffs argue that Zuffa "locked up" fighters by hiring, that is contracting with, more
23  than it needed.  *E.g.*, Ex. 70, Singer I ¶ 145 ("Zuffa restricted the supply of Fighter services by
24  consistently maintaining significantly more Fighters under contract than it could use"); CAC ¶ 109
25  (other MMA promoters "do not have access to the Elite Professional MMA Fighters necessary to
26  sustain and grow a profitable rival promotion company").  This is a classic predatory hiring claim.
27  Even if Plaintiffs deny using the phrase predatory hiring, Plaintiffs' claim depends on proving that
28  Zuffa locked up fighters from its competitors.

Plaintiffs come nowhere close to meeting the elements of a claim of predatory hiring or locking up the supply of fighters. That claim requires showing either that Zuffa hired the athletes solely "to harm the competition without helping itself," or Zuffa's "clear nonuse" of the athletes. *Universal Analytics*, 914 F.2d at 1258. First, as set forth above, there is undisputed evidence that Zuffa hired fighters to help its own business grow. SUF ¶ 13. As Plaintiff's own expert recognizes, "access to a deep pool of talented Fighters is a critical input" for any MMA promotion. Ex. 70, Singer I ¶ 158; SUF ¶¶ 13-15.

And second, the evidence that Zuffa used the athletes it hired and met its contractual obligations to provide the contracted-for bouts (and even cut fighters at the end of their contracts rather than maintain a surplus of fighters). Dr. Singer conceded that he was not aware of a single instance in which an athlete was not offered the contracted number of bouts. Ex. 16, Singer Dep. I 316:19-318:24. In the absence of evidence that (uninjured) fighters were not given bouts to fulfill their contracts, Plaintiffs have failed to show nonuse of fighters to support an antitrust claim because Zuffa contracted with fighters and then used the fighters in the contracted-for bouts. Dr. Singer did offer the opinion that UFC maintained more fighters than it needed, but he stated multiple times that he could not quantify an excess number and had not been asked to do that estimate. *Id.* 320:8-321:15. Plaintiffs' arguments that Zuffa hired more athletes than it needed as a matter of law do not show anticompetitive conduct. *Universal Analytics*, 914 F.2d at 1258.

### 2.   Extending Contracts for More Money Is Competition.

While Plaintiffs attempt to demonstrate anticompetitive effects through evidence of "coercion," it is not coercive to offer athletes *more money* to re-sign an exclusive contract. Such behavior is a well-recognized and procompetitive result of exclusive dealing arrangements. *E.g.*, *Balaklav* v. *Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (exclusive dealing arrangements "may actually encourage, rather than discourage, competition because the incumbent and other competing groups have a strong incentive continually to improve the quality and prices they offer in order to secure the exclusive positions"). For that reason, Plaintiffs cannot credibly claim that Zuffa's right-to-match clauses were anticompetitive. Under those clauses, Zuffa can retain a fighter *only* by offering a contract of equal or greater value to that offered by a competitor. If Zuffa declines to

match the offer, the fighter is free to sign elsewhere.  Nor can Plaintiffs credibly claim that negotiating a new contract prior to the expiration of the first is coercive.  Fighters who re-sign with Zuffa indisputably get paid more.  SUF ¶ 10; Ex. 4, Topel I ¶ 122 (Zuffa fighters were paid 21.2% *more* in show money for the first bout under a new agreement).

The Supreme Court has held that claims that a competitor acted anticompetitively by paying "too much" for an input do not give rise to an antitrust violation unless the payments are predatory—that is, unless the cost paid for the input (here, access to Fighter services) makes the sale of the output (here, Zuffa's offering of sports entertainment to viewers) unprofitable: A plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs.  That is, the predator's bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs.  *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 315, 325 (2007).

