# EXHIBIT 1

# Excerpts of Deposition of Lorenzo Fertitta

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon     )
Fitch, on behalf of             )
themselves and all others       )
similarly situated,             )
                                )
                 Plaintiffs,    )
                                )
     v.                         ) Lead Case No.
                                ) 2:15-cv-01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate      )
Fighting Championship and       )
UFC,                            )
                                )
                 Defendant.     )
_____ )


C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF LORENZO J. FERTITTA

Las Vegas, Nevada

March 23, 2017

9:09 a.m.


REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 49608

LORENZO J. FERTITTA - CONFIDENTIAL

### Page 30

1  a member of the Nevada State Athletic Commission in
2  1996 or 1997 and were a member for approximately four
3  years?
4       A.  Yes.
5       Q.  Okay.  And so, do you recall how long you'd
6  been off of the Nevada State Athletic Commission
7  before you and your brother Frank purchased the UFC
8  in January of 2001?
9       A.  I believe it was roughly six months.
10      Q.  And did you leave the Nevada State Athletic
11 Commission in anticipation of your purchase of UFC?
12      A.  No.
13      Q.  And what did you and your brother pay for
14 the UFC when you purchased it in January of 2001?
15      A.  The original purchase price at closing was
16 $2 million.
17      Q.  And did you have a role at UFC -- at the
18 UFC and then ultimately Zuffa that was something
19 other than simply owner?
20      A.  I did not have an executive title or an
21 executive role.
22          Being the what I would call the controlling
23 shareholder along with my brother, we certainly
24 weren't silent partners.  We were involved in the
25 business.  But I would say not in a management,

### Page 31

1  day-to-day, executive day-to-day role.
2       Q.  Is there a time when you came to take on
3  executive or day-to-day management duties at Zuffa?
4       A.  Yes.
5       Q.  Okay.  When was that?
6       A.  That was approximately 2007 or 2008.
7       Q.  And did you have a title at Zuffa?
8       A.  Yes.
9       Q.  And what was that title?
10      A.  Chief executive -- chairman and chief
11 executive officer.
12      Q.  That is chairman of the board?
13      A.  Yes.
14      Q.  And that was in 2007, you became chairman
15 of the board, approximately?
16      A.  Yes.  My testimony was 2007 or 2008.
17      Q.  Okay.
18      A.  I can't remember the exact month that I
19 went over there, but it was around that time.
20      Q.  Okay, understanding that.
21          At the time that you became chairman of the
22 board of Zuffa, who were the other board members?
23      A.  There were -- it was an LLC structure.
24          There was essentially me, my brother Frank,
25 and I believe Dana White would have been a board

### Page 32

1  member as well.
2       Q.  Okay.
3       A.  And by that time, Dana would have been an
4  equity partner in the LLC.
5       Q.  And did the composition of the board of
6  directors of Zuffa change at some time thereafter?
7       A.  Yes.
8       Q.  And how did it change?
9       A.  When we took a minority investment from
10 Flash Entertainment, they were able to appoint
11 someone to the board.
12          Their nominee was Marty Edelman.
13      Q.  There came a time when you sold Zuffa, LLC;
14 is that correct?
15      A.  Yes.
16      Q.  And when was that?
17      A.  That transaction closed in August of 2016.
18      Q.  And at the time that Zuffa was sold in
19 August of 2016, did Flash Entertainment continue to
20 have an equity interest up to the time of the sale?
21      A.  Yes.
22      Q.  And did Mr. Edelman continue to serve on
23 the board of directors at least up until the time of
24 the sale?
25      A.  Yes.

### Page 33

1       Q.  Okay.  Do you continue to hold any
2  position, either executive or nonexecutive position
3  with Zuffa?
4       A.  No.
5       Q.  Do you have a management or consulting
6  agreement with them?
7       A.  No.
8       Q.  Do you know if your brother, Frank
9  Fertitta, does?
10      A.  Yes.  I know that he does not.
11      Q.  Okay.  And how much was Zuffa sold for?
12      A.  The total closing value in debt plus equity
13 was 4,025,000,000.
14      Q.  4,025,000,000?
15      A.  Yes.
16      Q.  And who was the buyer?
17      A.  The buyer was a consortium of investors.
18 The lead investor and I would say I guess managing
19 investor was WME/IMG.
20          The balance of the investors that I'm aware
21 of, KKR, Silverlake Partners, and MSD Capital, which
22 is Michael Bell's family office invested in the form
23 of a preferred security.
24      Q.  In connection with the sale, did the
25 purchasers conduct due diligence?

LORENZO J. FERTITTA - CONFIDENTIAL

66

1  A. That is a good clarification. I wasn't
2  thinking in those terms.
3  Q. Okay. Going forward, I want to be clear,
4  so I don't have to be incorporating --
5      MR. ISAACSON: Does that affect your last
6  answer?
7  BY MR. DELL'ANGELO:
8  Q. I think it was incorporated into the
9  question, the prior answer.
10 A. Yes. It would affect my last answer. I
11 took the question as at any time, and that's why I
12 reflected back to the very early years when UFC first
13 started type of thing.
14 Q. I see. So would you like to clarify?
15 A. I'm sorry?
16 Q. Is there anything you feel that you need to
17 clarify?
18 A. Yes. Yes. During the time that I was
19 tenured at CEO of the company, I would say that --
20 relating back to your question, which I believe
21 was -- if you could just repeat the question and we
22 could start over, that would be fantastic.
23 Q. Sure.
24     During the course of your tenure as CEO and
25 chairman of Zuffa, did you come to the view -- did

67

1  you come to a view as to whether or not consumers
2  distinguished mixed martial arts from the UFC?
3  A. I believe that consumers, certainly
4  educated consumers, understood the difference between
5  UFC and mixed martial arts.
6  Q. Okay. And did that view change at any time
7  during the course of your tenure as CEO and chairman
8  of Zuffa?
9  A. No.
10 Q. During the course of your tenure as CEO and
11 chairman of Zuffa, did you ever come to believe that
12 the UFC had transcended the sport of MMA to become
13 the sport itself?
14 A. Yes. I felt like that UFC was the most
15 popular brand in the sport of mixed martial arts.
16 And that at times, as I mentioned, no different than
17 other industries where people say I'm going to get in
18 the Jacuzzi where Jacuzzi is actually a brand name.
19 You may not be getting into a Jacuzzi. Actually,
20 that represents a hot tub.
21     As I said, many times people say hand me a
22 Kleenex versus saying hand me a tissue. Many times,
23 people say give me a Coke versus just being a soda.
24     So I believe that UFC was the most
25 identified brand in the sport of mixed martial arts.

