# EXHIBIT 8

## Excerpts of Deposition of Ike Lawrence Epstein

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )   Case No.
                                 )   2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
          Defendant.             )
_____ )



C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

IKE LAWRENCE EPSTEIN

LAS VEGAS, NEVADA

MAY 26, 2017

9:07 a.m.



REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
Job No. 50641

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

14

1  given sworn deposition testimony?
2      A.  There certainly have been other lawsuits
3  against Zuffa.  I just don't recall ever giving sworn
4  testimony.  I may have, I'm just not remembering
5  right now.
6      Q.  Fair enough.
7          So I think the two that you did recall were
8  legal malpractice cases, I think you said?
9      A.  Right.
10     Q.  And the first one you identified, it was a
11 malpractice case against the other side in a case you
12 handled?
13     A.  Yeah.  It was a case where we had sued
14 somebody -- I don't know if we were the -- I can't
15 remember if we were the defendant.  I generally did
16 defense work, so we probably were the defendant.  We
17 won that case.
18         The client of the lawyer who was
19 representing, I believe, the plaintiffs, sued their
20 lawyer, and then, I got deposed in that case as to
21 what happened in our lawsuit.
22     Q.  So at your previous firm, you handled the
23 case, you won the case, the party on the other side
24 subsequently sued the lawyer handling, that
25 represented him or her in that case; and you

15

1  testified in that legal subsequent malpractice
2  litigation?
3      A.  Exactly.  I was subpoenaed, and they took
4  my deposition.
5      Q.  Now, the second case, was that a legal
6  malpractice case against you and your previous law
7  firm?
8      A.  Yes.
9      Q.  And you gave a deposition in that case,
10 correct?
11     A.  I did.
12     Q.  And was that case subsequently settled?
13     A.  Oh, yes.  Definitely settled.
14     Q.  It didn't go to trial?
15     A.  No, it did not go to trial.
16     Q.  In connection with your work at Zuffa, part
17 of your responsibility has been with respect to
18 regulatory matters?
19     A.  That's correct.
20     Q.  Is that correct?
21     A.  Yes.
22     Q.  Have you ever given any testimony in
23 connection with any of the regulatory proceedings?
24     A.  Well --
25     Q.  For example, in front of an athletic

16

1  commission or something like that?
2      A.  Yeah.  I mean, if that's what you're
3  referring to, I mean, there's --
4      Q.  I changed the subject a little bit.
5      A.  Yeah.  So I just want to make sure I
6  understand what you mean by regulatory because I've
7  certainly done some, provided some testimony in front
8  of state legislators which weren't necessarily -- I
9  mean, I wouldn't perceive that as regulatory.
10         So if you're talking about athletic
11 commissions, I've certainly made some presentations
12 in front of athletic commissions over the years.
13         MS. GRIGSBY:  I wouldn't call that
14 testimony, but I would say presentations.
15 BY MR. SAVERI:
16     Q.  And maybe I just shorthanded it.  Let me go
17 back through that.
18         With respect to your testimony in front of
19 legislative bodies, can you describe for me or
20 identify how many times you think you've done that?
21     A.  You know, I mean, once again, I'm not sure
22 whether it was testimony or whether it was
23 presentations.  A lot of it, you know, meetings with
24 legislators.  But as far as like formal hearings,
25 probably a handful over the years.

17

1      Q.  And can you recall generally what states?
2      A.  I do remember Massachusetts for some
3  reason.
4          As I'm sure you're aware of, we bought this
5  company, there was one state that sort of regulated
6  the sport of mixed martial arts.  And now, basically
7  every state does.  As a result, that happened as a
8  result of our actions.  I was very much involved in
9  that, literally going to every state in the country
10 and every province in Canada and all that stuff and
11 around the world.
12         So there were meeting after meeting after
13 meeting with legislators, and then, there were
14 certain hearings that took place where we provided
15 information about the sport, about you know, about
16 the rules, et cetera.
17         So I remember Massachusetts for some
18 reason.  It just rings a bell.  I just remember there
19 was a fighter there with us, and we made
20 presentations to a group in sort of a setting like
21 this.
22         Once again, I don't remember it being under
23 oath or particularly, you know, a testimony type
24 setting, but that's the type of stuff we did for --
25 we've done it for a decade-and-a-half trying to get

5  (Pages 14 to 17)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

---

**18**

1  the sport regulated around the world.
2  **Q.  Other than Massachusetts, do you recall any**
3  **other states in which you gave a similar presentation**
4  **of the type we've just been talking about?**
5  A.  I certainly remember New York where we
6  made, you know -- once again, it wasn't under oath
7  type of stuff, but we made presentations to
8  committees that were considering regulation of mixed
9  martial arts.
10  **Q.  Now, do you recall, though, any occasion**
11  **where it was a more formal setting, where you raised**
12  **your hand, took an oath, and appeared or answered**
13  **questions in front of a legislative body?**
14  A.  I really don't recall taking an oath.  I
15  mean, I certainly recall answering questions.  I
16  would say 15 years we've been doing it.  But I don't
17  recall like standing up and taking an oath.
18  **Q.  Okay.  Have you given any testimony,**
19  **description of the business of the type you've been**
20  **discussing, outside of the United States?**
21  A.  Yes.
22  **Q.  In what countries?**
23  A.  Well, virtually every province in Canada.
24  Brazil, France.  Russia, meeting with, you know,
25  federations and -- I mean, just so you understand,

---

**19**

1  the regulatory model in U.S. and North America is
2  state athletic commissions.  When you go to Europe
3  and basically the rest of the world, it's the Olympic
4  model federation base.  So there's been a lot of
5  interactions with federations in other countries.
6  **Q.  So these were governing bodies or athletic**
7  **federations that might have included or at least in**
8  **geographic scope had coverage for more than one**
9  **country?**
10  A.  Not necessarily more than one country.
11  I mean, you know, so we've talked to, like
12  for example, the International Wrestling Federation
13  over the years about creating sub federations,
14  regulate amateur and professional mixed martial arts.
15  I guess that's a global organization.
16  But when we talk about, you know, other
17  countries, we're typically going to meet with sports
18  ministers or, you know, government regulatory people
19  to talk about everything from, you know, the sport
20  was banned on television in many, many countries.  It
21  was illegal to take place in many, many countries.
22  So we had to go and talk to people and say, hey,
23  here's what the sport is about, here is the safety
24  record, here's the rules and regulations, allow it on
25  TV, allow a live event to take place.

---

**20**

1  So those are the type of meetings.  And
2  sometimes there was a sports minister, sometimes
3  there was the federation person, sometimes there was
4  the equivalent of the FCC in a particular country.
5  Just a variety of stuff that we've done over the last
6  decade and a half.
7  **Q.  Do you recall occasions when the Federal**
8  **Trade Commission opened investigations with respect**
9  **to Zuffa's businesses?**
10  A.  Yes, I do.
11  **Q.  Did you give any testimony to the FTC in**
12  **connection with any of those?**
13  A.  I don't recall giving any testimony where I
14  was sworn, you know, to, you know, an oath.  I'm sure
15  I provided -- I made presentations to the FTC chair.
16  I made presentations to the FTC investigators or
17  lawyers up in the Seattle office.
18  You know, we made a variety of
19  presentations.  As I'm sure you're aware, there were
20  two separate investigations that were both closed,
21  but we made a variety of presentations.  Neither of
22  those went to any formal hearing, so I can't
23  imagine -- I mean, I didn't testify, maybe I
24  submitted an affidavit.  I don't remember
25  specifically.

---

**21**

1  **Q.  Okay.  Just focusing for a second on the**
2  **first FTC investigation, did you make a presentation**
3  **to any of the FTC commissioners?**
4  A.  Yes, we did.
5  **Q.  And did you go to Washington to do that?**
6  A.  Yes, we did.
7  **Q.  And was the presentation made to the full**
8  **five-member FTC?**
9  A.  No.
10  **Q.  Do you recall what commissioner you gave**
11  **the presentation to?**
12  A.  John.  You know, my name memory is bad.  He
13  worked for Herb Kohl, I remember, before he was the
14  FTC chair.  John --
15  **Q.  It begins with an O?**
16  A.  No.
17  **Q.  Okay.  We'll come back to that.**
18  A.  It starts with a W.
19  **Q.  We'll come back to it.**
20  A.  I'll remember.
21  **Q.  All right.  Was that presentation recorded**
22  **in any way?**
23  A.  No.
24  **Q.  Were there written materials that you**
25  **presented as part of your presentation?**

---

6 (Pages 18 to 21)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

98

1      Did I read that right?
2    A.  You did.
3    Q.  Is that an accurate statement?
4    A.  I think it is, yes.  It's hard to read.
5    Q.  Now, turning back to the agreement again,
6  which is Exhibit 5, there's a question about
7  article 4, "Promotion," but in particular,
8  section 4.5, which is the exclusivity provision.
9      Do you see that?
10    A.  I do.
11    Q.  And could you tell me what from Zuffa's
12  perspective the business purpose of this provision
13  is?
14    MS. GRIGSBY:  Same objection.  This was
15  previously asked in the 30(b)(6).
16    THE WITNESS:  Well, putting on 40 fights
17  per year, and in order to put on 40 plus fights per
18  year, you have to know that fighters are available to
19  put on those events.
20    As you know, we've significantly increased
21  the output of events that we've put on creating more
22  opportunities for fighters every single year.  And in
23  order to be able to sustain that, you have to know
24  that a fighter is available to you so you can put on
25  those events.

