# EXHIBIT 9

# Excerpts of 30(b)(6) Deposition of Ike Lawrence Epstein on Acquisitions

```
                                                            1
                 UNITED STATES DISTRICT COURT

                     DISTRICT OF NEVADA


   CUNG LE; NATHAN QUARRY, JON    )
   FITCH, on behalf of            )
   themselves and all others      )
   similarly situated,            )
                                  )
            Plaintiffs,           )
                                  )
            vs.                   ) Case No.
                                  ) 2:15-cv-01045-RFB-(PAL)
                                  )
   ZUFFA, LLC, d/b/a Ultimate     )
   Fighting Championship and      )
   UFC,                           )
                                  )
            Defendant.            )
   _____)



                        CONFIDENTIAL

     VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

                 BY IKE LAWRENCE EPSTEIN

                    December 2, 2016

                   LAS VEGAS, NEVADA

                      11:29 A.M.


   Reported by:
   Sarah Padilla, CCR NO. 929
   Job No: 47777
```

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

34

1  weight classes, there was a -- that was a priority.
2     Q   So regarding the fighters from WEC who
3  were in the 135 and the 145 weight class, were the
4  majority of those WEC fighters given contracts with
5  Zuffa?
6     A   I believe they were.  I just don't have
7  the specific -- a detailed recollection of exactly
8  what fighters.  But that was the game plan to bring
9  everybody over.
10    Q   And you say that was the game plan to
11 bring everybody over, are you referring to the 135
12 and 145 weight class?
13    A   Well, no.  I'm referring to -- to all the
14 weight classes.  I think the game plan was -- the
15 other reason why we acquired WEC is that when we
16 entered into our deal with Spike TV, when the UFC
17 entered into its deal with Spike TV, Spike required
18 that we be exclusive to them, that we couldn't go to
19 any other cable networks.  We became aware that the
20 Outdoor Life Network, which ultimately became
21 Versus, which ultimately became the NBC Sports
22 Network, was interested in MMA content because of
23 the success of the UFC.  We couldn't put UFC content
24 on there because our deal with Spike restricted us.
25 So this gave us the opportunity to put more MMA

35

1  content on the Sports Channel, get all the marketing
2  and the exposure associated with that.
3          Because at this time, MMA, you know, was
4  still a very niche market.  It was something that,
5  you know, not a lot of people knew about or people
6  had misconceptions about it.  So one of the
7  strategies was get more content on a broadly
8  distributed cable channel so we could let more
9  people know about what MMA was all about.  And we
10 did that through the WEC brand because we couldn't
11 do it through UFC.
12    Q   And were there any fighters who were
13 fighting for WEC at the time of the acquisition who
14 were not given contracts with Zuffa?
15    A   You know, as I said, most of the fighters
16 were on one-fight deals.  So I don't remember
17 specifically, you know, how the new contracts were
18 entered into and which athletes were given new
19 contracts under the Zuffa-owned WEC.  But my
20 recollection is that we wanted all, the majority.
21    Q   And how long did UFC operate as WEC as a
22 stand-alone business?
23    A   I think three or four years.
24    Q   Through 2010?
25    A   That sounds about right.  I don't remember

36

1  the exact dates.
2     Q   And was there anyone at Zuffa who was
3  responsible for the WEC operations?
4     A   Yes.  Pete Dropick was one of the people
5  who were responsible for the general operations of
6  the WEC.  Reed Harris continued to be involved in
7  the WEC.  For a period of time Scott Adams, before
8  he left, was involved in the operation of the WEC.
9  And there was many, many others.  But those were the
10 three main people when it came to the operations of
11 the organization.
12    Q   So of those three people that you
13 mentioned, Mr. Adams, Mr. Harris, and Mr. Dropick --
14 were any of them, were any of them the number one
15 guy in terms of authority for the operations for
16 WEC?
17    A   That's a good question.  You know, I think
18 it changed at different periods of time.  But, you
19 know, I would say that Pete Dropick would have been
20 the individual who was sort of the lead person for
21 most of the time regarding the operations of the
22 WEC.
23    Q   During the time that Mr. Dropick may have
24 been the lead person for WEC operations, who did he
25 report to at Zuffa?

