# EXHIBIT 12

## Excerpts from the Second Deposition of Dr. Hal J. Singer

```
        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEVADA
                      -  -  -

CUNG LE, NATHAN QUARRY, JON: CIVIL ACTION
FITCH, BRANDON VERA, LUIS  :
JAVIER VAZQUEZ, and KYLE    :
KLINGSBURY on behalf of     :
themselves an others        :
Similarly situated,         :
            Plaintiffs   : CASE NO.
                          : 2:15-cv-01045-RFB
        vs.               : (PAL)
                          :
ZUFFA, LLC d/b/a ULTIMATE  :
FIGHTING CHAMPIONSHIP and   :
UFC,                        :
            Defendants    :
```

                    -  -  -

             Tuesday, January 23, 2018
                    DAY 2
                    -  -  -

       Continuation of videotaped

deposition of HAL J. SINGER, Ph.D., taken

pursuant to notice, was held at the

offices of BERGER & MONTAGUE, P.C., 1622

Locust Street, Philadelphia, PA 19103,

commencing at 10:19 a.m., on the above

date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.

                    -  -  -

             MAGNA LEGAL SERVICES
                  866.624.6221
                 www.MagnaLS.com



Page 375

```
 1    it's not -- it's certainly not necessary
 2    to engender competitive outcomes so long
 3    as the markets are more open, less
 4    restrictive and rivals get a foothold and
 5    are able to put forward compelling
 6    matches for MMA audiences.
 7        Q.   Are there -- at this point,
 8    following your rebuttal report, is it
 9    your opinion that there are many ways to
10    get to a lower foreclosure share that
11    would constitute an appropriate but-for
12    world?
13        A.    Well, remember, all that
14    needs to happen to get to a lower
15    foreclosure share is that Zuffa would
16    need to change the parameters of its
17    contracts with fighters in such a way as
18    to ensure that the cumulative duration of
19    the restrictions don't take you over some
20    level that a Court would deem
21    exclusionary.
22          That's all you need to get
23    the foreclosure share down.  We had
24    talked about whether 30 months -- 36
```

Page 376

```
 1    months was too long and, you know, what
 2    would be a -- what would be a duration
 3    that would be acceptable to a Court.
 4          That, to me, is really the
 5    key element of what you need in a
 6    contract to bring the foreclosure share
 7    down to levels of zero, 20 or 30 percent.
 8    After that, what we are doing here is we
 9    are just filling in other aspects of the
10    but-for world that would complement or be
11    consistent with that -- with that
12    outcome.
13        Q.   All right.  So in your
14    opinion, does but-for world have to
15    include contracts that are -- exclusive
16    contracts that are no longer than one
17    year?
18        A.    Well, I think we went
19    through this in the first -- in the first
20    deposition.  But, again, I mean, my
21    answer is not going to change.  It's
22    going to be -- it's going to depend on
23    where -- where the Court would draw the
24    line as to what's considered to be an
```

Page 377

```
 1    exclusionary arrangement.
 2          Now, I have tried to inform
 3    the Court based on what I think is the
 4    average career span of a fighter and
 5    that -- and that when we -- when we
 6    figure out how to draw that line, we
 7    ought to take into consideration how much
 8    of a fighter's remaining career span is
 9    left after they sign with Zuffa.
10          But depending on where that
11    line gets drawn, Zuffa could then
12    construct its contracts in such a way as
13    to comply with that -- with that line,
14    and with an important caveat:  So long as
15    30 percent, say, is tolerated, they
16    could -- they could carve off 30 percent
17    or, in fact, more if the market share is
18    not quite 100 percent.  They could carve
19    off a certain portion of their fighters
20    and subject them to potentially longer
21    contracts.
22          So there is not -- there is
23    not a -- there is not one way to get a
24    foreclosure share under 30, as we
```

Page 378

```
 1    discussed.  There are a lot of ways to
 2    get it down.  But these other parameters
 3    that I am informing right now are things
 4    that help fill in what the but-for world
 5    would look like.  They are meant to
 6    complement or be consistent with.  But
 7    they're -- I think that while we have
 8    been going in circles, these other
 9    parameters, while important, aren't the
10    levers that are pushing foreclosure down
11    to 30, 20 or zero percent.
12        Q.   Okay.  One simple point I
13    had been wondering about based on the
14    support, you had told me before that
15    there is not one way to get foreclosure
16    share under 30; there are a lot of ways
17    to get it down.
18          That's still your opinion?
19        A.   Oh, sure.  I just gave
20    you -- I just gave you two ways to do it.
21    One could be across the board, every
22    single contract contains the same
23    provision.  That would get you down.
24    Another way to do it would be to do a
```

MAGNA
LEGAL SERVICES

Page 387

1  more open, there is more worker
2  mobility.
3       Whether or not my model can
4  accommodate that distinction, I
5  would want to think about it some
6  more.  I just haven't thought
7  about it yet.
8  BY MR. ISAACSON:
9       Q.   Looking at paragraph 198,
10  there is a couple things you have listed
11  in your plausible but-for world, the
12  third of which is clauses that allow
13  fighters enhanced mobility.
14       What do you mean by that?
15       A.   I guess since I have already
16  listed right-to-match, I would certainly
17  include right-to-match in that.  But I am
18  thinking of the other -- the other
19  clauses that are extending the duration
20  or otherwise, tying up or sewing up of
21  fighters with Zuffa.
22       Q.   And the various tolling
23  provisions?
24       A.   Correct.  Tolling or

Page 388

1  exclusive -- the exclusive provision.  I
2  mean, we could -- we could go through
3  each one, but anything that --
4       Q.   I would rather not.
5       A.   Okay.
6       MR. CRAMER:  Were you done
7  with your answer?  Anything that
8  you were about to say.
9       THE WITNESS:  Yeah, anything
10  that extends the duration or
11  otherwise lessens mobility.
12  BY MR. ISAACSON:
13       Q.   Okay.  So but when you are
14  saying a plausible but-for world includes
15  clauses that allow fighters enhanced
16  mobility, what are you referring to?
17       MR. CRAMER:  Asked and
18  answered.
19  BY MR. ISAACSON:
20       Q.   For example, are you
21  referring to eliminating all of those
22  tolling restrictions that you have
23  pointed to or something less?  I am
24  trying to get an idea of what you are --

Page 389

1  what you are doing here.
2       MR. CRAMER:  Asked and
3  answered.
4       THE WITNESS:  I am referring
5  to any of the restrictions.  I am
6  not -- I am saying that it would
7  be plausible that most, if not
8  all, of them would go away.  It's
9  conceivable that some would stick
10  around.  But I think that what I
11  am trying to capture is a world in
12  which -- in which fighters have
13  greater mobility.
14  BY MR. ISAACSON:
15       Q.   So when you are referring to
16  clauses that allow fighters enhanced
17  mobility, are you assuming that most or
18  all of the tolling provisions go away?
19       A.   If those tolling provisions
20  have the effect of extending the duration
21  of the contracts beyond, say, 12 months,
22  then I think that in a more open and
23  competitive environment, those tolling
24  restrictions would likely go away.

Page 390

1       Q.   All right.  So by clauses
2  that allow fighters enhanced mobility,
3  you are thinking of tolling provisions
4  that have the effect of extending the
5  duration of the contracts beyond 12
6  months?
7       A.   Correct.
8       Q.   And in your plausible
9  but-for world, all of those tolling
10  provisions would go away, most of them?
11       A.   I think I gave you an
12  example where I could conceive of a
13  champion's clause staying around but
14  effectively being negated by virtue of
15  other more mobility.  I think the point
16  that I am trying to make here, just so
17  that it's clear if it wasn't, is that I
18  am trying to give some granularity to
19  what Zuffa's most likely or most
20  plausible contract would be in a but-for
21  world, and given the -- given the record
22  evidence, this is the best that I can do
23  at trying to give some granularity to
24  that contract.

