# EXHIBIT 14

# Excerpts from Deposition of Michael Mersch

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
　)
　　　　Plaintiffs, )
　)
　　　　vs. ) Case No.
　) 2:15-cv-01045-RFB-(PAL)
　)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
　)
　　　　Defendant. )
_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF

MICHAEL P. MERSCH

MORNING SESSION (PAGES 1 to 332)

LAS VEGAS, NEVADA

JULY 14, 2017

8:05 a.m.

REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 51253-A

MICHAEL P. MERSCH - CONFIDENTIAL

102

1  standardized or typical type bucket of what is an
2  expected business life cycle because it is a very
3  obviously nuanced industry, a very unique industry
4  that has its own, as I mentioned earlier, factors
5  that go into, you know, the development of a company,
6  the development of the value or the following of a
7  promotion.
8      So there's so many factors that go into it.
9  But yes, I mean, I think in general you could say
10 that a newer organization is going to have more
11 growing pains than one that has more experience.
12     Q. Can you describe the factors that make the
13 MMA promotion industry a unique industry?
14     A. I think that's -- I think that's an
15 extremely complicated question.
16     I think -- well, certainly, the -- you
17 know, the matchups that exist, as I mentioned
18 earlier, the individuals that are participating on
19 the card, I think, is probably arguably the most
20 important thing in how well those matchups are put
21 together, how compelling the matchup between
22 fighter A and fighter B is, I think is, and has
23 always been going back 200 years in boxing, you know,
24 the most important factor.
25     But there are a number of factors, and you

103

1  know, when I say some of these might be common sense,
2  they're really that.
3      If you have fighter A from, you know,
4  Dallas, Texas, it makes sense that putting on an
5  event in Dallas, Texas involving fighter A might be
6  more appealing to the fans who might buy tickets in
7  Dallas, Texas. So location is a big factor.
8      And again, there are any number of factors,
9  including, you know, style issues, matchup issues,
10 previous history issues.
11     So again, I think that the question is
12 impossible to answer with any specific detail because
13 there are just too many factors that would go into
14 you know -- in other words, if it was easy to distill
15 that down into a bottle, everybody would be doing it.
16     Q. So it's difficult to get into the business?
17     A. Not at all.
18     MR. WILLIAMS: Objection to the form of the
19 question.
20 BY MR. CRAMER:
21     Q. Well, you said if it was easy, everybody
22 would be doing it.
23     A. I did not say that.
24     Q. You said if it was easy to distill it into
25 a bottle, everybody would be doing it.

104

1  A. But "it" in my reference there was in
2  putting together the various ingredients that go into
3  putting together a successful MMA promotion. It had
4  nothing do with getting into or attempting to become
5  an MMA or a combat sports promoter.
6      Q. It's relatively easy to say, "I'm a
7  promoter"; it's hard to succeed at it is what you're
8  saying?
9      A. I think it's hard to succeed in any
10 business. I think without, you know, putting
11 together the right, you know, series of factors, you
12 know, given -- given various factors in, you know, in
13 the lifestyle of a different company like Starbucks
14 or Amazon, they might not be successful, but they
15 were able to come together and put together the right
16 ingredient of price and cost and deliverable factors
17 that made them appealing and has turned them into
18 very successful business.
19     Q. But one of the factors that would make an
20 MMA promotion a successful business is the ability to
21 have a sufficient number of fighters under contract
22 that you can put together compelling fights, correct?
23     A. I would agree that you have to have
24 compelling matchups and compelling fights to, you
25 know, generally succeed in MMA combat sports.

