# EXHIBIT 15

## Excerpts of Deposition of Denitza Batchvarova

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )  Case No.
                                 )  2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
          Defendant.             )
_____  )

VIDEOTAPED DEPOSITION OF DENITZA BATCHVAROVA

Las Vegas, Nevada

January 25, 2017

9:11 A.M.

Reported by:
Sarah Padilla, CCR NO. 929
Job No. 48403

26

1  super stars, no.
2      Q   Do you recall if that is part of the
3  explanation for the discrepancy between the two
4  estimates?
5      A   I don't recall.  But, I mean, there is --
6  the announcement is done differently, so there is
7  lines that are on this page that are not on the
8  previous page.
9      Q   If you turn back to page 87 of the current
10 exhibit, the presentation notes that, "Apparel
11 sponsors have small purses pointing to the UFC tax
12 as the main culprit."  Can you tell me what that
13 refers to?
14     A   At the time apparel companies who wanted
15 to -- that were sponsoring athletes going into the
16 octagon were paying an affiliation fee.  And so they
17 were -- from what we had understood at the time --
18 and Mr. Mersch is way better suited to explain --
19 they were pointing to that as a reason why they were
20 paying less to the athletes.
21     Q   They, being the apparel sponsors?
22     A   Sorry?
23     Q   When you say "they," are you referring to
24 the apparel sponsors were saying that is why they
25 were paying less to the athletes?

27

1      A   Yes.
2      Q   And the affiliation fee that is being
3  referred to here is the UFC tax?
4      A   Yes.
5      Q   And the analysis presented in this
6  presentation, did it assume that the fighters'
7  current sponsorship revenue would be maintained
8  under Project Next under the operating agreement?
9      A   Which sponsorship are you referring to?
10     Q   The outside sponsorship revenue.
11     A   This analysis essentially was attempting
12 to -- it was assuming that we would replace it with
13 revenue that we were distributing back to them.
14     Q   Okay.
15     A   And this -- I just want to clarify that
16 this only refers to sponsorship revenue derived by
17 athletes during our -- during their official events
18 when representing UFC.  So walking into the octagon,
19 press conferences, media days is their events.  We
20 don't have and we never had and never want to have
21 any rights to athletes outside of the octagon, what
22 they do in the 360 days that they are not officially
23 fighting or officially -- at official UFC events.
24     So we always saw that we are not -- you
25 know, we did not think that we were through

28

1  introducing the athlete policy, that we were taking
2  away 100 percent of their ability to derive
3  sponsorships.  We always looked at it as we are
4  taking a small part of their -- we did not think
5  they were going to loose 100 percent of their
6  sponsorship, no.
7      Q   Is it fair when we are talking about the
8  athlete revenue that Zuffa was attempting to -- the
9  athlete sponsorship revenue that Zuffa was
10 attempting to replace, we are referring to the
11 revenue that they would lose under the outfitting
12 program?
13     A   The revenue that they were deriving
14 walking into the octagon?
15     Q   Right.
16     A   Not necessarily the revenue that they
17 would lose, because some of them did not lose their
18 revenue.  You know, some of them still have their
19 side agreements with different companies and some of
20 them still have endorsement deals outside of walking
21 into the octagon.  So we were attempting to estimate
22 what they were deriving from walking into the
23 octagon.
24     Q   Right.  Gotcha.
25     And did that include also fight week in

29

1  general?
2      A   Yes.  I mean, it includes the official
3  events during fight week, so it includes press
4  conference, includes media day, open workout, and
5  weigh-ins, and the event.
6      Q   So under the athlete outfitting program,
7  during all of those events, they could only wear the
8  official uniform that was adopted; isn't that right?
9      A   They would have to comply with the athlete
10 outfitting policy, which doesn't necessarily mean
11 wearing a uniform.  But outside of those events,
12 they could do whatever they want.
13     Q   Gotcha.
14     A   During fight week.
15     Q   If you look on the bottom of the page 878,
16 it says, "We have assumed that fighters are made
17 whole on existing income generated.  No assumption
18 has been made on incremental revenue generated
19 through Project Next."  It says, "UFC can either
20 retain all incremental revenue or share a percentage
21 with the fighter.  Zuffa would look to generate a
22 meaningful profit in a second deal on Project Next."
23 Can you explain what that means?
24     A   It -- I'm sorry.  This is from 2013, so I
25 am struggling a little.  But I think that the --

