# EXHIBIT 16

## Excerpts of First Deposition of Dr. Hal J. Singer

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

- - -

IN RE:                          :   Civil Action
                                :   DOCKET NO.
CUNG LE, NATHAN QUARRY,         :   2:15-cv-01045-RFB-
JON FITCH, BRANDON VERA,        :   (PAL)
LUIS JAVIER VAZQUEZ and         :
KYLE KINGSBURG, on behalf       :   CLASS ACTION
of themselves and all           :
others similarly                :
situated,                       :
                                :
            Plaintiffs,         :
                                :
            v.                  :
                                :
ZUFFA, LLC, d/b/a               :
ULTIMATE FIGHTING               :
CHAMPIONSHIP and UFC,           :
                                :
            Defendants.         :

- - -

Wednesday, September 27, 2017
- - -

          Videotaped deposition of
HAL J. SINGER, Ph.D., taken pursuant to
notice, was held at the law offices of
Berger & Montague, P.C., 1622 Locust
Street, Philadelphia, Pennsylvania 19103,
beginning at 9:24 AM, on the above date,
before Constance S. Kent, a Certified
Court Reporter, Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public in and for the Commonwealth
of Pennsylvania.

          *  *  *
          MAGNA LEGAL SERVICES
          (866) 624-6221
          www.MagnaLS.com



1       (Exhibit No. Singer-1,
2   Expert Report of Hal J. Singer,
3   Ph.D., No. Singer-2, Errata, and
4   No. Singer-3, Errata II, were
5   marked for identification.)
6       THE VIDEOGRAPHER:  We are
7   now on the record.
8       This begins videotape No. 1
9   in the deposition of Hal J. Singer
10  in the matter of Cung Le versus
11  Zuffa, LLC, in the US District
12  Court for the District of Nevada.
13      Today is Wednesday,
14  September 27th, 2017, and the time
15  is 9:24 AM.
16      This deposition is being
17  taken at 1622 Locust Street in
18  Philadelphia, PA 19103 at the
19  request of Boies, Schiller &
20  Flexner, LLP.
21      The videographer is Sol Tran
22  of Magna Legal Services, and the
23  court reporter is Connie Kent of
24  Magna Legal Services.

1       Will counsel and all parties
2   present, please state their
3   appearances and whom they
4   represent.
5       MR. CRAMER:  Eric Cramer
6   from Berger & Montague for the
7   plaintiffs.
8       MR. DAVIS:  Joshua Davis on
9   behalf the Saveri Law Firm for
10  plaintiffs.
11      MR. SILVERMAN:  Dan
12  Silverman, Cohen Milstein Sellers
13  & Toll, on behalf of plaintiffs.
14      MR. SUTER:  Mark Suter,
15  Berger & Montague, on behalf of
16  the plaintiffs.
17      MR. ISAACSON:  Bill
18  Isaacson, Boies, Schiller &
19  Flexner for defendant Zuffa.
20      MR. WIDNELL:  Nicholas
21  Widnell, Boies, Schiller &
22  Flexner, for defendant Zuffa.
23      MR. NAKAMURA:  Brent
24  Nakamura, Boies, Schiller &

1   Flexner also for defendant Zuffa.
2       MR. CRAMER:  And on the
3   phone is Augie --
4       THE WITNESS:  Augie Urschel.
5       MR. CRAMER:  Augie Urschel
6   from Economists, Inc.?
7       THE WITNESS:  Correct.
8       MR. CRAMER:  You can spell
9   his name for the court reporter.
10      THE WITNESS:  I don't know.
11  Maybe Augie can spell his last
12  name, Urschel.
13      MR. URSCHEL:  U-R-S-C-H-E-L.
14      THE WITNESS:  Thanks, Augie.
15      THE VIDEOGRAPHER:  All
16  right.  Will the court reporter
17  please swear in the witness.
18      HAL SINGER, having been
19  first duly sworn, was examined and
20  testified as follows:
21          - - -
22      E X A M I N A T I O N
23          - - -
24  BY MR. ISAACSON:

1       Q.   So Dr. Singer, for ease of
2   reference, we're putting in front of you
3   Exhibits 1, 2 and 3.  Exhibit 1 is your
4   report, Exhibit 2 is your first errata
5   and Exhibit 3 is your second errata.  And
6   I'll be asking questions about those two
7   today, and if -- when you want to refer
8   to them, I wanted to make sure you had
9   them in front of you.
10      A.   Okay.
11      Q.   All right.  Now, I'm going
12  to ask you hopefully some detailed
13  questions about the various models that
14  you've -- that are included in your
15  report, but let me just ask you some high
16  level questions to make sure I understand
17  what models you have in -- in the report.
18      Now, for purposes of
19  damages, your first two damages models
20  are benchmark -- benchmarks against
21  Strikeforce and Bellator based on the
22  percentage of revenue paid to fighters;
23  is that correct?
24      A.   That is correct.



Page 10

1    Q.   Okay.  And those -- those
2   models don't include any explanatory
3   variables, they're a simple comparison of
4   the percentage of revenues between firms?
5        A.   I wouldn't put it that way.
6   They are a comparison of fighter wage
7   shares across the two firms.
8        Q.   Right.
9        A.   You said revenues.
10       Q.   You're correct, I misspoke.
11  So thank you.
12            They are -- they don't
13  include any other explanatory variables,
14  they're just a comparison of the
15  percentage of revenue paid to fighters
16  between firms?
17       A.   Well, these -- these are
18  benchmarks and -- and I think by the
19  construction of a benchmark, as opposed
20  to, say, a regression model, which I've
21  also included, these particular damages
22  models don't control for variables --
23  other variables in the same way that a
24  regression model might.

Page 11

1    Q.   Okay.  Then your next damage
2   model is a regression model, and that
3   shows the relationship -- attempts to
4   show the relationship between Zuffa's
5   foreclosure share and its own percentage
6   of revenue shared with fighters.
7        Do I have that right?
8        A.   Controlling for all other
9   things that could explain variations in
10  Zuffa's fighter wage share, yes.
11       Q.   Okay.  And that model
12  assumes that challenged conduct in this
13  case, as you've defined it in your
14  report, caused the foreclosure.
15       A.   No, I'm -- no, that's not
16  correct.
17       Q.   Okay.  Does it assume
18  that -- well, what caused the foreclosure
19  other than the challenged conduct?
20       MR. CRAMER:  Form.
21       THE WITNESS:  Can I have
22  that question back?
23       (Pertinent portion of the
24  record is read.)

Page 12

1        MR. CRAMER:  Misstates the
2   testimony, foundation, form.
3        THE WITNESS:  I believe the
4   challenged conduct is the -- is
5   the cause of the foreclosure
6   share, that's correct.
7   BY MR. ISAACSON:
8        Q.   Okay.  And for foreclosure
9   in your regression, you used what -- what
10  you called the tracked fighters
11  foreclosure measure; is that right?
12       A.   Are you speaking of the
13  regression in the damages section?
14       Q.   Well, I think you've used it
15  for several different things, but your
16  foreclosure regression, and maybe if you
17  want to look at Table 6 of your report,
18  page 125.
19       A.   Sorry, the page?
20       Q.   125.
21       A.   Okay.
22       Q.   Now, Table 6 on page 125 is
23  the output of your foreclosure
24  regression, correct?

Page 13

1        A.   It is the output of one
2   regression specification that appears in
3   a different section of the report,
4   correct.
5        Q.   Okay.  But it is an output
6   of your foreclosure regression, correct?
7        A.   I wouldn't put it -- I would
8   put it -- just to be -- just to clarify
9   what this is, it is the output of the
10  regression of one specification of the
11  regression that I ran in the
12  anticompetitive effects section of the
13  report.  I just want to make sure that we
14  don't conflate anticompetitive effects
15  with damages.
16       Q.   And I'm not trying to.  I
17  understand that this then gets used in
18  damages.  I'll take that next step.  But
19  let's give it a shorthand name?
20       A.   Okay.
21       Q.   Can we call it your
22  foreclosure regression or -- and this
23  would be one output because it's what --
24  the result of one specification, one



Page 38

1   of the question then.
2        For each of your models, you
3   have a but-for world where the
4   foreclosure share for Zuffa is either
5   zero percent, 20 percent or 30 percent.
6        Do I have that right?
7        A.   I think you've got that
8   right.
9        Q.   Okay.  And that's regardless
10  for what foreclosure is specified in the
11  regression?
12       A.   I'm just -- I wish we could
13  use a different word than specified.
14       Q.   What word would you use?
15       A.   The regression doesn't get
16  to specify the foreclosure share, just as
17  the regression doesn't get to specify how
18  many punches a fighter threw, right, or
19  how many successful punches.
20       Q.   Tell me what word you want
21  me to use.
22       A.   So the regression takes the
23  data as the world presents it.  The
24  regression doesn't get to specify.

Page 39

1        Q.   Foreclosure is an output of
2   the regression?
3        A.   No, it's an input.  It's an
4   input.
5        Q.   Okay.  So --
6        A.   But the regression doesn't
7   get to -- doesn't get to pick what
8   foreclosure is or specify it.  Maybe I'm
9   misinterpreting what you mean by--
10       Q.   I'm just trying to find a
11  word that you're comfortable with.
12       A.   The regression takes the
13  data as the world presents it and looks
14  for relationships between those data.
15       Q.   Right.
16       A.   All right?  So it doesn't
17  specify.  The -- maybe what would be
18  helpful is that the market definition --
19  the market definition that I choose and
20  the weights that I apply generate a
21  measure of foreclosure share.
22       Q.   Okay.
23       A.   Right?  And then I'm going
24  to apply a regression analysis.  But the

Page 40

1   regression doesn't get to specify, the
2   regression takes the foreclosure share as
3   an input.
4        Q.   So regardless of the measure
5   of foreclosure share that's generated by
6   any specific model, the world -- you are
7   going to assume for purposes of
8   estimating impact or damages that the
9   actual foreclosure share of Zuffa will be
10  zero, 20 percent or 30 percent depending
11  on the model?
12       MR. CRAMER:  Objection to
13  form.
14  BY MR. ISAACSON:
15       Q.   That's correct?
16       MR. CRAMER:  Objection to
17  form.
18       THE WITNESS:  It was close.
19  You said the model to start the
20  question, and just again to be --
21  to be specific, the regression --
22  the regression doesn't get to pick
23  the foreclosure share.  The
24  foreclosure share flows from which

Page 41

1   market definition and which
2   weighting method I use, right?
3   That -- that will generate a
4   foreclosure share that gets spit
5   out, I think, of a Microsoft Excel
6   file, and that foreclosure share
7   is going to be spit out alongside
8   each observation in the dataset.
9        The regression finds a
10  relationship between that
11  foreclosure share and the
12  fighters' wage share controlling
13  for all other things and then the
14  regression is done.
15       At that point, I -- I can
16  make use of the parameters that
17  come out of the regression to
18  project what a fighter's wage
19  share would be in a but-for world
20  in which the foreclosure share was
21  lower.
22       Sorry, I'm being -- I'm
23  being attacked here by a gnat.
24  And -- thank you.



Page 46

1          THE WITNESS:  I'd have to
2     think about it some more, but I
3     think I -- I think I gave you -- I
4     think I gave you what the answer
5     was, which is that it depends
6     on -- on how you draw the -- the
7     line.
8  BY MR. ISAACSON:
9     Q.   All right.  And how would
10 you define zero percent foreclosure?  You
11 said some of your models assume zero
12 percent foreclosure.  How do you define
13 zero percent foreclosure?
14     A.   So no model assumes it.
15 Just to be clear, I'm projecting but-for
16 worlds in which the foreclosure share is
17 zero, 20 or 30 percent.  But I'm
18 interpreting the question as how could
19 Zuffa get to zero percent foreclosure?
20     Q.   Right.  How would you define
21 Zuffa with zero percent foreclosure?
22     A.   It can get -- you could get
23 to zero percent foreclosure in myriad
24 ways.  So I'm not -- I'm not specifying

Page 47

1  exactly how you get there.  I can give
2  you examples, I think we just did, in
3  which the legal standard is 30 percent --
4  30 months -- sorry.  If the legal
5  standard were 30 months and if counter-
6  factually all of -- well, and if Zuffa's
7  contracts all were 12-month contracts,
8  then the foreclosure share by my measure
9  would be zero percent.
10          But that's just one way.
11 There are -- there are many -- there are
12 many ways to get your foreclosure share
13 down.  You can -- you can divest --
14 divest fighters and send -- send fighters
15 to a -- to an independent organization
16 thereby decreasing your market share and
17 thereby decreasing your foreclosure
18 share.
19          There's -- there are many
20 ways to get to -- to a lower foreclosure
21 share.
22     Q.   All right.  So can you give
23 me some other examples of ways that Zuffa
24 could get to zero percent foreclosure

Page 48

1  share?
2          MR. CRAMER:  I'm going to
3     object to the extent it calls for
4     a legal conclusion.
5          But you can answer.
6          And asked and answered.
7          THE WITNESS:  I think I've
8     covered -- I've covered the basis.
9     I think that the most -- the most
10 obvious way to construct it is by
11 coming up with a baseline in terms
12 of number of months in which an
13 exclusive contract is deemed
14 exclusionary and positing a world
15 in which Zuffa's contracts come
16 under that -- that cutoff.  They
17 could be 15 months long, they
18 could be 17 months long.
19 BY MR. ISAACSON:
20     Q.   All right.  And that cutoff
21 that needs to be posited, is that a legal
22 cutoff or is that a matter of economics?
23          MR. CRAMER:  Objection to
24     form.

Page 49

1          THE WITNESS:  I think it is
2     ultimately a legal decision, but
3     it can be informed through
4     economics.  I hope economics can
5     inform the law at times.
6  BY MR. ISAACSON:
7     Q.   All right.  You mentioned
8  reducing the baseline number of months
9  for the exclusive contracts, and you
10 mentioned divesting fighters to -- to an
11 independent organization from Zuffa.
12         Are there any other examples
13 that you can think of as to how Zuffa
14 could reach zero or near zero
15 foreclosure?
16     A.   Sure.  I can keep on coming
17 up with examples.
18         One example would be that
19 there's no exclusivity provision in the
20 contracts.
21     Q.   All right.  That's one.  Are
22 there any other examples?
23         MR. CRAMER:  Asked and
24     answered, form.



