# EXHIBIT 18

# Excerpts of Deposition of Cung Le

Confidential - Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

```
Cung Le, Nathan Quarry, Jon      )
Fitch, Brandon Vera, Luis Javier )
Vazquez, and Kyle Kingsbury on   )
behalf of themselves and all     )
others similarly situated,       )
                                 )
       Plaintiffs,               )
                                 )
  vs.                            ) Case No. 2:15-cv-
                                 ) 01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate       )
Fighting Championship and UFC,   )
                                 )
       Defendants.               )
                                 )
```

VIDEO DEPOSITION OF CUNG LE

Taken at the Offices of Boies, Schiller & Flexner
300 South 4th Street, Suite 800
Las Vegas, Nevada

On Tuesday, April 11, 2017
At 8:39 a.m.

Reported by: Jane V. Efaw, CCR #601, RPR



Page 14

```
 1   merged together to do a co-promotion, and I was the
 2   co-main event, and Frank Shamrock and Phil Baroni was
 3   the main event.  And I knocked out Tony Frykland in
 4   the third round.  And my fourth fight -- well, all my
 5   Strikeforce fights were in San Jose, but I can't
 6   remember the fighters.  Sam Morgan, another UFC
 7   Ultimate Fighter event.  And then I knocked him out
 8   in the third round.  And then I got a shot at the
 9   title against Frank Shamrock.  Do you need the dates
10   for the other two fighters?
11       Q.  No, I do not.
12       A.  Frank Shamrock was in 2008, match of 2008.
13   And that was still, I guess, a co-promotion between
14   the two fight leagues.  And I knocked him out in the
15   third round with a kick, broke his arm, and won the
16   world Strikeforce middleweight title.
17           Then from there I took some time off to go
18   do three movies back to back.  First movie was called
19   True Legends, which was a big Chinese director.  They
20   call him Yuen Woo-ping.
21           And then from -- after that I went to
22   Germany, did a movie with Ben Foster and Dennis Quaid
23   called Pandorum.  And it was released worldwide.  The
24   third movie I did was called Fighting.  It was with
25   Universal Pictures with Channing Tatum.  I don't
```

Page 15

```
 1   remember the actor's name.  The guy from Empire.
 2           And then I came back when Scott asked me --
 3   he needed a main event for -- in December, which gave
 4   me eight weeks.  And I wasn't doing anything, so I --
 5       Q.  December of what year?
 6       A.  December of 2 -- I don't remember.  I'm sure
 7   it's on the record somewhere, but I can't find it.  I
 8   don't know where it is.
 9       Q.  I'm sure it is.  So after three movies, you
10   come back and do a fight for Strikeforce?
11       A.  Yeah.  After the third movie, because I
12   really wanted to work with, you know, the big
13   studios, I couldn't hang onto the belt.  So I decided
14   to vacate my title so I can do the movies.  It was
15   actually on the fourth movie when I decided that I
16   was going to vacate the title because I got a chance
17   to work with a very famous director called -- his
18   name was Wong Kar-wai, and he's really famous in
19   China.  So I did that one.
20           And then another movie followed, which was
21   called Bodyguards and Assassins.  That's with Donnie
22   Yen, which is probably the biggest Chinese action
23   star right now.
24           And then when I did come back to fight, I
25   was dominating the fight, and I lost.  I suffered my
```

