# EXHIBIT 22

# Excerpts of Deposition of Brandon Vera

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon         )
Fitch, Brandon Vera, Luis Javier    )
Vazquez, and Kyle Kingsbury on      )
behalf of themselves and all        )
others similarly situated,          )
                                    )
      Plaintiffs,                   )
                                    )
  vs.                               ) Case No. 2:15-cv-
                                    ) 01045-RFB-(PAL)
Zuffa, LLC, d/b/a Ultimate          )
Fighting Championship and UFC,      )
                                    )
      Defendants.                   )
                                    )

DEPOSITION OF BRANDON VERA

Taken at the Offices of Boies, Schiller & Flexner
300 South 4th Street, Suite 800
Las Vegas, Nevada

On Thursday, February 16, 2017
At 9:11 a.m.

Reported by:  Jane V. Efaw, CCR #601, RPR



Page 34

1  fighter/world-renowned jui-jitsu guy. We met at
2  Abu-Dhabi for the Abu-Dhabi trials. He liked
3  training with me so much he invited me to San Diego.
4  When I came out to San Diego, that's when I met Mark
5  Dion. He owned City Boxing. I flew home. They flew
6  me back out to come train one more time, and then
7  when I came out the second time, that's when they
8  offered me a job and asked me to stay.
9    Q. What kind of job did they offer you?
10   A. They wanted me to teach, help coach and
11 fight for the gym.
12   Q. Boxing?
13   A. No, sir. MMA.
14   Q. Okay.
15   A. MMA or Muay Thai. I don't remember which
16 one it was.
17   Q. Do you remember generally when that was?
18   A. No, sir. Whenever I moved to California. I
19 don't know.
20   Q. And was Mark, or was Mr. Dion a trainer, or
21 just an owner of the gym, or what was his role?
22      MR. DELL'ANGELO: Objection. Compound.
23      THE WITNESS: Mark Dion was the owner.
24 BY MR. SKAGGS:
25   Q. The owner. But he wasn't a coach or

Page 35

1  anything like that?
2    A. Not for me. Not for me. I seen him train
3  other people, but not for me.
4    Q. At what point did he become your manager?
5    A. I don't know. That should be on file
6  somewhere.
7    Q. Was it after you moved out to San Diego?
8    A. Yes, sir.
9    Q. So during this whole time you're training
10 MMA. At what point did you decide that you thought
11 you could have a career as a professional MMA
12 athlete?
13   A. I always thought I could have a career as an
14 MMA athlete as soon as I saw Randy beating somebody
15 up with his wrestling. So I've always thought I
16 would have a career.
17   Q. At what point did you decide you would
18 actually pursue that?
19   A. As soon as I started training Muay Tahi,
20 jiu-jitsu and grappling, I started competing around
21 the world in those specific events and winning
22 everywhere. So I already knew I was going to be set
23 for MMA. So I thought of myself as an MMA fighter as
24 soon as I joined links.
25   Q. And what was your first professional MMA

Page 36

1  bout?
2    A. I don't know. I would have to look at my
3  record.
4    Q. Does Excalibur Extreme Fight Challenge ring
5  a bell?
6    A. That sounds right. What year was that, sir?
7    Q. 2002. Does that sound accurate?
8    A. Yes, sir.
9    Q. And do you remember how you got involved in
10 fighting for Excalibur?
11   A. I think they asked if somebody wanted to
12 fight, and I said yes. I think it was that simple.
13   Q. Did they ask you or Mr. Dion or someone
14 else?
15      MR. DELL'ANGELO: Object to the form.
16 Compound.
17      THE WITNESS: I think that was before Mark
18 Dion. I think.
19 BY MR. SKAGGS:
20   Q. Do you remember if you signed a contract
21 with Excalibur?
22   A. I don't know if we did.
23   Q. Do you remember how much you got paid?
24      MR. DELL'ANGELO: Object to the form.
25 Foundation.

