# EXHIBIT 48

# Excerpts of 30(b)(6) Deposition of Kirk Hendrick on Fighter Contracts

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of          )
themselves and all others    )
similarly situated,          )
                             )
        Plaintiffs,          )
                             )
        vs.                  ) Case No.
                             ) 2:15-cv-01045-RFB-(PAL)
                             )
ZUFFA, LLC, d/b/a Ultimate   )
Fighting Championship and    )
UFC,                         )
                             )
        Defendant.           )
_____)

CONFIDENTIAL

VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

BY KIRK D. HENDRICK

NOVEMBER 29, 2016

LAS VEGAS, NEVADA

9:05 a.m.

Reported by:
KENDALL D. HEATH
Job No: 47771

KIRK D. HENDRICK - CONFIDENTIAL

```
                                                                    94
 1   Zuffa.
 2      Q.  But I'm asking whether you were the
 3   person that made the decision?
 4      A.  Did I make the decision on behalf of
 5   Zuffa?
 6      Q.  Yeah.
 7      A.  No, I do not think that --
 8      Q.  Did you make a recommendation to remove
 9   the word "exclusive" at the time in 2011?
10          MS. GRIGSBY:  Objection to the extent it
11   goes into attorney-client advice, then I instruct
12   you not to answer.
13   BY MR. CRAMER:
14      Q.  Can you answer without giving --
15   revealing attorney-client privileged
16   communications?
17      A.  Ask me the question again.
18      Q.  Did you advise Zuffa to remove the word
19   "exclusive" from its PAR agreements in or -- in or
20   about July of 2011?
21      A.  No.  I couldn't answer that without
22   talking about attorney-client conversations.
23      Q.  Well, did Zuffa at the time when it took
24   the word "exclusive" out of its -- the title of its
25   promotional and ancillary rights agreements believe
```

```
                                                                    95
 1   that it was subject to any liability or exposure
 2   from the Federal Trade Commission or anyone else as
 3   a result of the word "exclusive" being in its PAR
 4   agreements?
 5      A.  No.
 6      Q.  Now, you told me that one of the reasons
 7   why the word "exclusive" was removed was because
 8   under Zuffa's agreement -- and let me know if I'm
 9   characterizing your testimony correctly -- a
10   fighter had the ability to fight for another MMA
11   promotion or another combat sport promotion during
12   the term of the fighter's engagement with Zuffa.
13   Is that what you said?
14      A.  If permitted.  It wasn't an open
15   relationship in terms of they -- they could come
16   and say I want to compete in this other
17   organization, and Zuffa would evaluate it.
18      Q.  So that -- if you turn to Exhibit 9,
19   Section 4.6 on page 4, is this the provision you're
20   referring to?
21      A.  Yes.
22      Q.  So it says, "Notwithstanding the
23   foregoing" -- well, the provision prior to that
24   says, "During the term, Zuffa shall have the
25   exclusive right to promote all of fighter's bouts,
```

```
                                                                    96
 1   and fighter shall not participate in or render his
 2   services as a professional fighter or in any other
 3   capacity to any other mixed martial art, martial
 4   art, boxing, professional wrestling, or any other
 5   fighting competition or exhibition, except as
 6   otherwise expressly permitted by this agreement."
 7          Do you see that?
 8      A.  Yes.
 9      Q.  And that was in Zuffa's standard
10   agreement; correct?
11      A.  Yes.
12      Q.  And what did that mean?
13      A.  As I was saying earlier, during the term
14   of this agreement, certain number of months,
15   certain number of fights, that athlete is saying
16   that they want to be promoted by the UFC, and the
17   UFC is committing to promote that certain number of
18   bouts during that time period, and so they're
19   intended to be available during that time period
20   they were exclusive.
21      Q.  Well, what if the fighter was available
22   to Zuffa whenever Zuffa wanted them?  In other
23   words, there was no Zuffa fight scheduled during
24   the period they were fighting for someone else,
25   this agreement goes beyond that; right?  This
```

```
                                                                    97
 1   agreement prevents a Zuffa fighter from fighting
 2   for a rival promotion, period; right?
 3          MS. GRIGSBY:  Objection to form.
 4   BY MR. CRAMER:
 5      Q.  In other words, this provision -- well,
 6   let me ask it this way.  This provision doesn't say
 7   that the purpose of the exclusivity is to make sure
 8   that the Zuffa -- that the Zuffa fighter is
 9   available when Zuffa calls upon that fighter to
10   fight.  It doesn't say that in this provision;
11   correct?
12      A.  Does it say that they have to be
13   available?  That's not the words, but that's
14   certainly what it means.  During this time period,
15   you have to be ready, willing, and able to compete
16   for the UFC.
17      Q.  Right.  But you can envision a
18   hypothetical situation where someone was ready,
19   willing and able to compete for the UFC, whenever
20   the UFC scheduled a bout, but also fought for a
21   rival promotion; right?  That's theoretically
22   possible?
23      A.  That's why we allowed it.  If it was
24   theoretically possible, it was actually possible,
25   but not likely because, in order to put on a
```

