# EXHIBIT 56

## Excerpts of Deposition of Scott Coker

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


CUNG LE; NATHAN QUARRY, JON      )
FITCH, on behalf of              )
themselves and all others        )
similarly situated,              )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )   Case No.
                                 )   2:15-cv-01045-RFB-(PAL)
                                 )
ZUFFA, LLC, d/b/a Ultimate       )
Fighting Championship and        )
UFC,                             )
                                 )
          Defendant.             )
_____)


HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

SCOTT COKER

LOS ANGELES, CALIFORNIA

AUGUST 3, 2017

9:09 a.m.


REPORTED BY:
CYNTHIA K. DuRIVAGE, CSR #451
JOB NO. 51251

98

SCOTT COKER - HIGHLY CONFIDENTIAL

1  industry"?

2      A.  You know, I've always felt that an industry

3  to be healthy -- I think I'm repeating, but an

4  industry to be healthy, you need two players, you

5  need Pepsi, you need Coke; you need Avis, you need

6  Hertz.  Because if there's only one person

7  controlling the marketplace, then fighter persons go

8  down, you know, the industry is controlled by one

9  say.  And I don't think that ever is a situation

10  where an industry can be healthy where there's only

11  one player.

12      Q.  Do you think that that could be -- if there

13  was only one player that that could be -- hurt

14  fighters?

15      A.  Yes.

16      Q.  Okay.  And what other ways -- what ways

17  would it hurt the fighters, in your opinion?

18      A.  Well, the biggest way is think about if

19  there's only one place to have a job, and then,

20  there's only a certain amount of slots available to

21  have employment, the fighter purses naturally would

22  go down because now you're in control of the

23  marketplace.  So now, you can dictate what an entry

24  fighter level would get and what a mid-tier fighter

99

SCOTT COKER - HIGHLY CONFIDENTIAL

1  would get, what a top-tier fighter would get.  And

2  you kind of control the marketplace at that point.

3      Q.  I think you testified that you wanted to

4  pursue Fedor at this time?

5      A.  At this time, yes.

6      Q.  So did you think that Fedor was an

7  important fighter for Strikeforce to try to get in

8  its roster?

9      A.  Yes.

10      Q.  And why?

11      A.  Being undefeated for ten years, coming off

12  of a big fight where he knocked out Andrei Arlovski.

13  Had a lot of heat on him.

14      I mean, he's the man.  Fedor is the

15  greatest of all time.  And when you can have a

16  fighter like that come on to your roster, it's always

17  a good day.

18      Q.  Did you believe that signing Fedor at

19  Strikeforce would help Strikeforce sell

20  pay-per-views?

21      MS. GRIGSBY:  Objection, foundation.

22      THE WITNESS:  I believed that he would help

23  drive ratings on Showtime, I believed that he would

24  put butts in seats.  I would believe that he would

100

SCOTT COKER - HIGHLY CONFIDENTIAL

1  help us drive ratings on CBS and eventually drive

2  ratings on pay-per-view.

3  BY MR. DELL'ANGELO:

4      Q.  So is it fair to say that you believe that

5  overall, attracting a fighter like Fedor would be,

6  you know, good for Strikeforce's business?

7      A.  Yes.

8      Q.  I think you testified a little earlier

9  today -- and I'm sorry, let me just withdraw that.

10      Is that generally true with other fighters

11  that have heat on them, as you described it, to use

12  that term?

13      A.  Could you repeat the question one more

14  time.

15      Q.  Sure.  So I wanted to know if that was also

16  generally true with respect to Strikeforce's ability

17  to attract other fighters that had heat on them, as

18  you used that term?

19      A.  Yes.  It would have been a great statement

20  and a great recruiting tool.

21      Q.  So getting a fighter like Fedor, you

22  believed, would have helped Strikeforce recruit or

23  attract other quality fighters?

24      A.  Yes.

101

SCOTT COKER - HIGHLY CONFIDENTIAL

1      Q.  Is that something that you viewed as being

2  important to Strikeforce?

3      A.  Yes.

4      Q.  And why is that?

5      A.  My goal was to build this company as big as

6  we could, become a -- you know, a sizeable player in

7  the mixed martial arts world.

8      And I felt like we had a lot of pieces in

9  place.  We started -- we started recruiting top

10  talent, that we were building from the ground up

11  with, say, like Ty Woodley, Luke Rockhold, Daniel

12  Cormier, a lot of the stars that are currently stars

13  today for the UFC.

14      We started building our free agent

15  fighters.  So we built the roster from the ground up

16  and we bought some of the fighters from the top down.

17  And I think that Fedor would have been the icing on

18  the cake for us, you know, to just show the industry

19  that, hey, these are real players, you can count on

20  them, and they're going to be here for a long time.

21      Q.  This email in Exhibit 7 is dated July 4,

22  2009, correct?

23      A.  Yes, that's correct.

24      Q.  Do you recall around that time frame, in

26  (Pages 98 to 101)

102

1      **SCOTT COKER - HIGHLY CONFIDENTIAL**
2   **2009, did Strikeforce acquire fighters from any other**
3   **promotion?**
4        A.  Yes.
5        **Q.  And what promotion was that?**
6        A.  In 2009, we acquired Pro Elite.
7        **Q.  And what was Pro Elite?**
8        A.  Pro Elite was a struggling mixed martial
9   arts fight company based out of Los Angeles.  They --
10  well, at this time, we already had acquired them.
11  This is prior to this.
12       **Q.  Right.  So the email in Exhibit 7 is**
13  **sometime later in 2009, Strikeforce had already**
14  **acquired Pro Elite?**
15       A.  That is correct.  And my thought, honestly,
16  was in October of '10 -- I'm sorry -- October of '08
17  is when we acquired Pro Elite.
18       So that's my belief.  So we acquired
19  Pro Elite, which had the CBS, Showtime contracts.  It
20  had Nick Diaz' contract, Robbie Lawler's contract, it
21  had Gina Carano's contract.  So we acquired a lot of
22  these great fighters at the end of '08.
23       **Q.  How did the acquisition -- well, let me**
24  **withdraw that.**
25       **Did Pro Elite include any other MMA brands**

103

1       **SCOTT COKER - HIGHLY CONFIDENTIAL**
2   **that Strikeforce acquired?**
3        A.  No, because it was not a purchase of the
4   entire company, it was just an asset purchase.  So we
5   plucked out certain things that we wanted and left a
6   lot of things that we didn't want.
7        **Q.  How did Strikeforce's acquisition of**
8   **Pro Elite impact Strikeforce's business?**
9        A.  When you have great fighters, great
10  personalities, a great TV deal, then you can get
11  great sponsorships, and you know, that's what helps
12  you drive your business.
13       **Q.  Is it your view, then, that without things**
14  **such as great fighters, you can't do those other**
15  **things, like attract great sponsors, et cetera?**
16       A.  It makes it very difficult.
17       **Q.  How would you -- how would you characterize**
18  **the -- I guess Strikeforce around the -- as an MMA**
19  **promotion at the time of the Pro Elite acquisition?**
20  **How would you characterize its trajectory in the MMA**
21  **marketplace?**
22       A.  Clearly, No. 2 in the marketplace.  I mean,
23  UFC had a 20-year, you know, first in market
24  advantage.
25       But I think we were gaining ground, gaining

104

1       SCOTT COKER - HIGHLY CONFIDENTIAL
2   momentum, income was pretty much -- those two years
3   was pretty much like a hockey stick.  In a down
4   economic time, we were not impacted by the economy
5   because we were still packing the stadium, we had
6   great ratings, and we were putting butts in seats.
7        When I think about that time period for
8   Strikeforce, I think that it was a great time for the
9   company because we had just acquired all these great
10  fighters, we already had great fighters.  We were
11  buying more fighters, we were starting to build more
12  fighters.  And we had a great TV deal, and you know,
13  once you added Showtime and CBS, Strikeforce became
14  really a regional brand to become a national brand.
15       **Q.  And was Strikeforce becoming a stronger**
16  **competitor to the UFC at that time?**
17       A.  Yes.
18       **Q.  And was Strikeforce competing with the UFC**
19  **for top talent at that time, that is, fighters?**
20       A.  The only fighter that I would think that we
21  were both after that we really wanted was Fedor.
22       **Q.  In terms of -- in terms of top fighters?**
23       A.  Because we had just acquired all these
24  great fighters, and we only had so many TV dates.
25  So, you know, the house is pretty full, if you can

