# EXHIBIT 67

## Declaration of Scott Coker in *In re Subpoena of Bellator Sport Worldwide, LLC*, Case No. 2:17-mc-00016 (C.D. Cal.) at ECF 1-3

KENDALL BRILL & KELLY LLP
Philip M. Kelly (212174)
*pkelly@kbkfirm.com*
Richard M. Simon (240530)
*rsimon@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Non-Party
Bellator Sport Worldwide, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

In Re Subpoena Of

BELLATOR SPORT WORLDWIDE, LLC

Underlying Matter

CUNG LE, NATHAN QUARRY and JOHN FITCH, *et al.*,

Plaintiffs,

v.

ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP and UFC,

Defendant.

Case No. 2:17-mc-00016

[Underlying Case: USDC Case No. 2:15-cv-01045-RFB-(PAL) (D. Nev. 2015)]

**DECLARATION OF SCOTT COKER IN SUPPORT OF NON-PARTY BELLATOR SPORT WORLDWIDE, LLC'S MOTION TO QUASH OR MODIFY SUBPOENAS**

*Filed concurrently with Memorandum of Points and Authorities; Declaration of Phil Kelly; [Proposed] Order*

Judge:

Date:
Time:



Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# DECLARATION OF SCOTT COKER

I, Scott Coker, declare as follows:

1. I am the President of Bellator Sport Worldwide, LLC, doing business as Bellator MMA ("Bellator"). I make this declaration in support of Bellator's motion to quash two subpoenas that have been issued in connection with a lawsuit in the State of Nevada, to which Bellator is not a party. I have personal knowledge of the facts set forth in this declaration, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. Bellator is a mixed martial arts ("MMA") promoter. Generally speaking, Bellator's business is to enter into contracts with professional MMA athletes and to organize competitive matches that it promotes as live arena entertainment and through cable television and, at times, pay-per-view.

3. I joined Bellator in 2014 as its President. I have thirty-one years of experience in promoting professional martial arts. I previously served as the founder and CEO of Strikeforce MMA, a large, competitive MMA promotion that was acquired in 2013 by Zuffa, LLC, the parent corporation of MMA promoter Ultimate Fighting Championship ("UFC").

4. Bellator was founded in 2008. Since its inception, Bellator has steadfastly grown its market, signing numerous new athletes from the United States and abroad, commanding record attendance, and continuing to expand its television audience, with distribution in more than one hundred forty countries. Today, it is this country's second largest MMA promoter.

5. UFC is the country's largest MMA promoter and Bellator's most powerful competitor, competing with Bellator on all fronts: for athletes, sponsors, venues, distribution, and ultimately audience.

6. I am informed that several prominent MMA athletes (the "Plaintiffs") have filed a lawsuit against Zuffa, LLC d/b/a Ultimate Fighting Championship and

UFC ("UFC") in federal court in Nevada, alleging that UFC has engaged anticompetitive behavior.

7. I am further informed that the Plaintiffs are athletes who allege that they are currently or were formerly exclusively signed to UFC. Plaintiffs are, or were, the same type of athlete that Bellator recruits and would conceivably seek to contract with, were they indeed free to negotiate and not bound by any conflicting agreements with UFC.

8. I have reviewed the subpoenas issued to Bellator by both the Plaintiffs and UFC (together, "Parties") in connection with their lawsuit in Nevada. I am informed and believe that Bellator has agreed to provide documents in response to many of the Parties' document requests. However, Bellator cannot agree to produce some of the confidential documents that the Parties have demanded, as doing so would lead to grave harm to Bellator.

9. For example, the Parties seek all contracts between Bellator and any professional MMA athlete, including draft agreements, as well as all documents related to the "negotiation, termination, cancellation, or transfer" of these contracts. (Plaintiff Demand No. 4 & UFC Demand No. 1). Such documents are highly confidential and extremely sensitive.

10. Bellator's contracts with MMA athletes contain confidentiality provisions which prohibit the parties to the contracts from revealing information regarding the terms and conditions of those contracts. In practice, the key terms and conditions of these contracts are never publicized in the normal course of business. Unlike some other professional sports where athlete deals are either publicly disclosed or well-known, in the MMA industry, such information is not disclosed by either promoters or fighters. Although some athletic commissions publicly disclose fighter purses, such disclosures do not include any other material terms or conditions of the athletes' deals with promoters, such as contract length, signing

bonuses, and other significant deal terms that govern the very nature of the promoter-athlete relationship.

11. Athlete contracts are treated as highly confidential, even within Bellator. Only a very limited group of senior executives and the legal department have access to the contracts. This limited group is comprised of only those staff who need to know the information to perform their job duties. Those persons may only access the files through secured paper and computer files. Those persons who have access understand that the terms of the contracts are highly confidential and not to be disclosed, even to other internal Bellator staff. These same protections extend to documents related to the "termination, cancellation, or transfer" of the athlete contracts.

12. All of the documents related to negotiation and drafting of Bellator's athlete contracts are also kept highly confidential. Typically, only a handful of people, including myself, our legal counsel, and one or two executives who are directly involved in the athlete negotiations are privy to the substance of such negotiations.

13. As with athlete contracts, negotiation documents are inaccessible within Bellator except to those who absolutely need access to perform their jobs (such as attorneys, who are additionally bound by attorney client privilege to maintain confidentiality). The persons who have access are made aware of the sensitivity of the information, and understand that documents and information in them are not to be disclosed or disseminated under any circumstances.

