# EXHIBIT 1

# Declaration of Robert H. Topel

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| CUNG LE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:15-cv-01045-RFB-BNW |
| | ) | |
| v. | ) | |
| | ) | |
| ZUFFA, LLC d/b/a ULTIMATE | ) | |
| FIGHTING CHAMPIONSHIP and UFC | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROBERT H. TOPEL

I, Robert H. Topel, do hereby swear, affirm, and attest as follows, based upon my personal knowledge of the matters contained herein:

1. My name is Robert H. Topel. I am an economist and I specialize in (among other things) microeconomics, which is the study of markets, pricing, and firm and industry behavior. I received a B.A. in economics from the University of California, Santa Barbara in 1974, and a Ph.D. in economics from the University of California, Los Angeles in 1981. I am the Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics Emeritus in the Booth School of Business at the University of Chicago. In addition to my position at the Booth School of Business, I have been a member of the faculties in the Department of Economics at the University of Chicago and the Department of Economics at the University of California, Los Angeles. At these institutions, I have taught courses on labor markets, empirical methods in economics, compensation and personnel policies, industrial organization and antitrust, markets and prices, economic theory, business strategy, and law and economics. At the University of Chicago I also served as the Director

of the George J. Stigler Center for the Study of the Economy and the State and as the Founding Co-Director of the Energy Policy Institute at Chicago.

2. I am also a Senior Consultant at Charles River Associates ("CRA"), an economics consulting firm specializing in the application of economic theory and statistics to legal and regulatory issues. For over 30 years I have consulted and served as an expert witness in matters involving antitrust liability, damages, and class certification. CRA is paid $1,450 an hour for my time spent on this matter and I receive compensation from CRA based on its billings in this case. My analysis is supported by my colleagues at CRA.

3. I have been retained by counsel for Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC (collectively, "Zuffa") to serve as an expert in economics in the above-captioned case. Thus far, I have submitted three reports in this case related to class certification, the first on October 27, 2017; the second on February 12, 2018; and the third on May 7, 2018. These reports contain the details of my analysis and opinions to date.

4. The opinions I have offered thus far in this matter include, but are not limited to, the following:

   a. Zuffa's success results from its business acumen. Zuffa has expanded the "market" for mixed martial arts ("MMA") by working to promote its acceptance, by aggressively competing for the most talented athletes, and by investing in both athletes and events.[1]

   b. Plaintiffs' main allegation is that Zuffa has exercised monopsony power in a putative market for "elite" MMA athletes, thereby reducing athletes' compensation. Importantly, none of Plaintiffs' economic experts have provided any analysis of

---

[1] I refer to the "market" in quotes because my analysis does not hinge on whether there is a well-defined antitrust market for elite MMA fighters.

how much Zuffa's athletes are actually paid, nor have they offered any evidence that athletes' compensation has been reduced by any of Zuffa's allegedly anticompetitive conduct. Plaintiffs' central allegation is that Zuffa's athletes' *compensation* was reduced, yet any analysis of actual compensation is conspicuous by its absence from their experts' reports and testimony. Contrary to Plaintiffs' claims, the compensation of Zuffa's athletes has steadily and materially increased, both before and during the Class Period. Zuffa pays its athletes significantly more than competing MMA promoters, and athletes that have joined Zuffa as a result of allegedly anticompetitive acquisitions of competing MMA promoters experienced significant pay increases.

c.   Zuffa's market-expanding strategy and investments have also benefitted consumers and other MMA promoters.

d.   Barriers to entry for MMA promoters are low. Competing promoters have ready access to inputs and facilities needed to stage MMA events, including access to MMA athletes, venues, broadcasters, and sponsors.

e.   Zuffa's acquisitions of other MMA promoters did not allow Zuffa to acquire or exercise monopoly or monopsony power.

f.   Zuffa's challenged contractual provisions are procompetitive. This conclusion is supported by the fact that MMA promoters without substantive market power use virtually identical provisions in their contracts with athletes.

g.   Plaintiffs' economic expert, Dr. Hal Singer, adopts an economically incorrect measure of Zuffa's "foreclosure share", which he defines as the fraction of "elite"

MMA athletes under allegedly anticompetitive contracts with Zuffa, to support his opinion that Zuffa's conduct increased its monopsony power.

h. Dr. Singer's measures of Zuffa's "foreclosure share" in the input markets for "elite" MMA athletes are flawed and unreliable. His "Tracked" measure of the input market is neither comprehensive nor consistent, excluding many other MMA promoters and their athletes. His "Headliner" measure of the input market conflates athletes' abilities with promoter acumen, and undermines Plaintiffs' claims of commonality across the proposed class.

i. Dr. Singer's econometric evidence of anticompetitive impact and harm to members of the bout class is misleading, fatally flawed, and unreliable. This is, in part, because Dr. Singer improperly measures athletes' compensation as a share of event revenue rather than as the monetary amount of compensation for an MMA athlete, which is the equivalent of the price paid by consumers in a monopoly case. There is no valid economic reason for treating revenue share as a measure of monopsony impact or harm.[2]

j. As shown in my first report, direct evidence demonstrates that Zuffa did not suppress athlete compensation, raise prices, or restrict output. Zuffa pays its athletes more than its competitors, has increased compensation to its athletes over the last decade, and has increased the compensation of athletes it signed from acquired promoters.

