—2:15-cv-01045-RFB-PAL—

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5                    Plaintiffs,       )  Case No. 2:15-cv-01045-RFB-PAL
                                       )
6        vs.                           )  Las Vegas, Nevada
                                       )  Tuesday, October 31, 2023
7  ZUFFA, LLC, d/b/a Ultimate          )  10:06 a.m.
   Fighting Championship and           )
8  UFC,                                )  MOTION HEARING
                                       )
9                    Defendants.
   _____

10

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            THE HONORABLE RICHARD F. BOULWARE, II,
                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:        See Pages 2 and 3

20

21

   COURT REPORTER:      Patricia L. Ganci, RMR, CRR
22                      United States District Court
                        333 Las Vegas Boulevard South, Room 1334
23                      Las Vegas, Nevada  89101

24

   Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
                    2:15-cv-01045-RFB-PAL
```

1   APPEARANCES:

2   For the Plaintiffs:

3           **DON SPRINGMEYER, ESQ.**
            WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
4           3556 E. Russell Road, 2nd Floor
            Las Vegas, Nevada 89120
5           (702) 341-5200

6           **ERIC L. CRAMER, ESQ.**
            BERGER & MONTAGUE, P.C.
7           1818 Market Street, Suite 3600
            Philadelphia, Pennsylvania 19103
8           (215) 875-3000

9           **BENJAMIN D. BROWN, ESQ.**
            COHEN, MILSTEIN, SELLERS & TOLL, PLLC
10          1100 New York Avenue, NW, Suite 500 West
            Washington, DC 20005
11          (202) 408-4600

12          **JOSEPH R. SAVERI, ESQ.**
            THE JOSEPH SAVERI LAW FIRM, INC.
13          555 Montgomery Street, Suite 1210
            San Francisco, California 94111
14          (415) 500-6800

15          **ROBERT C. MAYSEY, ESQ.**
            WARNER ANGLE HALLAM JACKSON & FORMANEK, PLC
16          2555 E. Camelback Road, Suite 800
            San Francisco, California 85016
17          (602) 264-7101

18
    For Defendant Zuffa, LLC:
19
            **J. COLBY WILLIAMS, ESQ.**
20          CAMPBELL & WILLIAMS
            700 South 7th Street
21          Las Vegas, Nevada 89101
            (702) 382-5222
22

23
    ////
24

25

```
                        2:15-cv-01045-RFB-PAL
```

 1 | APPEARANCES CONTINUED:

 2 | For Interest Party Sparacino, PLLC:

 3 |      **ELI KAY-OLIPHANT, ESQ.**
     SPARACINO, PLLC

 4 |      150 South Wacker Drive, Suite 2400
     Chicago, Illinois 60606

 5 |      (312) 216-5111

 6 |      **RYAN R. SPARACINO, ESQ.**
     SPARACINO, PLLC

 7 |      1920 L Street NW, Suite 835
     Washington, D.C. 20036

 8 |      (202) 629-3530

 9 |

10 |    LAS VEGAS, NEVADA; TUESDAY, OCTOBER 31, 2023; 10:06 A.M.

11 |                     --oOo--

12 |               P R O C E E D I N G S

13 |      THE COURT:  Please be seated.

14 |      COURTROOM ADMINISTRATOR:  Le versus Zuffa, LLC,

15 | 15-cv-1045-RFB-BNW.  Counsel, please make your appearances.

16 |      MR. BROWN:  Benjamin Brown of Cohen Milstein Sellers &

17 | Toll for the plaintiffs.

18 |      MR. CRAMER:  Good morning, Your Honor.  Eric Cramer

19 | from Berger Montague for the plaintiffs.

20 |      MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

21 | for the plaintiffs.

22 |      MR. SPRINGMEYER:  Good morning, Your Honor.  Don

23 | Springmeyer, Kemp Jones, for the certified class.

24 |      MR. MAYSEY:  Rob Maysey of Warner Angle on behalf of

25 | the plaintiffs.

———2:15-cv-01045-RFB-PAL———

1          MR. KAY-OLIPHANT:  Good morning, Your Honor.  Eli

2   Kay-Oliphant from Sparacino, PLLC.

3          MR. SPARACINO:  Good morning, Your Honor.  Ryan R.

4   Sparacino from Sparacino, PLLC.

5          MR. WILLIAMS:  And good morning, Your Honor.  Colby

6   Williams, Campbell & Williams, on behalf of the defendants.

7          THE COURT:  Good morning.

8          So we are here on this issue regarding contact with

9   potential class members in this case.  So who's going to be

10  speaking on behalf of Sparacino?

11         MR. KAY-OLIPHANT:  Your Honor, I'll be speaking.

12         THE COURT:  Why don't you come up to the podium.  I'm

13  sorry.  And remind me your name again, counsel.  I have the list

14  here, but I want to check it.

15         MR. KAY-OLIPHANT:  My name is Eli Kay-Oliphant.

16         THE COURT:  So you can -- Mr. Oliphant, that podium

17  rises up.  There's a little button there on top.  There you go.

18  I had some kids in here the other day.  That's why it's so low.

19         So, Mr. Oliphant, I want to ask you a few questions.

20  How many clients do you all represent?

21         MR. KAY-OLIPHANT:  We represent 15 former UFC athletes,

22  Your Honor.

23         THE COURT:  When were they retained?

24         MR. KAY-OLIPHANT:  They were retained at various times

25  over the outreach period which began in March of 2021.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  I'd like you to get the specific dates,

2     now, for when they were retained from your office.  I should

3     have asked you this before, but I want to know the dates.  The

4     dates when they were retained actually affects what might happen

5     in this case --

6          MR. KAY-OLIPHANT:  Certainly.

7          THE COURT:  -- and the timing of that.  So what I would

8     like for you to do is figure out the exact timing.  Now, if you

9     have some sense of it, you can tell us, but, right, there's

10    issues about these mailers and the second mailer.  And then, you

11    know, I issued an order some time later with an understanding

12    that certain contact wasn't happening.

13          Now, I understood there was 11.  Now, I'm understanding

14    that there's 15.  I want to know when those individuals

15    finalized their retention of Sparacino in terms of this case.

16    So is there a way that you could send a message to your office

17    so we could get that specific information?  And we can keep --

18    we can keep having a conversation about this, but I really want

19    to have that information for this hearing.

20          MR. KAY-OLIPHANT:  Totally, Your Honor.

21          Ryan, could you -- could you e-mail and try to find an

22    answer to that question?

23          MR. SPARACINO:  Yes.

24          MR. KAY-OLIPHANT:  In terms of what Your Honor is

25    trying to, sort of, get to the bottom of, I can give you some

—2:15-cv-01045-RFB-PAL—

1   facts and generalities, but we can definitely get you that data.

2          THE COURT:  So what dates approximately do you

3   understand this occurred?  Because, certainly, that's helpful if

4   you have some sense of when this happened.

5          MR. KAY-OLIPHANT:  Sure.  So the majority of our

6   clients signed engagement letters with us prior to the date that

7   the class was certified in this case, Your Honor.  I believe all

8   of them did.  But we will --

9          THE COURT:  So that was just this year, right?  I mean,

10  do you have anything more specific than that?  Because the

11  mailers were sent out some time ago, obviously, two years ago,

12  right.

13         MR. KAY-OLIPHANT:  That's correct.  So they were -- all

14  of our engagements occurred back during that time period, back

15  in 2021.  So we have not signed any additional engagement

16  letters since that time period, if that's what Your Honor is

17  asking.

18         THE COURT:  I am.  So from what you understand all of

19  these individuals finalized their retention of the firm some

20  time, let's say, in the spring to early summer of 2021.

21         MR. KAY-OLIPHANT:  I am almost 100 percent certain that

22  is accurate, but I would like to get the data to confirm.  And

23  I'm sorry that I don't have that at my fingertips at this

24  moment.

25         THE COURT:  No, that's all right.  That's helpful.

1        So I guess what I want to, Mr. Oliphant, figure out is,

2   from what I understand you're seeking to have contact with ab --

3   well, with class members up until what period of time?

4        MR. KAY-OLIPHANT:  So we believe that the proper rule

5   would allow us to send non-misleading, non-abusive

6   communications to absent class members up until the end of the

7   opt-out period as defined by this Court.

8        THE COURT:  Okay.  Now, I wanted to also be clear about

9   something else.  Other than the mailers and individuals who may

10  have followed up on the mailers, did your firm send any

11  additional letters, specifically, to potential clients?  I'm not

12  talking about a general mailer.  Like, for example, you have 15

13  clients here.  Someone reaches out, obviously, and says, "I'm

14  interested potentially in the firm."  As far as you know, were

15  there further communications with these 15 individuals or other

16  individuals who contacted the firm in response to the mailers?

