———2:15-cv-01045-RFB-BNW———

1            UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4  CUNG LE, et al.,                    )
                                       )
5              Plaintiffs,             )  Case No. 2:15-cv-01045-RFB-BNW
                                       )
6       vs.                            )  Las Vegas, Nevada
                                       )  Friday, November 21, 2023
7  ZUFFA, LLC, d/b/a Ultimate          )  11:36 a.m.
   Fighting Championship and           )
8  UFC,                                )  MOTION HEARING
                                       )
9              Defendants.             )
   _____  *C E R T I F I E D   C O P Y*

10

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14         THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19  APPEARANCES:       See Pages 2 and 3

20

21
   COURT REPORTER:     Patricia L. Ganci, RMR, CRR
22                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
23                     Las Vegas, Nevada  89101

24
   Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
2:15-cv-01045-RFB-BNW
```

1 APPEARANCES:
  For the Plaintiffs:

2

3        **DON SPRINGMEYER, ESQ.**
         WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
         3556 E. Russell Road, 2nd Floor
4        Las Vegas, Nevada 89120
         (702) 341-5200

5

6        **ERIC L. CRAMER, ESQ.**
         **PATRICK F. MADDEN, ESQ.**
         BERGER & MONTAGUE, P.C.
7        1818 Market Street, Suite 3600
         Philadelphia, Pennsylvania 19103
8        (215) 875-3000

9        **JOSEPH R. SAVERI, ESQ.**
         THE JOSEPH SAVERI LAW FIRM, INC.
10       555 Montgomery Street, Suite 1210
         San Francisco, California 94111
11       (415) 500-6800

12 For Defendant Zuffa, LLC:

13       **J. COLBY WILLIAMS, ESQ.**
         CAMPBELL & WILLIAMS
14       700 South 7th Street
         Las Vegas, Nevada 89101
15       (702) 382-5222

16       **WILLIAM A. ISAACSON, ESQ.**
         **JESSICA PHILLIPS, ESQ.**
17       PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
         2001 K Street, NW
18       Washington, DC 20006
         (202) 223-7300

19

20       **CHRISTOPHER S. YATES, ESQ.**
         LATHAM & WATKINS, LLP
         505 Montgomery Street, Suite 2000
21       San Francisco, California 94111
         (415) 395-8157

22

23

24

25

2:15-cv-01045-RFB-BNW

1          LAS VEGAS, NEVADA; FRIDAY, NOVEMBER 21, 2023; 11:36 A.M.

2                              --oOo--

3                   P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          COURTROOM ADMINISTRATOR:  The matter now before the

6  Court is Le versus Zuffa, Inc., Case Number

7  2:15-cv-1045-RFB-BNW.  Counsel, please make your appearances

8  beginning with the plaintiff.

9          MR. CRAMER:  Good morning, Your Honor.  Eric Cramer for

10  the plaintiffs.

11          MR. MADDEN:  Good morning, Your Honor.  Patrick Madden

12  for the plaintiffs.

13          MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri

14  for the plaintiffs.

15          MR. SPRINGMEYER:  Good morning, Your Honor.

16  Don Springmeyer for the plaintiffs.

17          THE COURT:  Good morning.

18          MR. ISAACSON:  Good morning, Your Honor.  It's Bill

19  Isaacson from Paul Weiss for the defendant.

20          MR. YATES:  Good morning, Your Honor.  Chris Yates from

21  Latham and Watkins for the Defendant.

22          MS. PHILLIPS:  Good morning, Your Honor.  Jessica

23  Phillips from Paul Weiss for the defendant.

24          MR. WILLIAMS:  And good morning, Your Honor.  Colby

25  Williams, Campbell and Williams, on behalf of the defendants.

1          THE COURT:  Good morning.  We have a couple of motions

2    that we are going to address here.  So let me get straight to it

3    here.

4          Mr. Isaacson, are you going to be arguing these

5    motions?

6          MR. ISAACSON:  No, Mr. Yates will be arguing the motion

7    to reopen discovery.

8          THE COURT:  Okay.  Well, why don't we have Mr. Yates

9    come up.

10         So, Mr. Yates, my basic question to you is this.

11   You've had years.  I got no motion to reopen discovery.  How is

12   that diligence?  How is this not a strategic decision that you

13   thought you were going to prevail in a class certification or on

14   the appeal and you didn't, and your sat on your hands and didn't

15   file a motion to reopen discovery, despite knowing all of this

16   information?

17         MR. YATES:  Your Honor, we moved to reopen discovery at

18   the earliest feasible time --

19         THE COURT:  No, no.  Let me ask you a question.  At the

20   time I said I was going to announce my decision, I said there

21   was going to be a delay while I looked at and waited for the

22   *Olean* decision.  Was there anything at that time that prevented

23   you from filing a motion to reopen discovery?

24         MR. YATES:  Your Honor, I believe there was because,

25   Your Honor, what was pending at the time was a motion to certify

1  both the damages class and an injunctive class.  The plaintiffs

2  admit there was going to have to be discovery on the injunctive

3  relief class.  Then they filed the --

4       THE COURT:  My question, though, I'm going to be very

5  direct, was there any legal impediment to you filing a motion to

6  reopen discovery at that time?  Was there anything that stopped

7  you, that prevented you, from filing such a motion, other than

8  making a decision about where you thought you were, right?

9  There was no order from this Court or anything like that that

10 said you couldn't file a motion to reopen discovery, right?

11      MR. YATES:  There was no such order that had been

12 issued by the Court.  However, as a practical matter, Your

13 Honor -- Your Honor was considering the class certification

14 decision.  And part of the class certification decision was

15 injunctive relief, which necessarily the plaintiffs admit was

16 going to require additional discovery.  They then filed the

17 Johnson case.  As part of our motion to dismiss in the Johnson

18 case, we say we need discovery, including in Le.  In our reply

19 brief we say the same thing.  We say the cases should be

20 consolidated.  That would be the most efficient way to go.  And

21 we say that discovery should be reopened in Le.  We then --

22      THE COURT:  So why not file a motion to reopen?  I

23 mean, Le is the case.  And so I guess what I'm pressing you on

24 is -- and I'm sure, counsel, you've done it multiple times --

25 you file a motion to reopen in the case you want to reopen.  I

—2:15-cv-01045-RFB-BNW—

 1  mean, it's actually a fairly straightforward motion.  You've

 2  done it here, right.  You could have done it earlier.

 3       And I understand that there might have been,

 4  quote/unquote, practical considerations, but, again, that's not

 5  necessarily something that establishes good cause or would be

 6  excusable neglect if you could have done it and you made a

 7  strategic decision not to do it.

 8       I'm trying to understand why I should consider your

 9  practical argument when, in fact, in this case that we're

10  talking about, Le, there was no impediment at all to filing a

11  motion that you filed recently years ago.

12       MR. YATES:  Well, Your Honor gave us leave to file the

13  motion on October 24th, which is what we did.  The cases speak

14  to providing notice to the Court, which we did, of the need for

15  further discovery.  We did that multiple times for years.  The

16  plaintiffs in their opposition claimed that we were not

17  diligent.  We were diligent.  Your Honor, there's nothing more

18  diligent that we could have done.

19       Again, injunctive relief was necessarily going to

20  require additional discovery.  Everyone agrees on that.  And so

21  the first -- the first time that we could, when we were filing a

22  motion to dismiss in the Johnson case, we notified Your Honor,

23  put the plaintiffs on notice, and then met and conferred with

24  them about the need for additional discovery in Le.

25       Frankly, it would be -- Your Honor, it would be error

———2:15-cv-01045-RFB-BNW———

1  -- it would be error not to give us this discovery because we're

2  talking about a situation where they're -- the plaintiffs are

3  trying to silo the class period.  The Courts, the *Geneva*

4  *Pharmaceuticals* and the Ninth Circuit, has said that entry even

5  after the class period is relevant in a monopoly or monopsony

6  case.

7          THE COURT:  Well, counsel, you weren't here for any of

8  the expert advice.  I didn't hear any of the experts say that

9  they needed data from after the class period to be able to prove

10  their theory within the class period.  And, in fact, I

11  questioned them quite extensively about that.

12          MR. YATES:  Sure.

13          THE COURT:  They did not say, "We believe based upon

14  our theories and our testimony that we need information after

15  the class period to establish what would be the monopsony power

16  within the class period."  I didn't hear anything from the

17  experts that said that.  I went back over their testimony in

18  preparation for my hearing today because I wanted to make sure

19  that I didn't miss anything.

20          We had extensive testimony from experts, and I didn't

21  hear any of them offer a theory as it relates to establishing

22  monopsony power that you need to wait two or three years after

23  the relevant period to provide that information.  And, in fact,

24  we allowed for and I allowed for them to supplement the

25  information.  And I didn't hear anything from those experts that

——2:15-cv-01045-RFB-BNW——

1    would suggest to me, because we're moving a little bit into

2    relevance, but would suggest to me that somehow the information

3    that you're now seeking to obtain would be relevant to the

4    determination of a monopsony within the class period.

5         MR. YATES:  Well, I believe -- I believe the experts

6    did talk about entry and they talked about the growth of

7    competitors.  And what's happened -- what's happened since the

8    class period is there's been additional entry.  PFL has entered,

9    and of course the plaintiffs -- I mean, the experts can't

10   predict exactly what's going to happen in the future.  At the

11   time everyone was thinking about the class period.  Your Honor

12   was holding hearings in 2018 and 2019.  No one knew that it was

13   going to be four years before class certification was decided.

14        THE COURT:  But I guess my question, counsel, is this.

15   If their theories or models as relates to monopsony were based

16   upon years of econometric study that said one of the best ways

17   for us to understand a monopsony is to look two or three

18   afterwards because it affects our lag, that would be one thing.

19   Then there would be potentially a basis for me to consider that.

20   They didn't say that.  That's what I'm saying to you.

21        They didn't say, "If we look at how we study

22   monopsonies, we typically look two or three years after a period

23   for a lag."  They didn't say that that was the basis for their

24   theories.  And that's why I'm saying to you it would be one

25   thing if it was in the information that would be relevant, but

1    if they didn't say that, including your own experts, why would I

2    find this to be relevant?

3            MR. YATES:  Well, because the Ninth Circuit and other

4    Courts say it's relevant, Your Honor.

5            THE COURT:  Well, yeah, that argument, counsel, is not

6    going to work for me here.  I'm talking about my case here

7    specifically.

