Eric L. Cramer (*Pro Hac Vice*)
Michael Dell'Angelo (*Pro Hac Vice*)
Patrick F. Madden (*Pro Hac Vice*)
BERGER|MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net

*Co-Lead Counsel for the Bout Class and*
*Attorneys for Individual and Representative Plaintiffs*

*(Additional counsel appear on signature page)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Cung Le, Nathan Quarry, Jon Fitch, Brandon Vera, Luis Javier Vazquez, and Kyle Kingsbury, on behalf of themselves and all others similarly situated, | Case No.: 2:15-cv-01045-RFB |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, | |
| Defendant. | |

## GLOSSARY OF ABBREVIATIONS

For the convenience of the Court and efficiency, Plaintiffs' Opposition to Zuffa's Renewed

Motion for Summary Judgment uses the following abbreviations:

| Expert Reports | Abbreviation | Exhibit |
|---|---|---|
| Expert Report of Hal J. Singer, Ph.D. (August 31, 2017) | SR1 | 1 |
| Rebuttal Expert Report of Hal J. Singer, Ph.D. (January 12, 2018) | SR2 | 2 |
| Supplemental Expert Report of Hal J. Singer, Ph.D. (April 3, 2018) | SR3 | 3 |
| Second Supplemental Reply Report of Hal J. Singer, Ph.D. (May 28, 2018) | SR4 | 4 |
| Declaration of Hal J. Singer, Ph.D. (November 13, 2023) | SR5 | 142 |
| Expert Report of Andrew Zimbalist in *Cung Le, et al. v. Zuffa, LLC* (August 30, 2017) | ZR1 | 5 |
| Expert Rebuttal Report of Andrew Zimbalist (December 26, 2017) | ZR2 | 6 |
| Expert Rebuttal Report of Professor Alan Manning (January 12, 2018) | MR1 | 7 |
| Expert Report of Guy A. Davis, CPA, CIRA, CDBV, CFE (August 31, 2017) | GDR1 | 8 |
| Expert Report of Professor Robert H. Topel (October 27, 2017) | TR1 | 9 |
| **Depositions** | **Abbreviation** | **Exhibit** |
| Deposition of Nathan Quarry (September 30, 2016) | Quarry Tr. | 11 |
| Rule 30(b)(6) Deposition of Kirk D. Hendrick on behalf of Zuffa, LLC (November 29-30, 2016) | Hendrick 30(b)(6) Tr. | 12, 13 |
| Rule 30(b)(6) Deposition of Ike Lawrence Epstein on behalf of Zuffa, LLC (December 2, 2016) | Epstein 30(b)(6) Tr. | 14 |
| Deposition of Denitza Batchvarova (January 25, 2017) | Batchvarova Tr. | 15 |
| Deposition of Kurt Otto (February 6, 2017) | Otto Tr. | 16 |

ii

| Depositions (continued) | Abbreviation | Exhibit |
|---|---|---|
| Deposition of Thomas J. Atencio (February 9-10, 2017) | Atencio Tr. | 17 |
| Deposition of Jon Fitch (February 15, 2017) | Fitch Tr. | 18 |
| Deposition of Brandon Vera (February 16, 2017) | Vera Tr. | 19 |
| Deposition of Kyle Kingsbury (February 17, 2017) | Kingsbury Tr. | 20 |
| Deposition of Jeremy Lappen (February 28, 2017) | Lappen Tr. | 21 |
| Deposition of Lorenzo J. Fertitta (March 23, 2017) | Fertitta Tr. | 22 |
| Deposition of Shannon Knapp (April 11, 2017) | Knapp Tr. | 23 |
| Deposition of Sean Shelby (April 12, 2017) | Shelby Tr. | 24 |
| Deposition of John Mulkey (April 19, 2017) | Mulkey Tr. | 25 |
| Deposition of Jeffrey Aronson (April 25, 2017) | Aronson Tr. | 26 |
| Rule 30(b)(6) Deposition of Drew Goldman on behalf of Deutsche Bank (April 28, 2017) | Deutsche Bank 30(b)(6) Tr. | 27 |
| Deposition of Ike Lawrence Epstein (May 25, 2017) | Epstein Tr. | 28 |
| Deposition of Joseph Silva (June 7, 2017) | Silva Tr. | 29 |
| Deposition of Scott Coker (August 3, 2017) | Coker Tr. | 30 |
| Deposition of Dana F. White (August 9-10, 2017) | White Tr. | 31, 32, 33 |
| Deposition of Hal J. Singer, Ph.D. (September 27, 2017) (excerpted) | Singer Tr. | 34 |
| Deposition of Paul Oyer (November 29, 2017) (excerpted) | Oyer Tr. | 35 |
| Deposition of Robert Topel (December 5-6, 2017) | Topel Tr. | 36, 37 |
| Deposition of Roger D. Blair (December 8-9, 2017) | Blair Tr. | 38, 39 |

| Other Terms | Abbreviation | |
|---|---|---|
| Consolidated Amended Antitrust Class Action Complaint, ECF No. 208 | CAC | |
| Reply in Support of Plaintiffs' Motion for Class Certification, ECF No. 554 | Class Reply | |
| Order Granting in Part and Denying in Part Plaintiffs' Motion to Certify Class, ECF No. 839 | CO | |
| Plaintiffs' Counterstatement of Facts | CSF | |
| Revenues generated by a live MMA event | Event Revenues | |
| Zuffa's exclusive Promotional and Ancillary Rights Agreements with Fighters that Plaintiffs claim form part of the exclusionary Scheme in this case | Exclusive Contracts | |
| Professional Mixed Martial Arts Athlete | Fighter | |
| Transcript of Proceedings, Evidentiary Hearing on Class Certification, ECF Nos. 724, 726, 730, 734, 741 | HT | |
| Zuffa's Renewed Motion for Summary Judgment, ECF No. 878 | Mot. or Motion | |
| Zuffa's Motion for Summary Judgment, ECF No. 573 | MSJ | |
| Professional Fighters League | PFL | |
| Response to Plaintiffs' Requests for Admission | PRFA | |
| Zuffa's Motion to Exclude Testimony of Dr. Hal Singer, ECF No. 524 | SD | |
| Plaintiffs' Consolidated Brief in Opposition to Zuffa, LLC's Motion to Exclude the Testimony of Drs. Hal Singer and Andrew Zimbalist, ECF No. 534 | SZDO | |
| World Series of Fighting | WSOF | |
| Zuffa's "Concise Statement of Undisputed Facts" | ZSF | |
| Exhibits to Zuffa's Renewed Motion for Summary Judgment, ECF Nos. 879-1 to 113 | Z.Ex. | |

iv

| Individuals | Abbreviation | Organization/Title |
|---|---|---|
| Jeff Aronson | Aronson | **Titan FC:** Owner and Chief Executive Officer |
| Thomas Atencio | Atencio | **Affliction MMA** |
| Denitza Batchvarova | Batchvarova | **Zuffa, LLC:** Senior Vice President of Strategy |
| Dr. Roger D. Blair | Blair | **Zuffa, LLC:** Economist |
| Scott Coker | Coker | **Bellator:** President; **Strikeforce:** Founder, Former President and Chief Executive Officer |
| Guy A. Davis | Davis | Plaintiffs' Expert Accountant |
| Ike Lawrence Epstein | Epstein | **Zuffa, LLC:** Senior Vice President and General Counsel; 30(b)(6) designee for Promoter Acquisitions Topics |
| Lorenzo Fertitta | Fertitta | **Zuffa, LLC:** Founder, Former Owner and Chief Executive Officer |
| Jon Fitch | Fitch | Named Plaintiff |
| Drew Goldman | Goldman | **Deutsche Bank**: Rule 30(b)(6) designee |
| Kirk Hendrick | Hendrick | **Zuffa, LLC:** Executive Vice President and Chief Legal Officer; Rule 30(b)(6) designee for Fighter Contract Topics |

v

| Kyle Kingsbury | Kingsbury | Named Plaintiff |
|---|---|---|
| Shannon Knapp | Knapp | **Invicta Fighting Championship:** Founder and President |
| **Individuals (continued)** | **Abbreviation** | **Organization/Title** |
| Jeremy Lappen | Lappen | **ProElite (Parent Company of EliteXC):** President of Fight Operations; **World Fighting Alliance (WFA):** Former Chief Executive Officer |
| Dr. Alan Manning | Manning | Plaintiffs' Expert Economist |
| John Mulkey | Mulkey | **Zuffa, LLC:** Former Chief Financial Officer |
| Kurt Otto | Otto | **International Fight League (IFL):** Founder and President |
| Nathan Quarry | Quarry | Named Plaintiff |
| Sean Shelby | Shelby | **Zuffa, LLC:** Vice President of Talent Relations and Matchmaker for UFC |
| Joseph Silva | Silva | **Zuffa, LLC:** Former Executive Senior Vice President of Talent Relations and Matchmaker for UFC |
| Dr. Hal Singer | Singer | Plaintiffs' Expert Economist |
| Dr. Robert Topel | Topel | **Zuffa, LLC:** Economist |
| Dana White | White | **Zuffa, LLC:** President |

| Brandon Vera | Vera | Named Plaintiff |
|---|---|---|
| Dr. Andrew Zimbalist | Zimbalist | Plaintiffs' Expert Economist |

Case No.: 2:15-cv-01045-RFB-BNW

PLAINTIFFS' OPPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

COUNTERSTATEMENT OF FACTS (CSF)..................................................................4

I.    MMA Promoters Require a Critical Mass of Marquee Fighters to Challenge Zuffa ........4

      A.    Marquee Fighters are the Principal Driver of MMA Promoter Revenues ............4

      B.    A Critical Mass of Top Fighters is Necessary to Compete with Zuffa.................5

II.    Zuffa's Anticompetitive Scheme Was Designed to Lock in Current and Potential Top Fighters to Exclusive Contracts for the Most Productive Parts of Their Careers .............7

      A.    Exclusive Fighter Contracts Restricted Fighter Mobility ......................................7

      B.    Zuffa Leveraged its Market Power to Extend Fighter Exclusivity .......................9

      C.    Zuffa's 2006-2011 Acquisitions Shuttered Rivals and Locked in Fighters.........10

III.    Zuffa's Scheme Substantially Impaired Competition .......................................................11

      A.    Zuffa's Scheme Succeeded in Locking up the Vast Majority of Top Fighters....11

      B.    The Scheme Deprived Promoters of a Key Input: a Critical Mass of Top Fighters ...................................................................................................................13

      C.    Zuffa's Scheme relegated other promoters to feeder or minor leagues ..............13

      D.    Due to the Scheme, Zuffa Has Had no Direct Competition................................15

IV.    Zuffa's Scheme Caused Anticompetitive Effects ............................................................16

      A.    The Scheme Suppressed Fighter Compensation ..................................................16

      B.    The Scheme Suppressed Marketwide Output of MMA Events ...........................17

      C.    The Scheme Reduced the Number of Fighters Paid for Bouts in the Input Market ...................................................................................................................18

V.    Zuffa's Scheme Had No Procompetitive Effects .............................................................19

ARGUMENT .....................................................................................................................20

I.    Record Evidence Establishes Zuffa's Substantial Market Power ...................................20

      A.    Direct Evidence of Market Power Suffices.........................................................20

      B.    Monopsony Power Suffices without Monopoly Power .......................................21

      C.    Wage Suppression Establishes Zuffa's Monopsony Power................................21

      D.    Depressed Output Confirms Zuffa's Monopsony Power.....................................24

Case No.: 2:15-cv-01045-RFB-BNW

E.      Circumstantial Evidence Confirms Zuffa's Monopsony Power .........................25

F.      Record Evidence Also Establishes Zuffa's Monopoly Power ...........................27

II.     The Evidence Establishes Zuffa Engaged in Exclusionary Anticompetitive Conduct ....28

A.      The Court Should Assess Zuffa's Conduct as a Whole .......................................28

B.      Zuffa's Scheme Substantially Foreclosed Competition.......................................29

C.      Zuffa's Long-Term, Exclusive Contracts Were Anticompetitive .......................33

D.      Zuffa's Coercion Was Anticompetitive ...............................................................34

E.      Zuffa's Acquisitions Were Anticompetitive .......................................................36

III.    Summary Judgment Is Not Appropriate Based on Procompetitive Justifications ...........37

A.      Zuffa's Defense of its Contracts Does Not Support Summary Judgment ...........37

IV.     Zuffa's Article III Standing Argument Does Not Support Summary Judgment .............39

CONCLUSION ..................................................................................................................40

PLAINTIFFS' OPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arminak & Assoc., Inc. v. Saint-Gobain Calmar, Inc.*,
    789 F. Supp. 2d 1201 (C.D. Cal. 2011) ...................................................................21

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) .............................................................................................36

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994) ..................................................................................36

*Been v. O.K. Indus., Inc.*,
    495 F.3d 1217 (10th Cir. 2007) ...........................................................................24

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .............................................................................................36

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ...............................................................................36

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
    961 F.2d 667 (7th Cir. 1992) ...............................................................................38

*City of Anaheim v. Southern California Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) .............................................................................29

*Cornwell Quality Tools Co. v. CTS Co, Inc.*,
    446 F.2d 831 (9th Cir. 1971) ...............................................................................29

*CoStar Grp., Inc. v. Com. Real Est. Exch. Inc*,
    2023 WL 2468742 (C.D. Cal. Feb. 23, 2023) .....................................................22

*Dial Corp. v. News Corp.*,
    165 F. Supp. 3d 25 (S.D.N.Y. 2016) ...................................................................30

*Distance Learning Co. v. Maynard*,
    2020 WL 2995529 (N.D. Cal. June 4, 2020) .......................................................25

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ..............................................................................29

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ..............................................................................3, 21

*Epicenter Recognition, Inc. v. Jostens, Inc.*,
    81 F. App'x 910 (9th Cir. 2003) ..........................................................................27

*Forsyth* v. *Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ............................................................................21

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..............................................................4, 21, 24, 37

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Cream, Inc.*,
895 F.2d 1417 (table), 1990 WL 12148 (9th Cir. 1990) .........................................39

*Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*,
158 F. App'x 413 (4th Cir. 2005) ........................................................................39

*In re Google Digital Advert. Antitrust Litig.*,
2021 WL 2021990 (N.D. Cal. 2021) ....................................................................36

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ............................................................................ 29

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ............................................................................25

*Independent Entertainment Group, Inc. v. National Basketball Association*,
853 F. Supp. 333 (C.D. Cal. 1994) ......................................................................39

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ..........................................................................25

*Jones v. Varsity Brands, LLC*,
618 F. Supp. 3d 713 (W.D. Tenn. 2022) ..............................................................36

*Jones v. Varsity Brands, LLC*,
618 F. Supp. 3d 725 (W.D. Tenn. 2022) ..............................................................36

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ..............................................................................21

*Laumann v. NHL*,
56 F. Supp. 3d 280 (S.D.N.Y. 2014) ....................................................................38

*Le v. Zuffa, LLC*,
216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................................4, 25, 29

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..........................................................................................40

*Luria Bros. & Co. v. FTC*,
389 F.2d 847 (3d Cir. 1968) ...............................................................................29

*Magnetar Techs. Corp. v. Intamin*, Ltd.,
801 F.3d 1150 (9th Cir. 2015) ............................................................................21

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
   2023 WL 6811871 (D. Or. Oct. 13, 2023) ................................................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................................21

*Mazda v. Carfax, Inc.*,
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ............................................................29

*Movie 1 & 2 v. United Artists Communications Inc.*,
   909 F.2d 1245 (9th Cir. 1990).............................................................................34, 35

*O.S.C. Corp. v. Apple Computer Inc.*,
   792 F.2d 1464 (9th Cir. 1986).................................................................................39

*O'Bannon v. NCAA*,
   802 F.3d 1049 (9th Cir. 2015).............................................................2, 3, 20, 21

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .......................................................................................20, 24

*Olean Wholesale Grocery Cooperative Inc. v. Bumble Bee Foods LLC*,
   31 F. 4th 651 (9th Cir. 2022) ...................................................................................40

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014)..................................................................................37

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
   797 F.2d 370 (7th Cir. 1986)....................................................................................38

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997)............................................................................27, 30

*Pac. Coast. Agric. Exp. Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir. 1975),
   526 F.2d 1196, 1204 (9th Cir. 1975)........................................................................27

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ...........................................................31

*Race Tires America Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)..................................................................................38, 39

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995).........................................................2, 20, 25, 26

*Simon & Simon, PC v. Align Tech., Inc.*,
   533 F. Supp. 3d 904 (N.D. Cal. 2021) .....................................................................29

*State of New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023)..................................................................................37

PLAINTIFFS' OPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ....................................................................................................4, 40

*Sterling Merch., Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011) .............................................................................................37

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
   2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) ...................................................................30

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ......................................................................................................40

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1298 (9th Cir. 1982) .....................................................................................29, 30

*United States v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) .............................................................................................40

*United States v. Syufy Enterprises*,
   903 F.2d 659 (9th Cir. 1990) .......................................................................................21, 37

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
   914 F.2d 1256 (9th Cir. 1990) .....................................................................................34, 39

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) .............................................................................................38

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
   857 F.2d 55 (2d Cir.1988) .................................................................................................39

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
   190 F.3d 974 (9th Cir. 1999) .......................................................................................26, 27

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ..........................................................................................................35

**Rules**

Fed. R. Civ. P. 12(h)(3)................................................................................................................4, 40

**INTRODUCTION**

Zuffa faces an uphill battle in its renewed motion for summary judgment ("Motion" or "Mot."). This Court has already found compelling evidence supporting each element of Plaintiffs' Section 2 claim based on Zuffa's contracts, coercion, and acquisitions (the "Scheme"). CO at 20-23 (elements of monopsonization claim); *id*. at 24-33 (Zuffa has monopsony power and there are high barriers to entry); *id*. at 33-44 (Zuffa engaged in "Anticompetitive Conduct to Support its Monopsony," including each component of its "Scheme": exclusionary contracts, coercion, and acquisitions); *id*. at 40, 57-59 (Scheme substantially foreclosed competition); *id*. at 44-71 (Scheme caused antitrust injury and damages to Class members by suppressing Fighter pay below competitive levels); *id*. at 41-43 ("overall effect" of Scheme was anticompetitive and Plaintiffs refuted Zuffa's "procompetitive rationales . . . by a preponderance of the evidence"). Zuffa fails even to address these findings and rulings.

