# Exhibit 9

Expert Report of Professor Robert H. Topel (October 27, 2017) (excerpted)

Highly Confidential Under Protective Order

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CUNG LE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP and UFC,<br><br>    Defendants. | Case No. 2:15-cv-01045-RFB-PAL |

**Expert Report of Professor Robert H. Topel**

**October 27, 2017**

compensation. Standard and widely-accepted economic models of competitive labor markets explain the determination of workers' wages, measured in dollars per worker. Dr. Singer ignores these models. Instead, he asserts without foundation that an MMA athlete's compensation should be measured as a share of event revenues rather than as dollars paid. This metric is economically incorrect: there is no economic basis for Dr. Singer's assumption that a decline in the share of total event revenue paid to an MMA athlete is evidence of anticompetitive harm. In fact, procompetitive, market-expanding conduct by Zuffa would cause this share to decline in the absence of any harm to an MMA athlete, even if actual compensation of these athletes rose— which in fact it did.

27. **Opinion 7**: Dr. Singer's regression evidence of anticompetitive impact and harm is misleading, fatally flawed, and unreliable. He claims to show that greater foreclosure of the market for MMA fighters by Zuffa has reduced the compensation of Class Members, yet his measures of both "foreclosure" and compensation are economically and econometrically incorrect. They will mechanically generate "evidence" of anticompetitive impact, even if such impact is impossible and even if compensation of MMA fighters is increasing. Dr. Singer measures "foreclosure" by the share of MMA fighters with particular contractual provisions who are under contract with Zuffa. In addition to other flaws discussed in detail below, this share will increase simply because Zuffa has competed aggressively on the merits, expanding relative to rival promoters and becoming the market leader. Dr. Singer's measure of labor market outcomes is not the compensation paid to its fighters, but instead the compensation of a fighter divided by Zuffa's revenue from the event in which the fighter performed. This measure will decline as Zuffa events become more popular, because event revenues increase—even if the pay of Zuffa fighters is rising. Together these errors imply a mechanical negative relationship between Dr. Singer's measures of "foreclosure" and "compensation": as Zuffa competed on the merits and became more successful at promoting MMA fighters and events, its share of MMA fighters under contract rose while compensation *as a share of event revenue declined*. This mechanical relationship says nothing about anticompetitive impact or harm.

28. **Opinion 8**: The economically correct measure of compensation is compensation— measured in dollars per athlete. Accepting *arguendo* the other flawed aspects of Dr. Singer's regression model, including his flawed measures of "foreclosure," I re-estimated his model using

10

### B. EXCLUSIVITY AND MULTI-BOUT CONTRACTS ASSIST IN PROTECTING PROMOTERS' INVESTMENTS AND BUILDING A BUSINESS

85. In the MMA marketplace, many aspects of the contracting structure between promoters and athletes are best understood as a solution to a ubiquitous free riding problem.

86. Generally speaking, free riding can arise when two parties are engaged in a repeated economic relationship. The success of that relationship depends on one or both parties making investments that increase the value of collaboration. But in some cases, one party may be able to capture the investments of its partner by switching to another partner—the capital resulting from the investments are not specific to the original parties. This ability to free ride on the first partner's investments discourages that firm from making investments in the first place.[139] For example, an insurance company that sells through independent agents can increase demand for its products by advertising. However, once potential customers respond to the advertising by contacting the independent agent, the agent may have an incentive to steer customers to other insurers that do not spend as much on advertising, and therefore can offer more attractive pricing to the customer and to the agent.[140] To prevent such free riding, insurers that invest heavily in advertising may use exclusive agents rather than independent agents representing multiple insurers, and may restrict the ability of agents to take their client list with them if they leave to represent another insurer. Otherwise, the insurer would not generate as much return from its advertising and market development, and would have less incentive to promote its products.

87. Both athletes and promoters make considerable investments that increase the value of the product offered to the public: athletes through their training, and promoters through promoting MMA events and athletes. However, there is an important difference between these investments. Investments in training borne by the athletes themselves are not subject to free riding because training is embodied in the individual athlete: when skilled athletes switch promoters, their embodied skills go with them to the new promoter. The original promoter cannot transfer those skills to a new athlete, so the athlete retains the ability to collect the returns on his own training investments. In contrast, a promoter's investments in an athlete increase the general

---

[139] See Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (2005) at Chapter 12, p. 414.

