# Exhibit 12

30(b)(6) Deposition of Kirk D. Hendrick on behalf of Zuffa, LLC (November 29, 2016) (excerpted)

```
                                                                    1
                    UNITED STATES DISTRICT COURT

                        DISTRICT OF NEVADA



CUNG LE; NATHAN QUARRY, JON   )
FITCH, on behalf of           )
themselves and all others     )
similarly situated,           )
                              )
          Plaintiffs,         )
                              )
          vs.                 ) Case No.
                              ) 2:15-cv-01045-RFB-(PAL)
                              )
ZUFFA, LLC, d/b/a Ultimate    )
Fighting Championship and     )
UFC,                          )
                              )
          Defendant.          )
_____)




                         CONFIDENTIAL

    VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

                    BY KIRK D. HENDRICK

                     NOVEMBER 29, 2016

                     LAS VEGAS, NEVADA

                        9:05 a.m.


Reported by:
KENDALL D. HEATH
Job No: 47771
```

                                                                  62

1   example or several examples, if we could, that that
2   clause was changed for a particular athlete.
3       Q.  I see.  So one question I had is why did
4   the change of the champion's clause for Mr. Liddell
5   from a 5/2007 agreement, why did that variation
6   appear in this column that reflects a change
7   between 2012 and 2013?
8       A.  So if I understand your question, you're
9   saying is the variation related to the change?
10      Q.  Correct.
11      A.  No.  The variation is trying to say is
12  that clause different for any athletes.  It doesn't
13  specifically relate to the redlining in the left
14  column.
15      Q.  I see.  Okay.  So the champion's clause,
16  part of this chart begins on page 18 and continues
17  through page 20; is that right?
18      A.  Correct.
19      Q.  And so this section of this chart is
20  attempting to capture the changes in the standard
21  promotional and ancillary rights agreement with
22  respect to the champion's clause from November 2003
23  through May 2013; is that right?
24      A.  Correct.
25      Q.  Okay.  And --

                                                                  63

1       A.  Actually, I don't mean to interrupt.  It
2   could be longer.  So I think the timeline actually
3   goes through summer, June of '15.
4       Q.  Okay.
5       A.  So this may have been the last change to
6   this section --
7       Q.  Okay.
8       A.  -- but you could actually say that it
9   goes through June of '15.
10      Q.  All right.  So is that true with respect
11  to this chart or generally that if we do not see a
12  change past, or a change between the last date in
13  the section and June of 2015, we can assume then
14  that the version that existed in the last column of
15  that section is the existing version?
16      A.  Yes.  That was the intent is that the
17  standard promotional agreement in place as of June
18  2015 hadn't been modified.  If we didn't show it,
19  the idea was this was the last modification.
20      Q.  Now, with respect to the variations part,
21  in particular with regard to the champion's clause
22  section here, you show two variations:  One on
23  page 19 and then one on page 20.
24          The first we talked about was with regard
25  to Mr. Liddell and the second was with regard to

                                                                  64

1   Mr. Brooks; is that right?
2       A.  Correct.
3       Q.  Sitting here today, do you know of any
4   variations to the champion's clause from the
5   standard form that are not identified in this
6   chart?
7       A.  Sitting here today, no, and that's kind
8   of what the intent here was is to help me testify
9   today.  If there had been a question about has
10  there been modifications, these would be a couple
11  that I could say, yes, I went back, I reviewed
12  Chuck Liddell's agreement, I reviewed Phil Brooks'
13  agreement.
14          Could I say that there's more?  Yes, I
15  believe there's more, but they're not in this
16  chart.
17      Q.  You believe there's more, but sitting
18  here today, you don't recall specifically any
19  promotional and ancillary rights agreement that had
20  a variation from the standard form other than the
21  two identified in this chart?
22          MS. GRIGSBY:  Objection, mischaracterizes
23  his testimony.
24          Are you asking Mr. Hendrick in his
25  personal capacity?

                                                                  65

1           MR. CRAMER:  No, speaking for Zuffa.
2           THE WITNESS:  As I sit here today, the
3   two that come to mind are these.  Do I believe
4   there's more?  Yes, I believe there's more, but I
5   don't recall them.
6   BY MR. CRAMER:
7       Q.  Okay.
8       A.  We could certainly go back and look at
9   more documents and provide more examples, but this
10  was a way for me to know of a couple while I sat
11  here today.
12      Q.  So you've identified a couple of
13  variations, two to be specific.  You believe there
14  are a few more.
15          Can you, on behalf of Zuffa, give me a
16  ballpark estimate as to the total number of
17  variations from the form of the champion's clause
18  that might exist from 2003 to 2015?
19      A.  No, I'd be guessing because it's not
20  something we track.  It's not like we have a
21  database that says are there variations to this
22  particular championship clause and, if so, what are
23  they.  So I don't know the answer to that.
24      Q.  Fair to say, though, that variations
25  specifically with regard to the champion's clause

KIRK D. HENDRICK - CONFIDENTIAL

```
                                                           66
 1   from the standard form were relatively rare?
 2       A.  I guess you'd have to define "relatively
 3   rare."  They certainly weren't common, I'd say
 4   that.  It wasn't a -- it wasn't a usual revision
 5   that we made.
 6       Q.  And so I don't have to spend a lot of
 7   time on each of these sections, would your answers
 8   in general with regard to the purpose of the
 9   variations section of this chart be the same for
10   each of these different sections of this chart?
11           MS. GRIGSBY:  Objection to form.
12   BY MR. CRAMER:
13       Q.  Let me re-ask the question because that
14   was confusing.
15           So if we turn now to the chart D part of
16   this with regard to the ancillary rights provision
17   starting on page 21, I see a variation on page 22,
18   a variation on page 26 to 27, a variation on
19   page 32, then again on 33, on 36, on 38 and 39 and
20   40 and 41, on 42, on 44, and that is it.
21           So those are all the variations that
22   Zuffa has identified regarding the ancillary rights
23   provision; is that right?
24           MS. GRIGSBY:  Objection.  Actually
25   mischaracterizes what's in the document.
```

```
                                                           67
 1   BY MR. CRAMER:
 2       Q.  All right.  Can you explain -- can you --
 3   what have I mischaracterized?
 4       A.  First of all, I don't know if you had
 5   mentioned page 21.
 6       Q.  Okay.
 7       A.  I might have missed that, but that's on
 8   the first page.
 9       Q.  Okay.
10       A.  Again, in order to help me testify today,
11   if we talked about have there been variations to
12   this particular clause, these are examples --
13       Q.  Okay.
14       A.  -- that would relate to that one.  Again,
15   they're not all of them, but they are specific
16   examples that we were able to go and pull out and
17   then actually include the full document, if you
18   needed to see the full document.
19       Q.  With regard to any of the variation
20   entries in this entire Tab A chart, does -- did
21   you, on behalf of Zuffa, have examples of
22   variations in mind that were not included in the
23   chart?
24       A.  No.
25       Q.  You can put that aside for now.
```

```
                                                           68
 1       Do you own a financial stake in Zuffa or
 2   its current owner?
 3       A.  No.
 4       Q.  Is any portion of your compensation from
 5   Zuffa or the UFC based on the financial success of
 6   Zuffa?
 7       A.  I would say that a potential bonus.  If
 8   the company does well, I would probably get a
 9   better bonus.
10       Q.  Discretionary?
11       A.  Yes.
12       Q.  Who determines your compensation?
13       A.  Well, my contract was in place before the
14   company sold, but the discretionary bonus will be a
15   decision made by WME/IMG, probably in consultation
16   with Dana White.
17       Q.  Okay.  So we've been talking about
18   promotional and ancillary rights agreements.
19       ==Is it fair to say that Zuffa requires all
20   of its MMA fighters to execute exclusive
21   promotional and ancillary rights agreements?==
22       A.  Yes.  When you join the UFC, one of the
23   first documents you need to sign is a promotional
24   and ancillary rights agreement.  So all the
25   athletes that compete in the UFC sign that
```

```
                                                           69
 1   document.
 2       Q.  Why is that?
 3       A.  That's the document that says for a
 4   period of time, Zuffa will promote this athlete in
 5   a certain number of events over a certain number of
 6   months.
 7           And that athlete is agreeing that they
 8   will compete for the UFC under UFC events for a
 9   certain amount of time and will promote those
10   events during that time period.
11       Q.  Are you aware, on behalf of Zuffa, of any
12   fighter that has fought for Zuffa that did not sign
13   an exclusive promotional and ancillary rights
14   agreement?
15       A.  I'm not.
16       Q.  I think we talked about this, but Zuffa
17   generally uses a form template as the basis for its
18   promotional and ancillary rights agreements with
19   fighters?
20       A.  I think I characterized it as a standard
21   promotional agreement.  I wouldn't call it a form
22   template, but a standard agreement that starts the
23   process.
24       Q.  Now, in addition to the binder that we
25   marked as Exhibit 2, I believe last week Zuffa
```

