# Exhibit 13

30(b)(6) Deposition of Kirk D. Hendrick on behalf of Zuffa, LLC (November 30, 2016) (excerpted)

```
                                                                    285
                     UNITED STATES DISTRICT COURT

                          DISTRICT OF NEVADA


    CUNG LE; NATHAN QUARRY, JON    )
    FITCH, on behalf of            )
    themselves and all others      )
    similarly situated,            )
                                   )
             Plaintiffs,           )
                                   )
             vs.                   )  Case No.
                                   )  2:15-cv-01045-RFB-(PAL)
                                   )
    ZUFFA, LLC, d/b/a Ultimate     )
    Fighting Championship and      )
    UFC,                           )
                                   )
             Defendant.            )
    _____)




                           CONFIDENTIAL

       VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

                      BY KIRK D. HENDRICK

                       NOVEMBER 30, 2016

                       LAS VEGAS, NEVADA

                          9:14 a.m.


    Reported by:
    KENDALL D. HEATH
    Job No: 47773-A
```

KIRK D. HENDRICK - CONFIDENTIAL

362

1  BY MR. CRAMER:
2     Q.  All right.  You can put the document
3  aside.  I'm just going to ask you some questions
4  and you can tell me whether Zuffa agrees or
5  disagrees with the following positions.
6        As of May 2007, was it Zuffa's position
7  that the UFC's brand of MMA was highly
8  distinguishable from competitors in part because it
9  had the majority of top fighters in the world under
10 contract.
11       MS. GRIGSBY:  Objection, scope.
12       THE WITNESS:  In May of 2007 -- say it to
13 me again.
14 BY MR. CRAMER:
15    Q.  Yeah.  Would Zuffa agree with the
16 following position, that the UFC's brand of MMA is
17 highly distinguishable from competitors in part
18 because it had the majority of fighters under
19 contract -- top fighters under contract?
20       MS. GRIGSBY:  Objection, scope.
21       THE WITNESS:  I think that was our goal
22 to be sure it was highly distinguishable.  That's
23 what we were talking about yesterday about
24 investing in the brand, investing in the sport.
25 Having top athletes in the UFC, I think, is an

363

1  important aspect of being able to promote fights
2  that fans want to see.
3  BY MR. CRAMER:
4     Q.  Can you tell me whether or not it is
5  Zuffa's position, or was as of May 2007, that the
6  UFC was closely approaching the position of having
7  branded a sport on the level of the NFL or Nascar,
8  but with stronger international appeal?
9        MS. GRIGSBY:  Objection, scope.  This
10 actually has no relation to fighter contracts.
11 BY MR. CRAMER:
12    Q.  All right.  I'll withdraw that question
13 then.
14       Can you tell me whether or not it was
15 Zuffa's position in May 2007 or any time that Zuffa
16 had been able to consolidate the vast majority of
17 the world's top fighters under one umbrella?
18       MS. GRIGSBY:  Objection, scope.  How does
19 that relate to fighter contracts?
20       MR. CRAMER:  Contracts.
21    Q.  By -- by signing up the majority of the
22 top MMA fighters, was it Zuffa's position in May
23 2007 or any time that -- that by doing that, it had
24 been able to consolidate the vast majority of the
25 world's top fighter under one umbrella?

364

1        MS. GRIGSBY:  Again, objection, scope.
2  So Topic 7 specifically notes the clauses.  This
3  isn't -- this question is unrelated to the effect
4  of the exclusivity clause or any of the other
5  clauses.  You're asking a very general question
6  about consolidation.
7  BY MR. CRAMER:
8     Q.  All right.  I'll ask a more specific
9  question.
10       Was it Zuffa's position in May of 2007 or
11 at any time that the UFC was able to secure
12 long-term exclusive contracts with the world's best
13 MMA fighters?
14    A.  You've got a pretty big time period
15 there.  So you're saying 2007 or any time --
16    Q.  Yeah.
17    A.  -- is it Zuffa's position -- say it to me
18 again.
19    Q.  That it was able to secure long-term
20 exclusive contracts with the world's best MMA
21 fighters?
22    A.  I don't know if that's possible.  I don't
23 think I could answer that sitting here.  With the
24 amount of fighters that come and go, and you're
25 saying at any time in 15 years, did we have -- what

