# Exhibit 14

30(b)(6) Deposition of
Ike Lawrence Epstein
on behalf of Zuffa, LLC
(December 2, 2016) (excerpted)

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CUNG LE; NATHAN QUARRY, JON )
FITCH, on behalf of )
themselves and all others )
similarly situated, )
　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　)
　　　　　vs. ) Case No.
　　　　　　　　　　　　　　　　) 2:15-cv-01045-RFB-(PAL)
　　　　　　　　　　　　　　　　)
ZUFFA, LLC, d/b/a Ultimate )
Fighting Championship and )
UFC, )
　　　　　　　　　　　　　　　　)
　　　　　　Defendant. )
_____)

CONFIDENTIAL

VIDEO RECORDED 30(b)(6) DEPOSITION OF ZUFFA, LLC

BY IKE LAWRENCE EPSTEIN

December 2, 2016

LAS VEGAS, NEVADA

11:29 A.M.

Reported by:
Sarah Padilla, CCR NO. 929
Job No: 47777

Page 22

1  "competitors," I guess you're talking about in this
2  MMA space, because we've got competitors outside of
3  that, so I just want to make sure.
4       Q    Fair enough.  In the MMA promotion space.
5       A    To varying degrees, I believe they were
6  all competitors.
7       Q    Were any of the MMA promoters that Zuffa
8  acquired during the 2006 to 2015 time frame the
9  number two competitor in Zuffa's eyes behind Zuffa?
10           MS. GRISBY:  Objection to form.
11           THE WITNESS:  You know, not necessarily.
12  I mean, this is a global business.  So when you say
13  sort of the number two, there could be the number
14  two in the U.S., there could be number two in Asia,
15  there could be the number, you know, two in Europe.
16  It's -- it's a global business, so I can't really
17  answer that one in generality.
18  BY MR. WEILER:
19       Q    Fair enough.  Did Zuffa acquire the
20  contractual rights to elite MMA fighters through any
21  of its acquisitions?
22           MS. GRISBY:  Objection to form.
23           THE WITNESS:  Yeah, I -- I don't know what
24  "elite MMA fighters" means, but we certainly
25  acquired the contracts of athletes, some of them

Page 23

1  very experienced, some of them with, you know, one
2  or two fights.
3  BY MR. WEILER:
4       Q    Does Zuffa consider there to be
5  qualitative differences between fighters who --
6  strike that.
7            During the 2006 to 2015 time frame, did
8  Zuffa consider there to be qualitative differences
9  between fighters who fought for the UFC and fighters
10  who fought at rival MMA promotions?
11       A    I mean, it's a hard question to answer.  I
12  think, you know, lots of other promotions had good
13  fighters in them, they had inexperienced fighters in
14  their rosters, and we had the same thing.  I mean,
15  we have fighters who have a handful of fights and
16  some that have, you know 30 fights.  So I just don't
17  understand how to answer it because I think they had
18  a variety of quality of athletes and we had a
19  variety of quality of athletes in the UFC.
20       Q    So is it your testimony that Zuffa did not
21  deem fighters who were fighting for rival promotions
22  during the 2006 to 2015 time frame to be of inferior
23  quality to the fighters who were fighting in the
24  UFC?
25       A    Not across the board, no.  Like I just

Page 24

1  said, we have experienced fighters in the UFC.  We
2  have inexperienced fighters.  We have fighters who
3  fall in the middle.  I mean, every fighter's really
4  different, and, you know, the other organizations
5  had similar type rosters.
6       Q    So are you familiar with an MMA promoter
7  called World Extreme Cage Fighting?
8       A    Yes, also we call it WEC.
9       Q    I was going to say can we call it WEC,
10  since it's --
11       A    Yeah, shorter.
12       Q    Did Zuffa purchase the WEC?
13       A    Yes.
14       Q    How did Zuffa come to acquire the WEC?
15       A    Zuffa came to acquire the WEC after
16  getting to know a couple of the principals or the
17  main principals in the organization, a guy by the
18  name of Reed Harris and another gentleman by the
19  name of Scott Adams.
20       Q    And who negotiated the WEC acquisition on
21  behalf of Zuffa?
22       A    Once again, I want to make sure we're
23  complete.  I think we listed it in the binder which
24  we attached as Exhibit 55, but --
25           MS. NERO:  And Tab A is the written out

Page 25

1  that was provided.
2            THE WITNESS:  Tab A, yeah.  But --
3  BY MR. WEILER:
4       Q    So turning to Tab A, there's a number of
5  names here:  Lorenzo Fertitta, Dana White, Lawrence
6  Epstein, Kirk Hendrick, John Mulkey, Marshall
7  Zelaznik.
8       A    Correct.
9       Q    And --
10       A    That's the guy you don't want to hear how
11  you pronounce this one.
12       Q    This is probably Mr. Bachvarova?
13       A    Bachvarova, that's good.  It's a woman,
14  but anyway.  It took me like years to figure out how
15  to pronounce it.  Yeah, so I think with respect to
16  WEC, it would have been Lorenzo Fertitta, Kirk
17  Hendrick, John Mulkey, and Dana White.
18       Q    Of the -- of the people who are listed
19  here in Tab A, did any of these people have primary
20  responsibility for the negotiation on behalf of
21  Zuffa?
22       A    You know, I don't think there was anybody
23  who was primarily responsible for it.  I mean, at
24  the time of this acquisition, the UFC was a very,
25  very small organization, you know, a few dozen

26

1  people. So it was necessarily a team effort to get
2  anything done, let alone an acquisition. So I'm not
3  aware that someone is specifically the lead person
4  on this thing, but the people that I mentioned were
5  involved.
6      Q   So did WEC reach out to Zuffa, or was it
7  the other way around?
8      A   I think UFC event reached out to WEC.
9      Q   And do you know who at -- at UFC reached
10 out to WEC?
11     A   My understanding is that Dana White was,
12 as I said previously, became acquainted with Reed
13 Harris and with Scott Adams. He had actually
14 attended some of the WEC events. And it was Dana
15 White who initially approached Reed Harris and said,
16 "You know what? I think there's an opportunity for
17 us to do something together. Would you be
18 interested?"
19     Q   Had the WEC staged successful MMA events
20 prior to Zuffa purchasing it?
21     A   I mean, it depends what you call
22 successful. But they'd certainly put on a series of
23 events, mainly in Indian reservations in California.
24 At the time, the sport -- for much of the time WEC
25 operated, the sport wasn't regulated in the state of

27

1  California, so they had to do it on Indian
2  reservations. But, yeah, they certainly put on a
3  fair amount of events.
4      Q   Did WEC stage events featuring Dan Severn?
5      A   You know, they may have. I don't recall.
6      Q   Do you know who -- strike that.
7          Who is Dan Severn?
8      A   Dan Severn is a former UFC champion who
9  fought in the UFC, certainly before Zuffa acquired
10 it in January of 2001.
11     Q   Is he a UFC Hall of Famer?
12     A   I believe he is.
13     Q   And did WEC stage events featuring Ken
14 Shamrock?
15     A   They may have.
16     Q   And who is Ken Shamrock?
17     A   Ken Shamrock is another fighter who fought
18 both in the UFC prior to the Zuffa acquisition, and
19 he did have a few fights in the UFC after the Zuffa
20 acquisition.
21     Q   Was he at one point a UFC Superfight
22 champion?
23     A   I think he was, yes.
24     Q   What is a Superfight champion?
25     A   You know, it's something that occurred

