# Exhibit 18

Deposition of Jon Fitch
(February 15, 2017) (excerpted)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Cung Le, Nathan Quarry, Jon Fitch ) Case No: 2:15-cv-01045-RFB(PAL)
Brandon Vera, Luis Javier Vasquez,)
and Kyle Kingsbury on behalf of   )
themselves and all others         )
similarly situated,               )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )
                                  )
Zuffa, LLC, d/b/a Ultimate        )
Fighting Championship and UFC,    )
                                  )
                                  )
          Defendants.             )

VIDEO DEPOSITION OF JON FITCH

taken at, Boies, Schiller & Flexner,

300 South Fourth Street, Suite 800,

Las Vegas, Nevada 89101 beginning at 9:23 A.M.

and ending at 4:54 P.M. on Wednesday, February 15, 2017

Reported by:
Sarah Padilla, CCR NO. 929
Job No.  296624 Pages 1-257



Page 82

```
 1  BY MR. WIDNELL:
 2     Q   Okay.  So did anyone as Zinkin tell you
 3  about communications they had had with Zuffa that
 4  indicated that Zuffa was unhappy with something you
 5  had done?
 6     A   No.  Not that I can remember, but I'm not
 7  ruling it out.
 8     Q   So how in your mind were your punished by
 9  Zuffa?
10     A   I was fired for not wanting to sign a
11  contract for no money forever.
12     Q   That was the video game incident, isn't
13  it?
14     A   Yup.
15     Q   Okay.  Were there other instances where
16  you were punished by Zuffa?
17     A   Other than -- nothing that is like a
18  blatant measurable thing.  They used a number of
19  different tactics in order to create enough power to
20  reign over us and instill fear over us with minor
21  comments.  You know, trying to get us to perform for
22  them before the fights in their prefight speeches.
23  You know, there were threats there.  If you don't
24  fight a certain way, you're not going to be
25  rewarded.
```

Page 83

```
 1     Q   So can you give me an example of that?
 2     A   Before the fights, Dana would always pull
 3  all the fighters into a room without manager
 4  management or the corner, just fighters and him and
 5  his security.  And he would give a speech about how
 6  we're all in this together, and then somewhere in
 7  throughout that, there would be a minimal threat
 8  about leaving it all in the cage and, you know,
 9  putting on a show or whatever.  If you couldn't live
10  up to that, there would be -- you wouldn't get
11  the -- you wouldn't get the good stuff, which wasn't
12  necessarily a threat, but it's do it the way we want
13  you to do or you're not going to get anything.
14     Q   So what was the way that Zuffa wanted you
15  to do it?
16         MR. DELL'ANGELO:  Objection to the form.
17         THE WITNESS:  Whatever their opinion on
18  what sold their fights, they wanted, right, they
19  didn't care, well, I don't know how to -- I mean,
20  they wanted stand-up fights.  They wanted Muay Thai.
21  They wanted Muay Thai with small gloves.  Guys who
22  wrestled too much, guys who didn't fight their style
23  that they liked wouldn't be given certain
24  opportunities.  They wouldn't be allowed to progress
25  and fight the next toughest guy.
```

Page 84

```
 1  Demian Maia is in a position right now he
 2  should be fighting for title, but since they don't
 3  like his fighting style, he's being punished and not
 4  given a chance to fight for title.
 5         And that sends a clear message to every
 6  other single fighter in the world, that if you're a
 7  ground-based fight, you will not succeed on the same
 8  level in UFC, not because you're not good enough and
 9  you can't beat the guys at the top, but because they
10  just don't like that style.
11  BY MR. WIDNELL:
12     Q   Do you know why they don't like that
13  style?
14         MR. DELL'ANGELO:  Objection to the form.
15  You can answer if you know.
16         THE WITNESS:  They don't understand it.
17  They're not good at it.  I don't know.
18  BY MR. WIDNELL:
19     Q   So it's never been communicated to you why
20  they don't like the style that you are describing, a
21  ground -- what did you call it?
22     A   A ground-oriented-type fight.
23     Q   Okay.  And would that be more wrestling?
24     A   More wrestling, grappling based, dimension
25  based.
```

Page 85

```
 1     Q   Rather than standing up and --
 2     A   Rock'em Sock'em Robots.
 3     Q   So no one at Zuffa has ever explained to
 4  you why they have a preference for one style over
 5  another?
 6         MR. DELL'ANGELO:  Object to form.
 7  BY MR. WIDNELL:
 8     Q   Did anyone at Zuffa ever explain to you
 9  why they have a preference for one style over
10  another?
11     A   No.  They never -- I never had
12  conversations with somebody from Zuffa explaining to
13  me why I was not getting benefits because of my
14  style.  I never had that conversation.
15     Q   Has anyone at Zuffa ever made a public
16  statement that you recall that explains why they
17  prefer one style over another?
18     A   I think Dana has made statements.  He's
19  called things boring.  He doesn't like certain
20  things.  But I think that's his opinion.  And he
21  pushes his opinion a lot of times.
22     Q   So we're talking about the ways that you
23  had been punished.  We talked about the video game
24  incident.  And then I think you said that there were
25  subtle ways that you interpreted as threats.  Is
```