In *Weyerhaeuser*, the Court vacated a finding of antitrust liability of a defendant sawmill operator accused of "bidding up the price of sawlogs to a level that prevented competitors from being profitable."  *Id*. at 314.  There, the lower courts had concluded that the jury could find that the sawmill engaged in predatory bidding if it "purchased more logs than it needed, or paid a higher price for logs than necessary, in order to prevent its competitor from obtaining the logs they needed at a fair price."  *Id.* at 317.  The Supreme Court disagreed.  The Court held that the same legal standard that applies to claims of predatory pricing (*i.e.*, claims that the defendant is charging too little for outputs) should apply to claims of predatory bidding (*i.e.*, claims that a defendant is paying too much for inputs).  *Id*. at 325.  "As with predatory pricing, the exclusionary effect of higher bidding that does not result in below-cost output pricing 'is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate' procompetitive conduct."  *Id*. (quoting *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)).  That is because "a firm complaining about the harm it suffers from nonpredatory price [or bid] competition is really claiming that it is unable to raise prices [or bids]" *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 337–38 (1990).  And that "is not antitrust injury."  *Id.* The antitrust laws are designed to promote this sort of aggressive price competition, which

ultimately benefits consumers.  For that reason, the Supreme Court announced a bright-line rule: "*only* higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability."  *Weyerhaeuser*, 549 U.S. at 325; *see also Cascade Health Sols.* v. *PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) ("predatory bidding on the input side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs").[11]

Plaintiffs can put forth no evidence that Zuffa's contracts with fighters resulted in below-cost output pricing of Zuffa's MMA offerings.  Ex. 70, Singer I ¶¶ 77-78.  This failure is fatal to Plaintiffs' claim that Zuffa's renewed contracts with fighters were exclusionary or anticompetitive. Dr. Singer's analysis confirmed that Zuffa's payments to fighters facilitated above-cost profitable output offerings of its MMA bouts.  SUF ¶ 13.  Dr. Singer also acknowledged that "keeping fighters with higher payments" would constitute evidence that Zuffa "behaved competitively" and "competed on the merits."  Ex. 12, Singer Dep. II 406:7-407:9.  He was unable to explain any reason why paying a fighter *more* for an extension could be considered anticompetitive.  *Id*.  All Dr. Singer could say was that "it's hard for me to understand . . . why a fighter would ever want to – want to extend the duration all things equal."  *Id.* at 408:13-409:22.  But, of course, all things are not equal when one promoter (Zuffa) is offering higher (above-cost) payments than another.

Because Plaintiffs cannot satisfy *Weyerhaeuser*'s bright-line rule, they attempt to side-step it; but they have no legal basis to do so.  Plaintiffs allege that Zuffa's conduct (paying fighters more) was anticompetitive not because it resulted in predatory below-cost pricing of Zuffa events but because Zuffa allegedly used "coercive" negotiating tactics, such as delaying athletes' final bout in their contract, matching athletes with suboptimal opponents, or scheduling athletes for

---

[11] Earlier this month, a district court in Oregon reaffirmed that *Weyerhaeuser*'s bright-line rule requires a plaintiff alleging monopsony to prove that defendant's input payments "caused the relevant cost of the output to rise above the revenues generated in the sale of those outputs." *Malheur Forest Fairness Coal.* v. *Iron Triangle, LLC*, 2023 WL 6811871, at *12 (D. Or. Oct. 13, 2023) (dismissing monopsony claim that defendant's outbidding of rivals for inputs constituted anticompetitive conduct because plaintiffs did not show "facts sufficient to establish that Defendant bid in a manner which caused a loss" at any point in the relevant period).

suboptimal slots on a fight card. *E.g.*, CAC ¶¶ 119, 123, 124, 126. But these allegations do not render *Weyerhaeuser* inapplicable to Plaintiffs' claims because if Zuffa did not offer more than any other promoter in terms of compensation and benefits, athletes would not sign with Zuffa. SUF ¶ 10. The primary mechanism keeping athletes contracted to Zuffa is Zuffa's offers of greater pay. *Id*. Plaintiffs have no evidence of an alleged coerced fighter who was paid less for an extension.