68

1  Q. And during the course of your tenure as CEO
2  and chairman of Zuffa, did you come to the view that
3  the real competitors of UFC were what else -- the
4  other things were happening in sports entertainment
5  rather than other MMA organizations?
6  A. Yes.
7      MR. ISAACSON: Objection to form.
8      THE WITNESS: Yes.
9  BY MR. DELL'ANGELO:
10 Q. Okay. And why is that?
11 A. The way I approached the business and
12 thought about the business was that, at the end of
13 the day, mixed martial arts, one of our events, UFC,
14 is a form of entertainment and sports. Sports
15 entertainment, clearly. Which means, when you think
16 about our core demographic, young males, 18 to 34,
17 was the demographic we primarily targeted, we had to
18 think about what else was consuming their time for
19 that entertainment time, that period.
20     So we actually spent a lot of time talking
21 about it internally, doing analysis, thinking about
22 it. It affected where we would put an event. It
23 affected what date we would put an event on because
24 we felt like not only were we competing with other
25 promoters and leagues in mixed martial arts but also

69

1  other sports, the NFL, the NBA, Major League
2  Baseball.
3      And certainly I always wanted to stay away
4  from March Madness. Wanted to stay away from boxing,
5  major boxing events, primarily a Floyd Mayweather
6  fight, Manny Pacquiao fight.
7      In addition to that, we would do some
8  analysis looking at what theatrical releases were
9  coming out, you know. Probably not a great idea to
10 hold a big pay-per-view or pay-per-view or do an
11 event on the same night that maybe Avatar or X Men or
12 some other movie that clearly was targeting our core
13 demographic was going to be released.
14 Q. Okay. And during the course of your tenure
15 as chairman and CEO of Zuffa, did there come a time
16 when, you know, the top 10 fighter in every MMA
17 division was under the UFC's umbrella?
18     MR. ISAACSON: Objection to form.
19     THE WITNESS: I don't know.
20 BY MR. DELL'ANGELO:
21 Q. I'd like to show you a video clip.
22 A. Um-hmm.
23     THE REPORTER: You don't need me to record
24 that, right?
25     MR. DELL'ANGELO: No. We're going to

18 (Pages 66 to 69)

146

1  Q.  Versus some other MMA promotion?
2  A.  Maybe they would have had the same feeling
3  with another one.  I can just tell you the experience
4  that I had in speaking to athletes.
5  Q.  Okay.  And by 2014, do you agree that Zuffa
6  strove to make sure that the events that it produced
7  were headlined by fighters who were ranked in the
8  top 10 in mixed martial arts?
9  A.  Yes, but it depends on what events you're
10 referring to because there were a number of events in
11 the UFC.  We had a number of events which typically
12 are on pay-per-view or a few times were on broadcast,
13 on Fox broadcast.
14     We had fight nights that were predominantly
15 on cable.  That would be Fox Sports 1 and Fox
16 Sports 2.
17     And then, we had some fights we did, as I
18 mentioned Fight Pass, which was a digital
19 over-the-top platform.
20     It wasn't so much about fighters being as
21 much in the top 10, but when you're talking about the
22 numbered events, typically, those are headlined by
23 the more popular or more accomplished fighters.  So
24 by default, they would probably be in someone's
25 top 10 because there's, you know, different rankings

147

1  out there at any given time.
2  Q.  Throughout of your testimony today, I
3  believe --
4  A.  Yes.
5  Q.  -- you've referred to the UFC a number of
6  times as a brand.
7     Is that a fair statement?
8  A.  Yes.
9  Q.  And in your view, by 2010, what did that
10 brand represent?
11 A.  In my view, the UFC represented best in
12 class in combat sports, it represented best in class
13 in sports in general.  It was finally a recognizable
14 brand.
15     You've got to understand, when we bought
16 the UFC in 2001, it was probably the most tarnished
17 brand in sports.  I mean, it's hard to get worse than
18 Senator John McCain calling us human cockfighting and
19 then living with that for a number of years as the
20 moniker that when people hear the word UFC, the first
21 thing that comes to mind is human cockfighting.
22     So through the work and the capital we
23 invested and the business strategies that we put in
24 place, yes, by 2010, I believe that the brand UFC
25 represented something that was a positive.

148

1  Q.  And did that brand by at least 2010 also
2  indicate to consumers that the UFC's fighters were
3  the best in the world?
4  A.  That's what we -- yes.  That's what we set
5  up to accomplish from a branding standpoint.
6     Whether or not they were, I don't know.
7  But in the eyes of the consumer, the idea was that if
8  a fighter was in the UFC, it meant that they were one
9  of the best fighters in the world.
10 Q.  And so, fair to say that from a consumer's
11 perspective, even if the consumer didn't necessarily
12 know the fighter by name, the fighter -- or, excuse
13 me -- the consumer would know that when it was
14 watching a UFC event, it was seeing the best
15 fighters, you know, out there at the time?
16    MR. ISAACSON:  Objection, calls for hearsay
17 and mind reading.
18    THE WITNESS:  Yes.  From the standpoint of
19 our branding and our marketing, the idea was that
20 when the consumer saw that there was a UFC fight,
21 they would think they were -- or, assume that they
22 were watching the best.
23    It's no different than if you go to -- if
24 you go to Tiffany's and buy a diamond, in the
25 consumer's mind, for whatever reason, it's better