99

1      If the fighters were not exclusive to us,
2  we could never put on 40 plus events per year, and
3  our output would significantly decrease.
4  BY MR. SAVERI:
5    Q.  Did the company ever do any studies about
6  alternatives to the exclusivity provision?
7      For example, you mentioned a second ago the
8  number of fights.
9      Did the company ever do any study where it
10  analyzed what would happen to the number of fights if
11  the company didn't have an exclusivity provision in
12  its form contracts?
13    A.  We didn't hire a third party.  It's
14  obvious.  If you don't know the athletes are under
15  contract with you, it's impossible for you to put on
16  40-plus events per year with 12 to 13 fights per
17  event.  It's just not possible.
18    Q.  Did you believe that the exclusivity
19  provisions benefited the fighters that are subject to
20  the exclusivity provision?
21    A.  Absolutely because it increased the output
22  of fights that we were able to do on the annual
23  basis.
24    Q.  And that applied to the fighters as a
25  whole?

100

1    A.  Of course.  Every single fighter.  I mean,
2  if we only did three events per year, that's not a
3  lot of output.
4    Q.  Were there particular fighters that you
5  believed that the exclusivity provision did not
6  benefit?
7    A.  No.
8    Q.  You believe that it benefited all fighters
9  equally?
10    A.  Listen, all fighters are different.  Their
11  positions in their career and where they stand are
12  different.
13      A fighter that's just starting out his
14  career, he wants as many fights as he can get from
15  the UFC.  Middle, later, their positions may change,
16  I don't know.
17      But at the end of the day, in order for us
18  to put the output of events that we put on every year
19  and continue to grow that output, which we've done,
20  you can't do it unless you have exclusive contracts
21  because you don't know whether the fighters are
22  available.
23    Q.  Now, if you look --
24    A.  In addition to that, we're promoting the
25  athletes not just event to event but throughout their

101

1  entire careers.  We're getting them on TV shows,
2  we're trying to, you know, increase their notoriety,
3  helping them with social media.  Doing a variety of
4  things to increase their marketability.  I mean, you
5  know, that's all part of this ecosystem whereby we
6  want to do as many events as we can, we want to try
7  to make as much money for the athletes as we can.  We
8  can't do that unless you have things that are
9  exclusive.
10      We like boxing, but they do three or four
11  fights a year at max.
12    Q.  If the fighters were not subject to the
13  exclusivity provision, they would have been free to
14  attempt to fight under fights organized or put on by
15  other promoters, right?
16    A.  Of course.
17    Q.  And in fact, the exclusivity provision --
18  one of the purposes of the exclusivity provision was
19  to prevent that, right?
20    A.  The purpose of the exclusivity provision is
21  to make sure that we know that the fighters are
22  available so we can put on 30, 40 fights per year.
23  You're talking about hundreds of fights we have to
24  put on every year.  You cannot do it if they are not
25  under exclusive agreements.  You cannot do it.

26  (Pages 98 to 101)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

---

**102**

1    Q.  But it's fair to say that the effect of the
2  exclusivity provision was that fighters who signed a
3  contract could not go out and reach agreements with
4  other promoters to fight?
5    A.  I disagree with that.
6       The effect of it was that we provided
7  numerous fights for athletes under the terms of those
8  agreements.  That they would not be there if we
9  didn't have exclusive arrangements with the athletes.
10    Q.  Okay, but if an athlete was subject to the
11  exclusivity provision, you would agree, wouldn't you,
12  that that provision prevented that fighter from
13  signing up to fight for another promoter during the
14  term of the contract?
15    A.  I agree with that narrow question that
16  you've asked.  I don't agree with the underlying
17  assumption that somehow there are more opportunities
18  and the athlete is going to make more money by going
19  out and, you know, doing one-fight deals with
20  different promoters.
21    Q.  Okay.  I move to strike the last part of
22  the answer.
23       Let me just get an answer to a "Yes" or
24  "No" question.
25       Did the exclusivity provision in these

---

**103**

1  contracts prevent fighters subject to the provision
2  during the term of the contract from making
3  arrangements to fight for other promoters during the
4  term of the contract?
5    A.  Yes.
6    Q.  And if the exclusivity provision was not
7  included in these contracts, fighters would have been
8  free to go fight for other promoters?
9       MS. GRIGSBY:  Objection to form.
10       THE WITNESS:  We did a series of one-fight
11  deals, I guess they'd be free to do whatever they
12  wanted to do.
13  BY MR. SAVERI:
14    Q.  And if other promoters were putting on
15  fights, that would have provided more content in the
16  marketplace or the more ability for viewers to see
17  fights, correct?
18       MS. GRIGSBY:  Objection --
19       THE WITNESS:  Incorrect.
20       MS. GRIGSBY:  -- calls for speculation.
21       THE WITNESS:  That's wrong.  Completely
22  false.
23  BY MR. SAVERI:
24    Q.  Completely false?
25    A.  Completely false.

---

**104**

1    Q.  So your testimony is that if there was no
2  exclusivity provision that there would not have been
3  fights shown by other promoters?
4       MS. GRIGSBY:  Objection, mischaracterizes
5  testimony.
6       THE WITNESS:  Not nearly to the level that
7  we're doing right now because we have a television
8  broadcast deal with Fox broadcasting that requires us
9  to deliver a certain number of events.
10       In order for us to get that deal, we have
11  to tell them we're able to staff these fights up with
12  events.
13       It's impossible to deliver on a contract,
14  and no television network would ever contract with
15  you if you didn't have these arrangements with your
16  athletes to deliver them for bouts.
17       So what would happen under what you're
18  laying out here is that the ecosystem would crash.
19  There would be many, many less fights because no
20  network is going to agree to sign a long-term deal
21  with you for many, many fights when you can't deliver
22  fighters to them and put on events.
23       So what will happen is that the number of
24  fights will decrease, and the fighters will be free
25  to do the one-off events here and there, but the

---

**105**

1  total output will significantly decrease.
2       That would be true for us, that would be
3  true for Bellator or anybody else.  If they didn't
4  have exclusive arrangements, which they all do, they
5  wouldn't be able to deliver on their Spike contracts,
6  One FC be able to deliver on its television
7  agreements in Asia, and the list goes on and on.
8  BY MR. SAVERI:
9    Q.  Does boxing have the same sort of
10  exclusivity provisions that we're talking about here
11  in their fighter contracts?
12    A.  Very similar.  We got it from boxing.
13    Q.  Okay, but there are -- we'll come back to
14  that.
15       Now, just focusing for a second, again, on
16  4.5, which is the exclusivity provision.
17    A.  Okay.
18    Q.  And then, turn back to Exhibit, I guess
19  it's 3, which is the hard-to-see Comcast.
20    A.  Got it.  Last page?
21    Q.  Yeah.  Yeah.
22    A.  Okay.
23    Q.  Same place.  It's the next line above it.
24  It says, "Grant of Promotional Rights."
25       Do you see that?

27 (Pages 102 to 105)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

106

1    A.  I do.
2    Q.  And it says:
3        "Fighter grants exclusive,
4    unrestricted worldwide right to
5    promote any and all mixed martial
6    arts contests during the term."
7        Do you see that?
8    A.  I do.
9    Q.  Is that an accurate statement?
10   A.  Yes, it is.
11       MR. SAVERI:  Could you mark this as the
12   next in order, please.
13       (Exhibit 6 was marked for
14   identification by the reporter.)
15   BY MR. SAVERI:
16   Q.  I'm handing you what's been marked as
17   Exhibit 6.  This document has the Bates No.
18   DB-ZUFFA-0006389 through 6457.
19   A.  Looks like it.
20   Q.  Now, do you recognize this document?
21   A.  No.
22   Q.  Just so we're clear, this is a document
23   that was produced to us in this case by Deutsche
24   Bank.
25   A.  Right.

107

1    Q.  Okay.  And if you turn to page 4.
2    A.  Got it.
3    Q.  Before we get there, let me just ask you
4    this.
5        Do you have any role in the preparation of
6    this document?
7    A.  I don't recall this document, so...
8    Q.  Maybe I got ahead of myself.
9        Would you just turn to the first page.
10   There's a section called "Reason For Presentation."
11       Do you see that?  It's the box in the
12   bottom half of the page.  Do you see that?
13   A.  I do see it.
14   Q.  And it says:
15       "Zuffa, LLC has approached
16   Deutsche Bank Securities to renew
17   their existing Senior Secured Credit
18   Facilities.  The Company is seeking
19   to refinance the existing," I think
20   it says, "465" or "485 million term
21   loan and a $50 million Revolving
22   Credit Facility with a $450 million
23   Term Loan and a 60 million --" is it
24   60 or 80 million -- "Revolving
25   Credit Facility."