37

1     A   You know, he reported in to a variety of
2  members of our senior executive committee including,
3  you know, myself, Kirk Hendrick, John Mulkey our
4  CFO, Dana White, Lorenzo Fertitta.
5     Q   So in terms of very large decisions on,
6  say, media contracts or something like that with
7  respect to the WEC, was there one person in
8  particular who Mr. Dropick would have to consult?
9     A   I don't think there was one person in
10 particular.  At this time, you know, we were a very,
11 very small organization.  And virtually all of the
12 major decisions the company made involved, you know,
13 myself once I joined the company, Kirk Hendrick,
14 Lorenzo Fertitta, John Mulkey our CFO at the time,
15 and Dana White.
16    Q   Was Zuffa's operation of the WEC
17 profitable?
18    A   That's a tough question to answer just
19 because -- for a variety of reasons.  One, because
20 we definitely had a lot of overhead that we sort of
21 handled for the WEC operation.  But I mean, at the
22 end of the day I really don't know whether it was or
23 it wasn't.
24    Q   I'd like to mark as Exhibit 57 a document
25 that has been created from a spreadsheet bearing the

174

1  page 17 of the agreement, please, Section 3.9.
2      A   Got it.
3      Q   Entitled contracts -- "Fighter Contracts."
4      A   I see it.
5      Q   Were the fighter contracts the primary
6  asset that Zuffa acquired from Strikeforce?
7      A   They were certainly one of the most
8  important assets that we acquired, yes.
9      Q   Was there any asset that were more
10 important that the fighter contracts?
11     A   I mean, the three assets that we got were
12 the fighter contracts, the library that they had --
13 and I mentioned previously, they had acquired some
14 other assets from other promoters in addition to the
15 Strikeforce brand and the contracts to Telecast and
16 CBS and Showtime.  So the fighter contracts were
17 definitely the most important, but there were other
18 important assets also.
19     Q   I would like to mark as an exhibit,
20 Exhibit 83, document bearing the Bates label
21 ZFL-0551556, goes through 1558.
22     A   All right.  I got it.
23         (Exhibit 83 was marked.)
24 BY MR. WEILER:
25     Q   Do you recognize this document?

175

1      A   Yes.
2      Q   And what is this document?
3      A   Strikeforce fighter contract list.
4      Q   And are the fighters on this list the
5  fighters whose rights Zuffa acquired as part of the
6  Strikeforce transaction?
7      A   It looks like it, yes.
8      Q   Was it a condition of the Strikeforce
9  agreement that any particular of these fighters
10 agree to have their contracts assigned to Zuffa?
11     A   Well, I mean, some of them I don't think
12 were assigned, and we may have signed them later on.
13 Like Hector Lombard, for example, I don't recall him
14 being assigned.  But I know we did sign him to a
15 deal later on.  I believe the vast majority of these
16 were assigned to us as part of the deal.
17     Q   Were there any fighters on this list who,
18 if they were not assigned to Zuffa as part of the
19 deal, would have resulted in Zuffa backing away from
20 the deal?
21     A   I don't know if there were -- go ahead.
22         MS. GRIGSBY:  Objection.  This is a
23 three-page list.  So can you please give the witness
24 time to just review every name on this list?
25         MR. WEILER:  Sure.  Please, sir, take all

176

1  the time you need.
2         THE WITNESS:  Want to me to go ahead and
3  answer?  Yes, so I don't specifically recall any
4  particular fighter, you know, if we don't get this
5  particular guy, this deal is off.  Clearly, we
6  wanted to get all the fighter contracts, but I don't
7  remember there being, "If we don't get Alistair
8  Overeem, for example, the deal's off."  I don't
9  recall that -- that discussion.
10 BY MR. WEILER:
11     Q   Direct your attention to the third column
12 here that's on this spreadsheet.  It's entitled
13 "Exclusivity."  Do you see where it says that?
14     A   I see it.
15     Q   What's the significance of this term here,
16 "exclusivity," as it appears on Exhibit 83?
17     A   It's giving a description of whether or
18 not the contract is exclusive to Strikeforce.
19     Q   When you say "exclusive to Strikeforce,"
20 do you mean whether -- strike that.
21         What do you mean by "exclusive to
22 Strikeforce"?
23     A   It means that the athletes were exclusive
24 to Strikeforce for MMA fighting.  You see, the vast
25 majority are exclusive.