MAGNA
LEGAL SERVICES

Page 383

1     Q.   And from that -- and from
2  that, your models -- your damages models
3  and your second impact model would
4  estimate -- would estimate damages impact
5  from that but-for world?
6         MR. CRAMER:  Objection to
7     form.
8         Go ahead.
9         THE WITNESS:  If you give me
10    a but-for foreclosure share, I can
11    tell you what the -- what the --
12    how much wages would go up by.
13  BY MR. ISAACSON:
14    Q.   All right.  Now, if the
15  Court were to rule that an exclusionary
16  contract is over two years and it's not
17  exclusionary, it's two years or less, if
18  you -- would an appropriate but-for world
19  then be contracts that were two years or
20  less, plus some other parameters, and
21  that would achieve a foreclosure share of
22  30 percent or less?
23        MR. CRAMER:  I am going to
24    object to the extent that this

Page 384

1     calls for a legal conclusion.
2         But go ahead and answer, if
3     you understand the question.
4         THE WITNESS:  Let me -- it
5     was a two-parter and let me take
6     the second part, which is probably
7     easier.  And that is, would it --
8     would it get you to a foreclosure
9     share below 30 percent?  And I
10    think that by the construction of
11    your hypothetical, it would, if I
12    understood it correctly.  You are
13    saying the Court deems anything in
14    excess of 24 months --
15        MR. ISAACSON:  Right.
16        THE WITNESS:  -- to be
17    exclusionary -- let me finish --
18    and you asked me to posit a world
19    in which the contracts were
20    exactly 24 months.
21  BY MR. ISAACSON:
22    Q.   My intent is this question
23  two is the same as the last question.  If
24  the Court has ruled that above two years

Page 385

1  is exclusionary and in the first
2  question, that they ruled that above one
3  year was exclusionary.  Everything else
4  -- everything else is the same.
5         MR. CRAMER:  Same objection.
6  BY MR. ISAACSON:
7     Q.   You would still -- if Zuffa
8  moved its contracts down to two years or
9  less, that would achieve foreclosure
10  shares of 30 percent or less?
11    A.   I think that if we draw the
12    line, if one were to draw the line at 25
13    months and if -- and if all of the
14    contracts came in at 24 months, then it's
15    almost tautological.  If that's how we
16    define foreclosure, then the foreclosure
17    would come in at less than 30 percent.
18    Q.   And in that situation, you
19  would reach the same conclusion as to the
20  amount of damages and your second impact
21  analysis -- second impact model would
22  remain the same?
23        MR. CRAMER:  Objection to
24    form, incomplete hypothetical,

Page 386

1     calls for a legal conclusion.
2         THE WITNESS:  I want to
3     think about it a little more, but
4     sitting here, it's not -- it's not
5     obvious how I would change my
6     impact model or damages model
7     based on that hypothetical.  I
8     probably would want to think about
9     it a little more.
10        But my -- what's giving me
11    some reservation is that -- I
12    wouldn't draw the line at 24.  I
13    think the 24 represents too much
14    of a fighter's life span or career
15    span.
16        And so that -- while it
17    would be a significant improvement
18    over where things are today, it's
19    conceivable that a movement
20    from 36, roughly where we are
21    today, to 24, would it engender
22    different competitive effects than
23    a movement from 36 to 12?  I mean,
24    certainly at 12, the market is

MAGNA
LEGAL SERVICES

Page 391

```
 1        Q.   Okay.  The next thing you
 2   say is an easier and more certain route
 3   to free-agency.
 4           What does that mean beyond
 5   what you have already described?
 6        A.   I think that might just be a
 7   restatement of the things that I have
 8   described.
 9        Q.   All right.  And then
10   enhanced co-promotion, what do you mean
11   by that?
12        A.   So I mean co-promotion in
13   the sense that there would be no
14   restrictions on fighters to participate
15   in an event with a rival MMA promoter.
16   So it's perhaps a broader definition than
17   literally engaging in the -- in the
18   co-promotion.  I think that it would make
19   sense in that world for both promoters to
20   engage in promotion, they would have
21   incentives to do so.
22           But the restriction that I
23   am -- that I have in mind is the
24   restriction that would prevent, say, a
```

Page 392

```
 1   Zuffa fighter for participating in an
 2   event with a non-Zuffa or Zuffa rival
 3   promoter.
 4        Q.   So you have referred in this
 5   to exclusive contracts of one year or
 6   less.  Well, maybe not.
 7           When you said -- when you
 8   say "substantially shorter duration
 9   fighter contracts of one year or less,"
10   are those exclusive contracts or
11   nonexclusive contracts?
12        A.   Well, they are exclusive
13   contracts but with a caveat, which is
14   that if there is an opportunity to
15   participate in an event with a rival
16   promoter, if I have No. 1 and you have
17   No. 2 and there is an opportunity to put
18   on an incredible show, that there
19   wouldn't be impediments, contractual
20   impediments to preventing that from
21   happening.
22        Q.   So in your -- in this world,
23   there would be one-year exclusive
24   contracts; however, if there was a
```

Page 393

```
 1   Bellator event that a UFC fighter wanted
 2   to fight in, the UFC fighter could go do
 3   that even during the one-year period?
 4        A.   I think that's what I have
 5   in mind.
 6        Q.   And the result of that would
 7   be that the UFC and Bellator or other
 8   promoters would end up co-promoting
 9   events; is that your assumption?
10        A.   I think that once you set in
11   motion the event and it -- and it
12   features a Zuffa fighter, that Zuffa
13   would have strong unilateral incentives
14   to want to promote that event, just as
15   they did with the Conor McGregor boxing
16   match.
17        Q.   And in your opinion, what
18   would happen to MMA in this world, would
19   most events be co-promoted?
20        A.   Well, I don't -- I don't
21   have an opinion as to -- as to whether
22   most would be.  I am just suggesting that
23   there would be more -- there would be
24   more co-promotion than what occurs today.
```

Page 394

```
 1        Q.   All right.  And is it -- am
 2   I correct that with regards to each one
 3   of these pieces of your but-for world,
 4   such as enhanced co-promotion, you don't
 5   have an opinion as to how much that piece
 6   would reduce foreclosure share?
 7           MR. CRAMER:  Objection to
 8   form.
 9           THE WITNESS:  I just don't
10   understand the question.  I don't
11   think that foreclosure share, as I
12   have constructed it, would be
13   sensitive to the level of
14   co-promotion.  I think, again, we
15   might have the causality running
16   in the other way.
17   BY MR. ISAACSON:
18        Q.   So in terms -- in terms of
19   your estimates of damages -- various
20   estimates of damages, you are not able to
21   isolate how much of those damages, for
22   example, are due to the lack of the
23   enhanced co-promotion that you describe
24   here?
```

**MAGNA◉**
**LEGAL SERVICES**

Page 403

1  that fair?
2      A.   I haven't expressed an
3  opinion.  It seems to me a restriction of
4  that nature could be consistent with a --
5  with a lower foreclosure share, and so as
6  an economist, remember, I go back -- my
7  model turns on the foreclosure share.
8  And so that's how I would attempt to
9  answer that question in the first
10 instance.  And I don't think that I -- my
11 model or anything that I have written or
12 read can inform in any kind of
13 intelligent way an answer to that
14 question.
15     Q.   Okay.  The -- in looking,
16 again, at the substantially shorter
17 duration fighter contracts of one year or
18 less, does that -- does that put any
19 limit on Zuffa re-signing or extending
20 the contract before the year expires in
21 exchange for paying the fighter more
22 money?
23     A.   Well, I think that the
24 plaintiffs are complaining that Zuffa is

Page 404

1  strategically using certain provisions of
2  the contract to lock fighters into
3  effectively perpetual extensions when
4  they want them.  And given that that is
5  part of the challenged conduct, I
6  would -- I would at least hope that if we
7  were to rewrite these in a way that they
8  were in compliance with the antitrust
9  laws, that that sort of gamesmanship
10 would be -- would be either disallowed or
11 much harder to engage in.
12     Q.   Right.  But in your opinion,
13 would those rewrite of the contracts
14 prohibit Zuffa from simply offering
15 fighters more money to extend the
16 contract beyond one year?
17         MR. CRAMER:  Incomplete
18     hypothetical.
19         THE WITNESS:  I don't think
20     that I have an opinion on that.
21 BY MR. ISAACSON:
22     Q.   And if Zuffa did
23 successfully extend the contracts beyond
24 one year by simply paying the fighters

Page 405

1  more money and did that with the same
2  amount of fighters as today, have two- or
3  three-year contracts, would that be
4  anticompetitive?
5          MR. CRAMER:  Incomplete
6      hypothetical, form.
7          THE WITNESS:  Well, when you
8      say did it the same as today, I
9      mean --
10 BY MR. ISAACSON:
11     Q.   The same amount, same
12 numbers.
13         MR. CRAMER:  Objection to
14     form, incomplete hypothetical.
15         THE WITNESS:  I think I
16     would need more specificity in the
17     hypothetical.  But if Zuffa
18     engaged in some of the same
19     tactics that it did today to
20     secure extension, such as refusing
21     to either give a fighter a fight
22     or giving the fighter an
23     inappropriate match-up as a
24     punishment for not extending, I