105

1      Q. If you only had one top fighter and nobody
2  to set up against that one top fighter, you're going
3  to struggle as an MMA promoter; you need more than
4  one, correct?
5      A. By definition and by pursuant to the rules
6  of every athletic commission on the planet, you
7  cannot have one person in a combat sports event.
8      Q. Right, but you can have lots of different
9  people who are MMA fighters but not necessarily at
10 the level of the top guy that you have. You need
11 other top guys to create compelling matchups?
12     A. You need to have compelling fights, whether
13 that's a top person against a top person, a mid-tier
14 fighter against a mid-tier fighter or a novice
15 fighter against a novice fighter.
16     The important thing, back to my earlier
17 comments, are about proper matchups, starting at all
18 times and being at all times mindful of the health
19 and safety aspects of matching up fighters.
20     Q. Right. So mindful of health and safety of
21 fighters, you can't just match up a champion
22 contender with some guy who just joined MMA fighting,
23 that might not even get approved?
24     A. In my -- in my experience, working with
25 virtually every athletic commission in the country,

326

1  period has passed, and at some point, whether it's
2  one day or 365 days into the right-to-match period,
3  at some point during that term, the fighter is
4  presented with an offer from a competing entity, and
5  then, is required to present that offer or at least
6  the material terms of that offer to Zuffa, and Zuffa
7  elects to match.
8       That was the original hypothetical you
9  presented, as I understood it.
10      Q.  Okay.  So let me change the hypothetical.
11 I think I understand the misunderstanding.
12      They wait the 90 days, and then, they want
13 to ensure themselves that they never again have to
14 fight for the UFC.  Right?  The only way to do that
15 is to wait 12 months without getting another offer,
16 correct?
17      A.  I don't think that -- I wouldn't agree that
18 that's the only way to do it.  In fact --
19      Q.  How else?
20      A.  You call up the UFC and say, hey, I don't
21 want to -- you know, I would rather -- I would
22 request that you will consider allowing me out of
23 this provision.  Even though I understand and respect
24 that you have that right, I would request that you
25 forego or elect to not enforce that right and allow

327

1  me to go my way, and I wish you the best as well.
2       Q.  Okay.  But now, I'm going to ask you to
3  assume that Zuffa wants to enforce its rights under
4  its contracts.  Let's assume that Zuffa thinks it's
5  contracts are important, doesn't want that fighter
6  out from under its rights of the contract.
7       The only way that fighter, who wants to
8  fight MMA but not for the UFC under a standard Zuffa
9  contract can fight for another promotion is to wait
10 the 90-day exclusive negotiation period and wait the
11 12 months without getting an offer from another
12 promotion.
13      After the 90 days and the 12 months, that
14 fighter now can fight for another promotion, correct?
15      A.  Without having the specifics of the
16 provisions in front of me, in answering your question
17 generally, that would be one way that the fighter
18 could get out from under their contract, or that
19 would be one way for the fighter to ensure that all
20 the basket of rights granted and mutually negotiated
21 were completely extinguished between both parties,
22 other than the rights that exist.
23      Q.  Assuming that Zuffa wanted to enforce every
24 right it had under its standard contract with the
25 fighter, it's the only way, waiting 90 days and

328

1  **12 months is the only way a fighter can ensure that**
2  **it no longer has to fight for the UFC and can fight**
3  **for another MMA promotion, correct?**
4       A.  I cannot think of any circumstance during
5  my time with UFC where your hypothetical has ever
6  played out in the manner or the fashion that your
7  hypothetical describes it.
8       But I would agree that, you know, following
9  the -- following the material terms of a contract and
10 to their natural conclusion is a way to naturally --
11 to terminate a contract and allow freedom to, you
12 know, otherwise contract with other entities.
13      MR. CRAMER:  All right.  Let's go off the
14 record.
15      THE VIDEOGRAPHER:  We are off the record,
16 4:12 p.m.
17      (There was a recess taken.)
18      (Whereupon, Court Reporter
19      Cynthia K. DuRivage was relieved by
20      Court Reporter Jualita Stewart, the
21      transcript of which is contained in
22      a separate booklet.)
23
24           *  *  *  *  *
25