8 (Pages 26 to 29)

62

```
 1      Q   Okay.  Do you know if fighters at the time
 2   were being compensated under that interpretation?
 3      A   I believe so.  There was nothing that
 4   would lead me to believe we weren't compensating our
 5   athletes based on our agreements with them.
 6      Q   Okay.  So I am handing you what has been
 7   marked Exhibit 101, which is Bates stamped
 8   ZFL-1103001 and attachment Bates stamp ZFL-1103002.
 9          (Exhibit 101 was marked.)
10   BY MR. SILVERMAN:
11      Q   Let me know when you have had a chance to
12   look through it.
13      A   Okay.
14      Q   Did you write this e-mail in the ordinary
15   course of business?
16      A   I did.
17      Q   And did you draft the attachment as well?
18      A   I did.
19      Q   Okay.  Can you describe what the
20   attachment is?
21      A   It was a kind of proposal on my part,
22   obviously as part of strategy.  At the time after we
23   announced the athlete outfitting policy, there was
24   kind of a lot of negative feedback and a lot of
25   noise in the market around our athletes, from our
```

63

```
 1   athletes as well.  And so obviously it was my
 2   attempt to kind of help or figure out something that
 3   would allow us to as a company come up with a
 4   strategy in how we want to deal with that and how we
 5   want to deal with the fact that, you know, our
 6   athletes are not happy, there is competition, that I
 7   can go and fight anywhere else, how do we -- it was
 8   my attempt to essentially get people thinking about,
 9   thinking about that in a more organized way.
10          You know, it was not an easy -- we knew
11   that the athlete outfitting policy is a tremendous
12   amount of change.  That's why, if you look at all
13   the documents, we started working on it two years --
14   two, three years prior to it actually coming into
15   place.  It wasn't something that we did lightly.
16   And we always looked at it as something that was a
17   net positive for everyone in involved, definitely a
18   net positive for the athletes as much as possible in
19   the short run and in the long run as well.  But, you
20   know, I think that we -- so that's why there is so
21   many documents going back and forth in terms of how
22   we want to do it, what is the right way, how do we
23   make the athletes even, all of that.
24          Having said that and as much as we knew it
25   was going to be a big change and change is scary and
```

64

```
 1   negative, I don't think that we were prepared for
 2   the amount of negative feedback that came from --
 3   from the general public.  I don't think that even,
 4   you know -- obviously there was some athletes that
 5   were extremely vocal -- negatively vocal about it.
 6   But at the same time the general public did not like
 7   it either.
 8          So it was  my -- I run strategy.  My job
 9   is to throw ideas out there and start conversation.
10   So this was one of those things that I throw out
11   there, "Hey, should we try to look at things long
12   term and we try to come up with something
13   that allows us to defend ourself from what
14   potentially could be coming at us?"
15      Q   So was the plan that you are proposing a
16   plan about a way to structuring fighter
17   compensation?
18      A   It was really more a plan to, "Hey, should
19   we think about how we go forward with, you know,
20   structuring fighter compensation?"  It is a very --
21   to this day, fighter compensation is very -- it's
22   disjointed.  I wouldn't say there is a structure
23   around it.  You are dealing with individual
24   athletes.  You are dealing with 180 athletes, I
25   think, currently on the roster.  So every
```