1    And I use three different
2  scenarios: Zero percent,
3    20 percent and 30 percent.
4  BY MR. ISAACSON:
5    Q.   Now, when you use a world in
6  which there -- Zuffa has zero percent
7  foreclosure, how does that translate into
8  any -- a market share for Zuffa?
9    A.   Oh, it could accommodate
10 many different market shares for Zuffa.
11 It is -- one way of putting it is almost
12 agnostic to the market share.  It
13 could -- it could accommodate many.
14    You can have -- just to be
15 clear, you can have a high market share
16 and zero foreclosure share if all of your
17 fighters are under, say, 12-month
18 contracts.
19    Q.   And do I understand
20 correctly that if all the Zuffa fighters
21 were under 12-month contracts, you would
22 expect the foreclosure share of Zuffa to
23 be zero or close to zero?
24    MR. CRAMER:  Objection to

1    form.
2    THE WITNESS:  So I -- I deem
3  a fighter to be foreclosed, or to
4  be working or employed pursuant to
5  an exclusionary contract if, as
6  you know, the contract is
7  exclusive and if the duration
8  exceeds a certain number of
9  months.  I use 30 months I think
10 as my -- my baseline approach.
11    And so if you -- if you
12 allow me to use that 30-month
13 baseline or cutoff as a measure
14 for whether a fighter is
15 foreclosed, and if your question
16 posits that every Zuffa fighter
17 under contract is -- is at
18 12 months, then by construction,
19 12 months is less than 30 months,
20 and therefore, under that
21 particular measure of foreclosure,
22 no fighter would be foreclosed.
23 BY MR. ISAACSON:
24    Q.   All right.  Is there any --

1  is there any measure of foreclosure where
2  a 12-month contract, in your opinion,
3  would not result in the zero or near zero
4  foreclosure?
5    MR. CRAMER:  Objection to
6    form.
7    THE WITNESS:  Let me hear it
8    back.  But I don't think I
9    understood it, but let me just
10   hear it.
11 BY MR. ISAACSON:
12   Q.   Well, because you just told
13 me about how your 30-month baseline, and
14 you confined your answer to that
15 particular measure of foreclosure.
16   And I'm asking you, is there
17 any measure of foreclosure where a
18 12-month contract for all Zuffa fighters
19 would not result in zero or near zero
20 foreclosure?
21   MR. CRAMER:  Objection to
22   form.
23   THE WITNESS:  Well,
24   certainly not if you use 30 months

1  as the cutoff, but if -- if the
2  court, for example, were to deem
3  that 12 months with an
4  exclusion -- with an exclusive
5  arrangement were exclusionary,
6  then contracts with 12 months
7  would be exclusionary.  It's
8  tautological.  It depends on where
9  you draw the cutoff and what --
10 what conditions you require for --
11 for one to conclude that a
12 contract was exclusionary.
13 BY MR. ISAACSON:
14   Q.   All right.  So I'm not
15 asking you any questions about what
16 courts rule, I'm asking you questions
17 that come out of your models.
18   Is there any measure of
19 foreclosure in any of your models where a
20 12-month contract for all Zuffa fighters
21 would not result in zero or near zero
22 foreclosure?
23   MR. CRAMER:  Objection to
24   form.  Asked and answered.



Page 46

```
 1          THE WITNESS:  I'd have to
 2     think about it some more, but I
 3     think I -- I think I gave you -- I
 4     think I gave you what the answer
 5     was, which is that it depends
 6     on -- on how you draw the -- the
 7     line.
 8  BY MR. ISAACSON:
 9     Q.   All right.  And how would
10  you define zero percent foreclosure?  You
11  said some of your models assume zero
12  percent foreclosure.  How do you define
13  zero percent foreclosure?
14     A.   So no model assumes it.
15  Just to be clear, I'm projecting but-for
16  worlds in which the foreclosure share is
17  zero, 20 or 30 percent.  But I'm
18  interpreting the question as how could
19  Zuffa get to zero percent foreclosure?
20     Q.   Right.  How would you define
21  Zuffa with zero percent foreclosure?
22     A.   It can get -- you could get
23  to zero percent foreclosure in myriad
24  ways.  So I'm not -- I'm not specifying
```

Page 47

```
 1  exactly how you get there.  I can give
 2  you examples, I think we just did, in
 3  which the legal standard is 30 percent --
 4  30 months -- sorry.  If the legal
 5  standard were 30 months and if counter-
 6  factually all of -- well, and if Zuffa's
 7  contracts all were 12-month contracts,
 8  then the foreclosure share by my measure
 9  would be zero percent.
10          But that's just one way.
11  There are -- there are many -- there are
12  many ways to get your foreclosure share
13  down.  You can -- you can divest --
14  divest fighters and send -- send fighters
15  to a -- to an independent organization
16  thereby decreasing your market share and
17  thereby decreasing your foreclosure
18  share.
19          There's -- there are many
20  ways to get to -- to a lower foreclosure
21  share.
22     Q.   All right.  So can you give
23  me some other examples of ways that Zuffa
24  could get to zero percent foreclosure
```

Page 48

```
 1  share?
 2          MR. CRAMER:  I'm going to
 3     object to the extent it calls for
 4     a legal conclusion.
 5          But you can answer.
 6          And asked and answered.
 7          THE WITNESS:  I think I've
 8     covered -- I've covered the basis.
 9     I think that the most -- the most
10     obvious way to construct it is by
11     coming up with a baseline in terms
12     of number of months in which an
13     exclusive contract is deemed
14     exclusionary and positing a world
15     in which Zuffa's contracts come
16     under that -- that cutoff.  They
17     could be 15 months long, they
18     could be 17 months long.
19  BY MR. ISAACSON:
20     Q.   All right.  And that cutoff
21  that needs to be posited, is that a legal
22  cutoff or is that a matter of economics?
23          MR. CRAMER:  Objection to
24     form.
```

Page 49

```
 1          THE WITNESS:  I think it is
 2     ultimately a legal decision, but
 3     it can be informed through
 4     economics.  I hope economics can
 5     inform the law at times.
 6  BY MR. ISAACSON:
 7     Q.   All right.  You mentioned
 8  reducing the baseline number of months
 9  for the exclusive contracts, and you
10  mentioned divesting fighters to -- to an
11  independent organization from Zuffa.
12          Are there any other examples
13  that you can think of as to how Zuffa
14  could reach zero or near zero
15  foreclosure?
16     A.   Sure.  I can keep on coming
17  up with examples.
18          One example would be that
19  there's no exclusivity provision in the
20  contracts.
21     Q.   All right.  That's one.  Are
22  there any other examples?
23          MR. CRAMER:  Asked and
24     answered, form.
```

1    THE WITNESS:  I can't think
2  of others.
3  BY MR. ISAACSON:
4    Q.   All right.  Now, you do
5  define markets in your report at a high
6  level.  Let me see if I've got what
7  you've got.
8        For input markets, you've
9  defined a tracked market by referring to
10  data from FightMetric -- FightMetrics
11  (sic) right?
12    A.   I certainly use FightMetrics
13  (sic), but I prefer to say that I have --
14  I have a relevant input market and a
15  relevant input submarket, and I use two
16  different standard industry databases to
17  identify the fighters in the relevant
18  input market.
19    Q.   Right.
20    A.   One is FightMetric, the
21  other one is Fight Matrix.  I'm very
22  upset about those names, but that's --
23    Q.   Right, they're not helpful
24  to us.

1    A.   They're not helpful.
2    Q.   But we'll live with them.
3        But -- so you have two
4  relevant input markets:  A tracked market
5  which -- for which you draw data from
6  FightMetric, and a ranked market which
7  draws from data from Fight Matrix,
8  together with the data from FightMetric.
9        Do I have that right?
10    A.   Again, I would prefer to say
11  there's one relevant input market that
12  we're -- that we're trying to measure and
13  I have two different ways of measuring
14  it.  One relies on a database from
15  FightMetrics (sic), which I refer to as
16  the tracked method.  That's -- that's
17  really the beginning, because as you
18  probably are aware, there's a few
19  additions that I tack on to -- to even
20  that measure.
21        And then as we move from the
22  tracked measure to the ranked measure,
23  I -- I include everybody who made it into
24  the tracked and I add on additional

1  fighters who were ranked, but not
2  tracked, as well as one other MMA
3  organization.
4    Q.   So those are two -- do I
5  understand it right, those are two
6  different relevant input markets that
7  you -- that you have defined?
8    A.   This -- this could be a
9  matter of semantics, but I prefer to say
10  there's one relevant input market and
11  these are two different ways to measure
12  it.
13    Q.   What is the one relevant
14  input market?
15    A.   It's -- I think I've defined
16  it in the report.
17    Q.   Feel free to point me in the
18  report.
19    A.   Okay.
20    Q.   If it helps you, the
21  relevant input market discussion is on
22  page 66.
23    A.   Well, if we're going to call
24  it anything by shorthand, I would prefer

1  to use the term relevant input market.  I
2  think that the language in the report
3  explains what I'm trying to get at, which
4  is a set of fighters with MMA fighter
5  services that would be used by an MMA
6  promotion organization to stage live
7  events.
8    Q.   You told me you preferred to
9  say there's one relevant input market and
10  there's two different ways to measure it.
11        What is the one relevant
12  input market?
13        MR. CRAMER:  Asked and
14  answered.
15        THE WITNESS:  These are --
16  these are MMA fighters who are
17  used as input to the production of
18  live MMA events.
19        And to clarify it, I said
20  two.  Of course there's a --
21  there's a third -- a submarket.  I
22  don't know if --
23  BY MR. ISAACSON:
24    Q.   Yeah, we'll get to the



Page 54

1    submarket.
2        A.    Okay.
3        Q.    The -- all right.  And the
4    submarket is the -- you used the
5    headliner definition; is that right?
6        A.    Correct.
7        Q.    And am I correct that in
8    your opinion, there would be no broader
9    market than the markets you have defined
10   using the tracked measure or the ranked
11   measure?
12       A.    Correct, there's no broader
13   market.  Already I think that the ranked
14   market is -- is potentially overly broad.
15       Q.    And when you -- when you say
16   there's no broader market, that would
17   mean there's no reasonable substitutes
18   outside those markets if, for example,
19   fighter pay where to go up?
20       A.    That's not quite what I
21   mean.
22       Q.    Well, let me ask you this.
23   Then let me just ask you this question:
24   In your opinion, are there no reasonable

Page 55

1    out -- substitutes outside the tracked
2    market and the ranked market if fighter
3    pay rises?
4        MR. CRAMER:  From what level
5    to what level?
6        MR. ISAACSON:  It goes up.
7        MR. CRAMER:  Okay.
8        THE WITNESS:  So I do
9    allow -- before I answer the
10   question, I just want to make sure
11   you understand how I get to the
12   market.  It's not entirely driven
13   by reasonable substitutes.  I'm
14   asking -- I'm trying to employ the
15   SSNIP test from the merger
16   guidelines, and I'm looking for
17   the smallest set of fighters such
18   that a hypothetical monopsonist
19   could exercise market power.
20       And that -- that is the
21   question that -- that drives the
22   analysis.
23   BY MR. ISAACSON:
24       Q.   And I'll ask you about your

Page 56

1    SSNIP analysis, which is S-S-N-I-P.
2        But just returning to my
3    question, in your opinion, are there no
4    reasonable substitutes outside the
5    tracked market and the ranked market if
6    fighter pay goes up?
7        A.    So that -- you haven't
8    posited the correct question for market
9    definition.  It's not if fighter pay goes
10   up.  It's -- the question is if -- if
11   Zuffa were to control a certain set of
12   fighters, could -- could Zuffa exercise
13   market power in the form of pushing wages
14   down?  You keep saying if prices go up.
15   That's not the -- that's not market --
16       Q.    I appreciate you telling me
17   I'm not asking the correct questions --
18       A.    Well, I mean --
19       Q.    But let's stick with --
20   let's stick with answering my questions.
21       A.    Okay.  Well, okay, but if
22   you ask me a question that makes no sense
23   as a matter of economics, I can't give
24   you an answer.

Page 57

1        Q.    In your opinion -- in your
2    opinion, are there no reasonable
3    substitutes for the fighters outside the
4    tracked market and outside the ranked
5    market?
6        A.    I would put the caveat that
7    if a hypothetical monopsonist controlled
8    all of the fighters in either of those
9    two markets, it would be able to
10   successfully exercise a wage suppression
11   below competitive levels without having
12   to fear that a sufficient number of
13   fighters inside of its net would -- would
14   substitute to something outside of the
15   net.
16       And that's a long way of
17   answering your question, but I think
18   doing so more precisely as to what is
19   considered reasonable.
20       If you -- if you have, say,
21   all of the ranked fighters, and you're
22   looking at it from the perspective of a
23   given ranked fighter, let's suppose a
24   highly ranked fighter, he or she will not



Page 70

1    offered alternative methodologies, they
2    all point to numbers that create a range,
3    and I think that -- that any one of them
4    would be a reasonable estimate of
5    damages.
6        Q.   And within that range, every
7    number within that range you consider to
8    be reasonable, correct?
9            MR. CRAMER:  Objection to
10           form.  Misstates the testimony.
11           THE WITNESS:  No, because
12       I -- I don't want to pick some
13       number that's -- that's -- that
14       just is randomly chosen between
15       two of my estimates.
16   BY MR. ISAACSON:
17       Q.   All right.  That's fair.
18           So every -- you've -- you've
19   estimated a range of damages.  Every
20   number within that range that you've
21   estimated, you would consider a
22   reasonable award of damages in this case?
23           MR. CRAMER:  Form.
24           THE WITNESS:  Every number

Page 71

1        associated with one of my damages
2        methodologies represents a
3        reasonable estimate of aggregate
4        damages.
5    BY MR. ISAACSON:
6        Q.   All right.  And amongst the
7    numbers associated with one of your
8    damages methodologies, you do not have an
9    opinion as to which one is more or less
10   appropriate as an award of damages; is
11   that correct?
12           MR. CRAMER:  I'm going to
13       object to the extent it calls for
14       a legal conclusion.
15           THE WITNESS:  I don't think,
16       at least sitting here today, I'm
17       prepared to speak to which is more
18       or less appropriate.  They can be
19       evaluated on other dimensions such
20       as more or less conservative.  But
21       more or less appropriate, I'm --
22       I'm not even sure I understand
23       what that means.
24   BY MR. ISAACSON:

Page 72

1        Q.   Okay.  You mentioned the --
2    you mentioned the FightMetric database
3    which is used in connection with your
4    tracked input market as well as your
5    ranked input market.  FightMetrics (sic)
6    is a service that promotions pay to --
7    pay FightMetric for; is that right?
8        A.   I think that a promotion can
9    subscribe and purchase the FightMetrics
10   (sic) data.  I know, for example, that
11   Zuffa uses it in its day-to-day business
12   operations.
13       Q.   Is it the case if you do not
14   subscribe, if you don't pay, that you're
15   not on FightMetric?
16       A.   That is not my
17   understanding.
18           MR. ISAACSON:  Can we mark
19       this as Exhibit 4?
20           (Exhibit No. Singer-4, Excel
21       spreadsheet, Weight Data for
22       Foreclosure Shares, was marked for
23       identification.)
24   BY MR. ISAACSON:

Page 73

1        Q.   Exhibit 4 is a backup file
2    we were provided.  It's titled Weight
3    Data for Foreclosure Shares.  We've
4    printed out a tab called Combined Event
5    Tab.  We've not altered the content, but
6    in order to have the columns fit on one
7    page, we rotated the first row to make
8    the column names vertical, and we also
9    added page numbers and shrunk the columns
10   to fit the content.
11           MR. CRAMER:  Which did you
12       add?
13           MR. ISAACSON:  We did add no
14       content.  We -- we did some things
15       to make it fit on the page.
16           MR. CRAMER:  You said you
17       added combined --
18           THE WITNESS:  No, I think he
19       said he rotated the titles, the
20       headers of the columns so that it
21       would fit.
22           MR. CRAMER:  Thank you.
23   BY MR. ISAACSON:
24       Q.   Now, as I understand this,



Page 74

1  this would be pay-per-view revenue data
2  that you relied on when you did your
3  foreclosure regression?
4      A.   It depends on which
5  weighting technique I used, right?  I've
6  done three different weighting
7  techniques:  The revenue weighted, the
8  ranked weighted and unweighted.
9      Q.   Okay.  So this would be the
10  data that you used when you weighted by
11  revenue; is that correct?
12      A.   I believe so.
13      Q.   And there -- looking at the
14  column called Pay-Per-View Multiplier,
15  which has a lot of 45s, all right, except
16  I think at the very end maybe there's one
17  50.  The last one is 50.
18          And do you understand
19  that -- what do you understand that 45
20  refers to?
21      A.   Sitting here, I'm not sure.
22  It seems close to what Zuffa was charging
23  per pay-per-view event, but I'd want to
24  get confirmation of that.