Page 16

```
 1   first loss in Strikeforce.
 2       Q.  So when you say -- when you came back to
 3   fight, are you referring to when you came back in
 4   December before --
 5       A.  In December or whatever.
 6       Q.  Whenever that was?
 7       A.  Yeah.  I can't remember.
 8       Q.  So you did three movies, you did a fight in
 9   December, and then you did some more movies?
10       A.  I did -- no, I can't remember if it was
11   three or four.  I was doing them
12   back-to-back-to-back-to-back.  So I couldn't remember
13   exactly how many movies.  Then I did a fight.  And I
14   lost.  And I believe they gave me a rematch within
15   six months, and I continued to train.  And then I
16   ended up winning that fight in the second round.
17           And then I ended up doing two movies back to
18   back.  Dragon Eyes and The Man with the Iron Fists,
19   which was with -- Dragon Eyes, I got a chance to star
20   in my first movie with Jean-Claude Van Damme and
21   Peter Weller, which is Robocop.  And then The Man
22   with the Iron Fists was with Russell Crowe, Lucy Liu,
23   Dave Bautista, Daniel Wu, and Jamie Chung.  And I
24   think that's all I can remember.
25           Then I came back to the states and was at
```

Page 17

```
 1   Comic-Con promoting movies.  Comic-Con is the biggest
 2   comic book show in, I guess, the U.S. or the world.
 3           And then I mentioned that by that time,
 4   Strikeforce was already bought by UFC.  And I ended
 5   up saying that I wanted to fight for the UFC.  And
 6   then Dana and Lorenzo brought me in and gave me a
 7   contract, and I think that was the end of my
 8   Strikeforce, I guess, deal because they tore my
 9   existing contract up.
10       Q.  All right.  Now, you say -- you mentioned a
11   number of movies.  You said, specifically I thought
12   that you starred in a movie called Dragon Eyes; is
13   that correct?
14       A.  That was my first starring role, which was
15   called Dragon Eyes, yes.
16       Q.  What other movies have you had starring
17   roles in?
18       A.  A movie by Lionsgate or Lighthouse called
19   Puncture Wounds with Dolph Lundgren, Vinnie Jones,
20   and Briana Evigan.  Those are my two starring roles.
21   And all the other ones were supporting leads, either
22   the main villain or a supporting lead to the lead
23   actor.
24       Q.  And when you say "the other ones," you had
25   supporting leads that would have been all the other
```



Confidential - Attorneys' Eyes Only

Page 18

```
 1  movies?
 2      A.  Yeah.  Like the Man with the Iron Fists.
 3  Fighting with Channing Tatum.  Pandorum I was, I
 4  guess, either fourth or fifth on the -- they call it
 5  the credits.  And then Puncture Wounds, I was a lead.
 6  And True Legends, I was one of the main villains.
 7  Bodyguards and Assassins, I was the main villain with
 8  the main fight scene.  The Grandmaster was nominated
 9  for two Oscars in film choreograph or cinematography
10  or whatever it's called.  And then best wardrobe.
11          I was shooting two movies at the same time
12  there.  I was shooting that movie, and I was doing
13  the Man with the Iron Fists, going back and forth.  I
14  guess I wasn't like a villain or a good guy.  I was
15  just one of the grandmasters who fought another
16  grandmaster.  And then for the Man with the Iron
17  Fists, I was one of the main guys in the Lion clan.
18      Q.  Have you ever been deposed before?
19      A.  I have never been deposed before.
20      Q.  Have you ever testified as a witness in any
21  trial or any type of proceeding?
22      A.  I have not been a witness.
23      Q.  Other than this lawsuit, have you ever been
24  a party to a lawsuit, either as a plaintiff or a
25  defendant?
```

Page 19

```
 1      A.  No, I have not.
 2      Q.  And how did you first decide to -- well, let
 3  me put it this way:  Before you agreed to be a
 4  plaintiff in this case, who did you talk to?
 5          MR. DELL'ANGELO:  Let me just instruct the
 6  witness that you can answer the question provided you
 7  don't reveal the substance of your communications
 8  with any attorneys.
 9          THE WITNESS:  I talked to Quinton "Rampage"
10  Jackson.  He made a call to me.  First he was talking
11  about a movie that he wanted me to star with him in.
12  And he changed the subject and talked about how the
13  UFC has messed him up and asked me to join the
14  lawsuit to help all the fighters not be taken
15  advantage of.  And I had to think about it.
16          And then he called me back.  And then I
17  didn't answer.  And then he texted me.  And he said
18  that he'd like to have me talk to someone about the
19  case.  And he was going to put us on a three-way
20  call.
21  BY MS. ISAACSON:
22      Q.  Conference call?
23      A.  Yeah.
24      Q.  And your first two conversations with
25  Mr. Jackson, what did he tell you about the possible
```