Page 37

1       THE WITNESS: Um, no, sir. I don't know if
2  I got paid.
3  BY MR. SKAGGS:
4    Q. You're not sure if you got paid at all?
5    A. I don't remember. No, sir.
6    Q. Is it possible you didn't get paid?
7    A. It could have been. Earlier shows you had
8  to chase promoters right after the show. So I really
9  don't remember if I got paid or not for that one, or
10 if I was just like, ah, let's go.
11   Q. What do you mean chase promoters?
12   A. After the show is over, sometimes a promoter
13 would take off on the smaller shows and not pay their
14 fighters.
15   Q. So they had agreed to pay a certain amount
16 of money, and then they would disappear?
17   A. It happens, yes, sir.
18   Q. Did it ever happen to you?
19   A. I don't remember if it happened at
20 Excalibur. I don't.
21   Q. Do you remember if it happened at any time?
22   A. Not to me, no, sir. Unless it was at
23 Excalibur.
24   Q. So that's the one?
25   A. For me.



```
                                                    Page 38                                                Page 40
 1    Q.  Who do you compete with now?                              1    Q.  Who is that?
 2    A.  I don't understand the question.                          2    A.  Mr. Hume.
 3    Q.  Which MMA promotion do you compete with now?              3    Q.  Matt Hume?
 4    A.  For One Championship.                                     4    A.  Yes, sir.
 5          (Whereupon Defendant's Exhibit 59                       5    Q.  And when was that verbal agreement made?
 6           was marked for identification.)                        6    A.  Before I signed this contract.
 7  BY MR. SKAGGS:                                                  7    Q.  And so what exactly was the verbal
 8    Q.  Mr. Vera, I've handed you what's been marked              8  agreement?
 9  Exhibit 59.  Do you recognize this document or these            9    A.  If it made sense, that I would be allowed to
10  documents?                                                     10  fight outside the promotion.
11    A.  Yes, sir.                                                11    Q.  Made sense for who?
12        MR. SKAGGS:  For the record, this is LE                  12    A.  All parties involved.
13  Plaintiffs' 0042859.                                           13    Q.  So One would have to agree to allow you to
14  BY MR. SKAGGS:                                                 14  fight outside the promotion?
15    Q.  What are these documents?                                15    A.  Along with me having to agree.
16    A.  This is my contract with One Championship.               16    Q.  Right.  So if One did not agree, then you
17    Q.  If you could turn to the page that ends --               17  would not be allowed to fight outside One?
18  and feel free to review it for as long as you need.            18    A.  This is true.
19  But I'll be first turning to the page that ends in             19    Q.  And the terms of this provision -- you would
20  865.  Are you there?                                           20  agree that the terms of this provision as it's
21    A.  Yes, sir.                                                21  written prevents you from competing with another MMA
22    Q.  Okay.  Do you see the section -- there's a               22  promoter?
23  "whereas," and then there's a C, section C.  It                23        MR. DELL'ANGELO:  Object to the form to the
24  starts with "The fighter agrees."  Do you see that?            24  extent that it calls for a legal conclusion.
25    A.  Yes, sir.                                                25        THE WITNESS:  I don't know.  I really don't

                                                    Page 39                                                Page 41
 1    Q.  Could you read that section for me?                       1  know because I have a verbal agreement as well.  So I
 2    A.  "The fighter agrees to appoint the company                2  don't know how much this would hold.  I don't know.
 3  as the fighter's sole and exclusive promoter for all            3  BY MR. SKAGGS:
 4  of the fighter future matches during the term and               4    Q.  So you're not sure if One would uphold the
 5  defined herein, and to grant the commercial rights as           5  verbal agreement versus the written agreement?
 6  defined herein in favor of the company upon the terms           6    A.  One has not lied to me at all on anything.
 7  and conditions of this agreement."                              7  So I hold their word in high value, in high regard.
 8    Q.  Does this provision prevent you from                      8    Q.  But ultimately you're not certain one way or
 9  competing with another MMA promoter?                            9  the other if you did ask to fight for another
10        MR. DELL'ANGELO:  Object to the form.  It                10  promotion, if they would agree or not?
11  calls for a legal conclusion.                                  11        MR. DELL'ANGELO:  Object to the form.
12        THE WITNESS:  So the question you asked was,             12        THE WITNESS:  I don't know.
13  does this prevent me?                                          13  BY MR. SKAGGS:
14  BY MR. SKAGGS:                                                 14    Q.  Okay.  Is this provision what's known as an
15    Q.  Does this provision prevent you from                     15  exclusivity provision or an exclusivity clause?
16  competing with another MMA promoter?                           16        MR. DELL'ANGELO:  Object to the form.
17        MR. DELL'ANGELO:  Same objection.                        17        THE WITNESS:  I don't know.
18        THE WITNESS:  It's hard to answer because                18  BY MR. SKAGGS:
19  this document isn't -- there's also a verbal                   19    Q.  Is it your understanding this provision
20  agreement with the company if another promotion asks           20  makes One your exclusive promoter?
21  for me, and it makes sense, then I can fight for                21        MR. DELL'ANGELO:  Objection.  Calls for a
22  another promotion.                                             22  legal conclusion.
23  BY MR. SKAGGS:                                                 23        THE WITNESS:  I don't know
24    Q.  Who is that verbal agreement with?                       24  BY MR. SKAGGS:
25    A.  The matchmaker.                                          25    Q.  You're not sure?
```



Page 190

1   Q.  So did you like wear the headphones and that
2  kind of thing?
3   A.  Yes, sir.
4   Q.  Do you have a contract with Dome Piece
5  Audio?
6   A.  No, sir.
7   Q.  Because I think you said Floyd's an old
8  friend?
9   A.  Yes, sir.
10  Q.  Has this finder's commission ever come up in
11 any other context with One?
12  A.  No, sir.
13  Q.  Do you know what the finder's commission
14 he's talking about is?
15  A.  No, sir.
16  Q.  Do you remember this email?
17  A.  Yes, sir.
18  Q.  Did you understand what he was talking about
19 when he sent it?
20      MR. KOFFMAN:  Object to the form.
21      THE WITNESS:  Um, if I find a cash sponsor
22 to bring onboard, it would be a 15 percent finder's
23 commission.  I'm just reading what he wrote.
24 BY MR. SKAGGS:
25  Q.  Uh-huh.