25 (Pages 94 to 97)

98

1  certain number of events per year, you got to have
2  a certain number of athletes available in order to
3  promote it, put tickets on sale, advertise it. And
4  if somebody was competing in another organization,
5  they would be not available to say, I'm on the
6  poster, I'm going to be at this event.
7      If they got injured in that event, then
8  they wouldn't be available for a certain amount of
9  time after that event. So it's in there to be sure
10 they're available.
11     Q. So let's look at 4.6, the provision that
12 you just referred to.
13     A. Uh-huh.
14     Q. So this says, "Not withstanding the
15 foregoing, in the event the fighter is not then the
16 UFC champion, fighter is permitted subject to the
17 written consent of Zuffa, which may be granted or
18 withheld in Zuffa's sole discretion, to contract
19 with other promoters or to engage in any mixed
20 martial arts bout or fighting competition or
21 exhibition promoted by other promoters, other bout,
22 during the term provided that" -- and then there's
23 two provisos.
24     But before I get to the two provisos,
25 first of all, I believe you testified that in order

99

1  for a fighter to be able to, consistent with this
2  contract, fight for a rival promotion during the
3  term or any extensions, that fighter would need
4  written consent from Zuffa; is that fair?
5      A. That's correct.
6      Q. And that fighter could not be a champ --
7  a UFC champion at the time; correct?
8      A. That's this clause; correct.
9      Q. Why?
10     A. Because by the time Zuffa or the UFC has
11 invested so much time and energy and money into a
12 champion, for that champion they need to defend the
13 belt, they need to be available to defend the belt.
14     To go fight somewhere else could cause
15 them again, not to be able to be promoted. And if
16 they get injured, then they also couldn't be
17 promoted. So it wouldn't keep the title available
18 for challengers and people to fight against that
19 belt.
20     Q. Now, there are two caveats. One was,
21 "Such other bout is not televised by any domestic
22 or international television network station, cable
23 system, satellite or other provider or via Internet
24 or wireless exhibition."
25     Why is that provision there? Why did

100

1  Zuffa care whether the bout is televised?
2      A. This language came from boxing
3  agreements, and probably was in the original
4  Beckley Singleton agreement that I mentioned.
5      The idea is if Zuffa is promoting you as
6  an athlete and spending time and energy and money
7  in promoting you to be known as a UFC athlete and
8  then you go compete somewhere else, that it could
9  hurt UFC's promotion of your next fight.
10     So the idea was if it was a -- a bout
11 that isn't widely televised, then it wouldn't cause
12 as much damage to the UFC's investment.
13     Q. How does it damage the UFC's investment
14 if a UFC fighter fights on television under a rival
15 promotion?
16     A. Well, first of all, you wouldn't want
17 them saying he's a UFC fighter, right, because that
18 would be trading off or possibly confusing the
19 consumer.
20     But if they were to fight on another
21 widely distributed television show and let's say
22 they lose, then you try to promote them in the UFC,
23 and let's say their record went from 5 and 0, but
24 now their next fight in the UFC, they're 5 and 1.
25     Q. Well, what if they win? Wouldn't a

101

1  widely televised victory under another promotion
2  make that fighter more profitable and promotable to
3  the UFC?
4      A. Not always because you're trying to
5  promote the UFC event as the one that they're
6  competing in and promoting on and on your
7  television channels or your Pay-Per-View shows.
8      Q. All right. There's another proviso in
9  there, but we'll skip that for a minute and go to
10 the last sentence of the provision.
11     It says, "Furthermore, fighter expressly
12 agrees that this agreement shall be automatically
13 extended for an additional 120 days for each nonUFC
14 promoted mixed martial arts competition or
15 exhibition that fighter participates in, and any
16 reference to the term herein shall be deemed to
17 include such extension."
18     Why is that provision there?
19     A. Back to what I was mentioning earlier,
20 that there's a certain amount of time that Zuffa
21 has to get this fighter a certain amount of fights,
22 so it's kind of like for lack of a better term,
23 there's a clock running against the UFC. If this
24 athlete were to come and say I'd like to compete in
25 another organization or possibly a wrestling event