105

1       SCOTT COKER - HIGHLY CONFIDENTIAL
2   understand what I mean by that.
3        So we were looking for that one fighter
4   that could make a big impact, and we wanted to get
5   Fedor on our roster.
6        **Q.  At that time, how would you characterize**
7   **Strikeforce's heavyweight division?**
8        A.  The thought behind getting Fedor, honestly,
9   was to put together I mean arguably the greatest
10  heavyweight tournament ever in the history of MMA,
11  especially North America.
12       And we already had Alistair Overeem, we had
13  Fabricio Werdum, we had Josh Barnett.  We had Brett
14  Rogers.  We had Big Foot Silva, and we had Andrei
15  Arlovski.
16       And I wanted to put Fedor on a roster so I
17  could put him in this tournament because I knew that
18  this was a tournament that was going to be a
19  significant difference maker in our sport.
20       **Q.  How did you think that Strikeforce's**
21  **heavyweight division compared to the UFC's**
22  **heavyweight division in 2009?**
23       A.  Yeah.  In 2009 and '10, we had more top 10
24  rated heavyweights than the UFC did.  So arguably, we
25  had a better heavyweight division than they did.

27 (Pages 102 to 105)

170

SCOTT COKER - HIGHLY CONFIDENTIAL

1    golf.
2         Q.  You weren't a student of the MMA promotion
3    industry or business, right?
4         A.  No.
5         Q.  So about three months later, you become
6    involved in Bellator, correct?  So June of 2014,
7    about three months after you kind of emerged from
8    your --
9         A.  Yes.
10        Q.  -- your hiatus, if you will?  Okay.
11        And so, from the time of March 2014 to the
12   time of June 2014, did you study or research Bellator
13   to try to understand it more and why it may have
14   lacked star power?
15        A.  No.  The mindset really wasn't to, you
16   know, like to study anything, really.  It was stop
17   and smell the roses, work a little bit, just relax.
18   Go on vacation, travel, you know, travel all over the
19   world for a year-and-a-half, and then, play a lot of
20   golf and just relax.
21        Q.  Right.  Yes, I appreciate that.  All I was
22   really trying to understand is up to June of 2014 how
23   dialed in you really were to Bellator's business and
24   why, you know --

171

SCOTT COKER - HIGHLY CONFIDENTIAL

1         A.  I had no idea.  Honestly, it was Kevin Kay
2    requesting a meeting, and I didn't even know who
3    Kevin Kay was, to be honest with you.  So I said,
4    okay, I'll go meet him.  But really, I'm going to go
5    open another company.  I remember telling some
6    friends:  I'm not in the business of building other
7    people's businesses, I'm go to build my own business
8    again and I'm going to go back and do this.
9         And I sat down with Kevin Kay, and he's
10   telling me what he's doing, telling me what he wants
11   to do, wants to make a move in the top position.
12        Originally, I thought he wanted me to work
13   with Bjorn Rebney.  I said, well, this is not -- you
14   know, by committee, this is -- something that has to
15   be very, you know -- somebody has to make the
16   decision.  I don't want to argue with somebody else.
17        And I said, Kevin, I go, your brand has
18   really been dented.  And you know, I'm coming up off
19   a very, very -- you know, time in my life where
20   Strikeforce was great, I want to create something
21   else great.
22        I remember telling Kevin this.  I said,
23   your ship is kind of like the Titanic.  You know?  Do
24   I want to jump on the Titanic as you guys are

172

SCOTT COKER - HIGHLY CONFIDENTIAL

1    tilting?  I go:  I don't know.  I go -- I had to
2    think about that.
3         And I said something to him, and I wanted
4    to see how he'd react.  And what I said was, I said:
5    Kevin, you don't only have a black eye in the
6    business, you have an orbital fracture, and I'm not a
7    surgeon.  I don't even know if I can help you.
8         He said:  Well, hey, think about it.  I
9    said:  Well, I'll think about it.
10        And I didn't call him back for a month
11   because I wasn't looking for a job, I didn't want to
12   be employed by anybody.
13        But he kept calling me and talking.  And
14   the more I talked to him, I started feeling good
15   about his vision.
16        And so, finally, after much -- you know,
17   thinking about it for two-and-a-half months, I said:
18   You know what, F it.  Let's go for it.  I'm going to
19   go and try my best and try to help build Bellator.
20   And then, they made the move to remove Bjorn, and I
21   came in two days later.  And that was March of '14,
22   yeah, March of '14.
23        Q.  In your estimation, as you just sort of
24   articulated, was Bellator's lack of star power part

173

SCOTT COKER - HIGHLY CONFIDENTIAL

1    of what made it like the Titanic in the MMA industry?
2         A.  I think it comes from leadership at the
3    top, and it was that tournament format.  To me, the
4    tournament format, my belief is this -- and I worked
5    for K-1 for eight years, which was the greatest
6    tournament format, you know, entity ever, that and
7    Pride.
8         And you should do tournaments when you have
9    eight stars because then, everybody can identify with
10   these eight fighters, just like we did for the
11   heavyweight tournament.
12        These were tournament formats that were
13   happening every week in a different city in a little
14   town that, you know, a lot of people didn't hear
15   about.  You know, I didn't even know what some of
16   these cities were.  And a 1500, 1800-seat stadium.
17   It just looked very small, very dark, very dingy, and
18   the product was just subpar.  And this is before, you
19   know, Viacom came in and took it over.
20        So that's what I was referring to.  Kevin
21   was like, you know.  And he goes:  Well, have you
22   watched our product lately?  I says:  No, not really.
23   And I really hadn't even watched one episode to that
24   point.  He goes:  Well, check it out.

44  (Pages 170 to 173)

174

SCOTT COKER - HIGHLY CONFIDENTIAL
1        SCOTT COKER - HIGHLY CONFIDENTIAL
2        And I said: You know, Kevin, the
3 tournament format doesn't work. I'm telling you,
4 you've got to have eight stars. And then, your
5 overlapping of tournaments were -- you know, because
6 this is what I was hearing from the managers and the
7 fighters and even some of my friends that are hard
8 core MMA fans can't keep up with which tournament is
9 fighting today and which one is next week and who,
10 what weight class. They just get confused because
11 there's so many tournaments going on at the same
12 time.
13        Q. Right.
14        A. So I told Kevin, I said: We have to change
15 the format. We have to go back to star fights, you
16 know, star versus star, and we have to --
17        MR. KELLY: Slow down a little bit.
18        THE WITNESS: I'm getting excited, you
19 know.
20        But I just told Kevin that we have to
21 change the format, and he was agreeable. He said:
22 Look, if we give you the reins, we're going to give
23 you the reins, and you go do it.
24        And I said: All right, let's go do this.
25

175

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2 BY MR. DELL'ANGELO:
3        Q. Before June of 2014, did Bellator have a --
4 you mentioned Viacom. Did Bellator have a
5 relationship with Viacom?
6        A. Before 2014?
7        Q. June of 2014, yeah.
8        A. That was coming out of -- yes, they did.
9        Q. And did Bellator's pre-June 2014
10 relationship with Viacom mean that Bellator had, you
11 know, access to capital to pay fighters that, you
12 know, had an upstart promotion might not otherwise
13 have?
14        MS. GRIGSBY: Objection to form.
15        MR. KELLY: Objection, foundation, calls
16 for speculation.
17        THE WITNESS: Yeah, I would have to
18 speculate at this point.
19 BY MR. DELL'ANGELO:
20        Q. Are you familiar with Dana White's
21 statements about, you know, the importance of
22 Bellator's relationship with Viacom as it relates to
23 Bellator's access to what he has characterized as
24 $5 billion in cash? Have you heard those statements?
25        A. No.