14. Bellator's business rests upon its agreements with MMA athletes. Bellator maintains the strict confidentiality of the agreements and related materials because disclosure (whether inadvertent or purposeful) of any of the above information would undermine Bellator's bargaining leverage and ability to attract and retain the best athletes necessary to build a successful promotion.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

15. For example, if individual athlete contract information were provided to Bellator's competitors, they would be able to anticipate Bellator's recruitment strategies, outflanking its ability to sign the best fighters, anticipating its strategies in each respective weight class and geographic market, and compromising its strategic plans to develop the best overall promotion. Indeed, Bellator's deals with individual athletes typically telegraph myriad factors not limited to the individual athlete's bout purses, but will also likely reveal strategic geographic market targeting, potential matchups in those markets, non-public event dates, programming, how Bellator plans to diversify the offering to Bellator fans, digital strategy, social media tactics, distribution plans, on-air talent casting, and important publicity announcement timing. Armed with Bellator's information, a dominant market player such as UFC could easily allocate its resources to one-up Bellator on critical deals, counter-program Bellator, and appropriate its business strategies, either to obstruct and stifle Bellator's initiatives or to exploit its weaknesses. Of course, such abuses would be entirely asymmetric, as Bellator does not have access to UFC's confidential contract information.

16. Moreover, disclosure of Bellator's fighter contracts to the Plaintiffs (many of whom may be presently under contract with UFC, but likely wish to negotiate with Bellator at some point) and to other MMA athletes would place Bellator at a grave competitive disadvantage in its negotiations with athletes. With comprehensive knowledge of Bellator's existing deals, price points, negotiating tactics, and business development priorities, athletes and their management would have more leverage to drive their own desired deal terms and precipitate disputes among athletes already under contract. Bellator would again be at an unfair disadvantage, because it lacks information concerning athlete negotiations with other promotions and their concomitant leverage.

17. In addition to the athlete contracts, the Parties also seek an array of actual and projected financial information. Their demands include a demand for

"[d]ocuments sufficient to show each Professional MMA Bout presented or promoted by Bellator....including...all income Your Company received from presenting each Professional MMA Event...the costs of promoting each Professional MMA Event...and any profit (or loss) derived therefrom." (Plaintiff Demand No. 12 & UFC Demand No. 7). UFC further seeks: "documents and data in as granular form as it is maintained sufficient to show all revenues, expenses, and other budget items relating to operating [Bellator] that are not included in your response to Request No. 7...." (UFC Demand No. 12). This financial information is strictly confidential, and Bellator would be seriously harmed by disclosure.

18. Bellator, a non-public entity, does not disclose its financial documents beyond its own ownership circle, including, but not limited to, event-level income and expense data, projections, or corporate-level financials and profit and loss statements. Moreover, Bellator's arrangements with venues, sponsors, and other key transaction partners, as well as other financial information related to Bellator's events and programming (e.g., venue deals, licensing fees, revenue share) are typically bound by nondisclosure agreements and confidentiality provisions with additional and far-flung third parties.

19. Within Bellator, the paper and computer files containing event-level income and expense information are protected and accessed only by senior executives who require particular categories of information in performing their respective job functions. Those persons who have access to any of this information understand that the information is strictly confidential and not to be disclosed to others, even internally.

20. Bellator's ability to compete in the MMA promotions marketplace would be gravely damaged if Bellator were compelled to turn over essentially all of its event-level and company-wide income and expense information to its largest and most powerful competitor. Such information would give UFC comprehensive knowledge of Bellator's strategic priorities and vulnerabilities. For example,

because UFC enters into venue agreements with many of the same venues that Bellator relies upon, insight into Bellator's venue deal terms would allow UFC easily to determine which events and venues are of particular importance to Bellator, where Bellator is committing the most resources, and which relationships would be easiest to undermine in seeking to exert priority for UFC events. As another example, if UFC were to see the bevy of the international licensing distribution fees Bellator currently commands and the programming it provides, UFC could easily negotiate with any of those distributors from an advantageous position and shut Bellator out of the marquee channels in each region. Moreover, Bellator's deal terms with particular venues, sponsors, broadcasters or other transaction partners may be based on revenue projections over multiple events, and as such current deal terms and forward projections are often intertwined, as are event-level data and more macroscopic promotion-wide information. As it is now, UFC has frequently counterprogrammed Bellator's events—for example by choosing venues or scheduling high profile matches to draw audience away from Bellator's own key matches. Such practices could become lethal if UFC were unilaterally armed with Bellator's event information.

21. Since Bellator's entry into the MMA industry, Bellator has seen UFC buy out, marginalize, and even drive competitors from the business. Indeed, as I described above, prior to joining Bellator, I founded a martial arts promotion called Strikeforce MMA, which by 2010 had grown to be the second largest MMA promotion in the world UFC acquired Strikeforce in 2011 and, within a few years, folded the entire promotion and its roster into UFC. UFC is an aggressive and ambitious enterprise, and I believe that if UFC were able to gain an advantage against Bellator either by receiving Bellator's confidential information or even simply leveraging the disadvantage caused by disclosure of Bellator's confidential information to athletes and others, it would certainly do so. Accordingly, disclosure of Bellator's confidential information pursuant to the Nevada subpoena would give

Bellator's largest and most powerful competitor a significant and unilateral advantage that would negatively harm Bellator and, in my opinion stifle competition in the MMA industry.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 18 day of ~~January~~ February, 2017, at Los Angeles, California.

Scott Coker
President, Bellator Sport Worldwide, LLC