---

[2] In some league sports—such as professional football, basketball, and baseball—collective bargaining agreements between a legally recognized players' union and the league (franchise owners) contain provisions guaranteeing that total player compensation will fall within a stipulated range of league revenues. Disputes may then arise regarding whether player compensation and league revenues have been properly measured. See, for example, Kevin M. Murphy and Robert H. Topel "The Economics of NFL Team Ownership", report prepared at the request of the National Football League Players Association (2009). MMA athletes are not unionized, and it makes no economic sense to argue that the levels or changes in "revenue share" must be indicative of monopsony power or harm.

k.  There is no common compensation structure for all Zuffa athletes.

l.  Dr. Singer has failed to specify or analyze a meaningful "but-for" market structure that would have existed in the absence of the challenged contract terms and conduct.

m.  Dr. Singer's damage calculations are misleading and unreliable, based as they are on his incorrect methods of estimating antitrust impact, as discussed above.

5.  It is my understanding that the Court certified the bout class in this matter. In the time that has passed since I submitted my last report in May 2018, which was prior to the Court's decision to certify the bout class, there have been numerous developments in the MMA industry that, as an economist, would find useful and important to analyze as a basis for the opinions I may form as an expert in the merits phase of this matter.

6.  For example, on June 26, 2018 Bellator announced a five-year, nine-figure streaming deal with DAZN, covering the U.S. and other broadcast markets served by the streaming service.[3] In March 2020 Bellator announced that they had signed a deal with ESPN Brasil to broadcast events in that country, and then on September 11, 2020 Bellator announced that its cards (events) would move to CBS Sports Network starting in October 2020, with preliminary bouts to stream on YouTube and CBSSports.com.[4] In 2021, Bellator announced that its events would begin airing on Showtime and that the BBC would broadcast Bellator events on BBC iPlayer in the United Kingdom.[5] Then in 2023, Bellator

---

[3] https://www.hollywoodreporter.com/news/general-news/bellator-perform-group-strike-major-streaming-deal-1123307/

[4] https://www.lance.com.br/fora-de-campo/espn-brasil-adquire-direitos-transmissao-bellator-principal-rival-ufc.html.amp and https://www.mmafighting.com/2020/9/11/21432619/bellator-mma-announces-move-from-paramount-network-to-cbs-sports-network.

[5] https://www.cbssports.com/mma/news/bellator-set-for-showtime-debut-in-april-as-star-studded-light-heavyweight-world-grand-prix-headlines-slate/amp/ and https://www.bbc.com/sport/mixed-martial-arts/56022194

landed a multi-year broadcast rights deal in Latin America with DirectTV and added a men's flyweight division, creating opportunities for new athletes to join.[6]

7. It has been reported that Bellator's revenue has increased since 2016, from approximately $18 million in 2016, to approximately $25 million in 2017 to approximately $35 million in 2018. According to these estimates, from 2014 to 2020 Bellator achieved year-on-year revenue growth of 20 percent or more in every year.[7]

8. Since I submitted my last report, The Professional Fighters League ("PFL") was established and has grown substantially. The PFL was founded in 2018 after acquiring the former World Series of Fighting ("WSOF") promotion in 2017. PFL is the first MMA organization in which individual athletes compete in a season-based format (comparable to the NFL, MLB, NBA, etc.). The PFL debuted its inaugural season in June 2018 at Hulu Theater at Madison Square Garden in New York City. In early 2018 PFL announced that it had reached a multi-platform distribution deal for its inaugural 2018 season with NBC Sports Group and Facebook.[8] Beginning in February 2019, the PFL's events began being broadcast by ESPN in the U.S. and TSN in Canada.[9] As of May 2022, PFL was valued at $500 million, up from $400 million in 2021.[10]

---

[6] https://www.bellator.com/article/Bellator-Multi-Year-Deal-Latin-America-DirecTV and
https://nypost.com/2023/07/28/kyoji-horiguchi-thrilled-to-compete-for-bellators-inaugural-flyweight-title/
[7] https://bloodyelbow.com/2020/02/06/an-in-depth-look-at-bellators-finances/ and
https://frontofficesports.com/professional-fighters-league-in-discussions-to-acquire-bellator/
[8] https://www.businesswire.com/news/home/20180129005882/en/Professional-Fighters-League-Reaches-Exclusive-Multi-Platform-Distribution
[9] https://mmajunkie.usatoday.com/2019/02/pfl-espn-multiyear-broadcast-deal-second-season-tournament-kayla-harrison
[10] https://www.cnbc.com/2022/05/19/alex-rodriguez-invests-in-mma-company-pfl-at-500-million-valuation.html