17       MR. KAY-OLIPHANT:  So I think -- let me make sure I

18  understand your question before I answer it.  Are you asking if

19  there was any communication whatsoever with any of the fighters

20  after a date certain?  Is that what you're asking?

21       THE COURT:  Yes.  So I appreciate the seeking

22  clarification.  Let's separate out people who eventually became

23  clients from people who did not become clients.  After the

24  second mailer, was there any contact with either through e-mail,

25  phone calls, any contact with class members or putative class

 1  members by the firm?

 2          MR. KAY-OLIPHANT:  Yes.  So there are a class of

 3  fighters who reached out to us in response to our mailers and

 4  who requested that we send -- prepare and send them an

 5  engagement letter and we did so, but then they never signed that

 6  engagement letter.  So for those people for whom there were

 7  pending engagement letters, there were some follow-up

 8  communications which are natural as part of the DocuSign system

 9  that asked them, "Hey, there's still this document out there

10  that you requested that you haven't signed yet.  Are you going

11  to sign it," that kind of thing.

12          THE COURT:  Right.

13          And approximately how many people would fall into that

14  category?

15          MR. KAY-OLIPHANT:  I believe it's about 15 additional

16  fighters, but I don't know for certain and we can -- we can get

17  that data as well.

18          THE COURT:  That's fine.

19          All right.  So, Mr. Oliphant, let me start with this.

20  I think the first mailer was very misleading.  I want to be very

21  clear about that.  I think it was -- as relates to, sort of,

22  making findings on unethical conduct, I'm not saying that.  I

23  find that letter to be a complete and total misrepresentation

24  about what the status would be with respect to what these

25  potential fighters had to do, and let me explain to you why.

1    One is it suggested that they somehow had to take some action or

2    retain people in order to get a benefit.  I think a plain

3    reading of that mailer suggests that, right.

4         And I think that that, right, is very troubling, right.

5    And I think the problem that you have with this Court is that

6    the second mailer doesn't say, "We might have made a mistake

7    about what we communicated."  It simply added more information.

8    So now you have potentially two mailers, right, and there's not

9    clarification as to what was in error with respect to the first

10   one, not a clear enough statement that says, right, "The first

11   mailer was mistaken if it suggested or you had this impression

12   as to a few different things, but one of the most important

13   things is that somehow they had to take some action to be able

14   to get a benefit."

15        I'm telling you that now because I've read this

16   multiple times, and I find that to be a serious issue with what

17   happened.  Given that finding, right, and the fact that there's

18   a second mailer, why would I permit further contact?

19        MR. KAY-OLIPHANT:  So if I may, may I -- may I ask a

20   question of the Court?

21        THE COURT:  You can.

22        MR. KAY-OLIPHANT:  Okay.  So when you read the first

23   solicitation that we sent, are you reading just the cover letter

24   or also the brochure that came with it?

25        THE COURT:  All of it.  Look, again -- because, look, a

1  layperson, right, you have to read through all of it to get a

2  sense of what it would convey.  One, it's totally confusing as

3  to what they have to do.  Two, right, it certainly suggests

4  that, right -- one, it doesn't suggest that they already have

5  representation, clearly, right.  It doesn't suggest clearly that

6  they don't need to take, right, any further action, right.  It

7  is confusing about that.  Yes, it's buried within the statement

8  of it, but that's not enough.

9        It is confusing, right.  And so I'm just saying this to

10  you now because I'll go back and take a look at it if you want

11  me to, but my mind is fairly made up as it relates to that.  So

12  you're going to have to deal with that particular finding

13  because then I have to figure out what I do about that, whether

14  or not the second mailing actually fixes that, which I don't

15  think that it does.  And if I make that finding, why would I

16  then permit further, right, contact with any putative class

17  members, or at this point the class members?

18        MR. KAY-OLIPHANT:  So, Your Honor, our intention was

19  not to mislead at all.  It was --

20        THE COURT:  I'm not making that finding.  So let me be

21  clear.  I'm not saying -- I want to be clear.  I am not making a

22  finding that the firm engaged in, sort of, unethical behavior or

23  a finding that would somehow at this point lead to a particular

24  violation of a local bar rule, although I do think a plain

25  reading of that is misleading as to what the status is for these

─2:15-cv-01045-RFB-PAL─

 1  individuals and confusing to a layperson.

 2          That being said, I think that the standards as to, sort

 3  of, unethical conduct in terms of misleading clients is slightly

 4  different, and so I'm not addressing that here.  I'm talking

 5  about in the context of this particular case, where the case

 6  was, what the particular rights were of the potential class

 7  members at that time, and what that mailer says in terms of it

 8  being misleading.

 9          So I'm saying that to you because that's a finding

10  that, again, I will hear you about why you think it's not

11  misleading, but I've read it a few times and that's what I come

12  away with every single time.

13          MR. KAY-OLIPHANT:  Okay.  Well, if I may.

14          THE COURT:  Go ahead.

15          MR. KAY-OLIPHANT:  I hear you and I appreciate the

16  preamble that you just provided regarding the ethicality issues.

17  That is very appreciated, but if I may.

18          The mailer that we sent specifically says --

19          THE COURT:  You're talking about the first one.  Let's

20  just be clear.  The first mailer?

21          MR. KAY-OLIPHANT:  Let's focus on the first one.

22          THE COURT:  Okay.  Because I want to --

23          MR. KAY-OLIPHANT:  Yeah.  Clear -- I think the

24  answer --

25          THE COURT:  Because we can address the second one

—2:15-cv-01045-RFB-PAL—

1  later, but let's talk about the first one.

2      MR. KAY-OLIPHANT:  Okay.  The mailer that we sent says

3  that this case is a class action and explains what opting out

4  would mean, which would be in the alternative to participating

5  in the class.  So my read of that -- now, the Court may disagree

6  and you may think that a layperson may disagree, but our attempt

7  there was to say, "You have options here in terms of whether or

8  not to stay in the class or to opt out if you want to pursue

9  your rights."

10      THE COURT:  So what part of the mailer do you think

11  most clearly communicates to them they don't have to take any

12  action, that they already have potential representation, and

13  they need do nothing to get a benefit?

14      MR. KAY-OLIPHANT:  Sure.  There's a -- there's a

15  portion of language in the brochure --

16      THE COURT:  Hold on.  Let me pull it up again with ECF

17  because I want to make sure that we're looking at the same

18  thing.  So I do want to give you an opportunity potentially to

19  change my mind, which is why I mentioned it to you.

20      MR. KAY-OLIPHANT:  Thank you, and I appreciate that,

21  Your Honor.  There's a part of the brochure that says, and I

22  quote --

23      THE COURT:  Okay.  Which exhibit is that again?  I'm

24  trying to pull it up from the ECF.  Do you know?

25      MR. KAY-OLIPHANT:  So the best version of it --

---2:15-cv-01045-RFB-PAL---

1          THE COURT:  Hold on.

2          MR. KAY-OLIPHANT:  The best version of it, Your Honor,

3    is ECF ...

4          There's the third exhibit to the original emergency

5    motion that class counsel filed has the entirety of the first

6    solicitation all in one exhibit.  It's 797-3.

7          THE COURT:  Dash 3.  Okay.  Hold on.

8          MR. KAY-OLIPHANT:  In the brochure there's a section

9    that says, and I quote, We anticipate filing an opt-out case

10   against UFC in 2021.  Opting out means that the plaintiffs in

11   our case would not participate in a class action lawsuit against

12   the UFC (Le versus Zuffa) that is currently ongoing and would

13   instead chart their own course.

14         So that language is specifically saying that you have

15   options here in terms of pursuing your rights.  One would be

16   stay in the class action.  The other would be --

17         THE COURT:  Where does it say that?  Where does it say

18   you don't have to take any action in order to still be able to

19   receive potential benefit --

20         MR. KAY-OLIPHANT:  So --

21         THE COURT:  -- and, and that preliminarily, right,

22   there's already counsel in this case?  Where does it say that?

23         MR. KAY-OLIPHANT:  So, it doesn't say explicitly that

24   language the way that Your Honor just said and I agree with you

25   on that, but our intention was to say that you have options here

———2:15-cv-01045-RFB-PAL———

1  to pursue your claims.  And then when and only when the class

2  counsel pointed out to us that they thought there was, sort of,

3  a miscommunication on that point did we then follow-up with a

4  second mailing that says those words explicitly, Your Honor,

5  when we heard them to say, "We think that you have not

6  adequately conveyed this concept" that we were trying to convey

7  in the first mailer.