8            MR. YATES:  Well --

9            THE COURT:  I decided this on my case already.  Look,

10   the Ninth Circuit has actually already looked at my

11   certification order, right.  They didn't actually allow for an

12   appeal on that order, and that order went through extensively

13   this theory.  So you're going to have to give me a reason why

14   within the record that's here, because each case is unique, as

15   to why, here, there is evidence or expert advice that would

16   somehow suggest that information beyond the class period is

17   relevant for determining monopsony power within the class

18   period.

19           MR. YATES:  Because it took four years for Your Honor

20   to decide class certification and there has been substantial

21   entry and expansion by competitors during that period, which as

22   a matter of law, if you look at *Rebel Oil*, if you look at the

23   *Syufy* case, if you look at the *Geneva Pharmaceuticals* case, must

24   be considered because current market conditions must be

25   considered when evaluating both market power and monopsony and

─────2:15-cv-01045-RFB-BNW─────

1  monopoly power.  That is -- that is fundamental.

2          And of course, again, no one thought it was going to

3  take four years for class certification to be decided.  The

4  experts did point to at the time PFL coming in, and they -- the

5  plaintiffs said they're just minor league.  PFL doesn't think

6  they're minor league today.  No one thinks they're minor league.

7  What does that mean?  That means that the plaintiffs' theory of

8  the case is dead wrong.

9          THE COURT:  But my question to you is, I want to go

10  back to this, can you point to me the portions of the record

11  here where your experts said it's important for us to consider

12  information beyond the class period to determine whether or not

13  there's monopsony power within the class period?  Where in the

14  record do your own experts say that?

15          MR. YATES:  Your Honor, I don't -- I didn't go back and

16  re-review the entire record to prepare for this hearing.

17  However, my recollection is that they were talking about entry.

18  They were talking about competitors coming into the marketplace.

19  They were talking about PFL, which had just entered at the --

20  just shortly before the class certification hearing.  That's

21  part of the reason that Your Honor allowed supplemental expert

22  reports, which I think counsels again in favor of reopening

23  discovery here or, at the very least, let us take some discovery

24  in Johnson that we can then use in the lead trial.

25          Otherwise, we're going to have a trial where the jury

—2:15-cv-01045-RFB-BNW—

1   is going to sit there and say, "Wow.  I don't know what has

2   happened since 2017."  And the reality is --

3           THE COURT:  Well, what if I tell them that's not

4   relevant?  First of all, I may decide that that's actually not

5   relevant.  Because the reason why I'm asking you, counsel, about

6   the expert advice is, in order for me to allow evidence, it

7   would have to be relevant.  And I'm saying this to you because

8   when we had the hearings, and that's why I'm focusing on the

9   record, I did go back and read their expert testimony explicitly

10  to figure out whether or not what you were offering now was

11  something that they suggested would be necessary for their

12  modeling to make the determination.  Because as it relates to

13  evidence, right, it's important for the Court to determine

14  what's relevant.

15          The fact of the matter is I may very well find, look,

16  that's actually misleading to the jury.  The inquiry is during

17  the class period did Zuffa have monopsony power, and to the

18  extent that there's evidence offered outside of the class

19  period, there would have to be relevance for that as it relates

20  to theories about monopsony power related to this case.  And

21  that's why, again, I'm focussed on the experts because that's

22  where we heard the testimony about monopsony power.

23          MR. YATES:  And respectfully, Your Honor, if Your Honor

24  were to exclude evidence of current market conditions, that

25  would be an error of law.

————2:15-cv-01045-RFB-BNW————

1          THE COURT:  You said that before.  And I know that

2     that's a strategic argument people make, but you can say that.

3          MR. YATES:  Well --

4          THE COURT:  And you all said the same thing about my

5     class certification, that that would be error, too.  And you are

6     free to, right, make that argument.  I'm trying to actually ask

7     you a question related to the record.  Simply saying to me it

8     would be error is actually not a particularly productive use of

9     our time here, counsel.  I would rather focus on what you think

10    is your best argument about this.

11          Because, again, I spent a lot of time preparing for

12    this today and I'm focussed on what it is that would give you --

13    what it is that's necessary.  I want to find out why this is --

14    I should allow this.  And I want to focus on what parts of the

15    monopsony theory that you've talked about.  One, you say entry.

16    Two, you say competitors.  But there was information about

17    competitors and entry during the period.  Why isn't that enough?

18          MR. YATES:  Because the continued entry of competitors

19    demonstrates there are not barriers to entry and that something

20    else must be accounting for what plaintiffs call wrongful

21    anticompetitive conduct.  Because where you've got competitors

22    who are entering and growing and who are saying that we actually

23    can get any fighter we want, it proves that the alleged 30-month

24    contracts are not barriers to entry.

25          These competitors -- and our experts did talk about

—2:15-cv-01045-RFB-BNW—

1  entry.  They did talk about expansion.  That's only continued.

2  That has only continued after the class period and after Your

3  Honor had the class certification hearing.

4      What has happened is that these competitors have

5  continued to grow, even though the plaintiffs say that the

6  contracts are virtually the same out -- after the class period.

7  So that's classic evidence which shows that the plaintiffs'

8  theory is wrong, that there is no monopsony power.  And,

9  frankly, you know, the entry -- entry and expansion are the key

10  things in most monopoly and monopsony cases.

11      THE COURT:  So I want to ask you a question about that.

12      MR. YATES:  Sure.

13      THE COURT:  One is are you arguing that Zuffa still

14  doesn't still -- because you can have competitors and still have

15  market power, right.  It doesn't -- it may mean that your market

16  power is lessened, but the existence of a competitor -- even

17  your experts acknowledged, the existence of a competitor does

18  not itself in fact negate the potential for market power and to

19  be able to exercise a monopsony as relates to wages.  And in

20  fact the threshold that your experts identified, which is like

21  around 30 or 40 percent, is well below what the -- what the

22  amount of market power is here.

23      And so one of the arguments that I was -- one of the

24  issues that I wanted to raise with you is about, even if this

25  were the case that they're competitors -- and we haven't even

1  gotten to the issue of changes in behavior, but assuming that

2  everything is the same, why would that matter if Zuffa is still

3  potentially or at least allegedly exercising market power?

4          MR. YATES:  Well, because we obviously vigorously

5  dispute Dr. Singer's calculations of market share and market

6  power.  We think they're wrong.

7          You know, Dr. Singer's opinions have been excluded

8  three times in three major cases since the class certification

9  hearings as unreliable.  So we don't think that the market share

10  calculations that Dr. Singer provided and which ultimately

11  formed the basis, I agree, for Your Honor's class certification

12  decision which obviously did not decide these issues as a matter

13  of fact --

14          THE COURT:  Right.

15          MR. YATES:  -- that's going to be for trial.  You know,

16  we vigorously dispute those market share calculations.

17          So entry and expansion by competitors is exactly what

18  needs to be tested to see if there is actual monopoly or

19  monopsony power, as the plaintiffs allege, or if something

20  different is going on here.

21          Our position -- we've said it all along, our position

22  is Zuffa created this sport.  Zuffa created this sport.  It's

23  natural that it had a head start for a while.  Competitors sat

24  back and waited for a while.  And what did they do?  They said,

25  "Okay.  Zuffa's made this sport mainstream.  It's now on TV

2:15-cv-01045-RFB-BNW

1    networks.  Sponsors like it now.  So we're going to get in."

2           And what's happened with PFL?  PFL, you know, at the

3    time of the class certification hearings were just getting

4    going.  And what's happened since then?  They've exploded.

5    They've got hundreds of millions of dollars of new money coming

6    in to their -- to their business.

7           That is classic evidence of entry and the fact that

8    there are not durable barriers to entry.

9           THE COURT:  So I guess again we go back to you say it's

10   classic evidence, but I don't have experts telling me that.  I

11   didn't have your experts saying to me classic evidence of this

12   is -- again, that's why I go back to this lag period, but let me

13   ask you another question.

14          Why couldn't the Court simply say, "Look, that's

15   attributed to change in behavior.  Zuffa no longer took" -- and,

16   again, allegedly because, again, I know these issues as a matter

17   of fact is going to be for the jury to decide.  But why wouldn't

18   I find, look, you know what, Zuffa changed its strategy.  It no

19   longer decided that it was going to acquire or force out

20   competitors because they recognize the potential for a case like

21   this one to proceed.  This case had already -- of course had

22   already been filed by that time.  Why wouldn't that be

23   potentially something that the Court should consider as it

24   relates to the information that you provide?

25          MR. YATES:  I just don't think -- I mean, I don't --

1  that's obviously -- you're making speculation.  There's

2  speculation there, Your Honor.  That's not based on any fact.

3  I'm sure the plaintiffs will make exactly that argument, if Your

4  Honor allows the discovery, which we respectfully submit should

5  be allowed here.

6       This is evidence and our experts -- going back to Your

7  Honor's previous question, our experts did talk about entry and

8  expansion.  And this evidence, it proves that what the

9  plaintiffs were saying at the time, which is all of these

10 competitors are minor league, is not true.  It is not true.  If

11 you look just at the quotes we put in our reply brief, all of

12 the competitors think that they have access to all of the

13 athletes that they need to put on viable MMA promotions.

14       THE COURT:  I guess my question is, do I have in this

15 record evidence from experts that would indicate that the effect

16 of these new competitors is to potentially eliminate the alleged

17 market power that existed?  Even if you disagree with it, right,

18 there is a dispute here and the Court considered it and it's

19 part of the Court's certification order.  Do you have expert

20 testimony that would suggest that this entry data would mean

21 that Zuffa is no longer allegedly even the market dominant power

22 that Dr. Singer said that they were?

23       MR. YATES:  I believe Dr. Topel addressed that.  He was

24 talking about entry and expansion, and this is a continuation of

25 that testimony.  Four-plus years have elapsed since that

2:15-cv-01045-RFB-BNW

1  testimony.  Obviously competitors have continued to grow and

2  expand, which is what we're going to argue to the jury,

3  ultimately, after -- after hopefully Your Honor allows us to get

4  into discovery on this.  We're going to argue to the jury that

5  establishes that these contracts that the plaintiffs say and

6  Dr. Singer contends are exclusionary are nothing of the sort.

7       THE COURT:  Well, let me ask you a separate question

8  because there's a separate issue about the trial date here.