Its Motion also suffers from other fatal flaws. One is that Zuffa's three principal arguments are at war with each other. Zuffa's first major argument is that it lacked monopsony power, so it *could not* restrict Fighter mobility, foreclose rivals, or suppress Fighter pay. Mot. at 15-21. Similarly, its second major argument is that Zuffa's Scheme *did not* restrict Fighter mobility, foreclose rivals, or suppress Fighter pay. *Id*. at 22-27, 31-37. In short, Zuffa claims it was a powerless market participant.

Those claims conflict with Zuffa's third major argument—that it was justified in restricting Fighter mobility, foreclosing rivals, and suppressing Fighter compensation because doing so supposedly had procompetitive effects. Mot. at 28-31. Zuffa claims, for instance, that the Scheme prevented "free riding." *Id*. Zuffa suggests that only with long-term exclusive contracts would promoters invest in their Fighters—"building up a cult following around their athletes." *Id*. at 28-29. Plaintiffs below contest this unsupported assertion, including because Zuffa could protect its investments by paying its Fighters enough to retain them. But Zuffa claims it had to do so through its long-term, exclusive contracts, conduct it alleges was procompetitive on net, even though it decreased Fighter mobility and pay.

Even if that claim were credible—it isn't—it contradicts Zuffa's position that it has never had monopsony power. Its free-riding argument is *premised* on anticompetitive harm. As Zuffa's economist conceded, eliminating the challenged contracts would increase Fighter mobility and result in "a transfer

1

of wealth from Zuffa to the athletes." Topel Tr. 84:11-18. If Zuffa's Scheme prevented free riding, it did so by restricting Fighter mobility in place of increasing Fighter compensation. *See* Areeda & Hovenkamp ¶658 ("[A] business justification is needed as a defense only if the challenged practice is prima facie unlawful in the first place.").[1]

To be clear, while Zuffa cannot be right on both sets of arguments, it can be wrong on both. And it is. Record evidence at least creates a genuine dispute of fact about whether Zuffa's anticompetitive conduct could and did suppress Fighter compensation, and that it did not have offsetting procompetitive effects. That suffices to defeat summary judgment.

Moreover, Zuffa's arguments to the contrary are rife with errors. That is true for its claim that this Court should grant summary judgment on Plaintiffs' "monopolization theory" because Plaintiffs do not seek *damages* based on monopolization. Mot. at 1-2. That conflates two separate issues: damages and anticompetitive effects. Plaintiffs seek *damages* based only on Zuffa's exploitation of its monopsony power to underpay its Fighters. But Plaintiffs also show that Zuffa's monopoly power bolstered its monopsony power, and also present compelling evidence of other anticompetitive effects, including reduced MMA events, artificially inflated prices, and degraded quality. Those monopsony and monopoly effects *confirm* Zuffa's Section 2 violation.

Zuffa's argument is similarly unsound that Plaintiffs lack evidence of its market power. *Id.* at 15-21, 37-39. Plaintiffs can establish that power through direct or circumstantial evidence. CO at 24 (citing *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995)). Either suffices. *Id*. Plaintiffs can demonstrate liability based on proof of monopsony power without proof of monopoly power. *Id.* at 23-24; *O'Bannon v. NCAA*, 802 F.3d 1049, 1070-71 (9th Cir. 2015).

Zuffa also incorrectly argues that Plaintiffs should lose summary judgment on monopsony power because no reasonable jury could find: (1) Zuffa artificially depressed output; (2) its potential rivals faced barriers to entry during the Class Period; or (3) its potential rivals faced barriers to entry after the Class Period. Mot. at 16-21. These arguments fail because they are both wrong on the facts and legally irrelevant: evidence of wage suppression alone suffices.

---

[1] The same contradiction inheres in Zuffa's position that it needed to lock up a deep pool of top athletes to staff its events. *Id.* at 29-31. Even if that were true—it isn't—it would not negate that Zuffa's conduct can and does cause anticompetitive harms, including suppressing fighter compensation.

That last point is fatal to most of Zuffa's arguments about monopsony power. The Ninth Circuit has held that proof of wage suppression to athletes suffices for an antitrust violation. *O'Bannon*, 802 F.3d at 1070-71 (suppression of athlete compensation demonstrates "an anticompetitive effect;" purported requirement that plaintiffs must also "show a decrease in output" is "simply incorrect"); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023) ("Apple argues that the district court's direct-evidence conclusion cannot stand because Epic did not show that Apple's restrictions reduced output. We squarely rejected this argument in *O'Bannon*."). Workers who show they were underpaid as sellers of services need not show other anticompetitive effects, such as a decrease in output. *Id.*[2]

Zuffa errs on this legal point because it cites cases that *recognize* that wage suppression is usually accompanied by output suppression, Mot. at 16, as is true here; but those cases do not *require* proof of output suppression in addition to wage suppression.[3] Thus, direct evidence of artificially suppressed compensation on its own is enough to support Plaintiffs' claim here. *Id.* Plaintiffs need not also show reduced output, inflated prices, or degraded quality, *id.*, even though Plaintiffs do so.

Plaintiffs have provided compelling evidence that the Scheme suppressed Fighter compensation. Indeed, as discussed above, Zuffa's arguments about the alleged procompetitive effects of its Scheme in effect concede that point. And this Court in granting class certification found that Plaintiffs' evidence proves that the Scheme suppressed pay below competitive levels. *E.g.*, CO at 51, 67, 71. So Zuffa's argument at summary judgment is in effect that a reasonable jury could not reach the same conclusion this Court did. As explained in CSF ¶26 and Argument I.C, the evidence confirms that the Court was right and Zuffa is wrong.

Zuffa also contends the challenged conduct was not unlawful because it did not substantially restrict Fighter mobility, foreclose rivals, or suppress compensation. Mot. at 21-27. As noted above, that position conflicts this Court's findings, the evidence, and Zuffa's asserted procompetitive justifications.

---

[2] Zuffa admits, and the Court has found, CO at 23, that claims based on monopsony and monopoly power are symmetric, and Zuffa applies cases involving monopoly power throughout its brief. *See, e.g.*, Mot. at 14 & n.4. Yet it fails to address *O'Bannon* (a monopsony case) or the many monopoly cases holding price effects suffice to prove market power without the need for output effects.
[3] *See infra* n.68 and accompanying text.

Further, Zuffa asks this Court to evaluate whether each component of its Scheme—exclusive dealing, acquisitions, coercion, and other anticompetitive behavior in isolation—taken alone would be illegal. But Zuffa's Scheme should be assessed *as a whole* based on the *cumulative anticompetitive effects* of its components. CO at 42 (citing *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152-53 (9th Cir. 2019)); *Zuffa*, 216 F. Supp. 3d at 1168-69. As this Court found, Zuffa's long-term exclusive contracts substantially foreclosed competition, particularly given Zuffa's acquisitions feeding Fighters into those contracts and its coercion rendering them in effect perpetual. CO at 34-43. Zuffa used its resulting market power to cause anticompetitive effects, rendering its Scheme unlawful as a whole.

Zuffa also contends that its conduct did not have anticompetitive effects because it allegedly had procompetitive effects. Mot. at 27-36. That confuses two issues. Under Section 2, Plaintiffs have the initial burden to prove anticompetitive harm. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). The burden then shifts to Zuffa to prove procompetitive justifications. *Id*. But procompetitive justifications do not *negate* anticompetitive effects. The two are not mutually exclusive. Indeed, as discussed above, Zuffa's asserted procompetitive effects implicitly *concede* anticompetitive effects. So Zuffa must make such a compelling showing of procompetitive effects that a reasonable jury would have to find in its favor. It has not—as this Court has already found. CO at 41-43.

Zuffa ends its brief with a particularly weak contention: Plaintiffs must show that all members of the Class were harmed to establish that they have Article III standing, and they cannot do so. Mot. at 39-40. But Article III standing requires only a credible claim that trial *may* establish injury; it does not require proof of actual injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). If the law were otherwise, a federal court would have to dismiss for lack of subject matter jurisdiction every time a plaintiff lost at trial. Fed. R. Civ. P. 12(h)(3). Second, Plaintiffs have presented evidence of harm to all Class members. SR1 ¶¶209-232; *see* CO at 63-67 (injury widespread across Bout Class).

## COUNTERSTATEMENT OF FACTS (CSF)

### I. MMA Promoters Require a Critical Mass of Marquee Fighters to Challenge Zuffa

#### A. Marquee Fighters are the Principal Driver of MMA Promoter Revenues

1. Marquee Fighters are the most important input for MMA promoters because Fighters draw

the audience—and therefore television deals and sponsors.[4] The UFC's longtime matchmaker Joe Silva testified that "it would devalue a promotion if the highest-level fighters in that organization are taken away" because "the highest-level fighters in an MMA promotion are a substantial component of the value of that organization." Silva Tr. 330:2-10.3.[5]

2.   Zuffa's claim that it had "an average of 18.1%" of Fighters in the Ranked Market under contract in any given year, ZSF ¶21, is not relevant or material. Fighters are not fungible, *see* SR1 ¶128; SR2 ¶¶23-24, 128-29, 140 & n.499; SR4 ¶48, and thus counting up Zuffa's raw share of athletes under contract absent some weighting is just noise. Rather, as Zuffa's economist admits, highly-ranked or better-known Fighters generate more Event Revenues. *See* Topel Tr. 432:10-24, 450:8-451:5 (admitting that "some fighters are more important to an MMA promotion than others" as "some generate more revenues"); *id.* 36:7-17; *id.* 431:2-7. Silva admitted, for instance, that "there is a group of fighters who, whether they're champions or not, . . . tend to separate themselves from the crowd as capable of being headliners;" and "an event will have difficulty succeeding without these top-level headline fighters." Silva Tr. 331:5-332:2.[6] And this Court found "Fighters are not homogenous; they vary in their ability to attract viewers." CO at 29. Relative to Fighters, the promoter's role is limited.[7]

**B. A Critical Mass of Top Fighters is Necessary to Compete with Zuffa**

3.   Because Fighters are not fungible and because the top Fighters drive revenues, as Zuffa has conceded, a "deep roster of talented fighters" is "essential" to stage live MMA events successfully.[8] Zuffa's economist also admitted, "To effectively compete with the UFC a competitor would need. . . a

---

[4] SR1 ¶¶20, 113; SR2 ¶132; Silva Tr. 102:23-103:3; Lappen Tr. 136:4-13, 142:17-18; Coker Tr. 88:13-89:3, 103:9-12.
[5] Kurt Otto, who ran a promotion that tried to compete with the UFC, testified that the ability to retain and recruit well-known fighters is "the epitome of the sport" because "they put butts in the seat . . . . It's the gasoline to the engine. Without that, you have zero." Otto Tr. 102:24-103:23. Zuffa's internal documents, third-party market analyses, and the testimony of Zuffa's economists confirm the importance of marquee Fighters. SR1 ¶¶20, 156-64; Topel Tr. 242:7-243:1; *id.* 241:4-16; *id.* 418:24-419:9; Ex. 119 at -52. Economists recognize that sport revenues rise with the quality of athletes. SR2 ¶¶89-102; SR3 ¶¶22-23; MR1 ¶¶6, 24-28, 31.
[6] *See also* Coker Tr. 89:4-7, 96:25-97:5; Atencio Tr. 54:22-55:3; *cf.* SR1 ¶20; SR2 ¶132; Blair Tr. 18:7-14 ("fans are more willing to pay to watch . . . superstars").
[7] SR1 ¶28; SR3 ¶¶22-23, 26-27, 33; SR4 ¶¶14, 16-17, 25, 40; TR1 ¶87; Topel Tr. 23:16-24:3, 24:20-25:9, 36:24-37:13, 54:3-14, 55:12-56:4; Coker Tr. 88:13-24 ("I believe the fighter is the key. . . And not everyone might believe that. They might believe that . . . it's the league, but I've always felt that fighters were number one."); *id.* 88:25-89:7.
[8] Ex. 97 at -439; Ex. 100 at -738 (same); *see also* Deutsche Bank 30(b)(6) Tr. 61:23-53:13 (Zuffa and Deutsche Bank jointly stated).

deep lineup of marquee fighters" and "good matchmaking from a deep roster of talented fighters under contract is essential." Topel Tr. 440:12-441:10; SR1 ¶158. Zuffa admits: "Without a sufficiently deep roster of athletes signed to long-term contracts, 'the ecosystem would crash.'" ZSF ¶13.

4.  Zuffa has conceded it has the "vast majority of top fighters" under multi-bout exclusive agreements—a barrier to entry and expansion for other promoters. SR1 ¶¶159-60 (quoting Zuffa documents). And its economist conceded that "having the vast majority of top fighters. . . under your contracts, . . . that creates. . . a competitive advantage that, all other things the same, make—an entrant's going to have to overcome that in order to come in and compete head-to-head and have the same success as Zuffa." Topel Tr. 435:17-437:22.[9]

5.  Promoters need a deep roster of talented Fighters to compete with the UFC because:

   a. **A promoter must supply multiple pairings of top Fighters**. SR1 ¶156. Not all top Fighters can be matched against each other because, *inter alia*, there are distinct weight classes, and repetitive pairings of the same top Fighters would have decreasing utility. *Id.*; *see also* Silva Tr. 130:18-131:16; Hendrick 30(b)(6) Tr. 217:17-218:10.
   b. **To develop new top Fighters**, promoters require access to a broad stable of top Fighters, as Fighters rise in the rankings only by defeating other top Fighters. SR1 ¶157. As Silva put it, "beating guys with crappy records won't convince anyone [a Fighter] is ready for the big leagues," *i.e.*, the UFC. Silva Tr. 130:10-132:10; Ex. 124 at -15.[10]
   c. **Top Fighters and aspiring top Fighters require a promoter with a critical mass of top Fighters**. *See, e.g.*, Topel Tr. 431:8-13 (noting that "the ability to develop their careers by fighting against highly-ranked opponents" is "one of the reasons they [Fighters] sign up"); *id.* 434:9-15; TR1 ¶96. Zuffa principal Lorenzo Fertitta made this clear: "[F]or any aspiring athlete that wants to become a fighter, we're at the top of the food chain . . . [T]heir goal is eventually to get to the UFC. So the talent pool is kind of coming to us so we kind of have the pick of the best fighters that are potentially out there."[11] In an environment in which Zuffa refuses, as part of the Scheme, to co-promote events with other MMA promoters, this makes Zuffa the only place to go.[12]

6.  Zuffa has conceded that by keeping top Fighters from other promoters the UFC will continue to be "the only viable alternative [for] a top tier fighter['s] career." SR1 ¶162; Ex. 143 at -60. Zuffa's executives acknowledge the importance of blocking other promoters' access to top Fighters to

---

[9] SR1 ¶¶159-60; Ex. 88 at -347; Ex. 45 at -154; Ex. 44 at -613; Ex. 92 at -384 (admitting UFC's "breadth of fighters under multi-year contracts . . . help[s] serve as an effective barrier to entry"); Ex. 97 at -439; Ex. 100 at -738 (same).

[10] PRFA No. 5 (Non-UFC Fighter Fedor Emelianenko could not be considered the best because "he's not going to fight anybody"); Silva Tr. 128:23-129:11.

[11] PRFA 33; PRFA 32; Shelby Tr. 164:11-13 ("[T]o be the best, you have to keep fighting the best, which can't happen in WSOF."); SR1 ¶¶20, 104-05, 112; SR2 ¶¶12, 21, 66.

[12] *See* White Tr. 154:5-8 (UFC "never co-promoted"); Silva Tr. 216:19-217:5 (admitting the reason for no co-promotion is concern about allowing other promoters to gain traction); Ex. 128 at -702; Topel Tr. 296:4-9 (same); SR1 ¶17; *see also* SR2 ¶¶221-26 (noting non-Zuffa promoters routinely co-promote); Topel Tr. 297:7-12 (admitting that non-Zuffa promoters engage in co-promotion).

maintaining the UFC's dominance.[13] In February 2014, for example, after exercising a provision of

Zuffa's Exclusive Contracts to prevent top Fighter Gilbert Melendez from defecting to Bellator,

Lorenzo Fertitta wrote to Dana White: "We gotta keep taking these [expletive]'s oxygen til they tap

out. We have sacrificed too much to let anyone get traction now."[14] *See* CO at 40.

## II. Zuffa's Anticompetitive Scheme Was Designed to Lock in Current and Potential Top Fighters to Exclusive Contracts for the Most Productive Parts of Their Careers

### A. Exclusive Fighter Contracts Restricted Fighter Mobility

7. Zuffa admits that to fight in the UFC, a Fighter must agree to exclusivity. ZSF ¶11.[15]

8. Zuffa admits its Exclusive Contracts restrict Fighter mobility, preventing the best Fighters

from moving to other promoters. Topel Tr. 75:6-19, 80:7-16, 78:20-79:1 (admitting its Exclusive

Contracts "restrict[] … athlete mobility"); CO at 34 (finding the contracts "effectively negated a

fighter's mobility to competitors and their ability to meaningfully negotiate with rivals").[16] Zuffa

restricts Fighter mobility through specific contractual provisions, such as:

    a. **The Exclusivity Clause** prevents UFC Fighters from working with other promoters, Hendrick 30(b)(6) Tr. 382:11-385:23 & 376:25-377:13; CO at 34, and the better the Fighter, the longer the term.[17]

    b. **The Right to Match Clause** gives Zuffa the right to match any offer made to a Fighter by another promoter for 12 months after the Exclusive Contract "term" and after any Exclusive Negotiation period.[18] As a result, "if there was a UFC fighter who no longer wanted to fight with the UFC for some reason and the UFC was determined to match any offer, that that fighter, in order to get out from under the contract, would need to wait. . . the 12 months of the right to match period." Silva Tr. 186:4-12.[19]

[13] *See, e.g.*, SR1 ¶162 (quoting Ex. 55, Ex. 72, Ex. 76); *id.* n.424 (quoting Ex. 58); Silva Tr. 315:23-317:8; Ex. 131 at -82.