[140] Howard P. Marvel, "Exclusive Dealing," *The Journal of Law and Economics*, vol. 25 (April 1982).

marketability and publicity of that athlete, which are embodied in the athlete's MMA reputation or identity. If an athlete switches promoters, the investments made by the original promoter continue to make the athlete more marketable and valuable with the new promoter. Absent contractual restrictions or other means of compensating the original promoter, a competing promoter can free ride on the investments made by the original promoter by hiring the established athlete. With no limitations on switching among promoters, this free riding would reduce the investments made by promoters in MMA events, and decrease the value of MMA events to consumers, athletes, and promoters.

88.     Dr. Singer acknowledges that Zuffa is responsible for all costs associated with its productions,[141] and also that athletes sign a PAR agreement with Zuffa that grants Zuffa "the exclusive right to promote and arrange all of the Fighter's Bouts."[142] Thus, all promotional investments for bouts are undertaken by Zuffa, which is the party best positioned to make such investments. Given the potential for free riding on these investments by competing promoters, the contractual arrangements in PARs are designed to limit free riding and give Zuffa an incentive to promote upcoming bouts and up-and-coming athletes. For example, athletes contract for multiple bouts. Multi-bout contracts provide an incentive to sign and promote athletes in the early stages of their careers because Zuffa will have the opportunity to reap a return on its investment near the end of the multi-bout contract if it has correctly identified talent and promoted the athlete successfully. Without such contracts, Zuffa might have an incentive to disproportionately promote matches featuring established athletes.

89.     Other elements of the alleged Challenged Conduct can also be understood as either a consequence of or a response to the concern that competing MMA promoters will free ride on promotional investments. For example, Dr. Singer lists as a vertical restraint of trade a provision that restricts competing MMA promoters that contract with athletes that have left the UFC from using video clips of previous UFC fights to promote upcoming fights.[143] But this is simply a reflection of Zuffa exercising its intellectual property rights over copyrighted works. The

---

[141] SINGER REPORT at ¶ 21.

[142] SINGER REPORT at ¶ 71; SINGER REPORT at n. 60.

[143] SINGER REPORT at ¶ 74.

95. Inherent to this solution to the transaction cost issue is that the marketplace will rely on matches between athletes contracted to the same promoter. Co-promoted matches, in which athletes from different MMA promoters compete against one another, are apparently non-existent.[155] There are also significant risks for the promoter whose job it is to sell the public on the idea that its athletes are the best. The promoter for the losing athlete in a cross-promoted event not only has lost that one bout but may also have diminished its ability to promote future events featuring its athletes because of the loss in the reputation and brand it had tried to create.[156] When discussing whether there can be procompetitive benefits to Zuffa's contracting practices, Dr. Singer suggests that a more competitive MMA industry could have matchups between athletes from different promoters.[157] Yet he provides no evidence of such cross-promotions between any promoters in the market, either currently or historically. The absence of cross-promotion, even among Zuffa's competitors, is strong evidence that cross-promotion is an inferior business model in MMA—it has failed the market test. The market reality is one of intra-promoter matches only.

96. Given this market outcome in which intra-promoter bouts are the universal business practice—not only by Zuffa, but also by competing promoters—there is a natural tendency for a leading promoter to attract a significant share of the top athletes. This follows from the complementarity of athlete talents in producing high-quality bouts, and the desire among athletes to fight against the best, statements which appear repeatedly in Dr. Singer's report.[158] Thus, the fact that Zuffa is larger than its rivals, has a larger share of top athletes, and is more successful at attracting audience share and revenue is not indicative of anticompetitive conduct, but rather follows naturally from the solution to the transaction cost problem that has been adopted by all competitors in the marketplace; such an outcome is procompetitive. The market structure induces aggressive competition between promoters to stage appealing events featuring matches among

---

[155] When discussing the possibility of cross-promoted fights, the only example that Dr. Singer cites is a boxing match between an MMA athlete and a boxer. (SINGER REPORT at ¶ 269.)

[156] Deposition of Scott Coker, (August 3, 2017) [hereinafter COKER TR.] at 84-87.

[157] SINGER REPORT at ¶ 269; see also SINGER REPORT at ¶¶ 283-4.