18 (Pages 66 to 69)

                                                                          70

1    produced additional template contracts, promotional
2    and ancillary rights agreement contracts in advance
3    of the deposition.  Do you know how that came
4    about?
5        A.  I do not.
6        Q.  Are those -- are the contracts that were
7    produced last week for purposes of this deposition
8    also in Exhibit 2 to the deposition?
9        A.  I'd have to see them to be sure.
10       Q.  To save time, is it okay with you if I
11   refer to the exclusive promotional and ancillary
12   rights agreement as PAR or EPAR?  Does that make
13   sense?
14            Do we understand EPAR as exclusive
15   promotional and ancillary rights agreements for
16   purposes of this deposition.
17       A.  And PAR as promotional and ancillary
18   rights agreements?
19       Q.  Right.
20       A.  I think that's fine.  That's not a term I
21   would have used, nothing we vernacularly would say,
22   but, yes, I'll try to keep that in mind.
23       Q.  Okay.  Just to try to save words.
24       A.  No.  I understand.
25       Q.  Help out our court reporter here.

                                                                          71

1            So Zuffa, from time to time -- I believe
2    we've established this already -- modified its EPAR
3    forms that included standard language; is that
4    fair?
5        A.  Yes.  Let's back up a second.
6        Q.  Okay.
7        A.  You said we want to talk about them as
8    EPAR and PAR?
9        Q.  Right.
10       A.  I might need a little more clarification
11   on why, because if you're going to start asking me
12   questions about EPAR, you'll notice that sometimes
13   they had that word in the heading --
14       Q.  Right.
15       A.  -- and sometimes they didn't.  So if it
16   matters to you about timeline, I'd like to clarify
17   that.  But if you're saying that the promotional
18   and ancillary rights agreement, sometimes referred
19   to as exclusive promotional and ancillary rights
20   agreement, was modified over the last 15 years,
21   that's correct.
22       Q.  Okay.  We'll just call it a PAR, and that
23   will stand for either promotional and ancillary
24   rights agreement or the exclusive promotional and
25   ancillary rights agreement.

                                                                          72

1        A.  Right.
2        Q.  It's the same general agreement; right?
3    It's a different title; is that right?
4        A.  Title and a few minor revisions in the
5    document.
6        Q.  Okay.  Well, I'll ask you later about
7    that change, but we'll call it a PAR.
8            What was the process by which the
9    standard forms were modified?  How did that work at
10   Zuffa?
11       A.  Well, I guess you're going to have to
12   talk about what time period when you say "standard
13   process."
14       Q.  So let's start in 2003.  And you have the
15   standard template that -- of the PAR agreement that
16   Zuffa uses to begin -- to send to athletes, here is
17   our standard PAR, and we've established that that
18   changes over time, what -- meaning that the form
19   changed over time.
20           What was the process in 2003 to, say,
21   2005 for those changes to be made?
22       A.  I guess to answer that, I'd have to back
23   up a little bit further, and then I'll try to get
24   in the year 2003, because as I was mentioning
25   earlier, that's the first electronic document we

                                                                          73

1    have here.
2            But when Zuffa purchased the assets of
3    the UFC in January 2001, there was already
4    promotional agreements in place.  I don't know if
5    they were called exclusive promotional agreements,
6    but they were promotional and ancillary rights
7    agreements that were prepared by Semaphore
8    Entertainment Group, I'll refer to as SEG.  That
9    was the prior owner.
10           Those agreements existed until such time
11   as a law firm here in Vegas, Beckley Singleton,
12   started creating another version of promotional and
13   ancillary rights agreement pretty much based off of
14   boxing agreements and the SEG agreement.  That was
15   the firm where Lawrence Epstein worked.
16           And those documents were then, I'm sure,
17   I wasn't there on behalf of the company, but they
18   may have been modified for a certain amount of
19   time.
20           The firm I was at that I mentioned
21   earlier, Jones Vargas, in, I believe it was the
22   summer of 2002, took those documents, the Beckley
23   Singleton version, the SEG version, boxing
24   contracts with the intent of trying to put them in
25   a little more cohesive version.

                                                       19 (Pages 70 to 73)

210

1   talking about Mr. Jackson's specific agreement?
2        MR. CRAMER: Well, it's quoted at the
3   top, Section 5.3. It's the standard 5.3.
4        THE WITNESS: But you're talking about
5   for Jackson?
6   BY MR. CRAMER:
7     Q. Yes.
8     A. Yeah. And repeat your question.
9     Q. Was it a correct interpretation of the
10  PAR to include the time Jackson spent filming the
11  Ultimate Fighter for Zuffa in calculating the
12  duration of the extension?
13    A. I'd have to see his agreement. At one
14  point there is now a provision that allows for --
15  if you're going to be a coach on the Ultimate
16  Fighter, it allows for a six months extension of
17  the terms specifically in the agreement. But
18  normally, even before that time we would have
19  talked to the coaches and said because of the time
20  necessary for filming and the time necessary for
21  airing the reality show, it's a time that you won't
22  be fighting, because normally the coaches would end
23  up in a big fight at the end of the show.
24       So the idea is you might not fight for
25  six months, but there will be a big event at the