365

1  was the phrase?
2     Q.  Where -- was the UFC able to secure
3  long-term exclusive contracts with the world's best
4  MMA fighters in May 2007 or at any time?
5     A.  You keep saying May two thousand -- or
6  any time, and I just don't know.
7     Q.  Let's ask -- May 2007 to May -- was it
8  true in May of 2007 that the UFC had been able to
9  secure long-term exclusive contracts with the
10 world's best MMA fighters?
11    A.  Without knowing the number, did we have a
12 lot of world's best fighters in the UFC in May of
13 2007?  Yes, I would say we did.  Did we have all of
14 them?  No, I'm sure we didn't.
15    Q.  But the UFC had the vast majority of top
16 fighters; correct?
17    A.  That's what you're saying that document
18 says.  I don't know.  I'd have to go back and look
19 in 2007 and see who was in the UFC, who was not in
20 the UFC.
21    Q.  Can you tell me whether it was Zuffa's
22 position in May of 2007 or at any time that it
23 believed that the UFC had attracted the best MMA
24 athletes?
25    A.  Kind of goes back to my previous answer.

21 (Pages 362 to 365)

KIRK D. HENDRICK - CONFIDENTIAL

366

1  May 2007 or any time. That's a long --
2    Q. Let's ask about May 2007.
3    A. In May 2007, was it UFC's belief that it
4  attracted -- what did you say?
5    Q. The best MMA athletes.
6    A. I think we certainly had a number of the
7  best MMA athletes in May of 2007. Again, do I know
8  if we had all of them? Do I know if we had --
9  didn't have some of them? I just have to go back.
10 You'd have to look at media articles. You'd have
11 to look at what the fans think. There's some that
12 probably were in the UFC that were some of the
13 best, I would say that.
14   Q. Was it Zuffa's position in May 2007 that
15 UFC athlete contracts are designed to retain talent
16 within the company?
17   A. The contract designed to retain talent?
18   Q. Yeah.
19   A. Yeah. During the -- during the term of
20 the agreement, that's what we've been talking about
21 for the last day or so, that Zuffa has to have the
22 ability to, if you sign up and you want to be
23 promoted by the UFC, you got to be in that time
24 period, available and able to compete.
25   Q. Was it Zuffa's position in May 2007 that

367

1  most of its contracts are one or two years in
2  length with an exclusivity clause that prevents
3  fighters from moving to different MMA organizations
4  while under contract -- while under contract, and
5  with negotiation and matching rights after the
6  agreement expires?
7    A. That's what we were talking about earlier
8  today is that you asked me about one or two years.
9  Without being specific, some -- some are shorter,
10 some are longer.
11       And if the clause, as you asked me there,
12 without agreeing to all of them, it sounds like
13 some of the clauses we talked about earlier. So if
14 those were clauses in the agreements that the
15 fighters negotiated and contracted with, I would
16 say that's included.
17   Q. Was it Zuffa's position in May 2007 that
18 its contracts typically give the UFC the right to
19 release athletes after one or two fights on the
20 basis of poor performance, providing the company
21 increased flexibility?
22   A. That's what we were talking about
23 earlier. If -- if an athlete wasn't able to
24 compete at the level of what UFC event competition
25 is and UFC quality of fights, then there has to be

368

1  an ability to not have them -- have mismatches in
2  the UFC.
3        You wouldn't want to have somebody who is
4  really good and somebody who is really bad. That's
5  not good for the consumers, and I don't think it's
6  good for the sport.
7    Q. Was it the UFC's position in May 2007
8  that the UFC typically has the right to retain
9  athletes who hold a championship title in any
10 weight class at the expiration of their contract
11 for one additional year, thereby ensuring that the
12 company continues to benefit from such a fighter's
13 potential popularity through additional promotions
14 and events?
15       MS. GRIGSBY: Yeah. Objection again.
16 This is -- you're just reading Deutsche Bank's
17 language and this wasn't drafted by Zuffa.
18       MR. CRAMER: I'm asking whether it's
19 Zuffa's position in May of 2007.
20       THE WITNESS: Can you read it to me
21 again? Sorry.
22 BY MR. CRAMER:
23   Q. Sure. Was it Zuffa's position in May
24 2007 that the UFC typically has the right to retain
25 athletes who hold a championship title in any