28

1  before we owned the company. I think it was a way
2  they used to sort of, you know, promote the events
3  and talk to them, the Superfights. Obviously, he
4  won some of those Superfights, so they anointed him
5  the Superfight champion. But that was before Zuffa
6  acquired the company in January 2001.
7         MS. GRISBY: Counsel, I'm just going to
8  object to the scope when you are referring to either
9  fighters or things that occurred before the time
10 frame, the relevant time period, as defined by your
11 30(b)(6) notice.
12        MR. WEILER: I think the questions are
13 relevant to the purposes for the acquisition, as
14 well as to inform me of the scope of the
15 negotiations, and as well as the decision to -- the
16 decision Zuffa made whether to acquire the
17 companies. But your objection is noted for the
18 record.
19 BY MR. WEILER:
20     Q   ==Prior to purchasing the WEC, was Zuffa==
21 ==concerned that the WEC could compete with the UFC by==
22 ==staging MMA events with MMA stars?==
23     A   ==I don't know what you mean by "MMA stars."==
24 ==But, I mean, you know, they were a -- a competitor==
25 ==in my view,== though mainly regional during the

29

1  events, as I mentioned previously in the Indian
2  reservations in California. I don't know if that
3  answered your question, but that's --
4      Q   Did Zuffa become aware at one point that
5  WEC planned to stage an event with Chuck Liddell?
6      A   I don't know if we became aware that they
7  planned to stage an event with Chuck Liddell. I
8  think there was -- Chuck Liddell was a UFC-signed
9  athlete. And I think there was some confusion about
10 whether UFC could sign him to a contract for him to
11 do one WEC event. ==Because WEC didn't have any==
12 ==long-term deals or athletes. They were all just==
13 ==one-fight deals.== So I think there was just some
14 confusion about whether they could do one fight with
15 Chuck, which was ultimately, I believe, resolved
16 between Reed Harris and Dana White.
17     Q   You say there was some confusion. Did
18 Zuffa issue WEC a cease and desist letter regarding
19 Mr. Liddell?
20     A   I believe Kirk Hendrick wrote a letter to
21 Reed Harris just informing him that we had a
22 contract or UFC had a contract with Chuck Liddell
23 and that the WEC couldn't do a single event with
24 him.
25     Q   And why did Zuffa send the cease and

30

1  desist letter to the WEC regarding Mr. Liddell?
2          MS. GRISBY:  Objection.  Scope.
3          THE WITNESS:  Because the UFC had a
4  contract with Chuck Liddell.
5  BY MR. WEILER:
6     Q   Did Zuffa consider cross-promoting the WEC
7  event with Mr. Liddell?
8     A   I don't think so.
9     Q   I would like to introduce what I think is
10 going to be Exhibit 56.
11         (Exhibit 56 was marked.)
12 BY MR. WEILER
13    Q   I'm just going to mark this for the
14 record, but then I'll refer you to the document in
15 the binder.
16    A   Okay.  Great.
17    Q   Exhibit 56 is a document bearing Bates
18 label ZUF-00172283 through 2323.
19    A   Which one is it?
20    Q   This is the asset purchase agreement for
21 the WEC.  It is Tab No. 1 in Exhibit 55.
22    A   Got it.
23    Q   Are you familiar with this document?
24    A   Generally, yes.
25    Q   And what is this document?

31

1     A   It is a World Extreme Cage Fighting, LLC
2  asset purchase agreement.  Or is this just the
3  disclosure schedules -- I don't.  It looks like this
4  is just the disclosure schedules, certainly
5  Exhibit 1.
6     Q   Yeah.  I think Tab 2 is what's been
7  introduced as Exhibit 56, which is the APA.
8     A   So you want me to look at Tab 1 first?
9     Q   No.  Let's just skip to Tab 2.  I was
10 reading the index wrong.
11    A   Got it.  So Tab 2 is the asset purchase
12 agreement, WEC Holdings, World Extreme Cage Fighting
13 LLC, Scott Adams, Reed Harris.
14    Q   And just for the record, who is Reed
15 Harris?
16    A   Reed Harris is a VP at Zuffa right now,
17 but at the time he was one of the owners of WEC.
18    Q   And who is Scott Adams?
19    A   Scott Adams is a guy who used to work at
20 the UFC, but was also one of the principals of WEC.
21    Q   So turning to page 6 of the agreement,
22 Section 2.1 where it says acquired assets.
23    A   Got it.
24    Q   Does this section of the agreement
25 describe the assets that Zuffa acquired from WEC?

32

1     A   It looks like it.  Obviously, there is
2  some schedules.  But looks like it, yes.
3     Q   Okay.  Directing your attention to page 7,
4  Subdivision G, Business Contracts.  Do you see that
5  section?
6     A   I do.
7     Q   As part of the acquisition, were the
8  contracts that WEC had with its fighters considered
9  business contracts for purposes of this acquisition?
10    A   You know, they may have been.  I mean,
11 WEC, as I mentioned previously, had most of its
12 fighters on one-fight deals.  So I'm not exactly
13 sure how many fighters' contracts were really
14 acquired because most of the contracts, as I said,
15 were on a fight-by-fight basis.
16    Q   At the time of the purchase in October of
17 2006, did Zuffa intend to operate the WEC as a
18 stand-alone business?
19    A   Yes, and that's what we did.
20    Q   Did Zuffa purchase the WEC so that it
21 could be a minor league for Zuffa's UFC fights?
22    A   No.
23    Q   Were any of the fighters who were fighting
24 for the WEC at the time of the acquisition given
25 contracts with Zuffa as a result of the acquisition?