Page 86

```
 1   that accurate, that description?
 2      A   Threats, fear, intimidation type of
 3   things.
 4      Q   So can you give me an example of that kind
 5   of threat?
 6          MR. DELL'ANGELO:  Objection.  Asked and
 7   answered.
 8          THE WITNESS:  Yeah, I've answered that.
 9   BY MR. WIDNELL:
10      Q   So we talked about how Dana would get the
11   fighters together before an event and say that he
12   preferred a certain style over another.  Was that
13   the only example -- is that the only kind of threat
14   that he made?
15      A   I mean, no.  There is just little things,
16   things he makes in public statements, the fights he
17   gives to certain people, the place on the -- your
18   place in the pay-per-view lineup, whether you fight
19   on the pay per view or you fight on the TV card,
20   whether you get sent overseas, the opponents you get
21   matched up against.  One of the ways they punished
22   me a lot of the times is they found me the toughest
23   guy they could find that nobody had ever heard of
24   before.
25          So they took really tough amateur-type
```

Page 87

```
 1   guys, but the crowd didn't know who they were.  It's
 2   a lose-lose fight for somebody with notoriety.
 3   Because if you don't go in there -- if you go in
 4   there and completely beat the guy up, fine, you were
 5   supposed to.  They didn't know who the other guy
 6   was.  You go in there and you win, but you don't
 7   destroy the guy, oh, you suck now because you didn't
 8   destroy a guy with no name.  Or you lose, you lose
 9   to a guy who has no name, and now your notoriety and
10   your value drops immensely.  They may even cut you
11   because you lost.
12          So that is one of the most subtle ways
13   that they really put fear into people, is they
14   control your destiny.  They control who you fight,
15   when you fight, and how much you fight for.
16      Q   So which guys in your fight history fit
17   that category of really tough guys that nobody knew
18   about?
19          MR. DELL'ANGELO:  At the UFC?
20   BY MR. WIDNELL:
21      Q   At the UFC.  Well, I assume it's at the
22   UFC since --
23          MR. DELL'ANGELO:  Just want to be clear.
24          THE WITNESS:  Well, my first fight, Brock
25   Larson, I hadn't done anything to irritate them yet.
```

Page 88

```
 1   BY MR. WIDNELL:
 2      Q   Did you have notoriety at that point?
 3      A   I did, enough to almost make it onto the
 4   Ultimate Fighting television show.  I had enough
 5   notoriety.
 6      Q   So let me just ask a quick question about
 7   that.  Would you say if you made it onto the
 8   Ultimate Fighting show, that that makes you an elite
 9   fighter?
10          MR. DELL'ANGELO:  Objection to form to the
11   extent that it calls for a legal conclusion.
12          THE WITNESS:  Man, I don't like it.  It's
13   an opinion, I don't like it.  But in a sense, like I
14   said, if you get that rubber stamp, it doesn't
15   necessarily make you elite to be on the show.  But
16   if you win the show and you fight for the UFC, like
17   I said that rubber stamp, I'm a UFC veteran.
18   BY MR. WIDNELL:
19      Q   Yeah.  That's the distinction I'm trying
20   to get at.
21      A   Yeah.
22      Q   So if you fight for the UFC --
23      A   So being on the show, maybe not.
24      Q   Maybe not?
25      A   Yeah.
```

Page 89

```
 1      Q   Okay.
 2      A   If you fight on the show and you lose and
 3   you don't get the contract, maybe not.  But that
 4   show may give you the ability to raise your
 5   notoriety, you fight at a smaller show and your
 6   notoriety gains some more, and then you get the --
 7   then you get the call.
 8      Q   Okay.  And in your case, the fact that you
 9   were being considered for the show meant that you
10   had the kind of notoriety that made you an elite
11   fight; is that correct?
12      A   Yeah.  Especially since it was the first
13   show.  It's different, though.  It's different now.
14   That first show, if you look at the level of
15   experience and competition to all the guys who were
16   on that show, they had all been around a long time.
17   You know, there were no newbies on that show.
18   Everybody there had ten fights or so.
19      Q   So is it fair to say that in that first
20   show they were all elite fighters?
21      A   It's a little different.  The first maybe
22   two or three, I can't remember, and they even had a
23   come-back show, and those were old guys that had
24   fought in the UFC before.  But, yeah, it's a sliding
25   scale.  Because now it's less experienced guys
```