Ultimately, Plaintiffs' theory—that Zuffa "coerced" Plaintiffs into signing contracts that paid them more and that these contracts were anticompetitive—is exactly the type of "antitrust" argument that *Weyerhaeuser*'s bright-line rule forbids because "mistaken findings of liability would chill the very conduct the antitrust laws are designed to protect." *Weyerhaeuser*, 549 U.S. at 320. And despite their wide array of liability allegations relating to other Zuffa conduct, Plaintiffs have failed to present *any* evidence of damages stemming from any Zuffa conduct that can be disaggregated from the non-predatory, above-cost payments to fighters. *Atl. Richfield*, 495 U.S. at 331-32, 339 (summary judgment is proper where plaintiff claims antitrust injury by an alleged monopolist's "threats, intimidation and coercion" to maintain prices at "artificially low and uncompetitive levels" because "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect").

### 3. Plaintiffs Have Not Presented Evidence of Anticompetitive Effects from Zuffa's Acquisitions of MMA Promoters.

Plaintiffs' efforts to include in their Challenged Conduct acquisitions made one to two decades ago are unavailing. Ex. 70, Singer I ¶¶ 41-51 (discussing acquisitions from 2006 to 2011). Plaintiffs could not have brought a standalone challenge to these acquisitions, most of which occurred more than four years before the Complaint was filed. *See New York* v. *Meta Platforms, Inc.*, 66 F.4th 288, 299 (D.C. Cir. 2023) (there is a presumptive four-year statute of limitations for challenging acquisitions). Plaintiffs' efforts to use these stale acquisitions to shore up their Section 2 claim fare no better.

Moreover, the "mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality" under the antitrust laws. 4 Phillip E.

Areeda *et al.*, Antitrust Law ¶ 901a (2009).  As the Ninth Circuit has recognized, "in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources."  903 F.2d at 663.  That is the case here.  Plaintiffs have presented no evidence that Zuffa "did anything improper to drive competitors out," *id.* at 672, and the evidence of new market entry and continued growth of existing competitors makes clear that Zuffa's acquisitions were not anticompetitive.  *Sterling Merch., Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011) (affirming summary judgment challenging exclusive contracts and acquisitions where there was new entry).

### 4. Aggressive Competition with Rivals Is Not Unlawful.

Plaintiffs also challenge Zuffa's various efforts to compete with rival promoters, such as through (1) the use of "Counter-Programming," that is scheduling events at the same time as rivals, Ex. 70, Singer I ¶¶ 52-58; (2) the retention of control over fighter video clips, *id.* ¶ 74; (3) the threat of litigation, *id.* ¶¶ 59-61; and (4) settlement with a competitor, HDNet LLC, *id.* ¶ 62. Plaintiffs may not condemn aggressive competition: the Sherman Act "is not directed against conduct which is competitive, even severely so," but only "against conduct which unfairly tends to destroy competition itself."  *Eastman* v. *Quest Diagnostics Inc.*, 724 F. App'x 556, 557 (9th Cir. 2018).  And threatening litigation or settling with rivals is not anticompetitive where, as here, the litigation and settlements are bona fide and not a sham.  *Kottle* v. *Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998).

### 5. Plaintiffs' Monopsony Broth Arguments Based on Conduct that Is Not Anticompetitive Fail.

Plaintiffs' efforts to rely on legal and procompetitive acts are unavailing.  While it is permissible for Plaintiffs to analyze the "combined" effect of a number of anticompetitive acts, this inquiry "does not transform otherwise proper conduct into anticompetitive conduct."  *Crowder* v. *LinkedIn Corp.*, 2023 WL 2405335, at *7 (N.D. Cal. Mar. 8, 2023).  In other words, any "overall combined effect" analysis does not permit Plaintiffs to "throw into the mix every potential allegation of misconduct" without regard as to whether such conduct is truly anticompetitive.  *Id.*; *see also Masimo Corp.* v. *Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *5-6 (C.D. Cal. June

10, 2004) ("clearly legal acts" cannot "bolster a plaintiff's antitrust case").  Because "it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition," Plaintiffs cannot establish their monopsony claim on the basis of aggressive competition.  *Rebel Oil*, 51 F.3d at 1433.