149

1  than the same exact diamond that maybe you buy down
2  the street.  It's the same product, but because it's
3  in the little turquoise box, there's perceived value
4  in that brand.  Brands have value, and we believe
5  that we created consumer value in the UFC brand.
6  BY MR. DELL'ANGELO:
7  Q.  Regardless of the value of the brand,
8  there's differentiation in the product that different
9  brands sell, isn't there?
10 A.  Yes.
11    MR. ISAACSON:  Objection to form.
12    THE WITNESS:  Yes.
13 BY MR. DELL'ANGELO:
14 Q.  Okay.
15 A.  Some brands do a better job than others.
16 Q.  Right.  But are you familiar with the
17 jeweler Van Cleef & Arpels?
18 A.  Yes.
19 Q.  And are you familiar with a jeweler Zales,
20 for example?
21 A.  Yes.
22 Q.  Do you think that they are selling
23 comparable products or products of equal value?
24    MR. ISAACSON:  Objection.
25    THE WITNESS:  I would say that Van Cleef &

LORENZO J. FERTITTA - CONFIDENTIAL

194

1  going to be aired on Fox Sports 1.
2       So we looked at the card.  Obviously, the
3  main event of the main card was the biggest fight of
4  the night.  But we would pepper in fights all
5  throughout the entire night.  Also, as a way to get
6  fans to show up to the venues early because they were
7  fights that mattered.  It was part of our business
8  strategy.
9       **Q.  When the UFC would put on a pay-per-view**
10 **event, were all the fights on the card televised?**
11      A.  In the early days, no.  And then, at some
12 period, when we were on Spike TV, prior to our Fox
13 contract, we actually learned from Affliction.  They
14 came up with a great idea.  They did their first
15 pay-per-view.  It was a smashing success for them.
16 And they broadcast their prelims on cable TV.
17      We were like, that's a really good idea.
18 And pretty much from there on out, I think we started
19 broadcasting our prelims on Spike.
20      And then, once again continued do that as a
21 strategy with Fox.
22      And then, when technology developed to the
23 point where you could do live streaming, we added
24 Fight Pass -- or actually, I just reminded myself, we
25 first started broadcasting the first two or three

195

1  fights on Facebook.  We were actually the first
2  sports organization to broadcast and stream a live
3  event on Facebook in a way to get broad distribution
4  and eyeballs.
5       So over time, it evolved into that, yes.
6       **Q.  And despite Affliction's great idea,**
7  **they're no longer in business either, right?**
8       A.  They are not in business, no.
9       **Q.  Have you ever sought to calculate what**
10 **percentage of Zuffa's revenue is paid to fighters as**
11 **fighter compensation?**
12      A.  Yes.
13      **Q.  And have you made that calculation for**
14 **every year that the company is in business?**
15      A.  Yes, I'm pretty confident we have.
16      **Q.  And is it fair to say that's probably a**
17 **relatively easy calculation to make if you have**
18 **financials or the income statements?**
19      A.  Yes.
20      **Q.  Okay.  So do you know what the percentage**
21 **of revenue, of Zuffa's revenue that was paid to**
22 **fighters as fighter compensation in 2009?**
23      A.  I don't specifically -- no, I don't
24 specifically know the amount paid in 2009.
25      **Q.  Okay.**

196

1       A.  I have a general percentage of what
2  percentage that's paid to fighters over time.
3       **Q.  Okay.  And what is that?**
4       A.  So when looking at UFC fighter pay, a lot
5  of times, people want to try to compare us to other
6  sports' percentage, but there are some issues there.
7       And one of the things I've always felt
8  strongly about and believe is you've got to put
9  apples for apples when you're starting to compare
10 percentages.  You can get -- you can get false
11 information if you don't otherwise do that.
12      UFC is very different from other sports
13 entities and sports leagues.  And what I mean by that
14 is that we bear all the cost of production and
15 marketing for an event compared to, say, other
16 leagues which, typically what they do is they take a
17 license from a network, and they essentially hand
18 that network the responsibility of broadcasting that
19 event, promoting that event, marketing that event.
20      So there's significant built-in costs that
21 we have to absorb, which inflates our revenue number
22 relative to other sports on an apples-for-apples
23 basis.
24      But with that said, I think we generally
25 over the last, I would say, five years-ish would be

197

1  around 20 percent, plus or minus.  It would vary
2  year-to-year based on pay-per-view and things like
3  that.
4       **Q.  I apologize, I think I didn't understand**
5  **something you said.  I would like to be clear.**
6       **It sounded like you said that the fact that**
7  **Zuffa pays for its production inflates its revenue or**
8  **increases its revenue number.**
9       **Is what you meant to say?**
10      A.  Yeah.  Yes.
11      **Q.  And can you explain what that means?**
12      A.  Sure.  Sure.
13      So if you're another sports league and a
14 network pays you a hundred dollars because that
15 network is going to bear the expense of all the
16 production and marketing -- and by the way, they're
17 also going to sell ads and generate revenue on that
18 end, that revenue and that expense doesn't sit on the
19 income statement or balance sheet of that company.
20      So they get the license fees, and they
21 don't have the same expenses associated with the
22 event that we would because we're actually incurring
23 all those costs.
24      **Q.  Okay.  Can you think of any years when**
25 **fighter pay as a percentage of revenue was below**

50 (Pages 194 to 197)

LORENZO J. FERTITTA - CONFIDENTIAL

198

1  **20 percent at Zuffa?**
2     A.  I'm sure there were.
3        I can remember that there was a point in
4  time when our business really accelerated, honestly,
5  beyond anything that we had ever budgeted or ever
6  anticipated.  That would have been around 2006, I
7  would believe, because we were able to secure our
8  first television contract in 2005 with Spike TV and
9  Viacom.
10       Due to the success of the ultimate fighter
11 reality show that we produced and paid for, it
12 increased the profile of the brand, kind of like I
13 was talking about before.  It's almost like when one
14 of these promotions signs a deal with a major media
15 company, you just flip the switch, and all the
16 sudden, the business changes overnight, and that's
17 essentially what happened with us.
18       I also believe that we had some outside
19 revenues in the year that we did UFC 100, I think
20 that was around 2010.  Once again, just exceeded any
21 budgets or forecasts or anything that we had.  For
22 whatever reason, we just had a lot of big fights that
23 year.
24       UFC 100 became this event that we never
25 anticipated.  We weren't even thinking about it as a