108

1        Do you see that?
2    A.  Yeah.  I can't tell whether it's 60 or 80.
3    Q.  So just looking at this, do you recall that
4    on or about the time of this document, which is in --
5    just looking for a date here -- it looks like
6    January 2013 or thereabouts, that Zuffa applied to
7    renew their credit facility with Deutsche Bank?
8    A.  I generally recall us, you know, looking to
9    renew our credit facility.  I don't know if it was
10   expiring or we were looking to take advantage of
11   favorable movement rates or what, but I generally
12   recall this.
13   Q.  At the time, did you have any
14   responsibility for providing due diligence material
15   or answering due diligence questions that Deutsche
16   Bank raised in connection with this facility?
17       MS. GRIGSBY:  Objection, foundation.
18       THE WITNESS:  I really don't remember
19   answering any questions, but I certainly could have.
20   BY MR. SAVERI:
21   Q.  Okay.  Now, let me go back to what I was
22   trying to focus on, which is on page 4 of the
23   document.
24   A.  Okay.
25   Q.  And there is a third paragraph that begins,

109

1    "UFC continually seeks."
2        Do you see that?
3    A.  No.  Where are we?  Oh, yes, yes, "UFC
4    continually seeks to add."
5    Q.  And then, I want to ask you a question
6    about some sentences further into that paragraph.
7    A.  Got it.
8    Q.  There's a sentence that says:
9        "Most contracts are four fights or
10   20 months, whichever comes first,
11   although marquis fighters typically
12   have longer-term contracts with an
13   exclusivity clause that prevents
14   fighters from moving to different
15   MMA organizations while under
16   contract and with negotiation and
17   matching rights after the agreement
18   expires."
19       Do you see what I read?
20   A.  I do.
21   Q.  Is that an accurate statement?
22   A.  Yeah.
23       MS. GRIGSBY:  Objection, foundation.
24   BY MR. SAVERI:
25   Q.  Excuse me.

28  (Pages 106 to 109)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

178

1    be putting on fights that just weren't -- that didn't
2    make commercial sense.  You can't guarantee -- what
3    if he loses.  This is a ten-fight, 60-month deal
4    fight.  So what if he loses five fights in a row, how
5    can we guarantee him anything when it comes to being
6    a main event.  You just can't -- you can't do all
7    those things because you have to deliver a product
8    that the customer is willing to buy.
9        As I mentioned previously, we're in a
10   hundred percent turn business.  We've got to sell
11   people every single time to put a pay-per-view on TV.
12   If we put an inferior product on TV, no one buys it.
13       So there's just a variety of things in this
14   deal that -- it's not a matter of wanting.  It either
15   legally wasn't possible or made absolutely no
16   commercial sense to do that.
17       Q.  Commercial sense for Zuffa?
18       A.  Made no commercial sense for anyone because
19   Bellator was never going to live up to this, so they
20   were submitting an offer that they had no intention
21   of ever living up to.
22       Q.  Well, Bellator was certainly free to make
23   that offer?
24       A.  Well, they're free to make an offer, but I
25   mean, I mean, it's -- and since that time, we've seen

179

1    how many events they've done on pay-per-view.  I
2    mean, that's not their business model.  Their
3    business model is going on Spike TV and getting
4    ratings on Spike TV, and that's what their business
5    model is.  Different business model than ours.
6        Q.  Now, did you think that -- so at the time,
7    though, following up on that, part of the UFC
8    business model was to broadcast events on
9    pay-per-view?
10       A.  Part of it is.
11       Q.  Right.  And Bellator did not?
12       A.  Bellator has done it one or two times.
13       Q.  And in terms of your position in the
14   marketplace, did you think the fact that you at UFC
15   did in fact have a model which included a substantial
16   number of pay-per-view events gave you leverage with
17   respect to attracting or negotiating fighters?
18       A.  Not necessarily, no.
19       Q.  Now, if you turn to the first page of the
20   email about Melendez, about in the middle of the
21   first page, Fertitta writes:
22           "Did he actually sign a contract
23        or just get an offer?"
24        Do you see that?
25       A.  I do see that.

180

1        Q.  Okay.  And then, you subsequently write
2    back.
3        Do you see that, it's a little farther up
4    in the thread:
5           "We should talk this weekend,
6        don't want him to sign."
7        Do you see that?
8        A.  No, I don't -- yes, I see that.
9           "We should talk this weekend.
10       Don't want him to sign," yes.
11       Q.  How could you prevent Melendez from
12   signing?
13       A.  Couldn't.
14       Q.  So when you wrote, "Don't want him to
15   sign," what did you mean?
16       A.  I think what I meant is don't want to sign
17   him.  I don't think we want to match the offer I
18   think is what I was saying, but I don't know.  I
19   mean, there's no way I could prevent him from signing
20   anything he wanted to sign.  So I don't know.  That
21   doesn't make any sense.
22       Q.  At this time, did you want Melendez to
23   fight in the UFC?
24       A.  Yeah.
25       Q.  And you didn't want to sign him because you

181

1    didn't feel like you could match the terms of the
2    offer that they were putting in front of you from
3    Bellator; is that correct?
4           MS. GRIGSBY:  Objection, foundation.
5        THE WITNESS:  The answer to the question,
6    we wanted to sign him.  The offer that was submitted
7    by Bellator was, as I said in the email, ridiculous.
8    It was commercially unreasonable, and legally, we
9    couldn't do it.  So it wasn't a decision one way or
10   the other.  We really didn't have a choice in the
11   sense whether we could accept this thing.
12       So we wanted to sign him.  He presented an
13   offer to us that was legally and commercially just
14   didn't make sense.
15   BY MR. SAVERI:
16       Q.  If Bellator hadn't written that offer which
17   Melendez' agent provided to you, would you have
18   signed Melendez?
19       A.  We would have tried.  I mean, we were
20   trying to sign him.  We wanted to keep him.
21       Q.  And if you were able to keep him, it would
22   have been at terms that didn't present the same
23   difficulties or problems that the Bellator offer did?
24       A.  No.  I said we couldn't violate our Fox
25   contract to sign fighters.  So we would have

46  (Pages 178 to 181)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

182

1    negotiated a deal that we could enter into.
2        Q.  Were there other occasions that you recall
3    when you -- when fighters with whom you were
4    negotiating received offers from Bellator that they
5    put in front of you that, for these reasons or
6    others, you decided you couldn't match?
7        A.  Yes.
8        Q.  And how many times do you think that
9    happened?
10       A.  I don't know.  I mean, it's happening more
11   frequently now than it ever has been.  It just
12   happened recently with Ryan Bader.  It just happened
13   recently with Rory McDonald.  Those are two that come
14   to mind that are fairly recent.
15       Q.  Were there occasions that you recall where
16   fighters with whom you were negotiating put Bellator
17   offers in front of you that you did in fact match?
18       A.  You know, I don't remember the exact
19   circumstances whereby we ended up with Eddie Alvarez,
20   the specifics, but there were a lot of things that
21   went back and forth there.  But he was -- we actually
22   had to make the offer to him in that situation
23   because he was coming off a Bellator contract, so
24   they had the right to match ours.
25       But there's a bunch of litigation that

183

1    occurred in that matter, and he went back after he
2    got sued.  And then, they didn't deliver.  And then,
3    he entered into a settlement agreement with them and
4    ultimately came to us.
5        I don't remember how the Gilbert Melendez
6    thing ended up getting resolved because he did come
7    back to the UFC.
8        Rampage Jackson was another one where they
9    made offers that we couldn't physically accept.
10   They, for example, gave him a reality show and agreed
11   to pay him much money for a realty show that they
12   were going to put Spike that we just couldn't -- we
13   couldn't match that.
14       I'm not -- it's not -- I can't remember a
15   situation where Bellator made an offer and we matched
16   it.  I think there was, but I just can't remember one
17   right now.
18       Q.  Is it fair to say that the fact that
19   Bellator was, from time to time, making offers to
20   fighters that the UFC wanted to sign that that put
21   competitive pressure on UFC with respect to those
22   fighters?
23       A.  Of course.
24       Q.  And was one of the ways you competed with
25   Bellator for fighters with respect to compensation to

184

1    the fighters?
2        A.  Of course.
3        Q.  And with respect to other business terms as
4    well?
5        A.  Other business terms too, yes.
6        (Exhibit 13 was marked for
7        identification by the reporter.)
8    BY MR. SAVERI:
9        Q.  I've handed you what has been marked as
10   Exhibit 13, sir.
11       Do you have that in front of you?
12       A.  Yes.
13       Q.  This is a -- I guess that's an offshoot of
14   the email thread from the previous document.  This
15   one has the Bates Nos. ZFL-0995568 through 95575.
16       You can look at the whole thing, but I'm
17   just going to ask you about the very top of the
18   chain, which is the email from Fertitta to yourself,
19   dated February 15, 2014.
20       Okay?
21       A.  Yeah.
22       Q.  So Fertitta writes to you and says -- and
23   again, this refers to this discussion about Gilbert
24   Melendez, "Tell them not to sign anything."
25       Do you see that?

185

1        A.  I do.
2        Q.  Do you know what he meant?
3        A.  Tell them not to sign anything.
4        Q.  Who is the "them"?
5        A.  Gilbert Melendez.
6        Q.  When Mr. Fertitta was writing you to tell
7    Melendez not to sign anything, what did you
8    understand Mr. Fertitta to be trying to accomplish?
9        A.  I think that he wanted to reach out to
10   Gilbert again and see if he could figure out a way to
11   sign the guy.  We obviously weren't going to match
12   it, so was there more money we could throw at him or
13   something to get him to stay with the UFC.
14       Q.  And did you tell Nahra or Melendez not to
15   sign, do you recall?
16       A.  I don't recall that, no.
17       Q.  And do you know if Mr. Fertitta actually
18   was able to talk to Nahra or Melendez and follow up
19   and come to some other kind of agreement at this
20   time?
21       A.  I don't remember at this time.  I know that
22   Melendez did ultimately come to the UFC, so I just
23   don't remember the circumstances.
24       Q.  Okay, fair enough.  Thank you.
25       I have a few of these to work through.  I'm

47 (Pages 182 to 185)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

190

1    Q.   Okay.  And then, Mersch writes back and
2  says:
3           "I'm not aware of anyone from the
4       UFC releasing any position on
5       Cheick."
6    A.  I see it.
7    Q.  And then, he continues:
8           "However, the contract provisions
9       concerning our rights to match, we
10      consider to be in effect.  As a
11      favor, however, I will consult with
12      Dana and Lorenzo and get back to
13      you."
14      Do you see that?
15   A.  I do.
16   Q.  And then subsequently, Mersch writes to you
17 and says:
18          "What are your thoughts on Kongo?
19      McGann is asking they be outright
20      released from the right to match."
21      Right?
22   A.  I see that .
23   Q.  And you write back and you say no?
24   A.  Correct.
25   Q.  Why did you say no?