177

1      Q   Was it important to Zuffa that the
2  agreements with Strikeforce between Strikeforce and
3  its fighters were exclusive as to Strikeforce?
4      A   Yes.  As I explained earlier, you can't --
5  you know, we were -- we were acquiring Strikeforce
6  in order to increase the output of our events.  And
7  as I said, as you ramp up and do 42, 43 events per
8  year, if you don't know the athletes are exclusive
9  to you, you can't plan that many events.
10     Q   Would Zuffa have acquired Strikeforce if
11 the contracts that had been assigned as part of the
12 transaction were not exclusive?
13     A   Probably not.
14     Q   And why not?
15     A   I explained previously, you just can't run
16 a business doing 42 or 43 events per year without
17 having the athletes exclusive to you because you
18 just can't produce that output of event not knowing
19 the athletes are going to be there for you and not
20 fighting for some other organization.
21         So, I mean, we might have still acquired
22 it and tried to get the athlete to sign exclusive
23 agreements with us.  But at the end of the day, our
24 business requires these to be exclusive because you
25 have so many events you need to put on every single

178

1  year. You have to know the athletes are there for
2  you to put on the event. Otherwise, the output of
3  events is necessarily going to go down. I mean, you
4  can have nonexclusive agreements, but you're only
5  going to be doing a handful of events per year.
6      Q   Do you know who created this document
7  here, Exhibit 83?
8      A   I don't know.
9      Q   Do you know how Zuffa determined whether
10 or not any given agreement was exclusive?
11     A   Well, I'm sure we received representations
12 from Strikeforce about it. But as part of our due
13 diligence, we look to the agreements. There aren't
14 that many of them.
15         MS. GRIGSBY: Counsel, I just have a
16 question. Is this a complete document? It looks
17 like on the top it has a .0001. Does that indicate
18 it's part of a family or an e-mail?
19         MR. WEILER: Counsel, these are Zuffa's
20 documents. I can't speak to the significance of --
21         MS. GRIGSBY: The question -- no. No.
22 No. The question is was it produced to you as this
23 is a stand-alone document?
24         MR. WEILER: I don't know. I don't know.
25 I think it was, but I'm not sure.

179

1      I'd like to mark as Exhibit 84 a document
2  bearing the Bates label ZFL-1242503 running through
3  2505.
4          (Exhibit 84 was marked.)
5          THE WITNESS: All right. I got it.
6  BY MR. WEILER:
7      Q   Do you recognize this document?
8      A   Not really.
9      Q   Do you know who might have created this
10 document?
11     A   No.
12     Q   As part of the Strikeforce transaction,
13 did Scott Coker assist Zuffa in signing Strikeforce
14 fighters to Zuffa?
15     A   As part of the -- say that again.
16     Q   Let's withdraw the question and just start
17 here.
18         Who is Scott Coker?
19     A   Scott Coker is a guy who was the guy who
20 was running Strikeforce. Been around the sort of
21 MMA and martial arts space for many, many years.
22 And he is the current CEO of Bellator.
23     Q   Was he ever employed by Zuffa?
24     A   Yes.
25     Q   In what capacity was Mr. Coker employed by

180

1  Zuffa?
2      A   He was employed as an executive with
3  Strikeforce brand.
4      Q   In connection with the Strikeforce
5  transaction, did Mr. Coker make any efforts to sign
6  Strikeforce fighters to Zuffa contracts?
7      A   After the deal was closed?
8      Q   At any time.
9      A   I don't remember him doing anything before
10 the deal closed. But certainly afterwards, he had
11 relationships with athletes and he would -- I'm sure
12 he was involved in some of those discussions. But
13 ultimately our -- our matchmaking team sort of took
14 over and signed new deals with the athletes. But
15 I'm sure Scott was involved early on with some of
16 those discussions. I don't recall.
17     Q   Did Mr. Coker receive any type of
18 compensation for signing any specific contracts
19 between fighters and Zuffa?
20     A   I believe there were some incentives that
21 were given to him to get some of the fighters that,
22 you know, that weren't signed, to assist in
23 essentially getting them to sign Zuffa agreements --
24     Q   And what were the --
25     A   -- if it was close.