Page 406

1      think that -- I think that that --
2      that is part of the challenged
3      conduct and I think that those
4      sorts of tactics would be absent
5      in a but-for world.
6  BY MR. ISAACSON:
7      Q.   Okay.  But all I am focused
8  on is if Zuffa pays more money to extend
9  the contract, not the other -- not the
10 other things you are pointing to.
11     A.   I hear you.
12     Q.   If Zuffa did that and
13 extended these contracts to the point
14 where they had the same effective
15 duration as the contracts have today,
16 would that have an anticompetitive effect
17 in your view?
18         MR. CRAMER:  Objection to
19     form, incomplete hypothetical.
20         THE WITNESS:  I mean, the
21     way that I am hearing the question
22     is that if Zuffa were to behave
23     competitively, and that is compete
24     on the merits, and keep fighters

MAGNA
LEGAL SERVICES

Page 407

1  with higher payments as opposed to
2  the exclusionary provisions, you
3  know, would that competition on
4  the merits be barred?  And I would
5  say that most likely not.  If it's
6  not part of the challenged
7  conduct, then I think that it
8  sticks around in the but-for
9  world.
10 BY MR. ISAACSON:
11     Q.   And if Zuffa offered
12 fighters contracts of one year or less
13 and the fighters then bargained on their
14 own behalf for longer contracts, is that
15 permitted in the but-for world?
16     MR. CRAMER:  Incomplete
17 hypothetical.
18     THE WITNESS:  I am loathed
19 to say that the economic model
20 permits or disallows anything.
21 The economic model requires, as
22 its input, foreclosure share.  And
23 what we are trying to do now in
24 this rebuttal report is to give

Page 408

1  more flavor or more granularity to
2  what a but-for world would look
3  like consistent with that lower
4  foreclosure share.
5     And so when you ask me a
6  question like this, it's not --
7  it's not obvious how with that --
8  with those ground rules how I can
9  rule in or rule out certain
10 aspects, unless they are obviously
11 part of the challenged conduct.
12 BY MR. ISAACSON:
13     Q.   I want to go over this again
14 because I don't understand your answer.
15     A.   Okay.
16     Q.   The -- you have written that
17 the plausible but-for world would have
18 fighter contracts of one year or less.
19     Is that a result to have to
20 end up one year or less, even if fighters
21 ask for contracts greater than one year?
22     MR. CRAMER:  Objection to
23 form.  Do you mean contracts
24 exactly like the contracts that

Page 409

1  exist today or guaranteed
2  contracts?  Or -- incomplete
3  hypothetical.  You need to
4  specify.
5     MR. ISAACSON:  You are doing
6  speaking objections now.  So...
7     MR. CRAMER:  You are asking
8  unfair and incomplete questions
9  that are vague.
10     THE WITNESS:  I guess I
11 would just have to think about it.
12 I am not -- it's hard for me to
13 understand how the duration of the
14 contract would ever -- why a
15 fighter would ever want to -- want
16 to extend the duration all things
17 equal.  It just seems like that
18 would represent a restriction on
19 that fighter's mobility.  So it's
20 hard to -- it's hard to understand
21 it, I guess, from an economic
22 perspective.
23 BY MR. ISAACSON:
24     Q.   You can't understand why a

Page 410

1  fighter would ever want the certainty of
2  a multiyear contract?
3     MR. CRAMER:  Objection to
4  form, incomplete hypothetical.
5     THE WITNESS:  Certainly not
6  the way that these contracts work.
7  I think that, you know, they work
8  as one-way ratchets, and I think
9  that you don't get paid unless you
10 fight.  And so the notion that I
11 would -- that I would, all things
12 equal, want to extend the contract
13 is just -- it's not obvious to me
14 why that would be in the fighter's
15 economic incentive.
16 BY MR. ISAACSON:
17     Q.   All right.  But in your
18 but-for world, can you conceive of
19 fighters who would want to have contracts
20 of greater than one year?
21     MR. CRAMER:  Objection to
22 form, incomplete hypothetical.
23     THE WITNESS:  It's hard for
24 me to conceive -- if the standard

MAGNA

LEGAL SERVICES

Page 455

```
1   of the top-tier labor economics journals?
2        MR. CRAMER:  Misstates the
3   testimony.
4        THE WITNESS:  Beyond the
5   ones that I just gave you?  I
6   don't know if I could -- if I
7   could give you others.
8   BY MR. ISAACSON:
9        Q.   Well, which ones have you
10  named by name?
11       A.   I think I gave you
12  the Journal of Labor Economics.  I think
13  I gave you Review of Labor Statistics, I
14  believe is one.  I am going by memory
15  here.  I think I have seen some specialty
16  journals as well.
17       I certainly cite articles,
18  but I don't -- I don't -- in various
19  labor journals.  But I would refer you to
20  the rankings instead of going by my
21  memory of labor journals.
22       Q.   Okay.  And you mentioned the
23  subfield of sports.  Are there leading
24  journals in that field that you could
```

Page 456

```
1   name?
2        A.   I don't know if I could name
3   them.  I certainly cited articles from
4   them, but I would refer you to the same
5   rankings.
6        THE VIDEOGRAPHER:  Excuse
7   me, Counsel.  We are approaching
8   ten minutes left on the disc.
9        MR. ISAACSON:  Okay.
10       - - -
11       (Off the record at this
12  time.)
13       - - -
14       MR. ISAACSON:  Why don't we
15  just change the tape.
16       THE VIDEOGRAPHER:  The time
17  is 12:22 p.m.  This is the end of
18  Disc 1.  We are off the record.
19       - - -
20       (Off the record at this
21  time.)
22       - - -
23       THE VIDEOGRAPHER:  The time
24  is 12:31 p.m.  This is the start
```

Page 457

```
1   of Disc 2.  We are on the record.
2   BY MR. ISAACSON:
3        Q.   You talked before about how
4   individual marginal revenue product
5   varies between fighters, and I think we
6   agree that fighter compensation agrees
7   between various fighters.
8        Does current fighter
9   compensation vary between fighters in the
10  same way that the individual marginal
11  revenue product varies between the
12  fighters?
13       MR. CRAMER:  Objection to
14  form.
15       THE WITNESS:  You used the
16  word "same" and that's what I am
17  tripping up on.  There is
18  certainly a relationship between a
19  fighter's MRP and his or her
20  compensation.
21  BY MR. ISAACSON:
22       Q.   Would you describe that
23  relationship as significant, substantial
24  or minimal or --
```

Page 458

```
1        A.   Again, I am going to go back
2   to just basic labor theory, that in a
3   competitive market, the fighter's
4   compensation would be equal to his or her
5   MRP, in a perfectly competitive -- let me
6   stipulate or let me add that caveat.  In
7   a monopsonized labor market, there is a
8   wedge between the MRP and the
9   compensation.
10       And there is certainly a
11  relationship under both extremes, of the
12  monopsonized market and the perfectly
13  competitive market.  And part of the
14  theory of the case is, as you know, that
15  the conduct here upset that normal
16  transmission mechanism, that is, it upset
17  what would have otherwise -- what gains
18  to fighter productivity that would have
19  otherwise been passed along in the form
20  of higher wages didn't occur, in my view,
21  as they -- as they would have in a world
22  absent the restrictions on fighter
23  mobility.
24       Q.   All right.  I understand you
```

MAGNA
LEGAL SERVICES

Page 459

1    to be saying that in the current world,
2    that gains in individual marginal revenue
3    product won't translate into individual
4    compensation in the same way as they
5    would in a competitive world.  Then the
6    competitive world, more of the marginal
7    revenue product, would translate into
8    compensation.
9        A.   More of the gains.
10       Q.   More of the gains.
11       A.   Yes.
12       Q.   Is there -- however -- with
13   the understanding that there is not the
14   same quantitative amount of translation,
15   is the -- is there still some sort of
16   linear relationship between the rate they
17   are going up?
18       A.   Again, it depends on whether
19   we are dealing with an open and free
20   labor market or a -- or a labor market
21   that is subject to a monopsony.
22            What we have observed here
23   is that fighter compensation, although it
24   was rising, did not -- did not keep up

Page 460

1    with the rate of growth in event
2    revenues, and I am positing that in a
3    more competitive environment indeed
4    showing, based on my econometric model,
5    that the rate of increase in compensation
6    would have been higher and more in line
7    with the rate of increase in event
8    revenue.
9        Q.   Now, you talked before about
10   your estimates of median career length,
11   and I believe in your rebuttal report,
12   it's approximately 41 months or five
13   bouts, fights.
14       A.   I think that I spent more
15   time estimating the duration and months
16   than in bouts.  I think that -- I think
17   that the relevant -- the relevant figure
18   here for what we are fighting about is
19   the duration as measured in months.
20       Q.   All right.  And to do
21   that -- to do that analysis, you used
22   data obtained from sherdog.com; is that
23   right?
24       A.   I believe so, yes.