329

1
2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____)
5
6
7       I, MICHAEL P. MERSCH, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.
14
15      _____
16          MICHAEL P. MERSCH
17
18
19
20 Sworn and subscribed to before
21 me, this        day of
22          , 2017.
23
24 _____
25      Notary Public

83 (Pages 326 to 329)

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                   330                                          332
 1         CERTIFICATE OF REPORTER           1              E R R A T A
 2      I, Cynthia K. DuRivage, a Certified  2
 3   Shorthand Reporter of the State of      3
 4   Nevada, do hereby certify:              4
 5         That the foregoing proceedings    5      I wish to make the following changes,
 6   were taken before me at the time and    6   for the following reasons:
 7   place herein set forth; that any        7
 8   witnesses in the foregoing proceedings, 8   PAGE LINE
 9   prior to testifying, were duly sworn;   9   ___ ___ CHANGE:_____
10   that a record of the proceedings was   10   REASON:_____
11   made by me using machine shorthand     11   ___ ___ CHANGE:_____
12   which was thereafter transcribed under 12   REASON:_____
13   my direction; that the foregoing       13   ___ ___ CHANGE:_____
14   transcript is a true record of the     14   REASON:_____
15   testimony given.                       15   ___ ___ CHANGE: _____
16         I further certify I am neither   16   REASON:_____
17   financially interested in the action   17   ___ ___ CHANGE: _____
18   nor a relative or employee of any      18   REASON:_____
19   attorney or party to this action.      19   ___ ___ CHANGE: _____
20         Reading and signing by the       20   REASON:_____
21   witness was requested.                 21
22         IN WITNESS WHEREOF, I have this  22   _____  _____
23   date subscribed my name.               23   WITNESS' SIGNATURE          DATE
24   Dated: August 1, 2017                  24
25                                          25