65

```
 1   conversation is a different conversation.
 2          But, you know, athlete composition is one
 3   of those items for us where it continues to grow.
 4   It is not going down.  It is only going up.  It is
 5   purposely going up, right.  We are purposefully
 6   making sure that we are paying athletes more.  We
 7   are taking care of them.  We are investing more and
 8   more in them.  So we know it is going up.
 9          So the question is let's think about it.
10   You know, let's think about it constructively, let's
11   think about there is -- athletes want more
12   guaranteed money.  They don't want discretionary
13   money.  All these things -- minimum compensation,
14   all these things are things that, "Why not actually
15   try to think about those a little more strategically
16   than what we are doing today?"
17          So this was my plan of, "Could we start
18   thinking about it?  Could we have a group of people
19   that sits down and starts creating some kind of a
20   long term strategy to make sure we continue to be a
21   leader and we retain our athletes or retain our
22   athletes and that we do more and more for them."
23   But it didn't go anywhere.
24      Q   So here when you are talking about fighter
25   compensation in this presentation, you are talking
```

17 (Pages 62 to 65)

74

1  don't think we even got to putting together a list
2  of, "Hey, who is coming up?"  I know that Tracy Long
3  always has a list of contracts that are expiring.
4  So I think that is probably where it would have gone
5  anyhow.
6      Q   Was this plan shared with Lorenzo, do you
7  know?
8      A   I don't recall.
9      Q   Did you ever have any meetings with anyone
10  about this plan?
11     A   Besides Nakisa who I sent this to, I don't
12  believe it got anywhere further.
13     Q   On the second point of the review you are
14  proposing, you said, "Building a defensive strategy.
15  How do we prevent other MMA promotions from taking
16  advantage of the situation?"  What did you mean by
17  that?
18     A   I mean, we are in a competitive market.
19  There is a lot of other organizations that would
20  love to have our athletes.  So it was really just
21  a -- it was really meant to think about how do we
22  continue to -- you know, how do we avoid that, how
23  do we avoid, you know, Bellator taking some of our
24  athletes, how do we avoid World Series of Fighting
25  coming and taking some of our athletes," so yeah.

75

1      Q   Were you planning to, in this project,
2  address that potential risk through a compensation
3  plan primarily?
4      A   This was as much as my thought process got
5  to at that point.
6      Q   Okay.  So the third point you mention a
7  compensation strategy as part of this plan that you
8  were proposing; is that right?
9      A   Yes.  Because, as I mentioned earlier,
10  fighter compensation is going up, it has since the
11  beginning of the company.  And it just -- I think
12  knowing that that is going to continue to do, how do
13  we do that?  How do we continue?  How do we continue
14  growing compensation?  And how do we prepare for it,
15  if you will?
16      You know, there is so many aspects of our
17  business that are changing all the time.  So it is
18  just one of those things where, "Hey, we should
19  probably think about do we have a strategy around
20  it?"
21      One thing that I think -- from my
22  perspective, one of the functions you asked me
23  earlier, what I receive.  I receive financial
24  planning and analysis.  Well, fighter costs are the
25  biggest cost line item that we have in our

76

1  financials.  And it is also the most unpredictable
2  line item in our financials, meaning that, you know,
3  this year alone we thought that in the beginning of
4  the year our budget pointed to athlete costs being
5  $135 million.  At the end of the year they were
6  actually $160 million that is -- close to $160
7  million.
8      So that is a huge variation for a business
9  that -- you know, it is something that I really wish
10  I had some visibility ahead of time.  Because that
11  means, as athletes costs grow and they grow with --
12  how do I say it -- in a way that you can't predict
13  and you can't plan for, it impacts the rest of our
14  business.  It means that we need to cut costs
15  elsewhere.  It needs to come out of somewhere -- or
16  we just need to plan for it.
17      So this was one of those things where
18  we've never had -- we actually don't -- we don't
19  have visibility into the long term athlete costs.
20  This one of those things where, "Hey maybe we should
21  start thinking about some kind of strategy that
22  allows us to plan for increases that are happening,
23  to plan for the continued, you know, enhancements
24  that are coming down the line."  So we did not get
25  there.