Page 75

1      Q.   So -- and I believe it is an
2  assumed number or a number that you have
3  used for what a customer pays for the --
4  for the pay-per-view event.  Is it the
5  number that they paid to Zuffa or is it
6  the number they paid to the pay-per-view
7  or cable company?
8      A.   It would be the number
9  that's charged by your cable operator.
10      Q.   And how much of the $45 does
11  Zuffa get?
12      A.   Oh, I'm not sure of that.
13  That would be -- that would be arranged
14  between Zuffa and the cable operator.
15      Q.   But for purposes of
16  calculating the weighted revenue, you
17  used the full $45 as if it went to Zuffa;
18  is that correct?
19      A.   I wouldn't put it that way.
20      Q.   Well, how would you put it?
21      A.   What I'm trying to capture
22  is -- is value created, and so the
23  question is how that 45 gets decomposed
24  between Zuffa and the operator is

Page 76

1  irrelevant to me.  I'm trying to figure
2  out value created by the fighter, the
3  fighter's marginal revenue product.
4      Q.   All right.  So for purposes
5  of estimating the weighted revenue, I am
6  correct that you used the full $45 that
7  went to the cable company as opposed to
8  the amount that went to Zuffa?
9      A.   I used the value created by
10  the event.
11      Q.   And the value created by the
12  event is the full amount that went to the
13  cable company and not the amount that
14  went to Zuffa, correct?
15      A.   I don't have an insight, at
16  least sitting here, as to how that -- how
17  that $45 got split between the two, but
18  what matters to me for my purposes is
19  trying to figure out how much the market
20  values the event, and so I want data on
21  the price paid by the consumer for the
22  event.
23      Q.   The -- now, looking down the
24  column called Gate.  You have some

Page 77

1  entries, but a lot of entries where it's
2  blank.  And am I correct that where you
3  did not have actual data for the gate,
4  you used some sort of average?
5      A.   Well, I wouldn't put it that
6  way.
7      Q.   Okay.  How would you put it?
8      A.   I would say that I computed
9  an average across a year for a given --
10  for a given promoter, and if there was a
11  blank in the field, the blank, by
12  construction, could not inform the
13  average.
14      Q.   I just asked you if you used
15  an average, but okay.
16          You did use -- where the
17  field was blank for gate, you used an
18  average across a year for the given
19  promoter?
20      A.   I believe that's the rule.
21  I'd want to go back and check that, but I
22  believe that we calculated an average
23  revenue per event, per fighter across the
24  promotion within a given year for



1    benchmark, which in Table 9, had
2    estimated damages of just under
3    $1.4 billion?
4        A.   I think that's fine, how you
5    put it. I actually think that comparing
6    10 and 11 gives you a better indication
7    of what the influence of inclusion of the
8    pre-Strikeforce observations do to the
9    regression, but you can also -- that
10   would be the preferred -- if you want to
11   see what the marginal effect is, I
12   would -- I would suggest that you compare
13   10 with 11.
14       Q.   All right.  Now, you have
15   estimated damages and foreclosure effect
16   relying on the relationship to the
17   percentage of revenue paid to fighters,
18   correct?
19           MR. CRAMER: Form.
20           THE WITNESS:  Can I hear
21       that back?  I'm sorry.
22   BY MR. ISAACSON:
23       Q.   You've estimated damages in
24   a foreclosure effect relying on a

1    relationship to the percentage of revenue
2    paid to fighters, what you called the
3    fighters' share?
4        A.   I think that I've offered --
5    I've offered, under one of my approaches
6    to damages, a regression-based approach
7    that relates foreclosure share to fighter
8    wage share.
9        Q.   I'm talking about something
10   slightly different.
11       A.   Okay.
12       Q.   Okay.  And we'll come to the
13   fighter wage share.  But in terms of
14   the -- go back to 125.
15       A.   Okay.
16       Q.   Table 6, which is an example
17   of the output of your regression that
18   we've been calling the foreclosure
19   regression, expresses that as there's an
20   increase in foreclosure share, there's a
21   decrease in fighter share, and the
22   fighter's share is the share of revenue
23   that goes to fighters.
24       A.   Or what I like to call -- or

1    what I like to call the fighter wage
2    share, a fighter/event share, fighter
3    revenue share is fine.
4        Q.   Fighter share as you've
5    written it here.
6        A.   Okay.
7        Q.   And when you estimate
8    damages using the Bellator and
9    Strikeforce benchmarks, you look at the
10   percentage of revenues paid to fighters
11   between -- and compare them amongst
12   firms, correct?
13       A.   With one modification, which
14   is when I do those Strikeforce and
15   Bellator benchmarks, I'm using aggregate
16   fighter shares.  In comparison when I --
17   when I perform the regression, I'm using
18   the wage share of a particular fighter.
19       Q.   All right.  And then when
20   you estimate damages using your
21   regression models, you also look at
22   fighter shares, what's the effect --
23   what's the -- damages are expressed as
24   the reduced share of revenue paid to

1    fighters?
2        A.   I'm sorry, when I'm doing
3    damages?
4        Q.   Yes.  When you're doing
5    damages, you're saying that the share
6    paid to fighters is lower than it
7    otherwise would be with -- if you had a
8    lower foreclosure?
9        A.   I think that's fair.
10       Q.   Okay.
11       A.   I also -- I just wanted to
12   clear up something as I -- you asked me a
13   few minutes ago about the number of
14   observations and I may have injected some
15   uncertainty because my brain was seizing
16   up as to whether or not it changes across
17   the different specifications, and as
18   I'm -- as I'm recalling now, you do, in
19   fact, have the same number of
20   observations across tracked, ranked and
21   headliner.  The only thing that's
22   changing here is how I define the
23   foreclosure share, but it's the same
24   regression dataset.



1    Q.   You have not done any impact
2  models or damages models where you --
3  where you use as an input the actual
4  amount of fighter pay as opposed to the
5  fighter share?
6        A.   I don't think that's true.
7  I have -- in my impact section, I've run
8  a model on levels, not related to
9  foreclosure share, but levels of fighters
10  compared to what other fighter were being
11  paid.
12            But if you're asking have
13  I -- have I run a model that relates
14  foreclosure share to the levels, I have
15  not done that.
16        Q.   All right.  I think I
17  understand you, but let me get it
18  straight.
19            You have not run any models
20  that establish the -- that establish the
21  fact of injury or the amount of damages
22  that rely on the actual salaries that
23  are -- not salaries, the actual
24  compensation paid to fighters as opposed

1  to the fighters' share?
2            MR. CRAMER:  Objection to
3  form.
4            THE WITNESS:  No, I'm going
5  to -- I'm going to say no to that
6  one.  I thought I just clarified.
7  BY MR. ISAACSON:
8        Q.   Just say no and I'll ask you
9  a follow-up question.
10        A.   Fine.  No.
11        Q.   The -- when you look at
12  actual fighter pay, that's when you
13  were -- when you used actual fighter pay
14  as opposed to fighter share, that's when
15  you performed regressions to determine
16  whether gains or losses in a compensation
17  were broadly shared across the bout
18  class, correct?
19        A.   Correct, as part of an
20  impact model.
21        Q.   Right.  And does that model
22  generate an amount of impact or amount of
23  damages?
24        A.   No, that model was to

1  establish the fact of common impact.
2        Q.   And the results showed that
3  individual fighter compensation per event
4  moves together with per event
5  compensation paid to other fighters; is
6  that correct?
7        A.   Yes.
8        Q.   Okay.  And while it
9  establishes that the compensation moves
10  together, the output of that model does
11  not actually demonstrate injury to any
12  specific fighter; is that correct?
13            MR. CRAMER:  Objection to
14  form.
15            THE WITNESS:  I would say
16  the output of that model in
17  conjunction with other steps in
18  that two-part proof show impact to
19  all fighters.
20  BY MR. ISAACSON:
21        Q.   Just look at paragraph 229.
22  You used the example in the middle of:
23        "In particular, a 1 percent
24  increase" --

1        A.   I'm not there yet, I'm
2  sorry.
3        Q.   I'm being impatient.  I
4  apologize.
5        A.   Okay.  Now I'm on 229.
6        Q.   In the middle you see, "In
7  particular a 1 percent increase"?
8        A.   Yes.
9        Q.   Okay.
10        "In particular, a 1 percent
11  increase in other fighters' per event
12  compensation is associated with an
13  increase in individual fighter
14  compensation of approximately
15  0.159 percent to 0.175 percent."
16            And you say that:
17        "This provides further
18  evidence of a pricing structure, and
19  accordingly of common impact flowing from
20  generalized compensation suppression."
21            Now, I understand that you
22  have concluded from this that this is
23  evidence of common impact.  But this
24  analysis by itself does not show any --

MAGNA
LEGAL SERVICES

Page 102

1  that in a but-for world fighters would
2  have been paid more; is that correct?
3      A.   This analysis must be
4  understood in conjunction with other
5  analyses in the section, the totality of
6  which establishes common impact.
7      Q.   I agree with that.  What I'm
8  saying is this -- this model by itself
9  would not show any injury to any specific
10 fighter, it would have -- it would have
11 to be considered in conjunction with
12 other analysis that you've done?
13     A.   I think that's fair.  I
14 would not -- I would not offer this model
15 by itself as proof of common impact.  I
16 would offer it, as I did, in conjunction
17 with other models in the section, and
18 record evidence, of course.
19     Q.   Right.  So the models that
20 actually conclude by themselves that
21 there was damage or impact to individual
22 fighters are all expressed in terms of
23 fighters' share and don't rely on data
24 but actual fighter pay; is that correct?

Page 103

1          MR. CRAMER:  Objection to
2  form.
3          THE WITNESS:  No, that's not
4  correct.
5  BY MR. ISAACSON:
6      Q.   The models that show actual
7  impact or damages by themselves all are
8  expressed in terms of the fighters' share
9  of revenue, correct?
10     A.   I wouldn't put it that way
11 either.
12     Q.   Okay.  For each of those
13 models you were looking at what the
14 fighter share of revenue actually was
15 compared to what it would be in the
16 but-for world using the models that
17 you've relied on, correct?
18     A.   For certain models, the
19 left-hand side variable of the regression
20 was expressed in terms of fighter share
21 as opposed to absolute level.
22          But I want to make clear for
23 the record that the numerator is the
24 fighters' pay.  So when you say the

Page 104

1  models aren't taking into consideration
2  the fighters' pay, I have to -- I have
3  to -- I have to reject that.
4      Q.   All right.  So there is a
5  variable in each of your impact models
6  and damages models that actually estimate
7  a dollar effect on fighters that relies
8  on the fighters' share as opposed to the
9  absolute level of compensation of the
10 fighter.  Do I have that right?  What you
11 call the variable on the left-hand side.
12     A.   Yeah, the dependent variable
13 in certain models is expressed in terms
14 of fighter's share, and to figure out
15 what the effect is on a fighter's
16 absolute pay, it's a ministerial change
17 to convert from an actual fighter share
18 to a but-for fighter's share, and then
19 knowing what the event revenue was to
20 convert to a but-for fighter pay.
21          So I think that -- I think
22 that to say that it's -- it's not making
23 use of actual fighter pay just misses
24 what's -- what's going on.

Page 105

1      Q.   All right.  So on page 155,
2  Table 8.
3      A.   Okay.
4      Q.   Which reports on a
5  regression you did for impact.  The
6  dependent variable there was the
7  fighter's share of revenue rather than
8  the absolute level of compensation, am I
9  correct?
10     A.   Correct.
11     Q.   Okay.  And the same would be
12 true for each of the regressions in your
13 damages models; is that correct?
14     A.   I believe that's fair, that
15 the dependent variable in those models
16 was fighter share of revenues.
17     Q.   I'm going to take a big
18 chance here and ask if you can explain
19 for our audience what you mean by a
20 dependent variable.
21     A.   Sure.  So the dependent
22 variable is the variable that we are
23 trying to understand and explain what --
24 what drives it to -- to move around.  And

**MAGNA**
LEGAL SERVICES

Page 106

1  so we -- you'll also hear the expression
2  the left-hand side variable, but -- but
3  it's -- it's the variable of interest.
4  We are -- we are trying to -- to
5  understand the world through -- through
6  that variable and to explain what causes
7  it to vary.
8      Q.  All right.  So I'd like -- I
9  think variable of interest is a phrase
10  you use in your report, and I guess it's
11  also comfortable calling it a dependent
12  variable for a layperson, the variable
13  we're trying to explain.  Both of those
14  would be acceptable?
15      A.  Sure.
16      Q.  Okay.  The --
17          THE VIDEOGRAPHER:  We're ten
18      minutes left on this tape,
19      Counsel.
20          MR. ISAACSON:  All right.
21      We'll go about five more minutes
22      and take a break.
23  BY MR. ISAACSON:
24      Q.  Have you done damages

Page 107

1  analysis before where you had used the
2  percentage of -- the percentage of
3  revenue as opposed to the absolute level
4  of compensation as the variable of
5  interest?
6      A.  It's possible.  Sitting here
7  I'm thinking of another -- of another
8  wage case that I did, which was -- which
9  I refer to as Arizona Travel Nurses, and
10  it's possible that we -- when we did our
11  modeling there, we expressed -- in fact,
12  it's kind of coming back to me.  I think
13  we were interested in a nurse's payment
14  relative to her bill rate.  So -- so yes,
15  I believe I've -- I've done something
16  like that before.
17      Q.  You say something like that,
18  have you done -- have you used as the
19  variable of interest before the share of
20  total revenue that goes to the labor
21  force, whether that labor force is an
22  employee or -- or contractors?
23      A.  I think so.
24      Q.  Okay.  And you think you did

Page 108

1  that in Arizona Travel Nurses?
2      A.  Yeah, it's an old case, but
3  I -- some -- some faint memories are
4  coming back, and I -- I believe that
5  to -- to establish similar things, common
6  impact there, we were -- we were looking
7  at the bill rate as the denominator,
8  that's how much the hospital was -- was
9  charging for the -- for the nurse, and
10  the numerator was the wage that went to
11  the -- to the nurse, and so it's an
12  analogous construction of a dependent
13  variable.
14      Q.  Any other cases that you --
15  where you've estimated damages using the
16  variable of interest or the dependent
17  variable as the share to labor?
18      A.  I'm not sure.  I'm not sure
19  how many other wage suppression cases
20  I've done besides -- besides these two.
21  I'd have to -- I'd have to go back and
22  think about it.
23      Q.  Okay.
24          MR. ISAACSON:  All right.