Page 20

```
 1  lawsuit?
 2      A.  He didn't explain it too well.  He just says
 3  it could help all the fighters.  I'm not sure I ever
 4  talked to him ever before.  But he jumps around a
 5  lot.  So I was a little bit confused.  So I just sat
 6  there and listened most of the time.
 7      Q.  What was your -- how would you describe your
 8  relationship with Mr. Jackson before the first phone
 9  call?
10      A.  We are very cordial.  We hung out a few
11  times.  I would call him a friend, but not a friend
12  that you hang out all the time, but like when you
13  meet up, you end up hanging out.  He showed up to one
14  of my open houses when I was helping this gym out,
15  and I put my program into the gym.  And he showed up
16  to help out.
17      Q.  And did Mr. Jackson tell you in those first
18  two phone calls who else was involved in bringing a
19  potential lawsuit?
20      A.  Mr. Jackson just said a bunch of fighters
21  and his boy -- I forget what the fighter was.  I
22  can't remember that one.  But he said there's a
23  handful of fighters, and he thinks I should be a part
24  of it.  And he said he'll get all the right contacts
25  together and put us on a three-way call.
```

Page 21

```
 1      Q.  When you say "and his boy"?
 2      A.  I guess his friend.  His lingo.  That's what
 3  he said, like as a friend.  Gosh, I can't remember
 4  exactly who the fighter was.  I don't remember, but
 5  he's all, Me and my boy were talking about this, and
 6  this is how it came together.  Yeah, Quinton, he's
 7  just all over the place.  So I was trying to keep up
 8  with him.
 9      Q.  And after the two phone calls, he texted
10  you; is that right, or was that in between the phone
11  calls?
12      A.  He was just texting me, Are you available?
13  Are you available?  And when I did see the texts, I
14  think the first time I was with one of my sons, and I
15  said no.  Then he texted back again and said, What
16  about now?  And I said, I'll text you.  And I think I
17  forgot to text him back.  And then he called the next
18  day, and then said, Are you ready?  And I said, Yeah.
19      Q.  When you say -- when he asked are you ready,
20  and you said yeah, ready for what?
21      A.  The three-way call.
22      Q.  And in those first two phone calls when he
23  was talking to you about the potential lawsuit, what
24  did you tell him about your views about the UFC?
25      A.  Um, I told him I had my issues with UFC, and
```



Confidential - Attorneys' Eyes Only

Page 22

1  you know, I'm retired now.  Oh, no.  I was thinking
2  about retiring.  And fighters all need to stand up
3  for their rights, and you know, the exclusive
4  contracts that we're all stuck under.  And you know,
5  there's really nowhere else to go and to, you know,
6  have a fair market value.  And then he actually
7  mentioned that he wanted to do a fight league and was
8  I open to fighting in it.  And I said, right now I'm
9  just doing your thing.
10     Q.  And by just doing your thing, what did you
11  mean?
12     A.  Focusing on my family.  Because when you're
13  a fighter, you actually -- you're very selfish, and
14  you don't spend enough time with the kids.  So I
15  wanted to spend more time with my kids.  And my boys
16  and, you know, my wife, who supported me from my
17  first MMA fight till, you know, my retirement.
18     Q.  And do I understand it that in those first
19  two conversations with Mr. Jackson, that you brought
20  up the issue of exclusive contracts; is that right?
21     A.  We both talked about it.  He mentioned to me
22  that his manager screwed them over with his contract,
23  but I didn't get into too much details about his
24  manager.  He volunteered a lot of the information
25  about, you know, what his manager did to him.  Like