Page 191

1   A.  I would imagine that's what he meant.
2   Q.  Did you ever get this finder's commission?
3   A.  No, sir.  I stepped back.  I put them in
4  touch, and they started talking.
5   Q.  Is Dome Piece Audio a One sponsor now?
6   A.  I don't believe it is.
7   Q.  Do you know that it isn't, or you're just
8  not sure?
9   A.  I don't think it is.
10  Q.  Did you ever request -- strike that.
11      Did you ever make a request to One to
12 compete for Glory Kickboxing?
13  A.  Yes, sir.
14  Q.  Did they grant that request?
15  A.  I don't believe we did.  I don't believe
16 they did.
17  Q.  Have you fought for Glory Kickboxing while
18 with One?
19  A.  No, sir.
20  Q.  So they said you weren't allowed to fight
21 for Glory while you were under contract with One?
22      MR. KOFFMAN:  Object to the form.
23      THE WITNESS:  I don't think it was --
24 correct.  I don't think it was the right person or
25 the right deal.

Page 192

1  BY MR. SKAGGS:
2   Q.  What do you mean by right person or right
3  deal?
4   A.  Um, I don't know if the person was known
5  well enough.  I don't know if the pay was high
6  enough.  I didn't -- I didn't get involved.  I just
7  mentioned it again, and then handed it off.
8   Q.  What did you mention?
9   A.  That I wanted to fight for Glory.  I wanted
10 to be in a kickboxing matching.
11  Q.  And who did you hand it off to?
12  A.  I think I spoke to one of the owners of
13 Glory about it, and told them to contact One with
14 details to follow.  And then I never heard anything
15 else.
16      (Whereupon Defendant's Exhibit 72
17      was marked for identification.)
18 BY MR. SKAGGS:
19  Q.  So I've handed you what's been marked
20 Exhibit 72.  It says LE Plaintiffs 0049146.  And it
21 looks like a direct message from you to Michael Zahn.
22 Who's Michael Zahn?
23  A.  I don't know.
24  Q.  You don't know who that is?
25  A.  No, sir.

Page 193

1   Q.  So you don't know who you were texting?
2       MR. KOFFMAN:  Objection to the form.  Asked
3  and answered.
4       THE WITNESS:  Is this a text?
5  BY MR. SKAGGS:
6   Q.  Oh.  I believe it's a Facebook message.
7  It's produced by the plaintiffs.
8   A.  I have over half a million fans on my page.
9  About half a million fans, so I don't know.
10  Q.  Well, the moral of the story, you don't know
11 who Michael Zahn is?
12  A.  No, sir.
13  Q.  Do you see you say, "I signed exclusive, and
14 the contract was better than my UFC one.  The game is
15 changing."  Do you see that?
16  A.  Yes, sir.
17  Q.  This is August 9th, 2014.  What did you mean
18 by "I signed exclusive"?
19  A.  I don't know.  I guess that's what I wrote.
20 Maybe he was telling me to fight in the UFC or go
21 back to the UFC.  I don't know.  I don't know what
22 else was said before this for me to reply.
23  Q.  Do you think you meant -- strike that.  Did
24 you mean signed exclusive with One, based on the
25 date?



Page 194

1      A.  I guess.  8/9 -- I guess.
2      Q.  And you said "The contract was better than
3   my UFC one."  How is your One contract better than
4   your UFC one?
5      A.  In terms of money, it wasn't better, but in
6   terms of dealing with them, handling things with
7   them, being spoken to in a respectful manner was way
8   different than anything I've ever dealt with with
9   UFC.
10     Q.  Your personal relationships and interactions
11  were better with One, and that's why it was better
12  than UFC?  Is that right?
13     A.  Yes, sir.  I can't think of anything else to
14  add at this time, but I think that was the basic
15  gist.
16     Q.  When you said the game was changing, what
17  did you mean by that?
18     A.  That fighters are starting to figure out
19  without them there would be no show.  There is no him
20  and me.  That we're deserving a lot more than we as a
21  collective group are receiving.  And that the
22  promoter is starting to realize this.  People are
23  starting to loosen their pockets and starting to try
24  to make change now.  That's what I meant.
25     Q.  Did you also mean that MMA athletes like