26 (Pages 98 to 101)

150

1  question, sorry.
2  BY MR. CRAMER:
3      Q.  Yeah, yeah.  That's fine.
4          Well, one way that Zuffa is able to try
5  to prevent rival MMA promoters from benefiting from
6  Zuffa's investment in its fighter is by making --
7  making, at least during the term of the time the
8  UFC fighter is under contract with Zuffa, by making
9  it exclusive; is that fair?
10     A.  No, I think you're mixing apples and
11 oranges a little bit.  It's not trying to keep them
12 from benefiting from the athlete during that time
13 period, it's trying to be sure they're available to
14 the UFC during that time period.
15     Q.  Would you agree with me that if a Zuffa
16 athlete that Zuffa has put a lot of promotion
17 behind during the term of the PAR agreement went
18 and fought for, say, Bellator, that would benefit
19 Bellator?
20     A.  Using the notoriety that that athlete
21 has?
22     Q.  Yes.
23     A.  Yeah.  That's occurred.
24     Q.  That has occurred?
25     A.  Yeah.

151

1      Q.  And it's in Zuffa's interest to try to
2  ensure that that not happen; correct?
3      A.  No.
4      Q.  It's not in Zuffa's interest not to --  to
5  prevent rivals from benefiting from investments
6  that Zuffa has made in fighters, or it is?
7      A.  No.  It's in Zuffa's best interest to
8  promote athletes during the time they are under
9  contract with the athlete and to put on fights that
10 the fans want to see.
11         After the time period where that athlete
12 is no longer under contract with the UFC, if
13 they've built up a persona and able to go use that
14 in some other organization, that's okay.  That's
15 part of the deal.
16     Q.  Okay.  Understood.  But let's talk about
17 during the period in which the fighter is under
18 contract with the UFC.  The UFC has an interest in
19 not having the fighters that it is investing in and
20 promoting, while they are under contract with the
21 UFC, fight for Bellator and benefit Bellator;
22 right?
23     A.  Ask me one more time.  I'm not sure I'm
24 following.
25     Q.  Yeah.  It is in the interest of the UFC

152

1  to make sure that fighters that it is investing in
2  and promoting in, during the term that those
3  fighters are under contract with Zuffa and any
4  extensions thereof, not go out and benefit a rival
5  MMA promoter; right?  That's in Zuffa's interest,
6  is it not?
7      A.  It's in Zuffa's interest that they be
8  available.  If you're saying if it's in Zuffa's
9  interest that they not go compete somewhere else, I
10 go back to they wouldn't be available.  I'm not
11 sure I understand.
12     Q.  Well, there's two things; right?  Zuffa
13 wants the fighters during the term of the contract
14 that they're under with Zuffa to be available.
15     A.  Right.
16     Q.  You testified to that many times.  But
17 Zuffa also doesn't want a rival MMA promoter to
18 piggyback and benefit on the investment that Zuffa
19 made in that fighter while that contract (sic) is
20 still under contract with Zuffa; right?
21     A.  I don't think that's the intent.  Would
22 an athlete being in another organization during the
23 exclusive term -- during that time period, Zuffa
24 has got to have the have chance to promote those
25 fights.  Would it be not in Zuffa's best interest

153

1  to have athletes competing somewhere else while
2  they're trying to promote those fights?  I'm not
3  sure if that's what you're asking.
4      Q.  Is that -- is that -- yes.  Can you
5  answer that question?
6      A.  In order to run the business, we have to
7  have a certain number of athletes available to us
8  in order to put on all the events we're putting on
9  in a given year or in a given month.  To have those
10 guys available and to be promoted during that time
11 period, that's part of the bargain.  That's part of
12 how we're able to run the company.
13     Q.  Well, put it this way:  If Zuffa knew
14 that -- let's say Zuffa did not have exclusive
15 contracts with fighters, and Zuffa knew that it
16 invested -- that any investment it made in fighters
17 could easily benefit a rival MMA promotion.  Would
18 Zuffa be more likely or less likely to invest in
19 promoting their fighters?
20         MS. GRIGSBY:  Objection, incomplete
21 hypothetical.
22         THE WITNESS:  Would Zuffa be more likely
23 or less likely to promote those fighters?  It would
24 be less investing in those fighters.
25 ///