176

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2        Q. In your experience as an MMA promoter, was
3 having access to, you know, cash alone as an MMA
4 promoter sufficient to attract top talent?
5        A. Is cash enough?
6        Q. In and of itself.
7        A. That's -- that's a very tricky question,
8 and I'll tell you why. Because if I went to a
9 fighter and I was trying to recruit a fighter and
10 let's say UFC was coming in and we're making the same
11 offer, right, they would have familiarity with both
12 of us. But let's say, you know, somebody else came
13 in and was willing to pay even more money.
14        A lot of times, a fighter will take what
15 they're familiar with, and it might be less money.
16        So I don't think money is the only, you
17 know, consideration because there has to be a comfort
18 level for them to trust you and want to fight for
19 you.
20        Q. And do the fighters also need to know that
21 they will have the opportunity to be matched against
22 fighters of, you know, comparable quality?
23        MS. GRIGSBY: Objection to form,
24 foundation.
25

177

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2 BY MR. DELL'ANGELO:
3        Q. In your experience.
4        A. I mean, I've never had a fighter that I've
5 offered a contract to say, well, I want to fight this
6 guy and then I want to do this and that. They want
7 to know their deal, and then, they'll go deal with
8 the division is my experience.
9        Q. I guess thinking about it differently,
10 let's take Fedor as an example since we talked about
11 him.
12        In your experience, would a fighter like
13 Fedor, would it be beneficial to his career to join a
14 promotion that only had unknown, untested fighters?
15        MS. GRIGSBY: Objection, calls for
16 speculation.
17        THE WITNESS: My opinion is that he
18 would -- he would take that into consideration, yes.
19 BY MR. DELL'ANGELO:
20        Q. Do you know if he was ever presented with
21 that kind of opportunity?
22        A. I will say this, he did fight in Russia
23 many times for small organizations that he felt that
24 he wanted to fight in Russia. So he fought for these
25 companies and they paid him, and he fought several

45 (Pages 174 to 177)

**178**

SCOTT COKER - HIGHLY CONFIDENTIAL

1  times there that were not big, big, you know,
2  worldwide companies.
3
4      Q.  So let's get back to sort of Bellator
5  post -- let's get back to Bellator post June 2014.
6  Or get to it, as the case may be.
7      Does Bellator have a policy regarding its
8  fighters' ability to sign sponsorship deals with
9  Bellator sponsors?
10      MS. GRIGSBY:  Objection, form.
11      THE WITNESS:  Yes, it has a policy, yes.
12  BY MR. DELL'ANGELO:
13      Q.  Does that policy include a sponsorship tax
14  like the one that you testified about at the UFC?
15      MS. GRIGSBY:  Objection, form.
16      THE WITNESS:  No.
17  BY MR. DELL'ANGELO:
18      Q.  And does Bellator have a policy that
19  governs its fighters' ability to sign with sponsors
20  that are not Bellator sponsors?
21      A.  Yes.
22      Q.  And what is that policy?
23      A.  I'll just explain the policy.
24      Q.  Sure.
25      A.  The basic policy is simple.  You can't have

**179**

SCOTT COKER - HIGHLY CONFIDENTIAL

1  a competing sponsor on a fighter that competes
2  against your league, you know, league sponsors.
3      So we have like Dave & Busters, our
4  fighters can't go get Buffalo Wild Wings, let's say,
5  kind of the same area.  Or if he has Bud Light and
6  ours is Miller, then there's a conflict.  So they
7  can't do that.
8      Other than that, they're free to go as long
9  as it falls under the rules and the regulations of
10  Viacom Media Company.
11      Q.  Otherwise, they're not -- aside from those
12  limitations, Bellator doesn't restrict its fighters'
13  right to have sponsors when they're fighting for
14  Bellator?
15      A.  Other than that, there's no other
16  restrictions.
17      Q.  And does Bellator have a policy regarding
18  co-promotion for its fighters?
19      A.  Can you explain that?
20      Q.  Sure.  Are you familiar with the term
21  "co-promotion" as it relates to the promotion of MMA
22  bouts?
23      A.  It could mean -- it could mean several
24  things.
25

**180**

SCOTT COKER - HIGHLY CONFIDENTIAL

1      Q.  Okay.  So what is your understanding of
2  what it is?
3      A.  My understanding is when another league,
4  like, say, for instance Rizin or KSW wants to
5  co-promote, then it becomes a co-promotion between
6  Bellator and Rizin or Bellator and, you know, KSW or
7  One FC.  That's what I think of as a co-pro.
8      Q.  Does Bellator have a policy regarding
9  co-promotion as you think of it?
10      A.  No.
11      Q.  So it doesn't prohibit co-promotion, right?
12      A.  No.
13      Q.  Does Bellator have a policy with respect to
14  whether or not a fighter under contract with Bellator
15  can fight for other promotions?  Other MMA
16  promotions, that is.
17      A.  Repeat that one more time just to make sure
18  I understand.
19      Q.  Yes.  Does Bellator have a policy regarding
20  whether or not fighters under contract with Bellator
21  may fight for other MMA promotions?
22      A.  Yes.
23      Q.  And what is that policy?
24      A.  Under the contract, it's an exclusive

**181**

SCOTT COKER - HIGHLY CONFIDENTIAL

1  contract with the fight company.  So they are not
2  allowed to compete.
3      Q.  And do you know when that policy came into
4  being?
5      MS. GRIGSBY:  Objection, foundation.
6      THE WITNESS:  I don't.  And I will say
7  this.  If we have a fighter that wants to fight in
8  Japan, then we'll send him.  If we have a fighter
9  that wants to fight in another league, we'll send
10  them.  We send fighters to Vienna sometimes.
11      I do believe, and again, I'm not a hundred
12  percent, but my belief is that we do have in some
13  fighters' contracts that they actually are allowed to
14  compete in a fight league in another country if we're
15  not -- if it doesn't hurt our business in the sense
16  that we have certain obligations to these athletes,
17  they have to fight two or three times a year.  And we
18  want to make sure that we're able to make that happen
19  for the athlete.  Otherwise, you know, we could be in
20  breach of the deal.
21      So that's kind of in a nutshell what that
22  agreement is.
23  BY MR. DELL'ANGELO:
24      Q.  Right.  So for example, you might not agree
25

46  (Pages 178 to 181)

182

SCOTT COKER - HIGHLY CONFIDENTIAL
1
2    to let a Bellator fighter fight another promotion if
3    it would prohibit you from -- prohibit Bellator --
4        A.   Booking him.
5        Q.   -- from booking him for a fight that you
6    owe him contractually?
7        A.   That's correct.  If it doesn't interfere
8    with our business.
9        Q.   Sure.
10       A.   If we have plans to fight a fighter and he
11   says, look, I want to fight in Russia against
12   so-and-so, I've had this conversation many times even
13   recently as a month ago with our -- one of our big
14   stars in London, with MVP Michael Page.  And he says:
15   I want to box.  And I said:  Go ahead.  Go box.  As
16   long as it doesn't interfere with your MMA schedule
17   and our obligation to fulfill our agreement with you,
18   then box away and enjoy yourself.
19       Q.   In the MMA promotion business, are you
20   familiar with the term "exclusivity" or "exclusivity
21   provision"?
22       A.   Of course.
23       Q.   What do you understand that mean?
24       A.   I mean, obviously, it's exclusive which
25   means that they're restricted, they can't do it.  But

183

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2    to me, there's the agreement, and then, there's the
3    spirit of the agreement.  And to me, the spirit of
4    the agreement always has to be an open door, back and
5    forth.
6        Q.   When Bellator was being operated by --
7    well, does there come a time after you became
8    involved with Bellator that the company changed its
9    contracts?
10       A.   Yes.
11       Q.   Okay.  And did those changes to its
12   contracts include changes to the exclusivity
13   provision?
14       A.   To my knowledge, yes.
15       Q.   And how did they change?
16       A.   Again, if we have a fighter that wants to
17   fight elsewhere and wants to put it in the contract,
18   then we might have done it for one or two people that
19   we said, okay, we'll let you go ahead and do it.
20           For the most part, I think these agreements
21   still have exclusivity provisions, but if they came
22   and talked to us like King Mo did, two years ago, he
23   wanted to fight in the Rizin tournament, so we let
24   him go to Japan and fight.  It was not a co-pro.  We
25   had no financial stake in the fight or what happened