9.  It has been reported that the Saudi Arabia Public Investment Fund has invested $100 million in PFL through its sports investment arm, SRJ investments, and are currently in discussions to acquire Bellator.[11]

10. PFL has other notable investors, including Ted Leonsis, owner of the Washington Capitals of the NHL, the Washington Wizards of the NBA and the Washington Mystics of the WNBA; and Alex Rodriquez, a former Major League Baseball star player. Rodriguez and Waverly Capital reportedly invested $30 million in PFL in 2022. At the time, a CNBC article reported, "The company will use the funds from the Rodriguez-Waverley deal to expand globally and target free agent athletes from Endeavor-owned UFC, PFL founder and Chairman Donn Davis said in an interview with CNBC. PFL wants to build a roster to leverage its pay-per-view 'Super Fight' event that's scheduled to debut in 2023."

11. Other promotions have similarly expanded within the MMA industry.

    - ONE Championship now draws an average of 50 million viewers per event compared to around 40,000 viewers six years ago,[12] and is now valued at over $1 billion after a fundraising round led by Guggenheim Investments and the Qatar Investment Authority.[13] ONE is reportedly planning on leveraging this expanding popularity and access to capital to expand its presence in the US market.[14]

---

[11] https://frontofficesports.com/professional-fighters-league-in-discussions-to-acquire-bellator/ and https://www.dailymail.co.uk/sport/mma/article-12463115/Saudi-Arabia-stake-Professional-Fighters-League.html
[12] Andrew Mills, *Mixed martial arts firm ONE Championship lays groundwork for a U.S. IPO*, Reuters (Aug. 31, 2022), https://www.reuters.com/markets/asia/mixed-martial-arts-firm-one-championship-lays-groundwork-us-ipo-2022-08-31/
[13] Amanda Christovich, ONE Championship Raises $150M at $1B Valuation, FRONT OFFICE SPORTS (Jan. 4, 2022), https://frontofficesports.com/one-championship-raises-150m-at-1b-valuation/
[14] *Ibid*.

- Invicta Fight Championships ("IFC") in April 2021 announced that Anthem Sports & Entertainment had acquired IFC, and starting in May 2021 IFC events would be broadcast live on the Anthem-owned networks AXS TV in the U.S. and Fight Network in Canada, as well as on IFC's YouTube channel.[15]

- In February 2022 Xtreme Fighting Championships ("XFC") announced the launch of XFC LATAM to co-produce all Latin America-based XFC fights, and in May 2022 announced its full year 2021 results with revenue increasing by 487 percent.[16]

12. These examples are just some of the events that have occurred among competitors in the dynamic MMA industry.  They can be indicative of the relative ease of entry and expansion by Zuffa's competitors.  As an economist providing expert analysis and opinions in this matter, it would be useful and important to investigate how these, and other, changes in the industry have impacted Zuffa's business, its competitors' businesses, and both athletes under contract with Zuffa as well as athletes under contract with Zuffa's competitors.  Plaintiffs in this case have alleged that Zuffa has monopoly power in the "market for promoting live Elite Professional MMA bouts in the U.S."[17] and monopsony power in the "market for Elite Professional MMA Fighter services."[18] I have offered opinions in this case that Zuffa's market-expanding strategy and investments have benefitted consumers and other MMA promoters, and that barriers to entry for MMA promoters are low. As an

---

[15] https://invictafc.com/2021/04/15/invicta-fc-acquired-by-anthem-sports-entertainment/
[16] https://www.globenewswire.com/news-release/2022/02/11/2383616/0/en/Xtreme-Fighting-Championships-Announces-the-Launch-of-XFC-LATAM.html and https://www.globenewswire.com/news-release/2022/05/09/2438424/0/en/Xtreme-Fighting-Championships-Announces-Full-Year-2021-Results-with-Revenue-Increasing-487.html
[17] Consolidated Amended Antitrust Class Action Complaint, *Cung Le, et al., v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, Case No. 2:15-cv-01045-RFB-PAL (D.Nev.) at ¶ 67.
[18] Consolidated Amended Antitrust Class Action Complaint, *Cung Le, et al., v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, Case No. 2:15-cv-01045-RFB-PAL (D.Nev.) at ¶ 90.

economist, it would be important to review and consider the extent to which Zuffa's competitors have expanded their businesses, and other competitors have entered the "market" to assess whether and how developments in the market have impacted the opinions I have offered in this case.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on this 24th day of October, 2023.

_____

ROBERT H. TOPEL