8            THE COURT:  Right.

9            MR. KAY-OLIPHANT:  Then we said, "We think this does

10  say that, but we hear you.  And so, therefore, we'll send the

11  second mailer."  And there are -- the cases are legion that say

12  that when there is a communication that is slightly misleading

13  or that could be seen to be slightly misleading, a quick

14  follow-up communication can remedy that situation.  And so

15  that's exactly what we did.

16            THE COURT:  Right.  So a couple of things, which is you

17  don't really have information on who saw which particular

18  mailer, right.  So you're assuming, right, that people have seen

19  both or -- because they have to, sort of, be read together to be

20  understood, I think, because there's some attempt at correction.

21            But if you want to then move to the second mailer, my

22  concern is it doesn't fix the problem, right, because it doesn't

23  clearly communicate what was the problem with the first mailer,

24  right.

25            So why don't we look at the second mailer and you tell

─2:15-cv-01045-RFB-PAL─

1   me how you think it fixes some of the issues.  And the issues,

2   Mr. Oliphant, again are, right, when you talk about options, one

3   of the options is very clear.  They don't have to do anything.

4   That is not in this first mailer really highlighted at all.  It

5   doesn't say, first, let me just -- let's just say, "You

6   potentially have rights here.  You don't have to do anything.

7   You would potentially receive compensation, and that there is

8   class counsel already preliminarily or on an interim basis

9   here."  It doesn't say that.

10          So the question is, what do you think about the second

11  mailer fixes some of these problems?  Point this out to me.

12          MR. KAY-OLIPHANT:  So, Your Honor, first of all, in

13  response to, sort of, what you're saying about the first mailer,

14  may I just say one thing?  Which is that our mailer is in stark

15  contrast to the vast majority of mailers that have been deemed

16  to be misleading on those points that you just described.  Most

17  of the mailers that have been deemed to be misleading said, "You

18  must act.  You have a deadline by which you must do something.

19  Protect your rights," those kinds of things.  Our mailer did

20  none of those things.  It just said, "We are available to talk

21  with you about whether or not you should consider opting out or

22  not."  We are not urging an opt-out in our mailer in any shape

23  or form.

24          THE COURT:  But how can you -- if you don't understand

25  what the option is about not opting out, then you're not

1  explaining their options.  So you can't say we're available to

2  opt out if you don't explain to them, "You don't have to do

3  anything," right.  "Even if you choose not do anything or opt

4  out, you would still be entitled to certain benefits," right.

5       So I agree with you that you can explain opt-out as an

6  alternative, but you have to first explain what their other

7  rights would be, which this first mailer clearly doesn't do.  It

8  doesn't start off saying, right, "There is a class action.  Here

9  is your right to be in the class.  Here is what your benefits

10  would be, and you don't have to do anything."  It doesn't start

11  saying that, right?

12       MR. KAY-OLIPHANT:  So, Your Honor, you're right that it

13  doesn't say you don't have to do anything, but it does say, "You

14  have alternatives in order to pursue your rights."  That's what

15  we were intending to say and we thought that that captured that

16  idea, but then in the second mailer --

17       THE COURT:  Okay.  Let's go to the second mailer.

18       MR. KAY-OLIPHANT:  And the language that's --

19       THE COURT:  Hold on a second.  And that is at ECF --

20  hold on.  Let me look at the docket again.  7 ...

21       MR. KAY-OLIPHANT:  I believe it's 797-5, Your Honor.

22       THE LAW CLERK:  Dash 4.

23       MR. KAY-OLIPHANT:  Is it 4?  Thank you.

24       THE LAW CLERK:  Or 876-6.

25       THE COURT:  Okay.  Let's see.  Let's look at this.

1        Okay.  Go ahead, Mr. Oliphant.  I'm there.

2        MR. KAY-OLIPHANT:  Okay.  So the second communication

3   identifies class counsel specifically, says they've been working

4   on the case since 2014 and says, and I quote, Your interests are

5   currently represented by interim class counsel, end quote.  And

6   that also, and I quote, You do not need to take any action at

7   this time to benefit from any recovery from the class action.

8        So the things that we heard them to say were your prior

9   communication about your options, which was that language that I

10  pointed to from the first -- from the first mailer -- and by the

11  way, the first mailer didn't come in the form of, like, a court

12  notice which is what has been found to be abusive in other

13  cases.  Did not do any of the things that were coercive in the

14  way that the cases that class counsel has cited has said

15  required a remedy.

16        THE COURT:  I don't think it's coercive.  Let me be

17  clear, I don't think it's coercive.  I just think it's

18  completely misleading, right, about the things that I mentioned.

19        Now, what you're saying to me is you think that this

20  second letter, the second mailer, cures some of the issues that

21  I mentioned.

22        MR. KAY-OLIPHANT:  Right.  And I guess what I would

23  posit to Your Honor is that where we have completely addressed

24  every concern that was raised and only eight days later, under

25  *Jubinville* and in other cases, too, that have looked at the

—2:15-cv-01045-RFB-PAL—

 1  totality of the circumstances and looking at the communications

 2  as a whole, they found these types of communications that are

 3  solicitations from third parties to not to be misleading.

 4        Now --

 5        THE COURT:  Okay.  But, Mr. Oliphant, you need to stop.

 6  As I said to you before, start from the assumption that I think

 7  the first mailer's misleading.  And then you should argue to me

 8  based upon what you think the second mail does to address that

 9  because --

10        MR. KAY-OLIPHANT:  Okay.

11        THE COURT:  -- again, having looked even with you here

12  at the first mailer and going through it with you, it's

13  misleading.  To me that's clear.  I'm not going to -- I don't

14  find that what you pointed out to me changes my mind.  So let's

15  talk about the second mailer.

16        MR. KAY-OLIPHANT:  Okay.

17        THE COURT:  And tell me why this fixed it, but this

18  also addressed a concern that I have, which is even if I were to

19  find that this fixes it, why wouldn't I say based upon the fact

20  that there are confusing communications here, you've had two,

21  say, "Look, I'm not going to allow further communications from

22  the firm at this point in time"?  So I want you to make that

23  connection because that's potentially what I'm looking at here

24  and saying, "You have your clients.  I'm not sure what they

25  understood or don't understand, but certainly I'm not sure why I

———2:15-cv-01045-RFB-PAL———

1  would permit that."  Also, because there are certain cases that

2  talk about class certification itself also being the endpoint

3  for the possibility.  There's also opt out.  There are different

4  dates --

5       MR. KAY-OLIPHANT:  Sure.

6       THE COURT:  -- that the Courts have used.  But in this

7  case I want you to address that because if I have this concern

8  about what's happened previously, why would I permit it now?

9       MR. KAY-OLIPHANT:  Okay.  Look at *In re: McKesson,*

10  which is from the Northern District of California.  In that case

11  there were communications that were misleading and that also

12  were dressed up in the form of a court notice to the putative

13  class members.  In that case the Court found that the

14  communications were misleading and that they should not come in

15  the form of a court notice and they should not explicitly

16  request as part of the communication opting out, like, check a

17  box to say that you were going to opt out of the class or

18  whatever, right.

19       And in that case because of the overriding concerns

20  related to the commercial speech protections under *Gulf Oil* the

21  *In re: McKesson* Court said, "Going forward I'm going to monitor

22  these communications to make sure that they are no longer

23  misleading."

24       So that's what we would propose to Your Honor.  What we

25  would propose to Your Honor is that to the extent that you find

1  that there was some sort of misleading statements that were in

2  the first communications, that is a basis under *Gulf Oil* to draw

3  a narrowly tailored remedy.  A total prohibition on

4  communications would be a broad restriction and prior restraint,

5  which would not be appropriate under the First Amendment.  But

6  what the Court could do and what the Court should do --

7          THE COURT:  You're saying I legally couldn't -- your

8  position is I legally couldn't say based upon the fact that I

9  find that there was a completely misleading communication here

10 and I don't find it was completely cured by the second mailer,

11 you're saying I couldn't prohibit the firm from having contact

12 with class members who are not -- who it has not retained?  Is

13 that what you are telling me?