9  What if I were to say to you, "Fine.  I'll allow you discovery,

10  but it has to be done by April 8th so we can go to trial.  I'm

11  not going to move that date," what would you say to me?

12       MR. YATES:  I'd say fine.  Your Honor, I did it last

13  year.  My wife didn't love the fact that I was gone for a lot of

14  the holidays and -- but that's what we do as trial lawyers.

15       THE COURT:  I'm just saying that because one of the

16  arguments the plaintiffs make --

17       MR. YATES:  Yeah.

18       THE COURT:  -- obviously is that this is a pretextual

19  argument about the trial date.  And, again, I haven't decided

20  the issue of the motion for summary judgment, but I'm saying

21  that because they've raised this as an issue about moving the

22  trial date.  And, as you know, the Court has to at least

23  consider that in the context --

24       MR. YATES:  Of course.

25       THE COURT:  -- of making this determination.

1            MR. YATES:  Of course.

2            THE COURT:  Right.  And they've argued that you have

3    said, "Oh, we need four to six months for this to happen.  We

4    can't complete it in the time that would be necessary for a

5    trial to go forward on that date."  And so they're arguing that

6    you're essentially trying to delay, and I wanted to give you an

7    opportunity to be able to directly address that by talking about

8    what you think that is going to be accomplished before the trial

9    date.

10           MR. YATES:  I -- I personally did this, as I said, last

11   year.  We went from discovery opening on December 21 to a trial

12   in the middle of April.  So about the same amount of time, Your

13   Honor.  This was in the District of Delaware.  It's a merger

14   case.  Merger cases, typically, you do all of the discovery,

15   including expert discovery, in four or five months.  It can be

16   done.  It can be done.  I am -- I would be --

17           THE COURT:  So let me ask you a question about that.

18           MR. YATES:  Yeah.

19           THE COURT:  So what is it -- again, because the

20   plaintiffs will argue that you're basically seeking open-ended

21   discovery.  And I guess my question to you is it seems to me

22   that really what you're asking for is to be allowed to

23   supplement your experts' testimony.  I mean, that seems to me

24   like what you're asking to do.  I don't know what else there

25   would be, but supplement their testimony in terms of their

1   expert opinions based upon --

2           MR. YATES:  Sure.

3           THE COURT:  -- subsequent market data, right.

4           MR. YATES:  That would be part of it, Your Honor.  I

5   think that, I mean, to me the key thing here would be to get the

6   testimony of the competitors, get documents from the

7   competitors.  We've already started that process in the Johnson

8   case.  Once Your Honor allowed discovery to open in Johnson,

9   we've subpoenaed them in Johnson.  But -- and the same

10  subpoenas, you know, the same discovery could and should be used

11  in Le.

12          So we would want testimony from the competitors after

13  getting you their documents --

14          THE COURT:  What would you need beyond their relative

15  market position?  So, in other words, if you wanted to get

16  testimony --

17          MR. YATES:  Sure.

18          THE COURT:  -- what you've talked about is entry and

19  expansion.  You don't really need anything from them directly

20  related to that, other than potentially basic numbers about, I

21  guess, their revenue or things like that.  But it doesn't seem

22  to me that that's extensive internal information.  There's some

23  information about, sort of, again relative market share and

24  power.  But tell me a little bit about what information you

25  believe that you would need --

—2:15-cv-01045-RFB-BNW—

1          MR. YATES:  Sure.

2          THE COURT:  -- from these third parties because

3   certainly that can hold things up as it relates to a trial date.

4          MR. YATES:  We have already been meeting and conferring

5   with Bellator and PFL and one other entity that we've subpoenaed

6   in the Johnson case.  They -- they've indicated they're willing

7   to produce documents once a protective order is entered.  That

8   has stalled things because the plaintiffs sat on our -- our

9   protective order for a period of weeks.

10          THE COURT:  I'm sorry, but what -- again, counsel, what

11   documents would you --

12          MR. YATES:  Sure.

13          THE COURT:  -- are you trying to obtain?

14          MR. YATES:  Sure.  I mean, we would want their -- we

15   would want their strategic plans.  We'd want their documents

16   regarding their ability -- their efforts to recruit fighters,

17   their efforts to develop fighters, and the like.  Because,

18   again, our theory of the case is that Zuffa's allegedly

19   exclusionary contracts do not actually exclude anyone and that

20   these competitors are able to put on viable MMA promotions.

21          Obviously Your Honor mentioned market share data.  We

22   would obviously want that.  We would want their strategic plans

23   to see what they're saying internally and also what they're

24   saying to investors because as I mentioned PFL, for example, PFL

25   just got $100 million from the Kingdom of Saudi Arabia

—2:15-cv-01045-RFB-BNW—

1  Investment Fund and $400 million from a variety of other

2  investors.  I can bet you dollars to doughnuts that there were

3  some documents prepared that were submitted to those potential

4  investors about their growth opportunities and how they're not

5  impeded at all by UFC.  So that's the kind of thing.

6          And then I think we take in addition --

7          THE COURT:  What about UFC information?

8          MR. YATES:  Sure.  We are ready, willing, and able to

9  update it.

10          THE COURT:  Right, because we spent a lot of time with

11  discovery orders related to protective orders regarding

12  statements, right.  And I can imagine huge fights about

13  conversations about what to do in the face of the lawsuit and

14  whether they're privileged or not, whether or not there's

15  conduct that we should change because of the lawsuit, which

16  would be potentially relevant, and we'd have this back and

17  forth.

18          And so we had a lot of discovery practice in this case

19  for the three-year discovery period related to protective orders

20  and what information would be provided.  Do you actually believe

21  that all of that could also be accomplished in this period of

22  time?

23          MR. YATES:  I would certainly hope so.  For better or

24  for worse, Your Honor, obviously I wasn't counsel in that time

25  period so I don't know all of the details and the ins and outs.

2:15-cv-01045-RFB-BNW

1          THE COURT:  Right.

2          MR. YATES:  But in my experience what happens when

3    you've got this kind of period where you have done discovery and

4    when you either reopen it or there's a new case is that counsel

5    take a lot of learnings from what the Court did in terms of

6    deciding issues either in the first case or -- or earlier in the

7    case.  And so I would fully expect that we could get things

8    done.  It requires cooperation on both sides.  That's the

9    reality.

10          These merger cases are able to go to trial fast because

11   both sides, both the Government and -- and the merging parties,

12   are motivated to get things done.  Zuffa is motivated to get

13   this discovery done.  We will commit to getting it done.

14          Again, you know, beyond the competitors, I think there

15   would be some depositions of additional fighters, perhaps,

16   managers or agents.  And, yes, I mean, I think Your Honor --

17   Your Honor's right.  I think there would be a short period to

18   supplement expert reports.  It's going to be nothing like the --

19   the -- you know, the expert report period that you had before.

20   There's just not time for it, but that's okay.

21          THE COURT:  Okay.  Hold on a moment.

22          MR. YATES:  Sure.  Certainly, Your Honor.

23          THE COURT:  And I wanted just to go back to one thing,

24   Mr. -- is it Yates?  Is that right?

25          MR. YATES:  Yates.  Thank you, Your Honor.

2:15-cv-01045-RFB-BNW

1           THE COURT:  Mr. Yates, what case can you point to me

2   that you believe provides the clearest example of a Court

3   reopening discovery as it relates to establishing monopsony

4   power or monopoly power in a class period post the class period?

5           So, in other words, the cases that you've cited I don't

6   know that they are directly on point, but, again, we don't have

7   that many monopsony cases --

8           MR. YATES:  Sure.

9           THE COURT:  -- period.  But I want to think about and

10   look at what case you think best legally supports your position

11   as it relates to the relevance of the information.  And I say

12   that because from my standpoint, Mr. Yates, if the information

13   isn't relevant, then obviously there's no reason or basis to

14   reopen the discovery.  That's certainly a threshold issue.

15   Apart from -- and we can disagree about potential issues of

16   diligence or not.  Certainly if it's not relevant, that doesn't

17   even matter because then we don't reopen discovery.

18           So tell me what you think is the best legal support for

19   that position.  Because, again, I've looked at the expert record

20   here, but I want to hear from you because I want to give you an

21   opportunity to make your best legal argument for that.

22           MR. YATES:  Sure.  I mean, I think the case that is the

23   closest, and then I'll come back to some Ninth Circuit

24   authorities, the *Geneva Pharmaceuticals* case, which is Judge

25   Cote out of the Southern District of New York, very experienced

—2:15-cv-01045-RFB-BNW—

1  judge.

2          THE COURT:  I know why you're quoting Judge Cote to me.

3  I don't know if everyone else knows, but I clerked for Judge

4  Cote, obviously, in the Southern District of New York.

5          MR. YATES:  I understand.

6          THE COURT:  Right.  Of course respect her legal acumen,

7  but so --

8          MR. YATES:  I think this was after your clerkship, Your

9  Honor, but --

10          THE COURT:  Right.  No, it was.  But tell me a little

11  bit about why that is and why it's relevant here.  Because,

12  again, Mr. Yates, I have focussed quite a bit on the experts

13  here because, I mean, we spent a lot of time with that -- as you

14  can see, I spent a lot of time with that in my order which goes

15  into very, very significant detail about the experts' opinions.

16  We spent a lot of time with that.

17          And so I'm focussed on how the legal arguments would

18  work with the expert testimony here.  So why don't you tell me

19  about why you think that case is compelling here.

20          MR. YATES:  Sure.  That case is filed in I believe

21  1998, and there's allegedly exclusionary conduct.  It goes up on

22  appeal and then comes back down from the Second Circuit.  And

23  what does Judge Cote allow?  The plaintiffs make the same

24  argument -- the plaintiffs in that case make the same arguments

25  as the plaintiffs in this case, which is, oh, evidence of what

2:15-cv-01045-RFB-BNW

1  happens after the alleged wrongful conduct cannot be considered.

2  Judge Cote categorically rejects that, categorically.  I mean, I

3  can quote it to Your Honor if Your Honor gives me one moment.

4        She says:  "The plaintiffs have urged that the entry of

5  USL Laboratories in 2003 and Gen Pharm in 2004" -- remember, the

6  case is filed in 1998 -- quote, can easily be dismissed as

7  irrelevant because their entry occurred five or more years after

8  plaintiff's entry and defendant's unlawful conduct which delayed

9  plaintiff's entry.