[14] Ex. 134 Rows 1499-1502. *See also* Fertitta Tr. 290:20-292:14. In another example, Silva decided not to cut one of the UFC's (former) top Fighters because the Fighter would sign with Bellator, giving Bellator "something easy . . . [a] [c]redible name." Silva Tr. 304:18-306:12; Ex. 130 at -03. Silva admitted that "one of the ways you can help the UFC is to keep a guy under contract [even if the UFC does not want him], because if you let him go, he would help Bellator." *Id.* 307:23-308:2.

[15] *See also* SR1 ¶¶21, 66; Hendrick 30(b)(6) Tr. 68:19-69:1; Ex. 122 at 2; Silva Tr. 259:8-20.

[16] *See also* Hendrick 30(b)(6) Tr. 366:14-19, 376:15-18 (UFC Exclusive Contracts are "designed to retain talent within the company"); Ex. 105 at -912; Ex. 97 at -392; Ex. 100 at -751; Silva Tr. 57:8-59:20 (agreeing with Deutsche Bank statements).

[17] *See also* Deutsche Bank 30(b)(6) Tr. 71:18-72:3 (Zuffa told Deutsche Bank that the exclusivity clause is part of how UFC fighter contracts are designed to retain talent); Ex. 102 at -304 & Mulkey Tr. 92:10-93:1; Ex. 97 at -392; Ex. 100 at -751; Ex. 86 at -447; Silva Tr. 280:7-282:10; Ex. 129.

[18] *See* SR1 ¶¶68, 73, 84-88; ZR1 ¶¶10, 12, 77; Ex. 100 at -751; Ex. 104 at - 933; Ex. 97 at -392; *id.* at -408; Deutsche Bank 30(b)(6) Tr. 71:18-72:3 (matching rights are "part of how the [fighter] contracts are designed to retain talent with the company"); Silva Tr. 184:16-185:16; *id.* 458:7-459:16 (same).

[19] *See also* White Tr. 389:18-390:10 ("It means that if they go out and . . . shop around the market, we have the right to match it[.]"); Hendrick 30(b)(6) Tr. 261:3-262:22 (after the term ends, there is a 365 day period during which Zuffa maintains the right to match, and that if "the offer comes in on day 365,

c. **The Exclusive Negotiation Clause** gives Zuffa the exclusive right to negotiate with the Fighter after the "term," typically for 3 months.[20] CO at 35 ("[D]uring the crucial period of renegotiation of a new contract, fighters cannot even talk to rival promoters to meaningfully understand or know their value outside of what Zuffa is offering them.").

d. **The Champions Clause** gives Zuffa the right to extend the contract of a Fighter who holds a championship for one year or three bouts. Ex. 105 at -912; SR1 ¶69.[21]

9. Zuffa claims that it has used similar exclusionary provisions continuously since it purchased the UFC in 2001. ZSF ¶13. In fact, Zuffa added the exclusive negotiation clause in 2004 and the total duration of its contracts has increased along with its market power, doubling from an average of 18 months in 2004 to more than 36 months by 2015. SR1 at Tbl.1 (p. 61). Contrary to Zuffa's contention about the average Fighter career length, ZSF ¶12, the effective term of Zuffa's Exclusive Contracts was longer than the average Fighter career.[22]

10. That certain other MMA promoters may also have exclusivity provisions, ZSF ¶15, is disputed and irrelevant. It is disputed in that the other promoters' contracts contained significant exceptions to exclusivity, often allowing Fighters to compete in other organizations, including the UFC. SR1 ¶¶107, 135-36; SR2 ¶¶236-37; *see also* SR2 ¶193 (discussing Topel admission that smaller MMA promotions had single-bout contracts). Further, the other promoters "included restrictive terms in their contracts because Zuffa did so, and would have removed them had Zuffa done so." SR2 ¶¶190, 236-37. Evidence shows that other promoters would have been willing to co-promote MMA events,

---

Zuffa then has 15 days with which to decide to match or not match"); ZSF ¶14; Topel Tr. 404:10-22, 406:9-407:8, 409:5-7 (fighter seeking to leave runs a risk because Zuffa has matching rights).

[20] *See* SR1 ¶¶73, 84; ZR1 ¶¶12, 77; Ex. 100 at -751; Ex. 104 at -933; Ex. 97 at -392; Deutsche Bank 30(b)(6) Tr. 71:18-72:3; Silva Tr. 184:16-185:16; *id.* 458:7-459:16; *id.* 186:4-12. *See also* White Tr. 391:5-20; Hendrick 30(b)(6) Tr. 261:3-262:22; ZSF ¶14.

[21] *See also* Hendrick 30(b)(6) Tr. 240:19-241:8; Ex. 122 at 4; Deutsche Bank 30(b)(6) Tr. 72:4-24 (Zuffa told Deutsche Bank that "the ability to retain champions for an additional year after their contract expires was part of how the contracts were designed to retain talent within the company"); Silva Tr. 58:20-59:4; *id.* 274:14-275:3. Zuffa uses tolling provisions allowing it to extend its contracts' terms in the event the Fighter is injured, retires, or refuses to fight for Zuffa. Ex. 122 at 7; Epstein Tr. 210:5-10; Silva Tr. 126:14-18; *id.* 275:9-276:18; *see also* Ex. 90 at -69; Ex. 133; SR1 ¶162, n.424.

[22] SR1 ¶89 & Tbl.1 (average effective term is 36.73 months with a median of 35 months); *see also* SR2 ¶¶64-66; ZSF ¶12 (admitting average athlete career at Zuffa is 0.82 years); CO at 39 (finding that average career length was between 31 and 41 months and average duration of exclusivity of UFC contracts was 36.7 months). Zuffa's contention that the average career for athletes who competed in at least one Zuffa bout is 8.7 years, ZSF ¶12, mischaracterizes those athletes' careers because that figure includes "the portion of a Fighter's career spent in the minor leagues (which is comparable to including a professional athlete's time playing in high school and college when calculating the length of his or her professional career)," SR3 ¶45; *see also id.* (Topel's calculation includes "bouts in extremely minor promotions that do not have a single athlete ranked between 1 and 650 in *any* weight class"); CO at 58 (Topel's calculation "includes time the fighter spent in the 'minor leagues' where they were not, realistically, competing for a contract with Zuffa").

SR2 ¶¶221-24, and remove other restrictive provisions such as the Right to Match Clause, if Zuffa had done so. SR2 ¶¶190, 194, 236-37 & n.756; Ex. 59 at -802-03.

### B.   Zuffa Leveraged its Market Power to Extend Fighter Exclusivity

11. Zuffa used its market power and negotiating leverage—including through coercion—to make its Exclusive Contracts effectively perpetual. *See* SR1 ¶¶75-91; SR2 ¶¶58, 62-63, 67; CO at 36-39. For instance, Zuffa forced its Fighters to renegotiate before the end of an existing contract's term to prevent the Fighters from ever becoming free agents. Plaintiff Vera explained how this worked: "Every time a fighter. . . is coming up on his renegotiation period, it was common knowledge in our industry that if you didn't sign the new agreement, that you were going to get frozen out or put on a dark show so that nobody would ever see your last fight." Vera Tr. 118:1-18. Zuffa President White conceded that "most guys never make it to the end of a UFC contract. They will get within three fights, and then they want to sit back down and start talking, right, to keep them."[23]

12. Zuffa would do the following to prevent a Fighter from reaching free agency:

a. **Move Fighters to unfavorable placement on the fight card for an event**[24] **or impose unfavorable matchups**.[25] As White described in a 2013 interview: "I can tell you this man, If you f***ing call [UFC matchmaker] Joe Silva and turn down a fight, you might as well say f***ing rip up my contract. He's a mean little f***er. You don't call Joe Silva and tell him you don't want to f***ing fight anybody man. You might as well just take the fight because it's going to be worse. You might as well just do it." PRFA No. 20; *see also* White Tr. 354:6-355:21; Ex. 43; Ex. 57.

b. **Control the timing of a bout** (*i.e.*, delay Fighters bouts) for Fighters on the last bout of their contract. Doing so punishes Fighters because they get paid only when they fight. SR1 ¶77. As Fitch testified, "If you don't get your bout agreement, you don't get paid, you don't get money, you can't feed your children."[26]

c. **Delay a Fighter from competing for another promoter** through the Right to Match and Exclusive Negotiation clauses. Those clauses prevent a Fighter reaching the end of a contract "term" from moving to another promoter for 12 to 15 months—an excessively long period to sit

---

[23] White Tr. 347:12-14; *id.* 390:20-24("Q. And so is it correct that if Zuffa renegotiates with a fighter before a fighter has completed his or her contract, the right to match period never opens up? A. Yeah. ***They never go to the open market***."); *see also* Ex. 50 at -976; Silva Tr. 384:9-23 ("Q. And between the third and fourth fight, the only number against which Zuffa had to bid was the last number in the prior contract; right? There's no outside bidder at that time; correct? A. Correct. They're still under an exclusive contract. Q. And by . . . enacting this practice . . . Zuffa would ensure that the fighter wouldn't reach the end of their deal; right? They'd now be fighting the first fight of a new deal; correct? A. [Yes].");  Ex. 132; Silva Tr. 383:9-15; Ex. 52 at -186.

[24] *See* SR1 ¶¶76-80; ZR1 ¶16; Batchvarova Tr. 36:7-11; Kingsbury Tr. 18:16-19:3; Ex. 51; Silva Tr. 401:2-19, 405:12-19; Ex. 71 at -15.

[25] *See* SR1 ¶77; Quarry Tr. 47:23-25; Ex. 51; Silva Tr. 401:2-19; Kingsbury Tr. 116:1-119:24; Fitch Tr. 86:21-87:15; Ex. 43; Silva Tr. 404:23-405:19, 426:6-12, 432:13-433:16, 126:14-18.

[26] Fitch Tr. 119:6-120:11; *id.* 110:4-23. *See also* Vera Tr. 118:1-18; SR2 ¶61 & n.231; Hendrick 30(b)(6) Tr. 265:5-267:13; Ex. 123; Silva Tr. 228:19-21, 464:3-8; Ex. 75; Ex. 56.

out given that careers are short and Fighters get paid only when they compete. Zuffa uses this "compensation gap" to coerce more seasoned Fighters to sign new deals.[27] The Right to Match and Exclusive Negotiation Clauses, along with the Champions Clause, were effective threats, ensuring that Zuffa rarely needed to enforce them formally.[28]

d. **Deprive Fighters of title opportunities**. Zuffa's control over title fights gave it leverage because the Scheme has meant that the UFC offers the only titles that matter. *E.g.*, Ex. 50 at -76; Ex. 121; Ex. 79 at -65; SR1 ¶79; Fitch Tr. 222:3-23; Kingsbury Tr. 51:12-22, 96:17-19, 142:12-143:2. Zuffa also refused to offer bouts for championship titles unless the Fighters were locked-up long-term. *E.g.*, Ex. 120 at -7332 (Silva: "Plus you know I would renegotiate with [Fighter] before giving him a title fight to make sure he is tied up."); Shelby Tr. 32:12-21-34:5.

## C.    Zuffa's 2006-2011 Acquisitions Shuttered Rivals and Locked in Fighters

13.  From 2006-2011, Zuffa enhanced its dominance by acquiring any potential competitor that could have posed a threat and locking in those promoters' top Fighters to exclusive deals. *See* CO at 39-40. In 2006, Zuffa acquired WEC, which featured top Fighters in lighter weight classes. Epstein 30(b)(6) Tr. 28:20-25, 33:14-20; SR1 ¶¶41-42. Zuffa ultimately merged WEC into the UFC.[29] Also in 2006, Zuffa acquired World Fighting Alliance ("WFA") as a "defensive strategy to eliminate a second tier competitive brand operating in the Las Vegas Market. . . . The reason for the acquisition was to control the WFA brand and prevent it from competing with the WEC and UFC."[30]

14. In 2007, Zuffa acquired its then-most significant competitor, PRIDE.[31] At that time, PRIDE had 21 of the 28 top Fighters outside of the UFC. *See* Ex. 111 at -140. Zuffa's PRIDE acquisition had a "strategic/preemptive nature… (i.e., to stop others from buying it)," and Zuffa "seriously contemplated acquiring [PRIDE] only to shut their business down and utilize the fighters in the UFC." Ex. 83 at -44. Lorenzo Fertitta stated that "this transaction advances Pride and the UFC way beyond and light years ahead of any other MMA organization." PRFA No. 4. Zuffa shut down PRIDE. White Tr. 167:13-18. After the acquisition, White bragged: "[L]ook at all the contracts we got from Pride and all the guys

---

[27] Fitch Tr. 119:6-23 ("[I]f I didn't sign up, if I didn't re-up with the contract, I wouldn't have gotten a bout agreement. Q: Until? A: They would have exercised their time limit term to the full."); *see also* Silva Tr. 184:16-185:16; *id.* 186:4-187:21; White Tr. 390:25-393:11; Hendrick 30(b)(6) Tr. 261:3-262:22; *id.* 263:25-264:7; Topel Tr. 114:17-116:1, 355:2-356:7, 357:25-358:6; SR1 ¶¶68, 84-87.

[28] *See* SR1 ¶79; Topel Tr. 355:2-6; *see also id.* 114:17-115:9, 355:12-356:6, 357:25-358:6 (right to match undermines promoters' incentive to formulate competing bid).

[29] *See* White Tr. 141:3-12 ("The UFC merged the WEC into the UFC because it wanted the lighter weight classes that the WEC had.").

[30] Ex. 47 at -590. Zuffa signed WFA's top Fighters to exclusive deals as well. Ex. 65 at 12; *see also* White Tr. 142:22-143:3, 313:11-13; Fertitta Tr. 81:18-82:5; SR1 ¶¶41-42.

[31] SR1 ¶43; Ex. 99 at -636; Deutsche Bank 30(b)(6) Tr. 125:5-14; Epstein 30(b)(6) Tr. 113:16-18; White Tr. 152:14-21.

that came over[.]" *Id.* 313:6-10; *id.* 167:24-168:13 ("Pride is dead, dummy. I killed them.").

15. In 2009, Zuffa acquired Affliction's Fighter contracts, shut down its promotion and moved its Fighters to the UFC. *See* Ex. 61 at -50-51; SR1 ¶¶44-46. On July 24, 2009, Zuffa's Mersch wrote: "Our main rival [Affliction] is done," and, later: "Any ramifications are good for us. We're going to get most of their fighters[.] Things are looking good . . . . This was a big day for the UFC." Ex. 62.

16. In the wake of these acquisitions, Strikeforce began to amass a roster of top Fighters. Ex. 67 at -19-20. Strikeforce's head, Scott Coker, testified, "In 2009 and '10, we had more top 10 rated heavyweights than the UFC did. So arguably we had a better heavyweight division than [UFC] did." Coker Tr. 105:23-25. After Zuffa acquired Affliction, Coker wrote: "[N]ow its ufc and strikeforce. [I]f we can[']t battle these guys it[']s over for the [MMA] industry. [UFC] will be the only one left. [W]e're the last chance otherwise fighters['] purses will go down if [UFC] is the only one. [W]e're luke skywalker and [UFC] is darth vader and the death star." Ex. 68 at -04. By 2011, Strikeforce had emerged as the "second most prominent and recognized . . . MMA organization in the world." Ex. 67 at -06; SR1 ¶47; Coker Tr. 103:17-24; Epstein 30(b)(6) Tr. 170:4-7; Silva Tr. 173:4-10; *id.* 316:15-18. Zuffa targeted Strikeforce for acquisition to obtain Strikeforce's Fighters.[32] In January 2011, Zuffa and Strikeforce together had the vast majority of top-ranked Fighters.[33]

17. Zuffa eliminated its last potential competition by acquiring Strikeforce in March 2011. SR1 ¶¶47-50. Coker testified afterwards, "you now had managers call [Coker] and say: Now our [Fighters'] purses are going to go down. Now there's only one buyer [for MMA talent] and it's not going to be good for MMA as an industry." Coker Tr. 135:10-19. Managers later confirmed to Coker that Fighter purse offers decreased by about 20%. *Id.* 137:14-21.

## III.   Zuffa's Scheme Substantially Impaired Competition

### A.   Zuffa's Scheme Succeeded in Locking up the Vast Majority of Top Fighters

18. Zuffa used its Exclusive Contracts and dominant market power to prevent top Fighters from becoming free agents, foreclosing other promoters' access to a sufficient stable of top Fighters.[34]

---

[32] White Tr. 214:4-220:20; Epstein 30(b)(6) Tr. 170:22-171:14; Silva Tr. 316:9-14; *id.* 173:22-25.
[33] *See* White Tr. 228:12-233:20; Silva Tr. 156:25-172:10; Ex. 126. Fertitta told Coker that he thought "Strikeforce [was] building a great brand, but we feel there should only be one brand, so we would like to buy your company." Coker Tr. 118:10-23.
[34] SR1 ¶¶159-66; SR2 ¶¶21, 42, 50-55, 69-71; Ex. 40; Silva Tr. 304:18-308:2.

19. Zuffa's supposed evidence of Fighter mobility, ZSF ¶¶16-17, 21-25, merely reflects that it cuts Fighters who no longer meet its standards. *See* SR1 ¶¶66, 80, 266. As the Raine Group, who analyzed the market for Zuffa, explained, "Fighters from UFC that are on Bellator are fighters that could no longer compete at the UFC level." Ex. 113 at -94. Zuffa's Silva echoed that understanding: "WSOF is where all of the fighters that we didn't want or got rid of went." Silva Tr. 177:7-178:21; Ex. 127 at -818.[35] Zuffa admitted in 2016 that "no athlete has left the UFC that the Company wanted to retain." Ex. 115 at 14; *id.* (UFC does not analyze retention rates because it does not lose Fighters it wants to keep); Ex. 66.[36] Zuffa's Scheme allowed it to lock in the vast majority of top Fighters. Silva bragged to White, "We Own MMA," listing the consensus rankings and showing that Zuffa controlled a high ratio of top-ranked Fighters in each weight class. *See* Ex. 84; Silva Tr. 156:25-172:10.[37]

20. Dr. Singer shows that Zuffa's Scheme foreclosed a large and increasing share of Fighters, especially Headliners (Fighters ranked in the top 15 of their weight class). SR1 ¶173 & Fig. 3; *see* SR1 ¶¶167-73; *id.* ¶¶306-09. By 2017, Zuffa had foreclosed *at least 90 percent* of Fighters in the relevant markets and between 91-99 percent of Headliners. SR1 ¶¶128-29, 167-73 & Fig. 3; HT1-135:20-

---

[35] Zuffa's examples of Fighters leaving the UFC, ZSF ¶¶22-24, are mostly athletes Zuffa cut or did not pursue. *E.g.*, Ex. 77 (re Bellator's offer to Phil Davis in 2015, Zuffa executives said: "No one wants to see him fight. He is extremely boring"); White Tr. 309:16-25 (Bellator Fighters Tito Ortiz and Quinton Rampage Jackson were "has-beens"). Zuffa offers no evidence that it wanted to retain any of the Fighters it cites, ZSF ¶¶22-24 & Ex. 79, because it did not.