[158] SINGER REPORT at ¶¶ 20, 106, 136, 138, 164.

their own contracted athletes. The most successful promoter will tend to attract the most talented athletes and produce the highest-valued events, at least until being supplanted by another promoter with a superior product or business acumen. In this regard, it is noteworthy that in Asia, which is the only other geographic market for MMA identified by Dr. Singer, he cites ONE Championship's claim that it has a 90 percent market share.[159]

97. Moreover, when viewed from the perspective of the marketplace implementing an efficient solution to a transaction cost problem, the horizontal acquisitions that are an element of the alleged Challenged Conduct discussed by Dr. Singer are in fact procompetitive. When competing promoters each have highly ranked athletes, but transaction costs deter promoters from arranging cross-promoted matches, horizontal acquisitions enable top athletes to compete against each other—the complementary inputs (highly talented athletes) are brought within a single firm, which the evidence indicates is necessary for them to fight each other. This result benefits customers, who want to see (and are willing to pay to see) matches between top athletes. As discussed below, it also benefits athletes, for whom compensation increased following these acquisitions. In Section IX, I show that Zuffa's horizontal acquisitions did not increase its market power.

### D. OTHER PROCOMPETITIVE BENEFITS OF ZUFFA'S CONTRACT PROVISIONS
#### 1. Tolling Provisions

98. Zuffa's tolling provisions allow Zuffa to extend the length of an athlete's contract for periods of time in which the athlete is injured or otherwise unwilling or unable to compete. This provision ensures that Zuffa has sufficient time to promote the designated number of bouts under the contract. Without this provision, an athlete could get injured once and be unavailable for the remaining duration of the term of Zuffa's contract thus depriving Zuffa of the benefit of the multi-bout contract it bargained for.

99. Dr. Singer states that in the case of injury, unwillingness to compete, or retirement, Zuffa's agreements permitted them to extend contracts beyond the stated term for "many

---

[159] "About ONE," available at https://onefc.com/about-one/ cited in SINGER REPORT at ¶ 122.

$19 million.[364] Dr. Singer has provided no evidence linking Zuffa's PPV prices to the Challenged Conduct, or even to its putative market power.

251. While Dr. Singer's conclusion that PPV prices increased by 24 percent is based on faulty calculations, he is correct that there was a reduction between 2010 and 2015 in total PPV buys. In 2010, Zuffa held 15 events that were available on PPV and sold 7.7 million residential buys. In 2015 Zuffa sold 6.4 million residential buys over 13 events.[365] However, this decrease was not the result of an anticompetitive increase in Zuffa's PPV prices, which did not increase. And while it is clearly uninformative to claim that every change in Zuffa's PPV offerings is the result of the exercise of monopoly power, Dr. Singer made no attempt to consider other factors that would cause Zuffa to offer fewer events. For example, in 2011, Zuffa signed a multiple year, multi-media rights agreement with Fox. As part of this deal, Fox agreed to broadcast four primetime live events per year and other Fox networks would broadcast Zuffa programming.[366] Zuffa's broadcast deal with Fox offers a reasonable explanation for why Zuffa broadcast fewer PPV events in 2015 than in 2010 since the four Fox primetime live events were similar to Zuffa's PPV events.[367] Furthermore, even if PPV viewership declined, it is reasonable to conclude that overall viewership of Zuffa MMA bouts increased because Zuffa events were more widely broadcast on cable television after the Fox deal than before.[368] They were simply offered through a different channel. Dr. Singer does not analyze these issues.

---

[364] SINGER BACKUP, *Zuffa Yearly Financial Statements_CKD.xlsx*. An increase in Zuffa's advertising expenses would simultaneously increase costs and demand. Moreover, Zuffa's total direct expenses increased from $193 million to $367 million between 2010 and 2015.

[365] WME-ZUFFA-00001150 at 9.

[366] ZUF-00470398.

[367] FERTITTA TR. at 146. Responding to a question about whether Zuffa strove to include headliners in their events, the witness responded that it depends on the type of event and placed PPV events and the four Fox Primetime live events within the same category, separate from other Zuffa events. "Yes, but it depends on what events you're referring to because there were a number of events in the UFC. We had a number of events which typically are on pay-per-view or a few times were on broadcast, on Fox broadcast."

[368] WME-ZUFFA-00001150 at pp. 8-9. Since the Fox deal, Zuffa's PPV buys have increased each year except in 2014, which Zuffa attributes to "a unique mix of bad luck and bad management." In 2014, PPV buys were adversely affected because for eight of Zuffa's thirteen PPV events, the main bouts were cancelled within several weeks of the event. Since Dr. Singer does not control for such bad luck, his methodology would attribute the resulting decline in PPV buys to Zuffa's Challenged Conduct.