211

1   end. I don't know -- so your question was, is this
2   appropriate or -- I'm not sure. I don't want to
3   misuse your word, but is this from Jackson's
4   contract? I don't know if that was in there
5   without looking at the document.
6     Q. Right. The next paragraph says, "The
7   reality is that Rampage has three fights left under
8   his current agreement with Zuffa, including the
9   fight on May 29, 2010."
10       Then it says, "As such, it is unlikely
11  that he will even get close to the March 5, 2012,
12  termination date noted in the February 1, 2010,
13  letter."
14       Why won't he get close to that
15  termination date? Do you know?
16    A. Well, one of the things we try to do is
17  get fighters' fights as quickly as possible, you
18  know. Our business is promoting events. So
19  without being able to interpret what Mike is saying
20  there, I believe what he's saying is three fights
21  within that amount of time should be sufficient
22  enough.
23       But as you can see if you read up above,
24  the earlier paragraphs, including the one you
25  skipped over, Rampage wasn't fighting a lot. So,

212

1   again, the clock ticking against the UFC and
2   Rampage not fighting, there's got to be some
3   ability for us to promote the events.
4     Q. All right. The next sentence says, "He
5   will hopefully fight at least twice in 2010, and at
6   that point we will almost certainly begin
7   negotiations on a new promotional agreement that
8   will make all of these dates irrelevant."
9        Do you see that?
10    A. Yes.
11    Q. Was it generally Zuffa's policy to begin
12  negotiating new deals with fighters it wanted to
13  re-sign before the final bout in the PAR term?
14    A. I think we're always negotiating with
15  fighters. It seems like, whether it's before their
16  fights have finished, I think that's fairly often
17  what happens.
18    Q. Why? Why did Zuffa begin negotiating
19  typically with fighters before the last bout in
20  their promotional agreement?
21    A. Because we want to know are they going to
22  be available beyond those fights. So managers
23  would call up all the time saying, okay, my guy's
24  in two fights or three fights, he wants more money.
25  Those inbound calls happen all the time, and can we

213

1   do a new deal.
2        MR. CRAMER: I'd like to mark as Exhibit
3   20 the next document, please.
4        (Plaintiffs' Exhibit 20 was marked
5        for identification.)
6   BY MR. CRAMER:
7     Q. Exhibit 20 is two e-mails on one page
8   with the Bates No. ZFL-0977248, and it has an
9   e-mail at the bottom from Ryan Parsons to Joe Silva
10  dated May 5, 2015. And then at the top, from Silva
11  to Parsons, re Pat, received May 5, 2015. Do you
12  see that?
13    A. Yes.
14    Q. Have you seen this series of e-mails
15  before?
16    A. I don't believe so.
17    Q. Okay. Do you know who Ryan Parsons is?
18    A. I know the name, but I don't know if I
19  know him personally.
20    Q. Silva says to Parsons, "He's only 3 and 2
21  in the UFC and 7-2 overall. The two good guys he
22  fought wrecked him inside of a round. I'm not
23  locking him into a long-term deal."
24       Then he says, "It's just a four fight
25  deal, and I always renegotiate before the last

                                                                    214

1   fight just like I am doing now.  So three fights
2   and we talk again.  Joe."
3          Do you see that?
4       A.  Yes.
5       Q.  Are -- was it Zuffa's policy to -- to
6   renegotiate before the last fight of a PAR
7   agreement?
8       A.  Is it Zuffa's policy?  I don't think
9   there's a policy to that.  Joe is saying it was his
10  practice to renegotiate before the last fight.  I
11  take him at his word what he put there.
12      Q.  Joe was the person responsible for
13  renegotiating with fighters when he wrote this?
14      A.  With that particular fighter,
15  certainly.
16      Q.  Were you aware that it was Silva's
17  practice that he would renegotiate with fighters
18  before the last fight?
19      A.  As I was saying earlier, I think that
20  happens all the time, the inbound calls, inbound
21  e-mails.  In this particular example, you've got a
22  manager saying, hey, it's time, you know, can --
23  would we consider giving my guy a new contract.
24          And Joe is saying, Let's see how he did.
25  And as you'll see, Joe is saying that he -- his

                                                                    215

1   record isn't that great.  Let's see how he does on
2   his next fight.
3       Q.  Do you take Joe at his word here, that he
4   always renegotiates before the last fight, just
5   like he said he was doing then?
6       A.  No.  I can't interpret one sentence as
7   being something that he does all the time, you
8   know.  If Joe was able to answer that, I would have
9   to ask Joe.  That's certainly not a company policy
10  or anything that I could sit here and testify to.
11      Q.  Is it fair to say that prior to the final
12  bout in a PAR agreement, Zuffa determines who the
13  fighter fights?
14      A.  No.
15      Q.  So Zuffa doesn't determine who the
16  fighter fights?
17      A.  Fighter has to determine.  You got to
18  start with the point that you can never make a
19  fighter fight anybody.  And do we offer them fights
20  in their weight class against people that we think
21  are fair matches and good matches?  Yes, but they
22  determine whether or not they're going to fight.
23      Q.  Right.  But if they turn it down, as
24  we've seen, Zuffa can extend the contract; right?
25      A.  Could.  As I stated earlier, rarely

                                                                    216

1   happens, but could.
2       Q.  But Zuffa has the discretion to determine
3   who the fighter fights under the PAR agreement;
4   correct?
5       A.  No.  We have the right to offer fighters,
6   but the fighter has to agree to fight the
7   opponent.
8       Q.  The fighter doesn't choose who the
9   fighter fights under the Zuffa PAR agreement; is
10  that right?
11      A.  No, I think I answered that.  The fighter
12  chooses who they're going to fight.  You can't make
13  anybody fight anybody.
14      Q.  Of course.  But if the fighter turns it
15  down, Zuffa has the hammer, and that hammer is they
16  never get to fight again unless they fight for the
17  person who Zuffa wants them to fight.
18      A.  No.  You're talking about if, in your
19  hypothetical, okay, so you turn down fighter A, so
20  I'm going to extend you for six months.
21      Q.  Yes.
22      A.  Fighter B for six months and fighter C.
23  It's just not how it works.  It's more like, I'll
24  offer you Fighter A, Fighter B, Fighter C, Fighter
25  D, Fighter E.

                                                                    217

1          And if they're eventually not fighting,
2   we've got to be sure that we have time to get a
3   fight in, but the fighters have to decide whether
4   or not they're going to fight a particular
5   opponent.
6       Q.  Right.  But the background agreement that
7   Zuffa has with its fighters both gives Zuffa the
8   discretion to decide who to fight, and allows Zuffa
9   to punish the fighter if they turn the fight down;
10  right?
11          MS. GRIGSBY:  Objection, argumentative.
12  BY MR. CRAMER:
13      Q.  You're saying -- you're saying Zuffa
14  doesn't, as a matter of practice, in your opinion,
15  punitively assign fights to fighters, but Zuffa has
16  the power to do that under the agreement; correct?
17          Zuffa could -- Zuffa could offer -- Zuffa
18  has the discretion under the agreement, if it
19  wanted to, to offer a strawweight fight to a
20  heavyweight?
21          MS. GRIGSBY:  Objection to form.
22          THE WITNESS:  It couldn't do that.
23  BY MR. CRAMER:
24      Q.  Why not?
25      A.  Because it's not offering a bout.