369

1  weight class at the expiration of their contract
2  for one additional year, thereby ensuring that the
3  company continues to benefit from such a fighter's
4  potential popularity through additional promotions
5  and events?
6    A. So, again, back to the clause we've
7  talked about over the last day and a half, the
8  championship clause, agreeing to everything, the
9  wording that's in that, that championship clause is
10 in there.
11       And I think you talked about the
12 popularity, but we've also talked about other
13 reasons why the championship clause is in there,
14 the investment that Zuffa's made in that athlete to
15 get them to that point in their career. So, yeah,
16 if you're talking about the championship clause,
17 that's in the agreement.
18   Q. Was it Zuffa's position in May 2007 that
19 the UFC's complete control and ownership of its
20 content also discourages competing organizations
21 from soliciting UFC fighters by restricting their
22 ability to market prior fights for promotional
23 purposes?
24       MS. GRIGSBY: Objection, scope.
25 ///

22 (Pages 366 to 369)

KIRK D. HENDRICK - CONFIDENTIAL

370

1  BY MR. CRAMER:
2      Q.  Is that the effects of the UFC's
3  exclusivity rights on rival promotions?
4          MS. GRIGSBY:  Which clause are you
5  referring to, because --
6          MR. CRAMER:  Well, there's several.  The
7  exclusivity clause, which is in 7 of the 30(b)(6)
8  notice; the ancillary rights clauses in 10.  I
9  think those would be the two that I would be
10 referring to.
11         THE WITNESS:  Can you read it to me
12 again?
13 BY MR. CRAMER:
14     Q.  Sure.  Was it the UFC's position --
15         (Court reporter asks for clarification.)
16         MR. CRAMER:  Yes, I apologize.
17     Q.  Was it Zuffa's position in May 2007 that
18 the UFC's complete control and ownership of its
19 content also discourages competing organizations
20 from soliciting UFC fighters by restricting their
21 ability to market prior fights for promotional
22 purposes?
23         MS. GRIGSBY:  Objection to form.
24         THE WITNESS:  Yeah.  I'm not sure what
25 that's saying.

371

1  BY MR. CRAMER:
2      Q.  Well, you would agree with me that in May
3  2007 through the contractual provisions or some of
4  them that we've talked about in this deposition,
5  the UFC had complete control and ownership of its
6  content; correct?
7      A.  It owns the content that's created from
8  the events, yes.
9      Q.  And would you also agree with me that
10 that ownership of the content discourages competing
11 MMA organizations from soliciting UFC fighters by
12 restricting their ability to market prior fights
13 for promotional purposes?
14     A.  That's the part I'm not sure I
15 understand.
16     Q.  So I believe you testified yesterday that
17 one of the reasons why Zuffa asks fighters for the
18 ability to have clips of their prior fights before
19 they were in the UFC is because it's important for
20 Zuffa to be able to promote a fight with a previous
21 clip of that fighter.  Do you recall that
22 testimony?
23     A.  No.  I don't believe I testified to that
24 at all.  I think I told you that I don't recall any
25 time that we've actually asked a fighter for a clip

372

1  from a previous fight.
2      Q.  Well, it's in 3.4G, I believe, of UFC's
3  contracts.
4      A.  We talked about that.  It's in the
5  agreement, but I told you that's just not something
6  that happens.
7      Q.  So it was not Zuffa's position in May of
8  2007 that the UFC's complete ownership and control
9  of its content discourages competing organizations
10 from soliciting UFC fighters by restricting their
11 ability to market prior fights for promotional
12 purposes?
13     A.  I don't know that when -- you broke it
14 down in the part that UFC owns it, but the --
15 whether or not it discourages that, I don't know if
16 that's something that Deutsche Bank was
17 interpreting.  I can't sit here and testify that
18 that was somehow discouraging somebody else.
19     Q.  Deutsche Bank got it wrong, is that your
20 view?
21     A.  No, I'm not saying they got it wrong, I'm
22 just saying that I don't understand why they're
23 saying that discouraged others.  I don't understand
24 the correlations as I sit here.
25     Q.  So is it your view that after the May