33

1     A   Yes.
2          MS. GRISBY:  Objection.
3          THE WITNESS:  Sorry.
4          MS. GRISBY:  Objection to form.
5          THE WITNESS:  Yes.
6  BY MR. WEILER:
7     Q   Do you know how many fighters were given
8  contracts with Zuffa as a result of the acquisition?
9     A   I don't.
10    Q   Do you know an approximate ballpark
11 percentage?  10 percent?  15?  20?
12    A   I don't know a percentage.  I mean, you
13 know, I do know that one of the main reasons --
14 ==there were several reasons why WEC was acquired.==
15 ==One was because they had a couple of weight classes==
16 ==that the UFC didn't have; I believe 135 and 145.==
17 ==And as we were expanding output of the overall Zuffa==
18 ==business, we felt like there was a great opportunity==
19 ==to grow in those particular weight classes because==
20 ==the UFC didn't have them.==  So I know that, if not
21 all, the vast majority of the fighters that were
22 associated with the UFC in the 135 and 145 weight
23 classes ultimately got new contracts with the
24 Zuffa-owned WEC, as did the -- they had higher
25 weight classes too.  But with respect to the lower

34

1  weight classes, there was a -- that was a priority.
2     Q   So regarding the fighters from WEC who
3  were in the 135 and the 145 weight class, were the
4  majority of those WEC fighters given contracts with
5  Zuffa?
6     A   I believe they were. I just don't have
7  the specific -- a detailed recollection of exactly
8  what fighters. But that was the game plan to bring
9  everybody over.
10    Q   And you say that was the game plan to
11 bring everybody over, are you referring to the 135
12 and 145 weight class?
13    A   Well, no. I'm referring to -- to all the
14 weight classes. I think the game plan was -- the
15 other reason why we acquired WEC is that when we
16 entered into our deal with Spike TV, when the UFC
17 entered into its deal with Spike TV, Spike required
18 that we be exclusive to them, that we couldn't go to
19 any other cable networks. We became aware that the
20 Outdoor Life Network, which ultimately became
21 Versus, which ultimately became the NBC Sports
22 Network, was interested in MMA content because of
23 the success of the UFC. We couldn't put UFC content
24 on there because our deal with Spike restricted us.
25 So this gave us the opportunity to put more MMA

35

1  content on the Sports Channel, get all the marketing
2  and the exposure associated with that.
3        Because at this time, MMA, you know, was
4  still a very niche market. It was something that,
5  you know, not a lot of people knew about or people
6  had misconceptions about it. So one of the
7  strategies was get more content on a broadly
8  distributed cable channel so we could let more
9  people know about what MMA was all about. And we
10 did that through the WEC brand because we couldn't
11 do it through UFC.
12    Q   And were there any fighters who were
13 fighting for WEC at the time of the acquisition who
14 were not given contracts with Zuffa?
15    A   You know, as I said, most of the fighters
16 were on one-fight deals. So I don't remember
17 specifically, you know, how the new contracts were
18 entered into and which athletes were given new
19 contracts under the Zuffa-owned WEC. But my
20 recollection is that we wanted all, the majority.
21    Q   And how long did UFC operate as WEC as a
22 stand-alone business?
23    A   I think three or four years.
24    Q   Through 2010?
25    A   That sounds about right. I don't remember

36

1  the exact dates.
2     Q   And was there anyone at Zuffa who was
3  responsible for the WEC operations?
4     A   Yes. Pete Dropick was one of the people
5  who were responsible for the general operations of
6  the WEC. Reed Harris continued to be involved in
7  the WEC. For a period of time Scott Adams, before
8  he left, was involved in the operation of the WEC.
9  And there was many, many others. But those were the
10 three main people when it came to the operations of
11 the organization.
12    Q   So of those three people that you
13 mentioned, Mr. Adams, Mr. Harris, and Mr. Dropick --
14 were any of them, were any of them the number one
15 guy in terms of authority for the operations for
16 WEC?
17    A   That's a good question. You know, I think
18 it changed at different periods of time. But, you
19 know, I would say that Pete Dropick would have been
20 the individual who was sort of the lead person for
21 most of the time regarding the operations of the
22 WEC.
23    Q   During the time that Mr. Dropick may have
24 been the lead person for WEC operations, who did he
25 report to at Zuffa?

37

1     A   You know, he reported in to a variety of
2  members of our senior executive committee including,
3  you know, myself, Kirk Hendrick, John Mulkey our
4  CFO, Dana White, Lorenzo Fertitta.
5     Q   So in terms of very large decisions on,
6  say, media contracts or something like that with
7  respect to the WEC, was there one person in
8  particular who Mr. Dropick would have to consult?
9     A   I don't think there was one person in
10 particular. At this time, you know, we were a very,
11 very small organization. And virtually all of the
12 major decisions the company made involved, you know,
13 myself once I joined the company, Kirk Hendrick,
14 Lorenzo Fertitta, John Mulkey our CFO at the time,
15 and Dana White.
16    Q   Was Zuffa's operation of the WEC
17 profitable?
18    A   That's a tough question to answer just
19 because -- for a variety of reasons. One, because
20 we definitely had a lot of overhead that we sort of
21 handled for the WEC operation. But I mean, at the
22 end of the day I really don't know whether it was or
23 it wasn't.
24    Q   I'd like to mark as Exhibit 57 a document
25 that has been created from a spreadsheet bearing the

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

106

1  Q  Who is Tom Paschall?
2  A  Tom Paschall is an associate -- was an
3  associate at Milbank Tweed in Los Angeles.
4  Q  Did Mr. Paschall have any role in the
5  Pride transaction?
6  A  He was a lawyer documenting the
7  transaction for us.
8  Q  Did Mr. Mr. Paschall have any role other
9  than documenting the transaction?
10 A  No.  I mean, he may have acted as
11 messenger for certain information at times.  But if
12 you're asking whether, you know, he was authorized
13 to negotiate on behalf of us, business terms, the
14 answer is, no, he was not.
15 Q  Let me direct your attention to the very
16 first sentence of the e-mail says, "I had a lengthy
17 meeting tonight with Mr. Sakakibara, Mr. Matsui, the
18 Nagashima attorney, and Mike Knett."
19 A  Correct.
20 Q  Do you see that?
21 A  I do see it.
22 Q  Were there any other -- strike that.
23    Do you know what meeting Mr. Paschall is
24 referring to here?
25 A  I don't.

107

1  Q  Are any of Mr. Sakakibara, Mr. Matsui --
2  strike that.
3    At this time this meeting were any of
4  Mr. Sakakibara, Mr. Matsui, or Mr. Knett employees
5  or representatives of Zuffa?
6  A  No, they were not.
7  Q  Did Mr. Paschall attend this meeting that
8  is referenced here on behalf of Zuffa?
9  A  I assume he did.
10 Q  Was Zuffa accurate in relaying to
11 Mr. Paschall its intentions in entering into the
12 Pride acquisition?
13    MS. GRIGSBY:  Objection.  Form.
14    THE WITNESS:  I mean, I don't know why we
15 wouldn't be.  He's our lawyer.  Why would we not
16 tell him what we want to do?  I mean, as I said,
17 this negotiation took many, many, months.  So -- but
18 I assume all throughout that, we conveyed our
19 intentions to Mr. Paschall.  Or we would have
20 conveyed it to his supervisor Ken Baronsky who was
21 his partner on this matter.
22    MR. WEILER:  I'd like to mark as an
23 exhibit, Exhibit 72, a document bearing the Bates
24 label DB-Zuffa-00006631 and it runs through 6675.
25    THE WITNESS:  Got it.

108

1    (Exhibit 72 was marked.)
2  BY MR. WEILER:
3  Q  Do you recognize this document?
4  A  I don't.
5  Q  Do you know if this is something that the
6  UFC created -- strike that.
7    Do you know if this is something that
8  Zuffa created?
9  A  I don't know.
10 Q  I will direct your attention to page 6 of
11 this document.
12 A  Got it.
13    MS. GRIGSBY:  Can I review this full
14 document?  I haven't had a time to look at it.
15    THE WITNESS:  Sure.
16    MR. WEILER:  Counsel, are you ready to
17 proceed?
18    MS. GRIGSBY:  No, I'm not quite yet.  And
19 since this wasn't produced by Zuffa, I just wanted
20 to ask, did this document come with highlighting?
21 Or is -- I'm just curious, was it produced with
22 highlighting?
23    MR. WEILER:  I don't recall that -- I
24 don't recall.
25    MS. GRIGSBY:  Ready.