Page 90

```
 1   getting in on the show.  So I wouldn't say
 2   necessarily.  In fact, a lot of those guys who were
 3   invited on that show, were invited on that show
 4   because they may have been considered elite already
 5   because they had notoriety.  The UFC, people had
 6   seen them fight, they'd seen videos, heard their
 7   name, things like that.
 8       Q   So your first fight with Brock Larson was
 9   a tough fight, was that to punish you?
10       A   Not necessarily.  But I -- I was set up to
11   lose that fight.  He was undefeated.  They were
12   going to try to start building him, right?  Because
13   it was the 185-pound division was a weak division.
14   They didn't have a lot of guys, a lot of talent.
15   They needed star power.
16           So they had this undefeated guy from
17   Minnesota.  They wanted to make him the Matt Hughes
18   of the weight class.  I was brought in to lose.
19   Now, I hadn't had any real experience with Zuffa at
20   the time, so they didn't really have any reason to
21   punish me.  But Zuffa and my management company were
22   already bitter rivals.  They already hated each
23   other.  DeWayne was no longer allowed in on
24   negotiations because him and Dana would just fight.
25           So there's possible -- possibility that he
```

Page 91

```
 1   was trying to punish my management by setting me up
 2   against this tough fight to lose.  But I took it
 3   anyways because I knew I was better than the guy and
 4   I just needed to get my foot in the door.  As soon
 5   as I had my foot in the door, I was straight.
 6       Q   How'd you know it wasn't a case of they
 7   were trying to punish Brock Larsen by matching him
 8   with you?
 9           MR. DELL'ANGELO:  Object to form.
10           THE WITNESS:  Of course I have to
11   speculate at this stuff, but he had an undefeated
12   record.  He was more marketable at that point.  He
13   had a large local following in Minnesota where he
14   was fighting.  So just on paper, it looks likely
15   that that was the situation.  Plus, I can't remember
16   fully, but he might have already been signed to a
17   multi-fight deal.
18   BY MR. WIDNELL:
19       Q   And if you are signed to the a multi-fight
20   deal, they don't have an incentive to --
21       A   They want to keep you.  They have a reason
22   they want to keep you around.  They don't want you
23   going somewhere else.
24       Q   So that's actually one way that a
25   multi-fight deal might be a good thing.  It shows
```

Page 92

```
 1   that they're making an investment in you?
 2           MR. DELL'ANGELO:  Objection to the form.
 3           THE WITNESS:  Yeah, I wouldn't say it's a
 4   good thing.  Just they want to make sure no one has
 5   access to you.
 6   BY MR. WIDNELL:
 7       Q   And why do they want to make sure nobody
 8   else has access to you?
 9       A   Because your notoriety could bring
10   notoriety to a rival competition.
11       Q   Okay.
12       A   If I have notoriety and I go to a promoter
13   who no one knows about, I'd bring all those fans
14   with me.  That's why they do it.
15       Q   Is there any other reason why they would
16   have want to have a multi-fight contract?
17           MR. DELL'ANGELO:  Objection to the form.
18   Calls for speculation.
19           THE WITNESS:  To my understanding, I mean,
20   it makes a lot of sense why the UFC would want a
21   multi-fight contract, they keep all the talent, you
22   can't go nowhere else, no one else can compete.  Of
23   course it's beneficial for the UFC contracts for the
24   UFC to have multi-fight contracts.
25
```

Page 93

```
 1   BY MR. WIDNELL:
 2       Q   And it sounds like it's your opinion that
 3   if you have a multi-fight contract, they're going to
 4   try and give that fighter better fights; is that
 5   correct?
 6           MR. DELL'ANGELO:  Objection to form
 7   mischaracterizes the witness's testimony.
 8           THE WITNESS:  Yeah.  No, I'm not saying
 9   that at all.
10   BY MR. WIDNELL:
11       Q   Okay.  I thought I'd heard that based on
12   the description of why they were matching you with
13   Brock Larsen.  But that's not the case?
14       A   No, that's not the case.  I was just
15   guessing, straight up guessing that he might have
16   had a multi-fight contract.  The situations we were
17   looking at, I was brought in short notice to fight,
18   so I didn't have as much time to prepare.  I didn't
19   have zero against, you know, he was like 16 and 0,
20   when you have an 0 you're highly marketable.  He
21   already had a large following in Minnesota where he
22   was fighting.
23           I didn't have much of a following because
24   I jumped from show to show to show.  His coach was
25   my coach, his jiujitsu coach at the time, David
```



Page 114

```
 1    Q   If you win; is that correct?
 2    A   Yes, only if you win.
 3    Q   Okay.  And then the next bout after that
 4  would have been 38/38 if you win; is that correct?
 5    A   Uh-huh.
 6    Q   And then the next bout after that would
 7  have been 42/42 if you won; is that correct?
 8    A   Correct.
 9    Q   Okay.  And based on the date of your
10  signature of that contract, can you tell me which
11  fights would have been covered?
12        MR. DELL'ANGELO:  Objection to the form.
13  Calls for a legal conclusion.
14        THE WITNESS:  I can't be a hundred percent
15  sure what the date on this one is.  That would be
16  either Chris Wilson GSP, Gono, Paulo Thiago, I
17  believe.
18  BY MR. WIDNELL:
19    Q   If you had fought all four fights on the
20  contract?
21    A   Yes, I fought all four on that.
22    Q   Ah, so now let's go to Exhibit 54 --
23    A   Correct.
24    Q   -- and see when that was signed.  So can
25  you tell from when that was signed whether you
```