Plaintiff also cannot rely on a so-called "monopsony broth" that includes legal conduct. *City of Anaheim* v. *S. California Edison Co.*, 955 F.2d 1373, 1378 (9th Cir. 1992).  The Ninth Circuit recently reaffirmed this point in *Dreamstime.com, LLC* v. *Google LLC,* 54 F.4th 1130, 1140-42 (9th Cir. 2022).  There, after finding that each challenged action individually failed to constitute anticompetitive conduct in the relevant market, the Ninth Circuit affirmed that "there can be no synergistic result from a number of acts none of which show causal antitrust injury to the plaintiff." *Id*. at 1142. (quoting *Cal. Comput. Prods., Inc.* v. *Int'l Bus. Machs. Corp.*, 613 F.2d 727, 736 (9th Cir. 1979)).  Like in *Dreamstime*, none of the "individual actions alleged" by Plaintiffs rises "to anticompetitive conduct in the relevant market" for Fighter services, and thus, "their collective sum likewise does not." *Dreamstime*, 54 F.4th at 1142.

### III.   Zuffa Is Entitled to Summary Judgment on Plaintiffs' Monopolization and Monopsonization Claims.

This Court found in its August 9, 2023 Order that "in the course of briefing and arguing their motion for class certification, Plaintiffs have abandoned their theory raised in the CAC that liability flows from Defendant's monopoly power in the output market." ECF No. 839 at 20 n.20. Plaintiffs have not defended the allegations of their Complaint alleging monopoly power over venues, sponsors, and television networks.  Order Denying Motion to Dismiss, *Le* v. *Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159 (D. Nev. 2016).  Plaintiffs have conceded that they do not seek damages for Zuffa's alleged monopolization.  ECF No. 534 at 37 (stating "Zuffa's *monopoly* power is not relevant to their theory of injury").  Dr. Singer offered no opinions as to whether any of the alleged monopolization conduct was anticompetitive. Ex. 16, Singer Dep. I 259:4-261:11. The claims of a monopoly over venues, sponsors, and media outlets were always implausible on their face.  MMA rivals of the UFC are, and always have been, free to compete for contracts with

any of a long and constantly growing list of venues, sponsors, and media outlets throughout the United States.  SUF ¶¶ 28-30.

The Court's grant of class certification also applies only as to Plaintiffs' monopsony power theory, not a monopoly theory.  Defendants are accordingly entitled to summary judgment as to the monopolization claims of the Complaint.  *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (claims that do not "cause respondents to suffer a cognizable injury" must be dismissed on summary judgment); *Magnetar Techs. Corp.* v. *Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (affirming summary judgment where no causal antitrust injury); *Arminak & Assocs., Inc.* v. *Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1206-12 (C.D. Cal. 2011) (granting summary judgment as to conduct underlying an abandoned monopoly broth theory).

In the absence of claims of monopolization, the claims of monopsony fail as a matter of law.  As this Court noted in its ruling on the motion to dismiss, the Ninth Circuit has explained that "while it is theoretically possible to have a middleman who is a monopolist upstream but not downstream, this is a somewhat counterintuitive scenario."  *Le*, 216 F. Supp. 3d at 1163 (quoting *Syufy*, 903 F.2d at 663).  In *Syufy*, the Ninth Circuit asked the question, why, if a company had market power, would it take advantage of that power in one market where there was a monopsony and not in the market where there was a monopoly.  *Syufy*, 903 F.2d at 663.  That is now the question in this case.  "The answers to these questions are significant because, like all antitrust cases, this one must make economic sense."  *Id.*  Plaintiffs no longer have evidence of Zuffa taking advantage of its alleged monopsony in an monopoly market, which underscores that their monopsony power allegations make no sense.

Summary judgment is required here because Plaintiffs' claims of monopsony standing alone make no economic sense and instead are antithetical to principles of free competition.  An alleged monopsonist without power in a monopoly market, as the Ninth Circuit called such a firm, is a "paper tiger."  *Syufy*, 903 F.2d at 672.  As here—where Zuffa has built an MMA industry from a rusty cage and a trademark into a widely popular sport with multiple promoters—there was no basis to condemn the *Syufy* defendant as a matter of law: "The record here demonstrates in graphic

detail that Syufy's entry into the Las Vegas first-run movie market resulted in a vast improvement for movie distributors and consumers alike." *Id.*  Likewise, here, Plaintiffs' abandonment of their claims of monopoly power means that there can be no basis under the antitrust laws to condemn, rather than commend, the UFC for what it has accomplished.