199

1  special event, and then, we started getting queries
2  and questions from fans saying:  What are you going
3  to do for UFC 100?  Nothing different.  Well, you
4  need to because it's a seminal moment because of the
5  enumeration of it.  And that event ended up
6  performing exceptionally well.
7     **Q.  Have you from time to time compared the**
8  **percentage of revenue paid by Zuffa to fighters to**
9  **the percentage of revenue paid to athletes in other**
10 **sports?**
11    A.  Yes.
12    **Q.  Do you recall doing so publicly?**
13    A.  Yes.
14    **Q.  What do you recall about that?**
15    A.  I recall -- first of all, I will say that I
16 did a lot of interviews.  Like I mentioned before, a
17 lot of interviews.
18       But I remember doing a specific interview
19 with ESPN where the subject matter of their interview
20 was specifically fighter compensation and fighter
21 payment.  That's why I recall that specifically.
22    **Q.  Right.  And what do you recall saying, if**
23 **anything, about the percentage of revenue that Zuffa**
24 **paid to fighters compared to the percentage of**
25 **revenue paid by other sports --**

200

1     A.  Sure.
2     **Q.  -- that --**
3     A.  Sure.  My recollection of that is that I
4  said that we felt like we compared favorably to other
5  sports.
6        I know a lot of other sports throw out
7  these terms like, you know, we pay 50 percent to our
8  athletes.
9        And what I tried to explain to the reporter
10 who was asking me questions was something similar to
11 what we talked about, that it's very hard to compare
12 the UFC with those other established leagues because
13 the business models are different from that
14 standpoint, we have to bear more overall costs for
15 the event.
16       Unfortunately, what I failed to point out
17 was that it really is completely unfair for anybody
18 to be comparing UFC's financials to that of the NFL
19 or Major League Baseball or the NBA.  It's really not
20 a comparison, and really, a more comparable sports
21 league would have been something more like Major
22 League Soccer, which had about the same -- been
23 around for almost the same period of time, whereas,
24 you know, I think baseball has been around for over a
25 hundred years and the NFL has been around for a very

201

1  long time and basketball since the '40s or '50s.
2     **Q.  Do you recall comparing internally with**
3  **your colleagues at Zuffa the percentage of revenue**
4  **paid to fighters versus the percentage of revenue**
5  **paid to players in the NFL?**
6     A.  Yes.  I'm sure we talked about that.
7     **Q.  What do you recall about, if anything,**
8  **about the comparators that you may have come up with?**
9     A.  I recall saying this isn't a very good
10 comparison because the NFL generates roughly 12- or
11 $13 billion a year, and at the time, we were probably
12 generating 4- to $500 million a year, so it's a
13 completely irrelevant comparison.  Let's find
14 something that's more comparable, and that's when we
15 started thinking about things like Major League
16 Soccer.
17    **Q.  And when was that?**
18    A.  I don't know specifically.  You know,
19 obviously, it's an ongoing conversation, something
20 that we would look at from time to time.
21    **Q.  Do you recall generally?**
22    A.  I would say over the past -- I would say
23 probably since 2011, 2010, somewhere in that
24 neighborhood.
25    **Q.  That you shifted the thinking to NFL -- a**

51 (Pages 198 to 201)

LORENZO J. FERTITTA - CONFIDENTIAL

242

1  would --
2      Q. Sure.
3      A. -- be great.
4      Q. Did Zuffa ever seek to prevent the
5  development of mixed martial arts brands that might
6  compete with Zuffa or mixed martial arts related
7  brands that Zuffa anticipated that it might develop?
8      A. No.
9      Q. Okay. Did you ever take the view that
10 Zuffa should take steps to stop competing MMA-related
11 brands from legitimizing themselves because they
12 might be a competitive threat to Zuffa?
13     A. I'm not sure I understand what that means
14 because I don't know what you're referring to.
15     Q. Sure.
16         Let me have marked as Exhibit, I think it's
17 25, an email beginning at Bates ZUF-00342075 through
18 77.
19         (Exhibit 25 was marked for
20         identification by the reporter.)
21 BY MR. DELL'ANGELO:
22     Q. Mr. Fertitta, would you take a moment to
23 look at Exhibit 25 --
24     A. Yes.
25     Q. -- and let me know when you're done.

243

1         (Pause in proceedings.)
2         THE WITNESS: Okay.
3  BY MR. DELL'ANGELO:
4      Q. So one of the -- what do you understand to
5  be the basic substance of the email of Exhibit 25?
6      A. I understand that Cagefighter and
7  MMA Authentics were a retail brand.
8         And what they wanted to do was have
9  exposure in our broadcast. Obviously, as I mentioned
10 before, the broadcast that we owned that we paid for
11 and put the capital up for.
12     Q. Right. And the email at the bottom of the
13 first page of the document is from Randy Klein.
14        Who is Randy Klein?
15     A. Randy Klein, I remember the name, I believe
16 he worked in our sponsorship department.
17     Q. And if you look at the second page of the
18 document, the email from Mr. Klein, the first full
19 sentence begins:
20            "If we allow a brand to legitimize
21            itself at a major retailer off of
22            our backs and the brand becomes
23            successful because of the exposure
24            we're giving it, it hurts our
25            ability to secure the UFC brand and