191

1    A.  Because I didn't want to release him from
2  the right to match because I -- I personally like
3  Cheick Kongo, he's a great guy, and I wanted to see
4  him fight for the UFC.
5       He was also from France, and he was a great
6  representative for the sport, somebody that we could
7  use to help us with regulatory issues in France, he
8  helped us before.  And so, I was hopeful that, you
9  know, maybe there's an offer that we could match to
10 keep him in the UFC.
11   Q.  When did he -- when was the next time he
12 fought for the UFC?
13   A.  I'm not sure he fought ever again for the
14 UFC.
15   Q.  All right.  So at the time of this email,
16 is it your testimony that you did or did not want to
17 arrange a fight for Kongo?
18   A.  It's not really my position to arrange a
19 fight for anybody.
20      It was my personal belief that we shouldn't
21 release him because I'd like to have the opportunity
22 to match an offer.
23      Now, ultimately, that decision was made by
24 Lorenzo or Dana, but would I advocate for certain
25 athletes that I thought were people we should keep

192

1  around.  As I mentioned, Cheick's a really -- I
2  personally had a great relationship with the guy.
3  He's a great -- he's a really handsome guy, he's very
4  articulate.  He's from France, which is a market that
5  we've been working on for many, many years to allow
6  events to take place.  And there's nothing like
7  having a French fighter in your corner when you're
8  trying to get that done.
9       So there were reasons in my world that were
10 important to have Cheick there, but ultimately, it
11 wasn't my decision.  So I just said, hey, listen,
12 we're not going to release him from this at this
13 time, and I'm sure we talked to Lorenzo and those
14 guys about it.  And I don't know what happened.
15 Maybe we did release him from the right to match or
16 we just didn't match.  I don't recall what happened.
17      This was my -- my position, not to release
18 him.  If Lorenzo or Dana decided they wanted to,
19 that's what we would have done.
20   Q.  Well, you understood from the email
21 exchange communications with -- Mr. McCann?
22   A.  McGann.
23   Q.  -- McGann, that Kongo wanted to be
24 released, right?
25   A.  Yeah.

193

1    Q.  All right.  And --
2    A.  Well, he wanted to be released from the
3  right to match.
4    Q.  Well, he writes at the beginning of the
5  chain:
6           "Does that mean he's free from
7       any -- free of any obligations?"
8       Do you see that?  It's right at the bottom
9  of the first page.
10   A.  I don't -- I don't know what Mr. McGann was
11 referring to.  I mean, it sounds like Mersch
12 responded, "No one has released him from anything,"
13 so we didn't know exactly what he was talking about.
14   Q.  Okay, but there's nothing in this that
15 specifically ties his request to being free from the
16 right to match.
17      This more generally says he's requesting to
18 be free of any obligations, right?
19   A.  No.  I mean -- I mean, you have to know
20 Anthony McGann.  I mean, he's -- as I said, I have a
21 great relationship with Anthony, and he's a very
22 colorful guy.  He speaks with an extremely heavy
23 Manchester, I believe, accent.  He didn't go to
24 Oxford or Cambridge, put it that way.
25      I don't know what he's saying here.  It

49 (Pages 190 to 193)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

194

1 looks like to me what he's saying is, hey, you know,
2 contract is expired. He has the exclusive
3 negotiations. He said non-negotiation period. That
4 means exclusive negotiation. And are you going to
5 let him out of the right to match.
6 And that's validated by what Mersch says
7 is, what are your thoughts on Kongo? McGann's asking
8 that they be outright released from the right to
9 match.
10 Q. Now, when you told him no, right, did you
11 think that was good for the fighter?
12 A. When I told Mike Mersch no?
13 Q. Yeah.
14 A. Certainly, as I mentioned previously, the
15 right to match is a tool that can be used very
16 effectively by fighters to make sure that the highest
17 offer is being made to them. So the answer is
18 absolutely, it was good for the fighter.
19 Q. I thought you told me a minute ago that one
20 of the reasons you said no was because Mr. Kongo was
21 French, and you thought it would be good for the UFC
22 to have a French fighter, correct?
23 A. That was certainly one of the reasons why I
24 personally -- once again, it was me personally, that
25 I like Cheick, I thought he was a nice guy, I thought

195

1 he was a great representative of the sport. He was
2 French. Once again, as I mentioned in the morning,
3 we spent 15, 16 years trying to get this sport
4 regulated around the world. France was one of the
5 few places now at this time where we weren't allowed
6 to do events. And so, me personally, because I
7 handled the regulatory affairs for the company and
8 handled all that type of stuff, wanted to have an
9 asset. But at the end of the day, it was up to Dana
10 and Lorenzo whether they wanted to keep him or not.
11 Q. Okay. But from at least your perspective,
12 the reason you wanted to say no is because you
13 thought it would be in the interests of the UFC to
14 not release him?
15 A. It's in both parties' interest. Yes, there
16 were benefits that the UFC would receive, but the
17 benefit he would receive was that he now had
18 essentially a stalking horse on the other side of the
19 transaction which would require any other promoter to
20 make the highest possible offer they could make to
21 hopefully ensure the UFC didn't match it.
22 So yes, we got some benefits out of it, but
23 so did he.
24 Q. Did you discuss that with McGann that
25 actually, he -- that his client was actually better

196

1 off under the right-to-match provision?
2 A. I don't necessarily recall discussing it
3 with McGann. I may have, but I've discussed it with
4 many managers over the years.
5 Q. Now, McGann writes to Mersch:
6 "He's 38 and time is precious to
7 him."
8 Do you see that? And it looks like a
9 smiley face. Do you see that? It's about in the
10 middle of the --
11 A. I do see that.
12 Q. So at the time, did you understand that at
13 least from McGann's perspective that at this point,
14 this was late in Kongo's career?
15 A. As I said previously, the guy has fought a
16 half a dozen times since this happened. I don't
17 think this was late in his career. We have many
18 athletes that fight well into their 40s. Cheick is
19 in incredible shape. He's an amazing athlete.
20 Q. So when his agent wrote, "He's 38 and time
21 is precious to him," you didn't believe him?
22 A. Well, I mean, time is precious to me at 15,
23 and I'm 50 now. It's very precious to me every day.
24 I mean, of course our time is precious.
25 But the facts are he's fought six times

197

1 since this contract was over.
2 He was not at the end of his career. I
3 think he's still fighting.
4 Q. But you're not a professional athlete,
5 right?
6 A. Not even close.
7 Q. And so you're far from the end of your
8 career, correct?
9 A. I don't know. Never know.
10 Q. But at 38 is quite -- is relatively late
11 for a UFC fighter. You would agree with me?
12 A. I wouldn't agree with you. If you take a
13 look at the sport, take a look at the history of a
14 lot of our athletes, take a look at Cheick Kongo's
15 career since he left, I believe he's still fighting,
16 it's not the end of his career. It takes a long time
17 to master these martial arts in order to be
18 proficient at, you know, one, two, three, four
19 martial arts.
20 There are many athletes that fight well
21 into their 40s. It just depends on the individual
22 athlete and, you know, how they're taking care of
23 themselves, how that are training.
24 Listen, I would agree with you, of course,
25 that everybody has a time horizon on which they get

50 (Pages 194 to 197)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

198

1 to pursue their trades, and athletes may have a
2 shorter one, but this was -- this was not the end of
3 his career, as evidenced by the fact he's fought, I
4 think, a half a dozen times since this discussion.
5 **Q. And again, to the best of your**
6 **recollection, at this time, did the UFC have any**
7 **plans to arrange fights for Kongo?**
8 A. His contract was expired. So I can't
9 imagine we had any plans. We were playing out the
10 situation.
11 And once again, I don't know whether we
12 waived this or not. We may have decided, you know
13 what, we don't want him.
14 This was my email, my view point on this
15 thing, which was I didn't want to. There were a
16 variety of reasons why I felt, you know, Cheick Kongo
17 would be great for the UFC.
18 (Exhibit 15 was marked for
19 identification by the reporter.)
20 BY MR. SAVERI:
21 **Q. There is the original. There's more.**
22 **Do you have Exhibit 15 in front of you,**
23 **sir?**
24 A. I do.
25 **Q. It's a two-page email with the Bates**

199

1 Nos. ZFL-0998102 through 103.
2 **Will you take a moment to look at it, sir.**
3 A. I see it.
4 **Q. If you look at the top of the first page,**
5 **there's an email from Sean Shelby to Joe Silva,**
6 **yourself, Lorenzo Fertitta, and Dana White.**
7 **Do you see that?**
8 A. I see it.
9 **Q. To the best of your recollection, did you**
10 **receive this email on or about November 27, 2013 from**
11 **Sean Shelby?**
12 A. I actually do recall this, yes.
13 **Q. Did you review this yesterday?**
14 A. No.
15 **Q. The email chain begins with an email from**
16 **Silva to Lorenzo Fertitta, yourself, Sean Shelby, and**
17 **Dana White.**
18 **Do you see that?**
19 A. I do.
20 **Q. And the email chain refers to the Ultimate**
21 **Fighter.**
22 **Do you see that?**
23 A. I do.
24 **Q. Okay. And when Mr. Silva wrote to you**
25 **November 26th, 2013, he was making a proposal for a**