181

1      Q   I'm sorry. Were you finished with your
2  answer?
3      A   Yeah.
4      Q   What was the nature of these incentives?
5      A   I don't remember. I just remember in
6  general there were some incentives that were given
7  to him to get him to clean up some of these fighter
8  agreements.
9      Q   Now, you said, "Clean up some of these
10 fighter agreements." What in the fighters
11 agreements needed to be cleaned up?
12     A   Well, it wasn't necessarily the
13 agreements. I mean, it was, you know, he had
14 relationships with athletes, and he was going to
15 help us recruit some of those athletes to the UFC.
16 Some of those had contracts with Strikeforce or had
17 had contracts with Strikeforce in the past. That's
18 all I recall about it.
19     Q   Were Zuffa's contracts any different than
20 Strikeforce's contracts with respect to sponsorship
21 opportunities for fighters?
22         MS. GRIGSBY: Objection. Scope.
23         THE WITNESS: I don't recall.
24 BY MR. WEILER:
25     Q   Do you recall any differences between the

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

```
                                            238                                                   240
 1                                                    1              INSTRUCTIONS TO WITNESS
 2    STATE OF _____ )                        2
 3                 ) :ss                              3       Please read your deposition over carefully
 4    COUNTY OF _____)                        4    and make any necessary corrections. You should state
 5                                                    5    the reason in the appropriate space on the errata
 6                                                    6    sheet for any corrections that are made.
 7         I, IKE LAWRENCE EPSTEIN, the witness       7       After doing so, please sign the errata sheet
 8    herein, having read the foregoing               8    and date it.
 9    testimony of the pages of this deposition,      9       You are signing same subject to the changes
10    do hereby certify it to be a true and          10    you have noted on the errata sheet, which will be
11    correct transcript, subject to the             11    attached to your deposition.
12    corrections, if any, shown on the attached     12       It is imperative that you return the original
13    page.                                          13    errata sheet to the deposing attorney within thirty
14                                                   14    (30) days of receipt of the deposition transcript by
15            _____                  15    you. If you fail to do so, the deposition transcript
16           IKE LAWRENCE EPSTEIN                    16    may be deemed to be accurate and may be used in court.
17                                                   17
18                                                   18
19                                                   19
20    Sworn and subscribed to before me,             20
21    this _____ day of _____, 2016.           21
22                                                   22
23    _____                23
24           Notary Public                           24
25                                                   25
```

```
                                            239                                                   241
 1    STATE OF NEVADA)                                1                 E R R A T A
          ) Ss                                        2
 2    COUNTY OF CLARK)                                3
 3                                                    4
 4       I, Sarah Padilla, a duly commissioned and    5       I wish to make the following changes,
 5    licensed court reporter, Clark County, State of Nevada,  6    for the following reasons:
 6    do hereby certify: That I reported the taking of the    7
 7    deposition of the witness, IKE LAWRENCE EPSTEIN, commencing  8    PAGE LINE
 8    on Friday, December 2, 2016, at 11:39 A.M.; That prior to    9    ___ ___ CHANGE:_____
 9    being examined, the witness was, by me, duly sworn to testify  10   REASON:_____
10    to the truth; That thereafter I transcribed my shorthand notes  11   ___ ___ CHANGE:_____
11    into typewriting and that the typewritten transcript of said   12   REASON:_____
12    deposition is a complete, true, and accurate record of said    13   ___ ___ CHANGE:_____
13    shorthand notes.  I further certify that I am not a relative   14   REASON:_____
14    or employee of any attorney or counsel of any of the parties   15   ___ ___ CHANGE: _____
15    nor a relative or employee of an attorney or counsel involved  16   REASON:_____
16    in said action, nor a person financially interested in the     17   ___ ___ CHANGE: _____
17    action; that a request [x] has [] has not been made to review  18   REASON:_____
18    the transcript.                                                19   ___ ___ CHANGE: _____
19          IN WITNESS WHEREOF, I have hereunto set my               20   REASON:_____
20    hand in the County of Clark, State of Nevada, this 22nd        21
21    day of December.                                               22   _____   _____
22                                                                   23    WITNESS' SIGNATURE         DATE
23          _____                                        24
            SARAH PADILLA, CCR 929                                   25
24
25
```

61 (Pages 238 to 241)