Page 461

1        Q.   And to do that calculation,
2    you calculated a career length using
3    fights for only those promoters in the
4    tracked market; is that correct?
5        A.   Are you speaking about in my
6    rebuttal report?
7        Q.   As of today, where do you
8    stand on this issue?
9        A.   I think the best estimates
10   as of today is what's in my rebuttal
11   report.  I think I have tried to -- I
12   have tried to cut it every which way
13   that's -- what I consider to be
14   reasonable.  I have also appealed to what
15   Zuffa itself has estimated its average
16   duration was of fighters, and I think
17   that my estimates are more in line with
18   Zuffa's internal estimates.
19       Q.   All right.  And for your
20   estimates, you relied on data from
21   sherdog.com?
22       A.   I think that is the
23   beginning of it.  I think I need more
24   than just Sherdog, but I think that that

Page 462

1    is the starting point of my analysis.
2        Q.   And then you calculated
3    career length using fights that appeared
4    in FightMetric?
5        A.   It sounds right, but I think
6    I just feel more comfortable -- given how
7    detailed the analysis was, I would
8    probably feel more comfortable going
9    there and telling you exactly what we
10   did.
11       Q.   All right.  You have got
12   your rebuttal report in of front of you,
13   if you want to look at it.
14       A.   Okay.  Let me see.  If you
15   have the chart handy, that might get us
16   there faster.  If not, I will try to find
17   it.
18       Q.   It might be on page 53.  You
19   have got median and mean duration to
20   Table 1 there.
21       A.   Right.  But I think -- I
22   think I now -- I now see what was
23   tripping me up.  You had imposed a
24   requirement, the added requirement that

MAGNA
LEGAL SERVICES

Page 463

1  we only measure their career span while
2  they are within the relevant input
3  market, and that's only the case for the
4  second and third rows, you see.  I think
5  you --
6      Q.   You -- I see.  All right.
7      A.   And the third market is yet
8  a different -- I mean, those are
9  different -- those are different market
10 definitions.  And I think you asked me
11 for one in particular.
12     Q.   All right.  So when you say
13 that your best estimate of the career of
14 a fighter is found in your rebuttal
15 report, would that be Table 1 on page 53
16 of your report?
17     A.   Correct.
18     Q.   And there, you look at four
19 different things.  One is limited to when
20 Zuffa fighters are fighting in Zuffa
21 bouts; is that right?
22     A.   Correct.
23     Q.   So that would exclude Zuffa
24 fighters who fought for other promoters

Page 464

1  either before or after their career at
2  Zuffa?
3      A.   Correct.
4      Q.   And then you use the
5  relevant input market tracked measure.
6  That is based on FightMetric data,
7  correct?
8      A.   Correct.
9      Q.   And that would be -- and you
10 would only be calculating fights that
11 were for the promoters in that market, in
12 that -- in FightMetric?
13     A.   Correct.  When they go
14 outside of the relevant input market as
15 defined by the tracked measure, then they
16 would no longer be considered to be
17 active in their career.
18     Q.   All right.  And you would --
19 and then for the third way you would look
20 at it, you would look for the ranked
21 measure, which is -- which would include
22 only the promoters in FightMetric?
23     A.   Well, my ranked measure
24 members starts with a set of all fighters

Page 465

1  in FightMetric and then expands it
2  to also include those that are in Fight
3  Matrix I think plus another promotion as
4  well.
5      Q.   I think they are totally
6  over overlapping, but let me -- let me --
7      A.   Oh, it's true that the way
8  it's constructed, the tracked measure of
9  the market definition sits perfectly
10 inside of the ranked measure, right.
11     Q.   All right.  So the ranked
12 measure includes all the promoters who
13 are either in Fight Matrix or
14 FightMetric?
15     A.   The fighters associated with
16 promoters, correct, yes.
17     Q.   So if you had fights outside
18 of those promoters, those would not be
19 counted as part of your career?
20     A.   Again, I just want to be
21 careful that as we moved to the ranked
22 measure, the -- it's the fighter that is
23 driving the analysis, not his or her
24 associated promoter, right?  It doesn't

Page 466

1  begin with a set of promoters.  It
2  happens to generate a set of promoters as
3  a byproduct.  But here, fighters are
4  going to be included regardless of who
5  their associated promoter is so long as
6  they have a rank higher than 650.
7      Q.   Right.  But I'm not talking
8  about market definition now.  I am just
9  talking about how you calculate the
10 median career of a fighter.
11     A.   Sure.
12     Q.   If they -- if they had
13 fights outside of the promoters who are
14 counted in FightMetric or Fight Matrix,
15 those would not be counted as part of the
16 fighter's career?
17     A.   I wouldn't -- I wouldn't put
18 it that way.  I would feel more
19 comfortable saying something like that
20 with respect to the FightMetric measure,
21 which is the tracked measure, because
22 that is driven by the identity of the
23 promoter.
24         The identity of the promoter

MAGNA
LEGAL SERVICES

Page 527

1      some help.  So promoters inside of
2    my relevant market or outside of
3    my relevant market?
4  BY MR. ISAACSON:
5      Q.   Yes, promoters inside your
6  relevant market.
7      A.   Remember -- the question
8  doesn't make any sense because it's a
9  hypothetical monopsonist pushing the
10  wages down, so it is the only -- it's the
11  only buyer in the relevant market.
12      Q.   In each of the relevant
13  markets that you defined, did you assume
14  that Zuffa was the only relevant buyer?
15      A.   No.
16      Q.   In the -- for example, in
17  the tracked market, did you test whether
18  if you reduced the individual pay of
19  Zuffa fighters, Bellator would step in
20  and pay the -- pay the amount they were
21  being paid and the fighter would move to
22  Bellator?
23      A.   I don't think the question
24  makes sense given that Bellator wasn't

Page 528

1  included in the -- in the tracked market
2  or at least -- sorry -- or at least
3  Bellator's fighters.  Remember, we are
4  contemplating a hypothetical monopsonist
5  who controlled all of the fighters in the
6  tracked market, including Bellator's
7  fighters.  Would that be a sufficient
8  number of fighters such that you could
9  push wages below competitive levels.
10      Q.   All right.  Bellator is a
11  promoter in the tracked market, right?
12      A.   Correct.
13      Q.   So is Affliction, correct?
14      A.   Anyone who was tracked by
15  FightMetric.
16      Q.   Okay.  So was WEC and
17  EliteXC?
18      A.   I can't tell you by memory
19  if those were or were not.
20      Q.   And did you -- I am just
21  trying to understand by the end of your
22  reply report what SSNIP analysis you have
23  done.
24      Did you do any actual

Page 529

1  testing to experiment to say what would
2  happen if Zuffa lowered what it's paying
3  its fighters, whether those fighters
4  would move to another promoters, such as
5  Bellator, World Series of Fighting?
6          MR. CRAMER:  Asked and
7      answered.
8          THE WITNESS:  I did -- I did
9      look at record evidence that spoke
10      to that, for example, that Zuffa
11      believed that -- that anything
12      outside of Zuffa was the minor
13      leagues and, therefore, there
14      wasn't much threat of a defection.
15      Also, we have the contract
16      themselves were preventing
17      defections.  So yes, I looked at
18      that.
19  BY MR. ISAACSON:
20      Q.   Other -- so you looked at
21  record evidence.
22      A.   Yes.
23      Q.   Other than looking at the
24  record evidence, did you do any testing

Page 530

1  to determine whether fighters in any of
2  your -- in any of your markets you were
3  defining would move to another promoter,
4  such as Bellator or World Series of
5  Fighting, if their individual pay
6  declined?
7          MR. CRAMER:  Objection to
8      form.
9          THE WITNESS:  When you think
10      about it, once you get into the
11      tracked, and particularly once you
12      get into the ranked, the market is
13      drawn so broadly that it subsumes
14      all of these rival promoters.  So
15      the question just doesn't make
16      sense as posed.  They are all in
17      the relevant market.
18  BY MR. ISAACSON:
19      Q.   Well, are you saying that
20  all -- all the rival promoters are in the
21  tracked market or in the ranked market or
22  in both?
23      A.   No, that's not what I am
24  saying.  I'm saying that your question

1  pertained to Bellator, I think, and
2  Bellator is inside of the tracked.  And
3  so it doesn't make sense to ask whether a
4  fighter in this hypothetical market would
5  substitute to Bellator.  It's already in
6  there.  We are asking if you control all
7  of those fighters, in addition to Zuffa's
8  fighters, in addition to whoever else is
9  inside of the tracked market, would that
10 be enough to permit you to exercise
11 monopsony power.
12       So I could help you along,
13 but asking if they would substitute to
14 Bellator isn't -- is nonsensical.
15     Q.   Well, you agree with me that
16 for the tracked market, Bellator,
17 EliteXC, WEC and other promoters are
18 participants in that market?
19     A.   I don't like to put it that
20 way, no.
21     Q.   All right.  Do you agree
22 that they are customers for the fighters?
23     A.   They are buyers in that --
24 in that market, yes.