           _____
23              CYNTHIA K. DuRIVAGE
                   CCR No. 451
```

```
                                   331
 1            INSTRUCTIONS TO WITNESS
 2
 3      Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7      After doing so, please sign the errata sheet
 8   and date it.
 9      You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
```

                                                                333

                    UNITED STATES DISTRICT COURT

                         DISTRICT OF NEVADA


    CUNG LE; NATHAN QUARRY, JON    )
    FITCH, on behalf of            )
    themselves and all others      )
    similarly situated,            )
                                   )
              Plaintiffs,          )
                                   )
              vs.                  ) Case No.
                                   ) 2:15-cv-01045-RFB-(PAL)
                                   )
    ZUFFA, LLC, d/b/a Ultimate     )
    Fighting Championship and      )
    UFC,                           )
                                   )
              Defendant.           )
    _____)


                     C O N F I D E N T I A L

                   VIDEOTAPED DEPOSITION OF

                      MICHAEL P. MERSCH

    AFTERNOON AND EVENING SESSIONS (PAGES 333 to 496)

                     LAS VEGAS, NEVADA

                       JULY 14, 2017

                         4:43 p.m.


    Reported by:
    Jualitta Stewart, CCR No. 807, RPR
    Job No. 51253-B

474

1  suppose, made in terms of the modification of the
2  sponsorship policy would certainly take a certain
3  amount of time for the -- the fighters and other
4  people -- sponsors to react to and adjust to those
5  desire -- desired or those -- those decisions that
6  were made as to propriety of changing the
7  sponsorship policy. And that occurred over the
8  course of many, many years.
9  BY MR. CRAMER:
10    Q.  It's fair to say that there were
11  companies like And1 or smaller companies that either
12  couldn't afford to or didn't want to pay UFC's
13  sponsorship tax and, therefore, UFC fighters lost
14  sponsorship revenue as a result of the UFC's
15  implementation of this policy, correct?
16    MR. WILLIAMS: Object to the form --
17  BY MR. CRAMER:
18    Q.  In the short run.
19    MR. WILLIAMS: Sorry. Object to the form
20  of the question.
21    THE WITNESS: I have no idea what
22  companies like AND1 could or could not afford. What
23  I know, you know, from based on the decisions that
24  And1 chose to make or similarly situated companies,
25  was that either they chose to include the UFC as a

475

1  part of their overall business plan or they chose
2  not to.
3    But as to whether there -- whether that
4  was a -- a decision that they either could or could
5  not, I have no idea what anybody could or could not
6  afford. I know that people either chose to enter
7  into those agreements, and in certain circumstances
8  they didn't choose to enter into those agreements.
9  BY MR. CRAMER:
10    Q.  It's fair -- it's fair to say that by
11  implementing this policy, Zuffa made it more
12  expensive than it used to be sponsor UFC fighters,
13  right? Before the policy they didn't have to pay
14  Zuffa any money and after the policy, they did,
15  right?
16    A.  I -- again, depending on the circumstance
17  and from a short-term analysis, I suppose that you
18  could make that argument.
19    Q.  And economic says that when you raise the
20  price of something, people buy less of it, right?
21    A.  Well, I don't know, which economist is
22  saying that? I suppose --
23    Q.  Every single one. Price -- it's supply
24  and demand. Prices go up, demand goes down.
25    A.  Again, I think in the short term that

476

1  your -- your impression that that -- that that
2  was -- had made an impact could -- possibly could be
3  accurate, I don't have any, again, specific
4  information. But in the long -- the goal was that
5  in the long run that it would eventually in order to
6  the benefit of -- of the entire industry, including
7  the fighters and the promoters involved, at least
8  the UFC relative to their decisions about their
9  business.
10    Q.  Did the UFC increase the compensation
11  that it offered to fighters to offset the loss of
12  sponsorship income to fighters as a result of this
13  policy?
14    A.  Over the course of my eight years with
15  the UFC, my observations, generally speaking,
16  without violating any privilege as to the specific
17  terms of any contracts, but I'm assuming you have
18  them all and can verify this, is that compensation
19  in the UFC paid to fighters continued to go up and
20  up and up over the course of time either because of
21  or in spite of the various economic conditions that
22  impacted, you know, the country, the industry, the
23  specific business of the UFC and their events.
24    And, again, whether, you know,
25  sponsorship had some role in that, I'm sure it had

477

1  some -- some. But there were so many various
2  factors that went into that and based on a bunch of
3  different reasons, the UFC through the various
4  efforts and business decisions undertaken by
5  Mr. Fertitta and Mr. White, Mr. Frank Fertitta, I