77

1      Q   Under project scope, the first point you
2  wrote "Create proposals for all high priority
3  athletes as identified last Thursday whose contracts
4  expire within one or two bouts."  Do you recall what
5  you are referring to about "identifying high
6  priority athletes last Thursday"?
7      A   I don't.  I really don't.
8      Q   And point No. 3 says, "Review and evaluate
9  fighter compensation and its components as a percent
10  of total revenue historically and as projected and
11  identify optimal target based on overall company
12  margin."  Why were you proposing to evaluate fighter
13  compensation as a percent of total revenue?
14      A   It is that -- I mean, it is one of the
15  ways that you could look at being able to project as
16  to look at historical benchmarks and look at them,
17  you know, on a going forward basis.  So it is
18  just -- it is a potential way do be able to express
19  on a relative basis what the compensation is.
20      Q   How about that particular metric, fighter
21  compensation as a percent of total revenue?  Why
22  were you proposing to look at that metric?
23      A   It is a revenue being all the income
24  sources.  It is a very typical way to look at any of
25  your costs as a percent of revenue.

20  (Pages 74 to 77)

198

1    were supplying legal advice in that answer?
2        A   I have absolutely no recollection of what
3    my response was to John, so --
4        Q   I'm handing you what has been marked as
5    Exhibit 122.  And it is Bates stamped ZFL-2508353
6    and attachment ZFL-2508355.
7            (Exhibit 122 was marked.)
8    BY MR. SILVERMAN:
9        Q   If you look at the e-mail on top, you are
10   CC'd on this; is that right?
11       A   Yes, I am.
12       Q   Can you tell me what the attached --
13   who -- first let's start can you tell me who Vinci
14   Partners are?
15       A   Vinci Partners, to the best of my
16   understanding, is a product equity firm in Brazil.
17       Q   And do you know what the purpose of this
18   attached presentation was?
19       A   I don't know.  I am not aware of it.
20       Q   Do you know why Nakisa Bidarian CC'd you
21   on the e-mail with this presentation attached?
22       A   When I joined the company, we were looking
23   to create a joint venture in Brazil with a strategic
24   partner.  So that process continued for a number of
25   months.  And we ended up not moving forward with a

199

1    strategic partner down in Brazil.  So as part of
2    that, as soon as I joined the company, I was kept
3    informed of the process.  But I was not active in
4    part of the process.
5        Q   Did you have any conversations with Vinci
6    Partners or any input into this presentation?
7        A   No, I did not.  I did not.  I don't
8    believe that -- I don't believe this was a
9    presentation that I was put to verify or any
10   collaboration with them.  It seems like it was a
11   presentation that they did develop by themselves.
12       Q   Do you know who commissioned that
13   presentation from Vinci Partners?
14           MS. LYNCH:  Objection to form.
15   BY MR. SILVERMAN:
16       Q   Strike that.
17           Did Zuffa -- do you know if Zuffa
18   commissioned this report from the Vinci Partners?
19       A   I'm not aware if we commissioned it.
20       Q   Do you know who else was working on this
21   potential private equity deal in Brazil?
22       A   It really was Lorenzo Fertita, John
23   Mulkey, Lawrence Epstein, Kirk Hendrick, Marshall
24   Zelaznik, Nakisa Bidarian, and Joe Carr.
25           MR. SILVERMAN:  Okay.  I think that is all my

200

1    questions.  I think you are done.  We are all done.
2            MS. LYNCH:  Okay.  If we can just take five
3    minutes so that I can talk to Brent and just see if
4    we have any follow-up questions.
5            MR. SILVERMAN:  Sure.
6            THE VIDEOGRAPHER:  We are off the video
7    record.  The time is 4:05 P.M.
8            (A short recess was taken.)
9            THE VIDEOGRAPHER:  We are back on the video
10   record.  The time is 4:15 P.M.  You may proceed.
11           --------------------------------
               CROSS-EXAMINATION
12           --------------------------------
13   BY MS. LYNCH:
14       Q   Hi.  This is Marcy Lynch.  On the record I
15   am just going to ask you a couple of follow-up
16   questions.  If you can turn back to Exhibit 119 that
17   Mr. Silverman entered as an exhibit.  And part of
18   your testimony was that you believed the UFC was
19   currently underpaid for the value you deliver to
20   Fox; is that correct?
21       A   Yes.
22       Q   Okay.  And would you also apply that same
23   statement to the value for Pay-Per-View tickets?
24       A   From a Pay-Per-View price, our objective
25   is always to provide value to the consumer.  So when