Page 109

1  Why don't we take a break?
2          MR. CRAMER:  Sure.
3          THE VIDEOGRAPHER:  The time
4  is 11:26 AM.  We are going off the
5  record, and this is the end of
6  Disk 1.
7      (Recess.)
8          THE VIDEOGRAPHER:  The time
9  is 11:40 AM.  This is the start of
10  Disk 2, and we are now on the
11  record.
12  BY MR. ISAACSON:
13      Q.  So I want to continue our
14  discussion of the percentage of revenue
15  paid to labor as the variable of
16  interest.
17          Is there economic literature
18  that you're familiar with that discusses
19  the percentage of revenue that's paid to
20  labor in a competitive industry as
21  opposed to an industry that's less
22  competitive?
23      A.  Is there economic
24  literature?



Page 114

1      Q.   All right.  Let me try it
2  this way then.  Can you identify any
3  peer-reviewed literature looking at
4  labor's share of revenues as the variable
5  of interest in determining
6  anticompetitive impact?
7           MR. CRAMER:  Form.  Asked
8       and answered.
9           THE WITNESS:  I don't know
10      if I'm -- if I'm going to be able
11      to call up names of particular
12      articles off the top of my head,
13      but I can tell you that -- that
14      the wage share of marginal revenue
15      product is the way that you
16      understand competition in
17      competitive labor markets and how
18      you understand the opposite.
19  BY MR. ISAACSON:
20      Q.   All right.  The -- and I
21  think -- and I'll come to that subject
22  right now, but right now you can't tell
23  me any peer-reviewed literature that
24  looked -- that analyzes anticompetitive

Page 115

1  impact by looking at labor share of
2  revenues; is that right?
3           MR. CRAMER:  Asked and
4       answered.
5           THE WITNESS:  I believe I've
6       cited some in my report, but
7       sitting here I can't -- I can't
8       tell you a particular article.
9  BY MR. ISAACSON:
10      Q.   All right.  If you look at
11  page 120 of your report, footnote 454?
12      A.   Yes.
13      Q.   You talk about elementary
14  economics which shows that competitive
15  firms paid labor a share of revenue
16  commensurate with labor's productivity
17  based on a marginal product to labor.
18           That's the principle that
19  you were just discussing with me?
20      A.   Yes.
21      Q.   Is that right?
22           And -- now the marginal
23  revenue product labor is the value of the
24  additional output created when a firm

Page 116

1  adds a worker, am I correct?
2      A.   I think that's a fair -- a
3  fair concept.
4      Q.   And is it -- is it correct
5  that standard economics would predict
6  that a worker's compensation would be
7  equal to that marginal revenue product of
8  labor?
9      A.   In a competitive
10  environment, the labor's share of his or
11  her marginal revenue product tends
12  towards higher values, and the limit
13  would -- would approach his or her
14  marginal revenue product.
15      Q.   And in a competitive
16  environment, standard economics would say
17  that the -- actually, let me start over.
18           When you expressed that
19  marginal revenue product is labor or
20  wages, do you ordinarily do that in
21  dollar terms or in a fraction of the
22  firm's revenue?
23           MR. CRAMER:  Objection to
24      form.

Page 117

1           THE WITNESS:  Do I
2       ordinarily do it?  I'm sorry, I'm
3       just not following.
4  BY MR. ISAACSON:
5      Q.   How about in standard
6  economics?
7           MR. CRAMER:  Same objection.
8           THE WITNESS:  I think that
9       in standard economics you would
10      put the wage in the numerator and
11      you'd put the marginal revenue
12      product in the denominator.
13  BY MR. ISAACSON:
14      Q.   And the marginal revenue
15  product would be expressed as a dollar
16  value?
17      A.   Yes.
18      Q.   And do economists ordinarily
19  measure the productivity of the
20  additional output -- well, let me put it
21  differently.
22           Do economists generally
23  measure the productivity created when a
24  firm adds a worker in dollar terms as

MAGNA
LEGAL SERVICES

1    opposed to as a percentage of revenue?
2         MR. CRAMER:  Objection to
3    form, to generally.  For what
4    purpose?
5         THE WITNESS:  A firm could,
6    if a firm bills -- if a law firm
7    bills an associate out at $400 an
8    hour, it could express what the --
9    what the young lawyer's salary on
10   an hourly basis is as a -- under
11   an assumed utilization rate as a
12   percentage of that young lawyer's
13   bill rate.
14   BY MR. ISAACSON:
15        Q.    And are you aware of any
16   studies which express the marginal
17   revenue product of labor in terms of the
18   percentage of revenue of the firm?
19        A.    I'm not aware, but as you've
20   expressed it, that's not quite what I'm
21   doing either.
22        Q.    Now, in terms of -- did you
23   make any effort to measure the marginal
24   revenue product of labor of UFC fighters?

1         A.    Yes.
2         Q.    Okay.  And what would you
3    point to me for that?
4         A.    What I did, which is I -- I
5    calculated the average revenue per event,
6    per fighter, and I'm using that as a
7    proxy for the marginal revenue product.
8         Q.    All right.  If the
9    average -- when you look at the average
10   revenue per event, per fighter, how do
11   you determine what part of that revenue
12   is the contribution of the fighter as
13   opposed to, for example, marketing,
14   promotions, production or the work of the
15   overall firm?
16        A.    So for my purposes, I don't
17   need to figure out that -- that
18   decomposition.  I will note, however,
19   that I cite a study in my literature
20   review section that suggests that the
21   fighter is responsible for, if not all,
22   the vast majority of -- of the
23   pay-per-view revenues that are captured
24   and not the brand.

1         Q.    Well, I didn't ask about the
2    brand.
3         The -- you would agree --
4    you would agree with me that effective
5    marketing and promotion could increase
6    the average revenue per event, correct?
7         A.    Yes.
8         Q.    And you would agree with me
9    that super- -- improving television
10   production can increase the average
11   revenue per event?
12        MR. CRAMER:  All things
13   equal?
14        MR. ISAACSON:  Yes.
15        THE WITNESS:  I'm not sure
16   what -- what you mean by improving
17   television production.
18   BY MR. ISAACSON:
19        Q.    A better production that
20   people enjoy more.
21        MR. CRAMER:  Objection to
22   form.
23        THE WITNESS:  And you're
24   asking me if I can conceive of

1    this as a matter of theory?
2    BY MR. ISAACSON:
3         Q.    Yes.
4         A.    As opposed to whether it
5    actually happened?
6         Q.    Yes.
7         A.    I think I'm -- I'm going to
8    grant you that as a matter of theory one
9    could -- one could add value by
10   increasing the quality of the production.
11        Q.    Okay.  Now, in this case,
12   you did not do an actual study yourself
13   of the contribution of the UFC fighters
14   to the average revenue per event; is that
15   right?
16        MR. CRAMER:  Asked and
17   answered.
18        THE WITNESS:  I think that's
19   correct.  As I noted a few moments
20   ago, that was not necessary for my
21   purposes.
22   BY MR. ISAACSON:
23        Q.    By using the average revenue
24   per event, per fighter as a proxy, were

**MAGNA**
LEGAL SERVICES

Page 138

1 more a valuable fighter is going to -- a
2 more highly ranked fighter is going to
3 generate more attention, more sales with
4 pay-per-view.
5     Q.   And if the same fighter
6 fought for Zuffa and Bellator in the same
7 year and the Zuffa event generated more
8 revenue, that fighter would receive a
9 higher weight in the foreclosure share
10 calculation when he or she fights for
11 Zuffa rather than Bellator; is that
12 right?
13     A.   That would only be true
14 under the revenue weighting approach.
15 It's not true under the other -- under
16 the other approaches.
17     Q.   Right.  Under the revenue
18 weighting approach, if the same fighter
19 fights for Zuffa and Bellator in the same
20 year and the Zuffa events generate more
21 revenue, that same fighter would receive
22 a higher weight in the foreclosure share
23 calculation when he or she fights for
24 Zuffa; is that right?

Page 139

1         MR. CRAMER:  Asked and
2     answered.
3         THE WITNESS:  I think I put
4     it in a way that -- that I
5     preferred.  I hear that as the
6     same question.
7 BY MR. ISAACSON:
8     Q.   Well, you didn't actually --
9 oh, okay.  You did say it was true under
10 the revenue weighting approach.  That's
11 right.  I'm sorry.  I only caught what
12 you said it was not true for.
13         The -- sometimes I ask the
14 same question if I'm trying to get the
15 answer.
16     A.   That's okay.
17     Q.   The -- now, you mentioned
18 the non-revenue weighting measures, and
19 one of those was where you weighted by
20 rank; is that right?
21     A.   To be precise, the inverse
22 of the rank, yes.
23     Q.   And inverse ranking means
24 you -- you were looking at ranked

Page 140

1 fighters 1 through 15; is that correct?
2     A.   Oh, not just in the
3 headliner definition.  I've -- I've
4 employed rank weighting in others as
5 well.
6     Q.   Okay.
7     A.   When you -- when you start
8 to combine fighters ranked 1 through 650
9 within a given weight class, you have a
10 real issue of how valuable is it on a
11 relevant basis to lock up number 1 versus
12 number 650.  The notion being that 1 is
13 more valuable, and the question is how do
14 you -- how do you express that
15 mathematically.
16         So one approach to that, of
17 course, is to -- is to give more weight
18 to the higher ranked fighter.
19     Q.   And let me understand how
20 you did express the inverse ranking.  For
21 the inverse ranking, if you had the
22 number 1 fighter and the number 15
23 fighter in a weight class, the number 1
24 fighter would be weighted 15 times more

Page 141

1 than the number 15 fighter?
2     A.   I think that's fair.  I
3 talked over you.  I'm sorry.  Yes, that's
4 fair.
5     Q.   And number 6 is weighted
6 twice as much as number 12?
7     A.   I think that's how the math
8 works, yes.
9     Q.   And did you do inverse
10 ranking for 1 through 650?
11     A.   I believe there is a
12 specification, it may not be in one of
13 the tables, but I think that we have done
14 inverse ranking under all of the market
15 definitions, including the ranked
16 definition.
17     Q.   And when you went to, say,
18 600, would the number 1 fighter be
19 weighted 600 times the number 600
20 fighter?
21     A.   Yes.
22     Q.   Okay.  And what's your basis
23 for using that inverse weighting, that 1
24 compared to 15 is 15 times as much, as

MAGNA
LEGAL SERVICES

Page 142

1    opposed to number 1 is worth something
2    more than number 15.
3            A.    Right.  So the basis is the
4    record evidence in the case.  The record
5    evidence tells us that the purpose of
6    the -- of the exclusionary arrangements
7    is to tie up the most valuable fighter so
8    as to prevent rivals from getting a
9    foothold.
10            So that tells me
11    qualitatively that it's more valuable to
12    have 1 through 15 sewn up than, say, 75
13    through 90.
14            Now the question is, how can
15    I, as an economist, quantify that -- that
16    difference in valuation, and I've tried
17    revenue weighting, I've tried rank
18    weighting and inverse rank weighting and
19    I've tried unweighted.  And at the end of
20    the day, my -- my basic regression model
21    is not sensitive to how -- how one does
22    the weighting.
23            Q.    I'm just focusing now on
24    your inverse ranking analysis.  And I

Page 143

1    understand that you concluded the number
2    1 fighter, for example, is more valuable
3    than the number 10 ranked fighter, but
4    what's the basis for quantifying that as
5    the number 1 fighter is ten times more --
6    worth ten times more than the number 10
7    fighter?
8            A.    I think there is record
9    evidence suggesting that it would be
10    sufficient to lock up only the headliners
11    in order to -- to cripple or to slow the
12    advance of a rival promoter.
13            So what the record evidence
14    is telling me is that -- is that 1
15    through 15, for example, are more
16    valuable than 75 through 90.  The record
17    evidence doesn't necessarily tell me how
18    to give those fighters more weight.  So
19    what I decided to do for one
20    specification was to weight a fighter
21    based on his or her inverse rank.
22            Q.    All right.  So when you say
23    headliners, you mean number -- those
24    ranked 1 through 15, correct?