Page 23

1  not letting him know what he was signing.  And then
2  me, I was just talking about the rights of all the
3  fighters, and you know, how much better it would be
4  to have fair market and be able to have other people
5  negotiate for, you know, you to become, you know,
6  part of the promotion or part of their fight league
7  for a big bout.
8     Q.  So do I understand that you talked -- in
9  those two first phone calls with Mr. Jackson, that
10  you talked about your fair market value?
11        MR. DELL'ANGELO:  Object to the form.
12        THE WITNESS:  The first conversation I
13  talked mainly with Rampage about a movie.  And then
14  that he wanted to meet and talk to someone that was
15  going to do that lawsuit against the UFC.
16  BY MR. ISAACSON:
17     Q.  But in those first two conversations with
18  you and Mr. Jackson, did you talk to him about what
19  you thought your fair market value was?
20     A.  No, I did not.
21     Q.  Did you discuss the subject of fair market
22  value in those first two conversations with
23  Mr. Jackson?
24     A.  I can't remember exactly what was said, but
25  just very brief.  He really didn't give me a chance

Page 24

1  to talk much.  He would always talk, and I would
2  listen.
3     Q.  Do you recall saying anything critical about
4  the UFC during those first two conversations with
5  Mr. Jackson?
6     A.  I asked him what happened with his fallout
7  with the UFC.  And he was just like -- he put the
8  blame on his manager.  And then he was rambling about
9  how he was treated unfair.  I just listened.  I was
10  the ear for him.
11     Q.  In those first two conversations with
12  Mr. Jackson, did you say anything about how you
13  thought you had been treated unfairly?
14     A.  Actually, I don't recall.  There was so much
15  said from movies to fights, and you know, character,
16  and why I should, you know, come down and meet one of
17  his producers.  It was just a lot going on.  There
18  was so much going on.  I can't exact recall or
19  remember exactly everything that was said because
20  Rampage will jump from topic to topic to topic to
21  topic, then come back around.
22     Q.  Did Rampage Jackson tell you he had spoken
23  to other fighters about bringing a lawsuit against
24  the UFC?
25     A.  He said there was other fighters taking part

Page 25

1  in it, but I don't recall him saying that.
2     Q.  So after those first two phone calls, did
3  you have a conference call with Mr. Jackson and
4  someone else?
5     A.  I did.
6     Q.  And who was the third person?
7     A.  The third person was Rob Maysey.
8     Q.  And Mr. Maysey is counsel for one of the
9  lawyers in the class action on the plaintiffs' side;
10  right?
11     A.  Yes.
12     Q.  And when you had the phone call, did you
13  understand that Mr. Maysey was representing
14  Mr. Jackson as a lawyer?
15     A.  I -- I don't -- I don't remember.  He just
16  said, talk to Rob.  He's a lawyer.
17     Q.  Did Mr. Jackson tell you anything about
18  Mr. Maysey before your phone call other than he was a
19  lawyer?
20     A.  Can you repeat that question?
21     Q.  Sure.  So before you had your conference
22  call, Mr. Jackson told you that Mr. Maysey was a
23  lawyer.  Did he tell you anything else about
24  Mr. Maysey?
25     A.  Um, that I needed to talk to Rob.



Confidential - Attorneys' Eyes Only

Page 98

1  did you work -- what's the period of time you worked
2  with Mr. Ibarra?
3      A.  I don't know.  I don't remember.
4      Q.  Did you work with Mr. Ibarra the entire time
5  you were fighting for the UFC?
6      A.  No, I don't think so.
7      Q.  Did Mr. Norensberg represent you with
8  respect to your Strikeforce fighter contract?
9      A.  I mentioned before that my agent,
10  Mr. Norensberg, only dealt with film and TV.  But I
11  kept my fighting separately.
12     Q.  And that was true when you were in
13  Strikeforce?
14     A.  Yes.
15     Q.  And your friend at Jones Day, Mr. Do, did he
16  review Strikeforce fighter contracts for you?
17     A.  He gave me advice on Strikeforce, my
18  Strikeforce contract.
19     Q.  And when he gave you advice, did you give
20  him copies of contracts to look at?
21     A.  Yes.
22     Q.  And did anyone negotiate with Strikeforce on
23  your behalf with respect to the fighter contracts?
24     A.  No one.
25     Q.  So you personally negotiated your fighter