Page 195

1   yourself were starting to go to other organizations?
2         MR. KOFFMAN:  Object to the form.
3         THE WITNESS:  Um, no, sir.  That's not what
4   I meant.
5   BY MR. SKAGGS:
6      Q.  Okay.
7          (Whereupon Defendant's Exhibit 73
8           was marked for identification.)
9   BY MR. SKAGGS:
10     Q.  So you've been handed what's been marked
11  Exhibit 73.  This is an article, "Brandon Vera talks
12  respect, family, and joining One FC," dated
13  October 22nd, 2014.  Do you recognize this document?
14     A.  Yes, sir.
15     Q.  So take your time looking through it, but
16  let me know when you're ready.  I'm going to point
17  you to a section on page 2.
18     A.  Okay.
19     Q.  And so you see the part that says "I did
20  have offers in the U.S."?  It's like in the middle of
21  the page.
22     A.  Yes, sir.
23     Q.  It says, "I did have offers in the U.S.
24  Everyone asks this question.  Vera talking about why
25  he signed with the Asian MMA company."  What offers

Page 196

1   were you referring to there?
2      A.  Glory was calling, and also Bellator.
3      Q.  Were there any others?
4      A.  No, sir.
5      Q.  And when -- about what time period were
6   those two organizations calling?
7      A.  I don't remember.  They all came in at the
8   same time.  I thought I knew the date until we got
9   snagged earlier.  But I need to do more research, and
10  maybe even call the ex-wife to find out when this
11  happened.
12     Q.  I don't want to make you do that.  So it was
13  around the same time you were talking with One.  Is
14  that generally right?
15     A.  Yes, sir.
16     Q.  And how were those offers made?  Were they
17  in writing or over the phone or over email?
18     A.  Over the phone.
19     Q.  They were all over the phone?
20     A.  Yes, sir.
21     Q.  Who did you talk to at Bellator?  Do you
22  remember?
23     A.  I don't remember, sir.  I don't remember.
24     Q.  Do you remember who you talked to at Glory?
25     A.  No, sir.

Page 197

1      Q.  All right.  You can set that document down.
2          (Whereupon Defendant's Exhibit 74
3           was marked for identification.)
4   BY MR. SKAGGS:
5      Q.  So you've been handed what's been marked
6   Exhibit 74.  That's LE Plaintiffs 0038683.  This is
7   an email from Tammy Chan to you.  Who is Tammy Chan?
8      A.  Tammy Chan works for One.
9      Q.  And what does she do there?
10     A.  I don't know.  I don't know anybody's title.
11  It seems like they all do the same stuff.
12     Q.  Okay.  Generally like what do your
13  interactions with her entail?
14     A.  She's at every event doing everything except
15  for like the behind-the-scenes, camera-roll TV stuff.
16     Q.  So she does a lot?
17     A.  Uh-huh.
18     Q.  Do you see it says "One FC is a world-class
19  sporting event"?
20     A.  Yes, sir.
21     Q.  Do you agree with that?
22     A.  Yes, sir.
23     Q.  And then underneath it says "90 percent
24  market share."  What does that mean?
25         MR. KOFFMAN:  Object to the form.  Calls for



```
                                                    Page 226
 1   the best in the world was.  Then it would be really
 2   easy to answer.
 3        BY MR. SKAGGS:
 4        Q.  You're not currently holding title?
 5            MR. KOFFMAN:  Object to the form.
 6            THE WITNESS:  I do currently hold title.
 7        BY MR. SKAGGS:
 8        Q.  So when you say, we would want to find out
 9   if we can hold a title, what do you mean by that?
10        A.  I'd like to find out if we could fight for
11   other titles.  Sorry.  Maybe it didn't come out
12   right.
13        BY MR. SKAGGS:
14        Q.  Is Fabiano Fernandes elite?
15            MR. KOFFMAN:  Object to the form.  Calls for
16   a legal conclusion.
17            THE WITNESS:  I don't believe Fabiano ever
18   fought for the UFC as well, either.
19        BY MR. SKAGGS:
20        Q.  Do you understand that Fabiano Fernandes is
21   ranged in the top ten worldwide in the bantam weight
22   class?
23            MR. KOFFMAN:  Object to the form.
24            THE WITNESS:  I did not know that.
25   ///
```

```
                                                    Page 227
 1        BY MR. SKAGGS:
 2        Q.  Would that change your opinion of whether or
 3   not he's elite?
 4            MR. KOFFMAN:  Objection to the form.  It
 5   calls for speculation.
 6            THE WITNESS:  Watching him fight somebody in
 7   the top ten would change my mind.
 8        BY MR. SKAGGS:
 9        Q.  Regardless of who that person was fighting
10   with -- strike that.  Regardless of which promotion
11   that other person was fighting with?
12            MR. KOFFMAN:  Object to the form.  You can
13   answer.
14            THE WITNESS:  I'd like to see him fight
15   somebody in the top ten in the UFC.
16        BY MR. SKAGGS:
17        Q.  And that would be the only way you would
18   ever consider him elite?
19            MR. KOFFMAN:  Object to the form.
20            THE WITNESS:  I don't know.
21        BY MR. SKAGGS:
22        Q.  But he would then be elite even though he
23   wasn't in the UFC?
24            MR. KOFFMAN:  Object to the form.
25            THE WITNESS:  If he beat somebody from the
```

```
                                                    Page 228
 1   UFC's top ten, if he won, maybe I'd consider him
 2   elite.  Is that what you're asking?  I can go with
 3   that.
 4        BY MR. SKAGGS:
 5        Q.  What about Roger Huerta?  Is he elite?
 6        A.  In my personal opinion, Roger Huerta is a
 7   solid fighter, but I do not know if he's elite.
 8        BY MR. SKAGGS:
 9        Q.  Do you believe that -- in your opinion, is
10   he elite?
11            MR. KOFFMAN:  Object to the form.  That's
12   what he just answered.
13            THE WITNESS:  That's what I just said I
14   thought.
15        BY MR. SKAGGS:
16        Q.  And you don't know?
17        A.  I don't know.
18        Q.  So you can't say yes or no whether Roger
19   Huerta is elite?
20            MR. KOFFMAN:  Object to the form.
21            THE WITNESS:  No, sir.
22        BY MR. SKAGGS:
23        Q.  Has he ever been elite, in your opinion?
24            MR. KOFFMAN:  Object to the form.
25            THE WITNESS:  I love him to death, but I
```

```
                                                    Page 229
 1   don't know if Roger Huerta has ever been elite.  He
 2   was a UFC fighter.  And again, these are just my
 3   personal opinions.  So I don't know.  I don't know if
 4   he was ever elite.
 5            (Whereupon Defendant's Exhibit 76
 6            was marked for identification.)
 7        BY MR. SKAGGS:
 8        Q.  Okay.  You've been handed what's been marked
 9   Exhibit 76.  Do you recognize this document?
10        A.  Yes, sir.
11        Q.  And this is a declaration that you signed;
12   is that right?
13        A.  Yes, sir.
14            MR. SKAGGS:  For the record, this is ZUF
15   1562.
16        BY MR. SKAGGS:
17        Q.  If you go to the second page of the
18   document, 1563, is that your signature at the bottom?
19        A.  Yes, sir.
20        Q.  And do you see where it says right above
21   that, "I declare under penalty of perjury that the
22   foregoing is true and correct"?
23        A.  Yes, sir.
24        Q.  Do you know what under penalty of perjury
25   means?
```