39 (Pages 150 to 153)

154

1  BY MR. CRAMER:
2      Q. Why?
3      A. Because if you didn't know that their
4  next fight was going to be in the UFC, then you
5  would be in a situation of saying I don't know if I
6  can invest enough money, promotions, tens of
7  thousands, hundreds of thousands, millions of
8  dollars, into a particular event and not know that
9  your next fight would be in the UFC.
10     Q. Zuffa would be concerned potentially that
11 a rival MMA promoter would free ride off of the
12 investment that Zuffa was making in a fighter;
13 correct?
14         MS. GRIGSBY: Objection to form.
15         THE WITNESS: No, it's not so much free
16 ride, it's more about knowing that you could keep
17 the matches available for the fans to want to have
18 the next fight after that fight.
19 BY MR. CRAMER:
20     Q. Section 4.5, if you turn back to it, it
21 doesn't simply prevent a fighter from participating
22 in other combat sports while under contract with
23 Zuffa, but it also says they can't render their
24 services as a professional fighter or in any other
25 capacity. What does that mean?

155

1      A. So that would be like if a competitor of
2  UFC said, I want UFC fighter to come do an
3  appearance and an autograph signing, or come be
4  part of my telecast, be part of my show, and the
5  concern here is there was a lot of trading off or
6  passing off of people trying to look like they were
7  the UFC, trying to say we're just like the UFC or
8  we look like the UFC.
9          So the concern was is that UFC athletes,
10 when they're under contract with the UFC for this
11 amount of time, that they're available to us and
12 they know they're being promoted by the UFC and not
13 out supporting some other competitive organization
14 that could cause consumer confusion.
15     Q. So Zuffa's -- so this provision would bar
16 Zuffa athletes, under contract with Zuffa during
17 the term of their contracts, from advertising for a
18 rival MMA promotion; is that right?
19     A. I think we would have to be more specific
20 on advertising. But yeah, like as an appearance,
21 as a come see Kirk Hendrick, UFC fighter who will
22 be at competitive organization on this Saturday.
23 He's going to sign autographs, he's going to do
24 these kind of things.
25         So that the consumers are wondering is

156

1  the UFC associated? Is this a UFC event? Why is a
2  UFC fighter at that event?
3      Q. And is one concern that Zuffa has and one
4  reason why it wrote Section 4.5 the way it did was
5  because if that confusion occurred, a rival MMA
6  promoter like Bellator would benefit from the
7  investment in fighters that Zuffa was making?
8          MS. GRIGSBY: Objection, asked and
9  answered.
10         THE WITNESS: Yeah. They would benefit
11 if the consumers thought it was a UFC event, UFC
12 affiliated, not so much the athlete. If the
13 athlete wants to go to a Bellator show, that
14 happens all the time.
15         If a UFC fighter is cornering one of the
16 guys that's in his camp or his gym at a competitive
17 organization, that happens all the time. It's more
18 so about trying to promote another organization
19 during a time period that Zuffa is trying to
20 promote that athlete, and being sure that it's
21 clear that this is a UFC event, this is a UFC
22 promotion. And that back in the day of where there
23 was a lot of confusion as to other organizations
24 trying to compare themselves or look like the UFC,
25 we had to make it clear that that was not a UFC

157

1  event.
2  BY MR. CRAMER:
3      Q. What if the UFC fighter went to a
4  Bellator event as a spokesperson for that event and
5  said, I'm not here as a representative of the UFC,
6  I'm here as a representative of Bellator, how would
7  that create confusion?
8      A. What do you mean when you say, "I'm not
9  here"?
10     Q. I'm not here as a representative of the
11 UFC, I'm here as a spokesperson on this occasion
12 for Bellator. I'm making it clear, this is a
13 Bellator event, not a UFC event. How is that going
14 to cause confusion?
15         MS. GRIGSBY: Objection, incomplete
16 hypothetical.
17         THE WITNESS: I don't know if that really
18 works in reality.
19 BY MR. CRAMER:
20     Q. Why?
21     A. Well, if the UFC has got -- let's take
22 your hypothetical -- that game might have -- that
23 fighter might have an event coming up in weeks or
24 days or maybe just had a fight weeks or days or
25 months ago and so they've just been associated and