184

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2    to King Mo.
3            And then, last year, he wanted to go again,
4    so, we said okay.  You know, we weren't booking him
5    at the time.  Go ahead and go fight your heart out.
6        Q.   Right.  So are you aware that Bellator
7    produced some documents to the plaintiffs in this
8    litigation?
9        A.   I believe so.
10       Q.   And have you had the opportunity to look at
11   any of those documents?
12       A.   I glanced at them, yes.
13       Q.   So I want to show you a couple of documents
14   I got that were produced by the plaintiffs in
15   litigation.  I'm going to hand you two at the same
16   time.
17           The first I'm marking as Coker Exhibit 11.
18   The Bates stamp begins SBPCL00003784.
19           And then, the second exhibit I'm going to
20   hand you is Exhibit 12, which begins SBPCL00002713.
21           (Exhibits 11 and 12 were marked for
22           identification by the reporter.)
23   BY MR. DELL'ANGELO:
24       Q.   You're welcome to take as much time as you
25   want to look at them, Mr. Coker, but I'm really at

185

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2    the moment just interested if you could take a quick
3    look and identify them so we can just cover a few
4    questions.
5        A.   Um-hmm.
6        Q.   Let's start with Exhibit 11.  Do you
7    recognize Exhibit 11?
8            MR. KELLY:  Are you asking him if he
9    recognizes the form?  Because it is redacted.
10           MR. DELL'ANGELO:  That's a fair question.
11   So I'll withdraw the question.
12   BY MR. DELL'ANGELO:
13       Q.   So Mr. Coker, do you recognize the form of
14   the document of Exhibit 11?
15       A.   It looks like a standard contract.
16       Q.   Of Bellator?
17       A.   Yes.
18       Q.   Would you turn to page 40 of the document.
19   The Bates is 3823.
20           Do you see a name and a signature there?
21       A.   Is it here?
22           MR. KELLY:  Keep going.
23   BY MR. DELL'ANGELO:
24       Q.   I think you've got it.
25           Do you see a name and a signature there?

47  (Pages 182 to 185)

190

```
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2    for itself.  It's either in there or it's not in
 3    there.
 4    BY MR. DELL'ANGELO:
 5        Q.  Why don't I read it and you can just
 6    answer.  So 6, "Grant Of Ancillary Rights" says:
 7            "Subject to the terms and
 8            conditions set forth below, fighter
 9            hereby grants to promoter the
10            following, unrestricted, irrevocable
11            worldwide rights in perpetuity,
12            ancillary rights."
13        Do you see?
14        A.  Um-hmm.
15        Q.  Would you agree that that doesn't contain
16    the term "exclusive," right?
17        A.  Correct.
18        Q.  And then, if you go down to A, it begins:
19            "The exclusive right during the
20            term to stage all bouts, sell
21            tickets, admission," et cetera.
22        Do you see that?
23        A.  Yes.
24        Q.  Is that an example of an exclusivity
25    provision of the type that you testified about a
```

191

```
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2    little bit earlier?
 3            MR. KELLY:  Object to the extent it calls
 4    for a legal conclusion.  The document speaks for
 5    itself.
 6            THE WITNESS:  I mean, look, I'm not a
 7    lawyer.
 8    BY MR. DELL'ANGELO:
 9        Q.  Sure.  I understand.
10        A.  But to me, this looks like an exclusive
11    provision.
12        Q.  Okay.  But then, I would also like you to
13    just take a moment to look at the following
14    paragraphs of this contract that you signed on behalf
15    of Bellator, B, C, D, E, F, G, H.
16        Do you see any of those that include an
17    exclusivity provision?
18            MS. GRIGSBY:  I'm going to object again --
19            MR. KELLY:  The document speaks for itself.
20    Take your time and --
21            THE WITNESS:  Are you asking me to read
22    through this thing now?
23    BY MR. DELL'ANGELO:
24        Q.  I just wanted to know -- I mean, look, you
25    signed the document, right, on behalf of Bellator.
```

192

```
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2    I'm just trying to see if you're aware if it has an
 3    exclusivity provision in anything other than 6A --
 4        A.  I'll be honest with you --
 5        Q.  -- in paragraph A --
 6        A.  Here is the process.
 7        Q.  Yes.
 8        A.  So I go and make a deal --
 9            THE REPORTER:  You all talked right at the
10    same time.  Sorry.
11            THE WITNESS:  So as president of the
12    company, I go, I make the deal with the athlete, and
13    then, I turn it over to our legal team and they
14    finish up with the fighter's legal time, and they
15    make the document and they execute it.  That's really
16    the process.
17            But I'm happy, you know, to read through
18    this if you'll give me a minute.
19            MR. KELLY:  Just so the question is in
20    mind, you're asking whether B through H --
21            MR. DELL'ANGELO:  Yeah.  They just contain
22    the same type of exclusivity provision that's in A.
23    By my reading, they don't, but I think you all seem
24    to be comfortable that the document speaks for
25    itself.
```

193

```
 1            SCOTT COKER - HIGHLY CONFIDENTIAL
 2            MS. GRIGSBY:  Yeah, I'm going to object,
 3    he's not a lawyer, and in terms of the term
 4    "exclusivity provision," I don't see that anywhere in
 5    the document.
 6            MR. DELL'ANGELO:  I'm going to object to
 7    the use of speaking objections.  We've spoken about
 8    that, Stacy.
 9            MS. GRIGSBY:  I don't think we have.
10            MR. DELL'ANGELO:  We have.  We wrote you a
11    letter, didn't we?
12            MS. GRIGSBY:  It wasn't to me.
13            MR. DELL'ANGELO:  Okay.  So it was to your
14    counsel.  You know what we mean, so please don't
15    persist because you know they're improper.
16    BY MR. DELL'ANGELO:
17        Q.  So --
18        A.  So --
19        Q.  As you've used the term, do you see an
20    exclusivity provision in any portion of paragraph 6
21    of Exhibit 12 other than part A?
22        A.  Does not appear to be.
23        Q.  Okay.  Thank you.
24            Has Bellator ever attempted to contract
25    with a fighter who was under contract with the UFC?
```

49 (Pages 190 to 193)

194

**SCOTT COKER - HIGHLY CONFIDENTIAL**
1
2   A.  No.
3   Q.  Why not?
4   A.  Because if they fight for the UFC, they
5   have a contract with the UFC which would not allow
6   them to come fight for us.
7       So the process has been that we would wait
8   until the fights are completely done, we go into a
9   matching rights period, and then, we'll talk to them
10  when they are free and clear to talk.
11      Q.  At Bellator, are you familiar with the term
12  "tent-pole event"?
13      A.  Yes.
14      Q.  What is a tent-pole event as it relates to
15  Bellator?
16      A.  We do six stadium shows.  When you say
17  stadium, the size of, let's say, Staple Center or
18  Anaheim or the Forum here, Madison Square Garden, and
19  it's six big events with all big fighters.
20      Q.  Can you just explain what a tent-pole event
21  is, like what that means?
22      A.  I would -- yeah.  I would base tent-pole on
23  the scale of the venue, the quality of the fighters,
24  and traditionally, we do them on a Saturday night
25  instead of a Friday night.  It's a three-hour show

195

1   SCOTT COKER - HIGHLY CONFIDENTIAL
2   instead of a two-hour show.
3       But it's sizeable matchups to attract
4   sizeable viewers.
5       Q.  Do tent-pole events, as that term is used
6   at Bellator, does that encompass fighters that are --
7   what types of fighters does it include?
8       A.  We would bring all of our top talent.
9       Q.  And does the term "Legend bouts," is that
10  something that Bellator promotes as well?
11      A.  From time to time, yes.
12      Q.  Okay.  And as Bellator promotes Legend
13  bouts, what are Legend bouts?
14      A.  I would consider a fight like the one we
15  just had at Madison Square Garden.  We had Chael
16  Sonnen fighting Wanderlei Silva.  Like a Legends
17  matchup.
18      Q.  Just going back to something I asked you a
19  moment ago about Bellator, I think you testified that
20  Bellator doesn't attempt to contract with fighters
21  who are under contract with the UFC, correct?
22      A.  Yes.
23      Q.  Okay.  In the MMA promotion business, are
24  you familiar with something called matching period?
25      A.  Yes.