14         MR. KAY-OLIPHANT:  We believe that it would be an

15 error, Your Honor --

16         THE COURT:  Okay.

17         MR. KAY-OLIPHANT:  -- because under *Gulf Oil* you have

18 to make an explicit finding, which it sounds like you are doing,

19 which is that there was some sort of specific harm that

20 occurred, and then you have to draw a very narrow remedy in

21 relation specifically to the harm that you've identified.

22 That's the *Gulf Oil* standard that applies in this situation.

23         THE COURT:  So why wouldn't it be narrowly tailored to

24 say, "Look, your firm is not the only firm, right, that can

25 actually represent these individuals and, in fact, other firms

—————2:15-cv-01045-RFB-PAL—————

1   could potentially reach out to them with a particular mailer,"

2   right?  Why wouldn't it be narrowly tailored for me to say, "In

3   this case you sent an incorrect mailer.  You have confusing

4   communications, right.  And so you don't get a third bite at the

5   apple after you've done that"?  Why do you think that that would

6   be inappropriate here?

7          MR. KAY-OLIPHANT:  Well, it would be a sweeping

8   restriction on future speech that may not be specifically

9   tailored to the types of misrepresentations that occurred here.

10  So what I am saying is that under the standard that's elucidated

11  under *Gulf Oil*, you have to look at -- you should look at, Your

12  Honor -- I'm sorry.  Not you have.  You should look at what the

13  specific harm was that was caused and try to see if you can form

14  a remedy that would in a way, sort of, cabin off the harm that

15  has occurred in the past.

16         So what we would propose is that if we were going to

17  solicit the rest of the absent class members, we would submit to

18  Your Honor for your approval before we would send it.  And you

19  could say, "Here's the parts that I find still misleading about

20  this," and we would fix it.  And that way we could ensure that

21  the class gets access to unconflicted advice that we're seeking

22  to provide them while at the same time avoiding the harm that

23  you've identified that occurred.

24         Now, to be sure, we take issue with Your Honor's

25  finding of fact, but setting that to the side entirely, we

—2:15-cv-01045-RFB-PAL—

1    believe that if you were to find that fact to be true that there

2    was prior misleading statements, you could describe what those

3    misleading statements were and we could design a remedy that

4    would allow for the First Amendment speech that we have to be

5    allowed while also allowing the Rule 23 need of the absent class

6    members to get this unconflicted advice.

7         THE COURT:  So let me ask you a question about this.

8    One of the other things I'm contemplating doing is actually

9    asking some of your clients to come in and explain to me what

10   was explained to them without the presence of plaintiffs'

11   counsel, but one of the issues that I can't monitor is what's

12   being said to them, right.  The reason why the prohibition might

13   be potentially appropriate is if I believed that I couldn't rely

14   upon accurate information being communicated.

15        And I could certainly -- I certainly believe I could

16   make that finding based upon the first -- on the first mailer.

17   I know you disagree with that.  So I'm not asking you to comment

18   on that, but what I'm saying to you is, what about me having

19   your clients come in here first and explaining to me what was

20   explained to them?  Because I don't know what they understood

21   about opting out when they retained you, right.  If they

22   considered it in the context of that first mailer, they clearly

23   from my standpoint would have been misinformed about what all of

24   their options were.

25        So what is your position on me actually having an

—2:15-cv-01045-RFB-PAL—

1   evidentiary hearing with just your clients here and asking them,

2   "What did you understand about what your options were?"

3            MR. KAY-OLIPHANT:  Your Honor, if you wish to do that,

4   that is your prerogative.  There's nothing that I can do to say

5   that you should not be allowed to do that.  And -- but -- but I

6   would also just, sort of, remind the Court what we put into our

7   briefing, which is that we have extended at no cost to them the

8   right for them to terminate us up until the end of the opt-out

9   period.  So to the extent that there's a harm here, they -- they

10  may leave us any time they wish.

11           THE COURT:  But the issue, Mr. Oliphant, of the harm is

12  the lack of information, right.  If you're asking me to allow

13  you to -- to allow the firm to continue to communicate, I can,

14  as I said, look at mailers, but what I can't do is when someone

15  calls, right, monitor what's communicated to them.  And that's

16  just as important as what the mailer says.

17           And so the reason why I am asking you about what was

18  communicated to the people retained, that would certainly give

19  me a sense of the extent to which, notwithstanding what might

20  have been misleading about the initial mailer, they were fully

21  apprised of what it meant to potentially opt out or retain the

22  firm.  Because I also wanted to have them understand, which can

23  be very complicated, what it means to be represented within a

24  class and who can do that within a class versus opt-out counsel.

25  Because that's somewhat confusing, I think.

2:15-cv-01045-RFB-PAL

1           Because essentially you are just representing opt-out

2    class members, right?

3           MR. KAY-OLIPHANT:  Well, they've not decided to opt out

4    yet.  But, yes, we represent individuals who are absent class

5    members currently in the class action.  I agree with that.

6           THE COURT:  Well, but that's an important distinction,

7    right.  If they say, "We don't want to opt out," are you going

8    to continue to represent them?

9           MR. KAY-OLIPHANT:  Well, we would tell them that the

10   purpose of our communication with them had concluded.  That

11   we -- we have engaged with them for the purpose of them making

12   that decision.

13          THE COURT:  Right.  So one of the things that I'm

14   concerned about is do they understand that if they choose not to

15   opt out, you all would no longer represent them.

16          MR. KAY-OLIPHANT:  I believe that they do understand

17   that.

18          THE COURT:  Okay.  Because when I look at the retention

19   letter, it's not exactly clear to me that that's communicated to

20   them, right.  That they understand that they only get you as a

21   lawyer, basically, if they choose to opt out.  If they choose

22   not to opt out, after speaking with you, then they go to class

23   counsel, right?

24          MR. KAY-OLIPHANT:  Or they just are in the class, Your

25   Honor, yes.

———2:15-cv-01045-RFB-PAL———

1        THE COURT:  Right, but --

2        MR. KAY-OLIPHANT:  Yes, they are represented by class

3   counsel as part of the class.  I agree.

4        THE COURT:  So where in the retention letter does it

5   say that?

6        You've provided an example of one, right.  Where is it?

7   I'm sorry.  I have to look at it.

8        MR. KAY-OLIPHANT:  I believe class counsel may have

9   attached an engagement letter that Mr. McKee did not sign to

10  Mr. McKee's declaration at Exhibit 5.

11        THE COURT:  Is that an inaccurate -- is that an

12  inaccurate engagement letter as relates to --

13        MR. KAY-OLIPHANT:  No, I think -- I think it is

14  accurate.

15        THE COURT:  Okay.  So where in the engagement letter

16  does it indicate that in fact if they decided not to opt out

17  that your relationship with them would be terminated?  That your

18  engagement with them is conditional upon them opting out?

19        MR. KAY-OLIPHANT:  Well, I would only quibble slightly

20  with the language that Your Honor just used, which is that our

21  engagement with them is up to and including their decision to

22  opt out or not.  And I believe that the engagement letter makes

23  that clear, but I would absolutely make that clear on this

24  record today and I would make that clear to any of my clients if

25  they asked me.  I don't think the engagement letter was meant in

——2:15-cv-01045-RFB-PAL——

1  any way to make it unclear that if they decide to stay in the

2  class, they're going with the class and we would not represent

3  them at that point.  And I will -- I will affirmatively say that

4  on the record right now.

5         THE COURT:  I understand that, but the question is when

6  they retained you did they understand that.

7         MR. KAY-OLIPHANT:  Yes.  Yes.  That -- those types of

8  ideas are exactly what are discussed with them, yes, totally.

9  And so, look, you could have an evidentiary hearing with them,

10  if you like, like you just said.

11        THE COURT:  Right.

12        MR. KAY-OLIPHANT:  And they would clearly -- I guess

13  they would have to waive privilege in order to talk with you

14  about what they -- what I said --

15        THE COURT:  Well, I could find -- look, the privilege

16  is at issue.  So I could make a finding that they had to talk to

17  me --

18        MR. KAY-OLIPHANT:  Sure.

19        THE COURT:  -- because, right, at this point in time

20  there is a real issue about the communications, and I have a

21  concern about that.  I think that there's clear law that would

22  allow me to ask them particularly outside the presence of

23  plaintiffs' counsel --

24        MR. KAY-OLIPHANT:  Sure.

25        THE COURT:  -- right, what they understood, right,

—2:15-cv-01045-RFB-PAL—

1  particularly where there's an issue about whether or not they

2  have been allegedly misled to opting out.  And there I think the

3  cases would allow that generally as relates to privilege, but

4  also about as relates to there being a heightened level of

5  scrutiny that District Courts can actually engage in as it

6  relates to making sure that there aren't these plans to

7  coordinate and opt out of a class certification.  But I was

8  asking you about that because that's certainly something that

9  would address potentially your concern.