10        Then she says, quote, The time period for analyzing the

11  ability of a competitor to enter the marketplace, however, is

12  not tied to the date of a defendant's alleged unlawful conduct.

13        And then if Your Honor looks at the *Rebel Oil* case and

14  the *Syufy* case out of the Ninth Circuit, they both speak -- and

15  there's another case that we cited in our briefing from the

16  Ninth Circuit as well -- they all speak to the fact that, you

17  know, the plaintiffs don't get to cabin in the time period and

18  say this is the only time period that's relevant.

19        If, as happened here, there's been a substantial delay,

20  not of Zuffa's choice or making, later information about current

21  competitive market conditions is relevant.  Entry and expansion

22  is quintessentially relevant information because it proves that

23  there are not barriers to entry.

24        And even if everything Dr. Singer said is correct about

25  market share -- and we obviously disagree with that

1  strenuously -- if there are not barriers to entry, then judgment

2  as a matter of law should be entered for Zuffa.

3          THE COURT:  Okay.

4          MR. YATES:  Okay.

5          THE COURT:  Thank you, Mr. Yates.

6          MR. YATES:  Thank you, Your Honor.

7          MR. CRAMER:  Good morning, Your Honor.

8          THE COURT:  Good morning, Mr. Cramer.

9          MR. CRAMER:  Is there anything in particular you would

10  like me to cover?

11          THE COURT:  So I want to focus a little bit on the

12  issue of relevance because, as I said to Mr. Yates, the issue

13  really for me is relevance.  And in looking at the record here,

14  I'm not sure that the record supports a finding that this isn't

15  relevant.  I mean, there's certain issues of diligence, but

16  assuming that we can set aside the issue of diligence, for the

17  moment, I want you to focus on relevance because that relates to

18  the record itself.

19          MR. CRAMER:  Yeah.  Thank you, Your Honor.

20          So we think it's pretty clear that nothing that happens

21  in 2021 or 2022 can -- can show that Zuffa did not have market

22  power from 2010 to 2017.  And the cases that Zuffa cites, they

23  talk about *Geneva*.  Well, it's true that in *Geneva* the Court

24  allowed discovery after a certain period of time, but the reason

25  why the Court decided that was relevant was two things that are

—2:15-cv-01045-RFB-BNW—

1  not at issue here.  Number one, the plaintiffs had sought

2  damages projected forward during the period for which the

3  defendant wanted discovery.  So the Court said, "Okay.  Well,

4  the plaintiffs are relying upon projections for this period, and

5  we should probably allow to see what actually happened in the

6  market rather than rely upon projections."

7         But of course, here, plaintiffs' damages end in June

8  2017.  We're not seeking damages for anything that happens in

9  2018 or 2019 or 2020.  Our damages end.  That's one reason why

10 *Geneva* is not relevant.

11        The second reason, and this is the reason why all of

12 the cases they cite are not relevant, is that in each of those

13 cases that Zuffa cites there was -- that the defendant came in,

14 the movant came in, and said, "Your Honor, there was a major

15 change in the trend."  Most of these cases are attempted

16 monopolization cases that they're citing.  Most of these cases

17 the market power that was alleged was fleeting.  And they came

18 in and said, "You know there was a major change in the trend."

19 And in *Geneva*, there was a huge change in the trend.

20        And what the defendant said is, "What this trend shows

21 is that the relevant market that the plaintiffs are showing

22 doesn't make sense because there's all kinds of substitution

23 going on.  And the trend changed."

24        Same thing in the other cases that Zuffa cites.  All of

25 them talk about a changed trend.  Zuffa cites the Ninth Circuit.

—2:15-cv-01045-RFB-BNW—

1   They cite the *Pomona* case, for example.  Let's talk about

2   *Pomona*.  What *Pomona* said was that a party who wanted some very

3   targeted discovery relating to a single issue in a single expert

4   report, they should be allowed to update that expert report

5   because what happened was the expert relied upon some studies

6   and those studies were updated.  And the Court didn't allow the

7   expert to update those studies.  The Ninth Circuit said the

8   Court should have allowed the expert to update those studies.

9        What Zuffa wants here is nothing like that.  And they

10  have not come in with any evidence of a change in trend.  What

11  they have said is what they have always said, competition is

12  just around the corner.  They point to what they call two new

13  entrants.  Who are their two new entrants in the six years after

14  2017?  PFL.  Is that really a new entrant?  They just bought

15  World Series of Fighting, re-branded it, and tried do the same

16  thing again.  They point to Bellator, which they've already

17  called and are currently calling a feeder league.

18        It's interesting that Mr. Yates cites the discovery he

19  wants from what these so-called competitors are telling their

20  investors.  What did Zuffa just tell their investors about the

21  relevance, the importance of these competitors?  What Zuffa just

22  told their investors, which they have to tell the truth to, they

23  can't say material falsehoods to their investors.  Zuffa -- not

24  Zuffa actually.  TKO, Zuffa's owners -- Zuffa's owner, CFO, just

25  said that all of these competitors, in particular Bellator and

—2:15-cv-01045-RFB-BNW—

1  PFL, they're feeder leagues.  They're like the XFL to the NFL.

2  That's what Zuffa is telling their investors and the public.

3  There is no trend towards more competition.

4          And, second, in all of the cases that Zuffa cites they

5  actually come in and say there is a change in trend.  Has Zuffa

6  or Dr. Topel or any of their experts said that market share or

7  market power has declined post 2017?  No, they don't even claim

8  that.

9          Dr. Singer based on publicly-available information

10  actually did a study.  He looked.  He took the headliner market,

11  which he used during the class period, and he used

12  publicly-available information.  And what he showed is that in

13  the headliner market between 2017 and 2023, UFC's market share

14  rose from 90 percent to 93 percent.  And why is that important?

15  Because the headliner market, that's where the money is.  That's

16  where the power is.  Those are the fighters that generate the

17  revenues.

18          And what -- the only evidence in the record about

19  market share and trend is that Zuffa's power rose after 2017.

20  It did not fall.  Zuffa points to the growth -- supposed growth

21  of PFL and Bellator, but it ignores its own growth.  Its

22  revenues doubled between 2017 and 2023.  Wage share has fallen,

23  reportedly, between 2017 and 2023.

24          Moreover, what Zuffa wants is basically a complete redo

25  because they say they want discovery.  They served subpoenas on

2:15-cv-01045-RFB-BNW

1  11 competitors in Johnson.  Those subpoenas are extremely broad.

2  They asked for evidence from 2006 to 2023.

3          When they're going to get all of that, we don't know.

4  We've just learned today that there were two out of the 11 meet

5  and confers.  When is that evidence going to come?

6          But even if that evidence were produced --

7          THE COURT:  Mr. Cramer, let me ask you this question.

8          MR. CRAMER:  Yes.

9          THE COURT:  One of the issues here that the Court is

10 focussed on as it relates to Zuffa's arguments is whether or not

11 they sought to reopen discovery or made statements about it.  I

12 mean, you've heard I asked Mr. Yates this question, but I'm

13 going to ask you a different question.

14         But the record is very clear.  Yes, there was a delay

15 here for reasons stated by the Court.  I don't recall the exact

16 record in Johnson as it relates to all of the, I guess, requests

17 for reopening discovery in Le.  I know there was no request,

18 obviously a motion, in this case.  But I want you to comment on

19 that.

20         MR. CRAMER:  First of all, the first time that Zuffa

21 said they wanted to reopen discovery in Le was in August of

22 2023.  Second, they have -- they never said, prior to August of

23 2023, that any of the discovery they were talking about was

24 relevant to the damages or liability in Le.  They said it was

25 relevant to injunctive relief, but of course Your Honor has put

—2:15-cv-01045-RFB-BNW—

1  the injunctive relief off until later.

2           So they have never publicly stated until August 2023

3  that any of this evidence that they said they wanted was

4  relevant to Le, liability, and damages.

5           THE COURT:  So let me ask you this other question --

6           MR. CRAMER:  Yes.

7           THE COURT:  -- related to that, Mr. Cramer.  If I'm

8  going to be deciding injunctive relief, the motions for that are

9  going to be filed and fully briefed a little bit later, why

10  wouldn't I reopen discovery for deciding the issue of injunctive

11  relief currently?  And so there's certainly an issue about, sort

12  of, the efficiency of doing that.

13           If the plaintiff, which they are asking for some

14  injunctive relief, why wouldn't I reopen discovery for that?

15           MR. CRAMER:  So, Your Honor, what our concern is is to

16  have a trial on liability and damages in Le starting on April

17  8th, 2024.  And what we don't want in that trial is apparently

18  what Zuffa is intending to do, start lobbing in out-of-context

19  statements to investors, apparently, from PFL in 2022 and then

20  argue, either through their expert or otherwise, that that

21  somehow shows Zuffa did not have monopsony power in 2012.

22           THE COURT:  Well, I want to be clear about one thing,

23  Mr. Cramer.  We have multiple issues that are going on.

24           MR. CRAMER:  Yeah.

25           THE COURT:  I have not decided an issue as relates to a

—————————2:15-cv-01045-RFB-BNW—————————

1    motion in limine.  Even if I were to find that potentially this

2    is not sufficiently-relevant information for Zuffa to reopen

3    discovery considering all of the factors, it doesn't necessarily

4    mean that I wouldn't allow them to present some evidence of

5    this.  We have to have a separate discussion about what's

6    admissible and relevant even if we were to go forward on April

7    8th date, and I understand your concerns, but I just want to be

8    clear, to the extent that the Court would decide about reopening

9    discovery one way or the other, there would still be a separate

10   discussion that would need to be had about the relevance of it.

11          I may decide, for example, to reopen discovery, but

12   then decide after seeing the discovery that it's in fact not

13   relevant in hearing the testimony.  But I want to be clear that

14   from my perspective those are separate issues.  What gets

15   admitted into trial versus what would be permitted in discovery

16   are two separate things.  There are plenty of situations where

17   discovery's allowed, and then once the discovery's produced the

18   Court may make the determination this is relevant, but that's

19   not relevant so you can't bring it in.  So I want to focus

20   really on the reasons that we are here.

21          And I want to go back to this issue about injunctive

22   relief.  What type of injunctive relief essentially would the

23   plaintiffs be seeking now?  And I know that -- this has been

24   briefed a little bit, but because I want to talk about that

25   today as it relates to reopening discovery.  What is it that

1   you're going to be seeking?