[36] *See also* Topel Tr. 395:20-396:15, 398:12-16; Ex. 100 at -751 ("Notably only one marquee fighter has ever defected from the UFC to a competing MMA organization and that individual later returned to the UFC."); Silva Tr. 59:14-20; Ex. 95 at -28; Ex. 101 at -085; Ex. 102 at -304; SR2 ¶61 (quoting White: "there's only one fighter that I've lost that I didn't want to lose," and citing documentary evidence that the Fighter was "no longer high on the UFC's shopping list"). This fact was well recognized in the industry. *E.g.*, Otto Tr. 427:22-428:4 ("If UFC had a fighter under contract and desired to keep that fighter under contract, it was generally understood in the MMA industry that Zuffa had the power to keep them.").

[37] PRFA No. 32 (L. Fertitta: "When you look at the top 10 in every division, we've got every fighter under our umbrella. All the fighters want to be with us because they want to fight the best competition. So from that standpoint . . . the competition isn't really relevant."); Ex. 60 (Shelby: "We now own the world at 135 & 145."). Otto, who ran another MMA promoter, testified: "If I need to go get fighters that are bigger names, they're not in the woods somewhere up in a tree hiding, they're in a fight organization. And if they're locked up in a contract prematurely or a contract that was transferred and assumed because of the acquisition, I have no shot of getting that fighter." Otto Tr. 246:19-247:19. Otto testified further about the effect of Zuffa's control of top Fighters: "[Y]ou gobble up organizations and you coincidentally get the contracts with that deal, and those guys are under contract, and even though they don't exercise their rights to fight them, they're still under contract, and they're locked up. So, you know, the talent pool was not there[.]" *Id.* 371:12-372:13. Lappen, with ProElite (parent company of EliteXC), testified that Zuffa's Exclusive Contracts affected EliteXC's ability to sign top Fighters. *See* Lappen Tr. 137:22-138:8.

157:14 (ECF No. 724).

**B.      The Scheme Deprived Promoters of a Key Input: a Critical Mass of Top Fighters**

21. By locking up the "vast majority of top fighters," the Scheme blocked potential competitors from entering or expanding. WME, which purchased Zuffa in 2016, observed: "While technical barriers to entry to host a fight are relatively low, practical barriers to entry are extremely high. UFC controls the best fighters, on staggered contracts." Ex. 118 at -78; *see also* CSF ¶¶3-6. While the "expiration dates" of its contracts almost never apply given Zuffa's exclusive contracts and coercion (*see* CSF ¶¶7-12), even if they did, Zuffa's staggering of its expiration dates, ZSF ¶14, would limit competition. Staggering means that at any given time only a small fraction UFC Fighters have even a theoretical chance at free agency, impairing rivals from obtaining a critical mass of top Fighters. Dr. Topel conceded that Zuffa's control of the "vast majority of top fighters" through its contracts created a barrier to entry and deprived other promoters of what they would have needed to challenge Zuffa's dominance. CSF ¶4. Because Zuffa had locked up the vast majority of top Fighters, other promoters were unable to compete. *E.g.*, Otto Tr. 246:19-247:19; CSF ¶¶18-20.

**C.      Zuffa's Scheme Relegated Other Promoters to Feeder or Minor Leagues**

22. Through the Scheme, Zuffa dominated MMA from at least 2007 through 2017 (and beyond). Deutsche Bank observed in 2007: "Based on all comparable metrics UFC is clearly the 800 pound gorilla in the MMA industry." Ex. 102 at -304. Zuffa conceded in 2009: "We are 'MMA'; everyone else is just a brand being pulled along in the wake of the UFC oceanliner." Ex. 87 at -95. Moody's found in 2010 that the UFC is the "Largest global MMA Promoter" that "dwarfs any of its competitors." Ex. 49 at -1183.[38] And as Zuffa recognized in 2010, "[UFC] is 95 percent of a billion dollar market," Ex. 94 at -952, and "UFC's annual revenues were more than $250 million in 2008, capturing about 90 percent of total MMA revenue," Ex. 85 at -805. Deutsche Bank echoed this in 2013, finding: "MMA in the United States is dominated by UFC. . . . [T]he Company has virtually no competition left." Ex. 97 at -403.[39] Zuffa's owners have long likened the UFC to a monopoly sports

---

[38] *See also* Ex. 106 at -05 (Moody's 2008); Ex. 92 at -84-85 (Moody's 2009); Ex. 107 at -39-40 (Moody's 2011); Ex. 108 at -58-59 (Moody's 2013); Ex. 82 at -87-88 (Moody's 2014); Ex. 109 at -74-75 (Moody's 2015); Ex. 110 at -82-83 (Moody's 2016).

[39] *See also* SR1 ¶¶130-31; Ex. 100 at -738 (Deutsche Bank ("DB") 2007); Ex. 104 at -928 (DB 2009); Ex. 98 at -534 (DB 2011); Ex. 48 at -311 (Goldman Sachs 2012); Ex. 96 at -276 (DB 2013).

league. SR1 ¶137, Fig.2. White touted in 2010: "There is no competition. We're the NFL. . . . There is no other guy." Ex. 139. A Zuffa executive repeated that admission in 2010, stating that "the UFC has no close 2nd place. . . . As the NFL is the defining brand of Football, UFC is the defining brand of mixed martial arts." Ex. 93 at -41.

23. Zuffa admitted its Scheme created "extremely high" barriers to entry, Ex. 118 at -78, leaving the UFC with "no major competitors on a domestic or global basis." Ex. 105 at -912. Other promoters have positioned themselves as "feeder" or "minor leagues." White conceded: "I don't look at those guys as competition at all. They're nowhere near the league that we're in. I need shows like this. They're the feeder leagues. All the guys who fight in those shows aspire to be in the UFC some day. They're creating all the UFC talent of tomorrow." White Tr. 194:21-195:5; Ex. 136 at 1.[40]

24. Zuffa cites certain promoters' boasts that the UFC had not affected their ability to sign Fighters, ZSF ¶¶21-22, 25, but these are not credible.[41] White has explained why: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it. You're all feeder leagues to the UFC[.] I want them to exist and make money because those guys create the next talent that will end up in our organization someday." PRFA No. 24. Zuffa's citations stand only for the proposition that Zuffa did not foreclose access to *all* Fighters. That is irrelevant because all Fighters are not the same, CSF

---

[40] *See also* Topel Tr. 376:25-377:19 (admitting Zuffa considered other promoters to be "minor leagues" and comparing them to AAA in MLB "where athletes play either because they like playing or because they hope to make it to the major leagues"); Ex. 54 (ONE initially sought to position itself as a feeder to the UFC); Shelby Tr. 180:14-182:24 (RFA, Legends, Titan FC and CFSC are feeder promotions); Ex. 41 & Ex. 42 at -51 (discussing Jungle Fights as feeder league); Aronson Tr. 33:10-34:9 & Ex. 121 at 3 (Titan FC "give[s] every single fighter a 'Zuffa Out' clause [*i.e.*, a clause permitting the Fighter to leave for the UFC if the UFC wants the Fighter] . . . because every kid training in MMA has the dream of being a UFC champion); Knapp Tr. 220:22-221:13 (Invicta "can't ask [its] athletes to fight hard for [Invicta] if [she's] not willing to fight hard for them and give them the opportunities they're looking for. And I assure you, every one of them wants to be in the UFC"); Ex. 81 at -916 (Zuffa executives referred to Invicta as "the women's minor league"); Atencio Tr. 75:22-76:11 (Non-Zuffa promoters were minor leagues or "steppingstones" for MMA athletes to get to the "top" (referring to the UFC)); Silva Tr. 141:17-144:4; *id.* 143:5-9 ("We had numerous promotions ask to be official feeder shows for the UFC."); Ex. 125 at -198. This lack of competition rebuts Zuffa's claim that fighters choose to compete for UFC "because of its high compensation and skill as a promoter," ZSF ¶10, rather than because Zuffa's Scheme eliminated all viable alternatives.

[41] The testimony of Lappen (EliteXC) and Otto (IFL) contradicts Zuffa's cited evidence, *supra* n.37. In addition, both Aronson and Knapp receive substantial revenue from Zuffa, bringing their credibility into question. Aronson Tr. 82:14-83:10, 92:8-93:16; Knapp Tr. 130:6-13, 63:24-64:13. And the evidence Zuffa cites, ZSF ¶¶21-22, 25, is further contradicted by (1) Dr. Singer's analyses showing that Zuffa has a dominant share of the Headliner Market, CSF ¶20, and (2) the testimony of Coker (Bellator), Atencio (Affliction) and others as to the importance of top Fighters. *See* CSF ¶¶1-6 & n.6; *id.* ¶19 & n.37.

¶¶1-2, Zuffa locked up nearly all current and potential top Fighters, CSF ¶¶4, 19-21, and what is necessary to compete with the UFC is a critical mass of top Fighters, CSF ¶¶3-6. Zuffa's evidence does not contradict that UFC is the "majors" and other promoters are not. As White testified, "Whether they like it or not, they're the farm league," White Tr. 192:25-193:14, and "I've said everybody was a feeder league to the UFC," *id*. 242:13-16; Ex. 89 at -195 ("All of the other shows out there act as minor leagues for the UFC. Guys get their experience and build their confidence in the other shows and if they are successful enough we bring them into the UFC."); CSF ¶23 & n.40.

### D.      Due to the Scheme, Zuffa Has Had no Direct Competition

25. Contrary to ZSF ¶¶18-25, even the most prominent non-Zuffa promoters have not been substitutes for the UFC, serving instead as feeders. SR1 ¶¶104-07, 134-40.[42] Market observers, including a consulting firm—the Raine Group—evaluating potential investors for Zuffa, viewed it as dominant in 2016. *Id*. ¶¶134-140; CSF ¶¶21, 23-25 & nn.38-40. The Raine Group stated in 2012 that the UFC has "no competitors on a domestic or global basis." Ex. 112 at -065.[43] Lorenzo Fertitta admitted in 2012, "There never has been a comparable outlet. . . . We've dominated this, this sport, alright? We've dominated the space." PRFA No. 17.[44] None of the promoters that Zuffa identifies, ZSF ¶¶18, 20, limits its dominance:

   a.  **Bellator** is not a direct competitor. In 2013, Deutsche Bank (with Zuffa's input and approval) represented to investors, "In recent years in MMA, promotions that have tried to position themselves as the UFC's primary competitor, such as Bellator, have always failed. Bellator's most recent event at UC Irvine's Bren Center attracted only 4,000 people… . None of the Bellator fighters are household names." Ex. 97 at -439. Zuffa's then-CFO, John Mulkey, edited a draft of Moody's 2014 Credit Opinion to describe Bellator as a "distant" competitor. Ex. 45 at -155; Mulkey Tr. 216:13-217:7; *id*. 218:16-219:8. Coker, head of Bellator starting in June 2014, described it as "a dying brand," because it lacked "star power . . . they didn't have very big names at Bellator." Coker Tr. 166:11-21. WME's diligence documents before acquiring the UFC in 2016 describe Bellator as a "[s]mall operator." Ex. 118 at -78. Zuffa's statement that Bellator "successfully outbid Zuffa" for Fighters, ZSF ¶22; *see also id*. ¶¶23-24, is contradicted by the evidence that "Fighters from the UFC that

---

[42] Zuffa's contention that "New MMA promoters are continuing to emerge," ZSF ¶20, is false and irrelevant because there are no new promoters post-2017, and all Zuffa's cited promoters are still feeder leagues not on par with the UFC. *See* CSF ¶¶22-25; SR5 ¶¶24-28.

[43] *See also* Ex. 114 (Item 2.3) ("Other smaller leagues are not able to compete given the UFC's size and scale.").

[44] Zuffa's claim that non-Zuffa promoters had equal access to venues, sponsors, and broadcasters, ZSF ¶¶ 28-30, is also incorrect. Dr. Singer demonstrates that Zuffa used its market power to prevent non-Zuffa promoters from accessing venues, sponsors, and broadcasters, which "further reinforced the[] exclusionary effects" of its Scheme. SR1 ¶5; *id*. ¶¶ 56, 74, 166 (outlining Zuffa's tactics, including counter-programming and exclusive agreements with venues, sponsors, and broadcasters forbidding them from doing business with other MMA promoters).

are on Bellator are Fighters that could no longer compete at the UFC level." Ex. 113 at -794; SR1 ¶134; Silva Tr. 191:12-205:14; White Tr. 299:8-307:17; 309:16-25; 315:6-316:3. In 2016, Bellator's revenue was $18.3M compared to just under $500M for Zuffa in North America. SR1 Tbl.3. Zuffa cites Bellator's reported up-to-"nine-figure," five-year broadcast deal with DAZN, ZSF ¶18, but that deal was canceled after two years. SR5 ¶27. Zuffa notes that by April 2021, Bellator broadcast exclusively on Showtime, ZSF ¶18, but in November, 2023, Showtime announced it would no longer broadcast MMA content, leaving Bellator without a network. SR5 ¶27.

b. **One Championship** ("ONE"), *a promotion that operated exclusively in Asia until May 2023*, began by telling Zuffa that it would be a UFC feeder league. Ex. 54.[45] White testified that ONE was a feeder organization, White Tr. 296:7-9, and UFC matchmaker Sean Shelby has successfully obtained the release from ONE to UFC of top ONE Fighters. Shelby Tr. 203:9-23. And the unverified numbers Zuffa quotes, ZSF ¶18, on ONE's financial condition are erroneous. *See* SR5 ¶27 & n.77.[46]

c. **PFL**, the successor to WSOF, does not directly compete with the UFC. PFL from its inception in 2012 through 2016 never achieved annual gross revenues of even 1% of the UFC's gross revenues. SR1 Tbl.3. Zuffa executives have conceded that WSOF does not have top Fighters and that it is a feeder league. Silva Tr. 177:7-178:21; Ex. 127 at -818 ("WSOF is where all the fighters that we didn't want or got rid of went."); Shelby Tr. 164:11-13; White Tr. 289:17-290:6; *see also* SR1 ¶136 & nn.367-69 (referencing record evidence that WSOF released its top Fighters to the UFC). Nearly all of Zuffa's discussion of PFL, ZSF ¶18, pertains to events after January 2018. The current CFO of TKO Group Holdings (which now controls the UFC), just boasted on an investor call that PFL (and Bellator) are "pipeline and feeder properties."[47] And White repeatedly mocks PFL's prospects.[48] PFL is not a significant competitor.[49]

# IV.     Zuffa's Scheme Caused Anticompetitive Effects

## A.     The Scheme Suppressed Fighter Compensation

26. That Zuffa raised Fighter pay over time, ZSF ¶¶8, 10, or that its dominance allegedly allowed it to pay more than other promotions, ZSF ¶9, is irrelevant because Zuffa's Scheme reduced competition and suppressed Fighter pay below levels that would have prevailed absent the Scheme. Dr. Singer's impact regression shows, for instance, that as there was an increase in the share of Fighters

---

[45] Zuffa offers no admissible evidence supporting OneFC's supposed valuation. ZSF ¶18.

[46] BloodyElbow.com reports that ONE only generated $5-8 million in revenue in 2022, is engaged in layoffs, and could run out of money in 2024. Investors are reportedly "embarrassed" about their involvement with ONE. *See ONE Championship's financial 'runway expected to expire' in 2024, more staff laid off – Report*, BloodyElbow.com (Nov. 21, 2023), available at https://bloodyelbow.com/2023/11/21/one-championship-finances-layoffs/.

[47] SR5 ¶27 (quoting *Q3 2023 TKO Earnings Call*, TKO (Nov. 7, 2023), https://investor.tkogrp.com/events-and-presentations/events/event-details/2023/TKO-to-Announce-Third-Quarter-2023-Results/default.aspx).

[48] SR5 ¶27 n.76.

[49] Zuffa cites Russian promoter Absolute Championship Berkut (ACB) that signed a handful of former UFC Fighters. ZSF ¶18. But ACB promoted only one (untelevised) event in the US and a second (untelevised) event in North America, with nothing upcoming. Zuffa does not dispute that ACB has "virtually no presence in the Relevant Geographic Market, and is hardly established in the marketplace." SR2 ¶32. And in 2020, ACB was placed on the OFAC sanctions list and cannot do business with American companies and citizens. SR5 ¶27.