KIRK D. HENDRICK - CONFIDENTIAL

218

1  Q.  Is that right?  So Zuffa -- so Zuffa's
2  interpretation of the agreement is unless you're
3  offering a bout within the weight class of the
4  fighter, it's not a bout under the Zuffa
5  agreement?
6      A.  Or again, another weight class that the
7  fighter wants to fight in.  You got guys who fight
8  in multiple weight classes.  But if you try to
9  offer a strawweight a heavyweight fight, that's not
10 offering a legitimate fight.
11     Q.  Does Zuffa have discretion as to card
12 placement, or is that up to the fighter as well, in
13 your view?
14     A.  I think sometimes the fighters may be
15 involved in saying where they want to be, but the
16 laying out of the card based on the television
17 positioning and those type of things is more up to
18 Zuffa's discretion.
19     Q.  And does the fighter decide whether the
20 fight will be on Pay-Per-View or not or is that
21 Zuffa?
22     A.  Well, they -- at a certain level --
23 you've got to realize these are all individualized.
24 And I know we're talking very general about a
25 fighter and fights, but if you get to a certain

219

1  level of compensation, you're generally going to be
2  on Pay-Per-View level fights because that's how we
3  recoup our investment.
4      So do they get to decide if they're on
5  Pay-Per-View?  Sometimes they do if their contract
6  provides, if you're a champion, you get
7  Pay-Per-View, if you're the challenger, you get
8  Pay-Per-View.
9      Some guys, which apparently -- was it
10 Quinton we were looking at -- that he got
11 Pay-Per-View regardless.  There's some fighters
12 that get Pay-Per-View for every fight.  So, again,
13 it's -- if you generalize too much, I don't know if
14 I can answer that.
15     Q.  Can you point me to any provision in
16 Zuffa's PAR agreement, any of the ones in front of
17 you, that say that a fighter has discretion at --
18 as to who they're going to fight in the UFC?
19     A.  I would have to go back through them and
20 look at the outline.  Let me see.  I'm not sure
21 that was a section that we would have pulled, so
22 I'm not sure I'm prepared to testify on that.
23     You can start with the example, though.
24 As I said, you can't make any athlete ever fight
25 another athlete.  That's given since the beginning

220

1  of combat sports.  But I just have to look.  I
2  don't believe that's one of the sections we were
3  asked to pull.
4      Q.  So sitting here today, you can't think of
5  any provision that provides discretion to the
6  fighter as to who they would -- who they would
7  fight against?
8          MS. GRIGSBY:  Objection.  I was just
9  wondering, can you point me in your 30(b)(6) notice
10 which topic is encompassed by this question?
11         MR. CRAMER:  The 30(b)(6) notice has a
12 question about the contracts with fighters in
13 general.  I think it's 2.
14         MS. GRIGSBY:  It says, "Any formal or
15 informal policies, principles, procedures,
16 processes, or practices regarding Zuffa's use
17 and/or negotiation" --
18         MR. CRAMER:  Yeah.
19         MS. GRIGSBY:  -- "of the fighter
20 contracts, and including the indemnity of any form
21 templates or standard versions."
22         But, again, how does that go to the
23 formal and informal policies, principles,
24 procedures, processes or practices?  You're asking
25 about specific language.

221

1          MR. CRAMER:  Well, the practice or policy
2  or procedure presumably would be based upon, in
3  part, contractual language.
4          MS. GRIGSBY:  Well --
5          MR. CRAMER:  And the witness has
6  testified that fighters have discretion as to who
7  they fight, and that seems contrary to several
8  provisions of this agreement.
9          But this person is here to testify about
10 the agreement, and if he has some provision of the
11 agreement that gives the fighter discretion as to
12 who they're going to fight or when they're going to
13 fight or on what portion of the card they're going
14 to fight, I'd like to see it.
15         MS. GRIGSBY:  Well, you asked about --
16 again, he's testifying as to Topic 2, which is the
17 practice and also the principles in terms of giving
18 fighters discretion.
19         I'm asking specifically your question
20 where you say, is there a provision in the contract
21 where you specifically mean to the clauses you're
22 interested in, we asked you if you had anything in
23 particular, to specify additional clauses.
24         So I think that this question actually
25 does fall outside the scope, and that the witness

56 (Pages 218 to 221)

KIRK D. HENDRICK - CONFIDENTIAL

234

1  Q. Well, Lawrence expected, did he not, that
2  Jones was going to turn down the fight, right,
3  "when he says no"?
4  A. Could have been that there was already
5  verbal conversations to that. So again, I --
6  Lawrence would have to answer what he meant there.
7  I was cc'd on this. I just don't recall.
8  Q. Now, Zuffa expected -- do you recall that
9  Zuffa expected Jones would turn down the fight
10 because Jones had recently defended his title by
11 defeating Gustafsson in September of 2013?
12 A. I do not recall that.
13 Q. Was -- was Zuffa's goal to present Jones
14 a fight that they knew he would turn down so they
15 could extend his agreement?
16 A. No.
17 Q. Did Zuffa ever do that?
18 A. Present a fighter with an offer of a
19 fight intending to get them to extend their
20 contract?
21 Q. Yes, intending, knowing or expecting that
22 they were going to turn it down so Zuffa could
23 extend the contract.
24 A. No, not to my knowledge. We're in the
25 business of trying to promote fights.

235

1  MR. CRAMER: All right. Let's go off the
2  record. Tape stopped.
3  THE VIDEOGRAPHER: This marks the end of
4  media No. 5 of the deposition of Kirk Hendrick. We
5  are off the record at 3:31.
6  (Break taken.)
7  THE VIDEOGRAPHER: We are back on the
8  record at 3:51, and this marks the beginning of
9  media No. 6 in the deposition of Kirk Hendrick.
10 BY MR. CRAMER:
11 Q. Please turn back to Exhibit 8, 2010
12 version 2, PAR agreement.
13 A. All right.
14 Q. And I would like to direct your attention
15 to Section 5.2 on page 5. Section 5.2 reads, "If,
16 at the expiration of the term, fighter is then the
17 UFC champion, the term shall be automatically
18 extended for a period commencing on the termination
19 date and ending on the earlier of (i) one year from
20 the termination date, or (ii) the date on which the
21 fighter" -- I'm sorry -- "the date on which fighter
22 has participated in three bouts promoted by Zuffa
23 following the termination date." It's entitled The
24 Extension Term.
25 "Any reference to the term herein shall

236

1  be deemed to include a reference to the extension
2  term where applicable."
3  Is this what Zuffa informally calls the
4  champion's clause?
5  A. Yes, I think that's accurate.
6  Q. If during the -- just some technical
7  questions about how this works.
8  If during the extension term under the
9  champion's clause a fighter is unwilling or unable
10 to fight, do the extension provisions in the
11 contract apply?
12 A. So a champion doesn't want to fight
13 again?
14 Q. Is unable or unwilling. So let's say
15 during the extension term, the year or three bouts,
16 the champion is injured and can't fight one of
17 those bouts. Does Zuffa have the right under the
18 PAR agreement to extend the term by six months?
19 A. So the championship, what we're referring
20 to as the extension term starts, and you're saying
21 if they're injured, can you extend the term. I
22 think the way that's -- first of all, that's never
23 happened. Very seldom does this ever happen and
24 would even come up.
25 But, the term would start on, as it says,