373

1  2007 version of this Confidential Information
2  Memorandum, Zuffa told Deutsche Bank they needed to
3  change that provision because it wasn't accurate or
4  not comprehensible?
5          MS. GRIGSBY:  Objection.  Are you asking
6  him in his individual capacity --
7          MR. CRAMER:  No.
8          MS. GRIGSBY:  Didn't you just say, isn't
9  that your view?
10         MR. CRAMER:  Zuffa's view.
11         THE WITNESS:  Is it Zuffa's view that we
12 told them to change that?  Is that your question?
13 BY MR. CRAMER:
14     Q.  Yeah.  Yeah.  Is it Zuffa's view that
15 that's incomprehensible?
16     A.  I don't know if that occurred or not.
17     Q.  Is it Zuffa's position that only one
18 marquee fighter has ever defected from the UFC to a
19 competing MMA organization, and that individual
20 later returned to compete in the UFC as of May
21 2007?
22     A.  As of May 2007, only one athlete,
23 "defected" was the word --
24     Q.  Yes.
25     A.  -- and came back?  That was a long time

23 (Pages 370 to 373)

KIRK D. HENDRICK - CONFIDENTIAL

374

1  ago.  I don't know if that was the case.  Possible.
2      Q.  Was it Zuffa's position in October 2009
3  that it had the vast majority of top fighters under
4  multi-fight exclusive contracts?
5      A.  That's what we talked about earlier.
6  Vast majority, I'm not sure we defined that.  Top
7  fighters, I would certainly agree that in -- what
8  month did you say of 2009?
9      Q.  October of 2009.
10     A.  October 2009.  We had a lot of very good
11 quality athletes competing in the UFC in October of
12 2009.
13     Q.  So just I need a yes or no.  Was it or
14 was it not Zuffa's position in October of 2009 that
15 the vast majority of top fighters were under
16 multi-fight exclusive contract?
17         MS. GRIGSBY:  Objection, asked and
18 answered.
19         THE WITNESS:  Without going back again
20 and looking at who was in and who was not in the
21 UFC, if that statement is saying that the vast
22 majority of them were in the UFC at that time, I'm
23 not disputing that.
24 BY MR. CRAMER:
25     Q.  And would you -- would Zuffa also agree

375

1  with me that having the vast majority of top
2  fighters under multi-fight exclusive contracts
3  created a barrier to entry for rival MMA promotions
4  trying to compete with Zuffa?
5      A.  I don't know if I could say that it was a
6  barrier to entry, especially in that time, because
7  I don't -- I'd have to go back and see who else was
8  out there.  But there's a lot of fighters inside
9  the UFC and outside the UFC, depending on the time
10 you'd be talking about.
11     Q.  Was it Zuffa's position in October of
12 2009 that its library of past events allows the
13 company to more effectively market upcoming fights,
14 a benefit that competing promoters often lack?
15     A.  Yeah.  The promoters wouldn't have the
16 UFC library.  So does that help the UFC promote its
17 next fight by having its prior fight?  Yes, I think
18 that's accurate.
19     Q.  Was it Zuffa's position in October of
20 2009 that it had the ability to attract the world's
21 most talented MMA fighters?
22         MS. GRIGSBY:  Objection, scope.  How does
23 this relate to any of the topics or the contract
24 clauses?
25         MR. CRAMER:  All right.  I'll withdraw