109

1  BY MR. WEILER:
2  Q  Okay.  Before we get to page 6, yeah, just
3  to ask you a question about the cover page.  It says
4  "Ultimate Fighting Championship, Lenders
5  Presentation, May 23rd, 2007."  Do you see that?
6  A  I do.
7  Q  Do you know what the Lenders Presentation
8  could be a reference to?
9  A  It could have been a reference to -- once
10 again, this is before I joined the company.  But it
11 could be a reference to a term loan that we were
12 trying to get for the company around that time.
13 Q  Is this a loan with Wells Fargo?
14 A  I don't think it was with Wells Fargo, but
15 I don't know.
16 Q  What's a term loan?
17 A  It's just a loan that is essentially
18 syndicated among a variety of investors, so it's --
19 it's similar to, I guess, a normal loan, but it's
20 just -- it's not done by one bank, typically.  It's
21 done -- sort of sold to a variety of investors.  So
22 it's sort of like a bond, but not really.  It
23 doesn't have the same legal requirements that you
24 have to have to have a bond issued.  But from an
25 investor standpoint, it's very akin to that.  You

28 (Pages 106 to 109)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

110

1   would buy a piece of a tranche of debt and get a
2   certain interest rate and have certain rights
3   associated with the loan you made.
4           And there's a market for it too, so it
5   would trade via -- Deutsche Bank traded ours.  But
6   there are other firms that can essentially make the
7   market for the trading on the debt, the term loan.
8       Q   And do you know one way or the other
9   whether in May of 2007 Zuffa was seeking to make --
10  I'm sorry -- seeking to sell a term loan to anybody?
11          MS. GRIGSBY:  Objection.  Scope.
12  BY MR. WEILER
13      Q   I guess I can withdraw the question.
14  Let's -- maybe a better way of doing it -- turn to
15  page 6.
16      A   Okay.
17      Q   There's text under the heading "Key
18  Highlights."
19      A   Yeah.  So this must be the term loan.
20  Because, yeah, it says, "First lane term loan,
21  $275 million."  So this must have been the -- some
22  of the materials for the presentation for the term
23  loan.
24      Q   So is Zuffa seeking to find investors in a
25  $275 million term loan?

111

1       A   Yes.
2       Q   And was Deutsche Bank assisting Zuffa in
3   that regard?
4       A   Yes.
5       Q   And do you know what the $275 million term
6   loan was going to be used for?
7       A   Yes.  Part of it was going to be used to
8   make a dividend to the owners.  And part of it was
9   going to be used to repay existing debt, a big chunk
10  of that associated with acquiring Pride.
11      Q   So was this a document that was created in
12  connection with the Pride acquisition?
13          MS. GRIGSBY:  Objection.
14          THE WITNESS:  I don't know that.  Once
15  again, this was before I joined the company.  What
16  it looks like to me, this was a -- as it says, a
17  lenders' presentation that was made in May of 2007
18  with Deutsche Bank to market the term loan that we
19  just discussed.
20  BY MR. WEILER:
21      Q   So the very top of page 6 here there's a
22  graphic.  And to the right it says "Payment to
23  owners: $199 million."  Is that the payment to
24  owners that you had referred to a moment ago in your
25  response?

112

1       A   Yes.
2       Q   And do you know how that money was going
3   to be used?
4           MS. GRIGSBY:  Objection.  Scope.
5           THE WITNESS:  It's the recapitalization of
6   the company.  So they were going to essentially --
7   that was going to be a dividend that was going to be
8   paid to the owners of the business.
9   BY MR. WEILER:
10      Q   Now, directing your attention to key
11  highlight part of the Document No. 4, it says,
12  "75 million senior secured revolver with Wells Fargo
13  partially drawn today will be fully drawn upon
14  closing of Pride."  Do you see where it says that?
15      A   Yes.
16      Q   Do you know what this 75 million senior
17  secured revolver is a reference to?
18      A   Exactly what it says.  75 million senior
19  security revolver with Wells Fargo.
20      Q   Is that how the Pride acquisition was, in
21  the first instance, financed?
22      A   You know, I believe it was.  Like I said,
23  I wasn't there when the deal was closed, but I
24  believe that was the funding mechanism that was used
25  to fund the Pride acquisition, the Wells Fargo

113

1   revolver.
2       Q   So did Zuffa provide information to
3   Deutsche bank in order to create this document?
4           MS. GRIGSBY:  Objection.  Foundation.
5           THE WITNESS:  I don't know who created it.
6   So whether Zuffa created it or whether Deutsche Bank
7   created it or somebody else.  So I mean, obviously,
8   there was some information we provided to them.
9   BY MR. WEILER:
10      Q   Do you see where it says here in this
11  second sentence that same part, "Pride was our
12  closest competitor"?
13      A   I see that.
14      Q   Was that an accurate statement as of the
15  time this document was created?
16      A   ==As I said previously, there's no doubt==
17  ==that Pride was a major competitor at the time of the==
18  ==acquisition.==  Whether they were our closest
19  competitor in the United States is a question.  They
20  were certainly a major, major player in the Japanese
21  market and other Asian markets.  But I think by this
22  time they had probably done one event in the U.S.
23  that wasn't very successful.
24      Q   Okay.  I will direct your attention to
25  page 15 of this document.

**114**

1    A   Got it.
2    Q   See where it says under the heading
3  "Pride"?
4    A   I do.
5    Q   "Pride, both defensive and offensive
6  acquisition."  Do you see where it says that?
7    A   I do.
8    Q   Is that accurate?
9       MS. GRIGSBY:  Objection.  Counsel, we just
10  pulled the original document and it looks like this
11  is not the original format of the document that you
12  have just provided to the witness.
13       MR. WEILER:  Would you prefer that a
14  document with a different format be provided to the
15  witness?
16       MS. GRIGSBY:  I would prefer a document
17  without Counsel's markings be provided to the
18  witness, or a clean document as it was produced to
19  you.
20       MR. WEILER:  Are you referring to the
21  highlighting that appears to be here on page 15?
22       MS. GRIGSBY:  Yes.  I had previously asked
23  you if there was highlighting in the original
24  document.  And we pulled our copy of the document
25  and it does not contain any highlighting.