Page 115

```
 1  fought all four fights under the contract that's
 2  Exhibit 51?
 3    A   I don't believe I did.  Looks like I was
 4  forced to re-sign before the Paulo Thiago fight, the
 5  UFC 100.
 6    Q   Okay.
 7    A   That is July 11, 2009.
 8    Q   Okay.  And for Exhibit 54, for that
 9  contract, can you tell me what your compensation for
10  the first fight was?
11    A   I believe 45 and 45.
12    Q   Okay.  So it is 45,000 and 45,000.  Now,
13  let's go back to Exhibit 51.  We talked about the
14  compensation.  Can you look at your fight history
15  and tell me what compensation you actually would
16  have gotten based on your wins and losses?
17    A   For which fight?
18    Q   So let me ask it this way.  So Chris
19  Wilson was the first fight on that contract, I think
20  we've established; is that correct?
21    A   Yes.
22    Q   And your starting compensation was
23  30,000/30,000; right.
24    A   Uh-huh.
25    Q   So for the first fight on that contract,
```

Page 116

```
 1  for Chris Wilson, would you have been paid
 2  30,000/30,000?
 3    A   No, because we started a new agreement.
 4    Q   Isn't this the new agreement?
 5    A   Huh-uh.
 6    Q   I thought that this was the agreement that
 7  covered Chris Wilson.
 8    A   What do you mean?
 9    Q   I thought that this was the agreement that
10  covered Chris Wilson, Exhibit 51?
11    A   No.  I'm sorry.  I don't understand what
12  you are asking.
13        MR. MAYSEY:  Can we go off record for a
14  second?
15        MR. DELL'ANGELO:  No, don't go off the
16  record.  Let him finish his answer.
17        THE WITNESS:  Yeah, I don't understand
18  what you're saying.  Under the new agreement I would
19  have fought for 45 and 45.  If I would have finished
20  the other agreement, it would have been 42, but I
21  did not finish the agreement.
22        MR. WIDNELL:  Okay, so.
23        MR. DELL'ANGELO:  Can you excuse me,
24  counsel, before you proceed.
25        MR. WIDNELL:  Yeah, did you want to go off
```

Page 117

```
 1  the record?
 2        MR. DELL'ANGELO:  We don't have to go off
 3  the record.  I think there's a lack of clarity about
 4  one of the exhibits that I think Mr. Masey has.  And
 5  I just ask you let him clarify with you.
 6        MR. WIDNELL:  Sure.
 7        MR. MAYSEY:  So Exhibit 54, can you read
 8  off the Bates label.
 9        MR. WIDNELL:  ZFL0414089.
10        MR. DELL'ANGELO:  I think Mr. Masey got
11  two of 53 but not one of 54.
12        MR. MAYSEY:  I got two of 53.
13        MR. DELL'ANGELO:  Ah.  Which is leading to
14  a little bit of confusion.
15        MR. McSWEENEY:  Ah, I see.  My apologies.
16  Is that all we need to cover?
17        MR. DELL'ANGELO:  Yes, thank you for your
18  indulgence.
19  BY MR. WIDNELL:
20    Q   So I just want to go back to Exhibit 51.
21  And I'm just trying to figure out what you would
22  have gotten paid for -- right now, just what you
23  would have gotten paid for the Chris Wilson fight.
24  Which Chris Wilson was the first fight under the
25  contract in Exhibit 51; is that correct?
```

Magna Legal Services

Page 118

```
 1    A    Yeah.
 2    Q    And would have been -- and based on the
 3  compensation on page 5 of Exhibit 51, you would have
 4  been paid 30,000 and 30,000; is that correct?
 5    A    Yeah; on the last set of contracts, first
 6  promotional agreement, the first fight was 30.
 7    Q    30/30?
 8    A    And 34/34, 38/38.  All the way up to 42.
 9    Q    Okay.  So for the very first fight you
10  would have been paid 30/30?
11    A    Yup.
12    Q    And you won that fight; right?
13    A    Yes.
14    Q    And so for the next fight, which was your
15  fight with GSP?
16    A    Uh-huh.
17    Q    You would have been paid 34/34 if you won?
18    A    If I won, but I did not.
19    Q    But you didn't win, so you would have been
20  paid 34; is that correct?
21    A    Yes.
22    Q    And then because you didn't win your next
23  fight, you would have been paid 34/34 also; is that
24  right?
25    A    Yes.
```