### IV.   <u>Plaintiffs Have Not Shown Article III Standing Because They Have Not Shown Antitrust Impact to Every Class Member.</u>

Summary judgment is also warranted because Plaintiffs have identified no method for determining whether individual class members were injured, which means they cannot show Article III standing for each class member.  As the Supreme Court recently reaffirmed, "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2208 (2021).  While the Court has not addressed whether such standing must be proven "*before* a court certifies a class," *id.* at 2208 n.4, it is well settled that a class seeking to proceed past the summary judgment stage "must set forth by affidavit or other evidence specific facts" demonstrating standing.  *United States* v. *$133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012).

Plaintiffs fail to do so.  Dr. Singer's model purports to establish that, as the proportion of 30-month contracts increases, the share of Zuffa's revenue devoted to athlete compensation declines.  But at most, the model shows that the aggregate compensation pool would have been larger as a share of Zuffa's revenue but-for the challenged conduct.  That proves nothing about the impact on each *individual* fighter's pay.[12]

The compensation for each class member in Plaintiffs' but-for world where athletes were not "locked up" by Zuffa's contracts is necessarily an individualized inquiry, which cannot be determined in the absence of a fighter-by-fighter assessment as to how much each fighter was worth on the open market.  But Plaintiffs have not conducted such an inquiry.  Nor can Plaintiffs fill this gap by asserting that Zuffa has a common "compensation structure."   Ex. 70,

---

[12] Even accepting Dr. Singer's model on its own terms and assuming it could show individual damages, the model predicts negative damages for 14 of the highest-paid athletes, including Conor McGregor, one of the most famous MMA athletes in the world. Ex. 4, Topel I  ¶¶  281, Ex. 34; *see also* ECF No. 540-3, Nakamura Decl. ¶ 14 (these 14 athletes account for approximately 27% of the total event compensation paid over the Class Period).

1   Singer I ¶¶ 212-29.  Even assuming Zuffa had such a structure, any reliance on Zuffa's *existing*

2   structure would make no sense because Plaintiffs are challenging that very structure.  Ex. 49,

3   Singer II ¶ 198; Ex. 12, Singer Dep. II 389:15-24, 392:4-393:5 (proposing a different compensation

4   structure of 12-month or less contracts, with some level on non-exclusivity or co-promotion of

5   events).    Accordingly, Plaintiffs have failed in their burden to "set forth specific facts"

6   demonstrating Article III standing.  *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555 (1992).

7   **CONCLUSION**

8       For the foregoing reasons, Zuffa respectfully requests that the Court grant summary

9   judgment in its favor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2   Dated: October 24, 2023                    Respectfully Submitted,

3
                                               PAUL, WEISS, RIFKIND, WHARTON &
4                                              GARRISON LLP

5                                              By: *William A. Isaacson*
                                               WILLIAM A. ISAACSON (*Pro hac vice*)
6                                              (wisaacson@paulweiss.com)
                                               2001 K Street, NW
7                                              Washington, D.C.  20006
                                               Tel: (202) 223-7300; Fax: (202) 223-7420
8

9                                              DONALD J. CAMPBELL (State Bar No. 1216)
                                               (djc@campbellandwilliams.com)
10                                             J. COLBY WILLIAMS (State Bar No. 5549)
                                               (jcw@campbellandwilliams.com)
11                                             CAMPBELL & WILLIAMS
                                               710 South 7th Street
12                                             Las Vegas, Nevada 89101
                                               Tel: (702) 382-5222; Fax: (702) 382-0540
13

14                                             *Attorneys for Defendant Zuffa, LLC, d/b/a*
                                               *Ultimate Fighting Championship and UFC*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Zuffa's Renewed Motion for Summary Judgment was served on October 24, 2023 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.


*/s/ William A. Isaacson*
William A. Isaacson