244

1            limits our opportunity to become the
2            brand of choice of Walmart. There's
3            too much at stake and revenue and
4            brand dominance if we allow this MMA
5            Elite to leverage us for this
6            purpose. From a competitive
7            merchandise perspective, we should
8            kill this."
9         Do you see that?
10     A. Yes.
11     Q. What do you understand Mr. Klein to be
12 saying?
13     A. Basically, what he's saying is that he
14 doesn't think we should do a sponsorship deal with
15 MMA Elite and Cagefighter.
16        And his reason for that is that at the
17 time, we were trying to build our brand of
18 merchandise, UFC merchandise.
19     Q. Right.
20     A. And from a business judgment standpoint, we
21 felt like that any -- for the most part, any
22 reasonable business, if they had a product, would not
23 let their competitor advertise or sponsor within
24 their business.
25        So it would be like, I own casinos,

245

1  Red Rock Resorts. If I went to Jim Murren at MGM,
2  and said, hey, I want to put Red Rock Resorts logos
3  on all the blackjack felts at MGM, I think I would
4  pretty much get the same response, however, maybe
5  more visceral.
6         That's not a general practice that
7  businesses that compete with each other do.
8      Q. Does that same concept explain why fighters
9  are not permitted to have over sponsors?
10     A. At one time -- there's really two -- two
11 reasons.
12        Actually, yes, that is a reason. We
13 actually -- "we" meaning UFC -- had a relationship
14 with an online poker business called Ultimate Poker.
15        So it was standard practice that if the UFC
16 had a category -- it didn't prevent fighters from
17 having other competitors in that category as
18 sponsors, they just couldn't wear it within our
19 broadcast.
20        It's the same idea of beer. We had a deal
21 with Bud Light, and the deal that we did with
22 Bud Light didn't prohibit athletes, our athletes,
23 from having sponsors with other beer companies, they
24 just couldn't walk into The Octagon or have exposure
25 on our television program that we own and we paid for

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

LORENZO J. FERTITTA - CONFIDENTIAL

246

1  that would have a competitor to Bud Light on their,
2  being their shorts, T-shirt, hat. I believe it's
3  standard in business as well.
4      Q. To the extent that a fighter had such a
5  sponsorship, that is, with a separate beer brand, for
6  example, am I correct that the UFC also precluded the
7  fighter from associating himself in any way with the
8  UFC as it related to the sponsorship?
9      A. So if a fighter had a sponsorship
10 relationship with a competing brand, your example, to
11 Bud Light, they absolutely could have that
12 relationship, and they could use their likeness or
13 whatever they wanted; they just could not use the UFC
14 along with it because we own the UFC license.
15     Q. Right. So the fact that an individual
16 athlete like a UFC fighter had participated in the
17 UFC, he or she couldn't use that background to
18 facilitate his sponsorship relationship and revenue,
19 right?
20     A. I don't know that that is the case.
21        He certainly couldn't -- he or she, I
22 should say, certainly couldn't use the UFC logo, the
23 UFC trademarks. The fact that he or she was a UFC
24 fighter is history. I mean, yes, I mean, it is what
25 it is.

247

1         But it's similar to other sports. I get a
2  kick every time I see Shaquille O'Neal doing Icy Hot
3  commercials, and I never see him wearing a Miami Heat
4  jersey or an Orlando Magic jersey or a Los Angeles
5  Lakers jersey. It's standard practice when
6  professional athletes do sponsorships outside of
7  something that their team or their league has some
8  type of relationship with that they're not allowed to
9  use the marks of the team or the league, et cetera.
10     Q. Is that true in individual sports as well?
11     A. I don't know.
12     Q. Has Zuffa ever used threats to intimidate a
13 fighter?
14     A. No, not in my opinion.
15     Q. Has it ever used a threat to scare a
16 fighter?
17     A. No.
18     Q. Has it ever used a threat to gain leverage
19 in a negotiation with a fighter?
20     A. No. We've taken some hard negotiating
21 positions for sure. I wouldn't call them threats,
22 though.
23     Q. Has Zuffa ever used a threat to negatively
24 impact a fighter's value to a potential competitor?
25     A. Not that I'm aware of.

248

1      Q. Do you recall ever receiving complaints
2  from fighters or their managers that the UFC or
3  members of the UFC had spoken with fighters in a
4  threatening manner?
5      A. I'm sure that I had some conversation --
6         MR. ISAACSON: Objection to form.
7         THE WITNESS: I'm sure that I've had some
8  conversations with fighters and managers maybe that
9  weren't happy with negotiations, maybe because they
10 weren't going the way they wanted them to, maybe
11 because -- maybe because, from a stylistic
12 standpoint, they weren't happy with that.
13        But when you use the word "threat," I would
14 say no, not a threat.
15     Q. Okay.
16     A. Can I take you up on that bathroom break
17 for a second?
18     Q. Absolutely.
19     A. I spoke a little bit too soon.
20        How long has it been?
21        MR. ISAACSON: We've been going for a
22 little over two hours.
23        THE WITNESS: Two hours?
24        THE VIDEOGRAPHER: We're going off the
25 record at approximately 4:09 p.m.

249

1         (There was a recess taken.)
2         (Exhibit 26 was marked for
3         identification by the reporter.)
4         THE VIDEOGRAPHER: We're going back on the
5  record. The time is approximately 4:26 p.m.
6  BY MR. DELL'ANGELO:
7      Q. Mr. Fertitta, you have before you a
8  one-page email that's been marked as Exhibit 26.
9         Have you had an opportunity to take a look
10 at it?
11     A. Yes.
12     Q. The email is an email from Anthony McGann
13 to you.
14        Do you see that?
15     A. Yes.
16     Q. And who is Anthony McGann?
17     A. Anthony McGann is a gentleman who manages
18 some fighters. He's based in middle England,
19 northern England, somewhere of that nature.
20     Q. And he manages Quinton Jackson, correct?
21     A. He did at one point, yes.
22     Q. And you in this email -- and Mr. Jackson
23 ultimately came to fight for the UFC, correct?
24     A. Mr. Jackson, Quinton has fought for us on
25 numerous occasions and throughout that period. He's

63 (Pages 246 to 249)