200

1 revised compensation structure for Ultimate Fighter
2 contracts?
3 A. That's correct.
4 **Q. Is it fair to say that this email chain**
5 **involves communications between the four -- one, two,**
6 **three, four, five of you about that suggestion?**
7 A. Yeah.
8 **Q. And just for purposes of the record, what**
9 **was the Ultimate Fighter?**
10 A. It still exists. The Ultimate Fighter is a
11 reality show that was created, I believe, in late
12 2004 that was -- first of all, it was a very
13 important promotional vehicle for the UFC brand. Up
14 until that point, the UFC was doing very, very
15 poorly. The Fertittas had sunken in 30, 40, 50
16 whatever the number of million dollars of their own
17 money funding this thing.
18 They decided that -- they had done a
19 reality show on a casino before, Green Valley Ranch
20 here in Las Vegas. They knew a producer by the name
21 of Craig Piligian. They thought maybe it was a good
22 idea to try to figure out a way to use a reality show
23 to get MMA content on mainstream television because
24 at this point, it was only pay-per-view events.
25 So partnered up with a guy by the name of

201

1 Craig Piligian. There were some other people
2 involved at first but ultimately it was Craig
3 Piligian and Pilgrim Films, and they produced a
4 reality showed called the Ultimate Fighter. Pretty
5 simple concept. 16 athletes live in a house. They
6 do all sorts of funny and interesting things, and at
7 the end of each episode, there's a fight, winner
8 stays, loser goes home.
9 It all culminates with a live event which
10 pits the two finalists against each other in addition
11 to some of the other contestants.
12 The theory was that we couldn't get MMA on
13 mainstream television, no one could take it, so maybe
14 this would be our Trojan Horse to sort of get it on
15 TV.
16 Ultimately, we were able to convince
17 Spike TV to broadcast the product. Unfortunately,
18 they were unwilling to pay for it, and they were
19 unwilling to pay any of the expenses associated with
20 underwriting it. They also took out the ad
21 inventory. So the Fertittas spent $10 million
22 underwriting the show and put it on Spike TV in, I
23 think, late 2004, early 2005, and that was sort of a
24 big turning point for the UFC.
25 Over the years, I think we've done 20-plus

51 (Pages 198 to 201)

202

1  different versions of it.
2      But the Ultimate Fighter was always sort of
3  a separate thing from the overall UFC.  And so,
4  different contracts were entered into the athletes
5  for their participation in the show initially.
6      And then, if you won the show, you
7  entered -- you got a UFC contract.
8      But as part of you entering into the
9  agreement to be on the reality show, you also entered
10  into like a three-year fight contract, and I think
11  this is what Joe Silva is talking about here.
12      **Q.  So at the beginning of the thread, in**
13  **November 2013, the Ultimate Fighter had been on air**
14  **for a number of years already, correct?**
15      A.  Fifth, so yeah, eight years.
16      **Q.  And at the time of the current contracts**
17  **with fighters that appeared on the Ultimate Fighter**
18  **were for three years, right?**
19      A.  Correct.
20      **Q.  And Silva proposed, wanted to make it, I**
21  **guess, nine?**
22      A.  Make it what?
23      **Q.  Right?**
24      A.  He wanted to make it what?
25      **Q.  He wanted to --**

203

1      A.  He wanted to make it nine years?
2      **Q.  Yeah.**
3          MS. GRIGSBY:  Objection to form.
4          THE WITNESS:  He wanted to make it nine
5  years?
6  BY MR. SAVERI:
7      **Q.  Excuse me.  I'm reading that he wanted to**
8  **make it -- I'm sorry, I was misreading.  He wanted to**
9  **make it nine fights.**
10      A.  Joe and I had been talking about this for a
11  while.  What happened is we have an athlete who is in
12  a second year of a -- let me step back for a moment.
13      Most of the fighters didn't make it too
14  far, but for the few athletes that did make it for
15  some period of time, they'd be in their second year,
16  and then, a fighter would come in at -- that wasn't
17  on the Ultimate Fighter that maybe wasn't even as
18  good and be getting paid more because the TUF athlete
19  was on this old contract.
20      So Joe was like, I think we should up the
21  numbers.  We had talked about it for a while.  We
22  should increase the numbers for athletes coming off
23  the Ultimate Fighter, and that's what he was
24  proposing here.
25      **Q.  So at the time, the Ultimate Fighter**

204

1  **contracts were three-year deals; is that correct?**
2      A.  Correct.
3      **Q.  And within the three years, the contract**
4  **provided for three fights; is that right?**
5      A.  I believe so, but it was a static payment
6  for each year.  If you won, you didn't go up in
7  compensation.
8      What Joe was saying was, I think we should
9  pay the guys more money if they keep winning.
10      **Q.  Now, was this proposal of Silva's adopted?**
11      A.  I don't know whether it was exactly adopted
12  the way he proposed it, but we definitely increased
13  the compensation for fighters that were on TUF.
14      **Q.  And what was your position on it?  I mean,**
15  **did you agree with it?**
16      A.  I agreed we should pay more.
17      **Q.  Did you think it was a good idea to pay**
18  **more because as part of that, you would get an**
19  **agreement from the fighters to fight in more fights?**
20      A.  No.  I thought it was a good idea to pay
21  them more.
22      **Q.  But without regard to how much they fought?**
23      A.  No.
24      **Q.  But the proposal, though, doesn't it**
25  **specify that the fighters will -- doesn't it provide**

205

1  **that the fighters will fight more?**
2      A.  You asked me what my position was.  I felt
3  it was a good thing to pay the fighters more money.
4      **Q.  Okay.**
5      A.  And that's what we ultimately did, we
6  changed the deal, and the fighters made more money.
7      **Q.  As part of that contract, were they also**
8  **obliged to fight more frequently?**
9      A.  I don't think so.
10      (Exhibit 16 was marked for
11      identification by the reporter.)
12  BY MR. SAVERI:
13      **Q.  Sir, I've handed you what has been marked**
14  **as Exhibit 16.**
15      **Do you have that in front of you?**
16      A.  I do.
17      **Q.  Will you take a moment to review it,**
18  **please.**
19      A.  I've read it.
20      **Q.  Do you recall this email, sir?**
21      A.  No.
22      **Q.  Now, the top of the email chain is an email**
23  **from Mr. Mersch to yourself with a copy to Kirk**
24  **Hendrick.**
25      **Do you see that?**

52 (Pages 202 to 205)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

246

1      A.  Because the guys who actually got in on the
2   fighters, they made like caricature action figures.
3   So it was a different category.
4      Q.  I'm sorry.  Let me turn -- let me turn off
5   the phone.
6          Now, you write again:
7          "The problem like with the JAKKS
8      situation is we let competitors get
9      in with our fighters and beat us to
10     the punch at retail."
11     What did you mean by "let competitors get
12  in with our fighters and beat us to the punch at
13  retail"?
14     A.  I think what I meant was is that we weren't
15  connecting our licensees with our athletes.  And what
16  was happening is the athletes would -- we've got a
17  deal with JAKKS, we need to make sure that JAKKS was
18  getting in with our athletes before they signed deals
19  with others.  We wanted JAKKS to sign a deal with
20  them.  It can be called Round 8 or Round 6 or
21  something like that that had bunch of
22  athletes to these exclusive caricature deals.
23     Q.  So were there other merchandisers, if
24  that's the word, who were approaching fighters, UFC
25  fighters, and making their own deals with those

247

1   fighters?
2      A.  I remember Round 6 or Round 8 or whatever
3   it was in the caricature space, yes.
4      Q.  And under those deals, presumably -- I
5   apologize.
6          (Cellphone ringing.)
7   BY MR. SAVERI:
8      Q.  Under those deals, the fighters would be
9   able to generate income from those contracts,
10  correct?
11     A.  Under what deals?
12     Q.  Well, in this email, you talk about
13  situations where competitors get in with our
14  fighters.
15     A.  Right.
16     Q.  And if I understand your testimony
17  correctly, that referred to situations where the
18  merchandisers, these companies, would enter into
19  contracts directly with UFC fighters, correct?
20     A.  Correct.
21     Q.  And presumably, one of the terms of that
22  contract was -- or those contracts would be that the
23  merchandisers would be paying the fighters directly,
24  correct?
25     A.  Correct.