1      Q.   Okay.  So in the tracked
2  market, did you test whether fighters in
3  that market would move to another buyer
4  in that market such as Bellator if their
5  individual pay declined other than
6  looking at record evidence?
7      A.   Again, no, and that's not
8  the relevant experiment to perform.
9      Q.   Okay.  And in the tracked
10 market, did you test whether fighters in
11 that market would move to another buyer
12 in that market such as World Series of
13 Fighting if their individual pay declined
14 other than looking at record evidence?
15     A.   World Series of Fighting, I
16 just can't recall if that's a promoter
17 that was tracked by FightMetric.  You
18 might -- you might be able to help me
19 out, and then I could give you an answer.
20     Q.   World Series of Fighting is
21 included in the -- is included in Fight
22 Matrix in your tracked -- in your
23 tracked --
24     A.   Did you mean to say Fight --

1  FightMetric?
2      Q.   Ranked market.
3      A.   Oh, ranked market.
4      Q.   Yes.
5      A.   So have you identified -- I
6  think it would help me.  You have
7  identified a promoter now for the first
8  time in the series of questions that sits
9  outside of the tracked but inside of the
10 ranked.
11     Q.   Yes.
12     A.   Got it.
13     Q.   And maybe it will help if I
14 repeat the question --
15     A.   Okay.
16     Q.   -- if anybody ever reads
17 this.
18     A.   Okay.
19     Q.   The -- in the -- in the
20 ranked market, did you test whether
21 fighters in that market would move to
22 another buyer in the market such as World
23 Series of Fighting if their individual
24 pay declined other than what you have

1  said, you looked at revenue evidence?
2      A.   I would say no.  They are --
3  they are already in the ranked market and
4  so we are not looking at substitution
5  within the ranked market.  That's not the
6  relevant inquiry.
7      Q.   Okay.  And -- all right.
8  Now, for each of those markets, let's go
9  to promoters that are outside the market.
10 Okay.
11      So for the tracked market,
12 did you look at -- did you test whether
13 fighters in that -- let me start over.
14      In the tracked market, other
15 than looking at record evidence, did you
16 test whether fighters in that market
17 would move to another buyer outside the
18 market such as World Series of Fighting
19 if their individual pay declined?
20     A.   I think that it was largely
21 informed through record evidence and
22 through other inferences that I made,
23 such as the profitability of Zuffa's
24 weight suppression with a much smaller



Page 535

1   set of fighters.  I think that there was
2   not a separate empirical analysis of
3   defection of fighters from -- the
4   promoters included -- in tracked, for
5   example, into the promoters included in
6   ranked but not in tracked.
7       Q.   And your answer would be the
8   same for ranked that -- in terms of the
9   type of analysis you used?
10      A.   Yes.
11      Q.   And your answer would be the
12  same for the headliner submarket?
13      A.   Correct.
14           MR. CRAMER:  Whenever it's a
15      good time for a break, we have
16      been going for over an hour.
17           MR. ISAACSON:  I think I may
18      be almost finished with something
19      here.
20           MR. CRAMER:  Sure.
21  BY MR. ISAACSON:
22      Q.   Did you consider any
23  narrower definitions to the market, by
24  which I mean did you consider a smaller

Page 536

1   market of buyers than your tracked
2   market?
3       A.   Sure, the headliner market.
4   The headliner submarket, as I like to
5   call it.
6       Q.   Was the headliner submarket
7   the smallest market you considered?
8       A.   That is the smallest market
9   I considered.
10           MR. ISAACSON:  All right.
11      Why don't we take a break.
12           THE VIDEOGRAPHER:  The time
13      is 2:33 p.m.  We are going off the
14      record.
15                - - -
16      (Off the record at this
17      time.)
18                - - -
19           THE VIDEOGRAPHER:  The time
20      is 2:51 p.m.  We are back on the
21      record.  This is the start of
22      Disc 3.
23  BY MR. ISAACSON:
24      Q.   Before the break, we were

Page 537

1   talking about the markets you defined.
2   With respect to the tracked market, did
3   you include all of the fighters that
4   fought for all of the buyers in that
5   market?
6       A.   It's conceivable that there
7   are some fighters who were out listed in
8   FightMetric but are affiliated with a
9   promoters who is.  It's conceivable.  But
10  I think I am more comfortable saying that
11  we let the FightMetric data dictate who
12  was in the market.  It's just whoever
13  they tracked.
14      Q.   Okay.  And the reason that
15  you didn't include all of the fighters
16  for all of the promoters in the tracked
17  market is because you let the FightMetric
18  data dictate who was in the market?
19      A.   Not really.  I think that we
20  are -- we are getting confused again
21  about -- about the market definition
22  exercise and the way that I measured and
23  identified fighters in the market.
24           I used various techniques,

Page 538

1   indirect and direct, of the SSNIP test to
2   try to inform the contours.  And I got to
3   an MMA fighter relevant input market, and
4   then I went out and found two databases,
5   one by FightMetric, another by Fight
6   Matrix, that would allow me to inform or
7   populate who the fighters were in that
8   market after we have defined it using the
9   SSNIP test.
10           So I -- I am just hesitating
11  on the way that you put the question.
12  It's not as if the database dictated who
13  was in the market.  We defined a market
14  as MMA -- professional MMA fighters, and
15  then we went out looking for databases
16  that would allow us to populate that
17  market with actual fighters.
18      Q.   Did you use the SSNIP test
19  to populate who were the buyers in the
20  market you defined?
21      A.   No.
22      Q.   Why -- why didn't you
23  include all of the fighters who fought
24  for buyers in the tracked market in your

Page 543

1    A.   Yes.
2        Q.   Now, your output markets are
3    the live MMA events in which the
4    participating fighters are either in the
5    relevant input market or the relevant
6    input submarket?
7        A.   Yes.
8        Q.   Okay.  And the consumers of
9    the output market include viewers, cable
10   networks, broadcast networks and
11   sponsors; is that fair?
12       A.   Well, certainly, viewers and
13   consumers.
14            Can I hear -- can I hear --
15       Q.   Viewers, cable networks,
16   broadcast networks, sponsors.
17       A.   I feel more comfortable
18   saying that viewers are the -- are the
19   primary consumers in the output market,
20   not the -- not the cable distributors.
21   That's just an intermediary between the
22   viewer and the -- and the producer of the
23   event.
24       Q.   So I am not -- I wasn't

Page 544

1    trying to assess anybody as primary or
2    secondary.
3            Rather, consumers -- do the
4    consumers in your output market include
5    viewers, cable networks, broadcast
6    networks and sponsors?
7        MR. CRAMER:  Asked and
8    answered.
9        THE WITNESS:  I don't recall
10   looking at substitution by
11   sponsors or substitution by cable
12   distributors.  I think that the
13   right lens is that of the
14   consumer's perspective, ultimately
15   the viewer.
16   BY MR. ISAACSON:
17       Q.   All right.  Well, let me use
18   a -- maybe it's my word choice.
19            Are the customers in your
20   relevant output market viewers, cable
21   networks, broadcast networks and
22   sponsors?
23       MR. CRAMER:  Objection to
24   form.