6  think helped grow the UFC into -- and put them in an
7  economic position where they were able to offer
8  higher salaries, more -- more compensation to the
9  fighters based on the totality of everything that
10  they were doing, including their decisions on a
11  sponsorship policy change here and there.
12    MR. CRAMER: All right. I move to strike
13  the answer. I asked a specific question.
14  BY MR. CRAMER:
15    Q.  Did the UFC increase the compensation to
16  the fighters to offset the loss of the sponsorship
17  income that the fighters incurred as a result of the
18  implementation of the sponsorship policy that we
19  were just discussing?
20    A.  And I testified that the UFC increased
21  the pay of the fighters for -- as long as I was
22  associated with the UFC, so yes.
23    Q.  Did -- did the the UFC pay Mr. Quarry --
24  offer to pay Mr. Quarry to make up for the loss of
25  the sponsorship money? Did you say, "Oh,

MICHAEL P. MERSCH - CONFIDENTIAL

478

1  Mr. Quarry, I know you're going to lose the And1
2  sponsorship, and as a result of that, we're going to
3  increase the amount that we pay you?
4       A.   I have no independent recollection of
5  this event taking place, although I don't dispute
6  that it happened.  And I have no independent
7  recollection of what the UFC did or did not do with
8  respect to Mr. Quarry.
9       Q.   Do you have any recollection at any time
10 that Zuffa went to any fighter and said "as a result
11 of you losing independent sponsorships because of
12 our sponsorship policy, we're going to increase your
13 bout compensation by 25 percent"?
14      A.   I have no knowledge whether that did or
15 did not occur.
16      Q.   You think it might have occurred?
17      A.   I don't know.  I have no independent
18 recollection that it occurred, but I have no idea
19 that it didn't occur.
20      Q.   So you think it was possible that Zuffa
21 had a sponsorship offset policy where it went around
22 modifying every fighters' contract to add additional
23 revenues in order to make up for lost sponsorship
24 monies and you just didn't know it happened?
25           MR. WILLIAMS:  Object to the form of the

479

1  question.
2           THE WITNESS:  I think that the UFC
3  created a multitude of different opportunities for
4  fighters that allowed them to enhance their revenue
5  streams in a multitude in different ways.
6           So it just depends on the -- you know,
7  the nature.  Again, it's a short-term analysis
8  versus long-term analysis.  Again, as to the
9  business reasons or rationale for why those
10 decisions were made, I would refer you to
11 Mr. Fertitta and Mr. White.
12 BY MR. CRAMER:
13      Q.   You can put that document aside.  I asked
14 the court reporter to mark as the next document
15 Mersch 44.  I think it's in front of you.
16           Do you have it?
17      A.   Yes, sir.
18      Q.   It's a two-page series of e-mails bearing
19 the Bates range ZFL-1009561.
20           MR. WILLIAMS:  Counsel, can we get a
21 copy?
22           MR. CRAMER:  Oh, yes.  Sorry.  Here you
23 go.
24           MR. WILLIAMS:  Thanks.
25 ///

480

1  BY MR. CRAMER:
2       Q.   So it's a two-page series of e-mails.  It
3  bears the Bates range ZFL-1009561 through 9562.
4  It's a May 2, 2013 e-mail chain involving
5  Mr. Mersche and Don Gold discussing the future
6  direction of sponsors which -- that conflict or
7  compete with the UFC Fit.
8       A.   I've -- I've looked it over.
9       Q.   Okay.  What is TRX?
10      A.   To the best of my recollection, TRX is a
11 gym product that individuals can purchase and use
12 for fitness either in a gym setting or a home
13 setting.
14      Q.   Turn to the bottom of the page, you write
15 in the very last sentence on the page, "To date, we
16 have allowed TRX as a fighter sponsor and they pay
17 us nothing.  But in light of our new policy of not
18 allowing competing fighters to UFC Fit."
19           Do you see that?
20      A.   Yes, sir.
21      Q.   So at some point, UFC started a policy or
22 imposed a policy that it did not allow sponsors that
23 compete with something called UFC Fit; is that
24 right?
25      A.   That would be how I would read that

481

1  e-mail, right.
2       Q.   What is UFC Fit?
3       A.   UFC Fit was a -- an in-home DVD or other
4  delivery-related fitness program similar to a PX90
5  or other fitness-related program that combined
6  exercise and diet and was, I think, led by a
7  respected MMA nutritionist dieticianist named Mike
8  Dolce.
9       Q.   In the e-mail that you write to Mr. Gold
10 on May 2nd, 2013 in the middle of the page you say,
11 "Talked with Moss and Reid yesterday and the group
12 consensus was we need to get this in front of
13 Lorenzo first before we take out this product
14 category as there will be fighters that will be
15 impacted financially by such a decision."
16           Do you see that?
17      A.   I sure do.
18      Q.   What -- what did you mean that there
19 would be fighters impacted financially by such a
20 decision?
21      A.   Again, in the short term if we -- if the
22 decision was made to allow a sponsor that -- or
23 disallow a sponsor that had -- had previously
24 been -- had a contractual relationship with a
25 fighter, there may have been a short-term impact to