201

1    we think about the next Pay-Per-View event and fight
2    card for that event, we always think of it as, "Are
3    we providing enough value for the $60 that consumers
4    are going to pay for it?"  So when we think of a
5    fight card, we think of it always as -- you know,
6    "Is this a Pay-Per-View card," which essentially
7    means is this -- "Do we believe this is providing
8    enough value to the consumer, you know, knowing that
9    we are asking to pay $60 for every event?"
10       Q   Between 2008 and the date of this
11   presentation in 2014, had the UFC raised ticket
12   prices on Pay-Per-View events?
13       A   No, we had not raised prices.  We raised
14   Pay-Per-View prices by $5 in 2015, which was the
15   first time since 2008.
16       Q   What were the considerations in raising
17   Pay-Per-View prices in 2015?
18       A   I think it was an ordinary course of
19   business.  We had kind of looked at boxing, which
20   was the only kind of other sport which is usually
21   consumed on a Pay-Per-View basis, which is priced at
22   $70.  We looked at the fact that we hadn't raised
23   the prices -- we hadn't raised the prices of
24   Pay-Per-View for a long period of time, and
25   essentially inflation had outpaced us significantly.

                                  51 (Pages 198 to 201)

202

1   And so we thought that, ordinary course of business,
2   moving Pay-Per-View by $5 was getting back to some
3   market, if you will.
4       Q   Did you consider the value provided to
5   consumers when you raised the ticket prices in 2015?
6       A   Yeah.  Absolutely.  We still -- as I said,
7   we always look at a Pay-Per-View events as an event
8   in which we have to -- we have to -- there is no
9   subscription in Pay-Per-View.  So for every single
10  event we are starting from buy zero.  You have to
11  convince consumers to buy it.
12      So every time, you know, if the price is
13  $55 or $60 or $65, essentially, every time you put
14  out a Pay-Per-View event, we are putting the card,
15  we are putting them in a way, "Look.  Our objective
16  is for people to say this is worth buying."  And
17  they are factoring that in when they are saying, "I
18  am going to pay $60 for this card.  Is this worth
19  paying 60?"
20      And I think that if, you know, you look at
21  some of the, you know, the bloggers or the kind of
22  feedback, it is very common for people to say, "This
23  is not worth $60," or "This is well worth the $60."
24  So our objective always is in how we build the fight
25  cards.  And something that Dana -- you can probably

203

1   talk to him about is that we are always building it
2   to provide value to the consumer.  That is always
3   our objective.  And when various prices, it just
4   raises the stakes that much more.
5       Q   And did Zuffa see a decrease in
6   Pay-Per-View buys in 2014?
7       A   2014 was the worst year for us -- well,
8   not the worst year.  It was -- in our modern
9   history, it was the worst year in Pay-Per-View
10  purchases for events.  It was driven by a number of
11  factors.
12      Q   What did the UFC seek to do in 2015 to
13  potentially improve on the 2014 Pay-Per-View buys?
14      A   We looked to come up with a strategy to
15  mitigate fighters falling off of Pay-Per-View
16  events.  That was one of the biggest issues that is,
17  I want to say, in 2014 out of the 13 Pay-Per-View
18  events that we had, we had eight of those the main
19  event fell off within a couple weeks from the event.
20  So that is -- from our perspective, every single
21  Pay-Per-View event, you know, we are starting from
22  zero in terms of marketing and marketing the
23  athletes and creating interest in it.
24      So when you have athletes falling off, you
25  know, two weeks before the event, now you are