Page 144

1            A.    I've defined headliners very
2    precisely as 1 through 15.  I think the
3    term headliners can connote other --
4    other numbers.
5            Q.    And in the example that I've
6    given of the number 1 fighter and the
7    number 10 fighter, those would both be
8    headliners within your definition?
9            A.    Correct.
10            Q.    And the number 1 fighter
11    would be worth ten times as much as the
12    number 10 fighter, that's correct?
13            A.    Under the --
14            Q.    We're only talking about the
15    inverse rank weighting.
16            A.    Good.
17            Q.    I'm correct that under the
18    inverse rank weighting, the number 1
19    fighter would be weighted ten times as
20    much as the number 10 fighter; is that
21    right?
22            A.    Correct.
23            Q.    And there's nothing in the
24    record that would support that relative

Page 145

1    difference between the number 1 fighter
2    and the number 10 fighter?
3            MR. CRAMER:  Misstates the
4    testimony.
5    BY MR. ISAACSON:
6            Q.    Is that correct?
7            A.    That is not correct.
8            Q.    Okay.  What would you point
9    me to?
10            A.    I would point you to the
11    section where I describe the basis for
12    headliner submarket, and I think the
13    record is very clear on this that -- that
14    the headliners are more valuable in the
15    eyes of the -- of the MMA promoters.
16            The question is -- is how do
17    you express that higher value in a way
18    that a computer can understand it for the
19    purposes of performing a regression
20    analysis and that's where I come in as an
21    economist, that's where my value added
22    is, if you will.  Silva is not going to
23    tell me, go get the inverse -- go get the
24    rankings and use inverse in your

MAGNA
LEGAL SERVICES

Page 146

1 regression.  That's not -- that's not how
2 he thinks, that's not -- that's not his
3 job, that's not what he does.  He says, I
4 want to lock up -- if you lock up these
5 people, I can thwart or cripple the
6 development of -- of rival MMA promoters.
7      Q.   Right.  But in my example,
8 I'm talking about the relative value of
9 two headliners.
10      A.   Sure.
11      Q.   Number 1 and number 10
12 fighter.
13      A.   Sure.
14      Q.   What would you point me to
15 in the record that would allow you to
16 conclude that the difference in value
17 between a number 1 ranked fighter and
18 number 10 fighter would be on a
19 proportion of ten to one?
20          MR. CRAMER:  By number 1 you
21      mean the champion, is that what
22      you mean?
23          MR. ISAACSON:  Ranked number
24      1.  I don't know if that's always

Page 147

1      the champion.
2          THE WITNESS:  The reason why
3      1 is more valuable than 10 is
4      that -- is that the way that you
5      advance in the MMA and the way
6      that you -- you achieve higher and
7      higher compensation and notoriety
8      and fame is by beating someone who
9      is ranked higher than you.
10          So you can't attract quality
11      fighters to your -- to your league
12      unless you can offer him or her
13      these opportunities for
14      advancement.
15          So the higher by
16      construction, given the way people
17      advance, are more valuable.
18      They're more valuable to the
19      fighters, they're more valuable to
20      the promoters, they're more
21      valuable to the consumer.
22          The record -- there's a ton
23      of record evidence telling me that
24      1 is more valuable than 10.

Page 148

1 BY MR. ISAACSON:
2      Q.   Right.
3      A.   Number 10, to be clear,
4 cannot -- cannot advance by fighting
5 number 13.
6      Q.   And I understand that you're
7 saying the record evidence says that the
8 one is more valuable than the other, but
9 I think you understand I'm talking about
10 the magnitude of the weighting that you
11 are giving it.
12          The -- what record evidence
13 is there that supports the magnitude of
14 weighting that you are giving it?  For
15 example, the number 1 fighter being worth
16 ten times more than the number 10
17 fighter, both of whom are headliners.
18      A.   Right.
19          MR. CRAMER:  Asked and
20      answered.
21          THE WITNESS:  I think you
22      see this in the -- in the higher
23      sales of pay-per-view when the
24      event features a higher ranked

Page 149

1      fighter.
2          If you were -- if you were
3      going to run two promotions, and
4      the highest ranked fighter in one
5      was 10, compared to the highest
6      ranked fighter in the other is 1,
7      you would expect, all things
8      equal, that the one with 10 as the
9      highest would generate less
10      revenue.
11          The -- the record evidence
12      speaks to this, the data speaks to
13      this, the economic literature
14      speaks to the importance of
15      fighter identities in determining
16      pay-per-view revenues.
17          So I feel very confident
18      that there is -- that there is a
19      basis for giving more weight under
20      the ranked weighting method.  And
21      then the question becomes how, as
22      an economist does, one implement
23      that or effectuate that.
24 BY MR. ISAACSON:

MAGNA
LEGAL SERVICES

1       Q.   All right.  Let's talk about
2   the non-headliners.
3            So in your inverse ranking
4   method, the number 100 fighter would be
5   worth six times that of the number 600
6   fighter?
7       A.   Sure.
8       Q.   And what in the record shows
9   that magnitude of difference in value?
10       A.   Oh, I think that you can go
11   to -- so we have a lot of evidence that
12   speaks to qualitatively the difference in
13   value, and I think what you're pressing
14   on is quantitatively.
15       Q.   Yes.
16       A.   Right?  Well, I just want to
17   make sure that --
18       Q.   That's why I keep saying
19   magnitude.
20       A.   Okay.  But I'm using -- I'm
21   using everything as the basis.  I'm
22   looking at the record evidence and
23   looking at data.  But I would point you
24   to data showing that higher pay-per-view

1   revenues, variations in pay-per-view
2   revenues can be explained by -- by who is
3   being offered, the rank of the -- of the
4   fighter that's being offered for that
5   particular event.
6       Q.   The -- you mentioned the
7   subject before, but let me go over it.
8            Now, in calculating the
9   foreclosure share, you used two
10   alternative definitions.  One was all
11   Zuffa fighters compared to total MMA
12   fighters weighted by revenue, and the
13   other was -- I'm sorry.  Actually, I
14   think I got that right.
15            So in calculating
16   foreclosure share, you used two
17   alternative definitions.  One was all
18   Zuffa fighters compared to total MMA
19   fighters, and the other you only included
20   fighters whose contracts contained a
21   champions clause and had a 30-month or
22   longer period of exclusivity.
23            Do I have that right?
24       A.   I think that's fair.

1       Q.   Okay.  And how did you
2   decide that the 30-month threshold was
3   appropriate?
4       A.   Primarily two ways.  If you
5   go to my report, there might be others,
6   but the first was I'm familiar with --
7   with various case law that speaks to what
8   constitutes a contract of sufficient
9   duration to be considered exclusionary.
10            And second basis was that
11   I -- I looked at the average and medium
12   duration of a fighter and I -- I wanted
13   to make sure that -- that the number that
14   I went with as the cutoff represented a
15   sizable or significant or material share
16   of the -- from an economic perspective of
17   the fighter's average career span.
18       Q.   I should have asked you this
19   before.  When we were looking at Figure
20   1, market share and 2 -- and Figure 3,
21   which is foreclosure share, foreclosure
22   share is the result of your regression?
23       A.   No.
24       Q.   Is that right?

1       A.   No.  So foreclosure share
2   would be an input to the regression,
3   right?  And so you can do one pass, which
4   I did, which is to presume that all
5   fighters working under -- under a Zuffa
6   contract will foreclose.  That's one
7   approach.  And in that case, foreclosure
8   share just equals Zuffa's market share.
9   And so whenever a fight or event pair
10   shows up in the regression database,
11   you'll see a measure of foreclosure
12   share, which is just equal to the market
13   share.
14            Under a second approach, you
15   can -- you can allow the foreclosure
16   share to deviate from the market share by
17   insisting that not only does the fighter
18   work for Zuffa, but the fighter also
19   fights pursuant to a contract that
20   contains a championship clause, is
21   exclusive and runs longer than -- equal
22   to or longer than 30 months.
23       Q.   All right.  So for some of
24   your models you used a foreclosure share

Page 154

1    that was equal to the market share, and
2    some you used a foreclosure share that
3    deviated from the market share; is that
4    correct?
5        A.   Yes.
6        Q.   All right.  And when you --
7    let's go back to our favorite tables.
8    Table 8, which was page 155.
9        A.   I'm sorry, 155?
10       Q.   Yes.
11       A.   I'm getting there.  Okay,
12   I'm there.
13       Q.   That's your -- that's the
14   result of your impact regression.  Did
15   you use a foreclosure share that was
16   equal to market share or that deviated
17   from it?
18       A.   Well, remember, when you --
19   when you fit the regression model, you're
20   using actual foreclosure share.  Actual
21   foreclosure share can be measured in many
22   ways, right?
23            When you -- when you go to
24   predict what an individual fighter would

Page 155

1    have received in the but-for world and
2    you set the foreclosure share to, in this
3    table, zero or 20 percent.
4        Q.   Right.  I'm talking about
5    the actual foreclosure share.  We've
6    already established that your but-for
7    shares were zero, 20 or 30 percent.  I
8    don't want to go back over that.
9        A.   Okay.
10       Q.   Okay.  In looking at the
11   impact regression, the common impact
12   regression, Table 8, when you use actual
13   foreclosure, did you use market share or
14   something that deviated from market
15   share?
16       A.   Oh, I believe it was the
17   foreclosure share that was allowed to
18   deviate from market share.
19       Q.   Okay.  And what about the
20   two regressions that we've gone over
21   before by which you estimated damages?
22       A.   The same answer.  I believe
23   that the ones in the damages -- involved
24   the foreclosure share that is allowed to

Page 156

1    deviate from market share.
2        Q.   Okay.  Now, would you
3    explain to me how the foreclosure
4    share -- the process of allowing the
5    foreclosure share to deviate from market
6    share?
7        A.   Oh, it's just a more
8    stringent standard that I apply.  So
9    under one approach you presume that
10   everybody fighting pursuant to a Zuffa
11   contract is foreclosed, and I gave the
12   bases -- bases for why one could
13   reasonable do that under one approach.
14            And then I said, in a second
15   pass, let's -- let's -- let's raise the
16   bar, let's make them -- let's create a
17   more stringent standard.  Now it's not
18   just sufficient just to -- just to have
19   fought pursuant to any old Zuffa
20   contract, it's got to be a contract with
21   very specific parameters in it.
22            So what's going to happen as
23   you toggle between the two, is that you
24   may have considered someone to be

Page 157

1    foreclosed under the first approach, but
2    yet he or she is not foreclosed under the
3    second approach.
4        Q.   And so would that be
5    numerically expressed by the difference
6    between the lines in Figure 1 and Figure
7    3?
8        A.   I think that's -- that's
9    generally fair.
10       Q.   I want to see if I can look
11   at them.
12            So the market shares in
13   Figure 1 were not used as inputs for
14   actual foreclosure in your impact or
15   damages models, correct?
16       A.   No, they were, right?  I'm
17   telling you that I've done -- I've done
18   anticompetitive effects and impact using
19   various measures of foreclosure share,
20   one that's triggered merely by virtue of
21   being an employee of Zuffa or fighting
22   pursuant to a Zuffa contract and others
23   where I apply more stringent standard.
24            If what you're asking me is

MAGNA
LEGAL SERVICES

Page 162

1   combination of multiple factors, the most
2   likely being that the duration of the
3   contracts back in that period were not
4   sufficiently long so as to turn on any
5   particular fighter as being foreclosed.
6          You also have times of lower
7   market share. So a lot of things are
8   contributing to -- to why Zuffa's
9   foreclosure share would be that small way
10  back in 2005.
11         Q.   So as I understand Figure 3,
12  what you've done is you take the market
13  share numbers on page 88, Figure 1, and
14  you eliminate all the fighters who are --
15  do not have champions clauses and do not
16  have a contract with a duration of over
17  30 months?
18         A.   That is one way of thinking
19  about it. I think you would get to the
20  same place. I think about it slightly
21  differently, but I think that would get
22  you to the same place.
23         Q.   Okay. And when you say --
24  for Figure 3, it includes the -- it says

Page 163

1   it includes the time -- Zuffa fighters
2   duration of greater than 30 months. Does
3   it also include Zuffa fighters with
4   champions clauses with durations less
5   than 30 months?
6          A.   No, right? Because you
7   need -- you need the champions clause --
8   for this -- for this measure you need the
9   champions clause, which turns out almost
10  of them have anyway, plus duration, terms
11  of extended duration to 30 months or
12  greater.
13         Q.   All right. And so what's
14  really happening is that between Figure 1
15  and Figure 3, because almost all
16  contracts have champions clauses, is
17  you're removing the contracts from the
18  market that have durations of less than
19  30 months?
20         A.   That is largely what would
21  be the driving distance between the two,
22  yes.
23         Q.   And when you say they have a
24  duration of greater than 30 months, is

Page 164

1   that a duration on its face?
2          MR. CRAMER: Objection to
3      form.
4   BY MR. ISAACSON:
5          Q.   Meaning as opposed to how
6   much time is left on the contract?
7          MR. CRAMER: Objection to
8      form.
9          THE WITNESS: It means that
10      at the time the fighter shows up
11      in the relevant market, we go look
12      at the fighter's contract and make
13      a determination if that contract
14      contains provisions such that the
15      duration of that contract exceeds
16      30 months.
17  BY MR. ISAACSON:
18         Q.   And though when we're saying
19  the duration of the contract, if I'm
20  halfway through a contract, there's a
21  difference between the duration of the
22  contract at the time of signing and the
23  remaining duration of the contract. I'm
24  trying to understand whether you're using

Page 165

1   the remaining duration of the contract or
2   the duration term at the date of signing?
3          A.   The latter. We're using the
4   duration of the contract at the time --
5   at the time of signing.
6          Q.   And -- and from your study,
7   what are the acts of Zuffa in this case
8   which are driving the increases in
9   foreclosure that are -- that we can see
10  in Figure 3. So the lines are obviously
11  going up sharply.
12         MR. CRAMER: Objection to
13      the form.
14         You can answer if you
15      understand it.
16         THE WITNESS: I think that
17      the -- the primary driver, the
18      acts -- part of the challenged
19      conduct that's driving the
20      foreclosure if you think about how
21      it's being triggered, are the
22      restrictions in the fighter
23      contracts, those are doing the
24      heavy lifting here, and that's the

Page 166

1    exclusive provision plus the
2    other -- the other provisions that
3    cause the contract's duration to
4    exceed 30 months.
5  BY MR. ISAACSON:
6        Q.    All right.  Now, would this
7  chart tell you that -- that the number or
8  percentage of contracts -- I guess both
9  the number and percentage of contracts
10 that Zuffa has with fighters with
11 duration over 30 months has increased
12 from 2005 to 2011?
13       A.    Can I just hear that back?
14 I'm sorry.
15       Q.    Sure.  Does this chart --
16 maybe I'll even put it differently.
17       Is this chart telling you
18 that the number or percentage of
19 contracts that Zuffa has been entering
20 with 30-month durations has been
21 increasing since 2005?
22       A.    I think that's one potential
23 inference.  I just want to add a caveat
24 that -- just to help -- help understand

Page 167

1  if that's okay.  And that is the
2  foreclosure share can also be going up
3  because Zuffa's market share is going up.
4  I don't know if that's captured in your
5  word percentage.
6        Q.    I'm going through one thing
7  at a time so, but one -- and I'm trying
8  to understand the things you think would
9  be significant drivers of the increasing
10 foreclosure share.
11       One thing that you, from
12 your investigation, would believe is
13 driving the increase in foreclosure share
14 would be Zuffa has been entering more
15 contracts since 2005 that have durations
16 of over 30 months?
17       A.    And what I'm asking you to
18 do is, can we do the ceteris paribus
19 assumption such that Zuffa's market share
20 is being held constant?  So what I'll
21 agree to -- maybe this will help, maybe
22 it doesn't help, is that -- is that
23 holding Zuffa's market share constant, a
24 higher percentage of -- of Zuffa