Page 99

1  contracts with Strikeforce; is that correct?
2         MR. DELL'ANGELO:  Object to the form.  Lacks
3  foundation.
4         THE WITNESS:  One more time, please.
5  BY MR. ISAACSON:
6      Q.  You personally negotiated your fighter
7  contracts with Strikeforce; is that correct?
8      A.  Yes.
9         MR. DELL'ANGELO:  Same objection.
10 BY MR. ISAACSON:
11     Q.  And you personally handled any negotiations
12 about fighter contracts with the UFC; is that
13 correct?
14     A.  Can you repeat the last one?  Sorry.
15     Q.  You personally had any discussions about
16 fighter contracts with the UFC that took place about
17 you.  I said that terribly.
18        You were the one who handled any discussions
19 with the UFC about your fighter contracts with the
20 UFC; is that correct?
21     A.  I flew in and talked to Dana and Lorenzo.
22     Q.  Was that for your initial contract?
23     A.  Yes.
24     Q.  And when you flew in, you flew in from where
25 to where?

Page 100

1      A.  From the Bay Area into Las Vegas.
2      Q.  And did they fly you into Las Vegas?
3      A.  No.  I was already heading over there.
4      Q.  And you had a meeting with them.  What did
5  they say to you in the meeting?
6      A.  Al lot of things were said.  Lorenzo said I
7  was one of his favorite fighters, and he wants me to
8  fight for the UFC.  And he used to watch -- him and
9  Dana used to watch me on ESPN do scissor kicks on
10 people and throw people on their heads and do crazy
11 kicks.  And they used to enjoy my fights.  And they
12 love what I did to Frank Shamrock, especially Dana.
13 And they want me to be under the UFC stable.
14 BY MR. ISAACSON:
15     Q.  How well did you know Dana White at the
16 conclusion of that meeting?  Is that the first time
17 you had met him?
18        MR. DELL'ANGELO:  Object to form.
19        THE WITNESS:  I had met Dana before.
20 BY MR. ISAACSON:
21     Q.  What did you say to Dana White and Lorenzo
22 during this meeting about joining the UFC?
23     A.  I said I was interested in fighting for the
24 UFC, and I just answered a few of Dana's questions
25 and listened to Lorenzo talk about my career with

Page 101

1  Strikeforce on ESPN and enjoyed me as an MMA fighter
2  when I fought with Strikeforce.  And to give him a
3  bid and let them talk over something.  And he walked
4  me down to their kitchen and had their chef cook me
5  some egg whites.  And then I waited there for a bit.
6  And they brought me back up, and Lorenzo had a
7  contract for me.  And he handed it to me.  And I
8  grabbed it, and I looked it over, but it was that
9  thick.
10        So they started talking about something
11 else.  And I said, Is it cool if I look it over and
12 have someone look it over?  They're like, Yes.  And
13 we talked a little bit more, and then I was off.
14     Q.  When you said could you have someone look it
15 over, who did you have in mind to look it over?
16     A.  At that time, I didn't have anyone in mind.
17 I was just making sure that I cover all my bases if
18 this was real or not.  You know, because I was still
19 under a contract with Strikeforce, but they bought
20 out Strikeforce.  So I was just, you know, kind of,
21 you know, there.  I was there.
22     Q.  Did you have someone look over the contract
23 that they gave you?
24     A.  Yes.  I believe we talked it over, Khoa.
25     Q.  Your friend and lawyer from Jones Day?