Page 230

1     MR. KOFFMAN: Object to the form. Calls for
2  a legal conclusion.
3     THE WITNESS: I don't know what it means,
4  but I don't think it's a good thing.
5  BY MR. SKAGGS:
6     Q. What's your understanding of what it means?
7     A. If you do it, you could be fined or go to
8  jail.
9     Q. And when is this document dated?
10    A. The 25th day of July, 2011.
11    Q. So if you go back to the first page, the
12 last sentence in paragraph 1 says, "I have other
13 professional options besides MMA, including
14 professional boxing and wrestling, but I find that I
15 can earn more money in MMA than in these other
16 sports." Is that a true statement?
17    A. That is an untrue statement.
18    Q. That is not a true statement?
19    A. That is not a true statement.
20    Q. You did sign this declaration under penalty
21 of perjury?
22    A. I did.
23    Q. And so when you signed it, that was not a
24 true statement?
25    A. It's not a true statement.

Page 231

1     Q. Paragraph 2, it says, "I have fought for
2  other promotions including WAC. Some of those
3  promotions were outside the United States. It does
4  not matter where the promotion is located or even
5  where the bouts are held, provided that they are able
6  to generate sufficient fan interest to make the fight
7  profitable for the promotion and the fighters." Is
8  that a true statement?
9     A. Yes.
10    Q. Everything in paragraph 2 is true?
11    A. Yes, sir.
12    Q. Paragraph 3 says, "Since joining the UFC, my
13 compensation has increased substantially." Is that a
14 true statement?
15    A. Since joining. Since the very beginning,
16 yes.
17    Q. Paragraph 4 says, "Another significant part
18 of my compensation is sponsorship. I credit the UFC
19 with providing me with the increased exposure that
20 built my name recognition to the point where I could
21 command those sponsorships." Is that a true
22 statement?
23    A. I don't know if that statement is true or
24 not. I don't know when they started their $50,000 --
25 their sponsor tax. And also on Number 3, a

Page 232

1  significant part of my compensation had consisted of
2  discretionary payouts by UFC -- by Zuffa. That's
3  never happened, either. On Number 3.
4     Q. What are you saying has never happened?
5     A. "A significant part of my compensation has
6  consisted of discretionary payouts by Zuffa." I
7  didn't mean to say it never happened. A significant
8  part of my compensation hasn't consisted of
9  discretionary payouts by Zuffa. So that's not right,
10 either.
11    Q. So you're saying that the second sentence of
12 paragraph 3 is an untrue statement?
13    A. Yes, sir.
14    Q. And it was untrue at the time you signed
15 this statement?
16    A. Yes, sir. So --
17       MR. KOFFMAN: There's no question pending.
18       THE WITNESS: Okay.
19 BY MR. SKAGGS:
20    Q. Paragraph 5 says "There are several reasons
21 why I believe the UFC is the best MMA organization to
22 fight in." Is that a true statement?
23    A. Yes, sir.
24    Q. Actually, could you read the second
25 sentence? It starts "First..."