KIRK D. HENDRICK - CONFIDENTIAL

242

1     (Witness reviewing document.)
2     A.  Okay.
3     Q.  All right.  The only thing I want to ask
4  you about is something that Mr. Silva said on
5  July 15, 2011.
6         Now, this is after the point at which the
7  UFC had acquired Strikeforce; is that right?
8     A.  Yes, would have been right around that
9  time.
10    Q.  And Overeem was a fighter with
11 Strikeforce; is that right?
12    A.  Yes.
13    Q.  Was he a champion with Strikeforce?
14    A.  I don't recall.
15    Q.  I just want to see whether you can help
16 me understand something that Silva said.  He said,
17 "We can't just take all of their champions away and
18 devalue the company."  See that?
19    A.  Uh-huh.
20    Q.  What does that mean?
21    A.  I don't know.
22    Q.  Well, he's talking about whether certain
23 fighters should come over from Strikeforce to the
24 UFC; is that right?
25    A.  That seems to be the conversation, yes.

243

1     Q.  And the concern is that if you take away
2  too many of the champions from Strikeforce,
3  Strikeforce would be devalued; is that right?
4     A.  Again, I would have to understand the
5  context of what he's saying.  You're reading me
6  that sentence, I understand that, but I don't
7  understand what he means by "devalue the company."
8     Q.  Well, why would -- does it make sense to
9  say that if you removed champions from a company,
10 it would devalue that company?
11    A.  I think taking away fighters at a certain
12 level could impair that company's ability to
13 promote fights.
14    Q.  Why?
15    A.  They didn't have the available fighters.
16 As I was mentioning earlier, us having a certain
17 number of shows and a certain number of fighters
18 per event, you need available athletes.
19        So Joe talking about all their champions,
20 he might be talking about certain number of people
21 as opposed to -- you're focused on the word
22 "champion" and he might not be.  And, again, I
23 can't speak for Joe.
24    Q.  In order to be a successful promotion,
25 you need enough fighters to put together events

244

1  that people want to watch; is that right?
2     A.  Well, it depends on the number of events
3  you're doing and the number of bouts per event.  So
4  as I was saying with us doing 41, 42 events a year
5  in the UFC, 24 to 26 athletes on a card, taking
6  into variables like injuries and everything else,
7  you need a certain number of athletes to be able to
8  fulfill those cards.
9         And it's not like one at a time, you
10 finish one, you start promoting another.  We
11 probably have five, six shows on sale at any given
12 time.  So you need -- you need enough athletes to
13 keep those fights available.
14    Q.  Okay.  You can put that document aside.
15        Is it fair to say that the champion's
16 clause gives Zuffa a unilateral option to renew the
17 contract for another year or three bouts if the
18 fighter is a UFC champion at the end of their term?
19    A.  Say that for me again.
20    Q.  That the champion's clause effectively
21 gives Zuffa a unilateral option to essentially
22 extend or renew the PAR agreement with the champion
23 for a year or three bouts?
24    A.  I don't know if I've ever considered it a
25 unilateral option.  It's kind of what we have

245

1  there.  It's an extension term that if you agree
2  that when you come into the UFC, that if your last
3  fight is as the champion, the contract extends for
4  a year.
5     Q.  And the fighter, if they are a champion
6  in their last fight for the UFC, they don't have a
7  choice as to whether or not their contract extends
8  for a year; it happens automatically?
9     A.  It happened.  If you're the champion and
10 that was your last fight on your termination date,
11 then there's this extension term.
12    Q.  And if that athlete was the champion
13 during their last fight, and they wanted their next
14 fight to be with Bellator or some other promotion,
15 they couldn't do that, at least for the -- for the
16 extension term?
17    A.  Right, for a year.
18    Q.  All right.  Put that --
19    A.  I guess I would caveat that to say a year
20 or doing another deal with the UFC.  I assume
21 you're meaning they don't want to do another deal
22 with the UFC.
23    Q.  Right.  So it could be, once they fulfill
24 the year, they can go somewhere elsewhere or they
25 could renegotiate with the UFC?