196

1   SCOTT COKER - HIGHLY CONFIDENTIAL
2       Q.  Okay.  What is a matching period?
3       A.  My understanding is that some contracts,
4   not all contracts, have a matching period.  So we
5   always ask the fighter:  Are you in a matching
6   period, or can you go straight to a -- I'm sorry.
7       Repeat that one more time.
8       Q.  My question really just was what is a
9   matching period, as you understand --
10      A.  Okay.  I was thinking more of the exclusive
11  negotiation period.
12      So a matching period is a certain amount of
13  time that is in a contract between a fighter and a
14  promoter that allows them to match another offer from
15  another league.
16      Q.  Okay.  And during the course of your tenure
17  at Bellator, has Bellator ever made an offer to a UFC
18  fighter who is coming off of a matching period?
19      A.  Who is --
20      MS. GRIGSBY:  Objection to form.
21      THE WITNESS:  Who is in a matching period?
22  BY MR. DELL'ANGELO:
23      Q.  Who is in a matching period.
24      A.  Yes, we have.
25      Q.  Okay.  Can you give me an example?

197

1       **SCOTT COKER - HIGHLY CONFIDENTIAL**
2   A.  Roy McDonald.
3       Q.  Okay.
4   A.  And Gegard Mousasi.
5       Q.  Any others that you can think of?
6   A.  Those are the two big -- the big fighters
7   that come to my mind.
8       (Exhibit 13 was marked for
9       identification by the reporter.)
10  BY MR. DELL'ANGELO:
11      Q.  Mr. Coker, I'm marking as Exhibit 13 an
12  exhibit that I'm handing to your counsel.  For the
13  record, Exhibit 13 is a declaration of Scott Coker In
14  Support Of Non-Party Bellator Sport Worldwide, LLC's
15  Motion To Quash Or Modify Subpoenas.
16      Do you recognize Exhibit 13?
17      A.  No.
18      Q.  All right.  Would you turn to the last page
19  of Exhibit 13.
20      Is that your signature?
21      A.  It appears to be.
22      Q.  Just take a moment and take a look at
23  Exhibit 13, and tell me if this refreshes your
24  recollection.
25      MS. GRIGSBY:  Objection.  Counsel, is this

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue · Ste 500, New York, NY 10123  1.800.642.1099

198

SCOTT COKER - HIGHLY CONFIDENTIAL
1   the state in which it was filed with the
2   highlighting?
3
4       MR. DELL'ANGELO:  Pardon?
5       MS. GRIGSBY:  Was this filed with
6   highlighting --
7       THE REPORTER:  I can't hear you.
8       MS. GRIGSBY:  Sorry.  Was this -- does
9   everybody -- does everybody else's document have
10  highlighting, or is it just mine?
11      MR. KELLY:  Yes.
12      MR. DELL'ANGELO:  It should not.
13      THE WITNESS:  This one does.
14      MR. RAYHILL:  Yes.  Let's pull those back.
15  Is there a place where I can make copies?
16      MR. DELL'ANGELO:  Why don't we go off the
17  record.  Thanks.
18      THE VIDEOGRAPHER:  Going off the record.
19  The time is 2:19 p.m.
20      (There was a recess taken.)
21      THE VIDEOGRAPHER:  Going back on the
22  record.  The time is 2:31 p.m.
23  BY MR. DELL'ANGELO:
24      Q.  So Mr. Coker, you have before you a
25  refreshed copy of Exhibit 13 entitled the

199

SCOTT COKER - HIGHLY CONFIDENTIAL
1   "Declaration Of Scott Coker in Support of Non-Party
2   Bellator Sport Worldwide LLC's Motion to Quash Or
3   Modify Subpoenas."
4
5       Would you first turn to the last page of
6   the document and tell if that's your signature?
7       A.  Yes.
8       Q.  Okay.  And what is the date on the
9   document?
10      A.  February of '17.
11      Q.  February of 2017?
12      A.  2017, yes.
13      Q.  You've had a moment to take a look at the
14  document.  Could you tell me if you recognize it?
15      A.  I do.
16      Q.  And it's a declaration that you executed in
17  February of 2017 -- or, January, sorry -- yes,
18  February of 2017?
19      A.  Yes.
20      Q.  Do you have any reason to believe that the
21  statements in here are inaccurate or incomplete in
22  any way?
23      A.  No.
24      Q.  Would you turn, please, to page 7 of 8 of
25  the document, if you're looking in the upper

200

SCOTT COKER - HIGHLY CONFIDENTIAL
1   right-hand corner there.
2
3       I want to direct your attention -- do you
4   see paragraph 21?
5       A.  This is 7?
6       MR. KELLY:  He's counting on the --
7       THE WITNESS:  Oh, I see.
8   BY MR. DELL'ANGELO:
9       Q.  In the upper right-hand corner.
10      MR. KELLY:  Yes.
11  BY MR. DELL'ANGELO:
12      Q.  Because the numbers are a little --
13      A.  You're looking at No. 7?
14      Q.  I'm looking at page 7 of 8 if you're
15  looking at the upper right-hand corner.
16      A.  Yeah.
17      Q.  If you could go down to line 13, if you're
18  looking in the left-hand axis there, each line is
19  numbered.
20      A.  Um-hmm.
21      Q.  And there's a sentence that begins at the
22  end of line 13 that says:
23          "As it is now, UFC has frequently
24          counterprogrammed Bellator's events,
25          for example, by choosing venues for

201

SCOTT COKER - HIGHLY CONFIDENTIAL
1   scheduling high profile matches to
2   draw audience away from Bellator's
3   own key matches.  Such practices
4   could become lethal if UFC were
5   unilaterally armed with Bellator's
6   event information."
7
8       A.  Um-hmm.
9       Q.  Could you just tell us what you meant by
10  UFC counterprogramming Bellator's events?
11      A.  Yes.  So we had a fight in January that we
12  considered one of our big tent pole fights, and it
13  was Tito Ortiz fighting Chael Sonnen.
14      And the calendar on the athletic commission
15  cleared, it's like we felt it was a good date and no
16  competition that day.
17      And so, we go and we announce this fight,
18  and we go on sale.  And then -- and this is all
19  public information from the internet.
20      Then Dana comes out and says, oh, we're
21  going to go on the same day.  We're going to go right
22  down the street from you in Anaheim, and we're going
23  to book the biggest fight card in the history of UFC.
24      So, you know, we say, okay, then now we'll
25  have to just do a better job, go out and sell some

51 (Pages 198 to 201)

246

SCOTT COKER - HIGHLY CONFIDENTIAL

1  matching rights clause, in there if you thought it
2  was detrimental to the fighters?
3      A.  I mean, we treat our fighters extremely
4  well, but this is also a business side where I
5  have -- it's my job to protect the company.  And if
6  one company out there that's industry leader is doing
7  it and you're not doing it, then it's not creating a
8  fair playing field.
9      Q.  Now, besides Strikeforce, do other MMA
10  promoters have a right-to-match clause?
11         MR. DELL'ANGELO:  Objection to form.
12         THE WITNESS:  I'm not sure.
13  BY MS. GRIGSBY:
14     Q.  Well, does Bellator have a right-to-match
15  clause in some of its contracts?
16     A.  I believe we do.
17     Q.  And has Bellator had a right-to-match
18  clause in its contracts since you've been president?
19         MR. DELL'ANGELO:  Objection to form.
20         THE WITNESS:  I believe so.
21  BY MS. GRIGSBY:
22     Q.  Has Bellator exercised the right-to-match
23  clause since you've been president?
24     A.  I can only -- I mean, maybe a couple times.
25

247

SCOTT COKER - HIGHLY CONFIDENTIAL

1      Q.  Do you remember examples of when Bellator
2  exercised the right-to-match clause when you were
3  president?
4      A.  I cannot.
5      Q.  If Bellator exercises the right-to-match
6  clause, then that means that the fighter would
7  generally stay with Bellator; isn't that right?
8         MR. DELL'ANGELO:  Objection to form.
9         THE WITNESS:  Yes.
10  BY MS. GRIGSBY:
11     Q.  But the right-to-match clause doesn't
12  prevent a different promoter from making an offer to
13  a fighter during the matching period, does it?
14         MR. KELLY:  Objection to the extent it
15  calls for a legal conclusion.
16         THE WITNESS:  Can you repeat that one more
17  time.
18  BY MS. GRIGSBY:
19     Q.  So the right-to-match clause, if you have a
20  fighter in Bellator, does not prevent a different MMA
21  promoter from making an offer to a fighter during the
22  matching period, does it?
23         MR. KELLY:  Same objection.
24         MR. DELL'ANGELO:  Objection to form.
25