10        If I were to find potentially that in fact everything

11  was appropriately communicated, that to me would potentially

12  then create a possibility for me to say, "Okay.  If I monitored

13  the mailings and I certainly had -- we had this conversation

14  about what could be communicated to them or if I were to require

15  you when you engaged them also to communicate certain

16  information to them so we could potentially also have -- we

17  could also have a discussion about what future engagement

18  letters would have to look like," that's what I might consider.

19        And so I'm just presenting that to you because it seems

20  to me that would be really the only way that I would consider

21  potentially allowing future contact.

22        But go ahead, Mr. Oliphant.  I know you want to respond

23  to that.

24        MR. KAY-OLIPHANT:  So I just wanted to say that not

25  having anticipated Your Honor going in this direction during the

—2:15-cv-01045-RFB-PAL—

1  hearing, I had not looked at the McKee engagement letter closely

2  again right before this hearing.  I believe, but don't know that

3  that exhibit that was submitted by class counsel also includes a

4  lengthy frequently-asked-questions section at the end of the

5  engagement letter that includes a lot of additional information.

6  And I believe that the types of information that Your Honor is

7  looking for us to have communicated to them is included therein

8  as well -- so I -- but if -- to the extent that that

9  frequently-asked-questions form is not actually attached to what

10 they submitted, I would submit that full engagement letter

11 packet that we sent to everyone to Your Honor for your review.

12 Because at the end of the day all we want is for these absent

13 class members to get non-misleading, totally straightforward,

14 objective, and ability to get access to unconflicted advice

15 about whether or not to opt out when the times comes.

16        And so whatever Your Honor thinks would be the best way

17 to proceed to get to that outcome, we will be more than willing

18 to comply with.

19        THE COURT:  Okay.  All right.  Thank you, Mr. Oliphant.

20        (Court conferring with courtroom administrator.)

21        THE COURT:  Okay.  Mr. Brown, is it?

22        MR. BROWN:  It is.  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        So, Mr. Brown, I'm going to ask you a different

25 question, which is if I went through the process that I

―2:15-cv-01045-RFB-PAL―

1   described with Mr. Oliphant, why wouldn't I let them then have

2   future communication?

3            MR. BROWN:  Thank you.

4            There are a number of reasons why it would not serve

5   class members to have further communications with Mr. Oliphant

6   and why -- or the Sparacino Firm, excuse me, and why there

7   really is no value proposition being offered to the plaintiffs

8   in this case.

9            On April 13th, 2021, the attorney, Ryan Sparacino, who

10  is seated in the courtroom, filed a sworn declaration with this

11  Court.  It's Docket Entry 809.  And in Paragraphs 42 and 43 of

12  that declaration he stated, quote, Sparacino is currently in

13  discussions with several elite antitrust litigation firms, and

14  went onto say, quote, Our intention is to reach a cocounsel deal

15  with a prominent national firm with antitrust and class action

16  experience comparable to Scotts and Scotts.  Sparacino's counsel

17  to its client about whether to opt out will depend heavily on

18  Sparacino's antitrust litigation partner firm.  That is, and I'm

19  still quoting, Sparacino's antitrust partner firm will be the

20  lead on the antitrust merits and class action/opt-out risk.

21           I'm still quoting, If Sparacino does not partner with a

22  high caliber antitrust firm, Sparacino will counsel clients to

23  remain in the class.  And if that occurs, Sparacino will not

24  seek any attorney's fees or costs from clients or interim class

25  counsel.

—2:15-cv-01045-RFB-PAL—

1          We are here today two and a half years from that sworn

2   representation to the Court, and the class has now been

3   certified.  Sparacino has not been able to partner with a

4   prominent national law firm with antitrust class action

5   experience.  They have acknowledged to this Court in a sworn

6   declaration that they do not have the requisite experience to

7   lead an analysis of the opt-out versus class action decision.

8          And, yet, as Paragraph 40 of Mr. Sparacino's same

9   declaration makes clear, and we just heard Mr. Oliphant repeat

10  this morning, the entirety of the scope of engagement that their

11  clients signed was that it would assist the clients in, quote,

12  analyzing their ability to opt out of the class action.  It does

13  not take a legal ethics expert to see that if counsel swears to

14  a court that it does not have the requisite experience and

15  expertise to accomplish its representation unless it partners

16  with qualified cocounsel and then does not partner with

17  qualified cocounsel, it cannot and should not proceed.  Which

18  begs the question of why we are even here at this point --

19          THE COURT:  Well, what if they say they have acquired

20  the knowledge, right, in the intervening period, Mr. Brown?  I

21  mean, we don't have specializations in law in terms of

22  certifications, right.  It's not like you have to be board

23  certified in antitrust law as it relates to being an attorney.

24  They could say, "In the intervening period we developed an

25  expertise and knowledge as it relates to antitrust law."  I'd

—2:15-cv-01045-RFB-PAL—

1    have no way of questioning them.  I'm not going to give them a

2    test, right, to figure that out.

3           So assuming they feel that they have the requisite

4    knowledge at this point in time, why then wouldn't I let them

5    have communications if I went through the process that I just

6    described?

7           MR. BROWN:  All right.  I would -- two-part answer.

8    Number one, I will answer your question with respect to the

9    hypothetical that, perhaps, they've somehow acquired the

10   requisite knowledge.  And then I will answer why Your Honor, we

11   believe, should prohibit further communications from their firm.

12          THE COURT:  So I really don't think it's actually

13   really productive to focus on the knowledge part.

14          MR. BROWN:  Okay.

15          THE COURT:  I need you to focus on the other part --

16          MR. BROWN:  All right.

17          THE COURT:  -- Mr. Brown, because I appreciate what

18   you're saying and I may ask Mr. Oliphant some questions about

19   that.  But, for me, the real basis for this Court to act would

20   be me making the finding, which I have made, right, that the

21   initial letter was misleading and that the second mailer may not

22   completely cure that.  And then the Court needs to figure out

23   what it can do to be assured that any future communication would

24   adequately apprise class members of all of their rights.  Why

25   wouldn't the process that I have outlined do that?

—2:15-cv-01045-RFB-PAL—

1          MR. BROWN:  The case -- the majority -- the vast

2   majority of the case law that has addressed this point says that

3   once a class is certified, counsel who are not class counsel

4   should not be reaching out and trying to solicit those -- those

5   clients, full stop, regardless of whether the counsel had

6   previously sent misleading mailers, which they have in this

7   case.

8          THE COURT:  Right.

9          MR. BROWN:  Now, Mr. Oliphant cited the Court to *In re:*

10  *McKesson*, which is a relevant case, and in that case it is true

11  the Court allowed further communications subject to Court

12  approval, but this is a critical distinction.  *In re: McKesson*

13  was all entirely precertification.  That case was about named

14  plaintiffs and their representatives before the class was

15  certified.

16         THE COURT:  Right.

17         MR. BROWN:  And this posture here -- I mean, there was

18  a period where we were in this strange interstitial period where

19  you had indicated your intention to certify the class, but the

20  final decision had not yet issued.  But right now, as of today,

21  that opinion has issued.  This class is certified.  And we

22  briefed this extensively in our -- in our briefs.

23         I would note that there were a number of California

24  cases and Ninth Circuit District Court cases.  And I would also

25  urge the Court to review the recent *Wayside Church* case out of

—2:15-cv-01045-RFB-PAL—

1  the Western District of Michigan and the *McWilliams* case out of

2  both the Southern District of Mississippi and the Sixth Circuit

3  because they go through the rationale for why solicitation is

4  entirely improper during this opt-out period.