2           MR. CRAMER:  So, first of all, Zuffa can take any

3   discovery it wants or needs in the context of the Johnson case

4   now.  So -- and it can be adjudicated later that that discovery

5   is relevant to injunctive relief in Le.

6           Second, the injunctive relief we will be seeking in Le

7   is some form of restricting the ability of the UFC to use

8   never-ending contracts, essentially, so some kind of cap on the

9   amount of time that those contracts can last.  Apparently --

10          THE COURT:  I'm sorry.  Would these be contracts that

11  were initially agreed to in the class period or subsequent

12  contracts?

13          MR. CRAMER:  No, the injunctive relief is about current

14  market conditions.

15          THE COURT:  Okay.  All right.

16          MR. CRAMER:  So that's why we think the injunctive

17  relief --

18          THE COURT:  But it would only apply -- if you're

19  talking about Le -- are you seeking injunctive relief for both

20  Le and Johnson?  Are you seeking injunctive relief for just one?

21  Because certainly, I mean, you could at least make the argument

22  that you would like it to apply to people in Johnson, but that

23  would be a little bit premature.

24          But are you talking about for injunctive relief the

25  class members for Le, and there may be some carryover, but I

—2:15-cv-01045-RFB-BNW—

1   don't think there would be necessarily -- well, I take that

2   back.  There probably is for those two classes.  Are you just

3   talking about those class members or are you talking about other

4   people?

5           MR. CRAMER:  So the injunctive relief in Le would apply

6   across the board to Zuffa as a whole, is what we would ask for,

7   and we would also ask for that in Johnson.  It would be a

8   generally-applicable injunction against the UFC that would say

9   that they could no longer engage in the same contracting

10  practices that they current -- currently engage in.  And it

11  would apply equally to the class members in Le and the class

12  members in Johnson.

13          Unfortunately, because the class in Le goes through

14  June 2017, a lot of those fighters are now retired or no longer

15  fighting with the UFC.  So it's going to be more relevant to the

16  current fighters who are the class members in Johnson.  And

17  that's why we think it makes more sense to handle the injunctive

18  relief claim in conjunction with the Johnson case.  Let's --

19  let's do the Johnson case, which goes from July 2017 to the

20  present, and let's do the Le injunctive relief claim with the

21  Johnson case because injunctive relief has to do with current

22  market conditions and current conduct.

23          THE COURT:  Why wouldn't I then just bifurcate the

24  injunctive relief?  It would seem to me that the injunctive

25  relief as it relates to the fighters in Le would be different,

1  in part, because of where we are procedurally.  The class has

2  been certified, right.  The request for the appeal has been

3  denied.  We're on a track to decide dispositive motions one way

4  or the other to figure that out, and depending on how they're

5  decided, the case moves forward I guess, or not.

6          But assuming that it moves forward and you're asking

7  for injunctive relief, why wouldn't I simply then just bifurcate

8  the relief and say, you know, "If you're going to ask for relief

9  for the Le class, then you have to separate that out"?  Because

10  if you're going to ask for both of them at the same time, then

11  it seems to me that it might make sense to reopen discovery.

12  Because I don't know how you're going to be simultaneously

13  asking me for injunctive relief for a combined class, but then

14  asking me to restrict discovery for that combined class to a

15  limited period of time.

16          MR. CRAMER:  Your Honor makes a good point, and I think

17  it probably does make sense to bifurcate the liability and

18  damages class in Le and the injunctive relief claim in Le.  I

19  think that does make sense.

20          THE COURT:  No, I don't know that, Mr. Cramer, you

21  could argue to me that we want to have injunctive relief that

22  applies now because we -- it applies to current conditions and

23  then simultaneously argue to me we don't think the current

24  conditions matter for liability damages, right --

25          MR. CRAMER:  Yeah.  No, you're -- you're right.

2:15-cv-01045-RFB-BNW

1          THE COURT:  -- for the bout class.

2          MR. CRAMER:  We recognize that.  What we want -- what

3   we think is -- we think Your Honor makes an excellent point.  We

4   think the orderly way to do this is to try the liability and

5   damages claim in Le in April of 2024, put the -- and bifurcate,

6   put the injunctive relief claim in Le together with Johnson and

7   try that separately.  That makes eminent sense.  Then the

8   damages and liability is through 2017.  What happens after 2017

9   is not relevant in our view.  No -- no more discovery is needed.

10          I mean, you'll recall, Your Honor, there were 12 years

11  of discovery in Le from 2005 to 2017, right.  There's

12  no -- there's no case that says that in order to prove a

13  monopoly or monopsony you need more than 12 years.  Dr. Topel

14  doesn't say that.  None of the experts say that.  No cases say

15  that.

16          The authorities we cited to Your Honor are three or

17  four years is probably enough to show durable monopoly or a

18  monopsony power.  So it's a self-contained case.  There's --

19  there's nothing more that plaintiffs need to show after 2017 if

20  we bifurcate the injunctive relief.  So we think that's

21  sensible.

22          THE COURT:  When you say "bifurcate," what I was saying

23  was bifurcate the two classes in terms of the cases; that if

24  you're asking for injunctive relief, right, for Le class

25  members, right, that your argument would have to be based upon

1    what occurred during the class period they should be permitted

2    to be able to get out of contracts or change what the terms were

3    or ask the Court to modify them.  That's very different than you

4    saying, "Well, we want to bifurcate it and have the damages for

5    Le and then have the injunctive relief for Le and Johnson

6    decided together."  That's not what I'm talking about.

7            I'm talking about separating out the injunctive relief

8    for Le and Johnson because, again, I don't know that it's

9    consistent to argue to me that that claim should be bifurcated,

10   but still those two classes should be considered together

11   because that would mean that the discovery regarding that would

12   cover 2006 to 2023, right?

13           MR. CRAMER:  You're right, you're right, Your Honor.  I

14   mean, we're in this situation where I think both sides agree

15   that injunctive relief claims are about current market

16   conditions.  And it would be -- make no sense to try to talk

17   about 2016 contracts and change those if Zuffa doesn't use them

18   anymore, right.

19           THE COURT:  Right.

20           MR. CRAMER:  But what we -- what we don't want from

21   Your Honor in terms of both Le and Johnson and injunctive relief

22   is to change -- is for some business practices that are being

23   used today to change.

24           So we agree, Your Honor.

25           THE COURT:  Yes, but how would that affect -- if many

—2:15-cv-01045-RFB-BNW—

1  of these fighters are retired or not still fighting, I mean,

2  what injunctive relief would the class members in Le even be

3  seeking then?

4          MR. CRAMER:  They're seeking -- I mean, they have

5  standing because of the law that says --

6          THE COURT:  Right.

7          MR. CRAMER:  -- that if they are fighting at or in the

8  market at the time they filed the case, they have standing.  But

9  the fact -- it's like in a college case what happens is if

10  you're a senior and you bring a case against your college and

11  you graduate, you can still seek injunctive relief.

12          THE COURT:  No, I've already found it.  I already found

13  the issue of standing.

14          MR. CRAMER:  Right, so --

15          THE COURT:  So the issue really, though, even

16  injunctive relief has to be very targeted and specific.  And

17  even if you have standing, it doesn't mean that you are going to

18  be entitled to whatever injunctive relief you seek.

19          MR. CRAMER:  Of course.

20          THE COURT:  Right.  The question is what would you be

21  seeking for fighters who are predominantly or almost all

22  retired.

23          MR. CRAMER:  Right.  For the retired fighters what

24  we're seeking is money damages.

25          THE COURT:  Okay.

1          And are there any class members in Le who are not

2    retired who would be seeking other form of damages as far as you

3    know?

4          MR. CRAMER:  I don't standing here today.  There may --

5    there may well be because it goes through June 2017.  But most

6    of the -- most of the -- almost all of the injunctive relief

7    will apply to the current fighters at the UFC.  The plaintiff in

8    Le -- the plaintiffs in Le that have standing have standing to

9    seek injunctive relief on behalf of the current fighters even if

10   they're not in the class in Le.  That's what we'll argue in what

11   we're going to file in December.

12          But we agree that will not be what we're seeking at

13   trial in Le in April of 2024, and that's an issue that can be

14   handled later.

15          THE COURT:  And when would we expect all of the

16   discovery in Johnson to be completed?

17          MR. CRAMER:  Discovery in Johnson is supposed to end in

18   February of 2025.

19          THE COURT:  Right.

20          MR. CRAMER:  I mean, it -- it -- I mean, one of the

21   concerns we have about the reopening of discovery in Le is that

22   it cannot be cabined to just looking at a few competitors in

23   2022 or 2023.  As Your Honor has pointed out, we also need

24   discovery from the UFC.  We need from their bankers and their

25   investors.  As we saw at the class hearing, a lot of the bankers

—2:15-cv-01045-RFB-BNW—

1  and investor materials are some of the best evidence of what

2  Zuffa is telling itself about its own market power and how

3  important those contracts are to be barriers to entry to

4  competitors.  And so we're going to want that discovery, too.

5          And, again, what Zuffa is saying is that the reason why

6  2022 entrants or expansion is relevant is because it says

7  something about Zuffa's conduct.  Well, we then have to know

8  whether the conduct in Le is the same as the conduct in Johnson.

9  It's -- Zuffa says it's a natural experiment.  Well, an

10 experiment you have to see whether -- if you're testing whether

11 the conduct is or is not a barrier to entry, you have to see

12 whether the conduct is the same.  So what we need --

13         THE COURT:  But, Mr. Cramer, are you saying to me that

14 you think that what we should do is decide damages in 2024 and

15 then wait until 2025 to decide injunctive relief for Le?

16         MR. CRAMER:  Oh.  In -- for Le what I'm saying is we

17 don't need anything more.  The record is closed.

18         THE COURT:  I'm talking about for injunctive relief --

19         MR. CRAMER:  In Le, yes.  Yes.  I am saying --

20         THE COURT:  Are you saying to me that what the schedule

21 should be is damages in April of 2024 if the trial goes forward?

22         MR. CRAMER:  Yes.

23         THE COURT:  Right.

24         And if there are damages awarded, then we -- because if

25 there aren't damages awarded, right, there would be no

2:15-cv-01045-RFB-BNW

1  injunctive relief -- well, likely would be no injunctive relief

2  that would be ordered potentially.

3       But what you're suggesting to me is that if I allow the

4  trial to go forward in April 8th after having potentially denied

5  the motions for summary judgment, that you still wouldn't seek

6  injunctive relief until the following year for the Le class?