Zuffa locked up (the "Foreclosure Share"), Zuffa paid its Fighters a lower share of its Event Revenues ("Wage Share"), and thus that absent the Scheme Fighter Wage Share, and pay, would be substantially higher.[50] Zuffa concedes that the "share of MMA fighters under contract rose while compensation *as a share of event revenue declined*." TR1 ¶27.[51] Dr. Topel admits the Exclusive Contracts prevent a "transfer of wealth" that would otherwise occur from Zuffa to its Fighters.[52] Zuffa's Fighters would have received between $800 million and $1.6 billion more in pay absent the Scheme.[53] The Scheme also suppressed pay at non-UFC promoters because it impaired their ability to compete.[54]

### B.    The Scheme Suppressed Marketwide Output of MMA Events

27. Zuffa's claim that it and certain other promoters expanded output over time, ZSF ¶¶7, 19, is irrelevant because what matters is restriction of marketwide output compared to competitive levels. *See supra* Sec.I.D & n.76.76 Dr. Singer found that Zuffa's actions "caused industry output of Live MMA Events to fall (both in absolute terms and relative to prior trends) because the output of Live MMA events by non-Zuffa promoters has fallen off sharply, with Zuffa's supply of Live MMA events not increasing by enough to make up for the difference." SR1 ¶204, ¶¶203-206, Figures 4A-4C. Indeed, the total number of live MMA events has actually declined since 2010. *Id.* ¶205; SR2 ¶47.[55]

28.  The Scheme caused output of pay-per-view attendance to fall. Total attendance at Live UFC MMA Events decreased significantly between 2011 and 2015, SR2 ¶¶48-49, as did PPV

---

[50] *See* SR1 ¶¶171, 180-87 & Tbls. 4-6; SR2 ¶¶3, 36, 40, 68, 72-87, 138, 144-48; SR3 ¶¶3, 12, 37, 40, 44, 46, 49; SR4 ¶7; Ex. 69 at -08; Coker Tr. 97:18-99:3; ZR2 ¶19; Blair Tr. 157:8-158:19. Dr. Singer shows the Scheme caused Zuffa to pay its Fighters a lower Wage Share than Strikeforce and Bellator. *See* SR1 Pt.III.D.1 & Pt.VI.A; SR1 Tbl.9, ¶247 (showing UFC pays 19.5% of revenues to Fighters vs. Strikeforce paying 63% and Bellator paying 44.7%). Similarly, the major sports all have greater competition for athlete services than Zuffa and so pay them about 50% or more of revenues. ZR1 ¶¶25-71. Two of the most prominent boxing promoters pay on average 66% of their revenues to boxers. ZR2 ¶86. Zuffa pays a paltry 20% or so of its Event Revenues. SR1 ¶¶189, 252 & Tbl.10; ZR1 n.242 & Tbls. 4-5; Ex. 53 at -35; Ex. 116 at *11; Ex. 78 at *10; Ex. 117; Ex. 63 at -69.

[51] Zuffa created a chart in 2013 tracking "Fighter Comp as % of UFC Event Revenue" from 2004-2012, showing that, as foreclosure share rose, the median annual Wage Share *fell* over this period. Ex. 53 at -35; Topel Tr. 250:11-251:7, 252:1-16. Event Revenues increase as Fighter talent increases, and thus Fighters are responsible for a significant and proportional share of Event Revenues. *See* SR2 ¶¶111-13, 118, 120; SR3 ¶¶22-23, 26, 28; SR4 ¶¶14, 16-17, 19; MR1 ¶¶24-27.

[52] *See* Topel Tr. 76:4-77:3, 78:20-79:1, 83:19-84:8, 84:11-85:5, 86:1-11, 124:1-13, 136:11-137:1, 140:19-22, 344:6-346:8.

[53] *See* SR1 ¶¶245-52 & Tbls. 9-11; SR2 ¶¶171-82; ZR1 ¶¶123-26 & Tbls. 4-6; ZR2 VI.

[54] SR1 ¶¶156-166, 183 n.454; SR2 ¶109; CO at 68 n.53 (Dr. Singer correct that Scheme suppressed wages at Strikeforce).

[55] *See* SR1 ¶¶203-207, 268 & Figs. 4A-4C (measuring reduced output of promoters in the Input Market); SR2 ¶¶44, 47-49.

viewership. *Id*. Total industry output—as measured by aggregate viewership of PPV events, non-PPV events, and live event attendance—declined in absolute terms from 2011 to 2015. *Id*. Dr. Topel concedes that residential PPV output of the UFC and the market restricted by 17 percent.[56]

29. Zuffa's Scheme restricted the supply of Live MMA events through acquisitions and denying rivals "access to the inputs necessary to stage high-quality fights[.]" SR1 ¶268. Further, as a matter of economics, suppressing pay reduces output. Dr. Topel has admitted that increasing Fighter pay relative to other sports would draw more and better athletes to MMA. Topel Tr. 475:6-21. Dr. Zimbalist found as pay rose in other sports, output expanded. *See* CSF ¶¶30-31 & n.60.

### C.   The Scheme Reduced the Number of Fighters Paid for Bouts in the Input Market

30. Zuffa's Scheme involved the UFC's practice of "shelving," *i.e.*, signing more Fighters to Exclusive Contracts than it was willing to put in productive bouts.[57] Shelving was inexpensive for Zuffa because it paid Fighters only when they fought. *See* SR1 ¶146; ZR2 ¶24; SR1 ¶¶193-196.[58] One non-UFC MMA promoter executive testified that Fighters at Zuffa were "collecting dust." Otto Tr. 116:12-21. Silva testified that he kept some Fighters under contract solely to impair "Bellator's ability to put on a successful event."[59] Zuffa's Scheme also reduced the quality of MMA Events.[60]

---

[56] *See* TR1 ¶251 (Dr. Singer "is correct that there was a reduction between 2010 and 2015 in total PPV buys. In 2010, Zuffa held 15 events that were available on PPV and sold 7.7 million residential buys. In 2015 Zuffa sold 6.4 million residential buys over 13 events"). Dr. Singer determined that the Scheme increased Zuffa's PPV prices above competitive levels and reduced output. SR1 ¶¶147-48, 197-207; SR2 ¶¶44-49; SR4 ¶46 (noting that Zuffa has further increased prices since the 2015 increase). Further, in connection with its debt offerings, Zuffa bragged, "Price increases for PPV transactions have [] shown inelastic demand characteristics, even during the economic slowdown." Ex. 103 at -690; *see* Ex. 104 at -936 (same): SR1 ¶199 & n.491 (statements from Zuffa and others indicating that PPV demand was insensitive to price hikes).

[57] At any given time, Zuffa had more fighters under contract than it was willing to put in bouts. *E.g.*, SR1 ¶¶145, 193-96, nn.478-83; SR2 ¶¶42-43, n.153; Silva Tr. 225:5-228:25; *id.* 238:4-21, 240:16-243:22, 248:11-14, 249:16-250:19, 257:8-15; White Tr. 343:20-24, 341:7-12, 340:9-12; Shelby Tr. 119:7-14, 128:1-17; Ex. 91 (Silva: "If I cut 5 guys a show and don't sign anyone new for 10 shows I STILL have too many guys under contract.").

[58] SR1 ¶194 n.478 ("[I]n January 2015, Fighter Joe Benavidez texted Sean Shelby expressing frustration about the infrequency of his fights: 'Damn it. I don't wanna only fight twice again this year. (Like I have 3 out of the last 4 years) I thought I had an opponent... What's the deal?' ZFL-1892287. Shelby replied, 'You have an opponent. I have 40 other guys in your weight class and 60 bantamweights, 80 featherweights. And I have to create contenders above all else right now. A logjam I hope is over before summer[.]' ZFL-1892294. Benavidez then replied, 'I just feel I'm in my prime and only fighting twice a year. It's killing me dude.' ZFL-1892308.").

[59] SR1 ¶194, n.481; Silva Tr. 304:24-306:12, 307:19-308:2.

[60] Zuffa's Scheme also reduced the quality of Live MMA Events by decreasing incentives for Fighters to invest in their careers. Dr. Zimbalist found that "fighters have less incentive to prepare and train in

---

Case No.: 2:15-cv-01045-RFB-BNW

## V.     Zuffa's Scheme Had No Procompetitive Effects

31. Zuffa provided no evidence that its Scheme had procompetitive effects. *See* SR1 ¶¶257-90; SR2 ¶¶210-41; SR4 ¶10.[61] It claims its Exclusive Contracts are necessary to prevent "free riding" on its investment in Fighters' brands. ZSF ¶¶ 1-10. Not so. The Fighters themselves, not Zuffa, do most of the investing, especially in training. ZR2 ¶95 n.168; TR1 ¶87, SR2 ¶220.[62] And workers increase their investments when they can move freely between jobs. SR2 ¶217; ZR2 ¶¶99-114. Dr. Zimbalist showed MLB, the NBA, the NFL, the NHL, and boxing all attempted to justify their restrictive athlete contracts on similar grounds, but their revenue, quality, and output all improved with expanded athlete mobility. ZR1 ¶¶79-80, 83-84, 89-103; ZR2 ¶¶9, 90, 97-114; HT 4-13:17-14:20 (ECF No. 734).[63]

32. Zuffa claims that long term Exclusive Contracts are necessary to "have enough athletes available" for events. ZSF ¶13. But any such alleged benefits could be achieved by less restrictive means, including higher pay, shorter contracts (Zuffa admits booking events only 8-12 weeks in advance), or co-promotion (making a stable of inactive Fighters unnecessary).[64]

---

the short run" because of suppressed wages from the Scheme, and in "the long run, prospective MMA fighters have less incentive to develop the necessary skills to participate in the sport, lowering the supply and overall quality of participants." ZR2 n.47. *See* ZR2 ¶¶90, 99; ZR1 ¶¶79-80, 83-84 (other sports saw increased investment from owners and increased quality as athletes used increased compensation to devote more time to training and exerted themselves more in competition); SR1 ¶¶286-90; SR2 ¶¶197-98, 211-12, 217, 234; HT 4-17:24-20:24 (ECF No. 734). Zuffa's economist Dr. Blair conceded that by suppressing athlete compensation "the quality of play would be lower and that. . . could have an impact on fan demand for watching major league games and. . . the competition o[n] the field. . . is lower and consumers are worse off as a result." ZR2 ¶100 (quoting Blair Tr. 148:24-149:5). Dr. Topel admitted increasing Fighter compensation relative to other sports would improve MMA quality. Topel Tr. 476:4-10; *see also id.* 154:22-25, 155:17-24.

[61] Nor has Zuffa quantified any procompetitive effects, Topel Tr. 148:25-149:6, 150:1-12, 153:18-25; Blair Tr. 245:14-19; SR2 ¶¶210, 212, 215-21, 232, or shown they outweigh the Scheme's anticompetitive effects, SR2 ¶¶215, 218, 241.

[62] Zuffa's payment of large dividends and lavish executive perks (including several corporate jets) indicates it would still have had plenty of funds to invest in fighter promotion without the supracompetitive profits obtained via the Scheme. GDR1 ¶36, 42; Ex. 137 (total distributions to Zuffa's private owners through the end of 2012 were approximately *$1 billion*).

[63] Zuffa's claims to have developed the sport of MMA, ZSF ¶¶3-6, are immaterial and disputed. SR2 ¶¶228-29, 232; *see also* Silva Tr. 83:22-84:2; *id.* 79:17-81:16; *id.* 82:3-9; Fertitta Tr. 28:6-29:3. And Zuffa's claim to have risked $10 million in developing an MMA TV show in 2005 is undercut by Plaintiffs' showing that Zuffa's small ownership group pulled tens of millions of dollars out of the company every year instead of reinvesting in the sport. *See* GDR1 ¶¶18, 22(2)-(3), 27-30, 32-33 & Tbls. 2, 7, 9; ZR1 ¶135 & Tbl. 7; White Tr. 561:17-563:19.

[64] Shelby Tr. 78:14-22; SR1 ¶¶257-290; SR2 ¶¶188-98, 210-41. In a more competitive environment, if Zuffa lacked Fighters to fill an Event card, it could have obtained them from another promoter or co-promoted events. SR2 ¶¶221-26, nn.725-730; Shelby Tr. 212:23-213:8. Co-promotion is common in boxing and among MMA promoters who lack market power. Even Zuffa has co-promoted when doing

PLAINTIFFS' OPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY JUDGMENT

33. By co-promoting fights, Zuffa could create any desired bout even if the Fighters were free agents. Less restrictive contracts would expand investment and output. The early 2000s, when the UFC co-promoted and had less restrictive contracts, coincided with the most rapid growth of the sport.[65]

# ARGUMENT

## I.   Record Evidence Establishes Zuffa's Substantial Market Power

Zuffa spends a good portion of its brief on arguments about market power. Mot. at 15-21. Most of them are not only wrong but irrelevant. Zuffa ignores that: (1) direct evidence suffices to establish monopsony power, CO at 24 (citing *Rebel Oil*, 51 F.3d at 1434); and (2) artificial wage suppression suffices as direct evidence of monopsony power. *O'Bannon*, 802 F.3d at 1070-71 (suppression of athlete compensation demonstrates "an anticompetitive effect;" purported requirement that plaintiffs must also "show a decrease in output" is "simply incorrect"). This Court has already found that Plaintiffs' evidence establishes that Zuffa's Scheme suppressed Fighter compensation. *See, e.g.*, CO at 51-57, 68-69. That is fatal to Zuffa's argument about market power.

### A.   Direct Evidence of Market Power Suffices

Direct evidence suffices to establish market power. *See* CO at 24. That makes sense. Market power is the ability to cause anticompetitive harm. Proof that a defendant *did* cause anticompetitive harm is proof that it *could* do so. Direct proof obviates the need for indirect (or circumstantial) evidence. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects on competition,' such as reduced output, increased prices, or decreased quality in the relevant market." (quoting *FTC. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986))).

---

so did not threaten its market power, such as the Mayweather-McGregor boxing match. *See* ZR2 ¶113; SR2 ¶¶222-226. Similarly, Zuffa could have imposed much shorter contracts and had sufficient Fighters available for its cards 8-12 weeks in advance. *See* SR2 ¶¶188-97.

[65] ZR2 n.19; Topel Tr. 330:3-14 ("Q. The contracts that were shorter early on when Zuffa had a smaller market share, were those efficient? A. In the context of the industry at the time I suspect they were."); Topel Tr. 330:24-331:10 ("Q. You would agree that during the early 2000s Zuffa invested substantial resources in developing the sport of MMA, right? A. Yes. Q. And in promoting MMA athletes, correct? A. Yes. Q. And it did so even with no evident market power, correct? A. Yes. And it did so with contracts of shorter duration, correct? A. That's your representation, yes.").

### B.  Monopsony Power Suffices without Monopoly Power

Just as antitrust claims based on monopoly power do not also require proof of monopsony power, so too antitrust claims based on monopsony power do not require proof of monopoly power. *See* CO at 20-24; *see also O'Bannon*, 802 F.3d at 1070-71 (suppressed compensation to athletes suffices as direct evidence of market power without evidence of suppressed output).[66] As this Court found, and Zuffa has admitted, monopsony power, like monopoly power, suffices for antitrust liability. *Id.*; Mot. at 14 n.4 (quoting *Weyerhaeuser*) (monopsony claim is mirror image of monopoly claim).[67]

To be sure, monopoly power often accompanies monopsony power. That is true here. Dr. Singer demonstrates that Zuffa's wage suppression also suppressed MMA output, artificially inflated its prices to MMA audience members, and degraded the quality of MMA events. CSF ¶¶27-29. Zuffa's position, however, conflates two separate points. The first is that proof of monopoly power is not necessary to prevail on a claim based on abuse of monopsony power. *O'Bannon*, 802 F.3d at 1070-71; *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-88 (9th Cir. 2000). The second is that abuse of monopsony power often causes monopolistic harms too, as it did here. *See infra* at 27-28.

### C.  Wage Suppression Establishes Zuffa's Monopsony Power

Direct proof of *one* monopsonistic harm—such as wage suppression—establishes monopsony power even in the absence of other such harms. *O'Bannon*, 802 F.3d at 1070-71; *Epic Games*, 67 F.4th at 984; *Qualcomm*, 969 F.3d at 989 (direct evidence of anticompetitive effects includes "reduced output, increased prices, *or* decreased quality in the relevant market") (emphasis added).[68] Here, the

---

[66] Zuffa mischaracterizes *United States v. Syufy Enterprises*, 903 F.2d 659, 665 (9th Cir. 1990), as holding that "[i]n the absence of claims of monopolization, the claims of monopsony fail as a matter of law." Mot. at 38. But in *Syufy* the government was unable to show anticompetitive effects in *either* the input *or* output market. The court noted that Syufy, a theater operator, charged competitive prices—there was no evidence of monopoly power—*and* paid its suppliers fees "far in excess of the national average," *id.* at 669-70—there was no evidence of monopsony power. The court observed that while it is possible to have a theory of antitrust liability that includes only a monopolist upstream, that theory "must make economic sense." *Id.* at 663. In *Syufy*, it did not.

[67] Zuffa's argument to the contrary relies on oddly inapposite precedent (Mot. 37-39): *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding plaintiff must show conduct caused cognizable injury, as Plaintiffs do here through evidence of underpayments, in addition to other anticompetitive effects, such as reduced output, degraded quality, and inflated prices to fans); *Magnetar Techs. Corp. v. Intamin*, Ltd., 801 F.3d 1150, 1159 (9th Cir. 2015) (same); *Arminak & Assoc., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1206-12 (C.D. Cal. 2011) (holding plaintiff could not rely on *procompetitive* conduct to prove anticompetitive intent).

[68] Zuffa's cases are not to the contrary. *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475-76 (9th Cir.

overwhelming evidence is that Zuffa's Fighters would have received dramatically higher compensation if not for Zuffa's Scheme. CSF ¶26; CO at 44-71. In arguing to the contrary, Zuffa contends (1) it increased its compensation to Fighters over time; (2) it paid more than its alleged competitors, and (3) Plaintiffs' proof fails because Dr. Singer does not measure directly the athletes' marginal revenue product ("MRP"), *i.e.*, their contribution to the increase in Zuffa's revenues. Mot. at 18-19. These arguments are sophistic, and this Court was right to reject them. CO at 44-63.

First, the issue is not whether Zuffa paid its Fighters more over time, Mot. at 18, but whether it *would have* paid them more in a competitive market. CO at 53 ("Dr. Topel's model fails to account for the fact that wages may rise in a monopsony but just not to what would be their competitive level in a competitive market. . . . His model thus failed to test the proposition at the heart of Plaintiffs' model."); *see also* SR2 ¶39, n.126 (discussing Topel admission that monopsony power may suppress worker pay even where wage levels are rising). Indeed, Zuffa *concedes* this point on the very same page that it contests it, acknowledging "the key inquiry at the heart of a monopsony case: how much *should* the wage be in a competitive market?" Mot. at 18.

Zuffa's argument is no more persuasive that it did not artificially suppress Fighter compensation because it paid them more than its alleged rival promoters. Mot. at 18. The evidence shows that Zuffa's Scheme enabled it to become and remain the dominant MMA promoter. CSF ¶¶8-12 (Zuffa restricted Fighter mobility through exclusive contracts and leveraging its market power), ¶¶13-20 (acquired rivals and locked top Fighters), ¶¶21-24 (and succeeding in creating high barriers to entry). As its representatives keep repeating, it is the "NFL" while other promoters are mere "pipelines or feeders." CSF ¶¶22-23. That Zuffa paid more than those feeder promoters casts no light on whether its Fighters would have received significantly more compensation in the absence of the Scheme.