237

1  one year from that day or three fights. I haven't
2  seen that come up, your hypothetical.
3  Q. How would Zuffa interpret -- how would
4  Zuffa react if a champion was injured and wasn't
5  able to fight any of the three bouts during the
6  year? Would Zuffa extend the term?
7  A. It's hard for me to sit here and answer
8  on behalf of the company on a hypothetical that has
9  never come up, so I don't know if I could answer
10 that.
11 Q. Okay. What if the champion at the end of
12 the extension term is still a champion? What
13 happens then?
14 A. It ends. So it's one year or three
15 fights, whichever occurs first.
16 Q. And if the fighter is still a champion at
17 the end of that extension term, there's no
18 additional extension?
19 A. No, never.
20 Q. That's never happened or --
21 A. No. It wouldn't be interpreted that way,
22 it doesn't read that way, and would never be -- you
23 know, try to have that kind of interpretation.
24 Q. Has Zuffa ever -- so we had some
25 testimony earlier today that there were some PAR

60 (Pages 234 to 237)

238

1  agreements, I think they may have been the single
2  bout PAR agreements or some other PAR agreements
3  that did not have champions provisions in them.
4  There were a few. Is that -- do you recall that
5  testimony?
6      A. I don't specifically recall the
7  testimony. Sorry.
8      Q. Okay. That's fine.
9          Do you know whether Zuffa has ever
10 permitted a fighter who did not have a champion's
11 provision in his contract a title fight?
12     A. I think it's in almost all of our
13 agreements, so, no, I don't recall.
14     Q. Does the champion's clause -- so how does
15 compensation work for the three bouts during the
16 extension term under the champion's clause? How is
17 the champion compensated during that period?
18     A. Well, certainly they're not going to make
19 less than their last fight. It would be a
20 negotiation.
21         In certain instances, you'll see a couple
22 of them, the outline we put together that depending
23 on who the athlete was. Chuck Liddell's contract,
24 for example, said it can't be any less than what I
25 made from my last fight. Phil Brooks said, it

239

1  can't be less than 115 percent of what I made from
2  my last fight.
3          Again, it's just -- it's only come up, to
4  my knowledge, maybe one time in 15 years that an
5  athlete didn't sign a new agreement without being
6  the champion where they said, I'm going to fight my
7  last fight, but I either don't want to fight or I
8  don't agree on compensation.
9      Q. What business purpose does this clause
10 serve?
11     A. This is because by the time somebody has
12 been promoted as a champion, by the length of money
13 and time and energy that's been put into promoting
14 that particular athlete as the UFC champion, we
15 want to be sure that we have an opportunity to
16 promote that athlete in a very short amount of
17 time, short number of bouts to recoup some of that
18 investment.
19     Q. Is it fair to say that a champion is
20 typically at the height of his or her popularity as
21 a fighter at the period of which he or she becomes
22 a champion?
23     A. Fair to say it's one of the high points
24 of their career. May not be always the highest,
25 because you have some people that are at the height

240

1  of their career that may not be the champion, but a
2  lot of times it's certainly a high point of their
3  career.
4      Q. Champions are more valuable, all things
5  equal to a promotion, than fighters who aren't
6  champions. Is that fair to say?
7      A. No, I don't think as a blanket statement
8  to say that they're more valuable. We have
9  fighters that, depending on lots of variables,
10 could be important for matching up and putting into
11 events.
12         We have sometimes guys that are
13 headlining a fight card, that may not be a
14 champion. Being a champion certainly helps us sell
15 events because you can have a championship event on
16 a card, but it doesn't always mean that they're the
17 most valuable athlete on the entire roster in that
18 division.
19     ==Q. Does the champion's clause prevent other==
20 ==MMA promotions from signing current UFC==
21 ==champions?==
22     ==A. Does it prevent them from signing==
23 ==current --==
24     ==Q. Let me finish the question.==
25     ==A. Okay.==

241

1      ==Q. Prevent them from signing current UFC==
2  ==champions who otherwise would have completed their==
3  ==obligations under the Zuffa and PAR agreement?==
4      ==A. For this extension period of time, they==
5  ==would still be contracted to the UFC.==
6      ==Q. And they would be exclusive to the UFC==
7  ==other than that one provision we talked about?==
8      ==A. That's correct.==
9          MR. CRAMER: I'd like to mark Exhibit 23,
10 the next document.
11         (Plaintiffs' Exhibit 23 was marked
12         for identification.)
13 BY MR. CRAMER:
14     Q. For the record, Exhibit 23 is a four-page
15 series of e-mails with the Bates range ZUF-00297321
16 through 324, and I'm just going to ask about the
17 e-mails on the first page -- really the e-mail in
18 the middle from Mr. Silva. The top e-mail is from
19 Bas dated July 14, 2011, to Silva and Alistair
20 Overeem, re Alistair Overeem.
21         Let me know when you're ready to answer
22 questions.
23     A. Okay. Give me a minute to read this.
24     Q. Yes. Of course.
25     A. Thank you.

242

1      (Witness reviewing document.)
2      A.  Okay.
3      Q.  All right.  The only thing I want to ask
4  you about is something that Mr. Silva said on
5  July 15, 2011.
6      Now, this is after the point at which the
7  UFC had acquired Strikeforce; is that right?
8      A.  Yes, would have been right around that
9  time.
10      Q.  And Overeem was a fighter with
11  Strikeforce; is that right?
12      A.  Yes.
13      Q.  Was he a champion with Strikeforce?
14      A.  I don't recall.
15      Q.  I just want to see whether you can help
16  me understand something that Silva said.  He said,
17  "We can't just take all of their champions away and
18  devalue the company."  See that?
19      A.  Uh-huh.
20      Q.  What does that mean?
21      A.  I don't know.
22      Q.  Well, he's talking about whether certain
23  fighters should come over from Strikeforce to the
24  UFC; is that right?
25      A.  That seems to be the conversation, yes.

243

1      Q.  And the concern is that if you take away
2  too many of the champions from Strikeforce,
3  Strikeforce would be devalued; is that right?
4      A.  Again, I would have to understand the
5  context of what he's saying.  You're reading me
6  that sentence, I understand that, but I don't
7  understand what he means by "devalue the company."
8      Q.  Well, why would -- does it make sense to
9  say that if you removed champions from a company,
10  it would devalue that company?
11      A.  I think taking away fighters at a certain
12  level could impair that company's ability to
13  promote fights.
14      Q.  Why?
15      A.  They didn't have the available fighters.
16  As I was mentioning earlier, us having a certain
17  number of shows and a certain number of fighters
18  per event, you need available athletes.
19      So Joe talking about all their champions,
20  he might be talking about certain number of people
21  as opposed to -- you're focused on the word
22  "champion" and he might not be.  And, again, I
23  can't speak for Joe.
24      Q.  In order to be a successful promotion,
25  you need enough fighters to put together events

244

1  that people want to watch; is that right?
2      A.  Well, it depends on the number of events
3  you're doing and the number of bouts per event.  So
4  as I was saying with us doing 41, 42 events a year
5  in the UFC, 24 to 26 athletes on a card, taking
6  into variables like injuries and everything else,
7  you need a certain number of athletes to be able to
8  fulfill those cards.
9      And it's not like one at a time, you
10  finish one, you start promoting another.  We
11  probably have five, six shows on sale at any given
12  time.  So you need -- you need enough athletes to
13  keep those fights available.
14      Q.  Okay.  You can put that document aside.
15      Is it fair to say that the champion's
16  clause gives Zuffa a unilateral option to renew the
17  contract for another year or three bouts if the
18  fighter is a UFC champion at the end of their term?
19      A.  Say that for me again.
20      Q.  That the champion's clause effectively
21  gives Zuffa a unilateral option to essentially
22  extend or renew the PAR agreement with the champion
23  for a year or three bouts?
24      A.  I don't know if I've ever considered it a
25  unilateral option.  It's kind of what we have