376

1  that question.
2      Q.  Was it Zuffa's position in October of
3  2009 that the company had over 200 fighters under
4  contract, excluding WEC and Pride, and continually
5  sought to add the best MMA fighters to its
6  franchise for both internal search efforts and from
7  competing organizations?
8      A.  Yeah.  I wouldn't -- I wouldn't know the
9  exact number, but I believe that number is probably
10 accurate, and it probably was the right number to
11 put on the number of events we were doing at that
12 time.  And would we be looking for other
13 up-and-coming fighters to promote?  Yeah.  We're in
14 the promotion business.
15     Q.  Was it Zuffa's position in October of
16 2009 that the UFC athlete contracts are designed to
17 retain talent within the company?
18     A.  Yeah.  That's the same question we talked
19 about earlier, that you have to know that they're
20 ready, willing and able to fight during the time
21 period we say we are going to promote them.
22         So you have to have an agreement that
23 says this is how long we have and how many fights
24 you're going to perform in.
25     Q.  Thank you.  Was it Zuffa's position in

377

1  October of 2009 that most of its contracts are two
2  years in length with an exclusivity clause that
3  prevents fighters from moving to different MMA
4  organizations while under contract and with
5  negotiation and matching rights after the agreement
6  expires?
7      A.  It's the same question we talked about
8  earlier that, you know, specific clauses are in the
9  agreement for specific business reasons, and I
10 think you said two years.
11         Again, I would have to check, but I have
12 no reason to believe that two years wasn't probably
13 the approximate amount of time in 2009.
14     Q.  Was it Zuffa's position also in October
15 of 2009 that its contracts typically give the UFC
16 the right to release athletes after one or two
17 fights on the basis of poor performance, providing
18 the company increased flexibility?
19     A.  That was a long -- long sentence.  Can
20 you say that to me again?
21     Q.  Yeah.  Was it Zuffa's position --
22     A.  Do you want me to read these or --
23     Q.  No, it's okay.
24     A.  Okay.  Go ahead.
25     Q.  Was it Zuffa's position in October of

24 (Pages 374 to 377)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

KIRK D. HENDRICK - CONFIDENTIAL

| | 378 | | 380 |
|---|---|---|---|
| 1 | **2009 that its contracts typically give the UFC the** | 1 | minutes ago, sounds like.  I'm not sure it's the |
| 2 | **right to release athletes after one or two fights** | 2 | exact same sentence, but again, that phrase doesn't |
| 3 | **on the basis of poor performance, providing the** | 3 | change the contract provision, right, but I think |
| 4 | **company increased flexibility?** | 4 | that's what it's trying to capture. |
| 5 | **MS. GRIGSBY:  Again, Counsel, if you** | 5 | Not being the author of that, I think |
| 6 | **really are reading these long clauses, I think you** | 6 | it's trying to say, if an athlete fought their last |
| 7 | **should give the benefit of the -- the witness the** | 7 | fight and they were the champion, that there's a |
| 8 | **benefit of reviewing the document.  That, again,** | 8 | championship clause.  And we talked about that |
| 9 | **we'll note for the record was prepared by a** | 9 | several times.  And then I think you said in that |
| 10 | **third --** | 10 | sentence, it talks about -- because of the |
| 11 | **(Court reporter asks for clarification.)** | 11 | popularity or something like that? |
| 12 | **MS. GRIGSBY:  A third party.** | 12 | Q.  Yeah. |
| 13 | BY MR. CRAMER: | 13 | A.  And I think I said earlier that |
| 14 | **Q.  I'm asking whether it was Zuffa's** | 14 | popularity is one thing, but it's also the chance |
| 15 | **position.  You can answer or not.** | 15 | to keep the investment that Zuffa's made in that |
| 16 | A.  I don't think that specifically lays it | 16 | athlete for a short amount of time. |
| 17 | out.  I think it said on poor performance, and I | 17 | And that we would, as we talked about |
| 18 | think you asked me this question earlier. | 18 | earlier, we still got to come to a decision of do |
| 19 | We actually referred to the clause that | 19 | they want to fight, do they want to fight within |
| 20 | talks about if an athlete lost a bout was the one | 20 | that year, do they want to fight up to three times |
| 21 | that you questioned me about earlier. | 21 | during their year, what are they going to be paid? |
| 22 | Q.  Yeah. | 22 | So there's a lot more that goes beyond that |
| 23 | A.  So it's not just poor performance.  Guys | 23 | sentence. |
| 24 | have poor performances all the time, but it's about | 24 | **Q.  Was it the UFC's position in October of** |
| 25 | could they not compete at the UFC level of | 25 | **2009 that the UFC's complete control and ownership** |