**115**

1       MR. WEILER:  Are you directing the witness
2  to not answer any questions regarding the text?
3       MS. GRIGSBY:  No.  I just asked that you
4  provide -- I will just note for the record that this
5  is not the original condition of the document Bates
6  stamp DB-Zuffa-0006645.  And to the extent you're
7  representing that it is the document as produced,
8  then, the original document was not in this form.
9       MR. WEILER:  Well, I'll represent for the
10  record I don't know why there's highlighting on this
11  document.  It could be that those were call-outs
12  that were done for the benefit of the witness.
13       So I believe there was a question pending.
14  Could you please read the question back to the
15  witness.
16       THE WITNESS:  I have the question.  You
17  said do you agree with No. 1, both offensive and
18  defensive acquisition.  I definitely agree with
19  offensive.  At this point we're definitely growing
20  our -- the UFC brand and we're trying to put on, you
21  know, more and more fights to grow the sport of
22  mixed martial arts.  We felt that, as I said, the
23  Pride brand had a tremendous amount of upside in the
24  Japanese market and Asian markets.  We felt that
25  there were opportunities to do Pride versus UFC-type

**116**

1  events that would create sort of an interesting
2  marketing opportunity.  As I told you before, we
3  were able to acquire their library of fights.  So
4  there's definitely a lot of offensive-type things
5  that we could do that really made this make sense.
6       On the defensive side, I mean, I'm sure
7  there was some benefits.  But Pride was on the way
8  out.  They were in trouble because of the Yakuza
9  stuff.  And their business was failing.  So there
10  may have been some defensive-type benefits, but they
11  paled in comparison to the offensive-types of
12  benefits this deal could present to us and did
13  present to us.
14  BY MR. WEILER:
15    Q   What's a defensive acquisition?
16    A   I assume what it means is, you know,
17  you're protecting your business, I guess.  I don't
18  know.
19    Q   Can a defensive acquisition be buy
20  something up in order to shut it down?
21    A   I mean, I guess it could be.
22    Q   Could a defensive acquisition be buy
23  something up in order to take out a close
24  competitor?
25    A   It certainly could be.  That wasn't what

**117**

1  happened here.
2    Q   Were any of Zuffa's acquisitions defensive
3  acquisitions in Zuffa's view?
4    A   Not in my view, no.
5    Q   You say "my view," you mean the view of
6  the company; is that correct?
7    A   Absolutely, Zuffa's view.  I said before
8  our goals in making these acquisitions were
9  different.  I mean, they were all different because
10  there were different circumstances around each
11  event.
12    Q   Is the question of whether something's a
13  defensive acquisition an issue that's in the eye of
14  the beholder in Zuffa's view?
15    A   I don't know.
16    Q   Do you see where it says Point No. 3 under
17  Pride, "We have all the superstars"?
18    A   I do see that.
19    Q   Is that accurate?
20    A   I think that, you know, the UFC certainly
21  had a great stable of athletes at the time.
22  Certainly Pride did too.  I don't know if it's true
23  that we had all of the stars at that exact moment.
24  But we certainly had some tremendous athletes as a
25  result of the acquisition of Pride.

134

1 not in there, it's not in there.
2   Q   Do you know why there was no reference
3 here to the fact that, as of May 24, 2007, Pride had
4 not fulfilled its obligations regarding background
5 investigation of its employees?
6   A   Well, I think the main reason was that
7 that was going to be done post close.
8   Q   So completion of the investigation of the
9 background of Pride's employees was a condition to
10 closing the agreement?
11   A   Well, it was --
12       MS. GRIGSBY:  Objection.  Mischaracterizes
13 testimony.
14       THE WITNESS:  No.  No.  It was -- the
15 question you asked me were what are the issues
16 covered here and was everything covered in here.
17 And I mentioned the issue relating to the background
18 investigations.  But my recollection is that the
19 background investigation were something that were a
20 condition, but we were going to deal with it after
21 close.  And obviously, they refused to participate
22 in the background investigations, and as a result,
23 the business closed.
24 BY MR. WEILER:
25   Q   And the background investigation that

135

1 we've been discussing relates to Pride's alleged
2 ties with the Yakuza organization; correct?
3   A   Well, it had to do with the senior
4 executives of the company.  I mean, we're buying a
5 number of assets that included the ongoing operation
6 of Pride.  Japan is a very difficult market to do
7 business with and in.  And we felt that we needed to
8 have Japanese people running the operation on the
9 ground in Japan.  So I wanted all those people that
10 were going to be working for the business to fill
11 out background investigation forms.  And virtually
12 all of the senior executives refused to fill out the
13 forms.
14   Q   Were there any issues regarding the
15 assignment of MMA fighters who were fighting with
16 Pride -- the assignment of their contracts to Zuffa
17 that caused the closing date to be pushed back?
18   A   I don't know whether -- there certainly
19 were issues.  I don't know whether that was the
20 specific reason for pushing the closing date back.
21 Some of those are referenced in this letter.
22   Q   Were there any issues regarding the
23 assignment of Pride fighters to Zuffa that nearly
24 caused Zuffa to back out of the Pride acquisition?
25   A   I mean, there were certainly issues with

136

1 respect to Fedor that were significant.  But that
2 didn't result in the UFC pulling out the deal.
3   Q   When you say Fedor, is that a reference to
4 Fedor Emelianenko?
5   A   Yes.
6   Q   Other than Mr. Emelianenko, were there
7 issues with the assignment of Pride contracts to
8 Zuffa that nearly caused Zuffa to back out of the
9 deal?
10   A   I don't recall that.  But once again, I
11 wasn't -- I wasn't there when the transaction was
12 consummated.
13   Q   I'd like to mark as Exhibit 75 a document
14 bearing the Bates label ZUF-000378347 going through
15 8371.
16       (Exhibit 75 was marked.)
17 BY MR. WEILER:
18   Q   Okay.  Do you recognize this document,
19 sir?
20   A   Yes.
21   Q   What is this document?
22   A   Looks like it's one of the reports that
23 Spectrum Gaming Group issued regarding the
24 background investigations of employees.
25   Q   And who is Spectrum Gaming Group?

137

1   A   Spectrum Gaming Group is a gaming
2 consulting group that does a variety of work in the
3 gaming field.  One of the things they do is they do
4 investigations into the backgrounds of individuals.
5 Frank and Lorenzo Fertitta were owners of a company
6 called Station Casinos, which had gaming licenses
7 here in Nevada and other jurisdictions.  And as a
8 result of them holding those privileged licenses,
9 gaming regulators hold them to a very, very high
10 standard regarding people that they associate with.
11 In fact, when this deal was done, Lorenzo met with
12 members of the Nevada Gaming Control Board and
13 Commission and let them know that, "You know,
14 listen, we're buying this company.  It's separate
15 from my gaming interests.  But it's certainly
16 something that, you know, I'm buying.  I promise you
17 that we will conduct thorough background
18 investigations on everybody, because there have been
19 these allegations of Yakuza involvement.  And we
20 will make sure that we don't do anything to
21 embarrass you, the regulators.  And we'll take
22 action if we find anybody who is not, you know,
23 worthy of us associating with them."
24       So this was all about them protecting
25 their gaming licenses in Nevada and other