Page 119

```
 1    Q    Okay.  And you won that next fight?
 2    A    Yes.
 3    Q    So for the last fight on the contract, you
 4  would have been paid 38/38; is that correct?
 5    A    I believe so.
 6    Q    But you said that they forced you to
 7  re-sign so that you were now paid 45/45; is that
 8  correct?
 9    A    Because if I would not have signed, I
10  would not have gotten another fight for a year,
11  which at that time I hadn't made enough money to sit
12  out a year.  I probably would have had to retire.
13  And there was no other place for me to go to make --
14  to make any money, so in that sense, yeah.
15    Q    And the reason why you would have to had
16  sit out a year is because after you finished your
17  fight --
18    A    Because if I didn't sign up, if I didn't
19  to do the re-up with the contract, I wouldn't have
20  gotten a bout agreement.
21    Q    Until?
22    A    They would have exercised their time limit
23  term to the full.
24    Q    And the reason you know about that is
25  because you heard about Huerta?
```

Page 120

```
 1    A    Because they had done it to other people.
 2    Q    And you've heard about -- you gave one
 3  other example; is that correct?
 4    A    Huerta and Arlovski.
 5    Q    So you know two examples --
 6    A    I know of two examples where the guys were
 7  brave enough to see it through.  Most guys know if
 8  you don't sign the re-up, you don't get your bout
 9  agreement.  If you don't get your bout agreement,
10  you don't get paid, you don't get money, you can't
11  feed your children.
12    Q    You don't get your bout agreement,
13  according to you.  And --
14    A    According to most, yeah.
15    Q    Okay.
16    A    According to management, according to
17  other fighters, according to the media, news media.
18    Q    As you understand it?
19    A    As I understand it, yes.
20    Q    And I'm not trying to dispute your
21  understanding.  But the contract ends after some
22  duration of time; correct?
23    A    It's supposed to end.  But they just keep
24  stacking up on top of it.
25    Q    So how do they stack up on top of it?
```

Page 121

```
 1    A    You sign a re-up.
 2    Q    Okay, but outside of the re-up, if you
 3  really didn't want to sign the re-up, the contract
 4  would end after the duration of the contract, which
 5  in the case of Exhibit 51, I believe is 18 months,
 6  and then --
 7    A    18 months without making a dime.  That
 8  would retire a fighter.  We don't make that much
 9  money.  You don't fight, you don't work for 18
10  months, you're not going to survive, you're not
11  going to live.  You don't get a choice.
12    Q    So you had fought a number of contracts --
13  a number of the fights prior to the point where you
14  were being considered for renegotiation; right?
15         MR. DELL'ANGELO:  Objection to the form.
16  BY MR. WIDNELL:
17    Q    So let me put it this way.  The contract
18  started with -- or the time started running from the
19  first fight of the contract, which was with Chris
20  Wilson; is that correct?
21    A    Yes.  I mean, I guess one of the things
22  that I guess I need to be clear about is, because of
23  the UFC's monopolistic position in the market and
24  their dominance, their belt is the only belt.  So
25  there is no reason to go anywhere else.  You're not
```

Page 122

```
 1  going to make money, you're not going to achieve,
 2  you're not going to be anything unless you fight for
 3  their belt.
 4        So that's another reason you're kind of
 5  forced to re-up these contracts.  There's nowhere --
 6  that's why I say, there's nowhere else to go because
 7  you're a fighter.  Fighters fight for titles.  The
 8  most coveted title is the UFC title.  You have
 9  nowhere else to go.
10     Q   And I understand that UFC maybe the most
11  attractive choice, and the next best choice may seem
12  to be a very bad choice.  But what I'm trying to
13  understand is how they're forcing you to re-sign a
14  new contract.  And I just want to make sure I
15  understand the mechanics of that.  So my
16  understanding, just taking Exhibit 51 as an example,
17  is -- under Exhibit 51, there would have been an
18  18-month duration of the contract, correct?
19     A   Uh-huh.
20     Q   And at the point that you started
21  renegotiating, it was after your third fight, which
22  was on January 31 of 2009.  So at that point there
23  was still eight months left on the contract when
24  they could schedule another fight for you; is that
25  correct?
```

Page 123

```
 1        MR. DELL'ANGELO:  Objection to the form.
 2  Mischaracterizes the witness's testimony.
 3        THE WITNESS:  Yeah.
 4        MR. WIDNELL:  I'm trying to characterize
 5  the contract, actually.
 6        MR. DELL'ANGELO:  Well, actually, one of
 7  the things you did was you said there was a
 8  negotiation, and I don't think the witness testified
 9  there was a negotiation, so it mischaracterizes the
10  witness's testimony.
11        I appreciate what you're trying to do, and
12  I think clarification would be helpful, but you
13  didn't achieve it with that.
14        MR. WIDNELL:  I understand what you're
15  saying about negotiation.
16  BY MR. WIDNELL:
17     Q   So there was a point where you re-signed a
18  contract sometime after January 31 of 2009.
19     A   Uh-huh.
20     Q   Right?  And at that point, the contract
21  that you were under had started in March 1st of
22  2008?
23     A   Uh-huh.
24     Q   So you had potentially nine more months
25  under the contract.
```