LORENZO J. FERTITTA - CONFIDENTIAL

250

1  been with us, he's not been with us.  He's fought for
2  competitors, he's come back to fight for us.  He's
3  moved around quite a bit.
4      Q.  In November of 2009, at the time of this
5  email, was Mr. Jackson under contract with UFC?
6      A.  Yes, I believe he was.
7      Q.  Okay.  And if you -- if you look a little
8  bit down, about halfway down the document, there's a
9  reference from Mr. McGann about Mr. Jackson being
10 concerned about recent quotes of a threatening manner
11 by Mr. White relating to Mr. Jackson.
12     Do you see that?
13     A.  I do.
14     Q.  Okay.  Does that refresh your recollection
15 that at least one manager contacted you about
16 concerns that he had about members of the UFC making
17 threats regarding fighters?
18     A.  Yes.  You know, specifically this
19 situation.  Obviously, situations are different.
20     I would say Quinton Jackson is -- otherwise
21 known as Rampage, that's what most people know him
22 by.  He's a very interesting guy.  I actually got to
23 know him pretty well.  He has one of the better
24 personalities of any of the fighters that I got to
25 build a relationship.  Funny guy, very funny guy.

251

1      The thing about Quinton, though, is there
2  is a very distinct pattern in his behavior.  When
3  Quinton originally fought for Pride, before he fought
4  for us, he had a pattern of continually complaining
5  about Pride, making accusations about Pride, whether
6  they were -- you know, how they treated him, whether
7  they were true or not, I don't know.
8      He then went on to fight at WFA because
9  when we acquired Pride, we wanted him to come with us
10 and he chose not to, he went with WFA.  And I believe
11 he continued on to make accusations about WFA, you
12 know, the way that they treated him and the event was
13 no good and they were doing wrong by him.  They were
14 giving him the wrong kind of opponents, they gave him
15 a wrestler, you know, on and on and on, whatever.
16     And then, when he came into the UFC,
17 originally, you know, the relationship was very good.
18 As I mentioned, I traveled with Quinton, got to know
19 him pretty well.  Quinton has issues, he has issues.
20     There was an incident actually where
21 Quinton had fought Forrest Griffin for the
22 heavyweight title, he was the heavyweight champion.
23 He lost the fight to Forrest Griffin, and Quinton had
24 a bit of a meltdown.
25     Immediately, we contacted him, me and Dan

252

1  took him out to dinner, and it was clear to me that
2  Quinton needed to go home and rest and take some time
3  off because he wasn't making sense during the dinner
4  at all, and I thought that there was maybe something
5  wrong with him mentally.
6      So I called our flight department, and we
7  talked about the planes.  And I said:  I don't want
8  Quinton to fly commercial back to Orange County where
9  he lives.  I want one of our planes to take him.  And
10 I actually had one of my assistants pick him up and
11 actually get on the airplane with him and fly him
12 from Las Vegas to Orange County to make sure that he
13 got home safe because I was concerned about his
14 mental well-being.
15     The next day or it may have been the day
16 after, we got a call that Quinton had been arrested,
17 that he had essentially had a meltdown.  He had a big
18 monster truck, meaning truck with big tires that runs
19 over other things, you know.
20     And he was running over other cars and
21 driving recklessly and was fairly incoherent when the
22 police finally got to him, and they had put him in
23 jail.
24     Quinton didn't really have anywhere to go
25 at the time, anyone to call.

253

1      So Dana decided to, once again, take it
2  upon himself and myself, we decided he should fly to
3  Orange County.  And Dana went down.  We hired an
4  attorney.  We got Quinton released by posting his
5  bail.
6      I then hired him another attorney that was
7  an expert in Orange County in matters of this sort.
8  I flew down to California, had lunch, interviewed the
9  attorney, talked to Quinton, held his hand through
10 the process and did many things for Quinton.
11     So there's a pattern of Quinton never being
12 happy.
13     Under this circumstance, I would say that
14 it probably follows the similar pattern of his
15 behavior once again.  I feel like Quinton is kind of
16 near and dear to my heart.  I really do like the guy,
17 and I've done a lot of great things to try to help
18 him along.
19     I know that he ended up leaving us for
20 Bellator.  He wanted to fight out the last contract
21 on his fight contract, and obviously, we allowed him
22 to do that.
23     We didn't want him to leave, but he chose
24 to leave, and he went to Bellator and immediately
25 went on to publicly broadcast a press conference to

LORENZO J. FERTITTA - CONFIDENTIAL

286

1  experienced fighters.
2      That was just my way of trying to explain
3  to the media and to people who asked how fighters are
4  compensated, not necessarily any matrix or anything
5  like that.
6      Q.  So is it your testimony that no such matrix
7  existed at the company, that is, a matrix of fighter
8  pay?
9      A.  As a standard tool -- no, I'm not saying
10 that.
11     As a standard tool for management, we had
12 what we'll call minimums.  And what that would mean
13 was that most fighters when they first come in in
14 their first fight in the UFC -- once again, not all
15 but most fighters would sign for what we would call a
16 minimum amount, which I believe is 10,000 to show,
17 10,000 to win, it could be 12,000 to show, 12,000 to
18 win.  I don't know where it is right now.
19     Q.  Could you look at Exhibit 24, page 33 of
20 178.
21     Do you have that before you?
22     A.  I do.
23     Q.  Would you look in the middle of the page,
24 the row, it's a kind of wide row, and the "From" is
25 from your cellphone number, 1            to

287

1  1-            .
2      Do you see that row?
3      The timestamp is 11-14-2013 at 4:45:36 p m.
4      A.  This is page 173?
5      Q.  I'm sorry.  Page 33 of 178.
6      A.  Okay, my bad.
7      Q.  In Exhibit 24.
8      A.  4:45:36 is the timestamp?
9      Q.  Yes.
10     A.  Okay.
11     Q.  Take a moment to read that text to
12 yourself, but in it, you refer to a pay scale for
13 fighters, correct?
14     A.  Let me read it first.
15     Okay.
16     Q.  In that text message, you refer to a pay
17 scale for fighters, correct?
18     A.  I'm referring to a scale relative to a
19 weight class, and I will tell you that we didn't have
20 pay scales for weight classes.
21     However, fighters tend to within certain
22 weight classes, certainly not all the time, tended to
23 have compensation that was in the same general, I
24 would say, general amounts, not specifically the same
25 by any means.