248

1      Q.  And so, that would be an income stream for
2   the fighters who were able to negotiate those
3   contracts?
4      A.  Right, but we were also delivering an
5   income stream to the athletes via the JAKKS deal.
6          So it wasn't one -- it was one,
7   essentially, or the other.  It wasn't that they lost
8   out if they didn't get the opportunity to do Round 5
9   or whatever it was, they would do the JAKKS deal.
10  The point is that Round 5 was going in and signing
11  exclusive deals with the athletes so they couldn't
12  get into the JAKKS program which was the master
13  licensee for UFC-branded stuff.
14         So it really -- it's not like they would
15  lose out.  My point is, is that we wanted them to be
16  with our licensee, they could make money with our
17  licensee as opposed to signing an exclusive deal with
18  a competitor.
19     Q.  Under these agreements, at least the
20  fighters had the choice or the ability to make their
21  own contracts and make their own deals with these
22  merchandisers and get whatever income stream that
23  they were able to negotiate, right?
24         MS. GRIGSBY:  Objection to form, compound.
25         THE WITNESS:  For the toys, they've always

249

1   had that.  They still do.
2   BY MR. SAVERI:
3      Q.  And when you say, "Beat us to the punch at
4   retail."  What did you mean by that?
5      A.  They were signing our athletes to exclusive
6   deals before we had the opportunity to get them to
7   sign a deal to make their doll in the JAKKS program.
8          And so, they were getting there first,
9   signing the athletes to exclusive deals, and then,
10  getting those products to retail before we could get
11  a JAKKS product to retail.
12         So I mean, the game plan was we got to put
13  together a strategy to get JAKKS to sign these
14  athletes before they went somewhere else and signed
15  exclusive deals.  And many athletes did.
16     Q.  So in the situation you're talking about
17  with JAKKS, was the problem that, for example, some
18  other manufacturer would have created one of these
19  action figures in the likeness of one of the fighters
20  before JAKKS was able to, and so, customers would go
21  to the store, and there would already be an action
22  figure in the likeness of one of the fighters?
23     A.  Yes.  Like I said, it was a slightly
24  different product, but like I said, with Round -- I
25  can't remember, I think it was Round 5.  Round 5 was

63 (Pages 246 to 249)

250

1    doing exclusive deals with many of the top athletes,
2    and so, they couldn't even be in the JAKKS program.
3          Ultimately, we figured out a deal with
4    Round 5 to make the athletes available to both the
5    JAKKS program and the Round 5 program.  So it
6    actually -- the athletes ended up getting royalties
7    from both products.
8          But at this period of time, we're having
9    some trouble with the JAKKS deal because Round 5 was
10   being aggressive in signing athletes to exclusive
11   deals.
12        Q.  Now, you proposed three alternatives.  Do
13   you see that?
14        A.  I do.
15        Q.  The second was, "ban everything and damage
16   our relationship with the fighters."
17            Do you see that?
18        A.  I think I gave three alternatives and
19   recommended one.
20        Q.  Okay.  I just want to understand what you
21   mean by your second alternative, "ban everything and
22   damage our relationships with fighters."
23            What do you mean by "ban everything"?
24        A.  I think in the apparel space because we're
25   talking now about MMA Elite, just not allow any other

251

1    apparel sponsors.
2        Q.  And the concern was there that if you did
3    that, the fighters who had arrangements with some
4    merchandisers would be foreclosed from them, and that
5    might make -- would make them upset, and that would
6    damage their relationship with you?
7            MS. GRIGSBY:  Objection, compound.
8            THE WITNESS:  Yeah.  As opposed to the
9    Reebok deal where we provided money to the athletes
10   for wearing the apparel, if we just banned
11   everything, it would just sort of be -- there
12   wouldn't be any money for apparel.
13   BY MR. SAVERI:
14       Q.  Now, you go on to write or you refer to a
15   tax.  You say:
16            "The deal with MMA Elite is a
17            five-month test to see if we can tax
18            these brands from coming into the
19            Octagon."
20            Do you see that?
21       A.  I do see that.
22       Q.  When you say, "tax," are you referring to
23   some kind of royalty?
24       A.  No.  I'm referring to requiring them to
25   essentially pay for the exposure that they're getting

252

1    in our show.
2          As I'm sure you've seen during, you know,
3    maybe you watch videos of bullfights, just a
4    tremendous amount of clutter, different brands, many
5    brands that were inappropriate like Condom Depot and
6    Dynamic Fastener and all these brands that just did
7    not fit with a top tier sports organization.
8          So the concept was let's require brands
9    that are substantial enough to pay an exposure fee,
10   and if they do that, then they have the ability to
11   also sponsor athletes.
12       Q.  And so, the tax you're referring to here is
13   this exposure fee you're referring to --
14       A.  Yes.
15       Q.  -- is that right?
16       A.  That's correct.
17       Q.  And that's a payment by a sponsor or
18   merchandiser to Zuffa?
19       A.  Correct, to give them the opportunity if
20   they want -- to also sponsor fighters too, yes.  But
21   we needed to clean up the clutter.  It was not
22   becoming at all.
23          In fact, when we did the Reebok deal, one
24   of the first calls we got was from ESPN saying:  This
25   is the best decision you ever made.  You're going to

253

1    get more coverage on ESPN because we can now know
2    whether UFC product is actually in the video.
3          And number two, we're not in the business
4    of exposing brands for free.  So we're not going to
5    advertise these brands that are all these fighters.
6    So you're going to get a lot more media coverage from
7    ESPN, which is incredibly important to the success of
8    the UFC brand, to the success of all our athletes'
9    brands, and to successful pay-per-view events, which
10   our athletes are partners in.
11         THE REPORTER:  Which our what?
12         THE WITNESS:  Partners in.
13         MR. SAVERI:  Did you get everything?
14         THE REPORTER:  No.
15         MR. SAVERI:  I was going to move to strike
16   the rest of the answer.
17         THE REPORTER:  I'll fill it in later.
18   BY MR. SAVERI:
19       Q.  And when you're referring to the tax or
20   these payments, this was a payment directly to the --
21   to Zuffa.
22           Were these -- strike that.
23           Now, you talked about, I think it was
24   Round 5 a minute ago?
25       A.  I think that's -- I can't remember whether

64 (Pages 250 to 253)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

270

1    In your email of April 2nd, 2009, to
2  Mr. Mulkey, you forward an email that you received
3  previously from Mr. Padawer.  No, excuse me.  An
4  email that you wrote to Mr. Padawer.
5    A.  Correct.
6    Q.  And this email that you wrote to
7  Mr. Padawer discusses this Round 5 proposal that
8  we've been discussing, correct?
9    A.  Correct.
10    Q.  And you write:
11        "This decision goes against the
12        DNA of our organization."
13        Do you see that?
14    A.  Um-hmm.
15    Q.  What do you mean by it went "against the
16  DNA of our organization"?
17    A.  I really don't recall.
18    Q.  Now --
19    A.  I think it had something to do with
20  sublicensing.  We don't -- I think -- typically, we
21  don't allow any assignment of our agreements to
22  anybody.  And so, this was essentially an assignment
23  of that agreement to Round 5.
24    Q.  Well --
25    A.  And so --

271

1    Q.  Did you finish?  I didn't mean into the
2  interrupt you.
3    A.  That's what it was, I guess.  I don't
4  remember specifically.
5    Q.  And why would that violate or be
6  inconsistent with the DNA of the organization?
7    A.  Because we don't allow assignment of our
8  agreements.  We want to enter into contracts with
9  people that we know, and you know, they should
10  perform under those agreements.
11    Q.  Now, you say:
12        "We are only agreeing to proceed
13        along this route if the following
14        are accurate."
15        Do you see that?
16    A.  Yeah.
17    Q.  And the third item says:
18        "Fighters will not have any
19        economic advantage as a result of
20        signing up with Round 5 as opposed
21        to the UFC."
22        Do you see that?
23    A.  Yes.
24    Q.  So you wanted to make sure that fighters
25  would have no economic advantage as a result of

272

1  signing up with Round 5 under this agreement,
2  correct?
3    A.  What we meant by that is we didn't want
4  there to be any disparity between the athletes'
5  royalties, that everybody had to be paid the same
6  royalty for their action figure.  And just because
7  somebody came in through Round 5, they shouldn't get
8  a higher royalty than somebody comes in from the UFC
9  side of things.
10    Q.  Okay.  So you wanted to make sure that the
11  fighters didn't make more money from coming in under
12  the -- you wanted to make sure that fighters wouldn't
13  do better if they were signed up by Round 5 as
14  opposed to the UFC?
15    A.  We wanted there to be parity.  So if one is
16  making more, the other is making less.
17    Q.  I'm sorry?
18    A.  We wanted there to be parity.
19    Q.  I understand that.  The next point, you
20  lost me.
21    A.  We wanted there to be parity.  We didn't
22  want one athlete to come in through Round 5 and have
23  a higher royalty rate than somebody who came in
24  through the UFC.  There had to be parity.  All
25  athletes needed to be treated the same.

273

1    Q.  Why is that?
2    A.  Because that's what we thought was fair to
3  all the athletes.
4    Q.  Well, wouldn't it be more fair to the
5  athletes who were able to get a higher price to be
6  paid more?
7    A.  The game plan was to get all athletes into
8  both programs so they'd be selling both JAKKS dolls
9  and the dolls that were being made by Round 5.
10        That's the whole point of it.  We wanted to
11  make sure they were in both programs so they made
12  twice as much money in the two different products as
13  opposed to just being in one product line.
14    Q.  Okay, but if one of your athletes could
15  make more money under Round 5 as opposed to the
16  other, why wouldn't that be better for that athlete?
17    A.  Well, the point is if they could.
18    Q.  Yeah.
19    A.  I guess it would.  And there were certain
20  athletes that, you know, ended up, I think, only
21  being in one product, they weren't in both.
22        But at the end of the day, the theory was
23  that if the athletes were in both products that were
24  hitting different segments of the toy market that
25  they would make more money.