Page 545

1        THE WITNESS:  And let's just
2    focus on cable networks.  Are
3    you -- I took your first question
4    to mean cable distributors.  Are
5    you -- are you intentionally
6    making a distinction between cable
7    networks and cable distributors
8    now?
9    BY MR. ISAACSON:
10       Q.   No.  I am not even sure what
11   you mean by a cable distributors.
12       A.   Oh, a cable distributor
13   would be like Comcast, and a cable
14   network would be like a station or a
15   network that appears on the cable system.
16       Q.   I mean -- well, let's --
17   let's do both.
18       A.   Okay.
19       Q.   So -- so Comcast is under
20   your definition a cable distributor?
21       A.   No.  Comcast is a
22   distributor.
23       Q.   A distributor.  Okay.
24       A.   Comcast happens to be

Page 546

1    vertically integrated into certain
2    networks as well.  But...
3        Q.   All right.  Okay.  So are
4    the customers in your relevant output
5    market viewers, cable stations, cable
6    networks, broadcast networks and
7    sponsors?
8        MR. CRAMER:  Form.
9        THE WITNESS:  I think that
10   I -- the most natural customer to
11   think of in the output market,
12   which is the consumption of the
13   event, is the viewer.  I think
14   that we could -- we could talk
15   about the way that sponsors -- the
16   role that sponsors play in this
17   market and the role that cable
18   networks play, but I -- they are
19   not -- they are not symmetrically
20   aligned with the viewers.  And I
21   think that if -- I am trying to
22   recall the methods that I used to
23   define the contours, and I think
24   it was largely from the

MAGNA
LEGAL SERVICES

1    perspective of viewers.
2  BY MR. ISAACSON:
3      Q.   So for your relevant output
4  market, are sponsors customers in that
5  market?
6          MR. CRAMER:  Asked and
7      answered.
8          THE WITNESS:  I just don't
9      like using -- I don't like using
10     the word "customer."
11 BY MR. ISAACSON:
12     Q.   Okay.  Are -- in your output
13 market, are sponsors buyers in that
14 market?
15         MR. CRAMER:  Asked and
16     answered.
17         THE WITNESS:  Sponsors are
18     buying advertising slots that are
19     associated with the event itself,
20     but I think the consumption of the
21     event is most properly understood
22     from the lens of the viewer, the
23     consumer.
24

1  BY MR. ISAACSON:
2      Q.   So does that mean sponsors
3  are not buyers in your relevant output
4  market?
5          MR. CRAMER:  Asked and
6      answered.
7          THE WITNESS:  They buy
8      advertising slots that are sold
9      alongside the event itself, but I
10     am -- I am considering the event
11     as the -- as what's being
12     produced.
13 BY MR. ISAACSON:
14     Q.   Okay.  In your relevant
15 output market, are broadcast networks --
16 I guess you don't like using the term
17 "customers" for broadcast networks; is
18 that --
19     A.   They are certainly not
20 the -- not the ultimate customer.  They
21 are an intermediary that gets them
22 between the ultimate customer and the
23 producer.  And only for a small sliver of
24 events.

1      I think the action, the
2  television action at least, is occurring
3  on the pay-per-view side, not on the
4  non-pay-per-view viewing side.
5      Q.   As you define your relevant
6  output market, are broadcast networks
7  customers or buyers?
8      A.   I think the broadcast
9  networks are buying the rights to
10 distribute the events to the ultimate
11 consumer, which is the viewer.  So I
12 still like to think about the consumer or
13 the buyer in the output market, the
14 event, the production of the event as the
15 consumer, the viewer, ultimately.
16     Q.   And so I just need to go
17 over this again because I understand you
18 think the consumer -- you think about the
19 consumer as the -- I guess as the -- as
20 the buyer ultimately, but I am trying to
21 figure out who you are excluding.  I
22 understand you have got the consumers in
23 there.
24         Are broadcast networks

1  customers or buyers in your -- in the
2  relevant output market you have defined?
3          MR. CRAMER:  Asked and
4      answered.
5          THE WITNESS:  I think they
6      are an intermediate -- an
7      intermediary that stands between
8      the customers and the producers of
9      the events, and only for a small
10     sliver of what I consider the
11     valuable television that's being
12     produced here.
13 BY MR. ISAACSON:
14     Q.   So does that mean they are
15 or are not customers or buyers in your
16 relevant output market?
17     A.   I think -- sorry.
18         MR. CRAMER:  I was going to
19 say, same objection.
20         Go ahead.  You may answer.
21         THE WITNESS:  I would -- I
22     would say it depends on how you
23     want to -- what question are you
24     trying to answer?



Page 551

BY MR. ISAACSON:
Q.   I am talking about the questions you are answering that you are defining in your market.  I am talking about your relevant output market.
A.   Sure.
Q.   Are the buyer -- are the broadcast networks buyers or customers in that market?
MR. CRAMER:  Same objection.
THE WITNESS:  I think that -- I would have to go back to my initial report, but if I am remembering correctly, I was looking at to where viewers would go in response to a SSNIP in the output market, not where cable distributors would go, not where cable networks would go.  I was looking at where viewers would go.  That's my memory, sitting here today, as to -- as to how I performed the SSNIP in the output market.

Page 552

BY MR. ISAACSON:
Q.   So at the -- by the end of your reply report, you have not done a SSNIP analysis for your output market for sponsors; is that correct?
MR. CRAMER:  Objection to form.
THE WITNESS:  I would have to go back and look at my initial report, but I -- my -- sitting here, I don't -- I don't recall doing that.
BY MR. ISAACSON:
Q.   Okay.  And at the end of your reports, for your -- for the relevant output market you have defined, you haven't done a SSNIP analysis for broadcast networks; is that correct?
A.   I think the same answer.  It's possible I had record evidence that spoke to the views of broadcasters, but I -- sitting here, that's not what I recall.
Q.   Okay.  For your relevant

Page 553

output market as you define it, you didn't do a SSNIP analysis for cable stations or cable networks?
A.   I don't recall doing a SSNIP, but I would have to go back and refer to my -- from that perspective, but I would have to go back and refer to my initial report.
Q.   Okay.  And do you -- are you able to say today whether cable stations or cable networks are customers in the relevant output market that you defined?
A.   I think that with the caveat that we are studying the non-pay-per-view events, which, of course, are not the important or salient or marketable or valuable component of the content that's being created, I think that you could say that the cable networks can serve as a proxy for the preferences of the ultimate consumers, but I think that I conducted my relevant output market analysis from the perspective of the ultimate consumers or customers, namely, the viewers.

Page 554

Q.   Are the consumers the only relative -- relevant customers in the output market you have defined?
A.   Can I have it back?
- - -
(The reporter read from the record as requested.)
- - -
BY MR. ISAACSON:
Q.   And by "consumers," I mean individuals who attend or watch events, such as myself.
A.   I am going to have it back.  I am sorry.
Q.   Sure.  I don't blame you.
- - -
(The reporter read from the record as requested.)
- - -
BY MR. ISAACSON:
Q.   And by "consumers," I mean individuals who attend events or watch them.
A.   I don't know what it means

MAGNA
LEGAL SERVICES

1  market, estimates the additional live
2  events that would have taken place if you
3  eliminated the challenged conduct?
4      A.   Events that occur -- that
5  are -- that are implicated or occur
6  within that ranked definition.  With
7  that -- with that caveat, yes, we are
8  comparing -- we are just taking a trend
9  of events that fall within a certain
10 market definition and comparing it to
11 what actually happened.  And no matter
12 what definition I use, it appears as if
13 there is a drop-off in challenged events
14 despite the fact that Zuffa's event are
15 rising.
16     Q.   All right.  And so within
17 the rank -- now, absent the challenged
18 conduct -- we talked about absent the
19 challenged conduct to some -- for quite a
20 while for your regressions and impact
21 analysis.  I don't want to go back over
22 that.
23         Is your but-for world of the
24 absence of challenged conduct for

1  purposes of Figure 4B the same world
2  where you have a foreclosure percentage
3  of 30 percent or below?
4      A.   I think it's the same
5  but-for world, but I am not -- I am not
6  using that same regression model as the
7  tool or the mechanism that allows me to
8  make this projection.  I am simply taking
9  a trend of output at the industry level
10 and projecting it forward from 2010.
11     Q.   All right.  So in Figure 4B,
12 using the ranked definition, you are
13 estimating how many additional bouts
14 would have taken place from 2010 to 2016,
15 assuming that there was foreclosure of
16 30 percent or less?
17     A.   Well, that last part of the
18 question doesn't completely make sense to
19 me.  These are -- there is not a specific
20 but-for foreclosure share that's lurking
21 in the background.  I don't have to
22 specify but-for foreclosure share to
23 calculate an output factor to demonstrate
24 an output effect in this analysis.