490

1     A.   1220 South Commerce Street, Suite 120,
2 Las Vegas, Nevada 89102.
3     Q.   What's the name of the company that you
4 work for?
5     A.   One of the companies that I provide
6 consulting and business services for at that address
7 is called -- well, there are a multitude of
8 companies, there's a variety, but they're
9 generically referred to collectively as the Focus
10 Companies.
11     Q.   And the Focus Companies are located at
12 the address you just gave?
13     A.   That's correct.
14     Q.   And what is the general business purpose
15 of the Focus Companies?
16     A.   There's a variety of business purposes
17 for the companies. There's about 40 of them that, I
18 think, are registered at that address that cover a
19 variety of different businesses.
20     Q.   Are you an employee or an independent
21 contractor?
22     A.   I am an employee for some -- for one of
23 the companies.
24     Q.   And you're an independent contractor for
25 others?

491

1     A.   I'm an independent contractor for a
2 number of people, correct.
3         MR. CRAMER: All right. That's all the
4 questions I have. Thank you.
5         THE VIDEOGRAPHER: Questions?
6         MR. CRAMER. No questions.
7         THE VIDEOGRAPHER: This concludes today's
8 deposition of Michael Mersch. Total number of media
9 used is seven.
10         We are off the record at 8:27 p.m.
11         (Thereupon, the taking of the deposition
12           concluded at 8:27 p.m.)

492

STATE OF _____ )
              ) :ss
COUNTY OF _____)


    I, MICHAEL P. MERSCH, the witness
herein, having read the foregoing
testimony of the pages of this deposition,
do hereby certify it to be a true and
correct transcript, subject to the
corrections, if any, shown on the attached
page.


    _____
      MICHAEL P. MERSCH



Sworn and subscribed to before
me, this _____ day of
_____, 2017.

_____
    Notary Public

493

    REPORTER'S DECLARATION
STATE OF NEVADA   )
              ) ss
COUNTY OF CLARK   )

    I, Jualitta Stewart, a duly commissioned
Notary Public, Clark County, State of Nevada, do
hereby certify:
    That I reported the taking of the
deposition of the witness, MICHAEL P. MERSCH,
commencing on Friday, July 14, 2017, at the hour of
4:43 p.m.
    That prior to being examined, the witness
was by me duly sworn to testify to the truth, the
whole truth, and nothing but the truth.
    That I thereafter transcribed my said
shorthand notes into typewriting and that the
typewritten transcript of said deposition is a
complete, true, and accurate transcription of said
shorthand notes taken down at said time.
    I further certify that I am not a
relative or employee of any party involved in said
action, nor a person financially interested in the
action.
    IN WITNESS WHEREOF, I have hereunto set
my hand and affixed my official seal in my office in

MICHAEL P. MERSCH - CONFIDENTIAL

```
                                    494                                              496
 1   the County of Clark, State of Nevada, this 1st day    1            E R R A T A
 2   of August, 2017.                                      2
 3                                                         3
 4                                                         4
              JUALITTA STEWART, RPR, CCR No. 807           5      I wish to make the following changes,
 5                                                         6   for the following reasons:
 6                                                         7
 7                                                         8   PAGE LINE
 8                                                         9   ___ ___ CHANGE:_____
 9                                                        10   REASON:_____
10                                                        11   ___ ___ CHANGE:_____
11                                                        12   REASON:_____
12                                                        13   ___ ___ CHANGE:_____
13                                                        14   REASON:_____
14                                                        15   ___ ___ CHANGE: _____
15                                                        16   REASON:_____
16                                                        17   ___ ___ CHANGE: _____
17                                                        18   REASON:_____
18                                                        19   ___ ___ CHANGE: _____
19                                                        20   REASON:_____
20                                                        21
21                                                        22   _____    _____
22                                                        23      WITNESS' SIGNATURE        DATE
23                                                        24
24                                                        25
25
                                    495
 1             INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7       After doing so, please sign the errata sheet
 8   and date it.
 9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12       It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

42 (Pages 494 to 496)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099