204

1   starting off -- all of a sudden you have a two-week
2   marketing window to convince consumers to purchase
3   the Pay-Per-View.  And so what -- for us, we just
4   looked at how do we mitigate, you know, creating
5   some strategies on either bulking up the card even
6   more to allow even if a matchup falls off, it is
7   still a very good fight card, or working with some
8   athletes to kind of make sure that they are prepared
9   in case someone falls off.  But essentially we are a
10  lot more active in making sure that the Pay-Per-View
11  cards were -- we had a strategy around to make sure
12  that every Pay-Per-View event was worth the extra
13  $5.  One, it was the worth the $60, but worth even
14  more, you know, to the consumers.
15      Q   And when the UFC prices tickets for live
16  events -- and if I am using the wrong phasing for
17  that -- when people actually physically go to watch
18  an event live, are there variations in the ticket
19  prices, or are they the same across the board?
20      A   There is much variation.  Because, just
21  like the Pay-Per-View events, we sell a very
22  different product every time.  Every one of our
23  events is a different product from the previous
24  event.  So we would price tickets according to -- in
25  particular to the live events, we would price it

205

1   according to what market we are in, what the
2   competition is in the market, who the athletes on
3   the card are, and how much interest we think there
4   will be in attending that event.
5       Q   And has the UFC been able to sell out all
6   of its events based on its ticket prices per each
7   event?
8       A   No, we are not.  I mean, I would say even
9   in instances -- we always try to price ticket
10  prices -- so obviously you don't set ticket prices
11  thinking, "Okay.  No one is going to come."  You set
12  them with the intention that people will buy the
13  tickets and attend.  But there are plenty of
14  instances where we price and realize that we've
15  priced too high, so we have to take prices down to
16  allow for a higher sell-through.
17      I want to say, on average our sell-through
18  is possibly in the 70 percent -- 70 some percent.
19  So we are -- there is events that are sellouts,
20  obviously, that are headlined by some of the key
21  matchups and more attractive matchups.  But we are
22  far from selling out every single event.
23      Q   And are there events that you believe have
24  been priced too high that have resulted in fewer
25  sell-throughs?

52 (Pages 202 to 205)

206

1      A   Yes, multiple.  Both here and the Vegas
2   market, outside of the Vegas market, yes, there are.
3      Q   Okay.  I don't have any other questions.
4      MR. SILVERMAN:  Okay.
5      THE VIDEOGRAPHER:  This concludes today's
6   deposition of Denitza Batchvarova on January 25,
7   2017.  The time is 4:23 P.M.  We are off the video
8   record.
9          (TIME NOTED: 4:23 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

207

1
2   STATE OF _____ )
3                       ) :ss
4   COUNTY OF _____ )
5
6
7          I, DENITZA BATCHVAROVA, the
8   witness herein, having read the foregoing
9   testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15      _____
16          DENITZA BATCHVAROVA
17
18
19
20   Sworn and subscribed to before
21   me, this        day of
22               , 2017.
23
24   _____
25      Notary Public

208

1   STATE OF NEVADA)
2                  ) ss
2   COUNTY OF CLARK)
3
4      I, Sarah Padilla, a duly commissioned and
5   licensed court reporter, Clark County, State of Nevada,
6   do hereby certify:  That I reported the taking of the
7   deposition of the witness, Denitza Batchvarova,
8   commencing on Wednesday, January 25, 2017, at 9:11 A.M.;
9   That prior to being examined, the witness was, by me,
10   duly sworn to testify to the truth; That thereafter I
11   transcribed my shorthand notes into typewriting and
12   that the typewritten transcript of said deposition is a
13   complete, true, and accurate record of said shorthand
14   notes.  I further certify that I am not a relative
15   or employee of any attorney or counsel of any of the
16   parties nor a relative or employee of an attorney or
17   counsel involved in said action, nor a person
18   financially interested in the action; that a request
19   [x] has [] not been made to review the transcript.
20      IN WITNESS WHEREOF, I have hereunto set my
21   hand in the County of Clark, State of Nevada, this 14th
22   day of February.
23
24      _____
          SARAH PADILLA, CCR 929
25

209

1          INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4   and make any necessary corrections. You should state
5   the reason in the appropriate space on the errata
6   sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8   and date it.
9      You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

53  (Pages 206 to 209)

210

```
1              E R R A T A
2
3
4
5      I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____  _____
23     WITNESS' SIGNATURE      DATE
24
25
```

54 (Page 210)