Page 168

1  contracts that are deemed exclusionary
2  will cause the foreclosure share to go
3  up.
4        Q.    Okay.  And if we don't hold
5  the market share concept, we use Zuffa's
6  actual market share, is Zuffa's
7  proportion of contracts with duration of
8  30 months risen since 2005, to your
9  knowledge?
10       A.    If I'm understanding your
11 question correctly, I just -- if I can
12 put it in my own words, the -- if the
13 numerator is the -- is Zuffa contracts
14 that are deemed exclusionary and --
15 sorry, fighters who are working pursuant
16 to a Zuffa exclusionary contract, that's
17 in the numerator, and the denominator is
18 all fighters in the relevant market.  So
19 to the extent that Zuffa either adds more
20 fighters through, say, acquisition, and
21 funnels them into these same exclusionary
22 contracts, or to the extent that Zuffa
23 extends the terms of the contracts such
24 that the duration starts to exceed 30,

Page 169

1  either of those will cause the
2  foreclosure share to increase.
3        Q.    Okay.  And do you believe
4  both of those were driving the increase
5  in foreclosure share?
6        A.    Yes.
7        Q.    And when -- you mentioned
8  extensions.  So when you are
9  incorporating contracts with a duration
10 of greater than 30 months, if you have a
11 contract with a duration of less than
12 30 months that is extended before the end
13 of the term to be greater than 30 months,
14 does that get included?
15       A.    No.  So in that sense we're
16 being very conservative.  So if you -- if
17 you marry up two 20-month contracts, and
18 do it in a way that -- that is strategic
19 so as to force the fighter to move into
20 the second as a condition of, say,
21 getting a good placement on a card, if
22 you strung together two 20s to achieve a
23 40, that would not be considered an
24 exclusionary contract under this

MAGNA
LEGAL SERVICES

Page 190

```
1          what you're asking me to assume is
2      to assume there are no artificial
3      restrictions.  I -- I don't know.
4      I'm trying -- when you say stand
5      alone, you need to give me more
6      context.
7   BY MR. ISAACSON:
8       Q.   That would be fine.  Go
9   ahead and assume there are no artificial
10  barriers to entry, there would remain the
11  natural barriers to entry that you've
12  identified, do you consider those to be
13  high barriers to entry?
14      A.   I consider them to be
15  economically significant in the sense
16  that it might be hard for you or I to
17  enter tomorrow in a timely and seamless
18  way.  But I think that a person like Mark
19  Cuban with access to capital and
20  experience in television and having his
21  own TV channel, there -- could likely
22  overcome the natural barriers.
23      Q.   The Strikeforce and Bellator
24  benchmarks, we talked about those this
```

Page 191

```
1   morning for purposes of damages.
2       A.   Yes.
3       Q.   I'm going to return to that
4   topic.
5            In those benchmarks, you are
6   using two competitors of -- of Zuffa
7   comparing the percentage of their
8   revenues paid to labor or paid to the
9   fighters to that of Zuffa.  I think we've
10  established that, correct?
11      A.   Correct.
12      Q.   Okay.  Why in economic
13  theory would you use the percentage of
14  revenue paid to labor by a competitor as
15  a benchmark?
16      A.   Because this is a voluntary
17  transaction between a willing buyer and a
18  willing seller as to the appropriate wage
19  in the -- in the MMA industry.  And so I
20  think if we're looking for -- for
21  reasonable comparables that exist within
22  the same relevant market, this is the
23  logical place to start looking.
24      Q.   When you use the term
```

Page 192

```
1   appropriate wage.
2       A.   Yes.
3       Q.   Are the Bellator -- is
4   Bellator paying the fighters higher
5   average wages than the UFC?
6       A.   I'd say it depends on which
7   fighter you're talking about, but --
8       Q.   I said average.
9       A.   Yeah, the weight -- sorry.
10          MR. CRAMER:  I was going to
11      say you mean today, Bellator?
12          MR. ISAACSON:  At any time.
13          THE WITNESS:  The -- the
14      levels of a Bellator or a
15      Strikeforce fighter on average
16      would tend to be below the levels
17      of the UFC fighters.
18  BY MR. ISAACSON:
19      Q.   So why, in economic theory,
20  would you use the percentage of revenues
21  that a competitor allocates to the labor
22  as a benchmark as opposed to the -- the
23  actual appropriate wage that they decided
24  to pay?
```

Page 193

```
1       A.   Here's why:  The record
2   evidence tells us that Zuffa had its eye
3   on the wage share, not the absolute wage,
4   they had its eyes on the wage share.
5   They were committed to pushing the wage
6   share at or below 20 percent.  This is
7   how the industry works, this is how they
8   think.
9            Now, imagine a but-for world
10  in which you strip out the exclusionary
11  contracts and Strikeforce and Bellator
12  and others are able to evolve into
13  legitimate and viable contenders for this
14  market, what would likely happen is that
15  their output would expand, their revenues
16  would expand and now their 60 percent
17  offerings, or in the case of Bellator
18  their 48 percent offerings, would start
19  to draw fighters away from UFC and
20  towards those rivals.
21          And now the question is what
22  does Zuffa have to do in this -- in this
23  but-for world?  Is Zuffa able to stay on
24  its 18 percent share when were all of its
```

1      Q.   Right.  And I understand you
2  know what you're trying to do.
3      A.   Oh, but I --
4      Q.   I'm trying --
5      A.   I'm trying to do it pursuant
6  to the standard.  The standard says find
7  a competitive benchmark.
8      Q.   Right.  And what -- in
9  determining what is a competitive
10  benchmark, are there any standards that
11  you're able to tell us today for doing
12  that, again for determining
13  anticompetitive effect or damages in an
14  antitrust case?
15      A.   Yes, and the standard, I'm
16  going to say it again, is you're looking
17  for a similarly situated firm that is
18  operating free from the challenged
19  conduct.  That's what you're trying to do
20  and that's what I did.
21      Q.   Right.  And in determining
22  what a similarly situated, are there any
23  standards for that?
24      A.   I don't think that there are

1  a set of ironclad standards that -- that
2  are going to apply in every instance.  I
3  think that there are some broad standards
4  and I think that when you get to the
5  application, the economist has to use
6  some judgment in making a determination
7  as to what constitutes a good benchmark.
8      Q.   All right.  And when you say
9  you think -- I understand you're going to
10  use your judgment.  But when you say, I
11  think there's some broad standards,
12  right, is there a description of those
13  broad standards or a list of those broad
14  standards that you looked at before you
15  did your report?
16          MR. CRAMER:  Asked and
17      answered.
18          THE WITNESS:  I'm familiar
19      with the literature but I did not
20      go back and consult one person's
21      article in an ABA journal that
22      would tell me what he or she
23      thought would be the standards.
24  BY MR. ISAACSON:

1      Q.   And is there any description
2  of those broad standards in your field
3  that you would consider authoritative?
4          MR. CRAMER:  Asked and
5      answered.
6          THE WITNESS:  I'd want to
7      see the article.  I would want to
8      see the article before I
9      considered it authoritative.
10  BY MR. ISAACSON:
11      Q.   But -- meaning today you
12  can't point to anything authoritative in
13  your field that would establish the broad
14  standards for determining whether two
15  firms are similarly situated in doing the
16  benchmark analysis?
17          MR. CRAMER:  Asked and
18      answered.
19          THE WITNESS:  Can I hear it
20      again?  I'm sorry.
21  BY MR. ISAACSON:
22      Q.   Today you can't point to
23  anything authoritative in your field that
24  would establish the broad standards for

1  determining whether two firms are
2  similarly situated in doing the benchmark
3  analysis?
4          MR. CRAMER:  Asked and
5      answered.
6          THE WITNESS:  I can't think
7      of a particular article, no.
8          THE VIDEOGRAPHER:  Counsel,
9      we have nine minutes left to the
10      end of this disk.
11          MR. ISAACSON:  Let's see if
12      I can do something in five
13      minutes.
14  BY MR. ISAACSON:
15      Q.   Paragraph 253.  I think we
16  agree when we've been talking about your
17  damages estimates today, they've been
18  about the bout class.  So let's talk
19  about your damages to the identity class,
20  or at least get a start on that.
21          Did you do any common impact
22  analysis for the identity class?
23      A.   Sure, I have a section
24  titled Common Impact For the Identity



Page 218

1   Class where I demonstrate what I consider
2   to be a rigid pricing structure when it
3   comes to identity payments.
4        Q.   Okay.  And did you do any
5   separate economic modeling such as you
6   did for the bout class?
7        A.   No, I did not.
8        Q.   The -- and you have two
9   methods of estimating damages for the
10  identity class as I understand it.  One
11  is that you take the percentage increase
12  in revenue that would be paid as the
13  fighter share, the increased percentage.
14  So for example, if the fighter share went
15  from 50 to 75 percent, that would be a 25
16  increase in fighter share, and then you
17  apply that percentage increase to the
18  identity payments actually made to
19  fighters?
20       A.   Close.  As stated in
21  percentage terms, and I give the -- I
22  give the sample in paragraph 253 where I
23  put the but-for share --
24       Q.   Yes.

Page 219

1        A.   Over the -- right, over the
2   actual share, and then I multiply that by
3   the payments that were made, correct.  I
4   mean, so long as that's what you're
5   saying, we're on the same page.
6        Q.   I think we're saying the
7   same thing.
8        A.   Okay.
9        Q.   But you're applying the
10  percentage increase in the fighter share
11  to the absolute payments for the identity
12  payments?
13       A.   Yes.
14       Q.   All right.  The -- and other
15  method of damages is you take the -- a
16  minimum payment of $2,500 and multiply
17  that by the number of the ancillary right
18  contracts?
19       A.   The PARS, P-A-R-S, yes.
20       Q.   PARS is not always self-
21  explanatory.
22            And the $2,500 figure comes
23  from a document that recommended that as
24  a minimum payment?

Page 220

1        A.   Correct.
2        Q.   And that was a
3   recommendation that was not accepted?
4        A.   Oh, I'm not sure that's my
5   understanding.
6        Q.   Okay.  Do you know whether
7   or not the $2,500 that you used for
8   estimating damages was a proposal or
9   something that was actually implemented?
10       A.   My understanding was that it
11  was the lower bound of something that was
12  ultimately implemented.
13            MR. ISAACSON:  Okay.  All
14  right.  Why don't we take a break?
15            THE VIDEOGRAPHER:  The time
16  is 2:10 PM.  This is the end of
17  Disk 2.  We are off the record.
18            (Recess.)
19            THE VIDEOGRAPHER:  The time
20  is 4:26 PM (sic).  This is the
21  start of Disk No. 3 and we are now
22  on the record.
23  BY MR. ISAACSON:
24       Q.   You can look at --

Page 221

1            MR. CRAMER:  The time is
2   what?
3            THE VIDEOGRAPHER:  2:26 PM.
4   I'm sorry.
5            MR. CRAMER:  Okay.
6   BY MR. ISAACSON:
7        Q.   If you could look at page
8   154 of your report, Table 7, which
9   displays the results of your first
10  analysis of common -- econometric
11  analysis of common impact.  We've looked
12  at this before.
13       A.   Yes.
14       Q.   And it says bout class
15  compensation structure.  And in paragraph
16  228 when you're discussing this, in the
17  first sentence -- I've actually said this
18  sentence several times, I think:
19            "I performed regressions to
20  determine whether gains or losses in
21  compensation are broadly shared across
22  the bout class."
23       A.   Yes.
24       Q.   Was -- did you use for the

MAGNA
LEGAL SERVICES

Page 258

1    is part of your analysis of what makes a
2    contract 30 months or longer?
3        A.   No.  No, there are few --
4    the retirement clause and some other
5    tolling provisions were not counted in --
6    when I went to add up the durations.  In
7    that sense, my -- my method is
8    conservative.
9        Q.   All right.  The -- so the
10   retirement clause or another tolling
11   provisions of the contracts, in the
12   absence of contracts that were 30 months
13   or longer, you don't have an opinion
14   about whether they're anticompetitive,
15   correct?
16       A.   On a stand-alone basis, no.
17           And you keep -- you keep
18   saying, just so the record is clear, in
19   the absence of 30 months.  Remember it's
20   exclusive plus duration.
21       Q.   Right.  Understood.
22       A.   Okay.
23       Q.   The -- the exclusive
24   negotiation clause, is that a provision

Page 259

1    that you have taken into account in
2    calculating the 30 months or more?
3        A.   Yes.
4        Q.   Am I correct that -- if my
5    colleague will allow me a compound
6    question to save time -- that items that
7    you have discussed include preventing the
8    use of fighter clips when you move to a
9    new promotion, moving sponsors with you
10   when you move to a new promotion, and
11   warning fighters not to sign over their
12   likenesses to other promoters, those
13   would -- you would not have an opinion
14   about whether those actions were
15   anticompetitive in the absence of
16   exclusive contracts that were 30 or more
17   months?
18       A.   I think that's fair.
19       Q.   Okay.  And do you have an
20   opinion about whether exclusivity
21   provisions with venues, sponsors or
22   broadcasters are anticompetitive in the
23   absence of exclusive contracts of 30 or
24   more months?

Page 260

1        A.   I don't have an opinion.
2        Q.   Okay.  Do you, together with
3    contracts, inclusive contracts that are
4    30 or more months, do the -- is it your
5    opinion that the exclusivity provisions
6    with venues increase the foreclosure
7    share of Zuffa?
8            MR. CRAMER:  Objection to
9    form.
10           THE WITNESS:  I think that
11   in conjunction with the primary
12   restrictions on fighter mobility,
13   the exclusives on the venues can
14   be -- can be considered to be
15   anticompetitive.
16           Whether they contributed to
17   higher foreclosure shares, I'd --
18   I'd have think about it.  I
19   imagine one might construct a
20   story, but I'd have to -- I'd have
21   to think about it some more.
22   BY MR. ISAACSON:
23       Q.   Okay.  Today you don't have
24   an opinion about whether exclusivity

Page 261

1    provisions with venues, even taken
2    together with exclusivity agreements with
3    fighters of 30 or more months, would
4    increase the foreclosure share --
5    increase the foreclosure share?
6        A.   Like I said, I can imagine
7    how they could funnel more fighters into
8    this net and therefore trigger the
9    mechanism that's causing the rate
10   suppression in my -- in my models, but I
11   don't really have an opinion beyond that.
12       Q.   In general, we'll save time
13   if you tell me whether you have opinions
14   as opposed to what you imagine.
15       A.   Okay.
16       Q.   Or could imagine.  I don't
17   mean that as a criticism, I mean that as
18   constructive.
19           MR. CRAMER:  Constructive
20   criticism.
21           MR. ISAACSON:  No, not even
22   that.  A constructive way to get
23   through the day.
24           MR. CRAMER:  Advice.