Page 102

1    A.  My friend.
2    Q.  Your friend who is also a lawyer at Jones
3  Day?
4    A.  Yes.
5    Q.  And you know Jones Day is a very large law
6  firm?
7    A.  You know, I don't pay attention how large
8  law firms are.  I've been friends with him for a
9  while.  I was one of his grooms in his wedding.  And
10  that's it.
11    Q.  The contract offer that they gave you that
12  day that you visited the UFC, that increased your
13  compensation from what you were making at
14  Strikeforce; is that correct?
15       MR. DELL'ANGELO:  Object to the form.
16       THE WITNESS:  Yes, that is correct.
17  BY MR. ISAACSON:
18    Q.  And did you later sign that agreement?
19    A.  Yes, I did.
20    Q.  And did your friend who was also a lawyer at
21  Jones Day, did he suggest any changes to the
22  agreement?
23    A.  He -- I believe he just says that, in his
24  words --
25       MR. DELL'ANGELO:  Well, you can answer the

Page 103

1  question whether or not he suggested changes, but
2  without disclosing the substance of your
3  communications with the person from whom you were
4  seeking legal advice.
5       THE WITNESS:  Can you repeat that real
6  quick?
7  BY MR. ISAACSON:
8    Q.  And let's be clear.  Your friend at Jones
9  Day, Mr. Do, even though he was your friend, he was
10  acting as your lawyer; correct?
11    A.  Um, you know, I --
12       MR. DELL'ANGELO:  Object to the extent it
13  calls for a legal conclusion.  But you can answer the
14  question, of course.
15  BY MR. ISAACSON:
16    Q.  He was giving you advice in the way a lawyer
17  would give you professional legal advice?
18    A.  I think a lawyer would be a lot more
19  professional because we were friends in a weird --
20  you know, in like how friends talk to each other.  A
21  lot of, you know, stupid jokes.
22  BY MR. ISAACSON:
23    Q.  Setting aside the stupid jokes, because your
24  lawyer would object if I asked for his legal advice.
25  If he's not giving you legal advice, I'll ask you

Page 104

1  questions about it.
2    A.  He just says, I would do that.  If it was
3  me, I would do this.
4    Q.  And he did not suggest any changes to the
5  contract?
6    A.  He only made it more clear that the contract
7  would not -- there was really no changes.  It was
8  just to make one area more clear.
9    Q.  He suggested to you that you make one area
10  of the contract more clear; is that correct?
11    A.  That I can remember.
12    Q.  Do you remember what that area of the
13  contract was?
14    A.  I believe it was -- it concerned -- because
15  I was doing movies at the time before I signed with
16  the UFC.  And that's all I can remember.
17    Q.  And you also had contracts for Ultimate
18  Fighter China with UFC; is that right?
19    A.  A contract --
20    Q.  I'm sorry.  They paid you for your work on
21  the Ultimate Fighter in China; correct?
22       MR. DELL'ANGELO:  Object to the form.
23       THE WITNESS:  Like being part of the show?
24  BY MR. ISAACSON:
25    Q.  Yeah.

Page 105

1    A.  Yes, they did.  But I couldn't really
2  negotiate my contract because it was -- you really
3  couldn't negotiate with Dana.
4    Q.  When you say you couldn't negotiate, you
5  mean your agreement for the Ultimate Fighter show in
6  China?
7    A.  Yes.
8       MR. ISAACSON:  I'll mark this Exhibit 3.
9          (Whereupon Exhibit 3 was marked
10          for identification.)
11  BY MR. ISAACSON:
12    Q.  All right.  Le Exhibit 3 is an email between
13  Susan Le and Gary Ibarra on September 11th, 2013,
14  related to the confidential Cung Le TUF China
15  agreement.  A copy of this was given to us by your
16  counsel as part of your files.  So this is an email
17  between your wife and your manager; correct?
18    A.  Gary only acted as someone who got me
19  sponsorship.
20    Q.  Did Gary represent you in connection with
21  the Ultimate Fighter China TV show?
22    A.  I don't recall.
23    Q.  And was your wife reviewing your contracts
24  for you?
25    A.  Yeah.