Page 233

1     A. "First is, provide me with the best
2  compensation and incentives."
3     Q. Is that a true statement?
4        MR. KOFFMAN: Sorry. Let me just clarify.
5  Do you mean at the time of the document or now?
6  BY MR. SKAGGS:
7     Q. Was that a true statement at the time you
8  signed the document?
9     A. Before I was educated, yes, sir.
10    Q. Can you read the sentence that starts
11 "Second"?
12    A. "Second, it has expanded the most resources
13 in promoting me and the events that I have fought
14 in."
15    Q. Was that a true statement at the time that
16 you signed this declaration?
17    A. Yes, sir.
18    Q. Do you see one sentence after that sentence,
19 it starts, "I have personally used..." It's right in
20 the middle of that paragraph 5.
21    A. Yes, sir.
22    Q. Can you read the sentence that starts "I
23 have personally used..."
24    A. "I have personally used the fighter
25 insurance twice."



```
                                                    Page 234
 1     Q.  The next sentence, sorry.  Could you read
 2  the next sentence also?
 3     A.  "Not only did UFC take care of all the
 4  insurance issues, but UFC employees checked in on me
 5  to see how I was doing."
 6     Q.  Were those statements true at the time you
 7  made them?
 8     A.  I just found out recently that they probably
 9  aren't -- a lot of my UFC medical bills went to
10  collections, and it's on my credit as paid, but in
11  collections.  So I don't know when they took care of
12  those.
13     Q.  Was it true at the time that you made those
14  statements?
15     A.  I don't know if they paid the insurance
16  bills or not.  I know I used insurance twice.  That
17  part's correct.  But them paying my insurance?  Not
18  if it went to collections.  Not them paying and
19  taking care of the bills.  Not if my stuff went to
20  collections.
21     Q.  Do you see the last sentence in that
22  paragraph 5?  It starts "Fifth..."
23     A.  "Fifth"?
24     Q.  Can you read that one?
25     A.  "The UFC is extremely well-run and
```

```
                                                    Page 235
 1  organized."
 2     Q.  Was that a true statement at the time you
 3  made it?
 4     A.  Yes, sir.
 5     Q.  Can you read paragraph 6?
 6     A.  "Other MMA organizations copied UFC's
 7  winning formula, those who are in Wet Dreams, Titan
 8  Fighting and Shark fights.  For example, all have
 9  televised events and compete for fighter talent with
10  the UFC prior to the acquisition.  I consider all of
11  those to be equivalent promotions to Strike Force."
12     Q.  Were those true statements at the time you
13  made them?
14     A.  No, sir.
15     Q.  Which statements were not true at the time
16  you made them?
17     A.  The whole thing.
18     Q.  There was nothing true about that paragraph?
19     A.  No.
20     Q.  And you signed this declaration under
21  penalty of perjury?
22     A.  Yes, sir.
23     Q.  Can you read paragraph 7?
24     A.  "Zuffa's acquisition of Strike Force can
25  only be positive from my perspective.  By acquiring
```

```
                                                    Page 236
 1  Strike Force, Zuffa was able to stage even more
 2  evenly matched fights.  This is better for me and
 3  better for fans.  Additionally, Strike Force will
 4  benefit from being run by Zuffa.  Zuffa will bring in
 5  stability and organization of Strike Force.
 6  Nonfighters, including my wife, Kerry Vera, will know
 7  they have a fight scheduled eight to ten weeks out
 8  instead of two to three weeks out."
 9     Q.  Are the statements in that paragraph
10  true -- strike that.
11         Were the statements in that paragraph true
12  at the time you made them?
13     A.  The last sentence.  No.  Fighters including
14  my wife Kerry Vera will know they have a fight
15  scheduled eight to ten weeks out instead of two to
16  three.
17     Q.  That's the only sentence in that paragraph
18  that's true?
19     A.  Yes, sir.
20     Q.  The other statements in that paragraph were
21  not true at the time you made them?
22     A.  No, sir.
23     Q.  Okay.  Can you read paragraph 8?
24     A.  "I did not expect Zuffa's ownership of
25  Strike Force to affect my contract.  Negotiating
```

```
                                                    Page 237
 1  leverage any way, I do not feel I have any less
 2  leverage negotiating for UFC.  Having done a purchase
 3  with Strike Force, that negotiating leverage is only
 4  affected by my performance in Octagon."
 5     Q.  Were those statements true at the time you
 6  made them?
 7     A.  No, sir.
 8     Q.  Were any of those statements true at the
 9  time you made them?
10     A.  No, sir.
11     Q.  Can you read paragraph 9?
12     A.  "I believe the Strike Force acquisition will
13  not change any for UFC and its many MMA competitors
14  to continue offering competitive compensation.  Every
15  promotion has to continue to attract the best
16  fighters by offering competitive compensation.  Other
17  promotions will have to pay higher salaries to get
18  the fighters to move from the UFC to their
19  promotions."
20     Q.  Were those statements true at the time you
21  made them?
22     A.  That's true.  Everybody had to offer higher
23  compensation.  But there was nobody around.
24     Q.  So which other promotions were you referring
25  to?
```