62 (Pages 242 to 245)

278

1  name on the fourth line of the first paragraph --
2  actually, the third and fourth line of the first
3  paragraph on Page 1, so I think that's fair.
4      Q. Okay. Well, let's look at Section 5.3,
5  which is on Page 4 of this contract.
6      It says, "The respective lengths of time
7  to provide fighter with a minimum number of bouts
8  enumerated in this Section 5 shall be extended for
9  any period of time that fighter is unable or
10 unwilling to compete.
11     "Such extension shall include, without
12 limitation, any time periods when fighter is
13 disabled, sick or injured for any reason,
14 incarcerated, suspended or revoked by an athletic
15 commission, has his ability to travel restricted by
16 a recognized governmental agency, or is otherwise
17 unable or unwilling or refuses to compete or train
18 for a bout for any reason whatsoever."
19     Do you see that?
20     A. Yes.
21     Q. Does that sound like the standard
22 provision, at least at the time, that reflected the
23 ability of Zuffa to extend the term?
24     MS. GRIGSBY: Objection; foundation. If
25 you want to show him the standard agreement, you're

279

1  free to do so.
2  BY MR. CRAMER:
3      Q. Do you know sitting here today whether
4  that sounds about what the standard provision 5.3
5  was in 2007?
6      MS. GRIGSBY: Objection to form.
7      THE WITNESS: Without reading it word for
8  word and comparing it, if you're asking me
9  generally do I think that that 5.3 is close, I
10 think that, you know, if you're looking for an
11 answer, yeah, I think that's probably close. But,
12 again, I'd have to read them side by side to be
13 sure it was accurate.
14 BY MR. CRAMER:
15     Q. Right. And if we look back at
16 Exhibit 26, you see in the middle of the page that
17 Emelianenko's representative wants to strike 5.3,
18 which is this provision, and Zuffa's response is,
19 we can't change or strike this provision or these
20 provisions; is that right?
21     A. Yes. So you're talking about Page 2 of
22 26? Exhibit 26?
23     Q. Yes.
24     A. Okay. Yeah. You're saying where Fedor's
25 attorney said -- I take that back. I'm not sure if

280

1  she's an attorney. Fedor's representative is
2  saying we suggest to strike Article 5.3. And then
3  you're saying the parenthetical says "we cannot
4  change or strike these provisions," I see that.
5      Q. So Zuffa refused to strike 5.3 from the
6  contract; is that right?
7      A. At this point in time, yes. I don't know
8  what happened after this obviously; right? Was
9  there further negotiations? I don't know. But in
10 this particular e-mail, I think that's correct.
11     MR. CRAMER: All right. We're almost
12 done with the tape so let's go off the record.
13     THE VIDEOGRAPHER: We're off the record
14 at 4:58.
15     (Proceedings adjourned)

281

STATE OF _____ )
                         ) :ss
COUNTY OF _____)


    I, KIRK D. HENDRICK, the witness
herein, having read the foregoing
testimony of the pages of this deposition,
do hereby certify it to be a true and
correct transcript, subject to the
corrections, if any, shown on the attached
page.


        _____
          KIRK D. HENDRICK



Sworn and subscribed to before me,
this _____ day of _____, 2016.

_____
    Notary Public

71 (Pages 278 to 281)

KIRK D. HENDRICK - CONFIDENTIAL

```
                                                 282
 1            REPORTER'S CERTIFICATE
 2
 3   STATE OF NEVADA    )
                        ) ss.
 4   COUNTY OF CLARK    )
 5
 6         I, KENDALL D. HEATH, CCR No. 475, a
     Certified Court Reporter for the State of Nevada,
 7   do hereby certify:
 8         That I reported the taking of the
     deposition of the witness, KIRK D. HENDRICK, Volume
 9   1, commencing on the 29 day of November, 2016, at
     the hour of 9:05 a.m.
10
           That prior to being examined, the witness
11   was duly sworn by me to testify to the truth, the
     whole truth, and nothing but the truth.
12
           That I thereafter transcribed my said
13   shorthand notes into typewriting and that the
     typewritten transcript of said deposition is a
14   complete, true and accurate transcription of my
     said shorthand notes taken down at said time, and
15   that a request has not been made to review the
     transcript.
16
         I further certify that I am not a relative
17   or employee of an attorney or counsel of any of the
     parties, nor a relative or employee of any attorney
18   or counsel involved in said action, nor a person
     financially interested in the action.
19
           IN WITNESS WHEREOF, I have hereunto
20   set my signature this 14th day of December, 2016.
21
22
              _____
23
                    KENDALL D. HEATH
24                  CCR No. 475
25
```

```
                                                 283
 1           INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7       After doing so, please sign the errata sheet
 8   and date it.
 9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12       It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
```

```
                                                 284
 1                E R R A T A
 2
 3
 4
 5      I wish to make the following changes,
 6   for the following reasons:
 7
 8   PAGE LINE
 9   ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE: _____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____    _____
23   WITNESS' SIGNATURE         DATE
24
25
```