248

SCOTT COKER - HIGHLY CONFIDENTIAL

1      THE WITNESS:  They can -- they can
2  negotiate with other leagues at that time.
3  BY MS. GRIGSBY:
4      Q.  And by the same token, the right-to-match
5  clause in, say, a UFC fighter's contract does not
6  prevent Bellator from making an offer to the fighter
7  during the matching period, does it?
8         MR. DELL'ANGELO:  Objection to form.
9         MR. KELLY:  Same objection.
10         THE WITNESS:  If a fighter is in a matching
11  period there in the UFC, they're also able to take
12  offers from multiple organizations.
13  BY MS. GRIGSBY:
14     Q.  In fact, you've made offers to free agents
15  from the UFC during the matching period as president
16  of Bellator, haven't you?
17     A.  Yes.
18     Q.  So one example would be Rory McDonald which
19  you mentioned earlier; is that right?
20     A.  Yes.
21     Q.  And you've also been able to sign as
22  president of Bellator Benson Henderson after his UFC
23  contract expired; is that right?
24     A.  Yes.
25

249

SCOTT COKER - HIGHLY CONFIDENTIAL

1      Q.  And generally, do you think that matching
2  helps drive up the offers for a fighter?
3         MR. DELL'ANGELO:  Objection to form.
4         THE WITNESS:  Yes.
5  BY MS. GRIGSBY:
6      Q.  And matching also, the right to match also
7  helps fighters see what their value is.
8         Wouldn't you agree?
9         MR. DELL'ANGELO:  Objection to form.
10         THE WITNESS:  Yes.
11     (Exhibit 24 was marked for
12     identification by the reporter.)
13  BY MS. GRIGSBY:
14     Q.  I'm handing you what has been marked Coker
15  Exhibit 24.  Exhibit 24 is Bates-stamped ZFL-2456113.
16         Do you recognize this document?
17     A.  Yes.
18     Q.  What is it?
19     A.  It was myself -- well, it was actually from
20  Jim Goddard and myself talking about Tito Ortiz.
21  Like I said, 2009, Tito either was a free agent or he
22  was going through his matching period.
23         Tito's manager or law firm, his name is
24  Ofir, he called me up and said that Tito was looking

63 (Pages 246 to 249)

250

1	SCOTT COKER - HIGHLY CONFIDENTIAL
2	to make a move away from UFC, are you interested?  So
3	we started talking.  And then, I was talking to
4	Jim Goddard about, you know, the opportunity, and
5	that's what this email is.
6	Q.  Now, in the middle of the page, Jim Goddard
7	writes to you, in an email dated March 16, 2009:
8	"Why won't UFC match if for no
9	other reason than to keep him from
10	us?  Is this a CBS or PPV?"  Which
11	I'm assuming means pay-per-view.
12	"Haven't reviewed Charlie's
13	suggested pro forma on a Tito deal."
14	And then, just above it, it looks like you
15	write back to Jim Goddard, Andrew Ebel and Kenn
16	Ellner on the same date.
17	"UFC will not match it.  They are
18	not built like that.  Showtime, CBS
19	and PPV.  PPV is where we make the
20	money, the dollars.  Charlie's model
21	might not fit Tito's expectations
22	but we should discuss.  These
23	opportunities do not come around too
24	often.  Thanks, SC."
25	Is that an email from you to Jim Goddard,

251

1	SCOTT COKER - HIGHLY CONFIDENTIAL
2	Andrew Ebel and Kenn Ellner?
3	A.  Yes.
4	Q.  And then you said UFC will not match it,
5	they are not built like that, what did you mean?
6	A.  We were looking to do partnership deals
7	with the athletes at that point.  So instead of the
8	traditional model where you're the athlete, maybe you
9	make a million dollars a fight and you make, you
10	know, some money on top of that, when it has been
11	like a $3 or $4 per pay-per-view buy, that was the
12	traditional model.
13	So what I talked to Tito about was, why
14	don't you and I go in partnership with this deal.
15	And so, you become a partner, and it's a one-off or
16	two-off or three-off event or however many fights you
17	want to do.
18	But basically, the partner would be the
19	fighter with you, and Strikeforce would put up the
20	money, we would have done a pay-per-view fight with
21	Tito versus somebody, and then, we would have split
22	revenues equally like a partner.
23	Q.  So at this time, in March of 2009, you
24	thought that Strikeforce could offer Tito Ortiz
25	something that the UFC could not match; is that

252

1	SCOTT COKER - HIGHLY CONFIDENTIAL
2	right?
3	A.  I think we would offer them something
4	different than they would traditionally offer.
5	Q.  And at this time in March 2009, you thought
6	that the UFC would not match it for Tito Ortiz; is
7	that right?
8	A.  That's correct.
9	Q.  Now, you testified a little bit that you
10	understood that UFC engaged in counterprogramming.
11	Do you remember that?
12	A.  Yes.
13	Q.  And you also testified that after
14	Strikeforce bought Pro Elite, you thought that there
15	was more counterprogramming; is that right?
16	A.  Yes.
17	Q.  Now, after Strikeforce brought Pro Elite,
18	do you know if UFC put on more events than it had in
19	prior years?
20	A.  I'm not sure.
21	Q.  Did Strikeforce ever engage in
22	counterprogramming of UFC?
23	A.  Well, we have done fights on the same date
24	because that was the only date available, but it
25	wasn't targeted fights like we're going after

253

1	SCOTT COKER - HIGHLY CONFIDENTIAL
2	anybody.  That's the difference, I think.
3	Q.  So would it be your testimony that
4	Strikeforce didn't intend to put on fights on the
5	same date, but it in fact did put on fights on the
6	same date as the UFC?
7	A.  Yes.
8	(Exhibit 25 was marked for
9	identification by the reporter.)
10	BY MS. GRIGSBY:
11	Q.  So I apologize, this is not stapled, but
12	this is Exhibit 25.  This is one copy.  Two copies.
13	Now, do you recognize this document?
14	A.  I don't recognize it, but I'm sure that it
15	was me sending it.
16	Q.  So this is ZFL-2396988.
17	A.  Okay.
18	Q.  And for the record, you are laughing.
19	A.  Okay.
20	Q.  I want to start with Mr. Spira's email
21	which is in the middle of the first page, sent on
22	March 5th, 2010 at 1:26 a.m., and it says:
23	"If indeed they are trying to get
24	the new Vanderbilt arena - reserve
25	all the hotel rooms," "Do on campus

64 (Pages 250 to 253)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

266

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2        combat event aside from the event
3        set forth herein."
4        Let me just back up.  Do you recognize this
5    document?
6        A.  No.
7        Q.  So on the last page, or the page that ends
8    with 234.
9        A.  My signature.
10        Q.  So that's your signature.  So you were the
11    signatory for this contract; is that right, on behalf
12    of Bellator?
13        A.  Yes.  I mean, we do have my signature stamp
14    on some of these documents, you know, that they're
15    authorized -- our legal team is authorized to sign it
16    on behalf of myself.
17        Q.  So you don't remember entering into this
18    contract; is that right?
19        A.  I can tell you, I've never read any venue
20    document probably ever in the history of my combat
21    sports promoting business.
22        Q.  Well, would it surprise you if venue
23    contracts have a provision, such as this one, where
24    it is exclusive and it cannot host other combat
25    sports during a certain window?