5      It is particularly problematic in this case because of

6  the misleading mailers that were -- that had already issued to

7  class.  We know that not -- those mailers didn't only have the

8  potential for confusion, but we have a sworn declaration on the

9  record in this case from Mr. Maysey attesting to his contacts

10  with multiple fighters who were genuinely confused as to who the

11  contact was coming from.  Was the Sparacino firm related to

12  class counsel?  Was it class counsel?  This -- and -- and there

13  are a number of reasons why we believe that it would not only be

14  proper for the Court to order all communications with other

15  putative class members to cease, but it's also appropriate for

16  the Court to issue a curative letter in this case and give

17  retained clients --

18      THE COURT:  Curative letter to whom?

19      MR. BROWN:  To the retained clients of Mr. Sparacino --

20  sorry -- of the Sparacino Law Firm because we believe that they

21  are entitled to a period to just consider.  We're not -- no

22  one's ordering them to, you know, leave the retention.  But the

23  retention agreement, as you pointed out, Your Honor, is very

24  confusing in this case.  Our best read, and Professor Stempel's

25  best read of the case, was that it actually provided counsel

—2:15-cv-01045-RFB-PAL—

1   with the option of advising clients to stay in the action and

2   then getting 40 percent attorney's fees on any recovery that

3   those clients get even if they don't provide any further

4   services to those clients.

5           THE COURT:  Well, let's just clarify that.

6           Is that true, Mr. Oliphant?

7           MR. KAY-OLIPHANT:  No, Your Honor.  Of course not.

8           THE COURT:  Okay.  Because I know there was this back

9   and forth.  That's not exactly how I read the letter --

10          MR. BROWN:  Okay.

11          THE COURT:  -- myself.  But if they're representing on

12  the record that they wouldn't take that action, that's good

13  enough for me.  So let's move on from there.

14          MR. BROWN:  Okay.  We move on from that.

15          So let's all assume that the retention agreement is

16  clear that the Sparacino Law Firm only gets paid for clients it

17  can successfully convince to opt out of the action.  If that's

18  the case, then the entire value proposition that they tout in

19  their briefs and that they have touted to clients is that they

20  give, quote/unquote, unconflicted advice as to whether to opt

21  out.  But if the entirety of their financial recovery is

22  dependent on successfully getting people to opt out of this

23  case, then that is an allusory promise.  There is no real

24  service being provided here.

25          And --

2:15-cv-01045-RFB-PAL

1        THE COURT:  I don't understand that.  There is -- the

2   service that's being provided is they provide people with

3   information about their choice to opt out, right.  Why is that

4   not -- I'm sorry.  I mean, what information is provided versus

5   how they get paid is completely different.

6        MR. BROWN:  Okay.

7        THE COURT:  Right, I mean, firms get paid on all sorts

8   of different business models and you have contingency

9   arrangements and other arrangements.  So if what you're saying

10  to me is that you don't believe that they would properly advise

11  individuals because they don't have a financial incentive to do

12  so, that's one thing.

13       MR. BROWN:  That is what --

14       THE COURT:  But it sounds like what you're saying to me

15  in plain language is they have no financial incentive to provide

16  balanced advice.

17       MR. BROWN:  Correct.

18       THE COURT:  Right.

19       MR. BROWN:  That is what I'm saying.

20       THE COURT:  Okay.  But of course they could say the

21  same thing about class counsel, right.  The class counsel does

22  not have an incentive, right, to advise people properly about

23  their opt out.  So I'm saying that to you, Mr. Brown, because

24  that's going to be the case in many situations like this.  And I

25  don't know that any Court has found that to be particularly

—2:15-cv-01045-RFB-PAL—

1   dispositive as it relates to the issues that are before me right

2   now.

3         MR. BROWN:  All right.

4         THE COURT:  Right.  So what I hear you saying is,

5   first, right, there are cases which I recognize have said once

6   the class is certified, the curtain comes down and that's it,

7   right, no more communication, specifically to avoid issues of

8   undermining the certification process.  And the Supreme Court

9   has even talked about that, which I referenced earlier.

10         What I'm trying to understand is the other arguments

11   you're raising, which it sounds like what you're saying is that

12   you're not confident based upon what's happened previously and

13   based upon the engagement letters that in fact these individuals

14   are getting proper advice as it relates to opting out and that

15   the Court, therefore, should prevent that based upon the history

16   of what's transpired thus far.

17         MR. BROWN:  I would -- that's generally correct, Your

18   Honor.  I would make two amendments to that.

19         THE COURT:  Okay.

20         MR. BROWN:  First, it is also the case and this

21   should -- I want to make sure this is not lost as the briefing

22   is really focussed on this.  That because the mailings have

23   been -- the communications that have already occurred have been

24   misleading, and numerous Courts have found that at that point,

25   especially after certification, the communications just should

—2:15-cv-01045-RFB-PAL—

1   cease from the law firm, period.

2          And the second point is -- and I understand I'm walking

3   very close to a line that you pointed out, you know, is maybe

4   not persuasive, but I just want to emphasize what I am -- what I

5   was saying and was not saying with respect to the original

6   declaration filed by Mr. Sparacino, which was we don't -- I'm

7   not asking the Court to make a determination as to whether

8   counsel is qualified to represent the clients -- its clients in

9   this case.  I'm just pointing out that Mr. Sparacino himself

10  swore to this Court that his firm was not and that they would be

11  relying on an antitrust expert -- a firm with antitrust

12  expertise.

13          THE COURT:  Right.

14          MR. BROWN:  So there's no -- there's no need to do

15  anything, but hold Sparacino to the text of their actual sworn

16  affidavit.  And along those lines, Mr. Oliphant also filed --

17          THE COURT:  Mr. Brown, I appreciate you coming back to

18  that, but --

19          MR. BROWN:  Right, I understand.  It's not persuasive

20  to you.  I was going to move to a different point.

21          THE COURT:  I appreciate it, but I'm not going to be

22  persuaded.

23          MR. BROWN:  I understand, I understand.  I appreciate

24  that.  But I was going to make a slightly different point, if I

25  may.

—2:15-cv-01045-RFB-PAL—

1      THE COURT:  Well, okay.  But, again, what I want you to

2  focus on is to what extent you think you should or not be

3  involved in the proceedings that I described.  Because honestly

4  I think that the Court could hold these ex parte proceedings

5  with clients and without your presence there.  I know what you

6  all would say, and in fact I would be more probably neutral,

7  obviously, in that regard.

8      So is there any reason why you would need to be present

9  during that?  I mean, you could potentially I guess provide some

10  suggested lines of, sort of, inquiry based upon the history that

11  you understand from speaking with people who have been

12  solicited, but is there any reason why you all need to be

13  involved in that process?

14      MR. BROWN:  I would -- I would think that while we

15  would prefer to be involved because I think we would prefer to

16  have the -- the transparency into the process, I mean, if these

17  are retained --

18      THE COURT:  Right.

19      MR. BROWN:  -- individuals.  Now, what gets tricky is

20  if it's a limited representation that is only for the purpose of

21  advising these individuals with respect to opting out or staying

22  in the class, technically, I guess they're still represented by

23  us until -- unless and until they opt out.  And so they are also

24  our clients in a way as well.

25      And it just gets very -- because of the way that the

—2:15-cv-01045-RFB-PAL—

1   retention agreement is -- has been crafted, it is confusing as

2   to what our relationship is with these represented individuals.

3          In Mr. Oliphant's recent declaration, just from a

4   couple months ago to this Court --

5          THE COURT:  Right.

6          MR. BROWN:  -- he said, and I'm quoting, Now that the

7   class is certified, Sparacino will follow the ethical rules

8   related to members of a certified class.  Sparacino will not

9   communicate with any of the class members unless, A, Sparacino

10  already represents them or, B, the class member initiates

11  communications with Sparacino.

12         So essentially not only are we requesting that the

13  Court follow the rule that has been recognized in most District

14  Courts within the Ninth Circuit of cutting off communications at

15  the point of certification, but also to do contrary and have the

16  Sparacino Law Firm continue to contact absent class members

17  going forward would be directly contrary to what they swore they

18  would do to this Court just a couple of months ago.

19         THE COURT:  So, I'm sorry, Mr. Brown.  So what you're

20  saying to me is you want me to tell them that they can't contact

21  anyone else.

22         MR. BROWN:  That's correct, yes.

23         THE COURT:  Okay.

24         MR. BROWN:  And we believe it's -- I mean, we've cited

25  a number of cases for that proposition to this Court, including

—2:15-cv-01045-RFB-PAL—

1  recent -- recent case law, including case law from this Court

2  and others in the Ninth Circuit.  And it is -- it is sound

3  policy to have a point at which we cut off communications with

4  firms that are trying to interfere with the -- with the Rule 23

5  process, and that's worth pointing out.