7       MR. CRAMER:  I think that's right.  We would seek

8  injunctive relief in conjunction with the Johnson trial.  I

9  think that would be the most orderly way to handle it because we

10  need discovery of the conduct through the present.  I think

11  that's -- that's the way it would have to happen.  We're open to

12  other ways of handling it.

13       THE COURT:  Well, I don't know honestly, Mr. Cramer,

14  that -- I have to think about that.  Because it seems to me that

15  you may have to make a choice about how much injunctive relief

16  you seek for the Le class if you're asking me to hold it off a

17  year.  That -- that's a substantial period of time for a class

18  and for the case.  And that I think goes to one of the arguments

19  that the defendant has made about efficiency.

20       And so as you're saying this to me, I'm concerned --

21       MR. CRAMER:  Okay.

22       THE COURT:  -- that asking me to decide the injunctive

23  relief for Le a full year after any potential trial would

24  potentially be very inefficient.  I'm not saying the Court

25  couldn't potentially do that.  I think there are reasons for the

—2:15-cv-01045-RFB-BNW—

1  Court to do that.

2          But I don't know that there would be an issue.  And

3  potentially, again, if there was even an award after a jury

4  trial, you would have a very sticky, messy situation as relates

5  to the finality of a judgment and the potential appeal of that

6  judgment as well.

7          And so as you're saying this, I'm thinking about how

8  this would work, and that seems to me to be a little bit

9  potentially problematic, Mr. Cramer.

10          MR. CRAMER:  So, Your Honor, we hear you on that.  Our

11  priority is to go to trial on damages and liability in Le in

12  April of 2024 if Your Honor denies the motion for summary

13  judgment.  If Your Honor thinks that -- that would not be

14  efficient to then do some kind of injunctive relief hearing

15  within a month or two of the damages verdict, then we could try

16  to do that, or if Your Honor thinks that, perhaps, injunctive

17  relief should just be handled in Johnson and not in Le at all --

18          THE COURT:  Right.

19          MR. CRAMER:  -- that might be another approach.

20          THE COURT:  What I'm saying to you is I'm just putting

21  you on notice --

22          MR. CRAMER:  Yes.

23          THE COURT:  -- as I think about this, which is that if

24  you're asking me not to reopen discovery and to move forward

25  with the case, assuming you prevail on a motion for summary

1  judgment at least as it going to trial, I'm not sure that I

2  would permit an injunctive relief claim to move forward for the

3  Le class.

4          MR. CRAMER:  Okay.

5          THE COURT:  Because I don't think that you can ask me

6  to do both of those things.  I think that they are

7  potentially -- and I'll look at -- again, I'm going to look back

8  over the schedule, but I think that they are potentially

9  inconsistent with one another and they disadvantage the

10  defendant and force them to defend both of those claims in that

11  way.

12          MR. CRAMER:  So, Your Honor, that is perfectly

13  understandable.  We will look at that.  It is possible then --

14  we will consider it, talk about it.  But it may make more sense

15  to deal with the injunctive relief claim in Johnson and abandon

16  the injunctive relief claim in Le, but again --

17          THE COURT:  Look, I'm not requiring you to do one thing

18  or the other.  What I'm saying to you is those arguments to me

19  are inconsistent with one another to ask me -- to say, "Well, we

20  want you to keep this potential date if we prevail all the way

21  through here, but we want you then to wait another year for an

22  injunctive claim."  That doesn't make sense to me.

23          MR. CRAMER:  Right.

24          THE COURT:  And so I don't know if you need to -- if

25  you would need to speak with your clients about that or how you

2:15-cv-01045-RFB-BNW

1  want to proceed, but I don't know that, to me, I would deny the

2  motion if you're still going to be pursuing injunctive relief.

3  It just doesn't necessarily make sense for the reasons that I

4  have outlined because --

5         MR. CRAMER:  Right.

6         THE COURT:  -- you're going to be seeking all sorts of

7  information about current conditions.  And if we're doing that,

8  why aren't we doing that once and then trying the case?  We

9  could still try the case in 2025 when that -- when that

10  discovery's ended, but I understand that that's not what you

11  want --

12         MR. CRAMER:  Right.

13         THE COURT:  -- and that's not what your clients have

14  wanted.  And so I'm just letting you know that because I don't

15  know that those two positions can be maintained.

16         MR. CRAMER:  That's fair.  And now, recall, that in

17  Johnson discovery is going on right now.  But I understand Your

18  Honor loud and clear.  I can tell you that our priority is to

19  have a trial in April of 2024.  We think that is the best way to

20  help resolve this case and both cases for -- and -- and that is

21  our priority.

22         So we will confer and -- and provide Your Honor -- we

23  have a motion due regarding injunctive relief in December.  We

24  can tell Your Honor what -- we can give Your Honor

25  information --

—2:15-cv-01045-RFB-BNW—

1          THE COURT:  Well, I'll tell you what I'm likely to

2  do --

3          MR. CRAMER:  Okay.

4          THE COURT:  -- potentially is I will think about -- I'm

5  going to have Mr. Yates come back up and answer some questions.

6  And what I'm likely to do is issue -- because I want the issue

7  of the reopening of the discovery to be decided either today or

8  tomorrow.  I'm not going to put this off.

9          So in my order I would simply say, Mr. Cramer, if I

10  decide to deny the motion, right, then that also means that the

11  Court would not permit injunctive relief to be based upon

12  anything other than the discovery that's been obtained in Le,

13  which might effectively preclude it, and that then the

14  plaintiffs could seek to ask me to reconsider my order if I'm

15  denying the motion after meeting and conferring with their

16  clients.

17          So if I were to rule in your favor, I would give you

18  potentially the option to speak with your clients and ask for me

19  to reconsider that and move the trial date if you want me to do

20  that.  But I'm not going to -- if you're going to prevail, I'm

21  not going to both keep the trial date and push injunctive relief

22  out for a year.  That's not going to happen, right.  So you may

23  have to make a choice.

24          MR. CRAMER:  Okay.  That -- we understand, Your Honor.

25  You've been crystal clear.  Appreciate it.

—————2:15-cv-01045-RFB-BNW—————

1          THE COURT:  Okay.

2          Mr. Yates.

3          MR. YATES:  Sounds like you wanted me back up, Your

4   Honor.  I'll come on up.

5          THE COURT:  Well, again, I wanted to give you an

6   opportunity to respond.  You heard the question I asked

7   Mr. Johnson [sic] because I don't think -- and you don't have to

8   comment on this.  Obviously you heard the Court -- that the

9   plaintiffs can't be arguing both for injunctive relief until

10  2025 and a trial date.

11         That being said, injunctive relief is obviously

12  different than damages in this case.  And so I wanted to give

13  you an opportunity to be able to respond to some of the

14  arguments that Mr. Cramer made because obviously, as I indicated

15  to Mr. Cramer, I want to decide the motion to reopen today or

16  tomorrow.  I just don't think that we should delay that anymore.

17  And so if you want to be able to respond, you can.

18         MR. YATES:  I appreciate that.  Thank you, Your Honor.

19         I think the -- you know, we're fine going to trial in

20  April of 2024 as long as we get the discovery.  And then

21  understand that Your Honor may -- may want to deal with in

22  limines downstream.  I understand that and appreciate that and

23  respect that.

24         I do think that the notion that we should be waiting a

25  year to then think about injunctive relief in Le doesn't make

1   any sense from an efficiency standpoint for the Court and the

2   like.  You know, we've -- we've argued for a long time that the

3   most efficient thing is to consolidate the cases and to just

4   have one trial.

5          Respect Your Honor's views on that and -- you know.

6   But I'm not sure they can just abandon their injunctive claims

7   today, but the arguments I've heard all suggest that Your

8   Honor --

9          THE COURT:  Well, I could just decide that the

10  injunctive claim can't proceed.  They don't have to abandon it.

11  I could simply say if they're pursuing the claim, they're

12  pursuing their damages claim, right, that they can't pursue an

13  injunctive claim later, which is why I said that to Mr. Cramer.

14         I'm not going to --

15         MR. YATES:  Right.

16         THE COURT:  I agree with you.  As I said, it makes no

17  sense --

18         MR. YATES:  Right.

19         THE COURT:  -- to have them both go forward in this

20  way, right.  So that's not going to happen, right.

21         But I do want you to understand that I may still decide

22  that I'm not going to potentially reopen discovery.  And

23  Mr. Cramer made some arguments about that, and I want you to

24  focus on that --

25         MR. YATES:  Sure.

1          THE COURT:  -- because, as far as I'm concerned, that

2     is sort of the focal issue here.

3          MR. YATES:  Perfect.

4          THE COURT:  And so I want you, again, to talk to me,

5     Mr. Yates, about two things.  One is, sort of, again timing

6     issues.  Partly it seems to me that there was simply a strategic

7     decision not to file a motion to reopen discovery, that you were

8     essentially -- and, again, you weren't involved in the case.

9     I'm not saying you, per se.

10         MR. YATES:  Understood.

11         THE COURT:  But that your client made a decision

12    strategically to wait to see my order, then to see if the order

13    could be appealed, and when your client didn't prevail on the

14    certification and didn't prevail on the request for the appeal,

15    then to seek discovery.  Typically that type of a strategic

16    decision would not be recognized as good cause or excusable

17    neglect.  And notwithstanding, again, the issue of the time that

18    it took for me to decide that, but I was actually, as I said in

19    the record, very clear that the reason why that was happening

20    was because I was considering *Olean* and the review of that as it

21    applied to the facts in this case and that that would take some

22    time for me to apply.

23         So it's not even as if the Court was opaque about, sort

24    of, what was the nature of the delay, right.  It was very clear.

25    I said, "I am inclined to grant the certification."  Then we had

—2:15-cv-01045-RFB-BNW—

1  a status conference where I said, "There are these cases that

2  are pending that I think are directly relevant."  Those cases

3  were decided.  And then after that, having gone through the

4  record which took some time, the Court issued its certification

5  order.  So it's not even as if your client was in the dark as to

6  what was happening.

7         MR. YATES:  Right.

8         THE COURT:  Right.  And so, again, I know you're coming

9  to this a little bit later, but why wouldn't I consider that a

10  strategic decision?