---

1997) (Mot. at 16) was overruled by *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012), and the portion of the opinion Zuffa quotes is dicta because the court found Plaintiffs had proven market power indirectly. *CoStar Grp., Inc.* v. *Com. Real Est. Exch. Inc*, 2023 WL 2468742, at *5 (C.D. Cal. Feb. 23, 2023) (Mot. at 17) is a district court case that did not even cite *O'Bannon* and is overruled by *Epic Games*. Defendants' quotation of *Areeda* is unavailing because it simply explains that a monopsonist also exercises its power by suppressing output in the market in which it purchases. The same paragraph notes, "Monopsony power can be estimated . . . by looking for evidence of persistent high margins, price discrimination, *or* output responses to price or cost changes." Philip Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application § 575 (5th ed. 2023) (emphasis added) (Mot. at 16).

Finally, Zuffa's implication that Dr. Singer should have measured MRP directly is a canard. Economists rarely can measure MRP *directly*. CO at 52-53 ("MRP is... a notoriously difficult metric to precisely quantify."). They must assess *indirectly* whether compensation is below competitive levels. Zuffa's economists used Wage Level—compensation measured in dollars—and estimated a regression rigged so it cannot show how the Scheme altered the relationship between Zuffa's revenues and Fighter pay. *See* CO at 53.[69] In contrast, Dr. Singer *tested* whether Zuffa's Scheme caused a decrease in the percentage of its event revenues its Fighters received. SR2 ¶¶73, 116-7; HT 1-75:12-76:10; 138:23-139:16 (ECF 724). His results could have come out either way. They showed Zuffa's Scheme had a statistically and economically significant effect, dramatically suppressing MMA Fighter compensation. *Id.*; CSF ¶26; CO at 62 (Dr. Singer's "modeling undisputedly demonstrates a relationship between Zuffa's foreclosure share and revenue share at a statistically significant level.").

The record is clear that Wage Share is the appropriate metric to evaluate the effects of Zuffa's Scheme on Fighters. CO at 52-57 (Wage Share appropriate and reliable); SR1 ¶¶21, 143-44; SR2 ¶¶5, 8, 88-109; SR3 ¶¶3-5; HT 1-104:16-109:22 (ECF No. 724). Zuffa's main basis for rejecting Wage Share is the opinion of its labor economist, Dr. Paul Oyer. But when confronted by numerous economic articles addressing compensation in professional sports, he admitted that they used Wage Share, HT 5-150:13-155:6 (ECF No. 741), that he had never seen them before, *id.*, and that he lacked expertise about professional sports. *Id.* 5-155:7-15. Moreover, he founded his opinion on a misinterpretation of the views of a labor economist that he recognized as "authoritative," Professor Alan Manning of the London School of Economics. *Id.* 5-162:17-163:9. Dr. Manning provided an expert report explaining that use of Wage Share is appropriate in analyzing the athlete pay in MMA. *See* MR1 ¶¶6, 24-28, 31; HT 5-18:14-21, 19:12- 17 (ECF No. 741). Dr. Manning is not alone in endorsing Wage Share. So does the relevant economic literature. CO at 54-55 (citing sports economics publications). So did Zuffa's own expert, Dr. Topel, in assessing compensation to NFL players. *Id.* at 55; HT 3-52:25-54:1 (ECF No. 730). So did Zuffa and its bankers in discussing the compensation Zuffa paid its Fighters. *Id.* at 54; HT

---

[69] Zuffa's regression has Wage Level as a dependent variable and event revenue as an independent variable with a single, fixed coefficient. As a result, it cannot detect changes in the relationship between fighter compensation and event revenues as a result of Zuffa's conduct. SR2 ¶¶108-9, 111, 114-20; SR3 ¶¶22-23, 35-37; SR4 ¶9; CO at 53.

1-111:6- 113:15 (ECF No. 724). And two of Zuffa's economists, Drs. Topel and Blair, made the devastating admission that changes in Wage Share *can* reveal the effects of changes in monopsony power—the relevant issue here. HT 3-55:1-56:5 (ECF No. 730); HT 5-20:11-24:1 (ECF No. 741).

Zuffa implies that Dr. Singer's Wage Share regression cannot distinguish the effects of the Scheme from Zuffa's procompetitive contributions to revenue. Mot. at 18-19. Untrue. The regression controlled for Zuffa's contributions by using Wage Share,[70] as this Court found. CO at 70 ("Plaintiffs' impact regression model controlled for the impact of other alleged factors, including any so-called 'special sauce' or business acumen of the Defendant, and establishes a statistically significant relationship between Defendant's alleged illegal conduct and Plaintiffs' damages").[71]

### D.  Depressed Output Confirms Zuffa's Monopsony Power

Although proof of output suppression is not necessary to show monopsony power, it also suffices. *AMEX*, 138 S. Ct. at 2284; *Qualcomm*, 969 F.3d at 989 (same). Zuffa argues that there is no evidence its conduct restricted output below the competitive level. Mot. at 17-18. Nonsense. First, Dr. Singer found that the total of Events in each relevant market was rising before Zuffa's acquisition of Strikeforce in 2011, and then fell as foreclosure increased. CSF ¶27; *see* ¶¶16-17. Zuffa challenges Dr. Singer's opinion that the Scheme caused output to fall as "conclusory." Mot. at 17.[72] But Dr. Singer showed that the Scheme *caused* wage suppression; standard economics supports Dr. Singer's finding that the Scheme also caused a contemporaneous downward shift in the trend of output.[73] Second, Dr.

---

[70] SR2 ¶108; SR3 ¶¶26-27.

[71] In attempting to overcome law of the case, Zuffa finally acknowledges that the issue at class certification is whether Plaintiffs offer evidence *capable of* proving their claims on a classwide basis, not whether Plaintiffs' proof is persuasive, as Plaintiffs asserted all along. Mot. at 19 n.5. The problem is that Zuffa demanded at class certification that this Court *find* for Plaintiffs on the merits on classwide impact, HT 6-64:20-67:25 (ECF No. 745), this Court so found, CO at 63-67, and it is too late for Zuffa to reverse position.

[72] Zuffa did not challenge Dr. Singer's output opinion in its *Daubert* motion, *see* ECF 540 at 38, n.63, and, in any event, the Court denied that motion. CO at 12-13.

[73] *See, e.g.*, Council of Economic Advisors, *Labor Market Monopsony: Trends, Consequences, and Policy Responses* at 3 (Oct. 2016) (https://obamawhitehouse.archives.gov/sites/default/files/page/files/20161025_labor_mrkt_cea.pdf) ("monopsonistic wage-setting . . . can lead to inefficient reductions in . . . output, where some workers who would have been willing to work at the competitive market wage are never hired"); *id.* at 2 ("Economic theory shows that firms with monopsony power have an incentive to employ fewer workers at a lower wage than they would in a competitive labor market."). *See also Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1232 (10th Cir. 2007) (conduct that suppresses Grower pay can "result[] in injury to both poultry producers (*i.e.*, growers) and end-users (*i.e.*, consumers)… . Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service" (quotation marks omitted)).

Zimbalist demonstrates that increasing pro athlete mobility and pay consistently increases revenues, popularity, quality—*and demand and output*. CSF ¶31. Third, while the relevant issue is not whether Zuffa's output decreased but whether it restricted market-wide output, Dr. Singer found, and Dr. Topel conceded, that total UFC pay-per-view viewership and attendance fell substantially. CSF ¶¶27-28.

Reasons for suppressed output include that Zuffa bought and shut down potential rivals, CSF ¶¶29, 13-17, and limited rival access to a necessary input—a critical mass of top Fighters. CSF ¶¶18-25, 1-6; CO at 57 ("As Zuffa's foreclosure share increases, its competitors' access to the critical input of fighters decreases and their concomitant ability to increase or maintain revenue also declines. The rise in Zuffa's foreclosure share thus prevents any meaningful competition in the market."). Zuffa's Scheme also included "shelving"—signing up top Fighters restricting bouts—causing Fighters to "collect dust" instead of competing. CSF ¶30.[74] Zuffa thus reduced MMA events. CSF ¶¶27-28.

Zuffa argues that it increased its *own* output over time. Mot. at 16-18. But its own PPV output declined.[75] And what matters is restriction of *market-wide* output compared to competitive levels, not *Zuffa's*. *Rebel Oil*, 51 F.3d at 1437 ("With a dominant share of the market's productive assets, a firm may have the market power to restrict *marketwide output* and, hence, increase prices") (emphasis added).[76] Zuffa's cases are not to the contrary. Further, the issue is whether output would have increased *by more* in a competitive market. To paraphrase Zuffa's admission about wages: the relevant issue in a monopsony case is how much *should* the output be in a competitive market? Mot. at 18.

### E.  Circumstantial Evidence Confirms Zuffa's Monopsony Power

---

[74] Zuffa's contention that it eventually placed its Fighters in "the agreed-upon bouts," Br. at 17, is beside the point: the Fighters preferred to participate in more bouts than Zuffa allowed.

[75] Dr. Singer proves the Scheme restricted *Zuffa's* output for PPV events. CSF ¶¶27-28. That is one reason that the Motion finds no support in *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *6 (N.D. Cal. June 4, 2020) (Mot. at 17). Others are that what matters is overall output, not Zuffa's (as discussed above), and that *Distance Learning* noted in dicta that an antitrust defendant's artificial depression of market-wide output by depression of its own output is *one way* to prove market power directly, but not that it is *the only way*).

[76] *See also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010) ("Nor does the complaint allege that interbrand competition. . . has been harmed by *marketwide* increased prices or reduced output.") (emphasis added); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) ("monopoly power" is "the ability to cut back the *market's total output* and so raise price") (emphasis added) (internal quotation marks omitted); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1169 (D. Nev. 2016) (allegations that Zuffa "artificially suppressed output in the *Relevant Output Market*, including reduced number of live Elite Professional MMA bouts than would exist in the absence of the challenged anticompetitive scheme," sufficiently pled antitrust injury) (emphasis added).

Analogous points apply to circumstantial evidence of Zuffa's market power, including market share and high barriers to entry: Plaintiffs need not show them, but they have. *Rebel Oil*, 51 F.3d at 1434 (either direct *or* indirect evidence of market power suffices). Plaintiffs can prove monopsony power circumstantially with evidence that a defendant has a dominant market share, and that barriers prevent existing or potential competitors from expanding in the short run. *Id.* Plaintiffs have shown Zuffa dominated properly defined markets and barriers prevented entry and expansion. CSF ¶¶4, 6, 8, 13,18-25; CO at 24-33 (circumstantial evidence establishes Zuffa's monopsony power). That is enough.

High Market Share. A major circumstantial indicator of monopsony power is a high market share. *Rebel Oil*, 51 F.3d at 1434. Zuffa ignores that issue in favor of misleading anecdotes and puffery about competitors entering the market and supposedly growing. Mot. at 19-21.

Courts recognize that a market share of 20-44% indicates sufficient market power to cause anticompetitive effects. CO at 27, n.27 (citing *Rebel Oil*, 51 F.3d at 1438 and antitrust scholars). Dr. Singer shows that from December 2010 through June 2017, Zuffa's share fluctuated between 71% and 99% (*See* SR1 ¶173 & Fig. 3; CSF ¶20); this evidence shows Zuffa's dominance. CO at 27-30.

Zuffa does not contest its dominant market share, but in addressing the loosely related issue of foreclosure share it argues that Plaintiffs improperly weight athletes. Mot. at 23-27. However, this Court already found Dr. Singer's weighting of Fighters "credible." CO at 27 n.28; *see also id.* at 57-58. Weighting makes sense because Fighters are not fungible. *See* CSF ¶2; *see also* CO at 29 ("Fighters are not homogenous; they vary in their ability to attract viewers. Plaintiffs' revenue and inverse ranking weights allow for the expression of this difference").

High Barriers to Entry and Expansion. In discussing barriers to entry and expansion, Zuffa cites cases where the undisputed record showed expansion of output "in the relevant market" and entry and growth of "significant competitors." Mot. at 20 (citing *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976-77 (9th Cir. 1999)). But Zuffa's supposed "undisputed evidence" of low barriers, Mot at 19, is both disputed and unpersuasive. Extensive evidence—including admissions from Zuffa's own executives and bankers—shows that "practical barriers to entry," including from Zuffa's staggered long-term Fighter contracts, "are extremely high." CSF ¶¶21, 23; CO at 31-33. Zuffa's contracts and other challenged conduct exacerbate the barrier imposed by promoters' need to access a

critical mass of top Fighters: "[T]hese coercive contracts damage the overall market environment by artificially restricting competitors' access to strong fighter talent which could be used to grow their business." CO at 31, 57. As a result, only Zuffa holds "major league" MMA events. Topel Tr. 376:25-377:19; ZR2 ¶100; CO at 39-43.

Zuffa identifies various foreign and "minor league" promoters as supposed evidence of low barriers to entry and expansion. Mot. 19-21. But the foreign entities are not in the relevant market, and the "minor league" promoters are insignificant. CO at 10, 26 (addressing foreign and minor league promoters); CSF ¶¶21-23. Their MMA events provide no more of a check on Zuffa's market power than G League events do on the NBA's market power.

<u>Durability</u>. Zuffa also suggests that its market power was not "durable," Mot. at 16, based on events that occurred after the Class Period. But Plaintiffs' evidence of Zuffa's high market power from December 2010 to June 2017, SR1 ¶173 & Fig. 3, establishes its durability. *Pac. Coast. Agric. Exp. Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir. 1975) (45-70% share over four years suffices for market power); 3A Areeda & Hovenkamp, Antitrust Law ¶801a, at 319 (2d ed. 2002) ("it is generally reasonable to presume that a firm has monopoly power when the firm's dominant market share has lasted, or will last, for at least five years").[77] Moreover, Zuffa does not claim, much less show, that its market share has fallen. To the contrary, Zuffa's market share has increased "from 90 percent in June 2017 to 93 percent in October 2023." SR5 ¶14.

### F.  Record Evidence Also Establishes Zuffa's Monopoly Power

As noted above, monopsonistic harm suffices. Plaintiffs need not also prove monopolistic harm. *See supra* Sec.I.B. That said, Plaintiffs have shown Zuffa's monopoly power. The Court has ruled that it would consider "arguments about Defendant's dominance in the output market insofar as it bolsters its exercise of monopsony power." CO at 20 n.20. So Zuffa is wrong that "the Court's grant of class certification. . . applies only as to Plaintiffs' monopsony power theory." Mot. at 38. Further, Dr. Topel

---

[77] Zuffa's cases do not help it. The supposedly exclusive contracts in *Western Parcel Express*, 190 F.3d 974 (Mot. at 20), were not exclusive because customers could choose an alternative provider even while under contract with UPS. *Id.* at 976. In *Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910 (9th Cir. 2003) (Mot. at 20), "the facts clearly show[ed] that [purchasers] are not required to deal exclusively with [defendant], and can. . . switch to different or additional vendors at will." *Id.* at 911. In *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163-64 (9th Cir. 1997) (Mot. at 19), the purported exclusive contracts were of "short duration and easy terminability."

has admitted that a monopoly provider of MMA Events would also be a monopsonist in the input market for Fighter services. Topel Tr. 463:17-464:-14. Thus, Plaintiffs' showing of monopoly power bolsters its showing of monopsony power, and Zuffa is not entitled to summary judgment on "the monopolization claims of the Complaint." Mot. at 38; *see also id.* at 37-39.

### (1) Direct Evidence: Reduced Output, Inflated Prices, and Degraded Quality.

Plaintiffs have developed extensive evidence that Zuffa's conduct not only suppressed Fighters pay, CSF ¶26, but also reduced market-wide output, artificially inflated prices, and degraded quality. CSF ¶¶27-33. Any of those harms suffices to establish monopoly power directly.

### (2) Circumstantial Evidence: High Barriers to Entry and High Market Share.

Plaintiffs' evidence of high barriers to entry and Zuffa's high market share, CSF ¶¶21-24, also provide circumstantial evidence of Zuffa's monopoly power. In the MMA market, Zuffa's monopsony power translates into monopoly power. *See* Topel Tr. 463:17-464:14; SR2 ¶¶21, 137; HT 3-153:6-154:19 (ECF No. 730).

### II.    The Evidence Establishes Zuffa Engaged in Exclusionary Anticompetitive Conduct

#### A.  The Court Should Assess Zuffa's Conduct as a Whole

Zuffa addresses separately each component of its anticompetitive Scheme, and then tacks a brief discussion at the end of its analysis about what it calls a "monopsony broth." Mot. at 36-37. As this Court has already held, Zuffa's analysis of each aspect individually is improper. CO at 42.

Plaintiffs demonstrate that Zuffa engaged in three forms of anticompetitive conduct that combined to cause anticompetitive effects. Its long-term, exclusive *contracts* locked up Fighters and foreclosed potential competitors. CSF ¶¶7-10. Its *acquisitions* eliminated potential rivals and snared additional Fighters in its anticompetitive contracts. CSF ¶¶17-21. Its *coercion* extended its contracts in effect in perpetuity at Zuffa's election. CSF ¶¶11-12. Dr. Singer rigorously demonstrated this conduct collectively suppressed Fighter competition, decreased output, and inflated prices. CSF 26-29; SR1 ¶¶180-207; SR2 ¶68. That is no vague "monopsony broth" theory. It is a structured and disciplined analysis. *See* CO at 33-44 (finding Scheme anticompetitive).[78]

---

[78] Zuffa conflates separate issues, Mot. at 36-37: whether conduct (1) is lawful on its own but is anticompetitive and can be *unlawful* as part of a scheme, or (2) has no anticompetitive effects and

## B.  Zuffa's Scheme Substantially Foreclosed Competition

### 1.      Plaintiffs Appropriately Measured Foreclosure.

Plaintiffs have presented abundant evidence that Zuffa's Scheme substantially foreclosed the input market for Fighters. *See* CSF ¶¶18-20; CO at 57. Dr. Singer demonstrates using various market definitions that Zuffa's Foreclosure Share was at least 50% during the Class Period, and generally much higher—as high as 99%. CSF ¶20; SR1 ¶¶128-29, 167-73 & Fig. 3. These levels more than suffice for substantial foreclosure. *See, e.g.*, *Cornwell Quality Tools Co. v. CTS Co., Inc.*, 446 F.2d 825, 831 (9th Cir. 1971) (holding that evidence of exclusive contracts covering 10 to 15% of the relevant market was sufficient to require submission to jury); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298 (9th Cir. 1982) (24% foreclosure unlawful); *Luria Bros. & Co. v. FTC*, 389 F.2d 847, 864-65 (3d Cir. 1968) (condemning over 30% as unlawful); *Mazda v. Carfax, Inc.*, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) (same). Zuffa admits these market shares demonstrate substantial foreclosure. *See* Mot. at 22 (conceding that 30-40% foreclosure levels suffice). And this Court has already credited Plaintiffs' evidence of substantial foreclosure. CO at, *e.g.*, 40, 57-59; *see* CSF ¶20.