245

1  there.  It's an extension term that if you agree
2  that when you come into the UFC, that if your last
3  fight is as the champion, the contract extends for
4  a year.
5      Q.  And the fighter, if they are a champion
6  in their last fight for the UFC, they don't have a
7  choice as to whether or not their contract extends
8  for a year; it happens automatically?
9      A.  It happened.  If you're the champion and
10  that was your last fight on your termination date,
11  then there's this extension term.
12      Q.  And if that athlete was the champion
13  during their last fight, and they wanted their next
14  fight to be with Bellator or some other promotion,
15  they couldn't do that, at least for the -- for the
16  extension term?
17      A.  Right, for a year.
18      Q.  All right.  Put that --
19      A.  I guess I would caveat that to say a year
20  or doing another deal with the UFC.  I assume
21  you're meaning they don't want to do another deal
22  with the UFC.
23      Q.  Right.  So it could be, once they fulfill
24  the year, they can go somewhere elsewhere or they
25  could renegotiate with the UFC?

254

1  letters or e-mails or have written communications
2  with fighters or their representatives saying, we
3  can't come to an agreement, we waive the rest of
4  the exclusive negotiation period. There is that
5  kind of communication?
6      A.  I believe so.
7      Q.  Okay.
8      A.  I'm not sitting here with a copy in front
9  of me. I did not find it searching for this
10 deposition purpose.
11     Q.  And we haven't found any such thing.
12     A.  Okay.
13     Q.  But if they do exist, we would like to
14 have them.
15         Secondly, does Zuffa have any
16 communications with fighters or their
17 representatives that say to the fighters that we
18 are waiving our rights under the right to match,
19 not that we are unwilling to match, but we are now
20 waiving any rights we might have to match whatever
21 offer a Zuffa athlete -- a former Zuffa athlete
22 might get?
23         Do you have such a communication?
24     A.  Not matching the rights, but we're
25 waiving our rights to match.

255

1      Q.  Right, we waive our right to match.
2      A.  I'd have to look and see if we have that.
3      Q.  All right. I'd like to see such --
4      A.  That's different than what I was talking
5  about earlier when I was talking about we would
6  tell them that we're not going to match.
7      Q.  Why would Zuffa waive a right to match
8  before it even -- before it even got the rival's
9  offer? Why would it do that?
10     A.  Again, it doesn't happen very often, but
11 if it did, and a fighter made clear that they
12 weren't going to fight in the UFC, I could see that
13 happen.
14     Q.  Is it Zuffa's view that the standard PAR
15 agreement bars Zuffa or UFC fighters from
16 negotiating with rival MMA promotions during the
17 term of their agreement with the UFC?
18     A.  Ask me again.
19     Q.  Is it Zuffa's position that its standard
20 PAR agreement with fighters blocks or bars Zuffa
21 fighters from negotiating -- or UFC fighters from
22 negotiating with rival MMA organizations during the
23 term of the PAR agreement?
24     A.  I think it's fair to say that while
25 they're being promoted by the UFC, we expect that

256

1  they're not negotiating another agreement. Do we
2  believe for -- that managers or fighters are not
3  out there doing that? I believe that's probably
4  happening, but during the time period to negotiate
5  another deal while they're still under contract
6  being promoted for the UFC, I don't think that
7  would be something that we would be saying is
8  permissible under the agreement.
9      Q.  So during the beginning of the term once
10 the Zuffa PAR agreement becomes effective until the
11 end of the term and through the 60-day or 90-day
12 exclusive negotiation period, it's Zuffa's position
13 that Zuffa is exclusively empowered to negotiate
14 with fighters to reach a new agreement?
15     A.  I think that's fair.
16     Q.  All right. Please turn to Section 13.2
17 of Exhibit 8, which is the right to match clause.
18 Page 11 of Exhibit 8.
19     A.  All right.
20     Q.  And this Section 13.2 is referred to by
21 Zuffa as "right to match"; correct?
22     A.  Correct.
23     Q.  And what does it generally provide?
24     A.  Well, as it says, if during that matching
25 period if an athlete goes out and gets an offer

257

1  from a competitive organization, that they will
2  present that offer to the UFC, and the UFC has a
3  defined amount of time to either match that offer
4  or not. And if the UFC can't offer it, then, of
5  course, the fighter can go and sign with that other
6  organization.
7          This actually ends up working out a lot
8  of times where if the fighter uses this, the
9  competitive organization has to give kind of their
10 best and final offer to the athlete because they
11 know that the athlete is saying I have to go take
12 that to the UFC, and the UFC could match it. So
13 you've got to come with your best offer.
14     Q.  And in 13.2 in Exhibit 8, that right to
15 match period is one year?
16     A.  Correct.
17     Q.  And it was one year for a long period of
18 time, correct, extending back several years?
19     A.  Yeah. I don't know the exact time frame
20 without looking at the documents, but for several
21 years.
22     Q.  Why does Zuffa -- let me ask it this way:
23 Why does Zuffa want this provision in its
24 contracts?
25     A.  This, again, is a chance for Zuffa to, a

65 (Pages 254 to 257)

258

1  lot of times, recoup its investment.  A chance for
2  Zuffa to say if I've promoted this athlete,
3  promoted that person, their brand, put them on
4  television, made a name for them, at the same time
5  they, you know, helped the UFC put on events, that
6  this is a chance to say, if you go to another
7  organization and they come up with an offer that we
8  can match, I want you to stay in the UFC.  Again, a
9  clause that was used a lot of times in boxing and
10 was taken from those contracts.
11     Q.  Under this provision, just so I
12 understand, fighters are unavailable to sign with
13 other MMA promoters during the term of the right to
14 match period unless Zuffa chooses not to match the
15 offer of the rival promoter; is that right?
16         MS. GRIGSBY:  Objection, form.
17         THE WITNESS:  Yeah.  Can you ask me
18 again.
19 BY MR. CRAMER:
20     Q.  Yeah.  So given this provision in Zuffa's
21 contracts, the only way an athlete who was under
22 contract with Zuffa can fight for a rival promoter
23 is if Zuffa, during that one-year matching period,
24 declines to match the rival offer?
25     A.  Yeah.  I think there's a couple of steps

259

1  there.  So what would happen is, if the athlete
2  hadn't negotiated a contract with the UFC, right,
3  so we're at the point where they have now fought
4  their last fight, they are past the negotiating
5  period, so they are entertaining offers from
6  competitive MMA promoters.
7         If your question is they can't fight for
8  that promoter until that promoter gives them a
9  written offer of what they want to pay and then
10 Zuffa has a time period to match that; is that
11 correct?
12     Q.  Yes.
13     A.  Yes, that -- I think that's correct.
14     Q.  And during that matching period and the
15 other -- there's some period of time after the
16 rival offer is made that Zuffa has to decide
17 whether or not to match that offer, but during that
18 period, Zuffa has under its control whether or not
19 to match that rival offer; correct?
20     A.  After presented with the offer --
21     Q.  Yes.
22     A.  -- Zuffa has a time period, a clock
23 ticking against them to match or not match.
24     Q.  Yes.  And so no Zuffa athlete with a
25 right to match clause in his or her contract can