| | 379 | | 381 |
|---|---|---|---|
| 1 | competition so that we can put on fair matches. | 1 | **of its content also discourages competing** |
| 2 | **Q.  Was it the UFC's position in October of** | 2 | **organizations from soliciting UFC fighters by** |
| 3 | **2009 that the UFC typically has the right to retain** | 3 | **restricting their ability to market prior fights** |
| 4 | **athletes who hold a championship title in any** | 4 | **for promotional purposes?** |
| 5 | **weight class at the expiration of their contract** | 5 | **MS. GRIGSBY:  Again, objection, form.** |
| 6 | **for one additional year, thereby ensuring that the** | 6 | THE WITNESS:  Read it to me again slow. |
| 7 | **company continues to benefit from such a fighter's** | 7 | BY MR. CRAMER: |
| 8 | **potential popularity through additional promotions** | 8 | **Q.  Yeah.  This is the same thing.** |
| 9 | **and events.** | 9 | A.  I know it's the same one, yeah. |
| 10 | **Is that Zuffa's position in October of** | 10 | **Q.  2007.  In other words, two years went by** |
| 11 | **2009?** | 11 | **and the position is the same.  And I'm asking** |
| 12 | A.  That's a long sentence.  There's a lot of | 12 | **whether it was Zuffa's position in October of 2009** |
| 13 | parts to that. | 13 | **that the UFC's complete control and ownership of** |
| 14 | Do you want me to read these, or do you | 14 | **its content also discourages competing** |
| 15 | want me to memorize them? | 15 | **organizations from soliciting UFC fighters by** |
| 16 | **Q.  I will read it again.** | 16 | **restricting their ability to market prior fights** |
| 17 | A.  Okay.  Go slow. | 17 | **for promotional purposes?** |
| 18 | **Q.  The UFC typically has the right to retain** | 18 | **MS. GRIGSBY:  Counsel, you just said the** |
| 19 | **athletes who hold championship title in any weight** | 19 | **position is the same.  Again to clarify, this is** |
| 20 | **class at the expiration of the contract for one** | 20 | **Deutsche Bank's position.  This is Deutsche** |
| 21 | **additional year, thereby ensuring that the company** | 21 | **Bank's --** |
| 22 | **continues to benefit from such a fighter's** | 22 | BY MR. CRAMER: |
| 23 | **potential popularity through additional promotions** | 23 | **Q.  And I'm asking whether it's Zuffa's** |
| 24 | **and events?** | 24 | **position as well, or was in October of 2009.** |
| 25 | A.  That's the same question we had a few | 25 | A.  And I think back where we were talking |

25 (Pages 378 to 381)

KIRK D. HENDRICK - CONFIDENTIAL

**Page 382**

1  about the May document, we talked about the fact
2  that does Zuffa own the product, the tape of the
3  events that it paid for and promoted and televised
4  and paid for all those costs.
5       And we agreed that, yes, Zuffa owns that
6  tape. And then you're asking me, does that
7  discourage other organizations, and I think that's
8  where I said, I'm not sure how that piece makes
9  sense. I don't know what you're trying to get at
10 in that sentence.
11      Q.   Was it Zuffa's position in August of 2011
12 that it had over 425 fighters under multi-fight
13 exclusive contracts with marquee fighters having
14 longer term contracts?
15      A.   Again, I'd have to look at the -- the
16 company records to see if that number's accurate.
17 I have no reason to believe that number is not
18 accurate of the number of fighters under contract
19 at that time period.
20      Q.   Under multi-fight exclusive contracts; is
21 that accurate?
22      A.   Multi-fight meaning the term, certain
23 amount of months, certain amount of fights within
24 those certain amount of months, exclusive contract.
25 Yeah, we talked about the fact that during that