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

138

1  jurisdictions.
2     **Q**   So did Zuffa engage Spectrum to look into
3  the Yakuza allegations?
4     **A**   Well, it was more than that.  I mean, they
5  were -- they were basically hired to conduct
6  background investigations on all of the key
7  executives and all of the employees, frankly, in the
8  Pride entity that we were acquiring.
9     **Q**   And when did Zuffa engage Spectrum?
10    **A**   I don't know the date.
11    **Q**   Did Zuffa engage Spectrum prior to the
12 closing of the Pride acquisition?
13    **A**   I believe they did.
14    **Q**   Who at Zuffa communicated with Spectrum
15 concerning Spectrum's investigation of the Pride
16 acquisition?
17    **A**   I assume Kirk Hendrick, John Mulkey.
18    **Q**   Do you know how often Mr. Hendrick or
19 Mr. Mulkey consulted with Spectrum?
20    **A**   No.  There may have been also people
21 involved in Station Casinos that were involved in
22 hiring Spectrum.  I just don't know.
23    **Q**   Did the investigation that Spectrum
24 performed relate to whether, as a result of the
25 Pride acquisition, Zuffa was going to be associating

139

1  with an unsuitable person for purposes of Nevada
2  law?
3     **A**   I don't -- I don't understand the
4  question.  The -- they never filled out any of the
5  forms.  They were obstructionists when dealing with
6  Spectrum.  And so they weren't able to make any
7  determinations one way or the other.  But the fact
8  that they were uncooperative was the determining
9  factor in not getting a favorable report from
10 Spectrum.
11    **Q**   Did you see -- this is the fourth
12 paragraph of the first page where it says "Problems
13 began at the very first meeting with DSC directors
14 and staff on April 24th, 2007," and it goes on to
15 describe -- well, various things.
16    **A**   Yup.
17    **Q**   But my question to you is whether Zuffa
18 knew about these issues that are described here in
19 paragraph 4 as of April 24th, 2007?
20    **A**   It looks like they did.  Certainly,
21 Spectrum knew about it.  I'm sure they communicated
22 that at some point to people at Zuffa.  But I think
23 everyone thought, "Hey, you know what?  Some
24 cultural issues here.  We'll get through it.
25 They'll provide us the information."  And then

140

1  that's not what happened.
2     **Q**   Do you see where it says here, turning to
3  page 3 of the document at the very top -- and I'm
4  just going to just start to read in the middle of
5  the sentence "he proved to be the least cooperative
6  and most obstructive of all the directors."
7     **A**   Where is this?
8     **Q**   This is at the very top of page 3.
9     **A**   Yes.
10    **Q**   -- "late in non-submission of documents by
11 Sakakibara, delayed and significantly extended the
12 completion of the probative process."  Do you see
13 where it says that?
14    **A**   I do.
15    **Q**   So is this a reference to Mr. Sakakibara?
16    **A**   That's what it looks like.
17    **Q**   So prior to the closing of the Pride
18 acquisition, is it accurate to say that Zuffa was
19 aware of these issues regarding Mr. Sakakibara?
20    **A**   You know, assuming Spectrum let them know
21 about this stuff, the answer is, yes, that they --
22 clearly Spectrum knew about it.  But I think
23 everyone assumed that, you know, there are cultural
24 issues, we're going to get through this thing, we'll
25 get it done.

141

1     **Q**   At the time of the investigation that is
2  referred to here in Exhibit 75, did Zuffa suspect
3  that Pride had ties to the Yakuza organization?
4     **A**   I don't think they knew one way or the
5  other.  Certainly, there had been reports.  But
6  nothing was substantiated.  And this was obviously
7  one of the purposes of doing this probative
8  investigation was to make sure there wasn't anything
9  there.
10    **Q**   But during the course of the investigation
11 Zuffa did, in fact, become aware of reports that
12 Pride had links to the Yakuza organization; correct?
13    **A**   Well, the reports that Pride was linked to
14 the Yakuza were the reason why Pride was for sale in
15 the first place.  So of course they knew about that
16 before the negotiations even began.  That's why they
17 wanted to sell, because they lost their TV
18 distribution, and that put them on the downward
19 slide.  And whether it was true or not, that was,
20 you know, never proved one way or the other.
21 Mr. Sakakibara continues to be a businessman in
22 Japan, and he owns a soccer team, and does other
23 stuff.
24    **Q**   Could Zuffa stage -- strike that.
25        Could Zuffa have staged events under the

36 (Pages 138 to 141)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

142

1  Pride brand without resolving the questions that it
2  had about Pride's ties to the Yakuza organization
3  following the consummation of the Pride acquisition?
4      MS. GRIGSBY:  Objection.  Calls for
5  speculation.
6      THE WITNESS:  I don't think, based upon
7  the staff and resources that we had in 2007, that we
8  could have put on an event under the Pride name in
9  Japan.  I'm sure we could have re-branded one of our
10 UFC event in the U.S. as a Pride event.  But we
11 didn't have a big organization then.  We didn't have
12 the resources to navigate a market like Japan.
13     So I don't think we could have done an
14 event in Japan or one of these other Asian markets
15 at that point.  But, you know, we certainly could
16 have re-branded a U.S. event, put the Pride name on
17 it.  And that was the reason why we were excited
18 about getting the employees of the Pride
19 organization, because we wanted to do events in the
20 market.  And it's a complicated market to do
21 business in.
22 BY MR. WEILER:
23     Q   So it wasn't a factor one way or the other
24 whether Pride had ties to the Yakuza organization in
25 terms of whether Zuffa could have put on any Pride

143

1  events?
2      MS. GRIGSBY:  Objection.  Form.
3      THE WITNESS:  Whether or not they had a
4  connection to the Yakuza was, I think, a separate
5  issue.  I mean, if it was determined that there were
6  connections to the Yakuza, you know, we couldn't do
7  any business with any of those people that were
8  associated with the Pride brand.  So all those
9  employees, Mr. Sakakibara, any of those people, we
10 just couldn't do business with.  You know, I guess
11 we could have acquired the assets and moved on from
12 there.  But we certainly couldn't have been in an
13 operating business with people that had definitive
14 ties to organized crime.
15     MR. WEILER:  I'd like to mark as
16 Exhibit 76 a document bearing the Bates label
17 ZFL-0864986 going through 4989.
18     (Exhibit 76 was marked.)
19     THE WITNESS:  All right.  I've got the
20 document.
21 BY MR. WEILER:
22     Q   Do you recognize this document?
23     A   No, I don't.  But it looks like a
24 non-competition agreement with Mr. Sakakibara.
25     Q   Was this document entered into as part of

144

1  Zuffa's acquisition of Pride?
2      A   It looks like it was.
3      Q   And just directing your attention to
4  page 2 at the bottom of the page under the heading
5  "Consideration," runs into the next page which is
6  page 3.  Does this provision describe the
7  consideration that was paid to Mr. Sakakibara as
8  part of his agreement to not compete?
9      A   I believe it does.
10     Q   Okay.  And it looks like from this
11 document the non-compete payments were made in
12 annual installments; is that correct?
13     A   Looks like that, yes, 1.285 million per
14 year.
15     Q   And do you know how many of these
16 installments were actually paid to Mr. Sakakibara?
17     A   I don't.
18     Q   At one point were these installment
19 payments stopped?
20     A   I believe they were.  We got into a
21 lawsuit with him.  We ultimately settled it and
22 ultimately resolved all these issues.
23     Q   When you say you got into a lawsuit with
24 Mr. Sakakibara --
25     A   Yes.