Page 124

```
 1     A   Uh-huh.
 2     Q   And then I understand there is a period of
 3  exclusive negotiation?
 4     A   Uh-huh.
 5     Q   But then the way this gets to another year
 6  of waiting --
 7     A   And matching, yeah.
 8     Q   -- is the matching part?
 9     A   Uh-huh.
10     Q   Is that right?
11     A   Yeah.
12     Q   Because the matching period is another
13  year after that?
14     A   They said I had nine months, so I had nine
15  months that I could have waited out.  And I would
16  have been sat for that nine months.  Then I would
17  have been given a contract to fight the last fight.
18  And then I have to sit and wait two months until I
19  can start taking offers from other people.  And then
20  they have the right to match.  You're talking about
21  two years of not fighting almost.  That's going to
22  retire a guy.  You can't -- there's no choice.
23        That's why I say forced.  Because you're
24  in a position where -- and it's not a negotiation,
25  he's right, there's no negotiation.  Here is what
```

Page 125

```
 1  we're offering; take it or leave it.  If you leave
 2  it, you're quitting, you are retiring, you're not
 3  going to survive in the sport anymore.  There's
 4  nowhere else to go.
 5     Q   Okay.  So I understand that that's your
 6  characterization of what happened.  But I just want
 7  to be clear.  The way that you may get this to be
 8  two years that you're going to have to sit around is
 9  because the right to match is a year, and you don't
10  believe that other promotors would get you an offer
11  during that time period; is that correct?
12        MR. DELL'ANGELO:  Objection.
13  Mischaracterizes the witness's testimony.
14        THE WITNESS:  No.  What I'm saying is
15  there is ample studies that show that matching
16  periods freezes markets.
17  BY MR. WIDNELL:
18     Q   What do you mean by freeze market?
19     A   They keep potential bidders from bidding.
20  It freezes them because they don't want to -- they
21  don't want to deal with the turmoil and struggle on
22  bidding on this guy and losing it.  They'd rather
23  not do it at all.
24     Q   So your position is that other bidders
25  won't bid during the matching period; is that
```



Page 218

1        THE WITNESS:  I mean, it's similar, like I
2    said.  I'll say it again, three-year-old with a
3    baseball bat and 900-pound gorilla with a baseball
4    bat.  I mean, it's the same type of contracts.  I
5    mean, these guys, these smaller shows copy the UFC.
6    There was a big hoopla a while ago about Ken Pavia
7    supplying Bellator with UFC contracts back in the
8    day.  I mean, these organizations copied UFC's
9    contracts.  I mean, they're all the same contracts.
10   But the idea of a three-year-old with a bat versus a
11   900-pound gorilla with a bat, these guys don't have
12   the power to inflict damage with what they're doing;
13   the UFC does.
14   BY MR. WIDNELL:
15      Q   Okay.  Let me refer you back to
16   Exhibit 51.  If you look at 5.2 on page 5.  It reads
17   "If, at the expiration of the term, fighter is then
18   the UFC champion, the term shall be automatically
19   extended for a period commencing on the termination
20   date and ending on the earlier of one year from the
21   termination date, or, two" -- I'm sorry -- "one year
22   from the termination date --
23         MR. DELL'ANGELO:  Sorry to interrupt you,
24   Counsel, but the witness doesn't have the exhibit
25   and we need to get him oriented.

Page 219

1         MR. WIDNELL:  Sorry.  It's Exhibit 51,
2    page 5.
3         MR. DELL'ANGELO:  Just flip it over to
4    make sure it's the right -- because they're the
5    same.
6         THE WITNESS:  What page on 51?
7    BY MR. WIDNELL:
8       Q   Page 5.  And paragraph 5.2.
9       A   Okay.
10      Q   And let me just start at the beginning.
11   "If, at the expiration of the term, fighter is then
12   the UFC champion, the term shall be automatically
13   extended for a period commencing on the termination
14   date and ending on the earlier of, one, one year
15   from the termination date, or, two, the date on the
16   which fighter has participated in three bouts
17   promoted by Zuffa following the termination date."
18   That -- and then in parenthesis "extension term."
19   "Any reference to the term herein shall be deemed to
20   include a reference to the extension term where
21   applicable."
22         So I believe that is the championship
23   clause or the champion's clause.  Is it your
24   understanding that that effectively locks the
25   champion in forever?

Page 220

1         MR. DELL'ANGELO:  Object to the form to
2    the extent it calls for a legal conclusion.
3         THE WITNESS:  As long as that fighter
4    wants to continue fighting and continues to win, he
5    will remain under contract with them.  If he loses
6    or chooses to sit out for one year, it appears, and
7    sit out the matching period, you're talk about a
8    champion who could potentially be on the bench for
9    one year to two years.  I mean, what does that do to
10   someone's value?  How is he going to fight for any
11   money two years after he's fought?
12        Like, yeah.  He would go from a very
13   lucrative position to not having much notoriety at
14   all in that situation.  So you -- you don't really
15   have the option of not continuing to fight for them
16   forever.  The only way out is if they cut you, if
17   they don't like you and they want to get rid of you.
18      Q   Now, I believe you said that all the
19   fighters talk about what happens in the UFC.  How
20   many times have you heard of a fighter talk about
21   this clause being invoked?
22      A   Randy Couture was one.  Chuck Liddell is
23   another.  I mean, there's been a number over the
24   years.  I can't remember them off the top of my
25   head, but I know they were a few guys, because