288

1      And you know, many times, you would have a
2  fighter, for instance, I believe this talks about --
3  I guess I don't know what weight class we're talking
4  about here, but in certain weight classes that varied
5  dramatically from the other fighters.
6      Q.  So what pay scale were you referring to?
7      A.  I'm not sure because I don't know what
8  fighter I'm talking about here, and I don't know what
9  weight class we're talking about, so I don't know.
10     Q.  Let me show you what I'm marking as the
11 next exhibit, 29, I believe.
12         (Exhibit 29 was marked for
13         identification by the reporter.)
14 BY MR. DELL'ANGELO:
15     Q.  Do you have Exhibit 29 before you?
16     A.  I do.
17     Q.  Do you recognize the document?
18     A.  I do.
19     Q.  What do you recognize it as?
20     A.  This document was an analysis that I had
21 asked for from Deni.
22     Q.  Batachvarova?
23     A.  Yes, from Deni Batachvarova.
24     I was interested in increasing the minimum
25 fighter pay, and what I wanted to see relative to the

289

1  minimum fighter pay was what the financial impact on
2  the company would be at various levels of minimum
3  fighter pay.
4      You know, typical financial analysis that I
5  think most companies do.
6      Q.  Could you look back at Exhibit 24, please.
7  Just get that in front of you.
8      Are you familiar with a fighter, I think we
9  mentioned him earlier today, Gilbert Melendez?
10     A.  Yes, I am.
11     Q.  Okay.  And did you engage in negotiations
12 with Mr. Melendez to contract to fight with the UFC?
13     A.  What was the last part of your question?
14     Q.  Did you engage in negotiations with
15 Mr. Melendez or his representatives to contract to
16 fight for the UFC?
17     A.  No, I don't remember contracting -- I
18 should say negotiating with him or his
19 representatives when he originally fought for the
20 UFC.
21     However, I was involved -- eventually, what
22 happened was Gilbert Melendez decided that he wanted
23 to fight out the term of his contract so that he
24 could go test the free agency market, free to deal.
25 And it was during that process that I remember, I

73 (Pages 286 to 289)

LORENZO J. FERTITTA - CONFIDENTIAL

290

1  recall being mostly involved in was that process.  I
2  was very involved in that.
3      Q.  And how did that process conclude?
4      A.  It concluded with a very long, drawn-out
5  negotiation.
6          My recollection is that Gilbert -- you
7  know, we had made Gilbert offers before his contract
8  expired.  He decided he didn't want to do that.
9          So once again, he fought out his last
10 fight, he wanted to test free agency.  And he went
11 out and was looking for offers from other promoters.
12         I don't know all of the different
13 promotions that he talked to or that he received
14 offers from, but ultimately, my understanding is that
15 Bellator made him a significant offer that ended up
16 being very much to his advantage.
17     Q.  But he, nevertheless, ended up contracting
18 with UFC, correct?
19     A.  Yes.
20     Q.  Would you look at page 75 of Exhibit 24,
21 please.  That's at ZFL-1897726.
22     A.  Yes.
23     Q.  And if you go down to about the middle of
24 the page, in the first-hand column in the from,
25 there's a text from Dana White to your 6097 number,

291

1  that's February 25, 2014 at 7:00 and 4 seconds p m.
2         Do you see that?
3      A.  I do.
4      Q.  And as you read across, it seems to refer
5  to negotiations that you had with a Melendez and
6  another dude.
7         Do you have an understanding of what
8  Mr. White is referring to there?
9      A.  Yes.
10     Q.  What is he referring to?
11     A.  He's referring to -- I believe he's
12 referring to Eddie Alvarez who was a Bellator
13 fighter.
14     Q.  He would be the other dude?
15     A.  Eddie, I'm assuming, was the other dude
16 because he had done the same thing but in Bellator
17 where he had decided to fight out the last contract
18 in Bellator and test the free agency market.
19     Q.  And Mr. White's text continues through the
20 next line.  Do you see that?
21     A.  Yes.
22     Q.  I'll read the two texts for you.  It says:
23         "Bro, you know I love you to
24         fuckin' death as it is, but what you
25         pulled off this week with Melendez

292

1          and 'other dude' is fuckin' badass.
2          Fuckin' cut throat nasty business
3          like you see in the movies.  Good
4          shit, homie.  Congrats."
5          And what's your response there?  Would you
6  read that, please.
7      A.  "We got to keep taking these
8          Fuckers' oxygen till they tap out.
9          We have --"
10         I don't see the end of that.
11     Q.  And who are the fuckers' oxygen that you
12 needed to keep taking, as you're referring to in that
13 text?
14     A.  I believe it was referring to Bellator.
15     Q.  All right.  I think -- why don't we take a
16 break.  We're coming to a close on our record time.
17         THE VIDEOGRAPHER:  We're going off the
18 record at approximately 5:26 p m.
19         (A recess was taken.)
20         THE VIDEOGRAPHER:  We're going back on the
21 record.  The time is approximately 5:37 p m.
22         MR. DELL'ANGELO:  So we'll note for the
23 record that in light of counsel's objections about
24 the introduction of publicly available documents that
25 were not produced in discovery, the fact that the