69 (Pages 270 to 273)

274

1    It would be better for the long-term
2 viability of the programs. Ultimately, both programs
3 failed, and that wasn't good for anyone.
4        (Exhibit 23 was marked for
5        identification by the reporter.)
6 BY MR. SAVERI:
7    Q.  I'm handing you what has been marked as
8 Exhibit 23, and just so you know, we've asked for
9 some printouts of text messages, and this is a
10 compilation of those text messages.
11        Let me ask you a question.  If you turn to
12 page 105.
13    A.  Okay.
14    Q.  Do you see entry 2531?  I think it's four
15 from the top.
16        Are you on page 157?
17    A.  Yes.
18    Q.  105, excuse me.  105 of 157.
19    A.  Yes.
20    Q.  And is the top entry on the page 2528?
21        If you look in the left-hand column, the
22 far left-hand column, there are a series of numbers.
23    A.  Yes.  You're talking about 2531?
24    Q.  Yes.  You're with me.
25    A.  Yes.

275

1    Q.  Do you see your name there?
2    A.  Yep.
3    Q.  And is that your mobile phone number?
4    A.  Yes, it is.
5    Q.  And the column -- the phone number in
6 column B, do you recognize that mobile phone number?
7    A.  No.  It could be Lorenzo's.  I don't -- I
8 never look at his number, so I just...
9    Q.  Let me represent to you for purposes of
10 this, that that's the mobile phone number of Lorenzo
11 Fertitta.
12    A.  Okay.
13    Q.  It's dated June 19th, 2013.
14        "Meeting with Round 5 guys now.
15        We are literally the worst partner a
16        licensee could have.  Embarrassing."
17        Do you see that?
18    A.  Yep.
19    Q.  Do you recall writing that?
20    A.  I do, actually.
21    Q.  And what was that about?
22    A.  You know, this is after the deal was in
23 place with Round 5.  We developed a, you know,
24 actually, a pretty good relationship with those guys.
25 They were actually really good guys.  And you know, I

276

1 just felt like we were doing a poor job both us and
2 our athletes of supporting our licensee.  I was just
3 being very honest about how I didn't think we were
4 doing a good job.
5    Q.  Okay, fair enough.
6        Going back to Exhibit 21, which is the
7 document I was just asking you about, this is the one
8 in 2009 that talks about this Round 5 proposal.
9    A.  Right.
10    Q.  To the best of your recollection, was the
11 deal with Round 5 and JAKKS signed?
12    A.  I don't know.
13    Q.  Okay.
14    A.  JAKKS went through a bankruptcy, and I
15 think at one time, we just had to deal separately
16 with Round 5.  I really don't recall.
17    Q.  Let me switch gears a little bit.
18        MS. GRIGSBY:  Are we going to use
19 Exhibit 23 again, or should we put it to the side?
20        MR. WEILER:  We'll be using it again, I
21 imagine.
22        MS. GRIGSBY:  Okay.
23        THE WITNESS:  Which one?
24        MS. GRIGSBY:  The big one.
25        MR. SAVERI:  You can just leave it in the

277

1 stack.  If we need to dig r it, we should be able to
2 find it.
3 BY MR. SAVERI:
4    Q.  I have some questions about Strikeforce.
5        Was Strikeforce a rival MMA promoter?
6        MS. GRIGSBY:  Objection to form.
7        THE WITNESS:  Strikeforce was a competitor.
8 Mainly regional shows but a competitor.
9 BY MR. SAVERI:
10    Q.  And from when to when?
11    A.  I don't recall.
12    Q.  Up until the time that Zuffa acquired
13 Strikeforce, was there a period of time when you
14 believed Strikeforce was not a competitor of Zuffa?
15    A.  Maybe early on, but for the most of their
16 existence, I would consider them a competitor.
17    Q.  And when did Zuffa decide to acquire
18 Strikeforce?
19    A.  I don't remember the date, but it was after
20 we were approached by people representing them saying
21 they wanted to sell the business.
22    Q.  And who made the decision to acquire
23 Strikeforce?
24    A.  Lorenzo Fertitta.
25    Q.  Did he ask you your opinion on whether or

70 (Pages 274 to 277)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

294

1     Q.  Did he regularly report on ratings of UFC
2  events?
3     A.  I believe he did.
4     Q.  And did he regularly report on ratings of
5  competitors' events?
6     A.  Yes.
7     Q.  And did you view his reports as important
8  business intelligence?
9     A.  I would view it as business intelligence.
10  I don't know how important it was, but...
11     Q.  Well, I mean, is it true that you hired him
12  to do this?
13     A.  This is one of many things that he did.
14     Q.  Well, this was just part of his job, right?
15     A.  Right, but he wasn't a ratings analyst.  He
16  was a financial analyst among many, many other
17  things.  He would get us some Nielsen ratings and put
18  it in an email and send it to us.
19     Q.  Now, the document refers to, I think the
20  term is counterprogram against our competition.
21     Do you see that?  It's in the third
22  paragraph.  The paragraph that begins, "Overall,
23  UFC 110 had a good showing."
24     Do you see where I'm reading from?
25     A.  I see that.

295

1     Q.  And then, a little bit farther down, it
2  says:
3        "In comparison to other shows we
4       have used a counterprogram against
5       our competition --"
6     A.  Got it.
7     Q.  And then, it goes on.  Do you see where I
8  am?
9     A.  I do.
10     Q.  What is the reference to "counterprogram
11  against our competition"?
12     A.  It looks like we were putting on
13  programming at the same time as our competitors'
14  programming.
15     Q.  And was that an effort to lower a
16  competitor's rating by diverting viewers away from
17  them to your programming?
18     A.  Not necessarily.  I mean, we're competing
19  against the NBA finals right now.  We're competing
20  against March Madness at times, NFL, Super Bowl.  I
21  mean, it's just we're putting on content on the same
22  day that they are, and we have an ability to see how
23  it compares to theirs.  Looks like they beat us too.
24     Q.  But this says, "counterprogram against our
25  competition."

296

1     Do you see that?
2     A.  I do see that.
3     Q.  It doesn't refer to the NBA or any of these
4  other sports, does it?
5     A.  My point is those are -- they
6  counterprogram us every single day.  Every time we
7  put on an event, every time we put on a taped
8  program, we're getting counterprogrammed by some
9  other sports entertainment program.
10     Q.  My question is:  Does the email refer to
11  any other form of competition other than Strikeforce?
12     A.  This email does not.
13     Q.  Okay.  And --
14     A.  Hold on.  Oh, I disagree with that.  "I'm
15  putting in a request to see how the NBA playoffs
16  performed Saturday night in the time slot."  So it
17  does reference the NBA.
18     Q.  Now, the ratings, though, that are listed
19  here, they don't say anything about the NBA, do they,
20  it's about Strikeforce?
21     A.  Yeah, that wasn't the question, though.
22  But you're right, the ratings.  Your new question
23  about the ratings is correct.
24     Q.  Now, at least with respect to the
25  counterprogramming against the competition -- well,

297

1  at least with respect to the counterprogramming
2  against Strikeforce, would you agree that one of the
3  purposes of the counterprogramming here was to
4  broadcast competitive content to that being shown at
5  the same time by Strikeforce?
6     MS. GRIGSBY:  Objection, compound.
7     THE WITNESS:  It's what we do every single
8  day of our lives, compete for the attention of the
9  consumer.  So I don't see this as being any different
10  than any other day of the week.  Obviously, we were
11  competing against the NBA, and there's a lot of
12  strong arguments that this creates an MMA night where
13  people can watch a ton of MMA in one night.  And
14  actually, when you put content on two different
15  channels around the same time, people flip back and
16  forth, and that's good for both properties.
17  BY MR. SAVERI:
18     Q.  Now, I just want to make sure I understand.
19     You've heard the term "counterprogram"
20  before, correct?
21     A.  I have.
22     Q.  And do you understand the use of the term
23  "counterprogram" to include -- strike that.
24     What do you understand the purpose of
25  counterprogramming to be as that term was used at the

75 (Pages 294 to 297)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

358

1  contain an exclusive period, did you mean contracts
2  such as Exhibit 5?
3          MR. SAVERI:  Object to the form.  Same
4  objection about the scope of the examination.
5          THE WITNESS:  Yes.
6          MS. GRIGSBY:  No further questions.
7          MR. SAVERI:  Thank you.
8          THE WITNESS:  Thank you.
9          THE VIDEOGRAPHER:  This concludes Volume 1
10  of the videotaped deposition of Ike Lawrence Epstein
11  on May 26th, 2017.
12          The original media from today's testimony
13  will remain in the custody of David Feldman Worldwide
14  Court Reporting.
15          The time is approximately 6:00 p.m.  We are
16  going off the record.
17          (The following occurred off the
18          video record.)
19          MR. NORTH:  Can we also stipulate that the
20  transcript be marked confidential and any
21  designations?
22          MR. SAVERI:  Whatever.  I mean, yes, okay.
23  That's fine.
24          MS. GRIGSBY:  That's what we usually do.
25

359

1          MR. WEILER:  Yes, that's fine.
2          (The deposition was concluded at
3          6:00 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

360

1
2  STATE OF _____ )
3                            ) :ss
4  COUNTY OF _____)
5
6
7          I, IKE LAWRENCE EPSTEIN, the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15          _____
16          IKE LAWRENCE EPSTEIN
17
18
19
20  Sworn and subscribed to before
21  me, this         day of
22        , 2017.
23
24  _____
25          Notary Public

361

1          CERTIFICATE OF REPORTER
2          I, Cynthia K. DuRivage, a Certified
3  Shorthand Reporter of the State of Nevada, do hereby
4  certify:
5          That the foregoing proceedings were taken
6  before me at the time and place herein set forth;
7  that any witnesses in the foregoing proceedings,
8  prior to testifying, were duly sworn; that a record
9  of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; that the foregoing transcript is a true
12  record of the testimony given.
13          I further certify I am neither financially
14  interested in the action nor a relative or employee
15  of any attorney or party to this action.
16          Reading and signing by the witness was
17  requested.
18          IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20  Dated:  June 12th, 2017
21
22
23          _____
23          CYNTHIA K. DuRIVAGE
            CCR No. 451
24
25

91  (Pages 358 to 361)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

362

1        INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7       After doing so, please sign the errata sheet
8    and date it.
9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

363

1        E R R A T A
2
3
4
5       I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE:_____
18   REASON:_____
19   ___ ___ CHANGE:_____
20   REASON:_____
21
22   _____    _____
23    WITNESS' SIGNATURE         DATE
24
25

92  (Pages 362 to 363)

364

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
            Plaintiffs,           )
                                 )
        vs.                      )   Case No.
                                 )   2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
            Defendant.            )
_____)


CONFIDENTIAL

VIDEO RECORDED DEPOSITION OF IKE LAWRENCE EPSTEIN

July 21, 2017

LAS VEGAS, NEVADA

2:22 p.m.