1      Q.   All right.  Let me try it
2  this way:  In Figure 4B, using the ranked
3  definition, you are estimating how many
4  additional bouts would have taken place
5  from 2010 to 2016, assuming the same
6  but-for world that would cause a
7  foreclosure share of 30 percent or less?
8      A.   So are you asking me what
9  the implied reduction in output was in
10 the ranked market?
11     Q.   I am just trying to
12 understand your but-for world.
13     A.   Oh, the but-for world is --
14 the but-for world doesn't vary as we move
15 across my analyses.  I am -- I am just
16 telling you we don't -- this analysis
17 that we do here, as you may or may not
18 know, is -- does not depend on my
19 specifying a but-for foreclosure level.
20 This is a trend analysis.  This is a
21 before/after analysis.
22     Q.   I realize that.  But the --
23 your but-for world in Figure 4B is the
24 same but-for world that generates a

1  foreclosure percentage of 30 percent or
2  less?
3      A.   I think that's fair.
4      Q.   Okay.  And using your trend
5  analysis, if I am reading this right, in
6  2016, for Zuffa events, which there were
7  approximately a little less than 700 in
8  the actual world, the -- in your
9  estimation -- no, actually you are not
10 estimating the Zuffa event.
11         So let me -- the total event
12 account.  The total MMA event account --
13 actually, that's kind of confusing.
14         Why is the total MMA account
15 less than the Zuffa account?
16     A.   The Zuffa numbers are on
17 the -- are on the left-hand side.  If you
18 want to read --
19     Q.   I am looking at the blue
20 line and the green line.
21     A.   Mine don't have
22 color-coding, but --
23         MR. CRAMER:  Here.
24         THE WITNESS:  Okay.  If you

1        want to read off the Zuffa event
2        count, you need to go to the axis
3        on the left-hand side.
4  BY MR. ISAACSON:
5        Q.   Yes, I understand that.
6  But -- oh, but the --
7        A.   And if you want to read off
8  the total or the non-Zuffa, you have to
9  go get the relevant curve and then go to
10 the right axis, the second axis.
11       Q.   So -- all right.  So the
12 Zuffa count would be 40-some.  That's
13 right, because you are not going to have
14 hundreds of those.  And for the green --
15 for the total, you are going to have a
16 little over 600?
17       A.   Which part of the -- so I
18 am -- I am following the green.  Which
19 part of the green line -- oh, by 2016,
20 you're right --
21       Q.   2016.
22       A.   -- that in the actual world,
23 what this is telling us is that there
24 were somewhere between 600 and, say, 700

1  events that featured someone in the
2  ranked definition, which is fairly broad.
3  Remember, this is anybody in the top 650.
4        Q.   Right.  So -- and in your
5  estimation, in the same world it gets you
6  a 30 percent foreclosure share or less,
7  the amount of total MMA event in 2016
8  would rise from -- some amount over 600
9  to a little over 1,800?
10       A.   If you have -- if you
11 defined your market so broadly as to
12 include anyone in the ranked definition,
13 you have to recall, these are -- these
14 are going to be events that feature
15 fighters who are relatively obscure in
16 MMA.
17        I think there is a reason
18 why I didn't use the same kind of A/B
19 convention in this figure as I did for
20 4A, in part, because I think the ranked
21 definition is likely too broad to get a
22 reliable estimation of the output effect
23 here.  I think -- I think that I would
24 point you to more realistic market

1  definitions.
2        Q.   Okay.  But am I right that
3  for the ranked definition which you are
4  projecting as an increase in bouts from
5  over 600 to a little over 1,800?
6        A.   What this graph shows is
7  that had the trend from 2001 --
8        Q.   I am sorry.  That was for
9  2016.
10       A.   What this shows is that had
11 the trend in total events in this market
12 definition, the ranked definition,
13 persisted, the trend that went from 2001
14 to 2010, had it persisted, then by 2016,
15 total events would be somewhere on the
16 order of 1,800.
17       Q.   All right.  And based on
18 that, you reached the opinion that there
19 would be over 1,800 events in the ranked
20 definition in the year 2016 in the
21 absence of the challenged conduct?
22       A.   I don't think that that's
23 the opinion that I reached.  I think that
24 I am trying to be complete with respect

1  to every plausible market definition to
2  show that output was restricted here.
3        Q.   All right.  Now, let me see
4  if I can understand -- do you have an
5  opinion as to how many additional bouts
6  there would be within the ranked
7  definition in 2016 in the absence of the
8  challenged conduct?
9        A.   I don't think that I have
10 ever said that I am predicting that
11 exactly 1,800 events would have occurred.
12 I think that what I am saying is that had
13 the trend persisted, the trend from 2001
14 to 2010, then one would predict that by
15 2016, this industry would have grown to
16 something on the order of 1,800 events.
17       Q.   All right.  But based on
18 that trend, are you reaching any opinions
19 about how many events would have taken
20 place within the ranked definition in
21 2016 in the absence of the challenged
22 conduct?
23       A.   I think the opinion that I
24 am willing to make or take based on this

MAGNA●
LEGAL SERVICES

Page 611

1   chart in conjunction with all the other
2   charts that I have is that there was an
3   output effect and that revenue --
4   industry output fell no matter -- from
5   2010, no matter how you define the
6   relative input market.
7       Q.   All right.   But are you able
8   to quantify that output effect within the
9   ranked definition?
10      A.   One could quantify it if one
11  were truly interested in getting a
12  number, but I don't know -- I don't know
13  what the precise number gives you above
14  and beyond that inference that can be
15  drawn by saying that it fell with respect
16  to every way you define the market.
17      Q.   Have you quantified an
18  output effect within the ranked
19  definition of total events from the -- by
20  eliminating the challenged conduct?
21          MR. CRAMER:  Asked and
22      answered.
23          THE WITNESS:  I don't think
24      that I have -- I have quantified

Page 612

1       it.
2   BY MR. ISAACSON:
3       Q.   All right.   Let me go to the
4   tracked definition.
5       A.   Okay.
6       Q.   So here, for the number of
7   bouts, I just look at the left axis; is
8   that correct?
9       A.   Correct.
10      Q.   Okay.  And help me
11  understand the brackets that are the
12  A and B.
13      A.   Sure.
14      Q.   So there is the dotted line
15  that goes to the top of the B bracket.
16          Do you see that?
17      A.   Yes.
18      Q.   Okay.   The -- is that a
19  combination of the Zuffa event and
20  non-Zuffa events reflected in the blue
21  line and the red line?
22      A.   No.  The dotted red is the
23  legend that tells you it's the but-for
24  non-Zuffa event count.  So all we are

Page 613

1   doing is we first plot the non-Zuffa
2   event account, which is the red line,
3   right, through 2010, and then we -- and
4   then we fit a trend line from 2001 to
5   2010 and we extrapolate forward and we
6   say of that trend had persisted, then
7   non-Zuffa events would have continued
8   increasing and would have -- would have
9   reached a certain level by 2016.
10      Q.   All right.   So in Figure 4A,
11  the red dotted line is your trend line
12  for non-Zuffa events; is that correct?
13      A.   Fit -- yes.   But
14  importantly, fit from 2001 to 2010 only.
15      Q.   By "fit," meaning you are
16  projecting the trend for 2010 through
17  2016 by the trend prior to 2010?
18      A.   That's fairly close.   We fit
19  the trend with data from '01 to 2010, and
20  then we project forward through 2016.
21      Q.   All right.   And based on
22  that trend analysis -- well, first of
23  all, in 2016, there is -- for non-Zuffa
24  events, there is -- it looks like there

Page 614

1   is approximately 20 events?
2       A.   In the actual world, yes,
3   2016, it looks like there were about 20
4   non-Zuffa events that are in the tracked
5   definition.
6       Q.   All right.   And in the
7   but-for world, there is a little over 40
8   events?
9       A.   For non-Zuffa, correct.
10      Q.   For non-Zuffa?
11      A.   Correct.
12      Q.   So is it your opinion, based
13  on the trend analysis in Figure 4A, that
14  for the tracked definition, that in the
15  absence of the challenged conduct, the
16  number of non-Zuffa events would have at
17  least doubled in 2016?
18      A.   I think my opinion is that
19  there is evidence here of an output
20  effect, of output suppression.   That --
21  that's my opinion.   Whether I am able to
22  quantify that to any reasonable degree is
23  a related question, and, of course, my
24  best estimate, if you insist, would be

MAGNA
LEGAL SERVICES

Page 619

1    red line, which is the ranked foreclosure
2    share, the foreclosure share goes from
3    zero percent to over 70 percent, correct?
4         A.   Well, you are -- from 2005
5    until 2010?
6         Q.   No.  From -- well, I am
7    sorry.  Let's do from 2007 until 2010.
8    They go from 20 percent to over 70
9    percent, correct?
10        A.   Correct.
11        Q.   And then after 2010, the
12   ranked foreclosure share goes from 70
13   percent to 90 percent and then declines
14   back under 80 percent, correct?
15        A.   Correct.
16        Q.   For the headliner share from
17   2007 to 2010, the foreclosure share goes
18   from, say, 35 percent to 90 percent,
19   correct?
20        A.   Are you on -- the headliner,
21   which --
22        Q.   That's purple.
23        A.   The purple, the revenue
24   weighted?