MAGNA
LEGAL SERVICES

Page 266

1      Q.   So any conduct, such as
2  counter-programming that increases
3  Zuffa's market share would increase the
4  foreclosure share and increase damages?
5          MR. CRAMER:  Objection to
6  form.
7          THE WITNESS:  It's a little
8  more complicated than that because
9  again you have to -- you have to
10  assume that the -- the contracts
11  that they're coming into are
12  exclusionary.
13          But if you grant me that,
14  then increases in Zuffa's market
15  share by, say, making life so
16  miserable for a rival that they
17  end up folding and losing all
18  their fighters to Zuffa, yes, is
19  going to increase foreclosure
20  share.
21  BY MR. ISAACSON:
22      Q.   Looking at Figure 3, which
23  is page 115?
24      A.   115?

Page 267

1      Q.   Yes.
2      A.   Okay.
3      Q.   You would not be able to
4  tell me how much of the foreclosure
5  shares here are attributable to conduct
6  such as counter-programming or exclusive
7  contracts with sponsors, and segregate
8  that out from the 30-year (sic) contracts
9  that are exclusive?
10          MR. CRAMER:  Objection to
11  form.
12          THE WITNESS:  You have to
13  tell me whether or not we have
14  exclusive long-term contracts
15  lurking in the background.  That
16  is the only necessary condition.
17          So if you take those away
18  and all you give me is counter-
19  programing, we don't get -- we
20  don't engender foreclosure.
21  BY MR. ISAACSON:
22      Q.   But if you --
23      A.   Let me just finish.
24          If you take those away and

Page 268

1  give me the threats or take those away
2  and give me the horizontal, we don't get
3  the -- we don't get the foreclosure.
4          So there's -- there's only
5  one necessary element according to this
6  model --
7      Q.   All right.
8      A.   -- and that element are the
9  restrictions of the exclusive --
10  exclusivity plus duration.
11      Q.   So there's one necessary
12  element for a foreclosure effect, and
13  that's the 30-month or more exclusive
14  contracts, correct?
15      A.   Yes.
16      Q.   Okay.  And in terms of the
17  magnitude of the foreclosure effect,
18  which is charted on Figure 3, are you
19  able to segregate out the effect of
20  30-year (sic) exclusive contracts from
21  the other conduct that's been alleged
22  such as counter-programming?
23          MR. CRAMER:  Form,
24  incomprehensible.

Page 269

1          THE WITNESS:  And I don't
2  understand -- let me try it this
3  way, that -- because there's only
4  one necessary condition, which are
5  these -- this 30-month exclusive
6  provision, if you take them out,
7  the foreclosure goes away.  So --
8  so I would, in a sense, think that
9  that -- that is -- that is what
10  matters and everything else is --
11  is just -- in its presence is
12  contributing -- to the extent it's
13  doing anything, it's contributing
14  through that mechanism.
15  BY MR. ISAACSON:
16      Q.   I understand what matters to
17  you, and you've been very clear about
18  that.  But for example, the foreclosure
19  percentage for the blue and purple lines
20  in 2007 are 30 to 40 percent.
21          Do you see that?
22      A.   Yeah.
23      Q.   All right.  And without the
24  necessary predicate of the 30-year (sic)

Page 270

1   contract -- 30-month exclusive contracts,
2   that would drop to near zero?
3        A.   Correct.
4        Q.   And --
5        A.   And so now if you asked me
6   that at point how to do an allocation
7   among --
8        Q.   No, I'm not --
9        A.   -- counter-programming, da,
10  da, da, we'd be allocating a pot of zero.
11       Q.   Let me ask -- let me ask
12  questions here.  Okay?
13           The -- in 2011, both those
14  numbers rise to about 90 percent.  Do you
15  see that?  The blue and purple lines?
16       A.   Yes.
17       Q.   Okay.  And without the
18  exclusive 30-year contracts, the
19  90 percent would drop to almost zero
20  percent?
21       A.   Correct.
22       Q.   Okay.  The rise from 2007 to
23  2011 from 40 -- 30 to 40 percent to
24  90 percent?

Page 271

1        A.   Uh-huh, yes.
2        Q.   Right?  Are you able to tell
3   me how much of that was due to exclusive
4   contracts of 30 or more months as opposed
5   to those contracts in combination with
6   other things such as counter-programming?
7           MR. CRAMER:
8           Incomprehensible, form.
9           THE WITNESS:  I just don't
10          understand how you do a
11          decomposition like that when
12          there's only one necessary
13          element.  If the necessary element
14          goes, the foreclosure drops to
15          zero, and the notion of allocating
16          zero across the other elements is
17          a fool's errand.
18  BY MR. ISAACSON:
19       Q.   Right.  So if it's a
20  necessary element to 40 percent or
21  90 percent, does that tell you why it
22  rose from 40 to 90 percent?
23       A.   No.
24          MR. CRAMER:  When it's a

Page 272

1   good time to break, we've been
2   going for about an hour.
3           MR. ISAACSON:  Sure.  Well,
4   actually, let me -- unless you're
5   dying.
6           MR. CRAMER:  No, no, go
7   ahead.
8   BY MR. ISAACSON:
9        Q.   There are allegations in
10  this case of the use of identity rights
11  of the plaintiffs such as things on Fight
12  Pass or on posters or on television
13  episodes.  You're aware of those?
14       A.   Yes.
15       Q.   Okay.  Are those
16  anticompetitive acts, in your opinion,
17  that contribute to the foreclosure
18  effect?
19       A.   The way that I'd prefer to
20  put it is that when -- when done in
21  conjunction with what I consider to be
22  the one necessary element, they're
23  anticompetitive, they're exacerbating
24  things, and I don't have an opinion on

Page 273

1   whether or not they would be
2   anticompetitive on a stand-alone basis.
3        Q.   Okay.  And would the use of
4   those identity rights in clips, poster,
5   television series, are those more the
6   result of the alleged anticompetitive
7   acts in this case, or are they actually
8   something that would tend to foreclose
9   competition?
10          MR. CRAMER:  Objection,
11          vague.
12          THE WITNESS:  I think that
13          telling a fighter that he or she
14          can't take her identity rights
15          with her to -- her clips, for
16          example, to the --
17  BY MR. ISAACSON:
18       Q.   Talking about something
19  different here.  I'm not talking about
20  taking clips with you.  I apologize for
21  interrupting.
22          I'm talking about just using
23  clips on Fight Pass, using an image in a
24  poster.  I'm not talking about

Page 286

1   with respect to, say, a finding of
2   monopsony power in the input
3   market.
4   BY MR. ISAACSON:
5       Q.   Well, you do have findings
6   of monopsony power that do rely on
7   revenue weighting, right?
8       A.   I think that under the --
9   under the indirect approach and under
10  only one pass through the indirect
11  approach, I weight fighters by -- by
12  revenues to make an inference about
13  Zuffa's high shares in that relevant
14  input market.
15      Q.   Right.
16      A.   But as you know, that's only
17  one of many, many approaches that allow
18  me to get to the conclusion of monopsony
19  power.
20      Q.   Okay.
21      A.   I actually prefer --
22      Q.   So let's return --
23      A.   Can I finish?
24      Q.   I thought you were.

Page 287

1       A.   I prefer direct evidence
2   generally, and I think that I've -- I
3   offer a slew of evidence that speaks to
4   how you can prove directly that Zuffa
5   exercises monopsony power.
6       Q.   I understand that you
7   offered direct and indirect evidence, but
8   I need to ask about them one at a time
9   and we can cover both.
10      A.   Okay.
11      Q.   So in terms of when you
12  define a market, can you describe to me a
13  situation where if you use revenue
14  weighting in the input market, where
15  the -- a monopoly firm would not
16  necessarily have a monopoly in the input
17  market?
18      MR. CRAMER:  Incomplete
19      hypothetical, form.
20      THE WITNESS:  I've never
21      given thought to that, and I'd
22      like to think about it and maybe
23      we'll come back.  But I don't
24      think I'm prepared to -- to

Page 288

1   construct a scenario about how
2   that could occur.
3   BY MR. ISAACSON:
4       Q.   All right.  The -- and then
5   you've described geographic market for
6   the output market also.  And is that also
7   North America?
8       A.   Yes.
9       Q.   All right.  The -- and in
10  terms of your SSNIP analysis -- all
11  right.  So did you do -- well, my
12  colleague wants to know so it seems like
13  a good question.
14      A.   I'm sure it is.
15      Q.   In the out -- in the output
16  market, what is being sold?  In the
17  output markets that you have defined.
18      A.   Sure.  I think that you
19  are -- the production or the product that
20  is being produced are -- is live MMA
21  events and the revenue associated with
22  those events can take the form of gate
23  revenue or pay-per-view.  That's from --
24  from the consumer side.  Of course,

Page 289

1   there's -- there's revenues from the
2   advertiser's side as well.
3       But I hope that answers your
4   question.
5       Q.   All right.  And does
6   pay-per-view compete with broadcast?
7       MR. CRAMER:  Objection to
8       form.
9       THE WITNESS:  I did not
10      conduct that inquiry.
11  BY MR. ISAACSON:
12      Q.   Do you have an opinion one
13  way or another about that?
14      A.   No.
15      Q.   All right.  With respect to
16  the -- does -- do the live venue events
17  compete with pay-per-view events?
18      A.   I don't even understand the
19  question.  Many of the pay-per-view
20  events are live.
21      Q.   Meaning I watch it on
22  pay-per-view as opposed to go see it
23  live.
24      A.   I haven't -- I haven't

MAGNA
LEGAL SERVICES

Page 290

1  studied that and I imagine for someone
2  who lives very far from the venue where
3  the live event is staged, they would not
4  be considered reasonably close
5  substitutes.
6     Q.   So for your input markets,
7  what evidence did you take into account
8  to assess customer's likely response to
9  price increase in the SSNIP analysis?
10  And feel free to point me to the sections
11  of your report that --
12     A.   Did you mean to say -- I
13  think you just conflated the input
14  markets and customers.  Maybe we should
15  start over.
16     Q.   Yes, I said price increase
17  rather than wage decrease, but let me
18  just put it this way:  What evidence in
19  your report did you take into account to
20  assess the likely response to a SSNIP in
21  the input markets?
22     A.   Sure.  So there it's the
23  perspective of the fighters not the
24  customers.  So I was tripping up over

Page 291

1  your --
2     Q.   Yes.
3     A.   -- injecting customers when
4  we're talking about input markets.
5        So I can take you to the
6  relevant sections, and I will, but of
7  course at high levels, I'm looking at
8  record evidence of -- of what fighters
9  and promoters thought about substitution
10  possibilities as you -- if you were to
11  move away from Zuffa to counteract a
12  hypothetical wage cut.
13     Q.   Okay.  So the first thing
14  you looked at was record evidence of
15  substitution.
16     A.   Or the perception of
17  substitution from the stakeholders, the
18  fighters, the promoters, and I'll just
19  point you, if you --
20     Q.   That's -- that's sufficient
21  for -- for item 1.
22        MR. CRAMER:  You asked him
23     to look at his report.
24        MR. ISAACSON:  I'm going

Page 292

1     to --
2        MR. CRAMER:  Okay.
3        MR. ISAACSON:  I'm not going
4     to ask him to recite all the
5     documentary evidence.
6  BY MR. ISAACSON:
7     Q.   And I understand that
8  there's documentary evidence that you're
9  not reciting today.
10        Okay.  Other than the record
11  evidence of the -- about sub- --
12  perceptions of substitutability from the
13  stakeholders, what would be other parts
14  of your SSNIP analysis for the input
15  market?
16     A.   I would direct you to
17  Section 3A 1 for all of the evidence that
18  I used to inform the construction of the
19  relevant input market.
20     Q.   That would be the record
21  evidence that you were referring to?
22     A.   Well, record evidence is
23  fairly broad, right, because it
24  encompasses almost everything.  But I

Page 293

1  will point -- to me the -- what helps to
2  guide me to the findings that I made with
3  respect to the input market was the fact
4  that Zuffa was able to successfully
5  suppress fighter wages, wages either
6  measured by -- by wage share, regression
7  or by knowledge of the fact that wage
8  shares were falling over time from
9  26 percent to 18 percent, yet Zuffa did
10  not suffer sufficient defection so as to
11  render that wage decrease unprofitable.
12        Now, that -- that tells you,
13  as a matter of economics, that a -- that
14  a reasonable starting place for defining
15  the contours of the relevant input market
16  is just the fighters under Zuffa's
17  control.  That was the -- the first thing
18  that occurred to me.
19        And once you -- once you
20  start there, you can start looking at
21  record evidence to determine whether
22  additional fighters from -- from rival
23  promotions ought to be included so that
24  you eventually get to the smallest set of

MAGNA
LEGAL SERVICES

Page 294

1  fighters such that a hypothetical
2  monopsonist could profitably exercise
3  monopsony power.
4        Q.   All right.  And you said
5  that Zuffa was able to successfully
6  suppress fighter wages -- wage share.
7  You were talking only about the share of
8  revenues there, correct?
9        A.   Correct.
10       Q.   Okay.  You didn't look at
11  whether Zuffa actually suppressed wages
12  and whether fighters moved to -- did not
13  move to other promoters after reduced
14  wages?
15          MR. CRAMER:  Compound,
16  objection to form.
17          THE WITNESS:  Actually, if
18  you take wage shares down from
19  26 percent to 18 percent and you
20  hold an event revenues constant,
21  that's a decrease in the absolute
22  wage for the fighter.
23          So I don't -- I don't
24  automatically except that every

Page 295

1      fighter was improved as they
2      marched from a 26 percent wage
3      share at Zuffa to an 18 percent
4      wage share.
5  BY MR. ISAACSON:
6        Q.   All right.  But in your --
7  in your hypothetical there you held
8  revenues constant.  Did you look at, as
9  part of your analysis of the input market
10  and defining that market, as to whether
11  Zuffa actually suppressed actual wages?
12          MR. CRAMER:  Objection to
13  form.
14  BY MR. ISAACSON:
15       Q.   As opposed to wage share?
16          MR. CRAMER:  Same objection.
17          THE WITNESS:  I'm focused on
18  wage share, of course, because
19  it's the right thing to look at
20  from an economic perspective.
21  We're trying to measure
22  exploitation, and the textbooks
23  tell you to do it as a share of
24  marginal revenue product.