Page 118

1   can't remember exactly, but the main concern I was
2   worried about is with the movies, and since they want
3   to lock down everything, with my identity, I just had
4   to make sure it's clear because there are certain
5   movies that will cast me, but then if they make an
6   action figure, then I need to have something where
7   I'm not locked up completely.
8       Q.  And I appreciate your telling me that, sir,
9   but my question is, whose idea was it to propose this
10  language to the UFC?
11      A.  It was, I believe, Khoa Do, who was taking
12  my -- I was asking him how I can change this, and he
13  says, you really can't.
14          MR. DELL'ANGELO:  You can answer the
15  question without revealing the substance of your
16  communications with your attorney.
17          THE WITNESS:  Yeah.
18  BY MR. ISAACSON:
19      Q.  So was it your view at the time that by
20  adding to the language relating to the UFC brand or
21  the bouts to the identity rights provision, that you
22  weren't really changing the meaning of the provision?
23      A.  I don't understand what you're saying.
24      Q.  Well, you said, "I believe this doesn't
25  really change anything from the contract, the

Page 119

1   proposed language."  I'd like to know what you mean
2   by that.  Why doesn't this proposed language change
3   anything in the contract?
4       A.  I think it just makes it more clear that my
5   likeness has the UFC, and of course the UFC brand is
6   with me, and UFC, they own the likeness.  But me
7   without the UFC, I can go do another movie and not be
8   locked into something with them.
9       Q.  So I think I understand it.  So the point of
10  the language is to make clear that UFC will own your
11  identity rights when you have the UFC brand, but when
12  you don't have the UFC brand, they don't have those
13  rights; is that correct?
14      A.  I believe so.
15      Q.  And by proposing that language, you didn't
16  think you were actually changing the contract?
17      A.  I don't know.  I sent it in.  It's been a
18  while.
19      Q.  When you said "I believe this doesn't really
20  change anything in the contract," you understood that
21  the contract identity rights provisions applied to
22  you when you wore the UFC brand, but when you weren't
23  wearing the UFC brand, you were free to do what you
24  want; is that correct?
25      A.  Uh-huh.  Yes.

Page 120

1       Q.  Thank you.  And Mr. Epstein responded to you
2   at the top of the page that he was fine with making
3   the change to Section 3.1.  Do you see that?
4       A.  Uh-huh, yes.
5       Q.  And in fact, they did make the change to
6   your contract in the revised promotional agreement;
7   isn't that correct?
8       A.  Yes.  But what I was saying doesn't really
9   change anything because whether it's now or down the
10  line, they own the likeness forever, just like the
11  contracts that they have keeps extending, and then
12  your likeness is part of the contract under this.
13  And it just continues.
14      Q.  And what you believe is that under the
15  contract you signed, that UFC owns your likeness
16  forever as long as you're wearing the UFC logo; is
17  that right?
18      A.  I believe it's just my likeness.
19      Q.  So do you believe that since you retired
20  that the UFC owns any part of your likeness as long
21  as you're not wearing the UFC logo?
22          MR. DELL'ANGELO:  Object to the form.
23          THE WITNESS:  You know, I don't know what
24  they still promote out there.  I don't see it all.
25  So if I saw everything that they had of mine, whether

Page 121

1   it had a UFC logo or not, I don't know what they're
2   using, so I couldn't answer your question.  I know
3   there's trading cards and there's action figures that
4   are out there.
5   BY MR. ISAACSON:
6       Q.  Well, I'm talking about your -- since you
7   retired, anything you do where you're not wearing UFC
8   gear or logo.  No one's ever tried to restrain you
9   from doing anything; right?
10          MR. DELL'ANGELO:  Object to the form.
11          THE WITNESS:  Not that I know of.
12  BY MR. ISAACSON:
13      Q.  No one's ever written to you and said,
14  Mr. Le, you have to stop doing this promotion or that
15  promotion since you retired?
16      A.  No.  I was still stuck in the contract for
17  over a year and a half after I retired.  And I
18  couldn't -- at one point I couldn't even be a
19  commentator somewhere else.  And I couldn't even
20  negotiate that I was going to fight with someone else
21  because UFC has it that I still had two fights left
22  on my contract, which should already have been done.
23  So I couldn't go to Bellator to even talk with anyone
24  else.
25          And really there's -- you know, I was stuck.