Page 238

1  A.  There wasn't any around.  I don't think I
2  wrote this statement.  I don't think this statement
3  is true.
4  Q.  So none of the statements in paragraph 9 are
5  true?
6  A.  No, sir.
7  Q.  And were not at the time that you signed
8  this declaration?
9  A.  No, sir.
10 Q.  Okay.  Can you read paragraph 10?
11 A.  "I believe MMA fighters have lots of options
12 currently, leaving aside their ability to become
13 professional boxers, wrestlers or martial artists.
14 There are any number of new MMA promotions who are
15 entering the field, and who, if they market their
16 bouts skillfully, can do as well as any of the
17 existing promotions over time."
18 Q.  Were those statements true at the time you
19 made them?
20 A.  No, sir.
21 Q.  Were any of those statements true at the
22 time you made them?
23 A.  I don't know if -- some of them may have
24 been, but --
25 Q.  Which ones may have been?

Page 239

1  A.  The ones we went over earlier.
2  Q.  I'm talking just about paragraph 10.
3  A.  Oh.
4  Q.  Were any of the statements in the paragraph
5  true -- strike that.
6      Were any of the statements in paragraph 10
7  true at the time that you made them?
8  A.  No, sir.
9  Q.  None of those statements in paragraph 10
10 were true at the time you made them?
11 A.  No, sir.
12 Q.  So am I correct to say that of the ten
13 paragraphs in this declaration, nine of them
14 contained untrue statements?
15     MR. KOFFMAN:  Object to the form.  You can
16 answer.
17     THE WITNESS:  Yes, sir.
18 BY MR. SKAGGS:
19 Q.  That you swore to under penalty of perjury?
20     MR. KOFFMAN:  Object to the form.
21     THE WITNESS:  Yes, sir.
22     (Whereupon Defendant's Exhibit 77
23      was marked for identification.)
24 BY MR. SKAGGS:
25 Q.  So you've been handed what's been marked

Page 240

1  Exhibit 77, LE Plaintiff's 48036.  It's an email
2  from -- well, the top of the email chain is an email
3  from Brandon Vera to Heather Miller.  Do you
4  recognize this document?
5  A.  Yes, sir.
6  Q.  I'll turn you to the second page of the
7  document, 037.  It's an email from Heather Miller to
8  you.  The last sentence of it reads, "If you have any
9  questions regarding the information contained in the
10 letter, or you do not agree with some of the
11 information included, please let me know, and changes
12 can be made before you sign."  Do you remember
13 Ms. Miller sending you this email?
14 A.  Yes, sir.
15 Q.  And did you choose to make any changes to
16 the declaration?
17 A.  No, sir.
18 Q.  So you signed the declaration under penalty
19 of perjury unchanged?
20 A.  Yes, sir.
21    MR. SKAGGS:  Take a break, short.
22    THE VIDEOGRAPHER:  We are now going off the
23 record.  The time is approximately 4:00 p.m.
24    (A recess was had)
25    THE VIDEOGRAPHER:  We are now back on the

Page 241

1  record.  The time is approximately 4:09 p.m.
2  BY MR. SKAGGS:
3  Q.  Mr. Vera, who is Anne Curtis?
4  A.  Anne Curtis is one of the top actresses,
5  entertainers in the Philippines.
6  Q.  Are you starring in a movie with Ms. Curtis?
7  A.  I will be.
8  Q.  Is it filming right now?
9  A.  We start filming March sometime.
10 Q.  It's preproduction right now?
11 A.  Yes, sir.
12 Q.  How much are you getting paid to be in that
13 movie?
14 A.  I don't know if I'm allowed to say that.
15 That's between me and my manager and group.
16     MR. KOFFMAN:  Can we just designate this
17 answer as "Attorney's eyes only" and keep it private?
18 I think we'll do it that way.
19     THE WITNESS:  It's one million pesos.
20 BY MR. SKAGGS:
21 Q.  Okay.
22 A.  It's about 20 thousand, 22 thousand.
23 Q.  U.S. dollars?
24 A.  Yes, sir.
25 Q.  Okay.  I think you mentioned to us earlier

Page 242

1  you do acting.  Is that the acting you were referring
2  to?
3      A.  Yes, sir.
4      Q.  Are there any other acting jobs?
5      A.  Roles are coming up.  They're starting to
6  come in now.  I have meetings when I get back to
7  close deals.
8      Q.  How many deals are there currently?
9      A.  Three.  Three on the floor.
10     Q.  Do you have any sense of how much you would
11 get paid for those?
12     A.  No, sir.  I have no idea.  I need to decide.
13     Q.  Okay.  And I believe you said you've also
14 been starring in commercials; is that right?
15     A.  Shooting commercials, yes, sir, for
16 FightCon.  For car products out there.
17     Q.  How much have you gotten paid for those
18 commercials?
19     A.  FightCon, I own part of the convention expo.
20 The commercials, I received everything.  In lieu of
21 compensation, I got everything done to my cars for
22 free, which would have been over a million pesos.
23     Q.  And I believe you said earlier you've been
24 doing speaking engagements; is that right?
25     A.  Yes, sir.