267

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2        MR. DELL'ANGELO:  Objection to form.
3        THE WITNESS:  You know, I'm just not sure.
4    BY MS. GRIGSBY:
5        Q.  We'll put that one to the side.
6        (Exhibit 28 was marked for
7        identification by the reporter.)
8    BY MS. GRIGSBY:
9        Q.  And I'm going to hand you what has been
10    marked as Exhibit 28, and you might have similar
11    answers, but we'll see.
12        A.  I'll try my best.
13        Q.  So Exhibit 28 has been Bates-stamped
14    SBPCL00000324 with the ending Bates stamp of
15    SBPCL00000341.
16        Just turning to the last page.
17        A.  Yes.
18        Q.  Is that your signature on the last page?
19        A.  Yes.
20        Q.  Do you recognize this document?
21        A.  No.
22        Q.  Do you recall entering into a site
23    agreement with the Chickasaw Nation at all, between
24    Bellator and the Chickasaw Nation?
25        A.  Yes.  I believe this document is in

268

1    SCOTT COKER - HIGHLY CONFIDENTIAL
2    reference to our Thackerville, Oklahoma event.  And
3    we go there, I think two or three times a year.  And
4    I think it came up for renewal in '16, and this looks
5    like the extension.
6        But again, the process would be, you know,
7    our venue staff member talking to the casino and the
8    host venue, and then, basically, I would green light
9    the terms and the conditions that they're proposing
10    or make changes.  And then, it just goes to legal,
11    and that's how it operates.
12        Q.  Well, looking at SBPCL00000332, which is
13    under heading 3, subparagraph Q, it says:
14        "Exclusivity.  Nation understands
15        and agrees that during the term, it
16        shall not host any other MMA events
17        aside from the event set forth
18        herein."
19        Is this the type of term that you would
20    approve?
21        A.  I didn't even know that was in the
22    agreement.
23        Q.  Now, would you say that Bellator is a
24    national promotion of MMA bouts events?
25        A.  Yes.

269

1        SCOTT COKER - HIGHLY CONFIDENTIAL
2        (Exhibit 29 was marked for
3        identification by the reporter.)
4    BY MS. GRIGSBY:
5        Q.  I'm handing you what has been marked as
6    Exhibit 29.
7        Now, this is an article from SB Nation,
8    which is "Spike TV president:  Bellator MMA on an
9    even footing with the UFC."  MMA fighting is the
10    category.  It's by Mark Raimondi, dated February 8th,
11    2015.
12        Now, I just want to direct your attention
13    to the last page.  On the last page, you're quoted as
14    saying:
15        "There's not going to be a fighter
16        on the planet.  We can't afford and
17        have access to."
18        Do you see that?
19        A.  Yes, I see it.
20        Q.  Did you make that statement?
21        A.  Yes.
22        Q.  And do you believe it's true that there's
23    not going to be a fighter on the planet that Bellator
24    can't afford and have access to?
25        MR. DELL'ANGELO:  Objection to form.

68  (Pages 266 to 269)

270

1          SCOTT COKER - HIGHLY CONFIDENTIAL
2          THE WITNESS:  Let me just explain the
3  steps.
4          So basically, it's -- access to, meaning if
5  they're a free agent, obviously, we have to -- we
6  can't just go steal fighters.  So that's maybe a
7  misstep on my part.
8          But I believe that we will be able to
9  afford the fighters that are getting the top dollar
10  out there.
11  BY MS. GRIGSBY:
12      Q.  So with that correction, which is there's
13  not going to be a free agent fighter on the planet
14  that we can't afford and have access to, would you
15  say it's true that there's not going to be a free
16  agent fighter that Bellator can't afford or have
17  access to?
18      MR. DELL'ANGELO:  Objection to form.
19      THE WITNESS:  I believe it's true.
20      (Exhibit 30 was marked for
21       identification by the reporter.)
22  BY MS. GRIGSBY:
23      Q.  I'm handing you what has been marked as
24  Exhibit 32 --
25      THE REPORTER:  Exhibit what?

271

1          SCOTT COKER - HIGHLY CONFIDENTIAL
2          MS. GRIGSBY:  32.  Oh, sorry.  30.
3  Exhibit 30.
4  BY MS. GRIGSBY:
5      Q.  Exhibit 30 is another article from
6  SB Nation called "AJ McKee re-ups for multiple years.
7  Will remain in Bellator MMA for foreseeable future."
8          Now, I just want to direct your attention
9  to the second page where the article starts.  The
10  last paragraph at the bottom.  The beginning of the
11  sentence reads:
12          "We have many of the best
13          featherweights in the world fighting
14          for Bellator, and AJ has left no
15          doubt in my mind that he belongs in
16          that group."
17          Did you make that statement?
18      A.  Yes.
19      Q.  And do you believe it to be true?
20      A.  Yes.
21      Q.  So you believe that Bellator has some of
22  the best featherweight fighters in the world, is that
23  right, fighting for Bellator?
24      MR. DELL'ANGELO:  Sorry.  I'm going to just
25  object to the form.  Vague and ambiguous as to time.

272

1          SCOTT COKER - HIGHLY CONFIDENTIAL
2  BY MS. GRIGSBY:
3      Q.  So this article is dated December 21st,
4  2015.
5      So as of December 2015, do you believe that
6  Bellator has or had some of the best featherweight
7  fighters fighting for Bellator in the world?
8      A.  Yes.
9      Q.  You can put that to the side.
10      (Exhibit 31 was marked for
11       identification by the reporter.)
12  BY MS. GRIGSBY:
13      Q.  So I'm handing you what has been marked as
14  Exhibit 31, which is an article, again, from
15  SB Nation, which reads, "Scott Coker: Bellator did
16  talk to Alistair Overeem's reps, but 'we chose' not
17  to make an offer."  It's dated February 16th, 2016.
18      Now, I just want to direct your attention
19  to the third page in this article.  In the third
20  paragraph up from the bottom, which starts as --
21  through to the last one in the article.  The third
22  paragraph up from the bottom.  It starts with, "And
23  same thing with Sterling."
24      Now, the last sentence in this box says:
25          "There are other free agents that

273

1          SCOTT COKER - HIGHLY CONFIDENTIAL
2          are on the market that we're going
3          after.  There's a lot of fighters
4          out there right now."
5      A.  Um-hmm.
6      Q.  Did you make that statement in 2016?
7      A.  Yes.
8      Q.  And do you believe it to be true, that in
9  February 2016, there were a lot of fighters out there
10  on the market that Bellator could go after?
11      A.  Yes.
12      Q.  You can put that to the side.
13      (Exhibit 32 was marked for
14       identification by the reporter.)
15  BY MS. GRIGSBY:
16      Q.  I'm handing you what has been marked as
17  Exhibit 32.
18      Exhibit 32 is an L.A. Times article
19  entitled "Bellator goes after free agents as it digs
20  in as alternative to UFC," dated January 21st, 2017,
21  by Lance Pugmire.
22      Now, in the article, in the third paragraph
23  of the second page, there's a quote from you that
24  says:
25          "We picked up a hundred percent of

69  (Pages 270 to 273)

274

```
1         SCOTT COKER - HIGHLY CONFIDENTIAL
2      the guys we went after last year.
3      It's a commitment by Spike TV and
4      Viacom."
5         Do you see that?
6      A.  Yes.
7      Q.  Did you make that statement?
8      A.  Yes.
9      Q.  And is it true that in last year, meaning
10     that as of January 2017, Bellator picked up a hundred
11     percent of the free agent MMA fighters that it went
12     after?
13     A.  Yes.
14        (Exhibit 33 was marked for
15        identification by the reporter.)
16  BY MS. GRIGSBY:
17     Q.  I'm handing you what has been marked as
18     Exhibit 33.
19        Now, since you've been president of
20     Bellator, have you followed the ratings that
21     Bellator's events have gotten either on free TV or on
22     pay-per-view?
23     A.  Yes.
24     Q.  Now, this article is another SB Nation
25     Bloody Elbow article entitled "Kimbo versus Shamrock
```

275

```
1         SCOTT COKER - HIGHLY CONFIDENTIAL
2      Bellator MMA (main event) averages 2.1 million
3      viewers on Spike," dated June 22nd, 2015.
4         Now, is it true that in June of 2015,
5      Bellator's Kimbo Slice/Shamrock event topped
6      2.1 million viewers on Spike?
7      A.  Yes.
8      Q.  And in your view, is that a sizeable
9      audience, 2.1 million viewers, for an MMA event?
10     A.  Yes.
11        MR. DELL'ANGELO:  Objection to the form.
12        THE WITNESS:  Sorry.
13        (Exhibit 34 was marked for
14        identification by the reporter.)
15  BY MS. GRIGSBY:
16     Q.  So let's look at -- this is Exhibit 34.
17        Exhibit 34 is another production from Shark
18     Entertainment.  The first email is really a long
19     forward, but it's from David I. Schwarz at Spike TV,
20     subject:  Spike press June 22nd, 2015, Bellator 138,
21     and then, it looks like there's a forward from Scott
22     Coker at Bellator on the same date, and finally, from
23     Christian Printup to you, Scott Coker, with a cc to a
24     number of individuals on June 22nd, 2015.  Oh,
25     Christian Printup.
```