6        This Court approves notice of a certified class.  This

7  is a -- this is a process that we as class action specialists go

8  through all the time.  The class gets certified, and the

9  official notice comes from -- it is Court approved -- it is

10 Court-approved language that tells them about the class that has

11 been certified and what their rights are under -- under Rule 23

12 and pursuant to the class certification, what the case is all

13 about.  And that is the process that's supposed to happen.  And

14 that is the process that's been interfered with and with further

15 communications during this period --

16        THE COURT:  I mean, how is it being interfered with?  I

17 mean, we already have certification.  So what's being interfered

18 with exactly?

19        MR. BROWN:  Well, potentially -- I don't know what the

20 timing is.  I mean, this -- if -- if this new wave of

21 solicitation the Sparacino Firm is envisioning here, again

22 contrary to the vast majority of what courts permit independent

23 of misleading previous communications, if that is coming at a

24 time before they even are getting Court-approved notice of the

25 certification of the class --

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Right.

2          MR. BROWN:  -- then we're talking about language that

3  -- I mean, I've never been involved, I will say, in a lifetime

4  or professional career of doing -- of doing class actions of,

5  you know, a Court-approved notice coming from opt-out counsel

6  before they're getting the official notice --

7          THE COURT:  Right.

8          MR. BROWN:  -- of the certification of a class.  I

9  mean, even if Your Honor didn't want to join the majority of

10 courts who have said that there is a -- it is a firm cut-off at

11 class certification from additional solicitations, it should be

12 on a case-by-case basis where there is some real benefit, where

13 the Court can understand and counsel can understand the real

14 benefit of these communications, and with counsel that can be

15 trusted and is reliable.

16         I mean, one need only read the briefs that have been

17 filed in this case to see the -- the language that is used,

18 the -- the creative characterization of facts that is involved

19 with the mailings and the briefs of this firm.  This is not the

20 case for an exception to that general rule.  And this is not a

21 case where the class members who would receive such

22 solicitations would actually have some real benefit.

23         I mean, this is -- this is a firm that by its own

24 admission doesn't have -- we know it doesn't have any investment

25 in this case compared to the thousands of -- of hours and the

—2:15-cv-01045-RFB-PAL—

1 | millions of dollars that have been put in by class counsel to

2 | build a record of this size.  And I will also note, with 15

3 | clients, there is no way that this firm or any other firm that

4 | they could conjure as a partner could create a financial

5 | incentive sufficient to actually prepare for and successfully

6 | try this case.  So anyone who's opting out of representation by

7 | our collective group of firms who have been waging this war for

8 | almost a decade and putting in instead with this firm and, you

9 | know, a handful of other people, does not reflect that they've

10 | been well advised and understand the likely ramifications of

11 | such a decision.  And that is why this is not such a case where

12 | an exception should be made to the general rule, Your Honor.

13 |          THE COURT:  Okay.  All right.  Thank you.

14 |          MR. BROWN:  Thank you.

15 |          THE COURT:  Mr. Oliphant, I have one main question for

16 | you, which is there are a number of cases that say once you have

17 | class certification that's the end of it.  That's where the

18 | communications should stop.  Why wouldn't I follow that line of

19 | cases here?

20 |          MR. KAY-OLIPHANT:  All of those cases for the most part

21 | relate to a represented party reaching out to the absent class

22 | members.  Rule 4.2 by its very language starts with the

23 | preamble, "While representing a client ..."

24 |          The whole point of that rule is to stop represented

25 | parties from dealing with absent class members.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Right.  But they're represented now because

2     they're in the class, right?  That's what these cases say.  They

3     basically say once the class is certified, they have class

4     representation, right?

5          MR. KAY-OLIPHANT:  If you look at the -- the reason why

6     they're represented -- for the purpose -- they are in some ways

7     represented, Your Honor.  I agree with that.  In all the cases

8     that class counsel has cited, for the most part they're about

9     defense counsel reaching out.  Sometimes they're about class

10    counsel reaching out.  But the vast majority of them relate --

11    the reason for Rule 4.2 does not apply here.  And their

12    application in this situation would run contrary to the way the

13    ABA model rules have been interpreted by the ABA which says that

14    they're not technically represented for these purposes until the

15    end of the opt-out period.

16          And, also, the real problem --

17          THE COURT:  Are you talking about in terms of them

18    receiving advice about what it in to opt out?

19          MR. KAY-OLIPHANT:  Absolutely, Your Honor.  Their

20    rule -- the way that they would impose it would take the rule

21    that has been grafted and created to stop defense counsel from

22    trying to pick off class members, frankly.  And they're using it

23    to try to stop absent class members from being able to get the

24    unconflicted advice about whether or not to opt out or not.  If

25    they don't have the ability to have access to that counsel based

———2:15-cv-01045-RFB-PAL———

1   upon this, sort of, application of Rule 4.2, they can't get it

2   because class counsel has a conflict of interests.

3          What their strategy here -- the whole thing that class

4   counsel just told you about how it wouldn't make sense for them

5   to opt out if there's only 15 of them, they are kneecapping our

6   attempt to build a potential coalition to do exactly what may be

7   in their best interest.  And they need to be able to learn that.

8          THE COURT:  Let me ask you this question.  I appreciate

9   that.  Let me ask you this question.  Why wouldn't I find, okay,

10  other firms can do it, but you all can't do it because of what's

11  happened here?  Why wouldn't I say, "You have an unfortunate

12  history here where there's been some misleading information and

13  that can't be undone.  And so they're certainly entitled to it,

14  but not from you."

15         MR. KAY-OLIPHANT:  *In re: McKesson* would counsel

16  against that.  Its application of *Gulf Oil* would say that when

17  there is a misrepresentation such as the one that you have found

18  here, the resolution of that, the remedy is not a broad

19  prohibition that blanketly denies commercial speech.  It is to

20  tailor the commercial speech going forward to ensure that that

21  type of miscommunication does not happen in the future.  That's

22  what *In re: McKesson* says.

23         And *Wayside Church*, the case that they would like you

24  to look at, is further support for our position because that

25  case the Court specifically looks at the First Amendment issues

———2:15-cv-01045-RFB-PAL———

1   and looks at *Gulf Oil* and says to itself, "There are categories

2   of types of communications that need to be restricted and not

3   restricted here based upon what's happened in the past."  That's

4   exactly what we're asking for Your Honor to do.

5           We think that with proper monitoring -- we disagree

6   that there was a miscommunication, but if Your Honor finds that,

7   there is a way to solve this problem without restricting First

8   Amendment rights and a way to solve the problem without stopping

9   these absent class members from getting the unconflicted advice

10  that they need.

11          THE COURT:  Okay.  And is it your firm's intention to

12  be sending out any additional mailers at this point in time or

13  any communications?

14          MR. KAY-OLIPHANT:  We --

15          THE COURT:  Pending this Court's order?

16          MR. KAY-OLIPHANT:  Oh, absolutely not, Your Honor.

17  Your Honor, we -- the part of my declaration that class counsel

18  just read was related to the pledge that Mr. Sparacino made to

19  this Court which was that while these issues are pending

20  resolution, we will not reach out to additional people and we

21  have abided by that pledge.  We will not send any more mailers

22  unless and until Your Honor says it's okay.  And we believe the

23  best way for that to go forward would be with your approval of

24  the language that would be in those mailers.

25          THE COURT:  Quickly, were you able to get the

———2:15-cv-01045-RFB-PAL———

1   information that I asked as relates to the dates of the --

2           MR. SPARACINO:  Yes.

3           THE COURT:  If you want to take a moment.

4           MR. KAY-OLIPHANT:  Yes.  So ...

5           THE COURT:  Any reason why we can't review that just to

6   put this on the record?  Because, again, partly I wanted to

7   figure this out and figure out what I may want to do, but I want

8   to figure out the timing as to when these retentions occurred.

9           So if you can go ahead and tell me what the dates were,

10  approximately.

11          MR. KAY-OLIPHANT:  Sure.  Do you want the specific

12  dates for each one?

13          THE COURT:  If they all occurred within -- so here's

14  what's helpful for me.  Did any of them occur between the first

15  and second mailer?

16          MR. KAY-OLIPHANT:  (Pause.)  The second mailer was on

17  March 26th, 2021, correct?

18          THE COURT:  Uh-hmm.

19          MR. KAY-OLIPHANT:  So the data that I have will not

20  specifically answer this question.  So let me explain.  After

21  Scott and Scott withdrew from the case, we sent to all of our

22  clients who had already signed engagement letters new engagement

23  letters that indicated exactly what the situation was with

24  regard to Scott and Scott and had them decide whether or not

25  they wished to re-engage us considering those facts.