11         MR. YATES:  It certainly was not, Your Honor.  And

12  Mr. Cramer is just dead wrong, and I was hoping that the

13  plaintiffs would concede that they were wrong on this point, but

14  they have not so I'll go through it.

15         He says that the first time that we asked for merits

16  and damages discovery in Le was in August of 2023.  That's what

17  he just told Your Honor.  If Your Honor looks at Page 3 of our

18  brief, back in 2021 and 2022 we said the two actions should be

19  consolidated and discovery should proceed promptly in this

20  action as well as to bring the discovery in Le current.

21         THE COURT:  No, I guess what I understood from

22  Mr. Cramer -- because I agree that that was what was requested

23  and I recall that being requested.  We in fact had hearings

24  about that, obviously -- is a motion.  So I think there's a

25  difference obviously between making that argument which was made

1   to me as it relates to the consolidation and the motion in Le.

2   I think that the record's fairly clear that there was mention of

3   joint discovery for the purposes of deciding whether or not to

4   consolidate the cases, and that occurred prior to August of

5   2023.

6           And so you don't need to address that because I took

7   Mr. Cramer as saying essentially a motion rather than

8   discussions.

9           MR. YATES:  You know, we did file documents with the

10  Court saying that discovery should be reopened in Le --

11          THE COURT:  Right.

12          MR. YATES:  -- in 2021 and 2022 and 2023.  I don't

13  think a party can be any more diligent than that.  We -- you

14  know, it wasn't me, it was Mr. Isaacson, you know, having

15  conversations with you made that clear in 2022.  And Your Honor

16  decided to stay discovery in Johnson.

17          We accept that.  But once Your Honor has decided that,

18  there's not much more that -- that a litigant can do.  We raised

19  it multiple times with the Court, and then -- and then we --

20  we -- Your Honor, we raised it again when the class

21  certification decision came down.  And then Your Honor set

22  October 24th to file it.  We filed it at the date Your Honor

23  said was -- was acceptable.

24          So I just don't know what more a litigant can do.  We

25  raised it in filings with the Court saying that discovery should

—2:15-cv-01045-RFB-BNW—

1  be reopened in Le to bring things current and to reflect current

2  market conditions.

3  　　　　The other point I would like to make, Your Honor,

4  Mr. Isaacson reminded me that the reason that there are no

5  models of monopsony power in the class certification record is

6  because that was conceded to be a common issue that -- the issue

7  of monopsony.  So, you know, that's -- that's -- I just wanted

8  to make that clear.

9  　　　　THE COURT:  Tell me what you mean by that, Mr. Yates.

10  Because when you say "a common issue," the case actually

11  evolved.  Initially the plaintiffs were arguing monopoly and

12  monopsony.

13  　　　　MR. YATES:  Right.

14  　　　　THE COURT:  And then their argument shifted slightly to

15  focus on monopsony --

16  　　　　THE COURT:  Correct.

17  　　　　THE COURT:  -- with monopoly being supportive of the

18  monopsony or the alleged monopsony power.  So I guess I want to

19  make sure I'm understanding --

20  　　　　MR. YATES:  Just I don't believe the experts were

21  speaking to, sort of, how you -- how you would model out

22  monopsony-type behavior in the way that Your Honor was I think

23  looking for because it was an issue that was ultimately going to

24  be common.

25  　　　　But in any event, what I think -- here's what I've

———2:15-cv-01045-RFB-BNW———

1  heard, Your Honor.  I've heard lots of statements by the

2  plaintiffs that discovery is open in Johnson.  You know, if Your

3  Honor were to decide to deny the motion to reopen -- and I

4  respectfully submit Your Honor should grant the motion to

5  reopen.  We can get this done.  We can try the case in April if

6  that's Your Honor's choice, or if Your Honor wants to combine

7  the trials, that's fine as well.

8          But if Your Honor denies the motion to reopen, Your

9  Honor should at least allow us to use Johnson discovery in Le.

10         THE COURT:  So tell me -- because that's the other

11  thing I want to ask about.  What Johnson discovery would you be

12  using?

13         MR. YATES:  The same stuff that I said we would be

14  seeking in -- in -- from the third parties and the like.  I

15  mean, we would want to put that evidence in and let the trier of

16  fact, assuming Your Honor denies the summary judgment motion,

17  evaluate that evidence.

18         THE COURT:  Can you give me an example of the type of

19  information that you would be talking about?  Because, again, it

20  seems to me part of this would be essentially supplementing

21  expert reports.  So what I would expect might happen, right, and

22  I wouldn't hold this against you all, is all of a sudden there

23  would be expert reports that would be supplemented in the middle

24  of the Johnson discovery period potentially if the case is going

25  to trial as a way to admit them.

2:15-cv-01045-RFB-BNW

1          Mr. Yates, that's the type of strategic decision that

2  seems to me is perfectly -- if the Court were to allow it, would

3  be acceptable.  I'm not saying you would do that, but it seems

4  to me that really what you're asking me to do is to allow you to

5  supplement information as relates to your expert's report and

6  about current market conditions --

7          MR. YATES:  Well --

8          THE COURT:  -- and to say essentially what you've said.

9  Fighters have left.  Competitors have risen.  This shows, sort

10  of, backwards looking that we never had the power that they said

11  that we had and, see, if we had, this would have never happened.

12          Now, your experts didn't say that at the evidentiary

13  hearings.  They didn't even say that two years later.  But

14  you're saying they can say that now and, again, we can talk

15  about whether or not that's appropriate or not.  And what I

16  understand you to be saying is, "We would like to be able to use

17  whatever we can acquire between now and when the case went to

18  trial from our experts and from competitors to be able to argue

19  these points to the jury if the case goes to trial."  Is that

20  right?

21          MR. YATES:  Well, I certainly -- I would love to be

22  able to -- I would love to be able to supplement expert reports

23  to reflect current market conditions, but I think that probably

24  would require Your Honor to grant the motion to reopen.

25          THE COURT:  Right.

—2:15-cv-01045-RFB-BNW—

1          MR. YATES:  But, you know, discovery -- we're going to

2   be taking discovery in Johnson.  These cases are obviously --

3   they are overlapping.  They're intimately related.  The alleged

4   conduct supposedly, according to plaintiffs, continues.

5          And so if we -- if we're able to discover information

6   from competitors as part of Johnson, all I'm saying is that that

7   should be part -- should be usable at a Le trial.  Now, Mr. --

8          THE COURT:  But I guess I'm -- okay.

9          MR. YATES:  Certainly.

10          THE COURT:  You have to be more specific, Mr. Yates.

11          MR. YATES:  Okay.

12          THE COURT:  What information specifically?  Let's set

13   the experts apart.  Let's move the experts apart.  What other

14   information would you be seeking?  Because it sounds like what

15   you were saying is you would be seeking essentially information

16   from competitors to say, you know, "We were actually able to

17   compete with Zuffa, and notwithstanding their market power, we

18   were able to poach fighters.  We were able to use their own

19   business model, and we could resist their efforts to acquire us

20   or to intimidate us."

21          MR. YATES:  Yeah, I think that would --

22          THE COURT:  Right?

23          MR. YATES:  I think that would be -- let me step back.

24   By the way, I just noticed the quote from the Abraham Lincoln

25   that's on the lectern.  And obviously I far exceeded the 135

—2:15-cv-01045-RFB-BNW—

1   seconds.

2          But I think that in my experience jurors are -- you

3   know, they're going to hear about econometrics, and a lot of

4   that is going to go over their head.  What is going to be

5   powerful to them is Scott Coker, the head of PFL, other

6   competitors saying directly to the jury, "We were not

7   restricted.  Our fighters are as good as the UFC's fighters."

8          Also, what else is probative?  They pay less than the

9   UFC by and large except for when they take stars.  So all of

10  that information, I think, is going to be incredibly powerful to

11  a trier of fact, a jury, who may or may not understand

12  econometrics, but will understand hearing directly from the

13  competitors that they are not minor league.  They believe that

14  they are competitors, and they have not been restricted or

15  restrained in any way.

16         THE COURT:  Okay.

17         All right, Mr. Yates.  Give me a moment.  I just need

18  to ask Mr. Cramer some questions.

19         MR. YATES:  Sure.  Thank you, Your Honor.

20         THE COURT:  I'll come back to you.

21         So, Mr. Cramer, I want you to respond to this potential

22  situation where I say, "I'm not reopening discovery, but if

23  defendant or plaintiffs find things in Johnson that they want to

24  use, they can petition the Court to use it.  But I'm not going

25  to categorically exclude it."  What's your position as relates

```
——2:15-cv-01045-RFB-BNW——
```

1  to that?

2          MR. CRAMER:  Our position is there is information

3  that's being produced in Johnson.  If they want to file -- they

4  want to put a document on their witness list or on their exhibit

5  list for trial, we'll deal with it before trial.

6          Our point, now, is that the parties need to be

7  preparing for trial in April 2024.  We're briefing summary

8  judgment.  And then we're going to prepare for trial.  The

9  record needs to come to a close.  It has to close.  We need to

10  be able to prepare --

11          THE COURT:  So let me ask you this question,

12  Mr. Cramer, because one of the things that is sort of creeping

13  in a little bit here --

14          MR. CRAMER:  Yeah.

15          THE COURT:  -- is what the trial arguments are going to

16  be.

17          MR. CRAMER:  Yeah.

18          THE COURT:  And certainly one of the things that has

19  happened with me in cases is I've seen someone argue something

20  in their trial brief, but I say, "Well, wait a minute.  You

21  can't have argued something as relates to me issuing a

22  particular discovery order and then turn around and use that

23  particular order in a different way to be able to make an

24  argument based upon, for example, a lack of information at a

25  trial."

1        So you're not saying, for example, that you would argue

2  on behalf of your clients, "Well, they haven't been able to

3  since demonstrate that competitors have entered the market," or

4  things along those lines at a trial in this case that would

5  suggest that had they had that information they could argue it

6  to the jury?

7        MR. CRAMER:  Our clients are not going to themselves

8  initiate putting in any evidence that's not already in the

9  record in Le.

10        THE COURT:  Okay.

11        MR. CRAMER:  We do not need it.  We show durable

12  monopsony power from at least 2010 to 2017.  There's no expert,

13  not Dr. Topel, not Dr. Singer, not any expert in this case has

14  said that you need more than seven years of showing of

15  foreclosure of monopsony power to prove a Section 2 case.  So --

16        THE COURT:  So are you saying to me, because I want to

17  be clear.