In response, Zuffa suggests Dr. Singer did not measure foreclosure properly. Mot. at 23-25. First, it argues that foreclosure was no more than 22% by assuming all Fighters are the same. Mot. at 23. They are not. CO at 29 ("Fighters are not homogenous; they vary in their ability to attract viewers.

---

cannot be unlawful even as part of a Section 2 scheme. Zuffa claims that *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022), and *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373 (9th Cir. 1992), hold that a monopsony claim cannot include components consisting of "legal conduct." Mot. at 37. But both say a court *should* assess all conduct that is part of a scheme together for anticompetitive effects. *Anaheim* warned "that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." 955 F.2d at 1376. *Dreamstime.com* recognized, "The Supreme Court has instructed courts to give plaintiffs in antitrust actions 'the full benefit of their proof without tightly compartmentalizing' each individual allegation, because the character and effect of an antitrust injury should not 'be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" 54 F.4th at 1142 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). So both precedents are consistent with this Court's ruling that the issue is whether Zuffa's conduct *as a whole* was *anticompetitive*, not whether each component on its own would be unlawful. CO at 42; *Zuffa*, 216 F. Supp. 3d at 1168 (quoting *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008)) ("[I]n the antitrust context, the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"); *In re NFL's Sunday Ticket*, 933 F.3d at 1152-52 (same); *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021) ("Sometimes . . . a series of activities will combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation.").

Plaintiffs' revenue and inverse ranking weights allow for the expression of this difference").[79] Dr. Singer's model reflects that different Fighters produce different revenues, while Zuffa would treat the 650th best flyweight Fighter as interchangeable with a heavyweight champion.[80] For this reason, the Court found that "Dr. Singer's use of a weighted foreclosure share supports a finding of robustness." CO at 59; *id.* ("Assigning the weight to fighters is appropriate because the products here (individual fighters) do not each represent the same value to the market."). The Ninth Circuit has endorsed revenue weighting. *Twin City*, 676 F.2d at 1298 n.5 (endorsing revenue weighting in measuring market and foreclosure share).

Zuffa's second argument is that its staggered contracts were less apt to cause anticompetitive harm because some of them could in theory expire at any given time. Mot. at 24. Zuffa does not attempt to quantify the share of Fighters who *actually* reached free agency; Zuffa's coercive tactics ensured that few, if any, top Fighters did. CSF ¶¶11-12; CO at 39, 43. Further, Zuffa's reasoning is backwards. If there were no coercion and Zuffa's contracts all ended at the same time, a potential rival (at least theoretically) could have wooed a critical mass of top Fighters in one fell swoop. Zuffa's staggering, however, would have prevented that from happening, so that no rival could assure Fighters that it is acquiring enough of them at one time to give them adequate opponents. CSF ¶21.[81] As a result, Zuffa's staggering was yet another way in which it relegated its potential rivals to "minor leagues" and prevented top Fighters from going elsewhere. CSF ¶¶22-24.[82]

Indeed, contrary to Zuffa's argument, the entire purpose of these staggered contracts was to increase foreclosure. WME, which Zuffa purchased in 2016, observed: "While technical barriers to

---

[79] Indeed, Zuffa's own expert admits as much. *See* Topel Tr. 432:10-24; HT 3-18:4-19:2 (ECF 730).
[80] *See* SR1 ¶99 (noting Dr. Singer's "Ranked" measure includes top 650 Fighters in each weight class).
[81] *See Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 31-32 (S.D.N.Y. 2016) (denying summary judgment where plaintiff offered "evidence that [defendant] intentionally staggered the end dates of key contracts to prevent competitors from acquiring a 'critical mass' of retail distribution"). Zuffa's cases, Mot. at 24, are inapposite. In *Omega*, the challenged exclusive contracts were found permissible not because they were staggered but because each *individual* contract had "short duration and easy terminability." *Omega*, 127 F.3d at 1163. In *Ticketmaster*, there was no claim that a "critical mass" was necessary nor was their evidence of the type of coercion at issue here; to the contrary, robust competition between rivals occurred each time a staggered contract came up for renewal. *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21397701, at *4 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005).
[82] *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *6 (C.D. Cal. Dec. 2, 2013) ("monopoly makes dealing with [defendant] an economic necessity and makes the cost of switching prohibitive").

entry to host a fight are relatively low, practical barriers to entry are extremely high. UFC controls the best fighters, *on staggered contracts*." Ex. 118 at -78 (emphasis added); *see* CSF ¶21. Moreover, Zuffa's brief is once again at odds with itself: Zuffa later argues that its Exclusive Contracts are procompetitive *because* "Zuffa must maintain a sufficiently deep roster of athletes" to succeed. Mot. at 29. Staggered contracts prevent potential rivals from doing the same. *See* CSF ¶¶21-25.

Zuffa's third argument is that Fighters move back and forth between the UFC and other promotions. Mot. at 24-25. Zuffa suggests this movement is in tension with foreclosure. It is not. Zuffa has repeatedly bragged that "no athlete has left the UFC that the Company *wanted to retain*," Ex. 115 at 14 (emphasis added), and that other promoters have access only to "the fighters that we didn't want or got rid of." Silva Tr. 177:7-178:21; Ex. 127 at -818; *see* CSF ¶19 (collecting examples).[83] Zuffa's evidence merely reflects that the UFC is the "major league" of MMA and cuts Fighters who do not meet its standards. SR1 ¶¶66, 80, 107, 136. Players frequently move between minor leagues and major leagues in other professional sports. That does not mean, for instance, that MLB lacks market power or that minor league baseball teams affect the salaries of MLB players.[84] Zuffa's evidence of Fighter movement does not contradict foreclosure. CSF ¶¶7-20.

Finally, Zuffa claims that what it calls its "competitors" in its brief—and what it calls "pipeline" or "feeder" promoters when it is not in Court—"do not agree they are foreclosed." Mot. at 25; *see* CSF ¶¶23-25 & n.41. That is unsurprising for several reasons. First, "pipeline" and "feeder" promotions can hold events by attracting Fighters who may one day fight—or fight again—in the UFC, along with other Fighters who may never qualify to do so. CSF ¶¶23-24. Second, Zuffa has great power over "pipeline" and "feeder" promotions, as one of their selling points to Fighters is that they may move up to the UFC; they often are understandably reluctant to anger Zuffa.[85] Third, there is extensive record evidence of foreclosure of rivals, CSF ¶¶18-25, including of non-UFC promoters complaining that the

---

[83] Moreover, as described above, even Zuffa's examples of Fighters who have left the UFC for other promoters, ZSF ¶¶ 22-24 & Z.Ex. 79, are almost all Fighters Zuffa cut or rejected. *See* CSF ¶19.

[84] *See* Topel Tr. 376:25-377:19 (admitting that Zuffa considered other promotions to be "minor leagues" and comparing "minor league" promotions to AAA in MLB "where athletes play either because they like playing or because they hope to make it to the major leagues").

[85] *See* CSF ¶24 & n.41. *A. H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302 (9th Cir. 1981), Mot. at 25, is distinguishable because there the plaintiff "failed to adduce *any* evidence of anticompetitive effect or intent" whereas here copious evidence rebuts the statements of other MMA promoters cited by Zuffa. *Id.* at 1307 (emphasis added).

Scheme deprives them of Fighters.[86] CSF ¶¶19-20 & n.37. Fourth, whether some non-UFC promoters are embarrassed to admit publicly that they are foreclosed is irrelevant. The evidence establishes foreclosure and Zuffa's longstanding dominance. CSF ¶¶18-25.

### 2.    Dr. Singer Appropriately Tested his Measure of Foreclosure Share.

Zuffa also criticizes a caricature of Dr. Singer's analysis of the potential of Zuffa's contracts for foreclosure. Mot. at 25-27. Dr. Singer's actual analysis was that contracts that last expressly for thirty months or longer—and often in perpetuity at Zuffa's election because of coercion—were *potentially* anticompetitive. SR1 ¶306; SR2 ¶¶73, 117. His hypothesis found support in part in his finding that the mean length of a Fighter's career in the UFC was about thirty months, SR1 ¶¶90-91; SR2 ¶¶64-66—the same length as the contracts he treated as *potentially* anticompetitive.

Dr. Singer then *tested* whether the proportion of Fighters subject to Zuffa's long-term exclusive contracts explained variations in the compensation it paid its Fighters. HT 1-75:12-76:10, 138:23-139:16 (ECF 724); SR2 ¶¶3, 73, 75 n.274 (ECF 518-4); CO at 52-59, 70. The regression analysis he did produced statistically and economically significant results. *Id.*; CSF ¶20.

Zuffa has never offered a competing explanation for Dr. Singer's compelling findings. Instead, it attacks a strawman. It claims Dr. Singer "admits that his conclusion that 30-month contracts are unacceptable is not drawn from any empirical assessment," Mot. at 25, when it finds support in an empirical assessment that Zuffa has never been able to explain on any other basis.

Zuffa also plays games with the length of Fighter careers. It notes that Dr. Singer calculates the *median* or typical duration of a Fighter's career as about eight or nine months. Mot. at 26. That is consistent with the *mean* length of about thirty months—and with Dr. Singer's empirical finding that the higher the proportion of contracts subject to Zuffa's contracts of thirty months or more, the lower the compensation Zuffa paid its Fighters. SR1 ¶186; SR2 ¶68; SR4 ¶7; HT 3-107:3-24 (ECF 730).

---

[86] One executive of an MMA promoter, Kurt Otto testified about the effect of Zuffa's control of top Fighters: "the talent pool was slim to none…. It's like, … you gobble up organizations and you coincidentally get the contracts with that deal, and those guys are under contract, and even though they don't exercise their rights to fight them, they're still under contract, and they're locked up. So, you know, the talent pool was not there[.]" *Id.* 371:12-372:13. Further, Lappen, with ProElite (parent company of EliteXC), testified that Zuffa's Exclusive Contracts affected EliteXC's ability to sign top Fighters. *See* Lappen Tr. 137:22-138:8.

Zuffa tries to combat that empirical finding with an irrelevant datum—Fighters who fought at least once in the UFC had average careers as paid Fighters *at any level* of 8.7 years. ZSUF ¶12. That is like calculating the average length of the baseball career of a player who had a proverbial "cup of coffee" in MLB by all their time in the minor leagues, and suggesting a thirty-month contract would not be long-term for that player because of their long tenure trying to make it to MLB. Unlike Dr. Singer who evaluates his measure of a potentially anticompetitive contract length with an empirical test, SR1 ¶186; SR2 ¶68; SR4 ¶7; HT 1-75:12-76:10, 138:23-139:16 (ECF 724), Zuffa performed none.

Zuffa makes two additional confused arguments. First, it claims that Dr. Singer's finding that the median Fighter's career lasts less than a year "makes no sense, [sic] because Dr. Singer concedes that 12-month exclusive contracts *would* be acceptable." Mot. at 26. It is unclear what point Zuffa is trying to make. Dr. Singer's finding of the median career length of UFC Fighters is an empirical fact. It is hard to understand why Zuffa would think that fact could change depending on the length of an acceptable contract. In any case, it is a separate issue whether twelve-month exclusive contracts are sufficiently long to be anticompetitive. Dr. Singer tested his hypothesized cut off—thirty-month contracts—and found that it explained variations in Fighter pay. SR1 ¶186; SR2 ¶68; SR4 ¶7. There is no inconsistency with that result and Dr. Singer's finding about the median length of a UFC career.

Zuffa implies a second, similarly confused argument: that there is a conflict between Dr. Singer's finding that the average UFC career is relatively short and his recognition of the importance of top Fighters. Mot. at 27. Zuffa implies that all that can matter is rising Fighters or established Fighters, but not both. *Id*. That is untrue. The evidence demonstrates that exclusive contracts of thirty-months make a difference, and that Zuffa routinely extended them when it wanted to do so, including through contractual clauses and coercion. CSF ¶¶7-10. That allows Zuffa to lock up both budding and established Fighters. It is significant that the Scheme can do and does both.

### C.  Zuffa's Long-Term, Exclusive Contracts Were Anticompetitive

Zuffa muddles two separate issues by implying that its Scheme did not have anticompetitive effects because it had potential procompetitive justifications. Mot. at 27-31. The opposite is true. Zuffa's assertion of potential procompetitive justifications is coherent only if its Scheme had

anticompetitive effects.[87] Zuffa claims that it locked up Fighters so it could benefit from its investments in them and maintain a deep pool of Fighters for its events. *Id*. Even if that were true, Zuffa's obvious alternative was to achieve Fighter loyalty by increasing compensation. So Zuffa's asserted procompetitive justifications *assume* anticompetitive effects—decreased Fighter mobility and pay—and then attempt to justify those effects. The implicit premise of Zuffa's argument satisfies Plaintiffs' initial burden: Zuffa's Scheme had anticompetitive effects.

Nonetheless, Zuffa pretends that Plaintiffs claim it violated the antitrust laws merely by *hiring* the best Fighters, and that Plaintiffs' only evidence that such conduct is anticompetitive is that Zuffa hired more Fighters than it needed and did not provide them sufficient bouts. Mot. at 31-32. In reality, Zuffa forced Fighters into long-term exclusive contracts, locking up the best Fighters for long periods, including through contractual provisions and coercion. CSF ¶¶7-12. To be sure, Zuffa *also* locked up more of them than it could offer bouts. *Id*. ¶30. But the primary anticompetitive effect of Zuffa's Scheme was to suppress Fighter compensation, *id*. ¶26, although it also decreased output, *id*. ¶¶27-29.

Rather than address that argument, Zuffa reframes Plaintiffs' claim as involving "predatory hiring." Mot. at 31. Zuffa then suggests that Plaintiffs do not satisfy the requirements for a standalone predatory hiring claim. *Id*. at 32. That argument fails for two reasons: first, Plaintiffs' claim in relevant part is based on exclusive contracts and coercion, not predatory hiring; and, second, as noted above, the Court should evaluate Zuffa's conduct as a whole, not each component in isolation.[88]

### D.  Zuffa's Coercion Was Anticompetitive

Plaintiffs have provided ample evidence that Zuffa engaged in coercion, forcing Fighters to renew their contracts on terms favorable to Zuffa on pain of facing retaliation. CSF ¶¶11-12; CO at 35-

---

[87] SR1 ¶258 ("Zuffa's efficiency defenses, like the claims made by owners in other professional sports leagues in the past, amount to the claim that Zuffa must be permitted to exercise monopoly and monopsony power for the good of the sport."); Topel Tr. 75:15-76:24 (conceding that exclusive contracts are "restrictions on athlete mobility" that inhibit competition and suppress fighter pay).

[88] The cases Zuffa cites do not support summary judgment. The plaintiff in *Universal Analytics, Inc. v. MacNeal-Schwendler Corp*., 914 F.2d 1256 (9th Cir. 1990) (Mot. at 32), asserted that the defendant hired its employees to prevent plaintiff from competing, but the evidence showed defendant's *primary* motive was to hire good employees, *id*. at 1259, the employees were put to productive use, *id*., not shelved like Fighters here, and they were free to leave the defendant and work again for the plaintiff, *id*., unlike Zuffa's Fighters who are trapped in long-term exclusive contracts. Zuffa's citation to *Movie 1 & 2 v. United Artists Communications Inc*., 909 F.2d 1245 (9th Cir. 1990) (Mot. at 31), is mystifying, as it held that anticompetitive conduct, a high market share, and an acquisition sufficed for an inference that the defendant "willfully maintained monopoly power." *Id*. at 1255.

39. That coercion fits neatly in Zuffa's Scheme. It enabled Zuffa to extend its contracts in perpetuity in its sole discretion. CSF ¶11; CO at 34-39, 43-44; *id*. at 39 (contracts and coercion "ensured that Defendant could maintain almost perpetual control over fighters").

Rather than confront this reality, Zuffa pretends that Plaintiffs' complaint is that it pays Fighters *too much* when it renews their contracts. Mot. at 32-35. According to Zuffa, Plaintiffs' position is that it violated the antitrust laws by retaining Fighters through inflated compensation. *See, e.g*., Mot. at 33-34 (discussing *Weyerheauser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312 (2007). *Weyerhauser* was a predatory purchasing case in which the plaintiffs claimed the defendant, *inter alia*, bid up prices to deprive competitors of an input. *Id*. at 316. Plaintiffs here allege that Zuffa did not bid up Fighter compensation but rather drove it down. CSF ¶26; CO at 43-71.

Coercion is an example. Zuffa did not want to wait to re-sign Fighters until their contracts ended. So it often required them to enter new contracts when they still had a fight or two left on their old ones. CSF ¶11. If they did not re-sign they would be punished—for example, by facing dangerous but unprestigious opponents. *Id.* ¶12. That suppressed Fighter pay; it did not inflate it. CO at, *e.g*., 36 (Zuffa's "coercive tactics in conjunction with the restrictive provisions of its contracts themselves had a devastating effect on fighters' ability to control their careers and compensation.").

So Zuffa's argument about coercion amounts to the same tired, erroneous claim it makes elsewhere: if Fighter pay increased over time—here, from contract to contract—Zuffa cannot have committed an antitrust violation, even if Fighter pay would have gone up *significantly more* without Zuffa's anticompetitive conduct. That is nonsense. The relevant inquiry is whether Zuffa would have paid Fighters more in a more competitive market—one without its Scheme, including coercion. Again, Zuffa itself admits that point: "the key inquiry at the heart of a monopsony case [is] how much *should* the wage be in a competitive market?" Mot. at 18. The answer is that without Zuffa's coercion "the wage" would have been higher. CSF ¶26; CO at 35-39.