260

1  fight for a rival MMA promotion unless Zuffa is
2  given the opportunity to match the rival offer; is
3  that fair?
4      A.  So no former fighter in the UFC can fight
5  for another promotion until that promotion's offer,
6  which would have been given to the athlete, right,
7  because he knows how much money he's making.
8      Q.  Yes.
9      A.  He has to present that to the UFC, and
10 then UFC either has to match that offer or not
11 before the athlete can compete in the other
12 organization?
13     Q.  Yes.
14     A.  I think I got all that right.
15     Q.  Yes, you did.
16     A.  It got pretty long.
17         Yes, I think that's accurate.  Now, we're
18 talking about a short amount of time because
19 after -- after they start negotiating, in general,
20 these managers are probably negotiating or not with
21 these other promoters during a certain amount of
22 time.
23         But even if you took them at their word,
24 they'd be negotiating on day one if they were a
25 good manager.  And so if they got that offer on day

261

1  one or two, you're still talking about a short
2  amount of time.
3      Q.  So I just want to understand the time
4  periods provided by the contract.
5          So the term ends, and then there is a
6  60-day or 90-day negotiation -- exclusive
7  negotiation period; right?
8      A.  Correct.
9      Q.  So 60.  And then there's a 365-day period
10 during which Zuffa maintains the right to match a
11 rival offer; is that right?
12     A.  To match?
13     Q.  To match.
14     A.  Yes.
15     Q.  Yes.  So 60 -- let's assume it's a 60
16 plus 365 is 425.  And then let's assume that the
17 offer comes in on day 365, Zuffa then has 15 days
18 with which to decide to match or not match?
19     A.  Technically under your hypothetical, I
20 guess, but wouldn't be a very good manager if he
21 waited to get an offer until the 365th day.
22     Q.  So assuming that the offer came in on day
23 365, that would be 425 days, plus the 15 days, so
24 that's 440 days that Zuffa either had -- after the
25 expiration of the term that Zuffa either has an

262

1  exclusive negotiation period or a period at which
2  Zuffa has the right to match a rival offer; is that
3  right?
4         MS. GRIGSBY: Objection. Are you talking
5  about which -- this agreement or --
6         MR. CRAMER: Yeah, under this
7  agreement.
8         THE WITNESS: So under this, we're
9  talking about Fighter 2010. I think if you take
10 all of your dates and add them up, and the
11 fighter -- you got to put in your hypothetical that
12 the fighter didn't have any offers; right?
13        So he had no offers after the 60-day
14 period. We don't know why, we're not sure why, but
15 he -- he didn't bring an offer to the UFC, and he
16 waited until the last day to bring an offer to the
17 UFC. So he hasn't fought in 14 months.
18        And I can't do the days as well as you
19 did, but you're talking about 400 and some odd days
20 that he decided not to fight. Then is there a
21 15-day right to accept that offer on day 365? Yes.
22 And then whatever that adds up to be.
23 BY MR. CRAMER:
24    Q. Fourteen months is a long time for a
25 fighter during the course of a fighter's career to

263

1  go without fighting; is that right?
2     A. Depends on the athlete; right? You got
3  some of them who want to fight a lot. You got
4  other guys who want to fight once a year or twice a
5  year. If they didn't want to fight for 14 months,
6  I would think that most athletes want to fight more
7  than that. We certainly need them to fight more
8  than that in order to get our time period in with a
9  number of fights.
10    Q. For athletes that, for whom fighting is
11 the major part of their career, and if they want to
12 fight on a regular basis, going 14 months without a
13 fight is a difficult thing for that fighter;
14 correct?
15        MS. GRIGSBY: Objection, hypothetical.
16 Incomplete hypothetical.
17 BY MR. CRAMER:
18    Q. You can answer the question.
19    A. That's actually what I was going to say
20 is I think that's what was missing in your
21 hypothetical.
22        So you've added 14 months where the
23 fighter didn't want to fight or maybe didn't have
24 an offer. I don't understand --
25    Q. No, no, where a fighter -- a fighter

264

1  is -- 14 months is a long -- assuming a fighter
2  wants to fight, 14 months is a long period of time
3  for a fighter to go without fighting; correct?
4     A. If they're ready, willing, and able to
5  take fights and to take offers and to accept or
6  reject offers, that would be a long period of
7  time.
8     Q. Fighters are independent contractors; is
9  that right?
10    A. Correct.
11    Q. And many don't have other forms of income
12 other than fighting; correct?
13    A. I don't know if you quantify. I would
14 say most of them are professional athletes, and
15 that's what they devote their time to, but I don't
16 know how many of them have other jobs.
17    Q. And as independent contractors, fighters
18 need to pay their own trainers and their own
19 managers and their own doctors; is that right?
20    A. They have their own businesses, yes.
21    Q. And they have other expenses associated
22 with those businesses, correct? Gym fees and other
23 fees; correct?
24    A. I would assume so.
25        MR. CRAMER: I'd like to mark the next

265

1  document as Exhibit 24.
2         (Plaintiffs' Exhibit 24 was marked
3         for identification.)
4  BY MR. CRAMER:
5     Q. This is a two-page series of e-mails. It
6  bears the Bates range ZFL-2642993 through 2994, and
7  the e-mail at the top is from Silva to Epstein, Mr.
8  Hendrick and Dana White dated January 27, 2008, and
9  the subject is Andrei.
10        I'll give you a moment to read it and let
11 me know when you're through.
12    A. Thank you.
13        (Witness reviewing document.)
14        Okay.
15    Q. Do you recall receiving this e-mail?
16    A. I don't.
17    Q. Do you recall the incident that's being
18 discussed in the series of e-mails?
19    A. A little bit, but more so just from
20 reading this than I would have from eight years
21 ago.
22    Q. Who's Andrei?
23    A. Andrei Arlovski.
24    Q. And he was a fighter with the UFC?
25    A. Correct.

KIRK D. HENDRICK - CONFIDENTIAL

266

1  Q. Do you know who Leo Khorolinksy is?
2  A. I don't know what his exact function was,
3  but he was, let's say, manager/agent for Andrei.
4  Q. And Khorolinsky is writing to Silva on
5  January 27, 2008, and he says a little bit towards
6  the middle of his statement, "As you are aware, as
7  of March 1, it will have been almost a year since
8  Andrei's last fight as compared to the prior 12
9  month period in which he fought four times.
10       "It is extremely damaging to Andrei's
11 career to be shelved for such a long period of
12 time and he can't sign an agreement that can
13 conceivably result in an additional six months
14 without a fight."
15       Do you see that?
16  A. Yes.
17  Q. Do you know what's being referred to
18 about being shelved here?
19  A. No.
20  Q. Does it make sense to you that it's
21 damaging to a fighter's career like Andrei not to
22 fight for a long period of time?
23  A. I could see a manager saying something
24 like that.
25  Q. And that makes sense, doesn't it?