**Page 383**

1  time period, they were agreeing that they wanted
2  the UFC to promote them and the UFC was agreeing I
3  will promote you during this time period.
4       Q.   And is it also Zuffa's position that it
5  had marquee fighters with longer term contracts, at
6  least as of August of 2011?
7            MS. GRIGSBY: Objection to form.
8            THE WITNESS: Yeah. I think marquee, I
9  don't know without defining what that word is, if
10 you're telling me that's the word in the document,
11 I assume we're talking about more the highly
12 compensated athletes.
13      If that's the term, more the guys with
14 highly compensated agreements might have had more
15 fights under their agreement.
16 BY MR. CRAMER:
17      Q.   Was it Zuffa's position in August of 2011
18 that UFC athlete contracts are designed to retain
19 talent within the company?
20      A.   I think this was the question you asked
21 me earlier. Are they -- are they designed during
22 that amount of time to be sure that they're
23 available, ready, willing and able to fight for the
24 UFC, be promoted by the UFC during that certain
25 amount of time, and that Zuffa would promote them

**Page 384**

1  during that certain amount of time.
2       Q.   Was it Zuffa's position in August of 2011
3  that most contracts are four fights or 20 months,
4  whichever comes first, although marquee fighters
5  typically have longer term contracts with an
6  exclusivity clause that prevents fighters from
7  moving to different MMA organizations while under
8  contract and with negotiations and matching rights
9  after the agreement expires?
10           MS. GRIGSBY: Objection to form.
11 BY MR. CRAMER:
12      Q.   Was that -- was that Zuffa's position in
13 August of 2011?
14      A.   That's a long one again. You want to
15 break it down in parts or you want me to try to go
16 off memory?
17      Q.   Let me just ask it this way: Was it
18 Zuffa's position in August of 2011 that it had
19 fighters with exclusivity clauses that prevented
20 them from moving to different MMA organizations
21 while under contract and with negotiation and
22 matching rights after the agreement expired?
23      A.   I think that goes back to what we were
24 talking about earlier. During the term of the
25 agreement, they're agreeing that they will be

**Page 385**

1  promoted by the UFC, but for the exceptions that we
2  talked about for quite a while yesterday.
3       There's certain times that athletes are
4  allowed to go compete for another MMA organization.
5  I don't know about that particular year. They
6  certainly compete in other nonMMA promotions, but
7  in general does the UFC contract have the
8  provisions I think you just stated to me? I think
9  that's generally accurate, yes.
10      Q.   And after the contract expires, there are
11 negotiation and matching rights, correct, in the
12 contracts?
13      A.   We're talking about 2011?
14      Q.   Yes.
15      A.   Yeah. I think those provisions --
16 actually you're right, matching and -- what did you
17 say, the right of first negotiation?
18      Q.   Yes.
19      A.   That's what I was trying to remember.
20 There was -- there was a certain time period that
21 there wasn't a right of negotiation. I'm not sure
22 exactly when, but you have the documents in front
23 of you.
24      Q.   Right. Now, you know what Moody's
25 Investors Services is?

26 (Pages 382 to 385)

KIRK D. HENDRICK - CONFIDENTIAL

|  | 386 |
|---|---|
| 1 | A. I do, yes. |
| 2 | Q. And did you have any involvement with |
| 3 | Moody's Investors Services issuing credit opinions |
| 4 | regarding Zuffa? |
| 5 | A. Very little. I know they were doing |
| 6 | that, but that would have been through our finance |
| 7 | group and through our Chief Financial Officer and |
| 8 | through Lorenzo Fertitta. And depending on the |
| 9 | time involved, Lawrence would have had some |
| 10 | involvement in that as well -- Lawrence Epstein. |
| 11 | I'm sorry. |
| 12 | Q. So Lawrence Epstein -- who was in the |
| 13 | finance group that would have been interfacing with |
| 14 | Moody's? |
| 15 | A. John Mulkey from our Chief Financial |
| 16 | Officer. I'm not sure which year you're talking |
| 17 | about, but if it's in the same time frame we've |
| 18 | been talking about, most likely it would have been |
| 19 | John Mulkey. |
| 20 | Q. Are you aware that Moody's issued a |
| 21 | credit opinion for Zuffa in November of 2009 |
| 22 | approximately? |
| 23 | A. Not specifically aware, but based on |
| 24 | these other documents you showed me about the |
| 25 | timing of the loans, I would think that sounds |