145

1      Q   -- what was the nature of that lawsuit?
2      A   He sued us.
3      Q   Why did Mr. Sakakibara sue Zuffa?
4      A   I mean, in general, he was claiming
5  breaches of the -- I believe of this non-compete and
6  of the purchase agreement.
7      Q   Did his lawsuit have anything to do with
8  whether Zuffa was going to continue to -- strike
9  that.
10     Did his lawsuit have anything to do with
11 whether Zuffa would stage MMA events under the Pride
12 brand?
13     A   I believe there was reference to that,
14 yes.
15     Q   As part of the Pride acquisition, did
16 Zuffa represent that it would continue the Pride
17 brand?
18     A   Yes.
19     Q   When Zuffa made that representation --
20 strike that.
21     Was it Zuffa's understanding that
22 continuing the Pride brand was important to Pride
23 for purposes of the acquisition?
24     A   I mean, my recollection is it was
25 something that was part of the agreement.  And

37 (Pages 142 to 145)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

166

1 Q Was it a big day for the UFC when the UFC
2 acquired Affliction?
3 A I'm not sure what a big day means. You
4 know, I do agree that, you know, the biggest thing
5 we thought we were going to get is the opportunity
6 to sign Fedor. And as a result of this, we got the
7 opportunity to sit down and meet with him in person
8 and worked very hard to try to get a deal done with
9 him. Unfortunately, we didn't. But that was --
10 that was something good. We thought we were going
11 to be in a position to finally get Fedor in the UFC.
12 And ultimately it didn't work out.
13 Q When you say "Fedor," is that a reference
14 to Mr. Emelianenko?
15 A Yes.
16 Q Why didn't Mr. Emelianenko sign with
17 Zuffa?
18 A I don't know. We made him a great offer.
19 I don't understand. I will never understand. We
20 have been negotiating with this guy for ten years
21 trying to get him to fight in the UFC. I will never
22 understand why he didn't come. But he didn't.
23 Q Did Mr. Emelianenko request to modify the
24 form fighter contract used by Zuffa as part of the
25 negotiations?

167

1    MS. GRIGSBY: Objection to scope.
2    THE WITNESS: He definitely wanted to
3 negotiate his deal, and we made a lot of compromises
4 to try to get him.
5 BY MR. WEILER:
6 Q Who negotiated with Mr. Emelianenko
7 following the Affliction transaction?
8 A I did. I mean, he doesn't speak English.
9 So he had a variety of advisers and people with him.
10 So I just want to make it clear that I wasn't
11 negotiating directly with him, because he doesn't
12 speak any English.
13 Q Was one of the issues in contention in the
14 negotiations with Mr. Emelianenko the identity
15 rights as defined under Zuffa's contracts?
16    MS. GRIGSBY: Objection to scope.
17 Obviously, this is in the topic of fighter
18 contracts. If you're asking Mr. Epstein in his
19 individual capacity, then he can answer if he knows.
20    MR. WEILER: I'll withdraw the question
21 and save it for later, by which I mean a future
22 deposition if necessary.
23 BY MR. WEILER:
24 Q Was there once an MMA promoter known as
25 Strikeforce?

168

1 A Yes.
2 Q Did Zuffa come to acquire Strikeforce?
3 A Yes.
4 Q And how did Zuffa come to acquire
5 Strikeforce?
6 A Strikeforce was owned by some guys that
7 were technology entrepreneurs. In addition, they
8 owned the HP -- I think it was the HP Arena in San
9 Jose, California. They also owned the San Jose
10 Sharks. And they had built Strikeforce.
11    At some point we got information that they
12 were shopping it. They no longer wanted to be in
13 the business. And so I believe Lorenzo Fertitta
14 spoke with the principals at Silicon Valley Sports
15 and Entertainment and began negotiating a sale of
16 the business to Zuffa. It was our understanding
17 there were other bidders for it. And ultimately, we
18 reached a deal to acquire Strikeforce in 2011, I
19 believe.
20 Q So is Mr. Fertitta -- sorry. Strike that.
21    Was Lorenzo Fertitta the primary
22 negotiator on behalf of Zuffa for the Strikeforce
23 transaction?
24 A Once again, you know, most of our deals --
25 all of our deals were done with our entire

169

1 management team. So myself, Kirk Hendrick, John
2 Mulkey, and Lorenzo Fertitta, in addition to Dana
3 White. So I'm not sure I would characterize him as
4 the primary person. But he was certainly very much
5 involved in this deal.
6 Q You further testified that Lorenzo
7 Fertitta spoke with principals at Silicon Valley
8 Sports and Entertainment. Who at Silicon Valley
9 Sports and Entertainment did Mr. Fertitta speak to
10 regarding the Strikeforce transaction?
11 A I always get the guy's name wrong, but
12 it's Stratton Sclavos, something along those lines.
13 Q Anybody else, other than Mr. Stratton
14 Sclavos?
15 A I don't think that's his name. But
16 anyway, not that I recall. I should remember him
17 because he had a very unique name.
18 Q Why did Zuffa acquire Strikeforce?
19 A You know, I said the company was for sale
20 and they had a good group of fighters. They had
21 done some events and they actually acquired some
22 libraries also from other promoters. And they had a
23 good brand in the Strikeforce brand, which was --
24 and also they had a television deal with Showtime
25 and CBS, which was interesting.

43 (Pages 166 to 169)

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

170

1  Q  Was Strikeforce a competitor of Zuffa at
2  the time Zuffa acquired Strikeforce?
3  A  Yes.
4  Q  Was Strikeforce Zuffa's closest competitor
5  at the time that Zuffa acquired Strikeforce?
6  A  It was certainly one of our biggest
7  competitors in the United States.  They didn't have
8  much of a presence outside the United States.  But
9  they were definitely a significant competitor in the
10  United States.
11  Q  Were there any closer competitors in the
12  United States than Strikeforce at the time of the
13  Strikeforce transaction?
14  A  I just can't remember when Bellator
15  started coming on the scene, the timing of that.
16  But as I said, they were a significant competitor.
17  They were mainly doing events in Northern California
18  at the arena that they owned, the HP Arena in San
19  Jose.  But they had a lot of good fighters and they
20  were a significant competitor to the UFC in the
21  United States, absolutely.
22  Q  Did Zuffa acquire Strikeforce in order to
23  sign its fighters to contracts with Zuffa?
24  A  Well, one of the factors we looked at in
25  acquiring the business was the roster of athletes