Page 221

1    champions want to fight the other champions who are
2    out there.  And they can't do that currently like
3    this, you know.  They're stuck.
4       Q   So your understanding is, Randy Couture,
5    Chuck Liddell, and at least some other fighters have
6    not been able to leave the UFC because UFC used this
7    provision?
8         MR. DELL'ANGELO:  Objection to form.
9    BY MR. WIDNELL:
10      Q   Is that correct?
11        MR. DELL'ANGELO:  Object to the form.
12   Mischaracterizes the witness's testimony.
13        THE WITNESS:  No, it's not what I'm
14   saying.  I'm saying that the UFC uses multiple
15   tools, including these contracts, to get people to
16   sign and be obedient, even if it's not in their best
17   interest.
18   BY MR. WIDNELL:
19      Q   Okay.  I understand that.  I've heard you
20   say that.  But what I'm really trying to ask about
21   is what instances are you aware of where this
22   provision, specifically, was invoked to keep a
23   champion from leaving the UFC?
24      A   I answered that.  That one instance that I
25   do know for sure was Randy Couture.  And it was



Page 222

1  discussed, a lot of people at the time wanted Chuck
2  to go and fight the Pride champion, unify the belts,
3  and it never happened. But it's also the fact that
4  there's nowhere else to go. The UFC has monopolized
5  the market and made their belt the only belt worth
6  having, right? Because they are the promoter and
7  the sanctioning body. They control the belt that
8  everybody wants. Everybody needs that belt. You're
9  not going to make as much money doing anything else
10 other than holding that belt. So yes, these
11 contracts never end because you have nowhere else to
12 go. They use multiple tentacles to make these
13 things happen.
14     Q   And you said that every fighter is
15 affected by the champion clause, how were you
16 affected by it?
17     A   Well, I was a contracted UFC fighter, and
18 the job and life goal and purpose for every fighter
19 is to win the highest coveted belt, the most
20 proclaimed, the most looked-up-to belt, and that's
21 the UFC belt. So everyone who is fighting for that
22 belt is affected by the provisions of that belt
23 throughout the sport, throughout the company.
24     Q   And how were you affected specifically?
25         MR. DELL'ANGELO:  Objection to the form.

Page 223

1  Asked and answered.
2         THE WITNESS:  Yeah. I believe I answered
3  that.
4  BY MR. WIDNELL:
5      Q   So what you said is, I'm saying that I
6  have no problem -- you said, well, I was a
7  contracted UFC fighter and the job and life goal and
8  purpose of every fighter is to win the highest
9  coveted belt, the most proclaimed --
10     A   Title.
11     Q   Title.
12     A   Trophy, award.
13     Q   So is the only way that you are affected
14 by the championship clause that the championship is
15 what you wanted to attain?
16         MR. DELL'ANGELO:  Objection to the form.
17 Mischaracterizes the testimony. Calls for a legal
18 conclusion.
19         THE WITNESS:  No.
20 BY MR. WIDNELL:
21     Q   So how were you affected?
22     A   I was affected the way that everyone was
23 affected. We're all fighting for the same belt. So
24 any terms and conditions around that belt affect
25 everyone who is competing for it. We're not there

Page 224

1  competing for money. We're there competing for
2  titles. We want the belt.
3      Q   Okay. But you were never a champion;
4  correct?
5      A   Not in the UFC, no.
6      Q   And your contract was never extended
7  pursuant to section 5.2 of your contract; is that
8  correct?
9          MR. DELL'ANGELO:  Objection to the form.
10         THE WITNESS:  It was in my contract,
11 though, so it affected me. If it wasn't going to
12 affect me, why would they put it in any contract.
13 BY MR. WIDNELL:
14     Q   So it affected your legal rights is what
15 you're saying; is that correct?
16     A   Yes.
17     Q   Okay. Now, at WSOF you are a champion;
18 right?
19     A   Yes.
20     Q   And the champion's clause does apply to
21 you; is that correct?
22     A   Correct.
23     Q   Does that prevent you from being able to
24 leave WSOF?
25     A   Correct. But, again, we're going with the