293

1  Mercer issue has not been resolved and that we have
2  not received a privilege log, we're not going to
3  close the deposition, but we don't have any further
4  questions subject to those issues.
5          MR. ISAACSON:  I will note that the
6  objection to which you referred to, I did not -- I
7  did not stop you from asking any of your questions on
8  the basis of that objection in all of your questions.
9  You had the ability to ask all of your questions.
10         Are you done?
11         MR. DELL'ANGELO:  Yes.
12         MR. ISAACSON:  Okay.
13         THE VIDEOGRAPHER:  No further questions
14 from anyone?
15         MR. ISAACSON:  I'm going to just ask a few
16 questions while we're here.
17
18             EXAMINATION
19 BY MR. ISAACSON:
20     Q.  Do you have Exhibit 29 -- actually,
21 Exhibit 27, sir?
22     A.  Yes.
23     Q.  Exhibit 27 was an article that you were
24 shown with comments about Dana White and Quinton
25 "Rampage" Jackson, and you were asked to look at the

LORENZO J. FERTITTA - CONFIDENTIAL

294

1  last paragraph of the article.
2      And the second-to-last paragraph says:
3      "Jackson," referring to Rampage
4      Jackson, "mad that White had been
5      critical of him for taking the role
6      said that he wasn't coming back."
7      So you talked about Rampage Jackson wanting
8  to be in the A Team movie rather than meeting his
9  commitment to be on the UFC television show.
10     Is that what is being discussed in that
11 paragraph?
12   A.  Yes.  That's my understanding is that
13 Rampage didn't fulfill his commitment to us and
14 instead decided to go off and film a movie.
15   Q.  All right.  Let me see if I can work
16 backwards through your pile to Exhibit 21.
17     Do you have Exhibit 21?
18   A.  I'm sure I have it somewhere here.  What
19 does it look like?
20   Q.  It says, "LexisNexis" in the upper left.
21   A.  There we go.
22   Q.  All right.  Exhibit 21 is a news article
23 dated September 29th, 2008.  So we're talking about
24 the year 2008.
25     And that's where you were shown on page 3

295

1  of this article a quote that was towards the bottom:
2      "UFC doesn't seem to worry much
3      about the other companies in the MMA
4      field, and" you, sir, "pull no
5      punches about the competition.  'No
6      one's ever successful except us, he
7      said, there is no No. 2'."
8      There's what you were saying in 2008,
9  right?
10   A.  Yes.
11   Q.  And on page 2 at the top, there's another
12 quote from you in the third paragraph.
13     Was this also something you said in 2008?
14     "People associate the sport with
15     UFC; we've had a very strong brand.
16     No one else has been successful with
17     this except us.  There is a long
18     list of tombstones."
19     Is that something else you said in 2008?
20   A.  Yes.
21   Q.  And then, the article says, "UFC almost
22 ended up in the same graveyard," and it talks about
23 your history.
24     Is that something that you agree with?
25   A.  Yes.

296

1   Q.  Would you explain why.
2   A.  As I mentioned previously in my testimony,
3  when we started the UFC, there really wasn't much to
4  it except for an idea.  We essentially bought some
5  trademarks, some IP.  We assumed some fighter
6  contracts and a couple of other commercial contracts
7  with some satellite providers.  I think there was a
8  DVD distribution deal in place.  It was a very small
9  business, and it was losing money.
10     From the time period of 2001 to roughly
11 about the beginning of or sometime in 2005, in order
12 to continue to operate the UFC, me and my brother had
13 to continue to fund operations through our own
14 capital.
15     And there was a point in time, probably
16 around 2004, where I actually made a conscious
17 decision to either shut down the UFC and cease
18 operations, or I thought maybe there was a
19 possibility that we could sell the UFC and get some
20 value, certainly not anywhere near what we had
21 invested but some value to help recoup some of our
22 investment.
23     And I had Dana go out into the marketplace
24 and talk to a few people in the market that he
25 thought would be interested.

297

1      Ultimately, I had a change of heart and
2  decided that I wasn't ready to quit.  That, at that
3  time in my career, I hadn't really had any big
4  business failures.
5      So it was very personal from my standpoint,
6  and really kind of made the decision that we were
7  going to try to figure out how to make this business
8  work one way or the other.
9      And we were very close to shutting down,
10 but we ended up deciding to take one more risk.
11     And back then at that time, media companies
12 wouldn't -- would barely take a meeting with us, let
13 alone pay us money for our product.  So --
14   Q.  Thank you.
15   A.  -- we decided to move forward.
16   Q.  All right.  Let me ask you two more things.
17     Exhibit 24, which is the large exhibit of
18 text messages, do you have that?
19   A.  Yes.
20   Q.  A few minutes ago, you were asked about
21 page 75.
22   A.  Yes.
23   Q.  And you indicated that the text message was
24 talking about Bellator.
25     Do you remember that?

75 (Pages 294 to 297)

LORENZO J. FERTITTA - CONFIDENTIAL

302

```
 1
 2      STATE OF _____ )
 3                    ) :ss
 4      COUNTY OF _____)
 5
 6
 7          I, LORENZO J. FERTITTA, the
 8      witness herein, having read the foregoing
 9      testimony of the pages of this deposition,
10      do hereby certify it to be a true and
11      correct transcript, subject to the
12      corrections, if any, shown on the attached
13      page.
14
15              _____
16              LORENZO J. FERTITTA
17
18
19
20      Sworn and subscribed to before
21      me, this       day of
22            , 2017.
23
24      _____
25          Notary Public
```

303

```
 1          CERTIFICATE OF REPORTER
 2       I, Cynthia K. DuRivage, a Certified
 3  Shorthand Reporter of the State of Nevada, do hereby
 4  certify:
 5          That the foregoing proceedings were taken
 6  before me at the time and place herein set forth;
 7  that any witnesses in the foregoing proceedings,
 8  prior to testifying, were duly sworn; that a record
 9  of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; that the foregoing transcript is a true
12  record of the testimony given.
13          I further certify I am neither financially
14  interested in the action nor a relative or employee
15  of any attorney or party to this action.
16          Reading and signing by the witness was
17  requested.
18          IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20  Dated:  April 6th, 2017
21
22
              _____
23              CYNTHIA K. DuRIVAGE
                  CCR No. 451
24
25
```

304

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

305

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____

_____   _____
   WITNESS' SIGNATURE         DATE

77 (Pages 302 to 305)