Reported by:
DEBRA D. SMALLEY, CCR #537
Job No. 51247-B

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

457

1    forum about the litigation.
2         Since then I've had meetings with rating
3    agencies. Once again, I don't know whether it was
4    raised at that particular meeting. I know we certainly
5    discussed it with our investors for -- you know, they own
6    the company so, of course, we discussed it with them.
7    But it was definitely -- the question was definitely
8    asked of us during the due diligence process of buying
9    the company, and that's when we said "Talk with Boies
10   Schiller, ask them whatever you want. I don't know
11   whether they'll answer any questions, but you can ask
12   them and then you make your own decision whether this
13   is a good case or bad case."
14        Q   And in the context of the purchase or the --
15   any of the financing associated with the purchase,
16   was there any amount of money reserved for purposes of
17   paying a judgment or settlement in this litigation?
18        A   Zero. Nothing.
19        Q   Okay. And do you know if any of the buyers or
20   lenders have reserved any money to pay the amount of the
21   judgment or settlement in this case?
22        A   I don't think the lenders would ever do that,
23   no. I don't -- I don't think so.
24        Q   Now, at the time of the sale, 2016, who owned
25   the equity in Zuffa?

458

1        A   Well, there are a variety of trusts and things,
2    you know, that --
3        Q   Is it fair to say that Lorenzo Fertitta, Frank
4    Fertitta, the trust associated with their families, Dana
5    White, January Capital, were the big equity owners --
6        A   Correct.
7        Q   -- of Zuffa at the time of the sale?
8        A   They were. They owned all the equity. January
9    had 10 percent, Dana had 9 percent, the Fertittas had
10   the rest.
11        COURT REPORTER: I'm sorry, say that one more
12   time.
13        THE WITNESS: I'm sorry.
14        January Capital had 10 percent, Dana had 9
15   percent, the Fertittas had the remaining 81 percent.
16   BY MR. SAVERI:
17        Q   And did those four have all the voting stock
18   in the company?
19        A   Yes.
20        Q   Now, when did the Fertittas acquire the UFC?
21        A   January 2001.
22        Q   Okay. And how much did they pay for it?
23        MS. GRIGSBY: Objection. Foundation.
24   BY MR. SAVERI:
25        Q   Do you know how much they paid for it?

459

1        A   Two million dollars.
2        Q   Since the acquisition of the UFC by the
3    Fertittas at that time, do you know how much has been
4    paid to the equity owners of Zuffa?
5        A   You mean at the sale or you mean distributions?
6        Q   Well, let's break it up.
7             So over the course of time there were dividends
8    paid out to the equity owners; correct?
9        A   Correct.
10        Q   And just focusing on the amount of dividends,
11   do you know how much was paid in dividends to Lorenzo
12   Fertitta?
13        A   No.
14        Q   Was it hundreds of millions of dollars?
15        A   Yes.
16        Q   Do you know how much was paid to Frank Fertitta
17   in terms of dividends during that period?
18        A   The exact same amount as Lorenzo got.
19        Q   You don't know, but it's hundreds of millions
20   of dollars?
21        A   I believe so.
22        Q   Do you know how much was paid in dividends to
23   Dana White?
24        A   No.
25        Q   You don't know, but hundreds of millions of

460

1    dollars?
2        A   I don't know about that in distributions,
3    dividends. I don't know if it was hundreds of millions.
4    Tens of millions.
5        Q   Tens of millions for sure?
6        A   For sure.
7        Q   And January Capital, how much were they paid in
8    dividends?
9        A   I don't know. They came in in what? 2008?
10   So -- 2009, maybe. I don't remember the exact date,
11   but --
12        Q   I thought it was 2010, but it was later?
13        A   Yeah, it was definitely later.
14        Q   But is it fair to say they, too, received
15   substantial sums of monies paid out in dividends
16   connected to their equity interests in the company?
17        A   Yeah, I mean for -- they certainly made tens
18   of millions of dollars, I would assume.
19        Q   Yeah.
20             And so how much did Lorenzo Fertitta invest in
21   the company?
22        A   He put up --
23        MS. GRIGSBY: Objection. Foundation.
24        THE WITNESS: Yeah, I don't have the exact
25   numbers, but, you know, he certainly invested probably

25 (Pages 457 to 460)

CONFIDENTIAL - IKE LAWRENCE EPSTEIN

461

1    25 to 30 million dollars of his own money, and his
2    brother did a similar amount.
3    BY MR. SAVERI:
4        Q   How much did Dana White invest in the company?
5        A   I don't think he invested anything in the
6    company.
7        Q   And we were talking a minute ago that January
8    Capital invested in 2008, 2009, maybe 2010, that period.
9            Do you know how much they invested?
10       A   It was around 200 million.
11       Q   And how much of the company did they get for
12   the 200?
13       A   Ten percent.
14       Q   During that same period of time we're talking
15   about, do you know how much was paid in -- in nominal
16   dollars or on a percentage basis to fighters?
17       A   No.
18       Q   Do you know that the fighters, in total,
19   received approximately half as much money as the four
20   equity owners did during that period just from the
21   payment of dividends?
22           MS. GRIGSBY:  Objection.  Foundation.
23           THE WITNESS:  I don't know that.
24   BY MR. SAVERI:
25       Q   Now, during that period, prior to the sale in

462

1    2016, did Zuffa borrow money for its business?
2        A   Yes.
3        Q   And they did so in 2007?
4        A   We did it a few times.  I don't remember the
5    exact dates.
6        Q   Do you recall, in approximately 2007, Zuffa
7    borrowed about 350 million dollars?
8            MS. GRIGSBY:  Objection.  Foundation.
9            THE WITNESS:  I recall in 2007 there was a --
10   I don't know if that was the first time we went to the
11   markets or the second time, but there was definitely a
12   term loan that was -- that was sold to the market.
13   BY MR. SAVERI:
14       Q   And was Deutsche Bank the lead underwriter?
15       A   I think so, yeah.
16       Q   And focusing on the 2007 debt issuance, do you
17   know how much, at that time, was paid to the equity
18   owners?
19       A   I don't remember exactly.  I know a portion of
20   the funds were used for the acquisition of Pride and
21   costs associated with that.
22       Q   Right.
23       A   And there were some other costs associated with
24   the operation of the business.  The remaining amount of
25   capital raised via that term loan was dividended out to

463

1    the then owners of the company.
2        Q   And do you recall how much of the approximately
3    350 million dollars was dividended out to the owners at
4    the time?
5        A   I don't.
6        Q   Do you know if it was over 200 million dollars?
7            MS. GRIGSBY:  Objection.  Foundation.
8            THE WITNESS:  I don't know.  Could have been.
9    I don't know.
10   BY MR. SAVERI:
11       Q   Now, in 2010, Zuffa borrowed money again;
12   correct?
13       A   Sounds about right.
14       Q   And the 2010 loan was approximately a hundred
15   million dollars; is that correct?
16       A   It makes sense.
17       Q   And was Deutsche Bank again the lead
18   underwriter?
19       A   They were certainly involved in it.
20       Q   Okay.  But you don't recall, as you sit here
21   today, who was the lead?
22       A   You know, there were other banks involved.
23   They were the lead, I know, on the first two, and
24   they probably -- I mean, they were a lead.  They
25   might have been co-lead, but they were certainly a

464

1    lead.
2        Q   And at the time of that -- that loan, how much
3    was paid to the equity owners in terms of dividends?
4        A   I don't know.
5        Q   A substantial amount of it?
6        A   Yes.
7            COURT REPORTER:  I need to go off the record.
8            MR. SAVERI:  Sure.
9            THE VIDEOGRAPHER:  We are off the record at
10   4:41 p.m.
11           (Off the record)
12           THE VIDEOGRAPHER:  Back on the record.  The
13   time is 4:44 p.m.
14   BY MR. SAVERI:
15       Q   So I've been asking you some questions about
16   the dividend payments to the equity owners.
17           Since the Fertittas bought Zuffa, is it true
18   that the equity owners have been paid approximately
19   1.5 billion dollars in dividends?
20           MS. GRIGSBY:  Objection.  Foundation.
21           THE WITNESS:  I don't know.
22   BY MR. SAVERI:
23       Q   Does Zuffa pay for private jet travel for its
24   executives?
25       A   Now it does not.  Other than some stuff for

26  (Pages 461 to 464)