Page 620

1         Q.   Yes.
2         A.   Okay.  I agree, 35 percent
3    looks pretty close, yes.
4         Q.   And for the tracked revenue
5    weighted from 2007 to 2010, it goes --
6    the foreclosure share goes from 40
7    percent to 90 percent, and then after
8    2010, it stays close to 90 percent,
9    correct?
10        A.   Are we on the purple now?
11        Q.   No.  That was the blue.
12        A.   The blue.
13        Q.   Tracked revenue weighted.
14        A.   The blue goes up after
15   2000 -- I mean, both the purple and the
16   blue go up after 2010.
17        Q.   But they go up between 90
18   and 100 percent, correct?
19        A.   Correct, but it's still an
20   increase.
21        Q.   They go from 30 to 40
22   percent to 90 percent between 2007 and
23   2010.  And after 2010, they go from
24   someplace, from anywhere from 90 to 95

Page 621

1    percent.
2              Does that sound right?
3         A.   For those two measures, I
4    think that's a fair characterization.
5    They are still going up after 2010.
6         Q.   All right.  So going back to
7    Figure 4A, am I correct that the
8    foreclosure shares in the trend for --
9    for the period before 2010 where you are
10   using the actual trends, that's the
11   period where the actual foreclosure rate
12   was rising the most rapidly, correct?
13        A.   It is -- it is a true
14   statement that foreclosure was rising
15   more rapidly prior to 2010 than after,
16   but it continued to rise after 2010.
17        Q.   All right.  And so if the
18   foreclosure share was rising most
19   significantly before 2010 compared to
20   after 2010, why does it make sense to
21   construct a trend line for before and
22   after 2010 to measure the effect of
23   foreclosure on output?
24        A.   Well, I think that, if

Page 622

1    anything, it would -- it would make the
2    analysis conservative.  It's basically
3    saying that the benchmark that I am
4    using, which is the pre-2010 period, was
5    already tainted or contaminated by
6    Zuffa's monopsony power.  So that trend
7    was already potentially reduced by virtue
8    of Zuffa's monopsony power.  And if we
9    could -- if we could have removed that
10   prior to 2010, it would serve as an even
11   better benchmark.
12        Q.   Well, isn't another way of
13   looking at this that the faster the
14   foreclosure share rises, the faster
15   output rises, according to your chart?
16        A.   No.
17        Q.   No.
18        A.   What we don't get to see is
19   what -- what would have happened to
20   output in the absence of Zuffa
21   monopolizing the market, selling up more
22   and more fighters beginning 2001.
23        Q.   Am I mathematically correct
24   that what I am observing is that the

MAGNA
LEGAL SERVICES

Page 623

1  faster the foreclosure share rises, the
2  faster output rises in your charts 4A --
3  in your chart 4A?
4          MR. CRAMER:  Asked and
5      answered.
6          THE WITNESS:  That's not the
7      right inference, no.
8  BY MR. ISAACSON:
9      Q.  I'm not asking you about the
10  inference.  I'm just -- am I -- am I
11  seeing the numbers right?  Mathematically
12  am I correct that the faster the
13  foreclosure share rises, the faster
14  output rises as reflected in those
15  charts?
16      A.  No, that's not -- you are --
17  you are stating it as if one is causing
18  the other or are related in any way, and
19  they are not.
20      Q.  Okay.  Without inferring any
21  causation, I just want to know if I am
22  looking at the charts correctly.
23      A.  I don't think you are
24  looking at the charts correctly.

Page 624

1      Q.  Okay.  The -- are you aware
2  of any trend analysis which show that the
3  faster the foreclosure rate rises, output
4  declines?
5      A.  I don't understand.  Are
6  you -- are you asking me about the
7  analyses that I have performed?
8      Q.  Sure.
9      A.  I -- I certainly don't -- I
10  haven't performed any analyses that would
11  illuminate that point.
12      Q.  All right.  And so if we
13  look at Figure 4C.
14      A.  Okay.
15      Q.  This is your headliner
16  measure.  And here, for total events, the
17  green line, your trend analysis here
18  shows that, say, approximately 60 -- we
19  will call it 66 actual events took place
20  in 2016, total MMA events.
21          And according to your trend
22  analysis, you would have expected over
23  100 in 2016?
24      A.  In the headliner submarket,

Page 625

1  that's correct, yes.
2      Q.  And so -- in the non-Zuffa
3  events with headliners, according to your
4  trend analysis, would have risen from an
5  actual number of a little over 20 to an
6  amount -- to, it looks like, 60 events;
7  is that right?
8      A.  Just if I could put it in my
9  own words, had the -- had the trends of
10  2001 to 2010 persisted, you would have --
11  you would have declined to only around 60
12  non-Zuffa events featuring headliners as
13  opposed to what happened in the actual
14  world, which was something around 30.
15      Q.  Do you conclude from this
16  trend analysis that output of either --
17  are you able to quantify from this trend
18  analysis the extent to which output would
19  have risen in the absence of the
20  challenged conduct?
21      A.  Well, if you -- if you
22  wanted to quantify it -- and for an
23  analysis that I performed in my rebuttal
24  report, I do -- I do quantify it, but if

Page 626

1  you wanted to quantify it, you could look
2  at the difference between the dash lines
3  and the straight lines.
4      Q.  Okay.  This isn't about what
5  I want to do.  This is about what
6  opinions you are giving.
7      A.  Sure.
8      Q.  Are you quantifying the
9  amount of output?  Are you giving the
10  opinion that the amount of output would
11  have increased in the absence of the
12  challenged conduct by the difference
13  between the actual numbers and the
14  current -- and the trend number in 2016?
15      A.  I think that a fair
16  characterization of my opinion is that
17  output was reduced, and if you wanted to
18  quantify it, the best estimate that I
19  could give would be the difference
20  between the dash lines, the projections
21  and the actual lines.
22      Q.  In your rebuttal report, in
23  paragraph 49.
24      A.  Okay.  Paragraph 49?

MAGNA
LEGAL SERVICES

Page 647

```
1        Q.   All right.
2            MR. ISAACSON:  Thank you.  I
3   don't have any more questions.
4            MR. CRAMER:  Very good.
5            THE VIDEOGRAPHER:  Okay.
6   The time is 5:12 p.m.  This is the
7   end of Dr. Hal Singer's
8   deposition.  We are going off the
9   record.
10            - - -
11        (The deposition concluded at
12   5:12 p.m.)
13            - - -
14
15
16
17
18
19
20
21
22
23
24
```

Page 649

```
1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4   carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign the
9   errata sheet and date it.
10   You are signing same subject to the
11   changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14        It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of
17   receipt of the deposition transcript by
18   you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 648

```
1        CERTIFICATE
2
3
4        I HEREBY CERTIFY that the
5   witness was duly sworn by me and that
6   the deposition is a true record of
7   the testimony given by the witness.
8
9
10
11
12   _____
13   Lori A. Zabielski
14   Registered Professional Reporter
15   CaseViewNet Reporter
16   Dated:  January 24, 2018
17
18
19
20
21
22        (The foregoing certification
23   of this transcript does not apply to any
     reproduction of the same by any means,
     unless under the direct control and/or
24   supervision of the certifying reporter.)
```

Page 650

```
1        - - - - - -
2        E R R A T A
3        - - - - - -
4   PAGE  LINE  CHANGE
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
```



Page 651

1       ACKNOWLEDGEMENT OF DEPONENT
2       I, _____, do
3   hereby certify that I have read the
4   foregoing pages,   338-652 PGS, and that
5   the same is a correct transcription of
6   the answers given by me to the questions
7   therein propounded, except for the
8   correction or changes in form or
9   substance, if any, noted in the attached
10  Errata Sheet.
11
12  _____
    HAL J. SINGER, Ph.D.        DATE
13
14
15
16
17  Subscribed and sworn
18  to before me this
19  _____ day of _____, 20_____.
20  My commission expires:
21  _____.
22
23  _____
    Notary Public
24

Page 652

1       LAWYER'S NOTES
2   PAGE   LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____