Page 296

1  BY MR. ISAACSON:
2        Q.   So my actual question was --
3  I understand you're focused on that, but
4  my question is, did you look at whether
5  Zuffa actually suppressed actual wages?
6        A.   Without controlling for
7  revenues, no.  Because it's incorrect to
8  do so.
9        Q.   So in performing your SSNIP
10  analysis for the input markets, is it
11  fair to say that you relied on the record
12  evidence about the issue of perceived
13  substitution from the stakeholders along
14  with your observations that when Zuffa
15  suppressed fighter wage shares, there
16  weren't significant defections?
17       A.   I think -- I think that
18  encompasses a lot.  I also think that
19  Zuffa in its ordinary course of business
20  made use of a FightMetrics (sic)
21  database.  I had -- the very first thing
22  I did when I -- when I got this case was
23  I started reading the economic literature
24  on the MMA industry, and almost every

Page 297

1      article I read, the FightMetrics (sic)
2      database formed the foundation of their
3      empirical analysis.
4          So I thought that that was a
5      reasonable place to begin to posit what
6      the smallest set of fighters that could
7      be under the control of a hypothetical
8      monopsony would be in order for it to
9      exercise market power.
10       Q.   All right.  Why did you use
11  the smallest set of fighters not the
12  smallest amount of promoters?
13       A.   Well, because we're looking
14  at the input market.  The fighters form
15  the elements of the input market.  They
16  happen to belong to promoters, but
17  fighters are the elements or the
18  ingredients.
19          But I'm -- if I'm a
20  fighter -- just to make it clear, if I'm
21  a fighter and I'm thinking about
22  substituting, defecting from UFC and
23  going to a rival promotion, I don't care
24  what the name of the promotion is or

MAGNA
LEGAL SERVICES

Page 310

1    321, that we came to outside of
2    the record evidence --
3    BY MR. ISAACSON:
4        Q.   Okay.
5        A.   -- that speak to, for
6    example, whether wrestling would be
7    perceived as a -- as a reasonable
8    substitute from the perceptive of
9    consumers to a live MMA event.  I think
10   that those Forbes articles and the record
11   evidence and knowledge that Zuffa was
12   able to profitably impose a price
13   increase on pay-per-view, all guided me
14   in reaching the final conclusion as to
15   the relevant output market.
16       Q.   I'm going to have you repeat
17   that because that was at the end of a
18   very long answer about what you were
19   going to look at.  Or I'll repeat it to
20   you.
21           In doing your SSNIP analysis
22   for the output markets, you relied on
23   Forbes articles and record evidence that
24   caused you to conclude that Zuffa would

Page 311

1    be able to profitably impose -- along
2    with knowledge that Zuffa was profitably
3    impose a price increase on pay-per-view
4    to reach your conclusions as to the
5    relevant output market?
6        A.   That's fair.
7        Q.   And your direct evidence is
8    discussed on page 98 -- beginning on page
9    98.
10       A.   Uh-huh.
11       Q.   All right.  The first item
12   of direct evidence is the power to
13   suppress fighter competition below
14   competitive levels.
15           And you list several items.
16   Each of those relate to reduced fighter
17   share; that is, the share of revenues
18   other than your reference to its
19   sponsorship tax.
20           Do I understand that right?
21       A.   Yes.
22       Q.   Okay.  The -- and how
23   significant was the sponsorship tax?
24           MR. CRAMER:  Objection to

Page 312

1    form.
2    BY MR. ISAACSON:
3        Q.   Can you quantify that tax
4    for me?
5        A.   I'm not sure I'm able to
6    that quantify the sponsorship tax.
7        Q.   Okay.  The second type of
8    direct evidence you talk about is the
9    direct -- is the evidence to restrict the
10   supply of fighter services, and you talk
11   about Zuffa consistently maintains
12   significantly more fighters under
13   contract than it could use.
14           Now, when you say
15   consistently, what years are you
16   referring to?
17       A.   The class period.
18       Q.   And so it's your opinion
19   that consistently throughout the class
20   period, that Zuffa maintained
21   significantly more fighters under
22   contract than it could use?
23       A.   Yes.
24       Q.   And when you say "than it

Page 313

1    could use," do you mean that it was
2    unable to give those fighters -- give
3    fights to those fighters?
4            MR. CRAMER:  Objection to
5    form.
6            THE WITNESS:  It was unable
7    to give fights to fighters in a
8    timely fashion.
9    BY MR. ISAACSON:
10       Q.   All right.  And when you say
11   a timely fashion, do -- were they able to
12   give the fights to the fighters within
13   the time period of the contract?
14           MR. CRAMER:  Objection to
15   form.
16           THE WITNESS:  I'm -- I'm
17   hesitating because I'm aware of
18   record evidence suggesting that
19   Zuffa on occasion would toll the
20   clock either for real or imagined
21   injury or --
22   BY MR. ISAACSON:
23       Q.   All right.  But I'm -- I'm
24   talking about a fighter who is ready,

Page 314

```
1    willing and able to fight.
2         A.   Yes.  I've got record
3    evidence of Zuffa denying that fighter a
4    fight.  Yes, I do.
5         Q.   Within the time period of
6    the contract?
7              MR. CRAMER:  Objection to
8         the form.
9              THE WITNESS:  Yes, within
10        the time period of the contract.
11   BY MR. ISAACSON:
12        Q.   So that --
13        A.   The fighters were
14   complaining that they were having to wait
15   very long times in between fights and
16   they were worried about what that was
17   doing to their careers, and you had --
18   you had Silva complaining that -- that he
19   didn't have enough opportunities to place
20   fighters into fights.
21             So there was a -- there was
22   a problem, and it's a -- it's a
23   convenient problem for a monopsonist, and
24   it's -- it generates anticompetitive
```

Page 315

```
1    effects.
2         Q.   So -- and you understand
3    that these were -- these 30-months plus
4    contracts also would each provide for a
5    certain number of bouts within the time
6    period of the contract?
7         A.   Yes.
8         Q.   Okay.  Give me an example.
9         A.   Oh, a term -- the term of
10   the contract would specify a combination
11   of bouts and time and say whichever one
12   came first, would -- would trigger the
13   term.
14             So I guess, and in thinking
15   about it, it's conceivable that -- that
16   some terms could have been triggered by
17   virtue of the time element as opposed to
18   the bouts.
19        Q.   So -- and I'm -- setting
20   aside any contracts that were tolled.
21        A.   Sure.
22        Q.   Just talking about the
23   situation of a ready, willing and able
24   fighter, can you tell me of any record
```

Page 316

```
1    evidence where the fighter was not
2    offered the contracted for number of
3    bouts within the term of the contract?
4              MR. CRAMER:  Object to the
5         extent that calls for a legal
6         conclusion.  Form.
7              THE WITNESS:  I -- I'm
8         recalling episodes where fighters
9         were complaining about not getting
10        fights, but I -- and I cite those,
11        I'm sure you're aware of that.
12             But sitting here, I can't
13        tell you whether the term expired
14        on -- by virtue of the time
15        running out or by virtue of the
16        bouts being fought for those
17        particular complaining fighters.
18   BY MR. ISAACSON:
19        Q.   And you have the
20   understanding that if Zuffa failed to
21   meet the bout commitment within the term
22   of the contract, it would be in breach of
23   the contract?
24             MR. CRAMER:  Objection to
```

Page 317

```
1         the term "bout commitment."
2         Objection to the extent it calls
3         for a legal conclusion.
4    BY MR. ISAACSON:
5         Q.   By the bout commitment, I
6    mean the number of bouts that were called
7    for under the contract?
8              MR. CRAMER:  Same objection.
9              THE WITNESS:  Am I aware of
10        such a provision?
11   BY MR. ISAACSON:
12        Q.   Yes.
13        A.   Yes.
14        Q.   Okay.  Are you -- can you
15   identify any record evidence of Zuffa
16   breaching any of the agreements with
17   fighters by failing to offer the required
18   number of bouts?
19             MR. CRAMER:  Objection, to
20        the extent it calls for a legal
21        conclusion, form.
22             THE WITNESS:  Yeah, I wasn't
23        citing episodes of breaches of
24        contracts.  I think that what
```

1          Zuffa was doing was -- was likely
2      inside of the letter of the law of
3      the contract, but nevertheless,
4      they were strategically delaying
5      fighters for many reasons,
6      including trying to lock a fighter
7      into the next contract.
8  BY MR. ISAACSON:
9      Q.   All right.  The -- are you
10 aware of an -- any plaintiff or proposed
11 class member who has alleged that Zuffa
12 failed to -- failed to offer them the
13 number of bouts that were required under
14 a contract within the term of that
15 agreement?
16          MR. CRAMER:  Same objection.
17      Objection to form.  Objection to
18      the extent it calls for a legal
19      conclusion.
20          THE WITNESS:  That's -- by
21      memory, that's not -- that's not
22      how I recall the evidence shaking
23      out.  The evidence shakes out in
24      a -- in a different way.

1  BY MR. ISAACSON:
2      Q.   All right.  When you say
3  significantly more fighters than it could
4  use, what's the magnitude of fighters
5  that you're talking about?
6      A.   Well, there's been a study
7  by -- by some economists looking at -- I
8  think trying to measure just by how much
9  the capacity problem was, but sitting
10 here, I -- I can't tell you how big it
11 was.  I can only describe it in
12 qualitative terms.
13     Q.   All right.  The study -- did
14 you do any -- the study that you're
15 referring to is quoted in your report?
16     A.   Yes.
17     Q.   Did you do anything to
18 validate or assess the data in that
19 study?
20     A.   Well, sure, I looked at
21 record evidence.  I saw Silva saying as
22 much.  I saw fighters in the record
23 saying as much.  I mean, everything was
24 pointing to the notion that -- that Zuffa

1  was -- was keeping fighters out, in part
2  to restrict the ability of rivals to
3  compete effectively.
4      Q.   Did you do anything to
5  replicate the work of that study?
6      A.   I did not.  I did not
7  replicate the work of that study.
8      Q.   Okay.  And can you give me
9  any magnitude of fighters that -- that we
10 are talking about.  50 fighters, 100
11 fighters in a year?
12         MR. CRAMER:  Objection to
13     form.
14         THE WITNESS:  I don't have
15     a -- I don't have a precise number
16     for you.
17 BY MR. ISAACSON:
18     Q.   When you say significantly
19 more fighters, can you give me a range?
20     A.   I don't know if I can
21 denominate it in terms of a range.  The
22 mechanism here is denying rivals access
23 to fighters and not being able to deploy
24 those assets in a timely fashion.  That's

1  the -- that's the mechanism.
2      Q.   Right.  But when you say in
3  your report that they consistently
4  maintain significantly more fighters
5  under contract than they could use, was
6  that more than ten fighters?
7      A.   I believe so, but sitting
8  here, I'm not in a position to give you a
9  quantitative estimate.
10     Q.   All right.  Would you be
11 able to say whether it was more than 50?
12     A.   Sitting here, I don't think
13 I can, but it's conceivable I can do
14 that.  If that were an assignment, I
15 could go try to estimate that.
16     Q.   Well, I'm not asking to give
17 you -- I'm not trying to give you new
18 assignments, I'm trying to understand
19 what you mean by -- what you meant --
20 what you mean when you wrote
21 significantly?
22     A.   Oh, I wrote significantly
23 because there were third parties, I'm
24 thinking of folks like Deutsche Bank, who

MAGNA

LEGAL SERVICES

Page 330

1    restriction in the pay-per-view output of
2    marquee events between 2010 and 2015?
3         A.   Yes.  That's what a
4    pay-per-view event is.  I mean, you're
5    not going to sell a pay-per-view event
6    unless you have headliner fighters in it.
7         Q.   So you're characterizing all
8    of the pay-per-view events as marquee
9    events when you say marquee events?
10        A.   I think that you might be
11   able to find counterexamples, a handful
12   of counterexamples of a pay-per-view that
13   doesn't feature a headliner, but in
14   general it would be really hard to sell
15   it unless it featured a headliner.
16        Q.   Right.  And did the -- and
17   if Zuffa -- if a firm decided that it
18   wanted to move marquee events from
19   pay-per-view to broadcast, would you
20   consider that direct evidence of power to
21   restrict supply?
22        MR. CRAMER:  Incomplete
23   hypothetical, form.
24        THE WITNESS:  Well, you're

Page 331

1    asking me to assume something that
2    I understand to be an unprofitable
3    move.
4         But if -- if your experts
5    can show evidence that these
6    marquee events moved one-for-one
7    from pay-per-view to -- to
8    television, I'd be happy to
9    consider such evidence.  But I
10   don't have an opinion on it right
11   now.
12   Q.   Okay.
13        THE VIDEOGRAPHER:  Excuse
14   me, Counsel.  We're approaching
15   ten minutes left on the disk.
16        MR. ISAACSON:  I think I'm
17   done.
18        Give me one minute, but I
19   think I'm about done for the day.
20        Give us a minute.
21        MR. CRAMER:  Let's go off
22   the record.
23        THE VIDEOGRAPHER:  The time
24   is 4:28 PM.  We are going off the

Page 332

1    record.
2         (Recess.)
3         THE VIDEOGRAPHER:  The time
4    is 4:31 PM.  We have been on the
5    record for five hours and
6    36 minutes.
7         MR. CRAMER:  All right.  We
8    have no questions.
9         MR. ISAACSON:  Thanks.
10        MR. CRAMER:  Let's go off
11   the record.
12        THE VIDEOGRAPHER:  All
13   right.  The time is 4:31 PM.
14        This concludes the
15   deposition and this is the end of
16   Disk 3.
17        (Witness excused.)
18        (Deposition concluded at
19   approximately 4:31 PM.)
20
21
22
23
24

Page 333

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6  deposition is a true record of the
testimony given by the witness.
7
      It was requested before
8  completion of the deposition that the
witness, HAL J. SINGER, Ph.D., have the
9  opportunity to read and sign the
deposition transcript.
10
11
12   _Constance Kent_____
     Constance S. Kent, CCR, RPR
13   Certified Court Reporter
     Registered Professional Reporter
14   Certified LiveNote Reporter
     and Notary Public in and for the
15   Commonwealth of Pennsylvania
     Dated:  October 1, 2017
16
17
18
19
20        (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Page 334

1           INSTRUCTIONS TO WITNESS
2
3           Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8           After doing so, please sign
9 the errata sheet and date it.
10           You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14           It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 335

1         - - - - -
       E R R A T A
2         - - - - -
3 PAGE  LINE  CHANGE
4 _____ _____ _____
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 336

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I,_____, do
5 hereby certify that I have read the
6 foregoing pages,  1 - 337, and that the
7 same is a correct transcription of the
8 answers given by me to the questions
9 therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 HAL J. SINGER, Ph.D.          DATE
17
18
19
20 Subscribed and sworn
    to before me this
21 _____ day of _____, 20____.
22 My commission expires:_____
23
    _____
24 Notary Public

Page 337

1         LAWYER'S NOTES
2 PAGE  LINE
3 _____ _____ _____
4 _____ _____ _____
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