Confidential - Attorneys' Eyes Only

Page 194

1  Q. That is, documents that were produced by
2  Zuffa in this litigation?
3      MR. ISAACSON: Objection. Hearsay.
4      THE WITNESS: Yes.
5      (Thereupon Exhibit 19 was marked
6      for identification.)
7  BY MR. DELL'ANGELO:
8  Q. Mr. Le, I'm handing you what's been marked
9  as Exhibit 19. Take a look at that document, please.
10 Just let me know when you've had an opportunity to
11 look at it.
12     Is Exhibit 19 one of the documents that you
13 had in mind that you read that was produced by Zuffa
14 in this litigation that led you to conclude that you
15 Mr. Bisping's HGH levels were elevated --
16     MR. ISAACSON: Objection.
17     MR. DELL'ANGELO: -- following your fight
18 with him in August of 2014?
19     MR. ISAACSON: Objection.
20     THE WITNESS: Yes, it was.
21     THE REPORTER: One at a time.
22 BY MR. DELL'ANGELO:
23 Q. And who is Lawrence Epstein, if you know?
24 A. He's a lawyer of the UFC.
25 Q. And do you know who Marc Ratner is?

Page 195

1  A. I believe he works as the commissioning body
2  of the fight, I think.
3  Q. Is that for the UFC?
4  A. Yes.
5      MR. DELL'ANGELO: I have no further
6  questions.
7      MR. ISAACSON: No questions.
8      THE VIDEOGRAPHER: This concludes the video
9  deposition of Cung Le. We are now going off the
10 record. The time is approximately 3:14 p.m.
11     MR. DELL'ANGELO: Before we go off, I just
12 want to note that we're going to read and sign. And
13 we'd like to designate it confidential subject to
14 review.
15     THE REPORTER: And would you like a copy of
16 the transcript, the same as last time?
17     MR. DELL'ANGELO: Yes, same order.
18     (Thereupon the taking of the
19     deposition was concluded at
20     3:15 p.m.)
21     * * * * *
22
23
24
25

Page 196

1           CERTIFICATE OF DEPONENT
2  PAGE  LINE  CHANGE       REASON
3
4
5
6
7
8
9
10
11
12
13
14
15        *   *   *   *   *
16
17    I, CUNG LE, deponent herein, do hereby
   certify and declare the within and foregoing
18 transcription to be my deposition in said action;
   that I have read, corrected and do hereby affix my
19 signature to said deposition.
20
21
22           _____
                 CUNG LE, Deponent
23
24
25

Page 197

1           REPORTER'S CERTIFICATE
2  STATE OF NEVADA  )
                    ) SS:
3  COUNTY OF CLARK  )
4    I, Jane V. Efaw, CCR No. 601, do hereby certify:
5    That I reported the taking of the deposition of
6  the witness, CUNG LE, at the time and place
7  aforesaid;
8    That prior to being examined, the witness was by
9  me duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth;
11   That I thereafter transcribed my shorthand notes
12 into typewriting and that the typewritten transcript
13 of said deposition is a complete, true and accurate
14 transcription of said shorthand notes taken down at
15 said time, and that a request has been made to review
16 the transcript.
17   I further certify that I am not a relative or
18 employee of counsel of any party involved in said
19 action, nor a relative or employee of the parties
20 involved in said action, nor a person financially
21 interested in the action.
22   Dated at Las Vegas, Nevada, this _____ day of
23 _____, 2017.
24
         _____
25       Jane V. Efaw, CCR #601



50 (Pages 194 to 197)