Page 243

1      Q.  How much do you get paid for those?
2      A.  200 -- 200,000 pesos.
3      Q.  How frequently are you doing those speaking
4  engagements?
5      A.  I'll have more lined up when I get home.
6      Q.  How many have you done so far?
7      A.  One, before I came here.
8      Q.  Okay.  Do you have any sense of how many
9  more you'll have lined up?
10     A.  I have two waiting to call someone when I
11 get back.
12     Q.  And your contracts with Zuffa didn't prevent
13 you from doing any of the acting commercials or
14 speaking engagements; is that right?
15         MR. KOFFMAN:  Objection.  Calls for a legal
16 conclusion.
17         THE WITNESS:  I don't know.  With Zuffa, you
18 said?
19 BY MR. SKAGGS:
20     Q.  Right.
21     A.  I don't know what it would entail because of
22 my image and likeness.  I have no idea.
23     Q.  But you have been acting and being in
24 commercials and doing speaking engagements post your
25 time with Zuffa?

Page 244

1      A.  Yes, sir.
2      Q.  And as far as you're aware, nothing in your
3  Zuffa contract has prevented you from doing that?
4          MR. KOFFMAN:  Object to the form.
5          THE WITNESS:  I don't know if anything in
6  the contract prevents me from doing that, but I know
7  nobody's contacted me.
8  BY MR. SKAGGS:
9      Q.  And you have been doing it -- strike that.
10 You have been acting, been in commercials, and been
11 doing speaking engagements?
12         MR. KOFFMAN:  Objection.  Asked and
13 answered.  You can answer again.
14         THE WITNESS:  Yes, sir.
15 BY MR. SKAGGS:
16     Q.  What is the MMA FA?
17     A.  MMAFA is the Mixed Martial Artists Fighters
18 Association.
19     Q.  Are you a member of the MMAFA?
20     A.  I am a member of the MMAFA.
21     Q.  Okay.  What do they do?
22         MR. KOFFMAN:  Object to form.
23 BY MR. SKAGGS:
24     Q.  What does the MMAFA do?
25     A.  Just organizing.  Getting fighters together,

Page 245

1  speaking about different things that have happened to
2  them.  What they want for change.  What they would
3  like to see happen when we do get an association
4  together.  Different policies.  We just talk about
5  association stuff.
6      Q.  Who are the MMAFA's executives?
7          MR. KOFFMAN:  Object to the form.
8          THE WITNESS:  Honestly, I don't know.
9  BY MR. SKAGGS:
10     Q.  Do you know, is there someone that sort of
11 leads them in the MMAFA?
12         MR. KOFFMAN:  Object to the form.
13         THE WITNESS:  I don't know who's leading the
14 MMAFA.
15 BY MR. SKAGGS:
16     Q.  Who else are you aware of that's involved in
17 leading or managing the MMAFA?
18         MR. KOFFMAN:  Object to form.  Go ahead.
19         THE WITNESS:  I think Rob is helping that
20 along in some way, shape, or form.  But it's really
21 just fighters talking right now a lot about what we'd
22 like to see happen.
23 BY MR. SKAGGS:
24     Q.  When you said Rob, do you mean Rob Maysey?
25     A.  Yes, sir.

Page 258

```
 1           CERTIFICATE OF DEPONENT
 2    PAGE  LINE  CHANGE        REASON
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15            *   *   *   *   *
16
17        I, BRANDON VERA, deponent herein, do hereby
      certify and declare the within and foregoing
18    transcription to be my deposition in said action;
      that I have read, corrected and do hereby affix my
19    signature to said deposition.
20
21
22        _____
               BRANDON VERA, Deponent
23
24
25
```

Page 259

```
 1              REPORTER'S CERTIFICATE
 2    STATE OF NEVADA  )
                       ) SS:
 3    COUNTY OF CLARK  )
 4      I, Jane V. Efaw, CCR No. 601, do hereby certify:
 5      That I reported the taking of the deposition of
 6    the witness, BRANDON VERA, at the time and place
 7    aforesaid;
 8      That prior to being examined, the witness was by
 9    me duly sworn to testify to the truth, the whole
10    truth, and nothing but the truth;
11      That I thereafter transcribed my shorthand notes
12    into typewriting and that the typewritten transcript
13    of said deposition is a complete, true and accurate
14    transcription of said shorthand notes taken down at
15    said time, and that a request has been made to review
16    the transcript.
17      I further certify that I am not a relative or
18    employee of counsel of any party involved in said
19    action, nor a relative or employee of the parties
20    involved in said action, nor a person financially
21    interested in the action.
22      Dated at Las Vegas, Nevada, this _____ day of
23    _____, 2017.
24
          _____
25        Jane V. Efaw, CCR #601
```