276

```
1         SCOTT COKER - HIGHLY CONFIDENTIAL
2      Do you recognize this document?
3      A.  It looks like a document that traditionally
4      comes to us, including myself from after an event,
5      from the press guys at Spike TV, David Schwarz.
6      Q.  Now, on the second page, do you see the
7      quote:
8            "Bellator produced an entertaining
9            night of fights that certainly
10           brought with it more headlines and
11           media attention than its main
12           competitor, the UFC," by SB Nations.
13           Do you see that?
14     A.  Yes.
15     Q.  And that is referring to -- all these
16     quotes are referring to the Shamrock/Kimbo Slice
17     fight; is that correct?
18     A.  Yes.
19     Q.  And do you agree with SB Nation that
20     Bellator produced an entertaining night of fights
21     that brought with it more headlines and media
22     attention than its main competitor, the UFC, for the
23     Shamrock/Slice fight?
24     A.  I believe for that event, we did.
25  ///
```

277

```
1         SCOTT COKER - HIGHLY CONFIDENTIAL
2        (Exhibit 35 was marked for
3        identification by the reporter.)
4   BY MS. GRIGSBY:
5      Q.  I'm showing you what has been marked as
6      Exhibit 35, which is an SB Nation article, dated
7      November 10, 2015 with a headline "Bellator slightly
8      tops UFC in total viewers over the weekend."
9         Now, do you remember the event discussed in
10     this article, which is Bellator St. Louis event in
11     November of 2015?
12     A.  Yes.
13     Q.  And do you agree that the St. Louis event
14     got better ratings than the UFC by drawing 814,000
15     viewers?
16     A.  Yes.
17     Q.  So during your time there, there have been
18     a number of times where Bellator's ratings have
19     either met or exceeded that of the UFC event during
20     the same time period; is that right?
21     A.  Yes.
22     Q.  And just to be clear, so during your time
23     at Bellator, there are a number of times when
24     Bellator's ratings have been the same or exceeded the
25     UFC?  I was just clarifying the question.
```

70  (Pages 274 to 277)

278

SCOTT COKER - HIGHLY CONFIDENTIAL
1
2    A.  Yes.
3        Q.  Now, earlier, you also testified that
4    Bellator has some main sponsors since you've been
5    president there; is that right?
6    A.  Yes.
7        Q.  And so, one of the core sponsors, you said,
8    was Miller Lite; is that correct?
9    A.  Yes.
10       Q.  And one of the sponsors is also -- is it
11   Monster Energy as well?
12   A.  Yes.
13       Q.  And Dave & Busters, you also mentioned as a
14   sponsor of Bellator; is that right?
15   A.  Yes.
16       Q.  And those are marquee sponsors, aren't
17   they?
18   A.  Yes.
19       MS. GRIGSBY:  Do you mind if I just take
20   five minutes?
21       MR. DELL'ANGELO:  Sure.
22       MS. GRIGSBY:  I don't think I've got much
23   longer.
24       MR. DELL'ANGELO:  Okay.
25       THE VIDEOGRAPHER:  Going off the record.

279

SCOTT COKER - HIGHLY CONFIDENTIAL
1
2    The time is 4:41 p.m.
3        (There was a recess taken.)
4        THE VIDEOGRAPHER:  Going back on the
5    record.  The time is 4:51 p.m.
6        (Exhibit 36 was marked for
7        identification by the reporter.)
8    BY MS. GRIGSBY:
9        Q.  I'm handing you what has been marked as
10   Exhibit 36.
11       So Exhibit 36 is another SB Nation article,
12   dated December 25th, 2014, entitled "Scott Coker on
13   UFC antitrust lawsuit."  Bellator is not a, quote,
14   "minor league," unquote.
15       Do you recall giving an interview with MMA
16   Fighting about the antitrust lawsuit that was filed
17   in December of 2014?
18   A.  I believe so.
19       Q.  Well, on the third page, above the bullet
20   Bellator 131, the paragraph above says:
21       "Labeling a league based on the
22       past can be misleading because the
23       fighters that are here today
24       fighting for us are going to be the
25       next Luke Rockholds and the next

280

SCOTT COKER - HIGHLY CONFIDENTIAL
1
2    Daniel Cormiers.  They're going to
3    be the next stars of the MMA."
4        In December of 2014, did you say that?
5    A.  I believe so.
6        Q.  And do you believe that labeling a league
7    as either a minor league or an up and coming can be
8    misleading?
9    A.  Yes.
10       Q.  Would you agree, at least as of December of
11   2014, that things in the MMA industry change very
12   quickly?
13   A.  Yes.
14       Q.  And you said in the fourth paragraph of the
15   second page that you don't think Bellator is a minor
16   league, do you?
17   A.  Bellator is not in a minor league.
18       Q.  And when you referred earlier to a
19   two-player market or a single-player market, you
20   would consider Bellator a player, wouldn't you?
21   A.  Yes.
22       MR. DELL'ANGELO:  Objection to form.
23       MS. GRIGSBY:  So I actually think that's
24   all I have for you.
25       THE WITNESS:  Okay.  Thank you.

281

SCOTT COKER - HIGHLY CONFIDENTIAL
1
2        MS. GRIGSBY:  Thank you very much.
3        MR. DELL'ANGELO:  I actually just have a
4    few follow-up questions.  We don't need to go off a
5    break.  We can just jump right in.  I'll be quick.
6        THE WITNESS:  Okay.
7
8        FURTHER EXAMINATION
9    BY MR. DELL'ANGELO:
10       Q.  Hello again, Mr. Coker.  I just have a few
11   follow-up questions, and I'll try to be quick.  I
12   know it's been a long day.
13       Ms. Grigsby asked you some questions about
14   extending fighter contracts.
15       Do you recall those questions?
16   A.  Yes.
17       Q.  Okay.  I'd just like to ask you a few
18   follow-up questions about that.
19       To the extent -- to the extent that you
20   have worked for an MMA promotion, either Strikeforce
21   or Bellator, and you've ever extended a fighter's
22   contract because of an injury -- let me withdraw
23   that.
24       To the extent that you've extended a
25   fighter's contract on the basis of an injury, have

71  (Pages 278 to 281)

298

1
2    STATE OF _____ )
3                            ) :ss
4    COUNTY OF _____ )
5
6
7         I, SCOTT COKER, the witness
8    herein, having read the foregoing
9    testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15   _____
16         SCOTT COKER
17
18
19
20   Sworn and subscribed to before
21   me, this        day of
22            , 2017.
23
24   _____
25         Notary Public

299

1
2         CERTIFICATE OF REPORTER
3         I, Cynthia K. DuRivage, a Certified
4    Shorthand Reporter of the State of Nevada, do hereby
5    certify:
6         That the foregoing proceedings were taken
7    before me at the time and place herein set forth;
8    that any witnesses in the foregoing proceedings,
9    prior to testifying, were duly sworn; that a record
10   of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; that the foregoing transcript is a true
13   record of the testimony given.
14         I further certify I am neither financially
15   interested in the action nor a relative or employee
16   of any attorney or party to this action.
17         Reading and signing by the witness was
18   requested.
19         IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21   Dated:  August 16, 2017
22
23
24   _____
             CYNTHIA K. DuRIVAGE
             CCR No. 451
25

300

1         INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8    and date it.
9      You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12     It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

1              E R R A T A
2
3
4
5      I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___CHANGE:_____
10   REASON:_____
11   ___ ___CHANGE:_____
12   REASON:_____
13   ___ ___CHANGE:_____
14   REASON:_____
15   ___ ___CHANGE:_____
16   REASON:_____
17   ___ ___CHANGE:_____
18   REASON:_____
19   ___ ___CHANGE:_____
20   REASON:_____
21
22   _____   _____
23   WITNESS' SIGNATURE      DATE
24
25

76  (Pages 298 to 301)