2:15-cv-01045-RFB-PAL

1          So the data that I have in front of me right now

2   relates to our current clients because they signed the new

3   engagement letter.

4          THE COURT:  Do you have the -- well, do you have the

5   information about the original engagement letter they signed?

6          MR. KAY-OLIPHANT:  So I think I could get that as well,

7   but, I mean, clearly we have data on everything.  I mean, like,

8   we could find that out for Your Honor.

9          THE COURT:  So here's what I would like for you to do.

10  One, I'm going to give you a week to be able to submit that

11  material as relates to what we want -- what I want to know is

12  when were they first engaged, and if they signed a second

13  letter, when that happened, right, the dates for the

14  particular -- you don't have to give me the names of which

15  client signed when.

16         MR. KAY-OLIPHANT:  Okay.

17         THE COURT:  But you do need to have a filing as to the

18  dates.  And I believe that class counsel is entitled to that, at

19  least the information as to the engagement, not as to who the

20  individuals are, right, but I think that.  So I would like for

21  you to do that.

22         I'd also like for you to send to me, right, a copy of

23  the engagement letters that they signed, the first one and the

24  second one.

25         Now, that -- if it's a standard letter, then you can

—2:15-cv-01045-RFB-PAL—

1   simply file that in the same filing that you're going to file

2   this information, right.  Because I think that class counsel's

3   entitled to a standard -- seeing the standard letter, but not

4   necessarily who may or may not have signed it.  So if it's,

5   however, different letters, then you need to provide the

6   different letters that are filed.

7         Now, what I will say is I think that class counsel is

8   entitled to this, but it's not public information.  So I want

9   you to file that under seal, but provide them with a copy of it.

10        MR. KAY-OLIPHANT:  Yes, Your Honor.

11        THE COURT:  Based upon the Court's finding that the

12  initial mailer was misleading and I don't find that the second

13  mailer was curative of that misleading information, I want to be

14  clear, I'm directing your firm not to have any future contact

15  with any class members until the Court issues a final ruling as

16  it relates to this process.  I know you've already agreed to

17  that.  I want to be clear about what it also means is that you

18  cannot retain -- be retained during this period of time by any

19  class members even should they reach out to you.

20        Now, if you want permission for that to happen, you can

21  certainly seek permission from the Court.  So I'm not saying

22  that if someone reaches out to you that they couldn't eventually

23  become your client, but what you're -- I'm telling you you have

24  to say to that individual is, "We're in the midst of litigation

25  regarding that retention.  We could potentially represent you,

—2:15-cv-01045-RFB-PAL—

1   but we need to get permission from the Court, right, in order to

2   do that."

3          And then you would have to come to me and get

4   permission to do that, should you be contacted during this

5   period of time.  Now, I don't anticipate that this is going to

6   take that long -- well, first, we're waiting on this -- the

7   Ninth Circuit to figure out what it's going to do.  I'm not

8   really sure what the story is, but we're waiting for the Ninth

9   Circuit to figure that out.  But I also need this other

10  information to figure out what I want to do in this case.

11         But I want to be clear, between now and when I make a

12  final ruling on this, right, you cannot be engaged by any class

13  members.  If you're contacted, you can tell them, as I've said,

14  that, "We're in litigation.  We would have to seek permission of

15  the Court to represent you, but we could potentially do that if

16  the Court gave us permission to do so."

17         Now, I'm not saying -- I don't know about people

18  contacting you.  They may or may not.  But obviously they would

19  potentially have the right to engage you should I permit that

20  based upon a process that I have to contemplate.

21         So I just want to be clear about that.  Are there any

22  questions about that, Mr. Oliphant?

23         MR. KAY-OLIPHANT:  I think your admonishment is very

24  clear on that point.  My only question relates to the 15 that we

25  do currently represent.  Are you saying that we should not

—2:15-cv-01045-RFB-PAL—

1  communicate with them at all either?

2          THE COURT:  No.  I don't -- I'm not saying that, that

3  you can't communicate with them, right, at all.  At this point

4  in time I don't really know what's been communicated with them,

5  and so I don't want to tell you to do something that would in

6  fact interfere with what's already been communicated.  That's

7  why I have to look at the timing of when they were -- when you

8  were retained, figure out what information they may or may not

9  have had, and also where the case was procedurally when they

10  were retained, and then I'll make a determination as relates to

11  that.

12          So for the 15 members that you currently have, I'm not

13  providing you with any direction as to how you communicate with

14  them or how often.  Okay?

15          MR. KAY-OLIPHANT:  I understand.

16          THE COURT:  Is a week enough time to be able to provide

17  the information to the Court?

18          MR. KAY-OLIPHANT:  Yes.

19          THE COURT:  Okay.

20          All right.  Anything else, Mr. Oliphant, that we need

21  to address today?

22          MR. KAY-OLIPHANT:  I don't think so.

23          THE COURT:  All right.  Thank you.

24          MR. KAY-OLIPHANT:  Thank you.

25          THE COURT:  Mr. Brown.

—2:15-cv-01045-RFB-PAL—

1          MR. BROWN:  I just -- I will just take one second, Your

2   Honor.  I just wanted to address a piece of housekeeping or

3   clarification.  It probably is apparent, but just to make sure

4   the Court is aware of all of the relevant filings in this case.

5          You know, plaintiffs filed an affirmative motion

6   seeking relief in the form of, you know, bans on future

7   solicitations, a curative letter, a chance to rescind.  That was

8   in Docket Entry Number 875.  We don't believe that there are

9   further briefing -- there's any further briefing beyond that

10  that is necessary to address this.  I just wanted to make sure

11  that in the Court's consideration of today's argument and these

12  issues that it fully, you know, considers that filing as well.

13          THE COURT:  I haven't forgotten what you've asked for,

14  Mr. Brown.

15          MR. BROWN:  Okay.  Thank you.

16          THE COURT:  I appreciate that.  And to the extent

17  there's any concern about that, obviously the Court will address

18  that in whatever final ruling it issues after receiving this

19  information from the third party here.

20          Okay.  Anything else we need to do today then?

21  Mr. Oliphant, yes.

22          MR. KAY-OLIPHANT:  Just to be clear.  Does Your Honor

23  want us to file our opposition brief to their new motion that is

24  related to these similar facts?  Our opposition brief would be

25  due November 7th, so in a similar timing as the information.

—2:15-cv-01045-RFB-PAL—

1          THE COURT:  Well, look, if you think it's going to have

2    more information than what you all have already filed with me, I

3    don't -- there's a lot of overlap, right, in these filings,

4    right.  And so if you feel that there's information there that

5    somehow I don't have that you would like to or need to

6    communicate, that's fine.  But I will say this.  You not filing

7    in response to that I will not consider to be you not opposing

8    the motion and, therefore, consenting to it being granted

9    because we have a local rule that talks about that.

10          But there has been a lot of back and forth and overlap,

11    right.  But if you -- you're certainly free to respond.  It may

12    be helpful to respond to something -- to some of that with some

13    of the information that you're going to be providing anyway in a

14    more generic form.  It's up to you.

15          So if you feel like it's important to have a response

16    on the record, even if it incorporates by reference other

17    information, you're free to do that.  But I don't find,

18    Mr. Oliphant, based upon what you all have already filed and our

19    conversation today that I would necessarily need more

20    information, but if you think that there's something else that

21    you want to put in front of me, that's fine.

22          MR. KAY-OLIPHANT:  Okay.  Thank you, Your Honor.

23          THE COURT:  All right.

24          Anything from anyone else in the courtroom?

25          All right.  I thank you all for your time.  We'll be

2:15-cv-01045-RFB-PAL

1  adjourned.  Thank you.

2          MR. BROWN:  Thank you, Your Honor.

3          MR. CRAMER:  Thank you, Your Honor.

4          MR. KAY-OLIPHANT:  Thank you, Your Honor.

5          (Whereupon the proceedings concluded at 11:14 a.m.)

6                      --oOo--

7              COURT REPORTER'S CERTIFICATE

8

9      I, PATRICIA L. GANCI, Official Court Reporter, United

10  States District Court, District of Nevada, Las Vegas, Nevada,

11  certify that the foregoing is a correct transcript from the

12  record of proceedings in the above-entitled matter.

13

14  Date:  November 2, 2023.

15                          /s/ **Patricia L. Ganci**

16                          Patricia L. Ganci, RMR, CRR

17

18

19

20

21

22

23

24

25