18        MR. CRAMER:  Yes.

19        THE COURT:  Because we dealt with a couple of issues

20  here.  Are you saying to me that if this case were to proceed to

21  trial, the plaintiffs would not be seeking to add any

22  information, if I were to deny the motion to reopen, beyond the

23  discovery that has been provided in Le?

24        MR. CRAMER:  Well, we won't unilaterally disarm.  If

25  Zuffa wants to put it in --

2:15-cv-01045-RFB-BNW

1          THE COURT:  No, that's not -- right.

2          MR. CRAMER:  Oh, okay.  Yeah.  Then the answer to that

3   is we will not.

4          THE COURT:  You're plaintiffs.  You present your

5   case --

6          MR. CRAMER:  Yes.

7          THE COURT:  -- right, and you argue it.  I'm not saying

8   that -- they obviously want to use it.  That's why they filed

9   these motions, right.

10          MR. CRAMER:  Yeah.

11          THE COURT:  That's not really the issue, right.  They

12   want this information to be provided.

13          MR. CRAMER:  Yes.

14          THE COURT:  And it seems to me that if I were to decide

15   this in your favor, that you couldn't then turn around and use

16   that to your advantage.  And I'm asking you that now because

17   there's no point of going through this if you're going to be

18   raising arguments at trial that effectively implicate recent

19   conditions or in any way suggest that that would be relevant

20   information.  Because if you're doing that, then obviously I

21   would grant the motion to reopen.

22          And I want to be clear about this on the record, right.

23   If you're saying to me now directly, "We will not use any

24   information if we were to go to trial, other than discovery in

25   Le," is that what you're telling me?

1          MR. CRAMER:  That is what I am telling you.

2          THE COURT:  All right.  Okay.

3          All right.  Thank you, Mr. Cramer.

4          MR. CRAMER:  Thank you, Your Honor.

5          THE COURT:  So here's what we're going to do for right

6   now.  I'm going to go back and look at this record a little bit

7   and decide whether or not I can decide this today.  I really

8   don't want to drag this out.  So we're going to take a short,

9   little break.  All I would say to you is to stay close to the

10  courtroom.  And maybe 15, 20 minutes or so.  Maybe around that

11  timeframe.  But I'm likely to come back in and give you my

12  ruling or let you know how we're going to proceed.  Okay?

13         COURTROOM ADMINISTRATOR:  Please rise.

14         MR. SAVERI:  Excuse me, Your Honor.  Can we stay in

15  here?

16         THE COURT:  Oh, no.  You don't have to stay in the

17  courtroom, but just be close so that if Ms. Smith needs to find

18  you, right, she doesn't have to chase around the hallway to find

19  you.

20         MR. SAVERI:  I plan on remaining in my seat, if that's

21  possible.

22         THE COURT:  Okay.  All right.

23         MR. CRAMER:  Thank you, Your Honor.

24         (Recess taken at 12:52 p.m.)

25         (Resumed at 1:07 p.m.)

—2:15-cv-01045-RFB-BNW—

1          THE COURT:  Please be seated.

2          So we are back on the record here.  I'll note the

3   presence of all counsel in this case.

4          So here's what we're going to do.  I'm going to deny

5   both motions in this case to reopen and to share discovery.  In

6   this case I don't find based upon my review of the record and

7   particularly the experts, including defendant's experts, that

8   the discovery's likely to lead to relevant information related

9   to damages.  The information that has been gleaned in the expert

10  reports themselves don't suggest the need for that considering

11  the relevant testimony at the time.  I think based upon the

12  record here that the class period itself is sufficient one way

13  or another to establish whether or not monopsony power existed

14  and without consideration for information beyond the class

15  timeframe.

16         I also find that plaintiffs would be prejudiced by any

17  further delay as it relates to the reopening of the discovery,

18  in part, because of the nature and amount of the discovery that

19  the defendants seek.

20         The Court doesn't find this to be a tailored or narrow

21  request.  It actually finds it to be a quite broad request,

22  which could lead to several months of discovery well beyond the

23  trial date that the Court has set in this case.

24         Trial in this case is imminent notwithstanding the fact

25  that there are dispositive motions in this case.  The Court in

—2:15-cv-01045-RFB-BNW—

1   essentially looking at the nature of those motions and having

2   considered the evidence in this case finds that it's quite

3   likely the case will proceed to trial and certainly likely

4   enough that the trial date must be considered in the context of

5   these motions.

6           I also find that the defendants have had sufficient --

7   more than sufficient time for the discovery and the discovery

8   that they seek was available to them and could have been

9   provided at the evidentiary hearing.  And the Court did allow

10  for supplementation at that time which would have been the

11  appropriate time to continue to request this, but there was not

12  a further request for that supplementation.

13          For all of those reasons, the Court is going to deny

14  both motions in this case.  I am going to restrict the

15  plaintiffs in this case to using just the discovery from Le in

16  their case-in-chief.  I also wanted to be clear that my decision

17  about these motions is not necessarily dispositive of evidence

18  that can be presented.  And what will happen as this case

19  proceeds to trial, as I think it likely will, is I'm going to

20  ask the parties to submit trial briefs early enough that should

21  there be issues that would suggest the need for certain types of

22  discovery outside of Le to be used, then we'll consider it at

23  that time.

24          But I want to be clear, Mr. Cramer and Mr. Yates and

25  Mr. Isaacson, I'm not making a categorical decision about

——2:15-cv-01045-RFB-BNW——

 1  admissibility as it relates to trial at this time.  I find that

 2  those decisions have to be made in the moment and potentially

 3  either side could open the door to information.  And so I'm

 4  saying that to the plaintiffs so they can be particularly aware

 5  of that.

 6         The other thing is, to the extent the plaintiffs seek

 7  injunctive relief in Le, it will be limited to the discovery in

 8  Le itself.  The Court will set a hearing on injunctive relief in

 9  Le after the trial in this case.  Obviously if the defendant

10  prevails at trial, then that will potentially be dispositive of

11  the injunctive relief.  Either way, Mr. Cramer, the plaintiffs

12  will be limited to the record as it relates to injunctive

13  relief.

14         Now, that may not provide for the nature of the relief

15  that you seek.  I will consider it at the time.  And if you want

16  me to reconsider allowing for information beyond the class

17  period to be used for injunctive relief in Le, you can ask --

18  you can file a motion for reconsideration, but I will tell you

19  that will lead to the trial date in this case being moved.  And

20  so I want to be clear about that.  You certainly have leave to

21  seek reconsideration of my order as relates to injunctive

22  relief, but if you seek reconsideration and I grant it, I will

23  move the trial date back to 2025.  So that's something that I

24  want to be very clear about in this case.

25         The other thing I wanted to talk with you all about is

1  preparation for trial.  As I've indicated, based upon the record

2  that I have and based upon the Court's certification order and

3  looking at the motions that have been filed, I think it's quite

4  likely this case will proceed to trial.  This will be a lengthy

5  trial, and so I think it's important for us to think about

6  scheduling issues.

7         One of the issues that I anticipate is going to happen

8  is we're going to have a fair amount of work dealing with

9  evidentiary issues regarding the experts and other evidence that

10 may come in.  And so what I'm going to ask you all to do is to

11 meet and confer to set a schedule, a trial schedule, regarding

12 deadlines, right.  I would like to be able to resolve all

13 evidentiary issues at least a month before trial, which means

14 you all will have to file briefs and motions probably starting

15 in January, right.

16        I'm going to require you to file trial briefs in this

17 case, and you'll have to file and prepare your exhibits and file

18 a joint pretrial order.  I'm going to ask you to meet and confer

19 about setting that, the deadlines for that.

20        At some point we're going to have to have an

21 evidentiary hearing I would fully anticipate as it relates to

22 exhibits in the trial and in particular expert testimony.  So

23 you all should meet and confer about that.

24        Any questions about the Court's order today?  I am

25 going to memorialize it in a minute order, but I'm not going to

—2:15-cv-01045-RFB-BNW—

1  issue a separate written order.  My reasons outlined here today

2  on the record as well as the reasons that I will include in the

3  minute order will be the final order of the Court as relates to

4  these motions.

5           Any questions, Mr. Cramer, about what the Court has

6  ordered today?

7           MR. CRAMER:  No, Your Honor.  Thank you.

8           THE COURT:  Mr. Yates, any questions about that?

9           MR. YATES:  No, Your Honor.

10          MR. ISAACSON:  Your Honor, no questions, but just, you

11  know, I had previously informed you I have a trial date on the

12  same -- on the same date.  And there are motions pending in that

13  case.

14          THE COURT:  As I understand it, Mr. Isaacson, that case

15  is not as old as this case.  This case is much older than the

16  case at least that I thought that you had identified.  I'm happy

17  to reach out to the Court in that case to let the Court know why

18  I'm not going to move the trial date, but I don't intend to move

19  the trial date, in part, because of my own trial schedule.  I

20  can't try the case much later without it pushing months later in

21  my own schedule, and so the window that I've given you is the

22  window that I have.  But I'm not going to move the trial date at

23  this point in time.

24          MR. ISAACSON:  All right, Your Honor.

25          THE COURT:  All right.  Mr. Cramer?

———2:15-cv-01045-RFB-BNW———

1          MR. CRAMER:  We saw Your Honor granted the motion to

2    start the notice process.

3          THE COURT:  Yes.

4          MR. CRAMER:  So we were going -- we're going to start

5    that, and the notice itself has the April 8th trial date.  And

6    we're going to go forward with that.  I just wanted to confirm

7    that with the Court.

8          THE COURT:  Yes.

9          MR. CRAMER:  All right.  Thank you, Your Honor.

10         THE COURT:  All right.  So anything else we need to do

11   today from counsel?  Anyone?

12         MR. CRAMER:  No, Your Honor.

13         THE COURT:  Anyone?

14         MR. YATES:  No, Your Honor.

15         THE COURT:  All right.  We'll be adjourned.  I'm going

16   to stay on the bench for a few moments.  Thank you.

17              (Whereupon the proceedings concluded at 1:15 p.m.)

18

19

20

21

22

23

24

25

―2:15-cv-01045-RFB-BNW―

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  November 21, 2023.

                                    /s/ **Patricia L. Ganci**

                                    Patricia L. Ganci, RMR, CRR