These same points apply to Zuffa's right-to-match clauses, which Zuffa lumps with coercion. Mot. at 32-33. Contrary to Zuffa's suggestion, those clauses did not *increase* Fighter pay. Zuffa's right-to-match—and exclusive negotiation period—clauses prevented Fighters from competing with another promotion for over a year after their contracts expired. CSF ¶¶8, 12. During that time Zuffa could

choose to retain them. *Id.* The clauses did not drive up compensation; Zuffa merely had to match an offer to retain a Fighter, not exceed it. *Id.* And Zuffa's ability to match deterred other promoters from wasting effort on wooing UFC Fighters in the first place. *Id.*

As this Court observed, Zuffa used these clauses, along with coercion, to make its contracts in effect perpetual. CO at 36 ("The coercive tactics in conjunction with the restrictive provisions of the contracts themselves had a devastating effect on fighters' ability to control their careers and compensation."). The clauses "prevented fighters from becoming free agents until 12-15 months after their last bout to incentivize fighters to stay with Zuffa. The 12 to 15 month waiting period would be one in which the fighter would not be earning any money from fighting and constituted a significant portion of a fighter's career. . . . This meant that competitive fighters could not practically endure a 12- to 15-month period of no bouts and no revenue if they wished to both live and remain competitive." CO at 36. So Zuffa's right-to-match and similar clauses deterred competition and deflated compensation.[89]

### E.  Zuffa's Acquisitions Were Anticompetitive

Zuffa's vague argument is unpersuasive that its acquisitions were not anticompetitive. Mot. at 35-36. Zuffa notes that some of the acquisitions occurred more than four years before Plaintiffs filed a complaint, so that they would not give rise to a claim if Plaintiffs pursued a "standalone challenge" to them. Mot. at 35. But acquisitions form part of the Scheme, and the Scheme stretched from before the limitations period until well after, and so Plaintiffs may rely on all of them.[90]

---

[89] The other cases that Zuffa cites (Mot. at 32-35) do not hold otherwise: *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994) (rejecting claim against hospital for refusing to give work to plaintiff-anesthesiologist in favor of competitor, not for locking plaintiff into long-term exclusive contract, as Zuffa did here); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) (addressing predatory *low* pricing, equivalent to artificially *inflated* pay, not artificially deflated pay, as is at issue here); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) (holding competitor did not suffer antitrust injury when defendant *lowered* its prices to gain market share, equivalent to *inflation* of pay, not deflation of pay, as is at issue here); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) (discussing predatory bidding to *inflate* prices on input side, not to deflate payments on input side, like Fighter compensation, as is at issue here); *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 2023 WL 6811871, at *12 (D. Or. Oct. 13, 2023) (same).
[90] As the Ninth Circuit explained in *Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014), when defendants commit acts during the statutory period in furtherance of an anticompetitive scheme and cause new harm to a plaintiff, the continuing violation doctrine tolls the statute of limitations. *Id.* at 1086. *See In re Google Digital Advert. Antitrust Litig.*, 2021 WL 2021990, at *5 (N.D. Cal. 2021) (holding plaintiffs can rely on acquisitions that occurred before the statutory period in support of liability provided those "acquisitions were made *in concert with* the company's other anticompetitive conduct") (emphasis added); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 725, 757 (W.D. Tenn.

Zuffa contends acquisitions are not necessarily anticompetitive when they occur in a competitive market. Mot. at 36. That means Zuffa's effort to contest that they were anticompetitive is doomed because it derives from its implausible argument that it lacked market power. CO at 39-43 (acquisitions contributed to Scheme's harm to competition).[91]

### III.   Summary Judgment Is Not Appropriate Based on Procompetitive Justifications

Once Plaintiffs prove anticompetitive effects, the burden is on Zuffa to show procompetitive effects. *Qualcomm*, 969 F.3d at 991. The Court then assesses which is dominant. *Id*.

#### A.  Zuffa's Defense of its Contracts Does Not Support Summary Judgment

Zuffa claims that its long-term contracts are procompetitive. Mot. at 28-29. But the Court has already held that Zuffa failed to present sufficient evidence of such justifications. CO at 39, 42. Zuffa offers no additional evidence, simply repeating its earlier failed arguments.

Free Riding. Zuffa claims its long-term exclusive contracts are necessary to prevent "free riding" on its investment in Fighter brands. Mot. at 27-29 (citing ZSF ¶¶1-10). But Zuffa's investment in its Fighters is minimal, CSF ¶31, and it would remain the same if its contracts were much shorter. SR1 ¶¶282-83; SR2 ¶¶214-17, 220. Further, the Fighters, not Zuffa, do most of the investing, including through self-promotion and training. CSF ¶31. *increases* worker investment. *Id.* Dr. Zimbalist showed MLB, the NBA, the NFL, the NHL, and boxing all defended similar behavior on similar grounds, but their revenue, quality, and output all increased with enhanced athlete mobility and free agency. *Id.* The

---

[91] 2022), *on reconsideration*, 2023 WL 5662590 (W.D. Tenn. Aug. 31, 2023) ("Alleged overt acts stretch beyond the statutory limitations period. Thus, the Court will consider these acquisitions as part of the aggregate of Defendants' alleged anticompetitive conduct." (quoting *Cont'l Ore*, 370 U.S. at 699)); *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 721 (W.D. Tenn. 2022) ("Plaintiffs' Complaint alleges antitrust violations based not only on acquisitions, but also on various forms of anticompetitive conduct that inflict new and accumulating injuries on them.").

By Zuffa's admission, *State of New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299 (D.C. Cir. 2023), merely noted that "standalone" challenges to acquisitions are untimely once the statute of limitations has run, Mot. at 35, but here the acquisitions are part of the ongoing Scheme.

[91] For this reason, none of the sources Zuffa cites support its argument. Mot. at 35-36. Phillip E. Areeda *et al.*, Antitrust Law ¶ 901a (2009); *Syufy*, 903 F.2d at 663, 672; *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011).

Zuffa also vaguely suggests that a collection of other conduct in which it engaged is not actionable because it was "aggressive competition," not "conduct which unfairly tends to destroy competition itself." Mot. at 36 (quoting *Eastman v. Quest Diagnostics, Inc.*, 724 F. App'x 556, 557 (9th Cir. 2018)). But that is question begging. The evidence shows that Zuffa engaged in this conduct—such as scheduling events at the same time as rival events and denying rivals access to promotion videoclips of fighters who left Zuffa—as part of its Scheme. SR1 ¶¶52-61, 74. It is up to the finder of fact to decide whether the conduct was anticompetitive or procompetitive.

same would be true here. Absent the Scheme, Zuffa could and would prevent "free riding" simply by paying Fighters more to ensure their loyalty.[92] That explains why Zuffa's economist, Dr. Topel, admitted at deposition that eliminating the challenged contracts would increase Fighter mobility and result in "a transfer of wealth from Zuffa to the athletes." Topel Tr., at 84:11-18.

Pool of Athletes. Zuffa asserts that it needs long-term Exclusive Contracts to maintain "a sufficient pool of athletes from which to staff events," Mot. at 29-31, and that the Contracts increase output. Mot. at 29. But much shorter contracts would suffice, given that Zuffa books events *only 8-12 weeks in advance*.[93] Further, Zuffa's position is pretextual, as Zuffa has allowed Fighters to compete in bouts organized by other promoters if they were not televised or did not otherwise compete with Zuffa. An example is the Mayweather-McGregor boxing match.[94] It shows Zuffa was not worried about availability but rather about MMA competition.[95] The same is true for Zuffa's argument that it needs multi-bout contracts to permit popular re-matches. Mot. at 30. It cites no evidence for this false claim. Co-promotion would enable Zuffa to create any bouts fans want to watch. Zuffa would just have to negotiate with the Fighters in a free market, which would increase their compensation.[96] Further Zuffa

[92] For this reason, courts observe, "[o]ften instances of claimed free riding are really complaints about competition," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 480 (7th Cir. 2020) (quoting Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 111 (2018)); *see id.* ("[C]omplete market exclusion is a suspiciously excessive remedy for claimed free riding, even where a certain amount of free riding actually occurs."); *see, also, e.g., Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 675 (7th Cir. 1992) ("When payment is possible, free-riding is not a problem because the 'ride' is not free."); *Laumann v. NHL*, 56 F. Supp. 3d 280, 298 (S.D.N.Y. 2014) (denying summary judgment where defendants' "theory of free riding [was] unclear and unpersuasive").

[93] Shelby Tr. 78:14-22; SR1 ¶¶257-290; SR2 ¶¶188-98, 210-41. Further, in a more competitive environment, if Zuffa lacked Fighters to fill an Event card, it could have obtained them from a feeder promoter or free agency, or could have co-promoted events. SR2 ¶¶221-26, nn.725-730; Shelby Tr. 297:7-12. Similarly, Zuffa could have imposed much shorter terms and had sufficient Fighters available for its cards 8-12 weeks in advance. *See* SR2 ¶¶188-97.

[94] SR1 ¶102 n.276; *see id.* ¶66 n.177 (describing exclusivity provision).

[95] *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986), does not support Zuffa as it merely held that a plaintiff that can obtain its own sales force has no right under antitrust law to help from the sales force of its monopolist-competitor, *id.* at 377-78, while acknowledging that if the monopolist-competitor took actions to block hiring key workers, as Zuffa did here, "it would have been guilty of exclusionary conduct." *Id.* Further, *Race Tires America Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010), is inapposite because there the defendant, unlike Zuffa, established procompetitive benefits from its conduct, *id.* at 80-83; the plaintiff there, unlike the Fighters here, had the opportunity to participate in a competitive market, *id.* at 83-84; and Plaintiffs here, unlike the plaintiff there, have shown coercion. *Id.* at 77-79.

[96] Such co-promotion is common in boxing and among MMA promoters who lack market power. Even Zuffa has been willing to do it when it does not threaten its market power, such as co-promoting the Mayweather-McGregor boxing match (since it lacks market power in boxing promotion). CSF ¶32

did not engage in the same anticompetitive behavior when it was less dominant. It nevertheless invested in Fighters and MMA grew more quickly than during the Class Period.[97]

Zuffa incorrectly claims that locking up Fighters for only a year would result in "single-bout contracts." Mot. at 30-31. Zuffa's basis for this assertion appears to be the average number of fights per year for UFC Fighters. But that average reflects Zuffa's anticompetitive practices of "shelving." CSF ¶30. Fighters can and want to compete up to three times per year. CSF ¶30 & n.58. Indeed, Zuffa's contracts assume Fighters often compete more than twice per year.[98]

Zuffa's also contends that its contracts must be procompetitive because other promoters use similar ones. Mot. at 30. This Court has rejected that argument because smaller market participants often mimic anticompetitive conduct by a dominant market actor once it has foreclosed competition, CO at 42, and some promoters nevertheless had less restrictive contracts than Zuffa did.[99]

## IV.     Zuffa's Article III Standing Argument Does Not Support Summary Judgment

Zuffa's standing argument, Mot. at 39-40, is meritless. Article III standing is a threshold issue that constrains federal judicial power. *Steel Co.*, 523 U.S. at 88. It does not require a showing that a plaintiff should win on the merits. A plaintiff lacks Article III standing only if its "claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* at 89 (quoting *Oneida Indian Nation of N.Y. v.*

---

n.64; ZR2 ¶113; SR2 ¶¶222-226. Zuffa also argues that "no network is going to agree to sign a long-term deal" without assurance events can be staffed. Mot. at 30. But for the reasons discussed in this section, Zuffa's claim that its long-term exclusive contracts are necessary to staff events is pretextual.
[97] *See* CSF ¶33; ZR2 n.19; Topel Tr. 330:3-14.
[98] SR1 ¶67 n.180 (term ended upon the earlier of fifteen months *or* 3 bouts).
[99] Some contracts are less restrictive than Zuffa's. Before being acquired, some Strikeforce contracts were "not exclusive and allow[ed] the fighters to have bouts elsewhere." SR1 ¶66 n.177 (quoting ZFL-1393175). Many also included "UFC-out" clauses. *See id.* ¶125 n.342; CSF ¶23 n.40.
    Nor is Zuffa right that its contracts are automatically lawful if it had *any* lawful intent. Mot. at 31. *Universal Analytics*, 914 F.2d at 1259 (Mot. at 27) is inapposite because it involved predatory hiring, which is not alleged here. *Independent Entertainment Group, Inc. v. National Basketball Association*, 853 F. Supp. 333, 340 (C.D. Cal. 1994) is inapplicable, *inter alia*, because the athletes there did not bring antitrust claims, *id.* at 335, and they were employees, not independent contractors, *id.* at 338 (distinguishing *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir.1988), on this basis). *Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*, 158 F. App'x 413, 420-22 (4th Cir. 2005) (Mot. at 27), is inapposite because the alleged anticompetitive effects were reduced output and quality, but no evidence established those effects. *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Cream, Inc.*, 895 F.2d 1417 (table), 1990 WL 12148, at *5-*6 (9th Cir. 1990) (Mot. at 28), similarly involved no evidence of anticompetitive effects. *O.S.C. Corp. v. Apple Computer Inc.*, 792 F.2d 1464, 1468 (9th Cir. 1986) (Mot. at 28), granted summary judgment in relevant part for lack of evidence of a conspiracy, not based on a procompetitive justification.

*County of Oneida*, 414 U.S. 661, 666 (1959)). Zuffa cites cases with plaintiffs who claimed the wrong *type* of injury; they did not fail to *prove* the right type of injury. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211-14 (2021) (Mot. at 39) (some class members suffered no concrete injury but only a technical statutory violation); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566-67 (1992) (plaintiffs alleged injury was based on "pure speculation and fantasy" in non-class case); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (Mot. at 39) (plaintiff had to show ownership or possessory interest for right type of injury in non-class case). If the law were otherwise, federal courts would have to dismiss for lack of subject matter jurisdiction without entering judgment every time plaintiffs lose at trial. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Further, the evidence here shows that Zuffa's Scheme harmed *all* class members. SR1 ¶¶209-232; SR2 ¶¶150-52. Dr. Singer used the very same methodologies that the Ninth Circuit approved in *Olean Wholesale Grocery Cooperative Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651 (9th Cir. 2022) (en banc), to establish classwide harm, including a regression and other statistical and qualitative analyses. *Id*. at 671-73. *Olean* rejected an Article III challenge like the one Zuffa makes here, holding confirmation of harm to 94.5% of a class—using the same technique Dr. Singer used to confirm harm to 99%—established injury to *all* class members. *Id*. at 682 ("We need not consider the Tuna Suppliers' argument that the possible presence of a large number of uninjured class members raises an Article III issue, because the Tuna Purchasers have demonstrated that all class members have standing here.").[100]

## CONCLUSION

For the foregoing reasons, Zuffa's Motion should be denied.

---

[100] The technique conservatively assumes that any unexplained upward variation in compensation is attributable to the alleged antitrust violation, implying that some class members somehow *benefited* from anticompetitive conduct. SR1 ¶231 & n.550. That is true even for cases involving criminal price fixing, as *Olean* did. So the technique provides a rigorous way to confirm classwide injury, but an inappropriate basis for inferring a lack of injury to any class members.

Dated: November 30, 2023                    Respectfully Submitted,

                                            By: /s/ Eric L. Cramer
                                                Eric L. Cramer

                                            Eric L. Cramer (*Pro Hac Vice*)
                                            Michael Dell'Angelo (*Pro Hac Vice*)
                                            Patrick F. Madden (*Pro Hac Vice*)
                                            Najah Jacobs (*Pro Hac Vice*)
                                            BERGER|MONTAGUE PC
                                            1818 Market Street, Suite 3600
                                            Philadelphia, PA 19103
                                            Phone: (215) 875-3000/Fax: (215) 875-4604
                                            ecramer@bm.net
                                            mdellangelo@bm.net
                                            pmadden@bm.net

                                            Joshua P. Davis (*Pro Hac Vice*)
                                            Julie Pollock (*Pro Hac Vice*)
                                            BERGER|MONTAGUE PC
                                            505 Montgomery Street, Suite 625
                                            San Francisco, CA 94111
                                            Phone: (415) 215-0962
                                            jdavis@bm.net
                                            jpollock@bm.net

                                            Joseph R. Saveri (*Pro Hac Vice*)
                                            Kevin E. Rayhill (*Pro Hac Vice*)
                                            JOSEPH SAVERI LAW FIRM, INC.
                                            601 California Street, Suite 1000
                                            San Francisco, California 94108
                                            Phone: (415) 500-6800/Fax: (415) 395-9940
                                            jsaveri@saverilawfirm.com
                                            krayhill@saverilawfirm.com

                                            Benjamin D. Brown (*Pro Hac Vice*)
                                            Richard A. Koffman (*Pro Hac Vice*)
                                            Daniel H. Silverman (*Pro Hac Vice*)
                                            COHEN MILSTEIN SELLERS & TOLL, PLLC
                                            1100 New York Ave., N.W., Suite 500
                                            Washington, DC 20005
                                            Phone: (202) 408-4600/Fax: (202) 408 4699
                                            bbrown@cohenmilstein.com
                                            rkoffman@cohenmilstein.com
                                            dsilverman@cohenmilstein.com

                                            **Co-Lead Counsel for the Bout Class and Attorneys
                                            for Individual and Representative Plaintiffs**

**Liaison Counsel for the Bout Class and Attorneys for Individual and Representative Plaintiffs:**

Don Springmeyer (Nevada Bar No. 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Phone: (702) 385-6000/Fax (702) 385-6001
dspringmeyer@kempjones.com

**Additional Counsel for the Bout Class and Attorneys for Individual and Representative Plaintiffs**:

Robert C. Maysey (*Pro Hac Vice*)
Jerome K. Elwell (*Pro Hac Vice*)
WARNER ANGLE HALLAM JACKSON &
FORMANEK PLC
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Phone: (602) 264-7101/Fax: (602) 234-0419
rmaysey@warnerangle.com
jelwell@warnerangle.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of November, 2023 true and correct copies of

**PLAINTIFFS' OPPOSITION TO ZUFFA'S RENEWED MOTION FOR SUMMARY**

**JUDGMENT** and its supporting papers were served via the District Court of Nevada's ECF system to

all counsel of record who have enrolled in this ECF system.


_/s/ Eric L. Cramer_
Eric L. Cramer