267

1  A. I don't know why. You know what I mean?
2  I don't know why Andrei didn't fight for 12 months.
3  Could have been because of his management.
4  Q. Right.
5  A. I just don't recall the specifics.
6  Q. But regardless of the reason, it's
7  difficult and potentially damaging to a fighter's
8  career not to fight for a long period of time;
9  right?
10  A. If they're ready, willing, and able to
11 fight and they want to fight, 12 months I would say
12 is a time period that is significant for a
13 fighter's career.
14  Q. You can put that document aside.
15  A. Can I take a quick break?
16       MR. CRAMER: Of course. Let's go off the
17 record.
18       THE VIDEOGRAPHER: We are off the record
19 at 4:34.
20       (Break taken.)
21       THE VIDEOGRAPHER: We are back on the
22 record at 4:37.
23 BY MR. CRAMER:
24  Q. Please turn to Exhibit 2, Tab A, Page 66.
25 This is the chart that Zuffa prepared, and in

268

1  particular page 66 has the June 2011 change of
2  Section 13.1, which is the right to match. And in
3  the middle of the page below, the red strike-outs
4  it says, "Zuffa shall have the option to match" --
5  and then the word "financial" was added.
6       So it says, "Zuffa shall have the option
7  to match the financial terms of any offer."
8       Was that -- was the addition of the word
9  "financial" meant to change the substance of the
10 provision in any way?
11  A. Yeah. So the idea here is let's say
12 another promoter had something that they could
13 offer that was not related to -- can you match, in
14 other words.
15      In order to match something, it's got to
16 be close to, if not apples to apples. So if a --
17 something was nonrelated to financial terms, the
18 idea was we'll try to match it, but we have to be
19 able to match the financial terms.
20  Q. Did something precipitate that change?
21 Was there some offer that came in from a rival
22 promotion that had financial terms plus, I don't
23 know, the right to meet Tom Cruise or something?
24  A. Good example. Good example. I don't
25 recall sitting here, but chances are, yes, there

269

1  was something in one of the rights to match of
2  either us matching another promoter or another
3  promoter matching us. And it needed to be
4  something that you were telling the athlete, I can
5  only match things that are physically possible,
6  like I might not be able to get you to meet Tom
7  Cruise.
8  Q. Okay. Is Tom Cruise one of the owners of
9  Zuffa at the moment?
10  A. I don't know. He might be. I don't
11 think so.
12       MR. CRAMER: All right. I'd like to mark
13 the next document as Exhibit 25.
14       (Plaintiffs' Exhibit 25 was marked
15       for identification.)
16 BY MR. CRAMER:
17  Q. For the record, Exhibit 25 is two pages
18 of e-mails bearing the Bates range ZFL-1000978
19 through 979, and the top e-mail is from Mersch to
20 Silva -- I'm sorry -- from Epstein to Mersch, cc'd
21 to Silva, Ray Kongo, sent on May 2nd, 2013. Let me
22 know when you've reviewed the document.
23  A. Just one minute. Thank you.
24       (Witness reviewing document.)
25  Q. All right. So who's Kongo?

**270**

1  A. Cheick Kongo.
2  Q. Who's that? Was he a fighter with the
3  UFC?
4  A. Yes. He fought heavyweight in the UFC.
5  Q. And do you know who Anthony McGann is?
6  A. He's a manager from over in the UK,
7  manages several fighters.
8  Q. So at the bottom, the McGann e-mail to
9  Mike Mersch says, "Can you give me a position on
10 Kongo. I know his contract is up and he has the
11 non-negotiation period, but someone from the UFC
12 released a position that you guys would not be
13 seeking to renew his contract. Does that mean he
14 is free of any obligations? I know the contract
15 says what it says, but if you guys are happy, then
16 he can have a release from this. Thanks, Mike."
17     Do you see that? And then Mersch says to
18 McGann, "I'm not aware of anyone from the UFC
19 releasing any position on Cheick, however, the
20 contract provisions concerning our right to match
21 be considered to be in effect. As a favor,
22 however, I will consult with Dana and Lorenzo and
23 get back to you."
24     And then Mersch says to Kongo -- I'm
25 sorry, Kongo says to Mersch, "We're not asking for

**271**

1  anything, but if you guys are happy to cut him
2  loose, then we can start looking for stuff for him.
3  He's 38 and time is precious to him."
4      And then Mersch says, "What are your
5  thoughts on Kongo? McGann is asking maybe outright
6  release from the right to match."
7      And Epstein says to Mersch, "No."
8      You see that?
9  A. I do.
10 Q. Do you recall that incident?
11 A. I do not.
12 Q. Do you know why Epstein refused to
13 release Kongo from the right to match?
14 A. I do not.
15 Q. Was that -- was that against Zuffa policy
16 to refuse to release a fighter from the right to
17 match?
18 A. I think you got a double negative there.
19 Can you say it for me again?
20 Q. Was it against Zuffa policy to refuse a
21 request to release a fighter from the right to
22 match?
23 A. Was it against Zuffa policy to refuse?
24 No, I don't think there is a Zuffa policy on
25 refusing or not refusing a fighter's request to be

**272**

1  released from that provision.
2  Q. Why would Zuffa not release Kongo from a
3  right to match? The guy was 38 years old and
4  apparently Zuffa didn't want him to fight.
5  A. I don't know.
6  Q. Did Zuffa ever have Kongo fight again?
7  A. I don't know.
8  Q. Was there a reason why Zuffa wanted to
9  punish Kongo and not allow him to fight?
10 A. I don't think "punish" is the right word,
11 and I don't see the word "punish" in here.
12 Q. All right. You can put that document
13 aside.
14     I'd like to introduce the next document,
15 which is Exhibit 26.
16     (Plaintiffs' Exhibit 26 was marked
17     for identification.)
18 BY MR. CRAMER:
19 Q. For the record, Exhibit 26 is a series of
20 e-mails with the Bates range ZFL-2643080 through
21 3083. And the cover e-mail is from Mr. Hendrick to
22 Epstein and Mersch dated 8/31/2007, re Fedor
23 Emelianenko, and there's a series of other e-mails.
24 And you'll let me know when you're ready to testify
25 about it.

**273**

1  A. (Witness reviewing document.)
2     Okay.
3  Q. All right. This is an e-mail that you
4  reviewed in the regular -- I'm sorry -- you sent at
5  the top in the regular course of your business; is
6  that right?
7  A. Yes. I would have been forwarding the
8  prior e-mail, it looks like.
9  Q. And how did you come to have a copy of
10 the e-mail from Mr. Tatum to Jaime Pollack that
11 was -- oh, you were cc'd on it, okay, so that's
12 what happened. You were cc'd on the Tatum e-mail,
13 and then -- which included the e-mail from Span to
14 Tatum; is that right?
15 A. That's what it looks like, correct.
16 Q. Who is Mr. Tatum?
17 A. He worked with us as a -- I don't know if
18 paralegal is the right word, but worked with us on
19 legal matters and some other licensing matters.
20 Was with the company for a period of time.
21 Q. And Mr. Emelianenko is a high-profile
22 fighter; is that right?
23 A. Yes. He's fought for quite a number of
24 years.
25 Q. Was Margo Span one of his