|  | 387 |
|---|---|
| 1 | about right. |
| 2 | Q. And then another one in December of |
| 3 | 2010? |
| 4 | A. Again, I don't recall specifically, but |
| 5 | that sounds probably right based on the term |
| 6 | loans. |
| 7 | Q. Is it fair to say that Moody's credit |
| 8 | opinions are intended to provide potential |
| 9 | creditors with an accurate representation of |
| 10 | Zuffa's ability to repay debts? |
| 11 | MS. GRIGSBY: Objection, scope. How does |
| 12 | this relate to fighter contracts, any of your |
| 13 | topics? Name one. |
| 14 | MR. CRAMER: Well, it has to do with the |
| 15 | contents of what's in the Moody's documents that |
| 16 | apparently they believe that having exclusive |
| 17 | contracts with fighters was one of the ways that |
| 18 | it -- Zuffa was able to show it had good credit. |
| 19 | Q. Would you agree with that, that one of |
| 20 | the reasons that Zuffa had good credit or was able |
| 21 | to secure good credit was because it had long-term |
| 22 | exclusive contracts with multiple top MMA |
| 23 | fighters? |
| 24 | MS. GRIGSBY: Again, can you just go back |
| 25 | to the clause or what exactly in your topics this |

|  | 388 |
|---|---|
| 1 | question relates to? |
| 2 | MR. CRAMER: Sure. |
| 3 | MS. GRIGSBY: I just want to note for the |
| 4 | record. Obviously you can depose the CFO |
| 5 | individually. You can depose Lorenzo Fertitta, the |
| 6 | former CEO, to ask these specific questions, but I |
| 7 | think that you're exceeding the scope of your |
| 8 | notice. |
| 9 | MR. CRAMER: The notice, specifically |
| 10 | question 7 and question 10 of -- and 7 through 14 |
| 11 | more generally discuss the -- Zuffa's understanding |
| 12 | of the effect of both the exclusivity clause in 7 |
| 13 | and the ancillary rights clauses in 10 collectively |
| 14 | on other MMA promoters and on Zuffa. |
| 15 | MS. GRIGSBY: But, you know, right now |
| 16 | you're asking something about -- I think you're |
| 17 | getting a little afield where you were talking |
| 18 | about Zuffa's ability to obtain credit. |
| 19 | Again, we asked -- especially, these |
| 20 | topics are exceedingly broad. If you had something |
| 21 | this specific in terms of like their ability to |
| 22 | obtain credit, credit facilities, then we ask the |
| 23 | plaintiff to identify with specificity. |
| 24 | MR. CRAMER: Right. Well, certainly the |
| 25 | effect of a series of contracts and clauses on |

|  | 389 |
|---|---|
| 1 | Zuffa and other MMA promoters includes the |
| 2 | financial effect. What other effect would we be |
| 3 | talking about? |
| 4 | MS. GRIGSBY: Again, you know, if you're |
| 5 | talking generally about the effect, it could be |
| 6 | Zuffa's rights under the agreements. But in terms |
| 7 | of its ability to get credit, which is really a |
| 8 | third-party decision, I just think it exceeds the |
| 9 | scope of the notice. |
| 10 | MR. CRAMER: It's directly within the |
| 11 | scope. In any event, I don't have a lot of |
| 12 | questions about it, about Moody's, but let me just |
| 13 | ask this question again. |
| 14 | Q. Is it Zuffa -- is it Zuffa's view that |
| 15 | having multiple top MMA fighters under long-term |
| 16 | exclusive contracts was one of the things that |
| 17 | allowed Zuffa to have good credit with both Moody's |
| 18 | and Deutsche Bank? |
| 19 | MS. GRIGSBY: Objection, form. |
| 20 | THE WITNESS: I'm not sure I could sit |
| 21 | here and say that was one of the reasons because |
| 22 | again, I don't think I'm the right person to |
| 23 | testify on that topic. |
| 24 | BY MR. CRAMER: |
| 25 | Q. Okay. Was it Zuffa's position in |

27 (Pages 386 to 389)