171

1  that they had.  So in that sense, you know, the
2  answer is, yes, we were interested in their
3  fighters.
4  Q  So what conclusions prior to the
5  Strikeforce acquisition did Zuffa come to, if any,
6  regarding Strikeforce's roster of fighters?
7  A  Well, like all rosters of fighters, I've
8  said before, they had a lot of diversity in the
9  fighters that they had.  They had fighters that, you
10  know, were -- had experience and had lot of fights;
11  they had ones that didn't have a lot of experience.
12  They also had a female division which we didn't have
13  in the UFC, so that was something also that was new
14  and different in the Strikeforce brand.
15  Q  Who at Zuffa made the final decision to
16  acquire Strikeforce?
17  A  Lorenzo Fertitta.
18  Q  Did Zuffa use any outside counsel in
19  connection with the Strikeforce acquisition?
20  A  Yes.
21  Q  Which firm?
22  A  I think it was Milbank.
23  Q  Is Mr. Paschall involved in the
24  Strikeforce acquisition?
25  A  I don't remember if Tom was involved in

172

1  that.
2  Q  I'd like to mark as Exhibit 82, a document
3  that is in your binder under a different --
4  A  18?
5  Q  -- numbers.  It's tab 18, correct.
6  Bearing Bates label ZFL-2128660 through 8704.
7  A  I've got it.
8     (Exhibit 82 was marked.)
9  BY MR. WEILER:
10  Q  Do you recognize this document that's been
11  marked here as Exhibit 82?
12  A  I do.
13  Q  And what is this document?
14  A  Asset purchase agreement between Zuffa and
15  Explosion Entertainment.
16  Q  And is this the agreement by which Zuffa
17  acquired Strikeforce?
18  A  That's correct.
19  Q  Directing your attention to page 12 of the
20  agreement.
21  A  Page 12?
22  Q  Yes, Section 2.5 titled "Purchase Price."
23  A  Got it.
24  Q  Is the figure that's indicated here
25  consideration that Zuffa paid for the Strikeforce

173

1  acquisition?
2  A  Yes, it is.
3  Q  And how did Zuffa come up with -- strike
4  that.
5     Was the purchase price that was paid,
6  which appears to be 34,250,000, a fair price for
7  Strikeforce?
8  A  It's the price we negotiated with them, so
9  I think it's a fair price.
10  Q  Did Zuffa perform any valuations of
11  Strikeforce prior to the acquisition?
12  A  We certainly did due diligence.  We didn't
13  hire any sort of outside valuation firm to analyze
14  the value of the assets, as far as I know, before
15  the transaction.  But we certainly -- you know, were
16  in a position to analyze what assets they had and
17  the opportunities that acquiring them would present
18  to us.
19  Q  Did Zuffa use financing in connection with
20  its acquisition of Strikeforce?
21  A  You know, I don't remember.  I mean, we
22  certainly had a revolver available to us, and we
23  could have.  I just don't know exactly where the
24  actual funds came from.
25  Q  I would like to direct your attention to

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

IKE LAWRENCE EPSTEIN - CONFIDENTIAL

174

1  page 17 of the agreement, please, Section 3.9.
2     A    Got it.
3     Q    Entitled contracts -- "Fighter Contracts."
4     A    I see it.
5     Q    Were the fighter contracts the primary
6  asset that Zuffa acquired from Strikeforce?
7     A    They were certainly one of the most
8  important assets that we acquired, yes.
9     Q    Was there any asset that were more
10 important that the fighter contracts?
11    A    I mean, the three assets that we got were
12 the fighter contracts, the library that they had --
13 and I mentioned previously, they had acquired some
14 other assets from other promoters in addition to the
15 Strikeforce brand and the contracts to Telecast and
16 CBS and Showtime.  So the fighter contracts were
17 definitely the most important, but there were other
18 important assets also.
19    Q    I would like to mark as an exhibit,
20 Exhibit 83, document bearing the Bates label
21 ZFL-0551556, goes through 1558.
22    A    All right.  I got it.
23        (Exhibit 83 was marked.)
24 BY MR. WEILER:
25    Q    Do you recognize this document?

175

1     A    Yes.
2     Q    And what is this document?
3     A    Strikeforce fighter contract list.
4     Q    And are the fighters on this list the
5  fighters whose rights Zuffa acquired as part of the
6  Strikeforce transaction?
7     A    It looks like it, yes.
8     Q    Was it a condition of the Strikeforce
9  agreement that any particular of these fighters
10 agree to have their contracts assigned to Zuffa?
11    A    Well, I mean, some of them I don't think
12 were assigned, and we may have signed them later on.
13 Like Hector Lombard, for example, I don't recall him
14 being assigned.  But I know we did sign him to a
15 deal later on.  I believe the vast majority of these
16 were assigned to us as part of the deal.
17    Q    Were there any fighters on this list who,
18 if they were not assigned to Zuffa as part of the
19 deal, would have resulted in Zuffa backing away from
20 the deal?
21    A    I don't know if there were -- go ahead.
22        MS. GRIGSBY:  Objection.  This is a
23 three-page list.  So can you please give the witness
24 time to just review every name on this list?
25        MR. WEILER:  Sure.  Please, sir, take all

176

1  the time you need.
2        THE WITNESS:  Want to me to go ahead and
3  answer?  Yes, so I don't specifically recall any
4  particular fighter, you know, if we don't get this
5  particular guy, this deal is off.  Clearly, we
6  wanted to get all the fighter contracts, but I don't
7  remember there being, "If we don't get Alistair
8  Overeem, for example, the deal's off."  I don't
9  recall that -- that discussion.
10 BY MR. WEILER:
11    Q    Direct your attention to the third column
12 here that's on this spreadsheet.  It's entitled
13 "Exclusivity."  Do you see where it says that?
14    A    I see it.
15    Q    What's the significance of this term here,
16 "exclusivity," as it appears on Exhibit 83?
17    A    It's giving a description of whether or
18 not the contract is exclusive to Strikeforce.
19    Q    When you say "exclusive to Strikeforce,"
20 do you mean whether -- strike that.
21        What do you mean by "exclusive to
22 Strikeforce"?
23    A    It means that the athletes were exclusive
24 to Strikeforce for MMA fighting.  You see, the vast
25 majority are exclusive.

177

1     Q    Was it important to Zuffa that the
2  agreements with Strikeforce between Strikeforce and
3  its fighters were exclusive as to Strikeforce?
4     A    Yes.  As I explained earlier, you can't --
5  you know, we were -- we were acquiring Strikeforce
6  in order to increase the output of our events.  And
7  as I said, as you ramp up and do 42, 43 events per
8  year, if you don't know the athletes are exclusive
9  to you, you can't plan that many events.
10    Q    Would Zuffa have acquired Strikeforce if
11 the contracts that had been assigned as part of the
12 transaction were not exclusive?
13    A    Probably not.
14    Q    And why not?
15    A    I explained previously, you just can't run
16 a business doing 42 or 43 events per year without
17 having the athletes exclusive to you because you
18 just can't produce that output of event not knowing
19 the athletes are going to be there for you and not
20 fighting for some other organization.
21        So, I mean, we might have still acquired
22 it and tried to get the athlete to sign exclusive
23 agreements with us.  But at the end of the day, our
24 business requires these to be exclusive because you
25 have so many events you need to put on every single

45 (Pages 174 to 177)