Page 225

1  three-year-old and a baseball bat versus a 900-pound
2  gorilla and a baseball bat. I'm getting screwed in
3  each situation, but I'm not getting screwed as bad
4  with the little guy. It doesn't hurt so bad when my
5  little son hits me.
6      Q   So how long do you have to stay with WSOF
7  because of your champion clause?
8          MR. DELL'ANGELO:  Objection to the form to
9  the extent it calls for a legal conclusion.
10         THE WITNESS:  Yeah, I'm not a hundred
11 percent sure. I have a promotional rights agreement
12 also. When that runs out, the provisions of the
13 title stuff will kick in, but it's the same -- same
14 thing. I mean, that provision is there, they all
15 use it because the top dog is using it. If they
16 didn't use it, the UFC would just pluck their
17 champions, all the other champions every time.
18 Every time someone won a belt, somebody would buy
19 them up.
20 BY MR. WIDNELL:
21     Q   Because the UFC would pay more for the
22 champion than the organization's paying itself?
23     A   Yeah. Not much, but they would just pay
24 enough to keep that guy to put that other company
25 out of business, because now they can't have a named

```
                                                Page 226
 1   fighter.  If they built the guy up, they could steal
 2   him away.
 3       Q   And when you were at UFC, the last fight
 4   that you fought you were getting paid, was it 66/66?
 5       A   Yup.
 6       Q   What are you getting paid now?
 7       A   With the last fight, it was a title
 8   defense, so I got a pay bump.  When I won the belt,
 9   I was paid 35 and 35, $70,000 for winning a world
10   title, which is $4,000 more than I got paid by
11   losing in the UFC.  And then I made 50 and 50 for
12   this last fight.
13       Q   Okay.  So you're locked in into your next
14   fight.  What will you be paid?
15       A   I will be paid 55 and 55 for the next
16   fight.
17       Q   Whereas, if you were at the UFC, the
18   championship clause would have locked you in.  Do
19   you think you would have been paid more than the
20   66/66 if you'd become a champion?
21           MR. DELL'ANGELO:  Objection to the form.
22   Calls for speculation.
23           THE WITNESS:  It's impossible to know what
24   I could possibly be paid.  You know, we don't have a
25   free unhindered market.  So I wouldn't be able to
```

```
                                                Page 227
 1   figure out what my real worth is.
 2   BY MR. WIDNELL:
 3       Q   Do champions at UFC get a percentage of
 4   pay per view?
 5           MR. DELL'ANGELO:  Objection to the form.
 6   Foundation.
 7           THE WITNESS:  UFC champions need to defend
 8   their belt in order to get a piece of the pay per
 9   view.  But, I mean, that all depends on
10   negotiations, if they're able to get very much.  I
11   mean, I can't recall the negotiation.  It's pretty
12   standard with a lot of those guys, what they're
13   getting.
14   BY MR. WIDNELL:
15       Q   So right now you're locked in at 50/50.
16   With the UFC you would be locked in at a higher rate
17   most likely; is that correct?
18           MR. DELL'ANGELO:  Object to the form.
19   Mischaracterizes the witness's testimony.
20           THE WITNESS:  I could guess.  I would have
21   to -- I would have to guess by looking at what I was
22   getting paid when I got cut.  And I would have to
23   guess by what my contemporaries are getting paid
24   also to figure that out.  But chances are I would be
25   making considerably more money.  But the funny thing
```

```
                                                Page 228
 1   is though that's probably a much smaller percentage
 2   of the proceeds the companies are making that I
 3   would get paid.  I bet you I'm making a much bigger
 4   percentage of what World Series of Fighting is
 5   making for their shows versus what I made of what
 6   the UFC is making.  World Series ending up doing
 7   gates of billions of dollars is not happening.  They
 8   give most of their tickets away at the gate.
 9   BY MR. WIDNELL:
10       Q   So when you said that WSOF's champion
11   clause has much less of an effect on you, it's
12   because you are making much -- a much larger
13   percentage of their overall revenue, even though
14   you're getting paid a lot less money.  Is that what
15   you meant by WSOF's champion clause affected you?
16       A   No, that's not what I mean.
17           MR. DELL'ANGELO:  Objection to the form.
18   Mischaracterizes the witness's testimony.
19           THE WITNESS:  No, that's not what I mean.
20   What's that question again?  That wasn't what I
21   meant.
22   BY MR. WIDNELL:
23       Q   When you said that the champion clause as
24   used by -- or the champion clause as used by the
25   WSOF had less of an effect on you.  But it sounds
```

```
                                                Page 229
 1   like you're locked into a contract with a lower
 2   compensation.
 3       A   Well, the thing with that is, I haven't --
 4   we've seen guys go from World Series to UFC.  I
 5   don't know if there was any champions yet.  It's a
 6   new organization.  But we have situations where guys
 7   like Justin Gaethje is a champ, and he may be
 8   allowed to leave.  A lot of these guys are content
 9   with being number two.  So they're willing to
10   release some of the champions.  I don't know.
11           Yeah, that's kind of the way it is.  The
12   UFC got rid of me because they were paying me too
13   much.  They didn't like me.  And I had nowhere else
14   to go so, yeah, I'm stuck.  I had to go there.  I
15   don't like that contract, but there's no other
16   options.  It's retire or do that.
17       Q   So you've talked about how the UFC didn't
18   like you.  I think you said it's because of stances
19   you took like the video game stances.  Is that what
20   you think is the reason for why UFC doesn't like
21   you?
22       A   That is one reason.  The other reason is
23   because I am a more grappling-based fighter, and
24   they want stand-up fights because they want more
25   knockouts.
```

